**HOLLINGSWORTH LLP**
Joe G. Hollingsworth (*pro hac vice*)
Eric G. Lasker (*pro hac vice*)
1350 I Street, N.W.
Washington, DC  20005
Tel:      202-898-5800
Fax:      202-682-1639
Email: jhollingsworthllp@hollingsworthllp.com
            elasker@hollingsworthllp.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 <br> Case No. 16-md-02741-VC |
| This document relates to: <br> ALL ACTIONS | |

**MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT**

Pursuant to this Court's Pretrial Order No. 1, No. 16-md-02741-VC (N.D. Cal. Oct. 6, 2016), ECF No. 2 (the "Order"), Monsanto Company ("Monsanto") submits its Case Management Statement.

**I.      THIS COURT'S ORDER PRIORITIZING GENERAL CAUSATION DISCOVERY AND AN EARLY *DAUBERT* HEARING SHOULD BE MAINTAINED.**

Section 8.ii of this Court's Order asks about the parties' positions on "[t]he possibility of bifurcating proceedings to address general causation before any plaintiff-specific questions." Order at 4.  Monsanto agrees that bifurcated discovery remains the most efficient path to reach a potentially dispositive issue at an early stage and asserts that the newly created MDL and the additional cases before this Court only strengthen the reasoning behind this Court's prior analysis in favor of bifurcation.

This Court was the first in this litigation to rule on this issue, bifurcating discovery in two cases and defining the common general causation question as "whether glyphosate and/or

1    Roundup can cause non-Hodgkin's lymphoma."  Order Granting Motion for Bifurcation,

2    *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal. June 16, 2016), ECF No.66, and

3    *Stevick v. Monsanto Co.*, No. 3:16-cv-02341-VC (N.D. Cal. June 16, 2016), ECF No. 20.  In fact,

4    Monsanto requested, and the Judicial Panel on Multidistrict Litigation (the "Panel") selected, this

5    Court based in part on its having two of the "most procedurally advanced actions," in which a

6    schedule had been implemented to maximize the efficiencies offered by bifurcation and permit

7    the early resolution of a significant issue.  *See In re Roundup Prods. Liab. Litig.*, MDL No. 2741,

8    2016 WL 5845994, at *2 (J.P.M.L. Oct. 3, 2016).  Echoing the reasoning offered by this Court

9    for its bifurcation decision, the Panel noted that "[r]egardless of the particular formulation of

10   Roundup at issue (all of which employ glyphosate as the active ingredient), or the nature of

11   plaintiff's exposure to glyphosate, all the actions entail an overarching query—whether

12   glyphosate causes non-Hodgkin's lymphoma in persons exposed to it while using Roundup."  *Id.*

13   at *1-2.

14          The creation of the MDL does not change this well-reasoned analysis.  In fact, bifurcation

15   is just as, if not more, necessary now given plaintiffs' attorneys' claims that this litigation will

16   involve thousands of plaintiffs.[1]  The outcome of the general causation proceedings may obviate

17   the need for discovery regarding issues such as specific causation that will consume significant

18   party and Court resources.  Further, the scientific evidence continues to exemplify why it is

19   essential for this Court to take an early look under *Daubert* at whether plaintiffs can meet their

20   general causation burden.  In the months since this Court's initial bifurcation ruling, the

21   Environmental Protection Agency ("EPA") has issued additional findings that cast more doubt

22   on plaintiffs' ability to do so.  For example, in September, EPA's Office of Pesticide Programs

23   ("OPP") issued a 227-page evaluation of glyphosate's carcinogenic potential, concluding that

24   "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans' at doses

25
26
27
[1] *See* Pls' Mot. for Transfer of Actions to the So. Dist. of Ill. Pursuant to 28 U.S.C. §1407 for Coordinated or Consolidated Pretrial Procs. at 2, *In re Roundup Prods. Liab. Litig.*, MDL No. 2741 (J.P.M.L. July 27, 2016), ECF No. 1; Resp. in Supp. of Pls' Mot. for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Procs. at 1, *In re Roundup Prods. Liab. Litig.*, MDL No. 2741 (J.P.M.L. July 29, 2016), ECF No. 8.

28

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC

relevant to human health risk assessment."[2]  Other regulatory agencies around the world also have continued to reject the conclusions on which plaintiffs' claims are based.  *See, e.g.*, Australian Pesticides and Veterinary Medicines Authority, *Regulatory position: consideration of the evidence for a formal reconsideration of glyphosate* at 12 (Sept. 2016), http://apvma.gov.au /sites/default/files/publication/20701-glyphosate-regulatory-position-report-final.pdf ("exposure to glyphosate does not pose a carcinogenic or genotoxic risk to humans" and "there are no scientific grounds for placing glyphosate and products containing glyphosate under formal reconsideration"); *id.* at 10-11 ("Following the assessment of the 19 studies relevant to the IARC carcinogenicity classification of glyphosate (Tier 2), the [Australia Department of Health's Office of Chemical Safety] concluded that there did not appear to be any new information to indicate that glyphosate poses a carcinogenic or genotoxic risk to humans."); New Zealand Environmental Protection Authority, *Review of the Evidence Relating to Glyphosate and Carcinogenicity* at 16 (Aug. 2016), http://www.epa.govt.nz/Publications/EPA_glyphosate _review.pdf ("The overall conclusion is that – based on a weight of evidence approach, taking into account the quality and reliability of the available data – glyphosate is unlikely to be genotoxic or carcinogenic to humans and does not require classification under [New Zealand's Hazardous Substances and New Organisms Act] as a carcinogen or mutagen.").[3]

### A.    A Substantial Amount Of General Causation Discovery Is Already Completed, And It Would Be Inefficient To Stop That Progress.

Continuing with bifurcated general causation discovery is also supported by the substantial progress made to date.  Pursuant to the schedule entered by this Court, Monsanto has

---

[2] EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 141 (Sept. 12, 2016) ("EPA OPP Report"), https://www.regulations.gov/ document?D=EPA-HQ-OPP-2016-0385-0094.  At the same time, EPA posted an October 2015 final report by its standing Cancer Assessment Review Committee ("CARC"), in which CARC endorsed EPA's existing classification of glyphosate as "Not Likely to be Carcinogenic to Humans."  Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate* at 10, 77 (Final Report, Oct. 1, 2015) ("EPA CARC Final Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0014.

[3] *See also infra* at pp. 17-18 (describing additional rejections of IARC's glyphosate conclusion).

1   directed significant legal and financial resources to move general causation discovery forward

2   toward an early *Daubert* hearing.  To date, Monsanto has produced over 3.5 million pages of

3   documents.  That production contains over 870,000 pages of non-custodial files, including

4   Monsanto's EPA registration and correspondence files related to glyphosate-based herbicides

5   ("GBH"), Monsanto's files of scientific studies and literature related to the safety of GBH to

6   people and other mammals, material safety data sheets regarding Monsanto GBH, labels for

7   Monsanto GBH, and public communications by Monsanto regarding the safety of its GBH.

8   Notably, these collections were produced without the use of search terms.

9           Monsanto's production also consists of files, documents, and e-mails from five

10  custodians that it identified as having substantial information relevant to the general causation

11  inquiry.  Consistent with the proportionality requirement in the Federal Rules of Civil Procedure,

12  these custodians' records were culled via the use of search terms, after which the subset was

13  reviewed for relevancy, confidentiality, and privilege.  Monsanto negotiated these search terms

14  with counsel from the Miller Firm, which represents plaintiffs in five cases in this MDL,

15  including *Stevick*.  Monsanto provided the initial production set to counsel at Andrus Wagstaff,

16  counsel for plaintiffs in 11 cases in this MDL, including *Hardeman*, in June 2016 (along with

17  several later supplements), and to Weitz & Luxenberg, plaintiffs' counsel in six cases in this

18  MDL, on August 16, 2016.[4]  By September 30, 2016, after various interim productions,

19  Monsanto had largely completed production of all documents and e-mails from these five

20  custodians.

21          On October 15, 2016, Monsanto produced additional documents held by seven other

22  Monsanto employees initially selected by the Miller Firm and then jointly requested by the

23

24

25  ─────────────────────
    [4] The negotiated search terms are reasonable, thorough, and compliant with the goals of efficient
26  discovery of electronic information set forth in Rule 34.  Monsanto remains willing to cooperate
    with plaintiffs' lead counsel in discussing any future good faith requests related to the search
27  terms.  However, Monsanto's proposed schedule, *see infra* pp. 10-15, assumes that the search
    terms and other procedures for document production will remain unchanged.
28

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC

1   Miller Firm and Andrus Wagstaff in their June 21, 2016 e-mail to this Court,[5] as well as a small

2   supplement for one of the original five custodians due to an earlier processing difficulty.

3   Monsanto does not agree that all of the additional custodians selected by plaintiffs possess

4   information relevant to general causation and has made specific objections to the depositions of

5   two of the seven individuals identified by the Miller Firm and Andrus Wagstaff.

6        In addition to this voluminous document production, Monsanto has received three sets of

7   requests for production (including over 31 requests, not including sub-parts) and multiple

8   interrogatories from Andrus Wagstaff.  Although some of those inquiries are duplicative of the

9   documents Monsanto already agreed to produce, others are not.  Monsanto has responded to the

10  first set, including making appropriate objections.  The time for responding to the second and

11  third sets has not yet expired.  Monsanto anticipates objecting to many of these requests on a

12  variety of bases, including that some are impermissible attempts to force the collection of

13  documents from Monsanto custodians who have no knowledge about general causation issues.

14       Because a significant portion of the necessary general causation discovery has already

15  been completed, an early *Daubert* hearing on general causation can still be achieved.

16      **B.**    **Other Courts Presiding Over Roundup® Lawsuits And Other Products**

17            **Liability MDLs Have Bifurcated Discovery To Address General Causation First.**

18       After this Court's decision to bifurcate discovery in *Hardeman/Stevick*, the only other

19  federal court to rule on this issue reached the same conclusion.  *See* Order Granting Defendant's

20  Motion to Bifurcate Discovery, *Giglio v. Monsanto Co.*, No. 3:15-cv-2279-BTM (WVG), 2016 WL

21  4098285, at *1 (S.D. Cal. Aug. 2, 2016) ("[T]he Court finds that conducting discovery in phases is an

22  efficient solution that may prevent the parties from engaging in extremely broad and potentially

23  wasteful discovery.").  Like this Court, the *Giglio* court emphasized the importance of deciding

24  the potentially dispositive issue of general causation before proceeding with discovery on other

25

26

27  [5] *See* E-mails between Timothy Litzenburg, The Miller Firm, and Kristen Melen, Courtroom Deputy to the Honorable Vince Chhabria (June 21, 2016) (Ex. 1 to concurrently filed Declaration of Joe G. Hollingsworth ("Hollingsworth Decl.")).

28

1   issues in plaintiff's far-ranging complaint, which mirrors those filed in all of the cases now

2   consolidated in an MDL before this Court:

3           The allegations in plaintiff's complaint span forty years and delve
            into defendant's marketing, labeling, and testing of Roundup.
4           Proceeding immediately on all issues would subject the parties to
            highly extensive discovery that may ultimately be unnecessary if
5           defendant prevails on its *Daubert* motion. Limiting phase one to
            general causation, on the other hand, will enable the parties and the
6           Court to arrive expeditiously at a potentially dispositive issue that
            the Court firmly believes can be separated from other liability and
7           damages issues.

8

9   *Id.*

10          Furthermore, the *Giglio* court specifically refuted the arguments against bifurcation

11  asserted by the same plaintiff's counsel in *Hardeman* and mirrored in oppositions filed by

12  plaintiffs in other cases where the issue was raised but not resolved prior to the formation of this

13  MDL.  For example, in rejecting plaintiff's argument that bifurcation was not necessary or

14  efficient because a Missouri state court had denied Monsanto's bifurcation request, the court held

15  that "[f]ocusing initial discovery on general causation serves efficiency interests for both the

16  parties and the Court, regardless of how discovery does, or does not, proceed in" state court.   *Id.*

17  at *2.

18          In response to plaintiff's arguments that the scope of general causation discovery was too

19  amorphous to be efficient, the *Giglio* court expressed "confiden[ce] that the parties (in the first

20  instance) and the Court (if necessary) will be able to reasonably define the boundaries of

21  discovery on general causation and promptly resolve any discovery disputes if they arise."  *Id.*

22  The court rejected a variety of other arguments against bifurcation as well.  *See id.* (rejecting

23  argument that an appeal of an adverse *Daubert* ruling would cause delay as "highly speculative,"

24  and finding that even if bifurcation allows defendant to "attack plaintiff's experts twice, the same

25  opportunity will also be given to plaintiff"); *id.* (noting that plaintiff will have an opportunity for

26  full discovery as long as general causation is proven, and "any public interest in this case surely

27

28

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC

lies in the question of whether Roundup is capable of causing non-Hodgkin's lymphoma, which is the issue on which phase one discovery will focus").[6]

For the same reasons, numerous courts presiding over products liability MDLs have similarly sequenced discovery so that general causation proceeds first. *See, e.g.*, Scheduling Order Relating to Phase I of Discovery at 1, *In re Viagra Prods. Liab. Litig.*, 0:06-md-01724-PAM (D. Minn. June 30, 2006), ECF No. 38 ("[T]argeted discovery and resolution of the issue of general causation serves the interest of all parties and the Court, promotes judicial efficiency, and prevents the potential waste of the parties' and the Court's resources.") (Ex. 4 to Declaration of Joe G. Hollingsworth in Support of Monsanto Company's Motion for Scheduling Order Regarding General Causation, *Hardeman v. Monsanto Co.*, No.: 3:16-cv-00525-VC (N.D. Cal. May 3, 2016), ECF No. 49-4); Initial Case Management Scheduling Order Regarding General Causation, *In re Incretin Mimetics Prods. Liab. Litig.*, No. 3:13-md-02452-AJB-MDD (S.D. Cal. Feb. 18, 2014), ECF No. 325 ("direct[ing] the parties' initial document production and motion practice" and "expert-related discovery" to "the threshold issue of whether general causation" exists) (Ex. 3 to Declaration of Joe G. Hollingsworth in Support of Monsanto Company's Motion for Scheduling

---

[6] In addition, two California state courts presiding over cases involving personal injuries allegedly caused by exposure to Monsanto's GBH have expressed an intent to hold early hearings about the sufficiency and admissibility of plaintiffs' scientific evidence regarding general causation. *See* Tentative Ruling on Motion for Scheduling Order Regarding General Causation, *Huerta v. Monsanto Co.*, No. RIC 1600639 (Cal. Super. Ct., Riverside Cty. Sept. 8, 2016) (Hollingsworth Decl., Ex. 2) (tentatively ruling that "bifurcation of discovery and limiting the first phase of discovery to the issue of general causation is warranted as it may prevent the parties from engaging in broad and potentially wasteful discovery if defendants were to prevail on a dispositive *Sargon* motion in limine"); Hearing Transcript at 9-10, *Huerta v. Monsanto Co.*, No. RIC 1600639 (Cal. Super. Ct., Riverside Cty. Sept. 8, 2016) (Hollingsworth Decl., Ex. 3) (affirming tentative ruling granting bifurcation, noting that if plaintiffs' experts are excluded, "the parties will have saved themselves a lot of unnecessary discovery moving forward to a general trial date," and if the case survives, "it doesn't really set anyone back . . . [because] [t]his is all discovery that has to be done, in any event"); Case Management Order No. 2 and Order Discharging Order to Show Cause Why Sanctions Should Not be Imposed on Plaintiffs' Counsel at 1-2, *Johnson v. Monsanto Co.*, Case No. CGC-16-550128 (Cal. Super. Ct., S.F. Cty. Sept. 28, 2016) (Hollingsworth Decl., Ex. 4) (directing parties to address at the next case management conference whether there is any impediment to holding "a prompt *Sargon* hearing regarding general causation, to be preceded by expert discovery on that issue"). Two other state courts have denied bifurcation via one-sentence orders, without providing any analysis or reasoning for doing so. *See Kennedy v. Monsanto Co.*, No. 16CM-CC00001 (Mo. Cir. Ct. Camden Cty. June 27, 2016); Order, *Schrack v. Monsanto Co.*, Case No. 0812 (Pa. Ct. C.P. Phila. Cty. Sept. 2, 2016).

---

Order Regarding General Causation, *Hardeman v. Monsanto Co.*, No.: 3:16-cv-00525-VC (N.D. Cal. May 3, 2016), ECF No. 49-3);[7] Pretrial Order No. 21: General Causation Expert Discovery and Related Motion Practice Regarding Celebrex, *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, No. 3:05-md-01699-CRB (N.D. Cal. Mar. 16, 2007) (Breyer, J.), ECF No. 1098 (ordering phased discovery schedule with initial phase addressing general causation) (Ex. 6 to Declaration of Joe G. Hollingsworth in Support of Monsanto Company's Motion for Scheduling Order Regarding General Causation, *Hardeman v. Monsanto Co.*, No.: 3:16-cv-00525-VC (N.D. Cal. May 3, 2016), ECF No. 49-6).

This sequencing has proven to be an effective and efficient path to the early consideration and, in some cases, resolution of potentially dispositive issues in complex products liability MDLs. *See, e.g.*, *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 968 (D. Minn. 2009) (granting summary judgment in bifurcated proceedings after simultaneously-issued order excluded plaintiffs' sole remaining general causation expert and noting "[t]hat decision effectively ended the current litigation, because . . . absent an admissible general causation opinion, Plaintiffs' claims necessarily fail"); *In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, No. 12-MD-2342, 2016 WL 1320799, at *5, 11 (E.D. Pa. Apr. 5, 2016) (granting summary judgment in favor of defendant Pfizer in all MDL actions after finding plaintiffs failed to present admissible expert testimony with respect to general causation); *In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 524 F. Supp. 2d 1166, 1184 (N.D. Cal. 2007) (Breyer, J.) (granting summary judgment after phased discovery for all plaintiffs who claimed heart attacks or strokes from

---

[7] In briefing regarding bifurcation before the creation of this MDL, some plaintiffs' counsel cited *In re Incretin Mimetics Prods. Liab. Litig.* as an example of the alleged inefficiencies of bifurcated discovery. In that litigation, the court bifurcated discovery to allow general causation to proceed first, then later expanded the boundaries of that discovery to include information relevant to the issue of preemption. Despite this small expansion of discovery, it is clear that the phased approach succeeded in allowing the court to resolve a key issue in the MDL without engaging in other unnecessary, wasteful discovery that would have occurred in an entirely un-phased proceeding. *See In re Incretin Mimetics Prods. Liab. Litig.*, No. 13-md-2452 AJB (MDD), 2014 WL 2532315, at *2-3 (S.D. Cal. June 5, 2014) (expanding scope of first discovery phase); *In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108, 1132 (S.D. Cal. Nov. 9, 2015) (granting summary judgment based on federal preemption, following discovery limited to the dispositive issues of general causation and federal preemption).

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC

1   exposure to 200 mg/d dose or less because no admissible expert testimony supported that general

2   causation claim); *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 652, 692 (D.N.J.

3   2008) (granting summary judgment after "Science First" motions regarding plaintiffs who lacked

4   admissible expert testimony that their alleged exposures were capable of causing the alleged

5   diseases, including cancer).  There is no reason to wait or engage in unneeded discovery before

6   addressing general causation.[8]

7          The Order states that additional arguments will be heard from newly involved parties at

8   the upcoming case management conference.  Order at 4.  Both Andrus Wagstaff and the Miller

9   Firm have been heard on bifurcation before this Court, and the oppositions to bifurcation filed by

10  counsel in other cases prior to the creation of this MDL do not raise any arguments that are

11  substantively different from those already rejected by this Court and the *Giglio* court.  These

12  similarities, as well as Monsanto's prior arguments regarding the need for and efficiencies of

13  bifurcation, support maintaining the current plan for sequenced general causation discovery and

14  an early *Daubert* hearing on that issue.

15  **II.      MONSANTO'S PROPOSED SCHEDULE ADHERES CLOSELY TO THAT
            ORIGINALLY ENTERED IN *HARDEMAN* AND *STEVICK*.**

16

17         Although the creation of an MDL has added to the number of cases and counsel before

18  this Court, meeting the goals of efficient general causation discovery and an early *Daubert*

19  hearing remain eminently possible.  As discussed above, continuing to proceed on that basis is

20  _____

[8] Other non-bifurcated MDLs also have issued *Daubert* rulings impacting large groups of cases
based on plaintiffs' inability to establish general causation, but often on a much longer timeline
(and after the expenditure of more resources by the parties and the court) than contemplated in
Monsanto's proposed schedule here, *see infra* Part II, and in this Court's Scheduling Order in
*Hardeman/Stevick*.  *See, e.g., In re Denture Cream Prods. Liab. Litig.*, No. 1:09-md-02051, 2015
U.S. Dist. LEXIS 9653, at *142 (S.D. Fla. Jan. 28, 2015) (excluding plaintiffs general causation
experts); Joint Stipulation That the Court's January 28, 2015 Order is Case-Dispositive, and
Defendants' Unopposed Motion for Judgment of Dismissal With Prejudice and for Entry of Final
Judgment at 1-2, *In re Denture Cream Prods. Liab. Litig.*, No. 1:09-md-02051 (S.D. Fla. Mar.
28, 2015), ECF No. 2310 (entering final judgment in favor of defendant in light of exclusion of
plaintiffs' general causation experts, applicable to all MDL cases except eight filed after expert
disclosure cutoff date); *In re Mirena IUD Prods. Liab. Litig.*, Nos. 13-MD-2434 (CS), 13-MC-
2434 (CS), 2016 WL 4059224, at *17-18 (S.D.N.Y. July 28, 2016) (entering summary judgment
in favor of defendants and disposing of all pending cases in the MDL, after excluding all of
plaintiffs' general causation experts under *Daubert*), *appeal docketed*, Nos. 16-2890 & 16-3012
(2d Cir. Aug. 19, 2016).

consistent with the Federal Rules of Civil Procedure, significant precedent (including in MDLs) and this Court's prior order recognizing the efficiencies and benefits of such an approach.

Assuming discovery will be bifurcated to prioritize general causation, Monsanto suggests the following schedule pursuant to section 8.iii of the Order. This schedule is consistent with the prior *Hardeman/Stevick* schedule and ensures that *Daubert*-related evidentiary hearings and oral argument still will occur in 2017.

**Proposed Schedule for Remaining General Causation Discovery:**

- Document availability for counsel with cases not previously involved in active discovery: **Upon entry of protective order**.

Prior to creation of the MDL, this Court in *Hardeman* and the *Giglio* court entered substantively identical protective orders and other discovery-related protocols regarding electronically stored information ("ESI") and privilege issues.[9] These orders were negotiated between Monsanto's counsel and Andrus Wagstaff. Further, plaintiffs' counsel Weitz & Luxenberg has agreed to be bound by an identical protective order in order to receive access to Monsanto's document production. Similar orders were previously negotiated with the Miller Firm (and subsequently entered in *Stevick*).[10]

---

[9] *See* Protective and Confidentiality Order, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal. June 24, 2016), ECF No. 75; Protective and Confidentiality Order, *Giglio v. Monsanto Co.*, No. 3:15-cv-02279-BTM-WVG (S.D. Cal. June 21, 2016), ECF No. 46; Order Governing Privilege Logs, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal. June 23, 2016), ECF No. 72; Order Governing Privilege Logs, *Giglio v. Monsanto Co.*, No. 3:15-cv-02279-BTM-WVG (S.D. Cal. June 21, 2016), ECF No. 48; Joint Stipulation and Order Governing Protocol for Discovery of Electronically Stored Information, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal. June 23, 2016), ECF No. 73; Stipulation and Order Governing Protocol for Discovery of Electronically Stored Information, *Giglio v. Monsanto Co.*, No. 3:15-cv-02279-BTM-WVG (S.D. Cal. June 21, 2016), ECF No. 49; Rule 502(d) Order, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal. June 24, 2016), ECF No. 76; Rule 502(d) Order, *Giglio v. Monsanto Co.*, No. 3:15-cv-02279-BTM-WVG (S.D. Cal. June 21, 2016), ECF No. 47.

[10] Protective and Confidentiality Order, *Stevick v. Monsanto Co.*, No. 3:16-cv-02341-VC (N.D. Cal. June 24, 2016), ECF No. 27; Stipulation and Order Governing Privilege Logs, *Stevick v. Monsanto Co.*, No. 3:16-cv-02341-VC (N.D. Cal. June 24, 2016), ECF No. 28; Stipulation and Order Governing Protocol for Discovery of Electronically Stored Information, *Stevick v. Monsanto Co.*, No. 3:16-cv-02341-VC (N.D. Cal. June 24, 2016), ECF No. 26; Rule 502(d) Order, *Stevick v. Monsanto Co.*, No. 3:16-cv-02341-VC (N.D. Cal. July 1, 2016), ECF No. 34.

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC

1    Monsanto requests that this Court enter the same discovery-related orders that it entered

2    in *Hardeman* in all actions in this MDL so that they will govern the access to documents of

3    counsel joining this litigation and continue to govern in cases where they have already been

4    agreed to or entered and where millions of pages of documents have already been produced.

5    Once these orders are entered, Monsanto will authorize plaintiffs' lead counsel (when appointed)

6    to make all documents previously produced in federal cases available to all other plaintiffs'

7    counsel in this MDL. Currently, the Miller Firm, Andrus Wagstaff, and Weitz & Luxenberg

8    already share prior productions through a single document repository using a vendor originally

9    retained by the Miller Firm.

10    • Proposed order regarding a deposition protocol and limits on written discovery

11    requests due to Court by: **November 30, 2016**.

12    In MDLs, it is common for the parties to negotiate a protocol for the conduct of

13    depositions. In fact, the Miller Firm previously sent Monsanto a draft protocol that could be

14    used as the start for those negotiations. Once lead counsel for plaintiffs is appointed, Monsanto

15    proposes that the parties undertake such negotiations with the goal of providing a joint proposed

16    protocol for this Court's consideration and approval. To the extent there are issues on which the

17    parties cannot agree, a joint letter submitting the dispute would be due on November 30, 2016.

18    Monsanto likewise proposes that the parties seek to negotiate reasonable limitations on

19    written discovery. As noted above, Monsanto has already produced millions of pages of

20    documents that include Monsanto's internal scientific studies and documents related to scientific

21    studies and analyses conducted by outside experts on Monsanto's behalf, in addition to other

22    custodial records (many of which were selected by plaintiffs). This production is reasonable and

23    proportionate to plaintiffs' needs in seeking to meet their *Daubert* burden on general causation

24    and is consistent with the amended Federal Rules of Civil Procedure. *See In re Bard IVC Filters*

25    *Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2016 WL 4943393, at *5 (D. Ariz. Sept. 16,

26    2016) (citing proportionality in denying plaintiffs' request for additional discovery, where

27    significant electronic discovery on the subject of plaintiffs' proposed expanded discovery had

28    already been conducted); *In re Benicar (Olmesartan) Prods. Liab. Litig.*, No. 15-2606 (RBK/JS),

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC

1    2016 U.S. Dist. LEXIS 137839, at *211-15 (D.N.J. Oct. 4, 2016) (citing proportionality

2    requirement of amended Rule 26(b)(1) in denying plaintiffs' motion to compel depositions as

3    redundant based on extensive discovery already conducted in phased discovery limited to

4    question of causation).  Should disputes arise, November 30, 2016 would be the deadline for

5    presenting them to the Court as well.

6         •    Identification of 10 additional current or former employee witnesses as custodians

7              for document production by: **December 2, 2016**.  Presentation of any objections

8              by: **December 9, 2016**.

9         Prior to the creation of this MDL, Monsanto volunteered to produce documents for the

10   five Monsanto employees most relevant to the question of general causation and to produce those

11   witnesses for deposition.  Monsanto further agreed to produce documents for seven corporate

12   employees jointly requested by the Miller Firm and Andrus Wagstaff as general causation

13   custodians.  Monsanto also agreed to schedule depositions for five of those seven individuals

14   even though some have no first-hand information relevant to general causation, and objected to

15   the depositions of the remaining two based on a lack of relevant knowledge and their executive

16   status within the company.  On September 16, just a few weeks before the October 15, 2016

17   production deadline, Andrus Wagstaff requested that Monsanto collect documents from 11

18   additional custodians without any explanation of these custodians' purported relevance to the

19   general causation question.  Monsanto objected to these requests.

20        Plaintiffs' motion and the Panel's decision to create this MDL have introduced multiple

21   new parties and counsel into this process, including many cases that were either not served on

22   Monsanto or were far from the discovery stage at the time of transfer.  This expansion requires

23   changes to the discovery plan originally crafted with just two sets of plaintiffs' counsel, as new

24   counsel will undoubtedly want to participate in the selection of any additional general causation

25   document custodians and general causation deponents.  Reasonable limits must be put in place to

26   prevent plaintiffs from abusing this process and to ensure that the goals of efficient, proportional

27   discovery and an early *Daubert* hearing are met.

28

1   There simply are not dozens of corporate witnesses with relevant personal knowledge of

2   the general causation issues.  Therefore, plaintiffs as a group should be limited to selecting no

3   more than 10 additional general causation document custodians by December 2, by which date

4   all new plaintiffs' counsel will have had access to the already-completed document production

5   for a sufficient time to inform their designation of additional custodians (assuming the discovery

6   orders discussed above are entered promptly).  Monsanto would have an opportunity to object to

7   the 10 additional custodians by December 9, 2016, if necessary.  These deadlines will ensure that

8   additional custodians are identified and objections resolved in a timely manner that does not

9   derail the remainder of the discovery schedule.

10       The 10 custodians in Monsanto's proposal would be in addition to the five already

11   offered voluntarily by Monsanto plus the seven previously requested by two plaintiffs' counsel,

12   bringing the total to 22 general causation document custodians.  Plaintiffs' counsel as a group

13   can decide whether to include in the ten selected any custodians identified in Andrus Wagstaff's

14   prior untimely request.

15   •   Deadline for plaintiffs (as a single group) to depose any or all of the five general

16       causation witnesses selected by Monsanto:  **December 16, 2016**

17       Under the *Hardeman*/*Stevick* schedule, all non-expert witness depositions were to be

18   completed by December 9, 2016.  On September 8, 2016, three months in advance of that

19   deadline, Monsanto offered plaintiffs' counsel in *Hardeman* and *Stevick* dates for the depositions

20   of the five general causation custodians selected by Monsanto.  *See* E-mails between Rosemary

21   Stewart, Hollingsworth LLP, and Aimee Wagstaff, Andrus Wagstaff (Sept. 8-26, 2016)

22   (Hollingsworth Decl., Ex. 5).  Plaintiffs' counsel rejected those dates on September 15, 2016.  *Id.*

23   Plaintiffs' counsel requested alternative, presumably later dates, citing the need for more time to

24   receive and review documents produced by Monsanto.  *Id.*  On September 26, 2016, Monsanto

25   offered plaintiffs' counsel a second set of dates on which the witnesses were available in

26   November or early December.  *Id.*  Despite being notified on September 30, 2016, that the

27   production of documents for these custodians was substantially complete, plaintiffs' counsel in

28   offered no response until October 13, 2016, when they claimed that depositions could not

1  proceed because they decided to request that additional search terms be used by Monsanto in

2  culling the document collection.  These efforts to derail efficient, proportional discovery should

3  not be accommodated.  There is no reason for further delay of these depositions.  If plaintiffs

4  wish to depose any of these individuals, they should be required to do so by December 16, 2016.

5  • Production of custodial files of no more than 10 additional general causation

6  custodians selected by plaintiffs (subject to any objections) completed by:

7  **February 3, 2017**.

8  • Deadline for plaintiffs (as a single group) to identify remaining general causation

9  witnesses to be deposed (for no more than 10 total general causation depositions):

10  **February 17, 2017**.  Presentation of any objections by: **February 24, 2017**.

11  For the reasons discussed above, plaintiffs should be limited to taking no more than 10

12  general causation fact witness depositions of current or former Monsanto employees.  The

13  number of deponents to be selected by this deadline will vary depending upon whether plaintiffs

14  choose to depose any or all of the five custodians identified by Monsanto.  To ensure that

15  depositions can be completed in a timely manner, Monsanto proposes that plaintiffs select the

16  remaining witnesses for deposition from among the remaining document custodians, subject to

17  objection by Monsanto, by the above dates.  Plaintiffs can, should they so choose, request

18  depositions prior to this deadline.

19  • Depositions of remaining non-expert general causation witnesses to be completed

20  by: **March 17, 2017**.

21  • Plaintiffs' expert reports due by: **April 17, 2017**.[11]

22  • Defendant's expert reports due by: **May 1, 2017**.

23  • Plaintiffs' rebuttal expert reports due by: **May 15, 2017**.

24  • Close of expert discovery: **June 7, 2017**.

25

26

27  [11] From this deadline forward, the "stagger" proposed by Monsanto between events is identical
to that in the Court's scheduling order for *Hardeman*/*Stevick*, with small modifications to avoid
deadlines on holidays and weekends.

28

- 14 -

- Monsanto's motion for summary judgment and *Daubert* motions due (one brief, 40 pages): **June 21, 2017**.

- Oppositions (and cross motion, if any) due (one consolidated brief for all plaintiffs, 40 pages total): **July 12, 2017**.

- Monsanto's reply (and opposition to cross motions, if any) due (one consolidated brief, 50 pages): **July 26, 2017**.

- Replies due (one consolidated brief for all plaintiffs, 30 pages): **August 4, 2017**.

- Possible live testimony from expert witnesses: **Week of August 14, 2017**.

- Oral argument on motions for summary judgment and *Daubert* motions: **August 17, 2017**.

III.    **MONSANTO DOES NOT BELIEVE AN INDEPENDENT EXPERT IS NEEDED OR WOULD BE HELPFUL BECAUSE NUMEROUS INDEPENDENT SCIENTISTS, INCLUDING EPA, HAVE ALREADY PERFORMED THIS FUNCTION.**

In response to the Court's inquiry in section 8.iv of the Order, Monsanto does not believe that the appointment of an independent expert is necessary or appropriate in this case because the Court already has access to extensive, independent expert analyses of the scientific evidence at issue here  through two very recent evaluations of glyphosate's carcinogenic potential conducted by EPA scientists (discussed below), as well as analyses by other regulatory and health agencies around the world.  All such independent analyses concluded that glyphosate does not pose a risk for cancer in humans.  The EPA analyses discuss all of the relevant scientific evidence that will be presented to the Court in these cases and also provide specific guidance on the proper methodology for assessing this scientific evidence.  With this independent expert guidance in place, the Court will be well prepared to consider the expert testimony presented by the parties' retained experts and to satisfy its gatekeeping responsibility under *Daubert* and Federal Rule Evidence 702 of ensuring that plaintiffs' general causation expert witnesses satisfy the "exacting standards of reliability" set forth in *Daubert* and its progeny.  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).

1    As discussed in Part I *supra*, on September 12, 2016, EPA's OPP issued a 227-page

2    evaluation of glyphosate's carcinogenic potential in which EPA concluded that "[t]he strongest

3    support is for [the descriptor] 'not likely to be carcinogenic to humans' at doses relevant to

4    human health risk assessment."  EPA OPP Report at 13, 141.[12]   In presenting this analysis, the

5    EPA first provided detailed guidance on how scientists evaluate and assess epidemiological

6    evidence, *id.* at 22-30, animal carcinogenicity studies, *id.* at 71-73, and genotoxicity studies, *id.*

7    at 97-99, and next conducted a study-by-study evaluation of each of these three bodies of

8    scientific evidence for glyphosate.  *See id.* at 30-45 (epidemiological studies), 73-96 (animal

9    carcinogenicity studies), and 99-126 (genotoxicity studies).  Based upon this scientific

10   evaluation, the EPA OPP concluded:

11            An extensive database exists for evaluating the carcinogenic
              potential of glyphosate, including 23 epidemiological studies, 15
12            animal carcinogenicity studies, and nearly 90 genotoxicity studies
              for the active ingredient glyphosate.  These studies were evaluated
13            for quality and results were analyzed across studies within each
              line of evidence . . . [, and] multiple lines of evidence [were
14            evaluated] using such concepts as strength, consistency, dose
              response, temporal concordance and biological plausibility.  ***The***
15            ***available data at this time do no[t] support a carcinogenic***
              ***process for glyphosate.***

16

17   *Id.* at 140 (emphasis added).[13]

18            In issuing this OPP report, EPA also officially released an earlier 87-page report setting

19   forth the independent findings of EPA's CARC, in which the 12 career EPA scientists on the

20   CARC likewise endorsed EPA's existing classification of glyphosate as "not likely to be

---

[12] The EPA OPP report was prepared in anticipation of the upcoming EPA Scientific Advisory Panel meeting on glyphosate's carcinogenic potential.

[13] This finding is particularly telling because EPA applies a protective, regulatory methodology in assessing causation that sets a lower burden of proof than that which plaintiffs must meet in this Court under *Daubert*.  *See, e.g.*, *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002) ("A regulatory agency such as the FDA may choose to err on the side of caution. Courts, however, are required by the *Daubert* trilogy to engage in an objective review of evidence to determine whether it has sufficient scientific basis to be considered reliable."); *see also Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 991 (8th Cir. 2001) (same).  The fact that EPA concluded that glyphosate does not pose a risk for cancer under this more protective, regulatory standard starkly illustrates the huge gulf that exists between plaintiffs' expert case and the type of reliable scientific evidence required under *Daubert*.

1  carcinogenic to humans."  EPA CARC Final Report at 10, 77.  Based upon its detailed analysis,

2  the EPA CARC concluded:

3  - "[E]pidemiological studies in humans showed no association between glyphosate
4  exposure and cancer of the following: oral cavity, esophagus, stomach, colon, rectum,
   colorectum, lung, pancreas, kidney, bladder, prostate, brain (gliomas), soft-tissue
5  sarcoma, leukemia, or multiple myelomas," and the "epidemiologic literature to date
   does not support a direct causal association" between glyphosate exposure and non-
6  Hodgkin's lymphoma.  *Id.* at 8, 9.

7  - "[T]here was no evidence of carcinogenicity in the eleven carcinogenicity studies
   conducted in Sprague Dawley or Wistar rats and CD-1 mice.  There were no
8  treatment-related increases in the occurrence of any tumor type in either sex of either
   species."  *Id.* at 9.

9
   - "[T]here is no concern for genotoxicity or mutagenicity.  Glyphosate was no[t]
10  mutagenic in bacterial reversion (Ames) assays or *in vitro* mammalian gene mutation
   assays.  There is no convincing evidence that glyphosate induces micronuclei
11  formation or chromosomal aberrations *in vitro* or *in vivo*."  *Id.*

12

13  The EPA CARC report also provides the Court with an independent expert critique of the

14  flawed analysis in the IARC monograph, upon which plaintiffs principally rely in support of

15  their general causation argument.  The EPA CARC explains that IARC failed to consider key

16  scientific data showing non-carcinogenicity in the select animal studies upon which IARC relied

17  and ignored other animal studies altogether.  *Id.* at 9.  The EPA CARC noted that IARC's

18  "omission of the negative findings from reliable studies may have had a significant bearing on

19  the conclusion drawn for evidence of carcinogenicity in animals."  *Id.*  The EPA CARC also

20  sharply criticized IARC's cherry-picked and unreliable analysis of genotoxicity studies, stating

21  that "[t]he inclusion of the positive findings from studies with known limitations, the lack of

22  reproducible positive findings and the omission of the negative findings from reliable studies

23  may have had a significant bearing on IARC's conclusion on the genotoxic potential of

24  glyphosate."  *Id.* at 10.

25  The EPA's OPP and CARC reports mirror similar findings in 2015-2016 by the European

26  Food Safety Authority ("EFSA"), the Health Canada Pest Management Regulatory Agency, the

27  German Federal Institute for Risk Assessment ("BfR"), the Australian Pesticides and Veterinary

28  Medicines Authority, the New Zealand Environmental Protection Authority, and the World

- 17 -

1  Health Organization ("WHO") and United Nations Food and Agricultural Organization – which

2  all very recently concluded that glyphosate is not carcinogenic, in direct contravention of the

3  IARC's 2015 classification of glyphosate as a 2A probable human carcinogen.[14]  And even the

4  IARC's 2A classification – deeply flawed as it is – does not support plaintiffs' causation case

5  under *Daubert* because IARC conceded (even under its methodology) that the epidemiological

6  studies provide only "limited evidence in humans for the carcinogenicity of glyphosate," which

7  IARC defines as meaning that "chance, bias, or confounding could not be ruled out with

8  reasonable confidence."  IARC, *Preamble to the IARC Monograph: Scientific Review and*

9  *Evaluation* available at http://monographs.iarc.fr/ENG/Preamble/currentb6evalrationale

10  0706.php.; *see General Electric Co. v. Joiner*, 522 U.S. 136, 145-47 (1997) (affirming district

11  court exclusion of expert testimony based upon epidemiological studies that failed to rule out

12  chance or confounding); *see also Conde v. Velsicol Chem. Corp.*, 24 F.3d 809, 813-14 (6th Cir.

13  1994) (rejecting plaintiffs' expert's causation opinion, which relied on a regulatory finding that

14  chlordane is a probable human carcinogen based on animal studies, where epidemiological

15  studies did not establish an association); *Hollander v. Sandoz Pharm. Corp.*, 95 F. Supp. 2d

16  1230, 1235, n.14 (W.D. Okla. 2000) ("In the absence of an understanding of the biological and

17  pathological mechanisms by which disease develops, epidemiological evidence is the most valid

18  type of scientific evidence of toxic causation"), *aff'd*, 289 F.3d 1193 (10th Cir. 2002).

19

20

21  [14] EFSA, *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate* at 2, EFSA Journal 2015; 13(11):4302 (published Nov. 12, 2015),

22  http://www.efsa.europa.eu/en/efsajournal/pub/4302; Letter from Bernhard Url, Exec. Director, EFSA, to Prof. Christopher J. Portier, Working Group Participant, IARC at 1 (Jan. 13, 2016),

23  https://www.efsa.europa.eu/sites/default/files/EFSA_response_Prof_Portier.pdf; Summary of the Pest Management Regulatory Agency Proposed Re-evaluation Decision at 15 (PRVD2015-01)

24  (Apr. 13, 2015), http://publications.gc.ca/collections/collection_2015/sc-hc/H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-1-eng.pdf; BfR, *The BfR has finalised its draft report for the re-evaluation of glyphosate* (Apr. 2,

25  2015), http://www.bfr.bund.de/en/the_bfr_has_finalised_its_draft_report_for_the_re_evaluation_of_glyphosate-188632.html ; Food & Agric. Org. of the U.N., World Health Org.,

26  Joint FAO/WHO Meeting on Pesticide Residues, Geneva, 9-13 May 2016, Summary Report at 2 (issued May 16, 2016), http://www.who.int/foodsafety/jmprsummary2016.pdf?ua=1; *see also*

27  *supra* p. 3 (citing conclusions of the Australian Pesticides and Veterinary Medicines Authority and the New Zealand Environmental Protection Authority).

28

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC

1   This Court thus already has a wealth of independent scientific analyses to assist it in

2   understanding the expert testimony that will be presented in these cases and the lack of scientific

3   reliability of plaintiffs' expert case in support of general causation.  Under these circumstances, the

4   appointment of an additional independent expert would be redundant and is unnecessary.

5   **IV.     OTHER MATTERS.**

6   Section 9 of this Court's Order directs the parties to address in their case management

7   statement any other matters that they wish to discuss at the case management conference.  In any

8   MDL, in addition to the issues mentioned above and in the Court's Order, there are a variety of

9   administrative constructs and procedures that need to be created, such as procedures for service

10   of new actions, the filing of any case-specific motions, protocols for preservation depositions,

11   among others.  Monsanto suggests that this Court's scheduling order include provisions for the

12   submission of a second proposed CMO setting forth the parties' respective or agreed positions

13   regarding these and other issues within 60 days after lead plaintiffs' counsel is appointed.

14   This Order also requests a list of all known similar cases pending in federal or state

15   courts.  Monsanto's list is attached hereto as Attachment A.

16

17   DATED: October 20, 2016                    Respectfully submitted,

18                                                          /s/ Joe G. Hollingsworth

19                                                          Joe G. Hollingsworth (*pro hac vice*)
                                                            (jhollingsworth@hollingsworthllp.com)

20                                                          Eric G. Lasker (*pro hac vice*)
                                                            (elasker@hollingsworthllp.com)

21                                                          HOLLINGSWORTH LLP

22                                                          1350 I Street, N.W.
                                                            Washington, DC  20005

23                                                          Telephone:  (202) 898-5800
                                                            Facsimile:  (202) 682-1639

24
                                                            Attorneys for Defendant
25                                                          MONSANTO COMPANY

26

27

28

MONSANTO COMPANY'S CASE MANAGEMENT STATEMENT
16-md-02741-VC