UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | |
| ALL ACTIONS | |

**PLAINTIFFS' CASE MANAGEMENT STATEMENT**

Pursuant to the Court's Pretrial Order No. 1, Plaintiffs submit this joint case management statement.

**I.    Plaintiffs Have Reached Consensus Regarding Plaintiffs' Leadership and Coordination Structure.**

**A.  Co-Lead Counsel.**

The demands of this case warrant a co-lead structure.  All Plaintiffs request a three-person, co-lead counsel structure as follows: Robin Greenwald, Michael Miller, and Aimee Wagstaff.  As their applications illustrate, these counsel have the experience, dedication, staff, and financial resources to litigate this MDL efficiently and effectively for the benefit of all Plaintiffs. More importantly, Ms. Greenwald, Mr. Miller, and Ms. Wagstaff have been the *de-facto* leaders of this litigation for some time and have built strong relationships and consensus among the numerous Plaintiffs' counsel litigating these matters.

**B.  Executive Committee.**

The case also demands additional firms to assist in the financial and attorney requirements of the MDL.  Plaintiffs agree that a six-person Executive Committee, composed of the three co-lead counsel named above and the following attorneys, would best serve this MDL and Plaintiffs: Michael Baum, Yvonne Flaherty, and Hunter Lundy.  Like the proposed co-leads, Mr. Baum, Ms. Flaherty, and Mr. Lundy have been instrumental in developing and supporting this litigation thus far.  They bring a wealth of experience and know-how to the table.  Incorporation of these six counsel into an Executive Committee will greatly facilitate

1

coordination among Plaintiffs.

**C. Plaintiffs' Steering Committee.**

Finally, Plaintiffs' counsel agree that the financial and work demands of this MDL would also benefit from the formation of a Plaintiffs' Steering Committee ("PSC"), with members nominated by Plaintiffs' leadership and confirmed by the Court.  If the Court agrees, Plaintiffs propose to submit a list of attorneys and their applications for nomination to a PSC within five (5) business days from the date the Court appoints leadership.

**D. Roles and Responsibilities of Co-Lead Counsel.**

The Co-Lead Counsel would have the authority and duty to coordinate and oversee the Executive Committee's and the PSC's responsibilities, as set forth below:

1. To propose agenda items for and to appear at periodic Court-noticed status conferences and hearings;

2. To schedule and set agendas for PSC meetings and to keep minutes or transcripts of these meetings;

3. To draft case management orders for the orderly and efficient litigation of this case, including a case management order that provides for the duties and responsibilities of the MDL leadership structure as set forth herein;

4. To enter into stipulations with Defendants;

5. To sign and file all pleadings relating to all actions in the MDL;

6. To determine and present in pleadings, briefs, motions, oral argument, or such other fashion as may be appropriate, personally or by a designee, to the Court and opposing parties the position of Plaintiffs on matters arising during the pretrial proceedings;

7. To coordinate and conduct discovery on behalf of Plaintiffs consistent with the requirements of the Federal Rules of Civil Procedure and the Local Rules of Practice for the Northern District of California;

8. To schedule and engage in settlement negotiations with Defendants, and if there is a settlement, propose a claims protocol and/or plan of allocation;

9. To liaise with defense counsel;

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

10. To liaise with and keep informed Plaintiffs' attorneys who file cases in this MDL and who are not appointed to leadership in this MDL;

11. To consult with and employ expert witnesses;

12. To enter into contracts and other agreements with vendors necessary to litigate this MDL, such as a document depository vendor, court reporting services, and expert witnesses;

13. To establish protocols for common benefit billing and disbursements, to maintain records of such billing and disbursements advanced by Executive Committee and PSC members, and to report periodically to the Executive Committee and PSC concerning disbursements and receipts;

14. To maintain and collect time and expense records for work performed, time billed, costs incurred and other disbursements made by all Plaintiffs' counsel whose work has been  specifically authorized, and submit at the Court's request in writing, *ex parte* and *in camera* reports to the Court regarding time billed in the prosecution of this action;

15. To retain the services of any attorney not part of the Executive Committee or  PSC to perform any common benefit work, provided the attorney so consents and is bound by the compensation structure established in this MDL;

16. To establish and maintain a depository for orders, pleadings, hearing transcripts, and all documents served upon Plaintiffs' counsel, and to make such papers available to Plaintiffs' counsel upon reasonable request;

17. To otherwise coordinate the work of all Plaintiffs' counsel, and perform such other duties as the Co-Lead Counsel deem necessary, in order to advance the litigation or as authorized by further Order of the Court; and

18. To perform any other necessary administrative and logistic functions of the Executive Committee and the PSC and to carry out any other duty as the Court may order.

**E. Appointment of Liaison Counsel.**

Plaintiffs' counsel met and have consensus on the recommendation of Plaintiffs' Liaison Counsel pursuant to the Court's Pretrial Order No.1.  Plaintiffs propose the appointment of Lori Andrus and Mark Burton as Co-Liaison, subject to the Court's approval.   Ms. Andrus and Mr. Burton will file a joint application for the position of Co-Liaison in the MDL docket.

**F.  Other Administrative Matters.**

Plaintiffs attach as Exhibit A a proposed schedule for the submission of case management orders that are necessary for the efficient and effective adjudication of this MDL.  The proposed deadlines in Exhibit A reflect the fact that counsel comprising the proposed Co-Lead Counsel and Executive Committee structure have been negotiating these matters with counsel for Monsanto for several months.

II.   **Circumstances Since the Phased Discovery Order in the *Hardeman* Case Indicate that Phased Discovery Is Not Warranted.**

A.     **Phased Discovery Will Not Advance the Speedy Resolution of This MDL.**

At the heart of Monsanto's phased discovery proposal is the hope that Monsanto will be able to exclude *all* of Plaintiffs' general causation experts under *Daubert* as being "unreliable" and then, in turn, prevail on summary judgment by arguing that Plaintiffs cannot submit admissible evidence that Roundup® exposure causes NHL. Thus, the wisdom of phased discovery turns on whether there is any reasonable probability that Monsanto will be successful in excluding all of Plaintiffs' experts under *Daubert*.  And, in light of the prevailing science, there is simply no reasonable probability that Monsanto will accomplish this Herculean task. There is already a disputed issue of fact regarding whether Roundup® exposure can cause NHL; it has been so deemed by a source that is unquestionably reliable.

The World Health Organization's International Agency for Research on Cancer ("IARC") concluded that glyphosate is a human carcinogen and that there is a strong association between glyphosate exposure and NHL.  Simply put, IARC is the most preeminent cancer-assessment authority in the world.  Several federal and state laws specifically rely on IARC monograph assessments.  For example, under the Toxic Substances Control Act of 1976, as interpreted by the EPA, "[a] chemical is considered to be a known or potential human carcinogen, for purposes of TSCA section 12(b) export notification, if that chemical is . . . classified as . . . 'probably carcinogenic to humans' (Group 2A) . . . by the World Health Organization International Agency for Research on Cancer (IARC)[.]" 40 C.F.R. § 707.60(2)(c).

Similarly, the U.S. Consumer Product Safety Commission ("CPSC") and the Occupational Safety and Health Administration ("OSHA") both recognize and accept the authority of IARC in assessing the potential cancer hazard of an agent. *See* 16 C.F.R. § 1500.135(a)(1)-(3) (describing similarities between IARC and EPA assessments); 29 C.F.R. § 1910.1450(b) (defining carcinogen as any substance identified as such by IARC). And, in California, by law, any substance listed as a probable carcinogen by IARC (like glyphosate) is presumed to be a carcinogen by the State of California—and the State of California is presently embroiled in litigation with Monsanto because it intends to list glyphosate as a substance known to cause cancer. *See* Cal. Lab. Code § 6382(b)(1); *California Chamber of Commerce v. Brown*, 196 Cal. App. 4th 233, 242, 126 Cal. Rptr. 3d 214, 219 (Ct. App. 2011).

Putting aside the respect and deference afforded IARC cancer assessments by Congress, EPA, CPSC, OSHA, and the State of California, the Federal Judicial Center ("FJC") specifically lists IARC as one "of the most well-respected and prestigious scientific bodies." Reference Manual on Scientific Evidence (Third) at 20 (2011). In discussing the IARC monograph process, the FJC explains that IARC "evaluates the human carcinogenicity of various agents" by reviewing "all of the relevant evidence, including animal studies as well as any human studies" and "[o]n the basis of a synthesis and evaluation of that evidence, IARC publishes a monograph containing that evidence and its analysis of the evidence and provides a categorical assessment of the likelihood the agent is carcinogenic." *Id.* at 564 n.46.

The likelihood of Monsanto's prevailing on a *Daubert* challenge is, thus, remote. Monsanto would have to convince this Court to ignore the IARC assessment and reject a near-unanimous agreement by regulators, legislatures, and the judiciary that IARC's method for hazard assessment sets the standard. Because the wisdom of phased discovery turns on whether Monsanto will be able to convince this Court that IARC, and the peer reviewed epidemiology, should be ignored, requiring phased discovery will only delay the resolution of this MDL. There is no need to shackle discovery with any restriction; it makes sense to allow this matter to proceed with general full-bore discovery consistent with the practice of nearly all other MDLs.

**B. Recent Discovery Shows that Separating General Causation Discovery from other Forms of Monsanto-Specific Discovery is Not Feasible.**

The creation of the MDL and the documents produced so far warrant reassessment of phased discovery in this litigation because 'general causation' discovery cannot be isolated from other Monsanto-specific discovery.[1]   In this case, 'general causation' is not a simple term of merely reading/interpreting the published articles and scientific literature.  Instead, Plaintiffs must actually discover *how* each article and study was conducted and *who* was involved. In the limited productions received so far, it is evident that Monsanto facilitated the "ghostwriting" of key articles and studies concerning Roundup's® safety and participated in the perpetuation of academic fraud about Roundup's® safety.  These activities call into question the reliability of Monsanto's and other scientists' studies about Roundup® exposure and human health—studies Monsanto's boldly cites as "independent" in defending claims that Roundup® causes cancer.  As a result, the issue of general causation is inextricably interwoven with other liability discovery.

Moreover, given the manner in which Monsanto maintains its ESI, most document discovery involves the production of individual custodial files.  Monsanto lacks the capability of searching for documents across all files.  Therefore, the only way to respond to document requests is for Monsanto to conduct targeted searches for *each* custodian (which is another reason to deny Monsanto's attempt to limit production of custodial files).  Thus, it makes little sense, to stage or limit discovery.  Once Monsanto has begun searching a custodian's files, why not conduct a complete search for all relevant documents instead of bickering about the actual

---

[1] The law does not favor bifurcation; unitary proceedings are the norm.  Indeed, when considering bifurcation, a court must balance the "potential savings against the risk of later duplicative discovery should it be necessary to resume the deposition of a witness or the production of documents."  MANUAL FOR COMPLEX LITIGATION § 11.422 (4th ed. 2004).  Bifurcation of discovery is permitted only when it promotes fairness and efficiency.  *See In re Plastics Additives Antitrust Litig.*, No. 03-CV-2038, 2004 WL 2743591, at *2 (E.D. Pa. 2004).  "[I]t is clear that in most instances, regular—that is, unbifurcated—discovery is more efficient."  *Central Transp. Intl., Inc., v. Gen. Elec. Co.*, No. 3:08-CV-136-C, 2008 WL 4457707, at *3 (W.D.N.C. Sep. 30, 2008); *see Awalt v. Marketti*, 75 F. Supp. 3d 777, 779 n.2 (N.D. Ill. 2014) ("bifurcation [of discovery] is now heavily disfavored" (internal quotation marks and citation omitted)); *Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, No. 09-CV-0100, 2011 WL 6000562, at *1 (D. Md. Nov. 29, 2011); *cf. In re Bendectin Litig.*, 857 F.2d 290, 307 (6th Cir. 1988) ("The piecemeal trial of separate issues in a single suit is not to be the usual course."); *Monaghan v. SZS 33 Assocs., L.P.*, 827 F. Supp. 233, 246 (S.D.N.Y. 1993) ("fundamental presumption" against bifurcation of trials); *Patten v. Lederle Labs*, 676 F. Supp. 233, 238 (D. Utah 1987) (single trial tends to lessen delay, expense, and inconvenience).

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

scope of the phased discovery and then, later, re-search that same custodian's files once the first phase of discovery is complete.  Indeed, it is difficult to agree on the scope of the proposed phased discovery—one side will read the scope broader than the other—and an order phasing discovery will almost certainly inject needless delay as the parties "litigate" those disputes.

Since the time that this Court phased discovery in *Hardeman*, Monsanto has used the *Hardeman* Order as a shield from producing additional custodial files, even when Plaintiffs show that additional custodial files have relevant, and even vital, information about whether exposure to Roundup® (including its surfactants) causes NHL and Monsanto's knowledge of those dangers.[2]  Monsanto's refusal centers on a dispute about an arbitrary number of potential custodians it should search,[3] notwithstanding the fact that this Court specifically denied Monsanto's request to limit production to 5 custodial files and held that the "plaintiffs may make any reasonable discovery request of Monsanto about whether Monsanto's product can cause non-Hodgkin's lymphoma, about Monsanto's knowledge on the issue, about any communication Monsanto has made on the issue, and about any scientific studies in which Monsanto may have been involved."  *Hardeman v. Monsanto Co.*, No. 3:16-cv-525, Doc. 66, June 16, 2016.  This discovery dispute exists because the parties are operating under a phased discovery order, illustrating why phased discovery creates more problems than it solves. What is more, there is no need for such disputes. Monsanto is already under a legal obligation in two cases to produce discovery on *all* issues.  In *Kennedy v. Monsanto Co.*, No. 16CM-CC00001, another Roundup®-NHL case, the Circuit Court in Camden County, Missouri, denied "bifurcation" of discovery on June 27, 2016. *See* **Exhibit C**.  Likewise, on August 30, 2016, the Philadelphia County Court of Common Pleas denied Monsanto's motion to permit discovery only on the issue of general

---

[2] *See,* Discovery Letter No. 2, filed October, 24, 2016, [ECF 14]. Each of the 11 requested custodians is currently on a legal hold, as initiated by Monsanto. Attached as **Exhibit B**. Monsanto filed a Response on October 27, 2016, also included in **Exhibit B.**

[3] If discovery is allowed to proceed as Monsanto proposes, this Court's order in *Hardeman* would be violated and Monsanto would essentially be in control of deciding which custodial files Plaintiffs should receive before the *Daubert* hearing.  This would leave Plaintiffs with incomplete information about Monsanto's knowledge of Roundup's® dangers and the accuracy, reliability, and efficacy of the "scientific" studies upon which Monsanto intends to rely.

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

1   causation. *Schrack v. FMC Corp. et al.*, No. 160400812. *See* **Exhibit D.** As a practical matter,

2   given Monsanto's refusal to produce the documents in *Hardeman* because of the phased

3   discovery order, the eleven custodial files in dispute had to be subsequently requested in the

4   *Kennedy* matter, which allows only one MDL law firm access to those documents. Nothing is

5   gained by denying MDL Plaintiffs access to documents and depositions that are available to the

6   Missouri and Pennsylvania plaintiffs who also allege that exposure to Roundup® and its

7   surfactants caused their NHL.

8          **C. Phased Discovery Will Cause Delays, Disputes, and Inefficiencies.**

9          Monsanto contends that phased discovery will lead to the effective and efficient

10  resolution of this litigation. Plaintiffs disagree. Simply, phased discovery invites unnecessary

11  discovery disputes and motion practice on, among other things, questions over whether a

12  discovery request or deposition question relates to "general causation," liability, or another

13  issue. Particularly in this litigation, these are wasted resources as Monsanto already is under a

14  legal obligation for full discovery in the *Kennedy* and *Schrack* matters. The time and effort that

15  would need to be expended on these disputes by the Court and the parties further illustrate why

16  bifurcation is inappropriate. *See True Health Chiropractic, Inc. v. McKesson Corp.*, No. 13-CV-

17  02219-JST, 2015 WL 273188, at *2 (N.D. Cal. Jan. 20, 2015) ("[B]ifurcation has the potential to

18  further complicate this litigation—even if Defendants are correct [regarding the bifurcated

19  issue]—because … the line between [bifurcated categories] can be difficult to discern."); 

20  *Surcharge Anti-Trust Litig.*, 258 F.R.D. 163, 173 (D.D.C. 2009) ("Courts must consider the

21  degree to which the [bifurcated] evidence is closely intertwined with, and indistinguishable from,

22  the [other] evidence in determining whether bifurcation is appropriate."); *id*. at 172 ("Because

23  the Court may be forced to spend time and resources resolving discovery disputes … bifurcated

24  discovery 'belies the principles of judicial economy.'" (internal quotation marks and citation

25  omitted)); *Arocho v. Nafzinger*, No. 07-CV-02603-REB-KLM, 2008 WL 5101701, at *1 (D.

26  Colo. Dec. 1, 2008) ("[P]retrial stays or bifurcated discovery have proven to be an inefficient

27  process, leading to confusion of the parties about the type of discovery permitted during the stay

28  and, consequently, discovery disputes which cannot be resolved without court assistance.");

1    *Trading Techs. Intern., Inc. v. eSpeed, Inc.*, 431 F. Supp. 2d 834, 840 (N.D. Ill. 2006) ("[W]e

2    would not be surprised if the parties engaged in extensive motion practice wrangling over

3    whether certain pieces of discovery were applicable to the liability case or the

4    willfulness/damages case."); *see also* MANUAL FOR COMPLEX LITIGATION § 11.424 (4th ed.

5    2006). ("Discovery disputes, with their potential for breeding satellite litigation, are a major

6    source of cost and delay.").

7          Moreover, courts addressing phased discovery, as proposed by Monsanto, have often

8    experienced difficulty implementing such a limitation. *In re Incretin Mimetics Prods. Liab.*

9    *Litig. ("Incretin")*, No. 3:13-md-02452-AJB-MDD, 2014 WL 2532315, at *2 (S.D. Cal. Feb 18,

10   2014), a case cited by Monsanto, perfectly illustrates the impracticality of bifurcation.  Less than

11   three months after entering an order limiting the first phase of discovery to general causation,

12   "the Court was alerted to a dispute as to the scope of [the limitation] as well as issues regarding

13   the timely and complete production of discovery." *Id.* at *2.  The court was forced to grant

14   "additional discovery and expand[] the scope of inquiry to include facts relevant to preemption,"

15   as well as decide multiple issues regarding whether discovery sought by the plaintiffs fell within

16   the scope of the bifurcated discovery. *Id.* at *1, *4.

17         Bifurcation impracticalities led a federal court in California to state that "[t]he theory and

18   the benefits of bifurcation, when placed in actual practice, will prove to be ephemeral." *In re*

19   *Paxil Litig.*, 212 F.R.D. 539, 547 (C.D. Cal. 2003) (internal citations omitted) (declining to

20   bifurcate general causation); *see also Trading Techs.*, 431 F. Supp. 2d at 841 ("[B]ifurcation can

21   lead to additional discovery disputes that actually add time and energy to a litigation."); *Ikonen v.*

22   *Hartz Mountain Corp.*, 122 F.R.D. 258, 265 (S.D. Cal. 1988) (determining arguments for generic

23   causation issues "not persuasive"). These impracticalities have already manifested themselves in

24   the instant litigation. Monsanto has objected to the production of documents concerning

25   carcinogenicity studies, oxidative stress, and other plainly relevant evidence on the grounds that

26   such requests exceeded the bounds of the Court's order.

27         Monsanto makes the puzzling argument that it would be inefficient to stop the progress

28   made to date since it already has produced a substantial amount of general causation discovery.

Br. at 3–5.  But, in fact, simply expanding the scope of allowable discovery to include *more* documents would have no effect on documents already produced and would perhaps resolve future inefficiencies and disputes over how to properly categorize documents.  Further, as set forth in Sections III and VII below, Monsanto's productions to date have been incomplete and need to be re-done.

In any event, as stated above, Monsanto is already under an obligation to conduct full discovery in two separate state court litigations.  Further, Monsanto has not submitted an affidavit as to the expected cost related to standard liability discovery, nor did it explain how the rules in the state court cases differ for purposes of the courts there denying phased discovery.  Thus, irrespective of the Court's decision to continue or expand phased discovery, Monsanto will have to produce documents about glyphosate and its knowledge of glyphosate, other product ingredients, and Roundup's® propensity to cause injury in the Missouri and Pennsylvania state court cases.  Monsanto's argument that the potentially voluminous document production in this case would be unduly burdensome and expensive—because of the number of plaintiffs potentially involved—is therefore unpersuasive.

**D.  General Causation Is Difficult to Isolate from Specific Causation.**

The bulk—if not the entirety—of Monsanto documents about Roundup® will relate to issues of general causation.  Indeed, other than a plaintiff who worked at a Monsanto facility where he was exposed to Roundup® or glyphosate, Monsanto is unlikely to have documents relating to an individual plaintiff's actual exposure to Roundup®.  Thus, the majority of discovery of Monsanto is essentially discovery of information that goes to the heart of general causation. That said, even though Monsanto's records largely concern general causation, courts recognize that general causation cannot be separated from specific causation.

In response to similar arguments made by Monsanto thirty years ago, an MDL Court held that "[G]eneric causation and individual circumstances concerning each plaintiff and his or her exposure" are often "inextricably intertwined."  *In re Agent Orange Prod. Liab. Litig.* MDL No. 381, 818 F.2d 145, 164–65 (2d Cir. 1987).  As a result, if separated, Plaintiffs' experts would be challenged twice—on the question of the exposure necessary to cause cancer generally and again

1   on the question of Plaintiff's exposure. Hence, multiple depositions would be necessary,

2   creating inefficiencies and the possibility that issues addressed in the first deposition could be re-

3   addressed in the latter deposition. *See In re Heparin Products Liab. Litig.*, No. 1:08-hc-60000,

4   2011 WL 1097637, at *3 (N.D. Ohio Mar. 22, 2011) ("If I were to bifurcate, plaintiffs would

5   have to put on product identification evidence not once, but twice; first to prove causation and

6   second to prove liability."); *Patten v. Lederle Labs.*, 676 F. Supp. 233, 238 (D. Utah 1987)

7   (denying bifurcation because the plaintiff's expert would have had to testify twice, once to

8   explain the toxic properties of the chemical at issue and again to explain the known actions of

9   this toxin in the human body); *Agent Orange*, 818 F.2d at 165. Trying to parse general and

10  specific causation opinions and the real risk of unfairly giving Monsanto two bites at the apple in

11  challenging Plaintiffs' experts, further militates against staged discovery.

12  **III.   Status of Current Discovery.**

13          Contrary to Monsanto's assertions, discovery is in its infancy. The document productions

14  so far are incomplete and inadequate. Prior to resolving the remaining discovery concerns set

15  forth below, there are two key issues that require the Court's immediate guidance and

16  intervention: (1) incomplete productions using inadequate search terms and (2) inappropriate

17  three-tier responsiveness searches. Each issue is described in detail, below, in sections VII (B)

18  and VII (C).

19          Because of the incomplete productions, no depositions have taken place of key Monsanto

20  employees. Monsanto offered dates in October but had not certified that any of the custodial

21  productions are complete. Not wishing to have to take the depositions twice, Plaintiffs' counsel

22  postponed them until Monsanto certified the produced custodial files are complete.

23          Additionally, in a discovery dispute currently before the Court, Plaintiffs' counsel

24  requested the production of eleven key employees' files that Monsanto has refused to produce,

25  even though preliminary review of the custodial files produced to date reveal that these

26  additional eleven employees are central to general causation issues. *See,* **Exhibit B**. That dispute

27  will have to be resolved, and, further production is expected. In all, should the Court decide

28  phased discovery will govern the MDL, Plaintiffs expect to depose dozens of witnesses, solely in

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

the "phase one" portion of phased discovery.  Plaintiffs anticipate these depositions can be accomplished in a timely manner, but production and a meaningful review of the material must be completed first.

Lastly, Plaintiffs object to Monsanto's vague request for "limitations on written discovery" as premature. Discovery has already been limited, at Monsanto's request, for phase one of the litigation in cases prior to this MDL.  The principle of "proportionality" under Rule 26(b)(1), cited by Monsanto, is an apt one to examine in this context.  Thousands of users have developed NHL following exposure and have filed suit or retained attorneys to do so.  A similar MDL for a cancer-causing product recently oversaw a global settlement totaling $2.4 Billion (MDL 2299, In re: Actos Products Liability, Western District of Louisiana).  *See also e.g., In re: EI DuPont de Nemours and Company C-8 Personal Injury Litigation*, 2016 WL 5884964 (S.D. Ohio Oct. 7, 2016) (holding where many plaintiffs alleged injury from defendant's chemical, "the importance of the issues at stake cannot be overstated for these thousands of plaintiffs … further, the amount in controversy is substantial, with two of the 270 cancer cases resulting in over $7 million in jury verdicts"; the court denied the defense-suggested limits on discovery and held the requested discovery was proportional to the large number of claimants and extremely large potential amount in controversy). As such, the principle of "proportionality" as argued by Monsanto should not limit discovery.

## IV.    Plaintiffs Disagree with the "Science" Contained in Monsanto's Case Management Statement.

Monsanto is requesting the Court phase discovery and conduct early *Daubert* hearings on general causation.  The Court's role in a *Daubert* analysis is to determine "whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline,'" not to weigh the evidence directly. *Estate of Barbarin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal citations omitted). In other words, it is not the Court's responsibility to determine the ultimate issue of general causation; that is a jury question. As such, Plaintiffs object to Monsanto's use of the Case Management Statement to argue the merits of general causation, as the statement was intended to address procedural and scheduling issues.  In fact,

1    discovery produced so far indicates that Monsanto has exerted inappropriate influence over the

2    very "authorities" Monsanto cites.

3            Although Plaintiffs do not believe general causation *Daubert* hearings should be

4    prioritized above all other issues, Plaintiffs will be prepared to present reliable evidence from

5    qualified experts that exposure to Roundup®, comprised of glyphosate plus surfactants, causes

6    NHL at any *Daubert* hearing.  That said, Plaintiffs confront some of the information about

7    Roundup® and glyphosate that Monsanto included in its Case Management Statement, as it is

8    both one-sided and misleading. Indeed, there is already a body of peer-reviewed, published

9    epidemiology, the greater weight of which shows a positive, statistically significant causal

10   relationship between exposure to glyphosate and the incidence of NHL, *including Monsanto-*

11   *sponsored epidemiological studies.*

12
13   **A.      The EPA's Office of Pesticide Programs ("OPP") Has Never Considered**
             **Whether Roundup® Is a Carcinogen.**

14           IARC reviewed glyphosate in the manner in which it is used in the real-world—as <u>one</u> of

15   the ingredients of the herbicide Roundup®.  Thus, when evaluating the risk of exposure to

16   glyphosate, IARC looked at the epidemiology of glyphosate in combination with the other

17   chemicals used in the Roundup® formulation(s) to increase glyphosate's penetration and toxicity,

18   *i.e.,* surfactants.  In contrast, the EPA does not make such a determination of the carcinogenicity

19   of Roundup® which is a combination of glyphosate with surfactants. The EPA, pursuant to its

20   regulatory authority, is limited to analyzing glyphosate in isolation and only on its effects on

21   non-human animals.  The EPA assessment is therefore of limited relevance to Plaintiffs who

22   were exposed to Roundup® as a product, which in fact contains other carcinogens in addition to

23   glyphosate.  For example, Roundup® contains formaldehyde, which IARC classifies as a group 1

24   carcinogen (carcinogenic to humans).  Roundup® also contains 1,4-Dioxane, which IARC

25   classifies as a group 2b carcinogen (possibly carcinogenic to humans), and which California has

26   categorized as a chemical known to cause cancer.  Roundup® contains n-nitroso-glyphosate,

27   which has not been assessed by regulatory authorities, but is in a class of compounds that IARC

28   has found to be carcinogenic.  Roundup® contains ethylene glycol (anti-freeze), which the

National Toxicology Program ("NTP") has found to be mutagenic.  Finally Roundup® contains polyethoxylated tallow amine ("POEA") which has been found to be genotoxic and cytotoxic and to increase the toxicity of glyphosate when used in combination with it.  The European Union recently has decided to ban the use of POEA in Roundup® products.  It is for these and other reasons that Monsanto cannot in good faith tell this Court that Roundup® is conclusively not a carcinogen.

**B.     The EPA Office of Pesticides Program Has Ties to Monsanto Over Glyphosate.**

While EPA is of limited relevance to the instant matter in light of its confined review, the following has transpired recently relating to glyphosate.  The EPA Office of Pesticides Program ("OPP") explicitly notes the limits of its review in the recent draft assessment to which Monsanto cites.  The draft assessment was supposed to be submitted for peer review in October, 2016, but that deadline has been postponed indefinitely.  In the draft assessment, the OPP remarks that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and that "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."  OPP draft assessment, p. 141.  The OPP notes that it rejected studies that used Roundup® instead of isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."  *Id.* at 70.  In its charge to the FIFRA Scientific Advisory Panel ("SAP"), established to peer review the OPP draft assessment, the OPP notes that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[4]  The OPP draft assessment is therefore of limited relevance as it does not

---

[4] https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_sap_charge_questions_-final.pdf

actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

Furthermore, the OPP is not the EPA; it is merely a subdivision of the EPA. As limited discovery to date has shown, the OPP draft assessments are inherently unreliable and biased. The OPP conducts no independent testing of glyphosate and relies more heavily on unpublished data submitted by Monsanto than it does publications subjected to a rigorous peer-review process. Indeed, discovery to date has revealed disturbingly close relationships between employees working at the OPP and Monsanto. In effect, documents suggest that the OPP coordinates with Monsanto behind closed doors to facilitate Roundup® remaining on the market. Unlike IARC, OPP assessments have never been cited by any federal or state court as an authority or reliable source on cancer causation, nor does the committee contain renowned international experts on cancer causation.

An earlier draft of the OPP report on glyphosate was leaked by someone within EPA in May 2016. EPA promptly retracted the report and disavowed its conclusions. *Reuters* reported that:

> The EPA took down the report and other documents on Monday afternoon [May 2, 2016], saying it did so "because our assessment is not final," in an emailed statement to Reuters. The agency said the documents were "preliminary" and that they were published "inadvertently."
>
> The EPA said its documents are part of its broader registration review, which began in 2009, of glyphosate and its potential human health and environmental risks.
>
> "EPA has not completed our cancer review," the EPA told Reuters in a statement. "We will look at the work of other governments as well as work by (the U.S. Department of Health and Human Services') Agricultural Health Study as we move to make a decision on glyphosate."
>
> The EPA said its assessment will be peer reviewed and completed by the end of 2016.[5]
>
> Documents have since indicated that the reliability of the OPP's October 15, 2015, report

---

[5] P.J. Huffstutter, *EPA takes Offline Report that Says Glyphosate Not Likely Carcinogenic*, Reuters May 2, 2016 *available at: http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.*

is highly questionable.  For instance, in documents released pursuant to a FOIA request, Michael

L. Goodis, Associate Director, Pesticide Re-evaluation Division, stated in an email dated March

23, 2015:

> As you can see, I received a call from Dan Jenkins of Monsanto regarding the cancer determinations coming out of the IARC.  Monsanto's position is that the report misrepresents the science and EPA's position and that he talked with Jess [Jess Rowland Chair, Cancer Assessment Review Committee ("CARC")] and Rick about it and asked whether we would be correcting the record. I told him that I was not aware of EPA sending out a specific message of "correcting the record," but that our draft risk assessment would contain the full body of the science. He sent the attached talking points and other information as an FYI.[6]

The "talking points" sent by Monsanto to the author of the CARC draft report are remarkably similar to the version of the CARC draft report that leaked to the public.  The "talking points" were submitted outside of the docket and comment period for the re-registration of glyphosate.[7]  Such informal access to and *ex parte* contacts with scientists drafting a supposedly independent review of glyphosate are contrary to sound, unbiased science.  IARC prohibits such inappropriate influence by interested parties and values impartiality.  See Monograph Preamble (Jan. 2006), p. 5, http://monographs.iarc.fr/ENG/Preamble/currenta5participants0706.php.   Further discovery will likely uncover additional biased, improper contacts between EPA personnel and Monsanto.

The OPP goes so far as to advocate for Monsanto by seeking to suppress the study of Roundup® by other federal agencies.  One such agency is the Agency for Toxic Substances and Disease Registry ("ATSDR"), which is part of the Department of Health and Human Services, and is charged with "using the best science, taking responsive public health actions, and providing trusted health information to prevent harmful exposures and diseases related to toxic substances."[8]  Pursuant to documents released via a FOIA request, Jack Housenger, head of the

---

[6] March 23 Email string including Dan Jenkins from Monsanto and Jess Rowland, lead author of CARC report. *Available at*: https://foiaonline.regulations.gov/foia/action/public/view/record?objectId=090004d280a434c6.
[7] Monsanto's Talking Points on IARC. *Available at:* https://foiaonline.regulations.gov/foia/action/public/view/record?objectId=090004d280a18c0f.
[8] http://www.atsdr.cdc.gov/.

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

OPP, requested that the ATSDR stop its efforts to review the dangers of glyphosate. [9] Unfortunately for the public, Housenger was successful in his efforts to quash ATSDR's review of glyphosate.

Another example of the OPP's overly intimate connection with Monsanto is found in the OPP's *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*, prepared for the SAP before the SAP hearing was continued indefinitely.   The paper rejects a causal connection between glyphosate and NHL, stating that if a true association existed one would expect to see higher "effect rates" of NHL where individuals are more exposed to glyphosate, such as in the United States and Canada.   The "evidence" for this statement is footnote 12, which states: "Components in glyphosate formulations in the US and abroad are similar according to personal communications with Monsanto."   In short, the underpinning of this aspect of the OPP's conclusion is based on unspecified "personal communications" with the company that makes the product.

For these reasons, Monsanto is resisting a comprehensive, independent review of glyphosate or Roundup® free from its industry influence.   Under FIFRA, the EPA has established a procedure to seek independent advice about a complex regulatory decision through a SAP.   7 U.S.C. § 136w.  The EPA scheduled a four-day SAP to peer-review the OPP's draft assessment of glyphosate for the week of October 17, 2016.  However, on October 12, 2016, Monsanto's lobbying group CropLifeAmerica successfully derailed the SAP by accusing two of the panelists as biased against industry.[10]  The SAP meeting is now "postponed" to a later as-yet undetermined date, again delaying the EPA's final review of glyphosate.[11]

The State of California, in contrast, has not allowed its assessment of Roundup® to be derailed, despite Monsanto's best efforts to do so.   The State has added Roundup® to the list of

---

[9] https://foiaonline.regulations.gov/foia/action/public/view/record?objectId=090004d280b5d6b3.
[10] Letter from CLA to EPA, available at: http://191hmt1pr08amfq62276etw2.wpengine.netdna-cdn.com/wp-content/uploads/2016/01/CLA-Comments-on-SAP-Disqualification-10-12-16.pdf.
[11] *EPA Bows to Chemical Industry in Delay of Glyphosate Cancer Review*, Huffington Post http://www.huffingtonpost.com/carey-gillam/epa-bows-to-chemical-indu_b_12563438.html.

Proposition 65 products in response to the IARC's conclusion that glyphosate is a probable human carcinogen.  In response, Monsanto sued the State of California to prohibit it from warning its citizens that Roundup® is carcinogenic.  The California Attorney General has filed a motion for judgment on the pleadings to that challenge, emphasizing the State of California's position about the importance and credibility of IARC assessment.  According to the California A.G., "IARC's scientific determinations are the gold standard in carcinogen identification." Brief, p. 2.  In describing the IARC process, the California AG notes:

> Further, IARC classifies carcinogens through a rigorous process of peer review that includes numerous procedures designed to promote the scientific integrity of its decisions. The IARC procedure for evaluating chemicals is thorough, impartial, expert, and open. Members of the Working Groups who study and classify each chemical and who publish the Monographs have typically published significant research on the subject chemicals. … Working Group members are free of outside influence that would constitute a conflict of interest, and the process is transparent and open to interested parties, including parties such as Monsanto.  IARC therefore has strong safeguards in place that are sufficient to assure the integrity of its scientific review. Given IARC's stature and expertise, as well as its thorough and open review process, the voters were entitled to rely on this scientific review process, without the need to add additional provisions to the statute either relating to IARC's work or requiring review of IARC's work.

*Id.* at 31.

Clearly, the question of whether Roundup® is a carcinogen will not be resolved in the context of a case management statement.  That said, Monsanto's transparent effort to poison the well by citing to preliminary reports by regulatory agencies must be understood in the context of the control that Monsanto exerts over the executive branch of the deferral government and much of the scientific community and the retaliation Monsanto pursues against anyone, including IARC, who concludes that Roundup® causes cancer.

Finally, Monsanto cherry-picks some other foreign regulatory authorities that allow the sale of Roundup®. However, several Countries are banning and restricting the use of Roundup.  For Example, based on "concerns about the carcinogenicity and endocrine disruptive properties of the herbicide glyphosate" the European Parliament voted to restrict the re-authorization and use of glyphosate in an attempt to minimize human exposure to the

carcinogenic chemical.  *Id.* Countries such as "France, the Netherlands and Sweden have all said they will not support an assessment by the European food safety authority (Efsa) that glyphosate is harmless" and "[g]lyphosate use has been banned or restricted in large parts of Europe."[12] (Arthur Nelson, EU states rebel against plans to relicense weedkiller glyphosate, The Guardian, 3/4/2016 available at:  http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.)  Glyphosate has additionally been banned in Sri Lanka, Argentina, and Malta.  The European Union will be enacting a blanket ban on the current formulation of Roundup®, which contains POEA, beginning next year.

## V.     Plaintiffs' Proposed Discovery and Case Schedule.

If the Court decides to proceed with a general causation *Daubert* hearing in advance of adjudication of the overall case, Plaintiffs are in substantial agreement with Monsanto on many aspects of its proposed discovery schedule.   Nevertheless, Plaintiffs propose several important changes to encourage efficiency and fairness.

- Proposed orders on deposition and written discovery protocol due by November 30, 2016 (agreed)

- Identification of additional custodians for document production by December 2, 2016, objections thereto by December 9, 2016 (agreed)[13]

- Monsanto certifies completion of first five custodial files by December 14, 2016

- First five custodians deposed by January 31, 2017

- Production of  additional custodial files certified complete by February 3, 2017 (agreed)

- Plaintiffs identify five trial plaintiffs by March 1, 2017

---

[12] Arthur Nelson, EU states rebel against plans to relicense weedkiller glyphosate, *The Guardian,* 3/4/2016 *available at:*  http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate

[13] Plaintiffs will be requesting many more custodians in "phase two" but have agreed to these limits in phase one in order to efficiently move beyond general causation issues.

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

1        • Deposition of additional non-expert witnesses accomplished by May 1, 2017

2        • Parties' expert reports due June 30, 2017

3        • Parties' expert reports due June 30, 2017

4        • Parties' rebuttal expert reports due July 31, 2017

5        • Close of expert discovery September 29, 2017

6        • Motions for summary judgment/ *Daubert* motions due October 30,  2017

7        • Oppositions to motions due November 30, 2017

8        • Parties' reply due December 15, 2017

9        • Trial on all issues:  February 2018

**VI.     Plaintiffs Agree that an Independent Expert Is Not Necessary.**

Plaintiffs are developing their experts and anticipate Monsanto is doing the same; there are likely to be experts in over a dozen specialties on both sides.  Accordingly, Plaintiffs do not believe the addition of an "independent" expert would aid the Court's analysis or resolution of this matter.  Plaintiffs again object to Monsanto's arguing its position on the substance of the case, but largely agree with Monsanto that a court-appointed expert is not needed, albeit for vastly different reasons.

The peer-reviewed, publicly available, published scientific literature overwhelmingly supports a significant relationship between Roundup® exposure and lymphoma.  The WHO has already deemed glyphosate a "probable human carcinogen."  Although Monsanto disagrees with and criticizes this classification, Monsanto cannot point to a more widely-respected authority on carcinogenicity.  Indeed, the State of California considers IARC to be the ultimate authority on the subject, having adopted its conclusions by force of law with Proposition 65.

**VII.    Other Matters.**

**A.  Production of Custodial Files.**

Monsanto refuses to produce 11 custodial files as requested by Plaintiff Hardeman. Each of the requested 11 custodians is currently under a legal hold, initiated by Monsanto. On October 24, 2016, Plaintiff Hardeman filed his Discovery Dispute Letter No. 2, **Exhibit B**.  Because Monsanto is using the *Hardeman* phased discovery order to refuse production, and in the interest

of moving the litigation forward, the 11 custodial files in dispute had to be subsequently requested by the Miller firm in the *Kennedy* matter (a case in which phased discovery was denied), which allows only one MDL law firm access to those documents.

### B.  Search Terms.

To date, Monsanto has produced documents based on a set of search terms requested by one of the lead Plaintiffs' firms. The list was compiled before Plaintiffs had an opportunity to review any of the produced documents.  At the time, Plaintiffs had specifically negotiated the right to supplement these search terms as discovery continued.

For example, during an informal ESI meeting in St. Louis, Missouri, on August 17, 2016, Plaintiffs learned for the first time that glyphosate/Roundup® are commonly referred to by Monsanto/outside scientists and some non-scientist Monsanto employees by a MON number, CP code, and/or PN code. Since that date, undersigned counsel has actively requested the universe of those codes/numbers and that they be included in the search terms.  Monsanto has yet to produce a complete list and has refused to include them in search terms.  On or about August 1, 2016, Monsanto began producing its initial custodial files.  Because no productions to date utilized the MON number, CP code, and PN code as search terms, every production is incomplete and should be re-done.

### C.  Responsiveness Searches.

The parties have an ongoing dispute regarding the process of Monsanto's "responsiveness searches." Currently the Monsanto document search process employs a two-tiered search; meaning, there are two separate search term lists and a document must contain a "hit" on **each** list before it is included in a production. The reason for requiring a document hit on both lists is to ensure that documents are relevant to this litigation. If a document hits on both search term lists, it should be included in the custodial file and produced.  However, it is not. Unbeknownst to Plaintiffs, Monsanto has been engaging in a third tier review for

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

"responsiveness."   Once a document hits on both search term lists, instead of producing the document, Monsanto is further restricting production by making subjective determinations of responsiveness.   Monsanto represents that approximately 25% of documents containing two search terms are eliminated and withheld due to their improper third tier review. That third review is likely resulting in relevant documents being withheld. Accordingly, Plaintiff requests the Court order Monsanto to produce those documents withheld by the third tier "responsiveness" review.   Alternatively, Plaintiffs propose that a random sample of documents withheld by Monsanto's third tier review be produced so that a determination can be made as to whether Monsanto's review results in the withholding of relevant documents.


DATED:  October 27, 2016                    Respectfully submitted,


/s/ Aimee Wagstaff                          /s/ Michael Miller
Aimee Wagstaff                              Michael Miller
aimee.wagstaff@andruswagstaff.com           mmiller@millerfirmllc.com
Andrus Wagstaff, P.C.                       The Miller Firm LLC
7171 West Alaska Drive                      108 Railroad Ave
Lakewood CO 80226                           Orange VA 22960
Ph 303-376-6360                             Ph 540 672 4224
F 303-376-6361                              F 540 672 3055


/s Robin Greenwald                          /s/ Yvonne Flaherty
Robin Greenwald                             Yvonne Flaherty
rgreenwald@weitzlux.com                     ymflaherty@locklaw.com
Weitz & Luxenberg                           Lockridge Grindal Nauen, PLLP
700 Broadway                                100 S Washington Ave, #2200
New York NY 10003                           Minneapolis, MN 55401
Ph 212-558-5500                             Ph 612-339-6900
F 212-344-5461                              F 612-339-0981


/s/ Michael Baum                            /s/ Hunter Lundy
Michael Baum                                Hunter Lundy
mbaum@baumhedlundlaw.com                     hlundy@lundylawllp.com
Baum Hedlund Aristei and Goldman, PC        Lundy Lundy Soileau & South, LLP
12100 Wilshire Blvd., Suite 950             501 Broad Street
Los Angeles, CA 90025                       Lake Charles, LA 70601
Ph 310-207-3233                             Ph 337-439-0707
F 310-820-7444                              F 337-439-1029

PLAINTIFFS' CASE MANAGEMENT STATEMENT
16-MD-02741-VC

1

**ECF CERTIFICATION**

2      Pursuant to Civil L.R. 5-1(i)(3), the filing attorney attests that she has obtained

3  concurrence regarding the filing of this document from the signatories to the document.

4

5  DATED: October 27, 2016                    ANDRUS WAGSTAFF, PC

6

7                                             By: /s/ Aimee H. Wagstaff
                                                  Aimee H. Wagstaff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28