Pages 1 - 163

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS          )    MDL No. 2741
                                )
LIABILITY LITIGATION            )    Case No. 16-md-02741
_____ )

                                     San Francisco, California
                                     Wednesday, November 16, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    ANDRUS WAGSTAFF
                    7171 West Alaska Drive
                    Lakewood, Colorado 80218
              BY:   **AIMEE WAGSTAFF, ESQUIRE**

                    ANDRUS WAGSTAFF
                    6315 Ascot Drive
                    Oakland, California 94611
              BY:   **KATHRYN MILLER FORGIE, ESQUIRE**


                    WEITZ AND LUXENBERG, P.C.
                    700 Broadway
                    New York, New York 10003
              BY:   **ROBIN L. GREENWALD, ESQUIRE**


 (Appearances continued on next page)




Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court

**<u>APPEARANCES (CONTINUED)</u>:**

For Plaintiffs Johnson, Shepherd, Hernandez, Ruiz:
      THE MILLER FIRM LLC
      108 Railroad Avenue
      Orange, Virginia  22960
    BY:  **MICHAEL J. MILLER, ESQUIRE**
      **TIMOTHY LITZENBURG, ESQUIRE**
      **NANCY MILLER, ESQUIRE**

For Plaintiffs McCall, Scheffer, Means, Patterson, Porath, Morris:
      BAUM HEDLUND ARISTEI AND GOLDMAN PC
      12100 Wilshire Boulevard, Suite 950
      Los Angeles, California 90025-7106
    BY:  **R. BRENT WISNER, ESQUIRE**
      **MICHAEL LIN BAUM, ESQUIRE**

For Plaintiffs Couey, Sanders, Work, Mendoza, Walker:
      LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
      501 Broad Street
      Lake Charles, Louisiana 70601
    BY:  **HUNTER W. LUNDY, ESQUIRE**
      **KRISTIE M. HIGHTOWER, ESQUIRE**
      **RUDIE R. SOILEAU, JR., ESQUIRE**

For Plaintiff Hardeman:
      Andrus Anderson LLP
      155 Montgomery Street, Suite 900
      San Francisco, California 94104
    BY:  **JENNIE LEE ANDERSON, ESQUIRE**
      **LELAND H. BELEW, ESQUIRE**

For Plaintiff Stevik:
      AUDET & PARTNERS LLP
      711 Van Ness Avenue, Suite 500
      San Francisco, California 94102
    BY:  **MARK E. BURTON, JR., ESQUIRE**

For Defendant:
      HOLLINGSWORTH LLP
      1350 I Street, N.W.
      Washington, DC 20005
    BY:  **JOE G. HOLLINGSWORTH, ESQUIRE**
      **ERIC G. LASKER, ESQUIRE**
      **HEATHER A. PIGMAN, ESQUIRE**

Also Present:   Tesfaye W. Tsadik, Esquire
      Pete Miller, Esquire
      Mr. Jonathan Jaffe

| | |
|---|---|
| 1 | <u>**Wednesday - November 16, 2016**</u>                              <u>**9:38 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling case No. 16-MD-02741, In re |
| 5 | Roundup Products Liability Litigation. |
| 6 | And no need for counsel to come up and state their |
| 7 | appearances.  We've got them already. |
| 8 | **THE COURT:**  Well, what I do want everybody to do is |
| 9 | introduce themselves so I can just put names to faces.  But you |
| 10 | don't need to line up in front of the podium. |
| 11 | Speak up when you introduce yourself. |
| 12 | (Persons present introduce themselves to the Court.) |
| 13 | **THE COURT:**  Good morning. |
| 14 | Okay.  So we have a handful of things to discuss.  I see |
| 15 | that a couple of letters were filed recently that I was only |
| 16 | just starting to go through this morning.  So I hadn't finished |
| 17 | reading those letters. |
| 18 | It looks like it's primarily about, if not exclusively |
| 19 | about, the Monsanto employees who are in Europe and whether |
| 20 | documents should be produced from them.  Is that right? |
| 21 | **MR. LASKER:**  Yes, Your Honor. |
| 22 | **THE COURT:**  Okay.  I guess the best place to start |
| 23 | would be with appointment of lead counsel and the question of |
| 24 | what sort of structure we should have in these cases.  And you |
| 25 | got my tentative view of it in the order we put out a couple of |

1  days ago.

2      Does anybody want to speak to that?  Have you guys elected

3  a spokesperson to argue why I'm wrong that it should just be

4  one lead counsel?

5          **MR. MILLER:**  I think we'd all like to speak to it, so

6  one of us -- we are probably after the same thing.  If I may,

7  Your Honor.

8          **THE COURT:**  Sure.  Please.  Come forward.

9          **MR. MILLER:**  May it please the Court.  Again, I'm

10  Michael Miller.

11      We saw Your Honor's tentative order.  We understand Your

12  Honor's rationale.  We're here to ask you to reconsider because

13  we work so seamlessly together.

14      Amy Wagstaff, Robin Greenwald and I have led a terrific

15  team.  It's working together.  And we just don't feel like

16  standing up here before you and creating any disharmony and

17  saying, gee, you ought to appoint one of us, because we think

18  the three of us are doing a great job.

19      Critically, this is not like -- more like *General Motors*

20  than it was *Volkswagen*; although it has nothing to do with cars

21  per se.  And I say that because in *Volkswagen* it was

22  informative where Judge Breyer appointed one lead counsel, but

23  the company had already admitted liability, and it was a

24  different sort of animal.

25      This is more like *General Motors*.  We have different

models.  We have different accusations.  We have a very
stringent defense.  We're going to have *Daubert* challenges that
the defendants think are very serious.  So I think to get ready
to do justice for thousands of plaintiffs, ultimately, it would
just be a better fit.

Any one of us could do it, but all three of us are doing
it so well together, we'd like the Court to consider three
coleads and let us work together.  We will not let the Court
down in any way, shape, or form, and we will not slow the
defendants down.

**THE COURT:**  So, as I think I mentioned in the order
that I put out, I mean, you know, conceivably we might want to
revisit the leadership structure after the first phase of the
litigation.

But, you know, to your -- with respect to your comparison
to *General Motors*, I mean, this is not like *General Motors*,
right now at least, at all because right now we are focusing on
one issue.  And that's general causation.

And I don't understand why, you know -- it strikes me just
sort of, look, I'm relatively -- I'm inexperienced in these
matters.  I've never been a plaintiff's lawyer in an MDL
before, much less a defense lawyer.  But on the face of it, it
seems, like, ridiculously bloated for this phase of the
litigation.

And I have to ask, why does there need to be such a

```
 1   bloated structure?  What's the point?
 2          MR. MILLER:  I wouldn't refer to it as bloated.
 3          THE COURT:  Other than the obvious, which is money.
 4          MR. MILLER:  I would call it Herculean, not bloated.
 5   We have to do the clients justice by looking at these
 6   documents, millions of them, as Monsanto has told us.  We have
 7   to take --
 8          THE COURT:  Well, wait a minute.  I mean, this is
 9   about who is lead counsel.  I mean, I'm not dictating who does
10   what work.
11          MR. MILLER:  Oh, I see your point.
12          THE COURT:  This is just about who is going to be lead
13   counsel.
14          MR. MILLER:  Let me rephrase then.  I apologize for
15   not correctly receiving your question.
16      I just think it would be easier -- I mean, the Court is
17   leaning towards it would be easier for one of us.  But I think
18   it would be easier and more efficient because if one of us does
19   it, I don't think any one of us in good faith want to do it
20   without counseling the other two anyway.  So that if the three
21   of us are appointed, we can just move as efficiently as we were
22   going to anyway.
23      That's our position.  Perhaps my co-counsel want to say
24   something else.  I think that's our position, and I thank you
25   for your time, Your Honor.
```

1          THE COURT:  Sure.

2          MR. MILLER:  All right.

3          MS. GREENWALD:  Good morning, Your Honor Robin

4   Greenwald.  And I apologize, I'm suffering from quite a cold.

5   So I'll try to be clear.

6          THE COURT:  As am I.  We may take more breaks than we

7   would normally do today.

8          MS. GREENWALD:  So in addition to what Mr. Miller

9   said, I do think that -- I'm on the *Volkswagen* committee,

10   actually.

11       And I think one of the unique issues there, in addition to

12   the fact that *Volkswagen* admitted liability at the very first

13   conference essentially, but the whole focus there was

14   settlement.

15       And as Your Honor knows, the plaintiffs are confident that

16   we will prevail on general causation.  I understand there's a

17   different position by Monsanto.  But we wouldn't look at this

18   case going forward even now as only general causation.  We will

19   be working towards looking at an ultimate trial in this MDL.

20       There are a number of plaintiffs in California.  Even if

21   Monsanto continues to refuse to waive lexicon, there will be a

22   number of options for plaintiffs to be tried before Your Honor.

23       And so we are going to proceed now in this, sort of,

24   simple -- not simple, but in this only general causation box.

25       We would be looking at documents --

1     **THE COURT:**  Excuse me.

2     **MS. GREENWALD:**  No, no.  I understand.

3     -- with an eye towards preparing this case ultimately for

4  trial before Your Honor.

5     And so I guess in some ways I look at this case needing

6  multiple -- I'm sorry.

7     **THE COURT:**  Okay.  So we've got somewhere between 5

8  and 22 document custodians that we're going to do discovery of,

9  and presumably somewhere between 5 and 22 depositions.  And

10  then we've got expert discovery.

11     I understand the idea when it -- you know, we get past

12  that stage and we're talking about figuring out what trials to

13  do and doing individual discovery with respect to individual

14  plaintiffs, it becomes, you know, much larger of an endeavor.

15     But right now -- I mean, it's a -- I just don't

16  understand.  I mean, I assume there's going to be one person,

17  kind of, taking the lead at the *Daubert* hearings; right?

18     **MS. GREENWALD:**  I think that's right, Your Honor.  I

19  think that --

20     **THE COURT:**  Who is the one person who is going to --

21  who is the science person?  Who's the person who's going to be

22  taking the lead on examining and cross-examining the experts?

23     **MS. GREENWALD:**  Well, I believe probably we'll share

24  among the three firms who would do which witness.  I assume

25  that we will share who will do the direct and the

1    cross-examination.  There are going to be multiple expert

2    witnesses here.

3        Also -- I don't want to jump ahead, and, actually,

4    Ms. Wagstaff is going to cover this, so I don't want to take

5    things out of turn, but one of the things or additions we would

6    propose to the scheduling order, even with respect to general

7    causation, is adding five trial plaintiffs into that.

8            **THE COURT:**  Yeah, I didn't understand that at all.  I

9    mean, we can talk about that.

10           **MS. GREENWALD:**  Right.  I realize I am premature on

11   that, but assuming Your Honor agrees with that -- and

12   Ms. Wagstaff will explain why we believe it's wise, even in

13   light of the bifurcation order -- we would have a team looking

14   towards developing that along the way.

15       And so I think that in a case like this, where there are

16   multiple plaintiffs from multiple jurisdictions, and the

17   coordination is even going to be necessary between the federal

18   and the state cases -- and you're right, Your Honor.  This is a

19   very expensive case for us.  There's no doubt about it.  And we

20   have relied on each other for quite a while to -- to advise and

21   counsel each other as things come up.

22       And, I mean, frankly, the only opposition to this

23   structure, other than Your Honor's concerns, is Monsanto.  The

24   plaintiffs actually agree and are working well together.

25           **THE COURT:**  I know.

1    I don't know that that gets you all the way there though.

2  Because it just seems so bloated for the first phase of the

3  litigation that it raises questions about why you've agreed.

4    I mean, have you-all made a decision about -- if it's one

5  lead counsel, have you-all come to an agreement on who it would

6  be?

7    **MS. GREENWALD:**  You're not going to like this answer.

8  We would like Your Honor to make that decision.  We just are

9  not comfortable doing that.

10    I guess one last thing I will say and then I'll sit down.

11  I'm trying.  The last point I would make is, let's say there's

12  one lead counsel.

13    In many cases if you have one lead counsel, you have the

14  people in your firm are the ones that you delegate various

15  issues to, and then you work with other firms.  Here, we've

16  kind of become our own little law firm.  It's a unique aspect

17  of this case.

18    I mean, frankly, most of my job -- most of my career is in

19  government.  I've only been in the plaintiff's side for 11

20  years.  And I've been on many MDLs since then, and this is the

21  first time I've been in a case where we really have almost

22  joined in this -- the law firm that's the Roundup litigation

23  law firm.

24    So I may very well contact Amy and Pearl on something, or

25  Mike and Tim -- even though Mike and Tim don't work in my

1   office -- on an issue because I know that's what they've been

2   working on.

3        So we've all in a way, up until now, had our individual

4   specialty and the issues that we have focused on.  And, of

5   course, we can still do that if you only pick one lead.  I

6   understand that, and we all understand that.  It's just our

7   preference to work as we've been doing and to not have that.

8   Because sometimes when that happens, and there's only one lead,

9   things can sometimes change.  And we don't want it to change,

10  frankly.  We've really enjoyed that collaboration and comradery

11  in this case.

12       So that's I guess -- I don't know what else I can say.

13       **THE COURT:**  Well, let me ask a few more questions if

14  you don't mind.

15       **MS. GREENWALD:**  Sure.

16       **THE COURT:**  What about -- there's no explanation of

17  why there needed to be three lead counsel and then an executive

18  committee that consisted of the three lead counsel and three

19  additional lawyers.

20       What is the point of that?

21       **MS. GREENWALD:**  Again, the six of us have been working

22  together for months.  We've had, I think, in the last -- let's

23  see.  We filed our case in October.  Then -- we've all filed in

24  a couple of weeks.  October 2015.  So it's been a little over a

25  year.  We've had multiple in-person meetings.  We have always

1   vetted potential experts, consultants.

2       Mr. Jaffe, who is our ESI expert -- our consultant, we

3   have -- six of us, frankly, have been working seamlessly.

4       I think the three of us here -- Ms. Wagstaff and

5   Mr. Miller and I -- I think we were the ones who early on, sort

6   of, moved forward before some of the other firms.  And so I

7   think that early on we had a little more -- we had more cases

8   and we were more involved in the beginning.  And now I think

9   that the other three firms were -- were happy to have this

10  structure of 3 and 3.

11      But people like recognition that they are part of the

12  team.  I mean, it's the reality of our litigation, is having

13  some recognition by a court, by a federal court overseeing our

14  case that, I respect the six of you to move this case forward.

15      And if at any time we end up being a burden to Monsanto,

16  they can come to Your Honor, and we would understand that.  We

17  will work -- I pledge, and all of us pledge, that we will make

18  this a seamless process for Monsanto.  We've done it so far

19  over the past months since the JPML centralized the case before

20  Your Honor.

21      And if it turns out that it just isn't working and it's

22  become a problem, I think all of us would agree that Monsanto

23  can come back into court and say, Your Honor, those pledges

24  they made in court didn't work.

25      And I don't think any of us would -- I mean, obviously,

1    Your Honor, would have to make that decision.  But it hasn't

2    been a problem to date.  We have -- it was -- it was a little

3    bit of an issue, of course, before centralization because we

4    would have one case, for example, in Fresno, and we would be

5    trying to negotiate something different than what happened here

6    and in San Diego.  But the centralization, of course, is to

7    resolve that.

8        But it is an unusual case that only has one lead.  In my

9    experience, it just hasn't been that way in the cases I

10   worked --

11           THE COURT:  What about in cases where courts have

12   bifurcated the proceedings and proceeded with general causation

13   first?

14           MS. GREENWALD:  I haven't worked on one of those

15   cases, I have to confess.  I have not.

16       So I don't know if -- I think that my colleagues have.

17   And I think they can address that.

18           THE COURT:  I'll hear from Ms. Wagstaff in just a

19   minute.

20           MS. GREENWALD:  Okay.

21           THE COURT:  So -- and then what about -- okay.  So

22   we've got -- and you'll have to forgive my relative ignorance

23   here about some of the terminology, but then we have the

24   idea -- I think you discussed the idea of a plaintiffs'

25   steering committee.  Am I remembering that correctly?

1        **MS. GREENWALD:**  Correct.

2        **THE COURT:**  And so you've got the lead counsel.  And

3   then you've got the executive committee, which consists partly

4   of lead counsel and partly of lawyers who are not lead counsel.

5   And then you've got this concept of a plaintiffs' steering

6   committee.

7        What exactly is it the plaintiffs' steering committee

8   would do?

9        **MS. GREENWALD:**  I think, Your Honor, today we're

10  willing to step down from that and recognize that as we proceed

11  now I think we are okay with what we have.  And if, in fact, at

12  some point in time that changes, then we -- and the case is

13  mushroomed to a point that we believe we need more, we would

14  come back to Your Honor.

15       But for today, we talked about it this morning and we all

16  agree that if we could have the six-executive-committee system,

17  the structure we proposed, we would step down now from any type

18  of plaintiffs' steering committee.  Again, hopefully with

19  the -- the opportunity to come back to Your Honor if, in fact,

20  circumstances change that make this structure untenable.

21       I mean, ironically, *Volkswagen* has 22 plaintiffs' steering

22  committee members in a case, again, where liability was

23  essentially conceded by *Volkswagen*.

24       So --

25       **THE COURT:**  I understand.

1      I don't need -- you-all seem to be assuming that I'm using

2  *Volkswagen* as a model.  Maybe just because Breyer is down the

3  hall or I used to clerk for him or whatever.

4      I haven't given any thought to *Volkswagen*.  I threw that

5  aside because it's such a different situation from this one.

6      I'm focusing on the fact that -- I mean, how many

7  lawyers -- how many lawyers are there in this MDL total?

8          **MS. GREENWALD:**  Well, there are more.  There's maybe,

9  I don't know, maybe three times what you see today.

10      The only reason I was mentioning *Volkswagen*, Your Honor,

11  wasn't -- actually, it wasn't Judge Breyer or this Court.  It

12  was more it's the only one I'm aware of in recent vintage where

13  there was only one lead.  That's the only reason I reference

14  *Volkswagen* actually.

15      Because every other MDL I am aware of -- again, I don't

16  know every MDL in the country, and I would not profess to, but

17  even *BP*, for example, which I was also on at the time, we had

18  two coleads and then an executive committee.

19      So, I mean, I think -- I don't know of any other case

20  besides *Volkswagen* where there's only been one lead.  Again,

21  I'm not saying there isn't one, but it's the only one I know

22  of, which is why I was raising *Volkswagen*.

23          **THE COURT:**  Okay.  I follow Judge Breyer all the time.

24  Good person to follow.

25          **MS. GREENWALD:**  Wonderful man.

1      **THE COURT:**  So -- but I guess one last question from

2  you, then I'll hear from Ms. Wagstaff.

3      **MS. GREENWALD:**  Of course.

4      **THE COURT:**  Which is, I notice that you didn't list

5  the *General Motors* MDL on your application and on your resume.

6  And I was -- but you were involved in that.

7      **MS. GREENWALD:**  Yes, I apologize.  That's my

8  oversight.

9      So my involvement in that case has pretty much waned.  And

10  I forgot.  I mean, honestly I have to tell you, I just forgot,

11  which is a little embarrassing, I have to confess.

12      I was liaison counsel in that case.  I am.  It's not

13  "was."  But because of the way that case has morphed -- and I

14  worked on mostly the bankruptcy issues earlier, and so those

15  bankruptcy issues resolved by the Second Circuit.  And so my

16  involvement in that case is very small.

17      One of my colleagues is doing one of the bellwether

18  trials, but I am not.

19      **THE COURT:**  So you aren't responsible for putting

20  forward that plaintiff who ended up --

21      **MS. GREENWALD:**  I was not.

22      **THE COURT:**  -- committing perjury?

23      **MS. GREENWALD:**  I was not.

24      I had nothing to do with that.  I promise you in this

25  case, our bellwethers will be selected in a different manner.

```
 1          THE COURT:  Okay.
 2          MS. GREENWALD:  Thank you, Your Honor.  Appreciate
 3  your time.
 4          THE COURT:  Thank you.
 5          MS. WAGSTAFF:  Good morning.  Amy Wagstaff.
 6      So I have the role of, I guess, batting cleanup right now.
 7  And so two points that I really wanted to bring to you.
 8      First of all is, you made a comment that this structure
 9  was proposed because of money.  And I just wanted to make sure
10  the record was clear that that's not at all why it's proposed.
11  It's proposed because of our clients.  And we think that we'll
12  get the best representation of our clients this way.
13      And unlike class actions, in mass torts we all actually
14  have individual clients.  And it's no coincidence that our
15  three firms have the most clients.
16      I know that my office right now has almost a thousand
17  cases under investigation.  I think Mr. Miller's firm is the
18  same.  And I think Ms. Greenwald's is pretty close to the same.
19      Our three firms have the most interest at stake and the
20  most clients, so, therefor, we want to be at the front of the
21  litigation making those sort of decisions.
22      Secondly, I have -- I don't have as much -- as many years
23  practicing in MDL as my colleagues here, but this is the first
24  time where I've actually seen a defendant file an opposition to
25  a proposed structure.  And it made me think, why would they do
```

that?

So what an MDL structure does and what a PSC does, it gives us, it gives the plaintiffs' side the comfort of resources of each other's work and of financial resources.

And there's no doubt that this is going to be expensive. And the way that PSC structures do work is that we would come together and pool our financial resources.

So it makes me think that Monsanto's objection to our structure when it's been working so well is that they want to, sort of, put a chink in our armor or they want to make us not to be able to work as well together.

THE COURT:  This might be an ignorant question.

MS. WAGSTAFF:  Sure.

THE COURT:  But can you talk to me more about the relationship between the financial structure and the leadership structure?  I mean, are those two things sort of inextricably connected?

MS. WAGSTAFF:  Yes.

THE COURT:  How you finance the cases will be affected by what the leadership structure looks like?

MS. WAGSTAFF:  Absolutely.

And without getting too much into our work product, I'll tell you very generally --

THE COURT:  Or you can tell me sort of abstractly --

MS. WAGSTAFF:  Sure.

1          **THE COURT:**  -- how MDL cases work in general in that

2    regard?

3          **MS. WAGSTAFF:**  Yeah.

4       So the way that MDL cases work in general is that when a

5    PSC is created, each of the firms, law firms that are in that

6    PSC, pool money together.

7       And that money pays for the general causation experts.

8    That money pays for the document vendors which are very

9    expensive.  They produce -- you know, they're very proud of the

10   fact they produced millions of documents.  Well, those have to

11   go somewhere.  We have to house those documents somewhere.

12   It's expensive every single month.

13       And so what we do is we make a cash call, sort of -- it's

14   sort of like -- Ms. Greenwald talked about having our own law

15   firm.  We make a cash call and we pull our resources.

16       Now, we've already, sort of, done that on a very low

17   level.  And so we've started because when we thought Your Honor

18   was going to -- when we had the Hardeman discovery order and we

19   had experts due in January, we already starting to pool our

20   resources together to get ready for that January date that's

21   now been vacated.

22       But our ability to finance this litigation is directly

23   affected by the PSC structure.

24       And I will submit to you that I agree with Ms. --

25          **THE COURT:**  Well, why -- again, we can speak of MDLs

1   generally.  We don't have to get into the details of this one.

2   But I guess, again, this may be a product of my lack of

3   experience in this area, but it's not obvious to me why that

4   has to be the case.

5        I mean, why can't there be one lead counsel and, you know

6   say, an executive committee or steering committee of three,

7   just hypothetically, and an agreement among six law firms to

8   pool their resources?  And that -- you know, presumably an

9   agreement at the end of the day what percentage of the fund

10  each law firm is going to get roughly, or something like that,

11  commensurate with the work they've put in.

12       Why does there have to be three lead lawyers and six

13  executive committee members to preserve whatever finance -- you

14  know, sort of, cost-sharing agreement exists?  I just don't

15  fully understand the relationship between the two.

16            **MS. WAGSTAFF:**  Sure.  That's a great question.

17       And, of course, there can be an informal agreement among

18  plaintiffs' counsel.  There always can be.  But plaintiffs'

19  firms, sort of, by and large, don't hunt well in packs.

20       This has been a group that has done really well together.

21  And I think that the ability to have a court order

22  crystallizing our sort of structure so far will help us stay

23  focused.

24       And I don't think it's really Monsanto's place to try to

25  disturb the way that we're running this litigation from the

1    plaintiffs' side.

2        And I think that having a court order there, as

3    Ms. Greenwald talked about, sort of recognizing and putting us

4    in a situation where we're all aligned, sort of, to go together

5    and work in the same way is great.

6        We've been working together for, you know, 13 or 14

7    months.  I don't remember when we had our first meeting.  And

8    there are examples after examples of how Monsanto has tried to

9    divide us throughout this litigation.

10       And I think that this is just something that plaintiffs

11   should be allowed to decide for themselves.

12       And I'll pledge to you that in three months from now or

13   six months from now we can stand up, and if there's issues with

14   it being unwieldy or if you feel like you don't have a point

15   person to talk to, if Monsanto feels like they are not getting

16   responses from us, then we'll revisit this in a heartbeat.

17       **THE COURT:**  So on the issue of this being none of

18   Monsanto's business, I assumed the reason it's Monsanto's

19   business is because if you have a leadership structure that is

20   bloated and is going to drive up costs, that will affect

21   settlement value of the cases.  And so Monsanto has an interest

22   in the plaintiffs not having a bloated structure.

23       Is that wrong?

24       **MS. WAGSTAFF:**  Well, I don't want to speak for

25   Monsanto.  If Mr. Hollingsworth would like to speak for them

1    about why they did it.

2        But, of course, it's not our intention to drive up costs

3    at all.  And I don't think that we would do anything to drive

4    up costs.  In fact, we're trying to do quite the opposite.

5    We're trying to figure out a path where we spend as least

6    amount of cost as possible.

7            **THE COURT:**  Another question I had was about liaison

8    counsel.

9        I've heard people use the term in conversations with other

10   judges and whatnot.  I heard people use that term in seemingly

11   different ways.  So is it your view that there should be a

12   liaison counsel?  And if so, what would -- can you describe to

13   me what their role would be?

14           **MS. WAGSTAFF:**  Sure.

15       So we followed your order a little bit.  I believe your

16   first order suggests you would have a liaison counsel.

17           **THE COURT:**  Yes.  And since I put that out, I've heard

18   people describe it in different ways.  So I'm scratching my

19   head now, trying to remember why I said that.

20           **MS. WAGSTAFF:**  Well, I have been in a lot of MDLs.

21   And the liaison counsel's role, I think, is different in

22   most MDLs.  I don't think that there is a standard liaison role

23   for an MDL.  I think it really depends on who liaison counsel

24   is.

25       I think -- obviously, I would not want to speak for the

1    Court, but I think it would be helpful to have a liaison

2    counsel in the city where the Court is located for either

3    last-minute hearings or for communication with the Court and

4    things of that nature.

5         Although I am licensed in California, I'm not, you know,

6    the most conversant on, maybe, the Northern District local

7    rules.  So a liaison would help make sure that we are doing

8    everything properly the way Your Honor wants it.

9         **THE COURT:**  Okay.  So one thing -- okay.  So let's --

10   so liaison counsel would be responsible for communicating with

11   the Court.  Is that one thing that liaison counsel --

12        **MS. WAGSTAFF:**  That could be something that the

13   liaison counsel could be responsible for.

14        And I think from our side, it's nice to have liaison

15   counsel that is familiar with the district where the MDL is

16   residing, and has practice here and knows -- knows the legal

17   community and knows the court.  That's one of the ways that we

18   will rely on liaison counsel.

19        **THE COURT:**  Okay.  What else does liaison counsel do,

20   other than potentially communicate with the Court?

21        **MS. WAGSTAFF:**  Well, liaison counsel from the

22   plaintiffs' side, it's our intention they will take an active

23   role and almost be like a quasi PSC member or executive

24   committee member or something of that nature.

25        I mean, our liaison counsel is engaged in meetings with us

on strategy.  They're engaged in briefing with us.  They --

        **THE COURT:**  But when you say "our liaison counsel" --

        **MS. WAGSTAFF:**  I'm sorry.

        **THE COURT:**  -- what do they do?  What does liaison counsel do?

        **MS. WAGSTAFF:**  Okay.  So let me -- I will make it very concrete.

    I was lead counsel in the Hardeman matter.  And Ms. Lori Andrus was our liaison counsel.  And so the role that she played was she made sure that I --

        **THE COURT:**  This was before --

        **MS. WAGSTAFF:**  Before --

        **THE COURT:**  You had a liaison counsel before the -- before --

        **MS. WAGSTAFF:**  I didn't call it liaison counsel, but I asked her to help me file -- like I said, even though I'm licensed here and I could have filed here on my own, I asked her to help me file so that I could make sure I complied with Your Honor's rules and Your Honor's practices, and that I could have someone local here sitting with us at the table to make sure that we were doing everything in the proper way administratively, and to -- you know, the way that I personally use liaison counsel as a substantive matter as well.  And this sort of goes back to my original point, which was I think it depends on the liaison person itself.

1    I mean, we have them both here.  Perhaps you could ask

2  them.  But --

3         **THE COURT:**  The title is liaison counsel.  What is --

4  liaison between who and who?

5         **MS. WAGSTAFF:**  Well, there's a couple of things.  One,

6  they could liaison between the state court actions, which now

7  outnumber the MDL actions.

8    I know that federal justices in the past have had a --

9  sort of a state-federal liaison, where they would start the

10  hearings and they would have that state-federal liaison stand

11  up and report, okay, what state filings have happened?  Give me

12  an update how far along they are.

13    I was on a panel with Judge Fallon last week, and he was

14  telling me that he -- his state court liaison actually gives

15  him a contact list of who are the state court judges and that

16  sort of thing.

17    So I'm sure either one of our proposed liaison would

18  embrace that role.  And then also --

19         **THE COURT:**  And who are your proposed liaison again?

20         **MS. WAGSTAFF:**  Mark Burton --

21         **MR. BURTON:**  I can come forward.

22         **MS. WAGSTAFF:**  -- and Lori Andrus.

23    And this is her partner, Jennie Anderson.  I am not sure

24  if you would like to hear from them.  But that's, sort of, the

25  role.

1    I see obviously with ECF, you know, we can communicate

2 with you to whatever extent you would want to us communicate

3 with you, and you back to us directly.

4    But would you like to hear from --

5    **THE COURT:**  Sure.  I still don't have the greatest

6 understanding of what liaison counsel does and how that role is

7 different from somebody on an executive committee or steering

8 committee here.

9    **MR. BURTON:**  Sure.

10    Lead counsel or co-lead counsel because it is true that

11 traditionally in MDLs --

12    **THE COURT:**  I apologize.  It's --

13    **MR. BURTON:**  I'm sorry, Mark Burton.  Jennie Anderson.

14 Her partner Lori Andrus is the proposed liaison.  She's out of

15 the country -- co-liaison, but she's out of the country right

16 now.

17    **THE COURT:**  Got it.

18    **MR. BURTON:**  Which makes a point that, co-lead counsel

19 is usually addressing and in charge of the merits of the

20 litigation; who's going to be handling which discovery issues,

21 certain experts, trial teams, that sort of thing.

22    Liaison counsel is more of an administrative role.  In

23 other words -- and I think this gets to the point of why we

24 need a more robust structure, even though Your Honor believes

25 that the litigation is kind of compartmentalized right now.

1        But I think everybody here has a lot of MDL experience.

2   And it's almost impossible to just say, okay, well, we're only

3   doing general causation discovery right now or general

4   causation litigation.

5        Most MDLs, that's what you're doing for the first year

6   anyway.  That's not unique to this particular litigation, I

7   wouldn't think at all.  That's a normal circumstance, to tell

8   you the truth.

9        But one of the things that starts causing a lot of work

10  for liaison in particular is -- my understanding is that

11  there's more current plaintiffs pending in state court than

12  there are in federal court.

13       Now, who's going to interact with those people?  And

14  currently there's only about three dozen federal cases being

15  coordinated in this action.

16       If a thousand cases need to be coordinated in this action

17  in the next two years, who from the administrative side assists

18  the other plaintiffs who are coming in to file?

19       Law firms that have not yet appeared for instance in the

20  action.  How do they learn about the prior pretrial orders, how

21  things were working, what the best practices are?

22       That's one of the jobs of liaison counsel, so that co-lead

23  counsel doesn't have the burden placed upon them of dealing

24  with new law firms coming in; explaining the history of the

25  litigation; explaining, you know, what forms are appropriate

1   for them to file, what appearances they can make, that sort of

2   thing.

3           **MS. ANDERSON:**  Your Honor, Jennie Anderson, of Andrus

4   Anderson.  I'm appearing on behalf of my partner, Lori Andrus,

5   as mentioned.

6       I would just -- I agree with everything that Mr. Burton

7   said.  Additionally, some other tasks that I have performed

8   when I have been liaison counsel are continued coordination

9   with the various other plaintiffs' counsel.

10      So the people in this courtroom are the people who want to

11  take the lead on the common benefit litigation.  We expect

12  thousands of cases to be filed in both federal and state court

13  here with many attorneys who are focusing just on their

14  individual cases and need to stay apprized of what's going on

15  in the common benefit work.  Liaison counsel provides that --

16  that flow of information with other counsel as well as with the

17  Court.

18      Some of my other tasks have been to provide information to

19  the Court with respect to the status of common benefit work to

20  help liaison -- or to help lead counsel with assignments and

21  follow up with other attorneys who want to participate more

22  actively in common benefit work.

23      So once you have thousands of cases on file -- right now

24  we know there are just approximately 36 in the federal system,

25  more than a hundred in the state court system.  But as you

heard, just the attorneys in this room have under investigation many thousands of cases that they anticipate to get on file in the short-term.  So those are some of the tasks.

Sometimes liaison counsel is appointed and they work with co-lead to develop the specifics of the administrative and coordination efforts as needed in the case.

Other times the Court may include specific tasks, specific roles and duties of liaison counsel, which Your Honor has the power to do either now or in the future.

But there is quite a bit of coordination and MDLs is unique in -- excuse me, a mass tort MDL is unique in that unlike a class case, there are all these individual cases that are still going to remain individual cases.  And so, therefore, counsel needs the information in order to ensure that their clients are being properly represented.

**THE COURT:**  And so the idea is that -- your idea is that there's three lead counsel.  There are three additional counsel that form -- that join with lead counsel to form the executive committee.

And the two of you, or your partner and you, would be -- as members of the executive committee, would be liaison counsel, or that one of you would be chosen?

**MR. BURTON:**  That would be up to them.  But typically we would be outside the -- we wouldn't necessarily be within the executive committee.

1          **THE COURT:**  Okay.  All right.

2          **MS. ANDERSON:**  And just to add to that, Mark and I, we

3    co-counsel on cases all the time.  We both have small firms,

4    and we work together on many, many matters.  So our --

5          **THE COURT:**  You are local?

6          **MS. ANDERSON:**  We are both in San Francisco.  And our

7    offices work very well together.  And our staff and the

8    attorneys in our offices are very familiar with one another.

9       So we think it would be a good partnership to assist lead

10   counsel on the ground here in San Francisco.

11         **THE COURT:**  Any idea -- you would kind of do all the

12   filings or all the -- deal with the Court on all the scheduling

13   matters, things like that?

14         **MR. BURTON:**  Or assist lead counsel in making those

15   arrangements for Your Honor.

16      You have to remember on the plaintiffs' side, typically

17   these are -- we are all small groups of very small law firms in

18   comparison to defense firms typically.  That's why we need

19   these sort of resources.

20      When you -- if you try to appoint one -- I wouldn't ever

21   want to have to be a lead counsel on my own in an MDL, that's

22   for sure, even though we've served in co-lead roles.

23      But I can tell you, you know, the MDLs basically, we hope

24   anyway, to impose a structure or have a structure that cannot

25   only formally but informally helps coordinate the entire

1   litigation around the country.

2       And if we start compartmentalizing the MDL as far as how

3   the claim structure is concerned, I think it could be a burden

4   on this Court and other Courts and the litigants down the road,

5   because of that important role it serves.  Not just in the MDL

6   cases, but you have to take into consideration -- and I know

7   you might not have dealt with this in the past, that there are

8   many different judges from many different states handling the

9   exact same type of cases.

10      And Mr. Miller might be brought in on a case where a judge

11  says, Well, I don't care what the MDL is doing, we're -- we're

12  setting trial for November 2017.  It's going to be a full-on

13  trial and go.  Or -- and documents have to be produced.  They

14  have to come into the MDL process because we're all

15  coordinating that, trying to share the cost with one ESI

16  protocol, one document repository.

17      I know the Court has this idea of how we can, kind of.

18  Orderly proceed, but you just have to take into consideration

19  that this is a little more dynamic than that, especially from

20  the MDL perspective, because we're really trying to set a

21  structure here that we can use to control the flow of

22  documents, discovery, trials, not just here but across the

23  country.

24          THE COURT:  Again, I think there's -- you know, a lot

25  of your comments seem to assume that the structure couldn't

1    change after the first phase of litigation.

2             **MR. BURTON:**  It absolutely can.

3        (Unreportable simultaneous colloquy.)

4             **MR. BURTON:**  Sure.  But remember, just as Ms. Wagstaff

5    was addressing and some of the other counsel, these are a lot

6    of very small firms.

7        In other words, in the middle of the litigation is a bad

8    time to get -- to change people's roles and try to get them

9    involved or not involved in litigation, in other words.

10       You want to get commitments from firms that they're in

11   now, not they're in as soon as the second phase happens, or

12   that in your coordination with the state courts that they're in

13   on coordinating their actions with the MDL right now, not nine

14   months from now, 12 months from now, 18 months from now.

15       To do it in the middle -- I'm not saying it can't be done.

16   We do make small changes in structures in MDLs all the time in

17   MDLs mid litigation.  But it makes it more difficult.

18       The attorneys that are working on this MDL, remember, also

19   have partners that have to be convinced to commit resources, as

20   well, to the litigation.  Not just in the MDL but in state

21   courts.  And so it becomes important for us right from the

22   beginning to set some sort of robust structure.

23       And I would just like to say, as far as MDLs are

24   concerned, this is probably the smallest overall structure from

25   a PSC/PEC point of view that I've seen in any recent pharma or

 1    other type of MDL like that.

 2         **THE COURT:**   Okay.   Does anybody from the plaintiffs'

 3    side -- you seem you might want to say something.

 4        And, Ms. Wagstaff, you're free to stay up there.

 5         **MS. WAGSTAFF:**   Thank you.

 6         **THE COURT:**   Do whatever you want.

 7         **MR. LUNDY:**   Hunter Lundy, Your Honor.

 8        I just want to answer your question about why this is not

 9    bloating and why these six firms are needed.   And it's from

10    experience.

11        We tried a five-week *Frye* hearing two years ago, in *Murray*

12    *vs. Motorola*, where the Court was handling in a manner similar

13    to where Your Honor wants to handle this case.   And it took

14    five weeks and it took every bit of six law firms.   And we

15    tendered -- we started with nine experts.   We tendered eight

16    witnesses and the defendants had that many or much more.   And

17    it took every bit of all of the resources.

18        And, I mean, I'm not going to volunteer the numbers that

19    it cost.   If the Court asks me, I would tell you how much it

20    cost just to make it through a *Frye* hearing.

21         **THE COURT:**   How much did it cost, Mr. Lundy?

22         **MR. LUNDY:**   It cost two-and-a-half-million dollars.

23    So each -- and that was for hard costs.   So that meant each of

24    the six firms were putting up one sixth of that --

25         **THE COURT:**   I wonder how much it would have cost if

1   you only had two firms as lead counsel, one firm or whatever.

2   That's the issue that I'm --

3          **MR. LUNDY:**  Your Honor, in response to that -- again,

4   this is why I'm talking about hard costs.  Because we were

5   paying the experts.

6       In this case -- this case is going to involve

7   epidemiologists, biostatisticians, toxicologists, cell

8   biologists.  It's going to involve some regulatory people.

9       In that case, Your Honor, they called the former chair of

10  the CDC who charged $16,000 a day to give testimony, at $2,000

11  an hour.  I'm just giving you that as an example how much these

12  experts -- and I'm just talking from years of experience.

13      So a six-firm executive committee -- and we're all in

14  agreement in the leadership -- is not unreasonable even in this

15  case.

16      And *Daubert's* a little more complicated than *Frye*.  You

17  know, *Frye* is just -- you know, the *Dyass/Frye* standard is the

18  general acceptance rule of a methodology employed by an expert

19  in determining whether or not their opinions are good.

20      And you only throw out opinions if they're outliers.

21  Here, they actually get to challenge the opinions.  And I don't

22  need to tell Your Honor what the *Daubert* standard is, but...

23      So that was five weeks with Judge Weisberg of Superior

24  District Court.  And what he had done, he had consolidated a

25  large number of filings that were in the D.C. Superior Court,

1  and everybody agreed to bind them to his ruling in that case.

2      So that's just an experience of an example of how much it

3  cost and what it took.  And we utilized every bit of those six

4  firms and their resources in doing it.

5          **THE COURT:**  Okay.  So the proposed structure here is

6  Wagstaff, Greenwald, Miller are lead counsel.  And then who

7  is -- who is -- who would be the three who come in and join the

8  executive committee?

9          **MR. LUNDY:**  On the executive committee, Your Honor, it

10  would be Michael Baum, it would be Yvonne Flaherty and myself

11  would be the three members of the executive committee.  Which

12  we're all putting our firms and our resources in to work with

13  this team of six law firms.

14          **THE COURT:**  Okay.  Ms. Wagstaff, did you want to say

15  something else?

16          **MS. WAGSTAFF:**  I just wanted to make sure that I

17  follow up on a comment that you just made about how much would

18  it cost if there wasn't six plaintiffs law firms.

19      I just wanted to make sure you understand what we're

20  talking about here, is that the expenses that we pool the money

21  for are not our plane tickets, hotel rooms, that sorts of

22  things.  We all will pay those on our own.

23      So what we're talking about is expert costs.  So the costs

24  will remain the same whether we have 20 firms or two firms.

25  It's just how many firms will pay for it.

```
 1        Does that make sense?
 2            THE COURT:  It does make since what you're saying, but
 3   it doesn't, I think, fully answer the question about
 4   efficiency.
 5        I worked on cases where, you know, as a lawyer there were
 6   ten members of the team putting together a brief.  And I've
 7   worked on cases where there was one member of the team putting
 8   together a brief, maybe somebody reviewing the brief and
 9   providing comments.  And I can assure you that in the later
10   situation, it is done a lot more efficiently, and a lot less
11   time is billed.
12            MS. WAGSTAFF:  Right.
13            THE COURT:  Right?  And so that's the concept that I'm
14   struggling with.
15        When we have a relatively -- I don't want to diminish the,
16   you know, significance of the first phase of the litigation.
17   And I don't want to diminish how difficult a job it's going to
18   be for everybody.
19        But, you know, it does -- logic says that, you know, the
20   fewer lawyers you have as lead on -- in that first phase,
21   the -- they might have to work harder than they would
22   otherwise, but the overall efficiency is going to be greater.
23   I mean, I think that logic tells you that.  That's the --
24   that's the hangup.
25        Do the folks from Monsanto want to say anything else on
```

1    this issue?

2            **MR. HOLLINGSWORTH:**  May it please Your Honor, just a

3    few things.

4        We agree with Your Honor that the procedure that they

5    proposed and this construct that they put together is

6    ridiculously bloated.

7        We agree with Your Honor that it's about money.  And we

8    think we do have a dog in this hunt, because we agree with Your

9    Honor that what they're doing is going to run up settlement

10   value.  And I think it's in our interest to keep that in check.

11       We also agree with Your Honor that the order that Your

12   Honor entered on Monday, which affirmed Your Honor's earlier

13   order that general causation should be the first step in this

14   case, is exactly the right way to go.

15       We think that Your Honor's discretion in every one of

16   these issues that I just mentioned are virtually bulletproof.

17   So it's in Your Honor's hands.  Your Honor gets to make the

18   decision here.  And I think the decision is something that will

19   be lasting.  And I don't think that it's vulnerable.

20       So --

21           **THE COURT:**  I don't care whether it's vulnerable.

22           **MR. HOLLINGSWORTH:**  So we're arguing that Your Honor

23   do the right thing.

24       I wrote down a couple of things before I came up here.

25   One is that the first phase of general causation would last for

1    a few more months.  We'll talk about schedule later, so I won't

2    presage that, but it's going to be months or maybe up to a

3    year.  So that's not a long time.

4        And then I also wrote down, but Your Honor has already

5    mentioned it, that Your Honor can revisit this at some point

6    after the general causation phase is completed.

7        If there's a reason, a sound reason to revisit on the

8    case, then if there's anything left of the case at that point,

9    of course, Your Honor can revisit the Court's decision and

10   change the Court's decision about what kind of construct should

11   be in place here.

12           **THE COURT:**  Okay.

13           **MR. HOLLINGSWORTH:**  Thank you.

14           **THE COURT:**  Does anybody from the plaintiffs' side

15   want to say anything else?  I want to take a 10-minute break.

16           **MR. WISNER:**  Your Honor, Frank Wisner.  I work with

17   the Baum Hedlund firm.

18       I just wanted to address the specific issue of, there's a

19   difference between hard costs in a case and attorneys' fees.

20   And as plaintiffs lawyers, we don't really bill hours.  We get

21   a contingency, typically, in our cases.  And why that's so

22   important is, whether or not ten people are looking at a

23   brief --

24           **THE COURT:**  The lodestar is going to be higher if

25   there are ten firms than if there are two firms.

1          **MR. WISNER:**  That is correct.  However, you have to

2    balance that against the simple fact is, if a firm is putting

3    up a substantial amount of money to finance these experts,

4    which is a significant expense, they need to have a say.

5          And that's why the structure is so important.  If they do

6    not have a say, there's an incentive to say, well, then fine,

7    I'm not getting involved.  I'll just ride your coattails.

8          And that's why MDLs typically have larger PSCs and why

9    there are so many voices.  That's why the structure that we

10   proposed, I think, really makes so much sense, because so far

11   we've actually been able to do a lot of these briefs, the joint

12   statement, for example.  It did go through some drafts, but it

13   actually went pretty quickly and pretty smoothly with the

14   structure.

15         So while I do appreciate that, I think we can say

16   sincerely that we all are very busy.  We're not using this to

17   bilk hours.  This is -- this is us trying to get to the core of

18   it.

19         **THE COURT:**  Yeah.  And it's not a question of bilking

20   hours.  It's a question of, like I said, in my cases I've

21   worked on as a lawyer, it's much -- the more lawyers there are

22   who are decision-makers, who have a seat at the table, the

23   higher the fees will be in reality.

24         **MR. WISNER:**  I think there's some truth to that.  I

25   think it would be disingenuous for me to say that's not the

1    case.  However, the more seats there are at the table, the more

2    resources you have to prosecute the case.  So there's that

3    balance.

4         And I think that what we've proposed, this three-leader

5    with the -- with the three additional members of an executive

6    committee, really strikes that balance quite well.

7         And just so you know, internally -- and I don't want to

8    get into specifics, but we have pretty much started

9    streamlining the process.  You're working on this; you're

10   working on this.

11        When we put together a brief, there's only three or four

12   people who are actually putting their hands on it and making

13   any substantive changes and comments.  We have it streamlined

14   already pretty well.

15        If you were to strike -- basically throw a wrench into

16   that, I think it actually would create more dissension.  It

17   would create more concern.

18        I mean, I hate to say -- that's, you know, spelling doom

19   obviously.  But I think that it's a real -- we've come to you

20   in good faith with this proposal, is all I'm saying.

21            **THE COURT:**  What -- what would be wrong with -- and

22   this is a question for you or whoever wants to answer it.

23        I mean, I guess I don't -- I'm not sure I understand

24   why -- okay.  Let's say I, sort of, back off with my insistence

25   that there be one lead counsel.  Let's say we say that, okay,

1    there can be three lead counsel.

2         Why isn't that enough?  I mean, why does there have to be

3    three more lawyers who are part of this executive committee?

4    Because then we've got three lawyers who are lead counsel,

5    three lawyers who are part of this executive committee, and two

6    more lawyers who are liaison counsel apparently.

7         I don't -- other than maybe the three lawyers from the

8    executive committee are putting money in, I don't see what -- I

9    don't see why three additional lawyers to form an executive

10   committee adds any value.

11        **MR. WISNER:**  I don't think it makes a difference one

12   way or the other on the costs or expenses.  Those three lawyers

13   on the executive committee are going to be involved whether or

14   not they're on the executive committee or not.

15        What allowing them to be on the executive committee does

16   is it creates an established Court-ordained structure that

17   guarantees a seat at the table.  That's it.

18        I mean, there's no way, even if you appointed one lead

19   counsel, that suddenly there wouldn't be coordination.  I mean,

20   it would just be unfair, and people would just start filing

21   their cases elsewhere.

22        So, you know, there has to be a consensus-building

23   process.  Whether or not you have that structure formally

24   placed or not, I don't think it's going to make a difference,

25   except that it could sow the seeds of dissension, which don't

1   currently exist.

2       And we've talked about how this is only a preliminary

3   ruling.  You know, Monsanto has said how you can always change

4   it later on, after the first phase.  If you think this isn't

5   working, change it.

6       But right now we've come to you in what is a truly amazing

7   group of -- a lot of lawyers got together and came up with this

8   plan, which is shockingly cohesive.

9       And it seems bizarre to sort of just say, okay, we're not

10  going to do that because I'm worried it's going to inflate

11  costs, because I don't think it will make a difference because

12  these people are still going to be involved one way or the

13  other.

14          **THE COURT:**  Does anybody else want to say anything

15  about why you need three -- other than they are putting money

16  in, why we need three additional people to form the executive

17  committee as opposed to just having three lead counsel and two

18  liaison counsel?

19          **MR. LUNDY:**  Your Honor, this is a unique case inasmuch

20  as that you've got the International Association of Research on

21  Cancer last year who came out with an assessment saying that

22  Roundup was a probable carcinogen and that many of the -- and

23  Monsanto is now attacking IARC.

24      And so there's witnesses all over the world that could be

25  impacted right here in this general causation hearing.  And so

1   there's witnesses that are strong.  So we've already formed a

2   scientific team of evaluation of experts and getting reports

3   ready, Your Honor.

4        We didn't know what you would do after this hearing as far

5   as scheduling dates and so forth.  So these six firms are

6   involved.

7        But Mr. Wisner is correct.  I mean, these six firms all

8   are invested.  And it takes every bit of these six firms'

9   effort to get this case presented to Your Honor because of

10  where all the experts are located and who they are and what

11  they are and the issues involved in this case.

12       And there's going to be a lot of discovery with Monsanto,

13  fact discovery, that goes to the heart of the expert opinions.

14  And the reason why is, they've addressed the EPA versus the

15  IARC, and we believe that there's a been a lots of ghostwriting

16  of work done by Monsanto on behalf of many regulatory bodies

17  and peer-reviewed studies, which goes to the heart of the

18  general causation issue.

19       So, Judge, there's a lot of work that has to be done.

20           **THE COURT:**  That's an issue that I've been, kind of,

21  pondering in my head:  Does that go to the heart of the general

22  causation issue?

23       I mean, whether, you know -- whether IARC's process is

24  flawed and whether, you know, EPA has been unduly influenced by

25  Monsanto, those are interesting questions.

1     But at the end of the day -- you describe those issues as

2 central to the general causation issue.  At the end of the day,

3 as I understand, my role in the first phase of the litigation

4 is to decide whether the expert testimony from the plaintiffs

5 satisfies a certain threshold such that it can go to a jury.

6     And how relevant is the -- we're not looking at the IARC's

7 conclusion that it's a probable carcinogen.  We're not looking

8 at the EPA's conclusion about glyphosate.  We're looking at the

9 experts' opinion to see whether it can clear the hurdle it

10 needs to clear to get to the jury.

11     How central is IARC's process by which it reached its

12 conclusion and EPA's process by which it reached its conclusion

13 to that question?

14     **MR. LUNDY:**  Your Honor, this is how it's central:  If

15 you just allow the plaintiffs to tender their experts, and

16 they're not allowed to call any witnesses, if they're only

17 allowed to cross-examine our experts based upon the data and

18 the science and the facts they relied upon, that's fine.

19     But if they're going to call witnesses, and we know that

20 their witnesses are giving opinions that are counter to the

21 opinions of our experts to challenge them under *Daubert*, and we

22 know that those opinions have been based upon academic fraud or

23 based upon ghostwritten studies, they have been based upon

24 internal data of Monsanto's that we know exists, then it is

25 extremely relevant, Your Honor.

1          **THE COURT:**  I didn't understand that answer.

2      My question was -- my question was:  The IARC process and

3  the EPA process --

4          **MR. LUNDY:**  Right.

5          **THE COURT:**  -- just to use the example of the two most

6  prominent agencies in this case, or organizations, entities,

7  whatever you want to call them, how central is their

8  decision -- decision-making process to the question that

9  ultimately needs to be decided here in the first phase of this

10  litigation?

11          **MR. LUNDY:**  Well, I think it's -- any epidemiologist

12  that's called to the stand to give an opinion that Roundup

13  causes non-Hodgkin lymphoma is going to have to state based on

14  what scientific evidence is he or she relying on in giving that

15  opinion.

16      And so they're going to say they're relying on IARC,

17  they're relying on three or four major epidemiological studies,

18  they're relying on a series of animal studies and so forth.

19  And --

20          **THE COURT:**  So we'll be litigating whether it's

21  reasonable for an expert to be relying on the IARC's

22  conclusions?

23          **MR. LUNDY:**  That's correct, Your Honor.

24          **THE COURT:**  Whether it's reasonable for their expert

25  to be relying in part on the EPA's conclusions?

1          **MR. LUNDY:**  That's correct.

2          **THE COURT:**  Okay.

3          **MR. LUNDY:**  I'm just emphasizing the manpower

4    required, Your Honor, based upon the structure.

5          **THE COURT:**  Okay.  Why don't we take, like, a

6    10-minute break.  Come back at 10 minutes to 11:00.

7          And in that time I'll make sure to read the letters that

8    were recently filed.  And we can maybe start talking about

9    discovery disputes and scheduling and whatnot.  Thanks.

10          **MR. HOLLINGSWORTH:**  Your Honor --

11          **THE COURT:**  Oh, yeah.

12          **MR. HOLLINGSWORTH:**  Excuse me.  I was hoping to ask

13    for a chance to reply to the comments about *Daubert* and what

14    the right inquiry is here.

15          **THE COURT:**  You'll have a chance.

16          **MR. HOLLINGSWORTH:**  Okay.

17          **THE COURT:**  I mean, that's not particularly relevant

18    to the question of who should be lead counsel and what the

19    structure should be.  So you'll have a chance.

20          I'm sure we'll talk about that a lot in the coming months

21    actually.

22          (Laughter)

23          (Recess taken from 10:37 to 10:53 a.m.)

24          **THE COURT:**  Okay.  Obviously, I'm operating with, you

25    know, less than full information here in making this decision.

1    I think that the fact that I'm operating with less than

2    full information probably argues in favor of my deferring to

3    plaintiffs on the structure that they're proposing.

4    So we'll go ahead and go with that.  So I'll ask you to

5    prepare a proposed order which identifies the -- you three as

6    lead counsel, the three as members of the executive committee,

7    or plaintiffs' steering committee or whatever it should be

8    called, and then I guess identifying those two folks as liaison

9    counsel as well.

10    **MS. GREENWALD:**  Thank you, Your Honor.

11    **MR. MILLER:**  Thank you, Your Honor.

12    **MS. GREENWALD:**  Thank you.

13    **MS. WAGSTAFF:**  Thank you, Your Honor.

14    **THE COURT:**  So maybe the next thing to do would be to

15    turn to the discovery issues that we have.

16    And I think we have -- so whoever plans to address those

17    can feel free to come up.

18    There are a couple of issues that I would describe as

19    maybe somewhat smaller, which is, there is an issue about

20    search terms and an issue about third-tier review that

21    plaintiffs expressed concern about.

22    And then there's just the issue of how many document

23    custodians.  Maybe we should deal with that large issue first,

24    the issue of document custodians.  And I wonder if maybe it

25    would be good to divide them into foreign and domestic.

1    Let me tell you what I have, the understanding in my mind

2  that I have of where we are at right now.  You can correct me

3  if I'm wrong.

4    So it started off with Monsanto identifying five people it

5  believed were the people who should be the -- the document

6  custodians from whom the documents should be gathered and

7  discovery should be provided.  And those people should be

8  deposed.

9    Then at some point seven other people were identified.

10 And I don't remember exactly how that happened.  But seven

11 other people were identified that I believe Monsanto eventually

12 agreed to produce their documents and to potentially put them

13 up for a deposition.

14    Is that right so far?

15         **MS. GREENWALD:**  Yes, Your Honor.

16         **THE COURT:**  Okay.  And then -- now we have a fight

17 about, is it maybe 11 more people?  Is that right?

18         **MR. LASKER:**  Your Honor, if I may, for Monsanto, Eric

19 Lasker.

20         **THE COURT:**  Why don't you come up.  If we're going to

21 be arguing about this, why don't you come up to the podium so

22 that the court reporter can hear you better.

23         **MR. LASKER:**  Yes, Your Honor.

24    To go through the history again, Monsanto identified five

25 individuals who had central knowledge about the toxicology,

1    human health effects of glyphosate.

2          THE COURT:  And it might be helpful for me if you

3    could remind me who those five people were and, sort of, what

4    their roles were in the company.

5          MR. LASKER:  Yes, Your Honor.

6          THE COURT:  Just briefly.

7          MR. LASKER:  The five are Donna Farmer.  She is a

8    senior toxicologist with Monsanto.  She has been with Monsanto

9    for about 25 years.  Much of her work has involved glyphosate,

10   including scientific research and scientific studies that she

11   has been involved in.

12       Daniel Goldstein is the lead for medical science at

13   Monsanto.

14         THE COURT:  I'm sorry, what was his title again?

15         MR. LASKER:  Lead for medical science.

16         THE COURT:  What for --

17         MR. LASKER:  Lead, l-e-a-d.  Sorry, Your Honor.

18       He is responsible for human health issues with respect to

19   a wide variety of products for Monsanto, including glyphosate.

20   He had been with the company for 16 years.

21       William, Bill Heydens is the product toxicologist.  And he

22   at one point --

23         THE COURT:  He is what?  Sorry.

24         MR. LASKER:  Product toxicologist for glyphosate.

25         THE COURT:  Okay.

1    **MR. LASKER:**  At one point he also ran Monsanto's

2 toxicology lab, animal studies lab.  And he conducted one of

3 the studies -- one of the animal toxinogenicity studies that

4 are at issue in the case.

5   David Saltmiras is --

6    **THE COURT:**  I'm sorry, what was his last name?

7    **MR. LASKER:**  Saltmiras, S-a-l-t-m-i-r-a-s.

8    **THE COURT:**  Okay.

9    **MR. LASKER:**  And he is the current toxicology manager

10 at Monsanto.  He was involved in one of the publications

11 whereby Monsanto was able to release data on a large number of

12 animal toxicology studies that previously had been submitted by

13 other registrants to regulatory agencies.  And he was involved

14 in getting that data out into the public sphere.

15   The fifth person we identified was Steve Adams.  And he

16 handles registration for glyphosate in the United States.  He's

17 been with the company for 36 years.

18    **THE COURT:**  Okay.  And then the -- and then the seven

19 additional people, you are, I assume, going to turn to those

20 people?

21    **MR. LASKER:**  Yes.

22    **THE COURT:**  Okay.  Go ahead.

23    **MR. LASKER:**  Those were seven individuals that were

24 identified by the Miller firm, I believe, initially.  And we

25 agreed to produce documents for them.

1     We don't believe that they are actually central to the

2 causation issue.  I can explain who they are.

3          **THE COURT:**  Please.

4          **MR. LASKER:**  The first is David Heering.  He is the --

5          **THE COURT:**  Sorry, what was the last name?

6          **MR. LASKER:**  Heering, H-e-e-r-i-n-g.

7          **THE COURT:**  Okay.

8          **MR. LASKER:**  And he is a scientist.  He's a Ph.D. as

9 well.  And he is the director of global glyphosate

10 stainability.

11     Most of his scientific work has been involved in biotech

12 products rather than glyphosate.  But he is in a current

13 position dealing with discussions about glyphosate safety at

14 least.

15     Dan Jenkins is U.S. agency regulatory affairs.  He's a

16 regulatory person.  He's not a scientist.  He is the point

17 person for communications with the EPA.  He would not have and

18 does not have scientific knowledge himself.

19     To the extent he's communicating scientific information to

20 the company -- to the EPA, it's based upon what the first four

21 scientists in our initial group of five have presented and

22 explained to him.

23     The next person --

24          **THE COURT:**  When you say "he doesn't have scientific

25 knowledge himself," he does have scientific knowledge himself.

He just maybe didn't -- he got it from other people.

He didn't do the studies himself?  Is that what you mean to say by that?  Of course, he has scientific knowledge.

**MR. LASKER:**  He has -- he has information that is provided to him.  But he is a regulatory affairs person.  He is not a scientist himself.  He doesn't have scientific training.

**THE COURT:**  Okay.

**MR. LASKER:**  So he communicates with the regulators, and he is involved and has expertise in dealing with the regulators.  But he does not have scientific information himself.

He would not be able to answer a question about how an animal study is conducted or -- other than referring to the experts at Monsanto, which is his -- his job.

**THE COURT:**  Okay.

**MR. LASKER:**  Susan Martino-Catt also --

**THE COURT:**  Martino what?

**MR. LASKER:**  Catt.  I've got to slow down on the names.  I'm sorry, your Honor.

Martino, M-a-r-t-i-n-o, hyphen Catt, C-a-t-t.

**THE COURT:**  Uh-huh.

**MR. LASKER:**  And she is currently involved with global supply and change strategy, which is not related to glyphosate in any way.

I believe she was identified, but perhaps Mr. Miller can

clarify, because at one point she was the director of global regulatory sciences.  And so, again, she was dealing with regulatory matters.

She does have a scientific degree, but she had not done any research with respect to glyphosate or toxicology.  Her scientific work, which is some years back now, was more with biotech products.

Maggie Morris is the director of global stewardship.  And so she deals with quality assurance reviews for laboratories. She has not conducted any scientific studies with respect to toxicology of glyphosate or with respect to glyphosate in general.  And that's M-o-r-r-i-s, Maggie Morris.

Bob McCarroll, M-c-C-a-r-r-o-l-l is the leader of global chemistry technology.  And he is involved with some of the research on the chemical formulation of certain surfactants and how the surfactants can be designed to be effective.

And surfactants, Your Honor, are additives that allow the glyphosate to hold on to the plant surface and penetrate the waxy surface of the plant.

He is not involved and has not done any research on any toxicology or any human health testing of any kind.  That's not also in his area.

Bob Fraley is an executive vice president --

**THE COURT:**  Bob what?

**MR. LASKER:**  Bob Fraley, F-r-a-l-e-y.

1    He is executive vice president and chief technology

2   officer of Monsanto.  He is part of Monsanto's leadership team.

3    I'm not sure why he was identified.  He has -- he's gone

4   up leadership of Monsanto, has had roles at very high up

5   reporting to people who are reporting to people that may have

6   been within his -- well down on a chain with him.  But, again,

7   maybe Mr. Miller can explain his -- Bob Fraley's relevance.

8    Kerry Preete, P-r-e-e-t-e, is executive vice president for

9   global strategy, also a member of the Monsanto executive

10  leadership team.

11   And, again, he has -- doesn't have any responsibility or

12  involvement in scientific research or studies with respect to

13  glyphosate.  He was at one point leader over the congressional

14  group for Roundup and now the sales and marketing.

15   But, again, he's not a scientist; would not have any

16  information with respect to the science of glyphosate or its

17  safety.  So those --

18       **THE COURT:**  I know I'm kind of being nitpicky here,

19  but the fact somebody is not a scientist doesn't mean they

20  don't have any information relating to the effects of

21  glyphosate.

22       **MR. LASKER:**  Well, Your Honor --

23       **THE COURT:**  You keep saying he doesn't have any

24  information relating to because he's not blank.

25       **MR. LASKER:**  Right.

1          **THE COURT:**  And that's kind of non sequitur, isn't it?

2          **MR. LASKER:**  Well, Your Honor, I think it goes to the

3     issue that is before the Court at this stage of the litigation,

4     which is the general causation *Daubert* issue.

5          To the extent that some of these individuals were provided

6     information from scientists that they know second- or

7     thirdhand, and that they have some understanding of for

8     purposes of their job, that does not go to the question of

9     whether that's -- what that -- the quality of that science, the

10    interpretation of that science.

11         They cannot provide any information at all about that.

12    What they can say is, I understand the scientists at the

13    company have looked at this issue.  They report to me.  We hire

14    good people.  I rely upon them for their expertise and

15    experience.

16         But beyond that, they're not going to be able to say

17    anything further on the issue.

18         And those sort of -- that sort of knowledge has no bearing

19    on the scientific issue of whether or not the actual nature of

20    the science is sufficient for plaintiffs' expert to be able to

21    meet their burden.

22         **THE COURT:**  Well, I mean, I assume what they would say

23    in response to that is there could be a regulatory person who

24    is not a Ph.D., but who's responsible for interfacing with the

25    EPA or with government agencies, who might be aware of -- and

1    I'm not saying that this happened; I'm just saying this is what

2    they might say -- who might be aware of flaws in the science

3    that they -- that Monsanto hasn't communicated to the EPA.

4        And so, I mean, at this point I was sort of nitpicking

5    with the way you were characterizing it.  And we can get into a

6    larger discussion of it after we sort of go through who these

7    various witnesses are.  But to say they are not a Ph.D. is not

8    to say they don't possess information that could be relevant to

9    the question of general causation, because they could be aware

10   of flaws in various studies, problems in various studies,

11   problems, you know -- putting -- they might say that, you know,

12   that the regulatory person was able to, sort of, sweep a

13   problem under the rug and convince an agency to do something,

14   despite having swept that problem under the rug.

15       All that would be relevant, wouldn't it, to the issue of

16   general causation and to the reliability of the EPA's

17   conclusion or somebody else's conclusion that glyphosate does

18   or does not cause cancer?

19           **MR. LASKER:**  Well, Your Honor, two things I'd like to

20   say in response.

21       First, we have -- we're not going just by their job

22   titles.  We've interviewed each of these individuals, including

23   the next 11, to try to probe whether they have any scientific

24   information and whether they actually have understanding of

25   science.

1        Dan Jenkins, who will be the person who works with EPA,

2   the one person who would fit into that role that you mentioned,

3   does not.

4        But, secondly, Your Honor, I think your point previously

5   was a correct point, which is that the science is a determining

6   factor here.   It's not what the regulators say the science is.

7   It's not what IARC says the science is.

8        An expert scientist under *Daubert* does not rely on what

9   somebody else says as the basis for an opinion.   They rely upon

10  the science.   And the issue in proceeding will be, does that

11  science support the opinion that they're reaching?

12       An expert who came in and said, I am a scientist and I

13  have looked at IARC and they say it's a carcinogen, therefore,

14  we're done, clearly would not get past the *Daubert* standard.

15       **THE COURT:**   No, but I assume you're going to have an

16  expert come in and say, I'm a scientist, and I've looked at the

17  studies.   I've looked at the same studies that the IARC looked

18  at.

19       Basically, as I understand what IARC does -- and you can

20  correct me if I'm wrong -- but my understanding is that they

21  effectively do, sort of, a meta study or they look at all the

22  studies that have been done, and assess the quality of those

23  studies, and make their own determination about it based on the

24  review of those studies.

25       The IARC isn't doing its own scientific study; correct?   I

1   mean, it's not doing its own epidemiological study; right?

2        **MR. LASKER:**  You are correct.  They are not doing

3   their own studies.

4        **THE COURT:**  So I assume you are going to have -- sorry

5   to under interrupt, but I just want to make sure I don't lose

6   my train of thought.

7        I assume you're going to have some expert come in and say,

8   yeah, the IARC has concluded that glyphosate is a probable

9   carcinogen but, you know, the method by which they reached that

10  conclusion -- I mean, you might also say -- I assume you're

11  also planning to say that, you know, that conclusion doesn't

12  have anything -- it doesn't have any bearing in relationship to

13  real-world use or real-world exposure of Roundup.

14       But I assume you're also -- an expert will also say, you

15  know, the methodology, the method by which they reached the

16  conclusion that glyphosate is a probable carcinogen was flawed.

17  Aren't you?

18       **MR. LASKER:**  Well, we will be saying that in this

19  instance.  I do think it's important to understand, though --

20       **THE COURT:**  You said you will be saying?

21       **MR. LASKER:**  In this circumstance --

22       **THE COURT:**  Yeah.

23       **MR. LASKER:**  -- and just for clarification, IARC does

24  not look at all the studies.  They're very clear about which

25  studies they look at and which ones they don't.  And that is

1    one of the issues.

2          **THE COURT:**  Right.  But that is something that the

3    expert is going to point out -- your expert, I assume, will

4    point out.

5        Your expert will get up here and say, look, IARC only

6    looked at this universe of studies.  It didn't look at that

7    universe of studies.

8        And for purposes of deciding the issue of general

9    causation, that's quite problematic because of, da-dat da-dat

10   da-da, and, therefore, the fact that the IARC did not -- the

11   fact that the IARC classified glyphosate as a probable

12   carcinogen is not helpful to the plaintiffs.

13       There's going to be something along those lines; right?

14         **MR. LASKER:**  I think there very well may, Your Honor.

15       But, again, the other point that's important to understand

16   here is that even putting aside the particulars of this review

17   by IARC of glyphosate, the -- there are significant legal

18   authorities -- and plaintiffs are aware of this as well.  Our

19   firm has tried many of these cases.  And we've cited some in

20   our papers; the Ryder case, the Glassbetter case -- that make

21   clear that what regulatory agencies do and the standards that

22   they hold the science to are much different than the issue

23   before this Court.

24       The issue before this Court under *Daubert* is a much more

25   stringent review.  And the fact is there are numerous cases,

including the Ryder and Glassbetter case, and many others we could cite, where regulators have reached a conclusion for precautionary purposes that there's a risk, and that's non-sufficient under *Daubert*.

I think the fact here that we have all the regulators saying there is no risk, there's a huge -- it's a huge gulf between what the plaintiffs' expert needs to do with the science and what others have found.

**THE COURT:** Okay.  And I get that.

**MR. LASKER:** Yeah.

**THE COURT:** But I assume just like you are going to have experts who, kind of, explain why the IARC's conclusions are not helpful and that the method by which they reach their conclusion is not useful in this context, they're going to have experts who try to explain why the EPA's conclusions are not reliable or not helpful in this context.

And the EPA, no doubt, reached its conclusions, whatever -- I don't remember exactly what conclusions the EPA reached, but no doubt the EPA reached its conclusions after receiving input from any number of sources, including Monsanto.

And so the -- you know, the -- to the extent that we all agree that it's fair game to discuss the value of the IARC's conclusions and the EPA's conclusions, then I'm having a hard time seeing why there would not be relevance to the communications between a Monsanto regulatory person and the

1   EPA, and what that, you know, sort of -- you know, what that

2   Monsanto regulatory person knew about the science when he was

3   communicating with the EPA and what he did and did not

4   communicate to the EPA.

5           **MR. LASKER:**  Well, two points again, Your Honor.

6       First, to be clear, our experts only will be addressing

7   IARC in response to plaintiffs' experts trying to use that as a

8   basis for a causation opinion.  The causation opinion turns

9   upon the scientific studies.

10      There is -- what EPA based its decision on, what the

11  regulators based their decision on, and if you read through

12  their analyses, it's based upon those studies and the science

13  of those studies.  It's not based upon what somebody tells them

14  what the studies say.  They get to say themselves.

15      In fact, EPA has more scientific information regarding

16  glyphosate than Monsanto does because the regulatory structure

17  and -- let me just step back here because this is an important

18  point to understand.

19      Monsanto is only one of a number, over 20 companies now

20  that actually market glyphosate-based herbicides.

21      And because of the way that EPA works, the studies that

22  are submitted in support of registration of these products are

23  separate.

24      There's actually seven entirely separate toxicological

25  bodies of studies that have been submitted by various

1  companies.  Monsanto has one of them.  But we don't have the

2  other six, five or six.

3       And there are confidential business information reasons

4  why those studies are not shared generally.  So EPA has actual

5  scientists who are looking at the underlying studies in a much

6  broader body of science.

7            **THE COURT:**  And those studies are not subject to FOIA

8  requests?

9            **MR. LASKER:**  They are not, Your Honor, because there

10 is confidential business information.

11      The HIPAA statute is set up the way that it is because if

12 those studies are released a new company could come in to want

13 to register and sell a product with a certain type of herbicide

14 and then use those studies to support their submission.

15      And for that reason, and also other reasons with respect

16 to how products are formulated, the actual scientific studies

17 are not available under FOIA.

18      This was an issue in part with how the IARC reviewed the

19 studies, because they didn't have the studies themselves.  They

20 had -- certain times they had what regulators had said about

21 the studies.  And they based their conclusions on

22 interpretations of regulatory documents discussing the studies.

23      Regulators -- EPA actually has the studies themselves.

24 And those are private, confidential information.

25      But turning back, Your Honor --

```
 1              THE COURT:  Go ahead.
 2              MR. LASKER:  -- to the issue of witnesses --
 3              THE COURT:  I was just pulling up the -- the
 4    plaintiffs' description of the 11 --
 5              MR. LASKER:  We'll get to that.  My, sort of, point
 6    about the seven beforehand --
 7              THE COURT:  Yeah.
 8              MR. LASKER:  There was one of those witnesses.  And
 9    there is only one witness who was the point person on
10    communications with the EPA.
11              THE COURT:  Got it.
12              MR. LASKER:  That's Dan Jenkins.
13              THE COURT:  Okay.  So -- I'm sorry.  You were going to
14    say something before we, sort of, turn to the 11 other people.
15              MS. WAGSTAFF:  Yeah.  I just wanted to say a few
16    things.  And I've actually asked my colleague to address each
17    of those 11.
18         We have picked those out from concrete documents that we
19    have found, and we have backup for each -- each of the 11.  But
20    I think it's worth noting that this litigation is not
21    necessarily about glyphosate.  I just wanted to make sure the
22    Court knows that.
23         Obviously, it is about glyphosate, but it's Roundup that
24    we're saying is the dangerous thing, which glyphosate is just a
25    subset of that.
```

1          Also, before we get into the 11 custodial files, I want to
2     make sure that Your Honor knows how the ESI is maintained and
3     searchable at Monsanto, just for one minute.
4          They can't do a horizontal search across all custodial
5     files.  So what I mean by that is, they can't put in
6     "glyphosate non-Hodgkin's lymphoma" and search their entire
7     database.
8          If they want to search Judge Chhabria's database they have
9     to lift up the thing and --
10         **THE COURT:**  I'm sure they've done that.
11         (Laughter)
12         **MS. WAGSTAFF:**  So lift it up and drop, you know, the
13    search terms in there.
14         So because of the way that they've decided to house and
15    search their ESI, it makes -- it makes it necessary for us to
16    request more -- more custodial files rather than less.  If that
17    makes sense to you.
18         Also, with the seven plus five custodial files that they
19    have produced to date -- we will get to this later when we talk
20    about search terms -- they haven't been completely fully
21    produced.
22         Because we had an informal ESI day in St. Louis.  Our ESI
23    expert who is here flew to St. Louis, and we met with their ESI
24    expert.  And we found very critical search terms that were not
25    included in any of the search terms to date, such as how

1    glyphosate and Roundup was even called internally.

2         So with that, I would like to ask Mr. Litzenburg to come

3    up and talk about the 11 custodial files.

4              THE COURT:  Okay.

5              MR. MILLER:  Your Honor, before he does, may I have

6    just one minute?

7              THE COURT:  Yes.

8              MR. MILLER:  Mr. Litzenburg is a very articulate man,

9    and I'm afraid the Court might be confused.

10        If I -- we didn't respond to his piling IARC in with the

11   EPA.  Mr. Lasker is right when he says EPA is a regulatory

12   agency, and no responsible scientist should be relying upon a

13   regulatory agency to opine about scientific matters.  But then

14   he lumps IARC in with that.

15        IARC is not a regulatory agency.  And I think every time

16   they say it is, one of us is bound by duty to get up and tell

17   Your Honor, in fact, it's not.  You will see on our papers we

18   submitted, it's a scientific agency.

19        And the reason it didn't look at all the studies --

20   Mr. Lasker said they didn't look at all the studies.  They only

21   looked at published peer-reviewed studies.  They will not look

22   at the internal studies of Monsanto because they are inherently

23   scientifically unreliable.  And that's important.

24             THE COURT:  Okay.  But we're going to have plenty of

25   time to bicker about this.

1      **MR. MILLER:**  I understand, Your Honor.  When I hear

2   that, I wanted equal time.

3      Thank you, Your Honor.

4      **MR. LITZENBURG:**  Good morning, Your Honor.  I'm

5   Timothy Litzenburg from Mr. Miller's firm.

6      **THE COURT:**  Good morning.

7      So the first thing I want to do, though, is just go

8   through the -- are you still seeking the custodial files from

9   the 11 witnesses?

10      **MR. LITZENBURG:**  We are.  And I think I'm in a unique

11   position to explain how we got there.

12      So for the first five custodial files, they were -- we had

13   no internal production to go off of.  Monsanto said, these are

14   the people that you want to look at and to ask whether our

15   product causes non-Hodgkin's lymphoma.  Take these five.

16      Of course we took them; they were offered.

17      I took, I think, the only depositions in this litigation

18   to date.  And the early ones were 30(b)(6) depositions.  They

19   were under a different state rule.  But they were corporate

20   designees on a number of topics.  I think the first one was

21   just the general organization and roles of personnel at

22   Monsanto and how that's changed over the years.

23      Those seven custodians which they are producing for now --

24   and, by the way, I don't think any of the first five and

25   certainly none of the next seven have been certified as we're

1  finished with the production yet.

2      But those next seven names, those came verbally from the

3  corporate designee at the deposition.  So the first five people

4  were, we want you to look at these people and find out if it

5  causes cancer.

6      The next seven names were the groomed and vetted corporate

7  designee, a very nice well-spoken lady who came and sat in the

8  room and said, And this is also who you want to ask if our

9  product causes cancer.

10      So that's how we came up with those seven names that are

11  in process.

12      The 11 names that are before Your Honor and are in

13  dispute, they represent the first names, the first custodians

14  at Monsanto that the plaintiffs have actually identified from

15  source materials as looks like this person has a very important

16  role, looks like this person has something very important to

17  say, handled this portion of the work.

18      And so those are the only and the first custodians that we

19  have selected by looking at the actual source material.

20          **THE COURT:**  So what you're saying is that this is

21  not -- that you might come back and ask for 10 more or 20 more

22  or 30 more, or something like, that after you continue to

23  review documents?

24          **MR. LITZENBURG:**  I'm sure --

25          **THE COURT:**  I'm not asking that in an accusatory way.

Just to clarify.

    **MR. LITZENBURG:**  I'm sure we'll identify other people whose files are important.

   I mean it more by way of saying that so far we have not had a single document produced out of somebody's file who we identified solely -- I'm sorry, that our side identified, that our side requested, came up with a name.

   In fact, I think I noticed the deposition of Kerry Preete, who you just heard was head of all Roundup products for a long time and remains at the -- at the company.

   I noticed his deposition.  A leave request is filed.  And that was early in the litigation.  And the defense lawyer said, You don't want him.  He doesn't know anything.  You don't want his deposition.  Take that down.

   And then, of course, in this 30(b)(6) deposition, the lady said, You'd have to ask Kerry Preete.  You would have to ask Kerry Preete.  He handled that.

   So he's in the second batch.

   But I do think it's important that we stop relying on Monsanto's suggestions.  "These are not the droids you want." They are over here.

    **THE COURT:**  "These are not the droids you're looking for."

   (Laughter)

    **MR. LITZENBURG:**  Exactly.  Exactly.

1    So I'm happy to address the 11 people in turn.   I will say

2    that they are all -- Your Honor compelled the defendants to

3    produce a list of recipients as a legal hold with respect to

4    this litigation.

5         And all 11, the defense representation, these people don't

6    have anything to do with these issues.   All 11 are on the short

7    list of people placed under a legal hold.

8         **THE COURT:**  I don't think that answers the question

9    whether -- I mean, we do have rules about proportionality and

10   whatnot.   And I don't think that answers the question whether

11   there should be a document production from them.

12        But I also, sort of, you know, as I've been -- throughout

13   this case I've been scratching my head, the premise that

14   Monsanto has adopted, or seems to have adopted, which is we

15   kind of decide who, you know -- who's relevance here.   And we

16   decide that you only get 5 or you only get 12 or whatever.   I

17   mean, that can't be right either.

18        **MR. LASKER:**  If Your Honor --

19        **THE COURT:**  So what I was going to suggest is that we

20   just sort of go -- let's put the foreign people aside, and

21   let's go through the domestic people, and let's figure out --

22   let's, sort of, take them one by one.

23        And, you know, without reference to arbitrary numbers how

24   many people they should be able to get discovery of, why should

25   or shouldn't they be able to get the records from the people

1   who they want now?

2       So --

3           MR. LASKER:  We're prepared to do that, Your Honor.

4       And, again, as our proposal for the schedule set forth in

5   our case management statement indicated, we were not limiting

6   to 5.  We were -- we would have 22 for the plaintiffs to

7   identify.  And that that is not based upon some arbitrary

8   construct.

9       Obviously we agreed and there was provision in our case

10  management statement for exactly this sort of dialogue, to,

11  explain why certain witnesses would or would not be relevant,

12  because we believe the individuals who have been identified by

13  the plaintiffs demonstrate the point, there are a small group

14  of individuals who have scientific knowledge that would be

15  relevant to the general causation in question.  And the people

16  we identified as the first five were the people who had by far

17  the most central knowledge of that.

18      And if you go through and talk about the individuals --

19  and we can move on to the next 11 individuals that the

20  plaintiffs have identified.  I mean, one of them is a woman

21  named Manda Sansom, is the person who operates Monsanto's

22  telephone help line in the United Kingdom.  I don't -- I can't

23  figure out what --

24          THE COURT:  Right.  So that's why I think -- that's

25  why I wanted to know who these first five people were, who the

1    seven people were, and why I want to go through, sort of, one

2    by one the people they've identified.

3        So I've got their letter in front of me now.  And they've

4    got -- so let's start with their first one, John Acquavella.

5    We'll skip over the people in Europe.

6            **MR. LASKER:**  Okay.

7            **THE COURT:**  Or Australia or New Zealand or wherever

8    they are for the moment.  And we'll get back to those people.

9            **MR. LASKER:**  John Acquavella, we would agree, does

10   have relevant knowledge.  He was an epidemiologist at Monsanto.

11   He hasn't been with the company for about a dozen years, but

12   he's done direct scientific research that's relevant to this

13   issue.

14           **THE COURT:**  Okay.  So he'll be included.

15       Katherine Carr.

16           **MR. LASKER:**  Excuse me, Your Honor.  I have it in a

17   slightly different order, so let me find her name.

18       Katherine Carr, she is an environmental assessment

19   scientist at Monsanto.

20           **THE COURT:**  What does that mean?

21           **MR. LASKER:**  She does research on the environmental

22   impacts of glyphosate, whether that be on how it affects the

23   soil, how it may affect failure to transport through waterways

24   when it gets -- when it's sprayed, how it affects microbes in

25   the soil, how it may affect fish.

1    These are entirely different types of organisms.  And

2   nobody, including IARC or anyone else, looks to that type of

3   science to determine human toxicology.  It's just an entirely

4   different area.  An important area for the company, but it has

5   nothing to do with toxicology for mammals generally or for

6   humans.

7        **THE COURT:**  Okay.  So in their description of

8   Katherine Carr, it makes reference to her having prepared a

9   detailed report that included discussion of human exposure of

10  Roundup.  Tell me why that is or is not relevant.

11       **MR. LASKER:**  Well, to the extent that environmental

12  failure to transport is talking about potential presence of

13  glyphosate in air generally or water generally, and how the

14  population at large might be exposed, that would be the

15  intersection there.

16       Plaintiffs in this case are alleging that they have unique

17  exposures beyond general background exposure to the extent they

18  exist or don't exist.  And we believe they don't.

19       But their exposures are alleging -- are based upon direct

20  application, direct use of the product.  There's a different

21  body of science and research that looks to the issue.

22       And John Acquavella actually is a scientist who did

23  research on that.  He did a study called The Farmer Family

24  Exposure study, in which he looked at individuals who applied

25  and used glyphosate to determine what their exposure levels

were.  That is relevant.  But there's not anything that

Katherine Carr would be doing research on.

**THE COURT:**  But she -- if she prepared a report about human exposure to glyphosate, to Roundup, and included the risk, you know, discussion or review of the risks associated with human exposure of Roundup, then why wouldn't she potentially have relevant information?

**MR. LASKER:**  Well, again, Your Honor -- and I don't have the study.  They've not presented us with the document that they're talking about.  And it may be useful that you had that process.

But the question of background exposures, glyphosate being released in the general environment, which is important for regulatory purpose, is not going to be an issue in this litigation because plaintiffs are alleging something different here.  They're alleging direct exposure --

**THE COURT:**  Right.  So we're talking on something that I obviously haven't looked at, but it sounds like you're limiting her report to general exposure in the environment as opposed to human exposure.

Have you read her report?

**MR. LASKER:**  As I said before, I've not seen the report, and plaintiffs have not provided us with the specific bases for their determinations with respect to these witnesses.

We did ask that question.  And part of the process that we

have in mind and one that would be, I think, more efficient for

this process is to have direct meet and confers because we

believe, at least with respect to certain of these witnesses --

plaintiffs may agree with us when we have this conversation --

that maybe these aren't the people we have in mind.

**THE COURT:**  Yeah, but I would like -- we're here now,

and I would like to start talking about it now and see how we

can, kind of, move things along.

So what -- what is Katherine Carr's report?  You base your

argument for her relevance on this report that she did.  What

does the report say?  What does it cover?

**MR. LITZENBURG:**  As I understand, she --

**THE COURT:**  Have you read the report?

**MR. LITZENBURG:**  I have not.  And I'm not sure what

we're referencing here.

**THE COURT:**  Do you have the report?

**MR. LITZENBURG:**  What I'm looking at is

correspondence.  I think that's where we found her.

When an inquiry comes in, starting in approximately 2003,

there's not a lot of noise at that point.  When an inquiry

comes in, we've heard somebody else asking, Does this cause

cancer?  It finds its way to Mrs. Carr.  And that is who is

charged with responding to it.

She represents herself on her own resume and her own

LinkedIn page.  She conducts the technical literature searches.

1   She maintains the literature database on the scientific issues

2   involving glyphosate.  She was a research chemist before she

3   rose to the position she's in now at Monsanto, where she was

4   responsible for conducting metabolism studies of animals.

5        These rules on these animal studies are going to be at the

6   core of this causation issue.

7            **THE COURT:**  Okay.  But -- I mean, so the problem I'm

8   having now is, you've got this paragraph in which you described

9   her role and made a case for her relevance.  And now you're

10  telling me a bunch of stuff that's not in that paragraph in

11  your letter.

12       So I'm trying to -- I'm having difficulty processing it.

13  And I want to know, you know, rather than you speaking of this

14  in general terms, I want to know, sort of concretely, what have

15  you seen?

16       What have you seen from the discovery you've done so far

17  that shows that she is likely to have relevant information?

18           **MR. LITZENBURG:**  Sure.  When an inquiry comes --

19           **THE COURT:**  And nonduplicative.

20           **MR. LITZENBURG:**  Right.  When an inquiry comes into

21  the company, it is often directed to her.  We've got another

22  question about whether this can cause --

23           **THE COURT:**  Inquiry comes into the company?

24           **MR. LITZENBURG:**  From a third party, Does your product

25  cause -- does your product cause lymphoma?  It will be

1   forwarded to Ms. Carr.

2       She is charged with maintaining the literature database

3   that is responsive to that question.  She is in charge of

4   studying the environmental impact, which of course is not just

5   grass.  It's -- it's how it absorbs into the human body.

6       And even among the authors who agree that this chemical

7   causes non-Hodgkin lymphoma, there's disagreement about the

8   route which it provides its way into the human system.

9       Again, she was -- she designed, she conducted some of the

10  animal studies which were sent to the various regulatory

11  agencies around the world.  She was charged with adding to

12  the -- setting things into the registration files at EPA and

13  other regulatory agencies.

14      She's directly at the center of this.  And any report --

15  again, I don't have it in front of me; I just have some

16  correspondence -- that she authored about the environmental

17  impact obviously has to do with residuals and paths of

18  absorption in the human and animal body.

19          THE COURT:  Okay.  Let's put a "maybe" by her name.

20      All right.  Eric Haupfear.

21          MR. LASKER:  Eric Haupfear.  Ah.  Okay.

22      He is a chemical engineer.  And his work is -- he's

23  currently involved with biotech, which is not related to

24  glyphosate.

25      He did spend some time working on the physical processes

1    of manufacturing glyphosate and how glyphosate is manufactured
2    most effectively in the lab.
3         I believe in their letter plaintiffs talk about him --
4    about Mr. Haupfear having information relevant to design
5    defect.  We can address that issue if we get to a separate
6    phase of the litigation.  But he does not have any information
7    with regard to scientific research or the safety of glyphosate.
8    He's a manufacturer.  He's involved in the manufacturing
9    process.
10        **THE COURT:**  But part of their causation argument is
11   related to the way Roundup is manufactured; right?
12        **MR. LASKER:**  They have made -- and this is more recent
13   because it was not something that was at issue in IARC or any
14   of the other reviews of this.
15        More recently -- and in their case management statement
16   they start talking about various contaminants.  Those exist, or
17   they do not exist, in the product.  And then the question is,
18   to the extent they exist in extraordinarily trace amounts,
19   whether or not that has any meaning scientifically.
20        Mr. Haupfear is not going to be able to answer that
21   question or have any information about that question, either
22   the -- the sentence is if these contaminants exist in any
23   glyphosate, those contaminants would have been in the
24   scientific studies in the first place, in the animal toxicology
25   studies that are conducted, or in the genotox studies that have

1    been conducted not only with respect to glyphosate but also

2    with respect to the surfactants and the formulations.

3         And that information then would parlay into studies of

4    whatever added theoretical impact those contaminants are

5    supposed to have would be in the studies and would be in the

6    results of those studies.  Those studies are the studies the

7    scientists can talk about.

8         Mr. Haupfear can talk about how they tried to make

9    glyphosate more cheaply.  The various processes in the -- in

10   the manufacturing site for that.  And, you know, there could be

11   arguments about whether or not Monsanto could have done

12   something more to try and lower what the plaintiffs, I think,

13   will allege were contaminants in the product.

14        That certainly if they were able to establish that -- I

15   don't believe they would be able to -- might be relevant in a

16   subsequent phase on design defects.

17        But the product is what the product is.  It's been tested

18   in animal studies.  It's been tested in epidemiology studies,

19   which is of the final product in which humans are exposed,

20   which is the question in this case.

21        And so those studies, if they are or if they are not

22   contaminants in the product, are part of the end result of

23   those studies.

24        Plaintiffs have to present data relevant to the issue of

25   causation.  So the question of how glyphosate was manufactured,

1   whether it could have been manufactured in a different way is

2   not a causation -- doesn't -- doesn't change the causation

3   analysis.

4           **THE COURT:**  Okay.

5           **MR. LITZENBURG:**  I think Your Honor hit right on a

6   salient point there, and I think it's important to keep drawing

7   this distinction.

8       This MDL is not comprised of plaintiffs who say that

9   glyphosate caused their non-Hodgkin lymphoma.  This MDL is

10  comprised of plaintiffs with lymphoma who say that Roundup

11  caused their cancer.

12      And Roundup, as we know, is -- has many components, one of

13  which -- an important one of which is this POEA, this

14  surfactant, which many published authors as well as, I would

15  expect, many of our retained experts will explain to the Court

16  has a synergistic or multiplistic effect on the glyphosate and

17  its carcinogenic properties.

18      There's a shroud of secrecy with Monsanto.  I've asked

19  them in pointed discovery requests, where does the POEA come

20  from?  What is the makeup of it?  And they respond, We won't

21  tell you.  It's a trade secret.  This is the gentleman who

22  would know.

23      Aside from the POEA and the synergistic effect with that

24  ingredient, it's well-known that Monsanto -- that this product,

25  Roundup, contains dioxin and formaldehyde.  And those are

1    well-known, generally accepted for a decade, human carcinogens.

2        The levels of, for example, dioxin have ranged over the

3    years.  The permissible levels that Monsanto will let slip

4    through the manufacturing process of dioxin have changed over

5    the years.  And they have made intracompany decisions about how

6    much dioxin they want in their Roundup.

7        How those decisions were made, when that has changed, what

8    quantities are there now, how did that happen, the

9    manufacturing process, these are all things that Mr. Haupfear

10   can speak to.

11       **THE COURT:**  Okay.  So we're going to have discovery of

12   Mr. Haupfear.

13       Kronenberg.

14       **MR. LASKER:**  Mr. Kronenberg, Dr. Kronenberg, has done

15   toxicology work.  But glyphosate is not one of the chemicals

16   that he has worked with.

17       He did have, at one point, supervisory responsibilities

18   over Donna Farmer among -- and Donna Farmer is one of the first

19   five individuals that we have produced documents for.  And we

20   have completed the document production for the first five and

21   the next seven.

22       **THE COURT:**  Okay.  So their description of Kronenberg

23   says that he holds meetings with the EPA to discuss toxicology

24   profiles, counters allegations that glyphosate is unsafe, meets

25   with outside experts to develop a network of paid consultants

1   to address future issues with glyphosate and surfactants, and

2   has initiated dozens of studies to support glyphosate

3   registration.

4       Is that not an accurate description of things that

5   Dr. Kronenberg has done?

6       **MR. LASKER:**  With respect to the last one, on

7   initiating multiple studies, I don't know what they are

8   referencing there.

9       There are individuals at Monsanto, and Dr. Kronenberg is

10  one of them, who are involved in public comments about the

11  safety of the product.  And there are a number of them.

12  Glyphosate is a major product for Monsanto.

13      A lot of those issues, Your Honor, we would agree, are

14  certainly relevant on the liability side of the issue.

15      But to the extent that discovery in this first stage is

16  opened up to anybody within Monsanto who's had a role in

17  discussing glyphosate safety with the general public or in

18  response to inquiries, that's an issue that is not really

19  related to the science.  It is only related to our

20  representations.

21      Plaintiffs may argue it's related to warnings, what have

22  you.  But it doesn't provides any additional information with

23  respect to the science.

24      And, Your Honor, just in general, as you may be aware,

25  this concept that statements made by company employees is at

1   all relevant to the *Daubert* issue has been rejected in lots of

2   cases.  It was rejected again in the Ryder case.

3       **THE COURT:**  Why is that -- the question is whether

4   this person has the information that's relevant to the

5   question.

6       Obviously, some statement that he made to the public or to

7   the EPA is not necessarily going to be relevant.  But this is a

8   question of whether we can look through his documents and

9   whether we should look through his documents to see if he has

10  relevant information.

11      And I guess my reaction is that, you know -- you know,

12  that particularly given that there was a time where he

13  supervised Farmer and that he is, you know, involved in -- he

14  is hiring experts to study glyphosate, you know, he might have

15  relevant information.

16      And so I -- you know, it's not obvious at this point that

17  it would be duplicative.

18      **MR. LASKER:**  I think, Your Honor, that you're hitting

19  the nail on the head on this, which is, it gets to the issue of

20  proportionality.

21      Because the individual -- Dr. Kronenberg then would be

22  relevant insofar as he had information about what Donna Farmer

23  knew and communications with her.  We are producing Donna

24  Farmer.  We agree she's directly relevant.

25      People move around in Monsanto a fair amount.  Dr. Farmer

1   has been with the company for 25 years.  If you then state that

2   anybody who supervised Dr. Farmer during those 25 years had

3   information that's relevant, you are greatly expanding the

4   scope of discovery in phase one, and without any real knowledge

5   ahead of time that there's going to be something about that

6   witness that actually is unique or that adds new information to

7   the issue.

8        And part of our concerns here, Your Honor, is this fact:

9   We have -- well, plaintiffs say it has been a product for 40

10  years at Monsanto.  There are a core group of individuals who

11  have actually studied the science and have information about

12  the toxicology.

13

14

15       There are lots of other people, and we can go through the

16  list, who at various points in time, as they work their way up

17  through management, have supervised individuals or have been

18  part of the process of communicating information about the

19  science that they are aware of because of the core group of

20  scientists who have done this research.

21       Can I say that none of those documents would be relevant

22  in some broad sense?  No.  But you get to a situation where it

23  becomes duplicative, you lose proportionality, and discovery

24  just expands to a much wider group of individuals where there

25  is no expectation or reason to believe, at this point in time,

they'll provide any unique information that is above what at
the outset is information that's only tangentially relevant to
the causation issue.

**THE COURT:**  Can you respond to the point Ms. Wagstaff
made earlier ago about the inability to do a horizontal search
and why -- why the information is kept that way, why the
documents are kept that way.

**MR. LASKER:**  She is correct on that.

Monsanto does not maintain a database that would allow a
search across all of its -- all of its business.  It would be
extraordinarily expensive and inefficient to be able to do that
anyway.  We've been told it would crash the system to try to do
that.

**THE COURT:**  Do you mean because the size of Monsanto?

**MR. LASKER:**  Because of the size of Monsanto.

There are lots of other companies that do this.  There
is -- and because of that, some of the best practices that come
out of the dome and whatnot talk about identifying key
custodians, this concept of having key custodians and only
going after their documents as a means of efficiency exactly to
avoid this problem of discovery, sort of, going out of control,
putting extraordinary costs on defendants that are unwarranted
by any, sort of, new or unique information.  That's why those
prudent practices have been in place.

But with respect, however, to the documents that the

1    plaintiffs do have, they have -- when you get the files for

2    Donna Farmer, for example, you get all of her emails, all of

3    her communications to her and from her.  So it's not that you

4    only have information about Donna Farmer.  You have a broader

5    set of information about who was involved in a scientific

6    study.

7        And, again, the fact that we're arguing now and discussing

8    now individuals who might have secondhand knowledge because

9    they supervised Donna Farmer, or folks who don't have

10   scientific knowledge, but they learn the scientific knowledge

11   from Donna Farmer and then they may speak to other people about

12   that, I think, points to the fact, you know, there has to be

13   some limitations, at this point, to the core group of

14   individuals so that we're not expanding well beyond anything

15   that is needed for the litigation, particularly at this stage

16   when we're dealing with a general causation issue that, as Your

17   Honor noted, rises or falls on the studies themselves.

18       It doesn't matter what Monsanto says about them.  It's the

19   science that matters.  And plaintiffs' experts will have to

20   present reliable bases of their opinion based upon those

21   studies, not based upon something Monsanto said.

22           **THE COURT:**  But based on it could be relevant what

23   Monsanto knows about the studies.

24       So do you want to address Dr. Kronenberg?

25           **MR. LITZENBURG:**  Yeah.  So in 2016, late 2016, after

all these lawsuits, we had their excellent outside litigation
counsel telling us, well, he didn't work on glyphosate.

In 2011, within the company, there's a widespread
announcement congratulating him on his new role.  "Joel
Kronenberg will assume the role of base chemical toxicology."
I'll skip ahead but, "He has oversight on the matters related
to safety assessment of pesticides.  In this role, he will
oversee toxicology support of reregistration, expanded use, and
freedom to operate activities for glyphosate."

That's why we requested him.

THE COURT:  Okay.

MR. LASKER:  And, Your Honor, that is consistent with
what we have said.  He supervised Donna Farmer.

The reregistration process, just to be clear, is a much
broader process than human safety.  In fact, carcinogenicity
was not on the radar screen for the reregistration process at
all.  It dealt with human products, environmental faith in
transport, some issues with eco tox, not dealing with human
safety.

He was above a group that Donna Farmer was in, as were a
number of people over the last 25 years going in and out.

THE COURT:  We're going to put a "maybe" by
Kronenberg's name.

What about Michael Koch?

MR. LASKER:  He's actually in a similar situation as

1    Kronenberg because he supervised Donna Farmer at one point as

2    well.

3        And, also, David Saltmiras was in a group.  He's also one

4    of the first five individuals we identified.  So there is a

5    relationship there.

6        As I said, Your Honor, there will be a number of people

7    over 25 years who have had roles in which they were supervising

8    over the folks who actually did this work.  So he would be in

9    the same category.

10        **THE COURT:**  I'm looking at their description of him.

11    They say he's currently the vice-chair of the toxicology forum,

12    responsible for addressing toxicological issues arising in the

13    safety assessments of Monsanto's products, including Roundup.

14        What's the toxicologic -- toxicology forum?  Do you know

15    what that is?

16        **MR. LASKER:**  I actually don't know what they're

17    referring to there, Your Honor.

18        **MR. LITZENBURG:**  I think what it's referring to, this

19    is the guy who was -- led the charge to form a -- to get

20    something published quickly in response to IARC.

21        And so he writes -- and this is the email.  This is why

22    we're requesting it.  In the spring of 2015 he writes to a

23    number of --

24        **THE COURT:**  Slow down a little bit.

25        **MR. LITZENBURG:**  -- people -- fortunately some of whom

1    we have their files, which is why we have seen this -- said,

2    "Hey, all, I'd like to get together and discuss the possibility

3    of publishing a manuscript that leverages existing data to

4    concisely and convincingly refute IARC's carcinogenicity

5    claims."  As far as we know, he headed up that effort.

6        Your Honor may know that there were subsequently

7    publications that Monsanto was behind, attempting to refute the

8    IARC findings.  This is something that's central.

9        And I'll say this, I think --

10       **THE COURT:**  But who were the other people involved in

11   preparing responses to the IARC conclusion?

12       **MR. LITZENBURG:**  Well, some of the people certainly

13   that we've -- some of the people on the Inter-Tech panel, some

14   of --

15       **THE COURT:**  Some of the people on what?

16       **MR. LITZENBURG:**  Inter-Tech Panel.

17       Some of whom are independent; some of who are not.

18   Dr. Acquavella left Monsanto, I believe, to go join the

19   Inter-Tech Panel so that he could represent himself as

20   independent.

21       Some of the people for whom we have production certainly

22   appear to be on this team.  Some people for whom we do not have

23   production seem to be on this team.

24       And I will say that aside from the scientific publications

25   themselves, a crucial part of this phase one will be the

scientific fraud that Monsanto perpetuated on the public and academia.  There's ghostwriting.  There are emails where they say, Who are we going to get to slap his name on this article that we've written?

Their approach is how can we -- and that's what's in this very email.  How do we combat what IARC says?

**THE COURT:**  That's not what's in that email.  That's what you're --

(Unreportable simultaneous colloquy.)

**MR. LASKER:**  -- IRAC's carcinogenicity claims.  Let's do a study --

**THE COURT:**  That does not indicate fraud at all.

**MR. LITZENBURG:**  Sure.

**THE COURT:**  So the thing about the email you read me is, it struck me as kind of the high-level guy who wants people below him to put together a response to IARC.

And so it's not clear to me from that email, at all, that he would have been involved in the nitty-gritty in a way that would give him, you know-- that he would be a possessor of information that's relevant to the question.

**MR. LITZENBURG:**  He's also the lead currently, I believe, of the Product Safety Center, which is some -- some division within Monsanto presumably having to do with human safety of their products.

As of April of 2016, he has been made the lead of the

1   Product Safety Center, which comprises toxicology and

2   composition groups.  Certainly don't think he should be

3   disqualified from production simply because he oversaw people

4   who had more boots on the grounds.  If anything, the opposite.

5       And I certainly think that, as we talk about IARC and

6   this, you know, effort to refute it, most of the IARC panel --

7   actually, all of the IARC panel is currently under subpoena

8   from Monsanto.

9       So they're continuing to attack from that side.  And we

10  would certainly like to be able to look at the files of the

11  people who were doing it internally.

12          MR. LASKER:  Your Honor, if I may, just to answer the

13  question that you asked, the individuals who have been directly

14  responsible for dealing with a response to IARC on the

15  scientific side have been Bill Heydens, David Saltmiras, and

16  Donna Farmer.  Those are the people within Monsanto who deal

17  with the scientific issues and scientific safety.

18      Again, the same issue, it is correct that there are a

19  number of people over the years that have supervised at some

20  high level those individuals.  And they will have documents

21  that talk about getting the scientists to respond to the

22  issues.  But there's no meaningful limit then on discovery.

23          THE COURT:  I mean, I was going to -- the question I

24  was going to raise is looking to Eric Sachs, who is the next

25  person on your list.  I mean, here's another person who it

seems like you would probably, sort of, put in the same

category as Koch, K-o-c-h.

    And I guess the question I have for the plaintiffs is, it

seems to me there is an argument that, you know, Koch and Sachs

are duplicative of the people you have so far.  But it also

seems like there's potentially an argument that they are

duplicative of one another.

        **MR. LITZENBURG:**  Hard to say.  Hard to say.

    We are going off -- again, we've been given five files.

And those files are the ones where Monsanto said, These are the

people that we want you to look at.  And we are pulling these

names from oblique references or they were the sender to some

of these people in these files.

    So we've been able to represent to the Court what we know.

You know, how much the area of overlap is, I can't say right

now.

    But I would certainly be hesitant -- I certainly don't

want to accept Monsanto's representations that these people are

not going to help plaintiff with their case because, again, we

sit here today without anybody independently identified by

plaintiff having had their custodial files produced.

        **THE COURT:**  All right.

        **MR. LASKER:**  Well, Your Honor, let me just clarify one

point that was made there.

    Monsanto has produced all of its files with respect to all

1   of the scientific research it has.   Those are not custodial.

2   That is company-wide.

3       We've provided all of our scientific studies.   We provided

4   all of our regulatory materials company-wide.   We have produced

5   and completed the production for 12 custodians; the five that

6   we identified and the seven that were identified by

7   Mr. Miller's firm, Mr. Litzenburg's firm.

8       The fact that plaintiffs are standing up here saying that

9   we are identifying people based upon oblique references, that

10  is the very concern that Monsanto has, because that is not a

11  meaningful limitation, then, on discovery, if oblique

12  references are going to be the standard by which Monsanto has

13  to go through a process that I will tell Your Honor, we've had

14  40 attorneys working full-time getting these productions for

15  the first 12.

16      Our schedule that we had in place and that we proposed is

17  premised in part upon the history we have, the experience we

18  have, one, in trying to identify what we believe will be

19  witnesses who have meaningful knowledge, and, frankly, beyond

20  that give plaintiffs an additional ability to get 22 custodian

21  files.   We've not identified 22 custodians we believe have

22  unique information.   But we are -- you know, to give plaintiffs

23  the ability to identify additional individuals.   And we are

24  prepared to do that.

25      But if we have to now provide documents for anybody who

has oblique references or some statements over a 40-year

history which glyphosate has been a product of Monsanto, then

this is going to get out of control.  We have no way of

limiting it, Your Honor.

**THE COURT:**  Okay.  Let's -- for the moment, let's put

Koch and Sachs in the maybe category.

And I think all the rest of them are -- 7, 8, 9, 10, and

11 are outside the U.S.  It's not clear whether that's true of

11, Steven Levine.

**MR. LASKER:**  Steven Levine is not.  He's in the U.S.

**THE COURT:**  Okay.  So maybe we'll talk about Steven

Levine.

So you provided a pretty high-level description of Levine.

Kind of suggests that he is, himself, at a pretty high level

and engages in things at a pretty high level of generality.

Honestly, based on your description, I would be inclined

to say that you should not be able to get a production from

him.

**MR. LITZENBURG:**  Based on our --

**THE COURT:**  Based on the description that you

provided.

**MR. LITZENBURG:**  Dr. Levine is the lead author on, I

think, 13 or 14 scientific articles which are clearly going to

form the core of this phase one.  He's the lead scientific

author --

1          **THE COURT:**  None of that is in your letter that you

2    submitted to me.

3          **MR. LITZENBURG:**  I understand that.

4          **THE COURT:**  What you say about Levine is he's

5    Monsanto's global lead for ecotoxicology and environmental risk

6    assessment.  He's worked for Monsanto since approximately 2000,

7    nearly exclusively in the field of ecotoxicology.

8       I don't know what ecotoxicology is, but it doesn't sound

9    like what this case is about.

10      He's instrumental in Monsanto's study, design and data

11   analysis.  That -- you know, I'm not going to let you get a

12   production from him based on that description.

13      So you were saying -- now, you were going to go on and

14   provide different information about him, that he's the author

15   of, you said --

16          **MR. LITZENBURG:**  -- internally --

17   (Unreportable simultaneous colloquy.)

18          **MR. LITZENBURG:**  -- he's touted as the first author of

19   13 peer-reviewed scientific articles in toxicology journals,

20   some of which are the very issues dealt with in this phase one

21   general causation phase.

22      He's been at the company since 2000.

23          **THE COURT:**  Do you have the document in front of you

24   that identifies him as the author of studies about --

25          **MR. LITZENBURG:**  I believe this is the document.  This

1   is his statement of qualification that's from internal

2   production.  I would be happy to --

3           THE COURT:  Read to me the part that you say shows

4   that he has relevant information about the -- about --

5   relevant, nonduplicative information about the ability of

6   Roundup to cause non-Hodgkin's lymphoma.

7           MR. LITZENBURG:  Give me a minute, if you would.

8           THE COURT:  Sure.

9           MR. LITZENBURG:  Glyphosate -- this is from his

10  self-described statement of the qualifications.

11      "Glyphosate products continue to come under global attack

12  both as a leading volume agricultural chemical and as an

13  adjunct to biotechnology.  Toxicology studies" --

14          THE COURT:  Slow down a little bit.

15          MR. LITZENBURG:  "Toxicology studies are published in

16  the open literature almost monthly threatening Monsanto's

17  freedom to operate in one or more geographies.  To protect

18  Monsanto's freedom to operate, Dr. Levine is continuing to

19  build the existing global network of ecotoxicologists who are

20  knowledgeable about glyphosate and who are willing to address

21  product issue."

22      He is self-describing as the chief recruiter of not

23  scientists who will determine whether it causes cancer but

24  scientists who will combat the attacks against glyphosate.

25          THE COURT:  Although, you were saying that he wrote

1     some --

2           **MR. LITZENBURG:**  He does.  And I don't think I have

3     that document in front of me.

4           **THE COURT:**  Okay.  As of now, I'm not allowing

5     discovery of Levine.

6           If you want to come back at a later time and make a --

7     we're going to build into the calendar a deadline for

8     identifying people who you know-- we're identifying document

9     custodians.  And as part of that process, I assume there's

10    going to be another fight about more document custodians.

11          And if you determine at a later stage that he's really

12    important to you, you can bring him up then.  That's without

13    prejudice.  But right now I'm not allowing discovery on him.

14          **MR. LITZENBURG:**  Very good.

15          **THE COURT:**  Okay.  So that leaves the foreigners,

16    we'll call them.  And it leaves the maybes.  And we'll get back

17    to the maybes in a second.

18          Of the foreigners, there was mention of Manda Sansom, who

19    is apparent -- that's the one who you said, sort of, responds

20    to calls about, hey, I spilled Roundup on me; what should do I?

21          **MR. LASKER:**  Yes.  And, frankly, most of the calls she

22    responds are, Should I use glyphosate twice a year?

23          I mean, it's mostly farmers in application.  A couple of

24    times she might have somebody who says, I splashed glyphosate

25    on me.  But that's about as close as it gets.

1      Most of her work is dealing with farmers on agricultural

2  uses.  She's an agronomist, and so that's her expertise in how

3  to use Monsanto to effectively apply it in the growing season.

4      **THE COURT:**  So they say in their letter -- and I'm

5  just wondering how carefully their letter was crafted, at this

6  point, but they said, "Dr. Sansom played a central role in

7  responding to issues raised by European governments related to

8  the safety and toxicity of glyphosate and glyphosate

9  formulations."

10     Are you saying that's not true?

11     **MR. LASKER:**  I don't know what they're basing that on,

12  no.

13     **MR. LITZENBURG:**  So this is the lady, as I understand

14  it, in pharmaceutical litigation we would call it adverse event

15  reporting.  I'm not sure they have a slightly different term

16  for it here.

17     But this is the point of contact with the outside world

18  for product safety.  If you spill glyphosate, if you drip it in

19  your ice tea when you're out in the field, and you have

20  concerns, and you want to know what your risk is, if you call

21  apparently you're connected to Ms. Sansom.

22     I think the reason her name was requested and appears on

23  this list is, we've already looked at, I think, from Farmer's

24  file a partial discussion with Ms. Sansom about the

25  carcinogenicity pretty early on, before it was in the public

1    sphere of Roundup.

2        People would call in and ask, Can it cause an cancer?

3    I've got it spilled on myself.  Is this something I should be

4    worried about cancer?

5        And she spurs an internal discussion -- and, again, this

6    is pretty early for these issues -- about whether it's the

7    glyphosate that people can get cancer from or the POEA.  And

8    there's some internal discussion.  We have a partial email of

9    whether POEA is within the type of surfactant that can and

10   does --

11           THE COURT:  Is she emailing and is she saying, hey, if

12   people are asking me if this causes cancer, what should I be

13   saying?

14           MR. LITZENBURG:  Yes, she does some research, again

15   from the small glimpses that we get.

16       Again, I'd love to have a sampling of her materials and

17   say to you that seven-tenths of it looks like it's relevant.

18           THE COURT:  What is she saying in the email?

19           MR. LITZENBURG:  She identifies --

20           THE COURT:  If she's just saying -- contacting Donna

21   Farmer and saying, what should I be saying about the cancer

22   issue, I mean, that's not enough to get --

23           MR. LITZENBURG:  Sure.

24       She's again interesting and unique in that she early on

25   identifies -- I think, based on some of her own research,

although I don't know how deep it was, POEA as being the more

specific concern in terms of carcinogenicity rather than

glyphosate itself.

     **THE COURT:**  But she's asking, How do I respond to a

question about that?

     **MR. LITZENBURG:**  I think she is injecting POEA into

the conversation that she believes that some of these concerns

are coming from science that is reflective of POEA causing

non-Hodgkin lymphoma.

     **MR. LASKER:**  Your Honor, I think their

understanding --

     **THE COURT:**  Can I see that email?

     **MR. LITZENBURG:**  Yep.

     **THE COURT:**  I want to look at that email.

   (Pause)

     **THE COURT:**  Okay.  Anything else, other than this

email?

     **MR. LITZENBURG:**  I don't have any materials, no.

     **THE COURT:**  Okay.  I'm not allowing -- I'm not

allowing discovery, at this time, of Manda Sansom.

   Okay.  So the rest of the Europeans, I guess we could -- I

mean, we could -- we could get into a discussion of whether

they are more like Manda Sansom or more like Acquavella.

   But, I guess, at first I -- you know, I did read your

letter about discovery of European employees.  I just didn't --

1   I mean, I'm not -- I hadn't read any of the cases that you

2   cited.  I only read the letter this morning during the break.

3       So, obviously, I would have to look a lot more into the

4   issue.  But I cannot imagine that I would not have the

5   authority to order document discovery of these document

6   custodians simply because they are in Europe.

7           **MR. LASKER:**  We agree with that, Your Honor.  You have

8   that authority.

9       The issue for us, though, will be that subject to that

10  order we will then need to make, depending on the different

11  privacy laws that apply in the different countries, significant

12  redactions under those laws that make it much more onerous

13  production.

14          **THE COURT:**  Okay.

15          **MR. LASKER:**  You certainly have the authority --

16          **THE COURT:**  I'm sorry, I read your letter quickly and

17  misunderstood what you were saying.

18          **MR. LASKER:**  No, you definitely have that authority.

19  The issue here is one of proportionality, one of burden, and

20  one of relevance.

21          **THE COURT:**  Okay.  So let's go then -- okay.  So thank

22  you.  That's helpful.

23      So let's talk about the other people then.

24      Xavier Belvaux.

25          **MR. LASKER:**  Xavier --

1    **THE COURT:**  One thing I want to, you know, propose to

2  the plaintiffs, at this point is, you know, if you want to meet

3  and confer on this promptly with them and, sort of, get your

4  presentation in order, because I think the problem is, you

5  know, this letter --

6    **MR. LITZENBURG:**  It doesn't have the source material.

7    **THE COURT:**  Doesn't give me much to work with.  And

8  that's why we have to put a lot of these people in the maybe

9  category.

10    **MR. LITZENBURG:**  Sure.

11    **THE COURT:**  There's only a few more people.  Why don't

12  we have an initial discussion about a few more people.

13    So Xavier Belvaux.

14    **MR. LASKER:**  Xavier Belvaux -- if that's how I

15  pronounce his name, you know, I don't know -- he also has done

16  regulatory work.  He's done it with various European

17  regulators, as we understand it, for the past 15 years.

18    And part of the issue here, when you get to foreign

19  regulators -- and each of these three individuals have had

20  communications with regulators in various countries in Europe.

21    Part of the issue we have here, which goes to

22  proportionality, is glyphosate is marketed around the world,

23  not only by Monsanto, as I said, but by dozens of other

24  registrants.

25    In the past year alone, there have been regulatory safety

reviews in which regulators have determined, as you know, Your

Honor, that glyphosate does not cause cancer, in Japan, in

Australia, and New Zealand --

**THE COURT:**  Right.  I guess, sort of, the general,

sort of, philosophical approach to these people is, you know,

if they were significantly involved in, you know,

communications with the agencies that concluded that Roundup

doesn't cause cancer.

**MR. LASKER:**  Right.

**THE COURT:**  Whether they conclude it.  I'm not

familiar with their conclusions.

Let me put it in a little more neutral way.  If someone

were significantly involved in the process by which an agency

reached a conclusion about Roundup and whether Roundup causes

cancer, and that person was significantly involved in

communicating with the agency and, sort of, making Monsanto's

pitch to the agency, it strikes me that there is -- that they

will -- they are likely to have relevant information.  And so

the only remaining question is whether it would be duplicative

or too burdensome.

**MS. GREENWALD:**  Your Honor --

**MR. LASKER:**  I would say, Your Honor, that I reach

that to a point.

Again, we're starting with a core of individuals at

Monsanto who understand the science and who are the scientists.

1    And then that information is conveyed to people in the

2    United States, who then convey information to other people.

3    And then we'll talk about conveying information at the end.

4    The same scientific information goes worldwide, and it

5    certainly does.  And then other individuals across the world

6    have that information, and they convey it to various regulators

7    around the world.

8         **THE COURT:**  But to the extent a European agency's

9    conclusion about Roundup is relevant to these proceedings, and

10   I think you've -- you know, you are making them relevant, I

11   think you have the right, common sense is you have the right

12   to -- again, I mean, why can't -- why can't we, sort of,

13   examine what went into the agency's decision and what

14   information the agency was receiving from Monsanto compared to

15   the information that Monsanto had?

16        **MR. LASKER:**  Well, Your Honor, what information the

17   regulators were considering is set forth in their regulatory

18   documents.  They describe all the studies that they are

19   considering.  And that is the basis of their very public

20   process.  That's the way these regulators work.

21        The information again gets to, sort of, the same science.

22   It's the same scientific studies that are reviewed again and

23   again by these regulators.

24        The question of what somebody -- it would not only be

25   Monsanto employees.  There would be employees, as I said, from

1   dozens of other companies that are involved in other countries

2   with glyphosate-based products.

3        All of those individuals would be conveying the

4   information to those regulators, including scientific studies

5   that Monsanto does not have.

6        Arguably, all of that is of some connection to the

7   scientific issue in that they're conveying the scientific

8   information, but it doesn't change the nature of the scientific

9   evidence.

10        It doesn't change the nature of the plaintiffs' burden

11   under *Daubert* and the burden that those plaintiffs' experts

12   will have.

13        No plaintiffs' expert -- they may -- I won't say what they

14   would put in their report, Your Honor, but no scientist would

15   say a regulator employee -- an employee in the Regulatory

16   Affairs Office in United Kingdom conveyed this information to

17   the European regulators and, therefore, that shows glyphosate

18   causes cancer.

19        That's not -- there's a lot of cases where -- even more

20   direct information from U.S.-based employees talking about the

21   science and scientists talking about the science at the

22   company, where courts have said that's not relevant to *Daubert*.

23        So we're a number of steps removed, now, from the direct

24   scientific evidence that is relevant to this first stage with a

25   product, as I said, has been around for decades and is sold in

1    dozens of countries.

2        And there's no limitation if you start extending it

3    overseas to regulatory employees who are communicating

4    information that they have learned.

5        And all of that is the same science that's in the

6    materials we've already produced to plaintiffs.  There's no

7    different scientific database at Monsanto.  They have all of

8    the materials.

9            **MR. MILLER:**  Your Honor, may I interject?

10           **THE COURT:**  Yes, sure.

11           **MR. MILLER:**  Michael Miller.

12       We've heard Your Honor's rulings.  Some are in; some are

13   out; some are maybe.

14       We were going to, now we have a leadership counsel, invite

15   ourselves to sit down with Monsanto's counsel next week.  We

16   heard the Court's guidelines.  See if we can't work out some of

17   these custodians.  And then if we can't, come back with a more

18   substantive explanation as to why we think a particular witness

19   is relevant.

20       Maybe we can work through this.  I don't think it's

21   something that we've been able to work through all the way.

22   They were concerned.  They wanted leadership counsel appointed.

23   Understandably.

24       We really didn't -- I think it would be efficient if we

25   tried that.  And that's why I interrupted Your Honor.

1      **THE COURT:**  I will give you my general guide -- sort

2   of, general gut reaction regarding the three remaining

3   foreigners.

4      The fact they are in Europe does not preclude --

5   necessarily preclude a production.

6      And it strikes me that there may be -- some of these

7   people may be duplicative.  For example, Garnett and Gustin in

8   particular.  Sorry.  Really, Belvaux, Garnett, and Gustin.

9      But, you know, I would be reluctant to say that, you know,

10  there can be no discovery on the people from Europe and the

11  communications they -- you know, the, sort of, pitch that

12  Monsanto was making to European regulatory agencies in light of

13  the fact that it is going to be, on some level, part of the

14  case.  And so I'll leave you with those comments as you meet

15  and confer.

16     So for right now, we know that we're adding Acquavella to

17  the list of document custodians.  And Haupfear.

18     And then we have Carr and Kronenberg and Koch and Sachs on

19  the maybe list.  And it seems to me there may be some overlap.

20  You know, they may be duplicative to a certain extent.

21     Levine and Sansom I've said no.

22     And then we'll put Belvaux and Garnett and Gustin on the

23  maybe list also.  And you also can meet and confer about that.

24     So there are seven more people who we are -- who are

25  still, kind of, up in the air whether they are going to be

1  document custodians.

2      **MR. LASKER:**  Understood, Your Honor.

3      **THE COURT:**  And so I think what we might do now, I

4  notice that it's 12:25.  Sort of hoping to be back home in bed

5  by now, but why don't we break for lunch and come back.

6      So what else do we need to discuss?

7      We need to set a schedule.  And there remains some issues,

8  I think, about search terms and about this issue that somebody

9  has referred to as third-tier review, or something like that.

10  I can't remember exactly what it is now.  What else do we need

11  to do?

12      **MR. MILLER:**  The independent expert concept, Your

13  Honor.

14      **THE COURT:**  Oh, yeah, science day.

15      **MR. MILLER:**  Yes.

16      **THE COURT:**  Science day as part of the schedule.

17      Anything else that we need to discuss?

18      **MR. MILLER:**  Scheduling order, proposed dates.

19      **MS. WAGSTAFF:**  Your Honor, we would also like to

20  discuss the ESI protocol.

21      **THE COURT:**  Wonderful.  Okay.  Okay.  And so on

22  scheduling, one thing I want you all to think about is that if

23  I -- think about it over the lunch break.  If I remember

24  correctly, Monsanto proposed *Daubert* hearings, like, in August

25  or something like that.

1    And I believe the plaintiffs proposed *Daubert* hearings

2   later in the year, like maybe November or something.  I don't

3   remember exactly.

4          **MR. MILLER:**  Yes.

5          **THE COURT:**  It can't be August because I don't want it

6   happening during the law clerk transition.  So I think it needs

7   to either be, like, June for the *Daubert* hearings or more like

8   October or November.

9    And so give that some thought whether -- would it be

10   realistic to do it in June?  My preference would be to do it in

11   June.  But I don't want to -- I don't want to be totally

12   unrealistic about it.

13    So you've got something to talk about over the lunch

14   break.  Why don't we meet back here at 1:00 o'clock.  Is that

15   okay?

16          **MR. MILLER:**  Very well, Your Honor.

17          **MR. LASKER:**  Thank you, Your Honor.

18          **THE COURT:**  All right.  Thank you.

19       (Recess taken from 12:25 to 1:06 p.m.)

20          **THE COURT:**  Okay.  Shall we deal with those other two

21   discovery issues, the search terms and the third-tier-review

22   issue and whatever else?

23          **MR. LASKER:**  Yes, Your Honor.

24    With respect to the search terms, and I have not had a

25   chance to talk to plaintiffs' counsel very much about this, I

1  wanted to try to get this in.  Maybe I'll short-circuit this

2  discussion.

3       Yesterday and this morning we provided identification of

4  the MON numbers, which was the issue in that letter.  We have

5  now gone back and gone through the production to identify other

6  documents that would be responsive, hitting upon those numbers.

7       There's not very many of them.  But we would commit to

8  producing those to the plaintiffs by a month from today.  So we

9  would get that production, and then we're prepared to do that.

10      I don't know if there's any other issues with respect to

11  the search terms that plaintiffs have, but we're moving forward

12  on that.

13           MS. WAGSTAFF:  So, Your Honor, the search terms were

14  negotiated by one law firm prior to the production of any

15  documents.

16      We've done a little bit of discovery now, including an

17  informal day where we found a pretty big and significant search

18  term that was missed.  And we think we have a little bit better

19  understanding of the search terms and now with the MDL.

20      So we would request -- well, first, I thank you guys for

21  doing that with the MON numbers.  I haven't looked at it yet.

22  It was about three or four pages of numbers that was served

23  last night.  But we would request maybe having 14 or 21 days to

24  come up with additional search terms that should be included in

25  past and prior productions now that we have an MDL and we have

1   a better understanding of what the search terms were and should

2   be.

3           MR. LASKER:  Your Honor, we would strongly oppose

4   that.  This is the first time we've heard this.

5       But plaintiffs have -- and it was two different

6   plaintiffs' firms that directly agreed to the search terms

7   which were in place six months ago.  And we heard a fair amount

8   this morning also about the fact that plaintiffs' counsel have

9   been meeting for 13 months on this and coordinating.

10      We have gone through a very laborious process in producing

11  documents, as I said, with these search terms.  And they are

12  very broad search terms.  Essentially, Your Honor, it is any

13  word that has something to do with a product.  And it's lots of

14  different words, "glyphosate" and "Roundup" and "surfactants"

15  and whatnot.

16      Any of those terms plus any terms having to do with

17  anything that would deal with cancer or genotox or other

18  toxicological terms that, again, we negotiated with two

19  different sets of plaintiffs' firms.  And we produced

20  everything, you know, using those search terms that, again, we

21  agreed with plaintiffs' counsel six months ago.

22      And so at this late date to reopen that issue -- and, Your

23  Honor, we did go back, for example, with respect to the MON

24  numbers, which are numerical terms -- MON, M-O-N, I'm sorry --

25  that are linked to certain -- certain chemical mixtures, and we

went through a very laborious process because we don't maintain

that information that way.  We're now going back to produce

additional documents.

    We don't, from our early searches, think there's going to

be many new documents at all from this.

    But if we're now reopening this issue after six months of

discovery, five months after your order, Your Honor entered the

bifurcation order in Hardeman, and again, that was supposed to

be a December 9 cutoff for fact discovery, it's very late in

the game.  And it's going to create a requirement on the

defendants to -- that's going to be, I anticipate, very

burdensome and time-consuming for us to be able to get to where

we all need to get to.

    **THE COURT:**  Why don't you have -- why don't you have a

list of additional search terms that you need now?

    The plan -- you know, we've had this conference scheduled

for a long time.  I said that we're going to deal with

discovery issues.  Why do you need 21 days to go back and

figure out which additional search terms you need?

    **MS. WAGSTAFF:**  Sure.

    So on September 16th, I believe that was the day, but it

was around there, we went to -- I flew to St. Louis and I met

with some of the attorneys and their -- and their ESI expert,

and we brought Mr. Jaffe, our ESI expert.

    It was in that meeting that we first learned that

internally Monsanto employees refer to glyphosate and Roundup by certain monikers that would not be on their face known or knowable.

I asked in that meeting on September 16th for that -- a list of that numbers and those CP codes and MON codes and product codes.  I followed up three or four times after that.  And I finally served formal discovery.  And the responses were served on me last night and this morning.

So, you know, I have to travel here from Colorado.  I didn't have time.  I got in at midnight last night.  I didn't have time to look through their pages of their MON code and their CP code.

THE COURT:  Right.  But what about -- I thought you were talking about other search terms that you need.  You said the search terms were negotiated by one or two --

MS. WAGSTAFF:  Right.

THE COURT:  -- law firms.

MS. WAGSTAFF:  I could --

THE COURT:  And now it's an MDL, we need more search terms.

I mean, what do you have in mind?

MS. WAGSTAFF:  Right.  Well, I could -- we could have a list by -- today is Wednesday -- by Monday.

THE COURT:  Can you give me some examples of search terms that you don't believe were included, that need to be

1    included?

2         **MS. WAGSTAFF:**  Well, this sort of dovetails into the

3    third tier of the search term responsiveness that Mr. Miller is

4    going to handle.

5         But there is -- right now the search terms have a List A

6    and a List B.  And the -- for a document to be responsive, it

7    has to hit on both lists.

8         And those -- those lists were negotiated with the Miller

9    firm and adopted by this Court as part of the Hardeman-Stevik

10   production.

11        And then once those two lists -- once it hits on both

12   those lists, they're taking a third swipe at it, and they're

13   cutting off documents that they claim are not responsive, even

14   though they hit on both of those lists.

15        So, you know, we can have a list to you or --

16        **THE COURT:**  What does that have -- why are you -- I

17   don't even have a sense of -- I mean, are you just, sort of,

18   collectively getting together and saying, oh, my God, we might

19   need more search terms?

20        **MS. WAGSTAFF:**  Well --

21        **THE COURT:**  And if it's not -- if that's not merely

22   what you're doing, then you should have examples of search

23   terms that you needed that weren't included.

24        **MS. WAGSTAFF:**  I'm sorry that -- I apologize to the

25   Court that I don't have that list with me right now.

```
 1        A bulk of them are going to be MON numbers, CP code

 2   numbers.  And then numbers that were based off of --

 3        THE COURT:  But they said that they're going to

 4   provide you with documents that hit those search terms.

 5        MS. WAGSTAFF:  Well, this was the first time I had

 6   ever heard that.

 7        THE COURT:  That's great.  But what additionally are

 8   you asking for, though?

 9        I don't understand what you're asking for that you -- I

10   mean, you said, well, we want to come up with an additional

11   list of search terms by -- you know, in 21 days or something.

12        MS. WAGSTAFF:  Yeah.

13        THE COURT:  I assume that means that the search terms

14   have not been adequate.  Can you provide me with any

15   explanation for why they haven't been adequate?

16        MS. WAGSTAFF:  Well, I would -- I ask that this

17   dovetail into the ESI discussion that we're going to go into.

18   But it would be terms that relate to, you know, some of the

19   studies that we're finding, or some of the ghostwriting issues

20   that we're talking about, or some of the knowledge issues that

21   aren't on their face knowable right away.

22        When we -- when the Miller firm negotiated these search

23   terms, one of the things that they were looking at, I'm sure, I

24   don't want to speak for them, but I'm guessing, is, sort of,

25   the terms that are -- that were obvious right from the
```

1   beginning of the litigation.

2       It's very common in MDLs or in any litigation that goes on

3   for a while, where millions of pages are produced, that you

4   sort of refine and tweak and add search terms.

5       It's been my understanding that Monsanto has never, to

6   this day, said that they won't add search terms.  And if

7   they're saying today they won't add search terms, this is the

8   first I've heard of that.

9       I don't know if they're saying they won't go back and

10  apply the new search terms to old productions, or if they are

11  saying they won't apply new search terms to new productions.

12  So I'm not sure what their position is that they're taking

13  today.

14       **MR. LASKER:**  I guess, the issue for us, Your Honor, is

15  that six months have passed.  We did get information on the

16  search terms that plaintiffs raised, and they've had these

17  documents for a while.  And we went through the effort and we

18  are going to be producing documents that have those search

19  terms.

20       I had not heard until today that there would be more

21  search terms.  And that is a concern for us that we're

22  reopening this issue after six months, because Your Honor does

23  have a schedule.  And Your Honor had a schedule in Hardeman,

24  also, that we were working under.  So for us to reopen this

25  whole issue is of concern.

1    Now, there's a separate issue with respect to the third

2    tier and the ESI that we can discuss.  I don't see how that

3    relates to the initial search terms, though, that are used.

4    And, again, the search terms are extraordinarily broad.

5    They basically catch anything that deals with glyphosate or

6    Roundup or surfactants by any name you could come up with and

7    anything that deals with human safety.  And if there's any

8    discussions of those issues in the document, it's produced.

9    So all the subsidiary issues, if they relate up to the

10   glyphosate and human health, would be pulled in.  They get

11   those documents from those search terms.

12        **MR. MILLER:**  Your Honor, may I?

13   I negotiated that search term agreement with defense

14   counsel.  And it was expressly reserved that we could add new

15   search terms.

16   Because what you have got to understand, when we first do

17   this, we don't know what their documents look like.  We don't

18   know what terminology they use.  We have to look at their

19   documents in order to supplement the search terms.  And we told

20   them that, and they agreed.

21   Now, I apologize to the Court.  I should have had the

22   attorney here from Virginia that's working on that new, very

23   short supplement.

24   We're not trying to be overburdensome.  We're trying to

25   work within the frame work of the goodwill agreement we made

```
 1   with them that we would be allowed to supplement the search
 2   terms.  The only reason we didn't complete the list was because
 3   we couldn't get agreement on these acronyms that they agreed to
 4   last night while we were in the air.
 5        So now we're on the ground.  They've given it to us.  We
 6   have an agreement to supplement search terms.  We want them to
 7   honor that.
 8        We want to give -- we can give it to the Court as early as
 9   Monday, a very narrowly defined additional search terms.  And
10   that's all we ask.
11           THE COURT:  Okay.  I mean, so why don't you provide
12   the -- so we know there's going to be an additional search.
13   And it's going to include the -- these numbers.
14           MR. LASKER:  The MON numbers, yes.
15           THE COURT:  So by Monday, why don't you --
16           MR. MILLER:  We will.
17           THE COURT:  -- identify additional search terms that
18   you want to be a part of that search.
19           MR. MILLER:  We will, Your Honor.  Thank you.
20           THE COURT:  And if you have a dispute about whether
21   those search terms should be included in this new search, you
22   can submit a discovery letter to me next week, and I'll look at
23   it next week.
24           MR. MILLER:  Your Honor, thank you.
25           THE COURT:  And I'll resolve it next week.
```

1            MR. MILLER:  Fair enough.  Thank you, Your Honor.

2            THE COURT:  Okay.  So that's search terms.

3       Now, this third-tier-review issue.

4            MR. MILLER:  It will be brief.  But it's -- we'll try

5   to get you out of here, because I know you're not feeling good.

6       It goes like this:  We negotiate search terms.

7            THE COURT:  I read the papers.

8            MR. MILLER:  Then I'll cut to the chase.

9            THE COURT:  So I understand the issue is that you

10  don't agree that they should have conducted a further relevance

11  review after having hit documents that contained terms from

12  both columns.

13           MR. MILLER:  Yes, Your Honor.  That's exactly it.

14      And there's a -- so they then arbitrarily take 25 percent

15  of the documents out before they give them to us.

16           THE COURT:  What do you mean "arbitrarily"?

17           MR. MILLER:  We don't understand how or why.  If it

18  has search term 1 and search term 2, it's relevant.

19           THE COURT:  I mean, I -- the way I understood your

20  description of it is that they were conducting -- they were

21  reviewing those documents for relevance.

22           MR. MILLER:  I don't understand what they're reviewing

23  them for.  And if we said that, we weren't very clear in our

24  papers.

25      I don't know exactly what the Court's -- my understanding

1    is -- and perhaps it's time for Mr. Lasker to explain to us

2    both how they get rid of 25 percent of documents.  I don't

3    understand it.

4         MR. LASKER:  I would be happy to explain, Your Honor.

5         The additional relevance review is really very, very

6    limited.  And I'll give you two examples of why we're taking

7    documents out.

8         One of the terms in the search is "Roundup," which is

9    clearly the name of the product.  Unfortunately, it's also is

10   an English term that's used for roundup of news, for roundup of

11   other things.  And so we're hitting on documents that use the

12   word "roundup" that don't mean -- that aren't talking about

13   Roundup or glyphosate.  Those documents go out.

14        The other issue we've had, the main issue we've had, is

15   the term "glyphosate."  A number of Monsanto employees have the

16   term "glyphosate" in their title.  And if they have an email,

17   their title comes up with their email, regardless of what the

18   email is about.  And there's lots of emails or other documents

19   that have nothing to do with glyphosate or Roundup, but it's in

20   their title and it's being hit.

21        But as long as the document actually deals with

22   glyphosate, Roundup, the chemical, we're producing that.  And

23   it doesn't -- Your Honor, we're not making cuts based among

24   general causation or science.  If it deals with Roundup or

25   glyphosate, we're turning it over.  That's the direction.

1    So we're not making a further relevance cut and saying,

2    well, this is not glyphosate, but it's not really related to

3    the first phase.  We're not doing that.

4         **THE COURT:**  So --

5         **MR. LASKER:**  We're producing everything -- I'm sorry,

6    Your Honor.

7         **THE COURT:**  I was just going to ask, so people are

8    doing these reviews manually?

9         **MR. LASKER:**  Yes.  After -- after -- after we've

10   done -- because first we do the color, which is with the key

11   terms, key search terms, and that reduces the documents down.

12       And then the additional search is, frankly, just to make

13   sure that the documents deal with Roundup or glyphosate or

14   surfactants or any of the other chemicals that are of interest.

15        **THE COURT:**  Right.  So I guess what I didn't

16   understand when I read your papers is, what's wrong -- I mean,

17   they could have simply done a responsiveness review manually

18   from the start.

19       And if they saw a document that used -- that included

20   search terms but they determined was not responsive, they could

21   have put that in the nonresponsive pile.

22        **MR. MILLER:**  True.

23        **THE COURT:**  But, instead, they didn't -- they did the

24   searches first and then they reviewed the documents that hit

25   for responsiveness.

1    I mean, I don't understand what's wrong -- I mean, that's

2    civil litigation.  That's discovery.  That's how -- that's what

3    happens.

4        **MR. MILLER:**  This is what happens.  And I understand.

5    But what concerns us is, okay, so somebody has -- where I

6    think -- it shouldn't be in the nonresponsiveness pile.

7        **THE COURT:**  Sorry?

8        **MR. MILLER:**  It shouldn't be in the nonresponsive

9    pile.  If you can follow this for one second.

10    So I understand the explanation from counsel.  Somebody

11    has Roundup in their title, Director of Roundup.  So that's one

12    hit.  Then there has to be a second hit done.  There has to be

13    a hit for "glyphosate" or "IARC" or "genotox" or some other

14    hit.

15    So now they're saying although that document has a

16    discussion of genotox and Roundup, it's nonresponsive.  And

17    I -- at a minimum, I would like the Court to take a random

18    sample of these documents and look at them in camera, without

19    us seeing them, to see if, in fact, those documents are, in

20    fact, nonresponsive.

21    I think there is an opportunity for error in failing to

22    turn over relevant documents under the process as they've laid

23    it out.

24        **THE COURT:**  Denied.

25        **MR. MILLER:**  Thank you for your time.

1          **THE COURT:**  Okay.  Any other discovery issues we need

2    to talk about?  Somebody said we need to talk about ESI.

3          **MS. GREENWALD:**  If Your Honor has --

4          **THE COURT:**  Sure.

5          **MS. GREENWALD:**  So I need my glasses.  Sorry.

6       I know how you feel, so I'm going to try to make this as

7    short as I can.

8       And Mr. Jaffe is here today, if Your Honor would like to

9    ask him any questions.  He is the consultant who we jointly

10   hired to work on some of the ESI issues that we've had.  I

11   think Ms. Wagstaff mentioned that they had a full day in

12   St. Louis with a Mr. Dodson from Monsanto to talk about some

13   ESI issues.

14      There's basically three points -- actually, two that I

15   would like to talk about as big picture.

16      The application with the ESI order that was negotiated in

17   Hardeman at this point has led to some problems with the

18   production.  And a lot of that is a result of not fully

19   understanding how electronic data is housed at Monsanto.

20      And after the ESI order, and implementation of that and

21   production of documents, Mr. Jaffe learned that there are some

22   unique aspects of storage of electronic information at

23   Monsanto.

24      And some of that is a function of the fact that glyphosate

25   was first created in the '70s, and now we're in 2016.  And, as

1  we all know, electronic data storage has changed substantially

2  over the course of 40-plus years.

3      So there's a lot of technical issues, Your Honor.  I don't

4  know -- I certainly am not as well-versed in the technology of

5  ESI as Mr. Jaffe, if Your Honor would like to hear from him.

6  If you want to hear from me, I will try to give you some

7  big-picture issues.  But I think that questions that you may

8  have that are specific would be better addressed by him.

9      But, for example --

10      **THE COURT:**  Whatever you know about ESI and the

11  technical issues, I know probably a hundred times less.

12      **MS. GREENWALD:**  Oh, you don't want to say that.  You

13  just insulted yourself, because I am really a dinosaur when it

14  comes to this.

15      I can give you some highlights that we're finding.  So one

16  issue is Monsanto has several unique categories of ESI.  And

17  there's some names for them, like "red laboratory notebook."  I

18  won't go over those details.

19      But there's, like, decentralized software that they have

20  within the system.  And the way the ESI order is currently

21  written, we're not getting the full breadth of -- of

22  information that we need.

23      The other issue that we're having a problem with is

24  something called SAS software.  And that is an acronym for

25  essentially what you and I might think of as an Excel

spreadsheet; numbers, documents.

When we get that in a pdf, you can't use it.  You can't really fully understand.  The columns don't even match up.  So it needs to be produced in, I guess, in a common parlance, what I might call native format, but something that would be a document that our side could actually use, understand and read in the format that it actually originally occurred.

Some documents are really large.  When they're broken down into very small categories -- I mean, small formats we can't make them out.  There's just been quite a few issues with the production in ESI generally.

I can also tell you that in a case that we were working on with Monsanto in the Eastern District of California before there was centralization, we had been negotiating with Monsanto to make some changes to the heart of the order in light of some of the problems I was learning from Ms. Wagstaff and Mr. Miller about some of the problems they were having with the ESI order as implemented in this case.

And it was our understanding, from our firm's perspective, that Monsanto was somewhat willing to meet us two-thirds, three-quarters of the way.  I'm not sure that that's still the case.

But I believe that if Your Honor has some specific questions of actual data that we're having a problem with, Mr. Jaffe is here and would be better at explaining it, if Your

Honor has five minutes of energy that you can give him an opportunity to explain.  If you don't want him to, that's fine also, but he is here.

**THE COURT:**  Well, I mean, I'm trying -- trying to get to the bottom line of what, if any, disagreement you all have about the protocol.

**MR. LASKER:**  I think, Your Honor, if we might, maybe I'll cut through this; although, we may talk with their ESI expert offline.  But the two issues that we understood that were still being negotiated or still being discussed, I think we can actually resolve amongst ourselves pretty easily.

We had some concerns about language that was unrelated to those issues, that don't -- that we couldn't understand.  But there's an issue of TIFF versus native, and I think we can resolve that pretty easily.

And the issue of global duplication with the enhanced field and paths, if that's what you're talking about, I think we can resolve that pretty quickly.  So I don't know whether we need to use the Court's time on that.  I think we can satisfy you on both of those points.

Again, part of the issue we had on ESI, that led to it not being resolved, was other things we didn't understand.  But we weren't sure if plaintiffs had concerns on it.  Those are the two issues.  I don't think we need to take up the Court's time at all.

1        **MS. GREENWALD:**  I think there's some more.  I think

2   there's others.

3        So, for example, another one I can explain in a pedestrian

4   way, is that Monsanto keeps electronic libraries.  And where it

5   stores those -- for example, in the old days, there would be an

6   index card, and you would go to the index card.  And how a

7   company actually -- so, for example, back when I was a

8   prosecutor, we used these (indicating).  And what you would put

9   on this document might be relevant to how you coded that, how

10  you -- how you maintained that document.

11       And these kind of electronic libraries that Monsanto uses

12  now, we're not getting that information in the current ESI

13  order.  So that's another example of, as I understand it, the

14  kind of information -- it's not a question of changing the ESI

15  order.

16       We're not asking for an entirely new ESI order.  I think

17  we're asking for some supplementation, some clarification, and

18  a little more specifics to the ESI order so that we're really

19  getting, first of all, the full breadth of the ESI information

20  that Monsanto holds, and, second of all, that we make sure that

21  we get the ESI -- that the ESI being produced is relevant to

22  the time period in which that information was kept, so that the

23  1970s and '80s is being produced.

24       So the order doesn't necessarily apply to each decade, so

25  to speak.  It was more designed to what I will call modern day.

And since a lot of these documents are older, Mr. Jaffe's explained to us that it's not going to produce some of the older documents in a way that would be relevant and useful for the plaintiffs to use -- I mean to be able -- in other words, it won't provide useful information for us to be able to review.

And what we're really trying to avoid is to have a lot of litigation over getting documents that we can't understand, we can't use, and then having dozens of meet and confers on individual documents because the production of it isn't in a useful format for us to be able to understand the documents and use them properly.

I mean, if this is something that we can negotiate without burdening Your Honor, I'm all for it.  I really am.  But on the call that we had a week ago, that was not the answer we were given.  And so if there's a change of heart, we're fine with that.

And we are more than happy to meet and confer on these issues, but it's more than the two that Mr. Lasker referenced.

**MR. LASKER:**  I don't know if it's worth having more conversation on this, Your Honor.  We had a list of 12 items we went through.  We thought we reached agreement on ten of them, and there were two left.

The problem we had last week was that we then got a proposal that revised a lot of narrative language in the

1  agreement that had been reached, without any explanation for

2  that.

3      Maybe it is that there's only technical issues that need

4  to be resolved.  I think it's -- I'm fairly confident saying

5  that this may not be the forum to try to work through all of

6  those.  We can revisit those.

7      But I know for the two issues that were outstanding, that

8  we can, I believe, resolve that.  And hopefully we can do the

9  others.  I don't -- I don't know that this would be a useful

10 expenditure of the Court's time.

11      **MS. GREENWALD:**  I'm getting a positive head shake from

12 our consultant that he believes these may very well be

13 technical and we can hopefully work them out.

14      And we've asked Monsanto if they can at least get some

15 small group together early next week.  Mr. Miller and

16 Ms. Wagstaff and I will go to D.C. so it's convenient for them.

17 And maybe we can start working out the process of working out

18 these issues.

19      So unless Your Honor --

20      **THE COURT:**  I was about to leave and leave you in here

21 until you worked it all out.

22      **MS. GREENWALD:**  Okay.

23      **THE COURT:**  Do you want to do that?

24      **MS. GREENWALD:**  We can do that too.

25      **MR. LASKER:**  Your Honor, there are actually folks who

1   are -- would be useful in the conversation that aren't in the

2   room from Monsanto.  If we can have phone call --

3         MS. GREENWALD:  Well, maybe -- I didn't mean to

4   interrupt.  I'm sorry.

5         MR. LASKER:  These issues end up being pretty

6   technical, as I understand it.  And working through the

7   documents and actually having examples that we can then both

8   look at at the same time, I think, makes that more useful.  I

9   don't know that we could do that in this courtroom.

10        MS. GREENWALD:  What I would recommend actually, Your

11   Honor, which I actually think is a great idea, we're all here.

12        I understand that some of your colleagues are not, but if

13   they can get on the phone, Mr. Jaffe is here.

14        We're here.  It would be great if we could go in a

15   conference room or somewhere and be able to call them, and

16   Mr. Jaffe can explain in much better ways than I can some of

17   the problems with the current ESI order.

18        And maybe we can hash it out right now.  I mean, I'm

19   ready.  I'm available.  I'm willing to do that if that's

20   acceptable.

21        MR. LASKER:  Your Honor, my concern is, I know these

22   conversations are lengthy.  Sometimes takes a significant -- I

23   don't know what the issues are going to be that they're going

24   to raise.

25        It would be nice to think we'd be done in 15 minutes or a

1   half hour.  But if they're planning on flying out for a meeting

2   to go through these issues, it suggests to me it's going to be

3   much more lengthy discussion that would keep the rest of --

4   keep us here for a few hours, if we can resolve it.

5       And I just -- I don't know, again, what issues are going

6   to be raised.  But I don't think it's something that can be

7   done in a 10-, 15-minute meet and confer.

8       **MS. GREENWALD:**  I can tell you -- and I won't belabor

9   this anymore -- we went over it last night in 20 minutes.  I

10  think we could make a lot of progress.

11      **THE COURT:**  Yeah, but you went over it last night in

12  20 minutes and you couldn't even articulate to me what the

13  problem is.  And you've got your guy nodding his head when he's

14  saying that he thinks there's only a couple of technical issues

15  left that can be worked out.

16      So what am I supposed to do with that?

17      **MS. GREENWALD:**  I understand, Your Honor.  This is --

18  it's unfair to you.  I don't -- I don't disagree.

19      So I think the technical issues that Mr. Lasker is talking

20  about, we've had several ESI problems.  One of them was a

21  specific letter that is not before Your Honor, and there was

22  some technical problems with some duplications of documents

23  that were produced.

24      And we agree that that's probably going to be worked out.

25  That's the subject of a letter that Your Honor hasn't even

```
1   seen.  It was never brought before you.  That's separate and
2   apart from the ESI protocol and some of the problems that we've
3   experienced with the current ESI protocol in the production
4   that's occurred thus far.
5       So one of my -- I mean, I'm at a little bit of a handicap,
6   because I wasn't part of the original negotiation of the ESI
7   order in Hardeman.  And I wasn't part of some of the problems
8   with the production there.
9       I only know what we were negotiating in another case
10  before centralization.
11          THE COURT:  Here's what we're going to do.  You need
12  to have -- you, the lawyer, need to have a full and complete
13  understanding of what's going on --
14          MS. GREENWALD:  Okay.
15          THE COURT:  -- and the ability to explain it.  And
16  until you develop a full and complete understanding of what's
17  going on and the ability to explain it to me, I'm not going to
18  get involved in it.
19          MS. GREENWALD:  I understand.
20          THE COURT:  And so when do you want to come back with
21  a full and complete ability to understand what's going on and
22  explain it to me?
23          MS. GREENWALD:  I understand.
24          THE COURT:  I mean, I'm available.  Anytime you want.
25  Do you want to do it next week?
```

1    **MS. GREENWALD:**  I will have my colleague do it.

2    Actually, Ms. Robertson is here.  She really understands it.

3    She has been negotiating it.  And we did tell Monsanto in

4    advance of today that we were going to have Mr. Jaffe come.  We

5    did explain that.  So in fairness --

6         (Unreportable simultaneous colloquy.)

7         **THE COURT:**  You're a lawyer.

8         **MS. GREENWALD:**  I understand.

9         **THE COURT:**  And you're raising an ESI issue with me.

10   If you're going to raise an ESI issue with me, you have to have

11   complete understanding of it and the ability to explain it so

12   that I can provide some assistance.

13        **MS. GREENWALD:**  I understand.

14        **THE COURT:**  It sounds like you don't even know what

15   you're arguing about.

16        **MS. GREENWALD:**  I'm not as well versed as I should be.

17   I agree, Your Honor.  And I don't know if you would be willing

18   to have Ms. Robertson come up and explain.  She has been

19   negotiating this, and she understands it much better than I do.

20        **THE COURT:**  If there's an actual dispute that needs to

21   be resolved, we're at the point where there's an actual dispute

22   that needs to be resolved, and you have a lawyer who

23   understands how to explain it to me so that I can address it,

24   I'm happy to do that.  Whether it's now or later.

25        **MS. GREENWALD:**  Okay.  Do you --

1          **THE COURT:**  Doesn't seem like you know.

2          **MS. GREENWALD:**  I only know the very big picture.  I

3     agree, Your Honor.

4          **THE COURT:**  Sounds like, basically, all you've said to

5     me is we're having some problems with electronic --

6          **MS. GREENWALD:**  No.  I mean, I do understand.  Like,

7     the library issue that we don't have access to how they

8     actually keep those documents within ESI.  I understand the big

9     picture of -- of the -- the -- sort of, the different decades

10    of documents and how the ESI order doesn't cover how it should

11    be produced in each of those eras of document preservation.

12       Like, right now the documents are on a cloud.  And in the

13    olden days, of course there was no cloud.  The specifics of

14    that, I'm not capable of explaining.  And I agree.

15       So I think you're right, Your Honor, whether you want to

16    do it today, in a week or two weeks, someone other than me

17    should stand up here before you and explain those details,

18    because I'm not the right person for that.  I agree.

19         **THE COURT:**  Okay.  Well, here's what I'll order you to

20    do:  By Monday file with the Court -- if you haven't worked out

21    your problems, file with the Court a proposed modified ESI

22    protocol, or whatever you people call it, with a detailed and

23    clear explanation of what you're modifying and why it needs to

24    be modified.

25         **MS. GREENWALD:**  Perfect.  We can do that.

```
1         THE COURT:  And then Monsanto can respond seven days

2    later.  And I will either issue the modified order or not, or

3    partially modified.

4         But it needs to be a very clear and detailed explanation

5    of what the problem is and what -- if you're proposing a change

6    to the protocol, provide a detailed and clear explanation of

7    the problem that you are solving by proposing a particular

8    change.

9         MS. GREENWALD:  We will do that, Your Honor.

10        And if it would help, we can provide a marked-up version,

11   red-line.  I know some Courts like to get the red-line version

12   so you can see what the original was and the proposals we're

13   making, and then we can explain each red-line change and why

14   and the relevance of it.

15        THE COURT:  Yes.

16        MS. GREENWALD:  We're happy to do that.  And I

17   apologize that I'm not better versed in this.

18        MR. LASKER:  Your Honor, seven days from Monday would

19   be right after Thanksgiving.  Could we ask for ten days?

20        THE COURT:  Sure.

21        MR. LASKER:  Or the following Friday?

22        THE COURT:  Sure.

23        MR. LASKER:  I appreciate that, Your Honor.

24        THE CLERK:  The following Friday or ten days?

25        THE COURT:  The following Thursday.  Ten days; right?
```

1    Okay.  So what else do we need to discuss?  The schedule?

2    **MR. MILLER:**  Scheduling, Science Day, and the

3    potentiality of an independent expert.

4    **THE COURT:**  I was thinking -- so independent expert,

5    what I was thinking of is maybe, sort of, a technical expert

6    for me, not somebody who would testify but somebody to help me

7    understand the science.  And what I would propose is that we

8    table that until after Science Day.  Let's, sort of, see how I

9    feel after Science Day.

10   **MR. MILLER:**  If I may then, Your Honor, ask, what

11   would the Court expect from the parties at Science Day?

12   **THE COURT:**  Presentation from -- basically a lesson in

13   the science that is -- that underlies all of this stuff.

14   **MR. MILLER:**  Very well, Your Honor.

15   **THE COURT:**  A sort of, here are the basics, Judge,

16   that you need to -- that we want to familiarize you with so

17   that you can understand the science and understand the expert

18   testimony.

19   **MR. MILLER:**  And would the Court want that from the

20   lawyers or from experts?

21   **THE COURT:**  Experts.  And it would be off the record.

22   **MR. MILLER:**  Okay.

23   **THE COURT:**  And we may -- we may video it, actually,

24   just so that we have it internally.  But it would be off the

25   record.  And there would be no -- as I think I indicated in the

1   order, no, you know, questions about what those people say in

2   their depositions on it.

3         **MR. MILLER:**  Would we be allowed to do the depositions

4   of the corporate representatives prior to Science Day, or does

5   the Court contemplate doing the Science Day earlier?

6         **THE COURT:**  I hadn't given -- I was hoping to do it

7   sooner rather than later because I assumed it might help me

8   give -- give me more equipment to resolve potential discovery

9   disputes.  But I haven't given a lot of thought to exactly when

10   it should happen.

11         **MR. MILLER:**  And last question, would the Court

12   contemplate that we would identify the witnesses we're going to

13   bring to Science Day prior to Science Day?

14         **THE COURT:**  Why not?

15         **MR. MILLER:**  Okay.  Just asking.

16         **THE COURT:**  Any reason not to?

17         **MR. MILLER:**  I couldn't think of any.  I just -- as

18   long as we apply the case of goose versus gander, it seems fair

19   to me.

20         **THE COURT:**  Okay.  I mean, I don't particularly care

21   about that, I don't think.

22     Okay.  So let's -- let's start putting together a

23   schedule.

24     First of all, what are people's thoughts about *Daubert*

25   hearings in June or July versus October/November?

1          **MS. WAGSTAFF:**  Your Honor, we had a brief --

2          **MR. HOLLINGSWORTH:**  Your Honor, can I inquire about

3    Science Day, please?

4          **THE COURT:**  Yes.  Sure.

5          **MR. HOLLINGSWORTH:**  We gave some thought to Science

6    Day.  And we respect Your Honor's suggestion on that, of

7    course.

8       And we thought that Science Day should be a general

9    approach to what glyphosate is, how glyphosate works, just as

10   background, as not the scientific evidence.

11      But the science, we thought, would involve the 14 animal

12   studies that we know are out there worldwide and what's known

13   about them.  We thought it would -- should involve the human

14   health epidemiology and what is known about them

15   scientifically.  We thought it should involve the so-called

16   genotoxicity studies and what is known about them.

17      We thought that it should be something that is presented

18   by the experts, as Your Honor suggests.  We thought that that

19   could be done by PowerPoint.  We thought that that should be

20   something that is in a lectured-style format by these experts.

21      We thought that the Court should be, with all due respect,

22   asking the questions, not the lawyers; that there wouldn't be

23   cross-examination.

24          **THE COURT:**  I agree with that.

25          **MR. HOLLINGSWORTH:**  That there wouldn't be a record.

1     We thought that the PowerPoint or other presentations that

2     might go with that should be submitted before the hearing by

3     each of the parties to Your Honor, but not submitted by the

4     parties to each other.  That's what we thought.

5           THE COURT:  All that sounds fine.  The only thing I

6     want to make sure we're on the same page on is I -- I mean, I

7     know it's a fine line, but I view this much more as building

8     the foundation for your final argument as opposed to making

9     your final argument about the science.

10          Does that --

11          MR. HOLLINGSWORTH:  I appreciate that.  I agree with

12    that.

13          So it wouldn't be adversarial.  It would be an explanation

14    of what all these components of what the evidence are and what

15    Your Honor is going to have to deal with in evaluating this

16    evidence for reliability and relevance under *Daubert*.

17          THE COURT:  Yeah.  And -- and one thing I want to make

18    sure that everybody understands is, I don't know if you noticed

19    me drinking from this mug.  This is a UC Santa Cruz mug.  I

20    went to UC Santa Cruz.

21          I took one science class at UC Santa Cruz.  Do you want to

22    know what it was called?  Physics for Poets.

23          So I want you -- I mean, the reason I want Science Day is

24    because I need the basics, the real basics.  And I want that to

25    be the focus of Science Day, is sort of giving me the

1  foundation to understand what your experts are going to be

2  presenting later, giving me the tools to understand that.

3      I don't want the focus to be -- I don't want your experts

4  to give me a, sort of, detailed argument for why Roundup does

5  or does not cause cancer.

6      Does that make sense?

7          **MR. HOLLINGSWORTH:**  Yes, I think it does.

8      There are -- worldwide, we think there are 14 or 15

9  long-term animal bioassays that evaluated the carcinogenicity

10  or not of glyphosate.

11      And we would present to you not -- not an argument as to

12  what we think that means in terms of the reliability or not of

13  pointless experts, but rather what those studies are, how long

14  they have been around, how they get evaluated, what kind of

15  expertise is needed to evaluate those things.

16      Same thing with respect to epidemiology.  I don't know,

17  with all respect, what Your Honor knows and has been involved

18  in on human health epidemiology, but those studies get

19  evaluated in a number of ways.

20      One major way that sort of subset of expertise that comes

21  into the evaluation of those studies is biostatistics.  So we

22  would want to explain to Your Honor how biostatistics gets done

23  on those kinds of studies.

24      Biostats also get done on the animal studies themselves.

25  So that would be an important, sort of, subset of what I think

1    that Your Honor would want to know about by way of background.

2        One final thing.  We would also include, although we think

3    it's a sideshow, we -- to the actual issue of what's reliable

4    and relevant under *Daubert*, we would also include what IARC

5    did, what the IARC monograph is, what EPA has done, what is the

6    nature of their various regulatory evaluations, and what -- and

7    just what that means, and what else is available in the way of

8    other worldwide regulatory evaluations for whatever that is

9    worth.

10       I think that is the kind of background that Your Honor

11   will need, given my understanding now, or what will be used by

12   both parties to make their case on *Daubert* or not.

13       **THE COURT:**  Well, I mean, on the issue of, you know,

14   background on the IARC and background on the EPA and what they

15   look for and stuff, I mean, I'm not sure why I need that now as

16   opposed to when we get to the *Daubert* motions.

17       You know, what I want is the technical -- I want you to

18   educate me on the technical aspects of this stuff, to, like I

19   said, give me the tools, you know, to help understand the

20   expert testimony that will come.

21       And so I guess my gut -- you know, I hadn't thought about

22   this carefully and I'm, you know -- I don't know if we have to

23   make a final decision about it now or not, but my gut is that,

24   you know, the -- how the EPA works and how the IARC works may

25   be a little bit removed from that, and removed from what I --

1   you know, the tools that I was hoping to develop coming out of

2   Science Day.

3           MR. HOLLINGSWORTH:  I appreciate that, Your Honor.  We

4   appreciate your reaction to that.  And I understand that.  And

5   I think I accept that.  So that was -- that was a side comment

6   that I made at the end anyway.

7       So I think that with -- with that, that we certainly would

8   want to do Science Day for Your Honor and do the best job as --

9   that we can.

10      One last question.  Are we talking about, say, a half day,

11  where the plaintiffs present for an hour and a half and we

12  present for an hour and a half, and Your Honor is asking

13  questions the whole time?

14          THE COURT:  Yeah.  Something along those lines, yeah.

15  Like maybe, you know, meet at 10 o'clock, and go until, you

16  know, one side goes until the lunch hour.  And then after lunch

17  we go another hour and a half or something like that.

18          MR. HOLLINGSWORTH:  I think we could put something

19  together between the two sides here and come up with a proposed

20  schedule for Your Honor.

21          THE COURT:  Okay.

22      So let's put together the overall schedule then, shall we?

23          MS. WAGSTAFF:  Your Honor, at this -- I could maybe

24  short-circuit this for you a little bit.  Mr. Holllingsworth

25  and I -- or Mr. Lasker, all three of us, were talking during

1    the lunch break.  And given your options of a June or an

2    October, I think we're all in agreement that October would

3    work.

4        Plaintiffs are -- we were going to come in today and agree

5    to the proposal with -- that Monsanto made, with a few

6    additions.

7        So knowing that we've agreed that the *Daubert* ending and

8    the oral argument will happen sometime the week of -- second or

9    third week of October, we would propose that we could put a

10   schedule together for you.  And hopefully it would be a joint

11   proposal and submit it to Your Honor.

12       There may be one issue we might need to flush out right

13   now, but other than that I think it might be your best -- best

14   use of your time to give us a chance to agree on something.

15       **THE COURT:**  Okay.  Yeah.  I guess, let me look at my

16   notes and --

17       **MS. WAGSTAFF:**  And a couple of other -- well, I'll let

18   you look at your notes.

19       **THE COURT:**  So, I mean -- hold on a second.

20       **MS. WAGSTAFF:**  And we're talking about the schedule

21   that's on page 14 and 15 of Monsanto's case management

22   statement?

23       **THE COURT:**  Right.

24       **MS. WAGSTAFF:**  I believe what we discussed is, as a

25   general proposition -- and this may have to tweak once we get

1   into the minutia -- we were talking about adding perhaps 60

2   days to most of these deadlines.  Again, with just a few tweaks

3   that hopefully we can agree on with Monsanto.

4        **THE COURT:**  Well, just because we're pushing back the

5   *Daubert* hearings 60 days, I don't know if I would push these

6   other deadlines back, automatically push them back 60 days.

7        I would suggest building some more time in so that you're

8   not squeezed -- you're not too squeezed at the end.

9        **MS. WAGSTAFF:**  Well, let me ask the Court this:  How

10  much time -- let's say -- I don't have a calendar in front of

11  me, but if we have October 15th for the possible live

12  testimony, what day would the Court like the reply briefs?  How

13  much time between the reply and live testimony?  And then we

14  can work back from there.

15       It's a Sunday?  So October 16th.

16       **THE COURT:**  So what are you -- let me ask a couple of

17  questions about that.  What are we envisioning in terms of

18  briefing?

19       I know that Monsanto said something about that in its case

20  management statement, but I think -- you were contemplating

21  cross motions for summary judgment.  I assume there's not going

22  to be a motion for summary judgment from the -- from the

23  plaintiffs on the issue of causation.

24       **MS. WAGSTAFF:**  I'm not sure.  But, you know, there

25  will be -- you know, it's hard to say with a knee-jerk reaction

that there won't be any *Daubert* motions or summary judgment
motions; right?

But I certainly anticipate filing some offensive *Daubert*
motions.  And so I would prefer -- and I discussed this just
very briefly, and they haven't had an opportunity to digest it,
but I propose just we have a -- you know, as written, it's
Monsanto's motion for summary judgment and *Daubert* motions due.
I propose that we have just had summary judgment motions and
*Daubert* motions due.  And I would propose that we just had a
motion and then, you know, three weeks later or something like
that, responses due, and then a reply due.  And --

**THE COURT:**  Yeah, I really don't -- I've never found
simultaneous briefs to be helpful.  I think it's much better to
have sequential briefs.

So I don't want you filing -- and I think it makes a lot
more sense the way they've -- I don't care who goes first, but
I think it makes a lot more sense for Monsanto to file its
motions about your experts, and its summary judgment motion
assuming it's going to file one.

And then you respond to that.  And at the same time, if
there's any -- there are any experts you want to knock out of
theirs, you can move at that time to do that.

So that there are basically four briefs instead of six
briefs.  And they're filed sequentially rather than
simultaneously.  I think that's better for everybody actually.

1          MS. WAGSTAFF:  Okay.

2          THE COURT:  Definitely better for me.

3          MS. WAGSTAFF:  That's what's most important.

4      As long as the plaintiffs have an opportunity, if it makes

5  sense, to file a *Daubert* brief on their experts, then I'm

6  fine --

7          THE COURT:  You mean on the defendant's experts?

8          MS. WAGSTAFF:  Exactly.

9          THE COURT:  Yeah.  You do that.  So round one is their

10  briefs on summary judgment and *Daubert*.  Round two is your

11  response to them and anything affirmative you want to argue.

12  And then round three is their reply to their -- their reply on

13  their original motions and any response to any affirmative

14  motion that you filed.  And then round four is your reply.

15          MS. WAGSTAFF:  So I'm okay with that stagger.  We can

16  figure out dates, I'm pretty confident, and submit something to

17  you by Friday --

18          THE COURT:  I thought -- I thought that the proposal

19  would be one brief.  And the page limitations that were

20  proposed sounded right to me that were included in Monsanto's

21  case management statement.  All that sounded right.

22          MS. WAGSTAFF:  The only -- I would just request that

23  however many pages they have, we have the similar amount of

24  pages.

25      And right here, maybe I'm reading this incorrectly, it

1    says that their reply is 50 pages and our reply is 30.   But

2    we'll work that out.

3            THE COURT:   Yeah.   I mean, maybe you should get 10

4    more on your oppositions and cross motion.

5            MS. WAGSTAFF:   We'll figure something out that's fair.

6            MR. LASKER:   I believe we can work that out, Your

7    Honor.

8            THE COURT:   Yeah.

9            MS. WAGSTAFF:   One concept that I would like to

10   incorporate into this schedule is, we would like to submit case

11   specific expert reports for five plaintiffs when we submit our

12   expert reports, just so that when our experts get deposed that

13   they do not have to be deposed twice.   They can be deposed on

14   case specific and on general.

15           THE COURT:   I think that's, sort of, contrary to the

16   spirit of what we're doing here, which is focusing on general

17   causation.   And your experts might have to get deposed twice.

18           MS. WAGSTAFF:   Okay.   Thank you, Your Honor.

19           THE COURT:   I saw there you had this proposal for

20   trial dates in early 2018.   We're going to do causation first,

21   then we're going to decide that question.   And then we're going

22   to -- or decide whether you can go to the jury on that

23   question.

24         And then we'll -- then we'll pick -- I mean, I don't have

25   an objection to, like, you people doing the work of identifying

1    five plaintiffs and starting to get them ready.  But we're not

2    going to proceed on those five people until after we get done

3    with this.

4        So let me look at my -- let's see.

5            **MS. WAGSTAFF:**  So does Your Honor have any conflict

6    with October 16th?

7            **THE COURT:**  The other question I was going to ask is,

8    how long do you think this will all take?

9        It's hard to know right now, I guess.  Although, I'm sure

10   Monsanto knows who its experts are going to be already.  You

11   may know who your experts are going to be already.  Probably

12   know who each other's experts are going to be already.  Don't

13   you?

14           **MR. LASKER:**  Not sure, Your Honor.

15           **MS. WAGSTAFF:**  We probably know theirs more than they

16   know ours.

17           **MR. LASKER:**  The hearing -- the evidentiary hearing

18   can go -- we've had *Daubert* hearings.  And it's the plaintiffs'

19   burden on *Daubert*.  They'll be presenting experts.  And that in

20   some ways drives it.

21           **THE COURT:**  Wasn't there -- there were *Daubert*

22   hearings on this issue or an issue similar to this issue in the

23   D.C. District Court.

24           **MR. LASKER:**  No, Your Honor.

25       In that case, actually, the judge resolved it on the

 1    papers without a *Daubert* hearing.  And I think it's because he

 2    viewed the issue as being so clear-cut on the papers that he

 3    didn't need a hearing.

 4         **THE COURT:**  Where is that judge now?

 5         Don't answer that question.

 6         **MR. LASKER:**  Okay.  But as far as evidentiary hearings

 7    are concerned, we've had evidentiary hearings that have lasted

 8    two weeks on *Daubert*.  We've had some that have been shorter.

 9    It does depend for us on who the plaintiffs are.

10         Again, it's their burden.  They're going to try to present

11    experts who can meet their burden.  And that does dictate how

12    long the hearing will be for Your Honor to be able to hear that

13    testimony and the testimony of our experts in response.

14         **MS. WAGSTAFF:**  And clearly we disagree with your

15    characterization of what happened in the D.C. District Court.

16         (The Court and courtroom deputy confer off the record.)

17         **THE COURT:**  I was assuming -- I developed an

18    assumption in my mind, and I don't know whether this is right

19    or not, that it would take the bulk of the week.  That may be

20    wrong.

21         I was kind of thinking if we could do it a week earlier in

22    October because of that big criminal trial that looks like it

23    might happen on November 10th.

24         **MS. WAGSTAFF:**  We're fine with October 8th.

25         **THE COURT:**  Are there any other big items jumping out

1    at you, Kristen, on that?

2            **THE CLERK:**  That Monday is blocked, Columbus Day.

3    Would you rather go the week before, like the 2nd then?

4            **THE COURT:**  Do we have any other big -- what big -- do

5    I have any big-ticket items in October right now?

6            **THE CLERK:**  The last week of September you have a

7    bench trial in OM Communications versus AT&T Corp.

8            **THE COURT:**  I don't think that will go.

9            **THE CLERK:**  Other than that, everything else seems --

10           **THE COURT:**  Standard.

11           **THE CLERK:**  Yeah.

12           **THE COURT:**  Why don't we do the week of -- start it

13   the Tuesday after Columbus Day, on October 9th or whatever.

14           **THE CLERK:**  October 10th.

15           **THE COURT:**  Yeah.  And, Kristen, why don't we block

16   out law and motion calendar that week so that I don't have to

17   be preparing for law and motion calendar on the 12th or 13th,

18   whatever it is.

19       And we'll do it then.  So as we get closer, I assume

20   you'll have a better sense of how long, how many experts are

21   going to testify and all that.  And we can drill down more on

22   how long it will take and what the hours are and stuff like

23   that.

24       And I was going to ask a couple more things.  Protective

25   order.  I mean, can we just all agree now that the protective

1    order applies in every case?  Any objections?

2           **MR. MILLER:**  No.

3           **THE COURT:**  The protective order applies in every

4    case?

5           **MR. LUNDY:**  Your Honor, I don't think we do agree

6    right now.

7           **THE COURT:**  You don't?

8           **MR. LUNDY:**  There might be some provisions that need

9    to be made on the original protective order.

10          **THE COURT:**  Okay.  As of now, the protective order

11   applies in every case.  If you want to move for relief from

12   that or move for a change, you can file a motion seeking a

13   change.  But for now, the protective order applies in every

14   case.

15          **MR. LUNDY:**  Thank you, Your Honor.

16          **MS. WAGSTAFF:**  Your Honor, just so we're clear, you're

17   talking about the protective order that was entered in the

18   Hardeman case; right?

19          **THE COURT:**  Correct.

20          **MS. WAGSTAFF:**  Because it was a different one in the

21   Stevik case.

22          **THE COURT:**  Okay.  Yes.  And if you could reflect that

23   in your -- in your scheduling order that you're going to

24   prepare for me, I would appreciate that.

25        Also, reflect in your scheduling order the deadlines we

1   talked about a little bit earlier, that you have a deadline of

2   Monday for the ESI -- for making -- for submitting a proposed

3   revised ESI protocol if necessary.

4       And then there was another deadline, I think, we set also.

5   I can't remember what that was.

6           **MS. WAGSTAFF:**  Search terms.

7           **MR. MILLER:**  Search terms, Your Honor.

8           **THE COURT:**  Search terms.  When was that?

9           **MR. MILLER:**  On Monday.

10          **THE COURT:**  Right.  That should be included in this

11  scheduling order that you submit to me.

12          **MS. WAGSTAFF:**  Okay.

13          **THE COURT:**  I want you to submit the scheduling order

14  by the end of this week.

15      And then what else did I -- let's see.  Protective order.

16  Wanted there to be a deadline for the submission of an order

17  regarding deposition protocols.  That will be included, I take

18  it?

19          **MR. LASKER:**  Yes, Your Honor.

20          **THE COURT:**  I guess there will be some sort of phased

21  deposition scheduled where we have a deadline for completing

22  the 5 or the 12 or whatever in such a such a date.  There

23  should also be the deadline for completing the remaining

24  depositions is such and such a date.

25      Maybe there would be three phases.  I don't know.

1      There should be a deadline for identifying additional

2  document custodians.

3          **MS. WAGSTAFF:**  Your Honor --

4      **MR. LASKER:**  Yes, Your Honor.  We'll reserve, and

5  we'll discuss this and put it into the schedule, the issue

6  of -- if there are disagreements on the issues of custodians or

7  depositions, we can address that.  We'll have that in the

8  schedule as well.

9          **THE COURT:**  Yeah.  Then I was going to talk about when

10  we should have our next status conference.

11          **MS. WAGSTAFF:**  Your Honor, I'd like to discuss real

12  briefly, and I haven't had a chance to talk about this with

13  Mr. Lasker, but the idea of a direct filing order.  I'm not

14  sure how the Court feels about that.

15      But right now when we file new cases, we're having to file

16  them all over the country, and then they get transferred in.

17      It's a very common practice in MDL to have an order that

18  we can directly file.  Again, I haven't spoken with him, so he

19  hasn't had a chance to talk to his client, but I would like to

20  put that on the Court's radar.

21      I don't know if -- I guess maybe we could propose a meet

22  and confer.  And if they're agreeable to the concept, we could

23  propose an order to you.

24          **THE COURT:**  And so the order would say what?  That

25  anytime anyone filed -- wants -- is preparing to file a lawsuit

in federal court on this issue, they should just file it
straight here?  Is that what --

    **MS. WAGSTAFF:**  Well, that's the end result of it.  The
order is, sort of, slightly different.

    A lot of times what happens is, you end up filing a master
complaint in here and people adopt that complaint.  And they
put on -- I mean, Courts do it different way.  But the one I'm
thinking of most recently, that I was involved with, had a line
that said, you know, the proper court that when you -- when and
if you ever were to remand, where it would go to.  But instead
of having to file in there and go through the JPML, and do a
CTO, and have it sent over to you is some administrative steps
that we can cut down on.

    **THE COURT:**  I mean, the -- I've never dealt with
something like that.  I'm certainly open to it.

    I mean, my gut reaction to that, of course, is that that
just -- I mean, it makes it even easier to not give actual
consideration to the case that you're filing, consistent with
Rule 11, before you file it.

    I mean, I think the problem -- the answer to that may be
that there are lots of lawyers out there who, no matter how
they have to file the case, will not give serious consideration
to their case consistent with Rule 11 before filing it.

    And there's nothing, really, you can do about it.  And
sort of, you know, a game of whack-a-mole by whatever procedure

1  you try to adopt to try to minimize that, it's probably not

2  going to work.

3       But, anyway, that's just me thinking out loud.

4       **MS. WAGSTAFF:**  I would like to go to the process

5  thinking good faith, on us at least, that we're going to comply

6  with Rule 11 before we file cases.

7       **THE COURT:**  I'm not talking about you.

8       **MR. LASKER:**  Your Honor, a few points I'd like to

9  make.

10      One, following up on your point which we agree is a

11 concern, and it is one of the issues that filing fees protect

12 against when you file in the initial court, you have to pay a

13 filing fee.  And that is some guarantee that you've done your

14 Rule 11 due diligence.

15      The other issues we have, though, with direct filing, one

16 is, it makes it easier for the plaintiffs but it makes it more

17 difficult for the Court.

18      And the reason is that at the end of this MDL process, if

19 they do get past general causation and cases are remanded --

20 and we don't think they will, but if they do, you don't know

21 where to send the case.  You don't have an original file.  So

22 then you have venue disputes that you will have to resolve for

23 however many cases.  And they're talking thousands.  I don't

24 know if it's actually going to happen, but then you have to

25 deal with those.  And those can be pretty complicated.

1       I mean, early in this litigation we had a case filed in

2   Central District of California with two plaintiffs who alleged

3   exposures in three different states.  And then they alleged

4   that they were diagnosed in one state; they were treated in

5   another state; they were residing in yet another state.  And it

6   was a very complicated venue issue that had to be resolved

7   and -- before that Court served and sent the cases back.

8       That would all then be issues Your Honor would have to

9   deal with.

10      The other --

11          **THE COURT:**  Well, wouldn't those have to be issues

12  anyway?  I mean, what would happen now is that somebody would

13  file a lawsuit in Kansas --

14          **MR. LASKER:**  Correct.

15          **THE COURT:**  -- and everybody would say, well, we know

16  this is -- needs to be transferred to the Northern District of

17  California.  And we go through the mechanics of making that

18  happen.

19      Any beef that you had with venue in Kansas as opposed to

20  venue in Missouri, you would weigh it and resolve later.  I

21  assume you wouldn't litigate -- I assume you wouldn't file a

22  motion to transfer it to Missouri.

23          **MR. LASKER:**  No, that's exactly right.

24      But that's the point, Your Honor.  At the end of the MDL,

25  you then transfer it back to the District of Kansas, and then

1    that judge decides venue.  And he will have venue in his one

2    case, as opposed to you having venue decisions in 300 cases

3    because they're all in the MDL.  It should be appropriately the

4    transferor court that makes that determination.

5         The other issue, Your Honor, is, to the extent that there

6    are issues of cases that we don't believe should be

7    transferred, they are not appropriate for the MDL.

8         The JPML now has procedures whereby you can make those

9    objections and prevent the case from being transferred in.  You

10   can't do that with direct filing.  And if you were to try to

11   make that argument, there's nowhere to transfer it back again.

12        So that's the problem we have with direct filing.  We've

13   been involved with MDLs where the courts have rejected direct

14   filing because of those problems.

15        **THE COURT:**  Yeah.  I mean, I guess I'm mildly

16   skeptical of it, but I'm happy to entertain any motion.

17        And I'm sure there's plenty of wisdom out there on the

18   practice.  And we can consult that wisdom if necessary.

19        **MS. WAGSTAFF:**  So maybe we just put it on the agenda

20   for the next hearing.

21        **THE COURT:**  Sure.  Yeah.  And you can -- you know,

22   brief it in your case management statement beforehand.

23        Is there any -- is there anything else I can do

24   procedurally to make life less difficult for you-all?

25        Is there any -- is there any other kind of streamlining I

1    can do or, you know -- I mean, I'm generally very open to -- it

2    wasn't that long ago that I was a lawyer.  So I'm still

3    interested in making life less difficult for you-all in

4    whatever way I can.

5            MR. LASKER:  I think on the Monsanto side you've done

6    a lot today, and I think we're in a good position with that.

7        We now have a structure in place with plaintiffs' counsel

8    and, I think, at this stage --

9            THE COURT:  Bloated as it may be.

10           MR. LASKER:  Bloated as it may be, and we can have our

11   discussions about that.

12       But let's see how we can work together with that.  And

13   we'll have the next case management at our status hearing, and

14   then we'll be in a better position of knowing.  But, I think,

15   right now we're in pretty good shape.

16           MS. GREENWALD:  Your Honor, I just had a question,

17   actually, for your purposes.

18       When I've done MDLs in the past, the Court has set up a

19   protocol for preconference letters where in advance, maybe

20   sometimes it's five days before, each party comes up with a

21   list of agenda items.  They exchange them, and then they submit

22   to the Court three to five days.  It's up to the Court the

23   proposed agenda items.

24       And then we put agreed-upon agenda items, and then

25   plaintiffs' agenda items, and defendant's, if we don't agree.

1    And then there's a page number, two pages, three pages, single

2    space.  It's really up to Your Honor.  But that sometimes helps

3    frame the issues before we come in so that we're not putting

4    issues before you for the first time when we stand here.

5        If it's something that you would like us to set up, we can

6    again meet and confer and come up with a suggestion for Your

7    Honor.  Or if you want to come up with one on your own.  I just

8    think it sometimes makes the conferences more organized for all

9    of us, and we're better prepared.

10       **THE COURT:**  Yeah.  I mean, in this instance --

11   whatever -- whatever is, sort of, the easiest way for the

12   parties to, you know, get organized in advance of these things

13   is fine with me.

14       For me personally, I think the way we did it is, we had

15   one side file their statement first, and then we had the other

16   side file their statement.  And in it you identified the stuff

17   that you wanted to talk about.  And I think we talked about

18   everything.  And if you want to do it that way, that's fine.

19   If you want to do it the way you're proposing, that's fine.

20       This was fine for me.  The way we did it was fine for me.

21       **MR. LASKER:**  The only other issue that occurs to me,

22   Your Honor, is with respect to the discovery-letters approach,

23   which we like and think is a good one.

24       But as far as the timing is concerned -- and part of that,

25   I think, was because of the fact we had this hearing

1    scheduled -- we had discovery letters that came in, two of them

2    right in a row, and we had to respond very quickly.

3        So to have some sort of set schedule, I just don't

4    remember -- and you may have already told us what your general

5    approach is as far as when -- you know, how much time we should

6    need to prepare for those.  We can probably work it out

7    ourselves as well.  I just want to avoid the circumstance we

8    had this morning before Your Honor.

9            **THE COURT:**  Yeah.  That was -- that ought to be

10    avoided for sure.

11        So I think that what we should do is, we should have a

12    protocol where, you know, somebody files a case management

13    statement, and then the other side files a case management

14    statement sometime after that.

15        I could have you file joint case management statements and

16    go back and forth, and send drafts back and forth.  But I think

17    it's probably easier for you-all if -- you know -- who went

18    first last time?  Did you go first last time?

19            **MR. LASKER:**  Yes, we did.

20            **THE COURT:**  I don't care who goes first.  Doesn't

21    matter who goes first.

22        But if one side sort of says, Here's what I want to talk

23    about and here are the rulings I want from you at the case

24    management conference, and then the other side files a

25    statement that says, Here's what I want to talk about and here

1   are the rulings I want from you, and that's, sort of, it.  And

2   you can include in that any discovery disputes that you have;

3   right?

4        So -- and it's up to you if you want to -- we still

5   haven't talked about when we're going to have our next

6   conference.  But if you-all want a ruling on a discovery issue,

7   you know, well in advance of the next time we're scheduled to

8   meet, just submit the discovery letter, and I'll rule on it.

9   And if I need to call a telephonic hearing or get you on the

10  phone or whatever, I'll do that.

11       But if you need something timely, just submit it in that

12  five-page discovery letter format that is in my standing order.

13  And -- or if you would rather wait and deal with it at the

14  status conference, just -- or if -- or if timing-wise it makes

15  sense to deal with it at the status conference, just put it in

16  the status conference statement, the case management statement.

17  And you can go first.  And then you can respond.  And then I'll

18  have both sides.  And we can talk about it at the case

19  management conference.

20       So the protocol will be, I think -- I don't know how we

21  did it this time, but you file your -- the defendants -- the

22  defendant files its case management statement ten days before

23  the conference.  And then plaintiffs file theirs five days

24  before the conference.

25       Does that -- how does that sound?

1          **MR. LASKER:**  That sounds fine, Your Honor.

2      I guess without knowing -- the only concern that -- for me

3   is if plaintiffs raises something in their case management that

4   we've not raised in ours, we would want Your Honor to have our

5   thoughts on it before the hearing begins.  But I don't -- you

6   know, if there's discovery dispute that's raised in their case

7   management statement that we didn't know about, you don't have

8   our position in writing.

9          **THE COURT:**  Well --

10         **MR. LASKER:**  But we can work that out.

11         **THE COURT:**  So that's an argument for doing a joint

12  case management statement.  If you're concerned about that,

13  then that's an argument for doing a joint case management

14  statement, as we usually do in these cases.

15         **MR. LASKER:**  Your Honor, that may make sense.  We can

16  talk about that.

17         **MS. WAGSTAFF:**  We can do joint.

18         **MR. LASKER:**  We can do a joint one, I think.

19         **MS. WAGSTAFF:**  We can do a joint five days before.

20         **THE COURT:**  Okay.

21         **MS. WAGSTAFF:**  And we have to start conferring ten

22  days before.

23         **MR. LASKER:**  That's fine.

24         **THE COURT:**  All right.  So we'll do that.

25      The joint case management statement is due -- the protocol

1  will be, the joint case management statement is due the Friday

2  before the case management conference.

3          **MR. LASKER:**  Will those be again -- what day is

4  today? -- Wednesdays?

5          **THE COURT:**  I think that will commonly be when they

6  are.

7          **MR. LASKER:**  Okay.

8          **THE COURT:**  But I'm flexible.

9          **MR. LASKER:**  Yeah.

10         **THE COURT:**  So that way you, sort of, tee everything

11 up, and you get a chance to respond to each other.

12     So when shall we meet next?

13         **MS. GREENWALD:**  How about a month from now?

14         **THE COURT:**  That's what I was going to throw out

15 there.

16         **MR. LASKER:**  That would be, sort of -- that's

17 November --

18         **MS. GREENWALD:**  We're in November now.

19         **MR. LASKER:**  December 16th, Your Honor.

20         **MS. WAGSTAFF:**  December 14th, which is a Wednesday.

21         **MR. LASKER:**  Which is a Wednesday.

22         **THE COURT:**  Uh-huh.

23         **MR. LASKER:**  That's fine, Your Honor.

24         **THE CLERK:**  9:30 again okay?

25         **THE COURT:**  Yeah, 9:30.

1    And then, of course, in the unlikely event that you decide

2  that everything is moving along swimmingly and there's nothing

3  to discuss, and you don't want to waste the time of flying out

4  here and all that kind of stuff, just let us know.

5        **MR. LASKER:**  We look forward to that, Your Honor.

6        **THE COURT:**  See you in 30 days.

7     (Counsel thank the Court.)

8     (At 2:20 p.m. the proceedings were adjourned.)

9                         -   -   -   -

10

11

12                **CERTIFICATE OF REPORTER**

13     I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15

16  DATE:   Friday, November 18, 2016

17

18

19                    _Katherine Sullivan_

20     _____

21     Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

22

23

24

25