# Exhibit 1

# MDL STANDARDS AND BEST PRACTICES

# DUKE LAW CENTER FOR JUDICIAL STUDIES

Duke Law School
Center for Judicial Studies
September 11, 2014

# CHAPTER 3

# ESTABLISHMENT AND USE OF COMMON FUNDS

A perennial challenge for a transferee judge managing a complex MDL is the issue of compensating plaintiffs' counsel, who almost exclusively work on contingency.  Litigation can last years and require the investment of millions of dollars in law firm time, resources, and out-of-pocket expenses.  During the litigation, some attorneys will devote themselves nearly entirely to the case from the outset, particularly those who are appointed to the steering committee or as liaison counsel, while others (for example, those whose clients file cases well after commencement of the litigation and establishment of the MDL) will benefit from this work done by other counsel.  Similarly, leadership counsel often agree to "front" the bulk of the costs and expenses of the litigation, assuming a significant expense and risk of nonpayment, while other plaintiffs and their counsel reap the benefits of those expenditures.

To address this equitable problem, MDL courts have long recognized an inherent authority to establish and operate common funds to assess parties and their counsel, and apportion and distribute the pooled monies.  As its name suggests, a common benefit fund is meant to compensate attorneys for the costs borne and work performed for the common benefit of all plaintiffs and their counsel.  Hence, the primary theory underlying such funds is the common benefit doctrine, which holds that persons who obtain the benefits of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.

The transferee court has a variety of powers and doctrines at its disposal in creating and overseeing a common benefit fund.[157] For example, the ability to assess common benefit attorneys' fees is recognized as within the courts' inherent managerial authority. It is well settled that a court's power to consolidate and manage litigation necessarily implies a corollary authority to appoint lead or liaison counsel and plaintiffs' steering committees, and to ensure that they are properly compensated for their work.[158] Courts also have found the related authority to assess common benefit attorneys' fees in the terms of agreements entered into among plaintiffs' counsel

---

[157]*Boeing Co. v. Van Gemert*, 444 U.S. 473, 478 (1980). *See also* MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. 2004) (discussing American Rule and common-benefit exception in complex cases). The doctrine has been articulated and applied in a series of Supreme Court decisions, including *Central R.R.& Banking v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164 (1939); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing*, 444 U.S. 472; and *Blum v. Stenson*, 465 U.S. 886, 900 (1984). Of primary importance to the Court in *Sprague* was the application of the Court's historic equitable power to spread the costs among others similarly situated who benefited from the efforts of the plaintiff. 307 U.S. at 166-67.

Under the "American Rule," a prevailing litigant is not ordinarily entitled to recover attorney's fees, and is responsible for payment of his or her own attorney's fee. The American Rule, however, can inequitably benefit those who avoid sharing the full burden and expense of litigation by relying on the work of others. The doctrine was originally, and still is, commonly applied to attorney fee awards in class actions where an attorney, acting on behalf of an individual plaintiff, recovers a fund for a group of individuals. 4 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 13:76 (4th ed. 2002). However, its application is not limited to the class action context; rather, it is based in the power of equity in doing justice between a party and beneficiaries of his litigation. *See Sprague v. Ticonic Nat. Bank*, 307 U.S. 161,166(1939); MANUAL FOR COMPLEX LITIGATION § 14.121 (4th ed. 2004).

"As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area. The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010). Thus, "MDL courts have consistently cited the common fund doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *Id.*

[158]*See* *Vincent v. Hughes Air West. Inc.*, 557 F.2d 759, 773-75 & n.15 (9th Cir. 1977); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1014-15 (5th Cir. 1977); *McAlister v. Guterman*, 263 F.2d 65, 69 (2d Cir. 1958). Courts have thus applied this inherent authority to compensate common benefit counsel in complex litigation. *E.g.*, *In re Diet Drugs Prods. Liab. Litig.* , 582 F.3d 524, 546–47 (3rd Cir. 2009); *In re Genetically Modified Rice Litig.*, 4:06 MD 1811 CDP, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2004) ("An MDL court's authority to establish a trust and to order compensations to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power."), *aff'd*, __ F.3d___ 2014 WL 4116482 (8th Cir. Aug. 22, 2014); *see also* MANUAL FOR COMPLEX LITIGATION § 22.62 (4th ed. 2004).

That basis of authority has not been without criticism from some quarters. At least one commentator has opposed a court's inherent authority to oversee a common benefit fund: "[T]he judicially created quasi-class action contravenes Article III of the Constitution, deprives litigants of their due process and jury trial rights, violates the Rules Enabling Act, impermissibly expands the scope of judicial authority under the multidistrict litigation statute, and does an end-run around the requirements of the class action Rule 23. Moreover, private settlement agreements consummated as quasi-class actions may, if unchecked, violate the spirit if not the letter of the court's *Amchem* and *Ortiz* decisions." Linda S. Mullenix, *Dubious Doctrines: The Quasi-Class Action*, 80 U. CIN. L. REV. 389, 412 (2011). This view, however, appears to be a minority opinion and one that, to date, has not been shared by any court.

and between plaintiffs' counsel and defendants.[159]  As the Fifth Circuit opined in the seminal *Florida Everglades* air disaster case: "[I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them. The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation."[160]

Litigation funding is a complex matter and one that varies with the needs of the case.  The plaintiffs' leadership will almost always create a housekeeping fund, which it uses to pay communal litigation expenses (for example, special master fees).  This is funded with periodic assessments paid by the leadership team (PEC, PSC), in addition to and apart from the litigation expenses that they are fronting (for example, travel costs).  This fund has no official involvement by the court.  However, in some cases, the court may establish a joint housekeeping fund, which is funded by joint assessments to the plaintiffs' leadership and the defendants, in order to allow payment of common expenses like special master fees.

These funds differ from the "common benefit fund," which serves to compensate counsel for their contributions to the litigation.  Typically, the transferee judge creates the architecture for this fund at the outset of litigation, but it will usually remain unfunded until much later in the

---

[159]*See* Jeremy T. Grabill, *Judicial Review of Private Mass Tort Settlements*, 42 SETON HALL L. REV. 123, 124 (2012); *see also In re Sulzer Orthopedics, Inc.*, 398 F.3d 778, 780 (6th Cir. 2005); *In re Vioxx Products Liab. Litig.*, 574 F. Supp. 2d 606, 609 & n.8 (E.D. La. 2008), *on reconsideration in part on other grounds,* 650 F. Supp. 2d 549 (E.D. La. 2009). Courts should therefore be aware that any matters addressed by agreement of the parties that expressly confer authority on the court may result in future challenges and rulings bearing on the party's interests, such as attorney's fees—*e.g.*, a court's consideration of the receipt of a contingency fee as a ground to reduce an award of attorney's fees. *See In re Sulzer Orthopedics*, 398 F.3d at 780.  But such an interpretation is not always clear.  Despite a court's contrary view, plaintiffs' attorneys have not always agreed that the settlement agreement terms vested the courts with the authority to impose contingency fee caps. Morris A. Ratner, *Achieving Procedural Goals Through Indirection: The Use of Ethics Doctrine to Justify Contingency Fee Caps in MDL Aggregate Settlements*, 26 GEO. J. LEGAL ETHICS 59, 73 (2013). "It is safe to assume at this point that lawyers involved in mass torts are on notice of this issue. It will be interesting to see whether such awareness limits the ability of court-appointed common benefit counsel to negotiate global agreement terms that both render individually-retained counsel's fees vulnerable to caps, and prompt widespread participation in MDL aggregate settlements." *See id.*

[160] *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1016.

litigation process, when cases are resolved through trial or settlement. (In some instances, a defendant's partial settlement or partial payment may fund the common benefit fund prior to the end of the case). The function of a common benefit fund is to compensate plaintiffs' counsel for their work based on their relative contributions to the outcome of the case. Its purpose is to ensure that all who benefit from the common fund will have contributed proportionately to the costs of the litigation, which is particularly important in mass tort litigation where the value of bellwether trials often exceeds the value of the particular claims being tried.

Despite the widespread use of common benefit funds, the implementation of these funds in any particular case is often hotly disputed. If the transferee court does not, at the outset, establish a process to implement a fund or funds (if and when monies become available), disagreements among counsel can arise, both during the MDL and certainly at the resolution or remand of individual cases. If the issue is left unresolved, the transferee judge invites avoidable disharmony at the MDL's conclusion, and may be confronted with a Gordian Knot which is not easily undone.

> **MDL STANDARD 5**: **The transferee judge should consider setting aside a portion of the anticipated monetary proceeds from the settlement and establish a common benefit fund (CBF) for the purpose of paying reasonable attorney's fees, costs, and expenses from that fund.**
>
> *Best Practice* 5A: As early as practicable in the litigation, the transferee judge should consider planning and establishing any common funds to be employed in the course of the litigation or in the event of settlement. In doing so, the court should communicate its expectations and provide guidance to the parties with regard to the purpose and operation of these funds, and invite the participation of counsel.[161]

---

[161] The Manual for Complex Litigation provides: "Early in the litigation the court should . . . establish the arrangements for the [leadership group's] compensation, including setting up a fund to which designated parties should contribute in specified proportions." MANUAL FOR COMPLEX LITIGATION § 14.215 (4th ed.); *accord In re Zyprexa Products Liab. Litig.*, 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006) ("[I]t has been a common practice in the federal courts to impose set-asides in the early stages of complex litigation in order to preserve common-benefit funds for later distribution.").

The authority for this power derives from the court's inherent authority to manage its own docket and its power under rule of civil procedure governing class actions to make such orders as necessary to manage such an action. *Turner v.*

In some cases, the court may find it helpful to establish a joint housekeeping fund at the outset of litigation, to cover joint costs of the litigation such as special master fees.  The amount assessed should be sufficient, but not more than necessary, to cover the recurring expenses with a cushion for unexpected expenses.  The court will likely want to establish a process for documentation, submission and judicial or special-master review of all claims against the housekeeping fund.  The court should, with input from the parties, select a bookkeeper or accountant and a bank to manage the fund.  All documentation and yearly audit reports should be maintained throughout the MDL and contained in the final accounting.   In creating and implanting this joint housekeeping fund, the court should consult with the lead plaintiff and defense attorneys to ensure the parties' buy-in; indeed, in most cases these bills can simply be apportioned and sent directly to defense counsel and the PSC for direct payment to the provider, rather than requiring the creation of a fund.   However, in special circumstances a joint housekeeping fund may be useful, and thus is noted here as one potential feature that a transferee judge may consider in structuring the MDL process.

Far more common is the creation of a framework for a common benefit fund.  The transferee court will often establish a framework for implementation and operation of a common benefit fund early in the life of the MDL, in the event that the case proceeds toward settlement. Courts have increasingly announced their common-benefit guidance in advance to signal their expectations to counsel on the front-end so that counsel can effectively manage the process; this practice has garnered the support of the parties and is expected to minimize conflict at the end of

---

*Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676 (E.D. La. 2006). While some have objected to establishing a fund early in the litigation (*i.e.*, that it would be premature and that it should not be established until after an opportunity for discovery and an accounting), that view is not only contrary to the prevailing opinion of courts and the Manual of Complex Litigation, but courts have noted that, "[e]ven if no common benefit compensation had yet been earned, there would be a need to put a holdback method into place promptly." *In re Zyprexa Products Liab. Litig.*, 467 F. Supp. 2d 256, 267 (E.D.N.Y. 2006).

the litigation.  Allowing the early input of counsel may be beneficial, not only in allowing the counsel a sense of ownership, but also in enabling the court's expectations to be aired with counsel having the opportunity to clarify interpretations of rules and procedures, or even suggest modification, in advance of the actual creation of a fund thereby minimizing later disputes.[162]

Before any distributions are made from the fund, the transferee judge may decide to provide an opportunity for all parties to be heard and to seek appropriate information.[163] Similarly, the court's determination of the percentage fee arrangement that determines the amount of the CBF should occur at the earliest practicable time.[164]

In lengthy and complex cases, the transferee judge may create a fund set aside expressly to make interim reimbursement payments to counsel for costs and expenses that they have accrued or incurred during the course of the litigation.[165]   The court should assess plaintiffs' counsel

---

[162] Federal court is not the sole venue for mass-tort, product liability, and other multiple-plaintiff complex cases; indeed, they are litigated in the state courts with some frequency.  However, because major mass-tort and product liability cases usually have a federal component (often an MDL), state-court MDLs (sometimes called "multi-case" or "centralized" litigations) have generally followed the federal courts in procedure as well as substance, including applying assessments for the creation of a CBF.  For example, a Rhode Island court overseeing the state multi-case litigation in the *Kugel Mesh* product liability MDL established a plaintiffs' steering committee, designated liaison counsel, and determined that 12% of the anticipated recovery would be set aside for the common benefit fund (8% for attorney's fees and 4% for costs and expenses).   Decision, *In re: All Individual Kugel Mesh Cases*, No. PC-2008-9999, 2009 WL 3328368 (R.I. Super., Aug. 11, 2009) (*"Kugel Mesh"*). Attorneys who filed dozens of cases in the proceedings after the establishment of the PSC and liaison counsel challenged the procedures on constitutional grounds; however, the court rejected their challenges while affording them the opportunity to be heard at the appropriate time.  *Id.*

Similarly, in the Vioxx litigation, a significant number of cases had been filed (and consolidated) in state courts and involved the imposition of assessments.[162]   When these cases settled for an aggregate amount of $4.85 billion, $315,250,000 (or 6.5%) was set aside as a common benefit fund for attorney's fees and expenses, which was distributed by order of the federal court. *See* Order & Reasons, *In re: Vioxx Products Liability Litig.*, MDL No. 1657 (E.D. La. Oct. 19, 2012) at 37.

[163]*In re Genetically Modified Rice Litig.*, 4:06 MD 1811 CDP, 2010 WL 716190, at *7 (E.D. Mo. Feb. 24, 2010).

[164] The Third Circuit Task Force Report recommended "that in the traditional common-fund situation and in those statutory fee cases that are likely to result in a settlement fund from which adequate counsel fees can be paid, the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel". THIRD CIRCUIT TASK FORCE REPORT, *COURT AWARDED ATTORNEY FEES*, 108 F.R.D. 237, 255 (1986)

[165]*See, e.g.*, *Mills*, 396 U.S. at 389 (having proved defendant's liability, "petitioners [sh]ould have been entitled to an interim award of litigation expenses and reasonable attorney's fees."); *see also generally In re: Diet Drugs*, 2002 WL 32154197 (MDL No. 1203) (Memo. & Pretrial Order No. 2622) (Oct. 3, 2002) (CBF established to pay, *inter alia*,

ratably and place the proceeds in this fund for periodic distribution.  Such reimbursements can greatly ease the financial burden on firms that have invested substantially in the litigation, but whose compensation will not occur until settlement, which may be years in the future.

> *Best Practice* 5B:  At the outset of the case, the transferee judge should issue a "common benefit order" or "assessment order." The order should establish parameters for how the common benefit fund will be funded, define the compensable functions of counsel, determine the method of compensation, specify what records must be kept, create guidelines for allowable fees and expenses, and set up a common benefit fund that designated parties will contribute to in specified proportions.[166]

The court typically should initially request input from leadership counsel regarding the parameters and rules for the contemplated common fund or funds.  Such an order should, *inter alia*, establish rules for documentation of attorney time, costs, and expenses, a procedure for counsel to submit claims to the fund, and for those claims to be reviewed.   The order will typically provide for later payment of common benefit costs and common benefit attorney's fees to court-appointed counsel and others who advanced costs or performed services for the common benefit.[167] Because discovery and other work product may be shared between federal and state court litigation, the judge may consider including provisions to reimburse costs and award fees to counsel who have performed common benefit work in state court proceedings, and to collect a

---

"the out-of –pocket and pre-settlement litigation expenses of plaintiffs' counsel approved by the court for reimbursement").

[166]*See generally* Leonard A. Davis & Phillip A. Garrett, Case Time and Cost Management for Plaintiffs in Multidistrict Litigation, 74 La. L. Rev. 483, 495-96 (Winter 2014); *see also* Case Management Order Number 16 (Establishing Common Benefit Fee and Expense Fund), In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Nov. 13, 2012) (ECF No. 61). *See generally* Leonard A. Davis & Phillip A. Garrett, Case Time and Cost Management for Plaintiffs in Multidistrict Litigation, 74 La. L. Rev. 483, 495-96 (Winter 2014); *see also* Case Management Order Number 16 (Establishing Common Benefit Fee and Expense Fund), In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation, MDL 2385, No. 3:12-md-02385-DRH-SCW (S.D. Ill. Nov. 13, 2012) (ECF No. 61).

[167]*See Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004) § 14.11; *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939).  The need for and *operation* of a court-ordered mechanism to equitably spread the cost of common benefit work of court-appointed, plaintiffs' counsel arose in an early MDL, and is discussed in *In re Air Crash Disaster at Florida Everglade*s, 549 F.2d 1006 (5th Cir.1977)

percentage of settlements and judgments from state court cases.  The order should also address issues such as settlement confidentiality, if necessary.[168]

The transferee judge should also establish procedures to ensure the fairness of the allocation process.  The court should require counsel to keep contemporaneous billing records/timesheets and periodically submit time and expense reports; the court should also provide a process of review as to the bills' reasonableness, and create a process by which an impartial arbiter can review the initial findings.  Appointed bookkeepers, accounting firms and special masters can play valuable roles in ensuring accurate review and resolution of any objections or disputes, as well as identifying any matters that must be resolved by the court.  The actual value to be assigned to the time expended is typically a matter best reserved until the time the case resolves.

> *Best Practice* 5B(i):  The transferee judge should assess each case in the MDL a specified percentage of the gross settlement. This global assessment will be deposited with the court or at the direction of the court into an account that is managed by the court.  This account is called the "Common Benefit Account" (CBA).

Early in the litigation process, if not in the initial case management orders, the transferee judge should issue clear orders regarding the types of expenses that will (and will not) be reimbursed by the common fund and the contemporaneous record keeping requirements for common benefit hours.  The transferee judge may solicit proposed orders regarding the common benefit fund; often the dynamics of litigation funding incentivize self–policing by counsel, such that the judge can often accept the proposals with little modification.  In contrast, in assessing the percentage of settlement funds that should be assessed to support the common benefit fund, while it may be helpful to solicit input, the judge should be aware that the common benefit fund is

---

[168]  For an example, see the Mirena litigation orders.

drawn from the contingency fees of the individual, originating attorneys.  Because these monies are not added to the defendant's payout, and because they are disproportionately going to the plaintiffs' leadership, the judge should look carefully at this latter category of proposals.

The percentage is typically within a range of 3% to 6% of the gross amount of the settlement (and in some cases, usually involving smaller settlements, up to 12%), although the percentage can (and should) vary depending upon the circumstances of the case, so this range should not be considered exclusive. Of course, the court should invite input from counsel as to the appropriate percentage, and may also examine precedent from other MDL courts as applied to the facts and circumstances of the particular MDL.

This determination often is made before there is a settlement or judgment paid, but after the transferee judge has gained a firm grasp of the value of the work being done by the PSC, and the level of expenses.  The court will also often enter an order that any MDL attorney who wishes to make a claim against the anticipated common benefit fund must first obtain approval of the PSC before performing the work absent exigent circumstances or approval of the court.

The court should also address in advance the issue of how to treat counsel in state cases who benefit from common discovery from the MDL but then refuse to pay into the CBF.  The court may consider addressing this issue with the state judges early in the litigation, and encourage those judges to enter orders requiring participation in the CBF as a condition for accessing MDL discovery.  At a minimum, the court should discuss issues of protocol and fairness with state judges to facilitate resolution of any eventual dispute.

> *Best Practice* 5B(ii):  The transferee judge should order the payor/defendant to withhold the specified percentage of the recovery from settlement proceeds and deposit that amount into a Common Benefit Account under the direction of the court.

The fixing of the case assessment and its percentage is usually the subject of much discussion and debate within the PSC and may become a matter of argument upon motion before the court.  The transferee judge will want to consider counsel's positions on the need and percentage then fix the percentage.  If there is no objection from MDL case attorneys, the judge will often accept the recommendation of the PSC as to the need and percentage amount." [169]

Once the percentage is decided, the court should act pursuant to the process previously established, and order the payor/defendant to withhold the specified amount of the recovery and deposit it into the separate account created for the CBF.  All accounting safeguards put into place for the housekeeping account should typically be duplicated.  The court should consider, and entertain any comments on, whether the same bank and accounting firm should manage both the common benefit fund and the housekeeping fund.

Because the assessment resulting in the CBF derives from the original attorney's fee, the transferee judge must first determine the amount of the original attorney's fee.[170]  Some settlements themselves contain a provision that requires any plaintiff accepting the settlement to also waive objection to the court's fee determinations.[171]

> *Best Practice* 5B(iii):  If a settlement is subject to a common benefit assessment, the assessment should be deducted not from the claimant's portion of the settlement but from the attorneys' fees payable under the individual contingent fee arrangement.[172]

---

[169] 31 Pharmaceutical and Medical Device Litigation § 9:5. Although the case assessment can become contentious, "in most, if not all, cases the court and the PSC understand the need for each case or claimant in the MDL proceedings to have to share in the common benefit expenses and this burden should not only fall on the shoulders of the PSC *members*.  The work benefits all plaintiffs who have claims within the MDL; therefore, all claimants in the MDL should and must share in the ongoing expenses.  Plaintiffs not participating in the MDL but having access to the MDL document depository may or may not be assessed a fee for such use."  *Id.*

[170] Under Fed. R. Civ. P. 23, the court has the authority to review the proposed fee for reasonableness. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La L. Rev. 371 (Winter 2014) ("Fallon") at 379.  The court also has the inherent equitable authority to police the parties' ethical responsibilities, *including* to supervise contingency fee agreements, and may *sua sponte* review the reasonableness of those agreements.  For example, in the *Vioxx* MDL, the court capped the primary attorney's fees at 32% of the settlement proceeds.

[171] *Id.* at 380-81.

[172] *See id.*

In the mass tort context, litigation involves not a class action settlement, but rather a complicated opt-in resolution of individual personal injury claims.  The claims in such cases usually are governed by contingent fee contracts between the individual claimant and their primary attorney.[173]   In this context, courts at times cap the amount of those contingent fee contracts.[174]   "The 'Common Benefit Percentage Amount' is calculated by multiplying the gross 'Individual Payment Amount' due to each Class Member by the 'Common Benefit Percentage.'  If a Class Member is represented by individual counsel, the 'Common Benefit Percentage Amount' is deducted from the individual counsel's fee."[175]   As a result, individual claimant attorneys who rely on the efforts of common benefit counsel to litigate the case and create a recovery will not receive a windfall, nor will claimants be effectively charged twice.

> *Best Practice* 5C: Early in the case, the transferee judge should establish a transparent procedure for the allocation of common benefit funds to reduce the potential for disputes among counsel and to encourage counsel to cooperate and avoid duplication of effort.

Establishing an allocation process that is transparent will help create a fair and open environment for all interested attorneys to perform work for the common benefit of all claimants and create a factual record for the eventual applications for common benefit fees.[176]

---

[173] *See In re Vioxx*, 760 F. Supp. 2d at 653.

[174] *Id.*

[175] *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 457 (E.D. Pa. Apr. 8, 2008) *aff'd*, 582 F.3d 524 (3d Cir. 2009); *see also In re Zyprexa Prods Liab. Litig.*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006) ("The Court of Appeals for the Second Circuit has sanctioned a common benefit fund derived from a fixed percentage of fees earned by individual *attorneys*.").

[176] *See In re Vioxx Products Liab. Litig.*, MDL 1657, 2014 WL 31645, at*5 (E.D. La. Jan. 3, 2014); *see also* Fallon, 74 LA. L. REV. at 381 ("The total amount of the common benefit fund should be reasonable under the circumstances, and the method for distributing it should be fair, transparent, and based on accurately recorded data."). Two decisions provide a good example of a transparent and non-transparent process.  In *In re High Sulfur Content Gasoline Products Liability Litigation ,* 517 F.3d 220, 223 (5th Cir. 2008).  the lead plaintiffs' counsel in a class action persuaded the district court, during an *ex parte* hearing and without the benefit of supporting data, to divide a lump sum attorney's fee award among more than six dozen plaintiffs' lawyers.  At that same hearing, the court "accepted [l]ead [c]ounsel's proposed order sealing the individual awards; preventing all counsel from communicating with anyone about the awards; requiring releases from counsel who accepted payment; and limiting its own scope of

*Best Practice* 5C(i):  The transferee judge should inform counsel early in the litigation that if they wish to be paid attorney's fees from the common benefit fund they must keep detailed and contemporaneous records of their work, and periodically submit reports to the court or a designee such as a special master or accountant.[177]

This practice encourages the attorneys to maintain adequate and contemporaneous records, and allows the court an opportunity to detect any problems or issues.[178]  Because the time records can be voluminous, some courts appoint a bookkeeper, accountant or similar professional to review the records and provide periodic reports to the court; costs are borne by plaintiffs' counsels' common fund.[179]

These contemporaneous records are the evidence the court will use to determine how to allocate fees, and counsel who fail to maintain contemporaneous and accurate time records throughout the course of a MDL or class action do so at their own peril as the absence of such records could result in forfeiture of the attorney's fee claim.

*Best Practice* 5C(ii): The transferee judge should request all interested parties to make submissions concerning what steps and procedures the judge should implement, as well as a suggested timetable, in determining any final or other awards of attorney's fees.[180]

---

review of objections to the allocation." *Id.* at 223-24.    Because "the record [was] bereft of factual information essential to ... appellate review," and because the sealing of the record "protect[ed] no legitimate privacy interest that would overcome the public's right to be informed," the Fifth Circuit vacated the award. *Id.* at 229-30.

In contrast, in *In re Diet Drugs*, the court held that the fee allocation process was sufficiently transparent. 582 F.3d 524 (3d Cir. 2009).

[177]*See* Christopher A. Seeger, James A. O'Brien III, *Administrative Housekeeping and Ethical Matters in Mass Tort MDLs and Class Actions*, 13 SEDONA CONF. J. 171, 173-74 (2012).

[178]*Id.*; *see also* MANUAL FOR COMPLEX LITIGATION § 14.214.

[179]*See Evans v. TIN, Inc.*, No. 11-2067, 2013 WL 4501061, at *5 (E.D. La. Aug. 21, 2013); *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 643 (E.D. La. 2010);*see also* Pretrial Order #6 at 4, *In re Vioxx Prods. Liab. Litig.*, MDL 1657, 2:05-md-01657-EEF-DEK (E.D. La. Apr. 8, 2005) (ECF No. 245).

[180]582 F.3d at 538-39.

During adjudication of both the interim and final fee awards, the transferee judge should permit objections and allow objectors to take limited discovery, if necessary. [181]

> *Best Practice* 5D: The court should decide what method for calculating the CBF is most appropriate for the particular settlement.

Generally, three alternatives are used: the *lodestar method* (reasonable hours expended on case multiplied by the reasonable hourly rate); the *percentage method* (simply designating a percentage of the original attorney's fee as the common benefit fee); or the *blended method* (designating a percentage, comparing that amount to the amount derived using the lodestar method, and determining a reasonable final figure based on that comparison).[182]

> *Best Practice* 5D(i): The transferee judge should consider applying a blended method (percentage method, with the lodestar method used as a cross-check) in calculating the common benefit fund.[183]

The majority of courts use the percentage of recovery method in common fund cases, with many using a lodestar multiplier as a cross-check for reasonableness (*i.e*, a blended approach).[184]

---

[181] Finally, the court required the auditor and plaintiffs' liaison counsel to submit volumes of data reflecting the time and money that class counsel spent on the diet drugs litigation—data that the court put on the public record and used to support the fee award that it ultimately granted.

[182] *Id.* at 381-86.

[183] As the Third Circuit Task Force observed, "[g]iven the substantial problems with the lodestar approach generally, the Task Force is highly skeptical about the use of the lodestar even as a cross-check when awarding a percentage of the common fund." TASK FORCE REPORT, at 422.    Accordingly, the Third Circuit Task Force concluded that the percentage fee, "tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel." *Id.* at 355; *see also* In re Diet Drugs, 582 F.3d 524, 540 (3d Cir. 2009) (citation omitted) ("In common fund cases such as this one, the percentage-of-recovery method is generally favored."); 6 BROMBERG & LOWENFELS ON SECURITIES FRAUD § 8:18 (2d ed.) (noting that after Task Force Report, "most courts returned to a percentage of recovery or settlement formula with some latitude in the percentage").  For the same reasons, the percentage fee method has been approved by the Supreme Court as well as several courts of appeals. *See, e.g., Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) ("[T]he [Supreme] Court . . . explicitly described a percentage calculation as a 'reasonable fee' in [common fund] cases.") (citing *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984)); *accord Camden Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task Force Report, and the foregoing cases from other circuits, we believe that the percentage of the fund approach is the better reasoned in a common fund case.") (collecting cases).

[184] *See* NEWBERG ON CLASS ACTIONS § 1:18 (5th ed. database updated June 2014) ("The majority of state and federal courts use a percentage of fund method, with or without a lodestar cross-check, to calculate fee awards"); *see also In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) ("The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' . . .   The lodestar method is more typically applied in statutory fee-shifting cases because it allows courts to 'reward counsel for undertaking socially beneficial litigation in cases where the

The percentage of the fund method in most cases aligns the interests of common benefit lawyers with that of their clients; the greater the recovery, the greater the fee award.[185]  This method also is efficiently administered by the courts and eliminates knotty issues of lodestar inequities.[186]  On the other hand, using solely the percentage of the fund method might result in a windfall to common benefit lawyers who achieve a substantial recovery with little effort or, in contrast, may undercompensate counsel in those cases where a small recovery is achieved due to circumstances beyond the control of the lawyers, such as a limited fund situation or the absence of a critical mass of injured claimants sufficient to support the litigation effort.  As a fair solution to this conundrum, the blended or hybrid method attempts to cross-check whether the fee percentage is reasonable. This method does require greater judicial diligence by applying a lodestar crosscheck, as well as the *Johnson* factors upon which the method is partially premised.[187]

---

expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation' or in cases where the nature of the recovery does not allow the determination of the settlement's value required for application of the percentage-of-recovery method. . . . Regardless of the method chosen, we have suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation"); *Maley v. Del Global Techns. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("[T]here is a strong consensus -- both in this Circuit and across the country -- in favor of awarding attorneys' fees in common fund cases as a percentage of the recovery."); *American Bank Note*, 127 F. Supp. 2d at 430 ("In recent years, a majority of the Circuit courts have approved the percentage-of-the-fund method."); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 832 (2010) (finding that 69% of judges use the percentage of fund method with or without the lodestar cross-check); Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 267 (2010) (finding that the lodestar cross-check is becoming more commonly used, with roughly 42.8% of courts using both lodestar and percentage methods between 2003-2008, whereas approximately 24.3% of courts used both between 1993-2002).

[185]  The lodestar, percentage of fund and blended methods for determining the reasonableness of an award of attorney's fees each have characteristics that either recommend or discredit them depending on the circumstances involved.  The lodestar method, for example, appropriately rewards those attorneys who undertook a greater number of hours than others to advance the interests of the common good.  At the same time, "the lodestar approach encourages the expenditure of hours, and so can lead to class lawyers running up the bill."  The lodestar method also requires an inordinate measure of judicial oversight and resources in order to police the submissions made by common benefit lawyers.

[186]  *See Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676, 682 (E.D. La. 2006) ("As the Federal Judicial Center has noted, '[i]n practice the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation. In addition, the lodestar method creates inherent incentive to prolong the litigation until sufficient hours have been expended.'  MANUAL FOR COMPLEX LITIGATION (FOURTH) § 14.121 (2004).  In light of the problems that have emerged with the lodestar method, the majority of Courts of Appeals have adopted the percentage-fee method in common-fund cases, either as a primary or secondary method of calculating fees.").

[187]Fallon, 74 LA. L. REV. at 384.

*Best Practice* 5D(ii): In determining fees to be paid to individual attorneys from the common benefit fund, the transferee judge will need to determine the customary hourly rate. In large MDL's the judge may find it helpful to use a national rate for certain purposes.

In calculating attorney's fee awards, courts typically use either the customary rate an attorney charges hourly clients or the hourly rates charged by attorneys of similar skill in the court's locale. Some courts have used standardized rates when awarding attorney's fees in common fund cases to ensure that all counsel are compensated fairly. A seminal case in this regard was the Agent Orange litigation, in which the court established flat hourly rates for partners and associates, and awarded fees to all counsel using those rates.[188] In a lengthy discussion, the Second Circuit noted that courts should normally use the hourly rate charged by attorneys in the area but approved the use of a national hourly rate under the circumstances, which included the length of the litigation and the large number of attorneys from across the country who were involved.[189]

Courts have also used national rates for a more limited purpose, such as in performing a lodestar crosscheck on a common fund fee award. In *Martin v. FedEx Ground Package System, Inc.*,[190] the court used the *Laffey* matrix, a widely recognized compilation of attorney and paralegal rate data, to come up with standardized rates based on attorneys' years of experience. Because the rates were tailored for the District of Columbia and the plaintiffs' counsel operated in California, the court adjusted the rates to account for California's higher cost of living.[191] By using these standardized rates, the court was able to more accurately compare the multiplier in the case before it with the multipliers awarded in other cases. "Standardized hourly rates result in a

---

[188]*In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1349-50 (E.D.N.Y. 1985), *aff'd in part, rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987).

[189] 818 F.2d at 231-34.

[190] No. C 06-6883 VRW, 2008 WL 5478576, at *6-7 (N.D. Cal. Dec. 31, 2008).

[191]*Id.* at *7.

meaningful comparison among multipliers in various cases.  If the standardized rates are lower than actual rates billed by attorneys, then a comparison of multipliers in many cases will indicate a higher standard multiplier.  Thus, counsel need not worry whether the standardized rates reflect their actual billing practices; the court seeks only to compare lodestar multipliers calculated at the same standardized hourly rates across many common fund cases."[192]

> *Best Practice* 5D(iii): The transferee court may also decide to use its discretion in awarding fees at current rates, rather than historical rates, if litigation occurs over a particularly extended period of time; however, this practice is disfavored in limited-fund cases.

District courts have the discretion to compensate prevailing parties for delays in the payment of fees by awarding fees at current rather than historical rates, in order to adjust for inflation and loss of use of those funds.[193]  "Current market rates have been used in numerous cases to calculate the lodestar figure when the legal services were provided over a multiple-year period and when use of the current rates does not result in a windfall for the attorneys."[194]  As the Supreme Court has explained, "compensation received several years after the services were rendered . . . is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings."[195]

There have been exceptions to this prevailing practice.  In certain circumstances, such as a limited fund settlement, it may be more appropriate for a court to use historical rates to calculate the fee award.[196]

---

[192]*Id.* at *6.

[193]*See Ortega v. O'Connor*, C-82-4045 MHP, 1996 WL 724779, at *5 (N.D. Cal. Dec. 6, 1996) (citing *Gates,* 987 F.2d at 1406)).

[194]*Murray v. Weinberger,* 741 F.2d 1423, 1433 (D.C. Cir. 1984).

[195]*Missouri v. Jenkins,* 491 U.S. 274, 283 (1989).

[196]*See Fanning v. Acromed Corp.*, 1014, 2000 WL 1622741, at 8 n.19 (E.D. Pa. Oct. 23, 2000) ("In apportioning the gross fee among Petitioners, the court will refer to the historical lodestar rather than the current lodestar. . . . the court is confronted with a limited fund and a percentage of recovery that is less than the current or historical lodestars. Here, it seems most equitable for the court to use the actual, historical lodestar in allocating the award.").

*Best Practice* 5E:   To avoid duplication and ensure equitable allocation of the resulting fund, the transferee court should appoint a common-fund fee committee, comprised of plaintiffs' leadership attorneys, or designate a special master or magistrate judge, to make fair and impartial allocation recommendations to the court; however, the court retains ultimate control over the allocation and distribution of funds. [197]

Distribution of the CBF, once it is established, should be done in a manner that promotes fairness and efficiency.  Although the court is, of course, the final arbiter, it should avail itself of the experience and insights of the PSC, or some subset thereof, whose members have stewarded the litigation efforts and who have observed the common benefit efforts of other non-PSC attorneys throughout the entire arc of the litigation.  In certain limited circumstances, including for example when a MDL proceeding has progressed over a period of years through dispositive motions, fact and expert discovery, substantive hearings, multiple bellwether trials and potentially interlocutory appellate review, a transferee judge may prefer the appointment of a special master or magistrate judge to help the allocation committee further scrutinize the common benefit efforts put forth by the various attorneys and law firms involved and to streamline the allocation inquiry.[198]

The transferee judge may decide to designate a special master to oversee the payment of common benefit fees and costs, with input from the leadership team.[199]  Some courts appoint an accounting firm or similar professional to provide accounting services such as compiling

---

[197] For a recent example of such a common benefit order, *see* "Amended Order No. 25:  Common Benefit Order," MDL No. 2151 in Toyota Unintended *Acceleration* Marketing, Sales Practices, and Products Liability Litigation (C.D. Cal. 2003), http://court.cacd.uscourts.gov/Cacd/RecentPubOp.nsf/Toyota?OUFallon at 387, citing *Vioxx.*

[198] The appointment of a Special Master is typically unnecessary in cases involving a circumscribed number of plaintiffs' law firms, and should be considered only in those complex cases where the number of counsel is so great and their efforts so varied and potentially obscured that individual contributions may have escaped the notice of the district court.

[199] Order Appointing Special Masters, In re Actos (Pioglitazone) Products Liability Litigation, MDL 2299, No. 6:11-md-02299-RFD-PJH (W.D. La. Apr. 11, 2012) (ECF No. 532).

submissions and providing reports to the court.[200]  The judge may also address the process for allocating common benefit funds to counsel in both federal and state litigation.[201]

There are several ways in which the court can approach the task of allocating fees.  One option is to request that the Plaintiffs' Steering Committee make a proposal, since the PSC members are usually most knowledgeable about the work performed by the various attorneys.[202] The transferee judge may also appoint a smaller committee of PSC attorneys to make recommendations about the appropriate allocation.[203]  In the Guidant Defibrillator litigation, the court established a "fee and cost allocation committee" to make a proposal to the court about the allocation of attorney's fees and costs among all counsel who were entitled to share in the common benefit fund.[204]

---

[200]*See* Davis & Garrett, *supra* note 60, at 495-96; *In re Vioxx Products Liability Litigation*, 760 F. Supp. 2d 640, 643-44 (E.D. La. 2010).  To calculate lodestar, the court will review the total number of hours submitted by counsel and determine whether it is reasonable in light of the work performed.  The hourly rate to be applied to this number is determined by reviewing rates charged by attorneys with similar experience and practice areas in the relevant geographic area (usually the state or region where the court sits).  The court adjusts this number based on the factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), including, *inter alia*, the novelty of the legal issues, the required legal skill, the opportunity costs and risks incurred in taking the case, the amount involved and results obtained, the experience, reputation and ability of the attorneys, and awards in similar cases. Fallon at 383.  The resulting number is the lodestar.  The percentage method arose in response to concerns about the lodestar method, including the perverse incentive for lawyers to protract litigation in order to increase their lodestar, and the substantial judicial resources necessary to oversee the attorney's timesheets and to conduct the reasonableness reviews.  By selecting a percentage, the court can compensate the attorneys not only for their legal services, but also for "the risk of loss or nonpayment assumed by carrying through with the case." *In re Combustion, Inc.*, 968 F. Supp. 1116, 1132 (W.D. La. 1997) (quoted in Fallon at 384). This method, too, has raised concerns about the arbitrariness of the percentages selected and the lack of transparency in the bases on which the court decides. Generally, but not mandatorily, the courts applying this method have chosen a lower percentage for larger settlements and a higher one for lesser results.  The blended method has found favor with many district courts because it in essence uses the lodestar and percentage methods to cross-check each other.  The court chooses a reasonable percentage, and then calculates lodestar; if the two numbers come out relatively close, then the percentage is deemed reasonable.

[201] Manual for Complex Litigation § 20.312; Managing Multidistrict Litigation in Products Liability Cases § 6(a).

[202]*See* Fallon at 387-88 (describing the process used by the allocation committee appointed by the court in the Vioxx litigation to gather information and make a recommendation).

[203]*See id.* at 387.

[204]*In re Guidant Corp. Implantable Defibrillator Prods. Liab. Litig.*, No. 05-1708, 2008 WL 451076, at *1 (D. Minn. Feb. 15, 2008).

Special masters can assist the court with the allocation of common benefit funds, particularly when a MDL proceeding has progressed over a period of years through dispositive motions, fact and expert discovery, substantive hearings, multiple bellwether trials and potentially interlocutory appellate review.   Courts have appointed special masters to oversee the disbursement of attorney's fees from a settlement fund, including conducting hearings on disputed matters and issuing recommendations to the court on their findings.[205]

Ultimately, the transferee judge must decide the appropriate allocation.   Even when presented with a reasonable recommendation from the PSC or a special master that is undisputed, the court must reach an independent conclusion that the allocation is fair and reasonable.   Judge Fallon, who presided over the Vioxx litigation, summarized his approach to issuing a ruling on the allocation of attorney's fees:

> At this point the court had before it the report of the allocation committee; the transcript and documents compiled by the allocation committee; the depositions, briefs, and transcript compiled by the Special Master, as well as his report; and the data showing the hours logged, costs expended, and the nature of the work performed.   The court prepared a summary chart listing the name of each fee applicant, a cross column for each category of work performed by the applicant, and the total time logged in performing that task.   The categories included such things as: preparing pleadings; taking or assisting in depositions; participating in written discovery; writing briefs; arguing motions; preparing for trial; participating in trials, appeals, or settlement negotiations; and administration and committee leadership.   Each category was assigned a number with categories such as participating in trials, participating in settlement negotiation, taking

---

[205] In the Zyprexa litigation, for example, the court appointed four special masters to oversee settlement negotiations and administer settlement agreements, and the court gave the special masters the discretion to order reductions or increases in the amount of attorney's fees awarded to claiming counsel. *In re Zyprexa Products Liab. Litig.*, 594 F.3d 113, 116 (2d Cir. 2010);   Courts have also appointed special masters to address disputes over the allocation of attorney's fees, for example in the Vioxx case and in *Turner v. Murphy Oil*. *In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640, 662 (E.D. La. 2010); *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 799 (E.D. La. 2008) (appointing a special master to allocate fees from the common benefit fund after the PSC was unable to achieve agreement).   In *Turner*, the special master implemented a process that required attorney fee applicants to submit ten-page affidavits in support of their requested fee awards, allowed five-page challenge affidavits in response, and gave counsel an opportunity to serve limited written discovery (consisting of five interrogatories and two requests for production) on other applicants, and notice depositions. 582 F. Supp. 2d at 803-04.   The special master also held a hearing after issuing his preliminary report at which counsel were allowed to call up to two witnesses and present five-minute closing arguments. *Id.* at 806.

depositions, writing briefs, and committee leadership having a larger number.  A total of these numbers generally revealed the individuals who performed the most significant work in resolving the litigation.[206]

*Best Practice* 5F:  Courts should explain their reasoning for the allocation to further the goal of transparency, to provide feedback to interested parties, and to ensure that any reviewing court has a sufficient record.[207]

The transferee judge should endeavor to create a complete and well-documented record, as well as a detailed explanation for the court's allocation decisions. The court should permit, and indeed require, counsel to brief any disputes, and it should issue written or otherwise on-the-record opinions including the reasons for the method and amount of allocation determined with legal citations to precedent.

*Best Practice* 5G:  In imposing fee assessments, the transferee judge should promote fairness among counsel, compensate counsel who made the recovery possible, and suppress perverse incentives among non-performing counsel.[208] This may include imposing fees on attorneys representing individual clients who opt out, yet use MDL discovery materials or otherwise enjoy the fruits of common benefit counsels' efforts. It may also include extending the fee structure to non-MDL participants, if the corporation agrees to a global settlement.[209]

Another issue the court may face is whether plaintiffs represented by non-leadership counsel should be charged with some of the costs of discovery.   As the Supreme Court has observed, "[t]o allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the

---

[206] Fallon, 74 LA. L. REV. at 388-89.

[207] "The court awarding [attorney's fees] should articulate reasons for the selection of the given percentage sufficient to enable a reviewing court to determine whether the percentage selected is reasonable." MANUAL FOR COMPLEX LITIGATION § 24.121, at 206.

[208] *See generally In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977) (requiring those who benefit from lead counsel's work to consolidated litigation to bear a portion of the fee award and reducing their contingent fee liability to their non-participating attorneys accordingly).

[209] *See generally In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977) (requiring those who benefit from lead counsel's work to consolidated litigation to bear a portion of the fee award and reducing their contingent fee liability to their non-participating attorneys accordingly).

plaintiffs' expense."[210]   However, in assessing whether to impose fees on non-participating

plaintiffs' counsel, and if so to what extent, the court should take a hard look at the work product

created, because depending upon the timing of the settlement and other factors, the work product

may be of more or less value to non-participating counsel.

Where a defendant enters into a global settlement of claims filed in different courts (for

example, if some lawsuits have not been incorporated into a MDL), the courts generally have

attempted to adhere to the MDL's procedures (including the establishment of a common benefit

fund) for the sake of efficiency and fairness.[211]   Again, the court should be careful to assess the

contribution of all attorneys, as state-court attorneys may have made a meaningful contribution

that was not—at the time undertaken—submitted to the MDL.

As noted above, in certain circumstances, MDL courts have placed caps on the amount of

contingent fees awarded for pursuing individual claims in a common-fund settlement.[212]   The

capping of contingent fees in mass tort MDLs, however, has not been without criticism. [213]

---

[210]*Mills v. Elec Auto-Lite Co*., 396 U.S. 375, 392 (1970).

[211]*See, e.g.*, *Roberts v. Johnson & Johnson*, No. MID-L-009782-06, 2010 WL 7504814 (N.J. Super. Ct. Law Div., Aug. 11, 2010) ("Order Approving the Settlement") (ordering common benefit fund payments be made in accordance with orders of federal MDL court).

[212]*See, e.g.*, *In re Vioxx Prods. Liab. Litig*., 574 F. Supp. 2d 606 (E.D. La. 2008) (capping plaintiffs' counsels' contingent fees at 32%); *In re Zyprexa Prods. Liab. Litig*., 424 F. Supp. 2d 488, 496 (E.D.N.Y. 2006) (capping plaintiffs' counsels' contingent fees at 35%).

[213]*See* Aimee Lewis, Note, *Limiting Justice:  The Problem of Judicially Imposed Caps on Contingent Fees in Mass Actions*, 31 Rev. Litig. 209 (2012).