# Exhibit 2

Case 3:16-md-02741-VC   Document 84-2   Filed 12/30/16   Page 2 of 4

(Hearing) Monsanto MDL CMC (In Re Roundup Prods. Liability Lit)  11/16/2016  2:27:00 PM

1

```
1              Pages 1 - 163
2        UNITED STATES DISTRICT COURT
3       NORTHERN DISTRICT OF CALIFORNIA
4   BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE
5   IN RE ROUNDUP PRODUCTS    )  MDL No. 2741
                              )
6   LIABILITY LITIGATION      )  Case No. 16-md-02741
    _____)
7
                      San Francisco, California
8                     Wednesday, November 16, 2016
9             TRANSCRIPT OF PROCEEDINGS
10  APPEARANCES:
11  For Plaintiffs:
                ANDRUS WAGSTAFF
12              7171 West Alaska Drive
                Lakewood, Colorado 80218
13          BY:  AIMEE WAGSTAFF, ESQUIRE
14              ANDRUS WAGSTAFF
                6315 Ascot Drive
15              Oakland, California 94611
            BY:  KATHRYN MILLER FORGIE, ESQUIRE
16
17              WEITZ AND LUXENBERG, P.C.
                700 Broadway
18              New York, New York 10003
            BY:  ROBIN L. GREENWALD, ESQUIRE
19
20  (Appearances continued on next page)
21
22
23  Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
            Official Reporter - U.S. District Court
24
25
```

2

```
1   APPEARANCES (CONTINUED):
2   For Plaintiffs Johnson, Shepherd, Hernandez, Ruiz:
                THE MILLER FIRM LLC
3               108 Railroad Avenue
                Orange, Virginia  22960
4           BY:  MICHAEL J. MILLER, ESQUIRE
                TIMOTHY LITZENBURG, ESQUIRE
5               NANCY MILLER, ESQUIRE
6   For Plaintiffs McCall, Scheffer, Means, Patterson, Porath,
    Morris:
7               BAUM HEDLUND ARISTEI AND GOLDMAN PC
                12100 Wilshire Boulevard, Suite 950
8               Los Angeles, California 90025-7106
            BY:  R. BRENT WISNER, ESQUIRE
9               MICHAEL LIN BAUM, ESQUIRE
10  For Plaintiffs Couey, Sanders, Work, Mendoza, Walker:
                LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
11              501 Broad Street
                Lake Charles, Louisiana 70601
12          BY:  HUNTER W. LUNDY, ESQUIRE
                KRISTIE M. HIGHTOWER, ESQUIRE
13              RUDIE R. SOILEAU, JR., ESQUIRE
14  For Plaintiff Hardeman:
                Andrus Anderson LLP
15              155 Montgomery Street, Suite 900
                San Francisco, California 94104
16          BY:  JENNIE LEE ANDERSON, ESQUIRE
                LELAND H. BELEW, ESQUIRE
17
    For Plaintiff Stevik:
18              AUDET & PARTNERS LLP
                711 Van Ness Avenue, Suite 500
19              San Francisco, California 94102
            BY:  MARK E. BURTON, JR., ESQUIRE
20
    For Defendant:
21              HOLLINGSWORTH LLP
                1350 I Street, N.W.
22              Washington, DC 20005
            BY:  JOE G. HOLLINGSWORTH, ESQUIRE
23              ERIC G. LASKER, ESQUIRE
                HEATHER A. PIGMAN, ESQUIRE
24
    Also Present:   Tesfaye W. Tsadik, Esquire
25              Pete Miller, Esquire
                Mr. Jonathan Jaffe
```

3

```
1   Wednesday - November 16, 2016           9:38 a.m.
2           P R O C E E D I N G S
3           ---000---
4           THE CLERK:  Calling case No. 16-MD-02741, In re
5   Roundup Products Liability Litigation.
6           And no need for counsel to come up and state their
7   appearances.  We've got them already.
8           THE COURT:  Well, what I do want everybody to do is
9   introduce themselves so I can just put names to faces.  But you
10  don't need to line up in front of the podium.
11          Speak up when you introduce yourself.
12          (Persons present introduce themselves to the Court.)
13          THE COURT:  Good morning.
14          Okay.  So we have a handful of things to discuss.  I see
15  that a couple of letters were filed recently that I was only
16  just starting to go through this morning.  So I hadn't finished
17  reading those letters.
18          It looks like it's primarily about, if not exclusively
19  about, the Monsanto employees who are in Europe and whether
20  documents should be produced from there.  Is that right?
21          MR. LASKER:  Yes, Your Honor.
22          THE COURT:  Okay.  I guess the best place to start
23  would be with appointment of lead counsel and the question of
24  what sort of structure we should have in these cases.  And you
25  got my tentative view of it in the order we put out a couple of
```

4

```
1   days ago.
2           Does anybody want to speak to that?  Have you guys elected
3   a spokesperson to argue why I'm wrong that it should just be
4   one lead counsel?
5           MR. MILLER:  I think we'd all like to speak to it, so
6   one of us -- we are probably after the same thing.  If I may,
7   Your Honor.
8           THE COURT:  Sure.  Please.  Come forward.
9           MR. MILLER:  May it please the Court.  Again, I'm
10  Michael Miller.
11          We saw Your Honor's tentative order.  We understand Your
12  Honor's rationale.  We're here to ask you to reconsider because
13  we work so seamlessly together.
14          Amy Wagstaff, Robin Greenwald and I have led a terrific
15  team.  It's working together.  And we just don't feel like
16  standing up here before you and creating any disharmony and
17  saying, gee, you ought to appoint one of us, because we think
18  the three of us are doing a great job.
19          Critically, this is not like -- more like General Motors
20  than it was Volkswagen; although it has nothing to do with cars
21  per se.  And I say that because in Volkswagen it was
22  informative where Judge Breyer appointed one lead counsel, but
23  the company had already admitted liability, and it was a
24  different sort of animal.
25          This is more like General Motors.  We have different
```

17

1    THE COURT:  Okay.
2    MS. GREENWALD:  Thank you, Your Honor.  Appreciate
3  your time.
4    THE COURT:  Thank you.
5    MS. WAGSTAFF:  Good morning.  Amy Wagstaff.
6    So I have the role of, I guess, batting cleanup right now.
7  And so two points that I really wanted to bring to you.
8    First of all is, you made a comment that this structure
9  was proposed because of money.  And I just wanted to make sure
10  the record was clear that that's not at all why it's proposed.
11  It's proposed because of our clients.  And we think that we'll
12  get the best representation of our clients this way.
13    And unlike class actions, in mass torts we actually
14  have individual clients.  And it's no coincidence that our
15  three firms have the most clients.
16    I know that my office right now has almost a thousand
17  cases under investigation.  I think Mr. Miller's firm is the
18  same.  And I think Ms. Greenwald's is pretty close to the same.
19    Our three firms have the most interest at stake and the
20  most clients, so, therefor, we want to be at the front of the
21  litigation making those sort of decisions.
22    Secondly, I have -- I don't have as much -- as many years
23  practicing in MDL as my colleagues here, but this is the first
24  time where I've actually seen a defendant file an opposition to
25  a proposed structure.  And it made me think, why would they do

18

1  that?
2    So what an MDL structure does and what a PSC does, it
3  gives us, it gives the plaintiffs' side the comfort of
4  resources of each other's work and of financial resources.
5    And there's no doubt that this is going to be expensive.
6  And the way that PSC structures do work is that we would come
7  together and pool our financial resources.
8    So it makes me think that Monsanto's objection to our
9  structure when it's been working so well is that they want to,
10  sort of, put a chink in our armor or they want to make us not
11  to be able to work as well together.
12    THE COURT:  This might be an ignorant question.
13    MS. WAGSTAFF:  Sure.
14    THE COURT:  But can you talk to me more about the
15  relationship between the financial structure and the leadership
16  structure?  I mean, are those two things sort of inextricably
17  connected?
18    MS. WAGSTAFF:  Yes.
19    THE COURT:  How you finance the cases will be affected
20  by what the leadership structure looks like?
21    MS. WAGSTAFF:  Absolutely.
22    And without getting too much into our work product, I'll
23  tell you very generally --
24    THE COURT:  Or you can tell me sort of abstractly --
25    MS. WAGSTAFF:  Sure.

19

1    THE COURT:  -- how MDL cases work in general in that
2  regard?
3    MS. WAGSTAFF:  Yeah.
4    So the way that MDL cases work in general is that when a
5  PSC is created, each of the firms, law firms that are in that
6  PSC, pool money together.
7    And that money pays for the general causation experts.
8  That money pays for the document vendors which are very
9  expensive.  They produce -- you know, they're very proud of the
10  fact they produced millions of documents.  Well, those have to
11  go somewhere.  We have to house those documents somewhere.
12  It's expensive every single month.
13    And so what we do is we make a cash call, sort of -- it's
14  sort of like -- Ms. Greenwald talked about having our own law
15  firm.  We make a cash call and we pull our resources.
16    Now, we've already, sort of, done that on a very low
17  level.  And so we've started because when we thought Your Honor
18  was going to -- when we had the Hardeman discovery order and we
19  had experts due in January, we already starting to pool our
20  resources together to get ready for that January date that's
21  now been vacated.
22    But our ability to finance this litigation is directly
23  affected by the PSC structure.
24    And I will submit to you that I agree with Ms. --
25    THE COURT:  Well, why -- again, we can speak of MDLs

20

1  generally.  We don't have to get into the details of this one.
2  But I guess, again, this may be a product of my lack of
3  experience in this area, but it's not obvious to me why that
4  has to be the case.
5    I mean, why can't there be one lead counsel and, you know
6  say, an executive committee or steering committee of three,
7  just hypothetically, and an agreement among six law firms to
8  pool their resources?  And that -- you know, presumably an
9  agreement at the end of the day what percentage of the fund
10  each law firm is going to get roughly, or something like that,
11  commensurate with the work they've put in.
12    Why does there have to be three lead lawyers and six
13  executive committee members to preserve whatever finance -- you
14  know, sort of, cost-sharing agreement exists?  I just don't
15  fully understand the relationship between the two.
16    MS. WAGSTAFF:  Sure.  That's a great question.
17    And, of course, there can be an informal agreement among
18  plaintiffs' counsel.  There always can be.  But plaintiffs'
19  firms, sort of, by and large, don't hunt well in packs.
20    This has been a group that has done really well together.
21  And I think that the ability to have a court order
22  crystallizing our sort of structure so far will help us stay
23  focused.
24    And I don't think it's really Monsanto's place to try to
25  disturb the way that we're running this litigation from the

Case 3:16-md-02741-VC   Document 84-2   Filed 12/30/16   Page 4 of 4

(Hearing) Monsanto MDL CMC (In Re Roundup Prods. Liability Lit)  11/16/2016  2:27:00 PM

21

1  plaintiffs' side.
2      And I think that having a court order there, as
3  Ms. Greenwald talked about, sort of recognizing and putting us
4  in a situation where we're all aligned, sort of, to go together
5  and work in the same way is great.
6      We've been working together for, you know, 13 or 14
7  months.  I don't remember when we had our first meeting.  And
8  there are examples after examples of how Monsanto has tried to
9  divide us throughout this litigation.
10     And I think that this is just something that plaintiffs
11 should be allowed to decide for themselves.
12     And I'll pledge to you that in three months from now or
13 six months from now we can stand up, and if there's issues with
14 it being unwieldy or if you feel like you don't have a point
15 person to talk to, if Monsanto feels like they are not getting
16 responses from us, then we'll revisit this in a heartbeat.
17     THE COURT:  So on the issue of this being none of
18 Monsanto's business, I assumed the reason it's Monsanto's
19 business is because if you have a leadership structure that is
20 bloated and is going to drive up costs, that will affect
21 settlement value of the cases.  And so Monsanto has an interest
22 in the plaintiffs not having a bloated structure.
23     Is that wrong?
24     MS. WAGSTAFF:  Well, I don't want to speak for
25 Monsanto.  If Mr. Hollingsworth would like to speak for them

22

1  about why they did it.
2      But, of course, it's not our intention to drive up costs
3  at all.  And I don't think that we would do anything to drive
4  up costs.  In fact, we're trying to do quite the opposite.
5  We're trying to figure out a path where we spend as least
6  amount of cost as possible.
7      THE COURT:  Another question I had was about liaison
8  counsel.
9      I've heard people use the term in conversations with other
10 judges and whatnot.  I heard people use that term in seemingly
11 different ways.  So is it your view that there should be a
12 liaison counsel?  And if so, what would -- can you describe to
13 me what their role would be?
14     MS. WAGSTAFF:  Sure.
15     So we followed your order a little bit.  I believe your
16 first order suggests you would have a liaison counsel.
17     THE COURT:  Yes.  And since I put that out, I've heard
18 people describe it in different ways.  So I'm scratching my
19 head now, trying to remember why I said that.
20     MS. WAGSTAFF:  Well, I have been in a lot of MDLs.
21 And the liaison counsel's role, I think, is different in
22 most MDLs.  I don't think that there is a standard liaison role
23 for an MDL.  I think it really depends on who liaison counsel
24 is.
25     I think -- obviously, I would not want to speak for the

23

1  Court, but I think it would be helpful to have a liaison
2  counsel in the city where the Court is located for either
3  last-minute hearings or for communication with the Court and
4  things of that nature.
5      Although I am licensed in California, I'm not, you know,
6  the most conversant on, maybe, the Northern District local
7  rules.  So a liaison would help make sure that we are doing
8  everything properly the way Your Honor wants it.
9      THE COURT:  Okay.  So one thing -- okay.  So let's --
10 so liaison counsel would be responsible for communicating with
11 the Court.  Is that one thing that liaison counsel --
12     MS. WAGSTAFF:  That could be something that the
13 liaison counsel could be responsible for.
14     And I think from our side, it's nice to have liaison
15 counsel that is familiar with the district where the MDL is
16 residing, and has practice here and knows -- knows the legal
17 community and knows the court.  That's one of the ways that we
18 will rely on liaison counsel.
19     THE COURT:  Okay.  What else does liaison counsel do,
20 other than potentially communicate with the Court?
21     MS. WAGSTAFF:  Well, liaison counsel from the
22 plaintiffs' side, it's our intention they will take an active
23 role and almost be like a quasi PSC member or executive
24 committee member or something of that nature.
25     I mean, our liaison counsel is engaged in meetings with us

24

1  on strategy.  They're engaged in briefing with us.  They --
2      THE COURT:  But when you say "our liaison counsel" --
3      MS. WAGSTAFF:  I'm sorry.
4      THE COURT:  -- what do they do?  What does liaison
5  counsel do?
6      MS. WAGSTAFF:  Okay.  So let me -- I will make it very
7  concrete.
8      I was lead counsel in the Hardeman matter.  And Ms. Lori
9  Andrus was our liaison counsel.  And so the role that she
10 played was she made sure that I --
11     THE COURT:  This was before --
12     MS. WAGSTAFF:  Before --
13     THE COURT:  You had a liaison counsel before the --
14 before --
15     MS. WAGSTAFF:  I didn't call it liaison counsel, but I
16 asked her to help me file -- like I said, even though I'm
17 licensed here and I could have filed here on my own, I asked
18 her to help me file so that I could make sure I complied with
19 Your Honor's rules and Your Honor's practices, and that I could
20 have someone local here sitting with us at the table to make
21 sure that we were doing everything in the proper way
22 administratively, and to -- you know, the way that I personally
23 use liaison counsel as a substantive matter as well.  And this
24 sort of goes back to my original point, which was I think it
25 depends on the liaison person itself.