# Exhibit 1

```
                  Pages 1 - 96
            UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
     BEFORE THE HONORABLE VINCENT CHHABRIA, JUDGE
IN RE ROUNDUP PRODUCTS        )   MDL No. 2741
LIABILITY LITIGATION          )   Case No. 16-MD-2741 VC
                              )
EDWARD HARDEMAN,              )
                              )
       Plaintiff,             )
                              )
 VS.                          )   Case No. C 16-00525 VC
                              )
MONSANTO COMPANY, et al.,     )
                              )
       Defendants.            )
_____)
EDWARD HARDEMAN,              )
                              )
       Plaintiff,             )
                              )
 VS.                          )   Case No. MC 16-80232 VC
                              )
MONSANTO COMPANY,             )
                              )
       Defendant.             )
_____)
                    San Francisco, California
                    Wednesday, December 21, 2016
              TRANSCRIPT OF PROCEEDINGS
Reported By:  BELLE BALL, CSR 8785, CRR, RDR
          Official Reporter, U.S. District Court
(Appearances, next page)
```

APPEARANCES:
For Plaintiffs:
       WEITZ AND LUXENBERG PC
       700 Broadway
       New York City, New York  10003
  BY:  ROBIN L. GREENWALD, ESQ.
     PEARL ROBERTSON, ESQ.
     ANDRUS WAGSTAFF PC
     6315 Ascot Drive
     Oakland, California  94611
  BY:  KATHRYN M. FORGIE, ESQ.
     ANDRUS WAGSTAFF PC
     7171 West Alaska Drive
     Lakewood, Colorado  80226
  BY:  AIMEE H. WAGSTAFF, ESQ.
     ANDRUS ANDERSON LLP
     155 Montgomery Street
     Suite 900
     San Francisco, California  94104
  BY:  LELAND H. BELEW, ESQ.
     LUNDY LUNDY SOILEAU & SOUTH LLP
     501 Broad Street
     Post Office Box 3010
     Lake Charles, Louisiana  70601
  BY:  RUDIE R. SOILEAU, JR., ESQ.
     BAUM HEDLUND ARISTEI AND GOLDMAN PC
     12100 Wilshire Boulevard
     Suite 950
     Los Angeles, California  90025-7106
  BY:  MICHAEL L. BAUM, ESQ.
     PEDRAM ESFANDIARY, ESQ.
     KENNEDY & MADONNA, LLP
     78 North Broadway
     White Plains, New York  10603
  BY:  ROBERT F. KENNEDY, JR., ESQ.
(Appearances continued, next page)

APPEARANCES, CONTINUED:
Also for Plaintiffs:
       THE MILLER FIRM, LLC
       The Sherman Building
       108 Railroad Avenue
       Orange, Virginia  22960
  BY:  TIMOTHY A. LITZENBURG, ESQ.
       THE LAW OFFICES OF TESFAYE W. TSADIK
       The California Building
       1736 Franklin Street
       10th Floor
       Oakland, California  94612
  BY:  TESFAYE W. TSADIK, ESQ.
For Third Parties Patricia Bledsoe and Texas A&M University:
       TEXAS ATTORNEY GENERAL'S OFFICE
       Administrative Law Division
       300 West 15th Street
       Austin, Texas  78701
  BY:  KIMBERLY FUCHS, ESQ.
For Defendant Monsanto:
       HOLLINGSWORTH LLP
       1350 I Street, N.W.
       Washington, D.C.  20005
  BY:  JOE G. HOLLINGSWORTH, ESQ.
     ERIC G. LASKER, ESQ.
     ROSEMARY STEWART, ESQ. (Telephonic)

                          4

1  Wednesday - December 21, 2016                    9:46 a.m.
2          P R O C E E D I N G S
3      THE CLERK:  Calling case No. 16-MD-2741, In Re: Roundup®
4  Products Liability Litigation; and 16-CV-525, Hardeman versus
5  Monsanto Company, et al.; and 16-MC-80232, Hardeman versus
6  Monsanto Company.
7      Appearances have already been taken.
8      THE COURT:  Hi, everyone.
9      (Counsel greet the Court)
10     THE COURT:  Should we talk about the motion to quash first?
11     MS. FUCHS:  Yes, Your Honor.  That is my motion.
12     THE COURT:  Come on up.
13     And appearances have been taken, but I haven't heard your
14  name.  What's your name?
15     MS. FUCHS:  Your Honor, my name is Kimberly Fuchs.  I'm from
16  the Attorney General's office in Texas, and I'm representing
17  non-parties Bledsoe and Texas A&M University.
18     THE COURT:  Welcome to California.
19     MS. FUCHS:  Thank Your Honor.
20     THE COURT:  And who's going to be arguing this for Monsanto?
21     MR. HOLLINGSWORTH:  I am, Your Honor.  Joe Hollingsworth.
22     THE COURT:  Why don't you go over there (Indicating), since
23  Monsanto is kind of occupying that side of the courtroom.  You
24  don't want to get too close to them.
25     (Request complied with by Ms. Fuchs)

5

1  THE COURT: So you all are kind of in an interesting
2  position here.
3  MS. FUCHS: We are, Your Honor.
4  THE COURT: Any new developments since the filings?
5  MS. FUCHS: No, Your Honor. I do have a thumb drive here
6  (Indicating), with the responsive documents on it, if you would
7  like to view them in camera.
8      Other than that, our arguments are essentially the same as
9  what we briefed. I would be happy to orally argue them, or
10 whatever your preference is.
11 THE COURT: Well, yeah. I mean, I have a couple of
12 questions. And I'm just -- I'm pulling up the subpoena, and I'm
13 pulling up the statute.
14     So, I mean, it seems to me that this -- you know, the answer
15 to this question turns primarily or maybe entirely on whether
16 these documents are, in fact, the World Health Organization's
17 property.
18 MS. FUCHS: Yes, Your Honor. That is our understanding.
19 THE COURT: But I guess I feel like I have -- we don't have
20 enough. Maybe you also don't have enough information, but I
21 feel like we collectively, from the filings, don't have enough
22 information to be able to figure out what, if any of this stuff,
23 is the World Health Organization's property.
24     And I was curious, you know, are there any -- is there
25 anything -- are there any agreements between -- what's the name

6

1  of the doctor?
2  MS. FUCHS: Dr. Rusyn.
3  THE COURT: Rusyn?
4  MS. FUCHS: Yes, Your Honor.
5  THE COURT: Is there some, like, agreement between the World
6  Health Organization or the IARC and Dr. Rusyn about the use of
7  documents generated in, you know, connection with his IARC work,
8  or ownership of the materials generated in connection with his
9  IARC work?
10 MS. FUCHS: Your Honor, not that I have in my possession.
11 But another interesting thing about this is that Dr. Rusyn did
12 this work not as part of the faculty of Texas A&M, but in his
13 individual capacity. And so the documents that we have, we're
14 not really the custodian of any of these documents. This is --
15 they're in the University's possession, solely because he
16 performed some of the work on his computer at the University and
17 using his University e-mail address.
18     And so, I don't represent Dr. Rusyn, because as -- the Texas
19 Attorney General's office represents state agencies and state
20 employees only when they're acting in their official capacity as
21 a University employee. And because did he this in his -- you
22 know, did this individually, I don't represent him.
23 THE COURT: Hm.
24 MS. FUCHS: So it's -- again, we are in kind of an
25 interesting situation here. I feel like I don't necessarily

7

1  have all the information that would be helpful for you. But
2  it's -- it's because the University is kind of tangential to
3  this whole thing, and we only have the information by virtue of,
4  you know, equipment, essentially.
5  THE COURT: Uh-huh. And this subpoena was directed to Texas
6  A&M, not to Dr. Rusyn individually.
7  MS. FUCHS: Yes, Your Honor. Yes, Your Honor.
8  THE COURT: So what you are saying is that on that thumb
9  drive, those are documents that were in Texas A&M's possession
10 because they were emails or documents or whatever that existed
11 on Texas A&M server's or text A&M's computers.
12 MS. FUCHS: Yes, Your Honor.
13 THE COURT: But to the extent that he had, like, a personal
14 laptop that he worked from out of his home, and used a personal
15 email address or something like that to communicate with IARC
16 people, that wouldn't be on the thumb drive.
17 MS. FUCHS: Yes, Your Honor. What we have is University
18 property, essentially.
19 THE COURT: Okay.
20 MS. FUCHS: There are some of the emails in one of the
21 categories that came from his -- from a private e-mail address,
22 but that is by virtue of the fact they were on his University
23 computer. Whether there are others that were from home, I don't
24 know.
25 THE COURT: Uh-huh. So I just -- you know, I find myself

8

1  having, you know, difficulty figuring out what to do in this
2  strange situation. I mean, on the one hand, you know, the
3  subpoena is, you know, ridiculously overbroad. And we can
4  certainly narrow the scope of the subpoena. But it's -- that
5  still doesn't help us answer the question what materials are
6  subject to immunity. And what materials might not be subject to
7  immunity.
8      I mean, I would think that any -- you know, if there's an
9  email exchange between Dr. Rusyn and his, you know, IARC
10 compatriots, or the other scientists around the world who were
11 part of this project of evaluating glyphosate, and they were
12 exchanging drafts of the monograph or opinions about what should
13 be in the monograph, I mean, I think it's probably fairly safe
14 to assume that that is IARC property, and that would be immune
15 from disclosure.
16 MS. FUCHS: Yes, Your Honor.
17 THE COURT: On the other hand, you know, if he sent an email
18 to someone else who was not part of the IARC group about the
19 work that IARC was doing, you know, and expressing an opinion
20 about, you know, the quality of the work that IARC was
21 performing or whatever, my guess is that probably wouldn't be
22 IARC property.
23     Have you done a review of the materials such that you are
24 able to break it down, something along the lines of what I'm
25 describing?

9

MS. FUCHS: Yes, Your Honor. And actually, on this thumb drive you will see that there are three different folders. And one is labeled "WHO." And those are communications with the World Health Organization.

The other is -- is labeled "JMPR." And what that is, what that stands for is a joint meeting on pesticide residues. And what that is it's an ad hoc body that's a collaboration between the United Nations and the World Health Organization. They meet every year; they've been meeting every year.

THE COURT: What is it called, again?

MS. FUCHS: Joint Meeting on Pesticide Residues.

THE COURT: Okay.

MS. FUCHS: They've been meeting every year since 1963.

THE COURT: And it's an organization who -- describe the organization again.

MS. FUCHS: It's an ad hoc body that's a collaboration between the United Nations and the World Health Organization. And their purpose is apparently to study, like, pesticide residues in the food source or in the food chain. And so that is what presumably would be protected by the same privilege. That's in a separate folder.

THE COURT: So are you saying that the folder -- so you were saying that the WHO folder represents communications with the WHO?

MS. FUCHS: Yes, Your Honor.

10

THE COURT: And the JMPR folder represents communications with this ad hoc working group?

MS. FUCHS: Yes, Your Honor.

THE COURT: Okay. Got it.

MS. FUCHS: And then there is a third folder in there. And that folder is labeled "Other." And that's where it gets a little bit more difficult, I think, than --

(Reporter interruption)

MS. FUCHS: There's a third folder and it's labeled "Other." And that's where it gets a little bit more difficult with regards to the privilege.

There are some things in there that it's not clear, you know, exactly whether the privilege would apply. Some of the things appear that they might not be relevant, that they might be -- because the subpoena was so broad that they're, you know, that they're brought in under that.

There are also documents in there that appear to be published articles. And our position would be if they are in the public domain, then they would be public. Even if -- you know, even if there are articles by the World Health Organization, if they published them, they're public.

So, the other category is more of a combination of things that we're not exactly sure where it comes in. I'm confident that at least some of that stuff can be released because, as I said, a lot of it appears to be things that are public. Some of

11

it appears not to be directly relevant to this litigation. Although I'm not sure, because I'm only tangentially involved here. And --

THE COURT: Congratulations.

MS. FUCHS: Thank you.

THE COURT: Does the other folder include stuff on glyphosate that wasn't done in connection with the IARC work?

MS. FUCHS: I don't think so. I'm not -- there are some things that might be. I'm not sure. It's a fairly large group of documents. And some of the stuff does appear to be published stuff on that.

I'm not sure -- I don't remember seeing any communications with parties that were not the World Health Organization, but were on that research that they essentially did for the World Health Organization. But I'm not sure.

And again, I have a pretty limited understanding of this whole --

THE COURT: Uh-huh. Well, I mean, Dr. Rusyn should be able to help you with that, right?

MS. FUCHS: Yes, Your Honor. And I talked to the University about it, and they are happy to reach out to Dr. Rusyn. If the -- you know, if this is something that we need to, I guess, explore more and see, you know, whether these communications that aren't directly what the World Health Organization are about, are about the research, we're happy to reach out to him

12

and get more information from him.

I believe that he did cooperate with the University in getting the documents together and so forth. And, you know, I don't think it would be a problem to have -- to go through with him and figure out exactly, if we can get some contours from the Court of exactly what we need to look for that should be released.

THE COURT: Uh-huh.

MS. FUCHS: I don't think it would be a problem to go to him and work with him to get that information.

THE COURT: Is there anything more we can do to educate ourselves on, you know, the degree to which or the extent to which these communications, say, in the first two folders, are considered -- let's take the first folder, to make it a little easier.

Is there -- is there anything more we can do to educate ourselves on the extent to which that material should be considered the World Health Organization's property?

MS. FUCHS: Your Honor, the World Health Organization's position has been that any communications with them, regardless of whether they are on point about the research, whether they're about traveling to Europe for meetings, their position is that they all fall under this umbrella.

THE COURT: But -- their position is that they all fall under this umbrella. But is their position that it's all their

13

1  property?
2      MS. FUCHS:  Yes, Your Honor.  That's their position.
3      THE COURT:  So, like, what is that based on?  Do they have
4  any contemporaneous evidence that they -- it was established
5  that these types of things would be considered the World Health
6  Organization's property?
7      I mean, I was -- I would have to think that, you know, if
8  the World Health Organization is entering into this arrangement
9  with scientists all over the globe to study, you know, a
10 substance, and prepare a monograph on it, you know, there would
11 be some sort of contract that the World Health Organization
12 would have these scientists sign to establish the sort of
13 boundaries of their relationship.
14     You don't have any contract along those lines?  Did you ask
15 Dr. Rusyn if he had a contract?  Did you ask the World Health
16 Organization if they had a contract governing this relationship?
17     MS. FUCHS:  Your Honor, I was -- I was not on this case in
18 the beginning.  I am unaware of any contract.  I would imagine
19 that was probably something that the previous attorney brought
20 up.  I can't imagine that that wouldn't have been attached.  But
21 I'm not entirely sure about that.
22     I will tell you that it was the original understanding under
23 the first communication with the World Health Organization that
24 they would be filing something with this Court to protect their
25 own privileges.  So this wasn't a position that the University,

14

1  you know, expected to be in.
2      And then they sent us a letter after they decided not to,
3  saying:  Don't release it, or you'll be in violation of
4  international law, and... (Shrugs shoulders)
5      (Laughter)
6      THE COURT:  Do you have any idea why they didn't file
7  anything?  I mean, they're not waiving any privilege by filing
8  something in this court.
9      MS. FUCHS:  Your Honor, we have no idea why they didn't file
10 anything.  After the phone conversation that my colleague had
11 with them, his understanding was that something would be filed,
12 and it wasn't.
13     And the followup just generated this letter (Indicating),
14 and telling --
15     THE COURT:  Yeah, I read the letter.  And the letter is
16 marginally helpful, but not -- you know.  And -- you know.  I
17 think the letter sort of at least creates a presumption in my
18 mind that communications -- the kinds of things in the first
19 folder --
20     MS. FUCHS:  Yes.
21     THE COURT:  -- and perhaps the second folder are probably
22 not subject to subpoena.
23     MS. FUCHS:  Yes, Your Honor.
24     THE COURT:  But it doesn't really help us define the breadth
25 of the immunity.

15

1      MS. FUCHS:  Yes, Your Honor.
2      THE COURT:  All right.  Maybe I could hear a little from
3  Monsanto now on this.
4      And maybe the first question we could talk about is, I mean,
5  what's your -- what's your argument for why communications
6  between Rusyn and other scientists in this working group about,
7  like, the content of drafts and stuff is not -- should not be
8  privileged?
9      MR. HOLLINGSWORTH:  Your Honor, they -- we have several
10 arguments about that.  Let me tell you what those arguments are.
11     First of all, there is no contract that we know of,
12 whatsoever, involving Dr. Rusyn or anybody else that we know of
13 who was on this panel.  We -- because the complaints contain 35
14 paragraphs that rely on IARC, purportedly to show that there's a
15 basis for the proposition that --
16     THE COURT:  That's not relevant to whether these documents
17 are immune from discovery.
18     MR. HOLLINGSWORTH:  Yes.  Yes.
19     THE COURT:  I'm not -- I know that the complaint trumpets
20 IARC's conclusion.  I'm asking the question about whether these
21 documents are immune from discovery.  Immune from subpoena.
22     MR. HOLLINGSWORTH:  My apologies for that, Your Honor.
23     So, as a result of the allegations in the complaint, we
24 decided to look into who was on the committee, the so-called
25 "112 Committee," which has about -- probably over 15 members.

16

1  Six of those people at least -- maybe more, but we confirmed
2  that six people on that committee did not work for a federal
3  agency.  Were either private parties, or worked for a state or
4  -- state institutions, like Dr. Rusyn, who worked for Texas A&M.
5  And we decided that we would subpoena them.
6      THE COURT:  Just a quick clarification question.
7      You said that of the 15 or so people, six or so did not work
8  for a federal agency.  What's the significance of that
9  conclusion?
10     MR. HOLLINGSWORTH:  If -- there are members of the committee
11 who did work for federal agencies in Washington.  Four people, I
12 believe.  A couple for United States EPA, and two for other
13 federal health agencies.
14     THE COURT:  Uh-huh.
15     MR. HOLLINGSWORTH:  In that case, there's a case from the
16 Supreme Court called Tuohy that requires the parties seeking
17 information that would otherwise be by subpoena in Federal Court
18 to do so by letter to the Department of Justice, which is what
19 we have done for those four people.
20     THE COURT:  I see.  And has the Department of Justice turned
21 over the documents for those four people?
22     MR. HOLLINGSWORTH:  No, they have not.  What they have
23 done -- and we are contesting this -- is convert those Tuohy
24 letters to FOIA requests.  Which we disagree with.  We think
25 that is contrary to what the Supreme Court case says.

17

1   And we are in discussions with them right now.  They haven't
2   said that they won't turn them over.  This is just the
3   procedural issue right now.  And it takes a while to deal with
4   the agencies involved in those cases.
5       But now, we are directly involved with the agencies rather
6   than the Department of Justice, which is where we thought --
7   where we started out, and where we think we should be.  So
8   that's that side of it.
9       But -- and so, in answering your first question, Your Honor,
10  we had these six people that we have subpoenaed.  And we have
11  already received responses from three of them, at least three of
12  them.  One is for one of Dr. Rusyn's counterparts on the animal
13  tox committee, whose name is Matthew Ross.  He is also a Ph.D.,
14  at Mississippi State, and he's produced all of his documents
15  from his work involving the IARC monograph on glyphosate.
16      And from those documents, we see no indication that any
17  conversation that he's had with people on the committee or in
18  connection with his work on the committee is property or assets
19  of IARC.  There's no IARC legend; there's no WHO legend.
20  There's no contract, as there would be in any case like this
21  that we've ever been involved in, where we always enter into
22  agreements with consultants before we provide them any kind of
23  information, making it clear who owns what in cases, and who
24  controls what, has custody and control of what and whatever in
25  situations likes that.

18

1       So there's nothing that we know of like that in connection
2   with Dr. Ross's materials.  And as I said, he worked at
3   Mississippi State.  And unlike the situation with Texas, with
4   all due respect, the folks from the Mississippi State Attorney
5   General's office and from Mississippi State University, we were
6   able to reach accommodations with them, and we have all those
7   materials.
8       A second person on the list of six --
9       THE COURT:  Maybe they didn't give any thought to whether
10  this immunity applied to production of documents.
11      MR. HOLLINGSWORTH:  They gave express thought to that, Your
12  Honor, and they decided that those materials are not the
13  property or assets of IARC, which is our position.  So we
14  respectfully disagree with Your Honor's initial conclusion about
15  what the property of IARC would be.
16      There's a second person within the six whose name is
17  Dr. Aaron Blair.  He spent his whole career in Washington; he's
18  retired now.  My experience with him goes back to the 1970s in
19  Washington.  He's the former head of NCI, the National Cancer
20  Institute.  And he was the chairman of this IARC committee that
21  worked on Monograph 112 involving glyphosate.  And he is in the
22  process of producing three tranches of materials to us about his
23  connections with the committee and his work on this committee.
24      THE COURT:  What is his name again?
25      MR. HOLLINGSWORTH:  Aaron Blair, B-L-A-I-R.

19

1   And we have received two tranches of that information --
2   there is nothing in that information -- there is information in
3   both of these people's files, which I think shows that IARC has
4   waived whatever claim of privilege or immunity or property or
5   custody or control in this case.
6       THE COURT:  Well, there has to be an express waiver.  Right?
7       MR. HOLLINGSWORTH:  I think there has to be an express
8   waiver for something that is the property of IARC.  But I don't
9   believe these materials are the property of IARC.
10      THE COURT:  Okay.  All right.
11      MR. HOLLINGSWORTH:  And I think --
12      THE COURT:  So I think maybe the accurate way to say it is
13  not that there's -- there's -- there are materials which show
14  that the IARC has waived the right to keep this stuff
15  confidential, but rather, there's material in there that
16  suggests that it's not IARC's property to protect.
17      MR. HOLLINGSWORTH:  Right.  And I brought those files with
18  me.  And I'm sorry we haven't had a chance to lay this out for
19  Your Honor in connection with the motion to compel, which is
20  what I thought the next step would be here.
21      So there are things that have happened since the last paper
22  that we filed in opposition to this motion to quash, which I
23  thought we would succeed on, frankly, but what do I know?
24      So, so we've talked to Dr. Blair; we've worked with
25  Dr. Blair; we've worked with Dr. Ross.  I think they have lots

20

1   of materials that show that there's a waiver here, and no
2   materials showing, that I know, of any kind of confidentiality
3   or contract right that IARC has.  So I don't believe that any of
4   the materials I have seen are IARC property or assets within the
5   meaning of that statute.
6       And we haven't subpoenaed IARC for any of that stuff.  We
7   know about the statute.  We haven't subpoenaed employees of
8   IARC, which we could.  The lead employee on this monograph is a
9   former EPA official who served for many years in that capacity
10  then, whose name is Kate Guyton.  We haven't subpoenaed her,
11  haven't attempted to.
12      But we have subpoenaed these six people.  And there is a
13  third person who happens to be currently the head of OEHHA,
14  which is a California state agency.  That's O-E-H-H-A.  I think
15  it stands for the Office of Environmental Health Hazard
16  Assessment.  I think.  Don't quote me on that, but I think that
17  is what OEHHA stands for.  And she is in the process -- was in
18  the process of producing her documents to us.  But my
19  understanding is that she may have hired an attorney, which the
20  other party -- which both Blair and Ross had as well.  And we
21  dealt with them.  So we will be ready to deal with Dr. Zeiss's
22  attorney, if and when we can.
23      There is a fourth person on the list of six whose name is
24  Dr. Jameson.  He is an independent consultant now, Your Honor,
25  who lives in Miami.  And we have attempted to contact him.  And

21

1  we served a subpoena on him as well.  He was involved heavily in
2  the issue of animal toxicology, which is very important in this
3  case.  Because it's the animal toxicology that's the basis on
4  which IARC made its determination that glyphosate is a probable
5  human carcinogen.  As to the epidemiology, the human data, they
6  decided that the information was insufficient to make that
7  conclusion.  So the animal data is key.
8      Jameson's a purported animal data expert, so we subpoenaed
9  him, too.  And he was prepared to talk to us about that, and did
10 talk to us about that.  But later we found out from one of the
11 Plaintiffs' attorneys in this case that he had been hired by the
12 Plaintiffs to be an expert.  So our conversations with him
13 ceased.
14     But we understand that he turned over all of his materials
15 involving the IARC work that he did in the IARC technical review
16 that he did to the Plaintiff lawyer in this case.  And that she
17 has Bates stamped those materials, and they are in her
18 possession.  So, you know, watch that space, more on that later.
19 And that's where we are.
20     But in response to Your Honor's question, we know of no
21 information from all that material so far that shows that there
22 is an express agreement about confidentiality or a simple
23 contract that would exist in every single case that I have ever
24 done involving this -- and this is not my first rodeo --
25 where -- where one party is working with an outside expert like

22

1  Dr. Rusyn, who the party admits is an independent outside person
2  who's not an employee of IARC.  That's expressed from the
3  documents as well.
4      So we don't think --
5      THE COURT:  Well, they don't -- do they -- they don't
6  necessarily have to be an employee of the IARC for their
7  communications with IARC to be IARC property.  I mean, that gets
8  back to my first question, which is:  Was there any contractual
9  arrangement about who owns the communications in the document?
10     MR. HOLLINGSWORTH:  There is no contractual relationship
11 that I know of.  There is no regulation that I know of that
12 applies to this situation specifically, in my humble opinion.
13 There is no statute that applies to this situation specifically.
14 These materials that we are --
15     THE COURT:  Well, I mean, there is a statute that
16 potentially applies to it, depending --
17     MR. HOLLINGSWORTH:  I don't think so, Your Honor.  You --
18     THE COURT:  Well, it just begs the question whether -- I
19 mean, you say it doesn't apply because it's not their property.
20 Right?
21     MR. HOLLINGSWORTH:  Well, there are several things that we
22 would say.  The files that we are concerned with here and that
23 our subpoenas are addressed to -- I'm sorry they're overbroad,
24 and we can narrow them -- are files that are generated by third
25 parties.  All third parties.  Not employees of IARC.  People

23

1  with whom IARC has no contract.  So, they are people whom IARC
2  has no expectation of confidentiality, Your Honor.  In the
3  normal context of that as I understand it, over years and years
4  of litigation, this issue that would be important under U.S.
5  law.
6      So there's no prior expectation that we can find in the
7  documents we already have that IARC was maintaining ownership of
8  this -- these property and assets, as those terms are used in
9  the statute.
10     THE COURT:  What is the --
11     MR. HOLLINGSWORTH:  I think the statute -- excuse me.
12     THE COURT:  Sorry.  Go ahead.
13     MR. HOLLINGSWORTH:  I think the statute is addressed to
14 attempt to subpoena or work process on assets or property of the
15 United Nations, okay?  And I can understand why the statute is
16 drafted that way.  But that's not what this is about.
17     THE COURT:  In the documents that you do have from these
18 other folks, what -- what's in there?  Are there, like, drafts
19 of the monograph?  Or --
20     MR. HOLLINGSWORTH:  There are drafts of sections of the
21 monographs.  Each of the six people I named, and a couple of
22 other people, including at least one at US EPA, were responsible
23 at the outset of this, via a committee that Dr. Rusyn was the
24 chairman of, for drafting up six or seven sections of the
25 monograph that were then taken to this meeting of IARC which

24

1  only lasted eight days in Leon, in 2014 or early 2015.
2      And from there, the overall committee, which I said is at
3  least 15 people, worked for eight days with the original drafts
4  that I think number -- number between four and six subsections,
5  based on what I have read so far.
6      And yes, we do have drafts of some of those.  In fact, we
7  have a draft of -- we have an early draft of the entire
8  monograph.
9      THE COURT:  Have you --
10     MR. HOLLINGSWORTH:  So I'm hoping you won't require me to
11 give that back to the United Nations.  But of course, I will, if
12 Your Honor so orders.
13     THE COURT:  Incidentally, have you provided those documents
14 to the other side?
15     MR. HOLLINGSWORTH:  No, but we have agreed to do that.
16     THE COURT:  Okay.
17     MR. HOLLINGSWORTH:  I think that the other side has asked us
18 for those documents.
19     THE COURT:  Uh-huh.  Now, let me -- going to the subpoena,
20 so I guess one question I have is if Dr. Rusyn engaged in some
21 sort of communication about glyphosate that was not in
22 connection with his work for the IARC.  Why would that be
23 relevant to this case?
24     MR. HOLLINGSWORTH:  For example, in several states, several
25 big Midwestern states where so much farming is done involving

25

1  corn and soybeans and in which glyphosate is used about
2  95 percent of the time, I think that would be -- certainly be
3  relevant to our consideration in this case.
4      THE COURT:  Well, why?  Why?
5      MR. HOLLINGSWORTH:  Well, I think that in the case of
6  Dr. Rusyn, and in the case of Dr. Blair, by the way, who's an
7  author of the currently-published version of the AHS study,
8  there is additional followup information that is being monitored
9  and developed right now about what that data shows, specifically
10 about whether or not there's an association between glyphosate
11 and non-Hodgkin's lymphoma, specifically.
12     THE COURT:  Okay, but wait a minute.
13     MR. HOLLINGSWORTH:  So I --
14     THE COURT:  Dr. Rusyn is not -- I presume is not going to be
15 a witness in this case.  Right?  He's not going to be testifying
16 as an expert.
17     And so you are subpoenaeing documents from Dr. Rusyn or from
18 his university in response to the allegation by the Plaintiffs
19 that -- or in response to reliance by the Plaintiffs on the
20 IARC's conclusions.
21     If Dr. Rusyn had some conversation with somebody else about
22 glyphosate that was not in connection with his IARC work, aren't
23 we getting pretty far afield -- and if Dr. Rusyn is not an
24 expert testifying in this case, aren't we getting pretty far
25 afield from this case?

26

1   It may be that you could -- pursuant to the Texas public
2   record laws, may or may not be able to get those sorts of
3   documents.  But this is a subpoena for this case.  So what's --
4   I just don't understand the relevance to this case.
5       MR. HOLLINGSWORTH:  Sure.  It's very relevant, Your Honor.
6   The -- the Working Group 112 looked carefully at the AHS data.
7   That is why I used it as an example in my answer to Your Honor's
8   question.  And I'm pretty sure that there is communication
9   between Rusyn and Blair involving that data.  The IARC went out
10  of its way to look at that data and consider that data.  And to
11  look specifically, based on that data, because they agree that
12  it's the best data in the world about the association between
13  glyphosate or not and non-Hodgkin's lymphoma.  There are 57,000
14  people being followed.  57,000 people.
15      And they wanted to know what that material showed, and what
16  the update is on that material.  And I think they're looking for
17  that material.  And I think Rusyn and Blair --
18      THE COURT:  So if Rusyn and Blair are communicating about
19  that material, that's communication with a cohort in the IARC
20  group.  But what about if Rusyn engages in some communication
21  with somebody else outside the context of his IARC work about
22  glyphosate?  I just don't understand how that is relevant to
23  this litigation.
24      MR. HOLLINGSWORTH:  That's a different question.
25      THE COURT:  That's the question I'm asking.

27

1       MR. HOLLINGSWORTH:  So that's a question involving --
2       THE COURT:  That's the same question I asked two minutes
3   ago.  Five minutes ago.
4       MR. HOLLINGSWORTH:  Right.  But my answer referred to the
5   AHS data, which I know that they have talked about, based on
6   other things that --
7       THE COURT:  Yes, but I'm not asking about his communications
8   with other IARC people.  Presumably his communications with
9   other IARC scientists about glyphosate is in connection with his
10  IARC work.
11      MR. HOLLINGSWORTH:  Yes.  Sorry, Your Honor.
12      THE COURT:  This subpoena --
13      MR. HOLLINGSWORTH:  Okay.
14      THE COURT:  -- asks for, like, if he would ever, you know,
15  if he ever gave -- if somebody uttered the word "glyphosate"
16  while they were passing him on the street, you want to know that
17  information.
18      MR. HOLLINGSWORTH:  If he has not been hired as an expert, I
19  see Your Honor's point, in that if he is communicating about
20  glyphosate with other people who are unconnected to the IARC
21  review, which Blair is not, and which the AHS information is
22  not, then --
23      THE COURT:  Okay, Blair is not one of these people -- he's
24  not one of the IARC scientists?
25      MR. HOLLINGSWORTH:  Blair is.  Blair was chairman of the

28

1   committee that wrote the IARC monograph.
2       THE COURT:  Right, okay.
3       MR. HOLLINGSWORTH:  He was the chairman.
4       THE COURT:  So any communications that he has made about
5   glyphosate that are not in connection with his work that he was
6   doing for the IARC should not be relevant in this, and should
7   not be the subject of this subpoena.  You agree with that?
8       MR. HOLLINGSWORTH:  Well, with some exceptions.  We've -- I
9   think we have already agreed with that, Your Honor.  But because
10  in his --
11      THE COURT:  Not according to what you're asking for in the
12  subpoena.
13      MR. HOLLINGSWORTH:  Well, we had discussions with
14  Dr. Blair's attorney about that.  So, we have attempted to limit
15  the --
16      THE COURT:  I'm asking about the subpoena to Dr. Rusyn.
17      MR. HOLLINGSWORTH:  Okay.
18      THE COURT:  That they have moved to quash.
19      MR. HOLLINGSWORTH:  Yes.
20      THE COURT:  Okay?  And I'm trying to get a sense of what is
21  -- of the vast amount of information that you have sought in
22  this subpoena, what is actually relevant to this litigation?  In
23  other words, I'm trying to work with you to narrow the subpoena
24  to something that's remotely reasonable.
25      MR. HOLLINGSWORTH:  Sure.

### 29

1  THE COURT:  I could just, I suppose, quash the subpoena on
2  the ground that it's grossly overbroad.
3  MR. HOLLINGSWORTH:  Yes.
4  THE COURT:  Would I have the authority to do that?
5  MR. HOLLINGSWORTH:  Absolutely.
6  THE COURT:  Okay.  So what I want to do is get a sense --
7  I'm comparing what you've written in the subpoena to what you're
8  saying now.  And it seems to be very, very different.  Because
9  what you're asking for in the subpoena is any time any document
10 relating to glyphosate was generated by or is in the possession
11 of Dr. Rusyn, he has to turn it over.
12 MR. HOLLINGSWORTH:  That's overly broad.
13 THE COURT:  Okay.  So, let's work together on this.  What do
14 you -- so, shouldn't it be limited -- to the extent that you're
15 attacking IARC's conclusion and IARC's methodology, shouldn't it
16 at least be limited to work he did for IARC?
17 MR. HOLLINGSWORTH:  Yes.
18 THE COURT:  And in connection with IARC?
19 MR. HOLLINGSWORTH:  Yes, and --
20 THE COURT:  So doesn't that eliminate a lot of the stuff?
21 The other folder in your thumb drive?
22 MS. FUCHS:  Yes, Your Honor.
23 THE COURT:  If not all of it?
24 MS. FUCHS:  Yes, Your Honor.  I believe there may be some
25 relevant documents still in there.  There would be these

### 30

1  published papers that would be -- that we believe are public
2  information.  Maybe some of them are just saved separately, so
3  I'm not sure if they were, you know, passed around in
4  conjunction with, but we're happy to turn that over if that's --
5  I mean, if that's something that the (Inaudible)...
6  (Reporter interruption)
7  MS. FUCHS:  That the Defendants are interested in.
8  THE COURT:  Okay.  But that still doesn't resolve the first
9  folder, and possibly the second folder --
10 MS. FUCHS:  Yes, Your Honor.
11 THE COURT:  ...which are documents.  I mean, I think
12 actually probably the second folder we could say the same thing
13 about, that that's not relevant.  Because what this subpoena
14 should be about is the work that Dr. Rusyn did in connection
15 with IARC, because you are attacking the IARC.
16 So we are down to the first folder now, basically.
17 MS. FUCHS:  Yes, Your Honor.
18 THE COURT:  Pretty much.
19 MR. HOLLINGSWORTH:  Your Honor, what is in the second folder
20 again, please?
21 THE COURT:  The second folder is communications relating to
22 the joint meeting on pesticide residues?
23 MS. FUCHS:  That's correct, Your Honor.
24 THE COURT:  Which is a collaboration between the UN and the
25 World Health Organization, which, as I understood it -- and

### 31

1  maybe I inferred too much from this, but as I understood it,
2  it's a project that is separate from the IARC project.
3  MS. FUCHS:  I believe so, Your Honor.  But I'm -- I cannot
4  tell you that with certainty.  I can find out if that's --
5  THE COURT:  That's obviously something you would need to
6  work with Dr. Rusyn on, as well.
7  MS. FUCHS:  Yes, Your Honor.
8  THE COURT:  Okay.  So it may be -- there's still an open
9  question about the second folder.  And if it's related to the
10 IARC work, perhaps it would still be, you know, appropriately
11 covered by the subpoena.
12 Go ahead.
13 MR. HOLLINGSWORTH:  Yes.  It may still be covered by the
14 subpoena, Your Honor.  If I may --
15 THE COURT:  But if it's a separate project from the IARC
16 project, --
17 MR. HOLLINGSWORTH:  Yes, it is.  And if I may explain --
18 THE COURT:  -- and it -- then it should not, right?
19 MR. HOLLINGSWORTH:  Yes.  It's A separate project.  The JPMR
20 is looking at pesticide residues.  And, the JPMR is associated
21 with the WHO, as IARC is associated loosely with the WHO.  And
22 after IARC made its determination that glyphosate is a probable
23 human carcinogen, the WHO JPMR said that there's no evidence
24 that glyphosate is a carcinogen, and therefore set food
25 tolerances for glyphosate that are applicable in Europe.  Or,

### 32

1  rather, they renewed them.  Okay.  So, so, with that caveat, I
2  agree with Your Honor.
3  THE COURT:  Okay.
4  MR. HOLLINGSWORTH:  It's not directly relevant to our
5  question about Dr. Rusyn's work on the IARC committee.  It may
6  be relevant to other aspects of this case.  So, so --
7  THE COURT:  Well, I don't know about --
8  MR. HOLLINGSWORTH:  -- separate subpoena on that.
9  THE COURT:  I mean, you don't have the right to go and
10 subpoena every document relating to every conclusion that any
11 person around the globe has come to about glyphosate.  Right?
12 MR. HOLLINGSWORTH:  Right.  And we have a pretty good handle
13 on the published data.  So I'm not so concerned about Folder 3,
14 either.
15 THE COURT:  Okay.  So it seems like we're pretty close.  It
16 sounds like you have a pretty good understanding of the JMPR and
17 its relationship to the IARC.  And the way you described it, it
18 sounds like we can pretty much cross out Folders 3 and 2, now.
19 And we are down to Folder 1.
20 MR. HOLLINGSWORTH:  With the caveat that we may be -- we may
21 ask Your Honor to enforce a subpoena about the JMPR material at
22 some later point in time.
23 THE COURT:  Okay.
24 MR. HOLLINGSWORTH:  We are making progress.
25 THE COURT:  All right, we're making progress.  We are down

33

to Folder No. 1. But, of course, that is the folder that, you know, that -- where the IARC could potentially make the strongest case that that stuff is its property.

So I guess my question to you is, you have your argument that it's not -- that this stuff is not the IARC's property. The World Health Organization apparently believes that it is IARC's property. I haven't been -- you know, you've got -- you've got your, you know, stacks of documents from other IARC people which apparently don't have any -- don't contain any indication that anyone believed that this was IARC's property. And apparently the documents that you have from Dr. Rusyn also contain no indication that anybody believed that this was IARC's property. So, but the IARC is asserting that it's IARC's property. But IARC isn't here, and IARC has decided not to file something in this court in response to this subpoena.

So the question is: What should I do now? I mean, what -- like, is there anything more that I can do to develop a better understanding of whether there is a colorable argument or a reasonable argument that this is, in fact, IARC property? I mean, are there any further submissions that anybody can make on that to help me make my decision? Or do I have to make the decision based on the limited information that I have now?

MS. FUCHS: Your Honor, we could reach out to the World Health Organization, and now that we have narrowed it to this one folder, ask, you know: Are there things in this folder that

34

you believe or don't believe are IARC property?

And, you know, potentially -- you know, again, we thought that they were going to participate, and they didn't. So I'm not sure how far I will get.

But I assume, based on what they said in this letter (Indicating), that if we send them these documents, they will tell us their position. And, you know, it's possible that -- because, you know, they -- they don't have the documents, apparently.

So, it's possible that they will say, you know, we --

THE COURT: They don't have the documents, but it's their property.

MS. FUCHS: But it's their property. Well, maybe they do have -- let me rephrase.

They probably do have the documents. Most of them are -- I guess they don't know which documents the University has, especially because of the relationship between Dr. Rusyn in his individual capacity in the University, there may be things that Dr. Rusyn has that the University doesn't have.

I don't -- my guess is that IARC doesn't know what the University has. They probably do have copies of all the documents, but not in the -- not in the format that -- you know, they don't know which ones of those documents are in the University's possession.

THE COURT: So roughly how many pages are in this WHO

35

folder?

MS. FUCHS: I don't necessarily have a great estimate, but it would probably be several hundred. Because it's a lot of emails, in addition to some other forms of communication.

THE COURT: Okay. So not that bad, in terms of reviewing it.

MS. FUCHS: Right. I don't believe it would be -- I mean, it might be, you know, 1,000 or maybe even a little more than that. But it's not going to be 10,000 pages, for sure.

THE COURT: Some light reading over the winter holiday?

Your view would be that I just -- I should deny the motion to quash, just as -- to the extent we're talking about the WHO folder.

MR. HOLLINGSWORTH: Yes. If Your Honor seeks --

THE COURT: But is there any more information that you can give me in support of your argument that this is not the IARC's property?

MR. HOLLINGSWORTH: I think if Your Honor asks for the WHO or IARC's position on this, Your Honor will receive the same kind of letter that Your Honor has already read, which does not meet the standard under the statute that we are all here concerned about, in my opinion, based on what we have already provided to Your Honor this morning.

So I don't think that they can do anything more than what is a totally post hoc attempt to claim property and asset rights on

36

this, which they don't have. And if they did have, they've long since given up. And if they had such --

THE COURT: Well, what --

MR. HOLLINGSWORTH: Excuse me. Excuse me.

THE COURT: Go ahead. Go ahead.

MR. HOLLINGSWORTH: The United States was invited to be here this morning, the Department of State. They decided not to be here. The IARC was invited to be here this morning to make this assertion. They decided not to be here.

I think it's an issue that they don't want to be associated with losing. And with all respect, I think that they should lose on this, at this point.

THE COURT: What about the assertions that you've made to me about the absence of any indication in the materials you've received from other IARC scientists that any -- there was any attempt to restrict the dissemination of these documents, or any attempt to assert confidentiality with respect to those documents? I mean, so far, what I have is your verbal assertion.

MR. HOLLINGSWORTH: Yes.

THE COURT: And I believe you. But is there any mechanism by which you can sort of present evidence of that to me?

MR. HOLLINGSWORTH: Yes.

THE COURT: That I could use to rely on in my ruling?

MR. HOLLINGSWORTH: Yes. We will provide an affidavit on

37

1  that, Your Honor.
2      THE COURT: Okay.
3      MR. HOLLINGSWORTH: We will go back through the documents
4  that we have from Dr. Blair and Dr. Ross, which number in the
5  thousands, and make sure that there is no claim of privilege or
6  any limitation on the disclosure or dissemination of those
7  materials. I don't think there's any. And, by the way, they
8  were disseminated over the internet. So --
9      THE COURT: What do you mean, they were disseminated over
10 the internet?
11     MR. HOLLINGSWORTH: They were disseminated via electronic
12 communication. I shouldn't have said "the internet." Although
13 I wouldn't be surprised, if I attempted to look on the internet,
14 that I could find some of these materials, with all respect. I
15 haven't done that.
16     So my comments went to what we have from several thousand
17 documents from Dr. Blair and Rawson. I believe that the answer
18 to Your Honor's question is no. But I'll confirm that, and then
19 provide an affidavit if an attorney affidavit is adequate for
20 Your Honor's purposes. Or I can provide some other kind of
21 affidavit, such as an IT professional.
22     THE COURT: Yeah, I don't know. I mean, I assume between an
23 IT professional and an attorney, that --
24     MR. HOLLINGSWORTH: Maybe two affidavits.
25     THE COURT: A distinction without a difference. But I'll

38

1  sort of leave that to you to figure out what is the best way to
2  present that.
3      MR. HOLLINGSWORTH: All right, Your Honor. Thank you.
4      THE COURT: But if you could make a presentation, sort of a
5  supplemental presentation about that, that would be good.
6      MR. HOLLINGSWORTH: Thank you.
7      THE COURT: When do you want to do that by?
8      MR. HOLLINGSWORTH: Getting that done before the end of this
9  week, because of the holiday, early next week may not be
10 possible, but during the -- during the mid -- mid to late next
11 week before the New Year's holiday. So some time next
12 Wednesday, Thursday or Friday.
13     THE COURT: You know, I'm just having the vision of some
14 poor associate who works for you --
15     MR. HOLLINGSWORTH: No, I'll be the one who's doing it,
16 myself, Your Honor. No, I'm just kidding. I'm being facetious
17 about that.
18     THE COURT: Why don't we do it, why don't we have the
19 deadline be a little bit later.
20     MR. HOLLINGSWORTH: Okay, fine. How about the deadline, the
21 Thursday after the New Year's holiday? Which I think would be
22 three, four, five, six --
23     THE COURT: The 5th, I think?
24     MR. HOLLINGSWORTH: The 5th.
25     THE COURT: Yeah, okay. That sounds good.

39

1      MR. HOLLINGSWORTH: All right, Your Honor.
2      THE COURT: And then any -- you know, sort of anything else
3  that you have on why or -- you know, why you think it isn't
4  their property. I think we've probably covered everything. So
5  that will be due on January 5th.
6      And then I think what I would like, you know -- I mean, we
7  don't want to like cause an international incident here, right?
8  So why don't you file a response to their submission.
9      MS. FUCHS: Yes, Your Honor.
10     THE COURT: And why don't do you that the following week.
11     MS. FUCHS: Yes, Your Honor.
12     THE COURT: So, like, the next Thursday, the 12th. And in
13 the meantime, you know, what I would appreciate your doing is,
14 you know, working with Dr. Rusyn on, you know, you know, and
15 working with the IARC on what these, you know, what these
16 documents are and why they should be considered IARC's property.
17     MS. FUCHS: Yes, Your Honor.
18     THE COURT: And I think IARC merely asserting now that this
19 is its property, you know, is a little bit unsatisfying.
20     MS. FUCHS: Yes, Your Honor.
21     THE COURT: And it would be interesting to know if there is
22 any contemporaneous evidence indicating that this was treated as
23 IARC's property.
24     MS. FUCHS: Absolutely.
25     THE COURT: And that the people involved believed that it

40

1  was IARC's property.
2      MS. FUCHS: Your Honor, I would be happy to reach out to
3  both IARC and Dr. Rusyn, and get any information I can for you.
4      THE COURT: Okay. And, and you can file -- you can file a
5  response on the 12th. And then I'll rule on the issue.
6      MS. FUCHS: Yes, Your Honor. And is my understanding
7  correct that the subpoena has been narrowed to essentially what
8  is in the first folder?
9      THE COURT: Yes.
10     MS. FUCHS: Thank you, Your Honor.
11     THE COURT: And what I would like to ask you to do, if you
12 don't mind, is I want to -- and the way I would like to proceed
13 for the rest of our session is I would like to talk to you all a
14 bit about scheduling. And then I would like to take a short
15 break.
16     And I -- you know, I don't think we will take too long to
17 talk about scheduling, but I'm wondering if you could stick
18 around until just after our break, because I want to sit in the
19 quiet of my chambers for a few minutes and think if I have any
20 other questions for you or any other directives for you.
21     MS. FUCHS: Absolutely, Your Honor.
22     THE COURT: Appreciate that. Okay. So you can go ahead and
23 have a seat wherever you are comfortable.
24     MS. FUCHS: Thank Your Honor.
25     THE COURT: And why don't we talk briefly about scheduling,

41

 1   and then we'll take a break, and then talk about the deposition
 2   protocol and then anything else that you want to talk about.
 3       MS. WAGSTAFF: Your Honor, before --
 4       THE COURT: You want to be heard on the --
 5       MS. WAGSTAFF: Just one moment.
 6       THE COURT: Sure.
 7       MS. WAGSTAFF: (Inaudible)
 8       (Reporter interruption)
 9       MS. WAGSTAFF: Aimee Wagstaffe for the Plaintiffs.
10       And we have stayed out of this, but if we could just ask
11   that we be provided those documents, this week, so that we can
12   have a chance to review them before the affidavit is filed on
13   the 5th, that would be great.
14       THE COURT: I assume it would be subject to some sort of
15   protective order.
16       MR. LASKER: Your Honor, actually, we would be happy
17   (Inaudible)...
18       (Reporter interruption)
19       MR. LASKER: I'm sorry.
20       We just produced the last set of those, I think, a couple
21   days ago. So you do have the documents already.
22       MS. WAGSTAFF: Okay, great.
23       THE COURT: All right. And yeah, you're free to --
24       MR. HOLLINGSWORTH: In exchange -- excuse me.
25       THE COURT: Yeah. I was just going to say you're free to

42

 1   file something on this, if you would like.
 2       MS. WAGSTAFF: I'm not sure I would like.
 3       MR. HOLLINGSWORTH: I was going to suggest that in exchange
 4   for that perhaps she can provide us with the documents that she
 5   has from Dr. Jameson which he thought were responsive to our
 6   subpoena, which is identic- -- similarly -- similar or identical
 7   to the factual situation with Dr. Rusyn.
 8       THE COURT: He's an expert of yours? That's their expert?
 9       MR. HOLLINGSWORTH: Yes.
10       MS. WAGSTAFF: Your Honor, they did subpoena Dr. Jameson.
11   And I wasn't prepared to talk on this, because it wasn't on the
12   agenda today.
13       But I do recall that Dr. Jameson received a letter either
14   from IARC or from who honestly I can't remember right now,
15   saying not to produce the documents. So I think that this needs
16   to be either formally set on an agenda, or allow me to review
17   sort of why we didn't produce those documents.
18       THE COURT: So let me just clarify. So Jameson is your --
19   is one of your experts. Correct?
20       MS. WAGSTAFF: That's correct, Your Honor.
21       THE COURT: Jameson is one of the IARC scientists?
22       MS. WAGSTAFF: That's correct, Your Honor.
23       THE COURT: Okay. And Jameson provided you with all his
24   IARC documents.
25       MS. WAGSTAFF: Yes.

43

 1       THE COURT: And, and IARC told Jameson to not provide them
 2   to the other side?
 3       MS. WAGSTAFF: Well, the timeline -- and again, I didn't
 4   know this was going to be on the agenda. But the timeline, they
 5   subpoenaed Dr. Jameson, who is in Florida. And Doctor -- and we
 6   had recently retained him as an expert witness.
 7       So I wrote a letter to Mr. Hollingsworth and/or his
 8   colleagues, and asked them to withdraw the subpoena as he was
 9   now a retained expert. And then they responded and said they
10   just want the documents that relate to his un-retained expert
11   work.
12       We said okay. But we don't represent Dr. Jameson with
13   respect to the subpoena. And then we said we would -- because
14   he's an expert for us, we would facilitate the transfer of
15   information, is basically how it went.
16       Dr. Jameson sent us documents. We Bates labeled them. We
17   made it very clear to the Hollingsworth firm that we weren't
18   representing him. And then Dr. Jameson writes to us and says:
19   I received this letter telling me not to produce these
20   documents. I'm guessing it may be similar to something that the
21   attorney for the Texas A&M just received, but I don't have that
22   letter in front of me.
23       So we wrote to them and we said we will keep these documents
24   exactly how they were produced to us. We will not destroy them.
25   We will keep them so that when you want to go to the Court to

44

 1   seek motion to compel or production or however you would like to
 2   receive them, they will be here in case the Court orders
 3   production.
 4       And that's sort of where we left it. And this was sort of
 5   sprung on us today, with no indication that this would be
 6   brought up.
 7       THE COURT: Well, the last part is not particularly
 8   relevant. And the comments about Jameson were relevant to the
 9   issue that we're discussing.
10       Okay. Well, I'm not going to order anything regarding
11   Jameson's documents right now. I first want to get this motion
12   to quash resolved. So, okay.
13       Regarding scheduling, what I was thinking, we have pending
14   this, you know, need, I think, to set deadlines with respect to
15   document custodians in these other groups. And, you know,
16   here's what I want to propose to you. Deadline for scheduling
17   depositions of Group B people would be the next case-management
18   statement.
19       (Noise from adjoining area)
20       THE COURT: Sorry, we -- prisoners are transported in that
21   room, so sometimes it gets a little loud.
22       So my idea was to have our next case-management conference,
23   like, on January 25th or January 27th. Those were the dates
24   that I was -- that I was pondering.
25       And the deadline for scheduling depos of the Group B people

45

1  would be the filing date of the case-management statement for
2  the next case-management conference. So that I know that you
3  have scheduled those depositions, and you are not waiting to
4  take 20 people's depositions in the last week of the discovery
5  period.
6      MS. WAGSTAFF: (Nods head)
7      THE COURT: And then the deadline for identifying to
8  Monsanto anybody in Group E who you would want -- whose
9  documents you would want would be February 1st.
10     If there's any dispute about whether those people should be
11 in Group E, that I would envision would be discussed in the next
12 case-management statement, and would require a very, very
13 detailed justification for including someone in Group E.
14     And I would anticipate that the next case-management
15 conference would be March 1st. And so the case-management
16 statement -- no, sorry.
17     February 22nd, is that what we talked about?
18     THE CLERK: (Nods head)
19     THE COURT: February 22nd. And so the case-management
20 statement would be due some time before then. And by that time,
21 you would have in that case-management statement which would be
22 due a few days before February 22nd, you would have to identify
23 anybody who you would want to include in Group E. And if
24 there's a dispute about it, include a detailed justification in
25 the case-management statement.

46

1      And then also in that same case-management statement that
2  would be due in mid-February, that would be the deadline for
3  scheduling depos of people in Groups C and D. And if there was
4  a dispute about whose deposition would need to be taken in
5  Groups C and D, there would again in that case-management
6  statement need to be a detailed justification for the taking of
7  those depositions along the lines of what I described in my --
8  in the order, Pretrial Order No. 3, I think it was.
9      So all of that might have been a little confusing. And we
10 can go over the dates again. But how does that grab you for
11 scheduling?
12     MS. WAGSTAFF: Your Honor, speaking for the Plaintiffs, we
13 would prefer to have the next conference be January 27th. The
14 reason for that is that we have one of the Group A depositions.
15     THE COURT: I noticed that, yeah.
16     MS. WAGSTAFF: And so we would like to get through that,
17 before -- in case anything comes up, have some time with you the
18 next day.
19     The parties have made an agreement that kind of we've drug
20 through from the Hardeman case, that we will do sort of a
21 30(b)(6) corporate deposition, corporate structure deposition
22 through written question, which we are going to serve on
23 Monsanto this year, in 2016, basically saying: Who, who played
24 this role, and in what years, to help us identify further
25 custodian files that we may need.

47

1  So assuming that that is timely responded to, and responded
2  to fully, I think we would have no problem meeting your February
3  1st deadline of requesting additional custodial files. But if
4  any hitch goes off with that, we --
5      THE COURT: What is your agreed-upon deadline for responding
6  to that?
7      MS. WAGSTAFF: Well, you know, we had sort of assumed that
8  it would be like an interrogatory type thing, so 30 days. If
9  Your Honor would like to -- we hadn't talked about anything
10 shorter than that, and I was actually negotiating it with
11 Ms. Stewart and Ms. Pigman, but I had assumed it would be 30
12 days.
13     THE COURT: Okay. I think we should have it be sooner than
14 that.
15     MS. WAGSTAFF: Okay.
16     THE COURT: First of all, what's your -- so what is this,
17 what is this, you're --
18     MS. WAGSTAFF: It's --
19     THE COURT: How do you describe what you're going to submit
20 to them?
21     MS. WAGSTAFF: This isn't the official name of it, but it's
22 sort of a 30(b)(6) corporate structure deposition by written
23 question.
24     So the way that it will look, you know, will be: Who was in
25 charge of this role for these following years? And assuming

48

1  that there's no objection, and that they timely respond, we will
2  have no problem meeting your February 5th deadline.
3      And this is an agreement we've had with the Hollingsworth
4  firm on how to treat -- gather this sort of information, for a
5  while now.
6      THE COURT: Okay, and when are you filing that? When are
7  you serving that?
8      MS. WAGSTAFF: I was going to serve it between the week of
9  Christmas and New Year's. So, by the end of the year.
10     THE COURT: So the deadline for that will be --
11     MS. WAGSTAFF: I can do December 30th.
12     THE COURT: December 30th. All right. And then the
13 deadline to respond to that I think should be around, you know,
14 January 21st or something like that. I don't know what day that
15 is.
16     THE CLERK: The 20th or 23rd.
17     THE COURT: January 23rd is the deadline to respond to that.
18     MS. WAGSTAFF: And, Your Honor, that will work, assuming
19 there's no objections. Can we meet and confer about objections
20 before? I would hate for them to bring objections for the first
21 time on the 23rd, and then we have eight days to try to figure
22 that out. So, I don't know, maybe objections by January 5th or
23 something?
24     And we could, if Your Honor would be willing, get on a
25 telephone call with you to resolve any objection that we may

49

1  have as to the scope of our questions.  I don't anticipate that
2  I would ask objectionable questions.
3      THE COURT:  Deadline for objections, January 5th.
4      MS. WAGSTAFF:  And while we're on the --
5      MR. HOLLINGSWORTH:  So we receive her questions on
6  December 30th, and then we have to respond with whatever we
7  object to, based on an initial review, by January 5th?
8      THE COURT:  Yeah, or a deadline to meet and confer regarding
9  objections.
10     MR. HOLLINGSWORTH:  Okay.  How about the deadline to meet
11  and confer on January 5th?  Thank you.
12     MS. WAGSTAFF:  Part and parcel of that agreement that we
13  made with the Hollingsworth firm, we also did an agreement on
14  electronic -- electronically-stored discovery.  We agreed not to
15  put our -- their deponent under oath and do a formal deposition.
16  We did an informal meeting.  And part of our agreement was that
17  I would give them my notes, they would edit it, and get it back
18  to me.  And then we would finalize it and figure out what we
19  needed to know about ESI, and where documents were stored and
20  that sort of thing, and where we needed to go look for
21  information.
22     Sorry.
23     We were hoping that if -- we gave them our notes back in
24  September.  And we --
25     THE COURT:  I'm sorry; I just don't understand what you are

50

1  talking about.  Sorry.
2      MS. WAGSTAFF:  Okay.  So instead of doing a 30(b)(6) of ESI,
3  which is sort of a typical first stage before discovery, we
4  agreed with the Hollingsworth firm that that wasn't necessarily
5  an adversarial deposition; we just wanted information.  So we
6  agreed to have our ESI expert and their ESI expert meet and sort
7  of come up with how ESI has been stored, and where we should go
8  look for it to sort of target our discovery.  And we have
9  re-energized that agreement.
10     So I'm just asking for deadlines to make that happen.  And
11  the process was that we would give the Hollingsworth firm
12  Plaintiffs --
13     THE COURT:  Okay.  During the break, you should be able to
14  sit down with each other and figure out those deadlines.
15     MS. WAGSTAFF:  Okay, we can do.  I see your eyes kind of
16  glaze over when we talk about ESI.
17     THE COURT:  Well, plus, I mean, you're all in the same room;
18  you can -- you should be able to sit down and figure out those
19  deadlines.  If you can't, after the break, I'm happy to try to
20  prevent my eyes from glazing over when you talk to me about it
21  again.
22     MS. WAGSTAFF:  Okay.
23     THE COURT:  And then the other thing is I think I want there
24  to be a deadline for taking depositions.  You had previously
25  expressed a bit of opposition to that.  Because you wanted to

51

1  figure out -- you wanted to sort of leave it to yourselves to
2  figure out the order in which you take depositions.  And maybe,
3  you know, it would be better to take somebody's deposition in
4  Group C before you take somebody's deposition in Group B, or
5  whatever.  But I'm more concerned about not having enough time
6  to take the depositions.
7      So, you have decided you want to take three -- I think three
8  depositions of people in Group B?  Is that right?
9      MS. WAGSTAFF:  I believe that's correct.
10     THE COURT:  Okay.  And so, as I said, in the next
11  case-management statement I want to know when those dates --
12  when those depositions are scheduled.  And I think they should
13  be completed before a certain date.  Like, I think it would be
14  reasonable to say you should complete those three depositions in
15  February, for example.
16     MS. WAGSTAFF:  We can certainly do that, if it would provide
17  more comfort to Your Honor.  Our preference would be just to
18  have a date that all depositions must be done.  But I understand
19  the helpfulness of having sort of roadblocks, and we would be
20  willing to do that.
21     THE COURT:  It would provide for more comfort for me if you
22  took those three depositions in February.  So I'm going to
23  require that you do that.
24     MS. WAGSTAFF:  Okay.  And I would just ask if there's ever a
25  particular deponent that we want to wait until the end, we would

52

1  just ask for an exception to take it out of time or something
2  like that.
3      MR. HOLLINGSWORTH:  What does that mean?
4      MS. WAGSTAFF:  It means that if -- for example, Dan Jenkins,
5  who's a Group B, if we for some reason felt that it would be in
6  our best interest to take him as one of the last depositions, I
7  would ask Judge Chhabria if I could please take him in April or
8  March instead of in February.
9      THE COURT:  Yeah.  And I would be reluctant to do that,
10  unless you came to me and said:  We've scheduled a bunch of
11  other people in February anyway.
12     MS. WAGSTAFF:  Right.
13     THE COURT:  So we're not sitting around, twiddling our
14  thumbs.  I mean, I know you won't be sitting around twiddling
15  your thumbs.  But I -- you know, what I'm -- you know.  I think
16  it is a very reasonable schedule we set, but I am uncomfortable
17  with the idea of not making progress along the way with this
18  stuff.
19     So, you know, and then I think, you know, we may -- at the
20  next case-management conference, we may set, you know, further
21  deadlines.  So we might say anybody you want to depose in
22  Group C, you know, or D, or whatever, has to be done by, you
23  know, April -- March 20th or something like that.  But we can
24  talk about that at the next case-management conference.
25     So how does that schedule sound?  So the idea would be the