# Exhibit 1

-   -

Pages 1 - 96
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE VINCENT CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS          )  MDL No. 2741
LIABILITY LITIGATION            )  Case No. 16-MD-2741 VC
                                )
EDWARD HARDEMAN,                )
                                )
        Plaintiff,              )
                                )
VS.                             )  Case No. C 16-00525 VC
                                )
MONSANTO COMPANY, et al.,       )
                                )
        Defendants.             )
_____)
EDWARD HARDEMAN,                )
                                )
        Plaintiff,              )
                                )
VS.                             )  Case No. MC 16-80232 VC
                                )
MONSANTO COMPANY,               )
                                )
        Defendant.              )
_____)

San Francisco, California
Wednesday, December 21, 2016
TRANSCRIPT OF PROCEEDINGS
Reported By:  BELLE BALL, CSR 8785, CRR, RDR
Official Reporter, U.S. District Court
(Appearances, next page)

APPEARANCES:
For Plaintiffs:
        WEITZ AND LUXENBERG PC
        700 Broadway
        New York City, New York  10003
        BY:  ROBIN L. GREENWALD, ESQ.
        PEARL ROBERTSON, ESQ.
        ANDRUS WAGSTAFF PC
        6315 Ascot Drive
        Oakland, California  94611
        BY:  KATHRYN M. FORGIE, ESQ.
        ANDRUS WAGSTAFF PC
        7171 West Alaska Drive
        Lakewood, Colorado  80226
        BY:  AIMEE H. WAGSTAFF, ESQ.
        ANDRUS ANDERSON LLP
        155 Montgomery Street
        Suite 900
        San Francisco, California  94104
        BY:  LELAND H. BELEW, ESQ.
        LUNDY LUNDY SOILEAU & SOUTH LLP
        501 Broad Street
        Post Office Box 3010
        Lake Charles, Louisiana  70601
        BY:  RUDIE R. SOILEAU, JR., ESQ.
        BAUM HEDLUND ARISTEI AND GOLDMAN PC
        12100 Wilshire Boulevard
        Suite 950
        Los Angeles, California  90025-7106
        BY:  MICHAEL L. BAUM, ESQ.
        PEDRAM ESFANDIARY, ESQ.
        KENNEDY & MADONNA, LLP
        78 North Broadway
        White Plains, New York  10603
        BY:  ROBERT F. KENNEDY, JR., ESQ.

(Appearances continued, next page)

APPEARANCES, CONTINUED:
Also for Plaintiffs:
        THE MILLER FIRM, LLC
        The Sherman Building
        108 Railroad Avenue
        Orange, Virginia  22960
        BY:  TIMOTHY A. LITZENBURG, ESQ.
        THE LAW OFFICES OF TESFAYE W. TSADIK
        The California Building
        1736 Franklin Street
        10th Floor
        Oakland, California  94612
        BY:  TESFAYE W. TSADIK, ESQ.
For Third Parties Patricia Bledsoe and Texas A&M University:
        TEXAS ATTORNEY GENERAL'S OFFICE
        Administrative Law Division
        300 West 15th Street
        Austin, Texas  78701
        BY:  KIMBERLY FUCHS, ESQ.
For Defendant Monsanto:
        HOLLINGSWORTH LLP
        1350 I Street, N.W.
        Washington, D.C.  20005
        BY:  JOE G. HOLLINGSWORTH, ESQ.
        ERIC G. LASKER, ESQ.
        ROSEMARY STEWART, ESQ. (Telephonic)

-   -
4

1   Wednesday - December 21, 2016            9:46 a.m.
2          P R O C E E D I N G S
3       THE CLERK:  Calling case No. 16-MD-2741, In Re: Roundup®
4   Products Liability Litigation; and 16-CV-525, Hardeman versus
5   Monsanto Company, et al.; and 16-MC-80232, Hardeman versus
6   Monsanto Company.
7       Appearances have already been taken.
8       THE COURT:  Hi, everyone.
9       (Counsel greet the Court)
10      THE COURT:  Should we talk about the motion to quash first?
11      MS. FUCHS:  Yes, Your Honor.  That is my motion.
12      THE COURT:  Come on up.
13      And appearances have been taken, but I haven't heard your
14   name.  What's your name?
15      MS. FUCHS:  Your Honor, my name is Kimberly Fuchs.  I'm from
16   the Attorney General's office in Texas, and I'm representing
17   non-parties Bledsoe and Texas A&M University.
18      THE COURT:  Welcome to California.
19      MS. FUCHS:  Thank Your Honor.
20      THE COURT:  And who's going to be arguing this for Monsanto?
21      MR. HOLLINGSWORTH:  I am, Your Honor.  Joe Hollingsworth.
22      THE COURT:  Why don't you go over there (Indicating), since
23   Monsanto is kind of occupying that side of the courtroom.  You
24   don't want to get too close to them.
25      (Request complied with by Ms. Fuchs)

5

1  THE COURT:  So you all are kind of in an interesting
2  position here.
3  MS. FUCHS:  We are, Your Honor.
4  THE COURT:  Any new developments since the filings?
5  MS. FUCHS:  No, Your Honor.  I do have a thumb drive here
6  (Indicating), with the responsive documents on it, if you would
7  like to view them in camera.
8  Other than that, our arguments are essentially the same as
9  what we briefed.  I would be happy to orally argue them, or
10  whatever your preference is.
11  THE COURT:  Well, yeah.  I mean, I have a couple of
12  questions.  And I'm just -- I'm pulling up the subpoena, and I'm
13  pulling up the statute.
14  So, I mean, it seems to me that this -- you know, the answer
15  to this question turns primarily or maybe entirely on whether
16  these documents are, in fact, the World Health Organization's
17  property.
18  MS. FUCHS:  Yes, Your Honor.  That is our understanding.
19  THE COURT:  But I guess I feel like I have -- we don't have
20  enough.  Maybe you also don't have enough information, but I
21  feel like we collectively, from the filings, don't have enough
22  information to be able to figure out what, if any of this stuff,
23  is the World Health Organization's property.
24  And I was curious, you know, are there any -- is there
25  anything -- are there any agreements between -- what's the name

6

1  of the doctor?
2  MS. FUCHS:  Dr. Rusyn.
3  THE COURT:  Rusyn?
4  MS. FUCHS:  Yes, Your Honor.
5  THE COURT:  Is there some, like, agreement between the World
6  Health Organization or the IARC and Dr. Rusyn about the use of
7  documents generated in, you know, connection with his IARC work,
8  or ownership of the materials generated in connection with his
9  IARC work?
10  MS. FUCHS:  Your Honor, not that I have in my possession.
11  But another interesting thing about this is that Dr. Rusyn did
12  this work not as part of the faculty of Texas A&M, but in his
13  individual capacity.  And so the documents that we have, we're
14  not really the custodian of any of these documents.  This is --
15  they're in the University's possession, solely because he
16  performed some of the work on his computer at the University and
17  using his University e-mail address.
18  And so, I don't represent Dr. Rusyn, because as -- the Texas
19  Attorney General's office represents state agencies and state
20  employees only when they're acting in their official capacity as
21  a University employee.  And because did he this in his -- you
22  know, did this individually, I don't represent him.
23  THE COURT:  Hm.
24  MS. FUCHS:  So it's -- again, we are in kind of an
25  interesting situation here.  I feel like I don't necessarily

7

1  have all the information that would be helpful for you.  But
2  it's -- it's because the University is kind of tangential to
3  this whole thing, and we only have the information by virtue of,
4  you know, equipment, essentially.
5  THE COURT:  Uh-huh.  And this subpoena was directed to Texas
6  A&M, not to Dr. Rusyn individually.
7  MS. FUCHS:  Yes, Your Honor.  Yes, Your Honor.
8  THE COURT:  So what you are saying is that on that thumb
9  drive, those are documents that were in Texas A&M's possession
10  because they were emails or documents or whatever that existed
11  on Texas A&M server's or text A&M's computers.
12  MS. FUCHS:  Yes, Your Honor.
13  THE COURT:  But to the extent that he had, like, a personal
14  laptop that he worked from out of his home, and used a personal
15  email address or something like that to communicate with IARC
16  people, that wouldn't be on the thumb drive.
17  MS. FUCHS:  Yes, Your Honor.  What we have is University
18  property, essentially.
19  THE COURT:  Okay.
20  MS. FUCHS:  There are some of the emails in one of the
21  categories that came from his -- from a private e-mail address,
22  but that is by virtue of the fact they were on his University
23  computer.  Whether there are others that were from home, I don't
24  know.
25  THE COURT:  Uh-huh.  So I just -- you know, I find myself

8

1  having, you know, difficulty figuring out what to do in this
2  strange situation.  I mean, on the one hand, you know, the
3  subpoena is, you know, ridiculously overbroad.  And we can
4  certainly narrow the scope of the subpoena.  But it's -- that
5  still doesn't help us answer the question what materials are
6  subject to immunity.  And what materials might not be subject to
7  immunity.
8  I mean, I would think that any -- you know, if there's an
9  email exchange between Dr. Rusyn and his, you know, IARC
10  compatriots, or the other scientists around the world who were
11  part of this project of evaluating glyphosate, and they were
12  exchanging drafts of the monograph or opinions about what should
13  be in the monograph, I mean, I think it's probably fairly safe
14  to assume that that is IARC property, and that would be immune
15  from disclosure.
16  MS. FUCHS:  Yes, Your Honor.
17  THE COURT:  On the other hand, you know, if he sent an email
18  to someone else who was not part of the IARC group about the
19  work that IARC was doing, you know, and expressing an opinion
20  about, you know, the quality of the work that IARC was
21  performing or whatever, my guess is that probably wouldn't be
22  IARC property.
23  Have you done a review of the materials such that you are
24  able to break it down, something along the lines of what I'm
25  describing?

9

1    MS. FUCHS:  Yes, Your Honor.  And actually, on this thumb

2  drive you will see that there are three different folders.  And

3  one is labeled "WHO."  And those are communications with the

4  World Health Organization.

5    The other is -- labeled "JMPR."  And what that is, what

6  that stands for is a joint meeting on pesticide residues.  And

7  what that is it's an ad hoc body that's a collaboration between

8  the United Nations and the World Health Organization.  They meet

9  every year; they've been meeting every year.

10    THE COURT:  What is it called, again?

11    MS. FUCHS:  Joint Meeting on Pesticide Residues.

12    THE COURT:  Okay.

13    MS. FUCHS:  They've been meeting every year since 1963.

14    THE COURT:  And it's an organization who -- describe the

15  organization again.

16    MS. FUCHS:  It's an ad hoc body that's a collaboration

17  between the United Nations and the World Health Organization.

18  And their purpose is apparently to study, like, pesticide

19  residues in the food source or in the food chain.  And so that

20  is what presumably would be protected by the same privilege.

21  That's in a separate folder.

22    THE COURT:  So are you saying that the folder -- so you were

23  saying that the WHO folder represents communications with the

24  WHO?

25    MS. FUCHS:  Yes, Your Honor.

10

1    THE COURT: And the JMPR folder represents communications

2  with this ad hoc working group?

3    MS. FUCHS:  Yes, Your Honor.

4    THE COURT:  Okay.  Got it.

5    MS. FUCHS:  And then there is a third folder in there.  And

6  that folder is labeled "Other."  And that's where it gets a

7  little bit more difficult, I think, than --

8    (Reporter interruption)

9    MS. FUCHS:  There's a third folder and it's labeled "Other."

10  And that's where it gets a little bit more difficult with

11  regards to the privilege.

12    There are some things in there that it's not clear, you

13  know, exactly whether the privilege would apply.  Some of the

14  things appear that they might not be relevant, that they might

15  be -- because the subpoena was so broad that they're, you know,

16  that they're brought in under that.

17    There are also documents in there that appear to be

18  published articles.  And our position would be if they are in

19  the public domain, then they would be public.  Even if -- you

20  know, even if there are articles by the World Health

21  Organization, if they published them, they're public.

22    So, the other category is more of a combination of things

23  that we're not exactly sure when it comes in.  I'm confident

24  that at least some of that stuff can be released because, as I

25  said, a lot of it appears to be things that are public.  Some of

11

1  it appears not to be directly relevant to this litigation.

2  Although I'm not sure, because I'm only tangentally involved

3  here.  And --

4    THE COURT:  Congratulations.

5    MS. FUCHS:  Thank you.

6    THE COURT:  Does the other folder include stuff on

7  glyphosate that wasn't done in connection with the IARC work?

8    MS. FUCHS:  I don't think so.  I'm not -- there are some

9  things that might be.  I'm not sure.  It's a fairly large group

10  of documents.  And some of the stuff does appear to be published

11  stuff on that.

12    I'm not sure -- I don't remember seeing any communications

13  with parties that were not the World Health Organization, but

14  were on that research that they essentially did for the World

15  Health Organization.  But I'm not sure.

16    And again, I have a pretty limited understanding of this

17  whole --

18    THE COURT:  Uh-huh.  Well, I mean, Dr. Rusyn should be able

19  to help you with that, right?

20    MS. FUCHS:  Yes, Your Honor.  And I talked to the University

21  about it, and they are happy to reach out to Dr. Rusyn.  If the

22  -- you know, if this is something that we need to, I guess,

23  explore more and see, you know, whether these communications

24  that aren't directly what the World Health Organization are

25  about, are about the research, we're happy to reach out to him

12

1  and get more information from him.

2    I believe that he did cooperate with the University in

3  getting the documents together and so forth.  And, you know, I

4  don't think it would be a problem to have -- to go through with

5  him and figure out exactly, if we can get some contours from the

6  Court of exactly what we need to look for that should be

7  released.

8    THE COURT:  Uh-huh.

9    MS. FUCHS:  I don't think it would be a problem to go to him

10  and work with him to get that information.

11    THE COURT:  Is there anything more we can do to educate

12  ourselves on, you know, the degree to which or the extent to

13  which these communications, say, in the first two folders, are

14  considered -- let's take the first folder, to make it a little

15  easier.

16    Is there -- is there anything more we can do to educate

17  ourselves on the extent to which that material would be

18  considered the World Health Organization's property?

19    MS. FUCHS:  Your Honor, the World Health Organization's

20  position has been that any communications with them, regardless

21  of whether they are on point about the research, whether they're

22  about traveling to Europe for meetings, their position is that

23  they all fall under this umbrella.

24    THE COURT:  But -- their position is that they all fall

25  under this umbrella.  But is their position that it's all their

13

1   property?

2       MS. FUCHS:  Yes, Your Honor.  That's their position.

3       THE COURT:  So, like, what is that based on?  Do they have

4   any contemporaneous evidence that they -- it was established

5   that these types of things would be considered the World Health

6   Organization's property?

7       I mean, I was -- I would have to think that, you know, if

8   the World Health Organization is entering into this arrangement

9   with scientists all over the globe to study, you know, a

10  substance, and prepare a monograph on it, you know, there would

11  be some sort of contract that the World Health Organization

12  would have these scientists sign to establish the sort of

13  boundaries of their relationship.

14      You don't have any contract along those lines?  Did you ask

15  Dr. Rusyn if he had a contract?  Did you ask the World Health

16  Organization if they had a contract governing this relationship?

17      MS. FUCHS:  Your Honor, I was -- I was not on this case in

18  the beginning.  I am unaware of any contract.  I would imagine

19  that was probably something that the previous attorney brought

20  up.  I can't imagine that that wouldn't have been attached.  But

21  I'm not entirely sure about that.

22      I will tell you that it was the original understanding under

23  the first communication with the World Health Organization that

24  they would be filing something with this Court to protect their

25  own privileges.  So this wasn't a position that the University,

14

1   you know, expected to be in.

2       And then they sent us a letter after they decided not to,

3   saying:  Don't release it, or you'll be in violation of

4   international law, and... (Shrugs shoulders)

5       (Laughter)

6       THE COURT:  Do you have any idea why they didn't file

7   anything?  I mean, they're not waiving any privilege by filing

8   something in this court.

9       MS. FUCHS:  Your Honor, we have no idea why they didn't file

10  anything.  After the phone conversation that my colleague had

11  with them, his understanding was that something would be filed,

12  and it wasn't.

13      And the followup just generated this letter (Indicating),

14  and telling --

15      THE COURT:  Yeah, I read the letter.  And the letter is

16  marginally helpful, but not -- you know.  And -- you know.  I

17  think the letter sort of at least creates a presumption in my

18  mind that communications -- the kinds of things in the first

19  folder --

20      MS. FUCHS:  Yes.

21      THE COURT:  -- and perhaps the second folder are probably

22  not subject to subpoena.

23      MS. FUCHS:  Yes, Your Honor.

24      THE COURT:  But it doesn't really help us define the breadth

25  of the immunity.

15

1       MS. FUCHS:  Yes, Your Honor.

2       THE COURT:  All right.  Maybe I could hear a little from

3   Monsanto now on this.

4       And maybe the first question we could talk about is, I mean,

5   what's your -- what's your argument for why communications

6   between Rusyn and other scientists in this working group about,

7   like, the content of drafts and stuff is not -- should not be

8   privileged?

9       MR. HOLLINGSWORTH:  Your Honor, they -- we have several

10  arguments about that.  Let me tell you what those arguments are.

11      First of all, there is no contract that we know of,

12  whatsoever, involving Dr. Rusyn or anybody else that we know of

13  who was on this panel.  We -- because the complaints contain 35

14  paragraphs that rely on IARC, purportedly to show that there's a

15  basis for the proposition that --

16      THE COURT:  That's not relevant to whether these documents

17  are immune from discovery.

18      MR. HOLLINGSWORTH:  Yes.  Yes.

19      THE COURT:  I'm not -- I know that the complaint trumpets

20  IARC's conclusion.  I'm asking the question about whether these

21  documents are immune from discovery.  Immune from subpoena.

22      MR. HOLLINGSWORTH:  My apologies for that, Your Honor.

23      So, as a result of the allegations in the complaint, we

24  decided to look into who was on the committee, the so-called

25  "112 Committee," which has about -- probably over 15 members.

16

1   Six of those people at least -- maybe more, but we confirmed

2   that six people on that committee did not work for a federal

3   agency.  Were either private parties, or worked for a state or

4   -- state institutions, like Dr. Rusyn, who worked for Texas A&M.

5   And we decided that we would subpoena them.

6       THE COURT:  Just a quick clarification question.

7       You said that of the 15 or so people, six or so did not work

8   for a federal agency.  What's the significance of that

9   conclusion?

10      MR. HOLLINGSWORTH:  If -- there are members of the committee

11  who did work for federal agencies in Washington.  Four people, I

12  believe.  A couple for United States EPA, and two for other

13  federal health agencies.

14      THE COURT:  Uh-huh.

15      MR. HOLLINGSWORTH:  In that case, there's a case from the

16  Supreme Court called Tuohy that requires the parties seeking

17  information that would otherwise be by subpoena in Federal Court

18  to do so by letter to the Department of Justice, which is what

19  we have done for those four people.

20      THE COURT:  I see.  And has the Department of Justice turned

21  over the documents for those four people?

22      MR. HOLLINGSWORTH:  No, they have not.  What they have

23  done -- and we are contesting this -- is convert those Tuohy

24  letters to FOIA requests.  Which we disagree with.  We think

25  that is contrary to what the Supreme Court case says.

17

1    And we are in discussions with them right now.  They haven't
2  said that they won't turn them over.  This is just the
3  procedural issue right now.  And it takes a while to deal with
4  the agencies involved in those cases.
5    But now, we are directly involved with the agencies rather
6  than the Department of Justice, which is where we thought --
7  where we started out, and where we think we should be.  So
8  that's that side of it.
9    But -- and so, in answering your first question, Your Honor,
10  we had these six people that we have subpoenaed.  And we have
11  already received responses from three of them, at least three of
12  them.  One is for one of Dr. Rusyn's counterparts on the animal
13  tox committee, whose name is Matthew Ross.  He is also a Ph.D.,
14  at Mississippi State, and he's produced all of his documents
15  from his work involving the IARC monograph on glyphosate.
16    And from those documents, we see no indication that any
17  conversation that he's had with people on the committee or in
18  connection with his work on the committee is property or assets
19  of IARC.  There's no IARC legend; there's no WHO legend.
20  There's no contract, as there would be in any case like this
21  that we've ever been involved in, where we always enter into
22  agreements with consultants before we provide them any kind of
23  information, making it clear who owns what in cases, and who
24  controls what, has custody and control of what and whatever in
25  situations likes that.

18

1    So there's nothing that we know of like that in connection
2  with Dr. Ross's materials.  And as I said, he worked at
3  Mississippi State.  And unlike the situation with Texas, with
4  all due respect, the folks from the Mississippi State Attorney
5  General's office and from Mississippi State University, we were
6  able to reach accommodations with them, and we have all those
7  materials.
8    A second person on the list of six --
9    THE COURT:  Maybe they didn't give any thought to whether
10  this immunity applied to production of documents.
11    MR. HOLLINGSWORTH:  They gave express thought to that, Your
12  Honor, and they decided that those materials are not the
13  property or assets of IARC, which is our position.  So we
14  respectfully disagree with Your Honor's initial conclusion about
15  what the property of IARC would be.
16    There's a second person within the six whose name is
17  Dr. Aaron Blair.  He spent his whole career in Washington; he's
18  retired now.  My experience with him goes back to the 1970s in
19  Washington.  He's the former head of NCI, the National Cancer
20  Institute.  And he was the chairman of this IARC committee that
21  worked on Monograph 112 involving glyphosate.  And he is in the
22  process of producing three tranches of materials to us about his
23  connections with the committee and his work on this committee.
24    THE COURT:  What is his name again?
25    MR. HOLLINGSWORTH:  Aaron Blair, B-L-A-I-R.

19

1    And we have received two tranches of that information --
2  there is nothing in that information -- there is information in
3  both of these people's files, which I think shows that IARC has
4  waived whatever claim of privilege or immunity or property or
5  custody or control in this case.
6    THE COURT:  Well, there has to be an express waiver.  Right?
7    MR. HOLLINGSWORTH:  I think there has to be an express
8  waiver for something that is the property of IARC.  But I don't
9  believe these materials are the property of IARC.
10    THE COURT:  Okay.  All right.
11    MR. HOLLINGSWORTH:  And I think --
12    THE COURT:  So I think maybe the accurate way to say it is
13  not that there's -- there's -- there are materials which show
14  that the IARC has waived the right to keep this stuff
15  confidential, but rather, there's material in there that
16  suggests that it's not IARC's property to protect.
17    MR. HOLLINGSWORTH:  Right.  And I brought those files with
18  me.  And I'm sorry we haven't had a chance to lay this out for
19  Your Honor in connection with the motion to compel, which is
20  what I thought the next step would be here.
21    So there are things that have happened since the last paper
22  that we filed in opposition to this motion to quash, which I
23  thought we would succeed on, frankly, but what do I know?
24    So, so we've talked to Dr. Blair; we've worked with
25  Dr. Blair; we've worked with Dr. Ross.  I think they have lots

20

1  of materials that show that there's a waiver here, and no
2  materials showing, that I know, of any kind of confidentiality
3  or contract right that IARC has.  So I don't believe that any of
4  the materials I have seen are IARC property or assets within the
5  meaning of that statute.
6    And we haven't subpoenaed IARC for any of that stuff.  We
7  know about the statute.  We haven't subpoenaed employees of
8  IARC, which we could.  The lead employee on this monograph is a
9  former EPA official who served for many years in that capacity
10  then, whose name is Kate Guyton.  We haven't subpoenaed her,
11  haven't attempted to.
12    But we have subpoenaed these six people.  And there is a
13  third person who happens to be currently the head of OEHHA,
14  which is a California state agency.  That's O-E-H-H-A.  I think
15  it stands for the Office of Environmental Health Hazard
16  Assessment.  I think.  Don't quote me on that, but I think that
17  is what OEHHA stands for.  And she is in the process -- was in
18  the process of producing her documents to us.  But my
19  understanding is that she may have hired an attorney, which the
20  other party -- which both Blair and Ross had as well.  And we
21  dealt with them.  So we will be ready to deal with Dr. Zeiss's
22  attorney, if and when we can.
23    There is a fourth person on the list of six whose name is
24  Dr. Jameson.  He is an independent consultant now, Your Honor,
25  who lives in Miami.  And we have attempted to contact him.  And

21

1 we served a subpoena on him as well. He was involved heavily in
2 the issue of animal toxicology, which is very important in this
3 case. Because it's the animal toxicology that's the basis on
4 which IARC made its determination that glyphosate is a probable
5 human carcinogen. As to the epidemiology, the human data, they
6 decided that the information was insufficient to make that
7 conclusion. So the animal data is key.
8      Jameson's a purported animal data expert, so we subpoenaed
9 him, too. And he was prepared to talk to us about that, and did
10 talk to us about that. But later we found out from one of the
11 Plaintiffs' attorneys in this case that he had been hired by the
12 Plaintiffs to be an expert. So our conversations with him
13 ceased.
14      But we understand that he turned over all of his materials
15 involving the IARC work that he did in the IARC technical review
16 that he did to the Plaintiff lawyer in this case. And that she
17 has Bates stamped those materials, and they are in her
18 possession. So, you know, watch that space, more on that later.
19 And that's where we are.
20      But in response to Your Honor's question, we know of no
21 information from all that material so far that shows that there
22 is an express agreement about confidentiality or a simple
23 contract that would exist in every single case that I have ever
24 done involving this -- and this is not my first rodeo --
25 where -- where one party is working with an outside expert like

22

1 Dr. Rusyn, who the party admits is an independent outside person
2 who's not an employee of IARC. That's expressed from the
3 documents as well.
4      So we don't think --
5      THE COURT: Well, they don't -- do they -- they don't
6 necessarily have to be an employee of the IARC for their
7 communications with IARC to be IARC property. I mean, that gets
8 back to my first question, which is: Was there any contractual
9 arrangement about who owns the communications in the document?
10      MR. HOLLINGSWORTH: There is no contractual relationship
11 that I know of. There is no regulation that I know of that
12 applies to this situation specifically, in my humble opinion.
13 There is no statute that applies to this situation specifically.
14 These materials that we are --
15      THE COURT: Well, I mean, there is a statute that
16 potentially applies to it, depending --
17      MR. HOLLINGSWORTH: I don't think so, Your Honor. You --
18      THE COURT: Well, it just begs the question whether -- I
19 mean, you say it doesn't apply because it's not their property.
20 Right?
21      MR. HOLLINGSWORTH: Well, there are several things that we
22 would say. The files that we are concerned with here and that
23 our subpoenas are addressed to -- I'm sorry they're overbroad,
24 and we can narrow them -- are files that are generated by third
25 parties. All third parties. Not employees of IARC. People

23

1 with whom IARC has no contract. So, they are people whom IARC
2 has no expectation of confidentiality, Your Honor. In the
3 normal context of that as I understand it, over years and years
4 of litigation, this issue that would be important under U.S.
5 law.
6      So there's no prior expectation that we can find in the
7 documents we already have that IARC was maintaining ownership of
8 this -- these property and assets, as those terms are used in
9 the statute.
10      THE COURT: What is the --
11      MR. HOLLINGSWORTH: I think the statute -- excuse me.
12      THE COURT: Sorry. Go ahead.
13      MR. HOLLINGSWORTH: I think the statute is addressed to
14 attempt to subpoena or work process on assets or property of the
15 United Nations, okay? And I can understand why the statute is
16 drafted that way. But that's not what this is about.
17      THE COURT: In the documents that you do have from these
18 other folks, what -- what's in there? Are there, like, drafts
19 of the monograph? Or --
20      MR. HOLLINGSWORTH: There are drafts of sections of the
21 monographs. Each of the six people I named, and a couple of
22 other people, including at least one at US EPA, were responsible
23 at the outset of this, via a committee that Dr. Rusyn was the
24 chairman of, for drafting up six or seven sections of the
25 monograph that were then taken to this meeting of IARC which

24

1 only lasted eight days in Leon, in 2014 or early 2015.
2      And from there, the overall committee, which I said is at
3 least 15 people, worked for eight days with the original drafts
4 that I think number -- number between four and six subsections,
5 based on what I have read so far.
6      And yes, we do have drafts of some of those. In fact, we
7 have a draft of -- we have an early draft of the entire
8 monograph.
9      THE COURT: Have you --
10      MR. HOLLINGSWORTH: So I'm hoping you won't require me to
11 give that back to the United Nations. But of course, I will, if
12 Your Honor so orders.
13      THE COURT: Incidentally, have you provided those documents
14 to the other side?
15      MR. HOLLINGSWORTH: No, but we have agreed to do that.
16      THE COURT: Okay.
17      MR. HOLLINGSWORTH: I think that the other side has asked us
18 for those documents.
19      THE COURT: Uh-huh. Now, let me -- going to the subpoena,
20 so I guess one question I have is if Dr. Rusyn engaged in some
21 sort of communication about glyphosate that was not in
22 connection with his work for the IARC. Why would that be
23 relevant to this case?
24      MR. HOLLINGSWORTH: For example, in several states, several
25 big Midwestern states where so much farming is done involving

25

1  corn and soybeans and in which glyphosate is used about
2  95 percent of the time, I think that would be -- certainly be
3  relevant to our consideration in this case.
4      THE COURT:  Well, why?  Why?
5      MR. HOLLINGSWORTH:  Well, I think that in the case of
6  Dr. Rusyn, and in the case of Dr. Blair, by the way, who's an
7  author of the currently-published version of the AHS study,
8  there is additional followup information that is being monitored
9  and developed right now about what that data shows, specifically
10  about whether or not there's an association between glyphosate
11  and non-Hodgkin's lymphoma, specifically.
12     THE COURT:  Okay, but wait a minute.
13     MR. HOLLINGSWORTH:  So I --
14     THE COURT:  Dr. Rusyn is not -- I presume is not going to be
15  a witness in this case.  Right?  He's not going to be testifying
16  as an expert.
17     And so you are subpoenaeing documents from Dr. Rusyn or from
18  his university in response to the allegation by the Plaintiffs
19  that -- in response to reliance by the Plaintiffs on the
20  IARC's conclusions.
21     If Dr. Rusyn had some conversation with somebody else about
22  glyphosate that was not in connection with his IARC work, aren't
23  we getting pretty far afield -- and if Dr. Rusyn is not an
24  expert testifying in this case, aren't we getting pretty far
25  afield from this case?

26

1      It may be that you could -- pursuant to the Texas public
2  record laws, may or may not be able to get those sorts of
3  documents.  But this is a subpoena for this case.  So what's --
4  I just don't understand the relevance to this case.
5      MR. HOLLINGSWORTH:  Sure.  It's very relevant, Your Honor.
6  The -- the Working Group 112 looked carefully at the AHS data.
7  That is why I used it as an example in my answer to Your Honor's
8  question.  And I'm pretty sure that there is communication
9  between Rusyn and Blair involving that data.  The IARC went out
10  of its way to look at that data and consider that data.  And to
11  look specifically, based on that data, because they agree that
12  it's the best data in the world about the association between
13  glyphosate or not and non-Hodgkin's lymphoma.  There are 57,000
14  people being followed.  57,000 people.
15     And they wanted to know what that material showed, and what
16  the update is on that material.  And I think they're looking for
17  that material.  And I think Rusyn and Blair --
18     THE COURT:  So if Rusyn and Blair are communicating about
19  that material, that's communication with a cohort in the IARC
20  group.  But what about if Rusyn engages in some communication
21  with somebody else outside the context of his IARC work about
22  glyphosate?  I just don't understand how that is relevant to
23  this litigation.
24     MR. HOLLINGSWORTH:  That's a different question.
25     THE COURT:  That's the question I'm asking.

27

1      MR. HOLLINGSWORTH:  So that's a question involving --
2      THE COURT:  That's the same question I asked two minutes
3  ago.  Five minutes ago.
4      MR. HOLLINGSWORTH:  Right.  But my answer referred to the
5  AHS data, which I know that they have talked about, based on
6  other things that --
7      THE COURT:  Yes, but I'm not asking about his communications
8  with other IARC people.  Presumably his communications with
9  other IARC scientists about glyphosate is in connection with his
10  IARC work.
11     MR. HOLLINGSWORTH:  Yes.  Sorry, Your Honor.
12     THE COURT:  This subpoena --
13     MR. HOLLINGSWORTH:  Okay.
14     THE COURT:  -- asks for, like, if he would ever, you know,
15  if he ever gave -- if somebody uttered the word "glyphosate"
16  while they were passing him on the street, you want to know that
17  information.
18     MR. HOLLINGSWORTH:  If he has not been hired as an expert, I
19  see Your Honor's point, in that if he is communicating about
20  glyphosate with other people who are unconnected to the IARC
21  review, which Blair is not, and which the AHS information is
22  not, then --
23     THE COURT:  Okay, Blair is not one of these people -- he's
24  not one of the IARC scientists?
25     MR. HOLLINGSWORTH:  Blair is.  Blair was chairman of the

28

1  committee that wrote the IARC monograph.
2      THE COURT:  Right, okay.
3      MR. HOLLINGSWORTH:  He was the chairman.
4      THE COURT:  So any communications that he has made about
5  glyphosate that are not in connection with his work that he was
6  doing for the IARC should not be relevant in this, and should
7  not be the subject of this subpoena.  You agree with that?
8      MR. HOLLINGSWORTH:  Well, with some exceptions.  We've -- I
9  think we have already agreed with that, Your Honor.  But because
10  in his --
11     THE COURT:  Not according to what you're asking for in the
12  subpoena.
13     MR. HOLLINGSWORTH:  Well, we had discussions with
14  Dr. Blair's attorney about that.  So, we have attempted to limit
15  the --
16     THE COURT:  I'm asking about the subpoena to Dr. Rusyn.
17     MR. HOLLINGSWORTH:  Okay.
18     THE COURT:  That they have moved to quash.
19     MR. HOLLINGSWORTH:  Yes.
20     THE COURT:  Okay?  And I'm trying to get a sense of what is
21  -- of the vast amount of information that you have sought in
22  this subpoena, what is actually relevant to this litigation?  In
23  other words, I'm trying to work with you to narrow the subpoena
24  to something that's remotely reasonable.
25     MR. HOLLINGSWORTH:  Sure.

29

1    THE COURT:  I could just, I suppose, quash the subpoena on
2    the ground that it's grossly overbroad.
3    MR. HOLLINGSWORTH:  Yes.
4    THE COURT:  Would I have the authority to do that?
5    MR. HOLLINGSWORTH:  Absolutely.
6    THE COURT:  Okay.  So what I want to do is get a sense --
7    I'm comparing what you've written in the subpoena to what you're
8    saying now.  And it seems to be very, very different.  Because
9    what you're asking for in the subpoena is any time any document
10   relating to glyphosate was generated by or is in the possession
11   of Dr. Rusyn, he has to turn it over.
12   MR. HOLLINGSWORTH:  That's overly broad.
13   THE COURT:  Okay.  So, let's work together on this.  What do
14   you -- so, shouldn't it be limited -- to the extent that you're
15   attacking IARC's conclusion and IARC's methodology, shouldn't it
16   at least be limited to work he did for IARC?
17   MR. HOLLINGSWORTH:  Yes.
18   THE COURT:  And in connection with IARC?
19   MR. HOLLINGSWORTH:  Yes, and --
20   THE COURT:  So doesn't that eliminate a lot of the stuff?
21   The other folder in your thumb drive?
22   MS. FUCHS:  Yes, Your Honor.
23   THE COURT:  If not all of it?
24   MS. FUCHS:  Yes, Your Honor.  I believe there may be some
25   relevant documents still in there.  There would be these

30

1    published papers that would be -- that we believe are public
2    information.  Maybe some of them are just saved separately, so
3    I'm not sure if they were, you know, passed around in
4    conjunction with, but we're happy to turn that over if that's --
5    I mean, if that's something that the (Inaudible)...
6    (Reporter interruption)
7    MS. FUCHS:  That the Defendants are interested in.
8    THE COURT:  Okay.  But that still doesn't resolve the first
9    folder, and possibly the second folder --
10   MS. FUCHS:  Yes, Your Honor.
11   THE COURT:  ...which are documents.  I mean, I think
12   actually probably the second folder we could say the same thing
13   about, that that's not relevant.  Because what this subpoena
14   should be about is the work that Dr. Rusyn did in connection
15   with IARC, because you are attacking the IARC.
16   So we are down to the first folder now, basically.
17   MS. FUCHS:  Yes, Your Honor.
18   THE COURT:  Pretty much.
19   MR. HOLLINGSWORTH:  Your Honor, what is in the second folder
20   again, please?
21   THE COURT:  The second folder is communications relating to
22   the joint meeting on pesticide residues?
23   MS. FUCHS:  That's correct, Your Honor.
24   THE COURT:  Which is a collaboration between the UN and the
25   World Health Organization, which, as I understood it -- and

31

1    maybe I inferred too much from this, but as I understood it,
2    it's a project that is separate from the IARC project.
3    MS. FUCHS:  I believe so, Your Honor.  But I'm -- I cannot
4    tell you that with certainty.  I can find out if that's --
5    THE COURT:  That's obviously something you would need to
6    work with Dr. Rusyn on, as well.
7    MS. FUCHS:  Yes, Your Honor.
8    THE COURT:  Okay.  So it may be -- there's still an open
9    question about the second folder.  And if it's related to the
10   IARC work, perhaps it would still be, you know, appropriately
11   covered by the subpoena.
12   Go ahead.
13   MR. HOLLINGSWORTH:  Yes.  It may still be covered by the
14   subpoena, Your Honor.  If I may --
15   THE COURT:  But if it's a separate project from the IARC
16   project, --
17   MR. HOLLINGSWORTH:  Yes, it is.  And if I may explain --
18   THE COURT:  -- and it -- then it should not, right?
19   MR. HOLLINGSWORTH:  Yes.  It's A separate project.  The JPMR
20   is looking at pesticide residues.  And, the JPMR is associated
21   with the WHO, as IARC is associated loosely with the WHO.  And
22   after IARC made its determination that glyphosate is a probable
23   human carcinogen, the WHO JPMR said that there's no evidence
24   that glyphosate is a carcinogen, and therefore set food
25   tolerances for glyphosate that are applicable in Europe.  Or,

32

1    rather, they renewed them.  Okay.  So, so, with that caveat, I
2    agree with Your Honor.
3    THE COURT:  Okay.
4    MR. HOLLINGSWORTH:  It's not directly relevant to our
5    question about Dr. Rusyn's work on the IARC committee.  It may
6    be relevant to other aspects of this case.  So, so --
7    THE COURT:  Well, I don't know about --
8    MR. HOLLINGSWORTH:  -- separate subpoena on that.
9    THE COURT:  I mean, you don't have the right to go and
10   subpoena every document relating to every conclusion that any
11   person around the globe has come to about glyphosate.  Right?
12   MR. HOLLINGSWORTH:  Right.  And we have a pretty good handle
13   on the published data.  So I'm not so concerned about Folder 3,
14   either.
15   THE COURT:  Okay.  So it seems like we're pretty close.  It
16   sounds like you have a pretty good understanding of the JMPR and
17   its relationship to the IARC.  And the way you described it, it
18   sounds like we can pretty much cross out Folders 3 and 2, now.
19   And we are down to Folder 1.
20   MR. HOLLINGSWORTH:  With the caveat that we may be -- we may
21   ask Your Honor to enforce a subpoena about the JMPR material at
22   some later point in time.
23   THE COURT:  Okay.
24   MR. HOLLINGSWORTH:  We are making progress.
25   THE COURT:  All right, we're making progress.  We are down

33

1 to Folder No. 1. But, of course, that is the folder that, you
2 know, that -- where the IARC could potentially make the
3 strongest case that that stuff is its property.
4   So I guess my question to you is, you have your argument
5 that it's not -- that this stuff is not the IARC's property.
6 The World Health Organization apparently believes that it is
7 IARC's property. I haven't been -- you know, you've got --
8 you've got your, you know, stacks of documents from other IARC
9 people which apparently don't have any -- don't contain any
10 indication that anyone believed that this was IARC's property.
11 And apparently the documents that you have from Dr. Rusyn also
12 contain no indication that anybody believed that this was IARC's
13 property. So, but the IARC is asserting that it's IARC's
14 property. But IARC isn't here, and IARC has decided not to file
15 something in this court in response to this subpoena.
16   So the question is: What should I do now? I mean, what --
17 like, is there anything more that I can do to develop a better
18 understanding of whether there is a colorable argument or a
19 reasonable argument that this is, in fact, IARC property? I
20 mean, are there any further submissions that anybody can make on
21 that to help me make my decision? Or do I have to make the
22 decision based on the limited information that I have now?
23   MS. FUCHS: Your Honor, we could reach out to the World
24 Health Organization, and now that we have narrowed it to this
25 one folder, ask, you know: Are there things in this folder that

34

1 you believe or don't believe are IARC property?
2   And, you know, potentially -- you know, again, we thought
3 that they were going to participate, and they didn't. So I'm
4 not sure how far I will get.
5   But I assume, based on what they said in this letter
6 (Indicating), that if we send them these documents, they will
7 tell us their position. And, you know, it's possible that --
8 because, you know, they -- they don't have the documents,
9 apparently.
10   So, it's possible that they will say, you know, we --
11   THE COURT: They don't have the documents, but it's their
12 property.
13   MS. FUCHS: But it's their property. Well, maybe they do
14 have -- let me rephrase.
15   They probably do have the documents. Most of them are -- I
16 guess they don't know which documents the University has,
17 especially because of the relationship between Dr. Rusyn in his
18 individual capacity in the University, there may be things that
19 Dr. Rusyn has that the University doesn't have.
20   I don't -- my guess is that IARC doesn't know what the
21 University has. They probably do have copies of all the
22 documents, but not in the -- not in the format that -- you know,
23 they don't know which ones of those documents are in the
24 University's possession.
25   THE COURT: So roughly how many pages are in this WHO

35

1 folder?
2   MS. FUCHS: I don't necessarily have a great estimate, but
3 it would probably be several hundred. Because it's a lot of
4 emails, in addition to some other forms of communication.
5   THE COURT: Okay. So not that bad, in terms of reviewing
6 it.
7   MS. FUCHS: Right. I don't believe it would be -- I mean,
8 it might be, you know, 1,000 or maybe even a little more than
9 that. But it's not going to be 10,000 pages, for sure.
10   THE COURT: Some light reading over the winter holiday?
11   Your view would be that I just -- I should deny the motion
12 to quash, just as -- to the extent we're talking about the WHO
13 folder.
14   MR. HOLLINGSWORTH: Yes. If Your Honor seeks --
15   THE COURT: But is there any more information that you can
16 give me in support of your argument that this is not the IARC's
17 property?
18   MR. HOLLINGSWORTH: I think if Your Honor asks for the WHO
19 or IARC's position on this, Your Honor will receive the same
20 kind of letter that Your Honor has already read, which does not
21 meet the standard under the statute that we are all here
22 concerned about, in my opinion, based on what we have already
23 provided to Your Honor this morning.
24   So I don't think that they can do anything more than what is
25 a totally post hoc attempt to claim property and asset rights on

36

1 this, which they don't have. And if they did have, they've long
2 since given up. And if they had such --
3   THE COURT: Well, what --
4   MR. HOLLINGSWORTH: Excuse me. Excuse me.
5   THE COURT: Go ahead. Go ahead.
6   MR. HOLLINGSWORTH: The United States was invited to be here
7 this morning, the Department of State. They decided not to be
8 here. The IARC was invited to be here this morning to make this
9 assertion. They decided not to be here.
10   I think it's an issue that they don't want to be associated
11 with losing. And with all respect, I think that they should
12 lose on this, at this point.
13   THE COURT: What about the assertions that you've made to me
14 about the absence of any indication in the materials you've
15 received from other IARC scientists that any -- there was any
16 attempt to restrict the dissemination of these documents, or any
17 attempt to assert confidentiality with respect to those
18 documents? I mean, so far, what I have is your verbal
19 assertion.
20   MR. HOLLINGSWORTH: Yes.
21   THE COURT: And I believe you. But is there any mechanism
22 by which you can sort of present evidence of that to me?
23   MR. HOLLINGSWORTH: Yes.
24   THE COURT: That I could use to rely on in my ruling?
25   MR. HOLLINGSWORTH: Yes. We will provide an affidavit on

37

1   that, Your Honor.

2       THE COURT:  Okay.

3       MR. HOLLINGSWORTH:  We will go back through the documents

4   that we have from Dr. Blair and Dr. Ross, which number in the

5   thousands, and make sure that there is no claim of privilege or

6   any limitation on the disclosure or dissemination of those

7   materials.  I don't think there's any.  And, by the way, they

8   were disseminated over the internet.  So --

9       THE COURT:  What do you mean, they were disseminated over

10  the internet?

11      MR. HOLLINGSWORTH:  They were disseminated via electronic

12  communication.  I shouldn't have said "the internet."  Although

13  I wouldn't be surprised, if I attempted to look on the internet,

14  that I could find some of these materials, with all respect.  I

15  haven't done that.

16      So my comments went to what we have from several thousand

17  documents from Dr. Blair and Rawson.  I believe that the answer

18  to Your Honor's question is no.  But I'll confirm that, and then

19  provide an affidavit if an attorney affidavit is adequate for

20  Your Honor's purposes.  Or I can provide some other kind of

21  affidavit, such as an IT professional.

22      THE COURT:  Yeah, I don't know.  I mean, I assume between an

23  IT professional and an attorney, that --

24      MR. HOLLINGSWORTH:  Maybe two affidavits.

25      THE COURT:  A distinction without a difference.  But I'll

38

1   sort of leave that to you to figure out what is the best way to

2   present that.

3       MR. HOLLINGSWORTH:  All right, Your Honor.  Thank you.

4       THE COURT:  But if you could make a presentation, sort of a

5   supplemental presentation about that, that would be good.

6       MR. HOLLINGSWORTH:  Thank you.

7       THE COURT:  When do you want to do that by?

8       MR. HOLLINGSWORTH:  Getting that done before the end of this

9   week, because of the holiday, early next week may not be

10  possible, but during the -- during the mid -- mid to late next

11  week before the New Year's holiday.  So some time next

12  Wednesday, Thursday or Friday.

13      THE COURT:  You know, I'm just having the vision of some

14  poor associate who works for you --

15      MR. HOLLINGSWORTH:  No, I'll be the one who's doing it,

16  myself, Your Honor.  No, I'm just kidding.  I'm being facetious

17  about it.

18      THE COURT:  Why don't we do it, why don't we have the

19  deadline be a little bit later.

20      MR. HOLLINGSWORTH:  Okay, fine.  How about the deadline, the

21  Thursday after the New Year's holiday?  Which I think would be

22  three, four, five, six --

23      THE COURT:  The 5th, I think?

24      MR. HOLLINGSWORTH:  The 5th.

25      THE COURT:  Yeah, okay.  That sounds good.

39

1       MR. HOLLINGSWORTH:  All right, Your Honor.

2       THE COURT:  And then any -- you know, sort of anything else

3   that you have on why or -- you know, why you think it isn't

4   their property.  I think we've probably covered everything.  So

5   that will be due on January 5th.

6       And then I think what I would like, you know -- I mean, we

7   don't want to like cause an international incident here, right?

8   So why don't you file a response to their submission.

9       MS. FUCHS:  Yes, Your Honor.

10      THE COURT:  And why don't you do that the following week.

11      MS. FUCHS:  Yes, Your Honor.

12      THE COURT:  So, like, the next Thursday, the 12th.  And in

13  the meantime, you know, what I would appreciate your doing is,

14  you know, working with Dr. Rusyn on, you know, you know, and

15  working with the IARC on what these, you know, what these

16  documents are and why they should be considered IARC's property.

17      MS. FUCHS:  Yes, Your Honor.

18      THE COURT:  And I think IARC merely asserting now that this

19  is its property, you know, is a little bit unsatisfying.

20      MS. FUCHS:  Yes, Your Honor.

21      THE COURT:  And it would be interesting to know if there is

22  any contemporaneous evidence indicating that this was treated as

23  IARC's property.

24      MS. FUCHS:  Absolutely.

25      THE COURT:  And that the people involved believed that it

40

1   was IARC's property.

2       MS. FUCHS:  Your Honor, I would be happy to reach out to

3   both IARC and Dr. Rusyn, and get any information I can for you.

4       THE COURT:  Okay.  And, and you can file -- you can file a

5   response on the 12th.  And then I'll rule on the issue.

6       MS. FUCHS:  Yes, Your Honor.  And is my understanding

7   correct that the subpoena has been narrowed to essentially what

8   is in the first folder?

9       THE COURT:  Yes.

10      MS. FUCHS:  Thank you, Your Honor.

11      THE COURT:  And what I would like to ask you to do, if you

12  don't mind, is I want to -- and the way I would like to proceed

13  for the rest of our session is I would like to talk to you all a

14  bit about scheduling.  And then I would like to take a short

15  break.

16      And I -- you know, I don't think we will take too long to

17  talk about scheduling, but I'm wondering if you could stick

18  around until just after our break, because I want to sit in the

19  quiet of my chambers for a few minutes and think if I have any

20  other questions for you or any other directives for you.

21      MS. FUCHS:  Absolutely, Your Honor.

22      THE COURT:  Appreciate that.  Okay.  So you can go ahead and

23  have a seat wherever you are comfortable.

24      MS. FUCHS:  Thank Your Honor.

25      THE COURT:  And why don't we talk briefly about scheduling,

(Hearing) Monsanto MDL CMC (Hardemamn v Monsanto Co., et al.)  12/21/2016  9:46:00 AM

41

1  and then we'll take a break, and then talk about the deposition
2  protocol and then anything else that you want to talk about.
3      MS. WAGSTAFF:  Your Honor, before --
4      THE COURT:  You want to be heard on the --
5      MS. WAGSTAFF:  Just one moment.
6      THE COURT:  Sure.
7      MS. WAGSTAFF:  (Inaudible)
8      (Reporter interruption)
9      MS. WAGSTAFF:  Aimee Wagstaffe for the Plaintiffs.
10      And we have stayed out of this, but if we could just ask
11  that we be provided those documents, this week, so that we can
12  have a chance to review them before the affidavit is filed on
13  the 5th, that would be great.
14      THE COURT:  I assume it would be subject to some sort of
15  protective order.
16      MR. LASKER:  Your Honor, actually, we would be happy
17  (Inaudible)...
18      (Reporter interruption)
19      MR. LASKER:  I'm sorry.
20      We just produced the last set of those, I think, a couple
21  days ago.  So you do have the documents already.
22      MS. WAGSTAFF:  Okay, great.
23      THE COURT:  All right.  And yeah, you're free to --
24      MR. HOLLINGSWORTH:  In exchange -- excuse me.
25      THE COURT:  Yeah.  I was just going to say you're free to

42

1  file something on this, if you would like.
2      MS. WAGSTAFF:  I'm not sure I would like.
3      MR. HOLLINGSWORTH:  I was going to suggest that in exchange
4  for that perhaps she can provide us with the documents that she
5  has from Dr. Jameson which he thought were responsive to our
6  subpoena, which is identic-- similarly -- similar or identical
7  to the factual situation with Dr. Rusyn.
8      THE COURT:  He's an expert of yours?  That's their expert?
9      MR. HOLLINGSWORTH:  Yes.
10      MS. WAGSTAFF:  Your Honor, they did subpoena Dr. Jameson.
11  And I wasn't prepared to talk on this, because it wasn't on the
12  agenda today.
13      But I do recall that Dr. Jameson received a letter either
14  from IARC or from who honestly I can't remember right now,
15  saying not to produce the documents.  So I think that this needs
16  to be either formally set on an agenda, or allow me to review
17  sort of why we didn't produce those documents.
18      THE COURT:  So let me just clarify.  So Jameson is your --
19  is one of your experts.  Correct?
20      MS. WAGSTAFF:  That's correct, Your Honor.
21      THE COURT:  Jameson is one of the IARC scientists?
22      MS. WAGSTAFF:  That's correct, Your Honor.
23      THE COURT:  Okay.  And Jameson provided you with all his
24  IARC documents.
25      MS. WAGSTAFF:  Yes.

43

1      THE COURT:  And, and IARC told Jameson to not provide them
2  to the other side?
3      MS. WAGSTAFF:  Well, the timeline -- and again, I didn't
4  know this was going to be on the agenda.  But the timeline, they
5  subpoenaed Dr. Jameson, who is in Florida.  And Doctor -- and we
6  had recently retained him as an expert witness.
7      So I wrote a letter to Mr. Hollingsworth and/or his
8  colleagues, and asked them to withdraw the subpoena as he was
9  now a retained expert.  And then they responded and said they
10  just want the documents that relate to his un-retained expert
11  work.
12      We said okay.  But we don't represent Dr. Jameson with
13  respect to the subpoena.  And then we said we would -- because
14  he's an expert for us, we would facilitate the transfer of
15  information, is basically how it went.
16      Dr. Jameson sent us documents.  We Bates labeled them.  We
17  made it very clear to the Hollingsworth firm that we weren't
18  representing him.  And then Dr. Jameson writes to us and says:
19  I received this letter telling me not to produce these
20  documents.  I'm guessing it may be similar to something that the
21  attorney for the Texas A&M just received, but I don't have that
22  letter in front of me.
23      So we wrote to them and we said we will keep these documents
24  exactly how they were produced to us.  We will not destroy them.
25  We will keep them so that when you want to go to the Court to

44

1  seek motion to compel or production or however you would like to
2  receive them, they will be here in case the Court orders
3  production.
4      And that's sort of where we left it.  And this was sort of
5  sprung on us today, with no indication that this would be
6  brought up.
7      THE COURT:  Well, the last part is not particularly
8  relevant.  And the comments about Jameson were relevant to the
9  issue that we're discussing.
10      Okay.  I'm not going to order anything regarding
11  Jameson's documents right now.  I first want to get this motion
12  to quash resolved.  So, okay.
13      Regarding scheduling, what I was thinking, we have pending
14  this, you know, need, I think, to set deadlines with respect to
15  document custodians in these other groups.  And, you know,
16  here's what I want to propose to you.  Deadline for scheduling
17  depositions of Group B people would be the next case-management
18  statement.
19      (Noise from adjoining area)
20      THE COURT:  Sorry, we -- prisoners are transported in that
21  room, so sometimes it gets a little loud.
22      So my idea was to have our next case-management conference,
23  like, on January 25th or January 27th.  Those were the dates
24  that I was -- that I was pondering.
25      And the deadline for scheduling depos of the Group B people

45

1  would be the filing date of the case-management statement for
2  the next case-management conference.  So that I know that you
3  have scheduled those depositions, and you are not waiting to
4  take 20 people's depositions in the last week of the discovery
5  period.
6      MS. WAGSTAFF:  (Nods head)
7      THE COURT:  And then the deadline for identifying to
8  Monsanto anybody in Group E who you would want -- whose
9  documents you would want would be February 1st.
10     If there's any dispute about whether those people should be
11  in Group E, that I would envision would be discussed in the next
12  case-management statement, and would require a very, very
13  detailed justification for including someone in Group E.
14     And I would anticipate that the next case-management
15  conference would be March 1st.  And so the case-management
16  statement -- no, sorry.
17     February 22nd, is that what we talked about?
18     THE CLERK:  (Nods head)
19     THE COURT:  February 22nd.  And so the case-management
20  statement would be due some time before then.  And by that time,
21  you would have in that case-management statement which would be
22  due a few days before February 22nd, you would have to identify
23  anybody who you would want to include in Group E.  And if
24  there's a dispute about it, include a detailed justification in
25  the case-management statement.

46

1      And then also in that same case-management statement that
2  would be due in mid-February, that would be the deadline for
3  scheduling depos of people in Groups C and D.  And if there was
4  a dispute about whose deposition would need to be taken in
5  Groups C and D, there would again in that case-management
6  statement need to be a detailed justification for the taking of
7  those depositions along the lines of what I described in my --
8  in the order, Pretrial Order No. 3, I think it was.
9      So all of that might have been a little confusing.  And we
10  can go over the dates again.  But how does that grab you for
11  scheduling?
12     MS. WAGSTAFF:  Your Honor, speaking for the Plaintiffs, we
13  would prefer to have the next conference be January 27th.  The
14  reason for that is that we have one of the Group A depositions.
15     THE COURT:  I noticed that, yeah.
16     MS. WAGSTAFF:  And so we would like to get through that,
17  before -- in case anything comes up, have some time with you the
18  next day.
19     The parties have made an agreement that kind of we've drug
20  through from the Hardeman case, that we will do sort of a
21  30(b)(6) corporate deposition, corporate structure deposition
22  through written question, which we are going to serve on
23  Monsanto this year, in 2016, basically saying:  Who, who played
24  this role, and in what years, to help us identify further
25  custodian files that we may need.

47

1      So assuming that that is timely responded to, and responded
2  to fully, I think we would have no problem meeting your February
3  1st deadline of requesting additional custodial files.  But if
4  any hitch goes off with that, we --
5      THE COURT:  What is your agreed-upon deadline for responding
6  to that?
7      MS. WAGSTAFF:  Well, you know, we had sort of assumed that
8  it would be like an interrogatory type thing, so 30 days.  If
9  Your Honor would like to -- we hadn't talked about anything
10  shorter than that, and I was actually negotiating it with
11  Ms. Stewart and Ms. Pigman, but I had assumed it would be 30
12  days.
13     THE COURT:  Okay.  I think we should have it be sooner than
14  that.
15     MS. WAGSTAFF:  Okay.
16     THE COURT:  First of all, what's your -- so what is this,
17  what is this, you're --
18     MS. WAGSTAFF:  It's --
19     THE COURT:  How do you describe what you're going to submit
20  to them?
21     MS. WAGSTAFF:  This isn't the official name of it, but it's
22  sort of a 30(b)(6) corporate structure deposition by written
23  question.
24     So the way that it will look, you know, will be:  Who was in
25  charge of this role for these following years?  And assuming

48

1  that there's no objection, and that they timely respond, we will
2  have no problem meeting your February 5th deadline.
3      And this is an agreement we've had with the Hollingsworth
4  firm on how to treat -- gather this sort of information, for a
5  while now.
6      THE COURT:  Okay, and when are you filing that?  When are
7  you serving that?
8      MS. WAGSTAFF:  I was going to serve it between the week of
9  Christmas and New Year's.  So, by the end of the year.
10     THE COURT:  So the deadline for that will be --
11     MS. WAGSTAFF:  I can do December 30th.
12     THE COURT:  December 30th.  All right.  And then the
13  deadline to respond to that I think should be around, you know,
14  January 21st or something like that.  I don't know what day that
15  is.
16     THE CLERK:  The 20th or 23rd.
17     THE COURT:  January 23rd is the deadline to respond to that.
18     MS. WAGSTAFF:  And, Your Honor, that will work, assuming
19  there's no objections.  Can we meet and confer about objections
20  before?  I would hate for them to bring objections for the first
21  time on the 23rd, and then we have eight days to try to figure
22  that out.  So, I don't know, maybe objections by January 5th or
23  something?
24     And we could, if Your Honor would be willing, get on a
25  telephone call with you to resolve any objection that we may

49

1  have as to the scope of our questions. I don't anticipate that
2  I would ask objectionable questions.
3  THE COURT: Deadline for objections, January 5th.
4  MS. WAGSTAFF: And while we're on the --
5  MR. HOLLINGSWORTH: So we receive her questions on
6  December 30th, and then we have to respond with whatever we
7  object to, based on an initial review, by January 5th?
8  THE COURT: Yeah, or a deadline to meet and confer regarding
9  objections.
10 MR. HOLLINGSWORTH: Okay. How about the deadline to meet
11 and confer on January 5th? Thank you.
12 MS. WAGSTAFF: Part and parcel of that agreement that we
13 made with the Hollingsworth firm, we also did an agreement on
14 electronic -- electronically-stored discovery. We agreed not to
15 put our -- their deponent under oath and do a formal deposition.
16 We did an informal meeting. And part of our agreement was that
17 I would give them my notes, they would edit it, and get it back
18 to me. And then we would finalize it and figure out what we
19 needed to know about ESI, and where documents were stored and
20 that sort of thing, and where we needed to go look for
21 information.
22     Sorry.
23     We were hoping that if -- we gave them our notes back in
24 September. And we --
25 THE COURT: I'm sorry; I just don't understand what you are

50

1  talking about. Sorry.
2  MS. WAGSTAFF: Okay. So instead of doing a 30(b)(6) of ESI,
3  which is sort of a typical first stage before discovery, we
4  agreed with the Hollingsworth firm that that wasn't necessarily
5  an adversarial deposition; we just wanted information. So we
6  agreed to have our ESI expert and their ESI expert meet and sort
7  of come up with how ESI has been stored, and where we should go
8  look for it to sort of target our discovery. And we have
9  re-energized that agreement.
10     So I'm just asking for deadlines to make that happen. And
11 the process was that we would give the Hollingsworth firm
12 Plaintiffs --
13 THE COURT: Okay. During the break, you should be able to
14 sit down with each other and figure out those deadlines.
15 MS. WAGSTAFF: Okay, we can do. I see your eyes kind of
16 glaze over when we talk about ESI.
17 THE COURT: Well, plus, I mean, you're all in the same room;
18 you can -- you should be able to sit down and figure out those
19 deadlines. If you can't, after the break, I'm happy to try to
20 prevent my eyes from glazing over when you talk to me about it
21 again.
22 MS. WAGSTAFF: Okay.
23 THE COURT: And then the other thing is I think I want there
24 to be a deadline for taking depositions. You had previously
25 expressed a bit of opposition to that. Because you wanted to

51

1  figure out -- you wanted to sort of leave it to yourselves to
2  figure out the order in which you take depositions. And maybe,
3  you know, it would be better to take somebody's deposition in
4  Group C before you take somebody's deposition in Group B, or
5  whatever. But I'm more concerned about not having enough time
6  to take the depositions.
7      So, you have decided you want to take three -- I think three
8  depositions of people in Group B? Is that right?
9  MS. WAGSTAFF: I believe that's correct.
10 THE COURT: Okay. And so, as I said, in the next
11 case-management statement I want to know when those dates --
12 when those depositions are scheduled. And I think they should
13 be completed before a certain date. Like, I think it would be
14 reasonable to say you should complete those three depositions in
15 February, for example.
16 MS. WAGSTAFF: We can certainly do that, if it would provide
17 more comfort to Your Honor. Our preference would be just to
18 have a date that all depositions must be done. But I understand
19 the helpfulness of having sort of roadblocks, and we would be
20 willing to do that.
21 THE COURT: It would provide for more comfort for me if you
22 took those three depositions in February. So I'm going to
23 require that you do that.
24 MS. WAGSTAFF: Okay. And I would just ask if there's ever a
25 particular deponent that we want to wait until the end, we would

52

1  just ask for an exception to take it out of time or something
2  like that.
3  MR. HOLLINGSWORTH: What does that mean?
4  MS. WAGSTAFF: It means that if -- for example, Dan Jenkins,
5  who's a Group B, if we for some reason felt that it would be in
6  our best interest to take him as one of the last depositions, I
7  would ask Judge Chhabria if I could please take him in April or
8  March instead of in February.
9  THE COURT: Yeah. And I would be reluctant to do that,
10 unless you came to me and said: We've scheduled a bunch of
11 other people in February anyway.
12 MS. WAGSTAFF: Right.
13 THE COURT: So we're not sitting around, twiddling our
14 thumbs. I mean, I know you won't be sitting around twiddling
15 your thumbs. But I -- you know, what I'm -- you know. I think
16 it is a very reasonable schedule we set, but I am uncomfortable
17 with the idea of not making progress along the way with this
18 stuff.
19     So, you know, and then I think, you know, we may -- at the
20 next case-management conference, we may set, you know, further
21 deadlines. So we might say anybody you want to depose in
22 Group C, you know, or D, or whatever, has to be done by, you
23 know, April -- March 20th or something like that. But we can
24 talk about that at the next case-management conference.
25     So how does that schedule sound? So the idea would be the

(Hearing) Monsanto MDL CMC (Hardemann v Monsanto Co., et al.)  12/21/2016  9:46:00 AM

53

1   27th for the next case-management statement.
2      I'll sort of go over it briefly one more time.  Sorry.  The
3   27th for the next case-management conference.
4      THE CLERK:  What time do you want that?  10:00?
5      THE COURT:  10:00 a.m.
6      And then the -- is that okay for everybody?  Yes?
7      MR. HOLLINGSWORTH:  Yes, Your Honor.
8      THE COURT:  Okay.  And then, then the case-management
9   statement would be due when?  What have we been doing?
10     MS. WAGSTAFF:  Your Honor, Monday the 23rd, which gives you
11  five days, would work with us.  I'm not sure if --
12     THE COURT:  That's fine.
13     MS. WAGSTAFF:  Okay.
14     THE COURT:  Okay.  So the case-management statement is due
15  January 23rd.  And as I said, in that case-management statement
16  must be a schedule --
17     MS. WAGSTAFF:  The deposition dates for Group B?
18     THE COURT:  Must be deposition dates for Group B.
19  And those depositions must take place in February.
20     MS. WAGSTAFF:  (Nods head)
21     THE COURT:  And then the case management conference after
22  that would be March -- no, sorry, February 22nd.  Does that work
23  for everybody?
24     MS. GREENWALD:  Uh-huh.
25     MR. HOLLINGSWORTH:  Does not work for me, Your Honor, but I

54

1   can -- we'll have coverage, without me.
2      THE COURT:  Okay.  You're not -- what do they call you?  An
3   indispensable employee?
4      MR. HOLLINGSWORTH:  No, I'm not.
5      THE COURT:  An essential employee.
6      MR. HOLLINGSWORTH:  Less all the time.
7      MS. WAGSTAFF:  Going back to the case-management statement
8   that's due on January 23rd, would you like us to let the Court
9   know what we have agreed on, the Group D?  I think you had
10  mentioned that earlier in terms of whether or not we would like
11  depose them, what agreements we've come to and/or argue if we
12  can't reach an agreement?
13     THE COURT:  What I was envisioning -- I had thought that
14  that might be too difficult for you.  Because you're not getting
15  -- and if I'm wrong, tell me.  But you are not getting the
16  documents for those people until early January.  Right?
17     MS. WAGSTAFF:  Oh, yeah.
18     THE COURT:  January 6th?
19     MS. WAGSTAFF:  That will be too difficult.  You're right.
20     THE COURT:  So what I was thinking is that that deadline
21  would be associated with the next case-management conference.
22  So the next case-management conference would be Feb. 22.  And
23  that is a --
24     THE CLERK:  At 10:00 a.m.
25     THE COURT:  At 10:00 a.m.  And that's a Wednesday?

55

1      So the case-management statement would be due the Friday
2   before, which is what date?
3      THE CLERK:  February 17th.
4      THE COURT:  And in that case-management statement, that is
5   the deadline for scheduling depositions of people in Groups C
6   and D.  So I want to know the dates of the depositions for
7   people in Groups C and D, to the extent you agree that they
8   should be deposed.
9      But if you disagree about whether the people in Groups --
10  which people in Groups C and D should be deposed, then that
11  needs to contain -- then the case-management statement that
12  you're filing on February 17th needs to include a detailed
13  explanation backed by evidence of why you need to take those
14  people's depositions, and why it would be both relevant and not
15  duplicative to take those people's depositions.
16     And then the deadline for identifying to Monsanto -- this is
17  the Plaintiffs' deadline for identifying -- and I'll do this in
18  a written order, but I just want to go through it to make sure
19  there's no big mistake in this schedule that we're setting.  The
20  deadline for the Plaintiffs to identify to Monsanto anyone --
21  anyone in Group E which is any remaining document custodians
22  would be February 1st.  And if there's any dispute about whether
23  those people should be in Group E, you have to, in the
24  February 17th case-management statement, include a detailed
25  justification for why the documents from those people will

56

1   produce relevant and non-duplicative material.
2      MS. WAGSTAFF:  Can I make one request, Your Honor, on the
3   scheduling?  Can we make the statement due Thursday the 16th
4   instead of Friday the 17th?
5      THE COURT:  Sure.
6      MS. WAGSTAFF:  That's for my East Coast friends who will be
7   working late on a Friday night.  I'm sure they would rather do
8   it Thursday night.
9      THE COURT:  Sure.  So, that's that.  Why don't we take a
10  break.  Any other, like, little scheduling issues that you have,
11  please take the break to work on them.  And then we'll come
12  back, we'll talk about Science Day; we'll talk about depo
13  protocol.
14     Is there anything other than those two things we need to
15  talk about?
16     MR. HOLLINGSWORTH:  I don't think so, Your Honor.  But I had
17  two brief things, just for the record.
18     THE COURT:  Go.
19     MR. HOLLINGSWORTH:  One is the deposition of Dan Jenkins,
20  which Your Honor suggested as being a Group B deposition, should
21  be completed by the end of February.  We're ready to go with Dan
22  Jenkins.  So I can smell something coming there, and I want the
23  Court to know that we're ready to do Dan Jenkins in February.
24     THE COURT:  I don't understand.  What can you smell coming?
25     MR. HOLLINGSWORTH:  Well, just based on what Ms. Wagstaff

57

1  said about Dan Jenkins.
2      MS. WAGSTAFF:  It was the first name --
3      THE COURT:  I think she was just using it as an example.
4      MR. HOLLINGSWORTH:  Right.  But we're ready to go with him.
5  And February 22nd, which is the -- the February case-management
6  conference, I have a conflict with -- that's a current conflict.
7  You know how lawyers' schedules are.  If that changes, I will be
8  here.  But as of now, I cannot be here on that date because of a
9  prior conflict.  So, someone would fill in for me, probably
10  Mr. Lasker and others.  But if my schedule breaks, I'll be sure
11  to be here.
12      THE COURT:  We would love to have you.
13      MR. HOLLINGSWORTH:  Thank you.
14      THE COURT:  So why don't we break until -- how much time do
15  you all think you could spend productively together, like,
16  agreeing on deadlines and stuff like that?
17      MS. WAGSTAFF:  Well, we just need five minutes to talk about
18  deadlines.
19      MR. HOLLINGSWORTH:  (Nods head)
20      MS. WAGSTAFF:  Not very long at all.
21      THE COURT:  All right.  We'll come back at 10:20 (sic).
22      MR. HOLLINGSWORTH:  Thank Your Honor.
23      THE COURT:  Thanks.
24      THE CLERK:  Court is in recess.
25      (Recess taken from 11:04 a.m. to 11:20 a.m.)

58

1      THE COURT: Okay.  Is it Ms. Fuchs?  Is that how it's
2  pronounced?
3      MS. FUCHS:  Yes, Your Honor.
4      THE COURT:  Thanks for waiting.  You know, I'll just sort of
5  emphasize, just for clarity's sake, what I'm hopeful that you
6  will be able to do.  I understand you may not be able to do it,
7  but what I would love for you to investigate to the extent
8  possible is, you know, the extent to which IARC actually does
9  have a property right to any of the documents in that first
10  folder, the WHO folder.  And, you know, we understand that IARC
11  seems to say that it does.
12      MS. FUCHS:  Yes.
13      THE COURT:  But, you know, you know, is there any
14  contemporaneous evidence that it thought that it did, you know,
15  at the time?
16      And also, in addition to, you know, contemporaneous evidence
17  that it subjectively believed it had a property interest in
18  documents like this, is there any objective evidence --
19      MS. FUCHS:  Yes, Your Honor.
20      THE COURT:  -- that IARC had a property interest in
21  documents like this?  And, you know, any further legal argument
22  that IARC has a property interest from documents like this.
23      MS. FUCHS:  Absolutely.  Yes, Your Honor.
24      THE COURT:  Okay.  And with that, thank you for coming.
25      MS. FUCHS:  Thank you, Your Honor.

59

1      THE COURT:  All right.  Back to scheduling, the only other
2  thing was Science Day.
3      On Science Day, what I would like to do is -- the parties
4  have agreed to February 8th.  I think maybe I originally
5  proposed February 8th.  I can't remember.  But my schedule has
6  become kind of jammed now in January and early February.  So,
7  what I would like to do is put it off.  I always think there may
8  be some benefit to putting it off, to having it a little bit
9  closer to the Daubert hearings.
10      So number one is I would like to put it off.  Let's schedule
11  it at a later case management conference.  Number two, one thing
12  I wanted to be clear about with respect to Science Day, and I
13  think that I may have misspoke about this at our last
14  case-management conference: I don't want to hear about any of
15  the studies about glyphosate.  I don't want to hear -- at
16  Science Day, I want to -- I want to learn about how to learn
17  about this stuff.  I don't want to hear about any of the actual
18  studies.
19      So that is the -- that sort of, I think, one bit of
20  guidance I can give you on that for now.  Does that make sense?
21      MS. GREENWALD:  Uh-huh.
22      MR. HOLLINGSWORTH:  Thank Your Honor.
23      THE COURT:  Okay.  On depo protocol, state-court
24  depositions, it seems to me that I cannot, you know, issue an
25  order necessarily that, you know, restricts the way the

60

1  state-court cases are going to be litigated.
2      But the last time we were here, we talked a great deal about
3  how this Plaintiffs' leadership structure was going to cause
4  things to be very efficient.
5      MS. GREENWALD:  Uh-huh.
6      THE COURT:  And if that means anything, it seems to me it
7  should mean that you will agree that the depositions taken in
8  this case on general causation apply to the state cases, and
9  that you agree to that.  The parties agree that the depositions
10  on general causation taken in this case apply to the state
11  cases.  And that to take somebody's -- to -- to take somebody's
12  deposition again or for an additional hour or something like
13  that in another case, you would need to, in light of the
14  agreement that you made in this case, you would need to make a
15  showing of good cause for why you need to take somebody's else's
16  -- that person's deposition again in the state case.
17      And I assume that, given the value that you all bring with
18  your leadership structure, that you will agree to that.  And
19  that that will be included in your deposition protocol.
20      MS. GREENWALD:  May I be heard, Your Honor?
21      THE COURT:  Sure.
22      MS. GREENWALD:  Thank you.  Robin Greenwald for the
23  Plaintiffs.
24      So Your Honor, in principle, of course, we agree with that
25  principle.  But in practice here, it's a little more complicated

61

1  than that, because we are working under a system where we don't
2  necessarily have all the documents when we take some of these
3  general-causation employee depositions.  We haven't worked
4  through all the privilege issues, because we are just getting
5  the logs now.
6       THE COURT:  I know, but that's what I'm saying.  What you're
7  agreeing to is that the deposition will apply in the state-court
8  cases, unless there's a good reason why you need to reopen it
9  for another hour and ask them about some documents that you
10  didn't have.
11       MS. GREENWALD:  Okay, Your Honor, I'm sorry.  So I guess one
12  of the issues that we have in the depositional protocol, some of
13  the language we don't agree with is it shifts the burden to us
14  to make certain showings of necessity.  And so --
15       THE COURT:  Yeah.  I would think that you should agree to
16  that.  I mean, you -- you are -- you have your crack at them
17  here.  And if there is, you know, something that you need to
18  talk to them -- something that comes up that you need to depose
19  somebody on in a future case, and you can show that you -- you
20  know, it wasn't reasonable to expect that you knew that you
21  would -- that you needed to talk to them about that in the
22  previous deposition, you just make that -- you agree that you
23  need to make that showing to justify further deposition of that
24  person.
25       MS. GREENWALD:  So if we can just have some clarification,

62

1  and I'm not trying to be difficult.
2       THE COURT:  No.
3       MS. GREENWALD:  But in fact, none of the state court cases
4  have any of the --
5       (Reporter interruption)
6       MS. GREENWALD:  I'm sorry.  I live in New York; I talk too
7  fast.
8       None of the deposition -- I'm sorry; none of the state-court
9  actions are in jurisdictions where there's a limitation on the
10  length of the deposition, for example.
11       So, so for example, if this were a proceeding in Delaware,
12  Missouri or even in San Francisco city court, we would be able
13  to take these depositions for more than seven hours.  We have
14  agreed to the presumptive seven hours in the deposition
15  protocol, in an effort to agree with Monsanto's counsel.  In
16  fact, I mean, whether that's sufficient or not to really do a
17  full general causation deposition, I don't think we know at this
18  point.
19       And so our concern about agreeing to that in a vacuum before
20  we have had an opportunity -- I mean, just for some examples,
21  Your Honor, Donna Farmer, she has 112,000 documents.
22  Mr. Goldstein has 50,000 documents.  I mean, I won't bore you
23  with all the different numbers.
24       So whether it's really sufficient to have seven hours with
25  Ms. Farmer in a general causation deposition, I can't stand here

63

1  right now and say we can.
2       THE COURT:  Well, you brought this case.  And you have
3  applied to be lead counsel.
4       MS. GREENWALD:  Correct.
5       THE COURT:  You need to have a grasp of the material.  And
6  if you need -- if there's a reasonable case for needing more
7  than seven hours for a particular deponent in this case, you can
8  try to negotiate that with Monsanto.  And if it doesn't work,
9  you can come to me.
10       Furthermore, if after you take that person's deposition in
11  this case, if it turns out that there was something you couldn't
12  be realistically expected to know about that you need to depose
13  them about that you didn't get a chance to depose them about in
14  this case, you can make that showing.
15       So all I'm saying is that you -- you should be in a
16  position -- having brought these cases, and having applied to be
17  lead counsel, you should be in a position to have a command over
18  this.  And you should be in a position to agree that these
19  depositions will apply in future cases, with the understanding
20  that, of course, if there's something that you were unable to
21  cover with them and you could not be realistically expected to
22  cover with them, that you can seek to reopen it in the other
23  case.
24       MS. GREENWALD:  So, Your Honor, I agree.  I mean, we don't
25  disagree with that concept.  I guess all I'm saying is that we

64

1  have proceeded, and -- and we know these cases, and we know
2  these witnesses.  We are going through documents at an
3  incredible rate right now.  But, for example, as Your Honor
4  knows, there's some custodian -- custodial files we won't have
5  at the time we take these January depositions.  And I understand
6  we can make a showing.  I do understand this.  All I'm saying is
7  we strategically, as lead counsel, made a decision that, given
8  the abbreviated schedule we have here, that we are going to make
9  these depositions work in seven hours.
10       And so all I'm trying to explain to Your Honor is our
11  concern of binding a case that's pending in state court where
12  maybe another strategic decision in the state court actually
13  would be to ask Donna Farmer or Dr. Goldstein more questions.
14       So I guess if the -- I just want to make sure that I am
15  clear on what we are fine, agreeing to.  As long as it's
16  understood and we recognize -- and there's a reference in here
17  that we understand that we are taking these depositions
18  accepting the seven-hour limitation of the federal system, and
19  that we don't have a full set of documents at the time we take
20  many of these depositions, and that we have an opportunity to, I
21  guess -- I did a case where the Court called it "gap-filling."
22  Of course, we're not going to go over the same issues with the
23  same documents.  It wouldn't be wise for us.
24       THE COURT:  You make a showing that you need to do gap
25  filling.

65

1    (Reporter interruption)

2    THE COURT: That you need to do gap-filling.

3    MS. GREENWALD: So I guess our concern is that the burden is

4    shifting to us to make a showing every time we want to do a

5    deposition in state court of the same person. And --

6    THE COURT: What's wrong with that? If you have command

7    over your case, it shouldn't be that hard to make a showing.

8    MS. GREENWALD: Well, I mean, that's right, Your Honor. But

9    there's going to be some lawyers in these cases where they're

10   not even here. They're not part of MDL. And so --

11   THE COURT: But you are their leader. And --

12   MS. GREENWALD: What if they're --

13   THE COURT: If they're not part of the MDL.

14   MS. GREENWALD: Right, uh-huh.

15   THE COURT: Well, I assume -- well --

16   MS. GREENWALD: I know of one case in Missouri right now

17   where the lawyer is not part of this MDL, and he has a case in

18   state court. He is not part of this case.

19   THE COURT: The lawyer is not part of this MDL.

20   MS. GREENWALD: Correct.

21   THE COURT: Well, I'm not sure that that lawyer can be

22   bound. But I would think that any lawyer involved in this MDL

23   can make that agreement. That: The cases that I'm bringing in

24   state court, you know, these depositions will count for those

25   cases. And if I need to do gap-filling, I'll make a showing

66

1    that I need to do gap-filling. I don't -- I agree with you on

2    that last point about a lawyer not being involved in this case.

3        So I don't see why you cannot include in your deposition

4    protocol language to that effect.

5        And I don't see why you wouldn't agree to that.

6    MS. GREENWALD: All right. So we'll go back and try to work

7    on language. It's less oppressive than Monsanto proposed. But

8    in line with what Your Honor -- we understand what Your Honor

9    would like us to negotiate on that.

10   MR. LASKER: Your Honor, if I may, just for clarification,

11   there was discussion about including something in the

12   case-management order to the extent that Monsanto had not

13   produced certain documents. We obviously disagree with that. I

14   don't think that is part of --

15   THE COURT: You mean in the deposition protocol?

16   MR. LASKER: In the deposition protocol, yes. I assume that

17   that's not what you had in mind --

18   THE COURT: It's just not necessary.

19   MR. LASKER: I agree.

20   THE COURT: That's not necessary.

21   MR. LASKER: That's my clarification. Thank you.

22   THE COURT: All right. So that's state-court depositions.

23   Number of questioners.

24   I'm sorry; did you have anything else?

25   MS. GREENWALD: No. I just wanted to make sure I covered

67

1    everything, Your Honor.

2    THE COURT: Okay. Number of questioners. It doesn't strike

3    me as a particularly good idea to have two lawyers questioning

4    one witness, but I'm not going to restrict that. If they want

5    to have two lawyers, they can have two lawyers do the

6    depositions.

7        Employees. It goes without saying that current Monsanto

8    employees can't be contacted. And I don't see any reason to

9    impose a restriction on contacting former employees.

10   MR. LASKER: I'm sorry, Your Honor. (Inaudible)

11   (Reporter interruption)

12   MR. LASKER: Sorry. I'll come up.

13   I just blanked out on your ruling on former employees.

14   THE COURT: Oh, that's okay. What I said was: Obviously

15   the Plaintiffs' lawyers can't contact current Monsanto

16   employees. And I don't see any reason to require them to

17   contact former employees through you.

18   MR. LASKER: Thank Your Honor. May I be heard on that?

19   THE COURT: Sure.

20   MR. LASKER: Okay. The issue with respect to contacting

21   former employees has two parts to it. And there is some case

22   law I can also direct Your Honor to on that. And there's two

23   concerns that we have with Plaintiffs' attorney contacting

24   former employees.

25       One deals with the possibility that a statement can be

68

1    combined or be imputed to Monsanto. And there is a case, EEOC

2    versus Placer -- and I apologize for us not having this in our

3    filing. It's 147 F. Supp. 3d., 1053. That talks about the fact

4    that there are certain circumstances in which an argument could

5    be made that a former employee talking about actions he or she

6    took while they were at the company during their employment

7    might be imputed to bind the company. And in those

8    circumstances, there could be an ethical restriction --

9    THE COURT: Sorry. A former employee -- statements that a

10   former employee made, when?

11   MR. LASKER: While -- during his or her employment. So

12   discussing actions that that person took during their employment

13   on behalf of the company might be imputed to the company. So

14   that --

15   THE COURT: A statement that the former employee made after

16   they left could be imputed to the company?

17   MR. LASKER: About actions. It's not the statement that

18   they made; it is the actions that they are describing that they

19   took while they were an employee. That that action would then

20   be imputed to the company. And that, that --

21   THE COURT: What does that have to do with contacting former

22   employees?

23   MR. LASKER: The ethical rules -- and it's California Rule

24   2-100 and ABA model Rule 4.2, discussed that circumstance. And

25   the majority rule under both of those provisions allows for

69

1  contact by the other side to former employees. But there is an
2  exception, and it is discussed in this EEOC versus Placer case,
3  where there's a situation where the former employee might be
4  able -- might be discussing things that could be imputed to or
5  bind the company. And that's one of the issues and one of the
6  concerns we have.
7     The second issue that comes up as well is with respect to
8  privilege. And particularly here, where this litigation is
9  already now almost two years after the IARC monograph
10 classification came out, and as Your Honor may have heard
11 through the news, there is a corporate merger going on --
12    THE COURT: Sorry, what?
13    MR. LASKER: There is a corporate merger transaction going
14 on with Monsanto. To the extent --
15    THE COURT: Like Bayer or something like that?
16    MR. LASKER: Yes, yes. To the extent that there are
17 employees who become former employees who were involved in
18 discussions with counsel, for example, about this litigation,
19 that's privileged. That was covered by the privilege.
20    Or even earlier situations, in other areas that Plaintiffs'
21 counsel would have no way of knowing, frankly, and I couldn't
22 expect that they would have any way of knowing. They could
23 then -- and even inadvertently, and the former employee might
24 not know -- end up with disclosures that breach the privilege.
25 It's not their privilege; it is the company's privilege to be

70

1  able to assert.
2     So there are two circumstances. And particularly with sort
3  of a broad rule allowing contact with former employees, and not
4  knowing who those employees would be, and not having any
5  procedures in place for that, we've got situations where both of
6  those issues occur. And those both would be problematic for
7  waiving privilege and for binding the company. And so those are
8  the reasons for our concern about that.
9     And it may be that we can handle this separately through
10 some sort of protocol of how --
11    THE COURT: To communicate with former employees?
12    MR. LASKER: Perhaps. There are some situations in which
13 courts have required opposing counsel, whichever side that might
14 be, to make certain disclosures when they reach out to former
15 employees that are --
16    THE COURT: I don't know. I guess the way that I feel about
17 it is that, you know, to the extent that employees have met with
18 lawyers, who are no longer employees, the lawyers can contact
19 those former employees and remind them of the privilege. And
20 remind them: Hey, you know -- you can even say: If anybody
21 tries to contact you, you know, please let us know.
22    But I'm not -- I don't -- I don't understand why that would
23 -- why there should be an additional requirement that they sort
24 of run it by you before they, you know, pursue their
25 investigation.

71

1     MR. LASKER: Well, I understand that, Your Honor. The
2  problem we have is that there are lots of former employees at
3  Monsanto. This case deals with a product that's been, you know
4  -- about 40 years.
5     THE COURT: But I'm particularly responding to your concern
6  about employees having spoken with lawyers about this. I mean,
7  presumably you know who those people are. I mean, unless it was
8  a casual conversation in the hallway between a lawyer and a
9  scientist. I mean, to the extent that, you know, outside
10 lawyers are doing interviews of people, I mean, you have records
11 of that.
12    MR. LASKER: Well, certainly with respect to our
13 investigation, and particularly for identifying people who might
14 have documents and also for making sure litigation holds are in
15 place, and who didn't have documents. A fairly large list, but
16 we would be able to identify those.
17    But we also have the situation, Your Honor, where there's
18 regulatory submissions and other submissions before we were
19 involved. And I can't say, standing here today, where
20 communications may have involved other attorneys prior to this
21 litigation, where there is a privilege. I don't -- and the
22 problem that we have again is, you know, there are certain
23 former employees who, again, we know, and we talk to, and we can
24 reach out to them. And I believe that would work, Your Honor.
25    But it's just a large universe of potential former employees

72

1  that we are not going to have any realistic way of knowing that
2  they're reaching out to, or, you know, if there was -- and I
3  understand that there is difficulties with having us -- you know
4  them tell us ahead of time. I understand why they wouldn't want
5  to be able to do that.
6     That may be why some courts have set forth procedures. And
7  there are -- including in some of the MDLs, where we've cited
8  Your Honor to a provision that one MDL court entered, that sort
9  of set forth guidelines to be able to address this issue. And
10 that may be the best way to go forward.
11    It does -- you know, we're in a situation where I can't tell
12 you who -- obviously, I can't tell you who they're going to
13 contact, and whether those people have that information, or
14 whether they can say something that would be a violation of the
15 ethical rules.
16    THE COURT: Well, if they contact somebody and they get
17 relevant information, they have to disclose that person to you
18 under the discovery rules anyway, right? They have to
19 supplement their disclosures, and identify more people than,
20 they've gotten information from. Right?
21    MR. LASKER: To the extent that they would be using that
22 information through that witness, yes.
23    THE COURT: Right, right. I think that's adequate, frankly.
24    MR. LASKER: But they would have -- for example, if there's
25 privileged communication that was disclosed.

73

1    THE COURT: Uh-huh.

2    MR. LASKER: That would be information that they have, they

3    could use to make -- again, I'm not saying that they would

4    be purposefully making use of information they know they

5    shouldn't be making use of. There's ethical rules against that.

6    But the employee may not know, and they may not know. And our

7    privilege will be breached, and they will be using that

8    information inadvertently --

9    THE COURT: But that's -- so, like, all of a sudden, in

10   every securities case that I have, I need to be adopting

11   protocols for how the plaintiffs' lawyer should be contacting

12   former employees from the company who's being sued in a

13   securities case? I mean --

14   MR. LASKER: I think it really depends on the nature of the

15   case, Your Honor. If there is a situation where you have a

16   defined time frame -- you know, the securities class action, you

17   have an initial presentation that took place during a certain

18   period of time, it involves certain people, it's sort of a

19   discrete issue, then you don't have this uncertainty that we

20   have here.

21   Here, we have a 40-year history with a product that has been

22   the subject of regulatory reviews going back 30 years.

23   THE COURT: I think that the existing rules allow for the

24   kinds of problems that you are identifying to be addressed. And

25   so I'm not going to impose any restriction on that.

74

1    MR. LASKER: Okay. Thank you, Your Honor.

2    THE COURT: Okay. In videotaping, what -- there was an

3    issue about videotaping that I didn't fully understand.

4    MS. GREENWALD: So --

5    THE COURT: Videotaping depositions.

6    MS. GREENWALD: Robin Greenwald, Your Honor.

7    So, Monsanto may very well not bring some of its witnesses

8    to court, wherever it is. They don't have to bring them to

9    various jurisdictions for the trial. And we believe this case

10   will --

11   THE COURT: Can you remind me the rules about that? I

12   didn't do a lot of trial work or discovery work when I was a

13   lawyer. So what are -- remind me of the rules about that.

14   MS. GREENWALD: So my recollection is that they can -- they

15   have to identify corporate --

16   THE COURT: Makes you wonder why I'm a trial judge now.

17   MS. GREENWALD: Oh, my gosh. What if I get this wrong? I'm

18   horrified.

19   THE COURT: I'm learning.

20   MS. GREENWALD: Okay. So, I think the Defendant has to

21   identify corporate representatives who will appear -- I'm sorry

22   -- who will appear at the trial. But they don't have to bring

23   every person who we have deposed, who we would like to have. So

24   we have subpoena powers over a certain distance from the

25   courthouse. And I think it's -- 100 miles?

75

1    THE COURT: But I thought -- I guess I was wrong about this,

2    but I thought that if there's an employee of the defendant in a

3    case, and that employee of the defendant has relevant

4    information, that they have to come to trial. That's wrong?

5    MS. GREENWALD: No. I don't believe they do. I mean, some

6    may have to, but I don't believe they all have to. So --

7    THE COURT: What's the dividing line between who has to and

8    who doesn't?

9    MS. GREENWALD: As a control group, I mean, I don't -- I've

10   never represented a defendant. I'm embarrassed to admit.

11   MS. WAGSTAFF: Your Honor, it has to do with subpoena power

12   of the courthouse. So if we were to try this case here, we

13   would only be able to subpoena people within a mile radius of

14   this courthouse.

15   MS. GREENWALD: Right.

16   MS. WAGSTAFF: You know. And so oftentimes a corporate

17   defendant will bring one witness that will sit at the table.

18   But they technically don't have to bring anyone. I've tried

19   cases in Federal Court and MDL where the defendant didn't bring

20   one witness. It's just up to the defendant.

21   THE COURT: Really.

22   MS. WAGSTAFF: So these videotaped depositions can be more

23   than just a discovery deposition. Sometimes they're what you

24   actually play at trial.

25   THE COURT: Okay. All right.

76

1    MS. GREENWALD: So I don't think they have to bring --

2    usually they have one or two corporate representatives, has been

3    my experience. But they won't bring the full panoply of people

4    who we may want to show to a jury.

5    THE COURT: Okay.

6    MS. GREENWALD: And studies have shown -- and I have only

7    read these recently; this was news to me -- that juries pay more

8    attention to videotaped depositions when they show the

9    questioner and then it shows the witness, versus -- for example,

10   you and, I talking now, it just --

11   THE COURT: You just want to be on TV.

12   MS. GREENWALD: No, I don't. Actually, I wasn't a big fan

13   of this.

14   THE COURT: That's what this is all about?

15   MS. GREENWALD: It's not. So actually, there are studies

16   that people pay more attention when it goes from the questioner

17   to the person who is actually giving the answers than if you

18   just look at the person giving the answers and then there's this

19   voice in the background.

20   THE COURT: I believe that.

21   MS. GREENWALD: The jurors find that confusing. And they

22   like to see. And by the way, one of things I want to mention

23   is -- that's all we wanted. We only wanted the right. We may

24   not even invoke it. We just want the right, for certain

25   witnesses, if we deem it appropriate -- and they would have the

77

1  same right -- to have two video cameras.  One on the deponent
2  and one on the questioner.
3      If, at the time of trial, there is some objection, Monsanto
4  can raise it then.  It's not lost for them forever.  But if we
5  are not allowed to do it now, we can never get it back.  So it's
6  really a preservation issue that I think can wait until the time
7  of motions in limine.  And if they think something we've done is
8  inappropriate as a questioner, and we're making faces or
9  whatever, which we're not going to do, but they have every right
10 at that point to say that it's prejudicial, confusing, whatever
11 they want to argue.  But now is not the time.  And so that's all
12 we wanted was an extra videotape.  That was it.
13     THE COURT:  Okay.
14     MS. GREENWALD:  It was new to me, too.  But it sounded like
15 it was worth it.
16     THE COURT:  No, I believe that.  I mean, I suspect that's
17 right.  And watching, watching the deponent just sitting there
18 often in silence for quite a while is -- you know, it's easy
19 to -- for the mind to wander, for sure.
20     Yeah.
21     MR. LASKER:  Thank you, Your Honor.  A couple of points on
22 this.
23     The first is -- and I take what you're saying -- it sort of
24 begs the question then about:  Well, do we need a third camera
25 then, so that there's a defendant's counsel also on the screen,

78

1  so that they have the full set.  And maybe -- there's only so
2  much --
3      THE COURT:  Why would you need defense counsel?  Why would
4  you need a third camera?
5      MR. LASKER:  If the witness was actually at trial -- and I
6  don't know the studies, Your Honor.  I mean, up here citing
7  studies.  But if there is some view that there is more
8  credibility or that the questioner gets some more power or punch
9  to their questions by being able to be on camera with just the
10 questioner and the witness, I expect the same thing would apply
11 to have the defense counsel on there, as well.  And we could
12 sort of go on from there, as to how you have to handle that.
13     The way this has always been handled, in my experience, I've
14 never --
15     THE COURT:  By your body language, I'm taking it that they
16 would love to have you on camera associated with these
17 witnesses.
18     MR. LASKER:  Well, I mean, we're perfectly happy to be
19 associated with these witnesses.  They're our employees.  But
20 the issue then gets to -- and maybe I was not looking at their
21 body language, but it gets to a separate point, where this
22 becomes now a strategic tactical -- I don't know if "game
23 playing" is the right word --
24     THE COURT:  That happens at trial.  I mean, everybody's --
25 you know, lawyers use body language at trial.  They use facial

79

1  expressions at trial.  So what?
2      MR. LASKER:  I understand that, Your Honor.  I generally
3  know with depositions, every video deposition I have been
4  involved in, and there's been other MDL cases where the courts
5  have ruled that this should be the case, a discovery deposition
6  is to get discovery before the jury.  And the camera is -- you
7  know, what the attorneys say, what the defending attorney says
8  is not the evidence that's being submitted in front of the jury.
9      THE COURT:  Okay.
10     MR. LASKER:  In our proceedings in court, obviously,
11 attorneys do what they can.  But that's not what the case is
12 decided on.  It's decided upon the evidence that's presented in
13 front of the witness.
14     And I understand the comment that there could be -- any
15 issues that can come up with having multiple cameras can be
16 resolved at trial.  But I have been in trial where we have
17 designated depositions to be played, and it's a very complicated
18 process.  And I'm just imagining now a situation where we now
19 have to determine when the camera is on whom, and how that
20 should work, and what's appropriate there.
21     THE COURT:  Then just bring the witness to the courtroom.
22     MR. LASKER:  Well, Your Honor, I mean, that again is -- I
23 mean, I understand the strategic issues that -- that could
24 raise.  But it is, you know, not the purpose of discovery
25 depositions, generally.

80

1      And, again, I just envision -- and particularly now we have
2  -- and I don't know how many attorneys are going to be involved,
3  if we're going to now have two attorneys now taking the
4  deposition --
5      THE COURT:  That happens at trial, too.
6      MR. LASKER:  For one witness?
7      THE COURT:  Sometimes.
8      MR. LASKER:  Well, that has not been my experience.
9      THE COURT:  I mean, certainly in any case where there are
10 multiple parties.
11     MR. LASKER:  That I would agree with, Your Honor.  Although
12 in this situation --
13     THE COURT:  There are multiple parties in this case.
14     MR. LASKER:  In connection with general causation, there
15 aren't multiple issues.  So the reason we have multiple parties'
16 counsel taking -- questioning is because they have different
17 parties with different issues to represent.
18     THE COURT:  I don't understand why they would want to split
19 up the deposition.  I mean, I think that is a strategic mistake
20 for them to do so.  I mean, I don't really get that.  But,
21 anyway.
22     MR. LASKER:  But, Your Honor -- I expressed our views.
23     THE COURT:  All right.  I understand your arguments.  And
24 you can have the two video cameras.
25     And then there was something about Bates numbers that I

81

1   could not make heads or tails of.

2     MS. GREENWALD: Okay. So, Robin Greenwald again. We'll try

3   to make this clearer next time. Sorry, Your Honor.

4     So in the deposition notice, sometimes we ask for specific

5   documents that relate to what we want to focus on or wasn't

6   included in --

7     (Reporter interruption)

8     MS. GREENWALD: I'm sorry. We ask for particular documents

9   that we either --

10    THE COURT: Hold on.

11    You know, it's -- it's okay. If you can't keep up with

12   them, it's okay. Just leave it blank. It's not that important.

13    (Reporter interruption)

14    MS. GREENWALD: So all -- all we were saying is that when we

15   have -- and we don't dispute that you can ask for documents in a

16   deposition notice. We agree.

17    And all we were saying is that if, in fact, the documents

18   were already produced, that Monsanto -- and we would have the

19   same obligation -- say: These are the Bates numbers of these

20   documents, rather than just go fish. I mean, there is 3.5

21   million documents already produced. Or some -- some identifier,

22   rather than just say: You already have those documents.

23    And all we were asking is that when we have a narrowly

24   requested document request in a deposition notice, if they say:

25   You already have it, that they just identify what that is.

82

1   Because we may not know what they're referring to.

2    THE COURT: Okay.

3    MS. GREENWALD: And Bates numbers made sense to us, because

4   that's how we identify documents.

5    THE COURT: So sometimes what happens is you do -- you --

6   you notice a deposition.

7    MS. GREENWALD: Uh-huh.

8    THE COURT: And then you ask them to produce documents. And

9   they produce documents on the day of the deposition, or they've

10   produce documents just a little bite before the deposition, so

11   you get a chance to review them before the deposition.

12    In this case, all the documents will have been produced.

13   Right?

14    MS. GREENWALD: Well, hopefully. But let's say, for

15   example, there's a set of documents that are not. Or we think

16   they're not. And then Monsanto says: Actually, they're there.

17   We're only saying that as to those documents, that they would

18   identify them.

19    This may not even come up, Your Honor. I mean, we're --

20   this deposition protocol was intended not just for the first

21   five custodial, but was really meant for the case.

22    And so, in all cases that I've ever worked on, we've always

23   had a provision that if there's a deposition notice that

24   includes a document request, that -- and those documents were

25   already produced and we don't realize that, that both parties

83

1   have the courtesy of saying: You already have it and it's this

2   Bates number. That's all. That's all we are asking for.

3    MR. LASKER: Well, we have a couple of issues with this.

4   And to put this into context, we have some deposition notices

5   that have already been issued for the first five custodians.

6   The first document request that they put on that, they had: Any

7   and all documents, records, studies, information, or other

8   materials reviewed by you in preparation for this deposition.

9    There's other problems with that that we'll be objecting to,

10   but it's a potentially broad request. They also ask for any and

11   all documents --

12    THE COURT: What's the problem with that?

13    MR. LASKER: To the extent that they're asking for work

14   product communications.

15    THE COURT: But you can ask for documents.

16    MR. LASKER: Yes.

17    THE COURT: You can ask about documents that they reviewed.

18   You can ask somebody what documents they reviewed in

19   preparation.

20    MR. LASKER: You certainly can do that. But there's going

21   to be questions about --

22    THE COURT: So that that you just read me, that's all they

23   were asking for, isn't it? Just the documents that they

24   reviewed in preparation for the deposition?

25    MR. LASKER: With that one, Your Honor. But there's also

84

1   requests for: All documents in your possession relating to

2   glyphosate, glyphosate-containing herbicides, surfactants and

3   not limiting to -- and surfactants, which is a broad array of

4   potential documents that we would, first of all, have to

5   interpret whether -- you know, in the time that they have left,

6   they're imposing the burden on us, basically, to do their job

7   and identify all these documents.

8    And there's -- as there have been spoken about, there's a

9   huge document production in this case. They're asking us to do

10   their work for them, identify all the documents that might

11   relate to these certain categories in the time period before

12   each -- for each deposition notice, and impose that duty on us

13   to do their work for them, to be providing them with all these

14   Bates numbers.

15    THE COURT: I guess I'm still having a little trouble

16   wrapping my brain around this, because -- okay.

17    So let's say there's somebody in Group A that is being

18   deposed in January. And that person is a document custodian who

19   we have all collectively decided their documents need to be

20   produced. They need to be deposed. And those documents have

21   been produced. The documents from the document custodian have

22   been produced.

23    And one would assume, one would hope, that any document that

24   is relevant to the deposition testimony will have already been

25   produced as part of the production for that document custodian

85

1  who is being deposed.

2    And then, so I understand and I think it probably is helpful

3  and efficient to ask for an identification of any documents the

4  deponent has reviewed to prepare for the deposition.  I think

5  that's actually -- will make things more efficient.

6    But I guess I'm not understanding why that other request

7  that you read to me is appropriate in that context.  I mean, it

8  seems like it -- maybe it's some effort to narrow -- I don't

9  know; I don't even understand what it's for, I guess.  In this

10  context.

11    MS. GREENWALD:  Your Honor, I think we can withdraw that and

12  if we have a narrow one, it's really the first one that's

13  important, so we can have an identification of what the witness

14  has used to prepare for the deposition.

15    So, if there's a particular document -- the second one I

16  think we both agree is too broad.  And we will go back and we

17  will review that.  We will withdraw it for now, and if there is

18  something very specific, we will contact Eric.  And we'll work

19  it out.

20    THE COURT:  Okay.

21    MS. GREENWALD:  But the first one, we do --

22    THE COURT:  I think especially, you know, these are

23  complicated topics, and the initial -- the agreement is seven

24  hours.  And it would be very helpful, rather than what you

25  usually do, which is ask the witness "What documents have you

86

1  reviewed in preparation," to ask that up front, and to get

2  production of that up front.  I think that is great.

3    MR. LASKER:  Well, yeah.  If I may, Your Honor, on that

4  one -- and I understand what you're saying -- I would ask for

5  the opportunity, though, for us to have briefing on that.

6  Because although, as a general matter, I understand what

7  Your Honor is saying, there is an extent to which, you know,

8  certain amount of questioning is allowed on that topic, but then

9  when it gets to be probing in too much detail there are issues

10  that --

11    THE COURT:  I know but that request that you read me, all

12  they're asking for is an identification of the documents they

13  read.

14    MR. LASKER:  Well, yes, Your Honor.  And to the extent that

15  it --

16    THE COURT:  You're not arguing that that is something they

17  can't ask about.  Are you?

18    MR. LASKER:  No, Your Honor.  But --

19    THE COURT:  So what's the problem with posing that question?

20  They're saying that's the only question they really care about.

21  That's the only thing they want to know in advance.  They want

22  to get an identification of which documents the witness has

23  reviewed to prepare for the deposition.

24    MR. LASKER:  Yes, Your Honor.

25    THE COURT:  That's all.

87

1    MR. LASKER:  I understand that, Your Honor.

2    THE COURT:  Okay.  And you want further briefing on that,

3  why?  What do you want to say in your further briefing about

4  identifying those documents?

5    MR. LASKER:  Well, Your Honor -- and again, I'm not -- and I

6  apologize for not having case law in front of me on this, with

7  that issue.  But in this case, there are work product

8  considerations that have gone in to the preparation for

9  individual witnesses.  And part of it is sort of trying to,

10  frankly, understand what the Plaintiffs might be doing.  Some of

11  it may have, you know, issues with respect to how we're

12  preparing to defend the case.

13    And so to the extent that you're getting into that detail of

14  disclosure, I do think there is an issue, that goes into the

15  question of --

16    THE COURT:  But every deposition I've ever been a part of,

17  like, after you ask the question about whether the deponent is

18  on drugs and stuff like that, you ask them -- at least, if

19  you're doing a good job, you ask them:  Which documents did you

20  review to prepare for your deposition?

21    MR. LASKER:  Right.

22    THE COURT:  And I have never heard any argument that that is

23  objectionable.  I thought it was like, of all the things that

24  lawyers argue about, --

25    MR. LASKER:  No, I --

88

1    THE COURT:  -- I thought that was one thing that lawyers do

2  not argue about.  Which is that you may not be able to ask

3  certain followup questions that might get into, you know,

4  privilege or work product or whatever, but you can ask them

5  which documents they reviewed in preparation for their

6  deposition.  Even though yes, of course, that reveals something

7  about what the defense lawyer is thinking, because the defense

8  lawyer helped them put those documents in front of them.

9    MR. LASKER:  I understand Your Honor's position.  And as I

10  said, at least in my -- I agree with you that we ask those

11  questions and get those answers in deposition.

12    And the only issue I have, Your Honor, here is that this is

13  going a bit further than that in the context of this litigation,

14  with us having to provide Bates numbers for a specific rundown

15  of all the documents.

16    And I take it, and I understand, Your Honor, that they would

17  not be able to pull out the documents, and say:  What the

18  defense attorney or what did defense counsel talk to you about

19  this document for?

20    But to be producing that in advance of the deposition to

21  give them a roadmap of what we believe may be important

22  documents I think does intrude upon work product in a way that

23  asking that question at a deposition and getting the answer from

24  the witness does not.

25    And, again, Your Honor, I don't -- I'm not prepared to brief

89

1   this, and cite to case law, but I think there is -- what I would
2   ask is -- and maybe, you know, I'll go back and look at this and
3   say:  I'm all wet; I shouldn't have made that argument; it's a
4   mistake; and I apologize, Your Honor; we won't be briefing that.
5   But standing here right today, my sense is that we are pushing
6   the line here beyond that which is appropriate.
7       THE COURT:  Okay.  So the ruling is that -- so they've
8   withdrawn -- all they care about is that first question.  My
9   ruling is that they can ask that first question.  And that will
10  be part of the deposition protocol.
11      If you want to file a motion for reconsideration of that
12  ruling, you can file a motion for reconsideration.
13      MR. LASKER:  I appreciate that, Your Honor.
14      THE COURT:  Okay.
15      And then the last thing was the experts.  And this is
16  another one that I just didn't understand.  We set a schedule
17  where the Plaintiffs do their expert disclosures, first and then
18  the Defendants do their expert disclosures.
19      So I don't understand why -- I mean, I was assuming when we
20  set that schedule that the Plaintiffs' depositions would be
21  taken -- Plaintiffs' experts' deposition would probably be taken
22  in that first month.  Is that wrong?  Was I assuming
23  incorrectly?
24      I mean, the Plaintiffs' expert reports are due May 1st.
25  Monsanto's reports are due June 1st.  Plaintiffs' rebuttal

90

1   reports are due June 15th.  Close of expert discovery,
2   July 21st.  Were you anticipating that all depositions of expert
3   witnesses would take place between June 15th and July 21st?
4       MS. GREENWALD:  Yes, Your Honor.  I've never done an expert
5   depo until all the reports are in.
6       THE COURT:  I see.  Okay.
7       MS. GREENWALD:  Otherwise -- they need the full set of
8   information before depositions would take place.  Otherwise,
9   there would be a request for a second one.
10      THE COURT:  I see.
11      MS. GREENWALD:  So, we'll be busy in the six weeks.
12      THE COURT:  I see.  Okay.  How many experts are there going
13  to be?  How many experts are you currently expecting to have?
14      MS. GREENWALD:  Between four and six.
15      THE COURT:  And how many experts is Monsanto currently
16  expecting to have?
17      MR. HOLLINGSWORTH:  I would say roughly four.
18      THE COURT:  Okay.  So you are talking about ten people,
19  roughly.
20      MS. GREENWALD:  Uh-huh.
21      THE COURT:  Not, at least, bound by that, obviously.  I
22  mean, the chances of this affecting the outcome of the case are
23  infinitesimal, infinitesimal.  And usually the plaintiff goes
24  first, so what's the big deal?
25      MS. GREENWALD:  It's fine, Your Honor.  We will be fine with

91

1   that.
2       THE COURT:  All right.
3       MS. GREENWALD:  Thank you.
4       THE COURT:  So I'll ask you to present a new protocol that
5   reflects these rulings.  And submit it.
6       MS. GREENWALD:  (Nods head)
7       THE COURT:  I'll ask you to do that before Monsanto goes
8   back and thinks about whether it wants to file a motion for
9   reconsideration.
10      Let's get the depo protocol on file in accordance with my
11  rulings.  And then, and then, and then if -- Monsanto can think
12  all it wants about the arguments that it wants to make about
13  that issue.
14      So when, when should you submit a revised protocol?
15      MS. GREENWALD:  So Your Honor, I think we need to do it
16  sooner than later.  Our first depo is January 12th.  So we will
17  get a revised markup to Monsanto by Friday.
18      And then, I don't know; we have been meeting and conferring
19  quite collaboratively.  It's been a very collaborative process
20  with Ms. Stewart.  So I think that if she's around next week, my
21  assumption is we'll be able to resolve it next week.
22      But I don't want to speak for them.  I don't know her
23  schedule next week.
24      THE COURT:  Who is Ms. Stewart?
25      MR. HOLLINGSWORTH:  Ms. Stewart and I are from the same law

92

1   school class, at the same law school.  She looks a lot younger
2   than I am.  But I know her well.  I know she celebrates
3   Christmas.  So I would like to check with her.
4       THE COURT:  When is the first deposition?
5       MS. GREENWALD:  January --
6       (Reporter interruption)
7       MS. GREENWALD:  I'm sorry, January 12th.  11?
8       MS. WAGSTAFF:  (Nods head)
9       MS. GREENWALD:  I'm sorry; January 11th.
10      (Off-the-Record discussion between Court and Clerk)
11      THE COURT:  Kristen tells me that Ms. Stewart is on the
12  phone.
13      MR. HOLLINGSWORTH:  But she can't talk.
14      THE COURT:  She can't talk.  We've put tape over her mouth.
15      MR. HOLLINGSWORTH:  Oh, she can talk?  Good.  Sorry.
16      THE CLERK:  I have unmuted it.  Go ahead, Ms. Stewart, if
17  you're still there.
18      (No response)
19      THE COURT:  Maybe she got bored.  Can't blame her.
20      MS. GREENWALD:  Oh.
21      MS. STEWART:  Hello?
22      THE COURT:  Oh, there she is.  Ms. Stewart --
23      MS. STEWART:  Yes, finalize the protocol next week, we can.
24      THE COURT:  So deadline for protocol is the 30th.
25      MS. GREENWALD:  Perfect.

93

1  THE COURT:  Deadline for submission of protocol is the 30th.
2  It should reflect my ruling on all the issues that we discussed
3  today.  And if there's anything, if there's anything left over
4  in dispute, you can submit a five-page joint letter brief on
5  whatever remains in dispute.  But it would be hard to imagine
6  that there would be.
7  MS. GREENWALD:  Okay.
8  THE COURT:  Okay.  Is there anything else that we should be
9  discussing today?
10  MS. GREENWALD:  So, Your Honor, I don't actually want to
11  discuss this, but I just wanted to -- there's been a lot of
12  discussion about the agricultural health study that
13  Mr. Hollingsworth refers to as AHS, as the largest study.  And I
14  just -- I know today is not the day, and I don't intend to.  But
15  we dispute that.
16  THE COURT:  You really -- it is really not necessary.
17  MS. GREENWALD:  I know.  I just wanted to --
18  THE COURT:  I just want to assure you I'm not going to go
19  get on the internet and start researching Mr. Hollingsworth's
20  assertion.
21  MS. GREENWALD:  Okay.  Thank Your Honor.
22  THE COURT:  Nor do I even remember what it was.  Anything
23  else?
24  MS. WAGSTAFF:  Your Honor, I just have four quick things
25  that won't take very long.

94

1  During the break we agreed to -- that Monsanto would get us
2  the ESI document by January 23rd.  So I just wanted to put that
3  on the record.  I wanted to confirm that although we are moving
4  Science Day, everything is staying exactly the same with the
5  October 9th, 10th Daubert, just for experts.
6  THE COURT:  Yes.
7  MS. WAGSTAFF:  Great.  And second, I wanted to just make two
8  corrections that I had misstated before and put in our
9  submission.
10  One was I put in our submission -- I didn't know if you were
11  going to reread it -- that no state had ordered phased -- no
12  state-court case had ordered phased discovery.
13  THE COURT:  I did read that.
14  MS. WAGSTAFF:  And then, actually, one has, in southern
15  California.  So I found that out after I submitted that.  And I
16  just want to make that clear on the record.
17  And second, when I said this morning that Dr. Jameson gave
18  us documents in response to Monsanto's subpoena, that is true.
19  And I believe you asked me if they were IARC documents.
20  And I just wanted the record to know I'm not sure who
21  created those documents, or if they're drafts or anything like
22  that.  So I just didn't want to make any representations as to
23  what -- the origination of the documents that I have from
24  Dr. Jameson, other than he transmitted them to me.
25  That's pretty much it.

95

1  THE COURT:  Okay.  And that actually, though, reminds me of
2  one other thing, which is Judge Breyer was mentioning to me that
3  in his -- one of his many MDLs that he's done, I guess maybe it
4  was -- was it Celebrex?
5  MS. GREENWALD:  Uh-huh, uh-huh.
6  THE COURT:  He did -- they did Daubert hearings.  And he
7  invited all the state-court judges who had those cases to come
8  participate in the Daubert hearings, including asking questions
9  of the witnesses, if they wanted to.
10  And that struck me as a really good potential way to save
11  resources, to allow those judges to participate in the hearing.
12  To invite them to do so, if they wanted to.
13  What do you all think of that?
14  MS. WAGSTAFF:  Well, for Plaintiffs -- I would like to speak
15  with my colleagues, but I think that if you're operating under
16  the same rules, meaning that the Court has also issued phased
17  discovery, we would probably welcome that.
18  I need to think a little bit more on the effect that would
19  have on a case that's not operating under phased discovery.
20  THE COURT:  Yeah.  No need to answer it now, but think about
21  it for one of our future meetings.
22  MR. HOLLINGSWORTH:  Thank you, Your Honor.
23  THE COURT:  Okay.  Anything further?
24  MS. GREENWALD:  (Shakes head)
25  THE COURT:  Thank you.

96

1  MS. GREENWALD:  Thank Your Honor.
2  MR. HOLLINGSWORTH:  Thank you, Your Honor.
3  THE CLERK:  Court is adjourned.
4  (Proceedings concluded)

(Hearing) Monsanto MDL CMC (Hardemamn v Monsanto Co., et al.)  12/21/2016  9:46:00 AM

-

CERTIFICATE OF REPORTER


I, BELLE BALL, Official Reporter for the United States


Court, Northern District of California, hereby certify that the


foregoing is a correct transcript from the record of proceedings


in the above-entitled matter.


/s/  Belle Ball_____


Wednesday , December 28, 2016


Belle Ball, CSR 8785, CRR, RDR