# EXHIBIT A

Confidential - Subject to Protective Order

```
 1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2
 3    IN RE: ROUNDUP            )
      PRODUCTS LIABILITY        )   MDL No. 2741
 4    LITIGATION                )
      _____   )   Case No.
 5    THIS DOCUMENT RELATES     )   16-md-02741-VC
      TO ALL CASES              )
 6
 7          WEDNESDAY, JANUARY 11, 2017
 8    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
 9                  - - -
10          Videotaped deposition of Donna
11    Farmer, Ph.D., Volume I, held at the offices
12    of HUSCH BLACKWELL, L.L.C., 190 Carondelet
13    Plaza, Suite 600, St. Louis, Missouri,
14    commencing at 9:04 a.m., on the above date,
15    before Carrie A. Campbell, Registered
16    Diplomate Reporter, Certified Realtime
17    Reporter, Illinois, California & Texas
18    Certified Shorthand Reporter, Missouri &
19    Kansas Certified Court Reporter.
20                  - - -
21
            GOLKOW TECHNOLOGIES, INC.
22       877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23
24
25
```

Confidential - Subject to Protective Order

1    about page 9478, just to be fair.  I think

2    you're looking at it, where it says

3    "surfactants."  That's the only place I

4    intend to ask you about.

5                Yes, ma'am.  I just wanted to

6    make sure you had time to review it first.

7                So this document discusses what

8    we've just been talking about, surfactants,

9    right?

10        A.    Yes.

11        Q.    And what it tells us is that

12   the upper barrier of the skin is very

13   lipophilic; is that right?

14                Showing you I'm just an old

15   country lawyer.

16                What's that mean?

17                MR. JOHNSTON:  Objection.

18        Foundation to this document.  It's a

19        draft, and we don't know what this is

20        or whether she had any role in

21        preparing it.

22                But you can answer if you can.

23                MR. MILLER:  Let's keep the

24        speaking objections down.

25                MR. JOHNSTON:  I can object on

Confidential - Subject to Protective Order

1          any basis, as long as I'm not

2          suggesting an answer.

3                 My point is we don't have any

4          foundation for this document.

5     QUESTIONS BY MR. MILLER:

6          Q.    What does lipophilic mean?

7          A.    Lipophilic means that there is

8     fat within that.  Fat-loving.  Lipophilic

9     means fat-loving.  But I -- this is -- I

10    agree, this is a draft.

11                MR. MILLER:  You've just

12         suggested an answer.  She just gave

13         the answer you just objected to.

14                MR. JOHNSTON:  I stated a fact,

15         Counsel.

16                MR. MILLER:  Yeah, well, I'm

17         going to call the judge if we do it

18         again.

19                MR. JOHNSTON:  Yeah, well,

20         please do.  I think he would be frank

21         with us.

22                MR. MILLER:  I will.

23    QUESTIONS BY MR. MILLER:

24         Q.    Let's back to work now.  Now

25    let me read the document that you provided.

Confidential - Subject to Protective Order

1  discuss conducting any studies.  I will not

2  support doing any studies on glyphosate,

3  formulations or other surfactant ingredients

4  at this time with the limited information we

5  have on the situation."

6          Right?

7      A.    That's what it says.  And I

8  think that's pretty prudent, to be able not

9  to support anything until you -- I didn't

10  have all the facts.  As you can see, I was on

11  vacation, I hadn't been involved in the

12  discussion, and that we wanted to have a

13  conversation.

14      Q.    So that was in 1999 and too

15  premature to study this issue about Roundup

16  mutagenicity at that time?

17          MR. JOHNSTON:  Objection.

18      Misstates her testimony.

19          Go ahead.

20          THE WITNESS:  Yeah, that's not

21      what I said.  I said we have to look

22      and say what is the situation, whether

23      they're asking -- do we already have

24      data that we can give to them that

25      would address their concern.

Confidential - Subject to Protective Order

1               That's your word, "situation,"

2     right?

3          A.     It's something we need to look

4     at, yes.

5          Q.     And the situation is Dr. Belle,

6     a scientist independent of Monsanto --

7               Right?

8          A.     Yes.

9          Q.     -- with several colleagues in

10    the article, wrote an article in what's

11    called the peer-reviewed literature, right?

12         A.     Yes.

13         Q.     And as you understand,

14    peer-reviewed literature means Dr. Belle, an

15    independent scientist without any affiliation

16    to Monsanto, does his scientific research and

17    then has it reviewed yet again by peer

18    reviewers who are going to look at it to see

19    if it's scientifically appropriate and

20    publish it in a peer-review journal?

21               MR. JOHNSTON:  Objection.

22         That's hopelessly compound.

23               Go ahead.

24               THE WITNESS:  So, yeah, what

25         part would you like me to talk about,

Confidential - Subject to Protective Order

1        about peer-review journal or what he

2        did?

3   QUESTIONS BY MR. MILLER:

4        Q.      I would like an answer to my

5   question.

6               Do you know what a

7   peer-reviewed journal is and how rigorous the

8   scientific review is, or is this something

9   you just don't know anything about?

10       A.      No, I do know about it, and

11  peer review can be rigorous or can be not

12  very rigorous.  We have so many journals

13  today, you have an impact factor of zero, and

14  you can have peer review and it doesn't mean

15  anything.  You can have an impact factor of

16  50, and you've got really significant peer

17  review.  So peer review isn't what it used to

18  be.

19              But again, the point of this

20  is, is whether this was in a peer-reviewed

21  journal.  This is what was being said about

22  his findings.  And scientifically and

23  technically a delay in a time to first cell

24  division -- and, oh, by the way, when they

25  took the Roundup product off of these cells,

Confidential - Subject to Protective Order

1    Q.    Inhibition of DNA synthesis,

2  what does that mean, Donna Farmer?

3    A.    It was that the cells were

4  inhibited from dividing, so they weren't

5  making DNA to be prepared for their cell

6  division, which, again, is talking about the

7  delay in the first cell division.

8    Q.    Who is Ashley Roberts?

9          Do you know who she is?

10   A.    It's a gentleman.

11   Q.    Excuse me.

12   A.    And he is with Intertek.

13   Q.    Who is Intertek?

14   A.    It's a consulting firm in

15  Canada.

16   Q.    And you and Monsanto retained

17  Intertek?

18   A.    Yes, we did.

19   Q.    On this issue of whether

20  Roundup is a probable human carcinogen?

21   A.    Well --

22         MR. JOHNSTON:  Objection.

23  Vague.

24         Go ahead.

25         THE WITNESS:  Yeah, it isn't

Confidential - Subject to Protective Order

1          Roundup.  It's about IARC's

2          classification of glyphosate as a

3          probable human carcinogen.

4               And, yes, we asked Intertek to

5          convene an expert panel to look at the

6          IARC monograph and data.

7               (Farmer Exhibit 1-16 marked for

8          identification.)

9     QUESTIONS BY MR. MILLER:

10         Q.     Let's look at Exhibit 1:16, a

11    series of e-mails between you and Mr. Ashley

12    Roberts at Intertek in 2015.

13              All right.  Let's go to page 3

14    of that, ma'am, which is Bates stamped 3935.

15    And here is an e-mail from Mr. Roberts to you

16    on these issues, and what he's -- it says,

17    "Hi, Donna."

18              In the second paragraph he

19    says, he has asked -- talking about someone

20    named Keith.  "He has asked if we need to

21    give any consideration to exposures of

22    formulants in the commercial product, at

23    least in applicators.  I was under the

24    impression they were inert, but reading

25    his -- but reading a response this morning in

1    towards Monsanto.

2         Q.    And who are the authors of that

3    different study?  Is that Williams?

4         A.    Williams, et al.

5         Q.    Did you have a hand in writing

6    the Williams article?

7              MR. JOHNSTON:  Objection.

8         Vague.  I'm sure there's many Williams

9         articles.

10             THE WITNESS:  There are a

11        number of Williams articles.

12   QUESTIONS BY MR. MILLER:

13        Q.    Did you have a hand in writing

14   any Williams articles?

15        A.    No, I did not.

16        Q.    You've never written a portion

17   of Dr. Williams' articles and then had her

18   put them in the public literature?

19        A.    So let's -- I'm kind of

20   confused with what you want to talk about.

21             This is about a development in

22   repro outcomes with a Dr. Williams in 2002.

23   And then there was another article in 2000

24   with Gary Williams.

25             And so Monsanto is involved in

Confidential - Subject to Protective Order

```
 1        A.      I don't remember.

 2        Q.      Let's look.

 3                "In order to further develop

 4   the relationship with Dr. Parry, it was

 5   recommended that the surfactant samples be

 6   provided to him for testing.  However, before

 7   sending Dr. Parry any samples, it was

 8   recommended that they undergo in-house

 9   testing first in similar in vitro screen,"

10   right?

11        A.      Yes.

12        Q.      So you never sent Dr. Parry any

13   samples, and he never was able to do any

14   testing; that's true, isn't it?

15                MR. JOHNSTON:  Objection.

16           Foundation.  Misstates the document.

17                Go ahead.

18                THE WITNESS:  That doesn't say

19           that.  It just said that we wanted to

20           do them in-house and that you can see

21           the request was made by toxicology to

22           include either me -- and there's

23           nothing in here that says we didn't

24           send anything to Dr. Parry.

25
```

Confidential - Subject to Protective Order

1    played.

2             MR. MILLER:  Please do.

3    QUESTIONS BY MR. MILLER:

4        Q.    All right.  You raise an

5    important point, Donna Farmer.

6             Statistical --

7             MR. JOHNSTON:  Object to you

8        calling her "Donna Farmer."  She's a

9        Ph.D.  You can call her Dr. Farmer.

10   QUESTIONS BY MR. MILLER:

11       Q.    No offense meant, Dr. Farmer.

12            Dr. Farmer, what does

13   statistical significance mean?

14       A.    Well, it's telling you that

15   there is -- when you look at the relationship

16   that it's more than just chance.

17       Q.    Right.

18            All right.  So you're aware

19   this study in 2008 was put in a peer-reviewed

20   journal?

21            MR. JOHNSTON:  Objection.  No

22       foundation based on this document.

23            THE WITNESS:  Yeah, I don't

24       remember which study this is.  It

25       doesn't tell the authors, and it

Confidential - Subject to Protective Order

1          doesn't tell anything about the

2          journal.

3                    MR. MILLER:  You're coaching

4          the witness.

5                    MR. JOHNSTON:  No I'm making a

6          foundation objection, Counsel.

7     QUESTIONS BY MR. MILLER:

8          Q.    Let's look at what else is in

9     this e-mail to you.

10                    It says, "The incidence of

11    non-Hodgkin's lymphoma has been increasing

12    over the past several decades."

13                    You were aware of that, weren't

14    you?

15                    MR. JOHNSTON:  Objection.

16          Foundation.

17                    THE WITNESS:  Again, this is a

18          press release from Beyond Pesticides,

19          so, again, it is a press release from

20          them.

21    QUESTIONS BY MR. MILLER:

22          Q.    My question, Dr. Farmer, is:

23    Are you aware, when you received this e-mail

24    or even as we sit here today, that, in fact,

25    the incidence of non-Hodgkin's lymphoma has

Confidential - Subject to Protective Order

1          these does not mean that it is causing

2          cancer, and you still have to look at

3          many other aspects about this for

4          glyphosate.

5                  And so this is -- this is just

6          a press release, again, from an

7          antipesticide organization.

8      QUESTIONS BY MR. MILLER:

9          Q.    You see it goes on to say that

10     "researchers at Northwestern University,

11     University of Nebraska Medical Center, and

12     the National Cancer Institute find that

13     agriculture exposure to insecticides,

14     herbicides and fumigants are associated with

15     2.6 to 5.0-fold increase in the incidence of

16     T-positive non-Hodgkin's lymphoma, paren,

17     refers to a specific genetic alteration in a

18     type of non-Hodgkin's lymphoma."

19                 Were you aware of that

20     information before receiving this e-mail?

21                 MR. JOHNSTON:  Objection.

22         Foundation and relevance.  That's not

23         limited to glyphosate.

24                 THE WITNESS:  Yeah, that's what

25         I was going to say, this is two

Confidential - Subject to Protective Order

```
 1        herbicides --
 2               MR. MILLER:  Yeah, classic
 3        coaching the witness yet again.  Okay.
 4               MR. JOHNSTON:  Counsel, if you
 5        would ask a fair question, I won't
 6        have to object.
 7               MR. MILLER:  Read the question
 8        back, and let's see if we can get the
 9        witness to answer this time.
10               (Court Reporter read back
11        question.)
12               MR. JOHNSTON:  Objection.
13        Foundation.
14               THE WITNESS:  I don't know
15        that.
16   QUESTIONS BY MR. MILLER:
17        Q.    I apologize, Dr. Farmer, it's
18   late in the day, but let's go back to the
19   exercise that began this document.
20               Your response to all of the
21   information that we've been discussing was,
22   "Here's the bottom line:  How do we combat
23   this?"
24               That's what you wanted to do,
25   was combat this new information, right?
```