1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HOLLINGSWORTH LLP**
Joe G. Hollingsworth (*pro hac vice*)
Eric G. Lasker (*pro hac vice*)
1350 I Street, N.W.
Washington, DC  20005
Tel:     202-898-5800
Fax:     202-682-1639
Email:  jhollingsworth@hollingsworthllp.com
            elasker@hollingsworthllp.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| This document relates to:<br><br>ALL ACTIONS | |

**MONSANTO COMPANY'S BRIEF REGARDING THE**

**RELEVANCE OF IARC AND EPA TO GENERAL CAUSATION**

## TABLE OF CONTENTS

I.    NEITHER IARC NOR EPA ANSWERS THE QUESTION OF SCIENTIFIC
      CAUSATION CENTRAL TO THIS CASE. ................................................................. 2

      A.    Plaintiffs Must Establish Scientific Causation With Expert Opinions
            Admissible Under *Daubert*. ................................................................. 2

      B.    EPA Assessments Are Based Upon Considerations Of Risk, Not
            Determinations Of Causation. ................................................................. 3

      C.    IARC Assessments Are Based On Hazard Identification, Not Causation. ............. 6

II.   DAUBERT REQUIRES A DIFFERENT EVALUATION OF THE SCIENTIFIC
      EVIDENCE THAN IS CONDUCTED BY IARC AND EPA. ........................................ 8

      A.    *Daubert* Requires That Every Piece Of Evidence Relied Upon To Support
            A Causation Opinion Be Individually Reliable And Rejects Expert
            Testimony Based On A "Weight Of The Evidence" Approach. ............................ 8

      B.    EPA Uses The More Protective "Weight Of The Evidence" Approach In
            Assessing Risk, While IARC Reaches Hazard Classifications Based Upon
            Cherry-Picking Data. ................................................................. 9

III.  DAUBERT PRIORITIZES CATEGORIES OF EVIDENCE DIFFERENTLY
      THAN DO IARC AND EPA. ................................................................. 11

      A.    Where Available, *Daubert* Looks To Epidemiology First Under The
            Scientific Method Of Proving Human Causation. ............................................. 11

      B.    IARC And EPA Prioritize Evidence Differently Than *Daubert* When
            Assessing Risk And Hazard. ................................................................. 13

IV.   CONCLUSION ................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Pa. Eng'g Corp.*,
   102 F.3d 194 (5th Cir. 1996) ................................................................................................ 9

*Arias v. DynCorp*,
   928 F. Supp. 2d 10 (D.D.C. 2013) .................................................................................... 8, 9

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ............................................................................. 9

*In re Breast Implant Litig.*,
   11 F. Supp. 2d 1217 (D. Colo. 1998) ............................................................................... 11

*Brumbaugh v. Sandoz Pharm. Corp.*,
   77 F. Supp. 2d 1153 (D. Mont. 1999) ............................................................................... 2

*Caraker v. Sandoz Pharm. Corp.*,
   188 F. Supp. 2d 1026 (S.D. Ill. 2001) ...................................................................... 2, 9, 12

*Conde v. Velsicol Chem. Corp.*,
   804 F. Supp. 972 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir. 1994) ............................ 14

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................................................................. *passim*

*Dunn v. Sandoz Pharm. Corp.*,
   275 F. Supp. 2d 672 (M.D.N.C. 2003) ............................................................................... 5

*Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ............................................................................................. 1

*Fed. Trade Comm'n v. Wellness Support Network, Inc.*,
   No. 10-CV-04879-JCS, 2013 WL 5513332 (N.D. Cal. Oct. 4, 2013) .................................. 4

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................................. *passim*

*Glastetter v. Novartis Pharm. Corp.*,
   107 F. Supp. 2d 1015 (E.D. Mo. 2000), *aff'd*, 252 F.3d 986 (8th Cir. 2001) ...................... 3

*Glastetter v. Novartis Pharm. Corp.*,
   252 F.3d 986 (8th Cir. 2001) ............................................................................................. 5

*Henricksen v. ConocoPhillips Co.*,
   605 F. Supp. 2d 1142 (E.D. Wash. 2009) ......................................................................... 7

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

*Hollander v. Sandoz Pharm. Corp.*,
    95 F. Supp. 2d 1230 (W.D. Okla. 2000), *aff'd in part and remanded,* 289 F.3d
    1193 (10th Cir. 2002) .................................................................................................. *passim*

*Johnson v. Arkema, Inc.*,
    685 F.3d 452 (5th Cir. 2012) ....................................................................................... 7

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) .................................................................................................. 11

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ................................................................................... 4

*Nelson v. Tennessee Gas Pipeline Co*,
    243 F.3d 244 (6th Cir. 2001) ................................................................................. 11, 12

*Norris v. Baxter Healthcare Corp.*,
    397 F.3d 878 (10th Cir. 2005) ................................................................................... 12

*Perry v. Novartis Pharm. Corp.*,
    564 F. Supp. 2d 452 (E.D. Pa. 2008) .................................................................... 12, 13

*Rider v. Sandoz Pharm. Corp.*,
    295 F.3d 1194 (11th Cir. 2002) ........................................................................ 5, 11, 13

*Siharath v. Sandoz Pharm. Corp.*,
    131 F. Supp. 2d 1347 (N.D. Ga. 2001), *aff'd sub nom. Rider*, 295 F.3d 1194
    (11th Cir. 2002) .................................................................................................. 11, 12, 13

*Soldo v. Sandoz Pharm. Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003) ................................................................ 3, 11, 13

*United States v. Zolot*,
    968 F. Supp. 2d 411 (D. Mass. 2013) .......................................................................... 1

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) .................................................................................................... 2

**Other Authorities**

Cancer Assessment Review Committee, Health Effects Division, Office of
    Pesticide Programs, U.S. EPA, *Cancer Assessment Document – Evaluation of
    the Carcinogenic Potential of Glyphosate* (Final Report October 1, 2015)
    ("EPA CARC Final Report"), https://www.regulations.gov/
    document?D=EPA-HQ-OPP-2016-0385-0014 ............................................................ 5

EPA, *Assessing Human Health Risk from Pesticides*, https://www.epa.gov/
    pesticide-science-and-assessing-pesticide-risks/assessing-human-health-risk-
    pesticide ................................................................................................................. 3, 4

EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*, Regulations.gov at 19 (Sept. 12, 2016) ("OPP Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094 ("Consistent with the 2010 draft framework, the agency has evaluated these multiple lines of evidence and conducted a weight-of-evidence analysis.") .................................................................................. 9

IARC, *Agents Classified by the IARC Monographs, Volumes 1-117*, 1, 16, 30, 31, 35 (Dec. 22, 2016), https://monographs.iarc.fr/ENG/Classification/ClassificationsAlphaOrder.pdf ....................................................................... 7

IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, A.2 (Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currenta2objective0706.php ...................................................................... 6

IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, A.4 (Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currenta4data0706.php ........................................................................... 10

IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, B.6. (Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currentb6evalrationale0706.php ................................................... *passim*

IARC, *IARC Monographs Questions and Answers*, 3 (2015) ("IARC Monographs Q&A"), http://www.iarc.fr/en/media-centre/iarcnews/pdf/Monographs-Q&A.pdf.................................................................................. 6, 7

Letter from Bernhard Url, Exec. Director, EFSA, to Prof. Christopher J. Portier, Working Group Participant, IARC at 1 (Jan. 13, 2016), https://www.efsa.europa.eu/sites/default/files/EFSA_response_Prof_Portier.pd ................... 7

Michael D. Green *et al.*, *Reference Guide on Epidemiology, in Reference Manual on Scientific Evidence* 549 (3d ed. 2011)........................................................... 12

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

Pursuant to this Court's January 25, 2017 Pretrial Order No. 8, ECF No. 120, Defendant Monsanto Company ("Monsanto") submits this brief addressing "whether alleged flaws and/or biases in EPA or IARC methods, studies, reports, or conclusions are relevant to general causation." Monsanto believes that they are not for two reasons.[1]

First, in order to satisfy plaintiffs' burden under *Daubert*, plaintiffs' experts must establish a reliable basis for their causation opinions based upon their own reviews of the underlying scientific evidence. They cannot simply rely on the conclusions reached by IARC (or on some attempt to distinguish the conclusions reached by EPA and other regulators worldwide). *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) (rejecting expert testimony based on the opinion reached by others); *United States v. Zolot*, 968 F. Supp. 2d 411, 426 (D. Mass. 2013) (same).

Second, and as set forth in more detail below, although several important distinctions demonstrate the greater scientific reliability of the EPA's methodology in concluding that glyphosate is not likely to pose a risk of cancer in humans over IARC's contrary cancer classification, neither entity based its conclusions on the same standards this Court will use in evaluating the methodology used by plaintiffs' experts. While this Court will be addressing whether plaintiffs' experts can provide a reliable scientific opinion that glyphosate *causes* non-Hodgkin's lymphoma ("NHL"), the EPA applied a conservative standard of "protective bias" that requires a much lower scientific showing of association in determining that glyphosate does not pose a potential *risk* for cancer (including NHL). IARC, in turn, requires an even lower showing of scientific proof to answer the question of *hazard identification*, that is whether glyphosate might present a theoretical cancer hazard, even if there is no actual risk in real world use.

---

[1] EPA's determination, after applying a more protective standard than *Daubert*, that glyphosate likely does not pose a risk for cancer in humans may be relevant to other issues in the case, such as exposure, specific causation, or for cross-examination and impeachment. *See infra* Section I.B.

1   EPA's finding that the science is insufficient to meet even the more protective regulatory

2   standard for risk demonstrates the huge gulf that exists between the scientific evidence and

3   plaintiffs' experts' necessary showing of causation under *Daubert*.  However, because neither

4   EPA nor IARC requires the level of scientific evidence required to satisfy plaintiffs' burden to

5   present admissible expert testimony of general causation, the parties' disputes over the flaws

6   and/or biases in the assessments conducted by EPA and IARC are not relevant to general

7   causation.

8   **I.      NEITHER IARC NOR EPA ANSWERS THE QUESTION OF SCIENTIFIC**

9   **           CAUSATION CENTRAL TO THIS CASE.**

10  **          A.      Plaintiffs Must Establish Scientific Causation With Expert Opinions**

11  **                  Admissible Under *Daubert*.**

12          The central issue before the Court is whether plaintiffs' experts can provide scientifically

13  reliable evidence that glyphosate and/or Roundup® can cause NHL in humans.  "Since

14  *Daubert*[,] … parties relying on expert evidence have had notice of the exacting standards of

15  reliability such evidence must meet."  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).  "The

16  subject of an expert's testimony must be 'scientific … knowledge.'"  *Daubert v. Merrell Dow*

17  *Pharm., Inc.*, 509 U.S. 579, 589-90 (1993).  "[I]n order to qualify as 'scientific knowledge,' an

18  inference or assertion must be derived by the scientific method," which "is based on generating

19  hypotheses and testing them to see if they can be falsified; indeed, this methodology is what

20  distinguishes science from other fields of human inquiry."  *Id.* at 593.[2]  "The hallmark of

21  [*Daubert*'s] reliability prong is the scientific method, *i.e.*, the generation of testable hypotheses

22  that are then subjected to the real world crucible of experimentation, falsification/validation, and

23  replication."  *Caraker v. Sandoz Pharm. Corp.*, 188 F. Supp. 2d 1026, 1030 (S.D. Ill. 2001); *see*

---

24  [2] *See also id.* at 590 (quoting American Association for the Advancement of Science amicus for
    the proposition that science "represents a process for proposing and refining theoretical
25  explanations about the world that are subject to further testing and refinement"); *Brumbaugh v.*
    *Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1156 (D. Mont. 1999) (expert must answer the "key
26  question" of whether the "theory being advanced by the expert is testable or has been tested, the
    methodology of which is what distinguishes science from other fields of human inquiry"
27  (citation omitted)).

28

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

1    *also Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 529 (W.D. Pa. 2003) (the "testing of

2    hypotheses" is "a critical aspect of the application of the scientific method").  Therefore, a

3    reliable methodology under *Daubert* must rule out findings that could be explained by bias,

4    confounding, and chance.  *See, e.g.*, *Glastetter v. Novartis Pharm. Corp.*, 107 F. Supp. 2d 1015,

5    1030 (E.D. Mo. 2000), *aff'd*, 252 F.3d 986 (8th Cir. 2001).

6         In *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), the Supreme Court provided

7    further guidance on an expert's burden in opining on scientific causation.  Plaintiff's experts

8    opined that the plaintiff's exposure to chemicals in the workplace had caused his lung cancer

9    based on a number of human epidemiological studies and animal studies.  Plaintiff and his

10   experts further argued that the chemicals at issue "are widely considered to be hazardous to

11   human health" and noted that "Congress, with limited exceptions, banned the[ir] production and

12   sale … in 1978."  *Joiner*, 522 U.S. at 139.  Such conclusions proved immaterial to the *Daubert*

13   inquiry: following a detailed review of each proffered study, the Supreme Court held that none of

14   them supported a scientifically reliable opinion on causation and affirmed the trial court's

15   exclusion of the experts' testimony.  *Id.* at 145.  Trial courts must carefully scrutinize each type

16   of evidence relied upon because there may be "simply too great an analytical gap between the

17   data and the opinion proffered."  *Id.* at 144.  In short, *Daubert*'s standards for evaluating

18   scientific evidence are high for a reason – they are crucial to protecting jurors from "powerful

19   and quite misleading" expert testimony based on shaky science.  *Daubert*, 509 U.S. at 595.

20        **B.    EPA Assessments Are Based Upon Considerations Of Risk, Not**

21             **Determinations Of Causation.**

22        EPA and other public health regulators are charged with protecting populations from

23   potential risks.  *See* EPA, *Assessing Human Health Risk from Pesticides*, https://www.epa.gov/

24   pesticide-science-and-assessing-pesticide-risks/assessing-human-health-risk-pesticides.  EPA

25   therefore follows a methodology in which the agency makes a series of conservative assumptions

26   to establish regulatory standards with significant margins of safety between potential human

27   exposure levels and potential health risks.  In doing so, it assesses the potential hazard and

28

- 3 -

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

1    conducts a dose-response assessment, then applies "uncertainty factors" to "create an additional

2    margin of safety for protecting people who may be exposed to the pesticides." *Id.* Moreover,

3    "[t]he pesticide law requires [EPA] to use an extra 10-fold safety factor, if necessary, to protect

4    infants and children from the effects of the pesticide." *Id.* Even applying this highly protective

5    standard, EPA concluded that glyphosate is not likely to pose a risk of cancer in humans.

6         Nonetheless, as numerous courts have recognized when assessing whether a plaintiff's

7    expert can meet his burden to reliably testify that a chemical can cause cancer, there are

8    fundamental differences between EPA's risk assessment approach and the *Daubert* standards

9    that preclude such experts from relying on regulatory determinations to satisfy their *Daubert*

10   burden. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1249-50 (11th Cir. 2005). As the

11   Eleventh Circuit explained, "the procedures commonly used in 'risk assessment' for the purpose

12   of establishing public health guidelines that represent 'acceptable' exposure levels for large

13   populations are often … of marginal relevance in estimating 'causation.'" *Id.* at 1249 (quoting

14   David Eaton, *Scientific Judgment and Toxic Torts – A Primer in Toxicology for Judges and*

15   *Lawyers*, 12:1 J.L. & Pol'y 5 (2003)). "Because a number of protective, often 'worst case'

16   assumptions . . . are made in estimating allowable exposures for large populations, these criteria

17   and the resulting regulatory levels . . . generally overestimate potential toxicity levels for nearly

18   all individuals." *Id.*; *see also Fed. Trade Comm'n v. Wellness Support Network, Inc.*, No. 10-

19   CV-04879-JCS, 2013 WL 5513332, at *10 (N.D. Cal. Oct. 4, 2013) (finding expert testimony

20   based on regulatory requirements rather than scientific principles does not satisfy *Daubert*).

21        Recognizing these fundamental differences, courts have held that risk-based

22   determinations by a regulatory agency that a chemical is associated with cancer do not constitute

23   a reliable scientific basis for a plaintiff's expert to testify that a chemical can cause cancer:

24        This risk-utility analysis [used by regulators] involves a much
           lower standard than that which is demanded by a court of law. A
25        regulatory agency such as the FDA may choose to err on the side
           of caution. Courts, however, are required by the *Daubert*
26        trilogy to engage in objective review of evidence to determine whether it has
           sufficient scientific basis to be considered reliable.
27

28
                                    - 4 -

*Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1201 (11th Cir. 2002); *accord Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 991 (8th Cir. 2001) ("The FDA evaluates pharmaceutical drugs using a different standard than the causation standard. . . . The FDA will remove drugs from the marketplace upon a lesser showing of harm to the public than the preponderance-of-the-evidence or more-likely-than-not standards used to assess tort liability. 'The methodology employed by a government agency results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances.'" (quoting *Hollander v. Sandoz Pharm. Corp.*, 95 F. Supp. 2d 1230, 1234 n. 9 (W.D. Okla. 2000), *aff'd in part and remanded*, 289 F.3d 1193 (10th Cir. 2002))); *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1215 (10th Cir. 2002) ("[T]his circuit has noted that differing standards militate against applying regulatory actions to the elements of tort law.  In assessing a district court's application of *Daubert*, we discounted a state agency's classification of a substance as a carcinogen, stating that the methodology employed by the agency 'results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances,' and that '[t]he agencies' threshold of proof is reasonably lower than that appropriate in tort law.'" (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 n. 3 (10th Cir.1999))); *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003) ("The FDA is concerned with safety and risk benefit analysis: if the risks outweigh the benefits, the FDA may take regulatory action . . . . The FDA's balancing does not demonstrate that Parlodel may cause stroke in postpartum women.").

Here, EPA has concluded that glyphosate likely does not pose a risk for cancer in humans, a finding that directly contradicts any contention by plaintiffs' experts that there is scientifically reliable evidence to establish causation under *Daubert*.[3]  However, because EPA's methodology does not track the *Daubert* analysis that will be conducted by this Court, an

---

[3] *See, e.g.*, Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. EPA, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate* (Final Report October 1, 2015) ("EPA CARC Final Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0014.

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

1    assessment of any biases and flaws in EPA's methodology is not necessary for the Court's

2    assessment of the reliability of plaintiffs' experts' causation opinions.

3         **C.     IARC Assessments Are Based On Hazard Identification, Not Causation.**

4         IARC limits its carcinogenicity evaluations to a "hazard assessment," which is only the

5    first step of the risk assessment methodology applied by the EPA.[4]  In other words, it is even

6    further removed from the appropriate *Daubert* standard.  Indeed, unlike EPA, IARC does not

7    then take into account levels of exposure, methods of exposure, or other factors central to a

8    determination of whether a substance can increase the risk of cancer in humans under real world

9    exposure scenarios.  *Id.*  IARC thus explains that while it purports to "identify cancer hazards," it

10   does not evaluate "the risks associated with exposure," and that a substance may be classified as

11   "probably carcinogenic" under its methodology "even when risks are very low with known

12   patterns of use or exposure."[5]  IARC also accepts that its methodology assigns a cancer

13   classification even where "chance, bias, or confounding [can] not be ruled out."  *Id.*  This

14   classification system can afford (or even require) such error because IARC's purpose is not to

15   assess actual risk of cancer – let alone causation – but to identify theoretical risks that might

16   occur in the future, explaining that "[r]ecognition of such carcinogenic hazards is important

17   because new uses or unforeseen exposures could lead to risks that are much higher than those

18   currently seen."  *Id.*

19        Ultimately, the IARC methodology allows for cancer classifications based upon a much

20   different and dramatically less rigorous scientific standard even than the risk-based standard

21   applied by regulators.  IARC has explained that its term "probably carcinogenic" has "no

22   quantitative significance."[6]  Thus, based on its "hazard identification" methodology, IARC has

23

24   _____
     [4] IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, A.2 (Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currenta2objective0706.php.

25   [5] *See* IARC, *IARC Monographs Questions and Answers*, 3 (2015) ("IARC Monographs Q&A"),
26   http://www.iarc.fr/en/media-centre/iarcnews/pdf/Monographs-Q&A.pdf.

     [6] IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, B.6.
27   (Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currentb6evalrationale0706.php.

28
MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

classified a wide variety of commonly-used substances and exposures as "carcinogenic" or "probably carcinogenic" to humans, including bacon, hot dogs, and red meat; alcoholic beverages; salted fish; shiftwork; frying food; and certain hot beverages.[7]  As one European regulatory agency concluded when reviewing IARC's glyphosate classification, IARC's findings – at most – constitute a first "screening assessment" of "the carcinogenic potential of agents" that does not rise to the level of a comprehensive regulatory determination.[8]  This lower standard, in part, explains the sharp disparity between IARC's assessment and the conclusions reached by EPA and numerous regulatory agencies worldwide that have assessed glyphosate under their more rigorous methodology and found that it does not pose a risk of cancer to humans, including in assessments since IARC's glyphosate monograph.[9]

IARC's hazard identification methodology thus falls far short of the standards of scientific reliability and relevance required for an expert to opine as to causation under *Daubert*. As a result of the discrepancies between the rigorous standards of *Daubert* and the more lax approach of IARC, courts have recognized that IARC applies a "*threshold of proof*" that is "*lower than that appropriate in tort law*."  *Johnson v. Arkema, Inc.*, 685 F.3d 452, 464 (5th Cir. 2012) (emphasis in original) (quoting *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996)).[10]

---

[7] *See* IARC, *Agents Classified by the IARC Monographs, Volumes 1-117*, 1, 16, 30, 31, 35 (Dec. 22, 2016), https://monographs.iarc.fr/ENG/Classification/ClassificationsAlphaOrder.pdf. According to IARC, a Group 1 classification means "carcinogenic to humans," and a Group 2A classification means "probably carcinogenic to humans."  IARC Monographs Q&A at 2.

[8] Letter from Bernhard Url, Exec. Director, EFSA, to Prof. Christopher J. Portier, Working Group Participant, IARC at 1 (Jan. 13, 2016), https://www.efsa.europa.eu/sites/default/files/EFSA_response_Prof_Portier.pdf.

[9] *See* Monsanto Company's Case Management Statement at 17-18, ECF No. 9 (listing recent glyphosate safety findings by regulatory bodies worldwide).

[10] Although some courts reference the outcomes of regulatory or IARC proceedings in their *Daubert* opinions, such references cannot substitute for or supplant the court's own review of the evidence under the *Daubert* standard.  *See, e.g.*, *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1175 (E.D. Wash. 2009) (noting conclusions of EPA and IARC, but conducting and citing extensive independent review of scientific evidence as basis for excluding plaintiffs' experts' general causation testimony).

---

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

1

II.      *DAUBERT* REQUIRES A DIFFERENT EVALUATION OF THE SCIENTIFIC

2

EVIDENCE THAN IS CONDUCTED BY IARC AND EPA.

3

The methodology of evaluating each piece of scientific evidence to support an opinion

4

of causation under *Daubert* also differs from that used in EPA risk assessments and IARC hazard

5

identifications.

6

A.      *Daubert* Requires That Every Piece Of Evidence Relied Upon To Support A

7

Causation Opinion Be Individually Reliable And Rejects Expert Testimony

8

Based On A "Weight Of The Evidence" Approach.

9

Under *Daubert*, a plaintiff must establish the scientific reliability and relevance of *each*

10

piece of scientific evidence upon which his expert relies in reaching a causation opinion.  *See,*

11

*e.g.*, *Joiner*, 522 U.S. at 145-146.  Expert causation opinions cannot be based on some inchoate

12

"weighing of the evidence," because, as required by the exacting and stringent requirements of

13

*Daubert*, such opinions cannot be tested or validated against known or potential rates of error,

14

leaving the court with nothing but the expert's self-serving *ipse dixit* assurances that his analysis

15

is scientifically appropriate.  *Id*; *see also id.* at 146-47 (affirming district court's conclusion "that

16

the studies upon which the experts relied were not sufficient, *whether individually or in*

17

*combination*, to support their conclusions" regarding causation) (emphasis added).  The Court

18

tested each of the individual pieces of scientific evidence relied on by plaintiffs' experts for

19

scientific reliability and relevance and found them lacking.  *Id.* at 145-46; *see also Hollander*,

20

289 F.3d at 1216 ("To suggest that those individual categories of evidence deemed unreliable by

21

the district court may be added to form a reliable theory would be to abandon 'the level of

22

intellectual rigor' of the expert in the field." (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526

23

U.S. 137, 152 (1999))).

24

In evaluating the scientific reliability and relevance of each piece of evidence upon which

25

an expert relies, courts have held that an expert may not cherry-pick isolated, statistical

26

associations out of a larger data base of contrary findings.  *See, e.g.*, *Arias v. DynCorp*, 928 F.

27

Supp. 2d 10, 24-25 (D.D.C. 2013) (excluding expert's general causation opinion based upon

28

- 8 -

cherry-picked results from epidemiological studies); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding testimony from expert who reached his opinion by "cherry-picking" studies that supported his conclusion and rejecting or ignoring contradictory evidence); *Caraker*, 188 F. Supp. 2d at 1034 (excluding experts' opinions that were based on "selective use" of data). When an expert cannot articulate an objective, principled basis for his selection of some evidence to follow and some to ignore, the gatekeeper applying *Daubert* is justified in concluding that he is engaged in something other than science. *See, e.g.*, *Arias*, 928 F. Supp. 2d at 25 (excluding expert testimony where expert failed to "explain why he decided to credit [one study's] results and dismiss [another study's] results").

**B.  EPA Uses The More Protective "Weight Of The Evidence" Approach In Assessing Risk, While IARC Reaches Hazard Classifications Based Upon Cherry-Picking Data.**

Rather than assessing the reliability of each piece of evidence individually, EPA employs a more conservative "weight of the evidence" approach in evaluating pesticides.[11] Although such an approach is in line with EPA's protective mission in assessing risk, a weight of the evidence approach is not sufficient to meet plaintiffs' burden to establish causation under *Daubert*. *See supra* Part II.A.; *Joiner*, 522 U.S. at 145-46 (rejecting weight of the evidence approach under *Daubert*).

IARC claims to employ a weight of the evidence approach,[12] but in fact does something far less reliable by cherry-picking individual pieces of evidence to reach its classification

---

[11] EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*, Regulations.gov at 19 (Sept. 12, 2016) ("OPP Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094 ("Consistent with the 2010 draft framework, the agency has evaluated these multiple lines of evidence and conducted a weight-of-evidence analysis."); *see also Allen*, 102 F.3d at 198 ("Regulatory and advisory bodies such as IARC, OSHA and EPA utilize a 'weight of the evidence' method to assess the carcinogenicity of various substances . . . .").

[12] IARC Preamble at B.6, http://monographs.iarc.fr/ENG/Preamble/currentb6eval rationale0706.php (stating in preamble that when classifying a substance or exposure, "the body

*(Footnote continued)*

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

decisions.  For example, IARC states that "[w]ith regard to epidemiological studies, cancer

bioassays, and mechanistic and other relevant data, only reports that have been published or

accepted for publication in the openly available scientific literature are reviewed."[13]  *Daubert*

makes clear, however, that there is no scientific basis for excluding all consideration of scientific

data that are not published in the "openly available scientific literature."  *See Daubert*, 509 U.S.

at 593 ("Publication . . .  does not necessarily correlate with reliability."); *id.* at 594 ("The fact of

publication (or lack thereof) in a peer review journal thus will be a relevant, though not

dispositive, consideration in assessing the scientific validity of a particular technique or

methodology on which an opinion is premised.").

IARC's methodology also includes selective reliance on only publicly available data

from government agency reports, not the underlying regulatory studies themselves, a

methodology that in this case led IARC to disregard a huge wealth of scientific data regarding

glyphosate's safety.[14]  Moreover, because of its hazard identification objective, IARC's

methodology allows it to base a classification on individual studies that are contradicted by the

findings of a significant majority of other similar studies.[15]  For example, IARC acknowledges

that under its selective hazard identification system, "[a] single [animal] study in one species and

sex might be considered to provide sufficient evidence of carcinogenicity" under some

circumstances.[16]  With respect to epidemiology, IARC will purport to find "limited evidence of

carcinogenicity" from a human epidemiology study for which "chance, bias or confounding

could not be ruled out with reasonable confidence," based on its *ipse dixit* claim that the "causal

---

of evidence is considered as a whole, in order to reach an overall evaluation of the
carcinogenicity of the agent to humans")

[13] IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, A.4
(Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currenta4data0706.php.

[14] IARC Preamble at A.4, http://monographs.iarc.fr/ENG/Preamble/currenta4data0706.php.

[15] *Id.*

[16] IARC Preamble at B.6, http://monographs.iarc.fr/ENG/Preamble/currentb
6evalrationale0706.php.

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

interpretation is considered by the Working Group to be credible."[17]  Such an approach is the antithesis of *Daubert*.  *See Nelson v. Tennessee Gas Pipeline Co*, 243 F.3d 244, 253 (6th Cir. 2001) ("Before any inferences are drawn about causation, the possibility of other reasons for the association must be examined, including chance, biases . . . confounding causes.").

IARC's methodology therefore excludes large amounts of data and renders its conclusions scientifically unreliable by imposing limitations that scientists do not follow in practice, thereby falling short of what *Daubert* requires.  *See Kumho Tire*, 526 U.S. at 156 (*Daubert* requires that an expert "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *see also Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1373 (N.D. Ga. 2001) (*Daubert* does not establish a "best efforts" test, and instead "demands reliable and relevant scientific opinion based upon reliable scientific methodology rather than mere subjective belief or unsupported speculation") (internal quotation omitted), *aff'd sub nom. Rider*, 295 F.3d 1194 (11th Cir. 2002).

**III.**   ***DAUBERT* PRIORITIZES CATEGORIES OF EVIDENCE DIFFERENTLY THAN DO IARC AND EPA.**

    **A.**   **Where Available, *Daubert* Looks To Epidemiology First Under The Scientific Method Of Proving Human Causation.**

"Epidemiology, a field that concerns itself with finding the causal nexus between external factors and disease [in humans], is generally considered to be the best evidence of causation in toxic tort actions."  *Rider*, 295 F.3d at 1198.[18]  Epidemiological studies are particularly important to support a plaintiff's expert's causation opinion where, as here, the substance at issue is widely used and there is a measurable background rate of the alleged injury regardless of exposure.

---

[17] *Id.*

[18] S*ee also Soldo*, 244 F. Supp. 2d at 532 ("epidemiology is 'the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or a disease'" (quoting *Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 1025-26 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir. 1994))); *Hollander*, 95 F. Supp. 2d at 1235 n.14 ("In the absence of an understanding of the biological and pathological mechanisms by which disease develops, epidemiological evidence is the most valid type of scientific evidence of toxic causation"), *aff'd*, 289 F.3d 1193 (10th Cir. 2002); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1224-25 (D. Colo. 1998) (same, citing cases).

Although under *Daubert*, "an expert's conclusions reached on the basis of other studies could be sufficiently reliable where no epidemiological studies have been conducted, no reliable scientific approach can simply ignore the epidemiology that exists." *Perry v. Novartis Pharm. Corp.*, 564 F. Supp. 2d 452, 465 (E.D. Pa. 2008); *Siharath*, 131 F. Supp. 2d at 1358 (absence of epidemiology may not be fatal to plaintiff's case, but plaintiff seeking to establish causation without such evidence will face a high evidentiary hurdle); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881-87 (10th Cir. 2005) (same). Further, experts in court cannot ignore or dismiss existing epidemiology because it conflicts with their conclusions. *See Perry*, 564 F. Supp. 2d at 465.

The finding in any one epidemiological study of an association between a substance and an injury is not equivalent to finding causation. *See Nelson*, 243 F.3d at 253 ("an association does not mean there is a cause and effect relationship."); Michael D. Green *et al.*, *Reference Guide on Epidemiology, in Reference Manual on Scientific Evidence* 549, 555 (3d ed. 2011). There are three reasons that a positive association may be observed in an epidemiological study: (1) chance, (2) bias or confounding, and (3) real effect. *Caraker*, 188 F. Supp. 2d at 1032. As the Supreme Court explained in *Joiner*, epidemiological research cannot provide a scientifically reliable basis for an affirmative causation opinion if it is statistically insignificant or inadequately controlled for bias and other confounders. *Joiner*, 522 U.S. at 145-46; *see also Caraker*, 188 F. Supp. 2d at 1032. Thus, for example, courts have excluded expert causation testimony based on purported statistically significant epidemiologic evidence where the study failed to account for bias or other confounding exposures that may explain the apparent association. *See, e.g.*, *Nelson*, 243 F.3d at 252-54 (expert's failure to account for confounding factors rendered his opinion unreliable).

Here, as will be discussed in more detail in the merits portion of the *Daubert* proceedings, there are numerous epidemiology studies examining whether exposure to a glyphosate-based herbicide increases the risk of developing NHL. In Monsanto's view, none of the data from these studies supports plaintiffs' claim of an association, let alone causation,

MONSANTO'S BRIEF RE RELEVANCE OF IARC AND EPA TO GEN. CAUSATION
3:16-md-02741-VC

between NHL and exposure to glyphosate-based herbicides. Plaintiffs will no doubt disagree on the merits, but it is clear that epidemiology addressing the exact issue before this Court exists and will be prioritized under *Daubert*.

Where reliable epidemiology data are not available, animal research may be a useful tool for raising (or refuting) suspicions that cannot be tested in humans, but there are significant differences in humans and laboratory animals that limit the degree to which animal research can validate a hypothesis that a substance can cause cancer in humans. Due to these extrapolation problems, courts applying *Daubert* to evaluate general causation have held that animal studies alone cannot prove causation in humans. *See Siharath*, 131 F. Supp. 2d at 1367 (quoting *Bell v. Swift Adhesives, Inc.*, 804 F. Supp. 1577, 1579-80 (S.D. Ga. 1992)). At a minimum, extrapolations from animal studies to humans are not considered reliable in the absence of a credible scientific explanation why such extrapolation is warranted. *See Soldo*, 244 F. Supp. 2d at 565; *Siharath*, 131 F. Supp. 2d at 1366-67. Here, even under the EPA's protective analysis, the reliable glyphosate-related animal studies support a finding of no likely risk of cancer in humans, which again demonstrates the gap between the scientific evidence and IARC's conclusions in this case.

**B.    IARC And EPA Prioritize Evidence Differently Than *Daubert* When Assessing Risk And Hazard.**

As a consequence of viewing scientific evidence through different lenses than the one this Court will use in applying *Daubert*, EPA and IARC (in a far less rigorous manner than EPA) employ methodologies in evaluating scientific evidence that are different from *Daubert*'s. For example, EPA's protective classifications traditionally have focused largely on animal tests in determining whether a chemical does (or does not) pose a *risk* of cancer, although its most recent reviews of glyphosate also have included analyses of the extensive negative epidemiology. This contrasts with *Daubert*'s emphasis that causation opinions in court be based on epidemiology where it exists. *See, e.g.*, *Rider*, 295 F.3d at 1198; *Perry*, 564 F. Supp. 2d at 465.

- 13 -

As discussed earlier, IARC's approach to valuing scientific evidence is less rigorous than either *Daubert* or EPA. IARC purports to consider all types of evidence, yet it assigns greater weight to animal studies and mechanistic studies in reaching its conclusions. For example, IARC will reach a classification of "probably carcinogenic to humans" where there is supporting animal and mechanistic evidence but "inadequate" epidemiologic evidence.[19] Notably, in reaching its 2A classification of glyphosate, IARC concluded that the epidemiological studies provide only "limited evidence in humans for the carcinogenicity of glyphosate," which IARC defines as meaning that "chance, bias, or confounding could not be ruled out …."[20] IARC's classification is based on such a different methodology as to render it irrelevant to a *Daubert* inquiry. *See Joiner*, 522 U.S. at 145-47 (affirming district court exclusion of expert testimony based upon epidemiological studies that failed to rule out chance or confounding); *id.* at 144-45 (affirming exclusion of expert testimony based on animal studies that were "dissimilar to the facts presented in this litigation" and animal studies showing one type of cancer are not reliable as a basis for an opinion about a different type of cancer in humans); *see also Conde*, 24 F.3d at 813-14 (rejecting plaintiffs' expert's causation opinion, which relied on a regulatory finding that chlordane is a probable human carcinogen based on animal studies, where epidemiological studies did not establish an association); *Hollander*, 95 F. Supp. 2d at 1235, n.14 ("In the absence of an understanding of the biological and pathological mechanisms by which disease develops, epidemiological evidence is the most valid type of scientific evidence of toxic causation"), *aff'd*, 289 F.3d 1193 (10th Cir. 2002).

## IV. CONCLUSION

For the reasons set out above, plaintiffs cannot satisfy their burden under *Daubert* based upon IARC's hazard identification decision regarding glyphosate or on purported criticisms of

---

[19] IARC Preamble at B.6(d), http://monographs.iarc.fr/ENG/Preamble/ currentb6evalrationale0706.php.

[20] *See id.* Under IARC's system, mechanistic data can raise a classification that would be lower based only on epidemiologic studies and/or cancer animal bioassays. *Id.* at 6(d).

1    EPA's finding that glyphosate does not pose a risk for cancer.  Therefore, any alleged flaws or

2    biases in the assessments conducted by EPA and IARC are not relevant to the general causation

3    issue before this court.

4

5

6    DATED: February 8, 2017                     Respectfully submitted,

7                                                /s/ Joe G. Hollingsworth
                                                 Joe G. Hollingsworth (*pro hac vice*)
8                                                (jhollingsworth@hollingsworthllp.com)
                                                 Eric G. Lasker (*pro hac vice*)
9                                                (elasker@hollingsworthllp.com)
                                                 HOLLINGSWORTH LLP
10                                               1350 I Street, N.W.
                                                 Washington, DC  20005
11                                               Telephone:  (202) 898-5800
                                                 Facsimile:  (202) 682-1639
12

13                                               Attorneys for Defendant
                                                 MONSANTO COMPANY
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -