Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

| | | |
|---|---|---|
| IN RE ROUNDUP PRODUCTS | ) | MDL No. 2741 |
| LIABILITY LITIGATION, | ) | Case No. 16-md-02741-VC |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | |
| ALL ACTIONS. | ) | San Francisco, California |
| _____ | ) | Friday, February 24, 2017 |

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

FTR 2:33 p.m. - 3:23 p.m. =  50 minutes

**APPEARANCES**:

For Plaintiffs:        Andrus Wagstaff, PC
                       7171 West Alaska Drive
                       Lakewood, Colorado  80226
                  BY:  **AIMEE WAGSTAFF, ESQ.**

                       Weitz & Luxenberg, P.C.
                       700 Broadway
                       New York, New York  10003
                  BY:  **ROBIN LYNN GREENWALD, ESQ.**
                       **PEARL A. ROBERTSON, ESQ.**

                       Andrus Anderson, LLP
                       155 Montgomery Street, Suite 900
                       San Francisco, California  94104
                  BY:  **LELAND HUMPHREY BELEW, ESQ.**

(Appearances continued on following page.)

Transcribed by:        Leo T. Mankiewicz, Transcriber
                       leomank@gmail.com
                       (415) 722-7045

APPEARANCES:  (cont.)


For the Plaintiffs:

                    The Miller Firm
                    108 Railroad Avenue
                    Orange, Virginia  22960
              BY:   **MICHAEL MILLER, ESQ.**
                    **JEFFREY ALAN TRAVERS, ESQ.**


For Defendant Monsanto Company:

                    Hollingsworth, LLP
                    1350 I Street NW #900
                    Washington, D.C.  20005
              BY:   **JOE G. HOLLINGSWORTH, ESQ.**
                    **ERIC G. LASKER, ESQ.**

1   <u>Friday, February 24, 2017</u>

2                                                          2:33 p.m.

3                   P R O C E E D I N G S

4           **THE CLERK:**  Okay, calling case number 16-MD-2741,

5   Roundup Products Liability Litigation.  Counsel, please state

6   your appearances, starting with plaintiff.

7           **MS. WAGSTAFF:**  Good afternoon, your Honor.  This is

8   Aimee Wagstaff for the plaintiffs.

9           **THE COURT:**  Good afternoon.

10          **MS. GREENWALD:**  Robin Greenwald and Pearl Robertson

11  for the plaintiffs.

12          **MR. MILLER:**  Michael Miller and Jeffrey Travers, your

13  Honor.  Good afternoon.

14          **THE COURT:**  Hi.

15          **MR. BELEW:**  Leland Belew for plaintiffs, your Honor.

16          **THE COURT:**  All right.  Defendants?

17          **MR. HOLLINGSWORTH:**  Joe Hollingsworth for Monsanto,

18  your Honor.

19          **MR. LASKER:**  Good afternoon, your Honor.  Eric Lasker

20  for Monsanto.

21          **THE COURT:**  Good afternoon.  All right, looking

22  forward to seeing you guys on Monday.

23          Before we get to these document custodians and

24  witnesses, I want to ask each side a question.  I don't want to

25  hear argument on it now, but I just want to get your position

1    on it, and there will be more time to argue it on Monday

2    afternoon, but the thing I want your position on is this:

3            We are inquiring about general causation.  The

4    question is, I want to get a little more -- I want to add a

5    little more specificity to that question, and it seems to me

6    there are two questions, two different questions, somewhat

7    different questions, we could be asking in phase I.

8            One question is:  Is Roundup capable of causing

9    cancer, or non-Hodgkin's lymphoma?  Period, end of story.

10           The other question we could be asking is sort of a

11   little closer to the question that Judge Roberts asked, or a

12   derivation, I guess, of the question Judge Roberts asked.

13   I think Judge Roberts, I think, conflated a little bit the

14   distinction between general causation and specific causation,

15   but another -- I suppose another way to ask the general

16   causation question would be:  Is glyphosate, or is Roundup,

17   capable of causing non-Hodgkin's lymphoma in the doses that the

18   plaintiffs were exposed to?

19           Or let me scratch that, and say it in a different way,

20   because I assume that different plaintiffs were exposed to

21   different doses.  So I guess the question could be, to make

22   sure that it covered all, you know, the entire MDL:  Is

23   glyphosate capable of causing non-Hodgkin's lymphoma, in the

24   highest possible dose the plaintiffs could have been exposed

25   to?

1     So you get the difference between the two questions?

2  One is simply, can Roundup cause non-Hodgkin's lymphoma, and

3  the other question is, can Roundup cause non-Hodgkin's lymphoma

4  in a particular dose, that dose being, you know, the highest

5  exposure to which a plaintiff was subject.

6     So like I said, I don't want to hear argument on that

7  right now.  I just want to get people's positions on that.

8     What is the plaintiffs' position on what is the

9  question to be answered in phase I?

10     **MR. MILLER:**  Amy and Robin, this is Mike.  I'll speak

11  unless someone else wants to.

12     **FEMALE VOICE:**  Go ahead.

13     **MR. MILLER:**  If I could, your Honor, then -- Mike

14  Miller -- we believe the questions ultimately are the same,

15  because what epidemiology does is look at exposures in

16  real-world dosing.  It doesn't look as a laboratory test would.

17     So I know your Honor doesn't want argument, but our

18  position is the questions merge into one question in the face

19  of epidemiology, because that is looking at real-world

20  exposures, when you compare people exposed in the real world to

21  people not exposed.

22     **THE COURT:**  Okay, but this -- but general causation is

23  not just going to involve epidemiology, is it?

24     **MR. MILLER:**  No, your Honor, there are several lines

25  of causality assessment, but I think both sides agree, and I'll

```
 1   let Mr. Hollingsworth speak for his, but --
 2            THE COURT:  I'm having trouble -- you're coming in
 3   really scratchy.  I'm having trouble --
 4            MR. MILLER:  I apologize.  I'll attempt to be louder.
 5            The Bradford Hill criteria has other lines, which
 6   we'll talk about, without getting into the merits of this case,
 7   just the scientific method, on Monday.
 8            THE COURT:  Okay, what do the defendants say?
 9            MR. HOLLINGSWORTH:  Your Honor, this is Joe
10   Hollingsworth, if I may.  If your Honor is -- can you hear me
11   okay, your Honor?
12            THE COURT:  Yeah, I can hear you fine.
13            MR. HOLLINGSWORTH:  Okay.  If I may, the Court is
14   looking at general causation in the first phase here, and we
15   believe that there's no reliable evidence of general
16   causation --
17            THE COURT:  I just want an answer to the question --
18            MR. HOLLINGSWORTH:  -- in this case, because --
19            THE COURT:  -- to my question.  I just want an answer
20   to my question.  What do you think is the way to look at it?
21            MR. HOLLINGSWORTH:  Well, the answer to your question
22   is that --
23            THE COURT:  I don't want -- I don't need to hear from
24   you right now that you don't believe that there is any evidence
25   of general causation.  That's not something I need to hear from
```

1    you right now.

2            MR. HOLLINGSWORTH:  I apologize, your Honor.

3    I apologize for that.  The general causation inquiry does not

4    concern itself with both.  So the question is whether

5    glyphosate is, er -- Roundup causes cancer at any dose.

6            THE COURT:  Is capable of causing cancer.

7            MR. HOLLINGSWORTH:  If we're going to --

8            THE COURT:  In other words, or to put it another way,

9    is capable of causing cancer at any dose.

10           MR. HOLLINGSWORTH:  Or is capable of causing cancer,

11   that's right.

12           THE COURT:  Okay.

13           MR. HOLLINGSWORTH:  So if we're going to --

14           THE COURT:  Okay.  Okay, that's all I need for now.

15   We can talk more about it on Monday, but I was just curious

16   what your views were.

17           In your briefs, you said -- this was before the

18   case -- you know, before the cases were consolidated, and it

19   was just in the Hardeman brief.  In your brief, you said

20   something a little bit different.  You said, you know, is

21   glyphosate capable of causing cancer at the dose the plaintiff

22   might have been exposed to.  So that's part of what prompted my

23   question about what the parties believe the inquiry is.

24           And then the other thing that prompted my question is

25   that Judge Roberts did it a little differently from how

1    Mr. Hollingsworth recited the question, right?  I mean, Judge

2    Roberts actually considered the plaintiffs' exposure when

3    discussing general causation, and again, when I read that,

4    I thought, I think he's conflating general and specific

5    causation when he says it that way.  So it --

6         MR. LASKER:  Your Honor, if I may -- this is Eric

7    Lasker -- and just for clarification on Judge Roberts' ruling

8    in the *Arias* litigation, the plaintiffs in that case did not

9    present any evidence of exposure.

10        So while I recognize that there's language that might,

11   in the opinion, that might address that, the Court was basing

12   his ruling on the same epidemiology that Mr. Miller was talking

13   about, as to whether or not there's a basis for a causation

14   opinion that glyphosate could cause, or Roundup could cause

15   cancer.  It was not based upon any evidence of exposure that

16   the plaintiffs had presented.

17        THE COURT:  Okay.  Well, I mean, we'll have plenty of

18   time to argue about that.  I'm not sure what to do with that in

19   light of what Judge Roberts said, but in any event, his ruling

20   is not precedential, so it doesn't --

21        MR. LASKER:  Yeah, I understand, your Honor.

22        THE COURT:  -- doesn't matter too much.  I was just

23   asking, and I was just reading his opinion in an effort to, you

24   know, wrap my brain a little more tightly around precisely what

25   the question is, because that obviously has -- precisely what

the question is has relevance to, you know, the relevance of the IARC conclusion, I think, and also to some of the -- to the discovery disputes that you have that we're here to talk about today.

So, you know, I appreciate the detail that you all put in and, you know, notwithstanding that detail and through no fault of your own, of course, it's somewhat difficult reading just this case -- this statement, you know, to get a firm grip on how important or unimportant these custodians are or these depositions are.

I guess, maybe let's start -- let me start with the depositions.  Let me start with the plaintiffs, and ask -- give me an example of something -- let's start with Richard Garnett. Give me an example of something he would say at the deposition -- that he would say at the deposition that would improve my ability to answer the general causation question.

**MR. TRAVERS:**  Your Honor, this is Jeffrey Travers for the plaintiff.  I think that's a good question.  I think one of the issues we're having is, we've deposed Donna Farmer, we've deposed David Saltmiras, and I think one of the issues that --

**THE COURT:**  I'm having -- I don't know if you're on the same line as Mr. Miller, but I'm having a terrible time hearing you.

**MR. TRAVERS:**  I apologize, your Honor.  I'm on a different line, and I'll try to speak more clearly.

1          **THE COURT:**  Okay.

2          **MR. TRAVERS:**  In particular, with Richard Garnett, one

3   example we cited, the three tests deal with exposure, which is,

4   you know, the question you raised earlier, and the extent to

5   which dermal exposure, which is probably going to be one of the

6   more exposure routes that our clients were -- you know, who

7   work with the Roundup in hand, we have an e-mail from Richard

8   Garnett saying that --

9          **THE COURT:**  Okay, but wait, hold on.  Let me cut you

10  off there.

11         **MR. TRAVERS:**  Yes, sir.

12         **THE COURT:**  Important -- one of the most exposure

13  routes for your clients, I think you said?  Is that relevant

14  to --

15         **MR. TRAVERS:**  Correct, yeah.

16         **THE COURT:**  Is that relevant to general causation or

17  specific causation?

18         **MR. TRAVERS:**  I think that goes to the question you

19  asked at the beginning of the hearing, you know, as a -- to my

20  understanding of defendants' filings so far, but I think they

21  may be retreating from that, that one of their defenses for

22  general causation is going to be that the possible exposure of

23  glyphosate -- or the possible exposure of glyphosate could

24  never get high enough to get to general causation.

25         So that was one of the -- you know, one of the

```
1    defenses we're anticipating, was their drop after general
2    causation, you know, that it may be less relevant, as far as
3    general exposure.
4            THE COURT:  I'm sorry, I mean, number one, it sounds
5    like you're kind of mumbling, and number two, the phone
6    connection is not very good.  I'm just having a hard time.
7            MR. TRAVERS:  I apologize.
8            THE COURT:  I'm just having a real hard time hearing
9    you.
10           MR. TRAVERS:  I apologize, your Honor.
11           THE COURT:  Are you talking into a speakerphone?
12           MR. TRAVERS:  No, I've got a land line.  It's just --
13           MR. MILLER:  I'm going to hang up, in hopes that it
14   will improve your ability to communicate, Mr. Travers.  It may
15   be my line.  I don't know what it is, but it might be my line.
16           THE COURT:  All right.
17           MR. MILLER:  Your Honor, excuse me, then.
18           MR. TRAVERS:  Yeah, and I will -- I'll try to talk
19   more slowly, but the dermal exposure does go to your first
20   question, and -- and my understanding from earlier briefing is
21   that defendant would raise as a defense to general causation
22   that the exposure never -- will not reach a high enough level
23   to cause cancer, but if they're not going to be pursuing that
24   defense on general causation, I would agree that the
25   (inaudible) question is less relevant.
```

1    But there are other issues with Richard Garnett.

2 I think we could -- I think it would be important in

3 deposition -- in Europe, Monsanto did face a lot of different

4 questions from European regulators --

5    **THE COURT:**  I don't know, I mean, I'm sorry, I just --

6 I just cannot -- I don't know if it's your phone or -- you

7 know, I don't know what it is, but I just can't -- you're

8 coming in really sort of muffled, and I just can't hear you.

9 I just can't --

10    **MS. WAGSTAFF:**  Your Honor, if we may switch speakers

11 for us -- this is Aimee Wagstaff -- and if I can ask Pearl to

12 jump in, and maybe her phone line is a little bit better for

13 you to hear.

14    **THE COURT:**  Yeah, I mean, should we just put this off

15 until Monday, since we're meeting on Monday?

16    **MS. GREENWALD:**  We could do that, your Honor.  That

17 may be easier for you, as well.  This is Robin Greenwald, I'm

18 sorry.  That may be easier, to have us in person.

19 Ms. Robertson definitely can be there.  So that would work, if

20 that's what you prefer.

21    **THE COURT:**  I don't know.  I mean, if somebody wants

22 to talk in a way that I can hear them, I'd be happy to do it

23 now, but I could not hear -- I just couldn't hear or understand

24 Mr. Travers at all.  So I -- you know, I don't know what to do.

25 I want to be helpful, but I can only be helpful if I can hear

1    you.  And I was able to hear Mr. Hollingsworth --

2            **MR. TRAVERS:**  I can try calling in on a different

3    line.

4            **THE COURT:**  I was able to hear Mr. Hollingsworth fine.

5    I can't hear Mr. Travers.  So should we just -- should we do

6    this on Monday?

7            **MS. WAGSTAFF:**  Yes, your Honor, let's do this on

8    Monday.

9            **THE COURT:**  I keep hearing a clicking, also.

10           **MS. WAGSTAFF:**  Your Honor, this is Aimee Wagstaff, and

11   I think that given the technical difficulties, we should do

12   this on Monday.

13           **THE COURT:**  Okay, all right.

14           **MS. WAGSTAFF:**  Before we hang up, I'd like to just

15   raise one comment with you, with Monsanto on the telephone, if

16   I may.

17           **THE COURT:**  Go ahead.

18           **MS. WAGSTAFF:**  So on February 10th, we filed a

19   discovery -- joint discovery letter, and in one of the

20   footnotes, we said that we would be filing a motion to

21   de-designate 30 documents by today.  When we filed that joint

22   discovery letter, we did not anticipate that we would be filing

23   multiple filings after that date with motions under seal, and

24   I think we have 34 or 36 documents under seal right now, and so

25   we are going to, with your permission, put off filing that

motion to de-designate until after the hearing on Monday, since

we have so much on the docket already with regard to

confidential documents under seal.

**THE COURT:**  That's fine with me.  I mean, I think --

**MS. WAGSTAFF:**  Okay.

**THE COURT:**  -- I'll be able on Monday to give you all

some guidance that might obviate the need to be de-designating

things so much.

**MS. WAGSTAFF:**  Great.  Thank you.

**MR. LASKER:**  Your Honor, this is Eric Lasker.  I have

a logistical question.  Just to make sure -- is your courtroom

set up for possible presentations?  Is there something special

we need to do to be able to provide those presentations or have

our experts provide those presentations on Monday?

**THE COURT:**  I don't know.  Your people have been

dealing with Kristen on it.  They haven't?

**MS. GREENWALD:**  So Eric, this is Robin.  I can call

you.  We were in communication with the court and we have all

those answers.  So we can --

**MR. LASKER:**  That would be great.

**MS. GREENWALD:**  I can call you when this call is over,

and I can tell you what we learned from the court.

**MR. LASKER:**  That would be great.  Thanks a lot.

**MS. GREENWALD:**  Okay.

And so your Honor, actually, Ms. Robertson -- if

1   you -- I don't mean to move around here, but she is available

2   now and she can get on the phone and answer, if you want to

3   start the other issue with the custodians now, and if you can

4   hear me, then you'd be able to hear her.  Can you hear me okay?

5          THE COURT:  Yes, I can hear you okay.  The only thing

6   is, there's this clicking, you know, this --

7          MS. GREENWALD:  I know.

8          THE COURT:  -- sort of repeated clicking.

9          MS. GREENWALD:  I don't know what that is.

10          THE COURT:  Does anybody know where that's coming

11   from?

12          MS. GREENWALD:  I don't.  I don't.

13          THE COURT:  Okay.  All right.

14          MS. GREENWALD:  Do you want to try, or no?

15          THE COURT:  Sure, and so --

16          MS. GREENWALD:  Okay.

17          THE COURT:  Your suggestion was that we talk about the

18   document custodians?

19          MS. GREENWALD:  If you'd like to start now and then

20   see if it works -- I know you have a full day on Monday -- and

21   see if you can hear her, and then if so, we can maybe discuss

22   some of it now?

23          THE COURT:  Okay.

24          MS. GREENWALD:  I wanted to make sure she could hear

25   you -- you could hear her.  So here you go.  I'm going to hand

1    the phone to her.

2              **THE COURT:**   Okay.   So same question, Ms. Robertson, to

3    you, about the document custodians, really, which is:   What are

4    you hoping to find that will be -- I mean, the question on

5    general causation is either going to be, you know, what -- can

6    glyphosate cause cancer in human beings, or, you know, can

7    glyphosate cause cancer in human beings at a dose that the

8    plaintiffs might realistically have been exposed to, and it's

9    going to be one of those two things.   It sounds like maybe it

10   will be the first question.

11             But give me an example of something you're hoping to

12   find, something you have a hint that you might find and that

13   you're hoping to find that would be relevant to the general

14   causation question.

15             **MS. ROBERTSON:**   Yes, your Honor.   Pearl Robertson for

16   the plaintiffs.

17             With respect to the deposition of Richard Garnett, we

18   are hoping to find, and we believe that we can find, through

19   his testimony, based on the documents reviewed as custodial

20   files thus far, information that he has related to the toxicity

21   of surfactants, as well as overall glyphosate safety.

22             The reason we think that his information is unique as

23   other custodians is because he is --

24             **THE COURT:**   Sorry, are you talking -- are you talking

25   about Martens now?

1          **MS. ROBERTSON:**  Richard Garnett, your Honor.  No,

2    Richard Garnett.  I stayed with the deposition.

3          **THE COURT:**  What?

4          **MS. ROBERTSON:**  I -- initially you had asked, your

5    Honor, about the depositions and maybe starting with those

6    first.

7          **THE COURT:**  I thought we were talking about the

8    custodians now.  You already have the documents --

9          **MS. ROBERTSON:**  Okay, I didn't realize --

10         **THE COURT:**  I'm sorry.  I thought you already had the

11   documents from Garnett and Haupfear.  Is that wrong?

12         **MS. ROBERTSON:**  Yes, your Honor.  I guess maybe I had

13   lacked clarity.  I was trying to explain why the documents we

14   found have led us to believe testimony from Richard Garnett

15   would warrant his deposition.

16         **THE COURT:**  Okay.  I'm sorry, I thought -- maybe

17   I misunderstood.  I thought you were moving on to the

18   custodians now and talking about the custodians.  But it's

19   fine.  I can --

20         **MS. ROBERTSON:**  I can do it in whichever order you

21   like.

22         **THE COURT:**  I can hear you now --

23         **MS. ROBERTSON:**  I thought we'd start with depositions,

24   and my apologies.

25         **THE COURT:**  Okay, I can hear you now, so if you want

1    to talk about the depositions also, that's fine.

2              **MS. ROBERTSON:**  Yes, your Honor --

3              **THE COURT:**  Okay, what do you think that Garnett --

4              **MS. ROBERTSON:**  -- whichever you prefer.  If you'd

5    like me to --

6              **THE COURT:**  What do you think Garnett will say?  What

7    do you expect that Garnett might say that would be relevant to

8    the issue of general causation, that you haven't already gotten

9    from somebody else?

10             **MS. ROBERTSON:**  Overall safety issues and Monsanto's

11   interactions in silencing some of those safety issues that were

12   raised by European scientists.

13             **THE COURT:**  Okay, and --

14             **MS. ROBERTSON:**  That would be the driving purpose of

15   that deposition.

16             **THE COURT:**  Okay, hold on.  Okay, and then what about

17   Eric Haupfear?

18             **MS. ROBERTSON:**  Eric Haupfear has a long history at

19   Monsanto, and we believe, because he's been there for 20-some

20   years, that he has knowledge unique to impurities in glyphosate

21   manufacturing, and that then also speaks to the safety of the

22   end-formulated Roundup product.  We haven't quite talked with

23   somebody yet who was in glyphosate manufacturing as deeply

24   embedded as Mr. Haupfear is.

25             **THE COURT:**  Okay.  So on the depos, does Monsanto want

```
1    to respond?
2              MR. LASKER:  Yes, your Honor.  This is Eric Lasker.
3    Can you hear me okay?
4              THE COURT:  Yeah, okay.
5              MR. LASKER:  Okay.  So with respect to Richard
6    Garnett, Richard Garnett is -- he's not a toxicologist.  He is
7    somebody in the regulatory function in Europe.  He's similar to
8    Dan Jenkins' role in the United States in talking to the EPA,
9    and his testimony would better direct the issue of how European
10   regulators assess glyphosate, which is an issue I understand
11   your Honor will be addressing on Monday, as far as whether that
12   is even relevant.
13             Our position is that it's not relevant for the reasons
14   we laid out in our brief on that issue, and Richard Garnett,
15   again, does not have any knowledge on the science of
16   toxicology.  He conveys information that he is provided by the
17   scientists at Monsanto who do do that research, which would be
18   Donna Farmer and Bill Heydens and David Saltmiras, who are the
19   three safety toxicologists at Monsanto that plaintiffs have
20   already deposed.  So he does not have any unique information or
21   any knowledge, frankly, that he'd be able to impart at his
22   deposition.
23             THE COURT:  Okay.
24             MR. LASKER:  With respect to Eric Haupfear, plaintiffs
25   have raised the issue of contaminants or trace impurities in
```

the manufacturing process of glyphosate.  The general causation

issue before your Honor will be based upon scientific studies

of glyphosate, the long-term rodent cancer bioassays,

epidemiological studies and the like.  All of those studies are

conducted with manufactured glyphosate, and if there are

impurities in the glyphosate, then those impurities are in the

glyphosate in those studies.

So the presence or lack of presence of those

impurities doesn't change the findings in any way and doesn't

affect the general causation issue before you.  It's still the

same studies that you'll be assessing and the experts will be

talking about with respect to epidemiology and the long-term

rodent cancer bioassays and the like.

So it's not going to change or advance your Honor's

ability to address those issues in the general causation phase.

THE COURT:  Okay.  Let me just ask the plaintiffs,

Ms. Robertson, one question.  It seems like what you're trying

to do here is sort of root through Monsanto as much as you

can -- no harm in trying, nothing wrong with trying -- but root

through Monsanto as much as you can to discern evidence,

discovery evidence, of Monsanto manipulating or unduly

influencing the science.

I mean, is that it, in a nutshell, for purposes of

phase I?

MS. ROBERTSON:  I don't think that's our purpose in

1  phase I, and I guess I may be -- maybe I can clarify our

2  position for Garnett and Haupfear.  We're not focusing on these

3  two deponents because of their interactions or manipulation

4  with the science.  We're more --

5      **THE COURT:**  Or concealment of science, right?  I mean,

6  that's -- that seems to be what --

7      **MS. ROBERTSON:**  I would think, yes.  Sorry, your

8  Honor.  Yes.

9      **THE COURT:**  That seems to be what your presentation

10  goes to, right?  We need to look -- we need to depose these

11  people, we need to get the documents from these custodians to

12  try to find evidence of manipulation of or concealment of

13  scientific information about the carcinogenicity of glyphosate,

14  essentially.

15      **MS. ROBERTSON:**  Yes, your Honor, and also when they --

16  when Monsanto conveyed to certain individuals, Garnett being

17  one of them, when testing should be or not be followed through

18  was based on recommendations by Monsanto.  So you are correct,

19  your Honor, yes, we are looking at concealment issues.

20      **THE COURT:**  Don't you think that you are much less

21  likely to find evidence of that, or evidence relevant to that,

22  in depositions than you are in documents?

23      **MS. ROBERTSON:**  I think the reason the deposition is

24  useful in these instances is we've been able to find

25  unpublished studies and other documents that suggest that there

1    have been studies that weren't published or completed, and in

2    an effort to further understand how the glyphosate testing and

3    genotoxicity issues have been addressed by Monsanto over the

4    years, we do believe that testimony will paint a broader

5    picture to allow us the type of science that has been relied

6    upon, and where we might be able, or -- how we might be able to

7    use the lack of that science or the failure by Monsanto to

8    continue to test those types of toxicity reports that were

9    suggested in Garnett's documents.

10            **THE COURT:**  Okay.

11            **MR. LASKER:**  Your Honor?

12            **THE COURT:**  Yeah.

13            **MR. LASKER:**  This is Eric Lasker, if I may.

14            **THE COURT:**  No, that's okay.  I don't need --

15            **MR. LASKER:**  I'd just like to -- a couple --

16            **THE COURT:**  I don't need to hear anything more about

17    the depositions.

18            **MR. LASKER:**  Okay.

19            **THE COURT:**  Now, tell me specifically what you have

20    reason to believe you will find in the -- in these four

21    custodians' files that you don't already have.

22            **MS. ROBERTSON:**  Yes, your Honor.  Mark Martens, as

23    outlined in our brief, had a significant bit of correspondence

24    with Dr. Perry.  Dr. Perry was discussed at length in Donna

25    Farmer's deposition.

1    So one of the things that was unable to be gleaned

2  from Donna Farmer's deposition is what actually happened to

3  Dr. Perry's studies and conclusions that found that glyphosate

4  could be toxic, and all of this relates to genotoxicity.

5    Mark Martens was the main point of contact with

6  Dr. Perry, and although we have searched the produced documents

7  really *ad nauseam* looking for these types of -- any type of

8  exchange related to the genotoxicity of glyphosate oxidative

9  damage, all of these issues that Dr. Perry expressly looked at

10  and then was told to not look at any further, we can't find his

11  documents or his studies.  So because Mark Martens was his main

12  point of contact, we believe they would be in his files.

13    THE COURT:  Okay, and Lisa Flagg?

14    MS. ROBERTSON:  Lisa Flagg relates to Monsanto's

15  quality assurance unit, as stated in our brief.  Again, she

16  relates in a different way to the makeup of Roundup

17  formulations and how glyphosate interacts with the surfactants

18  and other adjuvants, particularly NNG.  NNG is a trade compound

19  in Roundup, so it's not on Roundup labels, so --

20    THE COURT:  So I -- I have a question --

21    MS. ROBERTSON:  -- as much as we --

22    THE COURT:  I have a question about that.

23    MS. ROBERTSON:  Yes.

24    THE COURT:  I didn't see anything -- I mean, I always

25  understood your argument to be that glyphosate causes

1   non-Hodgkin's lymphoma and that it may interact with the

2   surfactants in Roundup to enhance causation, or something like

3   that, but I didn't see any indication of that in your brief

4   where you were discussing Lisa Flagg.

5           I mean, I didn't -- I saw reference to other

6   ingredients in Roundup that might also be carcinogenic, but

7   I didn't -- it may be that I didn't understand properly what

8   you were saying, but it didn't seem like you were making that

9   same connection between the other ingredients in glyphosate

10  that I was expecting you to.

11          **MS. ROBERTSON:**  I guess maybe I'm a little confused on

12  what your Honor is asking.  Plaintiffs' position is that the

13  formulated product of Roundup, all of the ingredients that go

14  into that formulated product need to be looked at.

15          So that we often refer to the -- we often refer to

16  inert ingredients, adjuvants or surfactants.  Within this

17  ambit, we do consider NNG to be included with those general

18  terms, though I think maybe that might be where the confusion

19  lies, in that NNG is specifically pointed out here, rather

20  than --

21          **THE COURT:**  Well --

22          **MS. ROBERTSON:**  -- it being called an adjuvant.

23          **THE COURT:**  -- I guess the -- my confusion is that

24  I never took you to be saying that -- I have never taken you in

25  this case to be saying that something other than, and

1   independent from, glyphosate in the Roundup product causes

2   cancer.  I took you to be saying that glyphosate causes cancer

3   and that glyphosate -- the way glyphosate interacts with other

4   products, and you've typically used the word "surfactants" in

5   your briefs, that the way glyphosate interacts with surfactants

6   enhances the cancer risk.  But I never understood you to be

7   saying that there may be separate chemicals in Roundup that

8   separately might cause cancer and you want to go looking for

9   those, too.  I mean, is that just a myth?

10          **MS. ROBERTSON:**  Oh, my apologies, your Honor, no,

11   you're absolutely correct.  We are looking at the formulated

12   Roundup product, glyphosate and its surfactants.  It's not as

13   if, with the Lisa Flagg instance, that we want to look at NNG

14   and point solely to NNG as what is causing NHL in our clients.

15   We were looking at NNG as part of the whole and how it

16   interacts with glyphosate.  So this is on the same vein as what

17   we've been saying and what your Honor understands.

18          **THE COURT:**  Okay, then -- so what is the indication

19   that, sort of the interaction with NNG increases the

20   carcino- -- I have such a hard time with that word --

21   carcinogenicity of Roundup?

22          **MS. ROBERTSON:**  I think we all practice how to say

23   "carcinogenicity" in the mirror ten times daily before we speak

24   with your Honor.

25          **THE COURT:**  I'll start doing it, too.

1      **MS. ROBERTSON:**  Yes, so specifically with NNG in this

2   context with Lisa Flagg is that this particular compound was

3   used in Roundup formulation, and it was tested as required by

4   EPA.  But after the IBT Labs brought, EPA dropped that

5   additional testing requirement, so long as Monsanto would keep

6   the levels of NNG below the one part per million.

7      What one of the main points that we think we could get

8   in looking at Lisa Flagg's documents is helping us paint this

9   broader history of high NNG levels that have been found and are

10   being found in Roundup products.  And so as the quality

11   assurance employee, Lisa Flagg would likely in her documents

12   have that sort of information as to when FIFRA might be sending

13   a notice to Roundup because this NNG is above the one part per

14   million, and things of that ilk.

15      **THE COURT:**  Okay, and I gather the same type of thing

16   with Gary Klopf with respect to 1,4-Dioxane?

17      **MS. ROBERTSON:**  Yeah, and Gary Klopf was an older

18   custodian that was identified, older meaning like, at Monsanto

19   in the earlier years.  And so the interest there is looking at

20   these 2000 to 2010 docs as the team lead, even though we do

21   identify the other six years he was with Monsanto where he was

22   in the Chemistry Formulation Technology Department.  I think

23   one of the bigger points we want to look at is this span of a

24   decade from 2000 to 2010, and how Monsanto worked with these

25   impurities and these ethoxylated surfactants with the

1    formulated product, tracing it back to how it interacts with

2    glyphosate.

3          **THE COURT:**  Okay, and I think I have a decent

4    understanding of why you want Hodge-Bell.

5          All right, does Monsanto want to respond on the

6    document custodians?

7          **MR. LASKER:**  Yes, your Honor.  So with respect to

8    Dr. Martens, and again, he's a regulatory scientist, the

9    argument that they made is sort of basically that they want to

10   be able to establish that Donna Farmer was not providing

11   accurate testimony.  They were fishing for some other answers,

12   because they did depose her, ostensibly, on this.  She

13   identified the studies that they say were not conducted, and in

14   fact, they're published studies, and they were published under

15   the name -- Donna Farmer's name.  They're on the -- I can bring

16   up the cite for it.

17         So there's not any new information here to be had.

18   There's just sort of, I think, the hope that maybe they can

19   find something that would be different, especially because they

20   don't like the documents that they have thus far.

21         With respect to Lisa Flagg, this again goes back to

22   the same issue, and your Honor, I think, asked the correct

23   question with respect to what the relevance might be, which is,

24   is there any science that plaintiffs are looking to that would

25   suggest that NNG interacts with glyphosate in some way as to

1   create a risk of cancer, and the answer, your Honor, on this is

2   that if there is any such interactions -- and we don't believe

3   there is -- it would be reflected in the studies on glyphosate,

4   and those are the same studies that your Honor will be looking

5   at and the experts will be talking about, regardless of what

6   the documents show on trace levels of impurities.  So

7   impurities --

8           THE COURT:  But --

9           MR. LASKER:  -- if they're there, they've all been

10  tested, in the same studies of glyphosate, and those are the

11  studies you'll be considering anyway.

12          THE COURT:  But, so is it --

13          MR. LASKER:  So Lisa Flagg's documents --

14          THE COURT:  Is that --

15          MR. LASKER:  -- and --

16          THE COURT:  If I could just interject, are you saying

17  that any glyphosate study will necessarily account for this NNG

18  question?  I mean --

19          MR. LASKER:  Yeah, NNG is a -- I'm sorry, your Honor.

20          THE COURT:  I was just going to say, I took the

21  plaintiffs to be saying, or at least implying, that, you know,

22  there might be an NNG question specific to Roundup that might

23  not be reflected in other glyphosate studies.

24          MR. LASKER:  Well, your Honor, the NNG is an impurity

25  that comes -- that emerges, at a bit trace level, in the

1    manufacturing process for glyphosate.

2              **THE COURT:**  Okay.

3              **MR. LASKER:**  And it's one of a number of impurities

4    that is part of the glyphosate that's manufactured.  That is

5    the glyphosate that is used in Roundup.  It's also the

6    glyphosate that's used in the scientific rodent cancer

7    bioassays, and we attached for your Honor the publication that

8    reviews the 14 cancer bioassays that have been conducted with

9    glyphosate.  They all are conducted with glyphosate with its

10   impurities on it, and so that's reflected in those studies.

11             And the epidemiological studies, of course, are

12   studies of human use in -- who used the Roundup product, the

13   formulated product that is sold and that the plaintiffs are

14   alleging they're exposed to.

15             And so again, to the extent that there is trace levels

16   of impurities, those impurities are in the product and those

17   are already reflected in the scientific studies.  So there's no

18   different scientific literature that comes to bear because of

19   this question.  You're still going to be looking at the same

20   studies with the same conclusions in determining whether or not

21   there is reliable evidence of general causation.

22             **THE COURT:**  Okay.  Gary Klopf?

23             **MR. LASKER:**  And Gary Klopf is similar, as far as

24   I understand, because the issue there is also an impurity that

25   is present in trace amounts in surfactants through the

1    manufacturing process, not unique to surfactants, it's found in

2    a lot of manufactured products, and so not use of surfactants,

3    use of Roundup, but again, to the extent that that impurity is

4    in the formulated product, that is reflected in the

5    epidemiological studies, which are studies of humans exposed to

6    the formulated product.  There's not new science, then, that

7    your Honor needs to look at.  It's the same scientific studies

8    that are already before your Honor.

9         **THE COURT:**  Okay.  Hodge-Bell?

10        **MR. LASKER:**  And Kimberly Hodge-Bell, she is, as we

11   explained in our papers, she is a toxicologist who worked for,

12   for a period of time the plaintiffs seem to be concerned,

13   worked directly for David Saltmiras and reported up to him, and

14   also worked with Donna Farmer and, you know, Heydens, all three

15   of whom plaintiffs have gotten documents for and deposed.

16        The specific documents that they attach to their

17   letter actually do not deal with any formulated Roundup product

18   that was marketed in the United States.  There's one document

19   that deals with a nematocide, which is just a different product

20   altogether.  One is a fast-acting gel, which has a small amount

21   of glyphosate in it, and another herbicide also, but it's not

22   the type of -- it's not a Roundup-based product, it's not the

23   type of product that plaintiffs have alleged exposure to, and

24   the other document deals with a product that was never marketed

25   in the United States, and plaintiffs have that information

because the MON number in that document -- we've identified all the MON numbers for formulated products marketed in the United States, and that's not on that list.

So the documents that they're pointing to that they claim or make for relevance, none of them are actually about the products at issue in this case.

**THE COURT:**  All right.  Final word from Ms. Robertson, on the custodians?

**MS. ROBERTSON:**  Yes, your Honor.  We have heard counsel reference epi studies and glyphosate formulation studies, and impurity studies throughout this phone call, and although defendants have promised over and over that these studies have all been produced to plaintiffs, to the extent that they have, we're obviously asking for additional productions because we have not yet located and found them, or we don't believe we have found all of them.

So potentially, this is something that could be resolved, in part, by an identifier -- MONGLY base identifiers produced by defendants.

**MR. LASKER:**  Your Honor, I'm not sure it's -- I'm not --

**THE COURT:**  Well, I mean, I don't know -- I'm sitting here sort of not really knowing what to say, but Ms. Robertson is suggesting that the disputes about these custodians could boil down to whether they have not found something that is in

1    the productions?  I don't know.  I have no idea what to say to

2    that.  I don't know -- I don't know what to say to that.

3    I don't know what to do, I don't know how to help you.  I mean,

4    do you want me to --

5            **MS. ROBERTSON:**  Yes, I understand, your Honor.

6            **THE COURT:**  -- sift through your documents for you?

7    I mean, what --

8            **MS. ROBERTSON:**  No, your Honor.  Potentially, that was

9    inartfully stated.  In part, defendants have argued that our

10   showing, which we feel like we met, that we -- with

11   particularized specificity, and document support, we feel like

12   we have truly shown your Honor that the identified custodians

13   should have -- these identified persons should be custodians.

14           One of defendant's arguments against why that

15   shouldn't be the case is by referencing studies that somehow

16   support our showing him.

17           So I think we are at the same position that we were,

18   that to the extent this defense can show, or at least counter

19   with a document showing us why, for example, Ms. Kimberly

20   Hodge-Bell is not relevant to our case, perhaps that would be

21   something that we could move forward from, but our

22   understanding, from the meet-and-confers and doing this

23   briefing and now having this argument, is that that isn't

24   necessarily the case.

25           The argument instead is that -- has boiled down to

1    proportionality and relevance, and we believe that we have

2    overcome both proportionality and relevance.  So my apologies

3    for adding confusion to the argument.

4              MR. LASKER:  Your Honor, would you like me to respond?

5              THE COURT:  Hold on, give me one sec.  I'm just

6    looking at...  All right, go ahead, Mr. Lasker, you can go

7    ahead and respond.  Then we'll wrap it up and I'll issue a

8    short written ruling on it.

9              MR. LASKER:  Well, with respect to, as to Hodge-Bell,

10   the point that I made was that the plaintiff had identified

11   documents and that they claim show that she's relevant because

12   of her knowledge of Roundup formulated product, and my response

13   on that was, none of the documents they attached for that

14   proposition are actually Roundup formulated product.

15        So we don't believe that she has any independent

16   scientific information on Roundup formulated.  It is the fact

17   that she has, since 2015, she was promoted and put into the

18   position where she is dealing with Roundup formulated products

19   that plaintiffs acknowledge that her position there is the same

20   and duplicative of the discovery they've already obtained from

21   Donna Farmer and David Saltmiras and Bill Heydens.

22        So I'm not sure what that issue is, but the documents

23   that they have attached to establish her relevance are not

24   documents that deal with Roundup formulated product sold in the

25   United States, and they certainly have not explained why her

1   testimony would not be duplicative of the testimony and the

2   documents they've already received, including all of the

3   scientific studies that Monsanto has, which was a separate

4   production altogether.

5          **THE COURT:**  Okay.

6          **MR. LASKER:**  With respect to the impurities issue,

7   just to be clear --

8          **THE COURT:**  Sorry, the what issue?

9          **MR. LASKER:**  I'm sorry, the impurities issue --

10         **THE COURT:**  Uh-huh.

11         **MR. LASKER:**  -- and the NNG issue, to be clear, the

12  plaintiffs have not presented any argument or basis to believe

13  that the scientific studies, the epidemiological studies, or

14  the rodent cancer bioassays would really address that issue.

15         There's no -- their argument is based on this premise

16  that there's some sort of -- there's something called the

17  100 percent pure glyphosate, does not have any impurities in it

18  in the manufacturing process, and that that glyphosate was used

19  in the scientific safety studies, and then there's this

20  separate glyphosate that has impurities, but they don't have

21  any evidence of that, and in fact, as we've shown through the

22  GLY publication, which we attached, your Honor, to the filing,

23  the glyphosate that's used in the animal studies, the 14

24  long-term rodent cancer bioassays, is glyphosate that was

25  manufactured and has impurities, and the percentage of

```
1    impurities is noted on all of those studies.  The

2    epidemiological studies are studies in the final formulated

3    product.

4         So to the extent that the plaintiffs are arguing that

5    there are some impurities that appear in that formulated

6    product, that is reflected in the epidemiological evidence.  If

7    those impurities created some risk of cancer, that would be

8    reflected in the epidemiological studies, and that's the same

9    studies your Honor will be looking at.

10        So this issue does not add anything to your Honor's

11   inquiry.  It doesn't change the inquiry at all.  You will be

12   looking at the same studies, regardless.

13        THE COURT:  Okay.  I'll give it a little more thought

14   this afternoon and then I'll issue something.  And then I'll

15   see you --

16        MR. LASKER:  Thank you, your Honor.

17        THE COURT:  I'll see you all on --

18        MS. ROBERTSON:  -- your Honor --

19        THE COURT:  -- Monday morning.  What time are we

20   meeting on Monday morning?  9:30?

21        MR. LASKER:  9:30?

22        THE COURT:  See you Monday morning.  Thank you.

23        MR. HOLLINGSWORTH:  Thank you, your Honor.

24        MR. LASKER:  And Robin, give me a -- you'll give me a

25   call, right?
```

1            **MS. GREENWALD:**  I'm going to send you an e-mail, Eric.

2    I'll have it by e-mail, and feel free to call me if you have

3    any questions.  It's all written out.

4            **MR. LASKER:**  Right.  Thank you very much.

5                                                    <u>3:23 p.m.</u>

6                            ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF TRANSCRIBER**

I, Leo Mankiewicz, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____ 02/28/2017

Signature of Transcriber         Date