Pages 1 - 64

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  ROUNDUP PRODUCTS          )
LIABILITY LITIGATION,             )
                                  )     NO. C 16-2741 VC
_____   )

                                San Francisco, California
                                Monday, February 27, 2017

                  TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                        ANDRUS WAGSTAFF, PC
                        7171 W. Alaska Drive
                        Lakewood, Colorado 80226
                BY:  **AIMEE H. WAGSTAFF**
                     **ATTORNEY AT LAW**

                        THE MILLER FIRM, LLC
                        108 Railroad Avenue
                        Orange, Virginia 22960
                BY:  **MICHAEL J. MILLER**
                     **TIMOTHY LITZENBURG (by phone)**
                     **ATTORNEYS AT LAW**

                         LUXENBERG, PC
                        700 Broadway
                        New York, NY 10003
                BY:  **ROBIN GREENWALD**
                     **PEARL ROBERTSON (by phone)**
                     **ATTORNEYS AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:        Rhonda L. Aquilina, CSR #9956, RMR, CRR
                    Official Court Reporter

**APPEARANCES:   (CONTINUED)**

For Defendant Monsanto Company:

                        HOLLINGSWORTH LLP
                        1350 I Street NW
                        Washington, D.C. 20005
            BY:   **ERIC GORDON LASKER**
                  **JOE HOLLINGSWORTH**
                  **HEATHER PIGMAN**
                  **ATTORNEYS AT LAW**

For Respondent:   USA

                        US ATTORNEYS OFFICE
                        Civil Division
                        450 Golden Gate Avenue
                        San Francisco, CA 94102
            BY:   **RAVEN MARIE NORRIS**
                  **ASSISTANT US ATTORNEY**

1    <u>**Monday - February 27, 2017**</u>                    <u>**2:05 p.m.**</u>

2                        **P R O C E E D I N G S**

3                           **---000---**

4         **THE CLERK:**  Calling Multi-District action 16-2741, In

5    re Roundup Products Liability litigation.

6         Counsel, please approach the podium, state your

7    appearances.  And thereafter counsel on the phone please state

8    your appearances.

9         **MS. WAGSTAFF:**  Good afternoon, Your Honor.  Aimee

10   Wagstaff for MDL plaintiffs.

11        **MS. GREENWALD:**  Good afternoon, Robin Greenwald for

12   the plaintiffs.

13        **MR. MILLER:**  And Michael Miller for plaintiffs.  Good

14   afternoon.

15        **MR. HOLLINGSWORTH:**  Joe Hollingsworth for Monsanto

16   Company, Your Honor.

17        **MR. LASKER:**  Eric Lasker for Monsanto, Your Honor.

18        **MS. PIGMAN:**  Heather Pigman for Monsanto.

19        **MS. NORRIS:**  Good afternoon, Your Honor.  Raven

20   Norris, Assistant U.S. Attorney, here on behalf of the EPA with

21   respect to the motion to compel.

22        **THE COURT:**  Good afternoon.  Feel free to have a seat

23   at the table if you prefer.

24        **MS. NORRIS:**  I wasn't sure when you were going to

25   call.

1              THE COURT:  Whatever is most comfortable.

2              MS. NORRIS:  Thank you, Your Honor.

3              THE CLERK:  Counsel on the phone, please state your

4    appearances.

5              MR. LITZENBURG:  Timothy Litzenburg for the plaintiff.

6              MS. ROBERTSON:  Pearl Robertson for plaintiff.

7              THE COURT:  Is that it?

8              THE CLERK:  We just have two counsel on the phone.

9              THE COURT:  Okay.  So the first thing I would like to

10   talk about -- and whoever wants to just be involved in the

11   discussion can come on up -- is the IARC, the relevance of EPA

12   and IARC conclusions, because I think everything else flows a

13   little bit from that.

14        And I guess maybe, Mr. Lasker, the first question I can

15   ask you is the EPA has done this study, published this study

16   that I guess has since been taken down from the Internet, from

17   their web site, but I think the EPA is doing a series of

18   pronouncements about glyphosate; is that right?

19             MR. LASKER:  Yes, Your Honor.  Just to clarify the

20   more recent events, there were two different groups since IARC

21   made the classification decision within EPA that looked at the

22   issue of glyphosate in cancer.  One is an organization, a group

23   of scientists, career scientists within EPA called the Cancer

24   Assessment Review Committee, that's CARC.  And they did the

25   first assessment.  That assessment was put on the web site -- I

1    forget -- on the EPA's web site at one point in May, I think,

2    of last year, and then it was taken down, and that was the

3    assessment that is addressed to some extent in some of the

4    plaintiffs' filings.

5         There then was -- and the reason it was brought down was

6    because it was part of an ongoing process that EPA was still

7    going through, hadn't finished yet, which then became a

8    separate report, which is of the Office of Pesticide --

9    Programs of Pesticides, which is the OPP report, which is a

10   second and separate, independent analysis that was done by EPA.

11   When that report was issued, there was also a whole docket on

12   the EPA web site.  The CARC report was then put back on the EPA

13   web site, because it was now timely, so that is now public.

14   It's on the EPA web site right now, as is the OPP report.  So

15   both of those are official reports and have been made publicly

16   available by EPA.

17          **THE COURT:**  Okay.

18          **MR. LASKER:**  They both reached the same conclusion,

19   which was that glyphosate-based palm, the epidemiological

20   studies, based upon the animal cancer bioassays is based upon

21   the genotoxicity studies, all the things you've been hearing

22   about this morning, was -- fits best within the classification

23   that EPA says is not likely to be carcinogenic, which is the

24   lowest of, I think, five options that they have for classifying

25   substances.

1    And as Your Honor knows from prior briefing, EPA has

2    reviewed glyphosate probably a half a dozen to ten times over

3    the years, from 1980 -- the early 1980s forward, once all the

4    data was in, and they have consistently reported -- found the

5    same thing based upon initial studies as they're coming in.

6    They kept updating their database.

7    The OPP report is now based upon the most extensive

8    database that's out there, so that includes not only Monsanto's

9    internal animal bioassay studies, but the studies that have

10   been conducted by six other registrants of Web Assay.  So they

11   had something like 14 or 15 different animal bioassays that

12   they looked at.  They had all the epidemiological studies, and

13   they had over -- I mean, scores of different genotoxicity tests

14   that they looked at.  So that's been the most fulsome of their

15   analysis.

16         THE COURT:  And now I actually know what those things

17   are, because --

18         MR. LASKER:  Right.  Exactly.

19         THE COURT:  Now, but it would -- this OPP report and

20   the CARC report, you would knock off those meta analysis;

21   right?  Those would be best described as like literature

22   reviews or something like that?

23         MR. LASKER:  Well, they are literature reviews.  They

24   are more of animal systemic reviews, systematic reviews.  For

25   example, with respect to epidemiology, you heard a lot from

both sides' experts about the applicable criteria, which is how

you put a whole bunch of sites together and how you assess

them, and that is the appropriate way of doing an assessment of

a collection of different data.

Now, there have been a couple of meta analyses that have

been published with respect to some of the epi studies.  Those

were consistent --

**THE COURT:**  Sorry.  With respect to what?

**MR. LASKER:**  The epidemiological.  I'm sorry.  The

shorthand "epi."

**THE COURT:**  I know what "epi" means now.

**MR. LASKER:**  Epidemiology.  I'm sorry, Your Honor.

There have been a couple meta analyses.  Those were part

of the OPP report.  They actually were all considered in the

OPP report.  They were also actually considered in the IARC

report with its analysis of the epidemiological evidence.  So

that was part of the studies and data that they looked at.  But

they also looked at all the studies, individually assessed them

for all things you've heard about today in reaching their

overall assessment.

**THE COURT:**  So what if -- so obviously the EPA has a

tremendous amount of expertise in this area, and it has done

what sounds like a comprehensive review of the studies that are

out there.

If an expert came and testified about whether glyphosate

1   is capable of causing cancer -- if an expert came and offered

2   an opinion that glyphosate is capable of causing cancer in

3   humans, but didn't mention the EPA reports and the EPA

4   conclusions, I assume that you would say that that -- you would

5   say that that expert opinion is not admissible.  It hasn't

6   considered -- an expert opinion should consider all the sources

7   and all the analyses on the question.  And the EPA being an

8   expert agency on this, its opinion is an important one, and for

9   an expert to come in here and offer an opinion on whether

10  glyphosate is capable of causing cancer, without explaining why

11  his conclusion is different from that of the EPA, I assume you

12  would say that's not an admissible expert opinion.

13          MR. LASKER:  Well, I think the way you formulated that

14  in your last sentence is accurate, in that, again, EPA is

15  looking at the underlying studies, and an expert would have to

16  be looking at the underlying studies.  Now, the fact that EPA

17  reached its conclusion based upon what we've described in our

18  briefing, which is a precautionary protective approach --

19  because EPA decided they didn't want to have to wait until they

20  established causation to take action.

21      If the expert is reaching a different conclusion that it

22  can cause cancer, which is a huge jump from where EPA is, there

23  would have to be some explanation as to why they're

24  interpreting the studies so dramatically differently.  So that

25  would be certainly questions we would, you know, have

1   questioning for that expert to try and explain how it is that

2   they're interpreting the science so dramatically differently

3   than not only EPA, but as we talked about all the other

4   regulatory agencies.  That doesn't mean --

5          THE COURT:  So the expert, I assume, would have to be

6   prepared to testify about what's wrong with the EPA's

7   conclusions.

8          MR. LASKER:  It would have to be able to testify as to

9   his interpretation of the studies and why -- explain why the

10  interpretation of those studies is different than the EPA's

11  assessment of the studies.  It wouldn't be that he has to -- an

12  expert has to rely upon conclusions of EPA or not rely upon

13  conclusions of EPA.  But if they're reaching conclusions as the

14  individual studies, which is the underlying science, and has no

15  explanation as to, for example, this study -- I'm looking at

16  this study and I'm saying it's an animal study, and it shows

17  that glyphosate causes these types of tumors in this mouse or

18  in this rat study, EPA has assessed that same study and

19  concluded no.  Well, if the expert just said *I disagree*,

20  there's no methodology there.  The expert would have to say,

21  well, these are the issues that I find in this study that lead

22  me to believe that that provides some reliable evidence of

23  causation, and why EPA -- they don't pay much attention to it,

24  because they didn't look at this, they didn't look at that,

25  they didn't look at that.

1    So it would be part of the expert's explanation of his or

2  her own methodology in reviewing the science, but it's not that

3  he has to agree or disagree with the EPA's conclusion per se,

4  but the methodology of how he reaches or she reaches her

5  conclusion in reviewing those studies.  That's where it comes

6  into play.

7         THE COURT:  And I assume that it's basically the same

8  answer on the flip side; right?

9         MS. WAGSTAFF:  Right.

10         THE COURT:  If Monsanto brought an expert in, and the

11  expert presented an opinion about the capability of glyphosate

12  to cause cancer, and it made no mention of the IARC's report or

13  IARC's literature review, or Monograph, or whatever we're

14  supposed to call it, you would say that cannot be an

15  admissible -- that the IARC is a respected scientific body; it

16  gathered some of the most respected scientists in the world,

17  and it studied all the studies or all of the published studies

18  and reached a conclusion that glyphosate is a probable

19  carcinogen, and this expert didn't say a word about it, you

20  have to exclude this expert.  This expert is not qualified to

21  testify to the jury.

22         MS. WAGSTAFF:  I mean, I think that's right, Your

23  Honor.  One thing I would add to that is IARC follows Bradford

24  Hill.  We've heard about Bradford Hill so much today.  So, yes,

25  we would, of course, call into question the inability to

1  recognize the IARC filing and at least explain why they

2  disagreed with it.  So, yeah, totally agree.

3          THE COURT:  So, I mean, it seems to me then that the

4  answer has to be that the EPA reports and the IARC Monograph

5  are relevant to the first phase of these proceedings.

6      I mean, you can't -- neither of you could say what you

7  just said and then follow that up with "the reports are not

8  relevant."

9          MR. LASKER:  Well, I'd say this, Your Honor.  I think

10  we agree that they're relevant in the sense of, as I mentioned,

11  with EPA having a precautionary approach, which is a lower

12  standard -- and you've looked at some of the cases we've

13  cited -- both the EPA and IARC explained that that's a lower

14  standard of proof with respect to causation that's required

15  under *Daubert*.

16      So, again, it's certainly, particularly with respect to

17  EPA, that is relevant.  It's a lower standard.  You have to get

18  here (indicating).  You can't get over here (indicating) and

19  explain how you get over there (indicating).  That's relevant.

20  Now --

21          THE COURT:  Well, you may be right or you may not be

22  right, that for purposes of general causation, EPA is here

23  (indicating) and we're here (indicating).

24          MR. LASKER:  Right.

25          THE COURT:  I don't know whether that's right.  I

1   mean, I don't think you cited any case to me where a court

2   said, you know, the standard that IARC uses or the standard

3   that EPA uses is different from the standard that you need to

4   satisfy for general causation.

5         MR. LASKER:  Well, yes, Your Honor, I believe we have.

6   And maybe this goes back to a discussion we were having on

7   Friday about the general causation and where that plays in.

8   But the *Allen* case was dealing with general causation.

9         THE COURT:  From the Fifth Circuit.

10        MR. LASKER:  That's from Fifth Circuit.  That was

11  dealing with general causation.  We've dealt, like we said, a

12  number of cases also with respect to the FDA, the *Rider* case,

13  the *Glastetter* case, the *Hollander* case.  There are a number of

14  courts where they're dealing with general causation.  And, for

15  example, litigation that our firm handled in connection with a

16  case with a drug called Parlodel.  That drug was withdrawn from

17  the market by FDA because of their concern of a risk of --

18        THE COURT:  Can I interrupt you for a second?

19        MR. LASKER:  Sure.

20        THE COURT:  I mean, I think I made this comment on

21  Friday about Judge Roberts' decision in the D.C. district

22  court, and it kind of seems like it may also be true of the

23  Fifth Circuit case, that there is sort of a -- you know, when

24  the Court makes a statement along the lines of, you know, the

25  IARC standard doesn't come close to, you know, the tort

1   causation standard, that that statement is not made in

2   isolation with respect to general causation.

3        And I wonder -- you know, obviously we don't need to sort

4   of reach a final meeting of the minds, or we don't have to have

5   a final agreement to disagree on this question right now, but I

6   don't understand -- I mean, if the question, at the general

7   causation phase, is is this substance capable of causing

8   cancer, then how is that different from the question that IARC

9   is asking?

10        **MR. LASKER:**  Okay, Your Honor.  We actually -- I went

11   back and looked at the Roberts opinion after our conversation

12   to make sure we were understanding what your question was.  And

13   I actually also pulled out a case from the Northern District of

14   California that addresses this exact issue, which is the

15   question of how does dose apply in connection with general

16   causation?  Because dose -- and actually the exposure level --

17   and Your Honor actually hit upon a very key point here -- it

18   sort of straddles specific -- it has different meanings with

19   respect to general and specific causation.  And in the *In Re*

20   *Bextra* opinion, and that is 524 F.Supp.2d, 11 --

21        **THE COURT:**  In Re what?

22        **MR. LASKER:**  In re Bextra -- I'm sorry -- B-E-X-T-R-A.

23   And that is a case that was cited by this Court in 2007, and

24   that's at 524 F.Supp.2d 1166.  And the question that the Court

25   was posed with is -- actually was MDL, and there were general

1    causation *Daubert* briefs before the Court.   And one of the

2    issues that was posed that the Court addressed -- and this is

3    at page 1174:   A threshold question raised by Pfizer's motion

4    is whether a particular dose of Celebrex is relevant to the

5    general causation inquiry.

6          So I think it's very similar to what Your Honor was

7    probing on Friday.

8          And when the Court explained, what the Court held was,

9    yes, dose does matter to general causation, because the

10   question in general causation is can a substance cause a

11   disease at a real world dose or at a dose that we are concerned

12   about.   And what the Court held -- and this is something that

13   was in Judge Roberts' opinion, it's the *In Re Bextra* opinion,

14   and, frankly, it's in cases in every circuit.   And I've

15   actually looked at this issue.   Every circuit has the same

16   standard, which is that when you're talking about general

17   causation and specific causation, and you're thinking about

18   dose, the general causation question is, is the level of

19   exposure that is at issue generally in this case, is that

20   capable of causing an adverse event?   It's not is a chemical

21   capable of causing whatever the disease is, it is, is an

22   exposure capable of causing a disease.

23          **THE COURT:**   Well, that's kind of what I was asking on

24   Friday.   You all said no.

25          **MR. LASKER:**   That's why we're back, because I looked

1   at Judge Roberts' opinion, and that's why we're looking back to

2   the opinion, because you then talk about your understanding of

3   what Judge Roberts had done, and then that made us realize

4   maybe we're understanding your question incorrectly.

5        So the first step is -- and, again, this is -- the *In re*

6   *Bextra* opinion actually cites cases from the Ninth Circuit, the

7   Fifth Circuit, the Tenth Circuit, and as I said, I think every

8   circuit has a case that says this, most at the court of appeals

9   level.  The general causation question is, is this type of

10  exposure generally, as the scientific papers would show, that

11  that's capable of causing an outcome?

12       The second question is --

13            **THE COURT:**  Would another way to put it be, you know,

14  is that it would be, you know, is this substance capable of

15  causing cancer at a dose that -- you know, at the maximum dose

16  that we could reasonably expect any of these plaintiffs to have

17  experienced, or something along those lines.

18            **MR. LASKER:**  Yeah, I think that's why we got confused.

19  And it gets confusing when you mention a specific plaintiff,

20  because we don't have evidence of what any of the plaintiffs

21  particularly --

22            **THE COURT:**  No, but we have allegations of

23  different --

24            **MR. LASKER:**  Right.

25            **THE COURT:**  So, I mean, I would think that we would

1    have to ask the question in a way that doesn't preclude, you

2    know, the farmer, the coffee farmer in Hawaii who, you know,

3    may have been exposed a lot more to glyphosate than the person

4    who used it, you know, once a month in their backyard for ten

5    years, or something like that.

6         I mean, we would have to ask the question in a way that

7    would apply to all plaintiffs in the MDL.

8              MR. LASKER:  Yeah, I think that's exactly right.  And

9    if you look at the discussion we have in our briefing about

10   what EPA then does and how IARC then looks at this.

11        So EPA asks, you know, what is the real world exposures

12   that we're dealing with.  And they have all sorts of ways of

13   measuring that, and they do that in the OPP report as well, and

14   they do that in general risk assessment.  And then they say

15   we're going to compare that to the max -- the dose that we

16   think we see in animal studies could present a risk, and then

17   we'll put safety factors of it over it.

18        So if we have, for example --

19             THE COURT:  Do they do the infamous fifty-fold safety

20   factor --

21             MR. LASKER:  Yeah, hundredfold is generally what's

22   going on.

23             THE COURT:  Hundredfold.

24             MR. LASKER:  Yeah.  So, for example, if they have a

25   rat study, and they say this rat study we have evidence of

1   cancer, or any other adverse effect, it will be called the

2   LOEL, which is the lowest effect level seen in any animal

3   study, and it's at this dose.  Where are they going to put a

4   safety factor of a hundred on that and say humans cannot be

5   exposed to 1 percent of that level, and if they're not, then we

6   have no problem, and that's --

7            **THE COURT:**  Is it like per kilogram of body weight or

8   something?

9            **MR. LASKER:**  Yeah, it's kilogram or milligram, or it's

10  usually much smaller -- much, much smaller than that.

11       So now what IARC does is they don't consider that at all.

12  They don't worry about real world exposures, because they're

13  doing something different.  And it's a perfectly appropriate

14  question to be asked, just a different question that they're

15  asking.  They're trying to do a single detection:  Is there any

16  future -- you know, we don't want to worry about what the

17  exposures are now; we're just seeing theoretical risks, and

18  they are pretty straightforward in their preamble in explaining

19  that's what they're doing.  If there's any potential risk,

20  we're not going to go that next step and say is it a real risk.

21  We're not going to do the safety measure, we're just going to

22  identify it, and then we're going to give that information to

23  other people, and they can use that for risk assessments.  They

24  can do that analysis.  That's just not our job.

25       And so what IARC is doing is, in general -- I'm not going

1    to talk about what they did in this case, because we have other

2    issues there -- but in general they are doing a single

3    detection.  They're the first line of caution, if you will.

4    The risk -- the regulatory agencies then do the next level

5    where they're saying, okay, we got to be able to deal with

6    exposures, and is there some risk.

7        Now, as it happens in this case, EPA determined that there

8    was no level of risk, so they actually didn't even set a safety

9    level, because they didn't find any level where there was a

10   risk, but oftentimes if there is, they'll put that safety

11   factor on.

12       And that is the issue that is being discussed in all these

13   court cases, which is, you know, EPA is being precautionary.

14   They have this hundredfold safety factor.  They're not asking

15   the question "Can this cause?"  They're saying "Is there a

16   risk?"  And therefore it's not enough, and you can't come in

17   and say EPA has raised this concern or FDA has withdrawn the

18   drug from the market because of this risk, which is what

19   happened in the latter case that we're dealing with.

20           THE COURT:  And I understand all the arguments that

21   you will make about how, you know, OSHA automatically requires

22   labeling of a substance if the IARC has determined that it's a

23   probable carcinogen or even, I believe, a possible carcinogen,

24   and California's Prop 65 has it automatic.  I get all that.

25   And we're going to have plenty of time to debate that.

1          But I think that what this discussion shows is that the --

2    for us, for the purposes -- and, you know, we're going to need

3    to discuss further at a later time precisely what is the

4    question we're asking here.  You know, I don't know if we need

5    to set that question in stone before the expert testimony comes

6    in.  Maybe the experts will be also testifying about what

7    precisely -- you know, giving us testimony to help us

8    understand what precisely the general causation question is in

9    this context.

10         But for now, it seems clear that the IARC and the EPA

11   reports are relevant to the general causation phase, because an

12   expert giving an opinion has to take account of them.  But by

13   the same token, for a lot of the reasons that you've given, and

14   for a lot of -- in light of a lot of the points that were made

15   by the experts this morning -- it's not central; right?  I

16   mean, it's -- as you put it, you have to explain why you came

17   to -- if you're an expert, you have to explain why you came to

18   a different conclusion from the IARC, or why you came to a

19   different conclusion from the EPA, or why the differences in

20   your conclusions don't matter, or, you know, why the EPA study

21   is off point, or the IARC study is off point.  But you do have

22   to account for that.  You have to account for that.  But what

23   you mainly have to account for is the studies.  What you mainly

24   have to -- what you mainly have to testify about, and what you

25   mainly have to provide an opinion about is the studies

1    themselves, not another agency's report on the studies.

2        And so I think that what that means as a matter of

3    principle for deciding these discovery issues -- right? -- is

4    that they are relevant, but they're not central, and third

5    party discovery about them should not sort of swallow what you

6    people are doing; right?  So a little bit of leeway should be

7    given to conduct discovery, you know, relating to these

8    studies.

9        And I think I saw in the papers that you said that the

10   person who chaired the IARC Working Group is being deposed.

11           MS. WAGSTAFF:  That's correct.

12           MR. LASKER:  Yes, Your Honor.

13           THE COURT:  And that's -- so IARC has agreed to that?

14           MR. LASKER:  IARC didn't say one thing or another.  We

15   both agreed with him, and he's fine.  That's a separate issue

16   about IARC, and what it -- you know, asserts its privilege or

17   not, but yes.

18           THE COURT:  Right.  Because why not; right?  I mean,

19   if you're the chair of the IARC Working Group, and you're one

20   of the most respected scientific bodies, why not?  And you've

21   reached a conclusion about this, why not, you know, answer some

22   questions about it; right?

23       So that's great.  So there's some discovery being done on

24   that.  There's already been some FOIA requests, and whatnot,

25   some discovery, quote-unquote, of the EPA.  And it sounds like

1   the only sort of remaining questions are, you know, the Texas

2   A&M stuff, and the Jess Rowland deposition; right?

3          **MS. WAGSTAFF:**   Right.   I mean, maybe there's a little

4   more than that, Your Honor, with EPA in it, because I --

5   obviously, Mr. Miller is going to address Jess Rowland, so I

6   don't want to step on that, because he's prepared to address

7   the issues with that.

8          But there are other components of EPA.   For example, the

9   Office of Research & Development actually agreed with the IARC

10  finding, and the Office of Research & Development is part of

11  EPA.   And so I think that that Jess Rowland is an important

12  place to start.

13         **THE COURT:**   But if the Office of Research &

14  Development agreed, the fact that you say that means that you

15  know that, and presumably there can be expert testimony about

16  that at Phase I; right?

17         **MS. WAGSTAFF:**   Well, we know that from a document.   We

18  don't know from any underlying information.   I mean, that would

19  be similar to Mr. Blair.   You could say, well, Monsanto knows

20  what IARC said.   IARC said it.   And Aaron Blair authored it.

21  But to get to understand why Dr. Blair and his team found what

22  they found in Monograph 112 is important.

23         And similarly, I think what EPA, in the various

24  branches -- I'm not saying 20 deposition, Your Honor, at all.

25  And I think we have to go back and caucus a little bit.   But

1   I'm not sure that we would stop at Jess Rowland.  There may be

2   one or two other people.  I'm not saying there is.  Again, I'm

3   not saying that.  I'm just saying that I don't want to

4   foreclose that until we have an opportunity to learn a little

5   more.  And so that's all I'm saying.  I just want to leave that

6   door slightly open, because I do think that if that's going to

7   be part of the analysis, then we may need to know a little more

8   about the inside workings of EPA.

9          **THE COURT:**  And I'm glad you brought that up, because,

10  to me, you know, I'm only comfortable -- and I realize that the

11  EPA has some procedural objections, which may or may not have

12  been resolved right now, we can get to those.  But for just

13  bookmarking for a moment the procedural issues, I mean, my

14  reaction is that sort of when you, you know, consider the

15  relevance of the EPA's reports, and you consider their

16  relevant -- you know, when you consider their relevance to this

17  litigation, and you sort of apply principles of proportionality

18  and whatnot, that it seems appropriate to take Jess Rowland's

19  deposition.

20      But what does not seem appropriate is that, you know,

21  allowing Jess Rowland's deposition to be taken opens the door

22  for a bunch of discovery into the EPA's internal processes.

23  You've had plenty of opportunity to do FOIA requests.  And, you

24  know, the idea of going around deposing a bunch of people in

25  the EPA -- I mean, if, you know, like I'm ready to sort of

 1  retract my position that it seems appropriate to take Jess

 2  Rowland's deposition if what it means is that it's going to

 3  open the door to, you know, a bunch of discovery on the EPA.  I

 4  mean, think about it.

 5          MS. WAGSTAFF:  I'm not saying that, Your Honor.  I

 6  want to make myself clear.  I was not saying that they should

 7  open up the door to anything else.  All I was saying is I don't

 8  want to foreclose something that I don't know.  Just like, for

 9  example Monsanto has subpoenaed every single member of the IARC

10  Working Group.  Even though they're deposing Aaron Blair, they

11  subpoenaed every Working Group member.  So -- and I'm not

12  saying that that means that we're going to try to depose or

13  subpoena everyone from EPA.  That is not my point, and that is

14  not what I was trying to say.  I was just saying that I

15  don't -- what we don't know.  I think you're probably right, I

16  just don't know, and I was just saying I didn't want to

17  foreclose.  I didn't want Monsanto to come back in two months

18  or a month after we depose Jess Rowland, if you grant that

19  motion today, if something comes up that none of us know right

20  now, that's very important, that's key to the door to this

21  issue, and come back and say, you know, this is one person we'd

22  like to get some more documents, we'd like to get something.

23  Who knows?  I can't anticipate something I don't know.  I don't

24  want the words to be thrown:  *Well you agreed that there's no*

25  *more.*

1          That's all I was trying to say, is just I don't want to

2     foreclose it.  But as we sit here now, that's the only one

3     we've asked for.

4          **THE COURT:**  It's interesting to note, this is -- the

5     EPA is obviously a government agency.  I mean, a lot of times I

6     think -- you know, let me put it a different way.

7          So the experts are going to be coming here in October, and

8     they're going to be testifying about the various studies.  And

9     I assume the studies were conducted by scientists affiliated

10    with universities, or whatever.  And normally when we have

11    expert testimony about studies like that, I assume that we do

12    not have third-party discovery of the people who conducted

13    those studies; right?  I mean, you've got some scientists who,

14    you know, is just minding his own business trying to help the

15    world by doing a study, and then all of a sudden there's

16    litigation about whether the substance is harmful, and the

17    scientists -- we start rifling through his emails, and we

18    start, you know, taking his deposition, no.

19          **MS. WAGSTAFF:**  No, of course not.

20          **THE COURT:**  So on one level it's a little bit weird to

21    say that -- you know, to be taking the deposition of the chair

22    of the IARC Working Group, and to be asking to take the

23    deposition of Rowland.

24          On the other hand, the EPA is not -- you know, there's

25    something different about the EPA and the IARC, you know, that

1    may justify, under the specific facts of this case, the kind of

2    limited discovery that we're contemplating here.

3        I'm less convinced now, by the way -- again, sort of

4    applying principles of proportionality -- I'm less convinced

5    that it's appropriate to, you know, deny the motion to quash by

6    Texas A&M, because, you know, arguably, Monsanto is getting

7    more than its entitled to by taking the deposition of the chair

8    of the IARC Working Group than to be getting documents

9    possessed by, you know, individual members of the Working

10    Group, emails and whatnot.  I'm not really sure, you know, I'm

11    not really sure that is proportional.

12        **MR. LASKER:**  Just a point of clarification, Your

13    Honor, if I may.  With respect to Aaron Blair, he actually was

14    subpoenaed by both sides, so that was -- the plaintiff actually

15    subpoenaed him, and we subpoenaed him, so we're both going to

16    be taking his deposition, just so it's clear.

17        **THE COURT:**  Yeah, and, actually, it's not obvious to

18    me that the testimony is going to be, you know -- I mean, it's

19    not obvious to me who -- which side that testimony is going to

20    favor at all.

21        But, okay, so with that in mind, I guess maybe I could

22    hear from the Government about where things are with the EPA.

23    And in particular, you know, you have these procedural

24    objections, and then they mentioned that they did serve --

25    ultimately serve a subpoena on Rowland.  So I was curious,

what -- or maybe they said they were going to, I don't know,

but tell me what is the status of -- what's the status?

       **MS. NORRIS:**  Sure.  As you know, Your Honor, in their

reply to our opposition, on February 10th, they introduced the

new evidence, and for the first time ever serving a subpoena on

Jess Rowland.  And it was my understanding we also have

confirmed with agency counsel that they have also received a

copy of the subpoena.  I believe they received it

February 23rd.  It looks like it may have been postmarked 2/16.

We're not concerned.  The point is, agency counsel now has a

copy of a federal court subpoena.  Jess Rowland, my

understanding, was personally served.  The plaintiffs indicated

that.

     So we would still take the position that it's premature,

because, as I stated in my brief, there are two avenues.  They

first requested voluntary testimony, key words being

"voluntary."  There was no subpoena.  We did deny it.  They

challenged that.  But I pointed out to them that they have an

option to subpoena testimony, and agency counsel considers that

separate request, with the same application of is it in the

best and clearly in the interest of the EPA.  They are

currently doing that, because they have the subpoena, and they

will issue a decision as soon as practicable.

     I've explained to the plaintiffs they don't have a

decision yet, so I can't say.

1          **THE COURT:**  But agency counsel already told them --

2  responded to them by saying it's not in the interest of the

3  agency.

4          **MS. NORRIS:**  The voluntary request.  I would

5  distinguish -- I actually would distinguish the two.  Because

6  the request that was sent by email by Mr. Litzenburg versus the

7  subpoena that's actually come in appears to be substantially

8  different, in that the subpoena actually has specific topics

9  identified, and a request for documents.  There was no request

10 for documents with the initial voluntary testimony request, and

11 there was actually two lines saying we're interested in talking

12 about his role in the committee and communications with

13 Monsanto.  Based on those short description, the agency said

14 that's not enough.  Much for the reasons that you've indicated

15 here, is that the agency has legitimate concerns about being

16 pulled in and to private litigation.  It's very -- EPA is

17 uniquely situated.  There's massive amounts of environmental

18 litigation, and they want to maintain their impartiality, and

19 that's a concern for them here.

20     Now that we have this subpoena that is more specific and

21 can allow us to detail, have more consideration, is this

22 something we will approve or authorize testimony to, I think we

23 can move forward.  I can't say what their ultimate decision

24 will be at this point, but I think we would argue that the two

25 requests are different, and that I don't think we should rule

on the motion to compel at this time until the agency's had an opportunity to look at the subpoena, particularly where the response date is 3/28.  So we do have some time.

And then just as to -- and I can -- I haven't had a chance to speak with the plaintiffs about this, but in reviewing the requests for documents, you mentioned FOIA, that is something we would mention to the plaintiffs, is that we need clarification as to whether the subpoena is actually requesting documents from the agency or Mr. Rowland personally before we can take action on that.  And we can work that out with plaintiffs directly to just get clarification of are you seeking agency records or not.  Because the way it's phrased right now, I'm just standing back, I do have some question as to whether they actually are asking for agency records, in which case there wouldn't be anything for the agency to respond to.

So again, coming back to -- I feel it's premature to grant this motion to compel.  Let's let the process see where it goes.

I think, as I said at the time, the denial was based on the very limited information we received via the email request, and that's -- and they had concerns at that time.

For the reasons I stated in my motion, the reason the procedural objections we had -- and part of the reason we didn't respond substantively is we still haven't seen the whole

1   motion, so we did have some concerns before we responded

2   substantively defending the voluntary denial request.

3        **THE COURT:**  I mean, what -- why would it possibly

4   be -- I mean, what substantive reason could the EPA have for

5   not wanting Mr. Rowland's deposition to be taken?

6        **MS. NORRIS:**  Well, I think it would go to -- it would

7   be under the concern of appearing impartial in this litigation,

8   and actually even of greater concern is will this lead to more

9   depositions, more document requests, taking significant agency

10  resources.

11       I mean, I think when you're dealing with these -- the

12  reasons we have these procedural protections in place, and why

13  we do take sometimes strong positions in not allowing it to go

14  forward, is we are very, very concerned about a slippery slope.

15  We don't want EPA people being used as experts in private

16  litigation around the country.

17       **THE COURT:**  And that, I get.  And as you heard, I

18  mean, I would be shocked if this created any kind of slope,

19  slippery, steep, not steep.

20       **MS. NORRIS:**  Correct.

21       **THE COURT:**  I would be very surprised if they were

22  allowed to do anything other than take Rowland's deposition.

23  Or, to be more precise, I would be shocked if they were allowed

24  to take anybody else's deposition besides Rowland.

25       But the impartiality point I didn't quite get.

1        **MS. NORRIS:**  Certainly.  I think the EPA is concerned

2   that by providing information -- and they've done this in cases

3   wherever they are pulled in -- is they do have a policy and

4   concern about not testifying in cases, because they feel that

5   they are testifying for one side or another, and they, as much

6   as possible, would like to remain impartial and stay out of

7   private litigations.

8        To the extent they're happy, you know, to the extent they

9   are able, and it's not subject to privilege, they're happy to

10  provide documents if documents are publicly available.  But

11  there are concerns where once you start going down the road of

12  testimony, you start -- the agency begins to be pulled in to

13  other actions, not just this one, but actions around the

14  country:  *Oh, look they did that deposition of Jess Rowland.*

15  *Well, maybe we can call him too.*  And that's -- so it's more a

16  slippery slope not just contained to this action, it is around

17  the country in environmental litigation nationwide, because the

18  EPA receives these requests fairly regularly.

19       **THE COURT:**  Yeah.  I mean, I think those are

20  appropriate concerns, and it's fair to, you know, they're fair

21  points.

22       I think that what I would say about this is that it's not

23  going to be a slippery slope here.  And there are some sort of

24  pretty specific and pretty unusual facts surrounding the

25  request for this deposition that probably, I would say,

1   outweigh those concerns in this instance.  And so, you know, I

2   want to be mindful of EPA's procedural objections, particularly

3   given the fact that we have time.  There's not -- you know,

4   this is not -- we're not in a fire drill situation.

5        But I have difficulty imagining at the end of the day that

6   I would not order -- I mean, obviously, I would need to look at

7   the -- if the EPA came up with reasons why his deposition

8   shouldn't be taken, I would have to look at those.  But based

9   on the record now, and based on the sort of unique facts that

10  we have now, I have a difficult time imagining that it would

11  not be appropriate for his deposition to be ordered.

12       So what -- what we can expect -- I mean, the EPA has a

13  deadline to respond to the subpoena of March 28th?

14            **MS. NORRIS:**  Correct.  But I believe a decision would

15  be issued well before that.  And that's basically what I have

16  indicated in here is we would issue a decision.  And at that

17  point it would be appropriate for this -- if it was that they

18  have denied again, they would outline the reasons for denial

19  much like they did with the voluntary testimony.  And then I

20  believe we're back here in part, as I requested in my motion,

21  if you did feel that it was not premature, that we have at

22  least an opportunity to defend a decision on the basis that it

23  was not arbitrary and capricious, and we could provide reasons.

24       I will say, because we now have a subpoena request, it is

25  a different procedural posture.  If a decision comes down, we

1    would still be prepared to come in, and if it is not granted,

2    although, as I said, it's a significantly different requests

3    with specifics.

4         **THE COURT:**  At a minimum, you'll have an opportunity

5    to brief it.

6       But, you know, I mean, the other thing I found curious

7    about the regulation was it seems to allow the, you know, the

8    EPA counsel to refuse a request pretty much on any ground.  I

9    mean, you can always say it's not in the interest of the EPA to

10    allow this deposition because we don't want to get in the habit

11    of allowing depositions.  You can say that -- you can use that

12    ground for denying a request every time.

13       So I guess, let me ask you, has the EPA ever concluded

14    that it was in the interest of the EPA to allow deposition?

15        **MS. NORRIS:**  I do not know of one of recent.  I do

16    know that there have been depositions.  I do not know if they

17    have recently approved one.  It's a pretty broad -- I didn't

18    ask my counsel to figure out where nationwide.  I think it's a

19    little bit more than counsel deciding on their own that this is

20    not in the interest.  As they specify in the regulations, they

21    confer with the group that is -- and the supervisors of the

22    individual being subpoenaed.  So they do -- it's not just

23    counsel, they go and they talk to the people and they say, *hey,*

24    *is this appropriate?  Do you think we want to move forward on*

25    *this*?  So it's not just a boilerplate "it's not in the

1    interest."  Consideration is taken into account.

2         Although I will say, Your Honor, the regulations are

3    different than other *Touhy* regulations I've seen with other

4    agencies.

5              THE COURT:  All right.  Thank you for that.

6         So I think it's fine to wait and see what the EPA does.

7    You've got my thoughts on it.  You know, when you get your

8    response from the EPA, you know, if you need to, you can file a

9    brief.

10        So procedurally, what would be the next thing?  If the EPA

11   says "no, it's not in the best interest of the agency to allow

12   Mr. Rowland's deposition to be taken," what do they need to do?

13             MS. NORRIS:  Well, either -- if we do decide that, I

14   think it could either be that we would bring a motion to quash

15   or they could bring a new motion to compel based on the

16   subpoena.  And we would be back here at that point, you know,

17   in the hopes that that won't be the case, but --

18             MS. GREENWALD:  I hope it's not the case as well, Your

19   Honor.  I think procedurally it would be incumbent upon the

20   government to file a motion to quash.  We have a subpoena

21   outstanding.  We have a motion pending.

22             THE COURT:  It's kind of what you say in your brief;

23   right?

24             MS. NORRIS:  Correct.

25             THE COURT:  So why don't I impose a deadline on the

1    Government for filing a motion to quash.

2          **MS. NORRIS:**  Okay.  I would say at a minimum, if we

3    could have 30 days just to -- or what's the date today?  The

4    compliance date is March 28th; is that correct?

5          **MS. GREENWALD:**  I think it is correct, yes.

6          **MS. NORRIS:**  So to bring a motion to quash by that

7    date.  Or, no, we could do the week before.

8          **THE COURT:**  I mean, that date seems fine.

9          **MS. NORRIS:**  That date is fine, March 28.

10         **THE COURT:**  So March 28th will be the EPA deadline to

11   file a motion to quash.

12         **MS. NORRIS:**  Certainly.  And obviously we hope to do

13   it as soon as is practicable.

14         **THE COURT:**  Great.  Okay.  So that takes care of the

15   EPA.

16         **MS. NORRIS:**  Thank you.  If there's nothing further, I

17   may excuse myself.

18         **THE COURT:**  You don't want to hang out?

19         **MS. NORRIS:**  It was fascinating, but thank you, Your

20   Honor.

21         **THE COURT:**  You weren't here this morning?

22         **MS. NORRIS:**  No I was not.  Next time.

23         **MS. GREENWALD:**  Good to see you.

24         **MS. NORRIS:**  Thanks.

25         **MS. GREENWALD:**  Your Honor, I'll have a sit now.

1          **THE COURT:**  Sure.  Okay.  So now -- maybe we get to

2     all these various sealing motions.

3          And having determined that there is -- you know, the

4     IARC's conclusions and the EPA's conclusions are relevant to

5     these proceedings, and therefore the motion to compel the

6     testimony of Rowland is relevant, I don't -- I can't conceive

7     of any reason why any of the materials submitted in connection

8     with the motion to compel Rowland's testimony should remain

9     under seal.

10          Do you want to rest or argue on that?

11          **MR. LASKER:**  If I may, Your Honor.

12          **THE COURT:**  You may.

13          **MR. LASKER:**  There are different categories of the

14     documents.  And as Your Honor knows, we have submitted an

15     affidavit in connection with the documents at issue.

16          And if I could just talk sort of categorically about some

17     of the issues where there are concerns for Your Honor to

18     understand, because I don't know that it necessarily is a

19     blanket ruling.  There's different priorities in these

20     documents, and there's different issues raised in the documents

21     that I want to point out.

22          So, for example, a number of the documents -- and this was

23     particularly the case with respect to the motion that Your

24     Honor heard on Friday dealing with the custodial records.

25     Those documents include, for example, documents dealing with

1   our manufacturing process and various issues that we deal with

2   in our manufacturing process to gain efficiencies, to be able

3   to make our product the way that we do are highly proprietary.

4        The glyphosate, as I mentioned previously, glyphosate is

5   not the only manufacturer and seller of glyphosate; it's a

6   competitive marketplace.  And so a lot of these documents that

7   go to the manufacturing process or the evaluation process go to

8   proprietary information that our competitors would have an

9   advantage if they had.

10       So those types of documents are --

11           THE COURT:  Can you give me a couple of examples of

12   your favorite documents?

13           MR. LASKER:  Yes, Your Honor, yes.

14           THE COURT:  And I will say that I -- I was focused

15   mostly on the documents submitted in connection with the IARC

16   EPA relevance briefing.

17           MR. LASKER:  Right.

18           THE COURT:  And the -- and the motion to compel

19   Rowland testimony.  I was focused on those.  But I thank you

20   for reminding me also about the documents that were at issue or

21   that were attached or quoted in connection with the motion that

22   we discussed Friday.

23       First, on the stuff submitted in connection with the IARC,

24   the briefing about the relevance of the IARC and EPA

25   conclusions, and the briefing on the Rowland deposition, and

1    the stuff that was quoted in those briefs, do you have any

2    further argument on why those should be sealed?

3            MR. LASKER:  Yes, Your Honor.  And let me focus on

4    specific documents.  I've got them in a binder.

5        But with respect to the Rowland subpoena -- and there's

6    two issues that I would raise with that -- first of all, one of

7    the documents, which is a memorandum -- if you recall I think

8    there are three emails and then there's one memorandum -- the

9    memorandum, in addition to discussions of glyphosate, has

10   discussions of Dicamba, which is a different product, and

11   Monsanto is -- before the EPA -- trying to secure regulatory

12   approval for this different product.  That, again, is

13   competitive information.  It's not relevant to this case.  And

14   so the first issue would be that with respect to these two,

15   that document, the discussion of Dicamba, would be redacted or

16   that would remain under seal.

17       The second issue -- and this may turn in part on what Your

18   Honor decides with respect to Mr. Rowland's deposition

19   ultimately.  But as we've set forth in some of our motions,

20   there is a separate issue when a document that is being asked

21   to be unsealed also relates to a third party that is not in the

22   litigation.  And the plaintiffs have, for whatever reason,

23   raised a number of allegations personal to Mr. Rowland, and

24   they're accusing him of essentially wrongdoing and misconduct

25   as an EPA official.

1          The EPA attorney just left.

2          But that does join us -- I mean, obviously we have our own

3    interests, and the case law talks separately about third

4    parties, and whether or not that's something the Court should

5    take in mind.

6          And the only suggestion, or the only comment I would make

7    on that is I can't speak to that issue, but I know it's a

8    relevant issue in the case law, and it's something I think

9    perhaps EPA can speak to, or somebody else.  But there is a

10   situation here.  And we've talked about, in our briefing for

11   our purposes, the concerns we have that they are trying to try

12   the case in litigation and the press.  And however Your Honor

13   feels about that, we have something we have to deal with

14   because we're in litigation.  That is one part of the analysis.

15         But to the extent that they are making accusations against

16   third parties about communications that that third party did

17   not believe was a public communication -- and, again, that

18   would be a separate issue for that particular case -- that does

19   raise higher concerns.

20         And a lot of our documents also that plaintiffs are

21   talking about, I mean, one of their themes --

22              **THE COURT:**  Well, I guess I'm not totally sure I

23   understand your point there.  I mean, I used to work for the

24   Government, and I communicated with third parties, regulated

25   parties, parties whose interests were adverse to the

1   Government, parties whose interests were aligned with the

2   Government, and I had assumed that every communication I was

3   having with a third party was potentially fair game, and that

4   somebody might shoot an email about the conversation they had

5   with Vince Chhabria about the healthcare law, and whatever.

6       I mean, I guess I don't -- I'm not sure I understand your

7   point that Mr. Rowland might have some sort of privacy

8   interests in his communications with Monsanto.

9           MR. LASKER:  And I'm at a loss to be able to argue

10  that.  That's not because I'm not EPA.  They just walked out of

11  the room.

12      I know the plaintiffs have some view about what documents

13  or what types of communications the EPA should believe are

14  public and which types they shouldn't believe are public.

15  That's not for Monsanto, frankly to say.

16      And so my only point there is not that this is an argument

17  that I present to people that you should listen to what I have

18  to say, but if there's going to be further -- and maybe there

19  won't be, I don't know, it depends, I guess, on what EPA

20  says -- I don't know if EPA should be the ones speaking to

21  that.  And, again, this is something that comes up in the case

22  law.

23      And separate from that, with respect to --

24          THE COURT:  I mean, I agree that you have to take,

25  when you're considering whether something should be filed under

 1   seal, you have to take into consideration privacy interests,

 2   and privacy interests of third parties.  I mean, I'm just not

 3   sure specifically here how Mr. Rowland could have a privacy

 4   interest in his communications with a regulated company.

 5        **MR. LASKER:**  You may be right, Your Honor.  I'm not

 6   here to make an argument.  I'm just pointing out that issue.

 7        And separately, Your Honor, there are a lot of the

 8   plaintiffs' allegations or the documents that they're attaching

 9   with respect to this issue of IARC and EPA, a large focus of

10   their argument is that not only is Monsanto doing all these

11   things that they say are wrong, but that these third parties

12   are in league with Monsanto in doing that.

13        And a lot of their documents are going to -- as you said,

14   these independent scientists are out there who are just doing

15   their job and doing studies, and now all of a sudden they're

16   being dragged into litigation.  And, you know, this is

17   litigation, for better or for worse, that people are following,

18   that what happens in this courtroom ends up on blogs, posts,

19   ends up in articles.

20        And, again, it is a consideration where you have third

21   parties who are being accused of things.  That strikes me as a

22   situation -- and case law also says that, that that is a

23   separate factor that the Court should take into account.  And

24   weighed against that, Your Honor, is what is the law with

25   respect to whether or not that information should be made

1  publicly available.

2      And the case law, the *Seattle Times* case, and the other

3  cases that we cited to Your Honor, seem to have now made a

4  distinction, and the Federal Rule of Civil Procedure 5 which

5  changed to make the point that the public's interest, right to

6  know, if you will, about these documents, it's not the same at

7  different stages of litigation.  So when you get to a

8  dispositive motion, when you get to a court, when you get to a

9  trial, when we get to maybe doubt here, then the public may

10  have a greater -- does have, under the law, a greater right to

11  access to these documents.

12      **THE COURT:**  Well, but wait a minute.  The dispositive

13  motion distinction, I mean, that's -- the question is just

14  whether the material is of significance to the litigation;

15  right?  I mean, it doesn't -- because it's not -- I don't think

16  because it's a dispositive motion -- didn't the *Center for Auto*

17  *Safety* case from the Ninth Circuit from last year make clear

18  that it doesn't, like there's no magic to the fact that

19  something is a dispositive motion or not?  I haven't read it in

20  a while, but --

21      **MR. LASKER:**  Yeah.  I have to say I'm not sure if that

22  case made enough distinction.

23      But I do think, in any event, there are cases I know that

24  have made a distinction with dispositive motions.  But what we

25  have here is documents that we would submit, and plaintiffs

1    will dispute this, that are taken out of context and make

2    certain allegations.  If discovery goes forward and they're

3    able to establish a basis for that sufficient to then be able

4    to make the argument in connection with a dispositive motion, I

5    mean, that's what discovery is, you get into the process,

6    you're finding these things out, and that process winnows down

7    what documents are relevant, whether or not this theory that

8    they're coming up with, based upon this passage from this email

9    or this document that they've pulled out, actually has any

10   legs.  And to make that determination at this stage, before any

11   of that has actually been tested, if you will, through the

12   discovery process to get to that final dispositive motion or

13   hearing or trial, is, I would submit, it's premature, because

14   then you have this issue of all these documents coming out, and

15   you don't know actually if they're dispositive.  They have

16   allegations.

17         **THE COURT:**  I understand your arguments, and I think

18   some of those arguments are relevant to the discovery letter

19   that -- which we can talk about in a little bit, and the issue

20   of, you know, designating documents "confidential."  But I

21   don't think they support those documents support sealing any of

22   the documents submitted in connection with the briefing about

23   the relevance of the EPA and IARC conclusions or in the

24   documents submitted in connection and -- quoted in connection

25   with the motion to compel Rowland's deposition.

1    So what about the other -- what about the stuff -- what

2    about the documents that came up on Friday, other than perhaps,

3    by the way, this Dicamba reference.  What about the documents

4    that were relevant to the motion that we discussed on Friday?

5         **MR. LASKER:**  Okay.  And, Your Honor, I don't know.

6    There are a lot of documents we can go -- I can give you

7    examples of documents.

8         **THE COURT:**  Can you give me like a couple of your

9    favorite examples?

10        **MR. LASKER:**  Okay.  So, for example, Your Honor, there

11   are some documents that are internal safety studies, and these

12   are studies that are submitted to the agency, and they're

13   considered confidential when they're submitted to the agency,

14   and we've talked about that previously.  Because under the

15   FIFRA statute, they're confidential because other registries

16   aren't allowed, aren't supposed to be able to use a former

17   registrant's study to be able to market the product.  That's

18   part of the statute, is to make sure that type of information

19   is proprietary and not released.

20        So, for example, we have a document that was attached as

21   Exhibit 10 to the letter brief, or I guess it's a brief, which

22   is an internal study.  It's got, I would say, confidential

23   restricted distribution, and it's an internal study.  That

24   falls within that category.  That would be one of those types

25   of documents.

1          There is also -- there were -- the study, Exhibit 13, is

2     another one of those documents that is an internal study.

3          Then there is, for example, a study -- exhibit 15 was an

4     internal study of manufacturing process at Monsanto with

5     respect to how they are controlling for various contaminants

6     that appear to the manufacturing process of glyphosate, which

7     is an issue that's based on all glyphosate manufacturers, a

8     variety of different steps that they take in the manufacturing

9     process, both to make the manufacturing process more efficient

10    for Monsanto, which is a financial advantage, a competitive

11    issue for Monsanto, also to make sure that, you know, the

12    impurities levels of Monsanto glyphosate are lower, frankly,

13    than other glyphosate in the marketplace, which is also

14    something that we seek to accomplish.  And that is how we do

15    that, and how we do manufacturing process, that is protected

16    information as compared to many manufacturers who have their

17    own methods of doing this, that have their financial costs or

18    benefits --

19          **THE COURT:**  Now, I didn't see -- I mean, I didn't --

20    you know, I didn't go through every one of the exhibits

21    submitted in connection with the motion that we discussed on

22    Friday.  I believe I did look at every exhibit submitted in

23    connection with Rowland, and submitted in connection with the

24    IARC, and EPA relevance briefing.  But the motion on Friday I

25    didn't look at everything.

```
 1          But nothing that you're describing to me was quoted in the
 2    briefs; right?  I mean, do you want to -- can we --
 3          MR. LASKER:  In passing, kind of, Your Honor, yes.
 4          THE COURT:  Right.  But maybe we can start that way.
 5    Is there anything in the briefs that should be sealed?
 6          MR. LASKER:  Your Honor, I have to admit, I did not go
 7    through the briefs.  I went through the exhibits first and not
 8    the briefs there were --
 9          THE COURT:  Okay.  So you've identified one category
10    of documents, which is, as I understand it, is internal
11    studies, internal safety studies submitted to the agency.
12          MR. LASKER:  Yeah, they were prepared for
13    regulatory -- well the manufacturing studies would not be
14    submitted to the agency.  That's part of our own manufacturing
15    process, but that's proprietary and confidential business
16    information.
17          THE COURT:  Okay.  And is it referenced to the
18    manufacturing process, or is it an actual roadmap of the
19    manufacturing process?
20          MR. LASKER:  It's -- I mean, if you look at Exhibit --
21    I'm sorry -- is it 15, it is a 30-page discussion of various
22    steps that are taken in the manufacturing process of
23    glyphosate.
24          THE COURT:  Okay.
25          MR. LASKER:  There are also a number of documents --
```

1    and we mentioned this, Your Honor -- with respect to, I think

2    it's Kimberly Hodge Bell, that aren't documents at issue in

3    this litigation.

4          THE COURT:  Say one more time.

5          MR. LASKER:  There are a number of documents that are

6    not related.  There's one that's maticide (sic), which is a new

7    product that Monsanto is investigating.  There was a

8    fast-acting gel that was a new product that Monsanto is

9    investigating.  There was an experimental or a factor

10   considered using that was part of internal deliberations that

11   never actually was used in products in the United States.  And

12   so this is all, again, Monsanto's internal research and

13   development, Monsanto's internal thinking about which products

14   it would be -- it would be presenting or it might pursue, which

15   again is very confidential in this proprietary type of

16   information.

17         MS. GREENWALD:  Which number are you talking about?

18         MR. LASKER:  So you have, for example, a study,

19   document 23, and it falls into that category.  Category --

20   document 24 falls into that category.  Document 25 falls into

21   that category.  That document also has information about how

22   much it's going to cost us to do certain studies.

23        So, you know, that's a separate issue that comes up.

24   Document 26 is a -- that's the fast-acting gel product, which

25   is a different product, that's not at issue in this litigation.

1          **THE COURT:**  So I get the idea that perhaps, perhaps an

2    internal safety study perhaps could be sealed, or parts of it

3    could be sealed.  I get the idea that documents that include

4    discussion of products that are unrelated to Roundup could be

5    sealed.

6          I guess the question I have -- I mean, there's a question

7    about how to proceed going forward, and there's a question

8    about these documents.

9          How should we proceed with respect to these documents?  I

10   mean, should -- it seems to me that the sealing request is at a

11   minimum overbroad.  I mean, what do you think is the best way

12   to proceed?

13         A lot of times what I do is I just -- when, you know, when

14   there's a sealing request that is significantly overbroad, I

15   just put out an order which says, "The sealing request is

16   significantly overbroad."  If Monsanto, or whoever the party

17   is, you know, Monsanto must by such and such a date submit a

18   renewed reasonable sealing request.  If the renewed sealing

19   request is not reasonable, all the materials will be filed

20   publicly.  The sealing request would be denied in its entirety

21   if the next sealing request is not reasonable.  And, you know,

22   embarrassment is not a ground for sealing.

23         I mean, that -- I, you know, I wonder if that's --

24   frankly, the problem is that with, you know, with these sealing

25   requests generally, and with this case in particular, I mean,

 1    the amount of work that it would take me, and far more

 2    importantly my law clerk, to go through all of the documents

 3    and figure out which aspects of the sealing request are

 4    overbroad and which are not, you know, I mean, it would just

 5    paralyze us, you know.  So, I mean --

 6              MR. LASKER:  I have a proposal, and I don't know if it

 7    makes sense, Your Honor, but I think it's in keeping in par

 8    with some of the rules that talk about -- and I know you're --

 9    in your standing order with respect to discovery disputes you

10    don't want documents attached to those -- some of these

11    documents you may believe are relevant and some you may not.

12    And one possible approach is that a brief -- the first instance

13    would not attach documents, but would explain with like a

14    proffer, if you will, types of documents that we have that we

15    believe might influence Your Honor's decision.  It won't be

16    attached, it won't be identified.  I mean, there's ways of

17    identifying it so you're not revealing confidential

18    information, but still provide Your Honor with the basis to

19    say, okay, I can see where they're going with this, I want to

20    see that document, or I don't need to see that.

21         For example, it seems like, in connection with this most

22    recent filing, there were a lot of documents you're just going

23    to need to be able to see to issue the ruling.  And prior to

24    the determination with respect to IARC and EPA, I don't know if

25    you were certain if you needed to see some of those documents.

1    That would --

2         **THE COURT:**  Well, those documents, I felt, I did feel

3    the need to look at that to make sure that privacy interests

4    were protected, you know, were not being violated by public

5    filing of the documents.

6         **MR. LASKER:**  Yeah, Your Honor.  I misspoke, Your

7    Honor.  The issue is whether or not Your Honor needed to see it

8    to be able to make the decision that's being presented as far

9    as what the motion was requesting.

10        **MS. GREENWALD:**  Could I?

11        **MR. LASKER:**  Your Honor, what we might be able to do

12   then is be able to have a method by which -- because we can try

13   as best we can, but the process is what the process is.  And

14   plaintiffs really have the right to make whatever arguments

15   they feel are appropriate for you to consider.  And they may or

16   may not be right that the document would be something that

17   would be something that you should see.

18        So we might be able to have a situation where, again,

19   they'll describe, they'll make a proffer, and Your Honor, when

20   they look at the brief, say I want to see these documents, then

21   we'll have a decision.  At least that will narrow or

22   potentially narrow the scope of these issues.

23        Because you're right.  This is -- it's not only for Your

24   Honor something that is creating a burden, but we're also

25   having five-day turnarounds.  We had 38 documents that we had

1    to go through here in five days to be able to file under seal.

2    You know, when this first came up, the very first time we were

3    facing this issue it ended up with us having to stand up and

4    argue to seal something that we were bound to file something

5    saying we don't think it's confidential.  We just haven't got

6    to it yet, because entirely that was with respect to Donna

7    Farmer's deposition.  We were backing off and saying no, no,

8    none of these are confidential, but we hadn't gotten there yet.

9    We just didn't have enough time.

10       So if we can come up with some technology to avoid that

11   which does not prejudice plaintiffs, allows them to make their

12   arguments, I think that would be most efficient.

13        MS. GREENWALD:  So, Your Honor, if I may.  I think

14   this conversation has gotten so far from where it should be

15   that I just wanted to make sure that I brought this up.

16       Monsanto is continuously trying to shift the burden to

17   plaintiffs.  And now they're suggesting we must proffer to Your

18   Honor before we can even file a document with a filing.

19       And the way that this has come about is that we negotiated

20   a protective order, and we entered into a process whereby

21   confidential documents would remain confidential and remain

22   protected from public disclosure.

23       And we also had a process in there that we agreed upon

24   when we challenged documents.  And then we started actually

25   following that process, and Monsanto didn't like it, so they

1    filed a brief saying we needed a, quote, litigation need.   They

2    came up with that phrase.

3        And then later, about a week later, they filed something

4    requesting that we could no longer even attach any documents,

5    whether confidential or not, whether they were our own

6    documents or not, whether whoever they were produced from, we

7    couldn't use them as an exhibit to a document.

8        And the answer to this could very simply be that they just

9    agree to dedesignate documents that aren't confidential.   And

10   there's a process for that, and we have given them documents,

11   as Your Honor has noticed, and as Your Honor said at the last

12   hearing, those four -- let's just take the Rowland documents.

13   There's nothing in there that deserves protection for the

14   protective order, yet they have continuously refused to

15   dedesignate them.

16       In fact, the response you saw, the United States when they

17   filed their response, they wouldn't even let us give those

18   documents to them.   So they filed their response not ever

19   seeing those documents.

20       And I think it's a very clever argument that Monsanto is

21   doing, that they're slowly shifting the burden to plaintiffs to

22   try to proffer to Your Honor a burden and a need for why we

23   need to attach documents.

24       And Your Honor has --

25            THE COURT:  Well, wait a minute.  I mean, there's

1   no -- you're not prevented from submitting any documents that

2   have been designated confidential.

3        **MS. GREENWALD:**  That's what they're requesting.

4   That's what Monsanto is requesting.

5        **THE COURT:**  You're only prevented from filing them

6   publicly while they are designated confidential.

7        **MS. GREENWALD:**  Correct.  But Monsanto has filed a

8   request with Your Honor.  And what I understood Mr. Lasker to

9   just say is that he would like it to be a new order of the

10  court that plaintiffs cannot attach documents to filings.

11  Maybe I misunderstood him, but...

12       **THE COURT:**  I didn't understand him to say that.

13       **MS. GREENWALD:**  Is that what you were saying?

14       **MR. LASKER:**  Well, I mean, my proposal was, with

15  respect to having Your Honor decide whether we needed the

16  documents to make a decision, certainly they have -- first of

17  all, there's some documents that are public.  But to the extent

18  that there's a document that's confidential, there's two

19  approaches:  They could either file it under seal and they have

20  to go through this, or they could make a proffer saying these

21  are the types of documents you want to file, and if Your Honor

22  says that's relevant to my decision, then again that is burden

23  is on us.

24       **THE COURT:**  That's not really a workable approach for

25  a variety of reasons, one of which is that, you know, I mean,

1   you have a filing deadline, and you're putting all this

2   together at the last minute and trying to meet the filing

3   deadline, and it's just not practical to have a meet and confer

4   about which documents should be filed under seal and which

5   shouldn't.  Sometimes it's practical, but other times it's not

6   practical to do that.

7        I think the -- you know, on the other hand, it -- you

8   know, Monsanto is having to turn over a ton of documents, and

9   the only way to do that in -- I assume the only way to do that

10  in a remotely efficient way is to err a little bit on the side

11  of designating stuff confidential.  And that's okay, like

12  that's -- you know, otherwise we wouldn't be able to have the

13  *Daubert* hearing, I suspect until, you know, 2020; right?

14       So what I want to try to figure out is if there's a way,

15  you know, if there's a way to -- if there's a solution that we

16  could come up with which recognizes that it is difficult often

17  for the plaintiffs to sort of front documents in advance, and

18  difficult for Monsanto to avoid over designating documents

19  confidential.

20       I mean, I think there's no question that Monsanto has over

21  designated, but that is not a criticism, that's just sort of a

22  reality of litigation with massive amounts of documents, I

23  think.

24       **MS. GREENWALD:**  Your Honor, I think the protective

25  order actually has a process in place for that.  We have

1    targeted a way to dedesignate documents so that we can do that

2    simultaneous to litigating this case, and that's in fact what

3    we did.  We sent a letter requesting to dedesignate 200

4    documents, and we followed the procedures set forth in the

5    protective order, which was why we negotiated that way, and why

6    I suspect Your Honor entered it that way, and then therefore

7    those documents would be de designated so when we had a filing,

8    we could attach them as exhibits, they wouldn't have to be

9    under seal, and we could go forward that way.

10         And the 200 documents that we chose, if you look at it,

11   track exhibits we've used in depositions; they track documents

12   that we think are hot documents, or documents that we think

13   that will be used as exhibits in motions or discovery motions,

14   and that is a process we can use, and that's what we have been

15   using, and that's already in place.

16         **MR. LASKER:**  Your Honor --

17         **THE COURT:**  But I think that -- you know, I am a

18   little bit concerned about -- as I said, Monsanto has to turn

19   over tons of documents.  A lot of the documents that

20   Monsanto -- and the practicalities are such that Monsanto kind

21   of has to err on the side of designating certain things

22   confidential, and I don't think that Monsanto should be faulted

23   for that.

24         So Monsanto is turning over tons of documents, many of

25   which will not be relevant to the litigation, many of which

1   will not be used in the litigation.  And I don't see why you

2   all should be spending time fighting over the designation of

3   most of those documents, because most of the documents will not

4   be used in the litigation.

5        And so, you know, I do think that it is appropriate in

6   this context for you to be able to have an explanation, if you

7   want documents dedesignated, for you to be able to have an

8   explanation why they're relevant to the litigation.  I don't

9   want this to be a process by which you're getting tons of

10  documents from Monsanto that are not going to be relevant to

11  the litigation that you want to make public.  And so you're

12  availing yourself of this mechanism in the protective order to

13  make them public because they don't -- shouldn't truly meet the

14  definition of confidential.

15       I mean, a lot of these documents, arguably, if we had more

16  time and we searched more narrowly, and we, you know, proceeded

17  with more precision, a lot of these documents you would never

18  be getting in the first place, probably.  And so the fact that

19  you're getting them -- I mean, I don't want this process and

20  the protective order to be used to dedesignate them, unless

21  they really are going to have -- be used in the litigation.

22       Do you think there's a realistic possibility that they

23  could be used in the litigation?

24            MS. GREENWALD:  Right.  And I understand, Your Honor,

25  and that's why I mentioned that the letter that we sent tracked

1    the exhibits that we've been using.  And I would -- I haven't

2    actually looked back at the 38 documents, or however many

3    documents are at issue now, but I would guess that a hundred

4    percent, if not 95 percent of them are on that list.

5         And part of the problem --

6         THE COURT:  When you say, "on that list," what do you

7    mean?

8         MS. GREENWALD:  The list of 200.  We sent 199 -- a

9    list of 199 documents to be designated to Monsanto a couple --

10   maybe a month or five weeks ago, or something or like that.

11   And I would suspect that all of the -- all or most of the

12   documents that are issued now under seal are probably on that

13   list, because we tracked that list through exhibits.

14        Now, I haven't compared that, so if I'm wrong --

15        MR. LASKER:  We have done the comparison, Your Honor.

16   If there was -- of the recent case management statement, there

17   were 32 documents attached.  Eight of those were on the list of

18   199.

19        THE COURT:  Wait.  Wait.  Hold on a second.  I'm

20   getting a little confused now.

21        Okay.  So you sent them -- pursuant to this procedure in

22   the protective order, you sent them a list of 200 documents,

23   okay.  Now, these Rowland documents, the documents --

24        MS. GREENWALD:  They were on there, yes.

25        THE COURT:  They were on there, okay.  And the

1   documents that were filed in connection with the briefing on

2   the relevance of the EPA and IARC --

3        **MS. GREENWALD:**  I would suspect they are, because

4   those are very important documents, and I would suspect that we

5   used those in depositions.

6        And what Mr. Lasker is telling me, that of the 34 that we

7   filed last week, only eight of them are, and there's probably

8   an explanation for that.

9        **THE COURT:**  Only eight -- of the 34 that you filed

10  last week --

11       **MS. GREENWALD:**  Eight.

12       **THE COURT:**  In connection with Friday's motion, the

13  Friday motion we'll call it, okay, of the 34 that you filed

14  under seal last week in connection with the Friday motion,

15  eight of them are on the list of 200.

16       **MR. LASKER:**  That would be accurate, Your Honor.

17       **THE COURT:**  But here's the bottom line.  I don't care

18  that much about that.  But the bottom line is I think it is

19  appropriate for Monsanto to say that if these documents -- they

20  may not, you know, technically meet the definition of

21  confidential in the protective order, but there's -- they

22  don't -- they're not going to be used in this litigation, so

23  leave us alone.  I think that is appropriate, okay.

24       So if you don't have understanding of how a document is

25  likely to be used in litigation, I think you need to leave

1   Monsanto alone regarding its confidentiality designations.

2   That's what I think.

3          MS. GREENWALD:  Okay.  And, obviously, what you think

4   matters more than what I think with regard to this.

5       And I would also say that --

6          THE COURT:  And I don't know if the protective order

7   needs to be modified for that purpose or if we can just operate

8   under that understanding.

9       But I think it is appropriate -- you know, I think we have

10  a problem -- I have a problem with Monsanto, because it's -- it

11  is insisting that stuff be filed under seal that should not be

12  filed under seal.  But I have a problem with the idea of, you

13  know, calling Monsanto on its confidentiality designations and

14  making that -- you know, asking them to dedesignate documents

15  that are not reasonably likely to be used in the litigation.

16  And I would like for us all to operate under those principles.

17         MS. GREENWALD:  Okay.

18         THE COURT:  So I will issue an order on that so that

19  everybody has something in writing.

20      And then on the -- so there are only 34 documents under

21  seal.  I think, rather than having you redo it, in connection

22  with the Friday order, Friday motion, I think I'll -- we'll

23  just look through these, and we'll decide what should be sealed

24  and when shouldn't be sealed.

25      What I will say, though, is that I will -- you know, I

1   feel like now I have had enough opportunity to explain to you

2   generally how I feel about sealing and the appropriate approach

3   to sealing.  And I will start issuing sanctions if stuff is

4   over sealed.

5       And, you know, one thing that you all can do is -- you

6   know, the plaintiff is in kind of -- the plaintiffs are in a

7   difficult position -- right? -- because they've gotten all

8   these documents, and they're all designated confidential, and

9   they're in a rush to meet a filing deadline, and they don't

10  have time to meet and confer with you all, or sometimes they

11  won't have time to meet and confer with you all about whether

12  documents should truly be designated confidential, and

13  therefore truly should be filed under seal.  And so they file a

14  bunch of stuff under seal, but then we have a process with our

15  rules about sealing for you all to submit a declaration --

16  right? -- and you can say *we do not oppose the unsealing of*

17  *80 percent of these documents*.  And that is where you need to

18  be.

19      You know, it's kind of a pain for plaintiffs to have to

20  file a lot of this stuff under seal when it shouldn't be under

21  seal.  But this litigation is a pain, and that's one of the

22  ways in which it's a pain.

23      But, really, it's incumbent upon Monsanto to sort of

24  operate in good faith on -- you know, when it files its

25  declarations in response to the plaintiffs' motion to seal

 1   documents that have been designated confidential by Monsanto.

 2   And that's the time for Monsanto to really drill down,

 3   understanding that you didn't have the opportunity to do so

 4   before when you were turning over 10 million documents.

 5          **MR. LASKER:**  Right.

 6          **THE COURT:**  But now that is the time for Monsanto to

 7   really be conscientious about the rule that when documents are

 8   relevant to the litigation, they shouldn't be under seal, even

 9   if they are not -- are embarrassing to Monsanto, you know, even

10   if Monsanto doesn't like what they say.  And so that is where I

11   will start issuing sanctions, is if Monsanto continues to be

12   overbroad in its response to the plaintiffs' sealing motions

13   filed with respect to documents that Monsanto has designated

14   confidential.

15          **MR. LASKER:**  I understand, Your Honor.  I have one

16   request, and then one other point I wanted to make.

17          I recognize that there's a five-day rule in this Court.

18   For example, with the 38, that causes a lot of time pressure,

19   and I don't know if Your Honor can extend that time pace so

20   that maybe we can avoid these problems so we actually have a

21   chance to breathe and look at the documents.  And so I don't

22   know if maybe we can extend that period to ten days so that we

23   have that ability so that we don't end up in the same sort of

24   rush situation where we can't even get a chance to look at

25   them, that would be helpful.

1          THE COURT:  That's fine.

2          MR. LASKER:  Okay.

3          THE COURT:  So from now on, it will be ten days.

4          MR. LASKER:  Okay.  And --

5          THE COURT:  Ten days, I mean --

6          MR. LASKER:  Well, I don't know.  I think I came up

7     with that off the top of my head.

8          THE COURT:  Ten court days.

9          MR. LASKER:  Ten court days, that's fine.

10          THE COURT:  I don't want your deadline to be on a

11     Sunday or something.

12          MR. LASKER:  Two weeks, I understand.

13          And Your Honor, just since we're not going to be

14     submitting something else with respect to the 34, there's a

15     couple issues else I wanted you to be aware of about these

16     documents.

17          THE COURT:  Please.

18          MR. LASKER:  Some of the documents are actually not

19     talking about our products, they're talking about other

20     manufacturers' products, and some of them have emails from

21     other manufacturer representatives.  Again, that's third party.

22     We don't really care.  But sometimes there are communications

23     that I can't talk about between individual manufacturers that

24     they may not want it out.  I don't know.  It's not my problem.

25     Maybe it's not our problem, maybe it is.  But I just wanted you

1    to be aware of that's going on with the documents.  There's

2    documents from Paxton Noble.  There's documents about other

3    company's products that are not ours, just so you're aware of

4    that.

5         The other issue, which is a tricker issue, and I don't

6    exactly have -- I don't actually know how to deal with -- is

7    European documents, and documents that have information about

8    people in Europe.  And we submitted -- and I hope Your Honor

9    has gotten the orders, we'll get that signed with respect to

10   the Martens documents to get that out.  But that is a separate

11   issue that raises privacy laws in Europe that are just really

12   very stringent.

13        And so I don't know exactly -- I mean, you can see the

14   briefing from the consent motion.  We provided to Your Honor

15   what those requirements are, and the privacy interests that

16   arise in connection with those.  My guess, with respect to the

17   most recent submission, because it is specific to certain

18   individuals that are in the Europe, you'll have the names and

19   be able to identify, *oh, this looks like it's Europe*, and that

20   is just another factor that you could take into consideration

21   when reviewing the documents.

22            **THE COURT:**  And I did, I saw that you submitted a

23   stip.  I have not reviewed it yet, but will do so promptly.

24            **MR. LASKER:**  We appreciate that, Your Honor.  That

25   will allow us to get started.  We can't start collecting the

1  documents until we have that.

2          **MS. GREENWALD:**  So, Your Honor, I would submit to you

3  that the case law in *Roman Catholic Archbishop of Portland*

4  discusses third-party interests in documents produced by

5  Monsanto, and allows that production to go forward.

6      I'm not sure that you entered an order with respect to the

7  sealing of Rowland's and the IARC.  Should we refile those not

8  under seal?

9          **THE COURT:**  I will issue a written order about sort of

10  a lot of what we discussed today, the relevance of IARC and EPA

11  reports, the Rowland deposition, the motion, Texas A&M's motion

12  to quash, and the motions -- all of these motions to seal.

13          **MS. GREENWALD:**  Okay.  Thank you, Your Honor.

14          **MR. LASKER:**  Thank you, Your Honor.

15          **THE COURT:**  Anything else for us to discuss?

16      We discussed sort of the discovery letter and the

17  confidentiality designations.  I think that's it.

18                          (No response.)

19          **THE COURT:**  All right.  Good.  When do we next see

20  each other?

21          **MS. WAGSTAFF:**  March 8th.

22          **THE COURT:**  March 8th for our next --

23          **MS. WAGSTAFF:**  Case management conference.

24          **THE COURT:**  That's our next case management

25  conference.

1          Okay.   Very good.   Thank you.

2               **ALL COUNSEL:**  Thank you, Your Honor.

3               (Proceedings adjourned at 3:37 p.m.)

4                         ---oOo---

1

2

3                    **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  DATE:   Monday, March 6, 2017

8

9

10

11  _____

12        Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                       Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25