UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOWN OF LEXINGTON, on behalf of itself and all others similarly situated,<br>    Plaintiff,<br><br>v.<br><br>PHARMACIA CORPORATION,<br>SOLUTIA INC., and<br>MONSANTO COMPANY,<br>    Defendants. | )<br>)<br>)<br>)     C.A. No. 12-CV-11645<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' OPPOSITION TO PLAINTIFF TOWN OF LEXINGTON'S MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF PETER G. SHIELDS, M.D.

Pharmacia LLC, Solutia Inc. and Monsanto Company (collectively "Pharmacia" for ease and convenience) oppose the Town of Lexington's motion to exclude the testimony and report of Dr. Peter G. Shields M.D.  Dr. Shields is an experienced and heralded oncologist and epidemiologist, with a particular focus on the causes of cancer.  He has decades of PCB-specific testing and research experience, having published primary research as recently as 2014.  His opinions demonstrate that there is no causal relationship between PCBs and cancer, a topic which Lexington has repeatedly raised since the inception of this case.  Nonetheless, Lexington seeks to exclude Dr. Shields' testimony as unreliable and irrelevant.

The gravamen of Lexington's claims are directed at proving ***potential adverse human health effects*** from airborne molecules of polychlorinated biphenyls (which Lexington avers were a component part of the window caulk and sealant installed in the Joseph Estabrook Elementary School prior to 1960).  Lexington presses "property damage" claims premised on the volitalization of PCB molecules into the school's indoor air and migration to other substrate materials.  Lexington has consistently averred that the presence airborne PCB molecules in

1

school indoor air at specific age dependent levels included in a September, 2009 federal EPA press release[1] was an essential element of its *prima facie* case.

Lexington alleges that Dr. Shields' testimony is unreliable because his opinions differ from those of the International Agency of Research on Cancer ("IARC"), his opinions are not based on animal studies, and he has not personally conducted any PCB research in the past two decades. Plaintiff Town of Lexington's Motion to Exclude the Report and Testimony of Peter G. Shields, M.D., Doc. 230 ("Lexington Motion") at 5-7. These contentions are riddled with holes and unsound logic. First and foremost, Lexington ignores Dr. Shields' expertise in epidemiology, which by definition focuses on the study of human populations. Second, Dr. Shields applied the Bradford Hill methodology, which remains the most appropriate and useful methodology to assess general causation. That his opinions may differ from one organization's findings does not render them suddenly unreliable. In addition, the statement by Lexington that Dr. Shields' opinions differ from IARC is preliminary; IARC has stated their reclassification for PCBs as a cause of malignant melanoma in 2013, but has not released their monograph setting forth their rationale. Dr. Shields explicitly stated he is waiting for that document. Finally, Dr. Shields has remained clinically active and continues to publish on the chemical and genetic causes of cancer. His opinions are based on a review of the scientific literature conducted from 1975 through 2014. Thus Dr. Shields' opinions take into account the current scientific literature on PCB's relation to cancer and carcinogenic agents in general.

Lexington also argues that Dr. Shields' opinions are not helpful in this case because "Lexington does not claim to have conducted PCB remediation because of fear of cancer". Lexington Motion at 7. This statement is belied by Lexington's own allegations in its

---

[1] Public Health Levels of PCBs in School Indoor Air (ng/m3): (1) Age 1-2; 70; (2) Age 2-3; 70; (3) Age 3-6; 100; (4) Age 6-12; 300; (5) Age 12-15; 450; (6) Age 15-19; 600; (7) Age 19+; 450.

2

Complaint: "PCBs are persistent environmental pollutants that have been demonstrated to cause cancer, as well as a variety of other adverse health effects. Children are particularly vulnerable to the toxic effects of PCBs." Complaint, Doc. 1 at ¶ 2. Even now, Lexington continues to inject the "toxic" and "carcinogenic" effects of PCBs into this litigation through its "rebuttal" experts. So, while Lexington plans to pursue scaremongering over alleged adverse health effects to "the children,"[2] it seeks to prevent Pharmacia from delivering established scientific facts to the jury. Thus, Dr. Shields' opinions are not only relevant but necessary to prevent Lexington from unduly prejudicing the jury with its bare assertions and statements unsupported by science.

As such, the Court should deny Lexington's motion in full.

## STATEMENT OF FACTS

In September 2012, Lexington filed the present product liability suit against Pharmacia, alleging PCBs were defective "in design" and that Pharmacia failed to properly warn and instruct about its products. While Lexington maintained that this was a property damage claim, it spent not less than eight full paragraphs describing "PCB toxicity". Complaint, Doc. 1 at ¶¶ 18-25. Among its allegedly toxic characteristics, Lexington alleged that the EPA, the International Agency for Research on Cancer, the National Toxicity Program and the National Institute for Occupational Safety and Health had each classified PCB as a "probable human carcinogen." Complaint, Doc. 1 at ¶ 19. Throughout the litigation, Lexington continued to emphasize the harmful health effects of PCBs.

---

[2] For example, Lexington represented to the Court that "The demolition of that building is currently scheduled so as to protect, to the maximum extent possible, the health and welfare of the 500 children who attend the school." Plaintiff Town of Lexington's Motion for a Protective Order Regarding Inspection of the Estabrook Elementary School. Doc. 69. " To comply with the EPA mandate, provide a healthy educational environment for Estabrook students, and promote public safety, Lexington must commence demolition of the contaminated building in March 2014." "[D]elaying demolition of the building would impose on Lexington and the hundreds of schoolchildren who would be forced to attend school in the continued presence of a hazardous building. ..." Plaintiff Town of Lexington's Memorandum or Reasons in Support of Motion for Protective Order Regarding Inspection of the Estabrook Elementary School at 1-2. Doc.70.

3

On November 14, 2014, Pharmacia timely produced a comprehensively authored report by Dr. Peter G. Shields, an epidemiologist and oncologist, to address Lexington's allegations that PCBs were a known human carcinogen. Expert Report Peter G. Shields, MD, November 14, 2014 (Updated 2/11/15 to reflect correction of headers) ("Shields Report"), attached as Exhibit A. The report was 115 pages with 416 article citations about the causes of cancer generally and PCBs in particular. It includes all, or almost all of the primary research ever published about PCBs and cancer. Dr. Shields graduated from the University of Pennsylvania in 1979 with a B.A. in Biochemistry and American Civilization. He went on to receive his M.D. in 1983 from Mount Sinai School of Medicine. Shields Report, Curriculum Vitae. Dr. Shields is currently a tenured Professor at Ohio State University's Department of Internal Medicine in the College of Medicine, and in the Department of Epidemiology at the College of Public Health. Shields Report at 5. Dr. Shields has authored several primary studies and review articles about PCBs from 1990 to 2006, including positive results when they occurred, and then decided temporarily to no longer pursue PCB research because of his belief that PCBs were not a measurable cause of cancer. In 2014, however, he again published on the topic, because he had the opportunity to consider PCB health effects in a new and better way. That paper failed to show an increased risk of cancer in humans, even among the most highly exposed in an occupational setting.

Dr. Shields offered six major conclusions in his report. Shields Report at 3-4.

- PCBs are not causally related to the development of cancer in humans;
- Epidemiology studies demonstrate that the rates of cancer mortality in workers with high levels of exposure to PCBs are not statistically increased;
- IARC's recent re-classification of PCBs as a known human carcinogen is only known as a news report. IARC's process for classification, includes publishing an extensive

monograph detailing their methodology and their conclusions with a literature review. This has not yet been released. Importantly, IARC considered all other cancers and concluded that there was not sufficient evidence for PCBs as a human carcinogen. At deposition, Dr. Shields stated he was waiting for the IARC monograph before he could formulate any opinions about it classification of PCBs. The classification by IARC, according to the news report, was based on occupational studies with exposures that were orders of magnitude higher than possible for Lexington's school occupants. In any event, Dr. Shields noted in his report on page 10 "It is important to note that is a known human carcinogen classified by IARC should not be equated with a conclusion that it will cause cancer in humans." Shields Report at 10;

- The general population is exposed to PCBs through diet;
- The dose-response relationship of exposure to disease is a fundamental concept for toxicology, while consistency among studies is a fundamental concept for epidemiology. The two of these together, considering studies of the most highly exposed PCB workers provides substantial reassurance to the general population for no increased risk;
- The EPA's suggested indoor air levels have a high margin of safety and exceeding those levels does not actually increase the risk of cancer; and
- Exposure to PCBs at very low doses cannot be assumed to increase the risk of cancer.

Dr. Shields was deposed on February 13, 2015. Deposition of Peter G. Shields, February 13, 2015, ("Shields Depo.") attached as Exhibit B. Lexington now moves to exclude all of Dr. Shields opinions and testimony.

## ARGUMENT

I. **Dr. Shields's Opinions Are Reliable**

5

Lexington argues that Dr. Shields's opinions are unreliable because they do not conform to IARC's findings, they are not derived from animal studies, they are not based on his personal research, and they were formed solely for the purposes of litigation. As discussed more fully below, these arguments are not a proper measure of reliability, and are simply false and a misrepresentation of his opinions and testimony. Dr. Shields's opinions employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field", *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999), and are thus not only reliable but admissible.

### A. Dr. Shields' Disagreement With The Conclusions Reached By IARC Is Not Indicative Of A Poor Methodology

Lexington argues that Dr. Shields's opinions are unreliable because they run contrary to one organization, the International Agency for Research on Cancer ("IARC"), and, incidentally Lexington's own "rebuttal" expert, Dr. Pessah. Mere disagreement alone, however, is insufficient to find an expert's opinions unreliable, particularly where the testimony in question is founded on a rigorous and tested methodology. *See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).

When scrutinizing potential experts, the "focus must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993). As such, "*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *Ruiz-Troche*, 161 F.3d at 85. Rather, the proponent must only show that the expert's conclusions were "arrived at in a scientifically sound and methodologically reliable fashion." *Id.*

To reach his opinions, Dr. Shields' applied a well-established practice for considering whether a chemical can cause cancers. Shields Report at 9. Specifically, Dr. Shields applied the Bradford-Hill methodology to assess causation, which, incidentally, is the same methodology

6

used by IARC. Shields Report at 10. The Bradford-Hill criteria were published in 1965 and have been in regular use since then, including by agencies such as IARC and the U.S. Department of Health and Human Services, for example, in Surgeon General's many reports on smoking. Dr. Shields and others have specifically published on the use of the Bradford-Hill criteria and PCBs (Shields 2006; Golden 2009; Golden 2003). Next, Dr. Shields applied the Bradford Hill guidelines to his meticulous review of over 300 human and animal studies on PCBs. Shields Report at 13-76. Dr. Shields concluded that, under the Bradford-Hill guidelines, there was no causal relationship between PCBs and all cancers and specific cancers: non-Hodgkin lymphoma, breast cancer, prostate cancer, colon cancer, liver cancer, lung cancer, sarcoma, pancreas cancer, or even melanoma. Shields Report 25-58. Dr. Shields provides over 400 citations throughout his report, confirming again and again that his conclusions are shared by scientists, oncologists, and professional communities.

Regarding his disagreement with IARC's conclusions, Dr. Shields makes two points: first, IARC's designation of PCBs as carcinogenic is limited to melanoma and cannot be extrapolated to other types of cancers, Shields Report at 13; second, the scientific literature does not support IARC's conclusion that there is a melanoma risk from PCBs, Shields Report at 44. IARC's statement has only been released preliminarily and relates to only one type of cancer, namely malignant melanoma. Where IARC considered all other types of cancer, it concluded that there is no sufficient evidence in humans to consider PCBS a known human carcinogen. Until the rationale and data for IARC's melanoma determination is released (now overdue by 2 years), it is unclear whether or not the Working Group opinions relate to Lexington in any way. Importantly, the IARC process and opinions are clear that its classifications should **not** be used

7

to opine that PCBs will cause cancer in humans. Thus, whether or not Dr. Shields disagrees with IARC, the views of this one agency does not make Dr. Shields' opinions unreliable.

It is well established that different scientists can use the same data and research to reach different, but equally admissible conclusions. "That two different experts reach opposing conclusions from the same information does not render their opinions inadmissible." *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000); *see also Hines v. Consol. Rail Corp.*, 926 F.2d 262, 274 (3d Cir. 1991); *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1341 (S.D. Fla. 1999) ("Merely because two qualified experts reach directly opposite conclusions using similar, if not identical, data bases, or disagree over which data to use or the manner in which the data should be evaluated, does not necessarily mean that, under *Daubert,* one opinion is *per se* unreliable."). Given Dr. Shields's well-reasoned analysis, Lexington's assertions that Dr. Shields's opinions are somehow unreliable because he does not agree with IARC's conclusions are unpersuasive.

Finally, contrary to the Lexington's suggestions, Dr. Shields adequately identified at least three other scientific organizations which similarly refused to classify PCBs as a <u>human</u> carcinogen.[3] *See* Shields Report, Table 2 at 15. For example, the EPA and American Council of Governmental Industrial Hygienists only confirmed PCBs as an animal carcinogen. NIOSH and OSHA only classified PCBs as a carcinogen with no further categorization. Shields Report, Table 2 at 15.

### B. Dr. Shields Is An Epidemiologist And Accordingly His Expert Opinion Is Based On Human Testing And Data

Lexington contends that Dr. Shields's opinions are unreliable because his opinions are not based on animal PCB studies. Lexington Motion at 6. Lexington somehow supports its

---

[3] As Lexington points out, Dr. Shields already agreed that PCBs can cause cancer in animals. Shields Dep. at 88. However chemicals that are carcinogenic to animals are not necessarily carcinogenic for humans.

8

argument by quoting from Pharmacia's toxicology expert, James Lamb, Ph.D., who relied on animal studies in his toxicological analysis. Lamb Depo. at 64, excerpts attached as Exhibit C. Lexington, however, fails to consider the differences between epidemiology and toxicology. As Dr. Shields stated in his report and at deposition, animal studies are not useful for making conclusions that PCBs *will* cause cancer in humans, rather they are used as a screening test for chemical exposures to assess what *may* cause cancer in humans. They are also used to understand how cancer mechanisms are affected by chemicals, but only when the similar mechanisms exist in the experimental animal model and humans. This often is not the case because the screening animal studies are designed to provide a positive result. The conclusion that a chemical *will* cause cancer in humans can only come from adequate human study, specifically through epidemiology. Shields Report at 9, 24; Shields Depo. at 121.

While toxicology and epidemiology are interrelated, they are still considered separate fields of study and expertise, each with its own methods, data points, and review. Toxicology is the study of "hazards or safety of chemicals" whether in humans or animals. Lamb Depo. at 7-8. Epidemiology, on the other hand, is the specific study of diseases, including their incidence, mortality, and risks in a *specific population.* Lamb Depo. at 8; Shields Depo. at 29.

> Q. And what is epidemiology?
> A. It's the study of disease and causes of the disease in populations.
> * * *
> A. Epidemiology is studying disease incidence, mortality, and in my case risks.
> Q. How about toxicology? What is that?
> A. Well, toxicology is a different specialty with overlap to epidemiology. That tries to understand the toxic effects in biological systems, including people. So toxicology includes laboratory tests and cell cultures, animal studies, but also humans.
> Q. Are laboratory tests and cell cultures techniques used by epidemiologists?
> A. Generally not. You know, there's some overlap. So in my research activities, I run a laboratory; and to better understand the causes of cancer in people, we will do … toxicology testing in the laboratory and then I apply it to the epidemiology. So there's a spectrum there.

Shields Depo. at 28-30.

> Q. What is the difference between toxicology and epidemiology?
> A. Epidemiology is more the study of human diseases; whereas toxicology is more the study of how chemicals cause harm, whether in humans or in animals. Epidemiologists study human populations; whereas I evaluate data on how a chemical causes harm.

Lamb Depo. at 8.

Dr. Shields does not consider himself a toxicologist. Shields Depo. at 31.

As to the animal studies, Dr. Shields explained that he did not place as much value on animal studies as human studies for multiple reasons.

> Among the types of data that should be evaluated, human epidemiological data is substantially more reliable than laboratory *in vitro* and experimental animal data, assuming the epidemiological and other human studies are of good quality. If there is sufficient epidemiological data to make a conclusion, then experimental animal or other studies are sometimes considered only in the context of understanding biological mechanisms.

Shields Report at 9. In addition, there are pathological dissimilarities between humans and animals and the methodologies used in animal studies "reduces confidence in extrapolating such to human cancer risk, such as high dose exposures and the maximally tolerated dose." Shields Report at 24. Dr. Shields explained that he did not have to rely on animal studies when he "had a large number of epidemiologic studies in people that trump animal studies." Shields Depo. at 121.

Finally, the EPA's reliance on PCB animal studies is driven out of "cautionary" concerns. Shields Report at 14. In fact, Dr. Shields explains that "these agency methods and findings are not appropriate to support a conclusion of cancer causation in a particular individual, or to predict risk in particular individuals, or to conclude whether the chemical is carcinogenic in humans at all." Shields Report at 14. The EPA is tasked with setting up precautionary measures to avoid any potential harm, while scientists like Dr. Shields are tasked with finding the precise

10

causes of cancer. These are very separate goals, and as such, different data sets will have different levels of relevance.

### C. Dr. Shields's Opinions Are Based On Recent Studies Of PCBs

Lexington contends that Dr. Shields's opinions are unreliable because he has not studied PCBs for approximately twenty years. Lexington Motion at 6. Lexington argues that Dr. Shields' lack of recent PCB research somehow renders his opinions out of touch with the current science and that the science changed in the past 20 years. Lexington Motion at 7.

First and foremost, Lexington's assertion that Dr. Shields has not studied PCBs for approximately twenty years is patently untrue. As Lexington admits in a footnote, although Dr. Shields' initial PCB research occurred in the 1990s, he published a PCB-related study just last year. Lexington Motion at 7, n. 6; Shields Depo. at 45. This article, which studied employees exposed to PCBs leaking from capacitors, required a direct study of PCBs and their potential effects on human health, and provided further support for Dr. Shields's already well-established opinions. Shields Depo. at 48, 50. After analyzing the data collected in the 2014 study, Dr. Shields concluded that despite the workers' incredibly high exposure, there still "really wasn't any clear increased cancer risk." Shields Depo. at 50. This conclusion aligned seamlessly with the conclusions from his original research in the 1990s. Shields Depo. at 44-45.

Second, it is clear from Dr. Shields's 2014 study that, regardless when the research was conducted, the results remain the same – there is simply not enough evidence to find a causal connection between PCBs and cancer. As Dr. Shields explains, he believes that his study of PCBs and cancer is a "dead issue." Shields Depo. at 123. "[O]nce it became clear that PCBs were not a cause of cancer, there was no point of doing any more studying." Shields Depo. at 44-45. The 2014 study represented a new opportunity for Dr. Shields to study PCBs and health

11

effects in a different way, only for him to find, yet again, that PCBs were not causing cancer in heavily exposed workers.

In addition, Dr. Shields also remains intimately familiar with the research performed in the past twenty years. Dr. Shields is a tenured Professor in the Departments of Internal Medicine in the College of Medicine and the Department of Epidemiology at the College of Public Health, and the Deputy Director of the Ohio State University Comprehensive Cancer Center. Shields Report at 5. In these positions, Dr. Shields is able to remain up to date and thoroughly connected to the leading theories on potential causes for cancer. Shields Depo. at 43-45. In fact, Dr. Shields cited not less than 235 studies published between 1994 and 2014 in reaching his conclusion. Shields Report, "Literature Cited", at 77-115. Accordingly, Lexington's allegation that Dr. Shields is somehow disconnected from the current scientific literature on PCBs is demonstrably false.

### D. Dr. Shields' Opinions Were Not Generated Solely For Litigation

Finally, Lexington argues that Dr. Shields' opinions are unreliable because they were generated "solely for litigation purposes". Lexington Motion at 1. However, Lexington provides zero factual support for this accusation. "That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). In addition, expert testimony which is "based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were derived by the scientific method." *Id.*, 43 F.3d at 1317.

Dr. Shields' opinions are based on his three decades of personal research and study, funded in-part through federal dollars, and his continuing familiarity with the scientific literature

12

conducted by others. As he explains in his report, Dr. Shields bases his opinions on a career of professional research into the causes of cancer and fostered by his continuing care of oncology patients. Shields Report at 5, 7. This is not the kind of litigation-entrenched opinion creation that federal courts have traditionally rejected. *See Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) (excluding testimony of a "professional Plaintiff's witness" based on lack of professional standards in conducting research and generating opinion by conducting research in preparation for expert testimony in another case); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (excluding expert testimony because "none of the experts based his testimony on preexisting or independent research"); *Nat'l Bank of Commerce (of El Dorado, Ark.) v. Dow Chem. Co.*, 965 F. Supp. 1490, 1518 (E.D. Ark. 1996) (excluding expert testimony because litigation was the force in directing his research and expert had performed no research on the product in question independent of litigation). As such, Lexington's assertion that Dr. Shields formed his opinions solely for litigation fails on its face.

## II. Dr. Shields' Opinions Are Relevant Because Lexington Has Repeatedly Made The Potential Cancer-Causing Effects Of PCBs An Issue In This Litigation

Lexington suggests that, despite dozens of its own motions, memoranda, and expert reports which claim that Lexington was forced to remove building materials because of potential negative health effects from PCBs, Dr. Shields' expert opinions about the carcinogenic effects of PCBs does not "fit" into this litigation. Lexington Motion at 7. Not only is this proposition absurd, but it defies the very theory proposed by Lexington since the inception of this case.

Lexington repeatedly argued that it was forced to remove the building products because they caused a "threat to public health." Complaint, Doc. 1 at ¶ 31.[4] Throughout the span of this

---

[4] While Lexington alleged it suffered property damage, there was actually no structural damage to Estabrook, the building products themselves were fully functional, and no structural weaknesses occurred because of the PCBs.

13

almost three-year-old litigation, Lexington has maintained that PCBs are dangerous because they are carcinogenic, and thus require remediation:

> PCBs are persistent environmental pollutants that have been demonstrated to cause cancer, as well as a variety of other adverse health effects. Children are particularly vulnerable to the toxic effects of PCBs. Complaint, Doc. 1 at ¶ 2.
>
> Just as in the environment, PCBs accumulate in the human body. According to the EPA, PCBs have been demonstrated to cause cancer, as well as a variety of other adverse health effects on the immune, reproductive, nervous, and endocrine systems of animals and humans. Complaint, Doc. 1 at ¶ 18.
>
> PCBs cause cancer and a variety of other serious adverse health effects, and children are particularly vulnerable to PCBs. Lexington's Opposition to Defendants' Motion to Dismiss, Doc. 26 at 16.
>
> PCBs are classified as known human carcinogens by the International Agency for Research on Cancer. According to the U.S. Environmental Protection Agency ("EPA"), children exposed to PCBs can suffer damage to their immune, reproductive, memory and endocrine systems . . . The Town of Lexington ("Lexington") suffered a multi-million dollar injury when it was required by EPA guidelines to reduce concentrations of PCBs in the indoor air at Estabrook Elementary School. Memorandum in Support of Motion to Certify Class, Doc. 119 at 2.
>
> This case concerns whether Massachusetts' children are attending schools in safe, healthy environments free from the presence of PCBs - a known human carcinogen. "PCBs are a toxic threat that should not be in any school." Reply in Response to the Motion to Certify the Class, Doc. 194 at 1.

Albeit untimely, Lexington now proffers "rebuttal" expert testimony to opine on this same issue:

> I concur with the [IARC] that, when considering the 'weight of evidence' from biologically plausible mechanisms, results from animal studies, and several dozen epidemiological studies, there is sufficient evidence for the carcinogenicity of PCBs in humans, especially for developing melanoma.
>
> Expert Report of Isaac Pessah at 4, attached as Exhibit D.
>
> Q: "Is your basis for concluding that Dr. Shields' conclusions, with respect to positive associations reflect spurious results rather than an increased risk, is that based solely on your reading of the IARC assignment?

14

A. No. It's also based on my understanding that PCBs that are tumor promoters have an adverse outcome pathway that's been well defined, and that is one of my expertise."

Deposition of Isaac Pessah, April 8, 2015, attached as Exhibit E.

Lexington argues that Dr. Shields' opinions are irrelevant because they only address one of "myriad adverse health effects related to PCBs." Lexington Motion at 8. Yet, Lexington correctly points out that expert testimony may be relevant "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *see Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 91 (1st Cir. 2014); *Clark v. Edison*, 881 F. Supp. 2d 192, 200 (D. Mass. 2012).

Here, Dr. Shields' opinions do not suddenly become irrelevant because he only addresses one aspect of Lexington's theory.[5] Quite the opposite, Dr. Shields' expert opinion will help guide the jury to determine a fact that Lexington caused to be at issue – whether PCBs are actually carcinogenic at the low doses present at Estabrook. This will help the jury determine if any potential adverse health effects from PCBs have any relationship whatsoever to Lexington's alleged property damage caused by volatilized PCB molecules from caulk and sealant installed in the Estabrook School more than 50 years ago.

Now, faced with an exceptionally qualified expert opining that PCBs are not causally connected to cancer, Lexington tries to dodge and weave its way out of the fanciful claim it created from whole cloth. The Court denied Lexington's motion to change its basic claims and legal theories in its March 24, 2015 order. Lexington framed the case that it must now prove.

---

[5] Unlike Lexington, Pharmacia decided to address each asserted health effect by an expert in that respective field. See Expert Reports of Drs. Lamb, Starr, Schell, and Shields.

15

Pharmacia marshaled competent, admissible evidence to demonstrate that Lexington's claim is baseless.

Accordingly, the Court must deny Lexington's motion to exclude the opinions and testimony of Dr. Shields.

### III. CONCLUSION

For the reasons discussed above, Pharmacia requests that the Court deny Lexington's Motion to Exclude the Report and Testimony of Peter G. Shields, M.D.

Dated: May 14, 2015

Respectfully Submitted,

MONSANTO COMPANY,
SOLUTIA INC., and
PHARMACIA CORPORATION

By their attorneys,

CAMPBELL CAMPBELL
EDWARDS & CONROY, P.C.

/s/ Richard L. Campbell

Richard P. Campbell (BBO# 071600)
Richard L. Campbell (BBO # 663934)
Brandon L. Arber (BBO # 676425)
Diana A. Chang (BBO # 682317)
Sean M. Hickey (BBO # 690865)
One Constitution Center, 3rd Floor
Boston, MA 02129
(617) 241-3000
rpcampbell@campbell-trial-lawyers.com
rlcampbell@campbell-trial-lawyers.com
barber@campbell-trial-lawyers.com
dchang@campbell-trial-lawyers.com
shickey@campbell-trial-lawyers.com

and

16

HUSCH BLACKWELL LLP

Carol A. Rutter (pro hac vice)
Robyn D. Buck (pro hac vice)
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Tel: (314) 480-1500
carol.rutter@huschblackwell.com
robyn.buck@huschblackwell.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of May, 2015, the foregoing document was filed electronically. Notice of this filing will be sent by e-mail to the following parties by operation of the Court's electronic filing system:

Bryan S. Gowdy
Creed & Gowdy, P.A.
865 May Street
Jacksonville, FL 32204
Telephone: (904) 350-0075
bgowdy@appellate-firm.com

Esther L. Klisura (pro hac vice)
Sher Leff, LLP
450 Mission Street, Suite 400
San Francisco, California 94105
Telephone: (415) 348-8300
eklisura@sherleff.com

Robert Chapman (pro hac vice)
Jon-Jamison Hill (pro hac vice)
Eisner Kahan Gorry Chapman Ross & Jaffe
9601 Wilshire Boulevard, Suite 700
Beverly Hills, California 90210
rchapman@eisnerlaw.com
jhill@eisnerlaw.com
(310) 855-3200

Scott P. Lewis
Melissa C. Allison
David S. Mackey
Anderson & Kreiger LLP
One Canal Park, Suite 200
Cambridge, MA 02141
(617) 621-6500
slewis@andersonkreiger.com
malison@andersonkreiger.com
dmackey@andersonkreiger.com

Kevin J. Madonna (pro hac vice)
Kennedy & Madonna, LLP
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 331-7514
kmadonna@kennedymadonna.com

/s/ Richard L. Campbell

18