# EXHIBIT 5

# EXHIBIT 5 A



August 24, 2016

Steven Knott, Designated Federal Official
Office of Science Coordination and Policy (7201M)
Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460-0001

*Submitted via Regulations.gov; Docket ID: EPA-HQ-OPP-2016-0385*

Re:   FIFRA Scientific Advisory Panel; Notice of Public Meeting:  EPA's evaluation of the carcinogenic potential of Glyphosate; Request for Information and Comments; Docket ID No. EPA-HQ-OPP-2016-0385 (July 26, 2016)

Dear Mr. Knott:

CropLife America ("CLA"), established in 1933, represents the nation's developers, manufacturers, formulators, and distributors of crop protection chemicals and plant science solutions for agriculture and pest management in the United States.  Our member companies produce, sell, and distribute crop protection and biotechnology products used by American farmers.  CLA supports a rigorous, science-based, and transparent process for government regulation of their member companies' products, representing the interests of its member companies by monitoring legislation, federal agency regulations and actions, and litigation that impacts the crop protection and pest control industries, and participating in such actions when appropriate.  CLA is committed to working with the U.S Environmental Protection Agency ("EPA" or "the Agency") as the federal agency responsible for the regulation of pesticides, on matters of importance to CLA member companies and the agricultural community.

On July 26, 2016, EPA published a notice [Federal Register (2016-17707)] of its intent to convene a meeting of the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel ("SAP") [EPA-HQ-OPP-2016-0385] to review EPA's evaluation of the carcinogenic potential of glyphosate, a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings.[1]  CLA members have significant concerns about the convening of the SAP on glyphosate given the extensive, scientifically-based risk assessments of the herbicide undertaken by regulators around the globe beginning with the EPA review and registration of glyphosate in 1974.

---

[1]   81 Fed. Reg. 48,794 (July 26, 2016).

Representing the Crop Protection Industry
1156 15th St. N.W., Suite 400  Washington, D.C. 20005  •  202.296.1585 phone   202.463.0474 fax   www.croplifeamerica.org

### A.   Convening a Meeting of the FIFRA SAP to Review the Carcinogenicity of Glyphosate is Unnecessary and an Inappropriate Use of EPA Resources

For over 40 years, the EPA—and all other regulatory and scientific agencies worldwide that have reviewed glyphosate —have concluded that glyphosate does not pose a cancer risk to humans.  This includes the European Commission, the Joint WHO/Food Agricultural Organization, Japan, and Australia.[2]  In March 2015, however, after review of only a subset of the glyphosate data previously reviewed by these entities, the International Agency for Research on Cancer (IARC) concluded differently—finding that glyphosate is "probably carcinogenic to humans."[3]  That conclusion spurred significant criticism from national regulators who responded that the evidence *did not* support IARC's conclusion.  *See, e.g.*, European Food Safety Auth. (EFSA), *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, 13 EFSA J. 4302 (Nov. 12, 2015) ("[G]lyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential . . . .").[4]

Moreover, within the past few months, two additional and significant reports have been published that provide the scientifically appropriate and valid rationale for immediate cancellation of the scheduled SAP. The most recent report of the FAO/WHO Special Session of the JMPR, "Pesticides in Food 2016," in its in-depth review found that glyphosate is unlikely to pose a carcinogenic risk to humans via exposure from diet.[5]  This expert meeting was called specifically to assess the differences in reported human health effects (carcinogenicity,

---

[2]   *See, e.g.*, 78 Fed. Reg. 25,396 (May 1, 2013); Scitox Assessment Servs., *A Review of the Eart Open Source (EOS) Report "Roundup and Birth Defects: Is the Public Being Kept in the Dark?"* (July 2013), http://archive.apvma.gov.au/news_media/docs/glyphosate_scitox_review_july_2013.pdf; European Comm'n, Directive 6511/VI/99, *Report for the Active Substance Glyphosate* (Jan. 21, 2002), http://ec.europa.eu/food/fs/ph_ps/pro/eva/existing/list1_glyphosate_en.pdf; *Report of Evaluation by Food Sanitation Council Agricultural Chemicals Residue Committee*, 50 Shokuhin Eisei Kenkyu, No. 8 (2000); WHO/FAO, *Pesticides Residues in Food* 145 (2011), http://www.fao.org/fileadmin/templates/agphome/documents/Pests_Pesticides/JMPR/Report11/Glyphosate.pdf.

[3]   Int'l Agency for Research on Cancer, WHO, *Glyphosate*, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, vol. 112 (2015), http://monographs.iarc.fr/ENG/Monographs/vol112/mono112-09.pdf .

[4]   *See also* Pest Mgmt. Regulatory Agency, Health Canada, *Proposed Re-evaluation Decision PRVD2015-01, Glyphosate* (Apr. 13, 2015), http://www.hc-sc.gc.ca/cps-spc/pest/part/consultations/_prvd2015-01/prvd2015-01-eng.php (overall weight of evidence indicates that glyphosate is unlikely to pose a human cancer risk); Ger. Fed. Inst. for Risk Assessment, *Does Glyphosate Cause Cancer?* (Mar. 23, 2015), http://www.bfr.bund.de/cm/349/does-glyphosate-cause-cancer.pdf. ("[T]he Federal Institute for Risk Assessment (BfR) was responsible for the human health risk assessment and *has assessed glyphosate as non-carcinogenic*. This was supported by competent national, European and other international institutions for health assessment including the WHO/FAO Joint Meeting on Pesticide Residues (JMPR).)"; New Zealand Environmental Protection Agency, *Review of the Evidence Relating to Glyphosate and Carcinogenicity* (Aug. 11, 2016), http://www.epa.govt.nz/Publications/EPA_glyphosate_review.pdf (overall weight of evidence indicates that glyphosate is unlikely to be carcinogenic); Japanese Food Safety Comm'n, http://www.fsc.go.jp/fsciis/meetingMaterial/show/kai20160324no1.

[5]   FAO/WHO. *Pesticides in Food 2016: Special session of the Joint FAO/WHO meeting on pesticide residues*.  FAO Plant Production and Protection Paper:  227.  Rome, August 2016.

genotoxicity, and mutagenicity) between historic JMPR expert assessments of glyphosate and those reported by the WHO International Agency for Research on Cancer (IARC) in 2015.[6] The experts reporting in the global report determined that glyphosate is unlikely to pose a carcinogenic risk to humans via exposure from diet.

Even more recently, regulators of the Environmental Protection Authority of New Zealand concluded, "based on a weight of evidence approach, taking into account the quality and reliability of the available data, glyphosate is unlikely to be genotoxic or carcinogenic to humans and does not require classification under HNSO as a carcinogen or mutagen."[7]

The rationale for convening this FIFRA SAP is not the need for more or better data; nor is it the submission of a greater set of animal and *in vitro* data from Part 158-required analyses. In fact, it is clear from the 2015 report of the EPA Cancer Assessment Review Committee (CARC) Report that EPA has no further questions as to the carcinogenicity of glyphosate.[8] EPA rationale for convening the SAP is that it contends there is a need for review of new data that was not available during its previous reviews of glyphosate safety data, and that based on the conclusions of the IARC 2015 glyphosate Monograph 112, more careful review of existing epidemiologic data is needed. However, as recently as October 2015 (months following the publication of the IARC Monograph), the CARC reported, "the epidemiological studies in humans showed no association between glyphosate exposure and cancer of the following: oral cavity, esophagus, stomach, colon, rectum, colorectum, lung, pancreas, kidney, bladder, prostate, brain (gliomas), soft-tissue sarcoma, leukemia or multiple myelomas." What is new for EPA consideration from what was concluded by EPA's own CARC in October 2015?

There is no scientific justification for another EPA review of glyphosate for carcinogenicity when the EPA CARC report of October 2015 found no concerns as to potential carcinogenicity. The EPA must be clear about any further study- and specific about its hypothesis as to what might be an impact that is yet to be considered. The absence of the usual precedent step to convening an SAP—an EPA CARC finding of some concern—raises questions as to the motivation undergirding EPA's intent to reconsider (once again) its previous findings and conclusions.

What's more, the ability of EPA to gather scientists more qualified than those engaged by FAO/WHO and the JMPR to once again review the scientific literature is unlikely. The Notice to convene the FIFRA SAP on glyphosate invites nominations of candidates to serve as *ad hoc* members of FIFRA SAP, which is to convene October 18, 2016 through October 21, 2016 (the "October 2016 meeting").

---

[6] World Health Organization. 2015. International Agency for Research on Cancer, Monograph on Glyphosate. Volume 112. Geneva Switzerland.

[7] New Zealand Environmental Protection Agency, *Review of the Evidence Relating to Glyphosate and Carcinogenicity* (Aug. 11, 2016), http://www.epa.govt.nz/Publications/EPA_glyphosate_review.pdf (overall weight of evidence indicates that glyphosate is unlikely to be carcinogenic).

[8] EPA. Office of Chemical Safety and Pollution Prevention 2015. Glyphosate: Report of the Cancer Assessment Review Committee. October 1 2015, Washington DC.

3

EPA is legally obligated to exclude industry members whose conflicts of interest and established biases preclude their ability to impartially contribute to the panel's final report, conclusions of which likely will inform regulatory determinations in the near term. CLA therefore opposes the selection of any *ad hoc* members who have already made a determination regarding the carcinogenic potential of glyphosate.

### B. The EPA Has an Obligation to Ensure the Impartiality of the FIFRA SAP

The Federal Advisory Committee Act (FACA) imposes strict conflict of interest requirements on the FIFRA SAP selection process.[9] EPA must ensure that the FIFRA SAP acts "in the public interest,"[10] and does not contain members with inappropriate special interests.[11] To meet the requirements established by FACA, the FIFRA SAP shall be comprised of impartial experts capable of providing an independent review of data on the carcinogenic potential of glyphosate. Indeed, the Office of Government Ethics advises against the participation of SAP panel members whose participation will create even the "appearance of loss of impartiality."[12]

Historically, EPA has placed a premium on expertise, knowledge and experience in the field when selecting members for its advisory committees.[13] The EPA SAP office has adopted conflict of interest rules for the selection of committee members, which aim to exclude those who "might be unable to provide impartial advice or [whose] impartiality in the particular matter might be questioned."[14] If a conflict exists between a panel candidate's private financial interests and duties as a panel member, EPA will, as a rule, seek to appoint another candidate instead.[15] Grounds for exclusion from a committee include performing consulting activities or providing expert testimony regarding an issue relating to that presented before the SAP.[16] Potential ad hoc members may also be excluded based on, *inter alia,* experience with the topic under consideration that suggests an established position or implicates an inability to render

---

[9] *See* 5 U.S.C. App. II, § 3(2).

[10] S*ee id*. App. II, § 9(a)(2).

[11] *See id.* § 5(b)(3).

[12] 5 C.F.R. § 2635.501(a) (2016); *see also* Sci. Advisory Bd., EPA, *Overview of the Panel Formation Process at the Environmental Protection Agency Science Advisory Board* 9-10 (Sept. 2002), https://yosemite.epa.gov/sab/sabproduct.nsf/WebFiles/OverviewPanelForm/$File/ec02010.pdf [hereinafter "*Overview of Panel Formation*"]; *see also* 18 U.S.C. §202(a); Sci. Advisory Bd., EPA, *Ethics for Advisory Committee Members*, https://yosemite.epa.gov/sab/sabproduct.nsf/Web/ethics?OpenDocument (last updated May 3, 2016).

[13] *Overview of Panel Formation*, *supra* note 12, at 9 (listing "[e]xpertise, knowledge, and experience" as "primary factors that determine whether an individual is invited to serve on an SAB Panel").

[14] *See* EPA, *Information on the Panel Formation Process for the EPA FIFRA SAP* (Sept. 16, 2004), http://www.epa.gov/sites/production/files/2015-06/documents/srb_process_interviews.pdf [hereinafter "*Panel Formation Process for the EPA FIFRA SAP*"]; 81 Fed. Reg. at 48,795.

[15] *See Overview of the Panel Formation*, *supra* note 12, at 9-10.

[16] *See Panel Formation Process for the EPA FIFRA SAP*, *supra* note 14, at 5-8.

4

impartial advice; evidence of partial "public statements on the issue"; and, evidence of financial conflicts of interest.[17]

The inclusion of scientists who are not impartial—or who have lost their appearance of impartiality—is counter to EPA's goal of assembling a panel of experts to provide sound, independent, and useful scientific and technical advice.[18] EPA therefore should not appoint to the FIFRA SAP any person who has publicly expressed an opinion regarding the carcinogenicity of glyphosate.

### C.   Representatives Who Are Not Impartial Must Not Participate as Ad Hoc Members of the FIFRA SAP

The IARC process and subsequent events revealed the pre-formed conclusions and conflicts of interest of several scientists with respect to the evaluation of the carcinogenic potential of glyphosate. By way of example, Dr. Kathryn Guyton, one of the lead IARC scientists, presented speeches to NGO groups both before and upon completion of the IARC review in which she stated that glyphosate is linked to breast cancer.[19] Dr. Christopher Portier served as the "technical advisor" to the IARC glyphosate review panel, and following publication of the IARC monograph, sought to induce regulatory agencies worldwide to adopt IARC's conclusions by undertaking a publicity campaign using letter-writing initiatives, articles and publications, and direct advocacy before regulatory bodies.[20] Dr. Portier has regularly engaged in policy advocacy against glyphosate since IARC's findings were published.[21]

---

[17]  *See id.* at 5-8, 10-14.

[18]  *See* EPA Sci. Advisory Bd., *supra* note 12, at 9.

[19]  *See, e.g.*, David Zaruck & Julie Kelly, *'The Facebook Age of Science' at the World Health Organization*, Nat'l Review (May 3, 2016), http://www.nationalreview.com/article/434845/WHO-cancer-agency-bad-science-labels-glyphosate-probably-carcinogenic.

[20]  As one example, Mr. Portier pleaded with the European Food Safety Authority ("EFSA") to rethink their own findings that glyphosate does not "pose a carcinogenic hazard to humans." Christopher Portier et al., *Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR*, (Nov. 27, 2015) *available at* http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf [hereinafter "*Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR*"]. *See also* Christopher Portier et al., *Difference in the Carcinogenic Evaluation of Glyphosate Between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, J. Epidemiol Community Health (2016) [hereinafter "*Differences Study*"].

[21]  In speaking to the Soil Association, for instance, Mr. Portier exaggerated the findings of the IARC report, stating that "Glyphosate is definitely genotoxic. *There is no doubt in my mind*." Curt DellaValle, *Monsanto's GMO Weed Killer Damages DNA*, AgMag (July 17, 2015), http://www.ewg.org/agmag/2015/07/monsanto-s-gmo-weed-killer-damages-dna; *see also* Sustainable Pulse, *WHO Cancer Expert: Glyphosate is Definitely Genotoxic* (July 15, 2015) http://sustainablepulse.com/2015/07/15/who-cancer-expert-glyphosate-is-definitely-genotoxic/. Tellingly, Mr. Portier himself questioned his impartiality with respect to the matter in question. In response to a question about his work with EDF and his research into glyphosate, Mr. Portier responded, "I agree that this has the appearance of being a conflict of interest." Kate Kelland, *How the World Health Organization's Cancer Agency Confuses Consumers*, Reuters (Apr. 18, 2016), http://www.reuters.com/investigates/special-report/health-who-iarc/.

Drs. Guyton and Portier serve as only two examples of scientists with disqualifying biases for the purposes of appointment to the FIFRA SAP October panel.  No scientist who has authored or contributed to the IARC monograph or who has advocated to the European Union that IARC's review is superior to that of other regulatory bodies[22] should participate in EPA's upcoming review of glyphosate's carcinogenicity.

Nor should the FIFRA SAP include those individuals who have made "written or oral public statements indicating the candidate has already formed a position on the topic."[23]  Such individuals include signatories to the "Stop Glifosate" initiative[24] and authors of "Concerns Over Use of Glyphosate-based Herbicides and Risks Associated with Exposures: A Consensus Statement."[25]  The bias born of expressing a public conclusion on a scientific topic compromises the ability of these individuals to deliver dispassionate, determinative scientific analysis and advice to EPA.

Finally, the FIFRA SAP should also exclude scientists who have a direct stake in final determinations of the FIFRA SAP on this issue.[26]  Scientists with a profit motivation that could be affected by the outcome of this process may seek to downplay the toxic effects of glyphosate on human health and well-being, or conversely, overemphasize or focus solely upon the benefits of glyphosate, consistent with the well-being of an employer.  For example, Dr. Portier serves as an expert in litigation on behalf of plaintiffs who argue that glyphosate causes cancer.[27]  Dr. Portier therefore has a direct profit motivation in the outcome of the FIFRA SAP deliberations.

It is EPA's charge to ensure the credibility of its determinations, particularly where the question regards a topic of great interest to the public health and environmental community.  The work of the ad hoc panel members in this October 2016 meeting of the FIFRA SAP will be critical to the determinations of the panel.  Accordingly, EPA should reject any nominees who have any direct or potential conflicts of interest or industry bias, or offer the appearance of partiality, on the question of the carcinogenicity of glyphosate.

---

[22]   *See, e.g., Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR*, *supra* note 20.

[23]   *See Panel Formation Process for the EPA FIFRA SAP*, *supra* note 14, at 16.

[24]   *See Stop Glifosato*, http://www.stopglifosato.it/ (last visited Aug. 11, 2016).  The StopGlifosate campaign began in 2015.  The campaign's signatories and supporters, such as Italy's Ramazzini Institute, publically endorse the IARC's challenged classification of glyphosate as "likely carcinogenic" to humans.  *Id.*

[25]   Myers et al. "Concerns Over Use of Glyphosate-based Herbicides and risks Associated with Exposures: A Consensus Statement," 15 Envtl. Health, no. 19 (2016).

[26]   This is consistent with the advice of the National Academies, which has stated "it is essential that the work of committees … not be compromised by issues of bias and lack of objectivity … . Questions of lack of objectivity and bias ordinarily relate to views, statements, or positions taken that are largely individual with a particular point of view or the positions or perspectives of a particular group." Nat'l Acad. of Scis., *Policy on Committee Composition and Balance and Conflicts of Interest* 4 (2003).

[27]   *See Differences Study*, *supra* note 20, at p. 4 ("Competing interests").

Thank you for your consideration of these comments.

Respectfully submitted,

*Janet E Collins*

Janet E. Collins, Ph.D., R.D., CFS
Senior Vice President
Science and Regulatory Affairs

Cc: Mr. Steven Knott

# EXHIBIT 5 B



October 12, 2016

Steven Knott, Designated Federal Official
Office of Science Coordination and Policy (7201M)
Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460-0001

*Submitted via Electronic Mail to Knott.Steven@epa.gov and via Regulations.gov; Docket ID: EPA-HQ-OPP-2016-0385*

      Re:    FIFRA Scientific Advisory Panel; Notice of Public Meeting: EPA's evaluation of the carcinogenic potential of Glyphosate; Request for Information and Comments; Docket ID No. EPA-HQ-OPP-2016-0385 (July 26, 2016)

Dear Mr. Knott:

      CropLife America ("CLA"), established in 1933, represents the nation's developers, manufacturers, formulators, and distributors of crop protection chemicals and plant science solutions for agriculture and pest management in the United States.  Our member companies produce, sell, and distribute crop protection and biotechnology products used by American farmers.  CLA members support a rigorous, science-based, and transparent process for government regulation of their products, representing the interests of its member companies by monitoring legislation, federal agency regulations and actions, and litigation that impacts the crop protection and pest control industries, and participating in such actions when appropriate.  CLA is committed to working with the U.S Environmental Protection Agency ("EPA" or "the Agency"), as the federal agency responsible for the regulation of pesticides, on matters of importance to CLA member companies, the agricultural community and the general public.

      On July 26, 2016, EPA published notice in the federal register of its intention to convene a meeting of the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel ("FIFRA SAP") to review EPA's evaluation of the carcinogenic potential of glyphosate, a non-selective, phosphonomethyl amino acid herbicide registered to control weeds in various agricultural and non-agricultural settings.[1]  The notice invites nominations of candidates to serve as ad hoc members of the FIFRA SAP, which is to convene October 18, 2016 through October 21, 2016 (the "October 2016 meeting").

---

[1]    FIFRA, Scientific Advisory Panel 81 Fed. Reg. 48,794 (Meeting July 26, 2016).

**Representing the Crop Protection Industry**

1156 15th St. N.W., Suite 400 Washington, D.C. 20005  •  202.296.1585 **phone**   202.463.0474 **fax**   www.croplifeamerica.org



Under FIFRA, the SAP serves in an advisory role and provides "comment[s] as to the impact on health and the environment" of registrations being considered by EPA.[2]  All final decision-making authority under FIFRA rests with EPA.  Pursuant to its authority under FIFRA, EPA has previously concluded that glyphosate is "not likely to be carcinogenic to humans."[3]

As CLA explained in its August 17, 2016 letter ("Conflicts Letter"), EPA is legally obligated to exclude scientists from the SAP whose conflicts of interest or established biases preclude their ability to contribute impartially to the panel's final report.  CLA therefore respectfully opposes the selection of Dr. Peter Infante, whose patent biases should disqualify him from service on the SAP.  CLA also asks EPA to take note of certain information regarding Dr. Kenneth Portier and confirm his ability to participate without any pre-formed conclusions, although it does not seek his disqualification.

### *The EPA Has an Obligation to Ensure the Impartiality of the FIFRA SAP*

The Federal Advisory Committee Act (FACA) imposes strict conflict of interest requirements on the FIFRA SAP selection process.[4]  As explained in greater detail in CLA's Conflicts Letter, EPA must ensure that the FIFRA SAP acts "in the public interest,"[5] and does not contain members with inappropriate special interests.[6]  To meet the requirements established by FACA, the FIFRA SAP shall be comprised of impartial experts capable of providing an independent review of data on the carcinogenic potential of glyphosate.  Indeed, the Office of Government Ethics advises against the participation of SAP panel members whose participation will create even the "appearance of loss of impartiality."[7]

To implement FACA's mandate, the EPA SAP office has adopted conflict-of-interest and bias rules for the selection of committee members, which aim to exclude those who "might be unable to provide impartial advice or [whose] impartiality in the particular matter might be questioned."[8]  Among other requirements, "appearance of lack of impartiality, lack of independence, and bias may result in disqualification." [9]

---

[2] 7 U.S.C. § 136w

[3] *See*, EPA's Office of Pesticide Programs, *Glyphosate Issue Paper:  Evaluation of Carcinogenic Potential* at 141 (2016).

[4] *See* 5 U.S.C. App. II, § 3(2).

[5] *See id*. App. II, § 9(a)(2).

[6] *See id.* § 5(b)(3).

[7] 5 C.F.R. § 2635.501(a) (2016); *see also* Sci. Advisory Bd., EPA, *Overview of the Panel Formation Process at the Environmental Protection Agency Science Advisory Board* 9-10 (Sept. 2002), https://yosemite.epa.gov/sab/sabproduct.nsf/WebFiles/OverviewPanelForm/$File/ec02010.pdf; *see also* 18 U.S.C. §202(a); Sci. Advisory Bd., EPA, *Ethics for Advisory Committee Members*, https://yosemite.epa.gov/sab/sabproduct.nsf/Web/ethics?OpenDocument (last updated May 3, 2016).

[8] *See* EPA, *Information on the Panel Formation Process for the EPA FIFRA SAP* 16 (Sept. 16, 2004), http://www.epa.gov/sites/production/files/2015-06/documents/srb_process_interviews.pdf [hereinafter "Panel Formation Process for the EPA FIFRA SAP"]; 81 Fed. Reg. at 48,795.

[9] *See id.* at 5-8, 10-14.

**Representing the Crop Protection Industry**

1156 15th St. N.W., Suite 400 Washington, D.C. 20005  •  202.296.1585 **phone**   202.463.0474 **fax**   www.croplifeamerica.org



*Dr. Infante's Biases Should Disqualify Him From Service on the Glyphosate SAP*

EPA's ethical rules should preclude Dr. Infante's participation in the glyphosate SAP.  Dr. Infante is a member of Collegium Ramazzini,[10] which has taken radical anti-pesticide positions, such as calling for a prohibition on all "pesticide use in all public areas, including residential areas and recreation grounds," even if regulatory agencies have concluded such uses were safe.[11]  Dr. Infante has also repeatedly testified—exclusively for plaintiffs—in chemical exposure cases against Monsanto Company, the original registrant of glyphosate, and its affiliated entities.[12]

Even more troubling, federal courts have concluded that Dr. Infante has engaged in a pattern of biased, results-oriented analysis that disqualified consideration of his opinions.  Of particular note is a decision of the Eastern District of Louisiana, which struck his testimony in a thoughtful and comprehensive opinion.  *See Burst v. Shell Oil Co.,* No. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015).  Judge Vance's *Burst* decision leaves little doubt that Dr. Infante is all-too-willing to manipulate scientific analysis to reach pre-determined outcomes (*i.e.,* invariably concluding a chemical is unsafe).  In *Burst*, she explained that Dr. Infante's analysis "suggest[ed] a methodology driven by an attempt to achieve a particular result," *id.* at *14, which was apparent in several respects:

- "[I]n several instances, **Dr. Infante cherry-picked data** from studies that did not otherwise support his conclusion, **failed to explain contrary results**, **reached conclusions the authors of the study did not themselves make**, and **manipulated data** without providing any evidence of his work."  *Id.* at 10 (emphasis added).

- "Dr. Infante cherry-picks data from studies in several significant instances and fails to explain contrary results in a manner that belies the reliability of his methodology."  *Id.* at *13.

- The court dryly observed that:  "Absent from Dr. Infante's report is any acknowledgment that this study separately examined the risk for [the specific cancer at issue] and did not find a statistically significant increased risk.  The Court can only speculate as to why Dr. Infante neglected to discuss this pertinent finding in his report."  *Id.* at *13.

- "[I]t is clear that Dr. Infante relied on a universe of divergent studies that either did not examine the substance at issue, did not examine the disease at issue, or did not exhibit statistically significant results.  Moreover, **Dr. Infante exhibited a willingness to ignore**

---

[10]  *See* http://www.collegiumramazzini.org/fellows1.asp?id=82
[11] *See* Collegium Ramazzini Statement, The Control of Pesticides in the European Union:  A Call for Action to Protect Human Health (2008) available at http://www.collegiumramazzini.org/download/13_ThirteenthCRStatement(2008).pdf
[12] *See* Roney v. GenCorp, et. al., No. 05-cv-788 (S.D.W. Va. 2005); Taylor v. Airco, Inc., et. al., No. 02-30014-MAP (D. Mass. 2002);  Lewis v. Airco, Inc., et. al., No. L-10503-02 (N.J. Civ. Div., Essex County 2002);  Skeen, et. al. v. Monsanto Company, No. G-82-468 (S.D. Tex. 1982).

**Representing the Crop Protection Industry**

1156 15th St. N.W., Suite 400 Washington, D.C. 20005  •  202.296.1585 **phone**   202.463.0474 **fax**    www.croplifeamerica.org



>  *or disregard contrary results, and to manipulate data* in a manner not supported by any evidence of his work or independent justification and, in one instance, inconsistent with the authors' own discussion." *Id.* at *16 (emphasis added).

Judge Vance also cast doubt on Dr. Infante's scientific rigor. In response to the court's question about an obvious gap in his analysis, the court noted: "At the hearing, Dr. Infante explained that he *performed the [relevant] calculation on a 'sticky note.'*" *Id.* at *14 (emphasis added).

*Burst* is not an outlier. The Eastern District of Washington has similarly struck Dr. Infante's testimony and noted his obvious willingness to disregard studies that contradicted his opinions. *See Henricksen v. Conoco Phillips Co.*, 605 F. Supp. 2d 1142, 1168–77 (E.D.Wa. 2009) ("[T]here is simply too great an analytical gap between the data presented and the opinions offered … such that it renders the expert testimony too speculative as a matter of law.; *id.* at 1172 (noting important study supporting contrary conclusion was conspicuously "not cited by Dr. Infante"); *id.* at 1174 (noting that while study at issue was updated "notably, Dr. Infante did not cite [the update] in his report").

Dr. Infante's public—and colorful— statements also indicate he will reflexively discount any and all industry-sponsored studies and lacks the temperament for unbiased analysis of glyphosate. Dr. Infante notably contributed to a 2014 book titled: *Our Daily Poison: From Pesticides to Packaging, How Chemicals Have Contaminated the Food Chain and Are Making Us Sick*, authored by Marie-Monique Robin (who also authored the anti-Monsanto book *The World According to Monsanto*). In *Our Daily Poison*, Dr. Infante:

- Expressed his disdain for all industry-sponsored studies, stating: "How does industry find scientists to do this kind of task? It buys them, that's all! Let's be clear—***it's what I call 'prostituted science.***'" *Id.* at 144 (emphasis added).

- Expressed his view that regulatory agencies are chronically incapable of evaluating industry-sponsored studies properly: "***The problem is that biased studies are then sent to regulatory agencies, who take them at face value***. That's how highly toxic substances have been contaminating our environment, our food, our fields or our factories, for decades." *Id.* (emphasis added).

- "Generally, studies sponsored by industry have been designed in such a way that it is nearly impossible to find harmful effects. The consequence is ***that the scientific literature is regularly polluted by worthless studies***. It's pathetic." *Id.* at 141 (emphasis added).

The glyphosate SAP is certain to consider industry-sponsored studies as part of its proceedings and there is no reason to believe that Dr. Infante will consider such studies as anything other than "prostituted science" and "worthless," as he has in the past. Dr. Infante's incendiary statements manifestly demonstrate that his "impartiality in the particular matter might be questioned."



The prejudice from Dr. Infante's bias is particularly acute because he is currently the only epidemiologist on the glyphosate SAP, potentially enhancing his ability to influence the SAP proceedings improperly.  Because of the potential importance of epidemiological data, EPA should replace Dr. Infante with an epidemiologist without such patent bias.

For all of these reasons, CLA respectfully requests that Dr. Infante be excluded from participation in the glyphosate SAP.

### EPA Should Confirm That Dr. Kenneth Portier Will Participate Without Any Pre-Formed Conclusions.

Although he has not previously testified against or otherwise expressed the patent bias against pesticide manufacturers or the science upon which they and/or regulatory bodies rely, Dr. Portier has expressed opinions about glyphosate that suggest he may already have pre-formed conclusions as to glyphosate's safety.  For example, Dr. Portier has stated that "glyphosate needs to go on the California Prop. 65 database" of chemicals that may cause cancer or have reproductive toxicity.[13]  Dr. Portier has also urged "manufacturers to come up with alternative products" to glyphosate because, in his view, "We don't like to see man-made carcinogens freely circulating in the environment."[14]

Dr. Portier is also the brother of Dr. Christopher J. Portier, a noted and vehement anti-glyphosate activist.  CLA requests that EPA confirm that his brother's views will not affect Dr. Portier's ability to evaluate the relevant evidence objectively and that he has not already formed a conclusion regarding the carcinogenicity of glyphosate.

Respectfully submitted,

*Janet E Collins*

Janet E. Collins, Ph.D., R.D., CFS
Senior Vice President
Science and Regulatory Affairs

---

[13] *See* Interview with Dr. Kenneth Portier on Smart Health Talk (Oct. 27, 2015) *available at* http://www.smarthealthtalk.com.

[14] *See* Dennis Thompson, *Genetically Modified Foods, Herbicides and Human Safety*, HealthDay (Aug. 19, 2015) *available at* https://consumer.healthday.com/vitamins-and-nutrition-information-27/food-and-nutrition-news-316/herbicides-and-gmos-702482.html.