# EXHIBIT 6

1              UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF CALIFORNIA

2

3    IN RE: ROUNDUP              )

     PRODUCTS LIABILITY          )   MDL No. 2741

4    LITIGATION                  )

     _____ )   Case No.

5    THIS DOCUMENT RELATES       )   16-md-02741-VC

     TO ALL CASES                )

6

7            WEDNESDAY, JANUARY 11, 2017

8    CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9                   - - -

10            Videotaped deposition of Donna

11   Farmer, Ph.D., Volume I, held at the offices

12   of HUSCH BLACKWELL, L.L.C., 190 Carondelet

13   Plaza, Suite 600, St. Louis, Missouri,

14   commencing at 9:04 a.m., on the above date,

15   before Carrie A. Campbell, Registered

16   Diplomate Reporter, Certified Realtime

17   Reporter, Illinois, California & Texas

18   Certified Shorthand Reporter, Missouri &

19   Kansas Certified Court Reporter.

20                   - - -

21

           GOLKOW TECHNOLOGIES, INC.

22      877.370.3377 ph | 917.591.5672 fax

                deps@golkow.com

23

24

25

Confidential - Subject to Protective Order

1          A.       It would be our formulations

2    and salespeople.

3          Q.       Who's in charge of formulation?

4          A.       I don't know at this time.

5          Q.       At any time who's been in

6    charge of formulations?

7          A.       William Abraham.

8          Q.       I'm sorry?

9          A.       William Abraham.

10         Q.       Is he still with the company?

11         A.       Yes, he is.

12         Q.       Do you know his title?

13         A.       No, I don't.

14         Q.       All right.  You mentioned you

15   weren't required to do cancer studies with

16   Roundup.

17                  Did I hear that correctly?

18         A.       The regulatory agencies have

19   very specific studies, and that is not one of

20   them.

21                  MR. JOHNSTON:  Counsel, what

22         number was that last exhibit?  I'm

23         sorry.

24                  MR. MILLER:  Yes, sir.  Hand

25         that back.

Confidential - Subject to Protective Order

1                    (Farmer Exhibit 1-9 marked for

2           identification.)

3    QUESTIONS BY MR. MILLER:

4           Q.     I want to look at a document

5    that's been prepared by Monsanto that

6    discusses these issues.

7                    Would it be fair to say,

8    Donna Farmer, that surfactants do in fact

9    increase a glyphosate's absorption by the

10   skin?

11          A.     I have no data to support that

12   statement.

13          Q.     All right.  Let's look at a

14   Monsanto document about that statement.

15   Okay?

16                  This is Exhibit 1:9, and it was

17   produced from your custodial file.  I have a

18   copy for you and counsel.

19                  Ma'am, here you go.

20                  MR. MILLER:  Counsel.

21                  MR. JOHNSTON:  Thank you.

22                  MR. MILLER:  Yes, sir.

23   QUESTIONS BY MR. MILLER:

24          Q.     Certainly feel free to look at

25   the entire document.  I'm going to ask you

Confidential - Subject to Protective Order

1   about page 9478, just to be fair.  I think

2   you're looking at it, where it says

3   "surfactants."  That's the only place I

4   intend to ask you about.

5                Yes, ma'am.  I just wanted to

6   make sure you had time to review it first.

7                So this document discusses what

8   we've just been talking about, surfactants,

9   right?

10      A.      Yes.

11      Q.      And what it tells us is that

12  the upper barrier of the skin is very

13  lipophilic; is that right?

14                Showing you I'm just an old

15  country lawyer.

16                What's that mean?

17                MR. JOHNSTON:  Objection.

18          Foundation to this document.  It's a

19          draft, and we don't know what this is

20          or whether she had any role in

21          preparing it.

22                But you can answer if you can.

23                MR. MILLER:  Let's keep the

24          speaking objections down.

25                MR. JOHNSTON:  I can object on

Confidential - Subject to Protective Order

1        any basis, as long as I'm not

2        suggesting an answer.

3            My point is we don't have any

4        foundation for this document.

5    QUESTIONS BY MR. MILLER:

6        Q.    What does lipophilic mean?

7        A.    Lipophilic means that there is

8    fat within that.  Fat-loving.  Lipophilic

9    means fat-loving.  But I -- this is -- I

10   agree, this is a draft.

11           MR. MILLER:  You've just

12       suggested an answer.  She just gave

13       the answer you just objected to.

14           MR. JOHNSTON:  I stated a fact,

15       Counsel.

16           MR. MILLER:  Yeah, well, I'm

17       going to call the judge if we do it

18       again.

19           MR. JOHNSTON:  Yeah, well,

20       please do.  I think he would be frank

21       with us.

22           MR. MILLER:  I will.

23   QUESTIONS BY MR. MILLER:

24       Q.    Let's back to work now.  Now

25   let me read the document that you provided.

Confidential - Subject to Protective Order

1                    "The natural barrier prevents

2       the hydration of the skin and prevents, for

3       instance, bacteria and other outer

4       microelements from entering the body through

5       the skin."

6                    Did I read that correctly?

7                    MR. JOHNSTON:  Objection.

8          Foundation.

9       QUESTIONS BY MR. MILLER:

10          Q.     You can answer.

11          A.     You read it correctly, but I --

12      this may have come out of my files, but I

13      didn't write this document.  My name is not

14      on this document.

15          Q.     "Glyphosate, on the other hand,

16      is very hydrophilic."

17                    What does hydrophilic mean?

18          A.     It doesn't like fat.

19          Q.     Okay.  "So initially a low

20      interaction between glyphosate and human skin

21      is to be expected."

22                    Did I read that correctly?

23                    MR. JOHNSTON:  Objection.

24          Foundation.

25                    THE WITNESS:  You did read it

Confidential - Subject to Protective Order

1      correctly, but, again, this is --

2      there's a piece that's missing of

3      this.  This is a proposal, not the

4      results.  So it's saying to be

5      expected.  This isn't saying it

6      happens.  This is all putting forth

7      kind of theories.

8              And I think if you go to the

9      data, you'll find out that there's

10     very little difference between

11     surfactants and very little glyphosate

12     goes across the skin.

13  QUESTIONS BY MR. MILLER:

14      Q.    This document produced from

15  your file tells us surfactants are able to

16  increase glyphosate absorption through the

17  skin by six different means.  I'm going to

18  read them and ask if I read them correctly.

19              "1, removal of lipids from the

20  epidermal surface due to surfactant action."

21              Did I read that correctly?

22              MR. JOHNSTON:  Objection.

23     Foundation.

24              He's asking you if he read it

25     correctly, not whether it's true or

Confidential - Subject to Protective Order

```
 1           not.

 2                     THE WITNESS:  Yeah, you read it

 3           correctly.

 4      QUESTIONS BY MR. MILLER:

 5           Q.     "2, increase of the hydration

 6      state of the skin under closed exposure

 7      conditions."

 8                     MR. JOHNSTON:  Objection.

 9           Foundation.

10      QUESTIONS BY MR. MILLER:

11           Q.     "3, increase of the skin

12      contact spreading water droplets by

13      surfactant action."

14                     MR. JOHNSTON:  Objection.

15           Foundation.

16      QUESTIONS BY MR. MILLER:

17           Q.     And "4, increase of contact

18      time with the skin due to decrease of

19      evaporation of water from the droplets

20      containing surfactant."

21                   5 and 6 -- and then we'll ask

22      you if I read this right, and we'll continue.

23                     "5, increase of subepidermal

24      blood flow due to irritant action of

25      surfactant."
```

Confidential - Subject to Protective Order

1                         And finally, "6, intraepidural

2       {sic} and subepidermal intercellular water

3       accumulation due to irritant action of the

4       surfactant."

5                         Did I read that correctly?

6                         MR. JOHNSTON:  Objection.

7            Foundation.

8                         THE WITNESS:  You said

9            "intraepidural," not "epidermal," in

10           the first one.

11      QUESTIONS BY MR. MILLER:

12           Q.    Well, thank you for that

13      correction.

14                    Now, which of those six ways

15      that the surfactant makes glyphosate more

16      able to get in the skin, which of those six

17      ways do you not agree happen?

18           A.    Again, this is a document that

19      was a proposal to look at dermal absorption

20      studies, so I wasn't involved in putting this

21      together.  They have made -- this to me looks

22      like they're making speculations about what

23      might happen.

24                    I think the important piece in

25      this is to go get the studies that resulted

Confidential - Subject to Protective Order

1    observed adverse effects on health and the

2    environment.  Since it is an important

3    objective to use environmentally safe and

4    less toxic products, the polyoxyethylene

5    tallowamine surfactants were replaced at

6    least in some Monsanto products by others."

7              Was that true?  Did you replace

8    some of the Roundup products in Europe and

9    stop using POA there?

10        A.    I think you need to kind of go

11   to the next sentence.

12        Q.    Sure.

13        A.    It fits in with what Mark said,

14   the company, to say:  My opinion was this

15   formulation was fine, but the company then

16   stated this decision was mainly based on eye

17   irritation potential and the aquatic toxicity

18   related to the formerly used substances.

19              We know that poly -- the POEA

20   can be irritating to the eyes.  It's

21   reversible and not permanent.  And because it

22   is a surfactant, it can have toxicity to

23   aquatic organisms.

24        Q.    And to follow up on this from

25   1999, just recently Europe has banned POEA in

Confidential - Subject to Protective Order

1    the near future, right?

2                    MR. JOHNSTON:  Objection.

3         Vague.

4                    Go ahead.

5                    THE WITNESS:  Based on a

6         political decision, not on a

7         toxicology position.

8                    POEA is still used in the US

9         and in Canada, completely approved and

10        supported.

11                   In my opinion and many other

12        people's, that that was a political

13        decision, not a safety decision.

14   QUESTIONS BY MR. MILLER:

15        Q.    The answer is, yes, POEA will

16   be off the market in Europe soon?

17        A.    It will be off the market in

18   Europe based on a political decision, not on

19   a safety decision.

20        Q.    Well, let's look at the

21   decision to ban POEA in the European market.

22                   (Farmer Exhibit 1-12 marked for

23        identification.)

24   QUESTIONS BY MR. MILLER:

25        Q.    We'll mark as Exhibit 1:12 a

Confidential - Subject to Protective Order

1    is a probable in vivo genotoxin," right?

2          A.      Yes, he does.

3          Q.      And in the next paragraph he

4    says, "Both glyphosate and Roundup induce

5    significant increased DNA strand breaks in

6    mouse liver and kidney," right?

7          A.      Yes, but up above, again, he

8    also talks about the Bolognesi doesn't meet

9    guideline standards.  And so, again, this is

10   an intraperitoneal injection.  It's only a

11   few animals.  And so he's giving us the

12   findings that he sees here.

13         Q.      Okay.  Let's go to the next

14   page, 2103.  He summarizes in that first full

15   paragraph, "The overall data provided by the

16   four publications provide evidence to support

17   a model that glyphosate is capable of

18   producing genotoxicity both in vivo and in

19   vitro by a mechanism based upon the

20   production of oxidative damage," right?

21         A.      He says that, but, again, I

22   want to remind you that there were some that

23   were negative.  And then again, oxidative

24   damage can be due to cytotoxicity.

25                 In many of the studies where we

Confidential - Subject to Protective Order

1   see these kinds of responses, it's secondary

2   to cytotoxicity, not a primary oxidative

3   response.

4         Q.     He recommended on page 2104,

5   paragraph B at the top there, ma'am, "an

6   assessment of the individual components of

7   Roundup mixture to determine whether there is

8   any components which act synergistically to

9   increase the potential genotoxicity of

10  glyphosate," right?

11        A.     He did, and it was a basis for

12  a study that we actually did.

13        Q.     What study?

14        A.     It was with Heydens, et al.

15        Q.     Can you spell that, please?

16        A.     It was Bill Heydens,

17  H-e-y-d-e-n-s.

18        Q.     Oh, your boss?

19        A.     Uh-huh.

20        Q.     And he did the study?

21        A.     No, there was a group of us.

22  We had some -- because we are not in a

23  laboratory.  We worked with some laboratory

24  people to look at this exact question

25  because, again, we did not believe that these

Confidential - Subject to Protective Order

1    findings were related to a genotoxic effect

2    but secondary to some cytotoxicity.

3              So we did a study doing an oral

4    route of exposure, which would be more

5    relevant, and we didn't reproduce the same

6    findings.  We did an intraperitoneal

7    injection and got the same findings but not

8    an oral one.

9              MR. MILLER:  I'll substitute

10         this.  I just wrote on it.  I

11         apologize.

12   QUESTIONS BY MR. MILLER:

13         Q.    All right.  Excuse me.  What is

14   the date of that study, and was it published?

15         A.    It was a series of studies, so

16   I don't remember exactly when they were, and

17   I think it was in 2008 or '9.

18         Q.    Were they published?

19         A.    It was published in one

20   publication.

21         Q.    Which publication?

22         A.    I don't remember what the

23   journal was.

24         Q.    Were they ever submitted to

25   Dr. Parry?

Confidential - Subject to Protective Order

1      A.      I would believe based on what I

2  see here that we would have had a

3  conversation with Dr. Parry because it

4  appears that that was the foundation for us

5  doing that study.

6              I don't know what the

7  conversations were with Mark and Dr. Parry,

8  but it was published, so it's out there in

9  the open literature.

10     Q.      So he made these

11  recommendations in 1999, and when did you

12  start these studies?

13     A.      Good question.  I don't know.

14  It took -- we didn't -- I don't remember when

15  we started them, but we did do them.

16     Q.      Were they ever repeated by

17  independent scientists?

18     A.      Anyone would be welcome to

19  repeat them if they'd like to.

20     Q.      You did not retain any

21  independent scientists to go repeat these.

22  These were done in-house at Monsanto?

23     A.      We have very qualified

24  scientists that can conduct these studies,

25  and we did those studies.  And then we put it

Confidential - Subject to Protective Order

1    out there in the peer-reviewed literature for

2    people to look and evaluate for their own.

3        Q.    Did you study to reproduce the

4    same results from a peritoneal exposure and

5    not oral?

6        A.    Yes, we did.  Because we wanted

7    to say is it -- when we see studies like

8    this, the big thing for us is to ask is it

9    real, and then is it reproducible, and then

10   what does it mean.

11              So we did the study again, and

12   it was real.  We saw the effects.

13              And then our question was, what

14   happens when you do a more relevant route of

15   exposure, and then what does that look like.

16       Q.    Let's look some more at what

17   Dr. Parry found in -- when requested to look

18   at these issues for Monsanto.

19              Dr. Parry told you he would

20   conduct these studies, right?

21       A.    I don't remember that

22   conversation.

23              (Farmer Exhibit 1-24 marked for

24        identification.)

25

Confidential - Subject to Protective Order

1    QUESTIONS BY MR. MILLER:

2         Q.    Let's look at it.  We'll mark

3    it as Exhibit 1-24, a copy of 1:24.

4              MR. JOHNSTON:  For the record,

5         I guess you've attached the metadata

6         catalog to the back of this.  Is

7         that -- you intend to mark that as

8         part of this exhibit or not?  You

9         haven't been.

10             MR. MILLER:  No, I don't intend

11        to since we have Bate stamps on them.

12   QUESTIONS BY MR. MILLER:

13        Q.    All right, ma'am.  This is

14   Exhibit 1:24, and it's a document generated

15   by Monsanto eight days after receiving

16   Dr. Parry's first report.

17             See it says December 10, 1999.

18             Oh, a long time afterwards.

19   I'm sorry.  Excuse me.

20             So exhibit -- I want to do this

21   accurate.

22             Exhibit 1:23 is February --

23   that's right, they do it different in

24   Europe -- February 10, 1999.  Okay.

25             So then quite a few months

Confidential - Subject to Protective Order

```
1    later, December 1999, a group meeting occurs

2    concerning these issues, and you are part of

3    that meeting.

4              Do you see "Donna Farmer"

5    there?

6         A.    It wasn't --

7              MR. JOHNSTON:  Objection.

8    Foundation.

9              Go ahead.

10              THE WITNESS:  This wasn't the

11         only reason why that meeting was held.

12         This was a subpart of a bigger

13         meeting.

14    QUESTIONS BY MR. MILLER:

15         Q.    Or nor did I suggest it was.

16              But it was part of the meeting,

17    fairly?

18         A.    It was one of the subject

19    matters, yes.

20         Q.    Okay.  And what we said there

21    was -- let's go to page 2 is really what I

22    want to ask you about.

23              On page 2 of these meeting

24    notes -- I'm looking at paragraph number 4 of

25    these notes up top and it says, "Some
```

Confidential - Subject to Protective Order

1    indication of DNA damage observed in

2    different test systems are due to cytotoxicity

3    properties of the formulation tested than to

4    actual mutagenicity," right?

5         A.    Correct.  That's what I've been

6    saying.

7         Q.    Yes, ma'am.

8               And let's go down three

9    paragraphs.  Dr. Parry says he'll do tests

10   for you to see if that's true, but Monsanto

11   doesn't want to let him, right?

12              MR. JOHNSTON:  Objection.

13         Argumentative.  Misstates the

14         document.  No foundation.

15   QUESTIONS BY MR. MILLER:

16        Q.    I want to ask you about the

17   exact words in the document in a minute.

18              Do you recall refusing to let

19   Dr. Parry do the tests that you and Bill

20   Heydens did?

21        A.    Well, these are different

22   studies than -- he's talking about doing in

23   vitro studies, and we did in vivo studies.

24        Q.    You never gave Dr. Parry any

25   material to do testing, right?

1           A.      I don't remember.

2           Q.      Let's look.

3                   "In order to further develop

4    the relationship with Dr. Parry, it was

5    recommended that the surfactant samples be

6    provided to him for testing.  However, before

7    sending Dr. Parry any samples, it was

8    recommended that they undergo in-house

9    testing first in similar in vitro screen,"

10   right?

11          A.      Yes.

12          Q.      So you never sent Dr. Parry any

13   samples, and he never was able to do any

14   testing; that's true, isn't it?

15                  MR. JOHNSTON:  Objection.

16          Foundation.  Misstates the document.

17                  Go ahead.

18                  THE WITNESS:  That doesn't say

19          that.  It just said that we wanted to

20          do them in-house and that you can see

21          the request was made by toxicology to

22          include either me -- and there's

23          nothing in here that says we didn't

24          send anything to Dr. Parry.

25

Confidential - Subject to Protective Order

1    QUESTIONS BY MR. MILLER:

2          Q.     I'm asking you a general

3    question, Dr. Farmer.  Of all your extensive

4    experience in glyphosate and Roundup, are you

5    sitting here and going to tell us that you

6    sent Dr. Parry samples to do any testing or

7    not?

8                 MR. JOHNSTON:  Objection.

9          Asked and answered.

10                Go ahead.

11                THE WITNESS:  I don't remember.

12          But this document doesn't say that we

13          weren't going to.  I don't know.

14   QUESTIONS BY MR. MILLER:

15         Q.     What the document says, "Before

16   sending Dr. Parry any samples, it was

17   recommended that they undergo in-house

18   testing first in a similar in vitro screen,"

19   right?

20                MR. JOHNSTON:  Objection.

21         Asked and answered.  Argumentative.

22   QUESTIONS BY MR. MILLER:

23         Q.     Is that what the document says,

24   ma'am?

25                MR. JOHNSTON:  Objection.

Confidential - Subject to Protective Order

```
1           Asked and answered.
2    QUESTIONS BY MR. MILLER:
3           Q.     You can answer.  He's not
4    instructing you not to answer.
5           A.     That's what it said, but,
6    again, he never says that we didn't send him
7    anything.
8           Q.     Who is William Graham?
9           A.     He is a -- with our
10   registration affairs group.  He's retired.
11   He was in Europe.
12          Q.     After his first report then,
13   ████████████████████████████████████████
14   being Dr. Parry, and persuade him that
15   glyphosate was not mutagenic, right?
16          A.     I don't remember that
17   conversation.  We believe it wasn't
18   genotoxic, and there were a number of other
19   large studies that met regulatory
20   requirements that were out there, and those
21   studies were not standard.  So I can believe
22   that we wanted to -- we didn't believe that
23   it was genotoxic or mutagenic.
24                 (Farmer Exhibit 1-25 marked for
25          identification.)
```

Confidential - Subject to Protective Order

```
 1    QUESTIONS BY MR. MILLER:
 2         Q.    All right.  Let's look at
 3    Exhibit 1:25, a series of e-mails to you and
 4    others about this issue.  It's a short,
 5    one-pager.
 6              MR. JOHNSTON:  Is this 25, did
 7         you say?
 8              MR. MILLER:  Yes, sir.
 9              MR. JOHNSTON:  Thank you.
10    QUESTIONS BY MR. MILLER:
11         Q.    All right.  Ma'am, you see you
12    were sent this e-mail in May of 1999 after
13    his first report, right?
14         A.    Yes.
15         Q.    All right.  And what is going
16    on here is William Graham below asked how --
17    I'm sorry, can we read that?  No, excuse me.
18              What William Graham is asking
19    is how much will it be.  The results are now
20    needed to persuade him.  Had nothing to do
21    with glyphosate is mutagenic.
22              That was the goal right after
23    his first report, was to send him more
24    materials and try to convince Dr. Parry that
25    your product is not genotoxic, right?
```

Confidential - Subject to Protective Order

1      A.      The studies --

2      Q.      Mutagenic, sorry.

3      A.      The studies that Dr. Parry

4  looked at, as we talked about, had some

5  unusual findings associated with them,

6  unusual routes of exposure, they didn't meet

7  guideline standards, and we didn't believe

8  that they represented glyphosate as

9  mutagenic.

10             And you can see the next

11  sentence says the ECCO Mammalian tox review

12  came out with this conclusion.  And over all

13  these years, all the regulatory agencies have

14  looked at those same studies that Dr. Parry

15  looked at, and they've concluded that they

16  don't support glyphosate being genotoxic or

17  mutagenic.

18             And so we -- again, we were

19  trying to work with Dr. Parry because we

20  didn't believe it was, and we were trying to

21  figure out what information can we give him,

22  because others agreed with us that it's not

23  mutagenic or genotoxic.

24             MR. MILLER:  Move to strike the

25         answer concerning regulatory agencies

Confidential - Subject to Protective Order

1        as nonresponsive.

2    QUESTIONS BY MR. MILLER:

3        Q.    Let's look at the e-mail from

4    author Mark Martens right above that.

10       A.    That's what's written there.

11       Q.    Okay.  You agreed to not send

12   Dr. Parry any samples, true?

13       A.    I don't remember.

14            (Farmer Exhibit 1-26 marked for

15       identification.)

16   QUESTIONS BY MR. MILLER:

17       Q.    Let's refresh your

18   recollection.  Exhibit 1-26, an e-mail

19   prepared by you in April of 2000 on this

20   issue.  Here we go.

21            Here, ma'am, is a copy for you

22   and a copy for counsel.

23            So, ma'am, here we are, still

24   in year 2000.  And Donna Farmer, you say -- I

25   want to read this exactly -- "Should I go

Confidential - Subject to Protective Order

1    ahead and ask Todd to repeat the studies?  Or

2    should we use a different assay?  I agree we

3    do not send samples to Dr. Parry until we get

4    this sorted out."

5              Right?  Your instructions were

6    not to send Dr. Parry any samples?

7              MR. JOHNSTON:  Objection.

8         Misstates the record.

9              THE WITNESS:  This is until we

10        get it sorted out.  So again, if you

11        go to the first e-mails, we're doing

12        not a normal micronucleus study, we're

13        doing a micronu -- it's called

14        micro-micronucleus, so it's a

15        screening study we were looking at,

16        and it looked like we had some

17        conflicting results.

18             And so that's what I was saying

19        is should we ask Todd to repeat the

20        studies or should we do a different

21        assay.  And I'm agreeing to someone

22        that we don't send the samples to

23        Dr. Parry until we get this sorted

24        out.

25             Again, it doesn't say that we

Confidential - Subject to Protective Order

```
 1          didn't send them to him.  We were just
 2          trying to assess what this screening
 3          study meant.
 4   QUESTIONS BY MR. MILLER:
 5          Q.      The fact is you never did send
 6   Dr. Parry any samples, did you?
 7                  MR. JOHNSTON:  Objection.
 8          Asked and answered three times now.
 9   QUESTIONS BY MR. MILLER:
10          Q.      Does this document refresh your
11   recollection in any way that you ever sent
12   your outside expert, Dr. Parry, any samples?
13          A.      I do not remember.
14          Q.      Dr. Parry's first name was Jim,
15   right?
16          A.      I believe it was James or Jim,
17   yes.
18          Q.      James.
19                  He passed away; you're aware of
20   that?
21          A.      I don't know when, but I was
22   aware of that.
23          Q.      I think it was 2010.
24                  Does that sound about right?
25          A.      I don't remember.
```

Confidential - Subject to Protective Order

```
 1           Q.      Okay.  All right.  Well, let's
 2    ask this:  Jim Parry, Dr. Parry, told
 3    Monsanto in 1999 that this issue of oxidative
 4    stress should be addressed.
 5                   Do you remember that?
 6           A.      We talked about it in that one
 7    document, and that's why we did the
 8    subsequent studies with Dr. Heydens, the
 9    publication we talked about.
10           Q.      Did you do stress marker
11    responses, stress response marker tests?
12           A.      Similar to the ones that were
13    in those publications.
14           Q.      Did you do clinical
15    biochemistry parameters?
16           A.      I believe we did.
17           Q.      And it's in a peer-reviewed
18    published journal?
19           A.      And there's histopathology as
20    well.
21           Q.      The truth was, ma'am, your boss
22    told you that you weren't going to do the
23    studies that Dr. Parry suggested, right?
24           A.      We did studies, and we did the
25    repeat of the Bolognesi.  That's what I
```

Confidential - Subject to Protective Order

1    remember doing.

2                    (Farmer Exhibit 1-27 marked for

3          identification.)

4    QUESTIONS BY MR. MILLER:

5          Q.    Let's look at an e-mail from

6    your boss, William Heydens, to you on this

7    issue, and we're going to mark it as

8    Exhibit 1:27.  All right?

9                    All right.  Ma'am, this is

10   William Heydens sends this e-mail in

11   September of 1999, right?

12         A.    Yes.

13         Q.    Sends it to you and others,

14   right?

15                    You see your name there, "Donna

16   Farmer"?

17         A.    Yes.

18         Q.    It's regarding the Parry

19   report, isn't it?

20         A.    Yes.

21         Q.    Okay.  And he says, "Mark, et

22   al." --

23                    Mark being Mark Martens, right?

24         A.    Yes.

25         Q.    -- "I've read the report and

1    agree with the comments.  There are various

2    things that can be done to improve the

3    report."

4               So Monsanto wants to change his

5    report and improve it, right?

6         A.     There are comments that -- they

7    provide to his report, and we were going to

8    provide comments back.

9         Q.     "Let's step back and look at

10   what we're really trying to achieve here.  We

11   want to find/develop someone who is

12   comfortable with a genotoxic profile of

13   glyphosate/Roundup and who can be influential

14   with regulators and scientific outreach

15   operations when genotox issues arise."

16              That was the goal, wasn't it?

17        A.     We look for experts to help us

18   in this area to answer questions and give us

19   feedback on what we can do, so, yes, we do

20   look for experts to help us in this area.

21        Q.     Your boss says, "My read is

22   that Parry is not currently such a person,

23   and it would take quite some time and dollar

24   sign, dollar sign, dollar sign studies to get

25   him there.  We simply aren't going to do the

Confidential - Subject to Protective Order

1    studies Parry suggests."

2                    This was marching orders from

3    your boss, wasn't it?

4        A.    Well, that may be what he said

5    then, but we did do the studies.  So again, I

6    would have you look at that Heydens

7    publication.

8        Q.    What Mark Martens said about

9    the Parry report, that it simply wasn't

10   suitable for defense of the product.

11                   You're aware of that, right?

12       A.    As we just talked about, we

13   didn't agree with Dr. Parry's interpretation

14   of all the data.  We thought it was secondary

15   to cytotoxicity and irrelevant routes of

16   exposure, and we obviously had a disagreement

17   with him.

18                   And, sure, if we have someone

19   who doesn't agree with the way we interpret

20   the data, we're not going to obviously have

21   them out there being spokespeople for us.

22       Q.    In fact, when Monsanto sent

23   Mark Martens over to meet with Parry, he was

24   irritated at Monsanto because of the pressure

25   that was being put on him.

1          You're aware of that, aren't

2    you?

3          A.    No, I'm not.

4               (Farmer Exhibit 1-28 marked for

5          identification.)

6    QUESTIONS BY MR. MILLER:

7          Q.    Let's take a look at it.  An

8    e-mail again from William Heydens and others.

9    I got a copy for each of you.  Here you go.

10              All right, ma'am.  So here --

11   what we have here is an e-mail from your

12   boss.  He copies William Heydens.  It's

13   regarding a meeting with Professor Parry.  I

14   believe you're copied, Donna Farmer, on the

15   original message.  Mark Martens had gone --

16   Martens had gone to meet with Dr. Parry after

17   his report, right?

18         A.    It was Mark Martens and Richard

19   Garnett.

20         Q.    And Richard Garnett, that's

21   right.

22              They stated, "The meeting

23   started off in a tense atmosphere because

24   Parry was irritated by the language used in

25   the mutagenicity section of the Williams, et

Confidential - Subject to Protective Order

1    al., paper," right?

2                    That's the Gary Williams paper,

3    right?

4         A.      Yes.

5                    But I think if you go back to

6    this one, it's more reflective of what was

7    the minutes of the meeting.  "Overall tone of

8    the meeting was positive after negative start

9    because Professor Parry found the tone of the

10   Williams, et al., CANTOX paper to be very

11   dismissive of the other researchers' work and

12   overdefensive in his attitude.  The

13   presentation on the results of the MON 3505

14   study changed the mood because it clarified

15   certain effects found in the Bolognesi and

16   Peluso papers."

17                   So I think that this reflects

18   more about the outcome of the meeting.

19        Q.      The paper that was irritating

20   him, Williams' paper, that's the one that was

21   funded by Monsanto?

22        A.      We worked -- yes, we funded

23   that.

24        Q.      And one cf the results from the

25   meeting with Dr. Parry was "broad

Confidential - Subject to Protective Order

1   agreement" -- let me show you, "broad

2   agreement that genotoxic results in some

3   studies with surfactants arose due to

4   oxidative damage rather than direct

5   genotoxicity."

6            So whatever, the broad

7   agreement, oxidative damage, right?

8        A.     Which, again, is precluded by

9   cytotoxic damage first that gets to the

10  oxidative damage.

11       Q.     "Consider supporting

12  studentship to help Professor Parry in

13  research programs on biological significance

14  of oxidative damage."

15           That was never done, was it?

16       A.     I don't know.

17           MR. JOHNSTON:  We're closing on

18       three hours and lunchtime.  Are you

19       near the end of the line or --

20           MR. MILLER:  Give me one second

21       and I'll ask maybe -- we can.  If you

22       want to break now, we can break now.

23           MR. JOHNSTON:  Okay.

24           MR. MILLER:  Okay?

25           MR. JOHNSTON:  Sounds good.

Confidential - Subject to Protective Order

```
1                    VIDEOGRAPHER:  We're going off
2          record.  The time is 12:28.
3            (Off the record at 12:28 p.m.)
4                    VIDEOGRAPHER:  We're going back
5          on record.  The time is 1:17.
6     QUESTIONS BY MR. MILLER:
7          Q.     Good afternoon, Dr. Farmer.
8          A.     Good afternoon.
9          Q.     You felt like the Dr. Parry
10    report that we were going over before the
11    lunch break put Monsanto in a genotoxicity
12    hole, right?
13         A.     No, we just -- there were other
14    people that had opinion about the
15    genotoxicity of glyphosate.  He just had a
16    different opinion, and we just didn't agree
17    with him.
18                 (Farmer Exhibit 1-29 marked for
19         identification.)
20    QUESTIONS BY MR. MILLER:
21         Q.     Let's just take a look at the
22    documents where you stated Dr. Parry put you
23    in a genotox hole.
24                 Exhibit 1-29.  A series of
25    e-mails to and from you concerning Dr. Parry.
```

Confidential - Subject to Protective Order

1              Do you remember this line of

2    e-mails?

3         A.      No, I don't.

4         Q.      Okay.  Well, here on the

5    beginning of page 1 here, it's an e-mail from

6    you to an Alan Wilson regarding comments on

7    Parry write-up, do you see that, in September

8    of 1999?

9         A.      Yes, and it starts from a

10   e-mail from Steve Wratten and others in the

11   back.

12        Q.      That's right, and we're going

13   to go to that.  And we're going to that right

14   now.  So let's go to page 596, that e-mail

15   from Steve Wratten.

16              Who is Steve Wratten?

17        A.      He was the regulatory affairs

18   manager for glyphosate.

19        Q.      And he was disappointed with

20   Dr. Parry's report, this Monsanto employee,

21   Steve Wratten, right?

22        A.      I'm not sure that I see that.

23        Q.      Well, I'll show you, ma'am.

24   First sentence, Steve Wratten's e-mail on

25   page 2, "I was somewhat disappointed in the

Confidential - Subject to Protective Order

1    Parry report."

2              Did I read that correctly?

3              MR. JOHNSTON:  Objection.

4         Incomplete.

5              THE WITNESS:  He talked

6         about -- you did read that, but it

7         said not particularly from his

8         conclusions but just the way they were

9         presented.

10   QUESTIONS BY MR. MILLER:

11        Q.    That's right, ma'am.

12              And he asked in the last

13   sentence in this first paragraph, "Has he

14   ever worked with industry before on this sort

15   of project," all right?

16        A.    Yes.

17        Q.    So on the next page, Donna

18   Farmer writes on the subject --

19              MR. JOHNSTON:  You mean the

20        page back, 95 -- 595?

21   QUESTIONS BY MR. MILLER:

22        Q.    The first page, 595, Donna

23   Farmer.  "Right now, the" -- "one option, I

24   agree we need someone else to interface with

25   Parry.  Right now, the only person I think

Confidential - Subject to Protective Order

1    that can dig us out of this genotoxic hole is

2    the good Dr. Kier," right?

3        A.     Kier, Dr. Kier.

4        Q.     Kier, yeah.

5               He's a -- that's Larry Kier,

6    isn't it?

7        A.     Yes, it is.

8        Q.     Consultant that Monsanto has

9    paid more than a few times to work on these

10   issues, right?

11       A.     No.  Dr. Kier was a gene tox

12   expert who was retired from Monsanto, and

13   based on his expertise, yes, we have kept him

14   as a consultant.

15       Q.     Right.

16              But now this clearly refreshes

17   your recollection that you felt Dr. Parry had

18   put you in a genotox hole?

19              MR. JOHNSTON:  Objection.

20        Misstates her testimony.  And

21        foundation.

22              THE WITNESS:  I said that, but

23        I think what we talked about, this is

24        from like 1999, and we did a lot of

25        work subsequent to this with -- to

Confidential - Subject to Protective Order

1           look at Dr. Parry's comments.

2                   We did work with him, and so I

3           think what we're getting at here is

4           that he -- we just had a difference of

5           opinion with him.  And we needed to

6           find some different data, and we know

7           that it wasn't genotoxic, and put the

8           information out there.  We just

9           disagreed with him.

10    QUESTIONS BY MR. MILLER:

11          Q.      What does clastogen mean?

12          A.      Again, it refers to structural

13    damage of genetic material.

14          Q.      Okay.  And clastogenic means

15    something that can cause this process of

16    clastogen, right?

17          A.      Structural damage, yes.

18          Q.      Okay.  So Dr. Parry did a

19    second report for Monsanto on Roundup, right?

20          A.      I don't remember.

21                  (Farmer Exhibit 1-30 marked for

22          identification.)

23    QUESTIONS BY MR. MILLER:

24          Q.      Let's look at it.  Exhibit 1:30

25    is a report prepared by Dr. Parry entitled

Confidential - Subject to Protective Order

1    "The evaluation of the potential genotoxicity

2    of glyphosate mixtures and component

3    surfactants."

4                    Here's a copy for you, ma'am,

5    and a --

6                    MR. JOHNSTON:  Are you asking a

7         question, or are you making a

8         statement, Counsel?

9    QUESTIONS BY MR. MILLER:

10        Q.      You can look at the document,

11   and then we'll have some more questions.

12                    MR. JOHNSTON:  Well, you

13        haven't established any of those

14        things you just said on the record,

15        Counsel.

16   QUESTIONS BY MR. MILLER:

17        Q.      Let me know when you're ready,

18   ma'am.

19        A.      Let me take a little bit.  This

20   is a pretty big report.

21        Q.      All right.  This Exhibit 1-30

22   was produced to us by Monsanto, and it's a

23   second report entitled "Evaluation of

24   potential genotoxicity of glyphosate,

25   glyphosate mixtures and component

Confidential - Subject to Protective Order

1    surfactants, James M. Parry."

2              Same Dr. Parry we've been

3    speaking of?

4              MR. JOHNSTON:  Objection.

5         Compound question.

6              And you're testifying, Counsel.

7         There's no foundation.

8    QUESTIONS BY MR. MILLER:

9         Q.    You can answer.

10        A.    Sorry, could you repeat the

11   question?

12             MR. MILLER:  Read the question

13        back.

14             (Court Reporter read back

15        question.)

16             THE WITNESS:  Yes.

17   QUESTIONS BY MR. MILLER:

18        Q.    Is this the same James M. Parry

19   we spoke about with the last report, ma'am?

20        A.    Yes.

21        Q.    And so in this report Dr. Parry

22   prepared a table of -- 14 tables of things

23   that he reviewed.

24             Is that fairly what this is, or

25   what would you explain this on the first page

Confidential - Subject to Protective Order

```
 1    to be Table 1 through 14?
 2                 What do they represent, ma'am?
 3                 MR. JOHNSTON:  Objection.
 4         Foundation.
 5                 THE WITNESS:  It is tables of
 6         what he reviewed.
 7    QUESTIONS BY MR. MILLER:
 8         Q.    Okay.  Now, let's look then at
 9    page 4237, Dr. Parry's report.
10                 And Dr. Parry says, and from
11    his evaluation, "These studies provide some
12    evidence that glyphosate may be capable of
13    inducing oxidative damage under both in vitro
14    and in vivo conditions."
15                 Did I read that correctly?
16                 MR. JOHNSTON:  Objection.
17         Foundation.
18                 THE WITNESS:  Just given that,
19         I'm not really sure what studies
20         he's -- I want to go back and look and
21         see what he's talking about.
22                 I believe that he's referring
23         to these miscellaneous end points that
24         are in studies that are, again,
25         through intraperitoneal injection, not
```

1           according to standard studies.

2                   And then you can see he talks

3           about this other one, that there was

4           no -- there was negative results, but

5           he's talking again about these other

6           studies from the Pelosi and Bolognesi

7           and Lioi that are not standard studies

8           required by regulatory agencies.

9                   And again, we talked about how

10          they can be secondary to in vitro

11          toxicity as well as in vivo toxicity

12          that could cause the oxidative damage,

13          but that's a result of the exposure

14          scenario.

15   QUESTIONS BY MR. MILLER:

16          Q.      These studies that he reviewed,

17   ma'am, were studies sent to him by Monsanto,

18   true?

19          A.      They were studies in the open

20   literature that we asked him to review.

21          Q.      Yes, ma'am.

22          A.      And again, as we talked about,

23   you have to look at how these studies are

24   conducted.  We talked about the

25   intraperitoneal injections, we talked about

Confidential - Subject to Protective Order

1    that they don't follow standard guidelines,

2    and again, that we didn't agree with his

3    evaluation of the studies.

4         Q.     He was the expert you selected

5    to review these papers, "you" being Monsanto,

6    true?

7         A.     Well, it does happen that we

8    have people that we don't agree with.

9    Experts have different opinions.  That's why

10   there are a lot of different experts out

11   there.

12        Q.     Sorry to interrupt you.

13              Let's look at page 4240,

14   another conclusion of expert Parry after

15   review of these studies.

16              "Evaluation.  These studies

17   provide some evidence that Roundup mixture

18   produces DNA lesions in vivo, probably due to

19   the oxidative damage.'

20              That was Dr. Parry's

21   conclusion, right?

22              MR. JOHNSTON:  Objection.

23        Foundation.

24              THE WITNESS:  Again, they're

25        referring back to the same studies

Confidential - Subject to Protective Order

1        we've been talking about that are

2        intraperitoneal injections, which is

3        not a normal route of exposure.  And

4        the COMET assay he's talking about is

5        in tadpoles, and those were at levels

6        that were toxic to the tadpoles.

7                So the results that we're

8        seeing here, again, are secondary.

9        Even though you see oxidative stress,

10       it's secondary to the toxicity that's

11       being observed in these studies.

12   QUESTIONS BY MR. MILLER:

13       Q.    Let's look at his conclusion on

14   page 4242, Overall Conclusions.

15                Number 2 is the one that I

16   would like to ask you about.  "There is

17   published in vitro evidence that glyphosate

18   is clastogenic and capable of inducing sister

19   chromatid exchange in both human and bovine

20   lymphocytes."

21                And he cites a public study

22   that proves that, doesn't he?

23       A.    Well, it doesn't --

24                MR. JOHNSTON:  Objection.

25       Foundation.

Confidential - Subject to Protective Order

```
 1              THE WITNESS:  I disagree with
 2         you that it proves that.  The
 3         conditions of that study, those were
 4         the findings, but that is not the
 5         basic conclusion of the outcome of
 6         glyphosate.
 7              This was another study that
 8         wasn't conducted according to
 9         guidelines and that had some problems
10         with the conduct of the study, and
11         there are other studies that conflict
12         these results.
13    QUESTIONS BY MR. MILLER:
14         Q.     He goes on on page 4244 under
15    the specific evaluation of the genotoxicity
16    of glyphosate to tell Monsanto that "on the
17    basis of the study of Lioi, I conclude that
18    glyphosate is a potential clastogenic in
19    vitro."
20              His conclusion, right?
21              MR. JOHNSTON:  Objection.
22         Foundation.
23              Go ahead.
24              THE WITNESS:  That's again what
25         he says.  But again, remember, this is
```

Confidential - Subject to Protective Order

1           in vitro, this is a petri dish

2           experiment, and again, that those

3           cells are sustaining toxicity,

4           meaning -- when we talk about

5           cytotoxicity, it means that the cells

6           are damaged and that the end that

7           you're seeing, this oxidative damage,

8           is then the result of the cells

9           sustaining cytotoxicity and not a

10          direct genotoxic effect.

11                  And you can see here it says

12          even -- there's another assay that

13          indicates it's not reproduced in germ

14          cells.

15   QUESTIONS BY MR. MILLER:

16          Q.     He says, "Under specific

17   evaluations of genotoxicity of glyphosate

18   mixture that the studies of Bolognesi

19   suggests that glyphosate mixtures may be

20   capable of inducing oxidative damage in

21   vivo."

22                  MR. JOHNSTON:  Objection.  No

23          foundation.

24   QUESTIONS BY MR. MILLER:

25          Q.     That was his conclusion, wasn't

1    it?

2                    MR. JOHNSTON:  Same objection.

3                    THE WITNESS:  Again, that was

4         the same study where they injected the

5         formulated product directly into the

6         abdomens of the animals.  There was

7         direct damage to the organs and to the

8         animal, and the results are secondary

9         to cytotoxicity

10   QUESTIONS BY MR. MILLER:

11        Q.    He tells us on -- he tells

12   Monsanto in this report at 4266 -- I'm just

13   about done with this report.

14                    But at 4266, Dr. Parry tells us

15   that there is -- this is in F.  "In view of

16   the increasing appreciation of the value of

17   COMET assay as a marker of tissue-specific

18   damage, I recommend the consideration of its

19   use in any in vivo studies performed."

20                    Do you see that?

21                    MR. JOHNSTON:  Objection.

22        Foundation.

23                    THE WITNESS:  I see that's what

24        he says.

25

Confidential - Subject to Protective Order

1    QUESTIONS BY MR. MILLER:

2          Q.      And Monsanto never performed a

3    COMET assay on any of its in vivo studies?

4          A.      We have a difference of opinion

5    of the value of the COMET study.  There are

6    other studies that are -- the COMET study,

7    you can actually get positive effects if you

8    take blood from people who have been on a

9    treadmill for 30 minutes.  So, again, you

10   have to look at the study and what it

11   provides.

12                 And this  again, comes back to

13   talking about the oxidative damage with

14   Bolognesi.  And again  remember, he is

15   talking about doing an assay where -- in

16   talking about looking at the liver and the

17   kidneys where we actually went and did the

18   studies in the whole animals that we shared

19   with you about the Heydens report.

20         Q.      The answer is Monsanto never

21   did COMET assays, true?

22         A.      No, we would not do COMET

23   assays.  We do not see it as a really

24   valuable assay.

25         Q.      And this expert who you asked

Confidential - Subject to Protective Order

1    to review these studies told you, "The COMET

2    assay would provide the ability to determine

3    whether damage is produced in a wide range of

4    tissues following glyphosate exposure."

5                    That's what he said, right?

6                    MR. JOHNSTON:  Objection.

7         Foundation.

8                    THE WITNESS:  This is an in

9         vitro assay, and instead we always

10        have higher value when you do an in

11        vivo study.  So we addressed the same

12        comments in an in vivo study that

13        would be of more value than the COMET

14        assay that, no, we would not conduct.

15   QUESTIONS BY MR. MILLER:

16        Q.    Dr. Parry goes on to conclude

17   his report on page 4267, "If the genotoxic

18   activity of glyphosate and its formulations

19   is confirmed, it would be advisable to

20   determine whether there are exposed

21   individuals or groups within the human

22   population."

23                    Do you remember receiving that

24   advice from Dr. Parry?

25                    MR. JOHNSTON:  Objection.  No

Confidential - Subject to Protective Order

```
 1            foundation.
 2                    THE WITNESS:  I see it here,
 3            but, again, the geno -- there is no
 4            genotoxic activity of glyphosate in
 5            its formulations.  We would disagree
 6            with that.
 7    QUESTIONS BY MR. MILLER:
 8            Q.    All right.  Let's look at --
 9    did you publish Dr. Parry's report?
10                    MR. JOHNSTON:  Objection.
11            Vague.
12    QUESTIONS BY MR. MILLER:
13            Q.    You can answer.
14            A.    No.
15            Q.    Did you submit Dr. Parry's
16    report to the Environmental Protection
17    Agency?
18                    MR. JOHNSTON:  Objection.
19            Vague.
20                    THE WITNESS:  The Environmental
21            Protection Agency is familiar with all
22            of those studies.
23    QUESTIONS BY MR. MILLER:
24            Q.    My question was not whether
25    they're familiar with the studies.
```

Confidential – Subject to Protective Order

1              Dr. Parry's report, did you

2    submit it to the Environmental Protection

3    Agency?

4         A.     I don't know if it was or not.

5              MR. JOHNSTON:  Vague.

6    Objection.

7    QUESTIONS BY MR. MILLER:

8         Q.     You thought he was a renowned

9    expert.  We looked at that e-mail.  Why

10   wouldn't it be important for people to know

11   about the report of this renowned expert on

12   the genotoxic potential of Roundup?

13             MR. JOHNSTON:  Objection.

14   Misstates the testimony.

15             THE WITNESS:  The EPA is fully

16        familiar with all these studies.  They

17        can make the determination themselves.

18        This is a report between Dr. Parry and

19        Monsanto.  There's nothing in there

20        that the EPA would not have been aware

21        of in terms of the studies.

22   QUESTIONS BY MR. MILLER:

23        Q.     How did Larry Kier pull you out

24   of the doghouse that Dr. Parry put you in?

25             MR. JOHNSTON:  Objection.

Confidential - Subject to Protective Order

1            Misstates the record.  No foundation.

2                    THE WITNESS:  I don't know.

3                    (Farmer Exhibit 1-31 marked for

4            identification.)

5     QUESTIONS BY MR. MILLER:

6            Q.    Let's take a look.

7     Exhibit 1-31 is an e-mail from you to Daniel

8     Goldstein concerning, among other things,

9     Dr. Parry.

10                   All right.  Ma'am, this is an

11    e-mail produced in request of production of

12    documents from Monsanto.  You see it's from

13    you at the top there, Donna Farmer,

14    September 2001, right, ma'am?

15           A.    Yes.

16           Q.    "So if we are not going to use

17    Dr. Parry, then why did Mark insist on

18    developing a relationship with him?"

19                   MR. JOHNSTON:  Objection.  You

20           read that wrong.

21    QUESTIONS BY MR. MILLER:

22           Q.    Let me read it again.  "So if

23    we are not going to use Dr. Parry, then why

24    did Mark insist we develop a relationship

25    with him?  Mark was not managing that well

Confidential - Subject to Protective Order

1    and almost landed us with Parry calling

2    glyphosate genotoxic...so we had to do these

3    additional studies to make him happy.  And if

4    it had not been for Larry Kier, we would be

5    in the dog..."

6            Dog what?

7       A.      Probably doghouse, but -- it's

8    Larry Kier.  But I think what I want to do is

9    go back to this page with Mark.  And what we

10   talked about early on is that we didn't agree

11   with Dr. Parry's conclusions about the

12   Bolognesi and Peluso studies, and with

13   Dr. Kier's help, because he is an expert in

14   gene tox as well, was able to help us to do

15   the studies that we talked about in vivo.

16          And as you can see here, it

17   says that we did these studies.  "We

18   conducted studies in the US where mice were

19   injected with the same formulation, with or

20   without glyphosate, and could demonstrate the

21   observed effects were not due to the

22   glyphosate but to the surfactant in

23   combination with the vehicle that caused the

24   precipitation of the surfactant onto the

25   liver and kidney capsules, and that then

Confidential - Subject to Protective Order

1    created this toxic effect on those organs.

2    All of these results have been openly

3    discussed with Professor Parry, an authority

4    in the field of mutagenicity in the UK, who

5    fully agrees with us that this finding is an

6    artifactual effect and in no way demonstrates

7    the mutagenicity of glyphosate.  We are now

8    preparing a publication to address the

9    issues."

10             And so I think when I'm talking

11   about this, it was through Larry's help that

12   we were able to provide Dr. Parry with all

13   the information he was able to look at, that

14   he had questions about, that we generated

15   extra data for him to change his conclusion

16   of those studies.

17       Q.    William Graham, in the e-mail

18   below, you asked, "Can we keep this" -- I'm

19   sorry, let me read it right.

20             William Graham says, "Can we

21   keep this to a limited number of people, as

22   we have the opinions and the solutions in

23   Europe?"

24             MR. JOHNSTON:  Is there a

25        question?

Confidential - Subject to Protective Order

1      Q.     Who would we talk to in quality

2   assurance to ask more questions about this?

3      A.     I don't know right now who that

4   would be.

5      Q.     Who's in charge of quality

6   assurance?

7      A.     I think you could probably go

8   to our -- I think it might be -- I don't know

9   who's in charge of quality assurance.

10     Q.     Can you name anybody who works

11  in quality assurance?

12     A.     There would be a woman named

13  Lisa Flagg.

14     Q.     Flag, F-l-a-g?

15     A.     F-l-a-g-g.

16     Q.     Okay.  Thank you.

17            All right.  Australia wasn't

18  the only country to point out potential

19  issues with the NNG, true?

20            MR. JOHNSTON:  Objection.

21  Vague.

22            THE WITNESS:  I don't remember.

23  QUESTIONS BY MR. MILLER:

24     Q.     Do you remember in 2004 Canada

25  raising concerns about Roundup glyphosate

Confidential - Subject to Protective Order

1    right?

2         A.      That's what it says.

3         Q.      Evidence in animals,

4    "sufficient" is what it says, right?

5         A.      That's what it says.

6         Q.      And for mechanistic evidence,

7    it says "genotoxicity and oxidative stress,"

8    right?

9         A.      That's what it says.

10        Q.      And it classifies the product

11   life to say it is a 2A, right?

12                And I know you disagree.

13        A.      I do disagree.

14        Q.      Okay.  I understand.

15        A.      And again, all five of them

16   came out to be 2A and 2B carcinogens.

17        Q.      Well, 2B, can you agree with me

18   that possibly carcinogenic is not as strong a

19   case as probably carcinogenic?

20                Can we agree on that?

21        A.      Again, that's their

22   determination, but, again, I wouldn't agree

23   with glyphosate being a 2A carcinogen.

24        Q.      I understand.

25                Dr. Parry told you about the

Confidential - Subject to Protective Order

1    oxidative stress issue back in 1999, right?

2         A.     Yes, and we talked about

3    studies that we did to address that.  And

4    since 1999, a lot has been learned about

5    oxidative stress and its relationship to

6    cytotoxicity versus a genotoxic response.

7         Q.     Let's spend a little time

8    looking at this and then we'll move on.

9                It says, "Glyphosate has been

10   detected in air during spraying, in water,

11   and in food."

12               Do you agree with that?

13               MR. JOHNSTON:  What page are

14        you on, Counsel?

15               MR. MILLER:  I'm sorry,

16        page 491, the bottom left side.

17               THE WITNESS:  I would agree

18        with that, but I think it's important

19        to point out that when it says it's

20        detected in air, if you go back and

21        you look at the study, they were

22        sampling near where they were

23        spraying.  So they were getting

24        through spray droplets that exposure.

25               We have applications on water.