# EXHIBIT A

ENDORSED
FILED
ALAMEDA COUNTY

MAR 17 2017

CLERK OF THE SUPERIOR COURT
By: ERICA BAKER, Deputy

1  Michael L. Baum, Esq. (SBN: 119511)
   mbaum@baumhedlundlaw.com
2  R. Brent Wisner, Esq. (SBN: 276023)
   rbwisner@baumhedlundlaw.com
3  Frances M. Phares, Esq. (LA #10388)
   fphares@baumhedlundlaw.com
4  **BAUM HEDLUND, ARISTEI, &**
   **GOLDMAN, P.C.**
5  12100 Wilshire Blvd., Suite 950
   Los Angeles, CA 90025
6  Telephone: (310) 207-3233
   Facsimile: (310) 820-7444
7

8  Nicholas R. Rockforte (LA #31305)
   nrockforte@pbclawfirm.com
9  Christopher L. Coffin (LA #27902)
   ccoffin@pbclawfirm.com
10 Jonathan E. Chatwin (LA #36410)
   **PENDLEY, BAUDIN & COFFIN, LLP**
11 1515 Poydras Street, Suite 1400
   New Orleans, LA 70112
12 Telephone: (504) 355-0086
   Facsimile: (504) 523-0699
13

Robert F. Kennedy, Jr., Esq.
rkennedy@kennedymadonna.com
Kevin J. Madonna, Esq.
kmadonna@kennedymadonna.com
**KENNEDY & MADONNA, LLP**
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 481-2622
Facsimile: (845) 230-3111

14 *Attorneys for Plaintiffs*

15          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16                 **FOR THE COUNTY OF ALAMEDA**

17                    **(UNLIMITED JURISDICTION)**

18
   LORETTA I. PENNIE, an individual; PABLO
19 AGUERO, an individual; MICHAEL J. ALLEN,
   an individual;  KELLY S. BARON, an individual;
20 JOHN BARTON, an individual; MARK
   BARTON, an individual; MARIA BEDOLLA,
21 individually, and as successor in interest to the
   Estate of David L. Bedolla, deceased; JEAN E.
22 BEVANMARQUEZ, an individual; MARK J.
   BLACKWELDER, an individual; DONALD E.
23 BRENNER, an individual; DEBORAH BROOKS,
   individually and as successor in interest to the
24 Estate of Dean D. Brooks, deceased; DENTON L.
   CARENDER, SR., an individual; FRANK
25 CHAVEZ, an individual; GINA E. DAVIS, an
   individual; RICHARD D'SOUZA, an individual;
26 RANDY A. FERBER, an individual; GARY W.
   HALL, an individual; PATRICIA HAMILTON,
27 individually and as successor in interest to the
   Estate of Bruce Hamilton, deceased;  JOHN S.
28 HENDERSON, an individual; PHIL P.

CASE No. **RG 17853420**

**COMPLAINT FOR DAMAGES AND
DEMAND FOR JURY TRIAL**

1.   **Strict Liability – Design Defect**
2.   **Strict Liability – Failure to Warn**
3.   **Negligence**
4.   **Fraud**
5.   **Breach of Express Warranties**
6.   **Breach of Implied Warranties**
7.   **Exemplary Damages**

**JURY TRIAL DEMANDED**

---

1

COMPLAINT

HERNANDEZ, an individual; ANN E.
HINSHELWOOD, an individual; STEVEN
LOUIS MCCORMICK, an individual; SHEILA
MITCHELL, an individual; TAMMY MORENO,
individually and as successor in interest to the
Estate of Andrew D. Moreno, deceased;
ANTHONY PRINCE MUNOZ, an individual;
TIMOTHY J. PARKER, an individual;
CAROLYN J. PIERCE, an individual; JOANNE
MARIE PLUMMER, an individual; GARY C.
PUCKETT, an individual; PAULETTE M.
RANDALL, an individual; RHODA B.
RATHKAMP, an individual; PARVIZ
REZAZADEH, an individual; DOUGLAS
SMITH, an individual; JOHN S. STRATTON, an
individual; STEVEN M. STROHM, an individual;
CHERYL Y. THRESHER, an individual; and
GEORGE T. WATSON, an individual; MERCY
O. SOLORIO, individually and as successor in
interest to the Estate of Estanislao Solorio,
deceased; JEFF INGRAM, an individual;
CHARLES VANNOY, an individual; and
CAROLYN MCCRAY, an individual,

        Plaintiffs,

  v.

MONSANTO COMPANY, a corporation;
WILBUR-ELLIS COMPANY, LLC, a
corporation; and WILBUR-ELLIS FEED, LLC, a
corporation; and DOES 1 through 100 inclusive,

        Defendants.

Plaintiffs, by and through their attorneys, Baum Hedlund Aristei & Goldman, P.C.,
Pendley, Baudin & Coffin, LLP, and Kennedy & Madonna, LLP, allege upon information and
belief:

## I.    STATEMENT OF THE CASE

1.    In 1970, Defendants Monsanto Company, Inc. discovered the herbicidal properties
of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.
Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the
growing of crops. By 2001, glyphosate had become the most-used active ingredient in American
agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds

by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.      Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## II.     JURISDICTION AND VENUE

9.      The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

10.     The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is a California resident, a corporation and/or entity organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or has sufficient minimum contacts in California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395 in that the subject injury occurred in Alameda County.

12.     Furthermore the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Monsanto has had sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

13.      Plaintiffs seek relief that is within the jurisdictional limits of the Court.

## III.    PARTIES

### Plaintiffs

14.     Plaintiffs herein are competent individuals over the age of 18, residents and citizens of the United States, California and Missouri, and hereby submit to the jurisdiction of this court

and allege that Venue in this Court is proper.  All Decedents were residents of California.

Plaintiffs and/or Decedents are hereinafter referred to as "Plaintiffs".

15.  Plaintiff Loretta I. Pennie currently resides in Alameda County.

16.  Plaintiff Pablo Aguero currently resides in Kern County.

17.  Plaintiff Michael Allen currently resides in Kern County.

18.  Plaintiff Kelly S. Baron currently resides in Santa Cruz County.

19.  Plaintiff John Barton currently resides in Kern County.

20.  Plaintiff Mark Barton currently resides in Kern County.

21.  Plaintiff Maria Bedolla, Individually, and as Successor in Interest to the Estate of David L. Bedolla, is and was at all relevant times a resident of California and currently resides in San Diego County.  David L. Bedolla was exposed to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2000 and was diagnosed with non-Hodgkin lymphoma.  David L. Bedolla died as a result of Roundup® exposure on February 4, 2010.  As a direct and proximate result of these injuries, Plaintiff Maria Bedolla has sustained the following damages:  pecuniary losses and mental anguish and pain suffered by reason of Decedent David L. Bedolla's death, medical expenses, funeral expenses, and the loss of the benefit of David L. Bedolla's services, care, maintenance, and support which David L. Bedolla would have furnished his wife had he lived; and, in addition, damages suffered by Decedent David L. Bedolla between the time of his injury and death for which he might have maintained an action but for his death, the medical expenses, prolonged physical pain, physical impairment, mental anguish and suffering, and the loss of enjoyment of life endured by Decedent David L. Bedolla between the time of his injury and death.

22.  Plaintiff Jean E. Bevanmarquez currently resides in Sacramento County.

23.  Plaintiff Mark J. Blackwelder currently resides in Solano County.

24.  Plaintiff Donald E. Brenner currently resides in Calaveras County.

25.  Plaintiff Deborah Brooks, Individually, and as Successor in Interest to the Estate of Dean D. Brooks, is and was at all relevant times a resident of California and currently resides in Orange County.  Dean D. Brooks was exposed to Roundup® and/or other Monsanto glyphosate-

containing products ("Roundup") through approximately 2002 and was diagnosed with non-Hodgkin lymphoma.  Dean D. Brooks died as a result of Roundup® exposure on July 11, 2016.  As a direct and proximate result of these injuries, Plaintiff Deborah Brooks has sustained the following damages:  pecuniary losses and mental anguish and pain suffered by reason of Decedent Dean D. Brooks' death, medical expenses, funeral expenses, and the loss of the benefit of Dean D. Brooks' services, care, maintenance, and support which Dean D. Brooks would have furnished his wife had he lived; and, in addition, damages suffered by Decedent Dean D. Brooks between the time of his injury and death for which he might have maintained an action but for his death, the medical expenses, prolonged physical pain, physical impairment, mental anguish and suffering, and the loss of enjoyment of life endured by Decedent Dean D. Brooks between the time of his injury and death.

26.     Plaintiff Denton L. Carender, Sr., currently resides in Kern County.

27.     Plaintiff Frank Chavez currently resides in Sacramento County.

28.     Plaintiff Gina E. Davis currently resides in Kern County.

29.     Plaintiff Richard D'Souza currently resides in Riverside County.

30.     Plaintiff Randy A. Ferber currently resides in Kern County.

31.     Plaintiff Gary W. Hall currently resides in Kern County.

32.     Plaintiff Patricia Hamilton Individually, and as Successor in Interest to the Estate of Bruce Hamilton, is and was at all relevant times a resident of California and currently resides in San Luis Obispo County.  Bruce Hamilton was exposed to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.  Bruce Hamilton died as a result of Roundup® exposure on September 2, 2015.  As a direct and proximate result of these injuries, Plaintiff Patricia Hamilton has sustained the following damages:  pecuniary losses and mental anguish and pain suffered by reason of Decedent Bruce Hamilton's death, medical expenses, funeral expenses, and the loss of the benefit of Bruce Hamilton's services, care, maintenance, and support which Bruce Hamilton would have furnished his wife had he lived; and, in addition, damages suffered by Decedent Bruce Hamilton  between the time of his injury and death for which he might have maintained an action

but for his death, the medical expenses, prolonged physical pain, physical impairment, mental anguish and suffering, and the loss of enjoyment of life endured by Decedent Bruce Hamilton between the time of his injury and death.

33.   Plaintiff John S. Henderson currently resides in Kern County.

34.   Plaintiff Phil P. Hernandez currently resides in Kern County.

35.   Plaintiff Ann E. Hinshelwood currently resides in Nevada County.

36.   Plaintiff Steven Louis McCormick currently resides in Kern County.

37.   Plaintiff Sheila Mitchell currently resides in Los Angeles County.

38.   Plaintiff Tammy Moreno, Individually, and as Successor in Interest to the Estate of Andrew D. Moreno, is and was at all relevant times a resident of California and currently resides in Ventura County. Andrew D. Moreno was exposed to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.  David L. Bedolla died as a result of Roundup® exposure on January 2, 2017.  As a direct and proximate result of these injuries, Plaintiff Tammy Moreno has sustained the following damages:  pecuniary losses and mental anguish and pain suffered by reason of Decedent Andrew D. Moreno's death, medical expenses, funeral expenses, and the loss of the benefit of Andrew D. Moreno's services, care, maintenance, and support which Andrew D. Moreno would have furnished his wife had he lived; and, in addition, damages suffered by Decedent Andrew D. Moreno between the time of his injury and death for which he might have maintained an action but for his death, the medical expenses, prolonged physical pain, physical impairment, mental anguish and suffering, and the loss of enjoyment of life endured by Decedent Andrew D. Moreno between the time of his injury and death.

39.   Plaintiff Anthony Prince Munoz currently resides in Fresno County.

40.   Plaintiff Timothy J. Parker currently resides in Mariposa County.

41.   Plaintiff Carolyn J. Pierce currently resides in Kern County.

42.   Plaintiff Joanne Marie Plummer currently resides in Contra Costa County.

43.   Plaintiff Gary C. Puckett currently resides in San Joaquin County.

44.   Plaintiff Paulette M. Randall currently resides in Santa Cruz County.

45.     Plaintiff Rhoda B. Rathkamp currently resides in Kern County.

46.     Plaintiff Parviz Rezazadeh currently resides in Riverside County.

47.     Plaintiff Douglas Smith currently resides in Placer County.

48.     Plaintiff John S. Stratton currently resides in San Diego County.

49.     Plaintiff Steven M. Strohm currently resides in Riverside County.

50.     Plaintiff Cheryl Y. Thresher currently resides in Kern County.

51.     Plaintiff George T. Watson currently resides in Kern County.

52.     Plaintiff Mercy O. Solorio, Individually, and as Successor in Interest to the Estate of Estanislao Solorio, is and was at all relevant times a resident of California and currently resides in Riverside County.  Estanislao Solorio was first exposed to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2013 and was diagnosed with non-Hodgkin lymphoma.  Estanislao Solorio died as a result of Roundup® exposure on February 8, 2014.  As a direct and proximate result of these injuries, Plaintiff Mercy O. Solorio has sustained the following damages:  pecuniary losses and mental anguish and pain suffered by reason of Decedent Estanislao Solorio's death, medical expenses, funeral expenses, and the loss of the benefit of Estanislao Solorio's services, care, maintenance, and support which Estanislao Solorio would have furnished his wife had he lived; and, in addition, damages suffered by Decedent Estanislao Solorio between the time of his injury and death for which he might have maintained an action but for his death, the medical expenses, prolonged physical pain, physical impairment, mental anguish and suffering, and the loss of enjoyment of life endured by Decedent Estanislao Solorio between the time of his injury and death.

53.     Plaintiff Jeff Ingram currently resides in Sacramento County.

54.     Plaintiff Charles Vannoy currently resides in Riverside County.

55.     Plaintiff Carolyn McCray is a resident of St. Louis, Missouri.

56.     Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Plaintiffs' use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"), supplied and distributed by Defendants herein, Plaintiffs suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including,

but not limited to non-Hodgkin lymphoma and other cancers, other permanent physical deficits, permanent bodily impairment and other sequelae. Plaintiffs' injuries required hospitalizations, in-patient surgeries, medication treatments, and other therapies to address the adverse physical effects and damage caused by Plaintiffs' use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup") from approximately 1974 through 2016.

57.    As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Plaintiffs used and/or were exposed to Roundup® and were diagnosed with serious health injuries including non-Hodgkin lymphoma and other cancers.

58.    As a result of using and/or being exposed to Defendants' Roundup®, Plaintiffs have been permanently and severely injured, having suffered serious consequences from Roundup®.

59.    As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs suffered severe mental and physical pain and have and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

60.    As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiffs required extensive emergency medical treatment, health care, attention and services, thereby incurring medical, incidental, and service expenses pertaining to emergency medical treatments and procedures undertaken in efforts to maintain and/or save Plaintiffs.

61.    Plaintiffs are individuals who suffered damages as a result of their injuries resulting from Plaintiffs' use and/or exposure to Roundup® and are authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiffs, resulting from Plaintiffs' use of Roundup®. Said injuries and damages sustained by Plaintiffs were caused or substantially contributed to by the wrongful conduct of Defendants and

DOES 1 through 100, inclusive.

62.    The product warnings for Roundup® in effect during the time period Plaintiffs used and/or were exposed to Roundup® were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

63.    The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Plaintiffs and the general public about the increased risk of serious adverse events that are described herein.

64.    Had Plaintiffs been adequately warned of the potential life-threatening side effects of the Defendants' and DOES 1 through 100, and each of them, inclusive, of Roundup®, Plaintiffs would not have purchased, used or been exposed to Roundup®.

65.    By reason of the foregoing, Plaintiffs developed serious and dangerous side effects including non-Hodgkin lymphoma and other cancers, related sequelae, physical pain and suffering, mental anguish, and loss of enjoyment of life.  By reason of the foregoing, Plaintiffs suffered economic losses and special damages including, but not limited to, loss of earning and medical expenses.  All to the Plaintiffs' general and special damages in excess of the jurisdictional limits of the Court.

66.    Plaintiffs have reviewed their potential legal claims and causes of action against the Defendants and have intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question. Plaintiffs have chosen to only pursue claims based on state law and are not making any claims which raise federal questions.  Accordingly, Plaintiffs contend that California State jurisdiction and venue is proper.

### Defendants

67.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®. Monsanto has regularly transacted and conducted business within the

State of California, and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Monsanto expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce and invoking the benefits and protection of its laws. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

68.     Defendant Wilbur-Ellis Company LLC is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California.  At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products including Roundup® within the State of California.

69.     Defendant Wilbur-Ellis Feed LLC (with Wilbur-Ellis Company LLC, hereinafter "Wilbur-Ellis") is a California limited liability corporation with its headquarters and principal place of business in San Francisco, California.  At all times relevant to this complaint, Wilbur-Ellis Feed, LLC sold and distributed Monsanto products including Roundup® within the State of California.  Wilbur-Ellis is a main distributor of Roundup, and, upon information and belief, distributed Roundup used by the Plaintiffs.

70.     Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

71.     At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

72.     The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendants DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sue said Defendants by such fictitious names.  Plaintiffs are informed and believe, and thereon allege, that each Defendant designated

herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiffs for the acts and omissions alleged herein below, and the resulting injuries to Plaintiffs, and damages sustained by the Plaintiffs. Plaintiffs will amend this Complaint to allege the true names and capacities of said DOE Defendants when that same is ascertained.

73.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the Defendants and each of the DOE Defendants was the agent, servant, employee and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each Defendants and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment and/or joint venture.

74.     Plaintiffs are informed and believe and allege that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees and/or fiduciaries of and/or were members in an entity or entities engaged in the funding, researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging and advertising of Roundup® and/or other Monsanto glyphosate-containing products. Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of its successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parent, subsidiary, affiliate, partner, co-venturer, merged company, alter ego, agent, equitable trustee, fiduciary and/or its alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a virtual destruction of Plaintiffs' remedy against each such alternate entity, and that each such Defendants has the ability to assume the risk spreading role of each such alternate entity.

75.     Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, that Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the States of California and Missouri and regularly conducted business in these States and in Alameda County.

76.     Upon information and belief, at relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in Alameda County, and in Missouri, either directly or indirectly through third parties or related entities, Roundup® and/or other Monsanto glyphosate-containing products.

77.     At relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the States of California and Missouri, which included but was not limited to selling, marketing and distributing Roundup® and/or other Monsanto glyphosate-containing products in the State of California and Alameda County.

78.     At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of California and including Alameda County, and the State of Missouri, said Defendants derived and derive substantial revenue therefrom.

**IV. EQUITABLE TOLLING**

79.     Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their illness, including non-Hodgkin lymphoma could be caused by their use and/or exposure to Roundup®. The discovery rule applies to these cases, and the statute of limitations has been tolled until the day the Plaintiffs knew or had reason to know that their illnesses, including non-Hodgkin

lymphoma, were linked to their use and/or exposure to Roundup®.

80.     Within the time period of any applicable statute of limitations, Plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

81.     Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their illnesses.

82.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the true risks associated with use of and/or exposure to Roundup®.

83.     As a result of Defendants' actions, Plaintiffs could not reasonably have known or learned through reasonable diligence that they had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

84.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants Monsanto had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendants knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities yet it failed to disclose the information to the public.

85.     Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professional could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and they were forced to rely on Defendants' representations.

/ / /

/ / /

## V.      FACTS

86.      Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

87.      Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

88.      For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

89.      The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Osborn & Barr joined or took over these misleading marketing efforts in the early 1990s and continued through 2012. Monsanto still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

90.      The manufacture, formulation and distribution of herbicides, such as Roundup®,

are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

91.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

92.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

93.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California.

94.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

95.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

96.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

97.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

98.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

99.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

100.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the

uterus from male rabbits."

101.    Three top executives of IBT were convicted of fraud in 1983.

102.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

103.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

104.    Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of Roundup®, and are used to convince customers to use Roundup®.  Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts.  All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe.  In fact, these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines.  Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

105.    Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry.  Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials.

106.    In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a

press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

107.    Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR.  The Glyphosate Task Force was solely responsible for preparing and submitting summary of studies relied upon by the by the BfR. Defendants have used this report, which they wrote, to falsely proclaim the safety of glyphosate.

108.    In October 2015, the Defendants as members of the Joint Glyphosate Task Force wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate arguing that the IARC classification is mistaken.  In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

109.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

110.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured

Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

111.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

112.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

(a)     Remember that environmentally friendly Roundup® herbicide is biodegradable.  It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences...

(b)     And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

(c)     Roundup® biodegrades into naturally occurring elements.

(d)     Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

(f)     You can apply Accord with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application,

soil microorganisms biodegrade Accord into natural products.

(g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

(i)     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)     "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

113.    November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)     its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

(b)     its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

(c)     its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

(d)     its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

(e)     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f)     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

114.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

115.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

116.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

117.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

118.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

119.    In assessing an agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

(c)      representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

120.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

121.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

122.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

123.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012[1].

124.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

125.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

---

[1] Roundup rose to the most-used herbicide in the world thanks in no small part to Osborn & Barr's marketing.

126.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

127.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

128.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

129.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

130.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

131.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

132.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

/ / /

/ / /

COMPLAINT

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

133.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

134.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

***Recent Worldwide Bans on Roundup®/Glyphosate***

135.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to

private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

136.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

137.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

138.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

139.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

140.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

141.    On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

142.    Wilbur-Ellis had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate -containing products actually used by the Plaintiffs.

## LIMITATION ON ALLEGATIONS

143.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144.     The allegations in this pleading are made pursuant to California law.  To the extent California law imposes a duty or obligation on the Defendants that exceeds those required by federal law, Plaintiffs do not assert such claims.  All claims asserted herein run parallel to federal law, i.e., the Defendants' violations of California law were also violations of federal law. Had Defendants honestly complied with California law, it would also have complied with federal law.

145.     Additionally, Plaintiffs' claims do not seek to enforce federal law.  These claims are brought under California law, notwithstanding the fact that such claims run parallel to federal law.

146.     As alleged in this pleading, the Defendants violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I:  STRICT LIABILITY (DESIGN DEFECT)

147.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

148.     Plaintiffs bring this strict liability claim against Defendants for defective design.

149.      At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.  At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiffs, as described above.

150.      At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs.

151.     At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products

in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

152.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

153.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

154.    At all times relevant to this action, Defendants knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

155.    Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

      a.    When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

      b.    When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      c.    When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendants could have employed safer alternative designs and formulations.

156. Plaintiffs were exposed to Defendants' Roundup® products without knowledge of Roundup®'s dangerous characteristics.

157. At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner, e.g., as a farmer, without knowledge of Roundup®'s dangerous characteristics.

158. Plaintiffs could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendants' suppression of scientific information linking glyphosate to cancer.

159. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed its Roundup® products to make them less dangerous. Indeed, at the time Defendants designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

160. At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

161.     Defendants' defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiffs herein.

162.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendants are strictly liable to Plaintiffs.

163.     The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries and/or death, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained their injuries.

164.     Defendants' conduct, as described above, was reckless.  Defendants risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

165.     As a direct and proximate result of Defendants placing its defective Roundup® products into the stream of commerce, and the resulting injuries and/or death, Plaintiffs and/or their Decedents have sustained pecuniary loss including loss of Decedents' society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

166.     As a proximate result of the Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs and/or their Decedents have suffered great mental anguish and other personal injury and damages.

167.     As a proximate result of the Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs and/or their Decedents sustained loss of income, loss of earning capacity and/or property damage.

168.     As a further proximate result of the conduct of Defendants, Wrongful Death Plaintiffs have incurred expenses for funeral, burial and other related costs pertaining to their Decedent's death, in amounts to be proved at trial.

169.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT LIABILITY (FAILURE TO WARN)

170.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

171.     Plaintiffs bring this strict liability claim against Defendants for failure to warn.

172.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

173.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

174.     At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn Plaintiffs of the dangers associated with Roundup use and exposure.

Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

175.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

176.    At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiffs.

177.    Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs.

178.    Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

179.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

180.    Plaintiffs were exposed to Defendants' Roundup® products without knowledge of their dangerous characteristics.

181.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendants' Roundup® products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

182.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of their exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using the products.

183.    Defendants knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

184.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

185.    This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. The Defendants were able, in accord with federal law, to comply with

California law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. The Defendants, however, did not disclose these known risks through any medium.

186.    To this day, Defendants have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

187.    As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiffs.

188.    Defendants are liable to Plaintiffs for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

189.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup® products, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

190.    As a direct and proximate result of Defendants placing  defective Roundup® products into the stream of commerce, Plaintiffs were injured and/or died and have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

191.    As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs and/or Decedents suffered great mental anguish and other personal injury

and damages.

192.    As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, before their death, Plaintiffs and/or Decedents sustained a loss of income, loss of earning capacity and property damage.

193.    As a further proximate result of Defendants' conduct, Plaintiffs and/or Decedents have incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

194.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:  NEGLIGENCE

195.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

196.    Defendants, directly or indirectly, caused Roundup®® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

197.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

198.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

199.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

200.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to  Roundup® products could cause or be associated with Plaintiffs' injuries and/or death, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

201.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

202.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of  Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

203.    Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc.  Nothing prevented Defendants from being honest in their promotional activities, and in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts, outside of the of the context of labeling.

204.    Despite their ability and means to investigate, study, and test its products and to provide adequate warnings, Defendants have failed to do so.  Indeed, Defendants have wrongfully

concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

205. Defendants' negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

g. Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiffs, consumers, and the general public that the product's risk

of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

206. Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

207. Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

208. Defendants' negligence was the proximate cause of Plaintiffs' injuries and/or death,

i.e., absent Defendants' negligence, Plaintiffs would not have developed cancer.

209.  Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of their products.  Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs.  Defendants' reckless conduct therefore warrants an award of punitive damages.

210.  As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiffs and/or Decedents were injured and/or died and have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

211.  As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs and/or Decedents suffered great mental anguish and other personal injury and damages.

212.  As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiffs and/or Decedents sustained a loss of income, loss of earning capacity and property damage.

213.  As a further proximate result of Defendants' conduct, Plaintiffs and/or Decedents have incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

214.  WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

/ / /

/ / /

## COUNT IV:  FRAUD

## (MONSANTO)

215.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

216.     Defendant Monsanto has defrauded the agricultural community in general and Plaintiffs in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

217.     Defendant Monsanto misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

218.     Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

219.     Plaintiffs relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Plaintiffs did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

220.     The misrepresentations and/or material omissions that form the basis of this fraud

claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant traditionally used to promote the product's efficacy and benefits.

221.     When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

222.     Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

223.     As a proximate result of Defendant Monsanto's fraudulent and deceitful conduct and representations, Plaintiffs have sustained damages and other losses in an amount to be proven at trial.

224.     As a proximate result of Defendant Monsanto's fraud, as alleged herein, Plaintiffs and/or Decedents sustained a loss of income, loss of earning capacity and property damage, including lost income.

225.     As a further proximate result of Defendant Monsanto's fraud, Plaintiffs and/or Decedents have incurred expenses for funeral, burial and other related costs pertaining to Decedents' death, in amounts to be proved at trial.

226.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF EXPRESS WARRANTIES
## (MONSANTO)

227.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

228.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

229.     Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

   a.   ensure that their products did not cause the user unreasonably dangerous side effects;

   b.   warn of dangerous and potentially fatal side effects; and

   c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiffs.

230.     As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the

labeling.

231.    At all times relevant to this litigation, Defendant Monsanto expressly represented and warranted to the purchasers of their products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use.  Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

232.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate.  Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Decedent, and/or that they were safe and effective as agricultural herbicides.

233.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

234.    Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

235.    Defendant Monsanto breached these warranties because, among other things,

Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a.     Defendant represented through their labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.     Defendant represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup products, therefore, were not safer than alternatives available on the market.

236.     Plaintiffs detrimentally relied on the express warranties and representations of Defendant concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Plaintiffs reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Plaintiffs would not have purchased or used Roundup® had the Defendant properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

237.     Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with their Roundup® products as expressly stated within their warnings and labels, and Defendant knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

238.     Plaintiffs had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

239. Plaintiffs used and/or were exposed to the use of Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

240. Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

241. As a direct and proximate result of Defendant Monsanto's breach of express warranty, Plaintiffs and/or Decedents have sustained pecuniary loss resulting from the loss of Decedents' society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

242. As a proximate result of the Defendant's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs and/or Decedent suffered great mental anguish and other personal injury and damages.

243. As a proximate result of the Defendant's breach of express warranty, as alleged herein, Plaintiffs and/or Decedents sustained a loss of income, loss of earning capacity and property damage, including lost income.

244. As a proximate result of the conduct of Defendant's breach of express warranty, Plaintiffs and/or Decedents incurred expenses for funeral, burial and other related costs pertaining to Decedents' death, in amounts to be proved at trial.

245. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

/ / /

/ / /

## COUNT V:  BREACH OF IMPLIED WARRANTIES
## (MONSANTO)

246.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

247.     At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

248.     Before the time Plaintiffs were exposed to the aforementioned Roundup® products, Defendant Monsanto impliedly warranted to its consumers, including Plaintiffs, that their Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

249.     Defendant Monsanto, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Plaintiffs' injuries and/or death.

250.     Plaintiffs were intended beneficiaries of the implied warranties made by Defendant to the purchasers of its herbicides.

251.     The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

252.     At all times relevant to this litigation, Defendant Monsanto was aware that consumers and users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were foreseeable users of Roundup®.

253.     Defendant Monsanto intended that Roundup® products be used in the manner in

which Plaintiffs in fact used them and which Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

254.    In reliance upon Defendant Monsanto's implied warranty, Plaintiffs used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

255.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

256.    Defendant Monsanto breached its implied warranty to Plaintiffs in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

257.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

258.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiffs and/or Decedents have sustained pecuniary loss resulting from the loss of Decedents' society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

259.    As a proximate result of the Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiffs and/or Decedents suffered great mental anguish and other personal injury and damages.

260.    As a proximate result of Defendant's breach of implied warranty, as alleged herein, before their death, Plaintiffs and/or Decedents sustained a loss of income, loss of earning capacity and property damage, including lost income.

261.    As a further proximate result of Defendant's breach of implied warranty, Plaintiffs

and/or Decedents incurred expenses for funeral, burial and other related costs pertaining to Decedents' death, in amounts to be proved at trial.

262.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## EXEMPLARY DAMAGES ALLEGATIONS

263.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

264.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of Roundup®'s safety risks.  Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

265.    This was not done by accident or through some justifiable negligence.  Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of Roundup®'s true risks would limit the amount of money Defendants would make selling Roundup® in California. This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading.  Plaintiffs were robbed of the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiffs' rights.

266.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred.  Accordingly, Plaintiffs request punitive damages against the Defendants for the harms caused to Plaintiffs.

## JURY TRIAL DEMAND

267.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

**PRAYER FOR RELIEF**

268. WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against the Defendants for:

    a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

    b. exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

    c. pre-judgment and post-judgment interest;

    d. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

    e. any other relief the Court may deem just and proper.

Dated: March 17, 2017             **BAUM HEDLUND ARISTEI & GOLDMAN, P.C.**



Michael L. Baum (CA #119511)
mbaum@baumhedlundlaw.com
R. Brent Wisner (CA #276023)
rbwisner@baumhedlundlaw.com
Frances M. Phares (LA #10388)
fphares@baumhedlundlaw.com
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

**PENDLY, BAUDIN, & COFFIN, LLP**
Nicholas R. Rockforte (LA #31305)
Christopher L. Coffin (LA #27902)
Jonathan E. Chatwin (LA #36410)
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 355-0086
Fax: (504) 523-0699
nrockforte@pbclawfirm.com
ccoffin@pbclawfirm.com

COMPLAINT

**KENNEDY & MADONNA, LLP**
Robert F. Kennedy, Jr., Esq.
rkennedy@kennedymadonna.com
Kevin J. Madonna, Esq.
kmadonna@kennedymadonna.com
48 Dewitt Mills Road
Hurley, New York 12443
Telephone:  (845) 481-2622
Facsimile:  (845) 230-3111

*Attorneys for Plaintiffs*

COMPLAINT