Pages 1 - 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE: ROUNDUP PRODUCTS          )
LIABILITY LITIGATION             )
                                 )     **NO. 16-md-02741 VC**
                                 )
_____  )

San Francisco, California
Thursday, May 11, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        THE MILLER FIRM LLC
        108 Railroad Avenue
        Orange, Virginia  22960
  BY:  **MICHAEL J. MILLER, ATTORNEY AT LAW**

        ANDRUS WAGSTAFF PC
        7171 W. Alaska Drive
        Lakewood, Colorado  80226
  BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**

For Defendant Monsanto Company:

        HOLLINGSWORTH LLP
        1350 I Street NW
        Washington, D.C.  20005
  BY:  **ERIC G. LASKER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
            Official Reporter

**APPEARANCES**:   (CONTINUED)

For Movant Jesudoss Rowland:
                    VINSON & ELKINS LLP
                    2200 Pennsylvania Avenue NW
                     Suite 500 West
                    Washington, D.C.  20037
              BY:  **WILLIAM E. LAWLER, ATTORNEY AT LAW**
                        (Via CourtCall)

For the United States of America:
                    BRIAN STRETCH
                    United States Attorney
                    450 Golden Gate Avenue - Civil Division
                    San Francisco, California  94102
              BY:  **RAVEN M. NORRIS, ASSISTANT U.S. ATTORNEY**

| | |
|---|---|
1 | **<u>Thursday - May 11, 2017</u>**                    **<u>2:04 p.m.</u>**

2                    **P R O C E E D I N G S**

3                         **---oOo---**

4        **THE CLERK:**  Calling Case Number 16-md-2741, In Re

5   Roundup Products Liability Litigation.

6     Counsel, please state your appearances for the record.

7        **MS. WAGSTAFF:**  Good afternoon, Your Honor.

8   Aimee Wagstaff for the plaintiffs.

9        **MR. MILLER:**  And Michael Miller.  Good afternoon.

10       **THE COURT:**  Good afternoon.

11       **MR. LASKER:**  Good afternoon, Your Honor.  Erik Lasker

12   for Monsanto.

13       **THE COURT:**  Good afternoon.

14     Okay.  Let's see, shall we talk about the mice first?

15     Let me ask you, Mr. Lasker --

16       **MR. LASKER:**  Sure.

17       **THE CLERK:**  Hold on one second, Judge.

18       Counsel, I don't have the microphones on at counsel table,

19   so I'll have you speak from the podiums because we do have

20   people appearing via telephone.

21       **THE COURT:**  All right.  Is Mr. Rowland's counsel

22   appearing by telephone to argue?  Is that right?

23       **MR. LAWLER:**  Yes, Your Honor.  Bill Lawler,

24   Vinson & Elkins, on behalf of Mr. Rowland.

25       **THE COURT:**  Okay.  Hello.

1          **MS. NORRIS:**  And Raven Norris on behalf of the EPA

2    just appearing.

3          **THE COURT:**  Mr. Lasker, on the -- well, you know what?

4    Maybe so that -- since the EPA is only here for the Rowland

5    piece and since Mr. Lawler is here by phone only for the

6    Rowland piece, why don't we deal with that first.

7          I will tell you, Mr. Miller, that my reaction to this is

8    that it's probably a little bit of overreaching to want to find

9    out more about what Mr. Rowland is doing for these companies.

10   So you want to sort of give it one more shot just to try to

11   explain it to me --

12         **MR. MILLER:**  Yes, Your Honor.

13         **THE COURT:**  -- why I should compel Mr. Rowland to give

14   more information?

15         **MR. MILLER:**  Yes, Your Honor, I will, and I'll

16   hopefully be compelling but I'll be brief.

17         Mr. Rowland was instrumental in writing the only

18   negative -- there's been several positive, we believe for the

19   plaintiff, reports from EPA, but the critical negative report

20   he wrote.

21         **THE COURT:**  Negative from your standpoint.

22         **MR. MILLER:**  Yes, Your Honor.

23         **THE COURT:**  Okay.

24         **MR. MILLER:**  And so we went to that deposition and we

25   called Your Honor, and Your Honor ruled.  And remember the

proffer from Mr. Rowland and his counsel that day and for weeks
before that depo had been he had no work after the EPA with the
chemical industry.

    Your Honor ruled he had to tell us the general -- the name
of where he worked and the nature -- general description, and
we asked him, and it turned out that was a false proffer.  He
worked for the chemical industry.

    And so --

            **THE COURT:**  As I sit here today, I don't have a
recollection of being told that he didn't work for chemical
companies.  I'm not saying you're wrong.  I'm just saying as I
sit here today, I don't have a recollection of what the initial
response was.

            **MR. MILLER:**  On page 17 of his deposition, Mr. Lawler,
as we proffered --

            **THE COURT:**  Hold on.  Let me pull it up.  Hold on a
second.

            **MR. MILLER:**  Yes, Your Honor.

                        (Pause in proceedings.)

            **THE COURT:**  Page 17 you said?

            **MR. MILLER:**  Line 24-25, Your Honor, page 17.

            **THE COURT:**  Hang on.  I'll get there.

                        (Pause in proceedings.)

            **THE COURT:**  Page 17 --

            **MR. MILLER:**  And that's the --

1          **THE COURT:**  -- line 24-25?

2          **MR. MILLER:**  Yes.  I'm looking at --

3          **THE COURT:**  Oh, okay.  I -- so there's some weird

4   pagination on what's been submitted.  There's different --

5   there are two different paginations, but I think I am there

6   now.  Okay.

7          **MR. MILLER:**  "As we proffered," this is Mr. Lawler,

8   "it's unrelated to the chemical industry."

9          **THE COURT:**  Okay.  So I'm not in the right place.  I

10  thought that I was on page 17, Rowland transcript, line 24; is

11  that --

12         **MR. MILLER:**  And 25, Your Honor.

13         **THE COURT:**  Are you sure that's where it is?

14         **MR. MILLER:**  There is a rough cut and then there is a

15  final one.

16         **THE COURT:**  Yeah.  I'm looking at the uncertified

17  rough.

18         **MR. MILLER:**  This is, I believe, the page number

19  from -- oh, I don't know.

20         **THE COURT:**  I believe that's what was put in front of

21  me --

22         **MR. MILLER:**  Okay.

23         **THE COURT:**  -- was the --

24         **MR. MILLER:**  Well, I'm quoting it, Your Honor.  I

25  mean, it's, "As we proffered, it's unrelated to the chemical

```
 1   industry."
 2        And then -- and I'm sure Mr. Lawler will correct me if
 3   it's not 100 percent correct.  It is 100 percent correct.
 4            MR. LAWLER:  I will correct you.
 5            MR. MILLER:  Well, then we'll have to look at it hard.
 6            THE COURT:  Okay.  Well, why don't -- Mr. Lawler, why
 7   don't you see if you can point me to -- so you -- so you filed
 8   a motion to compel -- Mr. Miller, you filed a motion to compel
 9   testimony?
10            MR. MILLER:  Yes, Your Honor.
11            THE COURT:  And you attached Exhibit 2 to that motion,
12   which was the unredacted version of the deposition transcript?
13            MR. MILLER:  Yes, Your Honor.
14            THE COURT:  That's what I have in front of me.
15            MR. MILLER:  Yes, Your Honor.
16            THE COURT:  And what you are pointing me to, page 17,
17   line 24-25, does not have the text that you are reading to me.
18        So, Mr. Lawler, can you help me with that?
19            MR. LAWLER:  Yes, I hope so, Your Honor, because I
20   think you and I are looking at the same transcript.
21        So if you go to page 252 --
22            THE COURT:  Page 252?
23            MR. LAWLER:  Right.
24            THE COURT:  You mean the page numbers down at the
25   bottom there?
```

1          **MR. LAWLER:**  Yes, sir.

2          **THE COURT:**  Okay.

3          **MR. LAWLER:**  Yes, sir.

4          **THE COURT:**  All right.  I'm there.

5          **MR. LAWLER:**  Okay.  And then you see -- on mine it has

6    page -- line 24 says (reading):

7               "So we proffered he has not worked for EPA -- excuse

8          me -- for Monsanto.  We proffer that he hasn't done

9          anything to do with glyphosate."

10    Are we on the same page, Your Honor?

11          **THE COURT:**  Yeah.

12          **MR. LAWLER:**  Okay.  So the point on the --

13          **MR. MILLER:**  Your Honor, before --

14          **THE COURT:**  Hold on, Mr. Miller.  Hold on, Mr. Miller.

15          **MR. MILLER:**  Yes, Your Honor.

16          **THE COURT:**  Okay.  Go ahead.

17          **MR. LAWLER:**  So there are -- the core of the proffer

18    was exactly that.  And if the Court can just flip through the

19    transcript, this is where -- the discussion we had with

20    Your Honor during the deposition.  So the previous page on

21    page 251, we proffered to defense counsel I understood there

22    are valid areas of inquiry; for example, whether Mr. Rowland

23    worked for Monsanto or ever worked for Monsanto.

24          There are a number of different times when -- I think the

25    Court did this -- we proffered that he had never worked for

 1   Monsanto, which is true.  We proffered that he'd never

 2   worked -- post-EPA -- that he'd never worked on glyphosate,

 3   which is true.

 4        In fairness to Mr. Miller, there was some, I think,

 5   imprecision on probably both of our parts as between the

 6   difference between the chemical industry and chemical

 7   companies.  Both of those terms were used, and it may be that,

 8   you know, there wasn't a common understanding of that.

 9        But in terms of the proffer which is being -- the

10   transcript that we've just seen, the core of that was that he

11   has not worked for Monsanto and hasn't done anything with

12   glyphosate, and that was, I think, the core part of what they

13   were -- what they're asking about.

14        So, you know, I think that, with all due respect, the lack

15   of a common understanding of what the difference between

16   "chemical industry" and the "chemical company" is really was

17   not the core of the issue and it shouldn't be the core today.

18        **THE COURT:**  Okay.  And so -- all right.

19   Okay.  Go ahead, Mr. Miller.

20        **MR. MILLER:**  Thank you, Your Honor.

21        **THE COURT:**  What is your theory -- what is your theory

22   of what you are going to get?  What are you trying to find?

23   What are you seeking?

24        **MR. MILLER:**  Can I give you a two-minute answer,

25   Your Honor?  And I'm just asking because it's important.  It's

```
 1    important.
 2              THE COURT:  Yeah, if you actually have the answer, but
 3    you couldn't even direct me to the right quote in the
 4    deposition.
 5              MR. MILLER:  I have --
 6              THE COURT:  So, yes, you can give a two-minute answer
 7    if what you are saying in your two-minute answer is meaningful.
 8              MR. MILLER:  I believe it will be, Your Honor.
 9              THE COURT:  Okay.  Go ahead.
10              MR. MILLER:  And may I give you the right quote on the
11    rough?  It's page 11, line 14 to 17.
12         And I apologize for the confusion, Your Honor.
13              MR. LAWLER:  Your Honor, that's not what I have.
14              THE COURT:  "No, I didn't."
15         "Did you apply for Medical School?"
16              MR. LAWLER:  Yes.
17              MR. MILLER:  I was just handed that by counsel.
18         Answering the Court's question, what I'm trying to get at,
19    Your Honor, is Mr. Rowland was at the IARC hearing as a
20    nonvoting observation person.  We know that Monsanto is talking
21    among themselves so what a nice job Mr. Rowland's doing at
22    IARC.
23         Four days after he comes back, we know that Monsanto asked
24    each other *Is there some way we can get in to the EPA on this*
25    *issue?*
```

1        We know the next day they decide to call Jess Rowland.

2    That's a fact.   These are all facts that we know.

3        We know that on the 23rd Monsanto gives talking points to

4    Mr. Rowland in March.

5        We know on April 28th Mr. Rowland calls Monsanto and says,

6    *I deserve a medal for stopping other scientists in the federal*

7    *government who have real training in this issue from doing a*

8    *report.*

9             **THE COURT:**  You know, you're mischaracterizing the

10   evidence.

11            **MR. MILLER:**  I don't believe I am, Your Honor.

12            **THE COURT:**  You just totally misstated the

13   statement -- the hearsay statement by Mr. Rowland.  I've seen

14   IARC's description -- I mean, excuse me, I've seen the Monsanto

15   e-mails describing what Rowland said, and you're totally

16   mischaracterizing it.

17            **MR. MILLER:**  I respectfully disagree.

18            **THE COURT:**  And so I'm going to ask you to sit down --

19            **MR. MILLER:**  Yes, Your Honor.

20            **THE COURT:**  -- unless you can be straightforward with

21   me about what the facts are in this case.

22            **MR. MILLER:**  I believe I am, and I apologize if the

23   Court thinks otherwise but I believe I am.  I read that a

24   hundred times, and I believe I am.

25        By September, Your Honor --

1          **THE COURT:**  You totally misstated it.  You completely

2     misstated it, and you inserted into it your own very slanted

3     characterization of what he said.  You did not --

4          **MR. MILLER:**  I apologize.

5          **THE COURT:**  -- describe what he actually said or what

6     Monsanto said that he said.  I mean, that's indisputable.

7       So I need you --

8          **MR. MILLER:**  I can sit down.  It speaks for itself.

9          **THE COURT:**  -- I need you to start being a responsible

10    lawyer --

11         **MR. MILLER:**  Yes, Your Honor.

12         **THE COURT:**  -- and stop conducting your public

13    relations campaign in this case.

14         **MR. MILLER:**  I apologize, Your Honor.

15         **THE COURT:**  I need you to start being a responsible

16    lawyer and start -- and stick with the facts and argue in

17    support of your motion based on facts, not based on your

18    mischaracterization of the evidence.

19         **MR. MILLER:**  Yes, Your Honor.

20         **THE COURT:**  Do you understand me?

21         **MR. MILLER:**  Yes, Your Honor.

22         **THE COURT:**  Okay.  Last chance.

23         **MR. MILLER:**  We think when he went to work for these

24    three companies, how much he was getting paid and how these

25    companies found out about him are relevant to bias, and we

1    would like to ask Mr. Rowland about that in a half an hour or

2    less.

3              THE COURT:  Okay.  But you know which companies he

4    worked for.

5              MR. MILLER:  We do, Your Honor.

6              THE COURT:  And so what -- why do you need more detail

7    about what he did?  I mean, your theory -- it seems like your

8    theory is that this was, like -- his work for these companies

9    was that Monsanto was somehow responsible for it and it was his

10   reward for doing Monsanto's bidding in the EPA.  Is that

11   basically your theory?

12             MR. MILLER:  Yes, Your Honor.

13             THE COURT:  Okay.  Well, so you know that he went to

14   work for these three companies.

15             MR. MILLER:  We do, Your Honor.

16             THE COURT:  And why do you need to know the details

17   about what he did?  I mean, they could -- the reward could have

18   been, you know, *You're going to* -- *we're going to require*

19   *you* -- *we're hiring you to sweep the porch on our vacation*

20   *bungalow in Hawaii once a month while you stay there for the*

21   *rest of the year*.  Okay?

22             MR. MILLER:  Yes, Your Honor.

23             THE COURT:  And that -- I mean, that would have

24   nothing to do with whether Monsanto was involved in giving him

25   some reward.

1          So the details of what he did for the company it doesn't

2     seem matters to your theory of whether he ended up with those

3     companies at the behest of Monsanto.

4          **MR. MILLER:**  I think how soon he went to work for

5     those companies after he left the EPA would, Your Honor.

6          **THE COURT:**  But you're asking about the details of his

7     work -- his projects for these companies.

8          **MR. MILLER:**  No, Your Honor.  I just --

9          **THE COURT:**  How does that matter?

10         **MR. MILLER:**  I would like to ask him when he went to

11    work for those companies, how those companies found out about

12    him, and how much those companies are paying him.

13         **THE COURT:**  Okay.  Motion denied.

14         **MR. MILLER:**  Thank you for your time, Your Honor.

15         **THE COURT:**  Okay.  So that disposes of -- we do -- the

16    only other thing we need to talk about with respect to Rowland

17    is the motion to seal.

18         **MR. LAWLER:**  Yes, sir.

19         **THE COURT:**  We might as well knock that out.  I don't

20    know if that matters for Mr. Rowland or for the EPA or not.

21         **MS. NORRIS:**  Not for the EPA.

22         **THE CLERK:**  Up to the microphone, please.

23         **THE COURT:**  Since we have people on the phone.

24         **MS. NORRIS:**  I understand.

25         Not for the EPA.  We did not take a position with regards

1   to this topic.

2           **THE COURT:**  Okay.

3           **MS. NORRIS:**  We are just here to observe.

4           **THE COURT:**  Then you're free to hang out or you're

5   free to leave.

6           **MS. NORRIS:**  As always, thank you, Your Honor, but I

7   will decline.  Thank you.

8           **MR. LAWLER:**  Your Honor, this is Bill Lawler.

9       I can't see if anyone is getting ready to talk or not.

10          **THE COURT:**  Yeah, which is why I generally don't allow

11  argument by phone, but I made an exception for you because I

12  didn't want Mr. Rowland to have the expense of you flying out

13  here.

14          **MR. LAWLER:**  Thank you.

15          **THE COURT:**  No, there's nobody getting ready to talk.

16  What do you want to say?

17          **MR. LAWLER:**  Okay.  Well, on the motion to seal, you

18  know, we did file on behalf of Mr. Rowland requesting that

19  portions as designated of the deposition be sealed, and we

20  would rest on our papers on that.

21          **THE COURT:**  I'm sorry.  Could you say that one more

22  time?  I was having trouble following you.

23          **MR. LAWLER:**  Oh.  I'm sorry, Judge.

24      If the motion -- if the motion to seal the Court is

25  addressing now are the portions of Mr. Rowland's deposition

1   that we requested be kept, you know, confidential and not

2   public, which goes to the fact that we were just talking about,

3   the nature of his post-EPA work, we do believe that it's

4   appropriate to continue to keep those sealed.

5        The rest of the deposition in terms of his work at EPA --

6   his work at EPA, which was the bulk of the deposition, we think

7   is -- you know, we don't have a view on.

8             **THE COURT:**  Okay.  Thank you.

9        Let me give this some thought.  Hold on a second.

10                     (Pause in proceedings.)

11            **THE COURT:**  Okay.  Now let me ask the plaintiffs, and

12  I'm going to ask you the same question about the motion to seal

13  in connection with the mice, let me ask the plaintiffs:  What

14  do you -- you know, I put out an order which made very clear

15  that you are only permitted to attach documents that really are

16  pertinent to the motion; that, you know, this -- you know, you

17  cannot use these proceedings to include as part of the court

18  file documents that you would like to see released to the

19  public if they're not relevant to the motion that you're

20  filing.

21       And so in light of that guidance, I'd like to give you an

22  opportunity with respect to the motion to seal -- you know, the

23  materials that you've submitted in connection with your motion

24  to compel testimony from Mr. Rowland, do you believe -- do you

25  stand by the idea that all of that was properly submitted in

1    connection with your motion?

2        That is to say, all of Exhibit 1 and all of Exhibit 2 to

3    your motion to compel, do you believe that that was all

4    properly submitted; or in light of the order that I issued on

5    an unrelated matter, which made clear that I was going to start

6    sanctioning you if you continued in your effort to file

7    documents that were not related to the motions you were filing

8    in an effort to get them released to the public, are you -- do

9    you have a different position about what parts of Exhibit 1 and

10   Exhibit 2 are relevant to your motion to compel and should be

11   filed in connection with your motion to compel?

12       **MR. MILLER:**  I don't have Exhibit 1 and Exhibit 2 in

13   front of me.  I can tell the Court we in good faith filed them;

14   but if the Court wants us to withdraw them, we will.  I mean,

15   we certainly didn't file them for purposes of press release.

16   We filed them for purposes of prevailing on the motion.  I can

17   make that representation.  But if the Court wants us to

18   withdraw them, we will.

19       **THE COURT:**  Why don't you have Exhibit 1 -- Exhibits 1

20   and 2 to your motion that is being argued here today in front

21   of you?

22       **MR. MILLER:**  It's irresponsible of me, and I take full

23   responsibility.  I brought the kitchen sink, but I didn't bring

24   them and I accept the responsibility.

25       **MS. WAGSTAFF:**  Your Honor, with respect to the mice

```
1   study motion that we're going to talk about soon, you said you
2   have the same question.  Going through the exhibits, Exhibit 1
3   is pretty lengthy, but I will represent to the Court that that
4   is how it was produced to us as a file.  So in the interest of
5   completeness, we have submitted that entire thing.
6        We cite --
7            THE COURT:  Is that a publicly available document?  I
8   mean, one question I had was this was a report from Monsanto to
9   EPA back in, like, the '80s or something; right?
10           MS. WAGSTAFF:  Right.  It's --
11           THE COURT:  I mean, is it a publicly available
12   document?
13           MS. WAGSTAFF:  So it should be because it was part of
14   the EPA file, but I don't know if it currently is right now
15   because back in the '80s I don't know that everything was
16   electronic like it is now.
17        But if you look at some of these documents, you can see
18   that this is sort of a file folder of sorts.
19        But to answer the question I think you're getting at,
20   which is we cite in Exhibit 1 three or four pages, so I would
21   stand by those pages that we actually cite in Exhibit 1.
22        I would stand by the request in Exhibit 2.  Exhibit 3 I
23   would as well.  Exhibit 4 is the same thing.  It was so large
24   that I have a note here that said I have it on e-mail if we
25   need it.  So we would probably do the same thing, like stand by
```

1   the parts of Exhibit 4 that we cited.

2          **THE COURT:**  Do you know how many pages Exhibit 4 is?

3          **MS. WAGSTAFF:**  I could look.

4          **THE COURT:**  It's 443 pages.

5          **MS. WAGSTAFF:**  That's probably why my responsible

6   paralegal said *Look at your e-mail.*

7          **THE COURT:**  Do you know how many pages of that

8   443-page document you cited in your motion?

9          **MS. WAGSTAFF:**  How many?

10          **THE COURT:**  One.

11          **MS. WAGSTAFF:**  Okay.  So, then, why don't I -- if you

12   let me tell you by the end of our argument today which ones we

13   want to stand by, I can report back and ask someone to tell me.

14          **THE COURT:**  Okay.  I think what I may -- what I may do

15   is -- I don't know.  I'll think about it, but I think probably

16   what I may do is I may give you an opportunity to, you know,

17   request that your exhibits in support of these two motions be

18   stricken and replaced by a more narrowly selected group of

19   exhibits, and then we -- I'll give you the opportunity to do

20   that --

21          **MS. WAGSTAFF:**  Okay.

22          **THE COURT:**  -- I think.  Let me -- I'll think about

23   that a little more after we're done today.

24          **MS. WAGSTAFF:**  Okay.  And I think truly, from at least

25   the plaintiffs' side, is that we're getting sort of used to

```
 1   what you prefer, and some courts prefer that the entire exhibit
 2   be filed and some courts prefer --
 3               THE COURT:  Right.  Right.
 4               MS. WAGSTAFF:  -- only a page or two.  And it turns
 5   out --
 6               THE COURT:  No, and that is an issue -- right? --
 7   because you want to make sure that you're not creating a
 8   concern about looking at excerpts of documents out of context
 9   and not being able to see the context.  So that is certainly an
10   issue, and those two concerns are competing.  Neither of those
11   concerns relates to the concern that I have, which is you using
12   this litigation as a vehicle to conduct a PR campaign.  It's
13   obvious to me that that is what you've been trying to do, and
14   that is going to stop.
15         And so -- but, nonetheless, you still do -- in deciding
16   which documents to submit in connection with motions, you do
17   have to conduct that balancing.  And I know that it's not
18   necessarily only going to be the page that you're citing.  You
19   may need to include other stuff for context, but you have to
20   give meaningful thought to that.
21               MS. WAGSTAFF:  Right.  And so -- and, like I said, as
22   we're learning what you prefer, we'll continue to do better in
23   the future, but we'll do whatever Your Honor orders with
24   respect to that.
25               THE COURT:  Well, and normally -- honestly, like,
```

 1  normally in summary judgment motions, for example, I often --

 2  you know, the parties will submit excerpts of depositions, and

 3  I often issue an order saying the parties are ordered to submit

 4  the entire deposition.

 5          MS. WAGSTAFF:  Sure.

 6      THE COURT:  But in this context, given the concern I

 7  have about the plaintiffs using this litigation as a vehicle to

 8  conduct a PR campaign, I'm going to be, you know, scrutinizing

 9  this much more closely, and you need to be much more careful

10  about what you're submitting and what you're not.

11      So, anyway, so that -- I think that leaves the only

12  remaining thing for us to discuss, then, is the mice, yeah?

13          MS. WAGSTAFF:  I believe so, Your Honor.

14      THE COURT:  And on that, let me ask Mr. Lasker.

15      MR. LASKER:  Yes, Your Honor.

16      THE COURT:  Does Monsanto rely, even in small part, on

17  this study in support of its arguments that Roundup is not

18  harmful?

19      MR. LASKER:  This is one of the 14 animal studies

20  conducted, so to that extent, yes.  We are not -- I can

21  represent we have not gone back to 37-year-old -- 35-year-old

22  slides and nobody has looked at 35-year-old slides in order to

23  render any expert opinions in this case.

24      THE COURT:  You haven't looked at the slides, but it's

25  one -- you said it's one of 14 animal studies that you do rely

1    on and that I gather that agencies have considered in making

2    the determination -- that IARC and EPA have considered in

3    making their determinations about the effects of glyphosate.

4          **MR. LASKER:**  Yes, Your Honor.  Our opposition is not

5    based on the question of whether or not this is not one of the

6    animal studies that will be relevant.  It's based upon a couple

7    of issues.

8          First is, as we've laid out in our briefing, the timing is

9    a major problem here.  It just is.  There is -- just so the

10   Court understands, because I know we make reference to it but

11   it may not be clear why this is, when we talk about 1,000

12   slides, you have --

13         **THE COURT:**  Well, it wasn't clear to me that the

14   plaintiffs were seeking 1,000 slides.

15         **MR. LASKER:**  Well, they would have to.  Let me just

16   explain what the slides are so it makes sense.

17         **THE COURT:**  Yeah.  Okay.

18         **MR. LASKER:**  So in a normal study, you may recall from

19   our science day -- but maybe not, probably not -- you have 50

20   male mice and 50 female mice, and so you have initially slides

21   of the kidneys from each of those mice.

22         What happened in this case was because of the regulatory

23   process back and forth, which involved a series of reviews by

24   the EPA, by the Pathology Working Group, and by the Science

25   Advisory Panel, which was independent of Monsanto, there was

1    resectioning and additional slides of those kidneys, which is

2    why we now have 1,000 kidney slides.

3         Now, as I understand what is going on with plaintiffs'

4    request -- so that gives rise to the timing issue.  There are a

5    large number of slides that would have to be reviewed; and for

6    there to be any meaningful scientific review, you couldn't say,

7    *Well, I just want to see that one slide,* because that's not

8    really going to be meaningful independent review of the type

9    that was done back in the 1980s by EPA when they looked at all

10   the slides and they looked at them blinded, the Pathology

11   Working Group and also by the Science Advisory Panel members.

12   So you would need to have some way to try and recreate that.

13        Now, I don't -- we don't believe it's even possible,

14   Your Honor, because --

15             **THE COURT:**  So if I could interrupt just for one

16   second --

17             **MR. LASKER:**  Yes, Your Honor.

18             **THE COURT:**  -- and ask you -- I mean, I guess it

19   depends what they want to analyze the slides for.  And although

20   I don't yet have a full understanding of that and may never

21   achieve a full understanding of that -- not through any fault

22   of theirs, but through my own limitations -- I gather that

23   there is, again, an allegation here that Monsanto manipulated

24   the science, and I gather that the allegation is that the

25   results from the control group or maybe even just one member of

1    the control group may have been manipulated or something.  Am I

2    describing your allegations accurately?

3              MS. WAGSTAFF:  Yeah.  Because you seem like someone

4    who wants more information than less, so if I may just take two

5    minutes to tell you what we're after.

6         So back in the mid-'80s -- well, first of all, I should

7    let you know, maybe you have never had the pleasure of having

8    10 million pages of documents dumped on you, it doesn't quite

9    come in a nice little indexed story.

10             THE COURT:  If you're responding to their accusation

11   that you didn't make the request in a timely manner --

12             MS. WAGSTAFF:  Don't do that?

13             THE COURT:  -- that's not going to prevent me from --

14             MS. WAGSTAFF:  Okay.

15             THE COURT:  -- that's not going to affect my ruling on

16   the motion.

17             MS. WAGSTAFF:  Okay.

18             THE COURT:  Okay?

19             MS. WAGSTAFF:  Excellent.

20        So back in the mid-1980s, we have pieced this story all

21   together through documents we have found that have been in

22   different places.  So it's the best version of the story we

23   have.  If it's not 100 percent accurate, it's what we believe

24   to be as accurate as we can have it right now.

25        Monsanto hired Bio/dynamics, which is a laboratory, to

1   test some mice slides.  Okay?  And they hired a gentleman named

2   Dr. McConnell.  And there were four groups.  There were a group

3   of mice that had glyphosate, a group of mice that had a little

4   bit more, and then medium level, and high level.  So none, low,

5   medium, and high levels.  Okay?

6        And so in his testing they found rare tumors --

7             THE COURT:  What was the company that he --

8             MS. WAGSTAFF:  Bio/dynamics.

9             THE COURT:  Okay.

10            MS. WAGSTAFF:  And so -- and Monsanto paid for that

11   testing.  And so in their testing -- in his testing they found

12   rare tumors in the medium group and in the high group, and

13   these were rare tumors that are not normally found in mice.  To

14   find them at all in this number of mice suggests that something

15   was going on, that it was carcinogenic.

16        So these results --

17            THE COURT:  Well, I'm not sure how relevant this is,

18   but I am curious because I understand that the tumors that were

19   found were benign kidney tumors.

20            MS. WAGSTAFF:  Well --

21            THE COURT:  And so why does that suggest that --

22            MS. WAGSTAFF:  I'm going to take you to that.

23            THE COURT:  Okay.

24            MS. WAGSTAFF:  So this testing was submitted to the

25   EPA, and in part because of that -- not solely but in part

 1   because of that they labeled it a Class E possible carcinogen.

 2        So for no real scientific reason that we can find, a few

 3   years later -- well, there's internal correspondence between

 4   Monsanto employees, and we've cited to most of it and which are

 5   in our exhibits; but for no real scientific reason that we can

 6   find, they decide to re-review those slides that Dr. McConnell

 7   did.  The same original slides.

 8        And so there is internal correspondence where they said

 9   that Dr. Kushner will find -- that if they could find a tumor

10   in the no glyphosate or the low dosage, then that would make

11   the study not statistically significant and, therefore, it

12   would lower the impact of it being a carcinogen.

13        So they said there was internal e-mail -- internal

14   correspondence, it was all cited in our brief, stating that he

15   will find that tumor in the low-to-no dosage.  Sure enough, he

16   re-reviews it -- this is a Monsanto paid employee -- and he

17   finds a benign tumor in the no or the low.

18        So then they submit --

19            **THE COURT:**  In one mouse?

20            **MS. WAGSTAFF:**  In the -- well, we don't -- we're not

21   exactly sure, but in the same slides that Dr. McConnell had

22   reviewed a few years earlier, the same actual physical slides.

23        So they give that to the EPA.

24            **THE COURT:**  So, like, on one slide or on multiple

25   slides, or you don't know?

1          **MS. WAGSTAFF:**  We believe it's just one but, again,

2     we're not positive yet.

3          **THE COURT:**  Okay.

4          **MS. WAGSTAFF:**  And so this is, again, us trying to put

5     all of this together in a very short time frame.

6          And so the EPA then suggests that they recut the slides.

7     So they recut new slides.  So now there are new slides.  And

8     they hire this PWG, which is the Pathology Working Group that's

9     cited in Monsanto's report.

10         Okay.  Now, the PWG, which we believed until recently was

11    related to or set forth or organized by the EPA, was actually

12    paid for by Monsanto, and we've got the invoices to show that

13    Monsanto was paying for the PWG to re-review new slides.

14         And so they confirm Dr. Kushner's review of finding a

15    pathology -- or finding a tumor in the low-to-no dose.

16         **THE COURT:**  Okay.

17         **MS. WAGSTAFF:**  Okay.  And so then what happens is that

18    Monsanto -- we have some trail of evidence where Monsanto has

19    then hired some independent pathologists in case the PWG study

20    doesn't come out how they want it.

21         Now, some of the Monsanto people that they have hired have

22    found no tumors in the low-to-no dosage, which confirms the

23    first original study from Bio/dynamics.

24         And so our understanding now is that Monsanto is --

25         **THE COURT:**  Could you say that last part again?

1          MS. WAGSTAFF:   Sure.

2      So throughout the course of when Monsanto started

3  re-reviewing these slides or cutting new slides, there have

4  been one or two people that have found -- that have agreed with

5  the original analysis that made it a Class C possible

6  carcinogen, meaning no tumors in the zero-to-low and some in

7  the mid-to-high.

8      So that's sort of where we are.  And then as a result, the

9  EPA class -- as a result of a lot of this stuff but in part

10  because of that, the EPA has reclassified that back in the '80s

11  as a Class E, which is, you know, not carcinogenic.

12      And so that sort of dominoed the entire next couple of

13  decades we believe, and we think it has an effect that's

14  extremely relevant to this case.

15      I know you said that the timing --

16          THE COURT:  Was it -- sorry.

17          MS. WAGSTAFF:  Uh-huh.

18          THE COURT:  Was it one of the -- was that, like, the

19  first animal study, or where does it fall in the line of the 14

20  animal studies?

21          MS. WAGSTAFF:  I'm not sure where it falls in the

22  line.  I mean, it's in -- glyphosate came on the market in the

23  late '70s, and we're talking '85, you know, so this is fairly

24  early on.  If Mr. Lasker knows specifically where it falls in

25  line, I would --

1          **MR. LASKER:**  This would be the second rodent study,

2    the first mouse study.  There have been four other registrants

3    who have performed independent mouse studies since then.  So

4    there are now five mouse studies along with the nine rat

5    studies.

6          **THE COURT:**  Okay.

7          **MS. WAGSTAFF:**  And so almost a year ago we were

8    sitting in this courtroom -- I think it was on May 1st, 2016 --

9    with the Hardeman case, and the transcript will show that we --

10   my partner Vance was here.  I don't know if you remember him or

11   not, but he was talking about buying the science, and that even

12   made its way into the transcript.

13         And so we let the Court know and Monsanto know that we

14   were questioning the validity of all of this science and that

15   this was going to be something we looked at.

16         And we didn't know until we found some of those e-mails a

17   few months ago really that there was something to be concerned

18   about with the validity of this particular study.

19         And as Mr. Lasker just said, that Monsanto is relying on

20   this, we also believe this should have been identified in the

21   initial disclosures back in May 2016 a year ago.

22         But that's sort of generally what we're looking for.  And

23   I have -- we have a scientist who is ready to go and start

24   looking at them if Your Honor will so allow, and he said that

25   he would need 30 days from the time that he gets them to issue

1  some sort of a finding.  And plaintiffs are very agreeable to

2  working out a protocol with Mr. Lasker and the rest of the

3  Monsanto team if Your Honor so desires.

4          THE COURT:  Okay.  One other question I have I guess

5  for the both of you -- I'll ask you for now -- is, and this may

6  be an ignorant question, but this -- as I understand it, the

7  study revealed that there were benign tumors in the kidneys of

8  mice who experienced medium or high exposure and may or may not

9  have been benign tumors in the kidneys of mice who experienced

10 low exposure.  That's the issue that you want to explore.  But

11 what does that have to do with non-Hodgkin's lymphoma?

12         MS. WAGSTAFF:  Okay.  Do you want me to go first?

13         THE COURT:  Please.

14         MS. WAGSTAFF:  Okay.  So what that has to do with

15 non-Hodgkin's lymphoma will best be described by the experts.

16 There's no doubt about that.  My scientific level of knowledge

17 is not to the level of being an oncologist, but I do know that

18 the classification and the web of classifications of glyphosate

19 since the '80s, '90s, the '00s, and now the '10s have been in

20 part set forth by this finding and that it was a cancerous

21 finding, and that the crux of it comes down to whether or not

22 there was a tumor found, and benign or not, in the zero and in

23 the low-dose mice.

24         And part of that, whether or not it's benign or not, would

25 have to be explained best by an expert on how that relates to

1    non-Hodgkin's lymphoma and how that actually can play into

2    that.  And we would probably supplement our expert reports to

3    educate Your Honor on that.

4          **THE COURT:**  So, in other words, you would have your

5    scientist spend 30 days with these slides; and then if the

6    scientist comes up with something that you believe is useful to

7    the proceedings, you would disclose a report from the

8    scientist, and then presumably they would have a rebuttal

9    report, and that would just be incorporated into the

10   proceedings that we have scheduled for October?

11         **MS. WAGSTAFF:**  Well, Your Honor, actually, it can be a

12   lot simpler than that.  Monsanto has access to these slides.

13   They could be testing them right now if they so choose.

14         They've relied on -- Mr. Lasker has told you that they're

15   relying on these in their defense, so presumably they'll be

16   incorporated into the defense reports that are due June 1.

17         Today is May 11th.  If we can have the slides by May 15th,

18   we could submit a rebuttal report by our deadline to submit a

19   rebuttal report and supplement the reports, you know, as

20   necessary.

21         So it doesn't have to have that much of a disruption on

22   the schedule currently before Your Honor.  And plaintiffs have

23   not asked for an extension.  We will, you know, supplement well

24   in advance of any deposition that an expert has, and the impact

25   that this new information would have on anyone's report is

```
 1   minimal.  It relates to one study that Monsanto has and has
 2   always had, and it's -- like I said, the substance of it is
 3   very small.
 4            THE COURT:  Okay.
 5            MR. LASKER:  So, Your Honor, if I may just respond and
 6   starting with the point that counsel just made and the question
 7   you just asked.
 8        Even under plaintiffs' theory, we're talking about
 9   something that they've now characterized as minimal and we
10   would characterize as virtually irrelevant to the Daubert
11   decision that Your Honor will be facing.
12        You're exactly correct to raise the question of what one
13   mouse in one study and one kidney has to do with the general
14   causation non-Hodgkin's lymphoma.
15        They have submitted --
16            THE COURT:  I don't know if it's one mouse and one
17   kidney.
18            MR. LASKER:  That's the issue that is in the case,
19   this one control mouse and whether or not there was one -- a
20   tumor in that kidney of that mouse.  That's -- the whole issue
21   is based upon that issue.
22            THE COURT:  So why do they have to -- why do they need
23   all 1,000 slides then?  Why don't they need -- why can't they
24   just look at -- I mean, this may be an ignorant question, but
25   why can't they just get that one slide or whatever slides
```

1    relate to that mouse's kidney and --

2            MR. LASKER:  Your Honor --

3            THE COURT:  Go ahead.

4            MR. LASKER:  Your Honor, if I may.

5       Because scientifically, and this is also part of *Daubert*

6    case law, you would not -- a scientist would not reliably just

7    target and look at one tissue to see if they could find

8    anything because that is not the way that science works.

9       And the way these animal studies work is that you look at

10   the slides without knowing if the animal -- this is, for

11   example, the way the Pathology Working Group that EPA requested

12   looked at this.  They don't know if the slides are from a panel

13   that has glyphosate or doesn't have glyphosate.  They don't

14   have, as this expert would have, a description of the finding

15   in that one isolated study.

16           THE COURT:  I see.

17           MR. LASKER:  So it would be preordained.

18           THE COURT:  I see.  So we don't know.  In other words,

19   are you saying to me that you wouldn't be able to select out

20   the slide where the scientist later found the tumor?

21           MR. LASKER:  No.  The issue, Your Honor, would be that

22   if an expert is -- or scientist is asked to review slides of an

23   animal study, they would not targetly look at one slide and one

24   tissue knowing whether the animal had glyphosate or didn't have

25   glyphosate administered and having an understanding of being

1    retained for one side of the litigation or not to decide that.

2         The way you would do it scientifically in order to reach

3    any opinion that would be reliable and could provide a basis

4    for a *Daubert* opinion -- and this goes back actually to the

5    Ninth Circuit's ruling in *Daubert* after it came back from the

6    Supreme Court.  The Ninth Circuit talked about

7    litigation-inspired science.  You can't -- that that's not

8    reliable.  If a litigation expert is doing something --

9         **THE COURT:**  Well, wait a minute.  But, I mean, it

10   depends on the inquiry that's being conducted.  And maybe I

11   misunderstand, but I got the sense that what Ms. Wagstaff was

12   saying is that we want to check -- you know, there's an

13   allegation that there was -- you know, a mouse had tumors,

14   benign tumors, on its kidneys --

15        **MR. LASKER:**  Right.

16        **THE COURT:**  -- and that that is what made the

17   correlations statistically insignificant -- rendered the

18   correlations statistically insignificant.

19        Why wouldn't it be enough to just check that one mouse to

20   see if, in fact, there is -- I mean, if it turns out that there

21   is a tumor on that mouse's kidneys, then that sort of confirms

22   the later conclusion drawn by the people at -- was it PWG?

23        **MR. LASKER:**  Well, there was a variety of groups.  The

24   Pathology Working Group.  There's also members of the Science

25   Advisory Panel that EPA impaneled that looked at this.

1          **THE COURT:**  So what am I missing?  I mean, why

2    wouldn't it be sufficient to just, like, look at that one slide

3    or the set of slides associated with that mouse?

4          **MR. LASKER:**  Because the issue for pathologists and

5    part of the issue that was in play in the 1980s is pathologists

6    have to use expertise in determining what they're seeing,

7    they're seeing a lesion there and determining whether or not

8    that is preneoplastic or neoplastic, which means indicative of

9    a tumor.  That is a scientific determination that you would

10   make in an objective way to try and figure out whether or not

11   it's a tumor or not.

12        Now, the way --

13         **THE COURT:**  You mean, like, comparing it to other --

14         **MR. LASKER:**  By comparing it to the other animals, but

15   also by looking at this without any preconceived idea of what

16   you're looking at.

17        If you already know -- and this is for all sciences.

18         **THE COURT:**  Okay.

19         **MR. LASKER:**  If it's not blinded --

20         **THE COURT:**  Go ahead.

21         **MR. LASKER:**  -- then it's not reliable and it would

22   not be admitted.

23         **THE COURT:**  Okay.

24         **MR. LASKER:**  The second issue, Your Honor, is that as

25   counsel has indicated to a certain extent, and we would think

1    it's even more strongly the case, this is a kidney tumor in one

2    of -- one mouse in 14 animal studies that's not related to

3    non-Hodgkin's lymphoma.

4         They have now submitted that they have a new expert

5    because none of the experts they've retained has the

6    qualifications to actually do the analysis that they are going

7    to say -- none of the experts that they have put forward has

8    talked about this one animal -- this one animal as being the

9    key to anything.  It's just one of 14 studies.  But they're now

10   saying that it would take their expert 30 days to review this.

11        Now, the idea that we would come forward with an expert

12   report first is completely backwards.  They have the burden of

13   proof to establish that.

14        They would -- and just to take a step back, Your Honor,

15   the issue with these slides, these are slides that are

16   maintained for regulatory purposes.  That's why they still

17   exist.  It's not as simple as us just providing them, so

18   there's going to have to be a protocol worked out and

19   plaintiffs acknowledge this.

20        So putting in time for that and 30 more days, it's now

21   May 11th, so we're talking about towards the end of June at the

22   earliest where we would get their expert's initial report.  For

23   us to then have an expert to do a rebuttal report, our

24   discovery deadline for expert discovery is July 24th, I

25   believe.  There is no way that this can be done in the schedule

1    that is currently in place, particularly to the extent that

2    plaintiffs are also representing that this may impact other

3    experts' opinions, other experts' reports.

4         All of their experts, frankly, for us to be able to meet

5    this discovery schedule would have been deposed or will about

6    to be deposed by the time at the earliest we could have this

7    new expert that they apparently have who they've not identified

8    conduct his review.

9         So what we're talking about here is something that will

10   require the schedule to be bumped at least two or three months

11   at the earliest in order to get this done.

12        **THE COURT:**  I don't understand that.  I don't

13   understand that.  I mean, why can't we proceed as planned with

14   all of the other experts and just have them, you know, submit

15   an expert report at the appropriate time about this issue,

16   which seems to be a discrete issue and as you characterize it

17   as a relatively unimportant issue?

18        I'm not in a position, of course, to make a decision about

19   whether this is important or unimportant in the grand scheme of

20   things.  I just don't have the equipment at this point to do

21   that; right?

22        But you characterize it as a relatively minimal issue,

23   almost -- and it seems like a discrete issue.  So why can't we

24   just do -- why can't we just have them set a schedule whereby,

25   you know, they put out an expert report by around the end of

1    June like you said and then you put out a rebuttal expert

2    report by, like, the end of July or something?  And, you know,

3    if you think depositions need to be taken, you can do that in

4    August.

5          MR. LASKER:  Well, Your Honor, the issue we have is

6    that each one of the five experts they've identified thus far

7    who have submitted an expert report -- and they have a sixth

8    who they may be submitting -- have already discussed --

9          THE COURT:  The sixth they may be submitting is --

10         MR. LASKER:  Dr. Jameson.

11         THE COURT:  -- the person from IARC?

12         MR. LASKER:  Yes, Dr. Jameson.

13    Each of them have already, of the ones they submitted --

14    already submitted discussed --

15         THE COURT:  By the way, that fact deposition did

16    happen?

17         MR. LASKER:  It did, Your Honor.

18         THE COURT:  Okay.

19         MR. LASKER:  Each of their experts already discussed

20    animal studies in their report.  Some of them rely upon the

21    kidney findings in this study as part of their opinion.  So --

22    and, in fact, they have one expert who uses that as part of a

23    large statistical analysis that he does that has lots of issues

24    and problems with it, but it is part of his opinion.

25         So it's not simply -- well, it is an issue that is in the

1  *Daubert* analysis; does not, we believe, have an impact on a

2  *Daubert* opinion because it's a kidney in a mouse and not a

3  human.  It does impact all these depositions because as

4  plaintiffs' counsel mentioned at one point in her argument

5  talking about something -- and I think they mention this also

6  in their pleading -- they would have their experts supplement

7  their reports based upon the finding or at the *Daubert* hearing

8  rely upon this finding in this tissue to be able to make

9  arguments that we would then not have deposed them on.

10      And, you know, I understand --

11          THE COURT:  But it doesn't seem like that would need

12  to happen.

13          MR. LASKER:  I'm sorry?

14          THE COURT:  It doesn't seem like that would need to

15  happen.  It seems like the way it could happen is that they

16  have an expert present a report on this and you, if you want,

17  have an expert rebuttal report; and if they want that expert to

18  come and testify at the *Daubert* hearings, they can do that.

19  And if you want your rebuttal expert to come and testify at the

20  *Daubert* hearings, you can do that.

21      But none of these other people are going to change the

22  opinions that they provide based on what this new expert does

23  with the slides.  I mean, why can't it be done that way?

24          MR. LASKER:  Well, Your Honor, if we are at a hearing

25  in which the -- for example, one of their experts has done a

statistical analyses based upon the information they have now.
I suppose you can tell him that he cannot consider the findings
of the tissue slide review, but you're now in a situation where
you're trying to create a different line of scientific
evidence, and there are experts who will say -- you know,
because a pathologist, if they're having somebody who is expert
in this, can talk about whether or not there's a finding in
this one tissue or not.

It's a separate question what that means in the context
even of that study because the initial finding in that study
was that, you know, even without that control tumor, the study
still did not show anything that was indicative of a
carcinogenic effect.

I mean, some of the things that the Pathology Working
Group, for example, discussed in review of the slide was that
it's -- not only is there a tumor in the control animal, but
there are other things that animal toxicologists look at with
respect to that finding and the other findings in the tissues.

For example -- and I apologize for getting into the
scientific weeds, if you will -- but whether there is what's
called preneoplastic lesions and whether or not there's a
progression to cancer, and whether there are other things
looking at the study as a whole that would indicate whether or
not there is a finding in this control animal or not, that that
is indicative of, in that study, a carcinogenic effect.

```
 1        And so they're trying to now --

 2            THE COURT:  But I've sort of lost track of the -- in

 3    your response I've sort of lost track of the answer to my

 4    question --

 5            MR. LASKER:  Yes.

 6            THE COURT:  -- which is -- and that may be my fault,

 7    but my question is:  Why can't -- I mean, we've got all these

 8    people -- we've got all these different experts who are

 9    presumably looking at the totality of it or portions of the

10    totality of it; right?  And they've got their opinions, and

11    their depositions are being taken on their opinions, and

12    they're not going to have any information by the time they

13    provide their deposition testimony about this new expert's

14    study of these slides.  And so those are going to be the

15    opinions that they're stuck with when they come in here and

16    testify in October, and then we're going to have somebody who

17    can testify about these kidney slides if their expert draws

18    some conclusions that they believe would be helpful to their

19    case, and we consider that too.

20        I mean, I don't -- I'm not -- I've sort of lost track of

21    your answer to that question, like, why that couldn't happen

22    that way.

23            MR. LASKER:  Because the issue, Your Honor, is that in

24    responding to -- let's hypothesize that plaintiffs' expert

25    comes back, the vet path, looks at this and says, *There's*
```

1    *not* -- *I don't see a tumor here*, and our vet path comes back

2    and says *We do see a tumor*.   Then you have a dispute over

3    whether or not there's a tumor in this one control animal.

4         But how that impacts the larger general causation question

5    has not been addressed, and it can't be addressed unless you

6    have the other experts address it because then Your Honor will

7    be faced with a dispute between two pathologists and you will

8    say, *Okay.  What does that mean?*  And unless the other experts

9    talk to you about that, you don't have any -- that is not

10   useful.

11        So that's the problem of trying to separate this out in

12   that way.

13            **MS. WAGSTAFF:**  So, Your Honor, if I may.

14        We served our expert reports on May 1 pursuant to your

15   order.   On May 3rd, two days later, we gave dates for every

16   single person of our experts.   As you can imagine, experts are

17   pretty busy, and we're mindful of the fact that you have

18   previously ordered that by discipline we produce our expert

19   first, we know that, and we've provided dates.   All of them are

20   at the beginning -- the beginning of them are the end of June.

21   The first one is June 19th, and that's Dr. Ritz.

22        So I would submit to you that if we could get the

23   pathology that we're seeking very soon, that we could

24   supplement reports as necessary before.

25        And I'd like to remind the Court that we're in this time

crunch not by plaintiffs' doing.  Mr. Lasker sat here and told

you how they're going to rely on this study.  And if I called

it minimal before, I'm sorry, I didn't mean minimal in

importance; I meant minimal and discrete in scope.  I didn't

mean in importance.

    **THE COURT:**  That's how I took it.

    **MS. WAGSTAFF:**  Okay.  And, you know, presumably

Monsanto has said all along, 14 mice studies -- or animal

studies, 14 animal studies.  They said that from the very

beginning.  I remember Mr. Hollingsworth saying that.  And,

yet, they didn't disclose these within their tangible items

within their custody or control back in May of '16.

   We asked for these documents in our requests for

production before the MDL was formed.  We didn't get them.  We

finally got these documents produced in December.  We had to

piece it all together, and then we asked in time to hopefully

get it within our original reports and they said, *No, we're not*

*giving it to you.*

   So it's unfortunate that we're here right now in this

situation, but we're here because Monsanto hasn't provided this

information that it should have provided a year ago.

    **MR. LASKER:**  Your Honor, if I may speak to that issue,

because I've not addressed it based upon your earlier

statements about timing.

   That representation that this is a new issue is just

completely false.  This study, this -- the findings of the
kidneys of the mouse in this study, the findings with respect
to the control animal in one of the mice in this study was
expressly discussed in the IARC monograph in March of 2015.

The documents that plaintiffs cite in their brief, in
their motion to compel, include documents from EPA that have
been publicly available and publicly discussed *ad nauseam* in
public forum forever that expressly address this exact issue.
Their motion cites to the 1986 SAP, which has been public for a
long time.  They cite to the 1991 review, RED, that EPA issued
that has been public for a long time.

All of those documents talk about this study, talk about
this issue, talk about this finding.  The EPA throughout has
determined, after an extensive analysis of a huge number of
different pathologists frankly, including SAP members for the
independent EPA, what their finding was, why they -- why they
reached the conclusion they did.  This is not a new issue.

The plaintiffs, for whatever reason, decided that in these
tissue slides, which they've known from the beginning existed
and they knew from the beginning there was this issue with the
control animal, for whatever reason they did not seek them
earlier on.

THE COURT:  When did they seek them?

MR. LASKER:  I think it was in the motion --

MS. WAGSTAFF:  It was --

1          **MR. LASKER:**  It was March 15th?

2          **MS. WAGSTAFF:**  It was March 15th --

3          **MR. LASKER:**  15th.

4          **MS. WAGSTAFF:**  -- and it's not for whatever reason.

5          **THE COURT:**  So hold on a second.

6          **MS. WAGSTAFF:**  Yeah.

7          **THE COURT:**  So they sought them March 15th?

8          **MR. LASKER:**  Yes.

9          **THE COURT:**  So I assume -- I mean, I know you-all were

10   incredibly busy during that period but, theoretically, I mean,

11   it could have been in their expert's hands by April 15th and

12   there could be a report by now --

13          **MR. LASKER:**  Well, Your Honor, our --

14          **THE COURT:**  -- from the expert.

15          **MR. LASKER:**  First of all, it would not have been by

16   April 15th because of the issues that I've already mentioned,

17   but we also have --

18          **THE COURT:**  Well, I assume that you could have put

19   together a protocol within a month.

20          **MR. LASKER:**  Well, Your Honor, we have legitimate

21   objections to production.  There's a reason why document

22   requests have a 30-day response time.  It was not only with

23   respect to this document request.  There were other document

24   requests that we responded to.

25       The fact that there is -- that we could have done

1    something faster than the federal rules require is not -- it's

2    not our burden to act more quickly because plaintiffs decide to

3    wait that period of time.

4         **THE COURT:**  But wait a minute.  You could have had it

5    in their -- they asked for it May 15th.

6         **MS. WAGSTAFF:**  March 15th.

7         **THE COURT:**  Excuse me, March 15th.  I'm saying you

8    could have had it in their hands April 15th.

9         **MR. LASKER:**  Yes, Your Honor, if we did not have

10   objections to this.  I mean, this is --

11        **THE COURT:**  What was your objection?

12        **MR. LASKER:**  The issue -- the objections were a series

13   of them.  Some of them is that this is an improper discovery

14   request given the nature of, you know, the proportionality with

15   respect to --

16        **THE COURT:**  But it's part of your defense.  I mean,

17   this is an animal study that's part of your defense.  It's part

18   of your case for why glyphosate doesn't cause cancer.

19        **MR. LASKER:**  Respectfully, Your Honor, we don't have

20   an affirmative burden here.  This is plaintiffs who decided

21   this is part of their case.  It is one of the animal studies.

22   It isn't --

23        **THE COURT:**  Well, wait a minute.  I mean, I don't

24   understand that response.  I mean, you relied on it as part of

25   your argument.  Okay?  Forget about burden.

1          MR. LASKER:  Right.

2          THE COURT:  It's part of your argument for why Roundup

3   doesn't cause cancer; right?

4          MR. LASKER:  It is part of the scientific evidence,

5   yes, Your Honor.

6          THE COURT:  Right.

7          MR. LASKER:  It's a very large --

8          THE COURT:  This study is part of the evidence that

9   you will present, and people's conclusions about this study is

10  part of the evidence that you will present in support of your

11  argument that Roundup does not cause cancer and there's not

12  even enough evidence to allow the question whether Roundup

13  causes cancer to go to the jury; right?

14         MR. LASKER:  Yes, Your Honor, but there's -- the

15  question, again, is -- and there are hundreds of studies on

16  this that have been raised in this litigation -- the question

17  is -- you know, we're not doing 1,000 slides for every animal

18  in every study.  There's a question of proportionality.

19  There's a question of whether or not there's any reasonable

20  basis --

21         THE COURT:  They're not asking for 1,000 slides for

22  every study.

23         MR. LASKER:  Well, respectfully, Your Honor, what

24  they're asking for is a fishing expedition because this is not

25  an issue that's new.  It's not an issue that hasn't been

 1   studied.  It is an issue where they are trying to hope that

 2   they'll find something different without any basis to conclude

 3   that.  I mean, again, this is a study that has been analyzed

 4   probably -- certainly more than any of the other studies that

 5   are out there.  They are using this study to try and at the

 6   last minute, Your Honor, submit a new issue.

 7        We have an expert discovery schedule here that it is

 8   impossible to divorce from this question.

 9        THE COURT:  Okay.  So if I order you to produce the

10   slides to them pursuant to an appropriate protocol, how do you

11   want -- what do you want to do?  How do you want to go about

12   things from here on out?  How do you want to go about phase I?

13   How do you want it to affect the rest of your schedule?

14        MR. LASKER:  Well, Your Honor, we don't want it to

15   affect the rest of the schedule certainly.  We have a schedule.

16   We have expert deadlines.  We have some dispositive *Daubert*

17   briefing and a *Daubert* hearing.  So we will adhere to that

18   schedule however the Court responds.

19        THE COURT:  Well, but you are telling me it's not

20   practical, it's not possible on the current schedule to

21   order -- to make these slides part of the case; and I'm telling

22   you if I decide I want these slides to be part of the case, I

23   will want you to tell me what you think the schedule should be.

24        MR. LASKER:  Well, Your Honor, then we would have to

25   try and figure out a way -- we would oppose any supplementation

1  of the other experts' reports.

2          **THE COURT:**  But you just --

3          **MR. LASKER:**  The plaintiffs would have -- I'm sorry.

4          **THE COURT:**  But you just made a pretty compelling

5  argument to me that if there are two pathologists disagreeing

6  about what the -- about the condition of the mice in this study

7  and all the other expert reports are based on an assumption

8  about the condition of the mice in that study, then it sort of

9  infuses a great deal of uncertainty into, you know, the rest of

10  that expert testimony.

11      And so what's your proposal for how to resolve that

12  problem if I exclude that the slides are going to be part of

13  this case?

14          **MR. LASKER:**  There would have to be, then -- it would

15  determine the type of expert, then, who would be able to

16  provide the review of the tissue slides because you wouldn't be

17  able to have somebody who did not have the broader expertise

18  with respect to what that means within the context of that

19  study.

20      And then it would have to be a separate expert who would

21  be able to then -- and, Your Honor, I'm sort of at a loss for

22  how you would then -- well, it would have to be an expert who

23  would be beyond -- would have expertise not only to review the

24  one tissue slide but would have to offer a broader opinion with

25  respect to, I guess, the animal toxicology so that that could

1  be a separate stand-alone expert opinion that would provide

2  context.  Now, that -- so that Your Honor would have a context

3  within -- with respect to that one expert to consider that.

4       But otherwise -- and, you know, we will have -- there will

5  be a big issue, and I've already mentioned this.  I don't know

6  how an expert can review the slides in a scientific manner at

7  this point because of the reasons I've already mentioned,

8  but --

9            **THE COURT:**  Sorry.  You don't know how an expert can

10  review the slides what?

11           **MR. LASKER:**  In a scientifically reliable manner at

12  this point.

13       The issue, again, one of the issues here that is a part of

14  our objection to this whole procedure to begin with is it is

15  much different to look at slides blindly the way that a vet

16  path does in the ordinary course of their scientific endeavors.

17  Scientists in a lab conduct a study, and they have the ability

18  to look at these things blindly and then try and reach

19  determinations that are not going to be biased, they're not

20  going to be informed by what the results might be or whether

21  the animal has received treatment or not.

22       To now go back 35 years later with slides where the

23  tissues and the findings have been described -- I mean, even if

24  you were to try to recreate a blinded review, the expert will

25  know exactly what this tumor looks like.  It's already been

1   described and so, therefore --

2           **THE COURT:**  So my question to you, though --

3           **MR. LASKER:**  Yes.

4           **THE COURT:**  -- is if I -- notwithstanding your

5   concerns about that --

6           **MR. LASKER:**  Yes.

7           **THE COURT:**  -- if I conclude that the slides will be

8   part of this case --

9           **MR. LASKER:**  Yes.

10          **THE COURT:**  -- maybe I'm wrong to conclude that --

11          **MR. LASKER:**  I understand.

12          **THE COURT:**  -- maybe it's going to turn out to be a

13  totally useless exercise, but if I conclude that you have to

14  turn the slides over to them, how do you want the case to

15  proceed from here?  Do you want it to affect the experts'

16  schedule, the deposition schedule, the expert disclosure

17  schedule, the hearing schedule?  How do you want -- how do you

18  believe it should affect the case?

19          **MR. LASKER:**  Oh, well, if Your Honor is going -- if

20  the Court is going to order that, we would request that

21  whatever opinion is to be expressed with respect to causation

22  based upon a finding with respect to this one slide review

23  would be expressed by that expert, whoever they retained, in

24  the broader context.  It wouldn't just be a vet path who would

25  say, *I see a tumor there.*  *I don't see a tumor there.*

1        It would be an expert who then would provide a broader

2   opinion that we can respond to.  That expert would be handled

3   outside of the current schedule but would provide an opinion

4   that would be rebutted to or not that would provide Your Honor

5   with context.

6        And then we would address that on a separate schedule, but

7   the other experts would not be able to now change their

8   opinions and sort of revise their opinions based upon that.

9   That would be separate.

10       They would have an expert --

11            THE COURT:  So what you're saying is there would be --

12   they have their expert pathologist to look at the slides, and

13   you will be able to have a rebuttal expert to rebut whatever

14   conclusion their expert offers regarding the slides, and then

15   there would be a separate expert to opine on the significance

16   of those conclusions --

17            MR. LASKER:  No, Your Honor.

18            THE COURT:  -- in the grand scheme of things?

19            MR. LASKER:  There are, and it would depend on who

20   they are, but there are experts who look at slides and also

21   look at studies and have the expertise to also put this into

22   context.

23       And so it would be one expert.  It would be an expert who

24   can do both of those things.  So it would not just be somebody

25   who said, *I've looked at the slide and I've seen this and,*

 1    *therefore, I think there's a tumor.*

 2         If plaintiffs want to raise this issue, they have an

 3    expert who would review that finding -- review that tissue

 4    slide.  If they find something different -- and I do think it

 5    would have to be conditioned upon that because otherwise

 6    there's no basis for a new expert -- but if they were to find

 7    something different, if they were to say, *I don't believe*

 8    *there's a tumor here*, then they also, that same expert, would

 9    need to be an expert who could then further opine as to what

10    significance that has with respect to this study.

11              **THE COURT:**  Why would it have to be the same expert?

12              **MR. LASKER:**  Because we're now getting to the point

13    where we are adding now it would be two experts per side, it

14    would be pushed two or three months out of the schedule, and

15    then we're at an issue where it's making the schedule -- it's

16    pressing up against the schedule.

17         And if they -- you know, if there is -- we would obviously

18    be in the same situation, Your Honor.  We would have one expert

19    who would have to respond on both those issues.

20         But that would allow us to address these tissue findings

21    if -- and, again, it would be conditioned on whether there's

22    something found without it impacting the rest of the schedule.

23              **MS. WAGSTAFF:**  Your Honor, if I may.

24         I find it telling that Mr. Lasker is bringing the topic of

25    a blinded and unblinded study up to you.  I actually wrote down

a quote from him earlier where he said, *If it's not blinded, it*
*wouldn't be reliable and, therefore, it's not admitted.*

     And if you remember the story I was telling you of
Dr. Kushner --

          **THE COURT:**  Yeah, I remember.  I thought of that
too --

          **MS. WAGSTAFF:**  -- that was unblinded.

          **THE COURT:**  -- but let's just talk about how the
schedule would be affected.

          **MS. WAGSTAFF:**  Okay.  So one of the ways that I think
it could work, we have offered dates, like I said, to them; and
if they would accept those dates, we could present a report
prior to the first date, which is June 19th.  So presumably
today is the 11th.  If we could agree to have a path protocol
in place by the -- what day is -- maybe the 16th or the 17th,
which is Tuesday or Wednesday of next week, we could get
working on it right away, and then we could have the slides or
have access to the slides by the 19th.  Presumably we could
stay within the dates that we've lumped and nothing changes.

     And if --

          **THE COURT:**  Well, wait a minute.

          **MS. WAGSTAFF:**  Sure.

          **THE COURT:**  Let's talk through the schedule in a lot
more detail --

          **MS. WAGSTAFF:**  Okay.

1          THE COURT:  -- to see if what you're saying is really

2   correct.

3          MS. WAGSTAFF:  That's probably a good idea.

4          THE COURT:  So the plaintiffs' expert reports were due

5   on May 1st with the possible exception of -- was it Jameson?

6   Is there going to be an expert report from Jameson?

7          MS. WAGSTAFF:  I think that there will be, Your Honor.

8          THE COURT:  Okay.

9          MS. WAGSTAFF:  It's due tomorrow and --

10         THE COURT:  It's due tomorrow?

11         MS. WAGSTAFF:  Yeah.

12         THE COURT:  Okay.

13         MS. WAGSTAFF:  Tomorrow is the deadline.

14         THE COURT:  So tomorrow you know whether there's going

15   to be an expert report from Jameson or not.

16         MS. WAGSTAFF:  I'm pretty sure there will be, but I

17   don't know 100 percent.

18         THE COURT:  Okay.  So the plaintiffs' expert reports

19   are in with the final one to be in tomorrow.

20      Monsanto's expert reports are due on June 1st; right?

21         MS. WAGSTAFF:  Correct.

22         THE COURT:  All right.  So plaintiffs' reports

23   May 1st.  Monsanto reports June 1st.  So those reports -- and

24   so how many experts are you talking about?  How many experts

25   does the plaintiff have?

1           MS. WAGSTAFF:  We identified five and Jameson would be

2     six.

3           THE COURT:  Okay.  And how is it going to work?  I

4     mean, are there going to be some experts who talk about animal

5     studies and other experts who talk about epidemiology?  Or

6     how -- who are your experts?

7           MS. WAGSTAFF:  Sure.  So we have a little bit of

8     overlap, and Mr. Lasker and I were just talking about that

9     earlier.  It's not a clear-cut in their mind that this is our

10    tox so it goes before their toxicology person, and that sort of

11    thing.

12        But some of our experts have more strengths than others.

13    We've got Dr. Jameson; Dr. Nabhan, who is -- and then

14    Dr. Nuget, who you met; Dr. Portier, who you met; Dr. Ritz,

15    who's an epidemiologist --

16          THE COURT:  Their names don't mean a lot to me.

17          MS. WAGSTAFF:  Okay.  Dr. Weisenberg.

18        We have --

19          THE COURT:  If you could just say the topics that

20    they're going to -- the topics that they're going to address.

21          MS. WAGSTAFF:  Sure.  Epidemiology, oncology, an NHL

22    expert, a pathologist.

23        And what am I missing?

24          MR. MILLER:  Toxicology.

25          MS. WAGSTAFF:  A toxicologist.

1              **THE COURT:**  I thought that was the first one you

2    mentioned, but I'm not sure.

3              **MS. WAGSTAFF:**  What am I forgetting?

4              **UNIDENTIFIED SPEAKER:**  Hematologist.

5              **MS. WAGSTAFF:**  Hematologist?

6       Hematologist.

7              **THE COURT:**  Okay.

8          **MR. LASKER:**  Your Honor, just to be clear on one of

9    the issues I think in response to your question, if I

10   understand it correctly, we received obviously the expert

11   reports.  The five experts that we received, I believe it's the

12   case that every single one of them offers opinions on the

13   epidemiology, the toxicology, and the genotoxicology.  So all

14   five of the experts talk about all of the different substantive

15   scientific fields, so there's not a demarcation where this

16   expert is an epidemiologist and only offers epidemiology

17   opinions.

18             **THE COURT:**  Okay.  All right.  And then Monsanto's

19   expert reports are due June 1st?

20             **MR. LASKER:**  Correct, Your Honor.

21             **THE COURT:**  And plaintiffs' expert rebuttal reports

22   are due June 15th.

23       Okay.  And you were contemplating the production of a

24   report from your expert on the slides --

25             **MS. WAGSTAFF:**  Uh-huh.

1           THE COURT:  -- when?

2           MS. WAGSTAFF:  Well, our expert has told us that 30

3    days after he has access to the report -- to the slides, he

4    could have a report.  So it's whenever Your Honor --

5           THE COURT:  So late -- end of June let's say, just --

6           MS. WAGSTAFF:  Yeah, sure.

7           THE COURT:  -- roughly.  We can argue later about the

8    dates if we have to, but let's say June 30th.

9           MS. WAGSTAFF:  Okay.

10          THE COURT:  Okay.  And then depositions start

11   happening?

12          MS. WAGSTAFF:  Yes, Your Honor.  Depositions -- I

13   don't have the case management order in front of me, but

14   depositions would start happening I think right after rebuttal

15   reports; right?  So presumably on the 15th they could start

16   happening, although the first date we offered was the 19th.

17          THE COURT:  Okay.  And then -- so we've got -- so some

18   of your experts will have done opening reports, rebuttal

19   reports, and their depositions will have been taken by the time

20   the expert on the slides provides his or her report?

21          MS. WAGSTAFF:  Well, yes, and I just thought of

22   something while you were talking about this.  If we -- you

23   know, since we're kind of working with all of the experts, we

24   know which ones will want to supplement their reports based on

25   whatever the person looking at the slides sees.  Well, no, not

1    all five I don't think, maybe they will, but not all five I

2    don't think will want to supplement their reports.  And

3    typically it's not a lot of the same experts who supplement

4    reports too.

5         So we could -- if you moved it back to June, we could take

6    two weeks out of that depo.

7              THE COURT:  If I moved what back to June?

8              MS. WAGSTAFF:  If you give us till you said June 29th

9    or June 30th, I think you just said late June, to review the

10   slides and produce a report.

11             THE COURT:  Okay.

12             MS. WAGSTAFF:  If you give that as a deadline for us

13   to supplement the reports too and we start depos on July 1

14   versus June 15th and we could take a week out of the briefing

15   schedule, then we're only missing seven days for this very

16   important topic to stay on schedule for the October 11th

17   *Daubert*.  I don't know if you followed me.  I kind of said it

18   in my head.

19             THE COURT:  No, I think I followed you.

20        So contemplate still putting out all these reports in May

21   and June, and it would contemplate providing a supplemental

22   report, you know, in early July; and then I guess they would

23   have to do like a -- do, like, rebuttals to that -- to whatever

24   supplemental reports come in?

25             MS. WAGSTAFF:  Well, so we've given our expert

1   reports.  So if we have until June 20th to provide a report on

2   the slides, if any, then they could start deposing our people

3   in July, although we probably want their expert reports before

4   the depositions start.

5        So presumably their -- this would be in the protocol, but

6   their expert could start looking at the slides while our expert

7   is looking at the slides; right?  I mean, there's no reason why

8   they both can't be looking at the slides at the same time.

9   They could get out a report and then serve one a few weeks

10  later.

11            **THE COURT:**  I don't know.  I don't know how it works

12  looking at slides.

13            **MS. WAGSTAFF:**  So it's not -- you know, both of them

14  would be an independent review of the slides.  If they wanted

15  someone to review the slides as well, my thought would be that,

16  you know, when they become available pursuant to the protocol,

17  one of the things they had suggested was that an independent

18  person would go in there.  Maybe the two pathologists could go

19  in together and, you know, take photos, or whatever the

20  pathologists need to do; and then they could write their own

21  reports, and we would give you ours, you know, a week before

22  you had to serve yours, or something like that.

23            **THE COURT:**  All right.  I'm going to -- I'll give this

24  a little bit more thought.

25        You know, I mean -- you know, one question is whether -- I

1   mean, what I wouldn't want to do -- again, I don't -- let's

2   just be totally honest here.  I do not have the ability to make

3   a decision about how important this is.  You know, I just

4   don't.  I don't -- I would need to take days and days and hear

5   testimony from experts -- right? -- to make an informed

6   decision about how important this is.

7        So I'm operating on incomplete information, and I have to

8   engage in a certain amount of speculation on this, and there's

9   just no -- you know, there's no -- unless we're going to have

10  *Daubert* hearings about how important these slides are --

11           **MR. LASKER:**  Understood, Your Honor.

12           **THE COURT:**  -- right?

13       And so, you know -- so, you know, one -- I mean, this

14  process -- and I don't think there's any question that it would

15  have been a lot better to have, you know, done -- you know,

16  gotten an examination -- an expert to examine these slides

17  earlier so that it could just be part of the regular expert

18  report process.

19       But, you know, I'm just -- I'm staring at the dates and

20  I'm trying to get a sense of whether -- you know, if I decide

21  to allow the slides to be part of the case and allow their

22  expert to examine the slides, you know, if it makes sense to

23  try to keep -- to insist on keeping all the experts on the same

24  schedule as opposed to just delaying things a little bit so

25  that everybody can incorporate all the information they want.

1   I mean, that's the -- you know, the proposals that you-all have

2   sound a little complicated and convoluted to me.

3        **MR. LASKER:**  Yes, Your Honor.  I think it may be clear

4   from my statements previously, if Your Honor's view is that

5   this is something that you'll be granting the request, we will

6   work with the plaintiffs and try and figure out a way to work

7   it within the schedule we have.

8       I mean, we've been all working very hard for the last year

9   under the schedule.  We've maintained the schedule, and I think

10  that's been a tribute to the parties and a tribute to

11  Your Honor that we've done that.  And, you know, for this issue

12  to blow that up I don't think is appropriate or necessary.

13      But I do understand the issue Your Honor has raised, and

14  that's the concern we've had since this issue first came up

15  about the timing of this.  And, again, this is -- I don't think

16  this issue should drive everything else that we've done for the

17  past year.

18       **THE COURT:**  If you put a gun to my head and force me

19  to guess, my guess would be that this issue should not drive

20  the schedule.  But, again, you know, I don't have the tools and

21  I don't think it makes sense for us to have a bunch of *Daubert*

22  hearings to give me the ability to determine how important

23  these slides are.

24       **MR. LASKER:**  I understand, Your Honor.

25       **THE COURT:**  So let me go back and think about it a

1    little bit.  I may summon you-all for a follow-up phone

2    conversation tomorrow.  I may just issue an order.  Let me

3    think about it a little bit more.

4            **MR. LASKER:**  Thank you, Your Honor.

5            **THE COURT:**  Okay.

6            **MS. WAGSTAFF:**  Your Honor, just one last thing.  If

7    you do order that this discovery is allowed and you don't talk

8    to us before you enter an order, if you could please enter a

9    deadline for us to submit a protocol.  That would be very

10   helpful in keeping it going along.

11      Thank you, Your Honor.

12           **THE COURT:**  Okay.  Thank you.

13           **MR. LASKER:**  Thank you, Your Honor.

14                (Proceedings adjourned at 3:26 p.m.)

15                        ---oOo---

16

17

18

19

20

21

22

23

24

25

1

2

3 **CERTIFICATE OF REPORTER**

4        I certify that the foregoing is a correct transcript

5 from the record of proceedings in the above-entitled matter.

6

7 DATE:   Monday, May 15, 2017

8

9

10

11 _____

12     Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25