R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@baumhedlundlaw.com
Michael L. Baum, Esq. (SBN: 119511)
mbaum@baumhedlundlaw.com
**BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.**
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| THIS DOCUMENT RELATES TO: | **DECLARATION OF R. BRENT WISNER IN RESPONSE TO PRE TRIAL ORDER 28** |
| ALL ACTIONS | HON. VINCE CHHABRIA |
| | HEARING:  AUGUST 24, 2017 |
| | TIME:  10:00 A.M. |
| | LOCATION:  COURTROOM 4 |

I, R. Brent Wisner, do hereby declare and state:

1. I am an attorney licensed to practice in the State of California and admitted to practice before this Court.  I am a shareholder with the law firm of Baum, Hedlund, Aristei & Goldman, P.C. ("Baum Hedlund"), and counsel of record for several Plaintiffs within this multidistrict litigation proceeding.  I make this declaration based on my personal knowledge and, if called as a witness, I would testify competently to these matters.

2. I will be present at the hearing set for August 24, 2017 at 10:00 am and will be ready to answer any questions that the Court may have about the topics discussed in this declaration or any other inquiries the Court would like to make.

3. I did not act in bad faith in this matter, as shown *infra*, but I believe that all future meet-and-confers must be audio recorded.

4.     This declaration is divided into seven parts.  Part I provides background information about myself and Baum Hedlund.  Part II discusses the events leading up to this document challenge dispute, and earlier unsuccessful efforts to gain Monsanto's cooperation in reviewing documents. Part III addresses my June 30, 2017 letter challenging the confidentiality designations of 86 documents.  Part IV discusses the meet-and-confer between the parties on July 12, 2017.  Part V discusses my communication to Monsanto in the days prior to the document release.  Part VI discusses the document release on August 1, 2017.  Part VII summarizes my final remarks.

I.     **About Me and Baum Hedlund**

5.     I have been practicing law since September 2012.  That year, I joined Baum Hedlund as an associate attorney.  Prior to that I worked as a law clerk to the Honorable Helen Gillmor in the United States District Court for the District of Hawaii for two years.  Prior to that, I graduated from Georgetown University with a Juris Doctor and Masters of Public Policy.  Notably, I graduated as a *pro bono* honoree, having volunteered well over 750 hours in *pro bono* legal work in various capacities while at Georgetown.

6.     During my practice, I have participated in numerous challenges regarding the confidentiality of documents.

7.     My law firm has a long history of challenging the confidentiality of documents and making them publicly available to regulators, academics, and the media—particularly when those documents relate to issues involving public health.  *See, e.g., Forst v. SmithKline Beecham Corp.*, 602 F. Supp. 2d 960, 974 (E.D. Wis. 2009); *Cunningham v. Smithkline Beecham*, No. 2:07 CV 174, 2008 WL 2572076, at *1 (N.D. Ind. June 25, 2008); *McDonnell v. Sw. Airlines Co.*, 292 F. App'x 679, 680 (9th Cir. 2008).  Due to the nature of our practice, we often come across documents during the discovery process that have broad public health implications.  These documents include scientific research that has been concealed from regulators impeding their capacity to safeguard the public. Baum Hedlund routinely publishes de-designated documents on our website and to the Drug Industry Documents Archive, hosted by the University of California, San Francisco. *See, e.g.*, https://www.baumhedlundlaw.com/prescription-drugs/paxil-injuries/paxil-trial-exhibits/; *see*

https://www.industrydocumentslibrary.ucsf.edu/drug/.  We do this because we believe that transparency in litigation, quite literally, saves lives.

## II.    OEHHA's NSRL Comment Period and May 8, 2017 Document Challenge

8.      The Office of Environmental Health Hazard Assessment (OEHHA) has already listed glyphosate as a substance known to the State of California to cause cancer.  The current issue before OEHHA is whether it will impose a no-significant risk level (NSRL) for glyphosate, which is tantamount to a safe harbor that would alleviate any requirement to warn about cancer risks associated with glyphosate when expected exposure is below the NSRL.  Monsanto's position is that the NSRL should be "infinite," thus obviating any carcinogenicity warning.

9.      I and others are aware that Monsanto had a private meeting with OEHHA on October 7, 2015, in which Monsanto presented "data" about where the NSRL should be set.  In that presentation, Monsanto cited and relied on published literature that had been ghost-authored by Monsanto employees.  Monsanto also failed to disclose other data suggesting that the absorption rate of glyphosate was more perilous to human health than was publicly disclosed.

10.     As a California citizen and an attorney representing nearly 100 Californians, I felt obligated to inform OEHHA about Monsanto's manipulation of science.  I, however, had a major obstacle—many of the documents I wanted to present to OEHHA were designated "confidential" by Monsanto, even though they did not contain any trade secrets or proprietary information.  Before I could send the documents to OEHHA, I would need to get Monsanto to withdraw its designations, either through agreement or waiver, or have the Court de-designate them.

11.      On May 8, 2017, Aimee Wagstaff sent Monsanto's counsel, Heather Pigman and James Sullivan, a request to de-designate 42 documents with a chart listing each document.  A true and correct copy of that letter and its attachment are attached as **Exhibit A**.  I personally drafted much of this letter.  This letter addressed nearly half of the documents that would be part of the 86 documents challenged later.

12.     In that letter, we explained that the challenge was made pursuant to "the Court's December 9, 2016 (Dkt. 64) and March 12, 2007 (Dkt. 186) Orders" and that "Plaintiffs formally

DECLARATION OF R. BRENT WISNER

challenge the confidentiality designations of the forty-two documents listed[.]"  Exhibit A at 1.  The

letter, however, did not specifically state the challenge was made with respect to Paragraph 16.2 of

the Protective Order.

13.     In the letter we explained the urgency of getting these getting these documents to

OEHHA:

> Because the MDL counsel represent dozens if not hundreds of California residents
> and citizens who have developed cancer as a result of Roundup and glyphosate
> exposure, we have a specific interest in accurately expressing our clients' views and
> interests to OEHHA. Additionally, throughout this litigation, Monsanto has raised
> issues about exposure levels and their relationship to general causation. While we
> do not necessarily agree that exposure level relates to general causation, Monsanto
> has claimed so and since OEHHA is expressing a regulatory view about that very
> issue, OEHHA's determination and comment period are potentially relevant to this
> phase of the litigation.

*Id.* at 1.

14.     The confidentiality challenge was time-sensitive because the OEHHA comment period

was set to expire on May 22, 2017.  Therefore, we requested that Monsanto get back to us as soon as

possible.

15.     First, we believed that Monsanto violated its good faith obligation under the Protective

Order by designating these documents as confidential when no portion of these documents contain

material entitling that designation.  Second, Monsanto never responded to our May 8, 2017 letter,

even after Ms. Wagstaff emailed to follow up on the document challenges multiple times.

16.     By June 8, 2017, since Monsanto had not filed a motion seeking continued protection

of the 42 documents.  Monsanto therefore waived any claim of confidentiality over those documents.

*See* Protective Order ¶ 16.3 ("Failure by the Designating Party to make such a motion . . . within 30

days . . . shall automatically waive the confidentiality designation for each challenged designation.").

However, the literal requirement of Paragraph 16.2, is that "[t]o avoid ambiguity as to whether a

challenge has been made, the written notice must recite that the challenge to confidentiality is being

made *in accordance with this specific paragraph of the Protective Order*."  Protective Order ¶ 16.2

(emphasis added).  Since the May 8, 2017 letter did not specifically reference Paragraph 16.2,

although it stated it was a formal challenge under the Protective Order, I and others decided not to

release the documents despite the fact that Monsanto had not responded timely. We decided to challenge the documents a second time using the specific language required by Paragraph 16.2.

17.      Ultimately OEHHA extended the time period for submitting comments until June 21, 2017. And, despite Monsanto never responding to our May 8, 2017 letter or subsequent emails, my office did submit a formal 14-page comment to OEHHA addressing some the serious scientific issues we believed impacted every Californian's heath. A true and correct copy of that comment is attached as **Exhibit B**. In filing that comment, we took care to not use or rely upon confidential material. The comment, however, did use a handful of documents this Court previously de-designated earlier in the litigation.

18.      This 14-page letter, sent to OEHHA, took considerable time and effort. It was done, however, because we at Baum Hedlund believed it was our responsibility, as officers of the Court and California citizens, to make sure that regulators were fully informed in making decisions that could affect individuals' health and the health of their families. We also appeared at the open comment period with several of our concerned California clients and provided testimony to OEHHA.

### III.   The June 30, 2017 Challenge

19.      In June of 2017, I approached the MDL Leadership about engaging in a renewed challenge process that involved many of the same documents to which we received no response in May and early June. My decision to pursue this new challenge stemmed from Pre-Trial Order No. 20. There, the Court clarified that:

> In this phase of the MDL, the proper remedy for overdesignation is to correct the discrete instances of overdesignation that require correction given the needs of the litigation.

PTO 20 at 2 (Dkt. 266).

20.      Based on this order, I understood the Court only wanted the parties to focus on *discrete* instances of overdesignation, not wholesale blanket challenges, as had been done in Pre-Trial Order 15.

21.      Thus, in June 2017, I requested and received authorization from the MDL Leadership to spearhead a new document challenge focused on very specific instances of overdesignation

DECLARATION OF R. BRENT WISNER

consistent with the Protective Order and PTOs 15 and 20.

22.     My colleague, Pedram Esfandiary, and I, prepared the letter initiating the document challenges under Paragraph 16.2 of the protective order.  I have attached a true and correct copy of that letter and accompanying chart as **Exhibit C**.

23.     In the letter, I specifically addressed the concerns raised by the Court and explained how this challenge was being made under the terms of the Protective Order *as well as* PTOs 15 & 20:

> This challenge is made pursuant to Paragraph 16.2 of the December 9, 2016 Protective and Confidentiality Order. We seek to meet-and-confer about documents we believe have been over-designated as "Confidential" by Monsanto. We have reviewed each document individually and selected only documents, listed out in detail on the attached chart, that do not contain trade secrets, sensitive commercial information, privileged material, or that are otherwise entitled to "confidential" protection under the law.
>
> In compliance with the Court's Pre-Trial Order 15 (PTO-15), clear reasons are set forth in the attached chart for why each challenged document is relevant to the general causation stage of this litigation.  . . .  All of the documents challenged in this letter are reasonably likely to be used in this litigation and relate to this phase of litigation.
>
> As you know, in the Court's Pre-Trial Order 20, the Court stated that "[i]n this phase of the MDL, the proper remedy for overdesignation is to correct the discrete instances of overdesignation that require correction given the needs of the litigation" and instructed the Parties to comply with the meet-and-confer process outlined in Section 16.2 of the Protective Order.  Recognizing that Monsanto's designation of nearly every document produced in this litigation as "Confidential" was not done in bad-faith, but simply because Monsanto erred on the "side of caution," this letter and the requested meet-and-confer is your chance to address a discrete set of documents, identified in the attached chart, and correct Monsanto's overdesignations.

Exhibit C at 1-2 (emphasis added).

24.     I further explained:

> The substantive basis for challenging *each* document is provided in the attached chart. Pursuant to the December 9, 2016 Protective and Confidentiality Order, you have fourteen (14) days to conduct a good-faith review of these documents and let us know whether you will be withdrawing these confidentiality designations, thus avoiding the need for any motion.

*Id.* at 2.

25.     I attached to the letter a 28 page, single-spaced chart, containing descriptions and quotes from each challenged document and an explanation as to why *each* document contained

information relevant to this phase of the litigation.

26.     I personally reviewed each document, and I believed that none of the documents contained even arguably confidential information.

27.     To further facilitate Monsanto's review of the documents, I also had all personal information from each document redacted, i.e., phone numbers, email addresses, etc., and sent Monsanto's counsel a hyperlink to a repository of the redacted challenged documents.  This was not required by the Protective Order or PTOs 15 & 20.  I did it as a courtesy to Monsanto's counsel, understanding that having to redact and pull up documents using bates numbers can extremely time consuming, a burden we undertook ourselves.

28.     On June 30, 2017, after receiving authority from the MDL leadership to send the letter, my secretary emailed the letter to Monsanto's counsel.

29.     In the letter we asked that Monsanto counsel notify us which date they would be willing to participate in a meet-and-confer prior to July 6, 2017 at the latest.

**IV.   The July 13, 2017 Meet-and-Confer**

30.     On July 6, 2017, I received an email from Monsanto's counsel, Gary Rubin, stating that he would be willing to participate in a meet-and-confer on July 13, 2017—the last possible day to meet-and-confer under the protective order (fourteen days after June 30).  A true and correct copy of that email and several subsequent emails are attached as **<u>Exhibit D</u>**.

31.     Mr. Rubin's email stated "We are available to discuss your letter" and did not state that Monsanto would be refusing to discuss the documents at issue.

32.     As the meet and confer date approached, I became concerned that Mr. Rubin might not be prepared to discuss the challenged documents in detail, as required by the Protective Order.  So because I was taking a deposition at the time, on July 10, 2017, I directed my associate to send an email to Mr. Rubin clarifying our expectations:

> The date of our meet and confer (Thursday July 13) falls on the eve of the 14 day meet and confer deadline. Thus, we expect that you will have reviewed the challenges and determined which documents have been inappropriately designated confidential and which you still contend are confidential and why. To facilitate your review, please find attached the challenged documents chart with two additional

columns where you may indicate your position with respect to each challenge. If you agree that a specific document will be de-designated, simply check the "Agree" box, or if you disagree with the challenge, please provide an explanation in the "Disagree" box. Please fill out the chart so that we can have an informal discussion about each document and decide how to proceed before expiration of the two week meet and confer period.

Exhibit D at 1.  Attached to the email was a Microsoft Word document, containing the substance of each of Plaintiffs' challenges to the documents with two additional columns.  A true and correct copy of that new chart is attached as **Exhibit E**.

33.    Our purpose, once again, in providing this chart was to facilitate Monsanto's review of the documents.  We provided a specific place for Monsanto to explain why any particular document warranted confidential protection.  In instances where Monsanto had no objection, we provided a column where Monsanto could check off, thereby waiving confidentiality. This process of using charts to deal with documents is the same process my firm has used in other confidentiality challenges in various litigations.

34.    In response to this email, Mr. Rubin stated: "Thank you for your e-mail. We plan to speak with you on Thursday, 1:00 p.m. your time."  Exhibit D at 1.  He did not state that Monsanto would not be prepared to discuss each document or would claim that it was not obligated to review these challenged documents at all.  It was my understanding, in light of Mr. Rubin's emails, that Monsanto planned to substantively discuss each document during the meet-and-confer. Any other assumption would mean that Monsanto's communications with us during the prolonged lead up to this meeting were a delay tactic.

35.    On July 13, 2017, we met by phone.  Present on the call from Plaintiffs side were myself, Pedram Esfandiary (of Baum Hedlund), Aimee Wagstaff (of Andrus Wagstaff), and Pearl Robertson (of Weitz & Luxenberg).  For Monsanto, James Sullivan and Gary Rubin (both of Hollingsworth) noted their presence and indicated that no one else was participating on their end.  To the best of my knowledge the phone call was not recorded and no party expressed consent to a recording.  In Mr. Rubin's August 2, 2017 declaration, he "quotes" me from the phone call, suggesting such a transcript exists.  *See* Dkt. 3 ¶ 12.  If it does, that recording should be made available to the Court, as it will confirm the accuracy of my declaration.

DECLARATION OF R. BRENT WISNER

36.     To the best of my memory, recollection, and notes, here is what I remember transpired on the call:

A.     Mr. Sullivan and Mr. Rubin refused to discuss any document or explain why any document was properly designated confidential, i.e., contained trade secret information or any other propriety information.

B.     Mr. Sullivan stated Monsanto was not required to review these documents because there was no "litigation need" and that reviewing the documents for confidentiality would be too burdensome.

C.     Mr. Sullivan explained that if this case was defeated at summary judgment, any confidentiality challenges would be mooted, so there was no need to review documents for confidentiality at this time.  I explained that I had personally challenged documents, even after losing at summary judgment, in other litigation, and that such argument was deeply disingenuous since many of these documents would likely be used at summary judgment.

D.     Mr. Sullivan stated that he had reviewed the documents to see if any of them were cited in Plaintiffs' expert reports (but not to see if they contain any confidential information).  He represented that none of them were cited in Plaintiffs' expert reports.  I have not verified whether that is true.

E.     I stated that we *had* explained why each of the documents were relevant to this phase of the litigation in the document chart, but Mr. Sullivan and Mr. Rubin disagreed. Neither of them however, would explain how any specific document was not relevant to the litigation.

F.     Mr. Sullivan told me that I needed to "go away" and explained that the Court empowered him to take that position in PTOs 15 and 20.   I asked if I could quote him on that, and Mr. Sullivan said I could.

G.     I pressed Mr. Sullivan and Mr. Rubin about what they thought qualified as a legitimate "litigation need" such that they would be willing to meet-and-confer about the confidentiality of any specific document.  Monsanto's lawyers refused to answer, only stating

that these documents and Plaintiffs' challenge did not qualify.

H.     I accused *Mr. Rubin and Mr. Sullivan* of acting in bad-faith on the call because they were not even willing to explain the definition of "litigation need" they were applying. Mr. Rubin, again, said he did not have to explain anything.

I.     Mr. Sullivan confirmed that the original designation of the documents produced by Monsanto as confidential in this litigation were done in good faith and were made by an actual attorney.

J.     Mr. Rubin, at one point, argued that because Monsanto's counsel did not receive the challenge letter until after midnight East Coast time, i.e., after 9:00 pm PT, the letter was not technically served until July 1, 2017.  I disagreed with this argument, but it nonetheless indicated to me that Mr. Rubin was fully apprised of the timing deadlines in the Protective Order.

K.     I inquired whether Mr. Rubin agreed that we had reached an impasse.  He agreed.

L.     Mr. Rubin then asked whether I would consider filing a joint discovery letter, as opposed to a full-fledged motion.  I stated that *I seriously doubted we would take that approach*, but that I would consult with Plaintiffs' counsel and let him know.

M.     At no time did I ever state that I "would either file a joint letter or motion with the Court or elect to drop their confidentiality challenge" as Monsanto stated in its Application for Emergency relief.  *See* Dtk. 416 at 1.  This statement to the Court was false.

N.     At no time did I state to Monsanto's Counsel that Monsanto was no longer required to abide by the terms of procedures set out in the Protective Order.

37.     I have personally engaged in numerous meet-and-confers regarding the confidentiality of documents and I have never been told, literally, to "go away."  It is unclear how Monsanto's counsel's conduct complied with the Court's requirement that "[t]he parties shall attempt to resolve each challenge in good faith."  Protective Order ¶ 16.2.

38.     I knew that even though Monsanto's counsel refused to engage in a meet-and-confer

with me, they would have to explain it to the Court.  The Protective Order explicitly contemplates this problem.  Under Paragraph 16.3, it states "[i]f the parties cannot resolve a challenge without court intervention" – a fact that even Monsanto concedes – "the Designating Party *shall* file and serve a motion to retain confidentiality under Civil Local Rule 7 . . . within 30 days[.]"  *Id.* ¶ 16.2 (emphasis added).  Further, such motion must contain "a competent declaration affirming" that the parties' good faith attempts to resolve the dispute.  Finally, "[f]ailure by the Designating Party to make such a motion including the required declaration within 30 days . . . ***shall automatically waive*** the confidentiality for each challenged designation."

39.    Following the July 13, 2017 meet and confer, I believed that Monsanto was obligated to take action or else waive its assertions of confidentiality. I fully expected Monsanto, who has thus far been represented by competent counsel, to take such action.

## V.    Follow-Up Email on July 27, 2017

40.    Following the meet-and-confer, I started preparing our opposition brief to the anticipated motion by Monsanto.  Indeed, all of the research for the motion I filed on August 1, 2017 (Dkt. 415) was prepared in anticipation of Monsanto's motion.  My research revealed a host of legal issues related to Rule 26(c) and the First Amendment.  This is why, even after Monsanto failed to file its motion to preserve confidentiality, I filed the motion seeking clarification of PTO 15 and 20— even after Monsanto's deadline of thirty days to respond had passed.  It is not true, as Monsanto has claimed, that the filing of the August 1, 2017 motion was some post-hoc effort to justify the public disclosure of the 86 documents.  That assertion is patently untrue, as explained in the motion itself.

41.    After two weeks following the July 13 meet and confer, however, I began to wonder whether Monsanto would file the necessary motion.   I grew concerned that Monsanto might repeat its position of May by simply ignoring us, or might have taken the fact I had not completely excluded the possibility of a joint letter pending discussions with co-counsel to mean that we might so act.

42.    To address my concerns and alleviate any doubt about whether we would agree to a joint letter, on July 27, 2017, I sent an email to Mr. Rubin stating that we would not participate in a joint letter.  A true and correct copy of that email is attached as **<u>Exhibit F</u>**.

43.     I contemplated, at that time, whether I should advise Mr. Rubin about his impending deadline to file a motion.  But after considering the ethical implications of giving such advice, I decided against it, because that would be acting against the interests of my own clients, and thus acting unethically.  Getting these documents into regulatory hands is something that would benefit my clients since this Court will consider regulatory action in deciding the merits of the case. Advising Monsanto's lawyers about its potential waiver of confidentiality would have violated my duties of loyalty, competence, and diligence owed my clients.  I knew that as I was responsible for my own competent lawyering, Monsanto's counsel was responsible for their competence, including knowing the deadlines they faced.

44.     Prior to sending this email to Mr. Rubin, I ran the contents of the email by Ms. Wagstaff to solicit her comments.  I explained to her that the email was designed to put Monsanto on notice that we would not be filing anything specific to these documents and that Monsanto was under the clock, without also divulging information in violation of our duty of loyalty to our clients.   Ms. Wagstaff agreed.

45.     At no time did I intend to trick or deceive Monsanto's lawyers about anything, nor did this even occur to me. From the beginning, I made significant efforts to make this confidentiality easy for Monsanto's counsel by providing revised list of documents, redacting, and so on.

**VI.   I Made the Documents Public and Sent them to Regulators**

46.     By July 30, 2017, 30 days after I sent the original letter to Monsanto's counsel challenging the 86 documents, Monsanto had not filed any motion to preserve confidentiality, thus "automatically waiv[ing]" confidentiality pursuant to paragraph 16.3 of the Protective Order.

47.     Notwithstanding that, in an abundance of caution, I waited an extra two days before disclosing the documents to anyone.  On Tuesday, August 1, 2017, after checking the docket to ensure that nothing had been filed, I authorized my webmaster to post the documents on our website. https://www.baumhedlundlaw.com/toxic-tort-law/monsanto-roundup-lawsuit/monsanto-secret-documents/  In listing the documents, I specifically used the language from the June 30, 2017 letter that described each document and explained its relevance.

48.     I sent hard copies of the documents, with a detailed cover letter, to the Office of Inspector General for the Environmental Protection Agency, which is apparently investigating illegal collusion between Monsanto and the EPA; OEHHA, which is still considering the NSRL issue for glyphosate; and the members of the European Parliament, which had previously written the Court requesting documents to assist their decision making process regarding glyphosate formulations' use in Europe (Dkt. 385).  A true and correct copy of the letters I sent are attached as **Exhibits G, H, and I**.

49.     I specifically copied Joe Hollingsworth on these letters and posted them to my law firm's website.  I also posted copies of this Court's Protective Order, my letter challenging the confidentiality of the documents, and an explanation of how the documents came to be declassified. I made these disclosures to be transparent.

50.     Prior to publicly releasing these documents, I researched whether I could make such disclosures under Ninth Circuit law governing discovery material.  And, based on my research, I concluded I was fully within my rights to post these documents once they were no long confidential.

51.     I did not release these documents believing, for one moment, that doing so would violate the Protective Order or any order of this Court.

52.     Monsanto's failure to file a motion made sense to me the more I thought about it. None of these documents contained confidential information in them.  I am not sure how Monsanto could have even filed a motion seeking continued confidentiality without also violating Rule 11, especially when this Court threatened Monsanto with sanctions for asserting frivolous claims of confidentiality in the past.

## VII.  Concluding Remarks

53.     I do not believe I acted in bad faith in my dealings with Monsanto.  I repeatedly attempted to engage Monsanto's counsel in discussing these documents, but I was rebuked at every turn.

54.     I never attempted to deceive or trick Monsanto in any way.  I was surprised when Monsanto failed to file a motion to preserve confidentiality, but could see the legal rationale for their

not doing so given the Court's prior admonishment regarding sanctioning Monsanto for maintaining frivolous confidentiality assertions.

55.     My decision to make these 86 documents public after Monsanto waived confidentiality over them was not done to retaliate against Monsanto or litigate this case in the media. I made these documents public because I felt they needed to be available to regulators, academics, researchers, and other attorneys to help make the world a safer place.   I also believe that getting these documents into the hands of decision makers was in my clients' best interests.

56.     The vitriol that Monsanto has spewed about myself, my law firm, and my fellow counsel to this Court and the media, speaks volumes about what is really going on.  For example, the day after this Court entered its order to show cause, Monsanto's Scott Partridge told Law 360:

> "They obviously made a calculated decision to violate two federal court orders," he said. "They decided that whatever sanctions they got were worth it."

> Partridge also questioned whether Baum Hedlund was the only firm involved in the suit who was involved in the decision to leak the documents, suggesting the plaintiffs' attorneys engaged in a "conspiracy" in which they could "sacrifice" Baum Hedlund to reveal "cherry picked" documents to the public.

**Exhibit J**, Emma Cueto, *Firm In Hot Water Over Releasing Monsanto Weedkiller Docs*, at 2-3 Law360 (Aug. 10, 2017).  The Monsanto spin machine is working overtime, spreading speculative and false claims about Plaintiffs' counsel motives and, literally, espousing conspiracy theories. These are the words of someone trying to rationalize their own mistake.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 14th of August, 2017 at Los Angeles, California.

By:  /s/ R.Brent Wisner
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

1

## **CERTIFICATE OF SERVICE**

2

    I, R. Brent Wisner, hereby certify that, on August 14, 2017, I electronically filed the foregoing

3

with the Clerk for the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to counsel of record.

4

5

                  /s/ R. Brent Wisner

                    R. Brent Wisner

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF R. BRENT WISNER