# EXHIBIT C

# BAUM  HEDLUND  ARISTEI  GOLDMAN PC

─────────── C O N S U M E R  A T T O R N E Y S ───────────

Washington, D.C. Office
12101 L Street, N.W.
Suite 800
Washington, D.C. 20037-1524
Office (202) 466-0513
Fax (202) 466-0527

12100 Wilshire Boulevard, Suite 950
Los Angeles, CA 90025-7114
Office (310) 207-3233
Fax (310) 820-7444
www.baumhedlundlaw.com

Philadelphia Office
1500 Market Street
12th Floor East Tower
Philadelphia, PA 19102-2100
Office (215) 665-5659
Fax (215) 569-8228

June 30, 2017

*VIA EMAIL*

Joe G. Hollingsworth
Heather A. Pigman
James M. Sullivan
HOLLINGSWORTH LLP
1350 I Street, N.W.
Washington, DC 20005
Email: jhollingsworth@hollingsworthllp.com
        hpigman@hollingsworthllp.com
        jsullivan@hollingsworthllp.com


Re:     *In Re: Roundup Products Liability Litigation*, 16-MD-2741 (N.D. Cal.)
        Letter Initiating Meet-and-Confer


Counsel,

I write to initiate a meet-and-confer regarding the asserted "confidentiality" of specific documents produced by Monsanto in discovery.  I have been appointed by the Plaintiffs' Leadership in the MDL to work on this issue with you.

This challenge is made pursuant to Paragraph 16.2 of the December 9, 2016 Protective and Confidentiality Order.  We seek to meet-and-confer about documents we believe have been over-designated as "Confidential" by Monsanto.  We have reviewed each document individually and selected only documents, listed out in detail on the attached chart, that do not contain trade secrets, sensitive commercial information, privileged material, or that are otherwise entitled to "confidential" protection under the law.

In compliance with the Court's Pre-Trial Order 15 (PTO-15), clear reasons are set forth in the attached chart for why each challenged document is relevant to the general causation stage of this litigation.  Plaintiffs are making a good-faith effort to "confer in advance of court filings about whether documents previously designated confidential truly need that designation." PTO-15 at 4; *see* Feb 27, 2017 Tr. of Proceedings at 55.  All of the documents challenged in this letter are reasonably likely to be used in this litigation and relate to this phase of litigation.

**BAUM HEDLUND ARISTEI GOLDMAN** PC

——— C O N S U M E R   A T T O R N E Y S ———

Joe G. Hollingsworth, et al
June 30, 2017
Page 2

As you know, in the Court's Pre-Trial Order 20, the Court stated that "[i]n this phase of the MDL, the proper remedy for overdesignation is to correct the discrete instances of overdesignation that require correction given the needs of the litigation" and instructed the Parties to comply with the meet-and-confer process outlined in Section 16.2 of the Protective Order.  Recognizing that Monsanto's designation of nearly every document produced in this litigation as "Confidential" was not done in bad-faith, but simply because Monsanto erred on the "side of caution," this letter and the requested meet-and-confer is your chance to address a discrete set of documents, identified in the attached chart, and correct Monsanto's overdesignations.  It is my sincere hope that through the meet-and-confer process we can avoid burdening the Court with having to review these documents and this confidentiality dispute can be resolved without Court intervention.

The substantive basis for challenging *each* document is provided in the attached chart.  Pursuant to the December 9, 2016 Protective and Confidentiality Order, you have fourteen (14) days to conduct a good-faith review of these documents and let us know whether you will be withdrawing these confidentiality designations, thus avoiding the need for any motion.  I am available to meet-and-confer and ask that you notify us by Thursday, July 6, 2017 of when you will be able to systematically go through each of these documents to see if there is some way we can come to an agreement outside of Court intervention.

To further facilitate your review, we have redacted the documents to remove irrelevant identifying information such as addresses, email addresses, phone, and fax numbers.  The redacted documents are available at HYPERLINK for your review.  Additionally, we have grouped the documents by subject-matter.

Best,
BAUM HEDLUND ARISTEI & GOLDMAN, P.C.

By: _____
     R. Brent Wisner
     Michael L. Baum
     Pedram Esfandiary

## CHALLENGED DOCUMENTS

| No | Bates | Description | Relevance |
|---|---|---|---|
| **Issue: Ghostwriting, Peer-Review & Retraction** | | | |
| 1. | MONGLY01000676, MONGLY01000680

2/8/2016 - 2/9/2016 | This document contains correspondence between Dr. William Heydens (Monsanto) and Ashley Roberts (Intertek) regarding the Expert Panel Manuscript. Dr. Heydens went "through the entire document and "indicated what I think should stay, what can go, and in a couple spots I did a little editing. I took a crack at adding a little text: on page 10 to address John's comments about toxicologists' use of Hill's criteria ... see what you think; it made sense to me, but I'm not sure if it will to others - please feel free to further modify and/or run by Cary." at *1. The edited draft is also attached and challenged for confidentiality. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's significant role in drafting and editing a manuscript drafted by supposedly independent expert consultants to refute IARC's carcinogenicity conclusions regarding glyphosate without disclosing Monsanto's contributions. This document is related to how the inherent conflict of interest may affect the credibility of the manuscript's refuting IARC's general causation conclusion. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 2. | MONGLY00999487

1/6/2016 | This document contains email correspondence between Dr. Heydens and Ashley Roberts (Intertek) wherein Dr. Heydens admits to writing "a draft introduction chapter back in October/November…[a]nd then comes the question of who should be the ultimate author ... you or Gary? I was thinking you for the Introduction chapter and Gary for the Summary chapter, but I am totally open to your suggestions." at *2. | This document is relevant and reasonably likely to be used in this litigation as it again indicates that Monsanto was a significant contributor to the Expert Panel Manuscript without disclosing its substantive role in the final publication which refuted IARC's general causation conclusion. Dr. Heydens explicitly suggests that affiliated consultants appear as authors instead of himself. Indeed, Monsanto own experts rely on the "Expert Panel" analysis. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 3. | MONGLY00998682, MONGLY00998687

1/9/2016 - 1/13/2016 | The documents contain email correspondence between Dr. William Heydens and Ashley Roberts (Intertek) wherein Dr. Heydens heavily edits ("here are my suggested edits to the Draft Combined Manuscript" at *1) the Expert Panel's manuscript drafted in opposition | The documents are relevant and reasonably likely to be used in this litigation as they demonstrate that the manuscript published under the authorship of the Expert Panel was composed with substantive contributions by Monsanto. Monsanto did not disclose its role in drafting the manuscript |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | to IARC's classification of glyphosate. The edited draft is also attached and challenged for confidentiality. | which directly challenged the general causation "2A probable carcinogen" conclusion by IARC. Indeed, Monsanto own experts rely on the "Expert Panel" analysis. The reliability and consensus of scientific literature is directly relevant to general causation.  These documents also go to witness credibility. |
| 4. | MONGLY02085862<br><br>2/4/2016 | This document contains an email from Dr. Heydens to Ashley Roberts regarding the introduction to the Expert Panel Manuscript. Among other features, Dr. Heydens' draft attempts to convey "that glyphosate is really expansively used." at *1. | It is relevant and reasonably likely to be used in this litigation for the same reasons as the above (MONGLY01000676) document. The reliability and consensus of scientific literature is directly relevant to general causation.  This document also goes to witness credibility. |
| 5. | MONGLY01023968<br><br>5/8/2015 - 5/11/2015 | This document contains email correspondence between Michael Koch and Dr. William Heydens regarding "Post-IARC Activities to Support Glyphosate". Dr. Heydens explicitly identifies one of the goals as "Publication on Animal Data Cited by IARC…Manuscript to be initiated by Mon as ghost writers". at *1. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's involvement in scientific publications without disclosing inherent conflicts of interest. Through ghost-writing, Monsanto is able to populate the scientific discourse with favorable studies on glyphosate without appearing to be involved in the dissemination of data. Regulators and consumers are thus not provided with an impartial and transparent assessment of Roundup and glyphosate; assessments which are then relied upon to evaluate the biological plausibility of Roundup and/or glyphosate as a carcinogen. This document is of similar nature to a document already de-designated by the Court in which Dr. Heydens advocates ghostwriting. *See* MONGLY00977267. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 6. | MONGLY01030787 | This document contains email correspondence between various Monsanto personnel and consultants wherein | This document is relevant and reasonably likely to be used in this litigation as it confirms Monsanto's |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | 11/3/2015 - 11/6/2015 | Dr. John Acquavella protests Monsanto's ghost-writing activities: "I can't be a part of deceptive authorship on a presentation or publication… We call that ghost writing and it is unethical." at *2, 3. | ghostwriting of scientific studies used by Monsanto to deny the biological plausibility of Roundup and/or glyphosate acting as a carcinogen. Regulators and scientists, relying upon ghostwritten studies, cannot weigh conflicts of interest when using the data to determine causation between glyphosate and carcinogenicity. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 7. | MONGLY02063095<br><br>9/26/2012 | This document contains a series of email exchanges between various Monsanto personnel regarding letters to the editor of Food and Chemical Toxicology seeking retraction of a study by Professor G.E. Seralini. Mr. Eric Sachs writes about his efforts to galvanize scientists in a letter-writing campaign in order to retract the article: "I talked to Bruce Chassy and he will send his letter to Wally Hayes directly and notify other scientists that have sent letters to do the same. He understands the urgency…I remain adamant that Monsanto must: not be put: in the position of providing the critical analysis that leads the editors to retract the paper." at *3, 2; *see also* MONGLY01045298 (below). | This document is relevant and reasonably likely to be used in this litigation as it demonstrates the significant role played by Monsanto in achieving the successful retraction of a scientific study regarding glyphosate's carcinogenicity without appearing to be directly involved in such efforts. Monsanto's influence on the quality and quantity of scientific data on glyphosate is related to the conclusions that regulators and researchers are able to reach with respect to whether carcinogenicity is a biologically plausible feature of glyphosate. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 8. | MONGLY01045298<br><br>8/20/2013 | This document identifies the "Business Goals" of Monsanto employee David Saltmiras for the fiscal year 2013. Dr. Saltmiras explicitly states under the "Employee Comments" section: "Throughout the late 2012 Seralini rat cancer publication and media campaign, I leveraged my relationship the Editor of Chief of the publishing journal, Food and Chemical Toxicology and was the single point of contact between Monsanto and the Journal." at 6. Moreover, Dr. Saltmiras acknowledges that he "[s]uccessfully facilitated numerous third party expert letters to the | This document is relevant and reasonably likely to be used in this litigation for similar reasons as the previous (MONGLY02063095) document. Dr. Saltmiras acknowledges Monsanto's intimate contact with the editor of FCT which, per document MONGLY02063095, led to the retraction of Professor Seralini's study from Food and Chemical Toxicology. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | editor which were subsequently published, reflecting the numerous significant deficiencies, poor study design, biased reporting and selective statistics employed by Seralini." at 3. | |
| 9. | MONGLY00900629

9/26/2012 | This document contains email correspondence between Bruce Chassy and the Editor of Food and Chemical Toxicology, Wallace Hayes, wherein Dr. Chassy urges Mr. Hayes to retract the Seralini paper at Monsanto's request (discussed above): "My intent was to urge you to roll back the clock, retract the paper, and restart the review process." at *2. | This document is relevant and reasonably likely to be used in this litigation as it confirms Monsanto's campaign to eliminate a study which observed the adverse effects of glyphosate. It is relevant for the same reasons as documents MONGLY02063095 and MONGLY01045298. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 10. | MONGLY02185742

8/21/2012 | This document is a 2012 consulting agreement between Monsanto and the editor of Food and Chemical Toxicology, Wallace Hayes for the period immediately preceding Mr. Hayes's involvement in the retraction of the Seralini paper from Food and Chemical Toxicology. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates the conflict of interest between Mr. Hayes' role as a consultant for Monsanto and his vocation as editor for a research journal which retracted a study determining that glyphosate is capable of being a carcinogen. The document is further indication of Monsanto's pervasive influence within the scientific community which is related to the availability and quality of data on glyphosate used by researchers and regulators to assess the scientific literature in determining the potential carcinogenicity of glyphosate. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 11. | MONGLY00971543

8/12/2012 - 8/13/2012 | This document is an email from Dr. David Saltmiras to Dr. Heydens wherein Dr. Saltmiras states "Contact Wallace Hayes to determine his availability and fees for attending the meeting." | The document does not contain trade secrets, sensitive commercial information or privileged material. This document is relevant and reasonably likely to be used in this litigation for the same reasons as the above (MONGLY02185742) document. Mr. Hayes' paid consultancy for |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | | Monsanto constitutes a conflict of interest with his role as editor of a journal publishing research on glyphosate--especially given his involvement in retracting a study pertaining to the biological plausibility of glyphosate as a human carcinogen. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 12. | MONGLY01096619<br><br>9/19/2012 - 9/20/2012 | This document contains an email correspondence between various Monsanto personnel wherein Dr. Saltmiras expresses the following with respect to the recently published study in Food and Chemical Toxicology by Seralini: "Wally Hayes, now FCT Editor in Chief for Vision and Strategy, sent me a courtesy email early this morning. Hopefully the two of us will have a follow up discussion soon to touch on whether I C'T Vision and Strategy were front and center for this one passing through the peer review process.... and what is that, Vision and Strategy? I also suspect this paper may be in our own best interests - the last rites for Seralini's few remaining shreds of scientific credibility." at *2. | This document is relevant and reasonably likely to be used in this litigation as it confirms Monsanto's intimate relationship with Wallace Hayes who was subsequently involved in retracting professor Seralini's study pertaining to the biological plausibility of glyphosate as a human carcinogen, a conclusion that was adverse to Monsanto's commercial agenda. The reliability and consensus of scientific literature is directly relevant to general causation.  This document also goes to witness credibility. |
| 13. | MONGLY00978886<br><br>10/9/2012 - 10/10/2012 | This document contains email correspondence between various Monsanto personnel wherein Daniel Goldstein writes the following with respect to professor Seralini's study: "Retraction- Both Dan Jenkins (US Government affairs) and Harvey Glick made a strong case for withdrawal of the paper if at all possible, both on the same basis- that publication will elevate the status of the paper, bring other papers in the journal into question, and allow Seralini much more freedom to operate. All of us are aware that the ultimate decision is up to the editor and the journal management, and that we may not have an opportunity for withdrawal in any event, but I felt it was worth reinforcing this request." at *3. | The document does not contain trade secrets, sensitive commercial information or privileged material. This document is relevant and reasonably likely to be used in this litigation as it confirms Monsanto's attempt to seek retraction of a study pertaining to the biological plausibility of glyphosate as a human carcinogen; a conclusion adverse to Monsanto's commercial agenda. Mr. Goldstein makes it clear that a retraction would curtail professor Seralini's "freedom to operate." *Id*. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |

| No | Bates | Description | Relevance |
|---|---|---|---|
| 14. | MONGLY00936725<br><br>9/28/2012 | This document contains email correspondence between Dr. Goldstein and Eric Sachs regarding the Monsanto campaign to retract professor Seralini's paper. Dr. Goldstein states: "I was uncomfortable even letting shareholders know we are aware of this LTE.... It implies we had something to do with it- otherwise how do we have knowledge of it? I could add 'Aware of multiple letters to editor including one signed by 25 scientists from 14 countries' if you both think this is OK." at *1. Mr. Sachs responds: "We are 'connected' but did not write the letter or encourage anyone to sign it." *Id.* | This document is relevant and reasonably likely to be used in this litigation as confirms Monsanto's undisclosed involvement in the successful retraction of a paper pertaining to the biological plausibility of glyphosate as a human carcinogen; a conclusion adverse to Monsanto's commercial agenda. Moreover, the document demonstrates that Monsanto personnel were aware of the imperative need to covertly instigate the retraction campaign and the inappropriateness of such action. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 15. | MONGLY01238768<br><br>9/12/2008 | This document is a peer review by Monsanto employee Dr. Charles Healy of a study titled "Cytotoxicity of herbicide Roundup and its active ingredient, glyphosate in rats". The document contains recommendations for rejecting the study which found substantial adverse cytotoxic effects associated with Roundup and glyphosate. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's covert manipulation of the science on glyphosate cytotoxicity given Dr. Healy's vested interests in Monsanto which conflict with the impartiality of the peer review process. Access to comprehensive, impartial peer-reviewed data on glyphosate, which is relied upon by both regulators and scientists to determine the associations between glyphosate and cancer, is thus limited given that Monsanto is able to circumvent the impartiality of the peer-review process. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 16. | MONGLY02286842<br><br>8/19/2008 | This document is an email from Dr. Charles Healy to Drs. Farmer and Saltmiras wherein Dr. Healy requests that Drs. Farmer and Saltmiras review the article that Dr. Healy has been asked to review: "you two would be the reviewers in fact and I would then collate your comments and be the reviewer of record." at *1. | This document is relevant and reasonably likely to be used in this litigation for the same reasons as the above (MONGLY01238768) document. Dr. Healy is violating the standards of the peer-review process by asking his Monsanto colleagues to review a study which observed the cytotoxic effects of glyphosate. Drs. Healy, Farmer, and Saltmiras all have vested interests in the study not |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | | being accepted for publication. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 17. | MONGLY01189468 <br><br> 9/9/2008 | This document is an email from Dr. Charles Healy to Drs. Donna Farmer and David Saltmiras wherein Dr. Healy informs Drs. Farmer and Saltmiras that their decision regarding the study sent to Dr. Healy for peer-review will determine whether the study will be published. | This document is relevant and reasonably likely to be used in this litigation as it confirms Monsanto's efforts in ensuring that studies which reach conclusions of adverse health effects associated with glyphosate are covertly barred from publication and do not contribute to the carcinogenic assessment of glyphosate. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 18. | MONGLY01723742 <br><br> 8/4/2015 | This document is from the custodial file of Dr. David Saltmiras and is titled "Glyphosate Activities". Dr. Saltmiras' activities for 2015 included: "IARC prep: AHS Sorahan reanalysis for multiple myeloma presented at EUROTOX 2012, Kier & Kirkland (2013), ghost wrote cancer review paper Greim et al. (2015), coord Kier (2015) update to K&K, pushed for Sorahan (2015)." | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's involvement in ghostwriting studies discussing the carcinogenic potential of glyphosate which is subsequently relied upon by the scientific community in determining general causation issues such as the biological plausibility of glyphosate as a carcinogen. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 19. | MONGLY02356274, MONGLY02356209 <br><br> 6/19/2016 - 7/7/2016 | This document contains email correspondence between Roger McClellan (editor of the journal which published the Expert Panel Manuscript) and Ashley Roberts regarding the Expert Panel Manuscript. Mr. McClellan notes several issues with the initial daft of the Manuscript and states: "These reports are essentially a rebuttal of IARCs process and conclusions. There appears to be a reluctance to be absolutely clear in presenting exactly what IARC | This document is relevant and reasonably likely to be used in this litigation as it contains an opinion by the editor of the journal that published the Expert Panel Manuscript that the Manuscript, which Monsanto edited and revised, essentially sought to discredit IARC and IARC's methodology which offered a general causation conclusion regarding glyphosate carcinogenicity that was adverse to Monsanto's commercial |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | concluded, the Panels conclusions and how they differ." at *4. The attached initial draft of the manuscript is also challenged for confidentiality. | agenda. The reliability and consensus of scientific literature is directly relevant to general causation. These documents also go to witness credibility. |
| 20. | MONGLY00919381, MONGLY00919400 11/18/2010 | This document is an email and from Dr. Donna Farmer wherein she informs John DeSesso that she "added a section in genotox from the Gasnier study ...see a attached a critique we did that I took that from. Am working on a section for gasiner in the mechanistic section. Also we cut and pasted in summaries of the POEA surfactant studies." at *1. The attachment is a draft of the Williams et. al. study with significant edits by Dr. Farmer which is also challenged for confidentiality | Both documents are relevant and reasonably likely to be used in this litigation as they demonstrate Monsanto's covert manipulation of the available scientific data on glyphosate. Scientists reading this published and peer-reviewed article would be unaware that the data was furnished by a biased contributor and the document is related to whether the inherent conflict of interest affects the merits of the data when determining the biological plausibility of glyphosate as a carcinogen. The reliability and consensus of scientific literature is directly relevant to general causation. These documents also go to witness credibility. |
| 21. | MONGLY01005425 2/23/2015 - 2/24/2015 | This document contains email correspondence between Eric Sachs (Monsanto) and Henry Miller, a Forbes contributor and fellow of the Stanford Hoover institute. Mr. Sachs asks Mr. Miller: "Are you interested in writing a column on this topic? Ideally, your article would precede the IARC decision. Why not set the table with the weight of scientific evidence before IARC convenes? Then, regardless of what they do, your article will set the stage for a science-based response." at *2. Moreover, Mr. Sachs informs his Monsanto colleagues: "Henry agreed to author an article on Forbes.com. John will work with a team internally to provide a draft and Henry will edit/add to make it his own." at *1. | This document is relevant and reasonably likely to be used in this litigation as it demonstrate Monsanto's effort to foster criticism of IARC in an article in anticipation of IARC's general causation classification of glyphosate as a probable carcinogen. Monsanto is a significant contributor to the article without disclosing its interest and involvement. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 22. | MONGLY02063611, MONGLY02063572 3/12/2015 - 3/18/2015 | This document contains email correspondence between various Monsanto personnel and Henry Miller. Mr. Miller is asked by Monsanto to write about the IARC decision and Mr. Miller responds with a request for a "high quality draft." at *6. Mr. Eric Sachs (Monsanto) | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto ghostwriting an article criticizing and discrediting IARC following the latter's general causation opinion that was adverse to Monsanto's |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | informs Mr. Miller that "We have a draft nearly done and will send to you by tomorrow." at *5. | commercial agenda. The attachment (MONGLY02063572) is a publicly available article and is thus inappropriately labeled confidential by Monsanto. The reliability and consensus of scientific literature is directly relevant to general causation. These documents also go to witness credibility. |
| 23. | MONGLY01680756<br><br>8/17/2015 | This document is a consulting agreement between Monsanto and Larry D. Kier, one of the individuals on the Intertek Expert Panel. Although the Expert Panel was supposed to be composed of scientists independent of Monsanto, the consulting agreement demonstrates that Dr. Kier worked directly for Monsanto and this relationship was not disclosed in the published manuscript. | This document is relevant and reasonably likely to be used in this litigation as it indicates the inherent conflict of interest between Dr. Kier as a consultant for Monsanto and his participation on the expert panel, which was concerned with addressing the general causation carcinogenicity conclusion by IARC. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 24. | MONGLY02816607<br><br>8/6/2015 - 8/14/2015 | This document contains email correspondence between various Monsanto employees wherein Dr. Donna Farmer comments with respect to the Expert Panel: "We have another consulting doing the same thing that John Acquavella is doing for the epidemiology area... Larry Kier is facilitating the gentox area of the expert, panel. We have had a contract with Larry Kier before. How do we get this set up for Larry so that he too can be paid - 12K in 2015? at *2. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates that Drs. Acquavella and Kier were hired Monsanto consultants prior to and during the expert panel- this inherent conflict of interest was not disclosed by the published manuscript which offered a rebuttal of IARC's general causation carcinogenicity opinion. The reliability and consensus of scientific literature is directly relevant to general causation. This document also goes to witness credibility. |
| 25. | MONGLY03934897<br><br>8/31/2015 | This document is an invoice dated August 31, 2015 from Monsanto to Dr. John Acquavella in the sum of $20,700 for "consulting hours in August 2015 related to the glyphosate expert epidemiology panel." at *1. | This document is relevant and reasonably likely to be used in this litigation as it speaks to the inherent conflict of interest between Dr. Acquavella as a paid consultant for Monsanto and his participation on the expert panel, which was concerned with addressing the general causation carcinogenicity conclusion by IARC. The |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | | reliability and consensus of scientific literature is directly relevant to general causation. |
| 26. | ACQUAVELLAPROD 00014559 1/7/2016 | This document contains email correspondence from 2016 between Drs. Acquavella and Heydens discussing Dr. Acquavella's consulting for Monsanto "on glyphosate litigation." at *2. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Dr. Acquavella's long-term consultancy for Monsanto on glyphosate-related issues, specifically with respect to the general carcinogenicity of glyphosate. The reliability and consensus of scientific literature is directly relevant to general causation. |
| *Surfactants, Carcinogenicity & Testing* | | | |
| 27. | MONGLY00922458 11/21/2003-11/24/2003 | This document contains email correspondence between Donna Farmer and Sekhar Natarajan, in which Dr. Farmer discusses the potential adverse effects of the formulated Roundup product, conceding that "you cannot say that Roundup is not a carcinogen…we have not done the necessary testing on the formulation to make that statement." at *1-2. | This document is relevant and reasonably likely to be used in this litigation as it evinces knowledge by a Monsanto toxicologist regarding the biological plausibility of the Roundup formulation, as opposed to glyphosate by itself, to act as a human carcinogen.  This is also relevant to Dr. Farmer's credibility, who is one of Monsanto's primary expert witnesses at the company. |
| 28. | MONGLY01155974 12/10/2010-12/14/2010 | This document contains email correspondence between various Monsanto personnel wherein Stephen Adams addresses the issue of testing Roundup formulations: "With regards to the carcinogenicity of our formulations we don't have such testing on them directly…" at *1. | This document is relevant and reasonably likely to be used in this litigation as it contains admissions by a Monsanto employee which strongly undermine Monsanto's contentions that it is not biologically plausible for the Roundup formulation to be carcinogenic.  It militates against Monsanto's claim that it has carried out sufficient testing to rule out the biological plausibility of Roundup to act as a human carcinogen. |
| 29. | MONGLY00923065 2/12/2001 - 2/13/2001 | This document contains email correspondence between various Monsanto personnel wherein Dr. Mark Martens states: "I don't know for sure how suppliers would react - but if somebody came to me and said they wanted to test Roundup I know how I would react - with serious concern. We have to really think about doing formulations even if they are not on the market . | This document is relevant and reasonably likely to be used in this litigation as it contains explicit concerns by Monsanto regarding the biological plausibility of the formulated product to cause cancer. |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | . . glyphosate is still in there and could get caught up in some false positive finding. at *1. | |
| 30. | MONGLY00877683<br><br>7/29/1999 - 8/3/1999 | This document, from 1999, contains email correspondence between various Monsanto personnel wherein Dr. Donna Farmer writes: "I will not support doing any studies on glyphosate, formulations or other surfactant ingredients at this time with the limited information we have on the situation." at *2. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates reluctance by a key Monsanto toxicologist to conduct studies on either glyphosate, Roundup formulations, or surfactant ingredients, suggesting Monsanto was concerned with the results it would find.  This is relevant to the issue of biological plausibility of Roundup and/or glyphosate as a carcinogen.  Indeed, Monsanto maintains that it is not biologically plausible for Roundup or glyphosate to be carcinogenic, a central contention of the general causation litigation, but then expresses fear of conducting studies since it will show a cancer risk.  This is also relevant to Dr. Farmer's credibility, who is one of Monsanto's primary expert witnesses at the company. |
| 31. | MONGLY01159775<br><br>3/4/2013 - 3/5/2013 | This document contains email correspondence between various Monsanto personnel wherein Xavier Belvaux confirms that: "We do not conduct sub-chronic, chronic or terotogenicity studies with our formulations." at *2. | This document is relevant and reasonably likely to be used in this litigation as it contains express admissions by Monsanto that it has not tested Roundup for chronic or sub-chronic toxicity. Such lack of thorough toxicological analysis undermines Monsanto's firm denial of the biological plausibility of Roundup's carcinogenicity based on sufficient testing. |
| 32. | MONGLY07080361<br><br>7/5/2000 | This document is a study "site visit" from July 7, 2000 of the "Farm Family Exposure" study. Dr. John Acquavella (Monsanto employee at the time) and John Cowell conduct the site visit. The report indicates numerous deficiencies with the study, including: "Protocol amendments had not yet been forwarded to the study team from Exponent; Many of the urines were very spotty and we found one day's urine that was obviously doctored. As at the Minnesota field site, the | This document is relevant and reasonably likely to be used in this litigation as it outlines significant deficiencies—including use of potentially doctored or "coached" data—with a study evaluating glyphosate exposure and the biological plausibility of glyphosate as a carcinogen.  This goes to the credibility and reliability of the study, which is relied upon extensively by Monsanto to mount its general causation defense. |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | field team is not reviewing the urines carefully and there is little, if any, coaching of the farm families; There were some obvious errors or missing entries in the questionnaires." at *7-8. | |
| 33. | MONGLY00978170<br><br>9/16/2015 - 11/2/2015 | This document contains email correspondence between Ashley Roberts (Intertek), Dr. Tom Sorahan (Monsanto consultant), and Dr. John Acquavella (former Monsanto employee and consultant). Dr. Sorahan reckons it is not accurate to claim that there is no evidence for Roundup's carcinogenicity. at *2. Dr. Acquavella concurs: "I agree as well that you can't say that there is no evidence." at *1. | This document is relevant and reasonably likely to be used in this litigation because it supports Plaintiffs' claim that there is evidence that Roundup causes cancer.  This document is also relevant to Daubert, since it shows independent Monsanto's consultants and scientists agreeing about the possibility that Roundup causes cancer. |
| 34. | MONGLY01182770<br><br>7/15/2008 | This document is a PowerPoint presentation concerning the "EU Expert Advisory Panel". Page 6 of the presentation is titled: "Monsanto's Roundup ® acts on one of the key stages of cellular division, which can potentially lead to cancer in the long term." at *6. The page references a French in-vitro study which observed adverse effects associated with Roundup.  The final page contains "questions" regarding how to "position" in-vitro hazards using "urine concentrations from applicator exposure into plasma concentrations." at *7. Monsanto also considers the risks in "running a new study". *Id.* | This document is relevant and reasonably likely to be used in this litigation to demonstrate that Monsanto was aware of the biological plausibility of Roundup as a carcinogen and realized the risks in conducting new studies that would confirm this suspicion already prevalent in the existing scientific literature. |
| 35. | MONGLY00989918<br><br>10/15/2014 | This document is an email from Dr. William Heydens to Richard Garnett regarding the "IARC evaluation of Glyphosate" wherein Dr. Heydens concedes that "while we have vulnerability in the area of epidemiology, we also have potential vulnerabilities in the other areas that IARC will consider, namely, exposure, genetox, and mode of action…" at *1. | This document is relevant and reasonably likely to be used in this litigation as it contains an admission from 2014 (more than six months before IARC classified glyphosate) by a leading Monsanto toxicologist that glyphosate faces issues in the areas of epidemiology, exposure, genotoxicity, and mode of action in the general causation evaluation by IARC, which indeed found that it is probable for glyphosate to act as a human carcinogen based upon the areas identified by Dr. Heydens.  It suggests reliability of IARC's |

| No | Bates | Description | Relevance |
|----|-------|-------------|-----------|
| | | | assessment, which goes to the heart of general causation. This is also relevant to Dr. Heyden's credibility, who is one of Monsanto's primary expert witnesses at the company. |
| 36. | MONGLY00990361<br><br>3/13/2015 - 3/17/2015 | This document contains an email from Dr. William Heydens to Mr. Josh Monken (Monsanto) wherein Dr. Heydens admits to the "Low level presence of formaldehyde" (carcinogen by inhalation) in Roundup; and "Low level presence of NNG (N-nitroso-glyphosate) in Roundup - many N-Nitroso compounds are carcinogenic." | This document is relevant and reasonably likely to be used in this litigation as a Monsanto toxicologist contradicts Monsanto's claim that it is not biologically plausible for glyphosate nor the Roundup formulation to be carcinogenic. This document suggests the opposite. It is also relevant to credibility of Dr. Heydens. |
| 37. | MONGLY00885526<br><br>4/19/2002 - 4/25/2002 | This document is an email correspondence between Drs. William Heydens and Donna Farmer, wherein the two discuss various studies which observed adverse effects by the formulated Roundup product. Specifically, Dr. Farmer acknowledges: "[t]he interest point is glyphosate all basically [sic] had no effect the formulated product did - does this point us to the coformulants - sufactants? [sic]" at *2. Dr. Heydens also admits, after discussing with Monsanto consultant John Desesso, that "we are in pretty good shape with glyphosate but vulnerable with surfactants. . . What I've been hearing from you is that this continues to be the case with these studies - Glyphosate is OK but the formulated product (and thus the surfactant) does the damage." at *1. | This document is relevant and reasonably likely to be used in this litigation as it is an indication that Monsanto was cognizant of the adverse effects of surfactants or was otherwise uncertain of the effects of surfactants in the formulated Roundup product with cancer. It is further directly relevant to general causation as Monsanto's toxicologists (deposed during general causation discovery) discuss Monsanto's position that it is not biologically plausible for Roundup to pose adverse health effects, a central feature of this litigation which is challenged by Plaintiffs. This is also relevant to Drs. Farmer's and Heyden's credibility, who are some of Monsanto's primary expert witnesses at the company. |
| 38. | MONGLY06486905<br><br>4/17/1999 - 4/19/1999 | This document contains email exchanges between various Monsanto personnel wherein Dr. Donna Farmer summarizes the findings of Monsanto's expert, Dr. James Parry: "Dr. Parry concluded on his evaluation of the four articles that glyphosate is capable of producing genotoxicity both in vivo and in vitro by a mechanism based upon the production of oxidative damage." at *3. | The document is relevant and reasonably likely to be used in this litigation as it contains conclusions by a former Monsanto expert in support of the biological plausibility of glyphosate to cause cancer—namely through glyphosate's genotoxic potential and its capacity to precipitate oxidative stress. This is also relevant to Dr. Farmer's credibility, who is one of Monsanto's primary expert witnesses at the company. |

| No | Bates | Description | Relevance |
|---|---|---|---|
| 39. | MONGLY01183933<br><br>8/6/2015 - 8/7/2015 | This document contains email correspondence between various Monsanto personnel regarding the Roundup formulation and the respective effects of glyphosate and surfactants, wherein Dr. William Heydens states that "surfactant in the formulation will come up in the tumor promotion skin study because we think it played a role there." At *3. | This document is relevant and reasonably likely to be used in this litigation as it once again demonstrates conclusions by Monsanto that it is biologically plausible for the formulated product to promote tumors. This is also relevant to Dr. Heyden's credibility, who is one of Monsanto's primary expert witnesses at the company. |
| 40. | MONGLY01208470<br><br>9/18/2014 | This document contains an email from Dr. Donna Farmer to Dr. John Acquavella. Dr. Farmer notes: "Just wanted to let you that what we have long been concerned about has happened. Glyphosate is on for an IARC review in March of 2015." at *1. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's long-term concerns about glyphosate being tested by an independent research agency which rendered a general causation conclusion regarding the potential for glyphosate to cause cancer. It also suggests reliability, an element under *Daubert*. This is also relevant to Dr. Farmer's credibility, who is one of Monsanto's primary expert witnesses at the company. |
| 41. | MONGLY01179185<br><br>10/14/2008 | This document contains email correspondence wherein Dean Nasser (Monsanto) sends a "Beyond Pesticides" publication to Dr. Donna Farmer. The publication references a study which found positive association between glyphosate and Non-Hodgkin's Lymphoma. Dr. Farmer responds: "We have been aware of this paper for awhile and knew it would only be a matter of time before the activists pick it up… how do we combat this?" at *1. | This document is relevant and reasonably likely to be used in this litigation as it indicates Monsanto has been aware of the links between glyphosate and NHL for a considerable amount of time. Furthermore, as Dr. Farmer indicates, Monsanto aim to "combat" the biological plausibility of glyphosate as a carcinogen only when the information gains significant public attention. This is relevant since it lends support to Plaintiffs' assertion that Monsanto has taken deliberate actions to influence scientific literature by attacking any study showing a link between Roundup and cancer. This is also relevant to Dr. Farmer's credibility, who is one of Monsanto's primary expert witnesses at the company. |
| 42. | MONGLY00878828<br><br>3/8/2000 - 3/12/2000 | This document contains email correspondence between various Monsanto personnel wherein it is stated with respect to Roundup surfactants: "While the tallow | This document is relevant and reasonably likely to be used in this litigation as it indicates that Monsanto was aware of the toxic effects of the |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | amine was considered toxic at 62.5 and 15.6 ug/ml, the C12 alkyl sulfate didn't exhibit toxicity at any of the test doses. While both of these compounds produced a marginal response which didn't meet the test criteria for a robust positive, they did elicit an effect which was judged to be an equivocal, but test article-related effect." at *5. | tallow amine surfactant in the formulated Roundup product.  This admission expressly contradicts Monsanto's position that there is no biologically plausible basis for Roundup to be considered a carcinogen. |
| 43. | MONGLY02721133  9/1/2005 | This document is a PowerPoint presentation which details Monsanto's regulatory goals for 2010. The strategy in Germany was to "Defend POEAs" and "push back on data requests." at *10. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's unwillingness to cooperate with national regulatory agencies in providing comprehensive data for the registration of Roundup.  This is particularly relevant since Monsanto routinely relies on the evaluations of foreign regulatory agencies to support its claim that Roundup does not cause cancer.  The lack of data regarding the safety of the formulated product (in this instance the surfactant POEA) is related to the issue of regulatory agencies reaching an informed consensus on the carcinogenicity of Roundup.  An important feature of general causation discovery has entailed the extent to which Monsanto circumvented proper regulatory safe guards. |
| 44. | MONGLY01051709  9/30/2013- 10/22/2013 | This document contains email correspondence between various Monsanto personnel regarding glyphosate registration and the presence of formaldehyde: "…our renewal has been rejected by technical expert due to the content of formaldehyde in our glyphosate." at *5. | This document is relevant and reasonably likely to be used in this litigation given that it pertains to a central general causation issue—the denial of glyphosate registration by a regulatory agency due to the presence of a carcinogenic chemical in glyphosate (formaldehyde).  This is also relevant to biological plausibility issues. |
| 45. | ACQUAVELLAPROD 00008909  1/23/2015 | This document contains email correspondence between Drs. Donna Farmer and John Acquavella, wherein Dr. Acquavella discusses the response from DeRoos, who carried out an epidemiological study on glyphosate, to | This document is relevant and reasonably likely to be used in this litigation as Monsanto's former employee and consultant recognizes the potential relevance of other ingredients in Roundup |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | Monsanto's comments regarding the dose thresholds cited by Monsanto as relevant for carcinogenicity. Dr. Acquavella reflects with respect to DeRoos' comments: "the issue of the human findings representing relevant routes of exposure (whatever that means) and being interpretable in and of themselves. Perhaps Tom should be prepared regarding the other ingredients in Roundup formulations being relevant for judging glyphosate." at *1. | formulations in assessing the biological plausibility of glyphosate as a carcinogen.  It also lends support to the DeRoos study, which is relied upon by experts on both sides.  The document is also relevant to credibility of one of Monsanto's primary witnesses, Dr. Acquavella. |
|  | ***Absorption, Distribution, Metabolism & Excretion*** |
| 46. | MONGLY03738295, MONGLY00888353  3/29/2002 - 4/2/2002 | These documents contains email correspondence (MONGLY03738295) between various Monsanto personnel regarding a Monsanto (MONGLY00888353) study on the dermal absorption of the formulated Roundup product as precipitated by the surfactant ("TNO Study"). Dr. Heydens expressed concerns with continuing such studies: "My primary concern is with the glyphosate in terms of the potential for this work to blow Roundup risk evaluations (getting a much higher dermal penetration than we've ever seen before." at *1. | These documents are relevant and reasonably likely to be used in this litigation as they pertain to (and contradict) Monsanto's causation defense that Roundup has a low absorption rate.  The results of the TNO study show "in vitro dermal penetration of glyphosate [with surfactant] through rat skin [to be] between 5 and 10%," but lower than 1.5% "in the absence of surfactants[.]" This scientific data is particularly relevant since it relates to the effects of the formulated product, i.e. Roundup, versus the effects of glyphosate alone.  Since the EPA only examined glyphosate, and expressly excluded studies that used the formulation—the substance Plaintiffs actually used—this provides reason from which a Trier of Fact could conclude the EPA's analysis was limited. Importantly, this study was never turned over to the EPA or European regulatory officials. |
| 47. | MONGLY03737014  4/4/2002 - 4/5/2002 | This document contains email correspondence between various Monsanto personnel wherein it is discussed that the Monsanto programs, including the TNO study (MONGLY00888353, challenged above), evaluating the absorption of glyphosate and formulations (including surfactants) will be ceased "because a further study was not likely to help us meet the project | This document is relevant and reasonably likely to be used in this litigation as it is directly related to the absorption, distribution, metabolism and excretion ("ADME") issue and biological plausibility, coupled with Monsanto's refusal to conduct further studies when results from the TNO study demonstrated higher absorption of |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | objective." at *2. Abandoning this scientific inquiry, however, "[w]e are left behind with too many questions after all this." at *1. | glyphosate based on the presence of the formulated product. It also goes to the heart of this Court's *Daubert* inquiry, showing that the lack of any scientific consensus is, in part, the product of Monsanto's avoiding testing of risks, not honest scientific investigation. |
| 48. | MONGLY06722561<br><br>8/8/2003 - 8/11/2003 | This document contains email correspondence between various Monsanto personnel wherein Dr. William Heydens observes with respect to two Monsanto rat studies: "Regarding acute toxicity, Terry, Donna and I reviewed mortality data from the inhalation database for IPA, NH4-, MEAand K-glyphoste formulations. Based on the mortality data seen in those studies, it is not outside the realm of possibilities that the 3 deaths were treatment – related." at *2. | This document is relevant and reasonably likely to be used in litigation as it contains an acknowledgment by Monsanto that glyphosate ADME—exposed through inhalation—has resulted in acute toxicity and caused the death of the test animals. Such "treatment-related deaths" via inhalation are directly relevant to the issue of whether it is biologically plausible for glyphosate to act as a human carcinogen. |
| 49. | MONGLY02335782, MONGLY02335784<br><br>8/13/2008 - 8/20/2008 | These documents contain email correspondence between various Monsanto personnel wherein Richard Garnett discusses the issue of acute toxicity via inhalation. Mr. Garnett states that glyphosate would be classified in the EU as "T Toxic; R23 Toxic by inhalation" based on a study he cites. at *1. The attachment is Monsanto Study "An Acute Nose-Only Inhalation Toxicity Study in Rats with Mon 78623". This study is one of the studies referenced by Dr. Heydens in the previous (MONGLY06722561) document to conclude that "it is not outside the realm of possibilities that the 3 deaths were treatment-related." MONGLY0672256 at *2. | These documents are relevant and reasonably likely to be used in this litigation as they are directly related to the issue of whether it is biologically plausible for glyphosate to act as a human carcinogen by virtue of respirational toxicity. |
| 50. | MONGLY06424476<br><br>6/1/2004 - 7/9/2004<br><br>MONGLY06409924<br><br>3/5/2002 - 3/8/2002 | The first document (MONGLY06424476) contains email correspondence between various Monsanto personnel regarding a 2002 Monsanto study which observed absorption of the surfactant (without glyphosate) in the GI Tract. Dr. Charles Healy (Monsanto) reports that the results showed "Absorption was at least 56% of dose at dosages of 1 and 10 mg/kg. | These documents are relevant and reasonably likely to be used in this litigation as they pertain to the ADME issue and biological plausibility— indeed Dr. Healy concedes that given the higher rate of absorption, Monsanto cannot justify avoiding "toxicity testing with similar inert ingredients." Given that the rate of absorption is |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | Approximately 17-27% of the dose was eliminated in the urine and approximately 31-36% of the dose was found in the bile." at *2. The second document (MONGLY06409924) contains further discussion of this issue, stating that Monsanto's purpose for conducting the study, which was "to see results which show no GI tract absorption of a surfactant in the tallow/ether amine groups." MONGLY06409924 at *1. Indeed, Dr. Healy states in MONGLY06424476 that: "Basically what we demonstrated was that the material is absorbed through the GI tract as shown. Nothing I am aware of that needs to be reported. We were hoping that we could demonstrate that the material was not absorbed as a means to obviate the need to perform toxicity testing with similar inert ingredients. Obviously that hope was not realized." at *2. | one of the features Monsanto relies upon to argue that there is no biological plausibility for glyphosate and/or Roundup to be carcinogenic, these documents go to the heart of such defense and are related to issues in general causation. |
| 51. | MONGLY06385823  9/23/2009 | This document contains email correspondence between Monsanto personnel wherein Richard Garnett acknowledges that: "The ADME has always been the weak link in our argument and the Spanish response highlights that we have not got rid of the problem." at *1. | This document is relevant and reasonably likely to be used in this litigation as it is a recognition by Monsanto that there are fundamental flaws in Monsanto's argument for absorption and excretion of glyphosate—a fact observed by regulators in Spain in their assessment of glyphosate—which is related to the issue of whether it is biologically plausible for glyphosate to act as a human carcinogen.  This document relates specifically to Monsanto's contention that glyphosate does not cause cancer because of low absorption rates. |
| 52. | MONGLY06653096  5/20/2003 - 5/22/2003  MONGLY01832749  10/19/1999 - 10/21/1999 | The first document (MONGLY06653096) contains email correspondence between various Monsanto personnel regarding "dermal penetration studies" wherein Dr. William Heydens notes the presence of "certain co-formulants like humectants that will make it highly likely we will get large amounts penetrating the skin." at *1. The second document (MONGLY01832749) contains acknowledgments by Dr. Daniel Goldstein that a humectant such as ethylene | These documents are relevant and reasonably likely to be used in this litigation as they are related to the issue of ADME absorption and that the formulated product is both absorbed at a higher rate and is more toxic—significant questions for the biological plausibility of glyphosate and Roundup as a carcinogen.  Such information is likely to be considered vital by |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | MONGLY01745304 | glycol (which is present in most Roundup formulations) is toxic to children at 70 cc of Roundup with 5% of ethylene glycol. at *1. The Third document (MONGLY01745304) is a fact sheet about ethylene glycol which indicates its presence in Roundup formulations ("less than 2%") and that "EG is a significant human toxin". at *1. | regulators and researchers when assessing the carcinogenicity of Roundup and glyphosate. |
| 53. | MONGLY04107778  8/16/2011 - 8/23/2011 | This document contains email correspondence between Maurice De Billot (Monsanto) and Christophe Gustin, wherein Mr. De Billot discusses the difficulties of dermal absorption using the UK POEM (The UK Predictive Operator Exposure Model) metric: "In Europe we are getting prepared to submit MON 79991 (720g/kg) for approval under the new Reg 1107/2009. We ran the UKPOEM model using a dermal penetration value of 3% and do not pass when applying 3.6kg/ha for the tractor mounted sprayer. I am aware of the set of studies that you ran on dermal absorption using pure K-salt and IPA-salt and also MON 52276 and MON 79351 which showed dermal absorption values of 1%. Putting 1% in the model we get a good result, so will need to show that the 1% dermal absorption numbers are equally valid for the MON 79991 formulation." at *2. | This document is relevant and reasonably likely to be used in litigation as it demonstrates that a difference of a couple of percentage points on dermal absorption using the UK POEM can change the regulatory risk assessment of glyphosate from safe to unsafe. A key element of Monsanto's defense on causation is that even if glyphosate could conceivably cause cancer it would require extremely high doses which do not occur in a realistic environment. This document refutes that contention. |
| 54. | MONGLY06509236  10/21/2002 | This document is an internal Monsanto summary of the "operator exposure when spraying Roundup under UK conditions." at *1. It provides an explanation of measuring the rate of Roundup absorption using the UK POEM (discussed in the above MONGLY04107778 document). | This document is relevant and reasonably likely to be used in this litigation as it pertains to the absorption of glyphosate and Monsanto's basis for measuring the rate of absorption to be in compliance with regulatory standards—a feature of general causation as Monsanto contests that Roundup and glyphosate can have adverse effects based upon negligible rates of absorption. |
| | **Regulatory & Government** | | |
| 55. | MONGLY03293245 | This document contains text-message correspondence between Mr. Daniel Jenkins, various Monsanto | This document is relevant and reasonably likely to be used in this litigation as it relates to Monsanto's |

| No | Bates | Description | Relevance |
|----|-------|-------------|-----------|
| | 2/11/2013 - 3/10/2016 | employees, and various EPA officials regarding regulatory aspects of glyphosate.  In reference to the United States Department of Agriculture, Mr. Jenkins comments: "might want to tell them we're going to need their support for glyphosate...We're in for a tough ride[.]" at *2. Mr. Jenkins also comments: "Jess is doing a nice job at EPA[.]" at *1. Jennifer Listello asks: "Is there anyone we can get to in EPA?" at *3. With regard to IARC, Mr. Jenkins comments: "Got john to agree to talk about how we might work together on changing IARC communication[.]" at *4-5. Mr. Jenkins asks Ms. Mary Manibusan (formerly EPA and co-chair with Jess Rowland on CARC publication): "do you know folks at ATSDR in HHS?" Ms. Manibusan responds: "Yes. Where specifically...on Tox profiles?" After Mr. Jenkins confirms, Ms. Manibusan responds: "I know lots of people. You can count o[n] me." Mr. Jenkins informs her that: "we're trying to do everything we can to keep from having a domestic IARC occur w this group. may need your help... I'll share some info, you tell me what you think we might be able to do, who you may know, etc ok?" to which Ms. Manibusan agrees. at *5. Mr. Jenkins also contacts Mr. Ty Vaughn: "I think we need to talk about a political level EPA strategy and then try to build a consensus plan w Michael on several fronts: glyphosate...we're not in good shape and we need to make a plan[.]" at *6. Following text messaging with Mr. Jack Housenger (EPA), Mr. Jenkins comments: "Spoke to EPA: is going to conclude that IARC is wrong. So is EFSA....pushed them to make sure atsdr is aligned, said they would...they're looking into getting a contact for me at cdc re bio monitoring" at *6-7. | collusion with EPA officials (subject of extensive general causation discovery), the attempt to preclude glyphosate review by ATSDR through EPA contacts, and strategies for addressing the general causation conclusion by IARC.  It is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate.  The document is also relevant to the credibility of Mr. Jenkins and other Monsanto personnel. |
| 56. | MONGLY02060344 | This document contains email correspondence between Jack Housenger, Director of the Office of Pesticide | The document is relevant and reasonably likely to be used in this litigation as it demonstrates |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | 6/24/2015 | Programs (EPA), Daniel Jenkins (Monsanto), and Dr. William Heydens (Monsanto).  Mr. Housenger reports to Mr. Jenkins that he has spoken to individuals at the Agency for Toxic Substances and Disease Registry (ATSDR), one of whom, the branch chief, Henry Abadin, "ended up saying that they would put glyphosate on hold holding the OPP risk assessment." at *2. Dr. Heydens acknowledges with respect to the ATSDR decision to not review glyphosate: "hopefully that keeps them from doing anything too stupid." at *1. | communications between Monsanto and regulatory agencies in furtherance of efforts to preclude evaluation of Roundup and glyphosate—a feature of general causation discovery in light of Mr. Jess Rowland's (also from the OPP) collusive relationship with Monsanto.  Further, the document is relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate.  The document is also relevant to credibility of Mr. Jenkins and Dr. Heydens. |
| 57. | MONGLY03064695  6/5/2015 – 6/24/2015 | This document contains email correspondence between various Monsanto personnel wherein Daniel Jenkins expresses concerns over the ATSDR glyphosate review and the information garnered from Mr. Housenger at the EPA's Office of Pesticide Programs regarding delaying the ATSDR review: "ATSDR Director and Branch Chief have promised Jack Housenger (Director of the US Office of Pesticide Programs) to put their report "on hold" until after EPA releases its preliminary risk assessment (PRA) for glyphosate… She describes ATSDR as being VERY conservative and IARC like in this regard as well as the fact that they are hazard based. Makes me very nervous, but I asked Jack whether or not he was worried about ATSDR coming out with something different and he said he wasn't and I think he was being genuine." at *1, 2. | This document is relevant and reasonably likely to be used in litigation as it indicates Monsanto's contacts with another EPA official, Jack Housenger (a key feature of general causation discovery in light of Mr. Rowland's collusive relationship with Monsanto) in furtherance of precluding glyphosate review by ATSDR which, according to Mr. Jenkins, utilizes a process similar to IARC and is thus likely to render a general causation evaluation adverse to Monsanto's commercial agenda. The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate and lends reliability to IARC's assessment.  The documents are also relevant to credibility of Mr. Jenkins and Dr. Heydens. |
| 58. | MONGLY02358772  4/1/2016 – 4/4/2016 | This document contains an email correspondence between various Monsanto personnel wherein James M. Nyangulu writes to Dr. William Heydens about meeting with Jesudoss Rowland, formerly of the EPA's Office of Pesticide Programs (OPP): "I reached out to Jess Rowland this morning. He is willing to talk tomorrow, however he has back to back meetings from 9:30till 1.1.30 am. He has given me his cell phone | This document is relevant and reasonably likely to be used in this litigation as it reaffirms Monsanto's intimate relationship with Mr. Rowland. This issue has been the subject of extensive general causation discovery thus far and is one of the central features of this litigation as Monsanto's collusive relationship with Mr. Rowland encouraged a finding by the EPA that glyphosate is not a |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | number for us to text him once we know what time we would like to meet him. He wanted to check with the Product Manager (PM) for MON102100 (not a good thing.... PM likely to deny the meeting). I discouraged him and hopefully he won't check with the PM." at *1. | carcinogen. Indeed, the document demonstrates that Monsanto leveraged its relationship with Mr. Rowland to circumvent the Product Manager's likely denial of such meeting. The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate.  The documents are also relevant to the credibility of Dr. Heydens. |
| 59. | MONGLY03859549  2/12/2016 | This document contains email correspondence between various Monsanto personnel wherein Jeremy Stump discloses details of a meeting he and Mr. Jenkins had with EPA officials  "Jim Jones and Jack Housenger earlier this afternoon." at *1.  With respect to glyphosate, "They wouldn't give a clear answer on when they might announce SAB/P…We argued that they should wait on making any announcements given upcoming JMPR and possibly other gov't determinations." at *2. Mr. Heering responds: "Did they comment on the suggestion to wait on announcing the SAP/B until after JMPR and other country announcements?" at *1. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's efforts through its relationships at the EPA to delay the Scientific Advisory Panel review of EPA's 2016 glyphosate Issue Paper. Monsanto's influence at the EPA in furtherance of regulatory approval of glyphosate through dissuading review has featured extensively in general causation discovery. The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate.  The documents are also relevant to credibility of Mr. Stump, Mr. Jenkins, and Mr. Heering. |
| 60. | MONGLY03878138  10/23/2015-10/26/2015 | This document contains email correspondence between Daniel Jenkins (Monsanto) and Jack Housenger (EPA OPP) regarding "atsdr". Mr. Housenger informs Mr. Jenkins: "We met with cdc about a month ago. We talked about that. They are waiting for our glyphosate RA. And they agreed to share what they do." at *2. Mr. Jenkins forwards the communication to Mr. David Heering (Monsanto), who responds: "Thanks for the update. Let us know if there is anything we can do to help." at *1. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's interactions with a key EPA official regarding ATSDR review of glyphosate.  Mr. Housenger has acted as buffer between Monsanto and other regulatory agencies to delay/preclude glyphosate reviews and this document is further indication of such efforts given Mr. Housenger's meeting with the Center for Disease Control (CDC) regarding ATSDR and CDC glyphosate review. Monsanto's relationships with EPA officials has featured extensively in general causation discovery and this document is directly related to the collusion issue.  The document is |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | | also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate.  The documents are also relevant to credibility of Mr. Jenkins, and Mr. Heering. |
| 61. | MONGLY03550799, MONGLY03550800  8/9/2016 | These documents contain a set of "talking points" in anticipation of Monsanto's meeting with EPA director Gina McCarthy.  The talking points include: "There is already enough for EPA to act without a SAP"; "If she pushes back on reviews by other agencies Hugh needs to question her as to why they then considered IARC's flawed classification and again, why are you convening an SAP when your own internal scientists have confirmed the safety of glyphosate"; "Why is this being politicized?" at *2. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's attempt to preclude a review by the Scientific Advisory Panel of the 2016 EPA glyphosate Issue Paper which offered a general causation carcinogenicity opinion regarding glyphosate.  It also shows Monsanto's effort to discredit IARC to the EPA, so it goes to reliability issues. |
| 62. | MONGLY02162507  1/15/2010 – 1/16/2010 | This document is an email correspondence between Dr. Donna Farmer and Steven Levine discussing the EPA Endocrine Disruption Program. Mr. Levine remarks that "They have made Gary Timm from OSCP [Office of Science Coordination and Policy] the head of the program at EPA NOT Jess Roland from OPP. This is not a good development and dramatically cuts our chance our chance for success." at *1. | This document is relevant and reasonably likely to be used in this litigation as it confirms Monsanto's intimate relationship with Mr. Rowland from the EPA who assisted Monsanto in circumventing the regulatory process, a central feature of Plaintiffs' general causation discovery concerned with proving that that the safety of Roundup has not been assessed by an impartial Office of Pesticide Program at the EPA.  The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate.  The document is relevant to the credibility of Dr. Farmer and Mr. Levine. |
| 63. | MONGLY03320237  10/7/2015 | This document is a PowerPoint presented by Monsanto to the California Office of Environmental Health Hazard Assessment on October 7, 2015 regarding the imposition of a No Significant Risk Level (NSRL) for glyphosate as an exemption to the requirement under Proposition 65 that Roundup be labeled as known to | This document is relevant and reasonably likely to be used in this litigation as it demonstrates efforts by Monsanto to limit OEHHA's consideration of data in determining the appropriate NSRL to animal bioassays with high exposure doses, thus leading to the calculation of a high NSRL.  An |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | the State of California to cause cancer following adoption by California of IARC's classification. | exemption from the Proposition 65 labeling requirement would mean that Monsanto was able to avoid the practical effects (having to label Roundup as known to the state to cause cancer) of IARC's general causation conclusion as adopted by OEHHA under proposition 65. The document also contains admissions by Monsanto about whether glyphosate can cause cancer. |
| 64. | MONGLY01061857<br><br>2/18/2009 – 2/22/2009 | This document contains email correspondence between various Monsanto personnel wherein Richard Garnett states the following with respect to gaining favorable regulatory assessment using in-vitro data: "Cannot win the battle on science alone (40% science : 60% politics) - need an experimental front, supported by a critical review of the literature, and a communication campaign to promote the message. Goal: 'the regulatory authority must have no doubts'". at *1. | This document is relevant and reasonably likely to be used in this litigation as it evinces the strategy adopted by Monsanto to overcome regulatory hurdles using the effective deployment of political influence to ensure that regulatory authorities "have no doubts" regarding the safety of glyphosate. Indeed, the extent to which Monsanto leveraged its intimate relations with regulatory officials to support the position that glyphosate is not carcinogenic has been an important feature of general causation discovery. The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate. |
| 65. | MONGLY01179968<br><br>3/30/2015 – 7/1/2015 | This document contains email correspondence between Monsanto and former EPA Office of Pesticide Programs employee, Mary Manibusan (now Exponent employee). Ms. Manibusan discusses her role as "co-chair with Jess Rowland" on the EPA CARC report; "lead toxicologist on a global pesticide review"; and service "on multiple internal review committees" in an attempt to "offer any assistance to support Monsanto product registrations and registration reviews" at *3. | This document is relevant and reasonably likely to be used in this litigation as it relates to Monsanto's relationships with former EPA officials that were involved in producing the CARC report partially authored by Mr. Jess Rowland—a report which concluded that it is biologically improbable for glyphosate to act as a human carcinogen. Indeed, Mr. Rowland, the circumstances of the CARC assessment, and the role of EPA officials following their tenure at the agency has featured extensively in general causation discovery. This document lends support to the allegation that EPA officials, after aiding Monsanto at the agency, |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | | would then leave EPA and start working for Monsanto or its allies. |
| 66. | MONGLY03316369<br><br>3/24/2015 | This document is titled: "IARC Follow Up Demonstrating Safety of Glyphosate" and details a number of goals including "invalidate relevance of IARC"; "prevent future bad IARC decisions on pesticides/GMOs"; and "Make sure determination doesn't get more widely adopted within WHO". at *1. | This document is relevant and reasonably likely to be used in this litigation as it confirms Monsanto's intention to discredit an international research agency which rendered a general causation carcinogenicity opinion that was adverse to Monsanto's commercial agenda. |
| 67. | MONGLY03327609<br><br>3/25/2015 – 4/27/2015 | This document contains email correspondence between various Monsanto employees regarding the organization of a panel in collaboration with the International Consortium on Applied Bioeconomy Research (ICABR). Mr. Eric Sachs (Monsanto) proposes to "call Jess Rowland tomorrow" in order to enquire about Mr. Rowland's availability as a panelist addressing "regulators more robust risk assessment process". at *1. The panel was initiated in light of the "recent publicity about Round-up and cancer…" at *10. | This document is relevant and reasonably likely to be used in this litigation as it pertains to Monsanto's relationship with Mr. Rowland (subject of extensive discovery during general causation stage) and efforts by Monsanto to address the general causation conclusion by IARC. The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate. |
| 68. | MONGLY03379079<br><br>2/2/2016 | This document contains email correspondence between Monsanto regulatory affairs employee Mr. Daniel Jenkins and members of Croplife America wherein Mr. Jenkins informs Ms. Janet Collings (Croplife) that Monsanto has been urging the EPA to not convene the Scientific Advisory Panel to review the EPA's 2016 glyphosate issue paper: "Find it troubling that he's saying it publicly, as we are urging them not to. It's a very bad move to be so equivocal, especially when EFSA is so definitive and hopefully JMPR will be soon too." at *2. | This document is relevant and reasonably likely to be used in this litigation as it shows Monsanto pressuring the EPA to preclude review of the issue paper which found it biologically improbable that glyphosate is a human carcinogen. Monsanto's role with respect to the EPA and influence at the agency has been subject of extensive discovery during the general causation stage and this document is a further reflection of Monsanto's motives for leveraging its relationship with the EPA to dissuade repeated examination of glyphosate. The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate. The document also goes to the credibility of Mr. Jenkins. |

| No | Bates | Description | Relevance |
|---|---|---|---|
| 69. | MONGLY02953363<br><br>6/5/2015 | This document contains a forwarded email which outlines Monsanto's regulatory strategy with respect to "addressing widespread confusion in the wake of the IARC classification…" at *1. "Recent Actions" include "significant outreach within the U.S. government to secure its engagement with the WHO in an effort to obtain that clarification. We have briefed key staff at EPA, USTR, USDA and the State Department as well as members of Congress." at *2. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's lobbying activities through the U.S. government in order to pressure the WHO to "clarify" the IARC classification. Monsanto's governmental influence has featured extensively in general causation discovery and motions practice and this particular effort is directed at influencing the organization which offered a general causation carcinogenicity conclusion with respect to glyphosate carcinogenicity. The document is also relevant to *Daubert*, since it undermines the reliability and purported "independence" of the EPA's evaluation of glyphosate. |
| 70. | MONGLY02056568<br><br>3/10/2016 – 4/22/2016 | This document contains email correspondence between various Monsanto personnel wherein Dr. Goldstein entertains the prospect of a "glyphosate symposium", which is "acceptable but direct Monsanto support would likely be a bad idea." at *1. The full proposal from Allister Vale begins on the second page and it is explicitly stated that "[f]unding via the Glyphosate Consortium would be a way of taking this kind of meeting forward. Given the hands off arrangement you mention I am confident it would be possible to put together a team of clinical / medical toxicologists to be primarily responsible for the organization. However, to make this work, neither I nor they could be in receipt of direct funding from Monsanto or the Glyphosate Consortium." at *2. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates Monsanto's involvement and financial support of glyphosate research initiatives without disclosing Monsanto's interest. Such research initiatives propagate scientific discourse about glyphosate which is relied upon by researchers when formulating causation opinions. Such evaluations will thus not be able to weigh the conflicts of interest inherent in the data—an issue related to determining whether it is biologically plausible for glyphosate to act as a human carcinogen. The reliability of scientific literature and consensus, especially consensus built on manipulation, is highly relevant to the issue of general causation. |
| 71. | MONGLY03401522<br><br>3/29/2016 – 4/6/2016 | This document contains email correspondence between various Monsanto personnel wherein David Carpintero discusses the French ban of Roundup tallowamine surfactant: "We are expecting the letter of intention from French regulator ANSES very soon, and it might point to 'imminent health risk' regarding the use of tallowamine. We do not agree with the withdrawal but | This document is relevant and reasonably likely to be used in this litigation as it relates to a regulatory agency concluding that it is biologically plausible for Roundup to pose a health risk. This document relates directly to general causation. |

| No | Bates | Description | Relevance |
|---|---|---|---|
| | | we will abide. We simple would need the argumentation for the ban/withdrawal to not be based on 'human health' but other on considerations like precautionary principle. The consequences of this ban if referring to human health risks have the potential to go beyond France and would potentially have global and trade impact. It is therefore of essence that any intention to ban does not refer to imminent human health risk." at *2. | |
| 72. | MONGLY02913526  2/23/2015 | This document details a number of goals to be pursued by Monsanto prior to and following the anticipated IARC decision.  Under "Post-IARC", the following objective is identified: "Orchestrate Outcry with IARC Decision [around] March 10, 2015". at *5. | This document is relevant and likely to be used in this litigation as it demonstrates Monsanto's intention to discredit IARC prior to the 2A classification.  Following the classification, Monsanto galvanized a campaign to discredit and defund an international research agency which rendered a general causation carcinogenicity opinion and found that it is biologically probable for glyphosate to act as a human carcinogen. |
| 73. | MONGLY03558820  4/28/2016 – 7/6/2016 | This document contains email correspondence between various Monsanto employees wherein John Lynch states: "To date I have eight industry associations, plus CropLife Canada, who have expressed interest in engaging in further discussions on how to collaborate as a more substantial critical mass, representing a significant chunk of Canada's GDP and innovation investments, to capture the attention of the federal government and encourage an approach to motivate IARC to make adjustments to their current inappropriate practices." at *2. | This document is relevant and reasonably likely to be used in this litigation as it demonstrates efforts by Monsanto to leverage political influence in an attempt to impact the procedures of a research agency (IARC) which arrived at a general causation opinion adverse to Monsanto's commercial agenda. |
| 74. | MONGLY03315608  10/5/2015 | This document contains email correspondence between various Monsanto personnel wherein it is stated: "As discussed on the weekly glyphosate call, the first two post-IARC glyphosate personal injury lawsuits in the U.S. were filed in late September. One case was filed | This document is relevant and reasonably likely to be used in this litigation as it indicates that Monsanto has long expected litigation over glyphosate causing cancer, suggesting an understanding that information Monsanto had |

| No | Bates | Description | Relevance |
|---|---|---|---|
|  |  | in New York and another in California. We had anticipated such litigation for some time." at *2. | internally assessed indicated a glyphosate or Roundup carcinogenicity risk. |
| 75. | MONGLY00947788<br><br>2/25/2015 | This document contains a list of studies/articles/reports relied upon by both IARC and Monsanto in supporting and challenging the "2A Probable Human Carcinogen" classification respectively. | This document is relevant and reasonably likely to be used in this litigation as it indicates the scientific literature assessed by IARC and relied upon by Monsanto in discrediting the IARC general causation conclusion. |