# Exhibit 7

(Hearing) Monsanto (In Re Roundup Prods. Liability Lit.) 2/24/2017 7:30:00 AM

Pages 1 - 36
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS        ) MDL No. 2741
LIABILITY LITIGATION,         ) Case No. 16-md-02741-VC
_____)
                              )
THIS DOCUMENT RELATES TO      )
ALL ACTIONS.                  ) San Francisco, California
_____) Friday, February 24, 2017

TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS
FTR 2:33 p.m. - 3:23 p.m. = 50 minutes

APPEARANCES:
For Plaintiffs:    Andrus Wagstaff, PC
                   7171 West Alaska Drive
                   Lakewood, Colorado  80226
             BY:   AIMEE WAGSTAFF, ESQ.
                   Weitz & Luxenberg, P.C.
                   700 Broadway
                   New York, New York  10003
             BY:   ROBIN LYNN GREENWALD, ESQ.
                   PEARL A. ROBERTSON, ESQ.
                   Andrus Anderson, LLP
                   155 Montgomery Street, Suite 900
                   San Francisco, California  94104
             BY:   LELAND HUMPHREY BELEW, ESQ.
(Appearances continued on following page.)
Transcribed by:   Leo T. Mankiewicz, Transcriber
                  leomank@gmail.com
                  (415) 722-7045

APPEARANCES: (cont.)

For the Plaintiffs:

        The Miller Firm

        108 Railroad Avenue

        Orange, Virginia  22960

   BY:  MICHAEL MILLER, ESQ.

        JEFFREY ALAN TRAVERS, ESQ.

For Defendant Monsanto Company:

        Hollingsworth, LLP

        1350 I Street NW #900

        Washington, D.C.  20005

   BY:  JOE G. HOLLINGSWORTH, ESQ.

        ERIC G. LASKER, ESQ.

---

                                                              3

1   Friday, February 24, 2017
2                              2:33 p.m.
3                       P R O C E E D I N G S
4        THE CLERK:  Okay, calling case number 16-MD-2741,
5   Roundup Products Liability Litigation.  Counsel, please state
6   your appearances, starting with plaintiff.
7        MS. WAGSTAFF:  Good afternoon, your Honor.  This is
8   Aimee Wagstaff for the plaintiffs.
9        THE COURT:  Good afternoon.
10       MS. GREENWALD:  Robin Greenwald and Pearl Robertson
11  for the plaintiffs.
12       MR. MILLER:  Michael Miller and Jeffrey Travers, your
13  Honor.  Good afternoon.
14       THE COURT:  Hi.
15       MR. BELEW:  Leland Belew for plaintiffs, your Honor.
16       THE COURT:  All right.  Defendants?
17       MR. HOLLINGSWORTH:  Joe Hollingsworth for Monsanto,
18  your Honor.
19       MR. LASKER:  Good afternoon, your Honor.  Eric Lasker
20  for Monsanto.
21       THE COURT:  Good afternoon.  All right, looking
22  forward to seeing you guys on Monday.
23       Before we get to these document custodians and
24  witnesses, I want to ask each side a question.  I don't want to
25  hear argument on it now, but I just want to get your position

                                                              4

1   on it, and there will be more time to argue it on Monday
2   afternoon, but the thing I want your position on is this:
3        We are inquiring about general causation.  The
4   question is, I want to get a little more -- I want to add a
5   little more specificity to that question, and it seems to me
6   there are two questions, two different questions, somewhat
7   different questions, we could be asking in phase I.
8        One question is:  Is Roundup capable of causing
9   cancer, or non-Hodgkin's lymphoma?  Period, end of story.
10       The other question we could be asking is sort of a
11  little closer to the question that Judge Roberts asked, or a
12  derivation, I guess, of the question Judge Roberts asked.
13  I think Judge Roberts, I think, conflated a little bit the
14  distinction between general causation and specific causation,
15  but another -- I suppose another way to ask the general
16  causation question would be:  Is glyphosate, or is Roundup,
17  capable of causing non-Hodgkin's lymphoma in the doses that the
18  plaintiffs were exposed to?
19       Or let me scratch that, and say it in a different way,
20  because I assume that different plaintiffs were exposed to
21  different doses.  So I guess the question could be, to make
22  sure that it covered all, you know, the entire MDL:  Is
23  glyphosate capable of causing non-Hodgkin's lymphoma, in the
24  highest possible dose the plaintiffs could have been exposed
25  to?

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 3 of 11

(Hearing) Monsanto  (In Re Roundup Prods. Liability Lit.)  2/24/2017  7:30:00 AM

5

1   So you get the difference between the two questions?
2   One is simply, can Roundup cause non-Hodgkin's lymphoma, and
3   the other question is, can Roundup cause non-Hodgkin's lymphoma
4   in a particular dose, that dose being, you know, the highest
5   exposure to which a plaintiff was subject.
6       So like I said, I don't want to hear argument on that
7   right now. I just want to get people's positions on that.
8       What is the plaintiffs' position on what is the
9   question to be answered in phase I?
10      MR. MILLER: Amy and Robin, this is Mike. I'll speak
11  unless someone else wants to.
12      FEMALE VOICE: Go ahead.
13      MR. MILLER: If I could, your Honor, then -- Mike
14  Miller -- we believe the questions ultimately are the same,
15  because what epidemiology does is look at exposures in
16  real-world dosing. It doesn't look as a laboratory test would.
17      So I know your Honor doesn't want argument, but our
18  position is the questions merge into one question in the face
19  of epidemiology, because that is looking at real-world
20  exposures, when you compare people exposed in the real world to
21  people not exposed.
22      THE COURT: Okay, but this -- but general causation is
23  not just going to involve epidemiology, is it?
24      MR. MILLER: No, your Honor, there are several lines
25  of causality assessment, but I think both sides agree, and I'll

6

1   let Mr. Hollingsworth speak for his, but --
2       THE COURT: I'm having trouble -- you're coming in
3   really scratchy. I'm having trouble --
4       MR. MILLER: I apologize. I'll attempt to be louder.
5   The Bradford Hill criteria has other lines, which
6   we'll talk about, without getting into the merits of this case,
7   just the scientific method, on Monday.
8       THE COURT: Okay, what do the defendants say?
9       MR. HOLLINGSWORTH: Your Honor, this is Joe
10  Hollingsworth, if I may. If your Honor is -- can you hear me
11  okay, your Honor?
12      THE COURT: Yeah, I can hear you fine.
13      MR. HOLLINGSWORTH: Okay. If I may, the Court is
14  looking at general causation in the first phase here, and we
15  believe that there's no reliable evidence of general
16  causation --
17      THE COURT: I just want an answer to the question --
18      MR. HOLLINGSWORTH: -- in this case, because --
19      THE COURT: -- to my question. I just want an answer
20  to my question. What do you think is the way to look at it?
21      MR. HOLLINGSWORTH: Well, the answer to your question
22  is that --
23      THE COURT: I don't want -- I don't need to hear from
24  you right now that you don't believe that there is any evidence
25  of general causation. That's not something I need to hear from

7

1   you right now.
2       MR. HOLLINGSWORTH: I apologize, your Honor.
3   I apologize for that. The general causation inquiry does not
4   concern itself with both. So the question is whether
5   glyphosate is, er -- Roundup causes cancer at any dose.
6       THE COURT: Is capable of causing cancer.
7       MR. HOLLINGSWORTH: If we're going to --
8       THE COURT: In other words, or to put it another way,
9   is capable of causing cancer at any dose.
10      MR. HOLLINGSWORTH: Or is capable of causing cancer,
11  that's right.
12      THE COURT: Okay.
13      MR. HOLLINGSWORTH: So if we're going to --
14      THE COURT: Okay. Okay, that's all I need for now.
15  We can talk more about it on Monday, but I was just curious
16  what your views were.
17      In your briefs, you said -- this was before the
18  case -- you know, before the cases were consolidated, and it
19  was just in the Hardeman brief. In your brief, you said
20  something a little bit different. You said, you know, is
21  glyphosate capable of causing cancer at the dose the plaintiff
22  might have been exposed to. So that's part of what prompted my
23  question about what the parties believe the inquiry is.
24      And then the other thing that prompted my question is
25  that Judge Roberts did it a little differently from how

8

1   Mr. Hollingsworth recited the question, right? I mean, Judge
2   Roberts actually considered the plaintiffs' exposure when
3   discussing general causation, and again, when I read that,
4   I thought, I think he's conflating general and specific
5   causation when he says it that way. So it --
6       MR. LASKER: Your Honor, if I may -- this is Eric
7   Lasker -- and just for clarification on Judge Roberts' ruling
8   in the Arias litigation, the plaintiffs in that case did not
9   present any evidence of exposure.
10      So while I recognize that there's language that might,
11  in the opinion, that might address that, the Court was basing
12  his ruling on the same epidemiology that Mr. Miller was talking
13  about, as to whether or not there's a basis for a causation
14  opinion that glyphosate could cause, or Roundup could cause
15  cancer. It was not based upon any evidence of exposure that
16  the plaintiffs had presented.
17      THE COURT: Okay. Well, I mean, we'll have plenty of
18  time to argue about that. I'm not sure what to do with that in
19  light of what Judge Roberts said, but in any event, his ruling
20  is not precedential, so it doesn't --
21      MR. LASKER: Yeah, I understand, your Honor.
22      THE COURT: -- doesn't matter too much. I was just
23  asking, and I was just reading his opinion in an effort to, you
24  know, wrap my brain a little more tightly around precisely what
25  the question is, because that obviously has -- precisely what

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 4 of 11

(Hearing) Monsanto  (In Re Roundup Prods. Liability Lit.)  2/24/2017  7:30:00 AM

9

1  the question is has relevance to, you know, the relevance of
2  the IARC conclusion, I think, and also to some of the -- to the
3  discovery disputes that you have that we're here to talk about
4  today.
5      So, you know, I appreciate the detail that you all put
6  in and, you know, notwithstanding that detail and through no
7  fault of your own, of course, it's somewhat difficult reading
8  just this case -- this statement, you know, to get a firm grip
9  on how important or unimportant these custodians are or these
10 depositions are.
11     I guess, maybe let's start -- let me start with the
12 depositions. Let me start with the plaintiffs, and ask -- give
13 me an example of something -- let's start with Richard Garnett.
14 Give me an example of something he would say at the
15 deposition -- that he would say at the deposition that would
16 improve my ability to answer the general causation question.
17     MR. TRAVERS: Your Honor, this is Jeffrey Travers for
18 the plaintiff. I think that's a good question. I think one of
19 the issues we're having is, we've deposed Donna Farmer, we've
20 deposed David Saltmiras, and I think one of the issues that --
21     THE COURT: I'm having -- I don't know if you're on
22 the same line as Mr. Miller, but I'm having a terrible time
23 hearing you.
24     MR. TRAVERS: I apologize, your Honor. I'm on a
25 different line, and I'll try to speak more clearly.

10

1      THE COURT: Okay.
2      MR. TRAVERS: In particular, with Richard Garnett, one
3  example we cited, the three tests deal with exposure, which is,
4  you know, the question you raised earlier, and the extent to
5  which dermal exposure, which is probably going to be one of the
6  more exposure routes that our clients were -- you know, who
7  work with the Roundup in hand, we have an e-mail from Richard
8  Garnett saying that --
9      THE COURT: Okay, but wait, hold on. Let me cut you
10 off there.
11     MR. TRAVERS: Yes, sir.
12     THE COURT: Important -- one of the most exposure
13 routes for your clients, I think you said? Is that relevant
14 to --
15     MR. TRAVERS: Correct, yeah.
16     THE COURT: Is that relevant to general causation or
17 specific causation?
18     MR. TRAVERS: I think that goes to the question you
19 asked at the beginning of the hearing, you know, as a -- to my
20 understanding of defendants' filings so far, but I think they
21 may be retreating from that, that one of their defenses for
22 general causation is going to be that the possible exposure of
23 glyphosate -- or the possible exposure of glyphosate could
24 never get high enough to get to general causation.
25     So that was one of the -- you know, one of the

11

1  defenses we're anticipating, was their drop after general
2  causation, you know, that it may be less relevant, as far as
3  general exposure.
4      THE COURT: I'm sorry, I mean, number one, it sounds
5  like you're kind of mumbling, and number two, the phone
6  connection is not very good. I'm just having a hard time.
7      MR. TRAVERS: I apologize.
8      THE COURT: I'm just having a real hard time hearing
9  you.
10     MR. TRAVERS: I apologize, your Honor.
11     THE COURT: Are you talking into a speakerphone?
12     MR. TRAVERS: No, I've got a land line. It's just --
13     MR. MILLER: I'm going to hang up, in hopes that it
14 will improve your ability to communicate, Mr. Travers. It may
15 be my line. I don't know what it is, but it might be my line.
16     THE COURT: All right.
17     MR. MILLER: Your Honor, excuse me, then.
18     MR. TRAVERS: Yeah, and I will -- I'll try to talk
19 more slowly, but the dermal exposure does go to your first
20 question, and -- and my understanding from earlier briefing is
21 that defendant would raise as a defense to general causation
22 that the exposure never -- will not reach a high enough level
23 to cause cancer, but if they're not going to be pursuing that
24 defense on general causation, I would agree that the
25 (inaudible) question is less relevant.

12

1      But there are other issues with Richard Garnett.
2  I think we could -- I think it would be important in
3  deposition -- in Europe, Monsanto did face a lot of different
4  questions from European regulators --
5      THE COURT: I don't know, I mean, I'm sorry, I just --
6  I just cannot -- I don't know if it's your phone or -- you
7  know, I don't know what it is, but I just can't -- you're
8  coming in really sort of muffled, and I just can't hear you.
9  I just can't --
10     MS. WAGSTAFF: Your Honor, if we may switch speakers
11 for us -- this is Aimee Wagstaff -- and if I can ask Pearl to
12 jump in, and maybe her phone line is a little bit better for
13 you to hear.
14     THE COURT: Yeah, I mean, should we just put this off
15 until Monday, since we're meeting on Monday?
16     MS. GREENWALD: We could do that, your Honor. That
17 may be easier for you, as well. This is Robin Greenwald, I'm
18 sorry. That may be easier, to have us in person.
19 Ms. Robertson definitely can be there. So that would work, if
20 that's what you prefer.
21     THE COURT: I don't know. I mean, if somebody wants
22 to talk in a way that I can hear them, I'd be happy to do it
23 now, but I could not hear -- I just couldn't hear or understand
24 Mr. Travers at all. So I -- you know, I don't know what to do.
25 I want to be helpful, but I can only be helpful if I can hear

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 5 of 11

(Hearing) Monsanto  (In Re Roundup Prods. Liability Lit.)  2/24/2017  7:30:00 AM

13

1   you.  And I was able to hear Mr. Hollingsworth --
2       MR. TRAVERS:  I can try calling in on a different
3   line.
4       THE COURT:  I was able to hear Mr. Hollingsworth fine.
5   I can't hear Mr. Travers.  So should we just -- should we do
6   this on Monday?
7       MS. WAGSTAFF:  Yes, your Honor, let's do this on
8   Monday.
9       THE COURT:  I keep hearing a clicking, also.
10      MS. WAGSTAFF:  Your Honor, this is Aimee Wagstaff, and
11  I think that given the technical difficulties, we should do
12  this on Monday.
13      THE COURT:  Okay, all right.
14      MS. WAGSTAFF:  Before we hang up, I'd like to just
15  raise one comment with you, with Monsanto on the telephone, if
16  I may.
17      THE COURT:  Go ahead.
18      MS. WAGSTAFF:  So on February 10th, we filed a
19  discovery -- joint discovery letter, and in one of the
20  footnotes, we said that we would be filing a motion to
21  de-designate 30 documents by today.  When we filed that joint
22  discovery letter, we did not anticipate that we would be filing
23  multiple filings after that date with motions under seal, and
24  I think we have 34 or 36 documents under seal right now, and so
25  we are going to, with your permission, put off filing that

14

1   motion to de-designate until after the hearing on Monday, since
2   we have so much on the docket already with regard to
3   confidential documents under seal.
4       THE COURT:  That's fine with me.  I mean, I think --
5       MS. WAGSTAFF:  Okay.
6       THE COURT:  -- I'll be able on Monday to give you all
7   some guidance that might obviate the need to be de-designating
8   things so much.
9       MS. WAGSTAFF:  Great.  Thank you.
10      MR. LASKER:  Your Honor, this is Eric Lasker.  I have
11  a logistical question.  Just to make sure -- is your courtroom
12  set up for possible presentations?  Is there something special
13  we need to do to be able to provide those presentations or have
14  our experts provide those presentations on Monday?
15      THE COURT:  I don't know.  Your people have been
16  dealing with Kristen on it.  They haven't?
17      MS. GREENWALD:  So Eric, this is Robin.  I can call
18  you.  We were in communication with the court and we have all
19  those answers.  So we can --
20      MR. LASKER:  That would be great.
21      MS. GREENWALD:  I can call you when this call is over,
22  and I can tell you what we learned from the court.
23      MR. LASKER:  That would be great.  Thanks a lot.
24      MS. GREENWALD:  Okay.
25  And so your Honor, actually, Ms. Robertson -- if

15

1   you -- I don't mean to move around here, but she is available
2   now and she can get on the phone and answer, if you want to
3   start the other issue with the custodians now, and if you can
4   hear me, then you'd be able to hear her.  Can you hear me okay?
5       THE COURT:  Yes, I can hear you okay.  The only thing
6   is, there's this clicking, you know, this --
7       MS. GREENWALD:  I know.
8       THE COURT:  -- sort of repeated clicking.
9       MS. GREENWALD:  I don't know what that is.
10      THE COURT:  Does anybody know where that's coming
11  from?
12      MS. GREENWALD:  I don't.  I don't.
13      THE COURT:  Okay.  All right.
14      MS. GREENWALD:  Do you want to try, or no?
15      THE COURT:  Sure, and so --
16      MS. GREENWALD:  Okay.
17      THE COURT:  Your suggestion was that we talk about the
18  document custodians?
19      MS. GREENWALD:  If you'd like to start now and then
20  see if it works -- I know you have a full day on Monday -- and
21  see if you can hear her, and then if so, we can maybe discuss
22  some of it now?
23      THE COURT:  Okay.
24      MS. GREENWALD:  I wanted to make sure she could hear
25  you -- you could hear her.  So here you go.  I'm going to hand

16

1   the phone to her.
2       THE COURT:  Okay.  So same question, Ms. Robertson, to
3   you, about the document custodians, really, which is:  What are
4   you hoping to find that will be -- I mean, the question on
5   general causation is either going to be, you know, what -- can
6   glyphosate cause cancer in human beings, or, you know, can
7   glyphosate cause cancer in human beings at a dose that the
8   plaintiffs might realistically have been exposed to, and it's
9   going to be one of those two things.  It sounds like maybe it
10  will be the first question.
11      But give me an example of something you're hoping to
12  find, something you have a hint that you might find and that
13  you're hoping to find that would be relevant to the general
14  causation question.
15      MS. ROBERTSON:  Yes, your Honor.  Pearl Robertson for
16  the plaintiffs.
17      With respect to the deposition of Richard Garnett, we
18  are hoping to find, and we believe that we can find, through
19  his testimony, based on the documents reviewed as custodial
20  files thus far, information that he has related to the toxicity
21  of surfactants, as well as overall glyphosate safety.
22      The reason we think that his information is unique as
23  other custodians is because he is --
24      THE COURT:  Sorry, are you talking -- are you talking
25  about Martens now?

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 6 of 11

(Hearing) Monsanto  (In Re Roundup Prods. Liability Lit.)  2/24/2017  7:30:00 AM

17

1    MS. ROBERTSON: Richard Garnett, your Honor. No,
2  Richard Garnett. I stayed with the deposition.
3    THE COURT: What?
4    MS. ROBERTSON: I -- initially you had asked, your
5  Honor, about the depositions and maybe starting with those
6  first.
7    THE COURT: I thought we were talking about the
8  custodians now. You already have the documents --
9    MS. ROBERTSON: Okay, I didn't realize --
10    THE COURT: I'm sorry. I thought you already had the
11  documents from Garnett and Haupfear. Is that wrong?
12    MS. ROBERTSON: Yes, your Honor. I guess maybe I had
13  lacked clarity. I was trying to explain why the documents we
14  found have led us to believe testimony from Richard Garnett
15  would warrant his deposition.
16    THE COURT: Okay. I'm sorry, I thought -- maybe
17  I misunderstood. I thought you were moving on to the
18  custodians now and talking about the custodians. But it's
19  fine. I can --
20    MS. ROBERTSON: I can do it in whichever order you
21  like.
22    THE COURT: I can hear you now --
23    MS. ROBERTSON: I thought we'd start with depositions,
24  and my apologies.
25    THE COURT: Okay, I can hear you now, so if you want

18

1  to talk about the depositions also, that's fine.
2    MS. ROBERTSON: Yes, your Honor --
3    THE COURT: Okay, what do you think that Garnett --
4    MS. ROBERTSON: -- whichever you prefer. If you'd
5  like me to --
6    THE COURT: What do you think Garnett will say? What
7  do you expect that Garnett might say that would be relevant to
8  the issue of general causation, that you haven't already gotten
9  from somebody else?
10    MS. ROBERTSON: Overall safety issues and Monsanto's
11  interactions in silencing some of those safety issues that were
12  raised by European scientists.
13    THE COURT: Okay, and --
14    MS. ROBERTSON: That would be the driving purpose of
15  that deposition.
16    THE COURT: Okay, hold on. Okay, and then what about
17  Eric Haupfear?
18    MS. ROBERTSON: Eric Haupfear has a long history at
19  Monsanto, and we believe, because he's been there for 20-some
20  years, that he has knowledge unique to impurities in glyphosate
21  manufacturing, and that then also speaks to the safety of the
22  end-formulated Roundup product. We haven't quite talked with
23  somebody yet who was in glyphosate manufacturing as deeply
24  embedded as Mr. Haupfear is.
25    THE COURT: Okay. So on the depos, does Monsanto want

19

1  to respond?
2    MR. LASKER: Yes, your Honor. This is Eric Lasker.
3  Can you hear me okay?
4    THE COURT: Yeah, okay.
5    MR. LASKER: Okay. So with respect to Richard
6  Garnett, Richard Garnett is -- he's not a toxicologist. He is
7  somebody in the regulatory function in Europe. He's similar to
8  Dan Jenkins' role in the United States in talking to the EPA,
9  and his testimony would better direct the issue of how European
10  regulators assess glyphosate, which is an issue I understand
11  your Honor will be addressing on Monday, as far as whether that
12  is even relevant.
13    Our position is that it's not relevant for the reasons
14  we laid out in our brief on that issue, and Richard Garnett,
15  again, does not have any knowledge on the science of
16  toxicology. He conveys information that he is provided by the
17  scientists at Monsanto who do do that research, which would be
18  Donna Farmer and Bill Heydens and David Saltmiras, who are the
19  three safety toxicologists at Monsanto that plaintiffs have
20  already deposed. So he does not have any unique information or
21  any knowledge, frankly, that he'd be able to impart at his
22  deposition.
23    THE COURT: Okay.
24    MR. LASKER: With respect to Eric Haupfear, plaintiffs
25  have raised the issue of contaminants or trace impurities in

20

1  the manufacturing process of glyphosate. The general causation
2  issue before your Honor will be based upon scientific studies
3  of glyphosate, the long-term rodent cancer bioassays,
4  epidemiological studies and the like. All of those studies are
5  conducted with manufactured glyphosate, and if there are
6  impurities in the glyphosate, then those impurities are in the
7  glyphosate in those studies.
8    So the presence or lack of presence of those
9  impurities doesn't change the findings in any way and doesn't
10  affect the general causation issue before you. It's still the
11  same studies that you'll be assessing and the experts will be
12  talking about with respect to epidemiology and the long-term
13  rodent cancer bioassays and the like.
14    So it's not going to change or advance your Honor's
15  ability to address those issues in the general causation phase.
16    THE COURT: Okay. Let me just ask the plaintiffs,
17  Ms. Robertson, one question. It seems like what you're trying
18  to do here is sort of root through Monsanto as much as you
19  can -- no harm in trying, nothing wrong with trying -- but root
20  through Monsanto as much as you can to discern evidence,
21  discovery evidence, of Monsanto manipulating or unduly
22  influencing the science.
23    I mean, is that it, in a nutshell, for purposes of
24  phase I?
25    MS. ROBERTSON: I don't think that's our purpose in

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 7 of 11

(Hearing) Monsanto (In Re Roundup Prods. Liability Lit.)  2/24/2017 7:30:00 AM

21

1  phase I, and I guess I may be -- maybe I can clarify our
2  position for Garnett and Haupfear. We're not focusing on these
3  two deponents because of their interactions or manipulation
4  with the science. We're more --
5      THE COURT: Or concealment of science, right? I mean,
6  that's -- that seems to be what --
7      MS. ROBERTSON: I would think, yes. Sorry, your
8  Honor. Yes.
9      THE COURT: That seems to be what your presentation
10 goes to, right? We need to look -- we need to depose these
11 people, we need to get the documents from these custodians to
12 try to find evidence of manipulation of or concealment of
13 scientific information about the carcinogenicity of glyphosate,
14 essentially.
15     MS. ROBERTSON: Yes, your Honor, and also when they --
16 when Monsanto conveyed to certain individuals, Garnett being
17 one of them, when testing should be or not be followed through
18 was based on recommendations by Monsanto. So you are correct,
19 your Honor, yes, we are looking at concealment issues.
20     THE COURT: Don't you think that you are much less
21 likely to find evidence of that, or evidence relevant to that,
22 in depositions than you are in documents?
23     MS. ROBERTSON: I think the reason the deposition is
24 useful in these instances is we've been able to find
25 unpublished studies and other documents that suggest that there

22

1  have been studies that weren't published or completed, and in
2  an effort to further understand how the glyphosate testing and
3  genotoxicity issues have been addressed by Monsanto over the
4  years, we do believe that testimony will paint a broader
5  picture to allow us the type of science that has been relied
6  upon, and where we might be able, or -- how we might be able to
7  use the lack of that science or the failure by Monsanto to
8  continue to test those types of toxicity reports that were
9  suggested in Garnett's documents.
10     THE COURT: Okay.
11     MR. LASKER: Your Honor?
12     THE COURT: Yeah.
13     MR. LASKER: This is Eric Lasker, if I may.
14     THE COURT: No, that's okay. I don't need --
15     MR. LASKER: I'd just like to -- a couple --
16     THE COURT: I don't need to hear anything more about
17 the depositions.
18     MR. LASKER: Okay.
19     THE COURT: Now, tell me specifically what you have
20 reason to believe you will find in the -- in these four
21 custodians' files that you don't already have.
22     MS. ROBERTSON: Yes, your Honor. Mark Martens, as
23 outlined in our brief, had a significant bit of correspondence
24 with Dr. Perry. Dr. Perry was discussed at length in Donna
25 Farmer's deposition.

23

1      So one of the things that was unable to be gleaned
2  from Donna Farmer's deposition is what actually happened to
3  Dr. Perry's studies and conclusions that found that glyphosate
4  could be toxic, and all of this relates to genotoxicity.
5      Mark Martens was the main point of contact with
6  Dr. Perry, and although we have searched the produced documents
7  really ad nauseam looking for these types of -- any type of
8  exchange related to the genotoxicity of glyphosate oxidative
9  damage, all of these issues that Dr. Perry expressly looked at
10 and then was told to not look at any further, we can't find his
11 documents or his studies. So because Mark Martens was his main
12 point of contact, we believe they would be in his files.
13     THE COURT: Okay, and Lisa Flagg?
14     MS. ROBERTSON: Lisa Flagg relates to Monsanto's
15 quality assurance unit, as stated in our brief. Again, she
16 relates in a different way to the makeup of Roundup
17 formulations and how glyphosate interacts with the surfactants
18 and other adjuvants, particularly NNG. NNG is a trade compound
19 in Roundup, so it's not on Roundup labels, so --
20     THE COURT: So I -- I have a question --
21     MS. ROBERTSON: -- as much as we --
22     THE COURT: I have a question about that.
23     MS. ROBERTSON: Yes.
24     THE COURT: I didn't see anything -- I mean, I always
25 understood your argument to be that glyphosate causes

24

1  non-Hodgkin's lymphoma and that it may interact with the
2  surfactants in Roundup to enhance causation, or something like
3  that, but I didn't see any indication of that in your brief
4  where you were discussing Lisa Flagg.
5      I mean, I didn't -- I saw reference to other
6  ingredients in Roundup that might also be carcinogenic, but
7  I didn't -- it may be that I didn't understand properly what
8  you were saying, but it didn't seem like you were making that
9  same connection between the other ingredients in glyphosate
10 that I was expecting you to.
11     MS. ROBERTSON: I guess maybe I'm a little confused on
12 what your Honor is asking. Plaintiffs' position is that the
13 formulated product of Roundup, all of the ingredients that go
14 into that formulated product need to be looked at.
15     So that we often refer to the -- we often refer to
16 inert ingredients, adjuvants or surfactants. Within this
17 ambit, we do consider NNG to be included with those general
18 terms, though I think maybe that might be where the confusion
19 lies, in that NNG is specifically pointed out here, rather
20 than --
21     THE COURT: Well --
22     MS. ROBERTSON: -- it being called an adjuvant.
23     THE COURT: -- I guess the -- my confusion is that
24 I never took you to be saying that -- I have never taken you in
25 this case to be saying that something other than, and

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 8 of 11

(Hearing) Monsanto (In Re Roundup Prods. Liability Lit.) 2/24/2017 7:30:00 AM

25

1  independent from, glyphosate in the Roundup product causes
2  cancer. I took you to be saying that glyphosate causes cancer
3  and that glyphosate -- the way glyphosate interacts with other
4  products, and you've typically used the word "surfactants" in
5  your briefs, that the way glyphosate interacts with surfactants
6  enhances the cancer risk. But I never understood you to be
7  saying that there may be separate chemicals in Roundup that
8  separately might cause cancer and you want to go looking for
9  those, too. I mean, is that just a myth?
10      MS. ROBERTSON: Oh, my apologies, your Honor, no,
11 you're absolutely correct. We are looking at the formulated
12 Roundup product, glyphosate and its surfactants. It's not as
13 if, with the Lisa Flagg instance, that we want to look at NNG
14 and point solely to NNG as what is causing NHL in our clients.
15 We were looking at NNG as part of the whole and how it
16 interacts with glyphosate. So this is on the same vein as what
17 we've been saying and what your Honor understands.
18      THE COURT: Okay, then -- so what is the indication
19 that, sort of the interaction with NNG increases the
20 carcino- -- I have such a hard time with that word --
21 carcinogenicity of Roundup?
22      MS. ROBERTSON: I think we all practice how to say
23 "carcinogenicity" in the mirror ten times daily before we speak
24 with your Honor.
25      THE COURT: I'll start doing it, too.

26

1       MS. ROBERTSON: Yes, so specifically with NNG in this
2  context with Lisa Flagg is that this particular compound was
3  used in Roundup formulation, and it was tested as required by
4  EPA. But after the IBT Labs brought, EPA dropped that
5  additional testing requirement, so long as Monsanto would keep
6  the levels of NNG below the one part per million.
7       What one of the main points that we think we could get
8  in looking at Lisa Flagg's documents is helping us paint this
9  broader history of high NNG levels that have been found and are
10 being found in Roundup products. And so as the quality
11 assurance employee, Lisa Flagg would likely in her documents
12 have that sort of information as to when FIFRA might be sending
13 a notice to Roundup because this NNG is above the one part per
14 million, and things of that ilk.
15      THE COURT: Okay, and I gather the same type of thing
16 with Gary Klopf with respect to 1,4-Dioxane?
17      MS. ROBERTSON: Yeah, and Gary Klopf was an older
18 custodian that was identified, older meaning like, at Monsanto
19 in the earlier years. And so the interest there is looking at
20 these 2000 to 2010 docs as the team lead, even though we do
21 identify the other six years he was with Monsanto where he was
22 in the Chemistry Formulation Technology Department. I think
23 one of the bigger points we want to look at is this span of a
24 decade from 2000 to 2010, and how Monsanto worked with these
25 impurities and these ethoxylated surfactants with the

27

1  formulated product, tracing it back to how it interacts with
2  glyphosate.
3       THE COURT: Okay, and I think I have a decent
4  understanding of why you want Hodge-Bell.
5       All right, does Monsanto want to respond on the
6  document custodians?
7       MR. LASKER: Yes, your Honor. So with respect to
8  Dr. Martens, and again, he's a regulatory scientist, the
9  argument that they made is sort of basically that they want to
10 be able to establish that Donna Farmer was not providing
11 accurate testimony. They were fishing for some other answers,
12 because they did depose her, ostensibly, on this. She
13 identified the studies that they say were not conducted, and in
14 fact, they're published studies, and they were published under
15 the name -- Donna Farmer's name. They're on the -- I can bring
16 up the cite for it.
17      So there's not any new information here to be had.
18 There's just sort of, I think, the hope that maybe they can
19 find something that would be different, especially because they
20 don't like the documents that they have thus far.
21      With respect to Lisa Flagg, this again goes back to
22 the same issue, and your Honor, I think, asked the correct
23 question with respect to what the relevance might be, which is,
24 is there any science that plaintiffs are looking to that would
25 suggest that NNG interacts with glyphosate in some way as to

28

1  create a risk of cancer, and the answer, your Honor, on this is
2  that if there is any such interactions -- and we don't believe
3  there is -- it would be reflected in the studies on glyphosate,
4  and those are the same studies that your Honor will be looking
5  at and the experts will be talking about, regardless of what
6  the documents show on trace levels of impurities. So
7  impurities --
8       THE COURT: But --
9       MR. LASKER: -- if they're there, they've all been
10 tested, in the same studies of glyphosate, and those are the
11 studies you'll be considering anyway.
12      THE COURT: But, so is it --
13      MR. LASKER: So Lisa Flagg's documents --
14      THE COURT: Is that --
15      MR. LASKER: -- and --
16      THE COURT: If I could just interject, are you saying
17 that any glyphosate study will necessarily account for this NNG
18 question? I mean --
19      MR. LASKER: Yeah, NNG is a -- I'm sorry, your Honor.
20      THE COURT: I was just going to say, I took the
21 plaintiffs to be saying, or at least implying, that, you know,
22 there might be an NNG question specific to Roundup that might
23 not be reflected in other glyphosate studies.
24      MR. LASKER: Well, your Honor, the NNG is an impurity
25 that comes -- that emerges, at a bit trace level, in the

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 9 of 11

(Hearing) Monsanto (In Re Roundup Prods. Liability Lit.)   2/24/2017 7:30:00 AM

29

1  manufacturing process for glyphosate.
2      THE COURT: Okay.
3      MR. LASKER: And it's one of a number of impurities
4  that is part of the glyphosate that's manufactured. That is
5  the glyphosate that is used in Roundup. It's also the
6  glyphosate that's used in the scientific rodent cancer
7  bioassays, and we attached for your Honor the publication that
8  reviews the 14 cancer bioassays that have been conducted with
9  glyphosate. They all are conducted with glyphosate with its
10 impurities on it, and so that's reflected in those studies.
11     And the epidemiological studies, of course, are
12 studies of human use in -- who used the Roundup product, the
13 formulated product that is sold and that the plaintiffs are
14 alleging they're exposed to.
15     And so again, to the extent that there is trace levels
16 of impurities, those impurities are in the product and those
17 are already reflected in the scientific studies. So there's no
18 different scientific literature that comes to bear because of
19 this question. You're still going to be looking at the same
20 studies with the same conclusions in determining whether or not
21 there is reliable evidence of general causation.
22     THE COURT: Okay. Gary Klopf?
23     MR. LASKER: And Gary Klopf is similar, as far as
24 I understand, because the issue there is also an impurity that
25 is present in trace amounts in surfactants through the

30

1  manufacturing process, not unique to surfactants, it's found in
2  a lot of manufactured products, and so not use of surfactants,
3  use of Roundup, but again, to the extent that that impurity is
4  in the formulated product, that is reflected in the
5  epidemiological studies, which are studies of humans exposed to
6  the formulated product. There's not new science, then, that
7  your Honor needs to look at. It's the same scientific studies
8  that are already before your Honor.
9      THE COURT: Okay. Hodge-Bell?
10     MR. LASKER: And Kimberly Hodge-Bell, she is, as we
11 explained in our papers, she is a toxicologist who worked for,
12 for a period of time the plaintiffs seem to be concerned,
13 worked directly for David Saltmiras and reported up to him, and
14 also worked with Donna Farmer and, you know, Heydens, all three
15 of whom plaintiffs have gotten documents for and deposed.
16     The specific documents that they attach to their
17 letter actually do not deal with any formulated Roundup product
18 that was marketed in the United States. There's one document
19 that deals with a nematocide, which is just a different product
20 altogether. One is a fast-acting gel, which has a small amount
21 of glyphosate in it, and another herbicide also, but it's not
22 the type of -- it's not a Roundup-based product, it's not the
23 type of product that plaintiffs have alleged exposure to, and
24 the other document deals with a product that was never marketed
25 in the United States, and plaintiffs have that information

31

1  because the MON number in that document -- we've identified all
2  the MON numbers for formulated products marketed in the United
3  States, and that's not on that list.
4      So the documents that they're pointing to that they
5  claim or make for relevance, none of them are actually about
6  the products at issue in this case.
7      THE COURT: All right. Final word from Ms. Robertson,
8  on the custodians?
9      MS. ROBERTSON: Yes, your Honor. We have heard
10 counsel reference epi studies and glyphosate formulation
11 studies, and impurity studies throughout this phone call, and
12 although defendants have promised over and over that these
13 studies have all been produced to plaintiffs, to the extent
14 that they have, we're obviously asking for additional
15 productions because we have not yet located and found them, or
16 we don't believe we have found all of them.
17     So potentially, this is something that could be
18 resolved, in part, by an identifier -- MONGLY base identifiers
19 produced by defendants.
20     MR. LASKER: Your Honor, I'm not sure it's -- I'm
21 not --
22     THE COURT: Well, I mean, I don't know -- I'm sitting
23 here sort of not really knowing what to say, but Ms. Robertson
24 is suggesting that the disputes about these custodians could
25 boil down to whether they have not found something that is in

32

1  the productions? I don't know. I have no idea what to say to
2  that. I don't know -- I don't know what to say to that.
3  I don't know what to do, I don't know how to help you. I mean,
4  do you want me to --
5      MS. ROBERTSON: Yes, I understand, your Honor.
6      THE COURT: -- sift through your documents for you?
7  I mean, what --
8      MS. ROBERTSON: No, your Honor. Potentially, that was
9  inartfully stated. In part, defendants have argued that our
10 showing, which we feel like we met, that we -- with
11 particularized specificity, and document support, we feel like
12 we have truly shown your Honor that the identified custodians
13 should have -- these identified persons should be custodians.
14     One of defendant's arguments against why that
15 shouldn't be the case is by referencing studies that somehow
16 support our showing him.
17     So I think we are at the same position that we were,
18 that to the extent this defense can show, or at least counter
19 with a document showing us why, for example, Ms. Kimberly
20 Hodge-Bell is not relevant to our case, perhaps that would be
21 something that we could move forward from, but our
22 understanding, from the meet-and-confers and doing this
23 briefing and now having this argument, is that that isn't
24 necessarily the case.
25     The argument instead is that -- has boiled down to

Case 3:16-md-02741-VC   Document 546-7   Filed 10/06/17   Page 10 of 11

(Hearing) Monsanto  (In Re Roundup Prods. Liability Lit.)  2/24/2017  7:30:00 AM

33

1   proportionality and relevance, and we believe that we have
2   overcome both proportionality and relevance.  So my apologies
3   for adding confusion to the argument.
4           MR. LASKER:  Your Honor, would you like me to respond?
5           THE COURT:  Hold on, give me one sec.  I'm just
6   looking at...  All right, go ahead, Mr. Lasker, you can go
7   ahead and respond.  Then we'll wrap it up and I'll issue a
8   short written ruling on it.
9           MR. LASKER:  Well, with respect to, as to Hodge-Bell,
10  the point that I made was that the plaintiff had identified
11  documents and that they claim show that she's relevant because
12  of her knowledge of Roundup formulated product, and my response
13  on that was, none of the documents they attached for that
14  proposition are actually Roundup formulated product.
15          So we don't believe that she has any independent
16  scientific information on Roundup formulated.  It is the fact
17  that she has, since 2015, she was promoted and put into the
18  position where she is dealing with Roundup formulated products
19  that plaintiffs acknowledge that her position there is the same
20  and duplicative of the discovery they've already obtained from
21  Donna Farmer and David Saltmiras and Bill Heydens.
22          So I'm not sure what that issue is, but the documents
23  that they have attached to establish her relevance are not
24  documents that deal with Roundup formulated product sold in the
25  United States, and they certainly have not explained why her

34

1   testimony would not be duplicative of the testimony and the
2   documents they've already received, including all of the
3   scientific studies that Monsanto has, which was a separate
4   production altogether.
5           THE COURT:  Okay.
6           MR. LASKER:  With respect to the impurities issue,
7   just to be clear --
8           THE COURT:  Sorry, the what issue?
9           MR. LASKER:  I'm sorry, the impurities issue --
10          THE COURT:  Uh-huh.
11          MR. LASKER:  -- and the NNG issue, to be clear, the
12  plaintiffs have not presented any argument or basis to believe
13  that the scientific studies, the epidemiological studies, or
14  the rodent cancer bioassays would really address that issue.
15          There's no -- their argument is based on this premise
16  that there's some sort of -- there's something called the
17  100 percent pure glyphosate, does not have any impurities in it
18  in the manufacturing process, and that that glyphosate was used
19  in the scientific safety studies, and then there's this
20  separate glyphosate that has impurities, but they don't have
21  any evidence of that, and in fact, as we've shown through the
22  GLY publication, which we attached, your Honor, to the filing,
23  the glyphosate that's used in the animal studies, the 14
24  long-term rodent cancer bioassays, is glyphosate that was
25  manufactured and has impurities, and the percentage of

35

1   impurities is noted on all of those studies.  The
2   epidemiological studies are studies in the final formulated
3   product.
4           So to the extent that the plaintiffs are arguing that
5   there are some impurities that appear in that formulated
6   product, that is reflected in the epidemiological evidence.  If
7   those impurities created some risk of cancer, that would be
8   reflected in the epidemiological studies, and that's the same
9   studies your Honor will be looking at.
10          So this issue does not add anything to your Honor's
11  inquiry.  It doesn't change the inquiry at all.  You will be
12  looking at the same studies, regardless.
13          THE COURT:  Okay.  I'll give it a little more thought
14  this afternoon and then I'll issue something.  And then I'll
15  see you --
16          MR. LASKER:  Thank you, your Honor.
17          THE COURT:  I'll see you all on --
18          MS. ROBERTSON:  -- your Honor --
19          THE COURT:  -- Monday morning.  What time are we
20  meeting on Monday morning?  9:30?
21          MR. LASKER:  9:30?
22          THE COURT:  See you Monday morning.  Thank you.
23          MR. HOLLINGSWORTH:  Thank you, your Honor.
24          MR. LASKER:  And Robin, give me a -- you'll give me a
25  call, right?

36

1           MS. GREENWALD:  I'm going to send you an e-mail, Eric.
2   I'll have it by e-mail, and feel free to call me if you have
3   any questions.  It's all written out.
4           MR. LASKER:  Right.  Thank you very much.
5                     3:23 p.m.
6                     ---o0o---

(Hearing) Monsanto  (In Re Roundup Prods. Liability Lit.)  2/24/2017  7:30:00 AM

37

```
 1
 2
 3            CERTIFICATE OF TRANSCRIBER
 4
 5       I, Leo Mankiewicz, certify that the foregoing is a
 6   true and correct transcript, to the best of my ability, of the
 7   above pages of the official electronic sound recording provided
 8   to me by the U.S. District Court, Northern District of
 9   California, of the proceedings taken on the date and time
10   previously stated in the above matter.
11       I further certify that I am neither counsel for,
12   related to, nor employed by any of the parties to the action in
13   which this hearing was taken; and, further, that I am not
14   financially nor otherwise interested in the outcome of the
15   action.
16
17       _____02/28/2017
18       Signature of Transcriber      Date
19
20
21
22
23
24
25
```