# EXHIBIT 122

Confidential - Pursuant to Protective Order

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  ROUNDUP PRODUCTS ) | |
| LIABILITY LITIGATION ) | MDL No. 2741 |
| _____ ) | Case No. |
| ) | 16-md-02741-VC |
| THIS DOCUMENT RELATES ) | |
| TO ALL CASES ) | |

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Videotaped Deposition of WARREN G. FOSTER,

Ph.D., taken in the above-captioned matter, before

and by Janis L. Ferguson, RPR, CRR, Court

Reporter, on Friday, September 15th, 2017,

commencing at 9:08 a.m., at the Sheraton Gateway

Hotel, Terminal 3, Toronto AMF, Toronto, ON

L5P 1C4.

Reported by Janis L. Ferguson
Registered Professional Reporter
Certified Realtime Reporter

## Page 2

A P P E A R A N C E S

For the Plaintiffs:
Pearl Robertson, Esquire
Robin Greenwald, Esquire
Weitz & Luxenberg, PC
700 Broadway, 5th Floor
New York, NY 10003
212-558-5991
probertson@weitzlux.com
rgreenwald@weitzlux.com

Tara Tabatabaie, Esquire  (Via phone)
Fulmer Sill
1101 N. Broadway Avenue
Suite 102
Oklahoma City, OK 73103
405-510-0077
admin@fulmersill.com

For the Defendants:
Ranjit S. Dhindsa, Esquire
John M. Kalas, Esquire
Hollingsworth, LLP
1350 I Street, N.W.
Washington, DC 20005
202-898-5800
rdhindsa@hollingsworthllp.com
jkalas@hollingsworthllp.com

Also Present:
Peter Goodale
Videographer

## Page 4

I N D E X (Continued)

FOSTER DEPOSITION EXHIBITS                    PAGE
18-13 - Regulatory Toxicology and Pharmacology    162
   Article

18-14 - Monsanto Document - MONGLY01947720    168
   through 7704

18-15 - Eric Wood Document, MONGLY07070096    179
   through 0099

18-16 - Greim Review Article              185

18-17 - Baldrick 2005 Study              213

18-18 - Baldrick 2007 Study              213

18-19 - OECD Guidelines, Guidance Document 116    215

18-20 - Elwell Article                  224

## Page 3

I N D E X

THE WITNESS - WARREN G. FOSTER, Ph.D.
EXAMINATION BY                          PAGE
Ms. Robertson                  6
Mr. Dhindsa                  242
Ms. Robertson                243

EXHIBITS
FOSTER DEPOSITION EXHIBITS            PAGE
18-1 - Expert Witness Report of Warren G.    15
   Foster, Ph.D.

18-2 - Notice to Take Oral and Videotaped    29
   Deposition of Dr. Warren G. Foster
18-3 - USEPA Lacayo Memorandum            30
18-4 - USEPA Kasza Memorandum            38
18-5 - Expert Report of Christopher J. Portier,    56
   Ph.D.

18-6 - Joseph Haseman Article in the Toxicology    57
   Pathology Journal
18-7 - Article in Biometrics Journal        59
18-8 - USEPA Zendzian Memorandum          72
18-9 - Curriculum Vitae of Warren G. Foster, Ph.D  88
18-10 - Dhindsa Letter Dated August 18, 2016    94
   to Dr. Foster

18-11 - Billing Records of Tech Tox Consulting    112

18-12 - Giknis and Clifford 2000 Report      138

## Page 5

MR. GOODALE:  We are now on the record.  My
name is Peter Goodale, certified legal
videographer for Golkow Technologies.

Today's date is September 15, 2017, and
the time on the video monitor is 9:08 a.m.

This video deposition is being held in
Toronto, Ontario, Canada, in the matter of In
Re:  Roundup Products Liability Litigation,
for the United States District Court for the
Northern District of California, MDL No.
2741.

The deponent is Dr. Warren G. Foster,
Ph.D.

Counsel, please identify yourselves and
state who you represent for the record.

MS. ROBERTSON:  Pearl Robertson, Plaintiffs.

MS. GREENWALD:  Robin Greenwald, Plaintiffs.

MR. DHINDSA:  Ranjit Singh Dhindsa on behalf
of Monsanto.

MR. KALAS:  John Kalas on behalf of Monsanto.

MS. TABATABAIE:  Tara Tabatabaie for
Plaintiff.

MR. GOODALE:  The court reporter is Janis
Ferguson, and who will now swear in or affirm
the witness.

Confidential - Pursuant to Protective Order

Page 6

1    W A R R E N  G.  F O S T E R, Ph.D., first
2    having been duly sworn, testified as follows:
3
4         MR. GOODALE:  Please begin.
5
6              EXAMINATION
7    BY MS. ROBERTSON:
8
9         Q.  Good morning, Dr. Foster.  Have you ever
10   given a deposition before?
11        A.  Yes.
12        Q.  And when did you give a -- what -- how many
13   prior depositions have you given?
14        A.  One.
15        Q.  When was that?
16        A.  2011, 2012, somewhere thereabouts.
17        Q.  And did you give this deposition as an
18   expert?
19        A.  Yes.
20        Q.  And what was the litigation?
21        A.  The litigation was Merck.  Marderosian v.
22   Merck.
23        Q.  And what was your expert opinion about?
24        A.  The trial or the case was about health
25   effects of hexavalent chromium, and I provided an

Page 7

1    expert opinion on whether or not hexavalent chromium
2    caused adverse reproductive effects in people exposed.
3         Q.  And which party were you an expert for?
4         A.  Plaintiffs.
5         Q.  Did you write an expert report for that --
6         A.  I --
7         Q.  -- case?
8         A.  I did.
9         Q.  Have you ever written any other expert
10   reports?
11        A.  No, I have not.
12        Q.  Have you ever been previously retained, aside
13   from the case we just talked about and aside from the
14   case today, as an expert in litigation?
15        A.  As an expert in litigation?
16        Q.  Correct.
17        A.  Not to my knowledge, no.
18        Q.  Have you ever been hired for litigation to
19   serve as a consultant?
20        A.  I have provided opinions to different --
21   different firms at different points in time.
22        Q.  Were any of these opinions related to
23   chemicals and health effects in humans?
24             MR. DHINDSA:  I object, to the extent it
25        calls for attorney confidential

Page 8

1    communications between Dr. Foster and whoever
2    may have retained him.
3         Q.  You can answer.
4         A.  In one case, I was asked by an attorney
5    whether or not pesticide might be involved in a
6    person's -- child's neurodevelopmental effects.  And
7    after a brief telephone conversation and discussion of
8    issues, it didn't go any further.
9             (Discussion held off the record.)
10        Q.  And what was the name of the pesticide?
11            MR. DHINDSA:  Same objection.
12        A.  I believe the pesticide's name was Dursban.
13        Q.  Prior to being retained by Hollingsworth,
14   have you ever looked at the carcinogenic effects of
15   glyphosate?
16        A.  No.
17        Q.  Prior to being retained by Hollingsworth, did
18   you have any opinion as to whether glyphosate could
19   cause cancer in humans?
20        A.  I hadn't looked at it, so, no, I had no
21   opinion on it.
22        Q.  And your expertise is toxicology, with a
23   special focus on reproductive toxicology.  Isn't that
24   correct?
25        A.  I trained in reproductive biology and pursued

Page 9

1    further training we had through Health Canada in
2    toxicology.
3         Q.  Aside from reproductive toxicology, do you
4    focus on any other subareas of toxicology?
5         A.  I'm not sure I understand your question.  Do
6    I focus on anything outside?  Does my work touch on
7    anything outside of reproductive toxicology?  Is that
8    what you're getting at?
9         Q.  No, sir.  You make a distinction on your CV
10   that you're -- you have a subspecialty in reproductive
11   toxicology.  Correct?
12        A.  Correct.
13        Q.  I'm just wondering if you have any other
14   subspecialties.
15        A.  No.
16        Q.  Do you conduct any toxicologic studies in
17   animals as part of your reproductive toxicology work?
18        A.  I have, over the past 25, 30 years, used
19   numerous animal studies in toxicology.
20        Q.  Have you conducted any?
21        A.  Yes.  Designed, conducted, collected the
22   data, collected the tissues, done the analysis,
23   interpreted the results.
24        Q.  And were these studies that you conducted and
25   designed related to carcinogenicity effects?

3 (Pages 6 to 9)

Confidential - Pursuant to Protective Order

Page 10

1    A.  Some, yes.
2    Q.  What is your understanding of a human health
3  risk assessment?
4    A.  Human health risk assessment is a complex
5  process that involves collection of data from animal
6  studies where hazards may have been identified.  The
7  risk assessor would then take the -- the information,
8  including human biomonitoring studies, human
9  epidemiological studies, animal studies, mechanistic
10  studies, and carry out a very thorough assessment of
11  the literature to determine whether or not there was a
12  risk or not.
13    Q.  Now, did you just describe for us a human
14  health risk assessment or a human health hazard
15  assessment?
16    A.  That would be a risk -- human health risk
17  assessment.
18    Q.  And what do you appreciate as a human hazard
19  health assessment?
20    A.  I have no idea what that means in the general
21  lexicon of what we do.
22      A health -- a hazard is where somebody would
23  conduct an animal experiment and determine whether or
24  not a hazard was present.
25    Q.  And a hazard assessment only occurs in an

Page 11

1  animal study, animal experiment?
2    A.  Hazards, in my understanding of how risk
3  assessment is conducted, are determined through animal
4  studies.
5    Q.  Does your expert report apply a human risk
6  assessment to the animal carcinogenicity analysis?
7      MR. DHINDSA:  Objection.
8    A.  I want to make sure I understand your
9  question correctly.  You're asking me did I do a risk
10  assessment of glyphosate's potential carcinogenicity?
11  Is that correct?
12    Q.  For the animal carcinogenicity analysis you
13  offer in your report.
14    A.  I reviewed the animal literature to determine
15  whether or not there were compound-related effects.
16    Q.  So is your answer that you did not conduct a
17  risk assessment on the animal carcinogenicity data?
18    A.  A risk assessment would be a much more
19  thorough analysis requiring assessment of biomonitoring
20  data, the epidemiological data, and the animal data
21  together.  And in -- as well as the mechanistic
22  information.  And I was retained to look at the animal
23  studies and determine whether or not there was a
24  compound-related effect, and that's what I focused my
25  attention on.

Page 12

1    Q.  Are you a statistician?
2    A.  No, I'm not, but I use statistics routinely
3  on everything I do.
4    Q.  Are you offering an opinion today as a
5  statistician?
6    A.  I'm not offering an opinion, although I use
7  it routinely in what I do.
8    Q.  Does your report evaluate the data using
9  statistics?
10    A.  I did not use statistics in calculating any
11  statistics in the review of the literature.  I reviewed
12  this -- the animal data.
13    Q.  Is it your opinion that a finding of a risk
14  between a chemical and a disease, based on animal
15  bioassays, is not sufficient to establish a causal
16  relationship between exposure and human health?
17      MR. DHINDSA:  Objection.
18    A.  I want to make sure I understand.  It's a
19  long question.
20    Q.  I can ask it again, if you'd like.
21    A.  Please.  Go ahead.
22    Q.  Okay.  Is it your opinion that a finding of a
23  risk between a chemical and a disease, based on animal
24  bioassays, is not sufficient to establish a causal
25  relationship between exposure and human health?

Page 13

1      MR. DHINDSA:  Objection.
2    A.  So if I understand the question correctly, if
3  a risk assessment has been conducted, and in the
4  conduct of the risk assessment there -- a risk is
5  identified, is that sufficient to establish a causal
6  relationship in humans?  And the answer to that
7  question would be no.
8    Q.  Is it probative, in your opinion?
9      MR. DHINDSA:  Objection.
10    A.  What do you mean by "probative"?
11    Q.  Does it offer any probative value to the
12  overall analysis of a risk assessment?
13      MR. DHINDSA:  Objection.
14    A.  I'm not -- I'm not a lawyer, so what do you
15  mean by "probative"?  That's a legal term, as far as
16  I'm aware, and I don't use it in -- normally in what I
17  do.
18      So are you -- are you suggesting that if I
19  were to see evidence of a -- a risk assessment's
20  conducted, and at the end of that risk assessment, the
21  risk assessor says there is a risk -- Compound X has a
22  risk for behavioral abnormalities.  Does that then
23  provide me with an interest in conducting further
24  studies to determine whether or not there's a causal
25  relationship?

4 (Pages 10 to 13)

Confidential - Pursuant to Protective Order

Page 14

1    Q.  Correct.
2    A.  If it was an area that I was interested in in
3   pursuing as a scientist, then I might look at that and
4   say, you know, this is -- this would justify further
5   studies.
6    Q.  Have you ever worked with any corporations to
7   assist them in gaining registration with a regulatory
8   body over a product?
9    A.  Okay.  The way I'm understanding your
10  question is have I worked with any company to assist
11  them in getting a product registered.
12    Q.  Correct.
13    A.  No, I have not.
14    Q.  What about any sort of drug or device,
15  pharmaceuticals?
16    A.  No, I have not.
17    Q.  Have you ever had any past involvement
18  working with EPA?
19    A.  Yes, I've worked with EPA on numerous
20  occasions.
21    Q.  And have you worked with EPA as a paid
22  employee of EPA?
23    A.  No.
24    Q.  Did you work with them as a consultant?
25    A.  Yes.  They've covered my expenses.

Page 15

1    Q.  And was this related to serving on a
2   scientific advisory panel?
3    A.  Over the course of my career, I've interacted
4   with them in -- in different capacities; reviewer on
5   grant programs, advisory panels, meetings,
6   contributions to meetings.
7    Q.  Have you had any involvement with EPA during
8   these meetings related to EPA guidelines?
9    A.  Sorry.  Have I had any interaction with EPA
10  in the past year or two on EPA guidelines?
11    Q.  When you've -- when you've been -- when EPA
12  has sought your opinion related to meetings or grant
13  programs and the like, have any of -- has any of this
14  work been related to EPA guidelines?
15    A.  I would say so, yes, in the respect of
16  developing endocrine-disrupting testing guidelines.
17    Q.  What about carcinogenicity guidelines?
18    A.  No, I have not participated in that area.
19    Q.  You state in your expert report that
20  regulatory studies favor the detection of false
21  positives -- false positive adverse outcomes in
22  preference to false negatives.  Do you recall that?
23    A.  Do you have a copy of my report?
24    Q.  I do.
25        (Foster Deposition Exhibit 18-1 - Expert

Page 16

1        Witness Report of Warren G. Foster, Ph.D. -
2        marked for identification.)
3    Q.  I'm going to mark the expert report of
4   Dr. Warren Foster as Exhibit 18-1.
5    A.  Thank you.
6        MR. DHINDSA:  I just want to note for the
7        record that the exhibit that you marked
8        doesn't have his attached CV that was entered
9        with it.
10       MS. ROBERTSON:  That's correct.  It's going
11       to be entered as a separate exhibit.  If you'd
12       like me to enter it all at once, by all
13       means, I'd be happy to.
14       MR. DHINDSA:  Whatever you prefer.
15  BY MS. ROBERTSON:
16    Q.  So, Dr. Foster, this is the -- this is your
17  expert report, correct?
18    A.  It appears to be, yes.  I have not reviewed
19  it from cover to cover, but it looks like it.
20    Q.  Understood.  And so what approach do you take
21  in looking at the animal data related to the detection
22  of false positives, as compared to false negatives?
23       MR. DHINDSA:  Objection.
24    A.  Can you restate that, please?
25    Q.  Sure.  What approach do you take in looking

Page 17

1   at the animal data related to the detection of false
2   positives, as compared to false negatives?
3       MR. DHINDSA:  Objection.
4    A.  The approach that I use is one that I've used
5   throughout my career; is to look at the conduct of the
6   study, details of the methodology, as well as the
7   interpretation of the data that's been generated, and
8   to explore all the -- all the data that's available in
9   relation to the outcomes of interest.
10       So I would look where -- where I have the
11  data, body weight, behavior of animals, if there's any
12  adverse affects, atypical behaviors that might be
13  present, and then take a look at the -- the -- the --
14  the outcomes that we see.
15    Q.  Dr. Foster, does the quality of the study or
16  observed effects during a study relate to whether a
17  false negative is observed?
18    A.  Does the quality of the study relate to
19  whether or not a false negative is detected?
20    Q.  Yes.  I asked -- my previous question, some
21  two questions ago, was about false positives and false
22  negatives.
23    A.  Right.
24    Q.  And your answer informed that you look at the
25  conduct of the study, details of the methodology, et

5 (Pages 14 to 17)

Confidential - Pursuant to Protective Order

Page 18

1  cetera.
2       So I'm wondering if that's responsive to my
3  question regarding -- related to false negatives and
4  false positives.
5       A.  It would be responsive to both.
6       Q.  So the quality --
7       A.  Because you're looking at the quality of the
8  study and how reliable the results are, regardless of
9  the direction in which they go.
10      Q.  So does your report approach the studies with
11 an eye toward finding a false negative or a false
12 positive?
13      A.  I don't approach the study a priori with the
14 goal of finding false positives or false negatives.  My
15 approach is to -- is to take an objective assessment of
16 the study and determine whether or not the outcomes
17 that were presented in the data are compound-related or
18 not.
19      Q.  Dr. Foster --
20      A.  So --
21      Q.  Oh, sorry.  Please finish.
22      A.  -- you know, I might look at a study and --
23 so I'm reviewing a paper, and in reviewing a paper, I
24 am going to be asking the -- author of that paper
25 whether or not they have interpreted their results

Page 19

1  fully, just as well as I might look at the paper and
2  say, well, you've overinterpreted your data as well.
3  So I'm looking at -- in both directions.
4       Q.  What would an overinterpretation of data be?
5       A.  An overinterpretation in a -- in a study
6  that's been submitted for publication might be where
7  they're making conclusions that are not supported by
8  the data that's presented in the paper.
9       Q.  What about for a study that is not submitted
10 for publication?
11      A.  Can you give me an example of what you mean
12 here.  There could be many things like that.
13      Q.  Well, what I'm trying to understand is what
14 an example of an overinterpretation of data would be.
15 And your answer relates to submitted publications.  So
16 is there overinterpretation of data from original study
17 authors?  Is that possible?
18      A.  Original study authors may overinterpret
19 their data, yes.
20      Q.  In what way?
21      A.  They may make conclusions that are not
22 supported by the data that they -- that they present in
23 their report.
24       So that -- I'm trying to think of an example
25 that I've seen recently.  But somebody might make the

Page 20

1  claim that they saw -- the chemical that they're --
2  that they're interested in was associated with an
3  adverse health effect, when in the study they had not
4  actually measured any health effects.
5       So an example of this is a recent thesis I
6  just examined, where the student examined exposure
7  to -- to Bisphenol A in the study, and in their
8  conclusions, they were commenting on health effects
9  that were not -- not examined in their -- anywhere in
10 their thesis.
11      Q.  Is the inverse also true?  Can study authors
12 underinterpret their original data when conducting an
13 experiment in animal bioassays?
14      A.  That can also happen, yes.  So somebody
15 may -- the example here might be somebody may not fully
16 appreciate the complexity of the assays they're looking
17 at and may not understand -- say they're measuring a
18 thyroid-stimulating hormone, and they've also noted
19 that as thyroid-stimulating hormone fell, they saw a
20 corresponding rise in thyroxine, and they've -- they've
21 not interpreted that as showing that there's -- they've
22 got internal consistency in corroborating evidence from
23 two different assays.
24      Q.  And, Dr. Foster, when you looked at the
25 animal carcinogenicity in this case, did you consider

Page 21

1  what the study authors submitted as in relation to
2  overinterpretation or underinterpretation of their data
3  results?
4       A.  Did I interpret the studies to determine
5  whether or not they were over- or underinterpreted?  Is
6  that your question?
7       Q.  Yes.
8       A.  That was something that I would consider,
9  yes.
10      Q.  And how did you go about this consideration?
11      MR. DHINDSA:  Objection.
12      Q.  Did you have access to all of the studies?
13      A.  I had access to study data in three studies,
14 and I also had a review paper in which I had the data.
15 But I don't typically rely upon reviewed data -- review
16 studies.  I might read them from the perspective of
17 giving me a place to start.  But in this particular
18 case, they actually had the study data appended that I
19 was able to -- to review.
20      Q.  And so for the appended study data, did that
21 study data include the original authors of the animal
22 carcinogenicity study's overinterpretation or
23 underinterpretation of results?
24      MR. DHINDSA:  Objection.
25      A.  To my knowledge, I only had the -- the

Confidential - Pursuant to Protective Order

Page 22

1    tabulated data.  In the text of the paper, on occasion,
2    there was some text discussion of the conduct of the
3    study.
4        Q.  And which review paper are you referring to,
5    Dr. Foster?
6        A.  I'm referring to the Greim, et al. study.
7        Q.  In your expertise, and listed on your CV,
8    what do you mean by "environmental carcinogenesis"?
9        A.  I'm looking at chemicals that are
10   commercial -- commercial chemicals that have been shown
11   to be environmental contaminants.  So --
12       Q.  And is this -- I'm sorry.
13       A.  So they're -- they're in the environment, and
14   there's potential for human exposure.
15       Q.  And is this in the context as it relates to
16   reproductive toxicology?
17       A.  Not always, no.  In occasion -- for instance,
18   in Dieldrin, we were interested in looking at the
19   carcinogenicity of that pesticide outside the
20   reproductive tract.
21       Q.  And that was the Merck case; is that right?
22   Did I get the name right?
23       A.  No.  That was -- the Merck -- the trial, you
24   mean?
25       Q.  I can -- let me rephrase.  And when you say

Page 23

1    "when we were looking at Dieldrin," what do you mean?
2        A.  I mean that my students and I had written a
3    grant for which we had obtained funding to examine the
4    impact of Dieldrin as a carcinogen.
5        Q.  What is Dieldrin?
6        A.  Dieldrin is a pesticide.
7        Q.  Do you know who manufactures Dieldrin?
8        A.  I do -- I do not know.  My understanding is
9    it's banned from production, and so I don't know who
10   manufactured it historically.
11       Q.  Okay.  Let's take a look --
12       (Discussion held off the record.)
13       Q.  Dr. Foster, what is an animal bioassay?
14       A.  An animal bioassay is a study involving
15   animals in which you would dose the animals with known
16   concentrations of your test substance, vehicle control,
17   plus at least three additional dose groups, and assess
18   outcomes of interest decided before the initiation of
19   the study.
20       Q.  What is a null hypothesis?
21       A.  A null hypothesis would be -- Chemical X will
22   not cause an increase in body weight would be a null
23   hypothesis.  It's a -- it's stated in a way that you
24   can -- the outcome of your study will either support or
25   disprove that -- that hypothesis.

Page 24

1        Q.  What type of rodents are used for rodent
2    carcinogenicity studies as it relates to this case?
3        A.  Mice and rats.
4        Q.  Does it matter which type of rodent is used
5    in an animal bioassay?
6        A.  The -- the decision to use mice and rats has
7    been something that has been arrived at through
8    international harmonization of test guidelines through
9    the OECD, as well as other test guideline groups.
10       So these are guidelines that have been
11   thoroughly vetted, they've been reviewed by each
12   participating country's expert delegate, as well as
13   peer-reviewed by experts within each country.
14       So, in essence, the guideline is a
15   peer-reviewed guideline that advises which -- what is
16   the most appropriate animal model to use, and mice and
17   rats have been chosen.
18       Q.  And you applied these OECD guidelines in your
19   analysis to -- as to whether these -- as -- your
20   analysis related to the quality of these studies,
21   correct, in your expert report?
22       A.  My knowledge is limited to the guidelines?
23   Is that what you're asking me?
24       Q.  I'm asking if you applied the guidelines
25   in -- in reviewing whether these reports were of

Page 25

1    sufficient quality for you to include in your expert
2    opinion.
3        A.  Well, I wouldn't have applied the
4    guidelines -- if I understand you correctly, the
5    studies were conducted in other labs, according to the
6    guidelines that were established at that point in time.
7    I would have reviewed the studies that were conducted
8    to see, to the extent possible, that they followed the
9    guidelines and that the data was of good quality.
10       Q.  All right.  And you found that these studies
11   all followed the guidelines.  Correct?
12       MR. DHINDSA:  Objection.
13       A.  I think that in looking at the individual
14   studies, that largely they followed the guidelines --
15   in general, they did.
16       So, for example, a study -- the OECD
17   guidelines advises that you -- your top dose is
18   1,000 milligrams per kilogram or thereabouts, the
19   maximum tolerated dose.  And some studies approached it
20   and got near it, but didn't quite achieve it.
21       Q.  Yes.  And that's the Lankas study you're
22   referring to.
23       A.  The Lankas study is one that did not achieve
24   it.
25       Q.  All right.  So I'd like to direct your

7 (Pages 22 to 25)

Confidential - Pursuant to Protective Order

Page 26

1    attention to Page 27 of your expert report, if we
2    could.
3        A.  (Witness complies.)
4        Q.  It's a rather lengthy paragraph carried over
5    from Page 26.  I'll give you a moment to find it.
6        But in the middle of that paragraph, you
7    state, "Therefore, as designed, the regulatory studies
8    favor the detection of false positive adverse outcomes,
9    finding non-treatment-related tumors in preference to
10   false negatives, missing detection of treatment-induced
11   tumors."
12       Do you see where I'm reading?
13       A.  Yes, I see where you're reading.
14       Q.  And as you sit here today, do you agree with
15   that statement?
16       A.  Yes, I do.
17       Q.  And is your -- is your expert opinion
18   following this notion to detect false positive adverse
19   outcomes?
20       A.  Can you say that again, please?
21       Q.  Sure.
22       THE WITNESS:  Sorry, Ran.
23       Q.  Is your expert analysis, as described in your
24   expert report following the statement, meaning are you
25   likewise -- are you likewise favoring the detection of

Page 27

1    false positive adverse outcomes as compared to false
2    negative adverse outcomes?
3        MR. DHINDSA:  Objection.
4        A.  I would say no to that question [sic].  My
5    goal in reviewing the -- the individual studies was to
6    try and determine what, if any, outcomes were
7    compound-related.
8        Q.  Dr. Foster, do you know what the
9    precautionary principle is?
10       A.  I've heard of it.  It's been used widely in
11   the lay press and elsewhere.  I'm not sure I really
12   understand it.
13       Q.  Do you know whether EPA follows the
14   precautionary principle?
15       A.  Well, since I really don't understand what it
16   is and how it would be put into practice, I can't
17   answer that question.  I don't know whether they do or
18   don't.
19       Q.  Let's look at Page 11 of your expert report.
20       A.  (Witness complies.)
21       Q.  You state here that, "The goal of a bioassay
22   is to identify adverse outcomes for hazard
23   identification."
24       Do you still agree with that statement today?
25       A.  I don't know, because I don't know where

Page 28

1    you're reading.  I'm on Page 11.  But where are you?
2        Q.  If you go into the first -- the main
3    paragraph, the one that stands alone on this page, and
4    it's in your discussion of -- and the paragraph begins
5    with, "In assessing rodent bioassay data..."
6        A.  Yes.  I'm in that paragraph.
7        Q.  Okay.  If you read down maybe six lines,
8    "Finally, bioassays are carried out with the goal of
9    identifying adverse outcomes for hazard
10   identification."
11       A.  Yes.
12       Q.  As you sit here today, do you agree with that
13   statement?
14       A.  I agree with that statement, yes.
15       Q.  Can you explain for us what you mean by this
16   statement, "Outcomes for hazard identification."
17       A.  The bioassay is conducted because you don't
18   really have any idea what the toxicological profile of
19   your chemical is.  So you're administering a vehicle,
20   plus at least three additional doses, one up to the
21   maximal tolerated dose, in assessing a broad range of
22   outcomes, in the effort to determine whether or not
23   there are adverse outcomes.
24       So an adverse outcome in this particular case
25   would be to see whether or not there are statistically

Page 29

1    significant differences in treatments versus controls.
2        (Discussion held the record.)
3        MR. GOODALE:  Off the record at 9:45 a.m.)
4        (Recess held.)
5        MR. GOODALE:  We're back on the record at
6    9:57 a.m.
7    BY MS. ROBERTSON:
8        Q.  All right, Dr. Foster, I'd like to show you
9    an exhibit we'll mark as 18-2.
10       (Foster Deposition Exhibit 18-2 - Notice to
11       take Oral and Videotaped Deposition of Dr.
12       Warren G. Foster -  marked for
13       identification.)
14       Q.  This is a Notice of Deposition of Dr. Warren
15   Foster.
16       Dr. Foster, have you seen this document
17   before?
18       A.  I've seen an email version of it, yes.
19       Q.  And if you could please go back to the fourth
20   page.  It's titled Schedule A.
21       A.  I'm sorry.
22       Q.  It's got a -- it's a number 1.  It's 4 on the
23   document, but it should be -- my apologies.  I'm
24   double-sided.
25       A.  Yes.  I'm on Page 4.  Or the last page.

8 (Pages 26 to 29)

Confidential - Pursuant to Protective Order

Page 30

1    Q.   The last page.  And it says Request No. 7?
2    A.   Yes.
3    Q.   And, Dr. Foster, were you asked to provide
4    any of these communications in response to this
5    request?
6    A.   I was.  And I didn't have any to provide.
7    Q.   Okay.  Thank you, Dr. Foster.
8         I'm going to go ahead and hand you what we're
9    going to call Exhibit 18-3.
10        (Foster Deposition Exhibit 18-3 - USEPA
11        Lacayo Memorandum - marked for
12        identification.)
13   Q.   Dr. Foster, for the record, if we could
14   please just consult your expert report quickly and look
15   at Citation 47.  I would ask, please, whether you can
16   confirm the document I handed you as Exhibit 18-3 is
17   your referenced Exhibit 47 -- or, sorry, Citation 47.
18   A.   I believe it is.
19   Q.   Thank you.  So, Dr. Foster, it's fair to say
20   that you've reviewed this memo before, correct?
21   A.   Yes, I believe I've reviewed this document
22   before.
23   Q.   And this document is an EPA memorandum,
24   correct?
25   A.   Yes.

Page 31

1    Q.   And this document relates to the glyphosate
2    feeding study, which is EPA Registration No. 524-308.
3    Correct?
4    A.   Correct.
5    Q.   And what do you appreciate this -- which
6    study do you appreciate this document as discussing?
7    A.   I believe this would be referring to the
8    Knezevich and Hogan study.
9    Q.   And who sponsored that study?  Do you know?
10   A.   The Knezevich and Hogan study?
11   Q.   Yes.
12   A.   I would have to look at my expert report to
13   see if I noted that.
14        In my expert report, I indicate that this
15   study was conducted by Monsanto.
16   Q.   And, Dr. Foster, was this one of the three
17   studies you mentioned earlier that you reviewed the
18   full data for?
19   A.   I believe that is the -- correct.
20   Q.   So, Dr. Foster, if we can go to the last full
21   page of content of Exhibit 18-3, the page right before
22   References.
23   A.   I'm sorry; which document do you want me to
24   go to?
25   Q.   Document 18-3.

Page 32

1    A.   Yep.  Last page before References.
2    Q.   So the last page of the memo.
3    A.   Yes.
4    Q.   And here the EPA is articulating that they
5    disagree with the registrant's position.  The
6    registrant in this context would be Monsanto, correct?
7    A.   The registrant would be Monsanto, yes.
8    Q.   And the last -- the last two sentences of the
9    first paragraph on Exhibit 18-3 read, "The registrant
10   wishes to avoid false positives while those concerned
11   with public health wish to avoid false negatives.
12   Hence, for this reason alone, Monsanto's argument is
13   unacceptable."
14        Do you see where I'm reading?
15   A.   I see where you're reading, yes.
16   Q.   So, Dr. Foster, you would agree that at least
17   at the time of this memo, that the regulatory studies
18   should favor the detection of false negatives.
19   Correct?
20        MR. DHINDSA:  Objection.
21   A.   Regulatory -- as I understand your question,
22   regulatory studies should favor the detection of false
23   negatives?
24   Q.   Correct.
25   A.   I think that the more appropriate way of

Page 33

1    stating that is that regulatory studies should favor
2    the detection of effects over not seeing something.
3         In other words, what you're trying to do is
4    screen, and you want to make sure that the -- you're
5    using a sensitive assay so that if there is something
6    worth looking at, you're not missing it by being too
7    conservative.
8    Q.   So, Dr. Foster, do you agree or disagree that
9    regulatory studies should favor the detection of false
10   negatives?
11        MR. DHINDSA:  Objection.
12   A.   I can't --
13        MR. DHINDSA:  Objection.
14   A.   I can't speak to the author of this report
15   and what's in their mind at the time, what's happening
16   before this email or this memo exchange is taking
17   place.
18        But the point that I'm making -- and I think
19   it's the valid point -- is that when you're a
20   government agency, you're trying to protect the health
21   of the -- of the overall population.  You want to
22   design an assay, a screening assay that's sensitive
23   enough in order to detect an effect over missing things
24   that may -- may be there.  So you don't want your assay
25   to be too conservative.

Confidential - Pursuant to Protective Order

Page 34

1      Q.   Dr. Foster, I think potentially you misspoke
2  there.  You were talking about if you're a government
3  agency and you're trying to protect the health of
4  overall population, you want to design an assay or a
5  screening assay that's sensitive enough.  You don't
6  mean the government agency wants to design an assay,
7  correct?
8      A.   The reason I stated it that way is that the
9  governments globally have come together and developed
10  the guidelines that companies then follow.  So the
11  company didn't develop the guideline.  The company had
12  no say in it.
13      Q.   Um-hum.
14      A.   So you're -- yeah, they're following a
15  prescribed guideline for -- for regulatory purposes.
16      Q.   And one of the goals of a government agency
17  in this context is to protect human health.  Correct?
18      A.   Governments in the United States and Canada
19  and elsewhere have participated in the development of
20  these guidelines in an effort to develop data that
21  would be useful in protecting the health of their
22  populations.
23      Q.   But, Dr. Foster, the government isn't
24  developing the data.  Aren't the study authors
25  developing the data?  Knezevich and Hogan in this

Page 35

1  instance?
2      A.   Knezevich and Hogan conducted the study that
3  generated data using a guideline that was approved by
4  governments.  So in this case, an OECD-style-type
5  guideline.
6      Q.   Understood.  And in evaluating the data that
7  Knezevich and Hogan gathered when they conducted the
8  study, the EPA, from a public health perspective, has a
9  concern with protecting against false negatives.  Isn't
10  that correct?
11          MR. DHINDSA:  Objection.  Asked and answered.
12      A.   The public health agency is interested in
13  order -- is interested in the results of studies that
14  would provide them information on whether or not a
15  compound has any potential hazard to health that they
16  could then investigate further.
17      Q.   And would it be fair to say that
18  investigating further is the result of finding study
19  results that have some sort of suspicious finding?
20  Meaning that it appears there is a dose relationship
21  within the animal bioassay?
22          MR. DHINDSA:  Objection.
23      A.   Can you -- can you rephrase or say that
24  again, please.
25      Q.   We'll just go ahead and look at Exhibit 18-3,

Page 36

1  and we'll do the second-to-last paragraph that begins
2  with, "Viewpoint is a key issue," and continues with,
3  "Our viewpoint is one of protecting the public health
4  when we see suspicious data.  It is not our job to
5  protect registrants from false positives.  We
6  sympathize with the registrant's problem, but they will
7  have to demonstrate that this positive result is
8  false."
9          Do you see where I'm reading?
10      A.   I see where you've read that, yes.
11      Q.   And so would you agree, Dr. Foster, that it
12  is, in fact, true that the EPA is concerned with
13  seeing -- with a false negative, as compared to a false
14  positive?
15          MR. DHINDSA:  Objection.  Asked and answered.
16      A.   I can see that the author of this is stating
17  that as his view -- his/her viewpoint.
18      Q.   Dr. Foster, let's look at the first page of
19  substance of Exhibit 18-3.  And we'll see here that the
20  author is Mr. Herbert Lacayo, statistician.
21      A.   Yes.
22      Q.   Tox/HED/OPP.
23      A.   Correct.
24      Q.   And would you agree that Dr. Herbert Lacayo
25  is an employee of the EPA?

Page 37

1      A.   Correct.
2      Q.   So this is an EPA memo, and it is the EPA's
3  position that there is a concern with false negatives.
4  Isn't that correct?
5          MR. DHINDSA:  Objection.  Asked and answered.
6      A.   I can't -- I can't say what the EPA position
7  is.  I see that an EPA employee, writing to another EPA
8  employee, is stating this as their opinion.  But I
9  don't know that this person, a statistician, speaks for
10  the entire EPA and states EPA policy.
11      Q.   Dr. Foster, you listed this document in your
12  Materials Consulted of your expert report, but you
13  don't cite it anywhere in your expert report.  Does
14  that mean you didn't rely on it to form your expert
15  opinion?
16      A.   I read the report as information that was
17  provided to me.  I did not cite it, because I did not
18  see it as being relevant in my expert report.
19      Q.   Well, if we look at Page 21 and 22 of your
20  expert report with respect to the Knezevich and Hogan
21  study, the only citation I see is Greim, et al., 2015.
22          So my question, Dr. Foster, is what you
23  relied on in forming this analysis.
24      A.   You're asking what -- what information I used
25  in order to conduct my review of the Knezevich and

Confidential - Pursuant to Protective Order

Page 38

1  Hogan study. So I looked at the Greim table. I also
2  looked at the memo that you had shared. I also looked
3  at the information from the Pathology Working Group and
4  additional memos going back and forth between the
5  group.
6      Q.  Can you identify me -- for me in your
7  materials consulted which citation relates to the
8  (PWG), which I assume is your citation to the Pathology
9  Working Group?
10     A.  Can I identify the reference that refers to
11  that?
12     Q.  Yes, please.
13     A.  I believe Reference No. 49 might be one that
14  refers to that.
15     Q.  Okay, well, let's go ahead and look at
16  Reference No. 49, then, Dr. Foster.
17         I'm going to hand you what we'll go ahead and
18  mark as Exhibit 18-4.
19         (Foster Deposition Exhibit 18-4 - USEPA Kasza
20         Memorandum - marked for identification.)
21     Q.  Can you identify this document for the
22  record, Dr. Foster.
23     A.  This is a memo from William Dykstra, Reviewer,
24  Toxicology Branch, from Lou Kasza, D.V.M., Ph.D.,
25  pathologist of the toxicology branch.

Page 39

1      Q.  So this is not the PWG?
2      A.  No. This is relating to that issue, but no.
3      Q.  And did you consider this document when
4  analyzing Knezevich and Hogan?
5      A.  I did review this article, yes.
6      Q.  This document states that the purpose was to
7  identify whether there was a tumor in the control
8  animal. Correct?
9      A.  That's correct.
10     Q.  And your report states that there -- you
11  believe there is a tumor in the control animal. Is
12  that correct?
13     A.  I believe that the Pathology Working Group
14  unanimously came to the conclusion that there was a
15  tumor there, yes. I did not individually personally
16  review the slides.
17     Q.  All right. Do you recall when the Pathology
18  Working Group made this determination?
19     A.  I don't know the date, no.
20     Q.  Was there a control tumor found by the
21  initial study authors, Knezevich and Hogan?
22     A.  My recollection is, no, they did not see the
23  initial -- the initial tumor.
24     Q.  You described for us that there was a request
25  to reanalyze tissue blocks identified -- tissue blocks

Page 40

1  within the Knezevich and Hogan study.
2      A.  Yes, there was.
3      Q.  What do you mean by "tissue blocks"?
4      A.  Okay. At the end of a study -- in this case,
5  since we're talking about kidneys, we'll focus on
6  kidneys. The kidneys would be embedded into paraffin,
7  and the paraffin is referred to as a tissue block. And
8  that tissue block would be used to -- that paraffin
9  tissue block would be cut on a microtome, and thin
10  paraffin sections would be added to a glass slide which
11  would then be stained with routine hematoxylin and
12  eosin, mounted with a cover slip for analysis by the
13  pathologist.
14         Typically, in these studies, because you're
15  dealing with large numbers of animals, one section
16  is -- is prepared per animal.
17     Q.  And so a tissue block is different from a
18  slide. Is that correct; my understanding?
19     A.  A tissue block is different from a slide,
20  yes.
21     Q.  Do you know who made the decision to
22  reanalyze the kidney sections of the Knezevich and
23  Hogan study?
24     A.  I do not know who made that decision, no.
25     Q.  Do you know why the decision was made?

Page 41

1      A.  I believe the decision -- well, no, I
2  don't -- I don't know why the decision was made. I
3  wasn't part of the process.
4      Q.  Is it -- after a -- after study authors
5  provide final pathology reports of the study conducted,
6  is it typical that two, three years after that study
7  report is submitted, that slides are recut?
8      A.  It's not unusual, no. If you see something
9  in the conduct of your study that's -- that might be
10  interesting or worthy of -- of reinvestigation, you
11  might go back and cut additional slides, yes.
12     Q.  Do you know whether there was anything
13  interesting or worthy of investigation with the
14  Knezevich and Hogan study that would warrant such a
15  recut of slides?
16     A.  I think in this particular case, the kidney
17  adenomas were rare, and so they wished to determine
18  whether or not any additional tumors might be present.
19         So in cutting the additional sections, the --
20  Monsanto is now at risk of -- of finding additional
21  tumors in their treated group.
22     Q.  Um-hum. Do you know whether --
23     A.  They did not.
24     Q.  Oh, sorry.
25     A.  They did not find any additional tumors in

11 (Pages 38 to 41)

Confidential - Pursuant to Protective Order

Page 42

1  the treated animals --
2      Q.  Um-hum.
3      A.  -- but the one in the control did appear.
4      Q.  Did you review any of the notes related to
5  Dr. Kuschner in the Knezevich and Hogan study?
6      A.  Did I review any of the notes between who?
7      Q.  Dr. -- any of the memorandum, I should say,
8  between Dr. Kuschner and Monsanto related to the
9  Knezevich and Hogan studies.
10     A.  I don't believe so, no.
11     Q.  Do you understand that a pathologist named
12  Dr. Kuschner reviewed the kidney slides of the
13  Knezevich and Hogan study?
14     A.  Yes.  Sorry, I do.  Yes.
15     Q.  Okay.  And do you know when he conducted this
16  review?
17     A.  No, I don't.
18     Q.  Do you know whether he conducted the review
19  after the kidney slides were recut?
20     A.  I believe it was after, but I can't state for
21  certain.
22     Q.  So as you sit here today, you don't have any
23  reason to know necessarily why the slides were recut,
24  do you?
25     A.  No, I don't.  My -- again, I'm looking at the

Page 43

1  animal data and assessing the quality of the data and
2  what the data is telling me.  What the -- the decisions
3  behind why studies were conducted, who conducted them,
4  it's not something that I looked at.
5      Q.  I understand.  I don't want you to speculate.
6      So on Page 22, you note that additional
7  tissue sections were taken from all four dose groups.
8      A.  I note that on Page 22?
9      Q.  Correct.
10     A.  Where are you?
11     Q.  We're in that same paragraph that we were
12  just referring to.
13     A.  (No response.)
14     Q.  If you look at the first sentence, it's
15  rather lengthy, but it ends with, "Examination of
16  additional tissue sections in all four dose groups..."
17     A.  Yes, I see that.
18     Q.  What do you mean by "all four dose groups"?
19     A.  Control, low, medium, and high.
20     Q.  Do you also mean in both males and females?
21     A.  I don't recall at the time.
22     Q.  When one conducts a reanalysis of tissue
23  blocks because there is a -- a need, wouldn't it be
24  important to resection all of the tissues in a
25  particular study in order to give the best quality of

Page 44

1  assessment of that study?
2          MR. DHINDSA:  Objection.
3      A.  I can't speak to what the rationale was of
4  the individuals that made the decision.
5      Q.  But in your expert opinion, wouldn't it be
6  important to gather all of the data from all of the
7  animals in the study?
8          MR. DHINDSA:  Objection.
9      A.  Not necessarily.  I think in this particular
10  case -- or, in general -- I can't really speak to this
11  case, because I don't recall.  But, in general, if I
12  was doing a study, and I saw something that was
13  interesting in the males, then I would go back and look
14  at the males.
15     Q.  Dr. Foster, is there equality in having
16  blinded review of animal data?
17     A.  What do you mean by "having blinded review"?
18     Q.  When a pathologist gets the study results, is
19  it important that that pathologist does not know which
20  dose group the animal is he's reviewing?  Blinded.
21     A.  I think that would be a benefit.
22     Q.  Is there any harm to conducting an unblinded
23  review?
24         MR. DHINDSA:  Objection.
25     A.  I'm not a pathologist, so I really can't

Page 45

1  speak to that.
2      Q.  I understand.
3      A.  In conducting a study, we do it with the
4  animals coded, so that we were unbiased in the
5  interpretation of the general results.
6          Pathology, as I understand it, is a little
7  bit different, and you would have to speak to the
8  pathologist about that.
9      Q.  Okay, Dr. Foster, you -- part of your opinion
10  related to the Knezevich and Hogan study and the
11  determination that there is a tumor in control animal
12  is based on the PWG report.  Correct?
13     A.  That's correct.
14     Q.  Did you look at the individual animal data
15  for -- from the PWG report?
16     A.  To my recollection, no.  I saw the -- the --
17  the correspondence.
18     Q.  How did you get the correspondence?
19     A.  I believe this is information that was
20  provided to me by Monsanto lawyers.
21     Q.  Did Monsanto lawyers also provide to you the
22  original study results conducted by Knezevich and
23  Hogan?
24     A.  Yes, I believe they did.
25     Q.  And did the Monsanto lawyers also provide you

12 (Pages 42 to 45)

Confidential - Pursuant to Protective Order

Page 46

1  the addendum to the Bio/Dynamics, Knezevich and Hogan
2  study?
3      A.  If you have a copy of it, could I look at it,
4  and then I'll be able to answer that?
5      Q.  I might -- I might be able to, so we'll start
6  on this.  Don't want you to answer any further.  I
7  don't know if I brought it.
8          Do you know if the Pathco PWG report is
9  publicly available?
10     A.  I don't know.
11     Q.  Do you know whether the original pathology
12 conducted by Knezevich and Hogan is publicly available?
13     A.  That, again, I would not know.
14     Q.  Your materials consulted cite to a number of
15 EPA documents, most of which deal with the Knezevich
16 and Hogan study.  Is there a reason you chose to focus
17 your research on EPA documents for this particular
18 study analysis?
19     A.  Those were documents that were provided to me
20 by the Monsanto lawyers.
21     Q.  Did you conduct any independent research on
22 the Knezevich and Hogan study?
23     A.  I did my own independent PubMed electronic
24 search.  I did not find anything additional related to
25 it.  In my recollection.

Page 47

1      Q.  Let's go ahead and look at Page 6 of your
2  expert report, Dr. Foster.
3      A.  Page?
4      Q.  6.
5      A.  6.
6      Q.  Sorry.  In the Literature Reviewed section.
7      A.  Yes.
8      Q.  It starts with, "A critical review of the
9  literature was carried out in which I reviewed all of
10 the available case materials."
11         Who carried this review out?
12     A.  I carried the review out.
13     Q.  So what do you mean --
14     A.  So --
15     Q.  -- by "available case materials"?
16     A.  So the variable case materials as they were
17 provided to me by Monsanto lawyers.  And then I go on
18 and -- and talk about the -- the literature cited in
19 the literature as well.
20     Q.  Right.  I understand that.  I'm just trying
21 to understand what you mean by "case materials" and
22 what materials that would include.
23     A.  Again, that would be the materials that were
24 provided to me for review.
25     Q.  Oh, okay.  So you did a critical review of

Page 48

1  the materials provided to you by Monsanto's attorneys.
2      A.  Correct.
3      Q.  Did you have any assistance in writing your
4  expert report?
5      A.  Sadly, no.  It was all mine.
6      Q.  No research assistant helping you pull
7  documents?
8      A.  My -- my wife helped with photocopying and
9  things like that.
10     Q.  Did you list all of these case materials you
11 conducted a critical review over in your Materials
12 Considered list?
13     A.  I believe it is complete, yes.
14     Q.  Dr. Foster, you have a lot of experience with
15 peer-reviewed journals; is that correct?
16     A.  Define "a lot of experience".
17     Q.  You're a journal referee, you've sat on
18 editorial boards, you've been published over 150 times.
19 You're very familiar with peer-reviewed journals.
20     A.  Yes.
21     Q.  Can you explain to me what a journal referee
22 is.  It's listed in your CV.
23     A.  It's a person that is identified by journal
24 editors as having expertise in the field, that would be
25 able to give a critical assessment of the quality and

Page 49

1  scientific merit of the submitted article.
2      Q.  So does this mean you receive a submitted
3  draft manuscript prior to publication?
4      A.  Prior to publication, authors submit their
5  articles to the journal through an electronic portal,
6  and the editor anonymously -- the editor selects
7  reviewers who are anonymous to the authors.
8      Q.  And where does the journal referee come in?
9      A.  Please help me.  What are you asking?
10     Q.  I'm trying to figure out what your role is in
11 the process as a journal referee to the peer-reviewed
12 literature process.
13     A.  Okay.  The peer reviewer would read the
14 submitted manuscript and would look at the manuscript
15 from title through to the last page, asking questions
16 about does the title accurately reflect the -- the
17 subject of the paper.
18         We would look at the introduction to
19 determine whether or not that the rationale for the
20 paper has been adequately described, has it been
21 thorough, has it -- has it omitted information that
22 could be important to include, have they provided an
23 adequate justification for the study and the doses that
24 are going to be used.
25         You would look at the materials and methods

Confidential - Pursuant to Protective Order

Page 50

1  to determine whether or not they're complete.  You
2  might also look at the methods that have been employed
3  to determine whether or not they're the state of the
4  art and whether they're comprehensive.
5      You would look at the statistical methods
6  that have been applied and determine whether or not
7  they've been adequately described and they're complete.
8      You would review the results and determine
9  whether or not the results have been accurately
10  presented.  Are they presented in the best format
11  possible.  Are they publication quality.
12      So, I mean, there's many, many issues that,
13  as a reviewer, you're looking at.  And what you're
14  trying to do is provide the editor with feedback on
15  terms of whether or not the paper makes a substantial
16  contribution to the scientific literature that's worthy
17  of publication.  You try and give them some context in
18  terms of priority for publishing; whether it's
19  appropriate for that journal.  And if there are issues
20  that might be useful in guiding the authors to improve
21  the quality of the paper.
22      Q.  So is journal referee just another name for
23  peer reviewer?
24      A.  If you would have asked that earlier, we
25  could have got there quicker, but, yes.

Page 51

1      Q.  And the process for peer review takes
2  significant time, correct?
3      A.  Yes.
4      Q.  And in the process of peer review, after
5  you've engaged in the first submitted draft, are
6  critiques or comments ever sent back to the study
7  author articulating we can't publish this; please look
8  at these concerns we have?
9      A.  Every submitted -- every submitted article,
10  the peer reviewer submits their comments back to the
11  editor.  The editor then reviews them to determine
12  whether or not they've been -- they're fair.
13      Sometimes you might get a reviewer that takes
14  advantage of the anonymity of the process and provides
15  comments that are not appropriate.
16      Q.  Um-hum.
17      A.  In any case, all of the comments are sent
18  back to the -- to the submitting author, the
19  corresponding author.
20      Q.  And then the submitting author likely makes
21  the determination as to whether they are going to
22  revise and resubmit, or maybe they need to go back to
23  the drawing board.  Correct?
24      A.  It would be up to the submitting author to
25  make a decision what they're going to do at that point.

Page 52

1      Q.  In your experience as a peer reviewer, how
2  long does the revision process normally take?
3      A.  I can't answer that.  It's --
4      Q.  More than a day?
5      A.  The -- the revision process?
6      Q.  Correct.
7      A.  You know, I've had papers come back and say
8  "accept as is".
9      Q.  Um-hum.
10      A.  So no revision needed.  Lovely to receive a
11  letter like that.
12      Q.  Okay.
13      A.  Extremely rare.
14      Q.  Okay.
15      A.  Most often you get something that requires
16  comment and revision.  And the revision process is
17  something that could be done quickly, depending upon
18  what are the things the submitting author has on their
19  desk at the time.  It might take a couple months.
20      So I think -- you know, I think outside
21  sometimes it might be three months, and editors might
22  give more time, depending upon the issues.
23      Q.  Okay.  So let's go ahead and look back at
24  Exhibit 18-4.
25      A.  (Witness complies.)  Yes.

Page 53

1      Q.  And it's the EPA memo we discussed earlier
2  that you have on your Materials Consulted list as
3  Citation 49.
4      This is a representation of the review of the
5  kidney section slides of the Knezevich and Hogan by Dr.
6  Kasza, branch pathologist at EPA.  Correct?
7      A.  That's correct.
8      Q.  And the interpretation in the Results section
9  states that, "The lesion may be a proliferative change,
10  having the potential to lead to the development of a
11  frank tumor.  But as the tissue can be seen under the
12  microscope as a small, well-demarcated focal cell
13  aggregate morphologically different --"
14      (Attorney Robertson interrupted by the
15      reporter.)
16      Q.  "-- tissue can be seen under the microscope
17  as a small, well-demarcated focal cell aggregate
18  morphologically different from the healthy-looking
19  surrounding kidney tissue.  The morphological
20  alteration does not represent a pathophysiological
21  significant change."
22      Do you see what I'm reading?
23      A.  (No response.)
24      Q.  That's what it says, right, Dr. Foster?
25      A.  That is what it says, yes.

Confidential - Pursuant to Protective Order

Page 54

1    Q.  And do you know whether EPA's analysis of the
2  kidney tissue slides occurred before or after the PWG
3  working group's review of the kidney slides?
4    A.  I can't state with certainty, but I believe
5  it happened before the Pathology Working Group.
6    Q.  Is this the type of incidence that you noted
7  earlier that would have encouraged a full tissue block
8  reanalysis of slides?
9    MR. DHINDSA:  Objection.
10   A.  I'm sorry; I got lost here.  Is this the
11  type of finding?
12   Q.  Earlier you had described that sometimes
13  years after a study is completed, tissue slides may be
14  recut.  Is -- given the language in this EPA memo, is
15  this one of those instances that would support
16  recutting kidney tissue slides?
17   MR. DHINDSA:  Objection.
18   A.  I can't say what were the driving factors
19  there.  I do know from my interaction with
20  pathologists, that it is not uncommon for them to see
21  something and for them to seek the input of other
22  pathologists and to cut additional slides.
23   Q.  But in this EPA memo, there's no indication
24  that EPA is asking for recut slides.  Correct?
25   A.  There's no indication in this memo that that

Page 55

1  took place or that this pathologist consulted with any
2  other pathologist at EPA.
3    Q.  Okay.  And on Page 22, same paragraph, you
4  note, "As Dr. Portier notes, with the tumor in the
5  control mouse included, there are no statistically
6  significant differences."
7    A.  This is Page 22; is that correct?
8    Q.  Correct.
9    A.  In that same paragraph?
10   Q.  First full paragraph, right after your
11  citation to PWG.
12   A.  Yes.
13   Q.  And is it your opinion today that Dr. Portier
14  also did not find a statistically significant
15  difference when adding a -- the supposed tumor in the
16  control group?
17   A.  Well, let's take a step back there.  The
18  Pathology Working Group, I think, was composed of five
19  different pathologists who all looked at -- looked at
20  the slides and unanimously came to the conclusion that
21  that was a real tumor; it wasn't a supposed tumor.
22   Q.  Okay.  Do you stand by the --
23   A.  So I don't think you've accurately
24  characterized --
25   Q.  -- position that Dr. Portier notes that the

Page 56

1  tumor in the control group included there are no
2  statistically significant differences?
3    A.  That's what I interpreted from his report,
4  yes.
5    Q.  Okay.  Well, let's look at his report.
6    (Discussion held off the record.)
7    Q.  I'm sorry, Dr. Foster, I need that real quick
8  to mark it as Exhibit 18-5.  Apologies.
9    A.  I was going to ask.
10   (Foster Deposition Exhibit 18-5 - Christopher
11   J. Portier, Ph.D. Expert Report - marked for
12   identification.)
13   Q.  So Dr. Portier discusses the Knezevich and
14  Hogan study on Page 36.  I guess that's not really --
15  he starts on Page 36, and he goes through 39.
16   Now, Dr. Foster, on Page 37, within the first
17  paragraph carried over, Dr. Portier explains that,
18  "Adenomas no longer have a significant trend, but
19  carcinomas have a marginally significant trend against
20  concurrent controls and clearly significant trend using
21  historic controls."
22   Do you see where I'm reading?
23   A.  Yes.
24   Q.  So, in fact, on Page 22 of your expert
25  report, it's not true that Dr. Portier included in his

Page 57

1  expert report a finding that stated no statistically
2  significant differences even with the tumor in the
3  control animal?
4    MR. DHINDSA:  Objection.
5    A.  Marginally significant cite.  Marginally
6  significant is non-significant.  You start out at the
7  beginning of your study, and you state a priori that
8  your cutoff value is .05.
9    In my experience as a peer reviewer, nobody's
10  going to publish anything as marginally significant.
11   Q.  Let's then take a look at Exhibit -- oh,
12  wait.  Before we take a look at Exhibit -- before we
13  take a look at the next exhibit, you stand by your
14  statement on Page 22 that Dr. Portier stated there are
15  no statistically significant differences.  Is that
16  correct?
17   A.  I do.
18   Q.  Now I will hand you what we'll mark as
19  Exhibit 18-6.
20   (Foster Deposition Exhibit 18-6 - Joseph
21   Haseman article in the Toxicology Pathology
22   Journal - marked for identification.)
23   A.  Yes.
24   Q.  And this is a journal article from Dr. Joseph
25  Haseman, published by the Toxicologic Pathology Journal

15 (Pages 54 to 57)

Confidential - Pursuant to Protective Order

Page 58

1  in 1984.
2    A.  Um-hum.
3    Q.  And, Dr. Foster, this is also listed on your
4  materials consulted as Citation 90.  So you've reviewed
5  this article previously, correct?
6    A.  I have looked at it, yes.
7    Q.  Now, in the Abstract, the last sentence of
8  the first paragraph, Dr. Haseman uses "marginally
9  significant" here.  Do you see where I'm reading?
10    A.  No, I do not.
11    Q.  In the Abstract, first --
12    A.  I'm in the Abstract.
13    Q.  First paragraph, last sentence.
14    A.  Oh, first paragraph, last sentence.  Yes, I
15  see that.
16    Q.  And would you agree that Toxicologic
17  Pathology is a peer-reviewed publication?
18    A.  It is a peer-reviewed publication, yes.
19    Q.  And can you -- what is the Society of
20  Toxicologic Pathologists?
21    A.  It is an organization to which pathologists
22  belong to share information, ideas.
23    Q.  And you're a member of the Society of
24  Toxicology, correct?
25    A.  I am.

Page 59

1    Q.  Are the two related?
2    A.  Don't know that they are.
3    Q.  Okay.  I'm going to go ahead and hand you now
4  what is going to be marked as Exhibit 18-7.
5        (Foster Deposition Exhibit 18-7 - Article in
6        Biometrics Journal - marked for
7        identification.)
8    Q.  And, Dr. Foster, this is an article that's
9  written by two department heads in biostatistical
10  science.  Would you agree?
11    A.  Correct.  Well, it's written by four people.
12  I don't know that they're department heads.  They are
13  from the department of biostats.
14    Q.  At the Harvard School of Public Health and at
15  the Dana-Farber Cancer Institute in Boston.  Correct?
16    A.  That is correct.
17    Q.  And if we can flip to Page 220 of this
18  article.
19    A.  (Witness complies.)
20    Q.  In the paragraph above No. 7, Discussion.
21  The fourth and -- well, I guess the first sentence
22  on -- in that column, second line down, through the
23  fifth line, we see, again, the use of "marginally
24  significant trend", don't we, Dr. Foster?
25    A.  I see that sentence, yes.

Page 60

1    Q.  And you'd agree that on the first page of
2  this article, this is discussing the trends
3  with respect to neurotoxicity of substances in animal
4  bioassays.  Correct?
5    A.  I do.
6    Q.  Okay.
7    A.  And I would also note that in the section
8  that you just asked me to read, they conclude with, "In
9  that regard, chemicals showing marginally significant P
10  trends based on our method may warrant further
11  investigation."  May.  It's a qualifier.
12    Q.  Okay.  But, Dr. Foster, you represented on
13  the record that no peer-reviewed article would ever
14  publish or use the phrase "marginally significant".
15        MR. DHINDSA:  Objection.  Misstates his
16        testimony.
17    A.  What I am stating is that no peer-reviewed
18  journal is going to look at data that's presented as
19  marginally significant in which the data -- the
20  conclusions of the report are based on that.  I'm not
21  saying that the words won't appear in a paper.
22    Q.  So you disagree with Dr. Haseman that you can
23  have a marginally significant trend in historical
24  controlled databases?
25        MR. DHINDSA:  Objection.

Page 61

1    A.  I'm not saying that.  I'm saying that you can
2  do statistics and people can assign those words to
3  them, but they don't carry a lot of weight in the
4  interpretation of the analysis.
5    Q.  Dr. Foster, do you know whether statisticians
6  use the phrase "marginally significant"?
7    A.  I have seen it used, yes.
8    Q.  And you're not a statistician yourself.
9  Correct?
10    A.  No, I am not.
11    Q.  Let's talk about your ultimate conclusion in
12  the Knezevich and Hogan study.  You state that there is
13  no evidence of tumor progression in the Knezevich and
14  Hogan study.  Isn't that correct?
15        MR. DHINDSA:  Objection.
16    A.  There are several reasons in this study why I
17  determine that the results are not compound-related.
18    Q.  Can you, please, direct me in your
19  citation -- Materials Consulted as to which citation
20  you rely upon to make those decisions and conclusions.
21    A.  In the final paragraph of my report, I lay
22  out the reasons why I've made that decision.
23    Q.  And which -- what do you cite to, Dr. Foster?
24    A.  I'm not citing to anything in my report.  I'm
25  citing to my experience of almost 30 years as a

Confidential - Pursuant to Protective Order

Page 62

1  toxicologist in reviewing animal literature from these
2  types of studies.  These are the types of analysis we
3  would come to.
4       Q.  And in your experience with animal studies,
5  you rely on historical controls in some instances;
6  isn't that right?
7       A.  They are one factor that we might look at,
8  yes.
9       Q.  Right.
10      A.  But not the only factor.
11      Q.  Agreed.  And on Page 6 of your expert report,
12  you give us a list of statements and opinions and
13  rationale.  And No. 6, in fact, discusses historical
14  controls.
15      A.  What page is that?
16      Q.  Page 6.
17      A.  Page 6, No. 6?
18      Q.  Right.
19      A.  Yes, that is there.
20      Q.  Okay.  And, in fact, you rank in order of
21  priority the appropriateness of the application of
22  historical controls to animal bioassays.  Isn't that
23  correct?
24      A.  Yes, I do.
25      Q.  And in the Knezevich and Hogan study, did you

Page 63

1  use the concurrent control or historic controls?
2       A.  I believe in my analysis, in looking at the
3  Knezevich and Hogan study, I looked at the concurrent
4  controls, in addition to looking at the additional
5  analyses that were conducted, together with the other
6  outcomes that were seen in the study.
7       Q.  What do you mean by "additional analyses
8  conducted"?
9       A.  I'm referring to the Pathology Working Group
10  there.
11      Q.  And did the Pathology Working Group at all
12  address historical controls?
13      A.  No, they did not.
14      Q.  All right.  And so you looked at the
15  concurrent controls as --
16      A.  I believe that's correct.
17      Q.  So if we looked at Dr. Portier's expert
18  report on Page 38, Table 9, he offers the data for
19  tumor incidences observed in the Knezevich and Hogan
20  study.  Do you see where I'm at?
21      A.  I see that, yes.
22      Q.  And we can agree that on Table 8 [sic] that
23  the column that lists under Doses, zero is going to be
24  the concurrent control group.  Correct?
25          MR. DHINDSA:  Table 8?

Page 64

1          MS. ROBERTSON:  Table 9.
2       A.  I believe that would be the concurrent
3  control, yes.
4       Q.  All right.  So we have concurrent control,
5  low dose, mid dose, and high dose.  Is that right?
6       A.  That would be correct.
7       Q.  Okay.  So if we look at the concurrent
8  controls for the Knezevich and Hogan study, and we look
9  at the -- for the purposes of your expert analysis, the
10 incidence of adenomas and carcinomas with one tumor in
11 the control group, no tumors in the low group, one
12 tumor in the mid dose group, and three tumors in the
13 high dose group.  Correct?
14      A.  So first -- first row?
15      Q.  It would be the fourth row, Dr. Foster, to
16 match the numbers --
17      A.  Fourth row, 1013?
18      Q.  Correct.  To match the numbers on the top of
19 Page 22 in your expert report.
20      A.  Yes.
21      Q.  Okay.  And in this instance of applying the
22 concurrent controls, you establish that there is no
23 dose response relationship, even though we have one
24 tumor in the concurrent control, one tumor in the mid
25 dose, and three in the high dose.

Page 65

1       A.  I see that, yes.
2       Q.  Yet, Dr. Foster, you conclude that there is
3  no dose response relationship shown in the Knezevich
4  and Hogan study.
5       A.  Again, I think you have to look at the study
6  in its totality.  So when we looked at the -- well,
7  when I looked at the Knezevich and Hogan study, in the
8  high dose group, we're looking at an 11 percent loss in
9  body weight in the highest dose group.  This is a
10 concern to me.  That's suggesting that there's
11 something going on in this study at that high dose
12 group that's potentially confounding the data.
13      Q.  Dr. Foster, where did you find the 11 percent
14 loss in body weight?  Where did you find that
15 information?
16      A.  This would have been found during the conduct
17 of my reading.  Whether this was reported in the --
18 the -- either the -- the -- I'm trying to come up with
19 the word -- the text of the Greim study or in the EPA
20 reports.
21      Q.  But you don't know, sitting here today, where
22 you got this number of 11 percent loss in body weight
23 in the highest dose group.
24      A.  No, I cannot tell you exactly where I found
25 that.  However, it is something I came across in my

Confidential - Pursuant to Protective Order

Page 66

1  review.
2      Q.  Is it not important to cite to statistical
3  information that you get from your review?
4      A.  Can you rephrase the question?
5      Q.  Is it not important to cite to where you get
6  statistical information from your review?
7      A.  It's important to reference where you get
8  information.  In this particular case, I'm referring to
9  the Knezevich and Hogan.  And so in my review of that
10 material, it was from the material relating to that
11 study.
12          It was either in the material I reviewed
13 directly relating to the data from the study or the
14 Greim, but it was in direct relationship to that study.
15     Q.  In your experience as a peer reviewer, would
16 you note that a citation is needed in this instance?
17     MR. DHINDSA:  Objection.
18     A.  In -- were I reviewing a paper like this, I
19 might suggest that they should put in a reference.
20     Q.  But it wouldn't always be necessary to put in
21 a reference that -- when you're citing 11 percent loss
22 in body weight?
23     MR. DHINDSA:  Objection.
24     A.  Again, I'm talking about the study that was
25 conducted, and I'm assuming that in my read of the

Page 67

1  material that was provided with this study, that is
2  where that information came from.
3          So in a report, in a published paper that is
4  referenced above, I would assume that's where that
5  information is coming from.
6      Q.  Dr. Foster, on Page 21, you note that there
7  was no statistically significant effect on survival.
8  Correct?
9      A.  I do make that statement, yes.
10     Q.  And if there's no statistically significant
11 effect on survival, wouldn't that mean that the dose
12 level is appropriate?
13     A.  Not on its own, no.
14     Q.  Well, isn't the purpose of achieving a
15 maximum tolerated dose is to administer as much as
16 possible without affecting the survival rates within
17 the study?
18     A.  OECD guidelines state that you're to use up
19 to 1,000 mg's. per kg. of your test substance or
20 5 percent of the maximal tolerated dose.
21         Now, in this study, they're using in their
22 highest dose group 4,945 mg's. per kg. in males, and in
23 the females, 6,000.
24         In conducting the study, didn't affect
25 survival.  However, in the high dose group, there was

Page 68

1  an 11 percent loss in body weight in the male animals.
2          Now, that body weight, I don't know why they
3  lost the weight.  Is it because the test substance is
4  affecting the palatability of the -- of the -- of the
5  food and they're not eating?  Is it because it's having
6  an effect upon the central nervous system and affecting
7  their desire to eat?  Is it because it's having a
8  systemic toxic effect that's affecting food absorption?
9  Is it giving them diarrhea?  Is it having an effect
10 upon the liver?  There are many reason why you might be
11 seeing a loss in body weight.
12         But if I see a 10 percent loss in a body
13 weight, my pathologists -- the veterinary pathologist
14 at our institution is going to tell me I need to look
15 at my animals and consider sacrificing the animals;
16 they're being adversely affected.
17     Q.  And was that done here?  Did they sacrifice
18 the animals?
19     A.  At the conclusion of the study, they
20 sacrificed the animals.
21     Q.  Well, you always sacrifice the animals at the
22 conclusion of a study, don't you, Dr. Foster?
23     A.  Correct.  This was done in 1993 under the --
24 sorry.  Done in 1983 at the conclusion, following their
25 guidelines.

Page 69

1      Q.  Right.  And --
2      A.  Whatever was standard at that time, they
3  followed that.
4      Q.  Right.  And so we don't know today why the
5  animals in the study lost the weight.  That's right,
6  correct?
7      A.  As I've just stated, what I know is they lost
8  11 percent of their body weight.
9      Q.  Okay.
10     A.  Which, to me, confounds the data in the
11 highest dose group.
12     Q.  But you're not a pathologist.  That's
13 correct?
14     A.  I'm an expert in animal toxicology.  I'm not
15 a pathologist.  I work with pathologists, but I am not
16 a pathologist.
17     Q.  What training do you have in animal
18 toxicology?
19     A.  I don't even know how to answer that.
20     Q.  Do you have any formal education in animal
21 toxicology?
22     A.  I trained at the -- at McMaster University as
23 a reproductive biologist and toxicologist.  And then --
24     Q.  In animals?
25     A.  In animals.  And then 10 --

18 (Pages 66 to 69)

Confidential - Pursuant to Protective Order

Page 70

1    Q.  What's a reproductive biologist?
2    A.  Someone that studies the -- the physiology of
3    the reproductive system.
4    Q.  Is it when the animal is alive?
5    A.  Can be when the animal is alive.  It might be
6    in tissue.  So I've done tissue culture.  I've done
7    human studies.
8        And then 10 years at Health Canada, to finish
9    answering your question, where I carried out animal
10   toxicology studies, from design through to publication
11   of study results.  And as the associate director, the
12   acting director of the environmental toxicology
13   program, I oversaw approximately 50 scientists and
14   technicians --
15   Q.  So it's --
16   A.  -- affecting animal toxicologies.
17   Q.  Apologies.  So it's your experience at Health
18   Canada and McMaster University that makes you an expert
19   in animal toxicology.  Am I understanding?
20   A.  I think what makes me an expert in toxicology
21   is not my decision, but that of the -- my colleagues
22   that call upon me for my opinion and for insight into
23   issues in toxicology.
24       So being invited to be an editor of the
25   Journal of Applied Toxicology, serving on the editorial

Page 71

1    boards for -- for different journals establishes me as
2    an expert.  Not my decision.
3    Q.  Um-hum.  Dr. Foster, your answer there said
4    an expert in toxicology.  I want to make a clear
5    distinction, because semantics are important.
6        Are you an expert in animal toxicology?
7    A.  I --
8    Q.  You stated that earlier.  I just want to make
9    the record clear.
10   A.  I'm sorry; I got lost.
11   Q.  I just want to make the record clear that as
12   you sit here today, you are offering an opinion as an
13   animal toxicologist -- expert in animal toxicology.
14   A.  Okay.  To be full in my answer, I am a --
15   have expertise as a toxicologist, and I've been asked
16   to provide my expert opinion on the animal literature
17   in this -- in this litigation.
18   Q.  Okay.
19       MR. DHINDSA:  Is now a good time for a break?
20       MS. ROBERTSON:  Yes.  I understand we only
21   have a little bit of time left on the tape,
22   so we can go ahead and take a break,
23   Dr. Foster.
24       MR. GOODALE:  This marks the end of Media 1
25   in the deposition of Dr. Warren G. Foster,

Page 72

1        Ph.D.  Going off the record at 11:07 a.m.
2        (Recess held.)
3        MR. GOODALE:  Here begins Media No. 2 in the
4        deposition of Dr. Warren G. Foster, Ph.D.
5        We're back on the record at 11:24 a.m.
6    BY MS. ROBERTSON:
7    Q.  Okay, Dr. Foster, I'm going to hand you
8    Exhibit 18-8.
9        (Foster Deposition Exhibit 18-8 - USEPA
10       Zendzian Memorandum - marked for
11       identification.)
12   Q.  Dr. Foster, if you could please look at your
13   Materials Consulted and identify whether this citation
14   matches -- or this Exhibit, 18-8, matches Citation No.
15   57, please.
16   A.  (Witness complies.)  As best as I can tell,
17   this is the document, yes.
18   Q.  And this document is another EPA memo.
19   Correct?
20   A.  This is a memo from William Dykstra, who I
21   believe is at EPA, passed through Dr. Zendzian at EPA
22   to Robert Taylor.  I don't know where Robert Taylor is.
23   Q.  Well, it says product manager, registration
24   division.
25   A.  Right.  But I don't know if that's

Page 73

1    registration division within EPA or elsewhere.  But I'm
2    going to assume it's in EPA.
3    Q.  Okay.  So, again, this memo is still talking
4    about the Knezevich and Hogan study, as indicated by,
5    "Review pathology report on additional kidney
6    sections."  Correct?
7    A.  Okay.  I've read the article -- the memo.
8    Q.  And we see on Page 2 in the conclusion that
9    the EPA determined that additional tumor in the control
10   group which had been re -- diagnosed from the
11   re-evaluation of the original slides was not present in
12   the recut kidney sections.  Correct?
13   A.  So in additional sections, no, there were no
14   additional tumors.
15   Q.  Well, it actually says "was not present".
16   A.  I see that sentence, and this is -- I don't
17   know the training of the individual, so they're
18   reporting the EPA pathologist Dr. Kasza's statement.
19   Q.  Do you know the training of the individuals
20   who made up the Pathology Working Group?
21   A.  I believe all of the five members were
22   Board-certified pathologists.
23   Q.  But you don't have any knowledge as to
24   whether EPA employed Board-certified pathologists to
25   review these kidney slides?  Is that your testimony

Confidential - Pursuant to Protective Order

Page 74

1 today?
2     A.  That's not what I said.  I said, looking at
3 the front page of this document, I do not know the
4 training of these people; Robert Taylor, Robert
5 Zendzian, William Dykstra.  I don't know if any of
6 those three are pathologists.
7         When I read the sentence, it's not stating
8 that they have examined them.  They're stating --
9 they're restating Dr. Kasza's statement.  That's the
10 way I'm interpreting this.
11     Q.  So do you disagree with the EPA that the EPA
12 did not find a -- do you disagree with the statement
13 that the EPA concluded that an additional tumor in the
14 control group was not present in the recut slides?
15         MR. DHINDSA:  Objection.  Objection.
16     A.  What I'm saying is that this -- the way I
17 read this memo is that they're restating Dr. Kasza's
18 statement, the EPA pathologist.
19     Q.  And so the restatement of Dr. Kasza's
20 statement is that an additional tumor in the control
21 group was not present in the recut kidney slides.  Is
22 that correct?
23     A.  Again, I'm state -- what I'm saying is I
24 stand by my original statement.  They are parroting the
25 statement that was made by Dr. Kasza.  We've already

Page 75

1 said what Dr. Kasza said.
2     Q.  Dr. Foster, I'd like you to look at
3 Citation -- your Materials Consulted, No. 153.  That is
4 a study that appears to be authored by Sawyer, and
5 Pathology Working Group report on glyphosate in CD-1
6 mice.
7     A.  I see that.
8     Q.  And would that citation be referring to your
9 PWG citation on Page 22?
10     A.  I believe that's correct.
11     Q.  And the date of that report is October 10,
12 1985.  Is that correct?
13     A.  The date on this report, yes.
14     Q.  And the date on this EPA memo is December 12,
15 1985.  Is that correct?
16     A.  Correct.
17     Q.  So, in fact, the EPA did review the recut
18 slides after the Pathology Working Group and concluded
19 that there was no renal tumor in the control animal.
20 Isn't that correct?
21         MR. DHINDSA:  Objection.
22     A.  Again, I come back to what I had said before;
23 that this memo is stating Dr. Kasza's -- they're
24 reporting what Dr. Kasza said.
25     Q.  And Dr. Kasza reviewed the slides after the

Page 76

1 Pathology Working Group.  Isn't that correct?
2     A.  I don't know when Dr. Kasza reviewed the
3 slides.
4     Q.  I direct your attention to Exhibit 18-4.  Is
5 this the memo you've been referred to, Dr. Foster, that
6 is Dr. Kasza's opinion?
7     A.  December 4 of 1985, yes.
8     Q.  And so it's true that Dr. Kasza reviewed the
9 recut kidney slides and did not find a tumor after the
10 Pathology Working Group had stated there was a tumor.
11 Is that correct?
12     A.  What I have here is a memo dated December 4
13 of 1985.  The memo was written December of 19 --
14 December 4th of 1985.  That does not tell me that he
15 did the analysis on December 3rd.  I have no idea when
16 the analysis was done.
17     Q.  Okay.  Well, let's look at the last page in
18 this exhibit and the test for significances of
19 differences between proportions dated 11/13/1985.
20         Dr. Foster, does this look like some study
21 results from a pathologist?
22     A.  This looks like statistics done December 11,
23 1985.
24     Q.  And is December -- no.  It is dated
25 11/13/1985.

Page 77

1     A.  The last page?
2     Q.  Correct.
3     A.  The top of my page says 12/11/85.
4     Q.  11/13/85.  Are you on Exhibit 18-4?
5     A.  (Witness indicates.)
6         MS. ROBERTSON:  Counsel, what does your say?
7         MR. KALAS:  11/13/85.
8         MS. ROBERTSON:  Apologies.  To make the
9         record clear, I'm going to have to confirm
10        whatever was printed off of EPA's FOIA
11        website.  My apologies.
12        MR. KALAS:  Let the record reflect there's
13        just -- at least two versions of this
14        document.  We don't know which one's right or
15        which one's wrong.  Or whether both are
16        right.
17 BY MS. ROBERTSON:
18     Q.  Dr. Foster, do you know which version you
19 used when you cited to Citation 49?
20     A.  Sitting here today, I could not tell you the
21 date that was on the document.
22     Q.  Dr. Foster, when you reviewed these memos
23 supplied to you by Monsanto's counsel, did these memos
24 bear a MONGLY Bates stamp along the bottom?  During
25 your review, Dr. Foster, not the one handed to you.

Confidential - Pursuant to Protective Order

Page 78

1      A.  I -- I cannot answer that.  I don't know.
2      Q.  Do you know whether --
3      A.  I have no recollection.
4      Q.  Do you know whether these documents had
5   "USEPA Archive Document" cover page that these exhibits
6   have?  Do you recall?
7      A.  Yes, the -- I'm pretty sure that what I
8   looked at looks like this (indicating).
9      Q.  And they had the USEPA Archive Document cover
10  page that you see on the front of 18-8, 18-4, and 18-7?
11     A.  Yes.
12     Q.  Dr. Foster, why didn't you apply concurrent
13  controls in your analysis of Knezevich and Hogan?
14     A.  I looked at all the data, not just the
15  concurrent controls.
16     Q.  What other historic controls did you look at?
17     A.  If we go to my report, I state in my report
18  that I looked at the information provided from the
19  Knezevich and Hogan, the recut, the Pathology Working
20  Group, and then I also looked at the results from other
21  endpoints, including the body weight.
22     Q.  Okay.
23     A.  So it wasn't just control groups and how
24  control groups -- I'm looking at all the data.
25     Q.  Dr. Foster, you do agree that in order to

Page 79

1   analyze a dose response, you need to look at the
2   treatment groups compared to the control group,
3   correct?
4      A.  I do.
5      Q.  And in this study, you chose the concurrent
6   control.  Isn't that correct?
7      A.  I believe that is correct.  But, again, I
8   looked at all the data.  I may have relied on the
9   concurrent controls in this case, but I looked at all
10  the data.
11     Q.  Dr. Foster, do you know whether the
12  regulatory bodies of EPA and ESLA looked at the current
13  controls or the historic controls?
14     A.  I cannot comment on what other regulatory
15  bodies did or didn't do.
16     Q.  Dr. Foster, would you agree that a renal
17  tubule adenoma is a rare tumor?
18     A.  I can agree that renal adenomas in mice are
19  rare, yes.
20     Q.  And in the instances of rare tumors, is it
21  appropriate to look at the historical controls?
22     A.  It would not be out of the question to look
23  at historical controls.
24     Q.  Isn't it --
25     A.  And, again, I looked at the concurrent

Page 80

1   controls, the historical controls, and the whole body
2   of data, not just whether or not there was statistics
3   involved or not.
4      Q.  Not talking about the concurrent controls,
5   not talking about the whole of the data, which set of
6   historical controls did you apply to your analysis of
7   Knezevich and Hogan?
8      A.  I believe I relied upon the concurrent
9   controls.
10     Q.  Dr. Foster, you just stated that you relied
11  on concurrent controls, historical controls, and whole
12  body data.  Did you not rely on historical controls for
13  your analysis?
14     A.  What I am stating is that I had looked at
15  them, but I relied upon the concurrent controls.
16     Q.  Which historic controls did you look at?
17     A.  Sitting here, I can't tell you which ones I
18  looked at.
19     Q.  So even in the instance of a rare tumor, such
20  as a renal tubule adenoma seen in the Knezevich and
21  Hogan study, you applied concurrent controls.  Is that
22  correct?
23     A.  I gave them more weight in this review.
24     Q.  Let's look at the article that you cited to
25  by Joseph Haseman.  It was handed to you earlier.

Page 81

1      A.  (Witness complies.)
2      Q.  I think it's 18 -- Exhibit 18-6.
3      A.  It is.
4      Q.  Okay.  And that first paragraph in the
5   abstract agrees that concurrent controls are an
6   appropriate control group for interpretive purposes,
7   just as you state on Page 6 of your report.  Correct?
8      A.  That's correct.
9      Q.  And, again, the last sentence in that
10  paragraph applies to the discussion of the use of
11  historical controls when you have a rare tumor.
12  Correct?
13     A.  Sorry.  Can you state your question again.  I
14  was reading.
15     Q.  Sure.  The last sentence in the paragraph --
16  the last sentence of the first paragraph in the
17  abstract applies to the discussion of the use of
18  historical controls when you have a rare tumor.
19  Correct?
20     A.  Correct.
21     Q.  Okay.  What methodology did you use to omit
22  the evaluation of historical controls in arriving at
23  your conclusion that there was no dose response
24  relationship with the renal tubule adenomas in the
25  Knezevich and Hogan study with glyphosate?

21 (Pages 78 to 81)

Confidential - Pursuant to Protective Order

Page 82

1      MR. DHINDSA: Objection.
2      A.   Again, coming back to my point, I looked at
3   the entire data set that was available to me.  And when
4   I see that we've got an increase -- or, sorry, a
5   decrease in body weight in the highest dose group, that
6   leads me to concern that there's something happening in
7   that group of animals that calls into the question the
8   interpretation of the data.
9      Q.   And so because you saw a loss in body weight,
10  you made the expert opinion to use concurrent controls
11  as compared to historical data controls, even though --
12     A.   It wasn't --
13     Q.   -- it was a rare tumor.
14     A.   I wasn't making the decision based on that to
15  which control group to look at; whether it was
16  concurrent controls or historical.  At this point, I'm
17  looking at the quality of the study and interpretation
18  of the overall information; what this study is telling
19  me, as is standard practice within the field.
20     Q.   Isn't it also standard practice in the field
21  to apply historical control data sets to rare tumors?
22     A.   Again, I didn't say that I did not look at
23  them.  What I am saying is that in looking at the data,
24  when I saw an 11 percent loss in body weight in my high
25  dose group, I became concerned that interpreting the

Page 83

1   results from the study was going to be difficult.  So
2   at that point, that became more important.
3      Q.   Your conclusion is that there's an absence of
4   dose response together with lack of evidence of tumor
5   progression, supporting your conclusion that the tumors
6   are spontaneously occurring and unrelated to treatment.
7   It's the second full paragraph on Page 22 of your
8   expert report.
9      A.   I see that.  I'm just going to read it again.
10  (Witness read.)  So in the body of that paragraph, I
11  lay out my reasons for determining that these were not
12  compound-related effects.
13     I come back to my point that in the high dose
14  group, you're almost five times the maximum dose
15  recommended by OECD, and you've got an effect on body
16  weight that leads me to question the -- the relevance
17  of the effects seen in those animals.  You take that
18  out, there is no dose response.  One, zero, one.
19     Then you add in that that there were step
20  sectionals done.  No additional tumors on any dose
21  group were found.
22     Q.   Dr. Foster, do you know what the mathematical
23  equivalent is to 1,000 ppm?
24     A.   Not off the top of my head, no.
25     Q.   In administering high doses in animal

Page 84

1   carcinogenicity studies, isn't one of the purpose to
2   administer a high dose so you can show the potential
3   toxic effect in humans?
4      A.   The purposes of going up to the high dose is
5   to have a dose that's sufficiently high that you don't
6   miss an effect if one is present.
7      Q.   And don't we use these animal bioassays and
8   gauging whether there is a present effect to apply to
9   whether a chemical can be a human carcinogen?
10     A.   Again, I come back to the point I've made
11  previously, is that in your high dose group, if you see
12  adverse outcomes on different endpoints that calls in
13  question and makes it difficult to interpret the --
14  whether or not those results are compound-related, then
15  you assign less weight to them.
16     Q.   Dr. Foster, did you assign less weight to
17  this study?
18     A.   I don't know what you mean by "did I assign
19  less weight to this study".
20     Q.   In your introduction of your expert report
21  and in your recent testimony, you talk about the weight
22  of studies, and you would assign less weight to studies
23  that have high doses in the high dose group.  Did you
24  assign less weight to this study?
25     A.   In this particular study, I did not find

Page 85

1   evidence of compound-related effects.
2      Q.   That's not the question.
3      A.   I think that's the bottom line.
4      Q.   That's not the question.  Did you assign less
5   weight to this study because of the high dose
6   administered to the high dose animal group?
7      MR. DHINDSA: Objection.  Asked and answered.
8      A.   I looked at the study and asked the question,
9   did -- in this study, were there compound-related
10  effects.  I did not see compound-related effects, so
11  there was no need to assign a weight to it.
12     Q.   So you only assign a weight to a study that
13  shows a compound-related effect.
14     A.   No.  What I'm saying here is that this -- in
15  looking at compound-related effects, I found it to be a
16  negative study.
17     Q.   Isn't loss in body weight the result of a
18  dose response?
19     A.   Sorry.  Say that again.  Isn't loss of body
20  weight --
21     Q.   Isn't loss in body weight the result of a
22  dose response?
23     A.   In this particular case, I don't know what's
24  causing the loss in body weight.
25     Q.   But it contributes to your overall conclusion

22 (Pages 82 to 85)

Confidential - Pursuant to Protective Order

Page 86

1    that this is a negative study, even though you don't
2    know what caused the lower body weight.
3         A.  I'm saying that the loss in body weight,
4    11 percent loss in body weight, leads me to question
5    the relevance of the findings.
6         Q.  So if there's --
7         A.  It's not reliable.
8         Q.  -- no loss in body weight, the results of
9    these findings would be relevant?
10        A.  Again, I come back to my point.  When I see a
11   loss in body weight, it causes me to question the
12   relevance of the findings.  There -- and whether or not
13   they're reliable.  I don't believe they're reliable,
14   and I don't believe they're reliable, because, again,
15   if you look at cross-studies now, I don't see this
16   tumor being recapitulated, re -- replicated in any
17   other study.
18        Q.  And as you sit here today, you don't know
19   where you got the information that there was a loss of
20   body weight of 11 percent.  Isn't that correct?
21             MR. DHINDSA:  Objection.  Asked and answered.
22        A.  In reading the material that was provided to
23   me from the Knezevich study, in that -- in my review,
24   there was a citation or an indication that there was an
25   11 percent loss in body weight.

Page 87

1         Q.  But as you sit here today, you don't know
2    which document that is.
3         A.  I do not -- I cannot tell you which document
4    that was, sitting here right now.
5         Q.  And do you recall, sitting here right now,
6    which set of historical controls you considered or
7    looked at or read when looking at the Knezevich and
8    Hogan study?
9         A.  Again, coming back to what I've said
10   previously, as I look primarily at concurrent controls
11   and the overall information I had on the study.
12        Q.  Right.  And as you sit here today, when you
13   looked at the overall information, do you recall the
14   data set name of the historical control data set that
15   you read when considering the Knezevich and Hogan
16   study?
17        A.  No, I do not know the name.
18        Q.  Okay.  Dr. Foster, we talked a little bit
19   earlier this morning about your experience, and we
20   mentioned your CV.  So I'd like to enter that into the
21   record at this time as an exhibit.
22             MS. ROBERTSON:  And, Counsel, for the record,
23             this is the continuation of Dr. Foster's
24             expert report submitted on July 31, 2017, and
25             that's why it begins on Page 47.

Page 88

1             This will be Foster Exhibit 18-9.
2             (Foster Deposition Exhibit 18-9 - Curriculum
3             Vitae of Warren G. Foster, Ph.D. - marked
4             for identification.)
5         Q.  Dr. Foster, your CV mentions that you've done
6    work for other industry.  Isn't that correct?
7         A.  Can you tell me where you're referring to.
8         Q.  Well, do you recall, as you sit here today,
9    as to whether you've done any industry work?
10        A.  Can you tell me what you mean by "industry
11   work".
12        Q.  Have you ever done any work for the a company
13   Exponent?
14        A.  I have participated with Exponent in the
15   authorship of an article.
16        Q.  And do you still correspond with Exponent?
17        A.  I don't know what you mean; do --
18        Q.  Do you have any emails with Exponent?
19        A.  I don't even know how to answer that.  I
20   mean, Exponent -- I -- I corresponded during the
21   writing of the article with several people, but I don't
22   know who all works at Exponent.
23        Q.  What about after the article?
24        A.  Not to my knowledge, no.
25        Q.  Do you know Mr. James Lamb?

Page 89

1         A.  I know the name, yes.
2         Q.  Do you know that James Lamb works at
3    Exponent?
4         A.  I don't know whether he does or doesn't.
5         Q.  Have you ever --
6         A.  He may.
7         Q.  Have you ever worked with James Lamb?
8         A.  I think we have worked together in the past.
9         Q.  What about Dr. Keith Solomon?  Do you know
10   Dr. Keith Solomon?
11        A.  I know who Dr. Solomon is.
12        Q.  Did you correspond with Dr. Solomon at all
13   related to glyphosate?
14        A.  No, I have not.
15        Q.  Did you do any research at the University of
16   Glelph [sic]?
17        A.  Who?
18        Q.  Did you do any research in preparation for
19   your export report at the University of Glelph [sic]?
20        A.  University of Guelph.
21        Q.  Please correct me.
22        A.  Guelph.
23        Q.  Pardon?
24        A.  Guelph.
25        Q.  Guelph.

Confidential - Pursuant to Protective Order

Page 90

1    A.  I have no idea where Glelph is.
2    Q.  My apologies.
3    A.  That's okay.  I don't think I've ever heard
4   it pronounced that way.  That's pretty good.
5    Q.  I'm horrible.  My husband makes fun of me all
6   the time.
7    A.  Well, that's okay.
8        Yes, I -- I did my undergrad at Guelph, I did
9   a Master's Degree at Guelph.  Guelph's just down the
10  road.  So, yes.
11   Q.  Did you work at Guelph at all while engaging
12  in expert research for the report you submitted in this
13  lawsuit?
14   A.  I've been to the library there, yes.
15   Q.  When did you go to the library there?
16   A.  It's been over a year of working on this.  I
17  couldn't tell you exactly when.
18   Q.  Six months ago?
19   A.  Possibly.
20   Q.  Three months ago?
21   A.  I don't believe so, no.
22   Q.  And while you were at the University of
23  Guelph, is that where you conducted your PubMed
24  searches?
25   A.  No.  I did the PubMed searches from my home

Page 91

1   office.
2    Q.  Okay.  Why did you go to the University of
3   Guelph?
4    A.  Potentially, because I was in the area
5   already for other reasons.
6    Q.  Did you do any research at the -- at your
7   University, McMaster's University's library?
8    A.  Yes.
9    Q.  Do you have any notes from the research that
10  you conducted at these libraries?
11       MR. DHINDSA:  Objection, to the extent it
12       calls for drafts of his expert report.
13   A.  Sorry?
14   Q.  Do you have any notes from the research you
15  did at these universities?
16       MR. DHINDSA:  Same objection.
17   A.  I would assume, yes.  I don't know exactly
18  what you're getting at.  It's --
19   Q.  Did you check out any books at either of
20  these universities to take home and conduct your
21  critical literature review?
22   A.  I don't believe I've checked out books in
23  probably the last 15 years.
24   Q.  Did you make any copies of any books or
25  articles while you were at the library?

Page 92

1    A.  I believe what I normally do is I read in the
2   library, make notes, insert into my reference manager
3   information that I might need.
4    Q.  Have you ever done any work with a company
5   called Gradient?
6    A.  I believe I have had a contract with Gradient
7   at some point.
8    Q.  What was the subject matter for the contract
9   with Gradient?
10       MR. DHINDSA:  Objection, to the extent it
11       calls for confidential information.  Go ahead
12       and answer.
13   A.  I can't say right off the top of my head what
14  that was about.
15   Q.  Do you know a Dr. Larry Kier, K-I-E-R?
16   A.  K -- sorry, K --
17   Q.  -- I-E-R.
18   A.  I don't think so, no.
19   Q.  Do you recall when you entered into an
20  agreement with the Hollingsworth firm related to this
21  case?
22   A.  Do I remember the date?
23   Q.  Or the approximate time.
24   A.  It's been a little more than a year.  I would
25  think.

Page 93

1    Q.  Do you recall who first contacted you to work
2   on this case?
3    A.  I believe that was Ran Dhindsa.
4    Q.  And you knew that at the time that you were
5   retained, the IARC had classified glyphosate as a 2A
6   carcinogen.  Correct?
7    A.  I don't know what I did or didn't know at
8   that time with -- with regard to glyphosate.
9        I think when I was initially approached, I
10  was asked if I would be able to provide an expert
11  opinion, and I provided Mr. Dhindsa with my CV to ask
12  whether or not it would -- they would be interested in
13  having my opinion.
14   Q.  Um-hum.  And was this CV similar to same as
15  the one we've entered here today as Exhibit --
16   A.  The CV that I sent to --
17   Q.  -- 18-9?
18   A.  Yes.  It would be very -- I mean, this has
19  been updated with the recent publications, but very
20  similar.
21   Q.  And so that CV would not include any articles
22  on glyphosate.  Isn't that correct?
23   A.  I have not published anything on glyphosate
24  specifically.  I've not carried out any -- any
25  experimental studies looking at glyphosate.

Confidential - Pursuant to Protective Order

Page 94

1     Q.   You are aware that IARC classified glyphosate
2  as a 2A, right?
3     A.   I am aware of that, yes.
4     Q.   Were you aware at the time Monsanto
5  approached you to serve as an expert in this case?
6     A.   I may have been aware of it.  I -- I can't
7  say one way or the other.
8     Q.   We have a letter here from your counsel dated
9  August 18, 2016.  That's the initial correspondence
10  between you and the attorney.  And I'll show it to you,
11  just to refresh your recollection, and we'll mark this
12  as Exhibit 18-10.
13          (Foster Deposition Exhibit 18-10 - Dhindsa
14           Letter Dated August 18, 2016 to Dr. Foster -
15           marked for identification.)
16     Q.   Does this letter look familiar to you?
17     A.   So far.  Yes.
18     Q.   Okay.  So, Dr. Foster, this letter shows that
19  you entered into an agreement to provide expert
20  consulting services with Hollingsworth, LLP on behalf
21  of Monsanto Company on August 18, 2016.  Isn't that
22  correct?
23     A.   That's correct.
24     Q.   And on August 18, 2016, sitting here today,
25  you can't recall whether you knew IARC had classified

Page 95

1  glyphosate as a 2A?
2     A.   I can't say that I know one way or the other.
3  I may have known that.
4     Q.   Did you review the IARC monograph for your --
5  for this case?
6     A.   I have, yes.
7     Q.   And to be clear, I'm talking about IARC
8  Monograph 112.
9     A.   Sorry.  Yes, to be clear --
10     Q.   Sorry.
11     A.   -- I have read IARC Monograph 112 --
12     Q.   And did you --
13     A.   -- subsequent to being retained, not before.
14     Q.   So you read it after you were retained.
15     A.   Yes.
16     Q.   And were you asked to read the monograph as
17  part of your expert consulting services by Monsanto
18  lawyers?
19     A.   Yes.
20     Q.   Prior to Monsanto lawyers asking you to read
21  the IARC Monograph 112, you did know that glyphosate
22  had been categorized as a 2A carcinogen, correct?
23          MR. DHINDSA:  Objection.  Asked and answered.
24     A.   As I already answered, I can't state with
25  certainty what I did or didn't know.  I may have known

Page 96

1  that.
2     Q.   Well, prior to receiving IARC Monograph 112,
3  you don't know today whether you knew if the
4  classification was a 2A?
5          MR. DHINDSA:  Objection.  Asked and answered.
6     A.   Again, I don't recall one way or the other
7  what I did or didn't know at that time.
8     Q.   So Monograph 112 could have been the first
9  time that you learned that glyphosate was a 2A.  Is
10  that correct?
11     A.   Again, at the time, I -- I can't say what I
12  knew on August 18th.  I may have known that.
13     Q.   When you entered into the expert consulting
14  agreement with Hollingsworth on behalf of Monsanto, you
15  were aware that Monsanto did not agree with IARC's
16  assessment.  Correct?
17     A.   Sorry, but I -- at the time I entered into
18  the agreement with Hollingsworth, I may have been able
19  to assume that, but I had no idea what Monsanto did or
20  didn't agree with.
21     Q.   Well, your expert consulting -- expert
22  consulting letter marked as Exhibit 18-10 describes
23  that you are to provide expert consulting services for
24  the purpose of assisting Hollingsworth in representing
25  Monsanto in connection with potential or actual

Page 97

1  litigation against Monsanto involving injuries
2  allegedly caused by Roundup and/or glyphosate.  That's
3  correct, right?
4     A.   That's what it says in the letter, yes.
5     Q.   And at the time you signed this letter, you
6  did understand that Hollingsworth was retaining you on
7  behalf of Monsanto --
8     A.   Yes.
9     Q.   -- to write an expert opinion related to
10  glyphosate.  Correct?
11     A.   That's correct.
12     Q.   You are aware today that Monsanto disagrees
13  with IARC's conclusion that glyphosate is a 2A
14  carcinogen, correct?
15     A.   I can deduce that, yes.  I haven't had any
16  direct conversation with anyone from Monsanto, that I
17  am aware of, but, yeah, I can -- I can figure that out.
18     Q.   You haven't read any documents that -- you
19  haven't read any news where Monsanto actively
20  criticizes IARC's 2A classification?  Is that correct?
21     A.   I can't say one way or another if I've seen
22  things like that.  I mean, it's quite likely that over
23  the past year I may have seen a news article or
24  something on CNN or -- or someplace.
25     Q.   How did you first begin researching

25 (Pages 94 to 97)

Confidential - Pursuant to Protective Order

Page 98

1  glyphosate and/or Roundup, as manufactured by Monsanto,
2  in connection with providing an expert opinion in this
3  case?
4      A.  How did I begin to conduct my research?
5      Q.  Correct.  What was the first thing you did?
6      A.  I don't recall what -- the first thing I did,
7  but I can imagine what the first thing I would have
8  done would be to have gone and done a PubMed search.
9      Q.  You didn't do any basic Internet searches to
10  figure out what glyphosate was, seeing as how you've
11  never written on glyphosate before?
12      A.  Internet searches, you mean go on Google?
13      Q.  Yes.
14      A.  I don't believe so, no.  I would have gone to
15  the published literature.
16      Q.  Have you done any research on IARC related to
17  the Monograph 112 and the classification of glyphosate
18  as a 2A carcinogen?
19      A.  Your question is not very clear to me.
20      Q.  I can rephrase.  In preparing to write your
21  expert report --
22      A.  Yes.
23      Q.  -- did you do any research on IARC as it
24  relates to Monograph 112 and the classification of
25  glyphosate as a 2A carcinogen?

Page 99

1      A.  Again, I have trouble understanding exactly
2  what you're asking me.  Did I -- did I investigate who
3  sat on the panel for IARC at 112?  Did I investigate
4  how IARC operated in 112?  Did I investigate what IARC
5  is?  No, I did not do those things.
6      Q.  Did you research Monsanto at all after being
7  retained by Hollingsworth, LLP?
8      A.  Again, the question is very vague, and I
9  don't know exactly what you're asking me.  Did I -- did
10  I seek to find out what chemicals Monsanto makes,
11  where -- you know, who works for Monsanto, any of those
12  things?  No, I did not.
13      Q.  Prior to being retained by Hollingsworth,
14  LLP, did you know that Monsanto manufactured
15  glyphosate?
16      A.  I can't state with certainly whether I knew
17  that or not, but I think I may have known that as just
18  part of general knowledge.
19      Q.  Prior to being retained by Hollingsworth,
20  LLP, did you know whether or not Monsanto manufactured
21  Roundup?
22      A.  I believe prior to being retained, I may have
23  known that glyphosate was the active ingredient in
24  Roundup.
25      Q.  But you didn't know whether manufactured --

Page 100

1  whether it was manufactured by Monsanto.
2      A.  I can't state with a hundred percent
3  certainty that it -- that I knew that it was or wasn't
4  manufactured by Monsanto.  But as part of general
5  knowledge, I think probably.
6      Q.  That's fair.  I understand.
7          Is it your understanding that by entering
8  into this expert consulting services agreement with
9  Hollingsworth, LLP on behalf of Monsanto Company, that
10  you would be advocating for Monsanto's position on
11  glyphosate?
12      A.  No, I don't believe that's the -- the
13  situation, in my understanding.  My understanding is
14  the same level of objectivity I bring to everything
15  that I do, and that is I'm advocating for the data;
16  what does the data say.
17      Q.  And by "data," you mean the three studies
18  that you reviewed and the Greim article.  Correct?
19      A.  I'm stating that for the studies that I
20  reviewed and for the data tables that were presented in
21  Greim.
22      Q.  Okay.  Are you aware that Monsanto posts
23  comments about glyphosate on its website?
24      A.  I don't know that.  I don't know -- I'm sure
25  they have a website, but I've never been to it.

Page 101

1      Q.  Now, Dr. Foster, you served on Monograph 117;
2  isn't that correct?
3      A.  I have served on that -- that panel, yes.
4      Q.  When was that IARC meeting in Lyon?
5      A.  If memory serves, it was in the fall of --
6  was it last fall?
7      Q.  Perhaps October 2016?
8      A.  Yeah.
9      Q.  And do you recall what Monograph 117 was
10  asked to assess; which chemical?
11      A.  We looked at Dieldrin, pentachlorophenol,
12  Aldrin, and T-cab.
13      Q.  And pentachlorophenol, or PCP, is an
14  insecticide and herbicide, isn't it?
15      A.  It was.  I don't believe it's manufactured
16  anymore.
17      Q.  Did you tell anyone in the administration of
18  IARC that you were working for Monsanto relating to
19  Roundup and glyphosate?
20      A.  I do not recall the details of my conflict of
21  interest statement that I submitted to IARC.  I believe
22  I informed them of everything that I felt was relevant
23  and was aboveboard.
24      Q.  Dr. Foster, you are aware that IARC's
25  conflict of interest requires disclosure of employment

26 (Pages 98 to 101)

Confidential - Pursuant to Protective Order

Page 102

1  and consulting activities; isn't that correct?
2      A.  I believe it requires that, yes.
3      Q.  And did you disclosure your consulting
4  agreement with Hollingsworth, LLP, on behalf of
5  Monsanto, with IARC in advance of Monograph 117?
6      A.  I can't say at this time whether I did or did
7  not.
8      Q.  Did you identify your work with Monsanto when
9  you filled out your declaration of interest?
10     A.  I have not done any work with Monsanto.  I
11 didn't --
12     Q.  Did you identify your work with Monsanto when
13 you filled out the declaration of interest with IARC?
14     A.  Again, I have not been employed by Monsanto,
15 I have not worked for Monsanto.
16     Q.  Dr. --
17     A.  I was obtained by Hollingsworth.
18     Q.  Yeah, but, Dr. Foster, this resulting
19 agreement [sic] says "on behalf of Monsanto Company".
20 You don't appreciate that to mean that Monsanto is
21 paying your bills?
22     A.  I believe that I filled out the conflict of
23 interest statement, to the best of my knowledge, as
24 honestly as I could.
25     Q.  Okay.  My question, though, actually was:

Page 103

1  The -- this exhibit, Exhibit 18-10, does, in fact,
2  state that you are doing consulting services on behalf
3  of Monsanto Company, does it not?
4      A.  It states that I am consulting to
5  Hollingsworth on behalf of Monsanto.
6      Q.  And doesn't that mean that you are employed
7  by Monsanto Company?
8      A.  I don't interpret it that way, no.
9      Q.  So you believe you're employed by
10 Hollingsworth, LLP?
11     A.  I don't believe I'm employed by Hollingsworth
12 either.  I believe I'm being compensated for my time.
13     Q.  Dr. Foster, what are the checks made out
14 to -- what are the checks payable to, to pay for your
15 time in this case?
16     A.  They're paid to my consulting company, Tech
17 Tox Consulting.
18     Q.  Does your consulting company pay taxes?
19     A.  It does, yes.
20     Q.  And so you pay taxes because you received
21 compensation for your services; is that correct?
22     A.  Compensation for the time put in on the
23 product, yes.
24     Q.  And as you sit here today, you don't believe
25 that is employment; is that correct?

Page 104

1      A.  Again, I come back to the point that I'm
2  being compensated for the time I put in to provide an
3  expert opinion as a scientist.
4      Q.  And you don't consider that employment; is
5  that correct?
6          MR. DHINDSA:  Objection.  Asked and answered.
7      A.  I don't believe to be -- myself to be
8  employed by Hollingsworth or by Monsanto.
9      Q.  So you believe --
10     A.  I'm being compensated for my time.
11     Q.  Do you believe Tech Tox Consulting to be
12 employed by Monsanto or Hollingsworth?
13     A.  No, I do not.  I think we are being
14 compensated for our time.
15     Q.  Did you disclose whether Tech Tox
16 Consulting -- did you disclose to IARC on your
17 declaration of interest that Tech Tox Consulting was
18 being paid by Monsanto in advance of Monograph 117?
19     A.  I cannot state today what I did or did not
20 put on my confidential -- my conflict of interest
21 statement to IARC.
22     Q.  Well, did you disclose to IARC that you were
23 being compensated for your time by Monsanto?
24         MR. DHINDSA:  Objection.  Asked and answered.
25     A.  Again, I don't recall what I did or did not

Page 105

1  put on, however, that in our
2          I would point out, however, that in our
3  review, we -- including my writeup for IARC, that we
4  concluded that Dieldrin, Aldrin, and pentachlorophenol,
5  the compounds that I was charged with looking at, were
6  all rated as carcinogenic.
7      Q.  And as you have pointed out for the record,
8  they're all banned and not sold in the United States.
9  Isn't that true?
10         MR. DHINDSA:  Objection.  Misstates
11     testimony.
12     A.  I -- my knowledge is, is that they're no
13 longer produced.
14     Q.  So it follows logic that because they've been
15 banned for several years, they would be a carcinogen.
16 Isn't that correct?
17         MR. DHINDSA:  Objection.
18     A.  Not necessarily, no.  They may have been
19 banned for other reasons.
20     Q.  But in this instance, they were banned
21 because they were carcinogenic; isn't that correct?
22         MR. DHINDSA:  Objection.
23     A.  I don't know that to be the case.
24     Q.  So you agree that if you did not disclose
25 Tech Tox Consulting being paid for its time or you

27 (Pages 102 to 105)

Confidential - Pursuant to Protective Order

Page 106

1  individually being paid for your time from Monsanto or
2  Hollingsworth, that IARC had no way to know that you
3  were working for Monsanto at the time you sat on
4  Monograph 117.
5       MR. DHINDSA:  Objection.
6       Q.  Isn't that right?
7       MR. DHINDSA:  Objection.
8       A.  Again, I think that mischaracterizes the
9  point.  I'm being compensated for the time that I put
10  in.  And, again, in all three compounds that I was
11  charged to look at, we all came to the conclusion that
12  they were carcinogenic.
13       Q.  Okay.  And the question was:  You agree that
14  if you did not disclose your consulting arrangement
15  with Hollingsworth on behalf of Monsanto, IARC had no
16  way of knowing in October of 2016, when you sat on
17  Monograph 117, that you were, in fact, doing work for
18  Monsanto.
19       MR. DHINDSA:  Objection.
20       Q.  Isn't that right?
21       MR. DHINDSA:  Objection.  Asked and answered.
22       Repeatedly.
23       A.  Prior to my signing this agreement on
24  October 18th, my review for IARC and the information
25  had already been written well in advance and submitted

Page 107

1  to IARC.  The panel meeting took place in October.
2       Q.  So you don't have any obligation in advance
3  of a meeting to disclose any -- any new conflicts of
4  interests, real or perceived, that appear in advance of
5  you sitting on a monograph panel?
6       MR. DHINDSA:  Objection.
7       Q.  Is that your testimony?
8       A.  Had I come to a conclusion that these
9  compounds were not carcinogenic, I -- I may have
10  thought to bring it up at that point.  But because we
11  arrived at the conclusion, I did not see it being
12  relevant.
13       Q.  But, Dr. Foster, you were engaged by
14  Hollingsworth, LLP months in advance of October 2016.
15  So it's only relevant if you would come to an adverse
16  decision?  Is that what your testimony is?
17       MR. DHINDSA:  Objection.
18       A.  No.  Again, I am saying that when I was first
19  consulted by IARC, I was not retained by Hollingsworth.
20  My review of the chemicals Aldrin, Dieldrin, and and --
21  pentachlorophenol was conducted, submitted to IARC
22  prior to that time.
23       Q.  When did you submit your review to IARC prior
24  to October 4th through 11th of 2016 for Monograph 117?
25       MR. DHINDSA:  Objection.

Page 108

1       A.  I can't say with certainty when it was
2  submitted.  There was back-and-forth.
3       Q.  And had you concluded that these three
4  chemicals that were subject of Monograph 117 were not
5  carcinogens, then you would have disclosed your
6  consultancy arrangement with Monsanto and
7  Hollingsworth?  Is that correct?
8       MR. DHINDSA:  Objection.
9       A.  Your -- your question is if I had -- if I
10  felt in my mind they were not carcinogens, I would have
11  disclosed?
12       Q.  I thought that's what your testimony was,
13  Dr. Foster.
14       A.  Is that what you're asking me?
15       Q.  I thought that was what your testimony was,
16  Dr. Foster.
17       A.  I believe if there was question in my mind
18  and uncertainty, then I would have disclosed.
19       Q.  So you knew there was a duty to disclose a
20  conflict of interest to IARC in advance of sitting on
21  Monograph 117.  Isn't that correct?
22       MR. DHINDSA:  Objection.
23       A.  Again, in -- in participating with IARC, I
24  believe I had conducted myself properly and had
25  informed them, to the best of my knowledge, what my

Page 109

1  consulting agreements were and weren't at that time.
2       Q.  Isn't it true that the IARC standard is to
3  update your declaration of interest in advance of
4  sitting on a monograph panel, Dr. Foster?
5       MR. DHINDSA:  Objection.
6       A.  I don't know what it is, to be honest.
7       Q.  You didn't read the IARC preamble?
8       A.  I have read the IARC preamble.  I don't
9  recall what it states on this issue right now.
10       Q.  But, in any event, you did not update your
11  declaration of interest and submit it to IARC after you
12  signed this agreement with Hollingsworth and Monsanto
13  on August 18, 2016; is that correct?
14       MR. DHINDSA:  Objection.  Asked and answered.
15       A.  I stand by the question I've asked --
16  answered.  Or the answer I --
17       Q.  You can't stand by his objection, Dr. Foster.
18       A.  No, I stand by the answer I have given.
19       Q.  That you did not disclose the conflict of
20  interest to IARC after you signed this agreement with
21  Hollingsworth and Monsanto on August 18, 2016.
22       MR. DHINDSA:  Same objection.
23       A.  And as I've stated, I informed them, to the
24  best of my ability, of what I thought was relevant.
25       Q.  Okay.  My question isn't what you thought was

28 (Pages 106 to 109)

Confidential - Pursuant to Protective Order

Page 110

1 relevant. My question is what you did.
2 　　　MR. DHINDSA: Same objection.
3 　　　A. And I answered to the best of my ability.
4 　　　Q. And you did not disclose your relationship
5 with Hollingsworth and Monsanto after you entered into
6 the agreement on August 18, 2016 to IARC. Isn't that
7 correct?
8 　　　MR. DHINDSA: Objection. Asked and answered.
9 　　　A. As I stated, I provided all the information
10 that I felt could represent a real or perceived
11 conflict of interest. I did not see this as a real or
12 perceived conflict of interest.
13 　　　Q. Is that your determination to make, or is it
14 IARC's?
15 　　　A. They asked me to fill out the conflict of
16 interest, and I filled it out to the best of my
17 understanding and ability at the time.
18 　　　Q. And that you did not resubmit the conflict of
19 interest after you entered into this agreement with
20 Monsanto and Hollingsworth. Is that correct?
21 　　　MR. DHINDSA: Objection.
22 　　　A. I did not resubmit another conflict of
23 interest statement. I believed what I had already
24 submitted was adequate.
25 　　　Q. Did you tell any of your fellow working group

Page 111

1 participants that you were working for Monsanto
2 relating to Roundup and glyphosate while you were at
3 Monograph 117?
4 　　　A. The issue never came up, to my knowledge.
5 　　　Q. Do you think the IARC administrators had a
6 right to know you were working for Monsanto in
7 connection with Roundup and glyphosate?
8 　　　MR. DHINDSA: Objection.
9 　　　A. I didn't consider it to be relevant, in view
10 of the position that I held on these chemicals.
11 　　　Q. Do you consider it relevant today?
12 　　　MR. DHINDSA: Objection.
13 　　　A. No, I do not.
14 　　　Q. Are you aware, Dr. Foster, that Monsanto is
15 engaged in a campaign to defund IARC?
16 　　　MR. DHINDSA: Objection.
17 　　　A. I have no knowledge of that.
18 　　　Q. Would you find it relevant to disclose your
19 consulting arrangement had you known that?
20 　　　MR. DHINDSA: Objection.
21 　　　A. That's asking me to speculate. I have no
22 idea, A, that it's happening, or, B, what the
23 rationale, if any, there is.
24 　　　Q. Okay, Dr. Foster, let's look at your billing
25 records.

Page 112

1 　　　MS. ROBERTSON: Counsel, I'll represent for
2 the record that these were sent as three
3 separate PDFs. We put them all in one
4 exhibit, rather than doing single pages.
5 This is Foster Exhibit 18-11.
6 　　　(Foster Deposition Exhibit 18-11 - Billing
7 　　　records for Tech Tox Consulting - marked for
8 　　　identification.)
9 　　　Q. Okay. So on August 2nd, 2016, you billed 1.5
10 hours for review of IARC document, General plus mice,
11 Pages 1 through 35.
12 　　　A. I see that, yes.
13 　　　Q. All right. And that's your third entry in
14 your relationship with Hollingsworth and Monsanto.
15 Correct?
16 　　　A. Correct.
17 　　　Q. On August 16, you billed two hours for review
18 of IARC document general, plus rat, Pages 35 to 92.
19 Right?
20 　　　A. Yes.
21 　　　Q. And this review was conducted just months
22 before the IARC meeting of Monograph 117. Right?
23 　　　A. That's correct.
24 　　　Q. Then if we go to the second page, on
25 October 15, 2016, you've billed two hours for IARC

Page 113

1 guidelines for conducting a review. Do you see that?
2 　　　A. Yes.
3 　　　Q. And that was only four days after the end of
4 the IARC meeting in Lyon, France, which you sat on for
5 Monograph 117. Isn't that correct?
6 　　　A. That's correct.
7 　　　Q. So immediately upon return from Lyon, France
8 in your service on IARC 117, you returned to work on
9 behalf of Monsanto. Isn't that correct?
10 　　　A. I returned to work and reviewed materials for
11 Hollingsworth.
12 　　　Q. And Hollingsworth and you entered into an
13 agreement on behalf of Monsanto. Isn't that correct?
14 　　　A. That's correct.
15 　　　Q. Then if we look at the third page, the first
16 entry, October 19, 2016, you again billed three hours
17 for IARC guidelines for conducting your review.
18 　　　A. Yes.
19 　　　Q. And, again, that's just days after you served
20 on an IARC monograph; isn't that correct?
21 　　　A. That would be correct.
22 　　　Q. Did you use info you gained at Meeting 117 in
23 your review for the IARC guidelines?
24 　　　A. Sorry; what was the question? I missed the
25 first part.

29 (Pages 110 to 113)

Confidential - Pursuant to Protective Order

Page 114

1    Q.  I'm sorry.  Did you use any of the knowledge
2  you gained from serving on Monograph 117 for reviewing
3  the IARC guidelines in connection with your work for
4  Hollingsworth on behalf of Monsanto?
5        MR. DHINDSA:  Objection.
6    A.  I don't know how to answer that.
7    Q.  Did Monograph 117 include review of
8  guidelines for conducting an IARC review?
9    A.  Did -- did the 117 panel meeting involve
10  looking at the --
11    Q.  Apologies.  I'll rephrase.
12        When you worked on the IARC Monograph 117,
13  did you review IARC guidelines for conducting review?
14    A.  On the first day, I believe it was something
15  that would have been presented.
16    Q.  But you didn't do it before.  Is that
17  correct?
18    A.  Before going to the meeting?
19    Q.  Correct.
20    A.  I may have read them before going to the
21  meeting.
22    Q.  Okay.  And as part of these guidelines,
23  doesn't IARC ask invited panelists to honestly disclose
24  any conflict or perceived conflict of interest, so that
25  IARC can decide whether its panelists should serve in

Page 115

1  the subgroups?
2        MR. DHINDSA:  Objection.
3    A.  I believe that's in the guidelines, yes.
4    Q.  But you didn't give IARC the opportunity to
5  make the decision, because you failed to disclose your
6  work on behalf of Monsanto.  Isn't that correct?
7        MR. DHINDSA:  Objection.
8    A.  Again, coming back to the issue of looking at
9  Aldrin, Dieldrin, and pentachlorophenol, I did not see
10  a conflict of interest.
11        (Discussion held off the record.)
12    Q.  Hypothetically, had you known that Monsanto
13  was engaged in a campaign to defund IARC before the
14  Lyon meeting for Monograph 117, do you think you would
15  have been obligated to inform IARC that you were
16  retained by Hollingsworth on behalf of Monsanto related
17  to Roundup and glyphosate litigation?
18        MR. DHINDSA:  Objection.
19    A.  Hypothetically speaking, if I knew that
20  Hollingsworth -- or, sorry, that Monsanto was involved
21  in a campaign to defund --
22    Q.  Correct.
23    A.  -- would I then have disclosed a conflict of
24  interest?
25    Q.  Would you have felt you would have been

Page 116

1  obligated to inform IARC that you had been retained by
2  Hollingsworth on behalf of Monsanto for Roundup and
3  glyphosate litigation?
4        MR. DHINDSA:  Objection.
5    A.  I have no knowledge that Monsanto is involved
6  in such activity.  But hypothetically speaking, if I
7  was involved in a meeting with IARC, and Company X is
8  acting in a manner to defund or -- I would have to
9  understand and know what the reasons were, to
10  re-evaluate my position in either direction.
11    Q.  And what if your research showed that the
12  Company X sought to defund IARC for an adverse opinion,
13  in their respect, to a chemical classified as a 2A?
14        MR. DHINDSA:  Objection.
15    A.  If the Company X is taking a position because
16  they had an opinion that was contrary to what they
17  wanted, what would I do?  I think, again, that I would
18  need a lot more information around the situation of why
19  they've adopted that position.
20    Q.  So Company X -- IARC reviewed a chemical
21  that's manufactured by Company X.  IARC determines the
22  chemical manufactured by Company X is a carcinogen.
23  You subsequently sit on an IARC panel unrelated to
24  Company X, but in your unrelated work, you are retained
25  as an expert for Company X.  When Company X engages in

Page 117

1  a campaign to defund IARC, should you not tell IARC,
2  even if your work with IARC is unrelated to Company X?
3        MR. DHINDSA:  Objection.
4    A.  I think I need a lot more information on
5  that.  The -- the situation -- you know, there -- there
6  might by many reasons why.  There -- there might be
7  legitimate reasons why they might adopt that position
8  that I -- that I have no knowledge of.
9    Q.  So as you sit here today, just association
10  between consulting work with -- as you sit here today,
11  your interpretation of what you must disclose on a
12  declaration of interest is subjective, in your view.
13        MR. DHINDSA:  Objection.
14    A.  No, I'm saying that there's -- it's a complex
15  issue.  And you're asking me to -- to adopt a
16  hypothetical situation where I have very limited
17  information, that I can't make a decision about.
18        I would need to know what the -- why Company
19  X has adopted the position, what the issues are.  Are
20  they -- are they meritus, are they not meritus.  I
21  would need to know what the IARC process was and what
22  their -- their conclusions and what they were -- why
23  they came to their conclusion.  And I would also have
24  to take a look at what I was consulting the company
25  for.  It might be minimal.  Trivial.

Confidential - Pursuant to Protective Order

Page 118

1      Q.   Okay.  So you filled out the declaration of
2   interest to the best of your ability and to the best of
3   your knowledge, and you feel like you did that
4   accurately, as you sit here today.
5          MR. DHINDSA:  Objection.
6      A.   Again, I believe that I did it accurately.
7          MS. ROBERTSON:  Okay, thank you.  Let's break
8       for lunch.
9          MR. GOODALE:  This marks the end of Media
10      No. 2 in the deposition of Dr. Warren G.
11      Foster, Ph.D.  Going off the record at
12      12:35 p.m.
13      (Recess held.)
14         MR. GOODALE:  Here begins Media No. 3 in the
15      deposition of Dr. Warren G. Foster, Ph.D.
16      We're back on the record at 1:26 p.m.
17  BY MS. ROBERTSON:
18     Q.   Okay.  Dr. Foster, earlier you testified that
19   you've done several animal studies; conducted,
20   directed, overseeing, et cetera.  Correct?
21     A.   Yes.
22     Q.   And is it true that all of those studies
23   relate to reproductive health issues?
24     A.   As I stated previously, no.  Some of those
25   studies were also involving cancer.

Page 119

1      Q.   Have you done any studies that relate to
2   pesticides in association with cancer?
3      A.   Yes.
4      Q.   And can you please look at your CV for us and
5   identify which of those studies relate to animal
6   studies.
7      A.   No. 43 is one.
8      Q.   And what page are you looking on in your CV?
9      A.   That is Page 75.
10     Q.   And what -- does this deal with a pesticide?
11     A.   No.  Sorry.  Let me just check.  That one did
12   not, no.
13     Q.   And with your research here on the mammary
14   gland differentiation, was that related to a
15   reproductive health issue?
16     A.   I'm sorry; where are you?
17     Q.   I'm still on 43.
18     A.   That was on mammary gland differentiation,
19   yes.
20     Q.   And does that relate to reproductive health
21   issues?
22     A.   It relates to cancer.  It's -- mammary gland
23   is hormonally dependent, but it's not part of the
24   reproductive tract.
25     Q.   Okay.  So women's health issues?

Page 120

1      A.   Yeah.
2      Q.   Okay.
3      A.   64, 65.
4      Q.   Do either 64 or 65 deal with a pesticide or a
5   chemical?
6      A.   64 is dealing with dieldrin, which is a
7   pesticide.  65 is dealing with a dietary supplement.
8      Q.   And so with 64 and 65, the research is
9   related to transgenic mice?
10     A.   It's involving transgenic mice, yes.
11     Q.   And are transgenic mice used in the data set
12   that you reviewed for glyphosate?
13     A.   Transgenic mice were not used in the data set
14   that I'm looking at.
15     Q.   And were the transgenic mice used in your
16   Study 64 and 65 because you were looking for a specific
17   observed effect that could be induced by the transgenic
18   mice?
19     A.   Sorry; I don't understand the question.
20     Q.   Why did you choose transgenic mice for these
21   two studies?
22     A.   Because we were looking at mechanism.
23     Q.   And these transgenic mice were known to be
24   good study subjects for the mechanism.  Correct?
25     A.   Correct.

Page 121

1      78.
2      Q.   And that's the Dieldrin again?
3      A.   Yes.
4      Q.   And what was the purpose behind this study?
5      A.   We were looking again at mechanism.
6      Q.   And for the -- how mechanism -- or how breast
7   cancer may be caused by Dieldrin, correct?
8      A.   We were looking, at this case, of how
9   Dieldrin is involved in a process that may be important
10   in cancer.
11     Q.   In breast cancer.
12     A.   And in this case, it applies to breast
13   cancer, but the process is not limited to breast
14   cancer.  It's in -- it's in development, it's in many
15   different kinds of cancers.
16     Q.   Was this study on 78 limited to breast
17   cancer?
18     A.   The focus was breast cancer.
19      99.
20     Q.   Did 99 look at a pesticide?
21     A.   99 was a study that looked at a number of
22   different chemicals, if I remember correctly.
23   Pesticides, if I remember correctly, were included.
24     Q.   Herbicides?
25     A.   I couldn't tell you for sure if they were or

Confidential - Pursuant to Protective Order

Page 122

1  were not included at that time.
2      Nos. 121 and 122 involve complex mixtures of
3  which there were pesticides, and there were tumors that
4  were looked at in those as well.
5      Q.  And the purpose was to not look at cancer,
6  though.  It was to look at systemic, immune, and
7  reproductive effects.  Correct?
8      A.  Correct.
9      138 is a tissue culture assay with my
10 colleague, Diane Desaulniers, from Health Canada, where
11 we were looking at a breast cancer cell line, and we
12 were looking at pesticides and other chemicals there as
13 well.
14     So on a quick review of the literature, those
15 are the ones that jump out at me.
16     Q.  So it's fair to say, Dr. Foster, that the
17 majority, if not most of your studies related to
18 animals deal with reproductive health and not the
19 chemical and potential association with cancer.  Is
20 that correct?
21     A.  I think it's fair to say that my work has
22 focused on chemical exposure and its impact upon animal
23 reproductive health.
24     Q.  But the majority of your articles aren't
25 looking at chemical exposure.  Or studies, rather.

Page 123

1  Isn't that correct?
2      A.  Sorry.  Say that again.  The majority --
3      Q.  Of these articles are not looking at the
4  chemical effect and the potential to cause cancer.  Is
5  that correct?
6      A.  The majority of these studies are looking
7  at -- are conducted in animal studies using
8  environmental contaminants to look at effects on target
9  organs, mostly of which are in the reproductive tract.
10     Q.  Okay.  Dr. Foster, if we could look at Page
11 59 of your CV.  And you offer Areas of Research
12 Interest.
13     A.  Yes.
14     Q.  Okay.  And is this still -- are these three
15 categories -- No. 1, reproductive epidemiology in
16 biomonitoring; No. 2, reproductive and development
17 toxicity and carcinogenicity of environmental and
18 dietary chemicals; and, No. 3, the cellular and
19 molecular mechanisms of endometriosis -- still your top
20 three research interests, as you sit here today?
21     A.  Yes.
22     Q.  Dr. Foster, if we could go to Page 22 of your
23 expert report, which focus on the Atkinson study,
24 please.
25     A.  (Witness complies.)  Page 22, you said?

Page 124

1      Q.  Yes, please.
2      A.  I'm there.
3      Q.  Okay.  And for the Atkinson study, do you
4  recall whether you reviewed the raw study data in
5  assess -- in evaluating the study for your expert
6  opinion?
7      A.  I don't -- I can't say one way or another.  I
8  believe what I was using in this case were the Greim
9  tables.
10     Q.  Okay.  And so in this instance, again, you
11 offer the low, mid, and high dose groups using
12 milligrams per kilogram per day.  Correct?
13     A.  Those were the dose levels used, yes.  In
14 milligrams per kilogram.
15     Q.  Right.  And you do agree that there was a
16 significant trend in hemangiosarcomas seen in high dose
17 group males.  Correct?
18     A.  I note that there was a significant trend for
19 hemangiosarcomas in the high dose group males.
20     Q.  And yet you discount that trend.  Correct?
21     A.  When you say I "discount", what do you mean?
22     Q.  You found a -- you determined that the trend
23 was not significant, based on other literature review.
24 Correct?
25     A.  "Significant" refers to a statistical

Page 125

1  determination.  Do you mean important?
2      Q.  The significant trend seen that's noted in
3  your expert report, does that factor into your
4  conclusion that the tumors are not treatment-related?
5      A.  What I see is there was a statistically
6  significant trend for hemangiosarcomas.  That's not the
7  end of the interpretation of the study, but, rather,
8  the beginning.  So I looked at that.
9      Q.  Okay.  But for your analysis on the Atkinson
10 study, it does begin with a discussion of
11 hemangiosarcomas only.  Correct?
12     A.  I don't know what you mean by "only".
13     Q.  You start with -- you're right.  You start
14 with hemangiosarcomas in looking at the Atkinson data,
15 correct?
16     A.  I start by describing the study, and then
17 I -- one of the tumors here that I discuss is
18 hemangiosarcomas, where I note that a significant trend
19 was found.
20     Q.  Okay.  And do you recall, as you sit here
21 today, what the numbers are that support that
22 significant trend?  You note that there are four of
23 45 -- that four hemangiosarcomas in 45 are found in the
24 high dose group males only.  Do you have the numbers
25 for the control, low, or mid dose groups?

Confidential - Pursuant to Protective Order

Page 126

1    A.  Sorry, I do not have the numbers before me.
2    Q.  Okay.  Well, let's take a -- a compare here
3  and look at Dr. Portier's report on Page 39, Table 10.
4  Do you see Dr. Portier's table, Dr. Foster?
5    A.  I see his table, yes.
6    Q.  Do you have any reason to dispute the
7  accuracy of the numbers in Table 10 of Dr. Portier's
8  report?
9    A.  I have no reason to either agree, nor
10  disagree with them.
11    Q.  Your expert report is consistent to show four
12  of 45 lesions in the high dose group.
13    A.  Sorry, I see four of 50.  On Page 10?
14    Q.  Yes.
15    A.  Or, sorry, Page 39, Table 10.
16    Q.  Yes.
17    A.  Hemangiosarcomas in the high dose group?
18    Q.  Yes.
19    A.  Males only.
20    Q.  Yes.
21    A.  He's got it reported as four of 50, not 45.
22    Q.  And where does your number 45 come from?
23    A.  I thought that's what you just finished
24  saying.
25    Q.  It's on Page 22 of your expert report.  You

Page 127

1  observe a significant trend of hemangiosarcomas with
2  four of 45 lesions found in the high dose group of
3  males.
4    A.  Okay.  If that's there, I most likely
5  obtained that from the Greim summary table.
6    Q.  But you do acknowledge that at the beginning
7  of the -- your analysis here in Atkinson, when you
8  describe the study, there were 50 animals in each dose
9  group.  Correct?
10    A.  I -- as I reported, yes.
11    Q.  Okay.  So why have you used only 45 as the
12  denominator for the high dose group?
13    A.  I would have to see the Greim table in order
14  to be able to -- to answer that question properly.
15    Q.  Is it fair to say that you think you got the
16  information from the Greim table?
17    A.  As I've just finished stating previously, I
18  believe I relied upon the Greim table for that
19  information.
20    Q.  Okay.  Do you know whether there were any
21  hemangiosarcomas found in the male control group for
22  the Atkinson study?
23    A.  Hemangiosarcomas in the control group.  I see
24  zero.
25    Q.  Do you have any reason to dispute the number

Page 128

1  reported by Dr. Portier on Page 39?
2    A.  I see no reason to agree, nor disagree with
3  it.
4    Q.  Dr. Foster, your report is unclear as to
5  whether there were any hemangiosarcomas reported in the
6  male control group.  So in explaining your analysis,
7  isn't it important to report on the hemangiosarcomas in
8  the control group?
9    A.  I'm not sure what it is you're asking there.
10    Q.  Isn't it true that the hemangiosarcomas seen
11  in the Atkinson study in the male mice should be
12  controlled -- compared against the concurrent controls;
13  thus it should be included in your report?
14    A.  By citing the paper, I'm citing what they
15  found.  I didn't -- did I write out zero of 50, zero of
16  50, zero of 50, four of 50 -- four of 50 or four of 45?
17  No, I did not write that out.
18    Q.  When you conducted your analysis, did you
19  consider the control group?
20    A.  Yes.
21    Q.  And you explain on Page 23 that the tumors
22  were not detected in a statistically significant trend
23  in male mice and other appropriately conducted
24  bioassays.
25    So what I'm trying to understand here is what

Page 129

1  your statistically significant trend is and whether
2  you've used the concurrent controls to calculate a
3  significant trend to compare against other studies.
4    A.  So you're reading the top sentence on
5  Page 23?
6    Q.  I'm actually trying to figure out as a whole,
7  Dr. Foster, how -- what your conclusion was, related to
8  the significant trend you noted in the Atkinson study.
9    A.  Sorry.  I don't understand your question.
10    Q.  Are the hemangiosarcomas seen in the male
11  mice in the Atkinson study dose-related?
12    A.  I am saying that according to the analysis
13  conducted, whether it was -- the four of 45 or four of
14  50, there was a statistically significant trend.
15    Q.  And is that the result of a dose
16  relationship?
17    A.  It's the result of the high -- the number in
18  the high dose group only.  But is that a dose-related
19  trend?
20    Q.  Correct.
21    A.  Yeah, I guess you could call that a
22  dose-related trend.  It's a -- a significant effect at
23  a high dose.
24    Is it a trend to -- a significant trend,
25  dose-related trend, zero, zero, zero, four, I don't see

33 (Pages 126 to 129)

Confidential - Pursuant to Protective Order

Page 130

1    it as a trend, because you're not getting an increasing
2    line, but you're getting dose-significant effect.
3        Q.   Okay.  So you call it a dose-significant
4    effect, but because we can't apply a linear model,
5    it -- it isn't a positive linear trend?  Is that what
6    you're saying?
7        A.   I stand by my report, where I say there was a
8    significant trend in hemangiosarcomas.
9        Q.   But you also --
10       A.   That was only found in the high dose group.
11       Q.   But you ultimately find that this is a
12   negative study.  So I'm trying to under --
13       A.   Ultimately, yes.
14       Q.   I'm trying to understand how you dismiss or
15   how you go about dismissing the significant trend you
16   noted in the hemangiosarcomas in the male mice.
17       A.   I don't dismiss.  I look at the entire study,
18   and I evaluate the overall study.  And in this
19   particular case, you've got tumors that are --
20   hemangiosarcomas in mice.
21          Now, I know that these are rare in humans.
22   They're also relatively rare in rats.  But in mice
23   these are not an uncommon tumor.
24       Q.   And you cite to the Elwell 2004 article for
25   that?

Page 131

1        A.   I do.
2        Q.   And when did you review the Elwell 2004
3    article?
4        A.   During the conduct of my background reading
5    for this report.
6        Q.   And did you -- have you reviewed the -- have
7    you reviewed the Elwell 2004 article recently in
8    preparation for your deposition?
9        A.   I have not reviewed any -- I have not
10   reviewed most of the papers that are on my Materials
11   Cited list recently.
12       Q.   Do you have a copy of the Elwell article?
13       A.   I'm sure I have a copy somewhere in my
14   records, yes.
15       Q.   Did your lawyers ask you to provide a copy of
16   that article?
17       A.   Yes, they did.
18       Q.   And did you provide a copy of that article?
19       A.   When I got asked for the article, I had
20   already left the office and was on my way here.
21          Now, I have prepared my expert report,
22   reviewed the literature in my home office here, in my
23   university office, as well as my -- my residence in
24   Florida, as well, as well as going into libraries and
25   so forth.  I know I have accessed the paper.  I don't

Page 132

1    know where that paper is at present.  And given the
2    short time frame that I had, I did not have the
3    opportunity to scour all my -- my file -- files to
4    provide that.
5        Q.   And so you don't have a copy of the article
6    electronically.
7        A.   I did not have access to one electronically.
8        Q.   Did you make a copy of the article for your
9    own personal use?
10       A.   I cannot recall whether I made a copy or just
11   made notes.
12       Q.   So you actually don't know if you have the
13   article.  Is that what you're saying?
14       A.   What I'm saying is this is a publicly
15   available article that has been published.  I don't --
16   I can't say with a hundred percent certainty that I
17   have a copy of the article.  I may have read the
18   article and simply made notes from it.
19       Q.   Okay.  So, previously, you misspoke when you
20   said you had a copy, but you had left the office on
21   your way here, and so you couldn't give it to your
22   lawyers.  You actually don't know if you have a copy;
23   is that right?
24          MR. DHINDSA:  Objection.  Mischaracterizes.
25       A.   With a hundred percent certainty, without

Page 133

1    going through my files and sitting down, I can't say, a
2    hundred percent certainty, I do or don't.  I know I
3    have read the paper.
4          (Discussion held off the record.)
5        Q.   Okay.  So, yeah, you did, Dr. Foster,
6    identify that this paper is publicly available.  So did
7    you access it through PubMed?
8        A.   It's listed in PubMed.
9        Q.   Um-hum.
10       A.   But did -- what do you mean by "did I access
11   it in PubMed"?
12       Q.   Did you obtain it from having a subscription
13   to PubMed and being able to pull the article
14   electronically after you ran your search on the
15   computer?
16       A.   No, I did not.
17       Q.   So you had to go and find the article.  Is
18   that correct?
19       A.   That's correct.
20       Q.   Okay.  So it's publicly available in
21   published form; hard copy only.  Is that correct?
22       A.   I don't know if that's true or not.  I know
23   that I didn't get it off the net.
24       Q.   Okay.  So in your instance, your PubMed
25   search led you to the article, and you then sought to

34 (Pages 130 to 133)

Confidential - Pursuant to Protective Order

Page 134

1  find the hard copy, because you couldn't find it
2  online.  Is that right?
3      A.  I believe that's correct.
4      Q.  And do you remember where you found the hard
5  copy of this article?
6      A.  The hard copy?  The textbook is available at
7  the University of Guelph in the main library.
8      Q.  Okay.  So is it a textbook or is it an
9  article?
10      A.  It's a book chapter, I believe.
11      Q.  Do you remember how long the article was?
12      A.  Not off the top of my head, no.  I don't
13  remember how long any of the articles were.
14      Q.  Do you --
15          (Discussion held off the record.)
16      Q.  Do you recall the mice that were the subject
17  of the Elwell article?
18      A.  Not right off the top of my head, but I think
19  they were the CD-1, but I'm not sure.
20      Q.  Well, it would be pretty important that
21  they're CD-1, wouldn't it be, Dr. Foster?
22      A.  Probably, yeah.
23      Q.  The Atkinson study was done with CD-1 mice,
24  correct?
25      A.  Yes, I believe that is correct

Page 135

1      Q.  And it's true that common neoplasms in mice
2  different -- or differ based on strain.  Isn't that
3  correct?
4      A.  They can, yes.
5      Q.  So Elwell, in order to be an appropriate cite
6  here, needs to be discussing CD-1 mice.  Isn't that
7  correct?
8      A.  The Elwell paper would.  However, it's not
9  the only paper that I -- I have on my Materials Cited
10  list that goes to this point.
11      Q.  That goes to the hemangiosarcomas -- or
12  sarcomas are common neoplasms in mice?
13      A.  In mice, yes.
14      Q.  Okay.  If you can direct me to additional
15  support.  See if those are CD-1 mice.
16      A.  I believe it's the Cohen reference.  No. 29.
17      Q.  And you believe that the Cohen reference
18  includes CD-1 mice?
19      A.  I believe it does, yes.
20      Q.  The title says "Hemangiosarcoma in Rodents".
21      A.  Correct.
22      Q.  For your discussion on the hemangiosarcomas,
23  you note that the hemangiosarcoma of four and 45 at an
24  incidence of 8.9 percent in the high dose group males
25  falls within the historical ranges reported by Giknis

Page 136

1  and Clifford 2000.  Correct?
2      A.  I note that, yes.
3      Q.  Why did you choose to apply historical
4  control data when you had current controls you could
5  have discussed?
6      A.  Because when I'm looking at the concurrent
7  controls, I see zero out of 50, and I have data here
8  that says that hemangiosarcomas in the CD-1 mice are
9  not uncommon.  They're not rare.  And so I'm asking the
10  question, is not finding them at all in the -- in the
11  low dose -- or the control group, I'm asking whether or
12  not the study is a reliable study.
13      Q.  But isn't it true, Dr. Foster, that the
14  concurrent control group is the first choice when
15  comparing studies?
16      A.  I agree.  It's one that I would weigh -- or
17  look at in my assessment.
18      Q.  But you don't assess the concurrent controls
19  in this study.
20      A.  I didn't say that.  I look at concurrent
21  controls, I look at historical controls.
22          Again, it's not where you'd look at just one
23  thing.  You look at it in balance.
24      Q.  Okay.  You don't evaluate the
25  hemangiosarcomas in the male mice against the

Page 137

1  concurrent controls in the Atkinson study, at least
2  within the Pages 22 and 23 of your expert report.
3  Isn't that correct?
4      A.  I don't know what you mean by I didn't -- I
5  don't evaluate or I don't consider it.
6      Q.  Dr. Foster, do you discuss the concurrent
7  controls related to hemangiosarcomas in Pages 22 and 23
8  in your expert report related to Atkinson?
9      A.  I don't explicitly state that the concurrent
10  controls were zero of 50.  That doesn't mean I didn't
11  consider it in coming to my conclusions.
12      Q.  But your conclusion is that the
13  hemangiosarcomas reported in the Atkinson study fall
14  within the historical ranges reported by Giknis and
15  Clifford 2000.
16      A.  I do state that, yes.
17      Q.  And because the incidence is well within the
18  range of historical controls, this makes these
19  hemangiosarcomas not treatment-related.
20      A.  I suggest that is one reason why it calls
21  that into question.
22      Q.  Now, you have a footnote, Footnote 3 on
23  Page 23, that cites to Dr. Portier's expert report for
24  the premise that he's confused of the historical
25  control data related to whole body hemangiosarcomas,

35 (Pages 134 to 137)

Confidential - Pursuant to Protective Order

Page 138

1   capturing all hemangiosarcomas.
2       A.  I see that, yes.
3       Q.  And is that still your opinion today?
4       A.  Yes.
5       Q.  All right.  Now, Dr. Foster, did you look at
6   the Giknis and Clifford data to make the determination
7   related to your criticism of Dr. Portier and the whole
8   body hemangiosarcomas, or did you just take the range
9   point?
10      A.  Sorry.  Did I refer to the Giknis --
11      Q.  Did you look at it?  Did you look at it to
12  see that Dr. Portier, as you state, is confused related
13  to the reporting of the hemangiosarcomas as whole body?
14      A.  I looked at the report, yes.
15          MS. ROBERTSON:  This will be Foster
16          Exhibit 18-12.
17          (Foster Deposition Exhibit 18-12 - Giknis and
18          Clifford 2000 Report - marked for
19          identification.)
20      Q.  So if we look at Page 9, Table 3 of the
21  Giknis and Clifford control data set --
22          MR. KALAS:  Counsel, can I note that the copy
23          you gave us appears to be missing the
24          even-numbered pages.
25          MS. ROBERTSON:  It's not double-sided?

Page 139

1           MR. KALAS:  It is double-sided, but it's
2           missing the even-numbered pages.
3       Q.  Dr. Foster, do you have all the pages?
4       A.  No, I do not.
5           MS. ROBERTSON:  This was an exhibit that was
6           entered into by the deposition of Dr. Portier
7           by the Hollingsworth firm, and this is the
8           complete exhibit entered into in that
9           deposition.
10          MR. KALAS:  I understand you're making that
11          representation.  I don't have those exhibits
12          in front of me.  But this does not appear to
13          be the complete Giknis and Clifford data set.
14          So we object to questions based on this
15          document based on that.
16  BY MS. ROBERTSON:
17      Q.  Dr. Foster, can you answer questions related
18  to the data listed on Table 3?
19      A.  I don't know how to answer that question,
20  because I -- if there's questions that are from Table 3
21  that might contain information from other pages, I'm
22  not going to be able to answer them.
23      Q.  Would you agree that Table 3 on Page --
24  beginning on Page 9 lists neoplasms in males and
25  appears to be the beginning of the table?

Page 140

1       A.  The title is Neoplasm in Male [sic].  And
2   what was your other point?
3       Q.  And that it appears to be the beginning of
4   Table 3; hence Table, comma -- colon -- 3.
5       A.  I can't tell if it is the beginning or not.
6       Q.  The beginning of the table identifies columns
7   by location and tumor, number of studies total, number
8   of studies.  Do you see that, Dr. Foster?
9       A.  I do.
10      Q.  And you can see that location and tumor
11  included in that column is liver?
12      A.  I see it.
13      Q.  And hemangiosarcoma is listed within the
14  liver category, correct?
15      A.  I see it.
16      Q.  And in the columns, reading across the line,
17  we see that there's data entry observed from 29 lesions
18  in 15 studies.  Correct?
19      A.  Yes.
20      Q.  For an overall incident range of 1.11 through
21  5 percent.  Correct?
22      A.  Yes.
23      Q.  And your expert report on Page 22 reports an
24  incident range for hemangiosarcomas of 12 percent.
25  Correct?

Page 141

1           MR. DHINDSA:  Objection.
2       A.  Yes.  I see that in the citation to Giknis
3   2000 --
4       Q.  Yes.
5       A.  -- that reports hemangioma -- hemangiosarcoma
6   incident rate reported in historical controls up to
7   12 percent.  That would be whole body hemangiosarcomas,
8   I believe.
9       Q.  Okay.  So do you know whether the Atkinson
10  study looked at the whole body hemangiosarcomas in
11  reporting on hemangiosarcomas?
12      A.  My recollection is that was whole body
13  hemangiosarcomas.
14      Q.  Isn't it true, Dr. Foster, that the Atkinson
15  study in CD-1 mice identifies hemangiosarcomas under
16  the identifying name, quote/unquote, Vascular System?
17      A.  Yes.
18      Q.  And is --
19      A.  I believe that's accurate.
20      Q.  Isn't it true that the liver is within the
21  vascular system and not whole body?
22      A.  Sorry.  That you're -- you're asking me if
23  the liver is part of the vascular system?
24      Q.  Correct.
25      A.  I would not normally consider it part of the

Confidential - Pursuant to Protective Order

Page 142

1  vascular system.
2      Q.  Would you agree that hemangiosarcomas are
3  vascular tumors?
4      A.  I believe that hemangiosarcomas are vascular
5  tumors that occur throughout the body.
6      Q.  So the data you cited to in Giknis and Hogan
7  [sic] is looking at the body, multiple organ.  Is that
8  correct?  The 12 percent range.
9      A.  I believe that's accurate.
10     Q.  Are you aware, Dr. Foster, that EPA cites to
11 the hemangiosarcoma range, as Dr. Portier does in his
12 expert report, with 1.1 to 11 percent?  Citing also to
13 the Giknis and Clifford paper.
14     A.  I don't recall that.
15     Q.  Do you know what rates EFSA used in their
16 recent reevaluation of the animal carcinogenicity data
17 for the range of hemangiosarcomas from Giknis and
18 Clifford 2000?
19     A.  No, I don't.
20     Q.  You do agree, Dr. Foster, that the tumor
21 trend in CD-1 mice is different in other strains of
22 mice for that same tumor, correct?
23         MR. DHINDSA:  Objection.
24     A.  Can be, yes.
25     Q.  So it's entirely practical that the dose

Page 143

1  response among rodent strains will differ, correct?
2         MR. DHINDSA:  Objection.
3      A.  You're asking me to speculate on whether or
4  not it might -- a dose response may differ by different
5  strains?  I would need to see more information on it,
6  but I think it's possible.
7      Q.  Okay.  And on Page 23, Dr. Foster, you -- you
8  note that you didn't see any hemangiosarcomas and other
9  bioassays.  Is that correct?  Apologies.  Let me
10 correct.  That's not right.
11         You note that hemangiosarcomas did not show
12 statistically significant trends in male mice and other
13 cancer bioassays, correct?
14     A.  Yes, I note that.  In other well-conducted
15 cancer bioassays in mice -- in male mice, there was no
16 statistically significant trend noted.
17     Q.  So if we look at Page 42 of Dr. Portier's
18 expert report, Table 12 in the Sugimoto study.
19     A.  What page?
20     Q.  42.  Are you there, Dr. Foster?
21     A.  I'm on Page 42.
22     Q.  And you see in Table 12 that hemangiosarcomas
23 in male mice, there were two hemangiosarcomas noted in
24 the Sugimoto study in the high dose group.  Correct?
25     A.  Hemangiosarcomas in male was zero of 50, zero

Page 144

1  of 50, zero of 50, 2 of 50, for a P trend of 0.062.
2      Q.  And that would be a significant statistically
3  trend, correct?
4      A.  No, that would not be a statistically
5  significant trend.  That is greater than .05.
6      Q.  Is it important to look at the fact that the
7  hemangiosarcomas are seen in the high dose group and no
8  other groups related to the Sugimoto study in the male
9  high dose group?
10     A.  Sorry.  Say that again.
11     Q.  Is it important to look at the fact that the
12 hemangiosarcomas are in the high dose group and no
13 other groups in the Sugimoto study?
14         MR. DHINDSA:  Objection.
15     A.  In the high dose group -- first off, there's
16 no statistically significant difference here.  However,
17 for completeness, we see two of 50 in the high dose
18 group, in the Sugimoto study.
19         And then if you look at the Sugimoto study,
20 we note that this is a study that in the high dose
21 group, where they're being dosed in males with 4,348
22 mg's per kilogram per day, that these animals were
23 noted to have liquid stool.  Liquid stool in an animal
24 is also considered to be sign of a potential systemic
25 toxic effect.

Page 145

1          So although I see something going on, two of
2  50, that's not statistically significant.  I would
3  again begin to question this study.
4      Q.  Did this study report any body weight loss in
5  the high dose groups?
6      A.  I don't recall whether it reported body
7  weight loss.  Let me look at my report, please.
8          So they reported it as retarded growth and
9  reduced food consumption.
10     Q.  Who reported?
11     A.  In this case, it was in the Greim text.
12     Q.  So the Greim review article report of this
13 finding.
14     A.  In the Greim review article, again, I
15 reviewed -- I relied primarily on the data that was
16 provided.  However, I note that there was also some
17 text that was provided in terms of how the study was
18 conducted and what was seen.  And that was useful.
19     Q.  Okay.  Now, in the paragraph above in the
20 Sugimoto study, we have a discussion here on malignant
21 lymphomas.  Correct?
22     A.  Sorry; I don't know where you're referring.
23     Q.  The first paragraph of Sugimoto.
24     A.  First paragraph?  Okay.  Yes.
25     Q.  And, here, you provide the control, low, mid,

37 (Pages 142 to 145)

Confidential - Pursuant to Protective Order

Page 146

1 and high dose numbers reported as two of 50, two of 50,
2 zero of 50, six of 50. Correct?
3     A. That's what's written here, yes.
4     Q. Okay. And if you look on Dr. Portier's
5 expert report, Table 12, Page 42, that gives us a
6 statistically significant trend. Correct?
7     A. Yes, that gives a statistically significant
8 trend.
9     Q. However, your conclusion for this study is
10 that it's strongly negative. How do you reach that
11 conclusion?
12     A. In the -- sorry. In the Sugimoto?
13     Q. Correct.
14     A. In looking at this, again, I come back to the
15 point that these animals in the high dose group were
16 noted to have liquid stool, retarded growth, reduced
17 food consumption, calling into question the effects in
18 the high dose group.
19         If we look at that, that would then go two,
20 two, zero, suggesting that somehow or another
21 glyphosate is potentially protective.
22     Q. How would glyphosate be potentially
23 protective when you have an incidence of six out of 50
24 in the Sugimoto study in the high dose group?
25     A. As I just indicated, when you've got retarded

Page 147

1 growth, reduced food consumption, liquid stool in the
2 high dose group, that calls into question the relevance
3 of findings in that dose group.
4     Q. So do you not include the high dose group --
5 oh. So the high dose group, then, is not included in
6 your analysis of whether this is a statistically
7 significant trend for malignant lymphomas. Correct?
8     A. No. What I am saying is that in this study,
9 where we see evidence of potential systemic toxic
10 effects as shown by liquid stool, retarded growth,
11 decreased food consumption, that's -- the
12 interpretation of the -- of findings in the high dose
13 group is difficult, if not impossible, to relate to a
14 compound-related effect.
15     Q. Did EPA accept the Sugimoto study as -- as
16 acceptable study?
17     A. They -- I didn't say it was an unacceptable
18 study, and I don't know what EPA -- EPA did or didn't
19 do. I'm conducting my own assessment of the
20 literature.
21     Q. Dr. Foster, isn't it important to ward
22 against false negatives? And by excluding the high
23 dose group, based on your analysis, you are, in fact,
24 encouraging false negatives?
25     A. I don't agree with that. I think it's

Page 148

1 important when you're interpreting the study results
2 that you evaluate all the information that you have
3 before you.
4     Q. And in this --
5     A. I'm trying to determine whether or not we
6 have a compound-related effect. And when I see
7 evidence that there is systemic toxicity, that makes it
8 very difficult for me, if not impossible, to conclude
9 that that's a compound-related effect.
10     Q. Do you know whether there was a survival
11 difference between the controls in the high dose group
12 in the study?
13     A. Sitting here at this moment, without having
14 the information before me, I can't say one way or
15 another whether there was a difference in survival.
16     Q. Do you have any reason to think that the
17 other observed effects led to a higher tumor rate?
18     A. The other observed effects. What are you
19 referring to?
20     Q. Do you have any reason to believe that the
21 liquid stool, retarded growth, and reduced food
22 consumption led to the tumors seen in the highest dose
23 group?
24     A. It's possible that the same mechanisms that
25 are leading to these metabolic effects. Or liquid

Page 149

1 stool, retarded growth, reduced food consumption could
2 be the consequence of something in these animals or in
3 that the -- the feed or in the dosing material that is
4 creating systemic toxicity, irritation of the gut
5 lining, or something like that, that could, indeed,
6 contribute to the -- the tumors.
7     Q. And you saw those potential contributions to
8 tumors in -- in the Sugimoto study when you did your
9 literature review?
10     MR. DHINDSA: Objection.
11     A. I -- I stand by what I've said, in that when
12 I see evidence of systemic toxicity, it makes it very
13 difficult to evaluate the quality or the
14 compound-related effect of -- of the test chemical.
15 This -- and this is not my decision. This is something
16 that is routinely done in evaluating toxicological
17 data.
18     Q. So when I have a high dose group that shows
19 tumors, I don't consider the cause of those tumors. I
20 first consider the quantity of the dose given to see
21 whether the tumor should even be evaluated?
22     A. What I'm saying is that -- let's forget the
23 outcome measure, whether it's tumors, whether it's
24 decreased follicle loss, whether it's behavioral
25 effects. You have animals in which you're getting

Confidential - Pursuant to Protective Order

Page 150

1  systemic toxicity. That now makes it very difficult to
2  determine whether the outcome you're looking at,
3  regardless of what it is, is being driven by the test
4  substance you're looking at.
5      Q.  And this is an analysis that you engage in to
6  ensure that you don't have a false negative.
7      MR. DHINDSA:  Objection.
8      A.  It's an analysis that I engage in, in order
9  to determine whether or not the outcome that I am
10  looking at is compound-related.
11      Q.  As you sit here today, do you know whether
12  the liquid stool, retarded growth, and reduced food
13  consumption are compound-related effects?
14      A.  In the conduct of this study, I see an -- I
15  see report that the animals experienced retarded
16  growth, reduced food consumption, and liquid stool.
17      Q.  And is that a compound --
18      A.  Suggesting that that's systemic toxicity.
19      Q.  And is that a compound-related effect?
20      A.  At this point I don't know what's driving it.
21      Q.  But you conclude that the animals with
22  malignant lymphomas seen in the high dose group,
23  because there may be a systemic toxicity, this high
24  dose group is not a compound-related effect. Am I
25  understanding correctly?

Page 151

1      MR. DHINDSA:  Objection.
2      A.  I'm saying because these effects were seen in
3  the high dose group, I cannot state with certainty that
4  these are compound-related effects. The tumors, that
5  is.
6      Q.  Do you have any indication from this study or
7  the literature you reviewed that there's evidence that
8  anything other than glyphosate caused these malignant
9  lymphomas in the CD-1 mice in Sugimoto?
10      A.  Again, I stand by my report and what I've
11  already testified; that at the high dose group, we've
12  got liquid stool, retarded growth, and reduced food
13  consumption.
14      Q.  And --
15      A.  The consequence of that is I cannot conclude
16  that there's a compound-related effect there.
17      Q.  Do you know when these observations were
18  made?
19      A.  What do you mean, when they were made?
20      Q.  In the study. At what point in time in this
21  18-month study were these observations made?
22      A.  At this point in time, I believe they were
23  reported towards the end of the study.
24      Q.  Is it not possible that cancer started to
25  develop before these events were seen?

Page 152

1      A.  It's also possible that these events started
2  before, too. I don't know.
3      Q.  So you don't know whether the malignant
4  lymphomas existed prior to your confounders you've
5  identified here. Is that -- is that correct?
6      A.  No. What I'm saying is that with the high
7  dose group, because I've got evidence of systemic
8  toxicity, that might have gone on for long periods of
9  time as well. I cannot conclude that the malignant
10  lymphomas here are a consequence of the compound.
11      Q.  And the inverse is also true.
12      MR. DHINDSA:  Objection.
13      A.  I'm looking at the data here and looking at
14  what I've seen. Because I have systemic toxicity, I
15  can't say that what it has -- what didn't appear, I
16  can't comment on, because I don't know what all didn't
17  appear.
18      Q.  But we do know that malignant lymphomas
19  appeared.
20      A.  We know that there was -- six out of 50
21  animals had malignant lymphomas.
22      Q.  And how does cancer --
23      A.  When they --
24      Q.  -- develop?
25      A.  Cancer is a -- a multi-step process that

Page 153

1  involves initiation and promotion --
2      Q.  So cancer doesn't develop, does it, Doctor --
3      MR. DHINDSA:  Were you finished with your
4  answer?
5      THE WITNESS:  Sorry?
6      MR. DHINDSA:  Were you finished with that
7  answer?
8      THE WITNESS:  No, I was going to go on,
9  but --
10      A.  It's -- it's a multi-step process involving
11  initiation, mutation in the -- in the -- in the DNA,
12  and promotion, proliferation. There's also repair
13  mechanisms that might take place to prevent tumors
14  from -- from developing. Tumors may be present
15  spontaneously in the animal and only show up later when
16  a promotional event happens.
17      Q.  As you sit here today, do you believe
18  glyphosate's a promoter?
19      A.  No, I do not believe it's a promoter.
20      Q.  So in this instance, the malignant lymphomas
21  would need to develop over time, not upon some
22  spontaneous event such as glyphosate-administered dose.
23  Correct?
24      A.  For tumors to have appeared, you're
25  suggesting that glyphosate would -- has to induced

39 (Pages 150 to 153)

Confidential - Pursuant to Protective Order

Page 154

1  [sic] a mutation earlier in the lifetime of the animals
2  that would result in tumors being seen at some point.
3      Q.  But we don't know that here, correct?
4      A.  We do not know that here.
5      Q.  And that's because these animal cancer
6  bioassays look at the animal one time, and that is at
7  death.  Isn't that correct?
8          MR. DHINDSA:  Objection.
9      A.  I don't believe that's true.  In the conduct
10  of our animal studies, we're looking at the animals on
11  a daily basis.  So the animal health technicians are in
12  examining the animals and looking for any signs, any
13  outward signs of issues.
14          So you might be looking for stereotypical
15  behaviors; circling, abnormal grooming, porphyria.
16  Multiple of things.  You would monitor the animals over
17  the course of the study.
18      Q.  And when over the course of a study, aside
19  from at death, do we look at animals to see if they
20  have developed malignant lymphomas?
21      A.  If -- if an animal dies during the course of
22  the study, it would be examined at that time --
23      Q.  At his death.  Yes, I agree.
24      A.  And if you saw something in animals where
25  they might be losing body weight or whatever, you might

Page 155

1  sacrifice -- do interim sacrifices to see if
2  something's going on there.
3      Q.  But, otherwise, it's only at death that
4  terminal sacrifice --
5      A.  Otherwise, it's at terminal sacrifice, yes.
6      Q.  And these malignant lymphomas were observed
7  at terminal sacrifice, correct?
8      A.  That's my understanding, yes.
9      Q.  So the malignancies found were only looked at
10  one time.  Correct?
11      A.  That's my understanding in this case, yes.
12      Q.  Is there any other method for assessing
13  carcinogenicity besides initiation and promotion?
14      A.  Can you help me out with that question?  I
15  don't know what you're asking.  It's -- it's too broad.
16      Q.  Initiation promotion is not the only
17  methodology to use -- that can be used to assess
18  carcinogenicity.
19          MR. DHINDSA:  Objection.
20      A.  They're not methods.
21      Q.  Approaches?
22      A.  Nor are they approaches.
23      Q.  Is there -- can I have an agent that causes
24  cancer without it being an initiator or a promoter?
25      A.  If an agent -- if a chemical does not act as

Page 156

1  a -- as a -- as an initiator or a promoter, then I do
2  not see how you're going to get a tumor.
3      Q.  Because for initiation and promotion, the DNA
4  needs to be reactive to the chemical agent that's
5  causing the cancer.  Correct?
6      A.  I might state that differently; that the
7  chemical needs to be reactive.  It needs to induce a
8  mutation.  It needs to be genotoxic, induce a mutation,
9  or it needs to act as a -- as a promoter.
10      Q.  Right.
11      A.  The DNA is not going to go find the chemical
12  and interact with it.
13      Q.  Yeah.  So meaning the carcinogen or their
14  metabolites react directly with the DNA.
15      A.  Correct.
16      Q.  As you sit here today, is it your opinion
17  that there are no other carcinogens -- there are no
18  carcinogens that are not also genotoxic?
19          MR. DHINDSA:  Objection.  Beyond the scope.
20      Q.  Did I understand that right?
21      A.  Can you state it again?
22      Q.  Yeah.  I'm just trying to make sure that I
23  clearly understand your earlier answer.  Is it true
24  that there -- a carcinogen must be genotoxic?
25          MR. DHINDSA:  Objection.  Beyond the scope.

Page 157

1      Q.  My -- so I was asked to provide an assessment
2  of the animal literature, which I've done.  My --
3  although I've looked at cancer carcinogenesis and I've
4  looked at different mechanisms in cancer development,
5  my understanding is that a chemical must be an
6  initiator or must act through tumor promotion in order
7  to produce carcinogenicity.
8      Q.  I understand that.  And I understand you're
9  not a pathologist.  Correct?
10      A.  No, I am not.
11      Q.  Do you have knowledge on epigenetics effects
12  on tumor suppressor genes?
13          MR. DHINDSA:  Objection.
14          (Attorney Robertson asked for clarification
15          by the reporter.)
16      Q.  Any knowledge on epigenetic effects on tumor
17  suppressor genes.
18      A.  Okay.  So epigenetic modification of the DNA
19  is something that's becoming increasingly important in
20  transgenerational effects.  It's something that I have
21  studied in our work, although I'm not a -- a molecular
22  biologist or -- and certainly not focused entirely on
23  epigenetics.
24      Q.  But we can agree that epigenetic effects on
25  tumor suppressor genes is different than initiation,

Confidential - Pursuant to Protective Order

Page 158

1  promotion in the realm of carcinogenesis. Correct?
2       MR. DHINDSA: Objection.
3       A. It would act in the ballpark of promotion.
4       Q. But it's not promotion. Is that correct?
5       MR. DHINDSA: Objection.
6       A. It could be seen as being in that ballpark.
7       Q. But it's not always.
8       A. I don't think that's -- I don't think that's
9  been resolved in the literature.
10      MR. DHINDSA: May I just make a statement for
11      the record?
12          Looking at what's been marked as
13      Deposition Exhibit 18-12 -- this is the CD-1
14      mouse data from Giknis and Clifford -- I'm
15      just objecting to any questions on this
16      document because the even-numbered pages are
17      missing, and moving to strike any such
18      questions and answers. This was Deposition
19      Exhibit 15-33 in the Portier deposition,
20      where the exhibit was a complete exhibit,
21      with all pages contained therein.
22      MS. ROBERTSON: Counsel, are you objecting to
23      the content's accuracies on Table 3?
24      MR. DHINDSA: It's just not -- it's not
25      complete. He's not able -- he's not able to

Page 159

1       properly answer the question you asked
2       without a complete document. That
3       specifically omits whole body data.
4       (Discussion held off the record.)
5       MR. GOODALE: This marks the end of Media 3
6       in the deposition of Dr. Warren G. Foster,
7       Ph.D. Going off the record at 2:32 p.m.
8       (Recess held.)
9       MR. GOODALE: Here begins Media No. 4 in the
10      deposition of Dr. Warren G. Foster, Ph.D.
11      We're back on the record at 3:03 p.m.
12  BY MS. ROBERTSON:
13      Q. Dr. Foster, have you ever done any work,
14  expert or otherwise, for CropLife Canada?
15      A. To my knowledge, I have never done anything
16  directly for them.
17      Q. And what about for CropLife America?
18      A. Same answer. To my knowledge, I have never
19  done anything directly for them.
20      Q. Isn't it true that CropLife Canada and
21  CropLife America are lobby groups for the industry?
22      A. They may be, they may not be. I don't know.
23      Q. Isn't it true that CropLife America is a
24  trade organization that represents developers and
25  manufacturers of herbicides and pesticides?

Page 160

1       A. Again, I don't really know.
2       Q. Dr. Foster, have you ever, in connection with
3  expert consulting, communicated via email, telephone,
4  or in person with Clare Thorp?
5       A. With whom?
6       Q. Clare Thorp.
7       A. To my knowledge, no. Where is Clare Thorp?
8       Q. CropLife America.
9       A. Not -- not to my knowledge. I don't believe
10  I've ever met with or spoken to that person.
11      Q. Okay. We can look at Page 112 of your CV,
12  please.
13      A. Of my CV? 112. Yes.
14      Q. And, specifically, the entry from 2013 to
15  2014 related to Exponent, Inc. in Alexandria, Virginia.
16      A. I see that, yes.
17      Q. And here you describe provided expert
18  technical advise for inclusion, government submissions,
19  on the relevance of exposure to hormonally active
20  chemicals and adverse human health outcomes. Correct?
21      A. Correct.
22      Q. And was there any work product that was the
23  result of this advice you gave to Exponent in 2013?
24      A. Was there any -- sorry. Was there
25  any work --

Page 161

1       Q. Work product. An article. A paper.
2       A. No. I -- this was not -- I did not provide a
3  published paper or anything like that, no.
4       Q. And did you provide an internal expert report
5  to Exponent?
6       A. (No response.)
7       Q. Non-published.
8       A. I believe what I did is I provided a letter
9  in which I -- I provided my opinion on assessing
10  hormonally active chemicals; how -- how to do it, what
11  it means.
12      Q. Were you paid for this work?
13      A. I believe I had a small contract for this,
14  yes.
15      Q. Was it hourly?
16      A. No. It was a flat rate.
17      Q. Do you recall what the flat rate was?
18      A. I do not recall what the actual number was.
19  But if I had to guess, I would say it was between 3-
20  and $4,000.
21      Q. And was this your only work that you've done
22  with Exponent?
23      A. As far as I'm aware, yes.
24      Q. Who approached you to do this work? Do you
25  recall that person's name?

41 (Pages 158 to 161)

Confidential - Pursuant to Protective Order

Page 162

1      MR. DHINDSA: Objection to the extent it
2   calls for anything confidential.
3      A. I can't say with certainty who it was that
4   actually approach -- approached me. It might have been
5   Lorenz Rhomberg.
6      Q. Is that somebody who works at Exponent?
7      A. I believe it is.
8      Q. How much time would you say you spent on
9   drafting this letter for Exponent?
10     A. I really couldn't say.
11     Q. Do you know what Exponent did with your
12  letter?
13     A. No, I don't.
14     Q. Dr. Foster, I'm going to hand you an article
15  that was published in Regulatory Toxicology and
16  Pharmacology. We'll mark that as 18-13.
17        (Foster Deposition Exhibit 18-13 - Regulatory
18         Toxicology and Pharmacology Article - marked
19         for identification.)
20     Q. Dr. Foster, have you ever seen this article
21  before?
22     A. Yes, I have.
23     Q. And you're listed on this article. Isn't
24  that correct?
25     A. That's correct.

Page 163

1      Q. As a corresponding author. Is that correct?
2      A. That's correct.
3      Q. And this is an article that was sponsored by
4   Exponent. Correct?
5      A. Exponent is listed on the author page, yes.
6   And then in the Conflict of Interest as well.
7      Q. And is this article sponsored by Exponent the
8   same one that's referred to here on Page 112 of your
9   CV?
10     A. Sorry; 112 of my CV?
11     Q. Correct.
12     A. Is this referring to this contract?
13     Q. Correct.
14     A. I believe that's probably accurate, yes.
15     Q. Okay. And, Dr. Foster, what participation
16  did you have in the drafting and publishing of these
17  critical comments, as published in Regulatory
18  Toxicology and Pharmacology?
19     A. I drafted a section, I read and edited the
20  section providing critical comments and intellectual
21  contribution to the overall document. I also spoke on
22  the telephone with the -- the co-authors.
23     Q. So you did more than just write a letter for
24  Exponent, as you previously testified. Is that
25  correct?

Page 164

1      A. Correct.
2      Q. Now that you have seen this article, how much
3   time did you spend in total on this project, would you
4   estimate?
5      A. Again, I couldn't say with certainty.
6      Q. Okay. And which section did you draft?
7      A. It was contents of different sections. Let
8   me take a look. So right off the bat, I had read the
9   updated 2012 assessment, so I read that over. Provided
10  my own notes and critical comments on what I thought
11  were strengths, weaknesses of the -- the 2012 update,
12  which I shared with my co-authors. I certainly
13  provided comment in the written sections of the state
14  of the science. And then the majority of my work
15  related to the human health issues. So sperm, semen
16  quality would be one area in which I drafted sections.
17  Endometriosis would have been another.
18     Q. And when you say "drafted sections," you --
19  you started from scratch and then submitted your
20  sections to the various other co-authors for review.
21  Is that correct?
22     A. Correct.
23     Q. And what was your criticism to WHO-UNEP State
24  of the Science of Endocrine Disrupting Chemicals
25  following the assessment?

Page 165

1      A. Following -- following what assessment?
2   Where -- where are we in the process? What are you --
3      Q. You initially said that you started by
4   reading the assessment.
5      A. So the WHO-UNEP State of the Science 2012
6   report came out. I read that and formed my own
7   opinions on that and held my own opinions for a while,
8   and then I was contacted by somebody from Exponent --
9   it might have been Lorenz Rhomberg -- and asked if I
10  would be interested in working with the group in
11  formulating this -- this document.
12     Q. And what was the purpose of this document?
13     A. Glen Van Der Kraak and I were both members of
14  the 2002 Assessment of Endocrine Disrupting Chemicals,
15  and both Glen and I felt that the 2012 assessment was
16  not a fulsome analysis and not a real update of the
17  state of the science. It was a selective review, as
18  opposed to a critical review of all of the available
19  literature.
20     Q. And a draft of -- or the first submission of
21  this article was received by the Journal of Regulatory
22  Toxicology and Pharmacology on December 4, 2013, as
23  indicated in the article info. Do you see that?
24     A. No. I will look for it, though.
25     Q. Front page.

Confidential - Pursuant to Protective Order

Page 166

1  A. Yeah.
2  Q. Article --
3  A. I see, yeah.
4  Q. So does that mean that these critical
5  comments underwent peer review?
6  A. My understanding is that, yes, this paper
7  underwent peer review.
8  Q. Do you recall whether -- or were you part of
9  the process after the peer reviewers revised or had
10 comments or any notations? Did you, again, then look
11 at this article prior to it being resubmitted for
12 publication?
13 A. If I remember correctly -- I mean, this is
14 going back some time, so I've published quite a few
15 papers since that time. But if I remember correctly,
16 we got reviewers' comments, and that there was a
17 teleconference amongst us and emails about how we
18 should respond to the comments.
19 Q. Had you ever previously worked with any of
20 your other co-authors on this report, aside from
21 Mr. Glen Van Der Kraak, who we already identified?
22 A. I believe it's Dr. Van Der Kraak.
23 Q. Yes. I'm so sorry. You're right; Doctor.
24 Apologies
25 A. I hold him in very high regard.

Page 167

1     Jim Lamb, I've met at SOT; a highly regarded
2  toxicologist. Julie Goodman is somebody I know. And
3  Lorenz Rhomberg I met. I don't -- I can't state with a
4  hundred percent certainty that we have not communicated
5  or done something together in the past, but.
6  Q. Okay. Did you ever have an in-person meeting
7  in order to work with your co-authors on this critical
8  comment article?
9  A. Meeting? Meeting --
10 Q. Face-to-face.
11 A. -- face-to-face?
12 Q. Yes, correct.
13 A. I didn't feel that was necessary in this
14 case.
15 Q. And you're listed as the third author on this
16 article. Was there any -- was there any dispute as to
17 the order of author articles -- article authors.
18 Sorry. Dyslexic.
19 A. I don't recall any dispute. And I believe,
20 outside of James Lamb, we're all listed alphabetically.
21 Q. And James Lamb here is likely listed as the
22 first author because he would be the corresponding
23 author. Is that correct?
24 A. That would be correct.
25 Q. Now, Dr. Foster, I'm going to hand you a

Page 168

1  document that was produced in this litigation by
2  Monsanto. This document is going to be Exhibit 18-14,
3  and it begins with the Bates number MONGLY01947702, and
4  it ends with 7704.
5       (Foster Deposition Exhibit 18-14 - Monsanto
6        Document - MONGLY01947720 through 7704 -
7        marked for identification.)
8  Q. I'd give you a moment to review, Dr. Foster,
9  unless you can tell me that you've seen this before.
10 A. I don't recall seeing it before, so I'd like
11 to read it over.
12 Q. Please.
13 A. (Witness reads.) Okay.
14 Q. Okay, Dr. Foster. On the second page of this
15 exhibit, MONGLY01947703, we see that part of Phase 2 is
16 that Exponent and Gradient staff will draft a detailed
17 critical review in response to the WHO-UNEP endocrine
18 report. Correct?
19 A. I see that that's what they're proposing,
20 yes.
21 Q. And we see that after this draft is
22 completed, select experts will review and comment as
23 co-authors on the draft document. Correct?
24 A. I see this. This reads a response to a
25 request for application and a proposal for work to be

Page 169

1  done. So it's -- it's what they're proposing to do.
2  Q. Okay. Now --
3  A. Not necessarily what was done.
4  Q. Okay. And they're proposing that the draft
5  be completed by Exponent and Gradient staff, and the
6  draft will then be shared with select experts who will
7  become co-authors after they review and comment on the
8  draft document. Correct?
9  A. That's what this says, yes.
10 Q. And you are listed as being considered for
11 inclusion in this critical review. Correct?
12 A. That is correct.
13 Q. And the very next paragraph, there's the
14 preliminary cost estimates for the labor by Exponent
15 and Gradient, as well as a 4- to $5,000 honorarium or
16 fee which will be appropriate for each of the experts.
17 Correct?
18 A. That's correct.
19 Q. Dr. Foster, isn't it true that this critical
20 review article was in part funded by the American
21 Chemical Council?
22 A. Based on the information that's put forward
23 before me, I don't see that that's where the money came
24 from.
25 Q. Isn't it true that the American Chemical

Confidential - Pursuant to Protective Order

Page 170

1    Council collaborated with CropLife America to fund this
2    article?
3        A.  I don't know that to be the case.  I can't --
4    I can't comment one way or another.  I don't have that
5    information.
6        Q.  Let's go back to your expert report on
7    Page 24.
8        A.  (Witness complies.)
9        Q.  And Page 24 talks about the Wood study, which
10   is listed as Study 14 in Greim.  Correct?
11       A.  Yes.
12       Q.  And this is, again, a CD-1 mouse study.
13   Correct?
14       A.  That is what I have written here, yes.
15       Q.  And do you recall, as you sit here today,
16   whether this was 18-month or 100 -- or a 24-month
17   study?
18       A.  This was an 80-week study.
19       Q.  It's close to 18 months.  Correct?
20       A.  That's correct.
21       Q.  And you have a -- a criticism here of
22   Dr. Portier with regard to biological development of
23   lymphomas in rodents and humans, and you cite to the
24   Morse 2003 article.  Correct?
25       A.  Yes.

Page 171

1        Q.  Is that your position, as you sit here today;
2    that there are clear differences in the biological
3    development of lymphomas in rodents and humans, as
4    described by Morse?
5        A.  It's my testimony that Morse has made this
6    point that there are clear differences, and I cite that
7    here.
8        Q.  Are you familiar with the data from Jackson
9    Laboratory Mouse Tumor Biology Database?
10       A.  What do you mean by am I familiar with it?
11       Q.  Do you know it exists?
12       A.  Do I know that Jackson Laboratory has such
13   data?
14       Q.  Correct.
15       A.  I believe I do know that.
16       Q.  And isn't it true that Morse 2003 and Morse
17   2010, both listed on your Materials Consulted, use
18   information from the Jackson Laboratory Mouse Tumor
19   Biology database in writing their articles on
20   lymphomas?  Isn't that correct?
21       A.  I can't state with certainly one way or the
22   other.
23       Q.  Isn't it true that B cell lymphomas in mice
24   has been compared to human immunohistochemical
25   staining, and many feel that this exhibits a parallel

Page 172

1    to the same disease in humans?
2        A.  I can't comment on what many others state or
3    don't state.  I'm referring in -- I'm citing the -- the
4    Morse study that has reviewed in the peer-reviewed
5    literature.
6        Q.  Okay.  So Morse 2003 represents that B cell
7    lymphomas in mice are not consistent with the same
8    cells seen in humans.
9        A.  Morse is saying that there are clear
10   differences and in the biological development of
11   lymphomas in rodents and humans.  The immune system in
12   mice and humans are well-known to be different.
13       Q.  Do you know whether Morse offers an opinion
14   on B cell lymphoma?
15       A.  I believe Morse does, yes.
16       Q.  And is it your testimony today that Morse
17   states that B cell lymphoma seen in mice is not similar
18   to that seen in humans?
19           MR. DHINDSA:  Objection.
20       A.  I go back to the -- what I've already
21   testified to; that Morse points out that there are
22   clear differences in the biological development of
23   lymphomas in rodents and humans, and, thus, he's
24   questioning and leading me to question whether there's
25   a connection between lymphomas in mice and humans.

Page 173

1        Q.  And does he do this specifically for B cell
2    lymphomas in mice?
3            MR. DHINDSA:  You're asking him that question
4            without showing him the article?
5            MS. ROBERTSON:  He cited to it.  He relied on
6            it.  It's his expert opinion.  He should be
7            able to testify what he relied on to make his
8            expert opinion.
9        A.  And I'm relying upon the point made by Morse
10   that there are clear differences in the development of
11   lymphomas in rodents and humans and that the immune
12   systems in mice and humans are -- are different in
13   important ways.
14       Q.  Did Morse 2003 report on whether there were
15   any similarities between lymphomas found in mice and
16   those found in humans, or did he only describe the
17   differences?
18       A.  To my knowledge, he was emphasizing the
19   differences.
20       Q.  When you say "emphasizing", does that mean to
21   say that he didn't discuss the similarities?
22       A.  I don't recall one way or the other.
23       Q.  Is it your testimony today that some -- that
24   it is not possible for some mouse lymphomas to have
25   strong histologic similarities to the human NHL

44 (Pages 170 to 173)

Confidential - Pursuant to Protective Order

Page 174

1    subsets?
2        A.  Say that again, please.
3        Q.  Is it your testimony today that based on your
4    literature review, mouse lymphomas do not have strong
5    histo -- histologic similarities to human NHL subsets?
6        A.  Histologic similarities is a point in time.
7    It's a snapshot.  It doesn't give me any insight into
8    the development of the tumor.  And so although there
9    may be histologic similarities, it doesn't get to the
10   point of whether or not they have similarities in
11   development between mice and humans.  They have same
12   cellular components.  They both contain ribosomes, they
13   both both contain nuclei.
14       Q.  Do you have whether mice and humans have the
15   same -- have similar histologic -- have histologic
16   similarities for B cell lymphoblastic cells?
17       A.  Okay.  I think where you're going with this
18   information is really outside my scope of expertise.
19   You're now starting to enter into the realm of a
20   pathologist.  And the expert opinion that I was asked
21   to provide was on the conduct of the animal studies,
22   not to histopathology.
23          So for the purposes of looking at this
24   information, I can't comment as an expert on the
25   histopathology.

Page 175

1        Q.  Okay.  But as an expert, you do comment on
2    the idea that your -- well, your opinion holds that
3    it's not biologically plausible for glyphosate to cause
4    NHL in humans.  Isn't that correct?
5        A.  My opinion is that glyphosate in the Wood
6    study did not induce a compound-related increase.
7        Q.  What about your overall conclusion for the
8    entirety of your expert report?  Don't you conclude
9    that it's not biologically plausible for glyphosate to
10   cause NHL in humans?
11       A.  My overall conclusion from the seven rat
12   studies and the five mouse studies is that glyphosate
13   did not induce compound-related effects that would lead
14   me to conclude that there is no evidence of glyphosate
15   acting as a human carcinogen.
16       Q.  So you don't offer an opinion as to
17   biological plausibility?
18          MR. DHINDSA:  Objection.
19       A.  In my report, would you like to point to my
20   report where we're talking about that?
21       Q.  I'm just asking you if you reached a
22   conclusion, based on your review, as it relates to
23   biological plausibility?
24          MR. DHINDSA:  Objection.
25       A.  Again, I'm going to come back to what I've

Page 176

1    testified and what my expert report states, is that in
2    looking at the individual studies and then looking at
3    the studies in aggregate, I saw no evidence of a
4    compound-related effect.
5        Q.  And that's different of biological
6    plausibility.  Is that what you're telling me?
7        A.  Biological plausibility becomes an issue once
8    one has seen a compound-related effect in a bioassay.
9           Now, I've looked at each of the individual
10   studies, and I've looked across the studies in
11   aggregate to reach the conclusion there was no
12   compound-related effect.
13       Q.  Still didn't answer the question.
14       A.  Yes, it does --
15          MR. DHINDSA:  Objection.
16       A.  -- answer the question.  It states quite
17   clearly that I did not see evidence of compound-related
18   effects.
19          So I'm -- you're asking me on biological
20   plausibility to explain something that didn't occur.  I
21   can't do that.
22       Q.  Well, in this section of the Wood, you have
23   talked about clear differences in the biological
24   development.  You cite to Morse.  And you then question
25   whether a connection between NHL in mice and humans can

Page 177

1    be definitively established.
2        A.  I see that section of my report, yes.
3        Q.  And that's what you cite to -- Morse to.  To
4    the best of your ability, as you sit here today, you
5    believe that's what that Morse citation stands for,
6    correct?
7        A.  To the best of my knowledge, Morse is
8    pointing out that there are clear differences between
9    the development of lymphomas in rodents and humans and
10   that there are important differences in the immune
11   system.  Only one issue that I looked at.
12       Q.  All right.  So for the data for the Wood
13   study, is this another one of the reports that you
14   relied on the Greim summary tables in forming your
15   expert opinion, or did you have the raw data?
16       A.  This report was in -- cited in Greim, so it
17   was in the Greim data tables.  And I looked at the
18   Giknis and Clifford data for historical controls as
19   well.  And there -- if I remember correctly in this
20   study, there was also concurrent controls from the same
21   lab -- concurrent controls.  Historic controls in the
22   same time frame, conducted in the same lab.
23       Q.  There were historic controls, not concurrent
24   controls.  You corrected yourself there, right?
25       A.  Concurrent controls would be from the same

Confidential - Pursuant to Protective Order

Page 178

1    study. There were historical controls from other
2    studies in the same lab at the same time frame.
3         Q.  How did you get that data?
4         A.  It's in the Tier 2 summary data.
5         Q.  What's the Tier 2 summary data?
6         A.  Tier 2 summary data is the data from the --
7    the lab.
8         Q.  Is the Tier 2 summary data from the lab
9    publicly available?
10        A.  I don't believe that's publicly available.
11        Q.  So who gave it to you?
12        A.  That would have been provided to me by the
13   attorneys.
14        Q.  Okay.  And then can you point to me in your
15   Materials Consulted where you cite to Safepharm?
16        A.  Where I cite to Safepharm?
17        Q.  Right.  You have it in parentheses here, so I
18   assume it's listed in your Materials Consulted?
19        A.  I believe it's No. 185.
20        Q.  Okay.  Wood, et al., 185?
21        A.  I believe that's the one, yes.
22        Q.  Does that citation say Safepharm in there
23   anywhere?
24        A.  No, it does not.
25        Q.  Okay.  So how is a reader intended to follow

Page 179

1    to your citation here with Safepharm to Citation 185?
2    It would be a little confusing, wouldn't it?
3         A.  It would be a little confusing, yes.
4         MS. ROBERTSON:  I'd like to mark Exhibit
5         Foster 18-15.
6         (Foster Deposition Exhibit 18-15 - Eric Wood
7         Document, MONGLY07070096 through 0099 -
8         marked for identification.)
9         Q.  I'll represent for the record this was
10   produced by Monsanto, and it starts with Bates number
11   MONGLY07070096 and ends with 0099.
12        Dr. Foster, have you seen this document
13   before?
14        A.  Yes, I believe.  I believe -- just let me
15   look through it, please.  Yes.
16        Q.  And is this document what you refer to in
17   your materials consulted as 185?
18        A.  I believe that's correct.
19        Q.  Okay.  And so your expert report identifies a
20   historical background incidence of 12 percent in the
21   18-month study from Safepharm.  And that's what -- this
22   document, Exhibit 18-15, is what you're citing to
23   there, correct?
24        A.  I believe that to be correct.
25        Q.  Okay.  And why did you choose to use the

Page 180

1    Safepharm data here, when this is just one study, not a
2    historical control data set?
3         A.  When I looked at the historical control data
4    cited in Giknis and Clifford, it indicated that it's
5    unusual to have zero lymphomas in a control group.
6         I then looked at this group, as well, to see
7    in another study conducted at the same lab what their
8    rates were.
9         Q.  And is that appropriate methodology to
10   follow?
11        A.  In trying to evaluate the overall value of
12   the study and the quality of the data, yes, it wouldn't
13   be inappropriate to do that.
14        Q.  Why not use a historical-controlled data set,
15   as compared to one study to compare?  Isn't there a
16   fear of skewing numbers?
17        A.  Again, I'm looking at historical controls --
18   I'm sorry -- controls that were conducted by the same
19   investigators, at the same lab and the same time, and
20   by same pathologists, I assume.  Same lab, so I would
21   assume the same pathologists.
22        Q.  And so the Safepharm data set is used in your
23   expert report as the better data set, as compared to
24   the concurrent controls?  Is that correct?
25        A.  No.  It's -- it is another piece of

Page 181

1    information that I can look at and help me in arriving
2    at my conclusion as to whether or not this study
3    performed as one would expect.  Are the differences
4    there compound -- or potentially compound-related or
5    not.
6         Q.  Can you identify another instance in where it
7    would be appropriate to apply a control group set from
8    one study, as compared to a historical-controlled
9    database study?  Have you ever done this before?
10        A.  Have I ever done --
11        Q.  Have you ever chose to use one historical
12   control study, as compared to a data set of historical
13   controls in analyzing data?
14        A.  Well, the way -- the way you're phrasing your
15   question is -- is difficult for me, because it sounds
16   like I do something at the exclusion of something else;
17   that I just ignore it, and I -- and I don't.  It's -- I
18   weigh all the information before me and evaluate it.
19        Have I had the opportunity to do this
20   previously?  I don't recall having the opportunity to
21   do it, because it's rare that you have control data
22   from another lab that's done contemporaneously by the
23   same investigators in the same lab and the same time
24   with the same pathologists.
25        Q.  Okay.  And on the second page of this

46 (Pages 178 to 181)

Confidential - Pursuant to Protective Order

Page 182

1 exhibit, in fact, the author is Brooks. Is that
2 correct?
3 A. Sorry. The second page?
4 Q. Wood is listed as the third author, but
5 the -- the first author there is Brooks. Correct?
6 A. I see that, yes.
7 Q. Okay. And this article is titled CD-1 -- in
8 part, CD-1, in parens, (ICR) BR Strain Mice, correct?
9 A. It is, yes.
10 Q. And your expert report indicates CR strain
11 mice. Is that a typo in your expert report, or is
12 there another data set we should be concerned with?
13 I'm looking at Document -- I'm looking at No. 185 on
14 your Materials Consulted list.
15 A. It's possibly that that's a typo.
16 Q. And Citation 185, right? That's what we're
17 talking about? Not the study?
18 A. Well, it's possibly a typo somewhere.
19 Q. Okay.
20 A. I can't state where the typo came from.
21 Q. Well, if you can't state where the typo came
22 from, is there some other data you relied on here that
23 would match this title for the CR strain of mice?
24 A. No, I don't -- no, I do not believe so.
25 Q. So it is this document that is 185?

Page 183

1 A. That's -- I would agree with that.
2 Q. Would it have made a difference in your
3 analysis if you were aware that the animals in the
4 Safepharm data set, which is Exhibit 18-15, were fed a
5 different diet than those in the Wood 2009 study?
6 A. So in 18-15, they were fed a different diet?
7 Q. Would it make a difference of your analysis
8 if 18-15 animals were fed a different diet than those
9 in the Wood 2009 study that you compare?
10 A. It would be something that I would want to
11 look at and I would want to know about. I did not note
12 that as a difference in my analysis.
13 Q. Sitting here today, do you know whether the
14 Wood animals were fed the same as the Safepharm
15 animals?
16 A. I cannot state one way or another without
17 that information. However, again, coming back to the
18 comment that I made, that this was work that was
19 conducted by the same group, the same lab, at the same
20 time, with the same pathologist, I would anticipate
21 that they would most likely have been fed the same diet
22 and housed under similar conditions.
23 Q. Okay. And we note here that there's a
24 certified diet fed to the Safepharm animals identified
25 as Rodent 5LF2. Correct?

Page 184

1 A. I see that, yes.
2 Q. And do you know whether Greim identifies what
3 the animals are fed?
4 A. Greim provided me with the data tables and
5 summary of the studies. I don't believe that they
6 stated the diet.
7 Q. Okay. So you're not aware today whether or
8 not Wood was fed the same as Safepharm. Is that
9 correct?
10 A. I cannot state whether they were or were not.
11 Q. Doctor, you testified that this Safepharm
12 data came from a Tier 2 summary. Can you explain that
13 a little further, for what you mean by Tier 2 summary.
14 A. Tier 2 summary, in my mind, is a second look
15 at the overall data; the pooling of the data.
16 Q. And who conducted the Tier 2 summary that
17 you're talking about?
18 A. Well, I believe this is Brooks.
19 Q. When you received this document, was it
20 received as produced and used as an exhibit here today?
21 A. I don't understand.
22 Q. Did it have any accompanying pages, or is
23 this the complete document you used when you referenced
24 Safepharm in cite to 185?
25 A. My recollection is that this is how I

Page 185

1 received the information.
2 Q. And on the second page of the exhibit, you do
3 see that it says "internal publication", correct,
4 underneath the title and the author name?
5 A. I see that, yes.
6 Q. Okay. So what do you take "internal
7 publication" to mean?
8 MR. DHINDSA: Objection.
9 Q. In this context with this document.
10 MR. DHINDSA: Objection.
11 A. In the context of this document, I believe
12 this is a report that was prepared by these authors for
13 internal use.
14 Q. And these authors also conducted the Wood
15 2009 study. Do you know who sponsored the Wood 2009
16 study?
17 A. I do not know that for sure at this point in
18 time.
19 MS. ROBERTSON: I'd go ahead and enter
20 into -- as an exhibit 18-16 the Greim article
21 that we've talked so much about.
22 (Foster Deposition Exhibit 18-16 - Greim
23 Review Article - marked for identification.)
24 (Discussion held off the record.)
25 MR. KALAS: Just note this is the article

47 (Pages 182 to 185)

Confidential - Pursuant to Protective Order

Page 186

1          without the supplementary material.
2    BY MS. ROBERTSON:
3          Q.  Dr. Foster, this is the review article that
4    we've been discussing today, correct?
5          A.  (No response.)
6          Q.  Is this what you appreciate to be the review
7    article that you --
8          A.  This is -- yes, that -- this is the -- what I
9    appreciate to be the review article that I've used the
10   summary tables from.
11         Q.  Okay.  And Greim doesn't use the study
12   authors.  They number the studies and then put in
13   parens the sponsor of those studies.  Correct?  On
14   Table 1, first page.
15         A.  Yes, they do.
16         Q.  Okay.  And so if we look for -- your expert
17   report has Wood 2009b.  We see that that's Study No. 8
18   sponsored by Nufarm.  Correct?
19         A.  Sorry?  Say that again.
20         Q.  So your expert report identifies Wood 2009b.
21         A.  Yes.
22         Q.  And Greim identifies Nufarm 2009b as Study 8.
23   Your report says 14.  I just want to make sure that we
24   can be accurate here on the record as to whether this
25   discussion here in your report is a or b.

Page 187

1          A.  I'm going to have to check to be sure.  It
2    could be a typo.
3          Study -- Study 8.  Sorry.  This was -- Study
4    8 was a study conducted in rats, whereas Wood, et al.,
5    2009 is Study 14, which is one that is conducted in
6    CD-1 mice.  So we're referring to Study 14 --
7          Q.  Okay.  So I can change that to 2009a.
8          MR. DHINDSA:  Well, I'm not sure about that.
9          Counsel, if this -- if it helps at all, the
10         top of Table 19, it's actually listed as
11         2009a, and then on the first line it's listed
12         as 2009b.
13         MS. ROBERTSON:  I'm just looking at the table
14         of contents.
15         MR. DHINDSA:  Okay.
16         MS. ROBERTSON:  I'm with you.  I agree with
17         the confusion here.  I'm just trying to make
18         sure that we're all on the -- on the same
19         page of what we're talking about.
20         A.  Yeah, we're all confused.
21         Q.  In any event, we're going to agree that Wood
22   2009 in your report is discussing Cd-1 mice and that
23   that study was sponsored by Nufarm.  Correct?
24         A.  What do you mean by "sponsored by Nufarm"?
25         Q.  Nufarm paid for the study to be conducted?

Page 188

1          A.  I don't know who Nufarm is, so they either
2    paid for it or they are the ones that conducted it
3    themselves.  I don't know -- I'm not in the industry,
4    so I don't know if this is a contract lab or -- or what
5    they are.
6          Q.  Okay.  Well, we can look at the Table of
7    Contents here in Greim, and we see that Greim
8    identifies Monsanto, Cheminova, Feinchemie Schwebda --
9          MS. ROBERTSON:  I'm sorry, Court Reporter.
10         A.  -- Excel, Arysta Life Sciences, Syngenta,
11   Nufarm.
12         A.  Yes.
13         Q.  And these appear to be industry-sponsored
14   studies and -- that's listed here, not the lab.
15   Correct?
16         A.  Sure.  I can go with that.
17         Q.  Okay.  And so the Safepharm data that you
18   used that was for internal use only must be a Nufarm
19   document.  Correct?
20         A.  Sorry.  You're asking me in this Safepharm
21   document here is a Nufarm document?
22         Q.  Correct.
23         A.  I would say that's possible, yes.
24         Q.  Okay.  And if it's for internal publication
25   only, how did you come to receive Nufarm unpublished

Page 189

1    documents?
2          MR. DHINDSA:  Objection.
3          A.  In the materials that I was provided to
4    review, this is a document that was included.
5          Q.  Dr. Foster, would you call this Safepharm
6    document a historical control database?  Would that be
7    an accurate representation of it?
8          A.  Would I refer to it as a historical control
9    database?  I would refer to it as contemporaneous
10   control database.
11         Q.  Dr. Foster, are you aware of the concept of
12   dual controls?
13         A.  Yes.
14         Q.  And as you sit here today, do you know
15   whether dual controls were applied to any of the
16   studies here in your expert report?
17         A.  Well, I think we need to define what is being
18   meant by "dual controls".  What -- what are you asking
19   me here?
20         Q.  What do you appreciate a dual control to
21   mean?
22         A.  A dual control might be a control group that
23   is through -- so you've got one control group that's
24   getting just the diet, and you've got another control
25   group that's just getting the vehicle.

48 (Pages 186 to 189)

Confidential - Pursuant to Protective Order

Page 190

1    Q.   And did you see that in any of these studies?
2    A.   I don't recall seeing that in any of these
3  studies.
4    Q.   One of your criticisms of Dr. Portier is his
5  use of pooling data.  Isn't that correct?
6    A.   I'm not sure that I agree with the
7  characterization of criticizing him.  I'm saying that
8  the use of pooling is an interesting concept that has
9  not been validated in the overall literature.
10   Q.   And you came to this conclusion by doing a
11 PubMed search.  Well, several of them.  Correct?
12   A.   Correct.
13   Q.   And when you engaged in your analysis of
14 these carcinogenicity studies, did you consider
15 comparison of similarly structured studies, meaning
16 same rodent, same duration, same number of rodents?
17 Did you look at those studies together, or did you look
18 at all the studies as a whole?
19   A.   I think I looked at it both ways.  I think in
20 looking at the literature, I evaluated studies that
21 were conducted -- so most studies that were conducted
22 in 18 month -- and conducted according to OECD
23 guideline carcinogenicity bioassays, I compared them,
24 yes.
25   Q.   And your -- your evaluation of the studies

Page 191

1  certainly took into account comparing CD-1 mouse, 24
2  month with other CD-1 mouse, 24 month, in part.
3    A.   In part, yes.
4    Q.   And you identify on Page 11 that Dr. Portier
5  employs a novel statistical approach, as you already
6  stated, that is not generally accepted by regulatory
7  toxicology.  Isn't that correct?
8    A.   What I'm stating there is that in my
9  knowledge, that it's an interesting proposal that has
10 not stood the test of time.  It hasn't been evaluated
11 in the literature.  And as a consequence, I'm not sure
12 that it's appropriate to use in this context.  I think
13 it's an interesting research proposal.
14   Q.   Has science developed over time?
15   A.   Science continues to develop over time.
16   Q.   And do methodologies change over time?
17   A.   Methodologies always are changing, yes.
18   Q.   Is it your expert opinion that scientific
19 analysis that is ahead of the curve should be
20 discounted or dismissed?
21   A.   Sorry.  My --
22        MR. DHINDSA:  Objection.
23   A.   Is it my opinion --
24   Q.   Your expert opinion, yeah.  You have a lot of
25 experience in science.

Page 192

1    A.   That novel, innovative methods should be
2  discounted and dismissed?
3    Q.   Correct.
4    A.   It depends on the context.  I -- I would need
5  to know more about what it is you're implying there.
6        I think we move forward by developing novel,
7  innovative techniques that we put out to our colleagues
8  to debate, critique, evaluate, and help us to improve
9  and strengthen.  Highlight where the weaknesses are and
10 develop a better product.
11   Q.   Let's look at Page 15 of your expert report.
12   A.   (Witness complies.)
13   Q.   Now we're -- now, this -- it begins on
14 Page 14, and you're discussing the Lankas 1981 study.
15 Correct?
16   A.   On Page 14, beginning at -- near the top, it
17 is the start of a discussion on the Lankas study.
18   Q.   Correct, yeah.  All right.  I'd like to
19 direct your attention to Page 15.
20        Now, Page 15, in the last paragraph, you
21 state, "Dr. Portier speculates that the 26-month
22 duration of the study offers unique insights that may
23 be missed in a study lasting only 24 months."
24        Do you see where I'm reading?
25   A.   I do.

Page 193

1    Q.   And then you offer a counter to that, saying
2  that you're not aware of any data that demonstrates a
3  26-month study would detect tumors at any different
4  rate.  Correct?
5    A.   No, that's not what I said.  I said that I'm
6  not aware -- sorry.  I'm not -- "However, no evidence
7  is offered that I am -- and I am not aware of any
8  evidence demonstrating that a 26-month study would
9  detect interstitial tumors at any different rate than a
10 24-month study."
11   Q.   Okay.  Well, let's look at what I believe is
12 responsive to your criticism here of Dr. Portier, which
13 would be Page 34 of Dr. Portier's report.
14   A.   Okay.  Page 34?
15   Q.   Um-hum.  I am trying to understand,
16 Dr. Foster, if this matches your criticism to
17 Dr. Portier that you identify on Page 15 of your expert
18 report.
19        So if you could please look at the first full
20 paragraph after the third Lankas 1981, which is in
21 bold, that begins with "however".
22   A.   Okay.
23   Q.   After the second Lankas bold.  Sorry?
24   A.   I'm going to want to look at the entire
25 paragraph here to see what --

49 (Pages 190 to 193)

Confidential - Pursuant to Protective Order

Page 194

1    Q.  Okay.  Understood.
2    A.  -- to get my context here.  Okay.
3    Q.  And is this what you're -- is this paragraph
4  what you're referring to on Page 15 of your expert
5  report, when you say, "Dr. Portier speculates..."?
6    A.  Yes, I believe that's what I'm referring to.
7    Q.  And as you sit here today, do you still
8  believe that this portion from Dr. Portier's report is
9  speculation?
10      MR. DHINDSA:  Objection.  I don't know which
11      portion you're referring to.
12    A.  What he's saying is that thyroid C cell
13  carcinomas could be a result of the longer exposure
14  period, even though the dose is substantially lower in
15  the study compared to the other two.  So he's saying
16  "could".  He's qualifying it as well.  So it's -- it's
17  speculative.
18    Q.  I'm just asking if you're -- if as you sit
19  here today, you still agree that Dr. Portier speculated
20  there.
21    A.  I believe he speculated there, yes.
22    Q.  It's important to consider study length and
23  the incidence of any adverse effect, isn't it,
24  Dr. Foster?
25    A.  It's important to evaluate the entire study,

Page 195

1  not just the study length.
2    Q.  You're right.  In part, study length is
3  important to consider when evaluating the entirety of a
4  study.  Correct?
5    A.  It would be one thing that I would look at,
6  yes.
7    Q.  And if tumors are observed in animals that
8  live for 26 months, but not in animals that live for
9  only 24 months, wouldn't it be a prudent observation
10  that perhaps those extra two months need to be
11  considered when looking at the study results for the 26
12  months showing tumors?
13      MR. DHINDSA:  Objection.
14    A.  Again, I would come back to the argument that
15  I would be looking at making comparisons of
16  compound-related tumors.  If there was a
17  compound-related tumor, then I would, indeed, look at
18  that.  But I did not see compound-related tumors here.
19    Q.  When you say "compound-related tumor," how do
20  you identify a compound-related tumor in advance of
21  looking at the study quality such as length, final
22  results, survival rates, et cetera?
23    A.  I don't do it in advance.  I do it in -- by
24  evaluating the entire study.
25    Q.  So the duration of the study does, in fact,

Page 196

1  go into whether there is a dose response.
2    A.  It's something that goes into my overall
3  assessment of the study and whether or not the
4  compound -- there are compound-related effects or not.
5    Q.  Okay.  And on Page 14, you give us, again,
6  some percentages from historical control data in the
7  second paragraph.  I'll give you a moment to locate it.
8    A.  Yes.
9    Q.  Why not use the concurrent controls?
10    A.  In this particular study, if I remember
11  correctly, there were a number of things that were at
12  issue.
13      In particular, the survival rate in the
14  control group was lower than in the higher dose group.
15  And for some reason in this study, the higher dose
16  group survived longer and did better.
17    Q.  And that's why you used historic controls
18  instead of the concurrent controls?
19    A.  It is one of the things that I considered,
20  yes.
21    Q.  And where did you find information related to
22  the survival rates of the animals?  It's uncited in
23  your report here.
24    A.  Again, this is one in which I believe,
25  because I didn't have the original data, I would have

Page 197

1  relied upon the Greim study, summary tables, and the
2  write-up in the -- in the Greim paper, if I remember
3  correctly.
4    Q.  So maybe we should have cited to Greim there,
5  correct?
6    A.  I'm sorry?
7    Q.  So Greim could be cited there.  Correct?
8    A.  Greim could be cited there in that case, if
9  that was it.
10    Q.  Would there be any other material you relied
11  upon that would give you such information?
12    A.  Such as?
13    Q.  It's your report, Dr. Foster.  I don't know
14  everything you reviewed.
15      So was there anything in addition to Greim
16  that could have told you that the number of animals
17  surviving to the end -- end of the study was higher in
18  the dose groups than the controls?
19    A.  Everything that I consulted is on my
20  Materials Consulted list.  And in my review of this
21  study, if I remember correctly, I looked at the Greim
22  summary tables and the text.
23    Q.  Which historical controls did you look at for
24  the study?
25    A.  In this particular case -- let me see if I

Confidential - Pursuant to Protective Order

Page 198

1    can figure it out here.
2         If I remember correctly in this particular
3    case, I may be referring to the Greim paper.
4         Q.  The Greim paper is a review summary, correct,
5    not a historical control database.
6         A.  No, it's not a -- a historical control
7    database.
8              MR. DHINDSA:  Is this an appropriate time for
9         a break?
10             MS. ROBERTSON:  The question is pending.
11        He's looking.
12             MR. DHINDSA:  Okay.
13        A.  Okay.  This is Study 1 under the Greim, so
14   this would have been material that I had from -- it's a
15   Monsanto-funded study, so I believe I actually had the
16   original data to look at.
17        Q.  Right.  But we're talking about historical
18   controls, and Monsanto doesn't have
19   historical-controlled data sets, do they?
20        A.  I don't know what Monsanto does or doesn't
21   have.
22        Q.  Well, in this instance, you said that you had
23   the original Monsanto study, but we're talking about
24   historical controls.  So I just want to make sure that
25   we're not -- we're not crossing hairs here.

Page 199

1         A.  No, I get that.  So as I read the Greim
2    paper, investigators noted that a terminal sacrifice in
3    the interest -- "The range of control animals, five
4    contemporary studies, historical controls was..."  The
5    incident with the highest dose was 12 percent, compared
6    to contemporary historical controls.  So this is where
7    I believe I'm getting that information from.
8         Q.  And you're talking about testicular tumors
9    there?
10        A.  Interstitial cell -- yes, I believe I am.
11             MS. ROBERTSON:  Okay.  We can take a break.
12             MR. GOODALE:  This marks the end of Media 4
13        in the deposition of Dr. Warren G. Foster,
14        Ph.D.  Going off the record at 4:14 p.m.
15        (Recess held.)
16             MR. GOODALE:  Here begins Media No. 5 in the
17        deposition of Dr. Warren G. Foster, Ph.D.
18        We're back on the record at 4:33 p.m.
19   BY MS. ROBERTSON:
20        Q.  Okay, Dr. Foster, we're -- we were on the
21   Lankas study before the break and your analysis of the
22   Lankas study.
23        Now, still talking about the interstitial
24   tumors of the testis, as stated in your expert report
25   on Page 14, the incidence is reported as zero, three,

Page 200

1    one, and six.  Correct?
2         A.  Correct.
3         Q.  And because of the 16 in the high dose group,
4    that's why you include as the last sentence in the
5    second paragraph, "The neoplastic changes in the testis
6    of the high dose group were evaluated to better
7    elucidate their importance," is that your analysis you
8    were talking about or Greim's?
9         A.  No, this is my evaluation.
10        Q.  Okay.  And so here you note that it's
11   important to look at the high dose group survival rate,
12   compared to the controlled group survival rate, because
13   these neoplasms may develop spontaneously.  Correct?
14        A.  I think it's well-documented that neoplastic
15   changes can occur spontaneously.  And in this
16   particular study, we had a much higher survival rate in
17   the -- the higher dose group than in the control group.
18        Q.  And as a result, you conclude that this can't
19   be -- the six interstitial testicular tumors are not
20   compound-related tumors.  Correct?
21        A.  Not solely on that basis.
22        Q.  Okay.  What's the other basis?
23        A.  So I'm looking at this.  I see the
24   pathology -- pathologist in their evaluation notes that
25   there was absence of compound-related hyperplasia.

Page 201

1    Hyperplastic changes would be expected to be present.
2    In -- if these were compound-related changes.  I looked
3    at the control.  And then the -- I looked at the issue
4    of the higher survival rates in the high dose group,
5    versus the controls.  And then I also went and looked
6    at other animal studies that also looked at exposures
7    that covered the same dose range, as well as much
8    higher levels.  And I note that this was not reported
9    in any other rodent study.
10        Q.  Interstitial testicular --
11        A.  Testicular tumors.
12        Q.  -- tumors are not in any other rodent study.
13        A.  I noted that there was no evidence in my
14   review of any compound-related replication of the
15   testicular tumors.
16        Q.  And for the Lankas study, the dose
17   administered to the high dose group is below OECD
18   current guidelines, correct?
19        A.  It was, yes.
20        Q.  And, in fact, you note that it's 300 ppm of
21   glyphosates for the high dose group.  Correct?
22        A.  Yes, I noted that that was the case, yes.
23        Q.  And do you know what 300 ppm correlates to
24   for milligrams per kilogram per day?
25        A.  I believe in the high dose group in the

51 (Pages 198 to 201)

Confidential - Pursuant to Protective Order

Page 202

1  males, that equivalent -- the equivalent of that is 34,
2  roughly, mg's per kg per day.
3      Q.   And 31, almost 31 and a half for the males.
4      A.   That -- I'm sorry.  I thought that -- 31.5 --
5  let me be clear -- is for the males.  Sorry.  34 for
6  the females.
7      Q.   And we can agree that that's a relatively, if
8  not greatly, low dose for the high dose group.
9  Correct?
10     A.   That would be a low dose, yes.
11     Q.   And it was such a low dose -- did that come
12  into your consideration with result to six tumors seen
13  in the high dose group?
14     A.   What do you mean, did it come into my
15  consideration?
16     Q.   With six tumors in the high dose group,
17  higher than any other group, doesn't this suggest that
18  the tumors are compound-related, as compared to the
19  controls, because the doses are so low?
20     A.   No.  I mean, it -- in your control group, you
21  don't have them surviving.  And we know that the longer
22  the animal lives, that spontaneous tumors occur, and
23  that the longer the animals live, the greater the
24  chance you're going to see tumors.
25     Q.   And so --

Page 203

1      A.   Spontaneously occurring.
2      Q.   Sorry.  Are you finished?  I don't want to
3  cut me off.  I'm sorry.
4      A.   You can cut me off now.
5      Q.   Okay.  Sorry.  So -- so, yeah, we can agree
6  that the longer the animal lives, the more likelihood
7  there is for a spontaneous tumor to occur.  Correct?
8      A.   Correct.  So in this particular study, even
9  though the doses are lower, I've got a problem with the
10  study on the basis that the low dose, survival bias,
11  the histopathology report, and the lack of replication
12  of the diet -- of the outcome in other well-conducted
13  studies that use this dose and much higher doses.
14     Q.   Can you identify a study that uses a dose
15  that's even within 500 ppm of the Lankas study?
16     A.   Atkinson used a dose of 11 mg's per kilogram,
17  so that would be in the same ballpark.
18     Q.   For the high dose group?
19     A.   Sorry.  You asked me if they used any -- any
20  dose that was in that range, not the high dose.  Any
21  dose.
22     Q.   Well, would you compare a high dose group
23  result to a low dose group result?
24     A.   I would compare on the equivalent dose.
25     Q.   But an equivalent dose is based on milligrams

Page 204

1  per kilograms per day.  So you're going to take a study
2  from 1981 in males, that from a high dose group
3  observation, and compare that to a study that has a low
4  dose group administration, that has a similar to same
5  milligram per kilogram per day?  Am I understanding
6  correct?
7      MR. DHINDSA:  Objection.
8      A.   What I stated was that there was no
9  replication of the testicular tumors in other studies
10  that used similars doses through to much higher doses.
11  You asked me was there another study that used any dose
12  that was similar.
13     Q.   Um-hum.
14     A.   I gave you a study in which they used one of
15  their doses that was similar and consistent with what I
16  had testified.
17     Q.   And that's the Atkinson study.
18     A.   I believe that was the Atkinson study, yes.
19     Q.   And which dose group are you referring to --
20     A.   Sorry.  Sorry.  Let me --
21     Q.   Sorry.
22     A.   Let's just make sure we're talking the right
23  one here.  Atkinson, et al., 1993.  This is Greim, et
24  al., Study No. 3, Page 19 of my report.
25     Q.   And which dose group are you referring to

Page 205

1  that's similar --
2      A.   So they have one dose group that's using 11
3  mg's per kilogram.
4      Q.   And that's the low dose group, correct?
5      A.   That's the low dose in that group.
6      Q.   And you didn't see a replication with the --
7  with tumor incidents in the Atkinson low dose group for
8  these testis interstitial cell tumors --
9      A.   That's correct.
10     Q.   -- or testicular tumors.
11     A.   That's correct.  And if you look at Suresh,
12  Greim study, they use the males a dose of 6.3 mg's.
13     So it's a little bit lower, covering the same
14  range, going 6.3 for 59.4 to 592.
15     (Witness asked for clarification by the
16     reporter.)
17     A.   59.4 to 595.5 mg's per kilogram per day.  So
18  they're overlapping that dose range.
19     Q.   Now, Dr. Foster, did the Atkinson study
20  authors report on all 50 animals in the low dose group
21  when they did their final analysis, as it relates to
22  testicular tumors?
23     A.   The Atkinson study is the study in which they
24  looked at the control in the high dose group and made
25  their comments there, if I remember correctly.

52 (Pages 202 to 205)

Confidential - Pursuant to Protective Order

Page 206

1      Q.  So, Dr. Foster, how did you compare the
2   Lankas study high dose group with the Atkinson study
3   low dose group for testicular tumors?
4      A.  If you're seeing something that's
5   compound-related, you would expect to see a dose
6   response with higher -- as you got higher.  They did
7   not see that in that study.
8          In the high dose group, there was no report
9   of a testicular tumor.
10         Then you look at the Suresh, another study
11  covering the same dose range.  They don't see it
12  either.
13     Q.  Okay.  But my question wasn't that.  My
14  question was whether Atkinson looked at the 50 animals
15  in the low dose group receiving the like -- the similar
16  dose that Lankas high dose group received.  Did the
17  study authors look for testicular tumors?
18     A.  Not in the low dose group, because they
19  didn't see them in the high dose.
20     Q.  So how did you compare the Atkinson low dose
21  group to the Lankas study?
22     A.  I didn't say I did.  The way I -- I stated my
23  testimony was that in studies that looked at similar
24  doses through to higher, they did not see a replication
25  in testicular tumors.

Page 207

1          Atkinson -- you asked me which studies
2   covered similar doses.  Atkinson is one that did.  They
3   only looked at the high dose versus the control.
4          If one is seeing a compound-related effect,
5   one would expect to see that if there were
6   compound-related effects, as you increase dose, you
7   would see an increase in the number of tumors.  That
8   wasn't seen in control versus the high dose group.
9          Then you go on to Suresh, that did look at
10  the animals from all the dose groups, and they don't
11  see an increase in testicular tumors.
12     Q.  Is it --
13     A.  So it's not just looking one -- one off at
14  one end point.
15     Q.  As you sit here today, do you know how many
16  testicular tumors appeared in the low dose group in
17  Atkinson?
18     A.  No, I do not.
19     Q.  As you sit here today, do you know how many
20  testicular tumors appeared in the low dose group of
21  Suresh?
22     A.  In the Suresh study -- This is Study 4.  In
23  this study was a negative study.  They did not find
24  evidence of compound-related tumors.  They would have
25  evaluated the testis as -- in a thorough study.  They

Page 208

1   did not find them.  So they were not reported.
2      Q.  And is your testimony today that Suresh
3   conducted a different analysis than Atkinson 1993?  Is
4   that my -- is that correct?
5      A.  What do you mean by a "different analysis"?
6      Q.  Well, Atkinson did not report on tumors --
7   all the tumor incidences seen, unless it
8   showed positive -- unless there was a positive finding
9   or compound-related finding between the control group
10  and the high dose group.  Correct?
11     A.  They -- the way I understand the Atkinson
12  study to have been conducted is they looked at the
13  control versus the high dose group and -- to determine
14  whether or not there were tumors being seen that
15  were different than the control, to decide whether or
16  not they were going to invest the money to go back and
17  look at the intermediate doses.
18     Q.  Okay.
19     A.  That would be my interpretation of their
20  thinking in that study.
21     Q.  And is that the same or different from the
22  study analysis of Suresh?
23     A.  That is different -- different than what
24  Suresh did.
25     Q.  So when you conclude that the interstitial

Page 209

1   testicular tumors have not been replicated, that's by
2   looking at the Suresh report.  Is that correct?
3      A.  Looking across all the studies, I see no
4   replication of testicular tumors in any study.
5      Q.  Now, your first full paragraph on Page 15,
6   still talking about the Lankas study, observes that the
7   statistical significant disappears once thyroid C cell
8   adenomas and carcinomas are combined.  Do you see where
9   I'm at?
10     A.  I'm reading that paragraph now.  Yes.
11     Q.  Okay.  And so once you combine the carcinoma
12  with the adenoma and the thyroid C cell for female
13  animals only, there's no statistical significance.
14     A.  Correct.
15     Q.  Do you know what animals McConnell 1986 used
16  when they published this article that you cite?
17     A.  I cannot recall at this point in time which
18  animals they were looking at.
19     Q.  Would it make a difference to combining
20  adenomas or carcinomas as to what animals McConnell is
21  talking about?
22     A.  It depends on the context in which this is
23  being written.  If he's talking as a pathologist and
24  stating that this is the appropriate thing to do in
25  evaluating rodent carcinogenicity assays, then, no, I

53 (Pages 206 to 209)

Confidential - Pursuant to Protective Order

Page 210

1 don't think it does.
2      Q.  Let's take a glance at Stout and Ruecker 1990
3 test on Page 16 and 17 of your expert report.
4      A.  Yes.
5      Q.  Stout and Ruecker is a Monsanto study,
6 correct?
7      A.  This was a study conducted by Monsanto in
8 Sprague-Dawley rats.
9      Q.  And is this one of the studies that you
10 received the full data set for?
11      A.  Yes.
12      Q.  And here you discuss the results of the Stout
13 and Ruecker using 60 animals in each group.  Is that
14 correct?
15      A.  Those are the numbers that they had, yes.
16      Q.  Okay.  If I could direct you to the Greim
17 paper, Study 2, that you have in front of you.
18      A.  Sure.  Somewhere.
19      Q.  Exhibit 18-16.  Isn't it true, Dr. Foster,
20 that Greim uses 50 animals when discussing the Stout
21 and Ruecker study?
22      A.  This is Table No. 5?  Where are we looking?
23      Q.  I'm looking at --
24      A.  I'm sorry.  In the text?
25      Q.  Yeah, 191 of the Greim article, Study 2,

Page 211

1 Monsanto 1990.
2      A.  He's reporting 50 animals per dose group.
3      Q.  As you sit here today, do you recall where
4 you got the number 60?
5      A.  I'm just reading through my report now.  If I
6 remember correctly, they used 10 animals in this study
7 as an interim sacrifice, leaving the 50 animals to go
8 through to the study conclusion.
9      So I believe Greim is talking about the study
10 conclusion.  I think at the start here, I'm talking
11 about the 60 that entered for each dose group, from
12 which ten were used for interim sacrifice.
13      Q.  Okay.  In the second paragraph of your expert
14 report on Page 16, under the Stout and Ruecker study,
15 when you provide the numbers for pancreatic islet cell
16 adenomas, you use the denominator using presumably
17 the number 60.  Correct?
18      A.  I have here, yes.
19      Q.  And why did you include the ten interim
20 sacrificed animals in your overall -- in your
21 identification of the pancreatic islet cell -- islet
22 cell adenomas?
23      A.  I believe that the reason that it was 60 was
24 looking at the overall study.
25      Q.  Isn't it true, Dr. Foster, that interim kills

Page 212

1 pursuant to OECD guidelines should not be part of the
2 final statistical analysis from a main study?
3      A.  They would be -- normally would be omitted.
4      Q.  Now, in this same discussion, you again note
5 historical controls and a range of zero to 17 percent
6 for these pancreatic islet carcinomas.  Correct?
7      A.  I don't see where you are.
8      Q.  The third paragraph.  I apologize.  Please
9 take your time.
10      And here in Footnote 2, you give -- you offer
11 your methodology behind using the range of historical
12 controls, as -- as opposed to the mean.  Correct?
13      A.  This is where I'm talking about that issue,
14 yes.
15      Q.  Okay.  And sitting here today, you believe
16 it's most appropriate to use the range of historical
17 controls as compared to the mean?  Is that correct?
18      A.  I do.
19      Q.  And for support of this, you cite to Baldrick
20 2005 and Baldrick 2007.
21      A.  That's correct.
22      (Discussion held off the record.)
23      Q.  Dr. Foster, we -- we'll mark both Baldrick
24 2005 and Baldrick 2007 -- Baldrick 2005 will be Foster
25 Exhibit 18-17.

Page 213

1      (Foster Deposition Exhibit 18-17 - Baldrick
2      2005 Study - marked for identification.)
3      Q.  And Baldrick 2007 will be Foster 18-18.
4      (Foster Deposition Exhibit 18-18 - Baldrick
5      2007 Study - marked for identification.)
6      Q.  Here is 18-18.
7      (Discussion held off the record.)
8      Q.  And these are the articles you refer to.
9 Correct, Dr. Foster?  I pulled the correct articles?
10 I'd like your confirmation, please.
11      A.  I believe these are the articles, yes.
12      Q.  Okay.  And we see that 18-17 deals with
13 Sprague-Dawley rats, and 18-18 is CD-1 mice.  Right?
14      A.  Correct.
15      Q.  Now, this -- this -- the subject of this article is
16 for comparison of tumor data with dual control groups.
17 Correct?
18      A.  Yes.
19      Q.  Okay.  And so in the context of your
20 methodology used for the use of range of historical
21 controls, you choose to cite to two articles related to
22 dual control groups.  Correct?
23      A.  They are talking about dual control groups,
24 yes.
25      Q.  And dual control groups are different from

54 (Pages 210 to 213)

Confidential - Pursuant to Protective Order

Page 214

1  historical control groups.  Correct?
2      A.  Yes.  I believe that to be true.
3      Q.  So Baldrick 2005 and Baldrick 2007 don't
4  necessarily support your position that the use -- that
5  the range of historical controls, as opposed to the
6  mean, is the most appropriate and common standard
7  practice for interpreting toxicologic data, does it?
8      A.  I'm going to take a few minutes to review the
9  paper.
10     Q.  Dr. Foster, sitting here today, if you can't
11 tell me whether Baldrick 2005 and 2007 support your
12 Footnote 2, we can just move on.
13         MR. DHINDSA:  Objection.
14     Q.  I won't ask any more questions on these
15 documents.
16         MR. DHINDSA:  Objection.  He's still
17 reviewing these documents.
18     Q.  I have no further questions on these
19 documents.
20     Dr. Foster, as part of your review of the
21 literature related to forming your expert opinion, you
22 looked at the OECD guidelines.  Correct?
23     A.  Correct.  I used OECD guidelines.  I looked
24 at them.
25     Q.  I'm going to mark Foster Exhibit 19.

Page 215

1      (Foster Deposition Exhibit 18-19 - OECD
2       Guidelines, Guidance Document 116 - marked
3       for identification.)
4      Q.  Dr. Foster, I just handed you Guidance
5  Document 116.  And -- and you consulted this document
6  in preparation to author your expert report.  Correct?
7  Report.  Citation 144.  I just want to make sure this
8  matches and I pulled the correct version.
9      A.  I've looked at these documents, yes.
10     Q.  I'd like to direct your attention to
11 Page 135, which discusses Historical Control
12 Considerations, Section 4.22.  And, Dr. Foster, these
13 are the guidelines that you've referenced throughout
14 the day with your use of the historical controls and
15 the evaluation of forming your expert opinion.
16 Correct?
17         MR. DHINDSA:  Objection.
18     A.  I have familiarity with OECD and their
19 guidelines, and I have referred to them.
20     Q.  And Paragraph 400, referring to Elmore and
21 Peddada 2009, discusses the incorporation of historical
22 control data and statistical analysis of
23 carcinogenicity studies, correct?
24     A.  Yes.
25     Q.  Okay.  Did you review Elmore and Peddada, as

Page 216

1  referenced here in OECD guidelines?
2      A.  I may have looked at it at some point during
3  my time as the Canadian national coordinator for OECD.
4  I did not look at it in the context of this study, that
5  I recall.
6      Q.  And Elmore and Peddada, as cited here in the
7  OECD guidelines, discuss how historical controls need
8  to consider rogue outliers.  Correct?
9      A.  That's what they are saying, yes.
10     Q.  And when you use a range of historical
11 controls, as compared to the mean, are you not more
12 likely to have a rogue outlier when you use the range?
13     A.  It is possible that you could.  However, I
14 did not rely on historic controls or concurrent
15 controls in reaching my opinion.  They are but one
16 factor.
17     Q.  And when you looked at the historical
18 controls of Chandra in 1992 that reported a historical
19 control range of zero to 17 percent, did you look at
20 the historical control data to consider whether there
21 was an outlier making the range so large?
22     A.  I'm sorry; where are we?
23     Q.  Page 16 at the bottom.
24     A.  Okay.
25     Q.  Accompanying Footnote 2, the range is zero to

Page 217

1  17 percent.  And you, I believe, are referencing
2  Chandra, et al., 1992.
3      A.  Correct.
4      Q.  And did you look at Chandra, et al., 1992, to
5  determine whether there was an outlier with respect to
6  this range of historical controls?
7      A.  Well, they're looking at the range, whereas
8  what you're referring to is this -- let's go back to --
9  what page was it?  134?
10     Q.  It was Section 4.22, if that helps out.  And
11 I will confirm 135.
12     A.  They are saying the mean and the standard
13 deviation can be affected by a rogue outlier, while the
14 mean and interquartile range is not.  Here I'm talking
15 about range.  I'm not talking about the mean, the
16 standard deviation.
17     Q.  You're talking about the interquartile range?
18     A.  I'm talking simply about the range, not the
19 interquartile range.  The range, period.
20     Q.  Okay.  So historical control considerations
21 as outlined by OECD don't talk about using the range,
22 do they?
23     A.  They don't exclude using it, no.
24     Q.  So what are you basing your methodology on
25 for using the range in your expert report?

55 (Pages 214 to 217)

Confidential - Pursuant to Protective Order

Page 218

1    A.  Almost 30 years' experience working in the
2  field.  And, again, it wasn't the only thing that I
3  relied upon.
4    Q.  What else did you rely upon?
5    A.  I looked at whether or not these were
6  compound-related effects based on the conduct of the
7  study.
8        So my methodology throughout all was
9  assessing survival of the animals.  Was there systemic
10  toxicity -- signs of systemic toxicity seen.  Were
11  there histopathological evidence of tumor progression.
12  Things like that.
13    Q.  Okay, yeah, I didn't ask a proper question.
14        I thought you were saying that you relied on
15  other things beyond your experience to use the range of
16  historical controls, and I was asking what else you
17  relied on that supports your use of ranges.
18    A.  Again, this is common throughout toxicology.
19    Q.  Do you find the range to be more relevant
20  than the mean when applying historical control data to
21  rare tumors?
22        MR. DHINDSA:  Objection.
23    A.  Again, I don't rely upon it to the exclusion
24  of other factors.  It's something that I look at.
25    Q.  So you can't answer that question because you

Page 219

1  don't isolate that particular analysis when deciding
2  whether to use historical controls.  Is that correct?
3        MR. DHINDSA:  Objection.
4    A.  I look at the data, I look at what's -- the
5  controls are doing.  If there's reason for me to look
6  at historical controls, then I will do so.  But I'd
7  look at it in the context of the overall study.
8    Q.  And what was your purpose in using historical
9  controls in the Stout and Ruecker analysis?
10    A.  In this particular study, we see differences
11  in survival with higher survival in the high dose
12  groups.  So 29, 38, 34, 34.
13        In males, you're look -- sorry.  That was
14  males.
15        Now, in this study, I also note that there
16  was a number of issues going on as well.  There's no
17  change in food consumption, but there's also a change
18  in increased liver weight found in the males.  Seeing a
19  sign of increased liver weight tells me that I've got
20  liver induction, and that is potentially confounding
21  effects at higher dose.
22    Q.  But, Dr. Foster, you state on Page 16 that
23  the data taken together suggests that the dose
24  selection was considered adequate for females.  Are you
25  speaking only to the males?

Page 220

1    A.  In this particular case, that's in reference
2  just to the males.
3        Sorry.  Are we --
4    Q.  I was trying to figure out why you choose to
5  use historical controls as opposed to concurrent
6  controls here.
7    A.  Okay.  I'm -- again, I'm looking at the
8  overall conduct of the study.  I'm seeing differences
9  in survival rate.  And then I go on and I also note
10  that the USEPA requested that additional data on
11  historical controls be looked at as well.
12        So it was not just me.  USEPA is asking that
13  they look at historical controls as well.
14        And this is in the context of the thyroid C
15  cell adenomas and hyperplasia.  The hepatocellular --
16        (Witness interrupted by the reporter.)
17    A.  Thyroid C cell adenomas, carcinomas, and
18  hyperplasia; hepatocellular adenomas, carcinomas, and
19  hyperplasia; and, three, the keratoacanthomas.
20    Q.  Okay.  But the EPA didn't ask for historical
21  control data related to the pancreatic islet cell
22  adenomas.  Isn't that correct?
23    A.  Not in this case, no.
24    Q.  But you consulted historical control data
25  sets.

Page 221

1    A.  In order to conduct a fulsome analysis of the
2  study, yes, I did look at historical controls.
3    Q.  Was this use of historical controls based on
4  using the study results from the 60 total animals, as
5  reported in your report, including the interim
6  sacrificed?
7    A.  I believe that's correct.
8    Q.  Let's take a look at the Brammer study, which
9  is the very next page in your expert report on Page 17.
10    A.  Yes.
11    Q.  And, here again, we're -- we have a
12  discussion on historical control data, this time using
13  Giknis and Clifford 2011.  Correct?
14    A.  Correct.
15    Q.  And in your analysis, what did you -- what
16  led you to use the Giknis and Clifford 2011 historical
17  control data set?
18    A.  In my analysis of the data, I believe that I
19  looked at Dr. Portier's report and noted that he used
20  it, so I went and looked at it as well.
21    Q.  And did you find it sufficient for the
22  purposes of this study?
23    A.  Did I find what sufficient for the purposes
24  of this study?
25    Q.  A sufficient historical control database to

56 (Pages 218 to 221)

Confidential - Pursuant to Protective Order

Page 222

1 apply to the Brammer results.
2      A.  I believe it was appropriate to apply in this
3 study.
4      Q.  Do you know the years of the Giknis and
5 Clifford data set?
6      A.  Do we have a copy here that we can refer to?
7      Q.  I'm just asking if you know it off the top of
8 your head.
9      A.  Off the top of my head, I don't know.
10      Q.  Okay.  Did you look at each of the studies in
11 this historical controlled data set to determine
12 whether there was an outlier causing such a large
13 range?
14      A.  (No response.)
15      Q.  In liver adenomas in Wistar rats.
16      A.  How would you look at an outlier in an
17 individual study, when it only reports the total
18 number?
19      Q.  The historical control data set, is what I
20 asked about.
21          Did you look at each of the studies in the
22 historical control data set taken as a whole and
23 determine whether there was an outlier at any of that
24 historical control data, such that the range of zero to
25 17.5 percent for liver adenomas in Wistar rats is not a

Page 223

1 wholly correct number?
2      A.  It's a correct number for the range for all
3 of the studies that they looked at.
4          In order to determine whether or not there's
5 a statistical outlier, one would be required to do a
6 Grubbs test.  I did not do a Grubbs test here.
7      Q.  Dr. Foster, are you aware that 13 of the 16
8 studies in the historical control data set, Giknis and
9 Clifford 2011, show a response of less than or equal to
10 2 percent?
11      A.  I don't have recollection of that at this
12 point in time.
13      Q.  Would it change your application of the
14 Giknis and Clifford data set to -- to note liver
15 adenomas with a range of zero to 17 1/2 percent?
16          MR. DHINDSA:  Objection.
17      A.  It wouldn't cause me to change my view.  I
18 would still look at the range.  They -- we have studies
19 that have had high response.  One might want to look at
20 that and say, well, we've got a study here that's a
21 high response; how do I interpret it.
22          So as -- looking at it as one factor in my
23 overall assessment.
24      Q.  Dr. Foster, 81 percent of the studies in the
25 historical control database for Giknis and Clifford

Page 224

1 report equal or less than 2 percent incidence of liver
2 adenomas in Wistar rats.
3          Given that knowledge, isn't the range of zero
4 to 17.5 percent an example of how using ranges for
5 historical controls may skew results?
6          MR. DHINDSA:  Objection.
7      A.  It's an example of where you have a wide
8 range.  And if you take an average or look at the
9 percentage of below a certain value, you can get a
10 different number.
11          (Discussion held off the record.)
12          MR. GOODALE:  Off the record at 5:17 p.m.
13          (Recess held.)
14          MR. GOODALE:  We're back on the record at
15 5:31 p.m.
16 BY MS. ROBERTSON:
17      Q.  I'm marking as Exhibit Foster 18-20 an
18 article entitled "Proliferative and Non-proliferative
19 Lesions in the Heart and Vasculature in Mice", as
20 authored by Elwell, et al.
21          (Foster Deposition Exhibit 18-20 - Elwell
22           Article - marked for identification.)
23      Q.  Dr. Foster, is this the article that we
24 talked about earlier that is your Citation 39 in your
25 Materials Considered -- Consulted list at the end of

Page 225

1 your expert report?
2      A.  Yes, this is the article.
3      Q.  We were handed this article by Monsanto
4 counsel around 2:00 p.m. today after the lunch break.
5 Did you give this report to the attorneys at the break?
6      A.  Yes.
7      Q.  How did you locate this article today?
8      A.  What do you mean, how did I locate it today?
9      Q.  How is it that you were able to give it to
10 your attorneys today?
11      A.  When it was requested that I obtain --
12          MR. DHINDSA:  I'm going to object to that
13          line of inquiry.
14          MS. ROBERTSON:  How did he get the document?
15          MR. DHINDSA:  Yeah, I think it's --
16          conversations between counsel and the
17          deponent are privileged.
18      Q.  Dr. Foster, did Monsanto's counsel give you
19 this document?
20      A.  No, they did not.
21      Q.  How did you come about obtaining this
22 document?
23      A.  I found this document through my PubMed
24 search, and I reviewed the document.  And then when I
25 was informed that you wanted a copy of it, as I

57 (Pages 222 to 225)

Confidential - Pursuant to Protective Order

Page 226

1  mentioned earlier today, I had already left my office
2  and was not able to locate it in my home office, and so
3  I asked one of my colleagues if they could look for it
4  for me.
5      Q.  And that's how you located the document
6  today.
7      A.  They were able to provide me with the
8  photocopy, yes.
9      Q.  Not had time to study the document or review
10  the document, given the density, but you have reviewed
11  this document in connection with forming your expert
12  opinion.  Correct?
13      A.  I have reviewed this document, yes.
14      Q.  I'd like to direct your attention to Page 5,
15  which is shown in the upper right-hand corner.
16      A.  The number 5 is, yes.
17      Q.  Yes.  And, also, on that page in the
18  right-hand column we see hemangiosarcomas.  Correct?
19      A.  Correct.
20      Q.  Is it not -- it's true, isn't it, that this
21  is the only place that mentions hemangiosarcomas with
22  discussion?
23      A.  What do you mean, "with discussion"?
24      Q.  Let me ask it another way, Dr. Foster.
25          Does Page 5, the paragraph on

Page 227

1  hemangiosarcomas, support your statement in your expert
2  report wherein you cite to Elwell for the premise that
3  hemangiosarcomas are common in CD-1 mice?
4      A.  This is one area in the report in which they
5  talk about it.
6      Q.  And is this the area that supports your
7  statement on Page 22 that tumors are rare in human, but
8  they are common neoplasms of mice, citing to Elwell
9  2004?
10      A.  This is one area where I saw it.  And then
11  the other, I note in the introduction they also point
12  out.  The -- given the relatively common occurrence of
13  spontaneous background lesions and the potential for
14  treatment of disk lesions in the cardiovascular
15  system --
16          (Witness asked for clarification by the
17          reporter.)
18      A.  Sorry.  So in the introduction, they point
19  out, "Proliferative and non-proliferative lesions of
20  the blood vessels are not uncommon in mice.  Given the
21  relatively common occurrences in spontaneous and
22  background lesions --" so this -- they're giving this
23  as the rationale why they're doing this study.
24      Q.  Okay.  And so is their rationale what caused
25  you to cite to Elwell 2004 on Page 22 of your expert

Page 228

1  report?
2      A.  Part of the reason.  And then I also cited --
3  or I didn't cite in the text, but I also have Cohen in
4  my Materials Considered list, which also looked at the
5  same issue.
6      Q.  And in the Elwell article, can you please
7  point me to where Elwell is stating that in CD-1 mice
8  hemangiosarcomas are common neoplasms?
9      A.  So in the introduction, they talk about it.
10  And then when you go to Page 5, they are talking about
11  Figures 2 -- 22 to 23, where they talk about it.
12      Q.  Okay.  And in the introduction, can you
13  please direct me -- because I must be missing it --
14  where they are talking about CD-1 mice.
15      A.  They are talking about mice in general.
16      Q.  Isn't it true that tumor incidences in mice
17  occurred differently among different strains?
18          MR. DHINDSA:  Objection.  Vague.
19      A.  Yes.  Do you have a -- are you -- are you
20  suggesting that CD-1 mice might be different than other
21  mice?
22      Q.  Well, isn't it true that CD-1 mice are
23  different than other mice?
24      A.  I'm not sure that the -- the information
25  that's providing [sic] in this report is suggesting

Page 229

1  that it's different for CD-1 mice.  They are talking
2  about mice in general.  These people, I believe, are
3  pathologists, so I'm going to rely upon them.
4      Q.  Okay.  And in the section from this article
5  on Page 2, first column, Amyloidosis, we get a specific
6  reference to B6C3F1 strains and CD-1 strains.  Correct?
7      A.  Yes.
8      Q.  But we don't get any specific such reference
9  in the hemangiosarcoma section, correct?
10      A.  To a specific strain being different?  No.
11      Q.  Okay.  Doctor, if I could direct your
12  attention to Page 18 of your expert report.
13      A.  (Witness complies.)
14      Q.  We talked a lot today about comparing
15  studies, quality of studies, considering studies.
16  Correct?
17      A.  Yes.
18      Q.  And as part of your consideration for the
19  studies and the material, you note the publication year
20  as relevant to study publications, for example, in the
21  context of applying historic controls.  Correct?
22      A.  I've -- I'm sorry.  Are you referring to when
23  I cite -- say Wood 2009a?
24      Q.  Just generally throughout your report, you do
25  have a mind toward citing to data and literature that

Confidential - Pursuant to Protective Order

Page 230

1  matches or is within the similar time frame as the
2  study you're discussing.  Correct?
3      A.  I'm trying to do that, yes.
4      Q.  Okay.
5      A.  And, also, just trying to make it possible so
6  that we can refer to the right study.  This is a -- a
7  voluminous amount of -- of literature to look at.  And
8  as we've both noted, looking at the individual studies
9  and looking at Greim, there is some difficulty in
10  matching them up, so.
11      Q.  Right.  And just so the record's clear, we're
12  talking this time about Wood and the Wistar rat study.
13  Not the mouse.  We previously talked about the mouse.
14      A.  This is -- excuse me -- Greim Study 8, and
15  it's in the Wistar rats, that's correct.
16      Q.  Okay.  And you have a reference here related
17  to mammary gland tumors and that they are common in
18  rats with a prevalence of 57 percent in female
19  Sprague-Dawley rats that are allowed to live out their
20  naturally lifespan.  Correct?
21      A.  Correct.
22      Q.  Are animals -- were animals in the Wood 2009
23  rat study allowed to live out their natural lifespan?
24      A.  No.  They were -- this was a rat study, so it
25  was a two-year carcinogenicity study.

Page 231

1      Q.  Is it true that mammary gland tumor incidence
2  is likely to increase the longer the rat lives?
3      A.  Yes.
4      Q.  And isn't it true that the Wood 2009 rat
5  study was only an 18-month study?
6      A.  I believe it was a two-year cancer bioassay.
7      Q.  Doctor, does your review in Greim just now
8  refresh your recollection that this is a 18-month study
9  in rats?
10      A.  I'm just looking for the right place.  So
11  there is the Nufarm 2009b.  This is Wood Study No. 8.
12      Q.  Yes.
13      A.  And this is a duration of two years.
14      Q.  And you relied on Greim to get this data, not
15  the actual study report.  Correct?  The study data.
16  Sorry.
17      A.  In this case, I believe I looked at Greim for
18  the data tables, and then I also -- if I remember
19  correctly, I also looked at Dr. Portier's report.
20      Q.  Okay.  Dr. Foster, are you familiar with the
21  journal Environmental Health Perspectives?
22      A.  Sorry.  The Journal of Environmental Health
23  Perspectives.
24      Q.  Perhaps I got the name wrong.  I better
25  check.

Page 232

1          (Discussion held off the record.)
2      Q.  Yeah, Environmental Health Perspectives.
3      A.  I --
4      Q.  Are you familiar with that journal?
5      A.  I -- I am familiar with that journal.  I've
6  published it in the past, and I have reviewed for them.
7      Q.  And you find it to be a reputable journal?
8      A.  I don't know what you mean by "reputable".
9      Q.  Well-respected?
10      A.  It is one of many scientific journals that we
11  publish in.
12      Q.  Yeah.  Standing alone.  But it's not, for
13  example, a journal that's supported by lobbyists or
14  anything like that.  It's a scientific journal.
15      A.  Environmental Health Perspectives is a
16  journal that is published by the Environmental
17  Health -- sorry -- Environmental Protection Agency.  I
18  believe they own and operate it.
19      Q.  Okay.  By chance, have you read the articles
20  by Lauren Zeise, Z-E-I-S-E, et al., on dose response
21  relationships for carcinogens?
22      A.  It's not ringing a bell for me at the moment.
23      Q.  Dr. Portier -- I'm sorry.  My apologies.
24          Dr. Foster, isn't it true that animal
25  bioassays can be looked at using non-linearity and

Page 233

1  linear trends?
2      A.  I would have to look at the paper in order to
3  get some context about where this is being referred to.
4      Q.  Dr. Foster, do you use linear trends when
5  analyzing the data for your expert report?
6      A.  I have as one -- one factor looked at that.
7      Q.  And when you see a dose response that doesn't
8  offer a linear trend, isn't it true that you determined
9  the dose response is not compound-related?
10      A.  Not based solely on that issue, no.
11      Q.  But in part.
12      A.  It is a factor that I look at, yes.
13      Q.  Isn't it true that a rare tumor will likely
14  result in a sublinear trend?
15      A.  It is possible, yes.
16      Q.  And under your analysis, rare tumors would be
17  dismissed or speculated, at least, because further
18  evaluation would need -- be needed, even though a dose
19  response is shown.
20          MR. DHINDSA:  Objection.
21      A.  I don't understand the question.  Can you
22  restate that, please.
23      Q.  If you observe a sublinear trend in the data,
24  you don't determine that that sublinear trend is a
25  positive study.  Correct?

Confidential - Pursuant to Protective Order

Page 234

1        MR. DHINDSA:  Objection.
2        A.  I don't determine that it is a positive or
3    negative study based on that factor alone.
4        Q.  Now, you see the list.  Many publications --
5    or -- yeah, publications, journals where you're a
6    journal referee.  We discussed that a little bit
7    earlier this morning.  Correct?
8        A.  Yes, we did.
9        Q.  And can I use journal referee to be
10   synonymous with peer reviewer in this context?  Is that
11   fair?
12       A.  That would be fair.
13       Q.  And on your CV you list that you're a peer
14   reviewer for the journal article Critical Reviews in
15   Toxicology.  Correct?
16       A.  I have reviewed on occasion, ad hoc basis,
17   for Critical Reviews in Toxicology, yes.
18       Q.  So you're not a permanent peer reviewer for
19   Critical Reviews in Toxicology.  Is that what you're
20   telling me?
21       A.  To my knowledge, there is no journal that has
22   such a thing as a permanent reviewer.
23       Q.  So it's more that you are contacted by the
24   journal when they think that your expertise could be
25   utilized as a peer reviewer because a paper is going to

Page 235

1    be submitted.  Is that correct?
2        A.  Not because a paper is going to be submitted,
3    but because a paper has been submitted.
4        Q.  Apologies.
5        A.  That they think I might --
6        Q.  Right.
7        A.  -- be able to provide them with a timely
8    review for.
9        Q.  Okay.  So I'll clear that up.  So you get
10   contacted by the journal after a paper has been
11   submitted, and that journal determines that perhaps
12   your expertise would make you a valuable peer reviewer,
13   and you're given the opportunity as to whether you want
14   to accept that -- accept the offer from the journal to
15   become a peer reviewer for a submitted article.
16       A.  For that article, yes.
17       Q.  Okay.  We talked about when the -- after an
18   article is peer-reviewed, it often has revisions sent
19   back to the article author.  Do you recall that
20   testimony?
21       A.  Yes.
22       Q.  Okay.  And in -- you stated that the return
23   time for resubmission to the journal varies.  Correct?
24       A.  Yes, I did.
25       Q.  Are there any factors that play into the

Page 236

1    variance, as to when a resubmission may be reviewed
2    again and published?
3        MR. DHINDSA:  Objection.
4        Q.  Like, is there a -- such a thing as a rush
5    review?
6        A.  (No response.)
7        Q.  On a resubmitted paper.
8        A.  I am not familiar with that.
9        Q.  Okay.  Have you ever, in your experience as a
10   peer reviewer for any journal, experienced a situation
11   where peer reviewers have sent substantive edits back
12   to the study author, and the study author resubmits the
13   paper in less than a day, and the paper is published
14   the very next day?
15       A.  In my experience, I have -- as a journal
16   editor, I have been on occasion surprised by how quick
17   some authors have turned around their -- their
18   revisions.  And I have seen quick -- within a day or --
19   a day or two.
20       Q.  And what about within a day or two and then
21   the journal accepts it?  Have you seen that as well?
22       A.  I think I've done it.
23       Q.  You've accepted same day?
24       A.  If I'm in the office, and I'm getting -- I
25   get an email from the -- the journal that says, one of

Page 237

1    the papers that has been assigned to you as by an
2    editor is in your dashboard to look at, I try and look
3    at them as quickly as I can in order to keep my email
4    from getting plugged up.  And, so, yeah, I try and deal
5    with them quickly.
6        Q.  And so you deal with them as a peer reviewer,
7    and the other peer reviewers assigned to this article
8    are, likewise, reviewing the resubmission by the
9    author, correct?  You're not the only person that's
10   looking at a resubmission.
11       A.  No.  If -- if there has been two or three
12   expert peer reviewers assigned to it, then when it
13   is -- comes back into the journal, it's automatically
14   sent to the two or three peer reviewers to reassess.
15       Q.  And do each of the peer reviewers need to
16   accept the changes from the resubmitted article before
17   it's published?
18       A.  They need to respond one way or the other.
19       Q.  How important is it to you in your practice,
20   your many years of experience, to have access to data
21   when you're completing a scientific article for
22   publication?
23       MR. DHINDSA:  Objection.
24       Q.  You do a lot of the data yourself for -- in
25   those instances where you're not conducting your own

Confidential - Pursuant to Protective Order

Page 238

1    study and then publishing on it.  How important is it
2    to you -- is it to you to have the underlying data
3    before you publish an article?
4             MR. DHINDSA:  Objection.
5        A.  I don't -- I'm not following your question.
6    I -- in my typical practice, I am reviewing -- I -- I
7    run the -- the study in my lab or together with my
8    collaborators.  We generate the data, we review it, and
9    write the paper.  So I have the data.
10       Q.  So the data is all your own.  You don't
11   have -- you don't ever publish or author anything on
12   someone else's data.  You use your own data.
13       Q.  If I'm doing a systematic or critical review
14   of the literature, then I would do a computerized data
15   search in order to obtain all the published literature
16   in both the peer-reviewed press and the gray
17   literature, to the extent possible, for my review.
18       Q.  And that would be a review article, though.
19   Correct?
20       A.  That would be a review article.
21       Q.  Okay.  When you were reviewing the Greim
22   review article and the supplemental tables, did -- did
23   it ever cross your mind as to whether Greim might
24   underreport any tumor incidences seen in the data sets?
25       A.  Did it cross my mind that he would

Page 239

1    underreport it?
2        Q.  That underreporting could happen?
3        A.  That's not something that crossed my mind.  I
4    don't have any reason to believe that did or did not
5    occur.
6        Q.  Okay.  Well, let's look at --
7            (Discussion held off the record.)
8        Q.  So if we look at Greim, the review article,
9    Exhibit 18-16 --
10       A.  I have the paper.
11           (Discussion held off the record.)
12       Q.  And under my interpretation, the --
13           (Discussion held off the record.)
14       Q.  -- the Atkinson studies were conducted by
15   Cheminova.  I have in my notes the Atkinson studies are
16   No. 3 and 11 in the Greim paper.
17       A.  Okay.
18       Q.  I'll give you a moment to review, and if you
19   could confirm that Cheminova 1993a and b are Atkinson,
20   we can move on.
21           (Discussion held off the record.)
22       Q.  Dr. Foster, can we agree that the Cheminova
23   studies refer to the Atkinson studies?
24       A.  It appears that they do.
25       Q.  Okay.  Great.  And in the review article by

Page 240

1    Greim on Page 199, Study 11, Cheminova 1 -- 1993b.
2        A.  Sorry.  P age 199.
3        Q.  Yep, the Cheminova study.
4        A.  Table 15.  I'm sorry?
5        Q.  No, just the Cheminova study.  I just want to
6    get your attention there.  That's where -- that's where
7    I want to look at.
8            Now, Table 16 on the next page relates to the
9    Atkinson findings as reported by Greim in the summary
10   article.  Correct?
11       A.  This refers to Cheminova study, yes; 1993b.
12       Q.  Okay.  And in Table 16, Study 11, do we see
13   any reporting of hemangiosarcomas?
14       A.  They are not listing them here as being
15   included in this table.
16       Q.  Okay.  Yet you discuss hemangiosarcomas on
17   Page 22 -- Pages 22 and 23 of your expert report.
18   Correct?
19       A.  Yes.
20       Q.  Okay.  So in the -- in the context of
21   reviewing data to form an expert opinion or even to
22   publish an article, there is a true value in receiving
23   underlying data.  Correct?
24           MR. DHINDSA:  Objection.
25       Q.  A review article would not be enough.

Page 241

1            MR. DHINDSA:  Objection.
2        A.  In this case, I'm responding to Dr. Portier,
3    and I would have gone back to Dr. Portier's report to
4    look at that information.
5        Q.  Okay.  So the hemangiosarcoma discussion in
6    your report is using some of Dr. Portier's data that he
7    reports on.
8        A.  Correct.
9            (Discussion held off the record.)
10           MS. ROBERTSON:  Can we take a five-minute
11   break, please.
12           MR. GOODALE:  Off the record at 6:00 p.m.
13   (Recess held.)
14           MR. GOODALE:  We're back on the record at
15   6:07 p.m.
16           MS. ROBERTSON:  Dr. Foster, I appreciate your
17   time today.  I pass the witness.
18           THE WITNESS:  Sorry?
19           MS. ROBERTSON:  I pass the witness.
20           MR. DHINDSA:  Can we have a few minutes,
21   please, off the record?
22           MR. GOODALE:  Off the record at 6:07 p.m.
23   (Recess held.)
24           MR. GOODALE:  We're back on the record at
25   6:18 p.m.

61 (Pages 238 to 241)

Confidential - Pursuant to Protective Order

Page 242

1              EXAMINATION
2    BY MR. DHINDSA:
3
4        Q.  Dr. Foster, do you recall earlier today
5    answering some questions relating to an article and
6    data tables by Greim?
7        A.  Yes, I do.
8        Q.  How did you use the Greim paper and data
9    tables in drafting your expert report?
10       A.  In drafting my expert report, I used the
11   original data to the extent that it was available to
12   me.  And in the events that I didn't have original
13   data, then I referred to the Greim summary tables.
14   And, if necessary, for additional context, I may have
15   gone to the Greim paper to look at some of the text.
16       Q.  When you say "Greim summary tables", are you
17   referring to data tables?
18       A.  Sorry.  The data tables?
19       Q.  When you -- when you --
20       A.  The data tables, yes.  Not the tables in the
21   text, but the data tables.
22       Q.  I'm going to hand to you what's been
23   previously marked as Deposition Exhibits Foster 18-17
24   and 18-18.  These are two articles authored by
25   Dr. Baldrick.

Page 243

1            Do you recall testifying about those earlier?
2        A.  I recall looking at these papers earlier
3    today, yes.
4        Q.  And you cited those papers in your expert
5    report; is that right?
6        A.  I did, yes.
7        Q.  For what purpose?
8        A.  Well, there's a -- as you know, there's a ton
9    of literature in this litigation.  And had I had the
10   chance to get to Table 6, you can see that looking at
11   two control groups that have been conducted presumably
12   at the same time, in the same lab, the same housing
13   conditions, with the same diet, that there's a range
14   that you -- you see that -- even between the two
15   groups.  So, presumably, the same pathologists --
16   everything else held the same.  And, therefore, I
17   believe it's important to look at the historical
18   controls as well and look at the range.  I think the
19   range is the more appropriate thing to examine.
20       MR. DHINDSA:  No further questions.
21       MS. ROBERTSON:  I have one follow-up
22   question, Dr. Foster.
23
24              EXAMINATION
25   BY MS. ROBERTSON:

Page 244

1        Q.  We can stick with Exhibits 18-17 and 18-18.
2    We're correct that even at the table you cite at Table
3    6, that the range is used there in the context of dual
4    controls.  Correct?
5        A.  This is in the context of dual controls, yes.
6        MS. ROBERTSON:  Thank you, Dr. Foster.  No
7    further questions.
8        MR. DHINDSA:  Nothing further.
9        MR. GOODALE:  This marks the end of Media 5
10   in today's proceedings in the deposition of
11   Dr. Warren G. Foster.  Going off the record
12   at 6:20 p.m.
13
14              *  *  *  *  *
15
16
17
18
19
20
21
22
23
24
25

Page 245

1    STATE OF NEW YORK  )
2                       )  SUPREME COURT
     COUNTY OF NEW YORK )
3        I, Janis L. Ferguson, RPR, CRR, a Notary Public in
     and for the State of New York, do hereby certify:
4
         That the witness whose testimony appears herein
5    before was, before the commencement of his/her
     testimony, duly sworn to testify the truth, the whole
6    truth, and nothing but the truth; that the testimony
     was taken pursuant to notice at the time and place
7    herein set forth; that said testimony was taken down in
     shorthand by me and after, under my supervision,
8    transcribed into the English language, and I hereby
     certify the foregoing testimony is a full, true, and
9    correct transcription of the shorthand notes so taken.
10       I further certify that I am neither counsel for,
     nor related to any parties to said action, nor in any
11   way interested in the outcome thereof.
12       IN WITNESS WHEREOF, I have hereunto subscribed my
     name this the 16th day of September, 2017.
13
14
15
16
17
     Janis L. Ferguson, RPR, CRR
18   Notary Public in and for the State of New York
19   My Commission expires:  5/28/2021
     Registration No. 01FE6282686
20
21
22
23
24
25

## A

**a.m** 1:16 5:5 29:3,6 72:1,5
**ability** 109:24 110:3,17 118:2 177:4
**able** 21:19 46:4,5 48:25 93:10 96:18 127:14 133:13 139:22 158:25,25 173:7 225:9 226:2 226:7 235:7
**abnormal** 154:15
**abnormalities** 13:22
**above-captioned** 1:13
**aboveboard** 101:23
**absence** 83:3 200:25
**absorption** 68:8
**abstract** 58:7,11,12 81:5,17
**accept** 52:8 147:15 235:14,14 237:16
**acceptable** 147:16
**accepted** 191:6 236:23
**accepts** 236:21
**access** 21:12,13 132:7 133:7,10 237:20
**accessed** 131:25
**accompanying** 184:22 216:25
**account** 191:1
**accuracies** 158:23
**accuracy** 126:7
**accurate** 141:19 142:9 163:14 186:24 189:7
**accurately** 49:16 50:9 55:23 118:4 118:6
**achieve** 25:20,23
**achieving** 67:14

**acknowledge** 127:6
**act** 155:25 156:9 157:6 158:3
**acting** 70:12 116:8 175:15
**action** 245:10
**active** 99:23 160:19 161:10
**actively** 97:19
**activities** 102:1
**activity** 116:6
**actual** 96:25 161:18 231:15
**ad** 234:16
**add** 83:19
**added** 40:10
**addendum** 46:1
**adding** 55:15
**addition** 63:4 197:15
**additional** 23:17 28:20 38:4 41:11 41:18,19,20,25 43:6,16 46:24 54:22 63:4,7 73:5 73:9,13,14 74:13 74:20 83:20 135:14 220:10 242:14
**address** 63:12
**adenoma** 79:17 80:20 209:12
**adenomas** 41:17 56:18 64:10 79:18 81:24 209:8,20 211:16,22 220:15 220:17,18,22 222:15,25 223:15 224:2
**adequate** 49:23 110:24 219:24
**adequately** 49:20 50:7
**admin@fulmersi...** 2:10
**administer** 67:15 84:2

**administered** 85:6 201:17
**administering** 28:19 83:25
**administration** 101:17 204:4
**administrators** 111:5
**adopt** 117:7,15
**adopted** 116:19 117:19
**advance** 102:5 104:18 106:25 107:2,4,14 108:20 109:3 195:20,23
**advantage** 51:14
**adverse** 7:2 15:21 17:12 20:3 26:8 26:18 27:1,2,22 28:9,23,24 84:12 107:15 116:12 160:20 194:23
**adversely** 68:16
**advice** 160:23
**advise** 160:18
**advises** 24:15 25:17
**advisory** 15:2,5
**advocating** 100:10 100:15
**affect** 67:24
**affirm** 5:24
**age** 240:2
**agency** 33:20 34:3 34:6,16 35:12 232:17
**agent** 155:23,25 156:4
**aggregate** 53:13,17 176:3,11
**ago** 17:21 90:18,20
**agree** 26:14 27:24 28:12,14 32:16 33:8 36:11,24 58:16 59:10 60:1 63:22 78:25 79:16 79:18 96:15,20 105:24 106:13

124:15 126:9 128:2 136:16 139:23 142:2,20 147:25 154:23 157:24 183:1 187:16,21 190:6 194:19 202:7 203:5 239:22
**Agreed** 62:11
**agreement** 92:20 94:19 96:14,18 100:8 102:4,19 106:23 109:12,20 110:6,19 113:13
**agreements** 109:1
**agrees** 81:5
**ahead** 12:21 30:8 35:25 38:15,17 47:1 52:23 59:3 71:22 92:11 185:19 191:19
**al** 22:6 37:21 178:20 187:4 204:23,24 217:2,4 224:20 232:20
**Aldrin** 101:12 105:4 107:20 115:9
**Alexandria** 160:15
**alive** 70:4,5
**allegedly** 97:2
**allowed** 230:19,23
**alphabetically** 167:20
**alteration** 53:20
**America** 159:17,21 159:23 160:8 170:1
**American** 169:20 169:25
**AMF** 1:17
**amount** 230:7
**Amyloidosis** 229:5
**analyses** 63:5,7
**analysis** 9:22 11:6 11:12,19 13:12 24:19,20 26:23

37:23 40:12 46:18 54:1 61:4 62:2 63:2 64:9 76:15 76:16 78:13 80:6 80:13 125:9 127:7 128:6,18 129:12 147:6,23 150:5,8 165:16 183:3,7,12 190:13 191:19 199:21 200:7 205:21 208:3,5,22 212:2 215:22 219:1,9 221:1,15 221:18 233:16
**analyze** 79:1
**analyzing** 39:4 181:13 233:5
**and/or** 97:2 98:1
**animal** 9:19 10:5,9 10:23 11:1,3,6 11:12,14,17,20,22 12:12,14,23 16:21 17:1 20:13,25 21:21 23:13,14 24:5,16 35:21 39:8,11 40:16 43:1 44:16,20 45:11,14 57:3 60:3 62:1,4,22 69:14,17,20 70:4 70:5,9,16,19 71:6 71:13,13,16 75:19 83:25 84:7 85:6 118:19 119:5 122:22 123:7 142:16 144:23 153:15 154:5,6,10 154:11,21 157:2 174:21 201:6 202:22 203:6 232:24
**animals** 9:17 17:11 23:15,15 40:15 42:1 44:7 45:4 68:1,15,15,18,20 68:21 69:5,24,25 82:7 83:17 122:18

127:8 144:22
146:15 149:2,25
150:15,21 152:21
154:1,10,12,16,19
154:24 183:3,8,14
183:15,24 184:3
195:7,8 196:22
197:16 199:3
202:23 205:20
206:14 207:10
209:13,15,18,20
210:13,20 211:2,6
211:7,20 218:9
221:4 230:22,22
**anonymity** 51:14
**anonymous** 49:7
**anonymously** 49:6
**answer** 8:3 11:16
13:6 17:24 19:15
27:17 46:4,6 52:3
69:19 71:3,14
78:1 88:19 92:12
109:16,18 114:6
127:14 139:17,19
139:22 153:4,7
156:23 159:1,18
176:13,16 218:25
**answered** 35:11
36:15 37:5 85:7
86:21 95:23,24
96:5 104:6,24
106:21 109:14,16
110:3,8
**answering** 70:9
242:5
**answers** 158:18
**anticipate** 183:20
**anymore** 101:16
**apologies** 29:23
56:8 70:17 77:8
77:11 90:2 114:11
143:9 166:24
232:23 235:4
**apologize** 212:8
**appear** 42:3 60:21
107:4 139:12
152:15,17 188:13

**appeared** 152:19
153:24 207:16,20
**appears** 16:18
35:20 75:4 138:23
139:25 140:3
239:24 245:4
**appended** 21:18,20
**application** 62:21
168:25 223:13
**applied** 24:18,24
25:3 50:6 70:25
80:21 189:15
**applies** 81:10,17
121:12
**apply** 11:5 78:12
80:6 82:21 84:8
130:4 136:3 181:7
222:1,2
**applying** 64:21
218:20 229:21
**appreciate** 10:18
20:16 31:5,6
102:20 186:6,9
189:20 241:16
**approach** 16:20,25
17:4 18:10,13,15
162:4 191:5
**approached** 25:19
93:9 94:5 161:24
162:4
**approaches** 155:21
155:22
**appropriate** 24:16
32:25 50:19 51:15
67:12 79:21 81:6
135:5 169:16
180:9 181:7
191:12 198:8
209:24 212:16
214:6 222:2
243:19
**appropriately**
128:23
**appropriateness**
62:21
**approved** 35:3
**approximate** 92:23

**approximately**
70:13
**Archive** 78:5,9
**area** 14:2 15:18
91:4 164:16 227:4
227:6,10
**Areas** 123:11
**argument** 32:12
195:14
**arrangement**
106:14 108:6
111:19
**arrived** 24:7
107:11
**arriving** 81:22
181:1
**art** 50:4
**article** 3:17,19 4:4
4:8,12 39:5 49:1
51:9 57:21,24
58:5 59:5,8,18
60:2,2,13 73:7
80:24 88:15,21,23
97:23 100:18
130:24 131:3,7,12
131:16,18,19
132:5,8,13,15,17
132:18 133:13,17
133:25 134:5,9,11
134:17 145:12,14
161:1 162:14,18
162:20,23 163:3,7
164:2 165:21,23
166:2,11 167:8,16
167:17 169:20
170:2,24 173:4
182:7 185:20,23
185:25 186:3,7,9
209:16 210:25
213:15 224:18,22
224:23 225:2,3,7
228:6 229:4
234:14 235:15,16
235:18,19 237:7
237:16,21 238:3
238:18,20,22
239:8,25 240:10

240:22,25 242:5
**articles** 49:5 91:25
93:21 122:24
123:3 134:13
167:17 171:19
213:8,9,11,21
232:19 242:24
**articulating** 32:4
51:7
**Arysta** 188:10
**aside** 7:12,13 9:3
154:18 166:20
**asked** 8:4 17:20
30:3 35:11 36:15
37:5 50:24 60:8
71:15 85:7,8
86:21 93:10 95:16
95:23 96:5 101:10
104:6,24 106:21
109:14,15 110:8
110:15 131:19
157:1,14 159:1
165:9 174:20
203:19 204:11
205:15 207:1
222:20 226:3
227:16
**asking** 11:9 18:24
24:23,24 37:24
49:9,15 54:24
95:20 99:2,9
108:14 111:21
117:15 128:9
136:9,11 141:22
143:3 155:15
173:3 175:21
176:19 188:20
189:18 194:18
218:16 220:12
222:7
**assay** 33:5,22,22,24
34:4,5,6 122:9
**assays** 20:16,23
209:25
**assess** 23:17 101:10
124:5 136:18
155:17

**assessing** 28:5,21
43:1 155:12 161:9
218:9
**assessment** 10:3,4
10:10,14,15,17,19
10:25 11:3,6,10
11:17,18,19 13:3
13:4,12,20 18:15
44:1 48:25 96:16
136:17 147:19
157:1 164:9,25
165:1,4,14,15
196:3 223:23
**assessment's** 13:19
**assessor** 10:7 13:21
**assign** 61:2 84:15
84:16,18,22,24
85:4,11,12
**assigned** 237:1,7,12
**assist** 14:7,10
**assistance** 48:3
**assistant** 48:6
**assisting** 96:24
**associate** 70:11
**associated** 20:2
**association** 117:9
119:2 122:19
**assume** 38:8 67:4
73:2 91:17 96:19
178:18 180:20,21
**assuming** 66:25
**Atkinson** 123:23
124:3 125:9,14
127:7,22 128:11
129:8,11 134:23
137:1,8,13 141:9
141:14 203:16
204:17,18,23
205:7,19,23 206:2
206:14,20 207:1,2
207:17 208:3,6,11
239:14,15,19,23
240:9
**attached** 16:8
**attention** 11:25
26:1 76:4 192:19
215:10 226:14

229:12 240:6
**attorney** 7:25 8:4
53:14 94:10
157:14
**attorneys** 48:1
178:13 225:5,10
**atypical** 17:12
**August** 3:22 94:9
94:14,21,24 96:12
109:13,21 110:6
112:9,17
**author** 18:24 33:14
36:16,20 51:7,18
51:19,20,24 52:18
163:1,5 167:15,17
167:22,23 182:1,4
182:5 185:4 215:6
235:19 236:12,12
237:9 238:11
**authored** 75:4
224:20 242:24
**authors** 19:17,18
20:11 21:1,21
34:24 39:21 41:4
49:4,7 50:20
167:17 185:12,14
186:12 205:20
206:17 236:17
**authorship** 88:15
**automatically**
237:13
**available** 17:8 46:9
46:12 47:10,15
82:3 132:15 133:6
133:20 134:6
165:18 178:9,10
242:11
**Avenue** 2:8
**average** 224:8
**avoid** 32:10,11
**aware** 13:16 94:1,3
94:4,6 96:15
97:12,17 100:22
101:24 111:14
142:10 161:23
183:3 184:7
189:11 193:2,6,7

223:7

**B**

**b** 111:22 171:23
172:6,14,17 173:1
174:16 186:25
239:19
**B6C3F1** 229:6
**back** 29:5,19 38:4
41:11 44:13 51:6
51:10,18,22 52:7
52:23 55:17 72:5
75:22 82:2 83:13
84:10 86:10 87:9
104:1 115:8
118:16 146:14
159:11 166:14
170:6 172:20
175:25 183:17
195:14 199:18
208:16 217:8
224:14 235:19
236:11 237:13
241:3,14,24
**back-and-forth**
108:2
**background** 131:4
179:20 227:13,22
**balance** 136:23
**Baldrick** 4:9,10
212:19,20,23,24
212:24 213:1,3,4
214:3,3,11 242:25
**ballpark** 158:3,6
203:17
**banned** 23:9 105:8
105:15,19,20
**based** 12:14,23
45:12 60:10,20
82:14 124:23
135:2 139:14,15
147:23 169:22
174:3 175:22
203:25 218:6
221:3 233:10
234:3
**basic** 98:9

**basing** 217:24
**basis** 154:11
200:21,22 203:10
234:16
**bat** 164:8
**Bates** 77:24 168:3
179:10
**bear** 77:24
**becoming** 157:19
**beginning** 57:7
125:8 127:6
139:24,25 140:3,5
140:6 192:16
**begins** 28:4 36:1
72:3 87:25 118:14
159:9 168:3
192:13 193:21
199:16
**behalf** 5:18,20
94:20 96:14 97:7
100:9 102:4,19
103:2,5 106:15
113:9,13 114:4
115:6,16 116:2
**behavior** 17:11
**behavioral** 13:22
149:24
**behaviors** 17:12
154:15
**believe** 8:12 30:18
30:21 31:7,19
38:13 39:11,13
41:1 42:10,20
45:19,24 48:13
54:4 63:2,16 64:2
72:21 73:21 75:10
79:7 80:8 86:13
86:14 90:21 91:22
92:1,6 93:3 98:14
99:22 100:12
101:15,21 102:2
102:22 103:9,11
103:12,24 104:7,9
104:11 108:17,24
114:14 115:3
118:6 124:8
127:18 134:3,10

134:25 135:16,17
135:19 141:8,19
142:4,9 148:20
151:22 153:17,19
154:9 160:9 161:8
161:13 162:7
163:14 166:22
167:19 171:15
172:15 177:5
178:10,19,21
179:14,14,18,24
182:24 184:5,18
185:11 193:11
194:6,8,21 196:24
198:15 199:7,10
201:25 204:18
211:9,23 212:15
213:11 214:2
217:1 221:7,18
222:2 229:2 231:6
231:17 232:18
239:4 243:17
**believed** 110:23
**bell** 232:22
**belong** 58:22
**benefit** 44:21
**best** 43:25 50:10
72:16 102:23
108:25 109:24
110:3,16 118:2,2
177:4,7
**better** 180:23
192:10 196:16
200:6 231:24
**beyond** 156:19,25
218:15
**bias** 203:10
**billed** 112:9,17,25
113:16
**billing** 3:23 111:24
112:6
**bills** 102:21
**Bio/Dynamics** 46:1
**bioassay** 23:13,14
24:5 27:21 28:5
28:17 35:21 176:3
231:6

**bioassays** 12:15,24
20:13 28:8 60:4
62:22 84:7 128:24
143:9,13,15 154:6
190:23 232:25
**biological** 170:22
171:2 172:10,22
175:17,23 176:5,7
176:19,23
**biologically** 175:3
175:9
**biologist** 69:23
70:1 157:22
**biology** 8:25 171:9
171:19
**Biometrics** 3:19
59:6
**biomonitoring** 10:8
11:19 123:16
**biostatistical** 59:9
**biostats** 59:13
**Bisphenol** 20:7
**bit** 45:7 71:21
87:18 205:13
234:6
**blinded** 44:16,17
44:20
**block** 40:7,9,17,19
54:7
**blocks** 39:25,25
40:3 43:23
**blood** 227:20
**board** 51:23
**Board-certified**
73:22,24
**boards** 48:18 71:1
**bodies** 79:12,15
**body** 14:8 17:11
23:22 65:9,14,22
66:22 68:1,2,11
68:12 69:8 78:21
80:1,12 82:5,9,24
83:10,15 85:17,19
85:21,24 86:2,3,4
86:8,11,20,25
137:25 138:8,13
141:7,10,12,21

142:5,7 145:4,6
154:25 159:3
**bold** 193:21,23
**book** 134:10
**books** 91:19,22,24
**Boston** 59:15
**bottom** 77:24 85:3
216:23
**BR** 182:8
**Brammer** 221:8
222:1
**branch** 38:24,25
53:6
**break** 71:19,22
118:7 198:9
199:11,21 225:4,5
241:11
**breast** 121:6,11,12
121:13,16,18
122:11
**brief** 8:7
**bring** 100:14
107:10
**broad** 28:21 155:15
**Broadway** 2:4,8
**Brooks** 182:1,5
184:18
**brought** 46:7

---

**C**

**C** 2:1 194:12 209:7
209:12 220:14,17
**calculate** 129:2
**calculating** 12:10
**California** 1:1 5:10
**call** 30:9 70:22
129:21 130:3
189:5
**called** 92:5
**calling** 146:17
**calls** 7:25 82:7
84:12 91:12 92:11
137:20 147:2
162:2
**campaign** 111:15
115:13,21 117:1
**Canada** 5:7 9:1

34:18 70:8,18
122:10 159:14,20
**Canadian** 216:3
**cancer** 8:19 59:15
118:25 119:2,22
121:7,10,11,13,14
121:17,18 122:5
122:11,19 123:4
143:13,15 151:24
152:22,25 153:2
154:5 155:24
156:5 157:3,4
231:6
**cancers** 121:15
**capacities** 15:4
**capturing** 138:1
**carcinogen** 23:4
84:9 93:6 95:22
97:14 98:18,25
105:15 116:22
156:13,24 175:15
**carcinogenesis**
22:8 157:3 158:1
**carcinogenic** 8:14
105:6,21 106:12
107:9
**carcinogenicity**
9:25 11:6,10,12
11:17 15:17 20:25
21:22 22:19 24:2
84:1 123:17
142:16 155:13,18
157:7 190:14,23
209:25 215:23
230:25
**carcinogens** 108:5
108:10 156:17,18
232:21
**carcinoma** 209:11
**carcinomas** 56:19
64:10 194:13
209:8,20 212:6
220:17,18
**cardiovascular**
227:14
**career** 15:3 17:5
**carried** 26:4 28:8

47:9,11,12 56:17
70:9 93:24
**carry** 10:10 61:3
**case** 1:4 6:24 7:7,13
7:14 8:4 20:25
21:18 22:21 24:2
28:24 35:4 40:4
41:16 44:10,11
47:10,15,16,21
48:10 51:17 66:8
79:9 85:23 92:21
93:2 94:5 95:5
98:3 103:15
105:23 121:8,12
124:8 130:19
145:11 155:11
167:14 170:3
197:8,25 198:3
201:22 220:1,23
231:17 241:2
**CASES** 1:6
**categories** 123:15
**categorized** 95:22
**category** 140:14
**causal** 12:15,24
13:5,24
**cause** 8:19 23:22
123:4 149:19
175:3,10 223:17
**caused** 7:2 86:2
97:2 121:7 151:8
227:24
**causes** 86:11
155:23
**causing** 85:24
156:5 222:12
**Cd-1** 75:5 134:19
134:21,23 135:6
135:15,18 136:8
141:15 142:21
151:9 158:13
170:12 182:7,8
187:6,22 191:1,2
213:13 227:3
228:7,14,20,22
229:1,6
**cell** 53:12,17

122:11 171:23
172:6,14,17 173:1
174:16 194:12
199:10 205:8
209:7,12 211:15
211:21,22 220:15
220:17,21
**cells** 172:8 174:16
**cellular** 123:18
174:12
**central** 68:6
**certain** 42:21 224:9
**certainly** 99:16
157:22 164:12
171:21 191:1
**certainty** 54:4
95:25 100:3 108:1
132:16,25 133:2
151:3 162:3 164:5
167:4
**certified** 1:23 5:2
183:24
**certify** 245:3,8,10
**cetera** 18:1 118:20
195:22
**chance** 202:24
232:19 243:10
**Chandra** 216:18
217:2,4
**change** 53:9,21
187:7 191:16
219:17,17 223:13
223:17
**changes** 200:5,15
201:1,2 237:16
**changing** 191:17
**chapter** 134:10
**characterization**
190:7
**characterized**
55:24
**charged** 105:5
106:11
**check** 91:19 119:11
187:1 231:25
**checked** 91:22
**checks** 103:13,14

**chemical** 12:14,23
20:1 23:21 28:19
84:9 101:10
116:13,20,22
120:5 122:19,22
122:25 123:4
149:14 155:25
156:4,7,11 157:5
169:21,25
**chemicals** 7:23
22:9,10 60:9
99:10 107:20
108:4 111:10
121:22 122:12
123:18 160:20
161:10 164:24
165:14
**Cheminova** 188:8
239:15,19,22
240:1,3,5,11
**child's** 8:6
**choice** 136:14
**choose** 120:20
136:3 179:25
213:21 220:4
**chose** 46:16 79:5
181:11
**chosen** 24:17
**Christopher** 3:16
56:10
**chromium** 6:25 7:1
**circling** 154:15
**citation** 30:15,17
37:21 38:7,8 53:3
55:11 58:4 61:19
61:19 66:16 72:13
72:14 75:3,8,9
77:19 86:24 141:2
177:5 178:22
179:1,1 182:16
215:7 224:24
**cite** 37:13,17 46:14
57:5 61:23 66:2,5
130:24 135:5
170:23 171:6
176:24 177:3
178:15,16 184:24

209:16 212:19
213:21 227:2,25
228:3 229:23
244:2
**cited** 47:18 77:19
80:24 131:11
135:9 142:6 173:5
177:16 180:4
197:4,7,8 216:6
228:2 243:4
**cites** 137:23 142:10
**citing** 61:24,25
66:21 128:14,14
142:12 172:3
179:22 227:8
229:25
**City** 2:9
**claim** 20:1
**Clare** 160:4,6,7
**clarification**
157:14 205:15
227:16
**classification** 96:4
97:20 98:17,24
**classified** 93:5 94:1
94:25 116:13
**clear** 71:4,9,11
77:9 95:7,9 98:19
171:2,6 172:9,22
173:10 176:23
177:8 202:5
230:11 235:9
**clearly** 56:20
156:23 176:17
**Clifford** 3:24 136:1
137:15 138:6,18
138:21 139:13
142:13,18 158:14
177:18 180:4
221:13,16 222:5
223:9,14,25
**close** 170:19
**CNN** 97:24
**co-authors** 163:22
164:12,20 166:20
167:7 168:23
169:7

**coded** 45:4
**Cohen** 135:16,17
228:3
**collaborated** 170:1
**collaborators**
238:8
**colleague** 122:10
**colleagues** 70:21
192:7 226:3
**collected** 9:21,22
**collection** 10:5
**colon** 140:4
**column** 59:22
63:23 140:11
226:18 229:5
**columns** 140:6,16
**combine** 209:11
**combined** 209:8
**combining** 209:19
**come** 34:9 49:8
52:7 62:3 65:18
75:22 83:13 84:10
86:10 104:1 107:8
107:15 126:22
146:14 175:25
188:25 195:14
202:11,14 225:21
**comes** 237:13
**coming** 67:5 82:2
87:9 115:8 137:11
183:17
**comma** 140:4
**commencement**
245:5
**commencing** 1:16
**comment** 52:16
79:14 152:16
164:13 167:8
168:22 169:7
170:4 172:2
174:24 175:1
183:18
**commenting** 20:8
**comments** 51:6,10
51:15,17 100:23
163:17,20 164:10
166:5,10,16,18

205:25
**commercial** 22:10
22:10
**Commission**
245:19
**common** 135:1,12
214:6 218:18
227:3,8,12,21
228:8 230:17
**communicated**
160:3 167:4
**communications**
8:1 30:4
**companies** 34:10
**company** 14:10
34:11,11 88:12
92:4 94:21 100:9
102:19 103:3,7,16
103:18 116:7,12
116:15,20,21,22
116:24,25,25
117:2,18,24
**compare** 126:2
129:3 180:15
183:9 203:22,24
204:3 206:1,20
**compared** 16:22
17:2 27:1 36:13
79:2 82:11 128:12
171:24 180:15,23
181:8,12 190:23
194:15 199:5
200:12 202:18
212:17 216:11
**comparing** 136:15
191:1 229:14
**comparison** 190:15
213:16
**comparisons**
195:15
**compensated**
103:12 104:2,10
104:14,23 106:9
**compensation**
103:21,22
**complete** 48:13
50:1,7 139:8,13

158:20,25 159:2
184:23
**completed** 54:13
168:22 169:5
**completeness**
144:17
**completing** 237:21
**complex** 10:4
117:14 122:2
**complexity** 20:16
**complies** 26:3
27:20 52:25 59:19
72:16 81:1 123:25
170:8 192:12
229:13
**components** 174:12
**composed** 55:18
**compound** 13:21
35:15 150:17
152:10 181:4
196:4
**compound-related**
11:15,24 18:17
27:7 61:17 83:12
84:14 85:1,9,10
85:13,15 147:14
148:6,9 149:14
150:10,13,19,24
151:4,16 175:6,13
176:4,8,12,17
181:4 195:16,17
195:18,19,20
196:4 200:20,25
201:2,14 202:18
206:5 207:4,6,24
208:9 218:6 233:9
**compounds** 105:5
106:10 107:9
**comprehensive**
50:4
**computer** 133:15
**computerized**
238:14
**concentrations**
23:16
**concept** 189:11
190:8

**concern** 35:9 37:3
65:10 82:6
**concerned** 32:10
36:12 82:25
182:12
**concerns** 51:8
**conclude** 60:8 65:2
148:8 150:21
151:15 152:9
175:8,14 200:18
208:25
**concluded** 74:13
75:18 105:4 108:3
**conclusion** 39:14
55:20 61:11 68:19
68:22,24 73:8
81:23 83:3,5
85:25 97:13
106:11 107:8,11
117:23 125:4
129:7 137:12
146:9,11 175:7,11
175:22 176:11
181:2 190:10
211:8,10
**conclusions** 19:7
19:21 20:8 60:20
61:20 117:22
137:11
**concurrent** 56:20
63:1,3,15,24 64:2
64:4,7,22,24
78:12,15 79:5,9
79:25 80:4,8,11
80:15,21 81:5
82:10,16 87:10
128:12 129:2
136:6,14,18,20
137:1,6,9 177:20
177:21,23,25
180:24 196:9,18
216:14 220:5
**conditions** 183:22
243:13
**conduct** 9:16 10:23
11:16 13:4 17:5
17:25 22:2 37:25

Confidential - Pursuant to Protective Order

41:9 46:21 65:16
91:20 98:4 131:4
150:14 154:9
174:21 218:6
220:8 221:1
**conducted** 9:20,21
9:24 11:3 13:3,20
25:5,7 28:17
31:15 35:2,7 41:5
42:15,18 43:3,3
45:22 46:12 48:11
63:5,8 66:20
90:23 91:10
107:21 108:24
112:21 118:19
123:7 128:18,23
129:13 145:18
177:22 180:7,18
183:19 184:16
185:14 187:4,5,25
188:2 190:21,21
190:22 208:3,12
210:7 239:14
243:11
**conducting** 13:23
20:12 44:22 45:3
67:24 113:1,17
114:8,13 147:19
237:25
**conducts** 43:22
**confidential** 1:8
7:25 92:11 104:20
162:2
**confirm** 30:16 77:9
217:11 239:19
**confirmation**
213:10
**conflict** 101:20,25
102:22 104:20
108:20 109:19
110:11,12,15,18
110:22 114:24,24
115:10,23 163:6
**conflicts** 107:3
**confounders** 152:4
**confounding** 65:12
219:20

**confounds** 69:10
**confused** 137:24
138:12 187:20
**confusing** 179:2,3
**confusion** 187:17
**connection** 96:25
98:2 111:7 114:3
160:2 172:25
176:25 226:11
**consequence** 149:2
151:15 152:10
191:11
**conservative** 33:7
33:25
**consider** 20:25
21:8 39:3 68:15
104:4 111:9,11
128:19 137:5,11
141:25 149:19,20
190:14 194:22
195:3 216:8,20
**consideration**
21:10 202:12,15
229:18
**considerations**
215:12 217:20
**considered** 48:12
87:6 144:24
169:10 195:11
196:19 219:24
224:25 228:4
**considering** 87:15
229:15
**consistency** 20:22
**consistent** 126:11
172:7 204:15
**consult** 30:14
**consultancy** 108:6
**consultant** 7:19
14:24
**consulted** 37:12
38:7 46:14 53:2
55:1 58:4 61:19
72:13 75:3 107:19
171:17 178:15,18
179:17 182:14
197:19,20 215:5

220:24 224:25
**consulting** 3:23
94:20 95:17 96:13
96:21,22,23 100:8
102:1,3 103:2,4
103:16,17,18
104:11,16,17
105:25 106:14
109:1 111:19
112:7 117:10,24
160:3
**consumption** 145:9
146:17 147:1,11
148:22 149:1
150:13,16 151:13
219:17
**contacted** 93:1
165:8 234:23
235:10
**contain** 139:21
174:12,13
**contained** 158:21
**contaminants**
22:11 123:8
**contemporaneous**
189:9
**contemporaneou...**
181:22
**contemporary**
199:4,6
**content** 31:21
**content's** 158:23
**contents** 164:7
187:14 188:7
**context** 22:15 32:6
34:17 50:17 185:9
185:11 191:12
192:4 194:2
209:22 213:19
216:4 219:7
220:14 229:21
233:3 234:10
240:20 242:14
244:3,5
**continuation** 87:23
**Continued** 4:1
**continues** 36:2

191:15
**contract** 92:6,8
161:13 163:12
188:4
**contrary** 116:16
**contribute** 149:6
**contributes** 85:25
**contribution** 50:16
163:21
**contributions** 15:6
149:7
**control** 23:16 39:7
39:11,20 42:3
43:19 45:11 55:5
55:16 56:1 57:3
63:1,24 64:3,4,11
64:24 73:9 74:14
74:20 75:19 78:23
78:24 79:2,6 81:6
82:15,21 87:14
125:25 127:21,23
128:6,8,19 136:4
136:11,14 137:25
138:21 145:25
180:2,3,5 181:7
181:12,21 189:6,8
189:10,20,22,22
189:23,24 196:6
196:14 198:5,6
199:3 200:17
201:3 202:20
205:24 207:3,8
208:9,13,15
213:16,22,23,25
214:1 215:11,22
216:19,20 217:20
218:20 220:21,24
221:12,17,25
222:19,22,24
223:8,25 243:11
**controlled** 60:24
128:12 200:12
222:11
**controls** 29:1 56:20
56:21 62:5,14,22
63:1,4,12,15 64:8
64:22 78:13,15,16

79:9,13,13,21,23
80:1,1,4,6,9,11,11
80:12,15,16,21
81:5,11,18,22
82:10,11,16 87:6
87:10 128:12
129:2 136:4,7,18
136:21,21 137:1,7
137:10,18 141:6
148:11 177:18,20
177:21,21,23,24
177:25 178:1
180:17,18,24
181:13 189:12,15
189:18 196:9,17
196:18 197:18,23
198:18,24 199:4,6
201:5 202:19
212:5,12,17
213:21 214:5
215:14 216:7,11
216:14,15,18
217:6 218:16
219:2,5,6,9 220:5
220:6,11,13 221:2
221:3 224:5
229:21 243:18
244:4,5
**conversation** 8:7
97:16
**conversations**
225:16
**coordinator** 216:3
**copies** 91:24
**copy** 15:23 46:3
131:12,13,15,18
132:5,8,10,17,20
132:22 133:21
134:1,5,6 138:22
222:6 225:25
**corner** 226:15
**corporations** 14:6
**correct** 7:16 8:24
9:11,12 11:11
14:1,12 16:10,17
24:21 25:11 30:20
30:24 31:3,4,19

32:6,19,24 34:7
34:17 35:10 36:23
37:1,4 39:8,9,12
40:18 43:9 45:12
45:13 48:2,15
51:2,23 52:6 53:6
53:7 54:24 55:7,8
57:16 58:5,24
59:11,15,16 60:4
61:9,14 62:23
63:16,24 64:6,13
64:18 67:8 68:23
69:6,13 72:19
73:6,12 74:22
75:10,12,15,16,20
76:1,11 77:2 79:3
79:6,7 80:22 81:7
81:8,12,19,20
86:20 88:6 89:21
93:6,22 94:22,23
95:22 96:10,16
97:3,10,11,14,20
98:5 100:18 101:2
102:1 103:21,25
104:5 105:16,21
108:7,21 109:13
110:7,20 112:15
112:16,23 113:5,6
113:9,13,14,20,21
114:17,19 115:6
115:22 118:20
120:24,25 121:7
122:7,8,20 123:1
123:5 124:12,17
124:20,24 125:11
125:15 127:9
129:20 133:18,19
133:21 134:3,24
134:25 135:3,7,21
136:1 137:3
140:14,18,21,25
141:24 142:8,22
143:1,9,10,13,24
144:3 145:21
146:2,6,13 147:7
152:5 153:23
154:3,7 155:7,10

156:5,15 157:9
158:1,4 160:20,21
162:24,25 163:1,2
163:4,11,13,25
164:1,21,22
167:12,23,24
168:18,23 169:8
169:11,12,17,18
170:10,13,19,20
170:24 171:14,20
175:4 177:6
179:18,23,24
180:24 182:2,5,8
183:25 184:9
185:3 186:4,13,18
187:23 188:15,19
188:22 190:5,11
190:12 191:7
192:3,15,18 193:4
195:4 197:5,7
198:4 200:1,2,13
200:20 201:18,21
202:9 203:7,8
204:6 205:4,9,11
208:4,10 209:2,14
210:6,14 211:17
212:6,12,17,21
213:9,9,14,17,22
214:1,22,23 215:6
215:8,16,23 216:8
217:3 219:2
220:22 221:7,13
221:14 223:1,2
226:12,18,19
229:6,9,16,21
230:2,15,20,21
231:15 233:25
234:7,15 235:1,23
237:9 238:19
240:10,18,23
241:8 244:2,4
245:9
**corrected** 177:24
**correctly** 11:9 13:2
25:4 121:22,23
150:25 166:13,15
177:19 196:11

197:3,21 198:2
205:25 211:6
231:19
**correlates** 201:23
**correspond** 88:16
89:12
**corresponded**
88:20
**correspondence**
45:17,18 94:9
**corresponding**
20:20 51:19 163:1
167:22
**corroborating**
20:22
**cost** 169:14
**Council** 169:21
170:1
**counsel** 5:14 77:6
77:23 87:22 94:8
112:1 138:22
158:22 187:9
225:4,16,18
245:10
**counter** 193:1
**country** 24:13
**country's** 24:12
**COUNTY** 245:2
**couple** 52:19
**course** 15:3 154:17
154:18,21
**court** 1:1,14 5:9,23
188:9 245:1
**cover** 16:19,19
40:12 78:5,9
**covered** 14:25
201:7 207:2
**covering** 205:13
206:11
**CR** 182:10,23
**creating** 149:4
**critical** 47:8,25
48:11,25 91:21
163:17,20 164:10
165:18 166:4
167:7 168:17
169:11,19 234:14

234:17,19 238:13
**criticism** 138:7
164:23 170:21
193:12,16
**criticisms** 190:4
**criticizes** 97:20
**criticizing** 190:7
**critique** 192:8
**critiques** 51:6
**CropLife** 159:14
159:17,20,21,23
160:8 170:1
**cross** 238:23,25
**cross-studies** 86:15
**crossed** 239:3
**crossing** 198:25
**CRR** 1:14 245:3,17
**culture** 70:6 122:9
**current** 79:12
136:4 201:18
**Curriculum** 3:21
88:2
**curve** 191:19
**cut** 40:9 41:11
54:22 203:3,4
**cutoff** 57:8
**cutting** 41:19
**CV** 9:9 16:8 22:7
48:22 87:20 88:5
93:11,14,16,21
119:4,8 123:11
160:11,13 163:9
163:10 234:13

---

**D**

**D** 3:1 4:1
**D.V.M** 38:24
**daily** 154:11
**Dana-Farber** 59:15
**dashboard** 237:2
**data** 9:22 10:5
11:17,20,20,20
12:8,12 16:21
17:1,7,8,11 18:17
19:2,4,8,14,16,19
19:22 20:12 21:2
21:13,14,15,18,20

21:21 22:1 25:9
28:5 31:18 34:20
34:24,25 35:3,6
36:4 43:1,1,2 44:6
44:16 45:14 60:18
60:19 63:18 65:12
66:13 69:10 78:14
78:24 79:8,10
80:2,5,12 82:3,8
82:11,21,23 87:14
87:14 100:15,16
100:17,20 120:11
120:13 124:4
125:14 136:4,7
137:25 138:6,21
139:13,18 140:17
142:6,16 145:15
149:17 152:13
158:14 159:3
171:8,13 177:12
177:15,17,18
178:3,4,5,6,6,8
180:1,2,3,12,14
180:22,23 181:12
181:13,21 182:12
182:22 183:4
184:4,12,15,15
188:17 190:5
193:2 196:6,25
198:16,19 210:10
213:16 214:7
215:22 216:20
218:20 219:4,23
220:10,21,24
221:12,17,18
222:5,11,19,22,24
223:8,14 229:25
231:14,15,18
233:5,23 237:20
237:24 238:2,8,9
238:10,12,12,14
238:24 240:21,23
241:6 242:6,8,11
242:13,17,18,20
242:21
**database** 171:9,19
181:9 189:6,9,10

198:5,7 221:25
223:25
**databases** 60:24
**date** 5:4 39:19
75:11,13,14 77:21
92:22
**dated** 3:22 76:12
76:19,24 94:8,14
**day** 52:4 114:14
124:12 144:22
201:24 202:2
204:1,5 205:17
215:14 236:13,14
236:18,19,20,23
245:12
**days** 113:3,19
**DC** 2:14
**deal** 46:15 119:10
120:4 122:18
237:4,6
**dealing** 40:15
120:6,7
**deals** 213:12
**death** 154:7,19,23
155:3
**debate** 192:8
**December** 75:14
76:7,12,13,14,15
76:22,24 165:22
**decide** 114:25
208:15
**decided** 23:18
**deciding** 219:1
**decision** 24:6 40:21
40:24,25 41:1,2
44:4 51:25 61:22
70:21 71:2 82:14
107:16 115:5
117:17 149:15
**decisions** 43:2
61:20
**declaration** 102:9
102:13 104:17
109:3,11 117:12
118:1
**decrease** 82:5
**decreased** 147:11

149:24
**deduce** 97:15
**Defendants** 2:12
**define** 48:16
189:17
**definitively** 177:1
**defund** 111:15
115:13,21 116:8
116:12 117:1
**Degree** 90:9
**delegate** 24:12
**demonstrate** 36:7
**demonstrates**
193:2
**demonstrating**
193:8
**denominator**
127:12 211:16
**density** 226:10
**department** 59:9
59:12,13
**dependent** 119:23
**depending** 52:17
52:22
**depends** 192:4
209:22
**deponent** 5:12
225:17
**deposition** 1:12
3:10,13 4:3 5:6
6:10,17 15:25
29:10,11,14 30:10
38:19 56:10 57:20
59:5 71:25 72:4,9
88:2 94:13 112:6
118:10,15 131:8
138:17 139:6,9
158:13,18,19
159:6,10 162:17
168:5 179:6
185:22 199:13,17
213:1,4 215:1
224:21 242:23
244:10
**depositions** 6:13
**Der** 165:13 166:21
166:22

**Desaulniers** 122:10
**describe** 10:13
127:8 160:17
173:16
**described** 26:23
39:24 49:20 50:7
54:12 171:4
**describes** 96:22
**describing** 125:16
**design** 33:22 34:4,6
70:10
**designed** 9:21,25
26:7
**desire** 68:7
**desk** 52:19
**detailed** 168:16
**details** 17:6,25
101:20
**detect** 26:18 33:23
193:3,9
**detected** 17:19
128:22
**detection** 15:20
16:21 17:1 26:8
26:10,25 32:18,22
33:2,9
**determination**
39:18 45:11 51:21
110:13 125:1
138:6
**determine** 10:11,23
11:14,23 13:24
18:16 21:4 27:6
28:22 41:17 49:19
50:1,3,6,8 51:11
61:17 148:5 150:2
150:9 208:13
217:5 222:11,23
223:4 233:24
234:2
**determined** 11:3
73:9 124:22 233:8
**determines** 116:21
235:11
**determining** 83:11
**develop** 34:11,20
151:25 152:24

153:2,21 191:15
192:10 200:13
**developed** 34:9
154:20 191:14
**developers** 159:24
**developing** 15:16
34:24,25 153:14
192:6
**development** 34:19
53:10 121:14
123:16 157:4
170:22 171:3
172:10,22 173:10
174:8,11 176:24
177:9
**deviation** 217:13
217:16
**device** 14:14
**Dhindsa** 2:12 3:6
3:22 5:18,18 7:24
8:11 11:7 12:17
13:1,9,13 16:6,14
16:23 17:3 21:11
21:24 25:12 27:3
32:20 33:11,13
35:11,22 36:15
37:5 44:2,8,24
54:9,17 57:4
60:15,25 61:15
63:25 66:17,23
71:19 74:15 75:21
82:1 85:7 86:21
91:11,16 92:10
93:3,11 94:13
95:23 96:5 104:6
104:24 105:10,17
105:22 106:5,7,19
106:21 107:6,17
107:25 108:8,22
109:5,14,22 110:2
110:8,21 111:8,12
111:16,20 114:5
115:2,7,18 116:4
116:14 117:3,13
118:5 132:24
141:1 142:23
143:2 144:14

149:10 150:7
151:1 152:12
153:3,6 154:8
155:19 156:19,25
157:13 158:2,5,10
158:24 162:1
172:19 173:3
175:18,24 176:15
185:8,10 187:8,15
189:2 191:22
194:10 195:13
198:8,12 204:7
214:13,16 215:17
218:22 219:3
223:16 224:6
225:12,15 228:18
233:20 234:1
236:3 237:23
238:4 240:24
241:1,20 242:2
243:20 244:8
**diagnosed** 73:10
**Diane** 122:10
**diarrhea** 68:9
**dieldrin** 22:18 23:1
23:4,5,6,7 101:11
105:4 107:20
115:9 120:6 121:2
121:7,9
**dies** 154:21
**diet** 183:5,6,8,21,24
184:6 189:24
203:12 243:13
**dietary** 120:7
123:18
**differ** 135:2 143:1
143:4
**difference** 55:15
144:16 148:11,15
183:2,7,12 209:19
**differences** 29:1
55:6 56:2 57:2,15
76:19 171:2,6
172:10,22 173:10
173:17,19 176:23
177:8,10 181:3
219:10 220:8

Confidential - Pursuant to Protective Order

**different** 7:20,21
   7:21 15:4 20:23
   40:17,19 45:7
   53:13,18 55:19
   71:1 84:12 121:15
   121:22 135:2
   142:21 143:4
   157:4,25 164:7
   172:12 173:12
   176:5 183:5,6,8
   193:3,9 208:3,5
   208:15,21,23,23
   213:25 224:10
   228:17,20,23
   229:1,10
**differentiation**
   119:14,18
**differently** 156:6
   228:17
**difficult** 83:1 84:13
   147:13 148:8
   149:13 150:1
   181:15
**difficulty** 230:9
**direct** 25:25 61:18
   66:14 76:4 97:16
   135:14 192:19
   210:16 215:10
   226:14 228:13
   229:11
**directed** 118:20
**direction** 18:9
   116:10
**directions** 19:3
**directly** 66:13
   156:14 159:16,19
**director** 70:11,12
**disagree** 32:5 33:8
   60:22 74:11,12
   126:10 128:2
**disagrees** 97:12
**disappears** 209:7
**disclose** 104:15,16
   104:22 105:24
   106:14 107:3
   108:19 109:19
   110:4 111:18

114:23 115:5
   117:11
**disclosed** 108:5,11
   108:18 115:23
**disclosure** 101:25
   102:3
**discount** 124:20,21
**discounted** 191:20
   192:2
**discuss** 125:17
   137:6 173:21
   210:12 216:7
   240:16
**discussed** 53:1
   136:5 234:6
**discusses** 56:13
   62:13 215:11,21
**discussing** 31:6
   60:2 135:6 186:4
   187:22 192:14
   210:20 230:2
**discussion** 8:7,9
   22:2 23:12 28:4
   29:2 56:6 59:20
   81:10,17 115:11
   125:10 133:4
   134:15 135:22
   145:20 159:4
   185:24 186:25
   192:17 212:4,22
   213:7 221:12
   224:11 226:22,23
   232:1 239:7,11,13
   239:21 241:5,9
**disease** 12:14,23
   172:1
**disk** 227:14
**dismiss** 130:14,17
**dismissed** 191:20
   192:2 233:17
**dismissing** 130:15
**disprove** 23:25
**dispute** 126:6
   127:25 167:16,19
**Disrupting** 164:24
   165:14
**distinction** 9:9 71:5

**District** 1:1,1 5:9
   5:10
**division** 72:24 73:1
**DNA** 153:11 156:3
   156:11,14 157:18
**Doctor** 153:2
   166:23 184:11
   229:11 231:7
**document** 1:5 4:5,7
   4:11 29:16,23
   30:16,21,23 31:1
   31:6,23,25 37:11
   38:21 39:3,6
   72:17,18 74:3
   77:14,21 78:5,9
   87:2,3 112:10,18
   139:15 158:16
   159:2 163:21
   165:11,12 168:1,2
   168:6,23 169:8
   179:7,12,16,22
   182:13,25 184:19
   184:23 185:9,11
   188:19,21,21
   189:4,6 215:2,5,5
   225:14,19,22,23
   225:24 226:5,9,10
   226:11,13
**documents** 46:15
   46:17,19 48:7
   78:4 97:18 189:1
   214:15,17,19
   215:9
**doing** 44:12 103:2
   106:17 112:4
   190:10 219:5
   227:23 238:13
**dose** 23:15,17
   25:17,19 28:21
   35:20 43:7,16,18
   44:20 64:5,5,5,12
   64:13,23,25,25
   65:3,8,9,11,23
   67:11,15,20,22,25
   69:11 79:1 81:23
   82:5,25 83:4,13
   83:14,18,20 84:2

84:4,5,11,23 85:5
   85:6,18,22 124:11
   124:13,16,19
   125:24,25 126:12
   126:17 127:2,8,12
   129:15,18,23
   130:10 135:24
   136:11 142:25
   143:4,24 144:7,9
   144:12,15,17,20
   145:5 146:1,15,18
   146:24 147:2,3,4
   147:5,12,23
   148:11,22 149:18
   149:20 150:22,24
   151:3,11 152:7
   153:22 194:14
   196:1,14,15
   197:18 199:5
   200:3,6,11,17
   201:4,7,16,17,21
   201:25 202:8,8,10
   202:11,13,16
   203:10,13,14,16
   203:18,20,20,21
   203:22,23,24,25
   204:2,4,11,19,25
   205:2,4,5,7,12,18
   205:20,24 206:2,3
   206:5,8,11,15,16
   206:16,18,19,20
   207:3,6,8,10,16
   207:20 208:10,13
   211:2,11 219:11
   219:21,23 232:20
   233:7,9,18
**dose-related**
   129:11,18,22,25
**dose-significant**
   130:2,3
**dosed** 144:21
**doses** 28:20 49:23
   63:23 83:25 84:23
   202:19 203:9,13
   204:10,10,15
   206:24 207:2
   208:17

**dosing** 149:3
**double-sided** 29:24
   138:25 139:1
**Dr** 3:13,22 5:12 6:9
   8:1 16:4,16 17:15
   18:19 20:24 22:5
   23:13 27:8 29:8
   29:11,14,16 30:3
   30:7,13,19 31:16
   31:20 32:16 33:8
   34:1,23 36:11,18
   36:24 37:11,22
   38:16,22 42:5,7,8
   42:12 44:15 45:9
   47:2 48:14 53:5
   53:24 55:4,13,25
   56:7,13,16,17,25
   57:14,24 58:3,8
   59:8,24 60:12,22
   61:5,23 63:17
   64:15 65:2,13
   67:6 68:22 71:3
   71:23,25 72:4,7
   72:12,21 73:18
   74:9,17,19,25
   75:1,2,23,24,25
   76:2,5,6,8,20
   77:18,22,25 78:12
   78:25 79:11,16
   80:10 83:22 84:16
   87:18,23 88:5
   89:9,10,11,12
   92:15 94:14,18
   101:1,24 102:16
   102:18 103:13
   107:13 108:13,16
   109:4,17 111:14
   111:24 118:10,15
   118:18 122:16
   123:10,22 126:3,4
   126:4,7 128:1,4
   129:7 133:5
   134:21 136:13
   137:6,23 138:5,7
   138:12 139:3,6,17
   140:8 141:14
   142:10,11,20

143:7,17,20 146:4
147:21 159:6,10
159:13 160:2
162:14,20 163:15
166:22 167:25
168:8,14 169:19
170:22 179:12
186:3 189:5,11
190:4 191:4
192:21 193:12,13
193:16,17 194:5,8
194:19,24 197:13
199:13,17,20
205:19 206:1
210:19 211:25
212:23 213:9
214:10,20 215:4
215:12 219:22
221:19 223:7,24
224:23 225:18
226:24 231:19,20
232:23,24 233:4
239:22 241:2,3,6
241:16 242:4,25
243:22 244:6,11
**draft** 49:3 51:5
164:6 165:20
168:16,21,23
169:4,6,8
**drafted** 163:19
164:16,18
**drafting** 162:9
163:16 242:9,10
**drafts** 91:12
**drawing** 51:23
**driven** 150:3
**driving** 54:18
150:20
**drug** 14:14
**dual** 189:12,15,18
189:20,22 213:16
213:22,23,25
244:3,5
**duly** 6:2 245:5
**duration** 190:16
192:22 195:25
231:13

**Dursban** 8:12
**duty** 108:19
**Dykstra** 38:23
72:20 74:5
**Dyslexic** 167:18

─────────

**E**

**E** 2:1,1 3:1 4:1 6:1
6:1
**earlier** 31:17 50:24
53:1 54:7,12 71:8
80:25 87:19
118:18 154:1
156:23 224:24
226:1 234:7 242:4
243:1,2
**eat** 68:7
**eating** 68:5
**edited** 163:19
**editor** 49:6,6 50:14
51:11,11 70:24
236:16 237:2
**editorial** 48:18
70:25
**editors** 48:24 52:21
**edits** 236:11
**education** 69:20
**effect** 11:24 20:3
33:23 67:7,11
68:6,8,9 83:15
84:3,6,8 85:13
120:17 123:4
129:22 130:2,4
144:25 147:14
148:6,9 149:14
150:19,24 151:16
176:4,8,12 194:23
207:4
**effects** 6:25 7:2,23
8:6,14 9:25 11:15
17:16 20:4,8 33:2
83:12,17 85:1,10
85:10,15 122:7
123:8 146:17
147:10 148:17,18
148:25 149:25
150:13 151:2,4

157:11,16,20,24
175:13 176:18
196:4 207:6 218:6
219:21
**effort** 28:22 34:20
**EFSA** 142:15
**either** 23:24 65:18
66:12 91:19
103:12 116:10
120:4 126:9 188:1
206:12
**electronic** 46:23
49:5
**electronically**
132:6,7 133:14
**Elmore** 215:20,25
216:6
**else's** 238:12
**elucidate** 200:7
**Elwell** 4:12 130:24
131:2,7,12 134:17
135:5,8 224:20,21
227:2,8,25 228:6
228:7
**email** 29:18 33:16
160:3 236:25
237:3
**emails** 88:18
166:17
**embedded** 40:6
**emphasizing**
173:18,20
**employed** 50:2
73:24 102:14
103:6,9,11 104:8
104:12
**employee** 14:22
36:25 37:7,8
**employment**
101:15 103:25
104:4
**employs** 191:5
**encouraged** 54:7
**encouraging**
147:24
**endocrine** 164:24
165:14 168:17

**endocrine-disrup...**
15:16
**endometriosis**
123:19 164:17
**endpoints** 78:21
84:12
**ends** 43:15 168:4
179:11
**engage** 150:5,8
**engaged** 51:5
107:13 111:15
115:13 190:13
**engages** 116:25
**engaging** 90:11
**English** 245:8
**ensure** 150:6
**enter** 16:12 87:20
174:19 185:19
**entered** 16:8,11
92:19 93:15 94:19
96:13,17 110:5,19
113:12 139:6,8
211:11
**entering** 100:7
**entire** 37:10 82:3
130:17 193:24
194:25 195:24
**entirely** 142:25
157:22
**entirety** 175:8
195:3
**entitled** 224:18
**entry** 112:13
113:16 140:17
160:14
**environment** 22:13
**environmental**
22:8,11 70:12
123:8,17 231:21
231:22 232:2,15
232:16,17
**eosin** 40:12
**EPA** 14:18,19,21
14:22 15:7,8,9,10
15:11,14 27:13
30:23 31:2 32:4
35:8 36:12,25

37:2,6,7,7,10,10
46:15,17 53:1,6
54:14,23,24 55:2
65:19 72:18,21,21
73:1,2,9,18,24
74:11,11,13,18
75:14,17 79:12
142:10 147:15,18
147:18 220:20
**EPA's** 37:2 54:1
77:10
**epidemiological**
10:9 11:20
**epidemiology**
123:15
**epigenetic** 157:16
157:18,24
**epigenetics** 157:11
157:23
**equal** 223:9 224:1
**equality** 44:15
**equivalent** 83:23
202:1,1 203:24,25
**Eric** 4:7 179:6
**ESLA** 79:12
**Esquire** 2:3,3,7,12
2:13
**essence** 24:14
**establish** 12:15,24
13:5 64:22
**established** 25:6
177:1
**establishes** 71:1
**estimate** 164:4
**estimates** 169:14
**et** 17:25 22:6 37:21
118:20 178:20
187:4 195:22
204:23,23 217:2,4
224:20 232:20
**evaluate** 12:8
130:18 136:24
137:5 148:2
149:13 180:11
181:18 192:8
194:25
**evaluated** 149:21

Confidential - Pursuant to Protective Order

Page 256

190:20 191:10
200:6 207:25
**evaluating** 35:6
124:5 149:16
195:3,24 209:25
**evaluation** 81:22
190:25 200:9,24
215:15 233:18
**even-numbered**
138:24 139:2
158:16
**event** 109:10
153:16,22 187:21
**events** 151:25
152:1 242:12
**evidence** 13:19
20:22 61:13 83:4
85:1 147:9 148:7
149:12 151:7
152:7 175:14
176:3,17 193:6,8
201:13 207:24
218:11
**exactly** 65:24 90:17
91:17 99:1,9
**Examination** 3:4
6:6 43:15 242:1
243:24
**examine** 23:3
243:19
**examined** 20:6,6,9
74:8 154:22
**examining** 154:12
**example** 19:11,14
19:24 20:5,15
25:16 224:4,7
229:20 232:13
**Excel** 188:10
**exchange** 33:16
**exclude** 217:23
**excluding** 147:22
**exclusion** 181:16
218:23
**excuse** 230:14
**exhibit** 15:25 16:4
16:7,11 29:9,10
30:9,10,16,17

31:21 32:9 35:25
36:19 38:18,19
52:24 56:8,10
57:11,12,13,19,20
59:4,5 72:8,9,14
76:4,18 77:4 81:2
87:21 88:1,2
93:15 94:12,13
96:22 103:1,1
112:4,5,6 138:16
138:17 139:5,8
158:13,19,20,20
162:17 168:2,5,15
179:4,6,22 182:1
183:4 184:20
185:2,20,22
210:19 212:25
213:1,4 214:25
215:1 224:17,21
239:9
**exhibits** 3:9,10 4:3
78:5 139:11
171:25 242:23
244:1
**existed** 152:4
**exists** 171:11
**expect** 181:3 206:5
207:5
**expected** 201:1
**expenses** 14:25
**experience** 48:14
48:16 52:1 57:9
61:25 62:4 66:15
70:17 87:19
191:25 218:1,15
236:9,15 237:20
**experienced** 150:15
236:10
**experiment** 10:23
11:1 20:13
**experimental** 93:25
**expert** 3:11,16 6:18
6:23 7:1,3,5,9,14
7:15 11:5 15:19
15:25 16:3,17
24:12,21 25:1
26:1,17,23,24

27:19 30:14 31:12
31:14 37:12,13,14
37:18,20 44:5
47:2 48:4 56:11
56:24 57:1 62:11
63:17 64:9,19
69:14 70:18,20
71:2,4,6,13,16
82:10 83:8 84:20
87:24 90:12 91:12
93:10 94:5,19
95:17 96:13,21,21
96:23 97:9 98:2
98:21 100:8 104:3
116:25 123:23
124:5 125:3
126:11,25 131:21
137:2,8,23 140:23
142:12 143:18
146:5 159:14
160:3,17 161:4
170:6 173:6,8
174:20,24 175:1,8
176:1 177:15
179:19 180:23
182:10,11 186:16
186:20 189:16
191:18,24 192:11
193:17 194:4
199:24 210:3
211:13 214:21
215:6,15 217:25
221:9 225:1
226:11 227:1,25
229:12 233:5
237:12 240:17,21
242:9,10 243:4
**expertise** 8:22 22:7
48:24 71:15
174:18 234:24
235:12
**experts** 24:13
168:22 169:6,16
**expires** 245:19
**explain** 28:15
48:21 128:21
176:20 184:12

**explaining** 128:6
**explains** 56:17
**explicitly** 137:9
**explore** 17:8
**Exponent** 88:13,14
88:16,18,20,22
89:3 160:15,23
161:5,22 162:6,9
162:11 163:4,5,7
163:24 165:8
168:16 169:5,14
**export** 89:19
**exposed** 7:2
**exposure** 12:16,25
20:6 22:14 122:22
122:25 160:19
194:13
**exposures** 201:6
**extent** 7:24 25:8
91:11 92:10 162:1
238:17 242:11
**extra** 195:10
**Extremely** 52:13
**eye** 18:11

---

**F**

**F** 6:1
**face-to-face** 167:10
167:11
**fact** 36:12 56:24
62:13,20 75:17
103:1 106:17
144:6,11 147:23
182:1 195:25
201:20
**factor** 62:7,10
125:3 216:16
223:22 233:6,12
234:3
**factors** 54:18
218:24 235:25
**failed** 115:5
**fair** 30:19 35:17
51:12 100:6
122:16,21 127:15
234:11,12
**fall** 101:5,6 137:13

**falls** 135:25
**false** 15:20,21,22
16:22,22 17:1,2
17:17,19,21,21
18:3,4,11,11,14
18:14 26:8,10,18
27:1,1 32:10,11
32:18,22 33:9
35:9 36:5,8,13,13
37:3 147:22,24
150:6
**familiar** 48:19
94:16 171:8,10
231:20 232:4,5
236:8
**familiarity** 215:18
**far** 13:15 94:17
161:23
**favor** 15:20 26:8
32:18,22 33:1,9
**favoring** 26:25
**fear** 180:16
**fed** 183:4,6,8,14,21
183:24 184:3,8
**fee** 169:16
**feed** 149:3
**feedback** 50:14
**feeding** 31:2
**feel** 118:3 167:13
171:25
**Feinchemie** 188:8
**fell** 20:19
**fellow** 110:25
**felt** 101:22 108:10
110:10 115:25
165:15
**female** 209:12
230:18
**females** 43:20
67:23 202:6
219:24
**Ferguson** 1:14,22
5:24 245:3,17
**field** 48:24 82:19
82:20 218:2
**fifth** 59:23
**figure** 49:10 97:17

Confidential - Pursuant to Protective Order

98:10 129:6 198:1
220:4
**Figures** 228:11
**file** 132:3
**files** 132:3 133:1
**fill** 110:15
**filled** 102:9,13,22
110:16 118:1
**final** 41:5 61:21
195:21 205:21
212:2
**Finally** 28:8
**find** 26:5 41:25
46:24 55:14 65:13
65:14 74:12 76:9
84:25 99:10
111:18 130:11
133:17 134:1,1
156:11 196:21
207:23 208:1
218:19 221:21,23
232:7
**finding** 12:13,22
18:11,14 26:9
35:18,19 41:20
54:11 57:1 136:10
145:13 208:8,9
**findings** 86:5,9,12
147:3,12 240:9
**finish** 18:21 70:8
**finished** 126:23
127:17 153:3,6
203:2
**firm** 92:20 139:7
**firms** 7:21
**first** 6:1 28:2 32:9
36:18 43:14 51:5
55:10 56:16 58:8
58:11,13,14 59:21
60:1 64:14,14
81:4,16 93:1 96:8
97:25 98:5,6,7
107:18 113:15,25
114:14 136:14
144:15 145:23,24
149:20 165:20
167:22 182:5

186:14 187:11
193:19 209:5
229:5
**five** 55:18 73:21
83:14 175:12
199:3
**five-minute** 241:10
**flat** 161:16,17
**flip** 59:17
**Floor** 2:4
**Florida** 131:24
**focal** 53:12,17
**focus** 8:23 9:4,6
40:5 46:16 121:18
123:23
**focused** 11:24
122:22 157:22
**FOIA** 77:10
**follicle** 149:24
**follow** 34:10
178:25 180:10
**follow-up** 243:21
**followed** 25:8,11,14
69:3
**following** 26:18,24
34:14 68:24
164:25 165:1,1
238:5
**follows** 6:2 27:13
105:14
**food** 68:5,8 145:9
146:17 147:1,11
148:21 149:1
150:12,16 151:12
219:17
**footnote** 137:22,22
212:10 214:12
216:25
**foregoing** 245:8
**forget** 149:22
**form** 37:14 133:21
240:21
**formal** 69:20
**format** 50:10
**formed** 165:6
**forming** 37:23
177:14 214:21

215:15 226:11
**formulating** 165:11
**forth** 38:4 131:25
245:7
**forward** 169:22
192:6
**Foster** 1:12 3:3,10
3:11,13,21,22 4:3
5:12 6:9 8:1
15:25 16:1,4,16
17:15 18:19 20:24
22:5 23:13 27:8
29:8,10,12,15,16
30:3,7,10,13,19
31:16,20 32:16
33:8 34:1,23
36:11,18 37:11,22
38:16,19,22 44:15
45:9 47:2 48:14
53:24 56:7,10,16
57:20 58:3 59:5,8
59:24 60:12 61:5
61:23 64:15 65:2
65:13 67:6 68:22
71:3,23,25 72:4,7
72:9,12 75:2 76:5
76:20 77:18,22,25
78:12,25 79:11,16
80:10 83:22 84:16
87:18 88:1,2,3,5
94:13,14,18 101:1
101:24 102:18
103:13 107:13
108:13,16 109:4
109:17 111:14,24
112:5,6 118:11,15
118:18 122:16
123:10,22 126:4
128:4 129:7 133:5
134:21 136:13
137:6 138:5,15,17
139:3,17 140:8
141:14 142:10,20
143:7,20 147:21
159:6,10,13 160:2
162:14,17,20
163:15 167:25

168:5,8,14 169:19
179:5,6,12 185:22
186:3 189:5,11
193:16 194:24
197:13 199:13,17
199:20 205:19
206:1 210:19
211:25 212:23,24
213:1,3,4,9
214:10,20,25
215:1,4,12 219:22
223:7,24 224:17
224:21,23 225:18
226:24 231:20
232:24 233:4
239:22 241:16
242:4,23 243:22
244:6,11
**Foster's** 87:23
**found** 25:10 39:20
65:16,24 83:21
85:15 124:22
125:19,23 127:2
127:21 128:15
130:10 134:4
155:9 173:15,16
219:18 225:23
**four** 43:7,16,18
59:11 113:3
125:22,23 126:11
126:13,21 127:2
128:16,16,16
129:13,13,25
135:23
**fourth** 29:19 59:21
64:15,17
**frame** 132:2 177:22
178:2 230:1
**France** 113:4,7
**frank** 53:11
**Friday** 1:15
**front** 74:3 78:10
139:12 165:25
210:17
**full** 31:18,20 54:7
55:10 71:14 83:7
193:19 209:5

210:10 245:8
**fully** 19:1 20:15
**Fulmer** 2:8
**fulsome** 165:16
221:1
**fun** 90:5
**fund** 170:1
**funded** 169:20
**funding** 23:3
**further** 8:8 9:1
13:23 14:4 35:16
35:18 46:6 60:10
184:13 214:18
233:17 243:20
244:7,8 245:10

---

**G**

**G** 1:12 3:3,11,13,21
5:12 6:1 16:1
29:12 71:25 72:4
88:3 118:10,15
159:6,10 199:13
199:17 244:11
**gained** 113:22
114:2
**gaining** 14:7
**Gateway** 1:16
**gather** 44:6
**gathered** 35:7
**gauging** 84:8
**general** 10:20
25:15 44:10,11
45:5 99:18 100:4
112:10,18 228:15
229:2
**generally** 191:6
229:24
**generate** 238:8
**generated** 17:7
35:3
**genes** 157:12,17,25
**genotoxic** 156:8,18
156:24
**getting** 9:8 14:11
91:18 130:1,2
149:25 189:24,25
199:7 236:24

237:4
**Giknis** 3:24 135:25
137:14 138:6,10
138:17,21 139:13
141:2 142:6,13,17
158:14 177:18
180:4 221:13,16
222:4 223:8,14,25
**give** 6:12,17 19:11
26:5 43:25 48:25
50:17 52:22 62:12
115:4 132:21
168:8 174:7 196:5
196:7 197:11
212:10 225:5,9,18
239:18
**given** 6:10,13 54:14
109:18 132:1
149:20 224:3
226:10 227:12,20
235:13
**gives** 146:5,7
**giving** 21:17 68:9
227:22
**glance** 210:2
**gland** 119:14,18,22
230:17 231:1
**glass** 40:10
**Glelph** 89:16,19
90:1
**Glen** 165:13,15
166:21
**globally** 34:9
**glyphosate** 8:15,18
31:1 75:5 81:25
89:13 93:5,8,22
93:23,25 94:1
95:1,21 96:9 97:2
97:10,13 98:1,10
98:11,17,25 99:15
99:23 100:11
101:19 111:2,7
115:17 116:3
120:12 146:21,22
151:8 153:25
175:3,5,9,12,14
**glyphosate's** 11:10

153:18
**glyphosate-admi...**
153:22
**glyphosates** 201:21
**go** 8:8 12:21 18:9
21:10 28:2 29:19
30:8 31:20,24
35:25 38:15,17
41:11 44:13 47:1
47:17 51:22 52:23
59:3 71:22 78:17
90:15 91:2 92:11
98:12 112:24
123:22 130:15
133:17 146:19
153:8 156:11
170:6 172:20
185:19 188:16
196:1 207:9
208:16 211:7
217:8 220:9
228:10
**goal** 18:14 27:5,21
28:8
**goals** 34:16
**goes** 56:15 135:10
135:11 196:2
**going** 16:3,10 18:24
30:8,9 38:4,17
49:24 51:21,25
56:9 57:10 59:3,4
60:18 63:23 65:11
68:14 72:1,7 73:2
77:9 83:1,9 84:4
114:18,20 118:11
131:24 133:1
139:22 145:1
153:8 155:2 156:2
156:11 159:7
162:14 166:14
167:25 168:2
174:17 175:25
187:1,21 193:24
199:14 202:24
204:1 205:14
208:16 214:8,25
219:16 225:12

229:3 234:25
235:2 242:22
244:11
**Golkow** 5:3
**good** 6:9 25:9 71:19
90:4 120:24
**Goodale** 2:18 5:1,2
5:23 6:4 29:3,5
71:24 72:3 118:9
118:14 159:5,9
199:12,16 224:12
224:14 241:12,14
241:22,24 244:9
**Goodman** 167:2
**Google** 98:12
**government** 33:20
34:2,6,16,23
160:18
**governments** 34:9
34:18 35:4
**Gradient** 92:5,6,9
168:16 169:5,15
**grant** 15:5,12 23:3
**gray** 238:16
**Great** 239:25
**greater** 144:5
202:23
**greatly** 202:8
**Greenwald** 2:3
5:17,17
**Greim** 4:8 22:6
37:21 38:1 65:19
66:14 100:18,21
124:8 127:5,13,16
127:18 145:11,12
145:14 170:10
177:14,16,17
184:2,4 185:20,22
186:11,22 188:7,7
197:1,2,4,7,8,15
197:21 198:3,4,13
199:1 204:23
205:12 210:16,20
210:25 211:9
230:9,14 231:7,14
231:17 238:21,23
239:8,16 240:1,9

242:6,8,13,15,16
**Greim's** 200:8
**grooming** 154:15
**group** 38:3,5,9
39:13,18 41:21
44:20 54:5 55:16
55:18 56:1 63:9
63:11,24 64:11,11
64:12,13 65:8,9
65:12,23 67:22,25
69:11 73:10,20
74:14,21 75:5,18
76:1,10 78:20
79:2 81:6 82:5,7
82:15,25 83:14,21
84:11,23 85:6
110:25 124:17,19
125:24 126:12,17
127:2,9,12,21,23
128:6,8,19 129:18
130:10 135:24
136:11,14 143:24
144:7,9,12,15,18
144:21 146:15,18
146:24 147:2,3,4
147:5,13,23
148:11,23 149:18
150:22,24 151:3
151:11 152:7
165:10 180:5,6
181:7 183:19
189:22,23,25
196:14,14,16
200:3,6,11,12,17
200:17 201:4,17
201:21,25 202:8
202:13,16,17,20
203:18,22,23
204:2,4,19,25
205:2,4,5,7,20,24
206:2,3,8,15,16
206:18,21 207:8
207:16,20 208:9
208:10,13 210:13
211:2,11
**group's** 54:3
**groups** 23:17 24:9

43:7,16,18 78:23
78:24 79:2 124:11
125:25 144:8,13
145:5 159:21
197:18 207:10
213:16,22,23,25
214:1 219:12
243:11,15
**growth** 145:8
146:16 147:1,10
148:21 149:1
150:12,16 151:12
**Grubbs** 223:6,6
**Guelph** 89:20,22
89:24,25 90:8,9
90:11,23 91:3
134:7
**Guelph's** 90:9
**guess** 56:14 59:21
129:21 161:19
**Guidance** 4:11
215:2,4
**guideline** 24:9,14
24:15 34:11,15
35:3,5 190:23
**guidelines** 4:11
15:8,10,14,16,17
24:8,10,18,22,24
25:4,6,9,11,14,17
34:10,20 67:18
68:25 113:1,17,23
114:3,8,13,22
115:3 201:18
212:1 214:22,23
215:2,13,19 216:1
216:7
**guiding** 50:20
**gut** 149:4

_____
**H**
**hairs** 198:25
**half** 202:3
**hand** 30:8 38:17
57:18 59:3 72:7
162:14 167:25
242:22
**handed** 30:16

77:25 80:25 215:4
225:3
**happen** 20:14
239:2
**happened** 54:5
**happening** 33:15
82:6 111:22
**happens** 153:16
**happy** 16:13
**hard** 133:21 134:1
134:4,6
**harm** 44:22
**harmonization**
24:8
**Harvard** 59:14
**Haseman** 3:17
57:21,25 58:8
60:22 80:25
**hazard** 10:14,18,22
10:24,25 27:22
28:9,16 35:15
**hazards** 10:6 11:2
**head** 83:24 92:13
134:12,18 222:8,9
**heads** 59:9,12
**health** 6:24 7:23
9:1 10:2,4,14,14
10:16,19,22 12:16
12:25 20:3,4,8
32:11 33:20 34:3
34:17,21 35:8,12
35:15 36:3 59:14
70:8,17 118:23
119:15,20,25
122:10,18,23
154:11 160:20
164:15 231:21,22
232:2,15,17
**healthy-looking**
53:18
**heard** 27:10 90:3
**Heart** 224:19
**held** 5:6 8:9 23:12
29:2,4 56:6 72:2
111:10 115:11
118:13 133:4
134:15 159:4,8

165:7 185:24
199:15 212:22
213:7 224:11,13
232:1 239:7,11,13
239:21 241:9,13
241:23 243:16
**help** 49:9 155:14
181:1 192:8
**helped** 48:8
**helping** 48:6
**helps** 187:9 217:10
**hemangioma** 141:5
**hemangiosarcoma**
135:20,23 140:13
141:5 142:11
229:9 241:5
**hemangiosarcom...**
124:16,19 125:6
125:11,14,18,23
126:17 127:1,21
127:23 128:5,7,10
129:10 130:8,16
130:20 135:11,22
136:8,25 137:7,13
137:19,25 138:1,8
138:13 140:24
141:7,10,11,13,15
142:2,4,17 143:8
143:11,22,23,25
144:7,12 226:18
226:21 227:1,3
228:8 240:13,16
**hematoxylin** 40:11
**hepatocellular**
220:15,18
**Herbert** 36:20,24
**herbicide** 101:14
**herbicides** 121:24
159:25
**hereunto** 245:12
**hexavalent** 6:25
7:1
**high** 43:19 64:5,13
64:25 65:8,11
67:25 82:24 83:13
83:25 84:2,4,5,11
84:23,23 85:5,6

124:11,16,19
125:24 126:12,17
127:2,12 129:17
129:18,23 130:10
135:24 143:24
144:7,9,12,15,17
144:20 145:5
146:1,15,18,24
147:2,4,5,12,22
148:11 149:18
150:22,23 151:3
151:11 152:6
166:25 200:3,6,11
201:4,17,21,25
202:8,13,16
203:18,20,22
204:2 205:24
206:2,8,16,19
207:3,8 208:10,13
219:11 223:19,21
**higher** 148:17
196:14,15 197:17
200:16,17 201:4,8
202:17 203:13
204:10 206:6,6,24
219:11,21
**highest** 65:9,23
67:22 69:11 82:5
148:22 199:5
**Highlight** 192:9
**highly** 167:1
**hired** 7:18
**his/her** 36:17 245:5
**histo** 174:5
**histologic** 173:25
174:5,6,9,15,15
**histopathological**
218:11
**histopathology**
174:22,25 203:11
**historic** 56:21 63:1
78:16 79:13 80:16
177:21,23 196:17
216:14 229:21
**historical** 60:23
62:5,13,22 63:12
79:21,23 80:1,6

80:11,12 81:11,18
81:22 82:11,16,21
87:6,14 135:25
136:3,21 137:14
137:18,24 141:6
177:18 178:1
179:20 180:2,3,17
181:11,12 189:6,8
196:6 197:23
198:5,6,17,24
199:4,6 212:5,11
212:16 213:20
214:1,5 215:11,14
215:21 216:7,10
216:17,18,20
217:6,20 218:16
218:20 219:2,6,8
220:5,11,13,20,24
221:2,3,12,16,25
222:11,19,22,24
223:8,25 224:5
243:17
**historical-contro...**
180:14 181:8
198:19
**historically** 23:10
**hoc** 234:16
**Hogan** 31:8,10
34:25 35:2,7
37:20 38:1 39:4
39:21 40:1,23
41:14 42:5,9,13
45:10,23 46:1,12
46:16,22 53:5
56:14 61:12,14
62:25 63:3,19
64:8 65:4,7 66:9
73:4 78:13,19
80:7,21 81:25
87:8,15 142:6
**hold** 166:25
**holds** 175:2
**Hollingsworth** 2:13
8:13,17 92:20
94:20 96:14,18,24
97:6 99:7,13,19
100:9 102:4,17

103:5,10,11 104:8
104:12 106:2,15
107:14,19 108:7
109:12,21 110:5
110:20 112:14
113:11,12 114:4
115:16,20 116:2
139:7
**home** 90:25 91:20
131:22 226:2
**honest** 109:6
**honestly** 102:24
114:23
**honorarium**
169:15
**hormonally** 119:23
160:19 161:10
**hormone** 20:18,19
**horrible** 90:5
**Hotel** 1:17
**hourly** 161:15
**hours** 112:10,17,25
113:16
**housed** 183:22
**housing** 243:12
**human** 10:2,4,8,8
10:13,14,16,18
11:5 12:16,25
22:14 34:17 70:7
84:9 160:20
164:15 171:24
173:25 174:5
175:15 227:7
**humans** 7:23 8:19
13:6 84:3 130:21
170:23 171:3
172:1,8,11,12,18
172:23,25 173:11
173:12,16 174:11
174:14 175:4,10
176:25 177:9
**hundred** 100:2
132:16,25 133:2
167:4
**husband** 90:5
**hyperplasia** 200:25
220:15,18,19

Confidential - Pursuant to Protective Order

Page 260

**Hyperplastic** 201:1
**hypothesis** 23:20
  23:21,23,25
**hypothetical**
  117:16
**hypothetically**
  115:12,19 116:6

**I**

**I-E-R** 92:17
**IARC** 93:5 94:1,25
  95:4,7,11,21 96:2
  98:16,23 99:3,4,4
  100:23 101:4,18
  101:21 102:5,13
  104:16,21,22
  105:3 106:2,15,24
  107:1,19,21,23
  108:20,23 109:2,7
  109:8,11,20 110:6
  111:5,15 112:10
  112:18,22,25
  113:4,8,17,20,23
  114:3,8,12,13,23
  114:25 115:4,13
  115:15 116:1,7,12
  116:20,21,23
  117:1,1,2,21
**IARC's** 96:15
  97:13,20 101:24
  110:14
**ICR** 182:8
**idea** 10:20 28:18
  76:15 90:1 96:19
  111:22 175:2
**ideas** 58:22
**identification** 16:2
  27:23 28:10,16
  29:13 30:12 38:20
  56:12 57:22 59:7
  72:11 88:4 94:15
  112:8 138:19
  162:19 168:7
  179:8 185:23
  211:21 213:2,5
  215:3 224:22
**identified** 10:6 13:5

39:25 48:23 152:5
  166:21 183:24
**identifies** 140:6
  141:15 179:19
  184:2 186:20,22
  188:8
**identify** 5:14 27:22
  38:6,10,21 39:7
  72:13 102:8,12
  119:5 133:6 181:6
  191:4 193:17
  195:20 203:14
**identifying** 28:9
  141:16
**ignore** 181:17
**imagine** 98:7
**immediately** 113:7
**immune** 122:6
  172:11 173:11
  177:10
**immunohistoche...**
  171:24
**impact** 23:4 122:22
**implying** 192:5
**importance** 200:7
**important** 43:24
  44:6,19 49:22
  66:2,5,7 71:5 83:2
  121:9 125:1 128:7
  134:20 144:6,11
  147:21 148:1
  157:19 173:13
  177:10 194:22,25
  195:3 200:11
  237:19 238:1
  243:17
**impossible** 147:13
  148:8
**improve** 50:20
  192:8
**in-person** 167:6
**inappropriate**
  180:13
**incidence** 54:6
  64:10 135:24
  137:17 146:23
  179:20 194:23

199:25 224:1
  231:1
**incidences** 63:19
  208:7 228:16
  238:24
**incident** 140:20,24
  141:6 199:5
**incidents** 205:7
**include** 21:21 25:1
  47:22 49:22 93:21
  114:7 147:4 200:4
  211:19
**included** 55:5 56:1
  56:25 121:23
  122:1 128:13
  140:11 147:5
  189:4 240:15
**includes** 135:18
**including** 10:8
  78:21 105:3 221:5
**inclusion** 160:18
  169:11
**incorporation**
  215:21
**increase** 23:22 82:4
  175:6 207:6,7,11
  231:2
**increased** 219:18
  219:19
**increasing** 130:1
**increasingly**
  157:19
**independent** 46:21
  46:23
**indicate** 31:14
**indicated** 73:4
  146:25 165:23
  180:4
**indicates** 77:5
  182:10
**indicating** 78:8
**indication** 54:23,25
  86:24 151:6
**individual** 25:13
  27:5 45:14 73:17
  176:2,9 222:17
  230:8

**individually** 39:15
  106:1
**individuals** 44:4
  73:19
**induce** 156:7,8
  175:6,13
**induced** 120:17
  153:25
**induction** 219:20
**industry** 88:6,9,10
  159:21 188:3
**industry-sponsor...**
  188:13
**info** 113:22 165:23
**inform** 115:15
  116:1
**information** 10:7
  11:22 35:14 37:16
  37:24 38:3 45:19
  49:21 58:22 65:15
  66:3,6,8 67:2,5
  78:18 82:18 86:19
  87:11,13 92:3,11
  106:24 110:9
  116:18 117:4,17
  127:16,19 139:21
  143:5 148:2,14
  169:22 170:5
  171:18 174:18,24
  181:1,18 183:17
  185:1 196:21
  197:11 199:7
  228:24 241:4
**informed** 17:24
  101:22 108:25
  109:23 225:25
**ingredient** 99:23
**initial** 39:21,23,23
  94:9
**initially** 93:9 165:3
**initiation** 23:18
  153:1,11 155:13
  155:16 156:3
  157:25
**initiator** 155:24
  156:1 157:6
**injuries** 97:1

**innovative** 192:1,7
**input** 54:21
**inquiry** 225:13
**insecticide** 101:14
**insert** 92:2
**insight** 70:22 174:7
**insights** 192:22
**instance** 22:17 35:1
  64:21 66:16 80:19
  105:20 124:10
  133:24 153:20
  181:6 198:22
**instances** 54:15
  62:5 79:20 237:25
**Institute** 59:15
**institution** 68:14
**intellectual** 163:20
**intended** 178:25
**interact** 156:12
**interacted** 15:3
**interaction** 15:9
  54:19
**interest** 13:23 17:9
  23:18 101:21,25
  102:9,13,23
  104:17,20 108:20
  109:3,11,20
  110:11,12,16,19
  110:23 114:24
  115:10,24 117:12
  118:2 123:12
  163:6 199:3
**interested** 14:2
  20:2 22:18 35:12
  35:13 93:12
  165:10 245:11
**interesting** 41:10
  41:13 44:13 190:8
  191:9,13
**interests** 107:4
  123:20
**interim** 155:1
  211:7,19,25 221:5
**intermediate**
  208:17
**intermin** 211:12
**internal** 20:22

161:4 185:3,6,13
188:18,24
**international** 24:8
**Internet** 98:9,12
**interpret** 21:4
84:13 103:8
223:21
**interpretation** 17:7
45:5 53:8 61:4
82:8,17 117:11
125:7 147:12
208:19 239:12
**interpreted** 9:23
18:25 20:21 56:3
**interpreting** 74:10
82:25 148:1 214:7
**interpretive** 81:6
**interquartile**
217:14,17,19
**interrupted** 53:14
220:16
**interstitial** 193:9
199:10,23 200:19
201:10 205:8
208:25
**introduction** 49:18
84:20 227:11,18
228:9,12
**inverse** 20:11
152:11
**invest** 208:16
**investigate** 35:16
99:2,3,4
**investigating** 35:18
**investigation** 41:13
60:11
**investigators**
180:19 181:23
199:2
**invited** 70:24
114:23
**involve** 114:9 122:2
**involved** 8:5 80:3
115:20 116:5,7
121:9
**involvement** 14:17
15:7

**involves** 10:5 153:1
**involving** 23:14
97:1 118:25
120:10 153:10
**irritation** 149:4
**islet** 211:15,21,21
212:6 220:21
**isolate** 219:1
**issue** 36:2 39:2
109:9 111:4 115:8
117:15 119:15
176:7 177:11
196:12 201:3
212:13 228:5
233:10
**issues** 8:8 50:12,19
52:22 70:23
117:19 118:23
119:21,25 154:13
164:15 219:16

**J**

**J** 3:16 56:11
**Jackson** 171:8,12
171:18
**James** 88:25 89:2,7
167:20,21
**Janis** 1:14,22 5:23
245:3,17
**Jim** 167:1
**jkalas@hollings...**
2:16
**job** 36:4
**John** 2:13 5:20
**Joseph** 3:17 57:20
57:24 80:25
**journal** 3:18,19
48:17,21,23 49:5
49:8,11 50:19,22
57:22,24,25 59:6
60:18 70:25
165:21 231:21,22
232:4,5,7,13,14
232:16 234:6,9,14
234:21,24 235:10
235:11,14,23
236:10,15,21,25

237:13
**journals** 48:15,19
71:1 232:10 234:5
**Julie** 167:2
**July** 87:24
**jump** 122:15
**justification** 49:23
**justify** 14:4

**K**

**K** 92:16,16
**K-I-E-R** 92:15
**Kalas** 2:13 5:20,20
77:7,12 138:22
139:1,10 185:25
**Kasza** 3:15 38:19
38:24 53:6 74:25
75:1,24,25 76:2,8
**Kasza's** 73:18 74:9
74:17,19 75:23
76:6
**keep** 237:3
**Keith** 89:9,10
**keratoacanthomas**
220:19
**key** 36:2
**kg** 67:19,22 202:2
**kidney** 40:22 41:16
42:12,19 53:5,19
54:2,3,16 73:5,12
73:25 74:21 76:9
**kidneys** 40:5,6,6
**Kier** 92:15
**kills** 211:25
**kilogram** 25:18
124:12,14 144:22
201:24 203:16
204:5 205:3,17
**kilograms** 204:1
**kinds** 121:15
**knew** 93:4 94:25
96:3,12 99:16
100:3 108:19
115:19
**Knezevich** 31:8,10
34:25 35:2,7
37:20,25 39:4,21

40:1,22 41:14
42:5,9,13 45:10
45:22 46:1,12,15
46:22 53:5 56:13
61:12,13 62:25
63:3,19 64:8 65:3
65:7 66:9 73:4
78:13,19 80:7,20
81:25 86:23 87:7
87:15
**know** 14:4 18:22
23:7,8,9 27:8,13
27:17,25,25 31:9
37:9 39:19 40:21
40:24,25 41:2,12
41:22 42:15,18,23
44:19 46:7,8,10
46:11,13 52:7,20
54:1,19 59:2,12
61:5 65:21 68:2
69:4,7,19 72:22
72:25 73:17,19
74:3,5 76:2 77:14
77:18 78:1,2,4
79:11 83:22 84:18
85:23 86:2,18
87:1,17 88:17,19
88:22,25 89:1,2,4
89:9,11 91:17
92:15 93:7,7 95:2
95:21,25 96:3,7
99:9,11,14,20,25
100:24,24 105:23
106:2 109:6 111:6
114:6 116:9 117:5
117:18,21 125:12
127:20 130:21
131:25 132:1,12
132:22 133:2,22
133:22 137:4
139:19 141:9
142:15 145:22
147:18 148:10
150:11,20 151:17
152:2,3,16,18,20
154:3,4 155:15
159:22 160:1

162:11 167:2,25
170:3 171:11,12
171:15 172:13
183:11,13 184:2
185:15,17 188:1,3
188:4 189:14
192:5 194:10
197:13 198:20
201:23 202:21
207:15,19 209:15
222:4,7,9 232:8
243:8
**knowing** 106:16
**knowledge** 7:17
21:25 24:22 73:23
88:24 99:18 100:5
102:23 105:12
108:25 111:4,17
114:1 116:5 117:8
118:3 157:11,16
159:15,18 160:7,9
173:18 177:7
191:9 224:3
234:21
**known** 23:15 95:3
95:25 96:12 99:17
99:23 111:19
115:12 120:23
**Kraak** 165:13
166:21,22
**Kuschner** 42:5,8
42:12

**L**

**L** 1:14,22 245:3,17
**L5P** 1:18
**lab** 177:21,22 178:2
178:7,8 180:7,19
180:20 181:22,23
183:19 188:4,14
238:7 243:12
**labor** 169:14
**Laboratory** 171:9
171:12,18
**labs** 25:5
**Lacayo** 3:14 30:11
36:20,24

**lack** 83:4 203:11
**Lamb** 88:25 89:2,7
    167:1,20,21
**language** 54:14
    245:8
**Lankas** 25:21,23
    192:14,17 193:20
    193:23 199:21,22
    201:16 203:15
    206:2,16,21 209:6
**large** 40:15 216:21
    222:12
**largely** 25:14
**Larry** 92:15
**lasting** 192:23
**Lauren** 232:20
**lawsuit** 90:13
**lawyer** 13:14
**lawyers** 45:20,21
    45:25 46:20 47:17
    95:18,20 131:15
    132:22
**lay** 27:11 61:21
    83:11
**lead** 53:10 175:13
**leading** 148:25
    172:24
**leads** 82:6 83:16
    86:4
**learned** 96:9
**leaving** 211:7
**led** 133:25 148:17
    148:22 221:16
**left** 71:21 131:20
    132:20 226:1
**legal** 5:2 13:15
**legitimate** 117:7
**length** 194:22
    195:1,2,21
**lengthy** 26:4 43:15
**lesion** 53:9
**lesions** 126:12
    127:2 140:17
    224:19 227:13,14
    227:19,22
**let's** 23:11 27:19
    36:18 38:15 47:1

52:23 55:17 56:5
57:11 61:11 76:17
80:24 111:24
118:7 126:2
149:22 170:6
192:11 193:11
204:22 210:2
217:8 221:8 239:6
**letter** 3:22 52:11
    94:8,14,16,18
    96:22 97:4,5
    161:8 162:9,12
    163:23
**level** 67:12 100:14
**levels** 124:13 201:8
**lexicon** 10:21
**Liability** 1:3 5:8
**libraries** 91:10
    131:24
**library** 90:14,15
    91:7,25 92:2
    134:7
**Life** 188:10
**lifespan** 230:20,23
**lifetime** 154:1
**likelihood** 203:6
**likewise** 26:25,25
    237:8
**limited** 24:22
    117:16 121:13,16
**line** 59:22,23 85:3
    122:11 130:2
    140:16 187:11
    225:13
**linear** 130:4,5
    233:1,4,8
**lines** 28:7
**lining** 149:5
**liquid** 144:23,23
    146:16 147:1,10
    148:21,25 150:12
    150:16 151:12
**list** 48:10,12 53:2
    62:12 131:11
    135:10 182:14
    197:20 224:25
    228:4 234:4,13

**listed** 22:7 37:11
    48:22 58:3 133:8
    139:18 140:13
    162:23 163:5
    167:15,20,21
    169:10 170:10
    171:17 178:18
    182:4 187:10,11
    188:14
**listing** 240:14
**lists** 63:23 139:24
**literature** 10:11
    11:14 12:11 47:6
    47:9,18,19 49:12
    50:16 62:1 71:16
    91:21 98:15
    122:14 124:23
    131:22 147:20
    149:9 151:7 157:2
    158:9 165:19
    172:5 174:4 190:9
    190:20 191:11
    214:21 229:25
    230:7 238:14,15
    238:17 243:9
**litigation** 1:3 5:8
    6:20,21 7:14,15
    7:18 71:17 97:1
    115:17 116:3
    168:1 243:9
**little** 45:6 71:21
    87:18 92:24 179:2
    179:3 184:13
    205:13 234:6
**live** 195:8,8 202:23
    230:19,23
**liver** 68:10 140:11
    140:14 141:20,23
    219:18,19,20
    222:15,25 223:14
    224:1
**lives** 202:22 203:6
    231:2
**LLP** 2:13 94:20
    99:7,14,20 100:9
    102:4 103:10
    107:14

**lobby** 159:21
**lobbyists** 232:13
**locate** 196:7 225:7
    225:8 226:2
**located** 226:5
**location** 140:7,10
**logic** 105:14
**long** 12:19 52:2
    134:11,13 152:8
**longer** 56:18
    105:13 194:13
    196:16 202:21,23
    203:6 231:2
**look** 11:22 14:3
    17:5,10,13,24
    18:22 19:1 23:11
    27:19 30:14 31:12
    35:25 36:18 37:19
    38:15 43:14 44:13
    45:14 46:3 47:1
    49:14,18,25 50:2
    50:5 51:7 52:23
    56:5 57:11,12,13
    60:18 62:7 64:7,8
    65:5 68:14 72:12
    75:2 76:17,20
    78:16 79:1,21,22
    80:16,24 82:15,22
    86:15 87:10 94:16
    106:11 111:24
    113:15 117:24
    119:4 121:20
    122:5,6 123:8,10
    126:3 130:17
    136:17,20,21,22
    136:23 138:5,11
    138:11,20 143:17
    144:6,11,19 145:7
    146:4,19 154:6,19
    160:11 164:8
    165:24 166:10
    179:15 181:1
    183:11 184:14
    186:16 188:6
    190:17,17 192:11
    193:11,19,24
    195:5,17 197:23

198:16 200:11
205:11 206:10,17
207:9 208:17
216:4,19 217:4
218:24 219:4,4,5
219:7,13 220:13
221:2,8 222:10,16
222:21 223:18,19
224:8 226:3 230:7
233:2,12 237:2,2
239:6,8 240:7
241:4 242:15
243:17,18
**looked** 8:14,20
    20:24 38:1,2,2
    43:4 55:19,19
    58:6 63:3,14,17
    65:6,7 78:8,14,18
    78:20 79:8,9,12
    79:25 80:14,18
    82:2 85:8 87:7,13
    101:11 121:21
    122:4 125:8
    138:14 141:10
    155:9 157:3,4
    176:9,10 177:11
    177:17 180:3,6
    190:19 197:21
    201:2,3,5,6
    205:24 206:14,23
    207:3 208:12
    214:22,23 215:9
    216:2,17 218:5
    220:11 221:19,20
    223:3 228:4
    231:17,19 232:25
    233:6
**looking** 16:21,25
    18:7 19:3 20:16
    22:9,18 23:1
    25:13 33:6 42:25
    50:13 63:2,4 65:8
    74:2 78:24 82:17
    82:23 85:15 87:7
    93:25 105:5
    114:10 115:8
    119:8 120:14,16

120:22 121:5,8
122:11,12,25
123:3,6 125:14
136:6 142:7
146:14 150:2,4,10
152:13,13 154:10
154:12,14 158:12
174:23 176:2,2
180:17 182:13,13
187:13 190:20
195:11,15,21
198:11 200:23
207:13 209:2,3,18
210:22,23 211:24
217:7 220:7
223:22 230:8,9
231:10 237:10
243:2,10
**looks** 16:19 76:22
78:8
**Lorenz** 162:5 165:9
167:3
**losing** 154:25
**loss** 65:8,14,22
66:21 68:1,11,12
82:9,24 85:17,19
85:21,24 86:3,4,8
86:11,19,25 145:4
145:7 149:24
**lost** 54:10 68:3 69:5
69:7 71:10
**lot** 48:14,16 61:3
116:18 117:4
191:24 229:14
237:24
**Lou** 38:24
**Lovely** 52:10
**low** 43:19 64:5,11
124:11 125:25
136:11 145:25
202:8,10,11,19
203:10,23 204:3
205:4,5,7,20
206:3,15,18,20
207:16,20
**lower** 86:2 194:14
196:14 203:9

205:13
**lunch** 118:8 225:4
**Luxenberg** 2:4
**lymphoblastic**
174:16
**lymphoma** 172:14
172:17
**lymphomas** 145:21
147:7 150:22
151:9 152:4,10,18
152:21 153:20
154:20 155:6
170:23 171:3,20
171:23 172:7,11
172:23,25 173:2
173:11,15,24
174:4 177:9 180:5
**Lyon** 101:4 113:4,7
115:14

———————
**M**
**M** 2:13
**main** 28:2 134:7
212:2
**majority** 122:17,24
123:2,6 164:14
**making** 19:7 33:18
82:14 139:10
195:15 216:21
**male** 68:1 127:21
128:6,11,23
129:10 130:16
136:25 140:1
143:12,15,23,25
144:8
**males** 43:20 44:13
44:14 67:22
124:17,19 125:24
126:19 127:3
135:24 139:24
144:21 202:1,3,5
204:2 205:12
219:13,14,18,25
220:2
**malignancies** 155:9
**malignant** 145:20
147:7 150:22

151:8 152:3,9,18
152:21 153:20
154:20 155:6
**mammary** 119:13
119:18,22 230:17
231:1
**manager** 72:23
92:2
**manner** 116:8
**manufactured**
23:10 98:1 99:14
99:20,25 100:1,4
101:15 116:21,22
**manufacturers**
159:25
**manufactures** 23:7
**manuscript** 49:3
49:14,14
**Marderosian** 6:21
**marginally** 56:19
57:5,5,10 58:8
59:23 60:9,14,19
60:23 61:6
**mark** 16:3 29:9
38:18 56:8 57:18
94:11 162:16
179:4 212:23
214:25
**marked** 16:2,7
29:12 30:11 38:20
56:11 57:22 59:4
59:6 72:10 88:3
94:15 96:22 112:7
138:18 158:12
162:18 168:7
179:8 185:23
213:2,5 215:2
224:22 242:23
**marking** 224:17
**marks** 71:24 118:9
159:5 199:12
244:9
**Master's** 90:9
**match** 64:16,18
182:23
**matches** 72:14,14
193:16 215:8

230:1
**matching** 230:10
**material** 66:10,10
66:12 67:1 86:22
149:3 186:1
197:10 198:14
229:19
**materials** 37:12
38:7 46:14 47:10
47:15,16,21,22,23
48:1,10,11 49:25
53:2 58:4 61:19
72:13 75:3 113:10
131:10 135:9
171:17 178:15,18
179:17 182:14
189:3 197:20
224:25 228:4
**mathematical**
83:22
**matter** 1:13 5:7
24:4 92:8
**maximal** 28:21
67:20
**maximum** 25:19
67:15 83:14
**McConnell** 209:15
209:20
**McMaster** 69:22
70:18
**McMaster's** 91:7
**MDL** 1:3 5:10
**mean** 13:10,15
19:11 22:8,24
23:1,2 28:15 34:6
37:14 40:3 43:18
43:20 44:17 47:13
47:21 49:2 50:12
63:7 67:11 84:18
88:10,17,20 93:18
97:22 98:12
100:17 102:20
103:6 124:21
125:1,12 133:10
137:4,10 151:19
166:4,13 171:10
173:20 184:13

185:7 187:24
189:21 202:14,20
208:5 212:12,17
214:6 216:11
217:12,14,15
218:20 225:8
226:23 232:8
**meaning** 26:24
35:20 156:13
190:15
**means** 10:20 16:13
161:11
**meant** 189:18
**measure** 149:23
**measured** 20:4
**measuring** 20:17
**mechanism** 120:22
120:24 121:5,6
**mechanisms**
123:19 148:24
153:13 157:4
**mechanistic** 10:9
11:21
**Media** 71:24 72:3
118:9,14 159:5,9
199:12,16 244:9
**medium** 43:19
**meeting** 101:4
107:1,3 112:22
113:4,22 114:9,18
114:21 115:14
116:7 167:6,9,9
**meetings** 15:5,6,8
15:12
**member** 58:23
**members** 73:21
165:13
**memo** 30:20 32:2
32:17 33:16 37:2
38:2,23 53:1
54:14,23,25 72:18
72:20 73:3,7
74:17 75:14,23
76:5,12,13
**memorandum** 3:14
3:15,20 30:11,23
38:20 42:7 72:10

memory 101:5
memos 38:4 77:22
    77:23
mentioned 31:17
    87:20 226:1
mentions 88:5
    226:21
Merck 6:21,22
    22:21,23
merit 49:1
meritus 117:20,20
met 160:10 167:1,3
metabolic 148:25
metabolites 156:14
method 60:10
    155:12
methodologies
    191:16,17
methodology 17:6
    17:25 81:21
    155:17 180:9
    212:11 213:20
    217:24 218:8
methods 49:25
    50:2,5 155:20
    192:1
mg's 67:19,22
    144:22 202:2
    203:16 205:3,12
    205:17
mice 24:3,6,16 75:6
    79:18 112:10
    120:9,10,11,13,15
    120:18,20,23
    128:11,23 129:11
    130:16,20,22
    134:16,23 135:1,6
    135:12,13,15,18
    136:8,25 141:15
    142:21,22 143:12
    143:15,15,23
    151:9 171:23
    172:7,12,17,25
    173:2,12,15
    174:11,14 176:25
    182:8,11,23 187:6
    187:22 213:13

224:19 227:3,8,20
    228:7,14,15,16,20
    228:21,22,23
    229:1,2
microscope 53:12
    53:16
microtome 40:9
mid 64:5,12,24
    124:11 125:25
    145:25
middle 26:6
milligram 204:5
milligrams 25:18
    124:12,14 201:24
    203:25
mind 33:15 108:10
    108:17 184:14
    229:25 238:23,25
    239:3
mine 48:5
minimal 117:25
minutes 214:8
    241:20
mischaracterizes
    106:8 132:24
missed 113:24
    192:23
missing 26:10 33:6
    33:23 138:23
    139:2 158:17
    228:13
misspoke 34:1
    132:19
Misstates 60:15
    105:10
mixtures 122:2
model 24:16 130:4
modification
    157:18
molecular 123:19
    157:21
moment 26:5
    148:13 168:8
    196:7 232:22
    239:18
money 169:23
    208:16

MONGLY 77:24
MONGLY01947...
    168:3
MONGLY01947...
    168:15
MONGLY01947...
    4:5 168:6
MONGLY07070...
    4:7 179:7,11
monitor 5:5 154:16
monograph 95:4,8
    95:11,16,21 96:2
    96:8 98:17,24
    101:1,9 102:5
    104:18 106:4,17
    107:5,24 108:4,21
    109:4 111:3
    112:22 113:5,20
    114:2,7,12 115:14
Monsanto 4:5 5:19
    5:20 31:15 32:6,7
    41:20 42:8 45:20
    45:21,25 46:20
    47:17 94:4,21
    95:17,20 96:14,15
    96:19,25 97:1,7
    97:12,16,19 98:1
    99:6,10,11,14,20
    100:1,4,9,22
    101:18 102:5,8,10
    102:12,14,15,19
    102:20 103:3,5,7
    104:8,12,18,23
    106:1,3,15,18
    108:6 109:12,21
    110:5,20 111:1,6
    111:14 112:14
    113:9,13 114:4
    115:6,12,16,20
    116:2,5 168:2,5
    179:10 188:8
    198:18,20,23
    210:5,7 211:1
    225:3
Monsanto's 32:12
    48:1 77:23 100:10
    225:18

Monsanto-funded
    198:15
month 190:22
    191:2,2
months 52:19,21
    90:18,20 107:14
    112:21 170:19
    192:23 195:8,9,10
    195:12
morning 6:9 87:19
    234:7
morphological
    53:19
morphologically
    53:13,18
Morse 170:24
    171:4,5,16,16
    172:4,6,9,13,15
    172:16,21 173:9
    173:14 176:24
    177:3,5,7
mounted 40:12
mouse 55:5 158:14
    170:12 171:9,18
    173:24 174:4
    175:12 191:1,2
    230:13,13
move 192:6 214:12
    239:20
moving 158:17
multi-step 152:25
    153:10
multiple 142:7
    154:16
mutation 153:11
    154:1 156:8,8

_____
          N
_____
N 2:1,8 3:1 4:1 6:1
N.W 2:14
name 5:2 8:10,12
    22:22 50:22 87:14
    87:17 89:1 141:16
    161:25 185:4
    231:24 245:12
named 42:11
national 216:3

natural 230:23
naturally 230:20
near 25:20 192:16
necessarily 42:23
    44:9 105:18 169:3
    214:4
necessary 66:20
    167:13 242:14
need 43:23 51:22
    56:7 68:14 79:1
    85:11 92:3 116:18
    117:4,18,21 143:5
    153:21 189:17
    192:4 195:10
    216:7 233:18
    237:15,18
needed 52:10 66:16
    233:18
needs 135:6 156:4
    156:7,7,8,9
negative 17:17,19
    18:11 27:2 36:13
    85:16 86:1 130:12
    146:10 150:6
    207:23 234:3
negatives 15:22
    16:22 17:2,22
    18:3,14 26:10
    32:11,18,23 33:10
    35:9 37:3 147:22
    147:24
neither 245:10
Neoplasm 140:1
neoplasms 135:1
    135:12 139:24
    200:13 227:8
    228:8
neoplastic 200:5,14
nervous 68:6
net 133:23
neurodevelopme...
    8:6
neurotoxicity 60:3
never 98:11 100:25
    111:4 159:15,18
new 2:5 107:3
    245:1,2,3,18

news 97:19,23
NHL 173:25 174:5
  175:4,10 176:25
nobody's 57:9
non-linearity
  232:25
non-proliferative
  224:18 227:19
Non-published
  161:7
non-significant
  57:6
non-treatment-r...
  26:9
normally 13:16
  52:2 92:1 141:25
  212:3
Northern 1:1 5:10
Nos 122:2
Notary 245:3,18
notations 166:10
note 16:6 43:6,8
  55:4 60:7 66:16
  67:6 124:18
  125:18,22 135:23
  136:2 138:22
  143:8,11,14
  144:20 145:16
  183:11,23 185:25
  200:10 201:8,20
  212:4 219:15
  220:9 223:14
  227:11 229:19
noted 20:18 31:13
  54:6 125:2 129:8
  130:16 143:16,23
  144:23 146:16
  199:2 201:13,22
  221:19 230:8
notes 42:4,6 55:4
  55:25 91:9,14
  92:2 132:11,18
  164:10 200:24
  239:15 245:9
notice 3:12 29:10
  29:14 245:6
notion 26:18

novel 191:5 192:1,6
nuclei 174:13
Nufarm 186:18,22
  187:23,24,25
  188:1,11,18,21,25
  231:11
null 23:20,21,22
number 29:22
  46:14 65:22
  121:21 126:22
  127:25 129:17
  140:7,7 161:18
  168:3 179:10
  186:12 190:16
  196:11 197:16
  207:7 211:4,17
  219:16 222:18
  223:1,2 224:10
  226:16
numbers 40:15
  64:16,18 125:21
  125:24 126:1,7
  146:1 180:16
  210:15 211:15
numerous 9:19
  14:19
NY 2:5

─────────
       O
─────────
O 6:1
object 7:24 139:14
  225:12
objecting 158:15
  158:22
objection 8:11 11:7
  12:17 13:1,9,13
  16:23 17:3 21:11
  21:24 25:12 27:3
  32:20 33:11,13
  35:11,22 36:15
  37:5 44:2,8,24
  54:9,17 57:4
  60:15,25 61:15
  66:17,23 74:15,15
  75:21 82:1 85:7
  86:21 91:11,16
  92:10 95:23 96:5

104:6,24 105:10
105:17,22 106:5,7
106:19,21 107:6
107:17,25 108:8
108:22 109:5,14
109:17,22 110:2,8
110:21 111:8,12
111:16,20 114:5
115:2,7,18 116:4
116:14 117:3,13
118:5 132:24
141:1 142:23
143:2 144:14
149:10 150:7
151:1 152:12
154:8 155:19
156:19,25 157:13
158:2,5 162:1
172:19 175:18,24
176:15 185:8,10
189:2 191:22
194:10 195:13
204:7 214:13,16
215:17 218:22
219:3 223:16
224:6 228:18
233:20 234:1
236:3 237:23
238:4 240:24
241:1
objective 18:15
objectivity 100:14
obligated 115:15
  116:1
obligation 107:2
observation 195:9
  204:3
observations
  151:17,21
observe 127:1
  233:23
observed 17:16,17
  63:19 120:17
  140:17 148:17,18
  155:6 195:7
observes 209:6
obtain 133:12

225:11 238:15
obtained 23:3
  102:17 127:5
obtaining 225:21
occasion 22:1,17
  234:16 236:16
occasions 14:20
occur 142:5 176:20
  200:15 202:22
  203:7 239:5
occurred 54:2
  228:17
occurrence 227:12
occurrences 227:21
occurring 83:6
  203:1
occurs 10:25
October 75:11
  101:7 106:16,24
  107:1,14,24
  112:25 113:16
OECD 4:11 24:9
  24:18 25:16 67:18
  83:15 190:22
  201:17 212:1
  214:22,23 215:1
  215:18 216:1,3,7
  217:21
OECD-style-type
  35:4
offer 11:13 13:11
  123:11 124:11
  175:16 193:1
  212:10 233:8
  235:14
offered 193:7
offering 12:4,6
  71:12
offers 63:18 172:13
  192:22
office 91:1 131:20
  131:22,23 132:20
  226:1,2 236:24
oh 18:21 41:24
  47:25 57:11 58:14
  147:5
OK 2:9

okay 12:22 14:9
  23:11 28:7 30:7
  38:15 40:4 42:15
  45:9 47:25 49:13
  52:12,14,23 55:3
  55:22 56:5 59:3
  60:6,12 62:20
  64:7,21 69:9
  71:14,18 72:7
  73:3,7 76:17
  78:22 81:4,21
  87:18 90:3,7 91:2
  94:18 100:22
  102:25 106:13
  109:25 111:24
  112:9 114:22
  118:1,7,18 119:25
  120:2 123:10,14
  124:3,10 125:9,20
  126:2 127:4,11,20
  130:3 132:19
  133:5,20,24 134:8
  135:14 136:24
  141:9 143:7
  145:19,24 146:4
  157:18 160:11
  163:15 164:6
  167:6 168:13,14
  169:2,4 172:6
  174:17 175:1
  178:14,20,25
  179:19,25 181:25
  182:7,19 183:23
  184:7 185:6
  186:11,16 187:7
  187:15 188:6,17
  188:24 193:11,14
  193:22 194:1,2
  196:5 198:12,13
  199:11,20 200:10
  200:22 203:5
  206:13 208:18
  209:11 210:16
  211:13 212:15
  213:12,19 215:25
  216:24 217:20
  218:13 220:7,20

222:10 227:24
228:12 229:4,11
230:4,16 231:20
232:19 235:9,17
235:22 236:9
238:21 239:6,17
239:25 240:12,16
240:20 241:5
**Oklahoma** 2:9
**omit** 81:21
**omits** 159:3
**omitted** 49:21
212:3
**once** 16:12 176:7
209:7,11
**one's** 77:14,15
**ones** 80:17 122:15
188:2
**online** 134:2
**Ontario** 5:7
**operate** 232:18
**operated** 99:4
**opinion** 6:23 7:1
8:18,21 12:4,6,13
12:22 13:8 15:12
25:2 26:17 37:8
37:15 44:5 45:9
55:13 70:22 71:12
71:16 76:6 82:10
93:11,13 97:9
98:2 104:3 116:12
116:16 124:6
138:3 156:16
161:9 172:13
173:6,8 174:20
175:2,5,16 177:15
191:18,23,24
214:21 215:15
216:15 226:12
240:21
**opinions** 7:20,22
62:12 165:7,7
**opportunity** 115:4
132:3 181:19,20
235:13
**opposed** 165:18
212:12 214:5

220:5
**Oral** 3:12 29:11
**order** 1:8 33:23
35:13 37:25 43:25
62:20 78:25
127:13 135:5
150:8 157:6 167:7
167:17 221:1
223:4 233:2 237:3
238:15
**organ** 142:7
**organization** 58:21
159:24
**organs** 123:9
**original** 19:16,18
20:12 21:21 45:22
46:11 73:11 74:24
196:25 198:16,23
242:11,12
**outcome** 23:24
28:24 149:23
150:2,9 203:12
245:11
**outcomes** 15:21
17:9,14 18:16
23:18 26:8,19
27:1,2,6,22 28:9
28:16,22,23 63:6
84:12 160:20
**outlier** 216:12,21
217:5,13 222:12
222:16,23 223:5
**outliers** 216:8
**outlined** 217:21
**outside** 9:6,7 22:19
52:20 167:20
174:18
**outward** 154:13
**over-** 21:5
**overall** 13:12 33:21
34:4 82:18 85:25
87:11,13 130:18
140:20 163:21
175:7,11 180:11
184:15 190:9
196:2 211:20,24
219:7 220:8

223:23
**overinterpret**
19:18
**overinterpretation**
19:4,5,14,16 21:2
21:22
**overinterpreted**
19:2
**overlapping** 205:18
**oversaw** 70:13
**overseeing** 118:20

**P**

**P** 2:1,1 60:9 144:1
240:2
**p.m** 118:12,16
159:7,11 199:14
199:18 224:12,15
225:4 241:12,15
241:22,25 244:12
**page** 3:4,10 4:3
26:1,5 27:19 28:1
28:3 29:20,25,25
30:1 31:21,21
32:1,2 36:18
37:19 43:6,8 47:1
47:3 49:15 55:3,7
56:14,15,16,24
57:14 59:17 60:1
62:11,15,16,17
63:18 64:19 67:6
73:8 74:3 75:9
76:17 77:1,3 78:5
78:10 81:7 83:7
87:25 112:24
113:15 119:8,9
123:10,22,25
126:3,13,15,25
128:1,21 129:5
137:23 138:20
139:23,24 140:23
143:7,17,19,21
146:5 160:11
163:5,8 165:25
168:14 170:7,9
181:25 182:3
185:2 186:14

187:19 191:4
192:11,14,16,19
192:20 193:13,14
193:17 194:4
196:5 199:25
204:24 209:5
210:3 211:14
215:11 216:23
217:9 219:22
221:9,9 226:14,17
226:25 227:7,25
228:10 229:5,12
240:1,8,17
**pages** 112:4,11,18
137:2,7 138:24
139:2,3,21 158:16
158:21 184:22
240:17
**paid** 14:21 103:16
104:18 105:25
106:1 161:12
187:25 188:2
**palatability** 68:4
**pancreatic** 211:15
211:21 212:6
220:21
**panel** 15:2 99:3
101:3 107:1,5
109:4 114:9
116:23
**panelists** 114:23,25
**panels** 15:5
**paper** 18:23,23,24
19:1,8 21:14 22:1
22:4 49:17,20
50:15,21 60:21
66:18 67:3 128:14
131:25 132:1
133:3,6 135:8,9
142:13 161:1,3
166:6 197:2 198:3
198:4 199:2
210:17 214:9
233:2 234:25
235:2,3,10 236:7
236:13,13 238:9
239:10,16 242:8

242:15
**papers** 52:7 131:10
166:15 237:1
243:2,4
**paraffin** 40:6,7,8
40:10
**paragraph** 26:4,6
28:3,4,6 32:9 36:1
43:11 55:3,9,10
56:17 58:8,13,14
59:20 61:21 81:4
81:10,15,16 83:7
83:10 145:19,23
145:24 169:13
192:20 193:20,25
194:3 196:7 200:5
209:5,10 211:13
212:8 215:20
226:25
**parallel** 171:25
**Pardon** 89:23
**parens** 182:8
186:13
**parentheses** 178:17
**parroting** 74:24
**part** 9:17 41:3 45:9
95:17 99:18 100:4
113:25 114:22
119:23 141:23,25
166:8 168:15
169:20 182:8
191:2,3 195:2
212:1 214:20
228:2 229:18
233:11
**participants** 111:1
**participated** 15:18
34:19 88:14
**participating** 24:12
108:23
**participation**
163:15
**particular** 21:17
28:24 41:16 43:25
44:9 46:17 66:8
84:25 85:23
130:19 196:10,13

Confidential - Pursuant to Protective Order

197:25 198:2
200:16 203:8
219:1,10 220:1
**parties** 245:10
**party** 7:3
**pass** 241:17,19
**passed** 72:21
**Pathco** 46:8
**pathologist** 38:25
40:13 42:11 44:18
44:19,25 45:8
53:6 55:1,2 68:13
69:12,15,16 73:18
74:18 76:21 157:9
174:20 183:20
200:24 209:23
**pathologists** 54:20
54:22 55:19 58:20
58:21 68:13 69:15
73:22,24 74:6
180:20,21 181:24
229:3 243:15
**pathology** 3:18
38:3,8 39:13,17
41:5 45:6 46:11
54:5 55:18 57:21
57:25 58:17 63:9
63:11 73:5,20
75:5,18 76:1,10
78:19 200:24
**pathophysiological**
53:20
**pay** 103:14,18,20
**payable** 103:14
**paying** 102:21
**PC** 2:4
**PCP** 101:13
**PDF's** 112:3
**Pearl** 2:3 5:16
**Peddada** 215:21,25
216:6
**peer** 49:13 50:23
51:1,4,10 52:1
57:9 66:15 166:5
166:7,9 234:10,13
234:18,25 235:12
235:15 236:10,11

237:6,7,12,14,15
**peer-reviewed**
24:13,15 48:15,19
49:11 58:17,18
60:13,17 172:4
235:18 238:16
**pending** 198:10
**pentachlorophenol**
101:11,13 105:4
107:21 115:9
**people** 7:2 59:11
61:2 74:4 88:21
229:2
**perceived** 107:4
110:10,12 114:24
**percent** 65:8,13,22
66:21 67:20 68:1
68:12 69:8 82:24
86:4,20,25 100:2
132:16,25 133:2
135:24 140:21,24
141:7 142:8,12
167:4 179:20
199:5 212:5
216:19 217:1
222:25 223:10,15
223:24 224:1,4
230:18
**percentage** 224:9
**percentages** 196:6
**performed** 181:3
**period** 194:14
217:19
**periods** 152:8
**permanent** 234:18
234:22
**person** 37:9 48:23
160:4,10 237:9
**person's** 8:6 161:25
**personal** 132:9
**personally** 39:15
**perspective** 21:16
35:8
**Perspectives**
231:21,23 232:2
232:15
**pesticide** 8:5,10

22:19 23:6 119:10
120:4,7 121:20
**pesticide's** 8:12
**pesticides** 119:2
121:23 122:3,12
159:25
**Peter** 2:18 5:2
**Ph.D** 1:13 3:3,11
3:16,21 5:13 6:1
16:1 38:24 56:11
72:1,4 88:3
118:11,15 159:7
159:10 199:14,17
**pharmaceuticals**
14:15
**Pharmacology** 4:4
162:16,18 163:18
165:22
**Phase** 168:15
**phone** 2:7
**photocopy** 226:8
**photocopying** 48:8
**phrase** 60:14 61:6
**phrasing** 181:14
**physiology** 70:2
**piece** 180:25
**place** 21:17 33:17
55:1 107:1 153:13
226:21 231:10
245:6
**Plaintiff** 5:22
**Plaintiffs** 2:2 5:16
5:17 7:4
**plausibility** 175:17
175:23 176:6,7,20
**plausible** 175:3,9
**play** 235:25
**please** 5:14 6:4
12:21 16:24 18:21
26:20 29:19 30:14
30:15 35:24 38:12
49:9 51:7 61:18
72:12,15 89:21
119:4 123:24
124:1 145:7
160:12 168:12
174:2 179:15

193:19 212:8
213:10 228:6,13
233:22 241:11,21
**plugged** 237:4
**plus** 23:17 28:20
112:10,18
**point** 25:6 33:18,19
51:25 82:2,16
83:2,13 84:10
86:10 92:7 104:1
105:2 106:9
107:10 135:10
138:9 140:2
146:15 150:20
151:20,22 154:2
171:6 173:9 174:6
174:10 175:19
178:14 185:17
207:14 209:17
216:2 223:12
227:11,18 228:7
**pointed** 105:7
**pointing** 177:8
**points** 7:21 172:21
**policy** 37:10
**pooling** 184:15
190:5,8
**population** 33:21
34:4
**populations** 34:22
**porphyria** 154:15
**portal** 49:5
**Portier** 3:16 55:4
55:13,25 56:11,13
56:17,25 57:14
128:1 138:7,12
139:6 142:11
158:19 170:22
190:4 191:4
192:21 193:12,17
194:5,19 232:23
241:2
**Portier's** 63:17
126:3,4,7 137:23
143:17 146:4
193:13 194:8
221:19 231:19

241:3,6
**portion** 194:8,11
**position** 32:5 37:3
37:6 55:25 100:10
111:10 116:10,15
116:19 117:7,19
171:1 214:4
**positive** 15:21
18:12 26:8,18
27:1 36:7,14
130:5 208:8,8
233:25 234:2
**positives** 15:21
16:22 17:2,21
18:4,14 32:10
36:5
**possible** 19:17 25:8
50:11 67:16 143:6
148:24 151:24
152:1 173:24
188:23 216:13
230:5 233:15
238:17
**possibly** 90:19
182:15,18
**posts** 100:22
**potential** 11:10
22:14 35:15 53:10
84:2 96:25 122:19
123:4 144:24
147:9 149:7
227:13
**potentially** 34:1
65:12 91:4 146:21
146:22 181:4
219:20
**ppm** 83:23 201:20
201:23 203:15
**practical** 142:25
**practice** 27:16
82:19,20 214:7
237:19 238:6
**preamble** 109:7,8
**precautionary** 27:9
27:14
**prefer** 16:14
**preference** 15:22

Confidential - Pursuant to Protective Order

26:9
**preliminary** 169:14
**premise** 137:24
　227:2
**preparation** 89:18
　131:8 215:6
**prepared** 40:16
　131:21 185:12
**preparing** 98:20
**prescribed** 34:15
**present** 2:17 10:24
　17:13 19:22 41:18
　73:11,15 74:14,21
　84:6,8 132:1
　153:14 201:1
**presented** 18:17
　19:8 50:10,10
　60:18 100:20
　114:15
**press** 27:11 238:16
**presumably** 211:16
　243:11,15
**pretty** 78:7 90:4
　134:20
**prevalence** 230:18
**prevent** 153:13
**previous** 17:20
**previously** 7:12
　58:5 84:11 87:10
　118:24 127:17
　132:19 163:24
　166:19 181:20
　230:13 242:23
**primarily** 87:10
　145:15
**principle** 27:9,14
**printed** 77:10
**prior** 6:13 8:13,17
　49:3,4 95:20 96:2
　99:13,19,22
　106:23 107:22,23
　152:4 166:11
**priori** 18:13 57:7
**priority** 50:18
　62:21
**privileged** 225:17
**probably** 91:23

100:5 134:22
　163:14
**probative** 13:8,10
　13:11,15
**probertson@wei...**
　2:6
**problem** 36:6
　203:9
**proceedings** 244:10
**process** 10:5 41:3
　49:11,12 51:1,4
　51:14 52:2,5,16
　117:21 121:9,13
　152:25 153:10
　165:2 166:9
**produce** 157:7
**produced** 105:13
　168:1 179:10
　184:20
**product** 14:8,11
　72:23 103:23
　160:22 161:1
　192:10
**production** 23:9
**Products** 1:3 5:8
**Professional** 1:22
**profile** 28:18
**program** 70:13
**programs** 15:5,13
**progression** 61:13
　83:5 218:11
**project** 164:3
**proliferation**
　153:12
**proliferative** 53:9
　224:18 227:19
**promoter** 153:18
　153:19 155:24
　156:1,9
**promotion** 153:1
　153:12 155:13,16
　156:3 157:6 158:1
　158:3,4
**promotional**
　153:16
**pronounced** 90:4
**proper** 218:13

**properly** 108:24
　127:14 159:1
**proportions** 76:19
**proposal** 168:25
　191:9,13
**proposing** 168:19
　169:1,4
**protect** 33:20 34:3
　34:17 36:5
**protecting** 34:21
　35:9 36:3
**Protection** 232:17
**protective** 1:8
　146:21,23
**provide** 13:23 30:3
　30:6 35:14 45:5
　45:21,25 50:14
　71:16 93:10 94:19
　96:23 104:2
　131:15,18 132:4
　145:25 157:1
　161:2,4 174:21
　211:15 226:7
　235:7
**provided** 6:25 7:20
　37:17 45:20 46:19
　47:17,24 48:1
　49:22 67:1 78:18
　86:22 93:11 110:9
　145:16,17 160:17
　161:8,9 164:9,13
　178:12 184:4
　189:3
**provides** 51:14
**providing** 98:2
　163:20 228:25
**prudent** 195:9
**public** 32:11 35:8
　35:12 36:3 59:14
　245:3,18
**publication** 19:6,10
　49:3,4 50:11,17
　58:17,18 70:10
　166:12 185:3,7
　188:24 229:19
　237:22
**publications** 19:15

93:19 229:20
　234:4,5
**publicly** 46:9,12
　132:14 133:6,20
　178:9,10
**publish** 51:7 57:10
　60:14 232:11
　238:3,11 240:22
**published** 48:18
　57:25 67:3 93:23
　98:15 132:15
　133:21 161:3
　162:15 163:17
　166:14 209:16
　232:6,16 236:2,13
　237:17 238:15
**publishing** 50:18
　163:16 238:1
**PubMed** 46:23
　90:23,25 98:8
　133:7,8,11,13,24
　190:11 225:23
**pull** 48:6 133:13
**pulled** 213:9 215:8
**purpose** 39:6 67:14
　84:1 96:24 121:4
　122:5 165:12
　219:8 243:7
**purposes** 34:15
　64:9 81:6 84:4
　174:23 221:22,23
**pursuant** 1:8 212:1
　245:6
**pursued** 8:25
**pursuing** 14:3
**put** 27:16 66:19,20
　103:22 104:2,20
　105:1 106:9 112:3
　169:22 186:12
　192:7
**PWG** 38:8 39:1
　45:12,15 46:8
　54:2 55:11 75:9

―――――――――
**Q**
―――――――――
**qualifier** 60:11
**qualifying** 194:16

**quality** 17:15,18
　18:6,7 24:20 25:1
　25:9 43:1,25
　48:25 50:11,21
　82:17 149:13
　164:16 180:12
　195:21 229:15
**quantity** 149:20
**question** 9:5 11:9
　12:19 13:2,7
　14:10 17:20 18:3
　21:6 27:4,17
　32:21 37:22 66:4
　70:9 79:22 81:13
　82:7 83:16 84:13
　85:2,4,8 86:4,11
　98:19 99:8 102:25
　106:13 108:9,17
　109:15,25 110:1
　113:24 120:19
　127:14 129:9
　136:10 137:21
　139:19 145:3
　146:17 147:2
　155:14 159:1
　172:24 173:3
　176:13,16,24
　181:15 198:10
　206:13,14 218:13
　218:25 233:21
　238:5 243:22
**questioning** 172:24
**questions** 17:21
　49:15 139:14,17
　139:20 158:15,18
　214:14,18 242:5
　243:20 244:7
**quick** 56:7 122:14
　236:16,18
**quicker** 50:25
**quickly** 30:14
　52:17 237:3,5
**quite** 25:20 97:22
　166:14 176:16
**quote/unquote**
　141:16

Confidential - Pursuant to Protective Order

**R**

**R** 2:1 6:1,1,1
**ran** 26:22 93:3
  133:14
**range** 28:21 137:18
  138:8 140:20,24
  142:8,11,17 199:3
  201:7 203:20
  205:14,18 206:11
  212:5,11,16
  213:20 214:5
  216:10,12,19,21
  216:25 217:6,7,14
  217:15,17,18,19
  217:19,21,25
  218:15,19 222:13
  222:24 223:2,15
  223:18 224:3,8
  243:13,18,19
  244:3
**ranges** 135:25
  137:14 218:17
  224:4
**Ranjit** 2:12 5:18
**rank** 62:20
**rare** 41:17 52:13
  79:17,19,20 80:19
  81:11,18 82:13,21
  130:21,22 136:9
  181:21 218:21
  227:7 233:13,16
**rat** 112:18 175:11
  230:12,23,24
  231:2,4
**rate** 141:6 148:17
  161:16,17 193:4,9
  196:13 200:11,12
  200:16 220:9
**rated** 105:6
**rates** 67:16 142:15
  180:8 195:22
  196:22 201:4
**rationale** 44:3
  49:19 62:13
  111:23 227:23,24
**rats** 24:3,6,17

130:22 187:4
  210:8 213:13
  222:15,25 224:2
  230:15,18,19
  231:9
**raw** 124:4 177:15
**rdhindsa@hollin...**
  2:15
**re-evaluate** 116:10
**re-evaluation**
  73:11
**reach** 146:10
  176:11
**reached** 175:21
**reaching** 216:15
**react** 156:14
**reactive** 156:4,7
**read** 21:16 28:7
  32:9 36:10 37:16
  49:13 60:8 66:25
  73:7 74:7,17 83:9
  83:10 87:7,15
  92:1 95:11,14,16
  95:20 97:18,19
  109:7,8 114:20
  132:17 133:3
  163:19 164:8,9
  165:6 168:11
  199:1 232:19
**reader** 178:25
**reading** 26:12,13
  28:1 32:14,15
  36:9 53:22 56:22
  58:9 65:17 81:14
  86:22 129:4 131:4
  140:16 165:4
  192:24 209:10
  211:5
**reads** 168:13,24
**real** 55:21 56:7
  107:4 110:10,11
  165:16
**really** 27:11,15
  28:18 44:10,25
  56:14 160:1
  162:10 174:18
**realm** 158:1 174:19

**Realtime** 1:23
**reanalysis** 43:22
  54:8
**reanalyze** 39:25
  40:22
**reason** 32:12 34:8
  42:23 46:16 68:10
  126:6,9 127:25
  128:2 137:20
  148:16,20 196:15
  211:23 219:5
  228:2 239:4
**reasons** 61:16,22
  83:11 91:5 105:19
  116:9 117:6,7
**reassess** 237:14
**recall** 15:22 39:17
  43:21 44:11 78:6
  87:5,13 88:8
  92:19 93:1 94:25
  96:6 98:6 101:9
  101:20 104:25
  109:9 124:4
  125:20 132:10
  134:16 142:14
  145:6 161:17,18
  161:25 166:8
  167:19 168:10
  170:15 173:22
  181:20 190:2
  209:17 211:3
  216:5 235:19
  242:4 243:1,2
**recapitulated**
  86:16
**receive** 49:2 52:10
  188:25
**received** 103:20
  165:21 184:19,20
  185:1 206:16
  210:10
**receiving** 96:2
  206:15 240:22
**Recess** 29:4 72:2
  118:13 159:8
  199:15 224:13
  241:13,23

**recollection** 39:22
  45:16 46:25 78:3
  94:11 141:12
  184:25 223:11
  231:8
**recommended**
  83:15
**record** 5:1,15 8:9
  16:7 23:12 29:2,3
  29:5 30:13 38:22
  56:6 60:13 71:9
  71:11 72:1,5 77:9
  77:12 87:21,22
  105:7 112:2
  115:11 118:11,16
  133:4 134:15
  158:11 159:4,7,11
  179:9 185:24
  186:24 199:14,18
  212:22 213:7
  224:11,12,14
  232:1 239:7,11,13
  239:21 241:9,12
  241:14,21,22,24
  244:11
**record's** 230:11
**records** 3:23
  111:25 112:7
  131:14
**recut** 41:7,15 42:19
  42:23 54:14,24
  73:12 74:14,21
  75:17 76:9 78:19
**recutting** 54:16
**reduced** 145:9
  146:16 147:1
  148:21 149:1
  150:12,16 151:12
**reevaluation**
  142:16
**refer** 138:10
  179:16 189:8,9
  213:8 222:6 230:6
  239:23
**referee** 48:17,21
  49:8,11 50:22
  234:6,9

**reference** 38:10,13
  38:16 66:7,19,21
  92:2 135:16,17
  220:1 229:6,8
  230:16
**referenced** 30:17
  67:4 184:23
  215:13 216:1
**References** 31:22
  32:1
**referencing** 217:1
**referred** 40:7 76:5
  163:8 215:19
  233:3 242:13
**referring** 22:4,6
  25:22 31:7 43:12
  63:9 66:8 75:8
  88:7 145:22
  148:19 163:12
  172:3 187:6 194:4
  194:6,11 198:3
  204:19,25 215:20
  217:8 229:22
  242:17
**refers** 38:10,14
  124:25 240:11
**reflect** 49:16 77:12
**refresh** 94:11 231:8
**regard** 60:9 93:8
  166:25 170:22
**regarded** 167:1
**regarding** 18:3
**regardless** 18:8
  150:3
**registered** 1:22
  14:11
**registrant** 32:6,7,9
**registrant's** 32:5
  36:6
**registrants** 36:5
**registration** 14:7
  31:2 72:23 73:1
  245:19
**regulatory** 4:4 14:7
  15:20 26:7 32:17
  32:21,22 33:1,9
  34:15 79:12,14

Confidential - Pursuant to Protective Order

162:15,17 163:17
165:21 191:6
**reinvestigation**
41:10
**relate** 17:16,18
118:23 119:1,5,20
147:13
**related** 7:22 9:25
15:1,8,12,14
16:21 17:1 18:3
24:20 42:4,8
45:10 46:24 59:1
89:13 92:20 97:9
98:16 115:16
119:14 120:9
122:17 129:7
137:7,8,25 138:7
138:12 139:17
144:8 160:15
164:15 196:21
213:21 214:21
220:21 230:16
245:10
**relates** 1:5 19:15
22:15 24:2 31:1
38:7 98:24 119:22
175:22 205:21
240:8
**relating** 39:2 66:10
66:13 101:18
111:2 242:5
**relation** 17:9 21:1
**relationship** 12:16
12:25 13:6,25
35:20 64:23 65:3
66:14 81:24 110:4
112:14 129:16
**relationships**
232:21
**relatively** 130:22
202:7 227:12,21
**relevance** 83:16
86:5,12 147:2
160:19
**relevant** 37:18 86:9
101:22 107:12,15
109:24 110:1

111:9,11,18
218:19 229:20
**reliable** 18:8 86:7
86:13,13,14
136:12
**relied** 37:23 79:8
80:8,10,15 127:18
145:15 173:5,7
177:14 182:22
197:1,10 218:3,14
218:17 231:14
**rely** 21:15 37:14
61:20 62:5 80:12
216:14 218:4,23
229:3
**relying** 173:9
**remember** 92:22
121:22,23 134:4
134:11,13 166:13
166:15 177:19
196:10 197:2,21
198:2 205:25
211:6 231:18
**renal** 75:19 79:16
79:18 80:20 81:24
**repair** 153:12
**Repeatedly** 106:22
**rephrase** 22:25
35:23 66:4 98:20
114:11
**replicated** 86:16
209:1
**replication** 201:14
203:11 204:9
205:6 206:24
209:4
**report** 3:11,16,24
7:5 11:5,13 12:8
15:19,23 16:1,3
16:17 18:10 19:23
24:21 26:1,24
27:19 30:14 31:12
31:14 33:14 37:12
37:13,16,18,20
39:10 41:7 45:12
45:15 46:8 47:2
48:4 56:3,5,11,25

57:1 60:20 61:21
61:24 62:11 63:18
64:19 67:3 73:5
75:5,11,13 78:17
78:17 81:7 83:8
84:20 87:24 89:19
90:12 91:12 98:21
123:23 125:3
126:3,8,11,25
128:4,7,13 130:7
131:5,21 137:2,8
137:23 138:14,18
140:23 142:12
143:18 145:4,7,12
146:5 150:15
151:10 161:4
165:6 166:20
168:18 170:6
173:14 175:8,19
175:20 176:1
177:2,16 179:19
180:23 182:10,11
185:12 186:17,20
186:23,25 187:22
189:16 192:11
193:13,18 194:5,8
196:23 197:13
199:24 203:11
204:24 205:20
206:8 208:6 209:2
210:3 211:5,14
215:6,7 217:25
221:5,9,19 224:1
225:1,5 227:2,4
228:1,25 229:12
229:24 231:15,19
233:5 240:17
241:3,6 242:9,10
243:5
**reported** 1:22
65:17 126:21
127:10 128:1,5
135:25 137:13,14
141:6 145:6,8,10
146:1 151:23
199:25 201:8
208:1 216:18

221:5 240:9
**reporter** 1:15,22,23
5:23 53:15 157:15
188:9 205:16
220:16 227:17
**reporting** 73:18
75:24 138:13
141:11 211:2
240:13
**reports** 7:10 24:25
41:5 65:20 140:23
141:5 177:13
222:17 241:7
**represent** 5:15
53:20 110:10
112:1 179:9
**representation**
53:4 139:11 189:7
**represented** 60:12
**representing** 96:24
**represents** 159:24
172:6
**reproductive** 7:2
8:23,25 9:3,7,10
9:17 22:16,20
69:23 70:1,3
118:23 119:15,20
119:24 122:7,18
122:23 123:9,15
123:16
**reputable** 232:7,8
**request** 30:1,5
39:24 168:25
**requested** 220:10
225:11
**required** 223:5
**requires** 52:15
101:25 102:2
**requiring** 11:19
**research** 46:17,21
48:6 89:15,18
90:12 91:6,9,18
98:4,16,23 99:6
116:11 119:13
120:8 123:11,20
191:13
**researching** 97:25

**resection** 43:24
**residence** 131:23
**resolved** 158:9
**respect** 15:15 37:20
60:3 116:13 217:5
**respond** 166:18
237:18
**responding** 241:2
**response** 30:4
43:13 53:23 64:23
65:3 79:1 81:23
83:4,18 85:18,22
143:1,4 161:6
168:17,24 186:5
196:1 206:6
222:14 223:9,19
223:21 232:20
233:7,9,19 236:6
**responsive** 18:2,5
193:12
**restate** 16:24
233:22
**restatement** 74:19
**restating** 74:9,17
**resubmission**
235:23 236:1
237:8,10
**resubmit** 51:22
110:18,22
**resubmits** 236:12
**resubmitted**
166:11 236:7
237:16
**result** 35:18 36:7
85:17,21 129:15
129:17 154:2
160:23 194:13
200:18 202:12
203:23,23 233:14
**resulting** 102:18
**results** 9:23 18:8,25
21:3,23 35:13,19
44:18 45:5,22
50:8,9 53:8 61:17
70:11 76:21 78:20
83:1 84:14 86:8
148:1 195:11,22

Confidential - Pursuant to Protective Order

210:12 221:4
222:1 224:5
**retained** 7:12 8:2
8:13,17 11:22
93:5 95:13,14
99:7,13,19,22
107:19 115:16
116:1,24
**retaining** 97:6
**retarded** 145:8
146:16,25 147:10
148:21 149:1
150:12,15 151:12
**return** 113:7
235:22
**returned** 113:8,10
**review** 4:8 12:11
21:14,15,19 22:4
37:25 39:5,16
42:4,6,16,18
44:16,17,23 47:8
47:11,12,24,25
48:11 50:8 51:1,4
53:4 54:3 66:1,3,6
66:9 73:5,25
75:17 77:25 80:23
86:23 91:21 95:4
105:3 106:24
107:20,23 112:10
112:17,21 113:1
113:17,23 114:7,8
114:13,13 122:14
124:23 131:2
145:12,14 149:9
164:20 165:17,18
166:5,7 168:8,17
168:22 169:7,11
169:20 174:4
175:22 185:23
186:3,6,9 189:4
197:20 198:4
201:14 214:8,20
215:25 226:9
231:7 235:8 236:5
238:8,13,17,18,20
238:22 239:8,18
239:25 240:25

**reviewed** 11:14
12:11 16:18 21:15
24:11 25:7 30:20
30:21 31:17 42:12
47:6,9 58:4 66:12
75:25 76:2,8
77:22 100:18,20
113:10 116:20
120:12 124:4
131:6,7,9,10,22
145:15 151:7
172:4 197:14
225:24 226:10,13
232:6 234:16
236:1
**reviewer** 15:4
38:23 49:13 50:13
50:23 51:10,13
52:1 57:9 66:15
234:10,14,18,22
234:25 235:12,15
236:10 237:6
**reviewers** 49:7
166:9 236:11
237:7,12,14,15
**reviewers'** 166:16
**reviewing** 18:23,23
24:25 27:5 44:20
62:1 66:18 114:2
214:17 237:8
238:6,21 240:21
**reviews** 51:11
234:14,17,19
**revise** 51:22
**revised** 166:9
**revision** 52:2,5,10
52:16,16
**revisions** 235:18
236:18
**rgreenwald@wei...**
2:6
**Rhomberg** 162:5
165:9 167:3
ribosomes 174:12
**right** 17:23 22:21
22:22 25:10,25
29:8 31:21 39:17

47:20 53:24 55:10
62:6,9,18 63:14
64:4,5 69:1,4,5
72:25 77:14,16
87:4,5,12 92:13
94:2 97:3 106:6
106:20 109:9
111:6 112:13,19
112:22 124:15
125:13 132:23
134:2,18 138:5
143:10 156:10,20
164:8 166:23
177:12,24 178:17
182:16 192:18
195:2 198:17
204:22 213:13
230:6,11 231:10
235:6 243:5
**right-hand** 226:15
226:18
**ringing** 232:22
**rise** 20:20
**risk** 10:3,4,7,12,14
10:16,16 11:2,5,9
11:17,18 12:13,23
13:3,4,4,12,19,20
13:21,21,22 41:20
**road** 90:10
**Robert** 72:22,22
74:4,4
**Robertson** 2:3 3:5
3:7 5:16,16 6:7
16:10,15 29:7
53:14 64:1 71:20
72:6 77:6,8,17
87:22 112:1 118:7
118:17 138:15,25
139:5,16 157:14
158:22 159:12
173:5 179:4
185:19 186:2
187:13,16 188:9
198:10 199:11,19
224:16 225:14
241:10,16,19
243:21,25 244:6

**Robin** 2:3 5:17
**rodent** 24:1,4 28:5
143:1 183:25
190:16 201:9,12
209:25
**rodents** 24:1
135:20 170:23
171:3 172:11,23
173:11 177:9
190:16
**rogue** 216:8,12
217:13
**role** 49:10
**roughly** 202:2
**Roundup** 1:3 5:8
97:2 98:1 99:21
99:24 101:19
111:2,7 115:17
116:2
**routine** 40:11
**routinely** 12:2,7
149:16
**row** 64:14,15,17
**RPR** 1:14 245:3,17
**Ruecker** 210:2,5,13
210:21 211:14
219:9
**run** 238:7
**rush** 236:4

─────────
**S**
─────────

**S** 2:1,12 6:1
**sacrifice** 68:17,21
155:1,4,5,7 199:2
211:7,12
**sacrificed** 68:20
211:20 221:6
**sacrifices** 155:1
**sacrificing** 68:15
**Sadly** 48:5
**Safepharm** 178:15
178:16,22 179:1
179:21 180:1,22
183:4,14,24 184:8
184:11,24 188:17
188:20 189:5
**sarcomas** 135:12

**sat** 48:17 99:3
106:3,16 113:4
**saw** 20:1,19 44:12
45:16 82:9,24
149:7 154:24
176:3 227:10
**Sawyer** 75:4
**saying** 60:21 61:1,1
74:16,23 82:23
85:14 86:3 107:18
117:14 126:24
129:12 130:6
132:13,14 147:8
149:22 151:2
152:6 172:9 190:7
193:1 194:12,15
216:9 217:12
218:14
**says** 13:21 30:1
53:24,25 72:23
73:15 77:3 97:4
102:19 135:20
136:8 169:9 185:3
186:23 236:25
**Schedule** 29:20
**School** 59:14
**Schwebda** 188:8
**science** 59:10
164:14,24 165:5
165:17 191:14,15
191:25
**Sciences** 188:10
**scientific** 15:2 49:1
50:16 191:18
232:10,14 237:21
**scientist** 14:3 104:3
**scientists** 70:13
**scope** 156:19,25
174:18
**scour** 132:3
**scratch** 164:19
**screen** 33:4
**screening** 33:22
34:5
**search** 46:24 98:8
133:14,25 190:11
225:24 238:15

searches 90:24,25
98:9,12
second 59:22 83:7
112:24 168:14
181:25 182:3
184:14 185:2
193:23 196:7
200:5 211:13
second-to-last 36:1
section 40:15 47:6
53:5,8 60:7
163:19,20 164:6
176:22 177:2
215:12 217:10
229:4,9
sectionals 83:20
sections 40:10,22
41:19 43:7,16
73:6,12,13 164:7
164:13,16,18,20
see 13:19 17:14
25:8 26:12,13
28:25 31:13 32:14
32:15 36:4,9,10
36:16,19 37:7,18
37:21 39:22 41:8
43:17 53:22 54:20
56:22 58:9,15
59:23,25 63:20,21
65:1 68:12 73:8
73:16 75:7 78:10
82:4 83:9 84:11
85:10 86:10,15
107:11 110:11
112:12 113:1
115:9 125:5 126:4
126:5,13 127:13
127:23 128:2
129:25 135:15
136:7 138:2,12
140:8,10,12,15,17
141:2 143:5,8,22
144:17 145:1
147:9 148:6
149:12,20 150:14
150:15 154:19
155:1 156:2

160:16 165:23
166:3 168:15,19
168:21,24 169:23
176:17 177:2
180:6 182:6 184:1
185:3,5 186:17
188:7 190:1
192:24 193:25
195:18 197:25
200:23 202:24
205:6 206:5,7,11
206:19,24 207:5,7
207:11 209:3,8
212:7 213:12
219:10 226:18
233:7 234:4
240:12 243:10,14
seeing 33:2 36:13
68:11 98:10
168:10 190:2
206:4 207:4
219:18 220:8
seek 54:21 99:10
seen 19:25 29:16,18
53:11,16 61:7
63:6 80:20 83:17
97:21,23 124:16
125:2 128:10
129:10 144:7
145:18 148:22
150:22 151:2,25
152:14 154:2
158:6 162:20
164:2 168:9 172:8
172:17,18 176:8
179:12 202:12
207:8 208:7,14
218:10 236:18,21
238:24
select 168:22 169:6
selection 219:24
selective 165:17
selects 49:6
semantics 71:5
semen 164:15
sensitive 33:5,22
34:5

sent 51:6,17 93:16
112:2 235:18
236:11 237:14
sentence 43:14
58:7,13,14 59:21
59:25 73:16 74:7
81:9,15,16 129:4
200:4
sentences 32:8
separate 16:11
112:3
September 1:15
5:4 245:12
serve 7:19 94:5
114:25
served 101:1,3
113:19
serves 101:5
service 113:8
services 94:20
95:17 96:23 100:8
103:2,21
serving 15:1 70:25
114:2
set 80:5 82:3 87:6
87:14,14 120:11
120:13 138:21
139:13 180:2,14
180:22,23 181:7
181:12 182:12
183:4 210:10
221:17 222:5,11
222:19,22 223:8
223:14 245:7
sets 82:21 198:19
220:25 238:24
seven 175:11
share 58:22
shared 38:2 164:12
169:6
Sheraton 1:16
short 132:2
shorthand 245:7,9
show 29:8 84:2
94:10 126:11
143:11 153:15
223:9

showed 116:11
208:8
showing 20:21 60:9
173:4 195:12
shown 22:10 65:3
147:10 226:15
233:19
shows 85:13 94:18
149:18
sic 27:4 63:22
89:16,19 102:19
140:1 142:7 154:1
228:25
sign 144:24 219:19
signed 97:5 109:12
109:20
significance 209:13
significances 76:18
significant 29:1
51:2 53:21 55:6
55:14 56:2,18,19
56:20 57:2,5,6,10
57:15 58:9 59:24
60:9,14,19,23
61:6 67:7,10
124:16,18,23,25
125:2,6,18,22
127:1 128:22
129:1,3,8,14,22
129:24 130:8,15
143:12,16 144:2,5
144:16 145:2
146:6,7 147:7
209:7
signing 106:23
signs 154:12,13
218:10
Sill 2:8
similar 93:14,20
172:17 174:15
183:22 204:4,12
204:15 205:1
206:15,23 207:2
230:1
similarities 173:15
173:21,25 174:5,6
174:9,10,16

similarly 190:15
similars 204:10
simply 132:18
217:18
Singh 5:18
single 112:4
sir 9:9
sit 26:14 28:12
42:22 71:12 86:18
87:1,12 88:8
103:24 116:23
117:9,10 118:4
123:20 125:20
150:11 153:17
156:16 170:15
171:1 177:4
189:14 194:7,18
207:15,19 211:3
sitting 65:21 77:20
80:17 87:4,5
94:24 107:5
108:20 109:4
133:1 148:13
183:13 212:15
214:10
situation 100:13
116:18 117:5,16
236:10
six 28:7 90:18
146:2,23 152:20
200:1,19 202:12
202:16
skew 224:5
skewing 180:16
slide 40:10,18,19
slides 39:16 41:7,11
41:15 42:12,19,23
53:5 54:2,3,8,13
54:16,22,24 55:20
73:11,25 74:14,21
75:18,25 76:3,9
slip 40:12
small 53:12,17
161:13
snapshot 174:7
Society 58:19,23
sold 105:8

Confidential - Pursuant to Protective Order

**solely** 200:21
233:10
**Solomon** 89:9,10
89:11,12
**somebody** 10:22
19:25 20:14,15
162:6 165:8 167:2
**someplace** 97:24
**something's** 155:2
**sorry** 15:9 18:21
22:12 26:22 29:21
30:17 31:23 41:24
42:14 47:6 54:10
56:7 68:24 71:10
81:13 82:4 85:19
91:13 92:16 95:9
95:10 96:17
113:24 114:1
115:20 119:11,16
120:19 123:2
126:1,13,15 129:9
138:10 141:22
144:10 145:22
146:12 153:5
160:24 163:10
166:23 167:18
180:18 182:3
186:19 187:3
188:9,20 191:21
193:6,23 197:6
202:4,5 203:2,3,5
203:19 204:20,20
204:21 210:24
216:22 219:13
220:3 227:18
229:22 231:16,22
232:17,23 240:2,4
241:18 242:18
**sort** 14:14 35:19
**SOT** 167:1
**sought** 15:12
116:12 133:25
**sounds** 181:15
**speak** 33:14 44:3
44:10 45:1,7
**speaking** 115:19
116:6 219:25

**speaks** 37:9
**special** 8:23
**specific** 120:16
229:5,8,10
**specifically** 93:24
159:3 160:14
173:1
**speculate** 43:5
111:21 143:3
**speculated** 194:19
194:21 233:17
**speculates** 192:21
194:5
**speculation** 194:9
**speculative** 194:17
**spend** 164:3
**spent** 162:8
**sperm** 164:15
**spoke** 163:21
**spoken** 160:10
**sponsor** 186:13
**sponsored** 31:9
163:3,7 185:15
186:18 187:23,24
**spontaneous**
153:22 202:22
203:7 227:13,21
**spontaneously** 83:6
153:15 200:13,15
203:1
**Sprague-Dawley**
210:8 213:13
230:19
**staff** 168:16 169:5
**stained** 40:11
**staining** 171:25
**stamp** 77:24
**stand** 55:22 57:13
74:24 109:15,17
109:18 130:7
149:11 151:10
**standard** 69:2
82:19,20 109:2
214:6 217:12,16
**Standing** 232:12
**stands** 28:3 177:5
**start** 21:17 46:5

57:6 125:13,13,16
192:17 211:10
**started** 151:24
152:1 164:19
165:3
**starting** 174:19
**starts** 47:8 56:15
179:10
**state** 5:15 15:19
26:7 27:21 42:20
50:3 54:4 57:7
61:12 67:18 74:23
78:17 81:7,13
95:24 99:16 100:2
103:2 104:19
137:9,16 138:12
151:3 156:6,21
164:13,23 165:5
165:17 167:3
171:21 172:2,3
182:20,21 183:16
184:10 192:21
219:22 245:1,3,18
**stated** 23:23 34:8
57:1,14 69:7 71:8
76:10 80:10
109:23 110:9
118:24 184:6
191:6 199:24
204:8 206:22
235:22
**statement** 26:15,24
27:24 28:13,14,16
57:14 67:9 73:18
74:9,12,18,20,24
74:25 101:21
102:23 104:21
110:23 158:10
227:1,7
**statements** 62:12
**states** 1:1 5:9 34:18
37:10 39:6,10
53:9 103:4 105:8
109:9 172:17
176:1,16
**stating** 33:1 36:16
37:8 60:17 74:7,8

75:23 80:14
100:19 127:17
191:8 209:24
228:7
**statistical** 50:5 66:2
66:6 124:25 191:5
209:7,13 212:2
215:22 223:5
**statistically** 28:25
55:5,14 56:2 57:1
57:15 67:7,10
125:5 128:22
129:1,14 143:12
143:16 144:2,4,16
145:2 146:6,7
147:6
**statistician** 12:1,5
36:20 37:9 61:8
**statisticians** 61:5
**statistics** 12:2,9,10
12:11 61:2 76:22
80:2
**step** 55:17 83:19
**stereotypical**
154:14
**stick** 244:1
**stood** 191:10
**stool** 144:23,23
146:16 147:1,10
148:21 149:1
150:12,16 151:12
**Stout** 120:2,5,12,20
211:14 219:9
**strain** 135:2 182:8
182:10,23 229:10
**strains** 142:21
143:1,5 228:17
229:6,6
**Street** 2:14
**strengthen** 192:9
**strengths** 164:11
**strike** 158:17
**strong** 173:25
174:4
**strongly** 146:10
**structured** 190:15
**student** 20:6

**students** 23:2
**studied** 157:21
**studies** 9:16,19,24
10:6,8,9,9,10 11:4
11:23 13:24 14:5
15:20 18:10 21:4
21:12,13,16 24:2
24:20 25:5,7,10
25:14,19 26:7
27:5 31:17 32:17
32:22 33:1,9
35:13 40:14 42:9
43:3 62:2,4 70:2,7
70:10 84:1,22,22
93:25 100:17,19
118:19,22,25
119:1,5,6 120:21
122:17,25 123:6,7
129:3 136:15
140:7,8,18 154:10
174:21 175:12,12
176:2,3,10,10
178:2 184:5
186:12,13 188:14
189:16 190:1,3,14
190:15,17,18,20
190:21,25 199:4
201:6 203:13
204:9 206:23
207:1 209:3 210:9
215:23 222:10,21
223:3,8,18,24
229:15,15,15,19
230:8 239:14,15
239:23,23
**study** 4:9,10 11:1
17:6,15,16,18,25
18:8,13,16,22
19:5,9,16,18 20:3
20:7,11 21:1,13
21:18,20,21 22:3
22:6 23:14,19,24
25:16,21,23 31:2
31:6,8,9,10,15
34:24 35:2,8,18
37:21 38:1 39:21
40:1,4,23 41:4,5,6

41:9,14 42:5,13
43:25 44:1,7,12
44:18 45:3,10,22
46:2,16,18,22
49:23 51:6 54:13
56:14 57:7 61:12
61:14,16 62:25
63:3,6,20 64:8
65:4,5,7,11,19
66:11,13,14,24
67:1,17,21,24
68:19,22 69:5
70:11 73:4 75:4
76:20 79:5 80:21
81:25 82:17,18
83:1 84:17,19,24
84:25 85:5,8,9,12
85:16 86:1,17,23
87:8,11,16 120:16
120:24 121:4,16
121:21 123:23
124:3,4,5 125:7
125:10,16 127:8
127:22 128:11
129:8,11 130:12
130:17,18 134:23
136:12,12,19
137:1,13 141:10
141:15 143:18,24
144:8,13,18,19,20
145:3,4,17,20
146:9,24 147:8,15
147:16,18 148:1
148:12 149:8
150:14 151:6,20
151:21,23 154:17
154:18,22 170:9
170:10,12,17,18
172:4 175:6
177:13,20 178:1
179:21 180:1,7,12
180:15 181:2,8,9
181:12 182:17
183:5,9 185:15,16
186:11,17,22
187:3,3,3,4,5,6,23
187:25 192:14,17

192:22,23 193:3,8
193:10 194:15,22
194:25 195:1,2,4
195:11,21,24,25
196:3,10,15 197:1
197:17,21,24
198:13,15,23
199:21,22 200:16
201:9,12,16 203:8
203:10,14,15
204:1,3,11,14,17
204:18,24 205:12
205:19,23,23
206:2,2,7,10,17
206:21 207:22,22
207:23,23,25
208:12,20,22
209:4,6 210:5,7
210:17,21,25
211:6,8,9,14,24
212:2 213:2,5
216:4 218:7 219:7
219:10,15 220:8
221:2,4,8,22,24
222:3,17 223:20
226:9 227:23
229:20 230:2,6,12
230:14,23,24,25
231:5,5,8,11,15
231:15 233:25
234:3 236:12,12
238:1,7 240:1,3,5
240:11,12
study's 21:22
subareas 9:4
subgroups 115:1
subject 49:17 92:8
108:4 134:16
213:15
subjective 117:12
subjects 120:24
sublinear 233:14
233:23,24
submission 165:20
submissions 160:18
submit 49:4 107:23
109:11

submits 51:10
submitted 19:6,9
19:15 21:1 41:7
49:1,2,14 51:5,9,9
87:24 90:12
101:21 106:25
107:21 108:2
110:24 164:19
235:1,2,3,11,15
submitting 51:18
51:20,24 52:18
subscribed 245:12
subscription
133:12
subsequent 95:13
subsequently
116:23
subsets 174:1,5
subspecialties 9:14
subspecialty 9:10
substance 23:16
36:19 67:19 68:3
150:4
substances 60:3
substantial 50:15
substantially
194:14
substantive 236:11
sufficient 12:15,24
13:5 25:1 221:21
221:23,25
sufficiently 84:5
suggest 66:19
137:20 202:17
suggesting 13:18
65:10 146:20
150:18 153:25
228:20,25
suggests 219:23
Sugimoto 143:18
143:24 144:8,13
144:18,19 145:20
145:23 146:12,24
147:15 149:8
151:9
Suite 2:9
summary 127:5

177:14 178:4,5,6
178:8 184:5,12,13
184:14,16 186:10
197:1,22 198:4
240:9 242:13,16
supervision 245:7
supplement 120:7
supplemental
238:22
supplementary
186:1
supplied 77:23
support 23:24
54:15 125:21
135:15 212:19
214:4,11 227:1
supported 19:7,22
232:13
supporting 83:5
supports 218:17
227:6
supposed 55:15,21
suppressor 157:12
157:17,25
SUPREME 245:1
sure 9:5 11:8 12:18
16:25 26:21 27:11
33:4 78:7 81:15
100:24 121:25
128:9 131:13
134:19 156:22
185:17 186:23
187:1,8,18 188:16
190:6 191:11
198:24 204:22
210:18 215:7
228:24
Suresh 205:11
206:10 207:9,21
207:22 208:2,22
208:24 209:2
surprised 236:16
surrounding 53:19
survival 67:7,11,16
67:25 148:10,15
195:22 196:13,22
200:11,12,16

201:4 203:10
218:9 219:11,11
220:9
survived 196:16
surviving 197:17
202:21
suspicious 35:19
36:4
swear 5:24
sworn 6:2 245:5
sympathize 36:6
Syngenta 188:10
synonymous
234:10
system 68:6 70:3
141:16,21,23
142:1 172:11
177:11 227:15
systematic 238:13
systemic 68:8
122:6 144:24
147:9 148:7 149:4
149:12 150:1,18
150:23 152:7,14
218:9,10
systems 173:12

| T |
| --- |

T 6:1
T-cab 101:12
Tabatabaie 2:7
5:21,21
table 38:1 63:18,22
63:25 64:1 126:3
126:4,5,7,15
127:5,13,16,18
138:20 139:18,20
139:23,25 140:4,4
140:6 143:18,22
146:5 158:23
186:14 187:10,13
188:6 210:22
240:4,8,12,15
243:10 244:2,2
tables 100:20 124:9
177:14,17 184:4
186:10 197:1,22

231:18 238:22
242:6,9,13,16,17
242:18,20,20,21
**tabulated** 22:1
**take** 3:12 10:7
16:20,25 17:13
18:15 23:11 29:11
52:2,19 55:17
57:11,12,13 71:22
83:17 91:20
117:24 126:2
138:8 153:13
164:8 185:6
199:11 204:1
210:2 212:9 214:8
221:8 224:8
241:10
**taken** 1:13 43:7
219:23 222:22
245:6,7,9
**takes** 51:1,13
**talk** 47:18 61:11
84:21 217:21
227:5 228:9,11
**talked** 7:13 87:18
176:23 185:21
224:24 229:14
230:13 235:17
**talking** 34:2 40:5
66:24 73:3 80:4,5
95:7 175:20
182:17 184:17
187:19 198:17,23
199:8,23 200:8
204:22 209:6,21
209:23 211:9,10
212:13 213:23
217:14,15,17,18
228:10,14,15
229:1 230:12
**talks** 170:9
**tape** 71:21
**Tara** 2:7 5:21
**target** 123:8
**taxes** 103:18,20
**Taylor** 72:22,22
74:4

**Tech** 3:23 103:16
104:11,15,17
105:25 112:7
**technical** 160:18
**technicians** 70:14
154:11
**techniques** 192:7
**Technologies** 5:3
**teleconference**
166:17
**telephone** 8:7
160:3 163:22
**tell** 65:24 68:14
72:16 76:14 77:20
80:17 87:3 88:7
88:10 90:17
101:17 110:25
117:1 121:25
140:5 168:9
214:11
**telling** 43:2 82:18
176:6 234:20
**tells** 219:19
**ten** 211:12,19
**term** 13:15
**terminal** 1:17
155:4,5,7 199:2
**terms** 50:15,18
145:17
**test** 23:16 24:8,9
67:19 68:3 76:18
149:14 150:3
191:10 210:3
223:6,6
**testicular** 199:8
200:19 201:10,11
201:15 204:9
205:10,22 206:3,9
206:17,25 207:11
207:16,20 209:1,4
**testified** 6:2 118:18
151:11 163:24
172:21 176:1
184:11 204:16
**testify** 173:7 245:5
**testifying** 243:1
**testimony** 60:16

73:25 84:21
105:11 107:7,16
108:12,15 171:5
172:16 173:23
174:3 206:23
208:2 235:20
245:4,5,6,7,8
**testing** 15:16
**testis** 199:24 200:5
205:8 207:25
**text** 22:1,2 65:19
145:11,17 197:22
210:24 228:3
242:15,21
**textbook** 134:6,8
**thank** 15:6 30:7,19
118:7 244:6
**thereabouts** 6:16
25:18
**thereof** 245:11
**thesis** 20:5,10
**thin** 40:9
**thing** 98:5,6,7
136:23 195:5
209:24 218:2
234:22 236:4
243:19
**things** 19:12 33:23
48:9 52:18 97:22
99:5,12 154:16
196:11,19 218:12
218:15
**think** 19:24 25:13
32:25 33:18 34:1
41:16 44:9,21
52:20,20 55:18,23
65:5 70:20 81:2
85:3 89:8 90:3
92:18,25 93:9
99:17 100:5
104:13 106:8
111:5 115:14
116:17 117:4
122:21 127:15
134:18 143:6
147:25 148:16
158:8,8 174:17

189:17 190:19,19
191:12 192:6
200:14 210:1
211:10 225:15
234:24 235:5
236:22 243:18
**thinking** 208:20
**third** 112:13
113:15 167:15
182:4 193:20
212:8
**thorough** 10:10
11:19 49:21
207:25
**thoroughly** 24:11
**Thorp** 160:4,6,7
**thought** 107:10
108:12,15 109:24
109:25 126:23
164:10 202:4
218:14
**three** 21:13 23:17
28:20 31:16 41:6
52:21 64:12,25
74:6 90:20 100:17
106:10 108:3
112:2 113:16
123:14,20 199:25
220:19 237:11,14
**thyroid** 194:12
209:7,12 220:14
220:17
**thyroid-stimulati...**
20:18,19
**thyroxine** 20:20
**Tier** 178:4,5,6,8
184:12,13,14,16
**time** 5:5 7:21 25:6
32:17 33:15 43:21
51:2 52:19,22
69:2 71:19,21
87:21 90:6 92:23
93:4,8 94:4 96:7,9
96:11,17 97:5
102:6 103:12,15
103:22 104:2,10
104:14,23 105:25

106:1,3,9 107:22
109:1 110:17
122:1 132:2
151:20,22 152:9
153:21 154:6,22
155:10 162:8
164:3 166:14,15
174:6 177:22
178:2 180:19
181:23 183:20
185:18 191:10,14
191:15,16 198:8
209:17 212:9
216:3 221:12
223:12 226:9
230:1,12 235:23
241:17 243:12
245:6
**timely** 235:7
**times** 48:18 83:14
**tissue** 39:25,25
40:3,7,8,9,17,19
43:7,16,22 53:11
53:16,19 54:2,7
54:13,16 70:6,6
122:9
**tissues** 9:22 43:24
**title** 49:15,16
135:20 140:1
182:23 185:4
**titled** 29:20 182:7
**today** 7:14 12:4
26:14 27:24 28:12
42:22 55:13 65:21
69:4 71:12 74:1
77:20 86:18 87:1
87:12 88:8 93:15
94:24 96:3 97:12
103:24 104:19
111:11 117:9,10
118:4 123:20
125:21 138:3
150:11 153:17
156:16 170:15
171:1 172:16
173:23 174:3
177:4 183:13

Confidential - Pursuant to Protective Order

184:7,20 186:4
189:14 194:7,19
207:15,19 208:2
211:3 212:15
214:10 225:4,7,8
225:10 226:1,6
229:14 241:17
242:4 243:3
**today's** 5:4 244:10
**told** 197:16
**tolerated** 25:19
28:21 67:15,20
**ton** 243:8
**top** 25:17 64:18
77:3 83:24 92:13
123:19 129:4
134:12,18 187:10
192:16 222:7,9
**Toronto** 1:17,17
5:7
**total** 140:7 164:3
221:4 222:17
**totality** 65:6
**touch** 9:6
**Tox** 3:23 103:17
104:11,15,17
105:25 112:7
**Tox/HED/OPP**
36:22
**toxic** 68:8 84:3
144:25 147:9
**toxicity** 123:17
148:7 149:4,12
150:1,18,23 152:8
152:14 218:10,10
**toxicologic** 9:16
57:25 58:16,20
214:7
**toxicological** 28:18
149:16
**toxicologies** 70:16
**toxicologist** 62:1
69:23 71:13,15
167:2
**toxicology** 3:17 4:4
8:22,23 9:2,3,4,7
9:11,17,19 22:16

38:24,25 57:21
58:24 69:14,18,21
70:10,12,19,20,23
70:25 71:4,6,13
162:15,18 163:18
165:22 191:7
218:18 234:15,17
234:19
**tract** 22:20 119:24
123:9
**trade** 159:24
**trained** 8:25 69:22
**training** 9:1 69:17
73:17,19 74:4
**transcribed** 245:8
**transcription** 245:9
**transgenerational**
157:20
**transgenic** 120:9
120:10,11,13,15
120:17,20,23
**treated** 41:21 42:1
**treatment** 79:2
83:6 227:14
**treatment-induced**
26:10
**treatment-related**
125:4 137:19
**treatments** 29:1
**trend** 56:18,19,20
59:24 60:23
124:16,18,20,22
125:2,6,18,22
127:1 128:22
129:1,3,8,14,19
129:22,24,24,25
130:1,5,8,15
142:21 143:16
144:1,3,5 146:6,8
147:7 233:8,14,23
233:24
**trends** 60:2,10
143:12 233:1,4
**trial** 6:24 22:23
**Trivial** 117:25
**trouble** 99:1
**true** 20:11 36:12

56:25 76:8 105:9
109:2 118:22
128:10 133:22
135:1 136:13
141:14,20 152:11
154:9 156:23
159:20,23 169:19
169:25 171:16,23
210:19 211:25
214:2 226:20
228:16,22 231:1,4
232:24 233:8,13
240:22 245:8
**truth** 245:5,6,6
**try** 27:6 50:17
237:2,4
**trying** 19:13,24
33:3,20 34:3
47:20 49:10 50:14
65:18 128:25
129:6 130:12,14
148:5 156:22
180:11 187:17
193:15 220:4
230:3,5
**tubule** 79:17 80:20
81:24
**tumor** 39:7,11,15
39:20,23 45:11
53:11 55:4,15,21
55:21 56:1 57:2
61:13 63:19 64:10
64:12,24,24 73:9
74:13,20 75:19
76:9,10 79:17
80:19 81:11,18
82:13 83:4 86:16
130:23 140:7,10
142:20,22 148:17
149:21 156:2
157:6,12,16,25
171:9,18 174:8
195:17,19,20
203:7 205:7 206:9
208:7 213:16
218:11 228:16
231:1 233:13

238:24
**tumors** 26:9,11
41:18,21,25 64:11
64:12 73:14 79:20
82:21 83:5,20
122:3 125:4,17
128:21 130:19
142:3,5 148:22
149:6,8,19,19,23
151:4 153:13,14
153:24 154:2
193:3,9 195:7,12
195:16,18 199:8
199:24 200:19,20
201:11,12,15
202:12,16,18,22
202:24 204:9
205:8,10,22 206:3
206:17,25 207:7
207:11,16,20,24
208:6,14 209:1,4
218:21 227:7
230:17 233:16
**turned** 236:17
**two** 15:10 17:21
20:23 32:8 41:6
59:1,9 77:13
112:17,25 120:21
143:23 144:17
145:1 146:1,1,19
146:20 194:15
195:10 213:21
231:13 236:19,20
237:11,14 242:24
243:11,14
**two-year** 230:25
231:6
**type** 24:1,4 54:6,11
**types** 62:2,2
**typical** 41:6 238:6
**typically** 21:15
40:14
**typo** 182:11,15,18
182:20,21 187:2

_____
**U**
**ultimate** 61:11

**ultimately** 130:11
130:13
**Um-hum** 34:13
41:22 42:2 51:16
52:9 58:2 71:3
93:14 133:9
193:15 204:13
**unacceptable** 32:13
147:17
**unanimously** 39:14
55:20
**unbiased** 45:4
**unblinded** 44:22
**uncertainty** 108:18
**uncited** 196:22
**unclear** 128:4
**uncommon** 54:20
130:23 136:9
227:20
**undergrad** 90:8
**underinterpret**
20:12
**underinterpretat...**
21:2,23
**underinterpreted**
21:5
**underlying** 238:2
240:23
**underneath** 185:4
**underreport**
238:24 239:1
**underreporting**
239:2
**understand** 9:5
11:8 12:18 13:2
19:13 20:17 25:4
27:12,15 32:21
42:11 43:5 45:2,6
47:20,21 71:20
97:6 100:6 116:9
120:19 128:25
129:9 130:14
139:10 156:20,23
157:8,8 184:21
193:15 208:11
233:21
**understanding**

10:2 11:2 14:9
23:8 40:18 70:19
99:1 100:7,13,13
110:17 150:25
155:8,11 157:5
166:6 204:5
**Understood** 16:20
35:6 194:1
**underwent** 166:5,7
**unique** 192:22
**United** 1:1 5:9
34:18 105:8
**universities** 91:15
91:20
**university** 69:22
70:18 89:15,19,20
90:22 91:2,7
131:23 134:7
**University's** 91:7
**unpublished**
188:25
**unrelated** 83:6
116:23,24 117:2
**unusual** 41:8 180:5
**update** 109:3,10
164:11 165:16
**updated** 93:19
164:9
**upper** 226:15
**use** 12:2,6,10 13:16
17:4 24:6,16
59:23 60:14 61:6
63:1 67:18 81:10
81:17,21 82:10
84:7 113:22 114:1
132:9 155:17
171:17 179:25
180:14 181:11
185:13 186:11
188:18 190:5,8
191:12 196:9
203:13 205:12
211:16 212:16
213:20 214:4
215:14 216:10,12
218:15,17 219:2
220:5 221:3,16

233:4 234:9
238:12 242:8
**useful** 34:21 50:20
145:18
**USEPA** 3:14,15,20
30:10 38:19 72:9
78:5,9 220:10,12
**uses** 58:8 203:14
210:20
**utilized** 234:25

---

**V**

**v** 6:21
**vague** 99:8 228:18
**valid** 33:19
**validated** 190:9
**valuable** 235:12
**value** 13:11 57:8
180:11 224:9
240:22
**Van** 165:13 166:21
166:22
**variable** 47:16
**variance** 236:1
**varies** 235:23
**various** 164:20
**vascular** 141:16,21
141:23 142:1,3,4
**Vasculature**
224:19
**vehicle** 23:16 28:19
189:25
**version** 29:18
77:18 215:8
**versions** 77:13
**versus** 29:1 201:5
207:3,8 208:13
**vessels** 227:20
**veterinary** 68:13
**vetted** 24:11
**video** 5:5,6
**videographer** 2:18
5:3
**Videotaped** 1:12
3:12 29:11
**view** 36:17 111:9
117:12 223:17

**viewpoint** 36:2,3
36:17
**Virginia** 160:15
**Vitae** 3:21 88:3
**voluminous** 230:7

---

**W**

**W** 6:1
**wait** 57:12
**want** 11:8 12:18
16:6 31:23 33:4
33:21,24 34:4
43:5 46:6 71:4,8
71:11 183:10,11
186:23 193:24
198:24 203:2
215:7 223:19
235:13 240:5,7
**wanted** 116:17
225:25
**wants** 34:6
**ward** 147:21
**warrant** 41:14
60:10
**Warren** 1:12 3:3
3:11,13,21 5:12
16:1,4 29:12,14
71:25 72:4 88:3
118:10,15 159:6
159:10 199:13,17
244:11
**Washington** 2:14
**wasn't** 41:3 55:21
78:23 82:12,14
100:3 206:13
207:8 218:2
**way** 14:9 19:20
23:23 32:25 34:8
74:10,16 90:4
94:7 95:2 96:6
97:21 103:8 106:2
106:16 124:7
131:20 132:21
148:14 170:4
171:21 173:22
181:14,14 183:16
206:22 208:11

226:24 237:18
245:11
**ways** 173:13 190:19
**we'll** 29:9 35:25
36:1,19 38:17
40:5 46:5 57:18
94:11 162:16
212:23
**we're** 29:5 30:8
40:5 43:11 65:8
72:5 118:16
154:10 159:11
167:20 175:20
182:16 187:6,18
187:19,20,21
192:13 198:17,23
198:25,25 199:18
199:20 204:22
221:11 224:14
230:11 241:14,24
244:2
**we've** 74:25 82:4
93:15 151:11
185:21 186:4
223:20 230:8
**weaknesses** 164:11
192:9
**website** 77:11
100:23,25
**weigh** 136:16
181:18
**weight** 17:11 23:22
61:3 65:9,14,22
66:22 68:1,2,3,11
68:13 69:5,8
78:21 80:23 82:5
82:9,24 83:16
84:15,16,19,21,22
84:24 85:5,11,12
85:17,20,21,24
86:2,3,4,8,11,20
86:25 145:4,7
154:25 219:18,19
**Weitz** 2:4
**well-conducted**
143:14 203:12
**well-demarcated**

53:12,17
**well-documented**
200:14
**well-known** 172:12
**Well-respected**
232:9
**went** 201:5 221:20
**weren't** 109:1
**WHEREOF**
245:12
**WHO-UNEP**
164:23 165:5
168:17
**wholly** 223:1
**wide** 224:7
**widely** 27:10
**wife** 48:8
**William** 38:23
72:20 74:5
**wish** 32:11
**wished** 41:17
**wishes** 32:10
**Wistar** 222:15,25
224:2 230:12,15
**witness** 3:3,11 5:25
16:1 26:3,22
27:20 52:25 59:19
72:16 77:5 81:1
83:10 123:25
153:5,8 168:13
170:8 192:12
205:15 220:16
227:16 229:13
241:17,18,19
245:4,12
**women's** 119:25
**wondering** 9:13
18:2
**Wood** 4:7 170:9
175:5 176:22
177:12 178:20
179:6 182:4 183:5
183:9,14 184:8
185:14,15 186:17
186:20 187:4,21
229:23 230:12,22
231:4,11

Confidential - Pursuant to Protective Order

**words** 33:3 60:21
61:2
**work** 9:6,17 14:24
15:14 69:15 88:6
88:9,11,12 90:11
92:4 93:1 102:8
102:10,12 106:17
113:8,10 114:3
115:6 116:24
117:2,10 122:21
157:21 159:13
160:22,25 161:1
161:12,21,24
164:14 167:7
168:25 183:18
**worked** 14:6,10,19
14:21 89:7,8
102:15 114:12
166:19
**working** 14:18 38:3
38:9 39:13,18
54:3,5 55:18 63:9
63:11 73:20 75:5
75:18 76:11,10
78:19 90:16
101:18 106:3
110:25 111:1,6
165:10 218:1
**works** 88:22 89:2
99:11 162:6
**worth** 33:6
**worthy** 41:10,13
50:16
**wouldn't** 25:3
43:23 44:5 66:20
67:11 134:21
179:2 180:12
195:9 223:17
**write** 7:5 97:9
98:20 128:15,17
163:23 238:9
**write-up** 197:2
**writeup** 105:3
**writing** 37:7 48:3
88:21 171:19
**written** 7:9 23:2
59:9,11 76:13

98:11 106:25
146:3 164:13
170:14 209:23
**wrong** 77:15
231:24

**X**

**X** 3:1 4:1 13:21
23:21 116:7,12,15
116:20,21,22,24
116:25,25 117:2
117:19

**Y**

**yeah** 34:14 97:17
101:8 102:18
120:1 129:21
133:5 134:22
156:13,22 166:1,3
187:20 191:24
192:18 203:5
210:25 218:13
225:15 232:2,12
234:5 237:4
**year** 15:10 90:16
92:24 97:23
229:19
**years** 9:18 41:6
54:13 61:25 70:8
91:23 105:15
222:4 231:13
237:20
**years'** 218:1
**Yep** 32:1 240:3
**York** 2:5 245:1,2,3
245:18

**Z**

**Z-E-I-S-E** 232:20
**Zeise** 232:20
**Zendzian** 3:20
72:10,21 74:5
**zero** 63:23 83:18
127:24 128:15,15
128:16 129:25,25
129:25 136:7
137:10 143:25,25

144:1 146:2,20
180:5 199:25
212:5 216:19,25
222:24 223:15
224:3

**0**

**0.062** 144:1
**0099** 4:7 179:7,11
**01FE6282686**
245:19
**05** 57:8 144:5

**1**

**1** 29:22 71:24
112:11 123:15
186:14 198:13
240:1
**1,000** 25:18 67:19
83:23
**1.1** 142:12
**1.11** 140:20
**1.5** 112:9
**1/2** 223:15
**1:26** 118:16
**10** 68:12 69:25 70:8
75:11 126:3,7,13
126:15 211:6
**100** 170:16
**10003** 2:5
**1013** 64:17
**102** 2:9
**11** 27:19 28:1 65:8
65:13,22 66:21
68:1 69:8 76:22
82:24 86:4,20,25
142:12 191:4
203:16 205:2
239:16 240:1,12
**11/13/1985** 76:19
76:25
**11/13/85** 77:4,7
**11:07** 72:1
**11:24** 72:5
**1101** 2:8
**112** 3:23 95:8,11,21
96:2,8 98:17,24

99:3,4 160:11,13
163:8,10
**116** 4:11 215:2,5
**117** 101:1,9 102:5
104:18 106:4,17
107:24 108:4,21
111:3 112:22
113:5,8,22 114:2
114:7,9,12 115:14
**11th** 107:24
**12** 75:14 140:24
141:7 142:8
143:18,22 146:5
179:20 199:5
**12/11/85** 77:3
**12:35** 118:12
**121** 122:2
**122** 122:2
**13** 223:7
**134** 217:9
**135** 215:11 217:11
**1350** 2:14
**138** 3:24 122:9
**14** 170:10 186:23
187:5,6 192:14,16
196:5 199:25
**144** 215:7
**15** 3:11 5:4 91:23
112:25 140:18
192:11,19,20
193:17 194:4
209:5 240:4
**15-33** 158:19
**150** 48:18
**153** 75:3
**15th** 1:15
**16** 112:17 200:3
210:3 211:14
216:23 219:22
223:7 240:8,12
**16-md-02741-VC**
1:5
**162** 4:4
**168** 4:5
**16th** 245:12
**17** 210:3 212:5
216:19 217:1

221:9 223:15
**17.5** 222:25 224:4
**179** 4:7
**18** 3:22 81:2 94:9
94:14,21,24
109:13,21 110:6
170:19 190:22
229:12
**18-1** 3:11 15:25
16:4
**18-10** 3:22 94:12,13
96:22 103:1
**18-11** 3:23 112:5,6
**18-12** 3:24 138:16
138:17 158:13
**18-13** 4:4 162:16,17
**18-14** 4:5 168:2,5
**18-15** 4:7 179:5,6
179:22 183:4,6,8
**18-16** 4:8 185:20,22
210:19 239:9
**18-17** 4:9 212:25
213:1,12 242:23
244:1
**18-18** 4:10 213:3,4
213:6,13 242:24
244:1
**18-19** 4:11 215:1
**18-2** 3:12 29:9,10
**18-20** 4:12 224:17
224:21
**18-3** 3:14 30:9,10
30:16 31:21,25
32:9 35:25 36:19
**18-4** 3:15 38:18,19
52:24 76:4 77:4
78:10
**18-5** 3:16 56:8,10
**18-6** 3:17 57:19,20
81:2
**18-7** 3:19 59:4,5
78:10
**18-8** 3:20 72:8,9,14
78:10
**18-9** 3:21 88:1,2
93:17
**18-month** 151:21

Confidential - Pursuant to Protective Order

170:16 179:21
231:5,8
**185** 4:8 178:19,20
179:1,17 182:13
182:16,25 184:24
**18th** 96:12 106:24
**19** 76:13 113:16
187:10 204:24
214:25
**191** 210:25
**1981** 192:14 193:20
204:2
**1983** 68:24
**1984** 58:1
**1985** 75:12,15 76:7
76:13,14,23
**1986** 209:15
**199** 240:1,2
**1990** 210:2 211:1
**1992** 216:18 217:2
217:4
**1993** 68:23 204:23
208:3
**1993a** 239:19
**1993b** 240:1,11
**1C4** 1:18

_____

**2**

**2** 72:3 73:8 118:10
123:16 144:1
168:15 178:4,5,6
178:8 184:12,13
184:14,16 210:17
210:25 212:10
214:12 216:25
223:10 224:1
228:11 229:5
**2:00** 225:4
**2:32** 159:7
**2000** 3:24 136:1
137:15 138:18
141:3 142:18
**20005** 2:14
**2002** 165:14
**2003** 170:24 171:16
172:6 173:14
**2004** 130:24 131:2

131:7 227:9,25
**2005** 4:9 212:20,24
212:24 213:2
214:3,11
**2007** 4:10 212:20
212:24 213:3,5
214:3,11
**2009** 183:5,9
185:15,15 187:5
187:22 215:21
230:22 231:4
**2009a** 187:7,11
229:23
**2009b** 186:17,20,22
187:12 231:11
**2010** 171:17
**2011** 6:16 221:13
221:16 223:9
**2012** 6:16 164:9,11
165:5,15
**2013** 160:14,23
165:22
**2014** 160:15
**2015** 37:21
**2016** 3:22 94:9,14
94:21,24 101:7
106:16 107:14,24
109:13,21 110:6
112:9,25 113:16
**2017** 1:15 5:4 87:24
245:12
**202-898-5800** 2:15
**21** 37:19 67:6
**212-558-5991** 2:5
**213** 4:9,10
**215** 4:11
**22** 37:19 43:6,8
55:3,7 56:24
57:14 64:19 75:9
83:7 123:22,25
126:25 137:2,7
140:23 227:7,25
228:11 240:17,17
**220** 59:17
**224** 4:12
**23** 128:21 129:5
137:2,7,23 143:7

228:11 240:17
**24** 170:7,9 191:1,2
192:23 195:9
**24-month** 170:16
193:10
**242** 3:6
**243** 3:7
**25** 9:18
**26** 26:5 195:8,11
**26-month** 192:21
193:3,8
**27** 26:1
**2741** 1:3 5:11
**29** 3:12 135:16
140:17 219:12
**2A** 93:5 94:2 95:1
95:22 96:4,9
97:13,20 98:18,25
116:13
**2nd** 112:9

_____

**3**

**3** 1:17 118:14
123:18 137:22
138:20 139:18,20
139:23 140:4,4
158:23 159:5
204:24 239:16
**3-** 161:19
**3:03** 159:11
**30** 3:14 9:18 61:25
218:1
**300** 201:20,23
**31** 87:24 202:3,3
**31.5** 202:4
**34** 193:13,14 202:1
202:5 219:12,12
**35** 112:11,18
**36** 56:14,15
**37** 56:16
**38** 3:15 63:18
219:12
**39** 56:15 126:3,15
128:1 224:24
**3rd** 76:15

_____

**4**

**4** 29:22,25 76:7,12
159:9 165:22
199:12 207:22
**4-** 169:15
**4,000** 161:20
**4,348** 144:21
**4,945** 67:22
**4.22** 215:12 217:10
**4:14** 199:14
**4:33** 199:18
**400** 215:20
**405-510-0077** 2:10
**42** 143:17,20,21
146:5
**43** 119:7,17
**45** 125:23,23
126:12,21,22
127:2,11 128:16
129:13 135:23
**47** 30:15,17,17
87:25
**49** 38:13,16 53:3
77:19
**4th** 76:14 107:24

_____

**5**

**5** 67:20 140:21
199:16 210:22
226:14,16,25
228:10 244:9
**5,000** 169:15
**5/28/2021** 245:19
**5:17** 224:12
**5:31** 224:15
**50** 70:13 126:13,21
127:8 128:15,16
128:16,16,16
129:14 136:7
137:10 143:25
144:1,1,1,17
145:2 146:1,1,2,2
146:23 152:20
205:20 206:14
210:20 211:2,7
**500** 203:15
**524-308** 31:2
**56** 3:16

**57** 3:17 72:15
230:18
**59** 3:19 123:11
**59.4** 205:14,17
**592** 205:14
**595.5** 205:17
**5LF2** 183:25
**5th** 2:4

_____

**6**

**6** 3:5 47:1,4,5 62:11
62:13,16,17,17
81:7 243:10 244:3
**6,000** 67:23
**6.3** 205:12,14
**6:00** 241:12
**6:07** 241:15,22
**6:18** 241:25
**6:20** 244:12
**60** 210:13 211:4,11
211:17,23 221:4
**64** 120:3,4,6,8,16
**65** 120:3,4,7,8,16

_____

**7**

**7** 30:1 59:20
**700** 2:4
**72** 3:20
**73103** 2:9
**75** 119:9
**7704** 4:6 168:4,6
**78** 121:1,16

_____

**8**

**8** 63:22,25 186:17
186:22 187:3,4
230:14 231:11
**8.9** 135:24
**80-week** 170:18
**81** 223:24
**88** 3:21

_____

**9**

**9** 63:18 64:1 138:20
139:24
**9:08** 1:16 5:5
**9:45** 29:3

Confidential - Pursuant to Protective Order

**9:57** 29:6
**90** 58:4
**92** 112:18
**94** 3:22
**99** 121:19,20,21

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | Case No. 16-md-02741-VC<br>MDL No. 2741 |
| This document relates to:<br><br>ALL ACTIONS | |

### EXPERT WITNESS REPORT

of

**Warren G. Foster, Ph.D., FCAHS**
**Professor**
**McMaster University**
**Hamilton, Ontario, Canada**



EXHIBIT

Foster 18
#1

*1 | P a g e*

## Table of Contents

1.0   INTRODUCTION:                                                                3

2.0 BACKGROUND AND QUALIFICATIONS:                                                 3

3.0 STATEMENT OF OPINIONS AND RATIONALE:                                           6

4.0 ASSESSMENT OF CARCINOGENICITY:                                                 7

5.0 ASSESSMENT OF EXPERIMENTAL ANIMAL LITERATURE:                                  12

6.0 MATERIALS CONSULTED:                                                           30

7.0 SUMMARY OF QUALIFICATIONS:                                                     47

8.0 STATEMENT OF COMPENSATION:                                                     119

# 1.0 Introduction:

Glyphosate (N-(phosphonomethyl)glycine) is a broad spectrum post emergent herbicide that has been registered for use globally. Though it has been confused with organophosphate pesticides, glyphosate is not an organophosphate but rather an aminophosphonic analogue of the natural amino acid glycine (Greim et al. 2015). Briefly, glyphosate is a highly water soluble (hydrophilic) chemical that is poorly absorbed from the skin (Wester et al., 1991). Oral exposure to glyphosate is considered to be the primary route of exposure (EPA, 2016). Absorption from the gut is estimated to be less than 30% of the oral exposure with negligible tissue accumulation and the majority excreted unchanged in the urine. Inhalation exposure is minimal and dermal penetration is low. The glyphosate that is absorbed from the skin is rapidly excreted mainly via the urine within 24 hrs. (Wester et al., 1991; Chan, 1992). Maximal human exposures of 0.47 mg/kg/day were estimated for children (1-2 years) and up to 0.03-7 mg/kg/day for mixer/loaders assuming that personal protective equipment was not employed (EPA, 2016). Regulatory agencies worldwide have independently assessed the *human health risk* for glyphosate, consistently reaching the conclusion that glyphosate is not a carcinogen. In contrast, in March 2015 the International Agency for Research on Cancer (IARC) finalized its *health hazard* assessment of glyphosate, a less stringent process than risk assessment, concluding that glyphosate is a probable carcinogen (classification 2A).

I have been retained as an expert to render opinions concerning the experimental rodent carcinogenicity bioassay literature including, but not limited to, those described by IARC and plaintiffs' experts purporting to link glyphosate exposure in rodents and carcinogenicity. Following a review of the available data I have concluded that glyphosate is not a rodent carcinogen. If glyphosate were carcinogenic in rodents, one would expect to see replication of carcinogenic findings of a particular tumor type across multiple studies. Such evidence is absent from this comprehensive and rich data set.

The following sections outline my background and expertise, approach taken in conducting my objective review of the data, assessment of the evidence, and my scientific opinions of the data. The opinions I plan to offer in this matter will include opinions set forth in this report, opinions that may be elicited from me in discussing or elaborating on those areas and/or responding to the testimony of plaintiffs' experts and any opinions formed based upon further literature review and review of any additional materials. My opinions are based on my review of the relevant scientific literature; materials specifically related to this case and related proceedings; and my education, training, research, and experience. A list of materials I have considered in forming my opinions is included in Section 6.0 below.

# 2.0 Background and Qualifications:

My expertise is in toxicology with a special focus on reproductive toxicology and environmental carcinogenesis. I have continuously carried out research in the field since 1991 conducting primarily animal studies according to established internationally accepted test guidelines

designed to provide data for government regulatory needs. I have also carried out numerous studies designed to assess human exposure and define mechanistic pathways to explain toxic phenomena including cancer. Over the course of my career, my expertise in the field has been recognized as shown by numerous invitations to provide expert technical advice to non-government organizations, government, and industry since 1991. Further detail of my background and expertise are summarized below:

(i) I obtained my undergraduate training (Hon. B.Sc.) in Human Biology from the University of Guelph, Guelph, Ontario, Canada (1979) and a M.Sc. from the University of Guelph in medical sciences (1986). I completed my doctoral training in medical sciences in 1991 at McMaster University.

(ii) I joined the staff of the Environmental Health Directorate at Health Canada in 1990 where I worked as a reproductive toxicologist. I was promoted to Head, Reproductive Toxicology Section and subsequently served as the Acting Division Chief, Environmental Health Directorate. As a Health Canada scientist, I oversaw an active research program consisting of four Sections focused on general, inhalation, reproductive/developmental toxicology and mutagenicity. During my career, I have designed and carried out animal studies to provide data necessary for regulatory assessment of chemicals under the Canadian Environmental Protection Act. Specifically, I designed, executed, and performed relevant data analyses, interpreted the study findings, and published the results of numerous animal studies for the assessment of the general, endocrine, reproductive and developmental toxicity as well as carcinogenesis of a broad range of chemicals including pesticides. I have also designed and executed numerous animal and tissue culture studies designed to elucidate mechanisms underlying the pathophysiology of observed adverse outcomes. I also participated in several epidemiological studies designed to assess human exposure to metals and persistent organic compounds to evaluate the potential impact of these exposures on human health. I have continuously carried out research and am recognized for my expertise in animal models and working at the intersection between animal research and clinical research (translational science). My productivity in the field and impact of my work has led to numerous invitations to present my findings at major international medical and scientific conferences and provide expert advice to government, non-government organizations, and industry since 1991 as detailed in my attached CV.

(iii) I am currently a Professor in the Department of Obstetrics and Gynecology at McMaster University where I lead a productive and well-funded research program designed to assess human exposure and the effect of environmental chemicals on adverse outcome pathways including oxidative stress, inflammation, autophagy, apoptosis, and cell proliferation; all of which are normal physiological processes that have also been associated with the pathogenesis of human disease including cancer. A separate line of inquiry in my laboratory is focused on the identification of clinical markers of endometriosis and novel therapeutic interventions. I am also a voluntary clinical professor in the Department of Reproductive Medicine at the University of California, San Diego where I conduct collaborative research in women's health.

*4 | P a g e*

(iv) McMaster University is a leading Canadian research intensive university that trains medical, undergraduate and graduate students in the medical sciences. I am involved in the teaching of undergraduate Bachelor of Health Sciences and Medical Students (Ovarian regulation and physiology of selective estrogen receptor modulators and selective progesterone receptor modulators). I teach several graduate courses (Reproductive Endocrinology and Environmental Toxicology) and directly supervise the training of graduate students and postdoctoral fellows. I mentor residents on their research projects and have served as the resident research coordinator and a member of the resident postgraduate education program as well as the postgraduate evaluation committee. I am also a member of the animal advisory committee and the animal research ethics board in the Faculty of Health Sciences at McMaster University.

(v) I have been continuously supported by the Canadian Institutes of Health Research (CIHR) since 2001. My research has also been supported by grants and contracts from the Natural Sciences and Engineering Research Council, The New York Community Trust, the American Chemistry Council, and Health Canada. I have published greater than 180 total career peer reviewed scientific publications. In addition, I have been invited to give over 92 invited scientific presentations and more than 137 presentations at scientific and medical conferences over the course of my career. My work is frequently cited with over 5,820 citations and an H-Index=45 (Measure of impact on the field).

(vi) I have served on numerous local, national and international expert panels including: National coordinator for the Organization for Economic Cooperation and Development (OECD) Test Chemical Guideline Program (bioassays for toxicology and carcinogenesis); WHO/IPCS Steering Group on Endocrine Disruptors, and Member, Council of Canadian Academies Panel, Integrating Emerging Technologies into Chemical Safety Assessment, and Expert Panel on the Integrated Testing of Pesticides. Recently, I also served as a member of an IARC expert monograph working group. I have also served on numerous, Local, National, and International grant review committees (e.g. Canadian Cancer Society, CIHR, NIH, and EPA-STAR), editorial boards, and have been elected by my peers to serve on the board of several prestigious scientific societies (e.g. Society of Toxicology Canada and the Canadian Fertility and Andrology Society) and recently was elected as a Fellow of the Canadian Academy of Health Sciences (CAHS).

(vii) I am currently an editor of the Journal of Applied Toxicology and a member of the editorial boards of the Journal of Toxicology and Environmental Health: B Critical Reviews, Reproductive Toxicology, Immunology, Endocrine & Metabolic Agents in Medicinal Chemistry, and the Faculty of 1000. Further details of my training and contributions to science are provided in my curriculum vitae included in section 7.0 of this report.

# 3.0 Statement of Opinions and rationale:

Unless otherwise stated, all the opinions expressed in this report are to a reasonable degree of scientific certainty including my opinion that glyphosate is not a rodent carcinogen. My opinion is based on my interpretation of the experimental animal studies and the following points:

(1) The animal studies have been conducted in accordance with recognized animal test protocols for carcinogenicity;

(2) Appropriate routes of test agent administration and dose ranges were used in these studies;

(3) The dose ranges used cover low concentrations through, and in some studies, well above the limit dose of 1,000 mg/kg/day;

(4) The methods of tissue analysis and data interpretation were appropriate;

(5) There is insufficient reliable scientific evidence of a dose-response relationship;

(6) Tumor incidences are generally within historical control ranges with the order of priority as follows:

   a. concurrent controls;
   b. historical controls from the same lab within 2-3 years; and
   c. historical controls from other labs or the same lab beyond 2-3 years.

(7) In all studies reviewed the data fails to show evidence of tumor progression;

(8) There is a lack of consistency of findings of tumor types across the animal studies (mice and rat) including within the same strain of rodent model; and

(9) Additional factors that further call into question the biological plausibility of putative compound-related changes.

Thus, taken together, these data demonstrate that tumors identified in the animal studies are most likely spontaneously occurring and unrelated to glyphosate exposure. Therefore, there is no scientifically reliable basis to justify a conclusion that glyphosate is a rodent carcinogen. Furthermore, I am not aware of any reliable scientific evidence available that Roundup formulations are a rodent carcinogen. I will use the following paragraphs to provide a detailed description of the literature reviewed, the methods of analysis employed to arrive at my conclusions, and highlight in each case how the study contributed to the above conclusions.

***Literature reviewed:*** A critical review of the literature was carried out in which I reviewed all available case materials, which are summarized in the literature-cited section of this report. I reviewed detailed data reports arising from industry sponsored animal carcinogenicity studies, the IARC report on Glyphosate (IARC 2015), EPA evaluations and correspondence, and other regulatory documents (e.g. EFSA, BFR, and the Science Advisory Panel report). In addition, I also carried out an independent literature search using PubMed on August 18th, 2016 and updated on October 3rd, 2016, May 17th, 2017, and July 7th, 2017 to ensure that all relevant literature was included in my assessment. Bibliographies of each paper were also searched for additional relevant papers. To assess the literature, I assigned greater weight to studies conducted according to internationally accepted test guidelines for carcinogenicity for the following reasons:

(1) Greater weight was assigned to studies using at least three dose levels (low, medium, and high) allowing for assessment of dose-response characteristics. Dose levels that covered broad ranges of concentrations including a high dose that approached or included the limit dose (1,000 mg/Kg/day) were also given greater weight. Studies that exceeded the limit dose with concentrations that fell below 5% of the overall diet were also highly valued in my assessment. It is essential to include in the study a high dose group represented by the limit dose or 5% diet concentration to assure that animals have been exposed to a concentration of the test agent that will markedly exceed human exposure. If the dose is in the 5% range it should be below the maximally tolerated dose (MTD) to mitigate potential frank toxicity that would confound the results. Thus, evidence of adverse health effects was also considered in my assessment in reaching my final conclusions.

(2) It is essential that cancer studies use an adequate number of animals in each treatment group to detect statistically significant increases in neoplastic lesions. For this reason, studies that used at least 50 animals/treatment group were viewed as compliant with regulatory test guidelines. Studies that failed to use an adequate number of animals/groups were assigned lower weight in my analysis.

(3) Study duration for cancer studies typically should be at least two years in length (24 months) in rats or 18 months for certain strains of mice. This is done to capture the majority of life expectancy of the animals. Unless justified by evidence of increased mortality or neoplastic lesions of sufficient size or number to induce unreasonable pain or suffering, experimental animal studies of shorter duration were given less weight.

(4) Tumor progression was considered important in my assessment owing to current understanding of the mechanisms of chemical carcinogenesis. Consequently, if present, I would assign greater weight to studies in which evidence of chemical-induced tumor promotion was demonstrable. Additionally, factors contributing to biological plausibility were evaluated.

## 4.0 Assessment of Carcinogenicity:

*Introduction and definitions* - To understand how exposure to a chemical can lead to cancer, it is necessary to introduce some definitions and briefly discuss how cancer bioassays are conducted. Cancer refers to a malignant neoplasm (an abnormal growth of tissue that forms a swelling or mass), a lesion resulting from the new or autonomous growth of a tissue. Neoplastic lesions may be either benign (non-cancerous growth of cell mass that does not possess the ability to invade neighboring tissues) or malignant (cell growth that tends to worsen and has the properties of cells that have reverted to a less differentiated form, uncontrolled cell growth, invasiveness, and metastasis). Benign lesions are characterized by slow growth of the tissue that fails to invade surrounding tissues. Examples of benign growths include moles, fibroids in the uterus and endometriosis. In contrast, a malignant neoplasm is characterized by rapid growth,

invasions of surrounding tissue, and metastases (growth of cancer cells in distant tissues). When cancer develops it typically follows the progression from benign to malignant growth.

A chemical carcinogen is any chemical or its metabolite that can induce neoplasia (abnormal growth). Throughout the animal literature I reviewed and the studies cited by plaintiffs' experts (Drs. Jameson, Portier, Neugut, Weisenburger, and Nabhan), reference is made to several different types of tumors. Plaintiffs' experts have noted the different tumors in relevant studies but have failed to carry out a critical appraisal of these studies and the data generated. The evaluation and interpretation of data from such rodent studies is paramount in determining their significance. Plaintiffs' experts merely count several tumors and generate statistical comparisons, often novel and untested, absent further analysis. Critical analyses largely absent from plaintiffs' expert reports include, but are not limited to, biological relevance (e.g. dose response, mechanism, relevant human exposure, and translation from rodents to humans), neoplastic continuum or progression, expected tumor incidences, and replication of tumor types across multiple studies. Therefore, I will describe the different types of tumors here and provide a detailed assessment of each study considered in rebutting the plaintiffs' experts and arriving at my conclusions.

Several different tumor types are discussed in the literature reviewed and therefore definitions are provided. Adenomas are benign tumors in which epithelial cells cluster together and form recognizable glandular structures. Also discussed in one study is an interstitial tumor of the testes. These tumors are also known as Leydig cell tumors (the cells that produce testosterone) a type of tumor that is typically benign although some may progress to malignancy. Another tumor type mentioned in the reports that I reviewed was a hemangioma. A hemangioma is a congenital malformation consisting of a benign tumor made up of newly formed blood vessels. The cause of these benign tumors is unknown and they can appear throughout the body, including the skin, liver, and bones. In contrast, a hemangiosarcoma is a malignant tumor of the blood vessels that has its origin in the vascular endothelium (the cells that line the blood vessel). Finally, also discussed in the animal studies are lymphomas. Lymphoma refers to a group of over a dozen tumors that arise from lymphocytes which are a type of white blood cell.

*Multistep pathway to cancer -* Cancerous growths are thought to arise through activation of the carcinogenic cascade that involves initiation, promotion, and ultimately neoplastic progression (Cohen and Ellwein 1991). A carcinogen is a physical (e.g. radiation) or chemical agent (or one or more of its metabolites) whose interaction with DNA typically induces a mutation in the genetic code and thus acts as an initiator of cancer. Mutations do not always lead to cancer since cells possess DNA repair mechanisms or the damage occurs in a non-coding region of the DNA. In contrast, clonal expansion of the mutated cell can occur if repair of the damaged DNA is unsuccessful.

Tumor growth occurs through the influence of growth factors or hormones that induce cell proliferation and thus tumor promotion. Substances that are only tumor promoters are typically not mutagenic and are unable to induce neoplastic lesions on their own.

Cancer progression refers to the irreversible conversion of a benign pre-neoplastic lesion to a neoplastic lesion. Chemicals that induce tumor progression are usually genotoxic. Tumor progression can occur spontaneously from the accumulation of chromosomal aberrations or instability of the chromosomes.

***Hallmarks of carcinogens*** - The impact of chemical agents on gene expression, cell signaling pathways, receptor binding and signaling, inflammation, immune surveillance, cell proliferation and nutrient supply has been recognized and are potentially important in the pathogenesis of cancer (Hanahan and Weinberg 2011). Ten key characteristics of chemical carcinogens have been described and summarized (Smith et al. 2016) and cited by Dr. Portier in his expert report. Although chemical carcinogens are reported to induce one or more of the 10 key characteristics, use of these hallmarks as a "rule in" test for carcinogenicity is unfounded. The concentrations and the experimental conditions needed to induce changes in any of the hallmark pathways must be carefully evaluated for their relevance to human health. Indeed, numerous chemicals have one or more hallmarks of carcinogens but the effects can only be produced at concentrations that far exceed potential human exposure.

While rodent carcinogenicity assays are used for identification of potential hazards, it is important to note that not all chemicals that have been shown to be rodent carcinogens have been found to be human carcinogens. Potential reasons for this lack of relationship include: different mechanisms of action in rodents compared to humans; differences in absorption, distribution, metabolism, and excretion; and the concentration of test chemical needed to induce cancer in rodents exceeds concentrations that can effectively be achieved in humans. The assessment of carcinogenic potential and health risk is a complex task involving more than simply counting lesion types and assigning a label. Critical to the process is assessment of the biological relevance of all adverse outcomes enumerated in a study and ultimately evaluation of human exposure relative to doses needed to induce an adverse outcome in the most sensitive animal model accounting for uncertainties in translation of results from animals to humans.

***Overview of cancer bioassays*** - In recognition of the long-term serious health consequences represented by chemical carcinogens, chemicals are routinely screened for their potential to induce cancer. Beginning in the early 1960's the National Cancer Institute began to develop animal test methods for the assessment of potential chemical carcinogenicity. Within a decade the two rodent species, two sex, and two year cancer bioassay was in wide use. Regulatory agencies from multiple countries subsequently standardized, validated, and harmonized rodent carcinogenicity test protocols. Standardized cancer bioassays are regulatory requirements for chemical registration. The World Health Organization (WHO) under the leadership of the Organization for Economic Cooperation and Development (OECD) oversees the International Program on Chemical Safety that is mandated with the development and validation of test guidelines for the assessment of chemical hazards. The OECD Test Guideline Program is responsible for a collection of the most relevant internationally agreed upon testing methods used by governments, industry and independent laboratories to assess the safety of chemical products. Test Guidelines are updated on a regular basis to keep pace with progress in science and countries' regulatory needs. The objectives of OECD carcinogenicity studies (OECD-TG-

*9 | P a g e*

451/452) and the combined chronic toxicity and carcinogenicity study (OECD-TG-453) are designed to observe test animals for a major portion of their life span for the development of neoplastic lesions with exposure to at least three doses of a test substance and a vehicle control using an appropriate route of administration (typically oral). Carcinogenicity bioassays are conducted over a period of 24 months for rodents; however, for specific strains of mice a duration of 18 months may be more appropriate, to account for the shorter life-span for these strains (e.g. CD-1 mice). A tumor incidence of 57% was found in Sprague Dawley (SD) rats allowed to live out their entire life-span (Davis et al. 1956). The average life-span of SD rats in this laboratory was approximately $760 \pm 21$ days and 87% of all tumors appeared after the animals were 540 days of age. Consequently, the study duration of 24 months (730 days) in cancer bioassays has been selected to account for the recognized long latency between initiation of cancer and the detection of tumors that follows tumor promotion and progression. This study design also accounts for compensatory mechanisms (e.g. DNA repair) as well as tissue repair providing an adequate time for tumors to appear. Note that a study may be terminated early should the number of survivors in the lower dose groups or the control group fall below 25 per cent. The study may also be terminated early if the tumor volume attains a size or number of tumors that seriously compromises the health of the animals. It is important to note that two-species, two-sex, rodent cancer bioassays conducted according to test guidelines usually generate reproducible results (Gold et al. 1987; Gold et al. 1989; Haseman and Huff 1987) that are valuable for human risk assessment. It is expected that studies adhering to standard operating procedures and following regulatory study guidelines would produce reproducible findings. Failure of studies to generate replicable data causes concern and calls into question the relevance of the data because of the probability the finding might be due to random chance, normal variation of the outcome, or methodological issues. Scientists faced with divergent results are compelled to explore the reasons for the lack of consistency in the data. Common reasons for lack of reproducible findings include: differences in study methodology; animal model used; duration or amount of test chemical exposure; analytical methods employed; time frame of the study; and normal variation in the outcome being observed.

*Interpretation of bioassay results* – Evaluation of bioassay results and determination of their importance involves several steps, including assessment of adherence to study protocol, statistical methods, data analysis, and interpretation. When reviewing any study, the first step involves understanding the question being addressed and the appropriateness of the animal model employed. For cancer bioassays, the main points to be addressed are the use of an appropriate rat or mouse strain, randomization to treatment groups, appropriate route of test chemical administration, dose levels that cover a broad range up to and including the limit dose, duration of study that allows for development of tumors, assessment of systemic toxicity, and accepted histopathological methods. In reviewing study reports it is important to consider the statistical methods employed to ensure that prescribed methods have been followed or if alternative methods have been employed, their use has been adequately justified.

Detection of statistically significant differences among and between treatment groups is important to note but their biological relevance must also be determined. Specifically, it is

possible to have statistical significance in the absence of biological relevance and thus the investigator must evaluate whether the changes detected are internally consistent based on the totality of the animal data collected and current understanding of underlying biological mechanism(s). This may involve consideration of the normal range for a given outcome. To do this it is best to make comparisons with concurrent controls or alternatively appropriate historical controls. I agree with Dr. Portier that it is best to compare data with contemporary controls. However, historical controls generated in the same lab within 2-3 years of the study may also provide useful information. If such historical control data is not available then it may be necessary to compare with data outside the preferred time period. However, that data should be used with extreme caution for quantitative analysis due to differences in the genetic makeup of animals of the same species/sex/strain over time and between laboratories.

In assessing rodent bioassay data, evidence that could indicate systemic toxic effects as shown by changes in body weight, stereotypical behaviors, abnormal vocalizations, porphyria, lacrimation, ruffled coat, barbering of the hair or changes in clinical chemistry and hematology should also be considered. The interpretation of bioassay outcome is based on the integration of what is known of study conduct, data produced, statistical analysis, and understanding of the underlying biology for each outcome. Finally, bioassays are carried out with the goal of identifying adverse outcomes for hazard identification. A properly conducted hazard identification, taking into account all of the available relevant evidence, is but one step in the process of determining risk. Risk assessment is a protective process used in regulatory toxicology that is the product of hazard, human exposure, and recognition of translational differences between rodents and humans. Furthermore, the determination of a risk does not necessarily mean causation has been established. Evidence of scientific causation involves the integration of additional issues such as demonstration that human relevant concentrations of the test chemical can reproducibly induce the adverse effects, evidence of human exposure, knowledge of internal dose, target tissue exposure, understanding of mechanism of action, and its applicability to humans. Consequently, these rodent bioassays on their own do not generate data that can establish causal relationships between external exposure and human health. However, these bioassays may generate data that suggests a compound is unlikely to be carcinogenic in humans.

The case of glyphosate is unusual in that there are multiple rodent (mouse and rat) study results from cancer bioassays. As a result, there are individual study results to evaluate. Additionally, results of the data generated can be assessed across studies. Dr. Portier uses a novel statistical approach for generating a test statistic for comparing current results with those of historical controls. I have not seen this approach applied elsewhere in the toxicology literature or in my profession, and thus I am not aware that this is a validated method that has been assessed by scientific peers or achieved general acceptance by the scientific community. In addition, Dr. Portier employs pooling of data across studies which again is a novel statistical approach that has not been peer reviewed, validated, and to my knowledge has not been tested to reach the level of a generally accepted approach in regulatory toxicology. Indeed, Dr. Portier admits that his methodology utilized in his report is novel and untested (Portier report, pg. 21). While pooling

*11 | P a g e*

such data has not yet been evaluated, validated, and thus is not generally accepted in the scientific community or ever even done to my knowledge, comparing data from rodent studies is a standard practice and paramount in assessing carcinogenicity.

Further, Dr. Portier acknowledges that "simple evaluation of the positive versus negative findings fails to resolve the issue of which findings are driving the overall responses in these data." (Portier report, p.47). A central concept of science is reproducibility of data both within a laboratory, across laboratories, and over time. The lack of reproducible effects, as revealed by the glyphosate data set, indicates that these effects are not compound-related.

Where statistically significant results are lacking, Dr. Portier repeatedly relies upon so-called "marginal trends" to ascribe significance to statistically insignificant data. In my field of expertise, typical research activity outcomes are either statistically significant at the $p<0.05$ level or they are not. The concept of "marginally significant trends" is not typically used in the biomedical literature.

In contrast to the approach of Dr. Portier I, like other scientists in the field, compare the results from multiple studies mindful of differences in animal strain, doses of test chemical employed, experimental conditions, analytical methods employed, data analysis, and interpretation of the study results. This comparison is undertaken utilizing a qualitative evaluation, with statistical significance forming just one piece of the overall evaluation. The generally accepted scientific methodology, which I employed, involves careful consideration of study design, conduct, analytical methodology, data analysis and interpretation to ensure that the results are not over or under interpreted. Moreover, to fully appreciate the data, a critical and qualitative appraisal of the data is necessary and this cannot be achieved through statistical analysis alone.

## 5.0 Assessment of experimental animal literature:

Animal studies are essential in regulatory toxicology, particularly in the absence of evidence of human exposure and epidemiological data. Animal studies allow scientists to address important questions that are either unethical or cannot be carried out in human studies. For example, in human studies, exposure to test chemicals and developmental life-stage of exposure are often unknown. Moreover, many target tissues (e.g. brain, liver, and kidney) are not easily accessible and thus cannot be examined in human studies. Thus, surrogate markers are frequently used to detect effects in these tissues. In contrast, experimental animal studies allow for the administration of known quantities of a test chemical of known purity under carefully controlled environmental conditions (temperature, humidity, time of day, lighting conditions, and unlimited access to water and food of controlled nutritional composition) in genetically similar animals of known age, developmental stage and health. Experimental animals are monitored over the course of the study for changes in biochemistry and hematology, allowing for the early detection of changes in health status. At study conclusion, a full necropsy is performed and all organ and

tissue samples undergo careful gross and histopathological assessment by board certified veterinary pathologists. Thus, these studies provide robust data for the detection of potential adverse outcomes for regulatory purposes that cannot be achieved through alternative means. Of additional importance, the concept of multiple comparisons increases the probability of finding differences through chance alone (Squire 1989). Dr. Portier also recognizes the problems multiple comparisons pose with a data set of this magnitude (Portier report, p. 40), though we disagree on the remedy for that problem (see pp. 21 and 47). Dr. Portier further acknowledges that one expects a certain number of positive findings due to chance alone (Portier report, p. 50). Thus, the finding of a statistically significant difference cannot be interpreted by itself to indicate a compound-related effect. Therefore, results of animal studies may elucidate statistically significant effects of treatments that must be evaluated further for their biological relevance.

Glyphosate has been assessed using regulatory toxicology studies in mice and rats. Sufficiently high doses of glyphosate were used in most studies, approaching or exceeding the limit dose as described in regulatory cancer test guidelines (e.g. OECD TG 451). Results from over a dozen regulatory studies revealed spontaneous tumors in several different tissues but all unrelated to glyphosate treatment. In view of the relatively large number of studies that have been carried out, it is remarkable that although incidental tumors unrelated to glyphosate exposure were found in individual studies, there is a consistent absence of evidence via replicated results for carcinogenicity across studies. The lack of reproducible tumor findings in animal studies designed specifically to produce reliable and reproducible results is compelling evidence for a lack of association between glyphosate and carcinogenicity. One should be mindful that rodent bioassays are not hypothesis driven, and require both gross and histopathological evaluation of all tissues thus increasing the probability of false positive results. Indeed, these studies are designed to maximize the potential of detecting compound-related effects at the expense of detecting false positive results. Detection of a statistically significant positive result is not the end of the study analysis but rather only the beginning of the scientific assessment as it is necessary to determine if the findings are spurious or represent biologically important findings. Consequently, I will describe each study in detail in the following sections.

## *Rat studies*

### *Studies judged as inadequate*

In combination, Drs. Neugut, Portier, and Jameson excluded six studies (Reyna, Chruscieleska, Excel, Seralini, Burnett; Pavkov and Wyland), all of which were reported to be negative studies with the exception of one (Seralini et al. 2014). While in total, plaintiffs' experts excluded six studies, they were not in complete agreement. However, given the methodological concerns and the lack of reliance of plaintiffs' experts, I give the six studies referenced above and the plaintiffs' expert opinions based on those same studies minimal weight in my causation analysis and will not discuss these studies further.

### *Studies judged as adequate*

Of the studies judged as adequate, Dr. Portier provides a statistical assessment of the data only whereas Dr. Jameson provides a summary of the results analogous to the listing of data in the IARC report for glyphosate. The entirety of Dr. Neugut's discussion of the animal data is comprised of two paragraphs and an accompanying table.  Similarly, Dr. Weisenburger, though acknowledging the existence of numerous negative glyphosate rodent studies, concludes without engaging in generally accepted toxicological analysis that "positive studies listed above cannot be dismissed, and provide sufficient evidence for the carcinogenicity of glyphosate in experimental animals … ." (Weisenburger Report at p. 8).  Plaintiffs' experts fail to provide a critical appraisal of the studies or interpretation of the data. Further they fail to discuss potential explanations for lack of consistency of study findings. Hence, the rationale for their conclusions is in my view unsupported. The results of each study and its' biological relevance are described in detail below.

**Bio/Dynamics Inc. 1981 Study BDN-77-2062 (Lankas et al., 1981 discussed in Greim et al., 2015 - Study 1):** In 1981 Bio/Dynamics Inc. conducted a combined chronic toxicity and carcinogenicity study of glyphosate for the sponsor. Sprague-Dawley rats were exposed to 30, 100 and 300 ppm glyphosate in the diet over the course of their lifetime (26 months). The dose was adjusted according to changes in body weight such that the rats were exposed to 3.05, 10.30, and 31.49 mg/Kg/day for males and 3.37, 11.22, and 34.02 mg/kg/day for females. Body weight, food consumption and clinical laboratory studies were conducted over the course of the study.

Neoplastic lesions were documented in the pituitary and pheochromocytomas in males and females and mammary tumors in females; however, the incidence was similar across all treatment groups and thus is not considered to be treatment related. Interstitial tumors of the testis (Leydig cell tumors) were detected in this study with an incidence of 0, 3, 1, and 6 in the controls, low, medium, and high dose groups, respectively. While the incidence of testicular tumors in the low and medium dose groups was within the highest incidence found for historical control (7%), the incidence of these tumors in the highest dose group (12%) was greater than that for the historical control group examined for this research laboratory. Consequently, neoplastic changes in the testis of the high dose group were evaluated to better elucidate their importance.

The testes received thorough histopathological evaluation. The study pathologists did not report any evidence of any dose related changes but did report a notable absence of compound-related hyperplasia. Hyperplastic changes would be expected to be present in the case of compound-related tumors and indeed to be coincident with the development of lesions. Moreover, there are several additional issues noted in the conduct of the study that impact the relevance of the testicular tumors. Specifically, the number of animals surviving to the end of the study was greater in the highest dose group compared to the control group. This is an important point because it creates the scenario where there were more animals in this group that had the opportunity to develop spontaneous neoplasms and thus could artificially increase the likelihood

*14 | P a g e*

of detecting a neoplastic change in this group compared to the control group. Had animals in the control group lived for the same length of time as those in the highest dose group (this is referred to as survival bias), it is possible that no effect may have been found. Furthermore, the absence of testicular tumors in the control group is below the historical range noted for this strain of rat and studies conducted by this laboratory. A lower response rate than expected in the control group could therefore increase the likelihood of detecting a false positive increase in testicular neoplasms.[1] Finally, interstitial testicular tumors have not been replicated in any other study including those in which much higher doses of glyphosate were employed. Moreover, it is relevant to note that, in the studies considered acceptable by plaintiffs' experts, doses similar to Lankas et al., along with much higher doses were employed, and no relationship between glyphosate and interstitial testicular tumors was found.

This study also revealed the presence of spontaneous occurrence of thyroid C cell tumors in females. A statistically significant trend for thyroid C cell carcinomas in the female animals only was observed (1/47, 0/49, 2/50, and 6/47). However, after combining thyroid C cell adenomas and carcinomas, which is appropriate (McConnell 1986), the statistical significance disappears. Although Dr. Portier agrees that combining these tumors is appropriate, he raises concern about these tumors in female rats even though none of the other studies revealed a statistically significant increased incidence of these tumors. I therefore conclude that the presence of thyroid C cell tumors in female rats in this study is not compound-related.

Although pairwise comparisons revealed a statistically significant increase in the number of pancreatic islet cell tumors for the lowest dose group (3.05 mg/kg/day) in male animals only, there was no evidence of a dose response (0/50, 5/50, 2/50, and 3/50). The low incidence of tumors, lack of evidence for tumor progression, absence of a dose response, and consistency with historical controls all support the conclusion that these tumors are not compound-related.

In summary, both the decreased survival in the control group compared to the highest dose group of rats together with the lower incidence of testicular tumors in the control group compared to historical controls increases the likelihood of finding a statistically significant increase in tumors amongst the other dose groups whose biological relevance is questionable. Dr. Portier speculates that the 26-month duration of the study offers unique insights that may be missed in a study lasting only 24 months. However, no evidence is offered and I am not aware of any data demonstrating that a 26-month study would detect interstitial tumors at any different rate than in a 24-month study in dose groups compared to control groups. I therefore conclude that the absence of a dose related increase in incidence of interstitial tumors, the absence of changes that

---

[1] An example might be illustrative here. If one expects a background rate of 6% for a given tumor in a study with four arms of 50 rats each, one would expect 3 out of 50 rats in each group to have that tumor (or 12 out of 200 overall). However, if the control group has 0% by chance, then one would expect 4 out of 50 rats in the remaining groups to have that tumor by chance because one would still expect 12 rats out of 200 to have that tumor.

would be indicative of tumor progression, and statistical limitations suggests that these tumors are incidental findings unrelated to glyphosate exposure.

Strengths of this study include an appropriate study design, adequate number of animals/dose group, use of three dose groups plus a negative control, appropriate methodology for tissue assessment and statistical analyses of the data. The study was conducted prior to the introduction of standardized and internationally accepted OECD test guidelines for carcinogenicity although much of the methodology is consistent with those guidelines. However, the use of a high dose that was substantially below the limit dose is a weakness of the present study.

**MSL-10495 (Stout and Ruecker, 1990; discussed in Greim et al., 2015 - Study 2):** This was a chronic study conducted by Monsanto in albino Sprague-Dawley rats (n=60/group) following a two-year cancer bioassay (consistent with the current OECD carcinogenicity TG-453). Rats were fed glyphosate (96.5% pure) in the diet for 24 months. Target doses were 2,000, 8,000, and 20,000 ppm. Using food consumption data, the authors calculated that the rats were exposed to 89, 362, 940 mg/Kg/day for the males and 113, 457, and 1,183 mg/Kg/day for the females of the low, medium, and high dose groups.

There was a treatment-related significant decrease in body weight among the female rats in the highest dose group in the absence of any change in food consumption. Significantly increased liver weight was also found for males in the highest dose group. The number of animals surviving to the conclusion of the study was 29, 38, 34, and 34 for males and 44, 44, 34, and 36 for females. Taken together, these data suggest that the dose selection was considered adequate for a carcinogenicity study. However, signs of toxicity in the highest dose group could confound interpretation of neoplastic changes. Regardless, non-statistically significant neoplastic changes were noted in pancreatic islet cells. Specifically, pancreatic islet cell adenomas (benign lesion) were found in 1/58 (2%), 8/57 (14%), 5/60 (8%), and 7/59 (12%) in the control, low, medium, and high dose group males. In females the incidence was 5/60 (8.33%), 1/60 (1.67%), 4/60 (6.67%), and 0/59 in the control, low, medium and high dose group females, respectively.

I conclude that the pancreatic islet cell adenomas are not treatment-related for several reasons. First, a dose related increase in the incidence of these lesions was not demonstrated in the males and the incidence of these tumors was higher in the control females compared to those treated with glyphosate. Furthermore, while pancreatic islet cell tumors are more common in male than female rats (Majeed 1997), these tumors are known to occur spontaneously in aged Sprague-Dawley rats (Chandra et al. 1992) and the incidence of these lesions in the current study was within the range of historical controls (0-17%)[2]. Moreover, there was no evidence of neoplastic

---

[2] I have used the range of historical controls as opposed to the mean, which is the common and standard practice in interpreting toxicological data. The range is more relevant compared to the mean because it provides the reviewer with a better appreciation for the spread of the data, which can be variable for many tumors and is thus important to take into consideration (Baldrick 2005; 2007).

progression noted in any of the pancreatic specimens examined and the only carcinoma that was found occurred in a male animal from the control group. Hence, the neoplastic changes documented in this study are in my opinion spontaneously occurring pancreatic islet cell tumors and unrelated to glyphosate treatment.

To complete its review, the United States Environmental Protection Agency (US-EPA) requested additional data on the historical controls for the following lesions: (1) thyroid C-cell adenomas, carcinomas, and hyperplasia; (2) hepatocellular adenomas, carcinomas, and hyperplasia; and (3) keratoacanthomas. A review of the data submitted on incidence of historical controls led to a conclusion that, for all three neoplasms, the incidences for all lesions fell within the range of historical controls and therefore, I conclude that these lesions were spontaneously occurring and unrelated to glyphosate treatment. Dr. Portier reports that there was a statistically significant trend for liver adenomas; however, this disappears when these lesions are combined with hepatocellular adenocarcinomas. I further noted that there was no compound-related replication of these tumors across multiple studies, there was no progression to carcinoma, no evidence of a dose response, and finally no significance when combining adenomas/carcinomas. Accordingly, I conclude within a reasonable degree of scientific certainty that glyphosate was not carcinogenic in this study.

Strengths of this study include use of an appropriate study design, number of animals/dose group, three dose groups and a negative control, appropriate route of exposure, use of a high dose that reached the limit dose, and adequate study duration.

**MRID (Brammer, 2001 – discussed in Greim et al., 2015 - Study 7):** This study was conducted by Syngenta and included Wistar rats of both sexes (52/group) treated with vehicle or glyphosate (121, 361, and 1214 mg/kg/day for males and 145, 437, 1498 mg/kg/day for females) in the diet for 24 months in a standard cancer bioassay. Strengths of this study include use of an appropriate study design, number of animals/dose group, three dose groups and a negative control, appropriate route of exposure, use of a high dose that exceeded the limit dose, and adequate study duration.

Results of this study revealed the presence of liver adenomas with an incidence of 0/52, 2/52, 0/52, and 5/52 in the control, low, medium, and high dose animals, respectively. It is important to note that in this study, males of the highest dose group were more robust as reflected in a better survival compared to the control group (26/52 vs. 16/52, respectively). Increased survival to the end of the study is relevant because it allows the animals longer exposure time for tumors to spontaneously emerge and thus increases the likelihood of detecting tumors in the high dose group compared to the control group. Furthermore, according to the historical control data cited by Dr. Portier, it is relevant to note that the range of liver adenomas in Wistar rats is 0 to 17.5% (Giknis and Clifford, 2011). Results of the present study are within the range of these historical controls. Thus, the findings of a 10% incidence in adenomas in rats of the highest dose group in

the present study are not in my opinion treatment related. Beyond just a statistical comparison of the numbers, there was no evidence of a dose response and evidence of progression from adenomas to adenocarcinomas was also lacking. Hence, for multiple reasons this is considered a negative carcinogenicity study.

**MRID 49987401 (Wood et al., 2009a – discussed in Greim et al., 2015 - Study 8):** Adult male and female Wistar rats were treated with vehicle of 95.7% pure glyphosate (95, 317, and 1230 mg/kg/day) in the diet. This was a combined chronic toxicity and carcinogenicity study and conducted according to regulatory guidelines. Strengths of this study include use of an appropriate number of animals/dose group, three dose groups and a negative control, appropriate route of exposure, use of a high dose that exceeded the limit dose, and adequate study duration. Combining a chronic toxicity study with a two-year cancer bioassay is seen as an additional strength of the study owing to the incorporation of additional outcome measures of general toxicity.

Results of this study failed to reveal a statistically significant increase in the incidence of mammary gland adenomas whilst there was a significant trend for increased incidence of mammary gland adenocarcinomas (2/51, 3/51, 1/51, and 6/51). Combination of adenomas and adenocarcinomas was significant using a pair wise test for the highest dose group only (2/51, 3/51, 1/51, and 8/51) and trend analysis was also significant. However, it is noted that there was no evidence of a dose response. Moreover, I note that in the Brammer study discussed above there was no evidence of a statistically significant trend for an increase in the number of mammary gland adenomas and adenocarcinomas. Furthermore, the incidence of adenomas and adenocarcinomas was higher in the controls of the Brammer study than in the treated animals. The same results were found in the Suresh study discussed in detail below.

Taken together these considerations lead me to conclude that mammary gland tumors in this study were not compound-related. In the summary of the study, there was no mention of proliferative changes. Dr. Portier asserts without reference that mammary adenocarcinomas can arise without the presence of adenomas. It is unclear where this comment derives from and it is inconsistent with the generally accepted view of cancer pathobiology. Mammary gland tumors are common in rats with a prevalence of 57% in female Sprague-Dawley rats allowed to live out their natural life-span (Davis et al. 1956) and within the historical control range for these tumors in Wistar rats (Giknis and Clifford, 2011). I note that there were no statistically significant mammary tumors detected in other well conducted studies in Wistar (Brammer, 2001; and Suresh, 1996) or any Sprague Dawley (Lankas, 1981; Enemoto, 1997; Atkinson et al., 1993; Stout and Ruecker, 1990) rats as summarized in Table 8 from Dr. Portier's report (p. 33).

*18 | P a g e*

A non-significant increase in skin keratoacanthomas (2/51/ 3/51/ 0/51, and 6/51) was noted but trend analysis was significant in the males. The dose response was not detected and the lack of pair-wise statistical significance suggests that this pattern of tumors is not compound-related. Furthermore, the lack of reproducibility of these findings - in other well conducted studies - further indicates that these findings were not compound-related.

In summary, this was a well-designed carcinogenicity bioassay that employed an appropriate route of exposure, number of animals, dose groups, and study duration. The maximal dose exceeded the regulatory requirement for a limit dose. Absence of evidence of a significant dose response for the mammary tumors, a common spontaneously occurring tumor, and lack of findings of tumor progression lead me to conclude that the mammary tumors were unrelated to glyphosate treatment. Therefore, it is my assessment that this is a well-conducted negative study.

**Atkinson et al. 1993 (discussed in Greim et al., 2015 - Study 3):** A combined chronic toxicity and carcinogenicity study was carried out using dietary exposure of glyphosate (98.9% pure) administered to 50 Sprague Dawley rats of both sexes/dose group. Five dose groups including a vehicle control were used. The males received 0, 11, 112, 320, and 1,147 mg/Kg BW/day while the females received 0, 12, 109, 347, and 1,134 mg/Kg BW/day for 104 weeks. Interim sacrifices were carried out at one-year in an additional 35 rats from each sex and dose group.

There were no adverse effects of treatments and histopathological assessment of tissues failed to reveal any morphological abnormalities in this study. Furthermore, there was no increase in the incidence of neoplasia in any tissue studied. Although there were no significant glyphosate effects on thyroid tumor incidence, Dr. Portier notes a statistically significant trend for follicular thyroid tumors based on the assumption that the unexamined mid-dose groups would not have any tumors. Thyroid follicular tumors are relatively common in rats with an average incidence of 3.79% and a range of 0-14% in control animals studied over 24 months (Giknis and Clifford, 2004). Thus, the high dose tumor incidence falls within the range of historical controls suggesting that these tumors are not compound-related. Moreover, the lack of reproducibility of these tumors in other studies further suggests that these are incidental findings that are not related to glyphosate exposure.

This study has a number of strengths including the study design employed, use of an appropriate route of administration, inclusion of four dose groups in addition to a vehicle control, use of an appropriate high dose, appropriate number of animals/dose group, two-year duration of the study, and inclusion of interim analysis of animals for signs of toxicity. No weaknesses were detected with the study design, execution or interpretation of the study results. Dr. Portier considers this a weak study because it failed to examine the pathology of all animals in mid dose groups. However, Dr. Portier's own report (p. 27) showed that adding in additional animals to the mid-dose groups did not produce a meaningful change in the p-trend unless one assumes that all animals in the mid dose groups would not have had tumors. However, as noted above, these are common tumors and thus this maybe an unreasonable assumption. Therefore, I assign little

*19 | P a g e*

weight to Dr. Portier's criticism especially because this study was consistent with the state of the art of the time that it was conducted. Accordingly, this study was considered a strong negative study that lends strength to the view that glyphosate is not a carcinogen.

**Suresh, 1996 (discussed by Greim et al., 2015 – Study 4):** In this study, 50 Sprague Dawley rats of each sex were assigned to one of three dose groups or a control. The animals were administered glyphosate (96-96.8% pure) at doses of 0, 6.3, 59.4, and 595.2 mg/Kg BW/day (males) and 0, 8.6, 88.5, and 886 mg/Kg BW/day (females) in the diet for 24 months. Results of this study did not elicit any evidence of adverse health effects and no morphological abnormalities were demonstrated in the histopathological assessment of the animal tissues studied. Furthermore, there was no evidence of a statistically significant increase the trend in tumor incidence in any of the tissues studied.

Overall, this is a well-designed study with numerous strengths including an appropriate study design for the assessment of carcinogenicity, use of three dose groups plus a control, route of glyphosate administration, and appropriate study length. A weakness of this study is the highest dose group falls below the limit dose.

**Enemoto, 1997 (discussed in Greim et al., 2015 – Study 6):** This was a combined chronic toxicity and carcinogenicity study carried out by Arysta Life Sciences in 50 Sprague Dawley rats for each sex and dose group. Rats were administered glyphosate in the diet at dose levels of 0, 104, 354, and 1127 mg/kg BW/day (males) and 0, 115, 393, and 1247 mg/kg BW/day (females) for two-years. Interim sacrifices were carried out at 26, 52, and 78 weeks in 10 rats of each sex/dose group. This study did not reveal any signs of adverse effects and histopathological assessment of the tissues did not demonstrate any evidence of any morphological abnormalities. However, although pair wise comparisons failed to reveal a statistically significant effect of treatments, Dr. Portier reports that there was a statistically significant trend for kidney adenomas (p. 30). Histopathological assessment of the tissues failed to reveal any evidence of hyperplasia and thus there was no evidence of tumor progression. The lack of evidence of morphological abnormalities (hyperplasia), absence of significant differences by pair wise comparisons, absence of dose response, and failure to replicate these findings in other well-conducted studies leads me to conclude that this observed trend is not glyphosate related.

This study has a number of strengths including the study design employed, use of an appropriate route of administration, inclusion of three dose groups in addition to a vehicle control, use of an appropriate high dose, appropriate number of animals/dose group, two-year duration of the study, and inclusion of interim analysis of animals for signs of toxicity. No weaknesses were detected with the study design, execution or interpretation of the study results. Accordingly, this negative study lends strength to the view that glyphosate is not a carcinogen.

### *Synthesis of rat studies*

In summary, while potential neoplastic changes were documented in these studies, the totality of the evidence leads me to conclude that these tumors were not glyphosate related. This is especially because, as Dr. Portier readily admits, statistically significant results are to be expected given the high number of tests performed across these studies. These studies all failed to demonstrate any evidence of statistically significant compound-related increased incidence of tumors. These studies are highly relevant and were generally conducted according to well-established and internationally harmonized regulatory carcinogenicity test guidelines. The conclusions in the current report diverge from those of Dr. Portier. Reasons for our divergent conclusions can in part be explained by differences in the methodology and analyses carried out. Specifically, in the current assessment of the data, I have assessed the overall scientific quality of the studies in addition to evaluating neoplastic changes in the context of the totality of scientific knowledge rather than limiting discussion to just a statistical analysis of the data. The absence of compound-related tumor findings in each of these individual negative studies indicates that in total glyphosate is not carcinogenic in rats. Therefore, I conclude that there is no scientifically reliable evidence of glyphosate carcinogenicity in rats.

## Mouse studies

### *Studies judged as inadequate*

The doses of glyphosate used in the Reyna and Gordon (1974) and Pavkov and Turner (1987) studies were inadequate and thus were excluded from my analysis. Dr. Portier similarly considered these studies and excluded them from his analysis. These studies were all negative; however, in view of their limitations and consistency of opinions on these studies they will not be discussed further here.

### *Studies judged as adequate*

**Knezevich and Hogan, 1983 (discussed by Greim et al., 2015 - Study 10):** The results of this mouse study conducted by Monsanto have received considerable attention owing to the pattern of kidney tubule lesions. Briefly, CD-1 mice (50/dose group for both sexes) were administered 99.8% pure glyphosate (161, 835, and 4,945 mg/Kg/day for male mice and 195, 968, and 6,069 mg/Kg/day for female mice) in the diet for 24 months. Results of this study revealed an 11% loss in body weight of the male animals in the highest dose group compared to controls. In addition, this study revealed that glyphosate treatment had no statistically significant effect on survival; however, kidney adenomas were found in 0/49, 0/49, 1/50, and 3/50 male mice. A reanalysis of

the tissue blocks identified one additional adenoma in the control group changing the dose response to 1/49, 0/49, 1/50 and 3/50.

Since it is typical of large cancer bioassays to only grossly examine the whole organ and to cut a single paraffin section for histopathological analysis, it is possible that even more tumors could be identified and further insight gained from examination of additional tissue sections in all four dose groups. Therefore, additional sections were cut for histopathological assessment and further insight was sought. Subsequently, a Pathology Working Group (PWG) met to review the kidney adenoma and carcinoma data. It is noteworthy that the PWG unanimously agreed that the control mouse tumor was present and should be considered. As Dr. Portier notes, with the tumor in the control mouse included there are no statistically significant differences. Moreover, I note Dr. Portier's statistical analysis indicated that none of the other mouse cancer bioassays to assess the carcinogenicity of glyphosate generated statistically significant incidences of compound-related kidney tumors using the guideline Fisher test or Cochran-Armitage trend analysis. The high dose of glyphosate used gives me confidence that that the absence of significant changes in kidney tumors is a genuine negative finding.

From my review of the data and subsequent analyses together with a review of the relevant correspondence, I conclude that the absence of a dose response together with lack of evidence of tumor progression supports the conclusion that these tumors are spontaneously occurring and unrelated to treatment. Drs. Neugut and Jameson use the $p$ trend from the IARC assessment to justify their conclusions of a statistically significant trend yet Dr. Portier disagrees with this conclusion. Moreover, the dose levels employed were at or near the limit dose for the medium dose group whereas in the highest dose group they are 5 times above the limit dose for the male high dose group. While an 11% loss in body weight in the highest dose group of males was detected no compound-related tumors were demonstrated. Finally, the step sectioning employed makes it even more unlikely that the tumors were a compound-related effect, as extra sections failed to identify any new tumors in any dose group.

**Atkinson, 1993b – (discussed in Greim et al., 2015 - Study 11):** In this carcinogenicity study, 50 mice/dose group of each sex were administered 97% pure glyphosate (98, 297, and 988 mg/Kg/day for males and 102, 298, and 1,000 mg/Kg/day for females) in the diet for 24 months. No pre-neoplastic or related neoplastic lesions were detected. Incidental pituitary adenomas were noted and there was a non-significant increase in bronchioalveolar adenomas of the males only. Dr. Portier suggests that some of these tumors are marginally significant. However, as previously noted in my report, the concept of marginal significance would not typically be accepted in any credible scientific publication. There was a significant trend in hemangiosarcomas with 4/45 (8.9%) lesions found in the high dose group of males only. While these tumors are rare in humans (Weiss 2008) they are common neoplasms of mice (Elwell 2004), suggesting a potential different underlying mechanism for their development in mice compared to humans. Also note that the two-year hemangiosarcoma incidence data reported for historical controls in CD-1 mice ranges up to 12% (Giknis 2000). This incidence is well within the range of the historical controls

*22 | P a g e*

cited by Dr. Portier[3]. Moreover, since these tumors were not detected in a statistically significant trend in male mice in other appropriately conducted cancer bioassays, the lack of replication weighs against considering these tumors to be treatment related. Finally, I note that kidney adenomas in this study were found in a dose pattern of 2, 2, 0, and 0. This pattern contrasts with that reported previously in mice (Knezevich and Hogan, 1983) with a pattern of 1, 0, 1, and 3. These conflicting data further illustrate the lack of consistency of data across studies and further indicate the lack of compound-related effects. This is a strong study owing to the study design, and the dose levels used, including a dose representative of the limit dose, and absence of confounding systemic toxicity. Hence, this study is considered a negative study.

**Sugimoto, 1997 (discussed by Greim et al., 2015 - Study 12):** A chronic study in ICR-CD-1 mice (50/dose group) treated with 97.6% pure Glyphosate (165, 838, and 4,438 in mg/kg/day in males and 153, 787, and 4,116 mg/Kg/day for female animals) in the diet for 18 months was performed consistent with an OECD carcinogenicity TG. In this study, malignant lymphomas were reported 2/50, 2/50, 0/50, and 6/50. The absence of a dose response, lack of statistical significance by Fisher pair wise comparison, and absence of compound-related effects on lymphomas in other well conducted mouse cancer bioassays lead me to conclude that these tumors are not compound-related. Furthermore, the incidence of these tumors falls within the range of historical controls in the Giknis (2000) report (0-14%) cited by Dr. Portier and the range of historical controls (3-19%) from contemporaneous studies conducted at the same laboratory (BFR, 2015).

A statistically significant increased incidence of hemangiomas (a non-malignant tumor) was found in the female mice only with a pattern of 0/50, 0/50, 2/50, and 5/50. However, effects seen at the high dose are potentially confounded by signs of systemic toxicity as revealed by liquid stool, retarded growth, and reduced food consumption (Greim et al. 2015). These are non-malignant lesions of unknown cause that generally appear early in life. The absence of evidence of tumor progression in an 18-month study is reassuring that glyphosate is not carcinogenic. In addition, I note that there were no compound-related hemangiomas found in other well designed carcinogenicity bioassays. Thus, potential compound-related effects in the high dose group of this study are considered less reliable.

In summary, this study has numerous strengths including study design including multiple dose groups, dose range and duration of the study and is therefore regarded as a strongly negative study.

---

[3]Dr. Portier appears to confuse historical control data for "whole body" hemangiosarcomas as capturing all hemangiosarcomas. Thus, he does not count hemangiosarcomas reported in the Giknis data at other sites, like the liver. In fact, hemangiosarcomas are a vascular tumor that appears throughout the body and thus it may be best to report these tumors as the number of mice with these tumors regardless of site.

**Wood et al., 2009b – (discussed in Greim et al., 2015 - Study 14):** In this chronic toxicity study, CD-1 mice (50/sex/treatment group) were given free access to food containing 95.7% pure glyphosate (71, 234, and 810 mg/Kg/day for male mice and 97.9, 300, and 1,081 mg/kg/day for female mice) for 80 weeks. Lung tumors and malignant lymphomas were detected in the male mice. While Dr. Portier argues that rodent and human NHLs are similar, it is unclear what he means. Specifically, are they similar in the biological processes of their origin, their pathobiology, incidence, progression, or ultimate impact on health? Contrary to Dr. Portier's suggestion, clear differences in the biological development of lymphomas in rodents and humans have been described (Morse, 2003) leading me to question whether the connection between lymphoma in mice and NHL in humans can be definitively established. Consequently, the published evidence, along with the known difficulty of directly extrapolating animal findings to humans, suggests that these tumors cannot be considered similar as suggested by Dr. Portier.

In this study, there was a statistically significant increase in the trend for the incidence of malignant lymphomas in the male mice. Historical controls from the same lab were available. The historical background incidence was 12% in an 18-month study (SafePharm) and thus the incidence in the high dose group in the current study is consistent with historical controls. Furthermore, lymphomas are common tumors in mice (Haseman et al. 1998; Ward 2006). The historical control data cited by Dr. Portier (Giknis and Clifford, 2005) indicate that it is unusual to have zero lymphomas in a control group. This observation, together with the absence of malignant lymphomas reported for the control group of the current study and considering the historical control rate of 12% in the same laboratory, suggests that the finding of statistically significant differences is most likely a statistical artifact. Therefore, I conclude that there were no treatment-related tumors in this study.

Treatment had no effect on lung adenomas but a trend towards an increase in lung adenocarcinomas was detected although statistical significance could not be demonstrated for the high dose group. The lack of agreement between the Fisher's comparison test and assessment of a trend is less convincing than if both are significant and prompts further analysis. Furthermore, the combined incidence of lung tumors (14/51, 12/51, 16/51, and 15/51) in this study lacks any evidence of a dose response and statistically significant changes could not be demonstrated. Moreover, absence of evidence of preneoplastic changes and tumor progression was noted indicating lack of compound-related effects. Dr. Portier speculates that tumors could arise by alternative mechanisms that do not involve pre-neoplastic lesions but fails to provide any citation to support his opinion. This notion runs contrary to widely accepted understanding of tumor pathobiology and thus is speculative at best. Therefore, I conclude that these are spontaneously occurring lesions unrelated to treatment.

This study has numerous strengths including study design including multiple dose groups, dose range, and number of animals/dose group. The 80-week duration of the study is shorter than the 24 months used for rat studies but is consistent with regulatory requirements for this strain of mice. Consequently, this study is regarded as a negative study.

**Kumar et al., 2001 – (discussed in Greim et al., 2015 - Study 13):** This study was conducted in Swiss Albino mice and failed to show evidence of morphological abnormalities although there was a statistically significant pairwise increase in the number of malignant lymphomas seen in the highest dose group; however, a statistically significant trend was not detected.

This study was noted to be of questionable value in a prior review (Greim et al., 2015) owing to a possible viral infection amongst the study animals. I note that this study was excluded from consideration by EPA and Dr. Jameson but that Dr. Portier considered this study. Furthermore, in Dr. Portier's revised report (p. 43), he cites a recent memo from Martens (2017) asserting that the incidences for malignant lymphomas and kidney adenomas described in Greim et al., (2015) and BFR (2013) are incorrect. I am troubled by the potential existence of multiple data sets for the same study and the lack of explanation or evidence of data verification. Consequently, the existence of two different data sets and lack of data validation together with the questionable value of this study owing to the potential viral infection leads me to conclude that this study is unreliable and thus was excluded from my analysis.

### *Synthesis of mouse studies*

In summary, a statistically significant trend towards an increase in incidental tumors in varying tissues was reported in four studies (Knezevich and Hogan, 1983; Atkinson, 1993b; Wood et al., 2009b; and Sugimoto, 1997). However, looking beyond a simple statistical analysis of the data to include a comparison of incidence with concurrent controls, historical controls or the relevant literature suggests that these tumors did not depart from normal variation for the individual tumor types. The lack of consistent evidence of dose response further indicates that glyphosate is not carcinogenic. Furthermore, the lack of evidence for tumor progression and absence of statistically significant effects when benign and malignant tumors were combined adds further strength to the conclusion that any effects were not compound-related. I also found that there was no replication of potential compound-related effects across these studies.

I note that these studies are highly relevant and were conducted consistent with well-established test guidelines. The conclusions in the current report diverge from those of Dr. Portier. Reasons for our divergent conclusions can in part be explained by differences in the methodology and analyses carried out. Specifically, in the current assessment of the data, I assessed the overall scientific quality of the study in addition to evaluating neoplastic changes in the context of the totality of scientific knowledge. My analysis extends beyond that of Dr. Portier who limits discussion to a statistical analysis of the data only, utilizing novel statistical procedures without

scientific validation supported only by unreferenced speculation about potential causes. The absence of compound-related tumor findings in each of these individual negative studies indicates that in total glyphosate is not carcinogenic. Therefore, I conclude that there is no scientifically reliable evidence of glyphosate carcinogenicity in mice.

## Synthesis of animal data

My review of the animal literature on the potential carcinogenicity of glyphosate revealed a robust data set. These studies were conducted over a wide span of time including introduction of regulatory test guidelines for carcinogenicity testing. I note that the majority of the studies reviewed followed regulatory guidelines for or were consistent with carcinogenicity testing guideline requirements.

Dr. Portier in his report argues (p. 52) that you cannot compare data across animal studies if you also argue that the data cannot be combined in a pooled analysis of the kind he carries out. However, it is a very different thing to look at results across studies you know are similar but have some important differences as opposed to treating them as if they are one big study suitable for combining in an unvalidated pooled analysis. Specifically, important differences between studies include a) different time periods, b) different labs, c) different doses, d) different rodent stocks, and e) known genetic drift. Animal studies are designed to control for or minimize the effect of other sources of variation that would confound the detection of a compound-related effect within the study. However, if you combine the data from multiple animal studies then you cannot exclude the influence of the above noted variables on the outcomes of interest (e.g. tumors). If you have a bias in time going one way (i.e. an increase in stomach tumors in that particular strain from 1970 – 2000), then that might produce significance when in fact there is no compound-related effect. Similarly, if there is a trend towards a decrease in incidence for a particular tumor over time, then combining data would increase the odds of not detecting tumors when they were in fact present. It is routine for toxicologists to compare the results of studies whereas combining studies in a single statistical analysis is not the current scientific standard. Although all studies detected tumors and some detected statistically significant increases of tumors, it is my opinion that the occurrences of these tumors were, within a reasonable degree of scientific certainty, incidental findings unrelated to glyphosate treatment. Glyphosate does not induce rodent tumors and thus, animal carcinogenicity experiments do not support the hypothesis that glyphosate poses a *health risk to humans*. The basis for my conclusions arise from multiple lines of consideration including the lack of consistency of the data across studies, weakness of the reported associations, lack of dose response characteristics, and absence of biological plausibility. Details of my considerations are described in the following paragraphs.

The animal studies reviewed were conducted according to or consistent with standardized and internationally recognized carcinogenicity test guidelines. Test guidelines are designed to produce robust and reproducible data. However, in the studies that I reviewed, I found no

consistency of tumor findings across the studies and tumors identified in the individual studies are, in my opinion, nothing more than statistical anomalies arising from multiple comparisons, unusually low prevalence of tumors in the control groups for common tumor types, decreased survival of control animals relative to treated animals, or evidence of systemic toxicity in the high dose group. Thus, there is a lack of consistency for any association of glyphosate exposure and tumor development. It was noted that a statistically significant trend was detected for hemangiosarcomas, a relatively common neoplasm in mice (Elwell 2004), in one mouse study (Atkinson, 1993) and was not replicated in other mouse studies. If glyphosate was acting as a carcinogen then I would expect the data to be reproducible with neoplastic changes in one study being replicated by other carefully conducted studies as previously described (Gold et al. 1987; Gold et al. 1989). Although there may be small variations between animals and studies, the mechanism of compound action is expected to remain constant and thus tumors in a given target tissue should be reproducible across animal studies. Indeed, I agree with Dr. Portier when he states that replication of studies "is critical in most scientific debates." (p. 5). Furthermore, I note that these regulatory studies typically assessed a broad spectrum of outcome measures including histopathological assessment of major organs. Therefore, as designed the regulatory studies favor the detection of false positive adverse outcomes (finding non-treatment related tumors) in preference to false negatives (missing detection of a treatment-induced tumor). In view of the lack of reproducibility of the tumor data between studies I conclude that these tumors are not compound-related. This view is further supported by similarity of incidence with concurrent and historical controls. While I appreciate that it is best to compare results with contemporaneous historical controls, this is not always possible especially with retrospective data. However, I note that the incidence of the tumors is generally in agreement with the published literature on tumor incidence in rats and mice (Chandra et al., 1992; Davis et al., 1956; Haseman et al., 1998; Majeed 1997; Prejean et al., 1973; Ward 2006; Giknis 2000; and Giknis and Clifford, 2011) providing further assurance that the observed tumor findings are spontaneously occurring and not attributable to glyphosate treatment. Thus, I conclude that the observed tumors are false positives and cannot be attributed to glyphosate treatment.

In addition to the lack of consistency across the studies, I further note that there is a general lack of a dose response for the tumor data. The dose response patterns reported in the reviewed studies can be characterized as inconsistent and in most cases statistically non-significant. Thus, the statistically significant dose-response curves when observed were of questionable biological relevance. It is important to acknowledge that, in almost all the cases, when tumor incidence became an observation of interest, it was almost exclusively a result of increased incidence in the highest dose group. Several studies used doses that were slightly to well above the limit dose (Brammer, 2001; Wood et al., 2009a; Knezevich and Hogan, 1983; Sugimoto, 1997). While this is acceptable when dosing through the diet, it remains important to ensure that the dose used is not inducing systemic toxicity that could confound interpretation of the study results. Moreover, the translational importance of potential adverse findings in these studies to humans is questionable. Therefore, I conclude that there is no scientifically reliable evidence from the studies reviewed that glyphosate treatment, under the conditions of these animal studies, can be considered carcinogenic.

In the context of assessing the animal carcinogenicity of glyphosate, I also assessed the biological plausibility that glyphosate is carcinogenic. Specifically, carcinogenesis is widely acknowledged to be a multistep process involving tumor initiation, promotion, and progression. Central to the process of carcinogenesis is the process of tumor initiation and tumor progression arising from genotoxic effects of a test chemical or its metabolites. While my task was to assess the animal literature, I note that the genotoxicity studies with glyphosate were both numerous and almost all (98%) were negative (Greim et al., 2015).

I further searched the literature for any evidence that glyphosate could act as a tumor promoter. One study suggested that glyphosate could act as a tumor promoter in a skin carcinogenicity test (George et al. 2010); however, any such mechanism remains elusive. While plaintiffs' expert Dr. Portier cites the preceding study as evidence of glyphosate's potential to act as a tumor promoter, this study has numerous shortcomings including but not limited to: no positive vehicle control, no defined source of substances or purity, low numbers of animals, and lack of pathological analysis. Therefore, I conclude that this poorly defined study does not provide convincing (or reliable) support for the notion that glyphosate acts as a tumor promoter.

From my review of the literature, I conclude that the carcinogenicity of glyphosate has been thoroughly evaluated according to validated and internationally recognized carcinogenicity test guidelines. Dr. Portier is correct when he notes, "it is clear that not every tumor shows a positive trend with glyphosate exposure." (pg. 46). In fact, the vast majority do not. Multiple well designed and executed studies conducted in rats and mice reveal that tumors are not more common in glyphosate treated animals than in the concurrent control groups. When perceived differences in tumor incidence were detected, careful evaluation of animal survival, body weight, historical control incidence, dose-response, and assessment for signs of tumor progression showed that tumors did not occur with higher incidence in the treatment groups compared to controls and thus glyphosate was not carcinogenic. Assessment of animal survival and body weight, as well as comparison with historical controls and histopathological assessment of proliferation and tumor progression are standard and expected procedures carried out routinely by scientists in regulatory, government, and academic laboratories worldwide. Thus, as an end-point, carcinogenesis does not meet the standard required for the establishment of a no effect level in the hazard identification step of the risk assessment process. Moreover, the lack of consistency of effects across well designed regulatory carcinogenicity studies, weakness of the evidence for any association in the animal studies, flat or non-linear dose-response, and absence of credible or reproducible evidence for biological plausibility further add confidence to the conclusion that glyphosate is not a carcinogen, a conclusion that is consistent with independent reviews from multiple expert government regulatory panels from around the globe (EFSA, US-EPA, BFR etc.).

In summary, I conclude that, on the basis of multiple carcinogenicity studies conducted in rats and mice, there is no scientifically reliable evidence of glyphosate-induced increased tumor incidence. I disagree with the conclusions of Drs. Portier, Jameson, Weisenburger, Neugut, and Nabhan that any of the individual glyphosate rodent studies discussed in their reports demonstrates that glyphosate is a rodent carcinogen, let alone that there are any replicated findings of tumor-related effects. Accordingly, I disagree with Dr. Portier's statement that in the rodent carcinogenicity studies "there is clear evidence of a biological gradient" (Portier report at p. 75). Moreover, any extrapolation of the incidental tumors found (all of which are unrelated to glyphosate) to humans is scientifically implausible given the differences in relevant dosing, as well as the translational challenges in extrapolating from animals to humans. Additionally, pooling of these studies is an unproven approach that makes no toxicological sense. The hallmark signs of carcinogenicity are absent from the robust glyphosate data set. The glyphosate data does not demonstrate: a dose-response relationship between glyphosate exposure and tumors; tumor progression (neoplastic continuum); or a biologically plausible mechanism of action. Moreover tumor incidences are generally what one would expect when considering pairwise and historical controls, and the expected number of positive findings due to chance alone. The absence of glyphosate-induced tumor incidence in any one study, given the large number of studies, is compelling evidence that glyphosate is not carcinogenic. With such a robust data set, if glyphosate were carcinogenic, one would expect to see evidence of carcinogenicity not only in an individual study, but replication of carcinogenic findings in a particular tumor type across multiple studies. Accordingly, I conclude that, within a reasonable degree of scientific certainty, glyphosate is not a rodent carcinogen.

Warren G. Foster, Ph.D., FCAHS
Professor
McMaster University
2017-07-31

# 6.0 Materials Consulted:

1. Acquavella, J. et al., *A case-control study of non-Hodgkin lymphoma and exposure to pesticides*, 86 Cancer 729 (1999).

2. Acquavella, J. et al., *Glyphosate epidemiology expert panel review: a weight of evidence systemic review of the relationship between glyphosate exposure and non-Hodgkin's lymphoma or multiple myeloma*, 46 Crit Rev Toxicol 28 (2016).

3. Anadon, A. et al., *Toxicokinetics of glyphosate and its metabolite aminomethyl phosphonic acid in rats*, 190 Toxicology Letters 91 (2009).

4. Arjó, G. et al., *Plurality of opinion, scientific discourse and pseudoscience: an in depth analysis of the Séralini et al. study claiming that Roundup™ Ready corn or the herbicide Roundup™ cause cancer in rats*, 22 Transgenic Research 255 (2013).

5. Astiz, M et al., *Antioxidant defense system in rats simultaneously intoxicated with agrochemicals*, 28 Envtl. Toxicology & Pharmacology 465 (2009).

6. Baldrick P. & L. Reeve, *Carcinogenicity Evaluation: Comparison of Tumor Data from Dual Control Groups in the CD-1 Mouse*, 35 Toxicologic Pathology 562 (2007).

7. Baldrick, P., *Carcinogenicity Evaluation: Comparison of Tumor Data from Dual Control Groups in the Sprague-Dawley Rat*, 33 Toxicologic Pathology 283 (2005).

8. Begley, D. et al., *Finding mouse models of human lymphomas and leukemia's using the Jackson laboratory mouse tumor biology database*, 99 Experimental and Molecular Pathology 533 (2015).

9. Benedetti, A. et al., *The effects of sub-chronic exposure of Wistar rats to the herbicide Glyphosate-Biocarb®*, 153 Toxicology Letters 227 (2004).

10. BfR, *Assessment of IARC Monographies Volume 112 (2015); Glyphosate*, Renewal Assessment Report: Glyphosate Addendum I to RAR (2015).

11. BfR, *Does glyphosate cause cancer?*, BfR Communication No 007/2015 (2015).

12. BfR, *Toxicology and Metabolism*, Renewal Assessment Report: Glyphosate Volume 3 Annex B.6 (2015).

13. Blettner, M., et al., *Traditional reviews, meta-analyses and pooled analyses in epidemiology*. 28 Int'l J Epidemiology 1(1999).

14. Bolognesi, C. et al., *Biomonitoring of genotoxic risk in agricultural workers from five Colombian regions: association to occupational exposure to glyphosate*, 72 J. Toxicol. Environ. Health A 986 (2009).

15. Bradford Hill, A., *The Environment and Disease: Association or Causation?*, 58 Proc R Soc Med 295 (1965).

16. Brewster, D. et al., *Metabolism of Glyphosate in Sprague-Dawley Rats: Tissue Distribution, Identification, and Quantitation of Glyphosate-Derived Materials following a Single Oral Dose*, 17 Fundamental and Applied Toxicology 43 (1991).

17. Brusick, D. et al., *Genotoxicity Expert Panel review: weight of evidence evaluation of the genotoxicity of glyphosate, glyphosate-based formulations, and aminomethylphosphonic acid*, 46 Critical Reviews in Toxicology 56 (2016).

18. Bus, J., *Analysis of Moms Across America report suggesting bioaccumulation of glyphosate in U.S. mother's breast milk: Implausibility based on inconsistency with available body of glyphosate animal toxicokinetic, human biomonitoring, and physico-chemical data*, 73 Regul Toxicol Pharmacol 758 (2015).

19. Bus, J., *IARC use of oxidative stress as key mode of action characteristic for facilitating cancer classification: Glyphosate case example illustrating a lack of robustness in interpretative implementation*, 86 Regul. Toxicol. Pharmacol. 157 (2017).

20. Caglar, S. & D. Kolankaya, *The effect of sub-acute and sub-chronic exposure of rats to the glyphosate-based herbicide Roundup*, 25 Envtl. Toxicology and Pharmacology 57 (2008).

21. Chan, P. & J. Mahler, *NTP Technical Report on Toxicity Studies of Glyphosate Administered in Dosed Feed to F344/N Rats and B6C3F1 Mice*, 16 Toxicity Reports Series (1992).

22. Chandra, M. & C. Frith, *Spontaneous neoplasms in aged CD-1 mice*, 61 Toxicology Letters 67 (1992).

23. Chandra, M. & C. Frith, *Spontaneous renal lesions in CD-1 and B6C3F1 mice*, 46 Experimental Toxicologic Pathology 189 (1994).

24. Chandra, M. et al., *Spontaneous neoplasms in aged Sprague-dawley rats*, 66 Archives of Toxicology 496 (1992).

25. Chang, E. and E. Delzell, *Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers*, 51 J. Environ. Sci. Health B 402 (2016).

26. Chorfa, A. et al., *Specific pesticide-dependent increases in α-synuclein levels in human neuroblastoma (SH-SY5Y) and melanoma (SK-MEL-2) cell lines*, 133 Toxicol. Sci. 289 (2013).

27. Chruścielska, K. et al., *Glyphosate Evaluation of chronic activity and possible far – reaching effects: Part 1. Studies on chronic toxicity*, 3-4 Pestycydy 11 (2000).

28. Cohen, S. & L. Ellwein, *Genetic errors, cell proliferation, and carcinogenesis*, 51 Cancer Res. 6493 (1991).

29. Cohen, S. et al., *Hemangiosarcoma in Rodents: Mode-of-Action Evaluation and Human Relevance*, 111 Toxicological Sciences 4 (2009).

30. Complaint, *Johansing v. Monsanto Company*, No. 2:16-cv-5035 (C.D. Cal. July 8, 2016)

31. Davis, R. et al., *Tumor incidence in normal Sprague-dawley female rats*, 16 Cancer Res. 194 (1956).

32. De Roos, A. et al., *Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study*, 113 Environ. Health Perspect. 49 (2005).

33. De Roos, A. et al., *Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men*, 60 Occup. Environ. Med. E11 (2003).

34. de Vivar Chevez, A. et al., *The role of inflammation in kidney cancer*, 816 Advances Experimental Medicine Biology 197 (2014).

35. Dixon, D., et al., *Summary of chemically induced pulmonary lesions in the National Toxicology Program {NTP} toxicology and carcinogenesis studies*, 36 Toxicology Pathology 428 (2008).

36. ECHA, *Guidance on the Application of the CLP Criteria: Guidance to Regulation (EC) No 1272/2008 on classification, labelling and packaging (CLP) of substances and mixtures.* European Chemicals Agency (2015).

37. EFSA, *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, 13 EFSA J. 4302 (2015).

38. El-Shenawy, N. et al., *Oxidative stress responses of rats exposed to roundup and its active ingredient glyphosate*, 28 Envtl. Toxicology & Pharmacology 379 (2009).

39. Elwell, M. et al., *Proliferative and non-proliferative lesions in the heart and vasculature in mice*, *in* Guides for toxicologic pathology (2004).

40. EPA, *Alkyl Alcohol Alkoxylate Phosphate and Sulfate Derivatives (AAAPDs and AAASDs – JITF CST 2 Inert Ingredients). Human Health Risk Assessment to Support Proposed Exemption from Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations*, (June 8, 2009).

41. EPA, *Alkyl Alcohol Alkoxylates (AAA – JITF CST 1 Inert Ingredient). Human Health Risk Assessment to Support Proposed Exemption from Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations*, (July 14, 2009).

42. EPA, *Alkyl Amine Polyalkoxylates (JITF CST 4 Inert Ingredients). Human Health Risk Assessment to Support Proposed Exemption from Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations*, (Apr. 3, 2009).

43. EPA, Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate* (Oct. 1, 2015).

44. EPA, FIFRA SAP, *Meeting Minutes and Final Report No. 2017-01: EPA's Evaluation of the Carcinogenic Potential of Glyphosate,* (Mar. 16, 2017).

45. EPA, *Guidelines for Carcinogen Risk Assessment*, (Mar. 2005).

46. EPA, Memorandum from D. Stephen Saunders Jr., Toxicologist, Section V, TOX/HED on Glyphosate Registration Standard Revision to Theodore M. Farber, Chief, Toxicology Branch, Hazard Evaluation Division (Mar. 1, 1986).

47. EPA, Memorandum from Herbert Lacayo, Statistician, Scientific Mission Support Staff TOX/HED/OPP on Use of historical data in determining the weight of evidence from kidney tumor incidence in the Glyphosate two-year feeding study; and some remarks on false positives to Reto Engler, Chief, Scientific Mission Support Staff TOX/HED/OPP (Feb. 26, 1985).

48. EPA, Memorandum from Jane Smith, Chemist, Chemical Coordination Branch, Health Effects Division on The HED Chapter of the Reregistration Eligibility Document (RED) for Glyphosate, Case #0178 to Lois Rossi, Chief, Reregistration Branch, Special Review and Reregistration Branch (Jan. 15, 1993).

49. EPA, Memorandum from Louis Kasza, D.V.M., Ph.D., Pathologist, Toxicology Branch, TS-769, EPA on Glyphosate – Evaluation of Kidney Tumors in Male Mice. Chronic Feeding Study to William Dykstra, Ph.D., Reviewer, Toxicology Branch, TS-769, EPA (Dec. 4, 1985).

50. EPA, Memorandum from Stephen L. Johnson, Executive Secretary, FIFRA Scientific Advisory Panel on Transmittal of the Final FIFRA Scientific Advisory Panel Reports on the February 11-12, 1986 Meeting to Steven Schatzow, Director, Office of Pesticide Programs (Feb. 24, 1986).

51. EPA, Memorandum from William Dykstra, Review Section I, Toxicology Branch I, Health Effects Division on Glyphosate – EPA Registration No. 524-308 – 2-Year Chronic Feeding/Oncogenicity Study in Rats with Technical Glyphosate to Robert J. Taylor, Product Manager 25, Registration Division and Lois Rossi, Reregistration Branch, Special Review and Reregistration Division (Dec. 13, 1991).

52. EPA, Memorandum from William Dykstra, Reviewer, Review Section I, Toxicology Branch I – Insecticide, Rodenticide Support, Health Effects Division on Glyphosate – EPA Registration Nos. 524-318 and 524-333 – Historical Control Data for Mouse Kidney Tumors to Robert J. Taylor, Fungicide-Herbicide Branch, Registration Division (June 19, 1989) (with memorandum attached regarding Nov. 10, 1988 EPA Meeting with Monsanto).

53. EPA, Memorandum from William Dykstra, Toxicologist, Registration Action Branch 1, Health Effects Division (7509C) on Glyphosate – Report of the Hazard Identification Assessment Review Committee to Melba Morrow, Branch Senior Scientist, Registration Action Branch 1, Health Effects Division (7509C) (Apr. 20, 1998).

54. EPA, Memorandum from William Dykstra, Toxicology Branch I – Insecticide, Rodenticide Support Health Effects Division, to Lois Rossi, Reregistration Branch, Special Review and Reregistration Division, and Robert Taylor, Fungicide-Herbicide Branch Registration Division, on Glyphosate; 2-Year Combined Chronic Toxicity/Carcinogenicity Study in Sprague-Dawley Rats – List A Pesticide for Reregistration, Casewell No. 661A, MRID No. 416438-01 (June 3, 1991).

55. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on Glyphosate; oncogenicity study in the mouse; PP #3E2845; Caswell No.: 661A to Hoyt Jamerson, Registration Division (Feb. 10, 1984).

56. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on Glyphosate; EPA Reg.#: 524-308; mouse oncogenicity study, Caswell #: 661A, Accession #: 251007-014 to Robert Taylor, Product Manager, Registration Division (Apr. 3, 1985).

57. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on EPA Reg. #: 524-308; Roundup; Glyphosate; Pathology, Report on Additional Kidney Sections, Caswell No. 661A, Accession No. 259621 to Robert Taylor, Product Manager, Registration Division (Dec. 12, 1985).

58. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on Glyphosate; EPA Registration No. 524-308; Roundup; Additional Histopathological Evaluations of Kidneys in the Chronic Feeding Study of Glyphosate in Mice to Robert Taylor, Product Manager, Fungicide-Herbicide Branch, Registration Division (Mar. 11, 1986).

59. EPA, Memorandum from William Dykstra, Toxicology Branch, Health Effects Division and George Z. Ghali, Science Analysis and Coordination Branch, Health Effects Division on Second Peer Review of Glyphosate to Robert Taylor, Fungicide-Herbicide Branch, Registration Division and Lois Rossi, Chief, Reregistration Branch, Special Review and Reregistration Division (Oct. 30, 1991).

60. EPA, Memorandum to Robert Taylor, Product Manager, Herbicide – Fungicide Branch, Registration Division on Consensus Review of Glyphosate, Caswell No. 661A (Mar. 4, 1985).

61. EPA, *Methyl Poly(Oxyethylene) C8-C18 Alkylammonium Chlorides (MPOACs – JITF CST 7 Inert Ingredients). Human Health Risk Assessment to Support Proposed Exemption from Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations*, (June 2, 2009).

62. EPA, Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*, Regulations.gov (September 12, 2016).

63. EPA, *Sodium and Ammonium Naphthalenesulfonate Formaldehyde Condensates (SANFCs – JITF CST 11 Inert Ingredients). Human Health Risk Assessment to Support Proposed Exemption from Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations*, (May 28, 2009).

64. Eriksson, M. et al., *Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis*, 123 Int. J. Cancer 1657 (2008).

65. Eustis, S. et al., *The Utility of Multiple-Section Sampling in the Histopathological Evaluation of the Kidney for Carcinogenicity Studies*, 22 Toxicologic Pathology 457 (1994).

66. Expert Report of Alfred I. Neugut, MD, PHD In Support of General Causation on Behalf of Plaintiffs, In Re: Roundup Products Liability Litigation, No. 16-md-02741-VC (N.D. Cal. May 1, 2017).

67. Expert Report of Dr. Chadi Nabhan In Support of General Causation on Behalf of Plaintiffs, In Re: Roundup Products Liability Litigation, No. 16-md-02741-VC (N.D. Cal. May 1, 2017).

68. Expert Report of Dr. Charles W. Jameson, Ph.D In Support of General Causation on Behalf of Plaintiffs, In Re: Roundup Products Liability Litigation, No. 16-md-02741-VC (N.D. Cal. May 12, 2017).

69. Expert Report of Dr. Christopher J. Portier In Support of General Causation on Behalf of Plaintiffs, In Re: Roundup Products Liability Litigation, No. 16-md-02741-VC (N.D. Cal. May 1, 2017).

70. Expert Report of Dr. Christopher J. Portier in Support of General Causation on Behalf of Plaintiffs, In Re: Roundup Products Liability Litigation, No. 16-md-02741-VC (N.D. Cal. June 27, 2017) [with accompanying Redline version].

71. Expert Report of Dr. Dennis Weisenburger, M.D. In Support of General Causation on Behalf of Plaintiffs, In Re: Roundup Products Liability Litigation, No. 16-md-02741-VC (N.D. Cal. May 1, 2017).

72. Fortes, C. et al., *Occupational Exposure to Pesticides With Occupational Sun Exposure Increases the Risk for Cutaneous Melanoma*, 58 J. Occup. Environ. Med. 370 (2016).

73. Friedenreich, C., *Methods for pooled analyses of epidemiologic studies*, 4 Epidemiology 295 (1993).

74. George, J et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 J. Proteomics 951 (2010).

75. German Federal Institute for Occupational Safety and Health, *Proposal for Harmonized Classification and Labeling: N-(phosphonomethyl)glycine; Glyphosate (ISO)*, CLH Report for Glyphosate (2016).

76. Giknis, M & C. Clifford, *Compilation of Spontaneous Neoplastic Lesions and Survival in Crl:CD® (SD) Rats from Control Groups*, Chrales River Laboratories (Mar. 2004).

77. Giknis, M. & C. Clifford, *Spontaneous Neoplastic Lesions in the Crl:CD-l (ICR)BR Mouse*, Charles River Laboratories (Mar. 2000).

78. Giknis, M. & C. Clifford, *Spontaneous Neoplastic Lesions in the Crl:CD-l (ICR) Mouse in Control Groups from 18 Month to 2 year Studies*, Charles River Laboratories (Mar. 2005).

79. Giknis, M. & C. Clifford. *Neoplastic and Non-Neoplastic Lesions in the Charles River Wistar Hannover [Crl:Wl(Han)]* Rat, Charles River Laboratories (Mar. 2011).

80. Gold, L. et al., *Interspecies Extrapolation in Carcinogenesis: Prediction Between Rats and Mice*, 31 Envtl. Health Persp. 211 (1989).

81. Gold, L. et al., *Reproducibility of Results in "Near-Replicate" Carcinogenesis Bioassays*, 78 J. Nat'l Cancer Inst., 1149 (1987).

82. Greim, H. et al., *Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies*, 45 Critical Reviews in Toxicology 185 (2015) with attachments.

83. Gress, S. et al., *Cardiotoxic Electrophysiological Effects of the Herbicide Roundup® in Rat and Rabbit Ventricular Myocardium In Vitro*, 15 Cardiovasc. Toxicol. 324 (2015).

84. Guyton, K. et al., *Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate*, 16 Lancet Oncology 490 (2015).

85. Haas, M., *Glyphosate – A 28-Day Oral (Dietary) Immunotoxicity Study in Female B6C3F1 Mice* (Mar. 12, 2012).

86. Hanahan, D. & R. Weinberg, *Hallmarks of Cancer: The Next Generation*, 144 Cell 646 (2011).

87. Hardell, L. et al., *Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: pooled analysis of two Swedish case-control studies*, 43 Leuk. Lymphoma 1043 (2002).

88. Haseman, J. & J. Huff, *Species Correlation in Long-Term Carcinogenicity Studies*, 37 Cancer Letters 125 (1987).

89. Haseman, J. et al., *Spontaneous neoplasm incidences in fischer 344 rats and b6c3f1 mice in two-year carcinogenicity studies: A national toxicology program update*, 26 Toxicology Pathology 428 (1998).

90. Haseman, J. et al., *Use of historical control data in carcinogenicity studies in rodents*, 12 Toxicologic Pathology 126 (1984).

91. Haseman, J. et al., *Value of historical control data and other issues related to the evaluation of long-term rodent carcinogenicity studies*, 25 Toxicologic Pathology 524 (1997).

92. Haseman, J., *Comments on the laboratory animal carcinogenicity studies evaluated in EPA's Glyphosate Issue Paper: Evaluation of Carcinogenic Potential, and an assessment of the comments by Dr. Christopher Portier on these studies*, Regulations.gov (December 7, 2016) https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0461.

93. Haseman, J., *Statistical issues in the design, analysis and interpretation of animal carcinogenicity studies*, 58 Envtl. Health Perspectives 385 (1984).

94. Heu, C. et al., *Glyphosate-induced stiffening of HaCa T keratinocytes, a Peak Force Tapping study on living cells*, 178 J. Struct. Biol. 1 (2012).

95. Heydens, W. et al., *Genotoxic Potential of Glyphosate Formulations: Mode-of-Action Investigations*, 56 J. Agric. Food Chem. 1517 (2008).

96. Hokanson, R. et al., *Alteration of estrogen-regulated gene expression in human cells induced by the agricultural and horticultural herbicide glyphosate*, 26 Hum. & Experimental Toxicology 747 (2007).

97. Hori, M. et al., *Non-Hodgkin Lymphomas of Mice*, 27 Blood Cells, Molecules, and Diseases 217 (2001).

98. IARC, *List of Participants*, Vol. 112 (Mar. 3-10, 2015).

99. IARC, *Overall evaluation of carcinogenicity: An updating of IARC monographs volumes 1 to 42*, IARC Monographs on the Evaluation of the Carcinogenic Risk to Humans Supplement 7 (1987).

100. IARC, *Preamble: IARC Monographs on the Evaluation of Carcinogenic Risks to Humans*, (2006).

101. IARC, *Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos*, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans (2015).

102. JITF, *Joint Inerts Task Force Cluster Support Team Information*, https://www.epa.gov/sites/production/files/2015-12/documents/jitf_cluster_support_team_table_5-17-2012.pdf.

103. JMPR, *Pesticide residues in food – 2004: Toxicological evaluations – Toxicological Monographs and Monograph Addenda,* Joint FAO/WHO Meeting on Pesticide Residues (2006).

104. Knezevich, A. & G. Hogan, *A Chronic Feeding Study of Glyphosate (Roundup® Technical) In Mice* (July 21, 1983).

105. Koller, V. et al., *Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells*, 86 Arch Toxicol 805 (2012).

106. Lankas, G. & G. Hogan, *A Lifetime Feeding Study of Glyphosate (Roundup® Technical) in Rats, BDN-77-416* (Sept. 18, 1981).

107. Larsen, K et al., *Effects of sub-lethal exposure of rats to the herbicide glyphosate in drinking water: Glutathione transferase enzyme activities, levels of reduced glutathione and lipid peroxidation in liver, kidneys and small intestine*, 34 Envtl. Toxicology & Pharmacology 811 (2012).

108. Lawlor, T., *Mutagenicity Test with MON 59112 in the Salmonella – Escherichia Coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay* (May 22, 2000).

109. Letter from Andre Varma, M.D. Chairman, Department of Community and Preventive Medicine, SUNY Stony Brook on chronic mouse feeding of Glycophosate (sic) on renal tumors to Marvin Kuschner, M.D., Dean, School of Medicine, SUNY Stony Brook (Oct. 1, 1985).

110. Letter from Bernhard Url, Exec. Dir. EFSA, to Christopher Portier, Sr. Contributing Scientist EDF (Jan. 13, 2016) (Available at https://www.efsa.europa.eu/sites/default/files/EFSA_response_Prof_Portier.pdf ).

111. Letter from Christopher Portier, Sr. Contributing Scientist EDF, to Vytenis Andriukaitis, Comm'r Health and Food Safety, European Comm'n (Nov. 27, 2015) (Available at https://www.efsa.europa.eu/sites/default/files/Prof_Portier_letter.pdf )

112. Letter from Frank S. Serdy, Manager, Federal and State Registration Affairs, Monsanto Co. on Resectioning of Kidneys – Glyphosate Chronic Mouse Study (BD-77-420; EPA Registration Number 524-308) to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Aug. 7, 1985).

113. Letter from Frank S. Serdy, Manager, Federal and State Registration Affairs, Monsanto Co. on Roundup® Herbicide EPA Reg. Nos. 524-308, 524-330, 524-339, 524-332, 524-343 Chronic Mouse Study With Glyphosate to Douglas D. Campt, Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Mar. 13, 1985).

114. Letter from Frank S. Serdy, Manager, Federal and State Registration Affairs, Monsanto Co. on Roundup Herbicide EPA Reg. No. 524-308 Additional Information Relating to Chronic Mouse Study, BD-77-420 to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Feb. 5, 1985).

115. Letter from Frank S. Serdy, Manager, Federal and State Registration Affairs, Monsanto Co. on Roundup® Herbicide EPA Reg Nos. 524-308, 524-330, 524-332, 524-339, 524-343. Chronic Mouse Study with Glyphosate to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (May 21, 1985).

116. Letter from George B. Fuller, U.S. and International Registration Director, Monsanto Co. on Glyphosate Registration Standard: Request for Meeting with EPA to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Oct. 5, 1988).

117. Letter from Klaus Stemmer, M.D., Institute of Environmental Health, Univ. of Cincinnati Medical Center on Roundup® Chronic Mouse Study with Glyphosate to Timothy Long, Ph.D., Senior Product Toxicologist, Monsanto Co. (Oct. 17, 1985).

118. Letter from Marvin Kuschner, M.D. on mouse kidney slides to Timothy J. Long, Ph. D., Senior Product Toxicologist, Monsanto Co. (May 11, 1985).

119. Letter from Marvin Kuschner, M.D., Dean, School of Medicine, SUNY Stony Brook on kidney adenomas found in mice exposed to glyphosate to Timothy Long, Ph.D., Senior Product Toxicologist, Monsanto Co. (Oct. 3, 1985).

120. Letter from Robert A. Squire, D.V.M., Ph.D. on chronic toxicity data on Glyphosate in mice to Timothy Long, Ph.D., Senior Toxicologist, Monsanto Co. (Sept. 29, 1985).

121. Letter from Robert Olson, M.D., Ph.D. Professor of Medicine, Professor of Pharmacological Sciences, SUNY Stony Brook on glyphosate mouse kidney adenoma study to Timothy Long, Ph.D., Senior Product Toxicologist, Department of Medicine & Environmental Health, Monsanto Co. (Oct. 7, 1985).

122. Letter from Robert W. Street, Manager, Product Health and Safety Information, Monsanto Co. on Roundup® Herbicide, EPA Reg. No. 524-308, Additional Information Relating to Chronic Mouse Study BD-77-420 to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Mar. 20, 1984).

123. Letter from Thomas F. Armstrong, Registration Manager, Monsanto Co. on Roundup® Herbicide EPA Reg. Nos. 524-308, 524-330, 524-332, 524-339, 524-343, 524-351 Addendum to Chronic Mouse Study with Glyphosate: Additional Evaluations to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Oct. 28, 1985).

124. Levine, S. et al., *Disrupting mitochondrial function with surfactants inhibits MA-10 Leydig cell steroidogenesis*, 23 Cell Biology Toxicology 385 (2007).

125. Li, Q. et al., *Glyphosate and AMPA inhibit cancer cell growth through inhibiting intracellular glycine synthesis*, 7 Drug Des. Devel. Ther. 635 (2013).

126. Lin, N. and V. Garry, *In vitro studies of cellular and molecular developmental toxicity of adjuvants, herbicides, and fungicides commonly used in Red River Valley, Minnesota*, 60 J. Toxicol. Environ. Health A 423 (2000).

127. Majeed, S., *Studies of the incidence of spontaneous pancreatic tumours in ageing cd rats*, 47 Arzneimittelforschung 879 (1997).

128. McConnell, E. et al., *Guidelines for Combining Neoplasms for Evaluation of Rodent Carcinogenesis Studies*, 76 Journal of the National Cancer Institute 283 (1986).

129. McConnell, R., *A Chronic Feeding Study of Glyphosate (Roundup® Technical in Mice): Pathology Report on Additional Kidney Sections Addendum to Final Report Dated July 21, 1983* (Sept. 26, 1985).

130. Mecchi, M., *Mutagenicity Test with MON 59117 in the Salmonella – Escherichia Coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay* (June 23, 2000).

131. Memorandum from R.W. Street, Manager, Product Health and Safety Information, Monsanto Co. on *Chronic Rat Study with Glyphosate BD-77-416* to Arthur Chin (Mar. 27, 1985).

132. Mink, P. et al., *Epidemiologic studies of glyphosate and cancer: a review*, 63 Regul. Toxicol. Pharmacol. 440 (2012).

133. Mink, P. et al., *Epidemiologic studies of glyphosate and non-cancer health outcomes: a review*, 61 Regul. Toxicol. Pharmacol. 172 (2011).

134. Morse, H. et al., *B Lymphoid Neoplasms of Mice: Characteristics of Naturally Occurring and Engineered Diseases and Relationships to Human Disorders*, 81 Advances in Immunology 97 (2003).

135. Morse, H. et al., *Mouse models of human B lymphoid neoplasms, in* The Lymphoid Neoplasms 281 (Ian T. Magrath et al. eds., 3rd ed. 2010).

136. Murli, H., *Chromosomal Aberrations in Cultured Human Peripheral Blood Lymphocytes wit MON 59117* (Apr. 28, 2000).

137. Murli, H., *Measuring Chromosome Aberrations in Human Whole Blood Lymphocytes With and Without Exogenous Metabolic Activation With a Confirmatory Assay With Multiple Harvests With MON 58121*, (Sept. 3, 1997).

138. Myers, J. et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, 15 Environmental Health 19 (2016).

139. Myhr, B., *In Vivo Mouse Micronucleus Assay with MON 59117* (May 31, 2000).

140. Myhr, B., *Mutagenicity Test on MON 59112 in the In Vivo Mouse Micronucleus Assay* (May 31, 2000).

141. NTP, *Technical Report on the Toxicology and Carcinogenesis Studies of Sodium Dichromate Dihydrate (CAS No. 7789-12-0) in F334/N Rats and B6C3F1 Mice*, National Institutes of Health (2008).

142. OECD, *Carcinogenicity Studies, OECD Guideline for the Testing of Chemicals, No. 451,* OECD (2009).

143. OECD, *Combined Chronic Toxicity\Carcinogenicity Studies, OECD Guidelines for Testing of Chemicals, No. 453,* OECD (2009).

144. OECD, *Guidance Document 116 on the Conduct and Design of Chronic Toxicity and Carcinogenicity Studies, Supporting Test Guidelines 451, 452 and 453*, OECD (2012).

145. Parajuli, K. et al., *Aminomethylphosphonic acid and methoxyacetic acid induce apoptosis in prostate cancer cells*, 16 Int. J. Mol. Sci. 11750 (2015).

146. Parajuli, K. et al., *Aminomethylphosphonic acid inhibits growth and metastasis of human prostate cancer in an orthotopic xenograft mouse model*, 7 Oncotarget 10616 (2016).

147. Pattengale, P. & C. Taylor, *Experimental Models of Lymphoproliferative Disease: The Mouse as a Model for Human Non-Hodgkin's Lymphomas and Related Leukemias*, 113 American J. Pathology 237 (1983).

148. Portier, C. & D. Hoel, *Optimal design of the chronic animal bioassay*, 12(1) J Toxicology Envtl. Health 1 (1983).

149. Portier, C. et al., *Age-specific models of mortality and tumor onset for historical control animals in the National Toxicology Program's carcinogenicity experiments.* 46 Cancer Res. 4372 (1986).

150. Portier, C. et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA).* 70 J Epidemiology Community Health 741 (2016).

151. Portier, C., *Comments of C. Portier on USEPA (EPA-HQ-OPP-2016-0385-0094)*, Regulations.gov (Oct. 4, 2016) https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0371.

152. Prejean, J. et al., *Spontaneous tumors in Sprague-dawley rats and swiss mice*, 33 Cancer Res. 2768 (1973).

153. Sauer, R., *Pathology Working Group Report on Glyphosate in CD-1 Mice* (Oct. 10, 1985).

154. Schinasi, L. and M. Leon, *Non-Hodgkin lymphoma and occupational exposure to agricultural pesticide chemical groups and active ingredients: a systematic review and meta-analysis*, 11 Int. J. Environ. Res. Public Health 4449 (2014).

155. Seralini, G. et al., *Answers to critics: Why there is a long term toxicity due to a Roundup-tolerant genetically modified maize and to a Roundup herbicide*, 53 Food and Chemical Toxicology 476 (2013).

156. Seralini, G. et al., *Conflicts of interests, confidentiality and censorship in health risk assessment: the example of an herbicide and a GMO*, 26 Environ. Sci. Eur. 13 (2014).

157. Seralini, G. et al., *Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize*, 50 Food and Chemical Toxicology 4221 (2012).

158. Seralini, G. et al., *Republished study: long-term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize*, 26 Envtl. Scis. Eur. 14 (2014).

159. Smith, M. et al., *Key characteristics of carcinogens as a basis for organizing data on mechanisms of carcinogenesis*, 124 Envtl. Health Persp. 713 (2016).

160. Solomon, K., *Glyphosate in the general population and in applicators: a critical review of studies on exposures*, 46 Critical Reviews in Toxicology 21 (2016).

161. Son, W. & C. Gopinath, *Early occurrence of spontaneous tumors in CD-1 mice and Sprague-Dawley rats*, 32 Toxicologic Pathology 371 (2004).

162. Sorahan, T., *Multiple myeloma and glyphosate use: a re-analysis of US Agricultural Health Study (AHS) data*, 12 Int. J. Environ. Res. Public Health 1548 (2015).

163. Squire, R., *The Interpretation of Equivocal Or Marginal Animal Carcinogenicity Tests*, 5 Cell Biology and Toxicology 371 (1989).

164. Stankowski, L., *Ames/Salmonella-E. coli Reverse Mutation Assay on Test Article 6933-22-20* (July 02, 1996).

165. Stegeman, S. & A. Li, *Ames/Salmonella Mutagenicity Assay of MON 0818* (Oct. 26, 1990).

166. Stegeman, S. & L. Kier, *Mouse Micronucleus Screening Assay of MON-0818* (Mar. 26, 1998).

167. Stout, L. & F. Ruecker, *Chronic Study of Glyphosate Administered in Feed to Albino Rats* (Sept. 26, 1990).

168. Sugimoto, Y et al., *Failure of parturition in mice lacking the prostaglandin f receptor*, 277 Sci. 681 (1997).

169. Tarazona, J. et al., *Glyphosate toxicity and carcinogenicity: a review of the scientific basis of the European Union assessment and its differences with IARC*, Archives of Toxicology (2017).

170. Tarone, R., *On the International Agency for Research on Cancer classification of glyphosate as a probable human carcinogen*, European Journal of Cancer Prevention (2016).

171. Thongprakaisang, S et al., *Glyphosate induces human breast cancer cells growth via estrogen receptors*, 59 Food & Chem. Toxicology 129 (2013).

172. *Tier II Summaries for Glyphosate Carcinogenicity Studies from Greim et al., 2015*, (Nov. 9, 2015).

173. Tuck, M. et al., *Standard operating procedures for serum and plasma collection: Early detection research network consensus statement standard operating procedure integration working group*, 8 JProteomeRes 113 (2009).

174. Uno, H., et al., *A versatile test for equality of two survival functions based on weighted differences of Kaplan-Meier curves*, 34 Statistics In Medicine 3680 (2015).

175. Vandenberg, L. et al., *Is it time to reassess current safety standards for glyphosate-based herbicides?*, 71 J. Epidemiol. Community Health 613 (2017).

176. Videotaped Deposition of Charles W. Jameson, In re: Roundup Products Liability Litigation, Case No. 16-md-02741-VC (N.D. Cal. May 3, 2017) (with all exhibits).

177. Ward, J., *Lymphomas and leukemias in mice*, 57 Experimental & Toxicology Pathology 377 (2006).

178. Weber, K., *Statistical Evaluation of Pre-Neoplastic and Neoplastic Lesions from Study: Study No. TOXI: 1559.CARCI-M Carcinogenicity Study with Glyphosate Technical in Swiss Albino Mice* (Jan. 23, 2017).

179. Weiss, S. & J. Goldblum, *Malignant vascular tumors, in* Ezinger and Weiss's Soft Tissue Tumors 703 (5th ed. 2008).

180. Wester, R. et al., *Glyphosate Skin Binding, Absorption, Residual Tissue Distribution, and Skin Decontamination*, 16 Fundamental and Applied Toxicology 725 (1991).

181. Wester, R. et al., *In Vitro Percutaneous Absorption of Model Compounds Glyphosate and Malathion from Cotton Fabric into and through Human Skin*, 34 Food and Chemical Toxicology 731 (1996).

182. Williams, G. et al., *A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment*, 43 Critical Revs. Toxicology 3 (2016).

183. Williams, G. et al., *Glyphosate rodent carcinogenicity bioassay expert panel review*, 46 Critical Reviews in Toxicology 44 (2016).

184. Williams, G. et al., *Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans*, 31 Regulatory Toxicology and Pharmacology 117 (2000).

185. Wood, E. et al., *Observations on the Development of Spontaneous Neoplasms in Male and in Female Crl: CD-1 (ICR) CR Strain Mice Following 18-Months on Control Diet* (July 24, 2008).

186. Wratten, S. et al., *MSL 0025540: Amended Report updating MSL 0023134 A Review and Discussion of Glyphosate Toxicology Test Materials* (Mar. 04, 2014).

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: ALL ACTIONS | **PLAINTIFFS' NOTICE TO TAKE ORAL AND VIDEOTAPED DEPOSITION OF DR. WARREN G. FOSTER** |

To:   Monsanto Company, by and through their counsel, Hollingsworth, LLP.

Please take notice that, pursuant to Rule 30 and Rule 45 of the Federal Rules of Civil Procedure, Plaintiffs' Counsel shall take the videotaped deposition upon oral examination of **Dr. Warren G. Foster on September 15, 2017** before a person duly authorized to administer oaths. The deposition shall commence at **9:00 a.m. ET at Sheraton Gateway Hotel, Terminal 3, Toronto AMF, Toronto, ON, L5P 1C4, Canada.** The conduct of the deposition, including its continuation if necessary, shall be governed by Pretrial Order No. 7: Deposition Protocol (ECF No. 103) and Rule 30 of the Federal Rules of Civil Procedure. Dr. Foster shall produce any documents identified in Schedule A attached to his Document Subpoena, at least 10 days prior to the deposition.

Dated: September 5, 2017              Respectfully submitted,

/s/ Robin Greenwald
Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY 10003



EXHIBIT
Foster 18
# 2

PLAINTIFF'S NOTICE TO TAKE DEPOSITION OF DR. WARREN G. FOSTER
16-MD-02741-VC

1

2

/s/ Aimee Wagstaff
Aimee Wagstaff
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, P.C.
7171 West Alaska Drive
Lakewood, CO 80226

/s/ Mike Miller
Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960

*Co-Lead Counsel for Plaintiffs
in MDL No. 2741*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE TO TAKE DEPOSITION OF DR. WARREN G. FOSTER
16-MD-02741-VC

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| IN RE: ROUNDUP PRODS. LIABILITY LITIG. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 16-md-2741-VC |
| MONSANTO COMPANY | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                    Dr. Warren G. Foster

*(Name of person to whom this subpoena is directed)*

❐ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: SEE ATTACHED SCHEDULE A

| Place: Weitz & Luxenberg, P.C., 700 Broadway, New York, NY 10003 | Date and Time: 09/12/2017 5:00 pm |
|---|---|

❐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    09/05/2017

| CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | /s/ Robin Greenwald |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*     Plaintiffs
_____ , who issues or requests this subpoena, are:

Robin Greenwald, 700 Broadway, New York, NY 10003, rgreenwald@weitzlux.com, 212-558-5802

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   16-md-2741-VC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                    *Server's signature*

                                          _____
                                                    *Printed name and title*

                                          _____
                                                    *Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDLUE A**

**DEFINITIONS**

1.       The term "Communication," as used in Schedule A shall include, but not be limited to, any contact or act by which information or knowledge is transmitted or conveyed between two or more persons and includes, without limitation: (1) written contact, including but not limited to letters, memoranda, PowerPoint presentations, email, text message, facsimile, internet-based meetings, or other written or electronic documents or files; (2) oral contact, whether by face-to-face meetings, internet-based meetings, video conferences, telephonic conversations, or otherwise; and (3) nonverbal acts intended to communicate or convey any meaning, understanding or other message.

2.       "Documents" shall include, but not be limited to, the original and/or any non-conforming copies of any and all written, printed, typed, graphic, photographic, visual or otherwise recorded material, and all microfilm, or electronic sound recording or transcripts thereof however produced or reproduced, including non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise, writings, drawings, records and recordings of every kind and description, whether inscribed by hand or by mechanical, electronic, microfilm, photographic or other means, as well as audio or visual reproduction of all statements, conversations or events including, but not limited to, agreements, bids, bonds, bulletins, calendars and appointment books, checks, circulars, communications, contracts, correspondence, statements, telegrams, receipts, returns, summaries, data books, accounting records, including ledgers, vouchers and books of account, computer printouts, information storage, media diaries and diary entries, drawings and charts,

including additions and revisions, estimates, evaluations, financial statements and records, instructions, inter- and intra-office communications, invoices, job site reports, investigative reports, audits, logs, memoranda of any type, minutes of all meetings, notes of all types, orders, including change, proceed and purchase orders questionnaires and surveys, photographs, price sheets, records, results of investigations, schedules including additions and revisions, statistical records, reports, analyses and studies of any kind, tape recordings, including any form of any recording of any telephone or other conversation, interview, conference, or meeting, and all contract and working papers as well as drawings, papers and files. A reference herein to any one or more of these types of documents shall be construed to include all other types of documents without limitations.

3. Words used in the singular shall, where the context permits, include the plural, and words used in the plural shall, where the context permits, include the singular.

4. "You" and "your" refers to the person served with and responding to these requests.

5. "Roundup® litigation" refers to the multidistrict litigation captioned, *In re Roundup Products Liability Litigation,* Case No. 3:16-md-02741-CV (N.D. Cal.), in which individuals have asserted or will assert a claim against Monsanto Company ("Monsanto") asserting that the use of Monsanto's Roundup®-branded products has caused their non-Hodgkin's lymphoma ("NHL").

## REQUESTS FOR PRODUCTION

As stated in the foregoing Notice, you are required to produce the following documents:

1.   All documents provided to you, or that you have, related to the Roundup® and/or glyphosate and cancer including, but not limited to, NHL, that are not publicly available.

2.   All studies, literature, materials, research files, publications, treatises or any other documents that are not publicly available that you have reviewed and upon which you rely and/or intend to rely upon as a basis for, or in any other way support, the opinions that you intend to offer in general causation phase of the Roundup® litigation, MDL 2741, or that were reviewed and/or considered by you in the course of formulating your opinions.

3.   Your most recent curriculum vitae.

4.   All billing records, invoices, or other documents reflecting time spent and/or fees and expenses charged by you (either directly or through your employer or other entity) in connection with the general causation phase of the Roundup® litigation, MDL 2741, and/or other   consulting work regarding glyphosate, IARC Monograph 112, Roundup®, Intertek Scientific & Regulatory Consultancy, other glyphosate- based products.

5.   Any retainer letter, contract, agreement, or other document setting forth the retention of you to work in the Roundup® litigation, MDL 2741.

6.   A copy of all abstracts, articles, draft articles, books or book excerpts, presentations, power points of which you are an author, co-author, drafter or editor which has as all or part of its subject matter NHL, glyphosate, Roundup®, other glyphosate-based products

and/or IARC that are not publicly available.  With respect to documents in this request relating to IARC, the time frame for the request is limited to 2014 to the present.

7.  All documents and communications regarding glyphosate, NHL, Roundup®, and/or other glyphosate-based products with any of the following people, agencies and/or entities:  Exponent, Failure Analysis Associates, CropLife America, Reuters, Glyphosate Task Force, Glyphosate Expert Advisory Panel, Food and Chemical Toxicology Journal, Critical Reviews in Toxicology, Joint Glyphosate Task Force, Toxicology Technical Working Group, Environmental Protection Agency (EPA), European Union (EU), European Food Safety Administration (EFSA), Intertek Scientific and Regulatory Consultancy, Intertek Expert Panel, International Agency for Research on Cancer (IARC), Dr. Christopher  Corcoran, Dr. William Fleming, Dr. Jay Goodman, Dr. Lorelei Mucci, Dr. Jennifer Rider, and Dr. Thomas Rosol.

Dated: September 5, 2017                     Respectfully submitted,

                                             /s/ Robin Greenwald

US EPA ARCHIVE DOCUMENT

EXHIBIT

Foster B
#3

PENGAD 800-631-6989



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

FEB 2 6 1985

MEMORANDUM

OFFICE OF
PESTICIDES AND TOXIC SUBSTANCES

SUBJECT:   Use of historical data in determining the weight
           of evidence from kidney tumor incidence in the
           Glyphosate two-year feeding study; and some
           remarks on false positives

TO:        Reto Engler, Chief
           Scientific Mission Support Staff
           TOX/HED/OPP (TS-769C)

FROM:      Herbert Lacayo, Statistician        *Herbert Lacayo! Feb 26, 1985*
           Scientific Mission Support Staff
           TOX/HED/OPP (TS-769C)

THRU:      Bertram Litt, Statistics Team Leader
           Scientific Mission Support Staff
           TOX/HED/OPP (TS-769C)

BACKGROUND

    The Glyphosate feeding study (EPA Reg. #: 524-308, Caswell
#: 661A, Accession #: 251007-014) on Charles River CD-1 mice
generated renal tubular adenomas in male mice at the 5000 and
30000 ppm dose levels.  The registrant (Monsanto) claims that
such tumors are "unrelated to treatment." (ref.1).  In support
of that they provide historical data from Bio/dynamics and two
other laboratories (ref.2).

    With respect to historical data we note the large number and
variety of factors which influence the life history of rodents in
chronic studies.  Hence, it is generally agreed that the most
relevant historical controls are experiments from the subject
laboratory studied within a 3 to 4 year "window" (ref.3).

SUMMARY

    The main purpose of this memo is to show one way historical
data may be used to evaluate the significance of tumors in the
glyphosate feeding study.  When these data are so used we can
conclude that Glyphosate dosing has a statistically significant
effect (at the p = .006 level) in the production of kidney
tumors in male mice.  The appropriate procedure is outlined in
the next section entitled Use of Historical Data.  The last
Section, Remarks on False Positives, addresses some comments
by Monsanto (Ref.1) on this subject.  That section outlines
some of the weaknesses in Monsanto's position.

## USE OF HISTORICAL DATA

The following information was derived from Reference 2.

| Data Source* | p (est.of tumor rate) | Sigma (est.of standard deviation) |
|---|---|---|
| Bio/dynamics | .00368 | .00212 |
| IRD Corp. | .00437 | .00109 |
| Combined | .00399 | .00094 |

The value p = .00368, derived from Bio/dynamics data is a reasonable choice to use as a historical control.  The data are from the same laboratory that performed the Glyphosate study and are within the appropriate 3-4 year time "window" (ref.3).  Further, the standard deviation of the estimate is reasonably small.

We will now examine the Monsanto contention that the kidney tumors are unrelated to treatment. (i.e. Glyphosate has no effect on kidney tumors).  First, consider the tumor rate in the Glyphosate Study: 4/198 = .0202 ---

In contrast, Bio/dynamics has the lower historical rate:

$$3/815 = .00368$$

The relevant question is:  What is the probability that the 198 CD-1 mice in the Glyphosate study will produce by pure chance 4 or more mice with kidney tumors?  Another way of stating this is - How likely are we to have a tumor rate of .0202 --- for the Glyphosate study given that the historical rata is .00368?

Questions of this type may be answered from manipulation of the relevant distribution which, in this case is the Binomial:

$$P(r \text{ out of } n \text{ mice have tumors}) = \binom{n}{r} p^r q^{n-r}$$

Where: n = the # of male mice in the study

r = the # of male mice with kidney tumors

p = .00368, the historical probability that an individual male mouse will develop kidney tumors.

q = 1 - p

*This does not include Hazleton Laboratories America, Inc. due to the small sample size of that data set

Using the above distribution and elementary but tedious
calculations, we generate the following table:

| # of mice with tumor | Probability that r or more mice will have tumors in a study with 198 male mice |
|---|---|
| r = 0 | 1. |
| 1 | .518177 |
| 2 | .165711 |
| 3 | .037443 |
| 4 | .006481 |

This last table indicates that based on a historical rate of
p= .00368 that the probability of seeing 3 or more mice with
kidney tumors is about .037; and the probability of seeing 4
or more such mice (i.e. seeing what in fact happened) is about
.0064. We note that even considering data from I.R.D., the p
value is about .01.

Under such circumstances a prudent person would reject
the Monsanto assumption that Glyphosate dosing has no effect
on kidney tumor production. Another way of saying this is
that if Glyphosate were truly unrelated to kidney production
we would expect to see 4 or more tumors in less than 1 out
of 100 experiments of the type sponsored by Monsanto. Thus,
Glyphosate is suspect.

REMARKS ON FALSE POSITIVES

In ref. 1 Monsanto notes that "...if 20 types of lesions
were evaluated at a probability level of .05, the number
expected to be positive would not be one in 20, but rather
the probability would be 64 in 100, an unacceptably high
value..." Monsanto is referring to the well-known fact
that by examining enough data it is likely that one will find
an excess of some tumor type by chance alone; thus generating
a false positive.

The Monsanto argument required the following assumptions:

1.  A mouse may develop 20 distinct and independent
    (in the statistical sense) types of tumors.
2.  The probability of each tumor type in a typical
    mouse is .05.

It follows from the above that:
P(a mouse has at least one tumor) = $1 - .95^{20}$
                                  = .6415

Hence in 100 mice one would on the average see 64 with tumors.
Monsanto proposes to avoid this "problem" of false positives by
analyzing the study" ...at the .01 probability level."

We disagree with the Registrants position.  First, even if
one did analyze the study at the .01 level as they suggest it
would still result (using the same mathematics as before) in
seeing 18 mice out of 100 with tumors.  And hence one still has
the problem of false positives from the registrant's viewpoint.
But this causes something worse from a regulatory viewpoint.
We have decreased the false positive rate (i.e., the probability
of saying that a chemical causes tumors when in fact it does not)
at the cost of increasing the false negative rate (i.e., the
probability of saying that a chemical doesn't cause tumors when
in fact it does).  The Registrant wishes to avoid false positives
while those concerned with the public health wish to avoid false
negatives.  Hence, for this reason alone Monsanto's argument is
unacceptable.

    We further disagree as follows:

    1. The two assumptions needed to support the Monsanto
       argument are themselves in need of support (especially
       the requirement for statistical independence).
    2. False positive results are less likely to occur with
       rare tumors (ref. 5).  And the tumors in question are
       rare.

    Viewpoint is a key issue.  Our viewpoint is one of protecting
the public health when we see suspicious data.  it is not our
job to protect registrants from false positives.  We sympathyze
with the Registrants problem; but they will have to demonstrate
that this positive result is false.

    Finally, we mention that none of the tumors occurred in the
control or low dose groups.  Instead there was one at 5000 ppm
and 3 at the 30000 ppm dose level.  This together with the
previous comments make it likely that there is a dose-tumor
relationship for Glyphosate.

REFERENCES

1.  Letter from Monsanto (signed by Frank. S. Serdy) to EPA
       (Attn: Robert J. Taylor) dated Feb. 5, 1985.

2.  Letter from Monsanto (signed by Robert W. Street) to EPA
       (Attn: Robert J. Taylor) dated March 20, 1984.

3.  J.K. Haseman, et al:  Use of Historical Control Data in
       Carcinogenicity Studies in Rodents - Toxicologic
       Pathology - 12:126-134. 1984.

4.  TOX Branch Memo from William Dykstra to Robert Taylor
       dated 9/4/84.

5.  T.R. Fears et al:  False-Positive and False-Negative Rates
       for Carcinogenicity.  Cancer Research. 271:1941-1945.
       July 1977.

CFR-180.364    Glyphosate       Roundup       3/12/85

File last updated  3/12/85

ACCEPTABLE DAILY INTAKE Da **DRAFT**

| RAT,Other NOEL | | S.F. | ADI | JP1 |
|---|---|---|---|---|
| mg/kg | ppm | | mg/kg/day | mg/day (60kg) |
| 10.000 | 200.00 | 100 | 0.1000 | 6.0000 |

Published Tolerances

| Crop | Tolerance | Food Factor | mg/day (1.5kg) |
|---|---|---|---|
| Grain Crops( 64) | 0.100 | 13.75 | 0.02965 |
| Avocados( 6) | 0.200 | 0.03 | 0.00009 |
| Citrus Fruits( 33) | 0.200 | 3.81 | 0.01144 |
| Coffee( 36) | 1.000 | 0.75 | 0.01119 |
| Grapes, inc raisins( 50) | 0.100 | 0.49 | 0.00074 |
| Leafy vegetables( 30) | 0.100 | 2.76 | 0.00828 |
| .nuts(161) | 0.500 | 0.10 | 0.00031 |
| Pome Fruits(125) | 0.200 | 2.79 | 0.00837 |
| Root Crop veg(138) | 0.100 | 11.00 | 0.03299 |
| SeedFood veg(143) | 0.200 | 3.56 | 0.01036 |
| Palm Oil(202) | 0.100 | 0.03 | 0.00005 |
| Pistachio nuts(210) | 0.200 | 0. .3 | 0.00009 |
| Asparagus( 5) | 0.200 | 0.14 | 0.00043 |
| Bananas( 7) | 0.200 | 1.42 | 0.00426 |
| Olives(104) | 0. 00 | 0.06 | 0.00009 |
| Stone Fruits(151) | 0.200 | 1.25 | 0.00374 |
| Sugar, cane&beet(154) | 2.000 | 3.64 | 0.10915 |
| Molasses( 96) | 20.000 | 0.03 | 0.00920 |
| Cranberries( 44) | 0.200 | 0.03 | 0.00009 |
| Cottonseed (oil)( 41) | 15.000 | 0.15 | 0.03375 |
| Kidney(203) | 0.500 | 0.03 | 0.00023 |
| Liver(211) | 0.500 | 0.03 | 0.00023 |
| Peanuts(115) | 0.100 | 0.36 | 0.00054 |
| Guava(184) | 0.200 | 0.03 | 0.00009 |
| Papayas(109) | 0.200 | 0.03 | 0.00009 |
| Mangoes( 83) | 0.200 | 0.03 | 0.00009 |
| Soybeans (oil)(148) | 6.000 | 0.92 | 0.08263 |
| Pineapple(123) | 0.100 | 0.30 | 0.00044 |
| Fish, shelifish( 59) | 0.250 | 1.08 | 0.00406 |
| Cucurbits( 49) | 0.100 | 2.84 | 0.00426 |
| Fruiting vegetables( 60) | 0.100 | 2.99 | 0.00449 |
| Small Fruit,berries(146) | 0.100 | 0.83 | 0.00124 |
| Hops( 73) | 0.100 | 0.03 | 0.00005 |
| Potable Water(198) | 0.500 | 133.33 | 1.00000 |
| Tea(162) | 4.000 | 0.07 | 0.00429 |

| JPI | TMRC | % ADI |
|---|---|---|
| 6.0000 mg/day (60kg) | 1.3686 mg/day (1.5kg) | 22.81 |

*************************************************************

Unpublished,Tox Approved   2F2680,2G2686

| CROP | Tolerance | Food Factor | mg/day (1.5kg) |
|---|---|---|---|
| Soybeans (oil)(148) | 4.000 | 0.92 | 0.05509 |
| Coconut( 35) | 0.100 | 0.03 | 0.00005 |

```
                    !PI              MPC              %PI
    0,000 mg/day(60kg)    1.4230 mg/day(1.5kg)    23.73
*******************************************************************

    Current Action   3r2930

        CROP            Tolerance  Food Factor   mg/day(1.5kg)
    Fish,shellfish( 59)     0.000       1.08       0.00000

                    !PI              MPC              % ADI
    0.0000 mg/day(60kg)    1.4230 mg/day(1.5kg)    23.73
*******************************************************************
```

US EPA ARCHIVE DOCUMENT

EXHIBIT

Foster B
# 4



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

WASHINGTON, D.C. 20460

December 4, 1985

004855

OFFICE OF
PESTICIDES AND TOXIC SUBSTANCES

MEMORANDUM

TO:        William Dykstra, Ph.D.
           Reviewer, Toxicology Branch, TS-769

FROM:      Louis Kasza, D.V.M., Ph.D.    *L K.*
           Pathologist, Toxicology Branch, TS-769

SUBJECT:   Glyphosphate -- Evaluation of Kidney Tumors in Male Mice.
           Chronic Feeding Study.

INTRODUCTION:

     Tumors (0 (1)*; 0; 1; 3) were found in the kidneys of male mice at
different dose levels.  There were differences in the pathologists' opinions
as to whether the small localized change in one kidney of the control group
(#1028) represented a tumor or not.  In order to provide more information,
the Agency recommended the preparation of three (3) additional sections from
each kidney in the male groups.  "The lesion was not present in the recut
specimens from that animal" in the control group (#1028).  In the final re-
evaluation of the questionable control kidney slides (#1028), the conclusion
was formulated that "The pathology staff at Bio/dynamics and I (Dr. McConnell)
reviewed the lesion and concur that it may be representative of a developing
tumor".

MATERIALS AND METHODS:

     I (Dr. Kasza, Branch Pathologist) requested all kidney sections from
male mice.  After selection of slides from all animals in which kidney tumors
were diagnosed, I studied them under the microscope.

RESULTS:

     There was no difference in diagnoses between my and other pathologists'
diagnoses with respect to kidney tumors in mid- (#3023) and high dose (#4029,
4023, 4041) groups.  With regard to the questionable male control kidney (#1028),
it is my opinion that the presence of a tumor can not definitely be established.
My interpretation is similar to the conclusion of Bio/dynamics' pathology staff
and Dr. McConnell, that the lesion "may be" a proliferative change having the
potential to lead to the development of a frank tumor.  But as the tissue can
be seen under the microscope as a small well-demarcated focal cell aggregate
morphologically different from the healthy looking surrounding kidney tissue,
this morphological alteration does not represent a pathophysiologically
significant change.

*In parentheses is the review pathologist's findings.

cc: T. Farber
    W. Burnam
    R. Engler
    R. Zendzian

Test for Significance of Differences Between Proportions   11/13/85

renal tubule adenoma mice                                        004855

| ppm | # RESP | Total | % +/-2(S.D.) | One Tail P Statistic Fisher's |
|---|---|---|---|---|
| 0.000 | 1 | 49 | 2.04+/-( 4.98) | |
| 1000.000 | 0 | 49 | 0.00+/-( 1.02) | $$$$$$ |
| 5000.000 | 1 | 50 | 2.00+/-( 4.88) | $$$$$$ |
| 30000.000 | 3 | 50 | 6.00+/-( 7.58) | 0.316 |

This linear trend test often gives incorrect results

Test for a linear trend is not significant

Test for Significance of Differences Between Proportions   12/11/85

renal tublule adenoma , male mice

004855

```
        ppm  # RESP Total    %  +/-2(S.D.)    One Tail P Statistic
                                               Fisher's
     0.000      0   - 49    0.00+/-( 1.02)
  1000.000      0     49    0.00+/-( 1.02) $$$$$$
  5000.000      1     50    2.00+/-( 4.88)  0.505
 30000.000      3     50    6.00+/-( 7.58)  0.125
```

This linear trend test often gives incorrect results

Test for Linear Trend in Proportions P =    0.016

## Expert Report
## Christopher J. Portier, Ph.D.

## Charge

Glyphosate acid is a colorless, odorless, crystalline solid. Glyphosate is the term used to describe the salt that is formulated by combining the deprotonated glyphosate acid and a cation (isopropylamine, ammonium, or sodium). This expert report is intended to review the available scientific evidence relating to the potential of glyphosate and glyphosate-based formulations (GBFs), including Roundup®, to cause Non-Hodgkin's Lymphoma (NHL) in humans.

## Qualifications

I received an undergraduate degree in mathematics in 1977 from Nicholls State University and a Master's degree and Ph.D. in biostatistics from the University of North Carolina School of Public Health in 1979 and 1981 respectively. My Ph.D. thesis addressed the optimal way to design a two-year rodent carcinogenicity study to assess the ability of a chemical to cause cancer[1, 2]; the optimal dosing pattern from my thesis is still used by most researchers. My first employment following my doctoral degree was a joint appointment at the National Institute of Environmental Health Sciences (NIEHS) and the National Toxicology Program (NTP) to conduct research on the design and analysis of experiments generally employed in toxicology. After 5 years with NIEHS/NTP, I developed my own research group which eventually became the Laboratory of Quantitative and Computational Biology and then the Laboratory of Computational Biology and Risk Assessment (LCBRA). One highlight during this period was the development of the Poly-3 Test for survival adjustment of data from two-year carcinogenicity studies in rodents[3, 4]; this test is used as the main method of analysis of these studies by the NTP and many others. We also did a complete analysis of the historical controls animals from the NTP studies[5, 6]. The LCBRA focused on the application of computational tools to identify chemicals that are toxic to humans, to develop tools for understanding the mechanisms underlying those toxicities and to quantify the risks to humans associated with these toxicities. The main toxicological focus of the LCBRA was cancer and my laboratory developed many methods for applying multistage models to animal cancer data and implemented the use of these models in several experimental settings[7-19]. In my last few years at the NIEHS/NTP, my research focus expanded to the development of tools for evaluating the response of complex experimental and human systems to chemicals[20-24] and the name of the laboratory shifted to Environmental Systems Biology.

Over my 32 years with the NIEHS/NTP, I was involved in numerous national priority issues that went beyond my individual research activities. After Congress asked NIEHS to work with the Vietnamese government to address the hazards associated with Agent Orange use during the Vietnamese War, I was given the responsibility of working with



my counterparts in Vietnam to build a research program in this area[25]. Congress also tasked NIEHS with developing a research program (EMF-RAPID) to address concerns about the risks to humans from exposure to power lines and to report back to Congress on what we found. I was in charge of evaluating all research developed under this program and was responsible for the final recommendations to Congress on this issue[26-28].

While at the NIEHS/NTP, I also had administrative positions that relate to my qualifications. From 2000 to 2006 I was the Director of the Environmental Toxicology Program (ETP) at NIEHS. The ETP included all of the toxicology research laboratories within the NIEHS Intramural Research Program. It was my responsibility to ensure the research being done was pertinent to the mission of the NIEHS, addressing high priority concerns about toxic substances and human health and that the NIEHS had adequate resources to complete this research.

During this time I was also Associate Director of the NTP, a position in which I was the scientific and administrative director of the NTP (The Director of the NTP was also the NIEHS Director and gave me complete autonomy in the management and science of the NTP). These two positions were historically always combined at the NIEHS and the NTP so that one person was in charge of all toxicological research at the NIEHS/NTP. The NTP is the world's largest toxicology program, routinely having 15 to 25 active two-year carcinogenicity studies, numerous genetic toxicology studies and many other toxicological studies being conducted at any given time. The NTP two-year carcinogenicity studies and their technical reports are also considered the "gold standard" of cancer studies due to their extreme high quality, their tremendous utility in evaluating human health hazards and the rigor and transparency they bring to the evaluation of the data. All data from NTP two-year cancer studies are publicly available including data on individual animals and images from the pathology review of each animal. The NTP is also home to the Report on Carcinogens, the US Department of Health and Human Services official list of what is known or reasonably anticipated to be carcinogenic to humans. It was my responsibility to decide what items eventually went onto this list while I was Associate Director of the NTP. In 2006, I became an Associate Director of the NIEHS, a senior advisor to the director and the director of the Office of Risk Assessment Research (ORAR). ORAR focused on stimulating new research areas on the evaluation of health risks from the environment and addressed major risk assessment issues on behalf of the NIEHS/NTP. For example, in this capacity, I lead a multiagency effort to understand the health risks to humans from climate change and to develop a research program in this area[29].

I left the NIEHS/NTP in 2010 to become the Director of the National Center for Environmental Health (NCEH) at the Centers for Disease Control and Prevention and simultaneously Director of the Agency for Toxic Substances and Disease Registry (ATSDR). NCEH does research and supports activities aimed at reducing the impact of environmental hazards on public health. One well-respected research effort of the NCEH is the National Biomonitoring Program. This program tests for the presence of hundreds of chemicals in human blood and urine in a national sample of people in the

2

United States. ATSDR advices the Environmental Protection Agency (EPA) and communities on the potential health impacts from toxic waste dump sites (superfund sites). ATSDR is required by law to produce ToxProfiles. These are comprehensive reviews of the scientific literature for specific chemicals generally found at superfund sites. They also provide an assessment of the safety of these chemicals. As part of my activities at ATSDR, I began a modernization of the ToxProfiles to use systematic review methods in their assessments; this effort was linked to a similar effort that I had helped to implement at the NIEHS/NTP.

Aside from my official duties in my various federal jobs, I also served on numerous national and international science advisory panels. Most notable, for my qualifications for this statement, are my serving as Chair from 2005 to 2010 of the Subcommittee on Toxics and Risk of the President's National Science and Technology Council, member and chair of EPA'S Science Advisory Panel from 1998 to 2003 (focused specifically on advising their pesticides program) and chair of the International Agency for Research on Cancer (IARC) advisory group that updated and improved its rules for reviewing scientific data to ensure that conclusions on the carcinogenicity of human exposures are the best possible (Preamble)[30]. As part of my work on science advisory panels, I have served on EPA's Science Advisory Board, as an advisor to the Australian Health Council on risk assessment methods, as an advisor to the Korean Food and Drug Administration on toxicological methods, and served on several World Health Organization (WHO) International Program on Chemical Safety scientific panels dealing with risk assessment. Besides the guidelines for evaluating cancer hazards used by the IARC, I have either chaired or served as a member of scientific panels developing guidance documents for other organizations including the EPA.

I have received numerous awards, most notably the Outstanding Practitioner Award from the International Society for Risk Analysis and the Paper of the Year Award (twice) from the Society of Toxicology Risk Assessment Specialty Section. I am a fellow of the American Statistical Association, the International Statistical Institute, the World Innovation Foundation and the Ramazinni Institute. I have published over 250 peer-reviewed scientific papers, book chapters and technical documents on topics in toxicology and risk assessment.

Finally, I have served on numerous national and international committees tasked with evaluating the risk and/or hazard of specific environmental chemicals, including glyphosate. For example, I have contributed to risk assessments for EPA, the Food and Drug Administration, the Centers for Disease Control and Prevention, the National Institutes of Health, the WHO and IARC.

## Reliance List

During the course of my preparation for this report, I have reviewed the following materials:

> a. All epidemiological data relating to the ability of glyphosate formulations to cause NHL in humans.

b. Scientific papers on the cellular origins of NHL
c. Peer-reviewed scientific data relating to the carcinogenicity, genotoxicity and oxidative stress caused by glyphosate
d. Technical reports relating to the carcinogenicity of glyphosate provided by the defendant to the lawyers for the plaintiff
e. The USEPA, the European Food Safety Authority (EFSA), the German Federal Institute for Risk Assessment, the European Chemical Agency, the IARC and the WHO/Food and Agriculture Organization Joint Meeting on Pesticide Residues reviews of the scientific literature relating to the potential for glyphosate to cause cancer.
f. Technical documents available from EFSA regarding animal carcinogenicity data on glyphosate prepared by organizations other than the defendant
g. Various other documents produced in the litigation

A complete list of my reliance materials is at the end of this report.

## Methodology for Causality Evaluation

The evaluation of whether glyphosate and/or GBFs can cause NHL in humans requires the review and synthesis of scientific evidence from studies of human populations (epidemiology), animal cancer studies, and studies investigating the mechanisms through which chemicals cause cancer. Many different approaches[31, 32] are used to synthesize these three areas of science to answer the question "Does this chemical cause cancer in humans?" In any of these three science areas, the quality of the individual studies has to be assessed and summarized to make certain the studies included in the overall assessment are done appropriately. Once the quality of the individual studies has been assessed, a judgment needs to be made concerning the degree to which the studies support a finding of cancer in humans. To do this, the EPA, IARC, the European Chemical Agency (EChA), the US Report on Carcinogens, and many others use guidelines[30, 33-35] that rely upon aspects of the criteria for causality developed by **Hill (1965)**[36].

Hill listed nine (9) aspects of epidemiological studies and the related science that one should consider in assessing causality. The presence or absence of any of these aspects is neither sufficient nor necessary for drawing inferences of causality. Instead, the nine aspects serve as means to answer the question of whether other explanations are more credible than a causal inference. As noted by Hill:

> *"None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a sine qua non. What they can do, with greater or less strength, is to help us to make up our minds on the fundamental question — is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?"*

The nine aspects cited by Hill include consistency of the observed association, strength

4

of the observed association, biological plausibility, biological gradient, temporal relationship of the observed association, specificity of the observed association, coherence, evidence from human experimentation and analogy. These are briefly described below.

An inference of causality is strengthened when several of the studies show a **consistent positive association** between cancer and the exposure. This addresses the key issue of replication of studies which is critical in most scientific debates. If studies are discordant, differences in study quality, potential confounding, potential bias and statistical power are considered to better understand that discordance.

An inference of causality is strengthened when the **strength of the observed association** in several studies are large and precise. These large, precise associations lessen the possibility that the observed associations are due to chance or bias. A small increase in risk of getting cancer does not preclude a causal inference since issues such as potency and exposure level may reduce the ability of a study to identify larger risks. Meta-analyses provide an objective evaluation of the strength of the observed association across several studies with modest risks to help clarify strength of the observed associations.

An inference of causality is strengthened when there is data supporting **biological plausibility** demonstrated through experimental evidence. Animal carcinogenicity studies, in which tumor incidence is evaluated in experimental animals exposed to pure glyphosate, play a major role in establishing biological plausibility. There are numerous types of mechanisms that can lead to cancer[37], most of which can be demonstrated through experimental studies in animals, human cells, animal cells, and/or other experimental systems. Occasionally, occupational, accidental or unintended exposures to humans allow researchers to evaluate mechanisms using direct human evidence.

An inference of causality is strengthened when there is a **biological gradient** showing a reasonable pattern of changing risk with changes in exposure (e.g. risk increases with increasing exposure or with longer exposure). In many epidemiological studies, this aspect cannot be examined due to limitations in the study design or due to a lack of clarity in the presentation of the results. When a study does address an exposure-response relationship, failure to find a relationship can be due to a small range of exposures, insufficient sample size or a changing exposure magnitude over time that has not been accounted for.

An inference of causality is strengthened when there is a **temporal relationship** in which the exposure comes before the cancer. This aspect is necessary to show causality; if it is not present, a causal inference is not plausible. Because the latency period for cancers can be long (years), evaluation of studies should consider whether the exposure occurred sufficiently long ago to be associated with cancer development.

An inference of causality is strengthened when the exposure is **specific** for a given cancer. This would mean that the disease endpoint being studied is only due to the cause being assessed. This issue is seldom applicable and, since NHL has other causes, specificity is not applicable to the determination of causality for glyphosate.

An inference of causality is strengthened when other lines of experimental evidence are **coherent** with a causal interpretation of the association seen in the epidemiological evidence.  To evaluate coherence, information from animal carcinogenicity studies, mechanistic investigations and information on the metabolism of the chemical being studied would be considered.

An inference of causality is strengthened when there is **experimental evidence in humans** supporting a causal interpretation.  Seldom is this type of information available when addressing the toxicity of chemicals.  However, experiments in which an individual reduces or limits exposures and the risk of cancer is reduced would carry considerable weight in the evaluation (e.g. studies evaluating the cancer risks of people who stop cigarette smoking compared with continuing smoking have demonstrated reduced lung cancer risks).  No such data are available for glyphosate.

Finally, an inference of causality is strengthened when there are other chemical agents with **analogous** structures showing similar effects in humans and/or animals and/or showing similar biological impacts in mechanistic studies.  No such data are available for glyphosate.

The most logical approach to developing an inference of causality is to step through each of the aspects of causality developed **by Hill (1965)**[36] and apply them to the available data for glyphosate and for glyphosate formulations.  This is done in the sections that follow.

## Consistency of the Associations seen in Human Epidemiological Studies

### Relevant Epidemiology Studies

In their meta-analysis, **Chang and Delzell (2016)**[38] performed a systematic literature search of all scientific literature up to June, 2015, to identify all epidemiological studies that were pertinent to evaluating an association between glyphosate and NHL.  They identified 12 relevant epidemiology studies[39-50].  Their search agrees with all current reviews of glyphosate and I will use their findings from the literature up until 2015.  To cover from June 2015 to the present (April 1, 2017), I used their searching algorithm and identified 117 additional published studies, none of which were new epidemiology studies.  These same 12 studies will be considered for use in this evaluation.  Other experts will be discussing the studies as well as their strengths and their weaknesses; I will focus on using the results of these studies in evaluating causality so I will only briefly describe each study.

**Cantor et al. (1992)**[39] did an in-person interview study comparing 622 white men, newly diagnosed with NHL, to 1245 population-based controls in Iowa and Minnesota.  They originally identified 780 cases, of which 694 (89%) were interviewed.  After pathology review, only 622 were found to have NHL, the remaining cases having leukemia or other diseases.  Three different sources of controls were used, random digit dialing (76.7% response rate), Health Care Financing Administration rolls (79% response

rate) and deceased controls with eligible proxies (77% response rate). Both cases and controls were questioned regarding their use of agricultural products including Roundup® and any other glyphosate-based formulations. For deceased or incompetent controls (184) and cases (number not given), proxy interviews were done with a close relative. When cases in farmers were compared to cases in non-farmer controls, 26 cases (out of 266) and 49 controls (out of 547) had handled herbicides containing glyphosate yielding an odds ratio[1] (OR) of 1.1 (95% confidence interval 0.7-1.9). This analysis controlled for vital status, age, state, cigarette smoking status, family history of lymphopoietic cancer, high-risk occupations and high-risk exposures in a logistic analysis. The authors noted there was "minimal evidence for confounding of results for any single pesticide by exposure to pesticides belonging to other chemical families." Because the exposure is determined based on interviews in cases and controls, this study has the potential for recall bias[2]. However, the authors note that the bias could both increase or decrease the OR because of non-differential exposure misclassification[3] because of difficulties in accurate recall of past pesticide exposures for both controls and treated individuals. This study will not be included separately into the evaluation since it overlaps with **De Roos et al. (2003)**[43]

Two additional studies conducted by **Zahm et al. (1990)**[51] in Nebraska and **Hoar et al. (1986)**[52] in Kansas collected information on pesticide and herbicide use, but did not report specifically on the effects of glyphosate. **De Roos et al. (2003)**[43] pooled the data from these two studies with the data from **Cantor et al. (1992)**[39] to examine pesticide exposure to glyphosate in farming as risk factors for NHL. The three case-control studies[39, 51, 52] had slightly different designs. The design for the Minnesota study[39] is

---

[1] The odds ratio (OR) is calculated as the proportion of exposed cases with disease to exposed controls divided by the proportion of non-exposed cases to non-exposed controls. For rare diseases, this value approximates the population risk ratio (PRR) which is the probability of having the disease in exposed individuals divided by the probability of having the disease in non-exposed individuals. If the PRR is 1, then there is no difference in the probability of having the disease regardless of your exposure. Values of PRR greater than 1 imply the risk is higher in the exposed population. Because the OR is an estimate of the PRR for rare diseases, it is usually accompanied by a 95% confidence interval that describes the probable range of the estimate. If the OR is greater than 1, then the exposure is associated with the disease. If the lower 95% confidence bound for the OR is greater than 1, this is typically used to say the association is statistically significant.

[2] Recall bias occurs when cases are more likely to say they are exposed to glyphosate than controls or when controls are more likely to say they are exposed to glyphosate than cases. The recall must be different for the cases than the controls for this to cause a bias; errors in recalling past exposures that happen for both cases and controls would not be recall bias.

[3] Non-differential exposure misclassification occurs when the probability of an error in determining whether an individual is exposed or not is the same for both cases and controls.

7

provided directly above. In Nebraska[51], the cases were identified through the Nebraska Lymphoma Study Group and area hospitals for 66 counties and included all white men and women diagnosed with NHL between July 1, 1983 and June 30, 1986. Controls were obtained by random-digit dialing, Medicare records or state mortality files depending upon age and vital status. All study participants were over age 21 and even though this study included a few women, they were excluded from the **De Roos et al. (2003)** analysis. The response rates for cases and controls were 91% and 87% respectively. In Kansas[52], cases were randomly sampled from a registry at the University of Kansas of white men, over age 21, diagnosed between 1979 and 1981. The response rates for cases and controls were 96% and 94% respectively. Controls were population-based matched on age and vital status. As for the Nebraska study, controls for live cases were obtained from Medicare records for cases 65+ and by random-digit dialing for cases <65 years; controls for deceased patients came from state mortality records. The resulting pooled case-control study had 870 cases and 2569 controls (for analyzing the relationship between glyphosate and NHL, there were only 650 cases and 1933 controls following exclusion of subjects with missing data). For any glyphosate exposure, there were 36 exposed cases and 61 exposed controls with an OR (95% confidence interval) of 2.1 (1.1-4.0) in a logistic regression analysis controlling for all other pesticides reported, age and study site. The authors also analyzed the data using a Bayesian hierarchical regression analysis yielding an OR (95% confidence interval) of 1.6 (0.9-2.8) controlling for the same parameters as the logistic regression. They also conducted an analysis of "potentially carcinogenic" pesticides which included glyphosate. When just one of these pesticides was used by subjects, the logistic regression OR was 1.6 (0.8-3.1), two to four pesticides yielded an OR of 2.7 (0.7 to 10.8) and when more than five were used, the OR was 25.9 (1.5-450.2) in the logistic regression analysis and 1.1 (0.8-1.7), 1.3 (0.7-2.3) and 2.0 (0.8-5.2) respectively for the Bayesian analysis. Removing glyphosate from the list of "potentially carcinogenic" pesticides yielded equivalent ORs of 1.2 for one pesticide, 1.2 for two to four pesticides and 1.1 for five or more pesticides. The authors note that the positive results seen in their study are not likely due to recall bias since there were few associations seen over the 47 pesticides they studied. Also, although some of the positive results could be due to chance, the use of the hierarchical regression analysis theoretically decreases the chance of false positive findings. In the Kansas study[52], suppliers for 110 subjects with farming experience were identified and provided information on the subjects' crops and pesticide purchases. In general, the suppliers reported less pesticide use than the subjects of the study with no consistent differences in agreement rates between cases and controls. The agreement between suppliers and subjects improved when pesticide use during the last 10 years was considered. This supports a reduced role of recall bias in these studies and a possible role of non-differential exposure misclassification. The reduced ORs when using the Bayesian analysis as compared to the logistic regression is not surprising because the authors used a non-informative prior rather than a less conservative prior. In addition, adjustment for 47 pesticides is also likely to reduce the significance of the observed ORs for pesticides that are associated with NHL as demonstrated by the analysis of "potentially carcinogenic" pesticides (this model is possibly over-parameterized since it

includes over 47 dependent variables for only 36 exposed cases; this can significantly reduce the ORs and increase the confidence bounds). This pooled case-control study is the strongest study with sufficient power (3.8% of subjects exposed) and will be included in the evaluation of causation.

**Lee et al. (2004)**[44] pooled data from **Zahm et al. (1990)**[51] and **Cantor et al. (1992)**[39] (previously described) to evaluate whether asthma acts as an effect modifier of the association between glyphosate exposure and NHL. Women were included in this analysis whereas **De Roos et al. (2003)**[43] excluded women. The final study published by Lee included 872 cases and 2336 controls of which 45 cases and 132 controls had been told by their doctors they had asthma. The OR of association between glyphosate and NHL in non-asthmatics was 1.4 (0.98-2.1) and 1.2 (0.4-3.3) in asthmatics when controlling for age, vital status and state (geographical location). This study completely overlaps with the study by **De Roos et al. (2003)**[43] with the exception of the inclusion of the few women in the study by **Zahm et al. (1990)**[51]. Since this study only looks at effect modification due to asthma, it does not contribute to the overall evaluation of causality and it will be excluded from further evaluations.

**Nordstrom et al. (1998)**[40] conducted a population-based case-control study of hairy cell leukemia (HCL); a subtype of B-cell NHL in Sweden that included an evaluation of exposures to glyphosate. The study included 111 men with NHL reported to the Swedish Cancer Registry between 1987 and 1992 (with one patient from 1993 accidentally included). Controls (400 in total) were drawn from the National Population Registry matched for age and county with the cases. The response rates were 91% for cases (10 refused to participate out of the original 121) and 83% (84 controls refused to participate out of 484 selected). Almost all questionnaires were answered by the subject of the study (4 cases and 5 controls were answered by proxies). The study reported an OR for glyphosate exposure and HCL of 3.1 (0.8-12) controlling only for age. This study had very limited power for detecting an association because there were only four cases and five controls with glyphosate exposure (1.8% of the total study population). In addition, because they failed to adjust for other exposures, the potential for confounding in this study is greater than those presented previously. The authors noted that they attempted to minimize recall bias by only using living cases in the analysis. Also, even though matching was performed to identify the controls, this matching was not used in the final analysis. This study was later used in a pooled analysis of HCL and NHL[42] and will not be considered independently in the evaluation for causation but will be used in the context of the pooled analysis.

**Hardell and Eriksson (1999)**[41] conducted a population-based case-control study of all male patients older than 25 years diagnosed with NHL between 1987 and 1990 in the four most northern counties of Sweden. After excluding misdiagnosed cases, they included 442 cases of which 404 answered their questionnaire (most by proxy) for a response rate of 91%; 192 of these cases were deceased. For each living case, two male matched controls were chosen from the National Population Registry and matched on age and county. For each deceased case, two male controls were chosen from the National Registry for Causes of Death, matched for age and year of death. The response

rate for the controls was 84% (741 out of 884 identified). Study subjects were sent a detailed questionnaire and, in most cases, this was supplemented with a phone interview. A complete working history was obtained with questions regarding exposure to numerous chemicals to avoid a focus on pesticides and organic solvents, the focus of the study. Exposure was defined as at least one full day of exposure more than one year before diagnosis. For glyphosate exposure, the authors identified four cases and three controls with exposures and a univariate OR of 2.3 (0.4-13). A multivariate analysis of both glyphosate and phenoxy herbicides produced an OR of 5.8 (0.6-54). The study has limited power for detecting an effect because the exposure frequency is very low (0.6% exposed). This study was later used in a pooled analysis of HCL and NHL[42] and will not be considered independently in the evaluation for causation but will be used in the context of the pooled analysis.

**Hardell et al. (2002)**[42] conducted a pooled analysis of NHL and HCL by combining the studies of **Nordstrom et al. (1998)**[40] and **Hardell and Eriksson (1999)**[41]. This study fully overlaps with the previous two studies. The analysis controlling for age, study, county and vital status yielded an OR of 3.04 (1.08-8.52) based on eight exposed cases and eight exposed controls. A more extensive analysis additionally controlled for other pesticides and yielded a smaller OR of 1.85 (0.55-6.20). As for the study by **De Roos et al. (2003)**, the analysis may be over-parameterized (more than eight dependent variables with only eight exposed cases) which could lead to a reduction in the ORs and larger confidence bounds. Even with the pooled data, **Hardell et al. (2002)** had limited power to detect an effect because the exposure frequency for cases and controls was very low (1% exposed). This study is a valid case-control study and will be used in the evaluation of causality.

In a later study, **Eriksson et al. (2008)**[46] conducted a population-based case-control study where cases were identified as NHL patients aged 18-74 years diagnosed in four major hospitals in Sweden from December 1, 1999 until April 30, 2002. In total, 995 cases were identified as matching the study parameters with 910 (91%) answering the questionnaire shortly after diagnosis. All cases were classified into subgroups with 810 B-cell, 53 T-cell, and 38 unspecified lymphomas. Controls (1,108) were randomly selected from the population registry and matched on health service, region, sex and age and interviewed in several periods during the conduct of the study; 1,016 controls responded to the questionnaire (92% response rate). Study subjects were sent a detailed questionnaire and, in many cases, a phone interview followed. Exposure was defined as at least one full day of exposure more than one year before diagnosis. The univariate analysis, adjusting for age, sex and year of diagnosis (cases) or enrollment (control) yielded an OR of 2.02 (1.10-3.71) based on 29 exposed cases and 18 exposed controls. When cases and controls were divided into those with ≤10 days per year exposure and those with >10 days per year exposure, the ORs were 1.69 (0.70-4.07) and 2.36 (1.04-5.37) respectively. When diagnoses were grouped into various subtypes of NHL, the results did not change dramatically except for small lymphocytic lymphoma and chronic lymphocytic lymphoma which showed an increased OR of 3.35 (1.42-7.89). A multivariate analysis of glyphosate controlling for other agents with statistically

increased odds ratios and/or odds ratios greater than 1.5 yielded an OR of 1.51 (0.77-2.94). In a similar analysis to the multivariate analysis, latency periods of one to ten years showed an OR of 1.11 (0.24-5.08) and >10 years had an OR of 2.26 (1.16-4.40). This study was much larger than the previous Swedish studies (2.3% exposed) and, although there may have been confounding from other pesticides, this was addressed in the multivariate analysis and the latency analysis. This study is a valid case-control study and will be used in the evaluation of causality.

**McDuffie et al. (2001)**[50] recruited incidence cases of NHL in men 19 years or older from six Canadian provinces with a first diagnosis between September 1, 1991 and December 31, 1994. Each provincial Cancer Registry or, in the case of Quebec, hospital, had a target number of cases and ended recruitment when the case number was reached. Controls were men 19 years or older selected at random from provincial health insurance records, computerized telephone listings or voter registration lists, depending upon the province. Cases and controls were sent questionnaires with surrogates ineligible to answer the questionnaires for deceased cases or controls. Each subject who reported 10 hours per year or more of pesticide exposure and a random sample of 15% who reported less exposure were interviewed by telephone to obtain details on pesticide use. A pilot study was conducted to obtain an improved version of the telephone interview questionnaire used by **Hoar et al. (1986)**[52] and **Zahm et al. (1990)**[51] that would provide accurate pesticide exposure assessment in the form of a screening questionnaire and a telephone interview questionnaire. This was followed by a validation study (27 farmers) where the final questionnaires used to screen and include potential cases and controls were administered and the answers regarding pesticide usage showed excellent concordance with purchases through their local agrochemical supplier. The screening questionnaire was returned by 517 cases of NHL (67.1% response rate) and 1506 controls (48% response rate). Following analysis of the screening questionnaire, the telephone interview was administered to 179 cases and 456 controls to obtain more detailed exposure information. The OR for glyphosate exposure and NHL was 1.26 (0.87-1.80) stratified by age group and province of residence and the OR was 1.20 (0.83-1.74) when the analysis also controlled for significant medical variables (51 exposed cases and 133 exposed controls). An exposure-response evaluation was performed where the OR for exposure between zero to two days per year was 1.0 (0.63-1.57) and for greater than two days per year was 2.12 (1.20-3.73) with the latter group having 23 exposed cases and 36 exposed controls. This study had excellent sample size and power (8.1% of subjects exposed), but a low response rate to the screening questionnaire. Also, by adjusting for significant medical variables, this study ruled out many confounders but did not adjust for other pesticide exposures. The effort to validate the recall of pesticide usage for farmers supports a lack of recall bias in the study. This study is a valid case-control study and will be used in the evaluation of causality.

**Hohenadel et al. (2011)**[48] re-analyzed the data of **McDuffie et al. (2001)**[50] to specifically investigate the impact of exposure to multiple pesticides on NHL. Four cases of NHL were excluded from this evaluation following a pathology review. They reported associations with the use of glyphosate with and without malathion but not with

11

glyphosate overall.  The OR for glyphosate (ever used) without malathion (ever used) was 0.92 (0.54-1.55) and the OR for glyphosate (ever used)  with malathion (ever used) was 2.1 (1.31-3.37).  **Chang and Delzell (2016)**[38] combined the ORs from the glyphosate only analysis with the glyphosate and malathion analyses using random-effects meta-analysis to get a combined OR for glyphosate of 1.4 (0.62-3.15).  This study was specifically targeted to interactions of various pesticides and does not substantively contribute to an evaluation of glyphosate.  Since it is a refined analysis of **McDuffie et al. (2001)**[50], it will be included in the evaluation of causation only in the context of the combined analysis provided by **Chang and Delzell (2016).**

**Orsi et al. (2009)**[47] conducted a hospital-based case-control study of men and women diagnosed with lymphoid neoplasms in five hospitals in France between 2000 and 2004 who were aged 20-75 years (the abstract gives the age range as 18-75 years). All diagnoses were cytologically or histologically confirmed.  The evaluation only included men and questionnaires/interviews were completed by 491 cases (95.7% response rate) which included 244 cases with NHL.  Controls were patients in the same hospital (mostly orthopedic or rheumatological patients) with no prior history of lymphoid neoplasms and excluding patients admitted to the hospital for cancer or a disease directly related to occupation, smoking or alcohol abuse.  The controls were matched to cases by hospital and age. Of the 501 candidate controls, 456 participated (91% response). Exposure was evaluated differently for subjects who had non-occupational exposures from those who had occupational exposures.  For both, the subjects had to fill out a questionnaire/interview on occupations and home gardening pesticide exposures.  For those who had worked professionally as farmers or gardeners for at least 6 months, a specific agricultural occupational questionnaire/interview was administered and exposure was determined on the basis of this extra data. The OR for occupational use of glyphosate and NHL was 1.0 (0.5-2.2) with 12 exposed cases and 24 exposed controls stratified by age and center category.  A further analysis was done by individual subtypes of NHL with an OR of 1.0 (0.3-2.7) for diffuse large cell lymphoma, 1.4 (0.4-5.2) for follicular lymphoma, 0.4 (0.1-1.8) for chronic lymphocytic leukemia (CLL) and 1.8 (0.3-9.3) for HCL.  No separate analysis of non-occupational use of glyphosate was provided, nor does it seem specific data on glyphosate usage was ascertained for subjects who were not professional farmers or gardeners.  This could lead to non-differential misclassification of exposure which could reduce the ORs of the study.  Barring this, the sample size was sufficient to detect an effect (5.3% with occupational exposure) and this study will be included in the evaluation of causality.

**Cocco et al. (2013)**[49] evaluated data from a multi-center case-control study of lymphoid neoplasms in six European countries from 1998 to 2004.  Cases included only adult patients diagnosed with lymphoma during the study period drawn from participating centers.  Controls were either selected by sampling from the general population on sex, age group, and residence area (Germany, Italy), or from hospital controls matched to the patient excluding patients with cancer, infectious diseases, and immunodeficiency diseases (Czech Republic, France, Ireland, Spain).  The study included 2348 lymphoma cases (88% participation) and 2462 controls (81% response rate in hospital-based controls and 52% in population-based controls).  Exposures were derived using an

12

occupational exposure matrix developed by industrial hygienists and occupational experts from the research centers. Only 35 individuals (cases and controls not broken out) in the study were exposed to carbamates (glyphosate was grouped with the carbamates). No results were provided for NHL and the only OR provided for glyphosate was for B-cell lymphoma where the OR was 3.1 (0.6-17.1) based on four exposed cases and two exposed controls. No information was provided on the total number of cases for each type of lymphoma evaluated. This study has very limited power to evaluate an association between NHL and glyphosate and provides only information on B-cell lymphomas with very few exposed cases and controls. As has been done by most researchers evaluating these data, this study will receive very little weight in the evaluation of causality.

**De Roos et al. (2005)**[45] reported results on the association of glyphosate and cancer incidence from the Agricultural Health Study (AHS), a prospective cohort study in Iowa and North Carolina, which included 57,311 private and commercial applicators who were licensed to apply restricted-use pesticides at the time of enrollment. Recruitment occurred between 1993 and 1997 and cohort members were matched to cancer registry files to identify cases and the National Death Index (1999) to ascertain vital status. Incident cancers were identified from the date on enrollment until 31 December, 2001, with the average follow-up time being 6.7 years. Comprehensive use data was obtained by self-administered questionnaire for 22 pesticides, ever/never use for 28 additional pesticides, and general information on work practices. Applicators were given a second self-administered questionnaire on occupational exposures and lifestyle factors. They used three exposure metrics in their analyses: a) ever personally mixed or applied pesticides containing glyphosate; b) cumulative exposure days of use of glyphosate (years of use times days per year); and c) intensity weighted cumulative exposure days (years of use times days per year times intensity of use). Persons whose first primary tumor occurred before the time of enrollment (1074) were excluded from the analysis as were those who were lost to follow-up (298), did not provide age information (7) or information on glyphosate use (1678) leaving 54,315 subjects for inclusion. There were 92 cohort members with a diagnosis of NHL during the study period of which 77.2% had ever used glyphosate resulting in a rate ratio[4] (RR) of 1.2 (0.7-1.9) when controlling for age and an RR of 1.1 (0.7-1.9) when controlling for age, lifestyle factors, demographics and five other pesticides for which cumulative-exposure-day variables were most highly associated with glyphosate cumulative-exposure-days (2,4-D, alachlor, atrazine, metalochlor, and trifluralin) or, for chemicals with only ever/never exposure information that were most highly associated with glyphosate ever/never use (benomyl, maneb, paraquat, carbaryl and diazinon). When cumulative exposure days in exposed individuals are divided into tertiles and RRs examined using the lowest exposed tertile as

---

[4] The rate ratio (RR) is estimated as the incidence in the exposed population divided by the incidence in the unexposed population. Incidence is calculated as the number of events in a fixed period of time divided by the person years at risk. Unlike the OR, the RR does not require the assumption of a rare disease to serve as a good estimate of the population risk ratio (PRR).

the reference group, the RRs drop with values of 0.7 (0.4-1.4) and 0.9 (0.5-1.6) for tertiles 2 and 3 respectively controlling for demographic and lifestyle factors and other pesticides (30,699 subjects).  When intensity-weighted exposure days are examined again using exposed tertile 1 as the reference group, the RRs drop with values of 0.6 (0.3-1.1) and 0.8 (0.5-1.4) for tertiles 2 and 3 intensity-weighted exposure days respectively controlling for demographic and lifestyle factors and other pesticides (30,699 subjects).  Analyses are not shown for the evaluation of the exposed tertiles against never exposed because the authors felt that never exposed and exposed subjects differed in terms of socio-economic factors and other exposures like smoking[45].

This is a typical cohort study, but has some limitations in terms of its interpretation.  The majority (75.5%) of subjects in the cohort reported having ever personally mixed or applied products containing glyphosate and was composed primarily of male, middle-aged, private applicators. For glyphosate, reliability of the answers by subjects on the use of glyphosate between the first and second questionnaire were evaluated in the AHS[53]: 82% agreement for whether they had ever mixed or applied glyphosate, 53% agreement on years mixed or applied, and 62% agreement on days per year mixed or applied and 62% agreement on decade first applied.  They saw no differences in over versus under reporting between the two questionnaires suggesting this could lead to non-differential exposure bias and reduce the RRs in this study.  Another weakness, noted by the authors, is that the small number of incident cases during follow-up period hindered precise effect estimates. Also, the high frequency of exposure to many pesticides (e.g. 73.8% were exposed to 2,4-D) means subjects unexposed to glyphosate were likely to be exposed to other agents that may also induce NHL, reducing the RRs. Also, as noted by the EPA's FIFRA Science Advisory Panel (SAP)[54] in their review of the EPA's issue paper on the carcinogenicity of glyphosate and as noted in a critique[55] of the European Food Safety Agency's risk assessment for glyphosate, the follow-up time in this cohort study may not be long enough to produce a sufficient sample size for evaluation of the association between NHL and glyphosate.  Like other studies, this study has few exposed cases and controls, but the authors adjust their analysis for many other pesticides which could reduce ORs and increase confidence bounds limiting the ability of the study to show positive results.  This study could also suffer from a survival bias because pesticide applicators were recruited as case participants after their exposure had begun and those with a cancer prior to enrollment were excluded.

This study will be included in the evaluation of causality.

## Consistency of Associations

Hill (1965)[36] defines consistency as the answer "yes" to the question "Has it repeatedly been observed by different persons, in different places, circumstances and times?"  For these studies, the answer is indeed yes.

If the population relative risk (PRR) for an association of glyphosate with NHL were equal to 1 (no effect), then one would expect very few statistically significant results in multiple studies and that about half of the studies would have ORs or RRs below one

and half above one. As noted by both the **IARC Monograph 112 (2015)**[56] and by **Chang and Delzell (2016)**[38], when comparing studies, the most reasonable comparison is to use the most-fully-adjusted risk estimates. I will mostly limit my comments to these most-fully-adjusted risk estimates.

Consistency of the associations across several epidemiology studies is not simply a matter of seeing how many were statistically significant and how many were not but must also address the consistency of the direction of the responses. Figure 1 shows a forest plot of all ORs and RRs from the epidemiology studies discussed previously. Each horizontal line in the forest plot shows the mean estimate of the OR/RR as a black square and the 95% confidence interval around this estimate as whiskers extending left and right from the black square.

The first obvious conclusion to be drawn from Figure 1 is that all of the mean OR/RR estimates (black squares) are consistently $\geq 1$. This implies that all of the studies are pointing in the same direction toward a positive effect. In their meta-analyses, **Schinasi and Leon (2014)**[57], **IARC (2015)**[56] and **Chang and Delzell (2016)**[38] all identified 6 papers (highlighted in red in Figure 1) as being the most reliable for evaluation of the ability for glyphosate to induce NHL in people: **McDuffie et al. (2001)**[50], **Hardell et al. (2002)**[42], **De Roos et al. (2003)**[43] and **(2005)**[45], **Eriksson et al. (2008)**[46] and **Orsi et al. (2009)**[47]. I will refer to these papers as the six core epidemiology studies. As noted above, if the true underlying risk ratio was 1 (no effect), you would expect about half of the findings to be below 1 and half to be equal to 1 or greater. Using only the results from the 6 core studies, you can see that all are $\geq 1$; the probability of this happening is $(0.5)^6$ or 0.016, strongly suggesting the studies do not agree with an underlying PRR=1 and that they consistently support a positive effect.

A second way in which consistency can be evaluated is to combine the individual studies using meta-analysis to obtain a combined analysis using both the ORs and the RR (CRR) and test for heterogeneity in the studies. The meta-analysis done by **Chang and Delzell (2016)** includes the same analysis as that done by the **IARC (2015)** and is an improvement over **Schinasi and Leon (2014)**, so I will focus my comments on using the **Chang and Delzell (2016)** meta-analysis. **Chang and Delzell (2016)** did four separate meta-analyses on the glyphosate epidemiology studies using two different methods (random-effects and fixed-effects models). In their first analysis (model 1)[5], they combined the most-fully-adjusted risk estimates from the six core studies to yield a CRR of 1.27 (1.01-1.59) for both random-effects and fixed-effects models supporting an association between NHL and glyphosate exposure in these studies. In a second analysis (model 2), they replace the results of the Bayesian analysis in **De Roos et al. (2003)** with the results of the logistic regression analysis and get the same CRR of 1.30 (1.03-1.64) for both random-effects and fixed-effects models. In a third analysis (model 3), they replace from model 1 the **McDuffie et al. (2001)** results in with a combined meta-

---

[5] **Chang and Delzell (2016)** provided only one significant digit to the right of the decimal point in their confidence bounds; the EPA SAP (2017) re-calculated models 1-4 of **Chang and Delzell (2016)** to provide two significant digits – these are presented here.

15

analytic result they derived from analyses by **Hohenadel et al. (2011)** (this study reanalyzed the same data as **McDuffie et al. (2001)**, splitting results between asthmatics and non-asthmatics) resulting in a CRR of 1.32 (1.00-1.73) for both random-effects and fixed-effects models.  Finally, in a fourth analysis (model 4), they use model 3 but replaced the Bayesian analysis in **De Roos et al. (2003)** with the logistic regression analysis yielding a CRR of 1.37 (1.04-1.82) for both random-effects and fixed-effects models.  In essence, none of the different meta-analyses rejected the notion of a combined, statistically significant positive effect.

**Figure 1:** Odds Ratios and Rate Ratios from the most-fully-adjusted risk estimates from selected epidemiology studies and from the meta-analyses of **Chang and Delzell (2016)**[38]. "RR" refers to the OR or RR from the study, "Lower" refers to the 95% lower bound, "Upper" to the 95% upper bound and "Weight" refers to the weight applied to that specific study in Model 1 of the meta-analysis (Table 3 in Chang and Delzell). For **De Roos et al. (2003)**, the first row is for the Bayesian model analysis and the second row, labelled "logistic regression" is from the logistic model analysis.



As stated above, another way to evaluate consistency in the epidemiological data would be to evaluate the heterogeneity in the studies.  Heterogeneity may be due to differences in participants, outcomes, exposure metrics, methods for questioning study subjects, sex of the subjects, etc. **Chang and Delzell (2016)** formally tested for heterogeneity of the responses from the six core studies using Cochran's Q statistic and the $I^2$ statistic[58].  For models 1 to 4, the p-values from Cochran's Q test are 0.84, 0.59, 0.85, and 0.63 respectively (typically you reject the concept of homogenous studies in favor of heterogeneous studies if p<0.10).  The $I^2$ statistic for all four models are 0.0% (values for $I^2$ can range from 0-100% with concern for heterogeneity above 50%).  The fact that the fixed-effects models and random-effects models gave the same results also supports a lack of heterogeneity in the data.  There is no indication of heterogeneity in these six core studies. Lack of heterogeneity supports the interpretation of the meta-analyses as showing a positive association and strong consistency of the findings across the six core studies.

**Chang and Delzell (2016)** also evaluated the association between subtypes of NHL and glyphosate exposure where possible. For B-cell lymphomas, they combined the results of **Eriksson et al. (2008)**[46]with those of **Cocco et al. (2013)**[49] and saw a CRR (random-effects and fixed-effects) of 2.0 (1.1-3.6) with an $I^2$ of 0 and a Cochran's Q test p-value of 0.58. For diffuse large B-cell lymphomas, they combined the results of **Eriksson et al. (2008)**[46] with those of **Orsi et al. (2009)**[47] and saw a CRR (random-effects and fixed-effects) of 1.1 (0.5-2.3) with an $I^2$ of 0 and a Cochran's Q test p-value of 0.79. For combined chronic lymphocytic leukemia and small lymphocytic lymphoma, they combined the results of **Eriksson et al. (2008)**[46] with those of **Orsi et al. (2009)**[47] and saw a CRR using the random-effects model of 1.3 (0.2-10) and for the fixed effects model 1.9 (0.9-4.0) with an $I^2$ of 83.7% and a Cochran's Q test p-value of 0.01. For follicular lymphomas, they combined the results of **Eriksson et al. (2008)**[46]with those of **Orsi et al. (2009)**[47] and saw a CRR (random-effects and fixed-effects) of 1.7 (0.7-3.9) with an $I^2$ of 0 and a Cochran's Q test p-value of 0.73. And finally, for HCL, they combined the results of **Nordstrom et al. (1998)**[40] with those of **Orsi et al. (2009)**[47] and saw a CRR (random-effects and fixed-effects) of 2.5 (0.9-7.3) with an $I^2$ of 0 and a Cochran's Q test p-value of 0.63. These subtype analyses are based upon small numbers of cases and only two studies making them unreliable, when considered individually, to address the question of consistency in the data. However, when they are combined with the results for the meta-analyses of the core studies of NHL, these studies add support to the conclusion that these data are consistent.

**Chang and Delzell (2016)** also performed a sensitivity analysis by only doing meta-analyses on studies with similar characteristics. Using only the five case-control studies, the CRR was 1.3 (1.0-1.7). Breaking them into the type of control used, there were four studies using population controls with a CRR of 1.4 (1.0-1.8). There were four studies with males only with a CRR of 1.3 (1.0-1.7) and two studies with males and females with a CRR of 1.2 (0.8-1.8). Three studies were done in North America with a CRR of 1.2 (1.0-1.6), three in Europe with a CRR of 1.3 (0.8-2.1); two of the three studies were in Sweden with a CRR of 1.6 (0.9-2.8). All of the resulting meta CRRs were the same for the fixed-effects model and the random-effects model. This sensitivity analysis shows that the results do not differ significantly from the main CRR for the six core studies combined adding support to the findings being consistent across the different studies.

In case-control studies, selection bias arises when the reasons cases and controls choose to participate in the study could lead to systematic biases that might result in a positive or negative finding independent of the exposure being studied. For example, if cases with exposure are more likely to participate than controls with exposure, the result would be higher OR values; however, this difference has to be differential and not simply a difference in participation rates. It is possible that in a few of these studies, the method by which controls were selected could contribute to selection bias that might lead to increased ORs. However, given the diverse types of cases and controls used in the five core case-control studies, this is unlikely to explain the consistent findings seen from these studies. It is also possible that the lack of complete data on cases versus controls could result in selection bias if the reasons for not completing the questionnaire/interview are different between cases and controls and relates to

17

exposure. There is no indication of this type of selection bias in these reports, and this is unlikely to explain the consistency seen in these data.

Exposure misclassification can lead to increases or decreases in the OR or RR values seen in both case-control and cohort studies. For example, in case-control studies, if cases are more likely to say they were exposed to glyphosate than controls, this would inflate the OR values; this is one type of recall bias. This type of bias is less likely in cohort studies. In all six of the core studies, this issue was discussed by the authors. In every case, they concluded there was bound to be some exposure misclassification, but that it was most likely non-differential, meaning that the misclassification was random; this would likely reduce the OR/RRs seen in the studies rather than increase them.

Confounding occurs when there is an exposure or some other factor that is tightly associated with both glyphosate exposure and NHL diagnosis that, if controlled for, could explain the results. The most likely source of confounding in these studies would be exposures to other pesticides. Four[42, 43, 45, 46] of the six core studies controlled for exposure to other pesticides and saw basically the same findings as the other two studies. Another concern for confounding would be if the cases had immune deficiencies that could be linked to NHL; in all of the case-control studies, such cases were excluded. Finally, other agricultural exposures (e.g. animals, other chemicals, infectious agents) could be correlated with glyphosate exposure and may be linked to NHL; none of the studies controlled for these factors. However, not all exposed cases were farmers; if confounding via other agricultural exposures is occurring, it is not possible to determine the magnitude or direction of such an effect from these data.

In conclusion, we have six core epidemiology studies done on two different continents by four different research groups using different designs, questionnaires and study populations that are highly consistent with no obvious bias or confounding that would explain the results. **There is a consistency of associations across the six core studies.**

## Strength of the Association seen in Human Epidemiological Studies

To explain strength of association, **Hill (1965)** gives the classic example of John Snow and the cholera epidemic of 1855 where the risk ratio of dying if you drank water from the Southwark and Vauxhall Company (polluted by sewage) compared to drinking from the Lambeth Company water (sewage free) was 14. Yet, for the six core studies, the OR/RR ranges from 1.0 to 1.85 for the most-fully-adjusted risk estimates and to 2.1 if you include the fully adjusted risk estimate from De Roos et al. (2003)[45] using logistic regression. These are moderate OR/RR estimates making it conceivable they are individually due to either chance or bias. Thus, with the exception of the logistic regression analysis in **De Roos et al. (2003)**[45], none of the core studies demonstrate large, precise risks as envisioned by **Hill (2016)**[36]. However, **Hill (1965)** was not expressing himself in statistical terms where the significance of an association is dependent upon the precision of the observations. If the statistical variation around an OR/RR estimate is large relative to the estimate itself, the estimate is not very precise

and generally would not be statistically significant. The result from the study by **Hardell and Eriksson (1999)** shown in Figure 1 is an example of an estimate with very large statistical variation. On the other hand, a very small (in value), precise OR or RR estimate could be statistically significant and prove important in deciding causation. The meta-analyses estimates shown in Figure 1 all demonstrate estimates of OR/RR that are significantly different from 1 rejecting the concept that the overall association is due to chance. The statistically significant estimate of the OR/RR for B-cell lymphomas in the meta-analysis support this finding as well.

In summary, we have six core epidemiology studies that all show approximately the same, modest increase in OR/RR that, when combined, demonstrate a significant strength of association. **There is a strong association across the six core studies**

## Biological Plausibility

The range of data one can use to determine biological plausibility is quite diverse and can be exceptionally complicated. For simplicity, it can be divided into the types of assays that can be used in this evaluation: animal cancer bioassays, toxicokinetic studies, studies from accidental exposures in humans, and studies of specific biological mechanisms in animals or cells derived from humans or animals. Animal cancer bioassays are intended to test whether glyphosate can cause cancers in mammals, thus supporting the concept that the chemical could cause cancer in humans. Toxicokinetic studies provide insight into the degree to which glyphosate is absorbed by humans, distributed to various organs in the body, what happens to the chemical once it is in the body (metabolism), and, finally, how it is eliminated from the body. Studies from accidental exposures in humans can provide some information on the effects of glyphosate through changes in the chemistry and cellular structure of human blood. Studies of biological mechanisms are generally addressing what effects the chemical may have on human and animal cells under controlled, laboratory conditions. Some of the studies in this section were done with technical grade (virtually pure) glyphosate and some with the glyphosate formulations that humans encounter in occupational and environmental settings. I will summarize the literature in each of these areas and offer an opinion to their support of biological plausibility of NHL in humans.

### Animal Cancer Bioassays

Typical animal cancer bioassays will expose animals (generally rats or mice) to a chemical for a substantial proportion of the animal's life (generally 2 years) then kill the animal and examine its organs and tissues for tumors. There are guidelines on how to conduct and analyze these studies. Typically, chemical registrants conduct cancer bioassays for pesticide approval pursuant to guidelines developed under the guidance of the Organization for Economic Cooperation and Development (OECD[59]). Other groups[30, 33, 34] provide guidance on how to analyze these studies based upon methodology papers from the published literature. These studies are conducted in a way that controls for everything in the animal's environment (e.g., food type, water quality, how often the animals are handled) leaving only the exposure to explain

differences in tumor formation between control and exposed animals. Even then, non-cancer endpoints can also be modified by the chemical and these may have an impact on tumor rates in the animals (e.g., survival, death from some other toxic effect of the chemical); these must be accounted for when reaching conclusions from the study.

Studies generally use four groups of animals, one group receiving no exposure (control) and the remaining three groups are test animals, with each group receiving different dose exposures to the chemical[60]. Doses generally above human experience are used in animal carcinogenicity studies because only relatively small numbers of animals are being used to evaluate risk for a large human population and because even the best known human carcinogens do not cause cancer in large fractions (say 20%) of the human population. The basic underlying premise of this design consideration is that, as the dose increases, so does the risk of getting a tumor. By exposing animals to the highest dose possible, you increase the ability of the study to identify a risk if one is present. However, one must be careful not to use a dose that is so high it will cause cancers by processes that would never work at lower doses. To avoid this, studies are designed around a maximum tolerated dose (MTD) or limit dose. This dose is generally determined based upon a subchronic study (90 days) in the same animals and is usually the maximum dose that can be tolerated by the animals without any signs of significant toxicity in the exposed animals (e.g., weight loss, tissue damage). The OECD and EPA provide guidelines[33, 59] on how to choose this top dose. These guidelines are in general agreement with the scientific literature[60].

The guidelines also address the methods by which the data should be analyzed. For example, the EPA guidelines[61] state that:

*"A trend test such as the Cochran-Armitage test (Snedecor and Cochran, 1967) asks whether the results in all dose groups together increase as dose increases. A pairwise comparison test such as the Fisher exact test (Fisher, 1950) asks whether an incidence in one dose group is increased over that of the control group. By convention, for both tests a statistically significant comparison is one for which p is less than 0.05 that the increased incidence is due to chance. Significance in either kind of test is sufficient to reject the hypothesis that chance accounts for the result."*

In fact, most guidelines and peer-reviewed publications come to the same conclusion[30, 59, 60, 62] on what tests to use, as did EPA's FIFRA Scientific Advisory Panel (SAP) in their review of the EPA's issue paper of the carcinogenicity of glyphosate[54]. The US National Toxicology Program (NTP) uses both a trend test[3, 4, 63] and Fisher's exact test for analyzing carcinogenicity data. Unless otherwise noted in this document, all p-values presented in this section on animal cancer studies were recalculated on my computer and are the exact one-sided p-values for the Fisher test ($p_{Fisher}$) and/or the Cochran-Armitage linear trend test ($p_{Trend}$) where appropriate. In cases where the data is pooled and the numbers of tumors are large, the approximate p-value based upon the normal distribution is used for the trend test to avoid excessive computation time; these are noted as $p_{TrendA}$. The approximation ($p_{TrendA}$) is generally equivalent to the exact p-value ($p_{Trend}$) when there are more than 10 animals with tumors[64].

To avoid doing large numbers of tests and over-analyzing the data, my comments will generally rely upon the use of the trend test with the results from Fisher's exact test serving as a descriptive discussion of the findings. This is in agreement with SAP comments[54] and is generally accepted in the evaluation of animal cancer studies.

Even with the high doses used in these studies, it is sometimes necessary to use "historical controls" to evaluate a given response. Historical controls are generally the historical collection of tumor responses from untreated control groups from studies in the same laboratory within two to three years of the study being evaluated[30, 34, 59, 65, 66]. Evaluation of the data using the historical controls should be done rigorously to correctly evaluate the responses seen in a given study. Where a valid historical control dataset was available, I used the mean tumor response in the controls to calculate the probability of observing the trend seen in the study or a more significant trend if the true probability of response is the historical control average; this is labeled $p_{Hist}$. In all cases, the guidelines and literature support the use of the control in the current study as the most appropriate control group to use unless there is a specific need to address historical responses. Many guidelines[30, 33, 34, 67] suggest historical controls be used for evaluating rare tumors and findings in assays that appear to be unusual. It is explicitly noted that significant increases in tumors over what is seen in the concurrent control should not be rejected simply because the tumors are in the range of the historical controls[30]. Nor is it recommended to reject significant increases in tumor responses because the control response is on the low end of the historical range. Animals are randomly assigned to control and exposure groups and any low response in controls is likely to also reflect similar response patterns in treated animals. This is in agreement with SAP comments[54] on the EPA issue paper on glyphosate[61] and with all guidelines for analyzing animal carcinogenicity data.

There are 13 animal carcinogenicity studies in rats[68-80] and eight in mice[81-88]. Only two studies[71, 77] appear in the peer-reviewed literature; the remaining studies are partially available through several sources. For three of the rat studies[70, 74, 78] and two mouse studies[83, 86], technical reports from the performing laboratory are available from documents provided by the registrant. For the remaining unpublished studies, data was obtained from the EPA review of glyphosate[61], the European Food Safety Authority review of glyphosate[89, 90] and supplemental material from a review of the carcinogenicity of glyphosate by a panel of scientists on behalf of Monsanto[91].

Many additional endpoints, other than cancer incidence and related toxicities, were evaluated in these studies; I will only provide comments on the tumor incidence data and related data where relevant to the cancer findings.

It is unusual to have multiple carcinogenicity studies in the same experimental animal model arising from different laboratories. Methods for the combined analysis of multiple animal cancer bioassays are not available in the scientific literature. However, pooled analyses, as conducted in epidemiology[92, 93] are applicable for combining animal carcinogenicity studies. The basic concept is to pool all data from the same sex/species/strain into one study and analyze it appropriately. The basic steps are: 1) select the studies to be pooled; 2) merge the data for analysis; 3) estimate study specific

21

effects; 4) estimate pooled effects; 5) explain the differences between the pooled effects and the individual study effects; 6) do a sensitivity analysis if possible. These steps will be used to analyze pooled data from animal carcinogenicity studies where pooling is done by sex, species, strain and duration of exposure to limit heterogeneity across pooled studies. In their recommendations to the EPA regarding EPA's issue paper on the carcinogenicity of glyphosate[54], the FIFRA Science Advisory panel strongly supported the use of a pooled analysis to address the question of consistency citing my comments to the EPA[94].

### Rat Studies

**Reyna and Gordon (1974)[76]** exposed Albino rats (probably Sprague-Dawley) to ammonium salt of glyphosate (13.85% purity) in a two-year chronic feeding study. Only EPA[61] reported on this study and provided no details other than to report there were approximately 70 animals per group and there was insufficient reporting on the histopathology findings. Insufficient detail is available on this study.

This study is inadequate for use in deciding on causality.

**Burnett et al. (1979)[70]** exposed male and female albino rats to an aqueous monosodium salt solution of glyphosate by oral intubation (purity not given). There were 90 animals per group and doses were 0, 3, 10 and 30 mg/kg/day for 24 months. EPA[61] reported that no histopathological alterations were observed; no additional information was available on this study. This study had severely reduced sensitivity to observe any cancer findings because the highest dose used in this study is very low compared to the MTDs in the other rat studies. This study does not contribute to the evaluation of cancer causation in laboratory animals and will be excluded from any further discussion.

**Lankas et al. (1981)[74]** exposed groups of 50 male and 50 female Sprague-Dawley rats to glyphosate (98.7% purity) in feed (see Table 1 for doses) for 26 months. This study is not in concordance with OECD guidelines (they were not available at the time of this study), but as noted by EFSA[89], it was in general accordance with the 1981 OECD guidelines. Information on this study was available from EPA[61], EFSA[89], Greim et al.[91], the original study report from Bio/dynamics Inc.[95] and memos from Monsanto to EPA provided by Monsanto.

There were no survival differences in this study and there was no indication that the highest dose used exceeded the maximum-tolerated dose.

Table 1 shows the statistically significant trend in testicular interstitial cell tumors that was observed ($p_{Trend}$=0.009). Historical controls were provided in the study report for five studies with response rates of 4/116, 5/75, 4/113, 6/113 and 5/118 for a mean response of 4.5% (24/535). Comparing this historical control mean to the observed response yields $p_{Hist}$=0.006, showing that this result is significant, even when comparing it to the historical control dataset. **Lankas et al. (1981)** argued that the tumor rates at sacrifice were not statistically significant from control suggesting this finding is not related to glyphosate. However, by reducing the numbers of animals to only those at

terminal sacrifice, the power to find an effect was significantly reduced. Also, if the tumor increases the animal's chances of dying, then some animals with tumors will die early, which could bias results only seen at terminal sacrifice. This type of analysis is simply never done; it appears to have been developed for this case to dismiss the effects seen in the study. **Lankas et al. (1981)** also suggested the control response was low compared to the historical rates, but the concurrent control is always the best control group to use unless it is clearly flawed[33, 34, 59]; in this case, there was no apparent problem with the controls because the probability of seeing 0/50 if the true background response is 4.5% is about 10% and this control group is not significantly different than the historical controls. **EFSA**[89] noted rates for interstitial cell hyperplasia (a potential precursor for the interstitial cell tumors) and saw no dose-response trend (Table 1). However, these very low rates would suggest that the tumors arising in the 10 animals that did get interstitial cell tumors are independent of a mechanism involving interstitial cell hyperplasia. The tumor response for interstitial cell tumors was not monotonic (tumor rates increasing as dose increases), but was still within statistical variation. The EPA SAP agrees, concluding that "requiring visual confirmation of a monotonic trend in scatter plots of data ... is known to be a poor way of assessing trend"[54].

An increase in Thyroid C-cell carcinomas (Table 1) was observed in female rats ($p_{Trend}$=0.003) but combining adenomas and carcinomas was only marginally significant ($p_{Trend}$=0.072). Independent pathologists brought in by Monsanto argued these tumors were not treatment related. The authors provided historical control data for both carcinomas and carcinomas combined with adenomas from nine control groups with mean responses of 4/453=0.9% for carcinomas and 46/453=10.2% for the combined tumors. The significance of both results was unchanged using the historical control data.

The authors also mentioned that the incidence of lymphocytic hyperplasia in the thymus and lymph nodes were slightly elevated above controls ($p_{Trend}$=0.143). The middle dose group was significantly different from controls ($p_{Fisher}$=0.018).

This study also had a statistically significant increase in pancreatic islet cell tumors in the lowest dose ($p_{Fisher}$=0.028) in males (Table 1), but not any of the other doses; the trend test was not significant ($p_{Trend}$=0.312).

The highest dose used in this study in Sprague-Dawley rats is far below the MTD. Even though EFSA[89] noted that this study was in general accordance with the 1981 OECD guidelines, they dismissed it for not meeting current guidelines due to the low-doses used. EPA[61] also excluded this study from consideration. However, the study saw an increase in testicular tumors in males and Thyroid C-cell carcinomas in females that should be carefully evaluated in determining causality. Also, this is the study with the longest exposure (26 months) and provides unique information to the overall evaluation.

Additional tumors seen to have significant increases in other studies using Sprague-Dawley Rats are also included in Table 1.

23

**Table 1:** Tumors of interest in male and female Sprague-Dawley rats the 26-month feeding study of **Lankas (1981)**[74]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 3.05 | 10.30 | 31.49 | |
| | Female | 0 | 3.37 | 11.22 | 34.02 | |
| Testicular interstitial cell tumors | Male | 0/50 | 3/50 | 1/50 | 6/50** | $P_{Trend}$=0.009 $P_{Hist}$=0.006 |
| Interstitial cell hyperplasia | Male | 1/50 | 1/50 | 1/50 | 0/50 | $P_{Trend}$=0.830 |
| Thyroid C-cell Carcinomas | Female | 1/47 | 0/49 | 2/50 | 6/47 | $P_{Trend}$=0.003 $P_{Hist}$=<0.001 |
| Thyroid C-cell Adenomas and Carcinomas | Female | 6/47 | 3/49 | 8/50 | 9/47 | $P_{Trend}$=0.072 $P_{Hist}$=0.072 |
| Pancreas Islet Cell Tumors | Male | 0/50 | 5/50* | 2/50 | 3/50 | $P_{Trend}$=0.312 |
| lymphocytic hyperplasia, thymus and lymph nodes | Female | 27/50 | 35/50 | 38/50* | 35/50 | $P_{Trend}$=0.143 |
| Thyroid C-cell Adenomas and Carcinomas | Male | 1/47 | 2/49 | 4/49 | 4/49 | $P_{Trend}$=0.122 |
| Thyroid Follicular-cell Adenoma | Male | 5/47 | 1/49 | 2/49 | 2/49 | $P_{Trend}$=0.748 |
| Liver Neoplastic Nodule | Male | 3/50 | 5/50 | 1/50 | 3/10 | $P_{Trend}$=0.630 |
| Kidney Adenoma | Male | 1/50 | 5/50 | 0/50 | 0/50 | $P_{Trend}$=0.979 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01

In conclusion, this study shows positive result for testes interstitial cell tumors and hepatocellular adenomas in male Sprague-Dawley rats and a positive response for thyroid c-cell carcinomas in female Sprague-Dawley rats and will be included in the overall evaluation of causation.

**Stout and Ruecker (1990)**[78] exposed groups of 50 male and 50 female Sprague-Dawley rats to glyphosate (98.7% purity) in feed (see Table 2 for doses) for 24 months. This study was done under OECD guidelines.

There were no survival differences in this study and there was no indication that the highest dose used exceeded the maximum-tolerated dose.

Pancreatic islet cell tumors were increased in all dose groups relative to the controls in male rats and statistically significant for the lowest ($p_{Fisher}$=0.015) and highest ($p_{Fisher}$=0.032) dose groups (Table 2). However, these rates include the 10 animals that were sacrificed at one year. Due to the short duration of exposure, the rats terminated at one year were likely not at risk of developing this tumor; it is very unusual to include these animals in the final tumor counts (EPA[61] also excluded these animals). In the pathology tables for this study, there were no tumors in any of the 10 animals at the interim sacrifice. Removing these 10 animals does not alter the p-values for trend or

Fisher's exact test. Historical control data for this tumor in this laboratory was reported as 23/432 or 5.3%[96] and a trend comparison against this control rate was not significant ($p_{hist}$=0.15). The lack of a trend is driven by the up and down nature of the response. Assuming the historical rate of 5.3% is correct, the chances of seeing eight or more tumors in 47 animals is 0.003. Similarly, for the mid- and high-doses, this probability is 0.124 and 0.014, respectively. Females did not show an increase in this tumor. The authors provided a table with the combined results for pancreatic islet-cell adenomas and carcinomas from this study with the tumor counts from the **Lankas et al. (1981)**[74] study arguing the results do not show a dose-related increase. Animals studied for 26 months versus 24 months can have very different responses to the same chemical and very different control incidence.

In male rats, there was a statistically significant trend ($p_{Trend}$=0.015) after removal of interim-sacrificed animals for hepatocellular adenomas but a significant increase for adenomas and carcinomas combined ($p_{Trend}$= 0.05, Table 2) and not in females (not shown). Liver carcinomas are generally also provided in a separate analysis, but these data were not provided by the authors (the data would suggest the hepatocellular carcinomas would have a negative trend).

There was also a significant increase in thyroid C-cell adenomas in the female rats ($p_{Trend}$=0.049) and a marginal increase[6] in adenomas and carcinomas combined ($p_{Trend}$=0.052) regardless of whether interim sacrificed animals are included (Table 2). In males, the trend for adenomas was $p_{Trend}$=0.084 and for adenomas and carcinomas was $p_{Trend}$ =0.091. Adenomas were seen in male rats at the interim sacrifice demonstrating that male rats at the interim sacrifice were at risk for this tumor. If these animals are added back into the analysis, the trend test in males has $p_{Trend}$=0.063 for adenomas and $p_{Trend}$=0.068 for adenomas and carcinomas combined.

Several other tumors demonstrating significant findings in other studies of Sprague-Dawley rats are included in Table 2 and do not show significant effects.

In conclusion, the finding of an increased incidence of pancreatic islet-cell tumors in this study cannot easily be ruled out as a chance finding. Findings of significant increases in liver adenomas in male rats with no increases in carcinomas could be due to chance. The findings of significant increases in thyroid c-cell tumors in males and females should be compared with other studies. This study will be included in the overall evaluation of causation.

---

[6] In statistics, it is common to refer to p-values in the range of 0.10>p-value>0.05 as marginal when the target p-value is ≤0.05; this is done to avoid missing trends in data reflected by almost significant findings

**Table 2:** Tumors of interest in male and female Sprague-Dawley rats from the 24-month feeding study of Stout and Ruecker (1990)[78]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 89 | 362 | 940 | |
| | Female | 0 | 113 | 457 | 1183 | |
| Pancreas Islet Cell Tumors (with interim sacrifice) | Male | 1/58 | 8/57* | 5/60 | 7/59* | $P_{Trend}$=0.147 $P_{Hist}$=0.140 |
| Pancreas Islet Cell Tumors (without interim sacrifice) | Male | 1/48 | 8/47* | 5/50 | 7/49* | $P_{Trend}$=0.147 $P_{Hist}$=0.150 |
| Hepatocellular adenomas (without interim sacrifice) | Male | 3/50 | 2/50 | 3/50 | 8/50 | $P_{Trend}$=0.015 |
| Hepatocellular Adenomas and Carcinomas (without interim sacrifice) | Male | 6/50 | 4/50 | 4/50 | 10/50 | $P_{Trend}$=0.050 |
| Thyroid C-Cell Adenomas (with interim sacrifice) | Female | 2/60 | 2/60 | 6/60 | 6/60 | $P_{Trend}$=0.050 |
| Thyroid C-Cell Adenomas (without interim sacrifice) | Female | 2/50 | 2/50 | 6/50 | 6/50 | $P_{Trend}$=0.049 |
| Thyroid C-Cell Adenomas and Carcinomas (with interim sacrifice) | Female | 2/60 | 2/60 | 7/60 | 6/60 | $P_{Trend}$=0.053 |
| Thyroid C-Cell Adenomas and Carcinomas (without interim sacrifice) | Female | 2/50 | 2/50 | 7/50 | 6/50 | $P_{Trend}$=0.052 |
| Thyroid C-Cell Adenomas (with interim sacrifice) | Male | 2/60 | 4/60 | 8/60 | 7/60 | $P_{Trend}$=0.063 |
| Thyroid C-Cell Adenomas (without interim sacrifice) | Male | 0/50 | 4/50 | 8/50** | 5/50* | $P_{Trend}$=0.084 |
| Thyroid C-Cell Adenomas and Carcinomas (with interim sacrifice) | Male | 2/60 | 6/60 | 8/60* | 8/60* | $P_{Trend}$=0.068 |
| Thyroid C-Cell Adenomas and Carcinomas (without interim sacrifice) | Male | 0/50 | 6/50* | 8/50** | 6/50* | $P_{Trend}$=0.091 |
| Testis Interstitial Cell Tumors | Male | 2/50 | 0/50 | 3/50 | 2/50 | $P_{Trend}$=0.296 |
| Kidney Adenomas | Males | 0/50 | 2/50 | 0/50 | 0/50 | $P_{Trend}$=0.813 |
| Thyroid Follicular Adenoma/Carcinoma | Males | 2/50 | 1/48 | 3/48 | 3/50 | $P_{Trend}$=0.225 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01

**Atkinson et al. (1993)**[68] conducted a combined chronic toxicity/carcinogenicity study of glyphosate (98.9% pure).   They used 50 Sprague-Dawley rats in each group for both sexes with dietary exposures given in Table 3. An additional 35 rats/sex/dose were included for interim sacrifices.

There were no survival differences in this study and there was no indication that the highest dose used exceeded the maximum-tolerated dose.

**Table 3:** Tumors of interest in male and female Sprague-Dawley rats from the 24-month feeding study of Atkinson et al. (1993)[68]

| Tumor | Sex | Doses (mg/kg/day) | | | | | p-values |
|---|---|---|---|---|---|---|---|
| | Male | 0 | 11 | 112 | 320 | 1147 | |
| | Female | 0 | 12 | 109 | 347 | 1134 | |
| Thyroid Follicular Adenomas and Carcinomas | Male | 0/50 | 0/21 | 0/17 | 2/21 | 2/49 | $p_{Trend}=0.099$ |
| Thyroid Follicular Adenomas and Carcinomas (adding terminal sacrifice animals to denominator) | Male | 0/50 | 0/50 | 0/50 | 2/50 | 2/49 | $p_{Trend}=0.034$ |
| Thyroid C-cell Adenomas and Carcinomas | Female | 8/50 | 1/27 | 1/29 | 1/29 | 7/49 | $p_{Trend}=0.197$ |
| Thyroid C-cell Adenomas and Carcinomas | Male | 9/50 | 1/21 | 1/17 | 2/21 | 9/49 | $p_{Trend}=0.183$ |
| Testes Interstitial Cell Tumors | Male | 3/50 | 1/25 | 0/19 | 0/21 | 2/50 | $p_{Trend}=0.580$ |
| Kidney Adenomas | Males | 1/50 | 0/50 | 0/50 | 0/50 | 0/50 | $p_{Trend}=1$ |
| Hepatocellular Adenomas | Males | 2/50 | 1/50 | 1/50 | 2/50 | 3/50 | $p_{Trend}=0.155$ |
| Pancreas Islet-Cell Adenoma | Male | 0/50 | 0/50 | 0/50 | 0/50 | 1/50 | $p_{Trend}=0.200$ |

*- $p_{Fisher}<0.05$, **- $p_{Fisher}<0.01$

The authors reported no significant effects, as do **EPA**[61] and **EFSA**[89].  The study did not do detailed histopathological examination on all animals in all groups for every tumor type, but did examine all control and high dose animals, all animals that died before study termination and animals showing macroscopic tumors at study termination; liver, kidney and lungs were examined for all animals.  This severely weakens the study for addressing dose-response trends.  However, in reviewing the pathology tables provided in **Greim et al. (2015)**[91], thyroid follicular adenomas and carcinomas were found to be marginally significant ($p_{Trend}=0.099$) by the trend test. If the three middle exposure groups had seen no other tumors and the denominators were the entire 50 animals on study, the trend analysis becomes significant ($p_{Trend}=0.034$).

Without examination of the animals free of gross tumors at terminal sacrifice, the findings from this study will be given less weight in the overall evaluation of causation.

**Brammer (2001)**[69] conducted a two-year carcinogenicity study in Wistar rats in which groups of 52 animals were exposed to glyphosate (97.6% pure) at doses provided in

27

Table 4 . An additional 12 animals were sacrificed at one-year.

A significant positive trend in survival was noted by the EPA (p=0.03), however this trend was not accomplished using a Kaplan-Meir test[97] (the appropriate test), but simply a test relating to the percent surviving to terminal sacrifice.   There was no indication that the highest dose used exceeded the maximum-tolerated dose.

**EPA**[61], but not **EFSA**[89], noted there was a statistically significant trend of hepatocellular adenomas in male rats with the highest dose also being statistically significant from the control.  Trend analysis gives $p_{Trend}$=0.008 and the Fisher's exact test comparison of high dose to control is $p_{Fisher}$=0.027.  EPA dismissed this finding as potentially due to a slight difference in the number of animals at the terminal sacrifice in this study versus controls. However, no formal statistical evaluation of survival is provided and it cannot be assumed from these numbers that survival was significantly impacted in these animals. **Greim et al. (2015)**[91] used slightly different numbers for this tumor because three animals (one in the control group, one in the low-dose group and one in the mid-dose group) in the interim sacrifice group died before their sacrifice time and, from the pathology tables provided in their paper, these could not be separated from others.  These numbers have been included in Table 4, but it does not change the significance of the findings.  **Greim et al. (2015)**[91] dismissed these findings, partly because of the same survival argument used by the EPA and partly because they had a historical control dataset where the range of historical response was from 0-11.5%; they did not provide the mean response or the individual tumor responses for these historical controls.  As mentioned earlier, dismissing results because they are in the range of the historical controls is an unacceptable method for using historical controls to evaluate a study, and in this case, there is no reason to question the concurrent controls.

**Table 4:** Tumors of interest in male and female Wistar rats from the 24-month feeding study of Brammer (2001)[69]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 121 | 361 | 1214 | |
| | Female | 0 | 145 | 437 | 1498 | |
| Hepatocellular Adenoma | Male | 0/52 | 2/52 | 0/52 | 5/52* | $p_{Trend}$=0.008 |
| Hepatocellular Adenoma (from Greim et al., 2015[91]) | Male | 0/53 | 2/53 | 0/53 | 5/52* | $p_{Trend}$=0.008 $p_{Hist}$=0.006 |
| Mammary Gland Adenomas and Adenocarcinomas | Female | 3/51 | 2/51 | 0/51 | 2/51 | $p_{Trend}$=0.575 |
| Skin Keratocanthoma | Male | 1/51 | 0/51 | 1/51 | 1/51 | $p_{Trend}$=0.392 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01

I obtained historical control data from 16 control  groups in Wistar rats from Charles River Laboratories for the years 2003 to 2011[98].  Although these are outside of the optimal time range for the animals used in the **Brammer (2001)** study, they can serve as an illustration of why using a range can be misleading. There were 52 liver adenomas

seen in 1217 control animals for a mean response of 4.27% with a range of 0% to 17.5% (individual study findings of 6/100, 0/60, 1/60,1/50,1/80, 14/112, 1/65, 0/60, 21/120, 0/50, 1/50, 2/60, 0/50, 1/100, 1/150, 2/50; 13 studies with ≤2% response).  Assuming the underlying probability of having a tumor in controls is 4.27%, $p_{Hist}$=0.006 (Table 4). Thus, even though the responses seen in **Brammer (2001)** are in the range of the historical controls, the trend is highly significant when historical controls are used appropriately. **Greim et al. (2015)** also mentioned findings of increased toxicity at the high dose for which they provided numbers for only hepatocyte fat vacuolation and hepatitis; none of these findings were statistically significant by any test.

In conclusion, this study shows a positive result for hepatocellular adenomas in male Wistar rats and will be included in the overall evaluation of causation.

**Pavkov and Wyand (1987)**[75] exposed Sprague-Dawley rats to glyphosate trimesium salt (sulfosate, 56.2% pure) in feed for two years. Eighty animals/sex were tested in the control, low-dose and mid-dose groups, and 90/sex were tested in the high dose group. Doses of 0, 4.2, 21.2 and 41.8 mg/kg/day were used in males and 0, 5.4, 27, and 55.7 mg/kg/day in females.  This study showed no significant findings according to EPA[61]. No details were given beyond that simple statement and no others reported on this study.  The doses in this study are far below the MTD so this study would have reduced sensitivity to detect an effect if one existed.  This study also used a different chemical than the other Sprague-Dawley rat studies and is not comparable on that basis.

This study is not acceptable for use in the evaluation of causality due to the lack of details about the study.

**Suresh, (1996)**[79] exposed Wistar rats to glyphosate (96.8% pure) in feed for two years. Fifty animals/sex were tested in four exposure groups shown in Table 5.

There were no survival differences in this study and there was no indication that the highest dose used exceeded the maximum-tolerated dose.

**EPA**[61] concluded there were no tumors increased due to glyphosate exposure in this study and **EFSA**[89] concluded that, "[n]one of the significant microscopic changes, increased and decreased incidences (in liver, spleen, lymph nodes, adrenals, thymus, gonads, uterus, mammary gland) observed have shown dose relationship, hence appeared to be incidental and not related to the treatment with the test compound." (page 491).  **Greim et al. (2015)**[91] provided data on hepatocellular adenomas and carcinomas in both sexes but none of these showed significant trends or pairwise tests (Table 5). However, there was another study with a strong significant trend in hepatocellular adenomas in Wistar rats[69] so these are also included in Table 5 for comparison.  No other tumors were mentioned by any other group and an examination of the grouped pathology tables provided by **Greim et al. (2015)** show an increase in mammary gland adenomas at the mid-dose ($p_{Fisher}$=0.017) but no significant trend. However, there was another study with a strong significant trend in mammary gland adenomas and adenocarcinomas combined in Wistar rats[80] so these are also included in Table 5 for comparison.  Like the **Atkinson et al. (1993)**[68] study, **Suresh (1996)** did not do full pathology on all of the animals in the interim exposure groups making

29

interpretation of this study problematic.

This study will be included in the overall evaluation of causation.

**Table 5:** Tumors of interest in male and female Wistar rats from the 24-month feeding study of Suresh(1996)[79]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 6.3 | 59.4 | 595.2 | |
| | Female | 0 | 8.6 | 88.5 | 886 | |
| Mammary Gland Adenoma and Carcinoma | Female | 5/40 | 3/28 | 8/33 | 2/48 | $P_{Trend}=0.970$ |
| Hepatocellular Adenoma | Male | 24/50 | 22/50 | 10/50 | 21/50 | $P_{Trend}=0.374$ |
| Skin Keratocanthoma | Male | 0/50 | 0/50 | 0/50 | 0/50 | $P_{Trend}=1$ |

\*- $p_{Fisher}<0.05$, \*\*- $p_{Fisher}<0.01$

**Enemoto (1997)**[72] exposed Sprague-Dawley rats to glyphosate (95.7% pure) in feed for two years. Fifty animals/sex were tested in four exposure groups (see Table 6). In addition, 10 animals per exposure group were exposed for 1 year and another 10 for 18 months at which point they were sacrificed and examined. These interim sacrifice animals (1 year and 18 months) are included in the analysis if tumors were seen in these groups.

There were no survival differences in this study and there was no indication that the highest dose exceeded the maximum-tolerated dose.

EPA and EFSA both found no significant changes in tumors in any group. **Greim et al. (2015)** again provide tables for a number of tumors, none of which show significant effects except for the incidence of kidney adenomas in male rats ($p_{Trend}=0.004$, Table 6). Examining the pathology tables provided in **Greim et al. (2015)** reveals no additional tumors showing an increase in tumor incidence with dose. A different study[74] in Sprague-Dawley rats demonstrated a strong significant trend in mammary gland adenomas, thyroid C-cell carcinomas, skin Keratocanthomas and testicular interstitial cell tumors so these are also included in Table 6 for comparison.

This study showed a significant increase in kidney adenomas and will be included in the overall evaluation of causation.

**Table 6:** Tumors of interest in male and female Sprague-Dawley rats from the 24-month feeding study of Enemoto (1997)[72]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 104 | 354 | 1127 | |
| | Female | 0 | 115 | 393 | 1247 | |
| Mammary Gland Adenoma | Female | 23/50 | 27/50 | 24/50 | 30/50 | $P_{Trend}$=0.106 |
| Kidney Adenoma | Male | 0/50 | 0/50 | 0/50 | 4/50 | $P_{Trend}$=0.004 |
| Thyroid C-cell Adenomas/Carcinomas | Female | 4/60 | 7/60 | 8/60 | 4/60 | $P_{Trend}$=0.692 |
| Thyroid C-cell Adenomas/Carcinomas | Male | 8/70 | 10/70 | 6/70 | 7/70 | $P_{Trend}$=0.697 |
| Thyroid Follicular-cell Adenomas/Carcinomas | Male | 4/70 | 2/70 | 1/70 | 0/70 | $P_{Trend}$=0.990 |
| Testes Interstitial Cell Tumors | Male | 3/49 | 2/50 | 0/50 | 2/50 | $P_{Trend}$=0.594 |
| Hepatocellular Adenomas | Male | 1/60 | 0/60 | 2/60 | 1/60 | $P_{Trend}$=0.371 |
| Skin Keratocanthoma | Male | 3/50 | 3/50 | 0/50 | 6/50 | $P_{Trend}$=0.065 |
| Pancreas Islet-Cell Adenoma | Male | 4/50 | 1/50 | 2/50 | 1/50 | $P_{Trend}$=0.844 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01

**Wood et al. (2009)[80]** exposed Wistar rats to glyphosate (94.7% to 97.6% pure) in feed for two years. Fifty-one animals/sex were tested in four exposure groups at doses shown in Table 7.

No survival differences were seen in this study.

**EFSA**[89] found no dose-related tumor increases while **EPA**[61] noted an increase in mammary gland adenomas and adenocarcinomas combined with $p_{Trend}$=0.062 for adenomas, $p_{Trend}$=0.042 for adenocarcinomas and $p_{Trend}$=0.007 for the combined tumors (Table 7). EPA concluded there was no progression from adenoma to adenocarcinoma and argued the increase was not glyphosate related. This conclusion is contradicted by the fact that 6 animals in control and the lower dose groups got carcinomas with no adenomas in any of the animals in these groups. It seems likely that, in this case, mammary gland adenocarcinomas can arise without the presence of any adenomas. **Greim et al (2015)[91]** also noted an increase in skin keratocanthoma in males ($p_{Trend}$=0.030). Review of the pathology tables identified no other tumors with increased tumor rates as a function of dose. There was another study with a strong significant trend in hepatocellular adenomas in Wistar rats[69] so this tumor is also included in Table 7 for comparison.

This study showed an increase in mammary tumors in females and skin keratoacanthomas in males and will be used in the evaluation of causality.

**Table 7:** Tumors of interest in male and female Wistar rats from the 24-month feeding study of Wood et al. (2009)[80]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 85.5 | 285.2 | 1077.4 | |
| | Female | 0 | 104.5 | 348.6 | 1381.9 | |
| Mammary Gland Adenomas | Female | 0/51 | 0/51 | 0/51 | 2/51 | $P_{Trend}$=0.062 |
| Mammary Gland Adenocarcinomas | Female | 2/51 | 3/51 | 1/51 | 6/51 | $P_{Trend}$=0.042 |
| Mammary Gland Adenomas and Adenocarcinomas | Female | 2/51 | 3/51 | 1/51 | 8/51* | $P_{Trend}$=0.007 |
| Skin Keratocanthoma | Male | 2/51 | 3/51 | 0/51 | 6/51 | $P_{Trend}$=0.030 |
| Hepatocellular Adenoma | Male | 0/51 | 2/51 | 1/51 | 1/51 | $P_{Trend}$=0.418 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01

**Excel (1997)[73]** exposed Sprague-Dawley rats to glyphosate (purity not given) in feed for two years. Fifty-one animals/sex were tested in four exposure groups at doses of 0, 150, 780 and 1290 mg/kg/day in males and 0, 210, 1060 and 1740 mg/kg/day in females. **EPA[61]**, **EFSA[89]** and **Greim et al. (2015)[91]** had concerns with the quality of this study, the characterization of the chemical being used and with tumor rates in this strain of animals being too low. The Supplemental Material from **Greim et al. (2015)** on this study shows no significant increase in any tumor and virtually all animals having no tumors in controls and treated animals.

This study is inadequate for use in deciding on causality for the same reasons given by the **EPA**, **EFSA** and **Greim et al. (2015)**.

**Chruscielska, K. (2000)[71]** exposed Wistar rats to glyphosate as a 13.8% solution (purity not given) in drinking water for two years. According to **Greim et al. (2015)[91]**, this appears to be the glyphosate formulation Perzocyd. Eighty-five animals/sex were tested in four exposure groups. The authors listed the doses as control, 300 mg/L, 900 mg/L and 2700 mg/L in drinking water. **Greim et al. (2015)[91]** estimated the intake of glyphosate to be 0, 1.9, 5.7 and 17 mg/kg/day for females and 0, 2.2, 6.5, and 19 mg/kg/day in males. There was a slight increase in malignant adenomas of the pituitary gland and an opposite decrease in pituitary adenomas suggesting no effect or potentially a promotional effect in which adenomas are promoted to carcinomas by glyphosate. No other increased tumor responses were reported in the manuscript. Because of the low exposures, this study is an inadequate challenge to the animals (the highest dose is far below the MTD). The reporting of this study is very limited and it the overall quality of the work cannot be evaluated.

This study is inadequate for use in deciding on causality.

**Seralini, G. E., et al. (2014)[77]** exposed Sprague-Dawley rats to the glyphosate formulation Roundup in drinking water for two years as part of a broader experiment on

Roundup-Ready Corn. Ten animals/sex were tested in four exposure groups at doses of 0, 0.00005, 400 and 22500 mg/L in females.  The authors reported an increase in the incidence of mammary gland tumors (mainly fibroadenomas and adenocarcinomas) in female rats with incidences of 5/10 for control and 9/10, 10/10, 9/10 ($p_{Fisher}$=0.016) in the low-, mid- and high-doses groups respectively.  It is difficult to assess the quality of this study due to limited reporting on the histopathological descriptions of the tumors and the very small sample size.

This study will not be used in the evaluation of causality.

### Joint Analysis - Rats

Table 8 summarizes the significance for all tumors of interest in rats.

**Brammer** (2001)[69] saw a significant increase in hepatocellular adenomas in male Wistar rats with increasing dose ($p_{Trend}$=0.008, Table 4).  The other two acceptable studies in Wistar rats (**Wood et al. (2009)**[80] and **Suresh (1996)**[79]) did not see significant increases (Tables 5 and 7). On the basis of statistical significance, these studies are inconsistent. To reject these findings based upon only 1/3 being positive is the same as rejecting a coin as being fair if, in three flips of the coin, the result is one head and two tails; it simply is not possible and there is a better way to address these findings. Given different doses and different sample sizes, we need to formally test for consistency in these studies.  **Suresh (1996)** saw 48% response for hepatocellular adenomas in controls whereas the other two studies saw no tumors in the control animals.  Thus, although all three studies are in Wistar rats, **Suresh (1996)** has a significantly different control response from the other two.  **Suresh (1996)** did not give a substrain for the Wistar rats used, but **Brammer (2001)** and **Wood et al. (2009)** used different substrains. All three studies used different diets and were conducted in different facilities.  Thus, there is no obvious explanation for the dramatically different rates in **Suresh (1996).** It is known that the same strain of rats from different laboratories can have markedly different control tumor responses.  Because they have similar control response, **Brammer (2001)** and **Wood et al. (2009)** can be pooled into a single study to ask the question "Does the significant trend for **Brammer (2001)** disappear when it is pooled with the negative study of **Wood et al. (2009)**?"  The analysis of the pooled studies yields $p_{Trend}$=0.013 supporting the conclusion that glyphosate causes hepatocellular adenomas in Wistar rats with similar background responses.

**Wood et al. (2009)**[80] saw a significant increase in mammary gland adenomas and adenocarcinomas ($p_{Trend}$=0.007, Table 7) in females that was not seen in the other two studies (Tables 4 and 6).  The background rates in these studies differ only slightly and a pooled analysis of all three studies yields $p_{TrendA}$=0.459, suggesting that combining the data eliminates the dose-response trend seen in **Wood et al. (2009)**.  However, if the Wistar rats used in **Suresh (1996)** differed in their response for hepatocellular adenomas, they may differ for this tumor as well.  Combining only **Wood et al. (2009)** with **Brammer (2001)** results in $p_{Trend}$=0.037.  Given the mixed results from the pooling for this tumor I conclude there is limited support for the notion that glyphosate can cause mammary gland adenomas and adenocarcinomas in Wistar rats.

33

**Wood et al. (2009)**[80] saw a significant increase in skin keratocanthomas ($p_{Trend}$=0.030, Table 7) in males that was not seen in the other two studies (Tables 4 and 6). The background rates in these studies differ only slightly and a pooled analysis of all three studies yields $p_{TrendA}$=0.010, suggesting that combining the data does not eliminate the dose-response trend seen in **Wood et al. (2009)**. Combining only **Wood et al. (2009)** with **Brammer (2001)** results in $p_{Trend}$=0.053. Given the results from the pooling for this tumor I conclude there is support for the notion that glyphosate can cause skin keratocanthomas in Wistar rats.

In Sprague-Dawley rats, there were four studies that were acceptable for inclusion in the evaluation of causality with one[74] yielding strong positive responses for thyroid C-cell carcinomas in females and testicular interstitial tumors and hepatocellular adenomas in males and another[72] yielding a strong result for kidney adenomas in males. **Lankas (1981)**[74] saw a significant increase in thyroid C-cell carcinomas in female rats exposed to glyphosate ($p_{Trend}$=0.003, Table 1) and a marginal increase in C-cell adenomas and carcinomas combined ($p_{Trend}$=0.072, $p_{hist}$=0.072, Table 1; two of the other three studies also saw marginal results for thyroid C-cell adenomas and carcinomas in females (Tables 2 and 3). A pooled analysis using all four studies yields $p_{TrendA}$=0.390. This pooled analysis does not support the results seen in **Lankas (1981)**. However, the **Lankas (1981)** study was for 26 months and the other three were for 24 months; the C-cell carcinomas could be a result of the longer exposure period even though the dose is substantially lower in this study compared to the other two. From these data, I conclude that the evidence is weak that glyphosate causes thyroid C-cell tumors in female Sprague-Dawley rats.

Thyroid C-cell adenomas and carcinomas combined, in males, show marginally significant dose-response trends in **Stout and Ruecker (1990**, Table 2) but not in the remaining three studies. Pooling all four studies yields a significant trend of $p_{TrendA}$=0.041. From these data, I conclude that there is evidence is that glyphosate causes thyroid C-cell tumors in male Sprague-Dawley rats.

Thyroid follicular-cell adenomas and carcinomas combined, in males, show a significant dose-response trend in **Atkinson et al. (1993**, Table 3) but not in the remaining three studies;. Pooling all four studies yields no significant trend with $p_{TrendA}$=0.618. From these data, I conclude that there is no evidence that glyphosate causes thyroid follicular-cell tumors in male Sprague-Dawley rats.

Hepatocellular adenomas, in males, show a significant dose-response trend in **Stout and Ruecker (1990**, Table 2) but not in the remaining three studies. Pooling all four studies yields a marginally significant trend with $p_{Trend}$=0.073. From these data, I conclude that there is limited evidence that glyphosate causes thyroid follicular-cell tumors in male Sprague-Dawley rats.

**Table 8:** Summary of significance tests for 5 tumors from 7 studies in Rats

| Study | Strain | Neoplasm | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Hepato-cellular Adenomas (males) | Mammary Gland Tumors (females) | Skin Kerato-canthoma (males) | Thyroid C-Cell Tumors (females) | Thyroid C-Cell Tumors (males) | Thyroid Follicular Cell Tumors (males) | Testis Inter-stitial Cell Tumors (male) | Kidney Adenomas (males) |
| Brammer (2001)[69] | Wistar | +++[1] | - | | | | | | |
| Wood (2009)[80] | | - | +++ | ++ | | | | | |
| Suresh (1996)[79] | | - | - | | | | | | |
| Pooled Wistar Rats | | ++[2] | ++[2] | +++ | | | | | |
| Lankas (1981)[74] | Sprague Dawley | -[3] | | | + | - | - | +++ | - |
| Enemoto (1997)[72] | | - | | | - | - | - | - | +++ |
| Atkinson et al. (1993)[68] | | - | | | - | - | ++ | - | - |
| Stout and Ruecker (1990) | | ++ | | | - | + | - | - | - |
| Pooled Sprague-Dawley Rats | | + | | | - | ++ | - | - | ++[4] |

[1]entries are $p_{Trend}/p_{Hist}$ with values: − p>0.1, + 0.1≥p>0.05, ++ 0.05≥p>0.01, +++ p≤0.01; [2]pooling results from **Brammer (2001)** and **Wood (2009)** only; [3]liver neoplastic nodules; [4]excluding **Lankas (1981)**

Another significant trend seen in Sprague-Dawley rats is the finding of testes interstitial cell tumors from **Lankas (1981)**[74] ($P_{Trend}$=0.009, Table 1); the other three studies were negative for this tumor (Tables 2, 3 and 6). Combining the other three studies with that of **Lankas (1981)** for testes interstitial tumors results in a p-value for trend that is clearly non-significant ($p_{TrendA}$=0.608). However, as noted above, the **Lankas (1981)** study was for 26 months and the other two were for 24 months; the tumors could be a result of the longer exposure period even though the dose is substantially lower in this study compared to **Stout and Ruecker (1990)**, **Atkinson et al.(1993)** and **Enemoto (1997)**.

The final tumor in Sprague-Dawley rats showing a strong significant trend is kidney

adenomas in males from the study by **Enemoto (1997)**[72] ($P_{Trend}$=0.004, Table 6).  The kidney tumor data is not significant for the studies by **Lankas (1981)**[74] (Table 1), **Atkinson et al. (1993)**[99] (Table 3) and **Stout and Ruecker (1990)**[78] (Table 2).  Pooling the **Enemoto (1997)** study with that of **Lankas (1981)**[74], **Stout and Ruecker (1990)** and **Atkinson et al. (1993)** yields $p_{TrendA}$=0.201.  Removing the 26-month study by **Lankas (1981)**[74] yields a p-value for the three combined 24-month studies of $p_{Trend}$=0.031; thus, the association between glyphosate and kidney adenomas in male Sprague-Dawley rats is supported by these data, even with the difficulty associated with interpreting the results in the low- and mid-doses in the **Atkinson et al. (1993)** study.  There is evidence to support an increase in kidney tumors in male Sprague-Dawley rats exposed to glyphosate.

In summary, there is evidence that glyphosate causes hepatocellular adenomas and skin keratocanthomas in male Wistar rats, mammary gland adenomas and adenocarcinomas in female Wistar rats and kidney adenomas and thyroid C-cell adenomas and carcinomas in male Sprague-Dawley rats.  There is limited evidence glyphosate causes hepatocellular adenomas in male Sprague-Dawley rats.

### Mouse Studies

**Reyna and Gordon (1974)**[86] exposed Swiss White mice to glyphosate (>97% purity) in feed for 16 months in males and 18 months in females. Fifty animals/group/sex were tested in three exposure groups; control, 17 mg/kg and 50 mg/kg. Only 10 animals per group were examined for histopathological changes.

There was no impact on survival of administration of glyphosate and no indication that the high dose exceeded the MTD.

No significant increases were seen in any tumor from this study.  However, given the small sample size for histopathological evaluation and the low doses used for this study, this study is inadequate.

This study will not be used in the evaluation of causality.

**Knezevich and Hogan, (1983)**[83] exposed CD-1 mice to glyphosate (99.8% pure) in feed for two years. Fifty animals/group/sex were tested in four exposure groups (see Table 9).

There were no survival differences in this study and there was no indication that the highest dose used exceeded the MTD.

**EPA**[100] found a significant increase in kidney tubular cell adenomas in male mice based upon the original pathology done from the study and this analysis is shown in Table 9 ($p_{Trend}$=0.019). Kidney tubular cell adenomas are very rare tumors in CD-1 mice so it is important to compare these results with the historical controls.  No historical controls were available from the laboratory that conducted **Knezevich and Hogan, (1983)** so IARC, EPA and EFSA all used historical control databases from published studies in the

36

literature[101-103]. These studies have virtually identical rates for the important tumors seen in CD-1 mice; I will use the study by **Giknis and Clifford (2000)**[102] since it best covers the range of studies we have for CD-1 mice. For studies of approximately two years, the mean historical tumor response in controls is 0.27%. Applying this control response rate to the kidney adenomas yields $p_{Hist}$=0.005, strengthening the significance of the evaluation against the concurrent control. EPA originally used a similar analysis and reached the same conclusions. However, in 1985, the registrant had a group of pathologists review the kidney slides. Using additional kidney sections from this study, the pathologists identified an additional adenoma in the control animals and changed the classification for three adenomas to carcinomas (Table 9). With these changes, the adenomas no longer have a significant trend ($P_{Trend}$=0.442, $P_{Hist}$=0.121) but carcinomas have a marginally significant trend against concurrent controls and a clearly significant trend using historical controls ($p_{Trend}$=0.063, $p_{Hist}$=0.002, historical control rate of 0.15%). These historical control rates may not apply to this analysis because the reevaluation of the kidney tumors considered additional sections and no information is available on how additional sections affect historical control rates in this strain of mice; differences have been seen in other settings[104]. The incidence of combined carcinomas and adenomas has the same marginal significance against the concurrent control and significance against the historical controls ($p_{Trend}$=0.065, $p_{Hist}$=0.011, historical control rate of 0.44%). However, there was considerable disagreement on whether the one adenoma in the control group was correctly diagnosed[105]. Removing this one adenoma from the control group results in $p_{Trend}$=0.019 and $p_{Hist}$=0.005.

Other CD-1 mouse studies have seen increases in malignant lymphomas, hemangiosarcomas and lung adenocarcinomas (males) and hemangiomas (females). Evaluations of those tumors for this study yields results that are not significant; for malignant lymphoma, $p_{Trend}$=0.754, $p_{Hist}$=0.767, with the historical control rate equal 6.2%, for hemangiosarcomas $p_{Trend}$=0.503, $p_{Hist}$=0.591, with the historical control rate equal to 2.5%, for lung adenocarcinomas $p_{Trend}$=0.918, $p_{Hist}$=0.899, with the historical control rate equal to 9.2% and for hemangiomas $p_{Trend}$=0.631. No other tumors were found in this study.

The **EPA**[61] has produced many different arguments to dismiss the findings of renal tumors from this study. One argument is that the pathology working group requested by the EPA in 1986 concluded these lesions were not glyphosate related because *"1) renal tubular cell tumors are spontaneous lesions for which there is a paucity of historical control data for this mouse stock; 2) there was no statistical significance in a pairwise comparison of treated groups with the concurrent controls and there was no evidence of a statistically significant linear trend; 3) multiple renal tumors were not found in any animal; and 4) compound-related nephrotoxic lesions, including pre-neoplastic changes, were not present in male mice in this study."* Reason number one no longer exists as there are two very good historical control databases for CD-1 mice[101, 102]. The second reason, while technically correct, is not supportable since the Agency's own guidelines for evaluating carcinogenicity studies state that *"Significance in*

*either kind of test* [trend or pair-wise] *is sufficient to reject the hypothesis that chance accounts for the result."* The third reason is also weak since one would not expect (nor require) multiple tumors to appear when dealing with a rare tumor. For the fourth point, EPA provides data on the rate of bilateral chronic interstitial nephritis in the study which it considers to show no statistically significant results although the trend test is highly significant ($p_{Trend}$=0.006, Table 9). EPA then states, without reference, that *"chronic interstitial nephritis is not considered to be a precursor lesion for tubular neoplasms"*. I could find no published research to either support or refute this statement. However, chronic interstitial nephritis is an inflammation of the interstitial tissue surrounding the glomeruli and tubules in the kidney. Inflammation is well known

**Table 9:** Tumors of interest in male and female CD-1 mice from the 24-month feeding study of **Knezevich and Hogan (1983)**[83]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 157 | 814 | 4841 | |
| | Female | 0 | 190 | 955 | 5874 | |
| Kidney Adenoma[1] (original pathology) | Male | 0/49 | 0/49 | 1/50 | 3/50 | $P_{Trend}$=0.019 $P_{Hist}$=0.005 |
| Kidney Adenoma (EPA pathology) | Male | 1/49 | 0/49 | 0/50 | 1/50 | $P_{Trend}$=0.442 $P_{Hist}$=0.121 |
| Kidney Carcinoma[2] (EPA pathology)u | Male | 0/49 | 0/49 | 1/50 | 2/50 | $P_{Trend}$=0.063 $P_{Hist}$=0.002 |
| Kidney Adenoma and Carcinoma Combined[3] (EPA pathology) | Male | 1/49 | 0/49 | 1/50 | 3/50 | $P_{Trend}$=0.065 $P_{Hist}$=0.011 |
| Malignant Lymphoma[4] | Male | 2/49 | 5/49 | 4/50 | 2/50 | $P_{Trend}$=0.754 $P_{Hist}$=0.767 |
| Hemangiosarcoma[5] | Male | 0/50 | 0/49 | 1/50 | 0/50 | $P_{Trend}$=0.503 $P_{Hist}$=0.591 |
| Bilateral Chronic Interstitial Nephritis | Male | 5/49 | 1/49 | 7/50 | 11/50 | $P_{Trend}$=0.006 |
| Hemangiooma[6] | Female | 0/49 | 1/49 | 1/50 | 0/50 | $P_{Trend}$=0.631 |
| Lung Adenocarcinoma[7] | Male | 4/48 | 3/50 | 2/50 | 1/50 | $P_{Trend}$=0.918 $P_{Hist}$=0.899 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01, [1]historical rate=0.27%, [2]historical rate=0.15%, [3]historical rate=0.44%, [4]historical rate=6.2%, [5]historical rate=2.5%, [6]No Historical Controls, [7]Historical rate=9.2%

to play an important role in kidney cancer[106] and many other cancers so this argument also fails to support rejection of these findings.

38

In summary, this study shows a positive result for kidney tumors in male CD-1 mice and will be included in the overall evaluation of causation.

**Atkinson, et al., (1993)**[81] exposed CD-1 mice to glyphosate (>97% purity) in feed for two years. Fifty animals/group/sex were tested in four exposure groups (see Table 10).

There was no impact on survival of administration of glyphosate and no indication that the high dose exceeded the MTD.

**Table 10:** Tumors of interest in male and female CD-1 mice from the 24-month feeding study of **Atkinson et al. (1993)**[81]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|-------|-----|------|------|------|------|----------|
| | Male | 0 | 98 | 297 | 988 | |
| | Female | 0 | 102 | 298 | 1000 | |
| Kidney Adenoma and Carcinoma Combined[1] | Male | 2/50 | 2/50 | 0/50 | 0/50 | $P_{Trend}$=0.981 $P_{Hist}$=1 |
| Malignant Lymphoma[2] | Male | 4/50 | 2/50 | 1/50 | 6/50 | $P_{Trend}$=0.087 $P_{Hist}$=0.085 |
| Hemangiosarcoma[3] | Male | 0/50 | 0/50 | 0/50 | 4/50 | $P_{Trend}$=0.004 $P_{Hist}$=0.001 |
| Hemangioma[4] | Female | 0/50 | 0/50 | 0/50 | 0/50 | $P_{Trend}$=1 |
| Lung Adenocarcinoma[5] | Male | 10/50 | 7/50 | 8/50 | 9/50 | $P_{Trend}$=0.456 $P_{Hist}$=0.449 |

\*- $p_{Fisher}$<0.05, \*\*- $p_{Fisher}$<0.01, [1]historical rate=0.44%, [2]historical rate=6.2%, [3]historical rate=2.5%, [4]No historical control rate, [5]Historical rate=9.2%

Hemangiosarcomas were the only tumors showing a significant trend in this study ($P_{Trend}$=0.004, $P_{Hist}$=0.001, Table 10). Also shown in Table 10 are the results for malignant lymphomas, kidney tumors and lung adenocarcinomas (males) and hemangioma (females); there is a marginal trend for malignant lymphomas ($P_{Trend}$=0.087, $P_{Hist}$=0.085) and no trend for kidney tumors.

The **EPA**[61] concluded the findings in this study were not treatment related based upon the tumors appearing only in the high dose group, a lack of statistical significance between the response in this group and control response and that these tumors are commonly observed in mice as both spontaneous and treatment related effects. There is no scientific support for excluding positive findings in the highest dose group, a view also held by the **SAP**[54]. I have already commented on how EPA's guidelines treat trend tests and Fisher's Exact test results, although in this case, the value of the comparison of the highest exposure group to controls, $p_{Fisher}$=0.059, is marginally significant. The argument regarding the frequency of this tumor in controls is addressed directly by the evaluation against the historical control rates; if these rates were high enough to exclude this finding, $P_{Hist}$ would have be above 0.05 instead of 0.001. The mean

historical control incidence of hemangiosarcomas in controls from two-year cancer bioassays in CD-1 mice is 2.5% and the response seen in the high-dose group is 8.9%. The SAP[54] stated very clearly that the practice, being used by the EPA, of negating a positive finding because of historical control data was not acceptable[54]. (page 63). The EPA Cancer Guidelines[33] state this very clearly "...*statistically significant increases in tumors should not be discounted simply because incidence rates in the treated groups are within the range of historical controls or because incidence rates in the concurrent controls are somewhat lower than average.*"

In summary, this study shows a positive result for hemangiosarcomas in male CD-1 mice and will be included in the overall evaluation of causation.

**Wood et al., (2009)**[88] exposed CD-1 mice to glyphosate (95.7% pure) in feed for 80 weeks. Fifty-one animals/groups/sex were tested in four exposure groups (see Table 11).

There was no effect on survival and no information suggesting the study exceeded the MTD.

No increase in kidney tumors or hemangiosarcomas (males) or hemangiomas (females) were seen in this study.  There was a monotonic increase in lung adenocarcinomas ($p_{Trend}$=0.028, $p_{Hist}$=0.031) in males and a monotonic increase in malignant lymphomas ($p_{Trend}$=0.007, $p_{Hist}$=0.007) in males.  The historical control incidence for this study is different from the earlier studies because this study is only for 80 weeks instead of 104 weeks (two years); the historical control rate for malignant lymphomas in CD-1 mice after 80 weeks is 2.6% instead of 6.2%, the historical control rate at two years[102].

For lung adenocarcinomas, the EPA[61] again argued a lack of significance for pairwise comparisons (in violation of its guidelines) and that there was no evidence of progression from adenomas to carcinomas. Even though there was no increase in lung adenomas as a function of exposure, it is possible to have an increase in lung adenocarcinomas without an associated increase in adenomas[107]. For malignant lymphomas, EPA notes that there was a statistically significant response and that the high dose was significantly different from control ($p_{Fisher}$=0.028), but then uses an argument based upon the number of analyses done in this study to adjust the Fisher Exact test p-value to 0.082 (an adjustment for multiple comparisons is indeed warranted in evaluating the outcomes of these animal cancer studies, this will be addressed later in my report in the evaluation of all of the studies combined).

The EPA[61] uses historical control data[103, 108] to exclude the malignant lymphomas and cite a mean response of 4.5% and a range of 1.5% to 21.7%.  **Son and Gopinath (2004)**[108] saw 21 animals out of 1453 examined prior to 80 weeks with lung adenocarcinomas (1.4%).  **Giknis and Clifford (2005)**[103] saw a mean rate of 4.5% with a range of 0% to 21.7% in 52 studies which included mostly 78 week controls (26 studies) and 104 week controls (21 studies).  Including only studies of 80 weeks or less, the rate in **Giknis and Clifford (2005)** is 37/1372=2.7% with a range of 0% to 14%. **Giknis and Clifford (2000)**[102] (the reference I have been citing) did a similar evaluation, using mostly the same data as their 2005 paper and saw an average tumor incidence before

40

80 weeks of 2.6% with a range of 0% to 14%. Based upon its flawed interpretation of the **Giknis and Clifford (2005)** historical controls, EPA argues that the incidence of concurrent controls in the study was low (it was 0%) and rejected the positive finding. In fact, of the 26 studies in the 18-month control groups evaluated by **Giknis and Clifford (2005),** eight (31%) had response of 0% and eight (31%) had only one tumor. The evaluation used by the EPA is incorrect.  In addition, as noted earlier, the use of historical control data to negate a positive finding is not supported by **EPA's guidelines**[33, 54] or its **SAP**[54].

There was an increase in the number of animals with multiple malignant tumors ($P_{Trend}$=0.046)

In summary, this study shows a positive result for malignant lymphomas and lung adenocarcinomas in male CD-1 mice and will be included in the overall evaluation of causation.

**Table 11:** Tumors of interest in male and female CD-1 mice from the 18-month feeding study of _Wood et al. (2009)_[88]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 71.4 | 234.2 | 810 | |
| | Female | 0 | 97.9 | 299.5 | 1081.2 | |
| Kidney Adenoma[1] | Male | 0/51 | 0/51 | 0/51 | 0/51 | $P_{Trend}$=1 |
| Malignant Lymphoma[2] | Male | 0/51 | 1/51 | 2/51 | 5/51* | $P_{Trend}$=0.007 $P_{Hist}$=0.007 |
| Hemangiosarcoma | Male | 0/51 | 0/51 | 0/51 | 0/51 | $P_{Trend}$=1 |
| Lung Adenocarcinoma[3] | Male | 5/51 | 5/51 | 7/51 | 11/51 | $p_{Trend}$=0.028 $P_{Hist}$=0.031 |
| Hemangioma[4] | Female | 0/51 | 2/51 | 0/51 | 1/51 | $p_{Trend}$=0.438 |
| Animals with Malignant Neoplasms | Male | 14/51 | 20/51 | 17/51 | 20/51 | $P_{Trend}$=0.203 |
| Animals with Malignant Neoplasms | Female | 23/51 | 15/51 | 17/51 | 18/51 | $P_{Trend}$=0.628 |
| Animals with multiple malignant tumors | Male | 1/51 | 2/51 | 3/51 | 5/51 | $P_{Trend}$=0.046 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01, [1]historical rate=0.44%, [2]historical rate=2.6%, [3]Historical rate=2.5%, [4]No Historical Control Rate

**Sugimoto (1997)**[87] exposed CD-1 mice to glyphosate (94.61-95.67% pure) in feed for two years. Fifty animals/group/sex were tested in four exposure groups (see Table 12).

There were no effects of treatment on survival and no indication the highest dose had exceeded the MTD.

Kidney adenomas ($p_{Trend}$=0.062, $p_{Hist}$=0.005), malignant lymphomas ($p_{Trend}$=0.016,

$p_{Hist}$=0.017) and hemangiosarcomas ($p_{Trend}$=0.062, $p_{Hist}$=0.004) in male mice and hemangiomas ($p_{Trend}$=0.002) in female mice all showed increased tumor incidence with increasing dose. The evaluation of lung adenocarcinomas in males showed no significant dose-related trend ($p_{Trend}$=0.148, $p_{Hist}$=0.140). This study also had an increase in animals with any malignancy in males ($p_{Trend}$=0.001) but not in females ($p_{Trend}$=0.362). Note that no hemangiosarcomas were seen in the 26 control groups evaluated by **Giknis and Clifford (2000)** so the development of an estimate of the historical control response is difficult (if the historical control rate is 0, then any observed response other than 0 has a p-value of 0). The fact that this tumor was never seen in the historical controls should strongly support any positive finding as being significant. However, to still allow for a test using historical control data, I used the historical control estimate of the mean response that would result in a 5% chance of seeing no tumors in 1149 animals. This estimated historical control response value was 0.0026. This value was used in the analysis for hemangiosarcomas in male CD-1 mice exposed for 18 months ($p_{Hist}$ <0.001).

**Table 12:** Tumors of interest in male and female CD-1 mice from the 18-month feeding study of **Sugimoto (1997)**[87]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 165 | 838.1 | 4348 | |
| | Female | 0 | 153.2 | 786.8 | 4116 | |
| Kidney Adenoma[1] | Male | 0/50 | 0/50 | 0/50 | 2/50 | $P_{Trend}$=0.062 $P_{Hist}$=0.005 |
| Malignant Lymphoma[2] | Male | 2/50 | 2/50 | 0/50 | 6/50 | $P_{Trend}$=0.016 $P_{Hist}$=0.017 |
| Hemangiosarcoma[3] | Male | 0/50 | 0/50 | 0/50 | 2/50 | $P_{Trend}$=0.062 $P_{Hist}$=0.004 |
| Hemangioma[4] | Female | 0/50 | 0/50 | 2/50 | 5/50* | $P_{Trend}$=0.002 |
| Lung Adenocarcinoma[5] | Male | 1/50 | 1/50 | 6/50 | 4/50 | $P_{Trend}$=0.148 $P_{Hist}$=0.140 |
| Number of animals with Malignant Neoplasms | Male | 5/50 | 5/50 | 11/50 | 16/50** | $P_{Trend}$=0.001 |
| Number of animals with Malignant Neoplasms | Female | 9/50 | 13/50 | 16/50 | 13/50 | $P_{Trend}$=0.362 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01, [1]historical rate=0.44%, [2]historical rate=2.6%, [3]historical rate=0/1424 (0.26% - 95% confidence limit), [4]No Historical Control Rate, [5]Historical rate=2.5%

**EPA**[61] only addressed the hemangiomas in the female mice and did not note any other significant effects. For the females, EPA argued that the high dose was approximately four times higher than the current recommended high dose from the **OECD guidelines**[109]. This study was correctly designed under the previous guidelines (the limit was <5% in feed) and there is no indication that this dose exceeded the MTD. The EPA also argued that when the p-value for Fisher's Exact test was adjusted for multiple comparisons, the new p-value for the high-dose group for hemangiomas was 0.055.

For the hemangiosarcomas in males, none of the 26 historical control groups examined by **Giknis and Clifford (2000)** had hemangiosarcomas, making this a very rare tumor in males prior to 80 weeks on study. The malignant lymphomas in males are statistically significant against both the concurrent controls and the historical controls. Finally, there is clearly an overall increase of malignancies in the males.

In summary, this study shows a positive result for kidney adenomas, malignant lymphomas and hemangiosarcomas in male CD-1 mice, hemangiomas in female CD-1 mice and an overall increase in malignancies as a function of exposure in male CD-1 mice. This study will be included in the overall evaluation of causation.

**Kumar (2001)**[84] exposed Swiss Albino mice to glyphosate (>95% purity) in feed for two years. Fifty animals/group/sex were tested in four exposure groups (see Table 13).

The survival was decreased in the highest exposure group but this was not statistically significant and there was no other data indicating the MTD was exceeded for this study.

Kidney adenomas ($p_{Trend}$=0.062) and malignant lymphomas ($p_{Trend}$=0.064, $p_{Hist}$ =0.070) in male mice demonstrated marginal statistical significance and hemangiosarcomas ($p_{Trend}$=0.500) in male mice demonstrated no statistical significance. In this study, not all animals in the low- and mid- dose groups were evaluated for kidney tumors, so a second analysis was done based on only the animals examined in these two groups ($p_{Trend}$=0.088). No historical control data was available for hemangiosarcomas and kidney adenomas in Swiss Albino mice. For the malignant lymphomas, EFSA provided a historical control data set showing a mean response of 46/250=0.184 (18.4%) with a range of 6% to 30%. Using this historical control data, the trend is only marginally significant ($p_{Hist}$=0.070). I have some concern that the responses at two of the doses are outside of the historical control range and the third dose is at the upper limit of the historical control range. However, this is a small historical control dataset for a tumor with a relatively high background tumor rate, thus placing too much emphasis on this historical control population is not warranted.

In a recent memo, Martens (2017) [110] asserts that the incidence counts for malignant lymphomas and kidney adenomas appearing in Greim et al. (2015)[91] and EFSA (2013)[89] are incorrect and provides different rates (shown in Table 13). The p-values for both of these tumors are reduced using the incidence counts from the Martens memo. However, it should be noted that if the counts for malignant lymphomas in the Martens (2017) memo are correct, then all three exposure groups have responses outside of the range of the historical controls. It is unclear from Greim et al. (2015), EFSA or Martens (2017) which tumor incidence counts are correct.

There was a significant increase in hemangiomas (any tissue) in female mice ($p_{Trend}$=0.004).

In summary, this study shows support for an increase for malignant lymphomas and kidney adenomas as a function of exposure in male Swiss Albino mice and an increase in hemangiomas in female Swiss Albino mice. This study will be included in the overall

**Table 13:** Tumors of interest in male and female Swiss Albino mice from the 18-month feeding study of **Kumar (2001)**[84]

| Tumor | Sex | Doses (mg/kg/day) | | | | p-values |
|---|---|---|---|---|---|---|
| | Male | 0 | 14.5 | 149.7 | 1453 | |
| | Female | 0 | 15 | 151.2 | 1466.8 | |
| Kidney Adenoma (only tissues examined microscopically) | Male | 0/50 | 0/26 | 1/22 | 2/50 | $P_{Trend}$=0.088 |
| Kidney Adenoma (as reported by Greim et al.) | Male | 0/50 | 0/50 | 1/50 | 2/50 | $P_{Trend}$=0.062 |
| Kidney Adenoma (as reported by Martens) | Male | 0/50 | 0/50 | 0/50 | 1/50 | $P_{Trend}$=0.250 |
| Malignant Lymphoma[1] (as reported by Greim et al.) | Male | 10/50 | 15/50 | 16/50 | 19/50 | $P_{Trend}$=0.064 $P_{Hist}$=0.070 |
| Malignant Lymphoma[1] (as reported by Martens) | Male | 10/50 | 16/50 | 18/50 | 19/50* | $P_{Trend}$=0.141 $P_{Hist}$=0.150 |
| Hemangiosarcoma | Male | 0/50 | 0/50 | 2/50 | 0/50 | $P_{Trend}$=0.500 |
| Hemangioma (any tissue) | Female | 1/50 | 0/50 | 0/50 | 5/50 | $P_{Trend}$=0.004 |

*- $p_{Fisher}$<0.05, **- $p_{Fisher}$<0.01, [1]Historical control rate=0.184 (46/250 mice)

evaluation of causation.

**Pavkov and Turner (1987)**[85] exposed CD-1 mice to glyphosate trimesium salt (56.2%) and 1% propylene glycol (wet weight vehicle) in feed for two years. Eighty animals/sex/group were tested in control, low- and mid-dose groups and 90 animals/sex were tested at the high dose. Exposure levels were 0, 11.7, 118 and 991 mg/kg/day in males and 0, 16, 159 and 1341 mg/kg/day in females. **EPA**[61] lists this study as completely negative for any cancer findings. No details on this study are provided by the EPA nor is it listed in the **Greim et al. (2015)**[91] manuscript. There was limited information on this study in a Data Evaluation Report from EPA (accession number 4021 40-06) that discussed findings from this study. EPA noted that body weight and food consumption were reduced in the highest exposure group, but the actual amounts of these reductions were not available. They also noted that the authors failed to make it clear that the tumors reported in the study had been histopathologically validated. Data was presented for tumors in the livers and lungs of male mice and the lungs of female mice. No other data is provided.

This study is not acceptable for inclusion in the evaluation of causation due to the lack of information on the tumor incidence in tissues other than liver and lung.

**George et al. (2010)**[82] exposed groups of 20 male Swiss Albino mice to a glyphosate

formulation (Roundup Original, 36g/L glyphosate) at a dose of 25 mg/kg (glyphosate equivalent dose) topically three times per week, topically once followed one week later by 12-o-tetradecanoylphorbol-13-acetate (TPA) three times per week, topically three times per week for three weeks followed one week later by TPA three times per week, or a single topical application of 7,12-dimethyl-benz[a]anthracene (DMBA) followed one week later by topical application of glyphosate three times per week for a total period of 32 weeks. Appropriate untreated, DMBA-treated, and TPA-treated controls were included. The group exposed to DMBA followed by glyphosate demonstrated a significant increase (p<0.05) in the number of animals with tumors (40% of the treated animals versus no tumors in the controls) indicating glyphosate has a promotional effect on carcinogenesis in the two-stage model in skin. This study addresses the question of whether glyphosate is more likely to cause skin tumors through initiation (starting the cancer process) or promotion (moving the process along after it starts). This study supports the overall concept that glyphosate can have an impact on tumor incidence.

**EPA**[61] discounted this study because it included only 20 animals per group, tested only males and did not conduct a histopathological analysis. It is hard to understand how EPA could reject a positive finding using 20 mice; typically one would ignore a negative study that had too few animals as not having sufficient statistical power to see an effect but never reject positive findings for this reason. Also, 20 animals per group is common for skin-painting initiation-promotion studies like the one presented here. Doing a study in only males is not a reason to ignore the positive findings in a study. Finally, in initiation-promotion studies of mouse skin, histopathological evaluation would be done if one were interested in separating papillomas from carcinomas. It is highly unlikely that the lesions seen in 40% of the DMBA/glyphosate treated mice were not papillomas or carcinomas.

Some members of the EPA SAP noted[54] that the rodent data were consistent with glyphosate acting as a tumor promoter but, because "*[t]here has been no direct test of this hypothesis (such as in a standard initiation-promotion bioassay)…,*" this "*conclusion was speculative.*" (page #). Because the EPA dismissed this study without any discussion, the SAP did not recognize there was an initiation-promotion supporting a promotional effect of glyphosate.

This study is included in the evaluation of causality as support for a promotional effect of glyphosate on some tumors.

**Joint Analysis - Mouse**

In their evaluation of the mouse studies, **EPA**[61] and **EFSA**[89] chose to challenge the results in each study separately, dismiss the studies as showing no effect, and never compared results across the various studies. In response to the evaluation done by the **IARC**[30], **EFSA**[90] extracted the original data and did trend tests on kidney tumors, malignant lymphomas and hemangiosarcomas in male mice in five of the mouse studies, the same five studies I consider acceptable for a causation analysis. Rather than formally evaluate these cancer responses for consistency by pooling the data where appropriate, EPA and EFSA simply produced a table with the responses for each dose

group in each study and concluded (subjectively) they were inconsistent.  In addition, EPA and EFSA argued that doses above 1000 mg/kg/day (there are only two of these) were outside the range of what would be tested today under OECD guidelines and should be excluded.  I will now address both points.

In CD-1 mice, there are four useful animal carcinogenicity studies and one study in Swiss Albino mice.  As with the rats, consistency across studies can be addressed in two ways.  The first is by simply looking at the overall findings to evaluate where they agree or disagree in terms of statistical significance. Table 14 summarizes the positive and negative findings for all five cancers in which at least one study in CD-1 mice showed a significant trend.  It is clear that not every tumor shows a positive trend with glyphosate exposure in every study.  For hemangiosarcomas in males, there are clear positive findings in the studies by **Sugimoto (1997)** and **Atkinson et al. (1993)** and non-significant responses in **Wood et al. (2009)** and **Knezevich and Hogan (1983)**.  In females, hemangiosarcomas are only present in the study by **Sugimoto (1997)**.  Malignant lymphomas in males are clearly positive in two studies[87, 88] and marginally positive in a third[81] but negative in the fourth[83].  Both of the strong positive studies exposed animals for 18 months.  Kidney tumors in males are positive in two studies[83, 87] and negative in the remaining two[81, 88].  Lung adenocarcinomas in males are only positive in the study by **Wood et al. (2009)**.  **Sugimoto (1997)** had four clearly positive associations between tumors and glyphosate while the others had two or less.

**Table 14:** Summary of significance tests for 5 tumors from 4 studies in CD-1 Mice

| Study | Months on Study | Neoplasm | | | | |
|---|---|---|---|---|---|---|
| | | Hemangio-sarcoma (male) | Hemangioma (female) | Malignant Lymphoma (male) | Kidney Tumor (male) | Lung Adeno-carcinoma (male) |
| Sugimoto 1997[87] | 18 | +/+++[1] | +++ | ++/++ | +/+++ | -/- |
| Wood 2009[88] | 18 | -/- | - | +++/+++ | -/- | ++/++ |
| Sugimoto & Wood Pooled | | ++/+++ | +++ | +++/+++ | ++/+++ | -/- |
| Atkinson 1993[81] | 24 | +++/+++ | - | +/+ | -/- | -/- |
| Knezevich 1983[83] | 24 | -/- | - | -/- | +/++ | -/- |
| Atkinson & Knezevich Pooled | | -/- | - | -/- | +/+ | -/- |
| All CD-1 Studies Pooled | | ++/++ | ++/++ | +/+ | +++/+++ | -/- |

[1]entries are $p_{Trend}/p_{Hist}$ with values: $-$ p>0.1, $+$ 0.1≥p>0.05, $++$ 0.05≥p>0.01, $+++$ p≤0.01

46

As seen for the rat studies, this simple evaluation of the positive versus negative findings fails to resolve the issue of which findings are driving the overall responses in these data. To do this, I will again pool the studies. Table 14 summarizes the pooled analyses.

For kidney tumors in males, pooling the two 18-month studies yields significant increases in incidence ($p_{Trend}$=0.015, $p_{Hist}$=0.003) and pooling of the two year studies shows marginal significance ($p_{Trend}$=0.081, $p_{Hist}$=0.054). Pooling all four studies results in ($p_{Trend}$=0.005, $p_{Hist}$=0.007), thus the positive trend remains. **Knezevich and Hogan (1983)** saw a 4% response for kidney carcinomas in their highest exposure group. The largest response seen for kidney carcinomas in controls in 48 studies by **Giknis and Clifford (2000)** and in 52 studies by **Giknis and Clifford (2005)** was 2% and in the control groups from 11 two-year cancer studies, **Chandra and Frith (1992)**[101] saw only one animal out of 725 with a kidney carcinoma. In 46 control datasets, **Giknis and Clifford (2000)** saw 39 control groups with no adenomas, five with one adenoma and two with two adenomas; both 24-month studies saw two adenomas in the highest exposure group, a very rare finding. To better illustrate, there are 16 groups of animals in the four studies. For any one group, there is a 2/44 or 4.3% chance of getting a response 4% or larger. The chances of randomly getting 3 or more such responses in 16 groups is 2.9% and the chances of two of these being in any two of the four highest exposure groups is 0.01. In summary, the strong finding in two of the four studies, the positive finding when all four studies are pooled and the very low probability that this is due to chance when compared to historical controls support the conclusion that glyphosate causes kidney tumors in male mice.

For malignant lymphomas in males, pooling the two 18-month studies, **Sugimoto (1997)** and **Wood et al. (2009)**, results in a significant trend ($p_{Trend}$=0.005, $p_{Hist}$=0.006). Pooling the two 24-month studies, **Knezevich and Hogan (1983)** and **Atkinson et al. (1993)**, yields ($p_{Trend}$=0.653, $p_{Hist}$=0.649). The main differences between these two findings is in the control response; the pooled control response at 24 months is 6/99 (6%) versus 2/101 at 18 months (2%). This is expected since, in the absence of any exposure, tumor rates increase as a function of age[5]. **Giknis and Clifford (2000)** show a control response at 18 months of 4% and a control response at 24 months of 6% (matching the value for the pooled studies). Pooling all four studies results in ($p_{TrendA}$=0.073, $p_{Hist}$=0.080). However, the responses seen for malignant lymphomas in controls by **Giknis and Clifford (2000)** show only one historical control group in twenty-six 18-month groups with 10% or higher response. The responses at the high doses (10% and 12%) in the two 18-month studies are very unlikely to have arisen by chance. There are eight groups of animals in the two studies. For any one group, there is a 1/26 or 3.8% chance of getting a response of at least 10% based on the 26 control groups from **Giknis and Clifford (2000)**. The chances of getting two or more such responses in eight groups is 0.035 and the chances of these being in three of the four highest exposure groups is 0.004. For the 24-month studies, the higher background rate makes it difficult to identify a small change in incidence, thus the findings in the 24-month studies and the 18-month studies are not inconsistent. In summary, the very strong findings in the 18-month studies, the very strong positive findings when the two 18-month studies are pooled, the low probability that the responses seen in the 18-month studies are due to chance, and the

47

marginal increase in malignant lymphomas in the 18-month study in Swiss Albino mice[84] support the conclusion that glyphosate causes malignant lymphoma in male mice.

For hemangiosarcomas in males, pooling the two 18-month studies results in a significant trend ($p_{Trend}$=0.015, $p_{Hist}$=0.002). Pooling the two 24-month studies yields ($p_{Trend}$=0.490, $p_{Hist}$=0.429). The main difference between these two findings is the 0/50 response in animals exposed at 4841 mg/kg/day in the study by **Knezevich and Hogan (1983)**. Removing this one exposure group in the pooled 24-month analysis yields ($p_{Trend}$<0.001, $p_{Hist}$<0.001). Pooling all four studies results in ($p_{Trend}$=0.045, $p_{Hist}$=0.043). No hemangiomas were seen in controls groups from twenty-six 18-month studies by **Giknis and Clifford (2000)** so the two hemangiosarcomas seen in the high dose group in the study by **Sugimoto (1997)** are biologically very significant. For the 24-month historical controls, only two out of 20 control groups had a response greater than 8%. In summary, the very strong findings in the 18-month studies, the positive finding when all four studies are pooled and the low probability that the responses seen in the 18-month studies are due to chance support the conclusion that glyphosate causes hemangiosarcomas in male CD-1 mice.

For hemangiomas in females, pooling the two 18-month studies results in a significant trend ($p_{Trend}$=0.001). Pooling the two-year studies results in $p_{Trend}$=0.424. Pooling all four studies results in $p_{Trend}$=0.018. In summary, the very strong findings in one 18-month study, the positive finding when all four studies are pooled and the low probability that the responses seen in the **Sugimoto (1997)** study are due to chance, support the conclusion that glyphosate causes hemangiomas in female CD-1 mice.

For lung adenocarcinomas in male CD-1 mice, pooling the two 18-month studies results shows no significant trend ($p_{Trend}$=0.417, $p_{Hist}$0.126). Pooling the two 24 month studies yields ($p_{TrendA}$=0.985, $p_{Hist}$=0.993). Pooling all four studies results in ($p_{TrendA}$=0.937, $p_{Hist}$=0.744). In summary, the moderate findings in one 24 month study, and the negative finding when any studies are pooled suggest that the linkage between glyphosate and lung adenocarcinomas in male CD-1 mice is due to chance.

The one study in Swiss Albino mice[84] was effectively negative for all endpoints except malignant lymphomas and kidney adenomas where marginally significant tumor responses were seen. Considering the findings for kidney adenomas in CD-1 mice, glyphosate may also cause kidney adenomas in male Swiss Albino mice from the study of **Kumar (2001)**.

To summarize the findings in mice, glyphosate causes hemangiosarcomas, kidney tumors and malignant lymphomas in male CD-1 mice and hemangiomas in female CD-1 mice after 18 months of exposure, kidney tumors in male CD-1 mice after 24 months exposure and possibly kidney adenomas in male Swiss albino mice. When 18-month and 24-month studies are pooled, there is a significant increase in hemangiosarcomas in male mice, hemangiomas in female mice and kidney tumors in male mice.

**Discussion and Summary Animal Carcinogenicity Studies**

As noted earlier, there has been a suggestion that using doses substantially larger than 1000 mg/kg/day exceeds the current limit dose set by the OECD. The only place in the **OECD guidance**[67] that addresses a dose of 1000 mg/kg/day is in paragraph 23 which reads:

*"For the chronic toxicity phase of the study, a full study using three dose levels may not be considered necessary, if it can be anticipated that a test at one dose level, equivalent to at least 1000 mg/kg body weight/day, is unlikely to produce adverse effects. This should be based on information from preliminary studies and a consideration that toxicity would not be expected, based upon data from structurally related substances. A limit of 1000 mg/kg body weight/day may apply except when human exposure indicates the need for a higher dose level to be used."*

This language does not preclude the use of a dose exceeding 1000 mg/kg/day nor does it advocate ignoring such doses when evaluating the results of an animal carcinogenicity study. In fact, the reasons for excluding a dose in an animal carcinogenicity study are clearly outlined in paragraph 90 within **OECD guidance**[59] and reads:

*"If the main objective of the study is to identify a cancer hazard, there is broad acceptance that the top dose should ideally provide some signs of toxicity such as slight depression of body weight gain (not more than 10%), without causing e.g., tissue necrosis or metabolic saturation and without substantially altering normal life span due to effects other than tumours. Excessive toxicity at the top dose level (or any other dose level) may compromise the usefulness of the study and/or quality of data generated. Criteria that have evolved for the selection of an adequate top dose level include: (in particular) toxicokinetics; saturation of absorption; results of previous repeated dose toxicity studies; the MOA and the MTD."*

While one study has a slight decrease in body-weight gain, there are no indications in any other studies of an exceedance in dose that would support ignoring the findings from any exposure group.

**EPA**[33] uses a slightly different criteria to determine which dose to include or exclude based on an earlier OECD document. These are spelled out in EPA's guideline document for carcinogenicity risk assessment[33]

*"Other signs of treatment-related toxicity associated with an excessive high dose may include (a) significant reduction of body weight gain (e.g., greater than 10%), (b) significant increases in abnormal behavioral and clinical signs, (c) significant changes in hematology or clinical chemistry, (d) saturation of absorption or detoxification mechanisms, or (e) marked changes in organ weight, morphology, and histopathology. It should be noted that practical upper limits have been established to avoid the use of excessively high doses in long-term carcinogenicity studies of environmental chemicals (e.g., 5% of the test substance in the feed for dietary studies or 1 g/kg body weight for oral gavage studies [OECD, 1981])."* As before, this applies to only one study presented in this review.

Both of these guidelines make good scientific sense. In the 12 acceptable rodent carcinogenicity studies included in this evaluation, no study had sufficient toxicity at the highest dose to justify removing the highest dose from the analysis. Hence, the analyses presented here did not drop the doses >1000 mg/kg/day. This is also supported by one member of the **EPA's SAP**[54].

Twenty chronic rodent carcinogenicity studies have been done using glyphosate as the test compound. Eight of these studies are unacceptable for use in an evaluation of causality leaving seven studies in rats and five studies in mice. Because of the large number of evaluations done in an individual animal carcinogenicity study, there is concern that the false-positive rates could be exaggerated. For example, if 20 evaluations are done and a finding is deemed significant if $p_{Trend} < 0.05$, then you would expect that 20*0.05=1 evaluation would be positive simply due to chance.

**Table 15:** Observed versus expected tumor sites with significant trends in the 12 acceptable rodent carcinogenicity studies using glyphosate.

| Species | Strain | Sex | Total Sites[1] | Exp. <0.05 | Obs. <0.05 | Tumors[2] p<0.05 | Exp. <0.01 | Obs. <0.01 | Tumors p<0.01 |
|---|---|---|---|---|---|---|---|---|---|
| Rat (7 studies) | Sprague-Dawley (4 studies) | M | 86 | 4.3 | 4 | TICT, TFAC, KA, HA | 0.9 | 2 | TICT, KA |
| | | F | 102 | 5.1 | 1 | TCCC | 1.0 | 1 | TCCC |
| | Wistar (3 studies) | M | 64.5 | 3.2 | 2 | HA, SK | 0.6 | 1 | HA |
| | | F | 76.5 | 3.8 | 2 | MC, MAC | 0.8 | 1 | MAC |
| Mouse (5 studies) | CD-1 (4 studies) | M | 42 | 2.1 | 8 | KA, KC, KAC, HS(2)[3], ML(2), LAC | 0.4 | 5 | KA,KC, HS(2), ML |
| | | F | 60 | 3 | 1 | H | 0.6 | 1 | H |
| | Albino (1 study) | M | 10.5 | 0.5 | 0 | | 0.1 | 0 | |
| | | F | 15 | 0.8 | 1 | H | 0.2 | 1 | H |
| Rats (7 studies) | All (7 studies) | M | 150.5 | 7.5 | 6 | TICT, KA, HA(2), TFAC, SK | 1.5 | 3 | TICT, KA, HA |
| | | F | 178.5 | 8.9 | 3 | TCCC, MC, MAC | 1.8 | 2 | TCCC, MAC |
| | | Both | 329 | 16.5 | 9 | TICT, KA, HA(2), TFAC, SK, TCCC, MC, MAC | 3.3 | 5 | TICT, KA, HA, TCCC, MAC |
| Mice (5 studies) | All (5 studies) | M | 52.5 | 2.6 | 8 | KA, KC, KAC, HS(2), ML(2), LAC | 0.5 | 5 | KA,KC, HS(2), ML |
| | | F | 75 | 3.8 | 2 | H(2) | 0.7 | 2 | H(2) |
| | | Both | 127.5 | 6.4 | 10 | KA, KC, KAC, HS(2)[3], H(2), ML(2), LAC | 1.3 | 7 | KA,KC, HS(2), H(2), ML |
| All (12 studies) | All (12 studies) | M | 203 | 10.1 | 14 | TICT, KA(2), HA(2), TFAC, SK, KC, KAC, HS(2), ML(2), LAC | 2.0 | 8 | TICT, HA, KA(2),KC, HS(2), ML |
| | | F | 253.5 | 12.7 | 5 | TCCC, MC, MAC, H(2) | 2.5 | 4 | TCCC, MAC, H(2) |
| | | Both | 456.5 | 22.8 | 19 | TICT, KA(2), HA(2), TFAC, SK, KC, KAC, HS(2), H, ML(2), LAC, TCCC, MC, MAC | 4.6 | 12 | TICT, HA, KA(2), KC, HS(2), H(2), ML, TCCC, MAC |

[1] Number of sites examined is based upon suggestions by Dr. J. Haseman in his written testimony to the EPA; male mice – 10.5 sites; female mice – 15 sites; male rats – 21.5 sites; female rats – 25.5 sites

[2] Tumor abbreviations are: KA – kidney adenoma; KC – kidney carcinoma; KAC – kidney adenoma or carcinoma; HS – hemangiosarcoma; H – hemangioma; HA – hepatocellular adenoma; LAC – lung adenoma or adenocarcinoma; ML – malignant lymphoma; MC – mammary gland carcinoma; MAC – mammary gland adenoma or carcinoma; TCCC – thyroid C-cell carcinoma; TFAC

– thyroid follicular cell adenoma or carcinoma; TICT – testes interstitial cell tumor; SK – skin keratocanthoma
$^{3}$(x): x studies with this result

The EPA asked the SAP to comment on its evaluation of glyphosate[61] at a meeting in Washington, DC in December 2016[54]. Many comments were received from outside experts at this meeting; one such set of comments came from Dr. J. K. **Haseman (2016)**[111]. **Haseman (2016)** directly addressed the false-positive error rate and concluded that the results seen in these studies were due to chance. He did this by deciding how many evaluations were likely for each study (broken into sex-by-species groups) and then aggregating the findings. He concluded that the effective number of analyses were 10.5 in male mice, 15 for female mice, 21.5 for male rats, and 25.5 for female rats. **Haseman (2016)** made two assumptions in his analysis that are not valid. The first was that all of the possible trend tests had been done on all of the sites he considered reasonable for such an evaluation. He identified eight positive findings. However, EPA had not evaluated all of the sites nor had they considered doing a formal analysis using historical control data. EPA identified eight sex/species groups that had at most one positive tumor finding using the trend test with $p_{Trend}$≤0.05. In Tables 1-14 above, I have identified 19 tumors with $p_{Trend}$≤0.05 or $p_{Hist}$≤0.05 and 12 with $p_{Trend}$≤0.01 or $p_{Hist}$≤0.01 (Table 15). Secondly, Dr. Haseman assumed one could aggregate all the studies into one large analysis of Type-1 error. However, inference in these studies is always made by sex/species/strain (e.g. glyphosate causes hemangiosarcomas in male CD-1 mice; not glyphosate causes cancer in rodents), and the analysis should have been done by grouping each separately. Table 15 shows these analyses as well as the aggregated analysis for all of the acceptable studies.

With the exception of male Sprague-Dawley rats, the observed number of tumors are at or near the expected number for the different sex/strain groups in rats (Table 15). For male Sprague-Dawley rats, 0.8 cases with $p_{Trend}$≤0.01 or $p_{Hist}$≤0.01 are expected and two were observed (p=0.21). In female CD-1 mice and Swiss Albino mice, the expected and observed numbers are approximately equal. However, in male CD-1 mice, there were 2.1 tumors expected for $p_{Trend}$≤0.05 or $p_{Hist}$≤0.05 and eight were observed (p<0.001) and there were 0.4 expected for $p_{Trend}$≤0.01 or $p_{Hist}$≤0.01 and five were observed (p<0.001). This clearly could not have occurred by chance alone. Even if one incorrectly groups all sexes and species together, there are 4.6 expected responses for $p_{Trend}$≤0.01 or $p_{Hist}$≤0.01 and 12 observed (p<0.001). Thus, chance does not explain the positive results seen in these studies.

## Conclusion for Animal Carcinogenicity Studies

There are several general issues that pertain to all animal carcinogenicity studies. There is considerable genetic variability across animal strains both over time and space. It is difficult to compare experiments done in different laboratories even when using the same strain of animal. This is obvious when you examine the rates for hepatocellular adenomas in Wistar rats across the three studies using this strain. Thus, each study

should be considered separately with regard to the findings in that study before being compared across studies.

The use of a p-value of 0.05 as the cut off for increasing tumor incidence does not account for trends in the data across multiple studies. Three studies with marginal responses of 6-8% in a given tumor could, when pooled for analysis, lead to highly significant findings. This issue is well-recognized in epidemiology but not usually considered in toxicology because of a lack of replicate studies. This case is fairly unique because of the larger number of studies available for analysis and requires a more rigorous evaluation of the data such as the pooled analysis presented in this report.

Pooling of the data for the evaluation of replicate studies makes sense as it addresses the question "Does the data as a whole support a finding of increased cancer incidence in these studies?" Some toxicologists may argue that the studies are not replicates and hence cannot be pooled. But if they are not replicates, then they cannot be compared to see if there is consistency across the studies. This is because there may be some subtle change from one study to another that leads to a positive finding in one study but a negative finding in other studies. Thus, either the studies are not good replicates so you cannot compare across studies and you cannot pool them, or they are good replicates so you can compare across studies and you can pool them. There is no argument that would support a comparison across studies that is appropriate when pooling is inappropriate.

There were seven rat studies and five mouse studies that were of sufficient quality and with sufficient details available for inclusion in this evaluation.

Glyphosate has been demonstrated to cause cancer in two strains of rats and one strain of mice. Glyphosate causes hepatocellular adenomas in male Wistar rats and, to a lesser degree, in male Sprague-Dawley rats, mammary gland adenomas and adenocarcinomas in female Wistar rats, skin keratocanthomas in male Wistar rats, and kidney adenomas and thyroid C-cell adenomas and carcinomas in male Sprague-Dawley rats. Glyphosate causes hemangiosarcomas, kidney tumors and malignant lymphomas in male CD-1 mice and hemangiomas in female CD-1 mice and possibly causes malignant lymphomas, kidney adenomas in male Swiss albino mice and hemangiomas in female Swiss albino mice. Thus, glyphosate causes cancer in mammals.

### Mechanisms Relating to Carcinogenicity

Many human carcinogens act via a variety of mechanisms causing various biological changes, taking cells through multiple stages from functioning normally to becoming invasive with little or no growth control (carcinogenic). **Hanahan and Weinberg (2011)**[112] identified morphological changes in cells as they progress though this multistage process and correlated these with genetic alterations to develop what they refer to as the "hallmarks of cancer." These hallmarks deal with the entire process of carcinogenesis and not necessarily with the reasons that cells begin this process or the early stages in the process where normal protective systems within the cells remove

52

potentially cancerous cells from the body.  While tumors that arise from a chemical insult to the cell may be distinct from other tumors by mutational analysis, they all exhibit the hallmarks as described by **Hanahan and Weinberg (2011)**.

Systematic review of all data on the mechanisms by which a chemical causes cancer is complicated by the absence of widely accepted methods for evaluating mechanistic data to arrive at an objective conclusion on human hazards associated with carcinogenesis.  Such systematic methods exist in other contexts[113], but are only now being accepted as a means of evaluating literature in toxicological evaluations[114-117].

In this portion of the report, I am focusing on the mechanisms that can cause cancer.  **Smith et al. (2015)**[37] discussed the use of systematic review methods in identifying and using key information from the literature to characterize the mechanisms by which a chemical causes cancer.  They identified 10 "Key Characteristics of Cancer" useful in facilitating a systematic and uniform approach to evaluating mechanistic data relevant to carcinogens.  These 10 characteristics are presented in Table 16 (copied from Table 1 of **Smith et al. (2015)**[37]).  While there is limited evidence on glyphosate for most of the key characteristics, genotoxicity (characteristic two) and oxidative stress (characteristic five) have sufficient evidence to warrant a full review.

**Genotoxicity**

Genotoxicity refers to the ability of an agent (chemical or otherwise) to damage the genetic material within a cell, thus increasing the risks for a mutation.  Genotoxic substances interact with the genetic material, including DNA sequence and structure, to damage cells. DNA damage can occur in several different ways, including single- and double-strand breaks, cross-links between DNA bases and proteins, formation of micronuclei and chemical additions to the DNA.

Just because a chemical can damage DNA does not mean it will cause mutations.  So, while all chemicals that cause mutations are genotoxic, all genotoxic chemicals are not necessarily mutagens.  Does that mean that the genotoxicity of a chemical can be ignored if all assays used for identifying mutations in cells following exposure to a chemical are negative?  The answer to that question is no and is tied to the limitations in tests for mutagenicity (the ability of a chemical to cause mutations in a cell).  It is unusual to see an evaluation of the sequence of the entire genome before exposure with the same sequence after exposure to determine if the genome has been altered (mutation).  There are assays that can evaluate a critical set of genes that have previously been associated with cancer outcomes (e.g. cancer oncogenes), but these are seldom applied.  In general, mutagenicity tests are limited in the numbers of genes they actually screen and the manner in which these screens work.

Because screening for mutagenicity is limited in scope, any genetic damage caused by chemicals should raise concerns because of the possibility of a mutation arising from that genetic damage.   In what follows, I will systematically review the scientific findings available for evaluating the genotoxic potential of glyphosate.  This will be divided into six separate sources of data based on the biological source of that data: (1) data from exposed humans, (2) data from exposed human cells in a laboratory setting, (3) data

from exposed mammals (non-human), (4) data from exposed cells of mammals (non-human) in the laboratory, (5) data from non-mammalian animals and others, and (5) data from cells from non-mammalian animals and others.  These six areas are based upon the priorities one would apply to the data in terms of impacts.  Seeing genotoxicity in humans is more important than seeing genotoxicity in other mammals, which is more important than seeing genotoxicity in non-mammalian systems.  In addition, seeing genotoxicity in whole, living organisms (*in vivo*) carries greater weight than seeing responses in cells in the laboratory (*in vitro*).  Basically, the closer the findings are to real, living human beings, the more weight they should be given.

Table 16: Key characteristics of carcinogens, **Smith et al. (2016)**[37]

| Characteristic | Examples of relevant evidence |
|---|---|
| 1. Is electrophilic or can be metabolically activated | Parent compound or metabolite with an electrophilic structure (e.g., epoxide, quinone), formation of DNA and protein adducts |
| 2. Is genotoxic | DNA damage (DNA strand breaks, DNA–protein cross-links, unscheduled DNA synthesis), intercalation, gene mutations, cytogenetic changes (e.g., chromosome aberrations, micronuclei) |
| 3. Alters DNA repair or causes genomic instability | Alterations of DNA replication or repair (e.g., topoisomerase II, base-excision or double-strand break repair) |
| 4. Induces epigenetic alterations | DNA methylation, histone modification, microRNA expression |
| 5. Induces oxidative stress | Oxygen radicals, oxidative stress, oxidative damage to macromolecules (e.g., DNA, lipids) |
| 6. Induces chronic inflammation | Elevated white blood cells, myeloperoxidase activity, altered cytokine and/or chemokine production |
| 7. Is immunosuppressive | Decreased immunosurveillance, immune system dysfunction |
| 8. Modulates receptor-mediated effects | Receptor in/activation (e.g., ER, PPAR, AhR) or modulation of endogenous ligands (including hormones) |
| 9. Causes immortalization | Inhibition of senescence, cell transformation |
| 10. Alters cell proliferation, cell death or nutrient supply | Increased proliferation, decreased apoptosis, changes in growth factors, energetics and signaling pathways related to cellular replication or cell cycle control, angiogenesis |

Abbreviations: AhR, aryl hydrocarbon receptor; ER, estrogen receptor; PPAR, peroxisome proliferator–activated receptor. Any of the 10 characteristics in this table could interact with any other (e.g., oxidative stress, DNA damage, and chronic inflammation), which when combined provides stronger evidence for a cancer mechanism than would oxidative stress alone.

The data being included in this review come from the peer-reviewed scientific literature, the summaries of reports in regulatory documents that are proprietary and for which I have limited access to the original work, and reports from industry that are proprietary to which I have been given greater access. All of these studies are included in the overall evaluation of causation.

### Genotoxicity in Humans *in-vivo*

Three studies have evaluated the potential genotoxicity of glyphosate formulations in exposed humans. **Paz-y-Miño et al. (2007)**[118] analyzed the blood of 24 exposed individuals (living within 3 kilometers of spraying) and 21 unexposed individuals (living 80 kilometers away from the spraying area) for DNA damage using the comet assay. All study subjects were from Ecuador and none of the controls or exposed individuals smoked, drank alcohol, took non-prescription drugs or had been exposed to pesticides during the course of their normal daily lives. Exposed and control individuals did some cultivating and harvesting but without pesticides or herbicides. Exposed individuals were analyzed within two months of spraying for the eradication of plants associated with illegal narcotics. An average of 200 cells per person were ranked between 0-400 depending on the amount of DNA in the comet's tail in order to calculate the mean amount of DNA damage. There was a significant difference between the mean total migration level of exposed individuals to controls (p<0.001). Data was given for each individual classified into five groups based upon the amount of DNA in the comet's tail. There was clearly a shift in the distribution of DNA in cells with the controls never seeing scores in the top two categories while all but three exposed had some scores in the top two categories. In essence, some of the DNA had been fragmented by the exposure.

In a second study by the same group, **Paz-y-Miño et al. (2011)**[119] evaluated the karyotypes (the chromosome count of the individuals and any alterations to the chromosomes as seen under a microscope) of 92 people living in 10 communities in northern Ecuador. Controls were from areas without spraying and both controls and exposed subjects had no history of exposure to smoking or other genotoxic compounds. This study saw no changes between controls and exposed subjects for 182 karyotypes evaluated.

**Bolognesi et al. (2009)**[120] studied women of reproductive age and their spouses in five areas of Colombia, four of which are subject to spraying for either narcotics control or sugar cane growing. There were 60 subjects from the Santa Marta area (organic coffee is grown without the use of pesticides), 52 from Boyaca (manual spraying for illicit drugs), 58 from Putumayo (aerial spraying for illicit drugs using a glyphosate formulation), 63 from Nariño (same exposure as Putumayo) and 28 from Valle del Cauca (aerial spraying of Roundup 747 (74.7% glyphosate) without additional adjuvant for sugar cane maturation). All subjects were interviewed with a standardized questionnaire designed to obtain information about current health status, health history, lifestyle and potential exposure to possible confounding factors (smoking, use of medicinal products, severe infections or viral diseases during the last six months, recent vaccinations, presence of known indoor/outdoor pollutants, exposure to diagnostic x-rays, and previous radio- or chemotherapy). In Santa Marta, blood samples were taken

once, during the initial interview. In Boyaca, blood samples were taken at the initial interview and 1 month later. In Nariño, Putumayo and Valle del Cauca, blood samples were taken at the initial interview, within five days after spraying and 4 months later. In lymphocytes, binucleated cells with micronuclei (BNMN) were lowest in Santa Marta and similar in the four exposed regions prior to exposure. Statistically significant increases in BMNM in Nariño, Putumayo and Valle del Cauca were seen between first and second sampling. The mean BNMN in Nariño and Putumayo was greater in respondents who self-reported direct contact with sprayed fields, but differences were not statistically significant. Multiple linear regression demonstrated statistically significant increases in BMNM in all four exposed regions post exposure when compared to pre-exposure and controlling for all other variables (p<0.001). The largest total change in mean BMNM values pre-exposure compared to immediate post exposure occurred in Valle del Cauca where spraying is done using Roundup with no additional adjuvant.

**Kier (2015)**[121] identified 16 additional studies of pesticide use that included some exposure to glyphosate. Eleven of the 16 studies demonstrated some degree of genotoxicity in the human populations studied but did not adequately attribute the exposure primarily to glyphosate so they are not included in this review.

In summary, two of the three studies in which genotoxicity endpoints were evaluated in humans in areas with exposure to glyphosate spraying showed statistically increased changes in DNA damage in blood. In the strongest study, in three areas where chromosomal damage (micronuclei) was examined in individuals pre- and post-spraying (<5 days) showed statistically significant increases. In one other area where post-exposure damage was measured one month after exposure, there was little change.

### Genotoxicity in Human Cells (*in vitro*)

Studies have explored the *in vitro* genotoxicity of glyphosate using a variety of different cell types (lymphocytes, fibroblasts, and immortalized cells from cancers of the larynx, mouth, blood and liver) using several different assays for markers of genotoxicity with or without metabolic activation.

**Mladinic et al. (2009)**[122] induced DNA strand breaks (comet assay) from exposure to glyphosate (purity not given) in lymphocytes from three healthy human donors (questionnaire used to exclude genotoxic exposures) at concentrations of 3.5, 92.8 and 580 µg/ml with S9 activation and saw effects at only the highest doses for cells without S9 activation.

**Alvarez-Moya et al. (2014)**[123] conducted a similar study using lymphocytes from human volunteers (questionnaire used to exclude genotoxic exposures) and exposure to glyphosate (96% purity) at concentrations of 0.12, 1.2, 12 and 120 µg/ml. A significant increase in DNA strand breaks (comet assay) was seen for all exposure groups with a clear dose-response relationship without metabolic activation (metabolic activation was not tested).

Using human HEP-2 cells, **Manas et al. (2009)**[124] induced DNA damage (comet assay) by

glyphosate (96% pure) at all concentrations ranging from 676 μg/ml to 1270 μg/ml (no S9 activation tested). Cell viability at the highest concentration was below 80% and values at the other concentrations were not given.

**Monroy et al. (2005)**[125] induced significant DNA damage (comet assay) in fibroblast GM 38 cells at concentrations of glyphosate (technical grade, purity not given) ranging from 676 μg/ml to 1000 μg/ml with a clear dose-response pattern. Over this same concentration range, they also saw concentration-dependent decreases in cell viability at all doses making the comet assay results difficult to interpret. In a similar analysis in the same paper, using fibrosarcoma HT1080 cells, they also saw concentration-dependent DNA damage and loss of cell viability. Activation by S9 was not used in either experiment.

**Lueken et al. (2004)**[126] induced DNA damage (comet assay) in fibroblasts GM 5757 at a concentration of glyphosate (98.4% purity) of 12,680 μg/ml in combination with exposure to 40 or 50 mM $H_2O_2$. Activation by S9 was not used in this experiment. According to the authors, cell viability at this exposure level was above 80%.

**Koller et al. (2012)**[127] significantly induced DNA damage (comet assay) in human TR146 cells (buccal carcinoma cells) from exposure to glyphosate (>95% purity) in a dose-dependent fashion at concentrations of 20 and 40 μg/ml. Above 40 μg/ml, there was a significant increase in tail intensity relative to controls, but the actual amount increased did not change as the dose increased (plateau). Using Roundup (Ultra Max) the authors saw virtually the same level of DNA damage at 20 and 40 μg/ml, but the concentration response continued to increase above that exposure. These experiments did not use S9 activation. They also used the CBMN assay in the same system to evaluate the total number of micronuclei in binucleated cells (MNI), the number of binucleated cells with micronuclei (BN-MNI), the number of nuclear buds (NB) and the number of nucleoplasmic bridges (NPB) caused by glyphosate and Roundup exposure. Two endpoints (NB, NPB) had significant increases at concentrations of 10, 15 and 20 μg/ml and two (MNi, BN-MNi) were significantly elevated for concentrations of 15 and 20 μg/ml. Equivalent Roundup exposures resulted in significant increases in all four measures of DNA damage at 10, 15 and 20 μg/ml. The results for the Roundup were greater than for glyphosate alone.

**Gasnier at al. (2009)**[128] exposed cells from the hepatoma cell line HepG2 to glyphosate (purity not given) and four glyphosate formulations. Only one glyphosate formulation was tested for DNA damage (comet assay) and they saw significant effects at equivalent concentrations of 0.05 μ/ml to 4 μg/ml of glyphosate (p-values not given). No p-values are provided and presentation of the results does not provide a clear means to compare these results with other studies. This study will not be used in the evaluation.

**Manas et al. (2009)**[124] obtained human blood samples from three healthy, non-smoking women and three healthy men with no history of pesticide exposure. Lymphocytes were cultured with glyphosate (96% purity) at concentrations of 34, 203, and 1015 μg/ml with no statistically significant changes in chromatid breaks,

chromosome breaks, chromatid gaps, chromosome gaps, dicentrics, acentric fragments, or endoreduplication.

**Mladinic et al. (2009)**[129] used blood from three non-smoking, healthy volunteers to evaluate the formation of micronuclei, nuclear buds and nucleoplasmic bridges as a function of exposure to glyphosate (98% purity).  Significant changes in micronuclei were seen following exposure to glyphosate at 92.8 and 580 μg/ml in S9 activated cells, but not those without metabolic activation.  Changes in nuclear buds were seen at 580 μg/ml for both S9 activated and non-activated cells while significant changes in nucleoplasmic bridges were seen only at 580 μg/ml in S9 activated cells.  This study contained a positive control (ethyl methanesulfonate at 200 μg/ml) which was also negative in all assays, many times showing effects below that seen for glyphosate.

**Bolognesi et al. (1997)**[130] obtained blood from two healthy female donors and exposed it to glyphosate (99.9% purity) or a Roundup formulation (30.4% glyphosate).  At concentrations of 1000, 3000 and 6000 μg/ml of glyphosate and at 100 and 330 μg/ml of glyphosate formulation, significant changes in sister chromatid exchanges (SCEs) were seen.  At 330 μg/ml, a non-significant increase in SCEs was seen for glyphosate alone that was approximately 20% below that seen for an equivalent glyphosate exposure from the Roundup formulation.  This study did not consider S9 activation.

**Lioi et al. (1998)**[124, 131] obtained blood from three healthy donors and exposed it to glyphosate (>98% purity).  At concentrations of 1.4, 2.9, and 8.7 μg/ml of glyphosate, significant changes in sister chromatid exchanges (SCEs) and chromosomal aberrations were seen. This study did not consider S9 activation.

**Vigfusson and Vyse (1980)**[132] exposed cultured human lymphocytes from two people to Roundup (% glyphosate unknown) at concentrations of 250, 2500 and 25000 μg/ml.  Results for the highest concentration were not provided due to lack of cell growth in culture.  SCEs were shown to be significantly increased for the remaining two concentrations in one donor and only for the lowest concentration in the other. While the relative SCE counts seen in this paper are similar to those from **Bolognesi et al. (1997),** the absolute counts in the controls are roughly three times higher in this study. This study did not consider S9 activation.

### Genotoxicity in Non-Human Mammals (*in vivo*)

**Bolognesi et al. (1997)**[130] exposed groups of three Swiss CD-1 male mice by Intraperitoneal (IP) injection with a single dose of glyphosate (99.9% purity, 300 mg/kg) or Roundup (900 mg/kg, equivalent to 270 mg/kg glyphosate).  Animals were sacrificed at four and 24 hours after injection and livers and kidney were removed to obtain crude nuclei from the adhering tissues. Both tissues demonstrated significant increases in DNA single-strand breaks (p<0.05) at four hours for both glyphosate and Roundup with no discernable difference between the responses.  At 24 hours, the presence of strand breaks was reduced and no longer statistically significant from controls.

**Peluso et al. (1998)**[133] exposed groups of six (controls, lowest doses of glyphosate-salt and Roundup) or three Swiss CD-1 mice (males and females, specific numbers not

specified, liver and kidney tissues combined for analysis) to the isopropylammonium salt of glyphosate or Roundup (30.4% isopropylammonium salt of glyphosate) for 24 hours. DNA adducts ($^{32}$P-DNA post labeling) were not evident in mice exposed to the glyphosate-salt alone in either liver or kidney, but were present in liver and kidney at all tested doses of Roundup showing a dose-response pattern.

**Rank et al. (1993)**[134] exposed male and female NMRI mice (three to five per sex) to glyphosate isopropylamine salt (purity not specified) and Roundup (480 g glyphosate isopropylamine salt per liter) by intraperitoneal injection. After 24 or 48 hours (only 24 hours for Roundup), polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 1000 cells. No significant increases were seen for any concentration in glyphosate-exposed animals (100, 150 and 200 mg/kg) or Roundup-exposed animals (133 and 200 mg/kg glyphosate equivalent dose). The positive controls, while not statistically significant, showed an increase in micronuclei.

**Bolognesi et al (1997)**[130] exposed groups of three, four or six male Swiss CD-1 mice to glyphosate (99.9% purity) and Roundup (30.4% glyphosate) by intraperitoneal injection in two equal doses given 24 hours apart. After six or 24 hours following the last exposure, polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 1000 cells. Mice given two doses of 150 mg/kg of glyphosate showed a non-significant increase in micronuclei at 6 hours and a significant increase at 24 hours. In contrast, mice given two doses of 225 mg/kg glyphosate equivalent of Roundup showed a significant increase in micronuclei at both six and 24 hours. The relative differences in mean absolute increase (subtract mean response in controls) in micronucleii between glyphosate and Roundup at 24 hours was 3.6 whereas the relative difference in glyphosate equivalent dose was 1.5 indicating a greater effect of the glyphosate formulation.

**Manas et al. (2009)**[124] exposed groups of male and female Balb C mice (group size not given, tissues combined for analysis) to glyphosate (96% purity) by intraperitoneal injection in two equal doses given 24 hours apart. Twenty-four hours post exposure, polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 1000 cells. No significant increases were seen at doses of 50 mg/kg and 100 mg/kg in glyphosate-exposed animals but a significant increase was seen at 400 mg/kg. The positive controls showed a statistically significant increase in micronuclei (roughly three times the control rate).

**Dimitrov et al. (2006)**[135] exposed groups of eight male C57BL mice (tissues combined for analysis) to Roundup (41% glyphosate) via gavage at a dose of 1080 mg/kg. At 6, 24, 72, 96, or 120 hours post exposure, polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 4000 cells (500 per animal). No significant increases were seen. They also looked for chromosomal damage in these animals and saw no significant increases. The positive controls showed a statistically significant increase in micronuclei.

**Prasad et al. (2009)**[136] exposed groups of 15 male Swiss CD-1 mice to Roundup (30.4% glyphosate) by IP injection at doses of 25 and 50 mg/kg. At 24, 48 or 72 hours post

exposure, polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 2000 cells per animal, five animals per sacrifice. Micronucleii counts were significantly increased (p<0.05) at all doses at all times relative to controls. In addition, the number of cells with chromosomal aberrations was significantly increased for all doses at all times. The control rate of micronuclei was similar to that of **Bolognesi et al. (1997),** but about 50% greater response for a dose that was approximately 10 times smaller.

**Grisolia et al. (2002)**[137] exposed groups of Swiss mice (sex and sample size not given) to Roundup (480 g glyphosate isopropylamine salt per liter) by IP injection at doses of 50, 100 and 200 mg/kg Roundup in two doses separated by 24 hours. At 24 hours post exposure, polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 2000 cells per animal. Micronuclei counts were not increased at any dose. This exposure appears to be the same formulation of Roundup used in the study by **Rank et al. (1993)** which was also negative.

**Coutinho do Nascimento and Grisolia (2000)**[138] exposed groups of six male mice (strain not given) to Roundup (% glyphosate not given) by IP injection at doses of 50, 100 and 200 mg/kg in two doses separated by 24 hours. At 24 hours post exposure, polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 1000 cells per animal. A significant increase in micronuclei were seen at a dose of 85 mg/kg. No increase was seen at 42 or 170 mg/kg.

**Cavusoglu et al. (2011)**[139] exposed groups of six Swiss albino mice by IP injection with a single dose of glyphosate formulation (RoundupUltra Max, 450 g/l glyphosate, 50 mg/kg glyphosate equivalent dose). Animals were sacrificed at three days after injection. Micronuclei in normochromatic erythrocytes were counted from a sample of 1000 cells per animal. There was a significant increase in micronuclei in erythrocytes (p<0.05). *G. bilboa* eliminated these effects.

**Chan and Mahler (1992)**[140] exposed groups of 10 male and female B6C3F$_1$ mice to glyphosate (98.6% purity) in feed at doses of 0, 507, 1065, 2273, 4776, and 10780 mg/kg in males and 0, 753, 1411, 2707, 5846, and 11977 mg/kg in females for 13 weeks. At sacrifice, polychromatic erythrocytes from peripheral blood were extracted and micronuclei counted from a sample of 10,000 cells. No significant increases were seen at any of the tested doses.

**Li and Long (1988)**[141] exposed groups of 18 male and female Sprague-Dawley rats to glyphosate (98% purity) by IP injection at a dose of 1000 mg/kg. At 6, 12 and 24 hours post treatment, 6 animals of each sex were sacrificed and polychromatic erythrocytes from bone marrow were extracted and micronuclei counted from a sample of 50 cells per animal. The percentage of cells with chromosomal aberrations was not increased at any time point following exposure.

### Genotoxicity in Non-Human Mammalian Cells (*in vitro*)

**Li and Long (1988)**[141] incubated Chinese hamster ovary cells (CHO-K1BH4) with glyphosate (98% purity) for three hours at concentrations of 5, 10, 50 and 100 mg/ml.

Cells were then plated using 200 cells per sample in triplicate and incubated for 8-12 days. Colonies were then counted and results expressed as mutant frequency. No positive results were seen in any experimental group with or without S9 activation. It is not clear why there is such a large difference in the incubation times in the various groups in this experiment, nor is it clear which groups incubated longer. In a second study in the same publication, non-induced primary rat hepatocytes (Fischer 344) were incubated with seven concentrations of glyphosate (12.5 ng/ml to 125 µg/ml) for 18-20 hours. No significant increases were seen for net grains per nucleus at any exposure concentration. There was a four-fold increase in the lowest exposure groups relative to controls and then every other treated group was below the control response. This is a very unusual finding and could be due to the way in which the data is adjusted for net grains in cytoplasm. The authors calculated net grains per nucleus by subtracting the highest cytoplasmic count from the nuclear count; if cytoplasmic count is increased by glyphosate this could bias the findings making any increase in nuclear count disappear. No data is provided to resolve this issue.

**Roustan et al. (2014)**[142] incubated Chinese hamster ovary cells (CHO-K1) with glyphosate (purity not provided) for three hours at concentrations of 2, 5, 10, 15, 17.5, 20, and 22.5 mg/ml. Cells were then plated using 200 cells per sample in triplicate and incubated for 24 hours. For each exposure concentration, 2000 bi-nucleated cells were examined for micronuclei. No positive results were seen in any experimental group without S9 activation but the four highest exposure groups were significant with a clear concentration-response pattern when S9 activation was present.

**Lioi et al. (1998)**[131] exposed lymphocytes from three unrelated healthy cows to glyphosate (>98% purity) for 72 hours to concentrations of 3, 14.4 and 28.7 µg/ml without S9 activation. Chromosomal aberrations scored from 150 cells were significantly increased (P<0.05) for all exposure concentrations of glyphosate with a clear concentration-response pattern. Similarly, SCEs per cell were increased at all concentrations (p<0.05) but no concentration response pattern was evident.

**Sivikova and Dianovsky (2006)**[143] exposed lymphocytes from two healthy young bovine bulls to glyphosate formulation (62% glyphosate) for 2, 24 and 48 hours using concentrations of 4.7, 9.5, 23.6, 47.3, 94.6 and 190 µg/ml without S9 activation. Chromosomal aberrations scored from 100 cells were not significantly increased (P<0.05) without S9 activation for any 24-hour exposure concentration of glyphosate (2- and 48-hours exposures were not done). SCEs per cell were increased at all 24-hour exposure concentrations (p<0.05) except the lowest concentration. At 48-hours, significant increases of SCEs per cell were seen at concentrations at or above 47.3 µg/ml (2-hour exposures were not done). Finally, after two hours of exposure with S9 activation, significant effects were seen at 5 and 10 µg/ml but not at 15 µg/ml (24- and 48-hour exposures were not done for S9 activation).

**Holeckova (2006)**[144] exposed lymphocytes from two healthy young bovine bulls to glyphosate formulation (62% glyphosate) for 24 hours to concentrations ranging from 28 to 1120 µmol/L without S9 activation. A significant increase in polyploidy was observed at 56 µmol/L, all other comparisons were without significance. However, this

one finding cannot be easily dismissed because all exposure groups above this concentration had too few cells for evaluation.  This study did not consider S9 activation.

**Genotoxicity in Non-Human Systems (*in vivo* and *in vitro*)**

Four studies[123, 145-147] in fish have seen positive results for genotoxicity (DNA strand breaks, different assays) following exposure to glyphosate.  In addition, one study[148] in oyster sperm and embryos exposed to glyphosate saw no increase in DNA damage (comet assay) and one study[149] in two strains of Drosophila melanogaster showed an increase in mutations (wing spot test) at the higher doses of exposure.

Fourteen studies[137, 145, 147, 150-160] in multiple fish species evaluated the relationship between various glyphosate formulations and genotoxicity with all studies showing positive results for various endpoints (DNA strand breaks, micronucleus formation, and chromosomal aberrations).  Two of the  studies[150, 152] were negative for micronucleus formation after exposure to glyphosate formulations and one of these[150] was also negative for chromosomal aberrations but both were positive in other markers of genotoxicity.  Two studies[161, 162] demonstrated genotoxicity (DNA strand breaks, micronuclei) in caiman from *in-vivo* exposure to a glyphosate formulation. Three studies[163-165] demonstrated genotoxicity (DNA strand breaks, micronucleus formation) in frogs or tadpoles from exposure to glyphosate formulations.  One study[148] in oyster sperm and embryos, one study[166] in clams and one study[167] in mussels exposed to a glyphosate formulation saw no increase in DNA damage (comet assay).  One study[168] in snails saw increased DNA damage (comet assay) following exposure to a glyphosate formulation. Two studies[169, 170] in worms saw mixed results for DNA damage (comet assay) with one of these studies[169] showing a positive result for micronucleus formation. One study[171] in Drosophila melanogaster showed an increase in sex-linked recessive lethal mutations.

In the published literature, five studies evaluated the impact of glyphosate in *in vitro* systems.  Two of these studies[172, 173] looked at genotoxicity of glyphosate in combination with UVB radiation and saw significant increases in DNA strand breaks (FADU assay) in bacteria without metabolic activation. One study[174] in eukaryote fish saw a significant increase in DNA strand breaks (comet assay) without S9 activation. Another study[141] showed no increase in reverse mutations in two strains of bacteria with and without S9 activation.

**Williams et al. (2000)**[175] summarized the literature regarding the use of reverse mutation assays in *S. typhimurium* (Ames Test).  Four studies using glyphosate and five studies of glyphosate formulations were all negative.  They cited one study[134] of a glyphosate formulation that was positive with S9 activation and negative without S9 activation. However, this study was positive with S9 activation in TA100 cells, negative with S9 activation in TA98 cells, negative without S9 activation for TA100 cells and positive without activation for TA98 cells.  They also summarized two studies of glyphosate in *e. coli* that were negative with and without activation.

Two additional studies[141, 176] of glyphosate using reverse mutation assays are available

from the scientific literature, both of which are negative.

### Regulatory Studies

EFSA[89] cited 14 reverse mutation assays in *S. typhimurium* (Ames Test), most of which were tested in strains TA 98, 100, 1535, 1537 (Table B.6.4-1). All 14 studies are listed as negative by EFSA. Actual data is provided for only one of the 14 studies and this study is clearly negative. EPA[61] cited 27 reverse mutation assays in *S. typhimurium* (Ames Test), most of which were tested in strains TA 98, 100, 1535, 1537 (EPA Table 5.1). All 27 studies are listed as negative. No data is provided for any of the studies. Kier and Kirkland (2013)[177] cited results from 18 bacterial reverse mutation assays of glyphosate and 16 of glyphosate formulations. Tabulated results and background information were provided for all 34 studies. Six studies of glyphosate alone demonstrated positive findings in one or more groups.

EFSA[89] cites three studies of gene mutations in mammalian cells, all of which are listed as negative (EFSA Table B.6.4-5), two  use the mouse lymphoma assay, and one uses the Chinese hamster ovary cell/hypoxanthine-guanine phosphoribosyl transferase (CHO/HGPRT) mutation assay. EPA[61] cites four studies, three of which appear to be the same as those cited by EFSA (EPA Table 5.2) and the fourth is another mouse lymphoma assay. All four are listed as negative. Kier and Kirkland (2013)[177] cite two of the mouse lymphoma studies and provide tabulated data. Neither study shows any indication of a statistically significant increase in mutation frequency at the thymidine kinase locus of L5178 mouse lymphoma tk(+/-) cells.

EFSA[89] cites one *in vitro* study of DNA damage and repair in mammalian cells which is listed as negative (EFSA Table B.6.4-6). This study is of unscheduled DNA synthesis (UDS assay) in primary rat lymphocytes. They also list five studies of chromosome aberrations (EFSA Table B.6.4-8), which are characterized as negative. Two studies are in human lymphocytes and two are in Chinese hamster lung (CHL) cells. Data for one of the studies in CHL is provided in tabular form and is clearly negative. EPA[61] cites eight *in vitro* studies of chromosome aberrations in mammalian cells (EPA Table 5.3); two of these studies match studies in the EFSA report. Four of the studies are from the literature[124, 131, 143, 178] and are reviewed above. Surprisingly, EPA refers to the study by Manas et al. (2009)[124] as negative although it was clearly positive in the comet assay., Additionally, EPA refers to the study by Sivikova and Dainovsky (2006)[143] as negative even though they saw clear effects of glyphosate on SCEs. Basically, all four of the literature studies cited by EPA are positive yet EPA lists only two of the four as positive. The remaining four studies are noted as negative; however, no data is supplied for these studies. Kier and Kirkland (2013)[177] cites eight literature studies (all reviewed above) and three regulatory studies with glyphosate exposure. The three regulatory studies are listed as negative, and the data are available as a table in the supplement material to Kier and Kirkland (2013); these studies are negative at all tested concentrations in CHL cells; one matches the study data provided by EFSA[89].

63

EFSA[89] cites nine micronucleus assays, three in Swiss Albino mice, two in NMRI mice, two in CD-1 mice, one in Sprague-Dawley rats, and one in CD rats (EFSA Table B.6.4-12). They list one study in Swiss Albino mice as weakly positive in males, one study in CD-1 mice as positive at the highest dose (data for this study is provided) and all other studies as negative. They discard one study with low doses in male Swiss mice, but the tables provided for this study show a clearly significant result at the highest dose used (30 mg/kg) and clear dose-response. They provide data for two of the negative studies which indicate these studies were indeed negative. EPA[61] (EPA Table 5.5) cites 20 micronucleus assays, four are available in the scientific literature and three are reviewed above (the fourth reference[179] was unavailable to me at the time of preparation of this report). The remaining 16 studies include six studies in Swiss Albino mice, four studies in CD-1 mice, three studies in NMRI mice, two studies in Sprague-Dawley rats and one study in Wistar rats. Since EFSA does not provide names associated with their micronucleus studies, I cannot determine if any of the studies cited by the EPA are the same as those cited by EFSA. EPA lists two of the literature studies as positive and two as negative (matching my reviews for the three studies I have access to) and all but one of the regulatory studies as negative (the one positive study was in Swiss-Albino mice). Kier and Kirkland (2013)[177] cite 12 regulatory micronucleus assays of glyphosate and provide data tables for all 12. All 12 of these studies are cited by EPA. Kier and Kirkland (2013) list 11 studies as negative and one as inconclusive. However, four of the studies show positive effects in at least one sex-by-treatment group. One of these four studies they list as inconclusive and the remaining three studies are determined to be negative because the response is within the range of the historical controls. As was discussed for the animal carcinogenicity studies, the correct group to use is the concurrent control. Kier and Kirkland (2013)[177] also cite 12 regulatory studies and three literature studies where animals are exposed to a glyphosate formulation. Two of the literature studies are reviewed above and the remaining study[179] was unavailable. Data for the 12 regulatory studies are all provided in tables by Kier and Kirkland (2013) and show two positive studies in CD-1 mice and negative studies for the remaining 10.

### Summary for Genotoxicity

This is a complicated area from which to draw a conclusion due to the diversity of the studies available (there are multiple species, multiple strains within a species, multiple cell types from multiple species, differing lengths of exposure, differing times of evaluation after exposure, differing exposures, numerous markers of genotoxicity, and finally both glyphosate and multiple different glyphosate formulations). There are three studies that evaluate the genotoxicity of glyphosate in humans directly, 36 experiments in eight strains of mice, three studies in rats, nine studies in human lymphocytes and four studies in other human cells, 12 studies in non-human mammalian cell lines (two using mouse cells, five using hamster cells, two using rat cells and three using cells from cows), a large number of studies in a wide variety of non-mammalian species, and a plethora of studies, mostly identical, in bacteria.

Some conclusions are straightforward"; glyphosate does not appear to cause reverse mutations for histidine synthesis in *Salmonella typhimurium*, regardless of whether

these reverse mutations are due to frameshift mutations or point mutations. I am cautious in this determination because there were several studies with positive results, but no clear pattern is evident. There is ample evidence supporting the conclusion that glyphosate formulations and glyphosate can cause genotoxicity in non-mammalian animal species. This clearly indicates that both glyphosate and the formulations are able to cause injury to DNA. So while findings of genotoxicity in these species do not speak directly to the hazard potential in humans, they do support a cause for concern.

The more important studies are those that have been done using mammalian systems, human cells and direct human contact. Table 16 summarizes these studies in a simple framework that allows all of the experimental data to be seen in one glance. This table does not address the subtlety needed to interpret any one study, but simply demonstrates when a study produced positive versus negative results.

Clearly, for *in vitro* evaluations in human cells, the majority of the studies have produced positive results. There was only one regulatory study evaluating glyphosate genotoxicity in human lymphocytes from healthy volunteers and that study was negative. The study was not significantly different from the other six studies in this category, five of which produced positive results. The majority of these studies used either the comet assay (a simple way for measuring any type of DNA strand break) or methods that counted specific types of strand breaks in the cells (e.g. SCEs, micronuclei, nuclear buds and nucleoplasmic bridges). From these assays, we can conclude there is DNA damage. For glyphosate formulations, there are only three studies in humans *in vivo*, two of which were positive.

The magnitude of the concentrations used in these studies could potentially lead to false positives if the glyphosate is causing cytotoxicity in the cells. All six studies using the comet assay were positive with no study showing a negative response below 10 µg/ml and mixed results below that with positive results at 0.12 and 3.5 µg/ml and negative results at 2.91 and 10 µg/ml. In general, the comet assays provide strong support for genotoxicity.

The four studies that directly addressed specific types of strand breaks in cells following exposure to glyphosate showed markedly different responses across the various concentrations used. **Manas et al. (2009)** saw no changes in chromatid breaks, chromosome breaks, chromatid gaps, chromosome gaps, dicentrics, acentric fragments or endoreduplication over the range of concentrations 3.4-1015 µg/ml. In contrast, **Lioi et al. (1998)** saw changes in SCEs over concentrations ranging from 1.4 to 8.7 µg/ml. Both studies were done in lymphocytes from volunteers. **Mladinic et al. (2009)** saw significant changes in micronuclei above 92.8 µg/ml and **Bolognesi et al. (1997)** saw positive changes in SCEs above 1000 µg/ml but not at 330 µg/ml. While changes have been seen in three of the four studies, the actual concentrations in which the changes are seen is not consistent across studies. I conclude that glyphosate causes DNA strand breaks, which is indicative of genotoxicity.

The micronucleus assays in rodents examining glyphosate genotoxicity are either all positive in one strain or all negative in one strain with the exception of the three studies

in CD-1 mice and four studies in Swiss Albino mice.  For the positive studies, we can ask the question of whether, in this strain, the actual number of micronuclei are consistent.

**Table 17:** Summary of *in vivo* and *in vitro* genotoxicity studies of glyphosate and glyphosate formulations in mammals[1]

| *In vivo* or *in vitro* | Species | Cell type or tissue | Glyphosate[2] | | Glyphosate Formulations | |
|---|---|---|---|---|---|---|
| | | | Number Positive | Number Negative | Number Positive | Number Negative |
| *In vivo* | Humans | Peripheral blood | | | 2 | 1 |
| *in vitro* | Humans | lymphocytes | 5 | 2(1) | 2 | |
| | | Hep 2 | 1 | | | |
| | | GM 38 HT1080 | 1 | | | |
| | | GM 5757 | 1 | | | |
| | | TR146 | 1 | | 1 | |
| *In vivo* | Swiss CD-1 Mouse | Liver/Kidney | 1 | 1 | 2 | |
| *In vivo* (micro-nucleus assay) | NMRI mouse | Erythrocytes | | 4(3) | | 2(1) |
| | Swiss CD-1 mouse | | 1 | | 2 | |
| | Balb C mouse | | 1 | | | |
| | B6C3F$_1$ mouse | | | 1 | | |
| | Swiss mouse | | 1(1) | | | 3(2) |
| | CD-1 mouse | | 2(2) | 1(1) | 2 (2) | 6 (6) |
| | Swiss albino mouse | | 1(1) | 3(3) | 1 | |
| | C57BL mouse | | | | | 1 |
| | Mouse (not specified) | | | | 1 | |
| | Rats (all) | | | 2(1) | | 1(1) |
| *In vitro* | Mouse | L5178 lymphoma | | 2(2) | | |
| | Chinese hamster | Lung | | 3(3) | | |
| | Chinese hamster | ovary | 1 | 1 | | |
| | Fischer rat | liver | | 1 | | |

| | Rat | Lymphocytes | | 1(1) | | |
| | Bovine | Lymphocytes | 1 | | 2 | |

[1]each entry in the table corresponds to a single study where a study is positive if at least one valid positive finding emerged from the study p<0.05; entries in the table are only for studies where data was available to review including data from EFSA[89] and Kier and Kirkland (2000)[177]; [2]numbers are the total number of studies in this category, numbers in parentheses are the subset of studies that are regulatory studies

In Swiss Albino mice, all four studies were done with males and females. Exposures were by oral gavage for the positive study (in female mice) and IP injection by the negative studies. The positive study was at 5000 mg/kg and the highest dose in any of the negative studies was 3024 mg/kg. Finally, the control response in the positive study was 6.7 micronucleated PCE per 1000 PCE whereas the controls in the three negative studies were between 0 and 0.6 micronucleated PCE per 1000 PCE. Any of these differences could easily explain the differences in response so the positive result in Swiss Albino mice should be accepted.

For CD-1 mice, the one negative micronucleus study was by oral gavage in males and females at a single dose of 5000 mg/kg. One of the positive studies was also by oral gavage in males at a single dose of 2000 mg/kg. Because of the nature of statistical noise, these two studies could both occur whether there is a true effect or not. For the other positive study, the dose was by IP injection in male mice with a positive response at 600 mg/kg that was more than double the response of the controls. These data support the finding that glyphosate can cause micronuclei in male CD-1 mice, which is indicative of genotoxicity.

The remaining *in vitro* assays in mammalian cells exposed to glyphosate show mixed results. The mouse lymphoma assay and the Chinese hamster ovary assays are looking for specific mutations that will allow these cells to grow in culture. The Chinese hamster lung, the two rat assays and the assay in bovine lymphocytes are measuring DNA damage and provide mixed results. In general, these responses appear to be negative with the exception of those seen in bovine lymphocytes that appear to show a positive increase in SCEs following exposure to glyphosate.

For glyphosate formulations, the main difference between the findings for glyphosate and those for the glyphosate formulations is the direct evidence for genotoxicity in humans and the micronucleus assays in Swiss mice. The observation of genotoxicity in humans following exposure to glyphosate formulations must carry the greatest weight in the overall analysis and two of the three studies were positive with the strongest study by **Bolognesi et al. (2009)**[120] showing the strongest response.

For the Swiss mouse studies of micronuclei, the fact that all three studies are negative for glyphosate formulations while one study is positive for glyphosate creates a clear disagreement. The positive study is an oral gavage study with an effect seen in male mice at 30 mg/kg/day. The two negative regulatory studies for glyphosate formulations were done at 2000 mg/kg (about 500 mg/kg glyphosate equivalent), were also oral

gavage studies and were replicates done in the same laboratory at different times. The remaining negative study used glyphosate formulation doses of 50-200 mg/kg (25-100 mg/kg glyphosate equivalent) but was done by intraperitoneal injection. With the exception of the different routes of exposure, the differences between these studies cannot be resolved.

In this case, a pooled analysis of the data is not possible because in almost every case, no one study is a clear replicate of another. Instead, the appropriate approach would be to do a meta-analysis and evaluate which aspects of the experimental designs are important to producing positive findings of genotoxicity. The studies with the most data for this type of analysis are the various *in vivo* assays of micronucleus formation. **Ghisi et al. (2016)**[180] did a systematic search to identify all published studies evaluating the ability of glyphosate or glyphosate formulations to induce micronuclei *in vivo*. The authors also used the data from **Kier and Kirkland (2013)**[177] summarized above. An experiment, in their evaluation, was defined by sex/species/route/form of glyphosate so that some studies doing both sexes using glyphosate and a glyphosate formulation will enter multiple times into the analysis. They identified 93 experiments from which it was possible to do a meta-analysis. Data were extracted for each study and the log ratio of the mean of each experimental group to the mean control response (E+) was used to evaluate effect sizes in the meta-analysis. For this meta-analytic mean, a value below zero suggests no genotoxicity while a value above zero suggests increased genotoxicity. A test of heterogeneity (Cochran's Q statistic  discussed earlier for the epidemiological data) was also evaluated.

Figure 2 is a reprint of Figure 1 from the study by **Ghisi et al. (2016)**[180] and is a forest plot from all studies they evaluated for glyphosate and glyphosate formulations. It is clear from this plot that the predominant response is positive in these data with an overall grand mean response across all studies of E+=1.37 and a 95% confidence interval of (1.356-1.381) (this is highly statistically significant with a p<0.0001). The Qt value for the grand mean was also statistically significant suggesting there are other explanatory variables in the data that would help to explain the overall variance.

Categorical variables were then used to make comparisons across the various strata in the data to identify which experimental conditions show the largest impacts on the mean response. Mammalian species presented a higher mean effect (E+=1.379; 1.366-1.391) than non-mammalian species (E+=0.740; 0.641-0.840). Glyphosate formulations showed a greater mean response (E+=1.388; 1.375-1.400) than did glyphosate (E+=0.121; 0.021-0.221), but both were significantly greater than zero. The mean response in studies using only male animals (E+=1.833; 1.819-1.847) was significantly different from zero as were studies using both males and females (E+=0.674;0.523-0.825) whereas the mean response in studies using only females (E+0.088; -0.153-0.328) was not. Peer-reviewed studies had higher mean response (E+=1.394; 1.381-1.407) compared to regulatory studies (E+=0.114; 0.027-0.202), but both means were significantly greater than zero, indicating an overall genotoxic effect. Other variables were examined such as length of exposure and magnitude of exposure that had very little impact on the overall findings.

The meta-analysis by **Ghisi et al. (2016)**[180] provides strong support for the hypothesis that exposure to glyphosate and glyphosate formulations increases the formation of micronuclei *in vivo*. This means that glyphosate and glyphosate formulations are damaging DNA in living, functioning organisms with intact DNA repair capacity strengthening the finding that glyphosate is genotoxic to humans.

**Figure 2:** Forest plot of studies evaluating micronucleus frequency in glyphosate exposure, arranged by effects size. The plot shows the estimate of the response ratio and 95% confidence interval (CI) of each experiment included in the meta-analysis. The number beside the bars represents the reference number of each experiment as in Table 1 of Ghisi et al. (2016)[180]. Grand Mean is the overall mean effects size of all studies. [Reprinted from Ghisi et al. (2016)[180]]



From a simply statistical perspective, there is another way in which one can decide if the positive findings in the micronucleus assays in the mice are due to chance. For the glyphosate studies, if one adds up all of the individual experimental groups, there are 79 total groups which correspond to 79 statistical tests. Assuming the critical testing level is 0.05 for all of the tests, one would expect to see just under four positive findings, yet six are observed. For the glyphosate formulations, there were 70 experimental groups so one expects 3.5 positive findings yet 12 are observed (p<0.01). Overall, there were a total of 149 experimental groups examined in mice for micronucleus formation and we observed 18 (7.5 expected, p<0.01). Repeating this analysis on the basis of studies instead of experimental groups, there were 15 studies for glyphosate (expected number is 0.75 positive) yet six positive were observed (p<0.01). For the glyphosate formulations, there were 18 studies (expected number is 0.9 positive) yet six positive

are observed (p<0.01).  Now expanding to all 69 studies presented in Table 17, there were 33 positive studies, but the expectation is a mere 3.5 (p<0.01).

It is clear that both glyphosate and glyphosate formulations have genotoxic potential. But which is worse?  Of the 69 experiments in Table 17, there were eight experiments from five research publications that addressed both glyphosate and a glyphosate formulation in the same laboratory.  Of these, two were negative for both glyphosate and the formulation and do not contribute to a discussion of relative potency.  The remaining six can provide some guidance on the relative potency of glyphosate to glyphosate formulations.  In **Koller et al. (2007)**[127], tail intensity for the comet assay were virtually identical when the amount of glyphosate in the formulation was compared to the results using glyphosate alone.  In the same paper, micronuclei and related biomarkers were consistently higher in the glyphosate formulation by 10-20%. In **Bolognesi et al. (1997),** DNA strand breaks in liver and kidney in Swiss CD-1 mice were virtually identical under equivalent doses of glyphosate and glyphosate formulations.  In their micronucleus assay, the glyphosate formulation was approximately 50% more potent.  Finally, **Bolognesi et al. (1997),** in their analysis of SCEs in human lymphocytes, the glyphosate formulation was approximately twice as effective as glyphosate alone.  In **Peluso et al. (1988)**[133], DNA adducts in livers and kidneys were only seen in mice treated with the glyphosate formulation, so these findings are not likely to be due to glyphosate. The data suggest a small increase in the potential for genotoxicity for glyphosate formulations relative to the genotoxicity one would see with glyphosate alone.

In summary, the data support a conclusion that both glyphosate and glyphosate formulations are genotoxic.  Thus, there is a reasonable mechanism supporting the increases in tumors caused by glyphosate and glyphosate formulations in humans and animals.

**Oxidative Stress**

Oxidative stress refers to an imbalance between the production of reactive oxygen species (free radicals) in a cell and the antioxidant defenses the cell has in place to prevent this.  Oxidative stress has been linked to both the causes and consequences of several diseases[181-186] including cancer[37, 187-191].  Multiple biomarkers exist for oxidative stress; the most common being the increased antioxidant enzyme activity, depletion of glutathione or increases in lipid peroxidation.  In addition, many studies evaluating oxidative stress used antioxidants following exposure to glyphosate to demonstrate that the effect of the oxidative stress can be diminished.

**Oxidative Stress in Human Cells (*in vitro*)**

**Mladinic et al. (2009)**[122] examined the induction of oxidative stress from exposure to glyphosate (98% purity) in lymphocytes from three healthy human donors (questionnaires were used to exclude other genotoxic exposures) at concentrations of 0.5, 2.91, 3.5, 92.8 and 580 µg/ml. Cells with and without S9 activation saw increases in total antioxidant capacity at only the highest dose for cells without S9 activation although a clear concentration response pattern was seen with S9 activation.

70

**Kwiatkowska et al. (2014)**[192] examined the induction of oxidative stress from exposure to glyphosate (purity not given) in erythrocytes obtained from healthy donors in the Blood Bank of Lodz, Poland.  Erythrocytes were exposed to concentrations of 1.7, 8.4, 17, 42.3, 85 and 845 µg/ml and incubated for 1 hour.  Oxidative stress (oxidation of dihydrorhodamine 123) was significantly increased at 42.3, 85 and 845 µg/l with a clear concentration-response pattern.

**Chaufan et al. (2014)**[193] examined the induction of oxidative stress from exposure to glyphosate (95% purity) and Roundup UltraMax (74.7% glyphosate) in HepG2 cells (human hepatoma cell line).  Exposure concentrations were 900 µg/ml for glyphosate and 40 µg/ml for the glyphosate formulation.  After incubation for 24 hours, oxidative stress (expressed as the activity of superoxide dismutase (SOD), catalase (CAT), glutathione (GSH) and glutathione-S-transferase (GST)) was significantly increased (p<0.0-5) for the glyphosate formulation (increased SOD activity) but not for glyphosate alone.

**Coalova et al. (2014)**[194] examined the induction of oxidative stress from exposure to a glyphosate formulation (Atanor, 48% glyphosate) or with a surfactant (Impacto) in Hep-2 cells (human epithelial cell line).  Exposure concentrations were 376.4 µg/ml for Atanor, 12.1 µg/ml for Impacto and 180.2 µg/ml for a mixture of the two.  After incubation for 24 hours, oxidative stress (measured as activity of SOD, CAT, GSH, and GST) was significantly increased for Impacto, Atanor and the mixture (CAT and GSH only, p<0.05 or p<0.01).

**Gehin et al. (2005)**[195] examined the induction of oxidative stress from exposure to glyphosate (purity unknown) and a glyphosate formulation (Roundup 3 plus, 21% glyphosate) in HaCaT cells (human keratinocyte cell line).  Glyphosate induced cytotoxicity in the cells which was reduced or eliminated by antioxidants.  The authors attributed the cytotoxicity to oxidative stress.

**Elie-Caille et al. (2010)**[196] examined the induction of oxidative stress from exposure to glyphosate (purity unknown) in HaCaT cells (human keratinocyte cell line).  Exposure concentrations ranged from 1700 µg/l to almost 12,000 µg/ml.  Glyphosate induced cytotoxicity in the cells and increased hydrogen peroxide $H_2O_2$ (dichlorodihydrofluorescein diacetate assay). This study used exceptionally high concentrations that may be inducing cytotoxicity by means that are independent of the oxidative stress observed.  Measuring oxidative stress using the dichlorodihydrofluorescein diacetate assay has limitations[197, 198].

**George and Shukla (2013)**[199] examined the induction of oxidative stress from exposure to a glyphosate formulation (Roundup Original, 41% glyphosate) in HaCaT cells (human keratinocyte cell line).  Exposure concentration ranged from 1.7 µg/ml to 17,000 µg/ml and exposure was for 24 hours.  Glyphosate significantly induced the formation of reactive oxygen species (dichlorodihydrofluorescein diacetate assay) at all exposures in a concentration-dependent fashion. Prior treatment of the cells with N-Acetylcysteine reduced the impact of glyphosate, but did not eliminate it.  Measuring oxidative stress using dichlorodihydrofluorescein diacetate has limitations[197, 198] that affect the clear

71

interpretation of these results.

**Oxidative Stress in Non-Human Mammals (*in vivo*)**

**Bolognesi et al. (1997)**[130] exposed groups of three Swiss CD-1 male mice by IP injection with a single dose of glyphosate (99.9% purity, 300 mg/kg) or Roundup (900 mg/kg, equivalent to 270 mg/kg glyphosate). Animals were sacrificed at eight and 24 hours after injection and livers and kidney were removed to obtain crude nuclei from the adhering tissues. Samples of liver and kidneys from these mice were evaluated for levels of 8-hydroxy-2'-deoxyguanosine (8-OHdG) which is a biomarker of oxidative stress[200]. There was a significant increase in the liver of 8-OHdG at 24 hours following glyphosate exposure, but not at eight hours and not in the kidney. At both eight hours and 24 hours, Roundup increased 8-OHdG in the kidneys, but the mild increase seen in the liver at 24 hours was not significant.

**Cavusoglu et al. (2011)**[139] exposed groups of six Swiss albino mice by IP injection of a glyphosate formulation (RoundupUltra Max, 450 g/l glyphosate, 50 mg/kg formulation). At the end of dosing, animals were fasted overnight then sacrificed. There was a significant increase in malondialdehyde in both liver and kidney and a significant decrease in GSH in liver and kidney from exposure to the glyphosate formulation. *G. bilboa* eliminated these effects.

**Jasper et al. (2012)**[201] exposed groups of 10 male and 10 female Swiss albino mice via oral gavage for 15 days to a glyphosate formulation (Roundup Original, 41% glyphosate, 50 mg/kg glyphosate equivalent dose). Animals were sacrificed at three days after injection. There was a significant increase in thiobarbituric acid-reactive substances (TBARS) in the liver for both male and female mice at both doses (p<0.05). The concentration of non-protein thiols was elevated in both dose groups for males and for the high dose only in females (no dose-response was seen for this endpoint).

**Astiz et al. (2009)**[202] exposed groups of four male Wistar rats by IP injection to a single dose of glyphosate (purity unknown, 10 mg/kg). Animals were injected three times per week for five weeks and then sacrificed. Thiobarbituric acid-reactive substances (TBARS assay), protein carbonyls (PCOSs), total glutathione levels, individual glutathione levels, SOD and CAT were all measured as biomarkers for oxidative stress in plasma, brain, liver and kidney. Glyphosate significantly increased TBARS in all tissues (p<0.01), total glutathione in brain (p<0.01), SOD in liver and brain (p<0.01) and CAT in brain. In a follow-up report[203], they demonstrate that lipoic acid eliminates or severely reduces the impacts of glyphosate on the brain.

**Cattani et al. (2014)**[204] exposed groups of four pregnant Wistar rats to glyphosate formulation (Roundup Original, 360 g/L glyphosate) in drinking water from gestational days 5-15 at a dose of 71.4mg/kg. Fifteen day-old pups (2 per dam) were examined for oxidative stress markers in the hippocampus. Pups had a significant increase in TBARS (p<0.05) and a significant decrease in GSH (p<0.01).

**George et al. (2010)**[82] exposed groups of four Swiss albino mice to a glyphosate formulation (Roundup Original, 36g/L glyphosate) at a dose of 50 mg/kg (glyphosate

72

equivalent dose) via a single topical application. Proteomic analysis of skin from the treated animals saw alterations in SOD1, CA III and PRX II, proteins known to play a role in the management of oxidative stress.

### Oxidative Stress in Non-Mammalian Systems

As for genotoxicity, oxidative stress from exposure to glyphosate and glyphosate formulations have been studied in various aquatic organisms; reviewed in **Slaninova et al. (2009)**[205]. Many of the studies reviewed by **Slaninova et al. (2009)** showed associations with glyphosate and oxidative stress in various organs. Since that review, additional studies have been completed that also demonstrate a positive association between glyphosate and oxidative stress[147, 156-159, 206-217].

### Summary for Oxidative Stress

Seven studies addressed oxidative stress in human cells and another six studies addressed it in mammalian systems. In lymphocytes and erythrocytes from healthy donors, oxidative stress was detected as low as 580 μg/ml in lymphocytes and at 42.3 μg/ml in erythrocytes. In Hep-G2 cells, no increased oxidative stress was seen for a single concentration of 900 μg/l. In two studies in HaCat cells, glyphosate induced oxidative stress in a continuous model fit to the results in one study and at the lowest concentration (1700 μg/ml) in the other. The most convincing studies in human cells for oxidative stress are the two studies in human blood.

In Swiss CD-1 male mice, increased oxidative stress was seen in the liver at 24 hours, but not at four hours after injection of 300 mg/kg glyphosate. No increase was seen in the kidney. In Wistar rats, repeated IP dosing with glyphosate lead to increased oxidative stress in multiple organs using multiple biomarkers. Thus, all of the laboratory studies demonstrated oxidative stress with a significant finding in the rat study.

In Hep-G2 cells, a glyphosate formulation demonstrated a robust increase in oxidative stress at 40 μg/ml. Given the negative response in this cell line for glyphosate alone, it must be concluded that this response is not due to glyphosate. In HEP-2 cells, a glyphosate formulation demonstrated a robust increase in oxidative stress via multiple biomarkers at 376 μg/ml and when a surfactant is added, at 180.2 μg/ml. In HaCaT cells, a glyphosate formulation demonstrated significant increases in oxidative stress from doses starting as low as 1.7 μg/ml in a concentration-dependent fashion. No studies were available in human lymphocytes.

In Swiss CD-1 mice, a glyphosate formulation significantly increased oxidative stress in the kidney but only demonstrated a mild (non-significant) increase in the liver. This study evaluated oxidative stress at two different time points following exposure and saw responses that differed over time. The strong increase in the liver for glyphosate but not glyphosate formulation, suggests a complicated response pattern for pure glyphosate versus the formulation that could be linked to the time since exposure. In Swiss Albino mice, a glyphosate formulation demonstrated increased oxidative stress by two separate biomarkers in both the liver and the kidney. In a second study in Swiss albino mice using a different biomarker but a similar dose, increased oxidative stress

was seen in both the liver and the kidney.  In Wistar rat pups exposed in utero, an increase in oxidative stress was seen in the hippocampus.  In Swiss albino mice, topical application of a glyphosate formulation to the skin resulted in a proteomic fingerprint suggesting oxidative stress was increased.

Though there are fewer studies for oxidative stress than there are for genotoxicity, the robust response seen here in human cells and in rodent studies clearly supports a role for both glyphosate and glyphosate formulations in inducing oxidative stress.  Thus, there is a second reasonable mechanism through which the tumors seen in humans and those seen in animals can be caused by glyphosate and glyphosate formulations.

**Summary for Biological Plausibility**

In the evaluation of causality, the evidence for biological plausibility is overwhelming. Glyphosate clearly causes multiple cancers in mice, two cancers in the hematopoietic system similar to what is seen in humans, causes cancer in rats, is genotoxic and induces oxidative stress. The findings are clear for both glyphosate alone and for glyphosate formulations. **There is strong support for biological plausibility in support of a causal association of glyphosate and glyphosate formulations with NHL.**

## Biological Gradient

Only three of the epidemiological studies provided information on biological gradients in their publications.

**Eriksson et al. (2008)**[46]  divided their cases and controls into those with ≤10 days per year of exposure and those with >10 days per year of exposure. The ORs were calculated using a multivariate analysis that included agents with statistically significant increased OR, or with an OR > 1.50 and at least 10 exposed subjects.  ORs for glyphosate were 1.69 (0.70-4.07) for ≤10 days per year and 2.36 (1.04-5.37) for >10 days per year. In their multivariate analysis, latency periods of 1-10 years showed an OR of 1.11 (0.24-5.08) and >10 years had an OR of 2.26 (1.16-4.40).  Thus, they show an increase with intensity of exposure and with latency.

**McDuffie et al. (2001)**[50], using a conditional logistic regression analysis controlling for major chemical classes of pesticides and all other covariates with p<0.05, the OR for ≤2 days per year of exposure was 1.0 (0.63-1.57) and for >2 days per year, the OR was 2.12 (1.20-3.73). Thus, they show an increase with intensity of exposure.

**De Roos  et al. (2005)**[45] used three exposure metrics in their analyses: a) ever personally mixed or applied pesticides containing glyphosate; b) cumulative exposure days of use of glyphosate (years of use times days per year); and c) intensity weighted cumulative exposure days (years of use times days per year times intensity of use).  For exposure measurements b and c, they divided the respondents into tertiles chosen *a priori* to avoid having sparse data when dealing with rare tumors.  For cumulative exposure days and using the lowest exposed tertile as the reference group, the RRs drop with values of 0.7 (0.4-1.4) and 0.9 (0.5-1.6) for tertiles 2 and 3 respectively adjusted for demographic and lifestyle factors and other pesticides (30,699 subjects).  When

intensity-weighted exposure days are examined, the RRs drop with values of 0.6 (0.3-1.1) and 0.8 (0.5-1.4) for tertiles 2 and 3, respectively adjusted for demographic and lifestyle factors and other pesticides (30,699 subjects).  Thus, they do not see a biological gradient in their responses.  However, the high frequency of exposure to many pesticides (e.g. 73.8% were exposed to 2,4-D) means subjects with low exposure to glyphosate were likely to be exposed to other agents that may also induce NHL; this could reduce the RRs in the higher exposure classes because it would inflate the RR in the low-exposure referent group.

**Eriksson et al. (2008)**[46] and **McDuffie et al. (2001)**[50] had consistent results for intensity of exposure per year (≤2 days per year, OR=1.0; ≤10 days per year, OR=1.69; >2 days per year, OR=2.12; >10 days per year, OR=2.26).  It is not possible to resolve the remaining differences between these three studies nor is it easy to argue that one study has more weight on this question than any other.  The studies use different measures of exposure or time since exposure, are done on different populations and have different statistical power to detect a trend.

In rodent carcinogenicity studies, there is clear evidence of a biological gradient.

**In general, there is support that a biological gradient exists for the epidemiological data and thus support from this aspect of the Bradford-Hill evaluation.**

## Temporal Relationship

Exposure must come before the cancers occur otherwise the epidemiology studies are useless. In this case, it is clear that exposure came before the onset of NHL.  **The need for a temporal relationship in the data supporting a causal association between glyphosate and NHL is satisfied.**

## Specificity

There are other causes of NHL[218-221] so this group of cancers is not specific to glyphosate. **There is little support for specificity**.

## Coherence

Humans, coming into contact with glyphosate, can absorb the compound into their bodies where it has been measured in blood and in urine[56, 222-226].  In laboratory animals, absorption, distribution and elimination of glyphosate and glyphosate compounds have been studied[140, 227] and show that glyphosate gets into the animal's bodies, distributes to numerous organs and is eliminated in urine.  The animal cancer studies clearly demonstrate that glyphosate in mammals can have toxic effects.

Mouse models have long served as surrogates for humans in understanding and developing treatments for many diseases. The same holds true for lymphoid tumors seen in humans.  For over 30 years, mouse models have been studied and evaluated as surrogates for NHL[228-232].  These publications and the associated classification systems for humans and mice indicate a close linkage between the diseases in humans and mice.

Thus, coherence is supported by the increased risk of malignant lymphomas in CD-1 mice, the marginal increase in these tumors in Swiss mice and the strong similarity between malignant lymphomas in mice and NHL in humans.

**There is strong support for coherence in the data supporting a causal association of glyphosate and glyphosate formulations with NHL.**

## Experimental Evidence in Humans

**There is no experimental evidence in humans** since purposely exposing humans to a pesticide, especially one that is probably carcinogenic, is not ethical and would never pass review by a human subject's advisory board.

## Analogy

I am unaware of any analogous compounds from the scientific literature. This, however, is not an area where I have sufficient background to express an opinion.

## Summary

Table 18 summarizes the information for each of Hill's aspects of causality. For these data, causality is strengthened because the available epidemiological studies show a consistent positive association between cancer and the exposure. The studies do not show different responses with some studies being positive and others negative, nor do they show any heterogeneity when analyzed together. And, in answer to Hill's question, the relationship between NHL and glyphosate exposure has been observed by different persons, in different places, circumstances, and times.

Causality is strengthened for these data because the strength of the observed associations, when evaluated simultaneously, are statistically significant, the findings are uni-directional and the results are unlikely to be due to chance. Even though none of the individual studies provide relative risks or odds ratios that are large and precise, the meta-analysis has objectively shown that the observed association across these studies is significant and supports a positive association between NHL and glyphosate.

Biological plausibility is strongly supported by the animal carcinogenicity data and the mechanistic data on genotoxity and oxidative stress. When addressing biological plausibility, the first question generally asked is "Can you show that glyphosate causes cancers in experimental animals?" In this case, the answer to that question is clearly yes. Glyphosate has been demonstrated to cause cancer in two strains of rats and one strain of mice. Glyphosate has been demonstrated to cause cancer in two strains of rats and one strain of mice. Glyphosate causes hepatocellular adenomas in male Wistar rats and, to a lesser degree, in male Sprague-Dawley rats, mammary gland adenomas and adenocarcinomas in female Wistar rats, skin keratocanthomas in male Wistar rats, and kidney adenomas and thyroid C-cell adenomas and carcinomas in male Sprague-Dawley rats. Glyphosate causes hemangiosarcomas, kidney tumors and malignant lymphomas in male CD-1 mice and hemangiomas in female CD-1 mice and possibly

causes malignant lymphomas, kidney adenomas in male Swiss albino mice and hemangiomas in female Swiss albino mice. Thus, glyphosate causes cancer in mammals. Thus, it is biologically plausible that glyphosate alone can cause cancer in mammals.

The next question generally asked is "Does the mechanism by which glyphosate causes cancer in experimental animals also work in humans?" The best understood mechanism by which chemicals cause cancer in both humans and animals is through damaging DNA that leads to mutations in cells that then leads to uncontrolled cellular replication and eventually cancer. It is absolutely clear from the available scientific data that both glyphosate and glyphosate formulations are genotoxic. This has been amply demonstrated in humans that were exposed to glyphosate, in human cells *in vitro*, in experimental animal models and their cells *in vitro* and *in vivo*, and in wildlife. One way in which DNA can be damaged is through the presence of free oxygen radicals that overwhelm a cell's antioxidant defenses. Glyphosate induces this type of oxidative stress, providing additional support for a biological mechanism that works in humans.

Table 18: Summary conclusions for Hill's nine aspects of epidemiological data and related science

| Aspect | Conclusion | Reason |
|---|---|---|
| Consistency of the observed association | Strong | Multiple studies, all are positive, meta-analysis shows little heterogeneity, different research teams, different continents, different questionnaires, no obvious bias or confounding |
| Strength of the observed association | Strong | Six core epidemiology studies all show the same modest increase, significant meta-analyses |
| Biological plausibility | Very Strong | Multiple cancers in multiple species, not due to chance, increased risk of rare tumors, convincing evidence for genotoxicity and oxidative stress |
| Biological gradient | Moderate | Clearly seen in the two case-control studies that evaluated it, not seen in the cohort study |
| Temporal relationship of the observed association | Satisfied | Exposure clearly came before cancers |
| Specificity of the observed association | Not needed | NHL has other causes, this does not subtract from the causal argument |
| Coherence | Strong | Glyphosate is absorbed, distributed and excreted from the body, cancers seen in the mice have strong similarity to human NHL |
| Evidence from human experimentation | No data | No studies are available |
| Analogy | No data | No studies available in the literature |

In general, there is support that a biological gradient exists for the epidemiological data and thus support from this aspect of the Bradford-Hill evaluation. Glyphosate ORs increased with time since first exposure and with intensity of use per year in the two case-control studies that evaluated at least one of these issues.

There is clearly the proper temporal relationship with the exposure coming before the cancers.

The human evidence is coherent. The basic findings in humans agree with the animal evidence for absorption, distribution and elimination of glyphosate. Also, one of the tumors seen in mice has almost the same etiology as NHL.

NHL is not specific to glyphosate exposure. There is no experimental evidence in humans and I did not find any references where researchers looked for analogous compounds with similar toxicity.

Hill (1965)[36] asks "*is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?*" There is no better way of explaining the scientific evidence relating glyphosate to an increase in NHL in humans than cause and effect.

**In my opinion, glyphosate probably causes NHL and, given the human, animal and experimental evidence, I assert that, to a reasonable degree of scientific certainty, the probability that glyphosate causes NHL is high.**

## The IARC Assessment of Glyphosate

In March 2015, the International Agency for Research on Cancer (an agency of the World Health Organization) brought together seventeen scientists (the Working Group) to evaluate the scientific evidence on whether glyphosate can cause cancer in humans. This group also contained one invited specialist (myself) to aid the Working Group (WG) in going through the science but who was not allowed to join discussions on the final conclusion or write any part of the document. The Working Group concluded that glyphosate falls in the category *"probably carcinogenic to humans (Group 2A)"*[56].

The IARC preamble[30] guides Working Groups on how to evaluate scientific literature to determine if something is a hazard. All Working Groups follow these guidelines and this process is accepted worldwide as a proper way to evaluate the literature for a hazard (e.g., the European Chemical Agency cites the IARC review process as guidance and then uses the exact same wording as IARC does to guide their own hazard evaluation process[34]).

The WG examined the epidemiological data and classified it as "*limited evidence of carcinogenicity,*" which is defined to mean "*a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered to be credible, but chance, bias or confounding could not be ruled out with*

*reasonable confidence*." This is a precise and clear description of the strength of the evidence from the epidemiological studies.

The WG examined the evidence from animal carcinogenicity studies and classified it as "*sufficient evidence of carcinogenicity,*" which IARC defines as: "*a causal relationship has been established between the agent and an increased incidence of malignant neoplasms or of an appropriate combination of benign and malignant neoplasms in (a) two or more species of animals or (b) two or more independent studies in one species carried out at different times or in different laboratories or under different protocols. A single study in one species and sex might be considered to provide sufficient evidence of carcinogenicity when malignant neoplasms occur to an unusual degree with regard to incidence, site, type of tumour or age at onset, or when there are strong findings of tumours at multiple sites.*" Based on the data available to IARC at the time of their review and the restrictions placed on the studies they can review by the Preamble, this conclusion is justified and correct.

One of the major criticisms of the WG review was that the WG did not review all of the animal carcinogenicity data that was available to the regulatory bodies and thus came to the wrong conclusions on the animal cancer data. In this review, I evaluated all 19 animal carcinogenicity experiments that have been collectively mentioned by any agency that reviews glyphosate. Where possible, I have analyzed the original data and used sound statistical methods to test for significant increases in cancer incidence in animals exposed to glyphosate. My conclusion is that the WG would have called this data "*sufficient evidence*" to support their findings despite not reviewing the additional studies analyzed herein. Despite the fact the industry kept these studies confidential, nothing contained in the withheld studies would have changed the WG conclusion.

On the mechanistic data, the IARC Working Group reviewed the same data that I reviewed, but I also evaluated, where possible, the proprietary data supporting the regulatory decisions. Where possible, I reanalyzed that data to be certain the results being presented were accurate. The IARC Working Group, using the guidelines set forth in their Preamble, declared strong support for the biological mechanisms of genotoxicity and oxidative stress. As I have shown here, there is strong support for these two mechanisms, even with the proprietary evidence from the industry studies. Thus, the IARC Working Group reached the correct conclusion.

To decide on a final classification for a compound, the IARC Preamble provides guidance on how the classification of the three areas are to be used. If the data in humans is "*limited*" and the data from animal carcinogenicity studies is "*sufficient*," the discussions should begin with Class 2A, "*the agent is probably carcinogenic to humans.*" Then, given the overall quality of the data set, the strength of the evidence from the mechanistic studies and any additional scientific issues that need to be considered, the Working Group will determine whether the data justifies a different category. In this case, the Working Group concluded 2A was the right category and I still believe the evidence supports that finding.

## The EPA Assessment of Glyphosate

Like IARC, the EPA has guidelines that are to be followed when evaluating scientific literature and making a determination about the carcinogenic potential of a chemical. Those guidelines have been developed over many years and are based on sound scientific guidance that myself and many other scientists have provided to the Agency. For their evaluation of glyphosate, the Agency did not follow their own guidelines, nor did they follow sound scientific practice.  This opinion is consistent with the review done by the **EPA FIFRA Scientific Advisory Panel**[54]. In addition, the Agency failed to find all of the relevant animal cancer studies and misinterpreted several of them.  The major problems with the Agency evaluation are:

- Misinterpretation of the epidemiological evidence, confusing the potential for bias and potential for confounding with real bias and real confounding, allowing them to give almost no weight to the case-control studies in favor of the one cohort study;

- Misinterpretation of the findings in the meta-analysis;

- Failure to properly use historical controls in the analysis of the animal carcinogenicity studies; declaring a significant finding as not due to the compound if it is in the range of the historical controls;

- Failure to analyze all tumors in all studies relying upon the industry submissions to have done this correctly;

- Failure to follow their guidelines on what constitutes a positive finding, disregarding significant trend tests when no corresponding pairwise comparisons are also significant;

- Disregarding positive findings in doses that are clearly not above the maximum dose the animals could be given with compromising the integrity of the study;

- Using unreasonable arguments about the overall false positive rates in the study without actually doing an analysis of this issue;

- Failing to recognize the similar findings in similar studies and to do a pooled analysis to determine if the negative effects in one study cancel out the positive effects in another;

- Giving very little weight to studies from the literature and relying almost entirely on studies provided by industry that have not undergone peer review for both quality and, more importantly in some cases, interpretation of the findings; and

- Comparing results across different species and strains for the animal cancer studies and the mechanistic studies with little regard for unique findings in any one study and consistent findings across multiple studies.

Similar comments apply to the evaluation done by the **European Food Safety Authority**[89] and the **European Chemical Agency**[233].  My detailed comments to these

agencies on their risk assessments are attached.  There were comments to my comments to EPA by other scientists and I also responded to those comments in the EPA docket for glyphosate.  These are also included in the attached Appendices.

_____
Dr. Christopher J. Portier

# Cited References

1.  Portier, C. and D. Hoel, *Optimal design of the chronic animal bioassay.* J Toxicol Environ Health, 1983. **12**(1): p. 1-19.

2.  Portier, C.J. and D.G. Hoel, *Design of the Chronic Animal Bioassay for Goodness of Fit to Multistage Models.* Biometrics, 1983. **39**(3): p. 809-809.

3.  Bailer, A.J. and C.J. Portier, *Effects of treatment-induced mortality and tumor-induced mortality on tests for carcinogenicity in small samples.* Biometrics, 1988. **44**(2): p. 417-31.

4.  Portier, C.J. and A.J. Bailer, *Testing for increased carcinogenicity using a survival-adjusted quantal response test.* Fundam Appl Toxicol, 1989. **12**(4): p. 731-7.

5.  Portier, C.J., J.C. Hedges, and D.G. Hoel, *Age-specific models of mortality and tumor onset for historical control animals in the National Toxicology Program's carcinogenicity experiments.* Cancer Res, 1986. **46**(9): p. 4372-8.

6.  Portier, C.J. and A.J. Bailer, *2-Stage Models of Tumor-Incidence for Historical Control Animals in the National Toxicology Programs Carcinogenicity Experiments.* Journal of Toxicology and Environmental Health, 1989. **27**(1): p. 21-45.

7.  Portier, C.J. and L. Edler, *Two-stage models of carcinogenesis, classification of agents, and design of experiments.* Fundam Appl Toxicol, 1990. **14**(3): p. 444-60.

8.  Portier, C.J., et al., *Biologically based models for risk assessment.* IARC Sci Publ, 1990(104): p. 20-8.

9.  Kopp-Schneider, A. and C.J. Portier, *Distinguishing between models of carcinogenesis: the role of clonal expansion.* Fundam Appl Toxicol, 1991. **17**(3): p. 601-13.

10.  Kopp-Schneider, A., C.J. Portier, and F. Rippmann, *The application of a multistage model that incorporates DNA damage and repair to the analysis of initiation/promotion experiments.* Math Biosci, 1991. **105**(2): p. 139-66.

11.  Kopp-Schneider, A., C.J. Portier, and F. Rippmann, *The Application of a Multistage Model That Incorporates DNA Damage and Repair to the Analysis of Initiation Promotion Experiments.* Mathematical Biosciences, 1991. **105**(2): p. 139-166.

12.  Kopp-Schneider, A. and C.J. Portier, *Birth and Death Differentiation Rates of Papillomas in Mouse Skin.* Carcinogenesis, 1992. **13**(6): p. 973-978.

13. Portier, C.J., A. Kopp-Schneider, and C.D. Sherman, *Using Cell Replication Data in Mathematical-Modeling in Carcinogenesis.* Environmental Health Perspectives, 1993. **101**: p. 79-86.

14. Kopp-Schneider, A., C.J. Portier, and C.D. Sherman, *The Exact Formula for Tumor-Incidence in the 2-Stage Model.* Risk Analysis, 1994. **14**(6): p. 1079-1080.

15. Portier, C., et al., *Modeling the number and size of hepatic focal lesions following exposure to 2378-TCDD.* Organohalogen Compounds, 1994. **21**: p. 393-397.

16. Kopp-Schneider, A. and C.J. Portier, *Carcinoma formation in NMRI mouse skin painting studies is a process suggesting greater than two stages.* Carcinogenesis, 1995. **16**(1): p. 53-9.

17. Portier, C.J., A. Kopp-Schneider, and C.D. Sherman, *Calculating tumor incidence rates in stochastic models of carcinogenesis.* Mathematical Biosciences, 1996. **135**(2): p. 129-146.

18. Portier, C.J., et al., *Modeling the number and size of hepatic focal lesions following exposure to 2,3,7,8-TCDD.* Toxicology and Applied Pharmacology, 1996. **138**(1): p. 20-30.

19. Kopp-Schneider, A., C. Portier, and P. Bannasch, *A model for hepatocarcinogenesis treating phenotypical changes in focal hepatocellular lesions as epigenetic events.* Math Biosci, 1998. **148**(2): p. 181-204.

20. Toyoshiba, H., et al., *Gene interaction network analysis suggests differences between high and low doses of acetaminophen.* Toxicol Appl Pharmacol, 2006. **215**(3): p. 306-16.

21. Gohlke, J.M. and C.J. Portier, *The forest for the trees: a systems approach to human health research.* Environ Health Perspect, 2007. **115**(9): p. 1261-3.

22. Gohlke, J.M., et al., *Genetic and environmental pathways to complex diseases.* BMC Syst Biol, 2009. **3**: p. 46.

23. Gohlke, J.M., et al., *Estimating the global public health implications of electricity and coal consumption.* Environ Health Perspect, 2011. **119**(6): p. 821-6.

24. Aylward, L.L., et al., *Evaluation of biomonitoring data from the CDC National Exposure Report in a risk assessment context: perspectives across chemicals.* Environ Health Perspect, 2013. **121**(3): p. 287-94.

25. Trong, I. and C. Portier. *Proceedings of the Viet Nam – United States Scientific Conferences on Human Health and Environmental Effects of Agent Orange/Dioxin, Part 1 and 2.* 2002. Ha Noi, Vietnam: US National Institute of Environmental Sciences and the Government of Vietnam.

26. Portier, C.J. and M.S. Wolfe, eds. *EMF Science Review Symposium Breakout Group Report for Epidemiology Research Findings*. 1998, National Institute of Environmental Health Sciences: Research Triangle Park, North Carolina.

27. Portier, C.J. and M.S. Wolfe, eds. *EMF Science Review Symposium Breakout Group Report for Clinical and In Vivo Laboratory Findings*. NIH Publication Number 98-4400. 1998, National Institute of Environmental Health Sciences: Research Triangle Park, North Carolina.

28. Portier, C.J. and M.S. Wolfe, eds. *Assessment of Health Effects from Exposure to Power-Line Frequency Electric and Magnetic Fields*. NIH Publication Number 98-

    3981. 1998, National Institute of Environmental Health Sciences: Research Triangle Park, North Carolina. 508.

29.    Portier, C.J., et al., *A Human Health Perspective on Climate Change*, N.I.o.E.H.S. Health and Human Services, Editor. 2010, Environmental Health Perspectives: Research Triangle Park, NC72.

30.    IARC. *Preamble to the IARC Monographs*. 2006  [cited 2017 3/8/17]; Available from: http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

31.    National Research Council. Science and Judgment in Risk Assessment. 1994, Washington (DC): National Academy of Sciences Press.

32.    National Research Council. Science and Decisions: Advancing Risk Assessment. 2009, Washington (DC): National Academies Press.

33.    USEPA, *Guidelines for Carcinogen Risk Assessment*, U.E.P. Agency, Editor. 2005: Washington DC166.

34.    European Chemicals Agency, *Guidance on the Application of the CLP Criteria: Guidance to Regulation (EC) No 1272/2008 on classification, labelling and packaging (CLP) of substances and mixtures*. 2015, European Chemicals Agency: Helsinki, Finland.

35.    National Toxicology Program. *Handbook for Preparing Report on Carcinogens Monographs*. 2015  [cited 2017 3/8/17]; Available from: https://ntp.niehs.nih.gov/ntp/roc/handbook/roc_handbook_508.pdf.

36.    Hill, A.B., *The Environment and Disease: Association or Causation?* Proc R Soc Med, 1965. **58**: p. 295-300.

37.    Smith, M.T., et al., *Key Characteristics of Carcinogens as a Basis for Organizing Data on Mechanisms of Carcinogenesis.* Environ Health Perspect, 2016. **124**(6): p. 713-21.

38.    Chang, E.T. and E. Delzell, *Systematic review and meta-analysis of glyphosate exposure and risk of lymphohematopoietic cancers.* J Environ Sci Health B, 2016: p. 1-27.

39.    Cantor, K.P., et al., *Pesticides and other agricultural risk factors for non-Hodgkin's lymphoma among men in Iowa and Minnesota.* Cancer Res, 1992. **52**(9): p. 2447-2455.

40.    Nordstrom, M., et al., *Occupational exposures, animal exposure and smoking as risk factors for hairy cell leukaemia evaluated in a case-control study.* Br.J Cancer, 1998. **77**(11): p. 2048-2052.

41.    Hardell, L. and M. Eriksson, *A case-control study of non-Hodgkin lymphoma and exposure to pesticides.* Cancer, 1999. **85**(6): p. 1353-1360.

42.    Hardell, L., M. Eriksson, and M. Nordstrom, *Exposure to pesticides as risk factor for non-Hodgkin's lymphoma and hairy cell leukemia: pooled analysis of two Swedish case-control studies.* Leuk.Lymphoma, 2002. **43**(5): p. 1043-1049.

43.    De Roos, A.J., et al., *Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma among men.* Occup Environ Med, 2003. **60**(9): p. E11.

44.    Lee, W.J., et al., *Non-Hodgkin's lymphoma among asthmatics exposed to pesticides.* Int J Cancer, 2004. **111**(2): p. 298-302.

45. De Roos, A.J., et al., *Cancer incidence among glyphosate-exposed pesticide applicators in the Agricultural Health Study.* Environ Health Perspect, 2005. **113**(1): p. 49-54.

46. Eriksson, M., et al., *Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis.* Int J Cancer, 2008. **123**(7): p. 1657-63.

47. Orsi, L., et al., *Occupational exposure to pesticides and lymphoid neoplasms among men: results of a French case-control study.* Occup Environ Med, 2009. **66**(5): p. 291-8.

48. Hohenadel, K., et al., *Exposure to multiple pesticides and risk of non-Hodgkin lymphoma in men from six Canadian provinces.* Int J Environ Res Public Health, 2011. **8**(6): p. 2320-30.

49. Cocco, P., et al., *Lymphoma risk and occupational exposure to pesticides: results of the Epilymph study.* Occup Environ Med, 2013. **70**(2): p. 91-8.

50. McDuffie, H.H., et al., *Non-Hodgkin's lymphoma and specific pesticide exposures in men: cross-Canada study of pesticides and health.* Cancer Epidemiol Biomarkers Prev, 2001. **10**(11): p. 1155-1163.

51. Zahm, S.H., et al., *A case-control study of non-Hodgkin's lymphoma and the herbicide 2,4-dichlorophenoxyacetic acid (2,4-D) in eastern Nebraska.* Epidemiology, 1990. **1**(5): p. 349-356.

52. Hoar, S.K., et al., *Agricultural herbicide use and risk of lymphoma and soft-tissue sarcoma.* JAMA, 1986. **256**(9): p. 1141-1147.

53. Blair, A., et al., *Reliability of reporting on life-style and agricultural factors by a sample of participants in the Agricultural Health Study from Iowa.* Epidemiology, 2002. **13**(1): p. 94-9.

54. FIFRA Scientific Advisory Panel Meeting Minutes, *Meeting Minutes and Final Report of the December 13-16, 2016 FIFRA SAP Meeting Held to Consider and Review Scientific Issues Associated with EPA's Evaluation of the Carcinogenic Potential of Glyphasate*, O.o.P. Programs, Editor. 2017, US Environmental Protection Agency: Washington, DC101.

55. Portier, C.J., et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA).* J Epidemiol Community Health, 2016. **70**(8): p. 741-5.

56. IARC Working Group, *Glyphosate*, In: *Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos.* 2015, IARC Monogr Prog. V. 112. p. 1-92.

57. Schinasi, L. and M.E. Leon, *Non-Hodgkin lymphoma and occupational exposure to agricultural pesticide chemical groups and active ingredients: a systematic review and meta-analysis.* Int J Environ Res Public Health, 2014. **11**(4): p. 4449-527.

58. Ioannidis, J.P., *Interpretation of tests of heterogeneity and bias in meta-analysis.* J Eval Clin Pract, 2008. **14**(5): p. 951-7.

59. OECD, *Guidance Document 116 on the Conduct and Design of Chronic Toxicity and Carcinogenicity Studies*, H.a.S.P. Environment, Editor. 2012, OECD: Paris.

60. Haseman, J.K., *Statistical issues in the design, analysis and interpretation of animal carcinogenicity studies.* Environ Health Perspect, 1984. **58**: p. 385-92.

61. Environmental Protection Agency, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential*. 2016: Washington, DC.

62. NRC Committee to Review the Styrene Assessment in the National Toxicology Program 12th Report on Carcinogens, in *Review of the Styrene Assessment in the National Toxicology Program 12th Report on Carcinogens: Workshop Summary*. 2014, National Academies Press: Washington (DC).

63. Bieler, G.S. and R.L. Williams, *Ratio estimates, the delta method, and quantal response tests for increased carcinogenicity.* Biometrics, 1993. **49**(3): p. 793-801.

64. Piegorsch, W.W. and A.J. Bailer, *Analyzing environmental data*. 2005, Chichester, West Sussex, England ; Hoboken, NJ: Wiley. xv, 496 p.

65. Haseman, J.K., G.A. Boorman, and J. Huff, *Value of historical control data and other issues related to the evaluation of long-term rodent carcinogenicity studies.* Toxicol Pathol, 1997. **25**(5): p. 524-7.

66. Haseman, J.K., J. Huff, and G.A. Boorman, *Use of historical control data in carcinogenicity studies in rodents.* Toxicol Pathol, 1984. **12**(2): p. 126-35.

67. OECD, *Combined Chronic Toxicity\Carcinogenicity Studies, OECD Guidelines for Testing of Chemicals, No. 453*, OECD, Editor. 2009: Paris.

68. Atkinson, C., Strutt, A., Henderson, W., et al. , *104-Week Chronic Feeding/ Oncogenicity study in rats with 52-week interim kill.* 1993.

69. Brammer., *Glyphosate Acid: Two Year Dietary Toxicity and Oncogenicity Study in Wistar Rats.* 2001: Central Toxicology Laboratory, Alderley Park Macclesfield, Cheshire, UK.

70. Burnett, P., Borders, J.;,Kush, J. , *Report to Monsanto Company: Two Year Chronic Oral Toxicity Study with CP- 76100 in Albino Rats*. 1979, Industrial Bio-Test Laboratories, Inc.: on behalf of Monsanto Co.

71. Chruscielska, K.B., J.; Kita, K, et al., *Glyphosate: Evaluation of chronic activity and possible far - reaching effects - Part 1. Studies on chronic toxicity.* Pestycydy, 2000. **3-4**: p. 10.

72. Enemoto, K., *24-Month Oral Chronic Toxicity and Oncogenicity Study in Rats, Vol. 1*. 1997: The Institute of Environmental Toxicology, Kodaira-shi, Tokyo, Japan.

73. Excel, *Combined chronic toxicity/carcinogenicity study of glyphosate technical in Sprague Dawley rats.* . 1997: Indian Institute of Toxicology, Pune, India.

74. Lankas, G., P., *A Lifetime Study of Glyphosate in Rats*. 1981, Monsanto: Report No. 77-2062 prepared by Bio Dynamics, Inc.

75. Pavkov, K.L., Wyand, S. , *Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Rats.* 1987: Stauffer Chemical Company.

76. Reyna, M.S., Gordon, D.E. , *Two- Year Chronic Oral Toxicity Study with CP67573 in Albino Rats: Monsanto*. 1974.

77. Seralini, G.E., et al., *Republished study: long-term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize.* Environmental Sciences Europe, 2014. **26**(1): p. 14.

78. Stout, L.D.a.R., P.A., *Chronic Study of Glyphosate Administered in Feed to Albino Rats*. 1990: Monsanto.

79. Suresh, T.P., *Combined Chronic Toxicity and Carcinogenicity Study with Glyphosate Technical in Wistar Rats*. 1996, Syngenta: Toxicology Department Rallis Research Centre, Rallis India Limited.

80. Wood, E., Dunster, J., Watson, P., and Brooks, P. , *Glyphosate Technical: Dietary Combined Chronic Toxicity/Carcinogenicity Study in the Rat*. 2009: Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK. Study No. 2060-012. April, 23, 2009.

81. Atkinson, C., Martin, T., Hudson, P., and Robb, D., *Glyphosate: 104 week dietary carcinogenicity study in mice*. 1993: Inveresk Research International, Tranent, EH33 2NE, Scotland. IRI Project No. 438618. April 7, 1993.

82. George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: a proteomic approach.* J Proteomics, 2010. **73**(5): p. 951-64.

83. Knezevich, A.L. and G.K. Hogan, *A chronic feeding study of glyphosate in mice: Monsanto*. 1983: Bio/Dynamic Inc., dated July 21, 1983. Report No. 77-2011. .

84. Kumar, D.P.S., *Carcinogenicity Study with Glyphosate Technical in Swiss Albino Mice*. 2001: Toxicology Department Rallis Research Centre, Rallis India Limited. Study No. TOXI: 1559.CARCI-M.

85. Pavkov, K.L., Turnier, J.C. , *Two-Year Chronic Toxicity and Oncogenecity Dietary Study with SC-0224 in Mice*. 1987: Stauffer Chemical Company.

86. Reyna, M.S. and D.E. Gordon, *18-Month Carcinogenicity Study with CP67573 in Swiss White Mice: Monsanto*. 1973: Industrial Bio-Test Laboratories, Inc.

87. Sugimoto, K., *18-Month Oral Oncogenicity Study in Mice, Vol. 1 and 2*. 1997: The Institute of Environmental Toxicology, 2-772, Suzuki-cho, Kodaira-shi, Tokyo, 187, Japan, Study No.:IET 94-0151.

88. Wood, E., Dunster, J., Watson, P., and Brooks, P. , *Glyphosate Technical: Dietary Carcinogenicity Study in the Mouse*. 2009: Harlan Laboratories Limited, Shardlow Business Park, Shardlow, Derbyshire DE72 2GD, UK. Study No. 2060-011. April, 22, 2009.

89. (BfR)., G.F.I.f.R.A., *Glyphosate Renewal Assessment Report: Toxicology and Metabolism*. 2013. V. 3. p.

90. (BfR)., G.F.I.f.R.A., *Glyphosate Renewal Assessment Report: Assessment of IARC Monographies Volume 112 (2015)*. 2015. V. 3Glyphosate Addendum I to RAR. p.

91. Greim, H., et al., *Evaluation of carcinogenic potential of the herbicide glyphosate, drawing on tumor incidence data from fourteen chronic/carcinogenicity rodent studies.* Crit Rev Toxicol, 2015. **45**(3): p. 185-208.

92. Blettner, M., et al., *Traditional reviews, meta-analyses and pooled analyses in epidemiology*. Int J Epidemiol, 1999. **28**(1): p. 1-9.

93. Friedenreich, C.M., *Methods for pooled analyses of epidemiologic studies.* Epidemiology, 1993. **4**(4): p. 295-302.

94. Portier, C.J., *Comments on Glyphosate Issue Paper (EPA-HQ-OPP-2016-0385-0094)*. 2016, US EPA Docket Number (EPA-HQ-OPP-2016-0385-0094): Washington DC.

95. Hogan, g.k., *A chronic Feeding Study of Glyphosate (Roundup Technical) in Rats*. 1981, Monsanto: Bio/dynamics Inc., E. Millstone, NJ.

96. EPA, *EPA Memo Stout and Ruecker*, I. William Dykstra.Toxicology Branch, Editor. 1991. V. MRID 416438-01 Tox review 008897. p.

97. Uno, H., et al., *A versatile test for equality of two survival functions based on weighted differences of Kaplan-Meier curves.* Stat Med, 2015. **34**(28): p. 3680-95.

98. Giknis, M. and C. Clifford. *Neoplastic and Non-Neoplastic Lesions in the Charles River Wistar Hannover [Crl:WI(Han)] Rat*. 2011; Available from: http://www.criver.com/files/pdfs/rms/wistarhan/rm_rm_r_wistar_han_tox_dat a_2011.aspx.

99. Acquavella, J., et al., *Glyphosate epidemiology expert panel review: a weight of evidence systematic review of the relationship between glyphosate exposure and non-Hodgkin's lymphoma or multiple myeloma.* Crit Rev Toxicol, 2016. **46**(sup1): p. 28-43.

100. Lacayo, H., *Memorandum: Use of historical data in determiningthe weight of evidence from kidney tumor incidence in the Glyphosate two-year feeding study and some remarks on false positives*, S.M.S. Branch, Editor. 1985, US EPA: Washington, DCC.

101. Chandra, M. and C.H. Frith, *Spontaneous neoplasms in aged CD-1 mice.* Toxicol Lett, 1992. **61**(1): p. 67-74.

102. Giknis, M. and C. Clifford, *Spontaneous Neoplastic Lesions in the Crl:CD-1(ICR)BR Mouse*. 2000, Charles River Laboratories.

103. Giknis, M. and C. Clifford, *Spontaneous Neoplastic Lesions in the Crl:CD-1(ICR)BR Mouse in Control Groups from 18 Month to 2 year Studies*. 2005, Charles River Laboratories.

104. Eustis, S.L., et al., *The utility of multiple-section sampling in the histopathological evaluation of the kidney for carcinogenicity studies.* Toxicol Pathol, 1994. **22**(5): p. 457-72.

105. Kasza, L., *Memorandum: Glyphosate - Evaluation of Kidney Tumors in Male Mice. Chronic Feeding Study*, T.B. Branch, Editor. 1985, US EPA: Washington, DCC.

106. de Vivar Chevez, A.R., J. Finke, and R. Bukowski, *The role of inflammation in kidney cancer.* Adv Exp Med Biol, 2014. **816**: p. 197-234.

107. Dixon, D., et al., *Summary of chemically induced pulmonary lesions in the National Toxicology Program (NTP) toxicology and carcinogenesis studies.* Toxicol Pathol, 2008. **36**(3): p. 428-39.

108. Son, W.C. and C. Gopinath, *Early occurrence of spontaneous tumors in CD-1 mice and Sprague-Dawley rats.* Toxicol Pathol, 2004. **32**(4): p. 371-4.

109. OECD, *Carcinogenicity Studies, OECD Guideline for the Testing of Chemicals, No. 451*, OECD, Editor. 2009: Paris.

110. Martens, M., *Memorandum to Joe Haseman, March 2, 2017: Analysis tumor data RAC 40 meeting*, G.T. Force, Editor. 2017: Helsinki, Finland.

111. Haseman, J.K., *Comments on the laboratory animal carcinogenicity studies evaluated in EPA's Glyphosate Issue Paper: Evaluation of Carcinogenic Potential,*

*and an assessment of the comments by Dr. Christopher Portier on these studies*. 2016, US EPA Docket Number (EPA-HQ-OPP-2016-0385-0094): Washington DC.

112.   Hanahan, D. and R.A. Weinberg, *Hallmarks of cancer: the next generation.* Cell, 2011. **144**(5): p. 646-74.

113.   Higgins, J.P.T. and S. Green, *Cochrane Handbook for Systematic Reviews of Interventions*. 2011, The Cochrane Collaboration.

114.   Birnbaum, L.S., et al., *Implementing systematic review at the National Toxicology Program: status and next steps.* Environ Health Perspect, 2013. **121**(4): p. A108-9.

115.   Murray, H.E. and K.A. Thayer, *Implementing systematic review in toxicological profiles: ATSDR and NIEHS/NTP collaboration.* J Environ Health, 2014. **76**(8): p. 34-5.

116.   Rooney, A.A., et al., *Systematic review and evidence integration for literature-based environmental health science assessments.* Environ Health Perspect, 2014. **122**(7): p. 711-8.

117.   Vandenberg, L.N., et al., *A proposed framework for the systematic review and integrated assessment (SYRINA) of endocrine disrupting chemicals.* Environ Health, 2016. **15**(1): p. 74.

118.   Paz-y-Miño, C., et al., *Evaluation of DNA damage in an Ecuadorian population exposed to glyphosate.* Genetics and Molecular Biology, 2007. **30**(2).

119.   Paz-y-Miño, C., et al., *Baseline determination in social, health, and genetic areas in communities affected by glyphosate aerial spraying on the northeastern Ecuadorian border.* Reviews on Environmental Health, 2011. **26**(1).

120.   Bolognesi, C., et al., *Biomonitoring of genotoxic risk in agricultural workers from five colombian regions: association to occupational exposure to glyphosate.* J Toxicol Environ Health A, 2009. **72**(15-16): p. 986-97.

121.   Kier, L.D., *Review of genotoxicity biomonitoring studies of glyphosate-based formulations.* Crit Rev Toxicol, 2015. **45**(3): p. 209-18.

122.   Mladinic, M., et al., *Evaluation of genome damage and its relation to oxidative stress induced by glyphosate in human lymphocytes in vitro.* Environ Mol Mutagen, 2009. **50**(9): p. 800-7.

123.   Alvarez-Moya, C., et al., *Comparison of the in vivo and in vitro genotoxicity of glyphosate isopropylamine salt in three different organisms.* Genet.Mol Biol, 2014. **37**(1): p. 105-110.

124.   Manas, F., et al., *Genotoxicity of glyphosate assessed by the comet assay and cytogenetic tests.* Environ Toxicol Pharmacol, 2009. **28**(1): p. 37-41.

125.   Monroy, C.M., et al., *Citotoxicidad y genotoxicidad en células humanas expuestas in vitro a glifosato.* Biomédica, 2005. **25**: p. 335-45.

126.   Lueken, A., et al., *Synergistic DNA damage by oxidative stress (induced by H2O2) and nongenotoxic environmental chemicals in human fibroblasts.* Toxicology Letters, 2004. **147**(1): p. 35-43.

127.   Koller, V.J., et al., *Cytotoxic and DNA-damaging properties of glyphosate and Roundup in human-derived buccal epithelial cells.* Arch Toxicol, 2012. **86**(5): p. 805-13.

128. Gasnier, C., et al., *Glyphosate-based herbicides are toxic and endocrine disruptors in human cell lines.* Toxicology, 2009. **262**(3): p. 184-91.

129. Mladinic, M., P. Perkovic, and D. Zeljezic, *Characterization of chromatin instabilities induced by glyphosate, terbuthylazine and carbofuran using cytome FISH assay.* Toxicol Lett, 2009. **189**(2): p. 130-7.

130. Bolognesi, C., et al., *Genotoxic Activity of Glyphosate and Its Technical Formulation Roundup.* J. Agric. Food Chem., 1997. **45**: p. 1957-1962.

131. Lioi, M.B., et al., *Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro.* Mutat Res, 1998. **403**(1-2): p. 13-20.

132. Vigfusson, N.V. and E.R. Vyse, *The effect of the pesticides, Dexon, Captan and Roundup, on sister-chromatid exchanges in human lymphocytes in vitro.* Mutat Res, 1980. **79**(1): p. 53-57.

133. Peluso, M., et al., *32P-postlabeling detection of DNA adducts in mice treated with the herbicide Roundup.* Environ Mol Mutagen, 1998. **31**(1): p. 55-59.

134. Rank, J., et al., *Genotoxicity testing of the herbicide Roundup and its active ingredient glyphosate isopropylamine using the mouse bone marrow micronucleus test, Salmonella mutagenicity test, and Allium anaphase-telophase test.* Mutat Res, 1993. **300**(1): p. 29-36.

135. Dimitrov, B.D., et al., *Comparative genotoxicity of the herbicides Roundup, Stomp and Reglone in plant and mammalian test systems.* Mutagenesis, 2006. **21**(6): p. 375-82.

136. Prasad, S., et al., *Clastogenic effects of glyphosate in bone marrow cells of swiss albino mice.* J Toxicol, 2009. **2009**: p. 308985.

137. Grisolia, C.K., *A comparison between mouse and fish micronucleus test using cyclophosphamide, mitomycin C and various pesticides.* Mutat Res, 2002. **518**(2): p. 145-150.

138. Coutinho do Nascimento A and G. C., *Comparative analysis between micronuclei tests in mice and in peripheral erythrocytes of Oreochromis niloticus in evaluation of mutagenic potential of the agrotoxins deltamethrin, dicofol, glyphosate, and imazapyr.* Pesticides: R Ecotoxicol E Meio Ambiente, Curitiba, 2000. **10**: p. 8.

139. Cavusoglu, K., et al., *Protective effect of Ginkgo biloba L. leaf extract against glyphosate toxicity in Swiss albino mice.* J Med Food, 2011. **14**(10): p. 1263-72.

140. Chan, P. and J. Mahler, *Toxicity Studies of Glyphosate (CAS No. 1071836) Administered in Dosed Feed to F344/N Rats and B6C3F1 Mice*, N.T. Program, Editor. 1992: Research Triangle Park, NC.

141. Li, A.P. and T.J. Long, *An evaluation of the genotoxic potential of glyphosate.* Fundam.Appl Toxicol, 1988. **10**(3): p. 537-546.

142. Roustan, A., et al., *Genotoxicity of mixtures of glyphosate and atrazine and their environmental transformation products before and after photoactivation.* Chemosphere, 2014. **108**: p. 93-100.

143. Sivikova, K. and J. Dianovsky, *Cytogenetic effect of technical glyphosate on cultivated bovine peripheral lymphocytes.* Int J Hyg Environ Health, 2006. **209**(1): p. 15-20.

144. HOLEČKOVÁ, B., *EVALUATION OF THE IN VITRO EFFECT OF GLYPHOSATE-BASED HERBICIDE ON BOVINE LYMPHOCYTES USING CHROMOSOME PAINTING.* Bull Vet Inst Pulawy, 2006. **50**: p. 533-536.

145. Moreno, N.C., S.H. Sofia, and C.B. Martinez, *Genotoxic effects of the herbicide Roundup Transorb and its active ingredient glyphosate on the fish Prochilodus lineatus.* Environ Toxicol Pharmacol, 2014. **37**(1): p. 448-54.

146. Lopes, F.M., et al., *Effect of glyphosate on the sperm quality of zebrafish Danio rerio.* Aquat Toxicol, 2014. **155**: p. 322-6.

147. Guilherme, S., et al., *Are DNA-damaging effects induced by herbicide formulations (Roundup(R) and Garlon(R)) in fish transient and reversible upon cessation of exposure?* Aquat Toxicol, 2014. **155**: p. 213-21.

148. Akcha, F., C. Spagnol, and J. Rouxel, *Genotoxicity of diuron and glyphosate in oyster spermatozoa and embryos.* Aquat Toxicol, 2012. **106-107**: p. 104-13.

149. Kaya, B., et al., *Use of the Drosophila wing spot test in the genotoxicity testing of different herbicides.* Environ Mol Mutagen, 2000. **36**(1): p. 40-6.

150. Cavalcante, D.G., C.B. Martinez, and S.H. Sofia, *Genotoxic effects of Roundup on the fish Prochilodus lineatus.* Mutat Res, 2008. **655**(1-2): p. 41-6.

151. Cavas, T. and S. Konen, *Detection of cytogenetic and DNA damage in peripheral erythrocytes of goldfish (Carassius auratus) exposed to a glyphosate formulation using the micronucleus test and the comet assay.* Mutagenesis, 2007. **22**(4): p. 263-8.

152. de Castilhos Ghisi, N. and M.M. Cestari, *Genotoxic effects of the herbicide Roundup((R)) in the fish Corydoras paleatus (Jenyns 1842) after short-term, environmentally low concentration exposure.* Environ Monit Assess, 2013. **185**(4): p. 3201-7.

153. De Souza Filho, J., et al., *Mutagenicity and genotoxicity in gill erythrocyte cells of Poecilia reticulata exposed to a glyphosate formulation.* Bull Environ Contam Toxicol, 2013. **91**(5): p. 583-7.

154. Gholami-Seyedkolaei, S.J., et al., *Optimization of recovery patterns in common carp exposed to roundup using response surface methodology: evaluation of neurotoxicity and genotoxicity effects and biochemical parameters.* Ecotoxicol Environ Saf, 2013. **98**: p. 152-61.

155. Guilherme, S., et al., *European eel (Anguilla anguilla) genotoxic and pro-oxidant responses following short-term exposure to Roundup--a glyphosate-based herbicide.* Mutagenesis, 2010. **25**(5): p. 523-30.

156. Guilherme, S., et al., *Differential genotoxicity of Roundup((R)) formulation and its constituents in blood cells of fish (Anguilla anguilla): considerations on chemical interactions and DNA damaging mechanisms.* Ecotoxicology, 2012. **21**(5): p. 1381-90.

157. Marques, A., et al., *Progression of DNA damage induced by a glyphosate-based herbicide in fish (Anguilla anguilla) upon exposure and post-exposure periods--insights into the mechanisms of genotoxicity and DNA repair.* Comp Biochem Physiol C Toxicol Pharmacol, 2014. **166**: p. 126-33.

158.   Marques, A., et al., *Erratum To: Progression of DNA damage induced by a glyphosate-based herbicide in fish (Anguilla anguilla) upon exposure and post-exposure periods--insights into the mechanisms of genotoxicity and DNA repair.* Comp Biochem Physiol C Toxicol Pharmacol, 2015. **168**: p. 1.

159.   Nwani, C.D., et al., *DNA damage and oxidative stress modulatory effects of glyphosate-based herbicide in freshwater fish, Channa punctatus.* Environ Toxicol Pharmacol, 2013. **36**(2): p. 539-47.

160.   Vera-Candioti, J., S. Soloneski, and M.L. Larramendy, *Evaluation of the genotoxic and cytotoxic effects of glyphosate-based herbicides in the ten spotted live-bearer fish Cnesterodon decemmaculatus (Jenyns, 1842).* Ecotoxicol Environ Saf, 2013. **89**: p. 166-73.

161.   Poletta, G.L., et al., *Genetic, enzymatic and developmental alterations observed in Caiman latirostris exposed in ovo to pesticide formulations and mixtures in an experiment simulating environmental exposure.* Ecotoxicol Environ Saf, 2011. **74**(4): p. 852-9.

162.   Poletta, G.L., et al., *Genotoxicity of the herbicide formulation Roundup (glyphosate) in broad-snouted caiman (Caiman latirostris) evidenced by the Comet assay and the Micronucleus test.* Mutat Res, 2009. **672**(2): p. 95-102.

163.   Clements, C., S. Ralph, and M. Petras, *Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay.* Environ Mol Mutagen, 1997. **29**(3): p. 277-288.

164.   Meza-Joya, F.L., M.P. Ramirez-Pinilla, and J.L. Fuentes-Lorenzo, *Toxic, cytotoxic, and genotoxic effects of a glyphosate formulation (Roundup(R)SL-Cosmoflux(R)411F) in the direct-developing frog Eleutherodactylus johnstonei.* Environ Mol Mutagen, 2013. **54**(5): p. 362-73.

165.   Yadav, S.S., et al., *Toxic and genotoxic effects of Roundup on tadpoles of the Indian skittering frog (Euflictis cyanophlyctis) in the presence and absence of predator stress.* Aquat Toxicol, 2013. **132-133**: p. 1-8.

166.   dos Santos, K.C. and C.B. Martinez, *Genotoxic and biochemical effects of atrazine and Roundup((R)), alone and in combination, on the Asian clam Corbicula fluminea.* Ecotoxicol Environ Saf, 2014. **100**: p. 7-14.

167.   Conners, D.E. and M.C. Black, *Evaluation of Lethality and Genotoxicity in the Freshwater Mussel Utterbackia imbecillis (Bivalvia: Unionidae) Exposed Singly and in Combination to Chemicals Used in Lawn Care.* Archives of Environmental Contamination and Toxicology, 2004. **46**(3).

168.   Mohamed, A.H., *Sublethal toxicity of Roundup to immunological and molecular aspects of Biomphalaria alexandrina to Schistosoma mansoni infection.* Ecotoxicol Environ Saf, 2011. **74**(4): p. 754-60.

169.   Muangphra, P., W. Kwankua, and R. Gooneratne, *Genotoxic effects of glyphosate or paraquat on earthworm coelomocytes.* Environ Toxicol, 2014. **29**(6): p. 612-20.

170.   Piola, L., et al., *Comparative toxicity of two glyphosate-based formulations to Eisenia andrei under laboratory conditions.* Chemosphere, 2013. **91**(4): p. 545-51.

171.   Kale, P.G., et al., *Mutagenicity testing of nine herbicides and pesticides currently used in agriculture.* Environ Mol Mutagen, 1995. **25**(2): p. 148-153.

172. Chen, L., et al., *The combined effects of UV-B radiation and herbicides on photosynthesis, antioxidant enzymes and DNA damage in two bloom-forming cyanobacteria.* Ecotoxicol Environ Saf, 2012. **80**: p. 224-30.

173. Wang, G., et al., *Damage to DNA caused by UV-B radiation in the desert cyanobacterium Scytonema javanicum and the effects of exogenous chemicals on the process.* Chemosphere, 2012. **88**(4): p. 413-7.

174. Alvarez-Moya, C., et al., *Evaluation of genetic damage induced by glyphosate isopropylamine salt using Tradescantia bioassays.* Genet.Mol Biol, 2011. **34**(1): p. 127-130.

175. Williams, G.M., R. Kroes, and I.C. Munro, *Safety evaluation and risk assessment of the herbicide Roundup and its active ingredient, glyphosate, for humans.* Regul Toxicol Pharmacol, 2000. **31**(2 Pt 1): p. 117-65.

176. Moriya, M., et al., *Further mutagenicity studies on pesticides in bacterial reversion assay systems.* Mutat Res, 1983. **116**(3-4): p. 185-216.

177. Kier, L.D. and D.J. Kirkland, *Review of genotoxicity studies of glyphosate and glyphosate-based formulations.* Crit Rev Toxicol, 2013. **43**(4): p. 283-315.

178. Lioi, M.B., et al., *Cytogenetic damage and induction of pro-oxidant state in human lymphocytes exposed in vitro to gliphosate, vinclozolin, atrazine, and DPX-E9636.* Environ Mol Mutagen, 1998. **32**(1): p. 39-46.

179. Chruscielska, K.B., J.; Kita, K et al., *Glyphosate: Evaluation of chronic activity and possible far - reaching effects - Part 2. Studies on Mutagenic Activity.* Pestycydy, 2000. **3-4**: p. 5.

180. Ghisi Nde, C., E.C. de Oliveira, and A.J. Prioli, *Does exposure to glyphosate lead to an increase in the micronuclei frequency? A systematic and meta-analytic review.* Chemosphere, 2016. **145**: p. 42-54.

181. Aghadavod, E., et al., *Role of Oxidative Stress and Inflammatory Factors in Diabetic Kidney Disease.* Iran J Kidney Dis, 2016. **10**(6): p. 337-343.

182. Kamceva, G., et al., *Cigarette Smoking and Oxidative Stress in Patients with Coronary Artery Disease.* Open Access Maced J Med Sci, 2016. **4**(4): p. 636-640.

183. Qureshi, M.A., Y.O. Kim, and D. Schuppan, *Hepatocellular carcinoma in nonalcoholic fatty liver disease: A link between oxidative stress and T-cell suppression.* Hepatology, 2016. **64**(5): p. 1794-1797.

184. Sayanthooran, S., et al., *Upregulation of Oxidative Stress Related Genes in a Chronic Kidney Disease Attributed to Specific Geographical Locations of Sri Lanka.* Biomed Res Int, 2016. **2016**: p. 7546265.

185. Turkmen, K., *Inflammation, oxidative stress, apoptosis, and autophagy in diabetes mellitus and diabetic kidney disease: the Four Horsemen of the Apocalypse.* Int Urol Nephrol, 2016.

186. Vakonaki, E., et al., *Complex interplay of DNA damage, DNA repair genes, and oxidative stress in coronary artery disease.* Anatol J Cardiol, 2016. **16**(12): p. 939.

187. Hecht, F., et al., *The role of oxidative stress on breast cancer development and therapy.* Tumour Biol, 2016. **37**(4): p. 4281-91.

188. Li, L. and F. Chen, *Oxidative stress, epigenetics, and cancer stem cells in arsenic carcinogenesis and prevention.* Curr Pharmacol Rep, 2016. **2**(2): p. 57-63.

189. Perse, M., *Oxidative stress in the pathogenesis of colorectal cancer: cause or consequence?* Biomed Res Int, 2013. **2013**: p. 725710.

190. Prasad, S., et al., *Oxidative Stress and Cancer: Advances and Challenges.* Oxid Med Cell Longev, 2016. **2016**: p. 5010423.

191. Toyokuni, S., *Oxidative stress as an iceberg in carcinogenesis and cancer biology.* Arch Biochem Biophys, 2016. **595**: p. 46-9.

192. Kwiatkowska, M., B. Huras, and B. Bukowska, *The effect of metabolites and impurities of glyphosate on human erythrocytes (in vitro).* Pestic Biochem Physiol, 2014. **109**: p. 34-43.

193. Chaufan, G., I. Coalova, and C. Rios de Molina Mdel, *Glyphosate commercial formulation causes cytotoxicity, oxidative effects, and apoptosis on human cells: differences with its active ingredient.* Int J Toxicol, 2014. **33**(1): p. 29-38.

194. Coalova, I., C. Rios de Molina Mdel, and G. Chaufan, *Influence of the spray adjuvant on the toxicity effects of a glyphosate formulation.* Toxicol In Vitro, 2014. **28**(7): p. 1306-11.

195. Gehin, A., et al., *Vitamins C and E reverse effect of herbicide-induced toxicity on human epidermal cells HaCaT: a biochemometric approach.* Int J Pharm, 2005. **288**(2): p. 219-26.

196. Elie-Caille, C., et al., *Morphological damages of a glyphosate-treated human keratinocyte cell line revealed by a micro- to nanoscale microscopic investigation.* Cell Biol Toxicol, 2010. **26**(4): p. 331-9.

197. Bonini, M.G., et al., *The oxidation of 2',7'-dichlorofluorescin to reactive oxygen species: a self-fulfilling prophesy?* Free Radic Biol Med, 2006. **40**(6): p. 968-75.

198. Kalyanaraman, B., et al., *Measuring reactive oxygen and nitrogen species with fluorescent probes: challenges and limitations.* Free Radic Biol Med, 2012. **52**(1): p. 1-6.

199. George, J. and Y. Shukla, *Emptying of Intracellular Calcium Pool and Oxidative Stress Imbalance Are Associated with the Glyphosate-Induced Proliferation in Human Skin Keratinocytes HaCaT Cells.* ISRN Dermatol, 2013. **2013**: p. 825180.

200. Valavanidis, A., T. Vlachogianni, and C. Fiotakis, *8-hydroxy-2'-deoxyguanosine (8-OHdG): A critical biomarker of oxidative stress and carcinogenesis.* J Environ Sci Health C Environ Carcinog Ecotoxicol Rev, 2009. **27**(2): p. 120-39.

201. Jasper, R., et al., *Evaluation of biochemical, hematological and oxidative parameters in mice exposed to the herbicide glyphosate-Roundup((R)).* Interdiscip Toxicol, 2012. **5**(3): p. 133-40.

202. Astiz, M., M.J. de Alaniz, and C.A. Marra, *Antioxidant defense system in rats simultaneously intoxicated with agrochemicals.* Environ Toxicol Pharmacol, 2009. **28**(3): p. 465-73.

203. Astiz, M., M.J. de Alaniz, and C.A. Marra, *The oxidative damage and inflammation caused by pesticides are reverted by lipoic acid in rat brain.* Neurochem Int, 2012. **61**(7): p. 1231-41.

204. Cattani, D., et al., *Mechanisms underlying the neurotoxicity induced by glyphosate-based herbicide in immature rat hippocampus: involvement of glutamate excitotoxicity.* Toxicology, 2014. **320**: p. 34-45.

205. Slaninova, A., et al., *A review: oxidative stress in fish induced by pesticides.* Neuro.Endocrinol Lett, 2009. **30 Suppl 1**: p. 2-12.

206. Cattaneo, R., et al., *Toxicological responses of Cyprinus carpio exposed to a commercial formulation containing glyphosate.* Bull Environ Contam Toxicol, 2011. **87**(6): p. 597-602.

207. Costa, M.J., et al., *Oxidative stress biomarkers and heart function in bullfrog tadpoles exposed to Roundup Original.* Ecotoxicology, 2008. **17**(3): p. 153-63.

208. de Menezes, C.C., et al., *Roundup effects on oxidative stress parameters and recovery pattern of Rhamdia quelen.* Arch Environ Contam Toxicol, 2011. **60**(4): p. 665-71.

209. Ferreira, D., et al., *Assessment of oxidative stress in Rhamdia quelen exposed to agrichemicals.* Chemosphere, 2010. **79**(9): p. 914-21.

210. Geret, F., et al., *Effects of low-dose exposure to pesticide mixture on physiological responses of the Pacific oyster, Crassostrea gigas.* Environ Toxicol, 2013. **28**(12): p. 689-99.

211. Glusczak, L., et al., *Acute exposure to glyphosate herbicide affects oxidative parameters in piava (Leporinus obtusidens).* Arch Environ Contam Toxicol, 2011. **61**(4): p. 624-30.

212. Guilherme, S., et al., *DNA damage in fish (Anguilla anguilla) exposed to a glyphosate-based herbicide -- elucidation of organ-specificity and the role of oxidative stress.* Mutat Res, 2012. **743**(1-2): p. 1-9.

213. Lushchak, O.V., et al., *Low toxic herbicide Roundup induces mild oxidative stress in goldfish tissues.* Chemosphere, 2009. **76**(7): p. 932-7.

214. Modesto, K.A. and C.B. Martinez, *Roundup causes oxidative stress in liver and inhibits acetylcholinesterase in muscle and brain of the fish Prochilodus lineatus.* Chemosphere, 2010. **78**(3): p. 294-9.

215. Ortiz-Ordonez, E., et al., *Effect of Yerbimat herbicide on lipid peroxidation, catalase activity, and histological damage in gills and liver of the freshwater fish Goodea atripinnis.* Arch Environ Contam Toxicol, 2011. **61**(3): p. 443-52.

216. Sinhorin, V.D., et al., *Effects of the acute exposition to glyphosate-based herbicide on oxidative stress parameters and antioxidant responses in a hybrid Amazon fish surubim (Pseudoplatystoma sp).* Ecotoxicol Environ Saf, 2014. **106**: p. 181-7.

217. Uren Webster, T.M., et al., *Effects of glyphosate and its formulation, roundup, on reproduction in zebrafish (Danio rerio).* Environ Sci Technol, 2014. **48**(2): p. 1271-9.

218. Adamson, P., et al., *Time trends in the registration of Hodgkin and non-Hodgkin lymphomas in Europe.* Eur J Cancer, 2007. **43**(2): p. 391-401.

219. Engels, E.A., *Infectious agents as causes of non-Hodgkin lymphoma.* Cancer Epidemiol Biomarkers Prev, 2007. **16**(3): p. 401-4.

220. Hennessy, B.T., E.O. Hanrahan, and P.A. Daly, *Non-Hodgkin lymphoma: an update.* Lancet Oncol, 2004. **5**(6): p. 341-53.

221. Muller, A.M., et al., *Epidemiology of non-Hodgkin's lymphoma (NHL): trends, geographic distribution, and etiology.* Ann Hematol, 2005. **84**(1): p. 1-12.

222.  Acquavella, J.F., et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study.* Environmental Health Perspectives, 2003. **112**(3): p. 321-326.

223.  Curwin, B.D., et al., *Urinary pesticide concentrations among children, mothers and fathers living in farm and non-farm households in iowa.* Ann Occup Hyg, 2007. **51**(1): p. 53-65.

224.  Wester, R.C., et al., *Glyphosate skin binding, absorption, residual tissue distribution, and skin decontamination.* Fundam.Appl Toxicol, 1991. **16**(4): p. 725-732.

225.  Wester, R.C., D. Quan, and H.I. Maibach, *In vitro percutaneous absorption of model compounds glyphosate and malathion from cotton fabric into and through human skin.* Food Chem Toxicol, 1996. **34**(8): p. 731-735.

226.  Zouaoui, K., et al., *Determination of glyphosate and AMPA in blood and urine from humans: about 13 cases of acute intoxication.* Forensic Sci Int, 2013. **226**(1-3): p. e20-5.

227.  Brewster, D.W., J. Warren, and W.E. Hopkins, *Metabolism of glyphosate in Sprague-Dawley rats: tissue distribution, identification, and quantitation of glyphosate-derived materials following a single oral dose.* Fundam.Appl Toxicol, 1991. **17**(1): p. 43-51.

228.  Begley, D.A., et al., *Finding mouse models of human lymphomas and leukemia's using the Jackson laboratory mouse tumor biology database.* Exp Mol Pathol, 2015. **99**(3): p. 533-6.

229.  Hori, M., et al., *Non-Hodgkin lymphomas of mice.* Blood Cells Mol Dis, 2001. **27**(1): p. 217-22.

230.  Morse, H.C., 3rd, J.M. Ward, and M.A. Teitell, *Mouse models of human B lymphoid neoplasms*, in *The Lymphoid Neoplasms*, I.T. Magrath, Editor. 2010, CRC Press: Boca Ratan, FL.

231.  Pattengale, P.K. and C.R. Taylor, *Experimental models of lymphoproliferative disease. The mouse as a model for human non-Hodgkin's lymphomas and related leukemias.* Am J Pathol, 1983. **113**(2): p. 237-65.

232.  Ward, J.M., *Lymphomas and leukemias in mice.* Exp Toxicol Pathol, 2006. **57**(5-6): p. 377-81.

233.  German Federal Institute for Occupational Safety and Health, *Proposal for Harmonized Classification and Labeling: Glyphosate*, F.O.f. Chemicals, Editor. 2016: Dortmund, Germany.

Toxicologic Pathology ISSN:0126-0135
Copyright © 1984 by the Society of Toxicologic Pathologists

Vol. 12, No. 2, 1984
Printed in U.S.A.

# Use of Historical Control Data in Carcinogenicity Studies in Rodents*

Joseph K. Haseman, James Huff and Gary A. Boorman

*Biometry and Risk Assessment Program and Toxicology Research and Testing Program, National Institute of Environmental Health Sciences, Research Triangle Park, NC 27709*

### Abstract

This paper considers the use of historical control data in the evaluation of tumor incidences from carcinogenicity studies in rodents. Although the most appropriate control group for interpretative purposes is always the concurrent control, there are instances in which the use of historical control information can aid an investigator in the overall evaluation of tumor incidence data. One example is rare tumors; another is a tumor that shows a marginally significant result relative to concurrent controls.

However, before historical control data can be used in a formal testing framework, a number of important issues must first be considered. The nomenclature conventions and diagnostic criteria for each study should be identical to insure unambiguous identification of all relevant tumors in the historical control database. Criteria should be established that will aid in determining whether a particular study should be included in the database. This will assure a homogeneous set of studies upon which to base statistical comparisons. Since study-to-study variability in tumor rates may exceed what would be expected by chance alone, these sources of variability should be identified and controlled. Finally, statistical procedures should be employed that adjust for extra-binomial variability.

This paper also summarizes tumor incidence data from untreated Fischer 344 rats and B6C3F₁ mice in the National Toxicology Program (NTP) historical control database. All studies in the database are of two years duration, and all neoplasms occurring with a frequency of 0.5% or more are reported.

### Introduction

The National Cancer Institute (NCI) Carcinogenesis Testing Program began in the 1960's. In 1978, the National Toxicology Program (NTP) was established, and in July 1981, the responsibility for the NCI carcinogenicity studies was transferred formally to NTP. To date, NCI and NTP have generated nearly 300 Technical Reports summarizing the results of laboratory animal carcinogenicity studies for a wide variety of chemicals [1, 2]. The majority of these investigations are two-year feeding or gavage studies involving male and female Fischer 344 rats and B6C3F₁

mice. For each of these studies detailed histopathology data—information on neoplastic and non-neoplastic lesions for individual animals—have been computerized and stored on the Carcinogenesis Bioassay Data System (CBDS).

Although the concurrent control group is always the first and most appropriate control group used for decision making [3, 4], there are certain instances in which the use of historical control information can aid an investigator in the overall evaluation of tumor incidence data. One example is rare tumors (which may require somewhat less stringent statistical evidence in a given study if the low spontaneous rate of the tumor can be demonstrated from historical control data); another is a tumor which shows a borderline

---

* Address reprint requests to Dr. J. K. Haseman, Biometry and Risk Assessment Program, NIEHS, Research Triangle Park, NC 27709.

Downloaded from tpx.sagepub.com at SAGE PUBLICATIONS on December 6, 2012



EXHIBIT

Foster 18
# 6

increase relative to concurrent controls (which may be discounted or considered to be biologically meaningful when historical control data are considered). Historical control data are also useful for quality control aspects of the study to determine if concurrent control tumor incidences are consistent with previously reported tumor rates [5].

There is currently no consensus regarding how and when historical control data should be used in the decision making process. The National Cancer Institute made limited use of historical control data to supplement the statistical analyses in certain Technical Reports [6]. In these instances the tumor incidences in chemically-exposed animals were often compared with the historical control range. If this tumor rate was within the historical control range, the effect was frequently regarded as being unrelated to chemical administration. Conversely, a tumor incidence outside the historical control range was often regarded as a chemically-induced effect.

Statistical issues related to the use of historical control data have been considered by a number of investigators [3, 4, 7, 8]. One goal of the National Toxicology Program is to investigate further the use of historical control information in the evaluation of tumor incidence data. This paper describes that research effort.

## METHODS

A systematic examination of historical control tumor incidence data from NCI/NTP carcinogenicity studies was carried out. These data were taken primarily from two year experiments involving Fischer 344 rats and B6C3F₁ mice. Modification of existing CBDS programs were made to facilitate detailed comparisons of tumor incidences within and among contract laboratories. One objective of this investigation was to define an NTP historical control database and to compare tumor incidences in this database with previously reported rates from earlier NCI studies [9, 10]. This new database could then be utilized as a reference point in the evaluation of tumor incidence from current NTP studies. A second objective was to identify major sources of study-to-study variability in tumor rates, using an approach similar to that employed by Tarone, Chu and Ward [4].

Within each laboratory the binomial variance test for homogeneity [11] was employed to assess the presence or absence of extra-binomial study-to-study variability. Analysis of variance procedures [12] were employed to quantify the potential sources of variability in tumor incidence (e.g., laboratory; pathologist within laboratory; animal supplier). The variance stabilizing arc sine transformation was employed in these analyses.

## RESULTS AND DISCUSSION

As the historical control tumor incidence data from NCI/NTP studies were reviewed, four issues became evident: (1) Different nomenclatures were used to describe the same lesion, (2) standardized criteria had not been defined for the inclusion of a study in the historical control database, (3) extra-binomial variability (i.e., variability among studies in excess of what would be expected by chance alone) was evident for certain tumors, and (4) appropriate statistical methodology for taking extrabinomial variability into account had not been adequately studied. These issues must all be addressed before historical control data can be used in a formal testing framework.

*Resolving Nomenclature Differences.* An examination of NCI/NTP historical data revealed that different terminologies were often being employed to describe the same tumor even for studies at the same laboratory carried out at approximately the same time. As an illustration, consider the data in Table I. If historical control data from this laboratory on pituitary chromophobe adenoma were to be used in a formal testing framework, one must be aware that the Adenoma NOS (NOS = not otherwise specified) diagnosis is almost certainly chromophobe adenoma, notwithstanding the different nomenclature. Thus, in this instance a statistical analysis should be based on the combined incidence of all pituitary adenomas including chromophobe adenomas.

TABLE I—Example of Differences in Pathology Nomenclature: Pituitary Tumors in Female F344 Rats

| Study[a] | Adenoma, NOS | Chromophobe Adenoma | Combined |
|---|---|---|---|
| A | 22/49 | 0/49 | 22/49 |
| B | 25/48 | 0/48 | 25/48 |
| C | 1/50 | 21/50 | 22/50 |
| D | 21/48 | 0/48 | 21/48 |
| E | 1/50 | 20/50 | 21/50 |

[a] Studies A–E are all recently completed studies from the same laboratory. NOS: not otherwise specified

TABLE II—Incidences of Primary Tumors in Untreated Control F344 Rats and B6C3F1 Mice[a]

| | MALE RATS | | FEMALE RATS | | MALE MICE | | FEMALE MICE | |
|---|---|---|---|---|---|---|---|---|
| | Number of Tumors (%) | SD (%) | Number of Tumors (%) | SD (%) | Number of Tumors (%) | SD (%) | Number of Tumors (%) | SD (%) |
| Circulatory System | 2320[b] | | 2370[b] | | 2343[b] | | 2486[b] | |
| Hemangioma | 4 (0.2) | 0.6 | 2 (0.1) | 0.4 | 34 (1.5) | 3.3 | 39 (1.6) | 1.9 |
| Hemangiosarcoma | 12 (0.5) | 1.1 | 3 (0.1) | 0.5 | 64 (2.7) | 2.6 | 48 (1.9) | 2.3 |
| Digestive system | | | | | | | | |
| Liver | 2306 | | 2356 | | 2334 | | 2469 | |
| Neoplastic nodule or adenoma | 78 (3.4) | 3.5 | 71 (3.0) | 3.0 | 240 (10.3) | 5.5 | 98 (4.0) | 3.9 |
| Carcinoma | 18 (0.8) | 1.3 | 4 (0.2) | 0.7 | 498 (21.3) | 6.9 | 101 (4.1) | 3.0 |
| Nodule or adenoma or carcinoma | 96 (4.2) | 3.9 | 74 (3.1) | 3.2 | 725 (31.1) | 7.5 | 196 (7.9) | 4.6 |
| Forestomach | 2276 | | 2329 | | 2252 | | 2336 | |
| Squamous cell papilloma | 5 (0.2) | 0.6 | 5 (0.2) | 0.8 | 6 (0.3) | 0.7 | 12 (0.5) | 1.5 |
| Squamous cell carcinoma | 1 (<0.1) | 0.3 | 2 (0.1) | 0.4 | 0 (0.0) | 0.0 | 2 (0.1) | 0.4 |
| Small intestine | 2212 | | 2284 | | 2148 | | 2234 | |
| Adenocarcinoma | 9 (0.4) | 0.9 | 1 (<0.1) | 0.3 | 14 (0.7) | 1.2 | 2 (0.1) | 0.4 |
| Endocrine System | | | | | | | | |
| Pituitary | 2158 | | 2262 | | 1903 | | 2051 | |
| Adenoma | 468 (21.7) | 11.7 | 995 (44.0) | 11.4 | 11 (0.6) | 1.5 | 163 (7.9) | 0.5 |
| Carcinoma | 51 (2.4) | 3.0 | 80 (3.5) | 4.7 | 1 (0.1) | 0.3 | 8 (0.4) | 0.9 |
| Adrenal | 2280 | | 2338 | | 2240 | | 2306 | |
| Cortical adenoma | 27 (1.2) | 1.3 | 74 (3.2) | 4.0 | 53 (2.4) | 3.0 | 7 (0.3) | 1.1 |
| Cortical carcinoma | 5 (0.2) | 0.6 | 7 (0.3) | 0.7 | 3 (0.1) | 0.6 | 1 (<0.1) | 0.3 |
| Pheochromocytoma | 388 (17.0) | 9.2 | 81 (3.5) | 3.0 | 28 (1.2) | 1.9 | 16 (0.7) | 1.2 |
| Pheochromocytoma, malignant | 23 (1.0) | 1.4 | 11 (0.5) | 1.0 | 2 (0.1) | 0.4 | 0 (0.0) | 0.0 |
| Thyroid | 2230 | | 2265 | | 2178 | | 2203 | |
| C-cell adenoma | 114 (5.1) | 4.4 | 111 (4.9) | 4.1 | 0 (0.0) | 0.0 | 2 (0.1) | 0.4 |
| C-cell carcinoma | 84 (3.8) | 3.3 | 81 (3.6) | 3.0 | 0 (0.0) | 0.0 | 0 (0.0) | 0.0 |
| Follicular cell adenoma | 22 (1.0) | 1.4 | 10 (0.4) | 1.0 | 22 (1.0) | 1.6 | 40 (1.8) | 2.1 |
| Follicular cell carcinoma | 17 (0.8) | 1.4 | 10 (0.4) | 0.9 | 5 (0.2) | 0.6 | 6 (0.3) | 1.5 |
| Pancreatic islets | 2226 | | 2303 | | 2237 | | 2280 | |
| Adenoma | 84 (3.8) | 3.6 | 18 (0.8) | 1.5 | 8 (0.4) | 0.9 | 9 (0.4) | 0.8 |
| Carcinoma | 46 (2.1) | 2.3 | 6 (0.3) | 0.8 | 0 (0.0) | 0.0 | 2 (0.1) | 0.4 |
| Hematopoietic System | 2320 | | 2370 | | 2343 | | 2486 | |
| Leukemia | 648 (27.9) | 10.2 | 414 (17.5) | 7.4 | 17 (0.7) | 1.7 | 52 (2.1) | 4.6 |
| Lymphoma | 51 (2.2) | 3.4 | 36 (1.5) | 2.2 | 280 (12.0) | 7.2 | 625 (25.1) | 10.0 |
| Leukemia/lymphoma[c] | 699 (30.1) | 10.5 | 448 (18.9) | 7.0 | 297 (12.7) | 7.3 | 677 (27.2) | 9.9 |
| Integumentary System | 2320 | | 2370 | | 2343 | | 2486 | |
| (Neuro)fibroma | 107 (4.6) | 3.2 | 34 (1.4) | 1.5 | 28 (1.2) | 2.7 | 1 (<0.1) | 0.6 |
| (Neuro)fibrosarcoma | 27 (1.2) | 1.4 | 20 (0.8) | 1.3 | 66 (2.8) | 4.4 | 21 (0.8) | 1.9 |
| Sarcoma, NOS | 10 (0.4) | 1.0 | 7 (0.3) | 0.7 | 40 (1.7) | 2.5 | 17 (0.7) | 1.6 |
| Squamous cell papilloma | 29 (1.2) | 1.7 | 6 (0.3) | 0.7 | 3 (0.1) | 0.5 | 6 (0.2) | 0.7 |

[a] Includes all tumors occurring with a frequency of 0.5% or greater, as of March 1983.
[b] Number of animals examined histopathologically (or, for certain lesions, the number of animals necropsied).
[c] This combination is included because certain early studies in the data base tended to use these terms interchangeably.

Although this particular example is fairly straightforward, others are less obvious. For example, the following terms for leukemia have been used in NCI/NTP studies: leukemia NOS, mast-cell leukemia, monocytic leukemia, myelomonocytic leukemia, mononuclear cell leukemia, granulocytic leukemia, lymphocytic leukemia, erythrocytic leukemia, and undifferentiated leukemia. To those unfamiliar with tumor pathology, it may not be clear which of these diagnoses represent synonymous terms for the same lesion and which represent histologically distinct leukemias, and therefore require separate analyses. The NTP position on this particular issue is that the most meaningful analysis is for all leukemia, rather than for any one particular type.

Another issue is the use of different sets of criteria for diagnosing a lesion. For example, some pathologists diagnose all thyroid C-cell proliferative lesions extending beyond the boundary of one follicle as C-cell carcinoma. Others diagnose all C-cell lesions located within the thyroid lobe as C-cell adenoma, regarding only lesions that extend beyond the thyroid capsule or having distant metastases as carcinomas.

Thus, the nomenclature conventions and diagnostic criteria for each study should be identical to insure unambiguous identification of all relevant tumors in the historical control database. As an initial step toward achieving this objective, the NTP has held workshops on kidney, liver, and pancreas pathology; each of the testing laboratories as well as leading diagnostic pathologists in the particular organ system have participated. During these workshops, examples of specific lesions were illustrated, discussed, and standardized diagnostic criteria formulated. These criteria have been incorporated into NTP's quality assurance and review procedures. Any diagnoses that do not conform to

Downloaded from tpx.sagepub.com at SAGE PUBLICATIONS on December 9, 2012

**TABLE II**—*Continued*

| | MALE RATS | | FEMALE RATS | | MALE MICE | | FEMALE MICE | |
|---|---|---|---|---|---|---|---|---|
| | Number of Tumors (%) | SD (%) | Number of Tumors (%) | SD (%) | Number of Tumors (%) | SD (%) | Number of Tumors (%) | SD (%) |
| Squamous cell carcinoma | 20 (0.9) | 1.3 | 15 (0.6) | 1.2 | 4 (0.2) | 0.7 | 6 (0.2) | 0.7 |
| Basal cell neoplasms | 22 (0.9) | 1.6 | 6 (0.3) | 0.7 | 2 (0.1) | 0.4 | 5 (0.2) | 0.8 |
| Keratoacanthoma | 20 (0.9) | 1.4 | 6 (0.3) | 0.8 | 0 (0.0) | 0.0 | 0 (0.0) | 0.0 |
| Lipoma | 12 (0.5) | 0.9 | 1 (<0.1) | 0.3 | 0 (0.0) | 0.0 | 0 (0.0) | 0.0 |
| Musculoskeletal System | 2320 | | 2370 | | 2343 | | 2486 | |
| Osteosarcoma | 12 (0.5) | 1.0 | 7 (0.3) | 0.8 | 3 (0.1) | 0.7 | 14 (0.6) | 1.1 |
| Rhabdomyosarcoma | 0 (0.0) | 0.0 | 2 (0.1) | 0.4 | 12 (0.5) | 1.6 | 2 (0.1) | 0.4 |
| Nervous System | | | | | | | | |
| Brain | 2301 | | 2348 | | 2303 | | 2378 | |
| Astrocytoma | 9 (0.4) | 1.0 | 12 (0.5) | 1.1 | 0 (0.0) | 0.0 | 0 (0.0) | 0.0 |
| Reproductive system | | | | | | | | |
| Mammary gland | 2320 | | 2370 | | 2343 | | 2486 | |
| Fibroadenoma | 51 (2.2) | 2.0 | 572 (24.1) | 10.1 | 0 (0.0) | 0.0 | 8 (0.3) | 1.1 |
| Adenocarcinoma | 6 (0.3) | 0.7 | 48 (2.0) | 2.4 | 0 (0.0) | 0.0 | 40 (1.6) | 2.3 |
| Preputial gland | 2320 | | | | 2343 | | | |
| Adenoma | 50 (2.2) | 3.4 | | | 2 (0.1) | 0.4 | | |
| Carcinoma | 63 (2.7) | 3.0 | | | 0 (0.0) | 0.0 | | |
| Prostate | 2154 | | | | 2343 | | | |
| Adenoma | 14 (0.6) | 2.0 | | | 0 (0.0) | 0.0 | | |
| Testis | 2285 | | | | 2312 | | | |
| Interstitial cell tumor | 2002 (87.6) | 8.9 | | | 8 (0.3) | 0.9 | | |
| Clitoral gland | | | 2370 | | | | 2486 | |
| Adenoma | | | 28 (1.2) | 1.8 | | | 0 (0.0) | 0.0 |
| Carcinoma | | | 46 (1.9) | 2.7 | | | 0 (0.0) | 0.0 |
| Uterus | | | 2318 | | | | 2360 | |
| Endometrial stromal polyp | | | 424 (18.3) | 8.1 | | | 22 (0.9) | 1.4 |
| Endometrial stromal sarcoma | | | 25 (1.1) | 1.7 | | | 13 (0.6) | 1.2 |
| Ovary | | | 2321 | | | | 2167 | |
| Granulosa cell neoplasms | | | 13 (0.6) | 1.0 | | | 2 (0.1) | 0.4 |
| Tubular adenoma | | | 0 (0.0) | 0.0 | | | 19 (0.9) | 1.4 |
| Respiratory System | | | | | | | | |
| Lung | 2305 | | 2354 | | 2328 | | 2388 | |
| Alveolar/bronchiolar adenoma | 35 (1.5) | 2.1 | 18 (0.8) | 1.4 | 282 (12.1) | 6.7 | 131 (5.5) | 3.6 |
| Alveolar/bronchiolar carcinoma | 20 (0.9) | 1.6 | 9 (0.4) | 0.9 | 119 (5.1) | 4.3 | 47 (2.0) | 2.3 |
| Special Sense Organs | | | | | | | | |
| Harderian gland | 2320 | | 2370 | | 2343 | | 2486 | |
| Adenoma | 1 (<0.1) | 0.3 | 0 (0.0) | 0.0 | 50 (2.1) | 2.8 | 32 (1.3) | 1.7 |
| Carcinoma | 1 (<0.1) | 0.3 | 0 (0.0) | 0.0 | 2 (0.1) | 0.4 | 1 (<0.1) | 0.3 |
| Other Tumors | 2320 | | 2370 | | 2343 | | 2486 | |
| Mesothelioma (tunica vaginalis) | 30 (1.3) | 1.7 | | | 0 (0.0) | 0.0 | | |
| Mesothelioma (other) | 23 (1.0) | 1.7 | 1 (<0.1) | 0.3 | 3 (0.1) | 0.5 | 0 (0.0) | 0.0 |

these standards are returned to the testing laboratory pathologist for reconsideration.

Another issue involves combining benign and malignant tumors (e.g., hepatocellular adenoma and carcinoma) for biological and statistical interpretation. For example, in their study of the variability of tumor rates in F344 rats and B6C3F$_1$ mice, Tarone, Chu and Ward [4] combined certain benign and malignant neoplasms, since "these combined types represent the histogenetic development of the tumors, and the groupings should minimize the effect of various pathologists in the program using different terms for the same stage in the development of a given tumor type." Ward [8] presents data illustrating different diagnostic criteria employed by four pathologists in the evaluation of liver lesions. The issue of tumor combinations should be carefully studied in advance, so that the historical control database can summarize the incidences of appropriate tumor combinations.

*Defining the Historical Control Database.*

Criteria should be established that will aid in determining whether or not a particular study should be included in the database. This will assure a homogeneous set of studies upon which to base statistical comparisons. Previous investigators [3, 7] have recognized this need and have emphasized that historical control databases should contain studies that are similar with respect to experimental factors known or suspected to affect the magnitude of tumor rates.

Certainly species, strain, sex, study duration, pathology protocols, nomenclature conventions, quality assurance and review procedures should be the same for each study in a particular historical control database. Ideally, diets, caging regimens, and various environmental parameters should also be comparable. Different types of control groups (e.g., untreated, corn oil gavage) should be dealt with separately. Other potential sources of variability (calendar year, laboratory, pathologist, supplier) should also be investigated, identified and controlled.

Downloaded from ips.sagepub.com at SAGE PUBLICATIONS on December 9, 2012

In June, 1982, a meeting of NTP pathologists and statisticians was held to establish an "updated" historical control database for tumor incidences. After considering the factors mentioned above, the group decided that this database should consist of all chemicals whose technical report drafts were peer reviewed in 1980 or later. This corresponds to those chemicals whose Technical Reports begin with number 193. Thus, many early NCI studies were excluded from the database. This action was not meant to indicate that these studies were flawed or that the pathology diagnoses were unreliable. These studies were excluded primarily because the pathology protocols, nomenclature conventions, quality assurance and review procedures, and other experimental factors noted above were different in some respects from those currently employed.

A further decision had to be made: when in the overall pathology evaluation process were diagnoses to be regarded as final and the study formally included in the database. It was decided that approval of the laboratory's pathology diagnoses by the NTP Pathology Working Group (PWG) should be the point in time in which a study becomes part of the database (The PWG consists of NTP pathologists and other experts in rodent pathology from academia and industry; their primary function is to review the pathology data and resolve any discrepancies in pathology diagnoses).

Table II summarizes the incidences of the more frequently-occurring tumors in the NTP historical control database; included are tumor incidences from untreated control male and female F344 rats (47 studies) and B6C3F₁ mice (51 studies). Most control groups had 50 animals/species/sex and all were from two year carcinogenicity studies. All neoplasms occurring with a frequency of 0.5% or more are listed. The current database contains information beginning with those studies reported in Technical Report 193 through those studies whose pathology diagnoses were finalized in CBDS as of March, 1983.

Comparing these rates with previous tabulations of control tumor incidences for F344 rats and B6C3F₁ mice [1, 4, 8–10, 13–17] showed that the incidence of several neoplasms are significantly higher in the current database. For F344 rats, the most notable increases as compared to Goodman et al. [9] are mononuclear cell leukemia (males: 28% vs. 12%; females: 17% vs. 10%), pituitary ad-

enoma (males: 22% vs. 11%; females: 44% vs. 29%) and adrenal pheochromocytoma (males: 18% vs. 9%). Similarly, for B6C3F₁ mice benign and malignant liver neoplasms (males: 31% vs. 21%; females: 8% vs. 4%) and pituitary adenoma (males: 0.6% vs. 0.1%; females: 8% vs. 3%) showed an increased incidence in the current data base compared to those reported by Ward et al. [10]. These differences in tumor rates are all significantly ($P < 0.01$) greater than what would be expected by chance alone.

These time-related trends are similar to those found by other investigators. When considering data from the early NCI studies, Ward [8] noted that "there is real evidence that tumor incidence at several sites in 2-year-old F344 rats has increased significantly over the past 8 years. The cause(s) is not known." One possible explanation is that over time more uniform criteria have been established for the diagnosis of these neoplasms. In addition, an in depth three-phase review of the pathology data has been developed and implemented by the NTP [18]. These time-related differences in tumor incidence are probably also affected by increased survival in the more recent studies due to improved animal husbandry, diets and environmental conditions. Moreover, not all studies summarized by Ward et al. [10] were of two year duration. One should not exclude the possibility that the incidence of these neoplasms is increasing due to one or more factors such as genetic drift or the presence of low level carcinogens in the diet (especially nitrosamines), water, bedding, etc.

*Identifying Sources of Variability.* Study-to-study variability in tumor rates may exceed what would be expected by chance alone. These sources of extra-binomial variability should be identified and controlled before attempting to use the database.

Time (calendar year) appears to be an important source of variability. Certain tumors show increased incidences in recent studies relative to earlier experiments. This variable can be controlled to some extent by limiting the historical control data to the more recent studies, as has been done by NTP. An additional strategy would be to employ a 3–4 year "window" for historical control data, i.e., to include in the database only those studies conducted within 3–4 years of the study being evaluated.

The laboratory is also an important source of variability for certain tumors. When all

Vol. 12, No. 2, 1984   HISTORICAL CONTROLS IN CARCINOGENICITY   131

TABLE III—Interlaboratory Variability in Control Tumor Incidence: Male F344 Rats[a]

| | Laboratory[a] | | | | | | | | | |
| Number of Studies<br>Number of Animals Necropsied | A<br>9<br>439 | | B<br>5<br>249 | | C<br>14<br>699 | | D<br>6<br>340 | | E<br>7<br>344 | |
| | Rate | Range | Rate | Range | Rate | Range | Rate | Range | Rate | Range |
|---|---|---|---|---|---|---|---|---|---|---|
| Overall Survival | 68 | 44–78 | 62 | 46–78 | 62 | 50–76 | 67 | 56–78 | 65 | 56–72 |
| Integument: Fibroma/Fibrosar-coma | 5 | 0–10 | 5 | 0–12 | 4 | 0–12 | 7 | 6–10 | 5 | 2–12 |
| All sites: Leukemia | 27 | 12–40 | 28 | 16–44 | 24 | 0–46 | 31 | 20–46 | 32 | 24–40 |
| Liver: Neoplastic Nodule | 2 | 0–5 | 2 | 0–8 | 3 | 0–12 | 5 | 0–10 | 6 | 0–12 |
| Liver: Carcinoma | <1 | 0–2 | <1 | 0–2 | 1 | 0–2 | 1 | 0–2 | 1 | 0–4 |
| Pituitary: Adenoma | 17 | 5–29 | 18 | 6–28 | 24 | 7–52 | 18 | 8–41 | 30 | 19–44 |
| Adrenal: Pheochromocytoma | 19 | 6–43 | 23 | 14–31 | 19 | 6–38 | 19 | 12–35 | 14 | 8–23 |
| Thyroid: C-Cell Tumor | 11 | 4–20 | 9 | 4–14 | 8 | 2–20 | 7 | 2–12 | 10 | 4–15 |
| Pancreas: Islet Cell Tumor[b] | 6 | 2–10 | 5 | 0–14 | 5 | 0–11 | 5 | 2–8 | 10 | 6–15 |
| Mammary Gland: Fibroadenoma | 3 | 0–6 | 2 | 0–4 | 3 | 0–8 | 3 | 0–6 | 2 | 0–4 |
| Testis: Interstitial Cell Tumor[b] | 88 | 68–95 | 85 | 71–96 | 86 | 72–96 | 96 | 94–98 | 91 | 86–96 |

[a] Values in the table represent % incidences.
[b] Significant (P < 0.05) interlaboratory variability.

TABLE IV—Interlaboratory Variability in Control Tumor Incidence: Female F344 Rats[a]

| | Laboratory[a] | | | | | | | | | |
| Number of Studies<br>Number of Animals Necropsied | A<br>9<br>439 | | B<br>5<br>249 | | C<br>15<br>747 | | D<br>6<br>337 | | E<br>7<br>350 | |
| | Rate | Range | Rate | Range | Rate | Range | Rate | Range | Rate | Range |
|---|---|---|---|---|---|---|---|---|---|---|
| Overall Survival | 75 | 66–84 | 73 | 68–80 | 71 | 50–84 | 74 | 66–78 | 77 | 62–86 |
| Integument: Fibroma/Fibrosar-coma | 2 | 0–6 | <1 | 0–2 | 2 | 0–4 | 2 | 0–4 | 2 | 0–6 |
| All sites: Leukemia | 16 | 8–28 | 22 | 14–38 | 15 | 0–24 | 17 | 12–20 | 17 | 6–32 |
| Liver: Neoplastic Nodule[b] | <1 | 0–2 | 4 | 0–8 | 3 | 0–8 | 3 | 2–4 | 5 | 0–12 |
| Liver: Carcinoma | 0 | — | 1 | 0–4 | <1 | 0–2 | 0 | — | <1 | 0–2 |
| Pituitary: Adenoma | 37 | 18–50 | 45 | 42–52 | 49 | 30–60 | 45 | 30–64 | 42 | 26–67 |
| Adrenal: Pheochromocytoma | 4 | 0–16 | 5 | 2–8 | 3 | 2–8 | 5 | 0–8 | 4 | 2–6 |
| Thyroid: C-Cell Tumor | 14 | 10–18 | 6 | 0–10 | 6 | 2–12 | 5 | 2–11 | 11 | 4–16 |
| Pancreas: Islet Cell Tumor | 1 | 0–4 | <1 | 0–2 | 1 | 0–7 | 2 | 0–4 | 2 | 0–6 |
| Mammary Gland: Fibroadenoma[b] | 28 | 18–35 | 21 | 16–26 | 31 | 20–44 | 18 | 10–23 | 15 | 2–38 |
| Uterus: Endometrial Stromal Po-lyp[b] | 15 | 8–22 | 26 | 21–31 | 21 | 4–35 | 22 | 10–37 | 12 | 8–16 |

[a] Values in the table represent % incidences.
[b] Significant (P < 0.05) interlaboratory variability.

contract laboratories with five or more studies in the NTP historical control database were considered, the following tumors showed significant (P < 0.05) interlaboratory variability (see Tables III–VI): pancreatic islet cell and testis interstitial cell tumors (male rats); liver nodules, thyroid C-cell tumors, mammary gland fibroadenomas, and uterine endometrial stromal polyps (female rats); lymphomas and pituitary tumors (mice); and lung tumors (male mice). No one laboratory appeared to report consistently high (or low) tumor incidences relative to the others, with the possible exception of Laboratory C, which tended to diagnose more tumors for mice than did the other four laboratories (Tables V and VI).

A specific example of inter-laboratory variability is given in Table VII. For male B6C3F₁ mice, the incidence of lung alveolar/bronchiolar adenoma or carcinoma is nearly three times as great in Lab C as in Lab D, and there is essentially no overlap of reported tumor rates between these laboratories (Table VII).

Downloaded from tox.sagepub.com at SAGE PUBLICATIONS on December 8, 2012

While this is admittedly a "worst case" example, differences of this magnitude may be important, and NTP is currently studying this issue in an effort to determine the underlying causes of laboratory-to-laboratory variability in tumor incidences.

A certain amount of interlaboratory variability is attributable to different diagnoses of a given neoplasm at different laboratories. Even though much effort is devoted to uniformity of diagnosis, histopathology is a judgmental science, with subsequent differential interpretation. Differentiations between hyperplasia and adenoma or between adenoma and carcinoma are sometimes not clear, and subjective differences in interpretation of these diagnoses can result in significant interlaboratory variability. Secondly, differences in laboratory geography with concommitant differences in the environment of the test animals may have an effect on the frequency of certain neoplasms. Tarone, Chu and Ward [4] hypothesize that "... unknown factors involving the diet, air, water, or bedding may play a role. . . . The unknown natural causes of certain tumors may allow slight modifications of ambient factors to greatly alter tumor incidence." Interlaboratory variability in tumor incidences in the NTP historical control database could not be attrib-

**TABLE V—Interlaboratory Variability in Control Tumor Incidence: Male B6C3F₁ Mice[a]**

| Number of Studies<br>Number of Animals Necropsied | A<br>9<br>448 | | B<br>5<br>248 | | C<br>15<br>745 | | D<br>8<br>398 | | E<br>10<br>280 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rate | Range | Rate | Range | Rate | Range | Rate | Range | Rate | Range |
| Overall Survival | 76 | 64–84 | 80 | 74–86 | 73 | 58–88 | 76 | 64–88 | 74 | 62–82 |
| Integument: Fibroma/Fibrosarcoma | 5 | 0–14 | 1 | 0–4 | 2 | 0–8 | 4 | 0–8 | 6 | 0–23 |
| Lung: Alveolar/Bronchiolar Tumor[b] | 19 | 8–29 | 16 | 8–27 | 22 | 12–34 | 8 | 2–12 | 11 | 2–15 |
| All sites: Lymphoma[b] | 9 | 2–14 | 8 | 2–18 | 16 | 4–32 | 12 | 6–18 | 8 | 2–10 |
| All sites: Hemangioma/Hemangiosarcoma | 4 | 0–6 | 2 | 0–6 | 6 | 0–20 | 3 | 0–6 | 2 | 0–7 |
| Liver: Adenoma | 9 | 6–14 | 6 | 2–10 | 12 | 0–22 | 9 | 2–14 | 9 | 2–17 |
| Liver: Carcinoma | 23 | 12–30 | 22 | 10–32 | 21 | 10–36 | 22 | 8–28 | 19 | 13–27 |
| Pituitary: Adenoma[b] | 0 | — | 0 | — | 2 | 0–6 | 0 | — | 0 | — |

[a] Values in the table represent % incidences.
[b] Significant ($P < 0.05$) interlaboratory variability.

**TABLE VI—Interlaboratory Variability in Control Tumor Incidence: Female B6C3F₁ Mice[a]**

| Number of Studies<br>Number of Animals Necropsied | A<br>9<br>446 | | B<br>5<br>247 | | C<br>15<br>748 | | D<br>8<br>400 | | E<br>7<br>371 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rate | Range | Rate | Range | Rate | Range | Rate | Range | Rate | Range |
| Overall Survival | 76 | 64–88 | 78 | 74–84 | 71 | 48–84 | 77 | 68–88 | 74 | 62–84 |
| Integument: Fibroma/Fibrosarcoma | <1 | 0–2 | 1 | 0–4 | 1 | 0–4 | 1 | 0–8 | 1 | 0–4 |
| Lung: Alveolar/Bronchiolar Tumor | 7 | 2–9 | 5 | 2–11 | 10 | 0–16 | 6 | 0–12 | 6 | 0–12 |
| All sites: Lymphoma[b] | 20 | 10–30 | 28 | 18–34 | 31 | 8–62 | 23 | 18–34 | 19 | 10–29 |
| All sites: Hemangioma/Hemangiosarcoma | 2 | 0–8 | 4 | 2–6 | 4 | 0–8 | 4 | 0–8 | 4 | 2–10 |
| Liver: Adenoma | 3 | 0–14 | 4 | 0–8 | 6 | 0–18 | 2 | 0–4 | 6 | 2–9 |
| Liver: Carcinoma | 4 | 0–6 | 4 | 0–10 | 4 | 0–8 | 6 | 2–15 | 4 | 0–9 |
| Pituitary: Adenoma[b] | 3 | 0–10 | 6 | 0–10 | 12 | 0–30 | 4 | 0–12 | 7 | 0–19 |

[a] Values in the table represent % incidences.
[b] Significant ($P < 0.05$) interlaboratory variability.

Downloaded from tpx.sagepub.com at SAGE PUBLICATIONS on December 8, 2012

TABLE VII—Historical Incidence of Lung Tumors (Adenoma or Carcinoma) in Male B6C3F₁ Mice at Five NTP Laboratories[a]

| | | LABORATORY | | |
|---|---|---|---|---|
| A | B | C | D | E |
| 4/50 (8) | 4/50 (8) | 6/50 (12) | 1/49 (2) | 1/47 (2) |
| 5/50 (10) | 5/47 (11) | 6/50 (12) | 3/50 (6) | 3/46 (7) |
| 8/49 (16) | 7/48 (15) | 6/49 (12) | 4/50 (8) | 5/46 (11) |
| 9/50 (18) | 10/50 (20) | 7/48 (15) | 4/46 (9) | 6/44 (14) |
| 9/50 (18) | 13/49 (27) | 8/50 (16) | 5/49 (10) | 7/47 (15) |
| 10/50 (20) | | 10/50 (20) | 5/49 (10) | 7/46 (15) |
| 11/50 (22) | | 10/50 (20) | 5/50 (10) | |
| 13/49 (27) | | 11/50 (22) | 6/50 (12) | |
| 14/48 (29) | | 12/50 (24) | | |
| | | 12/49 (24) | | |
| | | 13/49 (27) | | |
| | | 13/50 (26) | | |
| | | 14/50 (28) | | |
| | | 16/50 (32) | | |
| | | 17/50 (34) | | |
| Total: | | | | |
| 83/446 (19) | 39/244 (16) | 161/745 (22) | 33/393 (8) | 29/276 (11) |

[a] All NTP laboratories with five or more studies included.

uted to differences in survival, since this variable showed no significant differences among laboratories for any of the four sex-species groups (Tables III–VI).

The finding of significant laboratory-to-laboratory variability is consistent with the results of Tarone, Chu and Ward [4] who carried out a similar investigation with earlier NCI data. They found significant interlaboratory variability for several tumor types in both the F344 rat and B6C3F₁ mouse. An obvious solution to the problem of inter-laboratory variability in tumor incidence would be to limit historical control comparisons to the laboratory that carried out the particular study in question. The one possible exception might be rare tumors, which occur so infrequently that laboratory-to-laboratory variability will generally not be a problem.

For certain tumors pathologist-within-laboratories was a significant source of variability. Thus, one could argue that historical control comparisons should be limited to those diagnoses generated by the same pathologist as well as being restricted to the same laboratory at the same time period. However, the differences among pathologists were not as striking or as frequent as the laboratory-to-laboratory variability, due perhaps in part to the quality assurance and the PWG review procedures which minimize this source of variability (as noted earlier, the original pathologist is asked to reconsider any diagnosis that does not conform to the standard diagnostic criteria established by the NTP). Thus, it may be somewhat too restrictive as a general rule to require that both laboratory and pathologist be identical for

historical control comparisons. Animal supplier did not seem to be a major source of variability in NTP studies. This may be due to animals from all sources being derived from a single genotype and reared under standardized conditions.

Although further evaluation is in progress, when NTP utilizes historical control data, it generally limits comparisons to relatively recent (e.g., past 3–4 years) studies at the laboratory that conducted the study in question. This eliminates much (but not all) of the extra-binomial variability and is consistent with the recommendations of other investigators who have considered the historical control issue [3, 4].

*Developing Appropriate Statistical Methodology.* As indicated earlier, one simple strategy for utilizing historical control data is to examine the historical control range and determine whether or not the interval includes the tumor incidence observed in a particular group. Although there are situations in which the range may be helpful, there are problems associated with its use as a formal statistical analysis in the evaluation of tumor incidence data.

The range is sample-size-dependent, and tends to broaden as more studies are completed. If the range is based on only a few studies, then it is frequently narrow and a tumor rate in a test group could easily fall outside the range by chance alone. Conversely, if the historical control range is based on many studies, and hence potentially quite wide, a tumor rate in a test group may well be a chemically related effect even though the incidence is inside the upper bound of the historical control range.

Since the historical control range gets wider and wider as additional data are generated, it becomes progressively *more* difficult to obtain significant treatment-related effects (i.e., a tumor incidence outside the range) as more information is accumulated regarding control tumor rates. Intuitively, the opposite phenomenon seems more logical. Thus, a more appropriate statistical procedure is necessary before historical control data can be used in a formal testing framework.

Recently, three procedures were derived for the utilization of historical control data. The first was proposed by Tarone [7], who assumed a logistic model for dose response and an underlying beta distribution for the probability of tumor in the control popula-

Downloaded from hci.sagepub.com at SAGE PUBLICATIONS on December 4, 2011

tion. Thus, a beta-binomial model was assumed, with parameters estimated from historical control data. Setting up the likelihood function, an asymptotic (large sample) test based on a modified Cochran-Armitage statistic was obtained for the existence of a dose response. The control tumor rate used in the test procedure was in essence a weighted average of the historical and concurrent control group rates, with the relative weights determined in part by the magnitude of the extra-binomial variability in the historical control data.

A second method used a Bayesian approach [19]. The authors assumed that logits of the historical control rates were normally distributed and integrated out nuisance parameters to obtain a distribution for the slope of the linear effect. The slope was then tested by computing a Bayesian p-value, defined as the posterior probability of a positive or negative slope (whichever is smaller). Dempster et al. [19] stated that their Bayesian Z score principle and the asymptotic chi square sampling theory principle of Tarone yielded equivalent results in large samples.

The third method [5] was an exact conditional test rather than an asymptotic procedure, and like the Tarone procedure, it assumed an underlying beta-binomial model. An exact conditional test was derived by calculating the tail of the beta-binomial distribution, assuming the beta-binomial parameter values were known. This test was derived for pairwise comparisons rather than dose-response trends, but the method can be extended to include this more general case as well.

Hoel and Yanagawa [20] derived a locally most powerful test of trend for binomial response data using a beta prior distribution for the historical control information. This test provided a generalization of both the Tarone and Hoel procedures. The gain in asymptotic efficiency by incorporating historical control information was calculated and small sample methods were given. One major conclusion of their research was that a conditional exact test was preferred over an asymptotic test because of the poor operating characteristics of the asymptotic procedure for tumors having low background rates. A possible area of future research would be the extension of the methods described above to adjust for survival differences (and time-to-death-with-tumor). Considerations should also be given to possible time-related trends.

Finally, if the tumor rates observed in concurrent controls are inconsistent with past historical experience at that laboratory, then utilizing historical control data becomes more difficult. In this situation Cox and McCullagh [21] stated "it is far from clear how the historical controls could be used, or indeed whether they should be used, in formal comparisons."

In summary, when the biological significance of an observed increase in tumor incidence relative to concurrent controls is uncertain, historical control rates can aid in the overall evaluation. Current NTP philosophy is that the most appropriate comparisons are with concurrent controls. Supplemental comparisons with historical control rates may occasionally be made and should generally be limited to data from the same laboratory. For certain uncommon or rare tumors use of Program-wide rates may be appropriate. If, however, historical control data are to be used in a formal testing framework, several issues must be resolved: (1) defining the historical control database; (2) standardizing pathology nomenclature and diagnostic criteria; (3) identifying major sources of variability; and (4) developing and utilizing statistical procedures that adjust for extrabinomial variability and survival differences.

### REFERENCES

1. Chu KC, Cueto C, Jr, Ward JM (1981): Factors in the Evaluation of National Cancer Institute Carcinogen Bioassays. J. Toxicol. Environ. Health. 8:251–280.
2. Huff J (1982): Carcinogenesis Bioassay Results from the National Toxicology Program. Environmental Health Perspectives. 45:185–198.
3. Gart JJ, Chu KC, Tarone RE (1979): Statistical issues in interpretation of chronic bioassay tests for carcinogenicity. J. Nat. Cancer Inst. 62:957–974.
4. Tarone RE, Chu KC, Ward JM (1981): Variability in the Rate of Some Common Naturally Occurring Tumors in Fischer 344 Rats and (C57BL/6N X C3H/HeN)F1 (B6C3F1) Mice. J. Natl. Cancer Inst. 66:1175–1181.
5. Hoel DG (1983): Conditional two-sample tests with historical controls. Contributions to Statistics: Essays in Honor of Norman L. Johnson, P.K. Sen (ed.), North Holland Publishing Company Amsterdam, 229–236.
6. Society of Toxicology Task Force of Past Presidents. (1982): Animal data in Hazard Evaluation: Paths and Pitfalls, Fundamental and Applied Toxicology. 2:101–107.
7. Tarone RE (1982): The use of historical control information in testing for a trend in proportion. Biometrics. 38:215–220.
8. Ward JM (1983): Background Data and Variations in Tumor Rates of Control Rats and Mice. Prog. Exptl. Tumor Res. 26:241–258.

9. Goodman DG, Ward JM, Squire RH, Chu KC, Linhart MS (1979): Neoplastic and Nonneoplastic Lesions in Aging F344 Rats. *Toxicology and Applied Pharmacology*. 48:237–248.

10. Ward JM, Goodman DG, Squire RA, Chu KC, Linhart MS (1979): Neoplastic and Nonneoplastic Lesions in Aging (C57BL/6N x C3H/HeN) $F_1$ (B6C3F$_1$) mice. *J. Natl. Cancer. Inst.* 63:849–854.

11. Tarone RE (1979): Testing the Goodness of Fit of the Binomial Distribution. *Biometrika* 66:585–590.

12. Snedecor GW, Cochran WG (1980): *Statistical Methods*, Seventh Edition, the Iowa State University Press, Ames, Iowa.

13. Jacobs BB, Huseby RA (1967): Neoplasms Occurring in Aged Fischer Rats with Special Reference to Testicular, Uterine and Thyroid Tumors. *J. Natl. Cancer Inst.* 39:303–309.

14. Sacksteder MR (1976): Occurrence of Spontaneous Tumors in the Germ-Free F344 Rat. *J. Natl. Cancer Inst.* 57:1371–1373.

15. Sass B, Rabstein LS, Madison R, Nims RM, Peters RL, Kelloff GJ (1975): Incidence of Spontaneous Neoplasms in F344 Rats Throughout the Natural Life-span. *J. Natl. Cancer Inst.* 54:1449–1456.

16. Sher SP (1982): Tumors in Control Hamsters, Rats, and Mice: Literature Tabulation. *CRC Crit. Rev. Toxicol.* 9:49–79.

17. Sher SP, Jensen RD, Bokelman DL (1982): Spontaneous Tumors in Control F344 and Charles River-CD Rats and Charles River CD-1 and B6C3HF$_1$ Mice. *Toxicol. Letters.* 11:103–110.

18. Maronpot RR, Boorman GA (1982): Interpretation of Rodent Hepatocellular Proliferative Alterations and Hepatocellular Tumors in Chemical Safety Assessments. *Toxicologic Pathology.* 10:71–80.

19. Dempster AP, Selwyn MD, Weeks BJ (1983): Combining historical and randomized controls for assessing trends in proportions. *J. Am. Stat. Assoc.* 78:221–227.

20. Hoel DG, Yanagawa T (1984): Incorporating historical controls in testing for a trend in proportions. *J. Am. Stat. Assoc.* (in press)

21. Cox DR, McCullagh P (1982): Some aspects of analysis of covariance. *Biometrics.* 38:541–561.

Downloaded from tpx.sagepub.com at SAGE PUBLICATIONS on December 9, 2012