1

**HOLLINGSWORTH LLP**
Joe G. Hollingsworth (*pro hac vice*)

2

Eric G. Lasker (*pro hac vice*)
Martin C. Calhoun (*pro hac vice*)

3

Heather A. Pigman (*pro hac vice*)
1350 I Street, N.W.

4

Washington, DC  20005
Tel.:     (202) 898-5800

5

Fax:     (202) 682-1639
Email:   jhollingsworth@hollingsworthllp.com

6

elasker@hollingsworthllp.com
mcalhoun@hollingsworthllp.com

7

hpigman@hollingsworthllp.com

8

*Attorneys for Defendant*
*MONSANTO COMPANY*

9

10

UNITED STATES DISTRICT COURT

11

NORTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: | |
| ALL ACTIONS | **Hearing Date:   December 11, 2017**<br>**Time:              9:00 a.m.** |

13

14

15

16

17

18

19

**MONSANTO COMPANY'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS *DAUBERT* AND SUMMARY JUDGMENT MOTION BASED ON FAILURE OF GENERAL CAUSATION PROOF AND OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO STRIKE CERTAIN OPINIONS OF MONSANTO COMPANY'S EXPERT WITNESSES**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

ISSUES TO BE DECIDED ...................................................................................................... 1

INTRODUCTION ................................................................................................................... 1

I.      PLAINTIFFS MISREPRESENT THE GENERAL CAUSATION INQUIRY ...................... 5

II.     PLAINTIFFS' EXPERTS' OPINIONS ARE UNRELIABLE BECAUSE THEY DISREGARD THE EPIDEMIOLOGIC EVIDENCE IN FAVOR OF CONFOUNDED, BIASED, AND STATISTICALLY INSIGNIFICANT DATA ............................ 7

     A.  Plaintiffs' Experts Improperly Rely on Confounded Data .............................. 10

     B.  Plaintiffs' Experts Improperly Rely on Biased Data ...................................... 14

     C.  Plaintiffs' Experts Improperly Rely on Non-Significant Data ...................... 16

     D.  Plaintiffs' Experts Improperly Dismiss the Findings of the Only Prospective Cohort Study to Examine GBHs and NHL ...................... 17

     E.  Plaintiffs' Experts' Outcome-Driven Treatment of Unpublished Studies Likewise Demonstrates the Unreliable Nature of Their Methodology .......................... 19

     F.  Plaintiffs' Experts Fail to Faithfully Apply the Bradford Hill Criteria ......................... 22

     G.  Plaintiffs' Experts Improperly Seek to Lower Their *Daubert* Burden By Relying on Purported Epidemiologic Associations Below 2.0 ......................... 24

III.    PLAINTIFFS' OPPOSITION BRIEF HIGHLIGHTS RATHER THAN RESOLVES THE METHODLOGICAL DEFICIENCIES THAT RENDER THEIR EXPERTS' OPINIONS REGARDING THE ANIMAL DATA UNRELIABLE ................................... 25

     A.  Despite Plaintiffs' Specific Efforts to Buttress the Admissibility of Dr. Portier's Testimony, They Still Fail to Meet *Daubert*'s Standards ................................. 26

     B.  No Matter How Plaintiffs Describe It, Dr. Jameson's Methodology Fails To Satisfy *Daubert* ................................................................. 29

     C.  Plaintiffs' Other Arguments for Admissibility Are Equally Meritless ........................... 30

IV.    PLAINTIFFS' EXPERTS' OPINIONS REGARDING MECHANISTIC DATA ARE INADMISSIBLE ................................................................. 32

V.     TO AVOID ADDRESSING THE DEFICIENCIES IN THEIR EXPERTS' OPINIONS RAISED BY MONSANTO, PLAINTIFFS SEEK TO SHIFT THE FOCUS TO NON-*DAUBERT* ISSUES ................................................................. 36

OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION TO STRIKE CERTAIN OPINIONS OF MONSANTO'S EXPERT WITNESSES ................................... 40

I.      THERE IS NO SCIENTIFIC BASIS TO EXCLUDE DR. ROSOL'S OPINION, AS ALL MATERIALS HE REVIEWED WERE AVAILABLE TO BOTH PARTIES ........... 40

ii

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP. TO PLFS' MTN. TO EXCLUDE (3:16-md-02741-VC)

II.     DR. GOODMAN'S ROBUST AND WELL-SUPPORTED EVALUATION OF ALL
        AVAILABLE MECHANISTIC DATA IS ADMISSIBLE..................................................45

        A.   Dr. Goodman Applied a Rigorous Methodology to Both Positive and Negative
             Studies To Reach His Opinion That Glyphosate and GBHs Should Be Regarded as
             Non-Genotoxic........................................................................................................45

        B.   Plaintiffs Mischaracterize Dr. Goodman's Valid Criticisms of Paz-y-Mino 2007 and
             Bolognesi 2009, Studies Considered "Low Quality" By EPA .........................47

III.    DR. FOSTER'S OPINIONS ARE WELL-SUPPORTED AND HIS TESTIMONY
        SHOULD BE ADMITTED UNDER *DAUBERT*...................................................47

IV.     PLAINTIFFS' EFFORTS TO EXCLUDE DR. CORCORAN'S TESTIMONY LACK
        ANY FACTUAL BASIS AND MUST BE DENIED ...........................................49

V.      PLAINTIFFS' MOTION TO EXCLUDE DRS. MUCCI AND RIDER'S RELIANCE
        ON RECENT EPIDEMIOLOGICAL DATA MUST BE DENIED ..................................50

CONCLUSION..................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abold v. City of Black Hawk*,
No. Civ.03-CV-00299, 2005 WL 5807816 (D. Colo. July 18, 2005) ........................................ 35

*In re Accutane Prod. Liab. Litig.*,
No. 8:04-MD-2523-T-30, 2009 WL 2496444 (M.D. Fla. Aug. 11, 2009),
*aff'd*, 378 F. App'x 929 (11th Cir. 2010) .................................................................... 34

*Allison v. McGhan Med. Corp.*,
184 F.3d 1300 (11th Cir. 1999) ................................................................................. 18

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ...................................................................................... 33

*Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.*,
No. 2:09-CV-1182, 2012 WL 1970017 (D. Nev. June 1, 2012),
*aff'd,* 595 Fed. App'x 670 (9th Cir. 2014) ................................................................... 44

*Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
No. 09-civ-686, 2011 WL 6288415 (S.D.N.Y. Dec. 15, 2011) .................................... 41

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ........................................................... *passim*

*Black v. Rhone-Poulenc, Inc.*,
19 F. Supp. 2d 592 (S.D.W. Va. 1998) ...................................................................... 36

*Bolbol v. City of Daly City*,
754 F. Supp. 2d 1095 (N.D. Cal. 2010) ..................................................................... 28

*Brantley v. Int'l Paper Co.*,
No. CV 2:09-230, 2017 WL 2292767 (M.D. Ala. May 24, 2017) .............................. 35

*Brown v. China Integrated Energy, Inc.*,
CV 11-02559, 2015 WL 12720322 (C.D. Cal. Feb. 17, 2015) ................................... 49

*Burst v. Shell Oil Co.*,
Civ. Action No. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015),
*aff'd,* 650 F. App'x 170 (5th Cir. 2016), *cert. denied,* 137 S. Ct. 312 (2016) ............ 17

*Caraker v. Sandoz Pharm. Corp.*,
188 F. Supp. 2d. 1026 (S.D. Ill. 2001) ................................................. 4, 19, 39, 40

*Carl v. Johnson & Johnson*,
Nos. ATL-L-6546-14, ATL-L-6540-14, 2016 WL 4580145 (N.J. Super. Ct. Sept. 2, 2016) ..... 17

iv

*In re Chantix (Varenicline) Prod. Liab. Litig.*,
No. 2:09-CV-2039, 2012 WL 12920549 (N.D. Ala. Dec. 3, 2012) ........................................... 49

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)..............................................................................................................*passim*

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 2005) .............................................................................. 24, 25, 31

*In re Denture Cream Prod. Liab. Litig.*,
No. 09-2051, 2015 WL 392021 (S.D. Fla. Jan. 28, 2015), *aff'd sub nom.*
*Jones v. SmithKline Beecham*, 652 Fed. App'x 848 (11th Cir. 2016) .................................... 8, 14

*Dura Auto Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ........................................................................................... 33

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ............................................................................................... 1

*Fitts v. Unum Life Ins. Co. of Am.*,
98-00617, 2007 WL 1334974 (D.D.C. May 7, 2007)...................................................... 44

*Friend v. Time Mfg. Co.*,
422 F. Supp. 2d 1079 (D. Ariz. 2005) ............................................................................. 28

*Gaddy v. Blitz U.S.A., Inc.*,
No. 2:09-cv-52, 2011 WL 13193319 (E.D. Tex. Jan. 18, 2011) ..................................... 50

*Garcia v. Pueblo C.C.*,
299 F.3d 1233 (10th Cir. 2002) ...................................................................................... 13

*Garlick v. County of Kern*,
Case No. 1:13-CV-01051, 2016 WL 1461841 (E.D. Cal. Apr. 14, 2016)........................ 40

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997).....................................................................................................*passim*

*Good v. Fluor Daniel Corp.*,
222 F. Supp. 2d 1236 (E.D. Wash. 2002) ........................................................................ 17

*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*,
397 F.3d 1217 (9th Cir. 2005) ........................................................................................ 13

*In re Hanford Nuclear Reservation Litig.*,
292 F.3d 1124 (9th Cir. 2002) .................................................................................... 6, 25

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009) ........................................................................ 34

*Hollander v. Sandoz Pharm. Corp.*,
  289 F.3d 1193 (10th Cir. 2002) ................................................................. 3, 19, 39

*Johnson v. Arkema, Inc.*,
  685 F.3d 452 (5th Cir. 2012) ............................................................................. 37

*King ex rel. King v. Sec'y of HHS*,
  No. 03-584V, 2010 WL 892296 (Fed. Cl. Mar. 12, 2010) ........................................ 35

*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) ............................................................................... 4

*Lemmermann v. Blue Cross Blue Shield of Wis.*,
  713 F. Supp. 2d 791 (E.D. Wis. 2010) ................................................................. 14

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Prac. & Prod. Liab. Litig.*,
  174 F. Supp. 3d 911 (D.S.C. 2016) ................................................................. 21, 22

*Lloyd v. Johnson & Johnson*,
  Case No. BC628228, slip op. (Cal. Super. Ct., L.A. Cty. Oct. 20, 2017) .................... 25

*Lust v. Merrell Dow Pharm. Inc.*,
  89 F.3d 594 (9th Cir. 1996) ............................................................................... 20

*Magistrini v. One Hour Martinizing Dry Cleaning*,
  180 F. Supp. 2d 584 (D.N.J. 2002), *aff'd*, 68 Fed. App'x 356 (3d Cir. 2003) .......... 11, 15

*Maras v. Avis Rent A Car System, Inc.*,
  393 F. Supp. 2d 801 (D. Minn. 2005) .................................................................. 14

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ......................................................................................... 17

*McManaway v. KBR, Inc.*,
  852 F.3d 444 (5th Cir. 2017) ............................................................................. 24

*Miller v. Pfizer, Inc.*,
  196 F. Supp. 2d 1062 (D. Kan. 2002) .................................................................. 17

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
  639 F.3d 11 (1st Cir. 2011) ................................................................................ 4

*In re Mirena IUD Prod. Liab. Litig.*,
  202 F. Supp. 3d 304 (S.D.N.Y. 2016), *aff'd*, No. 16-2890-cv(L), 2017 WL 4785947
  (2d Cir. Oct. 24, 2017) ....................................................................................... 7

*Mullins v. Premier Nutrition Corp.*,
  178 F. Supp. 3d 867 (N.D. Cal. 2016) ............................................................. 13, 40

*Nelson v. Tenn. Gas Pieline Co.*,
   243 F.3d 244 (6th Cir. 2001) ............................................................... 8, 18

*Network Prot. Scis., LLC v. Fortinet, Inc.*,
   No. C 12-01106, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) ................................ 49

*Norris v. Baxter Healthcare Corp.*,
   397 F.3d 878 (10th Cir. 2005) .......................................................... 19, 39

*O'Hanlon v. Matrixx Initiatives*,
   No. CV 04-10391, 2007 WL 2446496 (C.D. Cal. Jan. 3, 2007) ......................... 30, 31

*Obesity Res. Inst., LLC v. Fiber Res. Int'l, LLC*,
   No. 15-cv-595, 2017 WL 1166307 (S.D. Cal. Mar. 29, 2017) .............................. 50

*Pirolozzi v. Stanbro*,
   No. 5:07-CV-798, 2009 WL 1441070 (N.D. Ohio May 20, 2009) ........................... 40

*Posen v. Ozier*,
   No. CV17-07, 2017 WL 4269957 (D. Mont. Sept. 26, 2017) .............................. 11

*In re Prempro Prod. Liab. Litig.*,
   765 F. Supp. 2d 1113 (W.D. Ark. 2011).................................................. 14

*Princeton Digital Image Corp. v. Office Depot Inc.*,
   No. 13-239, 2017 WL 3264068 (D. Del. Aug. 1, 2017)................................... 44

*Quad/Graphics, Inc. v. One2One Commc'ns, LLC*,
   No. 09-CV-99, 2011 WL 4478440 (E.D. Wis. Sept. 23, 2011)............................. 49

*Rios v. Welch*,
   856 F. Supp. 1499 (D. Kan. 1994) ...................................................... 13

*Salomon v. Andrea C.*,
   No. 06CV484, 2008 WL 686795 (S.D. Cal. Mar. 11, 2008)................................ 50

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
   950 F. Supp. 981 (C.D. Cal. 1996) ..................................................... 19

*Schudel v. Gen. Elec. Co.*,
   120 F.3d 991 (1997), *abrogated on other grounds by Weisgram v. Marley Co.*,
   528 U.S. 440 (2000)................................................................... 24

*Siharath v. Sandoz Pharm. Corp.*,
   131 F. Supp. 2d 1347 (N.D. Ga. 2001), *aff'd sub nom., Rider v. Sandoz Pharm. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ...................................................... 4, 20

*Stevens v. CoreLogic, Inc.*,
   No. 14-cv-1158, 2016 WL 8729928 (S.D. Cal. May 6, 2016) ............................. 13

*U.S. v. Grace*,
  597 F. Supp. 2d 1143 (D. Mont. 2009) ...................................................................... 4

*U.S. v. Lester*,
  234 F. Supp. 2d 595 (E.D. Va. 2002) ...................................................................... 34

*U.S. v. W.R. Grace*,
  504 F.3d 745 (9th Cir. 2007) ...................................................................................... 4

*In re Viagra Prod. Liab. Litig.*,
  658 F. Supp. 2d 936 (D. Minn. 2009) ...................................................................... 36

*Villagomes v. Lab. Corp. of Am.*,
  No. 2:08-CV-00387, 2010 WL 4628085 (D. Nev. Nov. 8, 2010) ............................... 32

*Waite v. All Acquisition Corp.*,
  194 F. Supp. 3d 1298 (S.D. Fla. 2016) ...................................................................... 39

*Wick v. Wabash Holding Corp.*,
  801 F. Supp. 2d 93 (W.D.N.Y. 2010) ...................................................................... 28

*Williams v. Mosaic Fertilizer, LLC*,
  No. 8:14-CV-1748-T-35, 2016 WL 7175657 (M.D. Fla. June 24, 2016) .................... 34

*Wise v. C.R. Bard, Inc.*,
  No. 2:12-CV-01378, 2015 WL 521202 (S.D.W. Va. Feb. 7, 2015) ............................. 49

*In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*,
  218 F. Supp. 3d 700 (N.D. Ill. 2016) ...................................................................... 28

*In re: Zoloft (Sertraline Hydrocloride) Prod. Liab. Litig.*,
  No. 12-md-2342, 2015 WL 7776911 (E.D. Pa. Dec. 2, 2015), *aff'd sub nom. In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787 (3d Cir. 2017) ...................... 8, 21

**Statutes**

Cal. Code Regs. tit. 27, § 25904(c) ...................................................................... 37

Cal. Labor Code § 6382(b) ...................................................................................... 37

**Other Authorities**

Fed. R. Civ. P. 26(a)(2)(B)(ii) ...................................................................................... 40

Fed. R. Evid. 104(a) ...................................................................................................... 1

Fed. R. Evid. 403 ............................................................................................................ 4

Fed. R. Evid. 702 ...................................................................................................... 1, 4

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

1

## Miscellaneous

Alavanja, C., et al., *Non-Hodgkin Lymphoma Risk and Insecticide, Fungicide and Fumigant Use in the Ag. Health Study*, PLoS One 9(10): e109332 (2014) .................................. 21

Alavanja, M., et al., *DRAFT-Lymphoma Risk and Pesticide Use in the Agricultural Health Study* (Mar. 15, 2013) ...................................................................................... *passim*

Andreotti, G., et al., *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110 J. Nat'l Cancer Inst. (published online Nov. 9, 2017) ........................... *passim*

Arnason, R., *Toxicologist Pans UN Glyphosate Report*, The Wester Producer (Mar. 27, 2015), http://www.producer.com/daily/toxicologist-pans-un-glyphosate-report/ ................................. 34

Blair, A., et al., *Guidelines for Application of Meta-Analysis in Environmental Epidemiology*, 22 Reg. Toxicol. & Pharm. 189 (1995). ............................................................. 20

Bolognesi, C., et al., *Biomonitoring of Genotoxic Risk in Agricultural Workers from Five Columbian Regions: Association to Occupation Exposure to Glyphosate*, 72 J. Toxicology Envtl. Health, Part A 986 (2009) ............................................. *passim*

Business Wire, *Glyphosate Task Force Opens Reading Room for Public Access to Studies* (Aug. 24, 2016), http://www.businesswire.com/news/home/20160824005470/en/Glyphosate-Task-Force-Opens-Reading-Room-Public .......................................................................... 41

C. Portier Consultations, LobbyFacts.eu (Dec. 21, 2015) ............................................. 41

California Environmental Protection Agency, Office of Environmental Health Hazard Assessment, Pesticide and Environmental Toxicology Branch, *Public Health Goals for Chemicals in Drinking Water: Glyphosate* (June 2007), https://oehha.ca.gov/media/downloads/water/chemicals/phg/glyphg062907_0.pdf ................. 38

Chang, E., et al., *Meta-Analysis of Glyphosate Use and Risk of Non-Hodgkin Lymphoma*, Exponent 1 (2017).................................................................................................. 10

Cimino, M., *Comparative Overview of Current International Strategies and Guidelines for Genetic Toxicology Testing for Regulatory Purposes*, 47 Envtl. Molecular Mutagenesis 362 (2006)........................................................................................ 46

Corcoran, C., et al., *Exact Methods for Categorical Data Analysis*, in *Encyclopaedic Companion to Medical Statistics* (2010).......................................................... 49

Corcoran, C., et al., *Power Comparisons for Tests of Trend in Dose-Response Studies*, 19 Statistics in Med. 3037 (2000)............................................................... 49

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP. TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

Cornwall, W., *Update: After Quick Review, Medical School Says No Evidence Monsanto Ghostwrote Professor's Paper*, Science (Mar. 23, 2017), http://www.sciencemag.org/news/2017/03/update-after-quick-review-medical-school-says-no-evidence-monsanto-ghostwrote ................................................................ 39

Corporate Europe Observatory, *Setting the Record Straight on False Accusations, Dr. C. Portier's Work on Glyphosate and IARC* (Oct. 19, 2017), https://corporateeurope.org/food-and-agriculture/2017/10/setting-record-straight-false-accusations-dr-c-portier-work-glyphosate ................................................. 42

De Roos, A, et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envtl. Health Perspectives 49 (2005) ...................... *passim*

De Roos, A, et al., *Integrative Assessment of Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma Among Men*, 60 Occup Envtl. Med. 1 (2003) .................... 12, 13

Dearfield, K. & Moore, M., *Use of Genetic Toxicology Information for Risk Assessment*, 46 Envtl. Molecular Mutagenesis 236 (2005) ............................................. 46

Dourson, M., et al., *Mode of Action Analysis for Liver Tumors from Oral 1,4-Dioxane Exposures and Evidence-Based Dose Response Assessment*, 68 Reg. Toxicology & Pharm. 387 (2014) ....................................................................... 27

E-Mail from Linda Birnbaum to Sharon Evans (Oct. 21, 2015, 8:10 AM) ...................... 42

E-Mail from Michael Alavanja to Dale Sandler, et al. (Feb. 27, 2014 1:05:23 PM) .......... 20

E-Mail from PLoS ONE editorial manager to Michael Alavanja (June 21, 2014 1:56 PM) ........ 21

E-Mail from Rosemary Stewart to Jeffrey Travers (Dec. 30, 2016, 9:13 AM) .................. 41

EPA, FIFRA Scientific Advisory Panel, *Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate*, Dec. 13-16, 2016 ................................................................... 36

EPA FIFRA Scientific Advisory Panel (SAP) Open Meeting Tr., EPA-HQ-OPP-2016-0385 (Dec. 13-16, 2016), https://www.epa.gov/sites/production/files/2017-02/documents/glyphosate_transcript.pdf ................................................. 26

EPA, Guidelines for Carcinogen Risk Assesment (Mar. 2005), https://www3.epa.gov/airtoxics/cancer_guidelines_final_3-25-05.pdf ...................... 27

EPA Mem. from Robert Taylor, Product Manager, to Monsanto (Dec. 22, 1975) .............. 23

EPA Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Sept. 12, 2016), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094 ...................................................................... 36

Eriksson, M., et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 Int'l. J. Cancer 1657 (2008)............*passim*

Exponent, *Design of Epidemiologic Studies for Human Health Risk Assessment of Pesticide Exposures*, CropLife America (Jan. 4, 2016) ............................................................ 19

Glyphosate Facts, *Glyphosate Task Force Opens Reading Room for Public Access to Studies* (Aug. 24, 2016), http://www.glyphosate.eu/gtf-statements/glyphosate-task-force-opens-reading-room-public-access-studies ................................................................ 41

GMWatch, *MEPs Protest Industry "Reading Room" for Secret Glyphosate Studies* (Sept. 28, 2016) http://gmwatch.org/en/news/latest-news/17241-meps-protest-industry-reading-room-for-secret-glyphosate-studies .......................................................... 42

Gray, G., et al., *The Federal Government's Agricultural Health Study: A Critical Review with Suggested Improvements*, 6 Human and Ecological Risk Assessment 47 (2000) .................................................................................. 19

Green, M., et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 549 (3d ed. 2011), https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf ...........................*passim*

Greim, H., et al., *Evaluation of Carcinogenic Potential of the Herbicide Glyphosate, Drawing on Tumor Incidence Data from Fourteen Chronic/Carcinogenicity Rodent Studies*, 45 Critical Revs. Toxicology 185 (2015) ...................................... 38

*GTF Response to Commissioner Andriukaitis' Letter Re: Publication of Studies*, Monsanto Blog (Apr. 6, 2016, updated Aug. 24, 2016), https://monsantoblog.eu/gtf-response-to-commissioner-andriukaitis-letter-re-publication-of-studies/................... 41

Hakim, D., *Monsanto Glyphosate Case: Select Documents Suggest Company Tried To Influence Public Debate Over Weed Killer*, Genetic Literacy Project (Aug. 3, 2017), https://geneticliteracyproject.org/2017/08/03/monsanto-glyphosate-case-selected-documents-suggest-company-tried-influence-public-debate-weedkiller/................... 39

Hakim, D., *Monsanto's Roundup Faces European Politics and U.S. Lawsuits*, N.Y. TIMES (Oct. 4, 2017), https://www.nytimes.com/2017/10/04/business/monsanto-roundup-europe.html?_r=0 ................................................................ 43

Hakim, D., *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed Documents*, N.Y. TIMES (March 14, 2017), https://www.nytimes.com/2017/03/14/business/monsanto-roundup-safety-lawsuit.html.......... 39

Hill, AB, *The Environment and Disease: Association or Causation?*, 58 Proc. R. Soc. Med. 295 (1965).......................................................... 22

Huff, J., Jameson, C., et al., *Carcinogenesis Studies: Results of 398 Experiments on 104 Chemicals from the U.S. National Toxicology Program*, 534 Ann. N.Y. Acad. Sci. 1 ........................................................ 48

IARC, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans,
    Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate,
    Malathion, Parathion, and Tetrachlorvinphos (2015)
    http://monographs.iarc.fr/ENG/Monographs/vol112/mono112-10.pdf.........................................7

International Monsanto Tribunal: Program (Oct. 14-16, 2016),
    http://www.en.monsantotribunal.org/program...............................................................43

Kabat, G., *IARC's Glyphosate-gate Scandal*, Forbes (Oct. 23, 2017),
    https://www.forbes.com/sites/geoffreykabat/2017/10/23/iarcs-glyphosate-gate-
    scandal/#4996ec931abd ..............................................................................................26

Kelland, K., *Exclusive: Congressional Committee Questions Operation of WHO Cancer
    Agency*, Reuters (Nov. 1, 2017), https://www.reuters.com/article/us-health-who-congress-
    exclusive/exclusive-congressional-committee-questions-operation-of-who-cancer-agency-
    idUSKBN1D15TU............................................................................................................43

Kier, L., et al., *Review of Genotoxicity Studies of Glyphosate and Glyphosate-based
    Formulations*, 43 Critical Revs. Toxicology 283 (2013).............................................38

Letter from C. Portier, Sr. Contributing Scientist EDF, to V. Andriukaitis,
    Comm'r Health and Food Safety, European Comm'n (Nov. 27, 2015).........................42

Letter from C. Portier to Federal Institute for Occupational Safety and Health,
    July 8, 2016, http://www.eomsociety.org/images/PDF/PortierOLII.pdf........................42

Letter from H. Hautala, Member of the European Parliament and others,
    to Bernhard Url, Exec. Director of the European Food Safety Authority (Mar. 15, 2016),
    https://www.asktheeu.org/en/request/is_glyphosate_safe_we_have_the_r..........................42, 43

Letter from Heather Pigman to Robin Greenwald and Kathryn Forgie (Sept. 5, 2017)...................41

Letter from Michael L. Baum, to Members of the European Commission,
    Parliament and Member States (Oct. 31, 2017), https://www.politico.eu/wp-
    content/uploads /2017/11/Letter20Re20Expert20Reports.pdf ...............................................43

Letter from R. Brent Wisner, Baum Hedlund Aristei and Goldman, PC, to Bart Staes,
    Member of the European Parliament (Aug. 1, 2017)..........................................................43

Letter from Six Members of the European Parliament (July 4, 2017)...............................................37

Lioi, M., et al., *Genotoxicity and Oxidative Stress Induced by Pesticide Exposure in Bovine
    Lymphocyte Cultures In Vitro*, 403 Mutation Res. 13 (1998)........................................33

Monsanto Papers: Proof of Scientific Falsification, YouTube (Sept. 27, 2017),
    https://www.youtube.com/watch?v=1_s18Qetab ................................................37, 43

Neslen, A., *Vote on Controversial Weedkiller's European Liscense Postponed*,
   The Guardian (Mar. 8, 2016), https://www.theguardian.com/environment/2016/mar/08/eu-
   vote-on-controversial-weedkiller-licence-postponed-glyphosate ................................................ 42

Occupational Cancer Research Centre, *An Detailed Evaluation of Glyphosate Use
   and the Risk of Non-Hodgkin Lymphoma in the North American Pooled Project
   (NAPP)*, CSEB Conference (June 3, 2015) .................................................................. 14

Orsi, L., et al., *Occupational Exposure to Pesticides and Lymphoid Neoplasms Among Men:
   Results of a French Case-Control Study*, 66 Occupational Envtl. Med. 291 (2009).................... 9

Pahwa, M., et al., *An Evaluation of Glyphosate Use and the Risk of Non-Hodgkin
   Lymphoma Major Histological Sub-Types in the North American Pooled Project
   (Aug. 31, 2015)* ........................................................................................................ 9

Pahwa, M., et al., *An Evaluation of Glyphosate Use and the Risk of Non-Hodgkin
   Lymphoma Major Histological Subtypes in the North American Pooled Project
   (NAPP) (Sept. 21, 2015) (unpublished draft)* ............................................................ 13

Paz-y-Mino, C., et al., *Evaluation of DNA Damage in an Ecuadorian Population
   Exposed to Glyphosate*, 30 Genetics & Moleculuar Biology 456 (2007)...........................*passim*

Reddit, *Glyphosate Task Force Opens Reading Room for Public Access to Studies*
   (May 26, 2017)
   https://www.reddit.com/r/farming/comments/4zcr4z/glyphosate_task_force_opens_reading
   _room_for/ ................................................................................................................ 42

Tarazona, J., et al., *Response to the Reply by C.J. Portier and P. Clausing
   Concerning Our Review "Glyphosate and Carcinogenicity: A Review of the
   Scientific Basis of the European Union Assessment and its Differences with IARC,"*
   91 Archives of Toxicology 3199 (2017)..................................................................26, 48, 49

Walker, E., et al., *Meta-Analysis: Its Strengths and Limitations*, 75 Cleveland Clinic J. Med.
   431 (2008) ................................................................................................................ 20

Williams, G., et al., *A Review of the Carcinogenic Potential of Glyphosate by Four
   Independent Expert Panels and Comparison to the IARC Assessment*, 46 Critical Revs. in
   Toxicol. 3 (2016) ................................................................................................ 38, 39

Williams, G., et al., *Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its
   Active Ingredient, Glyphosate, for Humans*, 31 Regulatory Toxicol. & Pharma. 117 (2000)38, 39

xiii

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

**ISSUES TO BE DECIDED**

I.  Whether plaintiffs have satisfied their burden to present expert testimony that is scientifically reliable and relevant within the meaning of *Daubert* and that is sufficient to prove general causation, *i.e.*, "whether there is sufficient admissible evidence that glyphosate and/or Roundup is capable of causing cancer (specifically, Non-Hodgkin's Lymphoma ["NHL"]) in humans." Pretrial Order 15 (filed Mar. 3, 2017), ECF No. 186.

II. Whether plaintiffs' failure to present sufficient admissible expert testimony to prove general causation entitles Monsanto Company ("Monsanto") to summary judgment in all Roundup® lawsuits pending before this Court.

III. Whether the challenged opinions of Monsanto's experts are admissible.

**INTRODUCTION**

"Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). *Daubert* challenges are "preliminary" admissibility questions under Federal Rule of Evidence 104(a), *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (quoting Rule 104(a)), and contrary to plaintiffs' claims here,[1] the proponent of the expert testimony under evaluation does not benefit from any inferences in its favor. Where an expert's causation opinion is based on unreliable methodologies or the expert's own *ipse dixit*, it must be excluded. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Plaintiffs' expert proof is all of this – unreliable, *ipse dixit* and junk science – which is only confirmed by their Opposition. For *epidemiology*, plaintiffs agree it is at the "heart of the general causation inquiry." Opp. at 19. Undisputedly, when properly controlled for chance, bias and confounding, the epidemiology literature demonstrates ***no*** statistically significant positive findings involving exposure to glyphosate-based herbicides ("GBHs"), such as Roundup®, and NHL,

---

[1] Plfs' (1) Resp. in Opp. to Monsanto Co.'s *Daubert* and Summ. J. Mtn. Based on Failure of General Causation Proof and (2) *Daubert* Mtn. To Strike Certain Ops. of Monsanto Co.'s Expert Witnesses at 1, ECF. No. 647 (hereinafter "Opposition" or "Opp.").

1

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP. TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

meaning **the epidemiology shows no association between GBHs and NHL**, *infra* at 7-10; *see, e.g.*, *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1172 (N.D. Cal. 2007) (epidemiologic study cannot provide evidence of general causation unless, among other criteria, it "properly accounts for potential confounding factors").  This conclusion is once again confirmed in the newest (November 2017) publication from the government-sponsored Agricultural Health Study ("AHS"), which finds "**no association** was apparent between glyphosate and any solid tumors or lymphoid malignancies overall, including NHL and its subtypes."[2]  Plaintiffs' experts' contrary epidemiological opinions, which are based on the use of uncontrolled and confounded data, do not satisfy either the scientific or legal requirements for admissibility under *Daubert*, *infra* at 7, 11-17.

Regarding <u>animal toxicology</u>, plaintiffs' experts concede that no scientifically accepted basis exists that allows them to extrapolate animal data to the human incidence of NHL.  *See Joiner*, 522 U.S. at 144 (approving exclusion of expert testimony based on "seemingly far-removed" animal studies where expert failed to explain why extrapolation to humans was scientifically proper); *infra* at 25-26.  They also offer no basis for the admissibility of their novel, untested, and unsupported interpretations of the animal data.  Instead, the record establishes that plaintiffs' experts apply different statistical methodologies – none of which has been subject to peer-review or other validation and each of which was developed and continues to evolve only for litigation – across different studies, subjectively including or excluding data in their analyses as needed to reach their desired pre-determined conclusions, *infra* at 26-29.  It is not surprising that such made-for-litigation *ipse dixit* is contrary to 40 years of conclusions by original study authors and scientists at numerous regulatory and scientific agencies, Mtn. at 2, 24-25.

Finally, regarding <u>mechanistic data</u>, plaintiffs concede it does not prove carcinogenicity or causation and fail to identify any reliable scientific methodology employed by their experts to support the admissibility or "fit" of this data, *infra* at 32-36.

---

[2] G. Andreotti et al., *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110 J. Nat'l Cancer Inst. (published online Nov. 9, 2017) ("AHS 2017") (emphasis added).

2

Ultimately, the simple truth is that the science on glyphosate and GBHs – which is vast and overwhelmingly attributable to scientists and entities having nothing to do with Monsanto – points in a single direction.  The epidemiology shows *no association* between human GBH exposure and NHL; the animal testing (conducted at doses that are orders of magnitudes above any human exposure) shows glyphosate is *not carcinogenic* in animals; the mechanistic data shows glyphosate is *not genotoxic or mutagenic*, meaning it does not cause harm to mammalian cells.  Plaintiffs' experts can only opine against the scientific consensus by applying unreliable, untested, and unsupported methodologies in a results-driven manner using confounded and flawed data and arguing for a lower standard to be applied than is required in a court of law.  This is unreliable methodology; this is *ipse dixit*; this is junk science.  Under *Daubert*, the Court must exclude such opinions.

Plaintiffs contend that rather than scrutinize each step of their experts' methodologies as required by *Daubert*, this Court should accept the amorphous weighing of the evidence standard putatively employed by several of their experts.[3]  *See, e.g.*, Opp. at 2, 22.  This Court should decline that invitation, as the "weight of the evidence" method has been repeatedly rejected as the applicable scientific standard in tort cases.  For example, in *Joiner*, the Supreme Court held that a district court's gatekeeping role under *Daubert* required a detailed examination of the reliability of the individual studies upon which the plaintiffs' experts' opinions were based, and that a group of epidemiology studies that are unreliable individually cannot become admissible simply because more than one appears to reach a similar result.  *Joiner*, 522 U.S. at 146-47 (holding that because "the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions ... the District Court did not abuse its discretion in excluding their testimony"); *Hollander v. Sandoz Pharm. Corp.,* 289 F.3d 1193, 1216 n.21 (10th Cir. 2002) (rejecting plaintiffs' argument that "even though each individual category of evidence

---

[3] *See, e.g.,* Opp. at 5 ("Dr. Jameson … utilized a weight-of-evidence methodology utilized by NTP and IARC … ""); *id.* ("Dr. Nabhan … concluded that '[t]he weight of the scientific evidence supports causality …'""); *id.* at 56 ("Dr. Portier's approach … contributes further to a weight of the evidence analysis.").

may be insufficient, all of the evidence considered as a whole raises factual questions [concerning causation]" as "inconsistent with *Daubert*"); *Caraker v. Sandoz Pharm. Corp.*, 188 F. Supp. 2d. 1026, 1040 (S.D. Ill. 2001) (evidence in aggregate "amounts to a hollow whole of hollow parts" where "the data points pulled from each 'type' of evidence are too limited, too disparate and too inconsistent"); *Siharath v. Sandoz Pharm. Corp*., 131 F. Supp. 2d 1347, 1371 (N.D. Ga. 2001) (an expert "cannot lump together lots of hollow evidence in an attempt to determine what caused a medical harm"), *aff'd sub nom*., *Rider v. Sandoz Pharm. Corp*., 295 F.3d 1194, 1196 (11th Cir. 2002).[4]

In short, to satisfy *Daubert*, "the expert's testimony must be reliable at each and every step or else it is inadmissible.  The reliability analysis applies to *all aspects* of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (internal citation omitted) (emphasis added); *see id.* ("Even if [some of the studies relied upon by plaintiff's expert] provided a plausible basis for general causation," the district court, after considering the "'reliability' and 'relevance'" of such evidence, "could still reach the conclusion that [expert's testimony] was inadmissible.").[5]  Here, plaintiffs' expert proof is *unreliable* at each

---

[4] *United States v. W.R. Grace* is not inconsistent.  Opp. at 46.  There, the district court granted defendant's motion *in limine* to exclude a specific study under Rule 702 without any consideration under *Daubert* of plaintiff's experts' methodology, the "reliability of the methods, as well as the fit of the methods to the facts of the case." *U.S. v. W.R. Grace*, 504 F.3d 745, 765 (9th Cir. 2007); *see U.S. v. Grace*, 597 F. Supp. 2d 1143, 1144 (D. Mont. 2009) (on remand).  Finding that the court "failed to consider the Rule 702 requirements with regard to causation" and misapplied Rule 403, the Ninth Circuit reversed. *Grace*, 504 F.3d at 765-66.  Far from supporting application of the "weight of the evidence" standard, the case underscores the importance of reviewing each piece of scientific evidence under *Daubert*.

[5] Plaintiffs' reliance on *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 23 (1st Cir. 2011) is misplaced.  Importantly, *Milward* differs from this case in that it addressed a relatively sparse body of scientific evidence related to a rare disease.  Here, NHL is among the most common cancers and has been the subject of decades of research, and there is a robust data set regarding glyphosate and GBHs.  *See* Monsanto Co.'s Notice of Mot. & *Daubert* & Summ. J. Mot. Based on Failure of Gen. Causation Proof at 4-6, ECF No. 545 (hereinafter "Motion" or "Mtn.").  Therefore, even assuming that the First Circuit accepts the elsewhere-rejected proposition that a kind of "weight of the evidence" approach can pass muster under *Daubert* in the factual scenario under which the case arose, it is not applicable here.  Further, as explained thoroughly herein, plaintiffs' experts' methodologies here fail to satisfy *Milward*'s criteria.  *See id.* at 17-18 (describing "six general steps").  Finally, where the "weight of the evidence" methodology is faithfully employed, as is the case with regulatory agencies making public health-driven risk assessments of

step of the way, requiting its exclusion.  Conversely, their motions to exclude several of

Monsanto's experts' opinions must be denied as lacking any basis in fact, law, or science.  *Infra* at

40-50.

## I.    PLAINTIFFS MISREPRESENT THE GENERAL CAUSATION INQUIRY.

In their Opposition, plaintiffs for the first time attempt to redefine the parameters of the

general causation inquiry, claiming that Monsanto has improperly "inject[ed] issues related to dose

and absorption" into the general causation phase of this case.  Opp. at 42-45.  They do so despite

previously agreeing that the general causation inquiry must be assessed at human-relevant doses:

> THE COURT:  So you get the difference between the two questions?  One is simply, can Roundup cause non-Hodgkin's lymphoma, and the other question is, can Roundup cause non-Hodgkin's lymphoma in a particular dose, that dose being, you know, the highest exposure to which a plaintiff was subject.  So like I said, I don't want to hear argument on that right now.  I just want to get people's positions on that.  What is the plaintiffs' position on what is the question to be answered in phase I?
>
> …
>
> MR. MILLER:  If I could, your Honor, then – Mike Miller – we believe the questions ultimately are the same, because what epidemiology does is look at exposures in real-world dosing.  It doesn't look as a laboratory test would.  So I know your Honor doesn't want argument, but ***our position is the questions merge into one question in the face of epidemiology, because that is looking at real-world exposures,*** when you compare people exposed in the real world to people not exposed.

Tr. of Official Proceedings 5:1-21 (Feb. 24, 2017), ECF No. 546-7.  Monsanto's position is the

same.[6]  Numerous courts, including in bifurcated proceedings such as this one, agree as well.  *See,*

*e.g.*, *In re Bextra*, 524 F. Supp. 2d at 1174; Mtn. at 9 (providing additional citations).

The inclusion of human-relevant exposures in the general causation inquiry is crucial.  As

described in more detail in Monsanto's Motion and *infra* at 25-26, 29, 33, neither animal testing

nor much of the mechanistic data at issue here relates to real-world human exposures.  Only human

epidemiology makes that assessment, and plaintiffs concede in their Opposition that

---

carcinogenicity, it uniformly leads to the opposite conclusion of that urged by plaintiffs.  Mtn. at 2.  Thus, plaintiffs cannot establish their experts' opinions admissibility even under the inappropriate "weight of the evidence" method.

[6] *See* Tr. of Official Proceedings 14:9-12 (Feb. 27, 2017) (Ex. 1) ("yes, dose does matter to general causation, because the question in general causation is can a substance cause a disease at a real world dose or a dose that we are concerned about.").

1    "epidemiology [is] at the heart of the general causation question." Opp. at 19.  Therefore, any

2    scientific methodology addressing even generally whether GBH exposure causes NHL in humans

3    must consider exposure levels.

4           Plaintiffs incorrectly rely on *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124,

5    1139 (9th Cir. 2002), to support their new contention.  Opp. at 42.  In fact, before the passage cited

6    by plaintiffs, the Ninth Circuit found that "the appropriate understanding of [general] causation is

7    … whether exposure to a substance for which a defendant is responsible, *such as radiation at the*

8    *level of exposure alleged by plaintiffs*, is capable of causing a particular injury or condition in the

9    general population." *In re Hanford*, 292 F.3d at 1133.  Plaintiffs' citation refers only to the

10   analysis and dismissal of individual plaintiffs' claims, which the Ninth Circuit found would be

11   more appropriately considered during the specific causation phase, if necessary.  *Id.* at 1139.

12          Plaintiffs' attempt to distinguish the *In re Bextra* decision cited by Monsanto as involving a

13   pharmaceutical product where exposure levels are known versus a chemical exposure where they

14   are not is similarly without merit.  Opp. at 42.  In fact, a variety of long-accepted studies establish

15   the maximum exposure levels of agricultural workers, the group that most frequently uses GBHs.

16   For example, the Farm Family Exposure Study ("FFES") (an epidemiological study of agricultural

17   pesticide applicators) found that the highest estimated systemic dose of glyphosate is .004

18   mg/kg/day.[7]  Mtn. at 5.  And agricultural workers are the focus of many epidemiology studies,

19   including those relied upon by plaintiffs, examining whether an association between GBHs and

20   NHL exists in humans.  Opp. at 24-28.  This Court should reject plaintiffs' efforts to deviate from

21   the well-settled requirement that human-relevant exposure levels must be considered as part of the

22   general causation inquiry.[8]

---

23   [7] Plaintiffs criticize the FFES as "doctored" based on an alleged "admission" from a decades-old

24   corporate memo.  Opp. at 44.  But, as Dr. Acquavella – the author of the study – explained at his
     deposition, the invalid urine sample discussed in that memo was excluded from the published study

25   and therefore had no influence on the results.  *See* Dep. of John Acquavella 465:1-466:17 (Apr. 8,
     2017) ("Acquavella Dep.") (Ex. 2).  No expert offered contradictory testimony.

26   [8] Plaintiffs also now claim that they are alleging exposure pathways beyond dermal exposure.
     Opp. at 44-45.  However, plaintiffs have presented no evidence on exposure pathways for GBHs

27   beyond a brief discussion of dermal absorption in the expert report of Dr. Nabhan.  Expert Report
     of Chadi Nabhan at 8, ECF No. 546-10 ("Nabhan Report").  Moreover, in addition to plaintiffs'

28

6

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

1

**II.     PLAINTIFFS' EXPERTS' OPINIONS ARE UNRELIABLE BECAUSE THEY DISREGARD THE EPIDEMIOLOGIC EVIDENCE IN FAVOR OF CONFOUNDED, BIASED, AND STATISTICALLY INSIGNIFICANT DATA.**

2

3         Plaintiffs acknowledge that epidemiology is "at the heart of the general causation question"

4   and provides "the best proof of the general association of a particular substance with particular

5   effects."  Opp. at 19-20.  Plaintiffs thus concede that epidemiologic evidence is the critical

6   evidentiary basis that would be necessary to support a reliable expert opinion on general causation.

7   *Id.* at 19.  Their experts' testimony confirms that they cannot meet their burden of proof on this

8   issue.  Plaintiffs' experts (and IARC, on which they rely) concede that the epidemiologic evidence

9   is, at best, "limited" because "chance, bias, and confounding could not be excluded as

10  explanations" for any purported association between GBHs and NHL.[9]  Given those concessions,

11

12  statements at the February 24, 2017 CMC, Mtn. at 5, plaintiffs' counsel has also disclaimed that any plaintiffs developed NHL from exposure to glyphosate from food, *see* Dep. of David Saltmiras

13  33:7-11 (Jan. 31, 2017) ("Saltmiras Dep.") ("Q: Okay. And you understand that none of my clients nor any filed case in this litigation is suing Monsanto claiming they got non-Hodgkin's lymphoma

14  from eating food?") (Ex. 3), and plaintiffs' experts have explicitly adopted IARC's methodology and conclusions in reaching their expert opinions in this case, *see, e.g.*, Mtn. at 3-4; *see also* Opp.

15  at 9 (IARC conclusions are "based on sound, reliable evidence"), without disputing or somehow exempting IARC's otherwise unrebutted conclusion that "[i]nhalation of glyphosate is considered

16  to be a minor route of exposure in humans."  IARC, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans, Some Organophosphate Insecticides and Herbicides: Diazinon,

17  Glyphosate, Malathion, Parathion, and Tetrachlorvinphos at 41 (2015), http://monographs.iarc.fr/ENG/Monographs/vol112/mono112-10.pdf.  Bare allegations in a

18  complaint cannot substitute for admissible expert testimony where required.  *See, e.g.*, *In re Mirena IUD Prod. Liab. Litig.*, 202 F. Supp. 3d 304, 316 (S.D.N.Y. 2016) ("[T]he issue of

19  secondary perforation is outside the realm of common knowledge and experience of a lay juror, which in all jurisdictions means that expert testimony is required."), *aff'd*, No. 16-2890-cv(L),

20  2017 WL 4785947 (2d Cir. Oct. 24, 2017).

21  [9] *See* Dep. of Alfred Neugut 61:16-25 (Aug. 7, 2017), ECF No. 546-3 ("Neugut Dep.") ("Q. So, looking just at the epidemiological data, bias and confounding cannot be excluded as an

22  explanation for the findings in those studies; correct?  A. Yes."); Nabhan Dep. 102:2-7 ("Q.  So you agree that the epidemiology evidence with regard to glyphosate and NHL is credible but

23  chance, bias, or confounding cannot be ruled out without reasonable confidence; is that right?  A. If this is what the IARC said, then I do agree with that.").  IARC reached the same conclusion

24  without the benefit of recent epidemiologic data from the AHS and North American Pooled Project ("NAPP") that the IARC Working Group Chair, Dr. Blair, conceded show no association between

25  GBHs and NHL, Dep. of Aaron Blair 119:13-25, 145:25-148:6, 172:11-15, 173:6-23 (Mar. 20, 2017), ECF No. 546-17 ("Blair Dep.").  In her expert report, Dr. Ritz stated that she "concur[red]

26  with the IARC conclusions after conducting my own independent analysis of the studies included in the IARC review."  Expert Report of Beate Ritz at 16, ECF No. 546-9 ("Ritz Report").

27  However, in her deposition taken after this same concession was highlighted in deposition cross of plaintiffs' other epidemiology experts, Dr. Ritz claimed that the statement in her expert report was

28  not addressing IARC's conclusion regarding the epidemiologic evidence.  Dep. of Beate Ritz

7

1    plaintiffs' experts also agree that the epidemiologic evidence is insufficient to show a causal

2    relationship between GBHs and NHL.[10]

3         These concessions about the "best proof" are fatal to plaintiffs' experts' causation

4    methodology.  As the Reference Manual's Reference Guide on Epidemiology explains: "Three

5    general categories of phenomena can result in an association found in a study to be erroneous:

6    chance, bias, and confounding.  Before any inferences about causation [] are drawn from a study,

7    the possibility of these phenomena must be examined."  M. Green et al., *Reference Guide on*

8    *Epidemiology,* in *Reference Manual on Scientific Evidence* 549, 572 (3d ed. 2011),

9    https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf ("Reference Manual"); *see also*

10   *Nelson v. Tenn. Gas Pieline Co.*, 243 F.3d 244, 253 (6th Cir. 2001) ("[b]efore any inferences are

11   drawn about causation, the possibility of other reasons for the association must be examined,

12   including chance, biases … , and confounding causes"); *In re Denture Cream Prod. Liab. Litig*.,

13   No. 09-2051, 2015 WL 392021, at *24 (S.D. Fla. Jan. 28, 2015) (granting defendant's *Daubert*

14   motion where epidemiologist failed to assess exposure, "adjust for confounders, and account for

15   bias"), *aff'd sub nom. Jones v. SmithKline Beecham*, 652 Fed. App'x 848 (11th Cir. 2016).

16        Plaintiffs seek to distract the Court's attention from these dispositive concessions by

17   presenting a chart prepared prior to the publication of AHS 2017 with confounded and overlapping

18   data from other epidemiologic studies to create a misimpression of a body of statistically

19   significant positive associations between GBHs and NHL.  Opp. at 23; *see* Expert Report of

20   Lorelei Mucci at 63, ECF No. 546-18 ("Mucci Report"); *In re: Zoloft (Sertraline Hydrochloride)*

21   *Prod. Liab. Litig.,* No. 12-md-2342, 2015 WL 7776911, at *9–11 (E.D. Pa. Dec. 2, 2015)

22

23   57:10-58:2 (Sept. 18, 2017), ECF No. 546-13 ("Ritz Dep.").

24   [10] *See, e.g.*, Neugut Dep. 40:2-8 ("Q.  You agree that the epidemiology alone is not sufficient to
     show a causal relationship between glyphosate and non-Hodgkin's lymphoma; is that correct?  A.

25   For – for the purposes for which they were evaluating it, I would say **that's correct**."); Dep. of
     Christopher Portier 140:16-141:15 (Sept. 5, 2017), ECF No. 546-2 ("Portier Dep.") ("A. [T]he

26   question was whether the epidemiology data, by itself, demonstrates causality, and the answer to
     the question is no" because "for the epidemiology data to exhibit clear causality, it would have had

27   to be sufficient instead of limited in the IARC review. I still believe it's limited and not sufficient
     by itself to demonstrate causality.").

28

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

(excluding testimony of expert epidemiologist who improperly claimed replication of study results based upon studies using overlapping data), *aff'd*, 858 F.3d 787 (3d Cir. 2017).[11]  They do not dispute, however, that all of the epidemiologic findings for GBHs and NHL arise out of just four data populations: the AHS cohort study and case-control studies from North America, France, and Sweden.  Nor do they dispute that the most fully-adjusted relative risks and odds ratios for GBHs and NHL in each study population are directly contrary to their misleading chart, with findings that hover above and below the null result of 1.0 and that do not report any statistically significant positive associations.  As discussed in Monsanto's Motion, statistical significance is "an important metric to distinguish between results supporting a true association and those resulting from mere chance."  Mtn. at 11 (citing *In re Zoloft*, 858 F.3d at 793).  And where confidence intervals, *such as all of those listed below*, "do not show any increased risk, and indeed, show a decreased risk, [because they] include[] values less than 1.0, we would say the study does not demonstrate a 'statistically significant' increased risk of an adverse outcome."  *Id.* (quoting *In re Bextra*, 524 F. Supp. 2d at 1174).

---

[11] None of the individual odds ratios presented on plaintiffs' chart are adjusted for other confounding pesticide exposures, despite the fact that adjusted odds ratios or relative risks are reported in most of the studies.  *See, e.g.*, Ritz Dep. 155:14-25, 157:20-158:5.  The chart multiplies these confounded data points by presenting separate odds ratios for the Lee, De Roos, Cantor, McDuffie, and Hohenadel studies despite the fact that the data from each of those studies is incorporated into the pooled analysis of the NAPP, which is separately listed, albeit only through an odds ratio that is not adjusted for other confounding pesticide exposures.  *See* Mucci Report at 37 & Figure 3.  The chart likewise double dips by presenting sub-analyses of confounded data from the same primary studies, including eight subtype odds ratios from M. Eriksson et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 Int'l. J. Cancer 1657, 1658 (2008), ECF No. 652-8 ("Eriksson 2008"), four subtype odds ratios from L. Orsi et al., *Occupational Exposure to Pesticides and Lymphoid Neoplasms Among Men: Results of a French Case-Control Study*, 66 Occupational Envtl. Med. 291 (2009), ECF No. 654-3 ("Orsi 2009"), and four subtype odds ratios from M. Pahwa et al., *An Evaluation of Glyphosate Use and the Risk of Non-Hodgkin Lymphoma Major Histological Sub-Types in the North American Pooled Project* at Slide 26 (Aug. 31, 2015), ECF No. 651-12.  Plaintiffs' counsel's attempt to characterize these overlapping odds ratios as independent for purposes of their concocted probability calculation, Opp. at 24, is spurious.

9

| Study | Relative Risk/Odds Ratio | Rows on Plfs' Chart (Opp at 23)[12] |
|---|---|---|
| AHS Study (2005, 2013, 2017) | 1.1 (0.7, 1.9)[13]<br>0.9 (0.7, 1.1)[14]<br>0.87 (0.64, 1.2)[15] | 13, 14, 15 |
| NAPP (2015) | 1.13 (0.84, 1.51)[16]<br>0.95 (0.69, 1.32)[17] | 1, 3, 4, 5, 6, 7, 8, 9, 14, 15, 20, 23, 29, 33 |
| Eriksson (2008) | 1.51 (0.77, 2.94)[18] | 2, 14, 15, 17, 18, 21,24, 27,30, 31, 32 |
| Orsi (2009) | 1.0 (0.5, 2.2)[19] | 11, 14, 15, 19, 21, 25, 27 |

Although their experts seek to rely on meta-analyses conducted before disclosure of the Alavanja 2013 and the 2015 NAPP data, plaintiffs also do not and cannot deny that the same analyses using that adjusted epidemiologic data yields a meta-relative risk of 1.0 (0.86, 1.12), a completely null result.[20]  This null finding is further bolstered by AHS 2017.  Plaintiffs' experts' assertions that they can nonetheless offer a reliable expert opinion that the GBH epidemiology supports a finding of general causation rests upon a series of flawed methodologies.

**A.  Plaintiffs' Experts Improperly Rely on Confounded Data.**

"To make a judgment about causation, a knowledgeable expert must consider the possibility

---

[12] The rows from plaintiffs' chart listed in this column set forth unadjusted findings that are either encompassed within the adjusted null findings of the study identified in column 1 or, for the meta-analyses on lines 14-15 of plaintiffs' chart, are included within the those findings.

[13] A. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envtl. Health Perspectives 49 (2005), ECF No. 653-12 ("De Roos 2005").

[14] M. Alavanja et al., *DRAFT-Lymphoma Risk and Pesticide Use in the Agricultural Health Study* (Mar. 15, 2013), ECF No. 650-4 ("Alavanja 2013"); E. Chang et al., *Meta-Analysis of Glyphosate Use and Risk of Non-Hodgkin Lymphoma*, Exponent 1, 4 (2017), ECF No. 652-10.

[15] AHS 2017 Table 2 (highest quartile intensity weighted exposure).

[16] *See* Ritz Dep. 280:15-22 (including data from both proxies and self-respondents).

[17] *See* Ritz Dep. 306:9-17 (self-respondents only).

[18] Eriksson 2008 at Table VII.

[19] Orsi 2009 at Table 3.

[20] *See* Mucci Report at 60; Blair Dep. 182-83, 189 (acknowledging that incorporation of updated AHS data and NAPP pooled data would reduce the meta-relative risk for GBHs and NHL and show no statistically significant association).  This updated meta-analysis underscores this Court's proper skepticism of meta-analyses of observational studies.  *In re Bextra*, 524 F. Supp. 2d at 1174.  That skepticism is warranted because it demonstrates that the associations reported in the earlier meta-analyses were due in their entirety to the failure of the underlying North American case-control studies to properly adjust for confounding by other pesticide exposures and publication bias that excluded consideration of the most updated and comprehensive findings from the AHS and the NAPP.  *See infra* at 15-16, 19-21.

1  of confounding factors." Reference Manual at 591.  As this Court has recognized, an epidemiologic

2  study cannot provide evidence of general causation unless it "properly accounts for potential

3  confounding factors."  *In re Bextra*, 524 F. Supp. 2d at 1172 (internal quotations omitted); *see also*

4  *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 604 (D.N.J. 2002) ("When

5  evaluating the internal validity of a study, the researcher or scientist must account for the roles of

6  bias, confounding factors, and the likelihood that the observed association is due to chance.")

7  (granting motion to exclude plaintiff's expert), *aff'd*, 68 Fed. App'x 356 (3d Cir. 2003).

8        The possibility of confounding is particularly important here because, as plaintiffs' experts

9  concede, epidemiologic studies have reported an increased risk of NHL in farmers that *predates* the

10  introduction of GBHs.[21]  Accordingly, plaintiffs' experts acknowledge that other pesticide

11  exposures may be a "major confounder for the issue of whether glyphosate can cause [NHL],"

12  Weisenburger Dep. 93:16-23, and that scientists need to "control for those other possible

13  confounders to be sure [one is] actually studying glyphosate."  Blair Dep. 91:23-92:4; *see also*

14  Neugut Dep. 67:19-68:21 (agreeing that "an epidemiological analysis of glyphosate and non-

15  Hodgkin's lymphoma should control for exposures to these other pesticides"); Ritz Report at 16

16  (use of most fully-adjusted odds ratios, such as those that adjust for other pesticide exposures,

17  "gives the reader confidence that the findings are most likely due to glyphosate/Roundup exposure,

18  instead of another potential cause that acts as a confounder").[22]

19        Notwithstanding this case law and their experts' concessions, plaintiffs now argue, without

20  *Daubert*-based precedent, that their experts should be allowed to rely on odds ratios that have not

21

22  [21] *See* Neugut Dep. 66:19-67:7 ("there is something going on with farmers and their exposures that
is leading to an increased risk of non-Hodgkin's lymphoma that we know for a fact is not

23  glyphosate"); Dep. of Dennis Weisenburger 179:24-180:5 (Sept. 11, 2017), ECF No. 546-16
("Weisenburger Dep.") (same); Blair Dep. 90:15-20 (same); Ritz Dep. 331:10-23 (same).

24  [22] Plaintiffs' argument that Monsanto is estopped from pointing out this flaw in their experts'
methodology based upon its objections to plaintiffs' request for admissions regarding other

25  pesticides is spurious.  Monsanto is not a manufacturer of the other pesticides and has no expert
knowledge regarding those pesticides, therefore its uncontested objections to discovery requests

26  regarding those pesticides cannot in any event give rise to estoppel.  *See Posen v. Ozier*, No. CV17-
07, 2017 WL 4269957, at *3 (D. Mont. Sept. 26, 2017) (quoting *Hamilton v. State Farm Fire Cas.*

27  *Co.*, 270 F.3d 778, 783 (9th Cir. 2001) (The Ninth Circuit restricts "judicial estoppel to cases where
the court relied on, or 'accepted,' the party's previous inconsistent position.")).

28

1   been controlled for other pesticide exposures.  Plaintiffs are forced to take this extraordinary

2   position because, as their own expert Dr. Neugut concedes, there is no fully-adjusted odds ratio

3   anywhere in the epidemiologic literature that reports a statistically significant positive association

4   between GBHs and NHL.  Neugut Dep. 158:23-159:6.  Indeed, as shown in the chart on page 10,

5   without resorting to this improper methodology, the GBH epidemiology consistently demonstrates

6   no association whatsoever between GBHs and NHL.  Plaintiffs cannot avoid this fatal

7   methodological flaw.

8           Plaintiffs contend that there is one study (A. De Roos et al., *Integrative Assessment of*

9   *Multiple Pesticides as Risk Factors for Non-Hodgkin's Lymphoma among Men*, 60 Occup Envtl.

10  Med. 1 (2003), ECF No. 652-9 ("De Roos 2003")) that reports in its logistic regression analysis a

11  statistically significant positive association adjusted for exposure to other pesticides, and they argue

12  that Dr. Neugut "misspoke" *twice* in response to "a misleading question" in testifying to the

13  contrary.  Opp. at 25 n.70; Errata Sheet to the Dep. of Alfred Neugut (served Nov. 5, 2017) (Ex. 4).

14  Notably, plaintiffs first made this argument in their opposition brief, which they filed *nine days*

15  *before serving Dr. Neugut's purported errata sheet* and *almost a month after receiving Monsanto's*

16  *motion* discussing why Dr. Neugut's admissions regarding this study doomed their claims.

17  Plaintiffs' convenient argument that Dr. Neugut "misspoke" is undercut by his unambiguous

18  testimony:

19          Q.   There is no odds ratio anywhere in the epidemiological literature that reports
                 for glyphosate and non-Hodgkin's lymphoma an adjusted odds ratio positive
20               association statistically significant; correct?

21               MR. TRAVERS:  Objection, misstates the evidence.

        A.   Not that -- correct, for the herbicides, for the -- um-hum.
22
                                          ***
23      Q.   Did not -- De Roos did not control for these other pesticide exposures in the
                 logistic regression analysis; correct?
24      A.   No.
        Q.   Again, the answer is unclear from my question.  Is it correct that Dr. De Roos
25               did not control for the other pesticide exposures in the logistic analysis?
        A.   That's correct.
26
    Neugut Dep. 158:23-59:6; 234:7-15.[23]  Plaintiffs' efforts to alter Dr. Neugut's initial testimony
27
    _____
28  [23] Plaintiffs point to deposition testimony of a study co-author, Dr. Weisenburger, as confirmation

after realizing it is fatal to their claims must be rejected.  *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1224-26 (9th Cir. 2005) (refusing to consider deposition errata sheet where "'corrections' were not corrections at all, but rather purposeful rewrites tailored to manufacture an issue of material fact").[24]

In any event, as their expert Dr. Ritz acknowledges, all of the data in De Roos 2003 was pooled into the subsequent NAPP study, which plainly does not report a statistically significant increased risk for GBHs when controlled for other pesticides.  *See* Ritz Dep. 276:23-277:12.[25] Plaintiffs struggle mightily to avoid the adjusted OR = 1.13 (0.84, 1.51) null finding in the NAPP, arguing that a native file of a slide deck presentation of the NAPP data indicates that one of the slides in which this odds ratio was reported was removed from the presentation.  Opp. at 27 n.76 (citing Expert Rebuttal Report of Beate Ritz at 8, ECF No. 653-2).  Plaintiffs do not explain how the decision of whether to present this slide at a conference is relevant to the scientific inquiry, but in any event, the same odds ratio is included in an earlier slide (slide 10) that was presented at the conference.  The same null 1.13 odds ratio also is included in the draft manuscript of the NAPP study upon which plaintiffs otherwise rely.  Opp. at 27; M. Pahwa et al., *An Evaluation of Glyphosate Use and the Risk of Non-Hodgkin Lymphoma Major Histological Subtypes in the North American Pooled Project (NAPP)* at 12 (Sept. 21, 2015) (unpublished draft), ECF No. 653-6.

---

that this logistic regression analysis adjusted for other pesticide exposures.  Opp. at 25.  In his full testimony, however, Dr. Weisenburger made clear that he did not know how the logistic regression was calculated.  *See* Weisenburger Dep. 115:3-122:9.

[24] *See Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 902-03 (N.D. Cal. 2016) (same); *Stevens v. CoreLogic, Inc.*, No. 14-cv-1158, 2016 WL 8729928, at *6 (S.D. Cal. May 6, 2016) (same); *Garcia v. Pueblo C.C.*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) ("We do not condone counsel's allowing for material changes to deposition testimony and certainly do not approve of the use of such altered testimony that is controverted by the original testimony."); *Rios v. Welch*, 856 F. Supp. 1499, 1502 (D. Kan. 1994) ("[A] plaintiff is not permitted to virtually rewrite portions of a deposition, particularly after the defendant has filed a summary judgment motion simply by invoking the benefits of Rule 30(e) ... .  [A] deposition is not a 'take home examination' and an 'errata sheet' will not eradicate the import of previous testimony taken under oath.").

[25] Plaintiffs' experts agree that "once you pool those studies into a larger study, it's that later pooled study that provides all the data relevant to a causation theme."  *See* Neugut Dep. 228:17-21; Ritz Dep. 284:9-19; *see also* Ritz Dep. 218:5-14 (opining that pooled analyses are more powerful than studies upon which they are based).

13

Plaintiffs alternatively argue that Dr. Ritz appropriately relied on unadjusted NAPP odds ratios, pointing to her deposition testimony that the NAPP adjustment for three other pesticides would only be appropriate if those pesticides were themselves risk factors for NHL.  Opp. at 27 & n.75.[26]  This argument is directly contrary to Dr. Ritz's statement in her expert report that use of the most fully-adjusted odds ratios "gives the reader confidence" in the analysis of the GBH NHL studies, Ritz Report at 16, which was made before Dr. Ritz learned of the null findings in the adjusted NAPP analysis.  *See* Ritz Dep. 277:18-278:4.  Dr. Ritz's abrupt about-face upon learning of this important evidence itself casts doubt on her methodology.[27]  Moreover, Dr. Ritz conceded that at least two of the three pesticides in the NAPP adjustment are risk factors for NHL, *see* Ritz Dep. 424:9-19, and she could not opine which NAPP analysis (adjusted or unadjusted) she believed was more valid, stating "[t]hat's a question I cannot answer."  *Id.* 296:5-15.

Plaintiffs likewise ignore confounding in relying on unadjusted findings in the Eriksson 2008 study.[28]  As Dr. Neugut explained, because of the failure to adjust for other pesticide exposures, it is "impossible to tell" whether the odds ratios for GBHs upon which plaintiffs rely would be elevated if controlled for the use of such pesticides.  Neugut Dep. 291:11-16.

**B.  Plaintiffs' Experts Improperly Rely on Biased Data.**

Courts routinely reject expert causation opinions based upon epidemiologic studies that fail to exclude the possibility of bias.[29]  Plaintiffs' experts agree that bias must be taken into account

---

[26] Even here, Dr. Ritz inexplicably relies on outdated data, citing unadjusted odds ratios contained in an earlier abstract that were each recalculated and lowered by the time the data was presented at the conference, long before she submitted her expert report.  *See* Occupational Cancer Research Centre, *An Detailed Evaluation of Glyphosate Use and the Risk of Non-Hodgkin Lymphoma in the North American Pooled Project (NAPP)*, CSEB Conference (June 3, 2015), ECF No. 650-3.

[27] See *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 807 (E.D. Wis. 2010) ("[P]ropelling the court's conclusion that Dr. al-Saghir's methodology … is unreliable is the fact that the [opinion] appears to have been 'cooked up' in the haste of deposition testimony after the doctor's original [opinion] ... could not survive even the slightest scrutiny in the form of the opposing counsel's questioning.").

[28] *See* Ritz Dep. 308:2-10 (conceding that the only odds ratio in Eriksson 2008 adjusted for other pesticide exposures is the multivariate analysis that finds no statistically significant association between glyphosate and NHL); Neugut Dep. 209:5-11 (Eriksson study's latency, dose-response and subtype analyses do not adjust for exposures to other pesticides).

[29] *See, e.g.*, *In re Denture Cream*, 2015 WL 392021, at *24; *In re Prempro Prod. Liab. Litig.*, 765 F. Supp. 2d 1113, 1119 (W.D. Ark. 2011); *Maras v. Avis Rent A Car System, Inc.*, 393 F. Supp. 2d

14

before any causal inference can be reached.  As Dr. Ritz explained, "[w]hat I teach my students is that what we have to make sure is that there's no bias and that [is] before everything else we are ever considering.  So I would not even consider data unless we would go through a rigorous analysis of all of the biases."  Ritz Dep. 47:12-18; *see also* Neugut Dep. 71:10-19 (bias can lead to a "reported odds ratio, a risk ratio, that is actually not reflective of the true association, because it has been artificially shifted in a certain direction, either higher or lower").

Plaintiffs' experts each identified a variety of biases that must be considered in interpreting epidemiologic data.  Expert Report of Alfred Neugut at 7-9, ECF  No. 546-11 ("Neugut Report"); Ritz Report at 7-8.  They failed, however, to conduct a "rigorous analysis" of these biases in reaching their opinions, relying instead on any cherry-picked data point they could find that might support their causation opinion.  Two illustrations demonstrate the impact of this flawed methodology.

First, Dr. Ritz relies heavily on the Eriksson 2008 study, which plaintiffs' Opposition highlights at pages 24-25 and in multiple rows of the chart on page 23.  But as Dr. Neugut concedes, Eriksson 2008 suffers from a systemic flaw that renders all of its analyses illegitimate. *See* Neugut Dep. 276:11-277:22, 281:7-18.  This flaw arises from the authors' decision to limit their comparison group of unexposed individuals to those who were not exposed to any pesticides whatsoever.  *Id.* 280:8-14.  Because individuals exposed to GBHs routinely have exposure to other pesticides that have been identified as potential NHL risk factors, the Eriksson odds ratios do not measure whether exposure to GBHs is associated with NHL but rather measure whether exposure to a mixture of pesticide exposures is associated with NHL.  This can best be understood by recalling the basic structure of a case-control study, in which the odds of an exposure in a diseased case population is compared to the odds of exposure in a healthy control population:

$$\frac{(NHL, \text{with exposure})/(NHL, \text{with no exposure})}{(Healthy, \text{with exposure})/(Healthy, \text{with no exposure})} = \text{Odds ratio}$$

801, 807-09 (D. Minn. 2005); *Magistrini*, 180 F. Supp. 2d at 604-05.

15

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP. TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

This systemic flaw in Eriksson 2008 makes it impossible to separate out the effects of different pesticide exposures, including exposures to other pesticides that were banned because of safety concerns, and helps explain why the study reports elevated NHL odds ratios for every pesticide analyzed in the study. *See* Eriksson 2008, Tables II, III, IV, V, and VI. This universal finding of elevated odds ratios suggests that the study suffers from recall bias, *i.e.*, an exaggeration of odds ratios, because cases (with NHL) are more likely to recall exposures than controls.[30]

Second, Dr. Ritz seeks to rely on NAPP data that includes proxy respondents (*i.e.,* data provided by spouses or family members rather than the study subject), despite the generally accepted epidemiologic concern that proxy respondent data is less reliable than self-respondent data. *See* Neugut Dep. 264:10-17, 265:23-266:4; Blair Dep. 140:15-23; Reference Manual at 586 ("Bias may also result from reliance on interviews with surrogates who are individuals other than the study subjects."). The bias introduced through the use of proxy respondents in the North American case-control studies was not identified until the data was pooled in the NAPP. When the NAPP looked solely at the more reliable self-respondent data, the NAPP odds ratio dropped from an already null finding of OR= 1.13 (0.84, 1.51) to an OR = 0.95 (0.69, 1.32). *See* Mucci Report at 46-47. This proxy bias also is evident in other analyses conducted with the same North American case-control study populations. *See* Blair Dep. 139:18-141:4; Mucci Report at 21.

### C.  Plaintiffs' Experts Improperly Rely on Non-Significant Data.

Dr. Neugut acknowledged that he "would not label an exposure as being associated with an outcome unless there is a finding of an increased risk that is statistically significant." Neugut Dep. 45:7-18. But faced with their own experts' concessions that chance cannot be excluded as an explanation for the findings in the GBH epidemiologic literature, plaintiffs now argue that statistical significance is not necessary. Opp. at 38-39. Plaintiffs contend that their argument is

---

[30] *See* Mucci Report at 55; Expert Report of Jennifer Rider at 29-30, ECF No. 652-6 ("Rider Report"); *see also* Reference Manual at 585 ("Research has shown that individuals with disease (cases) tend to recall past exposures more readily than individuals with no disease (controls); this creates a potential for bias called recall bias."); Ritz Dep. 310:2-312:4 (admitting that recall bias is a concern if all chemicals in a study report elevated odds ratios but contending – contrary to the data – that this did not occur in Eriksson).

1    supported by *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40-41 (2011), but the Supreme

2    Court in that case was addressing a separate issue of materiality for purposes of securities

3    disclosure requirements and expressly disavowed any opinion regarding whether expert testimony

4    based on non-significant findings is properly admitted.  When it was confronted with this issue in

5    the *Daubert* context, the Supreme Court rejected expert general causation testimony based upon

6    non-significant findings.  *See Joiner*, 522 U.S. at 145.

7         Numerous courts have faithfully followed *Joiner*'s guidance.  Those courts have recognized

8    that "[i]n [] the absence of a statistically significant difference upon which to opine, [an expert's

9    general causation] opinion must be excluded under *Daubert*."  *Good v. Fluor Daniel Corp.*, 222 F.

10   Supp. 2d 1236, 1243 (E.D. Wash. 2002).[31]

11   ### D.  Plaintiffs' Experts Improperly Dismiss the Findings of the Only Prospective
12   Cohort Study to Examine GBHs and NHL.

13        Plaintiffs' experts concede that cohort studies generally are preferred over case-control

14   studies because case-control studies are more susceptible to bias.[32]  Plaintiffs' experts also concede

15   that the AHS is the only cohort study to examine a putative association between GBHs and NHL

16   and is specifically designed to address some of the limitations in the case-control studies, including

17   recall and selection bias.  *See* Neugut Dep. 124:1-4; Blair Dep. 94:6-96:1; 155:25-157:21.  These

18   concessions highlight a significant flaw in their experts' causation methodologies because the 2005

19   published AHS study of GBHs unambiguously concluded that "[n]o association was observed

20   between NHL and [GBH] exposure in any analysis, including an analysis comparing the highest

21   with the lowest quintile of exposure."  De Roos 2005 at 51.  And the just-published 2017 updated

---

22   [31] *See Burst v. Shell Oil Co.*, Civ. Action No. 14-109, 2015 WL 3755953, at *13 (E.D. La. June 16,
23   2015), ("[T]he guidance of the Supreme Court and the Fifth Circuit instructs that [studies that do
     not demonstrate statistically significant results] do not reliably support epidemiologists' general
24   causation opinions in the context of toxic tort litigation."), *aff'd*, 650 F. App'x 170 (5th Cir. 2016),
     *cert. denied*, 137 S. Ct. 312 (2016); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1080 (D. Kan.
25   2002) (expert must have statistically significant studies as the basis of a general causation opinion).

26   [32] Neugut Dep. 72:1-73:1, 73:17-74-4, 77:6-78:25; Ritz Dep. 317:2-318:11 (conceding that the
     scientific community views cohort studies as having greater validity than case-control studies); *see
27   also Carl v. Johnson & Johnson*, Nos. ATL-L-6546-14, ATL-L-6540-14, 2016 WL 4580145, *19
     (N.J. Super. Ct. Sept. 2, 2016) (case-control studies "are considered less reliable than a prospective
28   cohort study").

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

AHS study (with 11 years of additional follow-up and four times the number of GBH-exposed cancer cases) likewise "observed no associations between glyphosate use and NHL overall or any of its subtypes."  AHS 2017 at 7.

Prior to the publication of the AHS 2017 study, plaintiffs proffered three arguments to cure their experts' error.  First, they argued, in sharp contrast to the study investigators' conclusions, that De Roos 2005 study actually supports their experts' causation opinion.  Opp. at 32.  But plaintiffs' own experts disagree.  *See* Neugut Dep. 127:11-18 (agreeing that De Roos 2005 "does not provide evidence that would validate the hypothesis that glyphosate exposure causes non-Hodgkin's lymphoma"); Weisenburger Dep. 190:18-191:20 (agreeing that De Roos 2005 was a negative study); Ritz Dep. 323:8-12 (testifying that De Roos 2005 "contributes very little" evidence in support of the hypothesis that GBHs causes NHL); Blair Dep. 155:11-157:21 (De Roos 2005 dose response analysis found a negative association between GBH exposure and NHL).[33]

Second, plaintiffs sought to flip the *Daubert* evidentiary burden by arguing that Monsanto's evidence of a lack of carcinogenicity is itself limited.  As an initial matter, they suggest that Monsanto is relying solely on the AHS cohort findings of no association between GBHs and NHL.  Opp. at 1.  As set forth in Monsanto's opening brief and *supra* at 8-10, this is false.  While the GBH case-control studies do suffer from a series of methodological flaws, the fully adjusted findings in the case-control studies likewise show no association, with the most reliable self-respondent data from the pooled analysis of all of the North American case-control studies reporting a negative association of OR = 0.95.

Third, Plaintiffs and their experts raised a number of criticisms regarding De Roos 2005.  But even assuming their experts would persist in those criticisms in light of the new AHS 2017 study, criticisms of existing tests are not a proxy for admissible expert testimony under *Daubert*.

_____

[33] The defense expert testimony cited by plaintiffs is not to the contrary.  The cited testimony speaks only to association, not causation.  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 n.16 (11th Cir. 1999) ("[s]howing association is far removed from proving causation"); *Nelson*, 243 F.3d at 253 (same); Reference Manual at 574 (same); *see also* Rider Dep. 262:5-22 (explaining that study reporting modest increased incidence of prostate cancer did not make any claims about evidence of causality).

*See, e.g.*, *Caraker*, 188 F. Supp. 2d at 1034 ("Plaintiffs' experts' broad criticisms of the existing epidemiological evidence do [] not help them meet their burden," as "plaintiffs' burden is an affirmative one, not served by such attacks."); *Sanderson v. Int'l Flavors & Fragrances, Inc*., 950 F. Supp. 981, 1000-01 (C.D. Cal. 1996) (holding that there is "no authority whatsoever for [plaintiff's] outlandish contention" that where "the lack of scientific evidence regarding the effects of a product is the result of the manufacturer's failure to test" plaintiff should be "excused from the burden" of proving causation); *Norris v. Baxter Healthcare Corp*., 397 F.3d 878, 886 (10th Cir. 2005) ("Mere criticism of [existing studies] cannot establish causation."); *Hollander*, 289 F.3d at 1213 (same).[34] Moreover, plaintiffs' experts abandoned many of their criticisms of De Roos 2005.[35]

### E. Plaintiffs' Experts' Outcome-Driven Treatment of Unpublished Studies Likewise Demonstrates the Unreliable Nature of Their Methodology.

In an attempt to avoid the powerful evidence of no association between GBHs and NHL in the Alavanja 2013 cohort study, plaintiffs and their experts rely heavily on the fact that the herbicide findings in the study were not published. Opp. at 34-38; *see* Neugut Dep. 189:14-190:3 (testifying that he did not even read Alavanja 2013); Ritz Dep. 347:16-348:19 (acknowledging that

---

[34] Plaintiffs reliance on two reports prepared for CropLife America is likewise unavailing. Neither of these reports makes any mention of glyphosate or De Roos 2005 and they each observe that the AHS study design is more reliable than the case-control study designs used in the other agricultural epidemiology studies. *See, e.g.*, G. Gray et al., *The Federal Government's Agricultural Health Study: A Critical Review with Suggested Improvements*, 6 Hum. & Ecological Risk Assessment 47, 50 (2000), ECF No. 653-11 ("We are particularly enthusiastic about the prospective cohort study of cancer outcomes because it responds directly to some of the methodological weaknesses of prior epidemiologic studies of farmers and pesticides."); Exponent, *Design of Epidemiologic Studies for Human Health Risk Assessment of Pesticide Exposures*, CropLife America at 15 (Jan. 4, 2016), ECF No. 652-7 ("The Agricultural Health Study Questionnaires were highly detailed, thorough, and thoughtfully designed. Few, if any, other epidemiologic studies have conducted more exhaustive questionnaire-based assessments of pesticide exposures."); *id.* at 18 ("The [AHS] questionnaires were particularly extensive … and the cohort was sufficiently large as to enable simultaneous statistical adjustment[s] for several potential confounders."); *id.* at 22 ("The [AHS] … cohort[] went farther than most in terms of conducting validation studies and sensitivity analyses, acknowledging sources of error and bias, and documenting exposure assessment approaches."). Plaintiffs' reliance on Monsanto employee statements made six years before De Roos 2005 is likewise unavailing.

[35] *See* Neugut Dep. 141:20-142:7 (abandoning criticism that De Roos 2005 underestimated glyphosate risk based on confounding from 2,4-D exposure in other farmers); *id.* 162:8-15 (conceding that latency is not a major problem in De Roos 2005); *id.* 152:22-153:10 (acknowledging that De Roos 2005 may be the most powerful epidemiologic study regarding glyphosate and NHL); *id.* 180:11-25 (withdrawing criticism of De Roos 2005 based on non-differential exposure misclassification).

19

1   she had not read Alavanja 2013 prior to preparing her expert report).  These arguments are moot

2   given the recent AHS 2017 peer-reviewed publication including even more updated AHS data.

3   Notably, however, both Drs. Neugut and Ritz readily rely upon unpublished studies when they

4   believe the studies *support* their opinions.  *See* Neugut Dep. 192:15-24 (admitting that he relied

5   upon an unpublished study to support his causation opinion in a separate litigation for the same

6   plaintiffs' law firm representing plaintiffs here); Opp. at 27 n.76 (discussing Dr. Ritz's reliance on

7   unadjusted odds ratios in unpublished NAPP manuscript); *see also Siharath*, 131 F. Supp. 2d at

8   1357-58 (excluding causation testimony of expert who, among other things, failed to account for

9   contrary findings in unpublished epidemiologic study); *Lust v. Merrell Dow Pharm. Inc.*, 89 F.3d

10   594, 598 (9th Cir. 1996) (courts "should be wary that the [expert's] method has not been faithfully

11   applied").

12   　　　Moreover, Dr. Neugut concedes that authoritative guidelines governing meta-analyses of

13   epidemiologic literature expressly instruct scientists to seek out and incorporate unpublished

14   data.[36]  As those guidelines explain, there is a bias against publishing studies that fail to find

15   positive associations.  Neugut Dep. 104:11-19.  This publication bias improperly pushes any meta-

16   analysis risk ratio above its true level if only published studies are analyzed.  *Id.* 105:17-106:8.  Dr.

17   Blair likewise has warned of the risk of publication bias and the need to take unpublished

18   epidemiologic studies into account, particularly in the field of environmental epidemiology.[37]

19   Indeed, while plaintiffs make much of the fact that a portion of Alavanja 2013 excluding

20   herbicides initially was rejected for publication, this rejection was attributed to the fact that the

21   study did not find associations between pesticide exposures and NHL.  *See* E-mail from Michael

22   Alavanja, to Dale Sandler et al. (Feb. 27, 2014 1:05 PM), ECF No. 653-17; Blair Dep. 201:19-

23   202:21.  Moreover, the peer-reviewer for the journal that then published the study in 2014

---

[36] Neugut Dep. 93:2-18, 105:7-16 (citing E. Walker et al., *Meta-Analysis: Its Strengths and Limitations*, 75 Cleveland Clinic J. Med. 431 (2008), ECF No. 651-1); *see also In re Bextra*, 524 F. Supp. 2d at 1175 (discussing meta-analysis of published and unpublished studies).

[37] *See* A. Blair et al., *Guidelines for Application of Meta-Analysis in Environmental Epidemiology*, 22 Reg. Toxicol. & Pharm. 189, 191 (1995) ("Publication bias is a critical issue in environmental health studies just as in other fields.").

specifically criticized the authors for their decision to **exclude** their findings for herbicides (including GBHs).  *See* E-mail from PLoS One editorial manager to Michael Alavanja (June 21, 2014 1:56 PM), ECF No. 653-15.  Plaintiffs' argument that the 2013 and 2014 studies had different NHL counts ignores the fact that the 2014 study included different pesticides and an additional three years of NHL diagnoses.[38]  And, of course, the published AHS 2017 study disposes of any suggestion that the updated and powerfully negative AHS data can be ignored.

Plaintiffs' experts' failure to account for the Alavanja 2013 cohort study is inexcusable. *See In re Zoloft*, 2015 WL 7776911, at *9 (excluding testimony of expert who failed to account for more recent epidemiologic findings contrary to his causation opinion); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Prac. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 932 (D.S.C. 2016) ("[F]ailing to adequately account for contrary evidence is not reliable or scientifically sound.").  With an additional seven years of follow-up to De Roos 2005, Alavanja 2013 was, prior to the new and likewise negative AHS 2017 publication, by far the largest study to analyze GBHs and NHL and includes hundreds of NHL cases in a cohort of more than 50,000 pesticide applicators.  Alavanja conducted a series of analyses of GBHs and found no association whatsoever for NHL in general, for any NHL subtypes (to the contrary, Alavanja reported a statistically significant negative trend for large B-cell lymphoma), or for NHL and GBHs in combination with other pesticides.  *See* Blair Dep. 171:21-176:1, 190:12-199:16.  This powerful data was not available to IARC and was not available to any of the numerous regulatory agencies around the world which, even without this data, have concluded that GBHs do not cause cancer.  *Id.* 178:1-7, 231:3-232:18.

Plaintiffs attack Alavanja 2013 for its use of imputation to account for cohort members who provided exposure data upon entry to the study but who did not respond to a subsequent, second-phase exposure survey.  Opp. at 34-35.  But Dr. Ritz concedes that (1) the AHS investigators have used the same imputation approach for every pesticide study they have published that includes data

---

[38] C. Alavanja et al., *Non-Hodgkin Lymphoma Risk and Insecticide, Fungicide and Fumigant Use in the Ag. Health Study*, PLoS One 9(10): e109332, at 2 (2014), ECF No. 653-16 (including cancer diagnoses through Dec. 31, 2011); Alavanja 2013 at 7 (including cancer diagnoses through Dec. 31, 2008).

1    from the phase 2 surveys, Ritz Dep. 357:4-16, (2) the AHS investigators have conducted and

2    published a validation study that specifically measured the accuracy of their imputation

3    methodology for each of 40 different pesticides (including GBHs which fell in the middle of the

4    pack), *id.* 365:9-366:8, and (3) she is not aware of anyone other than herself who has stated that the

5    imputation methodology used in the AHS is uniquely inappropriate for GBHs, *id.* 382:2-10.

6    Moreover, the just-published AHS 2017 study used the same imputation approach and confirmed

7    through a number of different sensitivity analyses that Dr. Ritz's criticisms are without merit.  AHS

8    2017 at 2-4.

9          **F.  Plaintiffs' Experts Fail to Faithfully Apply the Bradford Hill Criteria.**

10          Plaintiffs seek to cure the flaws in their experts' methodologies by claiming that their

11    experts applied the Bradford Hill factors for assessing causation.  Opp. at 16-19.  This argument

12    fails at the outset because – as even Dr. Neugut concedes, Neugut Dep. 314:7-15 – they did not

13    apply the methodology in the manner prescribed.  As Dr. Hill explained – and the Reference

14    Manual and numerous courts have recognized – application of the guidelines absent epidemiologic

15    evidence of an association "does not reflect accepted epidemiologic methodology."  Reference

16    Manual at 599 n.141 (citing same case law cited by Monsanto in its Mtn. at 37 n.72).  The *starting*

17    *point* is where epidemiological observations "reveal an association between two variables,

18    perfectly clear-cut and beyond what we would care to attribute to the play of chance."  A. Bradford

19    Hill, *The Environment and Disease: Association or Causation*?, 58 Proc. R. Soc. Med. 295, 295

20    (1965), ECF No. 649-17.  Thus, "[i]n assessing causation, researchers first look for alternative

21    explanations for the association, such as bias or confounding factors … .  We emphasize that these

22    [Bradford Hill] guidelines are employed only *after* a study finds an association to determine

23    whether that association reflects a true causal relationship."  Reference Manual at 598-599.[39]  As

24    IARC and plaintiffs' experts concede, the (by their measure) "limited" epidemiologic evidence on

25

26    ─────────────────────
      [39] *See also In re Lipitor*, 174 F. Supp. 3d at 916 ("in assessing causation, epidemiologists 'first
      look for alternative explanations for the associations, such as bias or confounding factors,' and

27    then apply the Bradford Hill factors to determine whether an association reflects a truly causal
      relationship") (citing Reference Manual and other case law).

28
      MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
      TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

GBHs and NHL does not meet this predicate requirement and the Bradford Hill factors accordingly do not come into play.

Moreover, plaintiffs' claim that the Bradford Hill factors support causation again is undermined by their own experts' testimony. For example, while plaintiffs argue that the *strength* factor weighs in favor of causation, Dr. Neugut opined that even by his accounting the strength of association between GBHs and NHL is "not a number that would … build your confidence that this was a – that there is a causal relationship." Neugut Dep. 333:7-16. The epidemiologic data likewise does not provide *consistent* evidence of an association, but rather shows no association with non-significant odds ratios and relative risks both above and below 1.0. Neugut Dep. 324:22-327:9. *Temporality* is not satisfied in the GBH U.S.-based case-control studies because of the latency period necessary for NHL to develop. Dr. Weisenburger claims that 6.7 years is too short of a time to detect the development of NHL and that a minimum of 10 years of latency is required to detect a relationship between GBHs and NHL. Weisenburger Report at 5. Likewise, at her deposition, Dr. Ritz opined that "ten years out is a good time frame" to allow for the development of NHL. Ritz Dep. 198:9-14. But the U.S. based case-control studies of farmers are based mainly on NHL cases diagnosed between 1979 and 1983, Neugut Dep. 230:15-231:3, no more than 8 years after GBHs were first approved for agricultural use. *See* EPA Mem. from Robert Taylor to Monsanto (Dec. 22, 1975), ECF No. 652-12; Reference Manual at 601 ("exposure outside a known latency period constitutes evidence, perhaps conclusive evidence, against the existence of causation").[40]

Finally, while plaintiffs claim that the Eriksson 2008 and McDuffie studies demonstrate a dose response, their experts did not agree. *See* Neugut Dep. 292:25-293:8 (conceding that there is no way to tell from the Eriksson study whether there is any difference between the odds ratios

---

[40] While plaintiffs argue that case-control studies can establish temporality, Opp. at 17-18, Dr. Neugut (and the Reference Manual) explain that cohort studies are needed to establish temporality. Neugut Report at 8 (noting one advantage of cohort studies is that they can ensure temporality); Reference Manual at 558 ("one advantage of the cohort study design is that the temporal relationship between exposure and disease can often be established more readily than in other study designs, especially a case-control design").

presented for less than ten days exposure compared to more than ten days exposure to GBHs); *id.*

220:5-11 (agreeing that under the McDuffie "dose-response" analysis, someone with three days of

exposure to GBHs could be classified as high exposure and someone with 20 days of exposure

could be classified as low exposure); Ritz Dep. 265:4-18 (McDuffie study does not provide

evidence of a dose response).  Indeed, Dr. Neugut agreed that "there is no data anywhere in the

epidemiologic literature reporting a higher risk of non-Hodgkin's lymphoma with greater intensity

exposure to glyphosate."  Neugut Dep. 133:16-20.  To the contrary, as reproduced below, the data

presented in AHS 2017 (Table 2 and Supp. Table 1) both for duration and intensity-weighted

duration exposure to GBHs shows no such dose response:

| GBH [exposure quintiles] | NHL Cases | RR (95% CI) Total days of exposure | NHL Cases | RR (95% CI) Intensity-weighted days of exposure |
|---|---|---|---|---|
| None | 135 | 1.0 (ref) | 135 | 1.0 (ref) |
| Q1 | 103 | 0.76 (0.57-1.01) | 113 | 0.83 (0.59-1.18) |
| Q2 | 117 | 0.87 (0.66-1.14) | 104 | 0.83 (0.61-1.12) |
| Q3 | 107 | 0.85 (0.64-1.13) | 112 | 0.88 (0.65-1.19) |
| Q4 | 116 | 0.80 (0.60-1.06) | 111 | 0.87 (0.64-1.20) |

### G.  Plaintiffs' Experts Improperly Seek to Lower Their *Daubert* Burden By Relying on Purported Epidemiologic Associations Below 2.0.

When properly evaluated for chance, bias, and confounding, the epidemiologic literature

does not show any positive association whatsoever between GBHs and NHL.  *See supra* at 7-10.

But even if one could accept their experts' flawed methodology in full, plaintiffs' expert

epidemiologists rest their causation opinions on an alleged association in the range of 1.3 to 1.5.

Neugut Dep. 331:7-15.  This purported association cannot support their causation opinion under

*Daubert* given the Ninth Circuit's holding that anything less than a doubling of the risk "actually

tends to disprove legal causation" because it means that there is a less than 50% chance that GBHs

caused any exposed individual's NHL rather than some other cause.  *See Daubert v. Merrell Dow*

*Pharm., Inc.* (*Daubert II*), 43 F.3d 1311, 1321 (9th Cir. 2005); *see also Schudel v. Gen. Elec. Co.*,

120 F.3d 991, 996 (1997), *abrogated on other grounds by Weisgram v. Marley Co.*, 528 U.S. 440

(2000); *McManaway v. KBR, Inc.*, 852 F.3d 444, 454 (5th Cir. 2017) (granting summary judgment

1    for defendant where "studies relied on by the Plaintiffs and their experts do not reflect a statistically

2    significant doubling of the risks of their injuries"); Mtn. at 12 n.17.[41]

3          As a Los Angeles court very recently explained in reversing a $417 million jury verdict

4    based in part upon the inadmissibility of the plaintiff's epidemiologist's causation testimony, "it is

5    to be recalled that the risk ratios being cited are *relative* risk-ratios – comparing the risk that

6    someone who uses talc will develop ovarian cancer to the risk that someone who did not use talc

7    will also develop cancer.  A relative risk ratio of 1.3 is well below the two-fold risk level necessary

8    to show that talc 'more probably than not' causes cancer."  Order Granting New Trial and Granting

9    Motion for Judgment Notwithstanding the Verdict, *Lloyd v. Johnson & Johnson*, Case No.

10   BC628228, slip op. at 29 (Cal. Super. Ct., L.A. Cty. Oct. 20, 2017) (Ex. 5) (citing *Daubert II* and *In*

11   *re Lipitor (Atorvastin Calcium) Mktg., Sales Prac. & Prod. Liab. Litig.*, 185 F. Supp. 3d 786, 791-

12   92 (D.S.C. 2016)).

13   **III.   PLAINTIFFS' OPPOSITION BRIEF HIGHLIGHTS RATHER THAN RESOLVES
           THE METHODLOGICAL DEFICIENCIES THAT RENDER THEIR EXPERTS'
14         OPINIONS REGARDING THE ANIMAL DATA UNRELIABLE.**

15         Plaintiffs agree with Monsanto that the epidemiology studies are the keys to answering the

16   general causation question here because they address what happens in humans.  *Supra* at 7. And

17   plaintiffs cannot overcome their experts' concessions that there is no scientific basis to extrapolate

18   to humans any of the findings they reached in evaluating the rodent glyphosate carcinogenicity

19   studies.[42]  Either of these facts alone is sufficient to resolve any *Daubert* inquiry in Monsanto's

20   _____

21   [41] *In re Hanford* reaffirmed the doubling of the risk requirement in cases like this where there is no
     definitive evidence that the exposure at issue is capable of causing disease and plaintiffs' experts
22   accordingly must rely on epidemiology to establish causation, 292 F.3d at 1135-37, while rejecting
     the requirement in cases where there is a scientific consensus that the exposure can cause the
23   disease at issue.  *Id.* at 1137.  *In re Bextra* raised but did not rule on the issue because the doubling
     argument was put forth only as to specific causation, which was not before the court (and plaintiffs
24   in any event relied upon a large randomized clinical trial that reported statistically significant risk
     ratios of 2.6 and 3.4).  *See* 524 F. Supp. 2d at 1181, 1183.

25   [42] *See* Portier Dep. 163:7-23 (rodent models "are not developed for the purpose of identifying
     tumors that arise in humans from exposure to chemicals"); *id.* 158:14-159:16 ("it has always been
26   a challenge to extrapolate from effects observed in experimental animal bioassays to potential
     effects in humans in order to protect humans from potentially harmful chemical exposures"); Dep.
27   of Charles Jameson 28:10-15 (Sept. 21, 2017), ECF No. 546-6 ("Jameson Expert Dep.") ("[T]he
     purpose of doing an animal bioassay study is to determine if the chemical can cause cancer in the
28   experimental animals.  And it's not – not looking to investigate does it form a specific kind of

25

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

1    favor. Mtn. at 23-24.[43] Plaintiffs' failed attempts to explain away the numerous methodological

2    flaws in their experts' opinions also require the same result.

### A. Despite Plaintiffs' Specific Efforts to Buttress the Admissibility of Dr. Portier's Testimony, They Still Fail to Meet *Daubert*'s Standards.

5    Dr. Portier's opinions must be excluded because they are nothing more than a series of

6    made-for-litigation assertions employing whatever methodology – no matter how untested or novel

7    – supports the outcome Dr. Portier pre-determined he would reach. Mtn. at 24-29. Plaintiffs do not

8    dispute, for example, that Dr. Portier's statistical machinations ignore data that does not support his

9    desired result, Mtn. at 24, 26-27, continually reinterpret the same data using methods that differed

10   from the study protocols dictated by the original study investigators, Mtn. at 24-25, and are instead

11   designed to ensure statistical significance, despite criticisms published by regulators, scientific

12   panels (such as several members of the Scientific Advisory Panel ("SAP") upon which plaintiffs so

13   heavily rely and misrepresent as endorsing Dr. Portier's opinions here, Opp. at 53),[44] and

14   independent scientists worldwide.[45] Finally, plaintiffs claim Dr. Portier followed various EPA

___

tumor that is the same as found in humans."); *id.* 9:3-6 ("[T]he fact that something causes a kidney tumor in a mouse, I don't know what that says about causing non-Hodgkin's lymphoma in humans."); *id.* 23:24-24:3 ("I don't know that anybody has done an investigation to see – to see if there is a correlation between the formation of hemangiosarcomas in laboratory animals and non-Hodgkin's lymphoma in humans."); *see also* Mtn. at 30 n.48 (citing additional examples).

[43] Plaintiffs concede that none of their experts other than Drs. Portier and Jameson are qualified to discuss the rodent carcinogenicity data. Opp. at 46 (stating that two "highly qualified experts … reviewed the animal data" on their behalf). Monsanto's motion to exclude the other experts' toxicology opinions should therefore be granted. Mtn. at 22.

[44] *See* EPA, FIFRA Scientific Advisory Panel (SAP) Open Meeting Tr. 998:16-1000:2, EPA-HQ-OPP-2016-0385 (Dec. 13-16, 2016), https://www.epa.gov/sites/production/files/2017-02/documents/glyphosate_transcript.pdf (Dr. Ken Portier describing need for proper consideration of false-positives); *id.* 1006:13-18 (Dr. Crump criticizing pooling of results across sexes and species); *id.* 1018:12-19 (Dr. Sheppard acknowledging that false positives arise when doing multiple statistical tests with many different tumors).

[45] *See, e.g.*, J. Tarazona et al., *Response to the Reply by C.J. Portier and P. Clausing Concerning Our Review "Glyphosate and Carcinogenicity: A Review of the Scientific Basis of the European Union Assessment and its Differences with IARC,"* 91 Archives of Toxicology 3199, 3201-3202 (2017) ("Tarazona 2017") (discussing variety of factors to be considered in analyzing rodent carcinogenicity data and noting Dr. Portier's analysis of the glyphosate data does not do so); G. Kabat, *IARC's Glyphosate-gate Scandal*, Forbes (Oct. 23, 2017), https://www.forbes.com/sites/geoffreykabat/2017/10/23/iarcs-glyphosate-gate-scandal/#4996ec931abd (criticizing IARC's review and discussing Dr. Portier's IARC involvement).

guidelines, Opp. at 51-52, but omit any discussion of why his interpretation of the data differs so significantly from EPA's, yet another sign that Dr. Portier's only "methodology" is to change applicable criteria however necessary to get the result he wants. Mtn. at 24-29.[46]

Plaintiffs attempt to attribute Dr. Portier's spinning wheel of statistical opinions to the timing of his access to data from the three Monsanto rodent bioassays. Opp. at 53. This argument is absurd. A peer-reviewed article published in 2015 included all of the tumor incidence data from the Monsanto studies. *Infra* at 38 n.68. The idea that Dr. Portier would wait two years to review that data strains credulity and, if true, raises a variety of additional questions about the methods he used in gathering and evaluating the data on which his opinions are based. The changes in his opinions that have occurred over time have had nothing to do with the tumor counts in the Monsanto studies. Instead, they track his results-oriented statistical test selection, his willingness to change statistical endpoints years after the study to better support his opinions, and the selective inclusion or exclusion of non-Monsanto studies in his unproven pooling analysis in order to manufacture statistically significant results. Mtn. at 24-29.

In his expert report, Dr. Portier claimed that his pooling methodology was novel, yet at his deposition, Dr. Portier claimed without citation that his pooling methodology had appeared in the peer-reviewed literature. Mtn. at 26. Plaintiffs' opposition belatedly identifies the articles Dr. Portier purportedly relies upon, Opp. at 53-54, but plaintiffs fail to even attempt to carry their burden to explain how those articles, which involve the pooled presentation of results within individual studies,[47] reliably ground Dr. Portier's methodology of pooling results across different studies with "considerable genetic variability." Mtn. at 26 (citing Portier Amended Report at 51).

---

[46] Nor did plaintiffs identify any published support for using historical controls to generate Dr. Portier's novel "p-hist" values. *See* Mtn. at 27-28. That EPA guidelines suggest that analysis of non-statistically significant uncommon tumors *may be informed* by the experience of historical controls, *see* EPA, Guidelines for Carcinogen Risk Assesment (Mar. 2005), https://www3.epa.gov/airtoxics/cancer_guidelines_final_3-25-05.pdf, is a far cry from using historical control values, as Dr. Portier has done here, to run novel statistical tests.

[47] *See, e.g.*, M. Dourson et al., *Mode of Action Analysis for Liver Tumors from Oral 1,4-Dioxane Exposures and Evidence-Based Dose Response Assessment*, 68 Reg. Toxicology & Pharm. 387, 391, 395 (2014), ECF No. 655-15 (discussing re-evaluation of a single 1978 rodent study and graphical representation of pooled incidence of certain endpoints).

For example, plaintiffs have no response or justification for Dr. Portier's choice to include three studies in rats (Brammer, Suresh, and Wood) in his pooled analysis for skin tumors, but then exclude one of those studies (Suresh) in his pooling analysis of two other tumor types.  Mtn. at 27.  Monsanto's motion must therefore be granted.[48]

In response to methodological flaws identified by Monsanto, Mtn. at 21-29, plaintiffs claim that Dr. Portier conducted a false-positive analysis via his modified Table 15.  Opp. at 55.  This assertion is contradicted by Dr. Portier's own testimony in which he explained that the Table's reported "expected" number of tumors – from which he derives his opinion that it is "extremely unlikely" the tumors in the rodent studies arose by chance – is nothing more than an "approximation" because he "cannot figure that number out."  Portier Dep. 317:10-318:6.  Dr. Portier does not provide any scientific methodology as to how he arrived at even his approximation – he just said "I feel I've probably put a number in here which is more than the number of evaluations which were actually done."  Portier Dep. 308:7-23.  Dr. Portier's unsubstantiated feelings cannot pass *Daubert* muster, and his "false-positive" analysis in Table 15 as well as the array of toxicology opinions that the analysis supposedly supports should be excluded.  *See Friend v. Time Mfg. Co.*, 422 F. Supp. 2d 1079, 1081 (D. Ariz. 2005) (noting it is appropriate to exclude expert testimony when "it is based on subjective beliefs or unsupported speculation which is no more than unreliable *ipse dixit* guesswork.") (citations omitted).

Finally, plaintiffs' claims that Dr. Portier's methodology appropriately included consideration re factors (such as the use of historical controls) present a misleading picture of what Dr. Portier actually did.  From the large body of historical control data available, Dr. Portier cherry-picked only the data that might support his opinion when plugged into his novel "p-hist" analysis.  Both the decision to ignore unhelpful data and to use his own made-for-litigation analyses are methodological flaws that ensured his "test" would gin up the desired result.  Mtn. at 27-28.  Such

---

[48] *See Bolbol v. City of Daly City,* 754 F. Supp. 2d 1095, 1115 (N.D. Cal. 2010) ("[P]laintiff fails to address this issue in her opposition brief and apparently concedes that she may not proceed on this claim.  Accordingly, the court grants summary judgment in favor of defendants as to this claim."); *see also In re Zimmer NexGen Knee Implant Prod. Liab. Litig.*, 218 F. Supp. 3d 700, 718 (N.D. Ill. 2016) (same); *Wick v. Wabash Holding Corp.*, 801 F. Supp. 2d 93, 105 (W.D.N.Y. 2010) (same).

1    methodological hijinks cannot withstand scrutiny under *Daubert*.  *Id.*

2       **B.  No Matter How Plaintiffs Describe It, Dr. Jameson's Methodology Fails To Satisfy**
3       ***Daubert*.**

4       Plaintiffs' claims that Dr. Jameson's hazard assessment, which he referenced at least 43

5    times during his deposition, Mtn. at 4, must be admitted, Opp. at 57, and that his "weight of the

6    evidence" approach must be adopted by this Court, Opp. at 56, are based on erroneous legal

7    standards that must be rejected.  *See supra* at 3-5, *infra* at 36.[49]

8       Plaintiffs claim that Dr. Jameson's methodology "is designed to answer" the question of

9    whether glyphosate can cause NHL in humans.  Opp. at 57.  They admit that the methodology he

10   employed is only designed to evaluate carcinogenicity in animals, but then claim without

11   identifying any scientific support other than Dr. Jameson's own *ipse dixit* that "one can usually rely

12   on the fact that a compound causing an effect in one mammalian species will cause it in another

13   species."  *Id.*  Even assuming that plaintiffs' claims of "usual reliance" were true (which they are

14   not), their argument ignores that when questioned specifically about the studies at issue here, Dr.

15   Jameson could not support such an analytic leap from the glyphosate rodent data to the question of

16   causation of NHL in humans.  Mtn. at 30 n.48.  Without that link, his testimony has no scientific

17   "fit" and cannot advance any issue in this case.  *Id.* at 58.

18      In a last ditch effort to support the admissibility of Dr. Jameson's opinions as consistent

19   with his pre-litigation methodology, Mtn. at 30-31, plaintiffs claim that the rodent studies show

20   "replicated findings of malignant lymphomas in mice," *id.* at 46, ignoring Dr. Jameson's

21   concessions that mice generally have a "high spontaneous incidence" of malignant lymphoma and

22   that he is aware of scientific literature *objecting* to the use of mice as a model for evaluating

23

24   _____

[49] Plaintiffs, without citation, claim that Monsanto criticized Dr. Jameson for not conducting a risk
25   assessment.  Although Monsanto did not do so, plaintiffs' explanation highlights why a hazard
     assessment is simply not enough to address the general causation question here.  Risk assessments,
26   according to Dr. Jameson, include an assessment of dose, whereas hazard assessments do not.
     Opp. at 57 (citing Jameson Expert Dep.).  Dose and exposure levels are essential components of
27   the general causation inquiry, *supra* at 5-6, and any analysis that does not include that assessment
     is inadmissible.

28
                                             29

whether a chemical can cause lymphoma precisely "because of the high background level."[50]
They also ignore Dr. Jameson's admission that his methodology depends upon his unsupported
belief that disregarding the rate of spontaneous tumors is appropriate, Jameson Expert Dep.
146:12-14 ("[J]ust because something occurs because of a spontaneous rate is no reason to
discount it from being an effect in a carcinogenicity study.").[51]

There is no dispute that animals used in rodent bioassays have high rates of spontaneous
tumors, including lymphoma, meaning that tumors are observed in every study even absent
compound-related effects. *See* Jameson Expert Dep. 133:17-134:8; *id.* 146:2-11. The issue here is
not whether tumors were observed; it is whether plaintiffs' experts employed a scientific
methodology to support their speculation that those tumors were glyphosate-related, an assumption
that cannot be made on tumor presence alone. From his own testimony it is clear that Dr. Jameson
has failed to rule out spontaneous tumors as the cause of the rodent study results on which he relies.
Further, he applies the wrong methodology in assessing causality both of the animal tumors
themselves and their biological relevance to humans. As such, his opinions must be excluded.
Mtn. at 29-31.

**C. Plaintiffs' Other Arguments for Admissibility Are Equally Meritless.**

Plaintiffs nevertheless claim that their experts' opinions must be admitted because they are
part of the evaluation of the data by the Bradford Hill criteria. Opp. at 48, 50, 58. Invoking the
term "Bradford Hill" does not allow plaintiffs to escape the plain result of their experts' testimony,
which proves their opinions are grounded in speculation, not science. *See Joiner*, 522 U.S. at 146
(rejecting causation opinion based on animal studies that plaintiffs' experts could not reliably
extrapolate to humans); *O'Hanlon v. Matrixx Initiatives*, No. CV 04-10391, 2007 WL 2446496, at
*2 (C.D. Cal. Jan. 3, 2007) ("[W]hen extrapolating from studies concerning one substance, one

---

[50] Mtn. at 23 (citing Jameson Expert Dep. 29:13-30:5, 133:17-134:8); Jameson Expert Dep.
146:12-14 (type of mice used in two of three studies have among the highest reported rates of
spontaneous lymphoma); *see also* Rosol Dep. 301:14-18 (increased incidence of lymphoma in
mice is well-known).

[51] Plaintiffs also have no answer for Dr. Jameson's departure from his published pre-litigation
methodology cautioning against using statistics inflexibly as he does here. Mtn. at 31 n.51.

1   species, one dose level or one manner of exposure, it is incumbent upon the expert to explain and

2   demonstrate why the extrapolation is scientifically proper. … [P]ositive results in other animal

3   studies, standing alone, cannot establish positive results for the human claiming the same impact

4   from the drug or chemical element."); *see also* Mtn. at 24 n.34 (providing additional citations);

5   *supra* at 22-23 (predicate requirements for use of Bradford Hill).[52]

6          Plaintiffs' claims that the testimony of Drs. Portier and Jameson satisfies *Daubert*'s fit

7   requirement fail.  Expert testimony which is not the product of a reliable scientific process does not

8   become admissible simply because plaintiffs believe it "enhances causation."  *See Daubert II*, 43

9   F.3d at 1315-16 ("something doesn't become 'scientific knowledge' just because it's uttered by a

10   scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the

11   scientific method' be deemed conclusive").  The determination that testimony is "relevant to the

12   task at hand" and "logically advances a material aspect" of the proponent's case *only happens if the*

13   *testimony itself is scientifically reliable*.  *Id.* at 1315 ("fit" requirement is "second prong of the

14   analysis").

15          Finally, plaintiffs claim that the similar conclusions of a few members of a non-binding

16   EPA SAP confer "acceptance within the relevant scientific field" on the methodology of both

17   experts.  Opp. at 48.  This is a gross misstatement of both the law and the facts.  *See infra* at 26

18   n.44 (discussing SAP members' rejection of Dr. Portier's flawed statistical analyses).  The

19   admissibility under *Daubert* of any opinion based on a putative scientific methodology, such as Dr.

20   Portier's ever-changing statistical analyses or Dr. Jameson's "extrapolation without evidence"

21   approach, is not established by the alleged agreement of a handful of people as to a set or sub-set

22

---

23   [52] Plaintiffs blatantly mischaracterize the testimony of Dr. Rosol in an effort to buttress their own
     experts' opinions.  Opp. at 49.  Far from agreeing that a finding of a compound-related tumor in an

24   animal can be extrapolated to humans as plaintiffs claim, Dr. Rosol testified that such findings in
     rodent studies are the first, but by no means last, step in assessing human relevance.  Dep. of

25   Thomas Rosol 324:8-325:15 (Sept. 15, 2017), ECF No. 655-7 ("Rosol Dep.").  The scientific
     propriety of extrapolating rodent findings to humans requires research support beyond the rodent

26   bioassay itself.  *See supra* at 30-31 (citing *Joiner* and *O'Hanlon*).  Even assuming their
     interpretations of the animal data were correct – which they are not – plaintiffs' experts concede no

27   such support exists here with regard to glyphosate and NHL in humans.  *See supra* at 25 n.42; Mtn.
     at 21-24.

28

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

1  of conclusions, especially where it has not been established that those individuals have expertise in

2  animal toxicology, employed the same methodologies as the experts, or would agree with the

3  experts' proposed use of a particular shared conclusion.  Nor is the agreement germane – the

4  opinions are inadmissible where the expert's conclusion is derived using a different methodology

5  that would not pass *Daubert* scrutiny to begin with.[53]

6  **IV.    PLAINTIFFS' EXPERTS' OPINIONS REGARDING MECHANISTIC DATA ARE
         INADMISSIBLE.**

7

8          Plaintiffs' opposition brief fails to meaningfully respond to the key arguments raised by

9  Monsanto regarding the mechanistic data's failure to satisfy the "fit" requirement of *Daubert*.  Mtn.

10 at 31-35.  For example, plaintiffs do not dispute the discrete objectives of the experiments or the

11 fact that genotoxicity does not equate to carcinogenicity, Mtn. at 33, and they concede that

12 mechanistic data alone cannot prove causation.  Opp. at 58 ("mechanistic data are probative ...

13 where [there is] epidemiology ...").[54]  Given these concessions and because their interpretations of

14 the epidemiologic data are not based upon any reliable scientific method, Monsanto's Motion must

15 be granted and this Court need not address the details of the mechanistic data.  Mtn. at 33.[55]

16 _____

17 [53] Mtn. at 3 (citing case law that even formal regulatory findings are not dispositive of the *Daubert* inquiry); Monsanto Co.'s Br. re Relevance of IARC and EPA to Gen. Causation at 3-7, ECF No. 134 (discussing differences between regulatory and *Daubert* standards).

18 [54] Plaintiffs' experts concede that cell change due to both genotoxicity and oxidative stress occurs
19 and is repaired naturally on a daily basis, precluding reliance on genotoxicity studies, including
   human *in vivo* studies, to establish causation.  Mtn. at 32 n.54 (citing concessions in depositions of
20 Drs. Weisenburger and Portier).  Nor do plaintiffs challenge that "explicit relationships" between oxidative stress and adverse outcomes in the human body "have yet to be defined," Mtn. at 31 (citing EPA), precluding reliance on oxidative stress to prove carcinogenicity.

21 [55] Monsanto also moved to exclude the opinions of Drs. Neugut, Weisenburger, Nabhan, Jameson,
22 Ritz, and Blair regarding the mechanistic data based on their lack of qualifications to offer such
   opinions.  Mtn. at 32 n.53.  Plaintiffs do not address this argument, and Monsanto's motion as to
23 those five experts must be granted.  Plaintiffs do rely on statements by non-retained expert, Dr.
   Ross, to establish the "importance" of the human *in vivo* studies.  Opp. at 59.  These statements,
24 which refer to *IARC's* conclusion regarding the mechanistic data, came after Dr. Ross testified that
   he "did not review the genotox" data and that he "was so focused on toxicokinetics [data]" that he
25 doesn't "know the specific details" about the studies, such as whether they controlled for exposures
   to pesticides and other chemicals.  *See* Dep. of Matthew Ross 58:22-59:1, 197:25-198:9 (May 3,
26 2017), ECF No. 546-15 ("Ross Dep.").  Plaintiffs' reliance on Dr. Ross's descriptions of the
   opinions of others, but which he does not hold and does not have a basis to evaluate, is improper.
27 *See Villagomes v. Lab. Corp. of Am.*, No. 2:08-CV-00387, 2010 WL 4628085, at *4-5 (D. Nev.
   Nov. 8, 2010) (excluding testimony of expert who was not qualified to opine on significance of
28 relevant issue but would "simply be parroting or serving as a spokesman" for another's opinion);

32

1    Plaintiffs' arguments regarding the mechanistic data also fail for other reasons. First,

2    plaintiffs concede that their experts' opinions are based primarily on two methodologically

3    unsound human *in vivo* studies (Paz-y-Mino 2007 and Bolognesi 2009).[56] Opp. at 58-59.[57] As

4    detailed in Monsanto's Motion, the significant methodological flaws in these studies render any

5    opinion based on them unreliable and inadmissible under *Daubert* as well. Mtn. at 35 n.65, 36

6    n.66-68. Plaintiffs' Opposition offers no basis under *Daubert* to support the admissibility of these

7    studies. For example, in response to Monsanto's arguments regarding Bolognesi 2009, Mtn. at 35

8    n.65, plaintiffs cite two post-study statements by one of the study's authors about one piece of data

9    that was deemed of low relevance in the study itself.[58] Plaintiffs' argument misses the point – the

10

11   *Dura Auto Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however
     well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different
12   specialty. That would not be responsible science.").

13   [56] C. Paz-y-Mino et al., *Evaluation of DNA Damage in an Ecuadorian Population Exposed to
     Glyphosate*, 30 Genetics & Molecular Biology 456 (2007) ("Paz-y-Mino 2007"); C. Bolognesi et
     al., *Biomonitoring of Genotoxic Risk in Agricultural Workers from Five Columbian Regions:
     Association to Occupational Exposure to Glyphosate*, 72 J. Toxicology Envtl. Health, Part A 986
14   (2009) ("Bolognesi 2009").

15   [57] Plaintiffs claim that these studies somehow establish that the "opinions extrapolating the results
     of other genotoxicity experiments to humans are substantiated." Opp. at 58. That argument is
16   wrong on multiple levels. As discussed earlier, *supra* at 3-5, each piece of scientific evidence must
     be evaluated individually to determine whether a proper methodology was utilized. As noted in
17   Monsanto's Motion, numerous deficiencies prevent such a conclusion here. *E.g.*, Mtn. at 34-35
     (plaintiffs rely on studies in which rodents were exposed to glyphosate directly by intraperitoneal
18   ("IP") injection at doses thousands of times higher than real-world human exposures). Further,
     plaintiffs cite no authority – and there is none – allowing the court to conclude that if these two
19   studies were the product of reliable methodologies, which they are not, then reliability is somehow
     established for other studies. *See generally Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d
20   256, 267, 270 (2d Cir. 2002) (in deciding whether an expert's opinion is reliable, "the district court
     should undertake a rigorous examination" of "all of the materials" on which the expert relies).
21   And "assumptions" of reliability are particularly unsupported here, where the "other studies" to
     which plaintiffs refer include many conducted on cells from plants, fish, or other non-human
22   subjects, were conducted *in vitro*, which is a different and dissimilar test system, and did not use
     the same or even similar test protocols or methods. For example, Drs. Portier, Jameson, Nabhan,
23   Ritz, and Weisenburger rely on M. Lioi et al., *Genotoxicity and Oxidative Stress Induced by
     Pesticide Exposure in Bovine Lymphocyte Cultures In Vitro*, 403 Mutation Res. 13 (1998), a study
24   that reported glyphosate-induced genotoxicity based on tests conducted with blood cells "drawn
     from the jugular vein" of three cows. *See id.* at 14.
25

26   [58] Plaintiffs completely ignore that all five study authors acknowledged the study's limitations *in
     the publication itself*, instead extracting select statements from Claudia Bolognesi's subsequent
27   publications in which she reported "significant increases in MN frequency." Opp. at 60 n.172.
     That increases in one measure of chromosomal damage were reported does *not* mean that that
28   damage can be reliably attributed to GBHs; instead, as the authors cautioned, the "smaller number

33

1    *Daubert* inquiry is whether a study's findings are *the product of a methodology that withstands*

2    *scientific scrutiny*, not whether plaintiffs' expert accurately quotes cherry-picked text extracted

3    from the paper.

4         Further, Dr. Portier failed to reconcile his opinion that the study's findings "must carry the

5    greatest weight," Am. Expert Report of Christopher Portier at 67, ECF No. 546-8 ("Portier

6    Amended Report"), with the study authors' conclusion that "[o]verall, these results suggest that

7    genotoxic damage associated with glyphosate spraying … is small and appears to be transient …

8    [and] the genotoxic risk potentially associated with exposure to glyphosate … is of low biological

9    relevance," Bolognesi 2009 at 994-995.[59]  Nor did Dr. Portier address the study's methodological

10   shortcomings, including those identified by the study's authors in the body of the study.[60]  And

11   although Dr. Portier claims that the genotoxic potential of GBHs is "worse" than glyphosate alone,

12   *see* Portier Amended Report at 70, he concedes that the GBH mutation tests are consistently

13   negative.  Portier Dep. 347:10-20.  His methodological failures require exclusion of his opinions

14   regarding the mechanistic data.[61]

15

16   of subjects recruited in this study and small amount of information about the exposure precluded
     any conclusions."  *See* Bolognesi 2009 at 995.

17   [59] *See In re Accutane Prod. Liab. Litig.*, No. 8:04-MD-2523-T-30, 2009 WL 2496444, at *2 (M.D.

18   Fla. Aug. 11, 2009) ("When an expert relies on the studies of others, he must not exceed the
     limitations the authors themselves place on the study."), *aff'd*, 378 F. App'x 929 (11th Cir. 2010);

19   *Williams v. Mosaic Fertilizer, LLC*, No. 8:14-CV-1748-T-35, 2016 WL 7175657, at *11 (M.D. Fla.
     June 24, 2016) (excluding expert who relied on data from studies to "reach conclusions that are at

20   odds with the authors' conclusions"); *Henricksen v. ConocoPhillips Co*., 605 F. Supp. 2d 1142,
     1169 (E.D. Wash. 2009) ("Nothing in *Daubert* or the Federal Rules of Evidence requires a district

21   court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the
     expert.") (citation omitted).

22   [60] *See* R. Arnason, *Toxicologist Pans UN Glyphosate Report*, The Western Producer (Mar. 27,
     2015), http://www.producer.com/daily/toxicologist-pans-un-glyphosate-report/ (co-author Dr.

23   Solomon stating that IARC's misinterpretation of the study as showing a relationship between
     GBHs and genotoxicity is "certainly a different conclusion than the one we [the authors] came to");

24   Bolognesi 2009 at 995 ("Although temporality was satisfied in the increase in frequency of BNMN
     after spraying, this response did not show strength as it was not consistently correlated with the rate

25   of application.  Recovery was also inconsistent with decreases in frequency of BNMN in the areas
     of eradication spraying but not in the area where lower rates were applied on sugar cane .... The

26   smaller number of subjects recruited in this study and small amount of information about the
     exposure precluded any conclusions ….").

27   [61] *See U.S. v. Lester*, 234 F. Supp. 2d 595, 600 (E.D. Va. 2002) ("[Expert] was required to show

28   his work, so to speak, and he did not.  In the absence of any evidence respecting the scientific

Similarly, plaintiffs' claim that Dr. Goodman conceded his methodological criticisms of Paz-y-Mino 2007 are "speculative," Opp. at 59, misconstrues the scientific issue before the Court. By failing to provide adequate information, *the authors required any reader to speculate about the reliability of the study's methodology*. Where such speculation is required, reliability of the methodology cannot be assumed as a matter of sound science. Dep. of Jay Goodman 225:3-18 (Sept. 22, 2017) ("Goodman Dep.").[62] Under *Daubert*, studies that omit key details necessary to evaluate their methodologies are unreliable and must be excluded.[63]

Plaintiffs also erroneously claim that the publication of both studies means the *Daubert* inquiry is satisfied as to their admissibility. Opp. at 58. Instead, "[p]eer review and publication

---

foundation for his opinions, the Court cannot conclude that [expert's] proffered testimony is scientifically reliable."); *Abold v. City of Black Hawk*, No. Civ.03-CV-00299, 2005 WL 5807816, at *11 (D. Colo. July 18, 2005) ("[Expert's] conclusions and the information available in this case is speculative, tenuous at best, and severely lacking in sufficient support ... . As a result, [expert's] opinion ... is unreliable under Fed. R. Evid. 702 and *Daubert* ...").

[62] Dr. Goodman testified that the Paz-y-Mino 2007 authors used a test method that involves some "subjectivity," Goodman Dep. 222:21-224:14, but did not implement measures to prevent that possibility from improperly influencing the results. *See* Paz-y-Mino 2007 at 458 (noting samples from "exposed" and "unexposed" groups were not evaluated simultaneously); Goodman Dep. 224:15-225:2. Similarly, plaintiffs claim that the authors' failure to assess how the study subjects' poor health, *see* Expert Report of Jay Goodman at 12, ECF No. 649-8 ("Goodman Report"); Paz-y-Mino 2007 at 457 (describing clinical history of exposed individuals), may have contributed to the perceived genotoxic effects reported runs contrary to the scientific rigor required by *Daubert*. Plaintiffs go one step further, declaring Dr. Goodman's testimony that the subjects' poor health may in fact be the sole cause of the effects observed is "speculative" because, according to them, the symptoms described in the article are consistent with acute glyphosate poisoning. Opp. at 63 n.179. But nowhere in Paz-y-Mino 2007 do the study authors attribute these symptoms to glyphosate poisoning. Nor do the authors, who describe the study subjects as "24 randomly selected individuals" living near an area "where aerial spraying with a glyphosate-based herbicide" had occurred, claim that the subjects exhibited similar clinical signs as individuals intentionally drinking glyphosate in attempt to commit suicide. *See* Paz-y-Mino 2007 at 457. With no way to ascertain *what* caused the study subjects' illnesses or *how* their condition affected the DNA damage observed based upon the information in the paper, that damage cannot be reliably attributed to glyphosate.

[63] *See King ex rel. King v. Sec'y of HHS*, No. 03-584V, 2010 WL 892296, at *67 (Fed. Cl. Mar. 12, 2010) (studies that had "analytical methods [that] were 'not transparent' and omitted 'important details'" making it "impossible to evaluate the studies" were "*not* reliable, and [could not] be accorded any weight.") (quotation marks omitted); *Brantley v. Int'l Paper Co.*, No. CV 2:09-230, 2017 WL 2292767, at *6 (M.D. Ala. May 24, 2017) ("While experts are not required to rule out every alternative cause, [expert's] failure to account for alternative causes … in this instance substantially impairs his already questionable theory .... The excessive number of variables in this study, combined with the apparent margin of error render the study totally unreliable.") (granting summary judgment for defendant).

35

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP. TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

mean little" if a study is based on unreliable methodology.[64]  As proponents of the scientific

evidence at issue, it is *plaintiffs' burden* to prove that opinions based on the studies are admissible

under *Daubert*, meaning that they are "grounded in the methods and procedures of science," not

"subjective belief or unsupported speculation."  Mtn. at 7 (citing *Daubert*).  Plaintiffs are unable to

do so here.  This outcome is not surprising given the studies' limited experimental purposes and

many methodological flaws, because of which both have been deemed "low quality" by EPA and

excluded from the agency's 2016 evaluation of glyphosate's carcinogenic potential.[65]  "[T]here is

simply too great an analytical gap between the data" presented in the human *in vivo* studies "and

the opinion proffered," *i.e.*, that GBHs are genotoxic (and therefore cause NHL in humans).  *See*

*Joiner*, 522 U.S. at 146.[66]

## V.     TO AVOID ADDRESSING THE DEFICIENCIES IN THEIR EXPERTS' OPINIONS RAISED BY MONSANTO, PLAINTIFFS SEEK TO SHIFT THE FOCUS TO NON-*DAUBERT* ISSUES.

Lacking any legitimate basis for their proffered opinions, plaintiffs spend numerous pages

of their brief trying to prop up IARC's credibility, making spurious claims that Monsanto's

scientists "ghostwrote" various articles, and providing other distractions that have nothing to do

with the reliability of their proffered testimony.  These arguments are irrelevant to the *Daubert*

inquiry and do not cure the deficiencies of their proffered testimony.

---

[64] *In re Viagra Prod. Liab. Litig.*, 658 F. Supp. 2d 936, 944-45 (D. Minn. 2009) (excluding expert's opinion based on unreliable published study as "lack[ing] sufficient indicia of reliability to be admitted as a general causation opinion"); *Daubert*, 509 U.S. at 593 (1993) ("Publication ... is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability ... ."); *Black v. Rhone-Poulenc, Inc.*, 19 F. Supp. 2d 592, 600 (S.D.W. Va. 1998) ("[M]ere publication of an article is not the end of the peer review process; it is but the beginning.").

[65] EPA Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 196 (Sept. 12, 2016), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094.

[66] It is telling that although plaintiffs repeatedly refer to the SAP report as an authoritative evaluation of the glyphosate epidemiology and animal data, Opp. at 10, 48, 51, 53, they conceal from the Court that the SAP concluded "that [EPA's] overall weight-of-evidence and conclusion that ***there is no convincing evidence*** that glyphosate induces mutations *in vivo* via the oral route are sound."  EPA, FIFRA Scientific Advisory Panel, *Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate*, Dec. 13-16, 2016 at 19, ECF No. 648-10 (emphasis added).

First, plaintiffs' attempt to buttress the credibility of IARC's hazard assessment is meaningless. Opp. at 6, 7, 9-10, 17, 29, 34, 56-57. Although a subject of intense disagreement between the parties, the credibility of IARC is not a component of the *Daubert* inquiry. Plaintiffs' experts' methodologies are. Plaintiffs do not dispute that a hazard assessment methodology such as IARC's – which does not take into account dose or human relevance – is insufficient to satisfy *Daubert* because it applies a "*threshold of proof*" that is "*lower than that appropriate in tort law*." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 464 (5th Cir. 2012) (emphasis in original) (quoting *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996)). Plaintiffs also do not dispute that Drs. Neugut, Jameson, and Nabhan employed ***only*** such a hazard assessment methodology. Thus, no matter how credible IARC is (or is not) in making a hazard assessment, these experts' opinions do not rise to the level of admissible evidence. Mtn. at 3-4.

Plaintiffs' efforts to discredit all regulatory agencies who disagree with IARC even though those agencies apply scientific standards far more stringent and reliable than IARC's is equally irrelevant. Opp. at 10-11. Remarkably, plaintiffs would have the Court give more credence to ***non***-scientific statements by a few members of the ***European Parliament*** who have joined plaintiffs' counsel in lobbying efforts, than to the European regulators that painstakingly reviewed the science and found no cancer link. *See, e.g.*, Ltr. from Six Members of the European Parliament (July 4, 2017), ECF No. 385 ("European Parliament Letter"); Monsanto Papers: Proof of Scientific Falsification, YouTube (Sept. 27, 2017), https://www.youtube.com/watch?v=1_s18Qetabo ("Monsanto Papers Press Conference") (press conference held by Kathryn Forgie of the Andrus Wagstaff firm and MEP Michèle Rivasi).[67]

---

[67] Plaintiffs also attempt to mislead the Court about certain regulatory reviews. For example, they claim that California "reviewed the IARC classification" and "concluded that glyphosate is a substance known to the state of California to cause cancer." Opp. at 9-10. Proposition 65, a California ballot initiative, requires that substances classified by IARC as group 2A automatically be listed as carcinogens without any further scientific analysis of whether IARC's conclusion is grounded in sound science. Cal. Labor Code § 6382(b) (providing for automatic listing of substances classified by IARC); Cal. Code Regs. tit. 27, § 25904(c) ("Comment is restricted to whether the identification of the chemical or substance meets the requirements of this section. The lead agency shall not consider comments related to the underlying scientific basis for classification of a chemical by IARC as causing cancer."). The California EPA reviewed the actual science in 2007, and the agency reached a conclusion consistent with that of regulators worldwide for 40 years – that glyphosate and GBHs are not carcinogenic. *See* California Environmental Protection

1    Finally, plaintiffs' assertion that Monsanto influenced the science by ghostwriting articles is

2    irrelevant and wrong.  GBHs have been on the market and the subject of independent scientific

3    research by academicians, government agencies, and other independent scientists for over 40 years.

4    Other than funding one meta-analysis and its update to include the Alavanja 2013 and NAPP data,

5    Monsanto had **no role** in the epidemiology studies.  Of the 12 rodent carcinogenicity studies relied

6    upon by plaintiffs' experts, only three are studies conducted by Monsanto.  The remaining nine are

7    studies conducted by or on behalf of other registrants without any Monsanto involvement, and the

8    original tumor data from each study has been published in the peer-reviewed literature.[68]  Plaintiffs'

9    allegation that the unanimous conclusion of these studies – that glyphosate does not cause

10   compound-related tumors in rodents – was somehow engineered by Monsanto is absurd on its face.

11   Plaintiffs' "ghostwriting" allegations regarding three articles that provide summaries, or

12   reviews, of primary data are also nothing more than an effort to distract the Court from their own

13   burdens as proponents of their experts' opinions and methodologies.  Opp. at 14-15.[69]  Notably,

14   much of the primary data discussed in these reviews comes from non-Monsanto studies, meaning,

15   once again, that Monsanto had no role in its generation.  Further, one of the three articles discloses

16   that a listed author is a former Monsanto employee, *see* Kier & Kirkland 2013 at 311, and all three

17   articles expressly disclose Monsanto's funding and/or involvement.[70]  Since plaintiffs' counsel

18

---

19   Agency, Office of Environmental Health Hazard Assessment, Pesticide and Environmental
     Toxicology Branch *Public Health Goals for Chemicals in Drinking Water: Glyphosate* at 1 (June
20   2007), https://oehha.ca.gov/media/downloads/water/chemicals/phg/glyphg062907_0.pdf ("Based
     on the weight of evidence, glyphosate is judged unlikely to pose a cancer hazard to humans.").

21   [68] *See* H. Greim et al., *Evaluation of Carcinogenic Potential of the Herbicide Glyphosate. Drawing
22   on Tumor Incidence Data from Fourteen Chronic/Carcinogenicity Rodent Studies*, 45 Critical
     Revs. Toxicology 185 (2015).

23   [69] *See* G. Williams et al., *Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its
     Active Ingredient, Glyphosate, for Humans*, 31 Reg. Toxicology & Pharma. 117 (2000), ECF No.
24   648-25 ("Williams 2000"); L. Kier et al., *Review of Genotoxicity Studies of Glyphosate and
     Glyphosate-based Formulations*, 43 Critical Revs. Toxicology 283 (2013), ECF No. 649-1 ("Kier
25   & Kirkland 2013"); G. Williams et al., *A Review of the Carcinogenic Potential of Glyphosate by
     Four Independent Expert Panels and Comparison to the IARC Assessment*, 46 Critical Revs.
26   Toxicology 3 (2016) ("Williams 2016").  At one point, plaintiffs contended that Monsanto
     ghostwrote the Greim paper as well, but they have abandoned that contention for good reason – a
27   Monsanto employee is clearly listed as one of the study's four authors.

28   [70] *See* Kier & Kirkland 2013 at 310-11 (authors "thank the following individuals for their

began their unsubstantiated media campaign to brand these papers as ghostwritten, many of the authors (one of whom, Dr. Acquavella, is a former Monsanto employee whose e-mail mentioning the term "ghostwriting" is often taken out-of-context and cited by plaintiffs to support their arguments) have publicly stated that no ghostwriting occurred.[71]

Plaintiffs' affirmative burden of proof cannot be satisfied by criticizing Monsanto or articles allegedly ghostwritten by Monsanto.[72]  That Plaintiffs even raise such distractions confirms the bankruptcy of their case on the merits.  *E.g.*, *Waite v. All Acquisition Corp.*, 194 F. Supp. 3d 1298, 1307-08 (S.D. Fla. 2016) (rejecting similar argument; "[a]lthough perhaps narratively interesting, [that argument] is irrelevant to the instant *Daubert* inquiry, which focuses solely on the reliability and helpfulness of any given theory and/or the qualifications of the expert positing such theory.").[73]

---

contributions … David Saltmiras (Monsanto Company)"); Williams 2000 at 160 ("[W]e thank the toxicologists and other scientists at Monsanto who made significant contributions to the development of exposure assessments and through many other discussions. … Key personnel at Monsanto who provided scientific support were William F. Heydens, Donna R. Farmer, ... ."); Williams 2016 at 16 ("Funding for this evaluation was provided to Intertek by the Monsanto Company which is a primary producer of glyphosate and products containing this active ingredient.").

[71] *See* D. Hakim, *Monsanto Weed Killer Roundup Faces New Doubts on Safety in Unsealed Documents*, N.Y. TIMES (Mar. 14, 2017), https://www.nytimes.com/2017/03/14/business/monsanto-roundup-safety-lawsuit.html (co-author David Kirkland said in an interview, "'I would not publish a document that had been written by someone else.'  He added, 'We had no interaction with Monsanto at all during the process of reviewing the data and writing the papers.'"); D. Hakim, *Monsanto Glyphosate Case: Select Documents Suggest Company Tried To Influence Public Debate over Weed Killer*, Genetic Literacy Project (Aug. 3, 2017), https://geneticliteracyproject.org/2017/08/03/monsanto-glyphosate-case-selected-documents-suggest-company-tried-influence-public-debate-weedkiller/ (co-author John Acquavella said "there was no ghostwriting"); W. Cornwall, *Update: After Quick Review, Medical School Says No Evidence Monsanto Ghostwrote Professor's Paper*, Science (Mar. 23, 2017), http://www.sciencemag.org/news/2017/03/update-after-quick-review-medical-school-says-no-evidence-monsanto-ghostwrote (officials at New York Medical College found "'no evidence' that [Dr. Gary Williams] violated the school's prohibition against authoring a paper ghostwritten by others").

[72] *See Norris*, 397 F.3d at 886 ("Mere criticism of epidemiology cannot establish causation."); *Hollander*, 289 F.3d at 1213 ("[Plaintiffs] have the burden of demonstrating the harmful effect of [the drug].  Accordingly, it was not unreasonable for the district court to conclude that [plaintiffs' expert's] attack on the [epidemiology] study did not constitute reliable [general causation] evidence ... ."); *Caraker*, 188 F. Supp. 2d at 1034 ("Plaintiffs' experts' broad criticisms of the existing epidemiological evidence do[] not help them meet their burden," as "plaintiffs' burden is an affirmative one, not served by such attacks.").

[73] The court rejected plaintiffs' argument that studies directly or indirectly funded by the

39

In addition to being baseless, plaintiffs' ghostwriting accusations do not satisfy their affirmative *Daubert* burden to establish the admissibility of their experts' causation opinions.[74]

### OPPOSITION TO PLAINTIFFS' *DAUBERT* MOTION
### TO STRIKE CERTAIN OPINIONS OF MONSANTO'S EXPERT WITNESSES

**I.    THERE IS NO SCIENTIFIC BASIS TO EXCLUDE DR. ROSOL'S OPINION, AS ALL MATERIALS HE REVIEWED WERE AVAILABLE TO BOTH PARTIES.**

As the only veterinary pathologist among the experts designated in this litigation, Dr. Rosol is uniquely qualified to opine on pathogenesis and human relevance of cancer and other findings from rodent studies.  Plaintiffs do not challenge Dr. Rosol's qualifications or the robust methodology used to reach his conclusions under *Daubert*, but instead claim that Dr. Rosol's opinions should be excluded because he reviewed information "withheld from [P]laintiffs."  Opp. at 62.  This argument is baseless and must be denied.

In addition to the 101 items on his materials considered list (all of which are either publicly available or produced to plaintiffs in this litigation), Dr. Rosol visited a public Reading Room in Brussels, Belgium, which housed eleven of the twelve rodent carcinogenicity studies at issue here.[75]  Two of those studies were conducted by or on behalf of Monsanto and produced to

---

manufacturer defendant are inherently inadmissible for the same reason.  *Id.*; *see Mullins*, 178 F. Supp. 3d at 904 ("That these studies appearing in peer-reviewed journals are industry-funded … [is a] factor [] that determine[s] the weight of the [expert's] opinions, not their admissibility."); *Garlick v. County of Kern*, Case No. 1:13-CV-01051, 2016 WL 1461841, at *3-4 (E.D. Cal. Apr. 14, 2016) (rejecting *Daubert* challenge to defendants' expert in civil rights/excessive force lawsuit whose studies "were funded by the City of San Diego in preparation for litigation" because that argument goes to bias and weight, not admissibility); *Pirolozzi v. Stanbro*, No. 5:07-CV-798, 2009 WL 1441070, at *5-6 (N.D. Ohio May 20, 2009) (rejecting *Daubert* challenge and holding that issue of industry-funded studies goes to "the weight to be accorded [to] the experts' testimony, rather than the admissibility of the testimony").

[74] Plaintiffs' claims that Monsanto's experts "relied" on these three articles are incorrect.  Dr. Foster looked at the review papers and therefore placed them on his materials considered list as required by Fed. R. Civ. P. 26(a)(2)(B)(ii), along with over 180 *other* materials.  Dr. Goodman likewise included the articles on his nearly 400-reference long materials considered list and testified that he did not base his opinions on the content of the papers, instead reviewing and relying upon the original study data itself, where available.  Goodman Dep. 158:11-15 ("I made an independent, in-depth, constructively critical evaluation of this large body of data here related to genotoxicity and reached my conclusion and then I said, like, [a]nd by the way, it's consistent with.").; Goodman Report at 31-33 (same).  Further, Dr. Goodman testified that his opinion would have been the same even if these review papers had not existed.  Goodman Dep. 158:24-159:5.

[75] Because the studies could not be printed or removed from the Reading Room due to their commercial and trade secret nature, Dr. Rosol handwrote over 50 pages of notes during his review,

40

plaintiffs in this litigation.[76]  As plaintiffs concede, the remaining studies were conducted by or on

behalf of other GBH registrants; they are not and have never been under Monsanto's possession,

dominion, or control.  *See* Email from Rosemary Stewart, to Jeffrey Travers (Dec. 30, 2016, 9:13

AM), ECF No. 656-14.  Monsanto could not "withhold" from plaintiffs studies it does not have.

Accompanied by significant publicity and in connection with the EU glyphosate re-

registration process, the Reading Room opened on August 24, 2016 and closed at the end of

October 2016.[77]  Plaintiffs do not – and cannot – dispute that the Reading Room was open to

anyone who cared to visit.  Access was free and required only that visitors complete an online

registration form to make an appointment.  Rosol Dep. 59:5-10, 61:13-64:1.

Plaintiffs' decision not to visit or to have their experts visit the public Reading Room is a

calculated litigation ploy, not a basis for exclusion of Dr. Rosol's testimony.  To be clear, Dr.

Portier, who lists Switzerland as his home address, *see* C. Portier Consultations, LobbyFacts.eu

(Dec. 21, 2015), ECF No. 655-1, is closely following EFSA's decision-making vis-à-vis

glyphosate.  He has actively engaged with European authorities through public and private

criticisms of EFSA's assessment of glyphosate and presentations before the European Parliament

and other EU-based entities, *all of which occurred after he agreed to serve as an expert in this*

---

all of which were produced to plaintiffs prior to Dr. Rosol's deposition.  *See* Ltr. from Heather
Pigman to Robin Greenwald and Kathryn Forgie (Sept. 5, 2017), ECF No. 655-7.  *See Bd. of Trs.
of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-civ-686, 2011 WL 6288415, at
*11 (S.D.N.Y. Dec. 15, 2011) ("Where the substance of [undisclosed reliance materials] is
incorporated into the body of [expert's] report, exclusion is not an appropriate remedy for failure
to produce [those materials].").

[76] *See* Expert Report of Charles Jameson, Exhibit B at 7, #72 (MONGLY00586054, 1983 mouse
study), #73 (MONGLY00593610, 1990 rat study), ECF No. 648-6 ("Jameson Report").  A third
rodent study conducted on behalf of Monsanto, but not available in the Reading Room, also was
produced to plaintiffs in full and was available to plaintiffs' experts.  *See* Jameson Report, Ex. B at
7, #71 (MONGLY01767038, 1981 rat study).

[77] *See* Business Wire, *Glyphosate Task Force Opens Reading Room for Public Access to Studies*
(Aug. 24, 2016), http://www.businesswire.com/news/home/20160824005470/en/Glyphosate-Task-
Force-Opens-Reading-Room-Public; *GTF Response to Commissioner Andriukaitis' Letter Re:
Publication of Studies*, MONSANTO BLOG (Apr. 6, 2016, updated Aug. 24, 2016),
https://monsantoblog.eu/gtf-response-to-commissioner-andriukaitis-letter-re-publication-of-
studies/; Glyphosate Facts, *Glyphosate Task Force Opens Reading Room for Public Access to
Studies* (Aug. 24, 2016), http://www.glyphosate.eu/gtf-statements/glyphosate-task-force-opens-
reading-room-public-access-studies.

*litigation and while he was receiving financial compensation from plaintiffs' counsel.*  *See* Portier

Dep. 71:8-75:4, 113:2-115:23, 122:10-132:23.  For example, leading up to the opening of the

Reading Room, Dr. Portier:

- Testified in September 2015 to German regulators regarding the differences between their assessment of glyphosate and that of IARC, *see* Portier Dep. 114:22-25; Corporate Europe Observatory, *Setting the Record Straight on False Accusations, Dr. C. Portier's Work on Glyphosate and IARC* (Oct. 19, 2017), https://corporateeurope.org/food-and-agriculture/2017/10/setting-record-straight-false-accusations-dr-c-portier-work-glyphosate;

- Commented in an October 2015 email to NIEHS scientist Linda Birnbaum that he was "having a bit of fun pushing the IARC Glyphosate finding into the European decision on [sic] re-registration," *see* E-mail from Linda Birnbaum to Sharon Evans (Oct. 21, 2015, 8:10 AM), ECF No. 655-1;

- Penned a November 2015 letter to EFSA expressing his "deep concern" over the agency's determination that glyphosate is "unlikely to pose a carcinogenic hazard to humans," *see* Ltr. from C. Portier, Sr. Contributing Scientist EDF, to V. Andriukaitis, Comm'r Health and Food Safety, European Comm'n (Nov. 27, 2015), ECF No. 655-1;[78]

- Commented to a European news outlet regarding EFSA's refusal to adopt IARC's scientific conclusions, A. Neslen, *Vote on Controversial Weedkiller's European Liscense Postponed*, The Guardian (Mar. 8, 2016), https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate; and

- Wrote to German regulators regarding his preference for IARC's analysis over theirs.  Ltr. from C. Portier to Federal Institute for Occupational Safety and Health (July 8, 2016), http://www.eomsociety.org/images/PDF/PortierOLII.pdf.

Plaintiffs' familiarity with European regulatory affairs goes beyond Dr. Portier.  Counsel

enjoys a relationship with the very MEPs who requested the opening of the Reading Room and

then protested outside of it.[79]  For example, on October 15, 2016, *while the Reading Room was still*

---

[78] Although he enlisted a variety of co-signatories to this so-called impartial letter, Portier apparently did not disclose to them his close financial relationship with plaintiffs' counsel or his financial conflict of interest, nor did he disclose those conflicts to the EU officials to whom the letter was addressed.  *See* Portier Dep. 73:18-75:4 (conceding that he failed to disclose to co-signees or EFSA the fact that he had been working as a private consultant for plaintiffs' counsel); Jameson Expert Dep. 277:11-278:5 (Dr. Jameson, a co-signee, "wasn't aware" that Dr. Portier had started working for plaintiffs' counsel when he participated in the letter to EFSA).

[79] *See* Ltr. from H. Hautala, Member of the European Parliament and others, to Bernhard Url, Exec. Director of the European Food Safety Authority (Mar. 15, 2016), https://www.asktheeu.org /en/request/is_glyphosate_safe_we_have_the_r (request by four MEPs (Bart Staes, Heidi Hautala, Benedek Javor and Michèle Rivasi) to EFSA demanding "access to all documents that have been used during the EFSA peer review" of glyphosate); Reddit, *Glyphosate Task Force Opens Reading Room for Public Access to Studies,* (May 26, 2017) https://www.reddit.com/r/farming /comments/4zcr4z/glyphosate_task_force_opens_reading_room_for/; GMWatch, *MEPs Protest Industry "Reading Room" for Secret Glyphosate Studies* (Sept. 28, 2016) http://gmwatch.org/en/news/latest-news/17241-meps-protest-industry-reading-room-for-secret-glyphosate-studies (describing protests by MEPs).

*open*, attorney Timothy Litzenburg, of the Miller Firm, another co-lead counsel in this MDL, and one of the MDL plaintiffs traveled to The Hague, just over 100 miles from Brussels, to hype their theories regarding glyphosate's impact on human health.  *See* International Monsanto Tribunal: Program (Oct. 14-16, 2016), http://www.en.monsantotribunal.org/program.  In July 2017, the same MEPs and plaintiffs' counsel filed a letter with this Court requesting access to deposition transcripts of Monsanto's corporate witnesses and "any accompanying and relevant documents or other evidence."  *See* European Parliament Letter.  Shortly thereafter, plaintiffs' counsel at Baum Hedlund, a firm which is, for now, a member of the MDL Executive Committee, made that happen by, among other things, providing the MEPs with 86 confidential documents.  *See* Ltr. from R. Brent Wisner, Baum Hedlund Aristei and Goldman, PC, to Bart Staes, Member of the European Parliament at 4 (Aug. 1, 2017), ECF No. 435-1 ("We hope that the European Parliament will be better informed in proceeding with their evaluation and classification of glyphosate as a result of having access to these documents.").  In September 2017, another plaintiffs' attorney, Kathryn Forgie of the Andrus Wagstaff firm, another co-lead counsel firm in this MDL, held a press conference in Paris, France, alongside one of the same MEPs to lobby European regulators not to re-approve the registration of glyphosate.  *See* Monsanto Papers Press Conference.  In October 2017, the Baum Hedlund firm and two other MDL plaintiffs appeared in Brussels to lobby European lawmakers to ban or restrict glyphosate.  *See* D. Hakim, *Monsanto's Roundup Faces European Politics and U.S. Lawsuits*, N.Y. TIMES (Oct. 4, 2017), https://www.nytimes.com /2017/10/04/business/monsanto-roundup-europe.html?_r=0.  In the same month, Baum Hedlund provided summaries and copies of plaintiffs' expert reports from this litigation to EU officials, advising them that the firm "expect[s] more documents from the ongoing U.S. litigation to be declassified in the near future … that may be of interest to European lawmakers."[80]

---

[80] *See* Ltr. from Michael L. Baum, to Members of the European Commission, Parliament and Member States (Oct. 31, 2017), https://www.politico.eu/wp-content/uploads /2017/11/Letter20Re20Expert20Reports.pdf.  Notably, *two congressional committees are investigating IARC* and considering eliminating its U.S. funding based on concerns about the "scientific integrity" of the monograph program and the "lack of transparency" in the group's meetings, deliberations, and drafts.  *See* K. Kelland, *Exclusive: Congressional Committee Questions Operation of WHO Cancer Agency*, Reuters (Nov. 1, 2017), https://www.reuters.com/article/us-health-who-congress-exclusive/exclusive-congressional-

1    Tactics aside, plaintiffs' experts' decision not to visit the public Reading Room is not a

2    basis for exclusion of Dr. Rosol's testimony, and is instead more evidence of their improper

3    methodological practice of ignoring unhelpful data.[81]  Moreover, plaintiffs' argument is also

4    meritless because, as Dr. Rosol explained at his deposition, key tumor data from the eleven

5    carcinogenicity studies he reviewed in the Reading Room is also available in other public sources,

6    including the Greim publication, which Drs. Jameson and Portier cited no less than 41 times.  *See*

7    Portier Amended Report at 22-44; Jameson Report at 19-28.

8    Plaintiffs mischaracterize Dr. Rosol's testimony by claiming that review of the underlying

9    pathology reports in the Reading Room was "essential" to his opinions.  Opp. at 62; *id.* ("all of Dr.

10   Rosol's opinions are predicated upon information to which Monsanto had access but that were

11   withheld from Plaintiffs").  At his deposition, Dr. Rosol made clear that he did *not* need the data in

12   the Reading Room to conclude that the rodent carcinogenicity studies show no evidence of a

13   carcinogenic effect; rather, even if he had never stepped foot in the Reading Room, he had

14   sufficient data from Greim 2015 and the three Monsanto studies to reach the same opinion.  *See*

15   Rosol Dep. 205:5-206:1 (explaining that the "major value of the reading room experience to me

16   has been the reading of the pathology reports.  It was interesting to read that none of the

17   pathologists thought there was a compound-mediated effect" but "for me to render my conclusion I

18   actually didn't have to go to the reading room.  The data that was available to me without going to

19   the reading room would have led to the same conclusion."); *id.* 208:5-209:3 (agreeing that the

20   carcinogenicity data from the 12 studies is "appropriately and adequately captured in the Greim

21   report").  Accordingly, plaintiffs' attempt to exclude Dr. Rosol's testimony must be denied.

22

23   committee-questions-operation-of-who-cancer-agency-idUSKBN1D15TU.

24   [81] *See Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.*, No. 2:09-CV-1182, 2012 WL
     1970017, at *4 (D. Nev. June 1, 2012) (no duty to produce documents that were equally available

25   to all parties), *aff'd*, 595 Fed. App'x 670 (9th Cir. 2014); *Princeton Digital Image Corp. v. Office
     Depot Inc.*, No. 13-239, 2017 WL 3264068, at *5 (D. Del. Aug. 1, 2017) (where expert's report

26   "fairly disclose[d] the theory on which he relie[d]," plaintiff lacked a "meritorious basis for
     exclusion" of materials in publicly-available internet archive); *Fitts v. Unum Life Ins. Co. of Am.*,

27   98-00617, 2007 WL 1334974, at *19 (D.D.C. May 7, 2007) (denying party's motion to exclude
     public records of which the party was aware and had authority to view).

28

44

MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)

## II. DR. GOODMAN'S ROBUST AND WELL-SUPPORTED EVALUATION OF ALL AVAILABLE MECHANISTIC DATA IS ADMISSIBLE.

Dr. Goodman is a board certified toxicologist specializing in the mechanisms underlying carcinogenesis.  For over 45 years, Dr. Goodman has taught and conducted research on toxicology as a faculty member of Michigan State University's Department of Pharmacology and Toxicology. Goodman Report at 1.  Plaintiffs do not challenge Dr. Goodman's qualifications to opine on the mechanistic data.  Instead, plaintiffs claim that because he "discount[ed]" the two methodologically flawed human *in vivo* studies described above and applied a "result driven methodology," his testimony should be excluded.  Opp. at 62-65.  Both of plaintiffs' arguments hinge on mischaracterizations of Dr. Goodman's testimony and a fundamental misunderstanding of plaintiffs' burden at the *Daubert* stage.  Accordingly, this motion must be denied.

### A. Dr. Goodman Applied a Rigorous Methodology to Both Positive and Negative Studies To Reach His Opinion That Glyphosate and GBHs Should Be Regarded as Non-Genotoxic.

In contrast to plaintiffs' experts' cursory review of select studies and parroting of IARC, Mtn. at 32 & n.55, Dr. Goodman critically evaluated all relevant mechanistic data involving glyphosate and GBHs.  Based on his review of over 200 genotoxicity and oxidative stress studies, including studies published in the peer-reviewed literature and unpublished regulatory studies performed according to well-established, standardized guidelines, Dr. Goodman concluded that glyphosate and GBHs are non-genotoxic.[82]  *See* Goodman Report at 3.  To evaluate this enormous and complex data set, Dr. Goodman applied a clear methodology, emphasizing the four types of tests "employed internationally for registration/approval of chemicals" for their ability to reliably "cover [] a spectrum of potential genotoxic events," *id* at 9; and, considering whether there were potential confounding factors present in each study that could impact the results.  *Id.* at 6.  This

---

[82] Further, consistent with EPA's view that "explicit relationships" between oxidative stress and adverse outcomes in the human body "have yet to be defined," Mtn. at 31, Dr. Goodman concluded that "while GBFs and/or glyphosate might be capable of causing oxidative stress under certain experimental conditions," oxidative stress is not a "reliable biomarker of [a chemical's] ability to cause cancer."  *See* Goodman Report at 3-4, 39.  Dr. Goodman further explained at his deposition that "the role of oxidative stress in carcinogenicity is really unclear" and there is insufficient data to conclude that oxidative stress can cause cancer.  Goodman Dep. 190:3-4, 190:18-191:1.

1    methodology has been published, peer-reviewed, generally accepted, and tested – the hallmarks of

2    reliability under *Daubert*.[83]

3           Plaintiffs mischaracterize Dr. Goodman's testimony, arguing the false predicate that he

4    "accepts all negative findings at face value – even when these findings are the product of methods

5    he deems unreliable in positive studies." Opp. at 65. At his deposition, Dr. Goodman made clear

6    that he employed the same rigorous criteria "regardless of whether it was a study where the author

7    reported a positive effect or the author reported a negative effect." Goodman Dep. 230:17-22. For

8    example, where negative studies utilized a non-physiological route of administration, like IP

9    injection (akin to intravenous injection) or extreme doses potentially resulting in cytotoxicity

10   (generalized cell toxicity precluding genotoxicity), Dr. Goodman did not simply accept those

11   studies at face value. Instead, based on decades of scientific experience, he critically evaluated the

12   data and determined that where no genotoxic effect is observed under "extraordinar[ily] … harsh

13   testing conditions," then that effect is not going to occur under "physiologically relevant"

14   conditions. Goodman Dep. 96:5-10, 238:8-17.

15          Plaintiffs further attempt to obfuscate Dr. Goodman's thorough methodology by implying

16   that because he was unable to recall specific details or titles of some of the hundreds of materials

17   he reviewed when questioned at his deposition, his testimony is unreliable. Opp. at 66 n.192. This

18   weak attempt to preclude Dr. Goodman's testimony fails for the same reasons discussed in

19   connection with their similarly baseless challenge to the admissibility of Dr. Foster's opinions.

20   *See infra* at 47-49.

21          Moreover, the four references identified by plaintiffs as studies "conducted with neither

22

23   _____

[83] *See* K. Dearfield et al., *Use of Genetic Toxicology Information for Risk Assessment*, 46 Envtl. Molecular Mutagenesis 236 (2005) (describing the tests identified by Dr. Goodman as the "most widely recommended" genetic toxicology battery and explaining that "[i]t is insufficient to determine that a chemical is positive in one of many genotoxicity assays and then assume that all adverse health outcomes will have a mutagenic [mode of action].");  *id.* at 240 (discussing the need to consider "maximum concentration level(s) for cytotoxicity"); M. Cimino, *Comparative Overview of Current International Strategies and Guidelines for Genetic Toxicology Testing for Regulatory Purposes*, 47 Envtl. Molecular Mutagenesis 362, 363 (2006) (genotoxicity test battery [emphasized by Dr. Goodman] developed to assess a "spectrum" of genetic damage); *id.* at 386 (explaining that positive responses in genotoxicity tests are "not sufficient to conclude that [a chemical] has a mutagenic [mode of action] for carcinogenicity").

24

25

26

27

28

GBFs nor glyphosate," are, as described in Opp. at 66 n.194, Ames tests on surfactants used in GBHs. Despite plaintiffs' willingness to implicate the "cocktail of other ingredients in the formulated product, such as surfactants," Opp. at 44, plaintiffs' experts failed to consider most of the genotoxicity testing conducted with surfactants, including those four Ames tests.

### B. Plaintiffs Mischaracterize Dr. Goodman's Valid Criticisms of Paz-y-Mino 2007 and Bolognesi 2009, Studies Considered "Low Quality" By EPA.

With all their eggs in the "human *in vivo*" basket, plaintiffs devote almost three pages of their Opposition brief to addressing Dr. Goodman's criticisms of those studies. Opp. at 62-65. In doing so, and as discussed in more detail above, *supra* at 32-36, 46, plaintiffs again mischaracterize both Dr. Goodman's testimony and the serious weaknesses in the human *in vivo* studies – as acknowledged by the authors and regulators including EPA – that preclude reliance on those studies to conclude that glyphosate or GBHs are genotoxic.

### III.   DR. FOSTER'S OPINIONS ARE WELL-SUPPORTED AND HIS TESTIMONY SHOULD BE ADMITTED UNDER *DAUBERT*.

Dr. Foster is well-qualified to opine about glyphosate's lack of carcinogenicity. He is a toxicologist with three decades of experience conducting and evaluating rodent toxicology studies, including studies of cancer in rodents. The first decade of his career was spent at Health Canada – the Canadian equivalent of EPA – and while there he evaluated the carcinogenicity of various pesticides. Dep. of Warren Foster 70:4-71:2 (Sept. 15, 2017), ECF No. 656-17 ("Foster Dep."). Since leaving Health Canada, Dr. Foster has worked in academia, where he has continued his research into rodent toxicology, including endpoints such as chemical carcinogenesis. *Id*. 8:22-9:2, 22:7-14. He has published more than a dozen articles on chemical carcinogenesis in rodents, *id*. 118:18-122:15 (referring to articles on CV focused on cancer in rodent models).

Plaintiffs claim that Dr. Foster utilizes an "inconsistent and erroneous" methodology by alleging that he applies certain analytical factors in a manner designed to reach his desired outcome. Opp. at 67. This argument has no factual support and ignores both the clear language in Dr. Foster's report and his deposition testimony about his methodology. For example, in his report, Dr.

1   Foster clearly outlines the factors he finds important when examining the rodent toxicology data.

2   Expert Report of Warren Foster at 6-7, ECF No. 649-7 ("Foster Report") (discussing importance of

3   tumor progression, replication, dose, dose-response and other qualitative and quantitative factors to

4   evaluation of rodent carcinogenicity data).  As he explained, the relative importance of each factor

5   may vary depending on the data, meaning that although each factor is always considered, not all

6   factors are always of identical value in interpreting individual pieces of data.[84]  It is Dr. Foster's

7   refusal to elevate one factor over another rather than plaintiffs' experts' sole focus on statistics that

8   is the reliable method for reviewing animal toxicology data.[85]

9          Plaintiffs attempted, but failed, to paint Dr. Foster's methodology as shifting.  *See, e.g.*,

10  Foster Dep. 195:19-196:20 (explaining that his methodology involves "evaluating the entire study"

11  using all factors identified in his report); *id.* 65:5-6 ("Again, I think you have to look at the study in

12  its totality"); *id.* 181:14-17 ("[T]he way you're phrasing your question is - - is difficult for me,

13  because it sounds like I do something at the exclusion of something else; that I just ignore it, and I

14  - - I don't."); *id.* 218:23-24 ("I don't rely upon [one factor] to the exclusion of other factors.  It's

15  something that I look at.").[86]  Dr. Foster's methodology is consistent both across studies and with

16  ───────────────

17  [84] Foster Report at 12 (discussing evaluation of various factors in addition to statistical significance in interpreting rodent carcinogenicity data); Foster Dep. 82:9-83:2, 181:11-24 (explaining that he

18  evaluates all of the data when interpreting a study but that certain issues within a given data set may be given greater value once the data is analyzed).

19  [85] Foster Report at 7-11; *see also* Jameson Report at 19 (discussing evaluation of similar factors as part of the "assessment of the experimental animal data"); J. Huff & C. Jameson et al.,

20  *Carcinogenesis Studies: Results of 398 Experiments on 104 Chemicals from the U.S. National Toxicology Program*, 534 Ann. N.Y. Acad. Sci. 1, 7 ("[s]cientific judgment [] must entail full

21  consideration of all the available relevant information together with the statistical findings in an attempt to assess the truth"); Tarazona 2017 at 3, 4 (discussing variety of factors to be considered

22  in analyzing rodent carcinogenicity data and noting Dr. Portier's analysis of the glyphosate data does not do so).

23  [86] Plaintiffs claim that Dr. Foster incorrectly compared the high dose group in one study (Lankas) with the low dose groups in two others (Atkinson and Suresh).  Opp. at 67-68.  However, Dr.

24  Foster evaluated each study independently and found no evidence of carcinogenicity in any study. Foster Report at 14-25.  And, unlike Dr. Portier's novel and speculative pooling "methodology,"

25  Dr. Foster only compared the studies *in response to plaintiffs' request* that he identify a study that used a dose within 500 ppm of the doses used in Lankas.  Foster Dep. at 203:14-204:18.  Plaintiffs

26  attempt to insinuate that Dr. Foster does not understand which dose groups can be compared between studies, but as Dr. Foster explained, his ultimate opinion was in fact based on comparing

27  the doses found in Lankas to "similar doses through to much higher doses."  *Id.* 204:10.  Plaintiffs other objections to Dr. Foster's testimony (opinions regarding tumor progression and loss of body

28  weight) are similarly without merit as Dr. Foster's methodology is based upon established

48

accepted scientific methods.

Finally, plaintiffs claim Dr. Foster's testimony is unreliable because he could not recall the specific page – out of the thousands he reviewed in forming his opinions – that referenced weight loss in certain rodents in one of the rodent bioassays.  An expert's "memory failures at his *deposition* … [do not] mean that the analysis in his *report* was flawed."  *Network Prot. Scis., LLC v. Fortinet, Inc.*, No. C 12-01106, 2013 WL 5402089, at *5 (N.D. Cal. Sept. 26, 2013) (emphasis in original).[87]

## IV.  PLAINTIFFS' EFFORTS TO EXCLUDE DR. CORCORAN'S TESTIMONY LACK ANY FACTUAL BASIS AND MUST BE DENIED.

Plaintiffs' challenge to Dr. Corcoran's expertise, Opp. at 56 n.165, is without basis.  Dr. Corcoran is a widely respected biostatistician – over the course of his career he has received millions of dollars largely from government agencies to conduct research on health and statistics issues.  Expert Report of Chris Corcoran at 2, ECF No. 655-12 ("Corcoran Report"); Dep. of Chris Corcoran 104:22-105:4 (Sept. 20, 2017), ECF No. 656-20.  He has over 20 years of experience applying biostatistics principles to the study and evaluation of categorical data, including rodent carcinogenicity data, and has published on the appropriate design of the statistical analysis of rodent carcinogenicity studies.[88]  Given his decades of work performing analyses similar to the one

---

scientific factors.  *See, e.g.,* Tarazona 2017 at 4 (noting "reduced body weight").

[87] *Brown v. China Integrated Energy, Inc.*, CV 11-02559, 2015 WL 12720322, at *5 (C.D. Cal. Feb. 17, 2015) (rejecting argument to exclude defendants' expert due to failure to recall at deposition certain specific details of cited material); *Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *15 (S.D.W. Va. Feb. 7, 2015) (declining to exclude expert's opinions "on the grounds that he was unable to recall the literature during his deposition"); *In re Chantix (Varenicline) Prod. Liab. Litig.*, No. 2:09-CV-2039, 2012 WL 12920549, at *2 (N.D. Ala. Dec. 3, 2012) (expert's inability to "remember details from the records he reviewed" is not a proper matter for the court's consideration at *Daubert* stage); *Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, No. 09-CV-99, 2011 WL 4478440, at *8 (E.D. Wis. Sept. 23, 2011) ("no reason to exclude [expert's] testimony" for lack of reliability where, at deposition, he could not recall specific numbers or closing rates).

[88] *See* Corcoran Report Curriculum Vitae at 1-2; D. Collett, Modelling Binary Data 1-2 (1st ed. 1991) (describing rodent carcinogenicity data as a good example of categorical data); C. Corcoran et al., *Power Comparisons for Tests of Trend in Dose-Response Studies*, 19 Statistics in Med. 3037 (2000); C. Corcoran et al., *Exact Methods for Categorical Data Analysis,* in *Encyclopedic Companion to Medical Statistics* (2010).

1  he conducts here, his testimony should be admitted.

2  **V.     PLAINTIFFS' MOTION TO EXCLUDE DRS. MUCCI AND RIDER'S RELIANCE
        ON RECENT EPIDEMIOLOGICAL DATA MUST BE DENIED.**

3          Plaintiffs argue that Drs. Mucci and Rider inappropriately rely on the unpublished Alavanja

4  2013 paper.  Opp. at 34-38.  However, plaintiffs' experts acknowledge that unpublished data should

5  be incorporated into epidemiology reviews and have relied upon it in formulating their opinions.

6  *Supra* at 19-22.  Contrary to plaintiffs' argument, it is their experts' methodology of willfully

7  closing their eyes to this important epidemiologic data that is unreliable.[89]

8                                    **CONCLUSION**

9          For all of these reasons, Monsanto's motion to exclude plaintiffs' expert testimony under

10  *Daubert* must be granted and summary judgment in Monsanto's favor entered.  Plaintiffs' motions

11  to exclude certain Monsanto experts are baseless and should be denied.

12  DATED:  November 10, 2017                    Respectfully submitted,

13                                               /s/ Joe G. Hollingsworth
14                                               Joe G. Hollingsworth (*pro hac vice*)
                                                 (jhollingsworth@hollingsworthllp.com)
15                                               Eric G. Lasker (*pro hac vice*)
                                                 (elasker@hollingsworthllp.com)
16                                               Martin C. Calhoun (*pro hac vice*)
                                                 (mcalhoun@hollingsworthllp.com)
17                                               Heather A. Pigman (*pro hac vice*)
                                                 (hpigman@hollingsworthllp.com)
18                                               HOLLINGSWORTH LLP
                                                 1350 I Street, N.W.
19                                               Washington, DC  20005
                                                 Telephone:    (202) 898-5800
20                                               Facsimile:    (202) 682-1639

21                                               *Attorneys for Defendant
                                                 MONSANTO COMPANY*

22

23

24  _____

25  [89] *See also Salomon v. Andrea C.*, No. 06CV484, 2008 WL 686795 at *3-4 (S.D. Cal. Mar. 11,
    2008) (admitting expert testimony based on unpublished data); *Gaddy v. Blitz U.S.A., Inc.*, No.
    2:09-cv-52, 2011 WL 13193319, at *9 (E.D. Tex. Jan. 18, 2011) ("Plaintiffs' arguments [regarding
26  expert's reliance on] non-peer-reviewed articles go more to weight than admissibility."); *Obesity
    Res. Inst., LLC v. Fiber Res. Int'l, LLC*, No. 15-cv-595, 2017 WL 1166307, at *3 (S.D. Cal. Mar.
27  29, 2017) (alleged flaws in data relied upon by expert go to weight afforded to opinion and not to
    admissibility of opinions).

28
                                            50
    _____
    MONSANTO'S REPLY MEM. ISO ITS *DAUBERT* & SUMM. J. MTN. RE GENERAL CAUSATION AND OPP.
    TO PLFS' MOTION TO EXCLUDE (3:16-md-02741-VC)