# Exhibit 5

**FILED**
Superior Court of California
County of Los Angeles

OCT 20 2017

Sherri R. Carter, Executive Officer/Clerk
By _____ _____ /Deputy
Jan Josef Manrique

# SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| Coordinated Proceeding<br>Special Title (Rule 3.550)<br><br>Johnson & Johnson Talcum Powder Cases<br><br>---<br><br>*Charmaine Lloyd, et al. v. Johnson & Johnson, et al.*, BC628228<br><br>Plaintiff Eva Echeverria | Case No. BC628228<br>JCCP No. 4872<br><br>ORDERS REGARDING DEFENDANTS JOHNSON & JOHNSON CONSUMER, INC. AND JOHNSON & JOHNSON'S COMBINED MOTION FOR NEW TRIAL, DEFENDANT JOHNSON & JOHNSON CONSUMER, INC.'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT, AND DEFENDANT JOHNSON & JOHNSON'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT<br><br>Hearing Date:  October 12, 2017<br>Time:  10:00 a.m.<br>Dept.: 307 |

## I.   BACKGROUND

### A. Brief Overview of the Case

This case involves the first trial of claims by plaintiffs in coordinated proceedings contending they developed ovarian cancer as a result of their use of defendants' products (Johnson's Baby Powder and Shower to Shower)[1] in their perineal area.  The products contain talc.

Plaintiff Eva Echeverria[2] ("Echeverria") testified that she began using Johnson's Baby Powder when she began menstruation in approximately 1965 at age 11 and used the product on a daily basis, and more frequently when menstruating, until 2016.  She used Shower to Shower less frequently.   She was diagnosed with high grade serous ovarian cancer in 2007.  The action was filed July 26, 2016.  An expedited trial was ordered given her medical situation and commenced July 21, 2017.

Prior to trial summary judgment was granted as to defendant Imerys Talc America, Inc. ("Imerys"), who supplied the raw talc for the products.  The case went to trial against defendants Johnson & Johnson and JJCI.  It was tried on a theory of negligent failure to warn.

The evidence showed that Johnson's Baby Powder was first sold in 1893.  The evidence focused largely on epidemiological studies that show a statistical correlation between talc usage

---

[1] The evidence at trial was that Johnson & Johnson manufactured talcum powder until 1967. Thereafter, the product, as well as Shower to Shower, was manufactured by Johnson & Johnson Consumer Inc. ("JJCI").  For purposes of this Order the defendants are referred to jointly except when separate reference is needed.

[2] Eva Echeverria died September 20, 2017.  Her daughter, Elisha Echeverria, Acting Trustee of The 2017 Eva Elaine Echeverria Living Trust, was substituted as plaintiff on October 12, 2017. For ease of reading reference to "plaintiff" is to Eva Echeverria.  No disrespect is intended.

and ovarian cancer. The first study mentioning talc and cancer apparently was published in 1971 (Henderson, et. al.) but the study was not admitted into evidence. The only reference to it in the record is a citation to it in another study (Boorman 1994) (Ex. L-97) wherein Boorman reported that there was "some concern reported about the perineal exposure to talc and the occurrence of ovarian cancer in women...although other studies have failed to find such an association" and cited to Henderson. (Tr. 1271:25-1272:14.) The reports in evidence were to the effect that since at least 1982 there has been an ongoing debate in the scientific community as to whether talc usage may cause ovarian cancer or whether the science supported only a finding that there was a statistical association between talc use and cancer. The jury was called upon to resolve this complex scientific question.

## B. A Brief Summary of the Law, the Evidence, and the Verdict

In an action alleging that a product causes cancer, giving rise to a duty to warn, causation must be proven with a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case.

> A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury. (See *Parker* v. *Employers Mutual Liability Ins. Co. of Wis*. (Tex. 1969) 440 S.W.2d 43, 47.)...With cancer the question of causation is especially troublesome....Under the present state of scientific knowledge...it is frequently difficult to determine the nature and cause of a particular cancerous growth....Although juries are normally permitted to decide issues of causation without guidance from experts, 'the unknown and mysterious etiology of cancer' is beyond the experience of laymen and can only be explained through expert testimony. ( *Parker* v. *Employers Mutual Liability Ins. Co. of Wis., supra*, at p.

46.) Such testimony, however, can enable a plaintiff's action to go to the jury only if it establishes a reasonably probable causal connection between an act and a present injury.

*Jones v. Ortho Pharm. Corp.* (1985) 163 Cal. App. 3d 396, 403-404.

As discussed in further detail below, Echeverria's expert witnesses testified as to various epidemiological studies, as well as studies on animals, and opined as to general causation. Laura Plunkett, Ph.D. ("Plunkett") testified that in her opinion perineal use of talc can cause ovarian cancer. She characterized talc as a toxin that causes changes in cell formation that become cancerous over time and extended use, relying on studies that showed talc initiates an inflammatory response in cells, leading to the production of reactive oxygen species and changes in gene expression. (Tr. 1048:22-1051:23; 1009:3-1009:6; 1622:9-27; 1623-1624:25.)

John Godleski, M.D. ("Godleski"), testified that evaluation by electron microscopy showed talc was present in Echeverria's ovarian tissue.

Evidence was  introduced that since at least 1982 (and possibly 1971 if the 1994 Boorman statements regarding Henderson's work are considered) several epidemiological studies showed a statistically valid correlation between talc exposure and ovarian cancer. Jack Siemiatycki, Ph.D. ("Siemiatycki") testified that in 2006 the International Agency for Research on Cancer ("IARC"), a division of the World Health Organization, categorized talc as "possibly" carcinogenic if used perineally. This term was defined to mean that "chance, bias, and confounding" could not be excluded as explaining the epidemiological results. IARC declined to find talc was a known or probable cause of ovarian cancer. (Ex. P-29; Tr. 1196: 7-23; 1198:8-1200:2; 2162:18-2163:10; 2282:5-2283:28; 2285:23-26; 2291: 15-23.) Siemiatycki, who chaired the IARC working group that classified talc as "possibly" carcinogenic, testified that in his view the present epidemiology results, including a pooled study (Terry 2013) sufficiently show a probable association between ovarian cancer and perineal talc use as that term is used by IARC (TR 2173:11-2176:19; 2401:22-28; 2412:20-2413:17) but conceded that the epidemiology was

4

insufficient prior to 2007 to conclude that there was a causal association between perineal use of talc and ovarian cancer. (Tr. 2300:15-19; 2362:11-22.) Siemiatycki authored a paper to the same effect, published in 2008. (Ex. P-105; Tr. 2300:9-14.)

Numerous epidemiologic studies were put to the jury showing a range of "relative risk" ratios. Siemiatycki explained that "relative risk" is the ratio of the risk among persons exposed to the risk compared to the risk among the unexposed, explaining that "if the risk of cancer in the general population... is 4 percent in the general population but among a group of people with a certain environmental exposure it is 6 percent, the relative risk of cancer due to that environmental exposure would be 6 percent divided by 4 percent equals 1.5." (Tr. 2126:17-2127:21.) He further explained that a ratio resulting in 2.0 is "the point at which the probability of causation, which is the probability that a given agent causes a specific disease, exceeds 50 percent ...." (Tr. 2434: 15-27.)

Annie Yessaian M.D. ("Yessaian"), Echeverria's treating physician, engaged in a "differential etiology" analysis and opined that that it was more probable than not defendants' products caused Echeverria's illness.

Echeverria emphasized at trial that condom manufacturers ceased using talc on their products in the 1990s. However, no admissible evidence was introduced suggesting that they did so because of information suggesting that talc was linked to ovarian cancer and the jury was instructed to disregard any such inference or suggestion.

Echeverria also introduced documents from defendants' files referencing a "talc/ovary problem" and documents that showed they engaged in efforts to persuade regulators and the scientific community, including the National Toxicology Program ("NTP") and IARC, that the studies were insufficient to conclude that talc was a probable cause of ovarian cancer, including evidence that Johnson & Johnson provided funding to a trade association known as the

1    Cosmetics, Toiletry, and Fragrance Trade Association ("CFTA") and that it also took steps on its

2    own to advance the debate in its favor.

3            Defendants introduced evidence there was no peer reviewed literature suggesting any

4    causal mechanism (i.e. that extended use of talc caused inflammation leading to cancer).  No

5    published peer-reviewed articles have determined talc to cause ovarian cancer. (Tr. 2276:21-

6    2277:19; 2280:2-10; 3695:19-3696:7; 3749:12-3750:1.)  Further, defendants' experts testified to

7    the effect that the epidemiology relied upon by Echeverria's experts, with four exceptions,

8    discussed *infra,* showed a relative risk ratio of less than 2.0.

9            Defendants also showed that talc is not recognized as an ovarian cancer risk by the

10   Centers for Disease Control or medical associations such as the American Congress of Obstetrics

11   and Gynecologists or Society of Gynecological Oncology. (Tr. 2714:2-2721:9; 3580:9-3590:5.)

12   The federal Food and Drug Administration has been requested to require manufacturers of talc

13   powders to warn of a potential link to ovarian cancer but declined to do so.  The most recent

14   Physician Data Query published by the National Cancer Institute concluded that "[t]he weight of

15   the evidence does not support an association between perineal talc exposure and an increased

16   risk of ovarian cancer." (Tr. 1619:6-1620:8.)  Although some manufacturers have recently placed

17   a warning on their product and Imerys advised of IARC's  2006 findings on its Material Safety

18   Data Sheet ("MSDS"), the evidence showed most manufacturers' products do not contain a

19   warning today.  There was no evidence of any warning by a manufacturer prior to 2007.

20           Defendants moved for nonsuit and a directed verdict, which were denied.

21           The jury was instructed based on CACI 1222, 430 and 431, with additional special

22   instructions.  Those instructions required Echeverria to show that each defendant manufactured

23   and sold Johnson's Baby Power and Shower to Shower to Echeverria and that prior to 2007 the

24   products were dangerous or likely to be dangerous when used in a reasonably foreseeable

25   manner, giving rise to an obligation to warn.  The jury was also given Special Instruction No. 1

that required Echeverria to show that exposure to talc was a substantial factor in causing her illness by showing through expert testimony that there was a reasonable medical probability that talc causes ovarian cancer and a reasonable medical probability that it was a substantial factor in causing Echeverria's ovarian cancer.  The jury was instructed under CACI 103 that liability as to both actual and punitive damages was required to be shown as to each defendant separately.  The jury was also instructed under CACI 3945 as to the burden of proof on punitive damages.  Echeverria requested instructions on agency and alter ego liability.  Those instructions were not given.

After a three week trial, including extensive expert testimony, the jury found in favor of Echeverria, awarding $68,000,000 in non-economic damages from Johnson & Johnson and $2,000,000 in non-economic damages from JCCI.  It assessed $340,000,000 in punitive damages against Johnson & Johnson and $ 7,000,000 against JCCI.

Defendants move for new trial or for judgment notwithstanding the verdict ("JNOV").

## C. Summary of Rulings and Orders

Mindful of the heavy burdens imposed on the moving parties, and the deference to be given to the jury's verdict, for the reasons that follow the Court concludes that defendants' trial motions should have been granted and now grants the defendants' motions for JNOV.  It also grants defendants a new trial on the grounds of (1) insufficiency of the evidence as to causation as to both defendants (Cal. Code of Civ. Pro. 657(6));  (2) error in law occurring at trial and excepted to by defendants (Cal. Code of Civ. Pro. 657(7);  (3) misconduct of the jury (Cal. Code

of Civ. Pro. 657(2)); and (4) excessive compensatory damages as to Johnson & Johnson and excessive punitive damages as to both defendants (Cal. Code of Civ. Pro. 657(5)).[3]

## II. JOHNSON & JOHNSON'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

### A.    Procedural Requirements and Legal Standard for JNOV Motions

A JNOV motion must be made within the time for filing and serving a notice of intention to move for new trial, and if a motion for new trial has been made the court is to rule on both motions at the same time. Cal. Code of Civ. Pro. §629(b).  Notice of this motion was timely filed and the motion was argued concurrently with the new trial motion.

"The court . . . shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made." Cal. Code of Civ. Pro. §629(a). The power to grant judgment notwithstanding the verdict is the same as the power to grant a nonsuit or directed verdict, all of which are based on the legal sufficiency of the evidence. (*Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 327-328.)  A motion for JNOV is akin to a demurrer to the evidence. Where a demurrer assumes all facts pleaded are true, a JNOV motion assumes all evidence supporting the verdict is true; the issue to be determined is whether such evidence constitutes a prima facie case. (*Moore v. San Francisco* (1970) 5 Cal.App.3d 728, 733.)

While evidence must be accepted as true and viewed in a light most favorable to the verdict, it must be substantial. (*Sweatman v. Dept. of Veterans Affairs* (2001) 25 Cal.4th 62, 68; *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234.)  "'Substantial evidence' is not synonymous with 'any' evidence. To constitute sufficient substantiality to support the verdict,

---

[3] The Court is also mindful that this case was prepared and tried in an expedited manner.  Trial counsel, as well as JCCP liaison counsel, were required to do an extraordinary amount of work on behalf of their clients in a short period of time and are to be commended in this regard.

the evidence must be 'reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case.'" (Id. at 284, citing *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 51.)

### B. The Parties' Arguments

Johnson & Johnson argues that JNOV must be granted as there was no evidence that it manufactured Johnson's Baby Powder or Shower to Shower. Further, it argues that if the evidence could be inferred to show that prior to 1967 it manufactured Johnson's Baby Powder there is no evidence to show it knew or should have known in the period 1965-1967 that talcum powder was linked in any way with ovarian cancer, as the first scientific work in this regard was published in 1982. It argues that as a matter of law it had no on-going duty to warn and further argues that it cannot be liable for the acts of its subsidiary absent a showing of agency or alter ego liability and that no such evidence was adduced.

Echeverria contends that witness Lorena Telofski ("Telofski"), designated as the "person most knowledgeable" by both defendants, as well as various experts and third parties, referred to "Johnson and Johnson" in their testimony without distinguishing between the two entities. She further contends that after 1967 Johnson & Johnson had knowledge that talc was the probable cause of ovarian cancer and thus had an on-going duty to warn consumers, notwithstanding that it did not manufacture the product because Johnson & Johnson "kept responsibility" over JCCI and directed it to manufacture the products, thereby justifying the imposition of liability against it.

### C. The Evidence As To Johnson & Johnson

The uncontradicted evidence was that Echeverria used Johnson's Baby Powder beginning at age 11 (approximately 1965) and until 2016.

1    The evidence as to who manufactured the products at issue during that time period was

2  limited and consisted of (1) an interrogatory asking the defendants "to state the first and last

3  dates of sale of each product" it manufactured or sold that contained talc.  The joint response

4  stated that Johnson's Baby Powder "debuted" in 1893 and Shower to Shower debuted in the

5  1960s (Tr. 3111: 19-27); (2) an interrogatory stating JJCI is a wholly owned subsidiary of

6  Johnson & Johnson existing since 1967 (Tr. 3111:2-3112:10);  (3) testimony through Telofski

7  that JJCI was responsible for the marketing and internal procedures and safety assessments of

8  both products (Tr. 811:8-14; 812:27-813:23; 852:18-853:1; 861:27-862:10; 863: 18-22); and (4)

9  demonstrative exhibits showing that the labeled packages show JJCI as the manufacturer of the

10  products.  (Ex. P-49; P-50) .

11    The only document in evidence dated prior to 1967 was a 1964 memorandum. (P-343).

12  That document discussed the development of a potential consumer research test with respect to a

13  powder made with a cornstarch product called "Dry Flo."  The penultimate paragraph states that

14  a Johnson & Johnson employee ( William Ashton) established that "the largest commercial uses

15  of Dry Flo are…as a condom lubricant where it replaced talc because it was found to be

16  absorbed safely in the vagina whereas, of course, talc was not."  No witness was called to explain

17  the meaning of this sentence, which is capable of two interpretations (whether talc was absorbed

18  in the vagina at all or whether, if absorbed, it was "safely" absorbed).  Echeverria argues this

19  document is sufficient to show both that Johnson & Johnson manufactured the products at issue

20  prior to 1967 and had a duty to warn and that it acted with malice in not doing so, supporting the

21  verdict against it.

22    //

23    //

24    //

25

**D.  Analysis**

**(1) Duty to Warn**

A duty to warn arises when a manufacturer fails to warn of facts that it knows or should know make a product likely to be dangerous. (*Trejo v. Johnson & Johnson* (2017) 13 Cal. App. 5th 110, 131, citing *Valentine v Baxter Healthcare Corp.* (1999) 68 Cal. App. 4th 1467, 1482.) As to Johnson & Johnson before a duty to warn could be imposed Echeverria was required to show that it manufactured the products at issue; that talc was the more likely than not cause of her ovarian cancer; and that Johnson & Johnson knew or should have known that talc probably would cause cancer.  In this regard a manufacturer will not be "charged with knowing more than what would come to light from the prevailing scientific or medical knowledge" at the time. (*Valentine,* 68 Cal. App. 4th at 1483-1484. *See also Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal. 3d 987, 1002 ["Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about."]; *Carlin v. Superior Court* (1996) 13 Cal. 4th 1104, 1112, (citing *Anderson*) ["Stated another way, a reasonably prudent manufacturer might reasonably decide that the risk of harm was such as not to require a warning as, for example, if the manufacturer's own testing showed a result contrary to that of others in the scientific community. Such a manufacturer might escape liability under negligence principles."])

Echeverria alleged that  Johnson & Johnson designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and sold the products (Echeverria First Amended Complaint, ¶¶ 14, 18, 20, 21, 85, 94, 131), made specific advertising claims (Id. at ¶¶ 25, 26), have continuously advertised and marketed the products since the 1970s (Id. at ¶31), and failed to warn (¶¶ 89, 90).

11

1    After initially referring to both Johnson & Johnson and JJCI in the pleading, for the most

2    part the two parties are jointly referred to as Johnson & Johnson. This is made clear in Paragraph

3    9 where, after introducing Defendant Johnson & Johnson Consumer Companies, Inc. (now

4    known as Johnson & Johnson Consumer, Inc.) as a wholly owned subsidiary of Johnson &

5    Johnson, Echeverria indicates that the two companies will thereafter be referred to jointly as the

6    "Johnson & Johnson Defendants." Echeverria did not allege any theory for holding the parent

7    liable for the acts of the subsidiary (such as alter ego or agency), but instead alleges the same

8    wrongful acts as to both. However, Echeverria did not establish this at trial.

9    Echeverria failed to put on direct evidence as to who manufactured the products in the

10   period 1965-1967. The interrogatory response read into the record is ambiguous but taken

11   together with Exhibit P-343 and the testimony of Telofski the jury could infer that Johnson &

12   Johnson manufactured the product prior to 1967.

13   The sole evidence argued to impose a duty to warn on Johnson & Johnson that existed

14   prior to 1967 is Exhibit P-343, authored in 1964. Interpreting the disputed sentence in the light

15   most favorable to Echeverria, the document states only that talc was not "safely absorbed" in the

16   vagina but does not discuss in any way the alleged consequences of that fact, i.e. that it was a

17   probable cause of ovarian cancer. There was no showing that as of 1967 there was any

18   suggestion by the scientific or medical community that talc was associated with ovarian cancer.

19   And, no internal documents from the company prior to that date suggest that conclusion. Thus,

20   one cannot infer from the document that Johnson & Johnson knew or should have known prior to

21   1967 that talc more probably than not caused ovarian cancer, such that any duty to warn of that

22   fact arose at that time.

23   The further evidence at trial was that after 1967 JJCI manufactured the products at issue

24   and was responsible for assessing their safety and determining whether warning labels should be

25   put on them. At oral argument and in her briefing Echeverria conceded that the documents and

1   evidence showed that Johnson & Johnson ceased making Johnson's Baby Powder in 1967.

2   However, she argues that because Johnson & Johnson called no witness to show that Johnson &

3   Johnson's "involvement" with talc products ended in 1967 the jury could infer that Johnson &

4   Johnson was liable for failure to warn. (Echeverria's Opposition to Johnson & Johnson's motion

5   for JNOV at page 2, lines 24-25.)

6       This argument fails. Echeverria bore the burden of proof on this issue. She presented no

7   evidence to contradict Telofski's testimony or the demonstrative exhibits. The law is well-

8   established that a holding company ordinarily cannot be held liable for the acts of its wholly

9   owned subsidiary absent a showing of agency or alter ego liability. (*Sonora Diamond Co. v.*

10  *Superior Court* (2000) 83 Cal.App.4th 523, 538-540.) "As a practical matter, the parent must be

11  shown to have moved beyond the establishment of general policy and direction for the subsidiary

12  and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out

13  that policy." (Id. at 542, emphasis in original.)

14      While evidence was introduced that JCCI is a wholly owned subsidiary of Johnson &

15  Johnson, no evidence was adduced as to why JCCI was created; that JCCI was created to make

16  the products on behalf of Johnson & Johnson; who JCI's officers and directors are or whether

17  they overlap with Johnson & Johnson's; that JCCI is undercapitalized; that Johnson & Johnson

18  controlled JCCI's day-to-day operations, nor any other evidence suggesting that an alter ego or

19  agency theory could be put to the jury. Further, the jury was not instructed on these theories of

20  liability as the evidence adduced was insufficient to support such instructions.

21      Echeverria argues that Telofski, who was designated as the person most knowledgeable

22  for both Johnson & Johnson and JJCI (Tr. 800:11-18), distinguished between the two companies

23  on only three occasions in her testimony. (Id. at Tr. 801:23-802:4; 804:7-19; 813:10-23.) She

24  argues that for the vast majority of her testimony, Telofski used the words, "Johnson &

25  Johnson." Echeverria, however, does not indicate the subject matters on which Telofski was

13

1  designated to testify. Further, Echeverria's counsel was aware when Telofski's deposition was

2  taken that Telofski was an employee of JJCI and that there were two separate corporations. To

3  the extent counsel asked questions regarding Johnson & Johnson, Telofski properly answered

4  them on behalf of that entity.

5      Finally, Echeverria notes the experts all referred to "Johnson & Johnson." That experts

6  or third parties referred to "Johnson & Johnson" does not save the verdict. None were asked to

7  opine that Johnson & Johnson (as opposed to JCCI) manufactured or distributed the products

8  after 1967 and indeed it was not shown that any would have had such knowledge.

9      Apparently recognizing that the oral testimony does not support a finding that Johnson &

10  Johnson manufactured or distributed the products after 1967 Echeverria orally argued that

11  Johnson & Johnson "hired someone" (JCCI) to make the products for it after 1967 but "kept

12  responsibility" for them, thereby imposing on Johnson & Johnson responsibility for placing a

13  warning on the products at all times. The documentary evidence and oral testimony that supports

14  these factual assertions is not of a quality sufficient to sustain the verdict.

15      First, and as noted above, there was no evidence that Johnson & Johnson "hired" JCCI to

16  make products for it. Further, the documents do not support an alter ego or agency theory of

17  liability. The documents may be grouped into several categories: those written by Johnson &

18  Johnson employees evidencing consideration of the marketing opportunities and obstacles for

19  talc (Ex. P-9 and Ex. P-10); documents showing that Johnson & Johnson sought to assert its

20  views in the scientific community as to what the scientific evidence showed vis-a-vis talc (Ex. P-

21  16, P-20, P-59, P-204, P 261 through P-264, P2-66, P-267); those that Echeverria argues show

22  that Johnson & Johnson declined to fund studies into research concerned with the possible link

23  between talc and ovarian cancer or would fund only if favorable results would be guaranteed

24  (Ex. P-55, P-262); and those that show that condom manufacturers and Imerys either ceased

25  using talc in their products or warned about its potential harm (Ex. P-19, P-27, P-396). In

1  addition, Echeverria argues that a document written by a JCCI employee shows that after 1967

2  Johnson & Johnson should be liable for its' subsidiary's failure to warn (Ex. P-764).

3      Considered individually or as a whole, and drawing all inferences in support of the

4  verdict, these documents could not be read by the jury as giving rise to a duty to warn on the part

5  of Johnson & Johnson after 1967.

6      The document on which Echeverria primarily relies to show that Johnson & Johnson was

7  "responsible" for JCCI is Exhibit P-764, dated January 11, 1994.  This is a draft document (not

8  on letterhead) entitled "Talc Questions and Answers" that posed various questions and answers

9  regarding the state of knowledge regarding scientific research on the issue of the linkage between

10  talc and cancer and responding to various studies to date.  The evidence at trial was that this

11  document was drafted by Don Jones who was in the research and planning group at JCCI.  (Tr.

12  895:22-896:12; 902:4-19.)  It made various references to Johnson & Johnson's decisions

13  regarding its labeling of Johnson's Baby Powder, indicated "Johnson & Johnson uses the highest

14  standards in making its baby powder," and stated "Johnson & Johnson had joined independent

15  researchers and the government in testing talc and that no link with cancer was found."

16      No showing was made as to what use, if any, the draft document was put.  There was no

17  showing that Johnson & Johnson expressly or impliedly authorized these statements.  Jones was

18  not called to testify and did not indicate the facts on which he based the statements related to

19  "Johnson & Johnson."  In short, that a JCCI employee of unknown authority stated in a draft

20  document that "Johnson & Johnson" made decisions regarding labeling of the product or used

21  the highest standards in makings "its" baby powder or engaged in research is insufficient to

22  show, as a matter of law, that Johnson & Johnson in fact manufactured and labeled the product

23  or "kept responsibility" for JCCI after 1967.  (*Young v. Horizon West, Inc.* (2013) 220

24  Cal.App.4[th] 1122, 1133; *van't Rood v. County of Santa Clara* (2003) 113 Cal. App. 4th 549,

25  571).

1    As to Johnson & Johnson's own acts, the assertions by Echeverria that Johnson &

2  Johnson employees considered marketing obstacles for talc based products is insufficient to

3  create an inference that Johnson & Johnson was liable for the acts of its subsidiary after 1967.

4    Exhibit P-9, a 1986 memo from Ashton's files referenced the fact that "safety of cosmetic

5  powders has been a concern, especially among health professionals. They have decided that

6  powders provide no health benefit. Therefore, the potential for harm from respirables or

7  accidental exposure should be avoided. Mothers are now being advised not to use baby powder,

8  especially talc baby powders." The document goes on to say that "retrospective studies have

9  implicated talc use in the vaginal area with the incidence of ovarian cancer. While a CFTA

10  sponsored animal study has shown talc does not migrate, this concern does affect use of powders

11  for adult women.... Based on the scientific evidence and extensive experience and use we

12  believe that cosmetic powders are safe for use in babies and adults." The document observes

13  that Johnson & Johnson holds patents for segregation of "super talc" and a cornstarch products

14  well as other patents and concludes that "J&J" is probably working at the limits of cosmetic

15  powders technology and "must pursue technologies which will provide a proven health benefit

16  for use of powders on babies." It also noted that it was possible to hypothesize that "pursuit of

17  technologies which would create talc based powders  of higher interest (than JBP) to adults could

18  be profitable."

19    No evidence was adduced as to why this document was written or to whom (if anyone) it

20  was sent. Fairly read it suggests that a scientist at Johnson & Johnson (Ashton) was suggesting

21  that baby powder use was impacted by the health community and that Johnson & Johnson might

22  in the future pursue technologies to increase the use of cosmetic powders. It could not be fairly

23  inferred from this document that Johnson & Johnson controlled JCCI, or "kept responsibility" for

24  it.

25

1    Likewise, Exhibit P-10, a memo dated August 5, 1992, from a Johnson & Johnson file

2  but without testimony as to its author or recipients, indicated that an obstacle to marketing the

3  product was "negative publicity from the heath community on talc (inhalation, dust, negative

4  doctor endorsement, cancer linkage)" and recommended investigation of an additive to reduce

5  dust. But, the document's vague reference to negative publicity from a "cancer linkage," without

6  more, was insufficient for a jury to find Johnson & Johnson "kept responsibility" for JCCI.

7    Nor are documents referencing the funding of studies sufficient to impose liability on

8  Johnson & Johnson. Exhibit P -55 was heavily relied upon by Echeverria. It is a 1975 memo on

9  Johnson & Johnson letterhead documenting that an employee named Gavin Hildick-Smith sent a

10  "small donation" to Keith Griffiths of the Tenovus Institute for Cancer Research in Cardiff,

11  England and suggesting that "it might be of value to identify the precise scientific data available

12  to Tenovus concerning talc and ovarian cells." A handwritten note attached by D. Petterson

13  inquired as to whether Hildick-Smith advised in advance of this donation and opined that the

14  donation "has certainly given Griffiths the opening to put us on notice of the talc/ovary

15  problem." Other than adducing testimony that Hildick-Smith was a doctor and Johnson &

16  Johnson employee (Tr. 883:19-28) no evidence was introduced as to the capacities of any of the

17  employees receiving the memo, or the role of "D. Petterson" at Johnson & Johnson or the

18  meaning of the term "talc/ovary problem." Nor was there any showing that Griffiths ever had or

19  provided any research to Johnson & Johnson which might have actually put it on notice of a

20  "talc/ovary problem," let alone that Johnson & Johnson controlled JCCI.

21    Nor does Exhibit P-262 support Echeverria's argument. This e-mail chain indicates

22  Johnson & Johnson would financially support "the Huncharek/Muscat narrative on ovarian

23  cancer" but was not "Yet" prepared to support a "diaphragm/ovarian epidemiological study."

24  That Johnson & Johnson declined to fund research could not be inferred by the jury to support a

25  finding that it controlled JCCI.

1    Exhibits P- 57  and P-27 are also insufficient to impose liability on Johnson & Johnson

2    for acts taking place after 1967.  Exhibit P-57 is an agreement by Johnson & Johnson dated June

3    4, 1994 guaranteeing funding of $10,000 to CFTA for the "management, coordination, and

4    development of scientific data ...pertaining to the safe use of talc," agreeing to indemnify CFTA

5    with respect to same, and further acknowledging that any CFTA reports "will become public

6    documents."  While this document clearly indicates Johnson & Johnson sought to bring to the

7    public's attention its views regarding the safety of talc it cannot be said, by inference or

8    otherwise, that it demonstrated that Johnson & Johnson exercised day-to day control over JCCI

9    sufficient to implicate the doctrines of alter ego or agency.  Similarly, that either Johnson &

10   Johnson or JCCI sought to bring their views forward either on their own or through CFTA, to

11   IARC and others in the scientific community (Ex. P-16, P-20, P-59, P-204, P-238, P-261-264, P-

12   266, P-267) and strategized about how to do so did not create evidence that Johnson & Johnson

13   controlled JCCI to such an extent as to make it liable for JCCI's decisions.

14   Documents from third parties also could not be relied upon to meet Echeverria's burden

15   of proof.  Exhibit P-16 to JCCI from a consultant (Wehner) suggesting that Johnson & Johnson

16   point out to the FDA the flaws in a proposed study and decline to fund same and Exhibit P-16

17   from Wehner to JCCI criticizing the manner in which CFTA analyzed certain data and noting

18   that its inaccuracies subject the industry to being perceived as the cigarette industry also could not

19   be used by the jury to infer that Johnson & Johnson was "responsible" for JCCI.  As an initial

20   matter, Wehner goes on to state that the public perception "would be a particularly tragic

21   misperception in view of the fact that the industry does have powerful, valid arguments to

22   support its position."  More importantly, that a third party consultant advised JCCI as to what he

23   believed its parent should do vis-à-vis the CFTA does and cannot establish that Johnson &

24   Johnson is liable for warnings on products it did not make or distribute. (*Young v. Horizon West,*

25   *Inc.* 220 Cal.App.4th at 1133; *van't Rood v. County of Santa Clara* 113 Cal. App. 4th at 571).

1    Similarly, Exhibit P-27, from Imery's Director of Product Safety, to Ashton, cautioning

2  that IARC could classify talc as potentially carcinogenic and suggesting that Ashton counsel his

3  management regarding same, as well as Exhibit P-396 between the same two persons,

4  transmitting an April 2004 scientific paper which the Imery's employee characterized as

5  "compelling" evidence of a theory as to how talc could cause ovarian cancer and cautioning that

6  the NTP could classify talc as a "causative agent" based thereon cannot be the basis for liability

7  against Johnson & Johnson.  A third party (Imerys) cannot create a relationship showing that

8  Johnson & Johnson had "responsibility" for JCCI, any more than the acts of a purported agent

9  suffice to show a principal-agent relationship. (Id.)

10    Finally, the fact that Johnson & Johnson was aware that condom manufacturers

11  discontinued the use of talc in its products in 1994 (Ex. P-19) or that Imerys put a warning on its

12  MSDS  (Ex. P-37) in 2006 does not establish that talc was known or should have been known to

13  cause ovarian cancer prior to 2007 or that Johnson & Johnson was "responsible" for JCCI

14  thereby.  As to the condom issue, Echeverria introduced evidence that another of her experts

15  (Plunkett), in her report, relied on a 1994 newspaper article that opined that condom

16  manufacturers removed talc from their products "in part due to ovarian cancer concerns." No

17  evidence was admitted, however, as to what those concerns were (i.e. whether the condom

18  industry ceased to use talc because the available science supported a conclusion that talc was a

19  *probable* cause of ovarian cancer or because the concerns surrounded publicity of the *possibility*

20  of such a link) and the jury was specifically instructed that the facts set forth in the article were

21  not admitted for their truth.  As such, evidence as to what the condom industry did could not

22  have properly been considered by the jury to establish knowledge on the part of Johnson &

23  Johnson, much less determine it was "responsible" for JCCI's decisions regarding warnings.

24

25

1   Likewise, the decision by Imerys in 2006 to put a statement on its MSDS that restated IARC's

2   2006 conclusion that talc was a "possible" carcinogen could not be used to show that in 2007

3   Johnson & Johnson had a duty to warn, or that it was responsible for JCCI.

4        Following oral argument on these motions Echeverria argued for the first time (in

5   supplemental papers filed October 13, 2017 and not authorized by the Court but nonetheless

6   considered) that Johnson & Johnson had an on-going duty to warn consumers and to recall the

7   products.  The cases cited by Echeverria, however, stand for the proposition that a manufacturer

8   of equipment *who continues to market the equipment* and determines it is likely to be dangerous

9   has a duty to recall the product or retrofit it.  (*Hernandez v Badger Constr. Equip Co.* (1994): 28

10  Cal. App. 4th 1791, 1827; *Lunghi v Clark Equip. Co. Inc.* (1984) 153 Cal. App. 3d 485, 494.)

11  Echeverria cites no authority for the proposition that a manufacturer who has ceased to make the

12  product must cause a warning to be placed on the product by another manufacturer or cause that

13  manufacturer to recall the product.  Moreover, Echeverria did not ask the jury to be instructed on

14  this basis under CACI 1223 or otherwise and cannot assert it for the first time after oral argument

15  on post-trial motions.

17      **(2) Punitive Damages**

18      As to punitive damages Echeverria was required to show by clear and convincing

19  evidence that Johnson & Johnson acted with malice, i.e. "despicable conduct which is carried on

20  by the defendant with a willful and conscious disregard of the rights and safety of others." Cal.

21  Civ. Code § 3294 subd. (c)(1).

23      The term "'despicable,'" though not defined in the statute, is  applicable to

24  "circumstances that are 'base,' 'vile,' or 'contemptible.' " (*College Hospital Inc.*

25  *v. Superior Court* (1994) 8 Cal.4th 704, 725 [34 Cal. Rptr. 2d 898, 882 P.2d 894],

quoting 4 Oxford English Dict. (2d ed. 1989) p. 529.)  Under the statute, "malice does not require actual intent to harm. [Citation.] Conscious disregard for the safety of another may be sufficient where the defendant is aware of the probable dangerous consequences of his or her conduct and he or she willfully fails to avoid such consequences. [Citation.] Malice may be proved either expressly through direct evidence or by implication through indirect evidence from which the jury draws inferences. [Citation.]" (*Angie M. v. Superior Court* (1995) 37 Cal.App.4th 1217, 1228 [44 Cal. Rptr. 2d 197].)

*Pfeifer v. John Crane, Inc.* (2013) 220 Cal. App. 4th 1270, 1299.

Because Johnson & Johnson is a corporate defendant Echeverria was also required to show by clear and convincing evidence that a director or managing agent acted with malice.  Cal. Civ. Code, § 3294, subd. (b). "A plaintiff may satisfy the 'managing agent' requirement of Civil Code section 3294, subdivision (b), through evidence showing the information in the possession of the corporation and the structure of management decisionmaking that permits an inference that the information in fact moved upward to a point where corporate policy was formulated. These inferences cannot be based merely on speculation, but they may be established by circumstantial evidence, in accordance with ordinary standards of proof." (*Romo v. Ford Motor Co.* (1999) 99 Cal. App. 4th 1115, 1141, disapproved on other grounds in *People v. Ault* (2004) 33 Cal. 4th 1250.)

The only employee of Johnson & Johnson referenced in the pre-1967 documents that Echeverria contends support punitive damages against Johnson & Johnson was William Ashton. There was no showing as to Ashton's capacity at Johnson & Johnson sufficient to support a punitive damage award. The testimony offered by Telofski was that Ashton was deceased, had retired some years earlier, and was in "research and development" at the time he left the company.  Telofski testified she was "not sure if he was a manager or director level" when he

1    left the company. Telofski went on to say she "really just doesn't know." (Ex. 1 and 2 to

2    Defendants' Compendium of Trial Transcripts.)  No questions were asked as to Ashton's

3    position in 1964.

4        Post 1967 the only Johnson & Johnson employees identified were Neal Matheson, who

5    signed Exhibit P-57 in 1994 and was Executive Vice President of Research & Development and

6    identified by Telofski as a "vice president in R &D" (Tr. 805:25-27) and Steve Mann, who

7    "worked" at Johnson & Johnson (Tr. 805: 15-17) and whose title was shown as "Director,

8    Toxicology." Mann communicated regarding funding the "Huncharek/Muscat study" (Exhibit

9    P-262) and Matheson and Mann exchanged e-mail correspondence regarding the CFTA Task

10   Force and steps Johnson & Johnson might take to bring its views to the attention of IARC and

11   others in the scientific community and monitored IARC's conclusions (Exhibits P- 204, P-261

12   through P-264, P-266, P-267).  Assuming that the jury could infer that these persons were

13   managing agents of Johnson & Johnson there was no showing that either engaged in manifest

14   disregard of safety or was reckless in not causing Johnson & Johnson to warn that talc was a

15   "probable" cause of cancer.  The best that can be said from the evidence is that they were aware

16   IARC classified talc as "possibly" carcinogenic, a standard insufficient as a matter of law to

17   require any warning, even had Johnson & Johnson been the manufacturer of the product.

18       In short, there was simply no evidence that Johnson & Johnson knew in the 1965-1967

19   time period that talc more likely than not caused ovarian cancer, giving rise to a duty to warn,

20   much less that a managing agent acted with requisite malice in failing to give the warning.  Nor

21   is the verdict saved by reference to argument that documents existing after 1967 can create a

22   basis for liability as to Johnson & Johnson based on JCCI's failure to warn.  The documents and

23   testimony, granting all inferences in favor of Echeverria, as a matter of law do not support

24   liability on an agency or alter ego theory, much less support a finding by clear and convincing

25

evidence that a punitive damage award was appropriate.  For these reasons alone the JNOV motion must be granted as to Johnson & Johnson.

Further, and as discussed below, Echeverria failed to meet her burden of proof to show that her use of Johnson's Baby Powder and Shower to Shower were the probable cause of her ovarian cancer.  Thus, as to both Johnson & Johnson and JCCI the motion for JNOV must be granted.

## III.   JCCI'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

### A.   Summary of the Argument

Defendants advance three arguments as to why JNOV must be granted based on the argument that Echeverria failed to present evidence sufficient to show that her use of talc based products was the probable cause of her ovarian cancer.  Specifically, they argue that Echeverria's specific causation expert, Yessaian, failed to present epidemiology showing talc was the more probable than not cause of her cancer and used an improper methodology for determining the cause of her cancer (differential etiology) given the lack of epidemiology.  JCCI  also argues that no substantial evidence was presented to show that it had a duty to warn prior to 2007 and that as a result JNOV on both the general and punitive damage awards must be granted.

Echeverria contends that the motion is not well taken, as she had no obligation to present epidemiologic evidence.  She further argues that Yessaian properly engaged in a differential etiology.  She argues further that other experts (Plunkett, Godleski, Siemiatycki) established general causation.  Finally, she argues that internal documents pre-dating 2007, discussed supra, showed that genital use of talc was not safe and knew that others in the industry warned of its dangers, supporting the punitive damage award against JCCI.

//

1    **B. The *Sargon* Ruling and a Summary of Yessaian' s Testimony**

2         In evaluating defendants' causation arguments, background concerning the general

3    causation testimony that was offered is necessary, as is an understanding of the permitted scope

4    of  Yessaian's testimony.

5         Prior to trial defendants made a series of motions under *Sargon Enterprises, Inc. v.*

6    *University of Southern Cal.* (2012) 55 Cal.4[th] 747 to exclude various expert testimony.  Certain

7    general causation experts were excluded and the testimony of others was limited.  A written

8    order issued, as did an oral clarification. (Tr. of July 18, 2017 at 5: 23-6:27.)  Yessaian was

9    permitted to opine that, using a "differential etiology methodology," it was "more probable than

10   not" that Echeverria's cancer was caused by her use of talc based on Echeverria's medical

11   history; the fact that talc was found in her ovarian tissue; 4 epidemiological studies involving

12   women using talcum powder who were diagnosed with ovarian cancer which showed an "odds

13   ratio" in excess of 2.0 thus permitting Yessaian to "rule in' talc as a causative agent; and other

14   studies generally showed an odds ratio of 1.22 to 1.39.  She was not permitted to testify that

15   inflammation of cells was involved in Echeverria's cancer.

16        The testimony at trial by Yessaian on specific causation was to the effect that her

17   methodology in determining the probable cause of Echeverria's cancer was to engage in a

18   "differential diagnosis," or "differential etiology," (Tr. 2609:16-18.)  She explained that this

19   process involved identifying risks for a disease; ruling out risk factors that you don't believe

20   apply; and ruling in what you believe is the cause of the cancer. (Tr. 2812:18-21.)  She testified

21   that she ruled out 13 other potential known risk factors for ovarian cancer that could be

22   applicable to Echeverria (genetics; history of family members with cancer at an early age or

23   breast or ovarian cancer; early onset of menarche; age, age at menopause; obesity; polycystic

24   ovarian syndrome; endometriosis; tobacco and alcohol use; use of hormone replacement therapy)

25   and considered "protective factors"  (number of pregnancies and births; breast feeding; use of

1   birth control pills; tubal ligation) (Tr. 2647:9 - 2648:18).  She testified she considered talc use a
2   risk factor based on epidemiological studies as well as the number of applications of talc
3   Echeverria had, which she estimated to exceed 30,000 and the number of years of talc usage
4   prior to diagnosis (32) (Tr. 2612:15 - 2613:2) and also considered  the "mechanism" by which it
5   is theorized that talc migrates to the ovaries, the fact that talc was found in Echeverria's ovarian
6   tissue, and the literature suggesting that talc exposure causes cancer by inflammation that
7   ultimately leads to malignant transformation of cells (Tr. 2613:10 - 2614:11; 2618:3- 2618:25;
8   Tr. 2611:11 - 2612:4; 2621:21-2630:6; 2675:8-2676:21).

9        As to the testimony that inflammation was considered the mechanism by which talc
10  caused Echeverria's cancer, the opinion including that testimony was stricken as no
11  inflammation was found in Echeverria's tissue.  (Tr. 2645: 18-20.)  Yessaian then testified more
12  generally that she considered the mechanism by which talc is hypothesized to cause ovarian
13  cancer is by way of inflammatory processes.  (Tr. 2646: 1-9.)

14       In reaching her conclusion that talc was a risk factor to be considered Yessaian relied on
15  four epidemiologic studies (Cramer 1982; Rosenblatt 1992; Cramer 1999; and Wu 2009) that
16  showed odds ratios in excess of 2.0 that a woman using talc would develop ovarian cancer (i.e.
17  that she had 50% or greater chance of developing cancer than women who did not use talc), as
18  well as 26 case controlled studies, 5 cohort studies showing "odds ratios" of 1.2 or 1.3, which
19  she opined showed that the women in those studies had a "trend of thirty percent increase in
20  risk," and meta-analysis and pooled analysis (Tr. 2658:5-12; 2820: 6-28; 2818:1-15).  Yessaian
21  admitted at trial that she knows of no studies showing a risk ratio over 2.0 for serous invasive
22  ovarian cancer, which is the type of cancer with which Echeverria was diagnosed (Tr. 2896:1-
23  2897:16) and that one study on which she relied (Cramer 1999) showed an odds ratio of 1.70 for
24  serous ovarian cancer (Tr. 2672: 6- 20) and a second (Wu 2009) also showed an odds ratio of
25  1.70 for serous ovarian cancer (Tr. 2672:21-2673:5).  She interpreted those results as a 70%

increased risk (Tr. 2896: 12-13.) She further testified that other studies on which she relied that showed an odds ratio of less than 2.0 were useful because they showed an increased risk of cancer developing in talc users and testified that specific studies showed this. She testified a study by Gertig (2000) showed a 1.4 odds ratio and interpreted this as meaning the subjects had a 40% increase in risk for serous ovarian cancer in women using talc (Tr. 2668:12-2669:19) and that a study by Gates (2008) showed an odds ratio of 1.6, which she interpreted as meaning that women who used talc had a 60% increase in the risk of developing serous ovarian cancer compared to those who did not (Tr. 2669:20-27) and that a "pooled" study by Terry (2013) had an "odds ratio" of 1.20 for serous ovarian cancer, which she interpreted as translating to a 20% increase in risk (Tr. 2670:11-15). She further acknowledged that Wu (2009) showed that a person with genital use of talc with 15,600-52,000 applications showed an odds ratio of 1.34 and acknowledged that the number was statistically insignificant (Tr. 2910: 21-25).

Yessaian also testified that because Echeverria was obese the estrogen effects of an increased body mass index might serve in combination with other factors to increase her ovarian cancer risk (Tr. 2870: 24-26) but stated that obesity more probable than not did not contribute to her cancer because elevated BMI is not associated with high grade serous ovarian cancer. (Tr. 2866: 16-22.) She testified she "ruled out" age as a possible cause of cancer although "it could have gone either way." (Tr. 2870:19-21.) She admitted that Echeverria's risk of ovarian cancer was increased by her number of ovulations but stated it was "less likely than not." (Tr. 2881:15-22.) She acknowledged that cancer is "multifactorial" (Tr. 2875: 4-10) and admitted that when she "ruled" out risk factors she ruled them out because it was "less than 50 percent likely that they were the factor." (Tr. 2883: 18-19).

She further testified that although many cancers have no known cause, she did not "rule out" unknown causes and that it was not possible to do so. After admitting idiopathic causes are the leading cause of ovarian cancer and that it was probable Echeverria's cancer was caused by

some risk factor science does not yet know about (Tr. 2864:26-2688:27), Yessaian testified that there was less than a 50% chance Echeverria's cancer was idiopathic. (Tr. 2888:19-26; 2890:28-2891:1; 2894:13-18.) However, she could not put a "percentage" on how less likely that was. (Tr. 2894: 20-21.)

**C. Analysis**

Following trial if the Court is convinced that there is no substantial conflict in the evidence and that the tendered expert opinions do not show specific causation (which, under *Jones v Ortho. Phar. Corp.* (1996) 163 Cal. App. 3d 396, must be shown by expert testimony in a case alleging cancer) a JNOV is properly granted. *See Osborn v. Irwin Mem'l Blood Bank* (1992) 5 Cal. App. 4th 234, 275. After considering it in totality and weighing all inferences in favor of Echeverria, the Court is persuaded that Yessaian' s opinion is insufficient as a matter of law to support the verdict.

**(1)  Specific Causation Was Not Shown**

**(i)        Yessaian Did Not Have a Basis to "Rule In" Talc**

Yessaian was the only expert called on specific causation.  She did not rely on the testimony of Plunkett or Siemiatycki in forming her opinions.  Thus, while the jury could well have evaluated the credibility and reliability of her opinions by comparing them to information provided by Plunkett and Siemiatycki, her determination that talc was a cause of ovarian cancer and was the "more probable than not" cause of Echeverria's cancer is dependent only upon her testimony and that of Godleski.  As to the latter, there was no dispute that he testified to locating talc in Echeverria's pathology tissue.  Thus, the evidence is not in conflict.

1   In conducting a differential etiology[4] Yessaian was required first to establish talc is a

2   probable cause of ovarian cancer.  Without establishing that fact, she could not "rule in" talc as a

3   probable cause of Echeverria's disease. As Yessaian explained, and as case law makes clear: "In

4   performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible

5   causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury

6   until the most likely cause remains. The final result of a differential diagnosis is the expert's

7   conclusion that a defendant's product caused (or did not cause) the plaintiff's injury." (*Glastetter*

8   *v. Novartis Pharms. Corp.* (8th Cir. 2001)  252 F.3d 986, 989. *See also Cooper v. Takeda*

9   *Pharmaceuticals America, Inc.* (2015), 239 Cal. App. 4th 555, 593-594.)

10  The only basis upon which Yessaian opined that talc is a scientifically plausible cause of

11  ovarian cancer was epidemiology and general reference to inflammation.  But, none of the four

12  studies on which she was permitted to rely (Cramer 1982; Rosenblatt 1992; Cramer 1999; and

13  Wu 2009) showed odds ratios in excess of  2.0 that a woman using talc would develop serous

14  ovarian cancer (i.e. that she had 50% or greater chance of developing cancer than women who

15  did not use talc).  Two did not break out serous ovarian cancer, although Yessaian admitted that

16

17

18

19  [4] Defendants argue that the use of a differential etiology methodology was not proper in
    the first instance because the testimony at trial was to the effect that when the causes of a disease

20  are largely unknown (as was testified to by both Yessaian and defense experts), a differential

21  etiology "is of little assistance."  Restatement (Third) of Torts: Phys. & Emot. Harm § 28 cmt. 4

22  (2010); S. Breyer et. al., *Reference Manual on Scientific Evidence* 3d Ed. (2011) 618 & n. 214.

23  The Court need not reach this issue as, even if the methodology could be used here, it was

24  employed improperly.

25

1   it was important to focus on histological type (Tr. 2896:1-4; 2834:27-2835:12.)   The two that

2   did (Cramer 1999 and Wu 2009) showed a relative risk ratio of 1.70.

3           The other studies on which Yessaian relied to show talc was a scientifically plausible

4   cause of serous ovarian cancer all showed relative risk ratios well below 2.0, i.e. in the range of

5   1.3.  Those statistics tend to *disprove* causation, as they show talc does not double the risk of

6   harm. (*Daubert v. Merrell Dow Pharm., Inc.* (9th Cir. 1995) 43 F. 3d 1311, 1321 (Emphasis in

7   original); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Prac. & Prod. Liab. Litig.*, (D.S.C.

8   2016) 185 F. Supp. 3d 786, 791-92.)  In this regard, it is to be recalled that the risk ratios being

9   cited are *relative* risk-ratios—comparing the risk that someone who uses talc will develop

10  ovarian cancer to the risk that someone who did not use talc will also develop cancer.  A relative

11  risk ratio of 1.3 is well below the two-fold risk level necessary to show that talc "more probably

12  than not" causes cancer. *See Marder v. G. D. Searle* (1986) 630 F. Supp. 1087, 1092.

13          Further, defendants showed (and it is not disputed) that the most recent study (Cramer

14  2016) found the relative risk ratio for serous ovarian cancer for persons like Echeverria who

15  were post-menopausal when they developed cancer; had not used hormone replacement therapy;

16  and had used talc for 24 years was 1.0—i.e. no greater and no less than women in the population

17  at large.

18          Echeverria argues that epidemiological studies were not required to prove causation,

19  citing *In re Neurontin Marketing, Sales Practices, and Products Liability Litigation* (D.

20  Mass.2009) 612 F.Supp.2d 116, 132.  (Opposition at 16, FN 8.)  However, the fact is that in

21  ruling talc "in" Yessaian relied almost entirely on epidemiological studies. To argue that

22  epidemiological studies are not *required* to establish causation is not persuasive given they were

23  utilized for such purpose.

24          Nor is it sufficient to argue that Yessaian did not rely solely on epidemiological studies or

25  that such studies formed only one facet of the factors she considered. (Opposition at 16:25 – 26.)

1  Although Yessaian testified that epidemiology was just one of the factors she looked at, she did

2  not mention any others. (Tr. 2657:25- 2658:12 and 2673:10-2674:8.) She did reference prior

3  testimony wherein she, "listed all the factors and elements that I evaluated." Presumably she was

4  referencing testimony at Tr. 2629:20-2630:6, cited in Echeverria's Opposition at 14:28, along

5  with a picture of the board on which Yessaian wrote her list. Within that testimony, Dr. Yessaian

6  ruled out other causes of Echeverria's ovarian cancer, but did not find any other factor to rule in

7  talc as a disease agent other than epidemiology.

8       In this regard it should be noted that Yessaian also did not "rule in" talc as a disease agent

9  based on the testimony of Godleski or her general understanding that that there is a plausible

10  biological mechanism (inflammation) by which it may be hypothesized that talc causes cancer,

11  nor could she in the absence of evidence that Echeverria had such inflammation.

12       The undisputed evidence was that epidemiology was the *only* basis that Yessaian could

13  and did "rule in" talc as a disease agent.  That evidence was extremely limited and, at best,

14  consisted of two studies (Cramer 1982 and Rosenblatt 1992) showing a relative risk ratio in

15  excess of  2.0.  In light of the other studies presented and, in particular the studies on which

16  Yessaian relied that showed that when stratified for serous ovarian cancer, the risk was 1.7 and

17  for those with characteristics most closely aligned with Echeverria's (serous ovarian cancer, no

18  use of hormone replacement therapy, and use of 24 years) no increased risk was shown,

19  substantial evidence was not provided by Yessaian to "rule in" talc.

20

21       **(ii)     Yessaian Did Not "Rule Out" Other Causes of Cancer**

22       As to what Dr. Yessaian "ruled out" in her differential etiology, Yessaian was able to

23  testify based on Echeverria's medical and personal history that some disease agents (genetics;

24  history of family members with cancer at an early age or breast or ovarian cancer; polycystic

ovarian syndrome; endometriosis; tobacco and alcohol use; use of hormone replacement therapy)

25  could be "ruled out."  However, as to others (age, number of ovulatory cycles, obesity)  Yessaian

did not rule them out.  She testified instead that in her opinion it was less probable than not that they caused Echeverria's disease.  She testified that "nobody" could eliminate obesity (Tr. 2876:28-2878:12) or age (Tr. 2876:4-14), and that although a high number of ovulatory cycles was a risk factor for ovarian cancer, Echeverria's number of ovulatory cycles was "less likely than not" the cause of the disease (Tr. 2881:20-2882:23).  Thus, she did not eliminate these potential causes but instead, "discounted" them.  As to obesity she did so on the basis of studies showing that obesity was not statistically linked to serous ovarian cancer (although it is linked to breast and uterine cancer) but as to age and number of ovulatory cycles, her testimony had no underpinning.

Likewise, she conceded that idiopathic causes are the leading cause of ovarian cancer and that it was *probable* Echeverria's cancer was caused by some risk factor science does not yet know about (Tr. 2864:26-2688:27), yet testified that there was less than a 50% chance Echeverria's cancer was idiopathic. (Tr. 2888:19-26; 2890:28-2891:1; 2894:13-18.) However, she could not put a "percentage" on how less likely that was.  (TR 2894: 20-21).

The Court is of the firm view that Yessaian's "ruling out" of age and ovulatory cycles, amounted to no more than speculation.  Her testimony that it was "probable" the cause of the cancer was unknown, but then putting a "less than 50% chance" on same (with no reasoning) likewise amounted to mere speculation.  Those facts show that the expert did not properly employ the methodology she espoused and independent of the fact that there was no evidence of substance to rule talc "in," persuade the Court that JNOV must be granted to JCCI and Johnson & Johnson on the basis that no specific causation was shown.

## (2) Defendants' Arguments Regarding Scientific Knowledge

Defendants argue that there was no substantial evidence supporting a duty to warn because such duty only arises when a product is shown to be dangerous based on scientific knowledge available to the manufacturer.  Echeverria argues that pursuant to *Carlin v. Superior*

31

*Court* (1996) 13 Cal.4th 1104, 1112-1113, in negligent failure to warn cases there is no

"generally recognized and prevailing best scientific and medical knowledge" requirement. This

is a misreading of the case. As the *Carlin* court explained, the difference between a strict liability

failure to warn and a negligence based failure to warn case is that in a strict liability setting, even

a reasonably prudent defendant manufacturer (with no duty to warn under a negligence standard)

may be liable if the trier of fact concludes based on scientific information available to the

manufacturer, the failure to warn rendered the product unsafe. (Id. at 1113.) Conversely, a

manufacturer who is aware of scientific evidence of a level of risk may be found to have acted

within the standard of care by not warning of the risk if, for example, it had other contrary

evidence. (Id. at 1112.)  Under either scenario, scientific knowledge is required for liability.

"Under a negligence standard, a reasonable manufacturer would not be charged with knowing

more than what would come to light from the prevailing scientific and medical knowledge."

(*Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1483-1484.)  However,

defendants did not ask for an instruction in this regard and cannot now use that as a ground for

JNOV.[5]

### (3) JNOV to JJCI  As To Punitive Damages Is Warranted

JJCI  argues that at a minimum a partial JNOV on the issue of punitive damages should

be granted as there was no substantial clear and convincing evidence of malice. Cal. Civ. Code

§3294(a). Echeverria contends that notwithstanding the fact that the scientific community was

(and is) divided on the question of whether talc causes ovarian cancer, internal documents

showed that JJCI "knew or should have known" that talc was dangerous or likely to be

dangerous giving rise to a duty to warn and that its failure to do so was in callous disregard of the

---

[5] Defendants asked for and received an instruction as to custom and practice (CACI 413)

safety of the public.  Specifically, she contends that JJCI was on notice that condom

manufacturers ceased using talc in the early 1990s and was aware of the scientific studies both

from its consultant (Wehner) and from the literature generally.  At trial Echeverria argued that

the literature, in particular Ex. P- 105 (Harlow 1992) and Ex. P- 107 (Cramer 1999)

demonstrated that ten percent of ovarian cancer cases in the United States are *caused* by the use

of talc based powders and from that fact Echeverria argued that JCCI should have warned about

the risk associated with the use of talc.

This is a misreading of the evidence.  Ex. P-105 was an epidemiologic study that

concluded that *if* a cause association were to pertain to daily users or users with more than

10,000 exposures applying the odds ratios in the study to the exposure rate among cases the

proportion of ovarian cancer incidence was approximately 10%.  Exhibit P-107 stated that there

was a consistent association between talc and ovarian cancer that appeared to be unlikely to be

explained by recall or confounding.  The dose response relationship was deemed weak.  The

authors hypothesized a biologically plausible causation mechanism and called for appropriate

warnings noting that avoidance of talc in genital hygiene use might *reduce* the occurrence of

ovarian cancer by at least 10%.  Other research, both before and after this, and in particular in the

time period 1980 to 2008, including a published 1995 report based on a joint symposium co-

sponsored by the FDA, the CFTA, and The International Association of Regulatory Toxicology

& Pharmacology in January 2004 (Ex. D-205) reported that "while some weak association

between talc exposure and ovarian tumors has been reported it was not sufficient warning for

concern"  and concluded that "the possibility of an association of talc exposure and ovarian

cancer is an important hypothesis of potential public health concern.  However, this association

remains a research hypothesis whose verification or falsification needs additional study."  These

additional studies took place, were considered by IARC in 2006, and led it to conclude that talc

1  was a "possible" rather than "probable" cause of ovarian cancer. (Ex. P-29; Tr. 1196:7-23;

2  1198:8-1200:2; 2162: 18- 263: 10; 2282:5-2283: 28; 2285:23-26; 2291: 15-23.)

3      Significantly, Echeverria cites to no internal research or study by JCCI that was not in

4  the public scientific domain.  Thus, there was no showing beyond the publicly available literature

5  that would show JCCI "knew or should have known" of the dangers of talc prior to 2007.

6      She also contends that internal documents, referenced above, showed that JCCI was

7  attempting to influence the scientific debate at NTP, sought to influence opinion leaders, and

8  sought to cause IARC not to list talc as "probably" carcinogenic, and declined to fund studies

9  that it did not believe were favorable to it.  These documents and theories are discussed, supra.

10  The documents, beyond showing that Johnson & Johnson did not control JCCI, also do not

11  constitute substantial evidence to support the punitive damages verdict against JCCI.  The only

12  document shown to have been written by a JCCI employee was P-764, the draft "Q & A".

13  While that document demonstrates JCCI had knowledge of the science available at that time, it

14  does not show that anyone at JCCI (much less a managing agent or employee) determined or

15  should have determined that talc was a probable cause of cancer based on the science available.

16      Further, and as discussed above, that condom manufacturers ceased using talc in its

17  products, without further information as to why they did so and that the information was known

18  to JCCI, or that Imerys disclosed the IARC classification on its MSDS, does not show a

19  conscious disregard for safety.  Echeverria's own expert, who chaired the IARC panel giving rise

20  to its classification of talc as "possibly" carcinogenic testified that in his opinion the scientific

21  evidence was insufficient to show as of 2007 that there was a causal relationship between

22  perineal talc use and ovarian cancer risk.  (TR: 2300:9-14; 2300:15-19; 2362:11-22; 2355:24-

23  2359:2; 239:3-13; 2363:10-2364:14; 2368:11-25.)  The Merritt study (2008) (Ex. L-811) also

24  concluded "chronic inflammation does not play a major role in the development of ovarian

25  cancer."

Reviewing all of the evidence in the light most favorable to Echeverria the best that can be said is that there was (and is) an on-going debate in the scientific and medical community about whether talc more probably than not causes ovarian cancer and thus giving rise to a duty to warn. Clear and convincing evidence of malice is lacking. In such circumstances an award of punitive damages based on theory of negligent failure to warn of the dangers cannot be sustained. *Cf. Kendall Yacht Corp. v. United California Bank* (1975) 50 Cal. App. 3d 949, 959; *Satcher v Honda Motor Co.* (5th Cir. 1995) 52 F. 3d 1311.

## IV. MOTION FOR NEW TRIAL

### A. Procedural Requirements and Legal Standard

#### (1) Timeliness

A party intending to move for a new trial must file notice of intention to move for new trial designating the grounds upon which the motion is made, after a decision is rendered and before entry of judgment, or within 15 days of the date of mailing notice of entry of judgment. CCP §659. The Court mailed notice of entry of judgment on August 21, 2017. Defendants filed their Notice of Intention to Move for New Trial on September 5, 2017. The motion is timely.

A motion for new trial must be ruled on within 60 days of mailing of notice of entry of judgment by the clerk or any party (whichever is earlier), or if no notice is given, 60 days after filing of the first notice of intent to move for new trial; after such time the court loses its power to rule on a motion for new trial. Cal. Code of Civ. Pro. §663a.

The last day for the Court to rule on the motion is October 20, 2017 (60 days from August 21, 2017).

#### (2) Legal Standard

Courts have no inherent right to order a new trial; the right is purely statutory and must be based on one of the grounds enumerated in the statute. (*In re Marriage of Herr* (2009) 174

Cal.App.4th 1463, 1465; *Fomco, Inc. v. Joe Maggio, Inc.* (1961) 55 Cal.2d 162, 166.) The potential bases for granting a new trial are enumerated in Cal. Code of Civ. Pro. §657.

Defendants' motion is based on the following:

(1) Insufficiency of the evidence to justify the verdict, or the verdict is against the law - §657(6)

(2) Irregularity in the proceeding of the court, jury, and/or adverse party, or orders of the court or abuse of discretion by which Defendants were prevented from having a fair trial - §657(1)

(3) Error in law occurring at trial and excepted to by Defendants - §657(7).

(4) Misconduct of the jury - §657(2)

(5) Excessive damages - §657(5)

**B.      Analysis**

**(1) Cal. Code of Civ. Pro. §657(6) –Insufficiency of evidence arguments**

"Insufficiency of the evidence is one of the most frequent grounds for new trial motions. It is also one as to which the trial judge has the broadest power." (Civil Trials and Evidence at 18:170.) The trial court is said to sit as the thirteenth juror and to have plenary power to order a new trial based on insufficiency of evidence. (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.) "While it is the exclusive province of the jury to find the facts, it is the duty of the trial court to see that this function is intelligently and justly performed, and in the exercise of its supervisory power over the verdict, the court, on motion for a new trial, should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict." (*People* v. *Robarge* (1953) 41 Cal.2d 628, 633 [262 P.2d 14].) Insufficiency of the evidence in this context means "an absence of evidence or that the evidence received, in

1    the individual judgment of the trial judge, is lacking in probative force to establish the

2    proposition of fact to which it is addressed." (*People* v. *Capps* (1984) 159 Cal.App.3d 546, 552,

3    fn. 5 [205 Cal.Rptr. 898].)   The court must independently assess the evidence supporting the

4    verdict. (Ibid.) The court's plenary power includes the power and duty to reweigh evidence (*Tice*

5    *v. Kaiser Co.* (1951) 102 Cal.App.2d 44, 46; *Armstrong v. Svoboda* (1966) 240 Cal.App.2d 472,

6    473), and to consider the credibility of witnesses and draw inferences that differ from those of

7    the jury (*Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1159-1160).

8    In reweighing evidence, trial courts are to be guided by a presumption that the verdict is correct.

9    (*Ryan v. Crown Castle NG Networks, Inc.* (2016) 6 Cal.App.5th 775, 785.)

10       Put another way, a trial court may uphold a jury verdict  resting on sufficiently weighty

11    evidence, even if the court itself might have reached a different conclusion.  However, the trial

12    court must conduct its own independent evaluation of the evidence, including weighing the

     evidence and judging the credibility of witnesses. *Id.*

13

14       In their combined Motion for New Trial, Johnson & Johnson and JJCI argue that the

     verdict is against the weight of evidence. They contend the evidence presented was insufficient

15    to establish causation, and that mere possibility is insufficient to establish a prima face case.

16    (*Jones v. Ortho Pharm. Corp.* 163 Cal.App.3d at 402.)

17       As to general causation, defendants argue that:

18       (1) The epidemiology studies do not show a strong association between genital talc use

19    and ovarian cancer, noting that the epidemiology studies reveal average risk ratios of 1.24-1.3.

20    (Tr. 1398:23-1402:8, 2459:5-2461:13, 3700:10-3701:8.).  This relatively weak association could

     be the result of chance. (Tr. 1443:12-1444:19 (Exhibit L-1769); Tr. 2332:25-2345:18; 2430:12-

21    28; 2456:19-2458:4; 2448:14-2489:13; 3178:22-3180:20; 3361:21-3370:19; 3700:10-3705:4.)

22       (2) The results of studies are inconsistent. (Tr. 1426:2-15, Exhibit P-104, at 3; 1430:5-

23    1433:5; 3714:2-3716:28; 1433:25-1438:5; Exhibit L-1769 Tr. 3705:9-3707:19; 3176:14-3178:7;

24    3361:2-20; 3721:10-3723:5; 3603:12-3607:13.)

25

(3) The studies fail to establish a dose-response relationship. (Tr. 3723:19-3724:1; 2389:21-2394:1; 2383:10-2389:5; 2823:3-2824:9 ( L-1811); 3182:14-3183:25; 3723:8-3736:2.) Echeverria's expert, Siemiatycki, testified that although a study by Terry (2013) showed "compatibility" with dose response, it was equally compatible with no dose-response. (TR 2383:10-2389:5).

(4) No animal study has ever shown that talc causes ovarian cancer. (Tr. 3186:11-3195:20 (Hamilton 1974); 1239:23-27; 1253:26-1255:2, 3186:11-3195:20 ( Ex.P-47); 1270:19-1276:28 (1995 Boorman).

(5) The proposed biological mechanism is speculative. (Tr. 3476:13-3480:23; 3492:20-26; 3464:9-3465:23; 3475:23-3480:23; 3492:20-26; 3536:4-13; 3567:12-3568:6; 3601:12-3602:1; 1359:3-10; 1363:12-19; 1383:3-9; 2483:11-2486:28; 1354:23-1357:9; Exhibit L-811; Exhibit P-47 at 3-5.)

(6) The consensus view in the regulatory, scientific, and medical community is that the science does not support a causal relationship. (Exhibit P-47; Exhibit P-29; Tr. 1196:7-23; 1198:8-12002:2; 2162:18-2163:10; 2282:5-2283:28; 2285:23-26; 2291:15-23; 1619:6-1620:8.) Talc is not recognized as an ovarian cancer risk by the Centers for Disease Control or medical associations such as the American Congress of Obstetrics and Gynecologists or Society of Gynecological Oncology. (Tr. 2714:2-2721:9; 3580:9-3590:5.) No published peer-reviewed articles declare talc to cause ovarian cancer. (Tr. 2276:21-2277:19; 2280:2-10; 3695:19-3696:7; 3749:12-3750:1.) The Clyde 2017 study, which was comprehensive, did not include talc as a risk factor even though it was considered as part of its analysis. (Tr. 1448:26-1459:9.)

As to specific causation, Defendants argue Yessaian's testimony was insufficient as a matter of law to prove specific causation for the reasons set forth above regarding JNOV. They further argue Yessaian's testimony was speculative and unreliable, and her credibility was undermined, because she focused only on studies that supported her conclusion while disregarding any contradictory data or cohort studies, including more recent studies, and ignored the studies she cited. They suggest "cherry-picking" metrics from different studies is not good science. (Tr. 2428:16-26; *In re Zoloft (Sertaline Hydrochloride) Prod. Liab. Litig.* (E.D. Penn.

2014) 26 F.Supp.3d 449, 460-462.).  In addition, even as to the four studies on which she relied Yessaian used only data or metrics she considered helpful. Her report indicated she would apply data based on Echeverria's estimated 30,000 lifetime genital applications of talc (Exhibit PP at 8), which would have produced a statistically insignificant relative risk ratio under the Wu 2009 study (Tr. 2908:6-2910:28).  They argue that to find a "better" odds ratio Yessaian switched to a different measure of use (years), which she had previously deemed less accurate. When questioned about this at trial Yessaian testified that the category for 50,000 lifetime applications applied to a combined genital and non-genital use, even though previously she testified that talc could not reach the ovaries through non-genital applications. (Tr. 2802:8-12.)

In contrast to Yessaian's testimony, Defendants assert their experts provided persuasive testimony that there was no inflammation in Echeveria's ovarian tissue, that most ovarian cancers are idiopathic, and that Echeverria had multiple risk factors that could account for her disease regardless of her talc use.

Echeverria asserts that sufficient evidence supporting the jury's verdict was presented, Echeverria agrees that the evidence showed that the relative risk ratio suggested by the bulk of the epidemiological studies was 1.3 (Tr. 2236:1-13, 3787:14-16.) She characterizes this number as statistically significant because talc is a nongenotoxic carcinogen requiring a series of mutational events to lead to ovarian cancer. (Tr. 1127:7-1128:15.) Echeverria argues based on the 6 meta-analyses and the Terry pooled analysis, plus the consistency of the 28 epidemiology studies, it is almost impossible that association is attributable to chance or bias. (Tr. 1563:5-18, 2314:1-20, 2236:1-13, 2249:7-14, Ex. 27 (P-47).)

Echeverria's opposition also argues that as to biological plausibility, she presented evidence that inflammation is a valid hypothesis as to how talc causes cancer.

She notes that animal studies in 1992 by the NTP found lung cancer in rats exposed to high levels of aerosolized talc.

Finally, repeating arguments made in opposition to the motion for JNOV, she argues that since 1964 Defendants have been aware of "the talc/ovary problem" and yet failed to warn (Opposition at 5:13-14) or donate to cancer research (Ex P-55).

Defendants respond that Echeverria's inflammation hypothesis is not supported by studies and there was no evidence presented that the kind of inflammation specific to talc is linked to cancer. As to Echeverria's argument that based on meta-analysis and the Terry study, it is almost impossible that the 1.3 association is attributable to chance or bias, Defendants note that Echeverria does not dispute that the association could be based on confounding, something her own expert admits is not eliminated in meta-analysis. (Tr. 2430:12-25.)

Defendant also argues that the weight of evidence did not establish a duty to warn because such a duty is only triggered when the prevailing scientific and medical knowledge supports it. (*Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1483-84.)

Finally, defendants suggest the jury was likely confused by repeated suggestions that the possibility of risk alone was sufficient to impose a duty to warn. (Tr. 656:15-689:27-691:19 (mistrial requested on argument in opening statement); 3997:19-3998:4; 4005:22-27 (closing argument.)

Sitting as the thirteenth juror the Court is of the firm conclusion that the evidence of specific causation is not sufficient to support the verdict, for the reasons set forth above respecting the JNOV, which are incorporated here in their entirety, and for the additional reason that Yessaian did not consider all available epidemiology and apply it to the facts relative to Echeverria except when it favored Echeverria. There was a lack of any proper testimony as to specific causation. In addition, and as to general causation, the Court respects the testimony of Siemiatycki to the effect that there have been many instances in history where a disease agent was identified notwithstanding that the exact mechanism by which the disease was caused was not identified. Further, given the nature of inflammatory responses, it is understandable that inflammation may not be easily shown, as Echeverria's experts testified. However, given the lack of anything other than a hypothesis about causation and the nature of the epidemiological evidence presented, defendants are entitled to a new trial pursuant to Cal. Code of Civ. Pro. § 657(6), as both specific and general causation evidence was lacking.

//

**(2) CCP §657(1) (7) - Erroneous Rulings and Improper Arguments**

In order to grant a new trial based on errors in law at trial, the error must have been prejudicial (Cal. Const. Article VI, §13), and erroneous as a matter of law (*Tun v. Wells Fargo Dealer Services, Inc.* (2016) 5 Cal.App.5th 309, 323). Additionally, the error must have been raised at trial.  In support of their motion defendants submitted the Declarations of Jurors 1 and 2.  Echeverria countered with the Declarations of Jurors 8 and 10.

*1.   Yessaian*

Defendants argue that Yessaian's testimony should have been excluded or stricken because she relied on the false assumption that an odds ratio of 1.51 was sufficient to show probability.  Additionally, her testimony should have been stricken when she violated the Court's order limiting it to the four epidemiology studies as her basis for ruling in talc as the cause of Echeverria's cancer. They argue Yessaian violated that order by testifying that the four epidemiological studies were not the sole studies she relied on (Tr. 2820:11-15; 2820:1-5), but instead that she relied on other epidemiological studies with risk ratios of 1.2 to 1.3 which, in her view, showed in increase in risk that supported finding talc the probable cause of Echeverria's cancer. (Tr. 2820:26-28.) This was misleading because a risk ratio of less than 2.0 actually tends to disprove causation. Defendants moved to strike this testimony but the Court denied the motion. (Tr. 2940:1-2953:28.)

Echeverria contends these criticisms go to the weight, not admissibility of  Yessaian's testimony.  In addition, they argue the Court indicated that Yessaian was not limited to the four studies but could also testify as to Echeverria's medical history, general literature, and risk factors that she ruled out, citing the ruling on the motion in limine.  Echeverria argues there was no showing of prejudice, noting that the juror declarations (which Echeverria argues should be stricken) do not say the outcome would have been different without Yessaian's testimony. Jurors 8 and 10 say they considered all the evidence and even Jurors 1 and 2 do not say the outcome would have been different without Yessaian's  testimony. Finally, Echeverria points out

1   that Defendants were free to, and did, criticize Yessaian's testimony by way of cross-
2   examination and in closing arguments. (Tr. 4060:22-4063:7.)

3     Echeverria is correct that in the absence of affidavits showing prejudice, the Court may
4   not grant a new trial under Cal. Code of Civ. Pro. §657(1). See Cal. Code of Civ. Pro §658.
  Accordingly, the motion for new trial on this ground is denied.

5     However, for the reasons set forth above the Court is persuaded that the testimony of
6   Yessaian was insufficient to establish specific causation and should therefore have been stricken.
7   The motion is granted on this basis under Cal. Code of Civ. Pro. §657(7) as to both defendants.

8

9     *2. CACI 431*

10     The Court relied upon *Cooper v. Takeda Pharmaceuticals America, Inc*. (2015) 239 Cal.
11   App. 4th 555 in instructing under CACI 431 (multiple causation), although it indicated that it had
12   some doubt this was appropriate. "[W]hen deciding whether an error of instructional omission
     was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other
13   instruction, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it
14   was misled." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580-581.)

15     Defendants argue that, unlike in *Cooper,* there was no factual basis to instruct on CACI
16   431 because Echeverria did not present evidence of any specific concurrent cause. Here,
17   Yessaian did not rule in other causes while opining that talc was the most substantial factor. (Tr.
18   2676:1-3, 2929:21-2930:7; 2931:4-14.)

19     Defendants argue given the Court's rulings that Yessaian was precluded from testifying
20   as to a possible "synergistic effect" that cause Echeverria's cancer, the fact that neither Godleski
     nor Yessaian testified to the biological plausibility of combined concurring causes, and the fact
21   that defense expert Juan Felix, M.D. testified without contradiction that talc-based adhesions
22   would not promote the growth of existing ovarian cancer (Tr. 3535:8-16), there was no basis for
23   a multiple cause instruction. They contend giving the instruction likely prejudiced the results by
24   diluting Echeverria's burden to show that talc was the "but for" cause. Defendants argue that at a
25   critical point in deliberations, the jury discussed multiple causation (Juror #1 Declaration, ¶¶ 2-

42

3), making it reasonably probable the jury would have reached a different result if properly instructed.

Echeverria argues that on cross-examination, Yessaian testified to Echeverria's family history of cancer, obesity, smoking, age, age at menarche, and genetics as possible factors in causing her cancer. (Tr. 2118:18-2119:9; 2869:15-2870;27; 2875:4-10; 2876:1-14; 3597:5-15.) But, she also testified that as to each factor she determined that it was not a "probable" cause of Echeverria's cancer. It is also true, however, that defendants argued to the jury there could be other causes for Echeverria's cancer, including unknown causes.

There are no admissible juror affidavits that suggest prejudice, confusion or the like. Thus, the motion cannot be granted under Cal. Code of Civ. Pro. §657(1). As to whether there was error of law the Court notes, as it did at trial, that in a case involving whether an agent causes cancer, where it must be shown by a more probable than not standard (in excess of 50%) that the agent caused the disease, CACI 431 is inherently confusing because, by definition, alternate "causes" must be less than 50% probable. That is, there cannot be more than one "probable" cause in a cancer case as a mathematical matter. Nonetheless, given defendants' arguments that alternate unknown causes were possible causes of Echeverria's cancer, the Court is bound by *Cooper* and denies the motion on the basis of improper instruction under Cal. Code of Civ. Pro. § 657(7).

### 3. Condom Article—Ex. 19

Defendants argue that the Court improperly allowed Exhibit P-19 to be shown to the jury. The article asserts that concern about talc as an ovarian carcinogen in the medical literature goes back 50 years and that condom makers removed talc from condoms in the 1990s for that reason. Defendants argue that the Court struck Echeverria's attempt to introduce the article through Plunkett's testimony and then improperly allowed it to be introduced through defendants' expert (Andersen) even though the condom article was not part of the testimony Plunkett actually gave at trial and was only reviewed by Andersen as part of his consideration of Plunkett's testimony and report. (Tr. 3395:9-3396:18.) Echeverria did not ask Andersen anything about the article

other than whether he had seen it. (Tr. 3397:7-22.) Although the Court gave a limiting instruction, Echeverria's counsel referred to it several times in closing argument. (Tr. 3928:10-21; 3947:21-3948:1; 3948:4-9; 3950:14-15; 3995:25-26: 4003:3-6), stating to the jury that "concern about talc as an ovarian carcinogen goes back 50 years in the medical literature" (Tr. 3947: 22-248) and arguing that the condom industry removed talc from condoms in 1996 because of ovarian cancer concerns (Tr. 3950: 14-16).

Echeverria contends there was nothing wrong with permitting cross-examination of Andersen about the article (since he said he relied on it in forming his opinion) (Tr. 3395:9-3396:18; 3396:16-22), or about allowing Echeverria's counsel to refer to it in closing arguments. Further, the Court gave a limiting instruction that it was not admissible for its truth but only for purposes of notice. (Tr. 3928:4-21.)

The Court concurs that Ex. 19 should not have been admitted and counsel's reference to it was both prejudicial and undermined the limiting instruction. The Supreme Court held in *People v. Sanchez* (2016) 63 Cal. 4th 665 that an expert may not testify as to case specific hearsay or use same as the basis for his opinion without establishing an applicable hearsay exception. The reasoning behind the opinion was the Court's recognition, among other things, that "[w]hen an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth.'" (Id. at 682-683, quoting *Williams v Villinos* (2012) 567 U.S. 90). The court disapproved the use of a limiting instruction in these circumstances.

Here, the only evidence was that Andersen read the newspaper article because it was attached to Plunkett's report and was the basis of *her* opinion. Contrary to the representation of counsel that he would "link up" the article to his cross examination of Andersen as to the basis of Andersen's opinion, he did not do so but simply read it into the record and then proceeded to argue to the jury that the facts contained within it were true. This resulted in a situation akin to

1    what *Sanchez* sought to avoid—having the jury receive a fact as true through expert testimony

2    when the fact as not been established in any reliable way.  And, repeated references to it were

3    clearly prejudicial as it was a key piece of evidence that Echeverria's counsel (Mr. Smith)  relied

4    upon in arguing that defendants knew or should have known that talc caused cancer and failed to

5    warn of the risks in derogation of safety to the public.

6          Together with the other evidentiary failures a new trial on this basis is proper as to both

7    defendants under Cal. Code of Civ. Pro. § 657(7).

8

9          *4. Lobbying*

10         Defendants argue that Echeverria's counsel disregarded limitations on use of lobbying

     evidence. After rejecting Echeverria's theory of conspiracy to influence regulatory agencies, (Tr.

11   1487:10-1488:5), the Court allowed in certain documents about attempts to influence NTP or

12   IARC. (Ex. P-27, P-263, P-264, P-396) for the limited purpose of showing Defendant's

13   knowledge that talc was being considered a carcinogen. (Tr. 3933:13-21.) Defense counsel

14   objected to various lobbying exhibits and moved for a mistrial after Echeverria's counsel argued

15   about lobbying in opening statement. (Tr. 691:20-693:1.)

16         Defendants contend Echeverria'ss counsel disregarded the limiting instruction, and this

17   conduct was repeated and unmistakably intentional. (Tr. 3982:25-3981:1; 4094:1-8; 4094:10-14;

18   4090:5-11; 4093:27-28; 3989:24-3991:18; 3984:17-18; 4002:27-4003:2; 3318:20-28; 670:2-15;

19   3978:4-8; 4083:3-16.)

20         Echeverria takes the position that there was nothing improper about referring to lobbying

     evidence in closing argument. Echeverria argues that counsel are entitled to state their views as

21   to what the evidence shows, citing Wegner, Civil Trials and Evidence (2017) at 13:42. Further,

22   the Court gave a limiting instruction. (Tr. 39906:9-3908:23), while allowing the jury to consider

23   evidence of lobbying to show knowledge of the danger of the product. (Tr. 3933:13-28; 4000:21-

24   4001:3.)

25

1    While counsel are entitled to argue the evidence, they must do so consistent with a

2  limiting instruction. (*Love v. Wolf* (1964) 226 Cal. App. 2d 378, 389.) Echeverria's counsel did

3  not limit his argument to suggesting that the lobbying evidence suggested that defendants knew

4  that there was scientific evidence concerning the possible link between talc and ovarian cancer.

5  Rather, Echeverria's counsel (Mr. Smith) argued that defendants improperly "fended off" the

6  NTP and stated that "if Johnson & Johnson would have just stayed out of it, let the scientists do

7  their work at the U.S. government, the NTP would have listed talc as a carcinogen as far back as

8  2000. (TR 3982:25-3984:1.) Counsel went on to argue that what defendants did to "prevent

9  regulation" was reprehensible conduct supporting an award of punitive damages. (TR 3984:17-
18.)

10    Although the jury was instructed that lobbying activity was permissible, the totality of

11  this argument disregarded the Court's limiting instruction and must be viewed as prejudicial and

12  further grounds for a new trial as to both defendants under Cal. Code of Civ. Pro. Code of Civ.

13  Pro. §657(7).

14

15    **(3) Cal. Code of Civ. Pro. § 657(2) --Jury Misconduct**

16    Defendants argue that the jury engaged in misconduct by considering attorneys' fees and

17  taxes in its compensatory award and by setting the amount of compensatory damages based on

18  the net worth of the defendants.   Defendants offer the declaration of Juror #1 (M.M, the

19  foreperson) and Juror #2 (J.D.H.) Echeverria offers the affidavits of Juror #8 (P.C.) and Juror
#10 (N.F.).

20    The three-step inquiry into jury misconduct includes (1) whether the affidavits supporting

21  the motion are admissible, (2) whether the facts establish misconduct, and (3) if so, whether it

22  was prejudicial. (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160.)

23    Under California law juror affidavits attesting to the jury's "mental processes" are

24  prohibited. However, consideration of "statements made" or "conduct occurring" during

25

deliberations is permissible. (Cal. Ev. Code § 1150; *Krouse v. Graham* (1977) 19 Cal.3d 59, 80; *In re Stankewitz* (1985) 40 Cal. 3d 391, 397-402.)

Defendants argue that the jury engaged in two forms of misconduct.

First, the jury improperly considering attorney fees, appellate costs and taxes in determining Echeverria's noneconomic damages. (Declaration of Juror No. 1, ¶4; Declaration of Juror No. 2, ¶6.) Echeverria argues this evidence should be disregarded because it is hearsay and goes to the jury's mental process. She also argues that the conduct does not amount to misconduct in any event because Jurors 8 and 10 disagree. Finally, Echeverria argues that if there was misconduct, it was not prejudicial because Jurors 1 and 2 at most say they did not participate in the deliberations regarding damages; Defendants have not shown that absent the alleged misconduct a different result would have been reached. Defendants argue in Reply that the declarations provide clear testimony that jurors discussed and agreed to base compensatory damages on attorneys' fees, appellate costs, taxes, and Defendants' wealth, which establishes prejudicial misconduct.

The evidence in the jury declarations is mixed as to its admissibility. Specific rulings on the objections are appended. Briefly, however, the statements by Jurors 1 and 2 that "[Jurors] stated that taxes, appeal costs and expenses would be taken out of Ms. Echeverria's compensation" and "After jurors raised these arguments, other jurors expressed an agreement to raise the amount of damages" are admissible. The statements are proof of an overt act (an agreement to raise damages based on impermissible considerations). They are not hearsay. The statements are not admitted to show they are true (that Echeverria would pay fees and taxes) but to show the statement was made. As the Supreme Court explained in *Weathers v. Kaiser Found. Hospitals*: "hearsay is defined as 'evidence of a statement that was made other than by a witness while testifying at the hearing and *that is offered to prove the truth of the matter stated.*'" ( Evid. Code, § 1200, subd. (a).) (Italics added.) However 'there is a well-established exception or departure from the hearsay rule applying to cases in which the very fact in controversy is whether certain things were said . . . and not . . . whether these things were true or false, and in these cases the words... are admissible not as hearsay, but as original evidence.'" (*Weathers v.*

*Kaiser Found. Hosps.*, (1971) 5 Cal. 3d 98, 109-110, citing *People* v. *Henry* (1948) 86 Cal.App.2d 785, 789.  See also *Enyart v. City of Los Angeles*, 76 Cal. App. 4th 499, 508, n. 5 [Statements reflecting on the bias of the jurors who uttered them are not hearsay]).

Although Echeverria secured juror declarations they did not refute what Jurors 1 and 2 reported.  An agreement to exclude improper items of compensation such as taxes and fees in a verdict is improper, particularly where the jury was instructed as to what they could consider. (*Krouse*, 19 Cal. 3d at 80-81; *Trammell v. McDonnell Douglas* (1984) 163 Cal. App. 3d 157, 172).   On the evidence here the Court is constrained to conclude that consideration of items of damages such as taxes and fees was serious misconduct, giving rise to a presumption of prejudice.  No rebuttable evidence was offered.  A new trial on this basis is thus required as to both defendants under Cal. Code of Civ. Pro. § 657(2), particularly given that this was a 9-3 verdict. (*Weathers v. Kaiser*, 5 Cal. 3d at 110.)

Defendants also argue that the jury improperly based compensatory damages on Defendants' wealth and apportioned the damages according to net worth. The jury awarded $68 million in noneconomic damages against Johnson & Johnson as compared to the company's $68 billion net worth, and $2 million against JJCI as compared to its $2 billion net worth.  While it may be inferred that the verdict was the result of consideration of wealth, statements regarding the manner in which the jury deliberated are inadmissible.  A new trial cannot be granted on this basis.

**(4) Cal. Code of Civ. Pro. §657(5) – Excessive Damages**

**(i)      Compensatory Damages**

Defendants argue the compensatory damage award is excessive on its face, and grossly disproportionate to the verdicts in prior talc-cancer cases and similar cases where plaintiff established that he or she was diagnosed with terminal cancer caused by defendant's product. Defendants contend this is due to improper arguments by Echeverria's counsel.

The evidence was that Echeverria was diagnosed with cancer in 2007.  She underwent surgery and multiple rounds of chemotherapy, including clinical trials, and endured their side effects, for ten years.  She testified that she has pain from tumors that have developed since her surgery.  (Tr. 3010:1-3011:3; Tr. 2574: 26-2577: 28; 3008:22-3009:17.)  She testified that she feared death when she became ill in late 2016 and was hospitalized with sepsis.  (Tr. 2998:28-2999:2.)  She testified to her fears and to the impact that her illness has had on her family, particularly her daughter, who took on the responsibility for her care at age 16 and delayed graduation from high school as a result, as well as her sadness at the potential of losing her relationship with her young grandson.  (Tr. 3011: 4-19.)  Yessaian testified that Echeverria had complications from the chemotherapy, resulting in multiple hospitalizations.  She also testified that for a woman of Echeverria's age the average life expectancy is 81 years.  (Tr. 2683:23-28.)

Given this testimony the Court is not persuaded that the compensatory damages against JCCI ($2 million) can be deemed excessive if liability were established. The number is well in line with other verdicts in comparable cases.  Accordingly, as to JCCI the motion for new trial on grounds of excessive damages is denied.

As to Johnson & Johnson, however, the court is convinced that the jury should have reached a different verdict. The compensatory verdict ($68 million) is plainly excessive. As found, *infra*, there is no evidence Johnson & Johnson manufactured baby powder  after 1967 and there is no evidence it  manufactured Shower to Shower.  Yet, the jury apportioned the damages 97% to Johnson & Johnson.  Given the misconduct of the jury in considering matters that were not to be included, and the arguments of counsel that were in violation of the Court's in limine motions, and given the other reasons why a new trial is required, a remittitur is not appropriate. A new trial is required on the basis of excessive noneconomic damages is granted as to Johnson & Johnson under Cal. Code. of Civ. Pro. § 657(5).

### (ii)    Punitive Damages

Defendants argue that the punitive damage award is against the weight of evidence and excessive. Defendants contend Echeverria failed to establish by clear and convincing evidence that Defendants acted with malice. Even if allowed, Defendants contend the Court should reduce

the damages as excessive and the product of passion and prejudice, driven by improper arguments seeking to punish Defendants for protected First Amendment activity and in violation of due process. *BMW of North America v. Gore* (1996) 517 U.S. 559, 574-575 indicates that punitive damages are to be reviewed based on (1) the degree of reprehensibility, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award, and (3) a comparison to civil penalties in comparable cases. Focusing on the second factor, Defendants cites case law showing historical practice is to compare the ratio of punitive to compensatory damages, and, although bright-line rules are to be eschewed, awards of more than four times the amount of compensatory damages, "might be close to the line of constitutional impropriety" (*State Farm Mutual Auto Ins. Co. v. Campbell* (2003) 538 U.S. 408, 425), but where compensatory damages are substantial, a lesser ratio ( 1:1) can reach the due process limit. (Ibid.) Ratios of 9:1 are inherently suspect. (*Simon v. San Paolo U.S. Holding Co.* (2005) 35 Cal.4th 1159, 1182.) Echeverria points out that the 5:1 ratio here is well within the limits that have consistently been upheld but does not identify a case upholding a very significant punitive damages award layered on top of a substantial compensatory damage award.

It is sufficient to state for these purposes that the evidence was insufficient to uphold a punitive damage award of any kind. Analysis of what constitutes a "proper" amount of punitive damages is thus unnecessary.  The punitive damages were excessive based on the evidence.  A new trial is required as to both defendants under Cal. Code of Civ. Pro. § 657(5).

**V.  ORDER**

For the foregoing reasons:

(1) The motions for JNOV by Johnson & Johnson and JCCI are granted;

(2) The motions for new trial by Johnson & Johnson and JCCI on grounds of (1) insufficiency of the evidence as to causation as to both defendants  (Cal. Code of Civ. Pro. 657(6)); (2) error in law occurring at trial and excepted to by defendants (Cal. Code of Civ. Pro. 657(7); (3) misconduct of the jury (Cal. Code of Civ. Pro. 657(2);

Civ. Pro. 657(2); and (4) excessive compensatory damages (as to Johnson & Johnson)

and excessive punitive damages (as to both defendants)(Cal. Code of Civ. Pro. 657(5)

are granted.

Dated:   *10/20/17*

MAREN E. NELSON
Judge of the Superior Court

PLEADINGS CONSIDERED

Filed September 5, 2017
- Defendant Johnson & Johnson's Notice of Intention to Move for a New Trial
- Defendant Johnson & Johnson's Notice of Motion for Judgment Notwithstanding the Verdict
- Defendant Johnson & Johnson Consumer Inc.'s Notice of Motion for Judgment Notwithstanding the Verdict

Filed September 15, 2017
- Defendants' Motion for New Trial (Combined Memorandum of Points and Authorities)
  - Defendants' Compendium of Trial Transcripts (Volumes I and II)
  - Declaration of Bart H. Williams in Support of Johnson & Johnson and Johnson & Johnson Consumer, Inc.'s Motions for New Trial and Motions for Judgment Notwithstanding the Verdict
    - Notice of Lodging Exhibits G and L to the Williams Declaration Conditionally Under Seal
    - Notice of Lodging Exhibits F, H, I, O, P, T, U, V, W, W and Y to the Williams Declaration Conditionally Under Seal
  - Declaration of Juror Number 1
  - Declaration of Juror Number 2

Filed September 25, 2017
- Plaintiff Eva Echeverria's Opposition to the Johnson & Johnson Defendants' Motion for New Trial
- Plaintiff Eva Echeverria's Opposition to Defendant Johnson & Johnson's Motion for Judgment Notwithstanding the Verdict
- Plaintiff Eva Echeverria's Opposition to Defendant Johnson & Johnson Consumer, Inc.'s Motion for Judgment Notwithstanding the Verdict
  - Declaration of Mark P. Robinson, Jr. (Under Seal and Redacted Versions)
  - Plaintiff Eva Echeverria's Compendium of Trial Transcript Excerpts
  - Evidentiary Objections to Declarations of Juror No. 1 and Juror No. 2
  - Request by Plaintiff and Motion to Strike Declarations of Juror Nos. 1 and 2 Submitted by Defendants
  - Affidavit of Juror Number 8 (P.C.)
  - Affidavit of Juror Number 10 (N.F.)

Filed October 3, 2017
- Defendants' Reply in Support of Motions for New Trial
  - Defendants' Response to Plaintiff's Request to Strike and Evidentiary Objections re Juror Declarations Submitted in Support of Motion for New Trial
  - Defendants' Objections to Plaintiff's Juror Affidavits re Defendants' Motions for New Trial
  - Defendants' Supplemental Compendium of Trial Transcript Excerpts
- Defendant Johnson & Johnson Consumer, Inc.'s Reply in Support of Motion for Judgment Notwithstanding the Verdict

- Defendant Johnson & Johnson's Reply in Support of Motion for Judgment Notwithstanding the Verdict

    Filed October 13, 2017
- Plaintiff's Supplemental Brief re Court's Questions at Hearing on Post-Trial Motions

    Filed October 16, 2017
- Defendants' response to Plaintiff's Supplemental Post-Hearing Brief

## II.    EVIDENTIARY OBJECTIONS TO THE DECLARATION OF JUROR NO. 1 (M.M.)

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| "3.    There were extensive *discussions* among the jurors about the distinction between 'possible' and 'probable' causes. I raised that distinction several times.   At one point while we were *discussing* this issue, one of the jurors *raised* and pointed to the jury instruction on 'Multiple Causes,' which said in effect that there could be more than one substantial cause.   After that, jurors in favor of the plaintiff *relied heavily* on that instruction in their arguments to other jurors."    Juror No. 1 Decl., at ¶ 3 (italics added). | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 3 of Juror No. 1's declaration concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached. Such statements are inadmissible pursuant to Evid. Code § 1150 and cannot be used to try to impeach the verdict. *See* Evid. Code § 1150(a); *see also* § I.A. *supra*; Cal. Judges Benchbook Civ. Proc. After Trial, Chp. 2, at § 2.27. "When a juror . . . gives the reasons for his or her vote, the words are a verbal reflection of the juror's mental processes, and consideration of such a statement as evidence of those processes is barred by Evid. Code § 1150." *Id.* | ☑ Sustained  ☐ Overruled |
| | **Hearsay.** Juror No. 1's statements about what other (unidentified) jurors discussed or raised verbally is inadmissible hearsay. | ☐ Sustained  ☑ Overruled |
| | **Speculation.** Juror No.1's statement about what he thinks other jurors thought was important or what they "relied heavily on" is speculation, lacks foundation and personal knowledge as to the thinking and decision-making of other jurors. | ☑ Sustained  ☐ Overruled |
| | **Lacks foundation, lacks detail, and conclusory.** | ☐ Sustained  ☑ Overruled |

EVIDENTIARY OBJECTIONS BY PLAINTIFF EVA ECHEVERRIA TO DECLARATIONS OF JUROR NO. 1 AND JUROR NO. 2

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| "4. When ~~discussing~~ non-economic damages, jurors initially *discussed* an amount much lower than what was ultimately awarded. Jurors who voted in favor of liability *argued* that there was going to be an appeal process and that the plaintiff's lawyers needed to be paid and were going to take much of the money. They also *stated* that taxes, appeal costs, and expenses would be taken out of Ms. Echeverria's compensation or out of the money received by Ms. Echeverria's daughter when Ms. Echeverria passed away. After jurors *raised* those *arguments*, other jurors *expressed* an agreement to raise the amount of the damages." Juror No. 1 Decl., at ¶ 4 (italics added). | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 4 of Juror No. 1's declaration concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached. The statements are inadmissible pursuant to Evid. Code § 1150 and cannot be used to try to impeach the verdict. *See* Evid. Code § 1150(a); *see also* § I.A. *supra*; Cal. Judges Benchbook Civ. Proc. After Trial, Chp. 2, at § 2.27. "Juror declarations that purport to show a deliberative error by one or more jurors are inadmissible to impeach the verdict, as are juror declarations that purport to show . . . [h]ow the jurors arrived at the award of damages." Cal. Judges Benchbook Civ. Proc. After Trial, Chp. 2, at § 2.29 (citing *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1604-05). | ☐ Sustained<br>☑ Overruled<br><br>*as to "They also stated . . . damages"* |
| | **Hearsay.** Juror No. 1's statements about other (unidentified) jurors' "discussions," their "arguments" or what they "argued," what they "stated," what they "expressed," or "raised" verbally is inadmissible hearsay. | ☐ Sustained<br>☑ Overruled |
| | **Lacks foundation, lacks detail, and conclusory.** Neither the substance of any such statements by others nor their identity is provided. The statements are vague and conclusory. | ☐ Sustained<br>☑ Overruled |

7 55

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| "5.     At the beginning when the jury first turned to *discussing* damages, one of the jurors who favored the plaintiff *expressed* that jurors who were in favor of the defense should not participate in the discussion The jury took a poll on the issue of whether defense jurors should participate in the damages discussion.  After the vote, although I (as the foreperson) facilitated the damages discussion by calling on jurors on writing things on | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 5 of Juror No. 1's declaration concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached. Such statements are inadmissible pursuant to Evid. Code § 1150 and cannot be used to try to impeach the verdict. *See* Evid. Code § 1150(a); *see also* § I.A. *supra.* "No evidence is admissible to show the effect (of improper influences) upon a juror in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Evid. Code 1150(a) (emphasis added). | ☑ Sustained ☑ Overruled *as to* "The jury" Participated" |
| the board, I did not express my views on the amount of compensatory damages.  The | **Hearsay**. Juror No. 1's statements about what one or more jurors (unidentified by name or juror | ☐  Sustained ☑ Overruled |
| other two defense jurors did not participate in the discussion of | number) supposedly said, discussed or expressed is inadmissible hearsay. | |
| compensatory damages after the poll was taken regarding their participation." Juror No. 1 Decl., at ¶ 5 (italics added). | **Lacks foundation, lacks detail, and conclusory**. Juror No. 1 does not have personal knowledge regarding the extent of participation of other jurors in discussions in the deliberation process. | ☐  Sustained ☑ Overruled |

*Sustained*

| | Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|---|
| 2 | "6.    ~~When deciding how to apportion damages between the two defendants,~~ the only thing the jury *discussed* as the basis for the division was the relative ~~net worth of the two companies~~. Jurors *agreed* to assess a larger amount for non-economic damages from the parent company (Johnson & Johnson) because of the ratio between the net worth of Johnson & Johnson and that of JJCI." Juror No. 1 Decl., at ¶ 6 (italics added). | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 6 of Juror No. 1's declaration concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached. These statements are inadmissible pursuant to Evid. Code § 1150 and cannot be used to try to impeach the verdict. *See* Evid. Code § 1150(a); *see also* § I.A. *supra*; Cal. Judges Benchbook Civ. Proc. After Trial, Chp. 2, at § 2.27.  "Juror declarations that purport to show a deliberative error by one or more jurors are inadmissible to impeach the verdict, as are juror declarations that purport to show . . . [h]ow the jurors arrived at the award of damages." *Id.* at § 2.29 (citing *Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1604-05). | ☐ Sustained<br>☑ Overruled |
| | | **Hearsay.** Juror No. 1's statements about what other (unidentified) jurors "discussed" or "agreed" regarding their decision-making process in awarding damages is inadmissible hearsay. | ☐ Sustained<br>☑ Overruled |
| | | **Speculation, lacks foundation, lacks personal knowledge, conclusory.** In paragraph 5, Juror No. 1 said that he and the other "defense jurors" did not participate in the damages discussion.  If that was true, it would mean that he lacks foundation and personal knowledge to state why or how other jurors "agreed" to assess damages. | ☐ Sustained<br>☑ Overruled |

*(handwritten annotations: "Sus..." in left margin; "• Jurors agreed" and "JICI" with markings in right margin; "& 57" at bottom center)*

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| 7.   "When the jury was *discussing* the amount of punitive damages, the jurors who voted in favor of liability *discussed* and *agreed* to set the number based on a percentage of the Defendants' net worth, as Allen Smith had argued in closing argument." Juror No. 1 Decl., at ¶ 7 (italics added). | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 7 concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached.  Such statements are inadmissible. *See* Evid. Code § 1150(a); *see also* § I.A. *supra*; Statements in "juror declarations that purport to show . . . [h]ow the jurors arrived at the award of damages" are inadmissible.   Cal.   Judges Benchbook Civ. Proc. After Trial, Chp. 2, § 2.29. | ☐ Sustained<br>☑ Overruled<br><br>*in the jurors agreed . . . argument* |
|  | **Hearsay.** Juror No. 1's statements about what other (unidentified) jurors "discussed" or "agreed" regarding their decision-making process in awarding damages is inadmissible hearsay. | ☐ Sustained<br>☑ Overruled |
|  | **Speculation, lacks foundation, lacks personal knowledge.**   Juror   No.   1   lacks   personal knowledge and his statements lack foundation as to what other jurors discussed or how or why they decided or "agreed" to award damages. | ☐ Sustained<br>☑ Overruled |
|  | **Not relevant.**   Evid. Code § 350.   It is not misconduct to consider the defendant's net worth in awarding punitive damages.  CACI 3945. *See also* Cal. Judges Benchbook Civ. Proc. After Trial, Chp. 2, § 2.53 ("[P]unitive damages must be supported by . . . evidence of the defendant's financial condition" and "the defendant's net worth is the critical determinant."). | ☐ Sustained<br>☑ Overruled |

58

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| "8.      When the jury was at a six-to-six impasse on the Friday before the verdict, one plaintiff juror *expressed* that she no longer wanted to participate. She even turned her chair away from the table. I wrote a note to the Court about the impasse. After we received a note back from the Court, we continued to deliberate, but the jury continued to be divided and could not reach the nine votes necessary to reach a verdict. The same juror *told* me that she was going to write to the judge and ask to be taken off the jury because of her frustration. She began writing a letter in front of the other jurors."   Juror No. 1 Decl., at ¶ 8 (italics added). | **Inadmissible pursuant to Evid. Code § 1150**. The statements in paragraph 8 concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached.  The statements are inadmissible. *See* Evid. Code § 1150(a); *see also* § I.A. *supra*. "No evidence is admissible to show the effect (of improper influences) upon a juror in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Evid. Code § 1150(a). | ☑ Sustained<br>☐ Overruled |
| | **Hearsay.** Juror No. 1's statements about what some other (unidentified) juror "expressed" or "told" him or said she was going to "ask" is inadmissible hearsay. | ☑ Sustained<br>☐ Overruled |
| | **Speculation, lacks foundation, lacks personal knowledge.** Juror No. 1's statements regarding why he thinks some other juror (who is not even identified) was frustrated is speculation and lacks foundation. | ☑ Sustained<br>☐ Overruled |
| | **Not relevant.** *See* Evid. Code § 350.  The fact that one juror at one point in time was frustrated or supposedly said that she was going to write a letter to the judge is not relevant.  The statements do not show misconduct, that the juror refused to continue to deliberate or did anything improper. | ☑ Sustained<br>☐ Overruled |

H 59

EVIDENTIARY OBJECTIONS BY PLAINTIFF EVA ECHEVERRIA TO DECLARATIONS OF
JUROR NO. 1 AND JUROR NO. 2

| | Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|---|
| 1 | | | |
| 2 | "9.     After the jury received | **Inadmissible pursuant to Evid. Code § 1150.** | ☑ Sustained |
| 3 | the note from the Court in | The statements in paragraph 9 are inadmissible | ☐ Overruled |
| 4 | response to the jury note, one of | because they concern the mental processes, | |
| 5 | the plaintiff jurors *argued* | deliberative thinking, and subjective reasoning of | |
| 6 | vociferously that the jury was | the jury regarding how the verdict was reached. | |
| 7 | being *told* it needed to reach a | *See* Evid. Code § 1150(a); *see also* § I.A. *supra.* | |
| 8 | verdict.  At that point, the jury | "'Evidence about a jury's 'subjective collective | |
| 9 | took a vote using a one to ten | mental process purporting to show how the | |
| 10 | scale to indicate how strongly | verdict was reached' is inadmissible.'" *English v.* | |
| 11 | we favored a given side ('1' | *Lin* (1994) 26 Cal.App.4th 1187, 1367. | |
| 12 | being strongest for defense, and | **Hearsay.** The statements about what some other | ☑ Sustained |
| 13 | '10' being strongest for | jurors "argued" regarding what they were "told," | ☐ Overruled |
| 14 | plaintiff).       Using that | and methodology referenced is hearsay. | |
| 15 | methodology, the 'average' | **Speculation, lacks foundation, lacks personal** | ☑ Sustained |
| 16 | was about a '7,' even though | **knowledge, lacks detail, conclusory.** Juror No. | ☐ Overruled |
| 17 | the jury remained divided. The | 1's statements about what he recalls the overall | |
| 18 | jury continued to deliberate | "average" numbers referenced in the | |
| 19 | through the end of the day on | methodology being "about" for the other jurors is | |
| 20 | Friday." Juror No. 1 Decl., at ¶ | speculation, lack foundation, lack detail, and are | |
| 21 | 9 (italics added). | vague and impermissible conclusions. | |
| 22 | | **Not relevant.** Jurors can consider the evidence | ☑ Sustained |
| 23 | | and "express opinions regarding it." *People v.* | ☐ Overruled |
| 24 | | *Steele* (2002) 27 Cal.4th 1230, 1266.  There is | |
| 25 | | nothing wrong with "jurors employ[ing] their | |
| 26 | | own reasoning skills in a demonstrative manner | |
| 27 | | . . . to the evidence admitted at trial." *People v.* | |
| 28 | | *Vigil* (2011) 191 Cal.App.4th 1474, 1485. | |

EVIDENTIARY OBJECTIONS BY PLAINTIFF EVA ECHEVERRIA TO DECLARATIONS OF
JUROR NO. 1 AND JUROR NO. 2

1   **III.   EVIDENTIARY OBJECTIONS TO THE DECLARATION OF JUROR NO. 2 (J.D.H.)**

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| "2.       On Friday August 18, 2017, the jury was split 6 to 6. Our foreperson sent a note to the Judge telling her that the jury could not reach a verdict. One plaintiff juror *said* she no longer wanted to participate in discussions.      She turned her chair away from the table and began writing something. After we received the note from the Judge and were still not able to reach a verdict, someone *said* we should just tell the Judge that we are a hung jury. At that point, one of the jurors angrily *said* that the note we received from the Judge said we had no choice but to reach a verdict." Juror No. 2 Decl., at ¶ 2 (italics added). | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 2 concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached.  Such statements are inadmissible. *See* Evid. Code § 1150(a); *see also* § I.A. *supra*. "No evidence is admissible to show the effect (of improper influences) upon a juror in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Evid. Code § 1150(a). | ☐   Sustained ☑   Overruled |
| | **Hearsay.** Juror No. 2's statements about what some other juror (unidentified by name, juror number or even gender) supposedly said or meant is inadmissible hearsay. | ☐   Sustained ☐   Overruled |
| | **Speculation, lacks foundation, lacks personal knowledge, lacks detail, and conclusory.** Juror No. 2's statements are vague, lack foundation, are speculative, conclusory and lack sufficient detail. | ☐   Sustained ☑   Overruled |
| | **Not relevant.** *See* Evid. Code § 350.  The fact that one juror at one point in time may have been frustrated or supposedly said that she was going to write a letter to the judge is not relevant.  The statements do not show misconduct, that deliberations did not continue, or anyone did anything improper. | ☑   Sustained ☐   Overruled |

61

| | Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|---|
| 1 | | | |
| 2 | "3.      We were not able to | **Inadmissible pursuant to Evid. Code § 1150.** | ☐  Sustained |
| 3 | reach a verdict on Friday | The statements in paragraph 3 concern the mental | ☑ Overruled |
| 4 | August 18. My best memory is | processes, deliberative thinking, and subjective | |
| 5 | that the jury was still divided 7 | reasoning of the jury regarding how the verdict | |
| 6 | to 5 in favor of the plaintiff at | was reached.   The statements are inadmissible. | |
| 7 | the end of the day." Juror No. 2 | *See* Evid. Code § 1150(a); *see also* § I.A. *supra*. | |
| 8 | Decl., at ¶ 3. | "No evidence is admissible to show the effect (of | |
| 9 | | improper influences) upon a juror in influencing | |
| 10 | | him to assent to or dissent from the verdict or | |
| 11 | | concerning the mental processes by which it was | |
| 12 | | determined." Evid. Code § 1150(a). "Evidence | |
| 13 | | Code 1150 may be violated not only by the | |
| 14 | | admission of jurors' testimony describing their | |
| 15 | | own mental processes, but also by permitting | |
| 16 | | testimony concerning statements made by jurors | |
| 17 | | in the course of their deliberations." *People v.* | |
| 18 | | *Sanchez* (1998) 62 Cal.App.4th 460, 475-76. | |
| 19 | | "[T]he mental processes of jurors are beyond the | |
| 20 | | hindsight probing of the trial court." *Maple v.* | |
| 21 | | *Cincinatti, Inc.* (1985) 163 Cal.App.3d 387, 394. | |
| 22 | | The rule prevents one or two jurors "from | |
| 23 | | upsetting a verdict of the whole jury by | |
| 24 | | impugning his own or his fellow jurors' mental | |
| 25 | | process or reasons for assent or dissent." Wegner, | |
| 26 | | at ¶ 18:288. | |
| 27 | | | |
| 28 | | | |

A 62

EVIDENTIARY OBJECTIONS BY PLAINTIFF EVA ECHEVERRIA TO DECLARATIONS OF
JUROR NO. 1 AND JUROR NO. 2

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| 4.   "On Monday August 21, 2017, ~~after almost no discussion~~, two more jurors switched to the plaintiff side, giving the plaintiff 9 votes." Juror No. 2 Decl., at ¶ 4. | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 4 concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached.  Such statements are inadmissible. Evid. Code § 1150(a); *see also* § I.A. *supra*.  "No evidence is admissible to show the effect (of improper influences) upon a juror in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Evid. Code § 1150(a).  "'Evidence about a jury's 'subjective collective mental process purporting to show how the verdict was reached' is inadmissible to impeach a jury verdict.'" *English v. Lin* (1994) 26 Cal.App.4th 1187, 1367. "[T]he mental processes of jurors" is not admissible.  *Maple v. Cincinatti, Inc.* (1985) 163 Cal.App.3d 387, 394. | ☐ Sustained<br>☑ Overruled<br>*in part* |
| | **Speculation, lacks foundation, lacks detail and conclusory.**   Juror No. 2 lacks personal knowledge and her statements lack foundation as to the reasons and decision making process of the other jurors – after "almost no discussion" – whatever that means, and what they considered or deemed important in reaching their verdict.  She does not say which jurors "switched" and she does not say or know why. | ☐ Sustained<br>☑ Overruled |

15 63

| | Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|---|
| 1 | | | |
| 2 | "5.   Once the *discussion* of | **Inadmissible pursuant to Evid. Code § 1150.** | ☐  Sustained |
| 3 | ~~damages began,~~ one of the | The statements in paragraph 5 of Juror No. 2's | ☐  Overruled |
| 4 | jurors who favored the plaintiff | declaration concern the mental processes, | |
| 5 | angrily *said* that those of us | deliberative thinking, and subjective reasoning of | |
| 6 | who had favored the defense | the jury regarding how the verdict was reached. | |
| 7 | should not participate in the | Such are inadmissible statements pursuant to | |
| 8 | discussion of damages. A vote | Evid. Code § 1150 and cannot be used to try to | |
| 9 | was taken regarding whether | impeach the verdict. *See* Evid. Code § 1150(a); | |
| 10 | we should be allowed to | *see also* § I.A. *supra.* "No evidence is admissible | |
| 11 | participate in the discussion of | to show the effect (of improper influences) upon | |
| 12 | damages. After the majority of | a juror in influencing him to assent to or dissent | |
| 13 | jurors voted that we should not | from the verdict or concerning the mental | |
| 14 | participate, the three of us who | processes by which it was determined." Evid. | |
| 15 | had voted for the defense did | Code 1150(a) (emphasis added).   The rule | |
| 16 | not participate in the discussion | prevents one or two jurors "from upsetting a | |
| 17 | of how to decide on an amount | verdict of the whole jury by impugning his own | |
| 18 | for compensatory damages, or | or his fellow jurors' mental process or reasons for | |
| 19 | on the amount of damages." | assent or dissent." Wegner, at ¶ 18:288. | |
| 20 | Juror No. 2 Decl., at ¶ 5 (italics | **Hearsay**. Juror No. 2's statements about what one | ☐  Sustained |
| 21 | added). | of jurors (unidentified by name or juror number) | ☐  Overruled |
| 22 | | supposedly said, discussed or expressed is | |
| 23 | | inadmissible hearsay. | |
| 24 | | **Lacks foundation, lacks detail, and conclusory**. | ☐  Sustained |
| 25 | | Juror No. 2 does not have personal knowledge | ☐  Overruled |
| 26 | | and her vague statements lack foundation | |
| 27 | | regarding the extent of participation of other | |
| 28 | | jurors in discussions in the deliberation process. | |

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| "6. The jurors who favored the plaintiff *said* they should increase the amount of damages that they had been *discussing* because Ms. Echeverria was going to have to pay taxes on the money, pay her lawyers, and pay for an appeal. After the jurors *raised* those possible costs, other jurors agreed to raise the amount of the damages. ~~The amount that the 9 plaintiff-favoring jurors *agreed* on for compensatory damages for Ms. Echeverria was based on the net worth of the defendant companies. The jurors *decided* to award a larger amount of money against the larger company just because they were a bigger company."~~ Juror No. 2 Decl., at ¶ 6 (italics added). overruled / sustained | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 6 of Juror No. 2's declaration concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached. Such statements are inadmissible pursuant to Evid. Code § 1150 and cannot be used to try to impeach the verdict. *See* Evid. Code § 1150(a); *see also* § I.A. *supra*; Cal. Judges Benchbook Civ. Proc. After Trial, Chp. 2, at § 2.27. "Juror declarations that purport to show a deliberative error by one or more jurors are inadmissible to impeach the verdict, as are juror declarations that purport to show . . . [h]ow the jurors arrived at the award of damages." *Id.* at § 2.29. | ☐ Sustained<br>☑ Overruled in part |
| | **Hearsay**. Juror No. 2's statements about what other (unidentified) jurors "said," were "discussing," or verbally "raised" or "agreed" regarding their decision-making process in awarding damages is inadmissible hearsay. | ☐ Sustained<br>☑ Overruled |
| | **Speculation, lacks foundation, lacks personal knowledge, conclusory**. In paragraph 5, Juror No. 2 said that she and the other "defense jurors" did not participate in the damages discussion. If that was true, it would mean that she has no basis to say why or how other jurors "decided" or "agreed" to assess damages. | ☐ Sustained<br>☑ Overruled |

1765

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| "7.  When  the  jury _discussed_  the  amount  of punitive  damages,  the  jurors who  voted  in  favor  of  liability did  what  Allen  Smith  asked them  to  do  in  his  closing argument – they set the number based  on  a  percentage  of  the Defendants' net worth." | **Inadmissible pursuant to Evid. Code § 1150.** The statements in paragraph 7 concern the mental processes, deliberative thinking, and subjective reasoning of the jury regarding how the verdict was reached.   Such statements are inadmissible. _See_ Evid. Code § 1150(a); _see also_ § I.A. _supra_; Statements in "juror declarations that purport to show . . . [h]ow the jurors arrived at the award of damages"  are  inadmissible.     Cal.  Judges Benchbook Civ. Proc. After Trial, Chp. 2, § 2.29. | ☑ Sustained<br>☐ Overruled |
| | **Hearsay**. Juror No. 2's statements about what other (unidentified) jurors said or their decision-making process in calculating damages based on what Juror No. 2 heard them say is hearsay. | ☐ Sustained<br>☑ Overruled |
| | **Speculation, lacks foundation, lacks personal knowledge**.     Juror  No.  2  lacks  personal knowledge and her statements lack foundation as to what other jurors discussed or how or why they decided or "set" to award damages. | ☑ Sustained<br>☐ Overruled |
| | **Not relevant.**    Evid. Code § 350.    It is not misconduct to consider the defendant's net worth in awarding punitive damages.  CACI 3945. _See also_ Cal. Judges Benchbook Civ. Proc. After Trial, Chp. 2, § 2.53 ("[P]unitive damages must be supported by . . . evidence of the defendant's financial condition" and "the defendant's net worth is the critical determinant."). | ☐ Sustained<br>☑ Overruled |

motion to strike: denied!⁶ 66

EVIDENTIARY OBJECTIONS BY PLAINTIFF EVA ECHEVERRIA TO DECLARATIONS OF JUROR NO. 1 AND JUROR NO. 2

10/20/17

## I.   EVIDENTIARY OBJECTIONS TO THE DECLARATION OF JUROR NO. 8 (P.C.)

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| ¶ 4, lines 10-11: "[E]veryone in the jury room was free to participate in the damages deliberations . . . ." | **Vague and ambiguous.**   The phrase "everyone in the jury room was free to participate in the damages deliberations" appears intended to address the contention in defense jurors' declarations that they were directed not to deliberate on damages, without actually refuting it. Two sentences later in the juror's declaration, she professes being unable to remember "whether or not" defense jurors were requested not to participate in damages deliberations. The two contentions—that defense jurors were requested not to deliberate on damages and that they were nonetheless "free to participate in the damages deliberations"— are not necessarily mutually exclusive, where being "free to participate" means something short of having a vote on the final awarded amount. *See* Evid. Code §§ 352, 765. | ☑ Sustained<br>☐ Overruled |
| | **Evidence   Code   § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process).   While testimony that specific jurors were told not to participate in damages deliberations, or did or did not in fact participate in them, could be admissible as observable conduct, this juror's subjective opinion about whether defense-leaning jurors were "free to participate in the damages deliberations" is an improper statement of mental processes to the extent it is based on the juror's vague feeling or sense of the room, rather than on actual statements made. | ☑ Sustained<br>☐ Overruled |
| ¶ 4, lines 12-13: "Everyone was given a chance to say what they thought about the amount to award Ms. Echeverria, including the jurors who voted for the defendants." | **Vague and ambiguous** as to the phrase "[e]veryone was given a chance to say what they thought." That language appears to be a lawerly non-refutation of the contention in defense jurors' declarations that they were directed not to deliberate on damages. Indeed, the very next sentence of the juror's declaration states that she cannot remember | ☑ Sustained<br>☐ Overruled |

| | | |
|---|---|---|
| | "whether or not" defense jurors were asked not to participate in damages deliberations. The two contentions—that defense jurors were requested not to deliberate on damages and that, notwithstanding, they could have interposed "what they thought about the amount"—are not necessarily mutually exclusive, where having "a chance to say what they thought" means something short of being permitted to vote. *See* Evid. Code §§ 352, 765. | |
| | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). While testimony that specific jurors were told not to participate in damages deliberations, or did or did not in fact participate in them, could be admissible as observable conduct, this juror's subjective opinion about whether "[e]veryone was given a chance to say what they thought" is an improper statement of mental processes to the extent it is based on a vague feeling rather than on actual statements made in the jury room. | ☑ Sustained<br>☐ Overruled |
| ¶ 4, lines 13-15: "I do not remember a request to exclude jurors from these deliberations, but whether or not that happened, everyone on the jury participated in reaching the verdict, and no one was excluded." | **Vague and ambiguous** as to the phrase "everyone on the jury participated in reaching the verdict, and no one was excluded." That artfully worded phrase appears calculated to distinguish between the finding of liability and the damages the jury ultimately awarded. It cannot be true both that there was a "request to exclude jurors from these deliberations" (about which, the juror avers, she cannot remember "whether or not that happened") and that "everyone on the jury participated in reaching the verdict, and no one was excluded" if "verdict" includes deliberations respecting damages. *See* Evid. Code §§ 352, 765. | ☑ Sustained<br>☐ Overruled |
| ¶ 5, lines 16-17: "Along with the other jurors, I voted based on the evidence that was presented against each of the defendants and the law that we were instructed to follow." | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). The statement as to what this juror purports to have subjectively considered in voting is inadmissible both as it concerns her own | ☑ Sustained<br>☐ Overruled |

| | | |
|---|---|---|
| | vote and particularly as it concerns the votes of other jurors. The statement goes to the subjective reasoning of the jury in reaching its verdict and is not verifiable and/or based on observable facts/expressions. | |
| | **Conclusory, and lacks foundation and personal knowledge** as to the basis for other jurors' votes. *See* Evid. Code § 702. | ☑ Sustained<br>☐ Overruled |
| ¶ 6, lines 22-23: "The evidence presented was considered and was interpreted by me based on my thinking about the evidence." | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). The statement as to how this juror purports to have interpreted the evidence and her subjective "thinking" is an example of her subjective reasoning, not verifiable and/or based on observable facts/expressions. | ☑ Sustained<br>☐ Overruled |
| ¶ 6, lines 23-24: "We all worked together and we used our own reasoning skills in a demonstrative manner based on the evidence that was presented in the trial." | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). The statement as to how this juror perceives the collective reasoning skills of the jury (and each juror individually, including herself) is not verifiable and/or based on observable facts/expressions. | ☑ Sustained<br>☐ Overruled |
| | **Conclusory, and lacks foundation and personal knowledge** as to the basis for the other jurors' deliberations and the manner in which they reached a verdict. *See* Evid. Code § 702. | ☑ Sustained<br>☐ Overruled |
| | **Vague and ambiguous** as to the phrase "demonstrative manner," which appears to have been inserted merely in order to avoid the prohibition of Evidence Code § 1150 on juror declarations concerning "mental processes." *See* Evid. Code §§ 352, 765. | ☑ Sustained<br>☐ Overruled |

69

II. **EVIDENTIARY OBJECTIONS TO THE DECLARATION OF JUROR NO. 10 (N.F.)**

| Material Objected to: | Grounds for Objection: | Ruling: |
|---|---|---|
| ¶ 3, line 10: "The compensatory damages verdict was a reasonable compromise." | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). Whether the juror believes the damages verdict was a "reasonable compromise" is not verifiable and/or based on observable facts/expressions.<br><br>**Conclusory and lacks foundation** as to whether the verdict was "a reasonable compromise." *See* Evid. Code § 702. | ☑ Sustained<br>☐ Overruled<br><br>☑ Sustained<br>☐ Overruled |
| ¶ 3, line 11: "Even though I wanted to award her more, I agreed to the lower amount." | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). Whether the juror wanted to award any more or less is not verifiable and/or based on observable facts/expressions." | ☑ Sustained<br>☐ Overruled |
| ¶ 3, lines 20-21: "From my standpoint, I am proud of the fact that all of us were very conscientious in a way that we considered all of the evidence that was presented." | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). The juror's statement about what "all of us [the jury]" "considered" goes to her subjective reasoning and is not verifiable and/or based on observable facts/expressions.<br><br>**Conclusory, and lacks foundation and personal knowledge** as to whether the other jurors were conscientious or considered all of the evidence. *See* Evid. Code § 702. | ☑ Sustained<br>☐ Overruled<br><br>☑ Sustained<br>☐ Overruled |
| ¶ 3, lines 22-23: "I believe that the process was fair to both the plaintiff and the defendants." | **Evidence Code § 1150** (Improper Statement of Jurors' Subjective Reasoning/Mental Process). The juror's statement of belief as to the fairness of "the process" goes to her subjective beliefs/reasoning and is not verifiable and/or based on observable facts/expressions. | ☑ Sustained<br>☐ Overruled |

*m̃ᵐ 10/20/17*

*570*