Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS           )
LIABILITY LITIGATION             )    Case No. 16-md-02741
_____ )

                                      San Francisco, California
                                      Thursday, November 9, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                        WEITZ & LUXENBERG, P.C.
                        700 Broadway
                        New York, New York 10003
                   BY:  **ROBIN L. GREENWALD, ESQUIRE**

                        THE MILLER FIRM LLC
                        108 Railroad Avenue
                        Orange, Virginia  22960
                   BY:  **MICHAEL J. MILLER, ESQUIRE**
                        **NANCY GUY MILLER, ESQUIRE**

                        ANDRUS WAGSTAFF
                        6315 Ascot Drive
                        Oakland, California 94611
                   BY:  **KATHRYN MILLER FORGIE, ESQUIRE**

                        LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
                        501 Broad Street
                        Lake Charles, Louisiana 70601
                   BY:  **RUDIE R. SOILEAU, JR., ESQUIRE.**

(Appearances continued on next page)

Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Official Reporter - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiffs:
                         ANDRUS ANDERSON LLP
 3                       155 Montgomery Street, Suite 900
                         San Francisco, California 94104
 4               BY:  LELAND H. BELEW, ESQUIRE

 5   For Defendant:
                         HOLLINGSWORTH LLP
 6                       1350 I Street, N.W.
                         Washington, DC 20005
 7               BY:  ERIC G. LASKER, ESQUIRE

 8   Telephonic Appearances:
                         Joe Hollingsworth, Esquire
 9                       Heather Pigman, Esquire
                         Jessica Richman, Esquire
10                       Rachal Rojas, Esquire
                         Aimee H. Wagstaff, Esquire
11                       David Wool, Esquire

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    <u>Thursday, November 9, 2017</u>                    <u>2:33 p.m.</u>

2                     **P-R-O-C-E-E-D-I-N-G-S**

3                           **---000---**

4         **THE COURT:**  Calling case number 16-md-2741, In re

5    Roundup Products Liability Litigation.

6         Counsel, please step forward and state your appearances

7    for the record.

8              **MS. GREENWALD:**  Robin Greenwald for the plaintiffs.

9         **MR. MILLER:**  Good afternoon, Your Honor.

10   Michael Miller for plaintiffs.

11             **THE COURT:**  Good afternoon.

12        **MR. LASKER:**  Good afternoon.  Eric Lasker for

13   Monsanto.

14             **THE COURT:**  Good afternoon.

15        So you've come all this way.  I don't know how much there

16   really is going to be to discuss.

17        **MR. LASKER:**  If I may, Your Honor, there's actually

18   been a pretty significant development, somewhat surprisingly,

19   this morning.

20        If I could just hand up to Your Honor, there was a major

21   new development in the science of glyphosate and nonHodgkin

22   lymphoma.

23        And, as you'll see, this data was published this morning

24   by the National Cancer Institute.  And the conclusion, just

25   sort of in short form -- it's also highlighted for you in the

abstract -- which is that in this large prospective cohort study, no association was apparent between glyphosate and any solid tumors or lymphoid malignancies overall, including Non-Hodgkin lymphoma, its subtypes.

        **THE COURT:**  Okay.

        **MR. LASKER:**  If I may, I would like to sort of put this into context for Your Honor, to explain how this impacts where we are and where we're heading in this case for the *Daubert* hearing.

        If you'll recall back to science day, just to put this in context, this is a cohort study.  And a cohort study, which began in the 1990s, enrolled about 57,000 pesticide applicators, obtained information about their exposure history, including exposure to glyphosate.

        And then the way cohort studies work, they follow them over time.  And as time goes by, more and more individuals in the cohort develop certain cancers.  And the ability to look at this issue of whether or not there's an association between an exposure and an outcome becomes more and more powerful.  There's more and more numbers.  There's more and more analyses that can be conducted.

        So this is the Agricultural Health Study.  And I don't know if you'll recall, from some of our other briefing, the discussions of this study.  It is -- and we are almost through the *Daubert* briefing.  Plaintiffs spent eight pages in their

1    opposition brief, specifically on this cohort study.

2        It was the lead study in our discussion of the

3    epidemiology.  Both sides have stated in their *Daubert* briefs

4    to this point that epidemiology is the key to the causation

5    analysis.

6            **THE COURT:**  Did you say this just came out?

7            **MR. LASKER:**  Yes.  It's highlighted on the top.  As

8    you look on the top, it was published November 9th.

9            **THE COURT:**  This may be a minor, unimportant question,

10    but you said that they spent eight pages talking about it in

11    their opposition brief before it came out?

12           **MR. LASKER:**  That's what I want to explain to Your

13    Honor.

14           **THE COURT:**  Okay.

15           **MR. LASKER:**  That's why I'm trying to put this in

16    context.

17       So the cohort study, which is the Agricultural Health

18    Study, as I said, they followed them over time.  And at certain

19    breaks or certain times they then look at the data to see what

20    is showing up to that point.

21       So there's a publication in 2005, which is an earlier look

22    at this data.  At that point, they had 92 individuals who had

23    developed nonHodgkin lymphoma.  To put that into context in

24    this analysis, they now have over 520 individuals with

25    nonHodgkin lymphoma.

1       So as time goes by --

2               THE COURT:  "They have" you mean --

3               MR. LASKER:  I'm sorry, the cohort.  This study.  It's

4       an ongoing study that goes forward in time.

5               THE COURT:  Okay.

6               MR. LASKER:  So in 2005, there's a publication that

7       shows no association of nonHodgkin lymphoma, but with only 92

8       individuals who had nonHodgkin lymphoma.  That still made it

9       the largest study, but nowhere near as powerful as the study is

10      now.

11      That study, of course, was addressed by both sides'

12      experts.  And the plaintiffs' experts raised certain concerns

13      about that study, including the fact that they thought 92 cases

14      of nonHodgkin lymphoma were not enough to do an analysis and

15      that they needed more followup time to allow more cases to

16      develop to be able to reach any conclusion.

17      There was then, in the course of discovery in this

18      litigation, third-party discovery of Dr. Aaron Blair, who, as

19      you might recall, was the chair of the IARC working group and

20      also had been involved in these -- in the AHS, the Agricultural

21      Health Study.

22      Through discovery of his files, we obtained a draft

23      publication analysis from 2013, that was of a variety of

24      different pesticides with updated information that included

25      some analysis of nonHodgkin lymphoma and glyphosate.

1    So that took us up to about 250 cases.  And there were a

2    number of analyses that were conducted in there, again showing

3    no association between nonHodgkin lymphoma and glyphosate.  And

4    that was then addressed by the experts, our experts, both on

5    our side and on their side.

6        And the plaintiffs' experts -- and they have two experts

7    in epidemiology, Your Honor, Dr. Neugut and Dr. Ritz -- had

8    different issues with that -- that study.

9        Dr. Neugut basically said that it's unpublished; and,

10   therefore, I'm not going to look at it.  And he didn't read it

11   and would offer no opinions about it whatsoever.

12       Dr. Ritz initially didn't read it, but then she did.  She

13   submitted a supplemental expert report that was largely focused

14   specifically on the 2013 analysis.

15       And she raised a number of concerns she had with the

16   analysis up to that date.  And they're pretty technical issues

17   she had.  But they're methodological questions she had, that

18   she didn't think were answered in the 2013 paper.

19       That is where things stood as of this morning.  Both

20   sides' experts have addressed this study and addressed the

21   analyses that they had as of that date.

22       As I said, this new study has just come out this morning.

23   We are obviously reviewing it pretty furiously.  We have had a

24   chance to talk with our experts sort of preliminarily this

25   morning.

1          One thing that our experts believe is that the issues that
2     Dr. Ritz raised with the 2013 study, some of the questions she
3     had, have now been resolved with this publication.  And very
4     specific criticisms she had are addressed in this publication.

5          And our experts will be submitting supplemental expert
6     reports.  This study will obviously be a key focus in the
7     *Daubert* hearing.  It has to be.  It's a major scientific
8     development on what both sides agree is the keystone area of
9     epidemiology.

10         We need, I think, for the record, for plaintiffs' experts
11    to offer any opinion on the study -- and there's case law
12    dealing with this -- you have need to have a supplemental
13    expert report before the *Daubert* hearing so that they can offer
14    any opinions.

15         And I don't know what their opinions will be.  I'm sure
16    they'll have some.  But we are now in a situation where this is
17    going to be a focus of the hearing.  And we need to have some
18    way -- and we've been trying to think about it, and we have met
19    and conferred with plaintiffs, and they will provide --
20    actually, in the cafeteria about an hour ago.  But we've been
21    trying to think about how we can handle this.

22         As Your Honor will recall, we had a somewhat similar
23    issue -- although it was much more speculative -- dealing with
24    slides of mouse study.  And that ultimately turned out to be
25    nothing.  But here we actually have a study.  There is no way

1    there is going to be nothing.

2         And we are also in the process of the briefing.  We're

3    filing our reply brief tomorrow.  We'll have the time to

4    discuss this.  Plaintiffs really don't because their briefing

5    is done except for a reply on their *Daubert* challenge of our

6    experts, which wouldn't really get to these issues.

7         So we've been trying to think about, on our side, how we

8    can deal with this and do it in sort of as narrow a focused way

9    as we can.  The scheduling is such it's hard for us to see how

10   this can be done within a month.

11        We would propose trying to come up with an accelerated

12   schedule and meet and confer with plaintiffs to maybe get this

13   study in two or three months so we don't push the hearing that

14   far into the future from where it's currently scheduled.

15        We would limit the additional proceedings to supplemental

16   reports specifically on this study.

17        **THE COURT:**  When you said "limit additional

18   proceedings," you mean additional submissions?

19        **MR. LASKER:**  Yeah, before the *Daubert* hearing.  I'm

20   sorry, Your Honor.  To this study.  We are not going to reopen

21   everything.  There's one thing that has happened, and we would

22   focus on that.

23        So we would have supplemental expert reports.  We'd have

24   depositions that would be limited in time.  We certainly don't

25   need full-day depositions.  It would be focused on this study.

1    And supplemental briefing with some page limitations, that

2    would be appropriate for the narrow focus we have here.

3        And then we would be able to proceed with the hearing, you

4    know, maybe by late February or early March, if we could.   I

5    think that time frame is doable.

6        Obviously, both sides are going to have to talk with their

7    experts about scheduling issues.

8        So that's kind of an interesting wake-up this morning.

9    We've been doing a lot of work, as you might imagine.

10            **THE COURT:**   I'll say.

11            **MR. LASKER:**   Thank you, Your Honor.

12            **MR. MILLER:**   Yes, Your Honor.   We oppose a

13    continuance.   And I'd like to explain.

14        We've been dealing with this issue and this study in all

15    of our discovery and all of our experts.   The Agricultural

16    Health Study supplemental report that was published this

17    morning is the unpublished report that we dealt with; that the

18    defendants dealt with in their brief and we dealt with in our

19    brief; that they talked to all our experts about and we talked

20    to all of their experts about.   The only difference is now it's

21    published instead of unpublished.

22        So the defendants have already gotten one continuance --

23            **THE COURT:**   Let me just ask you, you said the only

24    difference is that it is published instead of unpublished.   So

25    are you saying the experts had this very document in front of

1   them?

2          **MR. MILLER:**  No, Your Honor.  That document came out

3   this morning.

4       The unpublished data that is the basis for that document

5   has been debated by all the experts and is in our briefs.

6          **THE COURT:**  Okay.  But Mr. Lasker said that the data

7   that was debated in the briefs was based on -- I don't remember

8   the numbers, but 50-some subjects from 2005, and then

9   200-and-some subjects from 2013, from the records of the head

10  of the IARC working group.

11      Did I get that right?

12         **MR. LASKER:**  Yes.  Yes, Your Honor.

13         **THE COURT:**  And then -- and now there are how many

14  subjects?

15         **MR. LASKER:**  About 530, Your Honor.

16      And I'm not sure if Mr. Miller has had the opportunity to

17  review the study thoroughly.  It's not at all the same data.

18  It's much more data, and there's much different analyses.

19         **MR. MILLER:**  Your Honor --

20         **MR. LASKER:**  The 2013 paper was a study that looked at

21  a number of different pesticides.  And it had some analyses of

22  glyphosate in that.

23      But this study is much broader.  It focused specifically

24  on glyphosate.  It has more updated information, has more

25  information, has different analyses, none of which we've

1    addressed with their experts.

2          **THE COURT:**  Okay.

3          **MR. MILLER:**  2013 data is what that's based on.  We've

4    been debating with our experts --

5          **THE COURT:**  Have you read this yet?

6          **MR. MILLER:**  I briefly read it a half an hour ago.

7    And I looked at an abstract this morning when it came out.

8        And there will always be new studies coming out.  Science

9    is evolving.  If the defendants are going to get a continuance

10   every time a new piece of science comes out, we will never have

11   a *Daubert* hearing.

12       So we object to and can easily -- we've already cleared

13   the time.  The Court has cleared the time.  Experts have

14   cleared their time.  We've already dealt with the 2013

15   Agricultural Health Study data upon which that publication

16   is -- that's the core data upon which that publication is

17   based.

18       We have our own sound scientific reasons why that study is

19   not to be relied upon.  We can go over them now, but I don't

20   think it's proper to go over the merits of them.

21       But it's been discussed by every expert.  It's been

22   briefed.  It's in our brief.  That data, the 2013 data, the

23   first time we got that data was when we deposed Aaron Blair.

24   Aaron Blair produced that data as part of his deposition.

25       That's been almost a year now.  So our experts have looked

1    at it.  Their experts have looked at it.

2        In fairness to the defendants -- and I will agree with

3    them on this point -- the one expert that would not discuss

4    that data was Dr. Neugut, because he only wants to discuss

5    published data.

6        So as I explained to Mr. Lasker half an hour ago, we'll

7    get a supplemental report from Dr. Neugut.  We can have it in a

8    week.  If they want to narrowly depose Dr. Neugut again on that

9    issue, that's fine.  The Court would allow an hour or two for

10   that, we can get it done before December 11th.

11       So there's no surprise here.  And they can deal with it in

12   their reply brief.  That's fine with us.  It's data we have

13   dealt with, we're prepared to deal with at the *Daubert* hearing.

14   It's not a reason for continuance.  It's just another piece of

15   a puzzle and, we think, an unreliable piece, as we've

16   articulated in our brief and will at the *Daubert* hearing.

17           **THE COURT:**  Okay.  Where do you discuss -- where do

18   you discuss this -- where is it discussed in the briefs?

19           **MR. MILLER:**  I think Mr. Lasker's representation was

20   it's over eight pages.  And that's probably inaccurate --

21           **THE COURT:**  Where?  Give me the page numbers.

22           **MR. LASKER:**  Yes, Your Honor.

23       So the plaintiffs, in their opposition brief, address --

24           **THE COURT:**  "Opposition" --

25           **MR. LASKER:**  I'm sorry, opposition to our *Daubert*

1    brief.  I can start with our *Daubert* brief.

2              THE COURT:  All right.

3         MR. LASKER:  Well, the plaintiffs' opposition brief

4    deals with it, I think, at pages 29 through 38.  And that is

5    broken up into one section of the overall Agricultural Health

6    Study, which is an ongoing study.  Then they have a section on

7    the 2005 study, then have a section on the 2013 draft.

8         We deal with that, at least as a section header --

9    although we deal with it in other places -- in our brief.  And

10   it's our lead discussion of the epidemiology starting on page

11   12 through page 15.

12             THE COURT:  It's in your *Daubert* opening --

13        MR. LASKER:  In our opening brief, Your Honor.

14             THE COURT:  *Daubert* brief.

15        MR. LASKER:  Yes.  And we will, of course, be dealing

16   with it in our reply brief tomorrow.

17             THE COURT:  Give me the pages again.

18        MR. LASKER:  Sorry.  Yes.

19        In our brief, it is -- sorry, I took out theirs.  It is

20   pages 12 to 15 is the section that covers that.  Although

21   there's discussion of it elsewhere.

22        And in plaintiffs' it is pages 29 through 38.

23        And, Your Honor, we appreciate the fact --

24             THE COURT:  Hold on one second.

25        MR. LASKER:  Yeah.

1              THE COURT:  Give me a second.

2              MR. MILLER:  Your Honor, may I add one other document?

3              THE COURT:  Sure.

4              MR. MILLER:  We also dealt with it in a rebuttal

5    report from Dr. Ritz, epidemiologist from UCLA.  She provided a

6    supplemental rebuttal report on the 2013 data.

7              THE COURT:  Dr. who?

8              MR. MILLER:  Ritz.

9              THE COURT:  How do you spell that?

10             MR. MILLER:  R-i-t-z.

11             THE COURT:  Okay.

12             MR. LASKER:  And, Your Honor, if I might, because I'm

13   just not sure I'm clear on one of the things that Mr. Miller

14   stated.  He mentioned that Dr. Neugut will be preparing a

15   supplemental report.

16      Dr. Ritz, in her discussion of the 2013 study, raised two,

17   sort of, substantive critiques, both of which are actually

18   expressly addressed in the new study where they do certain

19   analyses that address and respond -- I don't think they were

20   responding directly to her criticism; that would be kind of

21   odd -- but respond exactly to the issues that she raised in her

22   rebuttal report.

23      So those arguments, at least from our experts'

24   perspective, no longer apply to this 2017 paper.  To the extent

25   they ever were valid criticisms, they have now been addressed.

1        Dr. Ritz will most certainly have something to say about

2    that.  We would need to know what her going opinions are going

3    to be.  We have no idea.  And I frankly admit I don't know

4    where she's going on this.  I often can get a sense, but I have

5    no idea where she's going to go on this.

6            **THE COURT:**  Okay.  Hold on.  Give me one second.

7            **MR. LASKER:**  Sure.

8        (Pause)

9            **THE COURT:**  Okay.  Well, I kind of flipped through the

10   plaintiffs' opposition brief and what they say about this

11   study.  Obviously, I couldn't read it carefully.

12       And, you know, based on what I've heard today, I mean, I'm

13   not really equipped -- based on what I've been given so far,

14   I'm not really equipped to judge whether this is a -- you know,

15   such a significant development that it requires, you know,

16   continuing the hearings and doing a new round of expert

17   reports, and all that, or whether it's just one more in the

18   inevitable, you know, series of developments that will continue

19   to occur.

20       So, you know, I don't know what to say.  I don't know what

21   to say right now.

22           **MR. LASKER:**  I appreciate this, Your Honor.  It's sort

23   of a -- a interesting situation we find ourselves in.

24       And I think the only thing that I can state on this,

25   again -- well, two things.  One is that the significance of the

1    development -- and we think this is a major development.  The

2    science wasn't there before, but this is by far the largest

3    study, is the best design study.  And it is conclusive,

4    frankly, in our view, on the issue.

5         But beyond just taking our word for it is the fact that

6    plaintiffs spent so much time in their brief trying to address

7    this issue.  And we will be --

8         **THE COURT:**  If you put it front and center, of course,

9    they have to spend time addressing the issue.  I don't think

10   that proves anything.

11        **MR. LASKER:**  Well, Your Honor, to the extent we're

12   going to be having a *Daubert* hearing to challenge their

13   experts' causation opinions and the reliability of the

14   methodology that they use in reaching a causation opinion --

15   and, obviously, Your Honor will determine that issue.

16        But if you recall, the last time we had a situation

17   somewhat similar to this, we were talking about tissue slide

18   from the 1983 mouse study and one, you know, tumor, in which

19   plaintiffs' experts -- plaintiffs believe was something that

20   they needed to have information on and need to have experts

21   analyze to be able to provide Your Honor with information.

22        This is an epidemiology study which both sides have

23   recognized is the focus of the inquiry.  It is the only cohort

24   study that has been conducted of this question with, as I said,

25   60,000 pesticides applicators.

1          THE COURT:  What's a pesticide applicator?

2          MR. LASKER:  It is somebody who has to actually

3     register -- it's people who use pesticides a significant amount

4     in their work.  And they have to register in various states;

5     make sure they have the proper training and what have you.

6          So these are individuals with the highest exposures.

7     This -- this new paper, for example, has analyses not only of

8     whether or not there's an association, but it has a whole

9     series of analyses at different exposure levels to determine

10    whether or not at higher exposures there is a higher risk, and

11    finding that there's not.

12         Has analyses of individual subtypes of nonHodgkin lymphoma

13    again at various dose levels.  This would be -- and we'll be

14    making this argument.  It would be -- for plaintiffs' experts

15    not to be able to address a cohort study like this, from the

16    National Cancer Institute, published in the Journal of the

17    National Cancer Institute, which is one of the highest profile

18    journals in the country on cancer, that in itself will be

19    disqualifying for any expert.

20         This is not an issue of one rat tumor or one mouse tumor

21    40, 50 years ago.  And the issue we have, Your Honor, again,

22    is --

23         THE COURT:  But why could it not just simply be

24    addressed in the testimony?  I mean, why do we have to press

25    the pause button and do more reports and more depositions?  Why

1    couldn't -- why couldn't we just address this new study that

2    came out?

3        I mean, nobody is blamed for not addressing it beyond the

4    way they addressed it in their reports, because it wasn't

5    published yet.

6        But why not -- why can't the study simply be addressed in

7    the testimony?

8            **MR. LASKER:**  Well, two points.  First, nobody, again,

9    has been able to address this study in their reports because

10   the analyses are different and the data is different.

11       So we have a situation --

12           **THE COURT:**  Right.

13           **MR. LASKER:**  -- where we would question those

14   witnesses and so they could.

15       If they have any opinions to offer on those, though, on

16   the study, they would need to have some kind of supplemental

17   report explaining what those opinions are, for us to know what

18   those opinions are --

19           **THE COURT:**  I mean, under these circumstances, do

20   their depositions have to be taken before the *Daubert* hearings?

21           **MR. LASKER:**  If they're going to have new opinions --

22   if they have no opinion on this study, and they concede that

23   it's a study that says what it says, and they have nothing else

24   to say about it, then I guess not.

25       But if they're offering opinions in support of their

1    causation opinion, that incorporate this study -- which I think

2    they have to -- I don't think; they would have to; there's no

3    way not to -- then they have a supplemental report and they

4    have opinions that we need to know what they are and discover.

5              THE COURT:  Are you entitled to that?  Like, legally

6    entitled to?

7              MR. LASKER:  There is case law that deals --

8              THE COURT:  I think that under some circumstances it's

9    appropriate, in a civil case, to have witnesses testify without

10   their depositions having been taken.

11             MR. LASKER:  Yes, Your Honor, I think that would be

12   right.

13        There is case law -- and maybe plaintiffs will stipulate

14   to this.  There is case law and there's appellate case law in

15   which an expert who is precluded from testifying at a *Daubert*

16   hearing about opinions that they did provide in their expert

17   reports.

18        We don't want to be in a situation here, on appeal, where

19   the plaintiffs are arguing that they didn't have an opportunity

20   to submit supplemental reports.

21        And, on the flip side, if the plaintiffs are coming in

22   with -- at the hearing with opinions that we've never heard

23   before, it's the same situation.  Our record now is getting

24   very confused for the appeal.

25        And, you know, again, this is -- this is something we've

1    been trying to figure out.  We've been researching the case

2    law.  And I actually have it on my phone to try and pull up

3    some of those cases for you when I sit down, I guess.  Or if

4    you'll let me, I'll try to find it right now, what those cases

5    are.

6        But we are concerned that we have the proper record before

7    the Court with supplemental expert opinions so that the *Daubert*

8    hearing is an appropriate hearing to test those opinions and

9    challenge those opinions.

10       **THE COURT:**  I mean, there are two questions, I think;

11   right?

12       One question is, under what circumstances can a Court just

13   say, no, sorry, we're going forward, and this is something that

14   you can deal with when they take a stand?  And it's a

15   development that occurred after the expert reports were

16   submitted.

17       And so, you know, every time something new comes out, you

18   don't have the right to press the pause button and take more

19   depositions and exchange more reports.  At some point you just

20   have to deal with new information on -- when the witness takes

21   the stand; right?

22       I'm quite sure that under some circumstances it is

23   appropriate for a Court to say that.  And so one question is,

24   what are the rules about that?

25       And then the next question, and probably related question,

1    is, just how important is this study?  And just how significant

2    is this development in the grand scheme of things?

3        And I think the answer to those two questions is the

4    answer to whether the hearings should go forward in December or

5    whether they should, you know, be postponed -- be pushed back.

6        I'm very reluctant to ask you to file briefs about whether

7    more briefs should be filed.  It seems a little ridiculous.

8        So I think that what I will do is ponder this, do a little

9    study on my own, and get back to you next week about how I want

10   to proceed.  And if I have questions, I'll ask you to file

11   letter briefs or something addressing my questions.  And you

12   should be ready on short notice next week to do that.

13       In terms of, you know, making your lives slightly less

14   miserable than they already are, when is the ideal time for you

15   all to get a decision from me about whether we are going

16   forward in December or pushing it back?

17       **MR. LASKER:**  Well, I don't know what the date is.

18   Obviously, we have lots of issues with our experts.  If we can

19   get something toward the end of next week, that would be

20   doable.

21       **THE COURT:**  Get what?

22       **MR. LASKER:**  Your viewpoint, the end of next week.

23       If it would be helpful to Your Honor, we can also submit

24   to you the sort of (unintelligible).  It's in the docket

25   somewhere, but way buried, the 2005 Agricultural Health Study

1    and the 2013 draft study so you can at least -- I don't suppose

2    you would be able to read them in any detail, but you'll see

3    the distinctions and the differences between those studies to

4    get a sense of the issues -- of the issues, if that will be

5    useful.

6          **THE COURT:**  I'll let you know if I need that.

7          **MR. LASKER:**  Okay.

8          **MR. MILLER:**  Just to follow up on that, and those two

9    documents have been available for the last year.  And our

10   experts have been debating them for the last year.  And those

11   documents were debated in their *Daubert* and our response.

12         **THE COURT:**  What Mr. Lasker is saying is that they are

13   significantly different from this document.

14         **MR. MILLER:**  That's where we don't agree.

15     There's nothing statistically significant in that

16   document.  They don't reach one statistically significant

17   finding in that document.  The document adds nothing important

18   to the scientific inquiry.

19         **THE COURT:**  You haven't really read it yet.

20         **MR. MILLER:**  Well, I did, Your Honor.  I read the

21   statistical confidence intervals.  And that's a quick read.

22   It's an easy read.

23     But we're at Your Honor's disposal.  If you want a letter

24   brief or a phone call, we're available.  And I agree with

25   Mr. Lasker that sometime next week the Court's decision is

1   reasonable and agreeable.

2          **THE COURT:**  Okay.  On how the proceedings will go, one

3   idea I wanted to float by you -- I mean, I know Monsanto has a

4   lot of objections to their -- we're going to sort all that out

5   after the testimony, okay.

6          **MR. LASKER:**  Right.

7          **THE COURT:**  But here's what I was -- as I was reading

8   your list of witnesses and how much time you wanted to allocate

9   to each one, and the like, for a minute I was thinking, well,

10  why don't I just read their expert reports before the hearings

11  and start with cross-examination on each witness.

12      Then I was thinking, you know, I'm not sure how good of an

13  idea that is because, you know, this is complicated stuff, and

14  there are a lot of experts.  And it may be difficult for me,

15  particularly before the testimony comes in, to keep track of

16  who is who.

17      I mean, I will tell you, I will read every word of every

18  expert report --

19          **MR. LASKER:**  Right.

20          **THE COURT:**  -- before the hearings start, okay.

21      So what I -- what I -- what I was wondering is if the most

22  efficient way to proceed with the witnesses would be to impose

23  a half-an-hour limit on the direct of each witness.

24      And the purpose of the half hour is to really summarize

25  and hit the high points of the testimony, to remind me about

1    the most important things in their reports that I read but

2    might not have focused on enough.   Right?

3        And the -- I think the qualification -- the stuff about

4    qualifications, I don't think we need to do that live.   I think

5    that can all be done on paper.

6        So qualifying the witnesses as experts, and talking about

7    their background and all the fancy degrees they have or not

8    fancy degrees they have, or whatever, how fancy is the

9    degree -- I'm quite sure there's nobody from UC Santa Cruz on

10   the list -- but that all gets done on the papers.

11       Half an hour for the witness on direct in as narrative a

12   form as you want, as narrative a form as you want the witness

13   to do it, gives a summary of the highlights of their opinion

14   and the most important points of their opinion.

15       On direct, lawyer can jump in and ask a question if the

16   witness forgot to say something important or whatever.   But if

17   it's half an hour of narrative testimony, I think that's fine.

18   And then cross-examination and then redirect.

19       It strikes me that that would be a more efficient way to

20   do it, so I wanted to see what you all thought about that.

21          MR. LASKER:   Yeah.   The parties actually met about

22   this over lunch, also, and want to think about what Your Honor

23   just said as well.

24       We had come up with an alternative solution that we had

25   reached agreement on as well.   And let me lay out my

1    understanding of it.  And, obviously, Ms. Greenwald can correct

2    me if I'm wrong.

3        But the issues in this case deal with three areas of

4    science: epidemiology, animal toxicology, and geno tox with

5    some mechanistic data.  And the plaintiffs' experts'

6    methodologies are somewhat similar.

7        And what we were discussing at lunch is whether we would

8    submit some of the experts on the paper and have other experts

9    provide live testimony so that there would be fewer experts in

10   the hearing.

11       And, at least from my perspective, I think that what that

12   would offer for Your Honor -- because, as you recognize, this

13   is very complicated stuff.  It would -- the direct examinations

14   will allow Your Honor to sort of get an understanding of the --

15   sort of what the opinions are and the bases for the opinions

16   and how the science has been analyzed.

17       I'm a little bit concerned that very short direct

18   examinations may not provides Your Honor with as much

19   information as would be useful.

20       So what we had been discussing, and we would need to meet

21   and confer to just sort of nail down some of the particulars,

22   is that we would be able to do this within the time period

23   allotted, bringing fewer than all of the experts for live

24   testimony, but experts that would cover all of the scientific

25   areas that are addressed in the *Daubert* challenge and

1   methodologies that are addressed in the *Daubert* challenge.   And

2   then the rest of them would be submitted on the papers.

3          THE COURT:   Presumably, each side would be picking

4   their best, the people they think are the most effective or

5   best experts.

6          MS. GREENWALD:   Your Honor, the other thought we had,

7   actually, was right in line with what you said.   We were

8   thinking only we had 45 minutes of direct and cross.   And I had

9   incorporated -- and I haven't even talked to Mr. Lasker about

10  this yet -- with an hour for the Court, if the Court wanted to

11  take an hour.   And we figured --

12         THE COURT:   I will likely -- if past experience in

13  these sorts of things is any indication, I will likely be

14  interrupting throughout.

15         MS. GREENWALD:   Right.

16         THE COURT:   When I have a question or need

17  clarification, I will interrupt.   So I don't think we need to

18  allot time for me.

19         MS. GREENWALD:   No, what I meant by that was we did

20  the math, assuming that Your Honor wants everyone to come.   We

21  did the math.   And we could do it, certainly, with 30 minutes

22  each.

23      I mean, again, we are not opposed to Mr. Lasker's

24  suggestion of picking three people at all.   That would be fine.

25  But if Your Honor decides that you would prefer more people to

1    come, we did the math as well, and it would work with even 45

2    minutes.  But 30 would also be -- I mean, it's fine with us, 30

3    on each side.

4           **THE COURT:**  So the idea would be you would each pick

5    one person from one area?

6           **MS. GREENWALD:**  Correct.

7           **THE COURT:**  Well, so that might be a good approach

8    too.  But I wonder if it would make sense to start with that

9    approach but have your other people on call in case I decide

10   during that week that I want to hear from them.

11       Like, if I say I want to hear another epidemiology person,

12   you know, or I want to hear your other epidemiology people, you

13   know, that's the most important, you know, or something like

14   that -- I mean, I -- I don't know.

15       I mean, again, it's sort of -- for me, it's sort of an

16   abstract discussion.  I haven't read the expert reports yet.  I

17   haven't, you know, read the briefs yet.  So it's difficult for

18   me in the abstract to know if, you know, it's going to hinder

19   me in some way to only hear from three experts on each side.

20       I guess what I would say -- so I guess what I would say

21   about that is that if you both believe that that's the best way

22   to approach it, then I would be inclined to defer to you.  But

23   think about whether, you know, you could have your other people

24   on call if I say I want to hear more about this.

25          **MR. LASKER:**  I mean, we can certainly talk about that

1   amongst ourselves and see if that -- that would work.

2          THE COURT:  So the idea then would be each side -- we

3   would hear from six witnesses.

4          MS. GREENWALD:  Correct.

5          THE COURT:  And what you're budgeting is, like, two

6   and a half hours of air time for each witness.  Is that about

7   right?

8          MS. GREENWALD:  Maybe even a little more, but that's

9   right.  Between two and a half and three and a half would work.

10         MR. LASKER:  Again, we just discussed this over lunch,

11  so there may be a wrinkle around the edges.  But the idea would

12  be that you would have enough time for each witness.

13      We're in a little bit of a -- as the defendants, we don't

14  know which experts they're going to be calling.  So I do want

15  to be able to at least have that conversation with plaintiffs'

16  counsel first, just to have more of an understanding of the

17  approach.  But, in general, that's the way we would go forward.

18         MS. GREENWALD:  We talked about it, as we said, at

19  lunch.  We could give names by, I would think, Monday, if we

20  went this 3-3, and talk it through to see if that would work.

21      So I think we could report back to you -- maybe I'm wrong,

22  but I think we could report back to you on Tuesday, at the

23  latest; maybe even Monday.  Since you're three hours'

24  difference from us on the East Coast, we could probably tell

25  you -- I don't know if you can.  I think we can on our side.

1   We don't have the same issues you have.  You maybe need a

2   little more time.

3        **MR. LASKER:**  Yeah.  They -- they thought about this a

4   little bit before I have because it was their proposal.  I just

5   would need to confer with my folks.  But sometime next week.

6        And, again, this will obviously be -- I think one of the

7   things we also did discuss is that this approach would probably

8   work whenever the hearing is.

9        **THE COURT:**  Although, so what I will say is that this

10  is obviously, like, a very important thing.  And so, you know,

11  if -- if 18 hours -- I mean, 18 hours of testimony kind of

12  sounds like a lot.  But if 18 hours of testimony is not enough

13  for me to develop a very strong understanding of this stuff,

14  then there should be more testimony.

15       Like, this is not -- you know, this is not like some

16  regular civil trial where you impose a ten-hour limit on each

17  side, and even if they can't do a great job of getting their

18  stuff in during those ten hours, kind of too bad because the

19  Court has, you know, 500 other cases.  That's not this case.

20       So if we -- you know, if we end up needing more than a

21  week to hear testimony, we'll take more than a week to hear

22  testimony.  So that's -- overall, if you, you know, come to a

23  meeting of the minds on that, taking that approach, that's

24  fine.

25       I also think there is more value to having a witness on

1    the stand than just having their testimony in on paper.  You

2    know, it is more helpful.  It's more likely to sink in when

3    it's -- when a witness -- when you've read the witness's stuff,

4    and they come take the stand, you can ask questions about it.

5    So, you know, keep those principles in mind.

6        The other thing is, I wonder -- I'm not sure what I think

7    about this.  I'm thinking out loud.  But, you know, we talked

8    about -- you mentioned, you know, wanting to make sure there's

9    a enough time for argument, for attorney argument.

10       And, you know, it's not clear to me whether that attorney

11   argument should come at the end of a long week of expert

12   testimony when everybody is tired or, you know, a week later or

13   two weeks later, or something like that.

14           **MS. GREENWALD:**  That would be fine.

15           **MR. LASKER:**  I think, from our perspective, Your

16   Honor, we want to proceed however is going to be best for you,

17   to make sure that you have a full understanding of the issues.

18       We do recognize there's some -- a lot of science here for

19   you to deal with, and we want you to make sure you have all

20   that information.

21       So, again, why don't we meet and confer with plaintiffs'

22   counsel.  I will -- again, I think this does also speak a bit

23   to the earlier issue about the importance of having all the

24   science in the record correctly for the hearing and having, you

25   know, the opinions laid out before the hearing.  It's all part

1    of this -- I'll make one last plug and get that point in.

2        But I think the parties can definitely meet and confer on

3    this.  And I don't know, also, if -- we can meet and confer and

4    talk about how you want some of the exhibits to be submitted

5    and what's the best format for you.  We both looked at your

6    standing order for trials, but that doesn't seem to quite be

7    right.

8        THE COURT:  Well, I assume -- is there going to be --

9    I assume you all are going to agree on what can be admitted.

10       To the extent -- I would say, for efficiency's sake, to

11   the extent that there are objections to something, let's just

12   do those on the paper too.

13       And anybody who wants to present anything to me can

14   present it to me.  And then I'm a judge, so I'm trained to

15   disregard things that I've seen.

16       MR. LASKER:  Right.

17       THE COURT:  And you can do objections on the paper.

18       So, you know, you should be able to submit a piece of

19   paper which establishes which exhibits are being admitted and

20   which exhibits are being provisionally admitted subject to

21   objection.  And the objection can be specified on paper.  And

22   you can kind of do that, I think, probably whenever you want.

23       I mean, we have to check with Kristen to make sure it

24   works mechanically with her, but I want to make it as easy for

25   you all and I don't want us to be taking time during the

1  hearings, you know, asking to -- for exhibits to be admitted or

2  bickering about whether they should be admitted.

3        **MR. LASKER:**  Yes, Your Honor.

4    And the hearing is under Rule 104, actually.  So the

5  recognition is a hearing before a judge.  It's not -- so the

6  rules of objecting are somewhat --

7        **THE COURT:**  Right.

8        **MR. LASKER:**  -- relaxed.

9        **MS. GREENWALD:**  And we have actually spoken to your

10  partner, Ms. Pigman, about this.  And we already have a plan of

11  when we're going to exchange and working all this out.

12    I think we're good on this.  And I think we will have --

13  well in advance of the hearing, any objections we would be able

14  to post and present to you.

15        **THE COURT:**  I feel like somebody asked for an

16  extension on the --

17        **MS. GREENWALD:**  Correct.

18        **THE COURT:**  -- submission --

19        **MS. GREENWALD:**  Right.

20        **MR. LASKER:**  We both did.

21        **MS. GREENWALD:**  We did that jointly because under the

22  current order, the exhibit list is due before the briefing is

23  finalized.

24    So we asked for an additional, like, ten days to meet and

25  confer, because we thought it was better to have all the

```
 1   briefing done before we met and conferred on exhibits.
 2              THE COURT:  That's fine.
 3              MS. GREENWALD:  We agree.
 4              THE COURT:  That's fine.
 5              MS. GREENWALD:  We're working well on this, and I have
 6   no concerns about being able to work it out.
 7         Your Honor, I have one question.  Listening to this was
 8   super helpful today.  So the three exhibits -- the three
 9   witnesses was not necessarily our idea.  But I'm hearing it
10   would maybe make more sense to bring everyone.  We have to
11   think about it as well --
12              THE COURT:  I don't --
13              MS. GREENWALD:  -- in light of your comments.
14         No.  I'm just saying if we have the full week of the 11th,
15   should we be budgeting time, assuming that the Friday will be
16   testimony not argument.
17         I mean, I think that makes sense to us.
18              THE COURT:  Yeah.  My gut is that -- whether we are
19   doing it the week of the 11th or a different week, is that we
20   should -- we can just budget for a full week of testimony.
21         And we'll have argument -- I think my -- I think the best
22   thing to do is to have argument not too far from it.  Like,
23   maybe even the next week.  You know, the next week or the week
24   after.
25              MR. LASKER:  That --
```

1          **MS. GREENWALD:**  That definitely works.

2          **MR. LASKER:**  The week of December 11th, that might not

3   work, I think, for somebody because there's a holiday somewhat

4   after that, which is also a consideration for some people.

5          **THE COURT:**  Okay.  Not for me.

6          **MS. GREENWALD:**  I was going to say we would be okay

7   with that.

8          **THE COURT:**  Okay.  All right.

9          **MR. LASKER:**  Thank you, Your Honor.

10          **THE COURT:**  Thank you.

11          **MS. GREENWALD:**  Thank you, Your Honor.

12      (At 3:20 p.m. the proceedings were adjourned.)

13                          -  -  -  -

14

15                   **CERTIFICATE OF REPORTER**

16      I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   DATE:   Monday, November 13, 2017

20

21

22

23   _____

24      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                U.S. Court Reporter

25