# EXHIBIT 13

Confidential - Pursuant to Protective Order

1              UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

2

3       IN RE: ROUNDUP            )

        PRODUCTS LIABILITY        )   MDL No. 2741

4       LITIGATION                )

        _____   )   Case No.

5       THIS DOCUMENT RELATES     )   16-md-02741-VC

        TO ALL CASES              )

6

7            TUESDAY, JANUARY 23, 2018

8      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

9                    - - -

10          VIDEOTAPED DEPOSITION of JENNIFER R.

11    RIDER, ScD, held at the offices of Cetrulo LLP,

12    2 Seaport Lane, Boston, Massachusetts,

13    commencing at 2:39 p.m., on the above date, before

14    Maureen O'Connor Pollard, Registered Merit

15    Reporter, Realtime Systems Administrator,

16    Certified Shorthand Reporter.

17                    - - -

18

19

              GOLKOW LITIGATION SERVICES

20        877.370.3377 ph | 917.591.5672 fax

              deps@golkow.com

21

22

23

24

25

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2    ANDRUS WAGSTAFF
      BY:  DAVID J. WOOL, ESQUIRE
 3         david.wool@andruswagstaff.com
           7171 West Alaska Drive
 4         Lakewood, Colorado 80226
           303-376-6360
 5
                  -and-
 6
      THE MILLER FIRM LLC
 7    BY:  JEFFREY A. TRAVERS, ESQUIRE
           jtravers@millerlawllc.com
 8           108 Railroad Avenue
             Orange, Virginia 22960
 9           540- 672-4224
             Counsel for Plaintiffs
10
11
      HOLLINGSWORTH LLP
12    BY:  ERIC LASKER, ESQUIRE
           elasker@hollingsworthllp.com
13           1350 I Street, N.W.
             Washington, DC 20005
14           202-898-5800
             Counsel for Defendant Monsanto
15
16
17
18
      V I D E O G R A P H E R :
19
      CHRISTOPHER COUGHLIN,
20    Golkow Litigation Services
21                     - - -
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1                         INDEX
      EXAMINATION                              PAGE
 2    JENNIFER R. RIDER, ScD
       BY MR. WOOL                              5
 3
 4              E X H I B I T S
      NO.           DESCRIPTION                PAGE
 5

      33-1    Supplemental Expert Report of
 6            Jennifer R. Rider, ScD............  10
 7    33-2    Andreotti, et al article,
              Glyphosate Use and Cancer
 8            Incidence in the Agricultural
              Health Study.....................  10
 9
      33-3    Agricultural Health Study.........  10
10
      33-4    Blair, et al article,
11            Reliability of Reporting on
              Life-Style and Agricultural
12            Factors by a Sample of
              Participants in the Agricultural
13            Health Study from Iowa...........  33
14    33-5    Montgomery, et al Author
              Manuscript, Characteristics of
15            non-participation and potential
              for selection bias in a
16            prospective cohort study.........  39
17    33-6    Heltshe, et al article, Using
              multiple imputation to assign
18            pesticide use for non-responders
              in the follow-up questionnaire
19            in the Agricultural Health Study..  50
20    33-7    Benbrook article, Trends in
              glyphosate herbicide use in the
21            United States and globally........  74
22

23

24

25
```

Confidential - Pursuant to Protective Order

```
1              P R O C E E D I N G S

2

3              THE VIDEOGRAPHER:  We are now on the

4    record.  My name is Chris Coughlin, and I'm a

5    videographer for Golkow Technologies.  Today's

6    date is January 23, 2018, and the time is 2:39.

7              This video deposition is being held in

8    Boston, Massachusetts in the matter of Roundup

9    Products Liability Litigation, MDL Number 2741,

10   United States District Court, Northern District

11   of California, Case Number 16-md-02741-VC.

12             The deponent is Dr. Jennifer Rider.

13             Will counsel please identify

14   yourselves and state whom you represent.

15             MR. WOOL:  David Wool from Andrus

16   Wagstaff for the plaintiffs.

17             MR. TRAVERS:  Jeffrey Travers with The

18   Miller Firm for the plaintiffs.

19             MR. LASKER:  Eric Lasker,

20   Hollingsworth LLP, for Monsanto.

21             MR. WOOL:  The court reporter is

22   Maureen O'Connor, and she will now swear in the

23   witness.

24

25
```

Confidential - Pursuant to Protective Order

1           JENNIFER R. RIDER, ScD,

2  having been first duly identified and sworn, was

3  examined and testified as follows:

4                  EXAMINATION

5  BY MR. WOOL:

6       Q.    Good afternoon, Dr. Rider.

7       A.    Hi.

8       Q.    How are you doing?

9       A.    Good.  Thank you.

10      Q.    So one, I know we haven't met before,

11  and I know that you've been through this process

12  before, but I can tell that you are somewhat

13  eager to give your answers, so if you'll just

14  give me a moment to finish my questions and let

15  counsel get in his objections where he wants to,

16  I think that will make the court reporter's job

17  a little bit easier.

18      A.    Okay.

19      Q.    Fair enough?

20      A.    Mm-hmm.

21      Q.    So I have marked as Exhibit 1 a copy

22  of your supplemental expert report.

23      A.    Mm-hmm.

24      Q.    Now, does that expert report, along

25  with the original expert report that you

Confidential - Pursuant to Protective Order

1    authored in this litigation, include all of your

2    opinions for the Andreotti study?

3            MR. LASKER:  Objection to form.

4       A.    I can't say that it includes all of my

5    opinions, but I felt like it covered the most

6    important issues.

7    BY MR. WOOL:

8       Q.    Since you authored that report, have

9    you read anything that changes any of the

10   opinions that are described in that report?

11      A.    No.

12      Q.    Now, in preparing that report, did

13   anybody assist you in summarizing literature?

14      A.    No.

15      Q.    You wrote the report by yourself

16   without the assistance of, say, a grad student

17   or a teaching assistant?

18      A.    That is correct.

19      Q.    All right.  And have you read any of

20   the plaintiff expert reports that were submitted

21   pursuant to Pretrial Order 34, which is the

22   Order that required the supplemental reports?

23      A.    Yes, I have.

24      Q.    Which expert reports have you read, if

25   you recall?

Confidential - Pursuant to Protective Order

```
1       A.    Yes.  I have read Dr. Ritz's report,

2   and Dr. Neugut's report, and I believe I also

3   took a quicker look at Dr. Portier's report.

4       Q.    All right.  Do you believe that

5   exposure is accurately assessed in the Andreotti

6   study?

7       A.    So I think that the authors did a good

8   job of making sure that even if there would be

9   some imperfect measurement of exposure like we

10  have in all epidemiologic studies, that it had

11  very little impact on the findings.

12      Q.    So it's fair to say that all

13  epidemiological studies have some degree of

14  inaccuracy?

15      A.    Yes.  I don't think we could find an

16  example of an epidemiologic study where there's

17  absolutely perfect reporting when you're talking

18  about a long-term follow-up of participants.

19      Q.    Have you ever collected occupational

20  exposure data for an epidemiological study?

21      A.    No.  I don't do occupational

22  epidemiology, but I certainly do epidemiology

23  that deals with questionnaire data and cancer

24  outcomes.

25      Q.    Now, have you ever designed a
```

 1    questionnaire for an occupational exposure

 2    study?

 3              MR. LASKER:  Objection to form.

 4       A.    Like I said, I don't do occupational

 5    epidemiology in my own research, so no, I

 6    wouldn't have designed those types of questions.

 7    But I have contributed to questions that have

 8    appeared on questionnaires for fairly high

 9    profile observational studies.

10    BY MR. WOOL:

11       Q.    Just to make things easier for me, how

12    does occupational exposure epidemiology differ

13    from what you do?

14              MR. LASKER:  Objection to form.

15       A.    So in my view, I think occupational

16    epidemiology is just looking specifically at

17    exposures a person would encounter while they

18    are working.  But the -- how we handle these

19    exposures in study design and analytics really

20    isn't very different from looking at any other

21    lifestyle exposure, which is something that I do

22    in my own work.

23    BY MR. WOOL:

24       Q.    And you've served as a peer review --

25    strike that.

Confidential - Pursuant to Protective Order

1           You have served as a peer reviewer for

2   various epidemiological journals, correct?

3       A.    That is correct.

4       Q.    And in your capacity as a peer

5   reviewer, have you ever peer-reviewed any

6   occupational exposure studies?

7       A.    I can't recall a specific example, but

8   it wouldn't surprise me if I have.

9       Q.    So it's possible?

10      A.    It's very possible that I have.  But I

11  have peer-reviewed a lot of articles.

12      Q.    Fair enough.

13            And the Andreotti study evaluated

14  exposure data, correct?

15      A.    Well, they related GBH use to various

16  cancer outcomes, yes.

17      Q.    Let's -- actually I'm just going to

18  mark this as Exhibit 2, which is the Andreotti

19  study.

20            MR. WOOL:  Here is a copy of it,

21  Counsel.

22            And I will mark as Exhibit 3 a copy of

23  the enrollment questionnaire.

24

25

Confidential - Pursuant to Protective Order

1              (Whereupon, Exhibit Number 33-1,

2              Supplemental Expert Report of Jennifer

3              R. Rider, ScD, Number 33-2, Andreotti,

4              et al article, Glyphosate Use and

5              Cancer Incidence in the Agricultural

6              Health Study, and Number 33-3,

7              Agricultural Health Study, were marked

8              for identification.)

9         MR. LASKER:  Which one?

10        MR. WOOL:  This is the private

11   applicator questionnaire.

12   BY MR. WOOL:

13        Q.   Now, have you seen this document

14   before?

15        A.   The private applicator questionnaire,

16   or this study?  Sorry, which one are we talking

17   about?

18        Q.   The private applicator questionnaire,

19   Exhibit 33-3.

20        A.   I have gone online to the Agricultural

21   Health Study website, but I believe I have spent

22   more time looking at the commercial applicator

23   questionnaire.

24        Q.   The commercial applicator enrollment

25   questionnaire?

Confidential - Pursuant to Protective Order

```
 1        A.     Correct.  Yes.

 2        Q.     And the Andreotti study evaluated both

 3   private applicators and commercial applicators,

 4   correct?

 5        A.     Yes.  So they all were people who were

 6   enrolled while they were getting their pesticide

 7   license, their applicator license.

 8        Q.     All right.  So if you look at

 9   Exhibit 3, Page 10, at the very top you will see

10   questions about Roundup, Jury, or glyphosate.

11               Do you see that?

12        A.     I do.

13        Q.     And the questionnaire asked whether

14   the cohort member has ever personally mixed or

15   applied the herbicide, how many years they

16   personally mixed or applied the herbicide, and

17   an average how many days per year they used it

18   along with when they first used the herbicide,

19   correct?

20        A.     Mm-hmm.

21        Q.     All right.  And this is the -- so the

22   questions on Page 10 on, I believe, row H are

23   the questions that form the baseline exposure

24   assessment for the Andreotti study for private

25   applicators, correct?
```

Confidential - Pursuant to Protective Order

1               MR. LASKER:  Objection to form.

2        A.    I would have to look more carefully at

3    this document to confirm that.

4               (Witness reviewing document.)

5        A.    Yeah, I mean, it seems reasonable that

6    this is the enrollment questionnaire and not the

7    take-home questionnaire, which they also did.

8    But I can't be sure just from looking at this,

9    no.

10       Q.    Well, if you turn to the very first

11   page, you will see --

12       A.    Enrollment questionnaire, yes.  Thank

13   you.

14       Q.    So we agree this is the enrollment

15   questionnaire --

16       A.    Yes.

17       Q.    -- by private applicators.

18              Now, cohort members were also asked

19   about the use of protective equipment, correct?

20       A.    Correct.

21       Q.    And if you turn to Page 15, Question

22   17 asks about the use of protective equipment,

23   correct?

24       A.    That is correct.

25       Q.    And Question 17 is not specific to any

Confidential - Pursuant to Protective Order

1   herbicide, is it?

2       A.    It just says, "What type of protective

3   equipment do you generally wear when you

4   personally handle pesticides?"  So that is

5   correct.

6       Q.    And so if somebody used more than one

7   pesticide and multiple types of protective

8   equipment, this questionnaire would not

9   distinguish which specific type of protective

10  equipment applied to which pesticide, would it?

11      A.    It doesn't appear this questionnaire

12  would.  I believe if we looked at the commercial

13  pesticide applicator questionnaire, that one

14  distinguishes at least by different classes of

15  pesticides.

16      Q.    Do you know approximately how many of

17  the cohort members were commercial applicators

18  versus private applicators?

19      A.    I would need to look back.  I don't

20  recall offhand, no.

21      Q.    I believe if you look at -- let's see.

22  Well, we can go back to that actually.

23      A.    Okay.

24      Q.    Now, if you look at Question 16 still

25  in the questionnaire, Page 15.

Confidential - Pursuant to Protective Order

1    A.    Okay.

2    Q.    Question 16 asks, "How do you

3  personally apply pesticides?"  Correct?

4    A.    Correct.

5    Q.    And Question 16 does not ask cohort

6  members to describe the application method

7  specific to a pesticide, does it?

8    A.    That is correct.  Again, I think this

9  is different than in the commercial

10  questionnaire.  But on this one, that is

11  correct.

12    Q.    So if somebody used multiple

13  pesticides, again we would have no way of

14  knowing which application method applied to

15  which pesticide, would we?

16         MR. LASKER:  Objection to form.

17    A.    That is correct.  I mean, we would

18  know how frequently they used particular

19  pesticides, but not the application method

20  specifically for each one.

21  BY MR. WOOL:

22    Q.    Okay.  Now, if we look at the

23  Andreotti study, Table 1, I think there's a

24  breakdown of the percentage of private

25  applicators versus commercial applicators, if

Confidential - Pursuant to Protective Order

1    you go under "applicator type."

2            Do you see that?

3    A.    Yes, I do.

4    Q.    Okay.  And at least for the kind of

5    ever-never -- or not never side.  Okay.

6            And so in the first column we are

7    looking at -- sorry, strike that.

8            In the first column of Table 1 we are

9    looking at never used glyphosate, correct?

10   A.    Correct.

11   Q.    And the total number of private

12   applicators is 8,476?

13           MR. LASKER:  Objection to form.

14   Mischaracterizes the document.

15   A.    So there are 91 percent of those who

16   never used glyphosate were private applicators,

17   meaning that's the majority of glyphosate users

18   were commercial applicators.

19   BY MR. WOOL:

20   Q.    Okay.  And the cohort members were all

21   restricted use pesticide applicators, correct?

22   A.    They all had to have their license.

23   That is how they were enrolled.

24   Q.    What is a restricted use pesticide?

25   A.    I'm not exactly sure what goes into

Confidential - Pursuant to Protective Order

1  the licensing requirements.  I just know that

2  that is how they enrolled the cohort, so that in

3  many ways the cohort would be more able to give

4  good quality information on pesticide use.

5      Q.    Is the use of personal protective

6  equipment something that could impact actual

7  exposure to glyphosate?

8      A.    I mean, I think we have data from

9  several biomonitoring studies that suggest that

10  yes, it does.

11      Q.    And in what way does the use of

12  personal protective equipment impact actual

13  exposure to glyphosate?

14      A.    Well, I mean, I think it's reasonable

15  to think that if you are wearing personal

16  protective equipment, you might have a lower

17  internal dose of glyphosate exposure.

18      Q.    And how did the authors in Andreotti

19  use the information about personal protective

20  equipment?

21      A.    They used it in their intensity

22  measures.  There's an algorithm for which they

23  calculated intensity of use, and personal

24  protective equipment was incorporated into that

25  algorithm.

Confidential - Pursuant to Protective Order

1    Q.    Are you familiar with the term

2  exposure misclassification?

3    A.    Yes, I am.

4    Q.    What does that term mean to you?

5          MR. LASKER:  Objection to form.

6    A.    It means the degree to which you are

7  assigning a participant the wrong value for

8  exposure, and it can be either differential or

9  non-differential with respect to the outcome.

10  BY MR. WOOL:

11    Q.    And what is the difference between

12  differential and non-differential just so we're

13  clear?

14    A.    So non-differential -- if we're

15  talking about exposure misclassification,

16  non-differential exposure misclassification

17  would mean that you're providing the wrong

18  information on exposure equally as often in

19  those who do and do not go on to develop the

20  outcome of interest, whereas differential, there

21  would be some difference in that

22  misclassification according to disease status.

23    Q.    And is non-differential exposure

24  misclassification a type of systematic error

25  that can occur in an epidemiological study?

Confidential - Pursuant to Protective Order

1          MR. LASKER:  Objection to form.

2     A.    I guess it is a type of error that

3   could create a bias, if that's what you mean by

4   systematic error.

5   BY MR. WOOL:

6     Q.    Have you heard the term systematic

7   error before as it relates to epidemiological

8   studies?

9     A.    Yes, some people use that term.  But

10   it's one of these terms that's used to mean very

11   different things.

12     Q.    Just so I'm clear, if I use the term,

13   what does the term mean to you?

14          MR. LASKER:  Objection to form.

15     A.    So I wouldn't really talk about

16   systematic error.  I would talk about the

17   specific type of bias that we're talking about.

18   BY MR. WOOL:

19     Q.    Okay.  Do you believe that exposure

20   misclassification can bias the results of an

21   epidemiological study towards the null?

22          MR. LASKER:  Objection to form.

23     A.    So you're asking if non-differential

24   misclassification can bias the results toward

25   the null?

1  BY MR. WOOL:

2      Q.    Yes.

3      A.    On average, that tends to be what

4  happens, especially when we're looking about

5  dichotomous exposures, but there's also random

6  error.  So you can't always expect that a point

7  estimate will be biased towards the null in a

8  given study.

9      Q.    And can exposure misclassification

10  impact the relative risk of a study?

11          MR. LASKER:  Objection to form.

12      A.    So again, are you talking specifically

13  about non-differential exposure?

14  BY MR. WOOL:

15      Q.    Let me clarify my question.

16          Can non-differential exposure

17  misclassification impact the relative risk

18  estimate in an epidemiological study?

19      A.    Yes, it can.

20      Q.    Can it have a substantial impact upon

21  relative risk estimates?

22      A.    It depends on a number of factors.  So

23  again, if we're just talking about

24  non-differential misclassification of exposure,

25  you know, we need to know the degree to which

Confidential - Pursuant to Protective Order

1  the exposure is being misclassified.  And then I

2  also mentioned there's also this random error

3  issue, and so, in general, that's less of a

4  problem in larger studies.

5      Q.    And accurate exposure assessments are

6  important in large cohort studies, correct?

7          MR. LASKER:  Objection to form.

8      A.    Well, yeah.  I mean, I think our goal

9  is to measure the exposure that we're thinking

10  to -- that we're hoping to relate to a

11  particular outcome.  And so in my own work I

12  want to get as close as I can to measuring that

13  exposure correctly.

14  BY MR. WOOL:

15      Q.    And do you believe the exposure

16  assessment in the Andreotti study is accurate?

17      A.    So I think they did a number of things

18  to ensure that they were getting very good

19  exposure reporting.  I think, you know, first of

20  all, just including a cohort of licensed

21  applicators, they were likely to get much better

22  information than, say, in some of the

23  case-control studies that had been conducted

24  previously.  And they also -- you know, they

25  have the initial baseline exposure, they have

Confidential - Pursuant to Protective Order

1    follow-up exposure, they look at exposure

2    classified in several different ways, so yeah,

3    so I think they did a good job in measuring the

4    exposure.

5        Q.    And what is selection bias, just so

6    we're clear on that term?

7        A.    So the sort of structural definition

8    of selection bias is when you're conditioning on

9    an effect of both exposure and disease.  So in

10   other words, one example would be if -- you

11   know, getting into the analysis of your study

12   depends on both exposure and disease.

13       Q.    Now, if we turn to Page 7 of

14   Exhibit 2, which is the Andreotti study.

15       A.    Okay.

16       Q.    If you look in the left-hand column.

17       A.    Sorry, we're on Page 7 you said?

18       Q.    Correct.

19       A.    Yes.

20       Q.    I mean, I'm sorry, not the left-hand

21   column, the right-hand column.

22       A.    Okay.

23       Q.    Okay.  At the top of the paragraph,

24   second to the bottom, the authors state that

25   "This evaluation has some limitations that

Confidential - Pursuant to Protective Order

1  should be acknowledged.  First, despite the

2  specific information provided by the applicators

3  about use of glyphosate, some misclassification

4  of exposure undoubtedly occurred."

5          Do you agree with that statement?

6     A.    Like I said, I think we would be very

7  hard-pressed to find an epidemiologic study

8  where there was absolutely no misclassification

9  of exposure, especially when we're dealing with

10  lifestyle or occupational behaviors.  So in that

11  way, yes, I would agree.

12     Q.    And does misclassification always bias

13  the results of a study in a particular

14  direction; for example, towards the null or away

15  from the null?

16          MR. LASKER:  Objection to form.  Asked

17  and answered.

18     A.    Yes, so I did -- this is what I stated

19  previously.  But in general, non-differential

20  misclassification of exposure would bias the

21  results towards the null, especially if you are

22  just talking about a dichotomous exposure.  But

23  we have random error issues as well, and so the

24  point estimate you obtain from a single study

25  wouldn't always be necessarily closer to the

Confidential - Pursuant to Protective Order

1    null.

2    BY MR. WOOL:

3        Q.    Now, if we go to -- back to your

4    report --

5        A.    Okay.

6        Q.    -- to Page 4, I want to ask you about

7    the last sentence of this top paragraph.

8             MR. LASKER:  I'm sorry.  I was on

9    Page 4, but the wrong document.  So Page 4, yes.

10   BY MR. WOOL:

11       Q.    Okay?

12       A.    Yes.

13       Q.    The last sentence you state that while

14   -- sorry, strike that.  You state, "While this

15   theoretically could lead to a shift in the

16   relative risk for any individual category in

17   either direction, because the reported relative

18   risk in all categories in Andreotti, et al

19   results are below 1.0, it is impossible for

20   non-differential exposure misclassification to

21   conceal any positive associations in that data,"

22   correct?

23       A.    Mm-hmm.

24       Q.    And so is it your opinion, as you sit

25   here today, that it is impossible that exposure

Confidential - Pursuant to Protective Order

1   misclassification could have concealed a

2   positive association in the Andreotti study?

3       A.    So I think you're taking that sentence

4   a bit out of context, because I'm talking in

5   this whole paragraph about a specific situation

6   where you're looking at exposure in multiple

7   categories, and you have exposure

8   misclassification specifically between two of

9   those categories, those would bias the results

10  towards each other.  So in that particular

11  situation you could have the results for one

12  category go towards the null and another

13  category go away from the null.

14          But here in the HS 2018 study that

15  we're talking about, all of the results for

16  every category are below 1, you know, except for

17  the reference value, of course, which is 1, so

18  there's no way for two categories to be biased

19  towards each other and for one to be then away

20  from the null.

21      Q.    Okay.  So if I understand, and I'm not

22  sure that I do, you're saying that it is

23  impossible for the results of -- strike that.

24          So because all the results are going

25  away from the null, you're saying that it is

Confidential - Pursuant to Protective Order

1  impossible that exposure misclassification could

2  lead to that result?

3          MR. LASKER:  Objection to form.

4  BY MR. WOOL:

5     Q.    Did I get that?

6     A.    No, that's not what I said.

7     Q.    Okay.  Sorry.  I just want to make

8  sure that I'm clear.  This isn't a trick

9  question or anything like that.

10     A.    It might be helpful to actually look

11  at the results in Table 2.

12     Q.    Table 2 of Andreotti?

13     A.    Correct.

14          So if we're looking at the results for

15  NHL, you can see there's -- the reference group

16  that's the no exposure category, and then all of

17  the quartiles of exposure have relative risk

18  estimates that are below 1.  Right?

19     Q.    Correct.

20     A.    So it is impossible for this one

21  specific situation that I'm describing where

22  non-differential misclassification can actually

23  in categorical exposure evaluations can drive

24  the relative risk away from the null

25  theoretically, but it can't happen here because

Confidential - Pursuant to Protective Order

1    every single category has a relative risk below

2    1.

3            So if you were misclassifying two

4    categories, only two categories, it's possible

5    that they would be biased towards each other.

6    But here that towards each other would still

7    result in estimates below 1.

8        Q.    And so is it your opinion that the

9    Andreotti study is a negative -- or produces a

10   negative result?

11           MR. LASKER:  Objection to form.

12       A.    So that is a term -- I don't know what

13   you mean by "a negative result."

14   BY MR. WOOL:

15       Q.    So a result -- or a relative risk of 1

16   is a null result, correct?

17       A.    That would be a null result, yes.

18       Q.    And so, I believe you used the term

19   negative result in your original report, so my

20   apologies if you didn't.

21           But would a result less than 1

22   indicate that the substance at issue in this

23   case, glyphosate, has a protective effect?

24       A.    So this is exactly why I think it's

25   very important to always look at the confidence

Confidential - Pursuant to Protective Order

1    intervals and not just the point estimate, so

2    absolutely not.  I would not regard this as a

3    protective association.  I would call this

4    consistent with no association.

5        Q.    And that's because 1 is within the

6    confidence intervals?

7        A.    That is correct.

8        Q.    All right.  Did you do any research on

9    the potential effects of exposure

10   misclassification prior to writing your report?

11           MR. LASKER:  Objection to form.

12       A.    I guess I don't quite understand what

13   you mean.  I mean, I think I evaluate all of my

14   own studies that I do in terms of exposure

15   misclassification, and I teach exposure

16   misclassification, but I don't think any of my

17   substantive research is on the issue of exposure

18   misclassification specifically.

19   BY MR. WOOL:

20       Q.    Forgive me, this isn't on your

21   reliance list.  Actually we can go back to that.

22           Have you heard the term baseline

23   misclassification before?

24           MR. LASKER:  Object to the form.

25       A.    No, I wouldn't know what you meant by

Confidential - Pursuant to Protective Order

1     that term.

2     BY MR. WOOL:

3         Q.    Okay.  So let's just talk about

4     potential misclassification at enrollment.

5         A.    Okay.

6         Q.    Okay.  So we have the enrollment form.

7     So is it correct that the cohort members were

8     asked to detail past pesticide use at

9     enrollment?

10        A.    That is correct.

11        Q.    And they were asked to recall several

12    different pesticides, correct?

13        A.    I believe 50 pesticides.

14        Q.    And they were asked to recall the

15    frequency of use for each of those pesticides,

16    correct?

17        A.    That is correct.

18        Q.    And they were asked to do that by

19    filling out a questionnaire?

20        A.    The enrollment questionnaire, correct.

21        Q.    And do you know -- strike that.

22              Were the cohort members able to

23    compare answers to their own records prior to

24    filling out the questionnaire?

25        A.    What types of records do you mean?

1    Q.    For example, purchase records.

2    A.    I'm not sure actually if they were

3    able to do that.

4    Q.    Do you know if they were permitted to

5    ask family members about their own use to, say,

6    corroborate their memory?

7    A.    I'm not sure.

8    Q.    Okay.  And in the Andreotti study, the

9    relative risks were calculated by comparing the

10   exposed group to the unexposed group, correct?

11         MR. LASKER:  Objection to form.

12   A.    Yes, or in their primary analyses

13   every quartile of use was compared to no

14   exposure.

15   BY MR. WOOL:

16   Q.    And in the De Roos 2005 paper, which I

17   believe you relied on for your original report,

18   correct?

19   A.    Correct.

20   Q.    The authors of that study looked at

21   the comparison between the upper quartiles and

22   the lowest quartile, correct?

23         MR. LASKER:  Objection to form.

24   A.    So in their dose-response analyses

25   that's correct, it was done slightly

Confidential - Pursuant to Protective Order

1  differently, and the reference group was the

2  lowest exposed group, but they also provided

3  ever-never analyses where they compared it to no

4  exposure.  So it was just presented slightly

5  differently, but the same information was

6  available.

7  BY MR. WOOL:

8      Q.    And do you believe that one of those

9  methods is more reliable than the other?

10     A.    So I mean, I think when we're

11  interested in determining causal associations,

12  what we're really interested in is the

13  comparison of exposure and different levels of

14  exposure to no exposure.  So I think if you're

15  looking to make sort of causal inferences from

16  your study, I think in a lot of ways that makes

17  sense.

18     Q.    Is it possible to accurately quantify

19  exposure misclassification in the Andreotti

20  study?

21          MR. LASKER:  Objection to form.

22     A.    So I think the authors did go through

23  a number of different analyses, and there were

24  also external studies that look at the degree to

25  which exposure misclassification could be an

Confidential - Pursuant to Protective Order

1    issue, and I think those studies show that the

2    determination of exposure is quite good, and

3    certainly in line with other types of lifestyle

4    exposures that we typically measure.

5    BY MR. WOOL:

6        Q.    But I guess my question was a little

7    bit different.

8              Is it possible to measure -- to get a

9    precise measurement, I should say, for exposure

10   misclassification in the Andreotti study?

11       A.    Right.  So we can do sensitivity

12   analyses to determine the degree to which

13   different levels of exposure misclassification

14   could affect our results, but, you know, we can

15   never definitively say that there is this

16   certain degree of exposure misclassification in

17   a particular study, because we would never have

18   that information.

19             But I think the important thing is

20   that you look to see how much that would impact

21   your findings, and then if it appears that it

22   would have very little impact you can have

23   confidence in your conclusions.

24       Q.    Okay.  So let's go to Page 10 of your

25   expert report.

Confidential - Pursuant to Protective Order

1      A.      Okay.

2      Q.      I'm sorry.  Strike that.  We'll go

3   back to that.

4              Now, in the questionnaires, is it

5   possible that some exposure misclassification

6   occurred at enrollment?

7      A.      So you're asking is it possible that

8   not every applicator correctly reported every

9   single occurrence of every pesticide?

10     Q.      Correct.

11     A.      Yes, that is a possibility.

12     Q.      Okay.  And what's the potential effect

13  on Andreotti of misclassification at enrollment?

14     A.      Well, again, I mean, I think there is

15  good data from several external studies that

16  say, you know, they're in the Blair 2002 study,

17  that agreement between pesticide reporting from

18  one year to the next is actually very good.  So

19  if it's quite precise, we would expect that to

20  have very minimal impact on the findings.

21     Q.      And so is it your opinion, as you sit

22  here today, that pesticide applicators

23  accurately report use year-over-year?

24              MR. LASKER:  Objection to form.

25     A.      Again, I think that there is always

Confidential - Pursuant to Protective Order

1    some degree of error in reporting of exposure.

2    But, you know, here what we're really trying to

3    do is put people into categories of exposure

4    ranging from low use to high use.  And if we can

5    do a reasonable job in estimating their

6    exposure, we can at least get them into the

7    right category, and then our inferences will be

8    valid.

9    BY MR. WOOL:

10       Q.    And you just mentioned Blair 2002.

11   Let's take a look at that, which I'll mark as

12   Exhibit 33-4.

13               (Whereupon, Exhibit Number 33-4,

14               Blair, et al article, Reliability of

15               Reporting on Life-Style and

16               Agricultural Factors by a Sample of

17               Participants in the Agricultural

18               Health Study from Iowa, was marked for

19               identification.)

20   BY MR. WOOL:

21       Q.    And this is the study that you just

22   described?

23       A.    That's correct.

24       Q.    All right.  And how did Blair

25   determine that pesticide applicators gave

Confidential - Pursuant to Protective Order

1  reliable reporting for pesticide use?

2      A.    So I agree -- well, they say here in

3  the last sentence of the introduction, "We took

4  advantage of a special situation in Iowa to

5  assess the reporting consistency for

6  agricultural and lifestyle factors on a sample

7  of the cohort that completed two questionnaires

8  approximately one year apart."  So I think

9  something happened in Iowa regarding licensing,

10  and so they were able to obtain data on, I

11  believe it's about 4,000 people twice.  2,895

12  applicators, and a second group of 1,193.

13      Q.    Now, if we turn to Page 96 of the

14  Blair study, look at Table 2.  For the days per

15  year mixed or applied statistic, what is the

16  exact agreement for glyphosate?

17      A.    So that would be .71 with a confidence

18  interval of .67 to .75.

19      Q.    Okay.  And Blair reports 52 percent

20  exact agreement for glyphosate for days per year

21  mixed or applied, correct?

22      A.    Sorry, where are you getting that?

23      Q.    In Table 2, if you go down you'll see

24  days per year mixed or applied on the far

25  left-hand column.

Confidential - Pursuant to Protective Order

1    A.    The exact agreement, yes, 52 percent

2    with a kappa of .71, yes.

3    Q.    And that 52 percent is telling us that

4    the categories are identical for 52 percent of

5    the responders, correct?

6    A.    Well, that's true.  But if you go down

7    to the text below the table, they also say that

8    agreement within one category of exact agreement

9    was 98 and 99 percent, much higher than for any

10   category.

11         So this is actually the advantage of

12   looking at the kappa statistic is the kappa

13   statistic takes into account sort of chance

14   agreement that can happen, but it can also tell

15   you about how close you are to the correct

16   answer, not just whether you're right or wrong.

17   Q.    And so what does that mean when the

18   authors say agreement within one category of

19   exact agreement was 98 and 99 percent?

20   A.    So I believe it means that, you know,

21   if the person would have been classified in the

22   second group -- hold on.

23         So if the correct category was the

24   second group, you know, 98 or 99 percent of

25   people would have put themselves in the first

Confidential - Pursuant to Protective Order

1  group or the third group, just as an example of

2  what that means by within one category, as an

3  example.

4      Q.   Right.  I think I was misunderstanding

5  of your answer.

6      A.   Okay.

7      Q.   And again, the groups -- or strike

8  that.

9           The categories are less than 5, 5 to

10  9 --

11           MR. LASKER:  You're talking about

12  days?

13           MR. WOOL:  Sorry, the categories.

14           MR. LASKER:  Can you show us where you

15  were.

16           MR. WOOL:  For days per year of use

17  categories.

18           MR. LASKER:  So this is the footnote

19  to Table 2?

20  BY MR. WOOL:

21      Q.   Yes, the footnote to Table 2.  The

22  categories of less than 5, 5 to 9, 10 to 19, 20

23  to 39, 40 to 59, 60 to 150, and more than 150?

24      A.   Correct.

25      Q.   And your testimony is that exact

1    agreement was 98 and 99 percent within those

2    categories, so 99 -- or 98 to 99 percent of the

3    people who, say, reported as being within 10 to

4    19 one year were in 20 to 39 the year before, is

5    that right?

6        A.    As an example, correct, yes.

7        Q.    Okay.  And so based on this result,

8    which is, again, the days per year mixed or

9    applied, do you believe that the mixed or

10   applied data that's reported in Andreotti, et al

11   is accurate?

12           MR. LASKER:  Objection to form.

13       A.    So as I've said before, I think this

14   lends support to the fact that the relative

15   risks that we're estimating are by and large

16   capturing people with regard to whether they're,

17   you know, low exposed or high exposed

18   individuals and relating that to unexposed

19   individuals.  So while yes, some people may have

20   been not perfectly classified, you would still

21   be able to identify elevations in the relative

22   risk across those categories.

23       Q.    Okay.  Now, you talk about selection

24   bias in your expert report.

25       A.    Okay.

Confidential - Pursuant to Protective Order

1    Q.    And this time we're going to stick on

2  your expert report for a second.  If you go to

3  Page 4.

4    A.    Okay.

5    Q.    You had talked about some of the

6  different strategies that have been used by the

7  Andreotti authors to validate the results of the

8  study a couple moments ago, and at kind of the

9  bottom paragraph in the middle you begin talking

10  about the Montgomery study, correct?

11    A.    Yes.  I see that, yes.

12    Q.    And what is the pertinence of the

13  Montgomery study?

14        MR. LASKER:  Objection to form.

15    A.    Well, the Montgomery study is one of

16  the studies that looked at how likely or

17  unlikely selection bias was to occur in the

18  Agricultural Health Study.

19  BY MR. WOOL:

20    Q.    And how did the authors of Montgomery

21  do that?

22    A.    So they look at the differences in the

23  population in terms of responders and

24  non-responders to the follow-up questionnaire,

25  and they find that even though there are some

Confidential - Pursuant to Protective Order

1  differences among non-responders in many

2  variables that they measured, they do analyses

3  to show that this really doesn't have a

4  meaningful impact on the results.

5      Q.    Okay.  And I've actually marked as

6  33-5 the Montgomery study.

7              (Whereupon, Exhibit Number 33-5,

8              Montgomery, et al Author Manuscript,

9              Characteristics of non-participation

10             and potential for selection bias in a

11             prospective cohort study, was marked

12             for identification.)

13     A.    Okay.

14  BY MR. WOOL:

15     Q.    And if you look at the conclusions in

16  the abstract section on the first page, the

17  authors note that "Differences between

18  non-participants and participants in follow-up

19  interview were generally small, and we did not

20  find significant evidence of selection bias.

21  However, the incidence of bias may depend on the

22  specific exposure and outcome under study."

23             Did I read that correctly?

24     A.    Yes, you did.

25     Q.    What do they mean by "the specific

Confidential - Pursuant to Protective Order

1    exposure and outcome under study"?

2        A.    So they here in this study looked at

3    specific exposures and outcomes, and selection

4    bias phenomenon could -- you know, it's not

5    general across a study population, you would

6    need to take into account the specific exposure

7    and disease outcome of interest.

8        Q.    And what exposures did they look at in

9    Montgomery?

10       A.    Let's see.  This is one, I believe,

11   they looked at smoking.

12       Q.    I think if you look at the bottom of

13   Page 2.

14       A.    Okay.  They looked at chloro -- you're

15   going to make me say that.

16       Q.    No, I won't make you say it.

17       A.    With prevalent depression, smoking

18   with prevalent chronic lung disease, and smoking

19   with incident cancer.

20       Q.    So they did not look at glyphosate and

21   non-Hodgkin's lymphoma, correct?

22       A.    That is correct, they did not.  Yes,

23   they did not look at glyphosate and NHL

24   specifically.

25       Q.    And would you view -- strike that.

Confidential - Pursuant to Protective Order

1           And is it possible that there are --

2   actually, strike that.

3           And in your expert report you note

4   regarding Montgomery that these results provide

5   evidence that selection bias due to follow-up,

6   survey non-responses not necessarily a major

7   concern, though this issue should also be

8   considered with respect to GBH, which is

9   glyphosate-based herbicides, and NHL

10  specifically?

11      A.    Yes.  And I think the authors did that

12  in their sensitivity analyses.

13          MR. LASKER:  Just clarify, authors of

14  what?

15  BY MR. WOOL:

16      Q.    Go ahead.  Yes, fair enough.

17      A.    Sorry.  The Andreotti, et al authors

18  in the most recent 2018 publication did several

19  sensitivity analyses that addressed concerns

20  about selection bias from non-response.

21      Q.    Okay.  But to the extent that you rely

22  upon Montgomery, this article assumes that

23  glyphosate response patterns are the same as the

24  other pesticides measured in this one, which is

25  chlorpyrifos with a prevalent depression, for

Confidential - Pursuant to Protective Order

1  example?

2          MR. LASKER:  Objection to form.

3      A.    No, I wouldn't characterize it that

4  way, because, again, the primary analysis that

5  was done in the JNCI Andreotti study used

6  multiple imputation, and so the patterns don't

7  need to be exactly the same, you just need to

8  have measured all of the variables which

9  influence response.  So they collected all of

10  this other information on, you know, many, many

11  covariates in this questionnaire, and then could

12  use those to predict glyphosate use.  So it

13  doesn't necessitate that the patterns need to be

14  the same.

15  BY MR. WOOL:

16      Q.    Do you agree, though, that the extent

17  of bias could be dependent upon the particular

18  outcome, for example non-Hodgkin's lymphoma?

19          MR. LASKER:  Objection to form.

20      A.    So I think I would be much less

21  concerned about in this study, because we have

22  complete information on all of the outcomes

23  through cancer registry, so this isn't a

24  situation where loss to follow-up causes us to

25  miss some of the cancer cases.  So no, I

Confidential - Pursuant to Protective Order

1   wouldn't be concerned about that.

2   BY MR. WOOL:

3       Q.    So let's talk about that for just a

4   moment.

5             How were the outcomes captured in the

6   Andreotti study?

7       A.    They used linkage to cancer

8   registries.  So they're not relying solely on

9   self-reported outcome data.

10      Q.    Which cancer registries?

11      A.    I believe the state cancer registries,

12  but they also do a search of the death index.

13      Q.    Okay.  So if somebody moved out of the

14  state of North Carolina and then developed

15  non-Hodgkin's lymphoma, would that be captured

16  by the Andreotti study?

17      A.    If someone left the state prior to

18  their cancer diagnosis, it is possible that you

19  would miss that case, unless that person died of

20  NHL, and then you would most likely capture them

21  through the death registry.

22            This is the same method we use in the

23  cohorts that I work on.  And like this study,

24  you know, you can say that cancer outcomes are

25  captured at least 98 percent of the time.

Confidential - Pursuant to Protective Order

1    Q.    And the Andreotti study that's the

2  subject of your supplemental report adjusts for

3  the presence of confounders, correct?

4    A.    That is correct.

5    Q.    And some of the confounders that the

6  study adjusted for are other pesticides,

7  correct?

8    A.    Yes, they included other pesticides.

9    Q.    And, in fact, one of your opinions in

10  this litigation is that plaintiffs' experts

11  failed to properly adjust for confounders,

12  correct?

13    A.    Could you provide a little more --

14  that the plaintiffs experts failed to adjust?

15    Q.    Yes.  I believe it is.  Let's see, for

16  example, on Page 10 of your supplemental report

17  at the very bottom, there's a heading

18  "Overadjustment for Other Pesticides."

19    A.    So that specifically was about an

20  issue that Dr. Ritz raised in her deposition

21  where she was saying that when you adjusted for

22  other pesticides, you could over-adjust and

23  would somehow wash out the effect of GBH and

24  NHL.  But I disagree with that.  I think that,

25  you know, the most important issue is to -- for

Confidential - Pursuant to Protective Order

1  your results to be internally valid is to make

2  sure that you don't have a common cause of

3  exposure and outcome.  It's probably the most

4  basic epidemiologic principle.

5          It's interesting that in this

6  particular study, the Andreotti JNCI study, the

7  adjustment for those potential confounders

8  didn't have any appreciable affect on the

9  results.  But that doesn't mean that those

10  things they adjusted for couldn't be confounders

11  in another study where the population was less

12  homogenous.

13     Q.    So would it be fair to say that it

14  would be improper to fail to adjust for a known

15  confounder in an epidemiological study?

16     A.    I think if you know something that is

17  a common cause of the exposure and the outcome,

18  you would adjust for it, if what you're

19  interested in is interpreting your results

20  causally.

21     Q.    And if something is a potential

22  confounder, is adjustment required for an

23  epidemiological study to be reliable?

24     A.    I think in general if we don't know

25  whether a variable is a confounder, and by that

Confidential - Pursuant to Protective Order

1    I specifically mean a variable that is a common

2    cause of the exposure and the outcome, you first

3    use your sort of biological knowledge about that

4    variable and its relationship with exposure and

5    disease to determine whether or not you should

6    adjust for it.

7        Q.    So if I understand your answer

8    correctly, sometimes yes, sometimes no, it's

9    just something that requires kind of more

10   granular focus depending on the substance, is

11   that fair?

12       A.    Well, I think this is why

13   epidemiologists need to know, you know,

14   something about the relationship between the

15   exposure and the outcome to determine what those

16   potential confounders might be.

17            The wrong approach is just simply, you

18   know, throwing everything in a model.  You have

19   to think that that could actually be a common

20   cause potentially of the exposure and the

21   outcome.

22       Q.    So you must think that a substance is

23   a common cause of both the exposure and the

24   outcome to rule it in as a confounder?

25            MR. LASKER:  Objection to form.

1    A.    As a potential confounder, correct.

2          So just to clarify, we wouldn't want

3    to put in our model anything that we thought was

4    an intermediate between our exposure and our

5    outcome, because if you adjust on an

6    intermediate it may take away some of the real

7    causal effect of that exposure on the outcome,

8    but your statistical model can't tell you the

9    difference between the situation where that

10   variable is a confounder and the situation where

11   it's an intermediate.  You have to use your own

12   biological knowledge of the relationship between

13   the exposure and disease to determine that.

14   BY MR. WOOL:

15   Q.    What about when a substance is not a

16   confounder, in that it has no association with

17   the disease, is it proper to adjust for

18   something that is not a confounder?

19         MR. LASKER:  Objection to form.

20   A.    So there are -- in epidemiology I

21   would say age is the most frequently considered

22   potential confounder.  We often adjust for age

23   in our analyses, even if age has no appreciable

24   impact on the relative risk that we see, just

25   because it's known to be an important

Confidential - Pursuant to Protective Order

1  confounder.

2  BY MR. WOOL:

3  Q.    So I'm asking a slightly different

4  question.  What I'm curious about is something

5  that you can definitively say is not a

6  confounder.  Let's say that there are 1,000

7  great cohort prospective studies that show that

8  smoking just doesn't have any effect one way or

9  the other on non-Hodgkin's lymphoma, if that

10  were the case would it be proper to adjust for

11  cigarette smoking as an example?

12  A.    I think it's, you know, rare that we

13  ever feel confident enough that smoking wouldn't

14  cause an outcome that you wouldn't at least try

15  to look at it as a potential confounder.

16  Q.    Okay.  Smoking was probably a bad

17  example.  Let's say Smart Water, for example.

18  If there were a bunch of studies that just said

19  that Smart Water has no effect one way or the

20  other on non-Hodgkin's lymphoma, would it be

21  proper to adjust for the use of Smart Water in

22  an epidemiological study?

23  A.    I think, again, you would only include

24  it if you thought that it could be a common

25  cause of exposure and your outcome.  If you

1  didn't have a reason to believe that that was

2  true, then no, it would be fine not to include

3  it.

4      Q.   And if you could definitively rule it

5  out, it would be fine not to include it as a

6  confounder?

7      A.   If you could definitively rule it out,

8  yes.  But I think, again, there are few

9  situations where we feel comfortable doing that.

10 I think erring on the side of being conservative

11 and adjusting is usually how we would proceed.

12           MR. WOOL:  Do you guys want to take a

13 quick break?

14           MR. LASKER:  Sure.

15           THE VIDEOGRAPHER:  Going off the

16 record.  The time is 3:34.

17           (Whereupon, a recess was taken.)

18           THE VIDEOGRAPHER:  Back on the record.

19 The time is 3:45.

20 BY MR. WOOL:

21     Q.   Dr. Rider, 37 percent of the

22 Andreotti, et al cohort was lost to follow-up,

23 correct?

24           MR. LASKER:  Objection to form.

25     A.   That's not how I would characterize

Confidential - Pursuant to Protective Order

```
 1    it, because, again, they did have information on

 2    outcomes, so they weren't completely lost to

 3    follow-up.  But it is true that 37 percent

 4    didn't respond to the follow-up questionnaire.

 5    BY MR. WOOL:

 6        Q.    Right.

 7              You mentioned imputation.  And to deal

 8    with that percentage of people who did not

 9    answer the follow-up questionnaire, the authors

10    performed an imputation, correct?

11        A.    Yes, multiple imputation.

12              MR. WOOL:  I'm going to mark as

13    Exhibit 33-6 the Heltshe article.

14              (Whereupon, Exhibit Number 33-6,

15              Heltshe, et al article, Using multiple

16              imputation to assign pesticide use for

17              non-responders in the follow-up

18              questionnaire in the Agricultural

19              Health Study, was marked for

20              identification.)

21    BY MR. WOOL:

22        Q.    You've seen this article before?

23        A.    Yes, I have.

24        Q.    Does this article describe the

25    multiple imputation that the authors performed?
```

Confidential - Pursuant to Protective Order

1      A.    Yes, it does.  It goes through the

2    imputation method, and then evaluates it for a

3    number of different pesticides.

4      Q.    Now, if you turn to Page 410, which is

5    the second page of the article, under Materials

6    and Methods the authors state that, "Our

7    specific multiple imputation" --

8            MR. LASKER:  Where are you?

9            MR. WOOL:  Sorry, under Materials and

10   Methods, I believe the third full sentence.

11           MR. LASKER:  Okay.

12           MR. WOOL:  Do you see it?

13           MR. LASKER:  Yes.

14   BY MR. WOOL:

15     Q.    The authors state, "Our specific

16   multiple imputation procedure imputes four

17   primary AHS exposure metric variables of

18   interest," and then a colon, "(1) use (yes/no)

19   of any pesticide in the interim period between

20   Phase 1 and 2; (2) use (yes/no) of 50 specific

21   pesticides in the interim period," which is

22   referenced in Table 1.  "(3) number of days of

23   use for a specific pesticide during Phase 2; and

24   (4) last year of application of any pesticides

25   within the 5-year period between Phase 1 and 2,"

Confidential - Pursuant to Protective Order

1    correct?

2        A.    Correct.

3        Q.    And so am I correct that the

4    imputation performed by the Andreotti, et al

5    authors derived these four metrics that are

6    listed here?

7            MR. LASKER:  Objection to form.

8            What do you mean by "the Andreotti

9    authors"?

10            MR. WOOL:  Strike that.  I agree that

11    was a confusing question.

12    BY MR. WOOL:

13        Q.    So the imputation was used to discern

14    these four metrics that are listed here,

15    correct?

16        A.    That is correct.  They were looking at

17    four -- they used models to predict these four

18    different outcomes.  They were exposures, but

19    they were the outcomes of the imputation models,

20    correct.

21        Q.    How was number of days of use for a

22    specific pesticide during Phase 2 calculated?

23        A.    The number of days of use of any

24    pesticide?

25        Q.    Yes.  Strike that.  I should have

Confidential - Pursuant to Protective Order

 1   clarified.

 2            So for the -- in the original study

 3   for the responders, how did they calculate that

 4   figure, the number of days of use for a specific

 5   pesticide?

 6            MR. LASKER:  Objection to form.

 7            I'm sorry, which study?

 8   BY MR. WOOL:

 9       Q.   The Andreotti study.

10       A.   Could I ask you --

11       Q.   Let me clarify.

12            In the Andreotti study, how did they

13   calculate the number of days of use for a

14   specific pesticide between the original

15   questionnaire and follow-up questionnaire?

16            MR. LASKER:  Objection to form.

17       A.   I apologize, I still don't understand

18   the question.  I don't know whether you're

19   talking about responders or non-responders.

20   BY MR. WOOL:

21       Q.   Okay.  We're talking about responders

22   here.  So let's go back to the Andreotti study,

23   actually, at the top of Page 2.

24       A.   Okay.

25       Q.   Are you there?

Confidential - Pursuant to Protective Order

```
1       A.    Yep.

2       Q.    Okay.  So looking at the top

3   right-hand column --

4             MR. LASKER:  I'm sorry, right hand on

5   Page 2?

6       A.    Of the Andreotti study.

7             MR. WOOL:  Of Andreotti.

8             MR. LASKER:  Sorry.

9   BY MR. WOOL:

10      Q.    This will make it easier.

11            MR. LASKER:  What column are we under?

12            MR. WOOL:  The right.

13  BY MR. WOOL:

14      Q.    And it states that, "At enrollment

15  applicators reported a number of years and days

16  per year each pesticide was used, while at

17  follow-up applicators reported the number of

18  days each pesticide was used in the most recent

19  year farmed."  Correct?

20      A.    That's correct.

21      Q.    So am I correct that the authors used

22  the most recent year farmed as one of the

23  metrics to determine the -- what did they call

24  it -- the intensity weighted lifetime days of

25  use?
```

Confidential - Pursuant to Protective Order

1          MR. LASKER:  Objection to form.

2     A.    So in the Andreotti, et al article,

3 their primary analysis used information from the

4 baseline questionnaire where they had asked

5 about the number of years and days per year of

6 use for each pesticide, as well as information

7 from the follow-up questionnaire where they

8 asked just about pesticide use in the most

9 recent year farmed.

10 BY MR. WOOL:

11    Q.    Okay.  And the number of days of use

12 for a specific pesticide during Phase 1 and 2

13 for responders was calculated using the number

14 reported for the most recent year farmed,

15 correct?

16          MR. LASKER:  Objection to form.

17    A.    So the, like I said, the authors used

18 all of the information that they gathered on

19 exposure in terms of number of years of use and

20 days of use for each pesticide from enrollment,

21 and then they distributed a follow-up

22 questionnaire roughly five years later, and that

23 questionnaire included questions about the

24 number of days of use for each pesticide within

25 the most recent year farmed.

Confidential - Pursuant to Protective Order

1    BY MR. WOOL:

2        Q.    Okay.  And to clarify, so between

3    enrollment and follow-up, that figure was the

4    only metric that was gathered for days per year

5    of use, that answer for the most previous

6    calendar year, correct?

7        A.    Right.  So the authors state that

8    there's an approximately five year period

9    between enrollment and the follow-up

10   questionnaire, and at the time of the follow-up

11   questionnaire the questionnaire included

12   questions just on the most recent year farmed,

13   not on every year, that is correct.

14       Q.    Okay.  Now you can go back to Heltshe.

15       A.    Okay.

16       Q.    Sorry, that was more complicated than

17   it should have been.  And again, we're on

18   Page 410.

19       A.    Okay.

20       Q.    So if we go back to where we were,

21   number 3, the number of days of use for a

22   specific pesticide during Phase 2 refers to --

23   actually, strike that.

24             Okay.  So Heltshe, kind of at a

25   10,000-foot level, used the information of

Confidential - Pursuant to Protective Order

1   responders to impute what non-responders would

2   have answered had they responded to the

3   questionnaires, correct?

4           MR. LASKER:  Objection to form.

5       A.    The goal of the imputation procedure

6   is to be able to use data from the whole cohort

7   even if participants had not responded to the

8   follow-up questionnaire, so they're using this

9   method to predict what a person's exposure would

10  have been at that particular time period.

11  BY MR. WOOL:

12      Q.    And so if responders' use data was

13  inaccurate, then that would decrease the

14  reliability of the imputed results, correct?

15          MR. LASKER:  Objection to form.

16      A.    So the information that's used in the

17  imputation it takes into account, of course, the

18  responders' data, but all of -- but also all of

19  the other variables and information that they

20  have for the entire cohort.  So they're using

21  every variable that could predict exposure to

22  predict particular exposure values.

23  BY MR. WOOL:

24      Q.    Is it possible for statistical

25  analysis to correct for exposure

Confidential - Pursuant to Protective Order

1   misclassification?

2          MR. LASKER:  Objection to form.

3      A.    There are a number of methods actually

4   that do corrections for exposure

5   misclassification, yes.

6   BY MR. WOOL:

7      Q.    Now, if the imputation model was

8   systematically biased to imputing no exposure,

9   would that diminish the power of the Andreotti

10  study?

11         MR. LASKER:  Objection to form.

12     A.    Would you mind just restating the

13  question one more time?

14  BY MR. WOOL:

15     Q.    Yes.

16         If the imputation model was

17  systematically biased to imputing no exposure,

18  would that reduce the power of the Andreotti

19  study?

20         MR. LASKER:  Same objection.

21     A.    So I think, first of all, I just want

22  to point that that their primary analysis wasn't

23  ever exposure versus no exposure, it was levels

24  of exposure compared to no exposure.  So I guess

25  I'm not sure how there would be a systematic

Confidential - Pursuant to Protective Order

1   bias towards imputing no exposure.

2   BY MR. WOOL:

3       Q.    Now, have you used imputation in any

4   of your epidemiological publications?

5       A.    I do not -- well, I can't say

6   definitively that any of my papers does not

7   include imputation, but at the same time I can't

8   come up with an example right now that does.

9       Q.    So let's see.  You might have used

10  multiple imputation, you might not have, you

11  just don't know sitting here?

12      A.    Yes, there's a possibility on a paper

13  for which I'm a co-author that multiple

14  imputation was used when there was missing data.

15      Q.    Okay.  So is it your opinion that the

16  imputation method utilized in the Andreotti

17  study has general acceptance within the

18  epidemiological community?

19      A.    Well, I think that it's well-suited

20  for certain situations when the data are missing

21  at random.  So I think when you're deciding

22  which method for strategy for handling missing

23  data you're going to use, you consider why the

24  data are missing.  And when they're missing at

25  random, multiple imputation is preferable to

Confidential - Pursuant to Protective Order

1    other approaches like, say, the complete case

2    analysis.

3         Q.    And in Andreotti the imputation was

4    performed using answers from the entire cohort

5    that answered Phase 2 questionnaires corrected,

6    and it -- strike that.  Let me just ask that

7    first.

8              MR. LASKER:  Objection to form.

9         A.    So could you just ask the question?

10   BY MR. WOOL:

11        Q.    Yes.

12             So I guess what I'm getting at is that

13   the imputation that was performed did not look

14   at whether the non-responders were from North

15   Carolina or from Iowa, correct?

16             MR. LASKER:  Objection to form.

17        A.    I completely disagree.  The imputation

18   procedure takes into account all types of

19   information that's available on all of the

20   applicators, so that's how they build their

21   imputation model.  And that's even described in

22   Heltshe.

23   BY MR. WOOL:

24        Q.    Okay.  So help me out here, I guess.

25   So the authors did take into account whether the

Confidential - Pursuant to Protective Order

1    responder was in -- strike that.

2         The authors did take into account

3    whether the non-responder was in North Carolina

4    or Iowa?

5    A.    I mean, I would need to look at the

6    Heltshe paper to recall exactly what variables

7    they ended up including in their imputation, but

8    they used a strategy where all of the variables

9    that most strongly predicted response were

10   included.  So again, I would have to review to

11   see whether state was one of those.  But if it

12   wasn't included, it was because it didn't affect

13   response -- I mean, it didn't affect the

14   exposure value.  Sorry.

15   Q.    Okay.  Now, if you turn to Page 413 of

16   Heltshe, and to Table 3.

17   A.    Okay.

18   Q.    And Table 3 provides metrics for

19   reference Brier scores, Brier score, and skill

20   Brier score, correct?  Table 3 on 414.

21   A.    Here we are.  Thanks.  Yes.

22   Q.    Okay.  Did you hear my question?

23   A.    That this table contains scores for

24   reference Brier, Brier score, Brier skill score.

25   Q.    Now, what is a Brier score?

Confidential - Pursuant to Protective Order

1      A.    A Brier score is just a statistic that

2   is used to measure the accuracy of a prediction

3   that's in discrete categories.

4      Q.    Have you ever used a Brier score in

5   your own research?

6      A.    No.  I, in fact, I think they're

7   fairly uncommonly used in epidemiology overall.

8   Sorry.  I mean, I think they're often used in

9   weather forecasting.

10         MR. LASKER:  Just for clarification,

11   did you say that Brier score is used to measure

12   the accuracy of a prediction that's in those

13   three categories?

14      A.    No, in discrete categories.

15         MR. WOOL:  Good catch.

16   BY MR. WOOL:

17      Q.    And so based on that answer, it would

18   be fair to say that you have not calculated a

19   Brier score before?

20      A.    I have never personally calculated a

21   Brier score, correct.

22      Q.    But you had heard the term Brier score

23   before reading the Heltshe paper, correct?

24      A.    I actually had not encountered Brier

25   scores before.

Confidential - Pursuant to Protective Order

1      Q.    So this paper was the first time that

2   you had encountered them as an epidemiologist?

3      A.    That is correct.  Like I said, I think

4   that I've never seen one in all of the papers

5   that I've reviewed, so I had to do some reading

6   on them.

7      Q.    What is the cutoff point at which you

8   believe a Brier score indicates accuracy that

9   would make the imputation methodology reliable?

10          MR. LASKER:  Objection to form.

11     A.    There is no such cutpoint that exists.

12   And, in fact, even for statistics that we use

13   very commonly in epidemiology, like sensitivity

14   and specificity, there's no cutpoint at which

15   you would say this is a good value or this is a

16   bad value, because it very much relates to what

17   you're trying to predict.

18   BY MR. WOOL:

19     Q.    So whether a Brier score indicates

20   that accuracy is unreliable -- strike that.

21          Within the field of epidemiology, is

22   there any sort of general consensus as to what

23   an acceptable Brier score is before, say,

24   accuracy is deemed unreliable?

25          MR. LASKER:  Objection to form.

Confidential - Pursuant to Protective Order

1      A.    I wouldn't be aware of that, but it

2  would surprise me because, like I said, we tend

3  to not utilize cutpoints like that because it's

4  very situation-specific.

5  BY MR. WOOL:

6      Q.    So it would depend on the situation,

7  correct?

8      A.    Yes, that's what -- I'm saying for

9  different measures that I am familiar with, like

10  sensitivity and specificity, you judge those

11  measures in context.

12     Q.    So how would you go about evaluating

13  an opinion that a Brier score was, I guess, you

14  know, too low to be deemed reliable?  I guess,

15  if I wanted to -- you know, if I was looking at

16  a paper and I saw a Brier score, I guess what

17  I'm trying to get at is how I would go about

18  evaluating, oh, this Brier score is way out

19  there or, you know, or is within a range that

20  would be considered acceptable?

21          MR. LASKER:  Objection to form.

22     A.    So like I said, I'm not -- I don't use

23  Brier scores, I hadn't been familiar with them,

24  so I think there are a number of other results

25  provided in this paper that are actually much

Confidential - Pursuant to Protective Order

1   more useful to me than the Brier score, which

2   you can see corresponds very tightly with the

3   prevalence of the particular pesticide, which

4   could be problematic.

5           So, you know, if you go to the next

6   page, for instance, they talk about the relative

7   errors, and that to me has more meaning than the

8   Brier score.

9   BY MR. WOOL:

10      Q.    Okay.  But generally am I correct that

11  the smaller the Brier score, the more accurate

12  the prediction?

13          MR. LASKER:  Objection to form.

14      A.    That is how a Brier score is

15  calculated.  0 would be perfect prediction.

16  BY MR. WOOL:

17      Q.    And how does a Brier skill score, how

18  is that different than just a Brier score?

19      A.    So they're comparing the Brier score

20  to some naive reference prediction.  In this

21  particular case they used the prevalence of

22  pesticide use in the 80 percent of the cohort,

23  you know, without the cohort that they held out

24  to do the imputation.  So they're basically

25  subtracting the reference Brier from the Brier

Confidential - Pursuant to Protective Order

1   score to get the Brier skill score.  So in the

2   skill score, you know, those could range between

3   negative 1 and 1, I believe.

4       Q.   Now, if you turn the page to Page 414,

5   I believe you said that that Figure 2 was more

6   important to you in determining the accuracy of

7   the imputation.  Did I hear that correctly?

8       A.   Well, I just -- I mean, this has

9   information that's more meaningful to me

10  because, again, the relative errors of the

11  imputed prevalence, you know, tell you something

12  about the error, taking into account how common

13  that particular pesticide is in the cohort.

14      Q.   Okay.  Sorry, did I interrupt you?

15      A.   No.  Thank you.

16      Q.   What is Figure 2 telling us with

17  respect to glyphosate?

18      A.   It's about in the middle of the pack.

19      Q.   And what does that mean?

20      A.   That there are pesticides with much

21  higher relative error than glyphosate.  And it's

22  also interesting that this relative error

23  doesn't relate at all to the Brier scores in

24  Table 2.  So you can find examples of pesticides

25  with very high relative errors like

Confidential - Pursuant to Protective Order

1    methylbromide, but that have the lowest of the

2    Brier scores.

3        Q.    And what does a negative relative

4    error indicate to you?

5        A.    Well, it's just that it's

6    underreporting the prevalence.

7        Q.    Right.

8              Now, still on Page 414, if you look at

9    the right-hand column, the first full paragraph,

10   the authors state, "A key assumption of any

11   imputation is that missingness is independent of

12   the unobserved outcome of interest or

13   unobservable confounders."

14             Do you agree with that statement?

15       A.    Yes, I do.

16       Q.    They go on to say, "The reduction of

17   bias and increase in precision from multiple

18   imputations is dependent on the covariates

19   associated with both non-response and the

20   endpoint variable, and factors associated with

21   non-participation which were included and are in

22   our imputation model."

23             Do you agree with that statement?

24       A.    Yes.

25       Q.    And they go on to say, "For our

Confidential - Pursuant to Protective Order

1    imputation analysis, the outcome of interest is

2    the missing pesticide use itself.  Montgomery,

3    et al showed there's little evidence for

4    selection bias in Phase 2 of the AHS, however

5    missing at random is an untestable assumption

6    without additional data, thus it is possible

7    that non-responders differ from responders in

8    variables we have not measured."

9           Do you agree with that statement?

10   A.    I mean, this is always the case in

11   epidemiologic studies.  The mechanism of

12   missingness is always untestable, but you're in

13   a much better position in a cohort study like

14   this where they have measured many, many

15   variables that could be used to predict exposure

16   levels.

17   Q.    So it would be fair to say that you do

18   agree with that statement?

19           MR. LASKER:  Objection to form.  Asked

20   and answered.

21   A.    So do I agree -- do I agree with the

22   statement that it's an untestable assumption

23   without additional data?

24   BY MR. WOOL:

25   Q.    Yes.

Confidential - Pursuant to Protective Order

1    A.    Yes, it is almost always the case that

2  in an actual epidemiologic study, not some sort

3  of simulation, that that is an untestable

4  assumption.

5    Q.    What is selection bias?

6    A.    I believe I've already answered this

7  question earlier, but --

8    Q.    I'm sorry.  Go ahead.

9    A.    I can answer it again.

10    Q.    If you don't mind.

11    A.    So if you're thinking about it

12  structurally, it's when you're conditioning on a

13  factor that is an effect of both the exposure

14  and the outcome.

15    Q.    Do you believe that maintaining a high

16  rate of follow-up in a cohort study is integral

17  to ensuring validity?

18         MR. LASKER:  Objection to form.

19    A.    That is a very general question.  I

20  think that if you're talking about outcome data,

21  that's one particular issue.  So, as I mentioned

22  before, the AHS is in a good position because

23  they obtained outcome data on all or virtually

24  all of the participants in terms of NHL through

25  cancer registries, so in that place, and, you

Confidential - Pursuant to Protective Order

1  know, I think that that is an integral aspect of

2  the validity of the study.

3  BY MR. WOOL:

4      Q.    Is there any agreement within the

5  field of epidemiology as to what constitutes a

6  high rate of follow-up?

7          MR. LASKER:  Objection to form.

8      A.    No, because, again, I think it really

9  depends on the particular situation in the

10  study, and how long you're following people, and

11  is this a chronic disease that you're looking at

12  or some short-term outcome.  So it's very hard

13  to provide a number of what's acceptable.

14  BY MR. WOOL:

15      Q.    Would it be reasonable for an

16  epidemiologist to put less weight on a study due

17  to a 37 percent loss in follow-up?

18          MR. LASKER:  Objection to form.

19          Are you talking about in general, or

20  in the Andreotti study?

21          MR. WOOL:  In general.

22      A.    I mean, I think if I was reviewing a

23  study and there was 37 percent of, again, not

24  lost to follow-up of the whole cohort, but we're

25  talking about missing follow-up data, I would

1  want to know that they thought carefully about

2  how they were going to handle that missing data

3  in their analysis, and that that was -- and that

4  the assumptions that they were making about why

5  that data were missing seemed appropriate.

6  BY MR. WOOL:

7      Q.    With respect to the Andreotti study,

8  would it be reasonable for an epidemiologist to

9  put less weight on that study due to the lost to

10  follow-up?

11          MR. LASKER:  Objection to form.

12     A.    So I think I already answered this.  I

13  can't speak for epidemiologists in general, but

14  I know that my own approach would be to try to

15  determine if the ways that they handled that

16  missing data was appropriate given why the data

17  were missing.

18  BY MR. WOOL:

19     Q.    Well, say, for example, with the

20  Andreotti study, if they got complete responses

21  from every participant, would the study be more

22  powerful in your mind?

23          MR. LASKER:  Objection to form.

24     A.    I mean, it's hard to speculate because

25  that's not the case.  And I think that, you

Confidential - Pursuant to Protective Order

 1   know, the sensitivity analyses that they did

 2   show us that regardless of how they handle that

 3   missing data, they're really coming up with the

 4   same conclusions.  They get very, very similar

 5   results.  And so in that way it seems like the

 6   missing data isn't having a large impact on the

 7   findings, so in that way I think it would be

 8   inappropriate not to consider this study.

 9   BY MR. WOOL:

10       Q.    So I'm not talking about whether to

11   consider it or not.  I'm talking about the

12   amount of weight that you would afford to the

13   study.  Do you understand the distinction?

14       A.    So I mean, I know how I would weight

15   it in terms of all of these studies that

16   currently exist on GBH use and NHL.  I think

17   that even with 37 percent missing data on a

18   follow-up questionnaire, you know, incomplete

19   data, in essence, on the enrollment

20   questionnaire, and follow-up for decades, and

21   much more information on co-variates that can be

22   adjusted for as confounders, and not having

23   concerns about the impact of recall bias or

24   selection bias from improper selection of

25   controls, I think all of those things lead me to

Confidential - Pursuant to Protective Order

1   weight this study, to rank it highest among all

2   of the data that's currently available.

3       Q.    Have you ever published a study where

4   37 percent of the population was lost to

5   follow-up?

6       A.    So again, you know, you keep saying

7   lost to follow-up, and that's not really how I

8   would characterize it here, because they're just

9   missing data on exposure on one questionnaire.

10  They're not lost because we have their outcome

11  data, so that's not how I would describe it.

12          So I think in cohorts that I've worked

13  on where they have done repeated exposure

14  measurements in questionnaires, you know, over,

15  say, four year intervals in the health

16  professionals follow-up study it is not at all

17  uncommon for a given exposure to be missing on,

18  you know, a third of the cohort for a given

19  survey cycle, so I can imagine that it wouldn't

20  be that difficult for me to find an example

21  where that was the case on a study that I'd

22  worked on.

23      Q.    Fair enough.

24          Have you done any research on changing

25  use patterns of glyphosate following the advent

Confidential - Pursuant to Protective Order

1    of Roundup Ready crops?

2              MR. LASKER:  Objection to form.

3        A.    So you asked if I had done any

4    research on it?

5    BY MR. WOOL:

6        Q.    Yes.  I don't think that -- I could be

7    mistaken, but I don't think that your expert

8    reports contains the Benbrook article.

9        A.    I don't believe I cited the Benbrook

10   article, but I have read that article.

11       Q.    You have read the article?

12       A.    Yes.

13       Q.    Okay.  So fair to ask you some

14   questions about it?

15       A.    Sure.

16       Q.    Thanks.

17              MR. WOOL:  I'm going to mark the

18   Benbrook article as Exhibit 33-7.

19              (Whereupon, Exhibit Number 33-7,

20              Benbrook article, Trends in glyphosate

21              herbicide use in the United States and

22              globally, was marked for

23              identification.)

24              MR. LASKER:  You gave me two.

25              MR. WOOL:  Christmas came early.

Confidential - Pursuant to Protective Order

1          MR. LASKER:  33-7?

2          MR. WOOL:  Yes.

3    BY MR. WOOL:

4      Q.    And you have reviewed this article?

5      A.    I have, yes.

6      Q.    All right.  Now, if you look at the

7    abstract box, the second sentence, the authors

8    note that, "Globally, glyphosate use has risen

9    almost 15-fold since so-called 'Roundup Ready,'

10   genetically engineered glyphosate" --

11         MR. LASKER:  Where are you reading?

12         MR. WOOL:  The second sentence of

13   Results.

14   BY MR. WOOL:

15     Q.    I'll start from the beginning.

16         "Globally, glyphosate use has risen

17   almost 15-fold since so-called 'Roundup Ready"

18   genetically engineered glyphosate-tolerant crops

19   were introduced in 1996.  Two-thirds of the

20   total volume of glyphosate applied in the US

21   from 1974 to 2014 has been sprayed in just the

22   last 10 years."

23         Did I read that correctly?

24     A.    Yes.

25     Q.    So meaning that approximately

Confidential - Pursuant to Protective Order

1    two-thirds of the total amount of glyphosate

2    sprayed in the United States occurred between

3    1974 and 2014, is that what that sentence means?

4        A.    Yes, I think so.

5        Q.    All right.  And if I'm not mistaken,

6    2005 was the last year of follow-up in the

7    Andreotti study, correct?

8        A.    For -- well, it was the last time that

9    they collected data from the follow-up

10   questionnaire on exposure.

11       Q.    So 2004 was the last year that

12   follow-up data from the questionnaire was

13   collected in Andreotti?

14       A.    You said 2005, and then 2004.  So the

15   follow-up questionnaire period occurred between

16   '99 to 2005.

17       Q.    So I think here's where the confusion

18   lies.  The question -- or the responses in 2005

19   dealt with the 2004 calendar year, correct?

20            MR. LASKER:  Objection to form.

21       A.    Yes, I believe that that's correct.

22   BY MR. WOOL:

23       Q.    All right.  So if you will turn with

24   me to Page 15 of the Benbrook article.

25            MR. LASKER:  15?

Confidential - Pursuant to Protective Order

1    BY MR. WOOL:

2        Q.    Sorry, 515.

3        A.    Okay.

4        Q.    And I'll ask you to look at Table 1.

5        A.    Mm-hmm.

6        Q.    Okay.  So in -- and they give figures

7    in thousand kilograms, and then in thousands of

8    pounds.

9        A.    Mm-hmm.

10       Q.    Since we're in the United States, I'll

11   ask you about the pounds.

12       A.    Okay.

13       Q.    Now, for glyphosate agricultural use,

14   in 1990 the authors report 7,400 thousand pounds

15   of glyphosate use?

16       A.    Correct, 7,400 in 1990 pounds, yes,

17   correct.

18       Q.    And then 27,500 in 1995?

19       A.    Correct.

20       Q.    And then 78,750 in 2000?

21       A.    Mm-hmm.

22       Q.    And then 157,500 in 2005?

23       A.    Yes.

24       Q.    And then the figure goes up to 235,814

25   in 2010?

Confidential - Pursuant to Protective Order

```
1        A.      Mm-hmm.

2        Q.      Correct?

3                And then it looks like it sort of

4    levels off a little bit, it goes up to 236,318

5    in 2012, correct?

6        A.      Correct.

7        Q.      And then it goes to 249,906 in 2014?

8        A.      That is what it says, yes.

9        Q.      And the Andreotti study -- strike

10   that.

11               So would it be fair to say that use of

12   glyphosate changed pretty dramatically over the

13   years that the Andreotti study was collecting

14   follow-up data?

15               MR. LASKER:  Objection to form.

16       A.      So here in this table they report

17   glyphosate use in pounds, and you can see that

18   there is an increase between 2000 and 2005,

19   which would be the follow-up questionnaire

20   period.

21               But what's interesting about this

22   article is that it shows how that's really

23   related to the availability of Roundup Ready

24   crops, and in many ways you can predict that

25   increased use if you know what farmers are
```

Confidential - Pursuant to Protective Order

1    farming.

2    BY MR. WOOL:

3        Q.    So do you recall if the follow-up

4    questionnaire for Andreotti asked participants

5    about the specific crops they were farming?

6        A.    Well, that is available in the

7    publication, another HS publication, so they did

8    ask for that information.  It was in, I think,

9    Alavanja 2006 they describe what types of crops

10   the farmers farm.

11       Q.    So if a cohort member had reported no

12   use of glyphosate at enrollment, but then began

13   using Roundup Ready crops, say, in 2004, if they

14   responded in 1999 to the questionnaire, the

15   questionnaire would not capture their glyphosate

16   use, correct?

17           MR. LASKER:  Objection to form.

18       A.    So just one clarification.  In the

19   Andreotti JNCI paper they talked about how the

20   follow-up questionnaire is approximately five

21   years after enrollment for the participant, so

22   we don't really have a reason to believe that

23   someone who answered on the earlier end of the

24   enrollment questionnaire would then, you know,

25   answer more than five years later on the

Confidential - Pursuant to Protective Order

1    follow-up questionnaire.

2         And that situation you described, yes,

3    certainly in some cases that could have

4    happened, but that would have a relatively small

5    effect on, you know, the total impact of

6    exposure measurement in the entire cohort.

7         So yes, for some people it will not be

8    imperfect -- it will be imperfectly captured,

9    but it's unlikely to have a meaningful impact on

10   the results given how much information they did

11   collect.

12   BY MR. WOOL:

13       Q.   Well, using the results of Andreotti,

14   is it possible to measure the frequency that

15   that particular scenario would have played out?

16       A.   I don't think it's possible directly

17   in the Andreotti paper, but I think there are a

18   number of pieces of information in this Benbrook

19   article that are actually really helpful in

20   terms of the increase in use between that period

21   that you're talking about.  It's actually -- it

22   doesn't really increase that much in that

23   period.

24       Q.   So what pieces of information, I

25   guess, would you point me to to establish that?

Confidential - Pursuant to Protective Order

1        A.    So, for instance, if you look at

2   figure 1.

3        Q.    In what?

4        A.    In the Benbrook paper.  So this is

5   specifically for soybeans.  We know that in

6   Iowa 80, percent of the farmers are soybean

7   farmers.  So if you look in that period, what

8   we're using between, you know, '90 --

9        Q.    During the follow-up period is what I

10  was asking about.

11       A.    Yes, so during '99 and 2005, you know,

12  you can see how much use increased during that

13  period.  So a lot of the increases would have

14  been -- would have been captured in that interim

15  period.

16       Q.    Do you know if any of the other

17  pesticides and herbicides that were surveyed in

18  the Andreotti study, if any of those had

19  increases in use that compared to glyphosate?

20       A.    Could you ask the question one more

21  time?

22       Q.    Yes.  I don't think I phrased it very

23  well.

24             Did any other pesticide or herbicide

25  surveyed in Andreotti, et al increase -- or did

Confidential - Pursuant to Protective Order

1   the use of that pesticide or herbicide increase

2   to the extent that glyphosate did during the

3   follow-up period?

4           MR. LASKER:  Objection to form.

5       A.    Again, I'm not an expert on the use of

6   -- glyphosate use patterns, but from reading of

7   this -- of the Benbrook article, and also there

8   was another paper I'm not recalling now on

9   trends, I think we know that because of Roundup

10  Ready crops, glyphosate has increased more

11  dramatically.

12          But in some ways when you're trying to

13  predict people's patterns of exposure, the

14  availability of Roundup Ready crops is really

15  helpful, because then those patterns of exposure

16  become determined by farming those particular

17  crops, and there's are much more specific

18  regimen for application.  So that information

19  can actually be helpful.

20  BY MR. WOOL:

21      Q.    So I guess due to the increase in use

22  of glyphosate, would it be fair to expect fewer

23  never responses in, say, 2000 as opposed to

24  earlier in the follow-up period?

25          MR. LASKER:  Objection to form.

Confidential - Pursuant to Protective Order

1    BY MR. WOOL:

2        Q.    Do you think that, say, people who at

3    enrollment had never used glyphosate, that as we

4    continue from 1997 to 2005 that the frequency of

5    never use responses is likely to decrease?

6             MR. LASKER:  Objection to form.

7        A.    I mean, we know that glyphosate use

8    increased, particularly among certain types of

9    farmers, right.  So you can see in this paper

10   that, you know, it's really due to three crops.

11   Right?  So there were definitely increases in

12   glyphosate use.  Whether that resulted in fewer

13   never users or just a greater degree of use, I

14   don't really know.  But again, you can predict

15   those patterns to a large degree by just knowing

16   what products -- what people are farming.

17   BY MR. WOOL:

18       Q.    All right.  Let me just ask a couple

19   more questions, and then I think we can wrap

20   things up.  I know that I've asked this at the

21   beginning, so my apologies if you've answered.

22            MR. LASKER:  Objection.  Asked and

23   answered.  Sorry.

24            MR. WOOL:  I knew it was coming.

25   BY MR. WOOL:

Confidential - Pursuant to Protective Order

```
 1      Q.    Did you have a chance to review any of

 2   the plaintiffs' deposition transcripts before

 3   today?

 4      A.    For the most recent depositions?

 5      Q.    Yes, for depositions conducted

 6   pursuant to Pretrial Order 34.

 7      A.    Yes, I have.

 8      Q.    Okay.  And which experts?

 9      A.    I have reviewed Dr. Neugut's

10   deposition, Dr. Ritz, and Dr. Portier's

11   deposition.

12            MR. WOOL:  Okay.  Let me take a quick

13   break.  I'll chat with Jeff, and maybe we can

14   wrap this up.

15            THE VIDEOGRAPHER:  Going off the

16   record.  The time is 4:27.

17            (Whereupon, a recess was taken.)

18            THE VIDEOGRAPHER:  Back on the record.

19   The time is 4:34.

20   BY MR. WOOL:

21      Q.    Now, we spoke about this briefly, but

22   one of the reasons for which you believe that

23   misclassification could not account for the --

24   or exposure, non-differential exposure

25   misclassification could not account for the
```

Confidential - Pursuant to Protective Order

1    results in Andreotti is because the relative

2    risks in all categories of the Andreotti study

3    are below 1.0, correct?

4              MR. LASKER:  Objection to form.

5         A.    So I explained earlier that, you know,

6    we usually say that on average -- that doesn't

7    mean in every study, single study all the time,

8    but on average non-differential exposure

9    misclassification would bias the results to the

10   null.  That's true for ever-never -- dichotomous

11   exposures when you just have yes versus no.

12             But when you start looking at exposure

13   in more than two categories, you can have the

14   situation where if you're just misclassifying

15   between two categories, those relative risk

16   estimates would be biased towards each other, so

17   you could actually get, for one of those

18   categories, bias away from the null.

19             So what I'm talking about in my report

20   is how that particular situation can't explain

21   -- can't be happening in the Andreotti, et al

22   2018 study because all of the relative risk

23   estimates for all of the categories are below 1.

24   BY MR. WOOL:

25        Q.    And one of the things that the authors

Confidential - Pursuant to Protective Order

1    did in an attempt to minimize non-differential

2    exposure misclassification was to perform some

3    sensitivity analyses?

4        A.    Yes.  That's correct.

5              MR. LASKER:  Objection to form.

6    BY MR. WOOL:

7        Q.    And if you turn to Page 5 of your

8    report.

9        A.    Okay.  All right.

10       Q.    In the final paragraph on Page 5, you

11   describe one of these sensitivity analysis that

12   sort of truncated the results of 2005.

13       A.    That is correct, that's one of the

14   analyses they conducted.

15       Q.    Okay.  And why did they truncate the

16   results of 2005?

17       A.    Because the follow-up questionnaire

18   period ended at 2005, and so ending follow-up at

19   2005 wouldn't make any assumptions about a

20   person's exposure after 2005.

21       Q.    Okay.  And in this particular

22   instance, you say that the risk ratio comparing

23   the highest quartile of intensity weighted

24   exposure to no exposure in analysis, the

25   truncated follow-up in 2005 was 1.04, which is

Confidential - Pursuant to Protective Order

1    also consistent with the primary analysis,

2    correct?

3        A.    Yes.  I also report the 95 percent

4    confidence interval around that estimate, which

5    is from .7 to 1.57.

6        Q.    Okay.  And so when the analysis was

7    truncated, that resulted in the risk ratio of

8    the highest exposure group going up, correct?

9             MR. LASKER:  Objection to form.

10       A.    Well, the confidence intervals for

11   this estimate and the estimate of the primary

12   analysis and the results of the two other

13   sensitivity analyses all overlap and they all

14   contain the null value.  And so, you know, I

15   think I mentioned earlier on, you know, we don't

16   dwell too closely on this point estimate because

17   it is, you know, subject to random error.  The

18   confidence interval takes that into account.

19             So I would interpret this result of

20   1.04 the same way that I would interpret the

21   result in the primary analysis of -- there's

22   NHL, for the highest quartile to no exposure of

23   0.87 in exactly the same way, and that's being

24   consistent with no association.

25             MR. WOOL:  That's it.  I don't have

1    any other questions.

2         A.    Okay.

3              MR. LASKER:  No questions.

4              THE VIDEOGRAPHER:  This concludes the

5    January 23, 2018 deposition of Dr. Jennifer

6    Rider.  Going off the record.  The time is 4:39.

7              (Whereupon, the deposition was

8              concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

1   COMMONWEALTH OF MASSACHUSETTS )

2   SUFFOLK, SS.                  )

3            I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4   and Notary Public in and for the Commonwealth of

5   Massachusetts, do certify that on the 23rd day

6   of January, 2018, at 2:39 o'clock, the person

7   above-named was duly sworn to testify to the

8   truth of their knowledge, and examined, and such

9   examination reduced to typewriting under my

10  direction, and is a true record of the testimony

11  given by the witness.  I further certify that I

12  am neither attorney, related or employed by any

13  of the parties to this action, and that I am not

14  a relative or employee of any attorney employed

15  by the parties hereto, or financially interested

16  in the action.

17           In witness whereof, I have hereunto

18  set my hand this 5th day of February, 2018.

19

20           _____

21           MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

22           Realtime Systems Administrator

23           CSR #149108

24

25

Confidential - Pursuant to Protective Order

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3             Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the appropriate

 6   space on the errata sheet for any corrections

 7   that are made.

 8             After doing so, please sign the

 9   errata sheet and date it.  It will be attached

10   to your deposition.

11             It is imperative that you return

12   the original errata sheet to the deposing

13   attorney within thirty (30) days of receipt of

14   the deposition transcript by you.  If you fail

15   to do so, the deposition transcript may be

16   deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

1                      - - - - - -

                     E  R  R  A  T  A

2                      - - - - - -

3    PAGE   LINE   CHANGE

4    _____  _____   _____

5       REASON: _____

6    ____  _____   _____

7       REASON: _____

8    _____  _____   _____

9       REASON: _____

10   _____  _____   _____

11      REASON: _____

12   _____  _____   _____

13      REASON: _____

14   _____  _____   _____

15      REASON: _____

16   _____  _____   _____

17      REASON: _____

18   _____  _____   _____

19      REASON: _____

20   _____  _____   _____

21      REASON: _____

22   _____  _____   _____

23

24

25

Confidential - Pursuant to Protective Order

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4          I, _____, do
    Hereby certify that I have read the foregoing
5   pages, and that the same is a correct
    transcription of the answers given by me to the
6   questions therein propounded, except for the
    corrections or changes in form or substance, if
7   any, noted in the attached Errata Sheet.

8

9   _____
    JENNIFER R. RIDER, ScD          DATE
10

11

12

13

14

15

16  Subscribed and sworn
    To before me this
17  _____ day of _____, 20____.
18  My commission expires: _____
19

    _____
20  Notary Public
21

22

23

24

25

1                    LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____   _____

4        _____  _____   _____

5        _____  _____   _____

6        _____  _____   _____

7        _____  _____   _____

8        _____  _____   _____

9        _____  _____   _____

10       _____  _____   _____

11       _____  _____   _____

12       _____  _____   _____

13       _____  _____   _____

14       _____  _____   _____

15       _____  _____   _____

16       _____  _____   _____

17       _____  _____   _____

18       _____  _____   _____

19       _____  _____   _____

20       _____  _____   _____

21       _____  _____   _____

22       _____  _____   _____

23       _____  _____   _____

24       _____  _____   _____

25