# EXHIBIT 14

Confidential - Pursuant to Protective Order

1            UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF CALIFORNIA

2

3       IN RE: ROUNDUP              )

        PRODUCTS LIABILITY          )   MDL No. 2741

4       LITIGATION                  )

        _____      )   Case No.

5       THIS DOCUMENT RELATES       )   16-md-02741-VC

        TO ALL CASES                )

6

7            TUESDAY, JANUARY 23, 2018

8      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

9                   - - -

10          VIDEOTAPED DEPOSITION of LORELEI A.

11   MUCCI, ScD, held at the offices of Cetrulo LLP,

12   2 Seaport Lane, Boston, Massachusetts,

13   commencing at 9:01, on the above date, before

14   Maureen O'Connor Pollard, Registered Merit

15   Reporter, Realtime Systems Administrator,

16   Certified Shorthand Reporter.

17                   - - -

18

19

20

21

             GOLKOW LITIGATION SERVICES

22        877.370.3377 ph | 917.591.5672 fax

                   deps@golkow.com

23

24

25

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2   ANDRUS WAGSTAFF, P.C.
     BY:  DAVID J. WOOL, ESQUIRE
 3        david.wool@andruswagstaff.com
          7171 West Alaska Drive
 4        Lakewood, Colorado 80226
          303-376-6360
 5
                   -and-
 6
     THE MILLER FIRM LLC
 7   BY:  JEFFREY A. TRAVERS, ESQUIRE
          jtravers@millerlawllc.com
 8           108 Railroad Avenue
             Orange, Virginia 22960
 9           540- 672-4224
             Counsel for Plaintiffs
10
11
     HOLLINGSWORTH LLP
12   BY:  ERIC G. LASKER, ESQUIRE
          elasker@hollingsworthllp.com
13           1350 I Street, N.W.
             Washington, DC 20005
14           202-898-5800
             Counsel for Defendant Monsanto
15
16
17
18
     V I D E O G R A P H E R :
19
     CHRISTOPHER COUGHLIN,
20   Golkow Technologies, Inc.
21                   - - -
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1                        INDEX
     EXAMINATION                              PAGE
 2   LORELEI A. MUCCI, ScD
      BY MR. WOOL                               5
 3
 4            E X H I B I T S
     NO.          DESCRIPTION               PAGE
 5
     32-1     Supplemental Expert Report of
 6            Lorelei A. Mucci, ScD, MPH........  5
 7   32-2     Andreotti, et al article,
              Glyphosate Use and Cancer
 8            Incidence in the Agricultural
              Health Study..................... 6
 9
     32-3     Blair, et al article,
10            Reliability of Reporting on
              Life-Style and Agricultural
11            Factors by a Sample of
              Participants in the
12            Agricultural Health Study from
              Iowa............................. 43
13
     32-4     Heltshe, et al article, Using
14            multiple imputation to assign
              pesticide use for
15            non-responders in the follow-up
              questionnaire in the
16            Agricultural Health Study........ 64
17
18
19
20
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on the

 4    record.  My name is Chris Coughlin, and I'm a

 5    videographer for Golkow Technologies.  Today's

 6    date is January 23, 2018, and the time is

 7    9:01 a.m.

 8              This video deposition is being held in

 9    Boston, Massachusetts, In Re:  Roundup Products

10    Liability Litigation, United States District

11    Court, Northern District of California, MDL

12    number 2741, Case Number 16-md-02741-VC.

13              The deponent is Dr. Lorelei Mucci.

14              Will counsel please identify

15    yourselves and state whom you represent.

16              MS. WOOL:  David Wool of Andrus

17    Wagstaff for the plaintiffs.

18              MR. TRAVERSE:  Jeffrey Travers, The

19    Miller Firm, for the plaintiffs.

20              MR. LASKER:  Eric Lasker,

21    Hollingsworth LLP, for Monsanto.

22              THE VIDEOGRAPHER:  The court reporter

23    is Maureen O'Connor, and she will now swear in

24    the witness.

25              MR. LASKER:  Let me clarify, do we
```

Confidential - Pursuant to Protective Order

1    have anyone on the phone?  We don't have

2    anything set up, so maybe we don't.

3

4              LORELEI A. MUCCI, ScD,

5    having been first duly identified and sworn, was

6    examined and testified as follows:

7                   EXAMINATION

8    BY MR. WOOL:

9        Q.   Good morning, Dr. Mucci.

10       A.   Good morning.

11       Q.   How are you doing this morning?

12       A.   Fine.  How are you?

13       Q.   Doing well.

14            So we are here to talk about your

15   supplemental report, is that your understanding?

16       A.   Yes.

17       Q.   I'm going to go ahead and hand you

18   what I've marked as Exhibit 32-1.

19            (Whereupon, Exhibit Number 32-1,

20            Supplemental Expert Report of Lorelei

21            A. Mucci, ScD, MPH, was marked for

22            identification.)

23            MR. WOOL:  Which is your supplemental

24   report that you authored pursuant to PTO 34 in

25   this litigation, is that correct?

Confidential - Pursuant to Protective Order

1        A.    Yes.

2        Q.    And if you don't know the pretrial

3    order number, that's fine.

4        A.    Okay.

5        Q.    And does this report along with the

6    original report that you authored contain all of

7    your opinions on the Andreotti study that was

8    just published, or is soon to be published in

9    2018?

10            MR. LASKER:  Objection to form.

11        A.    It's based on my opinion in reading

12    the most recent publication, as well as

13    additional readings I've done, yes.

14    BY MR. WOOL:

15        Q.    Okay.  Let me go ahead and hand you

16    what I've marked as Exhibit 2.

17            (Whereupon, Exhibit Number 32-2,

18            Andreotti, et al article, Glyphosate

19            Use and Cancer Incidence in the

20            Agricultural Health Study, was marked

21            for identification.)

22    BY MR. WOOL:

23        Q.    Which is the study in question.

24            And so I guess my question is, does

25    this supplemental report, which is Exhibit 1,

Confidential - Pursuant to Protective Order

1    together with your original report contain all

2    of the opinions that you intend to offer

3    relevant to Exhibit 2 that you have in front of

4    you?

5            MR. LASKER:  Objection to form.

6        A.    There may be additional -- I tried to

7    keep my report brief, and as such there may be

8    specific topics I didn't cover.  I raised the

9    most important topics, and those are enclosed in

10   my supplemental report.

11   BY MR. WOOL:

12       Q.    As you sit here today, are there any

13   opinions that you are aware of that you intend

14   to offer about Exhibit 2 that are not contained

15   in either Exhibit 1 or your original expert

16   report?

17       A.    I'll have to hear the questions and

18   then -- it's not clear to me.  There are

19   additional readings that I've done since I

20   submitted my report, and those are included in

21   the information that you all have received.  And

22   there's a little bit more that I've learned

23   about the topic, but the major points are

24   covered in the supplemental report.

25       Q.    When you say since you submitted your

1    report, are you referring to Exhibit 1?

2         A.   My supplemental report, Exhibit 1,

3    yes.

4         Q.   I just want to clarify.

5              All right.  And did anybody help you

6    in drafting Exhibit 1 other than, say, advice

7    that you received from counsel?

8         A.   No.

9         Q.   You didn't receive any help from a

10   grad student?

11        A.   No.

12        Q.   Did anybody summarize any articles for

13   you?

14        A.   No.

15        Q.   Nobody -- okay.

16             And you said you had read a couple of

17   new articles since you submitted that report,

18   correct?

19        A.   Yes.

20        Q.   And were those provided to us pursuant

21   to your notice of deposition?

22        A.   I'm sorry, I don't understand the

23   question.

24        Q.   Let me clarify that.

25             Do you recall offhand what additional

Confidential - Pursuant to Protective Order

1    materials you reviewed since submitting that

2    report?

3         A.   I've read a study, for example,

4    published by Benbrook describing trends in

5    glyphosate use over time.  There's papers like

6    that that I felt were relevant to my

7    understanding of the epidemiology literature,

8    particularly with respect to the Agricultural

9    Health Study.

10        Q.   Okay.  And have you read any of the

11   plaintiffs' depositions that were taken?

12        A.   Yes.

13        Q.   Which ones did you read?

14        A.   I've read through Dr. Ritz and

15   Dr. Neugut.

16        Q.   Just those two?

17        A.   Yes.

18        Q.   And any of the plaintiffs' expert

19   reports?

20        A.   Yes.

21        Q.   Do you recall which expert reports?

22        A.   Yes.  I read through Dr. Ritz, and I

23   skimmed through Dr. Neugut.  And I can't recall

24   the other ones that I've skimmed through.

25        Q.   That's fine.

Confidential - Pursuant to Protective Order

1            Okay.  So let's talk about, I guess

2      we'll call it the Andreotti study, is that fair?

3            A.    Yes.

4            Q.    Exhibit 2.

5            A.    Yes.

6            Q.    Okay.  So that study contained

7      information on both private and commercial

8      applicators, correct?

9            A.    Yes.

10            Q.    And there was a separate questionnaire

11      issued at enrollment for each subset, correct?

12            MR. LASKER:  Object to the form.

13            A.    I'm sorry, I don't understand the

14      question.

15      BY MR. WOOL:

16            Q.    Okay.  Have you reviewed the

17      questionnaires that the cohort members were

18      given at enrollment?

19            A.    Yes.

20            Q.    And do you recall if there was a

21      separate questionnaire for private applicators

22      and a different one for commercial applicators?

23            A.    I don't recall that, no.

24            Q.    Fair enough.

25            And following enrollment, everybody

Confidential - Pursuant to Protective Order

1    who was contained within the cohort received a

2    follow-up questionnaire at an approximate five

3    year interval, is that correct?

4         A.   I'm sorry, could you restate the

5    question?

6         Q.   So the cohort members were given a

7    questionnaire at enrollment, right?

8         A.   Yes.

9         Q.   And then there was a follow-up

10   questionnaire that was given at an approximate

11   five year interval?

12        A.   Yes.

13        Q.   And enrollment occurred in the early

14   '90s, correct, approximately?

15        A.   I just want to confirm.  So enrollment

16   was between 1993 to 1997.

17        Q.   Okay.  And then follow-up occurred

18   starting in approximately 1999?

19        A.   Yes.

20        Q.   To about 2005, correct?

21        A.   Yes.

22        Q.   And are you aware -- strike that.

23             Do you know what percentage of

24   respondents filled out their questionnaires in,

25   say, 1999 as opposed to, say, 2000, 2001, 2002,

Confidential - Pursuant to Protective Order

1    etcetera?

2        A.    No, that information is not provided.

3        Q.    Would that be important for you to

4    know?

5        A.    The information that was provided in

6    the Andreotti study describes a five year time

7    period, and so that provided sufficient

8    information that on average the cohort filled

9    out the questionnaire five years between

10    baseline and follow-up.

11        Q.    Is that information you would want to

12    know?  To clarify, would you want to know when

13    the cohort members filled out their follow-up

14    questionnaire?

15        MR. LASKER:  Objection to the form.

16        A.    As I said, I think there's sufficient

17    information that's provided in the methods from

18    Andreotti, et al describing that it was a five

19    year time period between the baseline

20    questionnaire and the enrollment questionnaire.

21    BY MR. WOOL:

22        Q.    So as you sit here today, when a

23    cohort member filled out their questionnaire is

24    not a piece of information you would be

25    interested in?

Confidential - Pursuant to Protective Order

1          MR. LASKER:  Objection to form.

2     A.    While it is important to understand

3   the timing of the questionnaire, I think there's

4   enough information that's provided in Andreotti,

5   et al to give a sense of the timing of the

6   baseline and follow-up questionnaire being five

7   years.

8   BY MR. WOOL:

9     Q.    Okay.  And in the follow-up

10  questionnaire, the cohort was asked to report

11  the number of days a pesticide was used in the

12  most recent year, correct?

13    A.    Yes.

14    Q.    And that answer was used to determine

15  three metrics that are used in the Andreotti

16  study?

17          MR. LASKER:  Objection to form.

18    A.    Could you clarify, three metrics?

19  BY MR. WOOL:

20    Q.    So the follow-up questionnaire was

21  used to determine ever-never use along with the

22  enrollment questionnaire, correct?

23    A.    Yes.

24    Q.    It was used to determine lifetime days

25  of use?

Confidential - Pursuant to Protective Order

1        A.    Yes.

2              MR. LASKER:  Object to form.

3        BY MR. WOOL:

4        Q.    And the follow-up questionnaire was

5        also used to determine the intensity of weighted

6        lifetime days of use?

7              MR. LASKER:  Object to form.

8        A.    The information for both

9        questionnaires was integrated into the lifetime,

10       weighted lifetime intensity measure, yes.

11       BY MR. WOOL:

12       Q.    So if a cohort member had not used

13       glyphosate prior to enrollment, ever-never use

14       for that member would be calculated from the

15       follow-up questionnaire, correct?

16             MR. LASKER:  Object to the form.

17       A.    I'm sorry, I don't understand the

18       specific question.

19       BY MR. WOOL:

20       Q.    Okay.  So, for example, if a cohort

21       member had never used glyphosate at or prior to

22       enrollment -- right?

23       A.    Yes.

24       Q.    -- the ever-never use that's

25       calculated in Andreotti would be dependent upon,

Confidential - Pursuant to Protective Order

1    I guess, both enrollment and then the follow-up

2    questionnaire, right?

3             MR. LASKER:  Object to the form.

4        A.   Both pieces of information were

5    integrated in determining ever-never exposure as

6    well as the intensity measures as well.

7    BY MR. WOOL:

8        Q.   And so if a cohort member did not use

9    glyphosate at enrollment or in the year prior to

10   follow-up, the follow-up questionnaire would

11   show that member as never having used

12   glyphosate, correct?

13            MR. LASKER:  Object to the form.

14       A.   I'm sorry, could you repeat the

15   question?

16   BY MR. WOOL:

17       Q.   Yes.

18            So if somebody enrolled in the AHS

19   study --

20       A.   Yes.

21       Q.   -- and they did not use glyphosate

22   prior to enrollment --

23       A.   Yes.

24       Q.   -- and then they did not use

25   glyphosate prior to the follow-up year, the

Confidential - Pursuant to Protective Order

1    results of Andreotti would show that participant

2    as never having used glyphosate?

3            MR. LASKER:  Objection to form.

4        A.   So just to -- so if a person had -- so

5    the information on ever-never use gets updated

6    across time because you have these two points of

7    information, and so the information on

8    ever-never exposure is based on the baseline

9    questionnaire, and then it's updated information

10   on the follow-up questionnaire, which is a

11   pretty standard epidemiological approach to

12   integrating a time varying exposure.

13   BY MR. WOOL:

14       Q.   And I think I've asked this, but the

15   follow-up questionnaire only inquired as to the

16   previous calendar year of use of a pesticide,

17   correct?

18           MR. LASKER:  Object to form.

19       A.   Yes.  The follow-up questionnaire

20   asked about the prior year of use, which is

21   actually a pretty standard epidemiological

22   approach to asking follow-up questionnaires.

23   You like to give a reference time point for

24   participants to answer whether or not they have

25   participated in an exposure.

Confidential - Pursuant to Protective Order

1    BY MR. WOOL:

2        Q.   So if somebody had used glyphosate

3    after enrollment but did not use glyphosate in

4    the calendar year immediately preceding

5    follow-up, would the follow-up questionnaire

6    have captured that glyphosate use?

7             MR. LASKER:  Objection to form.

8        A.   While that particular individual would

9    have been classified as being unexposed at both

10   time points, that would represent likely a very

11   unlikely scenario, a very low proportion of

12   participants.

13   BY MR. WOOL:

14       Q.   And --

15       A.   And would suggest actually that the

16   majority of their person time actually was spent

17   as unexposed, which would be appropriate, since

18   they would have only used a very short window of

19   time between the baseline questionnaire and the

20   follow-up questionnaire.

21       Q.   Okay.  And I believe you said that

22   that -- strike that.

23            How were lifetime days of use

24   calculated in the Andreotti study?

25       A.   The information that was used to

Confidential - Pursuant to Protective Order

1    calculate lifetime days of use included the

2    number of years an individual was using

3    glyphosate and the number of days of use per

4    year that it was being used.

5         Q.   And in determining the number of days

6    per year of use for the -- strike that.

7              So it is a combination of the days of

8    use reported in both the enrollment

9    questionnaire and at follow-up, correct?

10        A.   So again, it's a time varying

11   exposure, so the information sort of gets --

12   they're at -- you have the baseline information,

13   and then it gets updated again based on the

14   follow-up information.  So it's sort of a -- the

15   way the questionnaires were -- the data from the

16   questionnaires were integrated in terms of the

17   number of days of use and the lifetime days

18   allows this time varying exposure to be

19   calculated.

20        Q.   Now, you just used the term "time

21   varying exposure."

22        A.   Yes.

23        Q.   What do you mean by that term?

24        A.   It means, there are some things in

25   epidemiology that are fixed, someone's sex,

Confidential - Pursuant to Protective Order

1    someone's genetic susceptibility.  There are

2    other things where the exposures can vary over

3    time, smoking for example, someone may be

4    smoking at one time point and then may stop

5    smoking at the second time point, so things that

6    can -- whose exposure the prevalence can vary

7    over time is a time varying exposure.

8         Q.   All right.  And the Andreotti study

9    also calculated intensity weighted lifetime days

10   of use?

11        A.   Yes.

12        Q.   Correct?

13             Okay.  And how is the intensity score

14   calculated, if you recall?

15        A.   So the intensity -- there are several

16   publications, actually, which nicely show the

17   method by which the Agricultural Health Study

18   used different information on the use of

19   protective gear, information on the type of

20   spraying, whether they personally mixed.  And

21   there are a number of really -- one of the

22   strengths of the Agricultural Health Study is

23   the fact that it uses validated algorithms to

24   calculate this weighted intensity data and show

25   that it has a very good validity.

1        So while I don't -- I couldn't tell

2    you the exact formula, I do know in reading the

3    epidemiology literature on this topic that they

4    really used a validated algorithm for

5    calculating the intensity weighted days.

6        Q.   What do you mean by "validated

7    algorithm"?

8        A.   The approach that the Agricultural

9    Health Study took was to compare the information

10   from the questionnaire algorithm versus a

11   biological marker to compare how well, and there

12   was a first formula that was used, and then it

13   was actually revised based on additional

14   information on how well it predicted the urinary

15   markers.

16       Q.   Okay.  Now, if you look at Exhibit 2,

17   at the top of the second page, on the right-hand

18   column the authors state that "the intensity

19   score was derived from an algorithm based on

20   literature-based measurements and information

21   provided by the applicator, specifically whether

22   the participant mixed or applied pesticides,

23   prepared pesticide related equipment, used

24   protective equipment, and application method

25   used."

1          Are you following me?

2      A.   Yes.  That's the -- I was just

3   referring to -- so that was the -- based on the

4   algorithm that Dr. Coble had examined and then

5   had -- so it was based -- there was an earlier

6   algorithm they had developed which was used

7   actually in the first Agricultural Health Study,

8   and then they've actually refined this

9   algorithm, and this is what was used in this

10  updated publication of Andreotti, et al.  And so

11  it actually -- the way that they tested whether

12  the updated algorithm improved the information

13  on intensity weighted was using urinary based

14  biomarkers, so it's listed by Coble, et al.

15     Q.   And the authors state the algorithm

16  was based on literature-based measurements,

17  correct?

18     A.   Yes.  So I believe that was based on

19  the Dosemici algorithm.  But again, so they

20  started -- used that as a starting point, and

21  then they further refined it based on their own

22  questionnaire and tried to really optimize the

23  intensity weighted measure within the

24  Agricultural Health Study.

25     Q.   And is that what they mean when they

Confidential - Pursuant to Protective Order

1      say literature-based measurements?

2                 MR. LASKER:  Objection to form.

3           A.    I'm not sure what they mean by

4      literature-based measurements.  But what I

5      believe in reading all the past publications,

6      and if you read the Coble publication, it

7      describes in detail the approach that they took

8      starting with this baseline algorithm, and then

9      refining the algorithm using additional

10     components from the questionnaire, and then they

11     tested that within the Coble study to compare it

12     for two of the pesticides, compared and show

13     that the algorithm -- the new algorithm actually

14     improved the prediction with the biomarker

15     compared with the older algorithm.

16                So I'm not sure specifically what they

17     meant there by the literature base, but if you

18     read through the Coble study that's, in fact,

19     the process they used.

20     BY MR. WOOL:

21          Q.    Okay.  And in calculating the

22     intensity score, they also based that

23     calculation upon information provided by the

24     applicator, correct?

25          A.    It was the information that was

Confidential - Pursuant to Protective Order

1    provided in the first and second questionnaires.

2         Q.   Okay.  And specifically whether the

3    participant mixed or applied pesticides?

4         A.   There were a variety of factors

5    actually.  That was one of the factors, but

6    there were a variety of factors that went into

7    the algorithm.

8         Q.   And one of those was whether the

9    applicator used protective equipment, correct?

10        A.   Yes.  There were actually several

11   features, though.  What was interesting to see

12   in the Coble study was the importance of

13   including these multiple measures in the

14   intensity weighted algorithm.

15        Q.   And the questionnaire simply asked

16   whether personal protective equipment was used

17   when mixing, correct?

18             MR. LASKER:  Object to the form.

19        A.   I'm sorry, I don't recall the specific

20   wording of the questionnaire.

21   BY MR. WOOL:

22        Q.   Let me ask this.

23             Do you recall whether the

24   questionnaire asked whether personal protective

25   equipment was used specifically for mixing or

Confidential - Pursuant to Protective Order

1    applying glyphosate?

2         A.    I'm sorry, I don't remember the exact

3    wording of those questions.

4         Q.    Is the use of personal protective

5    equipment something that could affect exposure?

6              MR. LASKER:  Objection to form.

7         A.    In the Coble publication, that really

8    describes in detail the algorithm.  That's one

9    of the factors that's used in the algorithm.

10   And because it's felt that it's one of several

11   factors, that may influence the actual intensity

12   of the exposure.  So it is, in fact, one of many

13   variables that goes into the algorithm.

14   BY MR. WOOL:

15        Q.    And do you know if the questionnaire

16   asked whether somebody used personal protective

17   equipment generally for applying all pesticides?

18        A.    I'm sorry, if you have the

19   questionnaire I could take a look at it.  I just

20   don't recall the specifics of how the questions

21   were asked.

22        Q.    And I think the last part, and I might

23   be mistaken on this about the intensity score,

24   is that it weighed the application method used

25   by the applicator, is that correct?

Confidential - Pursuant to Protective Order

```
 1              MR. LASKER:  Objection to form.
 2        A.   I'm sorry, I don't understand the
 3   question.
 4   BY MR. WOOL:
 5        Q.   Did the intensity score incorporate
 6   the specific application method used in applying
 7   pesticides, if you recall?
 8        A.   I believe that it did, yes.  There
 9   were several factors that went into the
10   intensity weighted score.  If you have the
11   publication by Coble, et al we could take a look
12   and look at specifically, but I believe that is
13   the case.
14        Q.   We might get to that in a little bit.
15             So in effect what the authors of
16   Andreotti did with the follow-up questionnaire
17   was use the last year of use, and use the
18   information gathered from that to determine the
19   previous five years of use, is that fair?
20        A.   So the -- as I'd mentioned previously,
21   it's pretty standard in an epidemiological
22   questionnaire to provide some sort of reference
23   year.  And so the way the information on
24   ever-never was assessed, as well as the days and
25   years of use was updated, so you have
```

Confidential - Pursuant to Protective Order

1    information that was the baseline, and then it

2    was updated with the second questionnaire.

3         Q.   So based on the second questionnaire

4    and the answers that were given in that

5    questionnaire, did the authors use those answers

6    to essentially predict what the use would have

7    been for the five years prior to the

8    questionnaire?

9         MR. LASKER:  Objection to form.

10        A.   I'm not sure I understand specifically

11   your question.  Are you trying -- could you

12   clarify your question?

13   BY MR. WOOL:

14        Q.   I can clarify it.

15             So at follow-up, the follow-up

16   questionnaire, we agreed, only asked about the

17   year immediately prior to follow-up, correct?

18        A.   Correct.

19        Q.   And did the authors use that

20   information to predict what the use would have

21   been for the years between enrollment and

22   follow-up?

23        A.   The -- if somebody was using

24   glyphosate at the enrollment questionnaire and

25   then not using glyphosate at the follow-up

Confidential - Pursuant to Protective Order

1    questionnaire, and they talked about the year

2    prior, then that person would have been

3    classified appropriately as exposed up until the

4    second questionnaire, and then would be assigned

5    as unexposed from the year before and going

6    forward.  Does that make sense?

7              So the information -- yeah, so I

8    think -- yeah.  I'm not sure if I'm answering

9    the question specifically.

10   Q.   If I use glyphosate for -- let's say

11   five times a year for the year immediately prior

12   to enrollment --

13   A.   Yes.

14   Q.   -- in calculating my lifetime days of

15   use, how would the authors use that information?

16             MR. LASKER:  Objection to form.

17   A.   So I think you would have to also

18   account for the baseline information.  So again,

19   what we're thinking about is a follow-up forward

20   in time, so they would use that information,

21   they use the information on the baseline

22   questionnaire up until, and then updated the

23   information based on the follow-up questionnaire

24   which is, again, like standard epidemiological

25   approach that you would take for looking at an

Confidential - Pursuant to Protective Order

```
1     exposure that may or may not vary over time.
2     BY MR. WOOL:
3          Q.   Okay.  And if we turn to, I believe,
4     Page 3 of the Andreotti study.  Actually, sorry,
5     Page 4, Table 2.
6               The quartiles that are provided are
7     based on the intensity weighted lifetime days of
8     glyphosate use, correct?
9          A.   Yes.
10         Q.   And quartile 1 being the least amount
11    of use, correct?
12         A.   So the way the quartiles are formed,
13    it divides those who were exposed, it divides
14    those groupings into four equal groupings.  So,
15    yes, the quartile 1 would be those who have used
16    glyphosate but have less use, and quartile 4
17    would be the ones who are using glyphosate with
18    the most use.
19         Q.   And quartile 2 and 3 would be -- would
20    show increasing use?
21         A.   Correct.
22         Q.   Okay.  Now, would you expect to see
23    some random error in a cohort of this size?
24         A.   I'm sorry, with respect to what?
25         Q.   With respect to the exposure
```

Confidential - Pursuant to Protective Order

1    information that was provided by the cohort

2    members.

3         A.    I'm sorry, could you clarify what you

4    mean by "random error"?

5         Q.    You've heard the term random error

6    before?

7         A.    As an epidemiological concept, random

8    error in terms of chance, or random error in

9    terms of misclassification?

10        Q.    In terms of either.

11             MR. LASKER:  Objection to form.

12        A.    Have I -- so I guess, I think, in my

13   mind random error is a vague term, so I think if

14   you could ask me specifically what type of error

15   you're referring to when you ask me if there's

16   random error.

17   BY MR. WOOL:

18        Q.    With respect to chance, what does

19   random error mean to you as an epidemiologist?

20        A.    Random -- the role of chance implies

21   that you have a -- there's a true measure of the

22   relative risk, and then based on random sampling

23   you might get a certain distribution around that

24   true relative risk.  And the larger study that

25   you have, and the larger number of cases you

Confidential - Pursuant to Protective Order

1    have, as we have here, then that -- the

2    likelihood that random error is playing a role

3    actually decreases substantially.

4         Q.   So if I understand your answer

5    correctly, the larger the study the less the

6    likelihood of random error, correct?

7              MR. LASKER:  Objection to form.

8         A.   There's actually several factors that

9    go into whether or not you think random error is

10   playing a role, or the role of chance.  So the

11   size of the study, the number of cases, the

12   number of exposed cases, all of those are

13   factors that go into the role of changes.  So

14   the larger the study, the more cases you have,

15   and the higher the problems of exposed cases you

16   have, all of those will lower the likelihood,

17   and this is the case here we have in Andreotti.

18   BY MR. WOOL:

19        Q.   Do you know if the participants in the

20   cohort were allowed to take their questionnaires

21   home prior to filling them out?

22        A.   I'm sorry, I don't know that answer.

23        Q.   Do you know if they were allowed to

24   cross-reference their purchase records?

25        A.   I'm sorry, I don't know that answer.

1      Q.   Do you think that the data would have

2    been more reliable if they had been allowed to

3    cross-reference their purchase records?

4      A.   I'm not sure one way or the other.

5    What I do know was given the way the

6    questionnaire was given, there was actually some

7    validation studies that were done to show the

8    information the way they provided it was highly

9    reliable.  So there was a sample of about 4,000

10   of the participants who happened, because of the

11   regulations of the applicators came back a year

12   after they had filled out the baseline

13   questionnaire, and then they filled out the same

14   information, and then there was a reliability

15   study and said how reliable was the information

16   they gave a year ago with what they gave now,

17   and that actually showed high reliability.

18            So I think -- I'm not sure what they

19   had done and whether they were able to take the

20   questionnaire home, but what I do know is based

21   on the way the questionnaire was given the

22   results seemed to be very reliable in reporting

23   of glyphosate.

24      Q.   And the study that you described in

25   your answer, that is the Blair 2002 study, if

Confidential - Pursuant to Protective Order

1    I'm not mistaken, is that correct?

2         A.   I believe it was Blair 2001.

3         Q.   Blair 2001?

4         A.   Yes.

5         Q.   And are there any other validation

6    studies that you're relying upon that you

7    believe indicates that the answers given at

8    enrollment were accurate?

9         A.   Yes, there was another nice

10   publication.  Again, one of the really nice

11   things about the Agricultural Health Study is

12   that there are so many publications they've done

13   looking at the potential for bias, and I think

14   the Agricultural Health Study, in particular, is

15   a really nice example of epidemiology.

16              But another study they did was to

17   compare when different pesticides came on the

18   market, and then sort of did a -- you know, did

19   anybody report using glyphosate or other

20   pesticides prior to when they actually had come

21   on the market.  So again, that's another kind of

22   test of the reliability of the data.  And that

23   actually also showed very low likelihood of

24   people reporting a number of these pesticides,

25   including glyphosate, before they ever came on

1    the market.  So that's another kind of proof of

2    principle that the information is quite

3    reliable.

4         Q.   Do you have any experience collecting

5    occupational data, such as pesticide exposures,

6    for any of your own publications?

7              MR. LASKER:  Object to the form.

8         A.   While I haven't collected information

9    on pesticides exposure, I've been involved in

10   multiple, multiple studies collecting a wide

11   array of data.  There are a number of

12   commonalities in the collection of

13   epidemiological data, so I'm very familiar with

14   the principles of epidemiology data collection.

15   BY MR. WOOL:

16        Q.   So for any of those studies that you

17   just described, did any of these studies involve

18   occupational exposures?

19        A.   I'm sorry, could you clarify the

20   question?

21        Q.   Did they involve exposures to a

22   chemical of some sort that somebody was exposed

23   to during the course of their occupation?

24        A.   I'm sorry, which studies are you

25   referring to?

Confidential - Pursuant to Protective Order

1       Q.    You just said that you had been --

2       A.    My own studies.

3       Q.    Yes.

4       A.    Sorry.

5             So again, as I said, I have not been

6       involved in the collection of occupational data.

7       However, I have been involved in a wide array of

8       epidemiological risk factors.  Each of these

9       have a number of common principles.  I think the

10      reliability of information is valid, whether

11      it's a dietary factor or occupational factor or

12      body mass index.  So reliability is a well

13      standard epidemiological principle for assessing

14      the quality of exposure information.

15      Q.    Have you ever been involved in the

16      design of a questionnaire for occupational

17      exposure studies?

18      A.    As I had just mentioned, I haven't

19      been involved in studies of occupational based

20      exposures.  However, I have been involved in

21      multiple -- design of multiple questionnaires in

22      a range of study populations.

23      Q.    Have you ever been involved in the

24      validation of any questionnaires relevant to

25      occupational exposures?

Confidential - Pursuant to Protective Order

1              MR. LASKER:  Object to the form.

2         A.   As I've said, I haven't been involved

3    in the design or validation.  However, there are

4    some very common principles of assessing the

5    quality of data collection, and I think I can --

6    although I haven't been involved in the design

7    or specific validation of pesticides, I can look

8    at the epidemiology literature, I can look at

9    the study of Blair 2001 and Hoppin that show the

10   quality of the occupational -- or the pesticide

11   data that was collected in the Agricultural

12   Health Study seemed to be very reliable.

13        Q.   Okay.  And the questionnaires asked

14   about -- strike that.

15             The Agricultural Health Study

16   questionnaires didn't actually evaluate

17   exposure, did they?  They asked about use of a

18   pesticide and used some other factors, like

19   whether protective equipment was worn, etcetera,

20   to sort of determine exposure, right?

21             MR. LASKER:  Objection to form.

22        A.   I'm not sure what you mean by

23   "exposure."

24   BY MR. WOOL:

25        Q.   Well, so the Andreotti study

Confidential - Pursuant to Protective Order

1    determined the exposure by looking at the

2    frequency of glyphosate use, correct?

3              MR. LASKER:  Objection to form.

4         A.   The Andreotti study used a wide array

5    of factors, including the number of years of

6    use, the number of days of use, the different

7    use of protective gear.  There are a number of

8    factors in the algorithm that went into this

9    classification of intensity of days use,

10   weighted intensity days use.

11   BY MR. WOOL:

12        Q.   Do you recall whether the

13   questionnaire asked specific questions about the

14   methods of glyphosate application?

15        A.   I'm sorry, I don't recall that.

16             MR. LASKER:  Objection to form.

17   BY MR. WOOL:

18        Q.   Do you know whether the methods of

19   application can determine actual pesticide

20   exposure?

21             MR. LASKER:  Objection to form.

22        A.   I'm sorry, I'm not -- that's not my --

23   necessarily my area of expertise.  Again, I'm

24   not sure how the specific questions on

25   glyphosate were collected on the questionnaire.

Confidential - Pursuant to Protective Order

```
1      BY MR. WOOL:

2          Q.    Okay.  Do you know if the AHS study

3      examined the correlation between the methods of

4      application and the prevalence of non-Hodgkin's

5      lymphoma?

6               MR. LASKER:  Objection to form.

7          A.    I'm sorry, I don't understand your

8      question.

9      BY MR. WOOL:

10         Q.    So the AHS study gathered information

11     about the method of application, correct?

12              MR. LASKER:  Which study?

13              MR. WOOL:  Sorry, the Andreotti study,

14     my apologies.

15              MR. LASKER:  Start again.

16     BY MR. WOOL:

17         Q.    So the Andreotti study collected data

18     on the method of application, correct?

19         A.    By "method," you mean whether it was

20     aerial spraying?

21         Q.    Correct.

22         A.    Yes.

23         Q.    And do you know if the Andreotti study

24     looked at the correlation between that

25     information and the prevalence of non-Hodgkin's
```

Confidential - Pursuant to Protective Order

1    lymphoma in the study population?

2         A.   I don't recall reading any specific

3    study looking at that, no.

4         Q.   Okay.

5         A.   But actually, you know, I think what

6    the study by Coble showed actually was that they

7    developed -- and following up on the publication

8    of Dosemici, is that this algorithm that they

9    developed and tested in a number of different

10   studies that have been published by authors

11   involved in the Agricultural Health Study show

12   this updated algorithm that integrated multiple

13   pieces of information into the algorithm really

14   seemed to perform the best in terms of

15   predicting exposure to glyphosate, or the

16   intensity of exposure to glyphosate.

17        Q.   And in the Andreotti study, the cohort

18   members were selected because they applied for

19   licenses to use restricted use pesticides, is

20   that correct?

21        A.   I believe that they were -- let me

22   just refer to it.  Yes, they were seeking

23   licenses to apply restricted use pesticides when

24   they were enrolled.

25        Q.   And what is a restricted use

Confidential - Pursuant to Protective Order

1       pesticide?

2           A.   I'm not familiar with that term.  I'm

3       not sure what they mean by that specifically.

4           Q.   Okay.  Let's turn to Page 7 of your

5       report, which is Exhibit 2, and in the second

6       paragraph you note that "potential limitations

7       of the study" -- which is the Andreotti study,

8       which is Exhibit 1 in this deposition --

9       "include the possibility of non-differential

10      misclassification of glyphosate-based herbicide

11      exposure."

12               Did I read that correctly?

13          A.   Yes.

14          Q.   And just so we're clear, how would you

15      define non-differential misclassification?

16          A.   In this particular context what I mean

17      is that if there is measurement error in

18      glyphosate exposure, it's unrelated to the

19      outcome of non-Hodgkin's lymphoma.  And that's

20      one of the strengths of a cohort study.

21               In contrast, a differential

22      misclassification can occur sometimes in

23      case-control studies because the reporting of

24      the information on the exposure may be

25      influenced by the outcome itself.  It's a

Confidential - Pursuant to Protective Order

1    measure of recall bias.

2         Q.   And it's your opinion that

3    non-differential exposure misclassification is a

4    potential limitation of the Andreotti study,

5    correct?

6         A.   What I said is in epidemiology, it's a

7    standard approach.  We want to say if we see a

8    finding that's null, we want to try to

9    understand whether bias confounding or chance

10   were playing a role.  One factor that we might

11   be concerned about is non-differential

12   misclassification because it would tend to bias

13   a finding to the null.

14        Q.   Okay.  And if we turn to Page 3 of

15   your report, I believe you actually talk about

16   that potential limitation.

17        A.   Yes.

18        Q.   Now, is it your opinion that some

19   exposure misclassification did occur in the

20   Andreotti study?

21        A.   It's possible that there is some

22   misclassification, non-differential

23   misclassification of glyphosate-based exposure.

24   However, there's a number of lines of data that

25   would suggest that the amount of

Confidential - Pursuant to Protective Order

1    misclassification is probably not large, and

2    that's -- as I'd mentioned earlier, it's based

3    on the Hoppin publication, based on the Blair

4    2001 publication showing the very reliable

5    information.  It's based on the algorithm

6    developed by Coble and showing the validation

7    with urinary biomarkers.  So all of these would

8    suggest that while there -- if there is -- it's

9    important not only to know if there is

10   misclassification, but the extent of the

11   misclassification, so if there is

12   misclassification it's likely to be small.

13        Q.   So as you sit here today, can you tell

14   me whether there was some misclassification in

15   the Andreotti study?

16        A.   While I can't necessarily say

17   definitively yes or no if there is

18   misclassification, it would -- the true relative

19   risk would actually have been more protective

20   than what we observed in the study which -- you

21   know, so again, what I can say definitively is

22   that non-differential misclassification did not

23   hide a positive association between

24   glyphosate-based herbicides and NHL risk, so

25   that I can say.

1          Whether there is some non-differential

2     misclassification I can't exclude, but it would

3     not have led to a true relative risk being a

4     positive association in this study.

5          Q.   So if some non-differential

6     misclassification did occur, is it your opinion

7     that the true relative risk would be even lower

8     than what's reported?

9          A.   It's not my opinion, it's actually a

10    standard epidemiological principle.  So if you

11    have -- as I've shown in my figure 1 in my

12    report, it's a mathematical relationship.  If

13    you have a relative risk that you observe that's

14    less than 1, and you have non-differential

15    misclassification, then the true relative risk

16    would actually be even smaller than 1, than what

17    you observed away from 1.  So it's just a

18    mathematical relationship.  So it's not my

19    opinion, but it's actually an epidemiological

20    principle.

21         Q.   And so if, just to be clear, if some

22    exposure of misclassification did occur, then

23    the true relative risk reported in the Andreotti

24    study would, in fact, be lower than what is

25    reported, which I think you point out as .86?

```
 1          A.   Yes.

 2          Q.   Okay.  And you discuss some of the

 3     validation studies that show that the cohort

 4     provides reliable information?

 5          A.   Yes.

 6          Q.   And it is on the basis of some of

 7     those validation studies that you are able to

 8     surmise that the percent of exposure

 9     misclassification was low, I think -- strike

10     that, actually.

11               Okay.  You cited to the 2001 Blair

12     paper to support the proposition that exposure

13     misclassification was limited in the Andreotti

14     study, correct?

15          A.   Yes.

16          Q.   Okay.  Let's go ahead and take a look

17     at this.

18               I'm marking Blair 2001 study as

19     Exhibit 3.

20               (Whereupon, Exhibit Number 32-3,

21               Blair, et al article, Reliability of

22               Reporting on Life-Style and

23               Agricultural Factors by a Sample of

24               Participants in the Agricultural

25               Health Study from Iowa, was marked for
```

Confidential - Pursuant to Protective Order

1              identification.)

2    BY MR. WOOL:

3         Q.   Okay.  Just briefly, can you explain

4    what Blair did to determine the extent of

5    exposure misclassification?

6         A.   Yes.  So there were data available

7    from about 4,000 of the participants who filled

8    out a baseline questionnaire in the Agricultural

9    Health Study who actually came in a year later

10   and filled out the same exact questionnaire, and

11   so the authors compared how reliable the

12   information was between those two

13   questionnaires.  And reliability is an

14   established methodology for assessing the

15   quality of epidemiological data from

16   questionnaires.  So they compared the exact

17   agreement between these two questionnaires.

18        Q.   Okay.  If you turn to Page 95, Table

19   1.

20        A.   Yes.

21        Q.   You will see that they have what they

22   describe as a comparison of dichotomous

23   responses on pesticide use between first and

24   second questionnaires, correct?

25        A.   Yes.

Confidential - Pursuant to Protective Order

1      Q.   And they actually break down how

2    individual pesticides or herbicides fared in

3    terms of exact agreement, correct?

4      A.   Yes.

5      Q.   And Table 1 examines ever-never use,

6    is that correct?

7      A.   Yes.

8      Q.   And for glyphosate, the exact

9    agreement between the first and second

10   questionnaire is 82 percent, is that correct?

11     A.   Yes.

12     Q.   Okay.  And what is the kappa statistic

13   measuring?

14     A.   So the kappa statistic takes into

15   account the role that chance might play in the

16   fact that two people say the same thing on the

17   two different questionnaires.  So, you know, if

18   -- with glyphosate you have fairly high

19   prevalence of the exposure and therefore just by

20   chance you may have two people saying they used

21   glyphosate on the two different questionnaires,

22   so the kappa statistic basically adjusts for the

23   prevalence of the exposure in leading to

24   concordant answers.

25     Q.   And further down in Table 1 they

Confidential - Pursuant to Protective Order

1      provide these same calculation using method of

2      application, correct?

3          A.   Yes.

4          Q.   And, for example, the exact agreement

5      with hand-spraying on application is 72 percent,

6      correct?

7          A.   Yes.

8          Q.   And depending on what type of

9      application method was used, there are kind of a

10     range of different figures for exact agreement,

11     correct?

12         A.   Yes, yes.  So they ranged from

13     72 percent up to 99 percent.

14         Q.   Now, does the Blair paper indicate to

15     you that use of a pesticide in any given year

16     can be used to determine -- strike that.

17              Is it your opinion that the Blair

18     paper demonstrates that use of a pesticide in

19     any given year can accurately predict the

20     frequency of pesticide application in another

21     year?

22              MR. LASKER:  Objection to form.

23         A.   So what this tells us is about the

24     reliability of the quality of the information

25     that's provided.  It doesn't -- it gives you

Confidential - Pursuant to Protective Order

1    some sense of what the quality of

2    epidemiological data is.  That's what this paper

3    is telling us.

4    BY MR. WOOL:

5        Q.   And when you say "quality," does that

6    include whether the information is reliable?

7        A.   Exactly, yes.

8        Q.   Now if you turn the page over to

9    Page 96, and you look at Table 2, Table 2 is

10   telling us the agreement between the days per

11   year of pesticide use mixed and applied,

12   correct?

13       A.   It tells us a number of different

14   measures, including years mixed, days per year,

15   and decade first applied, yes.

16       Q.   Okay.  And if we look at glyphosate

17   and the days per year mixed or applied, the

18   exact agreement provided by Blair 2001 is

19   53 percent, correct?

20       A.   Actually that's the years mixed or

21   applied is 53 percent.

22       Q.   I'm sorry, yes.

23       A.   Yes.  And while that is true, if you

24   look further in the text, what's important to

25   note is that 90 percent of the subjects gave

Confidential - Pursuant to Protective Order

1    responses actually within one category of

2    agreement.  I think that's really an important

3    feature about -- you know, while it's true that

4    we may in epidemiology be unable to tell with

5    complete specificity the exact number of days

6    that somebody has used glyphosate or the number

7    of years they've applied, what this tells us

8    here is that we're able to appropriately rank

9    people as either high, low, or not exposed.

10           And so I think that's an important

11   feature as well.  So it's not only what's the

12   exact agreement in terms of the number of years

13   mixed, but also, you know, was it -- if the

14   categories were so disparate, then you're right,

15   then you might be a little bit more concerned

16   about that percent agreement.

17           But the fact in the text where it says

18   90 percent of subjects give responses within one

19   category of agreement, that's really important

20   additional information.  It suggests we can

21   appropriately rank people as high, low, or no

22   exposed.

23       Q.   Okay.  And if you look down below

24   Table 2, for years mixed or applied, the

25   categories are 1 or less, 2 to 5, 6 to 10, 11 to

Confidential - Pursuant to Protective Order

1    20, 21 to 30, and more than 30, correct?

2          A.    Yes.

3          Q.    Okay.  And if we go down in Table 2 to

4    days per year mixed or applied, for glyphosate

5    the exact agreement reported in Blair is

6    52 percent, correct?

7          A.    Yes.  And we have the same point

8    below, which is that although it's -- the exact

9    agreement is 52 percent, that the categories

10   within one -- 90 percent of the responses were

11   within one category of agreement.

12         Q.    And the categories for the days per

13   year of usage are less than 5, 5 to 9, 10 to 19,

14   20 to 39, 40 to 59, and 60 to 150 -- I'm sorry,

15   and more than 150, correct?

16         A.    Correct.  So what this tells us, then,

17   is that although the exact agreement of

18   somebody, for example, filling out 60 to 150 is

19   52 percent, it's highly unlikely that somebody

20   who used 60 to 150 would then on the second

21   questionnaire report less than 5.  So I think

22   the fact that you have 90 percent agreement

23   within one category is a really important

24   feature of this study.

25         Q.    But somebody could report, say, 150

Confidential - Pursuant to Protective Order

1    uses a year and then drop down to 40 years --

2    sorry, 40 uses per year --

3         A.   But that --

4         Q.   -- and that would be one category

5    apart, correct?

6         A.   Oh, I see what you're saying.  It's

7    possible, but we don't know exactly what the

8    difference was.  We don't know the exact value,

9    because it's such a broad range there.

10        Q.   Okay.  Right.  And so just what I want

11   to clarify is that the days per year mixed or

12   applied exact agreement figure is not telling us

13   that somebody might have used glyphosate one

14   more day per year, it's telling us that they are

15   in a different category, correct?

16        A.   I'm sorry, I don't understand.

17        Q.   Sorry, that was my fault.  The

18   question was not clear at all.

19             And so what I'm asking is, the exact

20   agreement percentage does not -- is not looking

21   strictly at whether or not there's a slight

22   variation in agreement, it is, in fact, looking

23   at whether or not somebody is in a different

24   category, correct?

25        A.   I'm sorry, I still don't understand

Confidential - Pursuant to Protective Order

1    specifically your question.

2         Q.   The percentage of agreement is based

3    on which category a cohort member falls into,

4    correct?

5              MR. LASKER:  Objection to form.

6         A.   So in the case of days per year, the

7    percent exact agreement of 52 percent suggests,

8    then, that 52 percent of participants reported

9    being in the same category of days per year of

10   use on both questionnaires.  And then the

11   follow-up is that 90 percent of the subjects

12   were within one category of exposure.

13              So again, you know, these are

14   categories of exposure, and suggesting that

15   we're able with this questionnaire to

16   appropriately rank people, and that's really the

17   goal of epidemiology.

18   BY MR. WOOL:

19        Q.   And what is the known rate of error

20   for predicting frequency of glyphosate use using

21   this method in the Blair study?

22              MR. LASKER:  Objection.

23        A.   I'm sorry, I don't understand your

24   question.

25   BY MR. WOOL:

Confidential - Pursuant to Protective Order

1          Q.    Okay.  Let's go to Page 7 of your

2     expert report.  And you state in the second

3     sentence of the second paragraph, "However,

4     validation studies" -- are you there?

5          A.    Yes.

6          Q.    Okay.  "However, validation studies

7     within the Agricultural Health Study show that

8     these licensed applicators have been shown to be

9     able to provide reliable self-reported

10    information in this cohort."  And then your cite

11    to that is this Blair study that we're looking

12    at in Exhibit 3.

13         A.    Yes, that's what I say in my report,

14    yes.

15         Q.    Are there any other cites or studies

16    that you rely upon to validate this opinion?

17              MR. LASKER:  Objection to form.  Asked

18    and answered.

19         A.    As I had mentioned earlier, although I

20    didn't cite it here, another piece of

21    information that's quite helpful is the

22    publication by Hoppin which looked at comparing,

23    particularly for the baseline questionnaire,

24    when people reported when they first started

25    using different pesticides, the authors compared

Confidential - Pursuant to Protective Order

1    those -- they wanted to know what -- if it was

2    an issue that people were reporting starting use

3    of pesticides prior to when they came on the

4    market, which would suggest they were an

5    incorrect response.  So that was another piece

6    of information that shows the reliability of the

7    information on exposure.

8    BY MR. WOOL:

9         Q.   Okay.  Can you turn to Page 98 of the

10   Blair article, please?  Now, at the top of the

11   right-hand column, the authors note that

12   "Although the reliability" --

13        A.   I'm sorry, you said at the top of the

14   right-hand --

15        Q.   Top of the right-hand column on

16   Page 98.

17        A.   Yes.

18        Q.   The authors note that "Although the

19   reliability of reported pesticide use among

20   farmers is as good as, for many other factors,

21   assessed by questionnaires in epidemiological

22   research and better than for some variables it

23   is important to assess affects of potential

24   misclassification on estimates of relative risk.

25   If the level of agreement between the first and

Confidential - Pursuant to Protective Order

1    second interview is considered a measure of

2    non-differential misclassification, we can

3    calculate affects on relative risk.  For

4    example, if the true relative risk was 4.0 in

5    non-differential misclassification for

6    ever-never handled individual pesticides is as

7    in Table 1 (from 79 percent to 88 percent

8    agreement), the calculated relative risk would

9    range from 2.0 to 2.6."

10          Did I read that correctly?

11     A.   Yes, that is what it says.  But I

12   think one important thing to remember is also

13   that the effect on the relative risk is also

14   going to be a function of the prevalence of the

15   exposure.

16     Q.   So what do you mean by that, just so

17   I'm clear?

18     A.    So if you -- if the prevalence of the

19   exposure is much lower, and you have the same

20   sort of agreement, you're going to see more

21   distortion in the relative risk than you would

22   with an exposure that's more common such as with

23   glyphosate, because the rare -- an exposure is

24   the more sensitive it is going to be to

25   misclassification on an absolute scale.

Confidential - Pursuant to Protective Order

1          Q.   Okay.  I just want to make sure I

2     understand what you're saying correctly.

3               You were saying that for more commonly

4     used pesticides that are not rare, that the

5     effect on the relative risk is not going to be

6     as sensitive?

7          A.   I can't recall which year it was, but

8     I know Blair has another publication about

9     misclassification where the authors show the

10    effect of the amount of misclassification on the

11    relative risk as a function of the prevalence of

12    the exposure.  I just don't recall specifically

13    what year that was.

14         Q.   I think 2011 maybe.

15         A.   Yes.  Possibly, yes.  So I think that

16    kind of shows the -- how those things are

17    interrelated with each other.

18         Q.   Do you believe that it is impossible

19    for non-differential exposure misclassification

20    to conceal a true positive association?

21               MR. LASKER:  Objection to form.

22         A.   Could you ask the question again?

23    BY MR. WOOL:

24         Q.   Yes.  Do you believe that it is

25    impossible for non-differential

Confidential - Pursuant to Protective Order

1    misclassification to conceal a true positive

2    association?

3          MR. LASKER:  Objection to form.

4          A.    I'm sorry, the words are

5    straightforward, but I'm still not understanding

6    what you're asking.

7    BY MR. WOOL:

8          Q.    Is it possible that in the Andreotti

9    study exposure misclassification could conceal a

10   true positive association?

11         A.    It's highly unlikely.  And the reason

12   that I say that is that given the odds ratio

13   that was estimated in Andreotti, et al was less

14   than 1, that makes it highly, highly, highly

15   unlikely that misclassification would mask a

16   positive association.  And that's based on

17   standard epidemiology principles.

18         Q.    So are you saying in effect that while

19   misclassification could bias the result towards

20   the null it could not, say, jump across 1?

21         A.    That's not just based on what I'm

22   saying, it's based on standard epidemiology

23   principles mathematically.  Like if you have a

24   very small study, a very small study, which we

25   don't have here in Andreotti, by chance it is

Confidential - Pursuant to Protective Order

1    possible that you might have something like

2    that.  But in this case of Andreotti, et al

3    where chance is very unlikely to have -- to do

4    this, mathematically non-differential

5    misclassification is going to bias a true

6    relative risk towards the null.  Therefore,

7    given the observed relative risk that we see in

8    Andreotti, et al, it's highly, highly unlikely

9    that it's masking a true positive association.

10         Q.   Now, if we go back to Table 2 --

11         A.   Of --

12         Q.   -- of the Blair article, Exhibit 3.

13    And again, we look at the days per year mixed or

14    applied figure for glyphosate.

15         A.   Sorry, days per year, or the years

16    per --

17         Q.   The days per year in the middle of

18    Table 2 --

19         A.   Yes.

20         Q.   -- which is reported again as

21    52 percent, would you expect the accuracy of --

22    or strike that.

23              In the questionnaires that were given

24    in Andreotti, et al, those questionnaires asked

25    about the last year of use, correct?

Confidential - Pursuant to Protective Order

1              MR. LASKER:  Objection to form.

2        A.   No, that's not correct.  It was -- in

3     the follow-up questionnaire it referred to the

4     last year farmed.

5     BY MR. WOOL:

6        Q.   Okay.  The last year farmed.

7        A.   Yes.

8             But this particular -- I'm sorry to

9     interrupt you.  But this particular reliability

10    study actually looked at the baseline

11    questionnaire, not the follow-up questionnaire.

12       Q.   Okay.

13       A.   Do you think it might be appropriate

14    for a quick break?

15       Q.   Absolutely.  We can take a break

16    right.  Now.

17       A.   That would be awesome.

18            THE VIDEOGRAPHER:  Going off the

19    record.  The time is 10:03.

20            (Whereupon, a recess was taken.)

21            THE VIDEOGRAPHER:  Back on the record.

22    The time is 10:17.

23    BY MR. WOOL:

24       Q.   All right.  So we were talking about

25    the Blair paper briefly before we went off the

Confidential - Pursuant to Protective Order

1      record, right?

2           A.    The Blair 2001?

3           Q.    The Blair 2001 paper.

4           A.    Yes.

5           Q.    And the Blair paper only examined the

6      exact agreement between enrollment

7      questionnaires, correct?

8           A.    It looked specifically at the baseline

9      questionnaire, yes, the reliability of the

10     information in the baseline questionnaire.

11          Q.    Are you aware of any papers that have

12     looked at the follow-up questionnaire?

13          A.    In terms of the reliability?

14          Q.    Yes.

15          A.    I'm not familiar, no.

16          Q.    And this Blair paper only looked at

17     two years of questionnaire data, correct?

18               MR. LASKER:   Objection to form.

19          A.    I believe actually the questionnaires

20     were completed one year apart.

21     BY MR. WOOL:

22          Q.    One year apart.

23               So one questionnaire, and then a

24     questionnaire the next year, correct?

25          A.    Correct.

Confidential - Pursuant to Protective Order

1          Q.   All right.  Let me ask you this.  Do

2     you consider the AHS to be a null study?

3                MR. LASKER:  Objection to form.

4                Which study are you talking about?

5     BY MR. WOOL:

6          Q.   I'm sorry, the Andreotti study.  I

7     keep saying AHS.

8                Do you consider the Andreotti study to

9     be a null study?

10               MR. LASKER:  Objection to form again.

11         A.   I find the findings on non-Hodgkin's

12    lymphoma, that there's no association between

13    glyphosate-based herbicides and the risk of

14    non-Hodgkin's lymphoma, or any of the

15    non-Hodgkin's lymphoma subtypes.

16    BY MR. WOOL:

17         Q.   You do not consider it to be a

18    negative study?

19               MR. LASKER:  Objection to form.

20         A.   I'm not sure what you mean

21    specifically by "negative study."  What I would

22    say about this is that the data suggests there's

23    no association between glyphosate-based

24    herbicides and the risk of non-Hodgkin's

25    lymphoma.

Confidential - Pursuant to Protective Order

1    BY MR. WOOL:

2        Q.   Do you believe that glyphosate-based

3    herbicides have a protective effect?

4        A.   I do not believe that, based on the

5    epidemiological evidence in this study, nor in

6    the totality of the epidemiology evidence, would

7    it suggest either a positive or inverse

8    association.

9        Q.   All right.  You're familiar with the

10   concept of imputation?

11       A.   Yes.

12       Q.   Okay.

13       A.   In the context of epidemiological

14   studies.

15       Q.   Right.  I should have clarified.

16       A.   Yes.

17       Q.   And in this study, was it 37 percent

18   of the population, I think, that was lost to

19   follow-up?

20            MR. LASKER:  Objection to form.

21       A.   So just to clarify, when we talk about

22   lost to follow-up, there's different

23   connotations in epidemiology.  We don't -- we

24   haven't lost to follow-up in terms of what

25   happened in terms of disease outcomes, but

Confidential - Pursuant to Protective Order

1    37 percent of the participants who filled out

2    the baseline questionnaire did not fill out the

3    second questionnaire.

4    BY MR. WOOL:

5        Q.   In any of your own publications, have

6    you ever had 37 percent of a cohort be lost to

7    follow-up?

8            MR. LASKER:  Objection to form.

9        A.   Well, I haven't -- in the cohort

10   studies that I've worked on, we haven't had

11   37 percent of our participants not complete a

12   second questionnaire.  I actually have been

13   involved in a cohort study where I -- while I

14   didn't use the follow-up questionnaire, that

15   particular follow-up questionnaire, more than

16   30 percent of the individuals did not fill out a

17   second questionnaire.  It was the Swedish

18   mammography cohort.  So I worked with their

19   baseline questionnaire, but that particular

20   cohort had a second questionnaire 30 percent of

21   the participants did not complete.  And they

22   took an approach very similar to what was done

23   with Andreotti, et al in terms of doing multiple

24   imputation, comparing multiple imputation to

25   complete case assessment, and did a variety of

Confidential - Pursuant to Protective Order

1       things to assess whether the amount of missing

2       data might influence the results.

3            Q.   Do you believe the Andreotti study

4       would be more reliable if fewer than 30 percent

5       had been lost to follow-up?

6            A.   Well, it's interesting.  In

7       epidemiology we should be concerned when we see

8       that 37 percent of the participants did not

9       complete the second questionnaire.  I definitely

10      believe that's a valid concern.  What's

11      reassuring, however, are the different

12      approaches that the authors, the Andreotti

13      authors, took in their publication to assess

14      whether such an amount of missing data might

15      influence the results.

16              In addition, there's a publication by

17      Heltshe which describes the methodology of the

18      imputation for the study.  They also did a

19      number of assessments of the quality of

20      imputation which suggest that it actually didn't

21      influence the results.  And finally there's

22      another publication by Montgomery.

23              What we're really concerned about is

24      whether the association between glyphosate and

25      non-Hodgkin's lymphoma is different in those who

Confidential - Pursuant to Protective Order

```
1     did fill out the second questionnaire and those
2     who didn't.  So all of those things together, I
3     think one should be concerned about this, but
4     multiple nodes of evidence suggest that it
5     didn't lead to a substantial bias in this study.
6          Q.   Do you believe that -- or strike that.
7               Can you explain briefly how the
8     authors imputed -- or strike that.  Let's
9     actually take a look at the Heltshe study real
10    quick.  We will mark this as Exhibit 4.
11              (Whereupon, Exhibit Number 32-4,
12              Heltshe, et al article, Using multiple
13              imputation to assign pesticide use for
14              non-responders in the follow-up
15              questionnaire in the Agricultural
16              Health Study, was marked for
17              identification.)
18    BY MR. WOOL:
19         Q.   And in the abstract the authors note
20    that "To assess the imputation procedure, a
21    20 percent random sample of participants was
22    withheld for comparison.  The observed and
23    imputed prevalence of any pesticide use in the
24    holdout dataset were 85.7 percent and
25    85.3 percent respectively."  Correct?
```

Confidential - Pursuant to Protective Order

1          A.   Yes.

2          Q.   And if you turn to Page 412, in the

3     right-hand column.  I think it's actually

4     highlighted in your copy.

5          A.   Yes.

6               MR. LASKER:  Okay.  Thank you.

7     BY MR. WOOL:

8          Q.   Okay.  And the highlighted portion, I

9     believe, in your copy starts with "In pesticides

10    with the highest prevalence have the largest

11    standard errors, while rarely used pesticides

12    have very little variability."

13              Is that what's highlighted in yours?

14         A.   That is what is highlighted.  I'm just

15    trying to see what they're referring to here.

16    What information -- standard error.  The

17    estimates of the standard error, so the

18    variability around the mean, which makes sense,

19    yes.

20         Q.   So, and am I correct that the more

21    prevalent a pesticide is used, what the authors

22    are saying is there will be a larger standard

23    error with that pesticide compared to a

24    pesticide that is not used frequently?

25         A.   It actually refers to they're slightly

Confidential - Pursuant to Protective Order

1    higher than the true standard error.

2         Q.   Okay.

3         A.   But that's different than the relative

4    error.  That concept of the standard error is

5    different than the relative error, so it's not

6    really describing how well the imputation

7    procedure worked.

8         Q.   Okay.  And how is the standard error

9    different than the relative error?

10        A.   Well, the standard error, you know, we

11   say the mean or the estimated prevalence is

12   40 percent, and then we have sort of a

13   distribution of what we think the true expected

14   prevalence is.  The relative error compares what

15   was actually observed in that 20 percent holdout

16   versus what was predicted based on the

17   imputation, so that relative difference in the

18   estimate.

19             So the standard error doesn't give you

20   a sense of whether the information is a valid or

21   not imputation, just giving you -- it's like in

22   a 95 percent confidence interval around an odds

23   ratio, that is comprised of the standard error

24   around the odds ratio.  It gives you a sense of

25   the distribution.

Confidential - Pursuant to Protective Order

1          Q.   And you would consider glyphosate to

2     be a highly used pesticide, correct?

3          A.   Yes, it is a highly -- the prevalence

4     is quite high.  But again, that doesn't -- what

5     that comment in the second column on Page 412

6     does not imply that because the prevalence is

7     high the relative error -- there's no -- if you

8     look, actually, in table -- where did I see it?

9     This is different than what I had downloaded.

10              Oh, here.  So Figure 2 here is a

11    figure showing the relative errors, which is a

12    better -- is really what you want to look at

13    when you want to assess how well the imputation

14    worked.  And there, actually, you can see that

15    there doesn't really seem to be a relationship

16    between the prevalence of the pesticide and the

17    distribution of the relative errors, and that is

18    reassuring actually.

19         Q.   Okay.  Now, on the same page that

20    you're on, Page 414.

21              MR. LASKER:  Okay.  I'm there.

22    BY MR. WOOL:

23         Q.   In the right-hand column, the first

24    full paragraph reads, "A key assumption of any

25    imputation is that missingness is independent of

Confidential - Pursuant to Protective Order

1    the unobserved outcome of interest or

2    unobservable confounders (i.e., missing at

3    random).  The reduction of bias and increase in

4    precision from multiple imputations is dependent

5    on the covariates associated with both

6    non-response and the endpoint variable and

7    factors associated with non-participation, which

8    were included in our imputation model.  For our

9    imputation analysis, the 'outcome' of interest

10   is the missing pesticide use itself," and they

11   cite to Montgomery, et al, which shows that

12   "there is little evidence for selection bias in

13   Phase 2 of the AHS.  However missing at random

14   is an untestable assumption without additional

15   data; thus it is possible that non-responders

16   differ from responders in variables we have not

17   measured."

18           Did I read that correctly?

19       A.   Yes, you read that correctly.

20       Q.   Okay.  So what is the untestable

21   assumption that they're talking about in that

22   section?

23       A.   It's this concept of the data being

24   missing at random, meaning that the reason that

25   the data are missing is not related to some

Confidential - Pursuant to Protective Order

1    factor of interest here.

2         Q.   Now, is it your opinion that this

3    imputation method used in Andreotti has general

4    acceptance within the epidemiological community?

5         A.   The use of imputation is a common

6    procedure in epidemiology, yes.  However, what I

7    think is important, as Andreotti has done, is to

8    evaluate whether it's worked or not worked.  So

9    while it is accepted, it's also accepted by

10   epidemiologists that we should do our best to

11   understand whether the multiple imputation

12   approach has given us a valid estimate of the

13   missing data.

14        Q.   And have you used an imputation model

15   in any of your own publications?

16        A.   Yes.

17        Q.   Have you used this imputation model?

18             MR. LASKER:  Objection to form.

19        A.   I wouldn't have used this specific

20   multiple imputation model because this was

21   specified specific -- you want to -- what you

22   want to do with multiple imputation is think

23   about what you're trying to predict, and you

24   want to use the covariates and the relationship

25   of those covariates to best predict the missing

Confidential - Pursuant to Protective Order

1    data.  So the approach in the study where I've

2    used multiple imputation was very different than

3    this.  But it's still -- it's using a similar

4    strategy which they have done here.

5    BY MR. WOOL:

6         Q.   Could baseline exposure of

7    misclassification impact the accuracy of the

8    imputation?

9              MR. LASKER:  Objection to form.

10        A.   In what context?  I'm sorry.

11   BY MR. WOOL:

12        Q.   Insofar as it provides a reliable

13   outcome.

14             MR. LASKER:  Objection to form.

15        A.   I'm sorry, could you ask specific -- a

16   more specific question?  I'm not sure I

17   understand what you're asking.

18   BY MR. WOOL:

19        Q.   As I understand, the Heltshe is

20   looking at, among other things, sort of the

21   validity of the imputation model, correct?

22        A.   Yes.

23        Q.   Okay.  And could a measurement error

24   in baseline glyphosate use impact the validity

25   of the model as it's used in Andreotti, et al?

Confidential - Pursuant to Protective Order

1                    MR. LASKER:  Objection to form.

2          A.    Are you asking more generally, or did

3     it in this particular case?

4     BY MR. WOOL:

5          Q.    Could it.

6          A.    I guess it may or may not.  It would

7     be hard to predict, because it would rely on a

8     number of factors.  So it might, but it may not

9     as well.

10                I think here in this specific example

11    what's really nice to see is that the imputation

12    methodology performed well in predicting use of

13    glyphosate in this study.

14         Q.    Now, if you turn back, I think, to

15    Table 3, you'll see that Table 3 gives us a

16    number of figures for the various pesticides at

17    use, or at issue in the Andreotti study,

18    correct?

19         A.    Yes.

20         Q.    And three of the calculations that

21    Table 3 provides are reference Brier scores,

22    Brier score, and Brier skill score, correct?

23         A.    Yes.

24         Q.    Now, what is a reference Brier score?

25         A.    Well, what these three metrics were

Confidential - Pursuant to Protective Order

1     used for here was to say how well -- did the

2     imputation approach do a better job, was it more

3     predictive than if you just used the model or

4     just looked at what the actual observed

5     prevalence was.  And so these three values here

6     are used to say did the imputation add more

7     information than if you just used the actual

8     observed data.

9           So it's a measure of should you just

10    do simple -- a simple approach, or should you do

11    this much more complicated approach.  So that's

12    what the Brier score is being used for here.

13        Q.   And have you ever calculated a Brier

14    score in any of your own publications?

15        A.   I have not used the Brier score, no.

16        Q.   Were you familiar with the Brier score

17    before this litigation?

18        A.   Although I wasn't familiar with this

19    particular score, I'm very familiar with

20    prediction modeling in different strategies

21    people use to assess how well predicted model

22    adds information compared to sort of a baseline

23    model.  So I wasn't familiar with this specific

24    measure, but could easily understand why it's

25    being used here.

Confidential - Pursuant to Protective Order

1        Q.   And so what does the reference Brier

2    score for glyphosate indicate?

3        A.   So again, you know, what we're really

4    interested here in this table is the Brier skill

5    score because it gives us a sense, compared to

6    the reference Brier, how much additional

7    information the multiple imputation model did in

8    proving the accuracy in the prediction.  So what

9    it tells us is that the imputation model gave

10   almost a 10 percent improvement in the

11   prediction of the imputed data compared to just

12   relying on this simple model.  So, and that is

13   compared to some of the other pesticides, for

14   example, benomyl where it doesn't look like the

15   imputation added much more information than if

16   you just used the simple model.

17        So does that answer your question?

18        Q.   Yeah, I think it answers it well

19   enough.

20        Do you believe that maintaining a high

21   rate of follow-up is integral to ensuring study

22   validity?

23        MR. LASKER:  Objection to form.

24        A.   Yeah.  As an epidemiologist, our goal

25   is to optimize the amount of follow-up, because

Confidential - Pursuant to Protective Order

1    that would ensure that there's no issue of a

2    selection bias being introduced.  But at the

3    same time, just because you might not have all

4    of the participants in your study completing the

5    second questionnaire, it doesn't necessarily

6    imply that a bias has resulted.  It's important

7    to evaluate whether a bias has resulted, but it

8    doesn't necessarily mean that it has occurred.

9    BY MR. WOOL:

10       Q.   In terms of the non-responders in

11   Andreotti, is it possible to rule out selection

12   bias?

13       A.   There are multiple nodes of evidence

14   that suggest that selection bias is not likely

15   to be a big concern here, and, you know, I think

16   we have that data from the Andreotti publication

17   itself where they looked at a number of

18   sensitivity analyses.  We have that in the

19   Montgomery study which looked at the -- a number

20   of factors in those who did and did not complete

21   the second questionnaire.  They also tried to

22   assess the potential role of selection bias in a

23   number of exposure/outcome relationships.  And

24   then also from Heltshe as well.

25            So I think all of these pieces of

Confidential - Pursuant to Protective Order

1      information would suggest that it's very

2      unlikely that selection bias would have led to a

3      bias in this Andreotti study.

4          Q.   But you can't definitively rule out

5      selection bias having occurred in the Andreotti

6      study, correct?

7               MR. LASKER:  Objection to form.

8          A.   Well, as an epidemiologist where we

9      never would be able to completely rule anything

10     out, I think again what's really important here

11     is that there's multiple nodes of evidence

12     showing whether this bias existed, and all of

13     these different nodes of evidence suggest that

14     the bias is very unlikely to have occurred in

15     this Andreotti study.

16              MR. LASKER:  Just for clarification,

17     are you saying nodes or modes?

18              THE WITNESS:  Nodes.

19              MR. LASKER:  That's what I thought, I

20     wanted to clear it up.

21     BY MR. WOOL:

22         Q.   We talked about a high rate of

23     follow-up just a second ago, right?

24         A.    (Nodding in the affirmative).

25         Q.   Okay.  Is there any agreement within

Confidential - Pursuant to Protective Order

1    the field of epidemiology as to what constitutes

2    a high rate of follow-up?

3              MR. LASKER:  Objection to form.

4         A.   I wouldn't -- I mean, I think it's

5    very context specific.  And again, our goal is

6    to try to have as high follow-up as possible.

7    If that doesn't occur, then it's also important

8    as an epidemiologist to evaluate the potential

9    for bias, which Andreotti has done specifically

10   here.  And also not only Andreotti, et al, but

11   also the many other publications that have

12   relied on the Agricultural Health Study second

13   questionnaire have also done -- looked at this

14   issue as well in the context of the exposure and

15   the outcome they were looking at.

16   BY MR. WOOL:

17        Q.   Would you consider a 37 percent loss

18   in follow-up to be a high rate of follow-up?

19             MR. LASKER:  Objection to form.

20        A.   I would say, again, it is a -- we

21   would be concerned just as we would be concerned

22   with any amount of missing data.  However, just

23   because there is that amount of missing data

24   doesn't mean necessarily bias occurred.

25             And I think as we've just talked

Confidential - Pursuant to Protective Order

1    about, these authors and many of the other

2    authors in the Agricultural Health Study have

3    evaluated the impact of bias.  Because you're

4    right, as an epidemiologist we should be

5    concerned.  However, it's really reassuring to

6    see from multiple studies, multiple lines of

7    evidence, the way they've looked at the

8    potential for bias in multiple ways, all of

9    these analyses suggest that selection bias did

10   not result in any -- in the study of Andreotti,

11   et al and glyphosate and NHL risk analysis.

12   BY MR. WOOL:

13        Q.   Would it be reasonable for an

14   epidemiologist to put less weight on a study due

15   to a 37 percent loss in follow-up?

16             MR. LASKER:  Objection to the form.

17        A.   Again, that's a very general comment.

18   And what I would want to know is -- so we can

19   think of it it's almost like a Bayesian

20   approach.  A priori if I heard there was

21   37 percent missing data, that would raise my

22   concern.  However, if I see that the authors,

23   and multiple authors have looked at this

24   question in multiple ways, and there doesn't

25   seem to be a bias occurred, my posterior

Confidential - Pursuant to Protective Order

1       probability then would be based on all this

2       information that a bias is unlikely to have

3       happened.

4                   So while it is something to think

5       about and to be concerned about, there are

6       standard approaches we can take as

7       epidemiologists to investigate whether a bias

8       indeed occurred.  And in this case, and again

9       from all of these different pieces of data that

10      we've talked about, it doesn't seem that the

11      37 percent missing data has resulted in any

12      substantial bias in this study.  And I think --

13      BY MR. WOOL:

14          Q.   Okay.  So in your capacity as a peer

15      reviewer, have you ever come across a study

16      where 37 percent of the cohort was lost to

17      follow-up?

18                  MR. LASKER:  Objection to form.

19          A.   As I mentioned, this wasn't

20      necessarily in the context of peer review.  But

21      as I've mentioned, I had previously collaborated

22      on the Swedish mammography cohort study, and

23      there -- and that's an NCI-funded cancer

24      epidemiology cohort, they published literally

25      hundreds of publications, and they have

Confidential - Pursuant to Protective Order

1    30 percent of their participants did not

2    complete the second questionnaire.  They did

3    multiple imputation, they compared it, just as

4    Andreotti did, to the complete case assessment,

5    they did a variety of assessments to see whether

6    the participants who completed both

7    questionnaires differed from those who only

8    completed one, so I -- there are

9    well-established epidemiology studies, cohort

10   studies that do have large amounts of missing

11   data.

12   BY MR. WOOL:

13        Q.   And is it possible that the loss in

14   follow-up in the Andreotti study is related to

15   exposure status?

16             MR. LASKER:  Objection to form.

17        A.   I'm not sure I understand what you

18   mean.  Because what you're really concerned

19   about is not whether the missing data is related

20   to the exposure status, but really whether the

21   missing data on the exposure is also

22   differentially related to the outcome.  That's

23   where the selection bias would occur.

24   BY MR. WOOL:

25        Q.   So I guess my question should be, do

Confidential - Pursuant to Protective Order

1    you know if lost in follow-up in AHS is related

2    to outcome status or -- strike that.

3              Can you definitively rule out that

4    loss in follow-up in the Andreotti study is

5    related to outcome status?

6              MR. LASKER:  Objection to form.

7         A.    While -- in the approach, one of the

8    approaches that -- there are a couple of

9    different approaches that would suggest that is

10   not the case.  In the sensitivity analysis

11   Andreotti, et al looked at first just the

12   individuals who had filled out both

13   questionnaires, so the complete case, so where

14   selection bias wouldn't have caused a problem.

15   And when you look at the relative risk estimates

16   for the association between glyphosate and NHL

17   risk there and compare it to the imputation, the

18   findings are very, very similar, very, very

19   similar.

20             Also, when they say well, let's just

21   look at the baseline questionnaire, when they do

22   that, again the results of that baseline

23   questionnaire compared to the follow-up

24   questionnaire, very, very similar.  So both of

25   those strategies would suggest that such a bias

Confidential - Pursuant to Protective Order

1    did not lead to any bias of the results.

2    BY MR. WOOL:

3         Q.   What does the concept of -- or what

4    does external validity mean within the field of

5    epidemiology?

6         A.   So external validity refers to

7    generalizability, meaning can you take the

8    findings in this one cohort study and

9    extrapolate that to other populations.

10        Q.   Do you believe that you can

11   extrapolate the results of the Andreotti study

12   to other populations?

13        A.   There's no reason for me to suggest --

14   there's no inclination to me to suggest why that

15   would not be the case, why an underlying

16   relationship between glyphosate and NHL risk

17   would differ in this population versus another

18   population.

19             And in fact, actually there was a

20   really nice editorial that accompanied

21   Andreotti, et al by Ward, Elizabeth Ward,

22   suggesting, actually, that the Agricultural

23   Health Study in many ways is an excellent

24   population to look at the association between

25   glyphosate and NHL risk.

Confidential - Pursuant to Protective Order

1      Q.   Now, what about the concept of

2   internal validity as it relates to the larger

3   field of epidemiology?

4      A.   Yes, internal validity is what we've

5   been talking about already.  It's thinking about

6   the concepts of whether bias confounding or

7   chance might explain an observed association.

8      Q.   And is internal validity a necessary

9   prerequisite to establish external validity?

10      A.   Certainly.  Well, I mean, really you

11   wouldn't want to generalize a bias finding to a

12   different population, so that's what that

13   concept means.

14      Q.   So I guess yes, internal validity is a

15   necessary prerequisite to external validity?

16          MR. LASKER:  Objection to form.

17      A.   Well, you need to have a study to be

18   internally valid to say anything meaningful

19   about the observed association, regardless of

20   generalizability.  But that's the case for every

21   epidemiological study, you want to make sure

22   that bias confounding and chance have not -- are

23   not explaining the observed association that you

24   have, which, you know, again, has been nicely

25   investigated here in Andreotti, et al.

Confidential - Pursuant to Protective Order

1     BY MR. WOOL:

2          Q.   Now, in your supplemental expert

3     report you completed a meta-analysis, correct?

4          A.   Yes.  What I did was to do an updated

5     meta-analysis where I, as you can see from

6     Figure 2 in my supplemental report, I looked at

7     point estimates from four different studies.

8          Q.   And one of those studies was Pahwa, et

9     al, 2016?

10         A.   Yes.  Was it -- yeah, Pahwa 2016.

11         Q.   Would it be improper to exclude that

12    study?

13         A.   Would it be improper to exclude that

14    study?

15         Q.   Yes, in the meta-analysis.

16         A.   I'm sorry, I don't understand your

17    question.

18         Q.   If I were to -- I guess, if a

19    meta-analysis did not include the Pahwa study,

20    would you consider that to be a flawed

21    meta-analysis?

22         A.   Well, I think in -- what you would do

23    in a meta-analysis is to evaluate -- you would

24    want to go through an understanding of all of

25    the available epidemiological studies that meet

Confidential - Pursuant to Protective Order

1    the criteria for the meta-analysis that you're

2    performing, so it would be very unclear why you

3    would exclude Pahwa here.

4        Q.   Okay.  And in the Andreotti study,

5    they evaluated the cohort at 20 years, correct?

6            MR. LASKER:  I'm sorry.

7        A.   I'm sorry, I don't understand your

8    question.

9    BY MR. WOOL:

10       Q.   Let me just go to Table 3, I think

11   that is little bit more clear.

12           MR. LASKER:  Where are you?

13           MR. WOOL:  Table 3 of Andreotti.

14           MR. LASKER:  Just get myself organized

15   here.

16           Page 6?

17           MR. WOOL:  Yes.

18   BY MR. WOOL:

19       Q.   And what is the right-hand column

20   showing us?

21       A.   So in this table the authors presented

22   data on intensity weighted days of exposure of

23   glyphosate and cancer risk, and in the right

24   column is looking at an analysis lagging -- or

25   introducing a latency to look at longer term

Confidential - Pursuant to Protective Order

1    effects of glyphosate-based herbicides.

2            MR. LASKER:  Just for the record, I

3    don't know if this is intended or not, this

4    Exhibit 32-2 does not include the supplemental

5    table.  I don't know if you intended it not to,

6    but we don't have it.

7            MR. WOOL:  It should have.

8            MR. LASKER:  It should have.  We don't

9    have it.

10           MR. WOOL:  Well --

11           MR. LASKER:  You won't ask those

12    questions.

13           MR. WOOL:  It is what it is at this

14    point.

15    BY MR. WOOL:

16       Q.   So staying in the right-hand column,

17    for the 20 year lag and looking at non-Hodgkin's

18    lymphoma, what are the figures in the

19    parenthesis telling us?

20       A.    I'm sorry, in the parenthesis, those

21    are 95 percent confidence intervals.  Is that

22    what you're referring to?

23       Q.   Yes.

24            And so what is the upper figure

25    telling us in those parenthesis?

1          A.    I'm sorry, I don't understand what

2    you're referring to.

3          Q.    If we look at the first quartile in

4    the parenthesis we see a range of .91 to 1.64,

5    correct?

6          A.    Yes.

7          Q.    Okay.  What is the 1.64 telling us?

8          A.    That's the upper bound of the

9    95 percent confidence interval.

10          Q.    And what -- you said upper bound or

11    upper --

12          A.    That's the upper bound of the

13    95 percent confidence interval.

14          Q.    What does the upper bound mean in the

15    field of epidemiology?

16          A.    So it gives you -- so we're estimating

17    what you think to be the relative risk, and then

18    you have some uncertainty around that estimate.

19    The amount of uncertainty is a function of the

20    number of cases, the prevalence of the exposure,

21    so this gives you a range of values that are

22    consistent.  Although you would think that the

23    range of values are more consistent with the

24    point estimate than the -- either the lower or

25    upper bound.  But to me what that tells you when

Confidential - Pursuant to Protective Order

1    you look at the 20 year lagged analysis, there's

2    no association between glyphosate-based

3    herbicides and risk of non-Hodgkin's lymphoma

4    with 20 -- even if you lag 20 years of exposure.

5         Q.   Okay.  But the upper bound for all

6    quartiles with a 20 year lag for non-Hodgkin's

7    lymphoma are above 1, correct?

8              MR. LASKER:  Objection to form.

9         A.   Well, that is correct.  The other way

10   to look at this is that all of the lower bounds

11   of the 95 percent confidence intervals are below

12   1, because when you look at the overall

13   association here, this really is telling us

14   there's no association between glyphosate-based

15   herbicides, assuming a 20 year lagged analysis,

16   and the risk of NHL.

17             I actually have -- I don't know if

18   it's helpful, but in my supplemental report we

19   also looked at the 15 -- I'm sorry, I don't have

20   those numbers specifically, but there was no

21   association either with assuming a 10 year, a

22   15 year, or a 5 year lag, which we see also in

23   this Table 3.

24   BY MR. WOOL:

25        Q.   And am I correct that for your

Confidential - Pursuant to Protective Order

1    meta-analysis, you did not include the results

2    with the 20 year lag?

3         A.    That information was not available for

4    all of these studies, so this particular

5    meta-analysis simply looks at the ever-never

6    exposure that was available from each of the

7    publications.

8              My goal wasn't to -- my goal was

9    really just to give sort of an information about

10   what the totality of the epidemiology is saying

11   to us.  You know, there is caveats, as I've said

12   previously, that we can come up with a meta

13   relative risk estimate, but it doesn't adjust

14   for any potential biases or confounders that

15   have not been taken into account here.

16        Q.    Just so I'm clear, you're not saying

17   that -- strike that.  I understand your answer.

18              Okay.  I think that's it for right

19   now.

20              MR. WOOL:  If you have any questions?

21              MR. LASKER:  None.  You don't have an

22   option.  We're done.

23        A.    Thanks so much.

24              THE VIDEOGRAPHER:  This concludes the

25   January 23, 2018 deposition of Dr. Lorelei

Confidential - Pursuant to Protective Order

1      Mucci.  Going off the record.  The time is

2      10:55.

3                  (Whereupon, the deposition was

4                  concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

1       COMMONWEALTH OF MASSACHUSETTS )

2       SUFFOLK, SS.                  )

3               I, MAUREEN O'CONNOR POLLARD, RMR, CLR,

4       and Notary Public in and for the Commonwealth of

5       Massachusetts, do certify that on the 23rd day

6       of January, 2018, at 9:01 o'clock, the person

7       above-named was duly sworn to testify to the

8       truth of their knowledge, and examined, and such

9       examination reduced to typewriting under my

10      direction, and is a true record of the testimony

11      given by the witness.  I further certify that I

12      am neither attorney, related or employed by any

13      of the parties to this action, and that I am not

14      a relative or employee of any attorney employed

15      by the parties hereto, or financially interested

16      in the action.

17              In witness whereof, I have hereunto

18      set my hand this 5th day of February, 2018.

19

20      _____

21      MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC

22      Realtime Systems Administrator

23      CSR #149108

24

25

Confidential - Pursuant to Protective Order

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition over

4        carefully and make any necessary corrections.

5        You should state the reason in the appropriate

6        space on the errata sheet for any corrections

7        that are made.

8                    After doing so, please sign the

9        errata sheet and date it.  It will be attached

10       to your deposition.

11                   It is imperative that you return

12       the original errata sheet to the deposing

13       attorney within thirty (30) days of receipt of

14       the deposition transcript by you.  If you fail

15       to do so, the deposition transcript may be

16       deemed to be accurate and may be used in court.

17

18

19

20

21

22

23

24

25

Confidential - Pursuant to Protective Order

1                         - - - - - -

                        E R R A T A

2                         - - - - - -

3      PAGE   LINE   CHANGE

4      _____  _____  _____

5           REASON: _____

6      ____  _____  _____

7           REASON: _____

8      _____  _____  _____

9           REASON: _____

10     _____  _____  _____

11          REASON: _____

12     _____  _____  _____

13          REASON: _____

14     _____  _____  _____

15          REASON: _____

16     _____  _____  _____

17          REASON: _____

18     _____  _____  _____

19          REASON: _____

20     _____  _____  _____

21          REASON: _____

22     _____  _____  _____

23

24

25

Confidential - Pursuant to Protective Order

1

2                    ACKNOWLEDGMENT OF DEPONENT

3

4                 I, _____, do
     Hereby certify that I have read the foregoing
5    pages, and that the same is a correct
     transcription of the answers given by me to the
6    questions therein propounded, except for the
     corrections or changes in form or substance, if
7    any, noted in the attached Errata Sheet.

8

9    _____
     LORELEI A. MUCCI, ScD          DATE
10

11

12

13

14

15

16   Subscribed and sworn
     To before me this
17   _____ day of _____, 20_____.
18   My commission expires: _____
19

     _____
20   Notary Public
21

22

23

24

25

Confidential - Pursuant to Protective Order

1                    LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____   _____

4        _____  _____   _____

5        _____  _____   _____

6        _____  _____   _____

7        _____  _____   _____

8        _____  _____   _____

9        _____  _____   _____

10       _____  _____   _____

11       _____  _____   _____

12       _____  _____   _____

13       _____  _____   _____

14       _____  _____   _____

15       _____  _____   _____

16       _____  _____   _____

17       _____  _____   _____

18       _____  _____   _____

19       _____  _____   _____

20       _____  _____   _____

21       _____  _____   _____

22       _____  _____   _____

23       _____  _____   _____

24       _____  _____   _____

25