# EXHIBIT 17

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3    ---------------------------X

4    IN RE: ROUNDUP PRODUCTS     MDL  No. 2741

5    LIABILITY LITIGATION        Case No.

6                                16-md-02741-VC

7    ---------------------------x

8    This document relates to:

9    ALL ACTIONS

10   ---------------------------x

11

12       DEPOSITION OF ALFRED I. NEUGUT, M.D. Ph.D.

13              New York, New York

14              January 3, 2018

15

16

17   Reported by:

18   MARY F. BOWMAN, RPR, CRR

19   JOB NO. 135741

20

21

22

23

24

25

1

2

3

4                          January 3, 2018

5                          10:09 a.m.

6

7

8              Deposition of ALFRED I. NEUGUT,

9      M.D. Ph.D., Columbia Medical School, 722

10     West 168th St., New York, New York, before

11     Mary F. Bowman, a Registered Professional

12     Reporter, Certified Realtime Reporter, and

13     Notary Public of the State of New Jersey.

14

15

16

17

18

19

20

21

22

23

24

25

1                    APPEARANCES:

2

3    ANDRUS WAGSTAFF ATTORNEYS AT LAW

4    Attorneys for Plaintiffs

5        7171 West Alaska Drive

6        Lakewood, Colorado 80226

7    BY:  AIMEE WAGSTAFF, ESQ.

8        KATHRYN FORGIE, ESQ. (By Telephone)

9        DAVID WOOL, ESQ. (By Telephone)

10            -and-

11   THE MILLER FIRM

12       108 Railroad Avenue

13       Orange, Virginia 22960

14   BY:  JEFFREY TRAVERS, ESQ.

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                      APPEARANCES:

2

3    HOLLINGSWORTH

4    Attorneys for Defendant, Monsanto

5         1350 I Street, N.W.

6         Washington, DC 20005

7    BY:  ERIC LASKER, ESQ.

8         GRANT HOLLINGSWORTH, ESQ.

9

10

11   Also Present:

12        Robin Greenwald, Esq. (By Telephone)

13            Weitz & Luxenberg

14        Michael Baum, Esq. (By telephone)

15            Baum Hedlund

16        Manuel Garcia, Videographer

17

18

19

20

21

22

23

24

25

Page 5

1                    INDEX:

2   WITNESS              EXAM BY:              PAGE:

3   A. Neugut           Mr. Lasker              9

4                       Ms. Wagstaff          129

5

6                    EXHIBIT INDEX:

7   NUMBER              DESCRIPTION          PAGE:

8   Exhibit 26-1 Document entitled "Glyphosate    15

9               Use and Cancer Incidence in

10              the Agricultural Health Study"

11  Exhibit 26-2 Excerpt from "Oxford            17

12              Academic"

13  Exhibit 26-3 Deposition Transcript of        25

14              Alfred Neugut dated   March

15              12, 2013

16  Exhibit 26-4 Supplemental Expert Report of   42

17              Alfred Neugut

18  Exhibit 26-5 Supplemental Expert Report of   46

19              Lorelei Mucci

20  Exhibit 26-6 Document entitled, "Accuracy    73

21              of Self-reported Pesticide Use

22              Duration Information from

23              Licensed Pesticide Applicators

24              in the Agricultural Health

25              Study"

1                    EXHIBIT INDEX:

2     NUMBER              DESCRIPTION            PAGE:

3     Exhibit 26-7 document entitled                79

4                 "Reliability of Reporting on

5                 Lifestyle and Agricultural

6                 Factors by Sample of

7                 Participants in the

8                 Agricultural Health Study from

9                 Iowa"

10    Exhibit 26-8 Document entitled, "Assessing    95

11                the Potential for Bias from

12                Nonresponsive to a Study

13                Follow-Up Interview"

14    Exhibit 26-9 Document entitled "Effects of    100

15                Self-reported Health

16                Conditions and Pesticide

17                Exposures on a Probability of

18                Follow-up in a Prospective

19                Cohort Study"

20    Exhibit 26-10 Document entitled, "Using       108

21                Multiple Imputation to Assign

22                Pesticide Use for

23                Nonresponders in the Follow-Up

24                Questionnaire"

25

1

2            THE VIDEOGRAPHER:  This the start

3       of video number up with of Dr. Alfred

4       Neugut, In re RoundUp Products

5       Liability Litigation on January 3,

6       2018, at approximately 10:09 a.m.

7            My name is Manuel Garcia.  I'm

8       the legal video specialist for TSG

9       Reporting Inc.  The court reporter is

10      Mary Bowman, in association with TSG

11      Reporting.

12            Counsel, please introduce

13      yourselves.

14            (Whereupon, counsel placed their

15      appearances on the audio record)

16            THE VIDEOGRAPHER:  Will the court

17      reporter please swear in the witness.

18  ALFRED I. NEUGUT, M.D. Ph.D.,

19      called as a witness by the defendants,

20      having been duly affirmed, testified as

21      follows:

22            MS. WAGSTAFF:  This is Aimee

23      Wagstaff on behalf of the plaintiffs.

24            On November 11, 2017, MDL Judge

25      Chhabria entered PTO 34, which ordered

1    that any expert wishing to testify

2    about the study published on

3    November 9, 2017, in the Journal of the

4    National Cancer Institute is to submit

5    a supplemental report and submit to a

6    deposition not to exceed 2.5 hours.

7              Today, Dr. Neugut is appearing

8    pursuant to PTO 34.

9              On December 21, 2017, Monsanto

10   issued a Notice of Deposition with 12

11   requests for production of documents.

12   It is my understanding you have

13   received the documents that are

14   responsive to that Notice of

15   Deposition.

16             Did you receive documents from

17   Mr. Travers?

18             MR. HOLLINGSWORTH:  Yes.

19             MS. WAGSTAFF:  Those are the only

20   responsive documents to that Notice of

21   Deposition.

22             Nonetheless, plaintiffs object to

23   the scope of number 7, 8, 9, 10, 11, 1

24   and partially 2 based on the fact that

25   they are beyond the scope of PTO 34.

1          MR. LASKER:  OK, I don't remember

2     what those numbers are, but I take

3     your --

4          MS. WAGSTAFF:  You haven't

5     memorized them?

6          MR. LASKER:  I will take your

7     objection under consideration, but

8     since, as I understand it, no documents

9     were withheld on those grounds, it is a

10    moot point, I guess.

11 EXAMINATION BY

12 MR. LASKER:

13     Q.    Good morning, Dr. Neugut.  I know

14   you have been before this before and we

15   have been before this before together.  So

16   I am just going to jump right in if that's

17   OK with you.

18     A.    Sure.

19     Q.    Dr. Neugut, would you agree it is

20   standard scientific methodology, when new

21   scientific evidence emerges, to consider

22   whether and how that new evidence impacts

23   the scientific knowledge ab initio?

24     A.    Yes.

25     Q.    The evolution of knowledge

1    through new research and study is, in fact,

2    integral to the scientific process,

3    correct?

4         A.    Yes.

5         Q.    Since we last met for your first

6    deposition, there has been a new

7    epidemiologic study published that looks at

8    whether there is an association between

9    glyphosate product exposure and

10   Non-Hodgkins lymphoma, correct?

11        A.    Yes.

12        Q.    And that is the study in -- and

13   we'll mark this as the first exhibit in

14   line.

15             MR. LASKER:  And I don't know if

16        it makes sense -- I didn't think about

17        this beforehand, how we are going to

18        formulate this because we have two

19        different depositions.  Let's make

20        this --

21             MS. WAGSTAFF:  Haven't we been

22        doing them numbered 1, 2, 3?

23             MR. LASKER:  Right, I know --

24             MS. WAGSTAFF:  Let's make this --

25             MR. LASKER:  I didn't know which

1   numbers we were at.  Let's -- let's go

2   off the record on second I'm sorry.

3          THE VIDEOGRAPHER:  The time is

4   10:13.  We are going off the record.

5          (Recess)

6          THE VIDEOGRAPHER:  The time is

7   10:16.  We are back on the record.

8          (Exhibit 26-1, document entitled

9   "Glyphosate Use and Cancer Incidence in

10   the Agricultural Health Study" marked

11   for identification, as of this date.)

12   Q.    So back on the record.

13          I have just marked as Deposition

14   Exhibit 26-1 the new study from -- that we

15   are discussing that had lead-off author of

16   Dr. Andreotti, correct?

17   A.    Yes.

18   Q.    And this paper was authored by 12

19   scientists, if I count this correctly, who

20   have affiliations in one way or another

21   with the National Institutes of Health,

22   correct?

23   A.    Some of them do.  Some of them

24   have other affiliations, but wherever.

25   Q.    And the publication is entitled,

1    "Glyphosate Use and Cancer Institute {sic}

2    in the Agricultural Health Study had been

3    published online, but it will be published

4    in the national -- the Journal for the

5    National Cancer Institute in this coming

6    year of 2018, correct?

7         A.    Yes.

8         Q.    You have served as a peer

9    reviewer for the Journal of National Cancer

10   Institute, correct?

11        A.    Yes.

12        Q.    How many peer reviewers does the

13   NCI Journal typically use to review

14   manuscripts before it is accepted for

15   publication?

16        A.    Two or three.

17        Q.    The Journal of the National

18   Cancer Institute is a highly respected

19   scientific journal, correct?

20        A.    Yes.

21        Q.    The Journal of the National

22   Cancer Institute, in fact, is one of the

23   most highly respected journals in the

24   world, correct?

25        A.    It is highly respected, yes.

1     Q.    You are familiar with the rating

2    scheme that ranks scientific journals based

3    on their impact factor, correct?

4     A.    Yes.

5     Q.    What is an impact factor?

6     A.    An impact factor is a measure of

7    how often the papers that are published in

8    the journal are cited by another in other

9    publications.

10     Q.    That would be other scientists

11    who are citing to the publication, correct?

12     A.    Correct.

13     Q.    And let me show you and we will

14    mark this as Exhibit 26-2.

15         (Exhibit 26-2, excerpt from

16        "Oxford Academic" marked for

17        identification, as of this date.)

18     Q.    This is something that comes from

19    the website for of the Journal of the

20    National Cancer Institute and on the third

21    page, you will see a listing of the

22    journal's impact factors going back from

23    between 2006 and 2016, correct?

24     A.    Yes.

25     Q.    The Journal of the National

Page 14

1    Cancer Institute routinely ranks among the
2    top 5 percent of all oncology journals in
3    the world, correct?
4         A.    Yes.
5         Q.    The 2018 National Cancer
6    Institute journal study that we have been
7    talking about that has been marked as
8    Exhibit 26-1 provides updated data for the
9    agricultural study cohort based upon
10   additional years of follow-up of 54,251
11   pesticide applicators, correct?
12        A.    Yes.
13        Q.    The study updated, and I think
14   they say this in the abstract, the study
15   updated the previous evaluation of the AHS
16   cohort, previous evaluation of glyphosate
17   with Cancer Institute incidence from
18   residency linkage through 2012 for North
19   Carolina and for 2013 in Iowa, correct?
20        A.    Yes.
21        Q.    The 2018 NCI Study, thus, had
22   cancer institute for these 54,251 pesticide
23   applicators extending nearly 40 years after
24   the introduction of glyphosate on to the
25   market, correct?

1      A.     Yes.

2             MS. WAGSTAFF:   Objection to form.

3      Q.     There are in total 575 cases of

4  Non-Hodgkins lymphoma among these pesticide

5  applicators, some of whom have been exposed

6  to glyphosate-based herbicides and some of

7  whom have not been, correct?

8      A.     Yes.

9      Q.     The prior publication analyzed an

10  AHS cohort which is the DeRoos 2005 study

11  was based on 92 NHL cases, correct?

12     A.     I don't recall.

13            MR. LASKER:   Let's pull out

14      Dr. Neugut's initial expert report.

15            MS. WAGSTAFF:   Counsel, I'll let

16      you ask a couple questions on this, but

17      this deposition was not designed nor

18      allowed to revisit his initial report

19      and so he is prepared nor ready to talk

20      about his initial report right now.   So

21      depending on how deep you go into his

22      initial report, I may instruct him not

23      to answer.

24            MR. LASKER:   Not going very deep

25      at all.   Just a number of things.

1          MS. WAGSTAFF:  All right.

2      Q.    It is fair to say, Dr. Neugut,

3  that the 2018 NCI study is significantly

4  more powerful in looking to an association

5  between glyphosate-based herbicides and

6  Non-Hodgkins lymphoma than DeRoos 2005,

7  correct?

8          MS. WAGSTAFF:  Object to form.

9      A.    Powerful in what sense?

10     Q.    In the ability to detect

11  statistical significance of an association?

12     A.    Yes.

13     Q.    With -- there are, in fact,

14  significantly more -- let me just show you,

15  Dr. Neugut, your initial expert report, and

16  this is on page 12.  We have a copy for you

17  if you just want to look it.  I won't mark

18  it as an exhibit.

19          MS. WAGSTAFF:  You can read as

20      much as you want of the report.

21     Q.    I am going to ask you to confirm

22  the number --

23     A.    What is this document?

24     Q.    So this is your initial expert

25  report?

1         MS. WAGSTAFF:  Can I have a copy

2     please?

3     A.    You mean from some months ago?

4     Q.    Yeah.  And the only information

5  on here is just to confirm your

6  recollection, you're talking about the

7  DeRoos 2005 study and there is -- you have

8  indicated the number of NHL cases for

9  Non-Hodgkins lymphoma and it is about

10  midway through the first paragraph as being

11  92 cases of Non-Hodgkins lymphoma in the

12  2005 DeRoos study, correct?

13         MS. WAGSTAFF:  Doctor, if you

14     need to read the whole part about

15     DeRoos 2005 to get your bearings, you

16     certain can and I renew my previous

17     objection.

18         Are you marking this as an

19     exhibit?

20     A.    I'm not seeing where -- I see,

21  OK.  Yes, it says 92 cases.  Is that what

22  you are referring to?

23     Q.    Yes.

24     A.    Um-hm, yes.

25     Q.    So the 2018 NCI study with

1    respect to Non-Hodgkins lymphoma has

2    roughly six times the number of NHL cases

3    as the 2005 DeRoos study, correct?

4            MS. WAGSTAFF:  Object to form.

5        A.    That's correct.

6            MS. WAGSTAFF:  You keep calling

7        it the 2018 study.  I don't know if you

8        mean to be doing that.

9            MR. LASKER:  It's going to be

10       published in 2018, so.

11       Q.    There are, in fact, significantly

12   more NHL cases with exposure to glyphosate

13   in the 2018 NCI study than there are in all

14   of the case control studies of glyphosate

15   in Non-Hodgkins lymphoma combined, correct?

16       A.    I wouldn't know.

17       Q.    Well, let's again, just to

18   refresh your recollection and continue with

19   your expert report, look at, for example,

20   the DeRoos -- I'm sorry, the McDuffie

21   study -- and that's on page 14 of your

22   initial report.  You can turn to page 14.

23       A.    14?

24       Q.    The McDuffie paper, if you look,

25   starting at line 5 of your description of

Page 19

1    that report with respect to Non-Hodgkins

2    lymphoma, McDuffie, the McDuffie study

3    looked at 51 exposed cases with

4    Non-Hodgkins lymphoma, correct?

5         A.    Yes.

6         Q.    And you would agree -- let me

7    strike that.

8               For the 2018 NCI study, there

9    were 440 cases of Non-Hodgkins lymphoma

10   with exposures to glyphosate, correct?

11        A.    You are talking about in the

12   ever/never --

13        Q.    Sure, if you can look on desk --

14   look at the 2018 study and particularly it

15   at table 2, which is on page 5.  There is

16   the breakdown of Non-Hodgkins lymphoma for

17   never exposure and the four quadrants of

18   exposure, correct?

19        A.    Yes.

20        Q.    And we have 135 cases of

21   Non-Hodgkins lymphoma out of the 575 that

22   had no exposure, correct?

23        A.    Yes.

24        Q.    Which means we have 440 cases of

25   Non-Hodgkins lymphoma with exposure to

1   glyphosate-based herbicides in that study,

2   correct?

3       A.    Yes.

4       Q.    And you would agree that 440

5   exposed NHL cases provides enough power to

6   address statistically the question whether

7   glyphosate-based herbicide exposure is

8   associated with Non-Hodgkins lymphoma,

9   correct?

10      A.    Can you state that question

11  again?

12      Q.    Sure.  You would agree that with

13  440 exposed NHL cases, the 2018 NCI study

14  has enough power, statistically, to address

15  the question whether glyphosate exposure is

16  associated with Non-Hodgkins lymphoma,

17  correct?

18      A.    I would not be able to know

19  without doing a power analysis as to

20  whether it could exclude a risk ratio of

21  1.3 or 1.4.  So I don't have any sense of

22  that.

23      Q.    OK.  Let's mark as 26-3, this is

24  testimony that you provided in connection

25  with the Actos litigation and I'll direct

1    to you certain page.

2             (Exhibit 26-3, Deposition

3        Transcript of Alfred Neugut dated

4        March 12, 2013 marked for

5        identification, as of this date.).

6        Q.    And if you look at the first page

7    of this transcript, you will see this is

8    testimony that you provided in court during

9    the trial of Jack Cooper.  Do you see that?

10       A.    Yes.

11       Q.    And on page 46, --

12       A.    41?

13       Q.    46.  So there is four pages on a

14   page, so it's actually on the top right of

15   each of the four squares, you will see the

16   number.

17             So if you go to page 46 of that

18   testimony.

19       A.    Yes.

20       Q.    Here, you are answering questions

21   from plaintiff's counsel who is also

22   plaintiff's counsel in this litigation,

23   Mr. Miller, correct?

24       A.    Yes.

25       Q.    And you are looking, talking

1    about a study, a cohort study that in this

2    case was looking at bladder cancer and

3    exposure to Actos, correct?

4        A.    Yes.  Yes.

5        Q.    In that case you were talking

6    about a study with 470 people with bladder

7    cancer.  And that, I take it, was either

8    who had exposure to Actos or who did not,

9    correct?

10       A.    I don't recollect, but I assume

11   it was talking about exposure to Actos,

12   yes.

13            MS. WAGSTAFF:  I will object to

14       taking snippet of testimony out of

15       context of the entire litigation.

16       Q.    And with respect to the Actos

17   litigation, in response to a question by

18   plaintiff's counsel, you testified that 470

19   exposed cases gave you a reasonable shot of

20   having statistical power to really address

21   the question that we are all interested in,

22   correct?

23       A.    There, we were talking about -- I

24   don't know what the risk ratios were that

25   were being discussed in my recollection at

1    this time at the time.

2             I mean, if one wants to know how

3    much statistical power there is, one has to

4    do a formal -- or one should do a formal

5    statistical analysis to be able to

6    determine that.  The size of the cohort is

7    really not the issue.  115,000 people is

8    really irrelevant or whether it is 50,000

9    people.

10             You're correct in talking about

11   the number of exposed cases.  It's the end

12   number of end points.  But again, I can't

13   ascertain -- and it also depends on the

14   exposure -- on how many are -- how many

15   unexposed there are, et cetera.

16             So I have no idea if we are

17   talking about risk ratios of 1.3 or 1.4 or

18   1.5, I have no idea how many cases one

19   would need to have enough statistical power

20   to address the issue and whether the study

21   was large enough to ascertain that.

22        Q.    You had not done any analysis

23   then to determine whether or not the 440

24   exposed NHL cases in the 2018 NCI Study

25   provides power sufficient to detect a rate

1    ratio of 1.3, or 1.4?

2        A.    So I did not do it up front and I

3    don't know if the -- I don't know if the

4    investigators did it either.  I don't

5    recall seeing it in the -- I don't recall

6    seeing it in the publication.  It's not

7    mentioned, to my recollection.

8             You could look through the paper

9    and see.  I don't recall seeing it in --

10   usually it is put in the methods section if

11   it's done and I don't recall seeing it in

12   the methods section either.

13       Q.    Have you done any power analyses

14   for glyphosate epidemiology to determine

15   the relative strength of studies with

16   respect to power to detect increased or --

17   association?

18       A.    Sure.  And usually the -- OK.

19   I'll let it go then.

20       Q.    The -- I think, as you mentioned,

21   the issue that you look at is the number of

22   exposed cases with Non-Hodgkins lymphoma?

23       A.    As compared to the controls.  I

24   mean both numbers are relevant.

25       Q.    Now, the 12 investigators that

1    published the 2018 NCI study, in their

2    abstract of the paper, conclude, in their

3    conclusion statement, "In this large

4    prospective cohort study, no association

5    was apparent between glyphosate and any

6    solid tumors or lymphoid malignancies

7    overall including NHL and its subtypes."

8            Did I read that correctly?

9        A.    Yes.

10       Q.    And in the conclusion section in

11   the text of their study, on page 712, the

12   investigators state, "Again, in our study,

13   we observe no associations between

14   glyphosate use and NHL overall or any of

15   its subtypes."

16           Correct?

17       A.    I'm not seeing where you're

18   reading, I'm sorry.

19       Q.    It's up on the screen as well,

20   but it's on page 7 and it is the first

21   column.  And the 12 investigators --

22       A.    Oh, I see.

23       Q.    -- in this paper state, "In our

24   study, we observed no associations between

25   glyphosate use and Non-Hodgkins lymphoma

1    overall or any of its subtypes."  Correct?

2        A.    Yes.

3        Q.    They further state that this lack

4    of association was consistent for both

5    exposure metrics -- and that's intensity

6    weighted, cumulative days of exposure, and

7    separately, cumulative days of exposure,

8    correct?

9        A.    Yes.

10       Q.    The lack of association was also

11   consistent for unlagged and lagged analyses

12   looking at different periods of time of

13   exposure, correct?

14       A.    Yes.

15       Q.    And it was -- the lack of

16   association was also consistent after --

17   consistent after further adjustments for

18   pesticides linked to NHL in previous

19   analyses, correct?

20       A.    Yes.

21       Q.    And the lack of association was

22   also found when they excluded multiple

23   myeloma from the Non-Hodgkins lymphoma

24   grouping, correct?

25       A.    Yes.

1      Q.    This statement by the
2   investigators accurately reports the
3   reported findings of the 2018 NCI study
4   with respect to glyphosate and Non-Hodgkins
5   lymphoma, correct?
6            MS. WAGSTAFF:   Object to form.
7      A.    It reports what they reported.
8      Q.    And this statement of the study
9   findings was accepted by the Journal of
10  National Cancer Institute after independent
11  peer review, correct?
12     A.    It's what was published.  I don't
13  believe the Journal of the National Cancer
14  Institute would claim infallibility or that
15  every study it publishes is totally
16  accurate or correct.
17     Q.    I understand.  But the statement
18  of the study's findings that there was no
19  association between glyphosate-based
20  herbicides and Non-Hodgkins lymphoma,
21  looking at it from all these different
22  angles, that statement was accepted by the
23  Journal of National Cancer Institute to be
24  published in its journal after independent
25  peer review, correct?

1          MS. WAGSTAFF:   Objection, asked

2     and answered.

3          A.    Yes.

4          Q.    Let's look at the rate ratios

5     that were reported in the study for

6     Non-Hodgkins lymphoma and we will look back

7     again to table 2, and this is on page 5.

8     We can go down a little bit and look at

9     this one a little closer.

10          Table 2 is setting forth a

11     finding -- are you OK?

12          A.     Sorry.

13          Q.    Table 2 sets forth the findings

14     from the 2018 NCI Study based upon

15     intensity weighted cumulative days of

16     exposure, correct?

17          A.    Yes.

18          Q.    And as you mentioned earlier, the

19     first category, the "none" in this table

20     would be "never" exposure, correct?  For --

21     and we will look specifically -- there is a

22     number of different cancers here, but let's

23     look at Non-Hodgkins lymphoma.

24          So we have 135 cases which would

25     be in the never exposure category, correct?

1    A.    Um-hm, yes.

2    Q.    And then we have four categories

3  that would make up in aggregate those

4  people who had exposure or were considered

5  "ever" exposure to glyphosate, correct?

6    A.    Yes.

7    Q.    And the never/ever rate ratio for

8  Non-Hodgkins lymphoma and glyphosate

9  exposure in the 2018 study, NCI Study would

10 be approximately 0.85, correct?

11   A.    In that ballpark.  I don't recall

12 the exact number, but it was around that.

13   Q.    The -- when we talk about

14 intensity weighted exposure, let's define

15 that or let's let the investigators of --

16 the NIH investigators explain clearly what

17 that means.

18        On page 2 of the Andreotti study,

19 they explained, and it is on the second

20 column towards the top, they explain how

21 the intensity score was derived for the

22 purposes of their analysis, correct?

23   A.    We are now on page 2 on the top

24 of the second column?

25   Q.    Yes, and you can see on the

1   screen where I'm pointing.

2        A.    OK.  Yes.

3        Q.    And the intensity score was

4   derived from an algorithm first based on

5   literature-based measurement --

6   literature-based measurements, correct?

7        A.    Yes.

8        Q.    And also on information provided

9   by the applicator, specifically whether the

10  participant mixed or applied pesticides,

11  correct?

12       A.    Yes.

13       Q.    Whether the applicator repaired

14  pesticide-related equipment, correct?

15       A.    Yes.

16       Q.    Whether the applicator used

17  personal protective equipment, correct?

18       A.    Yes.

19       Q.    And what application method was

20  used by the applicator, correct?

21       A.    Yes.

22       Q.    And going back now to table 2, on

23  page 5, and the findings for Non-Hodgkins

24  lymphoma are in the 2018 NCI Study, the NIH

25  scientists reported that there was a lower

1   incidence of Non-Hodgkins lymphoma in each

2   of the four different levels of glyphosate

3   exposure groups as compared to no exposure,

4   correct?

5            MS. WAGSTAFF:   Object to form.

6   A.   Not a low incidence.

7   Q.   I didn't say -- a lower

8   incidence.  Let me repeat the question.

9            The NHL scientists reported there

10  was a lower incidence of Non-Hodgkins

11  lymphoma in each of the glyphosate-exposed

12  groups than there was in the group with no

13  glyphosate exposure, correct?

14  A.   Yes.

15  Q.   Based upon -- OK.  And the NCI

16  Study also found no evidence of a dose

17  response for glyphosate intensity-weighted

18  days of exposure for Non-Hodgkins lymphoma

19  or any Non-Hodgkins lymphoma subtype,

20  correct?

21  A.   Correct.

22  Q.   The 2018 study also found no

23  evidence of a dose response and this is in

24  one of the supplemental tables, table 2, --

25  I'm sorry, table 1.  So if we go to the

1    first supplemental table, it's in your --

2         A.    Do I have that?

3         Q.    Yes, keep turning the pages,

4    you'll get past the references and then

5    there will be a first supplemental table,

6    table 1.  Do you see that?

7         A.    Yes.

8         Q.    This is the second exposure

9    method, correct?  Cumulative days?  This is

10   measuring for cumulative days, correct?

11        A.    Yes.

12        Q.    And if you look at the dose

13   response analysis for Non-Hodgkins lymphoma

14   by the separate exposure metrics, again,

15   there is no evidence of a dose response for

16   glyphosate-based herbicide exposure and

17   Non-Hodgkins lymphoma or any of its

18   subtypes, correct?

19             MS. WAGSTAFF:  Object to form.

20        A.    Correct.

21        Q.    And the 2018 NCI Study also found

22   no evidence of an association between

23   exposure to glyphosate-based herbicides and

24   Non-Hodgkins lymphoma when they limited

25   their analysis to different periods of time

1    of exposure, correct?

2              MS. WAGSTAFF:   Object to form.

3         A.    Can you clarify that?

4         Q.    So -- sure.   The NCI, the 2018

5    NCI Study conducted various lag analyses

6    looking at exposures in different periods

7    of time to glyphosate-based herbicides,

8    correct?

9         A.    Yes.

10        Q.    And each of those time periods

11   that they looked at for exposure, they did

12   not find evidence of an association between

13   glyphosate-based herbicides and

14   Non-Hodgkins lymphoma, right?

15        A.    Right.

16              MS. WAGSTAFF:   Object to form.

17        Q.    Some of these -- for example, the

18   12 NIH investigators looked to see whether

19   there was any association between

20   glyphosate-based herbicides and

21   Non-Hodgkins lymphoma if they limited their

22   analyses to exposures that occurred either

23   15 years before or 20 years before their

24   diagnosis with Non-Hodgkins lymphoma,

25   correct?

1    A.    Can you repeat that question.   I

2  am sorry.

3    Q.    Sure.   The NIH scientists who

4  conducted the 2018 NCI study looked to see

5  if there was any association between

6  glyphosate-based herbicides and

7  Non-Hodgkins lymphoma if they limited their

8  analyses to exposures that took place

9  either 15 years before or 20 years before

10  either the end of the follow-up period or

11  the date of diagnosis, correct?

12    A.    Yes.

13    Q.    So each of those analyses look at

14  exposures to glyphosate that date back

15  before the introduction of RoundUp Ready

16  crops, correct?

17         MS. WAGSTAFF:   Object to form.

18         Answer if you know.

19    A.    So the lagging took out the cases

20  that occurred during specific time frames

21  after the exposure was measured.

22    Q.    So the lagging, if I understand

23  correctly, and correct me if I am wrong,

24  for the 15-year lag -- let's start the

25  20-year lag.   It's easier math.

1          The 20-year lag, you are looking

2    at the exposure that took place at least 20

3    years prior to the end of the follow-up

4    period which is 2012 or 2013, correct?

5          A.    I haven't thought about it in

6    that way before, but let me think about it

7    for a moment.

8          Yes.

9          Q.    And then when the 2018 NCI Study

10   looked at exposures dating back to that

11   period prior to the introduction of RoundUp

12   Ready crops, there was no evidence of an

13   association from that glyphosate-based

14   exposure and nonHodgkins lymphoma, correct?

15          MS. WAGSTAFF:  Object to form.

16          Answer if you know.

17   A.    Correct.

18          Q.    The NIH scientists also looked to

19   see if there was any association between

20   glyphosate-based herbicides and

21   Non-Hodgkins lymphoma if they included

22   exposures that occurred either within five

23   years or within ten years of the end of the

24   study period of 2012, 2013, correct?

25          A.    Yes.

1    Q.    That analysis would then look at

2  glyphosate-based herbicide exposure

3  following the introduction of RoundUp Ready

4  crops, correct?

5    A.    Yes.

6    Q.    There was no evidence, in the

7  2018 NCI Study, of an association between

8  Non-Hodgkins lymphoma and glyphosate-based

9  herbicide exposure subsequent to the

10  introduction of RoundUp Ready crops,

11  correct?

12        MS. WAGSTAFF:   Object to form.

13    A.    Yes.

14    Q.    In fact, the rate ratios for

15  Non-Hodgkins lymphoma for the highest dose

16  of exposure were even lower when they

17  included exposures that occurred during the

18  period after the introduction of RoundUp

19  Ready crops, correct?

20    A.    I don't know offhand.

21    Q.    If you look at, again, table --

22  why don't we look at table 3 in this

23  analysis, and this is on page 6.  You've

24  reviewed all these tables, of course,

25  before today, right?

1    A.    Of course.

2    Q.    So table 3 in the 2018 NCI Study

3    has lag analyses that look at those two

4    time periods, five-year lag, which would

5    include exposures after the introduction of

6    RoundUp Ready crops, and the 20-year lag,

7    which would be limited to exposures prior

8    to the introduction of RoundUp Ready crops

9    and for Non-Hodgkins lymphoma, the

10   incidence of glyphosate -- I'm sorry, the

11   incidence of Non-Hodgkins lymphoma, the

12   highest exposure level after the

13   introduction of RoundUp Ready crops was

14   even lower than it was prior to the

15   introduction of RoundUp Ready crops,

16   correct?

17   A.    Which number are you referring

18   to?

19   Q.    So the highest exposure would be

20   quadrant 4, correct?

21   A.    You are talking about 0.87?

22   Q.    0.87, correct?

23   A.    Yeah.

24   Q.    In your supplemental expert

25   report, you state that there is -- this is

1    at -- I guess we should mark this.  We

2    didn't mark this yet.

3              MS. WAGSTAFF:  What table is that

4        there?

5              MR. LASKER:  Table 3.

6              MS. WAGSTAFF:  Oh, from the

7        supplemental.

8        Q.    So let's mark your supplemental

9    expert report as 26-4.

10             (Exhibit 26-4, Supplemental

11       Expert Report of Alfred Neugut marked

12       for identification, as of this date.)

13       Q.    Dr. Neugut, at page 11 in your

14   supplemental expert report, you discuss a

15   relative risk, what you describe as a --

16   this is the bottom of the page, a modest

17   relative risk of 1.3 to 1.4 for ever/never

18   use of glyphosate.  Do you see that?

19       A.    Yes.

20       Q.    And this modest relative risk of

21   1.3 to 1.4 is the number that you obtained

22   from the metanalyses that were conducted of

23   the glyphosate epidemiologic literature

24   back in 2015, correct?

25       A.    Yes.

1      Q.    You would agree that an updated

2    metanalysis of the current body of

3    epidemiologic data on glyphosate and

4    Non-Hodgkins lymphoma would result in a

5    lower relative risk, correct?

6              MS. WAGSTAFF:  Object to form.

7      A.    No.

8      Q.    The 2015 metanalysis included the

9    DeRoos 2005 analysis of the Agricultural

10   Health Study cohort, correct?

11     A.    Yes.

12     Q.    And that analysis, which was, as

13   we already discussed, with a smaller number

14   of cases reported an ever/never rate ratio

15   of 1.1, correct?

16     A.    I don't recall the figure, but

17   I'll take your word for it.

18     Q.    An updated metanalysis, if it

19   were to include the 2018 NCI journal study,

20   would substitute the 2005 analysis with a

21   larger study that has a lower ever/never

22   rate ratio, correct?

23              MS. WAGSTAFF:  Object to form.

24     A.    I wouldn't necessarily concur

25   that the JNCI study should be amalgamated

1 into a metanalysis.

2     Q.    I understand that.  Let me ask

3 the question this way:  If the 2018 NCI

4 Journal of National Cancer Institute study

5 was included in the metanalysis -- when

6 we've discussed previously how that

7 metanalysis -- the methodology that was

8 used for that metanalysis, if the 2018

9 Journal of National Cancer Institute study

10 was included in the metanalysis, the

11 relative risk would be lower than reported

12 in the 2015 metanalyses, correct?

13          MS. WAGSTAFF:  Objection.  The

14      witness has stated that he does not

15      believe it should be included.

16     A.    So I mean, again, if -- the I

17 mean, the first part in doing a metanalysis

18 is to evaluate the quality of the study,

19 and if I don't think the quality of the

20 study merits inclusion, I wouldn't concur

21 that it should be included.

22          If you want to include a study

23 that I don't think should be included and

24 get a result that I don't think is

25 accurate, then you can get any conclusion

1    you like.

2         Q.    I understand that.  I want to

3    separate this out though to make sure I

4    understand the math.

5              If the 2018 NCI Study results are

6    included in the metanalysis, that would

7    result in a lower relative risk than is

8    reported in the metanalyses that you rely

9    upon, correct?

10             MS. WAGSTAFF:  Objection, asked

11        and answered three times.

12             THE WITNESS:  Am I supposed to

13        answer?

14        Q.    Yes.

15        A.    I wouldn't really know.

16        Q.    So is it my understanding then

17   that you cannot determine whether replacing

18   a study that reported a 1.1 rate ratio with

19   92 cases with a study with 0.85 rate ratio

20   with 575 cases, you're not able to

21   determine, sitting here, whether that would

22   lower the meta-relative risk?

23             MS. WAGSTAFF:  Objection, asked

24        and answered, and the doctor has said

25        he does not believe it should be

1    included which is why he doesn't know.

2         Q.    It is still a fairly simple

3    mathematical issue thought, isn't it,

4    Dr. Neugut?

5              MS. WAGSTAFF:  Objection,

6         argumentative.

7         Q.    This is not complicated math, is

8    it?

9         A.    Clearly, if it were included,

10   incorrectly included, it would give you an

11   incorrect -- it would incorrectly obviate

12   the elevated risk.

13        Q.    The meta-relative risk would be

14   lower, correct?

15        A.    Yes.

16        Q.    Let me show you an expert report

17   that has been prepared by Monsanto's

18   experts, supplemental report by Dr. Mucci.

19             MS. WAGSTAFF:  Are you marking it

20        as exhibit?

21             MR. LASKER:  Yes.

22             MS. WAGSTAFF:  So I think it is

23        26-5.

24             (Exhibit 26-5, Supplemental

25        Expert Report of Lorelei Mucci marked

1    for identification, as of this date.)

2        Q.    Dr. Mucci, in her expert report,

3    provides her calculations of a

4    meta-relative risk based on the current

5    available epidemiologic data of

6    glyphosate-based herbicides and

7    Non-Hodgkins lymphoma.

8              Now, I understand that you have

9    disagreements to which studies you would

10   include in a metanalysis.  But let me ask

11   you first, Dr. Mucci, in her metanalysis of

12   the epidemiologic literature, which

13   includes the 2018 NCI Study, the North

14   American Pooled Project, the Eriksson study

15   and Orsi study, she calculates a

16   meta-relative risk for glyphosate-based

17   herbicide and Non-Hodgkins lymphoma of 0.9.

18             Did I read that correctly?

19       A.    Yes.

20       Q.    Do you have any reason to believe

21   that Dr. Mucci, using the studies that she

22   used, calculated this meta-relative risk

23   figure 0.9 incorrectly?

24       A.    I don't know Dr. Mucci, so I

25   don't have any reason to believe or not

Page 44

1    believe her.

2        Q.    OK, well, you're looking at the

3    data though.  It is not really an issue of

4    Dr. Mucci itself or herself or what you

5    know about her.

6            But looking at Dr. Mucci's

7    analyses, and again, do you have any reason

8    to believe that the calculation of the

9    meta-relative risk, the mathematical

10   calculation of 0.9 is incorrect?

11           MS. WAGSTAFF:  Objection,

12       Dr. Neugut has already testified that

13       he doesn't believe that the 2017 AHS

14       study should be included in

15       metanalysis?

16       A.    I mean, actually, based on her

17   analysis, we should all be taking RoundUp

18   to protect us against Non-Hodgkins

19   lymphoma.

20       Q.    Is it your determination she

21   decided there was a statistically

22   significant decreased risk of Non-Hodgkins

23   lymphoma?

24           MS. WAGSTAFF:  Objection --

25       A.    Just missing it.

1        Q.    So do you have any reason to

2    believe, looking at the numbers that

3    Dr. Mucci reports for the four

4    epidemiological studies that she used in

5    her analysis -- again, the 2018NCI study,

6    the North American Pooled Project study,

7    the Eriksson study and the Orsi study -- do

8    you have any reason to believe that her

9    calculation of a meta-relative risk of 0.9

10   is incorrect?

11       A.    No.

12             MS. WAGSTAFF:   Objection, also,

13       Dr. Neugut testified in his first

14       deposition that he wasn't relying on

15       the NAPP study.

16             MR. LASKER:   OK.  I'm going to

17       give you some leeway with your

18       objections, but these are not

19       objections now.   These are just

20       testimony and that is not proper.

21             You can object to form,

22       certainly, but objections that include

23       substantive information is not

24       appropriate for an objection.

25             MS. WAGSTAFF:  I will remind

1      counsel that plaintiffs actually tried

2      to get an order where we limited

3      objections to form that was strenuously

4      objected to by Monsanto.  So -- and

5      applied by the court so I will take

6      heed to your request, and I think that

7      everything I've said is completely

8      appropriate.

9      Q.    OK.  Dr. Neugut --

10      A.    I would say that I don't know the

11     NAPP study.  So if that's a significant

12     part of this, I'm not testifying on the

13     NAPP study or its inclusion or

14     noninclusion.  So if that's playing a

15     significant role here, I'm not prepared

16     or -- to talk about that.

17      Q.    And I was going to get to this

18     question later, but I'll ask you now, but I

19     think it is clear from the record, am I

20     correct in my understanding that you still

21     have not reviewed the NAPP study?

22      A.    It's not a peer-reviewed

23     publication.

24      Q.    OK, I need the record -- an

25     answer for the record.  Am I correct in my

1    understanding that you have not reviewed

2    the NAPP study?

3        A.    Correct.

4        Q.    Dr. Neugut, do you believe that

5    the 2018 NCI Study strengthens or weakens

6    the epidemiological evidence in support of

7    your opinion of an association between

8    glyphosate-based herbicides and

9    Non-Hodgkins lymphoma?

10       A.    I think it is noncontributory.

11       Q.    So am I correct in my

12   understanding that you do not believe that

13   the 2018 NCI Study provides evidence at all

14   with respect to with whether there is an

15   association between glyphosate-based

16   herbicides and Non-Hodgkins lymphoma?

17       A.    Yes.

18       Q.    Now, in your initial report, --

19   and this is discussing the AHS cohort, so

20   it is still part of this, the same cohort

21   that we are studying, but I want to make

22   sure I understand which of your opinions

23   extend to the 2018 NCI Study.  So let's

24   look back -- we -- you still have a copy of

25   your original expert report, correct?

1        A.      I'm sorry, which exhibit?

2        Q.      Your initial expert report.  I

3    don't know if we have marked it.  We can if

4    you want.

5        A.      We are talking about my original

6    report from way back when?

7        Q.      Right.

8        A.      Yup.

9        Q.      So at page 12 of your initial

10   expert report, you're talking about

11   criticisms that you had of the previous

12   published analysis of the AHS cohort which

13   was the 2005 DeRoos publication, correct?

14       A.      Yes.

15       Q.      The first criticism you had of

16   the DeRoos 2005 study which is, again, on

17   page 12 of your initial expert report, you

18   stated that the investigators would need to

19   follow the AHS cohort for a much longer

20   period of time in order to adequately

21   evaluate cancer and specifically NHL risk

22   from glyphosate exposure, correct?

23       A.      Yes.

24       Q.      The 2018 NCI Study includes

25   either 11 or 12 more years of follow-up of

1    cancer outcomes in the AHS cohort, correct?

2         A.    Yes.

3         Q.    The second criticism that you

4    made of the DeRoos 2005 study in your

5    initial expert report was for its alleged

6    failure to look at different dates of

7    exposure to assess the disease latency

8    period for Non-Hodgkins lymphoma, correct?

9         A.    Yes.

10        Q.    And as you have already

11   testified -- as you have already testified

12   today, the 2018 NCI Study does conduct

13   analyses and provide rate ratios for

14   different time periods or lagged periods of

15   exposure to assess disease latency,

16   correct?

17        A.    Yes.

18        Q.    The third criticism that you had

19   of the 2005 AHS study dealt with the issue

20   of potential confounding from other

21   pesticides.  And I -- I'm -- I think your

22   testimony on that was pretty clear from the

23   first deposition, so I'm going to jump over

24   that one for now and talk about --

25             MS. WAGSTAFF:  Object to form.

1    Q.    The fourth criticism you had

2  which is nondifferential exposure and

3  misclassification, correct?

4    A.    OK.

5    Q.    That is the issue that you focus

6  on in connection with your analysis also of

7  the 2018 NCI Study, correct?

8    A.    Yes.

9    Q.    So let's talk about those

10  criticisms and you can put away your old --

11  your prior expert report.

12         If I understand correctly, the

13  focus of your criticisms of the 2018

14  National Cancer Institute is a possibility

15  of misclassification of exposures, correct?

16         MS. WAGSTAFF:   Object to form.

17    A.    Yes.

18    Q.    And you note in your supplemental

19  expert report that the NIH investigators

20  who conducted the 2018 NCI Study also note

21  the possibility of exposure,

22  misclassification bias in their

23  publication, correct?

24    A.    In which publication?

25    Q.    In the 2018 NCI Study?

1      A.     Actually, I reread it and I'm not

2   sure that they do.

3      Q.     Well, let's look at what you have

4   stated in your expert report.  And this, I

5   believe, is on page 7 of your supplemental

6   expert report.

7      A.     My supplemental report?

8      Q.     Yes.  What is that, 26-4?

9      A.     What page are we on?

10     Q.     Page 7.  And at the top of page 7

11  of your supplemental report, you quote --

12  and this is an accurate quote from the 2018

13  NCI journal article, "Despite the specific

14  information provided by the applicators

15  about use of glyphosate, some

16  misclassification of exposure undoubtedly

17  occurred."  Correct?

18     A.     Yes.

19     Q.     And the NIH investigators further

20  state, "Given the prospective design,

21  however, any misclassification should be

22  nondifferential and lead to attenuated risk

23  estimates."

24         Correct?

25     A.     Yes.

Page 52

1    Q.    And you, in your expert report,

2  raise a number of criticisms of the study

3  design that you believe could have led to

4  such nondifferential exposure,

5  misclassification and attenuation of risk

6  estimates correct?

7    A.    I think I misread the discussion.

8    Q.    Yes.

9    A.    I misread this quotation.

10    Q.    I'm not sure I understand your

11  answer then.  In your expert report --

12    A.    I put it in here and I --

13  rereading the paper, I think I misread what

14  was -- what the paper says.

15    Q.    So let me ask you --

16    A.    So I --

17    Q.    -- separate from the paper?

18    A.    I think this quote -- I think my

19  interpretation of this quote is in error.

20    Q.    Let me ask you separate from the

21  quote.  In your expert report elsewhere,

22  you talk about misclassification of

23  exposure leading to attenuating risk

24  estimates, correct?

25    A.    Yes.

1        Q.    And you would also agree that

2   because the 2018 NCI Study is a cohort

3   study in which exposure information was

4   obtained prior to any disease outcome, that

5   any potential exposure misclassification

6   would be nondifferential with respect to

7   disease outcome, correct?

8        A.    So if by that you mean that it is

9   unbiased, the answer is no, I wouldn't

10  necessarily agree.

11       Q.    No, that wasn't my question.  Let

12  me ask my question again.  Because the 2018

13  NCI study --

14       A.    Right, OK, it's nondifferential

15  with regard to disease outcome.  Certainly

16  when the -- if by that you mean that when

17  the exposure measurement was made, no one

18  knew if they were going to get lymphoma --

19       Q.    Right?

20       A.    -- sure.

21       Q.    So just so the record is clear,

22  because I'm reading the question and

23  answer, it's not quite.

24            Am I correct then that the 2018

25  NCI Study, the exposure classification or

1    any misclassification would be

2    nondifferential with respect to disease

3    outcome?

4            MS. WAGSTAFF:  Objection, asked

5        and answered.

6        A.    I don't know what that means.

7        Q.    OK.

8        A.    That's a phrase that has no

9    meaning to me.

10       Q.    OK.  So let me try and rephrase

11   to make sure that you can -- that you

12   understand the question.

13           In the 2018 NCI Study, to the

14   extent that there was any exposure

15   misclassification in that study, given the

16   fact that exposure information was obtained

17   prior to knowledge of disease outcome, that

18   misclassification would be nondifferential

19   with respect to disease outcome, correct?

20       A.    You just repeated the question.

21   Again, I don't know what that phrase means.

22       Q.    There is -- do you have any basis

23   to believe that there was any difference in

24   exposure misclassification to the extent

25   that there was exposure misclassification

1    that was also associated with whether or

2    not the individual would subsequently get

3    Non-Hodgkins lymphoma?

4        A.    So I will agree that to the

5    degree that when the farmers -- the

6    applicators were answering the questions

7    with regard to their exposures, that

8    whatever biases or whatever errors they

9    were making in terms of -- or whatever

10   answers they were giving in terms of their

11   exposures were independent or unbiased by

12   their knowledge of whether they would

13   subsequently develop cancer or lymphoma or

14   whatever, that's the nature of a cohort

15   study.

16            But that doesn't mean that their

17   answers were unbiased.  Their answers --

18   their exposure measurements would have

19   been -- could have been and were likely

20   biased anyway in other ways which would

21   have then subsequently affected how the

22   subsequent associations would have been

23   determined with regard to their subsequent

24   association with the outcomes.

25            I don't know if that makes sense.

1      Q.    Let me start off, explore this

2   and make sure that we can understand each

3   other.

4            When we talk about, for example,

5   recall bias in a case control study, that

6   is --

7      A.    I -- different.

8      Q.    -- a situation where you have a

9   potential misclassification that would lead

10  to a -- that is associated both with

11  exposure information and disease outcome.

12  And that's what we referred to ultimately

13  as a bias that would be differential; it

14  would be pointed in one direction, correct?

15     A.    Well, either direction, but yes.

16     Q.    And that's because we have a

17  situation where the exposure information is

18  tied to the knowledge of the disease and

19  the disease outcome, correct?

20     A.    If it exists, if -- I mean, it

21  doesn't always occur, but when it occurs,

22  yes.

23     Q.    In a cohort study -- and one of

24  the strengths of a cohort study, and I

25  think you mentioned this previously --

1   because the -- these subjects of the study

2   do not know whether they're going to get

3   Non-Hodgkins lymphoma downward or not,

4   there is no basis for a -- if there is a

5   misclassification of exposure, if there is

6   an error, that's not going to be linked to

7   whether or not those individuals also

8   sometime in the future get Non-Hodgkins

9   lymphoma, correct?

10          MS. WAGSTAFF:  Object to form.

11      A.    So you don't have recall bias if

12   that's what you're asking, but you have

13   other biases.

14      Q.    Is there any information that you

15   can identify from the 2018 study whereby

16   any misclassification of exposure to

17   glyphosate-based herbicides would be

18   associated with whether or not that

19   individual in the future gets or does not

20   get Non-Hodgkins lymphoma?

21      A.    Repeat the question.

22      Q.    Is there any information that you

23   can identify from the 2018 NCI Study

24   whereby any of the misclassifications of

25   exposure that you discuss would be

1   associated with whether or not that

2   individual in the future gets or does not

3   get Non-Hodgkins lymphoma?

4        A.    So you don't need -- there is

5   undoubtedly misclassification error.  Blair

6   reported that at least for other

7   pesticides.  No one ever measured -- no one

8   ever seriously measured it.  So the fact

9   that the investigators, the 12

10  investigators from NIH didn't measure it,

11  or report it, is a limitation.

12             But it's -- there is no such

13  thing as having exposure classification

14  without having misclassification error and

15  almost always, misclassification error is

16  going to be biased by the nature of the

17  beast.

18             When you ask someone how much

19  broccoli do you eat, they give you the

20  wrong answer in how much broccoli they eat.

21  Everyone gives you the wrong answer in how

22  much broccoli they eat.

23             When you ask 50,000 people how

24  much broccoli they eat, you are going to

25  get an error in the end of the day in the

1    measurement of broccoli and it's not going

2    to be -- it's not going to average out to

3    the correct answer.  It's going to average

4    out in one direction or the other.  There

5    will be a bias at the end of the day in

6    broccoli.  Maybe everyone will

7    over-estimate how much broccoli they eat

8    because they want to look healthy or there

9    will be a bias one way or the other.

10           You don't need much bias -- you

11   don't need much bias to obviate a modest

12   risk ratio which is what we are talking

13   about here.  That's the problem when we are

14   talking about glyphosate and NHL.

15           I don't need to know how it

16   relates specifically to NHL because the

17   risk -- the problem is you have a

18   negative -- you have a null association.

19   So when you have a null association, you

20   can't assume -- if you had a positive

21   association of 2 or 3, I mean, we live --

22   in epidemiology, we live in a world of

23   error.  We are very tolerant of error.  We

24   love error -- we don't love error.  But we

25   are comfortable with error.  We live in a

1   world of error.  But there is a limit to

2   how much error you can tolerate when you're

3   in a world of modest risk ratios, and even

4   a small amount of misclassification error

5   or modest or bias in misclassification

6   error is going to eliminate a small risk

7   ratio.

8           So when you get a null result,

9   you have to be very skeptical of what you

10  find.  And that's where we are finding

11  ourselves here.  You have to be very

12  skeptical of a null finding.

13          If you had a -- in fact, most of

14  this Andreotti paper is actually totally

15  focused on the one positive finding.  I

16  mean, half of the discussion or more is

17  talking about the one positive finding that

18  they have.  Because that's where they are

19  really comfortable talking about it.

20          But when you have a null finding,

21  you have to assume that the -- even the

22  smaller errors eliminated it.  And that

23  it's really due to the smaller errors.  And

24  all the manipulations in the world, all the

25  sensitivity analyses and this and that

1    aren't going to make up for the error --

2    for the smaller errors, even the 10

3    percent, 15 percent errors, and that's what

4    I think fundamentally is a problem in the

5    AHS study, on top of all the other

6    problems -- the AHS study has a lot of

7    problems in it.  Each one of which is

8    tolerable.

9        Q.    Dr. Neugut, we are way beyond any

10   question and you actually haven't answered

11   my question so I'm going to ask it again.

12       A.    Please.

13       Q.    The question I asked -- I don't

14   know if you can turn to the question I

15   asked -- was with respect to the exposure

16   misclassification that you believe occurred

17   in the 2018 NCI study, given the fact that

18   that exposure information was obtained

19   prior to the date in which any of the

20   members of the cohort contracted

21   Non-Hodgkins lymphoma or did not, whether

22   or not there was misclassification is not

23   associated with disease outcome, correct?

24            MS. WAGSTAFF:  Objection, asked

25       and answered.

1      A.    It wasn't biased by their

2  knowledge of whether they were going to get

3  the disease or not, if that's what your

4  question is.

5      Q.    No, my question was any

6  misclassification that occurred for

7  exposure was nondifferential with respect

8  to disease outcome, correct?

9      A.    No.

10          MS. WAGSTAFF:  Objection.

11      Q.    Is there any reason to believe

12  that individuals who claim that they had

13  exposure to glyphosate were -- or

14  incorrectly claimed that they had exposure

15  to glyphosate were more likely or less

16  likely to get Non-Hodgkins lymphoma than

17  individuals who correctly answered the

18  exposure question?

19      A.    A bias that would have been

20  introduced with regard to exposure

21  classification would have led to some

22  errors in how the association would have

23  subsequently been observed with regard to

24  an outcome.

25          If that's what you're asking,

1  then the answer is it would have been -- it

2  would have led to an error in the

3  assessment of the association with NHL.

4      Q.    You understand -- and we talked

5  about this, you talked about this in your

6  expert report -- the issue of these

7  misclassifications biasing and attenuating

8  risk estimates towards the null?

9      A.    I am sorry, you have to --

10     Q.    You have discussed, in your

11  expert report, the possibility of these

12  type of misclassification errors biasing

13  rate ratios towards the null.  Correct?

14     A.    Or beyond the null.

15     Q.    Is there any exposure

16  misclassification you believe occurred that

17  you can explain would have resulted in a

18  bias of the rate ratio away from the null?

19  And if so, if you can explain how.

20     A.    Beyond the null, you mean?

21     Q.    No, away from null.  More distant

22  from the null.

23     A.    You mean to make the rate ratio

24  greater than 1?

25     Q.    Farther from the null in either

1  direction.

2      A.    So I don't specifically know the

3  biases that were operating in the

4  agricultural workers when they gave their

5  responses in terms of exposure of their

6  exposure.

7          So I can't specifically say how

8  the errors that occurred in their exposure

9  classification or in their exposure

10  measurement would have affected the

11  measurement of the association with NHL.

12          But biases could either attenuate

13  towards the null, they could attenuate away

14  from the null, or they could attenuate

15  below the null.

16      Q.    Can you identify or can you

17  describe any hypothetical scenario, based

18  upon your review of the 2018 NCI Study, how

19  the exposure misclassification that you

20  opine may have occurred could have biased

21  the reported rate ratios away from the

22  null?

23          MS. WAGSTAFF:   Objection, calls

24      for a hypothetical.

25      A.    Can you define --

1      Q.     Farther away from 1?

2      A.     Made it greater than 1?

3      Q.     Made it more distant from 1 in

4    either direction.

5      A.     So when you have the

6    nonresponders, I don't know how the biases

7    in nonresponders might -- who are not

8    appropriately assessed might have biased

9    it.  So there that would have been -- that

10   might have been associated with the

11   occurrence of NHL and I don't know how that

12   might have affected the risk, made it away

13   from the null.  But since here we are

14   seeing -- I'm -- I'm assuming here the most

15   of the errors biased towards the null or --

16   for the most part.

17     Q.     OK.

18            In your expert report, your first

19   criticism of the study was that the NCI

20   Study obtained exposure information through

21   self-reported answers on questionnaires,

22   correct?

23     A.     I'm sorry?

24     Q.     Your first criticism of the NCI

25   Study was in your supplemental expert

1    report and this is at page 6 in your

2    report.  Is that the NCI Study used --

3    obtained exposure information through

4    self-reported questionnaires, correct?

5         A.    Yes.

6         Q.    Self-reported questionnaires or

7    obtaining exposure information through

8    self-reported questionnaires is a standard

9    methodology in epidemiological research,

10   correct?

11        A.    Yes.

12        Q.    And you agree that self-report

13   can be reliable depending on the variable

14   which is being evaluated, correct?

15        A.    "Reliable" is a word that has

16   a -- has -- varies in terms of how reliable

17   reliable is.

18              As we were saying earlier, if

19   you're 90 percent valid, you're 10 percent

20   in error and how tolerable -- how tolerable

21   we are to reliability is a question of --

22   is the whole issue in what we are talking

23   about here.

24        Q.    I'm sorry, Dr. Neugut.  I was

25   just quoting your expert report so I

1  thought that would be an easy question.

2        MS. WAGSTAFF:  Objection,

3     argumentative.

4     Q.    You state in the indented

5  paragraph, "Self-report can be reliable

6  depending on the variable which is being

7  evaluated."  Correct?

8     A.    Yes.

9     Q.    And you have used self-reported

10 questionnaire exposure data in a large

11 number of your own published studies,

12 correct?

13    A.    Yes.

14    Q.    You have used questionnaire data

15 to examine associations between smoking and

16 various types of cancer, correct?

17    A.    Yes.

18    Q.    And you've used self-reported --

19 strike that.

20        You believe that self-reported

21 questionnaire data on smoking can be

22 reliable for the purposes of epidemiologic

23 research, correct?

24    A.    It depends on the situation.

25    Q.    Certainly for your studies, you

Page 68

1    believed that that was a reliable basis for

2    exposure information, correct?

3              MS. WAGSTAFF:   Object to form.

4         A.    Again, everything depends on the

5    context.

6         Q.    You have used questionnaire data

7    to examine associations between various

8    dietary factors in cancer, correct?

9         A.    Yes.

10        Q.    And you have published those

11   studies in the peer-reviewed literature,

12   correct?

13        A.    Yes.

14        Q.    And in publishing those studies,

15   you believed that the self-reported data on

16   dietary factors was sufficiently reliable

17   for peer-reviewed publication for potential

18   associations between those factors and

19   cancer, correct?

20        A.    Yes.

21        Q.    The NIH scientists who have been

22   examining the Agricultural Health Study

23   have published a number of independent

24   validation studies that sought to measure

25   the reliability of the exposure information

1   provided in the questionnaires by the AHS

2   cohort, correct?

3       A.    Yes.

4       Q.    Let me show you --

5            MS. WAGSTAFF:  We should -- it

6   hung up.

7            THE VIDEOGRAPHER:  The time is

8   11:29, we are going off the record.

9            (Recess).

10            THE VIDEOGRAPHER:  The time is

11   11:31.

12            MR. LASKER:  Let's mark the next

13   document in line, Exhibit 26-6, and the

14   reason we have changed to 26 is we have

15   been informed during the break that

16   that should be the proper numbering

17   scheme.  So all the prior exhibits that

18   had a "25" prefix should be changed to

19   "26."

20            MS. WAGSTAFF:  Yes, and we have

21   asked the court reporter to go back to

22   the record in the final transcript to

23   reflect 26-1 through 5.

24            (Exhibit 26-6, document entitled,

25   "Accuracy of Self-reported Pesticide

1          Use Duration Information from Licensed

2          Pesticide Applicators in the

3          Agricultural Health Study" marked for

4          identification, as of this date.)

5          Q.    Dr. Neugut, I have handed you as

6     Exhibit 26-6, an article with the lead

7     author of Jane Hoppin of the National

8     Institute of Environmental Health Studies,

9     entitled Accuracy of Self-reported

10    Pesticide Use Duration Information from

11    Licensed Pesticide Applicators in the

12    Agricultural Health Study."

13              Have you seen this publication

14    before?

15         A.    I don't have a recollection of

16    seeing this particular one, no.

17         Q.    If I could direct you to page

18    2 -- I'm sorry, not page 2.  Page 316,

19    table 2.

20         A.    Table 2?

21         Q.    Yes.

22         A.    And in this analysis, the NIH

23    investigators looked at duration of use

24    information and decade of first use

25    information in the questionnaires for

1  various pesticides.

2           And with respect to glyphosate,

3  which is separately listed on table 2, the

4  NIH investigators found that only one to

5  two percent of the AHS cohort respondents

6  gave inaccurate information on duration of

7  use or decade of first use of

8  glyphosate-based herbicides, correct?

9           MS. WAGSTAFF:  Objection.  The

10          witness has stated he doesn't remember

11          seeing this before.  This is a

12          scientific article that he needs time

13          to read the entire thing to give an

14          accurate answer.

15     Q.    Dr. Neugut, the NIH investigators

16  report that there was either a 1 percent or

17  a 2 percent error in the questionnaire

18  responses for glyphosate exposure for

19  duration of use or decade of first use

20  information, correct?

21          MS. WAGSTAFF:  Same objection.

22     A.    I don't know.

23     Q.    You didn't come across this study

24  in your review of the literature?

25     A.    I don't recall this one.  I don't

1    think I cite it.

2        Q.    Let me show you the final

3    paragraph of this publication.  It's on

4    page 317 of the paper.  Dr. Neugut?

5        A.    Which page?

6        Q.    317.  And the last paragraph

7    starts, "The AHS cohort consists of

8    certified pesticide applicators and their

9    spouses.  As certified pesticide

10   applicators, these subjects are trained

11   with regard to pesticide regulations and

12   are responsible for the purchase and

13   application of chemicals on their

14   property."

15           Did I read that correctly?

16       A.    Um-hm, yes.

17       Q.    The NIH investigators continue to

18   state, "This involvement with pesticide

19   selection and use makes farmers a

20   uniquely -- a unique occupationally-exposed

21   population and suggests why studies of

22   farmers' self-reports indicate the ability

23   to provide high quality data regarding

24   pesticide exposure."

25           Did I read that correctly?

1              MS. WAGSTAFF:  Object to form.

2       A.    Yes.

3       Q.    And this is now -- strike that.

4              If you have not -- and I think

5    we -- this publication also indicates that.

6    You have not reviewed all of the

7    publications that the NIH's investigators

8    have that look at potential accuracy or

9    potential errors in questionnaire responses

10   with respect to glyphosate exposure in that

11   cohort, correct?

12             MS. WAGSTAFF:  Object to form.

13        This is a 2002 publication?

14        A.    I guess I did not.  I don't

15   know -- I can't tell you what I missed.

16        Q.    Given that fact that you don't

17   know which of these publications and which

18   of these analyses you have reviewed, you

19   don't have a basis, sitting here today, to

20   dispute the statement that the NIH

21   investigators made with respect to their

22   conclusions from their analyses as far as

23   the accuracy of the exposure information

24   from the AHS cohort?

25             MS. WAGSTAFF:  Object to form.

1          A.     I believe I cited in my report,

2     reports that I read which cited error rates

3     that I was familiar with or that I came

4     across in my readings and I imagine there

5     are other reports as well have shown

6     misclassification in terms of glyphosate

7     misrepresentation.

8               I mean, does it say -- that they

9     had 99 percent accuracy in the study is --

10    I would need to really read this paper to

11    believe that anyone seriously believes that

12    they had 99 percent validity of

13    measurement.

14        Q.     Sitting here today, you're not in

15    a position to discuss the various analyses

16    that were conducted by the NHS

17    investigators in totality to determine the

18    accuracy of the questionnaire responses on

19    exposure to glyphosate, correct?

20        A.     No, but --

21               MS. WAGSTAFF:   Object to form.

22        A.     I would be highly skeptical if

23    they're going to argue that the

24    self-exposure measurements of glyphosate

25    use was 99 percent accurate.

1        Q.    It's, in fact, one of the reasons

2   that the NIH investigators decided to use a

3   cohort of farmers and pesticide applicators

4   for the purposes of their analysis was

5   because of the information they had that

6   suggested that those individuals would be

7   more likely to have accurate recall of

8   pesticide exposures than individuals in the

9   general population, correct?

10       A.    Yes.

11             MS. WAGSTAFF:  Objection, calls

12       for speculation.

13       Q.    Let me show you a different

14   publication.  And we will mark this as

15   Exhibit 26-7.

16             (Exhibit 26-7 document entitled,

17       "Reliability of Reporting on Lifestyle

18       and Agricultural Factors by Sample of

19       Participants in the Agricultural Health

20       Study from Iowa" marked for

21       identification, as of this date.)

22       Q.    And Dr. Neugut, for the record,

23   this is a publication, also in 2002 in the

24   peer-reviewed literature, lead author,

25   Dr. Blair, "Reliability of Reporting On

1    Lifestyle and Agricultural Factors by a

2    Sample of Participants In the Agricultural

3    Health Study from Iowa," again published in

4    2002.

5              Are you familiar with this

6    publication?

7         A.    I believe this one, I do know.

8         Q.    And in this study, the

9    investigators compared information provided

10   by over 4,000 members of the AHS cohort who

11   provide exposure information in two

12   separate questionnaires, one year apart,

13   correct?

14        A.    Yes.

15        Q.    And the NIH investigators

16   measured the reliability of the

17   questionnaire responses for pesticide

18   exposures by comparing the agreement in the

19   answers from one questionnaire to the next.

20   Correct?

21        A.    Yes.

22        Q.    For glyphosate specifically --

23   and they list this on table 1 on the second

24   page of their publication.  They found for

25   ever/never use, that there was a 82 percent

1    correlation as far as accuracy or

2    consistency in glyphosate exposure

3    information, correct?

4        A.    Yes.

5        Q.    The investigators compared this

6    with the consistency of findings with

7    respect to responses concerning smoking,

8    correct?

9        A.    I don't know that.  But --

10       Q.    Well, if you look at page 96 of

11   the publication, so it's the next page --

12             MS. WAGSTAFF:  Dr. Neugut, if you

13       need to read the entire publication

14       please take the time to do so.

15       Q.    If you look at the second column

16   on 96 the first paragraph, full paragraph,

17   "We also compared response to tobacco use"?

18             MS. WAGSTAFF:  Do you need to

19       take time to read it?

20       A.    Where are you looking.

21       Q.    On the second column in the text

22   right next to table 2, there is the first

23   indented paragraph starting, "We also

24   compared responses..."  Do you see that?

25       A.    Yes.

1    Q.    So the NIH investigators compared

2  the consistency of response with respect to

3  glyphosate use with a consistency of

4  response with respect to tobacco use.

5  Correct?

6    A.    Yes.

7    Q.    And the investigators found that

8  that there was the information on

9  ever/never glyphosate use was more

10  consistent than the information on numbers

11  of cigarettes smoked per day in these

12  questionnaires, correct?

13    A.    Yes.

14    Q.    The investigators also found that

15  the answers in the AHS questionnaires on

16  ever/never use of glyphosate was more

17  reliable than the data on alcoholic drinks

18  per day, correct?

19         MS. WAGSTAFF:  Objection,

20    relevance.  There is biases between

21    reporting on cigarettes and alcohol.

22         MR. LASKER:  There is no

23    objection to relevance in a deposition.

24         MS. WAGSTAFF:  I just objected to

25    relevance, so actually there is

1      apparently.

2           MR. LASKER:  They aren't proper.

3      I should have stated that differently.

4      Q.    Dr. Neugut, let me ask the

5      question again.

6           The investigators found that the

7      AHS questionnaire responses on ever/never

8      use of glyphosate were more consistent than

9      the answers provided with regard to

10     alcoholic drinks per day, correct?

11     A.    Yes.

12     Q.    The investigators have found that

13     the AHS questionnaire responses with

14     respect to ever/never glyphosate use was

15     almost twice as reliable as the data or the

16     questionnaire responses for vegetable

17     servings per day and fruit servings per

18     day, correct?

19     A.    I don't know if I would

20     characterize it as twice, but it was more

21     reliable.

22     Q.    There was for -- if you go down

23     to the bottom on page 96, with respect to

24     vegetable servings per day and fruit

25     servings per day, continue down that same

1    paragraph, there was agreement of 35

2    percent for vegetable servings per day and

3    40 percent for fruit servings per day as

4    compared to 82 percent --

5        A.    I'm sorry, I'm not seeing where

6    you're reading.

7        Q.    Page 96, the very last line of

8    text in that page, second column, they

9    provide the reliability data for vegetable

10   servings per day and fruit servings per

11   day?

12       A.    Um-hm.  Yes.

13       Q.    The reliability of questionnaire

14   responses with respect to vegetable

15   servings per day and fruit servings per

16   day, was less than half of the reliability

17   of the answers with respect the glyphosate

18   ever/never use, correct?

19       A.    Yup.

20       Q.    I'm sorry?

21       A.    Yes.

22       Q.    The two published analyses that

23   we have looked at of the accuracy of the

24   AHS cohort glyphosate exposure data was

25   looking at information that was obtained

1    prior to the introduction of RoundUp Ready

2    crops, correct?

3             And if you can look back at the

4    abstract, this information is based on the

5    first questionnaire and then one year apart

6    from that.  So again, the information on

7    reliability here is based upon information

8    provided prior to the introduction of

9    RoundUp Ready crops, correct?

10   A.    Reliability and accuracy are not

11   the same thing.

12   Q.    That -- my question is different.

13            The data that we have been

14   looking at with respect to reliability of

15   questionnaire responses was based upon

16   information in the first questionnaire,

17   provided in the first questionnaire prior

18   to the introduction of RoundUp Ready crops,

19   correct?

20   A.    Yes.

21   Q.    You would expect that the

22   accuracy of glyphosate exposure data in the

23   second AHS survey, after the introduction

24   of RoundUp Ready crops, would be even more

25   reliable, correct?

1          MS. WAGSTAFF:  Object to form.

2      A.    I'm sorry, I didn't follow the

3  question.

4      Q.    Once a farmer begins using

5  RoundUp Ready crops, their ability to

6  recall whether they use RoundUp is pretty

7  straightforward, right?  If they use

8  RoundUp Ready crops, they know they use

9  RoundUp?

10     A.    I really have no basis on which

11 to answer that question.

12     Q.    Are you not aware of the fact

13 that RoundUp Ready crops, if you use

14 RoundUp Ready crops, you would need to use

15 glyphosate on the crops?

16     A.    I understand the concept, but I

17 really have no knowledge of what a farmer

18 does or what a farmer doesn't do and

19 whether they -- what their knowledge or

20 what their behavior would be with regard to

21 knowing about glyphosate use or not.  I

22 would have no basis on which to answer that

23 question.

24     Q.    Do you have any knowledge with

25 respect to the weed management guidelines

1  that farmers use if they're using --

2  growing RoundUp Ready crops?

3      A.    No.

4      Q.    Do you know whether, in fact,

5  farmers who farm using RoundUp Ready crops

6  follow guidelines that specify certain

7  times in the year and numbers of times of

8  the year that they should apply RoundUp?

9      A.    I grew up in Brooklyn.

10      Q.    You have no information on that

11  one way or the other?

12      A.    No.

13      Q.    So you do not have any basis to

14  know one way or the other whether

15  individuals who -- farmers who grow RoundUp

16  Ready crops would have more reliable recall

17  with respect to whether they use RoundUp or

18  how they use RoundUp than individuals who

19  don't use RoundUp Ready crops?

20      A.    I don't have any basis on which

21  to -- I would assume that they're -- I mean

22  my assumptions in my report have been

23  simply that the glyphosate usage was

24  altered subsequent to the introduction of

25  these glyphosate-resistant crops.

1          But exactly what impact that
2     would have had specifically on farmer
3     practices or what that means in terms of
4     agricultural practices specifically or how
5     farmers react to that or what their
6     psychological behavior is, I have no -- I
7     would have no basis for knowing that or
8     understanding that or appreciating that.
9          Q.    Starting at the bottom of page 7
10    of your supplemental expert report and
11    continuing through page 11 of your report,
12    you're criticizing the 2018 NCI Study for
13    what you believe is an exposure
14    misclassification issue that arose with
15    respect to the phase 2 questionnaire,
16    correct?
17         A.    You're here -- you're where?
18         Q.    In your supplemental expert
19    report, starting page 7, we are moving
20    forward in your report now, on page 7 to
21    page 11, you're discussing the issues of
22    exposure misclassification that you believe
23    may have occurred in connection with the
24    second phase questionnaire.  Correct?
25         A.    Correct.

1    Q.    And you raise two issues that you

2    believe could lead to exposure

3    misclassification during this period; the

4    increase in glyphosate use after the

5    introduction of RoundUp Ready crops and

6    then the use of an imputation method to

7    derive exposure information during this

8    period for AHS participants who did not

9    respond to the second survey, correct?

10    A.    Yes.

11    Q.    Are there any other issues that

12    you believe led to exposure

13    misclassification during this period?

14    A.    Well, this is on top of the

15    original sin?

16    Q.    We already talked about your

17    views of the questionnaire responses.   But

18    with respect to the issues beyond what we

19    just discussed, dealing with the

20    reliability of questionnaire data

21    generally, are there any other issues

22    besides the increase in glyphosate use

23    after the introduction of RoundUp Ready

24    crops and the use of the imputation method

25    that you believe led to the exposure

1   misclassification and --

2        A.    Off the top of my head, I'm not

3   thinking of any.

4        Q.    And you agree that for -- that

5   there were 63 percent of the AHS cohort who

6   provided information on glyphosate exposure

7   both in the Phase 1 questionnaire and in

8   the follow-up questionnaire, second phase

9   questionnaire, correct?

10       A.    Yes.

11       Q.    And aside from the issues that

12  you've raised generally that we've

13  discussed with respect to questionnaires

14  generally, you do not raise any issue with

15  exposure misclassification for that 63

16  percent of the cohort, correct?

17       A.    Again, you will have measured

18  now -- the misclarification error that you

19  had in the baseline questionnaire, you will

20  now have duplicated in the second

21  questionnaire.

22       Q.    I understand and we have talked

23  about the issue of questionnaires

24  generally, but specific to --

25       A.    No.

1    Q.    -- your criticisms of the 2018

2  NCI Study --

3    A.    Right.

4    Q.    -- you agree that you don't have

5  any concerns of exposure misclassification

6  with respect to that 63 percent of the

7  cohort, correct?

8    A.    Correct.

9    Q.    And the 2018 NCI Study separately

10  analyzed the risk of Non-Hodgkins lymphoma

11  and glyphosate exposure solely for the

12  34,700 cohort members who answered both the

13  Phase 1 and Phase 2 survey, correct?

14    A.    Yes.

15    Q.    And that separate analysis still

16  included 306 cases of Non-Hodgkins

17  lymphoma, correct?

18    A.    I don't know the number off the

19  top of my head, but I believe you.

20    Q.    And with 306 NHL cases, that

21  analysis would have more than four times

22  the number of NHL cases that were in the

23  2005 DeRoos publication, correct?

24    A.    You mean the original 2005 --

25    Q.    Yes.

1    A.    Yes.

2    Q.    There was no association in the

3  2018 NCI Study between exposure to

4  glyphosate-based herbicide and Non-Hodgkins

5  lymphoma in those 34,000 members of the

6  cohort, correct?

7    A.    Correct.

8    Q.    And, in fact, for the highest

9  exposure group, for -- that was 34,700

10 individuals, for glyphosate-based

11 herbicides and Non-Hodgkins lymphoma, there

12 was a rate ratio as compared to no exposure

13 below 1.0 at 0.9, correct?

14    A.    I don't know offhand, but

15 again --

16    Q.    If we can look, I don't want you

17 to be guessing here, page 4, we will put

18 that up, 4.

19    A.    Right now, in the Andreotti

20 study?

21    Q.    Yes, the paper in the Journal of

22 the National Cancer Institute, 2018, and if

23 we are looking at page 4, they provide data

24 for -- if we limit the analysis to 34,698

25 participants who completed both

1   questionnaires reducing the total number of

2   cancer cases to 4,699.

3        A.    Which table are you in?

4        Q.    We are in the text on page 4.

5        A.    Yeah.

6        Q.    If you look up, you will see

7   where I am.  Towards the bottom of the

8   column.

9        A.    Oh, I'm sorry, OK.  So --

10       Q.    Right next to "testicular" on the

11  chart.  If you go over and look at the

12  text.

13             The sentence begins, "To evaluate

14  the impact of using imputed exposure data

15  for participants who did not complete the

16  follow-up questionnaire..." do you see

17  that?

18       A.    Yes.

19       Q.    "We limited the analysis to

20  34,698 participants who completed both

21  questionnaires reducing the total number of

22  cancer cases to 4,699.  Do you see that?

23       A.    I didn't see the last part.

24       Q.    "We limited the analysis to

25  34,698 participants who completed both

1    questionnaires" --

2        A.    Yes.

3        Q.    -- "reducing the total number of

4    cancer cases to 4,699."  Correct?

5        A.    Reducing total to 4,699.  Right,

6    go ahead.

7        Q.    Glyphosate use was not associated

8    with Non-Hodgkins lymphoma, with 306 total

9    cases and a rate ratio of 0.9 for the

10   highest quartile, quartile 4, correct?

11       A.    Yes.

12       Q.    In your supplemental report at

13   page 10, you discuss two publications that

14   you rely upon as addressing differences

15   between responders and nonresponders in the

16   Phase 1 and Phase 2 survey, one by

17   Montgomery and one by Dr. Rinsky and this

18   is in your supplemental expert report at

19   page 10.

20       A.    Yes.

21       Q.    And in fact, the Rinsky study

22   does not address Phase 2 responders and

23   nonresponders at all, does it?

24       A.    What does it address?

25       Q.    You read the publications.  Is it

1    your understanding that the Rinsky paper

2    addressed Phase 2 survey responses?

3             MS. WAGSTAFF:  Do you have a copy

4        of the article you can let him refresh

5        his memory with?

6             MR. LASKER:  After he answers the

7        question, sure.

8        A.    It was my impression that it did.

9    So --

10       Q.    Let's take a look at it.  We will

11   mark this as Exhibit 26-8.

12            (Exhibit 26-8, document entitled,

13       "Assessing the Potential for Bias from

14       Nonresponsive to a Study Follow-Up

15       Interview" marked for identification,

16       as of this date.)

17       Q.    Dr. Neugut, if you look at the

18   abstract, right up front, of the Rinsky

19   publication, they very clearly state that

20   they are looking at information or

21   responses to questionnaires provided in the

22   Phase 3 of the study between 2005 and 2010.

23   Correct?

24       A.    OK.  True.

25       Q.    This publication is irrelevant to

1    the 2018 NCI Study because it did not use

2    Phase 3 questionnaire responses, correct?

3             MS. WAGSTAFF:   Object to form.

4        A.    I would not say it's irrelevant.

5    I would say that while it doesn't directly

6    relate to the 37 percent who didn't respond

7    to the second interview, but the

8    characterization of those who are

9    nonresponders as compared to responders is

10   still applicable.

11       Q.    The data that you cite in your

12   expert report with respect to differences

13   in Phase 1, Phase 2 study responses from

14   Rinsky is inaccurate, correct?

15       A.    Is what?

16       Q.    Is inaccurate?

17            MS. WAGSTAFF:   Object to form.

18       Q.    Your characterization of that

19   data?

20       A.    Made a mistake, I made a mistake.

21   But the information is directly relevant to

22   characterizing responders to questionnaires

23   within the AHS study as compared to

24   nonresponders.

25            While you're correct that I made

1  a mistake in -- it is really a third

2  interview, but -- or third -- but the

3  characterization of who responds and who

4  doesn't respond is still going to be

5  germane and I'm not -- I'm not directly

6  making any statements or trying to make any

7  points with regard to the specifics of who

8  is a responder and whose not a responder.

9          I'm only giving information with

10  regard to what are the characteristics of

11  those who respond versus those who don't

12  respond and how that may influence the

13  associations that are subsequently

14  observed.

15    Q.    In the Rinsky publication, when

16  they deal with the Phase 3 survey, at page

17  8 and I -- the NIH investigators who

18  published this paper stated again in the

19  second column of page 8 that applying

20  pesticides at enrollment was not strongly

21  associated with responses to the 2005, 2010

22  interview.  That's your understanding of

23  that paper result as well, correct?

24    A.    Yes.

25    Q.    And with respect to disease

1  outcomes, that would not be immediately

2  apparent at the time of questionnaire

3  responses, such as cancer, the NIH

4  investigators also were of the view that

5  those disease outcomes would not be

6  associated with response or nonresponse to

7  the questionnaire. Correct?

8      A.    I'm -- I'm not -- I didn't follow

9  that last point.

10     Q.    OK.  Page 8, the investigators,

11 page 8 of the study, Rinsky and the other

12 NIH investigators concluded that

13 outcomes -- and this is in the second

14 column of the text -- the findings reported

15 here, the first paragraph, about two-thirds

16 of the way down --

17         MS. WAGSTAFF:  What page are you

18     on?

19         MR. LASKER:  Page 8.

20     Q.    The investigators concluded that

21 outcomes that did not have high rates of

22 rapid mortality or disability soon after

23 diagnosis also should not be strongly

24 associated with whether or not there was a

25 response or nonresponse to the

1    questionnaire.  Correct?

2        A.    Yes, but that's not germane to

3    our situation.

4        Q.    So is it your testimony that

5    Non-Hodgkins lymphoma has a high rate of

6    mortality and disability soon after

7    diagnosis?

8        A.    What?

9        Q.    Is it your opinion that

10   Non-Hodgkins lymphoma has a high rate of

11   rapid mortality or disability soon after

12   diagnosis?

13       A.    No, but they're looking at lung

14   cancer and bladder cancer where the risk

15   ratios are like 2 and 3 and 4.  We are

16   talking about risk ratios of 1.3 and 1.4.

17   So --

18       Q.    I'm not even sure I'm following

19   what you're saying.  But that is not

20   germane to my question.

21       A.    If they're saying that the degree

22   of bias that's introduced by the

23   nonresponses in this context are not going

24   to have a major influence on the risk

25   ratios, but they're looking at risk ratios

1    that are high, not risk ratios that are

2    small.

3        Q.    The Rinsky -- the NIH

4    investigators in their statement, without

5    mention of the issues that you just

6    discussed, because it is not mentioned in

7    their publication, state that selection

8    bias should not strongly influence

9    estimates of the association between

10   farming exposures and many of the

11   self-reported outcomes when analysis was

12   limited to the 2005-2010 interview

13   respondents, correct?

14       A.    Yes.

15       Q.    Now, let's look at the Montgomery

16   paper.

17            (Exhibit 26-9, document entitled

18       "Effects of Self-reported Health

19       Conditions and Pesticide Exposures on a

20       Probability of Follow-up in a

21       Prospective Cohort Study" marked for

22       identification, as of this date.)

23       Q.    This is the second --

24            MS. WAGSTAFF:   What's the time?

25       Q.    Dr. Neugut, this is second

Page 97

1    article that you cite in your supplemental

2    expert report, correct?

3              This is the paper you cite in

4    your expert report?

5              Is this the paper that you cite

6    in your expert report, the Montgomery

7    paper?

8         A.    Oh, yes.

9         Q.    In the abstract in their paper,

10   the Montgomery paper, the NIH investigators

11   in this peer-reviewed publication, state

12   the, "Differences between nonparticipants

13   and participants in the follow-up

14   interviews, the second phase interview were

15   generally small."

16             Did I read that correctly?

17        A.    Yes.

18        Q.    And the NIH investigators further

19   state that, "We did not find significant

20   evidence of selection bias."  Correct?

21        A.    Yes.

22        Q.    And in your expert report --

23             MS. WAGSTAFF:  Objection to

24        completeness.  There is another

25        sentence in the conclusion.

1      Q.     -- you disagree with the NIH

2   investigators in their analysis of their

3   findings in the Montgomery paper, correct?

4      A.     Do I?

5      Q.     That's my question.  Let me ask

6   you this:  Do you disagree with the

7   conclusions of the NIH investigators that

8   differences between nonparticipants and

9   participants in the follow-up second phase

10  interview were generally small and that

11  there was not -- they did not find

12  significant evidence of selection bias?

13          MS. WAGSTAFF:  Objection, there

14      is another sentence in the conclusion

15      that should be read for completeness

16      into the record please.

17          MR. LASKER:  If you want to read

18      that in your redirect, that's fine.

19      I'm asking a question about this

20      sentence in the conclusion.

21      A.     I would have to take a look at

22  this for a moment to reorient myself to the

23  paper.  I haven't seen it in a while.

24          MS. WAGSTAFF:  I would request

25      that the full conclusion be read, if

1          you are going to ask questions about

2          piecemeal to get sound bites.

3          Q.     Dr. Neugut, the record will

4     reflect that you have been looking at the

5     Montgomery paper now that you cite in your

6     expert report as evidence of what you state

7     are differences in Phase 1 and Phase 2

8     responses, that you have been reading that

9     paper now for three minutes or actually

10    more than that, four minutes of the

11    deposition time.  I asked a simple

12    question.

13         A.     I would say that --

14                MS. WAGSTAFF:  Objection to

15         asking a simple question.

16         A.     -- explicitly mixing or applying

17    pesticides was significantly associated

18    with participation at follow-up with an OR

19    of 0.52.  And it says explicitly,

20    "Characteristics associated with follow-up

21    among applicators."  That's, it lists here

22    those things that were associated with

23    response and nonresponse which is what I

24    alluded to now --

25         Q.     I will reask my question, because

1   I still don't have an answer to that.

2       A.    What is your question?

3       Q.    My question is the investigators,

4   the NIH investigators who conducted this

5   analysis, they stated in their conclusions

6   that differences between nonparticipants

7   and participants in the follow-up

8   interview, "The second phase AHS interview

9   were generally small and we did not general

10  significant evidence of selection bias."

11          My question to you is whether you

12  agree or disagree with the NIH

13  investigators?

14      A.    I think --

15          MS. WAGSTAFF:   Object to form.

16      A.    For the associations that they

17  looked at, that is correct.  But they did

18  not look at glyphosate and NHL.

19      Q.    Then, Dr. Montgomery and his

20  associates, if you look at page 492 of the

21  paper, in the text in the first column, the

22  bottom of the page, states that the

23  incident cancers cases -- that is, cancer

24  cases that developed subsequent to

25  questionnaire responses -- were not

1    significantly different from noncancer

2    cases in their probability of follow-up at

3    interview, correct?

4        A.    Yes.

5        Q.    And again, we discussed that

6    before, but that again indicates that there

7    is no bias with respect to responding or

8    nonresponding to the questionnaire that

9    would be associated with cancer outcomes,

10   correct?

11       A.    That is only for what they

12   specifically looked at in this paper, not

13   with regard to either glyphosate and NHL

14   and not specifically in the context of

15   small risk ratios.

16       Q.    Again, that's not really the

17   question I was asking about.  The issue

18   that they raise is that there was no

19   difference with respect to whether a cohort

20   member would respond or not respond to

21   Phase 2 based upon whether or not that

22   individual developed cancer, correct?

23       A.    Yes.

24       Q.    So the question of any

25   differences between whether you respond or

1    not respond was not associated with cancer

2    outcomes, correct?

3         A.    Yes.

4         Q.    In fact, if you talk about

5    glyphosate-based herbicide exposure and

6    Non-Hodgkins lymphoma, we know from the

7    analysis we just looked at in the 2018 --

8         A.    I am sorry, you have to talk

9    louder.

10        Q.    We know from the analysis we just

11   looked at in the 2018 NCI Study, only

12   looking at the individuals who responded to

13   Phase 2 and Phase 1, if you recall, they

14   had a 0.9 rate ratio for highest exposure

15   for glyphosate-based herbicides and

16   Non-Hodgkins lymphoma, correct?

17        A.    Yes.

18        Q.    And so we know from that analysis

19   in the 2018 NCI Study, that there was no

20   difference in the rate ratio for

21   Non-Hodgkins lymphoma if we look at

22   individuals who responded to the Phase 2

23   questionnaire versus individuals who did

24   not respond to the Phase 2 questionnaire,

25   correct?

1          MS. WAGSTAFF:   Objection,

2     misstates.

3     A.     I don't know that I would

4     characterize it that way.

5     Q.     There was no difference in the

6     findings when they looked at individuals

7     who responded to both Phase 1 and Phase 2

8     as compared to when they looked at the

9     total cohort, correct?

10          MS. WAGSTAFF:   Same objection.

11     A.     You get the same risk ratio.

12     Q.     In your supplemental expert

13     report at page 10, if you raise the

14     possibility of a cohort member who begins

15     using glyphosate after responding to the

16     first question -- this is the first full

17     paragraph on page 10, you raise the

18     possibility of a cohort member who begins

19     using glyphosate after responding to the

20     first questionnaire and does not respond to

21     the second questionnaire and then develops

22     Non-Hodgkins lymphoma, correct?  You

23     discussed that hypothetical situation?

24     A.     Yes.

25     Q.     And you state that this

1    individual would be considered an unexposed

2    Non-Hodgkins lymphoma case in the 2018 NCI

3    Study, correct?

4        A.    Yes.

5        Q.    That's not correct, is it?

6        A.    Because --

7        Q.    The NIH investigators actually

8    used an imputation methodology to determine

9    exposure for -- in Phase 2 nonresponders,

10   didn't they?

11       A.    How would they know that he used

12   it?

13       Q.    Let's take a look at the Heltshe

14   publication, and this is Exhibit 26-10.

15            (Exhibit 26-10, document

16       entitled, "Using Multiple Imputation to

17       Assign Pesticide Use for Nonresponders

18       in the Follow-Up Questionnaire" marked

19       for identification, as of this date.)

20       Q.    And you cited the Heltshe

21   publication in your supplemental expert

22   report, correct?

23       A.    Yes.

24       Q.    You're familiar with this paper?

25       A.    Yes.

1      Q.    If you look at page 410, the

2   second page of the publication.  The first

3   full paragraph on the left, column

4   starting, "When using pesticide exposure in

5   an analysis, there are several ways to

6   handle missing Phase 2 information."

7            Do you see that?

8      A.    Yes.

9      Q.    And they talk about the

10  possibility of ignoring nonresponse in

11  Phase 2 and implicitly assuming zero

12  pesticide exposure after Phase 1 which

13  would be erroneous for most participants

14  who did not complete the Phase 2

15  questionnaire, correct?

16     A.    Yes.

17     Q.    And that's the scenario, the

18  hypothetical that you were raising in your

19  expert report, correct?

20     A.    Yes.

21     Q.    The whole reason that the NIH

22  investigators instead, using an imputation

23  methodology, was to avoid that outcome,

24  correct?

25     A.    Yes.

1    Q.    And you agree that in using the

2    imputation methodology, there was -- strike

3    that.

4          You agree, and I think you state

5    this in your supplemental report -- you do,

6    at page 11 -- that imputation is frequently

7    used in epidemiologic research for dealing

8    precisely with this same problem in similar

9    circumstances, correct?

10   A.    Yes.

11         MS. WAGSTAFF:   Object to form.

12   Q.    And when -- just to explain how

13   this imputation works, the NIH

14   investigators analyze a wide array of

15   demographic and lifestyle and occupational

16   factors collected in the first

17   questionnaire and they determined which of

18   those factors were associated with

19   glyphosate use during the later time period

20   among the 34,700 cohort members who

21   responded to the second questionnaire.

22   Correct?

23   A.    Yes.

24   Q.    And they then looked at those

25   same variables, demographic, lifestyle and

1  occupation in the first questionnaire

2  responses for those individuals who did not

3  respond to Phase 2, correct?

4      A.    I'm sorry, say the last question

5  again.

6      Q.    The NIH investigators then looked

7  at those same variables, demographic,

8  lifestyle and occupational in the Phase 1

9  questionnaire responses for the individuals

10  who did not respond to Phase 2, correct?

11      A.    Yes.

12      Q.    And that is the method of

13  imputation is that they use all the

14  information that they actually obtained in

15  the Phase 1 questionnaires and in the Phase

16  2 questionnaires that responded to be able

17  to derive information as to whether or not

18  the nonresponders did or did not use

19  glyphosate during that time period,

20  correct?

21      A.    Yes.

22      Q.    There would, through that

23  imputation process for -- for example,

24  individuals -- I'm sorry, strike that.

25           In the individuals who responded

1    to Phase 1 and Phase 2, that 34,700 members

2    of the cohort, there were individuals who

3    had not used glyphosate in Phase 1 who

4    began using glyphosate in Phase 2, correct?

5         A.    Yes.

6         Q.    And through the imputation

7    methodology, the NIH investigators were

8    able to analyze all the various demographic

9    factors that was related with that change

10   in use pattern, correct?

11              MS. WAGSTAFF:   Object to form.

12        A.    Yes.

13        Q.    And they used that imputation

14   method also with respect to the

15   nonresponders so that a nonresponder who

16   did not use glyphosate during the Phase 1

17   period but had the similar demographic and

18   lifestyle and occupational variables would

19   be imputed to have used glyphosate in Phase

20   2, correct?

21        A.    Yes.

22        Q.    And in the Heltshe study, the

23   investigators in the very beginning at page

24   409, in the left-hand column, state, and

25   I'm quoting, starting about ten lines down

1   from the top, Introduction, "Multiple

2   imputation was been widely accepted and

3   used to account for missing data in large

4   national surveys and studies including

5   NHANES III, National Assessment of

6   Educational Progress, Children's Mental

7   Health Initiative and the Framingham Heart

8   Study, correct?

9       A.    Yes.

10      Q.    And you agree with that, correct?

11      A.    Yes.

12      Q.    The Heltshe validation study at

13  page 414, in the text in this 2012

14  publication, if you look at the second

15  column in the text about halfway down that

16  column, you see there referencing the

17  Montgomery paper, correct?

18      A.    Yes.

19      Q.    And that's the Montgomery paper

20  we were just discussing, correct?

21      A.    Yes.

22            MS. WAGSTAFF:  Where are you --

23      Q.    Halfway down --

24            MS. WAGSTAFF:  Got it.

25      Q.    And the NIH investigators in the

1    Heltshe paper state that Montgomery, et

2    al., show there is little evidence for

3    selection bias in Phase 2 of the AHS,

4    correct?

5         A.    Yes.

6              MS. WAGSTAFF:   Objection.   Can

7         you read the rest of the sentence

8         please.

9              MR. LASKER:   You can read that in

10        your --

11             MS. WAGSTAFF:   "However, missing

12        at random is an untestable assumption

13        without additional data."

14        Q.    Well, let me ask you that

15   question.   Are you aware of any

16   information, any data that you can point

17   to, that states that any miss -- any of the

18   information in the -- with respect to

19   nonresponse in Phase 2 was missing not at

20   random?

21        A.    Was what?

22        Q.    Missing not at random?

23        A.    Missing --

24        Q.    Not at random?

25             MS. WAGSTAFF:   While he is

1    thinking about that, I would like to

2    read the rest of the sentence.

3         MR. LASKER:  No, no, he can

4    answer the question and then you can do

5    whatever you want.

6    A.    How could there possibly be such

7  evidence?  I mean, since it's not

8  collected.

9    Q.    Are you -- can you point to any

10  information that says if there is any data

11  that's -- with respect to the Phase 2

12  questionnaire nonresponse that's not

13  missing at random?

14    A.    No.

15         MS. WAGSTAFF:  I would like, for

16    the completeness of the record, it

17    says, "Thus, it is possible that

18    nonresponders differed from responders

19    in variables we have not yet measured."

20    Q.    The NIH investigators state --

21  and I believe this is, again, in the

22  abstract of the front of the paper, that

23  the last line -- well, let me see here for

24  a second.  I don't want to direct you to --

25  OK.

1          Actually, let's look at the very
2     end of the paper, page 415, the conclusion.
3     The last sentence of the publication,
4     Heltshe publication, "The NIH investigators
5     conclude that this multiple imputation will
6     allow for bias reduction and improved
7     efficiency in future analyses of the AHS
8     cohort."  Correct?
9          A.    Yes.
10         Q.    And you agree with that, correct?
11         A.    Yes.
12               MS. WAGSTAFF:  Can you tell me
13         where you were reading that?
14               MR. LASKER:  Sorry, the last
15         sentence of the paper.
16         Q.    The NIH investigators also found
17    from their analysis in the Heltshe paper --
18    and just to explain, the way that the
19    Heltshe paper worked is they took the
20    individuals who responded to the first
21    phase questionnaire and then they pulled
22    out 20 percent of those individuals, sort
23    of pretended they hadn't responded, used
24    the imputation methodology to predict what
25    the answers should be, and then compared it

1    to their actual responses, correct?

2        A.    Yes.

3        Q.    And the NIH investigators found

4    when they did this analysis, that the

5    observed and imputed prevalence of

6    pesticide use in the hold-out data set were

7    85.7 percent and 85.3 percent respectfully

8    {sic}, correct?

9        A.    Do I have that written in my

10   report?

11       Q.    I don't think you do, but it is

12   mentioned in the abstract of the Heltshe

13   paper that you are relying upon.  It's

14   right in the abstract.  If you look at the

15   front of the paper or you can try and find

16   it in the paper, but it's in the body of

17   the abstract.

18       A.    They have all sorts of different

19   numbers in the paper itself.  So --

20       Q.    Are you aware of, sitting here

21   today, whether or not, in fact, the Heltshe

22   investigators found that their observed

23   imputed prevalence of pesticide use in the

24   hold-out data set was 85.7 percent and 85.3

25   percent respectfully -- respectively?

Page 114

1       A.     I didn't -- no, I'm seeing it

2    now.

3       Q.     OK.  So I'm not sure I understand

4    now.  Am I correct that the NIH -- strike

5    that.

6             The NIH investigators concluded

7    that the observed and imputed prevalence of

8    pesticide use in the hold-out data set were

9    85.7 percent and 85.3 percent respectfully,

10   correct -- respectively?

11      A.     Yes.

12             MS. WAGSTAFF:  Are you talking

13        about glyphosate or mixed load?

14             MR. LASKER:  I'm talking about

15        pesticide and it's right in the

16        abstract.  I'll ask the question again.

17      A.     That's for any pesticide use,

18   right.

19      Q.     Just so we are clear, when the

20   investigators use their imputation

21   methodology, they calculated 85.3 percent

22   use of pesticides and then when they looked

23   back at the actual responses in the

24   hold-out set, they found the actual number

25   was 85.7 percent, correct?

1    A.    Yes, for pesticides, correct.

2    Q.    And based upon, if you can look

3 at page 412.  On the left-hand column --

4    A.    412?

5    Q.    412.  And this is how -- under

6 results, imputation assessment, and

7 roughly --

8    A.    I'm sorry, we are in the first

9 column.

10   Q.    First column.  They discuss the

11 fact that in their view, the total

12 pesticide and the reference is total

13 pesticide imputation results indicates that

14 the logistic regression model underpinning

15 the multiple imputation procedure did

16 indeed preserve essential features of the

17 data, correct?

18   A.    I'm not seeing where you're

19 reading.

20   Q.    If you look under imputation

21 assessment, and about eight lines down they

22 state --

23   A.    "This indicates..."

24   Q.    "This indicates that the logistic

25 regression model underpinning the multiple

1    imputation feature, did, indeed, preserve

2    essential features of the data."

3            I read that correctly?

4    A.    Um-hm.  Yes.

5    Q.    And the N -- if you go back to

6    the abstract, in the front of the paper,

7    right after the discussion of total

8    pesticide use of 85.7 and 85.3 percent

9    respectfully -- respectively, the NIH

10   investigators further state that the

11   distribution of prevalence and days per

12   year of use for specific pesticides were

13   similar across observed and imputed in the

14   hold-out sample, correct?

15   A.    Yes.

16   Q.    And then the investigators in

17   this paper calculated a relative error for

18   the imputed ever/never use of 38 specific

19   pesticides, correct?

20   A.    Well, I don't know how many

21   pesticides there were, but many pesticides.

22   Q.    Going back to page 412, in the

23   right column, right above the very bottom

24   of the right column, right above, "Days per

25   year use of specific pesticides."  They

1    state that for only a few -- you see where

2    I am, about five lines up from the bottom?

3         A.    Yes.

4         Q.    "For only a few of the rare

5    pesticides used in Phase 2, does the

6    imputed prevalence differ from the true

7    prevalence by more than 20 percent?"

8              And they identify some pesticides

9    that belong to that category, correct?

10        A.    Yes.

11        Q.    And glyphosate did not differ by

12   more than 20 percent, correct?

13        A.    No.

14        Q.    And then they present that data

15   in figure 2 of their paper which is on page

16   414, and this lists all of the different

17   pesticides that we looked at, correct?

18        A.    Yes.

19        Q.    And the relative error, whether

20   it's more than 20 percent or less than 20

21   percent for all the different pesticides,

22   correct?

23        A.    Yes.

24        Q.    And there are some five

25   pesticides that overstated exposure by

1    maybe four of them by over 20 percent,

2    correct?

3         A.    Yes.

4         Q.    And with respect to glyphosate,

5    and the accuracy of the imputation

6    methodology, glyphosate fell basically in

7    the middle of the pack with respect to how

8    well the imputation methodology worked for

9    individual pesticides, correct?

10              MS. WAGSTAFF:  Object to form,

11         characterization of evidence.

12        A.    I don't know.  I don't know if

13   it's in the middle of the pack.  It is

14   where it is.

15        Q.    Well, there were roughly as many

16   pesticides that had a larger relative error

17   for the imputation methodology as there

18   were pesticides that had a lower relative

19   error, correct?

20              MS. WAGSTAFF:  Same objection.

21        A.    I don't know.

22        Q.    Well, you are looking at the

23   table here.

24              All the pesticides below

25   glyphosate have a greater relative risk,

1   correct?

2        A.    Which is about I'd say about 10.

3        Q.    And the pesticides, again, in the

4   top had a higher relative risk or higher --

5   I'm sorry, relative error than glyphosate,

6   correct?

7        A.    Had a better relative error.

8        Q.    No, they were off by more because

9   they are now going in the other direction

10  but the error is greater, correct?

11       A.    I see.  OK.

12       Q.    So glyphosate fell about in the

13  middle of the pack with respect to the

14  accuracy of the imputation methodology for

15  individual pesticides, correct?

16       A.    Yes.

17       Q.    And the NIH investigators for the

18  Agricultural Health Study have used the

19  same imputation methodology for every paper

20  that they published that has included data

21  for the Phase 2 questionnaire, correct?

22       A.    Yes.

23             MS. WAGSTAFF:  Object to form.

24       Q.    And there have been -- using the

25  same imputation methodology used in the

1    2018 NCI study -- maybe a dozen or more

2    studies in a peer-reviewed publication --

3    peer-reviewed literature coming out of the

4    Agricultural Health Study, correct?

5         A.    I don't know specifically, but I

6    wouldn't be surprised.

7         Q.    And that same imputation

8    methodology has been used in other

9    peer-reviewed publications looking at

10   potential associations with pesticides for

11   which the imputation methodology resulted

12   in greater relative error than glyphosate,

13   correct?

14        A.    I don't know.

15        Q.    Well, for example, if you can

16   look at lindane, on figure 2.  In the

17   Heltshe paper, lindane is the fourth

18   pesticide from the bottom in that figure?

19        A.    Yes.

20        Q.    So for lindane, there was a

21   greater error rate in the imputation

22   methodology than glyphosate, correct?

23        A.    Yes.

24        Q.    In your expert report, you cite

25   to the AHS findings in the 2014 paper that

1    uses imputation methodology for lindane,

2    correct?

3         A.    Yes.

4         Q.    So we know at least one situation

5    where peer-reviewed literature has been

6    published using imputation methodology with

7    pesticides where the imputation methodology

8    did not work as well as it did for

9    glyphosate, correct?

10              MS. WAGSTAFF:  Object to form.

11        A.    Yes.

12        Q.    Outside of this -- well, first of

13   all, are you aware of a single published

14   paper anywhere in the literature arguing

15   that the findings in all of these published

16   studies of the AHS cohort that have used

17   this imputation methodology are not

18   reliable because of their use of the

19   imputation methodology?

20              MS. WAGSTAFF:  Objection.  This

21        paper just came out five weeks ago, six

22        weeks ago.

23        Q.    Strike that.

24              So it is clear we just talked

25   about a number of papers that used that

1    imputation methodology, not just the 2017

2    NCI Study.  We know the 2014 paper looking

3    at insecticides, fungicides used that same

4    imputation methodology, correct?

5              MS. WAGSTAFF:  Same objection.

6        A.    I'm sorry, repeat the question.

7        Q.    You know that the 2014

8    publication that looked at insecticides and

9    fungicides for the AHS cohort for different

10   pesticides used the same imputation

11   methodology, correct?

12       A.    Yes.

13       Q.    Lots of other publications, as we

14   just discussed from the AHS, have been

15   using that same imputation methodology

16   that's used in the 2018 NCI paper?

17       A.    Yes.

18       Q.    So the 2018 paper is not new in

19   its use of the imputation methodology for

20   the AHS, correct?

21       A.    Correct.

22       Q.    Outside -- strike that.

23             Are you aware of a single

24   published paper anywhere in the literature

25   arguing that the findings in any of these

1    studies of the AHS cohort, using this

2    imputation methodology, are not reliable

3    because of their use of the imputation

4    methodology?

5         A.    No.

6         Q.    Outside of this litigation, are

7    you aware of any anyone who has argued in

8    any forum that the use of this imputation

9    methodology makes the findings of these

10   Agricultural Health cohort studies

11   unreliable?

12        A.    No.

13            MS. WAGSTAFF:  Objection, again,

14        this paper came out five weeks ago, so

15        there may be some criticism in the

16        future of it.

17            MR. LASKER:  The question and

18        answer will stand.

19            MS. WAGSTAFF:  OK.

20        Q.    In your expert report, you

21   suggest that differences in the responders

22   and nonresponders in the Phase 2

23   questionnaire could have concealed an

24   actual increased risk of Non-Hodgkins

25   lymphoma with glyphosate exposure in the

Page 124

1    2018 NCI study, correct?

2        A.    Yes.

3        Q.    In other words, you believe that

4    there were biases in the 2018 NCI study

5    that led to the reported rate ratio of

6    about 0.85 for ever/never use and -- but

7    without those biases, the 2018 NCI Study

8    would have reported a statistically

9    significant increased rate ratio above 1.0,

10   is that correct?

11       A.    I don't know what it would have

12   reported.  I mean, again, with the problems

13   that it has -- I don't know what the --

14   what it should have or could have or might

15   have reported.

16       Q.    Could you point to any data that

17   would indicate that if those biases had not

18   occurred, that you state occurred or the

19   misclassifications had not occurred that

20   you state occurred, that the reported rate

21   ratio of 0.85 would have, in fact, been

22   increased to a statistically significant

23   rate ratio above 1.0?

24            MS. WAGSTAFF:  Objection, same as

25       I said before.

1      A.     No, I just believe that the flaws

2   in the study make it impossible to

3   interpret the reported finding.

4      Q.     And based upon the actual

5   exposure data from the Phase 1

6   questionnaire, you would agree that there

7   is no suggestion that the 20,000 cohort

8   members who did not respond to the second

9   questionnaire were at increased risk of NHL

10  based upon their glyphosate exposures prior

11  to 1997, correct?

12     A.     I'm not able to answer that

13  question as I sit here.

14     Q.     Let's look at page -- this will

15  be the last line of questions -- page 4,

16  again, of the 2018 NCI Study.

17     A.     Which study am I looking at?

18     Q.     2018 NCI Study by Andreotti.  If

19  you look at page 4, we are talking about

20  the study by Andreotti, the main study here

21  we are talking about.

22         Page 4 of that study, again, in

23  the column of text, halfway down, there is

24  a paragraph that starts, "In primary

25  analysis...," do you see that?

1        A.      Yes.

2        Q.      And then about ten lines down,

3   they talk about an another analysis they

4   did when using only exposure information

5   reported at enrollment, correct?

6        A.      Yes.

7        Q.      So this is using the actual

8   questionnaire responses for the Phase 1

9   questionnaire, correct?

10       A.      Yes.

11       Q.      When using only exposure

12  information reported at enrollment, the

13  rate ratio and the highest exposure

14  quartile was 0.82 for Non-Hodgkins

15  lymphoma, correct?

16       A.      Yes.

17       Q.      And so based upon the actual

18  exposure data from the Phase 1

19  questionnaire, there is no suggestion that

20  the 20,000 cohort members who did not

21  respond to the second questionnaire were at

22  any increased risk of Non-Hodgkins lymphoma

23  based upon glyphosate exposures prior to

24  1997, correct?

25       A.      The upper limit of the 95 percent

1    confidence interval is 1.80.  So I would

2    say that that easily encompasses the risk

3    ratios we have been talking about.  So in

4    fact, you could encompass a much higher

5    relative risk.

6        Q.    So am I understanding correctly

7    then, your analysis of the epidemiology in

8    determining whether or not there would be

9    an association between glyphosate-based

10   herbicide exposure pre 1997 and

11   Non-Hodgkins lymphoma, your methodology is

12   to look at the highest edge of the 95

13   percent confidence interval to determine

14   whether or not there may be an association?

15            MS. WAGSTAFF:  Objection,

16        misstates testimony.

17       A.    I'm saying when you have a null

18   association.  You can't interpret or you

19   can't exclude what might be a positive

20   association and that further, in the

21   context of what we talked about earlier in

22   terms of misclassification error, again, we

23   talked earlier, our initial discussion was

24   about the misclassification error that was

25   even inherent in the original baseline,

1    baseline interview, and even a

2    misclassification error in that baseline

3    interview, which I'm sure there was, would

4    have been enough to introduce enough error

5    so that it would have obviated the ability

6    to assess or might have eliminated a

7    positive association.

8         My whole point here has been when

9    you don't see a positive association, you

10   have to be very conservative and very

11   skeptical about the interpretation of a

12   null finding, particularly when you have

13   such a high upper limit.  You can't -- you

14   can't be willy-nilly about it.

15      Q.   Just so I understand, this is the

16   same issue you discussed, again, about the

17   nondifferential, misclassification error

18   that you believe could have biased the rate

19   ratio towards the null, is that correct?

20      A.    Not just towards the null, but

21   even in this instance apparently possibly

22   below the null.  I mean -- yes.

23      Q.    And it's your understanding that

24   the nondifferential misclassification can

25   bias the rate ratio past the null in the

1    other direction, is that correct?

2         A.    Yes.

3              MR. LASKER:   OK.   No further

4    questions.

5              MS. WAGSTAFF:   We -- we can go

6    off the record.

7              THE VIDEOGRAPHER:   The time is

8    12:45.   We are going off the record.

9              (Luncheon recess)

10             THE VIDEOGRAPHER:   The time is

11   1:18.   We are back on the record.

12   EXAMINATION BY

13   MS. WAGSTAFF:

14        Q.    Dr. Neugut, I have a couple of

15   follow-up questions based on Mr. Lasker's

16   questioning of you this morning.

17             At the beginning of his questions

18   to you, there were a lot of questions that

19   related to the "power" -- "statistical

20   power" of certain studies.   Do you remember

21   that line of questioning?

22        A.    Yes.

23        Q.    Is "power" a technical term used

24   in -- by epidemiologists?

25        A.    Yes.

1    Q.    Can you please describe for the

2    judge and jury your meaning as an

3    epidemiologist of the term "power"?

4    A.    Power is whether a study is large

5    enough or has enough subjects to be able to

6    detect a given relative risk basically, so

7    it depends on what you think the relative

8    risk is going to be for a given association

9    between an exposure and an outcome.

10         So if you have a very large

11   relative risk, you can get by with a

12   smaller study.  If you have a -- if you are

13   looking for a modest relative risk, you

14   need a larger sample, sample size.  So

15   given that -- at least in our context with

16   glyphosate and NHL, we are talking about a

17   modest relative risk, so you would need a

18   fairly large study to be confident or to be

19   confident you would be able to, with a

20   given study, to be able to find the

21   relative risk, if it was there.  If it's

22   truly there.

23   Q.    So is it fair to say that "power"

24   in the epidemiology world relates to the

25   size of the study?

1     A.     Yes.

2     Q.     Is it possible to have a study

3  that is so powerful that it overcomes

4  particular flaws?

5           Stated another way, is power --

6  is the power of the study the most

7  important aspect of the study?

8     A.     No.  I mean, you can be

9  under-powered.  I mean, so if you -- again,

10 if you were looking for a modest risk and

11 you had a small study, then you would be --

12 you would have a poor study because you

13 wouldn't be able to find a small relative

14 risk.

15          But the real issue in a study is

16 its quality.  If a study sucks, it doesn't

17 matter how big the study is.  It -- the

18 quality of the study is what's paramount.

19          Even if the study is small, the

20 quality is what's most important in the

21 study.

22    Q.     So you could have a study that

23 had a million participants, but if it's

24 done poorly or the quality is bad, it's not

25 that helpful, is that correct?

1      A.     Sure.

2             MR. LASKER:  Objection to form.

3      Q.     I believe I wrote down when

4   Mr. Lasker asked you a question about the

5   2018 AHS study, I believe that the words

6   that you used were that that 2018 AHS study

7   was not contributory to your expert opinion

8   in this matter.  Is that the words that you

9   used?

10     A.     Yes.

11     Q.     Can you tell the judge and jury

12  what you mean by this study being

13  noncontributory to your opinion?

14     A.     So it my point was it was neither

15  positive nor negative or null.  The study

16  had so many flaws in my view that the

17  results are just not reliable enough to

18  contribute in a meaningful way to either

19  deciding that AHS -- that glyphosate and

20  NHL are either associated or not

21  associated.

22            Specifically, the discussion that

23  we had about misclassification error in the

24  first place about the way the

25  self-reporting was collected in the first

1   place and then the problem of the change,

2   the dramatic change in exposure to

3   glyphosate that took place after the

4   initial cohort was collected, so that

5   exacerbated the problem of exposure

6   assessment and then when the cohort had to

7   be reassessed because of that, then the

8   extreme loss to follow-up in the

9   reassessment of the cohort, 37 percent loss

10  of follow-up in a cohort study is a very

11  dramatic loss to follow-up you don't see

12  very often nowadays in a major cohort

13  study.  And that's a truly dramatic flaw in

14  the study.

15          And then the fact that we are

16  dealing with a modest association in the

17  first place which makes all of this a

18  problem.  If we were dealing with a

19  relative risk of 10, we could tolerate all

20  of these flaws and problems and all of

21  that.

22          As I said in my discussion,

23  epidemiology is very tolerant of error, but

24  if you combine all these errors and with a

25  modest association, together, the

1   cumulative effect is really to make really

2   to make the study fatally flawed and really

3   irreparable and that's why I think the

4   combination of all of these problems

5   together really makes the study

6   uninterpretable, particularly because it's

7   null.

8               When you get a positive

9   association, then you can be more --

10  particularly a strong association, then you

11  can be more confident about what you're

12  finding.  But a null finding is really very

13  much uninterpretable.

14              And that's why I think if you

15  actually read the paper, the authors are

16  totally focused on their one positive

17  finding, much more so, almost -- much more

18  so than on the null findings for all the

19  other cancers.  They're almost exclusive --

20  to a large part the paper focuses on their

21  one positive finding which who even knows

22  if it is, but that's what they really talk

23  about mostly.

24      Q.    So I think I just heard you say

25  that you -- it's your opinion that the

1    flaws that you've identified, which I

2    believe what you just said were a modest

3    risk ratio, the loss to follow-up, coupled

4    with the imputation, the change in

5    glyphosate use, and the misclassification

6    renders, combined, this paper to be fatally

7    flawed, is that what you said?

8              MR. LASKER:  Objection to form.

9         Objection to counsel giving testimony.

10        A.    Right, I mean, again, I don't

11   have a problem with imputation.  Imputation

12   is a way to -- is a common method of

13   dealing with loss to follow-up or other

14   problems of this sort.  But again, it's a

15   means of repairing a problem which we use

16   all the time.

17             It's just in combination with all

18   the other problems, it doesn't fully

19   correct -- it can't fully correct a flawed

20   study, and while I'm sure the authors are

21   going to use it or do use it for multiple

22   and will use it for multiple studies and

23   should, in the particular instance of

24   glyphosate and NHL, it's not going to be --

25   it's not adequate to fully compensate for

1    all the flaws that we just discussed.

2         Q.    OK, and Mr. Lasker, throughout

3    your deposition this morning, asked you

4    questions about the different tables in

5    Exhibit 25.1 which is the 2008 AHS study.

6              MR. LASKER:  I'm sorry, I made

7         a --

8              MS. WAGSTAFF:  I'm not going to

9         ask him anything specific.

10        Q.    Do you remember Mr. Lasker asking

11   you about the tables and the supplemental

12   tables that were printed online?

13        A.    Yes.

14        Q.    And the data in those tables, is

15   the data in those tables subject to the

16   same fatal flaws that you just described?

17        A.    Of course.

18        Q.    Mr. Lasker asked you if you would

19   turn to page 6 of your supplemental report.

20   Tell me when you're there.

21             MR. LASKER:  I've got it.

22        Q.    The bottom, the last sentence,

23   Mr. Lasker asked you about your cite to the

24   modest relative risk of 1.3 to 1.4 for

25   ever/never use.  Do you remember that line

1  of questioning by Mr. Lasker?

2      A.    Yes.  Yes.

3      Q.    Is a relative risk ratio of 1.3

4  to 1.4 an important risk?

5          MR. LASKER:  Objection to form.

6      A.    It can be, yes.

7      Q.    And in your scientific opinion,

8  does a relative risk of 1.3 to 1.4 support

9  a finding of causation?

10          MR. LASKER:  Objection to form.

11     A.    Yes.

12          MS. WAGSTAFF:  What was wrong

13     with that question?

14          MR. LASKER:  There is no

15     discussion of statistical significance,

16     confidence intervals, and it assumes

17     the relative risk of 1.3 to 1.4 that

18     doesn't exist.

19          MS. WAGSTAFF:  So I'm fine with

20     that.

21     Q.    Next, it talks about in that

22  sentence the ever/never use, do you see

23  that?  In page 6, the last words, page 6.

24  And just so the judge and the jury

25  understand a little bit about what that

1    means, when somebody does an ever/never

2    study, it the participants are grouped into

3    two categories, exposed and unexposed, is

4    that correct?

5        A.    Yes.

6        Q.    And am I correct in -- that

7    somebody who has been exposed for one day

8    to glyphosate is lumped in the same

9    category as someone who has been exposed

10   every single day, is that correct?

11       A.    Yes.

12       Q.    So the denominator in an

13   ever/never use for the exposed group

14   includes people that have been exposed one

15   day to glyphosate, is that right?

16            MR. LASKER:   Objection to form.

17       A.    I don't know if I used the word

18   "denominator," but the exposed group

19   includes people who have been exposed for

20   one day or more.

21       Q.    And in theory, in theory, that

22   might dilute the exposed group's risk

23   ratio, is that right?

24            MR. LASKER:   Objection to form.

25       A.    It would, in theory, yes.   It

1    would do that, yes.

2         Q.    And in fact, in an ever/never

3    analysis in the exposed group, due to this

4    dilution, one might miss an effect that is

5    truly there, is that correct?

6              MR. LASKER:  Last objection to

7         form.

8         A.    Theoretically, that's possible.

9         Q.    Earlier today, Mr. Lasker asked a

10   series of questions where he said, "'There

11   was no evidence' of dose response," or "'No

12   evidence' of an association between

13   glyphosate-based herbicides and NHL with

14   respect to the 2018 AHS study."

15             Do you remember that line of

16   questioning?

17        A.    Yes.

18        Q.    And your response was based on

19   the 2018 article, correct?

20             MR. LASKER:  Objection to form.

21        A.    Yes.

22        Q.    And the data contained within

23   that article, correct?

24        A.    Sure.

25        Q.    And we just described that the

Page 140

1    data in that article is subject to the same

2    fatal flaws that you have previously

3    testified to and that are in your report,

4    right?

5              MR. LASKER:  Objection to form.

6        A.    Correct.

7        Q.    Let's bring up the last report,

8    last study that Mr. Lasker showed to you,

9    the Heltshe -- how do you pronounce that

10   name?

11       A.    Heltshe.

12       Q.    Heltshe, bring up the Heltshe

13   study.

14             And Monsanto's attorney spent a

15   lot of time on this journal, asking you

16   questions.  Do you remember those

17   questions?

18             MR. LASKER:  Objection to form.

19       A.    Some of them.

20       Q.    So if you turn to page 410, table

21   1, Monsanto asked you to -- about the

22   numbers of the "mixed any pesticides" at

23   the top of the table.  Do you remember

24   that?

25             MR. LASKER:  Objection to form.

1  A. Yes.

2  MR. LASKER:  OK.  I didn't ask

3 about those numbers, but OK.

4  Q. The 8.-- 85.2 and the 82.82, do

5 you remember him asking you those

6 questions?

7  A. He actually asked about the

8 numbers in the abstract.

9  Q. OK.  But what he didn't ask about

10 was the specific glyphosate numbers,

11 correct?

12  A. Correct.

13  MR. LASKER:  Objection to form.

14  Q. And what are the specific --

15 actually, tell me the importance of looking

16 specifically at the glyphosate numbers with

17 respect to making a determination of

18 causation?

19  MR. LASKER:  I will object to the

20 entire line of questions with respect

21 to table 1.

22  A. We are talking about glyphosate

23 and NHL.  So obviously what we should be

24 addressing is glyphosate, not all

25 pesticides.

1          MS. WAGSTAFF:  Why are you

2     objecting?

3          MR. LASKER:  You are looking at

4     the wrong table.

5          MS. WAGSTAFF:  I know, but you

6     brought this article in and asked him

7     questions, so why are you objecting?

8          MR. LASKER:  I know.  The

9     questions were premised on my

10     questioning regarding table 1.  I

11     didn't ask any questions about table 1.

12     Q.    So again, what is the importance

13  of when there is data available for

14  glyphosate specifically, what is the

15  importance of considering that glyphosate-

16  specific data versus data relating to all

17  pesticides?

18     A.    Because we are talking about

19  glyphosate.  So obviously what's --

20  glyphosate is what's relevant, not all

21  pesticides.

22     Q.    So when you were asked questions

23  about the -- this article, you were not

24  asked about the glyphosate specific

25  numbers, is that correct?

1    A.    Right.

2          MR. LASKER:   Object to form.

3    Misstates the testimony.

4    Q.    And just to be clear, you're not

5    attacking the use of self-reporting or

6    imputation in general; rather, it's

7    specific to the facts of this case.  Do I

8    understand you correctly?

9          MR. LASKER:   Objection to form.

10   A.    Yes.  As Mr. Lasker said, both

11   self-reported questionnaires and imputation

12   are standard methodologies that are used by

13   all epidemiologists including myself in

14   most studies, many studies in epidemiology.

15          It's just that they have their

16   limitations, and in the proper context, one

17   has to be careful with their use.  And in

18   the particular context of this study, with

19   the, as I described earlier, with the

20   several flaws or problems here, the

21   problems become a cumulatively and

22   overwhelming issue and create what I

23   consider to be fatal flaws in our

24   interpretation of the outcomes of the

25   study.  So as to make it a basically an

1  uninterpretable study for the purposes of

2  this litigation.

3       Q.    So I understand and the judge and

4  jury understands correctly as well, if you

5  look at page 410, Mr. Lasker mentioned that

6  63 percent of the participants responded to

7  the first and second questionnaires.  Do

8  you remember that line of questioning?

9       A.    I guess, yes.

10      Q.    So said another way, 37 percent

11 did not respond.  Is that --

12      A.    Yes.

13      Q.    And it looks like in the first

14 full paragraph on page 410 on the text on

15 the left, I've got it highlighted right

16 here if you want to just see where it is.

17 It states that 37 percent in this

18 particular study equates to 20,968 people.

19 Is that correct?

20      A.    Yes.

21      Q.    So the authors were making

22 educated guesses on almost 21,000 people,

23 is that correct?

24           MR. LASKER:  Objection to form.

25      A.    Yes.

1    Q.    And they were making those

2    guesses during a time in which the

3    glyphosate use changed dramatically, is

4    that correct?

5              MR. LASKER:   Objection to form.

6    A.    Yes.

7    Q.    And has anything that you heard

8    today from Mr. Lasker changed your opinion

9    that you provided in your expert -- your

10   supplemental expert report?

11   A.    No.   I mean, the only thing I

12   would say is I did make an error in the

13   month -- my interpretation of the

14   Montgomery paper.   I didn't realize it was

15   the Phase 3 interview rather than the Phase

16   2, but it doesn't change the substance of

17   my -- what I was trying to elicit from that

18   paper which was that -- what were the

19   factors that predicted response or

20   nonresponse.

21             They are basically -- what I was

22   trying to get at in the Montgomery paper

23   was just to describe some factors which

24   predict response or nonresponse and the

25   fact that they were described for a

1    subsequent interview or survey is not, to

2    me, germane or critical.

3              MS. WAGSTAFF:   Thank you, Doctor.

4       No more questions.

5              THE WITNESS:   Thank you.

6              THE VIDEOGRAPHER:   The time is

7       1:38.  This is the conclusion of

8       today's deposition, January 3, 2018.

9

10                   _____

11                   ALFRED I. NEUGUT

12

13      Subscribed and sworn to

14      before me this   day

15      of          , 2018.

16

17      _____

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2      STATE OF NEW JERSEY )

                         )ss:

3      COUNTY OF UNION     )

4          I, MARY F. BOWMAN, a Registered

5      Professional Reporter, Certified

6      Realtime Reporter, and Notary Public

7      within and for the State of New Jersey,

8      do hereby certify:

9          That ALFRED I. NEUGUT, the

10     witness whose deposition is

11     hereinbefore set forth, was duly sworn

12     by me and that such deposition is a

13     true record of the testimony given by

14     such witness.

15         I further certify that I am not

16     related to any of the parties to this

17     action by blood or marriage and that I

18     am in no way interested in the outcome

19     of this matter.

20         In witness whereof, I have

21     hereunto set my hand this 3rd day of

22     January, 2018.

23

24     _____

              MARY F. BOWMAN, RPR, CRR

25

1                   * * *ERRATA SHEET* * *

2     NAME OF CASE:  In Re: RoundUp

3     DATE OF DEPOSITION:  1/3/18

4     NAME OF WITNESS:  ALFRED I. NEUGUT

5     Reason codes:

6          1. To clarify the record.
           2. To conform to the facts.

7          3. To correct transcription errors.

8     Page _____ Line _____ Reason_____
      From _____ to_____

9

10    Page _____ Line _____ Reason_____
      From _____ to_____

11

12    Page _____ Line _____ Reason_____
      From _____ to_____

13

14    Page _____ Line _____ Reason_____
      From _____ to_____

15

16    Page _____ Line _____ Reason_____
      From _____ to_____

17

18    Page _____ Line _____ Reason_____
      From _____ to_____

19

20    Page _____ Line _____ Reason_____
      From _____ to_____

21

22

23                  _____
                     ALFRED I. NEUGUT

24

25