# EXHIBIT 28

Page 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3    ----------------------------

                                 )

4    IN RE: ROUNDUP PRODUCTS      ) MDL  No. 2741

     LIABILITY LITIGATION         ) Case No. 16-md-02741-VC

5                                 )

     ----------------------------)

6                                 )

     This document relates to:    )

7                                 )

     ALL ACTIONS                  )

8                                 )

     ----------------------------

9

10

11

12

13

14

15        VIDEOTAPED DEPOSITION OF DR. CHADI NABHAN

16                 Rosemont, Illinois

17             Monday, January 15, 2018

18

19

20

21

22

23   Reported by:

24   PAULA CAMPBELL, CSR, RDR, CRR, CRC

25   JOB NO. 136021

1

2

3

4

5

6

7                        January 15, 2018

8                        8:53 A.M.

9

10

11           Videotaped discovery deposition of

12   DR. CHADI NABHAN, held at CROWNE PLAZA CHICAGO

13   O'HARE, 5440 North River Road, Rosemont,

14   Illinois, pursuant to notice before Paula

15   Campbell, CSR, RDR, CRR, CRC.

16

17

18

19

20

21

22

23

24

25

1    A P P E A R A N C E S:

2        THE MILLER FIRM

3        Attorneys for the Plaintiffs and the witness

4            180 Railroad Avenue

5            Orange, Virginia 22960

6        BY:   TIMOTHY LITZENBURG, ESQ.

7

8

9        HOLLINGSWORTH, LLP

10       Attorneys for the Defendant Monsanto Company

11           1350 I Street, N.W.

12           Washington, D.C. 20005

13       BY:   KIRBY T. GRIFFIS, ESQ.

14           STEPHANIE SALEK, ESQ.

15

16

17   ALSO PRESENT:

18           Robert Zellner, Videographer

19

20

21

22

23

24

25

Page 4

```
1   ---------------------- I N D E X ------------------
2
3   WITNESS                     EXAMINATION BY      PAGE
4   DR. CHADI NABHAN            MR. GRIFFIS       6, 113
5                               MR. LITZENBURG       111
6
7   ---------------------EXHIBITS---------------------
8                                           PAGE   LINE
9   Exhibit 29-1   Supplemental Report of      6      15
10                  Dr. Chadi Nabhan, M.D.,
11                  Pursuant to PTO N. 34
12                  and In Support of
13                  General Causation on
14                  Behalf of Plaintiffs
15  Exhibit 29-2   article entitled,          6      21
16                  "Glyphosate Use and
17                  Cancer Incidence in the
18                  Agricultural Health
19                  Study"
20  Exhibit 29-3   Monsanto Company's         7       3
21                  Notice to Take Oral and
22                  Videotaped Deposition of
23                  Dr. Chadi Nabhan
24  Exhibit 29-4   malathion monograph       92      23
25
```

1    VIDEOGRAPHER:  And good morning.  This is

2  the start of tape labeled number one of the

3  videotaped deposition of Dr. Chadi Nabhan taken

4  in the matter of In re: Roundup Products

5  Liability Litigation in the United States

6  District Court for the Northern District of

7  California, bearing Case Number 16-MD-02741-VC.

8    This deposition is being held at the Crowne

9  Plaza Chicago O'Hare Hotel, at 5440 North River

10  Road in Rosemont, Illinois, 60018, on Monday,

11  January 15th, 2018, at approximately 8:53 A.M.

12    My name is Robert Zellner from TSG

13  Reporting, Inc., and I am the legal video

14  specialist.  And the court reporter is Paula

15  Campbell, also in association with TSG

16  Reporting.

17    And will counsel please introduce

18  yourselves for the record.

19    MR. LITZENBURG:  Tim Litzenburg for the

20  plaintiff and the witness.

21    MR. GRIFFIS:  Kirby Griffis of

22  Hollingsworth, LLP, for Monsanto.

23    MS. SALEK:  Stephanie Salek from

24  Hollingsworth, LLP for Monsanto.

25    VIDEOGRAPHER:  Thank you.

1          And will the court reporter please swear in

2      the witness.

3          REPORTER:  Would you please raise your

4      right hand.

5    C H A D I   N A B H A N,

6      called as a witness, having been duly sworn,

7      was examined and testified as follows:

8    EXAMINATION

9    BY MR. GRIFFIS:

10     Q.  Good morning, sir.

11     A.  Good morning.

12     Q.  We've met one time, and that was at your

13   previous deposition; is that right?

14     A.  Correct.

15         (Exhibit 29-1 marked for identification.)

16     Q.  I have marked as Exhibit 1 -- and these

17   exhibits that I'm about to describe are in front of

18   you, sir -- Exhibit 1 your supplemental expert

19   report; correct?

20     A.  Correct.

21         (Exhibit 29-2 marked for identification.)

22     Q.  As Exhibit 2, an article by Andreotti and

23   others appearing in the Journal of the National

24   Cancer Institute in 2018 entitled "Glyphosate Use

25   and Cancer Incidence in the Agricultural Health

1    Study"; correct?

2         A.  Correct.

3             (Exhibit 29-3 marked for identification.)

4         Q.  And as Exhibit 3, the notice of this

5    deposition; correct?

6         A.  Correct.

7         Q.  Have you seen the notice of deposition

8    before, sir?

9         A.  I have.

10        Q.  It asks you to provide us with documents

11   that you have reviewed regarding glyphosate and

12   non-Hodgkin lymphoma, or either of those, since our

13   last deposition.

14            What have you brought in response to that,

15   sir?

16        A.  Actually, I don't have anything in print.

17   I've reviewed the paper, the -- that you have, which

18   is Exhibit 2.  I reviewed the editorial comment that

19   was written in the journal at the same time, written

20   by Elizabeth Ward, and I've refreshed my mind with

21   the previous papers that we discussed at the

22   previous deposition, specifically the DeRoos study

23   from 2005.  That's about it.

24            I have read some of the other depositions

25   that were done.  Dr. Neugut's deposition, I had a

1    chance to read that.  I read Dr. Jamison's

2    deposition as well, and I read two documents, one by

3    Dr. Ritz and one by Dr. Mucci that was provided to

4    me by counsel.

5         Q.  Those were expert reports?

6         A.  Yes.

7         Q.  Anything else, sir?

8         A.  No.

9         Q.  So you mentioned some previous papers, such

10   as DeRoos 2005, which we discussed at your prior

11   deposition.  Other than that, the only new things

12   that you have reviewed since your last deposition

13   concerning glyphosate and non-Hodgkin lymphoma or

14   glyphosate alone or non-Hodgkin lymphoma alone are

15   the Journal of National Cancer Institute's study

16   2018, the editorial comment by Elizabeth Ford [sic],

17   and depositions of Drs. Neugut and Jamison and

18   expert reports of Dr. Ritz and Mucci; is that

19   correct?

20        A.  Correct.

21        Q.  The publication that is Exhibit 2, sir, the

22   Journal of the National Cancer Institute 2018

23   publication, how did that come to your attention?

24        A.  I actually do get a table of contents for a

25   lot of the oncology-specific journals that I --

1   through my e-mail, and then it was also provided to

2   me by counsel.  But I have learned about it because

3   I have -- I get table of contents for about 20

4   journals that -- whenever something is -- is out

5   oncology related, I get notified.

6        Q.  When you received the table of contents

7   mentioning this article, did you retrieve it and

8   read it then?

9        A.  Not all of the journals I can get the

10  actual full article.  I get the abstracts usually,

11  so I wasn't able to immediately retrieve it, but

12  then subsequently I did.

13       Q.  How long did you spend reviewing this

14  article?

15       A.  I did not keep track of the number of

16  hours.  I would say maybe about two hours, give and

17  take.

18       Q.  And did you -- you know, we discussed at

19  your last deposition at some length your methodology

20  and your process for evaluating scientific

21  literature.

22            Did you apply the same process and

23  methodology in reviewing this article that you

24  applied previously in reviewing scientific

25  literature about glyphosate and non-Hodgkin

1  lymphoma?

2       A.  Of course.

3       Q.  And how would you describe the process that

4  you used to weigh this new study in forming opinions

5  about glyphosate causation?

6       A.  I'm not sure I understand the question.

7  How do I describe the process?

8       Q.  Yes.

9       A.  It's similar to the process I apply to any

10 scientific article with -- that I have an interest

11 in.  I read the paper.  I try to understand the

12 conclusions, and try to understand what

13 methodologies were applied to each of these

14 conclusions, and I form an opinion.

15      Q.  How informative do you consider the 2018

16 National Cancer Institute study to be with regard to

17 the issue of whether glyphosate-containing

18 substances can cause non-Hodgkin lymphoma?

19      A.  Well, I always applaud any study that

20 provides long-term follow-ups.  I mean, I think this

21 is really critical in oncology and in the

22 literature.  There are many studies that usually are

23 done, and you actually don't get any updated

24 literature and so forth.  But it did not add

25 anything that -- rather unusual or did not really

1   change anything pertaining to the body of

2   literature, but it's good that there is a longer

3   follow-up.  I applaud the authors for doing so.

4        Q.  So there was a previous article that we

5   talked about, the DeRoos 2005 study --

6        A.  Correct.

7        Q.  -- which reflected the early report of data

8   from the same set of data; correct?

9        A.  Correct.

10        Q.  And this is the follow-up that you were

11   just referring to; correct?

12        A.  Yeah.  This is the follow-up, and as I

13   said, I always applaud and I enjoy the fact that

14   authors and scientists look at follow-up data

15   because there is much in the literature where you

16   don't see a lot of follow-up.  And I believe there

17   would be additional papers, follow-up on the AHS.

18   It is ongoing, so I don't believe this would be the

19   last paper coming out.

20        Q.  You know that the -- there are multiple

21   publications from this same set of data on issues

22   other than glyphosate and non-Hodgkin lymphoma;

23   correct?

24        A.  Yes, I'm aware of that.

25        Q.  Do you consider the National Cancer

1   Institute 2018 study to be an improvement and an

2   expansion on the DeRoos 2005 data?

3        A.   It's an expansion because it reports on

4   longer follow-up and additional cases that have been

5   reported, as you are -- well know.  You can't really

6   improve on it because the study is what the study

7   is.  It's been designed in the '90s, and you can't

8   improve on a study design.  I have a lot of

9   reservations about the study design that was done.

10  So you can't improve on that.  It's already done.

11       Q.   In -- as a piece of evidence that you are

12  weighing in deciding whether glyphosate-containing

13  substances can cause non-Hodgkin lymphoma, do you

14  give more weight to the NCI 2018 study or to the

15  DeRoos 2005 study?

16       A.   I would give more weight to the NC -- the

17  JNCI article, because it is obviously longer

18  follow-up and there are more cases, so I think it

19  makes sense to take the data that is coming in this

20  article as an update, and it has more weight because

21  there are more cases.

22       Q.   And in what ways does the 2018 NCI data

23  improve on the data from 2005?

24       A.   Longer follow-up.  The longer follow-up and

25  the additional cases that have been reported.

1   That's pretty much it.

2        Q.  You would agree that this is a piece of

3   evidence that weighs against causation; correct?

4        A.  It is a piece of evidence that suggests no

5   causation between glyphosate and non-Hodgkin

6   lymphoma, which I don't agree with.

7        Q.  So you agree that it is a piece of evidence

8   against causation, but you disagree overall with

9   that conclusion that there is no causation; is that

10  accurate?

11       A.  I do disagree with the conclusion, yes.

12       Q.  And the rest of what I said is accurate as

13  well; correct?

14       A.  Yes.

15       Q.  As a piece of evidence against a causal

16  connection between glyphosate-containing substances

17  and non-Hodgkin lymphoma, how much does this weaken

18  your original opinion stated in your original expert

19  report that glyphosate causes non-Hodgkin lymphoma?

20       A.  It does not weaken it at all.

21       Q.  Why doesn't it weaken it at all?

22       A.  It doesn't add any information.  It just

23  adds longer follow-up to a previously done study.

24  It provides no additional scientific information of

25  substance.

1    Q.  Okay.  Could you explain, please, what you

2  mean by "adding no additional scientific

3  information" between the DeRoos 2005 data and the

4  NCI 2018 data?

5    A.  So the JNCI paper basically adds longer

6  follow-up.  So the follow-up now is through 2012 for

7  North Carolina and 2013 for Iowa.  So that's really

8  what it adds.  And it is rather predictable and

9  expected with longer follow-up you will have more

10  cases reported of cancer in general, non-Hodgkin

11  lymphoma.

12         That's really all what this study adds.  It

13  doesn't change the way the study was designed, it

14  doesn't change the drop of follow-up questionnaires,

15  it doesn't change the fundamental flaws that exist

16  in the Agricultural Health Study that were present

17  previously in the DeRoos study.

18    Q.  I'm just trying to understand fully the

19  difference between your statement that this -- this

20  has more weight than DeRoos 2005, given the

21  additional follow-up, but adds nothing of scientific

22  value.  Could you explain what you mean, please?

23    A.  What I mean by "more weight" is when you

24  have a longer follow-up study or you have additional

25  study that reports on the actual trial itself, you

1   will take the output or you would take the results

2   of the latest follow-up, and it -- basically, you

3   don't need to go back and take a look at DeRoos any

4   longer.

5           In other words, in the future, as we

6   continue to evaluate the Agricultural Health Study,

7   nobody's going, in my opinion, to go back and take a

8   look at DeRoos study any more in 2005.  Why would

9   they?  We have now an update in 2018, so that

10  becomes the benchmark at which you compare future

11  updates against.  That's what I mean.

12      Q.  Okay.  In your opinion, is this study so

13  flawed -- I know we'll be talking about some of the

14  flaws that you believe exist in the study later --

15  is it so flawed that it isn't of any value in

16  assessing whether glyphosate-containing substances

17  can cause non-Hodgkin lymphoma?

18      A.  Well, it really depends how you define

19  "value."  I believe anything in the literature does

20  bring some kind of value, and I think we -- we just

21  have to take this in the context of other

22  epidemiologic evidence and other body of literature

23  that exists.  I don't dismiss anything that is

24  published that is being peer reviewed and out in the

25  literature.  I may not agree with all the

1    conclusions, but I don't dismiss it.

2        Q.  What information, data, or conclusions in

3    the NCI 2018 study do you consider to be reliable?

4        A.  As I said, the -- the way the Agricultural

5    Health Study has been set to look at the incidence

6    of cancer and pesticides, including glyphosate, and

7    from these cancers, non-Hodgkin lymphoma, has been

8    established several decades ago.  So that's not

9    going to change, the way the study is designed and

10   the way the study is conducted.  All what we are

11   going to see is additional follow-up and additional

12   cases and additional things that are reported with

13   longer follow-up.

14            So what the JNCI paper adds is that, with

15   longer follow-up, this is what we have seen in terms

16   of additional cases, and the conclusions of this

17   particular paper mirrors the conclusions of the

18   DeRoos paper.  There are no really differences in

19   conclusions, the way I read this paper.  Basically,

20   the conclusions of this paper are rather similar to

21   the conclusions of the 2005 paper.

22       Q.  What size epidemiological study would it

23   take to shake your conviction that

24   glyphosate-containing substances cause non-Hodgkin

25   lymphoma?

1      MR. LITZENBURG:  Objection to form.

2      A.  So there is no such a thing.  You actually

3  have to define this a priori.  Prior to designing

4  the study, you have to decide, what -- what am I

5  looking for, how do I design the study, what are the

6  number of subjects I'm actually looking at, what's

7  the power of the study, et cetera, and you make that

8  decision.

9           I'm not an epidemiologist or a

10  statistician, but you don't make these decisions

11  actually after the fact.  You actually make these

12  decisions in the process when you design a study.

13  BY MR. GRIFFIS:

14      Q.  Well, you came to this after the fact.

15      A.  Right.

16      Q.  You are not an epidemiologist.  You weren't

17  designing a study.  You were looking at studies that

18  had been published, and you came to a conclusion,

19  without knowing about this because it didn't exist

20  yet, that glyphosate caused non-Hodgkin lymphoma;

21  correct?

22      A.  Correct.

23      Q.  What size new epidemiology study would it

24  take to shake your conviction?

25      A.  Well, at this point, nothing would shake my

1  conviction because, you know, short of doing the

2  randomized control trials where you expose some

3  subjects to glyphosate and others to no glyphosate

4  and demonstrate that the subjects who received

5  glyphosate do not have non-Hodgkin lymphoma, similar

6  to the folks who don't receive glyphosate, and

7  that's obviously a trial that cannot and should not

8  be performed.

9          So the body of evidence so far that I have

10 reviewed is convincing that there is a causation and

11 an association between glyphosate and non-Hodgkin

12 lymphoma.  This is an update of a previously

13 published trial in 2005 that I have took under full

14 consideration when I reviewed the body of literature

15 before.

16     Q.  So it's your view that this is something

17 that you have previously -- essentially this is

18 something that you have previously considered since

19 it's an expansion of data from an article that you

20 previously considered; is that fair?

21     A.  That is correct.

22     Q.  Turn to Exhibit 2, sir, which is the

23 National Cancer Institute 2018 study.  I want to ask

24 you about some specific things therein.

25          First, I'm in the abstract, the

Page 19

1  conclusions.  Do you see that?

2      A.  I do.

3      Q.  "In this large, prospective cohort study,

4  no association was apparent between glyphosate and

5  any solid tumors or lymphoid malignancies overall,

6  including NHL and its subtypes."

7          Did I read that right?

8      A.  You did.

9      Q.  And that was -- that accurately reports

10  what they found in the NCI 2018 study; correct?

11      A.  That reports their conclusions, correct.

12      Q.  Page 5, sir, first sentence under the

13  "Discussion" section:  "In this updated evaluation

14  of glyphosate use and cancer risk in a large

15  prospective study of pesticide applicators, we

16  observed no associations between glyphosate use and

17  overall cancer risk or with total

18  lymphohematopoietic cancers, including NHL and

19  multiple myeloma."

20          I read that correctly?

21      A.  You read it correctly.

22      Q.  And that accurately describes the findings

23  of the NCI 2018 study; correct?

24      A.  Of the authors who published in the JNCI

25  paper.

Page 20

1      Q.   On Page 7, sir.

2      A.   Okay.

3      Q.   Let's go to the last paragraph, "In

4    conclusion, we found no evidence of an association

5    between glyphosate use and risk of any solid tumors

6    or lymphoid malignancies, including NHL and its

7    subtypes."

8           As we discussed, that accurately describes

9    the conclusions of the NCI 2018 study; correct?

10     A.   That accurately describes the conclusions

11   that you just read, yes.

12     Q.   You read the deposition of Dr. Neugut, you

13   said?

14     A.   I did.

15     Q.   Do you agree with Dr. Neugut that -- and

16   Dr. Neugut is an epidemiology expert that has been

17   named by the plaintiffs; correct?

18     A.   Yes, he is.

19     Q.   You agree with him that the Journal of the

20   National Cancer Institute is one of the most highly

21   respected journals in the world?

22          MR. LITZENBURG:   Object to form.

23     A.   I -- I actually don't think that JNC -- I

24   mean, it's a good journal.  I don't think it's one

25   of the most highly respected journals in the world.

1    I think there are a lot of papers that get published
2    there that I have problems with, but it does have a
3    high impact factor, and it's definitely one of the
4    very good oncology journals that we view highly.  I
5    think "in the world" is stretching it.
6    BY MR. GRIFFIS:
7        Q.  You do -- do you agree with Dr. Neugut that
8    the Journal of the National Cancer Institute's
9    impact factor is routinely among the top 5 percent
10   of all oncology journals in the world?
11           MR. LITZENBURG:  Object to form.
12       A.  In oncology.
13   BY MR. GRIFFIS:
14       Q.  You agree with that?
15       A.  It is in the top -- I actually don't have
16   the actual -- I will have to look it up.  I'm not
17   sure top 5 percent, top 10 percent, but it has a
18   high impact factor.  I don't want to state
19   mistakenly what it is.  I would need to search and
20   see what the top 5 percent.  I'm sure it's in the
21   public domain.
22       Q.  The peer reviewers of the JNCI apply a
23   rigorous peer review; correct?
24       A.  I think peer reviewers for every journal
25   should apply rigorous peer review, whether it's JNCI

Page 22

1    or other papers.

2        Q.  And JNCI has a reputation for rigorous peer

3    review like other top journals; right?

4        A.  I don't know what peer review process they

5    have.  I don't peer review for them.  I peer review

6    for other journals, but I'm not sure what the peer

7    review process that exists at the JNCI.

8        Q.  You haven't been asked to peer review for

9    JNCI?

10       A.  I'm not a peer reviewer for JNCI, no.

11       Q.  Take a look at the authors for Exhibit 2,

12   sir.

13       A.  Sure.

14       Q.  And you see that under the listing of

15   authors there is "Affiliation of authors"?

16       A.  I see that, yes.

17       Q.  And by using their -- by designating them

18   with initials, they show which branches and

19   subbranches of the National Cancer Institute a

20   number of the authors belong to.

21           Do you see that?

22       A.  I see that.

23       Q.  And do you see that one, two, three, four,

24   five, six, seven, eight of the authors work at the

25   National Cancer Institute?

1    A.  I haven't counted.  I'll take your word for

2    it.  I'm -- I'm sure you did, one, two, three, four,

3    five, six at the Occupational and Environmental

4    Epidemiology Branch, and that's six, and then seven

5    is the Division of Statistics at the NCI.  I think

6    seven, as you said -- you said seven?

7    Q.  And then formerly of Occupational and

8    Environmental Epidemiology Branch, over on the next

9    line, Michael Alavanjas, who is deceased, which is

10   why is formerly.

11   A.  Okay.

12   Q.  Division of Cancer Epidemiology and

13   Genetics, National Cancer Institute, so those eight

14   are National Cancer Institute employees or former

15   employees due to deceased?

16   A.  Okay.  I mean, do you want me to count

17   them?  I'm fine.  It could be seven, it could be

18   eight.  I see the majority of the authors are

19   affiliated with the National Cancer Institute.

20   Q.  And then two more are with the National

21   Institutes of Health, a epidemiology branch,

22   National Institute of Environmental Health Sciences

23   at the National Institutes of Health?

24   A.  I see that, yes, DPS and CGP.

25   Q.  And then the remaining two with the

1   Department of Epidemiology at the University of

2   Iowa.

3        A.   And Public Health in Philadelphia.

4        Q.   And Public Health in Philadelphia

5   respectively; correct?

6        A.   Correct.

7        Q.   The bottom line of the first page, sir,

8   says, "Published by Oxford University Press 2017.

9   This work is written by U.S. Government employees

10  and is in the public domain in the U.S."  Correct?

11       A.   Yes, correct.

12       Q.   There are no industry authors or

13  affiliations for this study; correct?

14       A.   There are no industry authors or

15  affiliations.  I have not looked at any conflict of

16  interest of these authors, but I'm not aware of any.

17       Q.   At the end, sir, there is a statement about

18  funding; correct?

19       A.   What page?

20       Q.   It's Page 7.

21       A.   Yeah, I see that.

22       Q.   "This work was supported by the Intramural

23  Research Program of the National Institutes of

24  Health, National Cancer Institute, Division of

25  Cancer Epidemiology and Genetics, National Institute

1  of Environmental Health Science, the Iowa Cancer

2  Registry, and Iowa's Holden Comprehensive Cancer

3  Center, as well as the NIEHS-funded Environmental

4  Health Sciences Research Center at the University of

5  Iowa."  Correct?

6       A.  Correct.

7       Q.  So it's all government funding, mostly

8  federal government funding, to the National

9  Institutes of Health; correct?

10      A.  Yes, this information is not new.  I mean,

11 this has been the case since the inception of the

12 Agricultural Health Study.  There's nothing new

13 here.

14      Q.  Do you agree that National Institutes of

15 Health funding means that high standards and best

16 practices are used to ensure that the data is

17 accurate?

18      A.  It doesn't ensure the data is accurate.  It

19 just basically -- all what it does, it provides

20 funding for a study that the NIH views important.

21 You don't know what data you will generate from the

22 funding, because when you fund a study, you don't

23 really know what you are going to come with the

24 study.  You just decide on funding the study upon

25 its inception, because you view it important in the

1    public domain.

2           And that's what the NCI and the NIH did.

3    They funded the study and -- because of interests,

4    obviously, to the general public.

5        Q.  Have you had an NIH-funded study before?

6        A.  No, I'm not a basic scientist.  They do

7    more for basic science.

8        Q.  I'm going to ask the question again,

9    because I think you focused on the conclusions and

10   whether the conclusions are accurate.

11       A.  Sure.

12       Q.  My question is this, sir:  Do you agree

13   that NIH funding -- and perhaps you don't know, but

14   do you agree that NIH funding means that high

15   standards and best practices are used to ensure that

16   data is accurate?

17       A.  Yes.

18       Q.  We talked -- the -- let's talk for a moment

19   about peer review with regard to this study, sir.

20           Peer review -- this went through a peer

21   review process, which means that it has been

22   reviewed by experts in the field in order to be

23   accepted for publication; correct?

24       A.  Yes.

25       Q.  The authors that we just reviewed are

1   themselves epidemiology experts, and this would have

2   been reviewed by peers who understand epidemiology

3   as well; correct?

4       A.  I presume so.  I'm not really sure who

5   reviewed the paper.  I think it's -- again, we just

6   don't know who reviewed it, but your presumption is

7   probably accurate, that it will be sent to folks who

8   understand the field, but we just don't know really

9   who peer reviewed it.

10      Q.  The body of evidence was robust enough that

11  it was accepted by the peer reviewers, whoever they

12  were; correct?

13      A.  So acceptance of papers in the literature

14  does not always necessarily reflect that the paper

15  has no flaws or has -- or the body of evidence is

16  irrefutable.  There are many journals and many

17  articles.

18          So what this means, when a paper like this

19  is accepted in the JNCI, it means that the reviewers

20  that reviewed this paper found merit that it -- it

21  is worthy of publication in the JNCI.  That's really

22  all that means.

23      Q.  You would agree that the body of evidence

24  was robust enough that the peer reviewers accepted

25  it for publication?

1    A.  It was compelling to the peers that

2  reviewed this paper that they wanted this to be

3  published.  That's what you can tell from a peer

4  review process.

5    Q.  By the way, do you know -- we had some

6  discussion at your prior deposition about the IARC

7  Monograph being published in the Lancet.  Do you

8  know if IARC Monographs, when they're published in

9  Lancet are published there just by arrangement

10  automatically or if there is actually a peer

11  reviewed process first?

12    A.  I don't know, but I believe there is

13  actually a peer review.

14    Q.  Based on --

15    A.  I don't -- I don't think there is any paper

16  that gets into Lancet without peer review.

17    Q.  And what --

18    A.  I review for Lancet Haematology, and I'm

19  not aware -- I mean, the Lancet -- there's no -- to

20  my knowledge, there is no paper that gets published

21  in any of these journals without a review, JNCI or

22  Lancet or Lancet Oncology or whatever it is.  All of

23  these are peer review.  And I'm a peer reviewer for

24  Lancet Haematology, so I know for a fact that all of

25  these things get reviewed.

1          Whether there's an arrangement between --

2    you know, you could say the same for this, whether

3    there's an arrangement between these authors and the

4    JNCI where you expedite things and just get

5    published and just do a peer review, which is not

6    the same peer review that you would do for other

7    papers, I'm not aware.  I don't think we need to

8    speculate that.

9         Q.  Okay.

10        A.  We don't know.

11        Q.  So just to be clear, you don't know whether

12   IARC has an arrangement with Lancet that their

13   publications are deemed peer reviewed internally and

14   don't go through an additional Lancet peer review?

15        A.  What I have said is I don't believe any

16   paper gets published in Lancet without being

17   subjected to a peer review.  That's what I' said.

18        Q.  But the basis -- okay.  But the basis for

19   that is not inside knowledge about the Lancet's peer

20   review process or their arrangements with IARC?

21        A.  The basis of that, that any journal out

22   there usually have this as a particular standard.

23   There's no reason to believe that the Lancet would

24   deviate from the standard.

25          You know, when you look at the JNCI paper,

1   for example, just to give you just an example, the

2   paper was received for the first time on

3   August 22nd, 2017, when you look at the bottom.  It

4   was revised less than four weeks later.  And as a

5   peer reviewer for over 12 journals, for a journal

6   like the JNCI to have this reviewed and peer

7   reviewed and submitted back in less than four weeks

8   is rather unusual for a rigorous peer review, and

9   then it was accepted within two weeks on

10  October 6th, 2017.

11          So I don't know how rigorous the peer

12  review was here, but I can tell from you a Lancet

13  perspective, it's very rigorous, and it's very

14  difficult to get a paper in Lancet.  The same should

15  apply for JNCI, but I don't know what kind of

16  arrangement was here for a paper to be published in

17  less than four weeks that has thousands of cases and

18  so forth.  So I don't know.

19      Q.  You would be equally skeptical if the

20  Lancet publication was that fast or faster; right?

21      A.  I think if I'm going to put my skepticism

22  hat, I could be skeptical about any paper, when I

23  usually look at the received and revised.  But I

24  would maintain the hope that all of these journals,

25  JNCI, Lancet, and all of them, maintain the peer

1   review process, the rigorous process, because if I'm

2   going to wear my skepticism hat, I would be skeptic

3   about this one as well, in terms of peer review, and

4   I'm -- I'm not going to go there, because I believe

5   this was peer reviewed and the other one was peer

6   reviewed.

7        Q.  So you're not going to wear your skeptic

8   hat for either one of them?

9        A.  No, I won't.

10        Q.  When they did the peer review of the NCI

11   2018 paper, the peer reviewers would have actually

12   looked at the hypothesis being explored; correct?

13        A.  Yes, of course.

14        Q.  And they would have looked at whether the

15   authors were free of bias; correct?

16        A.  Well, that's actually a tough thing, to be

17   honest.  And, again, as -- as somebody who does a

18   lot of peer reviews, you know, all what you can look

19   at is the declared conflict of interest, and, you

20   know, oftentimes, you know, it's really tough to

21   know all of these conflicts.  But we try not to take

22   it into consideration when we review the papers.

23             And I can tell you, I've advocated for

24   years that peer review should be blinded to the

25   reviewers and the authors.  I actually think that

1    any paper that gets submitted for peer review, you

2    should not know who wrote it or the affiliations of

3    the authors.  So as a peer then, when you look at

4    the paper, you don't get biased by, oh, this person

5    is from a prestigious place and this name is great,

6    so it must be a good paper.

7          But this is not the way things are going,

8    so right now you get access for the most part to the

9    authors' names and affiliations and so forth.

10         So whatever these authors declared in their

11   conflict of interest is usually available for the

12   peers to look at and make their own decision.

13      Q.  Do they -- do peer reviewers look at

14   whether the authors are free of bias?

15      A.  When I peer review, I usually do.  I'm not

16   sure -- I don't know whether the peers that reviewed

17   this paper did.  I don't know.  I don't know who

18   reviewed it.

19      Q.  Do peer review -- do the peer -- would the

20   peer reviewers of JNCI have looked at whether the

21   conclusions were actually supported by the evidence

22   that was provided?

23      A.  Again, I don't know what they looked at.

24   It's hard for me to speculate what the peer -- what

25   the peers that reviewed this paper, who I don't know

1   who they are, what they looked at and how they

2   reached the conclusion of publishing or rejecting or

3   revising it and so forth.  I don't know who they

4   are.  I don't know what the process that they

5   implemented.  I did not review the paper, and I

6   don't know who reviewed it.

7        Q.  Okay.  Let me read you your testimony

8   regarding the Lancet peer review of the IARC

9   Monograph.

10       A.  Sure.

11       Q.  And tell me if you think that it applies to

12   this peer review as well.

13       A.  Go ahead.

14       Q.  "So when you do a peer review, you actually

15   have to look at the hypothesis, whether the

16   methodology is sound, whether the authors were free

17   of bias, and whether their conclusions actually were

18   supported by the evidence that they provide."

19           That's your testimony regarding the Lancet

20   peer review of the IARC Monograph.  Does that apply

21   just as well?

22       A.  That should be the case for any peer review

23   for any journal, whether it's Lancet, JNCI, JCO.

24   What -- what --

25       Q.  That should you apply just as well to

1  Exhibit 2, the JNCI 2018 study; correct?

2      A.  It should apply, yes, but what you asked

3  me, did it apply, and I said I don't know.  But it

4  should apply for any peer review process.  I agree

5  with that hundred percent.

6      Q.  So it should apply, but you don't know if

7  it did apply to JNCI.  You also don't know if it did

8  apply to Lancet; right?

9      A.  Absolutely.  But, I mean, again, like I

10 said, I'm trying not to wear my skepticism hat here,

11 and I would believe that, for the most part, these

12 papers get reviewed, and the reviewers, if they find

13 merit to the publication, they will accept.  If they

14 don't, they will reject.  And that's really all what

15 we can say.  We just don't know who they are and how

16 rigorous their review process was.

17     Q.  Had you been asked to peer review this

18 paper, would you have passed it for publication?

19     A.  Yes.  It would be a conflict of interest.

20 Yes, I would have not reviewed.

21     Q.  Let's say you had no conflict of interest.

22 Would you have approved it for publication?

23     A.  I mean, I think this would be published

24 somewhere.  Every paper has a journal, and every

25 journal has to have papers.  It's a matter whether

1  you think this is a JNCI or a JCO or some other less

2  specialized type of paper, because to me this is a

3  follow-up data on a previous study.

4        So, yes, I think the follow-up should be

5  published.  I'm -- I would be very supportive -- I

6  would have approved it for publication.

7        The question that I usually look at,

8  whether this type of paper should be published in a

9  journal like the JNCI, because the JNCI has a little

10  broader spectrum in terms of the audience, or maybe

11  a more specialized journal, like more of a specific

12  epidemiology journal, specific environmental type of

13  journal.  That would be the thing I would have had

14  to think about when deciding, but I do believe it

15  should be published, absolutely.  With this long

16  follow-up, I think it should be published.

17    Q.  Would you have approved it for publication

18  in JNCI?

19    A.  The thing that -- the reason I don't know

20  how to answer this because I -- you know, for the

21  journals that I review for, I know exactly a priori

22  the type of papers that they want, so I think the

23  JNCI would tell usually the reviewers that we want

24  papers that are in the top 25 percent or top

25  20 percent or top 10 percent.  So they usually let

1   us know how -- how powerful the paper they want in

2   order for us to approve it.

3          They also -- most journals will tell you

4   what the audience that they want.  So for some of

5   the journals I review for, they say, we want this to

6   apply for the general medical audience, not just

7   oncologists, not just epidemiologists.  So if you

8   are a primary care physician you would be

9   interested.  And other journals say, we want

10  something that is practice changing, something

11  fundamental.

12         So you will have to know, you know, from

13  the editor in chief usually and the editorial board

14  what they are looking for, and if that's what they

15  are looking for, I see no reason for it not to be

16  published in the JNCI.  I would have approved it.

17    Q.   Okay.  So I'm just going back to the

18  standards for peer review.  You were talking about

19  you being a peer reviewer at your last deposition

20  and the standards that should be applied, you don't

21  know if they were applied by particular peer

22  reviews, but presumably you follow your own

23  standards in peer review?

24    A.   Yeah, sure.

25    Q.   So in saying that this should be approved

1   for publication, you actually looked at the

2   hypothesis, at whether the authors were free of

3   bias, and whether their conclusions actually were

4   supported by the evidence that they provide;

5   correct?

6        A.   Yes, I would look at that.  I mean, just

7   because the study is negative, it doesn't -- and I

8   disagree with the conclusion, it doesn't mean I'm

9   going to say it can't be published.  I -- I think

10  it's a very good to have a healthy debate.  It's

11  fine.

12       Q.   Yes, sir.  And you have reviewed it, and

13  you agree that the hypothesis is sound, the authors

14  are free of bias, and the conclusions are supported

15  by the evidence provided; correct?

16       A.   I never said the hypothesis is sound.  In

17  fact, I said there are so many flaws in this study

18  that did not really change just because you have a

19  longer follow-up.  But all I said is, with longer

20  follow-up, it is appropriate to report on additional

21  public and additional data and so forth.

22            The hypothesis, as it was present in the

23  DeRoos study, remains the same hypothesis in the --

24  all what this is is just an update.  I mean, all

25  what this is is an update of a previously flawed

1    study.  That's what you did.

2        Q.  Do you --

3        A.  Just --

4        Q.  Do you agree or disagree, sir, that the

5    conclusions given in the NCI 2018 study are

6    supported by the evidence provided?

7        A.  The authors' conclusions are supported by

8    the evidence that they actually showed.  The

9    evidence has a lot of flaws, and subsequently the

10   conclusions will have a lot of problems.  But, yes,

11   their conclusions is supported by the evidence that

12   they evaluated.

13       Q.  Looking at Exhibit 1, sir, your

14   supplemental expert report.

15       A.  Okay.

16       Q.  In the first sentence of the analysis --

17   you have an introductory paragraph, which I'm

18   omitting -- the first sentence of your analysis, you

19   write, "I have read and analyzed this publication,

20   and my overall opinion remains unchanged."  Correct?

21       A.  Correct.

22       Q.  Did your reading an analysis of this

23   publication, was that as in depth as it would be for

24   a peer review?

25       A.  Of course.  I don't have to make the

1   decision whether it's accepted or rejected.  It's

2   already published.

3          Q.  But the process that you went through in

4   reading and analyzing it was as thorough as the

5   process that you would go through in reviewing a

6   draft for a publication; is that right?

7          A.  Yes, similar and similar to the body of

8   literature I reviewed that we discussed in my

9   previous deposition.

10          Q.  You say, "There are several flaws in this

11   study that challenges the recent conclusions stated

12   by Andreotti, et al."  Correct?

13          A.  It should have been "challenge," but, yes,

14   that is it.

15          Q.  And this is the complete list of flaws that

16   you believe exist in this study; correct?

17          A.  As I was able to discern.

18          Q.  You don't have any other in mind right now;

19   right?

20          A.  Not at this point.

21          Q.  Okay.  We'll run through them, and then we

22   will talk about them.

23              The first one was that the study was

24   restricted to two states, North Carolina and Iowa,

25   not representing other states; correct?

1       A.   That's correct.

2       Q.   "Second, the study essentially ended in

3   2001, not accounting for the more expanded and

4   increased use of glyphosate after that year."

5   correct?

6       A.   Correct.

7       Q.   "Third, and most importantly," you write,

8   "significant dropout rate in study participants

9   where follow-up and full interviews were completed

10  for only 63 percent of individuals."  Correct?

11      A.   Correct.

12      Q.   "Additionally, the AHS study relied on

13  self-reporting, which certainly resulted in some

14  additional misclassification of exposure/use."

15  Correct?

16      A.   Correct.

17      Q.   And "Lastly, in the authors' own admission,

18  there was an increased risk of multiple myeloma with

19  glyphosate exposure."  Correct?

20      A.   Correct, and acute leukemia as well.

21      Q.   And the last one isn't a flaw in the study;

22  correct?

23      A.   Say again?  I'm sorry.

24      Q.   You don't consider the last one to be a

25  methodological flaw in the study; correct?

1    A.   It's not a methodological flaw, no.

2    Q.   It is instead a point in favor of

3  glyphosate-containing substances causing some type

4  of cancer; right?

5    A.   Correct.

6    Q.   As far as the one that you have identified

7  as most important, the significant dropout rate,

8  would you please explain why you consider that to be

9  a flaw?

10    A.   You basically have missing data for

11  40 percent -- almost 40 percent of individuals.  I

12  mean, so -- I mean, it's very difficult, rather

13  impossible, to make a sound conclusion on a study

14  that was powered with the assumption that you need

15  to have all of these patients enrolled and

16  reporting, and then 40 percent you don't have enough

17  information on.

18         So it's very difficult for me, as I sit

19  here, to figure out, how would you actually reach a

20  conclusion when you don't have information -- proper

21  information for -- for that many patients.

22    Q.   Do you know the process that was used to

23  address that issue?

24    A.   When I looked at the paper, they talked

25  about, you know, imputation of data, which, again,

1  I'm not an epidemiologist, but I don't believe that

2  this is an appropriate way of -- you're simply

3  guessing, I mean, pretty much.  Imputation, to me,

4  is you're trying to guess the data on 40 percent,

5  almost 40 percent of folks we don't have information

6  on.  That's really what it is.  It's just a fancier

7  word for statistics -- statisticians to use who are

8  doing imputation of data.

9           But at the end of the day, you're really

10 guessing, and you're trying to fill in the blanks.

11 And maybe if you're filling the blanks for

12 5 percent, 7 percent of the folks that you did not

13 have a follow-up, I would be tolerant of that.  But

14 when you're close to 40 percent, that's really

15 stretching it.

16          So whatever methodology, imputation, not

17 imputation, it doesn't matter to me.  If you have

18 40 percent that you are missing, and you are trying

19 to fill in the blanks, it's just not going to

20 resonate with me as a scientist and as a lymphoma

21 specialist.

22     Q.  And you believe that the conclusions of the

23 NCI 2018 study irrevocably depend upon the

24 imputations of that missing data; correct?

25     A.  Well, I think a lot of the conclusion is

1    dependable on that, yes.

2        Q.   And if there was a portion that didn't

3    depend on that, you would have no objection to that

4    conclusion; right?

5        A.   I would -- again, I would look at it.  I

6    mean, I realize that they did a lot of analysis for

7    folks who had the follow-up and other individuals

8    who did not have the follow-up, and they tried to do

9    the imputation and they did the analysis only for

10   patients who they had the information on.  So I'm

11   fully aware of all of the analysis that they did.

12            And, again, it's -- what I said is that the

13   missing data and the -- is not going to be, in my

14   mind, remedied by the imputation of data.  You

15   probably have to ask a lot of statisticians and

16   epidemiologists of this.  But as a clinician, when

17   you tell me you have 40 percent missing and you did

18   whatever you did to fill in the blanks, you've lost

19   me as a clinician.

20       Q.   Okay.  So analyzing imputation and whether

21   it can accurately fill gaps in data is beyond you?

22       A.   It's like funny accounting.  You can always

23   make the spreadsheet look nice.  So, again,

24   statisticians will have ways to try to figure out,

25   how can we actually remedy a flaw in a particular

Page 44

1    study design.  That's fine.  It's great.  But as a

2    clinician, when I have to take this into account,

3    it's very difficult to take it into account because

4    you have a lot of missing information.

5          If you take any type of trial in the

6    oncology literature and you say, we've lost data on

7    40 percent of patients, and these are the results,

8    you will have a lot of eyebrows raised trying to

9    figure out how you can reach a conclusion with that

10   many dropout rate.

11         Again, I recognize there are other

12   statistical methods to remedy all of these things.

13   What I'm saying is, I don't agree with them because

14   somehow the authors or the scientists or the folks

15   who are in charge of the AHS should have figured out

16   a way to assure low dropout rate, more follow-up,

17   more rigorous follow-up.  That's really where the

18   rigor is, in the design of the study and how you

19   conduct the study, not after the fact.

20       Q.  So do you believe that imputation makes

21   studies invalid for your consideration, regardless

22   of how rigorous or reliable epidemiologists believe

23   imputation to be?

24       A.  I may not agree with what epidemiologists

25   come up with because I'm a clinician ultimately, and

1    I will have to figure out how to counsel patients

2    based on the available body of the literature.

3              What I said -- I didn't say it would be

4    invalid.  I would say it makes any study

5    significantly less powerful.  I am fully aware that

6    imputation is actually a statistical methodology and

7    it does exist and people do it, so I can't dismiss a

8    particular methodology that is being done by my

9    colleagues, whether they are statisticians or

10   epidemiologists.

11             What I said is when I see that process

12   being applied to 40 percent, then I have issues with

13   that, and I question the significance of it.  And I

14   don't know what the threshold where I don't have a

15   significance, but, you know, 5 to 10 percent, maybe

16   I have some tolerance to that.  But 40 percent is

17   too much for me to accept any type of a statistical

18   method that tries to guess data because similar -- I

19   mean, again, you are guessing data and trying to

20   fill in the blanks.

21        Q.  So at 40 percent -- it's actually --

22        A.  37 percent.

23        Q.  -- 37 percent.

24        A.  We are just saying 40 percent.

25        Q.  At 37 percent, you don't care what the

1    epidemiologists have to say about the reliability of

2    imputation or what the studies say about the

3    reliability of the AHS imputation process.  It's not

4    good enough for you; is that what -- is that a fair

5    description?

6         A.  I didn't say I don't care.  I said I

7    don't -- I believe the clinical significance of any

8    type of a study that has missing data of 37 percent

9    or 40 percent is very questionable, and whatever

10   process you try to do as a statistician or as an

11   epidemiologist to remedy that is going to be

12   questionable for me as a clinician because you are

13   ultimately guessing the data based on data of

14   others.

15        I mean, if you try to simplify to a layman

16   person, what is imputation?  It's guessing.  I mean,

17   at the end of the day, I'm not an epidemiologist or

18   a statistician, so I have to explain things to

19   myself to understand them.  Imputation of data is

20   you take the data that's available for other folks

21   that you have data on and you try to guess data for

22   people you don't have data on.  How rigorous is

23   that?  It's not rigorous.

24        So, again, for somebody who treats patients

25   and who have treated patients, that's really where I

1   question the type of methodology that's being done

2   to remedy the information.

3        Q.  You understand that there's a mathematical

4   formula which is adjusted and tweaked based on --

5        A.  I'm pretty -- I'm pretty sure.

6        Q.  -- based on empirical sampling of the data?

7        A.  Pretty sure, a lot of math and a lot of

8   squares and roots and all of these things.  Like I

9   said, like funny accounting.

10       Q.  And you understand that nobody guesses

11  anything?

12       A.  There's a lot --

13       Q.  They apply a mathematical formula?

14       A.  There's a lot of guessing.

15       Q.  How do you know?

16       A.  In imputation, there's a lot of guessing.

17  I mean --

18       Q.  Sir, you just explained you don't know how

19  to evaluate imputation as an epidemiologist.  How do

20  you know there is --

21       A.  I can evaluate as a clinician, okay?  I'm

22  not an epidemiologist, nor am I a statistician.  But

23  as a clinician, as I told you, if you need to

24  explain what imputation to a patient or a family

25  member or a colleague, so you can say all of this

1   buzz word, it's a math formula and all of these

2   things.

3           But at the end of the day, you are trying

4   to basically guess.  It's trying to guess to try to

5   fill in the blanks of information that is missing.

6   Maybe there's a math formula and all of this, but --

7   but, ultimately, it is guessing.

8           You don't have the primary data.  That's

9   what I'm trying to say.  You actually do not have

10  the data.  So you try to figure out how to fill in

11  the blanks, so whatever method you do, it does not

12  take away from the fact that you didn't have the

13  data.  Do you have the data on these 37 percent?

14  No.

15      Q.  Do you agree with Dr. Neugut?  You read his

16  deposition.  Do you agree with Dr. Neugut that

17  imputation is a standard and valuable method for

18  dealing with unreported data in epidemiology

19  studies?

20      A.  I agree with that definition because that's

21  what they try to do in epidemiology study, but just

22  recall, we are talking 37 percent that is missing

23  here.

24      Q.  Do you agree with Dr. Neugut that that

25  level of unreported data is comparable to very

1    reliable studies that have been done and relied on

2    by clinicians in the field?

3        A.  I can't comment on that, because I have not

4    reviewed all of that.

5        Q.  Have you started seeing patients since our

6    last deposition, sir?

7        A.  I'm not seeing patients now because of my

8    travel schedule, but I have a couple of things that

9    I'm exploring.

10       Q.  How long has it been since you've seen

11   patients?

12       A.  Sixteen months.

13       Q.  In Exhibit 2, sir, the NCI 2018 report --

14       A.  Okay.

15       Q.  -- on Page 2, I'm in the second column --

16       A.  Okay.

17       Q.  -- and I'm about three quarters of the way

18   down the top paragraph.

19       A.  Under "Statistical Analysis"?

20       Q.  No, above that one.

21       A.  Okay.

22       Q.  "For participants who did not complete the

23   follow-up questionnaire, 37 percent," do you see

24   that?

25       A.  Yeah, I see that.

1      Q.   Okay.  "For participants who did not

2  complete the follow-up questionnaire, 37 percent, a

3  data-driven multiple imputation procedure was used

4  to impute pesticide use since enrollment."

5          Did I read that correctly?

6      A.   You read it correctly.

7      Q.   Do you know what "multiple imputation" is?

8      A.   I presume it's several formulas that, you

9  know, you use the second formula based on the output

10 of the first formula, and so forth.

11     Q.   I presume you've never done imputation

12 yourself or reviewed or assessed imputation

13 yourself; is that right?

14     A.   That's right, I have not.

15     Q.   Under "Statistical Analysis," I'm about

16 nine or ten lines down, "We use Poisson regression."

17         Do you see that sentence?

18     A.   I see that, yes.

19     Q.   "We use Poisson regression to calculate

20 incidence rate ratios and 95 percent confidence

21 intervals and Proc Mianalyze," that's a computer

22 program, "to obtain the appropriate variants for the

23 imputed data."

24         And then there's a Statistics Institute

25 citation for Proc Mianalyze.

1      Are you able to explain that description of

2  the imputation procedure, sir?

3      A.  I'm unable to explain that -- that

4  particular procedure, no.

5      Q.  I assume you don't have a criticism of that

6  particular procedure because you don't understand

7  it; is that fair?

8      A.  So my criticism -- let me rephrase -- which

9  was very, very clear.  My criticisms are the dropout

10  and the loss of follow-up.  That's -- that's what I

11  was critiquing.

12      In any study, when you don't have data on

13  37 percent primary data, on 37 percent of study

14  participants, that's the biggest critique.  And what

15  I said, whatever process you do to remedy this,

16  whether imputation or something else, I have a

17  problem with as a clinician.  I may not know exactly

18  what the procedure is or the process you're doing,

19  but you've lost me when you say 37 to 40 percent of

20  folks you lost the primary data on.

21      So, yes, I applaud you for trying to remedy

22  this, and there's probably a lot of methodology to

23  do so.  It does not take away from the fact that

24  this becomes a very weak evidence when you don't

25  have that primary data.  I don't need to know what

1    the process is.  All what I need to know is you lost

2    data on 37 to 40 percent of folks.

3         Q.   Okay.  So just once you hear that the data

4    has been lost on 37 to 40 percent, that's enough for

5    you?

6         A.   That's more than enough, yes.

7         Q.   And is that enough for you to discount a

8    study entirely and not give it any weight, sir?

9         A.   As I said, the study is published.  It's

10   been published before, several other manuscripts

11   from the AHS have been published, as you said in the

12   beginning.  So it doesn't mean -- again, it

13   becomes -- it's a weakness of the study, it's a flaw

14   of a study.

15            Sadly, every study has strengths and

16   weaknesses, and so we can't -- we can't dismiss the

17   fact that this is a major weakness of this study.  I

18   don't dismiss it, because I don't dismiss anything

19   in the body of literature, but I may -- it will make

20   me question and have issues with the conclusions of

21   this particular study.

22        Q.   It causes -- let's put it this way, sir, I

23   understand you said that you would approve it for

24   publication --

25        A.   Uh-hum.

1      Q.  -- and that the conclusions of the authors

2   were supported by the evidence that they provided,

3   and so on, you approve -- you approve of its

4   existence.  But I'm asking you something else.  I'm

5   asking you about your own personal analysis that you

6   made as to whether the evidence supports the

7   conclusion that glyphosate-containing substances

8   cause non-Hodgkin lymphoma.

9           And as to that analysis, your own analysis

10   of the weight of the evidence, you've given no

11   weight to this study; is that right?

12      A.  I've given it weight that it exists, but it

13   didn't change my opinion, because all what this did

14   is it's reported an additional ten years of

15   follow-up for an already flawed study.

16      Q.  It didn't change your opinion at all;

17   right?

18      A.  Of course not.

19      Q.  Page 3 of 8, and I'm looking at the first

20   full paragraph on this page, the full paragraph

21   above "Results, and here they're discussing some of

22   the procedures that they used to assess whether

23   imputation changed or didn't change the outcome of

24   their -- of the results that they reported; right?

25      A.  Yes.

Page 54

1      Q.  It says, "In addition, we conducted

2  sensitivity analyses to evaluate the impact of

3  including additional exposure information," i.e.,

4  imputation; right?

5      A.  Yes.

6      Q.  "First, we calculated risk estimates

7  including cancer incidence data for the complete

8  follow-up period with only exposure information

9  collected at enrollment."  Right?

10      A.  I see that, yes.

11      Q.  So what that means, sir, is that they --

12  there were two questionnaires that were done in this

13  study, and the dropout that you are criticizing

14  happened between the first questionnaire and the

15  second questionnaire; right?

16      A.  Yes, the first questionnaire was done at

17  enrollment.

18      Q.  And 37 percent of people who answered the

19  first questionnaire did not answer the second;

20  correct?

21      A.  Correct.

22      Q.  So the first thing that they did to

23  check -- as a check on the imputation procedure was

24  to run all the numbers and the data just with the

25  people who completed both questionnaires; correct?

1    A.  I see that.

2    Q.  The second thing that they did is, "We

3 examined associations excluding imputed exposure

4 data, thereby limiting analyses to participants who

5 completed both the enrollment and follow-up

6 questionnaires."

7         That's the one I just described; right?

8    A.  I think that's the one you just mentioned,

9 they actually calculated the data based on the folks

10 who answered both.

11    Q.  And, "Finally, because the last exposure

12 information was collected between 1999 and 2005, we

13 truncated follow-up at 2005 to coincide with this

14 exposure period."  Correct?

15    A.  Correct.

16    Q.  So what they did in the last one is

17 shortened the follow-up period to match with the

18 questionnaire data that had been collected; correct?

19    A.  Yes.

20    Q.  If you turn to Page 4, sir.  I'm in

21 Column 1.

22    A.  Okay.

23    Q.  In the long paragraph starting "in primary

24 analyses," they describe all three of these

25 procedures that they followed; right?

1    A.  You -- "in primary analyses, we include

2  exposure" -- that's what you're talking about?

3    Q.  Yeah, in that paragraph.

4    A.  Yes, I see the paragraph.

5    Q.  And in that paragraph they describe, again,

6  all three of the sensitivity checks that they used

7  to assess the imputation procedure; right?

8    A.  I think they just repeat the same.  I'm not

9  sure how -- I'm not sure how much in depth they

10  describe it.  They talk about conducting several

11  sensitivity analyses, evaluating the impact of

12  including exposure data, et cetera.  So they did

13  repeat what they said to conclude the results.  I

14  see that.

15    Q.  Well, they assessed the data for -- based

16  just on information collected from the first

17  questionnaire.  They assessed the data for people

18  who answered -- just for people who answered both

19  questionnaires, and they truncated the follow-up

20  period to 2005.  Three different checks on the data;

21  correct?

22    A.  I see that, yes.

23    Q.  And what they reported for all three is

24  that they still found no association between

25  glyphosate-containing substances and non-Hodgkin

1  lymphoma; correct?

2       A.  That's what they found.

3       Q.  And all three of those sensitivity checks

4  involved more data and more exposed cases than exist

5  in the rest of the case control epidemiology,

6  correct, put together?

7       A.  It's more than the DeRoos trial, the

8  update, yes.  This is more of the update.

9       Q.  I'm not talking about the DeRoos.  I'm

10  talking about the case control studies like Eriksson

11  that you rely on for your conclusion that

12  glyphosate-containing substances cause non-Hodgkin

13  lymphoma?

14       A.  I rely on more than just Eriksson.  I rely

15  on other things.  I rely on Eriksson and other

16  epidemiology data and the IARC and so forth.  It's

17  not just Eriksson.

18       Q.  If you put all the epidemiology data that

19  you rely on together, there are fewer exposed cases

20  than for any of these sensitivity checks alone;

21  correct?

22       A.  I really have to do the math.  Honestly, I

23  don't know.  But if somebody has done the math and

24  this is what you came up with, there is no reason

25  for me to doubt the information.  But I haven't done

1    that math.  I haven't -- I haven't done and looked

2    at all of the cases that were reported in all of the

3    papers I looked and compared the number of cases

4    here.  It's not difficult to do, but I haven't done

5    it.

6        Q.  Now, in doing an imputation -- in applying

7    an imputation formula, sir, an imputation formula

8    would only bias results if the nonresponders, the

9    people who didn't respond to the second

10   questionnaire who did respond to the first, if their

11   exposure to glyphosate was systematically different

12   than the responders' exposure to glyphosate;

13   correct?

14       A.  I'm sorry.  Can you repeat the question?

15       Q.  Yes.  When -- when there's a piece of

16   missing data in an epidemiology study -- I will

17   start out more generally.  When there is a piece of

18   missing data in a epidemiology study and that piece

19   is filled in somehow, it's only going to bias the

20   results in a particular direction if the filling in

21   isn't random, doesn't contain random error.

22           Like, if you say, this person had one more

23   exposure day than he really had, and this person had

24   one less exposure day than he really had and you

25   make little mistakes that cancel out, it doesn't

1    affect your final result.  But if you tend to make

2    mistakes all in the same direction, then it would

3    tend to affect your final result; right?

4        A.  Oh, I see -- I see what you're saying.  I

5    think if the -- I see what you're saying.  I think

6    if the -- if the remedy, whatever that remedy which

7    I think we -- I already said I'm not a big fan of

8    any type of remedy when you have that high of a

9    dropout.  But if the remedy is random, as you are

10   mentioning, it hopefully should even out that you

11   don't have one bias towards one direction or

12   another.

13       Q.  And in order to -- that's the difference

14   between differential and nondifferential --

15       A.  Yes.

16       Q.  -- bias; right?

17           To have differential bias, the probability

18   of someone responding to the second questionnaire

19   would have to be associated with their glyphosate

20   exposure and their health outcome; right?

21       A.  Yes.

22       Q.  And there's no reason to suppose that

23   someone's likelihood of responding to the second

24   questionnaire is related to their exposure to

25   glyphosate and their health outcome; correct?

1      A.  We don't -- we don't know.  There's no

2  reason.  We don't know one way or the other.  That's

3  my point about the guessing part.  I mean, we are

4  already -- just the line of questioning back and

5  forth, it just tells us we are trying to guess what

6  happened.

7      Q.  All three of the sensitivity analyses that

8  were performed in the JNCI 2018 article could

9  themselves be published as a set of data that is

10  more powerful and robust and larger in volume than

11  the entire body of case control studies that you

12  rely on; correct?

13      A.  I think you -- this is -- you asked me this

14  question before.  I said I haven't done the count.

15  There's no reason for me to think it's not.  If

16  you've done the count and you're accurate, then it's

17  probably right.  I just have not counted this

18  myself.

19      Q.  So they looked at the data three different

20  ways without imputation, and looking at that data

21  all three of those ways without imputation yielded

22  the same overall result, no association between

23  glyphosate-containing substances and non-Hodgkin

24  lymphoma; correct?

25      A.  That's what they found, yes.

1      Q.   So with regard to those sensitivity

2  analyses and those conclusions that there was no

3  association between glyphosate-containing substances

4  and non-Hodgkin lymphoma, your imputation criticism

5  doesn't apply; right?

6      A.   How so?  I'm confused how my -- again, let

7  me just repeat.  I never critiqued any of the

8  processes that the epidemiologists or statisticians

9  do, whether it's imputation or some other fancy

10 terminology.

11          What I critiqued was specifically the high

12 dropout rate in a study that is prospective, and I

13 said, rigorous ways of assuring proper follow-up of

14 these folks that were enrolled should have been

15 applied if you want to reach the proper answer.

16 There is no reason to wait years until you get

17 questionnaires.  It could be ways of having more

18 rigorous follow-up.

19          I don't critique particular processes that

20 I'm not fully familiar with or I don't apply as a

21 clinician, but a dropout rate of that high is what I

22 critiqued.

23      Q.   Take a look, sir, at Page 4 of 8.

24      A.   Yes.

25      Q.   The first column.

1        A.   Yes.

2        Q.   And I am -- let's go to the second batch of

3   numbers, just to orient yourself.

4        A.   Table 2?

5        Q.   No, sir.   There are some numbers in that

6   paragraph.

7        A.   Okay.   Sure, no problem.

8        Q.   Confidence interval and so on.   And above

9   that they describe their first sensitivity analysis.

10  They say, "We conducted several sensitivity

11  analyses," and then the first one they describe is,

12  "When restricted to exposure reported at

13  enrollment," i.e., to just the data collected in the

14  first questionnaire, "the rate ratio and the highest

15  exposure quartile was 0.82."

16       A.   Sorry, I don't know where he's reading.

17  Where are you reading?   Oh, the second paragraph,

18  okay.   I thought it's the first paragraph, okay.

19       Q.   Yes, sir.   I will start over.   "We

20  conducted several sensitivity analyses."   That's

21  what we've been talking about --

22       A.   Yes, yes.

23       Q.   -- for a little while now.   And the first

24  one they describe is, "When restricted to exposure

25  reported at enrollment" -- in other words, the data

1    reported in the first questionnaire; correct?

2         A.  Yes.

3         Q.  -- "the patterns of risk were the same as

4    analyses that considered glyphosate use reported at

5    enrollment and follow-up."

6         So they found the same patterns without

7    imputation restricting to the first questionnaire as

8    with imputation; correct?

9         A.  Yes.

10        Q.  And then they gave the data for that, which

11   is a confidence interval straddling one and a point

12   estimate of below one for non-Hodgkin lymphoma;

13   correct?

14        A.  Yes.

15        Q.  And that reported data does not involve

16   imputation; right?

17        A.  I don't think it does, no.

18        Q.  So your criticism of imputation doesn't

19   apply to that piece of data; right?

20        A.  For this particular one, there was no

21   imputation of the data, that's correct.

22        Q.  And, similarly, their second sensitivity

23   analysis, sir, where they limited the analysis to

24   the 34,698 participants who completed both

25   questionnaires, again found glyphosate use to be not

1          So, again, we have the same overall outcome

2     of no association between glyphosate-containing

3     substances and non-Hodgkin lymphoma in this third

4     way of looking at the data without imputation;

5     right?

6          A.   As I said, this study has shown no

7     association mirroring the conclusions from the

8     DeRoos study in '05.  I am --

9          Q.   So both with and without imputation, the

10    NCI 2018 study shows no association between

11    glyphosate-containing substances and non-Hodgkin

12    lymphoma; right?

13         A.   The NCI study shows no association,

14    correct.

15         Q.   That's with and without imputation; right?

16         A.   With and without amputation -- imputation,

17    sorry.

18         Q.   Your expert -- I'm going to go back to your

19    expert report, sir, and the first of your

20    criticisms.  We just talked at some length about the

21    third of your criticisms, imputation.

22          But the first criticism that you had of the

23    study was that the study at its core was restricted

24    to two states, North Carolina and Iowa; right?

25         A.   Yes.

1      Q.  Do you believe that whether

2   glyphosate-containing substances caused NHL,

3   non-Hodgkin lymphoma, varies by region?

4      A.  We don't know the answer to that.

5      Q.  You think that it might vary by region?

6      A.  We don't know the answer to that.  What I

7   said is that, you know, you have a study that is

8   done at two states out of so many other states.  So

9   it's -- I recognize the -- probably the prevalence

10  of farmers and so forth, and that's why probably

11  North Carolina and Iowa were selected.  But it begs

12  the question, does this really represent everything

13  else across the U.S., and I don't believe we have an

14  answer to that.

15     Q.  The criticism that it only -- that it's

16  restricted to two states, North Carolina and Iowa,

17  is a valid criticism only if, whether Roundup causes

18  non-Hodgkin lymphoma varies by region; is that fair?

19     A.  It's fair.  And I said I don't -- we don't

20  know the answer to that.

21     Q.  Okay.

22     A.  But I think it's -- it's, obviously, when

23  you have something that is very restricted to two

24  locations, you'll have to ask the question given the

25  ubiquitous use of glyphosate across the U.S., so

1   that's really why you have to ask that question.

2       Q.  Okay.  I just --

3       A.  It's not --

4           (Unreportable cross-talk.)

5       A.  Glyphosate is -- glyphosate is not used

6   only in North Carolina and Iowa.  So if you are

7   doing really a prospective study and you are looking

8   prospectively as to whether substance A causes

9   disease X, unless you have a reason that substance A

10  is only used in this particular location, why are we

11  restricting only in -- only in those two areas.

12          So, again, as somebody who is trying to

13  look at the entire body of evidence, I'm seeing here

14  that there is a substance that's being used across

15  all 50 states, but the study is only restricted to

16  two.  So I need an explanation why only these two

17  and not others.

18      Q.  The -- have you heard anyone suggest that

19  whether glyphosate causes non-Hodgkin lymphoma

20  varies by region?

21      A.  Have I heard anyone say that?

22      Q.  Yes.

23      A.  No, I personally have not heard anyone say

24  that.

25      Q.  Do you know of any reason why it might be

1  that whether glyphosate causes non-Hodgkin's

2  lymphoma varies by region?

3      A.  It's not necessarily the region.  It's

4  really the practice patterns and how people utilize

5  the compound that may vary by region.  I think you

6  are mixing things.

7          So I don't know how farmers in Iowa are

8  using glyphosate compared to farmers in South

9  Carolina or in Florida or in Arkansas.  So I think

10  the region is not necessarily just the fact, you

11  have a lot of issues that may vary by region.  It

12  could be the training.  It could be how people use

13  PPEs, could be how folks understand the compound.

14  That you can -- you don't know.  And we really can't

15  control for.

16          So practice patterns of farmers and folks

17  and people who apply pesticides in North Carolina

18  and Iowa may not apply to what people do at other

19  states.  And, hence, I don't know, you know, how

20  would you really make a conclusion based on the

21  study that just looks only at two states.

22      Q.  Might the data from the Eriksson study in

23  Scandinavia be valid only in Scandinavia?

24      A.  I think you always have to look and ask

25  yourself whether certain things that are done

1    outside the U.S. apply to the U.S., if something

2    done in the U.S. that is applied to Europe.  So you

3    look at the entire body of literature.  And you

4    don't -- you can't take one study and just be

5    blinded to everything else.  So I -- again, it's a

6    matter of looking at the entire body of literature,

7    not being selective at what type of literature we

8    look at.

9        Q.  Do you know of anything about the

10   population that was being studied in North Carolina

11   and Iowa that would differ from other exposures in a

12   way that would invalidate the results of this study

13   as a general -- as reaching general conclusions

14   about glyphosate and non-Hodgkin's lymphoma?

15       A.  I don't know anything specific for the

16   farmers in North Carolina and Iowa.  I explained to

17   you, hopefully, what my issue is.  It's not

18   necessarily geography and so forth.  It's what

19   others do there that may not apply to folks that do

20   at other states, because some of this may -- again,

21   related to training, to how you apply the pesticide,

22   to the PPEs, et cetera, but I don't know off

23   firsthand anything specific for the folks in those

24   two states that may be different or similar to other

25   states.  I don't know.

1      Q.  And you know that the AHS -- AHS refers to

2  a large group of studies that has been generated by

3  an ongoing research project?  You understand that,

4  sir?

5      A.  I do.

6      Q.  And you know that there are multiple

7  publications from that group about the

8  characteristics of people in North Carolina and

9  people in Iowa and about how they controlled for

10  their exposures, their practices, their exposures to

11  other substances, their time spent on the farm,

12  their exposure to other animals, PPE, their exposure

13  to drift, et cetera, et cetera?  Have you read those

14  papers, sir?

15      A.  I have not seen all of these, no.

16      Q.  Do you know whether the large body of

17  literature that's been generated about the AHS pool

18  of data suggests any flaws in relying on data from

19  two states, North Carolina and Iowa?

20      A.  Not firsthand.  I tried to explain, again,

21  you know, the issue that I have with this particular

22  comment.  I think it's pretty clear --

23      Q.  Okay.

24      A.  -- what I said.

25      Q.  So you're flagging it as a possible

1    weakness in the study without knowing of anything

2    specific that bears out those concerns; is that

3    fair?

4         A.  Of course, I don't have anything

5    specific --

6              MR. LITZENBURG:  Object to form.

7         A.  -- but this is something that you --

8    it's -- it's glaring at you as a peer reviewer, as

9    somebody who is looking at this, and it's hard to

10   dismiss without trying to ask these questions.

11   BY MR. GRIFFIS:

12        Q.  You don't know if it's been addressed by,

13   for example, the statistical controls that were

14   applied to other factors and other exposures?

15        A.  I have not seen --

16             MR. LITZENBURG:  Object to form.

17        A.  -- the particular remedy to these issues.

18   BY MR. GRIFFIS:

19        Q.  Now, you said second, the second flaw that

20   you identified in the study is that you said the

21   study essentially ended in 2001, not accounting for

22   the more expanded and increased use of glyphosate

23   after that year; correct?

24        A.  Yes.

25        Q.  So would you -- would you elaborate on

1    that, please?  What is the problem with the study

2    ending in 2001?

3        A.  Well, if you look at the way the study is

4    designed, it's really designed based on

5    questionnaires with the first question -- with the

6    first questionnaire done when you actually enrolled

7    patients in ninety -- between '93 and '97, I

8    believe, and the first questionnaire looked at prior

9    exposure from decades before.  These -- again,

10   something that you've been exposed to 20 years or 30

11   years ago and forth.

12        The subsequent questionnaire was done in

13   1999 to 2005, and if I read correctly, they actually

14   asked specifically at exposure the year before, not

15   necessarily for many times or 10 years or 15 years

16   prior to that.

17        So the -- the pattern, you know, how can

18   you control to how folks were exposed prospectively

19   to this substance?  It's not really a constant.  The

20   use of glyphosate has changed over the years.  It

21   has increased significantly in the late '90s and

22   early 2000 and so forth.  So there's really

23   incremental use of the compound over these years,

24   and this incremental use and changes in the way

25   people have been exposed to it is actually not

1  factored in how the questionnaire is addressing

2  this.

3          So it's not constant.  Everything is

4  actually changing, but you're really asking question

5  only for the year before -- and you are doing this

6  before the incremental -- the significant increase

7  in use of glyphosate.

8      Q.  What's your understanding of when that

9  significant bulge in use occurred?

10     A.  A lot has happened in the early 2000s in

11 terms of the increase in use.

12     Q.  Okay.  So your understanding --

13     A.  So basically you're stopping -- you know,

14 you're stopping to look at what happened in terms of

15 exposure literally around almost the same time where

16 people are using -- are using it more.

17     Q.  So 2000 -- the 2001 cutoff is right when

18 the bulge began; is that your view?

19     A.  Well, there is no such a thing as right

20 where the bulge began.  I think the early 2000s is

21 as accurate as you can get.

22     Q.  Okay.

23     A.  I mean, you can't say May 2000 versus

24 July 2001.  Early 2000s where you -- late '90s and

25 early 2000s are where you really have seen

1  significant increase in the use of glyphosate across

2  the country and in the world, and somehow you

3  really -- your follow-up falls short of that in

4  2001.  And even the questionnaire is actually asking

5  only exposure just one year before.

6        So if you had -- if you had a lot of

7  exposure -- if you are asking somebody, you know, at

8  a particular year, what was the exposure the year

9  before, and they answer no, it doesn't account for

10 the exposure from three years before.  It's --

11 it's -- the way the questions are being asked is --

12 completely would miss the point of significant high

13 exposure for some patients -- for some individuals,

14 not patients.

15    Q.  So I understand that there's not a

16 particular month that you point to as suddenly a

17 bulge occurs, but 2001, that was an important year.

18 2002 was an important year, 2003?  Is that what

19 you're telling us?

20    A.  I said the early 2000s.

21    Q.  Okay.  And what's your basis for that, sir?

22    A.  It's my research.  When you look -- I mean,

23 again, a lot of this information, when you look to

24 when the use of glyphosate and take a look on the

25 worldwide web and try to understand when it's being

1    used, it's -- lots of this is public information.

2         Q.   What resource did you rely on for this?

3         A.   The worldwide web and what's going on in

4    the literature and -- and the information that's

5    been there in terms of when the use of

6    glyphosate-containing compounds have increased.

7         Q.   So you did a Google search and looked at

8    one of the --

9         A.   One of the searches --

10        Q.   -- links?

11        A.   One of the searches was Google searches,

12   and there is also some literature that I looked at.

13   And the previous deposition, but I wasn't sure -- I

14   didn't bring it with me.  I didn't think we were

15   going to discuss that today.

16        Q.   This is literature that you have provided

17   to us, sir?

18        A.   That is something that you have asked me

19   about in the deposition that we had before.

20        Q.   Is it literature that you have provided to

21   us, sir?

22        A.   I provide you with everything that I looked

23   at, yes.

24             THE WITNESS:  Can I take, like, a

25        five-minute break in about ten minutes?

1              MR. GRIFFIS:  Let's take it now.

2              THE WITNESS:  I'm okay.  I'm just trying to

3        base my --

4              MR. GRIFFIS:  Remind in ten minutes.  We'll

5        do it.

6              THE WITNESS:  -- need for the bathroom.

7        That's all.

8    BY MR. GRIFFIS:

9        Q.  Take Exhibit 2, sir, the 2018 NCI study,

10   and tell me where it says that the study essentially

11   ended in 2001.

12       A.  It's not the -- it's not ended.  It's

13   the -- the follow-up continues.

14       Q.  Okay.  I'm -- when I said "essentially

15   ended," I'm just quoting you from your --

16       A.  Yeah.

17       Q.  -- supplemental expert report.

18       A.  No, I think the follow-up -- the follow-up

19   continues.  And, again, I believe there would be

20   additional follow-ups and future publications from

21   the AHS study.  This is not going to be the last

22   one.

23       Q.  Okay.

24       A.  The follow -- I mean, you know --

25       Q.  Show me -- show me what you see in this

1    study that made you say, "Second, the study

2    essentially ended in 2001," in your supplemental

3    expert report.

4         A.  Yeah, I'll have to go in the -- I think on

5    the NIH website and look at the AHS.

6              Can I take a look at that?  Can I look at

7    the -- that's where I found it.

8         Q.  You may.  I don't know how exactly.

9         A.  That's fine.  That's fine.  I'll look at

10   it.

11        Q.  You didn't get that from this -- I mean,

12   you told me what you looked at to get ready to

13   generate your expert report.

14        A.  I understand.

15        Q.  And it didn't include that website.  It was

16   this paper.  So I presumed you got it from this

17   paper.

18        A.  I'll get back to this.  I'll look at it at

19   the break, if that's okay.  It's -- I don't want to

20   read the entire paper right now and take about 10 or

21   15 minutes.

22        Q.  Is it -- is it the statement in the

23   background, follow-up through 2001 in the abstract?

24        A.  Follow-up through 2001.  No, I think this

25   was probably the older follow-up.  This one is 2005.

1    I'll have to make sure that this was -- was it a

2    typo I said 2005 or 2001?  Is it okay if I table

3    this and just get back to you after the break?

4         Q.  Okay.

5         A.  I want to make sure I answer it for you.

6             MR. GRIFFIS:  Okay.  Why don't we take a

7         break then.

8             THE WITNESS:  Okay.

9             VIDEOGRAPHER:  Ending disc number one of

10        the deposition of Dr. Chadi Nabhan.  We are off

11        the record at 10:17 A.M.

12            (Recess taken from 10:17 A.M. to

13        10:26 A.M.)

14            VIDEOGRAPHER:  And beginning disc number

15        two of the deposition of Dr. Chadi Nabhan.  We

16        are back on the record at 10:26 A.M.

17   BY MR. GRIFFIS:

18        Q.  Okay.  Sir, you were going to look

19   something up for me, the basis for your opinion

20   that -- let me quote it correctly -- the basis for

21   your opinion that the study, the NCI 2018 study

22   essential ended in 2001.

23        A.  So, again, I didn't -- when I say "ended,"

24   as I clarified earlier, the study is continuing, and

25   as I said, you will have additional publications

1  coming out, and the JNCI paper will not, in my

2  opinion, be the last paper that comes from the AHS,

3  because it is ongoing.

4        I think what I meant by "ended" is that

5  the -- when you look at the original paper, the

6  DeRoos paper, when it's -- when it was originally

7  published, they looked at -- I think the follow-up

8  at that time was until 2001.

9        The follow-up of this study is until 2005

10 and the original questionnaire between 1993 to 1997

11 was probably the only questionnaire that was filled

12 by most -- by most participants.

13       The 2001 here would more accurately

14 reflected as 2005, because that's really the

15 follow-up of this particular study, as opposed to

16 2001.

17       Q.  And 2001 is incorrect, it reflects the --

18       A.  The DeRoos paper.

19       Q.  -- the follow-up date from the DeRoos 2005

20 paper and not the NCI 2018 paper?

21       A.  That's correct.

22       Q.  The NCI 2018 paper, second questionnaire,

23 went through 2005; right?

24       A.  Yes.

25       Q.  So they were collecting data well into the

1  glyphosate bulge in the early 2000s that you were

2  describing; right?

3       A.  They have collected data during some of

4  this bulge, yes.

5       Q.  And do you know what impact it would have

6  on the data to misallocate people's exposures based

7  on increased glyphosate use later when you don't

8  know whether someone is going to end up in the group

9  of people who develop non-Hodgkin's lymphoma or not?

10      A.  I'm not sure I understand the question.  If

11 you don't mind just --

12      Q.  Yes, sir.  It's an epidemio- --

13      A.  -- simplifying it or --

14      Q.  It's an epidemiology question.

15      A.  Okay.  Go ahead.

16      Q.  You have a questionnaire that runs through

17 2005, collecting data on exposures through 2005, and

18 you're suggesting the possibility that people's

19 exposures could shift after that date because of

20 changes in glyphosate use.

21      A.  I mean, it always could shift throughout,

22 right, yes.

23      Q.  But if it shifts in a way that's the same

24 for the group of people who end up developing

25 non-Hodgkin's lymphoma, as it does for the group of

1  people who don't end of developing non-Hodgkin's

2  lymphoma, then it would not alter the

3  epidemiological results; correct?

4      A.  If the shift is similar, it probably would

5  have less likelihood to alter the epidemiology

6  results.

7      Q.  Do you know of any reason that the

8  likelihood of someone using glyphosate in the future

9  but not during the time of questionnaire two would

10  be associated with whether or not they develop

11  non-Hodgkin's lymphoma later?

12      A.  Well, it's a matter -- it's -- the

13  fundamental issue here is how you are going to

14  answer the questionnaire between 1999 and 2005.

15  That's really the fundamental question.

16          And I think, given the fact that you can't

17  control how people are answering the questions,

18  there's a lot of recall bias in answering these

19  questions, and you're really answering the questions

20  only for just the immediate past before answering.

21  You're not answering for several years prior to

22  that.

23          So it's just how you answer the questions.

24  It's very possible that some folks might answer

25  differently based on what they are doing, if they

Page 82

1    have been -- if somebody is using a lot of other

2    pesticides, not necessarily glyphosate, they may

3    assume that they are using also glyphosate versus

4    somebody who is not using anything.

5            So I think that's really the issue.  It's

6    not about -- the follow-up is one possibility, but

7    also the way folks answer the questions is

8    inherently depending on some other biases that are

9    present in them.  So it's answering the questions

10   that's really fundamentally issue -- fundamental

11   issue here.

12       Q.  It sounds like you have identified a new

13   potential flaw in this NCI 2018 study that isn't in

14   your expert report, that people might fill out the

15   questionnaires inconsistently?

16       A.  It's the recall bias, which is something we

17   discussed about with the DeRoos study.  It's -- it's

18   inherent in -- in most of these trial -- most of

19   these type of studies.  It's difficult to -- to

20   remedy, except, frankly, the only way to remedy

21   something like this is by having more frequent

22   questionnaires and just trying to either just

23   have -- it requires a lot of resources to ask people

24   to fill a lot of these questionnaires more

25   consistently.  But that's -- that's something that

1  was present in DeRoos, still present here, because

2  it's the same study.  We talked about it before.

3      Q.  Can you explain what "recall bias" means to

4  an epidemiologist?

5      A.  You mean to a layman person?

6      Q.  Tell me your definition of "recall bias."

7      A.  Well, you know, if you are being asked

8  to -- to answer a question that -- about something

9  that happened in the past, you may not have the most

10  robust memory to remember all of the details of what

11  happened a year before or even ten years before to

12  provide the proper answers.

13          If I asked you what you had for dinner ten

14  days ago, you may not be able to answer that

15  accurately, but your answer might be dependent on

16  what you had dinner yesterday, and you may assume

17  that this is very similar.

18          So recall bias is basically not having the

19  precise answer.  You're dependent on your memory to

20  answer a question, and you may be correct some of

21  the times, and you may be wrong other times.

22      Q.  Okay.  I'm going to suggest to you, sir,

23  that that's wrong.  Tell me if this rings a bell.

24      A.  Go ahead.

25      Q.  Recall bias is a differential bias in a

Page 84

1  study caused by the fact that people who are

2  recalling -- one group of people who are recalling

3  are in a different situation than another group of

4  people who are recalling, the classic example of

5  which is that when you are in a case-control study,

6  people who have an illness that they believe may be

7  associated with an exposure are much more likely to

8  recall those exposures --

9      A.  That's correct.

10     Q.  -- than people who are just going about

11 their lives without suffering from any particular

12 malady.

13     A.  That is one way of recall bias, absolutely.

14 So if you have a disease -- you know, if you have a

15 disease in 2010 and you're being asked to remember

16 if you got exposed to something, you are more likely

17 to remember that versus somebody who did not have

18 the disease.  That is one way.

19         And another way, in my opinion, is also

20 trying to recall everything that actually has --

21 have happened in the past that you may not remember.

22     Q.  The type of recall bias that I described is

23 inherent to the same case-control studies that you

24 rely on --

25     A.  Yes.

Page 85

1      Q.   -- for your conclusions; right?

2      A.   I understand that.

3      Q.   In those case-control studies, like

4   Eriksson, et cetera --

5      A.   Uh-hum.

6      Q.   -- in those case-control studies, people

7   were asked about their exposures after they already

8   had non-Hodgkin's lymphoma, and they would have been

9   incentivized to remember better than the healthy

10  people, the healthy controls who were asked to

11  recall their exposure?

12     A.   In any case -- I think in any case-control

13  studies, you will always have that possibility.  I

14  think we know that people who have a disease are

15  more likely to remember something that has happened

16  to them versus healthy volunteers.  I think that's

17  an inherent limitation to case-control studies.

18     Q.   Yes, sir.

19          And cohort studies, like the NCI 2018 and

20  the DeRoos 2005, don't have that particular problem

21  because people are asked about their exposures

22  before they develop any illness; correct?

23     A.   In the beginning, yes, but, again, in

24  subsequent -- in this cohort study, you have

25  subsequent questionnaires to see what happens in

1  that duration.  And you're not accounting for that

2  gap between questionnaire A and questionnaire B as

3  to what happened in terms of pattern of exposure to

4  these individuals.

5          So, yes, in a cohort study that you are

6  looking at prospectively, you ask the individuals

7  who are participating a priori, you ask them before

8  it, what happened, and then you follow them

9  prospectively.  But in order for you to get proper

10 conclusion, all of other factors for these

11 individuals have to be stable and constant.  So

12 nothing really is changing to get these meaningful

13 conclusions.

14         And that's a big problem for epidemiology

15 study where you have a lot of exposures and external

16 factors because you can't really account for these

17 additional factors that folks are exposed to.  And

18 in this situation you can't really tell somebody

19 that, now we ask you this question, no more exposure

20 to glyphosate whatsoever until we talk to you in ten

21 years from now.  You can't control to that,

22 especially in pesticide applicators and farmers.

23         That's the big limitation when you are

24 talking to this cohort study, because you are unable

25 to tell these cohort of individuals that you are

1    studying that, from now on, after you've answered

2    this question, no incremental exposure is allowed,

3    and I'm going to follow you and see whether your

4    prior exposure has led to disease or not.

5             And that's not what happened in the AHS.

6    I'm not sure how you can do it, frankly.  It's not

7    really an issue that you can do practically.  It

8    requires a lot of money and resources.  So it's

9    really very difficult.

10            But if you want to talk science, that's the

11   only way in a cohort study that you do it.  At some

12   point in time, so in 1997 after you ask the first

13   questionnaire, these individuals that answered the

14   1993 to 1997 questionnaire, that's it, no more

15   exposure to anything after 1997.  And now in 2018,

16   20 years later, you go and see, based on your prior

17   exposure, prior to 1997, what happened to you.

18            But we all know in this room between 1997

19   and 2005 a lot of things changed for these

20   individuals, and that's the problem.

21       Q.  I want to get back to recall bias, because

22   that wasn't about recall bias.

23       A.  But that answer --

24       Q.  The other thing with recall bias --

25       A.  -- I was answering your comment about the

1    AHS that doesn't have that limitation.  So I was

2    describing to you the issue with the AHS that is

3    different -- it's not a case control, but it has a

4    different limitation as a cohort study.

5         Q.  That's a totally different issue than

6    recall bias; right?

7              MR. LITZENBURG:  Object to form.

8         A.  Okay.  Well, we can talk about recall bias

9    if you want.

10   BY MR. GRIFFIS:

11        Q.  Let's finish talking about recall bias.

12   The other thing that you called "recall bias" --

13        A.  You are the one who moved to the other one.

14        Q.  The other thing that you called "recall

15   bias," sir, was people not remembering correctly

16   when they are given a questionnaire; right?

17        A.  Well, I think that's important when I talk

18   to a layman -- when I talk to a patient and I talk

19   to -- and I asked you, actually, whether we are

20   describing to this a layman term.  When I talk to a

21   patient and I see a patient and I say, you know,

22   have you been exposed to X, Y, and Z, from a patient

23   perspective, they need to tell me based on their

24   memory and their recollection.

25              When they fill a questionnaire, when they

Page 89

1  come to the clinic and they are trying to fill a

2  questionnaire about their past history or past

3  occupational hazard or past exposure, they rely on

4  their memory.  From a patient perspective, that's

5  actually a recall.  And if they don't really

6  remember appropriately, then it might be an issue.

7      Q.  Just not remembering well is an issue for

8  questionnaires asked in case-control and cohort

9  studies; right?

10     A.  Absolutely.

11     Q.  Have you read the literature in which the

12  AHS questionnaires were validated against objective

13  data to test how accurate the recall of those

14  pesticide applicators was about the pesticides that

15  they applied?

16     A.  I have not seen that literature.  I would

17  probably look it up.

18     Q.  Now, on the new issue that I believe you

19  were identifying a moment ago that people's

20  exposures will not be -- remain fixed in between

21  questionnaires and so could vary from what they

22  reported at the time of the questionnaires, do you

23  understand that the authors of the NCI 2018 paper

24  took steps to adjust for and correct for that, sir?

25     A.  I think we -- together we read a lot of the

1    statistical and sensitivity analysis that they did

2    and so forth, and I think you have to try to adjust

3    for it.  It just doesn't take away from the

4    limitation of it.  I mean, and, again, this is not

5    just an AHS specific limitation.  This is really any

6    prospective cohort limitation.

7         Q.  And like some of the other biases that

8    we've been discussing today, it would only affect

9    the results if people's exposures after filling out

10   the questionnaire were correlated with the

11   particular -- a particular health outcome and not a

12   different particular health outcome?

13        A.  Yes, of course.  I mean, if it changed in a

14   way that affects the health outcome and so forth,

15   but -- but, again, as I said, this is not a

16   limitation just for the AHS study.  This is a

17   limitation for a lot of these epidemiologic

18   prospective cohort studies because you follow these

19   individuals prospectively asking one question, but

20   you are unable to stop that additional exposure from

21   happening moving forward.  It's impossible, given

22   the fact that these are farmers and pesticide

23   applicators.  That's what they do.

24        Q.  Do you know -- never mind that question.

25            Do you know the difference between

1  differential bias and nondifferential bias, sir?

2      A.  I think you just described it to me.  The

3  nondifferential, again, is if you -- if it's not

4  going to affect the health outcome and the bias is

5  almost equally distributed, then that's

6  nondifferential bias.

7      Q.  And people who are doing cohort studies

8  have ways to assess whether they have differential

9  biases and control for those; correct?

10     A.  I think there are lots of statistical

11 methods in an attempt to control for some of these

12 things, yes.

13     Q.  And do you know which ones were used in the

14 NCI 2018 study?

15     A.  They --

16     Q.  How effective they were?

17     A.  They did the sensitivity analysis that we

18 talked about.  They also looked at some of the

19 patients that answered only both questionnaires in

20 an attempt to get the information only from the

21 folks who answered the questions.

22     Q.  The fourth weakness that you -- the flaw

23 you identified in the NCI 2018 study is that it

24 relied on self-reporting; correct?

25     A.  Yes.

1    Q.  Now, I take it that at least part of the

2  reason that you think that's a problem is because

3  of, people might not recall correctly?

4    A.  Yes.  That's what we talked about.

5    Q.  Is that right?

6        Okay.  Is there anything else about it

7  other than that people might not recall correctly?

8    A.  No.

9    Q.  And all of the epidemiology studies that

10 you rely on for your opinion that

11 glyphosate-containing substances can cause

12 non-Hodgkin's lymphoma, involved self-reporting;

13 right?

14    A.  Yes.

15    Q.  So to the extent that that's a flaw in the

16 NCI 2018 study, it's also a flaw in those studies;

17 right?

18    A.  I think it's a flaw for most of the

19 epidemiology studies.  It's very difficult to have

20 an epidemiologic study without problems with

21 self-reporting.  That's the field of epidemiology.

22        MR. GRIFFIS:  Exhibit 4.

23        (Exhibit 29-4 marked for identification.)

24 BY MR. GRIFFIS:

25    Q.  Sir, I've marked as Exhibit 4 the IARC

1  Working Group 122 -- 112, rather, Monograph on

2  Malathion.

3          MR. LITZENBURG:  He's not answering any

4      questions about that.

5      A.  Why are we talking about malathion?

6  BY MR. GRIFFIS:

7      Q.  Sir, you understand that the IARC Working

8  Group 112, when it did its analysis of glyphosate

9  that you relied on in part for your conclusions,

10 also did analyses of some other pesticides,

11 including malathion?

12     A.  I understand that they looked at other

13 compounds as well as glyphosate, yes.

14     Q.  And did you understand that they put some

15 of their global analyses into the malathion

16 monograph and said so in their overview publications

17 rather than repeating them over and over again in

18 each monograph?

19         MR. LITZENBURG:  You don't have to answer

20     any questions about this, especially if you

21     haven't read it.

22     A.  I really don't remember.

23 BY MR. GRIFFIS:

24     Q.  Turn to Page 9, sir.

25     A.  This is a 124-page document I haven't read

Page 94

1   before.

2        Q.  Yes, sir.

3        Turn to Page 9 where they discuss the

4   Agricultural Health Study.

5        A.  Sure.

6        Q.  Do you see that they said, "Great efforts

7   were made in the Agricultural Health Study to assess

8   exposure among agricultural pesticide applicators

9   and their spouses.  These questionnaires and

10  algorithms have been extensively described and have

11  undergone several tests for reliability and accuracy

12  that have provided considerable insight into the

13  quality of this exposure assessment"?

14       A.  I read that.

15       Q.  Do you disagree with IARC's assessment

16  there, sir?

17            MR. LITZENBURG:  Object to form.

18            THE WITNESS:  Sorry.

19            MR. LITZENBURG:  I was just objecting again

20       to a document that had nothing to do with the

21       topic at hand.

22       A.  I don't necessarily disagree, but I have

23  not seen what type of these tests that were -- that

24  were applied, and that particular paragraph is not

25  referenced.  There is no reference.  But I'm

1    assuming they are going to expand on this in

2    subsequent paragraphs.

3    BY MR. GRIFFIS:

4         Q.  Yes --

5         A.  So I have no reason to doubt this

6    statement.

7         Q.  Okay.  Well, you do know, because we

8    discussed it, that there are -- there were internal

9    checks, the sensitivity analyses that were described

10   within the NCI 2018 paper; correct?

11        A.  Yes.

12        Q.  And you also know that there are a large

13   body, or a body anyway, of separate articles testing

14   various aspects of the AHS model, their algorithms,

15   their exposure assessments, et cetera, and that's a

16   body of literature that you have seen referenced

17   from time to time but haven't yourself read; is that

18   right?

19        A.  I have not read, yes, correct.

20        Q.  Okay.

21        A.  But I have seen it referenced.

22        Q.  On Page 11, sir, do you see at the bottom

23   of the first column, this is a section entitled

24   "Other Epidemiologic Studies," B, "Other

25   Epidemiological Studies."  A was "The AHS

1    Epidemiological Body of Data."

2         A.   Okay.  I see that.

3         Q.   "All of the studies" -- I'm in the second

4    paragraph, "All of the studies addressed historical

5    exposure to pesticides.  Therefore, the use of

6    biomarkers or monitoring data was not feasible at

7    the individual subject level.  Almost all of the

8    studies relied on self-reported data which, as

9    discussed above, is reasonably reliable and valid

10   when applicators were reporting their own use, but

11   may not be suitable for spouses or other farm

12   workers, particularly those exposed by reentry."

13        Do you see that, sir?

14        A.   I see that.

15        Q.   And you agree with me that pretty much all

16   of the epidemiology studies that we have discussed

17   together at any time concerning glyphosate and

18   non-Hodgkin's lymphoma rely on self-reported data;

19   right?

20        A.   Yes, it does.

21        Q.   Do you agree with the IARC that such data

22   is reasonably reliable and valid when applicators

23   were reporting their own use but might not be

24   suitable for others, as described here?

25        A.   I mean, for the most part, yeah.  I mean,

1   to the extent possible, you probably would remember

2   more than the spouses would remember, but I think

3   there were still some limitations that we talked

4   about.

5        Q.  Okay.  In the case of the NCI 2018 data,

6   that would be applicators reporting their own use;

7   right?

8        A.  That's correct.

9        Q.  The next -- the top of the next column, it

10  says, "Apart from the AHS," that's the dataset from

11  which NCI 2018 is drawn, "Apart from the AHS, few of

12  the studies included expert review of the data or

13  performed validity or reliability studies."  Right?

14       A.  I read that.

15       Q.  Do you know if any of the epidemiology

16  studies that you rely on that included expert review

17  of the data were validity or reliability studies?

18       A.  I think the IARC, the IARC has done an

19  extensive work and they had working groups and they

20  looked at the body of literature and genotoxicity

21  and everything to come up with the conclusion.

22       Q.  Okay.  What they are talking about -- what

23  the IARC is talking about here is not themselves,

24  because this was something that hadn't been

25  published yet, but the epidemiology studies; right?

1    That's what the header says there.

2           MR. LITZENBURG:  You are not suggesting

3        this is about glyphosate; right?  We are still

4        looking at the malathion document.

5           MR. GRIFFIS:  Sir, this is about

6        everything.

7           MR. LITZENBURG:  You are suggesting this is

8        about glyphosate?

9           MR. GRIFFIS:  Yes.  The malathion was where

10       they collected general conclusions and general

11       analyses information.

12          MR. LITZENBURG:  So your suggestion when it

13       says "other epidemiological studies," that's

14       referring to glyphosate?  In this Exhibit 4?

15          MR. GRIFFIS:  I've given you my answer.

16    I'm not going to discuss it further with you.

17          MR. LITZENBURG:  Okay.  Again, object, and

18       you don't have to answer any questions about

19       malathion or IARC's assessment of it.

20    BY MR. GRIFFIS:

21       Q.  I won't ask you a single question about

22    malathion, apart from the AHS.  So do you know if

23    any of the epidemiology studies that you relied on,

24    sir, any of the epidemiology studies that included

25    expert review of the data or included validity or

1   reliability studies in support of themselves?

2       A.  I am not aware of -- of the expert's review

3   or reliability studies, but have not looked

4   specifically at that.  And, again, this document

5   that you provided looks like it's discussing

6   specifically malathion, to my -- at least that's

7   what it says, unless I'm confused.  The entire

8   document is malathion.

9          MR. LITZENBURG:  Do you have any more

10      questions about Andreotti?  Otherwise, I would

11      say we ought to just shut it down.

12          MR. GRIFFIS:  These are questions about

13      Andreotti.

14   BY MR. GRIFFIS:

15      Q.  On Page 21, sir -- this is the last page

16   I'm going to direct you to in this document -- in

17   the left-hand column, the first column, in the

18   middle, I'm at a sentence starting "methodological

19   studies were completed."

20          Do you see that?

21      A.  One second.

22      Q.  Sure.

23      A.  In the left column, you said?

24      Q.  Left column, that -- in the first paragraph

25   there, in the first -- well, not the -- not the

1   paragraph stub, but the first full paragraph there,

2   about right in the middle of it, there's a sentence

3   that says "methodological studies."

4        A.  Yep, I see it.

5        Q.  Okay.  "Methodological studies were

6   completed to assess the reliability and validity of

7   the pesticide information provided by the

8   applicators."  Again, we are talking about the AHS

9   data, and they cite a couple of them there.  Do you

10  see that, sir?

11       A.  I see that.

12       Q.  So these are some of the outside studies,

13  not contained internally to NCI 2018, but some of

14  the outside studies that supported the data

15  analyses; right?

16       A.  I -- you know, I have to read the entire

17  124 -- I can't -- you can't just give me one small,

18  little three lines in one page in a document I

19  haven't read and expect me to comment.  I have no

20  comment on that.

21       Q.  The imputation method for the AHS is

22  discussed at the bottom of Page 21; right?

23       A.  I see the word "imputation method," yes.

24       Q.  And at the very end of this section, sir,

25  it says, "The working group considered the AHS to be

1    a highly informative study."  Right?

2         A.  Yes, it's highly informative.

3         Q.  And you agree with them?

4         A.  It is informative, yes.

5         Q.  Do you agree with them that it's highly

6    informative?

7         A.  It is informative.  I've answered that.

8         Q.  Okay.  Do you disagree that it's highly

9    informative?

10        A.  It is informative.

11        Q.  Is it not highly informative?

12        A.  Define "highly informative" to me.

13        Q.  You have --

14        A.  What's the difference between informative

15   and highly informative?

16        Q.  Well, you wouldn't go along with "highly

17   informative," sir, so what is the difference to you?

18        A.  Just -- to me, informative is the proper

19   way of saying something informative.  I don't like

20   using superlatives.

21        Q.  Do you understand, sir, that IARC

22   classifies the evidence that they rely on, including

23   into the category of highly informative?

24        A.  I do.

25        Q.  Did you review the IARC -- the preamble to

1   the IARC Monograph, sir?

2       A.   You are talking the monograph that we

3   discussed last deposition?

4       Q.   Yeah, and I'm not talking about the one

5   labeled "Glyphosate," but the preamble that applies

6   to every monograph that they do.

7       A.   I have reviewed the one that we discussed

8   at the last deposition.  I didn't review it for

9   today, but I reviewed it for the last deposition.

10      Q.   Okay.  Do you recall classification of --

11      A.   It was classified --

12      Q.   -- things into various -- no.  Do you

13  recall classification of pieces of evidence into

14  categories --

15      A.   Yes.

16      Q.   -- as to informativeness?

17      A.   Yes.

18      Q.   And that highly informative is their top

19  category?

20      A.   I -- I -- you asked me.  I said I don't

21  usually -- I mean, we have a lot -- in the

22  literature, sometimes you have to divide the

23  evidence based on certain categories based on

24  highly, less, and so forth.  You asked my opinion,

25  did I -- personally, Chadi Nabhan does not like to

1   use superlatives.  That's all.

2        Q.  Right.  So --

3        A.  That's all I said.

4        Q.  And I'm trying to help you not need to.

5   I'm just reminding you about this fact about IARC,

6   that they do use that superlative for their highest

7   level of evidence that they rely on.

8        A.  I'm aware.

9        Q.  So would you -- without using the word

10  "highly," would you put the NCI 2018 study into your

11  top category, your most influential category, as a

12  piece of evidence like IARC did?

13       A.  So, personally, I would not, because it's a

14  follow-up study to a previously reported study.  I

15  mean, I think I've said that probably about ten

16  times so far.  This is a follow-up study with longer

17  follow-up on a previously reported study.

18            So it's hard for me to put this at the

19  highest evidence.  It's not reporting any new

20  evidence.  It's not a new study.  It doesn't really

21  add anything except giving me additional years of

22  follow-up and additional cases.  So I'm not really

23  sure why I would give it the highest category

24  possible.

25       Q.  What about DeRoos 2005?  Would you put that

1    in the highest category?

2        A.   I think that, frankly, would have more

3    weight in my mind just -- well, more weight, in

4    essence, that it was the first time it was reported

5    in a peer-reviewed literature.  This one has the

6    more weight, it has more cases, and it's longer

7    follow-up.  But the first time you report ever on a

8    particular study is really when people are more

9    interested in trying to understand what's the output

10   of that -- of that particular research.

11       Q.   So DeRoos 2005 would be in your top

12   category because it's first?

13       A.   Because it's the first time, but this one

14   has, again, longer follow-up as well as more cases,

15   so you can't really dismiss that.  It's very

16   important.

17       Q.   The last flaw that you identified in your

18   supplemental expert report is -- and we agreed that

19   it wasn't a flaw so much as a point that you were

20   making.

21       A.   Yes.

22       Q.   -- that there was an increased risk of

23   multiple myeloma with glyphosate exposure?

24       A.   And acute leukemia that the authors talk

25   about.

1    Q.   Would you show me where the increased risk

2 of multiple myeloma in that statement is?

3    A.   I think the authors talked about two

4 diseases.  One is acute myeloid leukemia, and one is

5 multiple myeloma.  I will try to research that for

6 you.

7         So I think under -- in Page 3/8 under the

8 results, they go over the various type of diseases

9 that they actually have, and they talk about -- let

10 me just read that for you.  One second.  Where is

11 the -- I think they add -- they add non-Hodgkin

12 lymphoma -- there was also no evidence for

13 association with NHL or any NHL subtypes, the rate

14 ratio in the top exposure quartile was 0.87 for NHL

15 and 0.87 for myeloma.

16         And then the association for NHL was not

17 meaningfully changed where multiple myeloma was

18 excluded, and then they talk about acute myeloid

19 leukemia.  They do acknowledge it was not

20 statistically significant, but they observed an

21 increased risk of acute myeloid leukemia among

22 applicators in the highest quartile of

23 intensity-weighted glyphosate use compared to never

24 users.

25    Q.   So there was not an increased risk of

1   multiple myeloma with glyphosate --

2        A.  It's acute myeloid leukemia.

3        Q.  Okay.  You were wrong about the multiple

4   myeloma in the NCI 2018?

5        A.  I think I meant to said "acute myeloid

6   leukemia."  I'm sorry.

7        Q.  Okay.  Do you claim that glyphosate causes

8   acute myeloid leukemia?

9        A.  No, I don't think you can claim that.  I

10  think you could say -- you could say that there was

11  a trend for increased acute myeloid leukemia,

12  although that trend was not statistically

13  significant.  So it's -- I think additional studies

14  might be needed just to better understand whether

15  there is really increases for acute myeloid

16  leukemia, but this -- the NCI study is not

17  conclusive about the association between glyphosate

18  and acute myeloid leukemia.

19       Q.  On Table 2, sir --

20       A.  Of -- of the study?

21       Q.  Of Exhibit 2, yes, the NCI 2018.

22       A.  Okay.

23       Q.  Table 2 is one of the tables giving the

24  results in numerical form; correct?

25       A.  I see that, yeah.

1    Q.  For all cancers, there was no association,

2  P values were just above and just below 1.0 for all

3  quartiles, and the P trend was .91; correct?

4    A.  Yes, the risk ratio was -- yeah, I see

5  that.

6    Q.  Okay.  So it showed no association -- the

7  NCI 2018 showed no association for all cancers

8  grouped together; right?

9    A.  Yes.

10    Q.  And what is a P trend?

11    A.  It's just how the P is changing compared to

12  the quartiles.

13    Q.  And it's a way of measuring multiple

14  confidence intervals at once, to put it in simple

15  terms; right?

16    A.  Sure, right.

17    Q.  And it needs to be .05 to be considered

18  statistically significant; right?

19    A.  Yes.

20    Q.  Okay.  Let's skip over a bunch of solid

21  tumors here and go to lymphohematopoietic cancer.

22  It's on the next page.

23    A.  Okay.

24    Q.  So the lymphohematopoietic groups together

25  the subgroups that appear below it; correct?

1    A.  Yes.

2    Q.  And for four quartiles it shows the point

3  estimates and confidence intervals, for quartiles 1

4  through 3, their point estimates are below 1, and

5  it's exactly 1 for the fourth quartile, and all of

6  it is not significant; right?

7    A.  That's correct.

8    Q.  And the similar pattern of spanning the

9  confidence interval and showing no significant

10 association with most of the point estimates being

11 below 1.0 applies to Hodgkin lymphoma, non-Hodgkin

12 lymphoma in general, B-cell non-Hodgkin lymphoma,

13 chronic lymphocytic lymphoma, diffuse large B-cell

14 lymphoma, marginal-zone lymphoma, follicular

15 lymphoma, and multiple myeloma; right?

16   A.  Yes.

17   Q.  The non-Hodgkin lymphoma T-cell is also not

18 significant with a P trend of .31, although there

19 the point estimates are -- vary from the previous

20 set, they are above 1; right?

21   A.  Say again the last.

22   Q.  Yes.

23       The non-Hodgkin lymphoma T-cell --

24   A.  Uh-huh.

25   Q.  First of all, there is not very many cases

1   for non-Hodgkin lymphoma T-cell compared to some of

2   these others; right?

3        A.  Right, there is nothing.

4        Q.  And the P trend is .31, showing no

5   significant trend; correct?

6        A.  Correct.

7        Q.  And the confidence -- the point estimates

8   here are 1 for no exposure for the first M, which is

9   the first half of the data -- they had to use halves

10  because there was so little data -- the point

11  estimate is 4.25, the confidence interval spans 1,

12  and the point estimate goes down for the higher

13  exposed group to 1.53, and, again, the confidence

14  interval spans 1.  That's a nonsignificant finding;

15  right?

16       A.  Correct.

17       Q.  And that one is not broken down further

18  into further subtypes of T-cell lymphomas; right?

19       A.  There's not enough cases.

20       Q.  Yeah.

21          Acute myeloid leukemia, as we discussed, is

22  not a significant finding, but they suggested that

23  it was a possible trend to be looked at in future

24  studies, and you agreed with that; is that correct?

25       A.  I agree.

1    Q.  You have claimed, sir, that -- since we're

2    looking at this subtype breakdown here on Table 2,

3    and you, of course, are claiming to be an expert on

4    non-Hodgkin lymphoma, you've even been designated in

5    a letter naming your area of expertise as

6    non-Hodgkin lymphoma in this case.  Do you claim to

7    be an expert on any particular subtype of

8    non-Hodgkin lymphoma?

9    A.  All of them.

10   Q.  And you know that there are people -- there

11   are oncologists who treat non-Hodgkin lymphoma who

12   specialize in particular subtypes; correct?

13   A.  Very rare.  Very rare.  Some folks just do

14   T-cells, some folks do B-cells.  But for the most

15   part, if you are going to do non-Hodgkin lymphoma,

16   you do non-Hodgkin and Hodgkin, otherwise you can't

17   have a practice.

18   Q.  Okay.  So your practice is non-Hodgkin plus

19   Hodgkin?

20   A.  Lymphoma.

21   Q.  And all subtypes?

22   A.  Both of them are lymphomas.

23   Q.  And there are people who specialize in just

24   marginal-zone lymphoma or something, but they

25   would --

Page 111

1      A.   Very, very, very rare.

2      Q.   You would find them at a major university

3  or referral center?

4      A.   Extremely -- I mean, and they will have to

5  have a lot of funding to be able to do that, because

6  there's not enough cases to have a practice.

7           MR. GRIFFIS:  Okay.  Give me two minutes to

8           see if that's it.  I'm either done or almost

9           done.

10          VIDEOGRAPHER:  Going off the record at

11          11:04 A.M.

12          (Recess taken from 11:04 P.M. to

13          11:05 P.M.)

14          VIDEOGRAPHER:  We are -- we are back on the

15          record at 11:05 A.M.

16          MR. GRIFFIS:  All right.  Thank you for

17          your time, Dr. Nabhan.  I pass the witness.

18 EXAMINATION

19 BY MR. LITZENBURG:

20     Q.   I just have a couple questions about this

21 monograph about malathion.

22          Have you ever seen this before today?

23     A.   No, I have not.

24     Q.   Okay.  Nonetheless, would you turn to

25 Page 107 of the packet.

1        A.   Page 7?

2        Q.   107.

3        A.   Oh, 107.

4        Q.   Sorry.

5        A.   Okay.

6        Q.   And can you tell us what IARC's assessment

7   overall of malathion was in Section 6.3?

8        A.   "Malathion is probably carcinogenic to

9   humans (Group 2A)."

10        Q.   Okay.  And that is the assessment that

11   glyphosate received as well; is that correct?

12        A.   It is.

13        Q.   Okay.  And then if you look a couple pages

14   back, let's start on Page 103.

15        A.   Okay.

16        Q.   Now, this document was given to you today,

17   and counsel for Monsanto showed you some -- showed

18   you some positive comments about the AHS; would you

19   say that's fair?

20        A.   Yes.

21        Q.   Okay.  And then Page 103, it says that the

22   AHS did not find an increase in the relative risk of

23   non-Hodgkin lymphoma forever versus never use of

24   malathion, the second-to-last paragraph.

25             Do you see that?

1        A.   I see that.

2        Q.   Flipping it over to Page 104, the last

3   sentence before Section 5.2.2, it says, no excess

4   occurred in the Agricultural Health Study cohort; is

5   that right?

6        A.   Yes.

7        Q.   And, nonetheless, IARC saw fit to call this

8   pesticide a probable human carcinogen; right?

9        A.   Yes.

10       MR. LITZENBURG:   Okay.  Nothing further,

11       thanks.

12       MR. GRIFFIS:   Okay.

13   FURTHER EXAMINATION

14   BY MR. GRIFFIS:

15       Q.   Malathion, Page 7, sir.

16       A.   Okay.

17       Q.   Do you see that's headed Section 1.4.2,

18   "Exposure Assessment"?

19       A.   Yes, I see that.

20       Q.   And it reads, "This section summarizes the

21   exposure assessment and assignment for

22   epidemiological studies of cancer and exposure to

23   the pesticides considered in the present volume

24   (diazinon, malathion, glyphosate, tetrachlorvinphos

25   and parathion)"?

Page 114

1    A.  I see that.

2        MR. GRIFFIS:  No further questions.

3        MR. LITZENBURG:  Okay.  None.

4        VIDEOGRAPHER:  This concludes the

5    deposition of Dr. Chadi Nabhan.  We are off the

6    record at 11:08 A.M.

7        (Time noted:  11:08 A.M.)

8

9        _____

10                  DR. CHADI NABHAN

11

12   SUBSCRIBED TO AND SWORN BEFORE ME

13   THIS _____ DAY OF _____, 20__.

14   _____

     (Notary Public)  MY COMMISSION EXPIRES:_____

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2        I, Paula Campbell, CSR, RDR, CRR, CRC, do

3   hereby certify that on Monday, January  15, 2018

4   appeared before me, DR. CHADI NABHAN.

5        I further certify that the said witness was

6   first duly sworn to testify to the truth in the

7   cause aforesaid.

8        I further certify that the signature of the

9   witness to the foregoing deposition was not

10  specified by counsel.

11       I further certify that I am not counsel for

12  nor in any way related to any of the parties to

13  this suit, nor financially interested in the

14  action.

15       IN TESTIMONY WHEREOF, I have hereunto set my

16  hand on this 15th day of January, 2018.

17

18            _____

19            Paula Campbell, CSR, RDR, CRR, CRC
              Certified Shorthand Reporter
20            Registered Diplomate Reporter
              Certified Realtime Reporter
21            Certified Realtime Captioner
22            Illinois C.S.R. No. 084-003481

23

24

25

Page 116

```
 1          ERRATA SHEET FOR THE TRANSCRIPT OF:
 2   CASE NAME:          In re: Roundup Products Liability
 3   DEPOSITION DATE:    January 15, 2018
 4   WITNESS NAME:       Dr. Chadi Nabhan
 5   Reason codes:
 6         1.  To clarify the record.
            2.  To conform to the facts.
 7         3.  To correct transcription errors.
 8   Page _____ Line _____ Reason _____
     From _____ to _____
 9
     Page _____ Line _____ Reason _____
10   From _____ to _____
11   Page _____ Line _____ Reason _____
     From _____ to _____
12
     Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
     From _____ to _____
15
     Page _____ Line _____ Reason _____
16   From _____ to _____
17   Page _____ Line _____ Reason _____
     From _____ to _____
18
     Page _____ Line _____ Reason _____
19   From _____ to _____
20
                         _____
21                            DR. CHADI NABHAN
22   SUBSCRIBED TO AND SWORN BEFORE ME
     THIS _____ DAY OF _____, 20__.
23
     _____
24   (Notary Public)  MY COMMISSION EXPIRES:_____
25
```