# EXHIBIT 29

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE:  ROUNDUP PRODUCTS            )

     LIABILITY LITIGATION,               )

5                                        )

     _____ ) MDL No. 2741

6                                        )

     This document relates to:           ) Case No.

7                                        ) 16-md-02741-VC

     ALL ACTIONS                         )

8                                        )

     _____ )

9

10

11

12

13

14

15              VIDEO DEPOSITION OF

16          DENNIS WEISENBURGER, M.D.

17            MONROVIA, CALIFORNIA

18          MONDAY, JANUARY 22, 2018

19

20

21

22    REPORTED BY:

23    LISA MOSKOWITZ, CSR 10816, RPR, CRR, CLR,

24    NCRA REALTIME SYSTEMS ADMINISTRATOR

25    JOB NO. 136023

Page 2

1

2

3

4

5                JANUARY 22, 2018

6                  8:41 A.M.

7

8

9           VIDEO DEPOSITION OF DENNIS

10  WEISENBURGER, M.D., held at Courtyard by

11  Marriott, 700 West Huntington Drive,

12  Monrovia, California, before Lisa Moskowitz,

13  California CSR 10816, RPR, CRR, CLR, NCRA

14  Realtime Systems Administrator.

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    A P P E A R A N C E S:

2        ANDRUS WAGSTAFF ATTORNEYS AT LAW

3        Attorneys for Plaintiffs

4        7171 West Alaska Drive

5        Lakewood, Colorado 80226

6        BY:  KATHRYN FORGIE, ESQ.

7

8        BAUM HEDLUND ARISTEI & GOLDMAN

9        Attorneys for Plaintiffs

10       12100 Wilshire Boulevard

11       Los Angeles, California 90025

12       BY:  PEDRAM ESFANDIARY, ESQ.

13

14       HOLLINGSWORTH

15       Attorneys for Defendant Monsanto

16       1350 I Street, N.W.

17       Washington, D.C. 20005

18       BY:  KIRBY GRIFFIS, ESQ.

19       BY:  ELYSE SHIMADA, ESQ.

20

21   ALSO PRESENT:

22       ANDREW TURNER, VIDEOGRAPHER

23

24

25

1        --------------- I N D E X -----------------

2      WITNESS:            EXAMINATION                    PAGE

3      DENNIS WEISENBURGER, M.D.

4                         Mr. Griffis            9, 147

5                         Ms. Forgie                141

6

7

8        -------------- E X H I B I T S ------------

9      NUMBER                                      MARKED

10     Exhibit 31-1    Notice to take oral and        10

11                     videotaped deposition of

12                     Dr. Dennis D.

13                     Weisenburger

14     Exhibit 31-2    Amended Notice to take         10

15                     oral and videotaped

16                     deposition of Dr. Dennis

17                     D. Weisenburger

18     Exhibit 31-3    Supplemental report of         10

19                     Dr. Dennis D.

20                     Weisenburger, M.D.,

21                     pursuant to PTO number

22                     34 and in support of

23                     general causation on

24                     behalf of plaintiffs

25

1

2   Exhibit 31-4      Supplemental materials      10

3                     related to the 2017 AHS

4                     publication

5   Exhibit 31-5      Andreotti study            10

6   Exhibit 31-6      Malathion monograph        18

7   Exhibit 31-7      Expert report of Dr.       73

8                     Dennis D. Weisenburger,

9                     M.D., in support of

10                    general causation on

11                    behalf of plaintiffs

12  Exhibit 31-8      Bonner study               93

13  Exhibit 31-9      Koutros study              93

14  Exhibit 31-10     Koutros study              93

15  Exhibit 31-11     Heltshe study              103

16  Exhibit 31-12     Montgomery study           122

17  Exhibit 31-13     Rinsky study               122

18

19

20

21

22

23

24

25

1    QUESTIONS NOT ANSWERED

2          PAGE      LINE

3            20         9

4            20        16

5            21        14

6            22         5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    LOS ANGELES, MONDAY, JANUARY 22, 2018.

2                    8:41 A.M.

3

4            THE VIDEOGRAPHER:   Good morning.

5       This is the start of media labeled

6       number 1 of the video-recorded

7       deposition of Dennis Weisenburger in the

8       matter of Roundup Products liability

9       litigation in the court of the U.S.

10      District Court, Northern District of

11      California, case number 16-MD-02741-VC.

12      This deposition is being held at the

13      Courtyard Marriott, address 700 West

14      Huntington Drive, Monrovia, California

15      91016 on January 22 at approximately

16      8:41 a.m.

17           My name is Andrew Turner.  I am the

18      legal video specialist from TSG

19      Reporting, Incorporated, headquartered

20      at 747 Third Avenue, New York, New York.

21      The court reporter today is Lisa

22      Moskowitz in association with TSG

23      Reporting.

24           Counsel, will you please introduce

25      yourselves.

1          MS. FORGIE:  Kathryn Forgie for the

2      plaintiffs.

3          MR. ESFANDIARY:  Pedram Esfandiary

4      for the plaintiffs.

5          MR. GRIFFIS:  Kirby Griffis,

6      Hollingsworth, LLP, for Monsanto.

7          MS. SHIMADA:  Elyse Shimada,

8      Hollingsworth, LLP, for Monsanto.

9          THE VIDEOGRAPHER:  Thank you.

10         Will the court reporter please

11     swear in the witness.

12

13  Dennis Weisenburger, MD,

14             called as a witness, having been

15             duly sworn, was examined and

16             testified as follows:

17

18         MS. FORGIE:  I want to make a

19     statement for the record.

20         This deposition is being taken

21     pursuant to pre-trial order number 34.

22     It is limited to the recent Agricultural

23     Health Study publication.  It is also

24     limited to two-and-a-half hours of

25     questioning.

1               EXAMINATION

2  BY MR. GRIFFIS:

3      Q.   Good morning, Dr. Weisenburger.

4      A.   Good morning.

5      Q.   We met one time at a prior version

6  of this deposition; is that right?

7      A.   Yes.

8      Q.   You formed your opinions about

9  causation in this litigation, i.e., that

10  glyphosate causes non-Hodgkin's lymphoma

11  without any data from the Agricultural

12  Health Study after the DeRoos 2005

13  publication; correct?

14          MS. FORGIE:   Objection.

15          THE WITNESS:   That's correct.

16  BY MR. GRIFFIS:

17      Q.   At your deposition I showed you an

18  unpublished draft of some data through 2013

19  from the AHS pool of data, and we discussed

20  it.   That was not included in your original

21  report or in your original assessment of

22  causation; right?

23      A.   That's correct.

24      Q.   And that data, additional data, has

25  now been published in the 2018 publication

1    in the "Journal of the National Cancer

2    Institute," and we're going to be talking

3    about that today; right?

4         A.   Yes.

5         Q.   Now, you said in your

6    supplemental -- well, let me say what I've

7    marked prior to starting the deposition.

8    Exhibit 1 is the original notice of

9    deposition in this case.  Exhibit 2 is a

10   second notice of deposition with the time

11   corrected because you asked to be deposed at

12   9 o'clock, rather than 1 o'clock, the

13   original information we had.  3 is your

14   supplemental expert report that's marked in

15   front of you.  4 is an additional materials

16   considered list that we received quite

17   recently, and 5 is the National Cancer

18   Institute 2018 study.

19             (Exhibit Numbers 31-1, 31-2,

20             31-3, 31-4, and 31-5 were

21             marked for identification.)

22   BY MS. FORGIE:

23        Q.   Correct, sir?

24             MS. FORGIE:  I don't think we have

25        all the copies here, additional copies.

1       MR. GRIFFIS:  Do you need an

2    additional copy of the notice of

3    deposition?

4       MS. FORGIE:  I just want to make

5    sure I know what it is.

6       THE WITNESS:  Everything is here.

7       MS. FORGIE:  Yeah, but it's not

8    here.  Let me just look real quick.

9       Okay.

10   BY MR. GRIFFIS:

11      Q.   In your supplemental expert report,

12   sir, which is Exhibit 3, can you get that

13   out, please.  On the second page which is

14   also the last page, last paragraph, the

15   first sentence is "In conclusion, my opinion

16   on the role of glyphosate as a cause of NHL

17   has not changed based on the

18   recently-published update of the AHS";

19   correct?

20      A.   Yes.

21      Q.   So you don't rely certainly on the

22   NCI, National Cancer Institute 2018 study as

23   proof that Roundup does cause NHL; right?

24      A.   I do not.

25      Q.   And what weight do you give it as

1  evidence that Roundup glyphosate-containing

2  substances don't cause NHL?

3      A.   Well, I give it some weight because

4  it is now a published study in a reputable

5  journal, but there are significant issues

6  and flaws in the study which would lead me

7  to not give it very much weight or to change

8  my opinion.

9      Q.   Does it weaken your conviction that

10 Roundup or glyphosate-containing substances

11 cause non-Hodgkin's lymphoma?

12     A.   No.

13          MS. FORGIE:  Object to the form.

14          THE WITNESS:  No.

15 BY MR. GRIFFIS:

16     Q.   If you give it some weight, sir,

17 would you please explain how it is that it

18 does not weaken your conclusion?

19     A.   Well, the findings are basically

20 the same as the original De Roos study.

21 They added more cases.  They added more

22 follow-up time.  They did a bit more

23 sophisticated analysis, but the results are

24 basically the same in all findings.  So I

25 don't give it really more -- any more weight

1  than I gave the original De Roos study.

2      Q.   And that weight, the weight that

3  the original De Roos study had, was built

4  into your original evaluation and your

5  original expert report, of course; correct?

6      A.   Yes.

7      Q.   Would you please comment on why you

8  give it no more weight than you gave to the

9  De Roos 2005 paper if it is, as you just

10  said, larger and has more follow-up time and

11  more sophisticated methods of analysis?

12          MS. FORGIE:  Object to the form.

13          THE WITNESS:  Well, as I mentioned,

14      there are significant issues and flaws

15      with the study that I think call into

16      question the validity of the study in

17      terms of a negative finding, and, you

18      know, if one looks at all of the

19      epidemiologic evidence, there are

20      multiple case control studies which are

21      positive.  And there's one cohort study,

22      the Agricultural Health study, which is

23      negative.  So you've got multiple

24      positive studies, you've got one

25      negative study which is questionable,

1       and so it really doesn't change my

2       opinion to any degree.

3   BY MR. GRIFFIS:

4       Q.   I don't want to misrepresent the

5   methodology you applied, sir.  You certainly

6   don't just count up the positives and the

7   negatives and compare them.  You weigh the

8   value?

9       A.   Correct.

10      Q.   And reliability of each study

11  before you reach a conclusion.  Fair?

12      A.   Yes, that's correct.

13      Q.   And one important factor in

14  weighing the reliability and validity of

15  studies is the size of the study, the number

16  of exposed cases, the length of follow-up,

17  the sophistication of the epidemiologic

18  analysis, et cetera; correct?

19          MS. FORGIE:  Object to the form.

20          THE WITNESS:  Right.  You look at

21      each of the studies individually.  You

22      draw some conclusions about whether they

23      are acceptable studies or not, and then

24      you weigh that evidence.  And that's

25      what I did.

1    BY MR. GRIFFIS:

2         Q.   Is it fair to say that the -- you

3    identified a number of what you consider to

4    be flaws in the National Cancer Institute

5    2018 study in your supplemental expert

6    report; right?

7         A.   Yes.

8         Q.   Is it fair to say that it is

9    because of those flaws that you believe to

10   exist in the study that you have given it no

11   more weight than you originally gave to

12   De Roos 2005?

13        A.   Yes.

14        Q.   You don't claim that recall bias is

15   a flaw in the NCI 2018 study; right?

16             MS. FORGIE:  Object to the form.

17             THE WITNESS:  I don't claim that,

18        no.

19   BY MR. GRIFFIS:

20        Q.   Recall bias is a concern for case

21   control studies but generally not a concern

22   for cohort studies; is that fair?

23             MS. FORGIE:  Object to the form.

24             THE WITNESS:  That's true.

25   ///

1  BY MR. GRIFFIS:

2      Q.   And recall bias refers not to just

3  mistakes people might make when asked to

4  recall but differential recall based on

5  whether you already have the condition that

6  the study is looking at or don't have it;

7  correct?

8      A.   Yes.

9      Q.   And that's why it tends to apply to

10  case control and not as to cohort studies;

11  right?

12          MS. FORGIE:  Object to the form.

13          THE WITNESS:  Yes.

14  BY MR. GRIFFIS:

15      Q.   If someone said recall bias happens

16  any time you ask anyone to recall, they

17  wouldn't understand what they were talking

18  about epidemiologically speaking; right?

19          MS. FORGIE:  Object to the form.

20          THE WITNESS:  Well, in

21      epidemiologic terms, you're right.

22  BY MR. GRIFFIS:

23      Q.   Okay.  Now, do you know, sir, that

24  IARC found the AHS to be a highly

25  informative study including their imputation

1    procedures?

2           MS. FORGIE:  Object to the form.

3           THE WITNESS:  I don't recall that.

4    BY MR. GRIFFIS:

5        Q.   Have you been shown the malathion

6    monograph, sir?

7        A.   No.

8        Q.   And you know what I mean when I

9    refer to the malathion monograph?

10        A.   I assume it's an IARC monograph on

11    malathion.

12        Q.   Do you know that when the

13    glyphosate monograph was done, the same

14    working groups were simultaneously working

15    on other substances?

16        A.   Yes.

17        Q.   And actually dividing their time

18    between glyphosate and other substances --

19        A.   Yes.

20        Q.   -- including malathion.  You know

21    that, sir?

22        A.   I don't know what other pesticides

23    they were considering but yes, they were

24    considering other pesticides as part of

25    their work.

1      Q.   I'll show you the malathion

2   monograph.

3           MS. FORGIE:  I'm going to object to

4      this.  It's completely beyond the scope.

5      It's not in his supplemental report and

6      it's not about the AHS.  Unless you can

7      tie it pretty quickly to the AHS

8      publication, the actual publication

9      which was not published at the time --

10      the publication we're talking about

11      which was not published at the time the

12      malathion IARC monograph was, then I'm

13      going to instruct him not to answer.

14           MR. GRIFFIS:  I admonish counsel

15      not to make speaking objections.

16           MS. FORGIE:  That's not an

17      objection.  It's a statement as to what

18      is going on here.

19           MR. GRIFFIS:  I admonish counsel

20      not to make speaking statements.

21           MS. FORGIE:  I'll make whatever

22      statements I can that are important.

23           (Exhibit Number 31-6 was marked

24           for identification.)

25   ///

1    BY MR. GRIFFIS:

2         Q.    Turn, sir, to what I've marked as

3    Exhibit 6.  It's the same day as the other

4    monograms.

5              MS. FORGIE:  2015, three years

6         before the publication.

7              MR. GRIFFIS:  Counsel.

8              MS. FORGIE:  I'm asking why are we

9         talking about this when this --

10             MR. GRIFFIS:  We're not going to

11        have a debate on the record.  He's not

12        going to listen to your --

13             MS. FORGIE:  I can make whatever

14        statements I want.  Unless you can tie

15        this into his supplemental report or the

16        AHS publication we're talking about, I'm

17        going to instruct him not to answer.

18        It's not appropriate.

19             MR. GRIFFIS:  We'll be back.

20             MS. FORGIE:  Fine.  We've done that

21        before.

22   BY MR. GRIFFIS:

23        Q.    Counsel.

24              Turn to page 7?

25        A.    I'd like to state I haven't

1    reviewed this document.

2        Q.   Yes, sir.  You did review the

3    monograph for glyphosate; right?

4        A.   I did.

5        Q.   Take a look on page 7 under

6    "Exposure assessment."

7             Do you see that?

8        A.   Yes.

9        Q.   Do you see it says, "This section

10   summarizes the exposure assessment and

11   assignment for epidemiological studies of

12   cancer and exposure to the pesticides

13   considered in the present volume."

14             MS. FORGIE:  Don't answer that.

15   BY MR. GRIFFIS:

16        Q.   And it lists multiple substances

17   including glyphosate?

18             MS. FORGIE:  Don't answer that,

19        please.

20             This has nothing to do with what

21        we're here for.  I'm going to instruct

22        him not to answer.

23             MR. GRIFFIS:  This is about the AHS

24        data.

25             MS. FORGIE:  No, this is not about

1    the AHS publication.  This was published

2    three years before the publication, and

3    he's already stated he hasn't reviewed

4    it.

5  BY MR. GRIFFIS:

6    Q.   Sir, you have a criticism of

7  imputation; correct?  Imputation as done in

8  the NCI 2018?

9    A.   I have a criticism of imputation as

10  it was done with regard to glyphosate.

11    Q.   And do you know that the IARC

12  commented on that very imputation procedure?

13    A.   No, I don't know that they --

14    Q.   Turn to page 21, sir.

15    MS. FORGIE:  No, don't answer that.

16    Don't answer any questions about the

17    malathion.

18  BY MR. GRIFFIS:

19    Q.   Sir, you've said you haven't

20  reviewed the malathion monograph.  You also

21  haven't reviewed the section that addresses

22  IARC's assessment of epidemiology from the

23  agriculture Health Study including

24  glyphosate; is that right?

25    A.   I'm sorry.  Repeat -- would you

1  repeat the question?

2      Q.   Yes, sir.  You said you haven't

3  reviewed the malathion monograph.

4      A.   That's correct.

5      Q.   You also haven't reviewed the

6  section in the malathion monograph in which

7  IARC addressed its view of the Agricultural

8  Health Survey data including De Roos 2005

9  and multiple subsequent publications that

10 they took into account in the glyphosate

11 monograph and other monographs and gave its

12 assessment of the quality of that data;

13 right?

14         MS. FORGIE:  Don't answer that.

15     He's not going to answer questions about

16     the malathion monograph.

17 BY MR. GRIFFIS:

18     Q.   Do you agree with the working group

19 that the AHS is a highly informative study?

20         MS. FORGIE:  Could I have that read

21     back, please.

22 BY MR. GRIFFIS:

23     Q.   Do you agree with IARC that the AHS

24 is a highly informative study?

25         MS. FORGIE:  Object to the form.

1        THE WITNESS:   In general, I would

2    say yes.

3    BY MR. GRIFFIS:

4        Q.   Do you consider it to be -- let's

5    talk specifically about the NCI 2018 data.

6    You know, sir, that there have been many,

7    many publications from the AHS pool of data;

8    right?

9        A.   Yes.

10        Q.   And they address many possible

11    outcomes, not just non-Hodgkin's lymphoma

12    and glyphosate; right?

13        A.   Yes.

14        Q.   Many, many substances and other

15    exposures and other possible health risks

16    have been compared to many, many outcomes,

17    and there are multiple publications about

18    that; right?

19        A.   Yes.

20        MS. FORGIE:   Object to the form.

21    BY MR. GRIFFIS:

22        Q.   Are you aware that there have been

23    multiple publications using the same

24    imputation method that was used in the NCI

25    2018 paper?

1      A.   Yes, there have been others.

2      Q.   And there have been multiple

3  peer-reviewed papers applying that

4  methodology; right?

5      A.   Yes.

6      Q.   And you didn't know before today

7  that IARC had also looked at that same

8  imputation procedure; right?

9           MS. FORGIE:  Object to the form.

10           THE WITNESS:  I did not.

11  BY MR. GRIFFIS:

12      Q.   When you say that you agree with

13  IARC that -- well, when you say that the NCI

14  2018 paper is highly reliable, what do you

15  mean by that, sir?

16           MS. FORGIE:  Object to the form.

17           THE WITNESS:  I didn't make that

18      statement.

19  BY MR. GRIFFIS:

20      Q.   I'm sorry.  Highly informative.

21           MS. FORGIE:  Object to the form.

22  BY MR. GRIFFIS:

23      Q.   Let me ask it again cleanly --

24      A.   Well, you know, it lays out in

25  detail the follow-up that was done, the

1   methodology, and, you know, it is

2   informative in the sense that it provides

3   new information.  But as I said before, I

4   think that there are significant issues and

5   flaws that really take away from the -- call

6   the findings into question and take away

7   from the validity of the study.  And I'm

8   speaking specifically about the glyphosate

9   study.

10      Q.   Had you reviewed the NCI 2018

11   paper, would you have recommended it for

12   publication in the "Journal of the National

13   Cancer Institute"?

14      A.   I probably would have not.

15      Q.   You disagree with the peer

16   reviewers of the "Journal of the National

17   Cancer Institute" as to the appropriateness

18   of the publication?

19          MS. FORGIE:  Object to the form.

20          THE WITNESS:  I think the peer

21       reviewers probably didn't address the

22       issues and flaws in the study in an

23       informative way and so didn't call into

24       question the study.  I mean, I don't

25       know.  The peer review is secret; so we

1          don't know who the peer reviewers were,

2          and we don't know what they said or

3          didn't say.

4     BY MR. GRIFFIS:

5          Q.   Do you peer review for the "Journal

6     of the National Cancer Institute"?

7          A.   I don't remember if I have or not.

8     Not commonly.  Not usually, no.

9          Q.   You can't remember if you have; is

10    that right?

11         A.   I can't remember off the top of my

12    head if I have or not.

13         Q.   Okay.  Are there any -- what

14    journals -- are there any epidemiology

15    journals that you peer review for, sir?

16         A.   I have done reviews for "Cancer

17    Epidemiology, Biomarkers and Prevention."  I

18    may have done reviews for other epidemiology

19    journals, but in general, I don't accept

20    reviews from epidemiology journals.

21         Q.   Why is that?

22         A.   Well, because it's a lot of work,

23    and I'm a busy man.

24         Q.   Why is it a lot of work to do

25    epidemiology reviews?

1      A.    Well, any review is a lot of work.

2   You have to read the paper critically.   You

3   have to read the literature around it.   You

4   have to understand the methodology.   It can

5   take you literally hours and hours to do a

6   proper review of a complicated or difficult

7   article and write a very, I would say,

8   helpful and critical review of comments to

9   the editor and to the authors.   So it's a

10  lot of work to do that, and, of course, it's

11  done in my free time, my weekends, nights,

12  and holidays.   That's when I end up having

13  to do it because I have a full-time job.   So

14  I don't do it very often.   I very carefully

15  pick the articles that I review, things that

16  I'm interested in or things that I've

17  done -- I have myself done research on

18  usually.

19      Q.    Take a look at Exhibit 5, the NCI

20  2018 paper, sir.

21          I'm going to start out in the

22  abstract, the part marked "Conclusions.   The

23  author has concluded that in this large

24  perspective cohort study, no association was

25  apparent between glyphosate and any solid

1  tumors or lymphoid malignancies overall,

2  including NHL and its subtypes."

3          Have I read that correctly?

4  A.    Yes.

5  Q.    And that accurately describes the

6  findings of the study; right?

7          MS. FORGIE:  Object to the form.

8          THE WITNESS:  Yes.

9  BY MR. GRIFFIS:

10  Q.    In the discussion section, first

11  paragraph of the discussion section on

12  page 5 of 8, sir, the authors wrote, "In

13  this updated evaluation of glyphosate use

14  and cancer risk in a large perspective study

15  of pesticide applicators, we observed no

16  associations between glyphosate use and

17  overall cancer risk or with total

18  lymphohematopoietic cancers including NHL

19  and multiple myeloma."

20          Have I read that right?

21  A.    Yes.

22  Q.    That's an accurate description of

23  the finding in the study; right?

24          MS. FORGIE:  Object to the form.

25          THE WITNESS:  Yes.

1   BY MR. GRIFFIS:

2       Q.   On page 7 of 8, sir, in the

3   right-hand column in the first full

4   paragraph, the authors of the NCI 2018 study

5   comment on the scope of this study compared

6   to the De Roos 2005 publication, and they

7   write, "In this perspective cohort study, we

8   expanded a previous analysis of glyphosate

9   use and cancer risk with more than eleven

10  years of additional follow-up and more than

11  four times the number of glyphosate-exposed

12  cancer cases, n equals 5,779 compared with n

13  equals 1,324."

14          Did I read that right?

15      A.   Yes.

16      Q.   That's an accurate comparison of

17  this study to the De Roos 2005 study;

18  correct?

19          MS. FORGIE:  Object to the form.

20          THE WITNESS:  Yes.

21  BY MR. GRIFFIS:

22      Q.   On the other -- in the left-hand

23  column, sir, the first full paragraph, the

24  authors repeat that they observed no

25  associations between glyphosate use and NHL

1    overall or any of its subtypes.  And then

2    they say, "This lack of association was

3    consistent for both exposure metrics,

4    unlagged and lagged analyses, after further

5    adjustment for pesticides linked to NHL in

6    previous AHS analyses and when we excluded

7    multiple myeloma from the NHL grouping."

8             Have I read that correctly?

9             MS. FORGIE:  Object to the form.

10            THE WITNESS:  Yes.

11   BY MR. GRIFFIS:

12       Q.   And that's accurate.  They did all

13   those adjustments and they still found no

14   association; correct?

15            MS. FORGIE:  Object to the form.

16            THE WITNESS:  Yes.

17   BY MR. GRIFFIS:

18       Q.   In Table 2, sir, Table 2 of the

19   data table, these are their findings for all

20   cancers, multiple and specific, solid and

21   lymphohematopoietic cancers; correct?

22       A.   Yes.

23       Q.   For all cancers they found no

24   association.  All of the relative risks were

25   right around one; correct?

1          MS. FORGIE:  Object to the form.

2          THE WITNESS:  Yes.

3    BY MR. GRIFFIS:

4      Q.   And when -- generally speaking,

5    sir, when an epidemiology study investigates

6    whether a particular exposure causes a

7    particular outcome, it looks at a whole

8    bunch of different outcomes and it finds

9    relative risks a little bit above one, a

10   little bit below one, consistently none of

11   them are statistically significant, the

12   confidence interval is always straddling the

13   one, that's what you would expect to see

14   when a substance does not cause cancer;

15   right?

16          MS. FORGIE:  Object to the form.

17          THE WITNESS:  In general, yes.

18   BY MR. GRIFFIS:

19     Q.   So, in general, and we'll talk

20   about your specific criticisms of this in a

21   moment, of course, sir, but, in general,

22   this is the pattern of relative risks, point

23   estimates, and confidence intervals you

24   would expect to see in a large epidemiology

25   study where there is, in fact, no

1   association between the substance being

2   examined and the multiple cancers being

3   examined; correct?

4           MS. FORGIE:  Object to the form.

5           THE WITNESS:  Yes.

6   BY MR. GRIFFIS:

7       Q.   So we just talked about the all

8   cancers finding.  There are also multiple

9   breakdown, oral cavity, colon, rectum,

10  pancreas, lung, melanoma, prostate,

11  testicular, bladder and kidney --

12          MS. FORGIE:  Are you still on

13      Table 2?

14          MR. GRIFFIS:  Yes.

15          MS. FORGIE:  Thank you.

16  BY MR. GRIFFIS:

17      Q.   And those are all negative as well;

18  correct?

19      A.   I don't know.  I didn't look

20  carefully at them.

21      Q.   Yes, sir.

22      A.   Yes, I guess, they are all

23  negative.  That's true.

24      Q.   So they're all very close to one,

25  some of the values are above one, some of

1    the values are below one.  All of them are

2    non-significant and the P-trend, which is a

3    way of looking at a group of relative risks

4    and confidence intervals together for

5    different exposure levels, those are all

6    non-significant as well; correct?

7        A.   Yes.

8        Q.   And that was for the solid tumors

9    to be clear.

10            Let's talk about the

11   lymphohematopoietic cancers which would be

12   the lymphomas -- correct? -- and leukemias?

13       A.   Yes.

14       Q.   The overall figure for

15   lymphohematopoietic cancers is negative.

16   Relative risks are all one or below.

17   Confidence intervals all straddle the null,

18   the one; correct?

19            MS. FORGIE:  Object to the form.

20            THE WITNESS:  Yes.

21   BY MR. GRIFFIS:

22       Q.   And the subtypes, the Hodgkin

23   lymphoma breakdown is also negative.  The

24   overall non-Hodgkin's lymphoma breakdown is

25   negative; correct?

Page 34

1       MS. FORGIE:  Are you on Table 3 now

2   or Table 2?

3       MR. GRIFFIS:  Still on Table 2.

4       THE WITNESS:  Second part of

5   Table 2.

6       MS. FORGIE:  Okay.

7       THE WITNESS:  So both Hodgkin and

8   non-Hodgkin show the same pattern.

9   BY MR. GRIFFIS:

10   Q.   Right.  I.e., no association;

11   correct?

12   A.   Correct.

13   Q.   And then there's a breakdown for

14   various subtypes of non-Hodgkin lymphoma;

15   correct?

16   A.   Yes.

17   Q.   So for non-Hodgkin lymphoma B-cell,

18   there's no association.  For chronic

19   lymphocytic lymphoma and small lymphocytic

20   leukemia, there is no association; correct?

21   A.   Correct.

22   Q.   For diffuse large B-cell lymphoma,

23   no association; correct?

24       MS. FORGIE:  Object to the form.

25       THE WITNESS:  Correct.

1    BY MR. GRIFFIS:

2        Q.   For marginal-zone lymphoma, no

3    association; correct?

4        A.   Correct.

5        Q.   For follicular lymphoma, no

6    association; correct?

7        A.   Correct.

8        Q.   For multiple myeloma, no

9    association; correct?

10       A.   Correct.

11       Q.   For non-Hodgkin lymphoma T-cell, we

12   have the smallest -- we have a very small

13   exposed group so that they have to use

14   moieties instead of breaking into three or

15   four groups; right?

16       A.   Right.  They can only break them

17   into two groups.

18       Q.   Let's comment on that for a moment.

19   When there was enough data, they broke it

20   into four groups, into quartiles; right?

21           MS. FORGIE:  Object to the form.

22           THE WITNESS:  Tertiles or

23       quartiles, yes.

24   BY MR. GRIFFIS:

25       Q.   And when there was slightly less

1   data, they broke it into tertiles, and when

2   there was the least amount of data, they

3   broke it into moieties, into halves; right?

4        A.    Correct.

5        Q.    This is one of the ones for which

6   they had the least data, and these values

7   are above one, but they are not significant;

8   correct?

9        A.    Correct.

10           MS. FORGIE:   Objection.

11  BY MR. GRIFFIS:

12       Q.    So, again, there's no association

13  for non-Hodgkin's lymphoma T-cell in this

14  data; correct?

15           MS. FORGIE:   Object to the form.

16           THE WITNESS:   There's no

17       significant association.

18  BY MR. GRIFFIS:

19       Q.    The .31 is a measure of the

20  P-trend -- correct? -- whether there's an

21  association across the data?

22       A.    .31 just looks at trend by

23  comparing the different groups.  So what the

24  .31 is telling you is that the M2 group does

25  not have a higher risk ratio than the M1; so

1  that's why it's not significant.

2      Q.    This data would show -- you said

3  there's an association but not a

4  statistically significant one; right, sir?

5  Is that what you said?

6      A.    Right.  So you can see in the M1

7  there's an over fourfold increase odds ratio

8  for T-cell lymphoma, but since there's only

9  six cases in the M2 group, there wasn't an

10  increased -- there was a small increased

11  odds ratio.  So what this is telling you

12  there isn't really what I would call a

13  dose-response effect here, although it's a

14  very crude analysis with very few cases and

15  only two groups so . . .

16      Q.    So the data shows no-dose response?

17          MS. FORGIE:  Object to the form.

18          THE WITNESS:  Well, the data is so

19      small that it's hard to draw any

20      conclusions from that.

21          MS. FORGIE:  Counsel, when you get

22      a chance, the reason I keep asking if

23      we're still on Table 2 is maybe when you

24      finish Table 2, we can take a break.  I

25      left my phone, I think, in the room so

1      when you get to a good breaking point.

2      That's why I keep saying are you still

3      on table 2.

4          MR. GRIFFIS:  Okay.  I'll stop when

5      we're done with table 2.

6          MS. FORGIE:  Okay, or if there's an

7      earlier one, whatever is best for you.

8  BY MR. GRIFFIS:

9      Q.   So the data for non-Hodgkin

10 lymphoma T-cell is so small you can't draw a

11 reasonable conclusion; is that --

12         MS. FORGIE:  Object to the form.

13         THE WITNESS:  I would say that is

14     true.

15 BY MR. GRIFFIS:

16     Q.   You made a distinction earlier, and

17 I'm not talking about non-Hodgkin lymphoma

18 T-cell in particular, I'm talking in

19 general.  You made a distinction between

20 whether there's an association or not and

21 whether that association is statistically

22 significant; right?

23     A.   Right.

24     Q.   What does "statistically

25 significant" mean in epidemiology, sir?

1      A.   Well, it's a measure of the

2   likelihood of -- that the association is due

3   to chance.  So if it is statistically

4   significant, it's unlikely to be due to

5   chance.  It's very likely to be real.

6      Q.   When we're looking at each of these

7   point estimates like under follicular

8   lymphoma, the point estimate for the first

9   tertile is 0.89; correct?

10      A.   Right.

11      Q.   Where we looked to see if it's

12   statistically significant is the confidence

13   interval, the parenthetical afterwards and

14   to see if that spans or does not span the 1,

15   the null value; correct?

16      A.   Yes.

17      Q.   If somebody said statistically

18   significant means greater than one, and

19   that's all it means, they don't know what

20   they're talking about; right?

21          MS. FORGIE:  Well, object to the

22      form.

23          THE WITNESS:  Well, it depends

24      where the one is.

25   ///

1  BY MR. GRIFFIS:

2      Q.   A point estimate of greater than

3  one without regard to the confidence

4  interval.

5      A.   Yes, that's true.

6          MR. GRIFFIS:  We can take a break.

7          MS. FORGIE:  Thank you.

8          THE VIDEOGRAPHER:  We are going off

9      the record at 9:14 a.m.

10          (Recess taken from 9:14 a.m. to

11          9:24 a.m.)

12          THE VIDEOGRAPHER:  This continues

13      disk number 1.  We are going back on the

14      record.  The time is 9:24 a.m.

15  BY MR. GRIFFIS:

16      Q.   All right, Dr. Weisenburger, I'd

17  like to go to Exhibit 3, which is your

18  supplemental expert report.

19          You told me earlier that there are

20  a number of what you consider to be errors

21  or weaknesses or flaws in the NCI 2018 paper

22  that caused you to give it no more weight

23  than you gave to De Roos 2005.  What I want

24  to do first is just enumerate the flaws you

25  see in the NCI 2018 paper.  Let's get that

1    done first, and then we'll talk about them.

2             So I'll give you some guidance but

3    tell me if I'm wrong about anything.  It

4    seems to me that the first one that you

5    identified, sir, is a response rate one.

6    This is in the first -- the second

7    paragraph.  You raised the issue of problems

8    that could happen if response rates to

9    follow-up surveys are low, and then you say,

10   "Only 44 percent of enrolled applicators

11   completed and returned a supplemental

12   questionnaire"; correct?

13        A.   Yes.

14        Q.   That 44 percent does not -- doesn't

15   reflect a questionnaire that was actually

16   used in the NCI 2018; right?

17        A.   Oh, I'm sure data to perform that

18   supplemental questionnaire was used.

19             MS. FORGIE:  Object to the form.

20   BY MR. GRIFFIS:

21        Q.   The two surveys that were used were

22   the original one and the 1999 to 2005 one.

23   You go on to describe 37 percent of

24   applicators failing to respond to that one;

25   correct?

1      A.    Right.

2      Q.    And the two that are described in

3  the study and from which the data are pooled

4  in the NCI 2018 study and the text of the

5  study and the methods and analysis are the

6  1999 -- the original survey, 1993 to '97 and

7  the '99 to 2005 one; right?

8      A.    Well, the supplemental

9  questionnaire in which only 40 percent of

10  the applicators responded was a take-home

11  questionnaire after they filled out the

12  initial questionnaire for enrollment.  Okay?

13  And that data was used in many of the

14  studies and was probably used in -- it was

15  probably used in the analysis of the people

16  who responded to the second questionnaire.

17  And it was certainly used in the data from

18  De Roos 2000 -- the first De Roos paper.

19      Q.    2005?

20      A.    Yeah, so it's supplemental

21  information that they had on a subset and

22  they used that data.  They didn't just

23  discard that data.

24      Q.    Okay.  We'll come back to that.

25      A.    They used what they had.

1    Q.   The first error -- should I call

2  them errors or biases or flaws or what?

3    A.   I think they're flaws.

4    Q.   The first flaw that you identified

5  in your supplemental expert report is the

6  non- -- the relatively high non-response

7  rate.  The non-response rate; correct?

8    A.   In the follow-up and supplemental

9  questionnaires, yes.

10    Q.   Okay.  And the way that was

11  addressed you discuss at the bottom of the

12  first page, the last paragraph there.  The

13  imputation method; right?

14    A.   Right.  The imputation methods were

15  used to address the lack of response to the

16  first follow-up survey.

17    Q.   Okay.  So it's kind of --

18    A.   Not that it was used to address the

19  lack of information from the supplemental

20  survey done at the time of enrollment.

21    Q.   These are kind of the same

22  criticism.  It's a lack of follow-up and

23  then the imputation method that was used to

24  address that you have critiques of; correct?

25         MS. FORGIE:  Object to the form.

1          THE WITNESS:  You have to repeat

2      the question.  I don't understand the

3      question.

4  BY MR. GRIFFIS:

5      Q.   I'm just trying to get a list right

6  now so that we can go through and do them

7  one by one, a list of what you perceive to

8  be the flaws in the NCI 2018.

9      A.   Okay.

10     Q.   I'm trying to know whether the

11 response rate one goes with the imputation

12 one so we can address them together or if

13 they're distinct facets of those.

14     A.   So, yeah, the lack of response from

15 37 percent of the applicators, the authors

16 of the paper tried to address using this

17 imputation method.  So they basically used

18 their method to try and guess what the

19 responses would have been for those

20 37 percent of people who didn't respond.

21     Q.   Okay.  So the next flaw that you

22 identified is in the, if I'm reading it

23 correctly, it's in the second paragraph at

24 the end.  You said that "For the responders,

25 pesticide use data was only obtained for the

1    last year of farming prior to the follow-up

2    survey"; right?

3              MS. FORGIE:  Object to the form.

4              THE WITNESS:  Let's see.  Where is

5        that?

6    BY MR. GRIFFIS:

7        Q.   It's the second paragraph of your

8    supplemental expert report at the end of

9    that paragraph.

10       A.   Yeah, so they only asked -- in this

11   first follow-up questionnaire, they only --

12   which occurred anywhere from, I guess,

13   probably 6 to 12 years after the initial

14   questionnaire, they only asked for

15   information on pesticide use for the last

16   year of farming.  So they didn't ask for any

17   information in the period of time between

18   the last year of farming and the last year

19   that was included in the initial enrollment

20   questionnaire.

21       Q.   So that's a second flaw, the first

22   one being the low response rate and the

23   attempt to fix it with imputation which you

24   feel was unsuccessful, and the second one

25   was asking only for the last year of farming

1    in the follow-up survey.

2         MS. FORGIE:  Object to the form.

3    BY MR. GRIFFIS:

4        Q.   Is that right, sir?  Is that an

5    accurate list so far?

6        A.   Yes, that's true.

7        Q.   And then the third that I see if

8    I'm correct is that there was an increase in

9    glyphosate use that you believe likely

10   resulted in significant misclassification of

11   some exposures; right?

12       A.   Right.

13       Q.   The next thing you write is

14   imputation as we discussed.  That kind of

15   fits with the first criticism.

16            MS. FORGIE:  Object to the form.

17            THE WITNESS:  The third one that

18       you mentioned, the dramatic increase,

19       really reflects on how the cases were

20       actually classified in the initial

21       enrollment.  It also complicates the

22       attempt to impute or to guess what

23       the -- what the exposure was for those

24       that didn't respond.  So these things

25       are all tied together.

1    BY MR. GRIFFIS:

2        Q.   Okay.  The next one that I see --

3    and tell me if I've missed one -- is on

4    page 2, the first full paragraph, and you

5    make the point that there was a high -- high

6    usage of glyphosate, and so that's not an

7    optimal distribution among exposed and

8    unexposed; correct?

9        A.   That's correct, yes.

10       Q.   Is that the next one, or did I miss

11   one?

12       A.   I think that's the next one.

13       Q.   Okay.  And then the next, and I

14   think last -- but you'll correct me if I'm

15   wrong -- is a latency issue.  You said, "The

16   median lifetime years of glyphosate use was

17   only 8.5 years with a median follow-up time

18   of only about 18 years which may not be

19   enough exposure and/or follow-up time to

20   demonstrate an effect," and you called the

21   NCI 2018 at best an interim analysis?

22       A.   Yeah, it's both an exposure and

23   latency issue.

24       Q.   To recap, and again what I'm trying

25   to do is get a complete list before we start

1  digging in.  The flaws that you identified

2  are the relatively low response rate and the

3  attempt to address that through imputation

4  which you have criticisms of; two, the fact

5  the pesticide use data was obtained on last

6  year of farming in the second survey; three,

7  that there were secular trends in the use of

8  glyphosate that could affect exposure

9  analysis and change the figures; four, that

10  the relatively high frequency of exposure to

11  glyphosate made the distribution among

12  exposed and non-exposed non-optimal; and,

13  five, that it's too short a study so far in

14  terms of exposure and latency; is that

15  correct?

16          MS. FORGIE:  Object to the form.

17          THE WITNESS:  I would agree.  The

18     last one is, you know, the median

19     exposure was only 8.5 years which is

20     really not a long period of exposure in

21     a cohort study.  And the follow-up

22     probably needs to be even longer than it

23     is in this most recent publication.

24  BY MR. GRIFFIS:

25     Q.   Okay.  But those are the five

1    flaws; right?

2        A.   Yes.

3            MS. FORGIE:  Object to the form.

4    BY MR. GRIFFIS:

5        Q.   And there weren't any flaws that I

6    missed; correct?

7            MS. FORGIE:  Object to the form.

8            THE WITNESS:  Those are the ones

9        that I outlined in my report.

10   BY MR. GRIFFIS:

11       Q.   Did you have any in mind that you

12   didn't outline in your report?

13       A.   No.

14       Q.   All right.  I'd like to start with

15   flaw number 2, "Pesticide use data was only

16   obtained for the last year of farming."

17           So tell me if I'm correct here.

18   The concern is that someone may have started

19   to use glyphosate after the first survey but

20   continued to farm and not use glyphosate

21   during their last year of farming and then

22   reported no use of glyphosate in the second

23   survey and thus been undercounted?

24           MS. FORGIE:  Object to the form.

25           THE WITNESS:  There are a whole

1    variety of errors that could have

2    occurred there.  That's one of them.

3    For example, in the first survey they

4    could have been a non-user of

5    glyphosate, and in the second survey

6    they could have become a user of

7    glyphosate, but you wouldn't know when

8    they started using glyphosate.  Okay?

9    There's no way to know that.  The

10   reverse is true too.  So they may have

11   not -- they may have been a user of

12   glyphosate, and then they discontinued

13   glyphosate, and you wouldn't know when

14   they discontinued glyphosate.  So

15   there's no way to fill in the gap of the

16   years between the first survey and the

17   second survey.  So I guess in the

18   imputation you just guess what it was.

19  BY MR. GRIFFIS:

20       Q.   The imputation does address those

21  issues.  We'll discuss your criticisms of

22  imputation, but it does address those

23  issues; right?

24            MS. FORGIE:  Object to the form.

25            THE WITNESS:  Well, it attempts to

1    address them.

2  BY MR. GRIFFIS:

3      Q.   Okay.  So it's one of the pieces of

4  absent data that the imputation procedure is

5  designed to address.  That's fair?

6          MS. FORGIE:  Object to the form.

7          THE WITNESS:  Yes.

8  BY MR. GRIFFIS:

9      Q.   Do you have any evidence that there

10 was error introduced by asking people to

11 report on their last year of farming?

12     A.   Well, the reported data probably

13 was accurate because it's the most recent

14 year of farming.  So they should remember

15 that pretty accurately.  So with regard to

16 that there probably was not a lot of error.

17     Q.   And do you know whether it was the

18 best procedure to follow, for example, to

19 give people a shorter questionnaire to fill

20 out and increase their likelihood of

21 responding to it?

22          MS. FORGIE:  Object to the form.

23          THE WITNESS:  So that's true, but

24    what happens then is you don't have the

25    data you really need to answer the

1       question.  This is a problem with cohort

2       studies.  They cut short to some extent

3       on the way they gather the data, and

4       they try to compensate it by having

5       many, many more people in the study.

6       But what it means is that the quality of

7       the data is not as good as it should be.

8       And had they taken more time in the

9       follow-up questionnaire and asked the

10      questions for each of the years, it

11      wouldn't have added a lot of time to the

12      question because the years were anywhere

13      between maybe five and ten, maximum 12.

14      So they could have asked three or four

15      questions for each year and had all the

16      data they needed to really do it

17      properly.

18  BY MR. GRIFFIS:

19      Q.   You say on page 2 --

20      A.   So they have to actually impute the

21  data for the respondents too because they

22  don't know what they did in between.  It's

23  not just for the non-respondents, but it's

24  also for the respondents.

25      Q.   You say on page 2, sir, "Since all

1    of these various errors and exposure

2    classification were non-differential."  And

3    I don't want to ask you about the whole

4    sentence right now, but just tell me what

5    you mean by non-differential.

6              MS. FORGIE:  Object to the form.

7              THE WITNESS:  Non-differential

8         means that the errors were not linked

9         specifically to the exposure or to the

10        disease in question.  They were random

11        errors.

12   BY MR. GRIFFIS:

13        Q.   Okay.  So one person might slightly

14   underreport glyphosate.  One person might

15   slightly overreport glyphosate, and there's

16   no consistency in the lack of data or the

17   missing data in association with either

18   non-Hodgkin lymphoma or glyphosate exposure.

19   That's what non-differential means?

20             MS. FORGIE:  Object to the form.

21             THE WITNESS:  Non-differential

22        means that it's just as likely that --

23        well, it's just as -- it means that

24        there's no direction in the bias, that

25        the bias is going in both directions,

1     yes.  I guess that's what you said.

2  BY MR. GRIFFIS:

3     Q.   Okay.  And if there are a whole

4  bunch of little randomnesses, some of them

5  would be pointing in one direction and some

6  in the other, and they would kind of tend to

7  cancel out; is that right?

8       MS. FORGIE:  Object to the form.

9       THE WITNESS:  That's true, but what

10    would happen is it decreases the ability

11    of the study to detect a true finding.

12    It biases any of the results in general.

13    It biases the results towards the null.

14  BY MR. GRIFFIS:

15     Q.   And that was the rest of the

16  sentence?

17     A.   Right.

18     Q.   "Since all of these various errors

19  in exposure classification were

20  non-differential, they would result in a

21  bias toward the null and attenuate or

22  obliterate any true positive effect."

23      So they wouldn't tend in any

24  particular direction, but they would tend to

25  obscure in the direction of the null towards

Page 55

1    1.0?

2        A.    Right.

3        Q.    So that the outcome that you

4    measured, you say I found such and such a

5    relative risk, that would, in fact, be

6    closer to the null than it should be; is

7    that right?

8        A.    Yeah, so if you have a true

9    relative risk of say 3, and you have a

10   significant amount of exposure

11   misclassification, that could lower the risk

12   from a significant 3 to a non-significant 2

13   or a non-significant 1.8 or 1.2.  So that's,

14   in general, the effect of non-differential

15   misclassification.

16       Q.    And bias towards the null when you

17   have a point estimate that is below one

18   suggests that the true point estimate would

19   be even lower; right?  It would be .5

20   instead of .7, for example?

21           MS. FORGIE:  Object to the form.

22           THE WITNESS:  That would be -- that

23       would also happen, yes.

24   BY MR. GRIFFIS:

25       Q.    Okay.  So last year of farming.

Page 56

1  You've also told us -- the very next thing

2  you tell us is that there was a very major

3  increase in glyphosate use after the

4  introduction of glyphosate-resistant crops;

5  right?

6      A.   Yes.

7      Q.   Glyphosate is used on -- tell me if

8  you know.  I don't know whether you do or

9  not.  Glyphosate is used on some of the most

10 widely used crops in the country; right?

11     A.   Yes.

12     Q.   And there are glyphosate-resistant

13 versions of those meaning -- you're talking

14 about Roundup Ready; right?

15     A.   Yes.

16     Q.   So because of the introduction of

17 Roundup Ready crops, lots of farmers were

18 using glyphosate, and they were doing it

19 consistently year after year; right?

20          MS. FORGIE:  Object to the form.

21          THE WITNESS:  Well, I would say, in

22      general, that's true.  Farmers do stop

23      doing things.  They don't continue to

24      always do what they did before, but, in

25      general, the use of these agents

1       increase dramatically because farmers

2       found that they could increase their

3       yields by doing it.  So it was -- it had

4       a huge effect on how they farmed for

5       certain crops.

6   BY MR. GRIFFIS:

7       Q.   So if a farmer told you -- for

8   glyphosate.  If a farmer told you for

9   glyphosate the last year I was farming I

10  didn't use glyphosate, they probably weren't

11  using it before then either; right?

12          MS. FORGIE:  Object to the form.

13          THE WITNESS:  Probably that's true,

14      although we don't really know.

15  BY MR. GRIFFIS:

16      Q.   Okay.

17      A.   There may have been another reason

18  why they switched.  They could have switched

19  crops; right?  They could have decided to

20  plant something else in the field that year,

21  rotate their crops.

22      Q.   Sure.  We could think of scenarios,

23  but it's a relatively unlikely scenario that

24  somebody was using glyphosate and then the

25  last year they were farming they stopped

Page 58

1 using glyphosate and then they stopped

2 farming; right?

3          MS. FORGIE:  Object to the form.

4          THE WITNESS:  I don't know.  I

5     can't speculate.

6 BY MR. GRIFFIS:

7     Q.   It also makes it pretty easy to

8 impute and pretty easy to predict if you

9 built that into the formula, glyphosate

10 users are likely to continue to use

11 glyphosate?

12          MS. FORGIE:  Object to the form.

13     Calls for speculation.

14 BY MR. GRIFFIS:

15     Q.   Correct?

16     A.   I can't answer that question

17 either.  I don't know whether it was easy or

18 hard.  The method they used is quite

19 complicated.  It may be easy to use, but I

20 really -- there's no way to know how

21 accurate it is or was.

22     Q.   Well, it should be easier at least,

23 in general, to predict glyphosate use and

24 you project glyphosate use if glyphosate is

25 a widely used crop year after year -- widely

Page 59

1   used product year after year than if it's a

2   relatively rarely used herbicide that

3   someone might choose to use or not use;

4   right?

5           MS. FORGIE:  Object to the form.

6       Asked and answered.

7           You can answer it again.

8           THE WITNESS:  Well, it would -- I

9       suppose it would make it easier to

10      predict, but again, for example, if you

11      had somebody in the first survey they

12      weren't using glyphosate, and in the

13      second survey they were using

14      glyphosate, you really wouldn't know

15      when they started using it.  You would

16      have a window of when they started, but

17      you wouldn't know when they started and

18      you wouldn't know how many days per year

19      they started.  You wouldn't know

20      anything about the metrics of use during

21      that gap period.  And so, you know, so,

22      again, you've got to use the imputation

23      method to guess.

24  BY MR. GRIFFIS:

25      Q.   We'll talk about imputation in a

Page 60

1   minute, but at any point in using the

2   imputation method, does any person sit there

3   and make a guess, or do they apply a

4   formula?

5       A.   Well, the formula they use is, I

6   would say, an educated guess.   Okay?

7       Q.   Have you ever designed an

8   imputation formula yourself?

9       A.   No.

10      Q.   Would you be qualified to?

11          MS. FORGIE:   Object to the form.

12          THE WITNESS:   No.

13  BY MR. GRIFFIS:

14      Q.   What kinds of people -- and I don't

15  mean their personality traits but their

16  qualifications and professional training

17  would be qualified to generate an imputation

18  formula?

19          MS. FORGIE:   Object to the form.

20          THE WITNESS:   Well, it would have

21      to be -- it would have to be an

22      epidemiologist or sophisticated

23      biostatistician who understands the

24      issues around what they're trying to

25      impute.

1   BY MR. GRIFFIS:

2      Q.   So an epidemiologist or

3   biostatistician?

4      A.   Yes.

5      Q.   The optimal distribution issue,

6   sir -- and you remember what I mean by that?

7   This is on page 2, your statement that since

8   lots of people were using glyphosate, you

9   don't have an optimal 50 percent, 50 percent

10  distribution between exposed and unexposed?

11     A.   Right.  So yes.

12     Q.   So you're referring to a general

13  principle of epidemiology that you can best

14  compare two groups if your numbers are

15  divided evenly between those two groups;

16  right?

17     A.   Yes.

18             MS. FORGIE:  Object to the form.

19             THE WITNESS:  Yes.  In fact, you

20        know -- for example, in a case control

21        study, you design the study to have a

22        sometimes two- or three-to-one match of

23        controls to cases.  So you actually have

24        more controls in the case control study

25        than you do -- than you do cases.  And

Page 62

1          in this study, because so many of the

2          applicators used glyphosate, you've got

3          a balance going in the other direction

4          where you've got four patients or four

5          applicators who are exposed versus only

6          one that's unexposed.  So it's balanced

7          in the wrong direction.

8     BY MR. GRIFFIS:

9          Q.   The same math you're talking about

10    that makes 50/50 distribution give you the

11    cleanest numbers in your statistical

12    analysis for ever, never use tell you that

13    if you're dividing it into four exposed

14    groups and one unexposed group, then a

15    20 percent, 20 percent, 20 percent,

16    20 percent, 20 percent distribution is

17    optimal; right?

18              MS. FORGIE:  Object to the form.

19    BY MR. GRIFFIS:

20         Q.   Same numbers in each group?

21              MS. FORGIE:  Object to the form.

22              THE WITNESS:  In general, you want

23         it to be 50/50; right?  The fact you

24         divide your cases with disease into

25         sub-groups really -- I don't think --

1          you know, I think, in general, when you

2          design the study, you want to have a

3          50/50 balance to get the best power to

4          detect a difference.

5     BY MR. GRIFFIS:

6          Q.   Okay.  So as a biostats matter,

7     biostatistics matter, do you know whether

8     it's true or false that you get the most

9     power in a division into four exposed groups

10    and one unexposed group if your division is

11    as close to 20, 20, 20, 20 as you can get?

12              MR. ESFANDIARY:  Wait.  Object to

13         the form.

14              THE WITNESS:  I don't know the

15         answer to that.  If I was to guess, I

16         would say the power would be somewhat

17         less if you did it that way.

18    BY MR. GRIFFIS:

19         Q.   Less than what?

20         A.   It's less because you have less

21    people with disease in each group, not

22    because you have too many controls.

23         Q.   In the never ever, you can't do any

24    sort of dose-response analysis, and in the

25    group where you have four exposed groups at

1    different levels and an unexposed you can.

2         MS. FORGIE:  Wait.  Wait for a

3    question.

4         Is there a question?

5         MR. GRIFFIS:  You can; right? --

6    is the end of the question.  You stepped

7    on it.

8         MS. FORGIE:  Object to the form.

9         THE WITNESS:  So there are two

10   different -- you're asking two different

11   questions, and the answer is the same

12   for both, that you want to have equal

13   numbers of cases or diseased and

14   non-diseased people in your comparative

15   groups.  But if you take your diseased

16   group and you divide it into three or

17   four sub-groups, then you're going to

18   somewhat increase the power to detect

19   significant changes.  But it's not --

20   but it's because you divided your

21   diseased group into three or four

22   groups, okay, and decreased the numbers

23   in each.

24   BY MR. GRIFFIS:

25        Q.   If your intention is to look at

1    dose response by dividing into multiple

2    exposed groups, a lower-exposed group,

3    medium-exposed group, higher-exposed group

4    or four such groups, quartile, then the

5    optimum distribution in terms of power to

6    demonstrate or fail to demonstrate a dose

7    response would be an equal distribution into

8    each group.  Do you know whether that's true

9    or false?

10              MS. FORGIE:  Object to the form.

11         Asked and answered.

12              You can answer it again.

13              THE WITNESS:  I would say that --

14         again I would -- I'm not sure, but I

15         think that the greater numbers in any of

16         the groups would improve the power.

17         Okay?  So by decreasing the number of

18         cases or diseased people in each group

19         versus controls, if you decrease the

20         number of controls, again, you decrease

21         the power to detect anything.  So the

22         fact that you have more controls than

23         cases helps you.  It doesn't hurt you.

24         Okay?

25    ///

1   BY MR. GRIFFIS:

2       Q.   And power is a --

3            MS. FORGIE:  Were you finished?

4            THE WITNESS:  Yes.

5   BY MR. GRIFFIS:

6       Q.   You listed this one under your

7   sentence that since all of these various

8   errors were non-differential which makes it

9   not totally obvious to me --

10           MS. FORGIE:  What page are you on?

11           MR. GRIFFIS:  The second.

12  BY MR. GRIFFIS:

13      Q.   Which makes me not know whether you

14  mean to include this one in the list of the

15  errors that are not differential, do you?

16           MS. FORGIE:  Object to the form.

17           THE WITNESS:  No.  The issue we're

18       talking about is -- has -- has nothing

19       to do with classification differential

20       or non-differential classification.

21  BY MR. GRIFFIS:

22      Q.   Reducing the power of a study would

23  just tend to make it less able to detect a

24  variance from the null; correct?

25           MS. FORGIE:  Object.

1           THE WITNESS:  True variance from

2        the null.

3    BY MR. GRIFFIS:

4        Q.   Right.  So the values that you find

5    in the study, had you increased the power,

6    you would tend to predict that that would be

7    farther from the null?

8           MS. FORGIE:  Object to the form.

9    BY MR. GRIFFIS:

10       Q.   Correct?

11       A.   As you increase the numbers and you

12   increase the power, you're likely to find a

13   true and significant result increases.

14       Q.   So the drift would be as you

15   increase power, the drift would tend to be

16   further from the null; correct?

17          MS. FORGIE:  Object to the form.

18       Asked and answered.

19          THE WITNESS:  Not necessarily.  But

20       you're significant.  You would be much

21       more likely to show statistically

22       significance.  You can find the same

23       number with small -- you can find the

24       same result with smaller numbers, but it

25       may not be statistically significant; so

1     you increase the numbers in the study to

2     allow you to show statistical

3     significance.

4         MR. GRIFFIS:  I want to use the

5     bathroom.  Can we break for just five

6     minutes?  Not a long one.

7         MS. FORGIE:  Can we make it ten so

8     we can all get another cup of coffee?

9         MR. GRIFFIS:  Ten is fine.

10        THE VIDEOGRAPHER:  We are going off

11    the record at 9:58 a.m.

12        (Recess taken from 9:58 a.m. to

13        10:11 a.m.)

14        THE VIDEOGRAPHER:  This continues

15    disk number 1.  The time is 10:11 a.m.

16    We are back on the record.

17 BY MR. GRIFFIS:

18    Q.  So the fifth criticism we

19 identified earlier that you have of the NCI

20 2018 study is what you've titled, I believe,

21 exposure and latency.  It's a reference to

22 the median lifetime years of glyphosate use

23 in the study 8.5 and the median follow-up

24 time 18 years being too short; correct?

25    A.  Yes.

1    Q.   Let's talk about the 8.5 years, the

2  median lifetime years of glyphosate use

3  first.  What is your view of how long a

4  person needs to be exposed to glyphosate to

5  contract non-Hodgkin lymphoma if they will?

6    A.   Well, I don't think anybody knows

7  the answer to that question.  The longer,

8  the better.  So in typical cohort studies,

9  the workers are exposed to a certain

10  chemical during their careers, maybe 20,

11  even 30 years of exposure with long

12  follow-up.  So in this situation, the

13  exposure is a median of 8.5 years ranging

14  from five or six years to 14 years is not a

15  very long time of exposure for a cohort

16  study.

17    Q.   Are you talking about cohort

18  studies of non-Hodgkin lymphoma?

19    A.   I'm talking about cohort studies,

20  in general.

21    Q.   Your expert report -- in your

22  expert report you claim to be a specialist

23  in non-Hodgkin lymphoma, somebody who

24  focuses on that.

25    A.   Yes.

Page 70

1      Q.   And you've been involved in a

2  number of epidemiology studies as the

3  pathologist on the study; correct?

4           MS. FORGIE:  Object to the form.

5           THE WITNESS:  Actually not only the

6      pathologist, I was in charge and ran the

7      studies in Nebraska; so I was the PI on

8      the studies.

9  BY MR. GRIFFIS:

10     Q.   Do you have a view as to how much

11 exposure a person needs to have for

12 non-Hodgkin lymphoma to a suspect substance

13 in order to detect any effect?

14          MS. FORGIE:  Object to the form.

15          THE WITNESS:  It would depend

16     entirely on the substance, whether it

17     was a strong carcinogen or a weak

18     carcinogen.  So it's highly dependent on

19     the substance.  There's no one number

20     for -- there's no one generic number.

21 BY MR. GRIFFIS:

22     Q.   So what is your basis for saying

23 that for glyphosate and non-Hodgkin

24 lymphoma, 8.5 median years of exposure is

25 too short?

1          MS. FORGIE:  Object to the form.

2          THE WITNESS:  It's probably too

3      short.  I don't know that it's too

4      short, but it's probably too short based

5      on how other cohort studies have

6      evaluated other chemicals.  In other

7      words, the longer the better.  In this

8      case, it's relatively short.  You know,

9      what it means is that half of the people

10     had less than 8.5 years of exposure.

11 BY MR. GRIFFIS:

12     Q.   Is it the case that the sole basis

13 for saying 8.5 years is probably too short

14 for glyphosate and non-Hodgkin lymphoma in

15 the study your knowledge of other cohort

16 studies of other substances and other

17 disease outcomes?

18     A.   I'm just making a general

19 statement.  If you read about cohort studies

20 and how they're designed, you generally want

21 a long period of exposure to really be sure

22 that you have an adequate exposure to find a

23 significant association.  If you have short

24 exposures or small exposures, your chances

25 are much less defined in association than if

1    you have long exposures and high exposures.

2         Q.   Okay.  Other than those --

3         A.   So it's a general statement.

4         Q.   It's the general statement the

5    longer the better for cohort studies; right?

6         A.   Right.

7              MS. FORGIE:  Object to the form.

8         Asked and answered.

9    BY MR. GRIFFIS:

10        Q.   And there's no specific thing about

11   glyphosate and no specific thing about

12   non-Hodgkin lymphoma that makes you say that

13   8.5 years median is not enough to detect an

14   effect; right?

15             MS. FORGIE:  Object to the form.

16             THE WITNESS:  Correct.

17   BY MR. GRIFFIS:

18        Q.   The 18 years median follow-up time,

19   median follow-up is something we discussed

20   in your prior deposition; right?

21        A.   Correct.

22        Q.   You said in your expert report,

23   your original expert report -- I'll mark

24   that so we can look at it.  This is

25   Exhibit 7.

1          (Exhibit Number 31-7 was marked

2          for identification.)

3   BY MR. GRIFFIS:

4      Q.   I'm on page 5, sir.

5      A.   Okay.

6      Q.   You said -- you're talking about

7   the De Roos 2005 study in that paragraph;

8   correct?

9      A.   Yes.

10     Q.   That first paragraph?

11     A.   Yes.

12     Q.   You see in the middle of the

13  paragraph, "However, the median follow-up

14  time in this study was only 6.7 years, too

15  short a time to detect a meaningful increase

16  in NHL or other cancers associated with

17  glyphosate"; right?

18     A.   Yes.

19     Q.   And then at the deposition, sir, do

20  you recall that I asked you for an

21  association between a pesticide and

22  non-Hodgkin lymphoma, "How long a period of

23  time do you think you need between the

24  exposures and the cancers that you're

25  measuring?"

Page 74

1          And you said, "The longer the

2     better."

3          And I said, "Well, is ten years too

4     short?"

5          And you said "No, probably not?"

6          MS. FORGIE:  Object to the form.

7     If you're going to ask him questions

8     about his deposition, I think you have

9     to show it to him.

10  BY MR. GRIFFIS:

11     Q.  Do you recall that, sir?

12          MS. FORGIE:  Object to the form.

13          THE WITNESS:  I don't remember

14     specifically, no.

15  BY MR. GRIFFIS:

16     Q.  Do you recall me saying, "Okay, the

17  longer the better, 6.7 is too short, 10 is

18  probably long enough" and you couldn't be

19  more specific between those two; is that

20  fair?"

21          And you said, "Yes."

22          MS. FORGIE:  Object to the form.

23          THE WITNESS:  I don't remember.

24  BY MR. GRIFFIS:

25     Q.  Do you agree with that testimony

1  today?

2    A.   Well, I agree with the testimony

3  that the longer would be the better.  I

4  think probably ten years is when you would

5  begin to see cases that are associated with

6  the chemical.  So what would be the best

7  latency period?  Well, the best latency

8  period would be long so you would want to

9  follow locations for 30 or more years, okay?

10 And the median latency of 20 years is

11 probably a minimum where you would begin to

12 see a significant number of cases so that

13 you could actually demonstrate significant

14 increased risk.

15        So the longer the better.  Ten

16 years might be the minimum where you would

17 begin to see cases, an increase in cases.

18 Actually, if you look at the Eriksson study,

19 that's when they began to see statistically

20 significantly increased cases after ten

21 years.

22    Q.   Sir, when the data before you was

23 6.7 years of follow-up in the De Roos 2005

24 and you said ten years was probably enough

25 and now you have 18 years of follow-up and

Page 76

1    you say 18 years isn't enough and the study

2    is not done, you're moving the goalpost,

3    aren't you?

4              MS. FORGIE:  Object to the form.

5         It's unfair.  You're not showing him the

6         deposition.

7              THE WITNESS:  So 18 years is

8         probably not enough.  Okay?  But it's

9         interesting, if you look at Table 3 in

10        the paper where they've got 20 years of

11        follow-up, you begin to see elevated

12        odds ratios for non-Hodgkin's lymphoma

13        and its subtypes.  So this sort of

14        speaks to my point that you have to have

15        a long period of follow-up after

16        exposure to begin to see risk.  In fact,

17        if you look at Table 3, you see it.

18   BY MR. GRIFFIS:

19        Q.   Is that because it takes a long

20   time for non-Hodgkin lymphoma to show up

21   after an exposure?

22        A.   Yes.

23        Q.   And is that because it takes a lot

24   of exposure, like years and years of

25   exposure, or is this in reference to your

1    earlier point about 8.5 years of use in the

2    study, it takes a lot of years of exposure

3    to a substance for it to produce

4    non-Hodgkin's lymphoma?

5              MS. FORGIE:  Object to the form.

6              THE WITNESS:  In general, I would

7         say yes.  The more exposure, the more

8         likely you are to find elevated risks

9         that are significant.

10   BY MR. GRIFFIS:

11        Q.   The charts you're talking about,

12   sir, Table 3, tell me which one you're

13   pointing me to.

14        A.   Well, if you look at non-Hodgkin

15   lymphoma as a group, you can see increased

16   odds ratios in the higher-exposed group,

17   15 percent, 12 percent.  The same for B-cell

18   non-Hodgkin lymphoma.  And then if you look

19   at chronic lymphocytic leukemia, anywhere

20   between 19 and 25 percent increase.  If you

21   look at diffuse large B-cell lymphoma, you

22   see a 35 percent increase.  For T-cell

23   lymphomas, you actually have a threefold

24   increase that's statistically significant.

25   So you're beginning to see increased risk

Page 78

1   ratios when you use a minimum of follow-up

2   of 20 years.   Okay?

3        Q.   You don't claim, sir, that any of

4   these findings show that glyphosate causes

5   those subtypes or causes non-Hodgkin's

6   lymphoma; correct?   You're not relying on

7   this in support of your claim that

8   glyphosate --

9            (Simultaneous cross-talk

10       interrupted by the reporter.)

11  BY MR. GRIFFIS:

12       Q.    You're not relying on this for your

13  claim that glyphosate causes non-Hodgkin

14  lymphoma or its subtypes; right?

15           MS. FORGIE:   Object to the form.

16           THE WITNESS:   I'm not relying on

17       it, but it is data that suggests that a

18       longer follow-up is required to see

19       increased risks.   It's possible if we

20       follow these patients another ten years

21       with a 30-year lag, we'll have

22       significantly increased risks.   So this

23       is why I say in my report that at best

24       this is another interim analysis and to

25       really know the results of the

1      agricultural health study, you'll need

2      longer follow-up.

3  BY MR. GRIFFIS:

4      Q.   After a mean of 8.5 years of

5  exposure to glyphosate, it's going to take

6  more than 20 years to find a doubling of the

7  risk in these patients; correct?

8      MS. FORGIE:  Object to the form.

9      Mischaracterizes --

10  BY MR. GRIFFIS:

11      Q.   If it happens?

12      MS. FORGIE:  Object to the form.

13      Mischaracterizes his testimony --

14      THE WITNESS:  You'll need a

15      longer --

16      MS. FORGIE:  You have to wait until

17  I get my --

18      THE WITNESS:  I'm sorry.

19      So what I'm saying is we probably

20      need more exposure and we probably need

21      longer follow-up if the Agricultural

22      Health Study is going to show

23      significant increases in risk.  The data

24      here in Table 3 suggests that now the

25      risks are increasing for non-Hodgkin's

1        lymphoma with longer follow-up.

2    BY MR. GRIFFIS:

3        Q.    And there are no statistically

4    significant associations at five years,

5    10 years, 15 years, or 20 years for

6    non-Hodgkin lymphoma; correct?  It's the

7    third row of the -- data row of the chart;

8    right?

9        A.    There are increased risks, but

10   they're not statistically significant.

11       Q.    And you wouldn't say that a

12   non-statistically significant increased risk

13   shows causation; correct?

14           MS. FORGIE:  Object to the form.

15           THE WITNESS:  Well, you would

16       interpret it in the context of what you

17       know about from other studies.

18   BY MR. GRIFFIS:

19       Q.    There's no dose response even in

20   the 20-year period for non-Hodgkin lymphoma;

21   correct?

22           MS. FORGIE:  Object to the form.

23           THE WITNESS:  Well, the numbers are

24       very small, and, you know, so with small

25       numbers of cases in the various

1    quartiles and tertiles, it's difficult

2    to demonstrate.  But you don't see a

3    dose response here.  It's true.  You

4    don't see a dose response.

5  BY MR. GRIFFIS:

6    Q.   The least-exposed group has a

7  higher point estimate than the most-exposed

8  group; right?

9     MS. FORGIE:  Object to the form.

10     THE WITNESS:  In some of the

11    categories that's true.

12  BY MR. GRIFFIS:

13    Q.   For non-Hodgkin lymphoma overall

14  that's true; right?

15     MS. FORGIE:  Object to the form.

16     THE WITNESS:  Yes.

17 BY MR. GRIFFIS:

18    Q.   And that's one of the things that

19  goes into the P-trend analysis; right?

20  Whether there's a dose response; correct?

21    A.   Correct.

22    Q.   These P trends are all -- what is a

23  P-trend?  What is a statistically P-trend?

24  0.05?

25    A.   Or less than 0.05.

1       Q.   And none of these P trends in

2    Table 3 are below 0.05; right?

3       A.   Well, not for non-Hodgkin's

4    lymphoma.  For acute myeloid leukemia there

5    is a P-trend of 0.04.

6       Q.   For the 20-year lag.  That's the

7    one we were just talking about --

8       A.   Okay.

9       Q.   -- that you were focusing me on?

10      A.   Right.

11      Q.   The P trends in Table 3 for a

12   20-year lag, what is the smallest P-trend in

13   that?

14      A.   For non-Hodgkin's lymphoma or for

15   anything in the table?

16      Q.   Anything in the table, 0.3 for

17   lymphohematopoietic overall; right?

18           MS. FORGIE:  Now you've got two

19      questions pending.  Which one do you

20      want him to answer?

21           Object to the form.

22           THE WITNESS:  So acute myeloid

23      leukemia has a P-trend of 0.04 which is

24      statistically significant.

25   ///

Page 83

1   BY MR. GRIFFIS:

2       Q.   Do you believe that glyphosate

3   causes AML?

4           MS. FORGIE:  Object to the form.

5       Beyond the scope of this report.

6           THE WITNESS:  This data would

7       suggest that it does, but there isn't

8       other data out there to support it.  So

9       I would say we don't know the answer to

10      that.

11  BY MR. GRIFFIS:

12      Q.   So you're not going to give expert

13  testimony unless there's more data that

14  glyphosate causes AML; right?

15      A.   Correct.

16      Q.   That wouldn't be scientifically

17  appropriate to do based on this data;

18  correct?

19          MS. FORGIE:  Object to the form.

20          THE WITNESS:  Based on this data

21      alone, you're correct.

22  BY MR. GRIFFIS:

23      Q.   Now, for the 20-year lag, the

24  smallest P-trend on the chart in

25  supplemental Table 3 is for

1    lymphohematopoietic overall 0.3; correct?

2         MS. FORGIE:  Object to the form.

3         THE WITNESS:  You're talking about

4    the first item on Table 3,

5    lymphohematopoietic neoplasms?

6    BY MR. GRIFFIS:

7    Q.   Yeah.  The question is is that the

8    lowest P-trend in the 20-year lag column;

9    right?

10   A.   Correct.  .37.

11   Q.   Okay.

12   A.   Actually that's .31.

13   Q.   .37?  What are you looking at, sir?

14   A.   I'm reading you the P-trend for

15   lymphohematopoietic neoplasms.

16   Q.   In supplemental Table 3, 20-year

17   lag?

18   A.   In supplemental Table 3?

19   Q.   Yeah.

20        MS. FORGIE:  What table are you?

21        THE WITNESS:  I don't have

22   supplemental Table 3.

23   BY MR. GRIFFIS:

24   Q.   You don't have the supplementary

25   tables for this?

1      A.   I have them at home.  Have you

2   attached them to the --

3           MS. FORGIE:  I don't think they're

4       attached to the exhibit -- oh, wait.

5           THE WITNESS:  Maybe they are.  I'm

6       sorry.  I was looking at Table 3.

7       You're talking about supplemental

8       Table 3?

9   BY MR. GRIFFIS:

10      Q.   We don't need to.  This one shows

11  5-year and 20-year lag and supplemental

12  Table 3 shows five, ten, 15 and 20; right?

13      A.   Right.

14      Q.   So it just shows more columns.

15  Table 3 works fine.  It's the same data for

16  the 20-year.

17          MS. FORGIE:  There's no question

18      pending.

19  BY MR. GRIFFIS:

20      Q.   But -- okay.

21          At how many years of follow-up

22  would you consider the AHS data to be

23  complete, sir?

24          MS. FORGIE:  Object to the form.

25          THE WITNESS:  Well, you would want

1      to -- actually ideally, you would want

2      to follow the people for 20 or 30 or 40

3      or more years until almost everyone or

4      everyone is dead, and then you would

5      have the ultimate database to do your

6      final analysis of the data.  So that's

7      often the case in cohort studies.  They

8      go for 20, 30, 40 years.

9   BY MR. GRIFFIS:

10     Q.   For the 8.5 years of exposure, sir,

11  the exposure categories in the case control

12  studies that you rely on are much, much,

13  much lower than 8.5 years of exposure;

14  correct?

15          MS. FORGIE:  Object to the form.

16      Do you want him to look at those

17      studies?

18          THE WITNESS:  I don't remember the

19      details of those studies.

20  BY MR. GRIFFIS:

21     Q.   Like Eriksson is greater or less

22  than ten days; right?

23          MS. FORGIE:  Object to the form.

24  BY MR. GRIFFIS:

25     Q.   Do you remember that?

1          MS. FORGIE:  Object to the form.

2          THE WITNESS:  So in Eriksson they

3     looked at risk by days of exposure, and

4     you're right.  If it was less than -- if

5     it was greater than ten days of

6     exposure, they had a significantly

7     elevated risk.  That's true.

8  BY MR. GRIFFIS:

9     Q.   And is it your claim that in

10 Eriksson the greater than ten days the mean

11 was -- the mean of exposure in that was at

12 or greater than 8.5 years?

13         MS. FORGIE:  Object to the form.

14         THE WITNESS:  Well, again, I don't

15    remember the details of Eriksson.  I

16    think they also looked at the number of

17    years of exposure, and they looked at

18    the number of days of exposure.  In that

19    study, the number of days of exposure

20    resulted in an increased risk for

21    non-Hodgkin's lymphoma, right.

22 BY MR. GRIFFIS:

23    Q.   Do you know -- sorry.

24    A.   I don't have the study before me,

25 and I don't remember the details -- I don't

Page 88

1    remember the details about years of

2    exposure.

3        Q.   Let me just ask you this, sir,

4    since you criticized the NCI 2018 study for

5    8.5 median years of exposure being too

6    short.  Do you know of any study on

7    glyphosate and non-Hodgkin's lymphoma where

8    people were exposed as a median longer?

9            MS. FORGIE:  Object to the form.

10           He doesn't have the studies in front of

11           him.

12           THE WITNESS:  Off the top of my

13           head, I don't know.  I'd have to go back

14           and look at the studies to answer your

15           question properly.

16   BY MR. GRIFFIS:

17       Q.   Do you know of any study where the

18   median follow-up which you say was too short

19   at 18 years in the NCI 2018 study was longer

20   than 18 years?

21           MS. FORGIE:  Object to the form.

22           Asked and answered.

23           THE WITNESS:  This was the only

24           cohort study; so that question doesn't

25           really apply to the case-control

1     studies.

2   BY MR. GRIFFIS:

3       Q.   Do you know of another study where

4   the average time lapse between exposure and

5   non-Hodgkin lymphoma was greater than

6   18 years?

7             MS. FORGIE:  Object to the form.

8             THE WITNESS:  What --

9             MS. FORGIE:  Asked and answered.

10            THE WITNESS:  Study of glyphosate.

11  BY MR. GRIFFIS:

12      Q.   Yes.  Glyphosate and non-Hodgkin

13  lymphoma.

14      A.   No.  And, again, I don't have those

15  studies before me, and I don't remember the

16  details of those studies off the top of my

17  head today.

18      Q.   It could be that your criticisms of

19  8.5 years of exposure being too short and

20  18 years of follow-up being too short apply

21  with even greater force to the case-control

22  studies than which you relied; correct?

23            MS. FORGIE:  Object to the form.

24      Asked and answered, mischaracterizes the

25      testimony.

1           THE WITNESS:  I don't know the

2       answer to that.

3   BY MR. GRIFFIS:

4       Q.   Have you read Dr. Portier's

5   deposition, sir?

6       A.   Which deposition?

7       Q.   His recent deposition.  Did you

8   read it?

9       A.   Portier's deposition?  No.

10      Q.   Yes.  Okay.

11           If he said in his deposition that

12  the NCI 2018 study allowed for longer

13  latency than any published study on

14  glyphosate and non-Hodgkin lymphoma, do you

15  have any basis to disagree with that?

16           MS. FORGIE:  Object to the form.

17           THE WITNESS:  I don't agree or

18      disagree.  I don't know the answer.

19      That's his statement, not mine.

20  BY MR. GRIFFIS:

21      Q.   As we discussed earlier, you have a

22  criticism of the NCI 2018 study based on the

23  follow-up rate and the imputation procedure

24  used to address that; correct?

25           MS. FORGIE:  Object to the form.

1          THE WITNESS:  Yes.

2    BY MR. GRIFFIS:

3        Q.   And the AHS investigators published

4    their imputation procedure; correct?

5        A.   Yes, they published a paper on how

6    they did it.

7        Q.   That's the Heltshe paper which you

8    reviewed for your expert report; right?

9        A.   Yes.

10       Q.   There are also published papers in

11   which the investigators assessed -- took

12   their exposure calculations and fact-checked

13   them with biometric data from actual

14   exposures; correct?

15       A.   Yes.

16       Q.   The AHS -- the NCI 2018 study is

17   the only one out of all the epidemiology on

18   glyphosate and non-Hodgkin lymphoma that

19   does a weighted analysis that has been

20   published and checked with biometrics;

21   right?

22          MS. FORGIE:  Object to the form.

23          THE WITNESS:  That's correct.

24   BY MR. GRIFFIS:

25       Q.   It's the only one that does any

1   kind of sophisticated weighted analysis at

2   all; right?

3            MS. FORGIE:  Object to the form.

4            THE WITNESS:  That's correct.  You

5        only could do that kind of analysis in a

6        cohort study.

7   BY MR. GRIFFIS:

8        Q.   Being able to do that kind of

9   analysis gives you better data than you

10  could have otherwise; correct?

11           MS. FORGIE:  Object to the form.

12           THE WITNESS:  I'm not sure it gives

13       you better data.  It gives you some

14       confidence, I guess, in the way you did

15       your calculations, but the fact that

16       correlations between biomonitoring and

17       the algorithm that was used were quite

18       different for different pesticides and

19       different formulations and for some

20       there was good correlation and in some

21       there was poor correlation.

22           So one of the other criticisms of

23       the study which I didn't use, although

24       it also would result in exposure

25       misclassification, is if you use the

1          same algorithm for every pesticide,

2          you're going to have misclassification

3          more or less for each pesticide.

4     BY MR. GRIFFIS:

5          Q.   Do you know if that was done?

6          A.   That's what was done, yes.

7               (Exhibit Numbers 31-8, 31-9 and

8               31-10 were marked for identification.)

9     BY MR. GRIFFIS:

10         Q.   Sir, I've marked as Exhibits 8

11    through 10 published study by Bonner,

12    et al., involving lung cancer from the

13    Agricultural Health Study data, published

14    study by Koutros, et al., on bladder cancer

15    from the Agricultural Health Study, and a

16    published study by Koutros, et al., on

17    prostate cancer from the Agricultural Health

18    Study.  Correct, sir?

19         A.   Yes.

20         Q.   Have you seen those?

21         A.   I have not.

22         Q.   In the --

23              MS. FORGIE:  I'm going to just put

24         a general objection in here to 31-8,

25         which talks about lung cancer which he

1    has not read or cited in his

2    supplemental report.  And I object to

3    the use of 31-9 which he has not read or

4    cited to in his supplemental report that

5    talks about bladder cancer, and I object

6    to 31-10 that talks about prostate

7    cancer, which is also not addressed or

8    referenced in his supplemental report.

9    I'll decide later depending on the

10   questions whether I decide to instruct

11   him not to answer.

12 BY MR. GRIFFIS:

13   Q.   In the Bonner study, sir, on

14 page 545, middle column, last full

15 paragraph, do you see that they describe the

16 multiple imputation with logistic regression

17 procedure that was used in the AHS study?

18       MS. FORGIE:  Take your time and

19   read whatever you want.

20       THE WITNESS:  Yes.

21 BY MR. GRIFFIS:

22   Q.   Similarly, sir, on the Koutros

23 bladder cancer study, page 794, under

24 "Exposure Assessment" towards the end of

25 that first paragraph, do you see that they,

1  again, describe the imputation procedure?

2      A.   Yes.

3      Q.   The prostate cancer study, sir, on

4  page 64, do you see that, again, the AHS

5  imputation procedure is described?  Page 64,

6  first column.

7          MS. FORGIE:  Are you talking about

8      31-10?  Exhibit 31-10.

9          MR. GRIFFIS:  Yeah, the one that's

10     on prostate cancer.

11         MS. FORGIE:  I object to him being

12     asked questions about this.

13         THE WITNESS:  Yes.

14  BY MR. GRIFFIS:

15     Q.   We talked in general earlier about

16  the fact that there have been multiple

17  publications from the AHS and multiple

18  publications in which the AHS imputation

19  procedure was discussed and went to peer

20  review; correct?

21     A.   Yes, these papers were

22  peer-reviewed.  The differences between

23  these papers and the recent glyphosate paper

24  is these papers are mainly looking at

25  pesticides in -- which were used in distant

1  past or either discontinued or the use was

2  pretty stable over time.  In those kind of

3  situations it's much more plausible to

4  impute use.  But for glyphosate, as you

5  know, the use increased dramatically right

6  in the middle of the enrollment period and

7  continued to increase dramatically over

8  time.  It's impossible to capture that kind

9  of information which is critical to a cohort

10  study if you don't have adequate

11  participation in the follow-up

12  questionnaires.  So that's one of the fatal

13  flaws of the Agricultural Health Study.

14  They don't have adequate follow-up

15  participation in their follow-up

16  questionnaires to get real data.  So they

17  guess what the data is going to be.

18      Q.   So is your statement that is unique

19  to glyphosate?

20          MS. FORGIE:  Wait, wait.  Were you

21      finished with your answer?

22          THE WITNESS:  Yes.

23  BY MR. GRIFFIS:

24      Q.   Is your statement it's unique to

25  glyphosate?

1          A.    It's actually unique to glyphosate,

2      yes.

3          Q.    So the AHS study's imputation, not

4      that it's fine --

5              MR. ESFANDIARY:   Object to the

6          form.

7      BY MR. GRIFFIS:

8          Q.    -- works for everything else.   It

9      doesn't work for glyphosate.   Is that your

10     testimony?

11             MS. FORGIE:   Object to the form.

12             THE WITNESS:   I'm not sure it works

13         or doesn't work.   They used it for these

14         other studies.   It's an accepted method,

15         in general, when you don't have data and

16         you want to fill in blanks for data.

17         But for glyphosate, it's particularly

18         problematic in a situation where the use

19         of the chemical is increasing

20         dramatically over a relatively short

21         period of time right in the middle of

22         the enrollment period and right during

23         the first follow-up questionnaire.

24     BY MR. GRIFFIS:

25         Q.    Is your --

1      A.    This is very different than it is

2   for many of the other pesticides that have

3   been studied in these others' papers.

4   There's a big difference between what

5   happened in the use of all these different

6   pesticides compared to glyphosate.

7   BY MR. GRIFFIS:

8      Q.    Okay.   Is it your view that the

9   imputation method used was scientifically

10  acceptable for every other substance they

11  examined except for glyphosate?

12           MS. FORGIE:   Asked and answered.

13       You can answer it again.   Objection.

14           THE WITNESS:   Well, it was

15       acceptable -- I don't know whether it's

16       acceptable or not.   It was certainly

17       acceptable to the people who did the

18       studies and to the people who reviewed

19       the studies.   It's an acceptable method

20       that epidemiologists use.   I can't

21       answer whether it's acceptable to me or

22       not because I -- I suppose I would

23       accept it.   I don't know with what

24       confidence one can accept this kind of

25       methodology and particularly in the case

1        of glyphosate, I don't have a lot of

2        confidence in it.

3    BY MR. GRIFFIS:

4        Q.   Okay.   I'm not asking you to speak

5    for the peer reviewers of all these

6    journals, sir, or for the authors of NCI

7    2018 but just for yourself.   For yourself,

8    is the scientific imputation procedure

9    applied in the NCI 2018 paper scientifically

10   acceptable for all those other substances

11   but not for glyphosate?

12            MS. FORGIE:   Objection.   Asked and

13        answered.   He's answered it twice, and

14        you're asking about articles he has not

15        read and not cited.

16            You can answer the question in the

17        same way.

18            THE WITNESS:   I would just answer

19        that for me it's not acceptable for

20        glyphosate.   I cannot comment on the

21        others.   I have not reviewed them.   I

22        would say, in general, it's probably

23        acceptable although it's much less

24        scientifically valid than actually

25        gathering the data.   Okay?   Guessing the

1          data is not as valid as actually

2          gathering the actual data.

3    BY MR. GRIFFIS:

4          Q.    You would agree --

5          A.    They didn't do that in this --

6                MS. FORGIE:  Wait.  Let him finish.

7                THE WITNESS:  They didn't do that

8          in this study, and it's a fatal flaw in

9          this study particularly in regard to

10         glyphosate.

11      BY MR. GRIFFIS:

12         Q.    You would agree, sir, that not

13     being able to gather all the data is an

14     extremely common issue in cohort studies?

15               MS. FORGIE:  Object to the form.

16               THE WITNESS:  It is in some cohort

17         studies like the Agricultural Health

18         Study.  It's less common in other

19         studies.  It depends entirely on the

20         loyalty of the cohort and their

21         willingness to participate.

22      BY MR. GRIFFIS:

23         Q.    You agree that multiple imputation

24     is a very standard epidemiological technique

25     for dealing with absent data; correct?

Page 101

1          MS. FORGIE:  Object to the form.

2          THE WITNESS:  Yes.

3          MS. FORGIE:  Asked and answered

4     three times.  You're starting to badger

5     the witness.

6          THE WITNESS:  Yes.

7   BY MR. GRIFFIS:

8     Q.   Do you believe that glyphosate was

9   not involved in the Koutros study, the other

10  Koutros study on prostate cancer and the

11  Bonner study, Exhibits 8, 9, and 10?

12         MS. FORGIE:  Object to the form.

13    I'm not going to let him answer any more

14    questions about these three studies,

15    31-8, 31-9, and 31-10 which he has not

16    read, not cited, do not deal with NHL,

17    until he's had a chance to sit here and

18    read them.  So if you want him to read

19    them and answer your questions, he can.

20         MR. GRIFFIS:  What I want to know

21    is when he made the statements that he

22    did about glyphosate and imputation, did

23    you believe that glyphosate was not

24    involved in these studies?

25         MS. FORGIE:  My objection stands.

1       You can read them if you want

2   before you answer those questions.

3           THE WITNESS:  I don't know whether

4   they evaluate glyphosate in these

5   studies or not.  I don't know whether

6   they used the same method they used in

7   the 2018 study and the data is highly

8   questionable.

9   BY MR. GRIFFIS:

10      Q.   The peer reviewers of "The American

11  Journal of Epidemiology," "International

12  Journal of Epidemiology," and the

13  "Environmental Health Perspective" passed

14  that procedure; right?

15          MS. FORGIE:  Object to the form.

16  Again, he hasn't looked at these.  He's

17  already stated he doesn't know what's in

18  them.  It's not fair.  You're badgering

19  him.

20          You can answer one more time.

21          THE WITNESS:  They accepted the

22  papers for publication but they -- it's

23  unlikely that they understood the -- all

24  the issues surrounding glyphosate and

25  its use.  And I . . .

1          (Exhibit Number 30-11 was

2          marked for identification.)

3     BY MR. GRIFFIS:

4          Q.    Exhibit 11 is the Heltshe Study

5     which you cited in your expert report;

6     correct?

7          A.    Yes.

8          Q.    And this is a paper in which the

9     imputation procedure was tested; correct?

10              MS. FORGIE:   Object to the form.

11              THE WITNESS:   Yes.

12     BY MR. GRIFFIS:

13          Q.    And it was tested by withdrawing a

14     random sample of people who did respond to

15     the second survey and pretending that they

16     didn't respond and seeing how well the

17     imputation procedure predicted the actual

18     responses that those people gave; right?

19          A.    Yes.

20          Q.    So it compared imputation to real

21     responses, data that was actually gathered;

22     right?

23          A.    Right.

24          Q.    To see how well those two matched

25     up.

1           In the introduction, sir, the

2    left-hand column on the first page, it says

3    halfway down first paragraph, "Multiple

4    imputation has been widely accepted, and

5    it's been used to account for missing data

6    in large national surveys and studies," and

7    it lists multiple studies including the

8    Framingham Heart Study; right?

9        A.   Yes.

10       Q.   Do you have any criticism of the

11   quality of the studies listed, NHANES III,

12   National Assessment of Educational Progress,

13   Children's Mental Health Initiative, and the

14   Framingham Heart Study?

15           MS. FORGIE:  Object to the form.

16       This deposition is not about those

17       studies.  I'm going to let him answer

18       that question.

19           THE WITNESS:  I really don't know

20       much about any of these studies.

21   BY MR. GRIFFIS:

22       Q.   Are you able -- do you have the

23   expertise and experience to be able to

24   comment on whether multiple imputation is

25   widely used in major national studies that

1    are well respected like the ones listed

2    here?

3              MS. FORGIE:  Objection.  Asked and

4         answered.

5              You can answer it again.

6              THE WITNESS:  I would accept that

7         statement.

8    BY MR. GRIFFIS:

9         Q.   And the first sentence of the

10   article, sir, "Missing data is a common

11   problem in epidemiological studies and the

12   statistical implications of ignoring missing

13   data are well known, including loss of

14   statistical power and potentially biased

15   estimates of the association."  And then

16   they describe multiple imputation technique

17   as one way to address that.  Do you agree

18   with that?

19             MS. FORGIE:  Objection.  Asked and

20        answered.

21             You can answer it again.

22             THE WITNESS:  I agree that

23        imputation is one way to address this

24        problem, yes.

25   ///

1    BY MR. GRIFFIS:

2        Q.   In the Heltshe --

3            MS. FORGIE:  How much time is

4        there, please.

5            THE VIDEOGRAPHER:  Just for this

6        tape.

7    BY MR. GRIFFIS:

8        Q.   In the Heltshe study, sir,

9    glyphosate was in the middle range for

10   relative errors as calculated between the

11   actual respondents and the imputed figures;

12   correct?

13           MS. FORGIE:  Object to the form.

14   BY MR. GRIFFIS:

15       Q.   I'm looking, for example, at

16   Figure 2.

17       A.   You're looking at Figure 2?

18       Q.   Yes.  You're welcome to look

19   anywhere you like, but that's where I'm

20   looking.

21       A.   Yes, it's kind of at the lower

22   edge, but it's close to the middle.

23       Q.   Close to the middle.  Looking at

24   Table 3, sir, do you know -- do you know

25   what a Brier skill score is and how to

1       assess it?

2           A.    I don't.

3           Q.    All right.  Let's skip that then.

4                 In the discussion section on

5       page 413, sir, of the Heltshe Study, it says

6       three sentences in, "In analyses, imputation

7       is generally preferable to omitting

8       individuals who did not complete phase 2, in

9       our case, 37 percent of enrolled

10      individuals, due to possible selection bias

11      in the subset with complete data and

12      decreased precision of parameters estimates

13      using only a subset of data."

14                Do you see that, sir?

15          A.    Yes.

16          Q.    Do you agree that imputation is

17      preferable to ignoring the data?

18                MS. FORGIE:  Objection.  Are you

19          talking about in general or with

20          glyphosate?

21                THE WITNESS:  So -- yeah, so what

22          they're saying here is that imputation

23          is preferable to limiting the study to

24          those with complete data.

25      ///

1  BY MR. GRIFFIS:

2      Q.   And you know that there were

3  multiple sensitivity tests that were done in

4  the NCI 2018 study to test the accuracy of

5  its imputation procedure; right?

6          MS. FORGIE:  Object to the form.

7          THE WITNESS:  Yes.

8  BY MR. GRIFFIS:

9      Q.   None of those sensitivity tests

10  itself relied on imputation; right?  There

11  are ways of checking the data without

12  looking at it without imputation; right?

13          MS. FORGIE:  Object to the form.

14          THE WITNESS:  That's correct.

15  BY MR. GRIFFIS:

16      Q.   And all three of those sensitivity

17  checks came up with essentially the same

18  result, i.e., no association between

19  glyphosate and non-Hodgkin lymphoma;

20  correct?

21          MS. FORGIE:  Object to the form.

22          THE WITNESS:  It's correct, but

23      they all used the same basic flawed data

24      due to exposure misclassification.  So

25      it's not surprising they came up with

1      the same result.

2   BY MR. GRIFFIS:

3      Q.   They eliminated imputation entirely

4   in those sensitivity analyses; right?

5           MS. FORGIE:  Objection.  Asked and

6       answered.

7           You can answer it again.

8           THE WITNESS:  In some of the

9       analyses that's true.  I don't know

10      whether they did in all of them.  We'd

11      have to talk about them one at a time.

12  BY MR. GRIFFIS:

13     Q.   Let's do.  Page 4, first column.

14          MS. FORGIE:  Are you back to the

15      study?

16          MR. GRIFFIS:  Yeah.

17          MS. FORGIE:  That --

18          THE WITNESS:  Page 4?  Where are

19      you?

20  BY MR. GRIFFIS:

21     Q.   I'm in the first column, first full

22  paragraph within the paragraph that starts

23  in primary analyses, about three sentences

24  in.  And the first sensitivity test is

25  described -- they say "We conducted several

1  sensitivity analyses."

2          Do you see that?

3      A.   Right.

4      Q.   Okay.  So the first one was they

5  restricted to exposure report at enrollment,

6  in other words, the first questionnaire;

7  correct?

8      A.   Correct.

9      Q.   So people that answered the first

10 questionnaire, they just looked at that data

11 and left out the second questionnaire; so

12 they didn't need to impute any missing data;

13 right?

14     A.   Right.

15     Q.   And when they did that, when they

16 used only exposure information reported at

17 enrollment, rate ratio in the highest

18 exposed quartile was 0.82 percent and they

19 report the confidence interval expands one.

20          So when they did the first

21 sensitivity analysis leaving out imputation,

22 there was, again, no association between

23 glyphosate and non-Hodgkin lymphoma;

24 correct?

25          MS. FORGIE:  Object to the form and

1        asked and answered.

2               You can answer it again.

3               THE WITNESS:   That's correct.

4    BY MR. GRIFFIS:

5        Q.   Then they did a second sensitivity

6    analysis a different way.   "To evaluate the

7    impact of using imputed exposure data for

8    participants who did not complete the

9    follow-up questionnaire, we limited the

10   analysis to the 34,698 participants who

11   completed both questionnaires."   So if you

12   didn't answer the second questionnaire, they

13   left you out of this sensitivity test;

14   right?

15       A.   Correct.

16       Q.   So, again, they didn't need to use

17   imputation; right?

18              MS. FORGIE:   Object to the form.

19   BY MR. GRIFFIS:

20       Q.   There was no imputation in this

21   second sensitivity analysis?

22       A.    Well, there may have been some

23   imputation for the people who answered the

24   questionnaire because they had to impute

25   what their use was during that gap period we

1  talked about earlier.  They had to do it.

2  So they didn't include any imputation for

3  the 37 percent who didn't complete the

4  questionnaire, but they had to do some

5  imputation for the people who did complete

6  the questionnaire.

7      Q.   So you believe the imputation

8  procedure and not some other statistical

9  control is how the gaps were addressed in

10  people who answered the second

11  questionnaire; is that right?

12          MS. FORGIE:  Object to the form.

13          THE WITNESS:  I don't know the

14      answer, but I suspect that's how they

15      did it.

16  BY MR. GRIFFIS:

17      Q.   They didn't need --

18      A.   They don't tell you how they did

19  it.

20      Q.   Yes, sir.  The 37 percent -- for

21  the 37 percent, the second sensitivity

22  analysis leaves out that whole imputation

23  procedure; correct?

24      A.   Right, it leaves out all those

25  people.

1    Q.   And when they're left out, again,

2  there's no statistically significant

3  association, no association at all between

4  glyphosate and non-Hodgkin lymphoma;

5  correct?

6         MS. FORGIE:  Objection.  Asked and

7     answered.

8         You can answer it again.

9         THE WITNESS:  That's correct.

10 BY MR. GRIFFIS:

11   Q.   Now, the third sensitivity test

12 they truncated the follow-up period to 2005

13 so that their latest exposure information

14 that they had which was 2005 they stopped

15 follow-up there; so if they had mistakenly

16 imputed any exposures or non-exposures, that

17 wouldn't matter because they wouldn't be

18 looking into the future at those cancers;

19 right?

20         MS. FORGIE:  Object to the form.

21         THE WITNESS:  So -- yeah.  So they

22     imputed it for everyone, but they

23     stopped the follow-up at 2005.  So

24     presumably any exposure

25     misclassification that occurred after

1      that is not part of the issue.

2    BY MR. GRIFFIS:

3      Q.   Right.  It takes out that exposure

4    misclassification issue --

5      A.   Right.

6      Q.   -- as a sensitivity test; right?

7      A.   Right.

8           MS. FORGIE:  Object to the form.

9    BY MR. GRIFFIS:

10     Q.   And once again there is no

11   association in the resulting figures; right?

12          MS. FORGIE:  Objection.  Asked and

13       answered.

14          You can answer it again.

15          THE WITNESS:  Right, but, again,

16       it's not surprising because the

17       underlying data and the extent of the

18       exposure misclassifications that

19       occurred even at the time of enrollment

20       you wouldn't see anything.  So with each

21       of these sensitivity analyses, there are

22       still major issues and flaws just as

23       there is in the overall analysis.

24   BY MR. GRIFFIS:

25     Q.   Okay.  Let's get the imputation

1  addressed first.  As far as the imputation

2  procedure goes, the imputation procedure

3  that was used to address the 37 percent

4  non-respondents in the second questionnaire,

5  the NCI 2018 investigators did three

6  separate sensitivity analyses that didn't

7  rely on that imputation and came up with the

8  same lack of association between glyphosate

9  and non-Hodgkin lymphoma; correct?

10            MS. FORGIE:  Wait.  Object to the

11       form.  You've now asked him this four

12       times.  He can answer it one more time,

13       but you're badgering the witness.

14            You can answer it again.

15            THE WITNESS:  I believe the third

16       one did include imputation up to 2005.

17  BY MR. GRIFFIS:

18       Q.   Okay.  Left out a big piece of

19  imputation?

20            MS. FORGIE:  Object to the form.

21            THE WITNESS:  No, it included

22       imputation up to 2005.

23  BY MR. GRIFFIS:

24       Q.   And it left out a big piece of

25  imputation as well; correct? -- in your

1  view?

2         MS. FORGIE:  Object to the form.

3     Asked and answered.

4         You can answer it again.

5         THE WITNESS:  I don't know.  I'd

6     have to go back and look at that

7     carefully but -- I'd have to go back and

8     look at it carefully.  I thought it did

9     include imputation up to 2005.

10 BY MR. GRIFFIS:

11    Q.   You're not sure?

12         MS. FORGIE:  Object to the form.

13     Asked and answered.

14         THE WITNESS:  Let me look at it.

15     I'm unclear on the last one whether the

16     imputation was included or not.

17 BY MR. GRIFFIS:

18    Q.   Okay.

19    A.   I'd have to go back and review the

20 methods.

21    Q.   Okay.

22         MS. FORGIE:  Do you want him to do

23     that?

24 BY MR. GRIFFIS:

25    Q.   Since you're not clear about the

1   third one, let's ask about the first two.

2   They did two at least sensitivity tests that

3   omitted the imputation procedure.  Are we --

4           THE VIDEOGRAPHER:  I should switch.

5   BY MR. GRIFFIS:

6       Q.   That omitted the imputation

7   procedure and came up with the same lack of

8   association between glyphosate and NHL;

9   correct?

10          MS. FORGIE:  Object to the form.

11      Asked and answered like five times.

12          You can answer it again.

13          THE WITNESS:  I'm sorry.  Ask the

14      question again.

15          MR. GRIFFIS:  Switch tapes, and

16      we'll ask it again.

17          THE VIDEOGRAPHER:  This will

18      complete disk number 1.  We're going off

19      the record at 11:06 a.m.

20          (Recess taken from 11:06 a.m.

21          to 11:16 a.m.)

22          THE VIDEOGRAPHER:  This is the

23      beginning of disk number 2.  We are

24      going back on the record.  The time is

25      11:16 a.m.

1         THE WITNESS:  So I'd just like to

2      correct myself.  For the last

3      sensitivity analysis, they didn't use

4      imputed data for any of the 37 percent

5      who didn't complete the second

6      questionnaire.

7   BY MR. GRIFFIS:

8      Q.   For the last one, the third one

9   that we were talking about, the truncated

10  follow-up period --

11     A.   Yes.

12     Q.   -- to 2005, they didn't use any

13  imputed data?

14     A.   Not for the 37 percent.

15     Q.   Okay.  And the purpose of these

16  three sensitivity tests was to test how

17  reliable imputation was in this study;

18  right?

19         MS. FORGIE:  Object to the form.

20         THE WITNESS:  Well, they're

21      comparing different types of analysis to

22      see whether there's any difference, and

23      there wasn't any difference.  So they're

24      assuming that this confirms their

25      imputation calculations, but all this --

1         all the analyses are using the same

2         flawed data; so it's not surprising that

3         the results are not different.

4    BY MR. GRIFFIS:

5         Q.   Well, let's talk about imputation

6    first, not the same flawed data point which

7    we'll discuss with the imputation point.

8              As far as imputation goes, these

9    are three sensitivity tests that were done

10   to set aside imputation and see if similar

11   results were reached, and the answer was

12   yes.  We get similar results without using

13   imputation; right?

14        MS. FORGIE:  Objection.  Asked and

15        answered.  It mischaracterizes his

16        answer.

17        THE WITNESS:  So, yes, you get

18        similar results, but there's a real

19        selection bias that occurs here because

20        you're only analyzing data on people who

21        actually answered the two parts of the

22        questionnaire.  If you look at, you

23        know, are the people who didn't respond

24        to the second phase of the questionnaire

25        different than the ones who did respond,

1          they're actually very different.  So

2          this is the problem with just using this

3          kind of data because there's a selection

4          bias for people who actually answered

5          the questionnaire.  And those people are

6          very different actually than people who

7          didn't answer the second phase of the

8          questionnaire; so you're trying to guess

9          what the people who didn't answer the

10          second phase of the questionnaire --

11          you're trying to guess what exposure

12          they had when, in fact, they're very

13          different than the group that you used

14          to train your imputation.

15     BY MR. GRIFFIS:

16          Q.   First of all, you said that you're

17     relying on people who answered the second

18     questionnaire being similar to people who

19     didn't answer the second questionnaire;

20     correct?

21          A.   Yes.

22               MS. FORGIE:  Objection --

23               THE WITNESS:  But they aren't --

24          they're very different.

25     ///

1  BY MR. GRIFFIS:

2      Q.   As to the first sensitivity

3  analysis, that's not an accurate criticism

4  because that was restricted to data from the

5  first questionnaire; right?

6           MS. FORGIE:  Objection.  Asked and

7      answered.

8           You can answer it again.

9           THE WITNESS:  Right.  So in the

10     first -- so in the first sensitivity

11     analysis, you just use the initial data,

12     right.

13  BY MR. GRIFFIS:

14     Q.   Okay.  And you said that we know

15  that the people who responded to the second

16  questionnaire were different than the people

17  who didn't respond to it.

18     A.   Yes.

19     Q.   What's the evidence for that?

20     A.   Well, there's a paper by Montgomery

21  which I didn't cite, but there's a paper by

22  Rinsky which I did cite which also

23  references the paper by Montgomery, and both

24  those papers showed that the people who

25  answered the second questionnaire were

1    actually very different than the people who

2    didn't answer the second questionnaire.

3              MR. GRIFFIS:  Let's mark Rinsky and

4         Montgomery.

5              (Exhibit Numbers 30-12 and

6              30-13 were marked for

7              identification.)

8    BY MR. GRIFFIS:

9         Q.   Which one is Exhibit 12, sir?

10             MS. SHIMADA:  Montgomery.

11             THE WITNESS:  I'm sorry?

12   BY MR. GRIFFIS:

13        Q.   Montgomery is 12?

14        A.   Yes.

15        Q.   In Montgomery, they looked at the

16   difference between the people who responded

17   to the second questionnaire and the people

18   who didn't respond to it; right?

19        A.   Right.  They compared the two

20   groups.

21        Q.   In the abstract under

22   "Conclusions," they said "Differences

23   between non-participants and participants in

24   the follow-up interview were generally

25   small, and we did not find significant

1   evidence of selection bias"; right?

2          MS. FORGIE:  Object to the form.

3          THE WITNESS:  That's what they say.

4   BY MR. GRIFFIS:

5      Q.   In the Rinsky paper, sir, 13, this

6   is a comparison of people who did and didn't

7   respond to a third interview; right?

8      A.   Right.  Response was even worse in

9   the third questionnaire.

10     Q.   And the third interview doesn't

11  have anything to do with NCI 2018; right?

12         MS. FORGIE:  Object to the form.

13         THE WITNESS:  It doesn't, but it

14     shows you that there are going to be

15     even more problems in future analyses if

16     they're ever done.

17  BY MR. GRIFFIS:

18     Q.   As far as the critique of the

19  non-responders to the second questionnaire

20  in NCI 2018, Rinsky doesn't speak to that;

21  right?

22     A.   No, Montgomery does, but the

23  findings are the same.  And Rinsky

24  references Montgomery.

25     Q.   You've said several times during

1  this deposition that glyphosate is uniquely

2  problematic for the NCI 2018 study and for

3  the AHS dataset, in general, and that

4  imputation will be biased with regard to it

5  and that the basic data collection will be

6  wrong with regard to it; correct?

7        MS. FORGIE:  Object to the form.

8     Mischaracterizes his testimony.

9        THE WITNESS:  I think the marked

10     change in the use of glyphosate right

11     during the time of the enrollment and

12     during the period after the enrollment

13     has resulted in a significant amount of

14     exposure misclassification, which is a

15     problem for the study because this

16     exposure misclassification is

17     non-differential, and it biases any

18     potential real findings to the null.  So

19     it gives you a negative study, and this

20     is one reason why one in general has

21     less confidence in negative studies than

22     positive studies because when risk

23     ratios are not high, they can just

24     disappear with this kind of -- with this

25     level of misclassification.

1  BY MR. GRIFFIS:

2      Q.   And you have a hypothesis that

3  changes in glyphosate use caused

4  non-differential misclassification.  Do you

5  have any evidence that that is true?

6          MS. FORGIE:  Object to the form.

7          THE WITNESS:  No, but if you look

8      at how the study was done and

9      constructed, you'd know that there was

10     significant amounts of exposure

11     misclassification just by understanding

12     the nature of how the study was done.

13  BY MR. GRIFFIS:

14     Q.   Yes, sir.  You have a hypothesis,

15  but you don't have any evidence for it;

16  right?

17         MS. FORGIE:  Objection.

18     Mischaracterizes his testimony, asked

19     and answered.

20         You can answer it again.

21         THE WITNESS:  Well, I'm not part of

22     the study; so how can I develop

23     evidence?  I don't have -- I don't have

24     access to the raw data to develop

25     evidence.  How could I develop evidence?

1    BY MR. GRIFFIS:

2        Q.   Well, for example, sir, the NCI

3    2018 paper and the AHS pool of data, in

4    general, has all sorts of supporting studies

5    validating all sorts of different aspects of

6    it, which is something the case-control

7    studies don't have; right?

8            MS. FORGIE:  Object to the form.

9            THE WITNESS:  And many of those

10           studies raised the issue of exposure

11           misclassification and how it could be a

12           major problem in the Agriculture Health

13           Study.

14   BY MR. GRIFFIS:

15       Q.   And none of them detected any

16   exposure misclassification with regard to

17   the glyphosate; correct?

18           MS. FORGIE:  Object to the form.

19           THE WITNESS:  The studies didn't

20           necessarily focus on glyphosate.

21   BY MR. GRIFFIS:

22       Q.   To close the loop, you can't point

23   us to any evidence as opposed to your

24   hypothesis that the glyphosate data

25   incorporates differential misclassification;

1   right?

2           MS. FORGIE:  Object to the form.

3       Asked and answered.

4           You can answer it again.

5           THE WITNESS:  So if you understand

6       how the study was done, you know there

7       was a significant amount of exposure

8       misclassification, and basically the

9       study does not address that issue.

10      Okay?  The study does not address that

11      issue, and it should have been

12      addressed.

13  BY MR. GRIFFIS:

14      Q.   And imputation is designed to

15  address the problem of exposure

16  misclassification?

17          MS. FORGIE:  Objection.

18          THE WITNESS:  No, it's designed to

19      fill in the gaps in information, but it

20      can be also influenced by the initial

21      exposure misclassification which

22      occurred because that data is used as

23      part of imputation method.

24  BY MR. GRIFFIS:

25      Q.   And, again, so that the jury is

1    clear, when you say "the exposure

2    misclassification that occurred," it is the

3    exposure misclassification that you

4    hypothesized by looking at the study;

5    correct?

6            MS. FORGIE:  Object to the form.

7            THE WITNESS:  I think it's pretty

8        commonly -- if one studies the way the

9        study was done, if one studies the

10       methodology carefully, one can see that

11       there's a significant likelihood of

12       exposure misclassification which can't

13       be addressed -- which can't be addressed

14       and probably can't be measured because

15       of the way the study was done.

16   BY MR. GRIFFIS:

17       Q.   And there are no data or figures

18   that you can point to for that?

19           MS. FORGIE:  Object to the form.

20       Asked and answered.

21           You can answer it again.

22           THE WITNESS:  No, other than the

23       whole body of information that we know

24       about the agricultural health study.

25   ///

Page 129

1   BY MR. GRIFFIS:

2       Q.   All of the flaws or errors,

3   whatever term you like to use, that you've

4   discussed today and that you believe exist

5   with regard to this study, those are

6   non-differential, not differential; correct?

7           MS. FORGIE:  Object to the form.

8       Mischaracterizes his testimony.

9           THE WITNESS:  Yes, I think they're

10      non-differential.

11  BY MR. GRIFFIS:

12      Q.   Okay.

13      A.   The other problem with the

14  sensitivity analyses is that they're

15  focusing only on people who actually

16  responded to the questionnaires.  So there's

17  a selection bias in just analyzing that

18  data, and the study doesn't recommend doing

19  that because of the selection bias.  That's

20  why they decided to use the imputation data.

21  Okay?

22      Q.   Because it was better; right?

23          MS. FORGIE:  Object to the form.

24          THE WITNESS:  Because they thought

25      it would be better.

1  BY MR. GRIFFIS:

2      Q.   They thought it would be better,

3  and there are studies on whether it's better

4  like the Heltshe Study, and you can't point

5  anywhere where they found that it's worse;

6  correct?

7          MS. FORGIE:  Object to the form.

8          THE WITNESS:  It's not a matter of

9      whether it's worse or not.  It's do you

10     use the data, or do you not -- do you

11     just drop out the people who didn't

12     respond, and I think for most of the

13     analysis they did the imputation data is

14     acceptable.  But for glyphosate because

15     of the special circumstances, it is

16     highly questionable.

17 BY MR. GRIFFIS:

18     Q.   All three of the sensitivity tests

19 that were done would, if they were published

20 as a standalone study, would be the biggest

21 study out there other than NCI 2018 itself

22 on the subject of glyphosate and

23 non-Hodgkin's lymphoma; correct?

24         MS. FORGIE:  Object to the form.

25         THE WITNESS:  It's true, but they

1        would never be able to publish them that

2        way because of the tremendous dropout of

3        information and the selection bias that

4        would have been introduced; so that's

5        why they didn't do it.

6  BY MR. GRIFFIS:

7        Q.   And in order for the dropout to

8  matter, it would have to be differential;

9  correct?  It would have to -- people would

10 have to not respond to the second

11 questionnaire in a way that is correlated

12 with their propensity to be exposed to

13 glyphosate and contract non-Hodgkin's

14 lymphoma from their exposure to glyphosate;

15 correct?

16            MS. FORGIE:  Object to the form.

17            THE WITNESS:  We can't really know

18       what the effect of having those

19       37 percent of people respond.  We can't

20       really know what that is.  We can only

21       guess, and that's what they did.  The

22       fact is that the group that didn't

23       respond to the second questionnaire was

24       very different from the group that did,

25       and so it's very likely that the

1    imputation is flawed because of that

2    because they used a group of people who

3    were very different to impute the data

4    to people who -- to another group of

5    people.

6  BY MR. GRIFFIS:

7    Q.   Montgomery says "Differences

8  between non-participants and participants in

9  the follow-up interview were generally small

10 and we did not find significant evidence of

11 selection bias"; right?

12        MS. FORGIE:  Are you asking him

13   whether you're reading a section

14   correctly?

15        MR. GRIFFIS:  I'm asking whether

16   that was their conclusion.

17        MS. FORGIE:  Object to the form.

18        THE WITNESS:  That's what they say.

19   That's what they say.  If you look at

20   the details, the group that didn't

21   respond to the questionnaire were

22   younger.  They were less educated.  They

23   were more likely non-whites.  They had

24   poor health habits.  They smoked more.

25   They drank more.  They ate -- had diets

1     that weren't as good.  They were less

2     likely to use pesticides, to mix and

3     apply pesticides; so there were all

4     kinds of differences between the

5     non-responders and the responders that

6     call into question the whole imputation

7     process.

8  BY MR. GRIFFIS:

9     Q.   What evidence is there that any of

10 those factors is correlated with being

11 exposed to glyphosate and contracting

12 non-Hodgkin's lymphoma?

13        MS. FORGIE:  Objection.  Asked and

14     answered.

15        You can answer it again.

16        THE WITNESS:  We don't know the

17     answer to that because they never

18     gathered the data.

19 BY MR. GRIFFIS:

20     Q.   Take a look, sir, again, at Table 2

21 in Exhibit 5, the NCI 2018.

22     A.   Table 2?

23     Q.   Yes.  Let's just look at the data

24 for lymphohematopoietic -- no, let's do

25 non-Hodgkin's lymphoma.  Are you there?

1    A.   Your Table 2 of Andreotti?

2    Q.   Yes.

3    A.   Yes.

4    Q.   Table 2, Exhibit 5, the NCI 2018.

5  So we have here data for people who were

6  unexposed and people in four different

7  quartiles of exposure, Q1 being lowest, Q4

8  being highest; correct?

9    A.   Yes.

10        MS. FORGIE:  Object to the form.

11  BY MR. GRIFFIS:

12    Q.   The relative risk pointed out to

13  Mr. Gibbons 0.83, 0.83, 0.88, and 0.87.

14  Those are the respective relative risks for

15  quartiles 1 through 4; correct?

16    A.   Correct.

17    Q.   If there was non-differential

18  classification in this study that biased

19  results toward the null, then the true

20  relative risks that you would get for

21  non-Hodgkin lymphoma if you corrected for

22  those would be figures smaller than 0.83,

23  0.83, 0.88, and 0.87; correct?

24        MS. FORGIE:  Object to the form.

25        THE WITNESS:  If the data is

1    correct, that's true.  But there's no

2    obvious reason to be able to understand

3    why the risk ratios are lower than one.

4    Okay?  So if there's no risk --

5    right? -- if there's no risk, they

6    should be about one.  So the fact that

7    they're, you know, almost 20 percent

8    lower for some categories tells you that

9    there are also some methodologic issues

10   in the study which we don't understand.

11   Either the control group is very unlike

12   the group that got diseased or there's

13   some random error.  There is some other

14   issues here which is hard to understand,

15   why would the odds ratios actually be

16   lower than one?  We don't really believe

17   glyphosate is protective for disease;

18   right.

19   BY MR. GRIFFIS:

20        Q.   You testified earlier, sir, that

21   this pattern, a pattern for all cancers, for

22   oral cavity, colon, rectum, pancreas, lung,

23   melanoma, prostate, et cetera, is exactly

24   what you would expect to see in a substance

25   that does not cause cancer, i.e., point

1   value is somewhat higher than one, point

2   value somewhat lower than one, all clustered

3   tightly around one, all not significant,

4   except possibly with some multiple

5   comparison outliers here and there.

6        A.   You have --

7             MS. FORGIE:  Wait.  Objection.

8        Mischaracterizes his testimony.

9             THE WITNESS:  If you look at the

10       data for most of these other cancers,

11       the numbers are clustered around one.

12       For non-Hodgkin lymphoma, there's

13       significant -- they're lower than one,

14       consistently lower than one.  So what

15       that tells you is there's something

16       different here, and we don't understand

17       why that is.  Okay?  So the questions

18       about non-differential misclassification

19       actually changing a value below one is

20       nonsensical to me.  It makes no sense.

21       Okay?

22   BY MR. GRIFFIS:

23       Q.   So in your epidemiologic view, bias

24   towards the null only applies to increasing

25   P values -- increasing relative risks that

1       start out above one?

2              MS. FORGIE:  Object to the form.

3              THE WITNESS:  Well, if -- if they

4          start out above one, it will decrease it

5          towards the null.  If they truly start

6          below one, it will increase it towards

7          the null, but there's no reason to

8          believe that glyphosate actually

9          prevents non-Hodgkin lymphoma, is there?

10         No, there's not.  So it's sort of

11         nonsensical to make the argument below

12         one.  Okay?

13      BY MR. GRIFFIS:

14         Q.   Okay.  All of your points about

15      non-differential bias, they wouldn't take

16      something like the results that we see for

17      lymphohematopoietic and move it towards one

18      and beyond one and yield a statistically

19      significant positive association because

20      that would be the wrong direction for

21      non-differential bias; right?

22             MS. FORGIE:  Object to the form.

23             THE WITNESS:  So if it was lower

24         than one?

25      ///

1  BY MR. GRIFFIS:

2      Q.   Yeah, you're not going to get .87

3  ticking up towards one and beyond it by

4  correcting for non-differential bias by

5  definition; right?

6          MS. FORGIE:   Object to the form.

7          THE WITNESS:   No, but that's why I

8      say that the fact that the odds ratios

9      are lower -- consistently lower than

10     one, there must be another explanation

11     for that.   Okay?   Other than the fact

12     that glyphosate is protective of

13     non-Hodgkin's lymphoma.   That doesn't

14     make any sense either.

15 BY MR. GRIFFIS:

16     Q.   What is it?

17     A.   Uh-huh?

18     Q.   What is the other explanation?

19     A.   I don't know what the other

20 explanation is.   Either the control group is

21 so different from the cases that it doesn't

22 allow us to do a valid evaluation, or

23 there's some random error.   I don't know.

24 My guess is that there -- my guess is that

25 the control group is probably not a very

1   good group to use because they're very

2   different from the cases, and actually

3   that's the reason in the De Roos -- the

4   first De Roos paper that they did an

5   analysis of the low exposed to the high

6   exposed instead of using -- doing the

7   analysis of the high exposed versus the

8   controls.  And, in fact, it would have been

9   interesting for these folks to do the same

10   thing just to see if there's a difference.

11   Okay?

12          My guess is that these risk ratios

13   that are below one would have come much

14   closer and clustered around one.  So that's

15   another issue with this study.  The control

16   group that they used probably isn't a very

17   representative control group comparing the

18   controls to the cases.

19       Q.   Sir, to be fair, I've got five

20   minutes left.  You're supposed to be giving

21   expert testimony here.  None of this is in

22   your expert report.

23       A.   I'm answering your question.

24          MS. FORGIE:  Wait, wait, wait.

25   ///

1    BY MR. GRIFFIS:

2        Q.   Are you testifying to a reasonable

3    degree of medical certainty that these

4    figures represent a difference in the

5    control group from the composed group, and

6    that's the reason for this, and that's an

7    additional source of error in the data?  Is

8    that your testimony to a reasonable degree

9    of medical certainty?

10       A.   I'm suggesting that that may be an

11   explanation for the lower than one odds

12   ratios for non-Hodgkin's lymphoma.  I'm

13   suggesting that.

14       Q.   That's a speculation?

15           MS. FORGIE:  No.  Objection.

16           THE WITNESS:  It is speculation

17       because no one has explained why they

18       are not clustering around one, why

19       they're all low.  There's some

20       methodologic issue here that is not

21       addressed in the paper.

22           MR. GRIFFIS:  Pass the witness.

23           MS. FORGIE:  Okay.  We'll take a

24       break.

25           THE VIDEOGRAPHER:  Going off the

Page 141

1        record at 11:41 a.m.

2             (Recess taken from 11:41 a.m.

3             to 11:55 a.m.)

4             THE VIDEOGRAPHER:  This is

5        continuing disk number 2.  The time is

6        11:55.  We are going back on the record.

7

8                     EXAMINATION

9   BY MS. FORGIE:

10       Q.   Doctor, you were asked a series of

11  questions about your opinions about

12  misclassification flaws in the AHS

13  publication.  Do you remember those

14  questions?

15       A.   Yes.

16       Q.   And do some of those

17  misclassification flaws apply to the

18  63 percent that answered the second

19  questionnaire?

20       A.   Yes, they do.

21       Q.   So it's not just the 37 percent

22  that did not answer the second question that

23  those misclassification flaws applied to;

24  correct?

25       A.   Yes.

Page 142

1      Q.   You were also asked a series of

2  questions with regard to the 37 percent and

3  the questionnaires in there.  You were asked

4  a series of questions with regards to the

5  statement at that follow-up, applicators

6  reported the number of days each pesticide

7  was used in the most recent year farm.  Do

8  you remember those questions?

9      A.   Yes.

10      Q.   With regard to the other years for

11  which they did not answer that question,

12  what information, if any, do we have about

13  pesticide they were using?

14      A.   We don't have any -- we don't know.

15  We don't know what they were using.  We

16  don't know.

17      Q.   How many years were involved in the

18  period which we don't know what they were

19  using and how long they were using it?

20      A.   Somewhere between six and 12 years.

21      Q.   And all that data is not in the

22  study; correct?

23      A.   We don't know that data for any of

24  them.

25      Q.   You mentioned that you've never

1   used an imputation formula in any of your

2   publications.  Do you remember that

3   testimony?

4        A.   Yes.

5        Q.   And you mentioned that you don't

6   know exactly how you would use an imputation

7   method, but would you have access as

8   chairman of the department of pathology here

9   at a large cancer center, City of Hope,

10   would you have access to people who are

11   qualified to prepare an imputation process

12   if you needed it?

13        A.   Yeah.  So the studies I was

14   involved in remain case control studies

15   where we gathered nearly complete data on

16   all of the cases and controls so we didn't

17   have a need for imputation.  So I never

18   needed to use imputation to create data for

19   any of my studies.  But, you know, if there

20   had been a need, I would have engaged the

21   epidemiologists that I collaborated with to

22   do that.

23        Q.   But if you have the data, you don't

24   need to use an imputation process?

25        A.   Right.

1    Q.   If you collect the data, you don't

2  need to use an imputation process; correct?

3    A.   Right.  You want to use real data

4  whenever possible.

5    Q.   And they could have -- the authors

6  of the AHS study could have gotten that data

7  if they had asked those questions; is that

8  correct?

9    A.   They could have, yes.

10    Q.   Are you aware of any peer-reviewed

11  publications that discuss the

12  misclassification flaws in the AHS

13  publication that you've addressed today?

14    A.   Well, yes, there's the article by

15  Gray that I reference in my report that

16  talks about the fact that, you know, if you

17  don't gather data in the follow-up studies,

18  that there's a significant potential for

19  exposure misclassification.  And then

20  there's the study by Acquavella and another

21  study by Blair where they did some

22  biomonitoring, and they both discuss the

23  issue of exposure misclassification in the

24  Agricultural Health Study and how it could

25  be a significant factor.

1    Q.   So the exposure misclassification

2  flaws in the AHS publication that you've

3  discussed today are also mentioned in

4  peer-reviewed publications, and you just

5  named three of those; correct?

6         MR. GRIFFIS:  Objection.  Leading.

7         THE WITNESS:  Yes.

8  BY MS. FORGIE:

9    Q.   You were asked several questions

10  about how long it takes to develop

11  non-Hodgkin's lymphoma after the use of

12  Roundup.  Do you remember those questions?

13    A.   Yes.

14    Q.   Is it possible to develop

15  non-Hodgkin's lymphoma in one or two years?

16    A.   It is possible after a short

17  exposure, but it would be quite unlikely.

18  But it's possible.

19    Q.   And with regard to the answers that

20  you were giving, you were giving answers

21  about what you would want in an

22  epidemiological study as compared to what

23  would be exposure required in an individual;

24  is that correct?

25    A.   Well, we were talking about median

1  times of exposure or median times of

2  follow-up.  So, you know, as I said before,

3  the more exposure and the longer follow-up,

4  the better.

5      Q.   For purposes of an epidemiological

6  study; correct?

7      A.   Yes.

8      Q.   Oh, one more question.  You were

9  asked a question -- is the AHS publication a

10 prospective study or retrospective study?

11     A.   It's actually both because it's

12 retrospective from the time of enrollment

13 because that data is all gathered prior to

14 enrollment.  And then it is prospective in

15 the sense that as you go forward, they will

16 have additional follow-up questionnaires to

17 try to update the data and have a complete

18 and accurate database.

19     Q.   Do you agree that the imputation

20 error with regard to no differential

21 misclassification of exposure is only asking

22 about the last year of pesticide use

23 compounds or makes the flaws in the AHS

24 publication more severe than in any of the

25 case-control studies?

Page 147

1        MR. GRIFFIS:  Objection.  Leading.

2        MS. FORGIE:  I'll withdraw it.  I

3     don't have anything else.

4

5              FURTHER EXAMINATION

6  BY MR. GRIFFIS:

7     Q.   Sir, you said that it's possible to

8  develop non-Hodgkin lymphoma in one to two

9  years.  What's your evidence for that?

10     A.   No, what I said is it's possible

11  that an exposure could cause non-Hodgkin's

12  lymphoma after a short period of time.

13  There's some evidence for that in studies of

14  chemotherapy, high-dose chemotherapy, that

15  when you use some high-dose chemotherapy

16  that you can develop non-Hodgkin's lymphoma

17  as a result of that, using it for another

18  purpose like for breast cancer or testicular

19  cancer or acute leukemia.  But generally

20  those are using very toxic agents at high

21  doses.  You could have a very short latency

22  in that kind of a situation.  I discussed

23  that in my article that is referenced in my

24  first report.

25        MR. GRIFFIS:  No further questions.

Page 148

1          MS. FORGIE:  Thank you.

2          THE VIDEOGRAPHER:  We are going off

3    the record at 12:03 p.m.  This will

4    complete disk number 2 and complete

5    today's deposition.

6          (Time noted:  12:03 p.m.)

7

8

9

10          _____

11              Dennis Weisenburger, M.D.

12

13

14    Subscribed and sworn to before me

15    this      day of          , 2018.

16

17    _____

18              (Notary Public)

19

20    My Commission expires: _____

21

22

23

24

25

Page 149

1              C E R T I F I C A T E

2   STATE OF CALIFORNIA:

3

4          I, LISA MOSKOWITZ, CSR, RPR, CRR, CLR,

5   NCRA Realtime Systems Administrator,

6   Certified Shorthand Reporter, do hereby

7   certify:

8          That the witness whose deposition is

9   hereinbefore set forth was duly sworn, and

10  that such deposition is a true record of the

11  testimony given by such witness.

12         I further certify that I am not related

13  to any of the parties to this action by

14  blood or marriage, and that I am in no way

15  interested in the outcome of this matter.

16         IN WITNESS WHEREOF, I have hereunto set

17  my hand this 22nd day of January, 2018.

18

19

20

21  _____

22  LISA MOSKOWITZ, CSR 10816, RPR, CRR, CLR

23  NCRA Realtime Systems Administrator

24

25

```
 1   NAME OF CASE: Roundup Products Liability Litigation
 2   DATE OF DEPOSITION:  January 22, 2018
 3   DEPONENT:  DENNIS WEISENBURGER, M.D.
 4             1. To clarify the record.
             2. To conform to the facts.
 5             3. To correct transcription error.
 6   Page _____ Line _____ Reason _____
     From_____ to_____
 7
     Page _____ Line _____ Reason _____
 8   From_____ to_____
 9   Page _____ Line _____ Reason _____
     From_____ to_____
10
     Page _____ Line _____ Reason _____
11   From_____ to_____
12   Page _____ Line _____ Reason _____
     From_____ to_____
13
     Page _____ Line _____ Reason _____
14   From_____ to_____
15   Page _____ Line _____ Reason _____
     From_____ to_____
16
     Page _____ Line _____ Reason _____
17   From_____ to_____
18   Page _____ Line _____ Reason _____
     From_____ to_____
19
     Page _____ Line _____ Reason _____
20   From_____ to_____
21   Page _____ Line _____ Reason _____
     From_____ to_____
22
     Page _____ Line _____ Reason _____
23   From_____ to_____
24   Page _____ Line _____ Reason _____
     From_____ to_____
25
```