# Exhibit 10

Confidential - Pursuant to Protective Order

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2
 3      IN RE: ROUNDUP            )
        PRODUCTS LIABILITY        )   MDL No. 2741
 4      LITIGATION                )
        _____   )   Case No.
 5      THIS DOCUMENT RELATES     )   16-md-02741-VC
        TO ALL CASES              )
 6
 7            TUESDAY, JANUARY 23, 2018
 8      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
 9                    - - -
10            VIDEOTAPED DEPOSITION of LORELEI A.
11      MUCCI, ScD, held at the offices of Cetrulo LLP,
12      2 Seaport Lane, Boston, Massachusetts,
13      commencing at 9:01, on the above date, before
14      Maureen O'Connor Pollard, Registered Merit
15      Reporter, Realtime Systems Administrator,
16      Certified Shorthand Reporter.
17                    - - -
18
19
20
21
              GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
25
```

Page 2

```
1              A P P E A R A N C E S :
2    ANDRUS WAGSTAFF, P.C.
     BY:  DAVID J. WOOL, ESQUIRE
3         david.wool@andruswagstaff.com
          7171 West Alaska Drive
4         Lakewood, Colorado 80226
          303-376-6360
5
          -and-
6
     THE MILLER FIRM LLC
7    BY:  JEFFREY A. TRAVERS, ESQUIRE
          jtravers@millerlawllc.com
8         108 Railroad Avenue
          Orange, Virginia 22960
9         540- 672-4224
          Counsel for Plaintiffs
10
11
     HOLLINGSWORTH LLP
12   BY:  ERIC G. LASKER, ESQUIRE
          elasker@hollingsworthllp.com
13        1350 I Street, N.W.
          Washington, DC 20005
14        202-898-5800
          Counsel for Defendant Monsanto
15
16
17
18
19   V I D E O G R A P H E R :

     CHRISTOPHER COUGHLIN,
20   Golkow Technologies, Inc.
21               – – –
22
23
24
25
```

Page 3

```
1                  INDEX
2    EXAMINATION                   PAGE
     LORELEI A. MUCCI, ScD
     BY MR. WOOL                     5
3
4          E X H I B I T S
     NO.     DESCRIPTION          PAGE
5
6    32-1  Supplemental Expert Report of
           Lorelei A. Mucci, ScD, MPH........ 5
7    32-2   Andreotti, et al article,
           Glyphosate Use and Cancer
8          Incidence in the Agricultural
           Health Study..................... 6
9
10   32-3   Blair, et al article,
           Reliability of Reporting on
11         Life-Style and Agricultural
           Factors by a Sample of
12         Participants in the
           Agricultural Health Study from
13         Iowa.............................. 43
14   32-4   Heltshe, et al article, Using
           multiple imputation to assign
15         pesticide use for
           non-responders in the follow-up
16         questionnaire in the
           Agricultural Health Study......... 64
17
18
19
20
21
22
23
24
25
```

Page 4

```
1             P R O C E E D I N G S
2
3         THE VIDEOGRAPHER:  We are now on the
4    record.  My name is Chris Coughlin, and I'm a
5    videographer for Golkow Technologies.  Today's
6    date is January 23, 2018, and the time is
7    9:01 a.m.
8         This video deposition is being held in
9    Boston, Massachusetts, In Re:  Roundup Products
10   Liability Litigation, United States District
11   Court, Northern District of California, MDL
12   number 2741, Case Number 16-md-02741-VC.
13        The deponent is Dr. Lorelei Mucci.
14        Will counsel please identify
15   yourselves and state whom you represent.
16        MS. WOOL:  David Wool of Andrus
17   Wagstaff for the plaintiffs.
18        MR. TRAVERSE:  Jeffrey Travers, The
19   Miller Firm, for the plaintiffs.
20        MR. LASKER:  Eric Lasker,
21   Hollingsworth LLP, for Monsanto.
22        THE VIDEOGRAPHER:  The court reporter
23   is Maureen O'Connor, and she will now swear in
24   the witness.
25        MR. LASKER:  Let me clarify, do we
```

Page 5

```
1    have anyone on the phone?  We don't have
2    anything set up, so maybe we don't.
3
4         LORELEI A. MUCCI, ScD,
5    having been first duly identified and sworn, was
6    examined and testified as follows:
7              EXAMINATION
8    BY MR. WOOL:
9        Q.  Good morning, Dr. Mucci.
10       A.  Good morning.
11       Q.  How are you doing this morning?
12       A.  Fine.  How are you?
13       Q.  Doing well.
14        So we are here to talk about your
15   supplemental report, is that your understanding?
16       A.  Yes.
17       Q.  I'm going to go ahead and hand you
18   what I've marked as Exhibit 32-1.
19        (Whereupon, Exhibit Number 32-1,
20        Supplemental Expert Report of Lorelei
21        A. Mucci, ScD, MPH, was marked for
22        identification.)
23        MR. WOOL:  Which is your supplemental
24   report that you authored pursuant to PTO 34 in
25   this litigation, is that correct?
```

Confidential - Pursuant to Protective Order

Page 6

1    A.  Yes.
2    Q.  And if you don't know the pretrial
3  order number, that's fine.
4    A.  Okay.
5    Q.  And does this report along with the
6  original report that you authored contain all of
7  your opinions on the Andreotti study that was
8  just published, or is soon to be published in
9  2018?
10    MR. LASKER:  Objection to form.
11    A.  It's based on my opinion in reading
12  the most recent publication, as well as
13  additional readings I've done, yes.
14  BY MR. WOOL:
15    Q.  Okay.  Let me go ahead and hand you
16  what I've marked as Exhibit 2.
17    (Whereupon, Exhibit Number 32-2,
18    Andreotti, et al article, Glyphosate
19    Use and Cancer Incidence in the
20    Agricultural Health Study, was marked
21    for identification.)
22  BY MR. WOOL:
23    Q.  Which is the study in question.
24    And so I guess my question is, does
25  this supplemental report, which is Exhibit 1,

Page 7

1  together with your original report contain all
2  of the opinions that you intend to offer
3  relevant to Exhibit 2 that you have in front of
4  you?
5    MR. LASKER:  Objection to form.
6    A.  There may be additional -- I tried to
7  keep my report brief, and as such there may be
8  specific topics I didn't cover.  I raised the
9  most important topics, and those are enclosed in
10  my supplemental report.
11  BY MR. WOOL:
12    Q.  As you sit here today, are there any
13  opinions that you are aware of that you intend
14  to offer about Exhibit 2 that are not contained
15  in either Exhibit 1 or your original expert
16  report?
17    A.  I'll have to hear the questions and
18  then -- it's not clear to me.  There are
19  additional readings that I've done since I
20  submitted my report, and those are included in
21  the information that you all have received.  And
22  there's a little bit more that I've learned
23  about the topic, but the major points are
24  covered in the supplemental report.
25    Q.  When you say since you submitted your

Page 8

1  report, are you referring to Exhibit 1?
2    A.  My supplemental report, Exhibit 1,
3  yes.
4    Q.  I just want to clarify.
5    All right.  And did anybody help you
6  in drafting Exhibit 1 other than, say, advice
7  that you received from counsel?
8    A.  No.
9    Q.  You didn't receive any help from a
10  grad student?
11    A.  No.
12    Q.  Did anybody summarize any articles for
13  you?
14    A.  No.
15    Q.  Nobody -- okay.
16    And you said you had read a couple of
17  new articles since you submitted that report,
18  correct?
19    A.  Yes.
20    Q.  And were those provided to us pursuant
21  to your notice of deposition?
22    A.  I'm sorry, I don't understand the
23  question.
24    Q.  Let me clarify that.
25    Do you recall offhand what additional

Page 9

1  materials you reviewed since submitting that
2  report?
3    A.  I've read a study, for example,
4  published by Benbrook describing trends in
5  glyphosate use over time.  There's papers like
6  that that I felt were relevant to my
7  understanding of the epidemiology literature,
8  particularly with respect to the Agricultural
9  Health Study.
10    Q.  Okay.  And have you read any of the
11  plaintiffs' depositions that were taken?
12    A.  Yes.
13    Q.  Which ones did you read?
14    A.  I've read through Dr. Ritz and
15  Dr. Neugut.
16    Q.  Just those two?
17    A.  Yes.
18    Q.  And any of the plaintiffs' expert
19  reports?
20    A.  Yes.
21    Q.  Do you recall which expert reports?
22    A.  Yes.  I read through Dr. Ritz, and I
23  skimmed through Dr. Neugut.  And I can't recall
24  the other ones that I've skimmed through.
25    Q.  That's fine.

Page 10

1    Okay.  So let's talk about, I guess
2 we'll call it the Andreotti study, is that fair?
3    A.  Yes.
4    Q.  Exhibit 2.
5    A.  Yes.
6    Q.  Okay.  So that study contained
7 information on both private and commercial
8 applicators, correct?
9    A.  Yes.
10    Q.  And there was a separate questionnaire
11 issued at enrollment for each subset, correct?
12    MR. LASKER:  Object to the form.
13    A.  I'm sorry, I don't understand the
14 question.
15 BY MR. WOOL:
16    Q.  Okay.  Have you reviewed the
17 questionnaires that the cohort members were
18 given at enrollment?
19    A.  Yes.
20    Q.  And do you recall if there was a
21 separate questionnaire for private applicators
22 and a different one for commercial applicators?
23    A.  I don't recall that, no.
24    Q.  Fair enough.
25    And following enrollment, everybody

Page 11

1 who was contained within the cohort received a
2 follow-up questionnaire at an approximate five
3 year interval, is that correct?
4    A.  I'm sorry, could you restate the
5 question?
6    Q.  So the cohort members were given a
7 questionnaire at enrollment, right?
8    A.  Yes.
9    Q.  And then there was a follow-up
10 questionnaire that was given at an approximate
11 five year interval?
12    A.  Yes.
13    Q.  And enrollment occurred in the early
14 '90s, correct, approximately?
15    A.  I just want to confirm.  So enrollment
16 was between 1993 to 1997.
17    Q.  Okay.  And then follow-up occurred
18 starting in approximately 1999?
19    A.  Yes.
20    Q.  To about 2005, correct?
21    A.  Yes.
22    Q.  And are you aware -- strike that.
23    Do you know what percentage of
24 respondents filled out their questionnaires in,
25 say, 1999 as opposed to, say, 2000, 2001, 2002,

Page 12

1 etcetera?
2    A.  No, that information is not provided.
3    Q.  Would that be important for you to
4 know?
5    A.  The information that was provided in
6 the Andreotti study describes a five year time
7 period, and so that provided sufficient
8 information that on average the cohort filled
9 out the questionnaire five years between
10 baseline and follow-up.
11    Q.  Is that information you would want to
12 know?  To clarify, would you want to know when
13 the cohort members filled out their follow-up
14 questionnaire?
15    MR. LASKER:  Objection to the form.
16    A.  As I said, I think there's sufficient
17 information that's provided in the methods from
18 Andreotti, et al describing that it was a five
19 year time period between the baseline
20 questionnaire and the enrollment questionnaire.
21 BY MR. WOOL:
22    Q.  So as you sit here today, when a
23 cohort member filled out their questionnaire is
24 not a piece of information you would be
25 interested in?

Page 13

1    MR. LASKER:  Objection to form.
2    A.  While it is important to understand
3 the timing of the questionnaire, I think there's
4 enough information that's provided in Andreotti,
5 et al to give a sense of the timing of the
6 baseline and follow-up questionnaire being five
7 years.
8 BY MR. WOOL:
9    Q.  Okay.  And in the follow-up
10 questionnaire, the cohort was asked to report
11 the number of days a pesticide was used in the
12 most recent year, correct?
13    A.  Yes.
14    Q.  And that answer was used to determine
15 three metrics that are used in the Andreotti
16 study?
17    MR. LASKER:  Objection to form.
18    A.  Could you clarify, three metrics?
19 BY MR. WOOL:
20    Q.  So the follow-up questionnaire was
21 used to determine ever-never use along with the
22 enrollment questionnaire, correct?
23    A.  Yes.
24    Q.  It was used to determine lifetime days
25 of use?

Confidential - Pursuant to Protective Order

Page 14

1      A.  Yes.
2          MR. LASKER:  Object to form.
3  BY MR. WOOL:
4      Q.  And the follow-up questionnaire was
5  also used to determine the intensity of weighted
6  lifetime days of use?
7          MR. LASKER:  Object to form.
8      A.  The information for both
9  questionnaires was integrated into the lifetime,
10 weighted lifetime intensity measure, yes.
11 BY MR. WOOL:
12     Q.  So if a cohort member had not used
13 glyphosate prior to enrollment, ever-never use
14 for that member would be calculated from the
15 follow-up questionnaire, correct?
16         MR. LASKER:  Object to the form.
17     A.  I'm sorry, I don't understand the
18 specific question.
19 BY MR. WOOL:
20     Q.  Okay.  So, for example, if a cohort
21 member had never used glyphosate at or prior to
22 enrollment -- right?
23     A.  Yes.
24     Q.  -- the ever-never use that's
25 calculated in Andreotti would be dependent upon,

Page 15

1  I guess, both enrollment and then the follow-up
2  questionnaire, right?
3          MR. LASKER:  Object to the form.
4      A.  Both pieces of information were
5  integrated in determining ever-never exposure as
6  well as the intensity measures as well.
7  BY MR. WOOL:
8      Q.  And so if a cohort member did not use
9  glyphosate at enrollment or in the year prior to
10 follow-up, the follow-up questionnaire would
11 show that member as never having used
12 glyphosate, correct?
13         MR. LASKER:  Object to the form.
14     A.  I'm sorry, could you repeat the
15 question?
16 BY MR. WOOL:
17     Q.  Yes.
18         So if somebody enrolled in the AHS
19 study --
20     A.  Yes.
21     Q.  -- and they did not use glyphosate
22 prior to enrollment --
23     A.  Yes.
24     Q.  -- and then they did not use
25 glyphosate prior to the follow-up year, the

Page 16

1  results of Andreotti would show that participant
2  as never having used glyphosate?
3          MR. LASKER:  Objection to form.
4      A.  So just to -- so if a person had -- so
5  the information on ever-never use gets updated
6  across time because you have these two points of
7  information, and so the information on
8  ever-never exposure is based on the baseline
9  questionnaire, and then it's updated information
10 on the follow-up questionnaire, which is a
11 pretty standard epidemiological approach to
12 integrating a time varying exposure.
13 BY MR. WOOL:
14     Q.  And I think I've asked this, but the
15 follow-up questionnaire only inquired as to the
16 previous calendar year of use of a pesticide,
17 correct?
18         MR. LASKER:  Object to form.
19     A.  Yes.  The follow-up questionnaire
20 asked about the prior year of use, which is
21 actually a pretty standard epidemiological
22 approach to asking follow-up questionnaires.
23 You like to give a reference time point for
24 participants to answer whether or not they have
25 participated in an exposure.

Page 17

1  BY MR. WOOL:
2      Q.  So if somebody had used glyphosate
3  after enrollment but did not use glyphosate in
4  the calendar year immediately preceding
5  follow-up, would the follow-up questionnaire
6  have captured that glyphosate use?
7          MR. LASKER:  Objection to form.
8      A.  While that particular individual would
9  have been classified as being unexposed at both
10 time points, that would represent likely a very
11 unlikely scenario, a very low proportion of
12 participants.
13 BY MR. WOOL:
14     Q.  And --
15     A.  And would suggest actually that the
16 majority of their person time actually was spent
17 as unexposed, which would be appropriate, since
18 they would have only used a very short window of
19 time between the baseline questionnaire and the
20 follow-up questionnaire.
21     Q.  Okay.  And I believe you said that
22 that -- strike that.
23         How were lifetime days of use
24 calculated in the Andreotti study?
25     A.  The information that was used to

Page 18

1   calculate lifetime days of use included the
2   number of years an individual was using
3   glyphosate and the number of days of use per
4   year that it was being used.
5       Q.  And in determining the number of days
6   per year of use for the -- strike that.
7           So it is a combination of the days of
8   use reported in both the enrollment
9   questionnaire and at follow-up, correct?
10      A.  So again, it's a time varying
11  exposure, so the information sort of gets --
12  they're at -- you have the baseline information,
13  and then it gets updated again based on the
14  follow-up information.  So it's sort of a -- the
15  way the questionnaires were -- the data from the
16  questionnaires were integrated in terms of the
17  number of days of use and the lifetime days
18  allows this time varying exposure to be
19  calculated.
20      Q.  Now, you just used the term "time
21  varying exposure."
22      A.  Yes.
23      Q.  What do you mean by that term?
24      A.  It means, there are some things in
25  epidemiology that are fixed, someone's sex,

Page 19

1   someone's genetic susceptibility.  There are
2   other things where the exposures can vary over
3   time, smoking for example, someone may be
4   smoking at one time point and then they may stop
5   smoking at the second time point, so things that
6   can -- whose exposure the prevalence can vary
7   over time is a time varying exposure.
8       Q.  All right.  And the Andreotti study
9   also calculated intensity weighted lifetime days
10  of use?
11      A.  Yes.
12      Q.  Correct?
13          Okay.  And how is the intensity score
14  calculated, if you recall?
15      A.  So the intensity -- there are several
16  publications, actually, which nicely show the
17  method by which the Agricultural Health Study
18  used different information on the use of
19  protective gear, information on the type of
20  spraying, whether they personally mixed.  And
21  there are a number of really -- one of the
22  strengths of the Agricultural Health Study is
23  the fact that it uses validated algorithms to
24  calculate this weighted intensity data and show
25  that it has a very good validity.

Page 20

1       So while I don't -- I couldn't tell
2   you the exact formula, I do know in reading the
3   epidemiology literature on this topic that they
4   really used a validated algorithm for
5   calculating the intensity weighted days.
6       Q.  What do you mean by "validated
7   algorithm"?
8       A.  The approach that the Agricultural
9   Health Study took was to compare the information
10  from the questionnaire algorithm versus a
11  biological marker to compare how well, and there
12  was a first formula that was used, and then it
13  was actually revised based on additional
14  information on how well it predicted the urinary
15  markers.
16      Q.  Okay.  Now, if you look at Exhibit 2,
17  at the top of the second page, on the right-hand
18  column the authors state that "the intensity
19  score was derived from an algorithm based on
20  literature-based measurements and information
21  provided by the applicator, specifically whether
22  the participant mixed or applied pesticides,
23  prepared pesticide related equipment, used
24  protective equipment, and application method
25  used."

Page 21

1       Are you following me?
2       A.  Yes.  That's the -- I was just
3   referring to -- so that was the -- based on the
4   algorithm that Dr. Coble had examined and then
5   had -- so it was based -- there was an earlier
6   algorithm they had developed which was used
7   actually in the first Agricultural Health Study,
8   and then they've actually refined this
9   algorithm, and this is what was used in this
10  updated publication of Andreotti, et al.  And so
11  it actually -- the way that they tested whether
12  the updated algorithm improved the information
13  on intensity weighted was using urinary based
14  biomarkers, so it's listed by Coble, et al.
15      Q.  And the authors state the algorithm
16  was based on literature-based measurements,
17  correct?
18      A.  Yes.  So I believe that was based on
19  the Dosemeci algorithm.  But again, so they
20  started -- used that as a starting point, and
21  then they further refined it based on their own
22  questionnaire and tried to really optimize the
23  intensity weighted measure within the
24  Agricultural Health Study.
25      Q.  And is that what they mean when they

Confidential - Pursuant to Protective Order

Page 22

1 say literature-based measurements?
2     MR. LASKER: Objection to form.
3     A. I'm not sure what they mean by
4 literature-based measurements. But what I
5 believe in reading all the past publications,
6 and if you read the Coble publication, it
7 describes in detail the approach that they took
8 starting with this baseline algorithm, and then
9 refining the algorithm using additional
10 components from the questionnaire, and then they
11 tested that within the Coble study to compare it
12 for two of the pesticides, compared and show
13 that the algorithm -- the new algorithm actually
14 improved the prediction with the biomarker
15 compared with the older algorithm.
16     So I'm not sure specifically what they
17 meant there by the literature base, but if you
18 read through the Coble study that's, in fact,
19 the process they used.
20 BY MR. WOOL:
21     Q. Okay. And in calculating the
22 intensity score, they also based that
23 calculation upon information provided by the
24 applicator, correct?
25     A. It was the information that was

Page 23

1 provided in the first and second questionnaires.
2     Q. Okay. And specifically whether the
3 participant mixed or applied pesticides?
4     A. There were a variety of factors
5 actually. That was one of the factors, but
6 there were a variety of factors that went into
7 the algorithm.
8     Q. And one of those was whether the
9 applicator used protective equipment, correct?
10     A. Yes. There were actually several
11 features, though. What was interesting to see
12 in the Coble study was the importance of
13 including these multiple measures in the
14 intensity weighted algorithm.
15     Q. And the questionnaire simply asked
16 whether personal protective equipment was used
17 when mixing, correct?
18     MR. LASKER: Object to the form.
19     A. I'm sorry, I don't recall the specific
20 wording of the questionnaire.
21 BY MR. WOOL:
22     Q. Let me ask this.
23     Do you recall whether the
24 questionnaire asked whether personal protective
25 equipment was used specifically for mixing or

Page 24

1 applying glyphosate?
2     A. I'm sorry, I don't remember the exact
3 wording of those questions.
4     Q. Is the use of personal protective
5 equipment something that could affect exposure?
6     MR. LASKER: Objection to form.
7     A. In the Coble publication, that really
8 describes in detail the algorithm. That's one
9 of the factors that's used in the algorithm.
10 And because it's felt that it's one of several
11 factors, that may influence the actual intensity
12 of the exposure. So it is, in fact, one of many
13 variables that goes into the algorithm.
14 BY MR. WOOL:
15     Q. And do you know if the questionnaire
16 asked whether somebody used personal protective
17 equipment generally for applying all pesticides?
18     A. I'm sorry, if you have the
19 questionnaire I could take a look at it. I just
20 don't recall the specifics of how the questions
21 were asked.
22     Q. And I think the last part, and I might
23 be mistaken on this about the intensity score,
24 is that it weighed the application method used
25 by the applicator, is that correct?

Page 25

1     MR. LASKER: Objection to form.
2     A. I'm sorry, I don't understand the
3 question.
4 BY MR. WOOL:
5     Q. Did the intensity score incorporate
6 the specific application method used in applying
7 pesticides, if you recall?
8     A. I believe that it did, yes. There
9 were several factors that went into the
10 intensity weighted score. If you have the
11 publication by Coble, et al we could take a look
12 and look at specifically, but I believe that is
13 the case.
14     Q. We might get to that in a little bit.
15     So in effect what the authors of
16 Andreotti did with the follow-up questionnaire
17 was use the last year of use, and use the
18 information gathered from that to determine the
19 previous five years of use, is that fair?
20     A. So the -- as I'd mentioned previously,
21 it's pretty standard in an epidemiological
22 questionnaire to provide some sort of reference
23 year. And so the way the information on
24 ever-never was assessed, as well as the days and
25 years of use was updated, so you have

Confidential - Pursuant to Protective Order

Page 26

1  information that was the baseline, and then it
2  was updated with the second questionnaire.
3      Q.  So based on the second questionnaire
4  and the answers that were given in that
5  questionnaire, did the authors use those answers
6  to essentially predict what the use would have
7  been for the five years prior to the
8  questionnaire?
9      MR. LASKER:  Objection to form.
10     A.  I'm not sure I understand specifically
11 your question.  Are you trying -- could you
12 clarify your question?
13 BY MR. WOOL:
14     Q.  I can clarify it.
15         So at follow-up, the follow-up
16 questionnaire, we agreed, only asked about the
17 year immediately prior to follow-up, correct?
18     A.  Correct.
19     Q.  And did the authors use that
20 information to predict what the use would have
21 been for the years between enrollment and
22 follow-up?
23     A.  The -- if somebody was using
24 glyphosate at the enrollment questionnaire and
25 then not using glyphosate at the follow-up

Page 27

1  questionnaire, and they talked about the year
2  prior, then that person would have been
3  classified appropriately as exposed up until the
4  second questionnaire, and then would be assigned
5  as unexposed from the year before and going
6  forward.  Does that make sense?
7          So the information -- yeah, so I
8  think -- yeah.  I'm not sure if I'm answering
9  the question specifically.
10     Q.  If I use glyphosate for -- let's say
11 five times a year for the year immediately prior
12 to enrollment --
13     A.  Yes.
14     Q.  -- in calculating my lifetime days of
15 use, how would the authors use that information?
16     MR. LASKER:  Objection to form.
17     A.  So I think you would have to also
18 account for the baseline information.  So again,
19 what we're thinking about is a follow-up forward
20 in time, so they would use that information,
21 they use the information on the baseline
22 questionnaire up until, and then updated the
23 information based on the follow-up questionnaire
24 which is, again, like standard epidemiological
25 approach that you would take for looking at an

Page 28

1  exposure that may or may not vary over time.
2  BY MR. WOOL:
3      Q.  Okay.  And if we turn to, I believe,
4  Page 3 of the Andreotti study.  Actually, sorry,
5  Page 4, Table 2.
6          The quartiles that are provided are
7  based on the intensity weighted lifetime days of
8  glyphosate use, correct?
9      A.  Yes.
10     Q.  And quartile 1 being the least amount
11 of use, correct?
12     A.  So the way the quartiles are formed,
13 it divides those who were exposed, it divides
14 those groupings into four equal groupings.  So,
15 yes, the quartile 1 would be those who have used
16 glyphosate but have less use, and quartile 4
17 would be the ones who are using glyphosate with
18 the most use.
19     Q.  And quartile 2 and 3 would be -- would
20 show increasing use?
21     A.  Correct.
22     Q.  Okay.  Now, would you expect to see
23 some random error in a cohort of this size?
24     A.  I'm sorry, with respect to what?
25     Q.  With respect to the exposure

Page 29

1  information that was provided by the cohort
2  members.
3      A.  I'm sorry, could you clarify what you
4  mean by "random error"?
5      Q.  You've heard the term random error
6  before?
7      A.  As an epidemiological concept, random
8  error in terms of chance, or random error in
9  terms of misclassification?
10     Q.  In terms of either.
11     MR. LASKER:  Objection to form.
12     A.  Have I -- so I guess, I think, in my
13 mind random error is a vague term, so I think if
14 you could ask me specifically what type of error
15 you're referring to when you ask me if there's
16 random error.
17 BY MR. WOOL:
18     Q.  With respect to chance, what does
19 random error mean to you as an epidemiologist?
20     A.  Random -- the role of chance implies
21 that you have a -- there's a true measure of the
22 relative risk, and then based on random sampling
23 you might get a certain distribution around that
24 true relative risk.  And the larger study that
25 you have, and the larger number of cases you

Confidential - Pursuant to Protective Order

Page 30

1  have, as we have here, then that -- the
2  likelihood that random error is playing a role
3  actually decreases substantially.
4      Q.  So if I understand your answer
5  correctly, the larger the study the less the
6  likelihood of random error, correct?
7          MR. LASKER:  Objection to form.
8      A.  There's actually several factors that
9  go into whether or not you think random error is
10  playing a role, or the role of chance.  So the
11  size of the study, the number of cases, the
12  number of exposed cases, all of those are
13  factors that go into the role of changes.  So
14  the larger the study, the more cases you have,
15  and the higher the problems of exposed cases you
16  have, all of those will lower the likelihood,
17  and this is the case here we have in Andreotti.
18  BY MR. WOOL:
19      Q.  Do you know if the participants in the
20  cohort were allowed to take their questionnaires
21  home prior to filling them out?
22      A.  I'm sorry, I don't know that answer.
23      Q.  Do you know if they were allowed to
24  cross-reference their purchase records?
25      A.  I'm sorry, I don't know that answer.

Page 31

1      Q.  Do you think that the data would have
2  been more reliable if they had been allowed to
3  cross-reference their purchase records?
4      A.  I'm not sure one way or the other.
5  What I do know was given the way the
6  questionnaire was given, there was actually some
7  validation studies that were done to show the
8  information the way they provided it was highly
9  reliable.  So there was a sample of about 4,000
10  of the participants who happened, because of the
11  regulations of the applicators came back a year
12  after they had filled out the baseline
13  questionnaire, and then they filled out the same
14  information, and then there was a reliability
15  study and said how reliable was the information
16  they gave a year ago with what they gave now,
17  and that actually showed high reliability.
18          So I think -- I'm not sure what they
19  had done and whether they were able to take the
20  questionnaire home, but what I do know is based
21  on the way the questionnaire was given the
22  results seemed to be very reliable in reporting
23  of glyphosate.
24      Q.  And the study that you described in
25  your answer, that is the Blair 2002 study, if

Page 32

1  I'm not mistaken, is that correct?
2      A.  I believe it was Blair 2001.
3      Q.  Blair 2001?
4      A.  Yes.
5      Q.  And are there any other validation
6  studies that you're relying upon that you
7  believe indicates that the answers given at
8  enrollment were accurate?
9      A.  Yes, there was another nice
10  publication.  Again, one of the really nice
11  things about the Agricultural Health Study is
12  that there are so many publications they've done
13  looking at the potential for bias, and I think
14  the Agricultural Health Study, in particular, is
15  a really nice example of epidemiology.
16          But another study they did was to
17  compare when different pesticides came on the
18  market, and then sort of did a -- you know, did
19  anybody report using glyphosate or other
20  pesticides prior to when they actually had come
21  on the market.  So again, that's another kind of
22  test of the reliability of the data.  And that
23  actually also showed very low likelihood of
24  people reporting a number of these pesticides,
25  including glyphosate, before they ever came on

Page 33

1  the market.  So that's another kind of proof of
2  principle that the information is quite
3  reliable.
4      Q.  Do you have any experience collecting
5  occupational data, such as pesticide exposures,
6  for any of your own publications?
7          MR. LASKER:  Object to the form.
8      A.  While I haven't collected information
9  on pesticides exposure, I've been involved in
10  multiple, multiple studies collecting a wide
11  array of data.  There are a number of
12  commonalities in the collection of
13  epidemiological data, so I'm very familiar with
14  the principles of epidemiology data collection.
15  BY MR. WOOL:
16      Q.  So for any of those studies that you
17  just described, did any of these studies involve
18  occupational exposures?
19      A.  I'm sorry, could you clarify the
20  question?
21      Q.  Did they involve exposures to a
22  chemical of some sort that somebody was exposed
23  to during the course of their occupation?
24      A.  I'm sorry, which studies are you
25  referring to?

Page 34

1    Q.  You just said that you had been --
2    A.  My own studies.
3    Q.  Yes.
4    A.  Sorry.
5        So again, as I said, I have not been
6  involved in the collection of occupational data.
7  However, I have been involved in a wide array of
8  epidemiological risk factors.  Each of these
9  have a number of common principles.  I think the
10 reliability of information is valid, whether
11 it's a dietary factor or occupational factor or
12 body mass index.  So reliability is a well
13 standard epidemiological principle for assessing
14 the quality of exposure information.
15   Q.  Have you ever been involved in the
16 design of a questionnaire for occupational
17 exposure studies?
18   A.  As I had just mentioned, I haven't
19 been involved in studies of occupational based
20 exposures.  However, I have been involved in
21 multiple -- design of multiple questionnaires in
22 a range of study populations.
23   Q.  Have you ever been involved in the
24 validation of any questionnaires relevant to
25 occupational exposures?

Page 35

1        MR. LASKER:  Object to the form.
2    A.  As I've said, I haven't been involved
3  in the design or validation.  However, there are
4  some very common principles of assessing the
5  quality of data collection, and I think I can --
6  although I haven't been involved in the design
7  or specific validation of pesticides, I can look
8  at the epidemiology literature, I can look at
9  the study of Blair 2001 and Hoppin that show the
10 quality of the occupational -- or the pesticide
11 data that was collected in the Agricultural
12 Health Study seemed to be very reliable.
13   Q.  Okay.  And the questionnaires asked
14 about -- strike that.
15       The Agricultural Health Study
16 questionnaires didn't actually evaluate
17 exposure, did they?  They asked about use of a
18 pesticide and used some other factors, like
19 whether protective equipment was worn, etcetera,
20 to sort of determine exposure, right?
21       MR. LASKER:  Objection to form.
22   A.  I'm not sure what you mean by
23 "exposure."
24 BY MR. WOOL:
25   Q.  Well, so the Andreotti study

Page 36

1  determined the exposure by looking at the
2  frequency of glyphosate use, correct?
3        MR. LASKER:  Objection to form.
4    A.  The Andreotti study used a wide array
5  of factors, including the number of years of
6  use, the number of days of use, the different
7  use of protective gear.  There are a number of
8  factors in the algorithm that went into this
9  classification of intensity of days use,
10 weighted intensity days use.
11 BY MR. WOOL:
12   Q.  Do you recall whether the
13 questionnaire asked specific questions about the
14 methods of glyphosate application?
15   A.  I'm sorry, I don't recall that.
16       MR. LASKER:  Objection to form.
17 BY MR. WOOL:
18   Q.  Do you know whether the methods of
19 application can determine actual pesticide
20 exposure?
21       MR. LASKER:  Objection to form.
22   A.  I'm sorry, I'm not -- that's not my --
23 necessarily my area of expertise.  Again, I'm
24 not sure how the specific questions on
25 glyphosate were collected on the questionnaire.

Page 37

1  BY MR. WOOL:
2    Q.  Okay.  Do you know if the AHS study
3  examined the correlation between the methods of
4  application and the prevalence of non-Hodgkin's
5  lymphoma?
6        MR. LASKER:  Objection to form.
7    A.  I'm sorry, I don't understand your
8  question.
9  BY MR. WOOL:
10   Q.  So the AHS study gathered information
11 about the method of application, correct?
12       MR. LASKER:  Which study?
13       MR. WOOL:  Sorry, the Andreotti study,
14 my apologies.
15       MR. LASKER:  Start again.
16 BY MR. WOOL:
17   Q.  So the Andreotti study collected data
18 on the method of application, correct?
19   A.  By "method," you mean whether it was
20 aerial spraying?
21   Q.  Correct.
22   A.  Yes.
23   Q.  And do you know if the Andreotti study
24 looked at the correlation between that
25 information and the prevalence of non-Hodgkin's

Confidential - Pursuant to Protective Order

Page 38

1  lymphoma in the study population?
2      A.  I don't recall reading any specific
3  study looking at that, no.
4      Q.  Okay.
5      A.  But actually, you know, I think what
6  the study by Coble showed actually was that they
7  developed -- and following up on the publication
8  of Dosemici, is that this algorithm that they
9  developed and tested in a number of different
10  studies that have been published by authors
11  involved in the Agricultural Health Study show
12  this updated algorithm that integrated multiple
13  pieces of information into the algorithm really
14  seemed to perform the best in terms of
15  predicting exposure to glyphosate, or the
16  intensity of exposure to glyphosate.
17      Q.  And in the Andreotti study, the cohort
18  members were selected because they applied for
19  licenses to use restricted use pesticides, is
20  that correct?
21      A.  I believe that they were -- let me
22  just refer to it.  Yes, they were seeking
23  licenses to apply restricted use pesticides when
24  they were enrolled.
25      Q.  And what is a restricted use

Page 39

1  pesticide?
2      A.  I'm not familiar with that term.  I'm
3  not sure what they mean by that specifically.
4      Q.  Okay.  Let's turn to Page 7 of your
5  report, which is Exhibit 2, and in the second
6  paragraph you note that "potential limitations
7  of the study" -- which is the Andreotti study,
8  which is Exhibit 1 in this deposition --
9  "include the possibility of non-differential
10  misclassification of glyphosate-based herbicide
11  exposure."
12          Did I read that correctly?
13      A.  Yes.
14      Q.  And just so we're clear, how would you
15  define non-differential misclassification?
16      A.  In this particular context what I mean
17  is that if there is measurement error in
18  glyphosate exposure, it's unrelated to the
19  outcome of non-Hodgkin's lymphoma.  And that's
20  one of the strengths of a cohort study.
21          In contrast, a differential
22  misclassification can occur sometimes in
23  case-control studies because the reporting of
24  the information on the exposure may be
25  influenced by the outcome itself.  It's a

Page 40

1  measure of recall bias.
2      Q.  And it's your opinion that
3  non-differential exposure misclassification is a
4  potential limitation of the Andreotti study,
5  correct?
6      A.  What I said is in epidemiology, it's a
7  standard approach.  We want to say if we see a
8  finding that's null, we want to try to
9  understand whether bias confounding or chance
10  were playing a role.  One factor that we might
11  be concerned about is non-differential
12  misclassification because it would tend to bias
13  a finding to the null.
14      Q.  Okay.  And if we turn to Page 3 of
15  your report, I believe you actually talk about
16  that potential limitation.
17      A.  Yes.
18      Q.  Now, is it your opinion that some
19  exposure misclassification did occur in the
20  Andreotti study?
21      A.  It's possible that there is some
22  misclassification, non-differential
23  misclassification of glyphosate-based exposure.
24  However, there's a number of lines of data that
25  would suggest that the amount of

Page 41

1  misclassification is probably not large, and
2  that's -- as I'd mentioned earlier, it's based
3  on the Hoppin publication, based on the Blair
4  2001 publication showing the very reliable
5  information.  It's based on the algorithm
6  developed by Coble and showing the validation
7  with urinary biomarkers.  So all of these would
8  suggest that while there -- if there is -- it's
9  important not only to know if there is
10  misclassification, but the extent of the
11  misclassification, so if there is
12  misclassification it's likely to be small.
13      Q.  So as you sit here today, can you tell
14  me whether there was some misclassification in
15  the Andreotti study?
16      A.  While I can't necessarily say
17  definitively yes or no if there is
18  misclassification, it would -- the true relative
19  risk would actually have been more protective
20  than what we observed in the study which -- you
21  know, so again, what I can say definitively is
22  that non-differential misclassification did not
23  hide a positive association between
24  glyphosate-based herbicides and NHL risk, so
25  that I can say.

Confidential - Pursuant to Protective Order

Page 42

1    Whether there is some non-differential
2  misclassification I can't exclude, but it would
3  not have led to a true relative risk being a
4  positive association in this study.
5    Q.  So if some non-differential
6  misclassification did occur, is it your opinion
7  that the true relative risk would be even lower
8  than what's reported?
9    A.  It's not my opinion, it's actually a
10  standard epidemiological principle.  So if you
11  have -- as I've shown in my figure 1 in my
12  report, it's a mathematical relationship.  If
13  you have a relative risk that you observe that's
14  less than 1, and you have non-differential
15  misclassification, then the true relative risk
16  would actually be even smaller than 1, than what
17  you observed away from 1.  So it's just a
18  mathematical relationship.  So it's not my
19  opinion, but it's actually an epidemiological
20  principle.
21    Q.  And so if, just to be clear, if some
22  exposure of misclassification did occur, then
23  the true relative risk reported in the Andreotti
24  study would, in fact, be lower than what is
25  reported, which I think you point out as .86?

Page 43

1    A.  Yes.
2    Q.  Okay.  And you discuss some of the
3  validation studies that show that the cohort
4  provides reliable information?
5    A.  Yes.
6    Q.  And it is on the basis of some of
7  those validation studies that you are able to
8  surmise that the percent of exposure
9  misclassification was low, I think -- strike
10  that, actually.
11    Okay.  You cited to the 2001 Blair
12  paper to support the proposition that exposure
13  misclassification was limited in the Andreotti
14  study, correct?
15    A.  Yes.
16    Q.  Okay.  Let's go ahead and take a look
17  at this.
18    I'm marking Blair 2001 study as
19  Exhibit 3.
20    (Whereupon, Exhibit Number 32-3,
21    Blair, et al article, Reliability of
22    Reporting on Life-Style and
23    Agricultural Factors by a Sample of
24    Participants in the Agricultural
25    Health Study from Iowa, was marked for

Page 44

1    identification.)
2  BY MR. WOOL:
3    Q.  Okay.  Just briefly, can you explain
4  what Blair did to determine the extent of
5  exposure misclassification?
6    A.  Yes.  So there were data available
7  from about 4,000 of the participants who filled
8  out a baseline questionnaire in the Agricultural
9  Health Study who actually came in a year later
10  and filled out the same exact questionnaire, and
11  so the authors compared how reliable the
12  information was between those two
13  questionnaires.  And reliability is an
14  established methodology for assessing the
15  quality of epidemiological data from
16  questionnaires.  So they compared the exact
17  agreement between these two questionnaires.
18    Q.  Okay.  If you turn to Page 95, Table
19  1.
20    A.  Yes.
21    Q.  You will see that they have what they
22  describe as a comparison of dichotomous
23  responses on pesticide use between first and
24  second questionnaires, correct?
25    A.  Yes.

Page 45

1    Q.  And they actually break down how
2  individual pesticides or herbicides fared in
3  terms of exact agreement, correct?
4    A.  Yes.
5    Q.  And Table 1 examines ever-never use,
6  is that correct?
7    A.  Yes.
8    Q.  And for glyphosate, the exact
9  agreement between the first and second
10  questionnaire is 82 percent, is that correct?
11    A.  Yes.
12    Q.  Okay.  And what is the kappa statistic
13  measuring?
14    A.  So the kappa statistic takes into
15  account the role that chance might play in the
16  fact that two people say the same thing on the
17  two different questionnaires.  So, you know, if
18  -- with glyphosate you have fairly high
19  prevalence of the exposure and therefore just by
20  chance you may have two people saying they used
21  glyphosate on the two different questionnaires,
22  so the kappa statistic basically adjusts for the
23  prevalence of the exposure in leading to
24  concordant answers.
25    Q.  And further down in Table 1 they

Confidential - Pursuant to Protective Order

Page 46

1  provide these same calculation using method of
2  application, correct?
3      A.  Yes.
4      Q.  And, for example, the exact agreement
5  with hand-spraying on application is 72 percent,
6  correct?
7      A.  Yes.
8      Q.  And depending on what type of
9  application method was used, there are kind of a
10 range of different figures for exact agreement,
11 correct?
12     A.  Yes, yes.  So they ranged from
13 72 percent up to 99 percent.
14     Q.  Now, does the Blair paper indicate to
15 you that use of a pesticide in any given year
16 can be used to determine -- strike that.
17         Is it your opinion that the Blair
18 paper demonstrates that use of a pesticide in
19 any given year can accurately predict the
20 frequency of pesticide application in another
21 year?
22         MR. LASKER:  Objection to form.
23     A.  So what this tells us is about the
24 reliability of the quality of the information
25 that's provided.  It doesn't -- it gives you

Page 47

1  some sense of what the quality of
2  epidemiological data is.  That's what this paper
3  is telling us.
4  BY MR. WOOL:
5      Q.  And when you say "quality," does that
6  include whether the information is reliable?
7      A.  Exactly, yes.
8      Q.  Now if you turn the page over to
9  Page 96, and you look at Table 2, Table 2 is
10 telling us the agreement between the days per
11 year of pesticide use mixed and applied,
12 correct?
13     A.  It tells us a number of different
14 measures, including years mixed, days per year,
15 and decade first applied, yes.
16     Q.  Okay.  And if we look at glyphosate
17 and the days per year mixed or applied, the
18 exact agreement provided by Blair 2001 is
19 53 percent, correct?
20     A.  Actually that's the years mixed or
21 applied is 53 percent.
22     Q.  I'm sorry, yes.
23     A.  Yes.  And while that is true, if you
24 look further in the text, what's important to
25 note is that 90 percent of the subjects gave

Page 48

1  responses actually within one category of
2  agreement.  I think that's really an important
3  feature about -- you know, while it's true that
4  we may in epidemiology be unable to tell with
5  complete specificity the exact number of days
6  that somebody has used glyphosate or the number
7  of years they've applied, what this tells us
8  here is that we're able to appropriately rank
9  people as either high, low, or not exposed.
10         And so I think that's an important
11 feature as well.  So it's not only what's the
12 exact agreement in terms of the number of years
13 mixed, but also, you know, was it -- if the
14 categories were so disparate, then you're right,
15 then you might be a little bit more concerned
16 about that percent agreement.
17         But the fact in the text where it says
18 90 percent of subjects give responses within one
19 category of agreement, that's really important
20 additional information.  It suggests we can
21 appropriately rank people as high, low, or no
22 exposed.
23     Q.  Okay.  And if you look down below
24 Table 2, for years mixed or applied, the
25 categories are 1 or less, 2 to 5, 6 to 10, 11 to

Page 49

1  20, 21 to 30, and more than 30, correct?
2      A.  Yes.
3      Q.  Okay.  And if we go down in Table 2 to
4  days per year mixed or applied, for glyphosate
5  the exact agreement reported in Blair is
6  52 percent, correct?
7      A.  Yes.  And we have the same point
8  below, which is that although it's -- the exact
9  agreement is 52 percent, that the categories
10 within one -- 90 percent of the responses were
11 within one category of agreement.
12     Q.  And the categories for the days per
13 year of usage are less than 5, 5 to 9, 10 to 19,
14 20 to 39, 40 to 59, and 60 to 150 -- I'm sorry,
15 and more than 150, correct?
16     A.  Correct.  So what this tells us, then,
17 is that although the exact agreement of
18 somebody, for example, filling out 60 to 150 is
19 52 percent, it's highly unlikely that somebody
20 who used 60 to 150 would then on the second
21 questionnaire report less than 5.  So I think
22 the fact that you have 90 percent agreement
23 within one category is a really important
24 feature of this study.
25     Q.  But somebody could report, say, 150

Page 50

1  uses a year and then drop down to 40 years --
2  sorry, 40 uses per year --
3      A.  But that --
4      Q.  -- and that would be one category
5  apart, correct?
6      A.  Oh, I see what you're saying.  It's
7  possible, but we don't know exactly what the
8  difference was.  We don't know the exact value,
9  because it's such a broad range there.
10     Q.  Okay.  Right.  And so just what I want
11 to clarify is that the days per year mixed or
12 applied exact agreement figure is not telling us
13 that somebody might have used glyphosate one
14 more day per year, it's telling us that they are
15 in a different category, correct?
16     A.  I'm sorry, I don't understand.
17     Q.  Sorry, that was my fault.  The
18 question was not clear at all.
19         And so what I'm asking is, the exact
20 agreement percentage does not -- is not looking
21 strictly at whether or not there's a slight
22 variation in agreement, it is, in fact, looking
23 at whether or not somebody is in a different
24 category, correct?
25     A.  I'm sorry, I still don't understand

Page 51

1  specifically your question.
2      Q.  The percentage of agreement is based
3  on which category a cohort member falls into,
4  correct?
5      MR. LASKER:  Objection to form.
6      A.  So in the case of days per year, the
7  percent exact agreement of 52 percent suggests,
8  then, that 52 percent of participants reported
9  being in the same category of days per year of
10 use on both questionnaires.  And then the
11 follow-up is that 90 percent of the subjects
12 were within one category of exposure.
13         So again, you know, these are
14 categories of exposure, and suggesting that
15 we're able with this questionnaire to
16 appropriately rank people, and that's really the
17 goal of epidemiology.
18 BY MR. WOOL:
19     Q.  And what is the known rate of error
20 for predicting frequency of glyphosate use using
21 this method in the Blair study?
22     MR. LASKER:  Objection.
23     A.  I'm sorry, I don't understand your
24 question.
25 BY MR. WOOL:

Page 52

1      Q.  Okay.  Let's go to Page 7 of your
2  expert report.  And you state in the second
3  sentence of the second paragraph, "However,
4  validation studies" -- are you there?
5      A.  Yes.
6      Q.  Okay.  "However, validation studies
7  within the Agricultural Health Study show that
8  these licensed applicators have been shown to be
9  able to provide reliable self-reported
10 information in this cohort."  And then your cite
11 to that is this Blair study that we're looking
12 at in Exhibit 3.
13     A.  Yes, that's what I say in my report,
14 yes.
15     Q.  Are there any other cites or studies
16 that you rely upon to validate this opinion?
17     MR. LASKER:  Objection to form.  Asked
18 and answered.
19     A.  As I had mentioned earlier, although I
20 didn't cite it here, another piece of
21 information that's quite helpful is the
22 publication by Hoppin which looked at comparing,
23 particularly for the baseline questionnaire,
24 when people reported when they first started
25 using different pesticides, the authors compared

Page 53

1  those -- they wanted to know what -- if it was
2  an issue that people were reporting starting use
3  of pesticides prior to when they came on the
4  market, which would suggest they were an
5  incorrect response.  So that was another piece
6  of information that shows the reliability of the
7  information on exposure.
8  BY MR. WOOL:
9      Q.  Okay.  Can you turn to Page 98 of the
10 Blair article, please?  Now, at the top of the
11 right-hand column, the authors note that
12 "Although the reliability" --
13     A.  I'm sorry, you said at the top of the
14 right-hand --
15     Q.  Top of the right-hand column on
16 Page 98.
17     A.  Yes.
18     Q.  The authors note that "Although the
19 reliability of reported pesticide use among
20 farmers is as good as, for many other factors,
21 assessed by questionnaires in epidemiological
22 research and better than for some variables it
23 is important to assess affects of potential
24 misclassification on estimates of relative risk.
25 If the level of agreement between the first and

Page 54

1  second interview is considered a measure of
2  non-differential misclassification, we can
3  calculate affects on relative risk.  For
4  example, if the true relative risk was 4.0 in
5  non-differential misclassification for
6  ever-never handled individual pesticides is as
7  in Table 1 (from 79 percent to 88 percent
8  agreement), the calculated relative risk would
9  range from 2.0 to 2.6."
10      Did I read that correctly?
11      A.  Yes, that is what it says.  But I
12  think one important thing to remember is also
13  that the effect on the relative risk is also
14  going to be a function of the prevalence of the
15  exposure.
16      Q.  So what do you mean by that, just so
17  I'm clear?
18      A.  So if you -- if the prevalence of the
19  exposure is much lower, and you have the same
20  sort of agreement, you're going to see more
21  distortion in the relative risk than you would
22  with an exposure that's more common such as with
23  glyphosate, because the rare -- an exposure is
24  the more sensitive it is going to be to
25  misclassification on an absolute scale.

Page 55

1      Q.  Okay.  I just want to make sure I
2  understand what you're saying correctly.
3          You were saying that for more commonly
4  used pesticides that are not rare, that the
5  effect on the relative risk is not going to be
6  as sensitive?
7      A.  I can't recall which year it was, but
8  I know Blair has another publication about
9  misclassification where the authors show the
10  effect of the amount of misclassification on the
11  relative risk as a function of the prevalence of
12  the exposure.  I just don't recall specifically
13  what year that was.
14      Q.  I think 2011 maybe.
15      A.  Yes.  Possibly, yes.  So I think that
16  kind of shows the -- how those things are
17  interrelated with each other.
18      Q.  Do you believe that it is impossible
19  for non-differential exposure misclassification
20  to conceal a true positive association?
21      MR. LASKER:  Objection to form.
22      A.  Could you ask the question again?
23  BY MR. WOOL:
24      Q.  Yes.  Do you believe that it is
25  impossible for non-differential

Page 56

1  misclassification to conceal a true positive
2  association?
3      MR. LASKER:  Objection to form.
4      A.  I'm sorry, the words are
5  straightforward, but I'm still not understanding
6  what you're asking.
7  BY MR. WOOL:
8      Q.  Is it possible that in the Andreotti
9  study exposure misclassification could conceal a
10  true positive association?
11      A.  It's highly unlikely.  And the reason
12  that I say that is that given the odds ratio
13  that was estimated in Andreotti, et al was less
14  than 1, that makes it highly, highly, highly
15  unlikely that misclassification would mask a
16  positive association.  And that's based on
17  standard epidemiology principles.
18      Q.  So are you saying in effect that while
19  misclassification could bias the result towards
20  the null it could not, say, jump across 1?
21      A.  That's not just based on what I'm
22  saying, it's based on standard epidemiology
23  principles mathematically.  Like if you have a
24  very small study, a very small study, which we
25  don't have here in Andreotti, by chance it is

Page 57

1  possible that you might have something like
2  that.  But in this case of Andreotti, et al
3  where chance is very unlikely to have -- to do
4  this, mathematically non-differential
5  misclassification is going to bias a true
6  relative risk towards the null.  Therefore,
7  given the observed relative risk that we see in
8  Andreotti, et al, it's highly, highly unlikely
9  that it's masking a true positive association.
10      Q.  Now, if we go back to Table 2 --
11      A.  Of --
12      Q.  -- of the Blair article, Exhibit 3.
13  And again, we look at the days per year mixed or
14  applied figure for glyphosate.
15      A.  Sorry, days per year, or the years
16  per --
17      Q.  The days per year in the middle of
18  Table 2 --
19      A.  Yes.
20      Q.  -- which is reported again as
21  52 percent, would you expect the accuracy of --
22  or strike that.
23          In the questionnaires that were given
24  in Andreotti, et al, those questionnaires asked
25  about the last year of use, correct?

Confidential - Pursuant to Protective Order

Page 58

1    MR. LASKER: Objection to form.
2    A.  No, that's not correct.  It was -- in
3  the follow-up questionnaire it referred to the
4  last year farmed.
5  BY MR. WOOL:
6    Q.  Okay.  The last year farmed.
7    A.  Yes.
8        But this particular -- I'm sorry to
9  interrupt you.  But this particular reliability
10 study actually looked at the baseline
11 questionnaire, not the follow-up questionnaire.
12   Q.  Okay.
13   A.  Do you think it might be appropriate
14 for a quick break?
15   Q.  Absolutely.  We can take a break
16 right.  Now.
17   A.  That would be awesome.
18       THE VIDEOGRAPHER:  Going off the
19 record.  The time is 10:03.
20       (Whereupon, a recess was taken.)
21       THE VIDEOGRAPHER:  Back on the record.
22 The time is 10:17.
23 BY MR. WOOL:
24   Q.  All right.  So we were talking about
25 the Blair paper briefly before we went off the

Page 59

1  record, right?
2    A.  The Blair 2001?
3    Q.  The Blair 2001 paper.
4    A.  Yes.
5    Q.  And the Blair paper only examined the
6  exact agreement between enrollment
7  questionnaires, correct?
8    A.  It looked specifically at the baseline
9  questionnaire, yes, the reliability of the
10 information in the baseline questionnaire.
11   Q.  Are you aware of any papers that have
12 looked at the follow-up questionnaire?
13   A.  In terms of the reliability?
14   Q.  Yes.
15   A.  I'm not familiar, no.
16   Q.  And this Blair paper only looked at
17 two years of questionnaire data, correct?
18       MR. LASKER:  Objection to form.
19   A.  I believe actually the questionnaires
20 were completed one year apart.
21 BY MR. WOOL:
22   Q.  One year apart.
23       So one questionnaire, and then a
24 questionnaire the next year, correct?
25   A.  Correct.

Page 60

1    Q.  All right.  Let me ask you this.  Do
2  you consider the AHS to be a null study?
3        MR. LASKER:  Objection to form.
4        Which study are you talking about?
5  BY MR. WOOL:
6    Q.  I'm sorry, the Andreotti study.  I
7  keep saying AHS.
8        Do you consider the Andreotti study to
9  be a null study?
10       MR. LASKER:  Objection to form again.
11   A.  I find the findings on non-Hodgkin's
12 lymphoma, that there's no association between
13 glyphosate-based herbicides and the risk of
14 non-Hodgkin's lymphoma, or any of the
15 non-Hodgkin's lymphoma subtypes.
16 BY MR. WOOL:
17   Q.  You do not consider it to be a
18 negative study?
19       MR. LASKER:  Objection to form.
20   A.  I'm not sure what you mean
21 specifically by "negative study."  What I would
22 say about this is that the data suggests there's
23 no association between glyphosate-based
24 herbicides and the risk of non-Hodgkin's
25 lymphoma.

Page 61

1  BY MR. WOOL:
2    Q.  Do you believe that glyphosate-based
3  herbicides have a protective effect?
4    A.  I do not believe that, based on the
5  epidemiological evidence in this study, nor in
6  the totality of the epidemiology evidence, would
7  it suggest either a positive or inverse
8  association.
9    Q.  All right.  You're familiar with the
10 concept of imputation?
11   A.  Yes.
12   Q.  Okay.
13   A.  In the context of epidemiological
14 studies.
15   Q.  Right.  I should have clarified.
16   A.  Yes.
17   Q.  And in this study, was it 37 percent
18 of the population, I think, that was lost to
19 follow-up?
20       MR. LASKER:  Objection to form.
21   A.  So just to clarify, when we talk about
22 lost to follow-up, there's different
23 connotations in epidemiology.  We don't -- we
24 haven't lost to follow-up in terms of what
25 happened in terms of disease outcomes, but

Confidential - Pursuant to Protective Order

Page 62

1 37 percent of the participants who filled out
2 the baseline questionnaire did not fill out the
3 second questionnaire.
4 BY MR. WOOL:
5    Q.  In any of your own publications, have
6 you ever had 37 percent of a cohort be lost to
7 follow-up?
8       MR. LASKER:  Objection to form.
9    A.  Well, I haven't -- in the cohort
10 studies that I've worked on, we haven't had
11 37 percent of our participants not complete a
12 second questionnaire.  I actually have been
13 involved in a cohort study where I -- while I
14 didn't use the follow-up questionnaire, that
15 particular follow-up questionnaire, more than
16 30 percent of the individuals did not fill out a
17 second questionnaire.  It was the Swedish
18 mammography cohort.  So I worked with their
19 baseline questionnaire, but that particular
20 cohort had a second questionnaire 30 percent of
21 the participants did not complete.  And they
22 took an approach very similar to what was done
23 with Andreotti, et al in terms of doing multiple
24 imputation, comparing multiple imputation to
25 complete case assessment, and did a variety of

Page 63

1 things to assess whether the amount of missing
2 data might influence the results.
3    Q.  Do you believe the Andreotti study
4 would be more reliable if fewer than 30 percent
5 had been lost to follow-up?
6    A.  Well, it's interesting.  In
7 epidemiology we should be concerned when we see
8 that 37 percent of the participants did not
9 complete the second questionnaire.  I definitely
10 believe that's a valid concern.  What's
11 reassuring, however, are the different
12 approaches that the authors, the Andreotti
13 authors, took in their publication to assess
14 whether such an amount of missing data might
15 influence the results.
16       In addition, there's a publication by
17 Heltshe which describes the methodology of the
18 imputation for the study.  They also did a
19 number of assessments of the quality of
20 imputation which suggest that it actually didn't
21 influence the results.  And finally there's
22 another publication by Montgomery.
23       What we're really concerned about is
24 whether the association between glyphosate and
25 non-Hodgkin's lymphoma is different in those who

Page 64

1 did fill out the second questionnaire and those
2 who didn't.  So all of those things together, I
3 think one should be concerned about this, but
4 multiple nodes of evidence suggest that it
5 didn't lead to a substantial bias in this study.
6    Q.  Do you believe that -- or strike that.
7       Can you explain briefly how the
8 authors imputed -- or strike that.  Let's
9 actually take a look at the Heltshe study real
10 quick.  We will mark this as Exhibit 4.
11       (Whereupon, Exhibit Number 32-4,
12       Heltshe, et al article, Using multiple
13       imputation to assign pesticide use for
14       non-responders in the follow-up
15       questionnaire in the Agricultural
16       Health Study, was marked for
17       identification.)
18 BY MR. WOOL:
19    Q.  And in the abstract the authors note
20 that "To assess the imputation procedure, a
21 20 percent random sample of participants was
22 withheld for comparison.  The observed and
23 imputed prevalence of any pesticide use in the
24 holdout dataset were 85.7 percent and
25 85.3 percent respectively."  Correct?

Page 65

1    A.  Yes.
2    Q.  And if you turn to Page 412, in the
3 right-hand column.  I think it's actually
4 highlighted in your copy.
5    A.  Yes.
6       MR. LASKER:  Okay.  Thank you.
7 BY MR. WOOL:
8    Q.  Okay.  And the highlighted portion, I
9 believe, in your copy starts with "In pesticides
10 with the highest prevalence have the largest
11 standard errors, while rarely used pesticides
12 have very little variability."
13       Is that what's highlighted in yours?
14    A.  That is what is highlighted.  I'm just
15 trying to see what they're referring to here.
16 What information -- standard error.  The
17 estimates of the standard error, so the
18 variability around the mean, which makes sense,
19 yes.
20    Q.  So, and am I correct that the more
21 prevalent a pesticide is used, what the authors
22 are saying is there will be a larger standard
23 error with that pesticide compared to a
24 pesticide that is not used frequently?
25    A.  It actually refers to they're slightly

Page 66

1  higher than the true standard error.
2      Q.  Okay.
3      A.  But that's different than the relative
4  error.  That concept of the standard error is
5  different than the relative error, so it's not
6  really describing how well the imputation
7  procedure worked.
8      Q.  Okay.  And how is the standard error
9  different than the relative error?
10     A.  Well, the standard error, you know, we
11 say the mean or the estimated prevalence is
12 40 percent, and then we have sort of a
13 distribution of what we think the true expected
14 prevalence is.  The relative error compares what
15 was actually observed in that 20 percent holdout
16 versus what was predicted based on the
17 imputation, so that relative difference in the
18 estimate.
19         So the standard error doesn't give you
20 a sense of whether the information is a valid or
21 not imputation, just giving you -- it's like in
22 a 95 percent confidence interval around an odds
23 ratio, that is comprised of the standard error
24 around the odds ratio.  It gives you a sense of
25 the distribution.

Page 67

1      Q.  And you would consider glyphosate to
2  be a highly used pesticide, correct?
3      A.  Yes, it is a highly -- the prevalence
4  is quite high.  But again, that doesn't -- what
5  that comment in the second column on Page 412
6  does not imply that because the prevalence is
7  high the relative error -- there's no -- if you
8  look, actually, in table -- where did I see it?
9  This is different than what I had downloaded.
10        Oh, here.  So Figure 2 here is a
11 figure showing the relative errors, which is a
12 better -- is really what you want to look at
13 when you want to assess how well the imputation
14 worked.  And there, actually, you can see that
15 there doesn't really seem to be a relationship
16 between the prevalence of the pesticide and the
17 distribution of the relative errors, and that is
18 reassuring actually.
19     Q.  Okay.  Now, on the same page that
20 you're on, Page 414.
21     MR. LASKER:  Okay.  I'm there.
22 BY MR. WOOL:
23     Q.  In the right-hand column, the first
24 full paragraph reads, "A key assumption of any
25 imputation is that missingness is independent of

Page 68

1  the unobserved outcome of interest or
2  unobservable confounders (i.e., missing at
3  random).  The reduction of bias and increase in
4  precision from multiple imputations is dependent
5  on the covariates associated with both
6  non-response and the endpoint variable and
7  factors associated with non-participation, which
8  were included in our imputation model.  For our
9  imputation analysis, the 'outcome' of interest
10 is the missing pesticide use itself," and they
11 cite to Montgomery, et al, which shows that
12 "there is little evidence for selection bias in
13 Phase 2 of the AHS.  However missing at random
14 is an untestable assumption without additional
15 data; thus it is possible that non-responders
16 differ from responders in variables we have not
17 measured."
18        Did I read that correctly?
19     A.  Yes, you read that correctly.
20     Q.  Okay.  So what is the untestable
21 assumption that they're talking about in that
22 section?
23     A.  It's this concept of the data being
24 missing at random, meaning that the reason that
25 the data are missing is not related to some

Page 69

1  factor of interest here.
2      Q.  Now, is it your opinion that this
3  imputation method used in Andreotti has general
4  acceptance within the epidemiological community?
5      A.  The use of imputation is a common
6  procedure in epidemiology, yes.  However, what I
7  think is important, as Andreotti has done, is to
8  evaluate whether it's worked or not worked.  So
9  while it is accepted, it's also accepted by
10 epidemiologists that we should do our best to
11 understand whether the multiple imputation
12 approach has given us a valid estimate of the
13 missing data.
14     Q.  And have you used an imputation model
15 in any of your own publications?
16     A.  Yes.
17     Q.  Have you used this imputation model?
18     MR. LASKER:  Objection to form.
19     A.  I wouldn't have used this specific
20 multiple imputation model because this was
21 specified specific -- you want to -- what you
22 want to do with multiple imputation is think
23 about what you're trying to predict, and you
24 want to use the covariates and the relationship
25 of those covariates to best predict the missing

Confidential - Pursuant to Protective Order

1   data. So the approach in the study where I've
2   used multiple imputation was very different than
3   this. But it's still -- it's using a similar
4   strategy which they have done here.
5   BY MR. WOOL:
6       Q. Could baseline exposure of
7   misclassification impact the accuracy of the
8   imputation?
9       MR. LASKER: Objection to form.
10      A. In what context? I'm sorry.
11  BY MR. WOOL:
12      Q. Insofar as it provides a reliable
13  outcome.
14      MR. LASKER: Objection to form.
15      A. I'm sorry, could you ask specific -- a
16  more specific question? I'm not sure I
17  understand what you're asking.
18  BY MR. WOOL:
19      Q. As I understand, the Heltshe is
20  looking at, among other things, sort of the
21  validity of the imputation model, correct?
22      A. Yes.
23      Q. Okay. And could a measurement error
24  in baseline glyphosate use impact the validity
25  of the model as it's used in Andreotti, et al?

1       MR. LASKER: Objection to form.
2       A. Are you asking more generally, or did
3   it in this particular case?
4   BY MR. WOOL:
5       Q. Could it.
6       A. I guess it may or may not. It would
7   be hard to predict, because it would rely on a
8   number of factors. So it might, but it may not
9   as well.
10      I think here in this specific example
11  what's really nice to see is that the imputation
12  methodology performed well in predicting use of
13  glyphosate in this study.
14      Q. Now, if you turn back, I think, to
15  Table 3, you'll see that Table 3 gives us a
16  number of figures for the various pesticides at
17  use, or at issue in the Andreotti study,
18  correct?
19      A. Yes.
20      Q. And three of the calculations that
21  Table 3 provides are reference Brier scores,
22  Brier score, and Brier skill score, correct?
23      A. Yes.
24      Q. Now, what is a reference Brier score?
25      A. Well, what these three metrics were

1   used for here was to say how well -- did the
2   imputation approach do a better job, was it more
3   predictive than if you just used the model or
4   just looked at what the actual observed
5   prevalence was. And so these three values here
6   are used to say did the imputation add more
7   information than if you just used the actual
8   observed data.
9       So it's a measure of should you just
10  do simple -- a simple approach, or should you do
11  this much more complicated approach. So that's
12  what the Brier score is being used for here.
13      Q. And have you ever calculated a Brier
14  score in any of your own publications?
15      A. I have not used the Brier score, no.
16      Q. Were you familiar with the Brier score
17  before this litigation?
18      A. Although I wasn't familiar with this
19  particular score, I'm very familiar with
20  prediction modeling in different strategies
21  people use to assess how well predicted model
22  adds information compared to sort of a baseline
23  model. So I wasn't familiar with this specific
24  measure, but could easily understand why it's
25  being used here.

1       Q. And so what does the reference Brier
2   score for glyphosate indicate?
3       A. So again, you know, what we're really
4   interested here in this table is the Brier skill
5   score because it gives us a sense, compared to
6   the reference Brier, how much additional
7   information the multiple imputation model did in
8   proving the accuracy in the prediction. So what
9   it tells us is that the imputation model gave
10  almost a 10 percent improvement in the
11  prediction of the imputed data compared to just
12  relying on this simple model. So, and that is
13  compared to some of the other pesticides, for
14  example, benomyl where it doesn't look like the
15  imputation added much more information than if
16  you just used the simple model.
17      So does that answer your question?
18      Q. Yeah, I think it answers it well
19  enough.
20      Do you believe that maintaining a high
21  rate of follow-up is integral to ensuring study
22  validity?
23      MR. LASKER: Objection to form.
24      A. Yeah. As an epidemiologist, our goal
25  is to optimize the amount of follow-up, because

Confidential - Pursuant to Protective Order

Page 74

1  that would ensure that there's no issue of a
2  selection bias being introduced.  But at the
3  same time, just because you might not have all
4  of the participants in your study completing the
5  second questionnaire, it doesn't necessarily
6  imply that a bias has resulted.  It's important
7  to evaluate whether a bias has resulted, but it
8  doesn't necessarily mean that it has occurred.
9  BY MR. WOOL:
10     Q.   In terms of the non-responders in
11  Andreotti, is it possible to rule out selection
12  bias?
13     A.   There are multiple nodes of evidence
14  that suggest that selection bias is not likely
15  to be a big concern here, and, you know, I think
16  we have that data from the Andreotti publication
17  itself where they looked at a number of
18  sensitivity analyses.  We have that in the
19  Montgomery study which looked at the -- a number
20  of factors in those who did and did not complete
21  the second questionnaire.  They also tried to
22  assess the potential role of selection bias in a
23  number of exposure/outcome relationships.  And
24  then also from Heltshe as well.
25         So I think all of these pieces of

Page 75

1  information would suggest that it's very
2  unlikely that selection bias would have led to a
3  bias in this Andreotti study.
4      Q.   But you can't definitively rule out
5  selection bias having occurred in the Andreotti
6  study, correct?
7         MR. LASKER:  Objection to form.
8      A.   Well, as an epidemiologist where we
9  never would be able to completely rule anything
10  out, I think again what's really important here
11  is that there's multiple nodes of evidence
12  showing whether this bias existed, and all of
13  these different nodes of evidence suggest that
14  the bias is very unlikely to have occurred in
15  this Andreotti study.
16         MR. LASKER:  Just for clarification,
17  are you saying nodes or modes?
18         THE WITNESS:  Nodes.
19         MR. LASKER:  That's what I thought, I
20  wanted to clear it up.
21  BY MR. WOOL:
22     Q.   We talked about a high rate of
23  follow-up just a second ago, right?
24     A.   (Nodding in the affirmative).
25     Q.   Okay.  Is there any agreement within

Page 76

1  the field of epidemiology as to what constitutes
2  a high rate of follow-up?
3         MR. LASKER:  Objection to form.
4      A.   I wouldn't -- I mean, I think is
5  very context specific.  And again, our goal is
6  to try to have as high follow-up as possible.
7  If that doesn't occur, then it's also important
8  as an epidemiologist to evaluate the potential
9  for bias, which Andreotti has done specifically
10  here.  And also not only Andreotti, et al, but
11  also the many other publications that have
12  relied on the Agricultural Health Study second
13  questionnaire have also done -- looked at this
14  issue as well in the context of the exposure and
15  the outcome they were looking at.
16  BY MR. WOOL:
17     Q.   Would you consider a 37 percent loss
18  in follow-up to be a high rate of follow-up?
19         MR. LASKER:  Objection to form.
20     A.   I would say, again, it is a -- we
21  would be concerned just as we would be concerned
22  with any amount of missing data.  However, just
23  because there is that amount of missing data
24  doesn't mean necessarily bias occurred.
25         And I think as we've just talked

Page 77

1  about, these authors and many of the other
2  authors in the Agricultural Health Study have
3  evaluated the impact of bias.  Because you're
4  right, as an epidemiologist we should be
5  concerned.  However, it's really reassuring to
6  see from multiple studies, multiple lines of
7  evidence, the way they've looked at the
8  potential for bias in multiple ways, all of
9  these analyses suggest that selection bias did
10  not result in any -- in the study of Andreotti,
11  et al and glyphosate and NHL risk analysis.
12  BY MR. WOOL:
13     Q.   Would it be reasonable for an
14  epidemiologist to put less weight on a study due
15  to a 37 percent loss in follow-up?
16         MR. LASKER:  Objection to the form.
17     A.   Again, that's a very general comment.
18  And what I would want to know is -- so we can
19  think of it it's almost like a Bayesian
20  approach.  A priori if I heard there was
21  37 percent missing data, that would raise my
22  concern.  However, if I see that the authors,
23  and multiple authors have looked at this
24  question in multiple ways, and there doesn't
25  seem to be a bias occurred, my posterior

Page 78

1   probability then would be based on all this
2   information that a bias is unlikely to have
3   happened.
4        So while it is something to think
5   about and to be concerned about, there are
6   standard approaches we can take as
7   epidemiologists to investigate whether a bias
8   indeed occurred.  And in this case, and again
9   from all of these different pieces of data that
10  we've talked about, it doesn't seem that the
11  37 percent missing data has resulted in any
12  substantial bias in this study.  And I think --
13  BY MR. WOOL:
14      Q.  Okay.  So in your capacity as a peer
15  reviewer, have you ever come across a study
16  where 37 percent of the cohort was lost to
17  follow-up?
18      MR. LASKER:  Objection to form.
19      A.  As I mentioned, this wasn't
20  necessarily in the context of peer review.  But
21  as I've mentioned, I had previously collaborated
22  on the Swedish mammography cohort study, and
23  there -- and that's an NCI-funded cancer
24  epidemiology cohort, they published literally
25  hundreds of publications, and they have

Page 79

1   30 percent of their participants did not
2   complete the second questionnaire.  They did
3   multiple imputation, they compared it, just as
4   Andreotti did, to the complete case assessment,
5   they did a variety of assessments to see whether
6   the participants who completed both
7   questionnaires differed from those who only
8   completed one, so I -- there are
9   well-established epidemiology studies, cohort
10  studies that do have large amounts of missing
11  data.
12  BY MR. WOOL:
13      Q.  And is it possible that the loss in
14  follow-up in the Andreotti study is related to
15  exposure status?
16      MR. LASKER:  Objection to form.
17      A.  I'm not sure I understand what you
18  mean.  Because what you're really concerned
19  about is not whether the missing data is related
20  to the exposure status, but really whether the
21  missing data on the exposure is also
22  differentially related to the outcome.  That's
23  where the selection bias would occur.
24  BY MR. WOOL:
25      Q.  So I guess my question should be, do

Page 80

1   you know if lost in follow-up in AHS is related
2   to outcome status or -- strike that.
3        Can you definitively rule out that
4   loss in follow-up in the Andreotti study is
5   related to outcome status?
6       MR. LASKER:  Objection to form.
7       A.  While -- in the approach, one of the
8   approaches that -- there are a couple of
9   different approaches that would suggest that is
10  not the case.  In the sensitivity analysis
11  Andreotti, et al looked at first just the
12  individuals who had filled out both
13  questionnaires, so the complete case, so where
14  selection bias wouldn't have caused a problem.
15  And when you look at the relative risk estimates
16  for the association between glyphosate and NHL
17  risk there and compare it to the imputation, the
18  findings are very, very similar, very, very
19  similar.
20       Also, when they say well, let's just
21  look at the baseline questionnaire, when they do
22  that, again the results of that baseline
23  questionnaire compared to the follow-up
24  questionnaire, very, very similar.  So both of
25  those strategies would suggest that such a bias

Page 81

1   did not lead to any bias of the results.
2   BY MR. WOOL:
3       Q.  What does the concept of -- or what
4   does external validity mean within the field of
5   epidemiology?
6       A.  So external validity refers to
7   generalizability, meaning can you take the
8   findings in this one cohort study and
9   extrapolate that to other populations.
10      Q.  Do you believe that you can
11  extrapolate the results of the Andreotti study
12  to other populations?
13      A.  There's no reason for me to suggest --
14  there's no inclination to me to suggest why that
15  would not be the case, why an underlying
16  relationship between glyphosate and NHL risk
17  would differ in this population versus another
18  population.
19       And in fact, actually there was a
20  really nice editorial that accompanied
21  Andreotti, et al by Ward, Elizabeth Ward,
22  suggesting, actually, that the Agricultural
23  Health Study in many ways is an excellent
24  population to look at the association between
25  glyphosate and NHL risk.

Confidential - Pursuant to Protective Order

Page 82

1   Q.  Now, what about the concept of
2  internal validity as it relates to the larger
3  field of epidemiology?
4   A.  Yes, internal validity is what we've
5  been talking about already.  It's thinking about
6  the concepts of whether bias confounding or
7  chance might explain an observed association.
8   Q.  And is internal validity a necessary
9  prerequisite to establish external validity?
10   A.  Certainly.  Well, I mean, really you
11  wouldn't want to generalize a bias finding to a
12  different population, so that's what that
13  concept means.
14   Q.  So I guess yes, internal validity is a
15  necessary prerequisite to external validity?
16     MR. LASKER:  Objection to form.
17   A.  Well, you need to have a study to be
18  internally valid to say anything meaningful
19  about the observed association, regardless of
20  generalizability.  But that's the case for every
21  epidemiological study, you want to make sure
22  that bias confounding and chance have not -- are
23  not explaining the observed association that you
24  have, which, you know, again, has been nicely
25  investigated here in Andreotti, et al.

Page 83

1  BY MR. WOOL:
2   Q.  Now, in your supplemental expert
3  report you completed a meta-analysis, correct?
4   A.  Yes.  What I did was to do an updated
5  meta-analysis where I, as you can see from
6  Figure 2 in my supplemental report, I looked at
7  point estimates from four different studies.
8   Q.  And one of those studies was Pahwa, et
9  al, 2016?
10   A.  Yes.  Was it -- yeah, Pahwa 2016.
11   Q.  Would it be improper to exclude that
12  study?
13   A.  Would it be improper to exclude that
14  study?
15   Q.  Yes, in the meta-analysis.
16   A.  I'm sorry, I don't understand your
17  question.
18   Q.  If I were to -- I guess, if a
19  meta-analysis did not include the Pahwa study,
20  would you consider that to be a flawed
21  meta-analysis?
22   A.  Well, I think in -- what you would do
23  in a meta-analysis is to evaluate -- you would
24  want to go through an understanding of all of
25  the available epidemiological studies that meet

Page 84

1  the criteria for the meta-analysis that you're
2  performing, so it would be very unclear why you
3  would exclude Pahwa here.
4   Q.  Okay.  And in the Andreotti study,
5  they evaluated the cohort at 20 years, correct?
6     MR. LASKER:  I'm sorry.
7   A.  I'm sorry, I don't understand your
8  question.
9  BY MR. WOOL:
10   Q.  Let me just go to Table 3, I think
11  that is little bit more clear.
12     MR. LASKER:  Where are you?
13     MR. WOOL:  Table 3 of Andreotti.
14     MR. LASKER:  Just get myself organized
15  here.
16     Page 6?
17     MR. WOOL:  Yes.
18  BY MR. WOOL:
19   Q.  And what is the right-hand column
20  showing us?
21   A.  So in this table the authors presented
22  data on intensity weighted days of exposure of
23  glyphosate and cancer risk, and in the right
24  column is looking at an analysis lagging -- or
25  introducing a latency to look at longer term

Page 85

1  effects of glyphosate-based herbicides.
2     MR. LASKER:  Just for the record, I
3  don't know if this is intended or not, this
4  Exhibit 32-2 does not include the supplemental
5  table.  I don't know if you intended it not to,
6  but we don't have it.
7     MR. WOOL:  It should have.
8     MR. LASKER:  It should have.  We don't
9  have it.
10     MR. WOOL:  Well --
11     MR. LASKER:  You won't ask those
12  questions.
13     MR. WOOL:  It is what it is at this
14  point.
15  BY MR. WOOL:
16   Q.  So staying in the right-hand column,
17  for the 20 year lag and looking at non-Hodgkin's
18  lymphoma, what are the figures in the
19  parenthesis telling us?
20   A.  I'm sorry, in the parenthesis, those
21  are 95 percent confidence intervals.  Is that
22  what you're referring to?
23   Q.  Yes.
24     And so what is the upper figure
25  telling us in those parenthesis?

Confidential - Pursuant to Protective Order

Page 86

1    A.  I'm sorry, I don't understand what
2  you're referring to.
3    Q.  If we look at the first quartile in
4  the parenthesis we see a range of .91 to 1.64,
5  correct?
6    A.  Yes.
7    Q.  Okay.  What is the 1.64 telling us?
8    A.  That's the upper bound of the
9  95 percent confidence interval.
10   Q.  And what -- you said upper bound or
11 upper --
12   A.  That's the upper bound of the
13 95 percent confidence interval.
14   Q.  What does the upper bound mean in the
15 field of epidemiology?
16   A.  So it gives you -- so we're estimating
17 what you think to be the relative risk, and then
18 you have some uncertainty around that estimate.
19 The amount of uncertainty is a function of the
20 number of cases, the prevalence of the exposure,
21 so this gives you a range of values that are
22 consistent.  Although you would think that the
23 range of values are more consistent with the
24 point estimate than the -- either the lower or
25 upper bound.  But to me what that tells you when

Page 87

1  you look at the 20 year lagged analysis, there's
2  no association between glyphosate-based
3  herbicides and risk of non-Hodgkin's lymphoma
4  with 20 -- even if you lag 20 years of exposure.
5    Q.  Okay.  But the upper bound for all
6  quartiles with a 20 year lag for non-Hodgkin's
7  lymphoma are above 1, correct?
8    MR. LASKER:  Objection to form.
9    A.  Well, that is correct.  The other way
10 to look at this is that all of the lower bounds
11 of the 95 percent confidence intervals are below
12 1, because when you look at the overall
13 association here, this really is telling us
14 there's no association between glyphosate-based
15 herbicides, assuming a 20 year lagged analysis,
16 and the risk of NHL.
17   I actually have -- I don't know if
18 it's helpful, but in my supplemental report we
19 also looked at the 15 -- I'm sorry, I don't have
20 those numbers specifically, but there was no
21 association either with assuming a 10 year, a
22 15 year, or a 5 year lag, which we see also in
23 this Table 3.
24 BY MR. WOOL:
25   Q.  And am I correct that for your

Page 88

1  meta-analysis, you did not include the results
2  with the 20 year lag?
3    A.  That information was not available for
4  all of these studies, so this particular
5  meta-analysis simply looks at the ever-never
6  exposure that was available from each of the
7  publications.
8    My goal wasn't to -- my goal was
9  really just to give sort of an information about
10 what the totality of the epidemiology is saying
11 to us.  You know, there is caveats, as I've said
12 previously, that we can come up with a meta
13 relative risk estimate, but it doesn't adjust
14 for any potential biases or confounders that
15 have not been taken into account here.
16   Q.  Just so I'm clear, you're not saying
17 that -- strike that.  I understand your answer.
18   Okay.  I think that's it for right
19 now.
20   MR. WOOL:  If you have any questions?
21   MR. LASKER:  None.  You don't have an
22 option.  We're done.
23   A.  Thanks so much.
24   THE VIDEOGRAPHER:  This concludes the
25 January 23, 2018 deposition of Dr. Lorelei

Page 89

1  Mucci.  Going off the record.  The time is
2  10:55.
3    (Whereupon, the deposition was
4    concluded.)

Confidential - Pursuant to Protective Order

Page 90

```
 1    COMMONWEALTH OF MASSACHUSETTS )
 2    SUFFOLK, SS.              )
 3         I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
 4    and Notary Public in and for the Commonwealth of
 5    Massachusetts, do certify that on the 23rd day
 6    of January, 2018, at 9:01 o'clock, the person
 7    above-named was duly sworn to testify to the
 8    truth of their knowledge, and examined, and such
 9    examination reduced to typewriting under my
10    direction, and is a true record of the testimony
11    given by the witness.  I further certify that I
12    am neither attorney, related or employed by any
13    of the parties to this action, and that I am not
14    a relative or employee of any attorney employed
15    by the parties hereto, or financially interested
16    in the action.
17         In witness whereof, I have hereunto
18    set my hand this 5th day of February, 2018.
19
20         _____
21         MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22         Realtime Systems Administrator
23         CSR #149108
24
25
```

Page 92

```
 1         - - - - - -
              E R R A T A
 2         - - - - - -
 3    PAGE  LINE  CHANGE
 4    ___  ___  _____
 5      REASON: _____
 6    ___  ___  _____
 7      REASON: _____
 8    ___  ___  _____
 9      REASON: _____
10    ___  ___  _____
11      REASON: _____
12    ___  ___  _____
13      REASON: _____
14    ___  ___  _____
15      REASON: _____
16    ___  ___  _____
17      REASON: _____
18    ___  ___  _____
19      REASON: _____
20    ___  ___  _____
21      REASON: _____
22    ___  ___  _____
23
24
25
```

Page 91

```
 1         INSTRUCTIONS TO WITNESS
 2
 3              Please read your deposition over
 4    carefully and make any necessary corrections.
 5    You should state the reason in the appropriate
 6    space on the errata sheet for any corrections
 7    that are made.
 8              After doing so, please sign the
 9    errata sheet and date it.  It will be attached
10    to your deposition.
11              It is imperative that you return
12    the original errata sheet to the deposing
13    attorney within thirty (30) days of receipt of
14    the deposition transcript by you.  If you fail
15    to do so, the deposition transcript may be
16    deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

Page 93

```
 1
 2         ACKNOWLEDGMENT OF DEPONENT
 3
 4         I, _____, do
      Hereby certify that I have read the foregoing
 5    pages, and that the same is a correct
      transcription of the answers given by me to the
 6    questions therein propounded, except for the
      corrections or changes in form or substance, if
 7    any, noted in the attached Errata Sheet.
 8
 9    _____
      LORELEI A. MUCCI, ScD        DATE
10
11
12
13
14
15
16    Subscribed and sworn
      To before me this
17    _____ day of _____, 20_____.
18    My commission expires: _____
19
20    _____
      Notary Public
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

Page 94

1          LAWYER'S NOTES
2     PAGE  LINE
3     ____  ____  _____
4     ____  ____  _____
5     ____  ____  _____
6     ____  ____  _____
7     ____  ____  _____
8     ____  ____  _____
9     ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____
23    ____  ____  _____
24    ____  ____  _____
25