# Exhibit 11

Confidential - Pursuant to Protective Order

```
1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
2
3      IN RE: ROUNDUP           )
       PRODUCTS LIABILITY       )  MDL No. 2741
4      LITIGATION               )
       _____ )  Case No.
5      THIS DOCUMENT RELATES     )  16-md-02741-VC
       TO ALL CASES             )
6
7            TUESDAY, JANUARY 23, 2018
8     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
9                    - - -
10           VIDEOTAPED DEPOSITION of JENNIFER R.
11    RIDER, ScD, held at the offices of Cetrulo LLP,
12    2 Seaport Lane, Boston, Massachusetts,
13    commencing at 2:39 p.m., on the above date, before
14    Maureen O'Connor Pollard, Registered Merit
15    Reporter, Realtime Systems Administrator,
16    Certified Shorthand Reporter.
17                    - - -
18
19
             GOLKOW LITIGATION SERVICES
20      877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

A P P E A R A N C E S :

ANDRUS WAGSTAFF
BY: DAVID J. WOOL, ESQUIRE
   david.wool@andruswagstaff.com
   7171 West Alaska Drive
   Lakewood, Colorado 80226
   303-376-6360

      -and-

THE MILLER FIRM LLC
BY: JEFFREY A. TRAVERS, ESQUIRE
   jtravers@millerlawllc.com
   108 Railroad Avenue
   Orange, Virginia 22960
   540- 672-4224
   Counsel for Plaintiffs


HOLLINGSWORTH LLP
BY: ERIC LASKER, ESQUIRE
   elasker@hollingsworthllp.com
   1350 I Street, N.W.
   Washington, DC 20005
   202-898-5800
   Counsel for Defendant Monsanto




V I D E O G R A P H E R :

CHRISTOPHER COUGHLIN,
Golkow Litigation Services
      – – –

---

                     INDEX
EXAMINATION                           PAGE
JENNIFER R. RIDER, ScD
   BY MR. WOOL                          5

            E X H I B I T S
NO.      DESCRIPTION                   PAGE

33-1   Supplemental Expert Report of
       Jennifer R. Rider, ScD............ 10
33-2   Andreotti, et al article,
       Glyphosate Use and Cancer
       Incidence in the Agricultural
       Health Study..................... 10

33-3   Agricultural Health Study......... 10

33-4   Blair, et al article,
       Reliability of Reporting on
       Life-Style and Agricultural
       Factors by a Sample of
       Participants in the Agricultural
       Health Study from Iowa............ 33
33-5   Montgomery, et al Author
       Manuscript, Characteristics of
       non-participation and potential
       for selection bias in a
       prospective cohort study......... 39
33-6   Heltshe, et al article, Using
       multiple imputation to assign
       pesticide use for non-responders
       in the follow-up questionnaire
       in the Agricultural Health Study.. 50
33-7   Benbrook article, Trends in
       glyphosate herbicide use in the
       United States and globally........ 74

---

            P R O C E E D I N G S

      THE VIDEOGRAPHER:  We are now on the
record.  My name is Chris Coughlin, and I'm a
videographer for Golkow Technologies.  Today's
date is January 23, 2018, and the time is 2:39.
      This video deposition is being held in
Boston, Massachusetts in the matter of Roundup
Products Liability Litigation, MDL Number 2741,
United States District Court, Northern District
of California, Case Number 16-md-02741-VC.
      The deponent is Dr. Jennifer Rider.
      Will counsel please identify
yourselves and state whom you represent.
      MR. WOOL:  David Wool from Andrus
Wagstaff for the plaintiffs.
      MR. TRAVERS:  Jeffrey Travers with The
Miller Firm for the plaintiffs.
      MR. LASKER:  Eric Lasker,
Hollingsworth LLP, for Monsanto.
      MR. WOOL:  The court reporter is
Maureen O'Connor, and she will now swear in the
witness.

---

      JENNIFER R. RIDER, ScD,
having been first duly identified and sworn, was
examined and testified as follows:
            EXAMINATION
BY MR. WOOL:
   Q.   Good afternoon, Dr. Rider.
   A.   Hi.
   Q.   How are you doing?
   A.   Good.  Thank you.
   Q.   So one, I know we haven't met before,
and I know that you've been through this process
before, but I can tell that you are somewhat
eager to give your answers, so if you'll just
give me a moment to finish my questions and let
counsel get in his objections where he wants to,
I think that will make the court reporter's job
a little bit easier.
   A.   Okay.
   Q.   Fair enough?
   A.   Mm-hmm.
   Q.   So I have marked as Exhibit 1 a copy
of your supplemental expert report.
   A.   Mm-hmm.
   Q.   Now, does that expert report, along
with the original expert report that you

---

Confidential - Pursuant to Protective Order

Page 6

1 authored in this litigation, include all of your
2 opinions for the Andreotti study?
3        MR. LASKER:  Objection to form.
4    A.   I can't say that it includes all of my
5 opinions, but I felt like it covered the most
6 important issues.
7 BY MR. WOOL:
8    Q.   Since you authored that report, have
9 you read anything that changes any of the
10 opinions that are described in that report?
11    A.   No.
12    Q.   Now, in preparing that report, did
13 anybody assist you in summarizing literature?
14    A.   No.
15    Q.   You wrote the report by yourself
16 without the assistance of, say, a grad student
17 or a teaching assistant?
18    A.   That is correct.
19    Q.   All right.  And have you read any of
20 the plaintiff expert reports that were submitted
21 pursuant to Pretrial Order 34, which is the
22 Order that required the supplemental reports?
23    A.   Yes, I have.
24    Q.   Which expert reports have you read, if
25 you recall?

Page 7

1    A.   Yes.  I have read Dr. Ritz's report,
2 and Dr. Neugut's report, and I believe I also
3 took a quicker look at Dr. Portier's report.
4    Q.   All right.  Do you believe that
5 exposure is accurately assessed in the Andreotti
6 study?
7    A.   So I think that the authors did a good
8 job of making sure that even if there would be
9 some imperfect measurement of exposure like we
10 have in all epidemiologic studies, that it had
11 very little impact on the findings.
12    Q.   So it's fair to say that all
13 epidemiological studies have some degree of
14 inaccuracy?
15    A.   Yes.  I don't think we could find an
16 example of an epidemiologic study where there's
17 absolutely perfect reporting when you're talking
18 about a long-term follow-up of participants.
19    Q.   Have you ever collected occupational
20 exposure data for an epidemiological study?
21    A.   No.  I don't do occupational
22 epidemiology, but I certainly do epidemiology
23 that deals with questionnaire data and cancer
24 outcomes.
25    Q.   Now, have you ever designed a

Page 8

1 questionnaire for an occupational exposure
2 study?
3        MR. LASKER:  Objection to form.
4    A.   Like I said, I don't do occupational
5 epidemiology in my own research, so no, I
6 wouldn't have designed those types of questions.
7 But I have contributed to questions that have
8 appeared on questionnaires for fairly high
9 profile observational studies.
10 BY MR. WOOL:
11    Q.   Just to make things easier for me, how
12 does occupational exposure epidemiology differ
13 from what you do?
14        MR. LASKER:  Objection to form.
15    A.   So in my view, I think occupational
16 epidemiology is just looking specifically at
17 exposures a person would encounter while they
18 are working.  But the -- how we handle these
19 exposures in study design and analytics really
20 isn't very different from looking at any other
21 lifestyle exposure, which is something that I do
22 in my own work.
23 BY MR. WOOL:
24    Q.   And you've served as a peer review --
25 strike that.

Page 9

1        You have served as a peer reviewer for
2 various epidemiological journals, correct?
3    A.   That is correct.
4    Q.   And in your capacity as a peer
5 reviewer, have you ever peer-reviewed any
6 occupational exposure studies?
7    A.   I can't recall a specific example, but
8 it wouldn't surprise me if I have.
9    Q.   So it's possible?
10    A.   It's very possible that I have.  But I
11 have peer-reviewed a lot of articles.
12    Q.   Fair enough.
13        And the Andreotti study evaluated
14 exposure data, correct?
15    A.   Well, they related GBH use to various
16 cancer outcomes, yes.
17    Q.   Let's -- actually I'm just going to
18 mark this as Exhibit 2, which is the Andreotti
19 study.
20        MR. WOOL:  Here is a copy of it,
21 Counsel.
22        And I will mark as Exhibit 3 a copy of
23 the enrollment questionnaire.
24
25

Confidential - Pursuant to Protective Order

Page 10

1    (Whereupon, Exhibit Number 33-1,
2    Supplemental Expert Report of Jennifer
3    R. Rider, ScD, Number 33-2, Andreotti,
4    et al article, Glyphosate Use and
5    Cancer Incidence in the Agricultural
6    Health Study, and Number 33-3,
7    Agricultural Health Study, were marked
8    for identification.)
9    MR. LASKER:  Which one?
10   MR. WOOL:  This is the private
11   applicator questionnaire.
12   BY MR. WOOL:
13   Q.   Now, have you seen this document
14   before?
15   A.   The private applicator questionnaire,
16   or this study?  Sorry, which one are we talking
17   about?
18   Q.   The private applicator questionnaire,
19   Exhibit 33-3.
20   A.   I have gone online to the Agricultural
21   Health Study website, but I believe I have spent
22   more time looking at the commercial applicator
23   questionnaire.
24   Q.   The commercial applicator enrollment
25   questionnaire?

Page 11

1    A.   Correct.  Yes.
2    Q.   And the Andreotti study evaluated both
3    private applicators and commercial applicators,
4    correct?
5    A.   Yes.  So they all were people who were
6    enrolled while they were getting their pesticide
7    license, their applicator license.
8    Q.   All right.  So if you look at
9    Exhibit 3, Page 10, at the very top you will see
10   questions about Roundup, Jury, or glyphosate.
11        Do you see that?
12   A.   I do.
13   Q.   And the questionnaire asked whether
14   the cohort member has ever personally mixed or
15   applied the herbicide, how many years they
16   personally mixed or applied the herbicide, and
17   an average how many days per year they used it
18   along with when they first used the herbicide,
19   correct?
20   A.   Mm-hmm.
21   Q.   All right.  And this is the -- so the
22   questions on Page 10 on, I believe, row H are
23   the questions that form the baseline exposure
24   assessment for the Andreotti study for private
25   applicators, correct?

Page 12

1    MR. LASKER:  Objection to form.
2    A.   I would have to look more carefully at
3    this document to confirm that.
4    (Witness reviewing document.)
5    A.   Yeah, I mean, it seems reasonable that
6    this is the enrollment questionnaire and not the
7    take-home questionnaire, which they also did.
8    But I can't be sure just from looking at this,
9    no.
10   Q.   Well, if you turn to the very first
11   page, you will see --
12   A.   Enrollment questionnaire, yes.  Thank
13   you.
14   Q.   So we agree this is the enrollment
15   questionnaire --
16   A.   Yes.
17   Q.   -- by private applicators.
18        Now, cohort members were also asked
19   about the use of protective equipment, correct?
20   A.   Correct.
21   Q.   And if you turn to Page 15, Question
22   17 asks about the use of protective equipment,
23   correct?
24   A.   That is correct.
25   Q.   And Question 17 is not specific to any

Page 13

1    herbicide, is it?
2    A.   It just says, "What type of protective
3    equipment do you generally wear when you
4    personally handle pesticides?"  So that is
5    correct.
6    Q.   And so if somebody used more than one
7    pesticide and multiple types of protective
8    equipment, this questionnaire would not
9    distinguish which specific type of protective
10   equipment applied to which pesticide, would it?
11   A.   It doesn't appear this questionnaire
12   would.  I believe if we looked at the commercial
13   pesticide applicator questionnaire, that one
14   distinguishes at least by different classes of
15   pesticides.
16   Q.   Do you know approximately how many of
17   the cohort members were commercial applicators
18   versus private applicators?
19   A.   I would need to look back.  I don't
20   recall offhand, no.
21   Q.   I believe if you look at -- let's see.
22   Well, we can go back to that actually.
23   A.   Okay.
24   Q.   Now, if you look at Question 16 still
25   in the questionnaire, Page 15.

Confidential - Pursuant to Protective Order

Page 14

1    A.   Okay.

2    Q.   Question 16 asks, "How do you

3 personally apply pesticides?"  Correct?

4    A.   Correct.

5    Q.   And Question 16 does not ask cohort

6 members to describe the application method

7 specific to a pesticide, does it?

8    A.   That is correct.  Again, I think this

9 is different than in the commercial

10 questionnaire.  But on this one, that is

11 correct.

12   Q.   So if somebody used multiple

13 pesticides, again we would have no way of

14 knowing which application method applied to

15 which pesticide, would we?

16       MR. LASKER:  Objection to form.

17   A.   That is correct.  I mean, we would

18 know how frequently they used particular

19 pesticides, but not the application method

20 specifically for each one.

21 BY MR. WOOL:

22   Q.   Okay.  Now, if we look at the

23 Andreotti study, Table 1, I think there's a

24 breakdown of the percentage of private

25 applicators versus commercial applicators, if

Page 15

1 you go under "applicator type."

2       Do you see that?

3    A.   Yes, I do.

4    Q.   Okay.  And at least for the kind of

5 ever-never -- or not never side.  Okay.

6       And so in the first column we are

7 looking at -- sorry, strike that.

8       In the first column of Table 1 we are

9 looking at never used glyphosate, correct?

10   A.   Correct.

11   Q.   And the total number of private

12 applicators is 8,476?

13       MR. LASKER:  Objection to form.

14 Mischaracterizes the document.

15   A.   So there are 91 percent of those who

16 never used glyphosate were private applicators,

17 meaning that's the majority of glyphosate users

18 were commercial applicators.

19 BY MR. WOOL:

20   Q.   Okay.  And the cohort members were all

21 restricted use pesticide applicators, correct?

22   A.   They all had to have their license.

23 That is how they were enrolled.

24   Q.   What is a restricted use pesticide?

25   A.   I'm not exactly sure what goes into

Page 16

1 the licensing requirements.  I just know that

2 that is how they enrolled the cohort, so that in

3 many ways the cohort would be more able to give

4 good quality information on pesticide use.

5    Q.   Is the use of personal protective

6 equipment something that could impact actual

7 exposure to glyphosate?

8    A.   I mean, I think we have data from

9 several biomonitoring studies that suggest that

10 yes, it does.

11   Q.   And in what way does the use of

12 personal protective equipment impact actual

13 exposure to glyphosate?

14   A.   Well, I mean, I think it's reasonable

15 to think that if you are wearing personal

16 protective equipment, you might have a lower

17 internal dose of glyphosate exposure.

18   Q.   And how did the authors in Andreotti

19 use the information about personal protective

20 equipment?

21   A.   They used it in their intensity

22 measures.  There's an algorithm for which they

23 calculated intensity of use, and personal

24 protective equipment was incorporated into that

25 algorithm.

Page 17

1    Q.   Are you familiar with the term

2 exposure misclassification?

3    A.   Yes, I am.

4    Q.   What does that term mean to you?

5       MR. LASKER:  Objection to form.

6    A.   It means the degree to which you are

7 assigning a participant the wrong value for

8 exposure, and it can be either differential or

9 non-differential with respect to the outcome.

10 BY MR. WOOL:

11   Q.   And what is the difference between

12 differential and non-differential just so we're

13 clear?

14   A.   So non-differential -- if we're

15 talking about exposure misclassification,

16 non-differential exposure misclassification

17 would mean that you're providing the wrong

18 information on exposure equally as often in

19 those who do and do not go on to develop the

20 outcome of interest, whereas differential, there

21 would be some difference in that

22 misclassification according to disease status.

23   Q.   And is non-differential exposure

24 misclassification a type of systematic error

25 that can occur in an epidemiological study?

Page 18

1    MR. LASKER:  Objection to form.
2    A.   I guess it is a type of error that
3  could create a bias, if that's what you mean by
4  systematic error.
5  BY MR. WOOL:
6    Q.   Have you heard the term systematic
7  error before as it relates to epidemiological
8  studies?
9    A.   Yes, some people use that term.  But
10  it's one of these terms that's used to mean very
11  different things.
12    Q.   Just so I'm clear, if I use the term,
13  what does the term mean to you?
14    MR. LASKER:  Objection to form.
15    A.   So I wouldn't really talk about
16  systematic error.  I would talk about the
17  specific type of bias that we're talking about.
18  BY MR. WOOL:
19    Q.   Okay.  Do you believe that exposure
20  misclassification can bias the results of an
21  epidemiological study towards the null?
22    MR. LASKER:  Objection to form.
23    A.   So you're asking if non-differential
24  misclassification can bias the results toward
25  the null?

Page 19

1  BY MR. WOOL:
2    Q.   Yes.
3    A.   On average, that tends to be what
4  happens, especially when we're looking about
5  dichotomous exposures, but there's also random
6  error.  So you can't always expect that a point
7  estimate will be biased towards the null in a
8  given study.
9    Q.   And can exposure misclassification
10  impact the relative risk of a study?
11    MR. LASKER:  Objection to form.
12    A.   So again, are you talking specifically
13  about non-differential exposure?
14  BY MR. WOOL:
15    Q.   Let me clarify my question.
16    Can non-differential exposure
17  misclassification impact the relative risk
18  estimate in an epidemiological study?
19    A.   Yes, it can.
20    Q.   Can it have a substantial impact upon
21  relative risk estimates?
22    A.   It depends on a number of factors.  So
23  again, if we're just talking about
24  non-differential misclassification of exposure,
25  you know, we need to know the degree to which

Page 20

1  the exposure is being misclassified.  And then I
2  also mentioned there's also this random error
3  issue, and so, in general, that's less of a
4  problem in larger studies.
5    Q.   And accurate exposure assessments are
6  important in large cohort studies, correct?
7    MR. LASKER:  Objection to form.
8    A.   Well, yeah.  I mean, I think our goal
9  is to measure the exposure that we're thinking
10  to -- that we're hoping to relate to a
11  particular outcome.  And so in my own work I
12  want to get as close as I can to measuring that
13  exposure correctly.
14  BY MR. WOOL:
15    Q.   And do you believe the exposure
16  assessment in the Andreotti study is accurate?
17    A.   So I think they did a number of things
18  to ensure that they were getting very good
19  exposure reporting.  I think, you know, first of
20  all, just including a cohort of licensed
21  applicators, they were likely to get much better
22  information than, say, in some of the
23  case-control studies that had been conducted
24  previously.  And they also -- you know, they
25  have the initial baseline exposure, they have

Page 21

1  follow-up exposure, they look at exposure
2  classified in several different ways, so yeah,
3  so I think they did a good job in measuring the
4  exposure.
5    Q.   And what is selection bias, just so
6  we're clear on that term?
7    A.   So the sort of structural definition
8  of selection bias is when you're conditioning on
9  an effect of both exposure and disease.  So in
10  other words, one example would be if -- you
11  know, getting into the analysis of your study
12  depends on both exposure and disease.
13    Q.   Now, if we turn to Page 7 of
14  Exhibit 2, which is the Andreotti study.
15    A.   Okay.
16    Q.   If you look in the left-hand column.
17    A.   Sorry, we're on Page 7 you said?
18    Q.   Correct.
19    A.   Yes.
20    Q.   I mean, I'm sorry, not the left-hand
21  column, the right-hand column.
22    A.   Okay.
23    Q.   Okay.  At the top of the paragraph,
24  second to the bottom, the authors state that
25  "This evaluation has some limitations that

Confidential - Pursuant to Protective Order

1  should be acknowledged.  First, despite the
2  specific information provided by the applicators
3  about use of glyphosate, some misclassification
4  of exposure undoubtedly occurred."
5     Do you agree with that statement?
6     A.  Like I said, I think we would be very
7  hard-pressed to find an epidemiologic study
8  where there was absolutely no misclassification
9  of exposure, especially when we're dealing with
10 lifestyle or occupational behaviors.  So in that
11 way, yes, I would agree.
12    Q.  And does misclassification always bias
13 the results of a study in a particular
14 direction; for example, towards the null or away
15 from the null?
16       MR. LASKER:  Objection to form.  Asked
17 and answered.
18    A.  Yes, so I did -- this is what I stated
19 previously.  But in general, non-differential
20 misclassification of exposure would bias the
21 results towards the null, especially if you are
22 just talking about a dichotomous exposure.  But
23 we have random error issues as well, and so the
24 point estimate you obtain from a single study
25 wouldn't always be necessarily closer to the

1  null.
2  BY MR. WOOL:
3     Q.  Now, if we go to -- back to your
4  report --
5     A.  Okay.
6     Q.  -- to Page 4, I want to ask you about
7  the last sentence of this top paragraph.
8        MR. LASKER:  I'm sorry.  I was on
9  Page 4, but the wrong document.  So Page 4, yes.
10 BY MR. WOOL:
11    Q.  Okay?
12    A.  Yes.
13    Q.  The last sentence you state that while
14 -- sorry, strike that.  You state, "While this
15 theoretically could lead to a shift in the
16 relative risk for any individual category in
17 either direction, because the reported relative
18 risk in all categories in Andreotti, et al
19 results are below 1.0, it is impossible for
20 non-differential exposure misclassification to
21 conceal any positive associations in that data,"
22 correct?
23    A.  Mm-hmm.
24    Q.  And so is it your opinion, as you sit
25 here today, that it is impossible that exposure

1  misclassification could have concealed a
2  positive association in the Andreotti study?
3     A.  So I think you're taking that sentence
4  a bit out of context, because I'm talking in
5  this whole paragraph about a specific situation
6  where you're looking at exposure in multiple
7  categories, and you have exposure
8  misclassification specifically between two of
9  those categories, those would bias the results
10 towards each other.  So in that particular
11 situation you could have the results for one
12 category go towards the null and another
13 category go away from the null.
14       But here in the HS 2018 study that
15 we're talking about, all of the results for
16 every category are below 1, you know, except for
17 the reference value, of course, which is 1, so
18 there's no way for two categories to be biased
19 towards each other and for one to be then away
20 from the null.
21    Q.  Okay.  So if I understand, and I'm not
22 sure that I do, you're saying that it is
23 impossible for the results of -- strike that.
24       So because all the results are going
25 away from the null, you're saying that it is

1  impossible that exposure misclassification could
2  lead to that result?
3        MR. LASKER:  Objection to form.
4  BY MR. WOOL:
5     Q.  Did I get that?
6     A.  No, that's not what I said.
7     Q.  Okay.  Sorry.  I just want to make
8  sure that I'm clear.  This isn't a trick
9  question or anything like that.
10    A.  It might be helpful to actually look
11 at the results in Table 2.
12    Q.  Table 2 of Andreotti?
13    A.  Correct.
14       So if we're looking at the results for
15 NHL, you can see there's -- the reference group
16 that's the no exposure category, and then all of
17 the quartiles of exposure have relative risk
18 estimates that are below 1.  Right?
19    Q.  Correct.
20    A.  So it is impossible for this one
21 specific situation that I'm describing where
22 non-differential misclassification can actually
23 in categorical exposure evaluations can drive
24 the relative risk away from the null
25 theoretically, but it can't happen here because

Confidential - Pursuant to Protective Order

Page 26

1 every single category has a relative risk below
2 1.
3      So if you were misclassifying two
4 categories, only two categories, it's possible
5 that they would be biased towards each other.
6 But here that towards each other would still
7 result in estimates below 1.
8    Q.   And so is it your opinion that the
9 Andreotti study is a negative -- or produces a
10 negative result?
11      MR. LASKER:  Objection to form.
12    A.   So that is a term -- I don't know what
13 you mean by "a negative result."
14 BY MR. WOOL:
15    Q.   So a result -- or a relative risk of 1
16 is a null result, correct?
17    A.   That would be a null result, yes.
18    Q.   And so, I believe you used the term
19 negative result in your original report, so my
20 apologies if you didn't.
21      But would a result less than 1
22 indicate that the substance at issue in this
23 case, glyphosate, has a protective effect?
24    A.   So this is exactly why I think it's
25 very important to always look at the confidence

Page 27

1 intervals and not just the point estimate, so
2 absolutely not.  I would not regard this as a
3 protective association.  I would call this
4 consistent with no association.
5    Q.   And that's because 1 is within the
6 confidence intervals?
7    A.   That is correct.
8    Q.   All right.  Did you do any research on
9 the potential effects of exposure
10 misclassification prior to writing your report?
11      MR. LASKER:  Objection to form.
12    A.   I guess I don't quite understand what
13 you mean.  I mean, I think I evaluate all of my
14 own studies that I do in terms of exposure
15 misclassification, and I teach exposure
16 misclassification, but I don't think any of my
17 substantive research is on the issue of exposure
18 misclassification specifically.
19 BY MR. WOOL:
20    Q.   Forgive me, this isn't on your
21 reliance list.  Actually we can go back to that.
22      Have you heard the term baseline
23 misclassification before?
24      MR. LASKER:  Object to the form.
25    A.   No, I wouldn't know what you meant by

Page 28

1 that term.
2 BY MR. WOOL:
3    Q.   Okay.  So let's just talk about
4 potential misclassification at enrollment.
5    A.   Okay.
6    Q.   Okay.  So we have the enrollment form.
7 So is it correct that the cohort members were
8 asked to detail past pesticide use at
9 enrollment?
10    A.   That is correct.
11    Q.   And they were asked to recall several
12 different pesticides, correct?
13    A.   I believe 50 pesticides.
14    Q.   And they were asked to recall the
15 frequency of use for each of those pesticides,
16 correct?
17    A.   That is correct.
18    Q.   And they were asked to do that by
19 filling out a questionnaire?
20    A.   The enrollment questionnaire, correct.
21    Q.   And do you know -- strike that.
22      Were the cohort members able to
23 compare answers to their own records prior to
24 filling out the questionnaire?
25    A.   What types of records do you mean?

Page 29

1    Q.   For example, purchase records.
2    A.   I'm not sure actually if they were
3 able to do that.
4    Q.   Do you know if they were permitted to
5 ask family members about their own use to, say,
6 corroborate their memory?
7    A.   I'm not sure.
8    Q.   Okay.  And in the Andreotti study, the
9 relative risks were calculated by comparing the
10 exposed group to the unexposed group, correct?
11      MR. LASKER:  Objection to form.
12    A.   Yes, or in their primary analyses
13 every quartile of use was compared to no
14 exposure.
15 BY MR. WOOL:
16    Q.   And in the De Roos 2005 paper, which I
17 believe you relied on for your original report,
18 correct?
19    A.   Correct.
20    Q.   The authors of that study looked at
21 the comparison between the upper quartiles and
22 the lowest quartile, correct?
23      MR. LASKER:  Objection to form.
24    A.   So in their dose-response analyses
25 that's correct, it was done slightly

Confidential - Pursuant to Protective Order

Page 30

1 differently, and the reference group was the
2 lowest exposed group, but they also provided
3 ever-never analyses where they compared it to no
4 exposure. So it was just presented slightly
5 differently, but the same information was
6 available.
7 BY MR. WOOL:
8    Q.   And do you believe that one of those
9 methods is more reliable than the other?
10    A.   So I mean, I think when we're
11 interested in determining causal associations,
12 what we're really interested in is the
13 comparison of exposure and different levels of
14 exposure to no exposure. So I think if you're
15 looking to make sort of causal inferences from
16 your study, I think in a lot of ways that makes
17 sense.
18    Q.   Is it possible to accurately quantify
19 exposure misclassification in the Andreotti
20 study?
21        MR. LASKER:  Objection to form.
22    A.   So I think the authors did go through
23 a number of different analyses, and there were
24 also external studies that look at the degree to
25 which exposure misclassification could be an

Page 31

1 issue, and I think those studies show that the
2 determination of exposure is quite good, and
3 certainly in line with other types of lifestyle
4 exposures that we typically measure.
5 BY MR. WOOL:
6    Q.   But I guess my question was a little
7 bit different.
8        Is it possible to measure -- to get a
9 precise measurement, I should say, for exposure
10 misclassification in the Andreotti study?
11    A.   Right. So we can do sensitivity
12 analyses to determine the degree to which
13 different levels of exposure misclassification
14 could affect our results, but, you know, we can
15 never definitively say that there is this
16 certain degree of exposure misclassification in
17 a particular study, because we would never have
18 that information.
19        But I think the important thing is
20 that you look to see how much that would impact
21 your findings, and then if it appears that it
22 would have very little impact you can have
23 confidence in your conclusions.
24    Q.   Okay. So let's go to Page 10 of your
25 expert report.

Page 32

1    A.   Okay.
2    Q.   I'm sorry. Strike that. We'll go
3 back to that.
4        Now, in the questionnaires, is it
5 possible that some exposure misclassification
6 occurred at enrollment?
7    A.   So you're asking is it possible that
8 not every applicator correctly reported every
9 single occurrence of every pesticide?
10    Q.   Correct.
11    A.   Yes, that is a possibility.
12    Q.   Okay. And what's the potential effect
13 on Andreotti of misclassification at enrollment?
14    A.   Well, again, I mean, I think there is
15 good data from several external studies that
16 say, you know, they're in the Blair 2002 study,
17 that agreement between pesticide reporting from
18 one year to the next is actually very good. So
19 if it's quite precise, we would expect that to
20 have very minimal impact on the findings.
21    Q.   And so is it your opinion, as you sit
22 here today, that pesticide applicators
23 accurately report use year-over-year?
24        MR. LASKER:  Objection to form.
25    A.   Again, I think that there is always

Page 33

1 some degree of error in reporting of exposure.
2 But, you know, here what we're really trying to
3 do is put people into categories of exposure
4 ranging from low use to high use. And if we can
5 do a reasonable job in estimating their
6 exposure, we can at least get them into the
7 right category, and then our inferences will be
8 valid.
9 BY MR. WOOL:
10    Q.   And you just mentioned Blair 2002.
11 Let's take a look at that, which I'll mark as
12 Exhibit 33-4.
13        (Whereupon, Exhibit Number 33-4,
14        Blair, et al article, Reliability of
15        Reporting on Life-Style and
16        Agricultural Factors by a Sample of
17        Participants in the Agricultural
18        Health Study from Iowa, was marked for
19        identification.)
20 BY MR. WOOL:
21    Q.   And this is the study that you just
22 described?
23    A.   That's correct.
24    Q.   All right. And how did Blair
25 determine that pesticide applicators gave

Page 34

1 reliable reporting for pesticide use?

2    A.   So I agree -- well, they say here in
3 the last sentence of the introduction, "We took
4 advantage of a special situation in Iowa to
5 assess the reporting consistency for
6 agricultural and lifestyle factors on a sample
7 of the cohort that completed two questionnaires
8 approximately one year apart."  So I think
9 something happened in Iowa regarding licensing,
10 and so they were able to obtain data on, I
11 believe it's about 4,000 people twice.  2,895
12 applicators, and a second group of 1,193.

13    Q.   Now, if we turn to Page 96 of the
14 Blair study, look at Table 2.  For the days per
15 year mixed or applied statistic, what is the
16 exact agreement for glyphosate?

17    A.   So that would be .71 with a confidence
18 interval of .67 to .75.

19    Q.   Okay.  And Blair reports 52 percent
20 exact agreement for glyphosate for days per year
21 mixed or applied, correct?

22    A.   Sorry, where are you getting that?

23    Q.   In Table 2, if you go down you'll see
24 days per year mixed or applied on the far
25 left-hand column.

Page 35

1    A.   The exact agreement, yes, 52 percent
2 with a kappa of .71, yes.

3    Q.   And that 52 percent is telling us that
4 the categories are identical for 52 percent of
5 the responders, correct?

6    A.   Well, that's true.  But if you go down
7 to the text below the table, they also say that
8 agreement within one category of exact agreement
9 was 98 and 99 percent, much higher than for any
10 category.

11       So this is actually the advantage of
12 looking at the kappa statistic is the kappa
13 statistic takes into account sort of chance
14 agreement that can happen, but it can also tell
15 you about how close you are to the correct
16 answer, not just whether you're right or wrong.

17    Q.   And so what does that mean when the
18 authors say agreement within one category of
19 exact agreement was 98 and 99 percent?

20    A.   So I believe it means that, you know,
21 if the person would have been classified in the
22 second group -- hold on.

23       So if the correct category was the
24 second group, you know, 98 or 99 percent of
25 people would have put themselves in the first

Page 36

1 group or the third group, just as an example of
2 what that means by within one category, as an
3 example.

4    Q.   Right.  I think I was misunderstanding
5 of your answer.

6    A.   Okay.

7    Q.   And again, the groups -- or strike
8 that.

9       The categories are less than 5, 5 to
10 9 --

11       MR. LASKER:  You're talking about
12 days?

13       MR. WOOL:  Sorry, the categories.

14       MR. LASKER:  Can you show us where you
15 were.

16       MR. WOOL:  For days per year of use
17 categories.

18       MR. LASKER:  So this is the footnote
19 to Table 2?

20 BY MR. WOOL:

21    Q.   Yes, the footnote to Table 2.  The
22 categories of less than 5, 5 to 9, 10 to 19, 20
23 to 39, 40 to 59, 60 to 150, and more than 150?

24    A.   Correct.

25    Q.   And your testimony is that exact

Page 37

1 agreement was 98 and 99 percent within those
2 categories, so 99 -- 98 to 99 percent of the
3 people who, say, reported as being within 10 to
4 19 one year were in 20 to 39 the year before, is
5 that right?

6    A.   As an example, correct, yes.

7    Q.   Okay.  And so based on this result,
8 which is, again, the days per year mixed or
9 applied, do you believe that the mixed or
10 applied data that's reported in Andreotti, et al
11 is accurate?

12       MR. LASKER:  Objection to form.

13    A.   So as I've said before, I think this
14 lends support to the fact that the relative
15 risks that we're estimating are by and large
16 capturing people with regard to whether they're,
17 you know, low exposed or high exposed
18 individuals and relating that to unexposed
19 individuals.  So while yes, some people may have
20 been not perfectly classified, you would still
21 be able to identify elevations in the relative
22 risk across those categories.

23    Q.   Okay.  Now, you talk about selection
24 bias in your expert report.

25    A.   Okay.

Confidential - Pursuant to Protective Order

Page 38

1    Q.    And this time we're going to stick on
2  your expert report for a second.  If you go to
3  Page 4.
4    A.    Okay.
5    Q.    You had talked about some of the
6  different strategies that have been used by the
7  Andreotti authors to validate the results of the
8  study a couple moments ago, and at kind of the
9  bottom paragraph in the middle you begin talking
10 about the Montgomery study, correct?
11   A.    Yes.  I see that, yes.
12   Q.    And what is the pertinence of the
13 Montgomery study?
14         MR. LASKER:  Objection to form.
15   A.    Well, the Montgomery study is one of
16 the studies that looked at how likely or
17 unlikely selection bias was to occur in the
18 Agricultural Health Study.
19 BY MR. WOOL:
20   Q.    And how did the authors of Montgomery
21 do that?
22   A.    So they look at the differences in the
23 population in terms of responders and
24 non-responders to the follow-up questionnaire,
25 and they find that even though there are some

Page 39

1  differences among non-responders in many
2  variables that they measured, they do analyses
3  to show that this really doesn't have a
4  meaningful impact on the results.
5    Q.    Okay.  And I've actually marked as
6  33-5 the Montgomery study.
7          (Whereupon, Exhibit Number 33-5,
8          Montgomery, et al Author Manuscript,
9          Characteristics of non-participation
10         and potential for selection bias in a
11         prospective cohort study, was marked
12         for identification.)
13   A.    Okay.
14 BY MR. WOOL:
15   Q.    And if you look at the conclusions in
16 the abstract section on the first page, the
17 authors note that "Differences between
18 non-participants and participants in follow-up
19 interview were generally small, and we did not
20 find significant evidence of selection bias.
21 However, the incidence of bias may depend on the
22 specific exposure and outcome under study."
23         Did I read that correctly?
24   A.    Yes, you did.
25   Q.    What do they mean by "the specific

Page 40

1  exposure and outcome under study"?
2    A.    So they here in this study looked at
3  specific exposures and outcomes, and selection
4  bias phenomenon could -- you know, it's not
5  general across a study population, you would
6  need to take into account the specific exposure
7  and disease outcome of interest.
8    Q.    And what exposures did they look at in
9  Montgomery?
10   A.    Let's see.  This is one, I believe,
11 they looked at smoking.
12   Q.    I think if you look at the bottom of
13 Page 2.
14   A.    Okay.  They looked at chloro -- you're
15 going to make me say that.
16   Q.    No, I won't make you say it.
17   A.    With prevalent depression, smoking
18 with prevalent chronic lung disease, and smoking
19 with incident cancer.
20   Q.    So they did not look at glyphosate and
21 non-Hodgkin's lymphoma, correct?
22   A.    That is correct, they did not.  Yes,
23 they did not look at glyphosate and NHL
24 specifically.
25   Q.    And would you view -- strike that.

Page 41

1          And is it possible that there are --
2  actually, strike that.
3          And in your expert report you note
4  regarding Montgomery that these results provide
5  evidence that selection bias due to follow-up,
6  survey non-responses not necessarily a major
7  concern, though this issue should also be
8  considered with respect to GBH, which is
9  glyphosate-based herbicides, and NHL
10 specifically?
11   A.    Yes.  And I think the authors did that
12 in their sensitivity analyses.
13         MR. LASKER:  Just clarify, authors of
14 what?
15 BY MR. WOOL:
16   Q.    Go ahead.  Yes, fair enough.
17   A.    Sorry.  The Andreotti, et al authors
18 in the most recent 2018 publication did several
19 sensitivity analyses that addressed concerns
20 about selection bias from non-response.
21   Q.    Okay.  But to the extent that you rely
22 upon Montgomery, this article assumes that
23 glyphosate response patterns are the same as the
24 other pesticides measured in this one, which is
25 chlorpyrifos with a prevalent depression, for

Confidential - Pursuant to Protective Order

Page 42

1 example?
2      MR. LASKER:  Objection to form.
3      A.   No, I wouldn't characterize it that
4 way, because, again, the primary analysis that
5 was done in the JNCI Andreotti study used
6 multiple imputation, and so the patterns don't
7 need to be exactly the same, you just need to
8 have measured all of the variables which
9 influence response.  So they collected all of
10 this other information on, you know, many, many
11 covariates in this questionnaire, and then could
12 use those to predict glyphosate use.  So it
13 doesn't necessitate that the patterns need to be
14 the same.
15 BY MR. WOOL:
16     Q.   Do you agree, though, that the extent
17 of bias could be dependent upon the particular
18 outcome, for example non-Hodgkin's lymphoma?
19      MR. LASKER:  Objection to form.
20      A.   So I think I would be much less
21 concerned about in this study, because we have
22 complete information on all of the outcomes
23 through cancer registry, so this isn't a
24 situation where loss to follow-up causes us to
25 miss some of the cancer cases.  So no, I

Page 43

1 wouldn't be concerned about that.
2 BY MR. WOOL:
3     Q.   So let's talk about that for just a
4 moment.
5      How were the outcomes captured in the
6 Andreotti study?
7     A.   They used linkage to cancer
8 registries.  So they're not relying solely on
9 self-reported outcome data.
10     Q.   Which cancer registries?
11     A.   I believe the state cancer registries,
12 but they also do a search of the death index.
13     Q.   Okay.  So if somebody moved out of the
14 state of North Carolina and then developed
15 non-Hodgkin's lymphoma, would that be captured
16 by the Andreotti study?
17     A.   If someone left the state prior to
18 their cancer diagnosis, it is possible that you
19 would miss that case, unless that person died of
20 NHL, and then you would most likely capture them
21 through the death registry.
22      This is the same method we use in the
23 cohorts that I work on.  And like this study,
24 you know, you can say that cancer outcomes are
25 captured at least 98 percent of the time.

Page 44

1     Q.   And the Andreotti study that's the
2 subject of your supplemental report adjusts for
3 the presence of confounders, correct?
4     A.   That is correct.
5     Q.   And some of the confounders that the
6 study adjusted for are other pesticides,
7 correct?
8     A.   Yes, they included other pesticides.
9     Q.   And, in fact, one of your opinions in
10 this litigation is that plaintiffs' experts
11 failed to properly adjust for confounders,
12 correct?
13     A.   Could you provide a little more --
14 that the plaintiffs experts failed to adjust?
15     Q.   Yes.  I believe it is.  Let's see, for
16 example, on Page 10 of your supplemental report
17 at the very bottom, there's a heading
18 "Overadjustment for Other Pesticides."
19     A.   So that specifically was about an
20 issue that Dr. Ritz raised in her deposition
21 where she was saying that when you adjusted for
22 other pesticides, you could over-adjust and
23 would somehow wash out the effect of GBH and
24 NHL.  But I disagree with that.  I think that,
25 you know, the most important issue is to -- for

Page 45

1 your results to be internally valid is to make
2 sure that you don't have a common cause of
3 exposure and outcome.  It's probably the most
4 basic epidemiologic principle.
5      It's interesting that in this
6 particular study, the Andreotti JNCI study, the
7 adjustment for those potential confounders
8 didn't have any appreciable affect on the
9 results.  But that doesn't mean that those
10 things they adjusted for couldn't be confounders
11 in another study where the population was less
12 homogenous.
13     Q.   So would it be fair to say that it
14 would be improper to fail to adjust for a known
15 confounder in an epidemiological study?
16     A.   I think if you know something that is
17 a common cause of the exposure and the outcome,
18 you would adjust for it, if what you're
19 interested in is interpreting your results
20 causally.
21     Q.   And if something is a potential
22 confounder, is adjustment required for an
23 epidemiological study to be reliable?
24     A.   I think in general if we don't know
25 whether a variable is a confounder, and by that

Confidential - Pursuant to Protective Order

Page 46

1  I specifically mean a variable that is a common
2  cause of the exposure and the outcome, you first
3  use your sort of biological knowledge about that
4  variable and its relationship with exposure and
5  disease to determine whether or not you should
6  adjust for it.
7      Q.   So if I understand your answer
8  correctly, sometimes yes, sometimes no, it's
9  just something that requires kind of more
10 granular focus depending on the substance, is
11 that fair?
12     A.   Well, I think this is why
13 epidemiologists need to know, you know,
14 something about the relationship between the
15 exposure and the outcome to determine what those
16 potential confounders might be.
17         The wrong approach is just simply, you
18 know, throwing everything in a model.  You have
19 to think that that could actually be a common
20 cause potentially of the exposure and the
21 outcome.
22     Q.   So you must think that a substance is
23 a common cause of both the exposure and the
24 outcome to rule it in as a confounder?
25         MR. LASKER:  Objection to form.

Page 47

1      A.   As a potential confounder, correct.
2          So just to clarify, we wouldn't want
3  to put in our model anything that we thought was
4  an intermediate between our exposure and our
5  outcome, because if you adjust on an
6  intermediate it may take away some of the real
7  causal effect of that exposure on the outcome,
8  but your statistical model can't tell you the
9  difference between the situation where that
10 variable is a confounder and the situation where
11 it's an intermediate.  You have to use your own
12 biological knowledge of the relationship between
13 the exposure and disease to determine that.
14 BY MR. WOOL:
15     Q.   What about when a substance is not a
16 confounder, in that it has no association with
17 the disease, is it proper to adjust for
18 something that is not a confounder?
19         MR. LASKER:  Objection to form.
20     A.   So there are -- in epidemiology I
21 would say age is the most frequently considered
22 potential confounder.  We often adjust for age
23 in our analyses, even if age has no appreciable
24 impact on the relative risk that we see, just
25 because it's known to be an important

Page 48

1  confounder.
2  BY MR. WOOL:
3      Q.   So I'm asking a slightly different
4  question.  What I'm curious about is something
5  that you can definitively say is not a
6  confounder.  Let's say that there are 1,000
7  great cohort prospective studies that show that
8  smoking just doesn't have any effect one way or
9  the other on non-Hodgkin's lymphoma, if that
10 were the case would it be proper to adjust for
11 cigarette smoking as an example?
12     A.   I think it's, you know, rare that we
13 ever feel confident enough that smoking wouldn't
14 cause an outcome that you wouldn't at least try
15 to look at it as a potential confounder.
16     Q.   Okay.  Smoking was probably a bad
17 example.  Let's say Smart Water, for example.
18 If there were a bunch of studies that just said
19 that Smart Water has no effect one way or the
20 other on non-Hodgkin's lymphoma, would it be
21 proper to adjust for the use of Smart Water in
22 an epidemiological study?
23     A.   I think, again, you would only include
24 it if you thought that it could be a common
25 cause of exposure and your outcome.  If you

Page 49

1  didn't have a reason to believe that that was
2  true, then no, it would be fine not to include
3  it.
4      Q.   And if you could definitively rule it
5  out, it would be fine not to include it as a
6  confounder?
7      A.   If you could definitively rule it out,
8  yes.  But I think, again, there are few
9  situations where we feel comfortable doing that.
10 I think erring on the side of being conservative
11 and adjusting is usually how we would proceed.
12         MR. WOOL:  Do you guys want to take a
13 quick break?
14         MR. LASKER:  Sure.
15         THE VIDEOGRAPHER:  Going off the
16 record.  The time is 3:34.
17         (Whereupon, a recess was taken.)
18         THE VIDEOGRAPHER:  Back on the record.
19 The time is 3:45.
20 BY MR. WOOL:
21     Q.   Dr. Rider, 37 percent of the
22 Andreotti, et al cohort was lost to follow-up,
23 correct?
24         MR. LASKER:  Objection to form.
25     A.   That's not how I would characterize

Page 50

1 it, because, again, they did have information on
2 outcomes, so they weren't completely lost to
3 follow-up. But it is true that 37 percent
4 didn't respond to the follow-up questionnaire.
5 BY MR. WOOL:
6 Q. Right.
7 You mentioned imputation. And to deal
8 with that percentage of people who did not
9 answer the follow-up questionnaire, the authors
10 performed an imputation, correct?
11 A. Yes, multiple imputation.
12 MR. WOOL: I'm going to mark as
13 Exhibit 33-6 the Heltshe article.
14 (Whereupon, Exhibit Number 33-6,
15 Heltshe, et al article, Using multiple
16 imputation to assign pesticide use for
17 non-responders in the follow-up
18 questionnaire in the Agricultural
19 Health Study, was marked for
20 identification.)
21 BY MR. WOOL:
22 Q. You've seen this article before?
23 A. Yes, I have.
24 Q. Does this article describe the
25 multiple imputation that the authors performed?

Page 51

1 A. Yes, it does. It goes through the
2 imputation method, and then evaluates it for a
3 number of different pesticides.
4 Q. Now, if you turn to Page 410, which is
5 the second page of the article, under Materials
6 and Methods the authors state that, "Our
7 specific multiple imputation" --
8 MR. LASKER: Where are you?
9 MR. WOOL: Sorry, under Materials and
10 Methods, I believe the third full sentence.
11 MR. LASKER: Okay.
12 MR. WOOL: Do you see it?
13 MR. LASKER: Yes.
14 BY MR. WOOL:
15 Q. The authors state, "Our specific
16 multiple imputation procedure imputes four
17 primary AHS exposure metric variables of
18 interest," and then a colon, "(1) use (yes/no)
19 of any pesticide in the interim period between
20 Phase 1 and 2; (2) use (yes/no) of 50 specific
21 pesticides in the interim period," which is
22 referenced in Table 1. "(3) number of days of
23 use for a specific pesticide during Phase 2; and
24 (4) last year of application of any pesticides
25 within the 5-year period between Phase 1 and 2,"

Page 52

1 correct?
2 A. Correct.
3 Q. And so am I correct that the
4 imputation performed by the Andreotti, et al
5 authors derived these four metrics that are
6 listed here?
7 MR. LASKER: Objection to form.
8 What do you mean by "the Andreotti
9 authors"?
10 MR. WOOL: Strike that. I agree that
11 was a confusing question.
12 BY MR. WOOL:
13 Q. So the imputation was used to discern
14 these four metrics that are listed here,
15 correct?
16 A. That is correct. They were looking at
17 four -- they used models to predict these four
18 different outcomes. They were exposures, but
19 they were the outcomes of the imputation models,
20 correct.
21 Q. How was number of days of use for a
22 specific pesticide during Phase 2 calculated?
23 A. The number of days of use of any
24 pesticide?
25 Q. Yes. Strike that. I should have

Page 53

1 clarified.
2 So for the -- in the original study
3 for the responders, how did they calculate that
4 figure, the number of days of use for a specific
5 pesticide?
6 MR. LASKER: Objection to form.
7 I'm sorry, which study?
8 BY MR. WOOL:
9 Q. The Andreotti study.
10 A. Could I ask you --
11 Q. Let me clarify.
12 In the Andreotti study, how did they
13 calculate the number of days of use for a
14 specific pesticide between the original
15 questionnaire and follow-up questionnaire?
16 MR. LASKER: Objection to form.
17 A. I apologize, I still don't understand
18 the question. I don't know whether you're
19 talking about responders or non-responders.
20 BY MR. WOOL:
21 Q. Okay. We're talking about responders
22 here. So let's go back to the Andreotti study,
23 actually, at the top of Page 2.
24 A. Okay.
25 Q. Are you there?

Page 54

1   A.  Yep.
2   Q.  Okay.  So looking at the top
3 right-hand column --
4       MR. LASKER:  I'm sorry, right hand on
5 Page 2?
6   A.  Of the Andreotti study.
7       MR. WOOL:  Of Andreotti.
8       MR. LASKER:  Sorry.
9 BY MR. WOOL:
10   Q.  This will make it easier.
11       MR. LASKER:  What column are we under?
12       MR. WOOL:  The right.
13 BY MR. WOOL:
14   Q.  And it states that, "At enrollment
15 applicators reported a number of years and days
16 per year each pesticide was used, while at
17 follow-up applicators reported the number of
18 days each pesticide was used in the most recent
19 year farmed."  Correct?
20   A.  That's correct.
21   Q.  So am I correct that the authors used
22 the most recent year farmed as one of the
23 metrics to determine the -- what did they call
24 it -- the intensity weighted lifetime days of
25 use?

Page 55

1       MR. LASKER:  Objection to form.
2   A.  So in the Andreotti, et al article,
3 their primary analysis used information from the
4 baseline questionnaire where they had asked
5 about the number of years and days per year of
6 use for each pesticide, as well as information
7 from the follow-up questionnaire where they
8 asked just about pesticide use in the most
9 recent year farmed.
10 BY MR. WOOL:
11   Q.  Okay.  And the number of days of use
12 for a specific pesticide during Phase 1 and 2
13 for responders was calculated using the number
14 reported for the most recent year farmed,
15 correct?
16       MR. LASKER:  Objection to form.
17   A.  So the, like I said, the authors used
18 all of the information that they gathered on
19 exposure in terms of number of years of use and
20 days of use for each pesticide from enrollment,
21 and then they distributed a follow-up
22 questionnaire roughly five years later, and that
23 questionnaire included questions about the
24 number of days of use for each pesticide within
25 the most recent year farmed.

Page 56

1 BY MR. WOOL:
2   Q.  Okay.  And to clarify, so between
3 enrollment and follow-up, that figure was the
4 only metric that was gathered for days per year
5 of use, that answer for the most previous
6 calendar year, correct?
7   A.  Right.  So the authors state that
8 there's an approximately five year period
9 between enrollment and the follow-up
10 questionnaire, and at the time of the follow-up
11 questionnaire the questionnaire included
12 questions just on the most recent year farmed,
13 not on every year, that is correct.
14   Q.  Okay.  Now you can go back to Heltshe.
15   A.  Okay.
16   Q.  Sorry, that was more complicated than
17 it should have been.  And again, we're on
18 Page 410.
19   A.  Okay.
20   Q.  So if we go back to where we were,
21 number 3, the number of days of use for a
22 specific pesticide during Phase 2 refers to --
23 actually, strike that.
24       Okay.  So Heltshe, kind of at a
25 10,000-foot level, used the information of

Page 57

1 responders to impute what non-responders would
2 have answered had they responded to the
3 questionnaires, correct?
4       MR. LASKER:  Objection to form.
5   A.  The goal of the imputation procedure
6 is to be able to use data from the whole cohort
7 even if participants had not responded to the
8 follow-up questionnaire, so they're using this
9 method to predict what a person's exposure would
10 have been at that particular time period.
11 BY MR. WOOL:
12   Q.  And so if responders' use data was
13 inaccurate, then that would decrease the
14 reliability of the imputed results, correct?
15       MR. LASKER:  Objection to form.
16   A.  So the information that's used in the
17 imputation takes into account, of course, the
18 responders' data, but all of -- but also all of
19 the other variables and information that they
20 have for the entire cohort.  So they're using
21 every variable that could predict exposure to
22 predict particular exposure values.
23 BY MR. WOOL:
24   Q.  Is it possible for statistical
25 analysis to correct for exposure

Confidential - Pursuant to Protective Order

Page 58

1 misclassification?
2      MR. LASKER: Objection to form.
3      A.   There are a number of methods actually
4 that do corrections for exposure
5 misclassification, yes.
6 BY MR. WOOL:
7      Q.   Now, if the imputation model was
8 systematically biased to imputing no exposure,
9 would that diminish the power of the Andreotti
10 study?
11      MR. LASKER: Objection to form.
12      A.   Would you mind just restating the
13 question one more time?
14 BY MR. WOOL:
15      Q.   Yes.
16      If the imputation model was
17 systematically biased to imputing no exposure,
18 would that reduce the power of the Andreotti
19 study?
20      MR. LASKER: Same objection.
21      A.   So I think, first of all, I just want
22 to point that that their primary analysis wasn't
23 ever exposure versus no exposure, it was levels
24 of exposure compared to no exposure. So I guess
25 I'm not sure how there would be a systematic

Page 59

1 bias towards imputing no exposure.
2 BY MR. WOOL:
3      Q.   Now, have you used imputation in any
4 of your epidemiological publications?
5      A.   I do not -- well, I can't say
6 definitively that any of my papers does not
7 include imputation, but at the same time I can't
8 come up with an example right now that does.
9      Q.   So let's see. You might have used
10 multiple imputation, you might not have, you
11 just don't know sitting here?
12      A.   Yes, there's a possibility on a paper
13 for which I'm a co-author that multiple
14 imputation was used when there was missing data.
15      Q.   Okay. So is it your opinion that the
16 imputation method utilized in the Andreotti
17 study has general acceptance within the
18 epidemiological community?
19      A.   Well, I think that it's well-suited
20 for certain situations when the data are missing
21 at random. So I think when you're deciding
22 which method for strategy for handling missing
23 data you're going to use, you consider why the
24 data are missing. And when they're missing at
25 random, multiple imputation is preferable to

Page 60

1 other approaches like, say, the complete case
2 analysis.
3      Q.   And in Andreotti the imputation was
4 performed using answers from the entire cohort
5 that answered Phase 2 questionnaires corrected,
6 and it -- strike that. Let me just ask that
7 first.
8      MR. LASKER: Objection to form.
9      A.   So could you just ask the question?
10 BY MR. WOOL:
11      Q.   Yes.
12      So I guess what I'm getting at is that
13 the imputation that was performed did not look
14 at whether the non-responders were from North
15 Carolina or from Iowa, correct?
16      MR. LASKER: Objection to form.
17      A.   I completely disagree. The imputation
18 procedure takes into account all types of
19 information that's available on all of the
20 applicators, so that's how they build their
21 imputation model. And that's even described in
22 Heltshe.
23 BY MR. WOOL:
24      Q.   Okay. So help me out here, I guess.
25 So the authors did take into account whether the

Page 61

1 responder was in -- strike that.
2      The authors did take into account
3 whether the non-responder was in North Carolina
4 or Iowa?
5      A.   I mean, I would need to look at the
6 Heltshe paper to recall exactly what variables
7 they ended up including in their imputation, but
8 they used a strategy where all of the variables
9 that most strongly predicted response were
10 included. So again, I would have to review to
11 see whether state was one of those. But if it
12 wasn't included, it was because it didn't affect
13 response -- I mean, it didn't affect the
14 exposure value. Sorry.
15      Q.   Okay. Now, if you turn to Page 413 of
16 Heltshe, and to Table 3.
17      A.   Okay.
18      Q.   And Table 3 provides metrics for
19 reference Brier scores, Brier score, and skill
20 Brier score, correct? Table 3 on 414.
21      A.   Here we are. Thanks. Yes.
22      Q.   Okay. Did you hear my question?
23      A.   That this table contains scores for
24 reference Brier, Brier score, Brier skill score.
25      Q.   Now, what is a Brier score?

Confidential - Pursuant to Protective Order

Page 62

1    A.    A Brier score is just a statistic that
2  is used to measure the accuracy of a prediction
3  that's in discrete categories.
4    Q.    Have you ever used a Brier score in
5  your own research?
6    A.    No.  I, in fact, I think they're
7  fairly uncommonly used in epidemiology overall.
8  Sorry.  I mean, I think they're often used in
9  weather forecasting.
10       MR. LASKER:  Just for clarification,
11  did you say that Brier score is used to measure
12  the accuracy of a prediction that's in those
13  three categories?
14    A.    No, in discrete categories.
15       MR. WOOL:  Good catch.
16  BY MR. WOOL:
17    Q.    And so based on that answer, it would
18  be fair to say that you have not calculated a
19  Brier score before?
20    A.    I have never personally calculated a
21  Brier score, correct.
22    Q.    But you had heard the term Brier score
23  before reading the Heltshe paper, correct?
24    A.    I actually had not encountered Brier
25  scores before.

Page 63

1    Q.    So this paper was the first time that
2  you had encountered them as an epidemiologist?
3    A.    That is correct.  Like I said, I think
4  that I've never seen one in all of the papers
5  that I've reviewed, so I had to do some reading
6  on them.
7    Q.    What is the cutoff point at which you
8  believe a Brier score indicates accuracy that
9  would make the imputation methodology reliable?
10       MR. LASKER:  Objection to form.
11    A.    There is no such cutpoint that exists.
12  And, in fact, even for statistics that we use
13  very commonly in epidemiology, like sensitivity
14  and specificity, there's no cutpoint at which
15  you would say this is a good value or this is a
16  bad value, because it very much relates to what
17  you're trying to predict.
18  BY MR. WOOL:
19    Q.    So whether a Brier score indicates
20  that accuracy is unreliable -- strike that.
21       Within the field of epidemiology, is
22  there any sort of general consensus as to what
23  an acceptable Brier score is before, say,
24  accuracy is deemed unreliable?
25       MR. LASKER:  Objection to form.

Page 64

1    A.    I wouldn't be aware of that, but it
2  would surprise me because, like I said, we tend
3  to not utilize cutpoints like that because it's
4  very situation-specific.
5  BY MR. WOOL:
6    Q.    So it would depend on the situation,
7  correct?
8    A.    Yes, that's what -- I'm saying for
9  different measures that I am familiar with, like
10  sensitivity and specificity, you judge those
11  measures in context.
12    Q.    So how would you go about evaluating
13  an opinion that a Brier score was, I guess, you
14  know, too low to be deemed reliable?  I guess,
15  if I wanted to -- you know, if I was looking at
16  a paper and I saw a Brier score, I guess what
17  I'm trying to get at is how I would go about
18  evaluating, oh, this Brier score is way out
19  there or, you know, or is within a range that
20  would be considered acceptable?
21       MR. LASKER:  Objection to form.
22    A.    So like I said, I'm not -- I don't use
23  Brier scores, I hadn't been familiar with them,
24  so I think there are a number of other results
25  provided in this paper that are actually much

Page 65

1  more useful to me than the Brier score, which
2  you can see corresponds very tightly with the
3  prevalence of the particular pesticide, which
4  could be problematic.
5       So, you know, if you go to the next
6  page, for instance, they talk about the relative
7  errors, and that to me has more meaning than the
8  Brier score.
9  BY MR. WOOL:
10    Q.    Okay.  But generally am I correct that
11  the smaller the Brier score, the more accurate
12  the prediction?
13       MR. LASKER:  Objection to form.
14    A.    That is how a Brier score is
15  calculated.  0 would be perfect prediction.
16  BY MR. WOOL:
17    Q.    And how does a Brier skill score, how
18  is that different than just a Brier score?
19    A.    So they're comparing the Brier score
20  to some naive reference prediction.  In this
21  particular case they used the prevalence of
22  pesticide use in the 80 percent of the cohort,
23  you know, without the cohort that they held out
24  to do the imputation.  So they're basically
25  subtracting the reference Brier from the Brier

Confidential - Pursuant to Protective Order

Page 66

1 score to get the Brier skill score.  So in the
2 skill score, you know, those could range between
3 negative 1 and 1, I believe.
4 　Q.　Now, if you turn the page to Page 414,
5 I believe you said that that Figure 2 was more
6 important to you in determining the accuracy of
7 the imputation.  Did I hear that correctly?
8 　A.　Well, I just -- I mean, this has
9 information that's more meaningful to me
10 because, again, the relative errors of the
11 imputed prevalence, you know, tell you something
12 about the error, taking into account how common
13 that particular pesticide is in the cohort.
14 　Q.　Okay.  Sorry, did I interrupt you?
15 　A.　No.  Thank you.
16 　Q.　What is Figure 2 telling us with
17 respect to glyphosate?
18 　A.　It's about in the middle of the pack.
19 　Q.　And what does that mean?
20 　A.　That there are pesticides with much
21 higher relative error than glyphosate.  And it's
22 also interesting that this relative error
23 doesn't relate at all to the Brier scores in
24 Table 2.  So you can find examples of pesticides
25 with very high relative errors like

Page 67

1 methylbromide, but that have the lowest of the
2 Brier scores.
3 　Q.　And what does a negative relative
4 error indicate to you?
5 　A.　Well, it's just that it's
6 underreporting the prevalence.
7 　Q.　Right.
8 　　　Now, still on Page 414, if you look at
9 the right-hand column, the first full paragraph,
10 the authors state, "A key assumption of any
11 imputation is that missingness is independent of
12 the unobserved outcome of interest or
13 unobservable confounders."
14 　　　Do you agree with that statement?
15 　A.　Yes, I do.
16 　Q.　They go on to say, "The reduction of
17 bias and increase in precision from multiple
18 imputations is dependent on the covariates
19 associated with both non-response and the
20 endpoint variable, and factors associated with
21 non-participation which were included and are in
22 our imputation model."
23 　　　Do you agree with that statement?
24 　A.　Yes.
25 　Q.　And they go on to say, "For our

Page 68

1 imputation analysis, the outcome of interest is
2 the missing pesticide use itself.  Montgomery,
3 et al showed there's little evidence for
4 selection bias in Phase 2 of the AHS, however
5 missing at random is an untestable assumption
6 without additional data, thus it is possible
7 that non-responders differ from responders in
8 variables we have not measured."
9 　　　Do you agree with that statement?
10 　A.　I mean, this is always the case in
11 epidemiologic studies.  The mechanism of
12 missingness is always untestable, but you're in
13 a much better position in a cohort study like
14 this where they have measured many, many
15 variables that could be used to predict exposure
16 levels.
17 　Q.　So it would be fair to say that you do
18 agree with that statement?
19 　　　MR. LASKER:  Objection to form.  Asked
20 and answered.
21 　A.　So do I agree -- do I agree with the
22 statement that it's an untestable assumption
23 without additional data?
24 BY MR. WOOL:
25 　Q.　Yes.

Page 69

1 　A.　Yes, it is almost always the case that
2 in an actual epidemiologic study, not some sort
3 of simulation, that that is an untestable
4 assumption.
5 　Q.　What is selection bias?
6 　A.　I believe I've already answered this
7 question earlier, but --
8 　Q.　I'm sorry.  Go ahead.
9 　A.　I can answer it again.
10 　Q.　If you don't mind.
11 　A.　So if you're thinking about it
12 structurally, it's when you're conditioning on a
13 factor that is an effect of both the exposure
14 and the outcome.
15 　Q.　Do you believe that maintaining a high
16 rate of follow-up in a cohort study is integral
17 to ensuring validity?
18 　　　MR. LASKER:  Objection to form.
19 　A.　That is a very general question.  I
20 think that if you're talking about outcome data,
21 that's one particular issue.  So, as I mentioned
22 before, the AHS is in a good position because
23 they obtained outcome data on all or virtually
24 all of the participants in terms of NHL through
25 cancer registries, so in that place, and, you

Confidential - Pursuant to Protective Order

Page 70

1  know, I think that that is an integral aspect of
2  the validity of the study.
3  BY MR. WOOL:
4      Q.   Is there any agreement within the
5  field of epidemiology as to what constitutes a
6  high rate of follow-up?
7          MR. LASKER: Objection to form.
8      A.   No, because, again, I think it really
9  depends on the particular situation in the
10  study, and how long you're following people, and
11  is this a chronic disease that you're looking at
12  or some short-term outcome.  So it's very hard
13  to provide a number of what's acceptable.
14  BY MR. WOOL:
15     Q.   Would it be reasonable for an
16  epidemiologist to put less weight on a study due
17  to a 37 percent loss in follow-up?
18         MR. LASKER: Objection to form.
19         Are you talking about in general, or
20  in the Andreotti study?
21         MR. WOOL: In general.
22     A.   I mean, I think if I was reviewing a
23  study and there was 37 percent of, again, not
24  lost to follow-up of the whole cohort, but we're
25  talking about missing follow-up data, I would

Page 71

1  want to know that they thought carefully about
2  how they were going to handle that missing data
3  in their analysis, and that that was -- and that
4  the assumptions that they were making about why
5  that data were missing seemed appropriate.
6  BY MR. WOOL:
7      Q.   With respect to the Andreotti study,
8  would it be reasonable for an epidemiologist to
9  put less weight on that study due to the lost to
10  follow-up?
11         MR. LASKER: Objection to form.
12     A.   So I think I already answered this.  I
13  can't speak for epidemiologists in general, but
14  I know that my own approach would be to try to
15  determine if the ways that they handled that
16  missing data was appropriate given why the data
17  were missing.
18  BY MR. WOOL:
19     Q.   Well, say, for example, with the
20  Andreotti study, if they got complete responses
21  from every participant, would the study be more
22  powerful in your mind?
23         MR. LASKER: Objection to form.
24     A.   I mean, it's hard to speculate because
25  that's not the case.  And I think that, you

Page 72

1  know, the sensitivity analyses that they did
2  show us that regardless of how they handle that
3  missing data, they're really coming up with the
4  same conclusions.  They get very, very similar
5  results.  And so in that way it seems like the
6  missing data isn't having a large impact on the
7  findings, so in that way I think it would be
8  inappropriate not to consider this study.
9  BY MR. WOOL:
10     Q.   So I'm not talking about whether to
11  consider it or not.  I'm talking about the
12  amount of weight that you would afford to the
13  study.  Do you understand the distinction?
14     A.   So I mean, I know how I would weight
15  it in terms of all of these studies that
16  currently exist on GBH use and NHL.  I think
17  that even with 37 percent missing data on a
18  follow-up questionnaire, you know, incomplete
19  data, in essence, on the enrollment
20  questionnaire, and follow-up for decades, and
21  much more information on co-variates that can be
22  adjusted for as confounders, and not having
23  concerns about the impact of recall bias or
24  selection bias from improper selection of
25  controls, I think all of those things lead me to

Page 73

1  weight this study, to rank it highest among all
2  of the data that's currently available.
3      Q.   Have you ever published a study where
4  37 percent of the population was lost to
5  follow-up?
6      A.   So again, you know, you keep saying
7  lost to follow-up, and that's not really how I
8  would characterize it here, because they're just
9  missing data on exposure on one questionnaire.
10  They're not lost because we have their outcome
11  data, so that's not how I would describe it.
12         So I think in cohorts that I've worked
13  on where they have done repeated exposure
14  measurements in questionnaires, you know, over,
15  say, four year intervals in the health
16  professionals follow-up study it is not at all
17  uncommon for a given exposure to be missing on,
18  you know, a third of the cohort for a given
19  survey cycle, so I can imagine that it wouldn't
20  be that difficult for me to find an example
21  where that was the case on a study that I'd
22  worked on.
23     Q.   Fair enough.
24         Have you done any research on changing
25  use patterns of glyphosate following the advent

Page 74

1 of Roundup Ready crops?
2       MR. LASKER:  Objection to form.
3    A.   So you asked if I had done any
4 research on it?
5 BY MR. WOOL:
6    Q.   Yes.  I don't think that -- I could be
7 mistaken, but I don't think that your expert
8 reports contains the Benbrook article.
9    A.   I don't believe I cited the Benbrook
10 article, but I have read that article.
11    Q.   You have read the article?
12    A.   Yes.
13    Q.   Okay.  So fair to ask you some
14 questions about it?
15    A.   Sure.
16    Q.   Thanks.
17       MR. WOOL:  I'm going to mark the
18 Benbrook article as Exhibit 33-7.
19       (Whereupon, Exhibit Number 33-7,
20       Benbrook article, Trends in glyphosate
21       herbicide use in the United States and
22       globally, was marked for
23       identification.)
24       MR. LASKER:  You gave me two.
25       MR. WOOL:  Christmas came early.

Page 75

1       MR. LASKER:  33-7?
2       MR. WOOL:  Yes.
3 BY MR. WOOL:
4    Q.   And you have reviewed this article?
5    A.   I have, yes.
6    Q.   All right.  Now, if you look at the
7 abstract box, the second sentence, the authors
8 note that, "Globally, glyphosate use has risen
9 almost 15-fold since so-called 'Roundup Ready,'
10 genetically engineered glyphosate" --
11       MR. LASKER:  Where are you reading?
12       MR. WOOL:  The second sentence of
13 Results.
14 BY MR. WOOL:
15    Q.   I'll start from the beginning.
16       "Globally, glyphosate use has risen
17 almost 15-fold since so-called 'Roundup Ready"
18 genetically engineered glyphosate-tolerant crops
19 were introduced in 1996.  Two-thirds of the
20 total volume of glyphosate applied in the US
21 from 1974 to 2014 has been sprayed in just the
22 last 10 years."
23       Did I read that correctly?
24    A.   Yes.
25    Q.   So meaning that approximately

Page 76

1 two-thirds of the total amount of glyphosate
2 sprayed in the United States occurred between
3 1974 and 2014, is that what that sentence means?
4    A.   Yes, I think so.
5    Q.   All right.  And if I'm not mistaken,
6 2005 was the last year of follow-up in the
7 Andreotti study, correct?
8    A.   For -- well, it was the last time that
9 they collected data from the follow-up
10 questionnaire on exposure.
11    Q.   So 2004 was the last year that
12 follow-up data from the questionnaire was
13 collected in Andreotti?
14    A.   You said 2005, and then 2004.  So the
15 follow-up questionnaire period occurred between
16 '99 to 2005.
17    Q.   So I think here's where the confusion
18 lies.  The question -- or the responses in 2005
19 dealt with the 2004 calendar year, correct?
20       MR. LASKER:  Objection to form.
21    A.   Yes, I believe that that's correct.
22 BY MR. WOOL:
23    Q.   All right.  So if you will turn with
24 me to Page 15 of the Benbrook article.
25       MR. LASKER:  15?

Page 77

1 BY MR. WOOL:
2    Q.   Sorry, 515.
3    A.   Okay.
4    Q.   And I'll ask you to look at Table 1.
5    A.   Mm-hmm.
6    Q.   Okay.  So in -- and they give figures
7 in thousand kilograms, and then in thousands of
8 pounds.
9    A.   Mm-hmm.
10    Q.   Since we're in the United States, I'll
11 ask you about the pounds.
12    A.   Okay.
13    Q.   Now, for glyphosate agricultural use,
14 in 1990 the authors report 7,400 thousand pounds
15 of glyphosate use?
16    A.   Correct, 7,400 in 1990 pounds, yes,
17 correct.
18    Q.   And then 27,500 in 1995?
19    A.   Correct.
20    Q.   And then 78,750 in 2000?
21    A.   Mm-hmm.
22    Q.   And then 157,500 in 2005?
23    A.   Yes.
24    Q.   And then the figure goes up to 235,814
25 in 2010?

Confidential - Pursuant to Protective Order

Page 78

1   A.   Mm-hmm.
2   Q.   Correct?
3       And then it looks like it sort of
4   levels off a little bit, it goes up to 236,318
5   in 2012, correct?
6   A.   Correct.
7   Q.   And then it goes to 249,906 in 2014?
8   A.   That is what it says, yes.
9   Q.   And the Andreotti study -- strike
10  that.
11      So would it be fair to say that use of
12  glyphosate changed pretty dramatically over the
13  years that the Andreotti study was collecting
14  follow-up data?
15      MR. LASKER:  Objection to form.
16  A.   So here in this table they report
17  glyphosate use in pounds, and you can see that
18  there is an increase between 2000 and 2005,
19  which would be the follow-up questionnaire
20  period.
21      But what's interesting about this
22  article is that it shows how that's really
23  related to the availability of Roundup Ready
24  crops, and in many ways you can predict that
25  increased use if you know what farmers are

Page 79

1   farming.
2   BY MR. WOOL:
3   Q.   So do you recall if the follow-up
4   questionnaire for Andreotti asked participants
5   about the specific crops they were farming?
6   A.   Well, that is available in the
7   publication, another HS publication, so they did
8   ask for that information.  It was in, I think,
9   Alavanja 2006 they describe what types of crops
10  the farmers farm.
11  Q.   So if a cohort member had reported no
12  use of glyphosate at enrollment, but then began
13  using Roundup Ready crops, say, in 2004, if they
14  responded in 1999 to the questionnaire, the
15  questionnaire would not capture their glyphosate
16  use, correct?
17      MR. LASKER:  Objection to form.
18  A.   So just one clarification.  In the
19  Andreotti JNCI paper they talked about how the
20  follow-up questionnaire is approximately five
21  years after enrollment for the participant, so
22  we don't really have a reason to believe that
23  someone who answered on the earlier end of the
24  enrollment questionnaire would then, you know,
25  answer more than five years later on the

Page 80

1   follow-up questionnaire.
2       And that situation you described, yes,
3   certainly in some cases that could have
4   happened, but that would have a relatively small
5   effect on, you know, the total impact of
6   exposure measurement in the entire cohort.
7       So yes, for some people it will not be
8   imperfect -- it will be imperfectly captured,
9   but it's unlikely to have a meaningful impact on
10  the results given how much information they did
11  collect.
12  BY MR. WOOL:
13  Q.   Well, using the results of Andreotti,
14  is it possible to measure the frequency that
15  that particular scenario would have played out?
16  A.   I don't think it's possible directly
17  in the Andreotti paper, but I think there are a
18  number of pieces of information in this Benbrook
19  article that are actually really helpful in
20  terms of the increase in use between that period
21  that you're talking about.  It's actually -- it
22  doesn't really increase that much in that
23  period.
24  Q.   So what pieces of information, I
25  guess, would you point me to to establish that?

Page 81

1   A.   So, for instance, if you look at
2   figure 1.
3   Q.   In what?
4   A.   In the Benbrook paper.  So this is
5   specifically for soybeans.  We know that in
6   Iowa 80, percent of the farmers are soybean
7   farmers.  So if you look in that period, what
8   we're using between, you know, '90 --
9   Q.   During the follow-up period is what I
10  was asking about.
11  A.   Yes, so during '99 and 2005, you know,
12  you can see how much use increased during that
13  period.  So a lot of the increases would have
14  been -- would have been captured in that interim
15  period.
16  Q.   Do you know if any of the other
17  pesticides and herbicides that were surveyed in
18  the Andreotti study, if any of those had
19  increases in use that compared to glyphosate?
20  A.   Could you ask the question one more
21  time?
22  Q.   Yes.  I don't think I phrased it very
23  well.
24      Did any other pesticide or herbicide
25  surveyed in Andreotti, et al increase -- or did

Confidential - Pursuant to Protective Order

Page 82

1 the use of that pesticide or herbicide increase
2 to the extent that glyphosate did during the
3 follow-up period?
4      MR. LASKER: Objection to form.
5      A.   Again, I'm not an expert on the use of
6 -- glyphosate use patterns, but from reading of
7 this -- of the Benbrook article, and also there
8 was another paper I'm not recalling now on
9 trends, I think we know that because of Roundup
10 Ready crops, glyphosate has increased more
11 dramatically.
12      But in some ways when you're trying to
13 predict people's patterns of exposure, the
14 availability of Roundup Ready crops is really
15 helpful, because then those patterns of exposure
16 become determined by farming those particular
17 crops, and there's are much more specific
18 regimen for application. So that information
19 can actually be helpful.
20 BY MR. WOOL:
21      Q.   So I guess due to the increase in use
22 of glyphosate, would it be fair to expect fewer
23 never responses in, say, 2000 as opposed to
24 earlier in the follow-up period?
25      MR. LASKER: Objection to form.

Page 83

1 BY MR. WOOL:
2      Q.   Do you think that, say, people who at
3 enrollment had never used glyphosate, that as we
4 continue from 1997 to 2005 that the frequency of
5 never use responses is likely to decrease?
6      MR. LASKER: Objection to form.
7      A.   I mean, we know that glyphosate use
8 increased, particularly among certain types of
9 farmers, right. So you can see in this paper
10 that, you know, it's really due to three crops.
11 Right? So there were definitely increases in
12 glyphosate use. Whether that resulted in fewer
13 never users or just a greater degree of use, I
14 don't really know. But again, you can predict
15 those patterns to a large degree by just knowing
16 what products -- what people are farming.
17 BY MR. WOOL:
18      Q.   All right. Let me just ask a couple
19 more questions, and then I think we can wrap
20 things up. I know that I've asked this at the
21 beginning, so my apologies if you've answered.
22      MR. LASKER: Objection. Asked and
23 answered. Sorry.
24      MR. WOOL: I knew it was coming.
25 BY MR. WOOL:

Page 84

1      Q.   Did you have a chance to review any of
2 the plaintiffs' deposition transcripts before
3 today?
4      A.   For the most recent depositions?
5      Q.   Yes, for depositions conducted
6 pursuant to Pretrial Order 34.
7      A.   Yes, I have.
8      Q.   Okay. And which experts?
9      A.   I have reviewed Dr. Neugut's
10 deposition, Dr. Ritz, and Dr. Portier's
11 deposition.
12      MR. WOOL: Okay. Let me take a quick
13 break. I'll chat with Jeff, and maybe we can
14 wrap this up.
15      THE VIDEOGRAPHER: Going off the
16 record. The time is 4:27.
17      (Whereupon, a recess was taken.)
18      THE VIDEOGRAPHER: Back on the record.
19 The time is 4:34.
20 BY MR. WOOL:
21      Q.   Now, we spoke about this briefly, but
22 one of the reasons for which you believe that
23 misclassification could not account for the --
24 or exposure, non-differential exposure
25 misclassification could not account for the

Page 85

1 results in Andreotti is because the relative
2 risks in all categories of the Andreotti study
3 are below 1.0, correct?
4      MR. LASKER: Objection to form.
5      A.   So I explained earlier that, you know,
6 we usually say that on average -- that doesn't
7 mean in every study, single study all the time,
8 but on average non-differential exposure
9 misclassification would bias the results to the
10 null. That's true for ever-never -- dichotomous
11 exposures when you just have yes versus no.
12      But when you start looking at exposure
13 in more than two categories, you can have the
14 situation where if you're just misclassifying
15 between two categories, those relative risk
16 estimates would be biased towards each other, so
17 you could actually get, for one of those
18 categories, bias away from the null.
19      So what I'm talking about in my report
20 is how that particular situation can't explain
21 -- can't be happening in the Andreotti, et al
22 2018 study because all of the relative risk
23 estimates for all of the categories are below 1.
24 BY MR. WOOL:
25      Q.   And one of the things that the authors

Page 86

1 did in an attempt to minimize non-differential
2 exposure misclassification was to perform some
3 sensitivity analyses?
4    A.   Yes.  That's correct.
5        MR. LASKER:  Objection to form.
6 BY MR. WOOL:
7    Q.   And if you turn to Page 5 of your
8 report.
9    A.   Okay.  All right.
10    Q.   In the final paragraph on Page 5, you
11 describe one of these sensitivity analysis that
12 sort of truncated the results of 2005.
13    A.   That is correct, that's one of the
14 analyses they conducted.
15    Q.   Okay.  And why did they truncate the
16 results of 2005?
17    A.   Because the follow-up questionnaire
18 period ended at 2005, and so ending follow-up at
19 2005 wouldn't make any assumptions about a
20 person's exposure after 2005.
21    Q.   Okay.  And in this particular
22 instance, you say that the risk ratio comparing
23 the highest quartile of intensity weighted
24 exposure to no exposure in analysis, the
25 truncated follow-up in 2005 was 1.04, which is

Page 87

1 also consistent with the primary analysis,
2 correct?
3    A.   Yes.  I also report the 95 percent
4 confidence interval around that estimate, which
5 is from .7 to 1.57.
6    Q.   Okay.  And so when the analysis was
7 truncated, that resulted in the risk ratio of
8 the highest exposure group going up, correct?
9        MR. LASKER:  Objection to form.
10    A.   Well, the confidence intervals for
11 this estimate and the estimate of the primary
12 analysis and the results of the two other
13 sensitivity analyses all overlap and they all
14 contain the null value.  And so, you know, I
15 think I mentioned earlier on, you know, we don't
16 dwell too closely on this point estimate because
17 it is, you know, subject to random error.  The
18 confidence interval takes that into account.
19        So I would interpret this result of
20 1.04 the same way that I would interpret the
21 result in the primary analysis of -- there's
22 NHL, for the highest quartile to no exposure of
23 0.87 in exactly the same way, and that's being
24 consistent with no association.
25        MR. WOOL:  That's it.  I don't have

Page 88

1 any other questions.
2    A.   Okay.
3        MR. LASKER:  No questions.
4        THE VIDEOGRAPHER:  This concludes the
5 January 23, 2018 deposition of Dr. Jennifer
6 Rider.  Going off the record.  The time is 4:39.
7        (Whereupon, the deposition was
8        concluded.)

Page 89

1 COMMONWEALTH OF MASSACHUSETTS )
2 SUFFOLK, SS.              )
3        I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4 and Notary Public in and for the Commonwealth of
5 Massachusetts, do certify that on the 23rd day
6 of January, 2018, at 2:39 o'clock, the person
7 above-named was duly sworn to testify to the
8 truth of their knowledge, and examined, and such
9 examination reduced to typewriting under my
10 direction, and is a true record of the testimony
11 given by the witness.  I further certify that I
12 am neither attorney, related or employed by any
13 of the parties to this action, and that I am not
14 a relative or employee of any attorney employed
15 by the parties hereto, or financially interested
16 in the action.
17        In witness whereof, I have hereunto
18 set my hand this 5th day of February, 2018.
19
20        _____
21        MAUREEN O'CONNOR POLLARD, NOTARY PUBLIC
22        Realtime Systems Administrator
23        CSR #149108
24
25

Confidential - Pursuant to Protective Order

Page 90

INSTRUCTIONS TO WITNESS

1
2
3          Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8          After doing so, please sign the
9  errata sheet and date it.  It will be attached
10 to your deposition.
11         It is imperative that you return
12 the original errata sheet to the deposing
13 attorney within thirty (30) days of receipt of
14 the deposition transcript by you.  If you fail
15 to do so, the deposition transcript may be
16 deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

Page 91

1        - - - - - -
        E R R A T A
2        - - - - - -
3  PAGE  LINE  CHANGE
4  ____ ____ _____
5     REASON: _____
6  ___  ____ _____
7     REASON: _____
8  ___  ____ _____
9     REASON: _____
10 ____ ____ _____
11    REASON: _____
12 ____ ____ _____
13    REASON: _____
14 ____ ____ _____
15    REASON: _____
16 ____ ____ _____
17    REASON: _____
18 ____ ____ _____
19    REASON: _____
20 ____ ____ _____
21    REASON: _____
22 ____ ____ _____
23
24
25

Page 92

1
2          ACKNOWLEDGMENT OF DEPONENT
3
4          I, _____, do
   Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
   transcription of the answers given by me to the
6  questions therein propounded, except for the
   corrections or changes in form or substance, if
7  any, noted in the attached Errata Sheet.
8
9  _____
   JENNIFER R. RIDER, ScD       DATE
10
11
12
13
14
15
16 Subscribed and sworn
   To before me this
17 _____ day of _____, 20____.
18 My commission expires: _____
19
   _____
20 Notary Public
21
22
23
24
25

Page 93

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25