# Exhibit 3

William H. Fleming, M.D., Ph.D.

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4     --------------------------X

 5     IN RE:  ROUNDUP PRODUCTS      MDL No. 2741

 6     LIABILITY LITIGATION

 7                                   Case No.

 8                                   16-MD-02741-VC

 9     --------------------------X

10     THIS DOCUMENT RELATES TO ALL

11     CASES

12     --------------------------X

13

14

15              VIDEOTAPED DEPOSITION OF

16            WILLIAM H. FLEMING, MD, PHD

17

18               September 19, 2017

19                   9:14 a.m.

20

21              1350 I Street NW

22            Washington, DC 20005

23

24

25     Reported by: Denise D. Vickery, CRR, RMR
```

William H. Fleming, M.D., Ph.D.

---

Page 2

1  APPEARANCES:

2

3  For the Plaintiffs:

4     THE MILLER FIRM LLC

5     BY: TIMOTHY LITZENBURG, ESQ.

6     The Sherman Building

7     108 Railroad Avenue

8     Orange, VA 22960

9     540.672.4224

10    tlitzenburg@millerfirmllc.com

11

12

13  For the Plaintiffs:

14    BAUM HEDLUND ARISTEI GOLDMAN PC

15    BY: PEDRAM ESFANDIARY, ESQ.

16    12100 Wilshire Boulevard, Suite 950

17    Los Angeles, CA 90025

18    310.207.3233

19    pesfandiary@baumhedlundlaw.com

20

21

22

23

24

25

---

Page 4

1              I N D E X

2

3  EXAMINATION OF WILLIAM H. FLEMING, MD, PHD   PAGE

4  BY MR. LITZENBURG                       6

5  AFTERNOON SESSION                       162

6

7           E X H I B I T S

8

9  FLEMING DEPOSITION EXHIBITS          PAGE

10  20-1    Expert Report of            7

11         William H. Fleming, M.D., Ph.D.

12

13  20-2    ReStem LLC April 16, 2017    61

14         Invoice for NHL Project from

15         January 18, 2017 through

16         April 7, 2017 for Dr. Fleming

17

18  20-3    Supplemental Materials       129

19         Considered List

20

21  20-4    9.11 Monitoring and Treatment   177

22         Minimum Latency & Types or

23         Categories of Cancer by Howard

24

25

---

Page 3

1  APPEARANCES:  (Continued)

2

3  For the Plaintiffs:

4     WEITZ & LUXENBERG PC

5     BY: MAJA LUKIC, ESQ. (VIA TELEPHONE)

6     700 Broadway

7     New York, NY 10003

8     212.558.5991

9     mlukic@weitzlux.com

10

11

12  For the Defendant MONSANTO:

13    HOLLINGSWORTH LLP

14    BY: ROBERT E. JOHNSTON, ESQ.

15    BY: ERICA T. KLENICKI, ESQ.

16    1350 I Street NW

17    Washington, DC 20005

18    202.898.5800

19    rjohnston@hollingsworth.com

20    eklenicki@hollingsworth.com

21

22

23  Also Present:

24    Michael Gay, Videographer

25

---

Page 5

1         P R O C E E D I N G S

2              - - -

3         THE VIDEOGRAPHER:  We are on the

4  record.  The time now is 9:14.

5         This marks the beginning of Disk

6  No. 1 for the videotaped deposition

7  testimony of Dr. William H. Fleming in the

8  matter of In re: Roundup Products

9  Liability Litigation.  This case is

10  pending in the United States District

11  Court for the Northern District of

12  California, Case No. 16-MD-02741-VC.

13         Today's date is September 19,

14  2017.  This deposition is being conducted

15  at 1350 I Street, Northwest, Washington,

16  DC.

17         Will all attorneys present please

18  identify themselves and who they

19  represent.

20         MR. LITZENBURG:  Timothy

21  Litzenburg for the plaintiffs.

22         MR. ESFANDIARY:  Pedram

23  Esfandiary for the plaintiffs.

24         MR. JOHNSTON:  Robert Johnston

25  for Monsanto.

---

William H. Fleming, M.D., Ph.D.

Page 6

1     MS. KLENICKI: Erica Klenicki for
2  Monsanto.
3     THE VIDEOGRAPHER: Those on the
4  telephone please identify yourself.
5     MS. LUKIC: Maja Lukic from Weitz
6  & Luxenberg for plaintiffs.
7     THE VIDEOGRAPHER: My name is
8  Michael Gay. I'm with Golkow
9  Technologies. Our court reporter today is
10 Denise Vickery, also with Golkow
11 Technologies, and will now swear in our
12 witness.
13        ---
14    WILLIAM H. FLEMING, MD, PH.D.,
15 called for examination, and, after having been
16 duly sworn, was examined and testified as
17 follows:
18     THE VIDEOGRAPHER: You may
19 proceed.
20     EXAMINATION
21 BY MR. LITZENBURG:
22    Q.  Good morning, Dr. Fleming. My name
23 is Tim Litzenburg. We just met off the record,
24 but do you understand I represent several
25 thousand non-Hodgkin lymphoma patients?

Page 7

1    A.  I was not aware of -- of those
2  details, no.
3    Q.  Okay. You understand that I
4  represent the plaintiffs, the people that are
5  suing Monsanto for their injuries?
6    A.  I, you know, again, I'm not, you
7  know, I'm not privy to, you know, a lot of
8  details of the case.
9    Q.  What did you think this was today?
10   A.  This was a deposition to give you an
11 opportunity to discuss my expert report. My
12 expert report in a -- in a sentence was: I was
13 charged with reviewing, you know, the literature
14 and discussing the etiology of non-Hodgkin's
15 lymphoma. And as part of this I was asked to,
16 you know, look at any data which may actually
17 link glyphosate use with NHL.
18   Q.  Okay. That's what I was going to
19 ask you next. I'm going to hand you this.
20 Marking. She'll have to mark it.
21     (Document marked for
22 identification purposes as Fleming Exhibit
23 20-1.)
24 BY MR. LITZENBURG:
25   Q.  I have marked as Exhibit 1 the

Page 8

1  expert report of William Fleming, M.D., Ph.D.
2     Is that the report you're referring
3  to?
4    A.  Yes, it is.
5    Q.  Okay. Now, funny you said that
6  because it was almost exactly what I was going to
7  ask you.
8     Concisely what would you say is the
9  question that you were asked to answer?
10   A.  I was -- I was asked to do three
11 things. I was asked to give what is essentially
12 a lay description of what the immune system was
13 and what lymphoma was and spend some time
14 discussing what is known in the medical
15 literature about the etiology of lymphoma.
16     And I was then asked to, you know,
17 address the question of whether glyphosate was in
18 any way implicated based on the literature
19 available for review.
20   Q.  So were you asked to answer the
21 question of whether Roundup could cause
22 non-Hodgkin lymphoma?
23   A.  I was asked about glyphosate
24 specifically.
25   Q.  You don't know anything about the

Page 9

1  formulated product Roundup?
2    A.  The details of its formulation, no.
3    Q.  Have you looked at any literature or
4  studies involving the actual formulated product
5  that people use rather than the technical
6  glyphosate?
7    A.  No, I have not.
8    Q.  Okay. Do you think that that would
9  be an important thing for a scientist to look at
10 in determining whether the product Roundup could
11 cause cancer? Do you think they should look at
12 the formulated product that people use or the
13 technical salt that goes into it?
14   A.  I think that what you have to do is,
15 you know, look at the most credible scientific
16 data to address that question and the -- I
17 focused on the epidemiology literature. And on
18 my review, there was no epidemiology literature
19 reviewing various formulations of Roundup.
20   Q.  Okay. My question --
21   A.  Or various formulations of
22 glyphosate. I'm sorry.
23   Q.  Right. I'm going to make a
24 representation that none of our clients used
25 technical glyphosate. They all used formulated

William H. Fleming, M.D., Ph.D.

Page 10

1 products which contains a surfactant.
2      Do you understand what a surfactant
3 is?
4      A.   It --
5           MR. JOHNSTON:  Objection.
6    Compound.
7 BY MR. LITZENBURG:
8      Q.   Do you know what a surfactant is?
9      A.   I know what the term "surfactant"
10 means.  I do not have any expertise as it relates
11 to the use of surfactants in chemical compounds.
12      Q.   Okay.
13      A.   I am aware of the medical usage of
14 the term "surfactant."
15      Q.   Do you know what the surfactant
16 makeup is in formulated Roundup products?
17      A.   No, I don't.  You would have to ask,
18 you know, a chemical toxicologist that question.
19      Q.   Do you know -- you don't even know
20 what it's called, the name of the surfactant they
21 use in any of these products?
22           MR. JOHNSTON:  Objection.
23    Misrepresents the record and compounds
24    since there's multiple surfactants in
25    these products.

Page 11

1           THE WITNESS:  I have not delved
2    into the chemical composition of -- of
3    what -- of glyphosate.  No, I have not.
4 BY MR. LITZENBURG:
5      Q.   Do you -- can cancer be
6 multifactorial?
7      A.   I think it's fair to say that in
8 many cases it's been shown to be multifactorial.
9      Q.   Okay.  So, again, we want to take
10 the question of whether -- well, let me ask you
11 this.
12           Do you have an opinion as we sit
13 here today to a reasonable degree of medical
14 certainty whether exposure to Roundup can
15 contribute to lymphoma?
16      A.   The literature I have reviewed has
17 looked at glyphosate exposure and its potential
18 to or its potential relationship to NHL.  None of
19 this literature I'm aware of has -- has ever
20 addressed Roundup as a product.
21      Q.   Okay.  Well, let's -- let's stop for
22 a minute and talk about glyphosate.
23           Do you have an opinion to a
24 reasonable degree of certainty here, Doctor,
25 today whether or not glyphosate can contribute to

Page 12

1 the development of non-Hodgkin lymphoma?
2      A.   I'm not aware of any credible
3 scientific evidence that glyphosate is linked to
4 the development of NHL.
5      Q.   Well, it's a little bit different
6 question.  There's lots of sources, and I'm sure
7 we'll talk about them throughout the day.
8           Do you hold any opinion to a
9 reasonable degree of medical certainty about
10 whether glyphosate can or cannot contribute to
11 the development of lymphoma?
12           MR. JOHNSTON:  Objection.  Asked
13    and answered.
14           THE WITNESS:  Again, I have -- I
15    am not aware of any, you know, critical,
16    you know, credible science that -- that
17    suggests that there's a causative
18    relationship between glyphosate and NHL,
19    no.
20 BY MR. LITZENBURG:
21      Q.   Okay.  Are you aware of any science
22 that says that there's a relationship between
23 glyphosate and non-Hodgkin lymphoma?
24           MR. JOHNSTON:  Objection.  Asked
25    and answered.

Page 13

1           THE WITNESS:  I have -- I have
2    focused on the human epidemiology of this
3    question, and I find no evidence to
4    support that conclusion.
5 BY MR. LITZENBURG:
6      Q.   Are you aware of any what I'll call
7 positive epidemiological studies?
8           MR. JOHNSTON:  Objection.  Vague.
9           THE WITNESS:  It would -- it does
10    depend how -- how one defines "positive."
11 BY MR. LITZENBURG:
12      Q.   Are there any papers that you're
13 aware of that looked at epidemiological studies
14 and reached the conclusion that there was an
15 association?
16      A.   There are --
17           MR. JOHNSTON:  Objection.  Vague.
18    Go ahead.
19           THE WITNESS:  There are case
20    reports or -- pard me -- case-control
21    studies in literature that -- that suggest
22    the possibility of a relationship.
23           However, there is no data that I
24    felt in my scientific opinion, no credible
25    scientific data that -- that demonstrated

William H. Fleming, M.D., Ph.D.

Page 14

1    this.
2  BY MR. LITZENBURG:
3    Q.    Okay.  What papers reached a
4  positive result?
5    A.    Again, given the complexity of
6  trying to sort out all the different potential
7  causative agents in the agricultural business, it
8  was recognized in the late '80s that a large
9  prospective study was going to be the only way to
10 unravel all the details.
11       And, consequently, we have a large
12 prospective cohort study of more than 57,000
13 pesticide applicators, and I weighed this study
14 very heavily in reaching my conclusion.
15       MR. LITZENBURG:  Would you please
16 read that question back to the witness?
17       (The reporter read the record on
18 page 14 lines 2-3.)
19       MR. JOHNSTON:  Objection.  Vague.
20       THE WITNESS:  Again, we would
21 have to look at specific papers, and I
22 would have -- I would have to review the
23 abstracts of the papers to see where that
24 conclusion was made.
25 BY MR. LITZENBURG:

Page 15

1    Q.    How many epidemiological papers did
2  you review in looking at this?
3    A.    I would have to, to give you an
4  exact number, look at my MCL list here, but I
5  suspect it's in the range of five to six
6  case-control studies and one prospective cohort
7  study, but I considered but did not rely on the
8  case-control studies.
9    Q.    Okay.  You relied, I am assuming, on
10 some unpublished manuscripts in reaching your
11 opinion; right?
12    A.    No.
13    Q.    Okay.  So in considering the
14 Agricultural Health Study data, did you rely only
15 on De Roos 2003 or De Roos 2005?
16    A.    De Roos 2005.
17    Q.    Okay.  What about the 2003 paper?
18    A.    Again, it was, you know, not a
19 prospective cohort study.
20    Q.    Okay.  So you haven't looked at the
21 unpublished AHS data?
22    A.    I did not say that.
23    Q.    What did you -- I'm sorry.  I
24 thought you said that a moment ago.
25    A.    No.

Page 16

1    Q.    Okay.  So have you looked at this
2  unpublished AHS manuscript with comments off in
3  the margins that was produced by Dr. Blair?
4    A.    Yes, I did but, again, in answer to
5  your earlier question, I did not rely on this to
6  form my opinion.
7    Q.    Okay.  You relied only on negative
8  studies, is that fair, to formulate?
9       MR. JOHNSTON:  Object.
10 Objection.  Misstates the record and his
11 testimony.
12       THE WITNESS:  I -- this -- this
13 was -- the AHS study is not a negative
14 study.  It is a negative study for
15 glyphosate and NHL.
16 BY MR. LITZENBURG:
17    Q.    Do you know what a meta-analysis is?
18    A.    Yes.
19    Q.    What is a meta-analysis,
20 Dr. Fleming?
21    A.    A meta-analysis is a statistical
22 technique that epidemiologists will use to look
23 at data from a great many studies and -- and
24 combine them in order to see how the power of the
25 extra individuals, you know, influences the

Page 17

1  outcome.
2       This is something I have no
3  expertise in.  I'm not an epidemiologist.
4    Q.    What are you an expert in,
5  Dr. Fleming?
6    A.    I'm an expert in medical oncology,
7  particularly lymphoma.  I've specialized in
8  hematologic malignancies and have treated
9  patients with NHL and its subtypes now for more
10 than 25 years.
11    Q.    What of a -- as a medical
12 oncologist, what makes you uniquely qualified to
13 comment on the causality of this chemical in
14 non-Hodgkin lymphoma?
15    A.    Uniquely qualified?
16       MR. JOHNSTON:  Yeah.  Objection.
17 Misstates the legal standard.
18 BY MR. LITZENBURG:
19    Q.    Do you think there's anything that
20 makes you uniquely qualified among medical
21 oncologists to look at this question?
22       MR. JOHNSTON:  Objection.
23 Misstates the legal standard.  Calls for
24 speculation and a hypothetical.
25       THE WITNESS:  I -- I do not

William H. Fleming, M.D., Ph.D.

Page 18

1    believe I'm uniquely qualified, no.
2  BY MR. LITZENBURG:
3      Q.    Okay.  You're a pediatrician, aren't
4  you?
5      A.    No.
6      Q.    You're not?
7      A.    No.
8      Q.    Are you boarded in pediatrics?
9      A.    No.
10     Q.    Okay.
11     A.    I am boarded initially in internal
12 medicine and subsequently have maintained my
13 subspecialty accreditation in medical oncology
14 with the American Board of Internal Medicine, as
15 is indicated on my CV.
16     Q.    Are you a professor of pediatrics?
17     A.    Yes.
18     Q.    Okay.  But you do not consider
19 yourself a pediatrician?
20     A.    No.
21     Q.    Okay.  Have you let Oregon Health
22 State University -- I'm probably saying that
23 wrong.
24         What do you call it?
25     A.    OHSU.

Page 19

1      Q.    OHSU.  Have you let OHSU know that
2  you're not a pediatrician?
3      A.    They've appointed me as a professor
4  in three different departments and are well aware
5  of my qualifications.
6      Q.    Okay.  Do you train pediatricians?
7      A.    No.  Well, there are pediatric
8  trainees in hematology and oncology who come and
9  do research in my lab.
10         So in that context of laboratory
11 medicine, yes.  In the context of clinical
12 pediatrics, no.
13     Q.    Okay.  Do you treat patients?
14     A.    Yes.
15     Q.    How often?  How many days a week?
16     A.    One day a week now for the last, you
17 know, since 1993.
18     Q.    '93 did you say?
19     A.    Uh-huh.
20     Q.    So for the last 24 years, what has
21 the other 8 percent of your time been done?
22     A.    A combination of research and
23 administration and teaching.
24     Q.    Okay.  In the last year, what has
25 been the proportion of your patients that were

Page 20

1  pediatric patients versus adults?
2      A.    Oh, that's easy.  Zero pediatric
3  patients.  100 percent adults.
4      Q.    Okay.  You, again, are in the
5  department of medicine and pediatrics; is that
6  right?
7      A.    Correct.
8          I'd be happy to expand if you like.
9      Q.    But you don't treat any juvenile
10 patients?
11     A.    There are patients on the border in
12 their late teens that can go either way.  So I
13 have absolutely treated 17-year-olds who wanted
14 to be treated on an adult oncology service and,
15 yes.  So I've, you know, there's -- there's that
16 gray area, but patients below that age are
17 exclusively treated by the pediatricians.
18     Q.    When is the last time you treated a
19 patient that was younger than 17?
20         MR. JOHNSTON:  Objection.  Vague.
21         THE WITNESS:  Younger than 17?  A
22     very long time ago.
23 BY MR. LITZENBURG:
24     Q.    Okay.  How many 17-year-old patients
25 have you had in the last year?

Page 21

1      A.    None.
2      Q.    None?
3          When is the last time you treated a
4  17-year-old?
5      A.    I can't put a time and date on it.
6  It would have been on the bone marrow transplant
7  leukemia service sometime probably 2010, 2012.
8  It's been a while.
9      Q.    Since 2012, for the last five years,
10 you have not had a single patient under the age
11 of 18?
12     A.    Correct.
13     Q.    Okay.  Do you know why I asked you
14 if you were a pediatrician?
15     A.    Well, I'm a professor of pediatrics,
16 professor of medicine, professor of immunology
17 and microbiology, and I have -- also have an
18 appointment in -- in cellular and molecular
19 biology.
20     Q.    Okay.
21     A.    So all of these are on my CV.
22     Q.    Okay.  You teach in the department
23 of medicine and pediatrics; correct?
24     A.    I -- I teach medical students and I
25 teach postgrad or postgraduate trainees.  They

William H. Fleming, M.D., Ph.D.

Page 22

1  see patients with me in clinic.
2      Q.   So you are within the department of
3  medicine and pediatrics, are you not?
4      A.   Yes.
5      Q.   Okay.  Is there an oncology
6  department at OHSU?
7      A.   It's the Knight Cancer Center runs
8  an oncology program that is technically within
9  the department of medicine, but it's also
10  administered by the Knight Cancer Institute.
11      Q.   There's no department of medical
12  oncology at OHSU?
13      A.   There's about 70 physicians who
14  practice medical oncology in what was originally
15  called the division of hematology and medical
16  oncology, which was part of the department of
17  medicine.
18          The development of the Knight Cancer
19  Center over the past several years has changed
20  the administrative structure of this somewhat.
21  So that they are responsible for many of the
22  faculty activities, while the department of
23  medicine is responsible for promotion.
24      Q.   Okay.  Are there -- among those 70
25  physicians, are there some that don't teach

Page 23

1  pediatrics?
2      A.   We have joint conferences.
3  Hematology -- heme malignancies, which I have
4  expertise in, has a lot of similarity to
5  pediatric hematology because of the frequency of
6  leukemia in both age groups.
7          So we often have joint conferences
8  for specific topics.  Joint conferences for
9  visiting professors because it's interesting to
10  pediatricians who treat ALL and adults who treat
11  ALL, for instance, is, you know, very similar.
12          This is not true of the rest of
13  medical oncology where there are adult tumors
14  that do not occur in pediatrics, such as colon
15  cancer, and there are many pediatric tumors that
16  do not -- that do not occur in adults.
17      Q.   What are some of the pediatric
18  tumors that don't occur in adults?
19      A.   Rhabdomyosarcoma.  Ewing sarcoma.
20  They're very -- I shouldn't say never, but
21  they're very unusual to see them -- to see them
22  in adults.  Retinal blastoma.
23      Q.   Okay.  So did you -- of those three
24  cancers that you just mentioned, did you need to
25  look at any of them today -- I'm sorry -- before

Page 24

1  today for the purposes of this lawsuit in your
2  expert role?
3          MR. JOHNSTON:  Objection.  Vague.
4          THE WITNESS:  I'm sorry.  I don't
5      follow your question.
6  BY MR. LITZENBURG:
7      Q.   You just named three types of
8  malignancies?
9      A.   Uh-huh.
10      Q.   Okay.  Okay.  Of those three, did
11  you look at any of those malignancies, study any
12  of them in preparation for your deposition today
13  or to answer the question that you were supposed
14  to answer?
15      A.   No.
16      Q.   Okay.  I'll ask you the same
17  question two questions ago.
18          Are there medical oncologists at
19  your university who do not teach pediatrics?
20          MR. JOHNSTON:  Objection.  Asked
21  and answered by counsel's own admission.
22          THE WITNESS:  There would be
23  medical oncologists who do not train or
24  interact with pediatric trainees in their
25  adult clinic but, again, many people have

Page 25

1  laboratory studies.
2          Many people have protocols that
3  cross between adults and pediatrics and,
4  in fact, we have a number of trainees who
5  are jointly trained.
6          There's a joint program where you
7  can come out board certified in internal
8  medicine and pediatrics, and we have
9  several such individuals.
10          MR. LITZENBURG:  Could you read
11  the question back?
12          (The reporter read the record on
13  page 24 lines 18-19.)
14          MR. JOHNSTON:  Wait.  Wait.
15  Wait.  He hasn't asked you a question.  He
16  just had her read the record.
17          MR. LITZENBURG:  Really?
18          MR. JOHNSTON:  If that's the
19  question, it's asked and answered twice.
20          MR. LITZENBURG:  Let's see.
21          MR. JOHNSTON:  If you read his
22  answer, it answers the question.
23  BY MR. LITZENBURG:
24      Q.   Are there any medical oncologists
25  associated with your university who do not teach

William H. Fleming, M.D., Ph.D.

Page 26

1 in pediatrics, would not be called a professor of
2 pediatrics?
3          MR. JOHNSTON:  Objection.
4 Misstates his title and is asked and
5 answered.
6          THE WITNESS:  I -- I do not
7 understand the substance of your question
8 and can't answer it.
9 BY MR. LITZENBURG:
10    Q.    You do not know if there are
11 oncologists at your university that are not
12 professors of pediatrics?
13          MR. JOHNSTON:  Objection.
14 Misstates the record and his testimony.
15 Misstates his -- his resume¿½ and vague.
16          THE WITNESS:  Again, I am not
17 able to answer your question the way
18 you've posed it.
19 BY MR. LITZENBURG:
20    Q.    Okay.  Okay.  Again, going back
21 to -- I think the question of the day is:  Do you
22 hold an opinion about whether or not glyphosate
23 can cause non-Hodgkin lymphoma?
24          MR. JOHNSTON:  Objection.  Vague.
25 Asked and answered.

Page 27

1          THE WITNESS:  Based on my review
2 of the medical literature and -- I have
3 found no credible evidence that links
4 glyphosate to the development of NHL in
5 humans.
6 BY MR. LITZENBURG:
7    Q.    Would you allow -- if one of your
8 lymphoma patients came to you and asked if it was
9 safe to continue using Roundup in his yard, what
10 would you say as the physician?
11          MR. JOHNSTON:  Objection.
12 Incomplete hypothetical.  Assumes facts
13 not in evidence.  I'll go with those two.
14          THE WITNESS:  I would tell him
15 that there is no credible medical evidence
16 linking glyphosate to NHL at this time.
17 BY MR. LITZENBURG:
18    Q.    You know what Category 2A is in the
19 context of IARC?
20    A.    My recollection is, is that it's
21 probably carcinogenic according to IARC, but I
22 would have to check --
23    Q.    Okay.
24    A.    -- their.
25    Q.    What other substances that are

Page 28

1 probably carcinogenic according to IARC would you
2 encourage your lymphoma patients to continue
3 using in such a way, sir?
4          MR. JOHNSTON:  Objection.
5 Misstates his testimony.  Misstates the
6 record.  Beyond the scope of his opinion
7 and not relevant to this case.
8          THE WITNESS:  I do not advise my
9 patients based on IARC's assessment of
10 carcinogens specifically.
11 BY MR. LITZENBURG:
12    Q.    Okay.  Have you -- of the portion of
13 papers that you've done, how many of them have
14 been on the subject of pediatric treatment or
15 etiology, anything having to do with juveniles?
16          MR. JOHNSTON:  Objection.  Vague
17 as to "have done."
18          Do you mean that he's written?
19 Or he's an author on?
20 BY MR. LITZENBURG:
21    Q.    You have your publication list right
22 there.
23          MR. JOHNSTON:  So you're
24 withdrawing the question?
25          THE WITNESS:  Sure.  Could you

Page 29

1 repeat the question?
2 BY MR. LITZENBURG:
3    Q.    Sure.  Starting in these
4 publications -- hang on.  We'll look at that in
5 another 10 minutes at a break.
6          Okay.  Who are the other medical
7 oncologists at OHSU who teach pediatrics?
8          MR. JOHNSTON:  Objection.  Asked
9 and answered.  You want their names?
10          MR. LITZENBURG:  That's generally
11 what "who" means.
12          MR. JOHNSTON:  Objection.
13 Irrelevant.  Beyond the scope of his
14 expert opinion.
15          THE WITNESS:  I agree.  I don't
16 know the answer to that question.
17 BY MR. LITZENBURG:
18    Q.    You cannot name another professor of
19 oncology at OHSU who teaches pediatrics?
20          MR. JOHNSTON:  Objection.
21 Misstates his testimony.  Argumentative.
22          THE WITNESS:  Again, there's a
23 lot of complex activities where adult
24 medical oncologists interact with
25 pediatric trainees.

William H. Fleming, M.D., Ph.D.

Page 30

1    They are not necessarily teaching
2  them pediatrics.  They are teaching them
3  cancer biology.  They are teaching them
4  cancer epidemiology, if that's their area
5  of interest, but they are not, you know,
6  teaching them how to take care of specific
7  diseases in specific pediatric patients.
8  BY MR. LITZENBURG:
9    Q.    Would you be comfortable with the
10 American Board of -- you understand the American
11 Board of Internal Medicine has guidelines on
12 expert testimony?
13   A.    I'm not aware of those guidelines.
14   Q.    So you didn't look into what
15 guidelines there might control you professionally
16 before doing this?
17        MR. JOHNSTON:  Objection.
18   Assumes facts not in the record that
19   anything controls him professionally.
20        THE WITNESS:  Right.  I believe
21   I'm free to give my expert testimony or
22   opinion as I see fit.
23 BY MR. LITZENBURG:
24   Q.    Would you be comfortable with the
25 American Board of Internal Medicine reading this

Page 31

1  expert report that you've drafted for Monsanto?
2    A.    I would have no problem with anybody
3  reading this report.
4    Q.    Has your -- has anyone in your
5  department read it?
6        MR. JOHNSTON:  Objection,
7    counsel.  You know this is for litigation.
8    It's not something he passes around to his
9    department.
10        THE WITNESS:  I --
11        MR. JOHNSTON:  You're harassing
12   the witness.
13        THE WITNESS:  I have -- I have no
14   reason to get -- to distribute this to my
15   colleagues, no.
16 BY MR. LITZENBURG:
17   Q.    Okay.  Why as a clinician would the
18 etiology of non-Hodgkin lymphoma interest you?
19   A.    Because it comes up virtually every
20 day in clinic.
21   Q.    Okay.  Are you interested in
22 modifiable things -- exposures more so than
23 unmodifiable?
24        MR. JOHNSTON:  Objection.  Vague
25   and compound.

Page 32

1  BY MR. LITZENBURG:
2    Q.    In what context does it come up
3  every day in clinic?
4    A.    Gee, doc, why do I have this
5  lymphoma?
6    Q.    Uh-huh.  Do you --
7    A.    Gee, doc, why are my, you know, what
8  is the relative risk of my brother and sister
9  getting this?  My aging grandmother getting this?
10 My children getting this?
11   Q.    Do you ever answer those questions?
12   A.    I answer them all the time.
13   Q.    Okay.  When is the last time you
14 told a patient what you believe caused his
15 non-Hodgkin lymphoma?
16   A.    I -- I can't put an exact time and
17 date on it, but it would almost certainly be a
18 patient in the context of prior immunosuppression
19 for either a rheumatologic disease or organ
20 transplant because those are -- those are the
21 most common.
22   Q.    And so in that context, you would
23 tell him that his previous immunosuppression
24 therapy you believe contributed to the lymphoma?
25   A.    It would not usually be previous.

Page 33

1  It would usually be ongoing.
2        When you remove immunosuppression,
3  typically immunosuppression-driven lymphomas
4  disappear.
5    Q.    Okay.  Is there anything else that
6  causes lymphoma other than immunosuppression?
7    A.    Sure.  Patients who have Hodgkin's
8  disease have a significantly higher risk of
9  developing non-Hodgkin's lymphoma five to 10
10 years later.
11   Q.    Okay.  So --
12   A.    Whether this is due to the
13 chemotherapy that they've been given in the
14 context of their Hodgkin's disease or the
15 radiation therapy, or a combination of all three,
16 is not known.
17   Q.    Hodgkin disease, immunosuppression.
18        Anything else that you're aware of
19 that causes non-Hodgkin lymphoma?
20   A.    A number of different viral
21 infections can predispose to it.
22   Q.    Okay.
23   A.    They come in two different general
24 subtypes.  One where you actually have the virus
25 driving the lymphoma, such as reactivation of

Page 34

1 Epstein-Barr virus, or, two, HIV which actually
2 acts an immunosuppressant.  It doesn't cause the
3 lymphoma cells to proliferate and give rise to
4 lymphoma.  It suppresses the immune system.
5      Again, if you suppress the immune
6 system with HIV, when you treat that successfully
7 with the, you know, great therapies we have
8 today, then these lymphomas tend to regress or
9 not -- not occur.
10     Q.    Other than diseases, malignancies,
11 and medical treatments, are you aware of anything
12 that can cause non-Hodgkin lymphoma?
13          MR. JOHNSTON:  Objection.  Vague.
14          THE WITNESS:  There is emerging
15     evidence from the American Health Study
16     that's recently published that implicates
17     certain insecticides in this regard.
18 BY MR. LITZENBURG:
19     Q.    Okay.  So are there some
20 insecticides that you would advise a patient to
21 stop using if they asked?
22          MR. JOHNSTON:  Objection.
23     Assumes facts not in the record.
24          THE WITNESS:  Right.  I --
25          MR. JOHNSTON:  And a

Page 35

1     hypothetical.
2          THE WITNESS:  I agree.  I would
3     need a more detailed or a more focused
4     question to answer it meaningfully.
5 BY MR. LITZENBURG:
6     Q.    How many meta-analyses have been
7 published on the topic with which you have
8 concerned yourself in this litigation?
9     A.    In the issue of glyphosate and NHL?
10    Q.    Uh-huh.
11    A.    Yeah.  I did not rely on these
12 meta-analyses to -- to come to my conclusion, my
13 expert opinion.
14          What I did with them is what I did
15 with every review article and the IARC report
16 itself is that I used them to be sure I wasn't
17 missing any peer-reviewed published primary data
18 that would influence my opinion.
19    Q.    Doctor, how many meta-analyses have
20 been published on this topic?
21    A.    I can't give you an exact number.
22    Q.    Can you name a single one?
23    A.    I did not rely on meta-analyses for
24 my opinion.
25    Q.    Dr. Fleming, you're here today to

Page 36

1 testify on whether a chemical can cause
2 non-Hodgkin lymphoma, and you can't name a single
3 published meta-analysis on the topic?
4          MR. JOHNSTON:  Objection.
5     Argumentative.
6          Counsel laughed when he asked the
7     question let the record reflect.
8          THE WITNESS:  Meta-analysis,
9     while of some use in the epidemiology,
10    field is not something I would rely on
11    when I have a prospective cohort study.
12 BY MR. LITZENBURG:
13    Q.    Is that a no?
14          MR. JOHNSTON:  Again, let the
15    record reflect that counsel laughed.
16 BY MR. LITZENBURG:
17    Q.    Is that answer a no?
18    A.    I do not rely on meta-analysis of
19 retrospective studies when I have a robust
20 prospective cohort study.
21    Q.    Okay.  What other papers did you
22 ignore?
23          MR. JOHNSTON:  Objection.
24    Argumentative.  Misstates the record.
25          THE WITNESS:  I considered the

Page 37

1     papers on my Materials Considered List.
2          You would have to provide me with
3     examples that weren't on there and ask me
4     specifically why I did not look at it.
5 BY MR. LITZENBURG:
6     Q.    Can you name a single positive
7 paper?
8     A.    Positive in what respect?
9          MR. JOHNSTON:  Yeah.  Objection.
10    Vague.
11 BY MR. LITZENBURG:
12    Q.    It reached a statistically
13 significant result for the association of
14 glyphosate and non-Hodgkin lymphoma?
15          MR. JOHNSTON:  Objection.  Vague.
16          THE WITNESS:  I do not recall a
17    case-control study examining glyphosate
18    and NHL that showed a statistically
19    significant increased odds ratio after
20    adjustment for other pesticides.
21 BY MR. LITZENBURG:
22    Q.    So how many do exactly that, what
23 you just said?  How many studies do that?
24    A.    They -- it's challenging to do that
25 because you have to have a lot of patients

William H. Fleming, M.D., Ph.D.

1  enrolled in the study.  Again, this is why you
2  need a prospective cohort study.
3      Q.   Dr. Fleming, how many studies meet
4  the criteria that you just set forth?
5      A.   The Agricultural Health Study does.
6      Q.   Okay.  And what -- that's a
7  case-control study?
8      A.   No.  No.  I don't -- there isn't a
9  case-control study that I have had the
10 opportunity to review that I know of that shows a
11 statistically significant increase in odds ratio
12 after confounding factors have been taken into
13 account.
14     Q.    Are you aware of any case-control
15 studies examining glyphosate and NHL that adjust
16 for other pesticides?
17         MR. JOHNSTON:  To the extent you
18     recall.
19         THE WITNESS:  Not to the extent I
20     recall.  I'd have to review the specific
21     data you're talking about.
22 BY MR. LITZENBURG:
23     Q.   Dr. Fleming, what are you here to
24 tell us today?
25         MR. JOHNSTON:  Objection.

1      Argumentative.
2          He's here because you
3      subpoenaed -- you served a notice of
4      deposition on him.  He's not here to tell
5      you anything.
6  BY MR. LITZENBURG:
7      Q.    You can't name a single
8  meta-analysis on this topic, you can't name a
9  single positive paper on this topic, and you
10 can't name a single study that meets the criteria
11 that you just set forth?
12         MR. JOHNSTON:  Objection.
13     Misstates the record.  Argumentative.
14         THE WITNESS:  The AHS study does
15     correct for pesticide exposure.
16 BY MR. LITZENBURG:
17     Q.   Okay.  And where was the AHS study
18 published?  Any published results of that?
19     A.   The -- there are several published
20 results.  The first one is De Roos 2005.
21     Q.   Okay.  And that was a case-control
22 study?
23     A.   No.  This was cohort study.
24     Q.   Okay.  Let's see if we can get an
25 answer to that last question.

1          MR. JOHNSTON:  Go with a compound
2      question.
3  BY MR. LITZENBURG:
4      Q.    You said that in order to answer
5  this question, is that correct, that you would
6  have to look at a case-control study?
7          MR. JOHNSTON:  Yeah.  I think
8      you're asking your -- what you said.
9  BY MR. LITZENBURG:
10     Q.   In order to answer the question, are
11 you telling us you would need a case-control
12 study examining glyphosate and NHL that adjusted
13 for other pesticides?
14         MR. JOHNSTON:  Objection.  Vague.
15     What question?
16         THE WITNESS:  Again, I'm not sure
17     what your question is.
18 BY MR. LITZENBURG:
19     Q.   What was -- what was -- when you
20 gave me that -- that description, what were you
21 talking about, Doc?
22         MR. JOHNSTON:  Objection.
23     Improper.  Argumentative.
24 BY MR. LITZENBURG:
25     Q.   A case --

1          MR. JOHNSTON:  You're asking
2      questions.  He's giving answers, counsel.
3      So ask him a question and then he'll give
4      you an answer.
5  BY MR. LITZENBURG:
6      Q.   A case-control study examining
7  glyphosate and NHL with adjustment for other
8  pesticides.
9      A.   Right.  I did not --
10     Q.   When you --
11     A.   I did not see that, and the reason I
12 -- and this -- this is conjecture is the reason
13 is that most of these case-control studies did
14 not have an adequate number of patients to
15 adequately control for all the additional
16 exposures.
17     Q.   So you looked at zero studies --
18     A.   I looked --
19     Q.   -- that could answer this question
20 to your satisfaction?
21     A.   I looked at every study that's on my
22 MCL.
23     Q.   Okay.  What --
24     A.   And I considered every study on MCL,
25 and the only human epidemiology study I placed

William H. Fleming, M.D., Ph.D.

Page 42

1  any weight on was the AHS study.
2      Q.   It was not a case-control study?
3      A.   No.
4      Q.   Okay.
5      A.   It was a cohort study.
6      Q.   Okay.  So what was all that about
7  how you needed a case-control study to answer the
8  question?
9          MR. JOHNSTON:  Objection.  He
10  didn't say that.  You said that, counsel.
11  Objection.  Misstates the record.
12          THE WITNESS:  If you showed me a
13      case-control study that could address this
14      issue of confounding variables,
15      specifically the use of other pesticides,
16      it could theoretically, you know, be
17      important, but none of these studies
18      adjusted for that.
19  BY MR. LITZENBURG:
20      Q.   And none has been done to date to
21  your knowledge; right?
22      A.   Correct.
23          MR. JOHNSTON:  Objection.  Vague.
24  BY MR. LITZENBURG:
25      Q.   Okay.  So is it more fair to say

Page 43

1  that you don't know whether or not non-Hodgkin
2  lymphoma can be caused by glyphosate or is it
3  more -- or is your opinion actually that it
4  cannot cause non-Hodgkin lymphoma?
5          MR. JOHNSTON:  Objection.
6      Misstates the legal standard.  Asked and
7      answered.
8          THE WITNESS:  My opinion is it is
9      not known.
10  BY MR. LITZENBURG:
11      Q.   Okay.  And so have you looked at any
12  case specific -- are you going to be a
13  case-specific expert in this litigation?
14          MR. JOHNSTON:  Objection.  You
15      have his expert report, counsel.  He has
16      no case-specific opinions.
17          THE WITNESS:  I have not been
18      asked to do any future work in a
19      case-specific matter.
20  BY MR. LITZENBURG:
21      Q.   Have you looked at anybody's medical
22  records in the context of this glyphosate/Roundup
23  litigation?
24      A.   Oh, okay.  Sure.  I understand the
25  question.

Page 44

1          MR. JOHNSTON:  Wait a minute.
2  Hold on.  Hold on.  I need to take a break
3  before he can answer that question.
4          MR. ESFANDIARY:  Not when a
5  question is pending.
6          MR. JOHNSTON:  Well, then I
7  instruct him not to answer the question.
8          MR. ESFANDIARY:  On what grounds,
9  counsel?
10          MR. JOHNSTON:  On the grounds
11  that you here are noticed under the
12  federal system -- federal case.  He did
13  not offer a case-specific case in any
14  federal cases.
15          MR. LITZENBURG:  We're not asking
16  about what his opinion is.
17          MR. JOHNSTON:  You can't ask him
18  whatever you want.
19          MR. ESFANDIARY:  Yeah, we can.
20          MR. LITZENBURG:  I'm not asking
21  him about his opinion in his report.
22          MR. JOHNSTON:  This line of
23  questioning is improper.
24          MR. LITZENBURG:  I can't ask him
25  about other expert reports?

Page 45

1          MR. JOHNSTON:  You know what the
2  answer is.  You know what -- that he
3  provided a declaration in Dee Johnson.
4          MR. LITZENBURG:  I can't ask him
5  about other expert work, Bob?
6          MR. JOHNSTON:  What?  In this
7  case?
8          MR. LITZENBURG:  That he has
9  done.
10          MR. JOHNSTON:  Anywhere?  An
11  expert opinion anywhere on anything?
12          MR. LITZENBURG:  Yeah.  Do you
13  know if there's federal rules about
14  disclosing expert work?  What do you think
15  is the --
16          MR. JOHNSTON:  Sorry.  That
17  wasn't your question.  Your question was
18  specific to this case.  If you want to ask
19  him if he's ever asked -- offered a
20  case-specific opinion ever in any case,
21  I'll let him answer that question.
22  BY MR. LITZENBURG:
23      Q.   Have you been retained to perform
24  expert work on specific patients in the context
25  of this glyphosate litigation?

William H. Fleming, M.D., Ph.D.

Page 46

1     A.    I have been asked to review one very
2  specific question in one case.
3     Q.    Okay.  And did you look at whether
4  glyphosate could contribute to his non-Hodgkin
5  lymphoma?
6           MR. JOHNSTON:  I'm going to
7     object to this, counsel.  The question
8     that he provided a declaration on you know
9     has been resolved.  You guys have agreed
10    on a trial schedule.
11          You know that that was not a
12    causation issue.  It was a question of
13    life expectancy for someone with NHL.
14    These are improper questions in this
15    deposition.
16          MR. LITZENBURG:  Bob, I think
17    you've said more words on the record today
18    than Dr. Fleming has.
19  BY MR. LITZENBURG:
20    Q.    With that preamble from your
21  counsel, do you want to answer the question --
22          MR. JOHNSTON:  And I'm objecting
23    to this question.
24  BY MR. LITZENBURG:
25    Q.    -- of whether or not you've looked

Page 47

1  at a patient's records with an eye towards
2  whether glyphosate contributed to his non-Hodgkin
3  lymphoma?
4           MR. JOHNSTON:  Go ahead.
5           THE WITNESS:  I have looked at a
6     single patient's record in one context
7     only, and that was to provide my
8     professional opinion on whether this
9     individual was expected to live less than
10    six months.
11  BY MR. LITZENBURG:
12    Q.    Was --
13    A.    That was the focus of it.  The --
14  any other aspect of it was beyond the scope of
15  the evaluation I was asked to perform.
16    Q.    Was he a pediatric patient?
17    A.    No.  He was 40 -- 47 years old,
18  approximately.
19    Q.    Okay.  Here's the question I'm
20  interested in.
21          Would there be anything within a
22  person's medical records or medical history that
23  could lead you to conclude that glyphosate
24  contributed to their non-Hodgkin lymphoma?
25    A.    Would there ever?  Absolutely no.

Page 48

1           MR. JOHNSTON:  Objection.  Vague.
2     Hypothetical.
3  BY MR. LITZENBURG:
4     Q.    Okay.
5     A.    No.
6     Q.    So in order for you to determine
7  whether glyphosate contributed to a person's
8  non-Hodgkin lymphoma or not, you don't need to
9  look at any of their medical records; is that --
10  is that true?
11          MR. JOHNSTON:  Objection,
12    counsel.  You're confusing the issue of
13    general causation and specific causation.
14          He is here on general causation.
15    That's what his report is about in this
16    litigation.  I object to these questions
17    as outside the scope of his report.
18  BY MR. LITZENBURG:
19    Q.    He didn't tell you not to answer.
20  He just gave you a long-winded way to answer, but
21  I'll ask the question again.
22          In order for you to determine
23  whether glyphosate contributed to a specific
24  person's lymphoma, you wouldn't need to look at
25  their medical records at all, would you?

Page 49

1           MR. JOHNSTON:  You'd have to have
2     evidence that it causes it first, counsel.
3     You haven't -- that's what he's here to
4     talk about.
5           MR. LITZENBURG:  Bob, you just
6     literally answered the question.  There's
7     no objection.  You literally answered the
8     question with a statement.
9           MR. JOHNSTON:  I'm objecting that
10    this is an abusive question.  You know the
11    scope of his report.  The scope of his
12    report is general causation.  He says
13    there's no evidence of general causation.
14          So you're asking a question that
15    is beyond the scope of this report.
16  BY MR. LITZENBURG:
17    Q.    Dr. Fleming, is there anything that
18  you could know about a patient that can cause
19  you -- cause you to conclude that glyphosate
20  exposure contributed to their non-Hodgkin
21  lymphoma?
22          MR. JOHNSTON:  Objection.  Calls
23    for speculation.  Hypothetical.
24          THE WITNESS:  I am not aware of
25    any credible scientific evidence that

William H. Fleming, M.D., Ph.D.

1     links glyphosate exposure to the
2     development of NHL --
3  BY MR. LITZENBURG:
4     Q.   So --
5     A.   -- in a general sense.
6     Q.   So if you're answering that question
7  for any specific patient, you don't need to look
8  at anything, their medical record, their medical
9  history, their exposure history?
10         MR. JOHNSTON: Objection.
11  Hypothetical. Vague. Speculation. Go
12  ahead.
13         THE WITNESS: I would agree. If
14  I -- if I were to offer a specific
15  causation opinion, which I have not ever
16  offered for glyphosate and NHL, I would
17  want to look at all the potential records
18  I could.
19  BY MR. LITZENBURG:
20     Q.   And so if -- no, I'm asking.
21     You understand that the plaintiffs
22  in this litigation are not looking at other
23  chemicals, right, or other products?
24         MR. JOHNSTON: Objection. Vague.
25         THE WITNESS: I -- I'm not -- I'm

1     not aware of the scope of this litigation.
2  BY MR. LITZENBURG:
3     Q.   Okay. So backing up.
4     You said that you don't know whether
5  glyphosate can cause non-Hodgkin lymphoma; is
6  that correct?
7     A.   I said it is not known.
8     Q.   Okay.
9     A.   Meaning there is no credible
10  scientific evidence supporting a relationship.
11     Q.   It is not known?
12     A.   What --
13         MR. JOHNSTON: Hold on.
14  Objection. Vague.
15     Is that a question or a
16  statement?
17  BY MR. LITZENBURG:
18     Q.   Well, complete that sentence. It is
19  not known --
20         MR. JOHNSTON: He just --
21  BY MR. LITZENBURG:
22     Q.   -- that what?
23         MR. JOHNSTON: Objection. Asked
24  and answered. You can read it. It's on
25  the screen. Go ahead.

1         THE WITNESS: Please repeat the
2  whole question.
3  BY MR. LITZENBURG:
4     Q.   Are you able to answer the question
5  of whether or not glyphosate can contribute to
6  non-Hodgkin lymphoma?
7         MR. JOHNSTON: Objection. Asked
8  and answered repeatedly.
9         THE WITNESS: I am not aware of
10  any credible scientific evidence that
11  links glyphosate exposure to the
12  development of NHL.
13  BY MR. LITZENBURG:
14     Q.   And until you become aware of such
15  credible evidence, you would continue to advise
16  pediatric patients, for example, with lymphoma to
17  continue to use glyphosate?
18     A.   I do not advise pediatric patients
19  in any capacity.
20     Q.   How about adult patients?
21     A.   I would not advise adult patients
22  one way or another about glyphosate.
23     Q.   Would you present this expert report
24  to your department at the university?
25     A.   Happily.

1         MR. JOHNSTON: Objection. Asked
2  and answered.
3  BY MR. LITZENBURG:
4     Q.   Okay. All right. Who told you --
5  how did you come up with this method of the two
6  maps and the overlays?
7     A.   I reviewed the medical literature,
8  recognized that the AHS study was the gold
9  standard of a prospective cohort study that could
10  adjust for these pesticides, and it did not show
11  any increase in relative risk for individuals
12  exposed to glyphosate.
13     So at this point, to think about
14  this issue further after having reached that
15  scientific conclusion based on that data, I
16  decided could there be other data sets out there,
17  perhaps not necessarily linked together to
18  address this question, that I could query to find
19  out if there were, what would, you know, the
20  expected associations you would see if there was
21  some linkage.
22     So the answer to that question was
23  yes, and I was able to take the NCI data at the
24  county level for the incidence of non-Hodgkin's
25  lymphoma and, again, this is a robust data set.

William H. Fleming, M.D., Ph.D.

Page 54

1    It just allows you basically to --
2 to bring up that one graph -- all the
3 calculations have been done for you -- and
4 basically compare that to the US Geological
5 Services' map of glyphosate usage in the United
6 States.
7    And if there were to be some
8 potential linkage, one would expect that high
9 levels of glyphosate would correspond to a high
10 incidence of NHL nationwide.
11    Q.   How much time did you spend reading
12 scientific papers in this case?
13    A.   Which case?  The entire?  You mean
14 -- you mean on the entire case?  It's -- it's
15 hard to quantify that.
16    Q.   You don't know?
17    A.   Some papers I looked at, you know,
18 very quickly.  Read the abstract, read the title,
19 decided in my expert opinion it was not worth
20 pursuing further.  There were others I read in
21 more detail, and there were others I read several
22 times.
23    Q.   Dr. Fleming --
24    A.   It just -- it all depends.
25    Q.   Yeah.  Other than De Roos 2005, how

Page 55

1 many -- what other papers did you read several
2 times?
3    A.   I looked at the case-control
4 studies.
5    Q.   What were they?
6    A.   They are listed here.  There's about
7 five of them.
8    Q.   Okay.  Can you name one off the top
9 of your head?
10    A.   Sure.  Eriksson '08.
11    Q.   Okay.  And that was a positive
12 study; correct?
13    MR. JOHNSTON:  Objection.  Vague
14 as to "positive."
15    THE WITNESS:  In my view -- in my
16 view, it was a hypothesis-generating study
17 that did not show a statistically
18 significant relationship between
19 glyphosate exposure and NHL when even
20 corrected for the -- the multivaried
21 analysis, which was a short list of
22 variables and did not include all the
23 other potential exposures.
24 BY MR. LITZENBURG:
25    Q.   Your criticism is it considered and

Page 56

1 oversimplified in only considering a few
2 variables?
3    MR. JOHNSTON:  Objection.
4 Misstates his testimony.
5    THE WITNESS:  No.  I am
6 suggesting it doesn't provide
7 statistically significant data indicating
8 a clear relationship between glyphosate
9 and NHL.
10 BY MR. LITZENBURG:
11    Q.   And no study has been performed to
12 date that could -- regardless of what the data
13 generated was -- could provide that data for you
14 to convince you otherwise?
15    A.   Once --
16    MR. JOHNSTON:  Objection.  Vague.
17    THE WITNESS:  The AHS study does
18 a very comprehensive look at all the
19 pesticides in this, you know, important
20 prospective study.
21 BY MR. LITZENBURG:
22    Q.   How much time did you spend looking
23 at the AHS study?
24    A.   Again, I didn't have a particular
25 time run.  I've looked at it on several different

Page 57

1 occasions for different -- different lengths of
2 time.
3    Q.   Okay.  How much time did you spend
4 looking at the AHS study versus the two published
5 meta-analyses?
6    MR. JOHNSTON:  Objection.  Calls
7 for speculation.
8    THE WITNESS:  Again, I decided
9 early on to use meta-analysis as I would
10 any other review article.
11    So I read the title and the
12 abstract and then went immediately to the
13 reference section just to make sure that
14 they did not reference in that manuscript
15 any, you know, any primary data in the
16 literature that I had missed.
17 BY MR. LITZENBURG:
18    Q.   What review articles on this subject
19 were written by Monsanto employees in part?
20    A.   I am -- again, review articles I
21 used simply to look.
22    I didn't -- I did not base my
23 scientific opinion on the opinions provided in
24 any review article, and that would include the
25 IARC monograph and any review articles on this

William H. Fleming, M.D., Ph.D.

Page 58

1 topic. So I did not -- I did not delve into
2 those details.
3     Q.    Would you be comfortable presenting
4 to a professional organization of internal
5 medicine physicians and telling them that in your
6 opinion glyphosate cannot contribute to
7 non-Hodgkin lymphoma?
8         MR. JOHNSTON: Objection.
9     Misstates his testimony and asked and
10     answered. Go ahead.
11         THE WITNESS: I would be
12     comfortable testifying to any professional
13     body that based on the available
14     scientific evidence that there is no
15     credible association between glyphosate
16     and NHL.
17 BY MR. LITZENBURG:
18     Q.    Would you use those two maps?  Would
19 you present those to professional organization
20 physicians?
21     A.    I would -- yes, I'd be very happy to
22 present them, and I'll tell you why.  Because
23 they -- they are illustrative of the point.  So
24 the literature does not support an association.
25         Let's look beyond the literature.

Page 59

1 Let's look at huge data sets we have and let's
2 look at very obvious questions we can answer.
3         So those two maps have to be looked
4 at in context of the additional data on incidence
5 of NHL and, put together, they tell you that as
6 glyphosate usage has increased over time, NHL
7 incidence has plateaued and then fallen off.
8         Interesting but doesn't address
9 local regional differences in the use of
10 glyphosate.  Well, gee, is there any way we can
11 address that?  Just to get an idea, an
12 illustrative example, and the answer is yes.
13         As it turns out US EPA have a map of
14 glyphosate use.  The NCI has a very handy map of
15 county incidence of NHL.
16     Q.    How much time did you spend prior to
17 this week working on this case?
18     A.    Prior to which?  This week?
19     Q.    This week, yeah.
20     A.    On what?  I'm sorry.  Could you
21 complete the question?
22     Q.    The Roundup lymphoma litigation.
23         MR. JOHNSTON: Objection.  Vague.
24         THE WITNESS: I would have to
25     look at my invoices and add them up.

Page 60

1 BY MR. LITZENBURG:
2     Q.    Okay.  How much time have you spent
3 this week on this litigation?
4     A.    This week?
5     Q.    Uh-huh.
6     A.    What time is it now?
7         MR. JOHNSTON: 10:08.
8 BY MR. LITZENBURG:
9     Q.    It's 10 a.m.
10     A.    Reviewing my report, reviewing
11 documents, sitting here today, maybe four hours.
12     Q.    You've been here -- you got here
13 before 6 a.m. today?
14     A.    No.
15     Q.    Okay.  How long have you spent --
16     A.    Yes.  Well, I didn't -- I didn't
17 arrive today.
18     Q.    How long have you spent meeting with
19 the defense lawyers for Monsanto this week?
20     A.    This week.  Again, I can't give you
21 an exact number.  A few hours.
22     Q.    Okay.
23         MR. JOHNSTON: Counsel, we've
24     been going about an hour.  As soon as you
25     get to a convenient point, can we take a

Page 61

1 break?
2         MR. LITZENBURG: Yeah, sure.
3     Give me one or two more minutes and that's
4     a good idea.
5         MR. JOHNSTON: Sure.
6 BY MR. LITZENBURG:
7     Q.    All right.  I'm looking at your
8 invoices.  In fact, I'll give you a copy of
9 that --
10     A.    Sure.
11     Q.    -- as Exhibit 2.
12         (Document marked for
13     identification purposes as Fleming Exhibit
14     20-2.)
15         THE WITNESS: (Reviewing
16     document).
17         MR. JOHNSTON: Do you have a copy
18     for me, counsel?
19         MR. LITZENBURG: Yeah.
20         MR. JOHNSTON: Thank you.
21 BY MR. LITZENBURG:
22     Q.    All right.  We're looking at
23 Exhibit 2.
24         Do you recognize what this is?
25     A.    Yes.

William H. Fleming, M.D., Ph.D.

Page 62

1    Q.    What is it?
2    A.    It is a collection of billings I
3 have submitted for my time working on this
4 question of NHL.
5    Q.    And were you contacted before --
6 there's a retention letter dated January of 2017.
7         Did you have any contact with the
8 lawyers from Hollingsworth prior to 2017?
9    A.    I believe in -- yes.  Yes.  I
10 believe at some date -- I can't tell you when --
11 in relatively late 2016, I was called up and
12 asked what I thought about the -- about providing
13 an expert report on the etiology of lymphoma.
14    Q.    Okay.  When did they contact you?
15    A.    Again, I --
16         MR. JOHNSTON:  Objection.  Asked
17 and answered.
18         THE WITNESS:  I can't give you an
19 exact date.
20 BY MR. LITZENBURG:
21    Q.    Okay.  And you agreed to -- to write
22 a report on whether or not Roundup could cause
23 cancer?
24    A.    I agreed to do several things.
25 Hollingsworth has used me as a resource for

Page 63

1 general information on the biology of lymphoma,
2 the treatment of lymphoma.
3         I've answered a great many of their
4 questions that are, you know, not necessarily
5 directly in this report because they were, you
6 know, I provided general expertise on -- on the,
7 you know, clinical management of -- of NHL.  So I
8 did a great -- a great many things that are
9 reflected here.
10    Q.    Okay.  And when we look at this
11 packet, things that say Johnson versus Monsanto,
12 that was -- that was work on a specific case;
13 right?
14    A.    A specific case addressing a very
15 specific issue.
16    Q.    What -- so, and that's what I'm
17 getting at.
18         None of that time was spent
19 determining whether or not glyphosate is capable
20 of causing non-Hodgkin lymphoma.
21         That was spent looking at prognoses
22 and medical records; is that right?
23    A.    That is correct.
24    Q.    Okay.  So let's set aside anything
25 that says it's for Johnson.  You and I understand

Page 64

1 that that is another case that we have separate
2 from this.
3         Prior to drafting your report on
4 this, once you relied on the medical literature,
5 how much time did you spend reading the medical
6 literature?
7    A.    Again, I did combinations of
8 draft -- where it says "draft report," draft
9 report includes reading the literature and taking
10 notes.  I did not break out that -- those times
11 specifically.
12    Q.    Well, you wrote "literature review"
13 on the first page 3/9/17; right?
14    A.    Uh-huh.
15    Q.    Okay.
16    A.    Yeah.
17    Q.    And that's you put 2.25 hours there;
18 right?
19    A.    Right.
20    Q.    All right.  Between March of 2017
21 and when you began drafting this report say in
22 June 1 of 2017, you'll agree with me that's the
23 first time it says that you were drafting?
24    A.    Well, I see -- I see a
25 teleconference on May 17th.  So that would be

Page 65

1 before.
2    Q.    Were you taking dictation, sir, with
3 that time?
4         MR. JOHNSTON:  Objection.
5 BY MR. LITZENBURG:
6    Q.    Did you take any --
7         MR. JOHNSTON:  Vague.
8 BY MR. LITZENBURG:
9    Q.    -- dictation from the Hollingsworth
10 lawyers?
11         MR. JOHNSTON:  Objection.  Well,
12 first of all, we have an agreement in this
13 case that you're not going to ask about
14 the substance of communications with the
15 counsel.
16         So I'm going to object to that
17 question and instruct him not to answer.
18         MR. ESFANDIARY:  He's not talking
19 about the substance.  He's talking about
20 the contract.
21         MR. JOHNSTON:  Yeah, he is.  He's
22 asking whether he took dictation from
23 counsel is about substance.  So I'm not --
24         MR. LITZENBURG:  No, I'm asking
25 about --

William H. Fleming, M.D., Ph.D.

Page 66

1    MR. JOHNSTON:  He's not going to
2  answer that question.
3    Just like you guys have objected
4  to similar questions in prior depositions
5  so far, particularly the Weisenberger
6  deposition.
7  BY MR. LITZENBURG:
8    Q.   Dr. Fleming --
9    MR. JOHNSTON:  You want to ask a
10  different question?
11  BY MR. LITZENBURG:
12    Q.   -- did you type anything out that
13  Hollingsworth asked you to verbatim?
14    MR. JOHNSTON:  Objection.
15  That's -- look, you know the federal rules
16  prevent you from asking questions about
17  the creation of his expert reports.  That
18  is outside the scope of the rules and the
19  agreement in this case.
20    I'm instructing you not to
21  answer.
22    MR. LITZENBURG:  You're
23  instructing him not to answer --
24    MR. JOHNSTON:  Yes I am.
25    MR. LITZENBURG:  -- about

Page 67

1  anything about the creation of his expert
2  report?
3    MR. JOHNSTON:  Whether -- yes,
4  that's what the federal rules provide.
5    MR. ESFANDIARY:  That's not true.
6    MR. JOHNSTON:  Communication
7  between counsel and the expert about the
8  report is protected under the federal
9  rules.
10    MR. LITZENBURG:  Okay.  Well, I
11  guess we'll mark that for later.
12    Prior to June 1st --
13    MR. JOHNSTON:  That's fine.  If
14  you want to do that, we can go back and
15  re-depose all of the experts who you've
16  instructed not to answer on similar
17  grounds.
18  BY MR. LITZENBURG:
19    Q.   Prior to June 1st of 2017, how many
20  times have you spent reviewing literature?
21    A.   It's difficult to tell because only
22  once in all of these pieces of paper in front of
23  me here can I find -- well, let's see.
24    Only a couple times did I break out
25  literature and document review.  Actually, that

Page 68

1  was on Johnson's.  So strike that.
2    I basically at the end of the day
3  did not specifically put literature review or
4  document review down separately from, you know,
5  working on the report.
6    Q.   But you did?
7    A.   I did, but I did not do it
8  consistently because I learned that it wasn't
9  particularly important to do so.  So I -- I
10  basically changed, you know, I basically changed
11  the heading, if you will, and -- and billed the
12  time.
13    I'm paid for my time whether it's
14  reviewing the literature, having a
15  teleconference, or actually writing a report.
16    Q.   So when did you alter these bills?
17    A.   I have never altered these bills.
18    Q.   You said --
19    A.   I just said --
20    Q.   -- you went back and you changed?
21    A.   No.  I said on March 3rd or -- pard
22  me -- March 9, 2017, I had literature review.  On
23  April 3rd, it says "meeting preparation."
24  Meeting preparation almost certainly involved
25  some aspect of review of the literature I was

Page 69

1  going to discuss when I met at Hollingsworth.
2    I did not break out meeting
3  preparation into literature review, you know,
4  drafting, you know, report or anything else.  I
5  just -- I just gave it that title which --
6    Q.   You didn't do any drafting at all in
7  March or April of this year; right?
8    A.   You know, as soon as I begin the
9  literature review and handwrite some notes,
10  that's in my view beginning the -- that -- in my
11  view that's beginning the -- the draft report.
12    Q.   Why didn't you write that?
13    A.   It just did not seem important.
14    Q.   Dr. Fleming, in the first 10 hours
15  you spent on this case, two of them were spent
16  looking at the medical literature; right?
17    MR. JOHNSTON:  Objection.
18  Misstates his testimony.  Vague.  Asked
19  and answered.
20    THE WITNESS:  The meeting
21  preparation from April 3, 2017 almost
22  certainly contains the component of
23  literature review.
24    I needed to put down the sort of
25  general subject matter for that -- for

William H. Fleming, M.D., Ph.D.

Page 70

1  that time period that -- that I've
2  recorded there, that 1.25 hours, and that
3  -- that is not meant to be a detailed, you
4  know, inclusive statement.  It's a general
5  statement.
6  BY MR. LITZENBURG:
7      Q.    Through June 3rd of 2017, you had
8  billed 57 hours in this case and two of them are
9  reviewing literature; is that correct?
10     A.    That's because I did not
11  specifically, except in a couple of cases,
12  actually break out literature review from the
13  rest of the process.
14     Q.    Dr. Fleming, between March and June
15  3rd -- up through June 3rd, you did not spend
16  more than 2.25 hours out of 57 hours looking at
17  the literature; isn't that correct?  Isn't that
18  what you've written down?
19         MR. JOHNSTON:  Objection.
20  Compound.  Asked and answered.
21         THE WITNESS:  I'd like --
22         MR. JOHNSTON:  Misrepresents the
23  record.
24         THE WITNESS:  I'd like to answer
25  it one more time and say, I did not record

Page 71

1  reviewing the literature other than when
2  it is recorded.
3         However, the activities, such as
4  meeting preparation and draft report,
5  often included literature reviews as part
6  of that.  I was told there is no need to
7  break it down into granular detail.  So I
8  didn't.
9  BY MR. LITZENBURG:
10     Q.    Okay.  There's fair --
11     A.    So there may have been -- there may
12  have been a couple instances where that's what I
13  primarily did for those 2.2 hours, and I did not
14  review any -- any other materials and I did not
15  write too much down and that was purely just
16  perhaps -- you know, I can't speak to the
17  granular nature of that, but I did not mean to
18  exclude anything by the headings I have used in
19  my billing.
20     Q.    Let's look at the June -- that
21  second page, the June 3rd bill.
22         Between 5/5/17 and 5/25/17, all of
23  those entries are meetings with Hollingsworth
24  attorneys; right?
25     A.    (Reviewing document).  Yes.

Page 72

1      Q.    Okay.  So through June 3rd, we're
2  still at 2.25 hours of literature review; right?
3      A.    My billings do not accurately
4  reflect the amount of time I spent reviewing the
5  literature.  I was unaware that there would be
6  any need to do so.
7      Q.    Your billings do not accurately
8  reflect the time you spent?
9      A.    No.
10         MR. JOHNSTON:  Objection.
11  Misstates his testimony.  Go ahead.
12  BY MR. LITZENBURG:
13     Q.    Go ahead.
14     A.    My testimony is that my billings do
15  not accurately reflect each hour of literature
16  review as this was often done in the context of
17  writing the draft report, and there was no reason
18  to separate these out.
19     Q.    Okay.  By the time that you started
20  drafting the report on June 1st of 2017, you had
21  spent some, geez, 60 -- no, 57 hours or so
22  working on this case, two of which were looking
23  at the medical literature; right?
24     A.    That is not correct.
25         MR. JOHNSTON:  Objection.

Page 73

1  Compound.  Asked and answered.
2  Misrepresents the record.
3  BY MR. LITZENBURG:
4      Q.    Okay.  Name me again a single
5  meta-analysis looking at this question of the
6  association --
7         MR. JOHNSTON:  Wait, counsel.
8  Can we take a break?
9  BY MR. LITZENBURG:
10     Q.    -- between glyphosate and
11  non-Hodgkin lymphoma?
12         As soon as he answers that, we'll
13  take our break.
14         MR. JOHNSTON:  Asked and
15  answered.  Harassing the witness.  He's
16  already talked with you about this.
17         THE WITNESS:  I did not rely on
18  any meta-analysis to form my opinion.
19  BY MR. LITZENBURG:
20     Q.    Do you know if they exist?  Can you
21  name any?
22     A.    I know they exist.  I can't give you
23  authors, journals, and dates of publication off
24  the top of my head.
25     Q.    But you're here to tell you us

William H. Fleming, M.D., Ph.D.

Page 74

1 whether or not glyphosate can cause non-Hodgkin
2 lymphoma?
3     A.    I'm here to tell you that in my
4 medical expert opinion I find no credible
5 scientific evidence linking glyphosate to the
6 development of NHL.
7     Q.    All right.  Let's take a break.
8         MR. JOHNSTON:  Hold on.  Before
9 we do that, I just want to mark for the
10 record the fact -- or state for the record
11 that my instruction not to answer was
12 based on Pretrial Order 7 in this case,
13 Section B1, which provides:
14         No party will seek discovery of
15 any expert's notes, drafts of expert
16 reports, or communications with counsel.
17         And also on Federal Rule of Civil
18 Procedure 26(b)(4)(B) and (C) which
19 provides that communications with
20 counsel -- between an expert and counsel
21 are not discoverable.
22         THE VIDEOGRAPHER:  Time now is
23 10:22.  We are going off the record.
24         (A brief recess was taken.)
25         THE VIDEOGRAPHER:  The time now

Page 75

1 is 10:38.  We are back on the record.
2 This is the beginning of Disk No. 2.
3 BY MR. LITZENBURG:
4     Q.    Dr. Fleming, would you agree with me
5 that correlation and causation are not the same
6 thing?
7     A.    It, again, depends on the -- on how
8 you define it.  There's several different --
9 different ways to define "causation."
10     Q.    Are correlation and causation the
11 same thing?
12     A.    I do not believe they are, no.
13     Q.    Okay.  Can you tell me, please, how
14 do we determine causality in humans?  What is the
15 generally accepted way that cancer doctors do?
16     A.    Cancer doctors do this by, you know,
17 linking, you know, various outcomes with various
18 exposures and looking for statistically
19 significant differences in those outcomes, and we
20 do it for the most part obviously in the setting
21 of treatment for malignant disease.
22     Q.    And, again, I'm sort of talking more
23 -- well, why is it important to your treatment?
24     A.    Well, because if the treatment
25 works, it will cause more patients to survive.

Page 76

1 It will cause some patients to be cured, and
2 these are really important end points, which in
3 many ways are actually kind of similar to what
4 the epidemiology literature does with exposures
5 to various environmental agents.
6     Q.    Why does etiology matter to your --
7 your treatment plan?
8     A.    Oh.  Well, if somebody has had a
9 prior, you know, history of Hodgkin's disease and
10 chemotherapy, I'm going to think of their
11 lymphoma very differently because it's a
12 secondary lymphoma, and this will not necessarily
13 be cured by the standard chemotherapy we would
14 give if it was de novo disease.
15     Q.    Okay.
16     A.    This is true for a number of
17 secondary malignancies.
18     Q.    What chemicals cause non-Hodgkin
19 lymphoma?
20     A.    I am --
21         MR. JOHNSTON:  Objection.  Beyond
22     the scope of his report.
23         THE WITNESS:  Yeah.  I was -- I
24     was asked to address glyphosate and NHL.
25     Hodgkin's disease is, as you know, a

Page 77

1     completely separate disease entity.
2 BY MR. LITZENBURG:
3     Q.    Do you hold the opinion as a cancer
4 doctor, oncologist, that any chemical is capable
5 of causing non-Hodgkin lymphoma?
6         MR. JOHNSTON:  Objection.  Beyond
7     scope of his report.
8         THE WITNESS:  Again, I've been
9     focusing on glyphosate and NHL.
10 BY MR. LITZENBURG:
11     Q.    Okay.  What has the science
12 disclosed on Hodgkin's lymphoma?
13         MR. JOHNSTON:  Objection.  Beyond
14     the scope of his report.
15         THE WITNESS:  There are
16     associations between certain pesticides
17     and NHL that are listed in my report.
18 BY MR. LITZENBURG:
19     Q.    Is there is an association between
20 glyphosate and NHL in the literature?
21     A.    Not in the literature I choose to
22 rely on to formulate my report.
23     Q.    Okay.  What are the Bradford Hill
24 criteria?
25     A.    The Bradford Hill criteria are a

William H. Fleming, M.D., Ph.D.

1  list of criteria that are named after their
2  author which basically have been set up to guide
3  epidemiologic studies.
4      Q.    Okay.  What are they?
5      A.    Well --
6          MR. JOHNSTON:  Objection.  Beyond
7  the scope of his report.  Go ahead.
8          THE WITNESS:  I -- again, I do
9  not use Bradford Hill on a regular basis.
10  I use related evidence-based medicine
11  algorithms on a regular basis, which are
12  very similar to Bradford Hill.
13  BY MR. LITZENBURG:
14      Q.    When you perform --
15      A.    Any of them are.
16      Q.    -- like regression analyses
17  yourself; is that what you're saying?
18      A.    No.
19      Q.    Oh, okay.  Well, answer.
20      A.    When I -- when I look at, you know,
21  the temporality of -- of exposures or
22  dose-responses, these sorts of things, they are
23  listed as Bradford Hill criteria.  They're also
24  criteria in evidence-based medicine, you know,
25  going back many years.

1      Q.    So there are no pesticides that in
2  your opinion cause non-Hodgkin lymphoma?
3      A.    There are pesticides in a recent
4  publication from the Agricultural Health Study
5  that are statistically associated with a trend
6  towards increased NHL.
7      Q.    What are they?
8      A.    I refer back to my report for the
9  list and the citation.
10          Alavanja 2014 published a report
11  based on the AHS cohort that found that certain
12  subtypes of NHL were correlated to exposure to
13  lindane, permethrin, diazinon, Tribufos, and DDT.
14          The authors concluded that while
15  pesticides from different chemical and functional
16  classes were associated with an increased risk of
17  NHL, not all members of a given class were
18  associated with an elevated risk of NHL, total
19  NHL or its subtypes.
20      Q.    That's -- that study didn't look at
21  glyphosate, did it?  That paper 2014?
22      A.    This paper was derived from the same
23  cohort, therefore, data set, if you will, as the
24  2005 De Roos publication that they did not
25  address the question of glyphosate.

1      Q.    How many other chemicals did you
2  read studies on -- let's see.  How many other --
3  yeah.  How many other chemicals did you study the
4  causality of these articles that don't even
5  mention glyphosate?
6          MR. JOHNSTON:  Objection.
7  Assumes facts not in the record and goes
8  beyond the scope of his expert report.
9          THE WITNESS:  What I did in terms
10  of the scope of my expert report was to
11  look at NHL outcomes that were from the
12  AHS study.
13          So there was this pesticide
14  Alavanja 2014, and there was a second very
15  interesting study looking at allergies and
16  their effect on the risk of NHL.  This
17  would be Hofmann 2015.
18  BY MR. LITZENBURG:
19      Q.    Those are the two papers not
20  mentioning glyphosate that you relied upon?
21      A.    I relied --
22          MR. JOHNSTON:  Objection.  Vague.
23  Go ahead.
24          THE WITNESS:  I relied upon -- I
25  did not rely upon these papers to draw my

1  scientific conclusion.
2          I relied upon these papers to
3  show that there was plenty of evidence in
4  the AHS cohort of significant differences
5  in NHL outcome under certain
6  circumstances.
7  BY MR. LITZENBURG:
8      Q.    Uh-huh.  Do you know how
9  Hollingsworth or Monsanto came to you as an
10  expert?
11      A.    I don't know the details of how they
12  did that, no.
13      Q.    You just got a cold call?
14      A.    Well --
15          MR. JOHNSTON:  Objection.  Vague.
16          THE WITNESS:  Yeah.  Essentially
17  -- essentially I was called up, yes, on
18  the telephone and asked if I would be
19  willing to review the question of NHL
20  etiology in general and with a specific
21  emphasis on glyphosate.
22  BY MR. LITZENBURG:
23      Q.    Okay.  Who called you?  Was it
24  somebody from Hollingsworth?
25      A.    Yes.

William H. Fleming, M.D., Ph.D.

Page 82

1    Q.    Okay.  And that was late 2016 you
2  said?
3    A.    Approximately, yes.
4    Q.    Okay.  Why did you use, sir,
5  Bradford Hill criteria in your 9 -- 11-page
6  report?
7         MR. JOHNSTON:  Objection.
8  Misstates his report.
9         THE WITNESS:  I didn't use the
10  Bradford Hill criteria.
11         I cross-referenced, as it says
12  here in my report, a couple of the
13  Bradford Hill criteria, of which there are
14  nine.  Specifically the biological
15  gradient question or dose-response and the
16  temporality question, exposures, you know,
17  predating the development of it.
18         And I did this in the context of
19  looking -- after looking at other expert
20  reports that have used Bradford Hill
21  criteria to make the argument that
22  glyphosate exposure increases the risk of
23  NHL.
24         So to make my report cogent with
25  their reports, I restated the Bradford

Page 83

1  Hill criteria, but I could have simply
2  just talked about temporality, biological
3  gradients, as I have provided that data
4  in -- in several of the figures in my
5  report.
6  BY MR. LITZENBURG:
7    Q.    What proportion of your patients are
8  you treating for non-Hodgkin lymphoma?
9    A.    That's a tough question.
10         70 percent.
11    Q.    Okay.
12    A.    60 percent.  I don't know.
13    Q.    Okay.  Do you tell your patients --
14  do you ever use the word "latency" in talking
15  with your patients?
16    A.    The term seldom, if ever, comes up.
17    Q.    What does it mean to you as a
18  scientist?
19         MR. JOHNSTON:  Objection.  Vague.
20         THE WITNESS:  Latency to me means
21    the time from an exposure to an agent,
22    such as a chemotherapy agent for breast
23    cancer, and the development of a second
24    malignancy, such as AML, in patients who
25    are -- who are treated for breast cancer.

Page 84

1         So we've got a known exposure
2    time and dose and you've got -- you've got
3    an outcome, and the time between those two
4    is your latency period.
5  BY MR. LITZENBURG:
6    Q.    Does that vary -- that latency
7  period vary among cancers?
8         MR. JOHNSTON:  Objection.  Vague.
9         THE WITNESS:  I didn't review
10    latency amongst cancer in general as part
11    of my expert report.
12  BY MR. LITZENBURG:
13    Q.    Dr. Fleming, do you know whether
14  latency in solid organ tumors is longer, about
15  the same as, or shorter than length for blood
16  cancer?
17    A.    It --
18         MR. JOHNSTON:  Objection.  Vague
19    as to the exposure involved.
20         THE WITNESS:  It all depends.
21    We'd have to be much more specific.
22  BY MR. LITZENBURG:
23    Q.    It all depends on the cancer
24  subtype; right?
25         MR. JOHNSTON:  Objection.  Vague.

Page 85

1  Incomplete hypothetical.
2         THE WITNESS:  The subtype is one
3    of many factors that you need to consider
4    when discussing latency.  Sure.
5  BY MR. LITZENBURG:
6    Q.    It depends on what exposures there
7  were?
8         MR. JOHNSTON:  Objection.  Vague.
9         THE WITNESS:  It depends on a
10    great number of criteria.
11  BY MR. LITZENBURG:
12    Q.    Okay.  Well, you told us in this
13  paper that latency is 10 years?
14    A.    I'm saying with the best available
15  data we have, that's a very reasonable time frame
16  in which to expect lymphoma to develop.
17    Q.    Are there children with lymphoma or
18  other blood cancers under the age of 10 that come
19  through your hospital?
20    A.    Not through my clinic, but I'm sure
21  they come through the hospital and the pediatric
22  clinics.
23    Q.    Okay.
24    A.    Of which I am not a part.
25    Q.    Okay.  All right.  Tell us how you

William H. Fleming, M.D., Ph.D.

Page 86

1 arrived at this 10-year latency.
2   A.   I arrived at this 10-year latency by
3 reviewing the literature for secondary cancers,
4 which is well established for the treatment of
5 solid tumors, and the development -- with a
6 variety of different chemotherapy agents, and the
7 development of secondary malignancies, which are
8 almost exclusively acute myeloid leukemia.
9       There is relatively little data on
10 NHL as NHL is not typically a secondary cancer in
11 patients that have been treated for other tumors.
12 There are two notable exceptions to this.
13      One, as we've discussed, is the
14 development of NHL in patients that have
15 previously had Hodgkin's disease, and there are
16 additional reports this time in the pediatric
17 literature just suggesting the development of NHL
18 that follows the treatment of a variety of rare
19 pediatric tumors.
20      And these, you know, fit quite
21 nicely with the, you know, the basic latency
22 period, which is, you know, in the six to 10-year
23 range. So this is a -- I thought a very
24 reasonable place to start.
25   Q.   It fits quite nicely with the

Page 87

1 conclusion that -- well, scratch that.
2       You hold the opinion that outside of
3 the context of prior chemotherapy, radiation
4 therapy, and immunosuppression, the latency of
5 NHL is unknown; isn't that right?
6   A.   It is not well-defined, no.
7   Q.   Do you hold the opinion that outside
8 of the context of prior chemotherapy, radiation
9 therapy, and immunosuppression, the latency of
10 NHL is unknown?
11   A.   Outside of those contexts, yes, I
12 would agree with that statement.
13   Q.   Okay. So anything where you are
14 factoring in latency in this 11-page report we
15 can set that aside, right, in terms of causality
16 and plausibility?
17      If it takes -- if you're making an
18 assumption about latency, we can set that aside
19 from your report; right?
20      MR. JOHNSTON: Objection.
21 Misstates his report.
22      THE WITNESS: Right. I would
23 disagree with that.
24      I think there is no question that
25 latency exists. I think there's going to

Page 88

1 be significant variability in it.
2       I think an average time based
3 upon the data that we do have is a
4 reasonable time frame in which to -- to
5 begin to evaluate that.
6 BY MR. LITZENBURG:
7   Q.   Okay. Can you give me a citation to
8 a textbook or an article stating that a 10-year
9 latency is a valid assumption to -- to make in
10 terms of non-Hodgkin lymphoma?
11   A.   There is very little literature on
12 latency periods in NHL in the scientific
13 literature.
14   Q.   Okay. This is new work that you're
15 doing here with these two maps?
16   A.   I'm sorry. New work?
17   Q.   Yeah. This is like a novel
18 approach. You agree with me?
19   A.   Taking robust data sets and querying
20 them to see if there's relationships is what
21 we've done historically over time. Now, with
22 high-powered computing and centralization of
23 databases, we can just do it much better.
24   Q.   Okay. Well, let's look at these
25 maps on page 8 there.

Page 89

1       Is part of your opinion for this
2 litigation the fact that the noncorrelation of
3 these maps is supportive of non-causality of
4 glyphosate in non-Hodgkin lymphoma?
5   A.   The --
6       MR. JOHNSTON: Objection. Vague.
7       THE WITNESS: Could you restate
8   the question?
9 BY MR. LITZENBURG:
10   Q.   Who was your criticism of the
11 Eriksson 2008 study?
12   A.   My criticism with that is that the
13 difference in odds ratio did not survive
14 multivaried analysis.
15   Q.   Okay. What's multivaried analysis?
16   A.   Is when -- well, there's different
17 -- different definitions.
18   Q.   Okay.
19   A.   In the Eriksson paper, after
20 correcting for a modest handful of variables that
21 they thought may affect the outcome, the
22 statistical significance disappeared.
23      And then there's the other level
24 where I believe you need to correct for other
25 exposures that was not addressed in the paper at

William H. Fleming, M.D., Ph.D.

Page 90

1  all.
2      Q.    What exposure?
3      A.    Other exposures to pesticides --
4      Q.    Okay.
5      A.    -- and others that was not fully
6  addressed.
7      Q.    Okay.  Well, let's look at these
8  maps on page 8.
9      A.    Uh-huh.
10     Q.    How many variables did you control
11 for in this comparison?
12     A.    I didn't control for variables.
13           This is -- this is -- this is data
14 that's, you know, this is the best available data
15 we have on glyphosate usage per the US Geological
16 Survey mapping, and this is the best NHL
17 incidence.
18           And I have put them side to side as
19 an illustrative point that there were many areas
20 of very high glyphosate usage.  I draw your
21 attention to the Central Valley of California,
22 and when you look there it at Fresno and
23 Sacramento counties, they actually have a
24 relatively low incidence of NHL.
25           This is not what one would

Page 91

1  anticipate if there was a positive association
2  between glyphosate exposure and NHL.  This is
3  also true, you can see very clearly, in Central
4  Florida where there's a tremendous amount of --
5  of glyphosate usage, yet at the same time the NHL
6  rates are quite low.
7          So one would not anticipate this
8  result if there was a positive association.  Yet
9  here it is.
10     Q.    Can you tell me some things about
11 the population -- let me back that up.
12         What are the demographics of people
13 exposed to glyphosate in the Central Valley of
14 California?
15     A.    The demographics?
16     Q.    Yeah.
17     A.    Residents of -- of that area.  Many
18 of them who work in the agricultural industry
19 and, therefore, exposed to high levels of
20 glyphosate.
21     Q.    Okay.  What proportion of those are
22 migrant workers?
23     A.    I don't know what percentage of
24 migrant workers have, you know, high, low, or
25 medium levels of exposure.  I'm not aware of that

Page 92

1  data.
2      Q.    Is there any familial relationship
3  for non-Hodgkin lymphoma?
4      A.    No.
5      Q.    Okay.  Does it depend on race or
6  sex?
7      A.    Men the incidence is very slightly
8  higher than women.
9      Q.    Race?
10     A.    The incidence in African Americans
11 and Hispanics is somewhat lower than it is in
12 Caucasians.
13     Q.    Okay.  What is the incidence of --
14 well, are you aware of something called the
15 "Hispanic paradox"?
16         MR. JOHNSTON:  Objection.  Goes
17     beyond the scope of his report.
18         THE WITNESS:  I have not heard
19     that term before.
20 BY MR. LITZENBURG:
21     Q.    The healthy migrant effect?
22     A.    No.
23     Q.    These are -- these are pillars of
24 epidemiology when considering anything with an
25 Hispanic population.

Page 93

1          You can't tell me what either of
2  those are or stand for?
3          MR. JOHNSTON:  Objection to
4      counsel's testimony regarding what is a
5      pillar of epidemiology.  Improper
6      question.
7          THE WITNESS:  The data I
8      presented here on glyphosate usage in the
9      United States and NHL incidence by county
10     is not detailed epidemiologic data.
11         What it is is it's a snapshot of
12     two factors.  Glyphosate usage which
13     remains concentrated in agricultural areas
14     and subsequent NHL incidence eight to 12
15     years later.
16 BY MR. LITZENBURG:
17     Q.    Okay.
18     A.    That's all that is.  I'm not drawing
19 any statistical or numeric conclusions from this.
20         I am saying the expected association
21 one might see is often not seen, and that is
22 basically the extent to which this data could be
23 used as an illustrative example of that fact
24 only.
25     Q.    Are you talking is it a six to

William H. Fleming, M.D., Ph.D.

Page 94

1 nine-year latency period you thought was a
2 reasonable one?
3     A.    Six to nine, eight to 10.  I
4 chose --
5     Q.    Which one?
6         MR. JOHNSTON:  Objection.  Asked
7 and answered.
8         THE WITNESS:  I don't -- I don't
9 think that there's a data-driven
10 distinction between six -- six to 10,
11 eight to 12.  I think -- I think they're
12 overlapping and the same.
13         I think, you know, two years or
14 less is different from eight to 10 and six
15 or eight to 12 and six to 10.
16 BY MR. LITZENBURG:
17     Q.    You think that two years or less is
18 different from six to 10?
19     A.    Yeah, very likely.  I think --
20     Q.    That's your professional medical
21 opinion?
22     A.    This -- this doesn't --
23         MR. JOHNSTON:  Objection.
24 Argumentative.
25         THE WITNESS:  Yes.  This doesn't

Page 95

1     fall within the scope of a professional
2     medical opinion.
3         I am just saying that overlapping
4     ranges near 10 are similar, whereas,
5     something that is 80 percent less, namely,
6     two or 90 percent less, namely one year,
7     would be different.
8 BY MR. LITZENBURG:
9     Q.    You agree --
10     A.    This -- I'm sorry.
11     Q.    So you agree this couldn't -- this
12 manner of approach could never be part of a
13 professional medical opinion?
14     A.    No.
15         MR. JOHNSTON:  Objection.  Vague.
16 BY MR. LITZENBURG:
17     Q.    Okay.
18     A.    No, I disagree.
19     Q.    You did --
20     A.    This is an illustrative example of
21 the lack of correlation between glyphosate --
22 glyphosate use and NHL incidence using the best
23 available data that allows one to, looking at a
24 snapshot, illustrate that -- that issue.
25         And you can -- you'd spent as much

Page 96

1 time and energy as you like doing it, but I think
2 it clearly illustrates the point that a positive
3 relationship is not evident in these two data
4 sets when you put them together.  That's all I'm
5 saying.
6     Q.    You think that clearly illustrates a
7 point that there's no positive relationship?
8 These two maps?
9         MR. JOHNSTON:  Objection.  Asked
10 and answered.
11         THE WITNESS:  I believe that
12 this -- these maps are illustrative of the
13 robust epidemiologic data we have in the
14 Agricultural Health Study which does not
15 indicate any clear association between
16 glyphosate usage and NHL.
17 BY MR. LITZENBURG:
18     Q.    What does this have to do with the
19 Agricultural Health Study?  Which of these maps
20 came from the Agricultural Health Study?
21     A.    Neither.  I am saying that --
22     Q.    They illustrate the Agricultural
23 Health Study?
24     A.    They --
25         MR. JOHNSTON:  Objection.

Page 97

1     Misstates his testimony.
2         THE WITNESS:  They illustrate the
3 principal -- the principal finding of the
4 AHS study vis-a-vis glyphosate and NHL.
5 BY MR. LITZENBURG:
6     Q.    You agree we should ask Aaron Blair
7 what the principal is of the Agricultural Health
8 Study rather than Dr. Fleming?
9     A.    I think there's a principal finding
10 as it relates to glyphosate and NHL.  I'm not
11 saying that that is the main focus of the H --
12 AHS study.  That is the focus upon which I was
13 asked to render an opinion.
14     Q.    Okay.  And --
15     A.    And I used all available data to me
16 to test the hypothesis as to whether there could
17 be an association or what one would, you know,
18 look at what one would expect if there was an
19 association.
20         I used very robust databases and,
21 interestingly enough, there was no association.
22 Had we, you know, tried to associate cigarette
23 sales with lung cancer, this type of approach,
24 you know, would be -- would be successful.  It
25 has not been successful in demonstrating any --

William H. Fleming, M.D., Ph.D.

Page 98

1  any link between the two here.
2          There is an absence of the expected
3  outcomes here in several geographic areas if the
4  expectation was there was a positive
5  relationship.  There is no real evidence for it
6  here.
7      Q.    Have you done a map for cigarette
8  sales?
9          MR. JOHNSTON:  Objection.  Vague.
10  Outside the scope of his report.
11          THE WITNESS:  I'm not aware of
12      any maps for -- for cigarettes.  I'm
13      talking about data that's now many, many
14      years old that -- that correlated the --
15      the commercial production of cigarettes
16      and the subsequent rise in lung cancer.
17          Where you're looking at, you
18      know, two disparate things and you put
19      them together and you see a relationship
20      that you would anticipate from -- from
21      your hypothesis which was that the two are
22      linked.
23  BY MR. LITZENBURG:
24      Q.    You just told me that if you made a
25  map of cigarette sales here, it would show

Page 99

1  positive results.
2      A.    I did not --
3      Q.    Did you mean that?
4      A.    I did not mean to use the word
5  "map."  I did not say "map."
6          I said cigarette -- commercial
7  cigarette production in the United States at the
8  turn of the last century was followed by an
9  increase in lung cancer.  In looking at those
10  types of kind of large picture statistics is --
11  is useful.
12      Q.    Okay.
13      A.    And it can provide an illustrative
14  example of a relationship.  Not a statistically
15  epidemiologically-driven conclusion but, rather,
16  a real world conclusion that -- a real world data
17  that can -- can aid that conclusion.
18      Q.    This second figure, it says "NHL
19  incidence by county"?
20      A.    Yes.
21      Q.    Did you -- did you pull this map
22  from somewhere or did you make it with data taken
23  from somewhere?
24      A.    What's really nice about the SEER
25  program is it allows you to go ahead and to

Page 100

1  select different variables and different time
2  periods, and it plots the map for you.
3          So the folks at SEER have already
4  gone through the data, and they know which
5  parameters are reasonable to look at and which
6  ones are not.  And this is a publicly available
7  database, and you can go in there and -- and look
8  at these different parameters over time.
9          And as you'll see all races are
10  included, non-Hodgkin's lymphoma for both sexes
11  included, and the year is 2008 to 2012.  I could
12  have chosen different races.  I could have chosen
13  different diseases.  I could have chosen just
14  males.  I could have chosen just females.  But it
15  was that relatively narrow menu of choices.
16          I was, you know, couldn't ask it to
17  query NHL in people with blue eyes because that
18  was not a pull-down option.  So they only let you
19  graphically represent what they have gone over
20  and feel is accurate data.
21      Q.    Does the incidence of the AIDS virus
22  affect the incidence of non-Hodgkin lymphoma?
23      A.    No, absolutely not.
24      Q.    Autoimmune diseases have no
25  effect --

Page 101

1      A.    That wasn't your statement, sir.
2      Q.    -- on non-Hodgkin lymphoma?
3      A.    That wasn't your question.
4      Q.    The incidence of AIDS does not track
5  in any way the incidence of non-Hodgkin lymphoma?
6      A.    Sir, you said does the incidence of
7  the AIDS virus track with that, and the answer is
8  no.  It has not tracked with it now for more than
9  15 years.
10      Q.    Okay.  What auto --
11      A.    I'd be happy to tell you why.
12      Q.    What autoimmune diseases are closely
13  related with non-Hodgkin lymphoma?
14      A.    There's a variety of them listed in
15  my -- in my report.  Everything from Sjogren's
16  syndrome to rheumatoid arthritis.
17      Q.    Okay.  And where do -- how do we
18  factor for autoimmune disease on this map?
19      A.    Well, we actually don't, but
20  autoimmune disease distribution is not 80-fold
21  different as the -- as the -- or 25-fold
22  different as the glyphosate data is.
23          So the difference of glyphosate and
24  the difference in incidences here are -- are of
25  a -- of a different magnitude.

Page 102

1    Q.    This gives us no data.  It doesn't
2  anything to do with --
3    A.    Well, it's like comparing males and
4  females.  Your lifetime risk of developing NHL if
5  you're male is about 2.1 to 2.2 percent.  If
6  you're female, it's 1.8 percent.  For simplicity,
7  we say it's 2 percent overall.
8        Can you, you know, categorize it by
9  sex?  You can.  Is it meaningful to do so?  For
10  the most part not because these are very small
11  differences that would basically come out -- come
12  out in the wash at the end of the day.
13    Q.    You agree with me that this approach
14  doesn't take into account the distribution of
15  autoimmune disease?
16    A.    I am not aware of any data showing
17  marked regional differences in autoimmune
18  diseases.
19    Q.    You weren't aware of any data stream
20  marked regional differences in pesticide decision
21  until you looked at this data, were you?
22        MR. JOHNSTON:  Objection.  Vague.
23        THE WITNESS:  I would have
24    hypothesized that glyphosate usage would
25    be highest in agricultural areas.  I then

Page 103

1    went and got the data which shows that and
2    confirmed that hypothesis.
3  BY MR. LITZENBURG:
4    Q.    What about immunosuppressive
5  therapy?  Has that come forward on this approach?
6    A.    Immunosuppressive therapy, while a
7  practical day-to-day problem in patients treated
8  with significant degrees of immunosuppression for
9  organ transplantation and rheumatologic
10  disorders, represent a very small percentage of
11  the US population and would not be expected to
12  affect county-wide incidences of -- of NHL.
13    Q.    What's the incidence of that kind of
14  therapy in the Central Valley of California?
15    A.    Probably not much different than
16  it -- than it is, you know, north or south of
17  that, or if there is a difference, it's a very
18  modest difference.
19    Q.    Did you look into it?
20    A.    Highly immunosuppressed individuals
21  are not geographically defined.  I know this from
22  my treatment of making people profoundly
23  immunosuppressive during their bone marrow
24  transplant therapy, and half of those individuals
25  lived in urban areas and the other half drove

Page 104

1  many hours from rural areas to see me.  And the
2  one thing they had -- all had in common was that.
3        And this would also be true of other
4  types of transplant programs and, again, the
5  distribution of rheumatologic diseases would
6  likely follow that.
7    Q.    Doc, you're telling me that your
8  reason for that conclusion is anecdotal from your
9  practice?
10    A.    Conclusion of what?  I'm sorry.
11    Q.    How can you account for -- well,
12  tell me what the rate of immunosuppressive
13  therapy is in the Central Valley of California as
14  opposed to other places in the country?
15        You answered something about all
16  these folks that drive into your clinic.
17    A.    Sure.
18    Q.    What's that have to do with
19  anything?  Is that anecdotal evidence?
20        MR. JOHNSTON:  Objection.
21    Argumentative and vague.
22        THE WITNESS:  I described to you
23    a population of patients I have a lot of
24    familiarity with on a firsthand basis who
25    are immunosuppressed and dispersed evenly

Page 105

1    throughout the country, evenly throughout
2    the state of Oregon, Southwest Washington,
3    Idaho, Northern California, in a
4    rural/urban distribution.
5  BY MR. LITZENBURG:
6    Q.    Did you do anything to look into the
7  incidence of immunosuppressive therapy in the
8  Central Valley of California when writing this
9  11-page report?
10    A.    I did not.
11    Q.    Okay.  Speaking of anecdotal and
12  people driving into your clinic, you say you see
13  people from three states?  Is that about --
14    A.    We had a referral base at the bone
15  marrow transplant program at OHSU that includes
16  Southwest Washington and Idaho and individuals
17  who were far enough north in California that they
18  were part of our referral base, yes.
19    Q.    Okay.
20    A.    I had plenty of patients who were
21  immunosuppressed, got in their car and drove four
22  hours to see me in Portland, Oregon.  I would say
23  about half of my patients actually were from a
24  rural area and half of them were from the urban
25  area which, roughly, you know, is the population

Page 106

1  distribution in the United States today.
2    Q.    Okay.
3    A.    So I don't believe you have pockets
4  of highly immunocompromised patients in the
5  Central Valley or pockets of people who are not
6  at all immunocompromised in any particular county
7  or -- or agricultural area.
8    Q.    But you haven't done anything to
9  look into that?
10    A.    I am --
11        MR. JOHNSTON:  Objection.
12  Misstates his testimony.
13        THE WITNESS:  I am telling you my
14  20 years of anecdotal experience in the
15  tertiary care hospital that cares for all
16  people in a certain geographic catchment
17  area regardless of whether they are urban
18  or rural individuals.
19  BY MR. LITZENBURG:
20    Q.    Dr. Fleming, you're telling me that
21  based on your anecdotal evidence in Oregon you --
22  that's how you know the incidence of autoimmune
23  or immunosuppressive therapy in the central coast
24  of California -- I'm sorry -- the Central Valley
25  of California?

Page 107

1        MR. JOHNSTON:  Objection.  Beyond
2  the scope of his report and not an opinion
3  offered in this litigation.  Go ahead.
4        THE WITNESS:  This has been my
5  experience in Portland, Oregon, in
6  Stanford, California, and Atlanta, Georgia
7  over the last 30 years.
8  BY MR. LITZENBURG:
9    Q.    Okay.
10    A.    So this --
11    Q.    How many of your patients in
12  Atlanta, Georgia lived in the Central Valley of
13  California?
14    A.    I don't know the answer to that.
15    Q.    Do you think that we can use this
16  anecdotal evidence to draw determinations about
17  causality -- any conclusions about causality?
18        MR. JOHNSTON:  Objection.
19  Misstates his testimony.  Asks a
20  hypothetical.  Beyond the scope of his
21  report.
22        THE WITNESS:  I was answering an
23  earlier question that you raised about the
24  geographic distribution of
25  immunocompromised individuals and how that

Page 108

1  may impact the NHL incidence by county in
2  Figure 5 of my report.
3        And my professional opinion based
4  on lots of experience is, I do not believe
5  it was a major factor.  I cannot provide
6  specific published data to support that.
7  BY MR. LITZENBURG:
8    Q.    It's based only on anecdote and no
9  data; correct?
10    A.    It's based on -- it's based on 25
11  years of experience.
12    Q.    Anecdote?
13        MR. JOHNSTON:  Objection.
14  Misstates the record and his testimony.
15        THE WITNESS:  It is based on my
16  clinical expertise and experience over 25
17  years.
18  BY MR. LITZENBURG:
19    Q.    You didn't do -- lift a finger, turn
20  a page to find out what the incidence of
21  immunosuppressive therapy was to Central
22  Valley --
23        MR. JOHNSTON:  Objection.
24  BY MR. LITZENBURG:
25    Q.    -- Of California.

Page 109

1        Is that correct or incorrect?
2    A.    There were --
3        MR. JOHNSTON:  Objection.
4  Compound and argumentative.  Go ahead.
5        THE WITNESS:  Could you unpack
6  that question, please?
7  BY MR. LITZENBURG:
8    Q.    What is the incidence of autoimmune
9  disease in the central post of -- I'm sorry --
10  Central Valley of California as opposed to the
11  rest of the country?
12    A.    I do not know the answer to that.
13    Q.    What did you do to look into that?
14    A.    I did not look into it.
15    Q.    Okay.  What did you do to look into
16  the use of other pesticides in the Central Valley
17  of California?
18    A.    They wouldn't be relative to the
19  data, the illustrative data I'm showing you,
20  unless those pesticides actually inhibited the
21  development of NHL.
22    Q.    So there are not --
23    A.    I --
24    Q.    There are not any pesticides that
25  are associated with an increased risk of

William H. Fleming, M.D., Ph.D.

1 non-Hodgkin lymphoma?

2    A.   Decreased risk.

3    Q.   Wait. You hold the opinion that

4 certain pesticides are cancer protective?

5    A.   No, that's a conclusion from your

6 previous question.

7    Q.   Okay. How did you control for the

8 use or the distribution of other pesticides in

9 making this little map?

10       MR. JOHNSTON: Objection. Asked

11   and answered.

12       THE WITNESS: This is glyphosate

13   data only.

14 BY MR. LITZENBURG:

15    Q.   All right. Let's use your anecdotal

16 approach in clinic.

17       How many of your patients that came

18 in with non-Hodgkin lymphoma have used Roundup in

19 their life?

20    A.   I have no idea.

21    Q.   Okay. Will you begin keeping track

22 of that today as you think that this is anecdotal

23 evidence is an important way of determining

24 causality?

25       MR. JOHNSTON: Are you asking him

1 to? Are you asking him if he intends to?

2   Because you have no right to ask him to do

3   anything, counsel.

4       MR. LITZENBURG: Take it however

5   you want.

6       THE WITNESS: I --

7       MR. JOHNSTON: That's

8   argumentative and inappropriate.

9       THE WITNESS: I am not using

10   anecdotal evidence to determine

11   causality --

12 BY MR. LITZENBURG:

13    Q.   Okay.

14    A.   -- and have not done so in this

15 report.

16    Q.   Okay. So, again, how did you

17 compute or allow for variations in

18 immunosuppressive therapy in these hot spots as

19 you call them?

20    A.   Immunosuppressive therapy is

21 relatively rare. I would say it's exceedingly

22 rare based on the entire population of the United

23 States. I do not believe it is likely to affect

24 the regional outcomes in NHL, but I'm also not

25 aware of any data that speaks to that question.

1    Q.   Okay. Did you look to see if there

2 was any data that spoke to that question?

3    A.   No, I did not.

4    Q.   Okay. And what's your estimate

5 anecdotally of the number of new NHL patients

6 that you have that have used Roundup in the past?

7    A.   I have no knowledge of my patients'

8 use of Roundup.

9    Q.   What other probable human

10 carcinogens designated by IARC do you believe are

11 incapable of causing cancer?

12       MR. JOHNSTON: Objection.

13   Misstates his opinion. Misstates his

14   testimony. Hypothetical.

15       THE WITNESS: Right. Again, I

16   was charged with looking at glyphosate and

17   NHL and not general cancer causation.

18 BY MR. LITZENBURG:

19    Q.   Okay. Dr. Fleming, would you be

20 comfortable presenting to your peers in the

21 oncology department that they should tell

22 patients to continue using Roundup or glyphosate

23 products that they are treating for non-Hodgkin

24 lymphoma?

25       MR. JOHNSTON: Objection. Beyond

1 the scope of his report. Argumentative.

2       THE WITNESS: Right. I would

3   have no reason to comment to my colleagues

4   on this -- on this issue or advise them

5   one way or another.

6 BY MR. LITZENBURG:

7    Q.   Well, you've probably done more

8 research on it than any -- any NHL expert in

9 America; right? How long have you spent doing

10 this?

11    A.   I would have no idea what other

12 individuals have -- time other individuals have

13 spent on this question.

14    Q.   Well, that was going to be one of my

15 questions.

16       Did you recommend that Hollingsworth

17 contact anybody with expertise in this area?

18       MR. JOHNSTON: Objection. Vague.

19       THE WITNESS: I did not -- I was

20   not asked that question and I did not

21   offer that information.

22 BY MR. LITZENBURG:

23    Q.   Okay. Anecdotally, how many of your

24 NHL patients have used pesticide in the past?

25    A.   I have not asked them that question.

William H. Fleming, M.D., Ph.D.

Page 114

1    Q.   Okay.  This recordkeeping of
2  glyphosate use in the US, where does it come
3  from?
4           MR. JOHNSTON:  Objection.  Vague.
5    What recordkeeping?
6  BY MR. LITZENBURG:
7    Q.   The map.  Where do you get the data
8  from?
9    A.   The website is actually included
10  here in my report.  It's USGS National
11  Water-Quality Assessment Project.
12    Q.   But how is the data calculated?
13    A.   How is the data calculated?
14    Q.   Yeah.  I mean, is it a poll?
15    A.   There are agricultural districts
16  that report on their use of chemicals and other
17  variables, and this group collates this data and
18  provides usage maps, including this one for
19  glyphosate -- glyphosate.
20    Q.   Dr. Fleming, isn't it true you have
21  no absolutely no idea where they came up with the
22  data that's in this map?
23           MR. JOHNSTON:  Objection.
24    Argumentative.  You just answered your
25    question.

Page 115

1           THE WITNESS:  Yeah.  They -- they
2    -- they came up with it using -- using
3    this agricultural district data that is
4    widely used in the agricultural industry
5    to -- to keep track of -- of compounds and
6    other issues.
7  BY MR. LITZENBURG:
8    Q.   What is this widely -- how else can
9  you characterize this widely used agricultural
10  data?  What type of data are you talking about?
11  How is it measured?
12    A.   Using the best techniques available,
13  the group in the federal government charged with
14  coming up with these estimates receives reports
15  and solicits information and puts it together.
16  The details of which I am not aware.
17    Q.   What are the best techniques
18  available?
19    A.   I was simply assuming that the
20  government was using their best statistics to
21  generate information which is disseminated public
22  on the use of a variety of chemicals in
23  agriculture, including glyphosate.
24    Q.   You have no idea how they calculated
25  glyphosate usage, do you, Dr. Fleming?

Page 116

1           MR. JOHNSTON:  Objection.
2    Argumentative.
3           THE WITNESS:  I have no idea how
4    the NCI calculated NHL incidence either.
5  BY MR. LITZENBURG:
6    Q.   So we can set all this aside; right?
7           MR. JOHNSTON:  Objection.
8           THE WITNESS:  No.
9  BY MR. LITZENBURG:
10    Q.   Okay.  Well, how long was -- let's
11  see.
12           Do you know when they started
13  keeping data on glyphosate usage geographically?
14           MR. JOHNSTON:  Objection.  Vague
15    as to who.
16           THE WITNESS:  This is all
17    available on a -- this is all present on a
18    publicly available website.
19           I recall going back and looking
20    at it certainly back into the '90s and
21    through the 2000s.  You can click each
22    year and it repopulates it with the
23    updated data.
24  BY MR. LITZENBURG:
25    Q.   Okay.

Page 117

1    A.   But I can't -- I can't tell you for
2  how long, but my purpose here was to look at the
3  year 2000.  Because, as I describe in my report,
4  in the year 2000, almost 100 million tons were
5  used in the United States and 10 years later,
6  eight to 12 years later, I should say, this is
7  the incidence of NHL.
8           And so that's basically the two data
9  sets I wish to present to -- to look for any
10  associations.
11    Q.   Okay.  Do you know if -- is it based
12  on sales figures, the agricultural use of
13  glyphosate?
14    A.   I do know that there is different
15  regional ways in which agricultural activity is
16  monitored.
17    Q.   Name two.
18    A.   Well, I know the state of California
19  has a different definition than some of the other
20  states, but I'm not -- I'm not an expert on the
21  mechanics of the Water-Quality Assessment
22  Project.
23    Q.   Do you see a variance between the
24  state of California here and then the use of
25  glyphosate among other states?

William H. Fleming, M.D., Ph.D.

1    A.    There is no way --
2         MR. JOHNSTON: Objection. Calls
3    for speculation.
4         THE WITNESS: Yeah.
5         MR. JOHNSTON: Hypothetical.
6         THE WITNESS: There is no way to
7    interrogate that data with the data
8    available in the --
9  BY MR. LITZENBURG:
10   Q.    There's nothing remarkable about
11  California's glyphosate usage?
12        MR. JOHNSTON: Objection. Calls
13  for speculation. Incomplete hypothetical.
14        THE WITNESS: I -- I am not aware
15  of anything different. I am aware that
16  different states have different reporting
17  requirements on the use of chemicals.
18  BY MR. LITZENBURG:
19   Q.    Okay. What are California's
20  reporting requirements on the use of chemicals?
21   A.    You would have to ask the
22  regulators.
23   Q.    How does this map control for the
24  different, you know, all -- is it 50 different
25  methods of recordkeeping?

1    A.    I wouldn't know how many.
2    Q.    Do you know if they use biomarkers?
3    A.    I'm sorry?
4    Q.    Do they use biomarkers in the
5  calculation?
6         MR. JOHNSTON: Objection. Vague.
7         THE WITNESS: The measurement
8    here is the agricultural use, as
9    indicated, in pounds per square mile.
10  BY MR. LITZENBURG:
11   Q.    Okay.
12   A.    That does not sound like a biomarker
13  to me.
14   Q.    Is it sale figures?
15   A.    Records are used. Which ones I'm
16  not sure.
17   Q.    Don't we need to know that? Don't
18  you need to know that? Don't you need to have
19  spent three minutes determining that before you
20  signed this report, Dr. Fleming?
21   A.    I think there's a 20 -- a minimum
22  20-fold difference between different regional
23  areas on this map, and I think that is a very,
24  very wide range and will not be accounted for
25  by -- likely to be accounted for by

1  administrative differences in how this data is
2  collected.
3    Q.    You just -- when you were stammering
4  about how you don't know how this data is
5  collected, you said that all the states keep it
6  differently; right?
7         MR. JOHNSTON: Objection --
8         THE WITNESS: No.
9         MR. JOHNSTON: -- to stammering.
10  BY MR. LITZENBURG:
11   Q.    Oh, okay.
12        MR. JOHNSTON: Can you please
13  treat the witness respectfully, counsel?
14  Counsel.
15        MR. LITZENBURG: Okay. Yeah.
16        MR. JOHNSTON: Please treat the
17  witness respectfully. It is not
18  appropriate for you to be disrespectful to
19  the witness.
20  BY MR. LITZENBURG:
21   Q.    What are the differences among
22  states in collecting or aggregating the data on
23  glyphosate usage that you described?
24        MR. JOHNSTON: Asked and
25  answered. Objection.

1         THE WITNESS: I cannot give you
2    specific details on a state-by-state basis
3    as to the differences. That's something
4    you'd have to contact the USGS folks
5    about.
6  BY MR. LITZENBURG:
7    Q.    Okay. So they're not kept in a
8  standardized way amongst states; is that what
9  you're saying?
10   A.    I have no -- I have no firsthand
11  knowledge on how this data is actually collected,
12  processed or analyzed. I am aware of how it's
13  disseminated. I have used the disseminated data
14  to plot a graph based on criteria that the folks
15  who put this data together felt was -- felt were
16  reasonable parameters.
17   Q.    You felt that was the best way of
18  looking at this?
19   A.    This is the only nationwide data I
20  was able to easily find that could be converted
21  to a map to show the pattern of glyphosate use in
22  the United States.
23   Q.    And it was important for you to
24  convert it to a map because that's what you're
25  charged with doing?

William H. Fleming, M.D., Ph.D.

Page 122

1    A.    They converted.  No, the map is
2  there.  You click an icon that says "map."  A map
3  of the United States drops down.  It asks you a
4  couple of questions and that you can -- variables
5  you can put in there.
6         And then you push a button
7  indicating what years you're interested in
8  looking at, and you can look at each year
9  individually, and I chose the year 2000.
10    Q.    All right.
11    A.    And those are the -- those are the
12  only choices I used.
13    Q.    Can you name one way of gathering
14  this data that one state might have used?
15    A.    I did not investigate the method of
16  data collection from which this data set is
17  derived.
18    Q.    Did you look behind the data or the
19  methodology of any of the science that you looked
20  at today, Dr. Fleming?
21         MR. JOHNSTON:  Objection.  Vague
22    and --
23         THE WITNESS:  Absolutely.
24  BY MR. LITZENBURG:
25    Q.    How would you explain that failure

Page 123

1  to a first year medical student or a colleague
2  that you have no idea how this data was collected
3  and you'd have no idea because you have never
4  looked into it?
5         MR. JOHNSTON:  Objection.
6    Argumentative and disrespectful, counsel.
7    You can ask questions, but you cannot be
8    disrespectful of the witness.
9         THE WITNESS:  In my opinion, this
10    was the best available public data
11    demonstrating glyphosate usage in the year
12    2000 across the continental United States.
13  BY MR. LITZENBURG:
14    Q.    Okay.  What --
15    A.    These are the keepers of this data
16  set.  I cannot speak to the details of -- of how
17  it was collected.  I can only show you the data
18  that -- that output of that data.
19    Q.    Who are the keepers?
20    A.    US government reg -- it's US
21  government.  US Geological Survey and within the
22  US Geological Survey is USGS National
23  Water-Quality Assessment Project, NAWQA.  So this
24  is a government agency that provides annual
25  pesticide maps -- use maps for the United States.

Page 124

1         And I see now in looking at my
2  report they have done this since 1992.
3    Q.    So we have no data about the
4  regional usage of glyphosate, regional
5  variations, before 1992; is that correct?
6    A.    I didn't say that.
7    Q.    Do you have any data used in this --
8  in this map model of any glyphosate usage before
9  1992?
10    A.    The USGS National Water-Quality
11  Assessment Project provides data in map form
12  going back to 1982.  That does not address
13  whether data is available somewhere in some
14  archive in the government.  This is the publicly
15  available data.
16    Q.    Where is the '82 to '92 data?  You
17  just said --
18    A.    I'm sorry.  19 -- I meant -- if I
19  did, I misspoke.  I meant 1992 through 2014.
20    Q.    And then you told us you don't know
21  if there's any data before 1992?
22    A.    I am not aware of any publicly
23  available data that can be used to generate a
24  map.
25    Q.    Did you look for it?

Page 125

1    A.    Yes.
2    Q.    Where?
3    A.    I just -- I just looked for
4  agricultural pesticide use maps, and this -- this
5  is what -- what came up.  There are --
6    Q.    Well, you said --
7    A.    There are no, that I'm aware of,
8  competing government agencies that provide the
9  same publicly available information on this -- on
10  this issue.
11    Q.    Name the government agencies that
12  you inquired into whether they kept such data.
13    A.    I did it the other way.  I searched
14  -- I searched for pesticide use in the United
15  States maps.
16    Q.    Do Google?
17    A.    Google search.  Google Scholar.
18    Q.    Pesticide use in the United States
19  maps?
20    A.    US maps.  Looked at that.  Would
21  have looked at that in Google Scholar.  Would
22  have looked at that in probably a PubMed search
23  with those terms.  Yeah.
24    Q.    Okay.  Is that a good way of
25  determining etiology?

William H. Fleming, M.D., Ph.D.

Page 126

1    A.    It's a good way --
2    Q.    Creating Google for maps?
3    A.    It's a good way of collecting data.
4    Q.    Okay.
5    A.    It's a modern way of collecting
6 data.
7    Q.    All right.  What did you use to
8 determine whether or not there was data available
9 for this geographical variance before 1992?
10   A.    I did not identify any other
11 publicly available, readily accessible source of
12 data and chose to go with the USGS assessment
13 project --
14   Q.    Okay.
15   A.    -- which has been in place now for a
16 quarter century.
17   Q.    And you told me --
18   A.    This is -- this is the go-to place
19 for glyphosate usage data, much as the National
20 Cancer Institute is the go-to place -- one of the
21 main go-to places for cancer data in the United
22 States.
23   Q.    Does National Cancer Institute have
24 a position on glyphosate?
25   A.    I did not review the positions of

Page 127

1 any regulatory body or any position taken in a
2 review article or a formal position taken.  I
3 would not have reviewed a formal position taken
4 by the NCI.
5         I have reviewed the Agricultural
6 Health Study from 2005, and this was funded by
7 the National Institutes of Health and it was
8 funded -- it was basically done by
9 epidemiologists from the National Cancer
10 Institute, which is an institute within the
11 National Institutes of Health.
12   Q.    Was that a no?
13        What -- you said a minute ago that
14 the NCI was the go-to for?  What do you call them
15 the go-to for?
16   A.    Clinical -- clinical cancer
17 incidence in the United States.
18   Q.    Okay.  Do you know if they have a
19 position on the causality of glyphosate and any
20 cancer?
21   A.    I did not review opinions on that to
22 come to my conclusion.
23   Q.    Have you ever Google searched it,
24 make Google search the maps?
25   A.    It would -- it would -- it would not

Page 128

1 have -- it would not have been relevant one way
2 or another.
3         My job was to look at the primary
4 available data and to draw a conclusion.  I was
5 not asked to review the opinions of regulatory
6 agencies or think tanks or the federal
7 government.  I was asked to review the scientific
8 literature on this question.
9    Q.    You didn't look at any EPA reports?
10   A.    If they're on my MCL, I looked at
11 them.
12   Q.    All right.  Let's look at this MCL
13 because there seems to be a lot of confusion,
14 Doc.
15        MR. JOHNSTON:  Objection.
16   Argumentative.
17 BY MR. LITZENBURG:
18   Q.    Materials Considered List.  Now,
19 first of all, what is the difference between the
20 Materials Considered List and the Supplemental
21 Materials Considered List that I was subsequently
22 given?
23   A.    I don't know.
24   Q.    Okay.  You want to look at them
25 together?

Page 129

1    A.    Happy to.
2         MR. LITZENBURG:  Okay.  You've
3 got one there, which is within that
4 Exhibit 1.  I'm going to give you this.
5 We'll call this Exhibit 3.
6         (Document marked for
7    identification purposes as Fleming Exhibit
8    20-3.)
9 BY MR. LITZENBURG:
10   Q.    All right.  I've just given you
11 Exhibit 3, which says it's "Supplemental
12 Materials Considered List"?
13   A.    Yes.
14   Q.    Okay.  And how many items are on it?
15   A.    74.
16   Q.    Okay.  And how many items are on the
17 initial Materials Considered List?
18   A.    71.
19   Q.    Okay.  Is there -- would they
20 overlap by 71?
21   A.    I --
22   Q.    Or are they different lists?
23   A.    We can go through them one at a
24 time.
25   Q.    Who made them?

William H. Fleming, M.D., Ph.D.

Page 130

1    A.    Why don't we?
2    Q.    Who made them?
3    A.    I made them.
4          MR. JOHNSTON: Objection. That
5    clearly is in violation of rule -- the
6    Rule 26 on about the drafts, etc., of
7    expert reports.
8    BY MR. LITZENBURG:
9    Q.    Have you ever seen these before?
10   A.    Yes.
11   Q.    When?
12   A.    When I generated it.
13   Q.    Oh, you -- you wrote these lists?
14         MR. JOHNSTON: Counsel,
15   objection. You're not supposed to ask
16   about the drafting of expert reports.
17         MR. LITZENBURG: He offered it.
18   I didn't ask. He said he seen it when he
19   drafted it.
20         THE WITNESS: I did not.
21   BY MR. LITZENBURG:
22   Q.    Is that your under oath testimony?
23   A.    No, it is not.
24   Q.    Okay. What --
25   A.    I provided --

Page 131

1    Q.    Okay. What are --
2    A.    I provided a list of materials I
3    considered to Hollingsworth. They put it in
4    alphabetical order using the reference format
5    that you see in front of you.
6    Q.    Did they provide any of these to
7    you?
8    A.    Certainly.
9    Q.    Okay. How do we tell which ones?
10   A.    Well, we'd have to go through them
11   one at a time. I'm happy to.
12   Q.    Okay. Well, let's go through this
13   with this idea.
14         How many of these are regulatory
15   documents? You said it didn't matter to you what
16   regulators thought; right?
17   A.    I didn't say it didn't matter. I
18   said --
19   Q.    What did you say about regulators --
20   regulatory documents?
21         MR. JOHNSTON: It's on the
22   transcript, counsel. Asked and answered.
23   You're being abusive.
24         THE WITNESS: I said I did not
25   take review articles, think tank reports

Page 132

1    or regulatory decisions into consideration
2    when I prepared my scientifically
3    data-based driven report of the scientific
4    literature evaluating the role of
5    glyphosate and NHL, period.
6    BY MR. LITZENBURG:
7    Q.    Okay. So of these 74 things on this
8    list, tell me, what is the supplemental part of
9    it? What needed to be add -- what were the three
10   things that needed to be added?
11   A.    To be sure, we would need to go over
12   both lists one at a time to see where -- to see
13   if there's any differences before reference or
14   before number 72.
15   Q.    You don't know if there's any
16   differences?
17         MR. JOHNSTON: Objection. He
18   just testified to that. He suggested that
19   the way to do this would be to go through
20   it one at a time. If you would like to do
21   that, I'm sure he's willing to do that.
22         THE WITNESS: Absolutely.
23         (Reviewing document).
24   BY MR. LITZENBURG:
25   Q.    I don't want to use your time like

Page 133

1    that.
2          MR. JOHNSTON: It's your time
3    actually, counsel.
4    BY MR. LITZENBURG:
5    Q.    All right. So give me -- give me a
6    more concise statement about what you relied on
7    in forming your opinion today.
8    A.    I relied on studies addressing
9    potential links between glyphosate and NHL in
10   humans.
11   Q.    What did you do to identify -- you
12   said this was the best way of showing the
13   prevalence of glyphosate use geographically over
14   the US.
15         What did -- what is the second best?
16         MR. JOHNSTON: Objection.
17   Assumes. It's a hypothetical question.
18         THE WITNESS: I am not aware of
19   additional databases that are publicly
20   available and could be queried.
21   BY MR. LITZENBURG:
22   Q.    And what did you do to make yourself
23   aware of them?
24   A.    I searched the topic to begin with,
25   and the current government-funded database that

William H. Fleming, M.D., Ph.D.

Page 134

1 began 25 years ago was right at the top of the
2 search list.
3      Q.    When was glyphosate first marketed?
4      A.    Give me a moment.
5      Q.    Do you know offhand what decade it
6 is?
7      A.    I believe the year 1974.
8      Q.    Okay.  And where do we find the data
9 for the geospatial usage of glyphosate from 1974
10 to 1992?
11           MR. JOHNSTON:  Objection.  Asked
12      and answered.
13           THE WITNESS:  The GeoViewer data
14      is a relatively new adaptation to the SEER
15      database and has only been relatively
16      recently available.  It is not possible to
17      use geo version for historical purposes.
18 BY MR. LITZENBURG:
19      Q.    Okay.
20      A.    I used the most up-to-date data
21 which goes to 2014 and begins at 2008.  There may
22 be a time period or two behind that, but -- but I
23 wanted to use the most up-to-date data and to
24 look at how that fit with the glyphosate usage 10
25 years before.

Page 135

1      Q.    You only -- you only looked at the
2 data from 2008 to 2014 did you just say?
3      A.    Yes.  It's the most recent and
4 relevant data and, as shown in my report from NCI
5 SEER database statistics, the incidence has
6 changed over time.  So, you know, you want to
7 take what's the most current time frame and
8 ask -- and ask your question.
9           So it's a current -- it's as current
10 a database as I could use.
11      Q.    So you're jumping.  You're talking
12 about SEER now; is that right?
13           MR. JOHNSTON:  Well, objection.
14      The whole line of questioning is vague
15      because of this.
16           THE WITNESS:  Right.  I mean --
17 BY MR. LITZENBURG:
18      Q.    What is the best database?  The
19 superlative that you just used?
20           MR. JOHNSTON:  Objection.  Vague.
21           THE WITNESS:  Yeah.  I'm not -- I
22      don't understand your question.
23 BY MR. LITZENBURG:
24      Q.    It's the most recent and relevant
25 data.  As shown in my report, from NCI SEER

Page 136

1 database statistics, the incidence has changed
2 over time.  So you want to take what's the most
3 current time frame and ask your question so it's
4 as current a database as I could use.
5           What database are you talking about
6 there?
7      A.    I am talking about the SEER incident
8 rate database cancer by site, all races, both
9 sexes, and I used the initial studies I could
10 going back to 1975 through 2014.  This is shown
11 in Figure 3 of my report.
12           However, that -- that tells you that
13 over time the incidence of -- the increasing
14 incidence of NHL in the United States has
15 declined, plateaued and begun, you know, and
16 actually begun to truly decline.  Okay?
17           During this same time period, the
18 use of glyphosate has gone from about 1.4 million
19 to a hundred million tons per year.  So --
20      Q.    I think -- I think we need to slow
21 down.
22      A.    Okay.
23      Q.    Yeah.  I was asking you about the
24 metrics for the estimated agricultural use for
25 glyphosate, and now you're telling me you've got

Page 137

1 Figure 3 and SEER data; is that right?
2      A.    The glyphosate data is not SEER.  It
3 is not NCI.
4      Q.    Oh.
5      A.    It is, as we discussed a moment
6 ago --
7      Q.    Okay.
8      A.    -- part of the USGS National
9 Water-Quality Assessment Project.
10      Q.    When did we start talking about
11 cancer statistics?  I hadn't gotten there yet.
12 When did we start talking about that?  Because I
13 noticed a transition --
14           MR. JOHNSTON:  Apparently your
15      questions --
16 BY MR. LITZENBURG:
17      Q.    -- in the answers.
18           MR. JOHNSTON:  Objection.
19      Apparently your questions were vague,
20      counsel.  So perhaps you should try it
21      again.
22 BY MR. LITZENBURG:
23      Q.    Okay.  When you keep saying these
24 are the best databases, which were you referring
25 to?  Are you talking about cancer or pesticide

Page 138

1  uses?
2      A.    I believe that both of them are the
3  most relevant to the scientific question at hand.
4      Q.    These are --
5      A.    Both -- both of those databases.
6      Q.    These are the two most relevant data
7  points to the question of causality for you?
8      A.    I didn't say data points.  I said
9  databases.  That would include more than one data
10 point.
11     Q.    What was the other important data
12 points to that question?
13            MR. JOHNSTON:  Objection.  Vague.
14            THE WITNESS:  You'll have to be
15     more specific.
16 BY MR. LITZENBURG:
17     Q.    What are other variables that are
18 important to this causality question?
19            MR. JOHNSTON:  Objection.  Vague
20     and --
21            THE WITNESS:  Other -- other
22     variations or I'm -- I'm --
23            MR. JOHNSTON:  Asked and
24     answered.
25            THE WITNESS:  What causality

Page 139

1      question are we -- we have to talk about a
2      very defined definite data set and --
3  BY MR. LITZENBURG:
4      Q.    Okay.
5      A.    -- and hone in on it.
6      Q.    Okay.  So we're talking about
7  glyphosate and non-Hodgkin lymphoma.
8      A.    Uh-huh.
9      Q.    Are we clear on that?
10     A.    Yeah.
11     Q.    Okay.  What other variables are
12 important to that question of association?
13            MR. JOHNSTON:  Objection.  Asked
14     and answered.  You asked that answer
15     earlier.
16            THE WITNESS:  I believe I've
17     answered that question previously.
18 BY MR. LITZENBURG:
19     Q.    What was it, the answer?
20     A.    We've discussed it in the context of
21 a variety of different questions.
22     Q.    Okay.  Name one.  Name the third
23 most important variable.
24            Are you telling me --
25            MR. JOHNSTON:  Objection.  Calls

Page 140

1      for hypothesis.
2  BY MR. LITZENBURG:
3      Q.    -- the geographical distribution, it
4  might be sale or it might be your analysis -- we
5  don't know -- of glyphosate use in the US --
6      A.    Okay.
7      Q.    -- and SEER --
8      A.    I can -- I can --
9      Q.    -- incidence by county are the two
10 most important data points?
11            MR. JOHNSTON:  Objection.  Your
12     whole line of questioning is vague because
13     now you're mixing apples and oranges now.
14            THE WITNESS:  Right.  I -- yeah,
15     I need you to restate your question if you
16     would.
17 BY MR. LITZENBURG:
18     Q.    Okay.  You just said these are the
19 most important databases and the most important
20 data points.
21            To what?
22            MR. JOHNSTON:  Objection.  Vague.
23            THE WITNESS:  With regard to the
24     county level incidence of NHL, these are
25     the most recent data points available to

Page 141

1      analyze.
2            This makes the conclusions drawn
3      from them, you know, recent, not -- not
4      historical from 20 to 30 years ago, and
5      this is important because I was interested
6      in focusing on the current incidence of
7      NHL.
8  BY MR. LITZENBURG:
9      Q.    Why?
10     A.    The most recent one.
11            Because it doesn't really matter to
12 me the -- the -- I was not able to generate --
13 Data that I could not put into a map format
14 because it was not available to be done in a map
15 format was of no interest to me because I wanted
16 to demonstrate a nationwide association between
17 these two.
18     Q.    You wanted to demonstrate a
19 nationwide association?
20     A.    I wanted to look if there was one.
21 Absolutely.
22     Q.    Okay.  What -- you were starting to
23 say it was not important to you, which historical
24 data; is that what you're saying?
25            How old --

William H. Fleming, M.D., Ph.D.

1    A.    I said --
2    Q.    How old is data before it becomes
3  unimportant to you?
4    A.    It depends entirely on the context,
5  but if I was rendering an opinion on NHL today, I
6  would not be particularly interested in
7  county-specific data that preceded 1974 as
8  glyphosate was not in use whatsoever.  So that
9  historical data would be of no interest to me in
10  this matter.
11    Q.    Okay.  So how --
12    A.    It could -- it could be of interest
13  in answering another scientific question.  It
14  could be of interest in many other capacities,
15  but it would not be of interest to me in this
16  setting.
17    Q.    Okay.  Tell me two things -- tell me
18  one thing that you did to determine the county
19  level usage of glyphosate from 1974 to 1992.
20          MR. JOHNSTON:  Objection.
21          THE WITNESS:  This --
22          MR. JOHNSTON:  Misstates the --
23  misstates the testimony and not
24  encompassed within the expert report.
25          THE WITNESS:  The SEER

1  database --
2  BY MR. LITZENBURG:
3    Q.    Now we're jumping from --
4    A.    The SEER --
5    Q.    -- from county usage to cancer
6  incidents; right?
7          Because I want to make clear that
8  transition for the record when we do that.
9          I just asked you a question about
10  that top chart, which is glyphosate usage, right?
11  Has nothing to do with cancer, or am I wrong?
12          MR. JOHNSTON:  Objection.
13  Compound and argumentative.
14          THE WITNESS:  I thought you were
15  referring to the bottom chart.  So your
16  question is now about the top chart?
17  BY MR. LITZENBURG:
18    Q.    It always has been.  I mean, maybe
19  we need to demarcate the question a little bit.
20    A.    Sure.
21          MR. JOHNSTON:  Yes, that would
22  help.
23  BY MR. LITZENBURG:
24    Q.    We're looking at the top.
25    A.    Uh-huh.

1    Q.    All right.  You said this is about
2  the geographic distribution or usage of
3  glyphosate; right?
4    A.    Uh-huh.
5    Q.    And NCI doesn't -- doesn't --
6    A.    No.
7    Q.    -- keep such statistics?
8    A.    No, not at all.
9    Q.    So what did you do to look at the --
10  at the geographical distribution of glyphosate
11  from 1974 to 1992?
12    A.    From 1974 to 1992?
13    Q.    Yes.
14    A.    I did -- I did not look at that in
15  detail.
16    Q.    Okay.  What -- at what level did you
17  look at that data?
18    A.    For interest sake, I scanned the
19  glyphosate data in the database from some point
20  in the '90s through to the most recent date,
21  probably the last couple of years, and decided
22  that if I was going to correlate this with NHL
23  incidence, I would need to pick a year.
24    Q.    What year did you pick?
25    A.    I picked the year 2000 because the

1  year 2000 to me seemed important because we'd had
2  over a 70-fold increase in the amount of
3  glyphosate since its registration in 1974.  So
4  there was a tremendous amount of glyphosate in
5  the -- in the community.
6    Q.    Yeah.
7    A.    And this also, that was the latest
8  time point I could choose and still look at
9  incidence by county with a 10-year latency
10  period, and that's what drove the decision of --
11  of looking at these two data sets.
12          And I would like to continue to add
13  that the top glyphosate data set interestingly
14  defined, by my recollection, the agriculturally
15  intense areas of the United States pretty much
16  since its inception, and it was really only the
17  areas that the intensity of the use that changed
18  over time rather than the areas for the most
19  part.
20          So it was actually a very stable
21  representation of where the high levels were
22  used.
23    Q.    Okay.  You were answering, I
24  believe, the question of how you calculated or
25  where you pulled the data, the geographical

William H. Fleming, M.D., Ph.D.

1 distribution of glyphosate from 1974 to 1992.
2        Could you answer that for me now?
3        MR. JOHNSTON: Objection. Vague.
4 Misstates his testimony.
5        THE WITNESS: I --
6        MR. JOHNSTON: Misstates the
7 question he was answering.
8        THE WITNESS: Yeah. I -- I did
9 not specifically use the years you just
10 mentioned as part of my report.
11 BY MR. LITZENBURG:
12     Q.    Do you know anything about the
13 geographical use of glyphosate between '74 and
14 '92?
15        MR. JOHNSTON: Objection. Asked
16 and answered. He just answered that about
17 five minutes ago.
18 BY MR. LITZENBURG:
19     Q.    Okay. You told me that there was --
20 well, do you have an answer to that question?
21        MR. JOHNSTON: Yeah. Asked and
22 answered, but you can answer it if you
23 have the -- if you want to repeat your
24 answer.
25        THE WITNESS: I looked at that,

1    some of that data, but not all briefly,
2    and then did not include it in my report
3    because I didn't think it was material.
4 BY MR. LITZENBURG:
5    Q.    Where can I find that data? Where
6 would I go to to find geographical agricultural
7 use for glyphosate from 1980?
8    A.    I would direct you to the USGS
9 National Water Safety Assessment Project. They
10 will have a web page, and I suspect they will
11 have a button that says something along the lines
12 of "Contact Us" and you can ask them that
13 question.
14    Q.    That's the only way I get the data?
15        So did you ask them for it? Did you
16 ask them for raw data?
17    A.    I was not interested in those in
18 that time frame.
19    Q.    So you have no idea what the data is
20 from that time frame?
21    A.    I did not find that time frame
22 material in any way to my report.
23    Q.    The time frame from 1974 to 1992 is
24 not material in any way to whether glyphosate has
25 an association with -- with NHL?

1    A.    What I did in Figure 1 of this
2 report was to show the incidence of NHL changing
3 over time from 1975 to 2014, and I mentioned in
4 the text of the report the concomitant increase
5 in the use of glyphosate over that period of
6 time.
7    Q.    Okay. You said --
8    A.    And I chose the most recent time
9 frame to evaluate further using this -- these --
10 these maps because that was most representative
11 of the current state of the art for current
12 incidence of -- of NHL in the United States at
13 the -- at the county level.
14        And I backed that off by 10 years to
15 look at the glyphosate pattern. It wouldn't have
16 mattered if I backed off four years or six years,
17 the pattern was essentially the same. I chose
18 2000 because it accounted for a potential 10-year
19 latency period.
20    Q.    It wouldn't have mattered if you had
21 chosen -- well --
22    A.    The pattern would be the same. The
23 pattern would be the same.
24    Q.    These maps look the same going
25 back --

1    A.    They look -- what I was struck by
2 when looking at these maps was how similar they
3 looked over time, and there was a gradient from,
4 you know, very light yellow to very dark brown.
5 You can see those four groups less than 4.5
6 pounds all the way up to more than 88 pounds per
7 acre.
8        The patterns at the earliest maps I
9 looked at basically identified the Central Valley
10 of California. They identified the Northwest.
11 They developed -- they identified the central
12 portion of -- of Florida.
13        What was different somewhat was the
14 intensity of it and over time the areas that had
15 the highest use increased somewhat, but from a
16 pure pattern point of view, pattern recognition
17 point of view, these agricultural areas were
18 definable by glyphosate usage from the earliest
19 time points I recall available in the data set.
20    Q.    So you're telling me when you looked
21 at maps -- this is for 2000, But when you looked
22 at the same map for 1990, it looked about the
23 same?
24    A.    I don't know if I went back as far
25 as 1990. I went back a couple years and I went

William H. Fleming, M.D., Ph.D.

Page 150

1  forward several years, and I was -- I was struck
2  by the similarity in pattern and the fact that
3  there was a slight progression in the amount
4  total used, which fits, of course, with the
5  amount of glyphosate -- increasing amounts of
6  glyphosate used over time.
7      Q.   How many years did you use to
8  compare it to find this year to be emblematic?
9  You said you went forward a few years, back a few
10 years and found this fairly representative.  Can
11 you give us a number?
12     A.   That was not the --
13          MR. JOHNSTON:  Objection.
14 Misstates his testimony.
15          THE WITNESS:  Yeah.  That -- that
16 was not the description I gave to you
17 earlier.  It is not the description in my
18 report.
19 BY MR. LITZENBURG:
20     Q.   Okay.
21     A.   If you like me to restate what I
22 did, I would be happy to.
23     Q.   How did glyphosate usage patterns
24 change from 1990 to 2000?
25     A.   They would have significantly

Page 151

1  increased, and if you'll give me a moment here,
2  I'll see how close my report brackets the years
3  that you're questioning.
4          (Reviewing document).
5          Okay.  By 1990, the annual usage of
6  glyphosate in the United States had increased
7  from 1.4 million pounds in 1974 to 15 million
8  pounds.  This increased to 40 million pounds by
9  1995 and to 98 million pounds by the year 2000.
10         In 2014, maximum 2014, a range of
11 2008 to 2014, up to 14 years after the annual
12 usage of glyphosate reached 98 million pounds,
13 the annual incidence of NHL continued to slowly
14 decline.
15     Q.   Did you just tell me anything about
16 geography?
17     A.   This para -- this data does not take
18 into account any regional differences in either
19 glyphosate usage or incidence.  These are
20 important variables that will be considered in
21 the next section.
22     Q.   Okay.  I'm going to --
23     A.   The next section is entitled
24 "Regional differences in glyphosate use and the
25 incidence of NHL."

Page 152

1      Q.   And I'm asking you --
2      A.   I'm happy to read this for you.
3      Q.   I'm asking you for -- no, it was a
4  quick read.
5          I'm asking for the 10th or 11th
6  time:  How did this agricultural usage across the
7  country and its distribution, how did that change
8  from 1990 to 2000?
9          Do you understand what I'm asking,
10 first of all?
11         MR. JOHNSTON:  Objection.  He can
12 now answer for the 10th or 11th time to
13 the question that you've asked 10 or 11
14 times.
15         Do you know what he's asking you?
16 You can give the same answer you gave
17 before.
18         THE WITNESS:  By 1990, the
19 estimate was 15 million pounds.  By the
20 year 2000, the estimate was 98 million
21 pounds.
22 BY MR. LITZENBURG:
23     Q.   How are those 15 million pounds
24 distributed across -- well, let me take a step
25 back.

Page 153

1          You think the geographic
2  distribution of the glyphosate is important to
3  this causality question.
4          You chose that as one factor in
5  doing this analysis; right?
6      A.   I chose two large available data
7  sets to test the hypothesis of whether there was
8  any association with glyphosate and NHL, and I
9  have compared them in two figures in my report
10 labeled Figure 5.
11     Q.   Was geographical distribution one of
12 those?
13         MR. JOHNSTON:  Objection.  Vague.
14         THE WITNESS:  Geographical
15 distribution is a key component of both
16 the glyphosate data set and the NHL
17 incidence by county.  They are -- these
18 are -- this is demographic data -- I mean,
19 regional data.
20 BY MR. LITZENBURG:
21     Q.   Okay.
22         MR. JOHNSTON:  It's about
23 lunchtime, so wrap up soon?
24         MR. LITZENBURG:  Yeah.  We'll
25 quit in a couple minutes.

Page 154

1 THE VIDEOGRAPHER: 15 minutes
2 left on the tape.
3 MR. LITZENBURG: Okay. Sounds
4 perfect.
5 BY MR. LITZENBURG:
6 Q. Geographical distribution is a key
7 component of both the glyphosate data set and the
8 NHL incidence by county. This is demographic
9 data -- I mean --
10 A. Right.
11 Q. -- regional data.
12 You stand by that answer at least?
13 MR. JOHNSTON: Objection. Asked
14 and answered.
15 THE WITNESS: Could you repeat
16 the question?
17 BY MR. LITZENBURG:
18 Q. Yeah. Dr. Fleming, I'll go back to
19 my original question, which is: How did the
20 distribution patterns --
21 A. Uh-huh.
22 Q. -- of glyphosate differ between 1990
23 and 2000?
24 MR. JOHNSTON: Objection. Asked
25 and answered.

Page 155

1 THE WITNESS: I did not review
2 the distribution pattern for the dates you
3 have inquired about.
4 BY MR. LITZENBURG:
5 Q. Okay. Why not?
6 MR. JOHNSTON: Objection. Also
7 asked and answered.
8 THE WITNESS: I wanted to take
9 the most geographically regionally defined
10 data on NHL incidence in the United
11 States. This is from 2008 to 2012.
12 I wanted to back off at least 10
13 years to account for certain estimates of
14 latency that have been proposed to allow
15 sufficient time for any relationship
16 between glyphosate exposure and NHL
17 incidence to be evident.
18 Consequently, I didn't go back
19 past 2000 because I did not wish to
20 compare 1990 with 2004. I wanted to
21 compare current up-to-date glyphosate
22 data.
23 And I would also tell you that
24 the incidence by county is not available
25 historically for very long. This is --

Page 156

1 this is -- I'm not -- I'm not sure how
2 many other time periods were available to
3 analyze.
4 I chose the most recent one and I
5 worked backwards to say, all right, what
6 was the glyphosate usage in this country
7 approximately 10 years before or 10, you
8 know, at least 10 years before.
9 BY MR. LITZENBURG:
10 Q. Okay.
11 A. Eight to 12.
12 Q. I still haven't stopped talking
13 about that first map and you're talking about the
14 second one; right?
15 A. I'm talking about both of them
16 because either one in isolation doesn't address
17 the question in any way about any potential
18 correlation between glyphosate use and -- and NHL
19 incidence.
20 Q. You told me --
21 A. You can't look at either of them in
22 isolation and draw any conclusions.
23 Q. Did you tell me that the 70-fold
24 increase in glyphosate usage from 1974 to 2000
25 was important to you in forming your opinion in

Page 157

1 doing this?
2 MR. JOHNSTON: Objection.
3 Misstates his testimony.
4 THE WITNESS: The numbers you
5 have quoted represent in my mind a
6 significant increase in glyphosate usage
7 during that time period. That is not to
8 say it was not also significant in 2001,
9 in 1999. You know, it's all in the sort
10 of eye, you know, eye of the beholder.
11 That was not my -- my point.
12 My point was to illustrate with
13 nationwide data sets any relationship that
14 could be discerned between glyphosate
15 usage and NHL incidence by county.
16 This is, in my opinion, the best
17 data sets available to provide this
18 information in graphic form, and basically
19 anyone can look at this and draw their
20 conclusions as to whether there seems to
21 be overlap between high levels of
22 glyphosate and high levels of NHL.
23 It does not take any particular
24 epidemiologic expertise to do this,
25 medical expertise to do this. A nonexpert

William H. Fleming, M.D., Ph.D.

Page 158

1  can actually sit down and look at this
2  relationship themselves.
3  BY MR. LITZENBURG:
4      Q.   Okay.
5      A.   I was asked to prepare this report
6  for a Daubert hearing, and I was asked to make
7  this report to imagine I was a judge and to make
8  this information as accessible as I could to
9  people who did not have a strong background in
10 lymphoma genesis, lymphoma etiology, NHL
11 incidence, glyphosate.
12       So I used whatever tools I had at
13 hand to -- to provide that.  This is nothing more
14 than a simple demonstration of what turns out to
15 be, when looking at it, an absence of correlation
16 between these two variables.
17      Q.   Dr. Fleming, I'm going to try and
18 get an answer out of this to this question before
19 you go have lunch with your counsel and come back
20 and we'll see what you say afterwards.
21       You've told me from 1974 to 2000
22 that the usage of glyphosate changed by a 70-fold
23 increase; right?
24      A.   Approximately, yes.
25      Q.   Okay.  How did the geospatial

Page 159

1  distribution of glyphosate -- not cancer --
2  change between 1974 and 2000?
3       MR. JOHNSTON:  Objection.  Asked
4    and answered.  He's already answered that
5    question three times.
6  BY MR. LITZENBURG:
7      Q.   Do you know?
8      A.   I looked at the available data that
9  I could in the map format and was immediately
10 struck by the fact that the patterns of
11 glyphosate, which is what you're looking at in
12 that top figure, remain essentially constant
13 throughout time.  The color code changed as the
14 amount of glyphosate use increased.
15       To put it another way, the Central
16 Valley of California was present as an area of
17 high glyphosate use as early on as I looked.  It
18 remained that way through 2002, and it remained
19 that way for subsequent years.
20      Q.   How early did you look?
21      A.   I looked as early as the -- as the
22 mapping program had data for.
23      Q.   How far did you go back?
24      A.   I don't recall that because, again,
25 I focused on NHL and the approximately 10-year

Page 160

1  latency period and so I don't -- I don't recall
2  the exact date that this data set goes back for
3  being able to draw maps.
4      Q.   Well, ballpark it.
5       MR. JOHNSTON:  Objection.  He
6  doesn't know.  Asked and answered.
7       THE WITNESS:  I don't know.
8  BY MR. LITZENBURG:
9      Q.   Okay.
10     A.   It was not material --
11     Q.   And --
12     A.   It was not material to my report.
13     Q.   The distribution -- the changes in
14 distribution geographically between 1974 and 2000
15 are not important to your opinion or your report;
16 correct?
17      MR. JOHNSTON:  Objection.
18 Misstates his testimony.
19      THE WITNESS:  They are not
20 relevant to the data I present in Figure 5
21 of my report and only that.
22 BY MR. LITZENBURG:
23     Q.   And Figure 5 is only relevant if
24 there is an eight to 12-year latency period for
25 non-Hodgkin lymphoma.

Page 161

1       Do you agree with me there?
2      A.   Figure 5 is relevant for a -- it is
3  actually -- it is not known whether that is the
4  case.  I do not know for sure.
5       MR. LITZENBURG:  Break on that.
6       THE VIDEOGRAPHER:  Time now is
7  12:03.  We are going off the record.  This
8  is the end of Disk No. 2.
9       (Whereupon, at 12:03 p.m., a
10 luncheon recess was taken.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

William H. Fleming, M.D., Ph.D.

Page 162

1    AFTERNOON SESSION
2         (12:53 p.m.)
3    WILLIAM H. FLEMING, MD, PHD
4  called for continued examination and, having been
5  previously duly sworn, was examined and testified
6  further as follows:
7         EXAMINATION (CONTINUED)
8         THE VIDEOGRAPHER:  The time now
9  is 12:53.  We are back on the record.
10   This is the beginning of Disk No. 3.
11 BY MR. LITZENBURG:
12    Q.    Did you get a chance to get lunch,
13 Dr. Fleming?
14    A.    Yes, I did.
15    Q.    Are you ready to go?
16    A.    Absolutely.
17    Q.    Okay.  You've never done -- have you
18 ever done expert work before for litigation?
19    A.    I have provided expert reports in
20 the past, yes.
21    Q.    Okay.  What was the matter?
22    A.    It was a -- it related to
23 bisphosphonates and multiple myeloma.
24    Q.    Is somebody sued somebody?  It was a
25 court case?

Page 163

1    A.    No.  No.  I just provided expert
2  medical report, reviewing the history of the, you
3  know, up-to-date at the time treatment of
4  multiple myeloma.  I talked about the individual
5  case in some detail and then basically gave my
6  opinion on the utility of bisphosphonates and the
7  treatment.
8    Q.    But, I mean, who was it done for?
9  Who asked you to do it?  It wasn't a court case
10 is what I'm saying.  It wasn't in litigation?
11    A.    This was with Hollingsworth in 2010.
12    Q.    Okay.  Did you give a deposition --
13    A.    No.
14    Q.    -- in that case?
15    A.    This is the first deposition I've
16 ever given.
17    Q.    Have you ever served as an expert --
18 have you ever been sued before for malpractice?
19    A.    No, not that I'm aware of.
20    Q.    You gave me an answer about AIDS
21 earlier that I was surprised I didn't understand.
22        Do you agree with me that AIDS
23 increases the risk of non-Hodgkin lymphoma?
24    A.    That was historically true.  It is
25 no longer true.

Page 164

1    Q.    Okay.  Why is that?
2    A.    Because the HIV virus does not get
3  into lymphocytes and cause a clonal expansion of
4  lymphocytes resulting in lymphoma as EBD does.
5  It gets into cells and reduces their number and
6  their efficacy, and this results in
7  virally-induced immunosuppression.  It is in that
8  setting of virally-induced immunosuppression
9  specific to the HIV that lymphoma developed.
10        In the late 1800s or late 1980s
11 through about 1993, patients who presented with
12 full-blown AIDS often developed lymphoma.  And
13 from 1993 on, when HIV viral load could be easily
14 controlled, it turned out that the incidence of
15 lymphoma in those patients dropped off absolutely
16 dramatically.
17        We actually had a program at our
18 cancer center that was developed in the '90s, the
19 early '90s to evaluate HIV lymphoma.  It was a
20 research group, and we closed that research group
21 a number of years ago because HIV lymphoma
22 basically ceased to exist as a clinical entity.
23    Q.    And, in fact, if you look at Figure
24 3 in your report on page 4.
25        It's page 4.

Page 165

1    A.    Sure.  Yes.
2    Q.    That tracks that dip.  That's
3  exactly what you're saying; right?
4        It's rising -- in the second chart
5  on the right, it's rising up till about --
6    A.    The second --
7    Q.    -- 1993 and then there's -- then
8  there's a dip; right?
9    A.    The chart panel B on Figure 3 shows
10 the SEER data for NHL, all races, all sexes, in
11 the age group of 20 to 49.
12    Q.    Do you agree with me that that dip
13 has to do with AIDS just the mechanism that you
14 just explained?
15        MR. JOHNSTON:  Age or AIDS?
16        MR. LITZENBURG:  AIDS.
17        MR. JOHNSTON:  You mean HIV?
18        MR. LITZENBURG:  Uh-huh.
19        THE WITNESS:  This data does not,
20 you know, give -- this data set we're
21 looking at here does not give any
22 indication as to what the cause of that
23 is.
24 BY MR. LITZENBURG:
25    Q.    Dr. Fleming, neither does any of the

Page 166

1  charts that you've referred to today.
2        I mean, what does Figure 4 and 5
3  give us as to the cause of non-Hodgkin lymphoma?
4        MR. JOHNSTON:  Objection.
5  Argumentative.
6        THE WITNESS:  Figures 4 and 5 are
7  illustrative of the conclusion I drew from
8  the Agricultural Health Study that there
9  was no positive correlation between
10  glyphosate and NHL.
11  BY MR. LITZENBURG:
12     Q.   I thought we were actually finding
13  some common ground here.
14        Does this chart, Figure 3 on the
15  right, does that not describe precisely the trend
16  that you just told us about the AIDS virus and
17  doesn't, in fact, look at young people as
18  opposed to all people?
19        This is the 20 to 49.  That's
20  typically the age range in which you get new
21  cases of AIDS, isn't it, Dr. Fleming?
22        MR. JOHNSTON:  Objection.
23  Compound question and narrative, and I'm
24  guessing it's going to be difficult to
25  find common ground given how far out you

Page 167

1     are on the playing field.
2        But go ahead if you can answer
3  his question.
4        THE WITNESS:  There are a great
5  many factors that are represented here in
6  Panel B and I --
7  BY MR. LITZENBURG:
8     Q.   What?
9     A.   -- don't know -- I'm sorry?
10     Q.   What factors?
11        MR. JOHNSTON:  Can you let him
12  answer his question?  You're talking over
13  him, counsel.
14        THE WITNESS:  Okay.  It's not --
15  it's not possible to tell, looking at
16  this, what is responsible for -- for that
17  drop.
18        What you're saying is that the
19  successful treatment of the AIDS epidemic
20  could follow a similar pattern, but that's
21  a hypothetical to which I cannot give you
22  an answer.
23  BY MR. LITZENBURG:
24     Q.   You don't know how that -- you just
25  gave me a very learned answer about AIDS

Page 168

1  epidemic --
2     A.   Uh-huh.
3     Q.   -- and the specific years
4  affected --
5     A.   Yeah.
6     Q.   -- the incidence of lymphoma, didn't
7  you?
8        MR. JOHNSTON:  No.  Objection.
9  Misstates his testimony.
10        MR. LITZENBURG:  Bob, you can't
11  answer yes or no when I ask a question.
12        MR. JOHNSTON:  You can't ask
13  unfair questions.
14        MR. LITZENBURG:  Bob, you can't
15  answer no when I ask him a question.
16        MR. JOHNSTON:  I'm saying no, you
17  can't answer that question.  It's
18  improper.  You're -- argumentative.
19        MR. LITZENBURG:  You said -- you
20  think that's how you object to form is to
21  say no?
22        MR. JOHNSTON:  Well, I object to
23  form.
24        THE WITNESS:  The extent to which
25  therapy for HIV plays into this fall in

Page 169

1  Figure 3B is not a question I have looked
2  into in any detail to provide you with any
3  meaningful statistical answer.
4  BY MR. LITZENBURG:
5     Q.   But it follows the years you gave
6  me; right?  The trend in the years '80 to '93 and
7  then drop off, right, or does it?
8     A.   This --
9     Q.   Tell us if it does or it doesn't.
10        MR. JOHNSTON:  Objection.
11  Compound.  How many questions do you want
12  to ask him at once, counsel?  It's a
13  compound question.
14        THE WITNESS:  Could you repeat
15  the question, please?
16  BY MR. LITZENBURG:
17     Q.   Is the shape of this line described
18  by the trend that you just told me about AIDS
19  between 1980 and 1993?
20     A.   I gave --
21        MR. JOHNSTON:  Objection.  Asked
22  and answered.  Go ahead.
23        THE WITNESS:  I gave you a
24  generalization.  These are hard numbers.
25  Two different things.

William H. Fleming, M.D., Ph.D.

Page 170

1    I told you that after 1993 with
2 the advent of triple therapy, the entity
3 of AIDS lymphoma declined in the -- in the
4 ensuing years.
5    I did not mean to suggest that it
6 dropped as much as it did or as quickly as
7 it did in Figure 5B. I do not know, you
8 know, what other contributing factors are
9 involved.
10 BY MR. LITZENBURG:
11    Q.   Has anybody done a study on that?
12    A.   Again, beyond the scope of my expert
13 report here today.
14    Q.   Do you think if we stuck two maps
15 side by side it would answer the question for us?
16    MR. JOHNSTON: Objection.
17    Geez, counsel, you don't think
18 that's argumentative and disrespectful?
19    Objection to the conduct of this
20 deposition.
21    THE WITNESS: Again, beyond the
22 scope of my report.
23 BY MR. LITZENBURG:
24    Q.   You agree with me that those two
25 maps that we were looking at before only is true

Page 171

1 if the latency for non-Hodgkin lymphoma is
2 between eight and 12 years; right?
3    A.   Which two maps?
4    Q.   Page 8.
5    A.   No, I do not agree with that
6 statement.
7    Q.   Okay. So if the average latency of
8 non-Hodgkin lymphoma is six months, you're
9 telling me these maps are useful in determining
10 whether glyphosate caused it or not?
11    MR. JOHNSTON: Objection.
12 Misstates the testimony about what these
13 maps show.
14    THE WITNESS: These maps show, as
15 it's titled, the incidence on a
16 county-wide basis from 2008 to 2012.
17 BY MR. LITZENBURG:
18    Q.   But you made an assumption that
19 latency is between eight and 12 years in making
20 those two maps; right?
21    MR. JOHNSTON: Objection. Vague.
22 Misstates his testimony.
23    THE WITNESS: I believe eight to
24 12 years is a reasonable time to begin to
25 look at this question. I do not mean to

Page 172

1 suggest this covers the entire waterfront
2 in terms of possible latency.
3 BY MR. LITZENBURG:
4    Q.   What is your profession or your
5 industry view as a reasonable latency for
6 non-Hodgkin lymphoma?
7    MR. JOHNSTON: Objection.
8 Speculative.
9    THE WITNESS: As noted in my
10 report, outside of the context of chemo
11 and radiation therapy for Hodgkin's
12 disease and outside of the context of
13 developing lymphoma in organ
14 transplantation, very little direct
15 evidence is out there for the latency of
16 NHL.
17    In the vast majority of cases,
18 the latency in a given individual is
19 simply unknown.
20 BY MR. LITZENBURG:
21    Q.   Well, how did you pick eight to 12
22 to do this?
23    MR. JOHNSTON: Objection. Asked
24 and answered. We spent a significant
25 amount of time on that this morning,

Page 173

1 counsel.
2 BY MR. LITZENBURG:
3    Q.   Because it's not unreasonable? Is
4 that how you practice medicine or science?
5    MR. JOHNSTON: Objection.
6 Argumentative. And misstates the
7 testimony that you spent a significant
8 amount of time on this morning.
9    THE WITNESS: As I discussed
10 earlier today, the chemotherapy and
11 radiation therapy data, in combination
12 with data in patients that are
13 immunosuppressed, suggests that this is a
14 very reasonable time, and I believe that
15 there are hints in the case literature
16 studies suggesting 10 years is not
17 unreasonable.
18 BY MR. LITZENBURG:
19    Q.   I'm asking is that how you practice
20 medicine to do things that are not unreasonable?
21    MR. JOHNSTON: Objection. Vague.
22    THE WITNESS: We practice
23 medicine based on the best available data
24 at the moment we draw conclusions and make
25 decisions about treatment.

William H. Fleming, M.D., Ph.D.

Page 174

1 BY MR. LITZENBURG:
2     Q.    But words are important here in
3 litigation at least, and you keep telling me that
4 a latency period of eight to 12 years is not
5 unreasonable.
6           That's different from telling me
7 that you have an opinion that the latency period
8 of non-Hodgkin lymphoma is approximately eight to
9 12 years; right?
10          MR. JOHNSTON: Objection. Vague.
11    Compound.
12          THE WITNESS: My opinion, based
13    on the evidence available to me, is that
14    this time frame should be sufficient to
15    detect NHL.
16 BY MR. LITZENBURG:
17    Q.    And what if the latency is three
18 years? The relationship of these two maps to
19 each other doesn't tell us anything about
20 etiology, would it?  You're comparing 2000 to --
21 2008 to 2012; right?
22          MR. JOHNSTON: Objection.
23    Compound.  Two questions there, counsel.
24    Choose one.
25          THE WITNESS:  If it were limited

Page 175

1 to three years, that would be true.  In
2 the case of organ transplantation, there
3 are circumstances where the lymphoma can
4 develop earlier.
5           There is a subset of patients,
6 for whom we do not understand the reasons,
7 develop lymphoma within a year of
8 beginning immunosuppressive therapy.  The
9 risk for developing it persists until
10 about year 10.
11          Most patients don't develop it in
12 the first year.  Most patients do it
13 later.  It sort of peaks.  It tends to
14 peak at year 10.  That's not to say there
15 isn't a patient out at year 17 or 18.  I
16 just -- I'm just coming up with a
17 reasonable time window to -- to look at
18 this data in.
19 BY MR. LITZENBURG:
20    Q.    So then one year is not unreasonable
21 either?
22    A.    There are subsets of patients in
23 whom we have data that suggests NHL can develop
24 within one year, but that would not be
25 generalizable to the NHL population as a whole.

Page 176

1 The data -- the data in Figure 5 is basically
2 that generalization.
3     Q.    Would you agree with me that a
4 latency of one year is not unreasonable in the
5 context of non-Hodgkin lymphoma?
6           MR. JOHNSTON: Objection. Vague.
7           THE WITNESS:  I do not believe a
8    latency of one year is in any way typical
9    of the average latency for NHL based on
10    the data we have.  It would be -- it would
11    be an outlier, and I have no doubt you
12    could find patients in whom that was true,
13    but that would not be the general trend.
14 BY MR. LITZENBURG:
15    Q.    No.  Is it reasonable or not
16 reasonable to use that for a data?
17          MR. JOHNSTON: Objection. Asked
18    and answered.
19          THE WITNESS:  I took the best
20    available data from the -- on NHL
21    incidence by county, the most recent data,
22    and correlated it with an average of
23    approximately 10 years exposure to
24    glyphosate and have presented that data.
25          I have not looked at any other

Page 177

1 time frames, and I'm not prepared to
2 discuss that.
3           MR. LITZENBURG:  Okay.
4           (Document marked for
5    identification purposes as Fleming Exhibit
6    20-4.)
7 BY MR. LITZENBURG:
8    Q.    I handed you Exhibit 4.  It's a
9 document from, I believe, the 9.11 commission.
10 The heading is "9.11 Monitoring and Treatment
11 Minimum Latency & Types or Categories of Cancer."
12          Do you see that?
13    A.    If you'll give me a moment to read
14 it, counselor.
15          Yes, I see this.
16    Q.    Okay.  And in those five categories
17 below, which category would non-Hodgkin lymphoma
18 fit into?
19    A.    Well, it says that
20 lymphoproliferative and hematologic cancers,
21 including all types of leukemia and lymphoma.
22 Point three.
23    Q.    Okay.  And what does it list as a
24 minimum latency?
25    A.    0.4 years which they say is

Page 178

1 equivalent to 146 days.
2 Q. Is that unreasonable or not
3 unreasonable?
4 A. It's based on low estimate use for
5 lifetime risk of low level ionizing radiation
6 studies, and this represents a change from
7 lymphoproliferative cancers from the October 17,
8 2012, 9.11 version.
9 Q. What was the 2012 version?
10 A. Don't know.
11 Q. Okay. Do you know if it's gone up
12 or down?
13 A. Don't know.
14 Q. Okay. Is .4 years as a low end
15 estimate of latency, is that reasonable, not
16 reasonable, or a third?
17 A. This is a conclusion drawn by an
18 administrative group headed apparently by
19 Dr. John Howard. It's a white paper. It's an
20 opinion paper, and for the purposes of 9.11, they
21 are considering this to be the minimal latency.
22 I am not aware of the primary data
23 supporting this -- this allegation but -- per
24 this conclusion I should say, but at the same
25 time, I would not have searched out and reviewed

Page 179

1 this as this is a, you know, an opinion of a --
2 of a think tank, if you will.
3 Q. Right. In Figure 5 here, NHL
4 Incidence by County, how is that data reported?
5 Is it -- well, what does it mean by "county"?
6 A. What does it mean?
7 Q. Yes.
8 A. This would be the incident rate per
9 hundred thousand people in that particular
10 county.
11 Q. Is it where a person -- so if a
12 person is living -- does it count where a person
13 is living at the time of diagnosis? Does it
14 count the actual site they were diagnosed at, the
15 site of exposure? Where does that count?
16 MR. JOHNSTON: Objection. Vague.
17 THE WITNESS: How those variables
18 are addressed in the data set I cannot
19 tell you.
20 BY MR. LITZENBURG:
21 Q. You have no idea if the SEER data
22 collects where the person was diagnosed or where
23 they lived or where they lived at the time of
24 exposure? You have no idea what location that's
25 using to collect that data?

Page 180

1 A. I have confidence that the National
2 Institutes of Health and the SEER database that
3 they oversee through the National Cancer
4 Institute has carefully thought through these
5 issues and worked to present data that they feel
6 is -- is reliable based upon, you know, based
7 upon all of these variables.
8 Q. Well, nobody is saying that NCI is
9 unreliable.
10 I'm just asking you if you know --
11 if you work, say, in the Central Valley of
12 California?
13 A. Uh-huh.
14 Q. And you get diagnosed in San
15 Francisco, where is it going to count that
16 diagnosis for NHL in the SEER data?
17 A. I have not reviewed the specifics of
18 that question.
19 Q. Wouldn't that be crucially important
20 to our understanding here?
21 MR. JOHNSTON: Objection. Calls
22 for speculation and hypothetical.
23 THE WITNESS: I see patients from
24 Washington State on a routine basis. They
25 receive their diagnosis at my institution

Page 181

1 in Oregon. They drive five miles across a
2 bridge to another state.
3 I would think it very unlikely
4 that they would be included in an Oregon
5 statistic because they are logged into the
6 system as a state of Washington resident,
7 and the county that they're residing in is
8 also included because all that address
9 information is there.
10 They're basically all reported
11 cases of cancer in the United States or
12 all diagnosed cases of cancer in the
13 United States are supposed to be reported
14 and collated to facilitate our
15 understanding of the burden of disease,
16 and there is a, you know, well-organized
17 group of people who focus on this problem.
18 And how they addressed your
19 question, how they addressed your question
20 with granular detail, I don't know.
21 BY MR. LITZENBURG:
22 Q. So is your answer that this
23 represents the county in which the patient is
24 living at the time of diagnosis?
25 A. I do not know for certain whether

William H. Fleming, M.D., Ph.D.

Page 182

1  that is correct.
2      Q.    Okay.  So how can you make this
3  comparison or draw any conclusions from it if you
4  don't know whether this is showing the places
5  where people get non-Hodgkin lymphoma, the places
6  where they get diagnosed with non-Hodgkin
7  lymphoma, or the place where they were living at
8  the time the latency period begins?
9      A.    The people who constructed the SEER
10  database would have a clear set of rules because
11  the situation is actually more complex than you
12  make it out to be.  A person could have moved to
13  a county within six months, get diagnosed in
14  another county, and then returned to that second
15  county.  And where -- where are you going to
16  include that?
17      Q.    That's what I'm asking.
18      A.    They'll -- they'll -- they'll have a
19  standardized approach to answer your question,
20  and that will basically be a wash for all the
21  individuals who are recorded in the database.
22      Q.    No, that's the question that I'm
23  asking.
24      A.    They're certainly not going to
25  report the incidence of diagnosis at major

Page 183

1  teaching hospitals throughout America because it
2  would then appear that essentially all cancer
3  diagnosis in America were made in a few hundred
4  centers.
5          As you can see here, there's very
6  small counties throughout this map that are in
7  states with low populations and states with no
8  medical schools.
9      Q.    Yeah.
10      A.    So it's not going to be based on
11  where the diagnosis is made.
12      Q.    Yeah.  In fact --
13      A.    How long -- how long one needs to
14  reside in the county before they're considered a
15  county resident for purposes of the statistic I
16  do not know.
17      Q.    And, in fact, how many sites does
18  SEER collect this data from?
19      A.    The actual number of sites cannot be
20  ascertained from the information that SEER
21  provides in this.
22      Q.    Did you do --
23      A.    Because -- because the gray boxes in
24  here indicate one of two possibilities.  The data
25  is not available or the data, in the words of the

Page 184

1  NCI, has been suppressed.  And the reason it is
2  suppressed is that there are some counties in
3  this country that have a thousand residences or a
4  thousand residents, and there are counties like
5  LA County that have 10 million residents.
6          So if you've got a thousand people
7  in your county, there's -- you're not going to be
8  able to say too much about the annual incident
9  rate of lymphoma because the population base is
10  too small.
11          So much of the data here is because
12  I think they have to have at least, I think I
13  recall, 12 to 16 cases per county.  Otherwise the
14  information is censored or suppressed.
15      Q.    Dr. Fleming, do you know how many
16  sites SEER draws this data from?
17      A.    The actual number of physical sites?
18  No, I do not.
19      Q.    Do you know if it's less than 20?
20      A.    I do not know.
21      Q.    You don't know if it's more than a
22  hundred?
23      A.    I don't know the reporting system
24  for cancer diagnosis in the United States at a
25  granular detail.

Page 185

1      Q.    What is your estimate of the number
2  of sites that SEER draws this data from?
3      A.    I have no estimate to give you.
4      Q.    Okay.  If you're a migrant worker
5  moving up and down the Central Valley harvesting
6  vegetables and you get diagnosed in San Francisco
7  with non-Hodgkin lymphoma, where are you recorded
8  as getting non-Hodgkin lymphoma?
9      A.    We would have to check with the
10  rules and regulations that -- and guidelines that
11  SEER uses to construct the database.  I can't --
12  I'm not going to speculate on that.
13      Q.    What proportion of agricultural
14  workers in the Central Valley are migratory?
15      A.    Again, beyond the scope of my
16  report.
17      Q.    Do you think that the etiology of
18  non-Hodgkin lymphoma varies by subtype?
19      A.    Let me think for a minute.  That's a
20  complex question.
21          HTLV, particularly in people of a
22  Japanese background, tends to result in T-cell
23  malignancies.  So that is a subtype of -- of NHL.
24  Okay?
25          EBV-driven lymphomas tend to be

Page 186

1 B-cell lymphomas. EBV-driven lymphomas tend not
2 to be follicular low-grade lymphomas.
3       So the answer to your question is,
4 there is some data associating some etiologies
5 with some subtypes of NHL, but our data set and
6 knowledge is incomplete.
7   Q.   Does -- do either of your maps
8 account for that?
9   A.   It accounts for the overall
10 instance, which would include the common types of
11 NHL and the rare types.
12   Q.   Could we adjust to see if it -- do
13 the same thing for T-cell lymphoma versus B-cell
14 lymphoma?
15   A.   It cannot be done with the publicly
16 available NCI database, to the best of my
17 knowledge. Whether someone else at the NCI has
18 that data on a -- on an NCI server, you'd have to
19 ask them.
20   Q.   Did you look into it?
21       MR. JOHNSTON: Objection. Vague.
22       THE WITNESS: This question
23 looked at the overall NHL diagnosis, as do
24 the great majority of epidemiologic
25 studies.

Page 187

1       Subsequent subset analysis is
2   appropriate when patient populations are
3   large enough. That was not the goal of
4   the NCI in generating this
5   county-by-county data set.
6 BY MR. LITZENBURG:
7   Q.   So you agree with me when you look
8 at causality, you look at NHL overall and not on
9 just individual subtype?
10   A.   I don't think you're going to get a
11 low-grade lymphoma arising as a cause of
12 immunosuppression in an adult treated with an
13 organ transplant. You will not get a follicular
14 small cleave cell lymphoma, no.
15       So there is an example that I would
16 -- I would be suspicious if someone provided
17 those, you know, put those two together. But in
18 many other cases, in fact in most cases, we don't
19 know.
20   Q.   I move to strike that answer, and
21 I'm going to read it to you again.
22       Do you agree with me that when you
23 look at causality, you look at NHL overall and
24 not just by individual subtype?
25   A.   I think it's reasonable to look at

Page 188

1 both.
2   Q.   Okay. You don't account for
3 subtypes in this?
4   A.   Subtype? I can only go with the
5 data I have. Subtype analysis was not available
6 on this.
7   Q.   Are you certain?
8   A.   It was not easily publicly
9 available. If I petition the NCI to release
10 this, I could go through a review process where
11 they would release any data to me because I'm a,
12 you know, a physician scientist at a US
13 university.
14       I could go through a process to --
15 to -- to get my hands on any data, but it would
16 probably be in a format that I would not be able
17 to, you know, readily -- readily work with.
18   Q.   What format?
19   A.   It would -- the format --
20       MR. JOHNSTON: Objection. Calls
21 for speculation.
22       THE WITNESS: Yeah. This -- this
23 geo version -- this GeoViewer type of data
24 permits this county-by-county assessment.
25       Again, anybody, regardless of

Page 189

1 their background and statistics or
2 epidemiology, can go in there and click
3 and get a statistically valid
4 representation of the incidence by county
5 in those counties for which data is
6 available.
7 BY MR. LITZENBURG:
8   Q.   And you --
9   A.   You don't have to make any
10 decisions. The decisions have been made for you.
11 You can choose from a modest menu, and that's
12 basically the limitation of it.
13       I, again, cannot query this data set
14 and ask how many people with NHL -- how many
15 people with blue eyes got NHL in Florida. That
16 is not something I could query and present to you
17 today because that is not on the menu. Age and
18 sex and other variables are.
19   Q.   And you have no idea, again, what
20 "NHL Instance by County" means? You don't know
21 if that means the county of residence, the county
22 of residence of diagnosis, the county of
23 exposure? You have no idea, and it makes no
24 difference to your opinion, does it?
25       MR. JOHNSTON: Objection.

William H. Fleming, M.D., Ph.D.

Page 190

1  Absolutely compound and asked and
2  answered.
3        Choose a question.  Which one do
4  you want him to answer?
5  BY MR. LITZENBURG:
6     Q.    You have no idea what "NHL Instance
7  by County" means do you?
8     A.    It means that residents of the
9  United States have been assigned a county
10 following the diagnosis of NHL.
11    Q.    How is that defined?
12    A.    The details of that are determined
13 by the NCI and the SEER database.
14    Q.    Would that affect your --
15    A.    I can only speculate on this.
16    Q.    Would that affect your opinion?
17    A.    No, not at all.
18    Q.    It wouldn't affect your opinion if
19 this county is the place where the person was
20 exposed, the place where they lived at the time
21 of diagnosis, or the place where the site of
22 diagnosis is?  That wouldn't make any difference
23 to your opinion?
24       MR. JOHNSTON:  Objection.
25 Compound and calls for speculation.

Page 191

1        THE WITNESS:  Figure 5 -- my
2  opinion in this case is not dependent on
3  Figure 4 and Figure 5 at all.
4        Figure 4 and Figure 5, as I said
5  earlier, are illustrative of the data that
6  we have in the epidemiology literature
7  looking at a large cohort-based study.
8        I simply said, are there other
9  data sets that would illustrate to us
10 whether that was a, you know, you know, a
11 reasonable conclusion.  Would they have a
12 different finding?  Who knows?
13       So I went and plotted up the
14 data.  You got it in front of you.  It is
15 not epidemiologic data.  It is not the
16 data I based my opinion.
17       If I did not have any of the data
18 in Figures 1 through 5, this would not
19 change my opinion.
20 BY MR. LITZENBURG:
21    Q.    Is this an accepted method of
22 epidemiology?
23    A.    No.  It's not epidemiology at all.
24    Q.    Okay.  And what does -- well, are
25 you aware of published epidemiology on this

Page 192

1  subject that shows a dose-response?
2     A.    I am not aware of any dose-response
3  in the literature that I have seen that I would
4  consider to be scientifically credible because it
5  has not been adjusted for the use of other
6  pesticides or it simply does not meet statistical
7  significance after multivaried analysis that only
8  includes a relatively short list of variables.
9     Q.    What paper finds a dose-response but
10 then fails one of the criteria that you just
11 mentioned?
12       MR. JOHNSTON:  Objection.
13       THE WITNESS:  Again, I did not --
14 I did not memorize the content of -- of
15 these case studies reports.  If there's
16 one you'd like to discuss, please provide
17 it and I'll be happy to point out my
18 thinking.
19 BY MR. LITZENBURG:
20    Q.    Has any study concluded there's a
21 dose-response or not between glyphosate and NHL?
22       MR. JOHNSTON:  Objection.  Vague.
23       THE WITNESS:  There are -- I
24 recall abstracts of papers that have
25 suggested that that's what they conclude.

Page 193

1  I have looked at their primary data, and I
2  do not agree that it provides -- that it
3  provides convincing evidence of a
4  relationship between glyphosate and NHL in
5  a dose-dependent or non-dose-dependent
6  manner.
7  BY MR. LITZENBURG:
8     Q.    You looked at the primary data for
9  all these papers?
10    A.    I looked at -- I looked in the
11 case-control studies at some primary data.
12    Q.    Where did you get your answer?
13    A.    Primary data -- if you put numbers
14 in a table and those are the numbers and they,
15 you know, they haven't been adjusted, that's
16 primary data.  If you take it a step further and
17 say we did multivaried analysis on these things,
18 that's still primary data.
19    Q.    So for each of these papers, you
20 read the abstract and then you went and looked at
21 the primary data; is that --
22    A.    I looked at -- I looked at the
23 primary data.  There was -- there was a paper or
24 two that said there was potentially a
25 dose-response, and I looked at it.  And I was

Page 194

1  underwhelmed by the number of patients in the
2  study, I was underwhelmed by the dose-response
3  differences and, most importantly, I didn't rely
4  on them because they didn't adjust for other
5  pesticides.
6      Q.   What papers?
7          MR. JOHNSTON: Objection. Asked
8  and answered.
9  BY MR. LITZENBURG:
10     Q.   Were you underwhelmed? I mean, you
11 just told me that you were underwhelmed by
12 patient numbers of one of papers that showed a
13 dose-response. Which one?
14     A.   We could --
15         MR. JOHNSTON: Objection.
16 Misstates his testimony. That's highly --
17         THE WITNESS: Let's go to my MCL.
18 I'll point them out for you. That's fine.
19 It's not a problem.
20 BY MR. LITZENBURG:
21     Q.   Do you remember the question pending
22 is: Which of these shows a dose-response for
23 which you don't like the patient population
24 numbers?
25         MR. JOHNSTON: I'm going to

Page 195

1      object on the grounds that that's compound
2      and also argumentative and also
3      disrespectful.
4          THE WITNESS: (Reviewing
5      document).
6          The Eriksson 2008 paper, to the
7      best of my recollection, mentions a
8      potential dose-response.
9  BY MR. LITZENBURG:
10     Q.   Any others?
11     A.   To discuss this any further, I
12 suggest we just take it out and look at it to
13 refresh both our memories and we can -- I will be
14 happy to tell you what concerns me about their
15 analysis.
16     Q.   Well, you must have weighed two
17 lists. Tell me if there's anything that meets
18 that criteria.
19         MR. JOHNSTON: Objection to the
20     extent he recalls.
21         THE WITNESS: Yeah.
22         MR. JOHNSTON: Because this is
23 not a memory test, counsel.
24         THE WITNESS: Yeah. There was at
25 least one other case-control study that

Page 196

1      mentions dose-response in this regard.
2  BY MR. LITZENBURG:
3      Q.   Is dose-response one of the Bradford
4  Hill criteria?
5      A.   Yes.
6      Q.   Do you believe that latency varies
7  by subtype?
8      A.   Latency varies by a number of
9  different factors, and subtype would be one of
10 them.
11     Q.   Okay. Do you disagree with IARC
12 that this is a probable human carcinogen?
13         MR. JOHNSTON: Objection. Beyond
14     the scope of his report.
15         THE WITNESS: I did not consider
16     IARC's opinion in detail. I considered
17     the IARC monograph exactly as I would any
18     other review article as a review of
19     published data with which I used to
20     double-check that. There was no studies I
21     had excluded from my analysis.
22 BY MR. LITZENBURG:
23     Q.   What other disagreements do you have
24 with IARC in terms of carcinogens?
25         MR. JOHNSTON: Objection. No

Page 197

1      foundation. Misstates the record.
2          THE WITNESS: Yeah. I -- I am
3      not here to give an opinion today on
4      IARC's decision of the classification of
5      glyphosate. That's beyond the scope of my
6      report.
7          I am looking at the primary
8      scientific data.
9  BY MR. LITZENBURG:
10     Q.   Is there a more authoritative source
11 than IARC on what causes cancer and what doesn't?
12     A.   Yes.
13     Q.   What?
14     A.   The primary data in the world's
15 literature is the authoritative source on the
16 scientific significance of correlating any
17 exposure with -- with any disease.
18         IARC is an international
19 organization that reviews potential carcinogens,
20 and it is also an organization that brings
21 together, you know, large data sets from around
22 the world for investigators to query.
23         So they have a panel of
24 epidemiologists who sort of continually review
25 compounds that they may think are potentially

Page 198

1 carcinogens, yes.
2    Q.    Do you agree with the EPA's
3 classification of glyphosate or Roundup?
4    A.    Again, I did not take the EPA's
5 classification into consideration when I wrote
6 this report.
7    Q.    Why did you put it in your Materials
8 Considered List?
9    A.    I -- pardon me.
10    Q.    You just said you didn't consider
11 it, but it's on your Materials Considered List?
12    A.    I misspoke.  I did not rely upon it.
13 Again, because it is -- IARC is also
14 on my list.  I did not rely on IARC.  I did not
15 rely on any review articles.  I did not rely on
16 any opinion pieces.  I did not rely on any -- the
17 results for any regulatory agencies.
18    Q.    Was it all peer reviewed, everything
19 you relied on?
20        MR. JOHNSTON:  Objection.  Vague.
21        THE WITNESS:  Yes, at some
22    juncture all the -- all the data that --
23    that -- all the data I really relied on,
24    truly relied on, yes, was peer reviewed.
25    There was other aspects of it that were

Page 199

1    sort of updates of peer-reviewed data.
2        So while the final followup on
3    certain patients from AHS studies had not
4    yet been published, it was collected in
5    the same peer-reviewed format as the other
6    studies had, so...
7 BY MR. LITZENBURG:
8    Q.    So you relied on unpublished data?
9    A.    I didn't rely on it.  It was
10 congruent with the opinion of the De Roos 2005
11 article, of which it was a longitudinal
12 follow-up.  It strengthened the conclusions of
13 the 2005 article, but did not -- but did not
14 materially contribute to my opinion.
15    Q.    Do you know what the North American
16 Pooled Project is?
17    A.    Yes, I've heard of it.
18    Q.    Did you look at that unpublished
19 data?
20    A.    No, I did not.
21    Q.    Do you know if it's favorable to
22 Monsanto's case or unfavorable?
23    A.    I do not.
24        MR. JOHNSTON:  Objection.  Calls
25    for speculation and vague as to

Page 200

1    "favorable" and that he knows what
2    Monsanto's case is.
3        THE WITNESS:  And I do not -- I
4    do not know of any unpublished data from
5    this project.
6 BY MR. LITZENBURG:
7    Q.    So you were only given one set of
8 unpublished data?
9    A.    I was given the 2013 draft
10 manuscript by Alavanja, et al. updating
11 glyphosate in the AHS data set through 2008.
12    Q.    Do you think that this methodology
13 in Figures 4 and 5 is better than that of
14 Eriksson?
15    A.    Apples and oranges.  My -- I think
16 Figure 4 and 5 are illustrative of the
17 relationship described in the AHS study.  They
18 are completely congruent with it and do not show
19 the expected changes one would see if that
20 hypothesis or if that -- if that result was
21 different in fact.
22    Q.    Do you think that working in
23 agriculture places you at increased risk of
24 non-Hodgkin lymphoma?
25    A.    I think there's a very long,

Page 201

1 well-established set of data indicating that
2 farmers have a small but real increase in NHL
3 compared to the general population, yes.
4    Q.    Well, did you account for that in
5 Figures 4 and 5?
6    A.    The very highest levels of
7 glyphosate in Figure 4 essentially define the
8 major agricultural areas in the United States.
9 So they are accounted for very, very clearly in
10 Figure 4.
11    Q.    What are you measuring that by?
12    A.    I'm measuring that by -- It's the
13 use on a per square mile basis essentially
14 highlights the major agricultural areas of the
15 United States.
16    Q.    What are you --
17    A.    From the Central Valley from eastern
18 Oregon and eastern Washington to the Central
19 Valley of California to Northwest Texas to
20 Florida and all up the Southeastern seaboard and
21 into the West Coast.  These are -- these are all
22 highlighted.
23        I would -- I do not see what I would
24 consider a major agricultural area that -- that
25 has no estimate of usage.

William H. Fleming, M.D., Ph.D.

Page 202

1    Q.    What have you done to study measures
2  of major agricultural areas?  I mean, what are
3  you comparing this to to say that they match up?
4        It's circular logic, isn't it?
5        MR. JOHNSTON:  Objection.
6    Compound.
7  BY MR. LITZENBURG:
8    Q.    You're telling me that because they
9  use glyphosate, it's an agricultural area; is
10  that right?
11    A.    Uses of glyphosate certainly in the
12  range, the higher range, which I would say is of
13  greater than 88 pounds per square mile as
14  compared to less than 4 pounds -- so we're seeing
15  20-fold differences, round numbers -- aggregate
16  as expected within the major agricultural areas
17  of the United States.
18    Q.    Have --
19    A.    Full -- full stop.  I don't need --
20  I don't need any additional data to convince me
21  that the Central Valley of California has a high
22  glyphosate usage, and this is also true of, you
23  know, of the Midwest and Florida.
24        As I pointed out, it's -- it's very
25  clear.  We're not drawing fine lines and borders.

Page 203

1  We're looking at with -- we're looking at broad
2  areas of known agricultural activity that have
3  high uses of glyphosate.
4        That's -- they're essentially --
5  you're right.  They're essentially defined by
6  glyphosate use themselves.
7    Q.    So you would define a major
8  agricultural area by the amount of glyphosate it
9  uses?
10    A.    I think there would be a very strong
11  correlation, but I'd be happy to entertain any
12  data you have to the -- in the contrary.
13    Q.    Do you know how the AHS study
14  controlled for the elevated risk of agricultural
15  workers?
16    A.    Controlled for it?
17    Q.    Yeah.
18    A.    Yeah.  I'm not sure I understand
19  your question.
20    Q.    Did it?
21    A.    What they did was, they did what was
22  not possible in the case-control study where you
23  take a population of patients with a disease or
24  an outcome and then look down that list to find
25  affected individuals.

Page 204

1        They focused on pesticide
2  applicators.  They went where the assumed problem
3  was.  There was a lot of preliminary evidence
4  suggesting that might be a fruitful place to look
5  for the increased incidence of NHL in farmers.
6        And they said, all right, let's get
7  a cohort, a large cohort.  57,000 pesticide
8  users.  75 percent of whom had glyphosate
9  exposure.  So the tyranny of small numbers that
10  you get in case reports disappears when you have
11  a robust prospective cohort study.
12    Q.    You put in here that children are at
13  50 percent increased risk of non-Hodgkin lymphoma
14  if they grew up on a farm; is that right?
15    A.    Not as children.  That's not what it
16  says.
17    Q.    People who grew up on a farm through
18  18 years of age?
19    A.    Which is a very different statement.
20    Q.    Okay.
21    A.    That means if you grew up on a farm
22  through 18 years of life, your risk of developing
23  NHL subsequently was higher.  It does not say you
24  develop NHL as a child.
25    Q.    What is that excess risk from?

Page 205

1    A.    We do not know.
2    Q.    Okay.  You just know it can't be
3  glyphosate?
4        MR. JOHNSTON:  Objection.
5    Misstates his opinion.
6        THE WITNESS:  What I do know is
7    that the Agricultural Health Study
8    enrollees in 1993 were median age of 47,
9    and this means that all of them, I mean,
10    the median in that group would have been
11    older than 18 years of age in about 1961,
12    a full -- a full 13 years before
13    glyphosate became available.
14        So those individuals who were,
15    you know, in this study who have higher
16    incidences if, in fact, they were raised
17    on a farm, it had to be -- I have no idea
18    what the exposure was, but I know with
19    confidence that the vast majority of them
20    absolutely would not have been young
21    enough to have had any glyphosate exposure
22    in the first 18 years of their life.
23  BY MR. LITZENBURG:
24    Q.    Well, which is it?  You have no idea
25  what the exposure is or you have absolute

Page 206

1  confidence?
2          MR. JOHNSTON:  Objection.
3  Argumentative.
4          THE WITNESS:  I have absolute
5  confidence that the -- when you subtract
6  the median age of enrollees in 1993 and
7  then ask when they turned 18 years of age,
8  this would be approximately a decade
9  before glyphosate was ever used in the
10  United States.  Therefore, the -- one
11  cannot correlate.
12          One can conclusively, I think,
13  state that glyphosate in those individuals
14  who turned 18 before 1974, they simply
15  cannot have their disease, their NHL or
16  anything else, attributed to glyphosate in
17  childhood.
18  BY MR. LITZENBURG:
19      Q.    So the fact that NHL existed before
20  Roundup pushes you toward the conclusion that
21  Roundup can't cause NHL?
22          MR. JOHNSTON:  Objection.
23  Misstates his testimony.
24          THE WITNESS:  No.  In this very
25  well-defined group of patients who became

Page 207

1  adults long before glyphosate was
2  approved, we cannot attribute their NHL to
3  glyphosate, period.
4  BY MR. LITZENBURG:
5      Q.    Okay.  Did the incidence of
6  non-Hodgkin lymphoma increase, decrease, or stay
7  the same from '74 to present?
8          MR. JOHNSTON:  Objection.
9  Compound.
10          THE WITNESS:  That data is in
11  Figure 1 or -- pard me -- Figure 3 of my
12  report.
13          Individuals over 50 years of age
14  are shown in Panel A on the left.
15  Individuals between 20 and 49 years of age
16  are shown on the right.
17  BY MR. LITZENBURG:
18      Q.    And overall did it increase,
19  decrease, or stay the same?
20          MR. JOHNSTON:  Objection.  Vague
21  as to time frame.
22          THE WITNESS:  It exactly depends
23  on the time frame, and I will run through
24  that with you.
25          It's -- it increased quite

Page 208

1  substantively between 1975 and about 1990.
2  At that point, the curve began to flatten
3  out until 2004, and from 2004 on it has
4  actually begun to decrease.
5          So the pattern is an increase for
6  the first 10 or so years, a decrease in
7  the rate, followed by a fall.
8  BY MR. LITZENBURG:
9      Q.    The truth is from '74 to 2009, the
10  incidence of NHL has gone up in every single
11  subgroup that SEER measures; right?
12          MR. JOHNSTON:  Objection.  Vague.
13  BY MR. LITZENBURG:
14      Q.    Every race, every age group?
15          MR. JOHNSTON:  Objection.  Vague.
16          THE WITNESS:  Every single
17  subgroup?  The subgroups that SEER looked
18  at are actually, this is, you know, this
19  is SEER data.  It's there in the figure.
20          And this Panel A is adults age
21  50, all races, both sexes, 1975 to 2014,
22  and you can, you know, look at any -- any
23  time interval you wish there to -- to talk
24  about rate.
25          And the rate initially increased

Page 209

1  for unknown reasons, began to decrease,
2  plateaued, and fell.  In other words, the
3  more glyphosate was used over time in the
4  United States, the lower the incidence and
5  rate of incidence of NHL became until it
6  began to actually fully decline.
7  BY MR. LITZENBURG:
8      Q.    I'm sorry.  Do you know of a single
9  subgroup for which the rate -- the incidence of
10  NHL is lower today than it was in 1974,
11  Dr. Fleming?
12      A.    I did not do subset analysis in
13  conjunction with the SEER data I presented in
14  Figure 3.
15      Q.    Is that a no?
16      A.    I can't answer that off the top of
17  my head.  It's beyond the scope of my expert
18  report.
19      Q.    Do you know -- do you know if --
20  what was the long -- well, let's talk about AHS
21  unpublished data.
22          What's the loss to follow up there
23  approximately?
24      A.    I would have to refresh my memory.
25      Q.    You have no idea?  Was there a loss

William H. Fleming, M.D., Ph.D.

Page 210

1  to follow up?
2      A.    I can't -- there's a loss to follow
3  up in every study.  And, in fact, a well-designed
4  study will take into account the expected loss
5  over time in order to have sufficient numbers.
6      Q.    How do you do that?  How do you make
7  up for the loss over time?
8      A.    You talk to well-qualified
9  statisticians and epidemiologists before setting
10 up a comprehensive cohort study, as the AHS is,
11 and you say what would we anticipate, you know,
12 loss to follow up be over time and how should
13 we -- how many people should we enroll in the
14 study to compensate for this difference.
15     Q.    Uh-huh.  And how did they compensate
16 for the loss to follow up?  Did they make that?
17     A.    You can't compensate for the loss to
18 follow up.  Most --
19     Q.    What did they do to adjust it?
20          MR. JOHNSTON:  Objection.  Quit
21     interrupting him and let him answer your
22     question before you ask another one, which
23     renders your question a compound question.
24          THE WITNESS:  Could you repeat
25     your question, please?

Page 211

1  BY MR. LITZENBURG:
2      Q.    Yeah.  In the Agricultural Health
3  Study, what did they do to adjust for the loss to
4  follow?
5      A.    I am not sure of the details of
6  the -- in how the loss -- how the loss to follow
7  up impacted the calculations that the
8  epidemiologists did in their analysis.  I cannot
9  give you a granular answer on that.
10          I just know it's -- obviously by the
11 fact it's published data by a well-respected
12 group, I would -- I would expect the data to have
13 been handled in a way that most epidemiologists
14 would think was appropriate.
15     Q.    What does plausibility mean to you?
16     A.    As an English definition, I consider
17 the word plausible as possible.
18     Q.    Well, as a cancer doctor.
19     A.    I guess plausible is not, you know,
20 you know, a term that we, you know, we frequently
21 use.
22     Q.    It's one of the Bradford Hill
23 criteria; right?
24     A.    If something is implausible, it is
25 certainly -- if the premise is implausible, then,

Page 212

1  you know, there -- there can't be a meaningful
2  result derived from studying that premise.
3      Q.    No.  I asked if it was one of the
4  Bradford Hill criteria.
5      A.    I don't know if it's -- if it's one
6  of the nine Bradford.  I suspect it's
7  incorporated in it, but I have, you know, not
8  memorized all -- all nine criteria.
9      Q.    Do you know if Roundup has been
10 shown in some studies to cause DNA damage?
11     A.    I'm sorry.  I didn't hear your
12 question.
13     Q.    Do you know if Roundup has been
14 shown in any studies to cause DNA damage?
15     A.    Again, of -- I was -- I was retained
16 in this matter to look at human etiology and
17 epidemiology.  I was not retained as a DNA damage
18 expert.
19     Q.    What are the mechanisms of action
20 that you considered in looking at this potential
21 association?
22     A.    In my mind, before you have --
23 scientifically before you have a mechanism of
24 action, you first have to have a, you know, a
25 solid relationship, and I know of no credible

Page 213

1  scientific data that would suggest that there is
2  an association between glyphosate and NHL.  So
3  there would be no mechanism to study.
4      Q.    Do you know if there are any studies
5  concluding that glyphosate exposure causes
6  oxidative stress?
7      A.    I have not reviewed any such -- I
8  have not considered -- I have not relied
9  certainly on any of them.  Whether there's a
10 paper or two on my MCL, we could certainly check.
11     Q.    You don't know whether you looked at
12 one or more or not; is that right?
13     A.    If it's on my MCL, I looked at it.
14 I certainly did not use that study in any way to
15 arrive at my -- my opinion.
16     Q.    Okay.  A 20 percent increase in
17 cancer risk is clinically significant to a cancer
18 doctor, isn't it?
19     A.    All depends.
20     Q.    If a population that you're treating
21 the risk of, if their incidence of lymphoma goes
22 up by 20 percent because of exposure to
23 something, that's important to you as a doctor,
24 isn't it?
25          MR. JOHNSTON:  Objection.

William H. Fleming, M.D., Ph.D.

Page 214

1   Incomplete hypothetical.  Calls for
2   speculation.
3           THE WITNESS:  Anything we can do
4   to meaningfully reduce the cancer burden
5   in the United States makes sense.  Where
6   you put a cutoff, many factors determine
7   this.
8   BY MR. LITZENBURG:
9       Q.    And as those efforts to reduce the
10  cancer burden on the US, or whatever, you would
11  not tell a current patient to stop using Roundup?
12      A.    I would have no reason --
13          MR. JOHNSTON:  Objection.  Asked
14  and answered.
15          THE WITNESS:  I would have no
16  reason to because I have no credible data
17  leading me to that conclusion.
18  BY MR. LITZENBURG:
19      Q.    Do you agree that NHL can be
20  secondary to prior cancer treatment?
21          MR. JOHNSTON:  Objection.  Asked
22  and answered.
23          THE WITNESS:  In a very narrowly
24  defined group of patients, namely those
25  who have been previously diagnosed with

Page 215

1   non-Hodgkin's lymphoma, NHL can occur.
2   How much of that is due to the underlying
3   NHL genetics and the chemotherapy and
4   radiation therapy and those interactions
5   are not well understood.
6   BY MR. LITZENBURG:
7       Q.    What is the latency period for that
8   association?
9       A.    Again, probably in the six-year
10  range.  Six to 10-year range.
11      Q.    You've actually studied it, haven't
12  you?  You've published on it.  Do you remember?
13      A.    I have -- I have not published
14  anything on cancer latency.
15      Q.    Okay.  You don't remember publishing
16  a paper saying kids that get secondary NHL after
17  primary cancer treatment have a mean of 3.7 years
18  between the two?
19      A.    I'm sorry.  Whose?  May I see this
20  manuscript?
21      Q.    Do you remember participating,
22  having your name on a paper that said that?
23      A.    No, absolutely not.
24      Q.    Okay.  So that paper would be wrong,
25  and this would be correct?

Page 216

1           MR. JOHNSTON:  Objection.  Calls
2   for speculation.
3           You haven't shown him the paper,
4   counsel.  You're asking him to speculate
5   about what the paper says and take your
6   word for it, that's not proper.  You're
7   testifying.
8           THE WITNESS:  To the best of my
9   knowledge, I am not a coauthor on any
10  paper where the latency of -- of NHL is --
11  is the primary topic at all.
12  BY MR. LITZENBURG:
13      Q.    Okay.  Do you agree it's not proper
14  for scientists to develop an opinion and then
15  work backwards to get your data methodology to
16  fit it?
17      A.    I disagree with your
18  characterization.
19      Q.    No.  I asked you whether it was
20  appropriate or not.
21          MR. JOHNSTON:  Objection.  Vague.
22          THE WITNESS:  Yeah.  I -- your
23  example does not fit the real scientific
24  world in which I live and operate.
25  BY MR. LITZENBURG:

Page 217

1       Q.    Do you know what our intake of
2   glyphosate is, our biological load from just
3   eating everyday foods?
4           MR. JOHNSTON:  Objection.  Calls
5   for speculation and hypothetical
6   incomplete.
7           THE WITNESS:  Again, I was not
8   retained to provide any opinion on the
9   exposure of individuals to -- to
10  glyphosate.
11  BY MR. LITZENBURG:
12      Q.    Do you have an opinion on exposure
13  of people to glyphosate?
14          MR. JOHNSTON:  Objection.  Asked
15  and -- Objection.  Misstates his
16  testimony.
17          THE WITNESS:  Not individuals in
18  terms of their daily exposure and, you
19  know, through -- through food products,
20  crops, air, water, whatever.  I was --
21  that's not part of my expert report.
22  BY MR. LITZENBURG:
23      Q.    Did you look into it?
24      A.    No.
25      Q.    You don't know whether people get

William H. Fleming, M.D., Ph.D.

1 exposed to glyphosate through the diet?
2    A.    It doesn't really matter how they're
3 exposed to glyphosate when we have clear,
4 compelling, reliable cohort data showing no
5 association between glyphosate exposure and NHL,
6 and that was the focus of my report.
7    Q.    Is dietary glyphosate taken into
8 account in these Figures 4 and 5?
9    A.    That in Figure 4, that's glyphosate
10 usage, I believe, per acre in these agricultural
11 districts.  End of story.  But what --
12    Q.    And, again, you don't know if that's
13 based on sales figures.  You don't know where
14 that comes from; right?
15    A.    I know it is what the US government
16 consists -- considers the most reliable map of
17 glyphosate usage per acre in the United States.
18 That's all that data says.
19         You're inferring that it can be
20 looked at in greater detail, and I am -- I am not
21 aware that it can and I have not done so.
22    Q.    Is most of food grown in the Central
23 Valley of California consumed in the Central
24 Valley of California?
25         MR. JOHNSTON:  Objection.  Calls

1    for speculation and a hypothetical.
2         THE WITNESS:  Right.  I really
3    don't understand the full economics of the
4    food production in the United States.
5    Can't comment.
6 BY MR. LITZENBURG:
7    Q.    You did agree with me that
8 correlation is not the same as causation; right?
9    A.    Yes.
10    Q.    Okay.  And that's why we have
11 epidemiology and controls; right?
12         MR. JOHNSTON:  Objection.  Vague.
13         THE WITNESS:  It's -- you don't
14    always need to have epidemiology to
15    demonstrate a causal relationship and it's
16    not absolutely necessary, but
17    epidemiologic tools are often very helpful
18    in making these determinations.
19 BY MR. LITZENBURG:
20    Q.    And the bulk of the published
21 epidemiology in this case has a positive
22 association?
23         MR. JOHNSTON:  Objection.  Vague.
24         THE WITNESS:  I am not aware of
25    any statistically significant association

1 between glyphosate and NHL in the
2 published epidemiologic literature that
3 accounts and is adjusted for pesticide
4 exposure.
5 BY MR. LITZENBURG:
6    Q.    Do you believe bladder cancer is
7 associated with smoking?
8    A.    I'm sorry.  I didn't hear.
9         MR. JOHNSTON:  Excuse me.
10 BY MR. LITZENBURG:
11    Q.    Do you believe bladder cancer to be
12 associated with smoking?
13    A.    The --
14         MR. JOHNSTON:  Objection.  Beyond
15    the scope of the opinion.
16         THE WITNESS:  Again, not the --
17    not the subject of my expert report today
18    here.
19 BY MR. LITZENBURG:
20    Q.    Do you know?
21    A.    I am not prepared to provide expert
22 testimony as to that question today.
23    Q.    You don't know if you're qualified
24 to provide an answer?
25    A.    I am not prepared to provide expert

1 testimony outside of the question I've been asked
2 to address here.
3         MR. ESFANDIARY:  Doctor, where in
4    time --
5         MR. JOHNSTON:  Excuse me.  You're
6    not -- you're not allowed to speak on the
7    record counsel.  The deposition --
8         MR. ESFANDIARY:  Right.  I want
9    to make clear of whether his best answer
10    is his best answer, and he can't give
11    us --
12         MR. JOHNSTON:  You're not allowed
13    to speak on the record, counsel.   You're
14    not allowed to speak.
15         MR. ESFANDIARY:  Don't tell me
16    what I'm not allowed to do.
17         MR. JOHNSTON:  Oh, I will.  I
18    absolutely will tell you.
19         You're -- under the agreement and
20    the order entered by Judge Chhabria, only
21    one attorney is permitted to ask
22    questions.  You're in violation of the
23    court order, counsel.  Go ahead.
24 BY MR. LITZENBURG:
25    Q.    Do you know if smoking causes lung

William H. Fleming, M.D., Ph.D.

Page 222

1  cancer?
2     A.    There is a very strong association
3  between smoking and lung cancer, yes.
4     Q.    Okay.  And so you would -- you would
5  say it causes it?
6     A.    In some but not all people.  The
7  full 10 percent of lung cancer cases occur in
8  nonsmokers.
9     Q.    And you don't know whether it causes
10  bladder cancer or not?
11     A.    There is a literature that would
12  support an increased instance of bladder cancer
13  in certain individuals who harbor certain
14  mutations, two minor mutations.
15     Q.    Just two data points.
16         The rate of cigarette smoking in
17  Egypt has gone up steadily in the last 30 years
18  and the incidence or the percentage of diagnosed
19  cancers that are bladder cancers has gone down.
20  Those are two maps you could put up next to each
21  other.
22         Would that show us -- would that
23  disprove the theorem that smoking is associated
24  with bladder cancer?
25         MR. JOHNSTON:  Objection.

Page 223

1     Incomplete hypothetical.  Calls for
2  speculation.
3         THE WITNESS:  Right.
4         MR. JOHNSTON:  Misstates his
5  testimony.
6         THE WITNESS:  Yeah.  You'd have
7  to provide that data to me and -- and ask
8  me to formally analyze it.
9  BY MR. LITZENBURG:
10     Q.    You'd have to look at a whole lot
11  more variables, wouldn't you?
12         MR. JOHNSTON:  Objection.  Calls
13  for speculation.
14         Counsel, can you -- he can answer
15  the question, but can we take a break in a
16  few minutes?
17         MR. LITZENBURG:  Yeah.  Give
18  me --
19         MR. JOHNSTON:  I think there's a
20  question pending.  Go ahead and answer the
21  question.
22         THE WITNESS:  I'm sorry?
23  BY MR. LITZENBURG:
24     Q.    You would need to know a lot more
25  variables, wouldn't you?

Page 224

1         MR. JOHNSTON:  Objection.  Calls
2  for speculation.  Go ahead.
3         THE WITNESS:  To conclusively
4  formulate a scientific opinion, yes, you
5  would.  Absolutely.
6         MR. LITZENBURG:  Okay.  Time to
7  break.
8         THE VIDEOGRAPHER:  Time now is
9  1:59.  We are going off the record.
10         (A brief recess was taken.)
11         THE VIDEOGRAPHER:  Time now is
12  2:13.  We are back on the record.
13  BY MR. LITZENBURG:
14     Q.    Dr. Fleming, do you hold an opinion
15  that any extrinsic factor is responsible --
16  partially responsible for the rise in lymphoma
17  over the last 20 years?
18         MR. JOHNSTON:  Objection.  Vague.
19  Calls for speculation.
20         THE WITNESS:  Hepatitis C is an
21  extrinsic factor.  It affects a fair
22  number of the world's population and,
23  amongst other things, it increases the
24  risk for NHL.
25  BY MR. LITZENBURG:

Page 225

1     Q.    Any chemicals?
2         MR. JOHNSTON:  Objection.  Vague.
3         THE WITNESS:  There are recent
4  reports from the Agricultural Health Study
5  looking at a variety of pesticides, and
6  they are finding statistically significant
7  associations.
8         I can tell you that this has been
9  found for lindane, permethrin, diazinon,
10  and Tribufos, in addition to DDT.
11  BY MR. LITZENBURG:
12     Q.    And glyphosate; right?
13     A.    Glyphosate is not on this list.
14     Q.    Conveniently, but it's been found in
15  multiple publications to have statistically
16  significant increase; right?
17     A.    This is the updated study focusing
18  on NHL on the AHS cohort that does not talk about
19  glyphosate in any way, shape, or form.
20     Q.    So what information does it give us?
21     A.    Your --
22         MR. JOHNSTON:  Objection.  Vague.
23         THE WITNESS:  Your question was,
24  did I believe anything caused NHL.  My
25  answer -- extrinsic factors.  My answer

William H. Fleming, M.D., Ph.D.

1  was, yes, I do. Hepatitis C.

2      Your next question was, do you

3  know of any chemicals? My answer was yes,

4  and I have listed five of them.

5  BY MR. LITZENBURG:

6      Q.   You --

7      A.   I'm sorry. I don't understand your

8  question.

9      Q.   Before you -- so hepatitis C and

10 those five pesticides are the only extrinsic

11 factors you know of that are responsible for the

12 rise?

13     MR. JOHNSTON: Objection.

14 Misstates his testimony.

15 BY MR. LITZENBURG:

16     Q.   Anything else?

17     A.   No. Those are the only ones that --

18 that we've discussed so far. Those are the only

19 ones that I've put in my report.

20     Q.   Okay. Well, what else is there?

21     MR. JOHNSTON: Objection. Asked

22 and answered.

23     THE WITNESS: Well, there's --

24 there's --

25     MR. JOHNSTON: Go ahead.

1      THE WITNESS: There's other

2  factors in the case. We discussed the

3  manuscript. We discussed earlier looking

4  at the incidence of NHL in patients with

5  allergic rhinitis. This would be Hofmann,

6  et al. 2005.

7      Again, this is the cohort study

8  where they found a significant reduction

9  in NHL in farmers and spouses with

10 allergic rhinitis. Almost a 40 percent

11 reduction.

12     The hazard ratio was 0.63 and the

13 confidence limits were 0.51 through 0.79,

14 and this is very interesting and shows the

15 complexity of this problem because we

16 typically associate inflammation and

17 increased immunity with increased cell

18 turnover in cancer.

19     And here we've got increased

20 immune function in the setting of allergic

21 rhinitis and a decrease risk of lymphoma.

22 BY MR. LITZENBURG:

23     Q.   I just asked you to identify more

24 extrinsic factors that increased the incidence of

25 non-Hodgkin lymphoma, and you tell me that

1  rhinitis is cancer protective essentially; is

2  that right?

3      A.   I'm sorry. I misunderstood your

4  question. I thought you said that modulated NHL,

5  that influenced NHL. I did not -- I did not -- I

6  misunderstood your question.

7      Q.   Before you read that one 2014

8  article listing those other pesticides, were you

9  aware of any chemicals that caused non-Hodgkin

10 lymphoma?

11     A.   That were definitively studied in a

12 large cohort, no.

13     Q.   Okay. But you only need that one

14 paper to convince you that those four pesticides

15 cause non-Hodgkin lymphoma?

16     MR. JOHNSTON: Objection.

17 Misstates his testimony.

18     THE WITNESS: When you have a

19 prospective cohort study that's of

20 sufficient size to control for a variety

21 of different exposures, as we see in

22 agriculture, this type of data is vastly

23 superior to the hypothesis-generating

24 ideas that may come out of smaller

25 case-control studies.

1  BY MR. LITZENBURG:

2      Q.   And that data hasn't been published

3  on glyphosate; right? That article that you're

4  referencing over and over again doesn't mention

5  glyphosate?

6      A.   It --

7      Q.   It may gather data on glyphosate,

8  right, but it hasn't been published?

9      MR. JOHNSTON: Objection.

10     THE WITNESS: It --

11     MR. JOHNSTON: Compound and

12 vague. Go ahead.

13     THE WITNESS: The original data

14 was published. It showed no increased

15 risk. The manuscript is De Roos 2005.

16 Follow-up on that has not been published

17 and -- to the best of my knowledge.

18 BY MR. LITZENBURG:

19     Q.   Your testimony is De Roos 2005 did

20 not find increased risk associated with

21 glyphosate?

22     A.   Correct.

23     Q.   Okay. Well, how do you define

24 "statistical significance"?

25     A.   In science in general, it is defined

William H. Fleming, M.D., Ph.D.

Page 230

1 typically by the 95 percent confidence limit.
2    Q.   Okay.  So one year ago you were not
3 aware of any chemicals that could cause
4 non-Hodgkin lymphoma.  Today you're aware of
5 four, and they all come from the same article; is
6 that accurate?
7    A.   They --
8        MR. JOHNSTON:  Objection.
9        THE WITNESS:  -- do not come from
10   the same article.  No.  I mean, the
11   glyphosate conclusions come from one
12   article, the allergic rhinitis comes from
13   a second article, and the pesticides come
14   from yet a third article.
15 BY MR. LITZENBURG:
16    Q.   Allergic rhinitis doesn't cause
17 non-Hodgkin lymphoma.  I thought you just told me
18 that.
19    A.   It modulates the risk for
20 non-Hodgkin lymphoma.
21    Q.   I don't know how to use the word
22 "modulate."  You think I said that?  You think
23 you're answering my question?
24        MR. JOHNSTON:  Maybe your
25   questions are bad, counsel.

Page 231

1        THE WITNESS:  I'd be happy to
2   have you restate your question.
3 BY MR. LITZENBURG:
4    Q.   A year ago today you were not aware
5 of any chemicals that caused non-Hodgkin
6 lymphoma; is that correct?
7    A.   I can't say with precision when I
8 became aware of this other manuscript.
9    Q.   Did you read that manuscript in the
10 abstract, or did you read it as part of your work
11 for this case?
12    A.   I certainly reviewed it as part of
13 my work for this case, but the first time it came
14 to my attention, I can't put a time and date on
15 that.  So your assertion that one year ago I did
16 not know is not something I can -- I can agree to
17 or refute.
18    Q.   All --
19    A.   I simply don't know.
20    Q.   All four chemicals that you know to
21 cause non-Hodgkin lymphoma are in that one
22 article; right?
23    A.   That is a fair assessment, yes.
24    Q.   All right.  Page 4 of your report,
25 look at the bottom paragraph, please.

Page 232

1    A.   Sorry.  Just a second here.
2        Yes.
3    Q.   Okay.  It says "The observed plateau
4 in NHL instance."  That's the sentence I'm
5 concerning myself with.
6        Have you found that?
7    A.   Yes, I have.
8    Q.   Okay.  Now, I'm interested in you
9 explaining the subparts to me.
10        You proffer possible decrease in the
11 presence of extrinsic factors that previously
12 increased the risk of NHL.
13    A.   That is one possibility, yes.
14    Q.   Well, then we'll parse it out.
15        What are extrinsic factors that
16 previously increased the risk of NHL that
17 decreased over this period?
18    A.   This paragraph and this hypothetical
19 construct in this paragraph are not dependent on
20 any specifically identified.  This is -- this is
21 a theoretical analysis for the plateau and
22 decline in 2004, and it may be caused -- this is
23 -- this is just looking at the possibilities in a
24 general sense and does not refer to any
25 particular extrinsic factor.

Page 233

1    Q.   Do you know of any extrinsic factors
2 that previously increased the risk of NHL that
3 decreased over this period?
4    A.   Prior to the publication of the AHS
5 data looking at the pesticides, no.
6    Q.   All right.  And it postulates it's
7 possible the introduction of new external factors
8 in some way protect against the development of
9 NHL.
10        Do you know any such examples?
11    A.   Again, this wasn't a summary of
12 identified external factors.  This was -- this
13 was a theoretical construct that a decrease in
14 the presence of extrinsic factors and
15 introduction of some new factor that in some way
16 protects hypothetically or a combination of both
17 because both could be happening at the same time.
18    Q.   That wasn't my question.
19        Can you provide one example of
20 external factors that protect against the
21 development of NHL that decreased over this time
22 period?
23        MR. JOHNSTON:  Objection.  Asked
24   and answered.
25        THE WITNESS:  Allergic rhinitis.

William H. Fleming, M.D., Ph.D.

Page 234

BY MR. LITZENBURG:
1
2    Q.   That -- that decreased from '74 to
3 2014?
4        MR. JOHNSTON: Objection. Vague.
5    I think you --
6        THE WITNESS: I miss -- sorry. I
7    misunderstood your question.
8        That answer would not be
9    applicable to the time frame you
10   mentioned.
11 BY MR. LITZENBURG:
12   Q.   Okay. Can you list any examples?
13       MR. JOHNSTON: Objection. Vague
14   and misstates his testimony. He's already
15   answered that question.
16       THE WITNESS: This is a
17   hypothetic -- this is a hypothetical
18   construct about potential explanations for
19   why this may have occurred.
20       There is no data to support any
21   of those three possibilities, and it was
22   not meant in reference to any particular
23   factor or factors. That's why it was
24   posed in the hypothetical.
25 BY MR. LITZENBURG:

Page 235

1    Q.   Can you list any examples?
2        MR. JOHNSTON: Objection. Asked
3    and answered.
4 BY MR. LITZENBURG:
5    Q.   Is that a yes or no?
6    A.   For the years --
7    Q.   Yeah.
8    A.   -- that this is referring to, 1975
9 through 2003, where there was a significant
10 increase, I was not aware of any data that
11 identifies any specific extrinsic factors, as I
12 have told you --
13   Q.   Okay.
14   A.   -- for the initial rise or the
15 subsequent decline in the incidence.
16   Q.   You can't name a single possibility?
17   A.   It's unknown.
18       MR. JOHNSTON: Objection. Asked
19   and answered.
20 BY MR. LITZENBURG:
21   Q.   What about these three points? The
22 decrease in extrinsic factors, the introduction
23 of new external factors that protect work in
24 combination with each other to lead to a decline
25 in NHL?

Page 236

1        MR. JOHNSTON: Objection. Vague.
2        THE WITNESS: Yeah. You've
3    actually -- I have -- the combination is
4    the two together.
5 BY MR. LITZENBURG:
6    Q.   Uh-huh. How would this work in
7 combination to decrease the incidence of
8 non-Hodgkin lymphoma?
9    A.   Chemical Factor A hypothetically
10 causes NHL. Chemical Factor B gets introduced
11 and in some way mitigates the pathways
12 responsible for lymphoma development, and
13 lymphoma development declines. This is a
14 hypothetical.
15       Another hypothetical would be that
16 Factor A is an external factor causing NHL and
17 Factor B comes along and the use of Factor B
18 leads to the diminished use of Factor A and,
19 consequently, NHL incidence fall.
20       The third possibility is that both
21 of those things happen.
22       The fourth possibility that nothing
23 happens would be, you know, not worth postulating
24 because something is causing the incidence to go
25 down.

Page 237

1    Q.   And you can't give me one example of
2 a cancer protective chemical in the context of
3 NHL?
4        MR. JOHNSTON: Objection.
5    Misstates his testimony. Calls for
6    speculation.
7        THE WITNESS: Again, beyond the
8    focus of my report.
9 BY MR. LITZENBURG:
10   Q.   Okay. On page 5 at the bottom, it
11 says:
12       "Although NHL does not run in
13 families, if any first degree relative has any
14 form of blood cancer, this increases overall risk
15 of NHL by about twofold."
16       Can you explain that sentence to me?
17   A.   The sentence, I think, is
18 self-explanatory. If you have a -- if you ask
19 the question statistically, you know, does NHL
20 run in families? Is there a certain percent
21 elevated risk if a parent or an aunt or an uncle
22 has it? The answer is no if you ask that
23 question that way in the epidemiologic
24 literature. Okay?
25       However, if you ask the question,

William H. Fleming, M.D., Ph.D.

1 have you any first degree relative with any type
2 of blood cancer?  A different question.  This
3 will increase the risk of NHL by twofold.
4     Q.    Do you believe that to demonstrate
5 causality?
6     A.    This merely demonstrates an
7 association.  It doesn't -- it doesn't
8 necessarily.  There could be -- it could be
9 genetic susceptibility with multiple causes that
10 could be different from individual to individual.
11 This does not address any of those questions.
12     Q.    Is there an association between
13 glyphosate use and non-Hodgkin lymphoma?
14     A.    To my reading of the literature,
15 there is no credible scientific evidence that
16 establishes a relationship between glyphosate use
17 and NHL.
18     Q.    Why do we -- why are meta-analysis
19 done?
20     A.    I can't give you an expert opinion
21 as to the answer to that question.  I suggest you
22 speak with an epidemiologist.
23     Q.    Do you even know what the numerical
24 results of any of the meta-analyses in this case
25 are?

1     A.    I really did not review and look at
2 meta-analysis in any detail.
3         I will say that the reason
4 historically in medicine people have done it is
5 they've had very small numbers of patients to
6 deal with, and they wonder if by combining the
7 number of patients and trying to analyze it as a
8 group, as challenging as that is statistically,
9 whether that will shed any new light on the
10 problem.
11         My own personal experience with
12 meta-analysis in clinical medicine, not
13 epidemiology, is that it is, you know, not
14 typically not very useful, but if it is, it's
15 hypothesis-generating and you need to have a
16 prospective trial to address your question and
17 get your data.
18     Q.    Is it -- is a meta-analysis less
19 useful than Figures 4 and 5?
20         MR. JOHNSTON:  Objection.  Calls
21 for speculation.
22         THE WITNESS:  Apples and oranges.
23 Figures 4 and 5 are illustrative of the
24 results and consistent with the results
25 from the prospective study that forms the

1 basis of my opinion.  They are not
2 epidemiologic studies, so they cannot be
3 compared to any epidemiologic study.
4 BY MR. LITZENBURG:
5     Q.    Do you know if there's a published
6 meta risk that reaches statistical significance?
7     A.    I --
8         MR. JOHNSTON:  Objection.  Vague.
9         THE WITNESS:  Again,
10 meta-analyses by definition involve
11 analyzing retrospective studies.  With the
12 existence of a prospective study,
13 retrospective studies are certainly still
14 useful to generate further hypotheses, but
15 they -- they can't really, you know,
16 address the association question.
17 BY MR. LITZENBURG:
18     Q.    Do you -- is it your opinion that
19 two-thirds of cancers have no external
20 contributing factor?
21     A.    There's a very interesting article
22 published in Nature by Tomasetti, et al., and he
23 is an expert -- he and Burt Vogelstein, the
24 senior author -- are experts in colon cancer and
25 colon stem cells.  They have looked at this stem

1 cell question using hundreds of databases
2 throughout the country, trying to make sense of
3 what we actually know happens with exposures in
4 cancer.
5         In other words, there's genetic
6 factors, there's environmental factors, and then
7 there's unknown, and the unknown we have always
8 known in cancer medicine is the largest group.
9     Q.    Is it your opinion that two-thirds
10 of cancers have no external contributing factor?
11         That was the question.  Are you able
12 to answer it?
13     A.    Random mutations are likely to be
14 the main reason for the development of about
15 two-thirds of cancers rather than well-defined
16 genetics and exposures, yes.
17     Q.    So --
18     A.    That's the current state of the art.
19     Q.    -- two-thirds of cancers you believe
20 to be unifactorial and just genetic bad luck?
21     A.    I don't believe any cancers to be
22 unifactorial.
23     Q.    Okay.  So are you telling me those
24 two-thirds that what?  The gene mutation was the
25 primary factor, the most important factor, the

William H. Fleming, M.D., Ph.D.

Page 242

1 initiator?  What are -- what are you trying to
2 tell me?
3      A.    I am saying --
4          MR. JOHNSTON:  Objection.
5 Compound.  Calls for speculation.
6          THE WITNESS:  Right.
7          MR. JOHNSTON:  Vague.
8          THE WITNESS:  Could you unpack
9 your question?
10 BY MR. LITZENBURG:
11      Q.    Yeah.  In 66 percent of cancer
12 cases, you're saying that external factors played
13 no role or are you saying --
14      A.    No.
15      Q.    You're saying --
16      A.    No, that's not correct.
17      Q.    -- that genetic mutation would be
18 initiating?
19      A.    No, that's not correct.
20      Q.    What are you saying?
21      A.    I am referring to a paper by
22 Tomasetti, et al., that's in my Materials
23 Considered List that indicates of the mutations
24 that are involved in cancer, about two-thirds of
25 them have nothing to do with the initial

Page 243

1 underlying predisposition.  In other words,
2 mutations that you were born with, mutations that
3 you carried over from your parents.  So that's
4 the family genetics history.
5          The other piece is exposure, whether
6 it be cigarette smoke or alcohol in combination
7 with cigarette smoke or whatever you like, you
8 know, together really only represent about a
9 third of it.
10          The other mutations in cancer
11 randomly occur and that's because stem cells
12 continually divide to replenish our skin,
13 replenish our gut, replenish our lung epithelial,
14 and errors occur randomly, and as we get older,
15 our ability to repair those errors decreases.
16          This random accumulation of
17 mutations is probably what's responsible about
18 for about two-thirds of cancer.  Approximately a
19 third is primarily due to a combination of
20 genetics and environment.
21      Q.    You're talking about cancer overall?
22      A.    Yes, in the broadest sense.  This is
23 not applicable to any particular subset, but if
24 you'll look at that -- that manuscript, you'll
25 see they have looked at -- at registries that

Page 244

1 were provided to them by IARC to actually
2 interrogate, you know, stem cell turnover data in
3 order to -- to draw their conclusions.
4      Q.    And you have no idea how that
5 proportion translates to NHL?
6      A.    No, I wouldn't be able to say in the
7 case of NHL at all how that.  That's -- that's
8 sort of -- that's a global number.
9      Q.    Okay.  Can we agree these five
10 factors on page 5 -- inherited genetic disorders,
11 autoimmune disease, immunosuppressive drugs --
12 well, that's three factors --
13      A.    Uh-huh.
14      Q.    -- are not accounted for in your
15 Figure 5 in any way?
16      A.    They -- I disagree with that
17 statement.
18          They are obviously included in this
19 global data set because the data set is
20 all-comers with NHL, and if there's a transplant
21 recipient that's immunosuppressed, there's
22 somebody with hepatitis C that gets NHL, they
23 would all be part of that general population.
24      Q.    What's the difference between a
25 cohort study and a case-control?

Page 245

1      A.    Well, in my view, the single most
2 important aspect -- there are several
3 differences.  The most important aspect is one is
4 a retrospective study which looks back at
5 historical events, which bring in all sorts of
6 limitations and biases, and the other one
7 identifies a group of individuals who are
8 potentially at risk for a certain outcome.
9          It could be heart disease.  It could
10 be cancer.  It could be NHL.  And, in fact, the
11 prospective study only enrolls people who have
12 not yet developed the disease in question so they
13 can look at the development of disease over time
14 in that cohort.
15          There are four components they
16 analyze in a cohort study.  Exposed individuals
17 who develop the disease, exposed individuals who
18 do not develop the disease, unexposed individuals
19 who develop the disease, and unexposed
20 individuals who do not develop the disease.  This
21 gives a great deal of information into the
22 natural history of that disease and that
23 well-defined patient population.
24          In contrast, case-control study is
25 retrospective.  A case-control study by one form

Page 246

1  or another identifies individuals with a
2  particular disease, such as NHL, and then says
3  we're going to get age matched, sex matched,
4  contemporary controls, and we're going to now
5  question them as to their exposure to a drug,
6  their exposure to a chemical, what have you.
7        So they're in this situation where
8  they need to, in the case-control for NHL,
9  identify NHL, individuals with NHL and ask them
10  to participate in survey.  The basis of which is
11  we're trying to collect information on what
12  caused your cancer.  What can you tell us from
13  your memory?
14        In contrast, the prospective studies
15  essentially start with everybody in the same
16  place and say, okay, we need to keep very close
17  track of what's happening in the future.  We're
18  going to be asking you questions realtime, you
19  know, over -- over a period of time and ask you
20  to, you know, update your answers as life and
21  circumstances change.
22        So those are the fundamental
23  differences.
24    Q.    Okay.  What are the biases that each
25  are susceptible to?

Page 247

1        MR. JOHNSTON:  Objection.
2    Compound.
3  BY MR. LITZENBURG:
4    Q.    What is the biases that case-control
5  studies are susceptible to?
6    A.    Case-control studies are susceptible
7  primarily to recall bias.
8    Q.    Anything else?
9    A.    Meaning you're being asked to
10  estimate an exposure to something in the past,
11  and this is a challenging thing to do.
12    Q.    Anything else?
13    A.    Well, that, you know, that is --
14  that is one of the, you know, main important one
15  -- that's one of the most important biases in it.
16        And you've also -- you've also
17  selected people who are, you know, now have the
18  disease and are wanting to participate in such a
19  study, and this may be a different cross-section
20  of the population than if you study people
21  prospectively who didn't have the disease.
22        So people's motivation for being in
23  the study, for staying in the study, for
24  participating in it, and the same thing can be
25  said of control participants in a study.

Page 248

1    Q.    And --
2    A.    But it's the retrospective nature
3  that in my mind is the -- is the critical
4  component.  In clinical medicine, we do
5  retrospective studies all the time to generate
6  hypotheses, and then we test them prospectively.
7  The FDA will never give you a drug approval
8  without a prospective trial.  It simply isn't
9  done.
10    Q.    Doctor, would it be ethical to do a
11  prospective clinical trial on whether Roundup
12  gives you cancer?
13        MR. JOHNSTON:  Objection.
14    Misstates his testimony.
15        THE WITNESS:  Yes.  There --
16    there is no need to do a prospective trial
17    where patients are assigned various
18    groups.  You simply design a cohort in
19    which there are different individuals with
20    different exposures and then analyze the
21    data.
22  BY MR. LITZENBURG:
23    Q.    Would you agree a randomized
24  clinical trial is the gold standard and that's
25  what you're referring to when you say a new drug

Page 249

1  gets approved?
2    A.    You cannot do randomized studies in
3  a -- in a population of individuals unless
4  there's a clear potential benefit to that study,
5  and there would be no potential benefit to a
6  study that looked at extrinsic factors that
7  caused cancer.  Whereas, with treatment there is.
8    Q.    You pretty much just considered
9  temporality when you were deciding whether
10  there's a causality fit between this agent and
11  this disease; is that fair?
12        MR. JOHNSTON:  Objection.  Vague.
13  BY MR. LITZENBURG:
14    Q.    In terms of the Bradford Hill
15  criteria, you find that it found temporality; is
16  that fair?
17    A.    In terms of the Bradford Hill
18  criteria, I was able to say pretty definitively
19  that the marked steep increase in the incidence
20  of NHL between 1975 and 1985, the etiologic agent
21  for this has not been identified.  But I said
22  assuming approximately a 10-year latency period
23  and an introduction of glyphosate in 1974, it's
24  reasonable to conclude most, if not all, of the
25  cases in that 10-year period were not due to

William H. Fleming, M.D., Ph.D.

1 glyphosate.

2    Q.    It all depends on that presumption
3 of a 10-year latency period; right?

4        MR. JOHNSTON: Objection. Vague
5 as to "all."

6        THE WITNESS: Yes. It -- it
7 doesn't exclude the possibility of a given
8 individual having a shorter latency
9 period, no. But there is a general
10 feeling, I believe, that 10 years is a --
11 is a reasonable time period.

12        There's exceptions on both ends
13 of that, but if you're looking at the US
14 population over a 10-year period, the bulk
15 of the patients are not going to be
16 exceptions. They're going to cluster at
17 the averages.

18 BY MR. LITZENBURG:

19    Q.    What are the other Bradford Hill
20 criteria that you considered in this report?

21    A.    The presence of, you know, a
22 dose-response.

23    Q.    Anything else?

24    A.    Biological gradient. Those were the
25 two I particularly decided to, you know, hone in

1 on because those were relationships that I felt
2 hadn't previously been fully addressed.

3    Q.    Other than the two you particularly
4 chose to hone in on, did you consider any of the
5 other Bradford Hill criteria?

6    A.    I'd like to take a look at the list
7 to refresh my memory in order to discuss that
8 further.

9    Q.    Can you name two other Bradford Hill
10 criteria?

11    A.    I'm aware of the concepts. I'm not
12 aware of the verbiage.

13    Q.    Can you name one that you considered
14 in this case in addition to what you've already
15 told us?

16    A.    My goal was not to consider Bradford
17 Hill criteria. My goal was to consider the
18 temporal aspect and the dose-response aspect, as
19 I have in the -- in the data I showed you in this
20 report, and I linked those two particular ones to
21 Bradford Hill. I did not set out with a goal of
22 trying to meet all nine Bradford Hill criteria --

23    Q.    What's a --

24    A.    -- as part of this.

25    Q.    What's a confounding factor?

1    A.    A confounding factor is one that, if
2 taken into consideration, would no longer --
3 would actually be the real explanation for a
4 relationship between two things. So if you've
5 got, you know, if A and B look to be closely
6 associated, but C is a confounding factor which
7 could give a similar result, the result may be
8 due to C.

9        So as Bradford Hill himself said,
10 the important aspect of this is to make sure that
11 when you're comparing A to B, that some
12 confounding factor is not responsible for any
13 observed difference. That's basically his
14 central tenet.

15    Q.    How did you do that in Figure 5?

16        MR. JOHNSTON: Objection.
17 Misrepresents what Figure 5 is.

18        THE WITNESS: Yeah. Figure 5 is
19 not an epidemiologic study. Figure 5 is
20 not a statistical study. Figure 5 is a
21 snapshot over time of glyphosate usage and
22 NHL incidence.

23        This was constructed to address
24 the question of whether glyphosate usage
25 on a regional basis was in any way

1 associated with NHL incidence. Full stop.
2 No other -- no other conclusions can be,
3 you know, addressed from this, and this
4 was basically, you know, demonstrated that
5 the results of the AHS study were, in
6 fact, correct.

7        I had no idea of what Figure 5
8 was going to look like until I plotted
9 them and looked at them. It could have
10 easily been the other way around.

11        I'm showing it to you, you know,
12 because I chose to analyze that data and,
13 in fact, I chose to analyze this data in
14 this way, and you were not seeing expected
15 patterns you would if there was a clear
16 association of glyphosate and NHL at the
17 county level when correlated with usage --

18 BY MR. LITZENBURG:

19    Q.    Do --

20    A.    -- in very basic ways.

21        And the confounding factors that may
22 exist are certainly there, but they would be
23 somewhat mitigated that this is a country-wide
24 survey. So if there was a confounding factor in
25 the Northeast in 10 percent of the patients and

Page 254

1 in the Southwest in 2 percent of the patients, at
2 the end of the day, the patterns wouldn't really
3 change very much.
4    Q.    Confounding factors are all
5 geographic?
6         MR. JOHNSTON:  Objection.
7    Misstates his testimony.
8         THE WITNESS:  I did not make that
9    statement.
10 BY MR. LITZENBURG:
11    Q.    Okay.  Did you run this model for
12 any latency assumption other than this 10-year,
13 eight to 12-year?
14    A.    There is relatively little hard data
15 on the latency of NHL, as we discussed at length
16 earlier today.  I used the best available data to
17 look at what people seem to think is a reasonable
18 time period.  This has been suggested in the
19 literature in many studies.
20    Q.    That's not what I asked.
21         You said you didn't know what this
22 would look like before you ran it.
23         Did you also run it for a five-year
24 assumption and a 15-year assumption?  Anything
25 other than your 10-year assumption?

Page 255

1    A.    It's not a 10-year assumption.  If
2 you look at it, you'll see it's an eight to
3 12-year assumption.
4    Q.    Did you run it with any other
5 assumption?
6    A.    I looked at a couple of different
7 dates, dates for glyphosate exposure.  And as I
8 told you earlier, the intensity of the pattern
9 varied somewhat, but the distribution did not.
10 So I looked at that quite extensively.
11         I don't believe there were more than
12 perhaps one more choice of time frame in the --
13 in the GeoViewer data for the NCI.
14    Q.    Okay.
15    A.    So I chose the most up-to-date one.
16 I was, you know, just very simple
17 straightforward.  What's our most recent data on
18 NHL incidence by county?  Assume 10-year latency.
19 Okay.  What's glyphosate look like?  Fine.
20         I was interested to see how
21 glyphosate, you know, changed over time, and I
22 clicked on a great number of those years.  And as
23 I've discussed earlier, the data was essentially
24 the same in terms of distribution, although the
25 dose did change over time.

Page 256

1         So I was, therefore, you know,
2 pretty confident that if there was going to be an
3 association, the geographic association would not
4 dramatically change because the glyphosate data
5 didn't.
6    Q.    What other years did you look at for
7 this statement?
8    A.    For which one now?
9    Q.    What other years did you look at
10 before you picked 2000?
11         MR. JOHNSTON:  Objection.  Asked
12    and answered.  Misstates his testimony.
13         THE WITNESS:  I looked several
14    years past 2000 and then I looked several
15    years below 2000, including the earliest
16    point in which the data was available.  I
17    can't recall that now.
18         If you'd like to bring up the web
19    page, we can answer your question.
20 BY MR. LITZENBURG:
21    Q.    Do you know if it was the '40s or
22 the '90s?  Do you have a ballpark?
23         MR. JOHNSTON:  Objection.  Asked
24    and answered.
25         THE WITNESS:  I would say it was

Page 257

1 the 1990s.
2 BY MR. LITZENBURG:
3    Q.    Do you know if it went back to the
4 use -- did you look at the decade following the
5 introduction of Roundup to the market?
6    A.    This mapping data that we're talking
7 about here certainly does not go back to -- to
8 the 1970s.
9    Q.    Did you look for any data that did?
10    A.    I looked at data that was in a
11 well-organized data set that was publicly
12 available so that anybody could independently
13 bring up the data I'm showing you in Figure 4 and
14 Figure 5 on these websites, create it themselves
15 and print it out, print it out on as large a
16 piece of paper as they liked, project it on a
17 wall or a screen, and spend as much time as they
18 liked looking at it in as much of a granular
19 detail as they would like.  So this data is
20 available to you, and you can go back and have a
21 look at that.
22         I represent once again -- and I hope
23 for the final time -- that I looked at the most
24 recent data for incidents by county.  It is 2008
25 to 2012.  I'm interested in contemporary NHL

Page 258

1 incidents, and then I backed off by, you know,
2 till -- till the year 2000.
3    Q.   Is it your opinion that glyphosate
4 doesn't cause non-Hodgkin lymphoma?
5    A.   My --
6        MR. JOHNSTON: Objection. Asked
7 and answered.
8        THE WITNESS: My opinion is there
9 is no credible scientific evidence that
10 shows an association between glyphosate
11 and NHL.
12 BY MR. LITZENBURG:
13    Q.   So it's better characterized as you
14 simply don't know?
15    A.   There is --
16        MR. JOHNSTON: Objection.
17 Misstates his testimony.
18        THE WITNESS: Yeah. There is no
19 scientific evidence today that supports an
20 association between glyphosate and NHL in
21 what I consider to be a scientifically
22 credible manner.
23 BY MR. LITZENBURG:
24    Q.   Do you have an opinion as to whether
25 it increases or decreases the risk of non-Hodgkin

Page 259

1 lymphoma?
2        MR. JOHNSTON: Objection. Vague
3 as to "it." His opinion is stated in his
4 report. Asked and answered. You're
5 harassing the witness at this point.
6        Go ahead. You can answer it.
7        THE WITNESS: Would you like to
8 rephrase the question?
9 BY MR. LITZENBURG:
10    Q.   No. Do you have an opinion whether
11 Roundup or glyphosate exposure increases the risk
12 in a population for non-Hodgkin lymphoma?
13        MR. JOHNSTON: His opinion is
14 stated in his report. Vague. Asked and
15 answered. Argumentative and harassing.
16 Go ahead.
17        THE WITNESS: Again, I'd like you
18 to restate the question one more time
19 because there were a couple of words in it
20 that were different from the last time you
21 asked it, and I want to be sure I can
22 address every component of it.
23 BY MR. LITZENBURG:
24    Q.   Would the court reporter read it?
25    A.   Sorry?

Page 260

1        (The reporter read the record on
2 page 259 lines 10-12.)
3        MR. JOHNSTON: Same objections.
4        THE WITNESS: Which population?
5 That is a very vague statement. I can't
6 address that.
7 BY MR. LITZENBURG:
8    Q.   Do you have an opinion that
9 glyphosate or Roundup exposure increases the risk
10 of non-Hodgkin lymphoma in any population?
11    A.   I am not aware of any credible
12 scientific evidence linking glyphosate use to the
13 development of NHL.
14    Q.   Why did you ask me which population?
15    A.   Your first question sound like --
16 sounded like you were specifying something and
17 didn't complete it. Your second one was an
18 overall comment on global NHL.
19    Q.   Okay.
20    A.   So I did not understand what the
21 term "population" referred to. Was that a
22 population in California? A population in Iowa?
23 The population of the cohort study? I asked you
24 to clarify that question. Thank you.
25    Q.   And you agree that you would be

Page 261

1 comfortable at a meeting with other oncologists
2 discussing your recommendation for parents to go
3 ahead and continue using glyphosate around
4 children with NHL?
5        MR. JOHNSTON: I'm going to
6 object. You've asked that argumentative
7 and abusive and disrespectful question
8 three times today. I don't know why you
9 need to ask it a third time, but it's very
10 disrespectful and argumentative and
11 demonstrates how you intend to conduct
12 these depositions.
13        You can answer it again if you'd
14 like to.
15        THE WITNESS: I have no opinion
16 as to whether any individual should
17 continue or discontinue their use of
18 glyphosate. I have no opinion on that
19 matter.
20 BY MR. LITZENBURG:
21    Q.   The only thing you have an opinion
22 on whether they should expose themselves or not
23 expose themselves to are four chemicals in that
24 one article about pesticides?
25        MR. JOHNSTON: Objection. Goes

William H. Fleming, M.D., Ph.D.

Page 262

1 beyond the scope of his opinion in this
2 case.
3        THE WITNESS:  I am not in a
4 position here to provide expert testimony
5 on the details of insecticide exposure and
6 when it should and shouldn't be
7 recommended.
8 BY MR. LITZENBURG:
9    Q.    There are four things that you would
10 tell patients to modify their exposure to your
11 NHL patients, and they are those four pesticides
12 in that article; is that true?
13        MR. JOHNSTON:  Objection.
14 Misstates his testimony.  Speculative.
15 Incomplete hypothetical.
16        THE WITNESS:  I would explain to
17 patients that there was literature
18 implicating five pesticides that had been
19 recently published as part of a robust
20 prospective cohort study, and if they were
21 interested in more information about
22 these, you know, compounds, I would -- I
23 would discuss it further but...
24 BY MR. LITZENBURG:
25    Q.    Have you had that discussion before?

Page 263

1    A.    I have not actually been -- I have
2 mentioned to people that there may be
3 agricultural-related products.  I mean, this has
4 been known, as we discussed earlier, since at
5 least the 1970s it increased the risk in farmers.
6        And so if I'm talking to a farmer
7 and he says, hey, doc, what do you know now? I
8 will absolutely tell him that.
9        If I am talking to someone who lives
10 in an urban environment and has no questions
11 about exposures, I am not going to list these and
12 tell them that they must at all costs rethink
13 their exposure to these compounds and their
14 family must as well.  Because I don't believe the
15 association, while there, is strong enough to
16 make that kind of recommendation.
17    Q.    You wouldn't tell those same
18 patients or that farmer about any of the
19 literature on Roundup?
20        MR. JOHNSTON:  Objection.  Asked
21 and answered.
22        THE WITNESS:  I would tell a
23 patient in my office the same thing I'm
24 telling you today.
25        That in terms of glyphosate

Page 264

1 exposure and NHL, I do not believe there
2 is any credible scientific evidence
3 linking the two.
4 BY MR. LITZENBURG:
5    Q.    What else do you do -- all right.
6 Take a five-minute break.
7        THE VIDEOGRAPHER:  Time now is
8 2:54.  We are going off the record.
9        (A brief recess was taken.)
10        THE VIDEOGRAPHER:  The time now
11 is 3:06.  We are back on the record.
12 BY MR. LITZENBURG:
13    Q.    Dr. Fleming, one more question.
14        Is there anything that IARC has
15 classified one way or another that you've told
16 any of your patients about?
17    A.    Absolutely.  IARC classifies tobacco
18 as a Class 1 carcinogen.  It also classifies
19 alcohol as that, and certainly I counsel my
20 patients who both smoke and consume alcohol to
21 the added effects of doing that.
22    Q.    Okay.  So --
23    A.    It also -- if I may continue?
24    Q.    Yeah.
25    A.    There are a variety of

Page 265

1 chemotherapeutic agents -- cytotoxin,
2 Vincristine, etoposide, Busulfan, just to name a
3 few -- that are all classified as Level 1 human
4 carcinogens by IARC.  And I discuss these --
5 these when applicable when treating patients with
6 great regularity.
7    Q.    Okay.  Alcohol, tobacco, chemo.
8        Anything else?
9    A.    Those are the ones that absolutely
10 would be the great majority of things.
11 Occasionally a patient will, you know, make an
12 inquiry about something, a particular compound,
13 and if I don't readily know the answer, I'll say
14 I'll need to, you know, get back to you on that.
15 But, you know, my current answer is, it's not
16 ringing a bell, but next time we meet I'll have a
17 better answer for you.  And I'll go look it up.
18    Q.    Have any of those things been in
19 response to the IARC classification?
20        My guess is you don't tell your
21 patients about tobacco being a carcinogen because
22 IARC classified it as such; is that right?
23        That's a really poorly worded logic
24 question.
25        Have you begun telling any patients

William H. Fleming, M.D., Ph.D.

Page 266

1  about anything you believe is carcinogenic as a
2  result of IARC making that classification?
3      A.    Not recently that I can recall, no.
4      Q.    Okay.  And, again, what would you
5  need to know to determine whether glyphosate was
6  a contributing factor to the development of
7  somebody's non-Hodgkin lymphoma?  What would you
8  need to know about that person?
9      A.    I wouldn't need to know anything
10 about the person because you're asking a
11 case-specific causality question, and the general
12 causation question I should say the evidence is
13 very clear that there is no credible evidence
14 implicating glyphosate and NHL.
15         So discussing it in a granular form
16 with an individual patient at any length doesn't
17 seem to be productive.
18         MR. LITZENBURG:  All right.
19 That's all I got.
20         MR. JOHNSTON:  All right.  Give
21 us a second.  We may be done --
22         MR. LITZENBURG:  Okay.
23         MR. JOHNSTON:  -- but I want to
24 make sure.
25         THE VIDEOGRAPHER:  Time now is

Page 267

1  3:09.  We are going off the record.
2         (A brief recess was taken.)
3         THE VIDEOGRAPHER:  Time now is
4  3:12.  We are back on the record.
5         MR. JOHNSTON:  We don't have any
6  questions on behalf of Monsanto.  So I
7  assume this deposition is considered
8  closed at this point.
9         MR. LITZENBURG:  We agree.
10        THE VIDEOGRAPHER:  Time now is
11 3:12.  This deposition has concluded.
12
13        (Deposition concluded at 3:12 p.m.)
14
15              *    *    *
16
17
18
19
20
21
22
23
24
25

Page 268

1          - - - - - -
                E R R A T A
2          - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6     REASON:  _____
7  ____  ____  _____
8     REASON:  _____
9  ____  ____  _____
10    REASON:  _____
11 ____  ____  _____
12    REASON:  _____
13 ____  ____  _____
14    REASON:  _____
15 ____  ____  _____
16    REASON:  _____
17 ____  ____  _____
18    REASON:  _____
19 ____  ____  _____
20    REASON:  _____
21 ____  ____  _____
22    REASON:  _____
23 ____  ____  _____
24    REASON:  _____
25

Page 269

1
2     ACKNOWLEDGMENT OF DEPONENT
3
4         I,_____, do
5  hereby certify that I have read the
6  foregoing pages, and that the same is
7  a correct transcription of the answers
8  given by me to the questions therein
9  propounded, except for the corrections or
10 changes in form or substance, if any,
11 noted in the attached Errata Sheet.
12
13
14 _____
15  WILLIAM H. FLEMING, MD, PHD       DATE
16
17
18 Subscribed and sworn
   to before me this
19 _____ day of _____, 20____.
20 My commission expires:_____
21
22 _____
22 Notary Public
23
24
25

William H. Fleming, M.D., Ph.D.

Page 270

1              CERTIFICATE OF REPORTER
2     DISTRICT OF COLUMBIA     )
3              I, DENISE D. VICKERY, CRR/RMR and
4     Notary Public, hereby certify the witness was by
5     me first duly sworn to testify to the truth; that
6     the foregoing deposition was taken at the time
7     and place stated herein; and that the said
8     deposition was recorded stenographically by me
9     and thereafter reduced to printing under my
10    direction; that said deposition is a true record
11    of the testimony given by said witness.
12             I certify the inspection, reading and
13    signing of said deposition were NOT waived by
14    counsel for the respective parties and by the
15    witness; and that I am not a relative or employee
16    of any of the parties, or a relative or employee
17    of either counsel, and I am in no way interested
18    directly or indirectly in this action.
19
20
21
22
23             Denise D. Vickery, CRR/RMR
24
25    My Commission expires February 14, 2018