**Pages 596 - 770**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  ROUNDUP PRODUCTS        )
LIABILITY LITIGATION,           )   NO. M. 16-02741 VC
_____ )

San Francisco, California
Thursday, March 8, 2018


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                        The Miller Firm LLC
                        108 Railroad Avenue
                        Orange, VA  22960
                        (540) 672-4224
                        (540) 672-3055 (fax)
                BY:  **MICHAEL J. MILLER**

For Plaintiffs:

                        Andrus Wagstaff PC
                        7171 West Alaska Drive
                        Lakewood, CO  80226
                        (720) 255-7623
                BY:  **VANCE R. ANDRUS**
                     **AIMEE H. WAGSTAFF**
                     **DAVID JACKSON WOOL**

For Plaintiffs:

                        Andrus Wagstaff PC
                        6315 Ascot Drive
                        Oakland, CA  94611
                        (720) 255-7623
                BY:  **KATHRYN MILLER FORGIE**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

**<u>APPEARANCES</u>**:

For Plaintiffs:
                        Weitz & Luxenberg PC
                        700 Broadway
                        New York, NY 10003
                        (213) 558-5802
                BY:     **ROBIN L. GREENWALD**
                        **PEARL A. ROBERTSON**

For Plaintiffs:
                        Baum Hedlund Aristei and Goldman, P.C.
                        12100 Wilshire Boulevard, Suite 950
                        Los Angeles, CA  90024
                        (310) 207-3233
                BY:     **MICHAEL L. BAUM**
                        **ROBERT BRENT WISNER**

For Plaintiffs:
                        Lundy Lundy Soileau & South LLP
                        501 Broad Street
                        P.O. Box 3010
                        Lake Charles, LA 70601
                        (337) 439-0707
                BY:     **RUDIE RAY SOILEAU, JR.**

For Plaintiffs:
                        Andrus Anderson LLP
                        155 Montgomery Street, Suite 900
                        San Francisco, CA  94104
                        (415) 986-1400
                        (415) 976-1474 (fax)
                BY:     **LORI E. ANDRUS**

For Plaintiff Sioum Gebeyehou:
                        Law Offices of Tesfaye Tsadik
                        1736 Franklin Street, 10th Floor
                        Oakland, CA  94612
                        (510) 839-3922
                        (510) 444-1704 (fax)
                BY:     **TESFAYE WOLDE TSADIK**

1  **APPEARANCES**:

2  For Plaintiff Wanda Clarke:
                         Sill Law Group
3                        14005 N. Eastern Avenue
                         Edmond, OK  73013
4                        (405) 509-6300
                         (415) 509-6268 (fax)
5                BY:  **TARA TABATABAIE**

6  For Defendant Monsanto Corporation:
                         Hollingsworth LLP
7                        1350 I Street, NW
                         Washington, DC  20005
8                        (202) 898-5800
                BY:  **KIRBY T. GRIFFIS**
9                     **JOE G. HOLLINGSWORTH**
                      **JOHN M. KALAS**
10                    **ERIC GORDON LASKER**
                      **HEATHER ANN PIGMAN**
11                    **STEPHANIE SALEK**
                      **ERICA T. KLENICKI**
12

13  **Also Present**:  **The Honorable Ioana Petrou**
                   **Leonora Lynham**
14                 **Scott Duval**

15

16

17

18

19

20

21

22

23

24

25

1              <u>I N D E X</u>

2

3    Thursday, March 8, 2018 - Volume 4

4
     **<u>PLAINTIFFS' WITNESSES</u>**                              **<u>PAGE</u>**  **<u>VOL.</u>**
5

6    **<u>PORTIER, CHRISTOPHER (RECALLED)</u>**
     Direct Examination resumed by Ms. Greenwald         603    4
7    Cross-Examination by Mr. Lasker                     618    4

8

9    **<u>DEFENDANT'S WITNESSES</u>**                              **<u>PAGE</u>**  **<u>VOL.</u>**

10

11   **<u>BLAIR, AARON EARL</u>**
     By Deposition                                       702    4
12

13   **<u>ROSS, MATTHEW</u>**
     By Deposition                                       703    4
14

15   **<u>ROSOL, THOMAS</u>**
     (SWORN)                                             704    4
16   Direct Examination by Ms. Pigman                    704    4
     Cross-Examination by Ms. Wagstaff                   725    4
17

18   **<u>CORCORAN, CHRISTOPHER</u>**
     (SWORN)                                             737    4
19   Direct Examination by Mr. Griffis                   738    4

20

21

22

23

24

25

```
 1   Thursday - March 8, 2018                          8:05 a.m.

 2                        P R O C E E D I N G S

 3                             ---oOo---

 4        THE COURT:  All right.  Ready to resume?

 5        MS. GREENWALD:  Yeah.

 6        THE COURT:  Oh, argument.  You all asked about

 7   argument.  I could have argument.  I would not want to do it

 8   unless it's -- I want to do it -- I would like to have

 9   argument, I would like to have it when it's fresh, and the time

10   that I could have it next week would be Wednesday morning.  So,

11   like, Wednesday morning at 10:00 o'clock.

12        MR. LASKER:  And, your Honor, we had looked at that

13   because actually, Judge Petrou is having something on Tuesday

14   and there was a logic to that.  Unfortunately, we have some

15   medical issues on our side that week, and we were hoping to be

16   able to do it the week after, on Wednesday.

17        THE COURT:  I don't think so, because I'm going to be

18   in trial.

19        MR. LASKER:  Ah, okay.

20        THE COURT:  So we need to do it next week, and I

21   think Wednesday is the only time I can do it.

22        MR. LASKER:  Well, that makes it easy, then.

23        THE COURT:  So who were you planning on having for

24   argument?

25        MR. LASKER:  I'll be arguing.
```

1          THE COURT:  Okay.

2          JUDGE PETROU:  So counsel, if it's at all helpful,

3    I could move our Tuesday to sometime on Wednesday, if you were

4    trying to do it all in one day.  That would work fine for me.

5          MR. LASKER:  That would be great from me.  I'm coming

6    from the East Coast and we'll just have to figure out the

7    timing of the two.  How much time are you anticipating you'd

8    like for argument?

9          THE COURT:  I don't know.  Five or six hours.

10          MS. WAGSTAFF:  Each, right?

11          MR. LASKER:  Test like, though.  Right?

12          THE COURT:  You know, an hour or two.

13          MR. LASKER:  Okay.

14          THE COURT:  And for me, it could be -- it could be in

15    the morning or the afternoon.  Doesn't matter, I don't think.

16       Is that right, Kristen?

17          THE CLERK:  Yeah, I think that's fine.

18          THE COURT:  Because we moved that other -- we moved

19    the pretrial conference to Thursday afternoon, is that right?

20          MR. LASKER:  I have been told that morning would be

21    better on Wednesday, if we can do that.

22          THE COURT:  Okay.

23          MR. LASKER:  Then will we do the pretrial in the

24    afternoon?  Does that make sense?

25          JUDGE PETROU:  I think I can make that work.

1           MR. LASKER:  Okay.

2           THE COURT:  And then I assume Judge Petrou will have

3   her own argument at the appropriate time for her cases.

4           MR. LASKER:  Just so I'm clear, will you be attending

5   the argument?

6           JUDGE PETROU:  I don't know.

7           MR. LASKER:  That's fine, your Honor.  Thank you.

8           THE COURT:  I was assuming, I mean, anybody is

9   welcome to come watch, but I assume that because this is

10  argument in these cases, it should just be me presiding over

11  that part.

12          MR. LASKER:  Of course.  That makes sense to me,

13  your Honor.

14          MS. GREENWALD:  That works with us, Your Honor.

15          MR. WISNER:  And your Honor, for the JCCP proceeding

16  what time?

17          JUDGE PETROU:  Let's tentatively say 2:00 o'clock

18  next Wednesday.

19          MR. WISNER:  Okay, should I give notice?

20          THE COURT:  Yes.

21          MR. WISNER:  Okay.

22          THE COURT:  Okay.  Ready to proceed?

23          MS. GREENWALD:  Yes, thank you, Your Honor.

24

25

1    **CHRISTOPHER PORTIER**,

2    called as a witness for the Plaintiffs, having been previously

3    duly sworn, testified further as follows:

4    **DIRECT EXAMINATION** **(resumed)**

5    BY MS. GREENWALD:

6    **Q.**    Dr. Portier, yesterday afternoon -- if you could put up

7    slide 26, please -- yesterday afternoon we were talking about

8    slide 26, and we looked at the appropriate transcript last

9    night, because it appears that you testified that the studies

10   were 24- and 26-week studies.  Did you mean to say 24- and

11   26-month studies?

12   **A.**    Yes, 24- and 26-month studies.

13   **Q.**    Okay, great.  Thank you.

14        Okay, so if we could turn to slide 31, please.

15        Yesterday, at the end of the day, we talked to Dr. Portier

16   about roaming data, and that was slides 4 through 30, correct?

17   **A.**    Correct.

18   **Q.**    Using slides 31 through 33, can you please explain to the

19   Court the methodology that scientists employ for determining

20   whether the tumors found in animals arose by chance?

21   **A.**    Okay.  So once you see all of these tumors in this case,

22   you have to be worried that there are so many animals, so many

23   pathology evaluations going on, that maybe they just arose by

24   chance, and so you can actually address that.

25        Here's the methodology, in simple terms.  Suppose you have

1  an evaluation that requires 20 Cochran-Armitage tests.  For

2  each test, you determine if the p-value is less than .05.  So

3  you've got significance or not significance.  Because it's 20

4  tests and because the false-positive rate is five percent, by

5  chance, you would expect to get one positive finding.

6       Suppose there are three significant findings.  Then you

7  can actually calculate the probability of seeing three or more

8  significant findings.  Using simple first-year statistics and

9  probability in this case, with 3 for 20, the probability is

10 .076.  That means there's roughly a 1 in 13 chance all three

11 significant findings are due to chance.

12      So that's the methodology I'm going to employ for all of

13 these tumors.

14      Next slide, please.

15 **Q.**   If you can go to the next slide, please.

16 **A.**   So this is the tumors in the rats.  And I'm not going to

17 walk you through this huge table.  I'll do just one, the one

18 that matters.

19      If you look at male Sprague-Dawley rats, the first line,

20 there were 86 evaluations done.  That means you expect 4.3,

21 because 86 times .05.  We observed 7, and the probability of

22 that is .139.

23      I also looked at .01, we expected .9.  That's 86 times

24 .01.  We observed three, and the probability of that is .056.

25      So roughly it's a 1 in 18, 1 in 20 chance that all three

1 highly significant tumors in male Sprague-Dawley rats arose by

2 chance.  In my opinion, this is an unlikely finding.

3     Next slide.

4     This is the CD-1 mice.  Again, I'll just do the first one,

5 the males.  We expected 2.1.  We observed 8 for .05.  The

6 probability of that is virtually zero, one in a thousand.  The

7 same thing for .01, it's roughly one in a thousand.

8     These tumors cannot have arisen by chance.  It's just an

9 extremely rare event, if that were the case.

10 **Q.**   Next slide.

11     Dr. Portier, given these data, how do scientists determine

12 whether a chemical induces cancer in rodents?

13 **A.**   So the best place to go for this would be to look at the

14 definitions that EPA and others have for what constitutes

15 sufficient evidence of carcinogenicity in animals.

16     This is EPA's, and I'll read it,

17              "An agent that has tested positive in

18          animal experiments in more than one

19          species, sex, strain, site, or exposure

20          route."

21     That's the -- that's the limit of the detection.  You have

22 to see two or more.

23     Next slide.

24         **THE COURT:**  Can you adjust your mike a little bit

25 closer?  I'm told that you're not coming through on the video.

1  Sorry, I know yesterday I told you to move it away from you, so

2  I apologize.

3       **MS. GREENWALD:**  That was my fault, your Honor.  I

4  asked him to please move it away, also.

5  **Q.**  Dr. Portier why don't we stay on this slide.  Does the

6  data here support a finding of sufficient evidence under the

7  EPA definition?

8  **A.**  Absolutely.

9  **Q.**  And can you explain how?

10  **A.**  There were at least five very strong tumor findings in

11  these data.  They didn't arise by chance.  There's biological

12  reason to believe that they're real.  I'll show that in a

13  minute.  To me, it's so obvious that this is a positive study

14  practice.

15  **Q.**  Okay, if you can turn to slide 35, please.

16       Is the definition for EChA and IARC virtually the same as

17  that for EPA, even though there are a lot more words on the

18  page?

19  **A.**  Yes they're effectively the same.  And I will point out

20  that EChA and IARC use exactly the same definition.  EChA took

21  IARC's definition into their guidance documents.

22  **Q.**  Okay.  By the way, I want to ask you -- I want to go off

23  point for a minute.

24       In your deposition, do you recall that counsel for

25  Monsanto criticized you for failing to disclose work on this

 1  case, in connection with a letter to the -- a letter, Archives

 2  of Toxicology, a publication, in which your letter to the

 3  editor was published?  Do you recall that?

 4  **A.**  Yes, I do.

 5  **THE COURT:**  I didn't understand that question.

 6  **MS. GREENWALD:**  I'm sorry.

 7  **THE COURT:**  Can you ask it again?

 8  **MS. GREENWALD:**  Of course.

 9  **Q.**  In your deposition, counsel for Monsanto criticized you

10  for failing to disclose a letter to the editor that you sent to

11  Archives of Toxicology, the editor of that publication, in

12  which you did not identify that you were working on this case;

13  do you recall that?

14  **A.**  Yes, I do.

15  **Q.**  And that letter related to your criticism of the

16  European -- European Food Safety Authority's flawed methodology

17  in analyzing the data in this case, correct?

18  **A.**  Correct.

19  **Q.**  And did you do anything about that disclosure following

20  the deposition?

21  **A.**  Yes.  We wrote a letter to the editor, and they've since

22  added a conflict-of-interest statement.

23  **Q.**  Okay, and your publication, so to speak, what they

24  published was actually your letter to the editor, correct?

25  **A.**  Yes, correct.

1  Q.   Okay.  If you can go back, please, to slide -- if you

2  could go to slide 36, please.

3      Is statistical significance all that one -- all that a

4  scientist needs in order to decide that there are positive

5  findings in rodent studies?

6  A.   No.  You look at other issues, as well.  They're sort of

7  in the little one paragraph I read from EPA, and these are some

8  of the other issues.

9  Q.   And what is the biological significance of these rodent

10  study findings?

11  A.   Well, you -- you have tumors in multiple studies, multiple

12  species, multiple strains, and multiple sexes, and I've listed

13  them here for you to take a look at.  That's one the things

14  you'd like to see if you really want to call this a positive

15  study or positive studies.

16      You want to see regression from preneoplastic to benign to

17  malignant.  Not seeing it doesn't take it away, but seeing it

18  adds strength to the evidence, and we have three cases where

19  that occurs.

20      Next slide.

21      Rare tumor types really raise the biological significance

22  of a finding.  We have two rare tumor types in these studies.

23      If you see tumors at multiple sites in a single study,

24  that also strengthens the evidence you've got a positive

25  finding, and we have three cases where that is the case.

1    And finally, if you have tumors that are similar in

2 laboratory animals and humans.  That strengthens the case.

3    Malignant lymphomas in mice -- so when doctors want to

4 develop a therapy, researchers want to a develop a therapy for

5 NHL, they use a mouse that produces malignant lymphomas, and

6 they test the therapy in the mouse.

7    So the malignant lymphomas in the mouse are the closest

8 thing to NHL in humans.  There is no NHL in mice.

9 **Q.**  Okay.  If you can go back to slide 25, please.  Yesterday

10 we jumped over this slide, it was late in the afternoon, and so

11 I'd like to go over this now, Dr. Portier.

12    Can you please explain how tumors other than lymphomas are

13 relevant to the analysis here; and how they fit in to the

14 question of NHL in humans?

15 **A.**  Okay.  So historically, if you look at the evidence,

16 there's a dozen papers on this.

17    People have taken all of the known human chemical

18 carcinogens from IARC's list or from the Report on Carcinogens

19 list and they've looked to see if these occur in laboratory

20 animals.

21    And so all known human carcinogens are carcinogens in

22 laboratory animals.  There's not a single one that was missed.

23 Arsenic was missed for a while, but some very clever colleague

24 of mine figured how to find the right mechanism that worked.

25    Rats and mice generally do not get the same tumors when

1  both species are given the same chemical in the same

2  experiments at the same time.  So seeing the same site in

3  humans and rodents will strengthen the biological plausibility

4  of causality mediums, but it won't necessarily detract from it

5  if you don't find that.

6      And that's how it's used in these types of overall

7  evaluations.  That's the standard procedure for looking at

8  this.

9  **Q.**  Okay.  Slide 38, please.

10      Based on the results of the studies that you've testified

11  about here today and that are set forth in your expert report

12  in greater detail, what conclusions have you reached about

13  whether glyphosate can cause cancer in humans?

14  **A.**  In laboratory animals.

15  **Q.**  In laboratory animals, I'm sorry.

16  **A.**  Glyphosate can clearly cause tumors in laboratory animals;

17  malignant lymphomas in male mice and angiosarcomas in male

18  mice, hemangiomas in female mice, kidney tumors in male rats,

19  and mice, and skin tumors in male rats.

20  **Q.**  Okay.  If you can go to the next slide, please.

21      Now, we looked at this slide yesterday, but it didn't have

22  the bottom part on it, and I'd like you to talk about this

23  slide now in connection with the mechanism of action of

24  glyphosate as it applies to human cancer.

25  **A.**  Sure.  So this slide is simply to illustrate how chemicals

PORTIER - DIRECT / GREENWALD

1   can interact with the cancer process.

2        So you've heard about genotoxicity, up to this point.  The

3   chemical can go directly in to the cell and damage DNA, and

4   that would be genotoxicity.

5        The chemical can create oxidative stress in the cells, so

6   that you have free oxygen radicals.  All of the cells have lots

7   of oxygen and they produce free oxygen radicals that are

8   cleared up.  But if you start producing too many, these free

9   oxygen radicals can bind to DNA and other things, causing the

10  DNA damage.  So you can get genotoxicity through a secondary

11  pathway.

12       The chemical can affect DNA repair.  That's not as common,

13  but it clearly can.  Chemicals can affect cellular replication,

14  and when they do that, it can be selective.  So a mutated cell

15  will grow even faster with the chemical there.  That's called a

16  promotional effect.  And there is some evidence that glyphosate

17  has a promotional effect, as well, but it's just one study.

18       And finally, the chemical can affect the immune system.

19  Once you start getting tumors in the body, the immune system

20  tries to get rid of them because they're odd things to have in

21  the body, and if you affect the immune system, you can block

22  that action, and then spontaneously occurring tumors will

23  become faster, they'll appear faster.

24  Q.   If you can move to slide -- past slide 40, and you can go

25  to slide 41, please.

1    What considerations do scientists use to evaluate
2  mechanism?
3  **A.**   Well, there's -- there's many different types of studies
4  when you start looking at mechanisms.
5    You have *in vivo* observations.  These are studies done in
6  living organisms, mammals usually, but not always; humans,
7  laboratory animals and wildlife.  And then you have *in vitro*
8  observations.  These are done in cells, in some sort of
9  laboratory container.  There are various types, and you have
10  human cells or animal cells.
11    When you look will at the data, you give more -- if --
12  assuming all of the studies are of equal quality, because
13  that's not always the case, but let's assume they are -- you
14  give the greatest weight to the human *in vivo* observations,
15  then the laboratory *in vivo* observations, then the human cells,
16  then the animal cells, then the wildlife.  That would be my own
17  personal metric, but I think that was pretty much shared
18  scientifically by most others.
19    Finally, again saying the same thing I had said about the
20  same tumors in humans, seeing a plausible mechanism strengthens
21  causality.  Failure to see a mechanism does not negate other
22  positive findings, because we don't know how cancer is caused
23  in every single case; and so you're left wondering about it,
24  but that doesn't -- it shouldn't pull away from causality.
25  **Q.**   Next slide, please.

PORTIER - DIRECT / GREENWALD

1       What methodology did you follow to reach your opinion in

2  this case that glyphosate is gene toxic?

3  **A.**    This is different than what I did with the animal studies.

4  First, I did the same thing.  I evaluated the quality of all of

5  the studies.  That you have to do.  And there, you're looking

6  at the duration of the studies, the timing of the exposure

7  versus when you take an observation.

8       If there's cell killing in the *in vitro* studies, because

9  cell killing can cause all kinds of things, like DNA damage and

10  oxidative stress, independent of the mechanism we're looking at

11  for the chemical.

12       The type of assay used.  Some assays are better than

13  others, et cetera.

14       I didn't do data analysis here, because I don't have

15  access to the raw a data in any way, shape, or form.  I've got

16  some of it, but not all of it.  So instead, what I did was take

17  what the authors of the papers had done, in terms of giving me

18  p-values and evaluations and things like that, and I evaluated

19  their analysis and their conclusions presented by the author.

20       One thing I will say.  Many of these authors did pairwise

21  comparisons.  They didn't do trend tests.  So they're not using

22  the strongest statistical methodology they could be using.

23  There's nothing I can do about that.  I gave greater weight to

24  what I will call challenge assays.

25       So suppose you have a compound like glyphosate which is

PORTIER - DIRECT / GREENWALD                                              614

1   inducing oxidative stress, and you see that.  You can put

2   antioxidants in, and it goes away.  And that's -- that's

3   stronger evidence because now you've blocked the effect, the

4   effect itself.

5        And then I did in-depth scientific exploration of the

6   findings by reading other materials and looking at other stuff.

7   Q.   Okay, you can go to the next slide, please.

8        Just very briefly, are these the studies that you looked

9   at, about DNA damage in humans?

10  A.   Yes.  We've seen these already.  These are the three

11  studies on DNA damage in humans that were done in Central and

12  South America.  Two of them are clearly positive.  One of them

13  is -- arguably may be positive; maybe not.

14       But that's -- that's the evidence in humans directly.

15  Q.   So unless the Court has questions about those, I'd like to

16  go to the forest plot, which is the next slide, and have you

17  explain what this forest plot is, in connection with the

18  genotoxicity of glyphosate.

19  A.   Yes.  So you've seen that analyses for epi data.  You've

20  seen forest plots for the epi data.

21       What Ghisi did here, what they did here was they extracted

22  all of the data on micronucleus frequency.  So that's a type of

23  assay that's done, and it's one of the more common assays.

24  It's generally provided by the company to the regulatory

25  authority, to seek approval for the -- for the chemical.

1    So here, what you see is all of it plotted out for you to

2  look at it.  And what I'm pointing out here, with the little

3  red arrows, is what the results of the meta-analysis are.  So

4  this is just a forest plot.

5    If you look at only the regulatory studies, the finding is

6  statistically significant.  If you look at all of the studies

7  with pure glyphosate, the finding is statistically significant.

8  If you look at all of the peer-reviewed studies, it's

9  significant.  If you only look at mammals, it's significant,

10  and if you look at all of them together, it's significant.

11    So this is one way of quickly giving you a feel for what

12  all of this data could look like.  I didn't have to do this.

13  They did it for me.

14  **Q.**  If you go to the next slide, please, I think you've

15  already covered this generally, about the *in vitro* mechanism

16  studies.  Is there anything you want to add to what you've

17  already testified about?

18  **A.**  No.

19  **Q.**  Okay.  So Dr. Portier, what do you conclude about the

20  genotoxicity of glyphosate, based on the evidence in this case?

21  **A.**  Glyphosate is genotoxic.  It causes DNA damage, it's

22  clear, in several different assays and several different

23  species of several different types.

24    The glyphosate formulations also are genotoxic.  They do

25  the same thing.  And I didn't show it to you, but glyphosate

1  can also cause oxidative stress.  That's in my Expert Report.

2  **Q.**  Okay.  Lastly, Dr. Portier did you apply Bradford-Hill

3  considerations in reaching your opinions in this case?

4  **A.**  Yes, I did.

5  **Q.**  So, good.  So can you please explain, briefly, how you

6  applied Bradford Hill and your conclusions based on

7  Bradford Hill?

8  **A.**  I wrote the entire expert report around Bradford-Hill.  So

9  I looked at consistency.  It's strong.  This is the epi data

10  alone.  Using multiple studies, most are positive.  There's a

11  positive meta-analysis, and the new Agricultural Health Study

12  has such low power, it's fatally flawed.

13      Looking at the strength of the evidence, I recall it's

14  strong.  You have six of seven studies with a modest increase,

15  but a meta-analysis that's positive.

16  **Q.**  Can you slow down just a little bit, please?

17  **A.**  Yes.  Biological plausibility, I would rate that very

18  strong.  You have multiple cancers in multiple species; it's

19  not due to chance.  There's rare tumors, and you've got gene

20  toxicity and you've got oxidative stress.

21      Gradient deals with dose-response.  In humans, there's

22  some evidence there.  In the animals, it's perfectly clear

23  there is dose-response.  I gave that moderate.

24      Temporality is satisfied.  The dose comes before the

25  disease.

1        Specificity was not needed.  NHL has additional causes.

2        And finally, coherence is strong.  This stuff is absorbed.

3   The strong relationship between NHL and malignant lymphomas in

4   the mice gives a strong similarity.

5        So overall, that would be my evaluation by those

6   considerations.

7   **Q.**  Thank you, Dr. Portier.  Last question:  What is your --

8   next slide, please.  I'm sorry.

9        What is your opinion in this case about whether glyphosate

10  and glyphosate-based formulations cause cancer in humans?

11  **A.**   To a reasonable degree of scientific certainty, given the

12  human, animal, mechanistic evidence, glyphosate probably causes

13  NHL, and the probability that glyphosate causes NHL is high.

14         **MS. GREENWALD:**  Okay, thank you.

15        I have no further questions.  Thank you, your Honors.

16         **THE COURT:**  All right.  So Mr. Lasker.

17         **MR. LASKER:**  Your Honors, I apologize for the size of

18  the binders you're about to receive.  Dr. Portier has done a

19  number of analyses and has a number of expert reports with

20  attachments, and I'm going to try and go slowly, so that you

21  guys are always with me through the binders.  So if you're not

22  there, I trust you will let me know.

23        And Dr. Portier, also if you're not finding where I am in

24  to the binders -- and counsel, also, you have the binders, as

25  well.  Okay, great.

1        (Whereupon a document was tendered to the Court.)

2                      **<u>CROSS-EXAMINATION</u>**

3   **BY MR. LASKER**

4   **Q.**   Good morning, Dr. Portier.

5   **A.**   Good morning.

6   **Q.**   Dr. Portier, you reached your opinion that glyphosate can

7   cause NHL during your time as a special advisor at that IARC

8   Working Group meeting in March of 2015.   Correct?

9   **A.**   I've since strengthened it, but I did agree with the IARC

10  finding.

11  **Q.**   Right, and prior to your work on that working group, you

12  had never looked at the science regarding glyphosate, correct?

13  **A.**   That's correct.

14  **Q.**   And you agreed with the IARC Working Group conclusion

15  then -- and, I believe, as you testified yesterday afternoon --

16  you agree still today that the epidemiological evidence

17  regarding glyphosate and NHL was at the time of the IARC

18  meeting limited and not sufficient by itself to demonstrate

19  causality, correct?

20  **A.**   At an IARC meeting, you would never say it's sufficient by

21  itself.   You would -- you would say the human evidence is

22  sufficient, but you're still going to look at the animal

23  evidence and everything else.

24        But in this case it's limited evidence, that's correct.

25  **Q.**   Right, and thank you for the clarification.   IARC has a

PORTIER - CROSS / LASKER                    619

1  classification for human evidence of "sufficient," and they

2  have a classification below that for "limited," and in this

3  case, the IARC Working Group decided, based upon the

4  epidemiology that existed, that it was aware of, that the

5  evidence in humans was limited, and you agree with that,

6  correct?

7  A.    Correct.

8  Q.    And you still agree with that today?

9  A.    Yes.

10  Q.    And the IARC Working Group also reached a conclusion with

11  respect to the animal cancer bioassays, and in that area of

12  the -- of the lit- -- of the science, they concluded that the

13  information was sufficient, or, the evidence was sufficient

14  that glyphosate can cause tumors in animals, correct?

15  A.    Correct.

16  Q.    Up until the final day of the Working Group meeting,

17  though, through the work that had happened beforehand in the

18  first, I guess, six days of the meeting, the IARC Animals

19  Sub-group was recommending that IARC conclude that there was

20  only limited evidence of carcinogenicity in rodents, correct?

21  A.    There was -- I don't know.  There was a meeting on the

22  fourth day or fifth day, where that is what they said they were

23  thinking of doing; and there was great debate on that.

24  Q.    We discussed this during your deposition, but there was,

25  in fact, a meeting that was scheduled for March 9th, among the

1    Mechanisms subgroup.

2         And we can go to this, if you want, to refresh your

3    recollection; but I believe we discussed that as of March 9th,

4    which was the day before the Working Group meeting ended --

5    A.   Okay.

6    Q.   -- the subgroup was recommending that the full Working

7    Group classified that evidence as limited.

8         Does that refresh your recollection, or not?

9    A.   It does.  I do remember the meeting.  I thought it was

10   Friday, not on Monday, but yes.

11   Q.   Okay, and you were at the Working Group as a special

12   advisor, so you had a sort of different role.  You didn't vote,

13   for example, correct?

14   A.   Correct.

15   Q.   But one of the things that you did do during that meeting

16   was provide some assistance to some of the other Working Group

17   members in statistical analysis that they conducted, correct?

18   A.   No.  In evaluating analyses, yes.

19   Q.   Okay.  I'm sorry, I misspoke.  So they -- I think at one

20   point you said they asked you if you knew where they'd look to

21   find a certain type of statistical test, which is a

22   Cochran-Armitage Trend Test, correct?

23   A.   Correct.

24   Q.   And then afterwards, you checked over their math to see if

25   you agreed with how they did the analysis, is that correct?

1  A.   Well, I didn't have the program myself, so I just looked

2  at what came out, and it seemed appropriate.

3  Q.   Okay, and that -- if we can go to the IARC Monograph.

4       And this is at Tab 7, your Honors, and it will be -- it's

5  in Volume 1, Tab 7, of the Portier papers.  So the -- the

6  monograph, you've all seen this before, and if I could -- I

7  don't know if Judge Petrou has, but the rest of us are

8  familiar.

9       Turning to page 33, I guess it starts on 32, and then goes

10 to page 33.  And this is discussing the Knezevich mouse study

11 the 1983 mouse study that Monsanto conducted, correct?

12 A.   Oh, its always difficult, because --

13 Q.   It might help you, if you go on page 33, you'll see some

14 of the tumor counts, if you'd get familiar with those.  So on

15 page 33, you'll see these tumor counts that we've talked about

16 for renal tumors, right?

17 A.   This is Knezevich and Hogan.

18 Q.   Okay, and this analysis on page 33, in that first column

19 on the left, about two-thirds of the way down, which is the

20 renal tubule tumor data, with the P trend's here reported as

21 statistically significant, that is the Cochran-Armitage Trend

22 Test that we were just talking about that the Working Group

23 conducted during that meeting, correct?

24 A.   It's the -- it's the same test, but the p-value is

25 calculated at by an approximation method, based on the normal

1   distribution grid and the EXACT method.

2   Q.   Correct, and that's the point I was getting at, that you

3   sort of anticipated.

4        After the meeting, some other biostatisticians pointed

5   out -- and you agreed -- that there were flaws in this

6   analysis, and using the P-trend test, and that the EXACT trend

7   test would have been actually the correct measure to use here,

8   correct?

9   A.   That is correct.

10  Q.   And you'd been using the EXACT trend test in your

11  presentation here today, correct?

12  A.   That's correct.

13  Q.   And under the EXACT trend test, this trend actually is not

14  statistically significant, correct?

15  A.   But there's more in this paragraph that you missed.

16  Q.   I understand that.

17  A.   Okay.

18  Q.   But I am correct that using the EXACT trend test, this is

19  no longer a statistically significant finding, correct?

20  A.   It's a marginally significant finding, by my definition.

21  It's .068.

22  Q.   Okay, and if I could, also, just on that same page, there

23  were two mouse studies that the IARC Working Group considered

24  in reaching their conclusions.

25       The second is what we've been talking about.  It's the

1  Atkinson Study.  It's on the second column of page 33.  It's

2  that last paragraph.

3       And I think, again, looking at hemangiosarcoma numbers,

4  that may help you sort of place that study in the mind.  It's

5  that 24-month CD-1 Mouse study, the second paragraph on the

6  right column, final paragraph on the right column.

7  **A.**   Yes.

8  **Q.**   Okay, so this is the Atkinson Study, and the IARC Working

9  Group is reporting on hemangiosarcomas in that study.

10      Now, in your testimony here today and in your report, you

11  also provide the data from that study for renal tumors,

12  correct?

13 **A.**   Yes.  Every time I saw tumors in one CD-1 mice, I did it

14  in the other CD-1 mice.

15 **Q.**   And in this Atkinson Study, the findings for renal tumors

16  were two tumors in the control, two tumors in the low-dose,

17  zero tumors in their mid-dose, and zero tumors in their

18  high-dose, which you calculated as a significant --

19  statistically significant inverse trend, correct?

20 **A.**   I'd have to look at my p-values to make sure.

21 **Q.**   Okay.  Well, let's do that.

22      This is Tab 22.  So this is in the second volume.  And

23  when you get to Tab 22, it's going to be page 11, I believe, is

24  where you present -- or, I'm sorry.  Hold on, a second.

25 **A.**   Page 34.

1   Q.    Page 34?

2   A.    Yeah.

3   Q.    Thank you.  I tried.

4   A.    Yes.  It is a significant negative trend.

5   Q.    All right.  So just so the record is clear, this is the

6   same mouse study that IARC looked at, and for the kidney

7   adenomas and carcinomas combined, as you note in your expert

8   report, there was two in the control, two in the low dose, zero

9   in the mid-dose, and zero in the high dose, which is an inverse

10  -- statistically significant inverse trend of less tumors with

11  greater dose of glyphosate; correct?

12  A.    That is correct, but I will point out that the

13  IARC Monograph group did not have the Atkinson kidney tumor

14  data.  At least that was -- it was not apparent that they had

15  the kidney tumor data.

16      And the historical controls, which I point out, for the

17  kidney tumors were very, very low, making those three tumors at

18  the high dose very biologically significant.

19      So the decision was not just the p-value, it was also the

20  historical controls.

21  Q.    I understand that, and I think you mentioned at that point

22  you'd talked about the fact that, of any study anywhere that

23  you had seen in CD-1 Mouse, you had never seen more than two

24  control animals with this type of tumor.

25      Was that your testimony?

1  **A.**   I -- I think it was something along those lines.  I can't

2  be certain.  Where was I testifying?

3  **Q.**   That was yesterday, here.

4  **A.**   I don't recall saying exactly that.  That's the best I can

5  say.

6  **Q.**   But in any event, was it the -- was it the Atkinson Study,

7  which is the second study in the monograph, that one situation

8  where you've ever seen two tumors in a control group?

9  **A.**   No.  I was referring to the historical control databases

10 that I looked at after the IARC Monograph meeting.  I looked at

11 several, and in those, there were -- there was one case with

12 two animals in a control population.

13 **Q.**   Okay, and then --

14 **A.**   I don't know if it was the Atkinson Study.  It might have

15 been.

16 **Q.**   And then for IARC, they looked at two total mouse studies,

17 and it just happened that one of them had two tumors in the

18 control group.  The other --

19 **A.**   Yes, except IARC didn't see that.

20 **Q.**   Okay.  Now, you signed up --

21        **THE COURT:**  Sorry, could I ask a follow-up?  You

22 said, "Except IARC didn't see that."  Why didn't IARC see that?

23        **THE WITNESS:**  They didn't have that study.  That data

24 was not available.  IARC was, or -- the Atkinson Study, they

25 were using the write-up on that study from JNPR, the Joint

1    Meeting on Pesticide Residues of WHO; and so they were unable

2    to know what the counts were, because JNPR only put the

3    positive findings in their report.

4    **BY MR. LASKER**

5    **Q.**   And just to complete the loop on that, I guess, for the

6    Knezevich Study -- and we're still on page 33 in the

7    monograph -- the IARC group did not have the data on

8    hemangiosarcomas from that study either, correct?

9    **A.**   As far as I remember, yes, that's correct.

10   **Q.**   And, in fact, in the Knezevich Study there were no

11   hemangiosarcomas found in any of the treated animals, correct?

12   **A.**   That is correct.

13   **Q.**   And the IARC Working Group just didn't know that when it

14   did -- when it did their analysis.

15   **A.**   It probably did not change their analysis.

16   **Q.**   Well, I'm not -- we can all speculate on what that would

17   have done or would not have done, but the IARC Working Group

18   just didn't know that, correct?

19   **A.**   Correct.

20   **Q.**   Okay.  So you signed on, or -- you signed an agreement to

21   serve as an expert with plaintiffs in this litigation on

22   March 29th, 2015, correct?

23   **A.**   Going to be close to that date.  Again, I'd have to look

24   to check, but it's very close.

25   **Q.**   Two to three weeks after you came back from the Working

1  Group, correct?

2  **A.**   Yep, something in that range.

3  **Q.**   And since that time, you've also been involved not only in

4  working as a plaintiffs' expert, but in presenting your

5  opinions in various regulatory proceedings and before various

6  regulatory agencies about your views about glyphosate and

7  non-Hodgkin's lymphoma and cancer, correct?

8  **A.**   No.   Mostly I am presenting my views about the analyses

9  they'd done, and the faults with their analyses, not my

10  argument or view that says glyphosate causes cancer.

11  **Q.**   Okay.   Well, we have -- if we can go to -- and I

12  apologize -- tab 13, which was your original expert report in

13  this case, and -- sorry, I'll wait until you get there.   Sorry.

14  That's Volume 2.

15  **A.**   Um-hum.

16  **Q.**   It's got Tabs A. B.

17  **A.**   There it is.   It's the first one.

18  **Q.**   Whatever, yeah.   So that's why it gets a little confusing.

19       And I actually want to go to these tabs.   These tabs are

20  appendices that you attached to your initial expert report, and

21  it includes various submissions that you made, I think, either

22  to the European regulators or to the U.S. EPA, if I have that

23  correct.   But correct me if I'm wrong.

24  **A.**   Some of them are.

25  **Q.**   Okay, and if we can look, for example, at tab B, this is a

1  submission that you provided to the U.S. EPA, and this was in

2  connection with EPA's and the OPP's analysis -- that was hard,

3  sorry -- office of Pesticide Programs, I believe.

4  A.    Yes.

5  Q.    Okay, and so this is a submission that you made to EPA in

6  connection with their review of the OPP report on glyphosate,

7  correct?

8  A.    That is correct.

9  Q.    And the EPA OPP has subsequently finalized its review, and

10  that was just, well, more recently, in, I believe, the end of

11  2017, correct?

12  A.    No, EPA's current report is out for public comment for the

13  next 60 days, and then they will finalize it.

14  Q.    Thank you, I stand corrected.

15        And you submitted -- this was a guess -- a year and a half

16  after you had been retained as a plaintiffs' expert in this

17  litigation, correct?  That was October 4th, 2016?

18  A.    Yes.

19  Q.    But as you state in your disclaimer here, you were

20  submitting this report on your own behalf.  You were not

21  submitting it as a plaintiffs' expert.  Correct?

22  A.    That is correct.

23  Q.    Okay. and so the EPA had the benefit of your analysis as

24  an independent scientist and your review of this data, correct?

25  A.    That's correct.

1  Q.   And over the course of your work -- and we're going to go

2  through some of these different analyses that you provided at

3  different times -- you have provided a variety of different

4  pools of -- pooling of data?

5           JUDGE PETROU:  I just want to interrupt for one

6  second.  You mentioned that the EPA report is currently out for

7  public comment, is that correct?

8           THE WITNESS:  Correct.

9           JUDGE PETROU:  When do you expect there to be a final

10 EPA report?

11          THE WITNESS:  That's a --

12          JUDGE PETROU:  Best guess --

13          MR. LASKER:  Now we'll test your expertise.

14          THE WITNESS:  My guess is it will probably be out

15 there in the summer.

16          THE COURT:  Wanna bet?

17 BY MR. LASKER

18 Q.   So, Dr. Portier, in the various submissions -- and we can

19 walk through some of these -- and, in fact, we can start with

20 the same tab.  We're on tab B.

21     If you go to page, I think -- let me see one second,

22 here -- for example, tab -- page 19 in that same document we're

23 looking at, initial Expert Report.

24     You provide here a pooled analysis of male

25 hemangiosarcomas.  Do you see that Table 7 on top of that page?

1  **A.**   Yes, I do.

2  **Q.**   Now the pooling methodology that you used in this

3  submission is not the pooling methodology that you -- well, it

4  was presented to the Court in this case, correct?

5  **A.**   No.  The -- the pooled analysis with all of the four

6  CD-1 mice, that is the simple pooling.  This is the same for

7  that first column, for the first number and P trend.  The P for

8  that was also approximated, because I didn't have an EXACT

9  program for doing an EXACT, I since have, but that is the same

10 analysis.  The rest are somewhat different.

11 **Q.**   Hm.  So one of the things that you did in -- at one point

12 in your pooling is -- and I think you talked earlier a little

13 bit about the Poly-3 Test, which is trying to adjust for

14 different lengths of survival in individual animals, correct?

15 **A.**   Correct.

16 **Q.**   And at one point in your analysis, in your submissions to

17 various regulatory agencies, you attempted to use that

18 Poly-3 Test to equalize the length of the 18-month and 24-month

19 studies, and pool them using that Poly-3 analysis that you came

20 up with, right?

21 **A.**   That is correct, but I was criticized for that, and

22 I looked at it and I said, well, I don't really need to do

23 this.  I can do this analysis without having to do that

24 adjustment.  And so I just got rid of it.

25 **Q.**   Okay, and another thing that you did is you did pooling,

1  and then you dropped any findings where the dose was greater

2  than a thousand milligrams per kilogram, and that's -- you have

3  that listed in your Table 7-2, correct?

4  **A.**    Yes, that is because EPA was saying that there was no

5  positive trend below a thousand mg/kd/day, and I simply

6  demonstrated for them that there was.

7  **Q.**    And I also, I believe -- and I was trying to follow this

8  as it was going on, kind of complicated, but you also combined

9  doses to do pooling based not on sort of simple, just put them

10  all in and pretend it's one test, but to categorize doses in

11  various categories.

12      And I think you had zero being a control, which is

13  obvious, and then zero to 10 mg/kg -- milligrams per kilogram,

14  10 milligrams per kilogram to 1500 milligrams per kilogram, and

15  then anything above 1500 milligrams per kilograms.

16      And you grouped the studies that way, and did pooling

17  analysis using that approach, correct?

18  **A.**    That approach was used more for graphical purposes, so

19  that I could put the plots that generally showed the trend.  I

20  did the analysis just for completeness.  But I didn't really

21  use that.

22  **Q.**    Okay, but we have -- and maybe you can go to tab C,

23  because this is a little bit clearer.  I don't know which

24  submission this was, to which agency, but this is a

25  different -- a different one.  Maybe this is a different -- a

1   presentation.

2        Do you remember where this was -- where you were using

3   this PowerPoint?  I don't know that it matters.

4        If you go to -- and if your Honors are with me, Figures --

5   the last two pages in this tab 3 PowerPoint, Figures 7 and

6   Figures 8.

7        This is sort of that graphical demonstration that I was

8   talking about.  You have a Poly-3 adjustment, which is, now

9   you're trying put these 18-month and 24-month studies together

10  with the Poly-3 adjustment --

11            THE COURT:  Wait, I'm not sure I'm with you.

12            MR. LASKER:  Okay.

13            THE COURT:  So you're talking about tab C to his

14  initial expert report?

15            MR. LASKER:  Yes.  It's the second volume.

16            THE COURT:  Okay.

17            MR. LASKER:  And tab 13, and tab C.

18            THE COURT:  Okay, and then what?

19            MR. LASKER:  It's the last two pages.  They're not

20  numbered.  And it kind of -- oh, maybe I have it.  No mine's

21  probably wrong, because I have Table 9 and Figure 7, but it's

22  the Figure 7 which says hemangiosarcomas in male CD-1 Mice.

23        Do you have that?

24            THE COURT:  Yeah.

25

1  BY MR. LASKER:

2  Q.   So that page, and then the next page, are your depictions

3  of your methodology then which included that Poly-3 adjustment

4  at the time, and also was grouping them into different dose

5  groups.

6       And then I think the Figure 8 shows, again, you combining

7  them in to those dose groups, correct?

8  A.   So first of all, this was not an appendix of my expert

9  report, which is what you started with.  This was a slide

10 I sent you when you asked for copies of everything, but I don't

11 recall having this as an appendix of my expert report.

12 Q.   Well, I'll just represent, and I don't know if you were

13 aware of this or not, this was submitted to us as your expert

14 report, with all of these documents attached.  This was

15 document 3 to your expert report.

16 A.   I didn't know that.  I don't have a problem with it.  This

17 is not showing my analysis.  This is just showing the data.

18      And the second one, as I mentioned, is simply a graphical

19 tool to let you see the trend better.  It's hard to see the

20 trend in Figure 7, but you can clearly see it in Figure 8.

21      The p-values from the statistical analyses are the ones

22 from Figure 7, and it's highly statistically significant.  I

23 didn't think anyone could see that from this plot.  Hence, I

24 did the second plot.

25 Q.   Okay, and then if we go to tab E, there's another

1  attachment.  Again, I'm not sure when this was presented, or

2  where.

3       But if Your Honors are with me...?

4            **JUDGE PETROU:**  Where on tab E?

5            **MR. LASKER:**  I was waiting to get to tab E.

6  **Q.**  So this, now, is Table 7, and here you have, again, a

7  variety of different pooling approaches that you used, and one

8  thing you were doing here was you were also pooling the studies

9  for the CD-1 mice and the Swiss mouse, which is that fifth

10  mouse study, and you also did analysis where you pooled that

11  data together, correct?

12  **A.**  That is correct.

13  **Q.**  And that's not the methodology, either, that you wrote the

14  pooling analysis you presented to this court, correct?

15  **A.**  That's correct.  I've since then changed my mind and

16  decided that I was not going to pool different strains of rats

17  and mice.

18  **Q.**  Okay, and one other thing that you've done -- which I

19  think is another tab, unfortunately, if you don't recall -- but

20  you also at one point were doing your P trend analysis using --

21  I think you still are -- using the EXACT test, but then you

22  also did some P trends using the asymptotic test, you started

23  doing that if there was more than 10 tumors, I think, in the

24  finding.  Is that -- does that refresh your recollection?

25  **A.**  It's -- it might have been 10 or 15 --

1   Q.   Okay.

2   A.   -- but the asymptotic converges the p-value for the EXACT,

3   once you get that high, and running more than 10 takes a

4   tremendous amount of time on my computer.

5   Q.   Okay.

6   A.   These analyses were not done for the expert report.

7   Q.   No, I understand that.  I understand that.

8   A.   The expert report was asking me to do something else than

9   what I was doing in my response to EPA.

10  Q.   I understand.  I understand.

11  A.   Okay.

12  Q.   I'm not quibbling with you on that.  And you have -- and

13  to be fair to you, I think, there's no standard methodology for

14  doing what you're doing in this case, correct, the way of

15  pooling animal studies?

16       There's lots of different ways you can do this, and you've

17  tried out a lot of different ways of doing this over the last,

18  um, two and a half years, correct?

19  A.   There -- there are certainly ways to pool information and

20  do an analysis.  It has never been done for -- well, that's not

21  true.  It has been done for animal cancer studies that I'm

22  aware of in two cases, where they used the simple pooling

23  I used as well.  But it's not typical to have this many animal

24  studies, so I had to do something to try to bring that

25  together.

1   Q.   Okay.

2   A.   But it's a standard procedure that I've used.

3   Q.   Okay, and I think the two times that you talked about

4   where you found, other than your pooling in this case, where

5   there's been pooling of animal studies, that was by

6   Dr. Dourson, is that correct?

7   A.   That's correct.

8   Q.   And what he did, what is actually different than what

9   you're doing also, is he pooled the male and the female rodents

10  within an individual study, correct?

11  A.   He had two papers.  I think one was a cross-study and one

12  was within an individual study.

13  Q.   And he was pooling the male and the female rodents,

14  correct?

15  A.   I think with the cross-study, he pooled males and males

16  and males and females.

17  Q.   So that's another approach that one person took in these

18  two papers.

19  A.   Yes.

20  Q.   Okay, and all of these submissions -- I don't know that

21  I've captured all of them, because I know that you've continued

22  to present to various regulatory agencies.

23       Have you -- well, first of all, all of these presentations

24  that we've talked about and the different pooling approaches

25  that you used in other submissions were presented and given to

1    the EPA, for example, correct?

2    A.    You -- you have my submission to EPA.

3    Q.    Okay, and you also submitted your -- those pooling

4    analyses or those prior pooling analyses to the European

5    regulators, correct?

6    A.    I submitted -- I didn't submit to them the pooling

7    information.  I gave a presentation before the European

8    Chemical Agency Risk Assessment Review Group, and in that

9    presentation, I discussed pooling.

10   Q.    Okay, and was that the same pooling methodologies or one

11   of the pooling methodologies we've looked at, or was that the

12   methodology that you were presenting in this case, or was that

13   is different methodology?

14   A.    It may have been one of these slide sets.  It's the same

15   basic methodology.

16   Q.    Okay, and the EPA and the European regulators have seen

17   your -- at least they have some of your pooling approaches, and

18   they've considered that in their analyses, but they concluded,

19   contrary to you, that glyphosate did not cause cancer in those

20   animals, correct?

21   A.    That is not correct.

22   Q.    The EPA in its OPP report has -- which the Court has and

23   has read -- concluded that the evidence did not show that

24   glyphosate caused cancer in animals, correct?

25   A.    That is correct.  Your previous statement included them

1  doing pooling, which was not correct.

2  **Q.**   Right, and I understand, in fact, you're the only one

3  anywhere, despite all of the folks -- and there have been lots

4  of folks who have been looking at this data over the years,

5  around the world -- you're the only one anywhere who's done a

6  pooling analysis, correct?

7  **A.**   So first of all, EPA's Science Advisory Panel told them to

8  do a pooled analysis of the glyphosate data.  That is in their

9  report from the review they did of glyphosate.  They

10  highlighted my pooling to suggest this is something EPA wants

11  to do.

12      So in answer to your question, I might be the only one

13  who's done it, but it has been recommended by others.

14  **Q.**   To be fair -- and we're not going to be able to get into

15  the SAP, that's the Science Advisory Panel.  I was there, lots

16  of folks were there.  There were a number of people on that

17  panel.  There were a number of biostatisticians.  I think your

18  brother actually, as it happens, was on that panel.

19      The biostatisticians on the panel did not recommend that

20  EPA use your pooling approach, did they?

21  **A.**   I'd have to look at the report.  They recommended EPA use

22  a pooling approach.  They didn't say --

23  **Q.**   Well --

24  **A.**   -- it should be mine.

25  **Q.**   Well, we'll have to just leave it at that, because that's

639

1   another tab in another binder.  I'm not going to be able to do

2   that here today.

3       But I believe you testified this morning, based upon your

4   pooling analyses, that, "to me, it is so obvious that

5   glyphosate causes cancer, in animals" -- I think that was your

6   testimony earlier, correct?

7   A.   No.

8   Q.   Okay.  Maybe I misunderstood it.

9   A.   Again --

10  Q.   It's not obvious to you?

11  A.   You're arguing -- your arguing two things there.  One is

12  that I reached the decision based upon pooling; that is

13  incorrect.  And the second is my decision; that is correct.

14  Q.   Okay.  So is it, then, your testimony that from your

15  pooling analysis, it is not obvious that glyphosate causes

16  tumors in animals?

17  A.   The evaluation of animal carcinogenicity data goes beyond

18  statistical p-values, and so my conclusion on glyphosate is due

19  to all of the information that's available for me to look at.

20  The pooling analysis is part of making that decision.

21  Q.   I understand that, but I was just trying to parse it out a

22  bit.

23      Is it your opinion, based -- it was only the pooling

24  analysis, wouldn't you think, based only on the pooling

25  analysis, that that shows that glyphosate causes tumors in

1  animals?

2  A.   I can't do that.  You're asking me to separate all of my

3  knowledge that I've used in evaluating this, and just go to one

4  little piece of it, and I'm not going to do that.

5  Q.   Okay.  So the pooling analysis, then, is just one little

6  piece of your opinion?

7  A.   It's part of the analysis and evaluation of the data, yes.

8  Q.   And if that was all you had, you would not be able to

9  opine even that glyphosate causes cancer in rodents, is that

10  fair?

11  A.   This -- if that was all I had, then I wouldn't be

12  analyzing or evaluating these data, because then I wouldn't

13  know about all of the quality issues of the studies, and

14  that -- the fact that you've got matches across various sexes

15  and species of the different types of tumors.  That all plays a

16  role.

17  Q.   Okay, I understand that, and I respect you have all of

18  these other things that you're talking about, but if somebody

19  else was looking at this, another scientist was looking at

20  this, and let's say you were that other scientist and all you

21  were presented was this pooling analysis, am I correct in my

22  understanding that that would not be enough for you to reach a

23  conclusion that glyphosate can cause cancer in rodents?

24  A.   Not me, no.

25  Q.   Okay.  To be clear, so it would not be enough for you; is

1  that correct?

2  **A.**    If all someone gave me were a bunch of tumor names and

3  some pooled p-values, and nothing else, that would definitely

4  not be enough for me to say glyphosate causes cancer.

5  **Q.**   Okay.  The -- you also mentioned in your testimony the

6  fact -- I think this was yesterday afternoon -- that the data

7  that you had to look at on the animal studies was incomplete

8  because you did not have the full reports, except for the three

9  studies by Monsanto.

10      There are, I think, 12 -- no -- of the -- I guess there

11  would be nine other rodent studies that were conducted by other

12  companies.  And you don't have those full reports, correct?

13  **A.**    That is correct.

14  **Q.**   And you explained how that was -- that made it difficult

15  for you to do your analysis, correct?

16  **A.**    It makes it difficult for me to judge the quality of the

17  study.  It makes it difficult for me to verify that the

18  regulatory agencies, with regard to things like survival, and

19  stuff, got that right.  It's very difficult to judge that, and

20  it makes it impossible for me to do a survival-adjusted test.

21  **Q.**    Now, the regulators at EPA and the regulators in Europe,

22  the regulators in other countries in the world that have looked

23  at this data, they actually have those full reports, those full

24  animal study reports for all 12 of the studies you've been

25  talking about, correct?

1  **A.**    I assume they do.  I can't be certain of that.

2  **Q.**    Okay.  So in their analysis, they have the ability to be

3  able to do the type of thorough review of the animal data that

4  you just are not in a position to do, correct?

5  **A.**    That's not correct.  They did not analyze the data.  The

6  European Food Safety....

7      I can walk you through the way in which they do their

8  evaluation, Your Honor, if you'd like to know; but they don't

9  analyze the data.

10  **Q.**    Okay.  Well, I don't want to get into a debate about your

11  view of what they did or they didn't do.  My question was --

12  **A.**    No, it's not my view -- I'm sorry, it's not my view.  They

13  state it in their document, that they did not re-analyze the

14  data.  It's not my view.

15  **Q.**    Dr. Portier, they had in their possession the full study

16  reports and all of the data that you did not have.  They had

17  that in their possession, correct?

18  **A.**    I assume they did.

19  **Q.**    And the scientists at those agencies had the opportunity

20  to review those data, correct?

21  **A.**    They had the opportunity to look at it.

22  **Q.**    And you were in Europe during your conversations with

23  various -- and you've also -- I think you talked with some of

24  the European Union ministers at various points in time, is that

25  correct?

1  A.    I spoke with the Minister of Health of the European Union.

2  Q.    Okay, and there was a point in time -- and I'm not sure if

3  you're that aware of it or not -- where there was a Reading

4  Room created in Europe.  Are you familiar with that?

5  A.    Yes, I am.

6  Q.    Okay, and they put into that Reading Room the full -- or,

7  not the full, but -- additional information about these animal

8  studies, correct?

9  A.    I -- I don't know.  I didn't go.

10  Q.    Okay, but it was available for anyone?

11  A.    That's what they claimed.

12  Q.    Okay, it was available for anyone to go.  If you wanted to

13  go, you could have.

14  A.    No.  There were rules associated with going into that

15  room.  You had to be invited, so you had to petition to go in.

16  There were a whole set of rules I'd looked at it, and I decided

17  that the rules made it impossible to use it appropriately.

18  Q.    Okay.  So it's your understanding -- was it your

19  understanding that you can't do anything more than just ask if

20  you could go and sign your name and go?

21  A.    You had to ask every day.  If -- if you'd like to get the

22  rules, then I'll be happy to comment on why I did not take them

23  up on that.

24  Q.    Okay.  No, that's fine.

25  A.    But just to be clear -- okay? -- we're looking -- if I'm

1  looking at individual animal data from these studies, I'm

2  looking at 50,000 pieces of information; and being able to go

3  in to a reading room four hours a day and try to extract that

4  information would have been a ridiculous task for -- with

5  50,000 data points.

6  **Q.**   There's a lot of data regulators have, isn't there?

7  **A.**   There's a lot of data that the regulators have not looked

8  at.

9  **Q.**   Again, I'll just -- I have no way to argue with you about

10  what other people did, so I won't try to do that.

11       The -- and so what we have -- just to recap, you had

12  reached your opinion that glyphosate caused cancer in March of

13  2015, when you were at that Working Group meeting, correct?

14  **A.**   I agreed with the IARC decision.

15  **Q.**   Okay, and since that time, you've done a whole variety of

16  different analyses that have changed over time, and ultimately,

17  you have an opinion analysis that you presented in this case to

18  support that -- that finding that you have, that glyphosate

19  causes cancer, correct?

20  **A.**   There's too many things in that question for me to be able

21  to answer it.

22  **Q.**   I'm happy to try and reword it, then.

23       You reached your opinion in March of 2015 that glyphosate

24  can cause cancer, correct?

25  **A.**   I agree with the IARC decision.

1  Q.   And since that -- well, maybe that's -- maybe that's

2  what's holding us up.  Was IARC's decision that glyphosate can

3  cause cancer -- maybe I'm wording that incorrectly.  Let me

4  rephrase that.

5       Did you reach an opinion in March of 2015 that glyphosate

6  can cause cancer in humans?

7  A.   I've said it before.  I agreed with the IARC decision,

8  which was, it's a probable human carcinogen, by their

9  definition.

10 Q.   Okay so that you're making a distinction.  Maybe it's a

11 distinction with a meaning, maybe it's not.  I don't

12 understand.

13      Is it your understanding that IARC reached a conclusion

14 that glyphosate can cause cancer in humans?

15 A.   IARC reached the conclusion that glyphosate is a probable

16 human carcinogen.

17         THE COURT:  So I'd be curious -- it sounds like you

18 think there's a difference between those two things, and I'd be

19 very curious to hear your explanation of that.

20         THE WITNESS:  So first of all, for the IARC meeting,

21 I didn't have to reach a decision, because I was not allowed to

22 reach a decision.

23      So I made my decision in March of that year, and that I'm

24 now carrying through here is not a fair characterization; and

25 I'm trying to make that distinction, but the IARC has very

1   clear classification criteria, and those -- they stick to it

2   very carefully.

3       I didn't use their classification criteria here.  I used

4   straightforward Bradford Hill.

5       So I don't want to convolute the two, if -- if I have to,

6   because they're not the same.

7           THE COURT:  So that's what I would be interested in

8   hearing more from you about.

9       Mr. Lasker was asking you about the issue of whether

10  glyphosate can cause cancer in humans, and then you seemed to

11  draw a distinction between that concept and IARC's conclusion

12  that it's a probable carcinogen.

13      And so what I'm interested in hearing from you is:  What

14  distinction do you draw between those two formulations, if you

15  will?

16          THE WITNESS:  So when IARC reviewed it, they didn't

17  have all of the M.R. data, and I spent a lot of time, for a

18  year and a half, at my own expense, analyzing all of that

19  animal data that was there, that was becoming available for

20  people to look at.

21      So my opinion was changing over time, as I looked at more

22  and more of these studies.  And so -- and in essence, it's --

23          THE COURT:  I get that, I get that, but what I'm

24  asking is probably a more simplistic question than you think

25  I'm asking.

1              THE WITNESS:  Okay.

2              THE COURT:  You seem to draw a distinction between

3    the statement glyphosate can cause cancer in humans, or

4    glyphosate can cause NHL in humans on the one hand, and

5    glyphosate is a probable carcinogen on the other hand.

6         You seem to be either drawing a distinction between those

7    two things, or at least resisting conflating those two things,

8    and I want to hear from you, just conceptually, why -- why that

9    is.

10             THE WITNESS:  So the wording, "Glyphosate can cause

11   cancer" is inaccurate.  There are three categories at IARC that

12   potentially could say the same thing:  A known human

13   carcinogen, that means it can cause cancer; a probable human

14   carcinogen cause cancer, a possible human carcinogen can cause

15   cancer.

16        So I don't like the wording with regard to an opinion on

17   causality that was reached by IARC that I'm agreeing to.  It's

18   not that it can cause cancer.  It is that it is a probable

19   human carcinogen with a specific classification.  It's not

20   known, and it's not possible.

21        That's the distinction.  Maybe I'm being too picky, but --

22             THE COURT:  Well, no.  So what you're saying is not

23   that it -- that the IARC conclusion is that it probably can

24   cause cancer.  Is that right?

25             THE WITNESS:  Correct.

1              **THE COURT:**  Is that what you're saying?

2        So you're -- you want to -- your concern is that you don't

3   want to overstate the IARC's conclusion?  Is that it?

4              **THE WITNESS:**  Or understate it, that is correct.

5              **THE COURT:**  Okay, I appreciate that.  Thanks.

6   **BY MR. LASKER**

7   **Q.**  And just so I'm clear, maybe I don't understand the

8   distinction, you mentioned that you have done a lot of analyses

9   since March 2015, at your own expense, of all of this data.

10       And you obviously have also been doing this for

11  plaintiffs' counsel, and you've been retained and paid money

12  starting in March of 2015, and throughout.  We have your

13  invoices from plaintiffs' counsel also for analyses of that

14  data.

15       Is it that sometimes you did work and you didn't bill the

16  plaintiffs' counsel, and sometimes you did work and you did

17  bill the plaintiffs' counsel?

18  **A.**  Absolutely not.  The plaintiffs' counsel asked me to serve

19  as an expert witness in January of last year.  At that point, I

20  re-analyzed all of the data as carefully as I possibly could.

21  Before, I was just commenting on regulatory responses.

22       So the consequences of me making a slight error are -- or

23  a missed calculation is completely different than this setting.

24       So until that point, they had not asked me to analyze any

25  data.  They had simply been using me as for -- for expert

1    comment.

2    Q.    Well, and I hadn't intended on going through this,

3    although I do have one slide I guess I could go back to, but

4    you did -- and we talked about this in your deposition -- bill

5    the plaintiffs' counsel I think about $8,500 in June of 2016

6    for reviewing the EPA's Cancer Assessment Review Committee

7    report, correct?

8    A.    That's correct.

9    Q.    Okay, and so there are some things you were doing during

10   that period and that you were doing on behalf of the

11   plaintiffs' counsel, and you were billing for; and then there

12   are other things you were doing that you viewed as being

13   independent of your work for plaintiffs' counsel that you were

14   not billing for; is that fair?

15   A.    You -- your question was about analysis of data, and

16   that's not what I did with the CARC document.  It was simply,

17   provide an expert opinion, and I am answering to the analysis

18   of data business.  They did not pay me to analyze data until

19   January of last year.

20   Q.    Okay, and although you were retained in March of 2015, did

21   you understand at any point in time that the analyses that you

22   were doing would be part of what you were doing in this case,

23   or did you view that as entirely separate?

24   A.    I viewed it as entirely separate.

25   Q.    Okay.  Trying to get back to where I was in my outline,

1   here.

2        So I want to try to go through what you're doing in this

3   case now with your pooling analysis, and I know you provided

4   some slides, and I had a little bit of an advantage because

5   I've been looking at these for a long period of time, but I was

6   trying to come up with a different way, also, to look at these.

7        And so I'd like to walk you through, if we can, and first

8   of all, with respect to your opinions in this case, as late as

9   December of -- I think it was -- let me make sure I have this

10  correct -- I think it was December of 2016, yes -- you were of

11  the opinion that glyphosate was not positive for

12  carcinogenicity in the rats.  Correct?

13  A.   I'm sorry, say that again.

14  Q.   As late as December of 2016 -- and I think this was, now,

15  21 months or so after you signed on as a plaintiffs' expert,

16  and after the IARC Monograph -- it was your view that the

17  animal studies did not know that glyphosate caused tumors in

18  rats, correct?

19  A.   No.  I don't recall that.  It was my opinion that less

20  than positive findings in individual rat studies.

21  Q.   Okay.  Let's go to -- we were there.  It's tab 13, which

22  is, again, is your original Expert Report.  And now we are at

23  tab I.  We haven't gotten to tab I yet, have we?

24       And, your Honors, let me know when you're there.

25            THE COURT:  We're there.

1          MR. LASKER:  Okay.

2    Q.    And these are some major points you were making in

3    response to some criticisms I think you mentioned that you

4    received from your first submission to EPA.

5          And in paragraph 2, you're talking about analysis across

6    the studies, and this is --

7          THE COURT:  Is this -- sorry, is this paragraph 2

8    under Major Points or Minor Points?

9          MR. LASKER:  Yes, starting Dr. Haseman's analysis of

10   p-values.

11         THE COURT:  Okay.

12   BY MR. LASKER

13   Q.    And this is -- and we'll get to this a bit later on.  This

14   is that sort of analysis of multiple comparisons that you

15   presented this morning about looking at what you'd expect and

16   what you'd observed when you look at all of the data and try to

17   figure out, given that there are hundreds of different studies

18   here, and you have a 1 in 20 chance of a hit, this is talking

19   about that type of analysis, correct?

20         THE COURT:  I didn't really understand that question.

21         MR. LASKER:  Yeah, I know.

22         THE COURT:  Why don't we take a short break.

23         MR. LASKER:  Okay.

24         THE COURT:  Why don't we take our morning break and

25   resume again at 9:30.

1          **MR. LASKER:**  I'm trying, your Honor.

2          (Recess taken from 9:20 a..m. until 9:30 a.m.)

3          **THE COURT:**  Mr. Lasker, can I have a very quick

4   sidebar with you?

5          **MR. LASKER:**  Sure.

6          (Sidebar conference heard but not reported.)

7          **THE COURT:**  It was just a follow-up question for

8   Mr. Lasker about the medical issue that he raised earlier with

9   his team.

10  **BY MR. LASKER**

11  **Q.**   Doctor -- sorry.  Dr. Portier, over the break, did you

12  have an opportunity to review -- and I guess I'll make sure

13  everybody's back where we were.

14      We were at Exhibit 9 to your Expert Report, so tab -- at

15  least I'll get myself back to where we were -- tab 13, and

16  Exhibit 9, otherwise known as I, document 9.  And we were at

17  that second paragraph, under Major points.

18      And have you had a chance over the break to review that?

19  **A.**   Yes, I have.

20  **Q.**   Okay, and so at that time -- and this is the last sentence

21  of that paragraph.  You stated in your comments that were

22  submitted to EPA, if you ask the question, is glyphosate

23  positive in mice, the answer is yes, whereas the answer in rats

24  is probably no.  Correct?

25  **A.**   That's what I says.  That's sloppy language on my part,

1  because that's not what I was talking about.  I don't believe

2  that.  That is clearly an incorrect statement.

3      That whole evaluation was talking about whether all of the

4  tumors seen in the rats occurred by chance, and whether all of

5  the tumors seen in the mice occurred by chance, and what I

6  should have said was, the chance -- the probability that all of

7  the tumors occurred in mice is virtually zero, and it's

8  possible, at that time, that all of the results in the rats

9  could have disappeared, but since that time, your expert found

10  six additional tumors in the rat studies, and that changed that

11  probability.

12  **Q.**  Okay.  Well, first of all, I want to take that in parts.

13  If you could, turn to tab 14 in your binder.  It's the very

14  next tab.  And this -- this is -- it's somewhat earlier.

15      This was at least some e-mail that I assume you didn't

16  send to yourself, but you sent to somebody.  This is talking

17  about that Horizons -- that article, or that pro/con piece that

18  you were talking about that you submitted with respect to your

19  views of the EFSA, regulatory -- EFSA regulatory decision that

20  glyphosate does not cause cancer, you were on the yes side; and

21  then Jose Tarson was on the no side, correct?

22  **A.**  Correct, we did pro/con.

23  **Q.**  And on your statement on pro, if I could direct you to the

24  second column, and about midway through right above the -- sort

25  of the call-out, there is the line that you wrote then, with --

1    I guess it's five lines up from the call-out, "With the

2    exception....."

3         Are your Honors with me?

4              THE COURT:  Yeah.

5              THE WITNESS:  Yes, I'm seeing it.

6    BY MR. LASKER:

7    Q.   "With the exception of growth in a few non-malignant

8    tumors, none of the rat studies showed any effect," correct?

9    A.   That's based on the IARC Monograph.  This whole discussion

10   is based upon what was seen in the IARC Monograph, in which

11   they only had two non-malignant rat tumors.

12   Q.   And you, at this time, again had been -- I guess now it's

13   only about a year in, since you had signed on as a -- with a

14   law firm that's an expert in solvents in this case, correct?

15   This --

16   A.   I don't know what the date of this --

17   Q.   Well, I'm judging by the e-mail.  The e-mail says

18   March 2016.

19   A.   Yeah, I don't know when the Horizons piece was done and

20   taken out, but I would probably say yeah, I probably was.

21   Q.   Okay, and if we can -- and I apologize.  You have slide

22   32, which was in your presentation, and let's put that on the

23   screen?

24              MS. ROBERTSON:  Sure, he's working on it.  He'll have

25   it open.

1    **MS. GREENWALD:**  If you want any of those slides, just

2    tell us.

3    **MR. LASKER:**  I just did.

4    **Q.**   So slide 32 is your current understanding of the findings

5    in rats; and we may talk a little bit more about this table

6    later, but when you did all of these analyses of the different

7    tumors, and when you look at them -- first of all, when you

8    look at all rats, of both sexes, for that p-value of .05, which

9    is the p-value that most people have been talking about the

10   most at this time during this proceeding, you did not find any

11   statistically significant difference between what you'd expect

12   to see by chance, and what, in fact, was observed for rats in

13   all of these studies, correct?

14   **A.**   Not correct.

15   **Q.**   Oh, well, I'm sorry.  I'm looking at your table, here, and

16   maybe I'm misreading it, for all rats, both sexes, male and

17   female, you have 291 sites; 14.5 expected, because that's one

18   of 20, right?  That's the math?  That seems to be the correct

19   math, right?  And then 16 observed, and your probability is

20   .385, correct?

21   **A.**   Where?

22   **Q.**   I'm sorry, the bottom row.

23   **A.**   Oh, for the P .05.

24   **Q.**   Yes.

25   **A.**   Yes.

1  Q.   So for all rats, both sexes, all of the studies looking at

2  all of the tumors that you found up until this point in time,

3  you would expect by chance to see 14.5.  You saw 16, and that's

4  clearly not a statistically significant difference, correct?

5  A.   That's for P .05.

6  Q.   Okay, so you've also done a p-value of .01, I understand

7  that, and when you did that analysis, you found a more a little

8  bit of a difference.

9      And you report that as .074, but again at least as we've

10  been understanding from the other experts who have testified,

11  that is not a statistically significant difference, either.

12  A.   You're confusing a probability calculation with a

13  statistical test.  This is not a statistical test.  This is a

14  probability calculation.  What is the probability that I would

15  see six positive tumors in this dataset?  And that probability

16  is .074.

17      That means -- what that actually means is it's a -- it's a

18  1 in 18 chance that all -- in the last line -- all six

19  observations arose by chance, and in my opinion, that's not a

20  statistical test, and in my opinion that's very unlikely.

21  Q.   Okay, and just to be fair, obviously, there are lots of

22  different probabilities with different counts, and some of them

23  are higher and some of them are lower, and that's all reflected

24  in the various numbers that you have on this table, correct?

25  A.   Correct, but my conclusion only dealt with male

1    Sprague-Dawley rats.

2    **Q.**    Okay, that's fine.  So let's -- I want to try and -- and

3    you can take that down.  Thank you very much.  I want to try,

4    if we can, to -- well, yeah.  I want to try, if we can, to walk

5    through some of the pooling you presented in this case.  And

6    I'm trying to come up with a way -- and hopefully I have -- of

7    sort of walking that with you.

8        And I'd like to talk about the Sprague-Dawley rats.

9    **A.**    I didn't hear you.

10   **Q.**    I'm sorry, I'm going to try and go through the

11   Sprague-Dawley rats from your pooling.

12       And if I can put up slide 161, please.  Or if you could.

13   Thank you.  And we'll wait until we're in range.

14       Okay, and these are the four different Sprague-Dawley rats

15   studies that you considered.  There's the Lankas study, the

16   Atkinson study, the Stout and Ruecker study, and the

17   Enemoto study, and I Just want to walk through some of your

18   analyses here that you presented in your expert report.

19       So let's start with tab 22, your Honors, and it's in

20   binder two.

21       And this is Dr. Portier's rebuttal report, and in

22   particular, what we talk about what's on page 6, which is --

23   and the first full paragraph, which starts,

24                "Returning to Table 2, after pooling

25            all the data for adrenal cortical

1              carcinomas for female Sprague-Dawley rats."

2        Do you see that?

3    A.   Yes.

4              MR. LASKER:  Your Honors are with me?

5              THE WITNESS:  Yes.

6    BY MR. LASKER

7    Q.   So when you -- as I'm reading this, when you did your

8    logistic regression analysis pooling all four of these studies

9    together, you got a p-value of .984, and the way that works --

10   that is -- is statistically significant in the inverse

11   direction, correct?

12   A.   That's correct.

13   Q.   Okay.  So if we just put that up.  Pooling all four of

14   these slides together, you'd actually have a protective effect,

15   although nobody actually would submit that to any regulators as

16   proof that glyphosate is protective against adrenal cortical

17   tumors, correct?

18   A.   Correct.

19   Q.   Okay, but what you did -- and you describe this in, again,

20   on page 6, and you talked a little bit about that in your

21   direct -- is you decided to take out the Lankas study because

22   that's a 26-month study, correct?

23   A.   That's correct.

24   Q.   Okay.

25   A.   And that's, in fact, what's driving the negative trend,

1  because the Lankas study is 26 months.  It's control response.

2  It's untreated animal responses so much higher than the 24

3  months, and when you group them together, it looks like it's

4  going to drop.

5      If you remember, the Lankas study has very low doses, and

6  so it's got all of these responses way up here (indicating)

7  near the controls, and the others have much lower response

8  because they're 24-month.

9      So the trend you see at 24 months disappears, because of

10  the big number in Lankas at 26 months.

11  **Q.**  Okay.  I thought I understood that.  So just, we'll go to

12  the next slide, and what you did is you dropped Lankas and you

13  pooled the other three studies, and that is what you present in

14  your expert report as the significant trend for adrenal

15  cortical adenomas that cannot be easily discarded, and suggest

16  a potential for glyphosate to affect the adrenal cortical,

17  tumors, correct?

18  **A.**  I don't know, you've moved in and out of the microphone,

19  I missed some of your question.

20  **Q.**  I've got too many papers here.

21         **THE COURT:**  You were also talking pretty fast.

22         **MR. LASKER:**  I will slow down when I read.  Sometimes

23  I stop realizing that.  I'm sorry, your Honor.

24  **Q.**  But it is this analysis that you then rely upon for your

25  conclusion in your expert report, that this -- the significant

1   trend seen for adrenal cortical adenomas cannot be easily

2   discarded, and suggests a potential for glyphosate to also

3   affect adrenal cortical tumors, correct?

4   A.   That -- the -- that statement is talking about the

5   individual animal data, the individual study data, and the

6   pooling.

7   Q.   Okay.

8   A.   And everything about it that you asked.

9   Q.   Okay.  So let's move to kidney adenomas, and

10  unfortunately, we have to go to another tab in our binders,

11  tab 4.  This is your amended expert report.

12       And when your Honors are there, let me know.

13            JUDGE PETROU:  Page...?

14            MR. LASKER:  Page 35 and 36 is where it will start.

15  BY MR. LASKER

16  Q.   Unfortunately, we will stay with this tab for a while.

17       And at the bottom of page 35, again, on your -- I think

18  its your amended expert report, we were talking, the final

19  line, the fact that tumor in Sprague-Dawley rats showing a

20  strong significant trend in kidney adenomas in males.

21       So that's what we're talking about now, kidney adenomas in

22  males, and that sort of screens our next row.

23       And as you describe in this paragraph in your expert

24  report, when you pooled all four of the studies together, you

25  did not find a statistically significant trend, correct?

1   **A.**   That is correct.

2   **Q.**   Okay, so let's put that up on our display.  Actually, it's

3   all four of them.

4       Do we have the next slide?  Yes.

5       So of all four of those together, there was no trend, but

6   again, you described this earlier, because the Lankas study --

7   you decided, based upon your analysis, to remove that.  You

8   did -- you removed Lankas, and then you report a statistically

9   significant trend.  Correct?

10  **A.**   In -- in the pooling --

11  **Q.**   Yes.

12  **A.**   -- that is correct.

13  **Q.**   Right.

14  **A.**   But again, it's the same thing.  Would you like me to

15  explain why you would expect this with a 26-month study versus

16  24?  Okay.

17          **THE COURT:**  I remember that from yesterday's

18  testimony.

19  **BY MR. LASKER**

20  **Q.**   So let's move on to the next two tumor types, and that's

21  thyroid C-cell tumors and interstitial testicular tumors.

22      And if we can start with the testicular tumors, that is at

23  page 35, in the same report we were looking at.

24      So if you just turn back to page 35, and the paragraph

25  here starts,

 1                    "Another significant trend seen in

 2              Sprague-Dawley rats is the finding of

 3              testes interstitial cell tumors from Lankas

 4              1981."

 5       Correct?  Are you with me?

 6  A.   I'm sorry?

 7  Q.   Page 35?

 8  A.   Yes.

 9  Q.   The full paragraph under the table starts, "Another

10  significant trend seen in Sprague-Dawley rats -- "

11  A.   Correct.

12  Q.   " -- is the finding of testes interstitial cell tumors

13  from Lankas 1981," correct?

14  A.   Correct.

15  Q.   And then you pooled all of the data together; and you did

16  not find an effect, correct?

17  A.   That's correct.

18  Q.   So let's put that up.  I think it's, the next one would be

19  all four of them.  No effect.  Thank you.

20       Then you state, though,

21                    "However, as noted above, the Lankas

22              study was for 26 months, and the other two

23              were for 24 months.  The tumors could be a

24              result of a longer exposure period, even

25              though the dose is substantially lower in

1          this study, compared to the other three

2          tumors."

3     Correct?

4  A.   Correct.

5  Q.   So for this tumor type, you are suggesting -- we go to the

6  next slide -- that the Lankas study might be the informative

7  study, because it may have allowed for sufficient time to pass

8  for these tumors to develop, correct?

9  A.   No, I don't know what you mean by, "the informative

10 study."

11 Q.   Well, okay.  You were presenting the possibility in your

12 expert report, or you were presenting the suggestion in your

13 expert report that the Lankas study may have identified these

14 tumors because there was sufficient time for them to develop,

15 correct?

16 A.   The Lankas study had a positive finding for testicular

17 interstitial cell tumors.  That's non-arguable.  Clearly did.

18      My discussion here was, again, because it's 26 months,

19 it's possible this finding could have occurred in the other

20 studies, if they'd gone 26 months.

21      So I can't really rule it out totally, but the wording

22 here is very weak.

23 Q.   I understand.  I'm just trying --

24 A.   Okay.

25 Q.   I'm just trying to look through this, and I think this is

1   similar with thyroid C-cell tumors in females.  That's at page

2   34, which is just a page right before where we were.

3       And it's your second paragraph.

4                "In Sprague-Dawley rats, there were

5            four studies that were acceptable for

6            inclusion in evaluation of causality, with

7            one yielding strong positive responses for

8            thyroid C-cell tumors in females, and

9            testicular interstitial tumors and

10           hepatocellular tumors in males,

11           hepatocellular adenomas in males, and

12           another."

13      And then you turn to the Lankas study again, and its

14  finding for thyroid C-cell carcinoma in female rats, which was

15  a significant finding.

16  A.   I'm not finding this -- the female paragraph.

17  Q.   I'm sorry, it's the first full paragraph on page 34.  It

18  starts, "In Sprague-Dawley rats there were four studies...."

19  A.   Yes.  Okay.

20  Q.   All right, and if you go five lines into that paragraph it

21  says, "Lankas 1981," in bold?

22  A.   Yes.

23  Q.   "...saw a significant increase in thyroid C-cell

24  carcinomas in female rats."  Do you see that?

25  A.   Yes, I saw that.

PORTIER - CROSS / LASKER

1  Q.   Okay, and that was statistically significant, for the

2  Lankas study, correct?

3  A.   Yes.  That is correct.

4  Q.   Okay, and then going down a few more lines, when you

5  pooled all four of the studies together, you did not find any

6  statistically significant trend?

7  A.   That is correct.

8  Q.   And then you have that same discussion that you had for

9  testes, interstitial testicular tumors, that it may be that

10 because the Lankas study is 26 months, there has been

11 additional time for these tumors to develop, and if those other

12 studies had been for 26 months, they would have seen those

13 tumors as well, correct?

14 A.   Might have seen those tumors, and the last sentence

15 clearly shows you what I thought of this finding.

16 Q.   So it was weak evidence, but it was some.

17 A.   It was weak evidence.

18 Q.   In your opinion.

19 A.   Its weak evidence.  That's what it is.

20 Q.   Okay, and then, just to finish with thyroid C-cell tumors,

21 in males -- that's the next paragraph down -- and I'd have to

22 go to a another tab to do this, but the bottom line is that for

23 this tumor, you ended up pooling all four of the studies

24 together in order to reach a statistically significant finding,

25 correct?

1  **A.**   No.   That's a -- that's a -- first of all, I don't pool

2  them to reach a statistically significant finding.

3  **Q.**   Oh, I didn't mean to say that.

4  **A.**   I pooled the data to evaluate what will happen with the

5  data.   This is a mistake.   I should have put both sets of

6  pooling.

7  **Q.**   Okay, but --

8  **A.**   That's clearly a mistake, and we can look at my slide and

9  see what happens with both sets of pooling, but here, that's a

10  mistake.   I should have put the other pooling.

11  **Q.**   I'm sorry, what's the other pooling?   I'm lost now.

12  **A.**   Removed Lankas.

13  **Q.**   Oh, remove Lankas.

14  **A.**   And pool the remaining three.

15  **Q.**   For this one you, at least in your expert report, you

16  pooled all four of them, and,

17                  "From these data, I conclude that

18            there's evidence that glyphosate causes

19            thyroid C-cell tumors in male

20            Sprague-Dawley rats."

21  **A.**   That's what it says, but I'm telling you, it's a mistake.

22  I should have put the over pooling there, as well.   I think I'd

23  still have the same conclusion with the other -- with the

24  three, but I'd have to look.

25  **Q.**   Okay that's fair enough.   And I'm not going to do -- I

1  have one of these for Wistar rats, but I'm not going to go

2  through that one.

3      I want to switch, though, to the mice, because we haven't

4  talked about mice yet.  And first of all, with respect to the

5  mice studies, you mentioned there were, for the CD-1s, there

6  were those 24-month studies, and then the 18-month studies,

7  correct?

8  A.    Correct.

9  Q.    And when you pooled the data for all of the tumors you

10  looked at, for the 24-month studies, you didn't find actually

11  any statistically significant trends for any of the tumors you

12  looked at, just looking at the 24-month studies, correct?

13  A.    I'm sorry, say that again.

14  Q.    Sure.  When you pooled the results from the 24-month

15  studies, you did not find any statistically significant

16  increased trend under your methodology, correct?

17  A.    I'd have to look at my slide to make sure, or -- or

18  somewhere in this.

19  Q.    Well, let me -- I think if we have either -- well, my

20  colleague may be -- let me --

21      So this is, again, your rebuttal report.  What tab is

22  that?  Tab 22, thank you.

23  A.    Yep.

24  Q.    Whoops.  So if -- if you can go to tab 22 -- are you

25  there?

**PORTIER - CROSS / LASKER**

1  A.    Yeah.

2  Q.    Okay, great, and this is your rebuttal report, and it is

3  at page 11, which is Table 3, sort of summarizes your various

4  pooled analyses for the mice.

5       And are you with me?

6  A.    I'm with you.

7  Q.    Okay, so you have the pool in the Atkinson and Knezevich

8  studies, as we've discussed.  Those are the 24-month mouse

9  studies, correct?

10  A.    That's correct.

11  Q.    And for those mouse studies, when you pooled the 24-month

12  mouse studies, you did not have any statistically significant

13  increased trend for any of the tumors you looked at, correct?

14  A.    I have one marginal increase, and the rest are much

15  bigger.

16  Q.    Okay, and I want to talk about that marginal increase.

17  That is the renal tumors that we were talking about before when

18  we were discussing the IARC Monograph, correct?

19  A.    That is correct.

20  Q.    Okay, and so -- I'd like to sort of -- if we can put up

21  slide -- well, let me set the foundation first.  I'm sorry.  I

22  want to again put up those numbers before I talked about them,

23  but -- and if you recall, maybe this can shorten this a little

24  bit, those were the two studies.  One, the Knezevich study, had

25  one renal tumor in the control, zero in the low dose, one in

1  the medium dose, and three in the high dose, correct?

2  **A.**   I believe that's correct.

3  **Q.**   And the Atkinson Study, as we talked about, had two renal

4  tumors in the control, two in the low dose, zero in the

5  mid-dose, and zero in the high dose, correct?

6  **A.**   That is correct, but of course, they're different doses.

7  **Q.**   I understand.

8  **A.**   All right.

9  **Q.**   So let me just see if we can put up the slide.  I just

10  want to make sure we had that foundation.

11       So these are the two 24-month studies, and we have this

12  distribution, and I believe, from your calculation, you talked

13  about -- we talked about this previously -- Knezevich was about

14  .065, marginally significant increased trend, and Atkinson was,

15  I think, something like .981, which is a negative -- an inverse

16  trend, statistically significant.  Correct?

17  **A.**   Correct.

18  **Q.**   Okay, and then through your pooling methodology, you

19  pooled these findings together, and so it's -- you're treating

20  it like it's one study, as I understand it.

21       So you have two control groups, with one or two tumors in

22  them, and then you have low dose, I think that's the third and

23  fourth block, and two and zero are low dose.

24       The next two, zero and one, is the mid-dose, and the final

25  zero and three are the high-dose.  I understand they're

1  different doses in the studies, but those are how those tumors

2  distribute among the two studies, correct?

3  **A.**    No, I mean, the doses are tremendously different.

4  **Q.**    Oh?

5  **A.**    The high dose in the Knezevich and Hogan study is more

6  than four times larger than the high dose in the Atkinson

7  Study, and the high dose in the Atkinson study matches the

8  mid-dose in the Knezevich and Hogan study.  So you've

9  completely mixed these up, in a different way than they should

10 have been.

11 **Q.**    Okay, so just so I understand, it is that the high dose,

12 then, in that Knezevich study, 4,840 milligrams per kilogram,

13 is way higher than any of the doses you used in any of the

14 animal studies -- I think, than -- than on that whole dataset

15 we have, correct?

16 **A.**    It's -- I think it's the biggest, but it's not far from

17 one of the rat study numbers.

18 **Q.**    And we have had some testimony earlier today -- and I

19 think you also, earlier today, because you referenced it -- as

20 referenced yesterday in Dr. Jameson's testimony, about EPA

21 stating that for its guidelines, 1,000 milligrams per kilogram

22 was the highest dose that they look for in their studies,

23 correct?

24 **A.**    I don't know what you're asking me to say is correct.

25 That you discussed it?

PORTIER - CROSS / LASKER

1   **Q.**   Well, that's a good point.   You are familiar with the fact

2   that -- or, am I correct that EPA, in its guidance documents,

3   states that 1,000 milligrams per kilogram is an appropriate

4   high dose for these types of studies?

5   **A.**   You're incorrect.   That is not what their guidance says.

6   **Q.**   Okay, and their guidance talks about 1,000 milligrams per

7   kilogram as acceptable high dose?

8   **A.**   No, their guidance doesn't talk about 1,000-milligram per

9   kilogram.   EPA referred to the OECD guidelines, but the OEC

10   guidelines have two problems with them in regard to this

11   particular issue.   Number one, those guidelines were issued in

12   2009, and that's when they came to it from 5 percent in diet to

13   1,000 milligrams per kilogram per day.   The previous guidelines

14   were 5 percent in diet.   Every one of these is less than

15   5 percent in diet.   So they all matched the previous

16   OECD Guidelines.

17        Secondly, EPA's cancer guidelines for doing cancer risk

18   assessment clearly state 5 percent in diet.

19   **Q.**   Okay, thank you.

20   **A.**   I will finish by saying the OECD guideline doesn't put it

21   as a strict thousand.   They're saying that people who submit to

22   the agency don't have to go higher than a thousand.   They're

23   not saying, never go higher than a thousand.

24   **Q.**   Okay, fair enough.   And just to finish up this discussion,

25   through your pooling methodology, when you pooled the

1  Knezevich study, which was a moderate, or -- it wasn't

2  statistically significant, but it was -- I'm sorry, what's your

3  terminology for this?

4  **A.**   Marginally significant, by itself --

5  **Q.**   By itself --

6  **A.**   -- historical controls.

7  **Q.**   And the Atkinson study, which is a statistically

8  significant inverse negative study, when you combined those

9  together, you ended up with what you opine in this case is a

10 marginally significant increased trend, correct?

11 **A.**   Yes.

12 **Q.**   Okay.  I just want to -- so -- and that's how you're

13 pooling analysis works in this case, correct, to be able to

14 provide this sort of data?

15 **A.**   That's what occurs after the pooling.

16 **Q.**   Okay, and there is another analysis that you -- that you

17 did, and this is for hemangiosarcomas in male mice, and this is

18 again -- I'm sorry -- tab 4, and it's going to be -- I'm

19 sorry -- on page 48.

20     And here, you're looking at a hemangiosarcomas.  This is

21 the first full paragraph on page 48.  It starts, "For

22 hemangiosarcomas in males...."  Do you see that?

23 **A.**   Yes I see it.

24 **Q.**   And you're talking in the second line there about pooling

25 the 24-month studies, and again you find, as we've just

1  discussed, there's no trend at all.  It's basically flat.

2  Correct?

3  A.    That -- I don't know if it's basically flat.

4  Q.    Well the P trend is about .49.  That's almost as close to

5  flat as you can get, right?

6  A.    Yeah, but -- that's fine.

7  Q.    Yeah?

8  A.    There's nothing there.

9  Q.    Okay, and then you point out, though, that the main

10 difference between these two findings is that, again, in that

11 very, very high-dose group in the Knezevich study, there were

12 no tumors found; zero of 50 response in animals exposed at

13 4,841 milligrams per kilogram per day in the study by Knezevich

14 and Hogan.  Correct?

15 A.    That's correct.

16 Q.    And so what you did -- and again, one of your Sensitivity

17 Analyses -- is you just -- you looked to see what would happen

18 if you removed that high-dose group from the Knezevich study.

19 Removing this one exposure group in the pooled 24-month

20 analysis yields a P trend of .001, which is then a positive

21 trend for this tumor, correct?

22 A.    Correct, but I didn't use that in my overall decision.  It

23 was -- it was a matter of noticing that this was the case and

24 validating that yes, it was the case.

25     And this is a very -- this finding is very sensitive to a

1  single response in a single-dose group.

2  **Q.**   And that, in fact, also explains how you -- what happened

3  when you did that analysis for the renal tumors, where you

4  combined 1013 and 2200 to get a marginally significant

5  increased tend, is because it was very, very sensitive to those

6  three tumors in that very high-dose group, correct?

7  **A.**   That -- that finding would probably disappear -- in fact,

8  it would definitely disappear -- because of the high-dose

9  group.

10 **Q.**   Okay, and we talked a bit about malignant lymphomas in

11 mice, and I'm correct, I believe -- and we have this data,

12 again, we were -- I thought I have Exhibit -- which tab is this

13 Exhibit 1335, the rebuttal report?

14          **MR. KALAS:**   Tab 22.

15          **MR. LASKER:**   Tab 22.

16 **Q.**   You can refresh your recollection, but when you looked at

17 malignant lymphoma in the 24-month mouse studies and you pooled

18 those together, you did not find any statistically significant

19 increased trend for malignant lymphomas in the 24-month

20 studies, correct?

21 **A.**   That is correct.

22 **Q.**   And when you pooled all four of the studies together, you

23 got what I think you've defined as a marginally significant

24 finding, correct, for malignant lymphomas?  It's on the same

25 table.

**A.**   I don't see -- oh, the pool of all four, down at the

bottom.  Yeah, marginally significant.

**Q.**   And then, but if you do just the 18-month studies, then

you can -- then you are able to get your -- or then you were

able to calculate a statistically significant increased trend.

**A.**   When you pool the 18-month study, there is a statistically

significant trend.  I didn't try to get it.  That's what it is,

and 18-month and 24-month studies, as I explained yesterday,

as -- there's a big difference in time.  As the number of

animals in the control group go up, it gets noisier, and you

cannot find a statistically significant increase like you could

at 18 months.

     In fact, the argument put forth by industry when they

convinced OECD that they could do 18-month mouse studies was

that the 24-month mouse studies were too noisy, and the

18-month mouse study would have less in the control, and so the

ability to see an increase is enhanced.

     That's why they did the 18-month studies as the two most

recent studies, and 24-months before, is because OECD changed

the guidelines to allow it.

**Q.**   And just on this issue of malignant lymphomas, you cannot

cite any source document or any published document that

suggests that CD-1 or Swiss albino mice are appropriate mouse

models for assessing the potential for a substance to cause

non-Hodgkin's lymphoma in humans, correct?

1   **A.**   Say that again, please.

2   **Q.**   Sure.  You cannot cite any source document, any published

3   document, that suggests that CD-1 or Swiss albino mice are

4   appropriate mouse models for assessing the potential for a

5   substance to cause non-Hodgkin's lymphoma in humans, right?

6   **A.**   I can cite dozens.

7   **Q.**   Okay.  Well, let's put this up.  I'm sorry, slide -- and

8   this is your deposition.

9   **A.**   Can I -- can I -- I mean, I think --

10          **THE COURT:**  Hold on a second.  Let him do his thing,

11   and then you're free to --

12          **THE WITNESS:**  Thank you.

13          **THE COURT:**  -- you're free to respond to his thing.

14          **MR. LASKER:**  Let me do my thing.

15          **THE COURT:**  But as you do your thing, the first thing

16   that you need to do is cite the page and line numbers.

17   **BY MR. LASKER:**

18   **Q.**   Here's the full transcript.  That's where I'm taking him.

19   So it's Tab 1 in your report.  It's your deposition.

20   **A.**   Okay.

21   **Q.**   And page 171, line 21 through page 172, line 3.

22   **A.**   171.

23   **Q.**   Are you with me?

24   **A.**   Yes, I am.

25   **Q.**   Okay, and I asked you the question at line 21, and you can

1  read all the way through to the end.

2        I say,

3              "QUESTION:   No.   That's not really a problem

4              with the question.   Can you cite to any

5              source document, any published document that

6              suggests that CD-1 or Swiss albino mice are

7              appropriate mouse models for assessing the

8              potential for a substance to cause NHL in

9              humans?"

10        There was an objection, and then I'll read your full

11  answer.

12             "ANSWER:   No, probably not.   I'm hesitating

13             because the problem is OECD says these mice,

14             CD-1 mice, are good mice for studying

15             chemicals for producing cancer, hence that

16             document, in essence, is recommending if you

17             are going to look for cancer -- NHL is a

18             cancer -- then that's the right model.

19             That's why I'm hesitating.   That's not what

20             he's talking with about here, but that's why

21             I was hesitating, sorry."

22        And then I repeat the question.   And -- I can continue

23  reading through this for context, if you want.

24  A.   Oh, no, that would be fine.

25  Q.   And if you read through 174, you disagree with me, I keep

1    asking you, and you state again on line 9, page 173, "I cannot

2    cite a single publication."

3        Have I been reading that correctly?

4    **A.**    You have been reading it correctly, and it still holds.   I

5    wasn't paying as close attention to your question as I should

6    have been, but it's still the same answer.

7        NHL is a cancer.   CD-1 mice are recommended to use in

8    cancer bioassays to detect cancers.

9        We've talked about the fact that there is -- that any

10   cancer seen in an animal flags the probability of getting

11   cancer in humans.   You want to know about specifically for NHL.

12   And as I was saying earlier, that's not generally something

13   that happens.

14   **Q.**    Okay.   That's fair.

15            **THE COURT:**   Could I -- you had an exchange with

16   Mr. Lasker a little bit about ago about the OECD guidance.   Did

17   I get the acronym right.

18            **THE WITNESS:**   Yes.

19            **THE COURT:**   OECD guidelines, and I believe what you

20   said is that people are told they don't have to test at higher

21   than a thousand milligrams per kilogram.

22            **THE WITNESS:**   That is correct.

23            **THE COURT:**   Is that right?   And we had some

24   discussion with Dr. Jameson about this yesterday, but I wanted

25   to hear from you why it is, if you know, why it is that that is

1    the guideline, and what is the significance of that for this

2    case?

3             THE WITNESS:  So the reason that OECD chose to do

4    that guideline was because they put -- they put another

5    guideline in place, and then the mouse model guidelines no

6    longer made sense.

7         They were trying to find a way to save money to reduce the

8    amount of animals that are used, et cetera, and so they put a

9    line in that says, If you can show that this does no harm to an

10   animal at a thousand milligrams per kilogram per day, any

11   compound, then you don't necessarily have to do a bioassay.

12        Once they put that in, they said, well, why should we then

13   let the bioassay go to the maximum tolerated dose if it's

14   bigger than a thousand milligrams per kilogram per day?  So

15   we'll cut that off too, and so you don't have to go above that.

16        From a scientific perspective, I still prefer using the

17   maximum tolerated dose, but OECD and everyone in it has decided

18   that you don't have to go any higher than that.  It's unusual

19   for the maximum tolerated dose to exceed the, a thousand

20   milligrams per kilogram per day.  In essence, for most

21   bioassays, that that has no bearing whatsoever.  For this one,

22   it has bearing, because they have exceeded 1,000 milligrams per

23   kilogram per day.

24             THE COURT:  Okay.

25

1   **BY MR. LASKER**

2   **Q.**   Dr. Portier, I'd like to switch now a bit to your

3   discussion about multiple comparisons, and how that impacts

4   statistical analysis.

5       And I think you explained how -- what happens with p-value

6   .05 is if you do 20 tests, you're going to have one that pops

7   out as gradient .0 -- well, less than .05, just by chance,

8   correct?

9   **A.**   No.  You -- you might have one pop out, by chance at .05.

10  You don't necessarily -- you might have two.

11  **Q.**   Right, it's chance.  I understand.

12  **A.**   You don't know what chance really is.

13  **Q.**   Okay, and while you were discussing that in the context of

14  individual tumor findings, that same logic would apply with

15  respect to any analysis that was pooling data for individual

16  tumor types, given the size of our dataset, correct?

17  **A.**   I think it would be misleading if I brought the pooled

18  analysis into that calculation.

19  **Q.**   I wasn't suggesting that.  I had a simpler point.

20      There is, in any individual study, maybe 30 or 40 tumor

21  sites that are looked at by the pathologist, correct?

22  **A.**   I have a table with that in my Rebuttal Report.  It's not

23  20 or 30.  Well, the pathologist might look at them, but you

24  wouldn't analyze them.

25  **Q.**   Well, the pathologist would analyze them.

1  **A.**   No, a statistician would analyze them.

2  **Q.**   The pathologist would look to see if there were tumors,

3  and then if they found tumors, then the statisticians would

4  analyze them, right?

5  **A.**   Yes.

6  **Q.**   And so you'd have maybe 30 or 40 sites, and that's for

7  males and for females, so that as in any one study, you're

8  going to have 60 to 80 sites, correct?

9  **A.**   You have 30 to 40 sites in males and females.

10 **Q.**   So 30 to 40 in males, 30 to 40 in females, and you pooled

11 separately for males and females in your analysis.

12 **A.**   I pooled what?

13 **Q.**   Separately for males and females in your analysis?

14 **A.**   Oh, yes.   Okay.

15 **Q.**   And then we have mice and rats so we have 12 different

16 studies we're looking at, correct?

17 **A.**   Twelve studies in mice and rats, that's correct.

18 **Q.**   So that is, you'd have to multiply that 12, by the 60 to

19 80, to figure out the total sites that the pathologist looked

20 at.   It's a lot of sites, correct?

21 **A.**   It's a lot of tissues that they looked at, that is

22 correct.

23 **Q.**   And so out of all of those tumors, because there are so --

24 those sites, because there are so many, again, you have this

25 multiple comparison problem if you just start looking at one

1  tumor site or another tumor site.

2       You would expect, given how many tumor sites you're

3  looking at, however you do an analysis, by chance you might

4  have some that looked like a positive trend, correct?

5  **A.**   It's -- you -- I -- you're -- it's a very confusing

6  statement you made.  So I think you'll have to repeat it for

7  me.  I'm sorry.

8  **Q.**   Okay.  There are maybe a thousand -- I don't know -- there

9  are hundreds, at least, or a thousand different tissue sites

10  that have been examined, individual tissue sites that have been

11  examined by pathologists in this large dataset.

12  **A.**   Most of them -- most of them with no tumors at all.

13  **Q.**   I understand that.

14  **A.**   Correct.

15  **Q.**   And given they have all these different tumors sites, if

16  you were to do trend analyses, some of them would be zero

17  because there's no tumors, and some have tumors, and will have

18  findings one way or the other.

19       And by chance, the way statistics work, some of them are

20  going to appear statistically significant.  That's just

21  statistics, right?

22  **A.**   In any statistical analysis, you have a type one area, you

23  have a false-positive rate.  And yes, so for any one test, a

24  false-positive rate applies.

25  **Q.**   Okay, and I just want to talk a little bit about the

1  different tests that you did on multiple comparisons in which

2  you were looking at individual tumors and not the pooled

3  analysis, and you presented some of these slides, we looked at

4  the one you just did for rats a moment ago.

5      I just want to talk a little bit about the genesis of that

6  table, because you presented a table very much like the table

7  you presented to this Court in your initial expert report.

8      Do you recall that?

9  A.   Yes.

10 Q.   Okay, and in your initial expert report, you actually had

11 the numbers -- they were different in two ways, that I'd like

12 to sort of discuss with you.

13     Again, you're comparing the total sites that were

14 analyzed, and then the observed tumors, and you're seeing

15 whether or not they are greater or less than chance.  Correct?

16 A.   That's correct.

17 Q.   And in your initial expert report, you actually had a

18 higher number of total sites than you have in your current

19 report, correct?

20 A.   For some, yes.

21 Q.   Okay, and you decreased that number of total sites not

22 based upon actually going through and counting up total sites,

23 but based upon your judgment that actually, the -- or your

24 estimation that the number of total sites that you had probably

25 should be lower, correct?

1  **A.**   No.   I -- that's not correct.   So the original numbers

2  came from Joe Haseman in his comments to the USEPA.

3  Joe Haseman was the Chief Statistician for the National

4  Toxicology Program for 25 years, and those were his numbers.

5  He created -- he created those numbers by reading two of the

6  rat studies and two of the mouse studies and counting up, and

7  then, to that, adding what is a reasonable number of these

8  pooled analyses, and adenomas and carcinomas.

9      I went back and counted all of the studies, put those

10  counts for what's one, two, less than equal to three, into my

11  analysis, and used those numbers in the -- in the rebuttal, and

12  still, the same number of pooled analyses that I had with

13  Dr. Haseman, but I counted them all.

14  **Q.**   Well, let's just take this in steps.   First of all,

15  Dr. Haseman, when he did his analysis along lines that he did,

16  reported to EPA or submitted to EPA his findings, which was

17  that the number of tumor findings in the study were what you'd

18  expect to see by chance, correct?

19  **A.**   You have my tab on that with my comment back to him.

20  **Q.**   I understand that you don't agree with him.   I'm just

21  making clear for the record his conclusion, when he did this

22  analysis, was that the number of individual tumor sites

23  identified in these rodents was exactly what you'd expect to

24  see by chance, correct?   That was his conclusion?

25  **A.**   That was his conclusion.

1  Q.   All right.

2  A.   But he concluded it based on only half of the tumors from

3  the available data, because EPA didn't report half of the

4  tumors.

5  Q.   I understand you disagree with him.  I just want to make

6  clear what his analysis was, and I want to turn now to your

7  adjustment of your total tumor site.

8       And if you can go back to your deposition, at tab 1, and

9  this is page 316:23.  Are you with me?

10  A.   Yes, I am.

11            THE COURT:  Are you raising something that from the

12  deposition testimony that you believe is contrary to something

13  that he just said?

14            MR. LASKER:  Yes.  At least, I hope so.

15            THE COURT:  Okay.

16  BY MR. LASKER

17  Q.   So we're discussing this same Table 15 here, and I asked

18  you, at line 23, page 316,

19            "QUESTION:  Have you gone through the

20            exercise of adding up the sites that you

21            think should be combined, so you actually

22            have the total number of sites with adenomas

23            with carcinomas, and adenomas and carcinomas

24            combined, where you believe that's

25            appropriate?"

1    And you stated,

2        **"ANSWER:**   You can't do that evaluation sort

3        of in isolation.  So, no, I have not done

4        that."

5    Did I read that correctly?

6  **A.**   The question you just asked, and the previous one, had a

7  slight difference in answer.  I was talking about the tumors

8  from the Greim supplements and sitting down and adding them all

9  up, and Greim supplements don't have adenomas and carcinomas

10  combined.  So I can't count that one by myself unless I add it

11  myself.

12    But if you remember, I'm relying on the -- some of my

13  tumor counts come from the regulatory agencies.  I can't be

14  sure how many analyses the regulatory agencies did to give me

15  those numbers.  So I don't know what the true denominator is

16  from where I got my data sources, and hence, I can't do that,

17  but I did count every tumor in the Greim supplement.

18  **Q.**   Oh, I appreciate the clarification, and just so the

19  record's complete, and I didn't ask you this, but it's also on

20  page 318, lines 7 through 17, just in further clarification of

21  your answer, if you could agree -- and tell me if this is

22  correct.  I asked,

23        **"QUESTION:**   I'm not asking about the number

24        of analyses that were done.  I'm asking you

25        about the number of analyses that could be

1           done, because that's what you're Total Site

2           column is, correct?"

3      And you state:

4           "ANSWER:   No, the Total Site column should

5           be an estimate of the number of sites that

6           were done.  That is what it's attempting to

7           give you."

8      Correct?

9  A.   That is correct.

10 Q.   Okay, and your estimate of the total sites that you could

11 look at went down from your first expert report to your current

12 expert report, correct?

13 A.   In some of the groups, yes.

14 Q.   And you also -- and you talked about this a couple of

15 times -- increased the number of sites where you observed

16 tumors, and a lot of that was based upon the work that

17 Dr. Corcoran did, where he found some tumors you hadn't found,

18 and you added that to your observed sites, correct?

19 A.   That is correct.

20 Q.   And so that's what you used as your comparison to do your

21 multiple comparison analysis, correct?

22 A.   That is correct.

23 Q.   And I believe you testified that Dr. Corcoran was not

24 qualified to actually identify tumor sites, but for this

25 purpose, you used his -- the tumor sites he identified,

1   correct?

2   **A.**    That was not what I testified to.  The question was

3   whether or not he was qualified to evaluate the carcinogenicity

4   of these studies, and my answer didn't deal with his

5   statistical qualifications.  It dealt with his qualifications

6   in understanding what a bioassay is.

7   **Q.**    I appreciate that clarification, but Dr. Corcoran actually

8   also has a total number of sites that he looked at to identify

9   all of those tumors, correct?

10  **A.**    He actually has two.

11  **Q.**    Okay, and he did just, like Dr. Haseman, he did an

12  analysis, just like you did -- and we'll hear from him later

13  today or maybe tomorrow -- and he did not -- his conclusion,

14  like Dr. Haseman, was that the number of sites found with these

15  P trends less than .05 was what you'd expect to see purely by

16  chance, correct?

17  **A.**    But he made lots of errors in the sites that he looked at,

18  as well as analyzing sites with less than three tumors total,

19  at the sites.

20  **Q.**    I understand you disagree with him, and I understand you

21  disagree with Dr. Haseman --

22  **A.**    No, I agree with Dr. Haseman.  I'm sorry, that's putting

23  words in my mouth.

24  **Q.**    I'm sorry, maybe I misunderstood.  Dr. Haseman concluded

25  that the number of sites identified is what you'd expect to see

689

1  by chance.  Do you agree with that?

2  A.    I was answering the question about the number of how you

3  calculate the number of sites.  I agree with Dr. Haseman on how

4  you calculate the number of sites, and I disagree with

5  Dr. Corcoran.

6  Q.    Okay.  I understand.

7        Let's switch over to your opinions with regard to

8  genotoxicity, and you -- you talked about a little bit about

9  oxidative stress.  Do you recall that?

10  A.    Yes.

11  Q.    And just so people understand what that is, oxidative

12  stress is part of the energy system that drives our ability to

13  move, correct?

14  A.    That is correct.

15  Q.    And exercise causes oxidative stress, correct?

16  A.    Exercise causes free oxygen radicals that are used up

17  during the exercise and afterwards, but yes.

18  Q.    Okay.  Just so I'm clear, exercise causes oxidative

19  stress, correct?

20  A.    It increases the number of free oxygen radicals because

21  the body needs them at that point.  But yes, it -- it's not --

22  I don't know if you would call it oxidative stress.  That's my

23  problem with the terminology.  It clearly increases the amount

24  of free oxygen radicals in the cell.

25  Q.    Okay.  If I could ask you to turn to tab 1 again, that's

1  your deposition.

2  **A.**    Yep.

3  **Q.**    At page 353.

4       And are your Honors with me?

5            **JUDGE PETROU:**   Mm-hm.

6  **BY MR. LASKER**

7  **Q.**    Starting at line 3, we have the question we just talked

8  about, and, "You agree that oxidative stress," I asked you, "is

9  happening in our body all ever the time correct?"

10      And you answer, "It's part of the energy system that

11 drives our ability to move."

12      My next question, "So exercise causes oxidative stress,

13 correct?"

14      And your answer was, "Of course."

15 **A.**    I'm correcting the answer, because I don't know if the

16 definition of "oxygen stress" means free oxygen that's not

17 needed versus free oxygen that is needed.

18      We are agreeing on the same thing, that there are oxygen

19 radicals; they get much higher during exercise, in the cells.

20 **Q.**    Okay, and you would agree -- I'm not sure I understand the

21 qualification, but you agree, or at least -- well, I've got to

22 ask the question first.

23      Do you agree that having a cold causes oxidative stress?

24 **A.**    Probably.

25 **Q.**    Okay, and that was the answer you gave, not quite

1  qualified, but that was the answer you gave in your deposition,

2  so we're doing good.

3          **THE COURT:**  You don't need to be testifying.

4          **MR. LASKER:**  I'm sorry, I wasn't actually meaning to

5  imply anything.

6          **THE COURT:**  Well, you were.

7          **MR. LASKER:**  I was just talking.

8  **Q.**  And you would agree that it is fair to say that the fact

9  that a chemical causes oxidative stress does not mean that it

10  causes cancer, correct?

11  **A.**  That is a fair statement, that is correct.

12  **Q.**  Okay, and we talked about genotoxicity.  You would also

13  agree that even if a chemical is genotoxic, that does not mean

14  that it causes cancer, correct?

15  **A.**  Let me talk about general scientists first, and then about

16  myself, if that's okay.

17  **Q.**  Sure.

18  **A.**  There are scientists who believe that genotoxicity is

19  equivalent to cancer.  It's getting smaller as a group over

20  time, but there are some who still believe that genotoxicity

21  should be equivalent to cancer, and most genotoxic compound

22  companies don't even create them if they can avoid it because

23  it creates such a controversy.

24      In my reading of that literature, I would say that just

25  having a genotoxic finding does not lead to cancer.

PORTIER - CROSS / LASKER

1  Q.  All right, and in fact, a human cells routinely experience

2  DNA damage in the ordinary course of cell replication, without

3  any chemical exposure, correct?

4  A.  That's correct.

5  Q.  And the human body has repair mechanisms that respond to

6  DNA damage so that it doesn't cause further damage, correct?

7  A.  That is correct.

8  Q.  And for -- I think you actually have -- you had a slide

9  that you presented that sort of shows showed this progression

10  for a chemical to cause cancer through genotoxicity.  The

11  genetic change has to progress to a mutation.

12  A.  Through genotoxicity, yes, that would be correct.

13  Q.  And just because a chemical can cause DNA damage, but

14  doesn't mean that it will cause mutations.  Correct?

15  A.  That is correct.

16  Q.  And you also agree that the scientific evidence is

17  insufficient to classify glyphosate as a mutagen or capable of

18  causing mutations, correct?

19  A.  Let me think about that one for a minute.  I have to run

20  through all of the assays that I looked at in my head.

21     I would have to conclude that that is correct.  It's

22  genotoxicity, it's not mutations.

23     I will point out that for most evaluations of the genetic

24  toxicity of chemicals, they don't sequence DNA and look for

25  mutations.

PORTIER - CROSS / LASKER

1  Q.    Okay.

2  A.    So it would be rather unusual to have data that would

3  allow me to say, yep, it's a mutation.

4  Q.    Okay.  Well, in fact, both glyphosate and glyphosate-based

5  herbicides have repeatedly tested negative for mutagenicity in

6  the AIMS test, correct?

7  A.    That's reverse mutagenicity in the AIMS test.  It's a

8  specific gene for a specific case.  That doesn't mean it isn't

9  causing mutations, because the genome's a little bit longer

10  than what you see in the Salmonella.

11        So it's a -- its a clearly -- it clearly is negative in

12  the reverse mutation assay in Salmonella.

13  Q.    So just so the record is clear, both glyphosate and

14  glyphosate-based herbicides are clearly negative in the AIMS

15  test for mutagenicity, correct?

16  A.    I don't, right off the top of my head, I don't recall if

17  I looked at the AIMS assay results for the formulations.  I'd

18  have to go back and look at my report to be able to answer

19  that.  I did look at the glyphosate ones, that's I'm certain

20  of.

21  Q.    And they were negative?

22  A.    There were one or two positives in there, but there were

23  predominately 23, 24 negatives, one would have to conclude that

24  that was negative.

25  Q.    Just to perhaps refresh your recollection, if you could go

1   back to your deposition, tab 1, at page 347, line 10 --

2   **A.**    Yeah.

3   **Q.**    -- and it's line 10 through line 20.

4   **A.**    Yes.

5   **Q.**    And the question on line 10,

6           **"QUESTION:**  And you do agree, though, that

7           both glyphosate and glyphosate formulations

8           have consistently tested negative in the aims

9           mutagenicity test?  Correct?"

10      And your answer?

11          **"ANSWER:**   They have consistently, with the

12          exception, I believe, of four studies, but

13          there were a lot of studies -- consistently

14          tested negative for the reverse mutation

15          assays of a specific gene in Salmonella."

16  **A.**    Different, no.

17  **Q.**    So yes, the AIMS test --

18  **A.**    Just say Salmonella.

19  **Q.**    Yeah, okay.  Does this refresh your recollection that

20  glyphosate-based herbicides, likewise, at least from your

21  review as of the time of your deposition, tested negative for

22  mutagenicity in the AIMS test?

23  **A.**    The glyphosate formulations.  I'm really uncomfortable

24  with that.  I know I said this, but today, I'm uncomfortable

25  saying I really did look at the formulations.  I really would

1  have to go back and look.

2  **Q.**   That's fair.

3  **A.**   But I'm willing to say this.  My vague recollection is

4  that it's predominantly negative for the formulations.

5      I hesitate because there are so many different

6  formulations, I'd want to go carefully look through it and see

7  if the different formulations had something different in them,

8  so that the few positives they had might have come from a very

9  specific formulation.  But that's my recollection at this

10 moment.

11 **Q.**   I'd like to turn to the three human *in vivo* studies you

12 mentioned.  I think you stated in your direct testimony that

13 you gave the greatest weight to human *in vivo* evidence for

14 genotoxicity, as I recall, correct?

15 **A.**   What I said was, given all else equal and of equal quality

16 studies, I would rate the human *in vivo* evidence the highest.

17 **Q.**   Okay, and there were three studies that you cited to.

18 I think you said two were clearly positive, and one was

19 possibly positive.  Correct?

20 **A.**   Yeah.  It was -- one could interpret it as positive, one

21 could interpret it as negative.  It's a fair call to go either

22 way with that study.

23 **Q.**   Okay, and the first the first study is Paz-y-Miño 2007.

24     And this is, I believe, Defense Exhibit 1289.  I'm sorry,

25 it wasn't in our binders so I have copies for your Honors.

1              (Whereupon a document was tendered to the Court.)

2              **THE COURT:**  Mr. Lasker, can I ask you roughly how

3    much longer you have with this witness?

4              **MR. LASKER:**  Five minutes.

5              **THE COURT:**  Okay.  We can take a little short break

6    after that.

7    **BY MR. LASKER**

8    **Q.**   And this Defense Exhibit 1289 is the Paz-y-Miño 2007

9    study, correct?

10   **A.**   That is correct.

11   **Q.**   And this is actually dealing with a planned Colombian

12   spraying in Ecuador, which for other reasons I know about, and

13   this was the first test that you identified as a positive test

14   for genotoxicity, correct?

15   **A.**   That is correct.

16   **Q.**   And if I could direct -- ask you to look to the last

17   paragraph of this publication, where the investigators are

18   summarizing their conclusions, from this paper?

19   **A.**   Very last paragraph.

20   **Q.**   And the investigators state "Our findings suggest...."

21        Are your Honors with me?  Okay.

22              "Our findings suggest the existence of

23              a genotoxic risk for glyphosate exposure in

24              the formulations used during the aerial

25              sprayings, and indicate the need for

1           further studies on individuals exposed to

2           glyphosate to determine its possible

3           influence on genetic materials."

4      Correct?

5  **A.**   That's what it says.

6  **Q.**   And as you mentioned, there were two more studies.  There

7  was Bolognesi 2009 and there was Paz-y-Miño 2011.  They did an

8  additional study, correct?

9  **A.**   Yes, I believe so.

10 **Q.**   And the Bolognesi study is at tab 25 in your binder; your

11 second binder.  And if we go to those investigators'

12 conclusions, at the end -- are you with me?

13 **A.**   I'm trying to get to the end.

14 **Q.**   Okay.

15 **A.**   Okay.

16 **Q.**   Page 985, the second column.  Those investigators, and

17 they're -- this is the first full paragraph -- state that,

18 third line down, they're talking about Bradford Hill, which

19 we've heard some testimony about in this case,

20           "Based on the applicable Bradford Hill

21           guidelines, it is not possible to assign

22           causality to the increases in frequency of

23           BNMN."

24      And that was their measure of genetic damage, right?

25 **A.**   That is correct.

1   Q.   "...observed in our study," correct?

2   A.   That's what he says.

3   Q.   And you disagree with that, I take it?

4   A.   I don't -- I didn't apply Bradford Hill to that one study.

5   So I can't agree or disagree with it.  Do I believe there are

6   positive findings in this paper?  Yes, I do.

7   Q.   The investigators -- well, let's take a look, then, at the

8   final paper in this series, and that's Paz-y-Miño 2011, that

9   was the third in this series, correct?

10  A.   That's correct.

11  Q.   And that was at -- that's at tab 26.  And if we can go to

12  the conclusion again, which is at page 50 -- are you with me?

13  A.   I'm on 50, yeah.

14  Q.   Okay, so the bottom of the first column on the left, the

15  final paragraph in their conclusion states,

16              "Several research studies related to

17          glyphosate exposure have been conducted in

18          Colombia by Bolognesi...,"

19  and that's the study we were just talking about.  You can see

20  by the reference, correct?

21  A.   Yes.

22  Q.   (Reading)

23              "...Sanin, *et al.*, and Solomon, *et al.*,

24          which state that the study populations have

25          low genotoxic risk associated with

1              glyphosate."

2        Correct?

3   A.    That's what it says.

4   Q.    And then they continue, "Regarding our study," so this is

5   now their 2011 study, "we obtained results showing no

6   chromosomal alterations in the analyzed individuals."

7        Do you see that?

8   A.    That's what it says, yes.

9   Q.    And do you agree that that was their finding?

10  A.    No.  Table 2 says that's not their argument.  That's not

11  their finding.

12  Q.    Okay.  So you disagree with Paz-y-Miño and you disagree

13  with Bolognesi as to their conclusions, but -- based upon your

14  analysis of the data?

15  A.    I don't disagree with Bolognesi's conclusions.

16  Q.    Oh, I'm sorry.

17  A.    His abstract conclusion is very clear.  He says there is

18  genotoxic risk from exposure to glyphosate.  That's his

19  conclusion.  I agree with that, from his paper.

20  Q.    Okay, and his conclusion that causality cannot be

21  determined, or -- we can go back and quote the Bradford Hill

22  analysis -- his conclusion that there was not causality, do you

23  agree with that, or not agree with that?

24  A.    I don't know what he did.  All he said is one sentence

25  that says, we tried to apply it.  There's no description of why

```
 1   it didn't work.  I think it didn't work because they didn't

 2   have enough data to be able to do it, not because it didn't

 3   work.  I mean, not because it goes the opposite direction, but

 4   I don't know because there's nothing in there.

 5       All I can do is refer to the last sentence in his

 6   abstract, which very clearly states, we saw significant

 7   effects.

 8            MR. LASKER:  I have no further questions, your

 9   Honors.

10            THE COURT:  The last sentence in the abstract -- I'm

11   looking at the last sentence in the abstract.

12            THE WITNESS:  For Paz-y-Miño or Bolognesi?  I'm

13   sorry.

14            THE COURT:  I'm looking at the last one, Paz-y-Miño,

15   that --

16            THE WITNESS:  Oh, yeah, that one -- that one, they're

17   clear.

18            THE COURT:  Is that what you were pointing to just

19   now?

20            THE WITNESS:  No, I was going back to this other

21   Paz-y-Miño paper.  The last sentence reads,

22                "These results suggest that in the

23                formulations used during aerial spraying,

24                glyphosate had a genotoxic effect on the

25                exposed individuals."
```

1          THE COURT:  Okay.  Thank you.

2     Any redirect?

3          MS. GREENWALD:  Can we take a short break?  Then I'll

4  be really quick, if at all.

5          THE COURT:  Absolutely.  Why don't we return at

6  11:00 o'clock, and then with lunch today, hard stop at

7  12:00 o'clock.  We'll have lunch right at 12:00.

8          (Recess taken from 10:48 a.m. until 11:02 a.m.)

9          THE COURT:  When do we get to watch the movie?

10         MS. GREENWALD:  We didn't bring popcorn, though we

11  could go get some quickly.

12     Your Honor, we don't have any further questions of

13  Dr. Portier, and I just wanted to say at this point, other than

14  Dr. Nabhan, who is obviously not coming until Friday, the

15  plaintiffs -- that's the end of our presentation.  The movie

16  now is our counter-designation to Monsanto's designations.

17  They're not our affirmative designations.

18     So thank you, and thank you, Dr. Portier.

19         THE COURT:  Sorry to keep you waiting during the

20  break.

21         THE WITNESS:  That's okay.  I needed a break.

22         THE COURT:  All right.

23         MR. LASKER:  Thank you, your Honors.

24     We will be presenting the video of Dr. Blair first, and

25  then Dr. Ross maybe after lunch.

PROCEEDINGS

1      I do want to make one clarification based on a question

2  Your Honor asked earlier.

3      Dr. Blair provided some testimony with respect to the

4  NAPP.  He was looking at the June 2015 data that he was looking

5  at numbers from that slide deck.  Most of the testimony in this

6  case relates to a later slide deck, a later analysis, which was

7  in August of 2015.

8      And so the discussion we've had acknowledges that have

9  been focused upon the data from that later slide deck that

10  later analysis is slightly different.  So if you hear numbers

11  that are slightly different, I just wanted you to understand

12  why that was.

13          THE COURT:  Okay, and so, if I remember correctly,

14  the August -- the August was the Brazil presentation, and June

15  was Canada?  Is that right?

16          MR. LASKER:  That's correct.

17          THE COURT:  Okay.  Whenever you're ready.

18  (Videotape was played but not reported.)

19          MR. LASKER:  That was amazingly timely, Your Honor.

20          THE COURT:  It was.  And Mr. Lasker, I kept -- I kept

21  feeling tempted to say -- to ask you to slow down.  But I have

22  a feeling you would have, just like in real life, you wouldn't

23  have listened to me.

24          MR. LASKER:  I do what I do, Your Honor.

25          THE COURT:  So we'll resume at 1:00 o'clock.

```
 1            THE CLERK:  Court is in recess.

 2   (Recess taken from 11:58 a.m. until 1:07 p.m.)

 3            THE COURT:  All right.  You going to try to slow down

 4   in the next deposition?

 5            MR. LASKER:  Actually, it's Mr. Griffis you're going

 6   to be hearing, so that's going to be fine.

 7            THE COURT:  Excellent.

 8            MR. LASKER:  We'll now be playing excerpts from the

 9   deposition of Dr. Ross.  Dr. Ross was a member of the

10   mechanistic subgroup for the working group.

11   (Videotape was played but not reported.)

12            THE COURT:  Quick question.

13       Are the documents that you all asked them about -- are

14   they going to be in the record?

15            MR. LASKER:  Yes, Your Honor, the parties have been

16   talking about that and submit them at the end of the day.

17            THE COURT:  Okay.  Great.

18            JUDGE PETROU:  Can someone tell us now what article

19   it was that he was the author number 68?

20            MR. WISNER:  It's the consensus statement about the

21   IARC's reliability issued in response to the glyphosate

22   manuscript.

23            MS. WAGSTAFF:  Would you like us to print you out a

24   copy of that now?

25            JUDGE PETROU:  That's fine.
```

1          **MS. WAGSTAFF:**  Oh.

2          **THE COURT:**  All right.  What's next?

3          **MS. PIGMAN:**  Monsanto calls Dr. Thomas Rosol.

4          **THE CLERK:**  Please remain standing and raise your

5    right hand.

6                      **THOMAS ROSOL**,

7    called as a witness for the Defendant, having been duly sworn,

8    testified as follows:

9          **THE WITNESS:**  I do.

10          **THE CLERK:**  Thank you.  Please be seated.

11       Go ahead and adjust your microphone so it's directly in

12    front of you.  And for the record, please state your first and

13    last name, and spell both of them.

14          **THE WITNESS:**  Thomas Rosol.  T-h-o-m-a-s R-o-s-o-l.

15          **THE CLERK:**  Thank you.

16                    **DIRECT EXAMINATION**

17    BY MS. PIGMAN

18    **Q.**  Dr. Rosol, please tell the Court what your profession is.

19    **A.**  I'm a veterinary pathologist, with expertise in

20    toxicologic pathology.  I was a Professor at Ohio State

21    University for 30 years, and retired.  And now I am a professor

22    at Ohio University College of Osteopathic Medicine, and

23    Chairperson of the Department of Biomedical Sciences.

24    **Q.**  What role does a veterinary pathologist play in the

25    analysis of animal toxicology data?

**A.**   Well, the first thing the veterinary pathologist does --
and typically, it's a board-certified veterinary pathologist,
because that's required by the regulators -- generates all the
data.  All the histopathology slides are reviewed.  And if the
animals, during their necropsy or autopsy, have gross lesions,
then a pathologist will look at those gross lesions also.  Then
the data is evaluated by data analyst, and sometimes
statisticians.  And then the data comes back to the veterinary
pathologist to interpret the stats and the data.

**Q.**   And you mentioned board certified -- board certification.
Are you board-certified veterinary pathologist?

**A.**   I am.

**Q.**   And is veterinary pathology is a medical specialty?

**A.**   Absolutely.  So first of all, I'm a veterinarian.  I went
to veterinary school, and practiced veterinary medicine.  I was
trained to diagnose and treat animal diseases; everything from
rats and mice, to dogs, to elephants.  A very exciting
profession.

     And then the other thing veterinarians routinely do in
their work is they compare everything they do to humans.  We
translate what we do to human medicine, because we learn from
human medicine, and human medicine learns from us.  It's
interesting from a medical-school perspective, which I am now
gaining, it doesn't work backwards like it does in veterinary
medicine.  So "translational science" is a very common term

1    used now:  To translate findings in animals to people.

2    **Q.**   And I want to be clear on this from the outset, Dr. Rosol.

3    Does rodent bioassay data predict cancer in humans?

4    **A.**   No, it does not.

5    **Q.**   What does it predict?

6    **A.**   Rodent bioassay data demonstrates whether a chemical is

7    carcinogenic in either a rat or a mouse.

8    **Q.**   And are there chemicals that are carcinogenic in rodents

9    that have been proven not to be carcinogenic in humans?

10   **A.**   Absolutely.  In fact, most of the drugs we take and many

11   of the chemicals we use every day are carcinogenic in rodents,

12   and have been shown not to be carcinogenic in humans.

13   **Q.**   How many rodent bioassay data reviews have you been

14   involved in, in your career?

15   **A.**   Intensive reviews, probably in the range of a hundred.

16       And then many, many other ones with subset data or

17   incidence data.

18   **Q.**   And have you used your expertise in the field to evaluate

19   the glyphosate rodent bioassay data?

20   **A.**   Yes, I have.

21   **Q.**   How many rodent bioassays did you look at?

22   **A.**   I examined 12 rodent bioassays:  Five mouse, and seven

23   rat.

24   **Q.**   If you could tell us, what is your opinion, Dr. Rosol?

25   **A.**   So my overall opinion that -- to the best of my ability

1  and scientific rigor, I found glyphosate to not be a carcinogen

2  in rats and mice.

3  **Q.**   And are you offering that opinion to a reasonable degree

4  of scientific certainty?

5  **A.**   Yes, I am.

6  **Q.**   And can you explain the slide we're looking at for us, and

7  how that led you to your opinion?

8  **A.**   Okay.   So initially I looked at each bioassay individually

9  and examined all the data, read the pathology reports, and made

10  my opinions of carcinogenicity on an individual basis.   And I

11  found as individual studies, none of them demonstrated to me

12  evidence of carcinogenicity in rats or mice.

13       Then I looked at them in toto, because we had -- had some

14  false-positive data that I interpreted.   And looking at them in

15  toto and looking at repeatability between the bioassays, it

16  helped confirm my original conclusion that none of the

17  bioassays demonstrate carcinogenicity.   So my overall opinion

18  after looking at all 12 bioassays is that glyphosate is not a

19  rodent carcinogen.

20  **Q.**   And in terms of those findings, how does the glyphosate

21  rodent dataset compare to other bioassay data that you've

22  reviewed?

23  **A.**   That's a great question.   So, as we've heard from -- from

24  others, this is an enormous dataset.   It's unprecedented.   I

25  have not been involved in a study where I've looked at 12

1  bioassays for the same chemicals.  So from that aspect, it was

2  very, very interesting to me.  And there was excellent

3  repeatability across the studies, between the 12 studies.

4  Q.  So is it one of the cleaner sets you've ever reviewed?

5  A.  That's exactly correct.  So it's very important to put

6  this dataset into perspective.  That I don't think has been

7  shared at this hearing up to this point in time.  This is one

8  of the cleanest sets of data I have ever evaluated in terms of

9  carcinogenicity.  And this is something I routinely do

10  throughout my life.  So from my perspective, this data is --

11  has no evidence of carcinogenicity.  And -- if you use the

12  proper methodology to interpret the data.

13  Q.  We'll talk a little bit more about that methodology in a

14  moment, but I want to ask a couple other questions before we

15  get there.  Over what period of time were the bioassays you

16  reviewed conducted?

17  A.  Over three to four decades.

18  Q.  And were the bioassays conducted by different

19  laboratories?

20  A.  Absolutely.  Multiple laboratories produced this data.

21  Q.  Did those two facts have any influence on the strength of

22  the opinion you're offering?

23  A.  Yes, it did.  And it -- it strengthened my opinion,

24  because multiple laboratories were involved, and there was

25  clear evidence of repeatability of the negative findings.

1    **Q.**   The Court has already heard that bioassays contain

2    different dose groups, so we won't go back over all of that,

3    but I do want to ask you how the high dose groups in rodent

4    bioassays you reviewed compare to anticipated human exposure.

5    **A.**   So as we mentioned, most rodent bioassays use the maximum

6    tolerated dose.  And this is usually hundreds to thousands of

7    times greater than the maximum human exposure.  And the goal

8    for this is to actually induce toxicity, and make sure there is

9    some toxicity.

10        It was also mentioned that a thousand milligrams per

11   kilogram per day is the maximum dose.  And those are now the

12   accepted OECD Guidelines.

13        However, there's one caveat to that that hasn't been

14   mentioned.  That is if the chemical or drug is expected to be

15   exposed to humans at that high of a dose, then the dose can go

16   higher.  And in this case, the dose -- or the expected exposure

17   in humans is much lower than that.  So a thousand milligrams

18   per kilogram per day would be the maximum amount, but we do

19   have some studies --

20            **THE COURT:**  I think this is probably a pretty dumb

21   question, but is it -- is it a one-to-one translation?  So a

22   thousand milligrams per kilogram for the animal, compared to a

23   thousand --

24            **THE WITNESS:**  No, no.  That's not correct.

25            **THE COURT:**  -- for the --

 1          THE WITNESS:  That's not correct.  So there are -- so

 2   dosage is given based on body area.

 3          THE COURT:  Mm-hm.

 4          THE WITNESS:  Okay?  And so a human's body area -- we

 5   have a less area per mass than a mouse.  So there are

 6   correctional factors for mice and rats.

 7      So, for example, if a dosage in a human was -- correct

 8   dosage was -- you know, to treat a disease, for example, was

 9   10 milligrams per kilogram per day, the dosage in a rat might

10   be 50; and in a mouse it might be 70.  So somewhere in the

11   range of five to ten is a correct correction for that, for the

12   different species?

13          THE COURT:  Okay.  And so when you're studying --

14   when you're doing a mouse or a rat study, you are making some

15   assumption about how much humans are being exposed to this?

16          THE WITNESS:  If you do it by body area; but now with

17   standard testing it's actually done better than that.  And what

18   they do is they use the -- the pharmacokinetic data, where you

19   actually look at the blood level of chemical in the animal

20   and in the person, and you get a curve.

21      You know.  You give a drug.  The blood level goes up, and

22   then it goes down.  And you measure the area under the curve;

23   the AUC.  And so you can very specifically say whether the

24   animal's getting a similar AUC than the human.  So it's much

25   better than doing this correction for body area.  So science

1    has advanced.

2         And then even with different sexes -- for example, the

3    area under the curve might be different in male animals than

4    female animals.  That's why it's so important to have both male

5    and female animals in the studies, is because males and females

6    may metabolize the drug very differently, or absorb the drug

7    very differently.

8              MS. PIGMAN:  You're going to be told to slow down in

9    about five seconds.

10             THE WITNESS:  Okay.

11             THE COURT:  And so part of what you're going to

12   present to us to today, I assume, are assumptions about what

13   kind of exposure humans are getting to glyphosate?

14             THE WITNESS:  No.  I deliberated over the animal

15   carcinogenicity.

16             THE COURT:  Okay, but those studies --

17        I mean, a decision about how much to dose the animal --

18   shouldn't be it based, in part, on how much exposure humans are

19   getting?

20             THE WITNESS:  Not necessarily.  The decision is

21   made -- so there's short-term toxicity studies.  And then these

22   are the long-term toxicity studies.  And so you base your

23   maximum dosage on what you find in the short-term studies.  And

24   in the short-term studies glyphosate is a very, very weak

25   toxin.  And you can give very, very high levels to animals.

1     So the studies went to the thousand milligrams per

2   kilogram per day, or even higher in some earlier studies,

3   because it's not very toxic.  And so you want to maximize the

4   ability for these assays to detect carcinogenicity in the

5   chronic studies.

6     So most chemicals are much more toxic than glyphosate, and

7   so the dosages are based on these AUCs.

8          **THE COURT:**  Okay.

9   **BY MS. PIGMAN**

10  **Q.**   Dr. Rosol, speaking of dose, were you in the courtroom

11  when doctor -- and did you hear Dr. Portier testify that the

12  only variable in a rodent bioassay is dose?

13  **A.**   Yes, I was.

14  **Q.**   Do you agree with that statement?

15  **A.**   No, I don't.  It's partially true.  And I think what

16  Dr. Portier meant to say was that the only dependent variable

17  is the dose of the chemical compound.

18     What was -- what really needs to be discussed is the

19  biologic variable.  In animal studies the greatest cause of

20  variability in the data is biologic variability, which we

21  absolutely cannot control for.  That's why there are 50 to 60

22  animals per group:  Because animals differ.  And even though we

23  use inbred animals, which are animals that are like

24  brother/sister matings for many generations to make the animals

25  very similar, we still have a tremendous biologic variability.

**ROSOL - DIRECT / PIGMAN**

1  **Q.**   The next question if we could put up the next slide,

2  please.   What findings do you expect to see in any rodent

3  bioassay?

4  **A.**   So in a way, rodents are like people.   Rodent bioassay is

5  the -- is the approximate life span of the rat or mouse.   And

6  so rats and mice -- as they get older, they develop cancer.

7  And about 30 to 40 percent of rodents will die of cancer if

8  they're allowed to live for their lifespan, just like in

9  people, just like in dogs, and just like in cats.   So we expect

10  cancer in these assays.   All right?

11      Some tumors develop to a greater level than other

12  neoplasms, but in these studies you can actually see neoplasms

13  from any cell in the body -- literally hundreds of different

14  kinds of tumors -- but some are more common than others.

15      Veterinary pathologists are used to this variability, and

16  we take that variability into account.   The terminology I use

17  for this is a "natural history."   Each type of tumor has a

18  natural history.   And this is how physicians and veterinarians

19  use the knowledge to diagnose and treat disease.

20      A good example is a person might say, *Oh, I have cancer*.

21  First thing I want to know is:   Exactly what kind of cancer is

22  that?   Because the prognosis of the patient is going to be very

23  different, depending on the cell type involved.

24      Now as so, every bioassay I looked at has cancer.   We

25  expect that.   Okay?   So we cannot assume that tumors observed

1  in the exposed groups are compound mediated, until we follow

2  the process the veterinary pathologists do to interpret the

3  data correctly.  And, as I mentioned, the first step is to do

4  statistics, and then follow the process to evaluate the data.

5      So assessment of whether tumors are observed, are compound

6  mediated, requires consideration of a number of factors that

7  we'll talk about shortly.

8  **Q.**  And if we could go to the next slide, I'd like to ask you

9  how many tissues.  You mentioned a lot.  How many tissues are

10  you evaluating in a bioassay?

11  **A.**  I don't expect you to actually read all of the words under

12  every tissue.  This is just for emphasis; that every tissue in

13  the body is examined, from the nose, to every part of the

14  gastrointestinal tract, to the brain, to all of the organs.

15  And so, in general, 35 to 40 different tissues are examined

16  from each animal.  Okay?

17      So every animal in each group is examined.  There are

18  eight groups, because there are four groups of males, and four

19  groups of females.  And this is approximately 16,000 tissues

20  that are -- that are evaluated by the veterinary pathologist.

21  This takes approximately six months.

22      So when a pathologist does one of these studies, including

23  all of the data analysis, interpretation, and report-writing,

24  because the reports are between 1- and 2,000 pages, it takes

25  about a year and a half for a pathologist to do a bioassay.

ROSOL - DIRECT / PIGMAN

1  **Q.**   And are statistical analyses performed at some point in

2  these bioassays?

3  **A.**   Yeah.  So, as I mentioned, the veterinary pathologist is

4  involved in the gross examination and the histologic

5  examination.  And this data is usually put into a computer

6  program.  And then the computer and the data is delivered to a

7  statistician.  A statistician then completes descriptive

8  statistics and inferential statistics.  The inferential

9  statistics are the different tests and p-values that we've

10  heard so much about.  Then the data's returned to the

11  veterinary pathologist.  They take that data, and they

12  determine biologic significance of the findings.

13      In terms of rodent bioassays, the biologic significance is

14  whether there was a chemically mediated effect.

15      Now, keep in mind the pathologist is not just looking for

16  tumors.  These are old animals.  And as people get old, we get

17  many diseases.  So the pathologist diagnoses all of the

18  degenerative conditions, all of the inflammatory conditions,

19  all of the preneoplastic conditions, and all of the cancer

20  conditions.  So each organ has many diagnoses.

21  **Q.**   And you mentioned false-positive a moment ago.  How many

22  false-positives do you typically expect to see in a rodent

23  bioassay?

24  **A.**   So in general, a good rule of thumb is that you expect one

25  false-positive for every 20 examinations.  There are many

1  hypotheses that are tested for carcinogenicity in these

2  studies, and so in my personal experience, I usually see two to

3  five false-positive incidences of cancer in a typical rodent

4  bioassay.

5          **JUDGE PETROU:**  And does that number stay, whether

6  you're talking about the control group or one of the treated

7  groups?

8          **THE WITNESS:**  This is a conclusion made by the

9  statistician on a particular neoplasm that includes the control

10  and dosage groups.

11          **JUDGE PETROU:**  Mm-hm.

12  **BY MS. PIGMAN**

13  **Q.**   Do false-positives typically occur in a specific tissue

14  type?

15  **A.**   No, they do not.  They'll occur in a -- these are

16  false-positives, so they're random.

17          Now, think about this unique dataset we have.  When I

18  usually am involved in deliberations over these kinds of data,

19  I'm looking at one mouse study and one rat study.  Okay?  There

20  might be two to five false-positives in the mice and in the

21  rats.

22          Now we have 12.  Okay?  So the number of neoplasms that

23  are false-positive are going to be very large.  And you can see

24  there's a number of different tumors in many different tissues

25  that are under consideration for these bioassays.  And I think

1    that absolutely reflects what I would have expected.  There are

2    very few carcinogens I have been familiar with that would

3    affect so many different tissues.

4    **Q.**   Dr. Rosol, if we could go to the next slide, please.  Are

5    there dangers in misinterpreting false-positive data?

6    **A.**   Yes.  And this is what the veterinary pathologist does.

7    Once we get the deliberations back on the statistics, then we

8    look at this data.  We follow a process.  And if he just look

9    at the statistics, you will improperly assume that the

10   statistical significance means a biological significance.  I

11   think that's what's happening in this case.  That's why we have

12   so much deliberation in this process.

13       It's scientifically invalid to ignore all of the other

14   factors that we take into consideration when we interpret the

15   data in a bioassay.  And so this creates misleading

16   interpretations of the data.  And this is why it's very

17   important to read the pathology report.

18   **Q.**   And now mentioned this factor --

19       Oh, sorry.

20       **JUDGE PETROU:**  So, Dr. Rosol, you said there were

21   very few carcinogens that you have familiarity with that affect

22   so many different tissue types.  Is that correct?

23       **THE WITNESS:**  That is correct.

24       **JUDGE PETROU:**  But I didn't get the follow-up on

25   that, which is that if you see it affecting so many different

1  tissue types, do you tend to say it's more likely or less

2  likely a carcinogen?

3        **THE WITNESS:**  If the effects are real or biologically

4  significant, then that would mean it was a very severe

5  carcinogen.  And this is very uncommon.

6       And if you look at the toxicity data in the short-term

7  studies, this is one of the safest compounds I've ever seen.

8  So it just doesn't fit.  They don't correlate.

9  **BY MS. PIGMAN**

10 **Q.**  So moving on to the next slide, which is your

11 methodology -- we're going to come back to this a little later

12 in connection with the specific tumor type -- but if you could,

13 just briefly highlight some of the factors that you look at as

14 a veterinary pathologist.

15 **A.**  Okay.  Yes.  And I generated this slide to give you a feel

16 for how I do this.  First I look at size and magnitude of

17 effect.  This is very important to me.  The effects in these

18 studies are very small.

19      Then I look for a dose-response, because the incidence

20 should increase with dose.

21      I look for precursor lesions and lesion progression that

22 we heard about in the earlier testimonies.

23      Historical controls are very important to me.  And

24 importantly, the variability in each historical control varies

25 between tumors.

1      I also take into consideration if we expect a neoplasm.

2   If you don't expect a neoplasm, it has been estimated that

3   p-values of .05 overestimate effects by at least 90 percent.

4   So this is an interesting statistical deliberation.

5      I look at the morbidity and survivability, which was not

6   very important, except in the Swiss mouse experiment, because

7   most of the animals survive until termination.

8      And what's really unique about this dataset is we can

9   evaluate repeatability.  I can look at seven rat assays that

10  were very similar, and five mouse.  This is unbelievable.

11  Q.   Are you aware of Dr. Portier's testimony earlier about

12  pooling data across these 12 bioassays?

13  A.   Yes, I'm aware that he pooled his data.

14  Q.   Is that a valid scientific practice in your area of

15  expertise?

16  A.   In evaluation of rodent bioassays by veterinary

17  pathologists, I have never seen anyone pool data; and I think

18  this is absolutely scientifically invalid.  And I noticed that

19  this was not referenced in any way.  And I noticed that

20  Dr. Portier does not publish in the peer-reviewed literature on

21  pooling of data.  So this is actually quite a surprise to me.

22  And I -- I think it's invalid, but actually it didn't affect my

23  decision-making in my interpretation of the data, either.

24  Q.   And I do want to talk now move about to lymphoma

25  specifically.  Does lymphoma spontaneously occur in mice?

1  **A.**   Yes.  Lymphoma is -- is a high-incidence entity in mice,

2  and it has a high degree of variability.  This is in contrast

3  to rats that have a very low incidence of lymphoma.

4  **Q.**   Why is lymphoma so common in mice?

5  **A.**   Great question.  We really don't understand all of

6  ramifications of that, but probably it relates to genetics of

7  the animal.  And mice are unique, in that there's a retrovirus

8  that can cause lymphoma in mice that rats do not have, so I

9  suspect that those are two of the major reasons.

10  **Q.**   And does that high background rate make mice a poor model

11  to test causation of lymphoma?

12  **A.**   Okay.  So we heard both sides of this a little bit.  So it

13  makes them a poor model for determination of carcinogenicity of

14  lymphoma, because of the high background and the high

15  variability.

16      It makes them actually an interesting model for studying

17  treatment of lymphoma, because they have lymphoma, so you can

18  actually treat it.  And in my laboratory I have done

19  experiments using human lymphoma in mice, which I find much

20  more valid than looking at mouse lymphoma to make translation

21  to human disease.

22  **Q.**   And do experts in your field consider rats a better model

23  to determine what causes lymphoma?

24  **A.**   A better model?  For carcinogenesis, if you see an

25  increase in lymphoma in rats, this would be stronger evidence

1    of a carcinogenic effect.

2    **Q.**    In the seven rat studies that you reviewed in the

3    glyphosate dataset, did you see any evidence of lymphoma?

4    **A.**    No, I don't.

5    **Q.**    All right.  If we could go to the next slide, Dr. Rosol, I

6    believe this is a summary of your review the CD-1 Mouse study

7    data.  Is that right?

8    **A.**    That is correct.

9    **Q.**    Can you explain to us what we're looking at?

10   **A.**    Yeah.  So this is a rather complicated slide.  And what

11   the bars represent is the dose in the high-dose groups.  Okay?

12        So we have two high-dose groups.  And these are, again, in

13   the four mouse studies with glyphosate.  We have two high-dose

14   groups that are 4900 and 4300; so very high doses.  And then we

15   have two groups 988, and 810.  So close to a thousand.  Okay?

16        Two of these studies are 24 months, and two are 18 months,

17   but what I want you to do is look at those numbers at the

18   bottom of the page.  This is what I would get, as a

19   pathologist.  I'm looking at the incidence data for lymphoma in

20   four different studies of CD-1 mice.  And you can see this

21   incidence.  And when you look -- see, you never have the luxury

22   of looking at this much data.  2542.  Those numbers are the

23   same.  2206.  Also the same.  4216.

24        And so if you randomize these numbers, that's actually

25   what's happened here.  And if you just focus on the last count,

**ROSOL - DIRECT / PIGMAN**

1    0125, this might look like a dose-response, when it absolutely

2    isn't; because these aren't the numbers you need to diagnose a

3    biologically significant effect of lymphoma in mice.

4         Me and my piers would look at this data and say, *This is*

5    *an absolutely clean set of data*.

6    **Q.**   And when you say the numbers are all the same, can you

7    just explain a little more what you mean by that?

8    **A.**   Yes.  So in CD-1 mice, I would expect a number of

9    incidence anywhere from zero to six.  And probably I would

10   accept zero to nine, based on the historical data I have seen

11   in these datasets.  So these numbers, zero to six, could be

12   randomized in any group.  And that's what we have here.

13   **Q.**   And going back to an issue we talked about a moment ago --

14   and we can go the next slide -- how do the doses used in these

15   studies compare to EPA estimate of potential human exposure?

16   **A.**   So as I earlier mentioned, so the highest exposure

17   estimate for occupational handlers is 7 milligrams per kilogram

18   per day.

19        And what I find interesting -- something I learned from

20   these deliberations was that -- was that there was a cutoff in

21   the epidemiology data at two days per year of exposure.

22        Now, keep in mind these mice -- every bite of food they

23   took, they were eating glyphosate.  Okay?  So they usually eat

24   eight to twelve hours a day.  And so they have this exposure

25   365 days a year, at ten to a thousand times fold; the dose

1  that's considered the maximum exposure.  So a very different

2  kind of experiment.

3          **THE COURT:**  The could you repeat the part about the

4  maximum exposure in humans, and where that comes from?

5          **THE WITNESS:**  That -- that comes from the EPA report.

6  I think that's a 2017 report from the EPA.

7          **THE COURT:**  And what is it again?

8          **THE WITNESS:**  It's 7 milligrams per kilogram per day.

9          **THE COURT:**  Okay.

10 **BY MS. PIGMAN**

11 **Q.**   And the Court has already heard a little bit about the

12 Swiss mouse study.  We can go through that one pretty quickly

13 if we can have the next slide.  Did you review that, as well?

14 **A.**   I did review that.

15 **Q.**   What was your ultimate conclusion?

16 **A.**   My conclusion was that there was not evidence of a

17 carcinogenic effect with a cause of lymphoma based on these

18 data.  Keep in mind the Swiss mice have a much higher

19 background level than we expect in the CD-1.

20 **Q.**   Stepping back from lymphoma for a moment, did you apply

21 the same multifactorial methodology we've been discussing to

22 your review of all of the incidence data in the glyphosate

23 bioassay dataset?

24 **A.**   I used my same methodology that all veterinary

25 pathologists use for all of the data that were in the 12

1  datasets.

2  **Q.**   And if we could go to the next slide, please.  Tell us

3  what you concluded after that review.

4  **A.**   So I analyzed these eight factors in relation to the

5  natural history for the neoplasms for the different species and

6  different tissues.  I found no compound mediated effect in any

7  of the 12 studies.

8  **Q.**   Are you aware of any other scientific groups that have

9  applied the same methodology you did, and reached the same

10  conclusion?

11  **A.**   Absolutely.  Every publication I read in *Toxicologic*

12  *Pathology*.  All of the pathologists I work with.  This is the

13  approach that's time honored.  It's over 50 years old.  Every

14  study I read in *Toxicologic Pathology* uses this -- uses this

15  analysis.

16  **Q.**   And are you aware of any other groups or regulatory

17  agencies that have applied this methodology specifically to

18  glyphosate?

19  **A.**   So as I was able to read the pathology reports, all of the

20  pathologists for the 12 studies used this methodology.  And

21  they found no compound mediated effect.

22      The EPA used this methodology.  EFSA used this

23  methodology.  So many other groups have used the same

24  methodology.  I think if any person or group or veterinary

25  pathologists uses this methodology, they will come to the same

1    conclusion I and others have.

2              MS. PIGMAN:   Okay.   Unless there are further

3    questions, we'll pass the witness at this time.

4              MS. WAGSTAFF:   Dr. Rosol, I don't anticipate

5    referencing it, but do you want a copy of your deposition

6    transcript?

7              THE WITNESS:   Sure, if you've got it.

8              MS. WAGSTAFF:   And your Expert Report?

9         And if I use it, I'll give Your Honors a copy, unless

10   you'd like one now.

11             THE COURT:   Doesn't matter.

12             MS. WAGSTAFF:   Okay.

13                    **CROSS-EXAMINATION**

14   BY MS. WAGSTAFF

15   Q.   All right.   Dr. Rosol, my name's Aimee Wagstaff.   We've

16   never met before; have we?

17   A.   I don't believe so.

18   Q.   So you've been here for a few days.   Right?

19   A.   I arrived on Sunday.

20   Q.   Okay.   So you saw -- were you in the courtroom when

21   Dr. Jameson testified?

22   A.   I was in the courtroom on Tuesday and Wednesday.

23   Q.   Okay.

24   A.   So yes.

25   Q.   Yes, you were.   So did you hear Dr. Portier testify, as

1   well?

2   **A.**    That is correct.

3   **Q.**    Okay.  Excellent.  And in your report you referenced the

4   1983 Monsanto Mouse Study.  Right?

5   **A.**    That is correct.

6   **Q.**    Okay.  And you I think said in your deposition -- and I'm

7   paraphrasing you, but you said that there was one specific

8   control-group tumor that was interesting to you.  Do you

9   remember that?

10  **A.**    I'm not sure what you're referring to.

11  **Q.**    Okay.  So did anything stand out to you about the 1983

12  control-group tumors in that study?

13  **A.**    For which type of tumor are you referring to?

14  **Q.**    Renal.

15  **A.**    Yes, I do remember the data from that study.

16  **Q.**    Okay.  What do you remember about that renal tumor?

17  **A.**    So there was quite a bit of deliberation over that

18  neoplasm.  So I remember that the original dataset was that

19  there were no control tumors.

20  **Q.**    Right.

21  **A.**    There was one in low-dose.  No.  You know, I may be

22  mistaken.  Can I look in my --

23  **Q.**    Sure, of course.

24  **A.**    -- report?  It was like zero one zero three, or zero zero,

25  but I have to -- I'll find out.  I don't know if I have that in

ROSOL - CROSS / WAGSTAFF

1   my report.  There was either one tumor in the low-dose, or the

2   mid-dose.  I think it was in the mid-dose, but I'm not sure.

3   If you could refresh my memory what this -- incidence level

4   was.

5   **Q.**   Well, let me just kind of step back.  I think you

6   mentioned to Ms. Pigman earlier that one of the things you do

7   in your analysis is that you look at the slides.  Right?

8   **A.**   I looked at the slides?

9   **Q.**   Yeah.

10  **A.**   No.  I looked at the data.

11  **Q.**   Okay.  So do you know if those slides exist in the 1983 --

12  **A.**   I would assume they exist somewhere.

13  **Q.**   Okay.  Would you be surprised that I've actually seen

14  them?

15  **A.**   No, I wouldn't be surprised.

16  **Q.**   Why haven't you seen them?

17  **A.**   I don't need to see them.

18  **Q.**   Okay.  So even though there was great debate over them by

19  both the EPA, there was a Pathology Working Group over them, we

20  filed a motion to compel to see them, it didn't cross your mind

21  that maybe you might want to look at them?

22  **A.**   Not at all.  So I've served on many Pathology Working

23  Groups.  This is an excellent process to reach consensus on a

24  final diagnosis.  I know some of the pathologists that were on

25  that actual Pathology Working Group.  I have complete

1  confidence in their interpretation of the neoplasms.

2  **Q.**   But it wasn't important for you to actually lay your eyes

3  on them?

4  **A.**   No.

5  **Q.**   Okay.  Now let's go to something we probably agree on.

6  You heard both Dr. Jameson and Dr. Portier testify.  So you

7  heard Dr. Jameson say that the toxicology is used to determine

8  if a chemical is an animal carcinogen.  Right?

9  **A.**   I don't know exactly what process he uses.  I can describe

10 the process I use.

11 **Q.**   Okay.  Well, would you agree that toxicology is used to

12 determine whether or not an agent is an animal carcinogen?

13 **A.**   Toxicology is a science.  And toxicologists design

14 experiments --

15 **Q.**   Mm-hm.

16 **A.**   -- to assess carcinogenicity.

17 **Q.**   In animals?

18 **A.**   In animals.

19 **Q.**   Okay.  Excellent.  And you heard Dr. Jameson testify to

20 that.  Correct?  We can -- I mean, that's a pretty basic

21 toxicology principle.  Right?

22 **A.**   Yes.

23 **Q.**   Okay.  And you -- you also heard Dr. Jameson testify that

24 you then used the epidemiology to determine the tumor site in

25 humans.  Right?

1    **A.**    I believe I heard that.

2    **Q.**    Okay.  And didn't look at the epidemiology literature in

3    this?

4    **A.**    I'm a veterinary pathologist.  I focused on what I am an

5    expert in.

6    **Q.**    You didn't look at the epidemiology in this case.  Right?

7    **A.**    I only read some of the general knowledge and read the

8    IARC report.  So I read some information, but I do not proffer

9    an opinion on epidemiology.

10   **Q.**    Okay.  So you didn't rely on epidemiology in your opinion.

11   Correct?

12   **A.**    Absolutely not.  I only evaluated the data from the 12

13   bioassays, and made my opinion on carcinogenicity.

14   **Q.**    Okay.  Excellent.  And you mentioned earlier that there

15   were chemicals that are carcinogenic in rodents, but not in

16   humans.  Do you remember testifying to that --

17   **A.**    Yes.

18   **Q.**    -- a few moments ago?  Just -- what's an example of one?

19   **A.**    Oh, sure.  There are many examples.  So I don't know.  Are

20   you familiar with GLP-1 agonists?

21   **Q.**    No.  I mean, I'm going to take your word for whatever you

22   say.

23   **A.**    Well, GLP-1 agonists are a brand new drug.

24   **Q.**    I just need to know the name of one.

25   **A.**    GLP-1 agonist, parathyroid hormone are two examples I've

1   been very recently involved in.  And the GLP-1 --

2        (Reporter requests clarification.)

3        **THE WITNESS:**  And this is -- these are new drugs for

4   diabetes.  And when these drugs were being developed by

5   multiple pharmaceutical companies, they found that they induced

6   cancer in rats in the thyroid glands.  And then another company

7   developed a very similar drug, and it induced thyroid cancer.

8   So it was very clear that this class of drugs induces cancer in

9   had both rats and mice.  So obviously the FDA is very

10  concerned.

11       And once we recognize a carcinogen in a rodent, then you

12  have to determine the mode of action before you can determine

13  human relevance.  To determine the mode of action requires

14  experiments over five years or more.  So all of the

15  pharmaceutical companies got together and figured out the mode

16  of action.

17       And to make a short story -- make a story short, they

18  found that this was due to binding of the drug to certain cells

19  in the thyroid gland.  This only happens in rats and mice.

20  Doesn't happen in dogs, doesn't happen in primates, and doesn't

21  happen in people.

22       Now all these drugs are on the market, and helping

23  diabetic patients.

24  **Q.**   Okay.  And I'd actually didn't write down the name of

25  that.  What was it?

ROSOL - CROSS / WAGSTAFF

1   **A.**   GLP-1 agonist.

2   **Q.**   Okay.  And what does the epidemiology data say for GLP-1

3   agonist?

4   **A.**   So it's interesting.  So since it does cause cancer in

5   rodents in the thyroid gland, the FDA still requires that

6   post -- post registration of that drug, they're checking the

7   patients for thyroid tumors.  And they do that with a

8   biomarker.

9        To the best of my knowledge, they actually haven't found

10  any tumors induced by those drugs, but they're looking for it.

11  Now, what's interesting is in the process of looking for these

12  tumors, they've actually identified patients that spontaneously

13  developed thyroid tumors.  The thyroid tumors were removed, and

14  they were cured.  So it's just an amazing story.

15  **Q.**   There's really no epidemiology data for that one?

16  **A.**   I don't -- I am not knowledgeable on epidemiology.  Yeah.

17  **Q.**   Okay.  Excellent.  All right.  And you know we're not

18  challenging your qualifications here.  I'm sure you're a very

19  fine veterinary pathologist to render this opinion.  We're

20  actually not really even challenging your conclusions or your

21  methodology too much.

22       What we're most concerned -- I wouldn't say "concerned" is

23  the right word -- just curious about is the time you spent in

24  Brussels.  So if we could talk a little bit about that --

25  **A.**   Sure.

1    Q.    You went over to a Reading Room.  Correct?

2    A.    That's what it was called.

3    Q.    Orbing.  And this Reading Room houses the data for all

4    these 12 cases that we've been talking about.  Right?

5    A.    Well, the data from the 12 bioassays --

6    Q.    Mm-hm.

7    A.    -- were present electronically on individual computers in

8    the Reading Room.  This was available to anyone who wanted to

9    go.  I chose to go.  And it was very easy to go.  You basically

10   just signed up online.  You could sign up for up to four half

11   days.  I signed up for four half days.  And I looked at this

12   data.  And this was some of the data that I used in my

13   deliberations.

14        But what's very interesting is -- is once I examined all

15   the incidence data that was available, I actually didn't need

16   to go to the Reading Room, but I'm still glad I went.  And the

17   information weighed in on my decision.

18   Q.    And it would probably be easy to go -- you're right --

19   if -- if it wasn't just open for six weeks, and not publicly

20   known to people.  I mean, how did you find out that it was even

21   open?

22   A.    I don't remember.

23   Q.    You don't remember if you were researching or --

24   A.    I probably -- I probably was informed by Hollingsworth

25   counsel.

1  Q.   Okay.  And it was open from August 24th, 2016, to

2  Halloween of that year; so about six weeks.  Is that right?

3  A.   I don't recollect the opening hours.

4  Q.   And that was right around the time when you were drafting

5  your Expert Report.  Right?

6  A.   I completed my Expert Report July 31st.

7  Q.   Okay.  And so you spent -- I think you testified -- around

8  12 hours --

9  A.   Correct.

10  Q.   -- ish.  I mean, I'm not going to hold you to that, but

11  around 12 hours.  Right?

12       And you looked at the data for all 12 rodent cases?

13  A.   Well, let me clarify this.  So first of all, this was a

14  room with a long table that had approximately 10 computers on

15  this table.  Okay?  All of the data was on the computers.

16  Okay?  So I was monitored.  When I was in the room, usually

17  there was only one or two other persons in the room that were

18  examining the data.  And these were the slowest computers you

19  can imagine.  Okay?  And you can look at one screen at a time.

20  Q.   Okay.  So --

21  A.   And so if each report is 1,500 pages, you can imagine how

22  much data I actually got to examine in these two days.  Not

23  very much.

24  Q.   Right.  So how many --

25  A.   I actually wrote this all down in my notes, so you can

1  actually see all of the data that I examined.

2  Q.   Sure.  So how many pages do you think -- do you think you

3  actually went through?

4  A.   Well, the most important thing that I wanted to read that

5  actually wasn't necessary for my conclusion is I wanted to read

6  my peers -- other veterinary pathologists -- how they

7  interpreted the data, and how they reached these conclusions.

8       So the first thing I did was to read the pathology

9  reports, which was approximately 30 pages for each study.  This

10  was something I could easily accomplish in the first day.

11      Then I selectively I went through some of the data in the

12  other studies -- I mean in the 12 studies.

13  Q.   Okay.  So I was just -- I just went and got my calculator.

14  Sorry.  You said that you did 30 times 12.  Right?  So that's

15  360 pages of pathology reports.  Is that right?

16  A.   Mm-hm.

17  Q.   And then how many other pages do you think you reviewed?

18  A.   Oh, I don't know.  I looked at summary data.  So -- and

19  when I looked at the summary data, I actually wrote it down.

20  So this is -- was a very slow process.  Right?

21  Q.   Sure.

22  A.   And so I took approximately 50 handwritten pages of notes.

23  And I would guess I looked at 10 to 20 pages of summary data

24  for each study.

25  Q.   Okay.  So that's another 150 pages or 200 pages, so

1  around -- you've looked at around 600 pages.  Right?

2  **A.**   Yes, but actually that summary wasn't very useful to me.

3  Why?  Because -- because I could only write down some of the

4  data, but I wanted to have samples of the data I looked at.

5       So all of this data that I looked at, except for pathology

6  reports, is present in Greim in the supplementary data.  So I

7  actually came back and relied more intensely on Greim to finish

8  my deliberations, because the data I actually wrote down in the

9  Reading Room was not sufficient for me to complete my

10 interpretation.

11 **Q.**   Okay.  Do you feel like your opinion is more credible than

12 Dr. Jameson, and/or Dr. Portier because you visited this

13 private Reading Room?

14 **A.**   No, absolutely not.  My opinion is more credible because I

15 used the proper evaluation of the data to reach my conclusions.

16 The Reading Room -- the Reading Room pathology reports did not

17 influence my interpretation, but it is nice to see that all of

18 the other pathologists on all 12 studies agreed with my

19 interpretation.

20 **Q.**   Okay.  So would it be fair that around -- you reviewed

21 around 600?  I don't want to put words in your mouth.

22 **A.**   I really couldn't tell you how many pages.

23 **Q.**   Okay, but we would agree that there are -- I mean, I think

24 in just the 1983 study, alone, there are around 4,000 pages.

25 Isn't that right?

1  **A.**   Right.  And keep in mind that this -- these were old

2  computers with monochrome screens.  And you hit the arrow, and

3  you'd get the next page.  And you'd hit -- I mean, it was

4  excruciating.

5      And actually, the computers went down on the first day.

6  So for an hour and a half I couldn't even look at the data.

7  So, like I said, this was not important for me to make my

8  conclusions.

9  **Q.**   But -- so at most, I mean, you probably reviewed 1 percent

10 or something of what was over there.  Right?

11 **A.**   I reviewed a small percentage of the data.

12 **Q.**   Okay.  And it wasn't important for you to stay and review

13 more?  I mean, you had this data no one else has access to.

14 You didn't want to review it all?

15 **A.**   No.  I was ready to leave after two days.  I had what I

16 needed.

17          **THE COURT:**  Jeez.  In your Expert Report you made it

18 sound so fun.  It was like -- it was as if you were vacationing

19 in Tahiti.

20          **THE WITNESS:**  I had a couple nice dinners.

21 **BY MS. WAGSTAFF**

22 **Q.**   So have you reviewed any slides in your -- in your -- the

23 preparation of your Expert Report?

24 **A.**   No, I haven't.  In this kind of work I rarely look at

25 slides.  I do look at slides when there are disagreements in

1  diagnoses.  And I participate routinely in Pathology Working

2  Groups.

3          **MS. WAGSTAFF:**  Okay.  And there was -- well,

4  actually, strike that.  No further questions.

5          **THE COURT:**  Anything further?

6          **MS. PIGMAN:**  Nothing.

7          **THE COURT:**  Thank you.

8      We were thinking maybe we'll take a break, and then go

9  until 3:00 or 3:15; something like that.  So why don't we

10  take -- why don't we resume at 20 after?

11          **MR. GRIFFIS:**  Thank you, Your Honor.

12          **THE CLERK:**  Court is in recess.

13  (Recess taken from 2:13 p.m. until 2:26 p.m.)

14          **THE COURT:**  All right.  What's next?

15          **MR. GRIFFIS:**  Monsanto calls Dr. Chris Corcoran.

16          **THE CLERK:**  Please raise your right hand.

17                          **CHRISTOPHER CORCORAN**,

18  called as a witness for the Defendant, having been duly sworn,

19  testified as follows:

20          **THE WITNESS:**  I do.

21          **THE CLERK:**  Thank you.  Please be seated.  And for

22  the record, please state your first and last name, and spell

23  both of them.

24          **THE WITNESS:**  Sure.  It's Christopher.

25  C-h-r-i-s-t-o-p-h-e-r.  And the last name is Corcoran.  It's

CORCORAN - DIRECT / GRIFFIS

1    C-o-r-c-o-r-a-n.

2            THE CLERK:  Thank you.

3            MR. GRIFFIS:  Slide please.

4                   **DIRECT EXAMINATION**

5    BY MR. GRIFFIS

6    Q.   Good afternoon, Dr. Corcoran.

7    A.   Good afternoon.

8    Q.   You have a doctorate in biostatistics from Harvard

9    University.  Right?

10   A.   Yes.

11   Q.   Could you show us on the map which is Slide 2 where it is

12   that you work, sir?

13   A.   I'm sorry.  I just noticed that when Dr. Neugut was here,

14   that Utah actually appeared on that map, so I was kind of

15   excited about it.

16           THE COURT:  That doesn't seem like where Utah

17   actually is.

18           THE WITNESS:  No.  I said the same thing.  Apparently

19   Utah is south --

20           MR. GRIFFIS:  It's someone's mental map, I guess.

21           THE WITNESS:  There you go.

22   BY MR. GRIFFIS

23   Q.   Sir, we've heard some attacks on you over the last few

24   days.  So I'd like to spend just a minute on why it is that

25   people should listen to you about the opinions that you've

1  given in your Expert Report.  Could we have your qualifications

2  slide, please?  I hope this is showing up in a more centered

3  way on other monitors.

4  **A.**   Mine is a little off center.

5  **Q.**   We're good.

6  **A.**   We're good.  Well --

7  **Q.**   Go ahead, sir.

8  **A.**   I'm sorry.  Should I go ahead?

9  **Q.**   Absolutely.

10  **A.**   Well, I was kind of relieved this morning because when

11  Dr. Portier was testifying, he acknowledged that he thinks I am

12  qualified from a statistical standpoint, so that was a relief;

13  but I guess one thing I want to point out is that I'm here to

14  evaluate the statistical evidence from the rodent

15  carcinogenicity studies.

16       All of the charts that Dr. Portier showed with -- that

17  were filled with p-values for, you know, his logistic

18  regression models for his trend test -- that's actually my

19  dissertation was about.  So my dissertation -- my doctoral

20  dissertation at Harvard was about trend tests for these kinds

21  of dose-response experiments; and specifically, with specific

22  focus on what to do when you're analyzing small samples, and

23  what to do when you're analyzing samples that come from

24  different sources, like, say, in this case, from different

25  studies.  So that's my area.  That's one of my areas of

1  research expertise.

2  **Q.**    Have you been involved, sir, in creating industry

3  standards for analyzing samples when events are rare?

4  **A.**    Well, yeah.  For example, one of the trend tests that I

5  created as a part of my doctoral dissertation almost 20 years

6  ago that was published had to do with this exact setting, you

7  know:  What to do when you have rare outcomes or uncommon

8  events you're looking at, like some of the tumor types we're

9  talking about here for glyphosate, for these glyphosate

10 experiments.  But what to do when you have to compute a trend

11 test when the samples sizes are small, and you have this kind

12 of -- this kind of within-study -- these within-study

13 differences that we have heard about throughout the testimony

14 over the past few days.  How to handle them.

15     And before my -- before I solved this problem with my

16 advisor, there was no option for this.  And so this area of

17 small-sample inference statistical analysis is basically in a

18 trend test is something that I have a lot of expertise and

19 experience in.

20 **Q.**    And have you had NIH -- National Institute of Health --

21 grants to develop tests for regression with small samples and

22 rare outcomes, sir?

23 **A.**    Yeah.  I've -- well, this total really represents the sum

24 total of all NIH-funded grants.  I've worked on a lot of

25 collaborative projects having to do with risk for Alzheimer's

1  disease, cognition in aging, hip fracture among the elderly,

2  autism, cancer, and other chronic diseases.  So I've worked on

3  these large, complex, interdisciplinary projects that have been

4  funded by the NIH.

5       But two major NIH grants that I've had over the past, you

6  know, I'd say decade -- actually, I guess you could argue

7  three, but at least two grants have to do specifically with

8  this methodology -- logistic regression -- and doing trend

9  tests, basically, when you have outcomes that are relatively

10 uncommon.

11 **Q.**   Okay.  Let's apply your expertise, sir.  And would you --

12 I'm not going to recapitulate your whole Expert Report, of

13 course, but would you please summarize your critique of

14 Dr. Portier, please?

15 **A.**   Sure.  My independent evaluation, after having read his

16 Expert Report along with the material that was in the

17 appendices of his Expert Report -- you know, we've been in the

18 weeds a lot the last few days, so I want to try to kind of

19 categorize these problems in a way that helps us to kind of

20 identify what the broad problems are.

21      And so, you know, consistent, I think, kind of with my

22 Expert Report, which has more detail, I think I'd classify

23 these problems in three categories.  I mean, one is just the

24 inconsistency from, you know, throughout his evolving analyses;

25 that he hasn't used a consistent approach.  He's responded and

1  reacted to other criticisms, but it's been kind of a -- you

2  know -- a moving-goal-post kind of endeavor.  His analyses have

3  evolved.

4      I think the second, which is a really serious problem, is

5  this pooled approach that he's using, which is completely

6  flawed.  And -- and, you know -- and I think it has -- has kind

7  of a big bearing on his conclusions.

8      And the last, which I think is the overarching problem and

9  the most serious problem, is what in statistics we call a

10  "multiple testing problem" or "multiplicity problem" that --

11  we've heard that talked about on and off for the past few days,

12  as well.

13      But you know, the problem is:  What do you do when you

14  compute hypothesis tests for, in this case, hundreds, perhaps

15  even thousands, of outcomes?  How do you handle that?

16      And there are some conventional statistical approaches

17  that are used and that we teach, you know, in universities and

18  so on, that I teach to my students when I teach courses in

19  categorical data analysis; but there are conventional

20  approaches that are used; are widely accepted, you know, in

21  research circles.  And those adjustments were not applied here,

22  which is of major concern, because of the -- you know, there's

23  a lot of other people to talk about because the possibility of

24  having these spurious associations that have nothing to do with

25  glyphosate-related effects.

CORCORAN - DIRECT / GRIFFIS

Q.    Okay.  Dr. Corcoran, lots of people in this room know that
peer review is one of the things that Judges consider when
they're deciding whether scientific evidence is reliable or
not.  And I don't expect you to comment on the legal standard,
but is it the case that Dr. Portier's method has gone -- method
with regard to glyphosate has gone through a sort of peer
review?

A.    Yeah.  Well, I think that's one of the things here that's
interesting, is that, you know, as far as the statistical
analysis goes for these toxicology studies, there has been no
peer review to this point.  I mean that's, I think, more or
less what this is kind of about.

Q.    Some of his piers have been commenting, though.  Right?

A.    Right.  I mean, there hasn't --

I'm sorry.  Let me rephrase that.  There hasn't been a
peer review of the sort that I would expect if I sent a paper
to a journal with the results that -- you know, that he has or
that I have.  So that formal process hasn't happened.

But it's happening kind of, I guess you'd say, on an
ongoing basis, as his analyses have evolved, you know,
beginning -- beginning with his work with the IARC Working
Group, and continuing through these Expert Reports that he's
produced.

So, you know, it's -- I guess what I want to emphasize --
it's not just me.  You know, I've done my own independent

1  evaluation of his work, but as I've examined his Expert Report,

2  and especially the material that came with the Appendix, there

3  have been other -- there have been other researchers in the

4  field who, you know, even have, perhaps you'd argue, more

5  direct experience than I have with toxicology directly, like

6  Dr. Tarone and Dr. Haseman.  And their conclusions have been

7  negative.

8  **Q.**   Okay.  Without getting into the weeds about the

9  biostatistics critiques of Dr. Tarone and Dr. Haseman and the

10  responses and so on, would you just acquaint us briefly with

11  what it is that Dr. Tarone said?

12  **A.**   Right.  Dr. Tarone -- and again, this was part of my

13  review of Dr. Portier's Expert Report, because this was in the

14  Appendix.  Dr. Tarone -- you know, Dr. Tarone responded.  I

15  mean, I think he published a paper about the IARC results, but

16  this was just some brief correspondence of his.  And he

17  criticized the use of the approximate trend test, which, you

18  know, we don't need to get into too much technical detail,

19  because I've outlined, you know, the rationale for the

20  approximate versus the exact test in my Expert Report.

21  **Q.**   Dr. Tarone said that an exact test should have been used

22  by Dr. Portier instead of an approximate test?

23  **A.**   Right.  That's right.  And he had, you know, a couple of

24  other criticisms.  One is that he was wondering why negative

25  affects were ignored, for example; why we're only looking just

1  in one direction, when there are -- there are a bunch of

2  incidence -- I guess tumors where there was decreasing

3  incidence across dose groups.

4      Dr. Haseman -- he had -- he shared a couple of those

5  criticisms, but he also -- he also referred to the pooled

6  analyses that Dr. Portier was doing as fatally flawed -- is the

7  way he put it.  And he also said that historical control

8  approach that he was using was flawed.

9      And again, I don't want to go onto the -- some of the

10  technical reasons for that, because they're all contained in my

11  Expert Report, but my independent conclusions --

12      Oh, and I guess another criticism Dr. Haseman had was the

13  multiple testing comparisons; that there wasn't really a good

14  accounting for that.  In fact, it was that criticism, I think,

15  that led to Dr. Portier's inclusion of his Table 15, you know,

16  in his -- in his report that we've -- there's been a little bit

17  of discussion about today.

18  **Q.**   Dr. Portier keeps adjusting to respond to these

19  criticisms?

20  **A.**   Right.  Kind of -- his approach is moving along and

21  evolving, but the bottom line is that there hasn't been kind

22  of -- there it wasn't an *a priori*, you know, strategy or a

23  consistent approach to any of these analyses.  They've just

24  kind of evolved as time has passed.

25  **Q.**   Okay, sir.  Let's go to Slide 6, and talk about some

CORCORAN - DIRECT / GRIFFIS

1    examples of inconsistent methodology that you identified in

2    your Expert Report.

3    **A.**    Well, yeah.   I reviewed some of these in my Expert Report,

4    but, for example, you know, toward the beginning he was using

5    the approximate trend test.   Now, you know, he acknowledged the

6    exact trend test was useful, and he started using it in some of

7    his subsequent analyses, but it's still a problem, I mean, for

8    two reasons.

9         One is Dr. Jameson.   You know, in his results I was

10   interested to see yesterday that he's still using the

11   approximate test, even though, you know, Haseman, Tarone,

12   several other people that we've had -- you know, other people

13   who have testified -- have talked about how it's important to

14   use the exact.

15   **Q.**    That last slide of Dr. Jameson's where he was showing:

16   These are the --

17   **A.**    Right.

18   **Q.**    -- the ones that I consider to be statistically

19   significant p-values?   Those were from the approximate; not the

20   exact test?

21   **A.**    He was using an approximate p-value, which, as I pointed

22   out in my Expert Report, and as Haseman pointed out, and Tarone

23   pointed out, that can vastly underestimate the actual p-value.

24   And so it can lead to a large excess of spurious associations.

25   So it's still a problem now.

1        It's also a problem for -- you know, in terms of

2   Dr. Portier's Rebuttal Report, because he used -- you know, he

3   responded to my critique.  And he used a logistic regression.

4   He described that during his testimony yesterday; but again,

5   he's noted using exact logistic regression there.

6        So he was right that if you use logistic regression in the

7   right way, it can allow you to do a trend test or accomplish

8   the same purpose as a trend test, but he used the approximate

9   version of the logistic regression model, so we're kind of back

10  at square one.  In other words, we still have this

11  exact-versus-approximate problem.

12  **Q.**   Okay.  What's next, sir?

13          **JUDGE PETROU:**  Wait.  Before we go to what's next, I

14  just want to understand, because you're complaining about him

15  using inconsistent methodology; saying, *Then it was an*

16  *approximate trend test.  Now* -- I'm not quite sure when then

17  and now are; but in any event, now states that context.  But if

18  I understand your testimony correctly, you think it's a good

19  thing that he's how using the exact trend test?

20          **THE WITNESS:**  Yeah, but it's still problematic for

21  two reasons.  One is that it's still is a problem now, because

22  he's still using approximate version of the trend test with

23  those logistic regression results that he showed the other day.

24  So he wasn't using exact logistic regression, which, again, is

25  another thing for the -- that was a focus of my, you know,

 1   dissertation.  So I -- that's something I know quite a bit

 2   about.

 3        But the second issue is just a kind of a history of

 4   inconsistent --

 5            **JUDGE PETROU:**  No.  I heard that.

 6            **THE WITNESS:**  Yeah -- methodology.  So that's the

 7   reason.

 8        Yes, I'm happy when somebody's using that, but it's still

 9   not being used uniformly now.

10   **BY MR. GRIFFIS**

11   **Q.**   What's the next example, sir?

12   **A.**   Well, you know, the IARC Monograph.  I mean, you know, I

13   have to admit I'm a little bit confused by this, because I --

14   you know, what I heard -- what I've heard testimony over the

15   past few days is that -- and I think this may have been

16   Dr. Jameson -- that they had the Greim data, or they had the

17   data from the 12 studies available during the Working Group

18   meeting, but they -- he said that for one reason or another,

19   they didn't use all of the data.

20        Well, my reading of the IARC report is that they

21   dismissed, you know, all of the rat studies and some of the

22   mouse studies, saying that they were not usable, for their own

23   reasons.

24        But -- but in other words, then rat studies were not

25   admissible; now they can be used.

1     And so now we seem to have settled on this canon of these

2   12 studies, but that hasn't always been the case.

3     So, you know, it's a little bit confusing to me as an

4   external reviewer.  You know, those issues are a little bit

5   confusing in terms of why we -- why they were not admissible,

6   but now they are.

7   **Q.**   Yes, sir.  What else?

8   **A.**   Well, this has to do with the pooled analyses.  You know,

9   I think Dr. Portier -- and there have been others who have

10  testified over the past few days that, in spite of your best

11  efforts to control these bioassay experiments, you can't

12  control everything.  So there are these underlying differences,

13  like environmental or genetics differences, that arise from

14  study to study, that have to be accounted for.  And that's --

15  those were not important, because, you know, Dr. Portier said

16  he was just going to kind of lump data together across studies,

17  which, of course, was, you know, criticized by Joe Haseman and

18  myself.

19     But now, again, he says that they're important, because he

20  fit logistic regression models that he said accounted for that,

21  although his models didn't completely.  But at any rate, the

22  study difference were not important.  Now they are important.

23  That's why he applied the logistic regression models.  So

24  again, this kind of strikes at consistency.  There has not been

25  a consistent approach.

1   Q.   Could we have the next slide, please?

2   A.   Sure.   I pointed out some of these examples in my Expert

3   Report, so I don't want to belabor this, because I believe

4   Mr. Lasker kind of went over this in his cross-examination, but

5   this is especially striking to me.   And there were a few

6   examples of that that I outlined in my Expert Report.

7          You know, Dr. Portier talked today during his

8   cross-examination about how, you know, in the case of adrenal

9   cortical tumors among females in these Sprague-Dawley rat

10  studies -- these four studies.   He excluded Lankas, because he

11  eyeballed the -- you know, the kind of the spontaneous tumor

12  rate among controls, and he decided that it was not consistent

13  with the other studies, and so he eliminated Lankas from his

14  computations.   And he computed his trend test p-value based on

15  an incorrect but a pooled analysis with these other three.

16         And he did a similar thing for kidney adenomas.

17         Oh, sorry.   Let me go back.

18         But with thyroid C-cell tumors and interstitial testicular

19  tumors, he, you know, just focused on Lankas, at the expense of

20  the other three.   And finally with thyroid C-cell tumors, he

21  included all four.

22         I mean, this is -- I know that, you know, Dr. Portier said

23  that, *Well, I've got a lot of experience, you know, in -- in*

24  *this field, so I feel like I can navigate these using my own*

25  *judgment*; but there are statistical approaches for making this

1   kind of assessment without just making an executive decision

2   about what to include or exclude just based on your own

3   personal judgment.

4       And those approaches were not used.  He didn't do -- you

5   know, this is a statistical issue.  You know.  Are the Lankas

6   rats in this case -- are they different from the others?  Are

7   they different enough for me to eliminate?  That's a

8   statistical issue, and that wasn't really accounted for.

9           **THE COURT:**  Can you show me where in his report he

10  relied on the thyroid C-cell tumors conclusion there in the

11  third line, where only Lankas is used?

12          **THE WITNESS:**  Yeah, I think I can, if you just give

13  me a second.  Do I have his report or no?

14          **THE COURT:**  Take your time.

15          **MR. GRIFFIS:**  Yes.

16          **THE WITNESS:**  What tab is it?

17          **MR. GRIFFIS:**  His main Expert Report is Tab 2.

18          **THE WITNESS:**  Well, that's my -- oh.

19          **MR. GRIFFIS:**  I'm sorry three.  Three.

20          **THE WITNESS:**  Oh.  Three.

21          **THE COURT:**  Tab 3.

22          **MR. GRIFFIS:**  Tab 3.  Yes.

23          **THE WITNESS:**  So at page 34 of his report.

24          **THE COURT:**  Okay.

25          **THE WITNESS:**  He says that he says that -- at the

1  bottom he focuses on the Lankas study.  However, the Lankas

2  study was for 26 months, and the other three were for 24.

3      The C-cell carcinomas could be a result of the longer

4  exposure period, even though the dose was substantially lower

5  than the --

6          THE COURT:  Right, but then in the next sentence he

7  says, *From these data I conclude that the evidence is weak that*

8  *glyphosate causes thyroid and C-cell tumors in female*

9  *Sprague-Dawley rats.*

10          THE WITNESS:  But he does -- but he does include this

11  in his -- I guess you'd say, his patchwork of evidence.

12      In other words, if you look at the Table 8 --

13          THE COURT:  Okay.

14          THE WITNESS:  -- you'll notice that for thyroid

15  C-cell tumors there's a plus sign.  He's been testifying

16  that --

17          THE COURT:  Sorry.  Where?  Can you give me a second

18  to --

19          THE WITNESS:  Oh, I'm sorry.  Right in the middle of

20  the table there's a plus sign.

21      So in other words, he's counting that as what he has been

22  calling "marginally significant," which is a p-value for him

23  between 5 and 10 percent.  What I'm pointing out is that --

24          THE COURT:  And this is for -- that plus sign is for

25  female rats?

1          THE WITNESS:  That's right.

2          THE COURT:  And how can I tell from looking at that

3    table that that's for female rats?

4          THE WITNESS:  I think under -- on the top, the column

5    header "Thyroid C-cell Tumors -- Females."

6          THE COURT:  Oh, okay.  Right.  Thank you.

7          THE WITNESS:  So, you know, as he did with his slides

8    during his -- during his testimony, where he color coded the

9    slides to show, you know, if you kind of squinted your eyes and

10   crossed them slightly, you could kind of see where the

11   significance was.  That's kind of what he's doing with this

12   table, is that he's using plus signs to indicate something

13   approaching significant or something highly significant, so

14   that the impression one gets in looking at this table is that,

15   well, we see a pattern of significant -- ordinarily significant

16   results.  And so that's how he's using these kinds of results

17   to support his conclusion.

18   BY MR. GRIFFIS

19   Q.   And it's part of your criticism -- the inconsistency from

20   tumor type to tumor type, and what is clustered together to

21   reach these conclusions?

22   A.   That's right.  Yeah.

23   Q.   Could we have the next slide, please?  The whole thing?

24   A.   Sure.  Again, I don't want to belabor this one, either,

25   because I think that -- I think that Mr. Lasker already

1    questioned him about this; but from a statistical point of

2    view, what I want to point out here is that in -- and I'm

3    trying to review this based on his own citations that he uses

4    to support his pooling, but the idea here is that in one group,

5    the Knezevich Study, you have what at least you observe as a

6    higher incidence in the highest dose group compared to the

7    lowest.

8         So it looks like -- you know, we know we haven't done a

9    formal statistical test, but it looks like at least there's

10   higher incidence than there is in the low-dose group.

11        And the Atkinson Study is -- again, as Mr. Lasker already

12   reviewed today, combining these kidney tumors in the way that

13   he did, he got, you know, 2200, which actually turns out to

14   result in a p-value less than .05 that there is decreasing

15   incidence of tumor with glyphosate.

16        Well, again, from a statistical standpoint, one would not

17   ever just throw these data into the same pot and analyze them,

18   because, as we'll see, using his own citations, an important

19   step is to decide whether these affects are even, you know,

20   significantly different before you combine them.

21        So in other words, an important step in any kind of

22   analysis where you're using data from more than one study is to

23   decide whether the effects are consistent.

24   **Q.**   Let's go there and look at that, sir.

25   **A.**   What's that?

1   Q.   Let's go there and look at that.  And let me ask you a

2   couple prefatory questions.

3   A.   Sure.

4   Q.   There are a couple of citations that Dr. Portier made in

5   his Expert Report to articles that he said he followed in the

6   pooling analysis.  Right?

7   A.   Yeah.  I was interested in these articles because of the

8   way that he pooled.  He said that these articles supported his

9   approach, which is basically just to lump datasets together, as

10  though they came from the same experiment.  And so I think --

11  Q.   These are the Friedenreich and --

12  A.   Friedenreich and Blettner, yeah, studies.  I mean, these

13  are the ones that I took a look at.  Now --

14          JUDGE PETROU:  Are those in the exhibits?

15          MR. GRIFFIS:  Well, yeah.  They're not in a tab.

16  They're in the back pocket of the binders.  And let me give you

17  the references.  This is reference 91 and 92 in Dr. Portier's

18  Expert Report.  And I'm going to be asking some questions about

19  the Friedenreich.

20          JUDGE PETROU:  So I see that the methods for pooled

21  analyses by Friedenreich is labeled as Exhibit 911 there.

22          MR. GRIFFIS:  That's right.

23          JUDGE PETROU:  And is it Exhibit 598 for the other

24  one?

25          MR. GRIFFIS:  I believe that's right.  Is that right?

1    JUDGE PETROU:  For the *Traditional Reviews,*

2  *Meta-Analyses, and Pooled Analyses in Epidemiology* by Blettner,

3  *et al?*

4  **BY MR. GRIFFIS**

5  **Q.**   598.  I have some questions for you from Exhibit 911.

6    (Reporter requests clarification.)

7  **BY MR. GRIFFIS**

8  **Q.**   The one I just did?  You've looked at both of these.

9  Right?

10  **A.**   Yes.

11  **Q.**   And are they about pooling animal studies, or are they

12  about pooling epidemiology studies?

13  **A.**   No.  They're both in epidemiological journals.  You know,

14  the principles that -- the principles that they outline for

15  combining datasets for different sources are basically correct.

16  I don't -- I just heard -- I just heard the previous testimony

17  about, you know, how these datasets may or may not be pooled by

18  people in the toxicology community.  And so I don't really have

19  anything to say about that; but you know, Dr. Portier included

20  this.  This was his justification.  And so this is what I would

21  kind of expect to see in his analysis, in other words.

22  **Q.**   It's okay.  So on the subject that you were raising before

23  I brought this up, so that we could look at a reference while

24  you spoke, sir, you said that when -- before you do a

25  pooling --

1   **A.**   Yeah.

2   **Q.**   -- if you're even allowed to do it for animal studies in

3   the first place, you would look at whether there's

4   heterogeneity of results.   Right?

5   **A.**   Right.   And --

6   **Q.**   So could -- I'm sorry.   Could you bring up, Scott, Step 6

7   from Friedenreich?   That's on page 298, left-hand column.

8   **A.**   Right.   There are several steps that are outlined in both

9   of these papers.   This one -- I don't know -- has seven or

10   eight.   The other one has something like 12.   But they both --

11   you know, they both basically say very similar things.

12   **Q.**   It says -- I'm reading the second sentence, last -- also

13   the last sentence of that first paragraph.

14   **A.**   Right.

15   **Q.**   *If, on the other hand, statistical and methodologic*

16   *heterogeneity of effect is found across the studies, it would*

17   *be more appropriate to use a random or mixed effects model to*

18   *estimate the summary effects.*   Right?

19   **A.**   That's right.

20   **Q.**   Did he do so?

21   **A.**   No.

22   **Q.**   Step 7 is on the next column.   Explaining any

23   heterogeneity between studies.   And I'd actually like to look

24   at the second paragraph here; the second paragraph under that

25   column.   Yes.

758

1      And -- but I have a real -- actually, a broader question;

2   a more lay question.  When you explain heterogeneity between

3   studies, does "explaining" mean sitting down and giving a

4   reason why it's okay to put studies together?

5   **A.**   No.  It doesn't mean that you, just off the top of your

6   head, explain away the reasons for the heterogeneity, or

7   explain away why it is that you don't have to take care of it.

8      This is a statistical issue.  And so the correct

9   statistical model, which, you know, Dr. Portier, I think, made

10  kind of an attempt at after my -- after my own Expert Report

11  was filed -- in his Rebuttal Report he said, *Well, I'm using*

12  *logistic regression*, but this is a really crucial step.

13     With respect to that Knezevich and -- sorry -- Atkinson?

14  **Q.**   Atkinson, yes.

15  **A.**   -- the Knezevich and Atkinson example has a showing.

16     In other words, what this step has to do with is that you

17  need to check to see formally whether or not those

18  dose-response effects in these studies are the same, before you

19  just throw them into the same bunch.

20     And I gave an example in my own Expert Report where I

21  stepped through that very carefully for one of the combined

22  analyses that Dr. Portier did.  He didn't say anything about

23  that specifically.  I think he mentioned it briefly in his

24  testimony yesterday, but he didn't really say too much about

25  that in his Expert Report.

CORCORAN - DIRECT / GRIFFIS

1    What I did is I said, *Look.  If you're going to combine*
2    *the Brammer, Suresh, and Wood studies*, which was another
3    example I showed you in my Expert Report, *you need to assess*
4    *whether or not the dose-response effects are what we would call*
5    *"homogeneous,"* or whether they're similar.
6         And when I did, I saw that they were not.
7         And so, you know, I demonstrated how you would step
8    through that kind of analysis to make sure that your pooling,
9    you know, was -- was correct.
10   **Q.**   So this isn't a matter of biology judgment.  It's a matter
11   of biostatistics?
12   **A.**   No.  It's a statistical approach.  You know.  We're just
13   talking about the correct statistical approach.
14        And again, it's the same issue that was raised by, you
15   know -- by Joe Haseman, as well, in the appendix material in
16   his Expert Report.
17   **Q.**   You told us a little earlier, sir, that the biggest issue
18   that you identified with Dr. Portier's methodology was a
19   multiple testing --
20   **A.**   Right.
21   **Q.**   -- problem.  Would you --
22   **A.**   Before we actually advance to that, could I just say one
23   more thing about the pooling?
24   **Q.**   Absolutely.
25   **A.**   Statistically speaking, since we've been talking here a

1  lot about p-values and how to interpret them, and, you know --

2  and how especially to interpret results when we've computed

3  hundreds or hundreds -- or thousands, this is -- this pooling

4  issue is really crucial.  This is not just a minor

5  technicality, because, as I again explained in my Expert

6  Report, if you don't handle that heterogeneity correctly, then

7  the consequence is that you end up, in some sense, overstating

8  your sample size.

9      So in other words, what that does is it leads to an even

10  greater increase in potential spurious associations due to

11  chance if you don't make sure that you soak up, you know, those

12  differences between studies.

13      And so, you know, yes, the way that you handle it might

14  seem, you know -- to a non-biostatistician it may seem like a

15  technical issue, but it has enormous practical consequences.

16  And that's why Joe Haseman was so adamant about it.  And that's

17  why I pointed it out, as well.  So anyway, sorry.

18  **Q.**   Okay.  Thank you.  Multiple testing -- that's another

19  thing that Joe Haseman and you both raised.  Correct?

20  **A.**   Yes.

21  **Q.**   Would you please explain it the way that you explain it to

22  people who aren't, themselves, biostatisticians already?

23  **A.**   Right.  When I'm trying to explain this problem, you know,

24  again, I think it's been described by -- within other testimony

25  over the past few days, so I'll be brief.

1        But when I'm trying to explain this problem to my students

2   I teach, I sometimes just refer to it as "the green jelly bean

3   problem," because I use this comic strip.

4        Is it coming up?

5   **Q.**   I don't think so.  Slide 11, please.

6   **A.**   This is XKCD.com.  It's a kind of a comic for geeks and

7   nerds, but this is kind of what we're talking about.  So here

8   are a couple of researchers who want to find out whether or not

9   a jelly beans cause acne.  So they gather some data.  They look

10  at people who are eating more jelly beans.  They compare their

11  acne rates to people who are eating less -- fewer jelly beans.

12  And they get a p-value that's greater than point .05, so they

13  decide, well, there's no evidence that acne causes jelly beans.

14       But then as all of us -- you know, because it's human

15  nature, as all of us are prone to do, and especially in the

16  research community, when we have a lots of data to play with,

17  we start doing, you know, subset analyses, basically.  We start

18  dividing the data.  We start slicing and dicing the data, and

19  looking at different subgroups to see whether or not, you know,

20  we can find any subgroup for which there's an association.  And

21  so we start computing lots of p-values.

22       And so here, you know, we're computing it for purple, and

23  then brown, and pink.  And I don't know if this monitor has

24  great color resolution, so I hope I'm describing those

25  correctly.

**CORCORAN - DIRECT / GRIFFIS**

1  Q.   You don't need to name all those colors.

2  A.   Cyan and salmon.  I don't know.  There are a lot of colors

3  here, but -- and then finally bingo!  For the green jelly bean

4  down there, we see a p less than .05, which is the 1 out of 20,

5  as Dr. Portier said, on average that we'd expect to see.  And

6  so that's the thing that we advertise.  You know, that's the

7  sexy result.

8       And when I'm -- you know, for somebody like me, especially

9  in academia, where I'm trying to make a career out of, you

10  know, publishing positive results, this leads to a serious

11  excess of spurious associations where we're just looking for

12  p-values less than .05.

13  Q.   Can you just tell us in a nutshell what the difference is

14  between the first experiment, where they looked at jelly beans

15  overall, and said, *No significant result*; and the second one,

16  where they looked at each subset of colors, and found one, and

17  then made a report about it?

18  A.   Yeah.  I mean, sure.  The first experience -- the first

19  experiment is a planned, you know, experiment that has to do

20  with a single hypothesis about jelly beans and acne.  And so

21  that's the whole point of the experiment.

22       The rest of it is data dredging.  I mean, it's data

23  mining.  It's looking at as many subgroups as we can to, you

24  know, find associations.  And, you know, when we use the p less

25  than point .05 rule, we'd expect for about 5 percent of those

1  to come up by chance.

2  **Q.**   So if you look at enough jelly bean colors, you'll find

3  one just by chance, alone?

4  **A.**   And, in fact, if we reran that experiment, chances are the

5  next go-around, we might see zero color jelly beans; specific

6  colors that come up with p's less than .05.  We may see 2.  We

7  may see 3.  On average, we'll see 1.  And the next time you run

8  that jelly beans don't cause acne, it'll be a different color.

9       (Reporter requests clarification.)

10          **THE WITNESS:**  Yellow or red might be the one that

11  comes up positive on the next go-around.

12          **THE COURT:**  I think what he said is that, you know,

13  the next time you run it, you might see zero, or you might see

14  1, you might see 2, or you might see 3.

15  **BY MR. GRIFFIS**

16  **Q.**   So does Dr. Portier's work have a green-jelly-bean

17  problem?

18  **A.**   Yes, it does.  As I describe in my Expert Report, we're

19  talking about, you know, hundreds -- perhaps, you know, even

20  you could argue, many more than that -- potential p-values

21  based on this approach the kidney computed.  And there's no

22  adjustment for that multiplicity.

23  **Q.**   When you say there's no adjustment, do you mean he made

24  none; or there's no remedy in the field of biostatistics for

25  this?

**A.**    There is a remedy.  And it's pretty straightforward.  And

it's recommended within our own profession that you do

something like that.  He just didn't apply it.

**Q.**    What is it called?

**A.**    Generically, it's called a "multiple testing adjustment,"

or "MTP" for short.

**Q.**    Which one did you apply in your Expert Report?

**A.**    Well, the one that I applied is what's referred to as the

"false discovery rate approach," which -- it's grown a lot

more.  Its use has become a lot more widespread.  And it's

really generally kind of accepted now that -- it's very good.

It performs very well in situations like these, where you have

dozens or hundreds or thousands.  I work on genetic

experiments, where we do millions of hypothesis tests.

    And what the false discovery rate approach does that, you

know, multiple testing adjustments have not done historically

is it avoids -- for lack of a better phrase, it avoids throwing

the baby out with the bathwater because, you know, people

recognize couple of decades ago, as we -- as we, you know,

accumulated more and more data, and as it became possible to do

so many more statistical procedures, they realized that, well,

we don't want to place too high a penalty on this multiple test

adjustment, because we may throw out -- I guess what you would

say true-positives.  We would throw out actual effects.  And we

want to avoid doing that.

1      And so this false discovery rate approach was developed

2   specifically to make sure that you minimize the number of true

3   effects that you discard or that you reject, at the expense of

4   making sure that you keep that 5 percent type error rate.

5   **Q.**   Could we have slide, 14 please?  14.  Yes.

6      What does your field -- what are the standards of your

7   field with regard to how to deal with this sort of problem?

8   **A.**   Well, as Dr. Portier talked about yesterday, the American

9   Statistical Association is the oldest professional organization

10  of its kind.  It's, you know, the body that most all of us --

11  you know, Dr. Portier and myself, people like us,

12  statisticians, biostatisticians -- it's the body that we belong

13  to.  It's our professional society.

14     They actually came out with a very -- they took a very

15  unusual step a few years ago, because p-values are so overused

16  and so abused.  You know, in my Expert Report I pointed out

17  that there's actually been a lot of attention paid to them in

18  the popular press, not to mention the scientific press, because

19  so many results are not reproducible.  We just see the green

20  jelly bean thing advertised, and then nobody can every

21  reproduce it.  And we see lots of episodes like that.

22     So the ASA convened a panel OF very highly regarded

23  statisticians in our field.  And they met together, and they

24  came out with this statement on p-values to kind of give the --

25  you know, the profession some guidelines.  And they suggest a

few simple steps that are easy to apply in situations like

this, where you have, you know, many, many p-values.  One is

full reporting of all p-values, full transparency; so, in other

words, report about everything that you did everything that you

tried.

**Q.**   Is that an issue with Dr. Portier's report?

**A.**   Yeah.  I don't -- I mean, we have kind of some selective

results, especially when it comes to the pooling; but we

don't -- I mean, I was interested when I actually saw his

deposition that, you know, one of the Hollingsworth attorneys

asked him, you know, *How many how many p-values did you*

*compute?*  And he couldn't really answer -- because I was

curious about that, too.

**Q.**   Why does it matter if he didn't know how many; couldn't

say how many p-values he computed?

**A.**   Because that really undermines your ability to report, to

be completely transparent about everything that he did.

**Q.**   Is it possible to do accurate false discovery rate or

other corrections, if you don't know how many p-values you

calculated?

**A.**   No, absolutely not.  I mean, that's the baseline.  You

have to know how many p-values you computed, before you make an

adjustment.  So that's at a minimum.

**Q.**   Okay.  Would you briefly discuss the next bullet, sir?

We're a little short on time.

**A.**    Right.  And I think -- the second bullet point -- some

other testimony has alluded to this.  You know, P-values --

they do tend to be overused sometimes and abused on there.

So one -- and a second thing that the ASA suggests is --

is actually looking at treatment effects; so dose-response

effects instead of just p-values.

And finally, you know -- and I guess very importantly --

adjusting p-values for the number of tests using, for example,

false discovery rate, which is the most highly recommended

approach in this kind of case, where you have, you know, so

many p-values that you're evaluating, and that you want to make

sure that you don't throw out, you know, the true positives

along with the, you know, the false positives.  So the FDR

approach is the recommended standard in situations like this,

or it's recognized as the standard.

**Q.**    I know you talked about it at length in your Expert

Report, and I don't want to recapitulate all of that now -- we

haven't the time -- but would you please just tell us when you

did the false discovery rate analysis with regard to

Dr. Portier's data, to the extent you could understand it, what

did you find?

**A.**    I applied the false discovery rate adjustment, I think, in

my Expert Report some of the summary results; at least, for

any -- any tumor types that could have been statistically

significant.  Those are all contained in Appendices C and D,

1    and so we don't need to put those up here; they're in the

2    Appendix.

3         But what I found in the end was that there was none.  Once

4    you actually adjusted for the multiple tests, there was no

5    evidence of any glyphosate-related effect.

6         And, by the way, that was looking either for increasing

7    risk of tumor -- increasing incidence of tumor -- or

8    decreasing.

9              MR. GRIFFIS:  Thank you, sir.

10             THE WITNESS:  Thanks.

11             THE COURT:  Cross?

12             MS. ROBERTSON:  Your Honor, plaintiffs do have cross.

13   We're asking if we can break for the day so we can try and

14   clean up some of the questions to make them as concise as

15   possible.

16             THE COURT:  Okay.  The only thing I'm concerned about

17   is, you know, getting through tomorrow.

18             MS. ROBERTSON:  Understood, Your Honor.  I mean,

19   concise as possible -- given the testimony of Dr. Corcoran, I'm

20   going to need to readjust my questions.  I've been allotted 12

21   minutes by my side.  And I just definitely need to make sure my

22   12 minutes --

23             THE COURT:  Are used properly?

24             MS. ROBERTSON:  Yes, please.

25             THE COURT:  All right.  Fair enough.

```
 1        So, you know, we have about four and a half hours of air
 2   time left.  And I assume -- I can't remember.  Who's Monsanto's
 3   next witness after this?
 4             MS. WAGSTAFF:  Dr. Goodman?
 5             MR. LASKER:  Dr. Goodman is scheduled, Your Honor.
 6             THE COURT:  You may not call Goodman.  You may go
 7   straight to Mucci?
 8        (Reporter requests clarification.)
 9             MR. LASKER:  We have to look at our timing, as well,
10   with all of our witnesses at that are remaining.  We have
11   Dr. Nabhan also.  So I just don't know when he's going to be
12   going on, and what his time will be.
13             MS. WAGSTAFF:  Your Honor, we told you that
14   Dr. Nabhan needs to come out of time.  So we could probably
15   finish up Dr. Corcoran tomorrow morning.  And then put
16   Dr. Nabhan on after that, if that would work for everybody.
17             MR. LASKER:  Yeah.  That's what we were anticipating.
18             MS. WAGSTAFF:  Okay.  And then we would be done.
19             THE COURT:  Okay.
20             THE CLERK:  I think you'll have time.
21   (Discussion off the record.)
22             THE COURT:  I mean, I guess if we start at 10:00, I
23   mean, my -- the issue I'm concerned about is my hijacking too
24   much of Mucci's time, so I want to make sure I have enough
25   time.
```

1          **MR. LASKER:**  That's part of our calculation.  We

2   anticipated that, Your Honor.

3          **THE COURT:**  But I guess we should be okay.  I mean,

4   if we start at 10:00, and we --

5      I think what I would like to do is sort of tweak our

6   calendar tomorrow, if that's okay with people.  Start at 9:00,

7   and plan on ending at around 3:00.

8          **MS. ROBERTSON:**  Yes, Your Honor.

9          **THE COURT:**  That way, if we really need to go past

10  3:00, that gives us a little room.  I'm not sure we'll -- I

11  mean, with four and a half hours left.  And, you know, that --

12  that's about 9:00 to 2:30, or something like that, if you

13  include lunch breaks and whatnot.  I think that would be fine,

14  but I want to give us a little bit of cushion.  So why don't we

15  start at 9:00 tomorrow?

16         **MS. ROBERTSON:**  Yes, Your Honor.

17     (At 3:12 p.m. the proceedings were adjourned.)

18  I certify that the foregoing is a correct transcript from the

19  record of proceedings in the above-entitled matter.

20

21  *Lydia Zinn*

22  _____    March 9, 2018
    Signature of Court Reporter/Transcriber    Date

23  Lydia Zinn

24

25