**Pages 771 - 1012**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  ROUNDUP PRODUCTS          )
LIABILITY LITIGATION,             )  NO. M. 16-02741 VC
_____  )

San Francisco, California
Friday, March 9, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    The Miller Firm LLC
                    108 Railroad Avenue
                    Orange, VA  22960
                    (540) 672-4224
                    (540) 672-3055 (fax)
          BY:  **MICHAEL J. MILLER**

For Plaintiffs:

                    Andrus Wagstaff PC
                    7171 West Alaska Drive
                    Lakewood, CO  80226
                    (720) 255-7623
          BY:  **VANCE R. ANDRUS**
               **AIMEE H. WAGSTAFF**
               **DAVID JACKSON WOOL**

For Plaintiffs:

                    Andrus Wagstaff PC
                    6315 Ascot Drive
                    Oakland, CA  94611
                    (720) 255-7623
          BY:  **KATHRYN MILLER FORGIE**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

```
 1   APPEARANCES:

 2   For Plaintiffs:
                             Weitz & Luxenberg PC
 3                           700 Broadway
                             New York, NY 10003
 4                           (213) 558-5802
                      BY:    ROBIN L. GREENWALD
 5                           PEARL A. ROBERTSON

 6   For Plaintiffs:
                             Baum Hedlund Aristei and Goldman, P.C.
 7                           12100 Wilshire Boulevard, Suite 950
                             Los Angeles, CA  90024
 8                           (310) 207-3233
                      BY:    MICHAEL L. BAUM
 9                           PEDRAM ESFANDIARY
                             ROBERT BRENT WISNER
10
     For Plaintiffs:
11                           Lundy Lundy Soileau & South LLP
                             501 Broad Street
12                           P.O. Box 3010
                             Lake Charles, LA 70601
13                           (337) 439-0707
                      BY:    RUDIE RAY SOILEAU, JR.
14
     For Plaintiffs:
15                           Andrus Anderson LLP
                             155 Montgomery Street, Suite 900
16                           San Francisco, CA  94104
                             (415) 986-1400
17                           (415) 976-1474 (fax)
                      BY:    LORI E. ANDRUS
18
     For Plaintiff Sioum Gebeyehou:
19                           Law Offices of Tesfaye Tsadik
                             1736 Franklin Street, 10th Floor
20                           Oakland, CA  94612
                             (510) 839-3922
21                           (510) 444-1704 (fax)
                      BY:    TESFAYE WOLDE TSADIK
22

23

24

25
```

1    **APPEARANCES**:

2    For Plaintiff Wanda Clarke:

3                        Sill Law Group
                         14005 N. Eastern Avenue
                         Edmond, OK  73013

4                         (405) 509-6300
                         (415) 509-6268 (fax)

5                  BY:  **TARA TABATABAIE**

6    For Defendant Monsanto Corporation:
                         Hollingsworth LLP

7                         1350 I Street, NW
                         Washington, DC  20005

8                         (202) 898-5800
                 BY:  **KIRBY T. GRIFFIS**

9                      **JOE G. HOLLINGSWORTH**
                     **JOHN M. KALAS**

10                    **ERIC GORDON LASKER**
                   **HEATHER ANN PIGMAN**

11                    **STEPHANIE SALEK**
                   **ELYSE A. SHIMADA**

12

13    **Also Present:**  **The Honorable Ioana Petrou**
                   **Leonora Lynham**

14                    **Scott Duval**

15

16

17

18

19

20

21

22

23

24

25

1                              <u>I N D E X</u>

2

3    Friday, March 9, 2018 - Volume 5

4
     <u>PLAINTIFFS' WITNESSES</u>                        <u>PAGE</u>   <u>VOL.</u>
5

6    <u>NABHAN, CHADI</u>
     (SWORN)                                          794    5
7    Direct Examination by Mr. Miller                 794    5
     Cross-Examination by Mr. Griffis                 830    5
8    ReDirect Examination by Mr. Miller               851    5

9

10

11   <u>DEFENDANT'S WITNESSES</u>                          <u>PAGE</u>   <u>VOL.</u>

12

13   <u>CORCORAN, CHRISTOPHER (RECALLED)</u>
     Cross-Examination by Ms. Robertson               775    5

14

15   <u>MUCCI, LORELEI</u>
     (SWORN)                                          852    5
16   Direct Examination by Mr. Lasker                 853    5
     Cross-Examination by Mr. Miller                  952    5

17

18

19

20

21

22

23

24

25

```
 1  Friday - March 9, 2018                          9:10 a.m.
 2                   P R O C E E D I N G S
 3                        ---oOo---
 4          THE COURT:  All right.  Anything to discuss before we
 5  resume?
 6          MS. WAGSTAFF:  There is, your Honor.
 7          THE COURT:  Okay.
 8          MS. WAGSTAFF:  So I just -- we were reading the daily
 9  transcripts last night -- which you're doing a great job on, by
10  the way -- and I just wanted to clear something up so we didn't
11  have to waste time on it next Wednesday, but I made a comment
12  when I was crossing Dr. Rosol that plaintiffs were not
13  challenging all of the methodologies of Dr. Rosol.  Of course
14  we are, as shown in the Daubert brief.  And I just wanted to
15  make that clear in case I misspoke, so there was no question
16  about that.
17          THE COURT:  Yeah.  No problem.  All right.
18          MS. ROBERTSON:  Hi.
19          THE COURT:  Good morning.  All right.  You can take
20  it away.
21                   CHRISTOPHER CORCORAN,
22  called as a witness for the Defendant, having been previously
23  duly sworn, testified further as follows.
24                   CROSS-EXAMINATION
25
```

1  BY MS. ROBERTSON

2  Q.   Good morning, Dr. Corcoran.

3  A.   Good morning.

4  Q.   Dr. Corcoran, prior to this litigation did you ever design

5  a rodent carcinogenicity study to assess the ability of a

6  chemical to cause cancer?

7  A.   No, as I said yesterday in my testimony, a large part of

8  my career and my work has been spent on developing

9  methodologies that can be used to analyze data from these

10 experiments, including, you know, especially focused on methods

11 that are useful when the outcomes are rare or the sample sizes

12 are small, which is certainly true in this case.

13     And when I published on this in the past, I've used

14 examples from rodent carcinogenicity experiments that could be

15 analyzed using the methods I've developed.

16 Q.   Prior to this litigation, did you ever perform a rodent

17 carcinogenicity study to assess the ability of a chemical to

18 cause cancer?

19 A.   No, but as I said, I've been pretty heavily involved in

20 methodological developments in this area that are highly

21 applicable, I guess, in this case.

22 Q.   Dr. Corcoran, prior to this litigation, did you ever

23 oversee a rodent carcinogenicity study to assess the ability of

24 a chemical to cause cancer?

25          THE COURT:  Got to slow down.  Got to slow down.

1       Did you get the question?

2           **MS. ROBERTSON:**  Ms. Court Reporter, would you like me

3   to repeat?

4                      (Record read by reporter.)

5           **THE WITNESS:**  Yeah, no.  As I've been saying, I'm a

6   biostatistician, so I'm not a pathologist, I'm not a

7   toxicologist.  What I do is I analyze data.  I don't actually

8   design experiments, I work with people who do, and I analyze

9   the data that come from those experiments that's my job.

10  **BY MS. ROBERTSON:**

11  **Q.**  Dr. Corcoran, prior to this litigation, did you ever

12  design a study that addresses the optimal dosing pattern for

13  rodent carcinogenicity studies to assess the ability of a

14  chemical to cause cancer?

15  **A.**   No.  I understand from Dr. Portier's testimony that, you

16  know, that's what he -- that's what his dissertation was

17  focused on when he was getting his doctorate in biostatistics.

18  My Ph.D. was focused on developing methods that can be used to

19  analyze data from these kinds of experiments.  That was my

20  focus.

21       So we're both biostatisticians.  That was his emphasis.

22  Analyzing data from these experiments, that's my emphasis.

23  **Q.**  Dr. Corcoran, you are aware that Dr. Portier developed the

24  Poly-3 Trend test, correct.

25  **A.**   Yeah, I'm aware.

1  Q.   Is it your testimony that you believe Dr. Portier relied

2  solely on pooling analysis here?

3  A.   I'm sorry, can you repeat that?

4  Q.   Is it your testimony that you believe Dr. Portier relied

5  solely on pooling for his analysis here?

6  A.   No, that's not my testimony.

7  Q.   Isn't it true, Dr. Corcoran, that you didn't run logistic

8  regression with the full dataset in this case?

9  A.   How do you mean?  What do you mean by "full dataset"?

10 Q.   Using all of the p-values from the animal carcinogenicity

11 studies that are at issue in this case, did you conduct a

12 logistic regression test?

13 A.   I'm sorry.  The question's kind of confusing, because you

14 don't apply logistic regression to p-values, you apply logistic

15 regression to data.

16 Q.   Thank you for that clarification.  Did you apply a

17 logistic regression to the data in this case?

18 A.   In my expert report, I demonstrated how, if you were going

19 to actually combine datasets in the appropriate way, in the way

20 that Dr. Portier's references dictated, that I showed the steps

21 that would be required to do that, using, I think, the Brammer,

22 Suresh and Wood data.  That's what I used.  So I stepped

23 through those procedures the way that they were outlined in

24 Dr. Portier's references to show how you would do that

25 appropriately.

1  Q.  So aside from Brammer, Suresh and Wood, you did not

2  conduct a logistic regression and apply the logistic regression

3  to the data and the other animal carcinogenicity studies, the

4  nine, not counting Wood, Suresh and Brammer; is that correct?

5  A.  Well, it's an interesting question because, as Dr. Portier

6  testified, the Cochran-Armitage Trend Test is -- more or less

7  for statisticians it's the same thing as logistic regression.

8      So in other words, you can get a dose-response assessment

9  using either logistic regression or a trend test.  That's, you

10  know, what he understands and that's correct.  That's what I

11  understand, as well.

12     The reason why somebody would use logistic regression is

13  that you would have to control for other things, besides dose.

14  So if --

15  Q.  One moment.

16     I'm sorry, your Honor, to interrupt the witness, but that

17  really wasn't my question.

18     THE COURT:  I think it's appropriate for him to be

19  answering the way he is.

20     MS. ROBERTSON:  Okay.

21     THE WITNESS:  So in other words, you know, if you're

22  going to be "pooling" data from different studies, and I use

23  "pooling" in quotes, because, you know, I don't think he did it

24  correctly, but if you're going to be combining information from

25  different datasets using logistic regression, it's like you're

1  doing a trend test, but you're adding in other factors in the

2  model that allow you to account for the fact that there are

3  these study differences that we've been talking about over the

4  past few days.

5       (Clears throat.)  Excuse me.

6       So if in other words, in essence, yes, I -- you know, the

7  trend test represents the answer that you would get if you did

8  an exact logistic regression for dose-response.

9       What I was criticizing in his expert report is the fact

10 that you can't just throw data together if you're going to

11 combine information from different studies; that if you were

12 going to do that, you'd have to extend the trend test to

13 somehow account for those differences, and which he kind of

14 attempted to address in his rebuttal, but he did not address

15 adequately, as you know, I stepped through yesterday in my own

16 testimony.  He didn't follow the steps that his own references

17 outlined for doing that correctly.

18 **Q.**   Okay, I think we're still missing each other a little bit.

19 My question was whether you ran the logistic regression to the

20 data, aside from those three that you've already -- those three

21 studies, Brammer, Suresh and Wood, that you've already pointed

22 out, did you run logistic regression in your expert report, is

23 there something in your appendices that shows you us you

24 applied it to the rest of the dataset?

25 **A.**   Right, let me step through this again, in two parts, just

1  to make sure that.

2           **THE COURT:**  Well, first, it seems like you could

3  answer yes or no to that question.

4           **THE WITNESS:**  Well, yeah, but the answer's a little

5  bit difficult because, like I said, for a statistician, the

6  Cochran-Armitage Trend Test is kind of a version of logistic

7  regression, and so from a -- you know, from a technical

8  standpoint the answer is yes.  I did --

9           **THE COURT:**  Okay.

10          **THE WITNESS:**  -- I used -- I used -- in fact, just

11  for the record, even though I know this is kind of a technical

12  detail, but just to make sure it's in the transcript in case

13  somebody goes back and looks at this, the trend test -- and I

14  think Dr. Portier alluded to this as well in his testimony --

15  the trend test is in statistics what we called a scored test

16  from a logistic regression model.  So every time you're doing a

17  trend test, in essence, you're performing a logistic

18  regression.

19      So yes, in that sense, I performed a logistic regression

20  in computing every single p-value that was in all of my tables.

21  **BY MS. ROBERTSON**

22  **Q.**  So you agree, Dr. Corcoran, that the Cochran-Armitage test

23  is a logistic regression test?  Is that what you're testifying?

24  **A.**  It's a scored test -- and again, I'm sorry, you'd have to,

25  you know, sit through one of my really exciting categorical

1  data analysis classes or, you know, any such class at a

2  university and learn how that is, but yes, it's a score test

3  for logistic regression model.

4  Q.    Thank you.  Now, Dr. Corcoran, the tumor counts referenced

5  in your expert report come from the Greim summary tables,

6  correct?

7  A.    Yes.

8  Q.    And from the Greim summary tables, you counted 1,016

9  tumors, is that right?

10 A.    That's right, yeah, 1,016 tumors that had at least one

11 observed, er -- 1,016 types that had at least one observed

12 tumor.

13 Q.    Thank you.  And so then you took that tumor count, the

14 1,016, and you plugged those into your computer program to

15 create the appendices we see at the end of your expert report,

16 right?  You didn't write that out by hand.  It went into a

17 computer program and generated the tables.

18 A.    The p-values themselves were computed using software, yes,

19 they were computed using the SAS statistical software program.

20 Q.    And then for your Tables C and D that you talked about

21 yesterday, Tables C and D include all 1,016 tumors, is that

22 correct?

23 A.    C and D, with the false discovery rate adjustments?

24 Q.    Yes, sir.

25 A.    Well, let me make sure I'm clearing about what you are

1  asking.  Are you asking whether the adjustment was made with

2  respect to all 1,016 tumors simultaneously?

3  **Q.**  Table C and D show the --

4  **A.**  Right.

5  **Q.**  -- computation of the 1,016 total tumor types, correct?

6  **A.**  No.  Tables C and D show only a subset of the tumor types

7  for which the individual EXACT trend test p-value was less than

8  .05, with the associated adjustment for multiple testing, the

9  false discovery rate adjustment.

10      So, no, Tables C and D do not contain all 1,016 p-values.

11          **JUDGE PETROU:**  Can you tell us why it says, in Tables

12  C and D, computed across 1,016 total tumor sites?

13          **THE WITNESS:**  Oh.  Thanks, okay.

14          **JUDGE PETROU:**  I think that's why the question keeps

15  coming up.

16          **THE WITNESS:**  I understand that, yeah, and I'm glad

17  you actually raised this point, because when Dr. Portier was

18  testifying, he said -- he said something like, well,

19  Dr. Corcoran adjusted the, you know -- for the green jelly bean

20  problem we're talking about yesterday.

21      By the way, I was curious, have you ever actually

22  transcribed green jelly beans in this courtroom?

23          **THE REPORTER:**  Yesterday.

24          **THE WITNESS:**  Yesterday was the first?  That's good.

25      Anyway, for that green jelly bean problem I was talking

1   about yesterday, you know, we -- there's a conventional

2   approach for adjusting for all of those p-values to make sure

3   that you -- you know, that you account for all of the tests

4   that you're doing.

5       And when Dr. Portier was testifying the other day, I was

6   listening, and he said that -- that you might have adjusted for

7   all 1,016 tumor types, and I hasn't done it in, I think, the

8   way that he was suggesting, and I apologize if the -- if the

9   title for these appendices was unclear.

10      Let me make sure that you know exactly how I did the FDR

11  adjustment for those tables.

12      What I did, for example -- can we just turn to my report

13  so I can show you?

14          MS. ROBERTSON:  Sure, I have it.

15          THE WITNESS:  Which tab is it, again, my own expert

16  in my binder?

17          MR. GRIFFIS:  It's 2, I believe.

18          THE WITNESS:  Oh, it's number 2, sorry.

19          MR. GRIFFIS:  I think it was 3.

20          THE WITNESS:  So for example, in my expert report,

21  you know, let's look at the Wood table B.3, so the mouse data.

22  BY MS. ROBERTSON:

23  Q.   Excuse me, B.3?  I thought we were talking about Tables C

24  and D.

25  A.   Yeah, we are, but this relates to how the p-values were

1  computed for C and D.

2  **Q.**   Okay.

3  **A.**   So that's why I have to talk about this.  So B.3, which is

4  on page 42 of my report.

5      Now here are -- two, four, six, eight, ten, twelve,

6  fourteen, sixteen, eighteen, twenty -- 21 tumors for males, 21

7  tumor types, starting with adrenal adenoma and ending with

8  lymphoma.

9      So what I did when I made the FDR adjustment, because

10  I wanted to err on the safe side, I wanted to make sure I

11  wasn't -- I wasn't, I guess, incurring too large a penalty for

12  all of the multiple tests.

13      So what I did was, for these mice, and the Wood data, and

14  the male group, when I made my multiple-test correction, when I

15  applied the FDR, it was only for these 21 tumor types.  So it

16  wasn't for all 1,016.

17      Now, again, remember what I talked about with the green

18  jelly bean problem yesterday.  The more tests that you're

19  doing -- really, some statisticians would argue, well, you

20  should throw -- you know, if I'm talking about just tumors with

21  three or more -- with an incidence of three or more, or if I'm

22  talking about all 1,016, I should throw all three or four

23  hundred or all 1,000 in the same mix, and make the adjustment

24  simultaneously for all of the p-values that I computed.

25      What I did, to make sure that I was being safe, in other

1  words, is I actually only adjusted within sex within study.

2      So in other words, what you see in the Appendices C and D,

3  these p-values adjusted for false discovery rate, like, for

4  example, on page 46, for all of the mouse and rat studies,

5  these adjusted rates are only within study within sex.

6      So, in other words, I'm not -- I'm not, you know,

7  penalizing the p-values as much as you would think.  I'm

8  actually erring, you know, kind of on the other side, if

9  anything.  So that's how these were computed.

10          **MS. ROBERTSON:**  Judge, I don't want to continue

11  unless it answered your question.

12          **JUDGE PETROU:**  You can go ahead.

13          **MS. ROBERTSON:**  Okay.

14          **THE WITNESS:**  So -- just to make sure you're clear,

15  I want to make sure I'm clear on this, I looked at all 1,016,

16  but as I made the adjustment, I only made them within the

17  study.

18          **JUDGE PETROU:**  No, I understand that.

19          **THE WITNESS:**  So, just so you know.

20  **BY MS. ROBERTSON**

21  **Q.**  Dr. Corcoran, would you agree that there is a difference

22  between primary and secondary tumors?

23  **A.**  Yeah.  I think you asked me about this during my

24  deposition, and -- and I agree with that.

25  **Q.**  You agree there's a difference?

1   **A.**   Yeah.   You -- I think there was some dialogue in my

2   deposition that --

3           **THE COURT:**  Don't worry about your deposition, just

4   go ahead and answer the question.

5           **THE WITNESS:**  Oh, okay.  Yeah, there's a difference

6   between primary and secondary tumors.

7   **BY MS. ROBERTSON:**

8   **Q.**   At the time you formed your opinion in this case, did you

9   know the difference between primary and secondary tumors?

10  **A.**   I -- yeah, I think -- I think I understood that.  I mean,

11  I wouldn't call myself an expert in pathology, but -- but I

12  understood, in looking at the data from Greim that I was using,

13  that -- that the -- that the -- there were differences between

14  those two.

15          **MS. ROBERTSON:**  Can we please pull up deposition at

16  page 150, lines 12 to 17?

17      Your Honors, I have hard copies if you'd would like them,

18  or we're going to put it on the screen.

19          **THE WITNESS:**  Got it.

20  **BY MS. ROBERTSON**

21  **Q.**   Okay, and there, Dr. Corcoran, you were asked the same

22  question about primary and secondary --

23          **JUDGE PETROU:**  May I see the hard copy, please?

24          **MS. ROBERTSON:**  Absolutely.

25      (Whereupon a document was tendered to the Court.).

1          THE COURT:  Thank you.

2          MS. ROBERTSON:  It's page 150.

3          THE WITNESS:  Could I have a copy of my deposition as

4   well --

5          MS. ROBERTSON:  Absolutely.

6          THE WITNESS:  -- please?  Thanks.

7          MS. ROBERTSON:  And for the record, this is Exhibit

8   379.

9   BY MS. ROBERTSON

10  Q.   We're at page 150.

11  A.   Got it.

12  Q.   All right, and there, you were asked if you knew the

13  difference between primary and secondary tumors.

14  A.   Uh-huh.

15  Q.   And your response was, "I am not really kind of familiar

16  with the differences between primary and secondary tumors."

17  Isn't that correct?

18  A.   Yes.

19          MR. GRIFFIS:  Could we have 18 through 22 read,

20  please?

21          THE COURT:  Sure.

22          MS. ROBERTSON:  Absolutely.

23          "QUESTION:  So you don't know what a primary

24          tumor is.

25          "ANSWER:    Answer:  Well I do.  I mean, I

1              wouldn't say that I'm expert in tumor

2              pathology, no."

3 **Q.**   So, in fact, the only way you get to the tumor count 1,016

4 is by counting primary and secondary tumors, correct?

5 **A.**   Well, what I did to get the 1,016 is I transcribed all of

6 the data from the Greim supplement, and that's how I

7 actually -- those are -- those are the data that I used for my

8 analysis.

9         **JUDGE PETROU:**  So Dr. Corcoran, are secondary tumors

10 included in the 1,016, or not?

11        **THE WITNESS:**  Yes, yeah.  So whatever was listed in

12 the Greim supplement, that's what I used.

13 **BY MS. ROBERTSON**

14 **Q.**   Dr. Corcoran, can you cite to me a single peer-reviewed

15 article that applies false discovery rate to animal bioassays?

16 **A.**   Well, the false discovery rate approach is actually now

17 one of the most cited papers in science, and so it's been, you

18 know, very influential.  It's very widely applied across all of

19 the sciences.

20      I think, you know, in 2014, I think it was just a few

21 years ago, the journal Nature, which is one of the most

22 respected journals in our scientific research, they actually

23 listed the 100 most cited papers, not just statistical papers,

24 but papers, period, and the paper that actually suggested the

25 false discovery rate approach was the 60th most cited paper in

1  science for, you know, the last at least century, and it's the

2  fifth most cited paper in statistics.

3      So when I say that it's accepted in our field by, you

4  know, people in statistical practice, I think that goes without

5  saying.

6      The ASA in that statement on p-values that I alluded to

7  yesterday, they actually specifically mentioned it, as well.

8  **Q.**   Dr. Corcoran, are you an ASA fellow?

9  **A.**   No.

10 **Q.**   Can we please look at deposition page 169, lines 21 to 25?

11 Dr. Corcoran, at your deposition you were asked the same

12 question I asked previously,

13          **"QUESTION:**  Can you cite to a single

14          peer-reviewed article that applies false

15          discovery rate to animal bioassays?"

16 Your answer was,

17          **"ANSWER:**    I don't think so.  Not off the

18          top of my head."

19 **A.**   Mm-hm.

20 **Q.**   Is that still true today?

21 **A.**   Well, since that deposition, I was interested to see that

22 the EPA actually came out with their -- I can't remember what

23 it's called exactly, but it was a -- it was a report that they

24 issued about glyphosate this past fall, after my deposition,

25 and the false discovery rate approach was actually mentioned.

1        And so I -- you know, with respect to the toxicology

2    studies of glyphosate and, in fact, that paper -- it's

3    Benjimini and Hochberg.

4        So I guess I should spell that for you.

5    B-E-N-J-I-M-I-N-I, and Hochberg is H-O-C-H-B-E-R-G.

6        That's the seminal paper from 1995 that actually gave rise

7    to the false discovery rate and the one that's so widely cited

8    now.

9        But that paper was actually cited in that EPA report, and

10   so I was interested in what they had to say about it, and so I,

11   you know, I looked at some of the minutes, as well, and

12   Dan Zelterman, who's a colleague of mine at Yale, he actually

13   suggested that it would -- that it was used for the glyphosate

14   toxicology data.

15       So it was discussed by that Scientific Advisory Panel with

16   respect specifically to toxicology data.

17   Q.   Thank you.  My question was whether the statement on the

18   screen is true today.  Can you give us a peer-reviewed article?

19   A.   Peer-reviewed article?

20   Q.   To an animal bioassay, sir.

21   A.   It's kind of a funny question, because when you're talking

22   about one of the 60 most influential scientific papers of all

23   time, what that means -- and it's, you know, that's a list

24   that's published by Nature.

25       It doesn't have anything to do with, you know, the

1  specific branch of science.  It has to do with all of the

2  sciences.

3      I mean, if a toxicologist would -- would publish in

4  Nature, which he or she would, of course, then, you know, you

5  have to consider that's a paper that, you know, would be

6  useful.

7  **Q.**  Dr. Corcoran --

8          **THE COURT:**  Well, but could you -- I mean, could you

9  just answer the question?  And then, if you need to explain

10  your answer, that's fine.

11          **THE WITNESS:**  Oh, okay.  Thanks.

12          **THE COURT:**  You didn't even answer this question.

13          **THE WITNESS:**  No, but as far as the use of

14  bioassays --

15          **THE COURT:**  Okay, so the answer is no, right?  I take

16  it, the answer is no.

17          **THE WITNESS:**  No, but I think --

18          **THE COURT:**  You can now explain why the answer is

19  no --

20          **THE WITNESS:**  Right.

21          **THE COURT:**  -- or why you think it doesn't matter,

22  but try to answer her question.  So if you need to time to

23  explain your answer to provide context, feel free to do so, but

24  you've got to at least answer the question.

25          **THE WITNESS:**  Okay.  Sure.

1       So, no, not off the top of my head, with all of that added

2   context.

3   **BY MS. ROBERTSON:**

4   **Q.**   Thank you.  And Dr. Corcoran, isn't it true that National

5   Toxicology Program, the NTP, does not use multiple comparisons,

6   including FDR?

7   **A.**   I really don't know what, you know, what the NTP's

8   requirements are.

9       You know, what I'm tasked to do in this case is just

10  provide my kind of own independent evaluation just based on my

11  own background and my own expertise, my own experiences.

12      So, you know, that's what I'm applying here, not -- not

13  regulatory requirements that -- that are esoteric to particular

14  agencies.

15          **MS. ROBERTSON:**  Thank you.  I have no further

16  questions.

17          **THE COURT:**  Any redirect?

18          **MR. GRIFFIS:**  No, your Honor.

19          **THE COURT:**  Okay.  Thank you very much.

20          **THE WITNESS:**  Okay.  Thanks very much.

21  (Witness excused.)

22          **THE COURT:**  Okay, what's next?

23          **MR. MILLER:**  I think Dr. Nabhan.  Your Honor, with

24  the Court's permission, we would call Dr. Nabhan.

25          **THE COURT:**  Great, and then what's -- just curious,

1    what's the plan for the defendants after that?

2           MR. LASKER:  We're not calling Dr. Goodman, so we

3    will be calling Dr. Mucci.

4           THE COURT:  Okay, and for Dr. Nabhan, how long do you

5    expect the direct to go?

6           MR. MILLER:  I'm sorry, your Honor.  I would say the

7    direct is an hour or less.

8           THE COURT:  Okay, great.  Thank you.

9           MR. MILLER:  Depending on what the Court might ask.

10          THE CLERK:  Please raise your right hand.

11                          CHADI NABHAN,

12   called as a witness for the Plaintiffs, having been duly sworn,

13   testified as follows:

14          THE WITNESS:  I do.

15          THE CLERK:  Please be seated.  Speak clearly into the

16   microphone, and spell your last name for the record.

17          THE WITNESS:  Chadi Nabhan.  First name C-H-A-D-I,

18   last name N-A-B-H-A-N.

19          MR. MILLER:  Now, I'm going to hand you this water,

20   Doctor, should you get thirsty.

21          THE WITNESS:  Should I trust you?

22          THE COURT:  I have a glass of glyphosate here, if you

23   want.

24                          (Laughter.)

25

1      <u>**DIRECT EXAMINATION**</u>

2    BY MR. MILLER

3    Q.   How do we pronounce your last name?

4    A.   N-A-B-H-A-N, "NAH-ban."

5    Q.   Nabhan, all right.  And Dr. Nabhan, good morning.

6    A.   Good morning.

7    Q.   You have never been an expert witness before?

8    A.   It's my first time.  I'm a rookie.

9    Q.   All right, and in order to explain and articulate your

10   opinions here today, did you assist in preparing a PowerPoint?

11   A.   I did.

12   Q.   Okay.  Let's go to slide 2, and look at your background,

13   and you can please explain some of this to us?

14   A.   So for the past year and a half, I've been working in

15   administrative and health outcomes research at Cardinal Health

16   as Chief Medical Officer of Specialty Solutions, which is one

17   the divisions within Cardinal Health.

18   Q.   Okay, not too fast, and loud enough for everyone to hear

19   you.

20   A.   And prior to that, I was at the University of Chicago as

21   an Associate Professor of Medicine in Hematology-Oncology.  I'm

22   a hematologist and medical oncologist by training.  I ran the

23   Clinical Cancer Center, I was director of the cancer clinics,

24   which oversaw all disciplines within cancer care, and I was the

25   Medical Director of the international program, as well, which

NABHAN - DIRECT / MILLER                    796

1  looked at getting international patients into the cancer

2  center.

3  Q.    All right, so you're a medical doctor.

4  A.    I am.

5  Q.    And you're a hematologist-oncologist.

6  A.    I am.

7  Q.    And now, you are board-certified in these subspecialties

8  of hematology-oncology?

9  A.    I am.

10 Q.    And how long have you been board-certified in oncology and

11 hematology?

12 A.    Since 2002.

13 Q.    Uh-huh.  All right.

14 A.    And in internal medicine since 1998.

15 Q.    Very well, sir.  Let's go to the next page of our slide.

16 A.    So this is just a background.  The University of Chicago,

17 when I was there, it remains one of 42 institutions of the NCI

18 comprehensive centers which, you know, for the NCI to designate

19 a comprehensive cancer center, it requires good clinical

20 translational basic and preventive medicine research.

21 Q.    You're going to have to slow down, because this lady has

22 been working all week, all right?

23       So NCI means, of course, National Cancer Institute, right,

24 Doctor?

25 A.    All right, I'll be slow.

1  Q.   Okay.

2  A.   During my tenure there, the last fiscal year we had 48,000

3  visits, over 5,000 new cases, while I was the Medical Director

4  of the Cancer Center.

5  Q.   It's not on your slides, but I'll ask you now:  How many

6  of those were lymphoma cases?

7  A.   I actually don't remember top of my head, so I don't want

8  to misstate.  I don't remember the exact number of lymphoma

9  cases.

10 Q.   Estimate?

11 A.   But it's in the thousands.

12 Q.   Okay.  So while you were at the University of Chicago, is

13 it fair to say, or not, that you treated non-Hodgkin's lymphoma

14 patients every day?

15 A.   Eighty percent of my practice throughout my career has

16 been lymphoid malignancy and CLL, 80 percent of my publications

17 and research is lymphomas and CLL, which is a form of lymphoid

18 malignancy, as well.  So my practice was dedicated to lymphoma

19 is 80 percent of the cases, but 20 percent I did some GU

20 pathology, seeing prostate cancer as well.

21 Q.   Okay, so the thrust of your practice --

22       THE REPORTER:  I'm sorry, I lost you.  You did some

23 GU...?

24       THE WITNESS:  GU, which stand genitourinary, so I --

25 about 20 percent of my practice was prostate, with about 80 to

1  85 percent was in lymphomas.

2  **BY MR. MILLER:**

3  **Q.**   And before you were a professor at the university of

4  Chicago -- let's go to the next page, please -- if you could

5  tell us about your experience there.

6  **A.**   So prior to that, I was at Advocate Lutheran General

7  Hospital.  It's a large community tertiary hospital, with

8  Advocate Health Care, and in Chicago.  I was the Chief of

9  Oncology and Hematology for the five years immediately prior to

10 being recruited to the University of Chicago.

11      The Director of the Hematology-Oncology program.  So I was

12 in charge of training and educating fellows who are going to be

13 future hematologists or oncologists, and the Director of the

14 Cancer Institute at that institution.  Then I was recruited to

15 University of the Chicago.

16 **Q.**   How many future board-certified hematologists-oncologists

17 have you trained in your career, approximately?

18 **A.**   Many.  I mean, I think we all, in oncology we all pride

19 ourselves for being mentors.  I think it's probably one of the

20 most satisfying things, to train future physicians who are

21 going to care for patients.

22      I would say, you know, directly, probably at least 25 to

23 30 oncologists I have mentored and I've helped in publishing,

24 and writing research and so forth; but we are, you know, as a

25 team, we are indirectly involved in training many of the

1  oncologists.

2  **Q.**   Sure, and I don't want you to leave your scientific common

3  sense at the door.  Will you only give us your opinions today

4  if you would feel giving comfortable giving those same opinions

5  to the fellows that you train to become future oncologists?

6  **A.**   Absolutely.

7  **Q.**   All right, so you were, from 2003 to 2013, at Advocate

8  Lutheran General Hospital.

9       Let's go to the next slide, if we could.

10 **A.**   Just start to give you a background of that particular

11 hospital, because it's a little bit different than the

12 University of Chicago.  It's over 600-bed community teaching

13 tertiary referral hospital for regional -- for other regional

14 institutions within the area, one of the top hundred hospitals

15 in the U.S.

16      And my role was there really to, essentially, aside from

17 training and educating fellows, to improve various cancer

18 service lines.

19      So we've actually built a very robust bone marrow

20 transplant program, neuro-oncology programs, and we received

21 the QOPI certification, which is the Quality Oncology Practice

22 Initiative, which is the highest quality award by the American

23 Society of Clinical Oncology.  We did that both at the

24 University of Chicago and at Advocate, which basically it's an

25 award that testifies that these patients are receiving quality

NABHAN - DIRECT / MILLER

1    and safe care for cancer.

2    **Q.**   Let's go to the next slide, please.

3    **A.**   So I'm board-certified in internal medicine, hematology,

4    and medical oncology, as we just said.   I am licensed in five

5    states.

6        The reason I received the California license is because I

7    think at some point I'm going to move to California because of

8    the weather.   Not sure.

9        Again, my practice is really focused on lymphomas and CLL,

10   About 80 to 85 approximate percent of the time.

11       I have seen 30 lymphoma patients a week, at least four to

12   five new patients a week.

13       All of the community oncologists in the regional area have

14   my cell phone and e-mail, and I was a referral or resource for

15   them, seeing patients, difficult cases mainly, that was

16   referred to me.

17   **Q.**   Very good, sir.   Could we go to the next page of the

18   slide?

19   **A.**   So really, my past and current research continues to focus

20   on lymphoma; couple of areas, disparities in lymphoma care,

21   very interested in real world evidence.

22       I think we all can agree that clinical trials don't always

23   represent what happens in the real world.   Clinical trials

24   often enroll younger patients, healthier patients, patients who

25   are able to travel, even, to academic sites to get in studies.

1      So I'm very interested in what happens for the 90 to

2  95 percent of lymphoma patients who are not in clinical trials.

3  **Q.**   All right, sir.

4  **A.**   Heavily engaged in health outcomes research.  I have

5  authored or coauthored over 200 peer-reviewed publications,

6  manuscripts and abstracts, and presented my research at

7  national and international meetings.

8      In fact, I am going to present some of my lymphoma

9  research in Stockholm for the European Hematology Association

10 this summer.

11     And some of my research are in very high journals such as

12 *JAMA, Journal of Hematology and Blood,* and so on.

13 **Q.**   Let's go to the next page, please.  Are these some samples

14 of the kind of research you've done and published in the

15 peer-reviewed literature?

16 **A.**   Yes, just one or two, a few there.

17 **Q.**   And are these in lymphoma?

18 **A.**   Yes, and all peer-reviewed, obviously.

19 **Q.**   Very well, sir.  Before we get to your general causation

20 opinions, you and I have never worked together before, right,

21 sir?

22 **A.**   We have not.

23 **Q.**   In fact, we met last night, but you've been working with

24 our law firm because we asked you to review these issues,

25 right, sir?

1  A.   Yes.  Yes.

2  Q.   All right, let's go.  And you've reviewed a lot of stuff,

3  let's put it this way.  It's in your report.

4  A.   Yes.

5  Q.   All right.  Let's go to your general causation opinions,

6  please.

7  A.   So there's a lot of literature out there, and I think, you

8  know, at the end of the day, as a clinician, as someone who

9  treats patients, who sees patients, and who has to decide what

10 is the best approach for patients in terms of treatment,

11 prognosis and prevention -- which is very important -- I'm

12 convinced that there is enough literature and enough evidence

13 to suggest that Roundup® can cause and be a substantial

14 contributor to the development of non-Hodgkin's lymphoma.

15 Q.   And do you hold that opinion to a reasonable degree of

16 medical certainty?

17 A.   I do.

18 Q.   And let me ask you this:  If I was a fellow and I came to

19 you and I said, Dr. Nabhan, should I look only at the

20 epidemiology or should I look only at the -- at the

21 biomechanical animal data, or should I look at everything, as a

22 scientist, in order to reach my conclusions, what would you

23 tell me?

24 A.   You really have to look at the totality of evidence.

25 I think it's one of my pet peeves when someone would look at

1  one part of the evidence, ignores the rest.  It's similar to

2  some of my fellows who would -- who used to read the abstract

3  of an actual paper, and not read the actual paper, not read the

4  actual methods, and not read the supplement tables, and the --

5  the things that are posted online, that are usually just -- are

6  buried, because you're just too busy, you just get to the

7  conclusions.

8      So you look at the totality of evidence.  You cannot just

9  look at one thing versus another.

10 **Q.**   All right, sir.  Now your second bullet point here, we've

11 talked about some in this courtroom this week.  Please tell us

12 what this opinion is, sir.

13 **A.**   Again, there are no -- there are no case-control studies

14 that will be perfect.  I think we can critique every single

15 paper that is published.  It's part of our role as peer

16 reviewers, and I peer-review every week several articles.

17     So you can always find the good and bad, in every study.

18 That's always the case, as we --

19 **Q.**   We didn't -- I'm sorry to interrupt.  We didn't go over

20 that in your qualifications.  You are actually a peer reviewer

21 for peer-reviewed journals?

22 **A.**   For clinically-oriented journals, like, again we're

23 looking --

24 **Q.**   Example?

25 **A.**   *Blood*, *Journal of Medical Oncology*, *JAMA*, *JAMA Oncology*,

1   *annals of internal medicine*.  These are clinical journals.

2   **Q.**   Yes, sir.

3   **A.**   So in the literature I reviewed, there are some

4   case-control studies that suggested a dose-response effect,

5   which again, confirms my opinion about the association.

6   **Q.**   All right.

7           **THE COURT:**  Could I ask a question about that slide?

8       You know, we have those two bullets.

9       Am I to interpret this slide as saying that the reason you

10  have the opinion in the first bullet is, in insignificant part,

11  because of what is said in the second bullet, that is, the

12  dose-response effect is seen in some case-control studies?

13          **THE WITNESS:**  Not necessarily, no.

14          **THE COURT:**  All right.

15          **THE WITNESS:**  I think in some studies there was

16  evidence of dose-response in terms of the amount of exposure

17  and the duration, and in others not, but I don't believe

18  that -- in other words, even with the lack of -- even if there

19  were no dose-response, I think there's enough evidence from the

20  other studies that I saw and I read to suggest a causation and

21  correlation.

22          **THE COURT:**  Okay, thanks.

23  **BY MR. MILLER**

24  **Q.**   Let's go on to the next slide, if we could.  Explain this

25  slide, three bullet points, for us, please.

1    **A.**    You know, I honestly think the most important part in this

2    one is bullet three, which is -- again, I'm a clinician, I'm

3    not an epidemiologist or a statistician, but we're on the front

4    line with patients.

5          At the end of the day, we have to look at what we -- the

6    evidence that we have, when you're sitting in front of a

7    patient who has cancer, and they're asking you, what do I do

8    next, what treatment do I get, et cetera, you need to look at

9    everything and provide an opinion.

10         So all clinicians -- excuse me -- will look at the

11   totality of evidence, especially when looking at epidemiology

12   studies, and the -- you know, when you look at the totality of

13   evidence and what has been written and published, it is

14   supportive of causality between glyphosate and non-Hodgkin's

15   lymphoma.

16   **Q.**    And asking you to not leave your real world experience at

17   the door, the Court has asked a question of other witnesses

18   this week:

19         Have people, in your opinion, knowing what you know now,

20   gotten non-Hodgkin's lymphoma in real world exposures from

21   exposure to glyphosate-based products?

22   **A.**    In my opinion, absolutely, yes.

23   **Q.**    And in fact, have you been asked to review files of people

24   who have non-Hodgkin's lymphoma who have been exposed to

25   glyphosate-based products, and put your professional reputation

1  on the line about whether they, in fact, have a causal

2  connection between the two?

3  A.   I have been asked to do so, and if I didn't believe that,

4  I wouldn't be here.

5  Q.   So -- and we haven't heard this concept in the courtroom

6  yet, but what is a differential diagnosis?

7  A.   Well, differential diagnosis is when you're faced with a

8  patient who have certain signs and symptoms suggestive of a

9  disease, you have to look at what these signs and symptoms

10  might be in relation to.  There could be several other diseases

11  that have similar signs and symptoms, right?  A person could

12  present with a cough and it could be lung cancer, but it could

13  be just simple bronchitis.

14      So I think differential diagnosis, when a clinician is

15  faced with a patient who has signs and symptoms but does not

16  know yet the diagnosis and, in his or her mind, goes through

17  what are the possibilities of what this patient might have.

18  Q.   If --

19  A.   And then you go through tests and imaging and so forth to

20  get to the proper diagnosis.

21  Q.   If I were to walk into your office, independent of this

22  courtroom, and say, Dr. Nabhan, you've told me I have

23  non-Hodgkin's lymphoma, and I spent 15 years working on a farm,

24  I've been exposed to Roundup®, would that on your differential

25  now, knowing what you know?

1    **A.**   So it would be on the differential of possible etiology or

2    possible triggering event developing the disease.  The

3    patient -- if I -- if the patient already has the disease, then

4    there's no differential diagnosis for the diagnosis.

5    **Q.**   Sure.

6    **A.**   I already know that the person has lymphoma.  But in every

7    patient who walks in every physician's office -- and I will

8    challenge any physician -- you always ask about occupational

9    exposure.  You always ask, what you do for a living?  Do you

10   smoke?  Do you drink?  Do you do drugs?  You ask about these

11   things.

12        And unless you ask, because you're trying to identify and

13   modifiable risk factor to tell you your patient, maybe you

14   should stop drinking, maybe you should stop smoking, then why

15   are we asking these questions?

16        And we spend a lot of time asking these questions for a

17   reason, because there are scenarios where patients have certain

18   risks that, if we try to mitigate, we are going to do a better

19   job.

20   **Q.**   Let's take a look at the next slide.  All right, thank

21   you.  Yeah, we could go -- I think we've been through that.

22   Yeah, let's go to the next slide, please.

23                    (Pause in proceedings.).

24            **THE WITNESS:**  Computer malfunction.  I can have

25   water.

1          **MR. MILLER:**  A little machine issue here.

2   **Q.**   Well, let's not spend a lot of time here.  I have a hard

3   copy.

4          What we're trying to do, since you're the only

5   non-Hodgkin's lymphoma expert who treats patients, I just

6   wanted you to explain to the Court some basic concepts about

7   non-Hodgkin's lymphoma.

8   **A.**   So I mean, I would say I go through this -- it's back

9   (indicating) it's back.

10  **Q.**   There it is, all right.

11  **A.**   So it's a very --

12  **Q.**   Thank you, your Honor.

13  **A.**   -- it's a very typical question, and I promise you that

14  anybody in this courtroom that, God forbid, they ever have any

15  type of disease or cancer, the first question that they will

16  ask an oncologist is, Why did I get that?  And number two is,

17  What do I do next?  And number three, What's my prognosis?  And

18  number four, What's the impact on my family?  I've done this

19  many times, and these are the four common questions asked.

20         So I oftentimes answer these questions before being asked

21  this, because I know this is what goes through a patient's

22  mind.

23         So to simply find non-Hodgkin's lymphoma, just, you know,

24  as a big category, is divided in to T-cell and B-cell, and each

25  one of them, the T-cell non-Hodgkin's lymphoma and the B-cell

1   non-Hodgkin's lymphoma, they are divided into two major

2   categories.  One we call indolent, and one we call aggressive.

3      So indolent means you might discover it by chance.  It's

4   not very fast growing.  It may not cause a lot of symptoms

5   right away.  And aggressive, obviously, is the opposite.

6      The classifications have evolved over the years, of

7   non-Hodgkin's lymphoma.

8      The last classification of non-Hodgkin's lymphoma was

9   published in *Blood* in 2016, by Swerdlow and colleagues, and

10   that's the last classification, 2016, where we know now we have

11   over 60, six-zero, types of non-Hodgkin's lymphoma.  Thirty

12   years ago, we thought we had only ten.

13      So the improvement in classifications mirrors our better

14   understanding of disease biology.  We understand a little bit

15   better about each disease.

16      And this classification actually does help us as

17   clinicians, in terms of assisting prognosis and deciding on

18   treatment.

19      When we look at causation and when we talk about

20   occupational hazards and so forth, it is very difficult, nearly

21   impossible, to look at that for every single subtype of 60 of

22   them.

23      So when we look at causation, we look at non-Hodgkin's

24   lymphoma as a big umbrella.  That's how we view it, as

25   clinicians.  It's very difficult to say, oh, I want to know

1  exactly the cause of this particular type.  Sometimes we can,

2  and we have certain associations between infectious agents and

3  certain viruses and particular rare subtypes of non-Hodgkin's

4  lymphoma.

5      I mean, an example, *H. pylori* is associated with a form of

6  non-Hodgkin's lymphoma called "MALToma."  It's rare, but we

7  know it's associated with it.

8      But for the most part, when we look at causation, we look

9  at the entire disease.

10  Q.  And in fairness to Monsanto, sometimes there's

11  non-Hodgkin's lymphoma that's we just don't know the causes,

12  right?

13  A.  I have taken care of many patients --

14  Q.  Sure.

15  A.  -- with non-Hodgkin's lymphoma that we have no idea why

16  they have it, and I'm not suggesting whatsoever that every

17  non-Hodgkin's lymphoma is caused by glyphosate --

18  Q.  Of course not.

19  A.  -- at all.  What I'm suggesting is that there's a subset

20  of patients with non-Hodgkin's lymphoma that have developed the

21  disease because of this exposure.

22      And I think identifying this risk would be very important

23  now, and moving forward, to prevent future cases and to help

24  some patient.

25  Q.  Are they called modifiable risk factors?

A.    Modifiable risk factors.

Q.    And is that something that clinicians seek, to modify the

behavior of the individual so that they would avoid the risk

factor?

A.    We do it every day in clinic and outside of clinic.

There's a reason why we tell people to wear seat belts.

Q.    Sure, or protective suits.

A.    Right.

Q.    Now, we've talked in this courtroom about latency, and as

a non-Hodgkin's lymphoma expert, I'd like to hear your opinions

in that regard.

A.    So it really differs widely, and I think it's really --

and I have some examples just to illustrate my point.

      It's very difficult to answer the question of what is the

latency of non-Hodgkin's lymphoma, which is, from when you were

exposed to an offending agent to the time of developing a

advisable tumor.  This varies widely.  And I've said that

previously.

      Some cancers could develop in less than year of being

exposed to a carcinogenic agent.  Some could take much more

time.

      I put a quote here from the EPA, but if you move to the

next slide on there, these are other quotes in terms of what

the latency.

      But I'll -- I want to show the two examples that -- there

NABHAN - DIRECT / MILLER

1  are many examples I could bring in just to explain how the

2  latency actually differs in patients.

3      There's an example that I -- well, before we go to the

4  example, this is -- no, the next one, the World Trade Center.

5  Yeah.  So this is from the World Trade Center Health Program,

6  and they state -- and I completely agree with the statement,

7  because this is what we see in clinical practice.  I mean, at

8  the end of the day, we can look at numbers for weeks and weeks

9  and weeks, but this is what happens in real life.  This is what

10 happens in real world.

11     It could be as early as 0.4 years, they said, based on low

12 estimates, useful lifetime risk, and it could be much higher

13 than that.  And the two examples that I'm going to show you

14 just illustrates this particular thing, because it's really

15 what we see in practice.

16     So this is -- this is just an example.  This is a paper

17 that I actually helped with, although I'm not a co-author on

18 it.  So "PTLD" stands for post-transplant lymphoproliferative

19 disorder.  This is a form of lymphoma that occurs after solid

20 organ transplantation.

21     So solid organ transplantation is the triggering event.

22 Patients receive -- undergo solid organ transplantation, and

23 then they are placed on immunosuppressant agents, so you won't

24 reject the organ that you received.  So the solid organ

25 transplant and the immunosuppressants are the triggering event

1  that these patients have.

2      If you look at the arrows, this study showed that patients

3  develop PTLD at a median time of 48 months.  The range is one

4  month to 216.

5      I have seen patients who get the solid organ transplant

6  and a couple of months later, they develop this type of

7  lymphoma.  So they have had no risk factors prior to this

8  trigger event.  Their latency period was very short.  They

9  developed the disease.  Others may take 216 months until they

10  develop the disease.

11      Another example, in the following slide.

12  Q.  Before we go to the next example, just to keep the record

13  clear, they developed one within month up to 216 months PTLD,

14  what is PTLD?

15  A.  It's a form of non-Hodgkin's lymphoma.

16  Q.  Okay.

17  A.  But about five percent of PTLD could be Hodgkin.  So PTLD

18  stands for post-transplant lymphoproliferative disorder.

19  Q.  Thank you.

20  A.  So this is a form of lymphoma.  Ninety-five percent are

21  non-Hodgkin's, there's about 5 percent of these PTLD that are

22  Hodgkin.

23      But the point I'm trying to make here is not the actual --

24  it's a lymphoid malignancy, and the latency is impossible to

25  predict.  In clinical practice, we don't even look at -- we

1   don't -- we stopped trying to predict.

2          JUDGE PETROU:  So this is related to transplants and

3   immunosuppressant drugs.

4          THE WITNESS:  But that's a triggering event.

5          JUDGE PETROU:  No, I understood.  And I think I know

6   the answer, but I want to be quite clear:  You don't have a

7   basis for determining a range of latency periods for

8   non-Hodgkin's lymphoma based upon exposure to a pesticide,

9   herbicide, something of that nature.

10         THE WITNESS:  Yeah, my opinion is, it could vary.  It

11  could vary.

12     Again, you know, I view the chemicals or pesticides and so

13  forth as triggering events, as an offender event, as a problem

14  that this patient or this individual has.

15     So similar to this offending event, similar to this

16  offending example, it could have short-term or long-term.

17         JUDGE PETROU:  Based on a variety of factors.

18         THE WITNESS:  Variety of factors.

19         JUDGE PETROU:  Okay.

20         THE WITNESS:  And the next example actually

21  illustrates the exposure to chemotherapy.  So the next

22  example -- this is another example in terms of:  When do

23  patients develop treatment-related AML, which stands for "acute

24  myeloid leukemia," or MDS -- myelodysplasia -- after bone

25  marrow transplant?  Bone marrow transplant, usually patients

1  receive high-dose chemotherapy, so they get chemicals, they get

2  the chemotherapy.

3      And if you look at the arrow I have here, they developed

4  this hematologic malignancy from four months to six years.

5      In heme malignancies, it is very difficult to say that a

6  patient needs 20 years to develop something, or one year to

7  develop something.  We have seen it all over.  And if you ask

8  most hematologists and most folks who treat leukemia and

9  lymphoma, they will tell you it could be very short; it could

10 be very long.

11     And these are two examples.  One of them -- both of them

12 had a triggering event.  That's why I brought them up.  And

13 there's not enough time to bring so many examples.  More than

14 happy to provide a lot of literature on this that shows you

15 such a wide variation of latency.

16 **BY MR. MILLER**

17 **Q.**   I think we're going to skip the explanations of the

18 medical -- let's look at one or two, but let's see the next

19 slide.

20     Real quickly, if we could move off of latency, and we're

21 done now.  Unless the Court has any questions, we're done with

22 latency.

23 **A.**   Sure.  This is just, I guess, the explanation of the

24 lymphatic system.  You can keep moving.

25     This is the lymphatic system part of the -- again, it

1  helps -- B-cells and T-cells, like we talked about.

2       Next slide.

3       The B-cells usually produce antibodies that fight

4  infections.  The antibodies recognize prior offending pathogens

5  that they may have been exposed to.

6       The T-cells usually do two things.  They try to push --

7  they help the B-cells to do their job, and they also do their

8  own job in fighting infections, as well as cancers.

9       In fact, a lot of the advances that you are hearing about

10  in the news over the past couple years are working on the fact

11  how can we manipulate the T-cells to do a better job in

12  fighting cancer.

13       So non-Hodgkin's lymphoma, as we just talked about on the

14  previous slide, could develop from T-cell or B-cell.  And

15  T-cell usually is worse than B-cells, in terms of prognosis and

16  outcomes.  The only way to differentiate between both of them

17  is to do a biopsy.  And there are about 60 types, as we talked

18  about.

19       Next slide.

20       Again, there's not a whole lot here to say, except the

21  fact that the lymphoma is part of the -- you know, when

22  patients have lymphoma, it affects their immune system, so they

23  are prone to the disease itself and to the infectious

24  complications.

25       Next.  Again.  Next.

1          This leads to lots of organ dysfunction.

2          When I look at etiology of how certain offending agents

3   may cause lymphoma, it's not -- I mean, again, it's always a

4   matter of beautiful papers that are written in many

5   peer-reviewed journals, but the reality is, nobody knows

6   hundred percent what actually happens.

7          Oxidative stress is one proposed mechanism by which, you

8   know, the cells are unable to fight the free radicals, and they

9   are damaged.  So this actually leads to the possibility of

10  development of cancer in non-Hodgkin's lymphoma.  There's good

11  data that non-Hodgkin's lymphoma could develop from oxidative

12  stress.

13  **Q.**   This next slide, Progression to Tumor, can you talk about

14  this in the context of what we call the two-hit theory of

15  cancer?

16  **A.**   Yeah.  I mean, there's a lot to talk about this slide, so

17  I'll try to simplify it.

18         And I think, you know, when you -- when you go -- when you

19  see the word "chemical," and this could be -- think of it as

20  any offending problem, offending agent.  The example that

21  I gave you for those two diseases were, one was bone marrow

22  transplant, the chemicals, the chemotherapy one was the

23  immunosuppression and support, but basically, an offending

24  agents could cause an oxidative stress that damages the normal

25  cells.  The DNA damage could subsequently lead to having

1   additional mutations that you can't repair.  The system is

2   unable to repair the mutations that have evolved.  And then,

3   additional stressful events could occur that lead to the

4   development of cancer.

5       So the type of offending agents -- or we're calling here

6   "chemicals" just for simplicity -- could interfere in any part

7   of this particular flow.

8       So you could have a chemical that is affecting the

9   development or the evolution from normal cells to damaged

10  cells, but as an additional triggering event that occurs after

11  that, that might speed up developing a mutation, or speed up

12  development of cancer.

13      It's a theoretical model.  I think, as a clinician, my

14  advice always to patients and families and people that we talk

15  to is, at the end of the day, it may be very difficult to know

16  when this particular thing happened, but this is what we can do

17  to maybe prevent it from getting worse, and maybe what you can

18  do to mitigate that problem in the future, and this is what you

19  should do to move ahead and treat.

20  **Q.**  All right, next slide, please.

21      All right, just a few comments on epidemiology we'll come

22  back to if the Court wants to go through each study, but you've

23  prepared this slide.  Explain it to us.

24  **A.**  Again, I'm not a an epidemiologist, but I did look at the

25  epidemiology literature, because I think it's important to look

1  at.  Ultimately, I think every epidemiologist will acknowledge

2  that every study has its own merits, its own flaws.  It's just

3  the way it is.  It's like every clinical trial.

4  Q.   Have you seen that, as a peer reviewer?

5  A.   Of course, the world is not perfect.  It's just the way it

6  is.

7  Q.   Have you ever gotten a draft article from someone that

8  wants to be in a peer-reviewed journal and you wrote on it

9  "perfect study, absolutely flawless"?

10 A.   I have never done that, and I think if I do this, the

11 editor will call me and say, "What's wrong with you?  There's a

12 conflict of interest right there."

13 Q.   Okay.

14 A.   So it just doesn't happen, and that's why, anytime you

15 look at peer-reviewed literature and you look at the footnotes

16 you look at when the paper of received, and when the paper was

17 revised and when the paper was accepted.

18      And I can tell you, every time I see that the time from

19 received to revised very short, my eyebrows usually rise,

20 because I'm thinking, okay, this was not given enough time to

21 even look at, formally.

22      So again, some studies are good.  Some studies -- no study

23 is perfect, but as a clinician, you have to take the weight of

24 evidence and make sense of it.

25 Q.   Would a responsible clinician look solely at the epi- --

NABHAN - DIRECT / MILLER

1    I mean, we've had some great questions, frankly, and one of

2    them is:  Does the epidemiology, all by itself, prove causality

3    here?  What's your opinion on that?

4    **A.**   You can't just take epidemiology, right?  I mean, I think

5    you look at the epidemiology studies and then you try to link

6    this with -- okay, epidemiology is very suggestive.  Are there

7    any reason to think there's some mechanistic evidence that this

8    agent may cause problems, on the DNA level, on the cellular

9    level?  Then, is there any animal studies that may support some

10   of this?

11        So then you need to look at all of this.  And a lot of

12   it -- from a clinician's view, we don't really sit down and

13   re-analyze and re-perform a peer-review process for every

14   single paper that has been published.  It's already

15   peer-reviewed.  It's already published.  It's done.  My job as

16   a clinician is not to peer-review the entire literature again.

17        Again, maybe look at other bodies and other experts who do

18   this, and who do this such as the IARC, and I looked at the

19   IARC very thoroughly, and I firmly believe in the conclusions

20   of the IARC, and that actually makes a huge difference for us

21   as clinicians.

22   **Q.**   All right.  I think you've now anticipated the next slide.

23   Let's go to it, please.

24   **A.**   So -- no, I think there's one before this, yeah.

25   **Q.**   I'm sorry, go ahead.

**A.**    Again, so from a clinician's view, we look at the totality

of evidence.  We do review epidemiology studies but we do

consider the source.  We try to look at this to the extent

possible.

So looking at the evidence, when we look at the source and

we look at a body such as the IARC, which was formed in 1965,

has 25 member countries, meets three times a year, and the goal

is just to assess the carcinogenicity of compounds, and then

they've published these in *Lancet* and *Oncology*, I went back and

I wanted to understand, well, what was the history of IARC?

Why should I really believe what the IARC says?

Can we move to the next slide, please?

**Q.**    Sure.

**A.**    So here's the historical perspective.  The IARC has

assessed over 1,000 compounds so far.  So 1,003 compounds, to

be precise.  International perspective and collaboration.

Outside stakeholders are allowed to be there, and to observe.

And they don't take every agent that you tell them, okay,

go take a look at this for carcinogenicity.  No, they don't.

You have to prove that there is enough human exposure to get

the IARC's interest, and there's enough animal data and some

studies to support that it's worth the time for the IARC to

actually even look at these compounds.

And after all of this, very few agents the IARC would

suggest that they are carcinogenic.

822

1          So from 1,003 compounds, only 120 were labeled as

2    carcinogenic, 12 percent, and only 8 percent, 81, are probably

3    carcinogenic.

4          So the totality, with all they've done, they came up with

5    20 percent of the 1,003 that either are carcinogenic and

6    probably carcinogenic.

7          So the IARC is not out there to label everything as

8    carcinogenic.  In fact, 80 percent, they say they're not.

9          So as a clinician, I will look these epidemiology studies,

10   then I look at bodies such as the IARC, I look at the history,

11   and it's hard to argue, with all of the data that the IARC

12   looked at and with the history, so I tend to obviously believe

13   the data that came out of IARC.

14   Q.   Sure.  Go to the next slide.

15         We've heard a lot of discussion the Agricultural Health

16   Study and the Agriculture Health Study updated report from

17   Andreotti.

18         Do you want to weigh in on this?  You have a slide.

19   A.   Sure.  So first, I think, you know, it's important to put

20   into perspective that this study was actually looked at by the

21   IARC, and it was actually taken into consideration by the IARC.

22   So it was not necessarily ignored.

23   Q.   The original study?

24   A.   The original study.

25   Q.   Sure.

1   **A.**   So all of what this, to me -- again, I'm talking wearing

2   my clinician's hat, and I think all of this is, is an updated

3   analysis, in my mind, for an already flawed study.

4         The intent of the Agricultural Health Study was actually

5   very good.  The plan was very good.  They actually wanted to

6   figure out all of the these exposures and so forth.

7         But the study, by itself, has so many flaws, so it's great

8   that we keep getting updates of flawed study, and I'm sure

9   there will be additional updates in a few years, but it doesn't

10  change the fact that there were so many flaws in this study,

11  it's impossible to draw any conclusions.

12        You have 37 percent loss of follow up, and in the

13  subsequent questionnaires, in Phase II and III, when you ask --

14  **Q.**   Let me stop you right there.  Did you go online and

15  actually look at the questionnaire?

16  **A.**   I -- I did, not all of them, because each one was 28

17  pages --

18  **Q.**   Okay.

19  **A.**   -- but I did look at a couple of the questions for Phase I

20  and Phase II, yes.

21  **Q.**   Okay, and -- well, did you have any concerns about that?

22  **A.**   There are two major concerns.  Just -- if I may.

23        The bullet point 4 is a very important part that I

24  found -- it's intriguing, and it's actually written in the

25  Methods section of the *JNCI* paper.

1          So participants that completed the questionnaire -- so in

2     Phase II and Phase III -- they completed that answering only

3     about their exposure for the one year immediately before they

4     answer.  So it wasn't for the duration of since the last time

5     you actually answered.  It was just for the one year

6     immediately before.

7          So if you look at the Methods section of the *JNCI* paper,

8     you will see that very well spelled out.

9          They say, you know, the respondents, they actually

10    answered for the one year immediately before they answered the

11    question.  Well, that's only one year.  And that's really an

12    issue.

13    **Q.**   Well -- I'm going to stop you there.

14         So in 1993, when they started, somebody fills out the

15    questionnaire and they go, "Never used glyphosate."  In '94,

16    with the growth of the use of glyphosate, they used glyphosate,

17    they use glyphosate in '95, they use glyphosate in '96, they

18    use glyphosate in '97.  They got non-Hodgkin's lymphoma.  Are

19    they listed as an exposed case or a non-exposed case?

20    **A.**   Non-exposed, because they answered in 1992 that they were

21    not.  But not only this.  I mean, this is one piece.  But I'm

22    going to even take you to the Phase II.

23         So on the Phase II questionnaire, as a respondent, you

24    answer only for -- so if you're answering the question, you

25    know, Phase II, let's say, 2003, right?

NABHAN - DIRECT / MILLER

1  Q.   Yes.

2  A.   If you're answering the question in Phase II between 2003

3  and 2005, you are supposed to answer based on your exposure for

4  the one year immediately before you are handed the

5  questionnaire.

6  Q.   And that's the questionnaire --

7  A.   So you could be exposed in 1998, 1999 and 2000, but if you

8  were not exposed in 2002 and you are answering in 2003, you are

9  non-exposed.

10  Q.   So you could have used six years' worth of glyphosate, but

11  not the year before you filled out the second part --

12  A.   Exactly.

13  Q.   -- and you're constantly unexposed --

14  A.   Exactly.

15  Q.   -- even though you've had six years of exposure.

16  A.   That's written in the Methods section of the *JNCI* paper.

17       Number two is, you already have significant dropout in

18  terms of the -- you know, the folks who answered, on number 3

19  the control arm, the arm that was technically not supposed to

20  get glyphosate, was -- had a high increased risk anyway.  They

21  were farmers.  They were pesticide applicators.  So they

22  actually had higher risk of developing non-Hodgkin's lymphoma.

23       So when you choose the control group as a group that

24  already has higher risk of non-Hodgkin's lymphoma, and you lose

25  37 percent of respondents, and a lot of folks are going to

1  answer non-exposed while they were exposed, and the glyphosate

2  exposure is actually increased during the time period of the

3  study, it is impossible to have to have a positive finding in

4  the AHS.  Of course it's going to be negative, because so many

5  flaws.

6  **Q.**  Let's go to your next slide, then, the real world

7  implications of all of this.

8  **A.**  Well, I mean, the real world implication is, at the end of

9  day, you are faced with patients who have a disease, and again,

10  if you have been with a friend or a family member or anybody,

11  the first thing you ask is, why did I get this?

12      Unfortunately, in the majority of cases in lymphoma, our

13  answer is, we don't know.  That's the reality.  We don't know

14  why most patients get non-Hodgkin's lymphoma.

15      But there are situations that we do.  There are situations

16  that could be something linked to an occupation, something

17  linked to a situation that you have, and that's when we tell a

18  patient, I think this is why this occurred, and my advice to

19  you is not to do this occupation or not do this function,

20  because it may slow the progression of your disease, it may

21  cause slowness of it, or it may prevent another type of

22  lymphoma you have.

23  **Q.**  And that's what we want from your real world opinions.

24      If you were with a patient tomorrow and they had symptoms

25  of possibly having hematopoietic cancer and told you they were

1  applying Roundup®, would you tell them that's a modifiable risk

2  factor?

3  **A.**    Yes.  I would.

4  **Q.**    Okay.

5  **A.**    Absolutely.

6  **Q.**    All right.  Finish looking at your slide here, if you

7  would, sir.

8  **A.**    Again, it says -- I think it's repeating some of the

9  things that I've already mentioned in terms of the

10  dose-response, in terms of trying to look at the totality of

11  evidence.

12       We can move to the next slide.

13  **Q.**    Okay.

14  **A.**    This just has my view of how important it is to patients.

15       You know, we can talk a lot about p-values, and so forth,

16  and I think it's really important to think that there's

17  statistical significance and there's a clinical significance.

18       There's absolutely no magic in 0.05.  This was an

19  arbitrary number that was chosen, so you could level set when

20  you look at clinical trials.

21       So there are many studies, in fact, in oncology that show

22  drug A is better than drug B, with a statistical significance

23  of 0.05, but it adds 10 days of life.  Some of these papers

24  were published in the *New England Journal of Medicine*.

25       How clinically significant is it?  So again, it's a matter

1    of numbers.  So clinicians care about the clinical significance

2    of the data, not just of the p-value.  Yes, we take p-value,

3    yes, we look at all of this, but ultimately, what's clinically

4    significant?

5         And I think there's enough evidence out there to suggest

6    that the exposure to glyphosate have clinical significance in

7    terms of causing and contributing to non-Hodgkin's lymphoma.

8    **Q.**   I'm going to diverge from your PowerPoint for one second.

9         You did -- I'm going to just walk through and get it on

10   the record if you reviewed these case-control studies, and if

11   they formed a piece of the puzzle for your opinion.

12        The McDuffie study that we've talked about a lot here,

13   2001, did you review it, read it?

14   **A.**   I have.  I may not remember every single word, but I have.

15   **Q.**   I understand, and it's got some issues that we've

16   discussed, like all studies have, but did it form a piece of

17   the puzzle for your opinion?

18   **A.**   Yes.

19   **Q.**   Okay, and Hardell 2002, was that a piece of the puzzle for

20   your opinion, as well?

21   **A.**   Yes.

22   **Q.**   And it was not a perfect study either, was it?

23   **A.**   There are no perfect studies.

24   **Q.**   Okay, and De Roos '03, you reviewed that, and was that a

25   piece of puzzle?

1   A.   It was.

2   Q.   Okay, and we've talked about AHS.

3        You did you review the Eriksson study 2008, and was that a

4   piece of the puzzle for your opinion?

5   A.   I did, and it was.

6   Q.   Okay.  You also reviewed the meta-analysis of Schinasi and

7   Léon?

8   A.   I have.

9   Q.   And was that a piece of the puzzle for your opinions here?

10  A.   Yes.

11  Q.   And lastly, the meta-analysis of Chang and Delzell, you

12  reviewed that, and was that a piece of the puzzle, formulating

13  your opinions?

14  A.   I have.

15       MR. MILLER:  I don't know if the Court has any

16  questions about the technicalities of these studies.  I leave

17  it to the Court.

18  Q.   All right.  Let's go, then, to your Conclusions slide.

19  A.   So after systematic review of the literature, both

20  epidemiological and other studies, applying the Bradford-Hill

21  Criteria, holds an opinion that glyphosate exposure can and

22  does cause non-Hodgkin's lymphoma in patients.

23       And again, this is just totality of evidence.  It's very

24  easy to poke a problem in every single study.  I can do it

25  myself.  But at the end of the day, we have to look at the

1    totality of evidence, and that's what I did.

2             MR. MILLER:  Thank you very much.  Please answer the

3    questions of the Court or counsel for Monsanto.

4             THE WITNESS:  Thank you.

5             MR. MILLER:  Thank you, your Honor.

6             THE COURT:  How long do you plan on cross being?  I

7    wanted to see if now is a good time for a morning break.

8             MR. GRIFFIS:  Twenty minutes or less, your Honor.  We

9    can certainly break, if you'd like.

10            THE COURT:  You want to break?  Yeah, let's break

11   now, and we'll resume at half past.

12            THE CLERK:  Court is in recess.

13         (Recess taken from 10:25 a.m. until 10:36 a.m.)

14            MR. GRIFFIS:  I have some materials to hand out.

15         (Whereupon a document was tendered to the Court.)

16            MR. GRIFFIS:  We have the binder for everyone we

17   should, but do not yet have the three exhibits that we handed

18   up copies of --

19            THE COURT:  We got them.

20            MR. GRIFFIS:  -- for your clerk.  We just don't have

21   quite enough yet.  We'll resolve that later.  I'm sorry.

22                      **CROSS-EXAMINATION**

23   BY MR. GRIFFIS:

24   **Q.**  Could we pull up first a copy of the slide 39 from the

25   direct examination?  Thanks.

1    **A.**    Is this 39?

2    **Q.**    Yeah, it's the same as 39 that was used in the previous

3    examination, sir.  This is our copy of it.  Do you recognize

4    that?

5    **A.**    I do.

6    **Q.**    Okay, and you see in front of you a document labeled, "Key

7    Characteristics of Carcinogens as a Basis for Organizing Data

8    On Mechanisms of Carcinogenesis," by Smith and others, sir?

9    **A.**    Yes.  It's a review article.

10   **Q.**    It is, and do you see that author -- the second author and

11   the last author Kathryn Guyton and Kurt Straif, do you

12   recognize them as IARC executives?

13   **A.**    I recognize Guyton and Straif.

14   **Q.**    Okay.  Do you see Christopher Portier at the end of the

15   first line there?

16   **A.**    I do.

17   **Q.**    And do you know, sir, that this is one of the documents

18   that IARC uses in assessing mechanism of cancer?  This is the

19   list of the 10 key characteristics of carcinogens when they're

20   doing the mechanism analysis for IARC reviews these days; do

21   you know that, sir?

22   **A.**    I don't know if they use this.  I did not know that.  No.

23   **Q.**    Okay.  They do, and we will look at the monograph in a

24   moment.

25        But take a look at the Discussion section.  So that we can

1  see the list of the 10 key characteristics of cancer.  This is

2  the Discussion section.

3  **A.**   Which page?

4  **Q.**   In the abstract.

5  **A.**   Okay.

6  **Q.**   Okay.  So we have labeled 1 through 10 the key

7  characteristics of carcinogens that IARC looks at, and I'd like

8  to point out that number 2 is genotoxic and number 5 is

9  oxidative stress, and we all know that IARC found that there

10  was strong evidence for those mechanisms, correct?

11  **A.**   Yes, we do.

12  **Q.**   Okay.  Now, take a look, please, at number 3, "Alter DNA

13  repair or cause genomic instability."

14     Chemicals that alter DNA repair or cause genomic

15  instability, of course, can promote carcinogenesis by the

16  mutagenic effect of those actions, right?

17  **A.**   I don't think we know the exact mechanism of how this

18  would occur after the genomic instability.  Nobody really

19  knows.  All what we know sometimes is the genomic instability

20  could occur upon exposure to something.  What happens

21  afterwards is really not well defined or discerned.

22  **Q.**   On your chart, sir, "Altered DNA repair would have impact

23  at the level of DNA repair," correct?  It's on the slide in

24  front of you.

25  **A.**   I see that.  This does not necessarily happen for every

1  carcinogen in that exact manner.

2  Q.   Oh yeah, I understand.

3  A.   Some causes one versus the other, and so forth.

4  Q.   Yes, sir.  I'm pointing out right now -- what we're

5  pointing out right now is how various mechanisms of

6  carcinogenesis, so that you'll understand, affect different

7  parts of this process.

8  A.   I understand.

9  Q.   Obviously with other carcinogens, because IARC didn't find

10  these mechanisms with regard to glyphosate, right?

11  A.   Yeah, I understand.  I just want to make sure to point out

12  that there are -- we don't always know the mechanism of

13  carcinogenesis of known carcinogens.  So there were two

14  important issues here.  I want to make sure I go on the record

15  of saying that.

16  Q.   We don't know for glyphosate.

17  A.   No, I didn't say for glyphosate.  What I said is, we don't

18  always know the exact mechanism of action of carcinogenesis for

19  every carcinogen.

20  Q.   And we don't know for glyphosate, right?

21  A.   We sometimes have suggestive mechanism of action.  We have

22  evidence that this is how it may happen, how it may occur, but

23  we don't always have an absolute, that this is the only way

24  that carcinogenesis would occur, and no other way.  We may find

25  out in the future.  I don't think anyone in this courtroom can

1  tell me how tobacco causes lung cancer.

2  Q.   Sir --

3  A.   We know it's a carcinogen.

4  Q.   -- you don't claim that you know a mechanism by which

5  glyphosate has causes cancer, right?

6  A.   We have suggestive mechanisms through oxidative stress and

7  genotoxicity.  I said that we don't know if these are the only

8  mechanisms by which glyphosate could cause cancer or

9  non-Hodgkin's lymphoma.  We may find other mechanisms the

10 future that may be different than the current understanding.

11 Q.   Number 7 is Immunosuppressive, right?

12 A.   Yes.

13 Q.   You have a section of your chart labeled, "Immune System,

14 Chemical affecting the immune system."  Immunosuppressive

15 carcinogens would act in that section of the process, correct?

16 A.   I see that, yes.

17 Q.   And non-Hodgkin's lymphoma is fundamentally tied to the

18 immune system, in that lymph cells are immune cells, right?

19 A.   We would consider that correct, in terms of, it's somewhat

20 of an immune system disease.

21 Q.   And let's look quickly at number 9 and number 10.

22 "Immortalization," which is a process by which cells that

23 aren't supposed to be immortal become immortal and never die,

24 which is real bad because we want our cells to eventually die

25 once they stop being useful, right?

1  **A.**    Yes.   We would like to have a balance between cell

2  survival and cell death.

3  **Q.**    And then --

4  **A.**    And whenever that balance goes towards survival of the bad

5  cell, then there's a problem, pretty much in almost the

6  majority of cancers.   That's really how cancer develops.

7  **Q.**    And 10, "alter cell proliferation, cell death or nutrient

8  supply."   So numbers 9 and 10 would act at the level of

9  uncontrolled growth of mutated cells, that last box there,

10  right?

11  **A.**    Just the -- as it's stated, in terms of immortalization,

12  affecting nutrient supply and cell death and proliferation.

13  **Q.**    On your chart, that's where it would act, at the end,

14  right?

15  **A.**    It could be related to the -- any part, in terms of, you

16  know, when the cells are mutated and then they develop into

17  cancer, that's because there's no apoptosis, there is no cell

18  death and the cells continue to proliferate.

19       So cancer, in general, just cancer, is overgrowth of

20  cells, and that's literally why we have cancer that could occur

21  in every body organ.   It's a lack of balance between cell death

22  and cell survival.

23       Whenever that scale tips towards cell survival of the

24  malignant cell, these cells continue to proliferate, and

25  eventually they become visible as tumors or as cancers on an

 1  X-ray or clinically.  So in every cancer, this is what you will

 2  see, this balance between cell survival and cell death.

 3       Now what triggers this?  What tips one way or the other?

 4  It's always up for debate, and sometimes it's well studied and

 5  well known.  Sometimes it's not.

 6  Q.   In Exhibit 1030, sir, the IARC Monograph -- which I

 7  believe is in the record already -- would you turn to page 78.

 8  A.   That's a very abbreviated version of that IARC Monograph.

 9  Q.   It is, sir.  In order to save trees, I left off the

10  parts --

11  A.   It's only three pages of a hundred-page document, so

12  I hope I can answer the question.

13  Q.   You can have my copy, with the full version --

14  A.   I answer in context, that's what I mean.

15  Q.   Okay.  The context is section 5, where the results of the

16  Working Group are given with regard to mechanism.  Do you have

17  Section 5.4 of the relevant data where mechanism is described?

18  A.   5.4, yes.

19  Q.   Okay.  On page 78, first line of the first full paragraph,

20  do you see that the Working Group reported,

21            "There is weak evidence that glyphosate

22            or glyphosate-based formulations induce

23            receptor-mediated effects"?

24       That's one of the key characteristics we didn't talk

25  about.  Do you see that?

1  **A.**    I see that.

2  **Q.**    And have you read the preamble before?

3  **A.**    I -- I have not yesterday.

4  **Q.**    Okay, and do you recall from your reading of the preamble

5  "weak" is the lowest category for mechanism evidence, when

6  there is any evidence?

7  **A.**    Yeah.  So let me just explain.  It's a very important

8  point, because that's why sometimes you say, mechanisms of

9  action, and there are scenarios where a particular compound or

10  a disease that you know how this disease developed or how this,

11  or how A caused B, but it doesn't always happen across the

12  board.  So you don't have all mechanisms of the reason why

13  cancer develops occur for every particular compound.

14  **Q.**    Okay.

15  **A.**    So some compounds may actually trigger cell survival.

16  Some may prevent cell death.

17  **Q.**    If it will help you, sir, I'm not trying to argue that any

18  carcinogen has all 10 characteristics.  So you don't need to

19  counter me on that point.

20  **A.**    I didn't review this particular evidence, but if the IARC

21  says this particular aspect of the mechanism of action is weak,

22  then it's weak.

23  **Q.**    Okay, and cell proliferation or death is addressed in the

24  next.  "There is weak evidence" -- this is the top of the next

25  paragraph -- "that glyphosate may affect cell proliferation or

1    death."  Correct?

2    A.    Yes, I see that.

3    Q.    And the question I asked before, actually, I don't think

4    you answered.

5         Do you remember, from when you read the preamble, that

6    "weak" is the lowest category description that they have that

7    they list for mechanism evidence?

8    A.    I don't, but if you have it, I can look at it.

9    Q.    I do have it, sir.  It's in front of you.  It's

10   Exhibit 1049, page 21.

11            THE COURT:  It's one of the loose documents.

12            THE WITNESS:  Yeah, I just saw that.

13   BY MR. GRIFFIS

14   Q.    Yeah, the last of the loose documents.

15   A.    Which page?

16   Q.    Page 21.  They're describing their procedures under header

17   C for Mechanistic and Other Relevant Data.  At the top of the

18   second paragraph, they describe the terminology, the strength

19   of the evidence, that "any carcinogenic effect observed is due

20   to a particular mechanism is evaluated using terms such as

21   'weak', 'moderate' or 'strong.'"

22        And obviously, the weakest term that they give there is

23   "weak."  Right?

24   A.    Yes.

25   Q.    Okay.  Weak evidence is also in the monograph.  Back to

1    page 78 of Exhibit 1030, in the next paragraph.

2    **A.**    I'm sorry, are we...?

3    **Q.**    We're back to the monograph, exhibit 1030, page 78.

4    **A.**    Okay, mm-hm.

5    **Q.**    And we're on to the next paragraph.

6                     "There's weak evidence that glyphosate

7              may affect the immune system, both the

8              humoral and cellular response."

9         Correct?

10   **A.**    Correct.

11   **Q.**    And then finally, to wrap this up, the next paragraph.

12                    "With regard to the other key

13             characteristics of human carcinogens -- "

14             **JUDGE PETROU:**  Counsel, you're reading really

15   quickly.

16   **BY MR. GRIFFIS**

17   **Q.**    (Reading:)

18                    "With regard to the other key

19             characteristics of human carcinogens, the

20             Working Group considered that the data were

21             too few for an evaluation to be made."

22        Right?

23   **A.**    Yes, that's what it says.

24   **Q.**    And like IARC, you aren't claiming evidence for mechanisms

25   other than oxidative stress and genotoxicity, right?

**A.**   I believe these are the suggestive mechanisms.  I don't
believe that anyone knows necessarily hundred percent the
mechanism.  And frankly, clinicians, as clinicians, we don't
always necessarily -- it's nice to know, it's good to know.  It
provides an intellectual and intelligent conversation amongst
colleagues and peers, but at the end of the day, the mechanism
of action is not really that critical if you know something is
causing a problem.

**Q.**   It doesn't matter too much for a clinician, right?

**A.**   I said, it matters.  It doesn't matter that much if you're
already convinced that there is a problem that occurs.

     And I actually give you an example of tobacco association
with lung cancer and bladder cancer.  I think everybody in this
room is convinced, hopefully -- if not, we have to talk outside
the court -- that smoking and tobacco use does cause the
majority of lung cancers, 95 percent, and the majority of
bladder cancers.

     We may not know how.  We may not understand how.  But just
because I don't know how, I'm not going to call my patient and
say, "Go ahead and smoke."

     So I think it's very important to understand that we'd
like to know the mechanism of action, we'd like to understand
it, but clinicians care more about whether a problem has
occurred and what to do about it.

**Q.**   Take down the slide, please, Scott.

NABHAN - CROSS / GRIFFIS

1      Dr. Nabhan, you can't say that glyphosate increases the

2    risk of non-Hodgkin's lymphoma by 1 percent, or 15 percent, or

3    what, right?

4    **A.**   In some studies, it doubled the risk.  In some studies,

5    the odds ratio is 1.5.  I think it increases the risk.  I think

6    studies are not always consistent in terms of how -- what is

7    the incremental risk that we are talking about.

8    **Q.**   I'm talking about the actual risk that you believe

9    glyphosate actually increases in the real world.

10   **A.**   And I think I just answered.

11   **Q.**   We talked about that and you've said, "I can't say.  It

12   could be 1 percent, as far as I'm concerned."  Right?

13   **A.**   I actually didn't say it could be 1 percent.  What I said

14   is that it in some studies it has shown to have an odds ratio

15   of 2 plus.  In others, it was less than 2.

16      So the studies have shown increased risk of exposure to

17   glyphosate with the development of non-Hodgkin's lymphoma.

18      To quantify that risk, there is a lot of controversy over

19   this, and I'm not really sure that we know exactly what that

20   quantification is, but it exists, and accordingly, it exists

21   enough that we need to tell patients and people who actually

22   use that agent about it, so we can prevent this from happening

23   further.

24   **Q.**   So is it true or false that it could be 1 percent, as far

25   as you're concerned?

1  **A.**   I don't know.  I can't speculate.  You're asking me to

2  speculate, and I don't think I can do that.

3  **Q.**   Okay.  You've told me in the past it could be 1 percent,

4  right?

5          **THE WITNESS:**  Do I repeat the same answer,

6  your Honor?

7  **BY MR. GRIFFIS**

8  **Q.**   We can show you.  Do you see, in tab 3 of your binders?

9  **A.**   It could be a hundred percent.  I see what you're saying.

10  It could be 1 percent, it could be a hundred percent.  My point

11  is --

12  **Q.**   You don't know?

13  **A.**   -- I can't quantify the risk.  In my mind, the risk is

14  clinically significant enough that patients need to be aware of

15  it.  Now, you may think 1 percent is not clinically

16  significant, somebody else may think clinically 1 percent is

17  significant.  Some people --

18  **Q.**   Would you turn --

19  **A.**   -- might say a hundred percent is not significant.  To me,

20  I think that's an individual thing, but the risk is not zero.

21  It exists, and accordingly, we need to make sure we modify it

22  to prevent this from happening to other patients.

23  **Q.**   Would you are turn to your expert report, sir?

24  **A.**   Sure.  Where?

25  **Q.**   It's in your binder.  I don't have the same tabs that you

1   do.  I think it's 3.

2   **A.**   Tab 3, you say?

3   **Q.**   I believe so.  Is that right?

4           **THE COURT:**  I think it's 1.

5   **BY MR. GRIFFIS:**

6   **Q.**   1, I'm sorry, tab 1, and turn to page 11 of it.

7   **A.**   Page 11?

8   **Q.**   Yes.

9   **A.**   Sure.

10  **Q.**   And do you see there under the large header, "Assessment

11  of Carcinogenic Risk in humans," first header, sub-header

12  "Epidemiological Studies," you started discussing the

13  McDuffie study in the first paragraph?

14  **A.**   I see that.

15  **Q.**   Okay, and you said, in describing the McDuffie study, and

16  this is about the middle of the paragraph,

17           "Among major chemical classes of

18           herbicides, the risk of NHL was

19           statistically significantly increased among

20           glyphosate-exposed individuals with an odds

21           ratio 1.26, 95 percent confidence interval,

22           0.87 to 1.8,"

23  and we talked about that sentence when we had your deposition,

24  right?

25  **A.**   Yes.

NABHAN - CROSS / GRIFFIS

1   Q.   Okay.   And you -- when you say, "statistically

2   significant," what I learned, sir, is that when you say,

3   "statistically significant," what you mean is an odds ratio of

4   above 1.0, whether it's p-value of less than .05 or not, right?

5   A.   I think -- and I just alluded to that earlier.   There's --

6   the statistical significance is the p-value of 0.05, but

7   there's nothing magic about the 0.05, and we have to always

8   think of clinical significance as we look at many of these

9   studies.

10       So if you continue to the second paragraph of this --

11           **JUDGE PETROU:**   You know what, I need to take a

12   five-minute break.

13           (Recess taken from 10:54 a.m. until 10:59 a.m.)

14           **THE COURT:**   Everyone back?

15   BY MR. GRIFFIS

16   Q.   Dr. Nabhan, you rely heavily on IARC for your opinion that

17   glyphosate causes non-Hodgkin's lymphoma, correct?

18   A.   I do.

19   Q.   With regard to the -- you know what I'm talking about when

20   I say the AHS 2018 study?

21   A.   That's the *JNCI* paper?

22   Q.   Yes.

23   A.   Yes.

24   Q.   You agree that the NIH funding that funded that paper and

25   the project -- the whole AHS project -- means that high

1    standards and best practices were used in gathering and

2    assessing the data, right?

3    **A.**   No, I don't agree with that.  I agree that it was

4    well-intended when it first started, and obviously, it was a

5    very important project to do.  The intentions was very well

6    conceived at the time, it was funded and so forth, but this

7    does not mean that the way the trial actually took place

8    necessarily was not flawed.  There's a difference.

9    **Q.**   Let me ask the question again.

10       Do you agree that the NIH funding means that high

11   standards and best practices were used to ensure that the data

12   was accurate?

13   **A.**   I think I answered that.  What I said is that the NIH

14   funds studies that they believe are important to the public,

15   and that was the intent, clearly.

16       But unfortunately, as the trial and as the study went on,

17   there are so many flaws that took place that still, the NIH

18   continued to fund it and has to report and so forth, but just

19   because you fund a study, it means that you believe in the

20   importance of the study, but you know, the NIH didn't

21   intentionally say, we need to have 37 percent of people not

22   answer questions.  They would have liked for people to answer,

23   but it happened.

24       So it doesn't mean that there are no flaws of the study

25   just because the NIH funded it.  I mean, that's saying that

1  anything that is funded by the NIH and the NCI, I cannot

2  critique, which is not appropriate.

3  **Q.**   Tab 4 is your January 15th, 2018 deposition.  Why don't

4  you turn there, sir, page 26.

5       And if we can have slide 35, please?

6  **A.**   Page 26 of...?

7  **Q.**   Tab 4 of your January 15th, 2018 deposition.  I'm on page

8  26, lines 12 through 17.  Do you recall this question and

9  answer.  My question is this, sir:  "Do you agree that NIH

10  funding, and perhaps you don't know -- "

11  **A.**   You said page 24?

12  **Q.**   Page 26, and it's 12 through 17.  Are you there?

13  **A.**   Page 24.  It says, "And that's why -- "

14       **THE COURT:**  Do you want to start reading from the

15  middle of page 25, question, "Do you -- "

16       **JUDGE PETROU:**  I think the problem is that the

17  witness is looking at the numbers on the bottom of the page

18  rather than the deposition page numbers.

19       **MR. GRIFFIS:**  Oh, I see.

20       **THE WITNESS:**  No, I can see the deposition numbers

21  page 7, page 25?

22       **THE COURT:**  Yeah, but I would start reading at page

23  25, line 14.

24       **MR. GRIFFIS:**  Okay 25, line 14.

25       **THE WITNESS:**  Please do.

1    BY MR. GRIFFIS

2    Q.   Are you there, sir?

3    A.   Yes, I'm here.

4    Q.   (Reading:)

5              "QUESTION:   Do you agree that National

6              Institutes of Health funding means that high

7              standards and best practices are used to

8              ensure the data is accurate?

9              "ANSWER:    Answer:  It doesn't ensure the

10             data is accurate.  It just basically -- all

11             that it does, it provides funding that the

12             NIH views is important.  You don't know what

13             data you will generate for the funding,

14             because when you fund a study, you don't

15             really know what you are going to come up

16             with a study.  You just decide on funding a

17             study -- "

18   Am I going too fast?

19             " -- you just decide on funding the

20             study upon its inception, because you view

21             it is important in the public domain, and

22             that's what the NCI and the NIH did."

23   A.   That's exactly what I just answered.

24   Q.   (Reading:)

25             "They funded the study, and because of

1          interest, obviously, to the general

2          public."

3     And then after a question about whether you had an NIH

4 funding study before, at 8.

5          "QUESTION:  I'm going to ask the question

6          again, because I think you focused on the

7          conclusions and whether the conclusions are

8          accurate.

9          "ANSWER:    Sure.

10          "QUESTION:  My question is this, sir:  Do you

11          agree that NIH funding -- and perhaps you

12          don't know, but do you agree that NIH funding

13          means that high standards and best practices

14          are used to ensure that the data is accurate?

15          "ANSWER:    Yes.

16 A.   At the time of inception, that's what they ensured, yes,

17 but again, as you saw in my previous answer, which you weren't

18 planning on reading, but it does say exactly that it doesn't

19 ensure the data is accurate.  It just basically says it

20 provides funding for a study that's important.

21     So at the time you invest in a study, you realize it's

22 very critical, it's important, I'm going to dedicate resources

23 and money to fund it, and then you follow, and see what

24 actually happens.

25     Some studies are great, and they maintain the integrity

1  and they're actually fine, and some are not.

2      So my point is, just because the NIH or the NCI funds a

3  study, it doesn't mean that these studies are immune to

4  criticism and they're not flawed.

5  **Q.**   You would have approved --

6  **A.**   In fact, the literature is full of studies that are funded

7  by these agencies that are not accurate.

8  **Q.**   You would have approved it for publication.

9  **A.**   I would have approved it for publication, because I think

10  it's important to be there.  I would have accompanied it by a

11  more critical editorial than the editorial that was written.

12  I probably would have not accepted this paper in the *JNCI*.

13  I would have definitely suggested a much lower impact journal.

14  **Q.**   Now, despite this being a very major foul-up with a lot

15  more data than the De Roos 2005 paper, you told me that this

16  doesn't weaken your opinion about non-Hodgkin's lymphoma at

17  all, right?

18  **A.**   The follow-up of a flawed study would continue to show

19  flawed results.  If you follow it for 20 more years, it's going

20  to still show flawed results.

21  **Q.**   And when I asked you what kind of epidemiology study --

22  never mind the NCI *JNCI* 2018 study, but an ideal imaginary

23  epidemiology study, what kind of epidemiology study would shake

24  your conviction, you said, nothing would shake my conviction

25  about non-Hodgkin's lymphoma and glyphosate, correct?

**A.**    That's right, because you just look at the entire

evidence.   There is no -- and again, I think I said that

earlier, there is no perfect epidemiology studies.   You put any

epidemiology study, and I promise you we both can find a lot of

good things about it and bad things about it.

**Q.**    At this point, nothing would you shake your conviction.

**A.**    At this point, the IARC report is very convincing.   It

looked at the totality of evidence.   It incorporated the

AHS Study.   The IARC only -- from 1,000 compounds that they

reviewed over 40 years, only 20 percent they declared

carcinogen.

I don't believe the IARC is out there to get compounds and

just declare everything is carcinogen, no.   They actually put a

lot of thought into the data, a lot of thought into

epidemiology.

And they're very critical even to accept to review a

compound.   They actually reject most of the proposed compounds,

to decide whether they are carcinogens or not.

So it's very difficult to discard a body like the IARC,

who put a lot of thought into all of this, and they conclude

the conclusion that they have.

And then, in all honesty, I went back and I looked at some

of these studies, and despite their flaws, there is convincing

evidence that there is increased risk and causality, including

the meta-analysis that was very interesting.

1  Q.   Thank you, Doctor.

2  A.   You're welcome.

3       THE COURT:  Any redirect?

4       MR. MILLER:  Very briefly.

5                   **REDIRECT EXAMINATION**

6  BY MR. MILLER

7  Q.   I just want to follow up on that last question.

8       What you told counsel was that if someone did a randomized

9  clinically-controlled trial, that would have informed you and

10 affected your opinion, wouldn't it?

11 A.   It would be unethical to do.

12 Q.   Well, that's the problem now, because it's a known

13 carcinogen, it would be unethical to do a randomized clinical

14 control trial.

15 A.   Correct.

16       MR. MILLER:  Thank you.  I have no further questions.

17       THE COURT:  Anything further?

18       MR. GRIFFIS:  No.

19       THE COURT:  Okay, thank you very much.

20       THE WITNESS:  You're welcome.  Thank you.  Do I leave

21 this here?

22 (Witness excused.)

23       THE COURT:  All right, last witness?

24       You can hand it back to the lawyers.  They can deal with

25 it.

1          **MR. LASKER:**  Your Honor, Monsanto calls

2   Dr. Lorelei Mucci to the stand.

3       And just some prefatory comments before she gets to the

4   stand.  One, I'd like to introduce Alicia Shimada at counsel

5   table, who's assisting me in this matter.

6       And second, I know your Honors have a lot of questions.

7   I want to just lay out the order that I have sequenced things

8   in, so if I've missed anything, you can let me know.

9       We're planning on first discussing, after her general

10  opinions and some summary, the 2018 *JNCI* study and the

11  arguments that have been raised by plaintiffs' experts about

12  nondifferential exposure misclassification.

13      And then there are four issues that I have, I believe,

14  your Honors are interested in, and that's why I've decided to

15  prioritize, which is, confounding by other pesticides, the

16  issue of latency, the issue of recall bias, and the issue of

17  the proxies and proxy bias.

18      And obviously, if there are other issues that you want to

19  cover, I'm sure you'll have ask a question, and if you let me

20  know, I can try and guide Dr. Mucci to answer those questions,

21  as well.

22          **THE COURT:**  Great.  Thank you.

23                          **LORELEI MUCCI**,

24  called as a witness for the Defendant, having been duly sworn,

25  testified as follows:

1          **THE CLERK:**  Please be seated, speak clearly into the

2   microphone, and spell your last name for the record.

3          **THE WITNESS:**  My last name is Mucci.  It's spelled

4   M-U-C-C-I.

5                    **DIRECT EXAMINATION**

6   **BY MR. LASKER**

7   **Q.**   Good morning, Dr. Mucci.

8   **A.**   Good morning.

9   **Q.**   Can you please describe briefly for the Court where you

10  work and what you do?

11  **A.**   I am a cancer epidemiologist.  Currently I am Associate

12  Professor of Epidemiology at the Harvard School of Public

13  Health, and I'm also leader of the Cancer Epidemiology Program

14  at the Dana Farber Harvard Cancer Center.

15  **Q.**   We've heard a lot of testimony over the course of this

16  week about different types of scientific evidence, epidemiology

17  animal toxicology, and mechanistic studies.

18         How does epidemiology fit in this body of science, in

19  addressing the question of whether a particular substance can

20  cause a particular type of cancer in humans?

21  **A.**   Epidemiology is really an essential component in

22  understanding causes of cancer, and the reason is that if we're

23  interested in cancer in humans, the ideal model to study that

24  is in humans.

25  **Q.**   What type of evidence do epidemiologists need to see

1  before they can reach a conclusion that there's a causal

2  association between an exposure and cancer?

3  **A.**    It's important that epidemiologists not rely just on the

4  findings of one study, but it's really important to evaluate

5  the results that have been done in multiple studies, and

6  preferably in multiple populations, to evaluate the consistency

7  across studies.

8  **Q.**    And within each individual study, what does an

9  epidemiologist look for to determine whether there is a

10  positive association between an exposure and an outcome that

11  could inform causality?

12  **A.**    So we're looking at all of the available epidemiological

13  literature.  When we're first evaluating each of these studies,

14  we want to assess whether the observed association may be due

15  to potentially bias, confounding or chance.

16  **Q.**    Okay, we've heard a lot about that, so I'm not going to go

17  through those issues, but Dr. Mucci, have you had an

18  opportunity to review the glyphosate epidemiological

19  literature?

20  **A.**    Yes, I have.

21  **Q.**    And have you prepared an exhibit that summarizes the

22  findings of these studies?

23  **A.**    Yes, I have.

24  **Q.**    Okay.  Let's put that up, slide 2.  And if you could,

25  explain for the Court what information is depicted on this

1  slide.

2  **A.**   So there have been multiple publications that have

3  evaluated glyphosate and NHL risk.  However, those studies

4  really can be summarized by these four main studies presented

5  here.

6       The first study, which is called the NCI study, or

7  Andreotti et al., is the only cohort study that has

8  investigated glyphosate and NHL risk.

9       The lower three studies are case-controlled studies.

10       So the second study by Pahwa, et al. includes a pooled

11  analysis of case-controlled studies from the United States and

12  from Canada.

13       Orsi, et al. is a hospital-based study that was conducted

14  in France.

15       And then finally, Eriksson was the case-controlled study

16  that was conducted in Sweden.

17  **Q.**   And there are a couple of other studies we've heard some

18  discussions and brief discussion of in this case, a study by

19  Hardell and a study by Cocco.  Are those included in your

20  table?

21  **A.**   No.   *A priori*, I decided to not discuss them here, and the

22  reason is that the number of exposed cases in both of those

23  studies was extremely low, so it was less than -- it was four

24  cases in each that were exposed to glyphosate.  So it really

25  make inferences from those studies meaningless.

1   Q.   Other than those two studies, do the -- does the data

2   depicted on your forest plot encompass all of the data,

3   epidemiological data that exists with respect to glyphosate and

4   non-Hodgkin's lymphoma?

5   A.   Yes, it does.

6   Q.   And which of the odds ratios -- well, let me actually back

7   up.

8        Can you explain for the Court what we're seeing here, with

9   respect to the squares and the lines and the diagram?

10  A.   So in this forest plot, for each of the studies, the

11  square represents the estimated relative risk from each of the

12  studies, and the line through it is the width of the 95 percent

13  confidence intervals around each study, and then the actual

14  size of the square refers to the overall size or power of the

15  study, which is influenced not only by the overall size of the

16  study, but especially the number of cases, particularly the

17  number of exposed cases.

18       And so as you can see, Andreotti et al., because of not

19  only the number of the cases but the number of exposed cases,

20  is the most powerful of the studies.

21  Q.   And what is the diamond on the bottom?

22  A.   So I -- I undertook a -- I calculated what's called a

23  meta-relative risk, which is a weighted relative risk that

24  weights each of the four relative risks there by the size of

25  the study, which comes up with a summary estimate.

1  **Q.**   Okay, and before we get to that, I should have asked

2  previously, which of the odds ratios in your forest plot or

3  risk, or -- rate ratios adjusted for pesticides and which are

4  not?

5  **A.**   So the only one that is not adjusted is from Orsi, and

6  that's because there were no multivariable adjusted odds ratios

7  that were presented in that study.  All of the others are

8  adjusted for demographic factors, as well as for use of other

9  pesticides.

10        **THE COURT:**  Could I ask a follow-up question about

11  that?

12        **THE WITNESS:**  Yes, your Honor.

13        **THE COURT:**  So, but you nonetheless included the

14  Orsi study in your forest plot.  Can you explain why?

15        **THE WITNESS:**  Yeah, I think that's an important

16  question.  I included it because it does provide some data.

17  However, really one of the challenges in doing meta-analyses is

18  that the validity of the meta-analysis relies on the validity

19  of each of these four studies.

20     So I present it more as a graphical depiction to show you

21  the results of these studies, but I think we were going to walk

22  through the studies, each of them, and discuss what the

23  limitations are, and how those limitations might influence our

24  results.

25        **THE COURT:**  But -- and without going through all of

1   the detail right now, can you just kind of highlight for me or

2   just flag for me what's the value that the Orsi study brings?

3           THE WITNESS:  Honestly, I think there's very little

4   in the Orsi Study.  It -- even -- it was a hospital-based

5   case-controlled study, which makes you concerned about the

6   quality of the controls in that study.  It's nothing founded,

7   yes.

8           THE COURT:  I'm trying to, again, without getting too

9   much in the details --

10          THE WITNESS:  Right.

11          THE COURT:  -- maybe it's appropriate to tell me,

12  "I'll get back to you on that" because I don't want to

13  interrupt the presentation too much, I'm trying to distinguish

14  in my mind, well, why did she include Orsi in the forest plot

15  but not the other two that she said had so little -- so few

16  cases that were useless?

17          THE WITNESS:  Yeah, I think that's an excellent

18  point.  I think if I were performing -- I -- a true

19  meta-analysis, what I would do is to, in that meta-analysis,

20  actually discuss the quality of the studies, and I might limit

21  and do a sub-relative risk estimate based on the data that I

22  thought were the highest quality, and I think I would have

23  excluded Orsi.

24          THE COURT:  Okay.

25

1   BY MR. LASKER

2   Q.    And I'm not going to ask you to calculate this on the

3   stand, but given the weight of the various studies that

4   incorporated in your meta-analysis, what role does the Orsi

5   odds ratio play in your overall meta-analysis summary?

6   A.    So in total, there were only 12 exposed cases in the Orsi,

7   et al. study, and therefore, if we excluded that from the

8   estimate of the summary relative risk, it would be virtually

9   identical to what's estimated here.

10        So it's not having a lot of impact, but I think the points

11  that you've raised, your Honor, are really important when we

12  think about the quality of these studies.

13  Q.    And if you could, just explain what that diamond, then,

14  represents, in the summary.

15  A.    So it's, as I mentioned, it's the summary relative risk,

16  where we're waiting each of the studies, and coming up with a

17  summary estimate.

18        The center of the diamond represents the relative risk

19  estimate for the meta-analysis; and the width of the diamond

20  gives you a sense of the width of the 95 percent confidence

21  interval.

22  Q.    And I think you've actually already answered this question

23  in response to the Court's inquiry, but what is your view of

24  the value of a meta-analysis, or meta-relative risk, in

25  assessing of body of epidemiologic literature?

1    **A.**    For me, I think it's-- it provides a graphical depiction

2    for us to be able to compare results, across the studies.

3        However, I think if you really want to understand the

4    results of each studies, and it's important to consider the

5    strengths and limitations, and really to evaluate first whether

6    the observed associations you see could be explained by bias,

7    confounding or chance.

8    **Q.**    Let's then start walking through the individual studies,

9    and I'd like to start by discussing the Agricultural Health

10   Study, which we've heard a lot about, but I don't know if we've

11   had a summary of what that study is and how it was designed.

12       So if you could, explain to the Court what the study was.

13   **A.**    So it's a cohort study of 54,000 licensed pesticide

14   applicators from Iowa and North Carolina, and these individuals

15   were selected specifically because there was interest in

16   studying the health effects, both cancer and non-cancer health

17   effects, of pesticides, and it was felt that pesticide

18   applicators could provide high quality information about

19   pesticide use.

20       The design was a cohort study.  As such, it avoids the

21   recall bias that we might be worried about in case-controlled

22   studies.  The questionnaire that's included in the Andreotti,

23   et al. studies was based on two time points; first at baseline

24   between 1993 and '97; and then again five years later, between

25   1999, and 2005.

1          The baseline questionnaire actually captured information

2     not only about the current use of 50 different pesticides, but

3     also collected information about past use of pesticides.

4          And the reason that's important particularly for

5     glyphosate is that it allows us to look at potential latency

6     effects of glyphosate, of more than 30 years of exposure

7     information.

8          Also, another feature of the Agricultural Health Study, as

9     you can see, 834 percent of the cohort were at some point

10    exposed to glyphosate, and why that's important is that it

11    allows us to also look at dose-response, and in particular,

12    look at the potential associations with NHL for very high

13    levels of glyphosate compared to no exposure to glyphosate.

14         **THE COURT:**  Could I ask a clarification question

15    about that?

16         **THE WITNESS:**  Um-hum.

17         **THE COURT:**  The 83 percent figure, is that from the

18    baseline response?

19         **THE WITNESS:**  No.  I'm sorry, that was through the

20    second questionnaire.

21         So the baseline questionnaire, I believe it was 75 percent

22    of the population was exposed, at the baseline questionnaire,

23    and then five years later, it was 83 percent.

24         **THE COURT:**  Thanks.

25         **THE WITNESS:**  So the cohort to follow up for cancer

1   incidence both in Iowa and North Carolina, there are high

2   quality cancer state registries that were linked to the study,

3   and so what's nice about that is it captures incident cases of

4   cancer including non-Hodgkin's lymphoma; and through follow-up

5   with 2013, there were 575 incident cases.

6        And as I mentioned --

7   **BY MR. LASKER**

8   **Q.**   Let me just stop you there, because the court already

9   understands that we haven't had any discussion about the cancer

10  registries before.  The court understands we can just move on

11  but -- okay, good.

12  **A.**   So there were, because of the prevalence of exposure,

13  it's -- the Andreotti, et al. study actually has the highest

14  proportion of exposed cases of any of the epidemiology studies,

15  which is important when we think about both the statistical

16  power of the studies, but also, as I mentioned, our ability to

17  look at potential dose-response associations.

18  **Q.**   Okay, I'm sorry, did you get to the last bullet?

19  **A.**   Yeah.  So there was detailed data that was collected

20  through the questionnaires, on a range of demographic factors,

21  lifestyle factors, as well as the use of a total of 50

22  pesticides, which allowed a detailed consideration of potential

23  confounding factors in the analysis phase through multivariable

24  models.

25  **Q.**   What did the --

1          THE COURT:  Could I -- sorry, could I ask a couple

2   questions about the questionnaire?

3          So my recollection from Dr. Ritz's testimony was that this

4   was, like, a 20- or 30-page questionnaire, something like that,

5   and pesticide applicators were asked to fill it out when they

6   were coming in to get their permit for applying pesticides.

7          And they were put in a room and given 20 minutes or a half

8   an hour or something to fill out this questionnaire, sort of on

9   the spot, without having any time to reflect on the amount of

10  pesticide exposure they've had, and the various different

11  pesticides they've used over the years.

12         That does seem kind of problematic in terms of

13  reliability, and so I was wondering if you could comment on

14  that.

15         THE WITNESS:  Yeah, sure.  So I think that's -- you

16  know, I think with epidemiology questionnaires, we are always

17  concerned about the potential for measurement error

18  misclassification.

19         What's nice about the Agricultural Health Study was they

20  evaluated the reliability of the responses.

21         I don't know if we want to pull up that.

22         MR. LASKER:  We can jump to that part of it, if you

23  want your Honor.

24         THE COURT:  Sure.

25         MR. LASKER:  We'll skip there, and we'll come back.

1  Q.   Let's go to slide 6.

2  A.   So there was, within the Agricultural Health Study,

3  actually 4,000 of the participants came back one year later and

4  filled out the same questionnaire, in the same sort of

5  circumstances that they had filled out the questionnaire the

6  first time.

7       What's nice about that is it allows us to compare the

8  concordance of responses between the two questionnaires, and

9  get a sense of the reliability of information that's presented

10 by the participants.

11      And what that information showed us was that the quality

12 of pesticide use, more generally, but also for glyphosate in

13 particular, was quite reliable.

14      So the concordance for glyphosate between the two

15 questionnaires was 82 percent.  That's a value that is quite

16 similar in epidemiology to other factors we look at, like

17 tobacco use, for example.  So that provided reassurance.

18      In addition, what was really important, I think, in this

19 study was it showed, when looking at sort of the different

20 dose-response levels, that the reliability of the responses for

21 the levels of dose were 90 percent or more agreement.

22      And why that's important is that when you look at the

23 dose-response associations that are presented in Andreotti, et

24 al., it shows you that it's very unlikely that people in the

25 very highest doses of glyphosate are potentially misclassified

1   and really had no exposure and vice-versa.

2        So it's possible that there's some potential

3   misclassification at that lower range where people haven't used

4   pesticides or haven't used glyphosate very often, but I think

5   what this reliability showed was that the validity of the data

6   for the higher doses is probably quite good.

7            JUDGE PETROU:   So the 82 percent concordance rate

8   relates to what?

9            THE WITNESS:   Specifically comparing the answers on

10  glyphosate use in the first and second questionnaires.

11           JUDGE PETROU:   Specifically is that the yes, no, I've

12  used, not used it, or the dosing?

13           THE WITNESS:   Exactly.   So it's the yes-no is

14  82 percent, but then when they looked at the level of dose,

15  that's when they saw agreement of 90 percent, so that people

16  who were categorized as moderate or high, if they were

17  changing, it was really only one category.   So you weren't

18  getting people in the really higher categories being classified

19  incorrectly in the lowest category.

20           JUDGE PETROU:   So it's 82 percent concordance for

21  yes-no, and then within the yeses, a 90 percent for the level

22  of usage.

23           THE WITNESS:   That is correct.

24  BY MR. LASKER

25  Q.   Just to be clear, within the 90 percent you talk about one

1  level agreement or one category.  What does that mean?

2          MR. MILLER:  I'm sorry to interrupt.  May I have the

3  Exhibit number and a copy of that?

4          MR. LASKER:  I wasn't -- actually, this is the Blair

5  2002.  So it's Defense Exhibit 596.

6  Q.  But you can explain it again, and talk about 90 percent --

7          MR. MILLER:  I'm sorry.

8          MR. LASKER:  I'm sorry.

9          MR. MILLER:  596?

10         MR. LASKER:  I'm sorry.  Thank you, my apologies.

11         (Whereupon a document was tendered to the Court.).

12         MR. LASKER:  No, no, no (indicating) there.

13         THE COURT:  We're all friends here.

14         JUDGE PETROU:  Which Exhibit number in your binder is

15  it, counsel?

16         MR. LASKER:  It is tab 5 in our binder.

17 Q.  And if you could, actually, take us to the tables in this

18 study.  So if you could actually walk the Court through this,

19 this is in the outline -- I apologize that we weren't

20 prepared -- and show the Court first where the 81 or

21 83 percent, whatever it is, for exact, for ever/never uses, and

22 then what your point was about, within one level of -- I can't

23 remember exactly what the term was.

24 A.  So the ever/never comparison is presented in Table 1,

25 which is on page 95 of this study, and glyphosate is near the

MUCCI - DIRECT / LASKER

1    top, and you can see the exact agreement or concordance is

2    82 percent for the --

3        **JUDGE PETROU:**  I need to ask a point of

4    clarification, because I thought you were talking about, when

5    you were giving us the 90 percent or 82 percent, I thought you

6    were referring to the 4,000 individuals who filled out the same

7    document or questionnaire one year later.

8        **THE WITNESS:**  Yes.  Yes, exactly.

9        **JUDGE PETROU:**  Okay, and this Table 1, when it says

10   between first and second questionnaire, it's referring to that

11   one year?

12       **THE WITNESS:**  Yes, exactly.  Right, sorry, it's

13   confusing.  It's not referring to that follow-up questionnaire

14   within the larger study.  It's really referring to one year

15   later.

16       **MR. LASKER:**  And your Honor, this publication was

17   before the second phase questionnaire.  It's 2002.

18       **THE WITNESS:**  And so then in the -- in the text --

19   and I think we -- can we call it up here?

20       **MR. LASKER:**  Sure.

21       **THE WITNESS:**  In the text, it talks specifically

22   about the agreement.

23       **MR. LASKER:**  It's going to be on the next page.

24       **THE WITNESS:**  Is it on the -- it's in the discussion?

25   Sorry.  I'm can't recall specifically where it is.

1        JUDGE PETROU:  I'm seeing where it says, 90 percent

2   gave responses within one category of agreement?

3        THE WITNESS:  Yes, exactly.  Thank you.

4        JUDGE PETROU:  It's -- yeah, it's the second page.

5   It's page 9, the column on the left, and the first full

6   paragraph.

7        MR. LASKER:  There you go.

8        THE WITNESS:  Yes, 90 percent exactly.  Yes.

9        JUDGE PETROU:  And what does it mean when it says,

10  within one category?

11       THE WITNESS:  So they were looking specifically at

12  the lifetime-days categories; and there were multiple

13  categories.  I can't recall, I think there were a total of six

14  or seven different categories.

15  BY MR. LASKER:

16  Q.   I think it's footnoted on the table -- actually, no.  Go

17  back to the next table, go back to where you were.

18  A.   To Table 1.

19  Q.   No, I'm sorry, I'm talking to her.

20       Sorry go to Table 2, please.

21  A.   No, it's not.  It's not presented.  I think it's only,

22  unfortunately, presented in the text -- the discussion.  But

23  then we looked in the actual study specifically, where they

24  have the different categories.

25  Q.   I have a footnote in this table that has it, as well.  If

1  you go down to the bottom of the table -- I'm sorry.

2          JUDGE PETROU:  No, actually.

3          THE WITNESS:  You're right, you're correct, in the

4  legend, right here.  So you can see these are the different

5  categories for days of years per use.

6      And so essentially what was happening was that

7  90 percent -- if the exact -- the actual reporting on the first

8  baseline was 5 to 9, the 90 percent of people were within one

9  category of each other.  So the likelihood that somebody who

10  reported 5 to 9 would then report in the category of 60 to 150

11  was.

12          JUDGE PETROU:  Okay, so if someone had originally

13  reported 5 to 9 to be within one group, they would now have to

14  report somewhere between less than 5, and 10 to 19.

15          THE WITNESS:  Correct.

16  BY MR. LASKER

17  Q.   And if you could, go back to your testimony previously

18  where talked about -- and I think, your Honors, you've already

19  had those quartiles of exposure in this study where the top

20  dose was over a hundred-something days.

21      How does the fact that we have the different dose

22  levels -- and we have a measure of risk at that highest dose

23  group of over 109 days exposure to compare to people with no

24  exposure -- how does this data -- what does this data suggest

25  with respect to possibly misclassification bias between that

1  highest exposure group and non-exposed?

2  **A.**   So this -- the results from this study would suggest that

3  misclassification of people at the extremes, so highest versus

4  lowest, or none, is very little, based on this reliability

5  study.

6  **Q.**   And just to refresh the Court's recollection, although I

7  think the Court will recall it anyway, what were the rate

8  ratios reported in the NCI 2018 study, comparing that

9  highest-exposure group with over a hundred and some-odd days of

10  cumulative exposure to glyphosate, with individuals who

11  reported no exposure?

12  **A.**   So there was no association at all between comparing those

13  with the highest versus no exposure.

14        **MR. LASKER:**  Your Honor, does that answer your

15  question?  Okay, great.  I'll go back.

16  **Q.**   Yes.  So we were talking about --

17        **THE COURT:**  Sorry, could I just ask one more very

18  quick and probably dumb question?

19     The 4,000 -- roughly 4,000 people who filled out the

20  questionnaire the following year, was that specifically for the

21  purpose of testing this?

22        **THE WITNESS:**  No.  So they -- actually, it was sort

23  of -- it was sort of a -- it was lucky, in a way.  They had to

24  come back specifically because they had to renew their

25  pesticide applications, and so they would -- sort of, it was

1    lucky that they came back in, and so they -- the investigators

2    took the chance to look at the reliability of information,

3    because they were coming in anyway.

4         So they didn't design it specifically that way, but

5    because the 4,000 people were already coming back, they gave

6    them the questionnaire the second time to look at the

7    reliability.

8              THE COURT:  Do we know anything about that population

9    and why they needed to come back and renew their applications?

10             THE WITNESS:  Yeah, so it was specifically people who

11   were from Iowa, and they had to, I believe, renew their

12   licenses, and I think that was why they came back in.  There

13   was something about the renewal of their license that was

14   required for them to come back in.

15             THE COURT:  But we don't know what that is, what

16   distinguished them from the other 52,000 people that required

17   them to come back in, to renew their licenses?

18             THE WITNESS:  That is correct.

19             THE COURT:  Okay.

20   BY MR. LASKER

21   Q.   Dr. Mucci, you had previously discussed some of the

22   characteristics of the AHS cohort analysis.  Can you briefly

23   explain for the Court what the investigators reported out as

24   results of their study in the 2018 *JNCI* article?

25   A.   So, what were the results specifically?

1  Q.    Yeah.

2  A.    So there were a number of analyses that were evaluated

3  within the Andreotti, et al. study.

4        First, there was no evidence of ever an association

5  between ever exposure to glyphosate and risk of NHL.

6        There were two different estimates of dose-response that

7  were evaluated, one looking at lifetime-days of use, and the

8  other was lifetime-days of use that was also weighted by the

9  intensity of exposure.

10       In neither of those dose-response associate relationships

11 was there any association -- there was no association between

12 the highest exposure to glyphosate and risk of NHL.

13       Because of the long-term follow up of information on

14 glyphosate, the investigators were able to look at different

15 potential latency of effects.  So they were able to look at

16 shorter effects of 5 years, 10 years, and the longer effects of

17 15 and 20 years or more of exposure; and in none of these

18 analyses was there any evidence of an association between

19 exposure to glyphosate and NHL risk.

20 Q.    Now, plaintiffs' experts have criticized the 2018 *JNCI*

21 study based upon something called nondifferential exposure

22 misclassification.  Have you reviewed this criticism?

23 A.    Yes, I have.

24 Q.    And is that criticism, in your opinion, valid?

25 A.    So I think it's appropriate, and as I've mentioned, it's

1  appropriate whenever you're reading through an epidemiology

2  study to first consider whether the observed findings are

3  potentially due to confounding bias or chance.

4      However, after reviewing all of the analyses that the

5  investigators did, including some sensitivity analyses that

6  we'll talk about, as well as the validation studies, I don't

7  think you can -- I don't think that makes sense.

8      There's also three specific reasons why it doesn't make

9  sense.  I've talked about the validation studies.  I've talked

10 about the sensitivity analyses.  The first point actually is

11 really that it doesn't make sense mathematically.

12 **Q.**  Okay.  Well, we're going to go back to each of these, but

13 let's talk about mathematically why.

14     And I think we've had some discussion previously about how

15 nondifferential misclassification biases towards the null, but

16 if you could, again explain to the Court what -- how that would

17 work.

18 **A.**  So what happens with nondifferential misclassification is

19 it's diluting an effect.  And so if -- if the true association

20 were positive, let's say 1.4, and there was differential

21 misclassification, it would dilute the effect and make it look

22 closer, the relative risk closer to 1.

23     If there was complete random error in the data, then

24 you're -- the relative risk actually would be 1.

25     However, it's not mathematically possible for

1    nondifferential misclassification to make a positive

2    association cross 1, and that's what would have to happen,

3    given what the actual observed relative risk is for glyphosate

4    exposure in the AHS cohort.

5              MR. LASKER:  Do your Honors understand that?

6              THE COURT:  Not fully.

7              MR. LASKER:  Okay.

8              THE COURT:  Maybe not at all.  But I guess my math

9    skills are de minimis.

10        But if you -- I guess what I don't understand is, let's

11   say you have -- there is, in fact, a significant association

12   between a chemical and a disease, and let's say, if you did the

13   study properly, you would see -- you know you'd come out at a

14   2.0 odds ratio with, you know, with a small confidence

15   interval.

16             THE WITNESS:  Mm-hm.

17             THE COURT:  And -- but let's say there's a bunch of

18   misclassification error, and what you come out with is .99.

19        What you seem to be saying is if that misclassification

20   did not occur, it could never go -- if you corrected it, it

21   could never go above 1.

22        Or to put it another way, it seems like what you're saying

23   is that if you had the perfect study, and it came out at 2,

24   then it would be mathematically impossible for

25   misclassification to bring it down to .99.

1    And if that's what you're saying, I don't understand that;

2  and if it's not what you're saying, explain it to me again what

3  you're saying.

4         **THE WITNESS:**  Right.  So it, in fact, it is what I'm

5  saying.  And so the reason is, in a cohort study -- and one of

6  the examples that you have -- so if you have an exposed group

7  here, and they're truly exposed, meaning that we're actually

8  perfectly -- we perfectly classified exposed people as exposed,

9  and let's say the incidence in that population is 10 in a

10  hundred, and then you have the unexposed group, and they're

11  perfectly classified as unexposed, and their true incidence

12  rate is 5 in a hundred.

13         So then the relative risk would be 10 in a hundred divided

14  by 5 in a hundred, which would be a relative risk of 2.

15         So what happens with nondifferential misclassification is

16  you have some of the exposed people coming down in the

17  unexposed group, and the issue there is that because it's not

18  related to the incidence, you're basically bringing that higher

19  incidence rate into the unexposed group.

20         So the denominator's going to be a little bit bigger than

21  it, was; and then vice-versa, you're bringing some of that --

22  you could have it either way.  There could be one direction of

23  misclassification or both, and then you're bringing the -- so

24  if you bring it just down, the exposed people are wrongly

25  classified as unexposed, then it's going to dilute the effect,

1  because your denominator, or your -- sorry, yeah, your

2  denominator is higher than what it should be.

3       Vice-versa, if you have some unexposed people who are

4  wrongly classified as exposed, now they're bringing that same

5  incidence rate that they have into their numerator.  That's

6  also going down.  So again, the relative risk is also less.

7  It's attenuated than what it was.

8       So if you basically make the groups -- even if you

9  completely measure completely with error, the worst that you

10  can do is make the two groups have the exact same incidence

11  rate.  There's no mathematical way for -- because it's

12  nondifferential, because it's not related --

13            JUDGE PETROU:  That's not really the point.  You're

14  talking about nondifferential classification, and it's your

15  opinion there's no basis to believe that with this study there

16  was differential classification --

17            THE WITNESS:  That is correct.

18            JUDGE PETROU:  -- that would impact the numbers in a

19  way that's troubling.

20            THE WITNESS:  That is correct.  Because it's the

21  cohort study, because there's no way that the cancer

22  development influenced how they reported on their exposure

23  because the cancer happened after they reported, it's

24  nondifferential.  So that's -- that's exactly right.

25            THE COURT:  But couldn't it -- couldn't the errors

1   cause the result of the study to be somewhere below zero in a

2   non-statistically significant way, still?

3             **MR. LASKER:**  You mean below 1, your Honor?

4             **THE COURT:**  Yeah.

5             **MR. LASKER:**  You said, below zero.

6             **THE COURT:**  Oh, sorry.

7             **THE WITNESS:**  So in part, by chance, you could have

8   something like that.  However, there was actually -- and I

9   can't recall the specific study that actually was -- Dr. Blair

10  was one of the co-authors on this study, where they did

11  different simulations where they made different assumptions

12  about how much misclassification there had to be, as well as

13  how the sample size and the number of cases would influence

14  that.

15      And so with the larger the study you have, or the larger

16  number of cases you have, the role that chance -- that chance

17  finding of having a negative finding really diminishes.

18      So if we had a much smaller study, and we had a much

19  smaller number of cases, then you might worry, just by chance,

20  1 in 20 times you might end up with this potentially small

21  inverse association, but here, because the study is so large,

22  because the number of cases is so large, that likelihood of a

23  chance of the mis- -- nondifferential misclassification leading

24  to a relative risk that's below 1 is very, very, very small.

25            **JUDGE PETROU:**  So you'd mentioned that with the

1  first, the one -- I hesitate to say the second questionnaire,

2  because we've been using that for the follow-up

3  questionnaire -- but the 4,000 that did that second

4  questionnaire a year later, where there was a 90 percent rate

5  on the ever/never question.

6                    (Simultaneous colloquy.)

7           **THE REPORTER:**  I'm sorry, please speak one at a time.

8           **JUDGE PETROU:**  Between the questionnaires, the

9  original questionnaire and the follow-up questionnaire one year

10  later that approximately 4,000 people completed, with the

11  percentage in the low 80s consistency between ever and never,

12  do you know whether that reflects a pretty even number going

13  one way or the other, or whether the bulk of those went from

14  ever to never versus never to ever?

15          **THE WITNESS:**  I'm going to just look at the tables to

16  see if we have some information about that or not.

17      So unfortunately, what we have is just the number

18  of percent agreement.  So -- and I don't remember reading in

19  the discussion about the directionality.

20          **JUDGE PETROU:**  Okay.

21          **MR. LASKER:**  Your Honor?

22          **THE COURT:**  Continue.

23  BY MR. LASKER

24  **Q.**   Great.  So I think we've now addressed the mathematical

25  issue here.

1        And just to be clear, again, the issue of nondifferential

2   misclassification in a mathematical issue, given the results of

3   the study, also would be one that would have to see as between

4   the very highest-exposure group and no exposure, in order to

5   impact the results of the study, correct?

6   A.    Right.

7   Q.    So the second thing you mentioned was validation studies,

8   or the second thing on your list, and can you explain what a

9   validation study is?

10  A.    A validation study is where we compare the information

11  that's collected for example from a questionnaire, with some

12  sort of what we think might be a gold standard, and that

13  provides us some assessment of the validity of the findings.

14  Q.    Okay.  We've already talked about, I think, the main

15  validity study, which is the Blair 2002 study.

16       So unless your Honors have any further questions about

17  that 4,000 questionnaires, let's move on to the next part of

18  the album.

19  A.    There was --

20  BY MR. LASKER

21  Q.    I think there's -- I think, actually, we should be on the

22  next slide, on the different types of validation studies.

23       So we have the validation of the questionnaire responses

24  we've already discussed about.

25       The next item on your list is validation of intensity

1   algorithm.

2        Your Honors are familiar with the intensity algorithm.  Do

3   we need to do anything further?

4            **THE COURT:**  I could benefit from another explanation

5   of it.

6   **BY MR. LASKER**

7   **Q.**   Can you, Dr. Mucci, explain what the intensity algorithm

8   was in the AHS study was, and what the purpose of it was?

9   **A.**   So one of the dose-response measures that was used

10  integrated not only the lifetime days of use, but also tried to

11  estimate the actual dose of that exposure by integrating

12  information that was reported on whether or not the individual,

13  for example, personally mixed a substance, and therefore, might

14  be have greater exposure; whether that person was using

15  protective gear, as well as potentially the method in which

16  they applied different pesticides.

17       And so the idea was to use an algorithm that had been

18  developed to get a better dose of exposure to pesticides, and

19  that's what the intensity --

20           **JUDGE PETROU:**  Doctor, in regards to the protective

21  gear, which seems like an important question to me in

22  determining how much exposure there actually is, the

23  questionnaire did not differentiate, if I remember correctly,

24  between this list of pesticides and herbicides, is that

25  correct?

1         **THE WITNESS:**  That is correct, right.  So it was

2   asked just more broadly about the use of protective gear, and

3   so I think that's a critical issue and one that the validation

4   study, the intensity algorithm, can help us address whether the

5   quality of the way that question was asked still holds up for

6   whether it's valid in glyphosate.

7   **BY MR. LASKER:**

8   **Q.**   And just because, the next question in the outline, to

9   clarify for the dose-response, there were -- I think you take

10  it, two dose-response calculations, one that used intensity

11  weighting and one that did not, is that correct?

12  **A.**   Yes, that is correct.  And also, just to say that none of

13  the case-controlled studies integrated information on any of

14  these measures of intensity in their assessment of

15  dose-response.

16        **MR. LASKER:**  Is your -- do you need any more

17  information on the intensity algorithm?

18  **Q.**   Okay, let's go to the validation study, and we've seen

19  this study before.  This is slide 7.  It's the Acquavella 2006

20  table.

21      The table I have is Table 4.  First of all, there's a

22  variety of different numbers provided in this study, and we've

23  talked about it -- we'll again talk about the ranking by

24  intensity score, and urine levels of glyphosate.

25      But I first want to talk about the actual correlation

1   numbers that are also presented in this study, because

2   plaintiffs' experts have pointed to the correlation of

3   numbers -- I'm not sure if that's the exact terminology -- as

4   being low, and that being an issue of concern with respect to

5   how well this algorithm works for the epidemiologic study.

6        So if you could at least first address that issue, and

7   then we'll go to this table.

8   **A.**   Yeah, sure.  So the correlation coefficients are estimated

9   by comparing the actual intensity level with the actual level

10  of the biomarker.

11       And so that what that means is that it's looking at to see

12  whether the intensity algorithm can give us a really good

13  estimate of the actual level of exposure, and a correlation of

14  .23 isn't as high as we might want to see.  However, what the

15  goal of -- what this particular study shows and how the

16  intensity algorithm ends up being used in the AHS cohort is

17  instead categorizing individuals.

18       And so -- and why that's important is that I think the

19  study by Acquavella actually shows that we can appropriately

20  rank individuals on their exposure.  We might be less likely to

21  be able to say the exact dose of the exposure that they got,

22  but we can more accurately classify individuals as having a

23  very high level versus a very much lower level.

24  **Q.**   And how, if at all, did the results of Table 4 inform that

25  question?

1   **A.**    Right.  So what Table 4 does is to categorize individuals

2   into -- if you look at the second shaded area of yellow, into

3   four different intensity categories, based on the intensity

4   algorithm; and then what we have -- the next two.

5   **Q.**    Just for clarification, since there are two levels, if you

6   can just explain what the two different measures are, why we

7   have two of them?

8   **A.**    Right.  So the first actually calculated the intensity

9   algorithm using field observers.  The field observers were

10  actually observing what the individual farmers were doing.

11          The second set of data is that data that's actually

12  reported by the farmers.  And so I think, in the sense the

13  questionnaire and the Agricultural Health Study is based on

14  self-reported data, that's why I was looking specifically at

15  that one.  But both of them, you know, show good ability of the

16  algorithm to work.

17          And so what they compared, in terms of the biological

18  marker, was to look at levels of glyphosate excreted in the

19  urine, and then they're presented as either the mean or the

20  median value.

21          And in this case, actually, if you could highlight on

22  Figure 2, panel A --

23  **Q.**    Just a second.

24  **A.**    It's on page 72 of the manuscript, on the left side, and

25  it's the first panel on the top of Figure 2.  Oh, sorry that's

1  Table 2.

2      If we could have Figure 2 of panel A?  Great.

3      So what this is showing us -- this is a scatterplot of the

4  individuals, the 48 individuals that had urine levels of

5  glyphosate.

6      This is what their distribution looked like this in those

7  48 individuals.

8      What's important to see is, you can see this sort of line

9  of data at 0.5, and so essentially, anybody who was had a

10 levels of glyphosate in the urine that were not detectable were

11 there.

12     And so what happens is you have a lot of individuals at

13 the zero level, which means your data are not normally

14 distributed.  So in that case, you should really rely on the

15 median value, or the mean, because the data -- one of the

16 assumptions of using a mean is that your data are normally

17 distributed, which they are not.

18 **Q.**  And just so the Court understands, and I can understand,

19 am I correct, then, that what this is measuring is that there

20 were these lines of individuals, including individuals at the

21 highest intensity by algorithm, they weren't wearing protective

22 gear or they were involved in mixing but used glyphosate, and

23 nonetheless, didn't have any glyphosate detected in their

24 system?

25 **A.**  Well, we actually don't -- right, exactly.  So you here,

 1  right, exactly.  That is correct, yes.

 2  **Q.**   Okay, and then --

 3          **JUDGE PETROU:**  I'm sorry, I should know but I don't.

 4  How are these intensity categories determined?

 5          **THE WITNESS:**  So these categories were based on the

 6  intensity algorithm, and then they divide the groups into three

 7  categories, which they -- I'm just trying to see how they

 8  divided these three groups.

 9          **JUDGE PETROU:**  And specifically, I'm curious if it's

10  possible to know how that -- how those categories, which were

11  mathematically determined, relate to actual exposure and use

12  levels, because I've been curious throughout, as we've been

13  looking at different studies, at how these various cutoff

14  points are determined.

15          **THE WITNESS:**  Right.

16          **JUDGE PETROU:**  And I'd love to know if they in any

17  way correlate with these intensity levels.

18          **MR. LASKER:**  And just so I understand, is that with

19  respect to the *JNCI* study, or --

20          **JUDGE PETROU:**  There are a number of studies we've

21  looked at.

22          **THE WITNESS:**  Right, so I can definitely answer it

23  for the *JNCI* study, how they made the cut points, they used

24  quartiles --

25          **JUDGE PETROU:**  No, I remember that.

1          THE WITNESS:  But here -- yeah, so it looks like

2     they're -- I think -- I don't know that they used tertiles, per

3     se, but it looks like they tried to get three equal groupings

4     of people, so they divide the 48 people into three groups, so

5     that there would be a similar number of people.  So it's

6     essentially similar to -- to tertiles, dividing them equally.

7          But that's not the approach of the other case-control

8     studies, as you mentioned, which is problematic; how did they

9     arrive at these cut points.

10         Okay, so if we could go back to the figure or the table

11    that we had up, Table 4.

12         So if we look at the median values for glyphosate

13    comparing levels 1, 2, 3 and 4, what you can see is that the

14    individuals who are ranked in the highest based on the

15    intensity category are also have the highest median level of

16    glyphosate in their urine.

17         And vice-versa; so you have a seven-fold difference

18    between the highest and the lowest category of exposure.

19    BY MR. LASKER

20    Q.   Okay.  Can you, again, explain for us how this intensity

21    algorithm then is used in that one -- the -- the dose-response

22    analysis in the Andreotti study that incorporates intensity?

23    A.   Oh, I'm sorry.  Could you please ask that question again?

24    Sorry.

25    Q.   Sure.  Can you explain how this intensity algorithm is

1  then used in the one dose-response analysis in Andreotti that

2  incorporates intensity?

3  **A.**   Right.  So what they did was to take the lifetime-days or

4  cumulative days of exposure, and then multiply that by this

5  intensity algorithm to get the intensity dose, and then divided

6  individuals into four equal quartiles of exposure.

7          **MR. LASKER:**  And do you have any questions about this

8  issue?  Otherwise, I'll move to the third validation, which

9  goes to imputation.

10         **THE COURT:**  Yeah.  Before we do that, why don't we

11 take a lunch break.

12         **MR. LASKER:**  Okay.

13         **THE COURT:**  Why don't we return at resume 12:45, at

14 12:45.

15         (Recess taken from 11:57 a.m. until 12:45 p.m.)

16         **THE COURT:**  Okay.  You perhaps will not be surprised

17 by this.  I have another question, another math question for

18 you.  I wanted to follow up on your example.

19    Okay.  So you gave me an example of, I think, 100 people

20 unexposed, and a hundred people exposed.  In the group of 100

21 people unexposed, 5 cases.  In the group of the 100 people

22 exposed, 10 cases.

23         **THE WITNESS:**  Mm-hm.

24         **THE COURT:**  Now, let me go from there, and give you

25 an example.  So let's say that misclassification error causes

**MUCCI - DIRECT / LASKER**

1  four of the cases in the exposed group to move over to the

2  unexposed group, and it causes two of the cases in the

3  unexposed group to move over to the exposed group, at which

4  point, I believe, we have seven cases in the unexposed group

5  and eight cases in the exposed group.

6      Did I get those numbers right?

7          **MR. LASKER:**  I'm sorry?

8          **THE COURT:**  Let's try it again.  Let's try it again.

9  Okay?

10         **MR. LASKER:**  I knew where you were going, but I

11 didn't do the math, so I'm not sure.

12         **THE COURT:**  All right.  So we have 15 total, right?

13         **THE WITNESS:**  Ten.  I wonder if we could even somehow

14 draw it.

15         **THE COURT:**  Here, let's get a board.

16         **MR. LASKER:**  Yeah we've got a board, we've got the

17 chalkboard, maybe.

18         **MR. MILLER:**  Your Honor can use the back of that

19 board if you want, that large board and a marker.  Do you have

20 a marker?  I knew this would come in handy somewhere.

21     Your Honor, may I stand over here?  (indicating).

22         **THE COURT:**  Sure.

23             (Court is writing on the board.)

24         **MR. LASKER:**  This is a first.

25         **JUDGE PETROU:**  Off the record for a moment.

1              (Discussion off the record.)

2         THE COURT:  Okay.  So we have -- in the unexposed

3    group we have a hundred people, and we have five people with

4    cases; and in the exposed group we have a hundred people, and

5    we have 10 people with cases.

6         Let's take -- let's say that as a result of

7    misclassification, four people move from -- four cases move

8    from the exposed group to the unexposed group, so that makes

9    nine.  And that makes six.  Right?

10        And let's say one -- here's where my -- this is where my

11   math was off.  Let's say one person from one case from the

12   unexposed group moves over here (indicating).  So that gives us

13   seven, seven cases in the exposed group.

14        And leaves us with eight cases in the unexposed group.

15        Do I have that right?  So we're still at 15.  Okay?

16        THE WITNESS:  (Witness nods affirmatively.)

17        THE COURT:  So now, as a result of misclassification,

18   we have a situation where we have more cases in the unexposed

19   group than we do in the exposed group.

20        And so the odds ratio is going to be less than 1, right?

21   What's the odd -- can it possible to do that calculation,

22   roughly, what the Odds Ratio would be?

23        THE WITNESS:  I -- I -- I'm not sure, but actually

24   what you've shown is a very nice example of differential

25   misclassification.

MUCCI - DIRECT / LASKER

1      THE COURT:  Why is it differential misclassification?

2      THE WITNESS:  Because what we -- if it were

3  nondifferential, then the -- a similar proportion of the

4  exposed non-cases would also have been misclassified, as well.

5      Here, the exposure is a completely associated with the

6  outcome.  So therefore, it's differential.  It's --

7      THE COURT:  But why couldn't this have happened by

8  chance as a result of misclassification error?  Why couldn't --

9  why couldn't four people -- four cases have gotten over here

10  from the exposed group, and one case have gone over here from

11  the unexposed group.

12      THE WITNESS:  Right.  So I think that could be a

13  scenario, but again, that would end up being differential

14  because the misclassification of the exposure was different

15  in -- at -- in the cases versus the non-cases.

16      So it's sort of -- it's --

17      THE COURT:  So nondifferential just means that the

18  errors occur from both sides, roughly equally?  That's all that

19  that means?

20      THE WITNESS:  So both for -- so if there's mis- --

21  let's say that if, in fact, out of those 10 exposed cases, 4 of

22  them were wrongly classified as unexposed, you'd have a similar

23  proportion, you'd have 40 of the co- -- of the total cohort of

24  exposed also misclassified, in order for it to be un- -- for

25  the misclassification to be similar in the cases and the

1   non-cases.

2          **THE COURT:**  You mean, so -- so what we would really

3   have here is, like, 60 exposed people and 40 unexposed people,

4   and what we'd really have is here is 40 exposed people and 60

5   unexposed people?

6          **THE WITNESS:**  No.  So, sorry.  So out of the 10

7   exposed cases, you were saying that 4 of them were now

8   unexposed.

9          **THE COURT:**  Right.

10         **THE WITNESS:**  So then 40 of those hundred would also

11  go to the denominator there.  So that's right.

12      But on the other side, you were just saying that there

13  were -- how many cases were?  Sorry, one?

14         **MR. LASKER:**  One.

15         **THE COURT:**  One.

16         **THE WITNESS:**  Only one.  So therefore, 10 of that

17  hundred would have moved over.  So it would be 60 plus --

18         **THE COURT:**  But you're assuming -- I guess that's the

19  confusion that I have, is -- and it's again, probably because

20  my math skills are less than rudimentary, but you're assuming

21  that if one -- if one case from the unexposed group goes over

22  here, that means that a certain number of people from the

23  unexposed group were actually exposed.

24         **THE WITNESS:**  Exactly.

25         **THE COURT:**  But does that have to be the case?

1          THE WITNESS:  If it's nondifferential, then it, by

2    definition, it does have to be the case.  And because --

3          JUDGE PETROU:  Hold on, hold on, because that is the

4    question I asked you right before we took the lunch break, was,

5    is it part of your opinion the assumption that the

6    misclassification that occurred was nondifferential?

7          THE WITNESS:  Correct.

8          JUDGE PETROU:  And you said yes, the

9    misclassification was nondifferential, and so there is that

10   natural follow-up of, how do you know that, or why do you

11   believe that?

12         THE WITNESS:  Right, so the reason it's

13   nondifferential in this cohort study is that there's no way

14   that the development of cancer in the future in any way would

15   have influenced how the people reported on what their exposure

16   was.

17        There's -- there's not really -- you know, that's --

18   recall bias happens, and that's a differential bias --

19         JUDGE PETROU:  Right, right.

20         THE WITNESS:  -- because having -- being a case

21   sometimes can influence how you report here --

22         JUDGE PETROU:  So that's a recall bias issue.

23         THE WITNESS:  Exactly, right.  So that's a

24   differential bias.

25        It's nondifferential because it's -- it's -- there are

MUCCI - DIRECT / LASKER                    893

1    similar amounts of misclassification in the people who

2    ultimately become cases and those who remain cancer-free.

3    That's why.  That's the definition of nondifferential.

4        So the misclassification in the exposure is similar in the

5    people who do develop cancer and those who don't; and so that's

6    what we have in this situation, with a cohort study.

7            THE COURT:  And so is another way of saying that,

8    that -- that the -- using my example, forgetting for the moment

9    about how many people go from the unexposed group to the

10   exposed group and *vice versa*, is that a way of saying that my

11   example of ending up with eight cases in the unexposed group

12   and seven cases in the exposed group could never happen by

13   chance?

14           THE WITNESS:  Well, I think -- remember we were

15   talking about that -- that issue, and Blair sort of

16   investigated the effect of chance?

17       And if you have small numbers by chance, just as you were

18   saying by chance you might have, even though it's

19   nondifferential, just by chance you might have slightly more of

20   the cases as you have going one direction than the other, in

21   the -- in the situation -- even with a hundred, though, it

22   seems sort of -- a hundred on each side starts to seem unlikely

23   that you would have, by chance, a nondifferential

24   misclassification that would lead to going through the value of

25   one, and having a lower odds.

 1      But especially in the case of the Agricultural Health

 2  Study, where you have 50,000 people 575 cases, because -- that

 3  the -- the role that chance would play, potentially, when

 4  nondifferential misclassification could lead to this type of

 5  result, is -- is very, very uncommon.

 6          **THE COURT:**  Okay, and if -- but in my scenario, is it

 7  correct to say that this is very, very uncommon, if everything

 8  else in the study went right?

 9      Like, could other things in the study have gone wrong, to

10  get us below one, an odds ratio of below one, such that the --

11  the -- the misclassification error could move us back above

12  one?

13          **THE WITNESS:**  It would be -- again, it would be -- it

14  was highly unlikely.

15      And I think the way to think about the misclassification,

16  let's say we have the hundred people who are exposed.  We're

17  really thinking about, well maybe 20 percent of them were

18  misclassified.  So you're moving 20 percent of the whole

19  hundred, and then the question is:  How many of that hundred

20  were cases?

21      And then vice versa, with the unexposed group you have a

22  hundred people.  Let's say 10 percent of those people were

23  misclassified as exposed.  So by chance, how many of those are

24  cases?  And with a distribution of a hundred, and with 10 and 5

25  cases -- well, maybe 10 and five wasn't quite enough.

1        **JUDGE PETROU:**  Right.

2        **THE WITNESS:**  You could see more by chance that you

3   might have this issue, but it's -- as you get larger numbers

4   and as you get -- as you -- yeah, larger number sample size and

5   larger number of cases, the role that chance could play in

6   something like this is -- is quite rare.

7        And -- and with -- nondifferential sort of stands on its

8   own.  There may be other biases we want to talk about, but

9   they're not going to have a multiplicative effect.  They sort

10  of act potentially independently.

11       **THE COURT:**  Okay.  Thanks.  Sorry about that.

12       **MR. LASKER:**  No, no problem.

13       **JUDGE PETROU:**  Judge, I'll ask a follow up on that

14  before we move into the next topic.

15       Yeah.  So Doctor, your testimony was, and I quote, "the

16  misclassification in the exposure are similar in the people who

17  do develop cancer and those who don't."

18       That's the situation we have.  And the last part wasn't an

19  exact quote.

20       And one thing that you brought up was the whole recall

21  bias issue and why that isn't an issue here.  Fine, understood,

22  get that.

23       What are the other main issues that you look at or are

24  concerned about when thinking about misclassification in a case

25  like this, and potentially differential misclassification?

1          THE WITNESS:  It's in -- in the setting of a cohort

2  study, it's -- it's -- I -- what the -- we're sort of reassured

3  because situations of differential bias are just -- they don't

4  arise in the way they do with case-controlled studies.

5      One type of differential bias that you could think about,

6  which is not the case here, is if you have -- if you're

7  following people for the incidence of non-Hodgkin's lymphoma,

8  and you don't have complete knowledge of who develops

9  non-Hodgkin's lymphoma or not --

10          JUDGE PETROU:  Right.

11          THE WITNESS:  -- and that's somehow maybe related to

12  the exposure, you could have a bias here, but we're --

13          JUDGE PETROU:  We've just talked about the registries

14  and --

15          THE WITNESS:  Right, exactly.  So that's one type of

16  bias that you could have that would be differential in a cohort

17  study we could be worried about, but it's not a case here.

18          JUDGE PETROU:  And I presume this is in your

19  questions, but I'll flag it if it's not.  I'd like to hear some

20  of the same testimony relating to the follow-up data, the lack

21  of people responding, how it was computed and why you think

22  there's still nondifferential classification.  Okay?

23          MR. LASKER:  That's exactly where I'm going,

24  your Honor.

25          THE COURT:  But before you get there, one other

1  question about your testimony this morning.

2       You talked about, I think you gave a 90 percent figure for

3  the response -- the responses for the second questionnaire, and

4  I think you said that 90 percent of them landed within one

5  classification of their response, in the question -- in the

6  first questionnaire.  Did I get that right?

7            THE WITNESS:  Yeah, so in terms of the reliability

8  study, the questionnaires that were one year apart, yeah.  So

9  90 percent of those landed within one category in terms of the

10 dose-response, yes.

11           THE COURT:  And how many categories were there?

12           MR. LASKER:  Could we put that back up?  It's going

13 to be the 2002 Blair Study.

14           THE WITNESS:  It's Tab 5 and it's --

15           MR. LASKER:  It is the footnote on Table --

16           THE WITNESS:  Yes the footnote on Table 2.  And so,

17 for years of use --

18           MR. LASKER:  Just one second.

19           THE WITNESS:  Oh, sorry.

20           MR. LASKER:  There you go.  You got it.

21           THE WITNESS:  All right.  So for years of use there

22 were six categories, and for days per year there were seven

23 categories.

24           THE COURT:  Okay, and do you know how many people hit

25 their -- hit the same category that they responded on, in the

1    first questionnaire?

2         THE WITNESS:  Yeah, that's a good question.

3    Unfortunately they don't present that number here.

4         THE COURT:  Okay, and so the range could be -- I

5    mean, just using the Days Per Year category, the range could be

6    anywhere from 20 to 150 days for those 90 people?

7         THE WITNESS:  Mm-hm.

8         THE COURT:  And -- and so we know that 10 -- those

9    90- percent of -- of respondents, and we know that 10 percent

10   of the people who responded 40 to 59 days, responded with

11   something higher than 150 days the next year, or something

12   under -- under 20 days of the next year.  Is that right?

13        THE WITNESS:  Um, so I mean, I think -- I think so.

14   If the true answer was between 40 and 59, and then, like you're

15   saying, right.  So 90 percent of them would have either been

16   one category less or one category more.

17       And then -- yeah.  It would be true that 10 percent of

18   those individuals then would have ended up in the highest or in

19   the lowest.

20        THE COURT:  And so would it, in terms of numbers,

21   roughly 90 percent of the people who first responded 40 to 59

22   days, all we know about them is that the following year they

23   responded somewhere between 20 and 150 days a year.

24       And then the 10 percent -- for 10 percent of the people,

25   roughly, who responded in the first questionnaire between --

1   that they used glyphosate between 40 and 59 days per year,

2   they -- the second time, the following year they responded

3   either with something more than 150 or something less than 20.

4       Is that -- did I get that right?

5           THE WITNESS:  So between, I think, between 10 and 19,

6   they would have landed in that category.

7           THE COURT:  Couldn't they have also said --

8           THE WITNESS:  Or that's right, yes --

9           THE COURT:  -- less than five?

10          THE WITNESS:  No, and so that is true.

11      And I -- but I think that when we think about

12  misclassification and, as I mentioned earlier, that these types

13  of reliability estimates are online with data such as for

14  tobacco smoke, where we are able to show associations, and in

15  different studies.

16      It's also in line with things like obesity, which again,

17  we've studied with respect to cancer risk and validated

18  multiple studies, and I think what's reassuring is that

19  90 percent people, if they were 40 to 59, are between 20 and

20  that upper level, but they're not zero.

21      And so I think -- and again, what you could see also from

22  the biomonitoring study and from the correlation coefficient

23  being on the lower side is maybe you are not accurate in saying

24  the exact level of intensity, but it seems like what we can do

25  is appropriately rank people as high or low.

1      And I think -- I think that is one of the limitations with
2  this approach, but I think you are able to rank people
3  appropriately.
4  **BY MR. LASKER**
5  **Q.**  And just to follow up on that, if we can pull up -- and
6  I'm sorry it's the 2018 study, Supplementary Table 1.
7      And this goes back to a point that Judge Petrou was
8  raising earlier about -- I don't have -- I'm sorry -- which I
9  don't have my cheat sheet which tab is this for the --
10         **MS. SHIMADA:**  Four, tab 4.
11         **MR. LASKER:**  Tab 4.
12  **Q.**  And if I could ask you to turn to Supplementary Table 1,
13  which is Cumulative Days Exposure.
14      And as we looked at previously, there's a footnote on the
15  bottom, on the second page of that table, at the bottom of the
16  table, that talks about the quartiles of cumulative days of
17  exposure, with the highest quartile being over 108.5 days,
18  correct?
19  **A.**  Yes, that is correct.
20  **Q.**  And then if we look at the dose-response for non-Hodgkin's
21  lymphoma, which is at the top of that same page, just based on
22  cumulative days, in that highest Quartile 4, with greater than
23  108 days, the rate ratio is 0.8 compared to people who report
24  absolutely no exposure.  Correct?
25  **A.**  Correct.

**MUCCI - DIRECT / LASKER**

1  **Q.**   Okay, and so again, what does that discussion you were

2  just having with the Court about the levels of agreement

3  between questionnaire responses indicate, when you have that

4  0.8 between the very highest exposure and no exposure?

5  **A.**   Right.  So it seems unlikely, based on the results of

6  these validation studies, that -- that you have only, at most,

7  minimal misclassification, and people who are in the highest

8  quartile compared to those who were unexposed, so that amount

9  of misclassification, you feel much better about at the

10  extremes based on the validation studies.

11         **MR. LASKER:**  Okay.  So now, Judge Petrou, we'll move

12  to the validation studies of the -- of the multiple mutation.

13         **THE WITNESS:**  So that would be Tab 8.

14  **BY MR. LASKER:**

15  **Q.**   Yes.  Well, let's -- so first of all --

16  **A.**   Sorry, sorry.

17  **Q.**   Let me just ask the prefatory questions, and then that

18  will get us there.

19       So first of all, Dr. Mucci, is multiple imputation a

20  standard methodology in epidemiology?

21  **A.**   Yes, it is.  It's a standard approach that we use to deal

22  with missing data in our studies.

23  **Q.**   And there's been discussion of the nonresponders, the rate

24  of nonresponders, which I believe is 37 percent.  Have you been

25  involved with cohorts studies where multiple imputation has

1  been used with that level of missing data?

2  **A.**    Yes.  One example is a cohort called the Swedish

3  Mammography Cohort.  It's a cohort of similar size, 50,000

4  women, who completed a baseline questionnaire, actually around

5  the same time frame as the AHS filled out their baseline

6  questionnaire.

7      There was a follow-up questionnaire where 30 percent of

8  the women did not complete that follow-up questionnaire, and

9  the study investigators have used multiple imputation to impute

10 that data, and that imputation has been used in multiple

11 complications.

12          **JUDGE PETROU:**  What was the purpose of that study?

13          **THE WITNESS:**  The main interest of that study was

14 looking at risk factors for breast cancer as well as other

15 cancers.  It collected -- it was created by women who were

16 first coming to mammography screenings in Sweden.  They were

17 given a baseline questionnaire, and the main hypotheses were

18 around different lifestyle factors for breast cancer research

19 and other cancers.

20 **BY MR. LASKER**

21 **Q.**  And Dr. Mucci, had there been, prior to the 2018 *JNCI*

22 study, other peer-reviewed publications that have come out of

23 the AHS cohort that have used the multiple imputation

24 methodology?

25 **A.**    Yes.  To date, there have been eight other studies that

1    have used multiple imputation.

2    **Q.**    And did any of these other peer-reviewed publications look

3    at glyphosate for other cancers?

4    **A.**    Yes, three of those did.

5    **Q.**    Okay, could we put up slide 8, which will be a slide that

6    tries to explain how multiple imputation works?

7           And could we just, Dr. Mucci, explain what we're seeing on

8    the screen?

9    **A.**    Sure.  So just to give a little background on multiple

10   imputation, it works because there are known patterns of

11   co-exposure to different factors in the data.

12          So you might have a person of a certain age who also

13   smokes and tends to have a certain weight, et cetera, and the

14   multiple imputation approach then uses people who have complete

15   data, and say, who do -- for the people that are missing data,

16   who do they look like that are closest to, and they use that

17   information to impute.

18          So the variables that were used in the imputation included

19   a range of demographic variables, lifestyle factors, medical

20   history, as well as farming-related and pesticide use.

21          And so from this figure, there were three different pieces

22   of questionnaire responses that were used to impute the data

23   for the 19,000 individuals who did not come complete the

24   Phase II questionnaire.

25          So first, there was information that was from the baseline

1   questionnaire for those people who have missing data; and then

2   there was information -- and the people were matched to those

3   who were -- the remaining 34,000 who completed both

4   questionnaires using their baseline information.

5       And then again, there's information that was using the

6   questionnaire responses for the Phase II survey, for those

7   people who completed both.

8       And all three levels of that data were used in the

9   imputation process.

10  **Q.**   Okay, now, the plaintiffs' experts have argued that

11  multiple imputation cannot account for an increase in use of

12  glyphosate from the period of Phase I to the period of

13  Phase II.  Is that consistent with your understanding?

14  **A.**   No.  It's not.  And the reason is that, as you can see

15  from this diagram, there's -- there's information that's

16  captured for the 34,000 individuals during that follow-up time

17  to collect data that might be changing.

18      And because of the way the multiple -- and an advantage of

19  this multiple imputation approach, in fact, is that it's able

20  to capture those trends over time, and match people based on

21  the correlation of data within individuals.

22      **JUDGE PETROU:**  I'm sorry, I missed something

23  completely.  What data was gathered on the -- who did you say

24  data was gathered on?

25      **THE WITNESS:**  So in terms of --

1          **JUDGE PETROU:**  In the follow-up.

2          **THE WITNESS:**  In the follow up, so it was for the

3   34,000 individuals who filled out both questionnaires.

4          **MR. LASKER:**  I'm going to go to the validation study,

5   but I want to make sure your Honors --

6          **JUDGE PETROU:**  Those were my questions to make it

7   easier --

8          **MR. LASKER:**  Okay, okay.

9   **Q.**  Now, Judge Petrou raised the issue of whether or not there

10  are differences -- there might be differences between

11  individuals who responded to the questionnaire and individuals

12  who did not respond to the questionnaire, that could raise

13  concerns about potential bias.

14       Were there any validation studies that were conducted to

15  look into that question?

16  **A.**  There were, and I just want to comment also that we should

17  be, as epidemiologists, concerned with the fact that there is

18  37 percent missing data.  We do want to rule out that there are

19  not biases that are systematic as a result of this missing

20  data.

21       I think what's really nice, though, about the Agricultural

22  Health Study is a number of validation studies as well as

23  sensitivity analyses we're going to talk about.

24       So I think that the first strategy that the investigators

25  did was in the manuscript by Montgomery, *et al*. -- no sorry.

1          **MR. LASKER:**  I'll put that up.  Its slide 9.  It's

2   Tab 7 in your binders, your Honors.

3          **THE WITNESS:**  And so the first question they wanted

4   to know:  What were -- did the baseline characteristics differ

5   for people who did and did not participate in the follow-up

6   questionnaire?

7          And the reason that is important is that if -- if there

8   are differences and those differences are in some way

9   associated with the outcome we are interested in -- so cancer

10   and non-Hodgkin's lymphoma -- that could induce what's called

11   selection bias.

12          And so if -- if there were very limited differences

13   between those who did and didn't participate, your concern

14   about selection bias is reduced.

15          So in this study, what Montgomery did was to compare the

16   characteristics of those individuals on lifestyle demographic

17   factors.  They also compared cancer incidence rates overall.

18   They didn't look specifically at non-Hodgkin's lymphoma

19   incidence rates, but they did look at cancer incidence overall.

20   And what they showed was that overall, the differences between

21   their participants and non-participants was actually fairly

22   small.

23          And when we looked specifically at cancer incidence in the

24   population, there was virtually no difference between those who

25   did and did not complete the questionnaire.

1    They also in this study tested whether there was selection

2  bias for three specific exposure and disease associations.

3  They were not looking at non-Hodgkin's lymphoma, but they did

4  look at smoking and lung cancer risk, as well as the

5  association between smoking and non-cancer lung conditions.

6    And all of these data supported the likelihood that there

7  was no selection bias induced by the fact that there was

8  missing data, and it's really probably because the

9  characteristics of those who did and did not participate were

10  generally similar.

11  **BY MR. LASKER**

12  **Q.**   And we also had some testimony about another validation

13  study by Heltshe that pulled out some portion of the population

14  to test the imputation method.

15    So if we can -- this is Tab 8 in your binders, Your Honor.

16  It's slide 10 for those in the courtroom.

17    And this is described -- here's a graphic illustration of

18  what was done in the Heltshe study, which is at Tab 8.

19    So if you could, explain to the Court what is depicted in

20  this slide.

21  **A.**   So what Heltshe, et al. did was another approach to

22  assessing the quality of the imputation method.

23    And so what they did here was they had 34,000 individuals

24  who completed both a baseline questionnaire and the follow-up

25  questionnaire.

1        So out of these 34,000 individuals, they actually withheld

2   20 percent of them, which turned out to be about 6800 people.

3        So they took those people and put them aside, and then

4   they used the same imputation method, and for the 80 percent of

5   the remaining people or 27,000 individuals, they then imputed

6   the data for that 20 percent holdout set.

7        And so what's nice about doing it in this way is they

8   could directly compare the results of what the data looked like

9   for the imputed values for these exposures compared to what the

10  people actually responded to, and do that direct comparison and

11  test how the imputation method worked.

12          MR. LASKER:  Okay, and before I move on, do your

13  Honors have any further questions about how this study was

14  conducted?

15          JUDGE PETROU:  Not right now.

16          MR. LASKER:  Okay, so if we can just pull up slide

17  11.

18  Q.   This is the overall conclusions of the Heltshe paper.

19  There was also specific conclusions or specific data provided

20  with respect to each of the, I think, 40 or so individual

21  pesticides that they looked at.

22       And can you first just provide your opinion as to what

23  this study showed and what it indicated with respect to the

24  imputation both generally and for glyphosate?

25  A.   So for overall use of any pesticides, the -- based on the

1  self-reported data, the prevalence of using any pesticide was

2  85.7 percent, and imputed prevalence was 85.3 percent.  So they

3  were actually fairly similar.

4      And similarly, the distribution for days of years per use

5  as well as prevalence for specific pesticides was fairly

6  similar for a variety of pesticides.

7      And we can actually look specifically to see how

8  glyphosate did, comparing the imputed value versus what was

9  observed in this holdout dataset.

10 Q.   Okay, and why don't -- first of all, if you could direct

11 the Court, because I don't have it in front of me -- there's

12 figure number, but I'm not sure what page it is.

13 A.   Right, so it's Figure 2 on page 414.

14 Q.   Thank you.

15 A.   So this is plotting the relative error in the imputed

16 prevalence compared to the observed prevalence.

17     And it can be thought of, if you take one minus, it can be

18 thought of similarly to the reliability study.  It's the sort

19 of concordance between the imputed and observed reported

20 information on glyphosate use.

21 Q.   Okay, let me just go back and take that back a step

22 because I'm not sure if that was clear.

23     Could you repeat how you compared that to the Blair 2002

24 study on the reliability of the first questionnaire?

25 A.   Right.  So just to clarify, so what's plotted here are

**MUCCI - DIRECT / LASKER**

1  relative errors for each of the pesticides.  You can see

2  there's a relative error of zero, which would mean they were

3  perfectly concordant with each other.

4      The ones to the left, where it's negative, suggest that

5  the imputed value was lower than it was for the observed value.

6      Then on the right-hand side, you have those where the

7  imputed value was higher than the reported value for the

8  pesticide.

9      And so the relative error, you can calculate the relative

10  error, but to calculate the concordance, you can take one minus

11  the relative error to give you a proportion of concordance

12  between imputed and the observed data.

13      And when we do that, you can see glyphosate -- the

14  relative error was 17 percent, which means that the concordance

15  was 83 percent, which actually is fairly similar, in terms of

16  number, where it was the concordance for the reliability

17  between the baseline questionnaire and the one year follow-up

18  for those 4,000 people that filled out those two, to look at

19  the reliability.  So fairly similar, in terms of a

20  classification.

21  Q.  And just to further clarify, this measure would be an

22  ever/never measure, correct?

23  A.  Yes, correct.

24  Q.  And in this case, given the data that we have for the

25  highest exposure group, we actually would need to be seeing

1  misclassification from the non-exposed to people at the very,

2  very highest exposure, correct?

3  **A.**   Exactly, correct.

4  **Q.**   And there has been testimony in this case -- you can keep

5  that up there, I'm sorry -- that the imputation methodology,

6  while it may have been perfectly fine for other pesticides, was

7  uniquely unsuited and did not work for glyphosate.

8       Is that consistent with the data that's reported in this

9  validation study?

10 **A.**   So actually, if you -- if -- if we could draw a line

11 through the relative error for glyphosate, and draw a similar

12 line on the right side, because again, some of them, the

13 imputed value was less than the observed, and for some it was

14 greater, but you really want to take the absolute difference,

15 what you can see is that glyphosate ends up sort of being in

16 the middle range.

17      You have a number of pesticides on both sides either

18 over-imputed or under-imputed, which are -- have more error

19 than glyphosate does.

20      Does that make sense?

21 **Q.**   It does.

22      I don't know if your Honors are going to get there, but if

23 your Honors understand, we can just move on.

24 **A.**   Okay, right.  So glyphosate, while not perfect, it

25 certainly suggests it does quite well in relation to the other

1  pesticides that are presented here.

2          MR. LASKER:  Okay, unless your Honors have questions,

3  I'm going to move off the validation studies now into

4  sensitivity analyses.

5          JUDGE PETROU:  This is not exactly on topic, a

6  related question.  Does it concern you at all that the

7  follow-up questionnaire only asked about usage in the prior

8  year?

9          THE WITNESS:  I understand the comments have been

10 made about concerns, what that is.  I'll say why I'm not

11 concerned, and why it doesn't, I don't think, have really any

12 impact on the results.

13     So if you read through the Agricultural Health Study, you

14 can see that the baseline questionnaire was filled out between

15 '93 and '97, and then the follow-up questionnaire was sent to

16 individuals five years later.

17         MR. LASKER:  If we can bring up, actually, so that we

18 can all be looking at it, or your Honors can look at -- I don't

19 know the Exhibit number.  What was Andreotti again, what tab?

20         MS. SHIMADA:  Tab 4.

21         MR. LASKER:  And page 2, the method Study Design.

22 And if we could just pull up that other....

23         THE WITNESS:  All right.  So if you go on the left

24 column under Methods, under Study Design, that first paragraph

25 discusses that the -- the follow-up interview questionnaire was

1    given five years -- approximately five years after enrollment.

2         And so what that means, then, since it was asking

3    information about the questionnaire just prior -- I mean,

4    sorry -- the year just prior to that follow-up, when that

5    follow-up questionnaire was given, then really we're talking

6    about a four-year period.

7         And so for me to be concerned about any substantial

8    change, it would mean that there were people who were unexposed

9    at baseline somehow started using glyphosate in those four

10   years and then stopped, and then were not using it at the

11   follow-up questionnaire.

12        That's the only -- those are the only people I would be

13   worried about, about being misclassified, because they wouldn't

14   be captured as using glyphosate in either the baseline or

15   follow-up questionnaire.

16        It -- it seems like that proportion of people is probably

17   fairly small.  So the influence on --

18        **JUDGE PETROU:**  So when you're doing -- and I should

19   know this, but I don't.  As I sit here, I can't figure out what

20   the answer is.  When they're doing the calculations, let's say

21   we have someone who responded to both, okay?  So we're not

22   trying to impute data to that person.  And on the first

23   go-round he -- I think he said it was 96 percent indicated that

24   there was no usage, and then at the five-year mark indicated

25   heavy usage.

1           What is the presumption for those years in between?

2                THE WITNESS:  Right, so that's a great question.

3           So they -- the way -- and this is how we do our

4      epidemiology study --

5                JUDGE PETROU:  Mm-hm.

6                THE WITNESS:  -- was for the four years from when

7      they were not using until when they started heavily using,

8      they'd still be classified as not using, and then they would

9      start heavy use.  And so --

10               JUDGE PETROU:  That's exactly what I was wondering

11     about because I was wondering, what happens during that time --

12               THE WITNESS:  In those four years.

13               JUDGE PETROU:  -- because the presumption is that

14     whatever the answer is on day one is the answer that is in

15     place from day one through the next four years, regardless, and

16     then what the answer is at the year five-mark goes backwards

17     one year.

18               THE WITNESS:  Right, and then it goes forward again

19     with them, and so -- right, so you do raise an issue, are you

20     concerned about misclassification.

21          But we know those -- those people were very likely

22     unex- -- basically, the question is, how much would they change

23     in that ranking if you knew for sure that all of them who were

24     classified as unexposed actually were heavily exposed for those

25     four years, and the question is whether or not they would they

1    change the ranking so dramatically.

2        I don't think so, because it's such a short amount of

3    follow-up time.  From the follow-up questionnaire until when

4    the end of follow-up was is another between 8 and 14 additional

5    years.

6        So you actually have more time of follow up from the

7    baseline questionnaire than you do from that four-year time

8    period.

9        So it -- it could introduce some error, but it's-- again,

10   it's unlikely to be a substantial amount of misclassification.

11       **THE COURT:**  Let me ask a follow-up question on that.

12       So is maybe another way to say that, that at least for

13   purposes of ever versus never exposed, it's only going to be a

14   problem -- that category of person is only going to be a

15   problem if they're diagnosed with non-Hodgkin's lymphoma in

16   that four-year interim?

17       **THE WITNESS:**  So actually, if they're diagnosed --

18   right.  Well, that's a good question.

19       It's -- if we're -- it would -- you might be worried about

20   it if you're not -- that you're doing reserves without any

21   consideration of latency.

22       So if you really think that is an extremely short latency,

23   then maybe that would be a concern, but if you think that

24   really the latency is at minimum 5, perhaps at minimum 10

25   years, then if those cases were diagnosed in that period, then

1  I'm actually not as worried anymore, because you have all of

2  that information.

3      When the cancer probably was starting to develop, we're

4  correctly capturing them as unexposed, so I think it's really

5  an issue when we have shorter latency periods.

6  **BY MR. LASKER**

7  **Q.**   Okay.  Let's move onto the sensitivity analyses, your

8  Honors.

9      And first of all, can you explain what a sensitivity

10  analysis is?

11  **A.**   Sensitivity analyses are analyses we do to test certain

12  assumptions that we've made in our main analysis.

13  **Q.**   Okay, and did the AHS investigators conduct any

14  sensitivity analyses of the findings in their study?

15  **A.**   Yes, there were three main sensitivity analyses that were

16  done.

17       **MR. LASKER:**  Okay, let's put up slide 12.

18  **Q.**   And if you can, explain what was done in this sensitivity

19  analysis.

20  **A.**   Right.  So the first two sensitivity analyses were, again,

21  the investigators being concerned that the imputation might

22  have led to some sort of bias, and so what they did here was to

23  only use the complete data that they had from the baseline

24  questionnaire.  So they didn't integrate the follow-up

25  questionnaire at all, so imputation was not an issue.

1    And so what -- when they did this analysis, you can see

2  here that the relative risk estimate compares individuals in

3  the highest exposure quartile to those who are unexposed, and

4  the relative risk estimate there is virtually identical to what

5  it was in the main analysis; so suggesting at least this

6  testing of the sensitivity to the imputation seems to suggest

7  it was not a problem.  So --

8  **Q.**   Let's put on slide 2?

9  **A.**   Oh, so then another way -- and again, I think what's

10  really nice about the approach that the Agricultural Health

11  Study investigators took was they really wanted to test this

12  issue of the imputation from multiple angles.

13    So the second strategy they used was to only use the

14  complete data on the 34,000 individuals who answered both

15  questionnaires, and then look at the association with cancer

16  outcomes.

17    So again, this is the relative universe comparing the

18  highest quartile to those non-exposed, and what you can see

19  here is that the relative risk estimate is virtually identical

20  to the main analysis, as well as the other sensitivity

21  analysis, so again giving us reassurance that the imputation

22  approach did not introduce significant bias.

23  **Q.**   Okay.  Before we move to a third sensitivity analysis,

24  there was also a lagged analysis in this study.  Can you

25  explain how, if at all, that provided further, sort of,

1  sensitivity analysis of the results?

2  **A.**    Right.  So as I mentioned, there were four different

3  lagged analyses that the investigators considered.  They looked

4  at latency periods of 5, 10, 15, and 20 years.

5       So since we in this study have follow-up up to 2013, the

6  latency analysis from 15 and 20 years actually only relies on

7  the baseline questionnaire, which was included for everybody.

8       So those results are sort of not influenced in any way by

9  the imputation, and again, those relative risk estimates for

10 the 15- and 20-year latency analysis were virtually identical

11 to the main analysis.

12 **Q.**    Let's go to the third sensitivity analysis.

13 **A.**    So the third sensitivity analysis was addressing the

14 question of whether the potential increase in glyphosate use in

15 the AHS participants could have led to some sort of bias.

16      So that the fact that there wasn't data integrated on the

17 third questionnaire into this study, that there might have been

18 changing increasing use, might have led to -- might have

19 influenced the results in some way.

20      So what they did here was they used the baseline

21 questionnaire as well as the follow-up questionnaire, including

22 the imputed data, but then they ended the follow up at 2005.

23 So they're sort of ignoring, potentially or -- they're not

24 ignoring, their testing the assumption about whether the change

25 in glyphosate between 2005 and 2013 could have influenced the

1  results in some way.

2       And so what they showed here, again, was that there --

3  when you compare the highest exposure quartile to unexposed,

4  there's no association between glyphosate and NHL risk.

5  Q.   Dr. Mucci, given the findings of these validation studies

6  and the sensitivity analyses that we've been discussing, is

7  there any basis in the data to conclude that the findings of

8  the 2018 NCI study were biased due to nondifferential

9  misclassification?

10 A.   No.  Given the results of the sensitivity analysis and the

11 validation studies, I -- I feel confident that we can include

12 significant nondifferential misclassification.  If there

13 exists, it would be a very small of nondifferential

14 misclassification.

15 Q.   And we've talked, and a number of the experts have talked

16 about sort of the nature of epidemiologists to critically

17 review studies and raise criticisms of possible issues that

18 could arise.

19      Is it standard epidemiological methodology, however, to

20 ignore the findings of validation studies and sensitivity

21 analyses when you're making those criticisms?

22 A.   No, and the reason is that, as I mentioned earlier, as an

23 epidemiologist, when you review a particular study or a body of

24 studies, and you want -- you look first at the results.  You

25 want to try to understand whether those observed associations

1   could be due to bias, confounding or chance.

2       So it's really critical to take in all of the available

3   information that helps you evaluate whether these bias or

4   confounding might exist in your data.  So it's really critical

5   to take all of that information together.

6   **Q.**   And given the results of the sensitivity analyses and the

7   validation studies you've just walked through, what is your

8   opinion as to the robustness of the findings -- the reliability

9   of the findings that are reported in the 2018 *JNCI* study?

10  **A.**   I think, you know, we haven't talked yet about some of the

11  other issues, such as their approach to confounding, which

12  again, I think their approach to confounding was extremely

13  reliable.

14      So I think, taking into account that analysis approach

15  that they use for dealing with confounding, as well as their

16  concerns around various issues around misclassification, all

17  taken together, I think these data are extremely robust.

18      **MR. LASKER:**  Okay, I was actually going to move to

19  confounding now, but that will take me largely out of the

20  AHS study, so I want to make sure your Honors have had your

21  questions answered with respect to that study, because the next

22  discussion will be more statistical, for this.

23      **THE COURT:**  Let me just glance at my notes real

24  quick.

25      **MR. LASKER:**  Okay.

1           **THE COURT:**  Could I ask -- you touched on this

2   already, and I apologize if you already directly answered the

3   question, but how many people remained under-exposed after

4   Phase II in the -- in the AHS cohort?

5           **THE WITNESS:**  So there were 83 percent of the

6   individuals who, by the end of the study, had reported prior

7   exposure to glyphosate.  So 17 percent of those remained

8   unexposed.

9           **THE COURT:**  And how did that compare to the

10  Phase I response?

11          **THE WITNESS:**  In the Phase I, I believe the -- the

12  prevalence was 75 percent.  So about 80 percent of individuals

13  started using glyphosate between the baseline and follow-up

14  questionnaire.

15          **THE COURT:**  Okay.  So one of Dr. Ritz's criticisms of

16  the study that I think may be you have not addressed yet --

17  unless I missed it, which is entirely possible -- is the fact

18  that way too many members of the cohort are exposed for the

19  study to be useful.

20      Could you address that?

21          **THE WITNESS:**  Yeah.  Sure.  So it's not correct,

22  actually, and, in fact, it's a real strength that 83 percent of

23  the cohort is exposed, because we can look at a whole range of

24  exposure.  We have people, as you can see --

25          **MR. LASKER:**  Do you want to pull up the

1    dose-response?

2            **THE WITNESS:**  Yeah, sure, if you could, put up the

3    categories for the quartiles of the dose-response.

4    **BY MR. LASKER:**

5    **Q.**   So now, is that the table -- supplementary table with the

6    days of use?

7    **A.**   Yes, correct.  So what that allows us to do is to look at

8    a whole range of exposure --

9    **Q.**   No, no, no, the footnote on the end of this, at the end of

10   the table.

11   **A.**   The footnote there.  Um.  So we have 17 percent of 50,000

12   individuals.  So it quite a large number who remained

13   unexposed.

14       And then what it allows us to do is to look at low levels

15   of exposure, all the way up to more than 108 lifetime-days of

16   exposure.  And if we think about the case-control studies, the

17   upper end is -- I think the highest in one of the studies was

18   10.  So we really can look -- because there's so much exposure,

19   we can really look at high and low levels of exposure.

20       Another way to think about it is the prevalence of

21   cigarette smoking in epidemiology studies right now is probably

22   around 17 percent.  Again, if you have to put that in a visual,

23   17 percent of 50,000 is quite high, and we can look at

24   relatively small associations between cigarettes --

25           **THE COURT:**  You say the percentage of people smoking

1   or the percentage of people not smoking?

2           THE WITNESS:  So the percentage of people smoking is

3   17 percent.  So 83 percent of individuals are not smoking in

4   the study, so it's-- again, I think what -- you know,

5   17 percent, if there were only a hundred people in our cohort,

6   it would be concerned about power.

7       Here, where we have 17 percent of 50,000 individuals,

8   that's a lot of individuals who are unexposed who remain

9   under-exposed.

10      Plus the advantage of having 83 percent have some sort of

11  exposure is that we're able to test in this dataset whether

12  very high levels of glyphosate where you might expect the --

13  you know, if this were -- if something were to be associated

14  with cancer, what you'd expect is a lot more exposure to it

15  would be associated with even stronger risk.

16          JUDGE PETROU:  Finish your answer, before I ask.

17          THE WITNESS:  So just I think here what we can do is

18  we're able to look at doses of exposure that are 10 times

19  greater than what the case-control studies are, in that upper

20  quartile, but again, we don't see any association there.  So it

21  provides some reassurance.

22      Yes, your Honor.

23          JUDGE PETROU:  Going back to an earlier answer,

24  I believe you said, in response to Judge Chhabria's question,

25  that you are weren't so concerned about the lack of data

1  between years 1 to 4, because -- am I understanding you

2  correctly that you do not believe this is a disease with a

3  short latency period?

4        THE WITNESS:  Yes, for this particular exposure,

5  correct.  Yes.

6        JUDGE PETROU:  Okay, so does it concern you at all,

7  if my notes are correct, my notes indicate that the median

8  years of use for the people in this study, over half of them

9  have less than eight and a half years of exposure?  Is that

10  correct?

11        THE WITNESS:  At -- that's a good question.

12     So the median, yeah, the median lifetime years of use was

13  8.5 years, yes.  Correct.

14        JUDGE PETROU:  So does that concern you at all, if

15  it's your view that this is a disease with this kind of

16  exposure requires a long latency period, does this indicate to

17  you in some way that this is maybe more of an interim-level

18  study rather than a more conclusive, final study?

19        THE WITNESS:  So I think -- it's an interesting

20  question, but the amount of years of use is a little bit

21  different than the amount of follow-up time we have on those

22  individuals.  So --

23        JUDGE PETROU:  So explain that to me.  How is that

24  different?

25        THE WITNESS:  Right, so --

 1          **MR. LASKER:**  Maybe we could move to the slide on

 2   latency.  Let me see if you could put up on the screen slide

 3   17.

 4          **JUDGE PETROU:**  I do want to stick with this study for

 5   now, before you respond to it.

 6          **MR. LASKER:**  This study is in here.  It's the top

 7   bar, just in responding to your question.

 8          **JUDGE PETROU:**  No, I see that.

 9          **THE WITNESS:**  So with the 8.5 years of use, you know,

10   we don't know when exactly in time they were using that.  They

11   could have been using it in the 1980s, 1990s, 2000s.

12      But what we do know is the start of when they were

13   exposed; but then we also have this huge amount of follow-up

14   time.

15      So it's a different -- the different question that we have

16   is, you know, how much follow-up time do we have from people

17   when they potentially first could have been exposed, which was

18   in 1975, and then all the way through 2013.  So we actually

19   have more than 30 years of latency.

20      So some of those 8.5 years were in the individuals who

21   were using it very early on, and then stopped.

22          **JUDGE PETROU:**  And then stopped.

23          **THE WITNESS:**  And then some of them might have been

24   more recent.

25      So I actually -- I feel quite confident here that there is

1  sufficient latency, given the distribution, and since the

2  median was 8.5 years, if you look at the inter-quartile

3  range --

4          JUDGE PETROU:  Mm-hm.

5          THE WITNESS:  -- which the upper range would be the

6  75th percentile, so 25 percent were using it at least for 14

7  years or more.

8          JUDGE PETROU:  Isn't that -- just based on your

9  earlier testimony, are you confident in the data relating to

10  people who used it who were in the bottom three quartiles?  The

11  top quartile, you said, is how many years or more?  Fourteen?

12          THE WITNESS:  Years of use, yes.

13          JUDGE PETROU:  Okay, so let's kick out that quartile.

14  Is this data that you feel you can rely on if it's a total use

15  of less than 14 years, for everyone?

16          THE WITNESS:  Yeah so I -- I am.  Again, because

17  I think the question, this is really what happened to these

18  people, so the question is, given that amount of exposure, is

19  that enough to lead to cancer occurrence?

20      But so, you know, again they may have gotten -- let's say

21  it's even only five years of exposure and let's say it happened

22  here.  You then have 10, 15, 20 years of follow-up, even from

23  when that last happened.

24      You know, so with cancer, you -- let's say the analogy was

25  cigarette smoking.  So someone could smoke for 10 years and

1  then quit smoking.  They actually unfortunately remain at

2  elevated risk even 10, 15, 20 years after they stopped smoking.

3  And so -- and you can pick that up in the data.

4       So I think it's an analogous thing where if there were an

5  association, if a pesticide were able to cause cancer, if they

6  were using it for five years and then stopped, that elevation

7  would still be present 15, 20 years later.

8           **JUDGE PETROU:**  Similar to the smoker, if the smoker

9  kept smoking, that would be even worse.

10          **THE WITNESS:**  And that would be even worse, exactly,

11  right.

12          **THE COURT:**  Could I ask one more question before we

13  turn from the AHS Study?  One more question about the high

14  percentage of people being exposed.

15       Another thing sort of seared in to my brain from

16  Dr. Ritz's testimony was this map that she put up, showing how

17  much exposure has increased in Iowa compared to North Carolina,

18  and I believe she said that the AHS data suggested that a lower

19  percentage of people remained exposed in Iowa compared to

20  North Carolina, and she really questioned that, given the --

21  how much glyphosate was used in Iowa.

22       I mean, I got the impression that everybody takes a shower

23  in glyphosate every day in Iowa.

24       So do you have any comments on that?

25          **THE WITNESS:**  I -- so I -- I know there was a piece

1    of data that looked at when farmers were starting to use

2    glyphosate and pesticide applicators, and actually, like, on

3    soybeans being one of the major crops that's being used with

4    glyphosate, and that uptake already sort of started leveling

5    off in the -- you know, I think it was around 2000 or so.

6         So, you know, I think this is a population who may have

7    already been starting to use glyphosate, already; and so that

8    the trends may be different than what you're seeing in the

9    whole State of Iowa, where they might be using glyphosate more

10   frequently and more recently in the home.

11        And I think there was some data -- and I'm not recalling

12   the name of the particular article -- that looked at these --

13   these trends in use of glyphosate in different acreages of

14   farms, but it's -- soybean was one of the major crops, and

15   glyphosate use was already starting to come up in the late

16   1990s, early 2000s.

17             THE COURT:  Okay.

18   BY MR. LASKER

19   Q.   Okay.  Since we're on the issue of latency, if we can go

20   back to the slide that we had on the screen, and talk about

21   what this slide indicates with respect to the potential issues

22   of latency, with the various studies that have been discussed

23   in litigation?

24   A.   Right.

25             THE COURT:  Sorry, before you -- Angie was just

1   showing the clock.  You have, like, a minute left or something.

2       So how much -- assuming that we don't constantly

3   interrupt, how much --

4           **JUDGE PETROU:**  Big assumption.

5           **THE COURT:**  -- how much do you think you have left.

6           **MR. LASKER:**  I think we could probably finish in

7   about 15 or 20 minutes.

8           **THE COURT:**  Okay.

9   BY MR. LASKER

10  Q.   Okay, so with respect to, then, the latency issue --

11  A.   Right.

12  Q.   -- what does this graphic illustrate on the question of

13  latency periods between the different studies?

14  A.   Sure, and as if I took -- actually, I just thought of an

15  additional comment to the question that you had earlier about,

16  sort of, you know, let's say that there -- you know, one of the

17  questions is, has there, since that last second questionnaire,

18  a dramatic uptake, and now everybody in the cohort is using

19  glyphosate?

20      The AHS investigators in the sensitivity analysis actually

21  tested that in their third sensitivity analysis, where they

22  truncated follow-up to 2005, so they were only looking at cases

23  that occurred up until 2005.  So any exposure that happened in

24  the future, so they sort of test that directly.

25  Q.   So Dr. Mucci, can you just explain what is depicted in

1   this chart?

2   **A.**   Yeah.   So this chart shows the -- when cases were

3   diagnosed in the various different studies.

4         So the Agricultural Health Study represents -- the first

5   line of data you can see there include cases between 1993,

6   which is the first incident case, all the way up through 2013,

7   so it really has the longest potential latency.

8         You can see some of the these other studies, I put -- here

9   I'm presenting the publications, not the summary studies that I

10  mentioned.

11        So, for example, the NAPP study, which was Pahwa, et al.

12  study, included both, you know, the Cantor, De Roos, as well as

13  McDuffie studies; and what you can see there is some of the

14  U.S. studies that were included in the North American Pooled

15  Project have very short latencies.

16        So that in 1975, that's when the arrow shows glyphosate

17  was approved for agricultural use in the United States.

18        And then at the very bottom, the gray arrow to the right

19  represents a time frame when cases would have had the potential

20  for a 10-year latency since glyphosate was first introduced.

21        And so what you can see here is that the -- the Cantor

22  study, which was one of the first U.S. case-control studies,

23  would not -- none the cases would have had 10 years of latency;

24  and as a result, the analysis of the pooled project, also the

25  majority -- the case-controlled study that contributed the most

1   cases was from Cantor et al., so therefore, this also has

2   issues of latency.

3          MR. LASKER:  I know you said you weren't going to ask

4   any questions, but do you have any questions about this chart?

5       Okay, let's go to the issue of confounding?

6          THE COURT:  Well, I didn't say we weren't going to

7   ask questions.

8          MR. LASKER:  I was going to do it during their time,

9   that's why.

10         THE COURT:  I have a very hypothetical question.

11         MR. LASKER:  I'm sorry, your Honor that seemed

12  unlikely.

13  Q.   If we can go to the issue of confounding, based upon your

14  review of the glyphosate epidemiology, do you believe it is

15  appropriate to rely upon odds ratios that have not been

16  adjusted for other pesticide exposures when that data is

17  available?

18  A.   No, I don't.  I think it was a concern that many of the

19  studies showed that individuals who were using glyphosate were

20  more likely to be using other pesticides, and also use of some

21  of those other pesticides were independently associated with

22  NHL.  So therefore, that meets the definition of confounders.

23      So it was important to at least investigate whether

24  confounding due to other pesticides might be an issue.

25  Q.   Okay, and there's been a question that's been raised at

1  various points in this proceeding about whether a confounder

2  has to be causally associated with a disease for it to be --

3  for it to act as a confounder and for adjustments to be

4  necessary.  What is your opinion on that issue?

5  **A.**  So that's actually not correct.  The standard modern

6  epidemiology approach to confounding is simply that the

7  confounder should be associated in some way with the outcome.

8      I think an example of this is what we think about in -- as

9  age.  In our analyses for cancer incidence, we almost always

10  adjust for age.  It isn't age *per se* that causes cancer.

11  There's something basically going on about age.  But age

12  captures as a proxy for something else.

13      So even though it's not causally related to the outcome,

14  it's correlated with something else, and so therefore, it's

15  appropriate to adjust for it, and by adjusting for something

16  that's correlated with something else, for example, with

17  pesticides, it may not be those specific pesticides, could be

18  something else about farming, but we're able to capture the

19  bias that's introduced by the confounding factor.

20  **Q.**  Okay, and if we can put up slide 16, and we saw this slide

21  previously.  This is from the manuscript for the NAPP, and it

22  discussed the approach they took for identifying the three

23  pesticides that they adjusted for in their analysis.

24      And first of all, do you believe that this -- is this the

25  proper analysis to identify confounders that should be adjusted

1  for in epidemiologic studies?

2  **A.**    Yes, this is the appropriate approach to take.  What they

3  did was to identify factors or pesticides that were correlated

4  with the exposure, and then they used the literature to look at

5  pesticides that had been previously associated with NHL risk.

6      It doesn't matter if they're causally related, just that

7  they were previously associated, because if that is the case,

8  that meets the definition of a confounder that can introduce

9  bias, and this was actually the similar strategy that the

10 Agricultural Health Study took in their efforts to accounting

11 for confounding other pesticides.

12 **Q.**    And Dr. Mucci, in light of the fact that the NAPP

13 investigators identified these three pesticides using this

14 standard methodology as confounders, would it be

15 methodologically appropriate to rely upon odds ratios from the

16 NAPP that were not adjusted for these three pesticides?

17 **A.**    No, it would not, because -- and what was shown in the

18 slide deck that Dr. Pahwa presented, you can see the effect due

19 to confounding by these three pesticides in the data.

20     When you look at the analysis, the odds ratios that were

21 concretely (phonetic) adjusted, those were somewhat elevated,

22 and those relative, er -- odds ratios were attenuated when you

23 adjusted for confounding due to those other three pesticides.

24 **Q.**    And with respect to -- also with respect to the

25 Eriksson study, and just so the record is clear, because we've

MUCCI - DIRECT / LASKER

1    not really sort of summarized, the Eriksson study is from the

2    same research group that published the earlier Hardell study.

3    **A.**    Yes, that is correct.

4    **Q.**    Okay.   This is a later study, looking at the Swedish

5    population, correct?

6    **A.**    Correct.

7    **Q.**    In the Eriksson study, was there any evidence in the

8    manuscript or in the paper that indicated that there was

9    confounders -- other pesticides that would act as confounders

10   for the glyphosate?

11   **A.**    Yes, and so actually, the Eriksson group took a strange

12   approach, actually, to defining the unexposed group.   So in all

13   of the other studies, individuals who were in the unexposed

14   group were unexposed to glyphosate, and that's what we want to

15   do.   We want to compare what the risk is of NHL is in a group

16   where the only difference is the exposure.   Instead, what

17   Eriksson did was to have in the unexposed group those who were

18   unexposed to any pesticide.

19        So essentially, they threw out from the whole analysis

20   people who were exposed -- well, unexposed to glyphosate, but

21   exposed to other pesticides, and they eliminated those

22   completely from -- from the analysis.   And what resulted was

23   that everybody who was using glyphosate by definition was also

24   using another pesticide.

25        So it was almost as if they had introduced intractable

1  confounding by the way they defined the unexposed group, and

2  that issue of confounding you can actually see in the

3  multivariable analysis that they performed in Table 7 of the

4  manuscript.

5  Q.  And we've seen that table before, but could the multi-

6         THE COURT:  That was the one with --

7         MR. LASKER:  Yeah, that's the one with arsenic.

8         THE COURT:  Arsenic, okay, thank you.  I assume

9  you're going to get to the arsenic.

10         MR. LASKER:  Yeah, the arsenic.  I can't go without

11  the arsenic.

12      Actually, let's pull Table 7 up, so we can talk about

13  that.

14  Q.  This is in the Eriksson Study.

15      It's Tab 3, your Honors.  There's Table 7.

16      And first of all, before we get to arsenic, although I

17  know we will get there, does this multivariate analysis, given

18  the design of the study, how they classified unexposed -- can

19  multivariate analysis actually adjust for all potential

20  confounding that might be in the study?

21  A.  It's impossible to know, but it's-- it's concerning,

22  because the definition, as I mentioned, of the unexposed group

23  really leads to this intractable confounding.

24      So we didn't -- we don't have enough information to know

25  what other pesticides, because of the definition, were highly

1   correlated with glyphosate use.  So we can't really tell from

2   the approach that they took.

3       And there's, you know, normally what we would have in a

4   manuscript is some information about the association between

5   the observation exposure and other exposures, so that potential

6   confounders -- so we could look at the degree of confounding

7   that was introduced.  We don't have that here.

8       But one concern potentially here with Eriksson is the fact

9   that we see so many elevated relative risk estimates.

10  **Q.**   We're going to get to that.

11  **A.**   Okay.

12  **Q.**   That's the next thing we're going to be dealing with, but

13  there was also indication in this manuscript -- and we've

14  talked about it earlier -- about MCPA and the correlation

15  between MCPA use and glyphosate.

16      Given that, and given the odds ratios that we said are

17  reported in Eriksson for MCPA, does that pesticide -- at least

18  we have enough information about that pesticide to determine

19  whether or not it would be a confounder?

20  **A.**   Yes, correct.  Yeah.  So from the manuscript, we know that

21  people who are previously using MCPA were subsequently using

22  glyphosate.  So there was probably a strong correlation between

23  the confounder and the exposure there.

24      And the univariate level, you can see that it's

25  independently associated with the outcome.  So therefore, it

MUCCI - DIRECT / LASKER

1    meets the definition of a confounder.

2          MR. LASKER:  And I'm now going to ask Judge

3    Chhabria's question, which is:  Is there a way, from the data

4    that's been presented in this table, to remove arsenic out of

5    the analysis and re-run the multivariate analysis to determine

6    what the odds ratios would be?

7          THE WITNESS:  No, it would not be possible to do

8    that.  One thing to note, while -- the reason to not put a

9    variable into a multivariable model, so a reason not to put a

10   covariate in as a potential confounder if it is not a

11   confounder, is it can sometimes influence the standard error or

12   the 95 percent confidence interval and lead to a wider

13   confidence interval.

14      Another important thing to remember with epidemiology is

15   that if you have a confounded odds ratio, your -- by

16   definition, your confidence interval is going to be biased.  So

17   you can't calculate the confidence interval unless you have an

18   unbiased odds ratio.

19      So whether arsenic should or should not have been in the

20   model, I couldn't say.  We can't say because we don't have

21   enough information in this manuscript.

22      You know, is it -- is arsenic standing in for some other

23   potential confounder?  Again I can't tell you.  Could it have

24   maybe affected the odds Ratio?  Again, I can't tell you.

25      But what I can tell you is that it's okay if it's in there

1  and it's not a confounder, because all it would have -- it

2  wouldn't impact the odds ratio.  It would only affect,

3  potentially, the standard error, or the 95 percent confidence

4  interval.

5  **Q.**  And so, to put a point on it, for glyphosate we have an

6  odds ratio of 1.51 in multivariate, and confidence interval of

7  .77 to 2.94.  What would be a potential impact if arsenic was

8  not a proper confounder --

9          **THE REPORTER:**  I'm so sorry, could you kindly slow

10  down and start your question again?

11  **BY MR. LASKER**

12  **Q.**  Looking at the odds ratios for glyphosate, and the

13  confidence interval for glyphosate in the multivariate

14  analysis, if arsenic was not a proper confounder but still was

15  put into that multivariate analysis, how would that have

16  potentially impacted the multivariate odds ratio for

17  glyphosate?

18  **A.**  So it would have no effect on the odds ratio.  It might

19  increase the width of the 95 percent confidence interval by a

20  small amount.

21  **Q.**  And if we can move to the issue of recall bias, and there

22  was -- first of all, what are the factors that can impact

23  whether there's recall bias?

24  **A.**  So recall bias in the study can occur for a number of

25  reasons.

1          First, if -- there may be in the public domain some

2     information about a potential cause of cancer.  So once an

3     individual has cancer, it's a stressful time, and you can

4     ruminate about the potential causes of your cancer, and if

5     you've heard, for example, that pesticides might underlie risk

6     of non-Hodgkin's lymphoma, you may be actually sort of not

7     realizing that you're doing this, but you may be over-reporting

8     use of certain pesticides.  So that's one way that recall bias

9     can impact a study.

10          A second way which can impact a study is that the way in

11     which cases -- the information from cases is collected differs

12     from the way the controls information is collected.  And that

13     can be shown.  So I know --

14     Q.   Let me just move on to the next question, because I'm over

15     my clock, and they want us to move it along.

16     A.   Okay.

17     Q.   Would it -- is recall bias something that happens just in

18     general, or is it going to be specific to each individual study

19     whether recall bias exists?

20     A.   It's specific to each study.

21     Q.   Okay, and we heard some testimony with respect to Dr. Ritz

22     where a case-control study reports out odds ratios that are for

23     all of the exposures or almost all of the exposures, above 1.0.

24          Is that, in your opinion, an indication of a potential

25     recall bias problem?

**A.**   When I see a case-control study and I see a number of the
exposures have positive associations, I'm worried about some
sort of systematic bias.

    With a case-controlled study, the first bias you might
think about is recall bias.

        **MR. LASKER:**  Okay.  And if your Honors, we don't need
to go through this in much detail, but in the Eriksson study,
Tab 3 in your binder, I would refer the Court to Tables 2 and
Table 4.  We've already looked at those previously in
Dr. Ritz's testimony, and those were -- they are what they are,
and you can look at them.

    Also, I would direct the Courts' attention to the
McDuffie study, which is Tab 2 in the binder, and Table 2, 3,
and 8.

    And the McDuffie study present the odds ratios for all of
the different exposures that are looked at in that study, and
you can see where they are relative to 1.0.  And we also have
the Hardell study, which is Tab 15, and this study is actually
a pooled analysis.  It actually includes NHL, and then also
hairy cell leukemia, they pooled two small studies into that
one.  And if you look -- that's at Tab 15, and you can look at
all of the reported odds ratios.  I don't have --

        **THE COURT:**  Could I just get a clarification --

        **MR. LASKER:**  Sure.

        **THE COURT:**  -- of your testimony, Mr. Lasker?

1          MR. LASKER:  I'm sorry about that.

2          THE COURT:  If you want a couple minutes to go

3    through this with her, you can, but one thing I missed was

4    whether you're talking about studies reporting out high odds

5    ratios for other pesticides, or the concept of reporting out

6    high odds ratios for other kinds of cancers.

7          MR. LASKER:  Okay, so in this point of the --

8          THE COURT:  Why don't you explore that with the

9    witness.

10         MR. LASKER:  Okay.

11   Q.   So with respect to other studies, if there are other

12   studies that are looking at other pesticides or other outcomes

13   where there's not elevated odds ratios, what, if anything, does

14   that tell you with respect to recall bias in an independent

15   study, either looking at the same compounds or different

16   compounds and the same diseases and different diseases?

17   A.   So it may not tell us, really, anything, and the reason is

18   that recall bias is really study-dependent.  It's both the

19   disease itself, as I mentioned, what's known about the

20   association with the disease in the public domain, and then how

21   cases and controls were queried.

22        I think, for example, with McDuffie there was an initial

23   questionnaire, and then there was a follow-up interview for

24   individuals who reported using pesticides; and what was shown

25   was that the cases were interviewed more so than the controls,

1  and that -- those kind of things make you worry.

2      And there was another.  There was a paper by Dr. Blair and

3  Dr. Zahm that actually showed that the way in which individuals

4  were probed about information, whether it was sort of an

5  open-ended response or whether it was more probing through an

6  interview, you're getting a different reporting of exposure; a

7  higher prevalence in the interview.

8      So if more of your cases are getting interviewed than your

9  controls, and by definition, because of that, they're just more

10  likely to report on different pesticides, you're almost

11  inducing a recall bias just because you're interviewing the

12  cases differently than you're interviewing the controls.

13          THE COURT:  So the way you see concern in McDuffie

14  and Eriksson and Hardell is that when you look at the numbers,

15  the red flag for you is that there's a higher than 1 odds

16  ratio, not just for glyphosate and NHL, but for a variety of

17  other pesticides and NHL.

18          THE WITNESS:  Yes, that is correct.

19          THE COURT:  Okay.

20          THE WITNESS:  And that just makes me worry that

21  there's some sort of systematic bias, and you sort of go

22  through and think what biases might there be.

23      I think with Eriksson, another potential bias that we've

24  already talked about is the confounding that was due to the way

25  that the exposure -- the unexposed group was defined.  But you

1  know, with any case-control study, we do want to rule out that

2  recall bias might not lead to kind of spurious associations.

3          THE COURT:  One thing that everybody agrees on is

4  that farmers have had higher incidence of non-Hodgkin's

5  lymphoma before the introduction of glyphosate.

6          THE WITNESS:  Yes.

7          THE COURT:  And on one level, that's perhaps helpful

8  to Monsanto's case, but on another level, perhaps that

9  diminishes the concern about recall bias stemming from the

10  elevated odds ratios for the other pesticides, because --

11  I mean, just sort of stepping back and using logic, seems

12  like -- it seems like it would not be an unreasonable

13  assumption to say, well, they're probably -- regardless of

14  glyphosate's effect, other pesticides -- there's probably an

15  association between the use of those other pesticides and

16  non-Hodgkin's lymphoma.

17      So in this context, might that actually diminish the

18  concern about recall bias?

19          THE WITNESS:  It potentially could, but it seems

20  like, you know, in the case, I think, of Eriksson, for example,

21  it's more like -- it's more likely to be due to the

22  confounding.  There probably aren't --

23          THE COURT:  Well, Eriksson --

24          THE WITNESS:  Right.

25          THE COURT:  Well, maybe let's forget about

1   Eriksson --

2              THE WITNESS:  Okay, right.

3              THE COURT:  -- and talk about, you know, McDuffie or.

4              THE WITNESS:  Mm-hm.

5              THE COURT:  -- or -- I don't know.  We haven't talked

6   about De Roos 2003 yet --

7              MR. LASKER:  Right.

8              THE COURT:  -- but -- and I assume you were going to

9   get to that.  But if those studies show elevated odds ratios

10  for other pesticides, is it as much of a red flag as it would

11  be in a different context, I guess, is my question.

12             THE WITNESS:  Well, I guess, I mean it's -- it's

13  not -- for -- you're not definitively saying that there's bias,

14  it just raises concern.

15      I guess the question is, then, are all of these pesticides

16  that farmers are exposed to leading to NHL?  That seems

17  unlikely to be the case.

18             THE COURT:  Why?

19             THE WITNESS:  I think -- you know, it's interesting.

20  Yeah, it's a good question, right.  I couldn't say -- I haven't

21  done a review of the epidemiology of these other pesticides.

22  So you're -- it is possible.  I couldn't exclude that, that's

23  true --

24             THE COURT:  Okay.  Sorry, go ahead.

25             THE WITNESS:  No, I was just going to say that

1   there's other issues, I think, with Cantor and the studies that

2   are included in De Roos, that we haven't talked about, which

3   are the bias that we do know about, which is for sure proxy

4   bias, and that we see, though, when we adjust for the proxy

5   bias, our results are attenuated towards the null value.

6            THE COURT:  And there's the lag issue with those

7   studies.

8            THE WITNESS:  Exactly, yes.

9            THE COURT:  But on this issue of recall bias, you

10  know, flipping through the IARC Monograph, you know, they also

11  talk about -- they explore the link between glyphosate exposure

12  and other cancers.

13           THE WITNESS:  Mm-hm.

14           THE COURT:  Right?  And it seems like -- I -- correct

15  me if I'm wrong, but it seems like with respect to just about

16  every other cancer these case-control studies have not shown

17  elevated Odds -- or significantly elevated Odds Ratios.  Right?

18           THE WITNESS:  Right I.

19           THE COURT:  And so doesn't -- if -- if these -- if

20  with these kinds of populations, farmers and whatnot, who are

21  pesticide applicators, if we -- if there was, you know, a

22  recall-bias concern, wouldn't we be much more likely to see

23  elevated Odds Ratios in these case-controlled studies of other

24  cancers also?

25           THE WITNESS:  So the -- it -- you know, the thing

**MUCCI - DIRECT / LASKER**

1  about recall bias -- I actually am not as concerned about

2  recall bias explaining the study findings that we have.

3      And again, if you think about the four epidemiology

4  studies that I presented on that first slide, they really don't

5  show any evidence of any positive association.  I'm not quite

6  as worried about recall bias in the context of this body of

7  literature.

8      I am a little bit concerned with the McDuffie Study,

9  because of this issue of the fact that the cases were more

10  likely to be interviewed than the controls were.

11      And there was a prior study by Blair and Zahm that showed,

12  you know, doing more in-depth probing, more likely to get

13  people to report on not just glyphosate, but a variety of

14  pesticides.  So I think it's almost like it wasn't the classic

15  way we think about recall bias, necessarily; but again, I'm not

16  as worried about recall bias.

17      What I am worried about is confounding, because a lot of

18  the estimates initially were not adjusted.  I'm concerned about

19  the proxies in the U.S. studies, and the bias that was clear

20  from the analysis that Dr. Pahwa and colleagues did in the NAPP

21  that showed, when you took away the data that was presented by

22  proxies, that attenuated the Odds Ratio to the null value.

23      So again, those are the ones that -- the ones that I'm

24  more worried about; are confounding and the proxies bias.

25          **THE COURT:**  Why don't we turn to those?

1          MR. LASKER:  Yes.  Okay.  Just one follow-up

2   question.

3   Q.   If all of the other pesticides were actually associated

4   with non-Hodgkin's lymphoma, what does the impact of that have

5   on the importance of adjusting for the confounding effect of

6   other pesticides?

7   A.   Right.  That would be really critical.  Then it supports

8   the hypothesis or importance of adjusting for confounders.

9   Q.   Okay.  So let's go to the proxy bias issue, which -- we

10  can just put up Slide 20.  We've seen this before.  This is

11  from the De Roos 2003 Study.  It's Tab 1, Defense Exhibit 720.

12          And what can you tell us with respect to the numbers of

13  proxies or the percentage of proxy respondents in the cases and

14  in the controls in this study?

15  A.   So as you can see from this figure, 31 percent of cases

16  data came from proxies; but actually a much higher

17  proportion -- almost 40 percent of the controls -- had their

18  data from proxies.

19  Q.   Okay.  And if we can just go now to Slide 21, which we've

20  also seen previously during Dr. Neugut's testimony, this is a

21  call-out of the glyphosate data from that table, but it is at

22  Plaintiff's Exhibit 303.

23          THE COURT:  Could you go back to that last slide just

24  for one second?

25          MR. LASKER:  Sure.  Yeah.

1    **THE COURT:**  Thanks.

2    **MR. LASKER:**  Okay.  If we can go to Slide 21.  And,

3  as I said, this is Tab 13.  It was introduced as Plaintiff's

4  Exhibit 303.  This is a pull-out of the glyphosate data from

5  that table.

6  **Q.**  What does this data indicate, and how does that

7  potentially impact the findings in the De Roos 2003 Study?

8  **A.**  So this particular table looks at what the frequency

9  specifically of glyphosate was, based on the data that came

10  from the direct interviews with the respondent versus the

11  proxies.  And what you can see, actually, was there was a huge

12  underreporting of glyphosate exposure by the proxies compared

13  to the self-reported data.  So it's --

14  **Q.**  If we can go back to the De Roos 2003 table then.  What

15  impact would that have, then?  Given the relative percentage of

16  proxy respondents in the case and controls, what impact would

17  that have on the reported Odds Ratio out of the De Roos Study

18  for glyphosate?

19  **A.**  So the -- the Odds Ratio in a case-control study is

20  calculated as the odds of exposure in the cases divided by the

21  odds of exposure in the controls.

22    Since you have a higher proportion of proxies who are

23  underreporting the exposure in the controls, your denominator

24  is getting smaller, which then means that your Odds Ratio is

25  going to be overestimated away from the one -- null value.

1  Q.   And if you'd turn to Slide 22, this is from the NAPP slide

2  deck.  And can you just explain for the Court what is reflected

3  here, and how it relates to your prior testimony?

4  A.   So what you can see -- and this -- and these are the

5  estimates that are adjusted for confounders; the three

6  pesticides that were potential confounders.

7       And what you can see here is the Odds Ratio, when you

8  included both the proxy and self-respondents, was 1.13; but

9  when you look at just the data for the self-respondents only,

10  the relatively risk for ever exposure goes down to 0.95,

11  suggesting there's a bias.

12       And also you can see when you look at -- it's also the

13  case with duration, as well as the -- really, the most

14  meaningful measure of dose-response in this table is the

15  lifetime-days analysis.  Again, there not much of a change,

16  actually; but still slightly attenuated.

17       There was -- just to note, there was no difference in the

18  frequency, but I don't think that's really a meaningful

19  estimate of dose-response, just looking at the number of the

20  days per year.

21  Q.   And just to -- well, I think we're going to end it now,

22  Your Honor, with my final questions on this.

23       Dr. Mucci, based upon your review of the the glyphosate

24  epidemiological literature, have you reached an opinion as to

25  whether there is evidence of an association between

1  glyphosate-based herbicides and non-Hodgkin's lymphoma?

2  **A.**    Yes, I have.

3  **Q.**    And what is that opinion?

4  **A.**    So my opinion first is based on reviewing all of the

5  evidence, and taking the estimates that are the most

6  potentially unbiased estimates there are; so those that were

7  adjusted for confounding, as well as for the U.S. studies

8  accounting for the potential of proxy bias.

9       And when you look at the body of epidemiological

10  literature on this topic, there's no evidence of a positive

11  association between glyphosate and NHL risk.  There's no

12  evidence of dose-response of associations for glyphosate and

13  NHL risk.

14  **Q.**    And is it standard epidemiologic methodology to look at

15  studies that report out null findings, and, through

16  criticisms -- methodological criticisms of those studies, reach

17  an affirmative opinion that there is causation?

18  **A.**    No, it is not.

19  **Q.**    And why is that?

20  **A.**    Because you can't -- you can't -- you can't observe what

21  the true relative risk is, if -- even if you're concerned about

22  bias, there's no way to be sure what the true estimate is.  You

23  have the data that you have.  You can't assess causation based

24  on a null study, even if you are concerned about potential

25  bias.

1  **Q.**   And, given the body of epidemiologic literature with

2  respect to glyphosate-based herbicide and non-Hodgkin's

3  lymphoma, do you believe, following reliable methodology, an

4  epidemiologist could conclude that there is a causal

5  association between glyphosate-based herbicides and

6  non-Hodgkin's lymphoma?

7  **A.**   No.   As we've discussed today, based on following a

8  standard methodology and evaluating all of the studies, there's

9  no way to come to a causal conclusion about glyphosate and NHL

10 risk.

11         **MR. LASKER:**   Thank you.

12     Your Honor, I don't have any further questions.

13         **THE COURT:**   Why don't we take a ten-minute break?

14 And then I'm assuming we're pretty close to wrapping up.

15 (Recess taken from 2:25 p.m. until 2:38 p.m.)

16         **THE COURT:**   Okay.   Have at it.

17         **MR. MILLER:**   Thank you, Your Honor.

18

19

20

21

22

23

24

25

1                    **CROSS-EXAMINATION**

2    **BY MR. MILLER**

3    **Q.**   Good afternoon.

4    **A.**   Good afternoon.

5    **Q.**   How have you been, Dr. Mucci?

6    **A.**   Fine, thank you.

7    **Q.**   Very good.  All right.  I promise we have to talk slow.

8    It's late Friday.

9         Let's define some areas of expertise.  Then we'll move

10   into some opinions.  We can get through this, I think, fairly

11   quick.  You are an epidemiologist?

12   **A.**   Yes, I am.

13   **Q.**   Yes, ma'am.  You're not a medical doctor?

14   **A.**   No, I'm not.

15   **Q.**   Or -- so you're not an oncologist or hematologist?

16   **A.**   No, I'm not.

17   **Q.**   You don't hold yourself out as an expert in those areas.

18   Fair?

19   **A.**   Correct.

20   **Q.**   Okay.  And we heard about occupational epidemiology from

21   Dr. Ritz.  You're not an occupational epidemiologist.  That's

22   fair?

23   **A.**   My expertise is as a cancer epidemiologist.  However, I am

24   well versed in understanding the methodologic issue in all

25   forms of epidemiology.

1  Q.   You are absolutely an epidemiologist.  I am not suggesting

2  otherwise.  Okay.  All right.  And you're at the Harvard

3  T. H. Chan School of Public Health?

4  A.   Yes.

5  Q.   Yes, ma'am.  And they have a website there.  Right?

6  A.   Yes.

7  Q.   Yeah.  And this is the first time that you've been an

8  expert.  Right?

9  A.   Yes.

10  Q.   Okay.  And you don't want to leave your real-world

11  opinions about these issues at the courthouse door.  Right?

12  You're -- you're not going to tell us something here that you

13  don't practice every day in your practice?  Is that a fair?

14  A.   I'm sorry.  I don't understand specifically your question.

15  Q.   Well, I mean, people -- let's ask it a different question.

16      Is it fair for people to go to your website at your

17  school, and rely on the information that they see on your

18  website?

19  A.   Which website specifically are you referring to?  There

20  are several websites of School of Public Health.

21  Q.   Harvard University School of Public Health, T. H. Chan.

22  Is it reasonable?

23  A.   I'm sorry.  I don't know which website you're referring

24  to.  Do you mean the main school website?  My own personal

25  website?  I just wasn't sure which website you were referring

1  to.

2  **Q.**   Would it matter?

3  **A.**   Why don't you ask your question?   Sorry.

4  **Q.**   Can we rely on all of the websites at Harvard, or only a

5  few of them?

6  **A.**   Well, it's hard to make a blanket statement, since I'm not

7  sure specifically what website.   The information that -- any

8  information that I provided, I feel very confident in relying

9  on.

10 **Q.**   Well, let's take a look.   We looked at the website last

11 night.   And let's look at --

12      We've got a copy for you, ma'am, and a copy for the

13 Court --

14 (Whereupon a document was tendered to the Court.)

15          **MR. MILLER:**   -- and for defendants.

16 **Q.**   These are some of the exhibits we intend to use as we

17 explore these issues.

18          **MR. WOOL:**   The first one's a PowerPoint.

19 **BY MR. MILLER**

20 **Q.**   Let's put up exhibit -- Exhibit 111, which is tab in your

21 binder.   We're on to that one now.

22          **MR. WOOL:**   It's Tab 9.

23          **MR. MILLER:**   Thank you.   Tab 9, so everyone knows.

24 **Q.**   And this -- this is Harvard T. H. Chan.   That's where you

25 are a professor?

1   **A.**   Yes, I am.

2   **Q.**   School of Public Health?  Ma'am, you have to answer

3   verbally.

4   **A.**   Yes, I am.  Yes.

5   **Q.**   All right.  Thank you, ma'am.  It says in pertinent part

6   here -- and I just want to ask if you agree.  We saw this last

7   evening -- *IARC is a World Health Organization body that has*

8   *among its activities to produce independent scientific*

9   *consensus reports on the causes of cancer.*

10          That's true; isn't it?

11  **A.**   Yes, it is.

12  **Q.**   Yes, ma'am.  All right.  Let's go, then, to the next page

13  in our book.  And this is Tab 14 -- excuse me -- also off your

14  website, ma'am.  And what it says is that in March 2015, 17

15  experts from 11 countries assessed the carcinogenicity of 5

16  pesticides, including glyphosate, at the IARC.  A summary of

17  the final evaluations was published in *Lancet Oncology*.

18          This is from your website; isn't it, ma'am?

19  **A.**   It -- just to clarify:  Our school's website.  It's not my

20  own personal website.

21  **Q.**   Yes, ma'am.  I appreciate that clarification.

22  **A.**   Yes.

23  **Q.**   So at Harvard, at your School of Public Health, they put

24  up -- it was an important piece of medical and scientific

25  information; the fact that IARC had declared glyphosate a

MUCCI - CROSS / MILLER

1   probable human carcinogen?

2   A.   I -- they're reporting on this publication and, yes,

3   providing some context for the IARC panel.  Yes.

4   Q.   Sure.  So if I were to go to the Harvard website to learn

5   about glyphosate, I would see this -- right? -- as I did last

6   night?

7   A.   Yes.

8   Q.   And it would tell me that glyphosate was classified as

9   probably carcinogenic to humans, Group 2A.  And it says,

10  *indicating there was limited evidence for carcinogenicity in*

11  *humans, and sufficient evidence of carcinogenicity in animals*.

12      Do you see that, ma'am?

13  A.   Yes, I do.

14  Q.   And, in fairness, you said to Counsel just before he sat

15  down that you looked at the totality of the evidence.  Do you

16  remember that?

17  A.   Yes.

18  Q.   To be clear, you did not look at the mechanistic evidence,

19  the toxicology, or the animal data.  Fair?

20  A.   What I was commenting on specifically was regarding the

21  epidemiology studies, which -- I did look at all of the

22  available epidemiology studies on glyphosate and NHL risk.

23  Q.   Yes, ma'am, but you did not look at the toxic data.

24  Right?

25  A.   I was evaluating the validity of the epidemiological

1  findings specifically.  And that's what I commented on in my

2  discussion.

3  Q.   Okay.  You're entitled to explain, but I just want to be

4  clear.

5       Answer:  No, I did not look at the toxicological data.

6  Right?

7  A.   No, I did not look at the toxicological data.

8  Q.   Yeah.  All right.  And, Dr. Mucci, you looked at -- you

9  did not look at the animal data.  True?

10  A.   I did not look at the animal data.

11  Q.   All right.  Yes, ma'am.  Thank you.

12       And you did not do the Bradford Hill analysis.  True?

13  A.   I did not do a formal Bradford Hill analysis in my report?

14       I do comment on some of the Bradford-Hill Criteria, and

15  how those relate specifically to the epidemiology study, but I

16  did not do a formal Bradford Hill analysis.

17  Q.   And while you have told us that you do not rely upon or

18  believe that we should rely upon the case-control studies

19  here --

20       That's generally what you have told us.  Right, Dr. Mucci?

21  A.   That is not specifically what I've said.  What -- I

22  raised --

23  Q.   Okay.

24  A.   -- concerns about some of the methodologic issues for both

25  the cohort study and the case-control study, and went through

1  some of those issues; but I didn't say we should not rely on

2  the case-control studies.

3  Q.  Yes, ma'am.  I understand.  Thank you for that correction,

4  Dr. Mucci, because the Harvard website here says, quote,

5  "Specifically, increased risk of non-Hodgkin's lymphoma was

6  consistent across case-controlled studies of occupational

7  exposure in the United States, Canada, and Sweden."

8       That's true; isn't it?

9  A.  That is -- I think what -- the job here is to do a summary

10  of what the IARC report said.  And this is, in fact, what the

11  IARC report said.  So I think they're restating what IARC said.

12      I don't think they, in this website, were doing a formal

13  evaluation of the epidemiology studies of glyphosate.

14  Q.  And you and I, Dr. Mucci, had a chance to look at this

15  when I had the opportunity to take your deposition up in

16  Boston, I think, in October last year.  Right?

17  A.  Yes.

18  Q.  And you have made no effort to ask the school of Harvard

19  to pull this down because it's unreliable?  Is it -- that's

20  fair.  Right?

21  A.  I'm -- actually, I'm not concerned that it's unreliable.

22  What I'm actually just saying is this is what was written about

23  the IARC report.  This was -- it actually all seems like valid

24  information.

25      That the classification was two-way -- so that seems

1  valid.

2      That there was limited evidence of carcinogenicity in

3  humans -- that seems valid.

4      So I think what they've done here is they're simply

5  highlighting the announcement that came out from the IARC

6  report here.  So I don't think they're making any real

7  consensus statement about their -- the state of evidence,

8  themselves.  They're really just reporting on what IARC

9  reported on.

10 Q.  They go on, on the Harvard website, if you would, please,

11 to the next page.  And I'm not going to read the whole thing,

12 but they tell us about the potential mechanisms for cancer.

13 And they articulate the two pathways that are referenced in *The*

14 *Lancet* report and the IARC report.  Right?

15 A.  They do list also with respect to the IARC report here,

16 yes.  This is a summary of what was stated in IARC.

17 Q.  Sure.  And let's turn, now, to the report that you think

18 is very significant:  The Agricultural Health Study.  Right?

19     Now, you have to answer verbally.

20 A.  Oh, sorry.  I Agricultural Health Study is one of the

21 important epidemiology studies on this topic.

22 Q.  Yes, ma'am.  And when I took your deposition --

23     I'll tell you what.  Let me just ask the question.

24     Fair that when I took your deposition, you did not know

25 that the cohort was among licensed applicators; people who were

1  applying for a license to be pesticide applicators?  Do you

2  remember that?

3  **A.**    I don't remember that.  No.

4  **Q.**    Take a look at it.  And you have a copy there.  And I'm

5  not trying to --

6          **MR. WOOL:**  It was Tab 19.

7  **BY MR. MILLER**

8  **Q.**    All right.  Tab 19, if you would.  And I think you'll find

9  that at page 39, line 18 to 22.  Let me read it.  And if

10  there's anything else you or counsel want me to read, I'd be

11  happy to.  My question to you, ma'am, was, *Do you understand*

12  *that they were applying for licensed commercial pesticide*

13  *applicator licenses?*

14      Your answer was, *I was not aware one way or the other if*

15  *they were.*

16  **A.**    I think the context in which I was responding to was I

17  wasn't aware one way or the other that they were actually in

18  the process of applying for the application at the time they

19  completed their questionnaire.  I was definitely aware that

20  these were the study was based on licensed applicators,

21  themselves; but I'm not sure I was aware at the time that they

22  filled out the questionnaire that they were actually applying

23  for the license.

24  **Q.**    When studies are being prepared and they're going to be

25  performed, oftentimes the authors will put their methodology in

1   a publication, so other scientists can review that methodology.

2   Is that fair?

3   **A.**   It can be.  It can be what they do.  Yes.

4   **Q.**   Yeah.  I'm not saying it's done all of the time, but

5   that's often done.  That's fair; isn't it?

6   **A.**   Yes.

7   **Q.**   Okay.  And ironically, the Agricultural Health Study

8   was -- that methodology was available before the results came

9   back.  You're aware of that?

10  **A.**   Could you provide the publication that you're referring

11  to?  I'm not sure which one you're referring to.

12  **Q.**   Sure, sure.  Harvard critiqued the Agriculture Health

13  Study.  You're aware of that; aren't you?

14  **A.**   That is not correct.  There were authors that were on

15  faculty at Harvard.  There were also authors on that study from

16  many other institutions.  It was -- so I would not refer to it

17  as a "Harvard study."

18  **Q.**   Okay.  What's the tab on the Gray Study?

19           **MR. WOOL:**  Tab 1.

20           **MR. MILLER:**  Okay.  Tab 1.

21  **Q.**   And will you at least agree with me, Dr. Mucci, that this

22  is, in fact, the federal government's "Agriculture Health

23  Study:  A Critical Review with Suggested Improvements"?  Right?

24  You have to answer verbally.

25  **A.**   Yes.  This is -- the title of this is what you've said,

1   yes.

2   **Q.**   And Dr. Gray was the first author.  Is that fair?

3   **A.**   Dr. Gray was the first author.  Yes.

4   **Q.**   And where was Dr. Gray a professor at the time?

5   **A.**   Dr. Gray at the time was at the Harvard School of Public

6   Health.

7   **Q.**   Okay.  And as I go back -- and I want to go back a little

8   bit.  I apologize.  But prior to your request to be involved in

9   this by the Hollingsworth firm, you had done no studies about

10  glyphosate.  Right?

11  **A.**   No, I had not.

12  **Q.**   Okay.  And you had done no critique or observation of the

13  Agricultural Health Study.  Right?

14  **A.**   No, I have not.

15  **Q.**   And you didn't -- weren't aware that, in fact, Dr. Gray,

16  at Harvard, with others, had done a critique of the

17  Agricultural Health Study when I first took your deposition.

18  Fair?

19  **A.**   At the time I took the deposition, I'm not sure if -- I

20  don't think I was aware at that time of the deposition that

21  this had been done, back in 2000.

22  **Q.**   And it's important to note, so we put this in perspective,

23  Year 2000, the first questionnaires had already been completed,

24  because, as you and I know, they were completed in what years?

25  **A.**   They were completed between 1997 and 2003.

1  Q.   I think it was '93 and '97, Dr. Mucci.

2  A.   I'm sorry.  '93 and '97.  Yes.  Sorry.

3  Q.   Okay.  So they'd already been completed.  And now we have

4  Dr. Gray and about 10 or 12 doctors writing a critical

5  assessment about what kind of information we might get out of

6  the Agricultural Health Study.  That's fair; isn't it?

7  A.   So, yes.  In fact, that is absolutely fair.  And they

8  raised a number of important concerns that -- as an

9  epidemiologist, that I would be concerned about, as well.  And

10  what's really wonderful about what the Agricultural Health

11  Study investigators have done, as we've talked about earlier

12  today, is to perform a number of Sensitivity Analyses,

13  validation studies that address these points that are raised in

14  this particular publication since then.

15  Q.   Let's take a look at what Dr. Gray and these other

16  scientists said before the results came out.  Okay?  They said

17  there were important limitations of the Agricultural Health

18  Study.  I'm sorry.  I'm reading at --

19            MR. WOOL:  Page 48.

20  BY MR. MILLER

21  Q.   It's on the screen.  Do you see it there, Doctor?

22  A.   Yes.

23  Q.   *Important limitations include low and variable rates of*

24  *subject response to administered survey.*  Do you see that?

25  A.   Yes.

1   Q.   You've told us that 50,000 people responded, about, to the

2   first survey?  Is that fair?

3   A.   54,000 individuals completed the questionnaire.

4   Q.   How many licensed pesticide applicators were in during --

5   filed for an application during that process in North Carolina

6   and Iowa?

7   A.   I'm not really sure.

8   Q.   It was over 90,000; wasn't it?

9   A.   I'm not sure how many there were.  No.  I'll take that --

10       And actually, you know, that's fairly standard with the

11  recruitment to cancer epidemiology studies.  The Nurses Health

12  Study is a study that I've been involved in where we had

13  120,000 nurses.  We had actually sent out invitations to four

14  times as many nurses in order to get that 100,000.

15       That type of low participation rate in the interim study

16  doesn't lead to any bias.  It's not really something to be

17  worried about, actually.  It is a comment, but it's not

18  something to worry about.

19  Q.   And I understand you're not worried about it here today,

20  but I want to see what Dr. Gray had to say about it then.

21  Okay?  He said that, *Low and variable rates of subject response*

22  *to administered surveys, concerns about the validity of some*

23  *self-reported non-cancer health outcomes, limited understanding*

24  *of reliability and validity of self-reporting of chemical use,*

25  *and an insufficient program of biological monitoring to*

*validate the exposure of surrogates employed in the AHS*

*questionnaires, possible confounding by unmeasured non-chemical*

*risk factors for disease, and the absence of detailed plans for*

*data analysis and interpretation that include explicit a priori*

*hypothesis* --

Tell the Court what an *a priori* hypothesis is.

**A.**   It's a hypothesis that a set the investigators will set

out to test prior to doing any specific analyses.

**Q.**   And to be clear, there was -- and that makes -- a study is

more respected within the field of epidemiology is if it has an

*a priori* hypothesis.  That's fair; isn't it?

**A.**   You know, I'm not sure the context in which they're saying

this, in particular, because I think there were a broad set of

*a priori* hypotheses that the AHS investigators were interested

in specifically to look at the health effects of pesticides on

cancer and non-cancer endpoints.  So it's quite a broad set of

hypotheses; but with a cohort study as rich as AHS is, I think

it's a reasonable approach.  So I'm not exactly sure the

context in which they're saying there were not *a priori*

hypotheses.

**Q.**   Well, to be more specific, Dr. Mucci, I think you and I

can agree it was not an *a priori* hypothesis prior to the

questionnaires as to whether glyphosate increased the risk of

non-Hodgkin's lymphoma.  That's fair; isn't it?

**A.**   I'm not sure.  It may not have been.  It might have been.

1    I'm not sure.

2    **Q.**    What they warned in 2000 was -- if we go to the next page.

3         And that's on page 52, Counsel.

4              **MR. LASKER:**  Thank you.

5    **BY MR. MILLER**

6    **Q.**    In the first box -- and again, this is from Dr. Gray, at

7    Harvard, and others.  *The low and variable response rates to*

8    *the supplemental questionnaires seriously affect the quality of*

9    *the Agricultural Health Study.*

10        That's what Dr. Gray said.  Right?

11   **A.**    That is what Dr. Gray said.  It is what he said.

12             **JUDGE PETROU:**  Just so I'm clear, those supplemental

13   questionnaires -- I know there were a number of them.  That

14   refers primarily to the questionnaires completed by spouses.

15   Is that correct?  If you look at the prior page, it talks about

16   it.

17             **THE WITNESS:**  Oh, okay.  Yeah, I haven't read through

18   this since the deposition.  So, yeah.  So that may be what

19   they're referring to, then, I guess.

20             **JUDGE PETROU:**  I mean, I'm not going to testify.

21             **THE COURT:**  Everybody else has.

22             **JUDGE PETROU:**  So I would suggest, though, if we're

23   going to answer questions about the supplemental

24   questionnaires, to be clear what questionnaires we're talking

25   about.

1    **THE WITNESS:**  Right.  So can we just say specifically

2    what -- the questionnaires you're referring to?

3    **THE COURT:**  And you can take your time to glance

4    through for context, you know, before you answer questions

5    about these quotations.

6    **THE WITNESS:**  All right.  Could you just point to

7    me -- I'm sorry -- where specifically you're commenting on page

8    52?

9    **MR. MILLER:**  I'm on page 52 of Dr. Gray's critique of

10   what this study might provide.  And let's look, now, at the

11   third box down.  It's -- we're still on page 52.

12   **THE COURT:**  No.  Let's keep looking at the first box.

13   She can answer that question.

14   **MR. MILLER:**  Okay.  All right.

15   **Q.**  So the question is:  Did Dr. Gray and others say, quote,

16   "The low and variable response rates to the supplemental

17   questionnaire seriously affect the quality of the AHS?"

18   And I think the question we all want to know is:  What is

19   your response to that?  And what supplemental questionnaires do

20   you think we're talking about?

21   **A.**  So in reading through on the second paragraph of page 51,

22   they talk about the participation rates by the applicators to

23   enroll into the study.  So you have 82 percent private of

24   applicators, and 42 percent of commercial applicators.

25   As I mentioned -- and I think, given what we actually are

1    taught at Harvard in terms of how the proportion of people who

2    are invited to enroll actually do enroll doesn't affect the

3    quality of data -- I'm not sure if that's what they're

4    referring to.

5        It does seem, however, there were three supplemental

6    questionnaires that were given to the applicator, to the

7    spouse, and to the female family health which were being used

8    to enroll the spouses and other family members for the

9    Agricultural Health Study that we're looking by Andreotti, *et*

10   *al*.  That's really focused not on the other family members, but

11   the applicators, themselves.

12       So while it may be concern about how these supplemental

13   questionnaires are going to be using -- that particular point

14   doesn't seem to be relevant to the topic of glyphosate and NHL

15   in the Andreotti Study.

16           **JUDGE PETROU:**  It's not relevant, even if part of the

17   information that's being gathered from the spouse has to do

18   specifically with pesticide exposure?

19           **THE WITNESS:**  I don't think any information from the

20   spouse was integrated into the intensity algorithm for the

21   estimate of dose-response.  I think there was a comment to me

22   Andreotti's Study that said there was no proxy respondent

23   information used in the data on glyphosate use, so I don't

24   think that would -- the information on spouse was integrated

25   into the intensity algorithm.

1    **JUDGE PETROU:**  I just don't know.  I'm just noting

2  that on page 51, last full last paragraph, it starts by saying

3  the supplemental questionnaires are intended to gather more

4  detailed information from the applicator and his or her spouse

5  about pesticide use.

6    So I -- I would like to know if you can answer the

7  question about whether that additional information about

8  pesticide use somehow, some way, made it either into the data

9  that was used, or any of the reliability tests that were run on

10 it.

11    **THE WITNESS:**  Right.  So in reading through the

12 Methods section for the Andreotti Study as well as the earlier

13 publication from De Roos, 2005, they only referred to the main

14 study questionnaires.  They don't mention, at all, using any

15 supplemental questionnaires to estimate glyphosate exposure in

16 any of the dose-response.  So -- and if there was a specific

17 comment about no proxy data was used.  So -- which shouldn't --

18 yeah.  So --

19    **JUDGE PETROU:**  I understand that.

20    Also, one of the supplemental questionnaires is for the

21 applicator, him or herself.  So when you say, "No proxy data,"

22 that does not say to me that supplemental questionnaires

23 prepared by the individuals applying the glyphosate or other

24 chemicals was not used.

25    **THE WITNESS:**  Right.  And so I guess my -- what I

1   was -- when you read through 51, the comment is the AHS uses

2   the supplemental questionnaires to enroll spouses and other

3   family members.

4       So my thought in reading that was that perhaps -- well,

5   it's just not clear to me what specifically the questionnaires

6   are that are being used, or how they're being used; but the

7   way, at least, it was described in the Methods section for the

8   Andreotti Study doesn't describe any of these enrollment

9   questionnaires.  It doesn't -- you know, because I think that

10  you would be concerned about missing data, potentially; but

11  that isn't described, at all, in the Methods section for

12  Andreotti, *et al*.

13  **BY MR. MILLER**

14  **Q.**  Let's, if we could, because the Court's -- thank you.

15          **THE COURT:**  Are you switching topics?

16          **MR. MILLER:**  No.  It's reasonably related to this

17  topic, I think.

18          **JUDGE PETROU:**  I like "reasonably related."

19          **THE COURT:**  Well, I have a follow-up the question.

20          **MR. MILLER:**  Yes, Your Honor.

21          **THE COURT:**  Go ahead.  You may be asking the

22  question, so go ahead.  I'll interrupt you if you --

23          **MR. MILLER:**  That's all right, Your Honor.

24      I'm going to ask about the follow-up questionnaire, so if

25  the Court wants to stick with the original questionnaire, then

971

1    I should --

2              THE COURT:  When you say "the follow-up

3    questionnaire," you mean Phase 2?

4              MR. MILLER:  Yes, Your Honor.

5              THE COURT:  Okay.  Before you get to that, let me --

6    this discussion reminds me of another criticism that Dr. Ritz

7    had.  It's a little different from the one I was describing

8    earlier when I was asking you about this.  She talked about how

9    the respondents to this questionnaire, in contrast to the

10   Nurses Study that I guess you are involved in, just don't

11   really care about it.  They don't care, or there's a concern

12   that they don't really care about the answers that they're

13   giving, and they don't really care about how accurate they are.

14       Again, these are people who go in to get their pesticide

15   license.  And this is, like, something they need to get out of

16   the way before they fill out their -- before they get their

17   pesticide license.  They may even view it as a precondition, or

18   something.

19       And one piece of evidence that she cites for that is that

20   they sent these people home with supplemental questionnaires,

21   and very few people sent them in.  So she cited that as

22   evidence that these people don't -- these subjects -- these

23   cohort people who are in the cohort don't really care.  And

24   that raises concerns about the quality of the answers they gave

25   in the questionnaire when they were in to get their pesticide

 1   license.  And so I was wondering if you could respond to that.

 2        **THE WITNESS:**  Sure.  I mean, I guess one comment

 3   would be these people -- if they were coming in at the time

 4   that they were, you know, getting their pesticide applications,

 5   they felt it was important enough to complete these

 6   questionnaires, at baseline, anyway.  The questionnaires were

 7   fairly lengthy, and so they could have just said, *No.  I'm*

 8   *sorry.  I'm not really interested*.

 9        So I guess my question would be:  What evidence might she

10   have that the quality of the data --

11        Because I think the question is if you're not -- if they

12   don't really care one way or the other about what they respond

13   to, there's going to be a lot of nondifferential

14   misclassification.  And then actually, what we saw through the

15   reliability studies and through the biomonitoring study of

16   the -- of the intensity algorithm was there was actually fairly

17   good reliability, and fairly good estimate of dose-response in

18   intensity algorithm.

19        So to me, that suggests that the quality of data they

20   provided was fairly good; but again, you know, if -- if these

21   individuals didn't really care, I guess the question is:  Why

22   would they go through the trouble of sitting there and filling

23   out a questionnaire that might have taken them 45 minutes to

24   do, when they could have just come in, gotten their

25   application, and left?

1          **THE COURT:**  Okay.

2          **THE WITNESS:**  Again, I'm sorry.  I don't know what

3     their state of mind was when they filled it out.

4     **BY MR. MILLER**

5     **Q.**   And out of the 90,000 people that were applying for the

6     pesticide application, 40,000, approximately, of them did just

7     that.  They didn't fill out the supplemental questionnaire.  Is

8     that fair?

9     **A.**   Yeah.  So it looks like about 44 percent of the

10    applicators completed and returned the additional

11    questionnaire.  I think that is what it says.  Yes.

12    **Q.**   Yes?

13    **A.**   And I guess the question is -- and it's not clear to me,

14    again, from Andreotti at all if, at all, this supplemental

15    questionnaire was used in the study of glyphosate and NHL risk.

16    So I'm not sure if that is meaningful or not meaningful.

17    **Q.**   Well, let's go back and look what Dr. Gray cautions, if we

18    could go to the third box on page 52.  *If low response rates*

19    *occur with the follow-up questionnaires.*

20          That happened; didn't it?

21          **MR. LASKER:**  I'm sorry.  Where are you?

22          **MR. MILLER:**  I'm sorry.  I'm on page 52.  It's on the

23    screen on page 52.

24          **THE COURT:**  In it middle of the second paragraph.

25          **MR. LASKER:**  All right.  Thank you.  Go ahead.

1  BY MR. MILLER

2  Q.    *If low response rates occur with the follow-up*

3  *questionnaires* --

4      That happened; didn't it, Dr. Mucci?

5  A.    Yes.  As we discussed, 37 percent of the participants did

6  not come and fill out the second follow-up questionnaire.

7  Q.    And what Dr. Gray tells us if that happens, as it did,

8  quote, *The potential for bias will increase partly* --

9      -- from what, ma'am?

10  A.    So the potential for bias will increase partly from

11  misclassification of subjects, and partly from residual

12  confounding.

13  Q.    And you had told the Court earlier -- and if we can go --

14  and I'm going to come back to this, but you had told the Court

15  earlier -- well, let me back up.

16      First of all, you and I agree that in that first period

17  from '93 to '97, a person could fill out the response -- that

18  questionnaire -- and say, "No use glyphosate," because they're

19  not using glyphosate, and then start using glyphosate the next

20  year?

21  A.    Yes.  That's correct.

22  Q.    And if they were to get non-Hodgkin's lymphoma, they're

23  classified as a non-user.  Right?

24  A.    Yes.  And that is true.  And as we discussed also, that

25  seems to really be unlikely to cause substantial

1    nondifferential misclassification, because of the issue of --

2    that would be a very short latency period in what we're -- so

3    it seems like unlikely to really lead to much of a

4    misclassification.

5    Q.   I never take good-enough notes when a witness is on the

6    stand, but I did write this down.  You said the latency problem

7    wasn't that much of a concern for you -- correct me if I'm

8    wrong -- because it was only four years between the first

9    questionnaire and the second questionnaire.

10        Is that, generally speaking, what you said?

11   A.   What I -- what I -- yeah.  That is -- what I was -- yes,

12   exactly.  So any sort of measurement error that might have

13   occurred during that time -- it's unlikely that the exposure

14   that's happening in those four years is going to lead to --

15   immediately to the development of NHL, if there's a causal

16   association.

17   Q.   Right.  And you, of course, have never treated anyone for

18   NHL.  Right?

19   A.   Yes.  That is -- well, that is true.

20        I think what I -- what many of the experts, including

21   experts of your own, have stated is that with cancer, and with

22   specifically non-Hodgkin's lymphoma, we're looking at latency

23   periods of years; not one year or two years.

24   Q.   You were here today when Dr. Nabhan, a board-certified

25   hematologist/oncologist who has treated thousands of people for

1  non-Hodgkin's lymphoma, told us there were studies that, as

2  early as four months after the insult, they have diagnosed

3  non-Hodgkin's lymphoma.  Are you aware of those studies?

4  **A.**  So just to clarify, I came in at the end, so I didn't hear

5  him say that specifically.

6  **Q.**  I apologize.

7  **A.**  But there are certainly types of exposures when the

8  latency period can be quite short.  But actually, you know, the

9  AHS investigators were able to look at relatively short latency

10  periods.

11      And again, when they looked at just the data on the longer

12  latency, where you'd still capture that kind of exposure

13  information from the baseline questionnaire, there was no

14  association.

15      So it's -- they were able to look at shorter latencies and

16  longer latency periods in that study.

17  **Q.**  And you told the Court that it was only four years, but

18  I'm going to suggest to you -- and I think you'll agree, once I

19  do -- that it actually could be eight years between the first

20  questionnaire and the second questionnaire.

21  **A.**  That -- the way -- as they described in the Andreotti, *et*

22  *al.*, Study, you know, the individuals were given the second

23  questionnaire five years after the first questionnaire.  And so

24  the individuals who completed their first questionnaire in '93

25  were given that questionnaire.  Then five years later the

1   people who were given their questionnaire in '97, again, were

2   five years later.  So the Andreotti Study actually specifically

3   says that questionnaire was given five years after the first

4   questionnaire.

5   Q.   Not four, but five.  Okay?  Is that right?

6   A.   Five years.  And so why I said four years was that

7   follow-up questionnaire asked about exposure information in the

8   year prior.

9   Q.   What year were the -- and it was actually a phone

10  interview for the second questionnaire.  Are you aware of that?

11  A.   Yes.  That is correct.  Our CATI interview.

12       (Reporter requests clarification.)

13          THE WITNESS:  CATI.  CATI interview.

14  BY MR. MILLER

15  Q.   And those --

16  A.   Computer-Assisted Telephone Interview.

17  Q.   And those phone interviews continued until when?

18  A.   So the phone interviews were conducted -- can we --

19  Q.   It's in the Methods section in the Andreotti.

20  A.   I just can't recall.  It's been a long morning, Counselor.

21  I can't remember the specific details, but --

22  Q.   It's 2005, ma'am?

23  A.   If you can tell me what tab it is.

24  Q.   Yes, ma'am.  It's Tab 4 of the defense binder.  Andreotti

25  Study.  On the Methods section, which is page 2 of 8, it says

1   phone interviews were completed in 2005.

2   **A.**   Ah, I'm sorry.  Tab 4?

3   **Q.**   Yes, ma'am.

4   **A.**   Tab 4, for me, is Exponent.

5            **THE COURT:**  I think you should be in the black

6   binder.  That's the binder, I think, that plaintiffs --

7            **THE WITNESS:**  Sorry.  Sorry.  Yes.  Tab 4.  Yes.

8   **BY MR. MILLER**

9   **Q.**   If I say "ma'am" instead of "doctor", I mean no

10  disrespect.  Sometimes I just do that.  And I apologize right

11  now.

12       Dr. Mucci, if you'll look there, it shows that the phone

13  interviews went on until 2005.  Is that accurate, ma'am -- or

14  Doctor?

15  **A.**   Yes, it does say that.  Yes.

16  **Q.**   And so the first questionnaires were all completed by

17  1997.  Right?

18  **A.**   That's what it says.  Yes.

19  **Q.**   So we'd agree, then, now that it can be up to eight years

20  between the first data collection and the second data

21  collection.  Right?

22  **A.**   So then it actually would be seven years, if you want to

23  take away --

24  **Q.**   Sure.  That's why I'm a political science --

25  **A.**   Yeah, but given that the --

**MUCCI - CROSS / MILLER**

1      I think, on average, it was five years, as described in

2   the Methods.  And so they are really -- the majority of cases,

3   then, would have been a four-year gap.

4   **Q.**   Small matter, but from '97 to '05 would be eight years?

5   **A.**   I'm sorry?

6   **Q.**   Eight years; wouldn't it?

7   **A.**   Yeah.  I'm saying, though, it was eight years; but then

8   because they collected information about the past year of

9   exposure, yes.

10  **Q.**   Sure, okay.  All right.  So eight years?

11  **A.**   Yes.

12  **Q.**   All right.  Let's go back to our PowerPoint.  And we're

13  looking at, so we all continue our point of reference, the Gray

14  Study; Dr. Gray from Harvard critiquing what might be found

15  in -- the validity of what might be found in the AHS materials.

16  And I'm at page 56, 57, if we could.

17  **A.**   I'm sorry.  What tab?

18  **Q.**   I'm sorry?

19  **A.**   What tab are we at?

20          **MR. MILLER:**  What tab is that?

21          **THE COURT:**  One.

22          **MR. WOOL:**  Tab 1.

23  BY MR. MILLER

24  **Q.**   All right.  Tab 1.  It's on your screen, ma'am, page 55 of

25  57.

 1            THE COURT:  56 through 57.

 2  BY MR. MILLER

 3  Q.   I'm sorry.  56.  Excuse me.  56.

 4       Okay.  And I just want to ask you about this concept in

 5  epidemiology.  It says, quote, *In large prospective follow-up*

 6  *studies of relatively common exposures and diseases, exposure*

 7  *misclassification tends to be nondifferential with regard to*

 8  *disease status.*

 9       Right?

10  A.   Yes.

11  Q.   Okay.  And you would call non-Hodgkin's lymphoma a

12  relatively common disease, or rare?  And I know you're not a

13  medical doctor, but you have an opinion on that, and I'd like

14  to hear it.

15  A.   I'm sorry.  Where are you talking -- I'm sorry.

16  Q.   I'm just asking --

17            MR. LASKER:  I'm having trouble.

18            THE COURT:  I'm also having trouble finding it on

19  page 56.

20            MR. MILLER:  Oh, I apologize.

21            THE COURT:  You're reading from page 56.  Where on

22  the page is it?

23            MR. MILLER:  Where is it?

24            MR. WOOL:  57.

25            MR. MILLER:  It's on 57 at the bottom right of the

1  page, Your Honor.  And I'll wait until everyone finds it.

2            THE COURT:  You said bottom right the page?

3            MR. LASKER:  Got it.

4            MR. MILLER:  Well, the bottom of the page.  Excuse

5  me.

6            THE COURT:  Okay.

7  BY MR. MILLER

8  Q.   Okay.  So the first question is:  Do you consider

9  non-Hodgkin's lymphoma a rare or common disease?

10 A.   In -- I -- in the -- in general, it is, on an annual

11 basis, a -- it's more rare than it would be considered common.

12     In the context of this particular question where we have

13 575 incident cases of non-Hodgkin's lymphoma, we would consider

14 that to be a large number of cases.

15 Q.   But would you consider --

16     If one of your students at Harvard asked you, "Is

17 non-Hodgkin's lymphoma a rare or common disease?" what would

18 you tell them?

19 A.   I would say it's more rare than it is common, but it's not

20 an uncommon cancer.

21 Q.   Now I want to read the next sentence, if I can, and ask

22 you about it.  You believe that the exposure misclassification

23 in AHS and Andreotti is nondifferential, I believe you told us.

24 Right?

25 A.   Yes.

1  Q.   Okay.  This tells us, from Dr. Gray at Harvard, quote,

2  *Nondifferential exposure misclassification will produce bias*

3  *toward the null if exposure is classified dichotomously,*

4  *exposed versus unexposed, high versus low exposure.*

5  A.   Yes.

6  Q.   That's true; isn't it?

7  A.   Yes, it is.

8  Q.   All right.  Last sentence, and then we'll move on, but it

9  says here in Dr. Gray's paper, quote, *There is no guarantee*

10 *that exposure misclassification will be nondifferential, even*

11 *if objective exposure assessment procedures are used.*

12     Is that true?

13 A.   I'm sorry.  Where are you reading?

14 Q.   Yes, ma'am.  At the bottom of the page 57, the last

15 sentence.  Do you see that?

16 A.   Yes.  And so actually, if you read the sentence before

17 that, it provides the context for that second sentence.  And

18 the first sentence reads, *In small studies or studies in which*

19 *exposure is rare or disease rates low, the impact of*

20 *misclassification, again, is unpredictable.*

21     And it was sort of along the lines of what we discussed

22 earlier, that, with nondifferential misclassification, in

23 smaller studies, the role of chance can occasionally lead to

24 crossing; but as we've sort of discussed, that is not the

25 context here of the Agricultural Health Study, where we have

 1  575 cases in 50,000 individuals, and a common exposure

 2  prevalence.

 3  **Q.**   All right.  Last quote I want to ask you about Dr. Gray --

 4          **THE COURT:**  Hold on.  Could I ask a follow-up

 5  question about that sentence?

 6          **MR. MILLER:**  Yes, Your Honor.

 7          **THE COURT:**  What the sentence does say is "in

 8  small" -- the sentence that you flagged for us -- "in small

 9  studies," which this is not, or "studies in which exposure is

10  rare," which this is not --

11          **THE WITNESS:**  Mm-hm.

12          **THE COURT:**  -- or "disease rates are low," which this

13  is?

14          **THE WITNESS:**  I would say it's not; but you know, on

15  an annual basis the incidence of non-Hodgkin's lymphoma is

16  fairly low; but if we look at, with this long follow-up, the

17  fact that we have 575 cases, I would -- I would not classify

18  that as low.

19          **THE COURT:**  Oh, see, I took -- when -- when they say

20  disease rates are low, I didn't take that to be referencing

21  total number of cases.  I took that to be referencing --

22          **THE WITNESS:**  The per-annual disease rate?

23          **THE COURT:**  Yeah.

24          **THE WITNESS:**  I think it's poorly written, I think,

25  the way it's written.

1        However, what they're referring to is really the impact of

2   small numbers of cases, which we don't really have here.

3        **THE COURT:**  Okay.  And so to the extent that -- to

4   the extent they are trying to say -- may or may not be trying

5   to say it.  If they were trying to say that whenever the

6   disease rate is low, the impact of misclassification is going

7   to be unpredictable, you disagree with that?

8        **THE WITNESS:**  I think -- I think if, in the

9   discussion we had earlier, Your Honor, where we talked about

10  when you have nondifferential misclassification in a small

11  study, you can by chance end up having a bias that might be

12  unpredictable, I wouldn't -- the way they've written it here,

13  it makes it sound like it's more likely than not to be

14  unpredictable.  I think that the issue with nondifferential

15  misclassification that chance may play a role if you have a

16  small study with a low prevalence of exposure and a low rate of

17  disease; but in the context of a larger -- and we've discussed

18  that issue together.  And I think there can be a role of

19  chance, but I wouldn't classify it as unpredictable in small

20  studies.

21       Still, for the most part, it's going to tend to bias to

22  the null.  Chance may be playing more of a role in the result;

23  but when our study's much larger and the number of the cases is

24  much larger and exposure is common, the role that chance might

25  be playing in terms of how nondifferential misclassification

```
 1  may act is -- it's pretty predictable, actually, there.
 2  BY MR. MILLER
 3  Q.   Last quote on Dr. Gray and his study on AHS.  And I'm on
 4  page 59, last full paragraph of full pesticide use.  Do you see
 5  where we are?
 6  A.   The last paragraph on 59.  Yes.
 7  Q.   In it middle of the paragraph.  He says -- he and his
 8  colleagues -- quote, *The information that USEPA plans to*
 9  *collect* --
10  A.   I'm sorry.
11  Q.   Page 59.
12  A.   That's not the bottom paragraph.  That -- it's -- I'm
13  sorry.  Where?
14  Q.   Page 59.
15  A.   Yes.
16  Q.   The last paragraph before --
17  A.   Oh, before pesticide use.
18  Q.   Yes.  Yes, Doctor.  Quote, *The information that USEPA*
19  *plans to collect may be useful in its own right, but for the*
20  *reasons stated above, it is not likely to be as useful as it*
21  *could be for use in the epidemiologic analysis to be -- to be*
22  *performed in the AHS*.
23       That was Dr. Gray's concern in Year 2000, before results
24  were known.  Right?
25  A.   Yes.  And -- and that was a concern that was actually
```

1  investigated by the AHS investigators using the biomonitoring

2  studies to examine the extent to which their estimates of

3  dose-response and using an intensity algorithm could

4  appropriately rank individuals based on their biological

5  exposure to pesticides like glyphosate.  And so I think it's a

6  reasonable concern to have about whether the questionnaire can

7  accurately capture the actual exposure to the pesticides, but

8  what was nice about the Agricultural Health Study is that they

9  did, indeed, perform these biomonitoring studies to investigate

10  how well the questionnaire data did in predicting the actual

11  dose of exposure.

12  **Q.**   Dr. Mucci, I apologize, but I was in too big a hurry.  I

13  do have one last quote I'd be in trouble if I didn't ask your

14  opinion on.  This is Dr. Gray, page 58, top of the page.  He

15  forewarned us in Year 2000, quote, *Misclassification will*

16  *reduce the power of the study to detect any genuine*

17  *cause/effect relationships, and will reduce the validity of the*

18  *findings.*

19       That's what he was concerned about before the results were

20  known.  Right?

21  **A.**   Yes.  This was a concern that he raised.

22  **Q.**   He went on to caution, *Reductions in power are serious*

23  *issues, because they will undermine the ability of government*

24  *and industry to regulate harmful exposures, and to reassure*

25  *farmers with 'negative results.'*

1          That was his caution in Year 2000; right, Doctor?

2   **A.**    Yes.  And misclassification is a concern on the effect

3   that it could have on reducing power; but for many of other

4   reasons we've discussed earlier today, it is unlikely that

5   there's substantial misclassification of glyphosate exposure in

6   this study.  We see this through the number of validation

7   studies that were done.

8          Therefore, what we'd really be worried about is

9   substantial misclassification.  And again, the other part of it

10  is that mathematically, when we look at what the estimated

11  ever-versus-never exposure to glyphosate is on NHL risk

12  mathematically, I don't think misclassification --

13  nondifferential misclassification could even have occurred to

14  the extent to which -- that it would have an impact on

15  statistical power.

16  **Q.**    Well, your friend and colleague, Elizabeth Chang -- you

17  know who she is.  Right?

18  **A.**    I don't know an Elizabeth Chang.

19  **Q.**    Dr. Chang.  I apparently got her first name wrong.

20  **A.**    Dr. Ellen Chang.

21  **Q.**    Excuse me.  I apologize.  Dr. Chang is a colleague of

22  yours?

23  **A.**    She was a colleague.  She -- we were students together.

24  **Q.**    Yeah.  And Dr. Chang, in January of 2016, wrote a critique

25  on this issue you've reviewed before:  The Exponent --

1  **A.**    Yes.  We discussed it together in the context of the

2  deposition.

3  **Q.**    Yes, Dr. Mucci, I think we did.  I just want to ask you

4  one or two questions about it now, and then we'll just move on

5  from it, as well.

6          **MR. LASKER:**  What tab?

7          **MR. MILLER:**  It's at Tab 4.

8       Right?  Is that the right tab?

9          **MR. WOOL:**  Yeah.

10  **BY MR. MILLER**

11  **Q.**    So you're on Tab 4, Doctor?  All right.  And I just want

12  to go -- you've talked about selection bias here today, and I

13  want to look at what Dr. Chang had to say about that issue.

14          **THE COURT:**  What page are you on?

15          **MR. MILLER:**  I am on page 19, Your Honor.

16          **MR. LASKER:**  19?

17          **MR. MILLER:**  Yes.

18  **Q.**    See where it says "Selection Bias"?  Let me know when

19  you're there, Dr. Mucci, on page 19.  She says, quote -- she

20  and others that wrote the Exponent report -- *Over 80 percent of*

21  *eligible pesticide applicators and 75 percent of spouses -- of*

22  *married private applicators enrolled in the AHS Study during*

23  *the initial recruitment phase, which took place at licensing*

24  *facilities for application of restricted-use pesticides.*

25       And she references AHS 1996.  Right?  That's the methods

1  paper.  Right?

2  **A.**    Yes.

3  **Q.**    Okay.  *However, only 44 percent of enrolled pesticide*

4  *applicators completed the detailed, take-home questionnaire*

5  *shortly after enrollment.*

6       That's true; isn't it, Doctor?

7  **A.**    As we discussed earlier, yes.

8  **Q.**    And participation in follow-up questionnaires was also

9  highly incomplete:  64 percent of private applicators,

10 59 percent of commercial applicators, and 74 percent of spouses

11 in Phase 2.  That's generally your understanding of the

12 lost-follow-up issue that we have.  Right?

13 **A.**    So that the -- the -- as we discussed earlier, that is the

14 proportion of people who did not complete these supplemental

15 questionnaires.

16 **Q.**    And Dr. Chang's conclusion was, *Thus* -- and I'm quoting.

17 *Thus, considerable selection bias could have occurred if*

18 *nonparticipation was related to exposure and health status.*

19 Right?

20 **A.**    Yes.  That's what it says.

21 **Q.**    She says as of January 2016, when this was written, quote,

22 *A formal analysis of bias due to study-dropout rates does not*

23 *appear to have been conducted.*

24 **A.**    Ah, yes.  That may be correct.

25      I guess my comment would be if -- if it doesn't seem that

1   these supplemental questionnaires were integrated into the

2   Andreotti, *et al*., Study, it's not -- it's appropriate to be

3   concerned if we're going to be using these questionnaires in

4   some other way, but since they don't seem to be an issue in the

5   Andreotti, *et al*. Study --

6          **JUDGE PETROU:**  I need to go back to that point,

7   because I was skimming the Andreotti Study as you were

8   testifying, and I just don't see that one way or the other in

9   there.

10         **THE WITNESS:**  Right.

11         **JUDGE PETROU:**  So what is your, essentially, best

12  evidence for the supplemental questionnaires, including the

13  supplemental questionnaire prepared by the individuals actually

14  applying these products were not -- that they were not used in

15  the data?

16         **THE WITNESS:**  So what's my evidence for this?

17         **JUDGE PETROU:**  Right.

18         **THE WITNESS:**  I feel like it's a really good

19  question.  And I couldn't -- I can't really speculate if it --

20  if they did use it and didn't mention it; but I guess my

21  comment is that both the Andreotti Study describes in detail so

22  much about its methods, about --

23         **JUDGE PETROU:**  Well --

24         **THE WITNESS:**  -- participation rates, and things like

25  that.  So I guess the question is:  Why wouldn't they have

1    commented on that -- the use of the supplemental questionnaire

2    and the issues with missing data if -- if they had used it?  So

3    I guess that's where I sort of come out, but I am not --

4            **JUDGE PETROU:**  It seems pretty silent to me, as I

5    read it, either way.  That's why I'm kind of trying to push you

6    a little bit on it, to see if there's some more information out

7    there, or if we're just missing the key sentences in the

8    Andreotti Report, which I may very well be doing.

9            **THE WITNESS:**  You know, I guess, again, you know, it

10   isn't clear that they have, or it isn't clear that they

11   haven't.  They just don't describe it in any way; but you know,

12   my sense is that in the discussion Andreotti, *et al.*, really

13   questioned and tried to, as we do with epidemiology, look at

14   the observed associations and say, you know, *What -- to what*

15   *extent could bias have led to the findings we have?*

16       And they discuss nondifferential misclassification.  They

17   consider the imputation approach, and the missing data there.

18       So I guess the question is:  If they had missing data from

19   the supplemental questionnaire, why didn't they describe that

20   as a potential issue here?

21           **JUDGE PETROU:**  Right.

22           **THE WITNESS:**  So to me, that's why I think they

23   didn't integrate it.

24           **JUDGE PETROU:**  Conversely, why doesn't the author of

25   the paper we're looking at right now care about this, if the

1  data wasn't considered?

2          **THE WITNESS:**  I think that's a good question.  So I

3  guess the question is --

4  **BY MR. MILLER**

5  **Q.**  While you're looking for that, this is Exponent, prepared

6  for CropLife.  I said Dr. Chang.  I don't know that it was

7  Dr. Chang that actually wrote it.

8  **A.**  Right.  So this particular Exponent publication isn't

9  focused specifically on glyphosate, so it's not specifically

10  focused on the Andreotti Study.  It's more generally talking

11  about the Agricultural Health Study in its totality.  So I

12  think perhaps they're commenting specifically on studies that

13  might be integrating these follow-up questions or supplemental

14  questionnaires; that they might potentially have concerns about

15  selection bias and even, you know, I think -- you know, this --

16          And the reason, again, I'm thinking it's not an issue here

17  in the Andreotti Study is they -- the Andreotti colleagues

18  refer to the Montgomery piece, which compared the

19  characteristics of the participants and nonparticipants in the

20  follow-up questionnaire where we had so much missing data.  So

21  I feel like they think about -- they were thinking about these

22  things.  They were thinking about the concerns about missing

23  data and its role, and sort of have commented on that potential

24  in the data.

25          So that's why I think, although it is a concern more

1  broadly, potentially, in the Agricultural Health Study, it's

2  not necessarily specific to the Andreotti the analysis of

3  glyphosate.

4  **Q.**   Last quote is on the screen from this Exponent critique.

5  It's -- just to be precise, it's called "Design of

6  Epidemiologic Studies for Human Health Risk Assessment of

7  Pesticide Exposure."  And here's the last quote that we want to

8  ask about.  It's on page 19.   There conclusion was --

9         **MR. LASKER:**  Where on page 19?

10        **MR. MILLER:**  Page 19, last sentence, first paragraph.

11  Selection bias.

12        **MR. LASKER:**  Okay.

13        **THE WITNESS:**  Last sentence of the first paragraph.

14  **BY MR. MILLER**

15  **Q.**   Yes, Doctor.  Quote, *Thus an analysis reliant on follow-up*

16  *questionnaires or reliant on covariates with a high degree of*

17  *missing data, selection bias is a major concern in the*

18  *agriculture health study*.  True?

19  **A.**   So that is what the Exponent people have said.  And it is,

20  as I discussed earlier, a valid concern to have when you do

21  have missing data.  As I had mentioned previously, we when we

22  have missing data like this, we are concerned potentially about

23  selection bias.

24       However, what we've seen through Sensitivity Analyses,

25  what we've seen through the validation of the imputation

1    algorithm, is actually that there didn't seem to be any bias

2    introduced by the missing data.

3         Generally, the characteristics of the participants who

4    filled out this second follow-up questionnaire and those who

5    did not fill it out were quite similar.  So there was some

6    study analysis looking at potential for selection bias there.

7    Didn't seem to have bias.  And again, there were a number of

8    validation studies of the algorithm, and also the Sensitivity

9    Analyses.

10        So again, I think it is valid to have this concern.  And

11   it's a concern we should all have as epidemiologists.  Was

12   there an issue?  So it's really nice that we can answer that

13   question in the Agricultural Health Study because of the

14   Sensitivity Analyses and because of the validation studies.

15   **Q.**   We looked earlier, when we started our question and

16   answer, at the website for Harvard School.  Remember that

17   general line of questions?

18   **A.**   Yes.

19   **Q.**   And I said or read to you what your website -- your

20   school's website said about the importance of IARC.  You

21   generally remember that question?

22   **A.**   Yes.

23   **Q.**   And you said to me that was your school's website; not

24   necessarily your opinion; something to that effect.  Is that

25   fair?

1  **A.**   No.   What I was clarifying -- you kept calling it my

2  website.   And I was just clarifying that that wasn't my

3  website; that it was our school's website.

4  **Q.**   But you do not dispute that those items are significant

5  enough to be on your university's website.   Is that fair?

6  **A.**   I think it's important, as public health -- as a

7  public-health institution, that we report when reports come out

8  like this, to let the public know about recent findings.   So I

9  think it's completely valid for them to have commented on this

10  IARC report --

11  **Q.**   Sure.

12  **A.**   -- and also to describe what the findings were.

13       And one of the points on the website also mentions that

14  the epidemiology evidence of these was actually limited.   I

15  think that's what we've been talking about today.   And I

16  actually agree that there's limited evidence from the

17  epidemiology studies.

18       And, in fact, now, since the IARC report, we have two

19  additional pieces of data that add to this.   One is this recent

20  report of the Andreotti, *et al*., Study, which is the largest

21  number of exposed cases of glyphosate.   And secondly, we have

22  the analyses by Dr. Pahwa and colleagues in the NAPP, where

23  they address the issue of residual confounding that existed, as

24  well as the bias introduced by the proxies in -- in the North

25  American studies.

996

1    So those were -- those data have come out since IARC was

2    published; but even still with the data that IARC had, as you

3    could see from our website, the evidence for the human data is

4    felt to be limited.

5    Q.   The Andreotti Study is not on the Harvard website.  That's

6    true; isn't it, Dr. Mucci?

7    A.   The Andreotti Study was just published recently.  It was

8    published after that particular announcement came out.

9        I'm not sure who put the IARC findings on.  I'm not sure

10   that they're necessarily following this topic of glyphosate,

11   but I think it is an important addition to add to the website,

12   so that readers can have a bigger picture of what the

13   epidemiology is.  But I think, you know, as I said, the comment

14   about IARC on our website does note that the epidemiology

15   evidence on glyphosate and NHL risk is limited.

16   Q.   And "limited," you know, in IARC, means "credible"?

17   A.   I think it means that it's -- it's limited, which is what

18   it says on the website.  And so I think --

19   Q.   What's this?

20   A.   This is actually our textbook of cancer epidemiology that

21   came out earlier this year.

22   Q.   And you're one of the editors?

23   A.   Yes, I am.

24   Q.   And you cite IARC as authority for causes of various

25   cancers in this book.  That's true; isn't it, Dr. Mucci?

1  **A.**   We discuss IARC in the context of assessing causation for

2  cancer as one -- one scientific consensus panel, as we do on

3  the website, as well.

4  **Q.**   And this book is available in searchable format; isn't it?

5  **A.**   I'm not sure what you mean.

6  **Q.**   You can download it and search it; the whole book?

7  **A.**   I wasn't aware of that, actually.

8  **Q.**   Oh, really?

9  **A.**   Yeah.

10  **Q.**   Do you know how many times your book references IARC?

11  **A.**   I do not.

12  **Q.**   We have searched it, and I'll represent to you it's 475

13  times.  You and I can agree IARC's a very reliable authority;

14  can't we?

15  **A.**   IARC is -- you know, I'm actually not sure how many

16  publications in total are included in this book.  I think IARC,

17  as I mentioned, is one piece of evidence to consider in the

18  evaluation of risk factors for cancer.  And so I'm not -- I've

19  never seen that IARC is not a good scientific consensus panel.

20  **Q.**   But Hollingsworth Law firm didn't want you to comment on

21  the totality of the evidence.  They just wanted you to look at

22  the epidemiology.  Right?

23  **A.**   Actually, they've -- no one at Hollingsworth ever told me

24  not to look at other evidence.  I'm trained as an

25  epidemiologist.  My expertise is in the area of cancer

1  epidemiology.  Therefore, my expertise is being able to

2  critically review the epidemiology evidence, which I have done

3  for this for today, and for all of the information that I've

4  provided in my Expert Reports.

5  **Q.**  In your textbook, you rely on IARC for formaldehyde and

6  embalming fluid, and voluntary smoking and lung cancer, among

7  other areas.  Right?  You rely on IARC to be what you think is

8  important enough to put in a textbook for people to look at

9  causality?

10  **A.**  So again, you're highlighting specifically what we've

11  commented on in reference to IARC, but we also referenced a

12  number of other articles.  So, for example, if you look at the

13  relationship between passive smoking and lung cancer, not only

14  do we refer to IARC; you can see the next slide is we refer to

15  the Surgeon General's report.

16  **Q.**  Sure.

17  **A.**  We also commented on individual epidemiology studies.  And

18  again, I think IARC is a piece of evidence to evaluate in

19  looking at different risk factors and a summarizing evidence,

20  but it's not the only piece of evidence.

21  **Q.**  Nor was I suggesting it should be.  A true scientist

22  should weigh all of the evidence.  Right?  That's what you'd

23  want your students --

24  **A.**  In --

25  **Q.**  I'm sorry.  I didn't mean to interrupt.  But that's what

1  you'd want all of your students to do, really?

2  **A.**   In assessing whether, in epidemiology studies, there's an

3  association between a risk factors and cancer, it would be

4  important to evaluate all of the epidemiology evidence to

5  assess whether there's an association between a factor and a

6  disease.

7  **Q.**   You've had some criticisms of the analysis of the

8  epidemiologists that have testified for plaintiffs in this

9  case.  Generally, you remember that, in your direct

10  examination?

11  **A.**   What I've commented on is sometimes the inconsistencies

12  that seem to come from some of the experts, you know, for

13  example, you know, around latency.  Sometimes there's a comment

14  that we might think there are shorter latencies.  Sometimes

15  there are longer latencies.  I think I've commented and

16  critiqued the fact that sometimes the plaintiffs' expert

17  witnesses have commented that you should use the highly

18  adjusted estimates, and then other times they'll say, *Oh, you*

19  *should really use the crude estimate*.  So that's the comments

20  I've critiqued.

21  **Q.**   In your book -- we've Googled it up -- I'll represent to

22  you, you cited Dr. Neugut seven times as an authority in

23  cancer.  Are you aware of that?

24  **A.**   I -- again, so let's look at the specific studies.  It

25  looks like there were seven studies on which he was a coauthor,

1  and which we cited as part of our epidemiology studies.  So I

2  think those were probably very relevant to do.

3  **Q.**   You know Dr. Neugut to be a man that uses reliable

4  scientific methodology, in his 40 years of being at Columbia?

5  Isn't that fair?

6  **A.**   Actually, I don't know Dr. Neugut.  I haven't followed his

7  work.  I'm not sure that I worked on these specific chapters.

8  As you can see, different authors were assigned to different

9  chapters.  So I actually don't know anything about Dr. Neugut.

10      All I do know about are the comments -- some the comments

11  that he made, some of which I did not agree with, as I wrote in

12  my Expert Report.

13  **Q.**   You cited Dr. Weisenburger eight times in your textbook.

14  Are you aware of that?

15  **A.**   No, I was not aware of that.

16  **Q.**   Let's go to page 129 of your textbook.  You lay out the

17  determinations that IARC can make about whether an agent is

18  carcinogenic.  Right?

19          **MR. LASKER:**  Mr. Miller, do you have a copy of the

20  textbook so I can sort of read the context?

21          **JUDGE PETROU:**  Exhibit 5.

22          **MR. WOOL:**  Tab 5.  Tab 5.

23          **MR. MILLER:**  It's at Tab 5?

24          **MR. WOOL:**  We copied the pages.  And they're in

25  sequential order, but the PowerPoint page -- pages numbers.

1          **MR. LASKER:**  Okay.  So what page are we on?

2          **MR. ESFANDIARY:**  Move along.

3          **MR. LASKER:**  Oh, I'm sorry.  Okay.

4          **MR. MILLER:**  Page 129, I think, of the textbook.

5   Right?

6   **Q.**  You know that is what you have in your textbook right.

7   **A.**  So, yes, these are the established criteria that IARC

8   uses.  And, as we know, glyphosate received a classification of

9   Group 2A.

10  **Q.**  And you don't take issue with that.  You haven't looked at

11  the whole body of evidence.  Right?  You're not here to do

12  that.

13  **A.**  Exactly.  I have provided my expert opinion regarding the

14  epidemiology studies, which -- and again, important comment is

15  that not only did I look at the epidemiology studies that IARC

16  looked at, but now there's a lot more evidence that we have,

17  including the updated analysis and the Agricultural Health

18  Study, as well as the updated analysis within the North

19  American Pooled Project.

20  **Q.**  Dr. Mucci, in a 700-page textbook that just came out in

21  2018, where you've referenced IARC over 400 times, not one time

22  do you or any of your coauthors say IARC got it wrong?

23  **A.**  I'm sorry.  That's -- I'm not sure the context in which

24  you're saying this.  We use IARC as a reference when we're

25  describing relationships between risk factors and cancer risk.

1   I'm not sure specifically what you're saying.  IARC got it --

2   **Q.**   Wrong?

3   **A.**   -- wrong.  I'm not sure.

4       Actually, there is one example where IARC originally had a

5   classification for coffee that -- I think they've since

6   downgraded coffee's carcinogenicity in its most recent

7   findings.  So that's one example where IARC did get it wrong.

8       But I think IARC is -- as I've mentioned, it's one of the

9   scientific consensus panels.  It's what we've stated on our

10  website.  It's one source of information that we look at.

11      But again, you know, IARC -- what I'm commenting on

12  today -- what I've commented on today specifically is on the

13  body of epidemiology studies, which include studies that have

14  come out since the IARC report.

15  **Q.**   And those studies that have come out since the IARC

16  report -- they've downgraded coffee, but they have not

17  downgraded glyphosate-based products.  They are still a 2A.

18  That is true; isn't it, Dr. Mucci?

19  **A.**   According to IARC's classification, the classification is

20  2A.  However, my comments today and in my reports have

21  specifically commented on the epidemiology studies.

22      And I think, in looking at the epidemiology evidence,

23  there's no evidence of a positive association between

24  glyphosate and NHL risk.  Again, I haven't commented on other

25  aspects that IARC has commented on.

1  Q.   And you've mention four criteria that you were going to

2  talk about at the beginning of your direct examination:

3  Confounding, latency, recall, and proxy bias.  Those were four

4  topics that you discussed.  Right?

5  A.   Those are four topics they we discussed.  Yes.

6  Q.   And there are epidemiologists on the IARC panel that

7  concluded that glyphosate was a probable human carcinogen.

8  Right?

9  A.   Well, that was the classification that was used.  As I

10  mentioned earlier, the -- the -- and if you pull up the

11  website, again, the epidemiology was considered to be limited

12  evidence.

13       And now we have even more evidence from the epidemiology

14  studies, from a well-designed cohort study with a large number

15  of cases.  Again, the evidence of the association between

16  whether or not glyphosate is classified in a certain way by

17  IARC -- what we do know, what I've commented on specifically,

18  is around the epidemiology studies.  And based on those

19  studies, there's no association between glyphosate and NHS.

20  Q.   I know that's your opinion, Dr. Mucci.  My question was

21  very targeted.  Can we at least agree there are epidemiologists

22  on the panel that reviewed glyphosate?

23  A.   Yes, there were epidemiologists that reviewed glyphosate.

24       (Reporter requests clarification.)

25            THE WITNESS:  -- on the IARC panel.

1  BY MR. MILLER

2  Q.   Isn't it fair to assume that the epidemiologists on the

3  IARC panel knew about the concept of confounding?

4  A.   Not only did they know about the concept of confounding,

5  but they actually commented on confounding in the IARC panel.

6  Q.   And still --

7          THE COURT:  Mr. Miller, this line of questioning is

8  not helpful to anybody.

9          MR. MILLER:  Yes, Your Honor.

10          THE COURT:  We know that the epidemiologists at IARC

11  know about confounding.

12          MR. MILLER:  Thank you.

13  Q.   Let's move on, Doctor.  It is late in the day.  I just

14  want to look at one other area with you.  Let's turn to urinary

15  bladder cancer, out of your textbook.  You concluded --

16          THE COURT:  By the way, Mr. Miller, I'll let you know

17  that you have under six minutes left on your clock.

18          MR. MILLER:  Thank you, Your Honor.  I will use it

19  accordingly.  I appreciate that.

20  Q.   All right.  Well, I just want to look at that real quick,

21  because I think it's very instructive.  You mention --

22          THE COURT:  Doesn't matter what you think.  Just ask

23  her questions --

24          MR. MILLER:  Sorry, Your Honor.

25          THE COURT:  -- in your remaining five and a half

1   minutes.

2          MR. MILLER:  I won't let it happen again, Your Honor.

3   Q.   Let's turn to page 562 of your textbook.

4   A.   Is it in my binder.  I don't have the textbook here.

5   Q.   I'll give you a copy.

6   A.   No.  I mean, that's fine just.

7          THE COURT:  Yeah.  It's in the binder in Tab 5.

8          JUDGE PETROU:  562.

9          THE COURT:  Well, if you look at Chapter 22, Urinary

10  Bladder Cancer, I think that's what he's trying to get to.

11         THE WITNESS:  Okay.  Thank you, Your Honor.

12         MR. MILLER:  If you want this, Doctor, I can hand you

13  the whole book.

14         JUDGE PETROU:  Counsel, what page are we looking at

15  within this chapter?

16         MR. MILLER:  Your Honor, page 562.

17         JUDGE PETROU:  That's what I don't see.

18         THE COURT:  Yeah.  I don't see that, either.

19         THE WITNESS:  Yeah.  There's no 562 included.

20  BY MR. MILLER

21  Q.   Are you familiar with the inter Actos issue, at all;

22  pioglitazone issue, at all?

23  A.   I'm sorry.  I couldn't hear what you just said.

24  Q.   Are you familiar with the Actos issue with bladder cancer

25  that's reported in your book, or is this something you don't

1    recall?  I just want to ask.  That's all.

2    **A.**    I'm sorry.  I don't understand what you're saying.

3    **Q.**    Actos.

4    **A.**    Actos.

5    **Q.**    Pioglitazone.  Are you familiar with that?

6    **A.**    Yes, I am.  Thank you.  Sorry.  I couldn't hear what you

7    were saying.

8    **Q.**    We're both doing the best we can.

9         And my point is just this.  You list the IARC finding.

10   And in that situation, there were case-control studies that

11   showed the association; a large cohort that did not show the

12   association.  Yet in your book you reach or report that it's a

13   risk factor -- pioglitazone -- for bladder cancer.

14   **A.**    I'm sorry.

15   **Q.**    Do you see the point?

16   **A.**    You pulled it away so quickly, I can't find it.

17              **MR. WISNER:**  I can't see anything with this thing.

18              **THE COURT:**  I think if you want to ask her questions

19   about this, you should put the book in front of her.  Perhaps

20   you should have bought multiple copies of the book.  Maybe you

21   didn't want to support Dr. Mucci, but --

22              **MR. MILLER:**  May I approach, Your Honor?

23              **THE COURT:**  You may.

24              **MR. MILLER:**  Here, Doctor.  Sorry.

25              **THE WITNESS:**  So actually what I'd like to comment

```
 1   on, because I think what's more important is really what --

 2            THE COURT:  Well --

 3            THE WITNESS:  Yeah.  Okay.

 4            THE COURT:  But first go ahead and answer his

 5   questions.

 6            THE WITNESS:  Okay.  Sure.

 7            THE COURT:  And then if you need to --

 8            THE WITNESS:  Okay.  Sure.

 9            THE COURT:  -- provide context to it, you can.

10            THE WITNESS:  Sure.  Sorry.

11            THE COURT:  So I think what he was asking was,

12   whatever that chemical or substance is called, he was saying

13   you stated that there was risk associated with it, even though

14   there was a negative cohort study and positive case-control

15   studies relating to it.  I think that was the question.

16            THE WITNESS:  Right.  So I think it's critical in

17   any -- in evaluating the association of any exposure and any

18   disease to critically evaluate the individual epidemiology

19   studies.  Just because it's a cohort study doesn't mean it's

20   always going to be better than a case-controlled study.

21       However, in the context of glyphosate what's really

22   important to remember is that when you use the most highly

23   adjusted relative-risk estimates, and take away the bias that

24   was present because of the proxies, the case-control studies

25   actually are in line with the data from the cohort studies
```

1  supporting no association.

2      So in that case, actually -- in the case of glyphosate --

3  there doesn't seem to be a distinction between the evidence

4  from the case-control cohort studies.  They're all supporting

5  no association.

6      But again here, you know, each -- just because -- just

7  because a cohort study doesn't find something doesn't --

8  doesn't mean that it's -- you know -- do you know what I mean?

9  Like, it's -- the cohort study doesn't always have to be right.

10      What's nice about a cohort study is it's free from some of

11  the biases we're concerned about in case-control studies, but

12  we always want to look critically at all of the epidemiology

13  evidence to look at the results, and assess whether bias or

14  confounding or chance might have influenced our study results.

15          **MR. MILLER:**  Okay.  This is my last question.  I'm

16  wrapping it up.  What's the exhibit number of the book?

17          **MR. WOOL:**  301.  It's a loose document.  It's a loose

18  PowerPoint.

19          **THE WITNESS:**  "Towards a Cancer-Free Workplace"?

20          **MR. MILLER:**  Yes.  Yes.  Is that it?

21          **MR. WOOL:**  Yeah.

22          **MR. MILLER:**  It should look like this on the front,

23  Doctor.

24          **MR. WOOL:**  I flipped it over.

25

1              **MR. MILLER:**  There you go.  Thank you.

2  **Q.**   Doctor, you've seen this before.  Right?

3  **A.**   Yes, I have.

4  **Q.**   And this is a presentation in Ontario, in June, of what

5  we've called "NAPP data."  Right?

6  **A.**   Yes.

7  **Q.**   Okay.  And I just want to show you this, and walk through

8  it with you, and then I'll sit down.  Let's go, if we could,

9  please, to this page.  "Frequency.  Number of Days Per Year of

10  Glyphosate Handling and Non-Hodgkin's Lymphoma Risk."

11              Do you see that, Doctor?

12  **A.**   Yes, I see it.

13  **Q.**   Okay.  Now, you did not go over this with defense counsel

14  during your direction examination.  Right?

15  **A.**   No, I did not.

16  **Q.**   Okay.  And it says at the bottom that these results are

17  adjusted for --

18              Could you let us know what they're adjusted for?

19  **A.**   Yes.  These are adjusted for age, sex, date, cancer in a

20  first-degree relative, use of proxies, use of personal

21  equipment, and the use of three potential pesticide

22  confounders.

23  **Q.**   They're also adjusted for proxy respondents; aren't they?

24  **A.**   Yes, they put proxy respondents in the model.  However,

25  that's not an appropriate way to adjust for the bias due to

1   proxy respondents.  Since it's a misclassification, you don't

2   want to adjust for it like it's a confounder.  You want to

3   eliminate the bias by restricting your analysis to only

4   self-respondents.

5   **Q.**   After these scientists -- Dr. Pahwa, and others --

6   adjusted for use of a 2,4-D, use of dicamba, use of malathion,

7   and use of proxy respondents for greater than two days' use,

8   they had a statistically significant increased risk overall.

9   Is that true?

10  **A.**   Yes.  While that is what is presented here in a June 3rd

11  presentation, there's actually a presentation that was actually

12  the one that was presented at the scientific conference on --

13  in August where the results are actually a little bit

14  different; more attenuated.  Those same results are the ones

15  that are being highlighted in Dr. Pahwa's manuscripts, so we

16  think they're the most updated results.

17       And then finally -- so that's an issue.  So I think these

18  data are a little bit old.  They are adjusted for proxy bias.

19       But finally, when we're thinking about dose-response, this

20  categorization of looking at number of days of the year is not

21  really a meaningful estimate.  When you look at the

22  lifetime-days of use in this same analysis, and you adjust for

23  the confounding, you can see the effect of the confounders on

24  the association.

25       And there's -- in that analysis, there's no evidence of

1011

1    dose-response relationship.  This isn't really a meaningful

2    estimate of dose-response, because what we're talking about is

3    two days per year.  You don't know if somebody's used it only

4    one year or ten years, and so it's not really meaningful

5    estimate of dose.

6        It's -- what you really want to be looking at is the

7    lifetime years of exposure, which, again, in the Pahwa

8    analysis, when you account for confounding, account for the

9    proxy bias, shows no association.

10   **Q.**   Last question, Dr. Mucci.  Are you aware that now in the

11   State of California glyphosate is listed as a known cause of

12   cancer?

13   **A.**   I was not aware one way or the other.

14           **MR. MILLER:**  Thank you for your time, Doctor.

15           **THE WITNESS:**  Thank you.

16           **THE COURT:**  Okay.  I would like everyone to give a

17   round of applause to our court reporter.  She had the hardest

18   job in the room this week.

19       You can step down.  Thank you.

20           **THE WITNESS:**  Thank you.

21   (Witness excused.)

22           **THE COURT:**  And I assume there's nothing further for

23   user us to discuss right now.  We'll just see you on Wednesday

24   at 10:00 o'clock.

25           **MR. LASKER:**  10:00 o'clock?  I didn't know.  It's

1012

1   10:00 o'clock in the morning?

2           **THE COURT:**  I thought that's what we decided.

3           **MR. LASKER:**  I have not tracked all of the e-mails.

4           **THE COURT:**  We had a conversation about whether

5   Judge Petrou may want to listen in.  Does that work?

6           **JUDGE PETROU:**  I should be able to finish my earlier

7   hearing by then.

8           **THE COURT:**  Well, so we'll plan on 10:00 o'clock.

9   We'll let you know.  It won't be earlier than that.  The only

10  chance is that it might be later; 10:30, or something like

11  that.

12          **MR. LASKER:**  Okay, or 2:00 p.m.  Thank you,

13  Your Honor.

14          **THE COURT:**  If they're late, will you -- like, do I

15  need to give them an excuse or something?  Thank you.

16      (At 4:01 p.m. the proceedings were adjourned.)

17  I certify that the foregoing is a correct transcript from the

18  record of proceedings in the above-entitled matter.

19

20  *Lydia Zinn*

21  _____        March 10, 2018
    Signature of Court Reporter/Transcriber   Date
22  Lydia Zinn

23

24

25