# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
OF THE NATIONAL ACADEMIES

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

# Reference Guide on Epidemiology

MICHAEL D. GREEN, D. MICHAL FREEDMAN, AND LEON GORDIS

*Michael D. Green, J.D., is Bess & Walter Williams Chair in Law, Wake Forest University School of Law, Winston-Salem, North Carolina.*

*D. Michal Freedman, J.D., Ph.D., M.P.H., is Epidemiologist, Division of Cancer Epidemiology and Genetics, National Cancer Institute, Bethesda, Maryland.*

*Leon Gordis, M.D., M.P.H., Dr.P.H., is Professor Emeritus of Epidemiology, Johns Hopkins Bloomberg School of Public Health, and Professor Emeritus of Pediatrics, Johns Hopkins School of Medicine, Baltimore, Maryland.*

CONTENTS

I. Introduction, 551
II. What Different Kinds of Epidemiologic Studies Exist? 555
    A. Experimental and Observational Studies of Suspected Toxic Agents, 555
    B. Types of Observational Study Design, 556
        1. Cohort studies, 557
        2. Case-control studies, 559
        3. Cross-sectional studies, 560
        4. Ecological studies, 561
    C. Epidemiologic and Toxicologic Studies, 563
III. How Should Results of an Epidemiologic Study Be Interpreted? 566
    A. Relative Risk, 566
    B. Odds Ratio, 568
    C. Attributable Risk, 570
    D. Adjustment for Study Groups That Are Not Comparable, 571
IV. What Sources of Error Might Have Produced a False Result? 572
    A. What Statistical Methods Exist to Evaluate the Possibility of Sampling Error? 574
        1. False positives and statistical significance, 575
        2. False negatives, 581
        3. Power, 582

    B. What Biases May Have Contributed to an Erroneous Association? 583
        1. Selection bias, 583
        2. Information bias, 585
        3. Other conceptual problems, 590
    C. Could a Confounding Factor Be Responsible for the Study Result? 591
        1. What techniques can be used to prevent or limit confounding? 595
        2. What techniques can be used to identify confounding factors? 595
        3. What techniques can be used to control for confounding factors? 596
V. General Causation: Is an Exposure a Cause of the Disease? 597
    A. Is There a Temporal Relationship? 601
    B. How Strong Is the Association Between the Exposure and Disease? 602
    C. Is There a Dose–Response Relationship? 603
    D. Have the Results Been Replicated? 604
    E. Is the Association Biologically Plausible (Consistent with Existing Knowledge)? 604
    F. Have Alternative Explanations Been Considered? 605
    G. What Is the Effect of Ceasing Exposure? 605
    H. Does the Association Exhibit Specificity? 605
    I. Are the Findings Consistent with Other Relevant Knowledge? 606
VI. What Methods Exist for Combining the Results of Multiple Studies? 606
VII. What Role Does Epidemiology Play in Proving Specific Causation? 608
VIII. Acknowledgments, 618
Glossary of Terms, 619
References on Epidemiology, 630
References on Law and Epidemiology, 630

Examining a study for potential sources of bias is an important task that helps determine the accuracy of a study's conclusions. In addition, when a source of bias is identified, it may be possible to determine whether the error tended to exaggerate or understate the true association. Thus, bias may exist in a study that nevertheless has probative value.

Even if one concludes that the findings of a study are statistically stable and that biases have not created significant error, additional considerations remain. As repeatedly noted, an association does not necessarily mean a causal relationship exists. To make a judgment about causation, a knowledgeable expert[121] must consider the possibility of confounding factors. The expert must also evaluate several criteria to determine whether an inference of causation is appropriate.[122] These matters are discussed below.

## C. Could a Confounding Factor Be Responsible for the Study Result?[123]

The third major reason for error in epidemiologic studies is confounding. Confounding occurs when another causal factor (the confounder) confuses the relationship between the agent of interest and outcome of interest.[124] (Confounding and selection bias (Section IV.B.1, *supra*) can, depending on terminology, overlap.) Thus, one instance of confounding is when a confounder is both a risk factor for the disease and a factor associated with the exposure of interest. For example, researchers may conduct a study that finds individuals with gray hair have a higher rate of death than those with hair of another color. Instead of hair color having an impact on death, the results might be explained by the confounding factor of age. If old age is associated differentially with the gray-haired group (those with gray hair tend to be older), old age may be responsible for the association found between hair color and death.[125] Researchers must separate the relationship between gray hair and risk of death from that of old age and risk of death. When researchers find an association between an agent and a disease, it is critical to determine whether the association is causal or the result of confounding.[126] Some

---

121. In a lawsuit, this would be done by an expert. In science, the effort is usually conducted by a panel of experts.
122. For an excellent example of the authors of a study analyzing whether an inference of causation is appropriate in a case-control study examining whether bromocriptine (Parlodel)—a lactation suppressant—causes seizures in postpartum women, see Kenneth J. Rothman et al., *Bromocriptine and Puerpal Seizures*, 1 Epidemiology 232, 236–38 (1990).
123. *See* Grassis v. Johns-Manville Corp., 591 A.2d 671, 675 (N.J. Super. Ct. App. Div. 1991) (discussing the possibility that confounders may lead to an erroneous inference of a causal relationship).
124. *See* Rothman et al., *supra* note 61, at 129.
125. This example is drawn from Kahn & Sempos, *supra* note 31, at 63.
126. Confounding can bias a study result by either exaggerating or diluting any true association. One example of a confounding factor that may result in a study's outcome understating an

epidemiologists classify confounding as a form of bias. However, confounding is a reality—that is, the observed association of a factor and a disease is actually the result of an association with a third, confounding factor.[127]

Confounding can be illustrated by a hypothetical prospective cohort study of the role of alcohol consumption and emphysema. The study is designed to investigate whether drinking alcohol is associated with emphysema. Participants are followed for a period of 20 years and the incidence of emphysema in the "exposed" (participants who consume more than 15 drinks per week) and the unexposed is compared. At the conclusion of the study, the relative risk of emphysema in the drinking group is found to be 2.0, an association that suggests a possible effect). But does this association reflect a true causal relationship or might it be the product of confounding?

One possibility for a confounding factor is smoking, a known causal risk factor for emphysema. If those who drink alcohol are more likely to be smokers than those who do not drink, then smoking may be responsible for some or all of the higher level of emphysema among those who do not drink.

A serious problem in observational studies such as this hypothetical study is that the individuals are not assigned randomly to the groups being compared.[128] As discussed above, randomization maximizes the possibility that exposures other than the one under study are evenly distributed between the exposed and the control cohorts.[129] In observational studies, by contrast, other forces, including self-selection, determine who is exposed to other (possibly causal) factors. The lack of randomization leads to the potential problem of confounding. Thus, for example, the exposed cohort might consist of those who are exposed at work to an agent suspected of being an industrial toxin. The members of this cohort may, however, differ from unexposed controls by residence, socioeconomic or health status, age, or other extraneous factors.[130] These other factors may be causing (or

---

association is vaccination. Thus, if a group exposed to an agent has a higher rate of vaccination for the disease under study than the unexposed group, the vaccination may reduce the rate of disease in the exposed group, thereby producing an association that is less than the true association without the confounding of vaccination.

127. Schwab v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1199–1200 (E.D.N.Y. 2006), *rev'd on other grounds*, 522 F.3d 215 (2d Cir. 2008), describes confounding that led to premature conclusions that low-tar cigarettes were safer than regular cigarettes. Smokers who chose to switch to low-tar cigarettes were different from other smokers in that they were more health conscious in other aspects of their lifestyles. Failure to account for that confounding—and measuring a healthy lifestyle is difficult even if it is identified as a potential confounder—biased the results of those studies.

128. Randomization attempts to ensure that the presence of a characteristic, such as coffee drinking, is governed by chance, as opposed to being determined by the presence of an underlying medical condition.

129. *See* Rothman et al., *supra* note 61, at 129; *see also supra* Section II.A.

130. *See, e.g., In re* "Agent Orange" Prod. Liab. Litig., 597 F. Supp. 740, 783 (E.D.N.Y. 1984) (discussing the problem of confounding that might result in a study of the effect of exposure to Agent Orange on Vietnam servicemen), *aff'd*, 818 F.2d 145 (2d Cir. 1987).

protecting against) the disease, but because of potential confounding, an apparent (yet false) association of the disease with exposure to the agent may appear. Confounders, like smoking in the alcohol drinking study, do not reflect an error made by the investigators; rather, they reflect the inherently "uncontrolled" nature of exposure designations in observational studies. When they can be identified, confounders should be taken into account. Unanticipated confounding factors that are suspected after data collection can sometimes be controlled during data analysis, if data have been gathered about them.

To evaluate whether smoking is a confounding factor, the researcher would stratify each of the exposed and control groups into smoking and nonsmoking subgroups to examine whether subjects' smoking status affects the study results. If the relationship between alcohol drinking and emphysema in the smoking subgroups is the same as that in the all-subjects group, smoking is not a confounding factor. If the subjects' smoking status affects the relationship between drinking and emphysema, then smoking is a confounder, for which adjustment is required. If the association between drinking and emphysema completely disappears when the subjects' smoking status is considered, then smoking is a confounder that fully accounts for the association with drinking observed. Table 4 reveals our hypothetical study's results, with smoking being a confounding factor, which, when accounted for, eliminates the association. Thus, in the full cohort, drinkers have twice the risk of emphysema compared with nondrinkers. When the relationship between drinking and emphysema is examined separately in smokers and in nonsmokers, the risk of emphysema in drinkers compared with nondrinkers is not elevated in smokers or in nonsmokers. This is because smokers are disproportionately drinkers and have a higher rate of emphysema than nonsmokers. Thus, the relationship between drinking and emphysema in the full cohort is distorted by failing to take into account the relationship between being a drinker and a smoker.

Even after accounting for the effect of smoking, there is always a risk that an undiscovered or unrecognized confounding factor may contribute to a study's findings, by either magnifying or reducing the observed association.[131] It is, however, necessary to keep that risk in perspective. Often the mere possibility of uncontrolled confounding is used to call into question the results of a study. This was certainly the strategy of some seeking, or unwittingly helping, to undermine the implications of the studies persuasively linking cigarette smoking to lung cancer. The critical question is whether it is plausible that the findings of a given study could indeed be due to unrecognized confounders.

In designing a study, researchers sometimes make assumptions that cannot be validated or evaluated empirically. Thus, researchers may assume that a missing potential confounder is not needed for the analysis or that a variable used was adequately classified. Researchers employ a sensitivity analysis to assess the effect of those assumptions should they be incorrect. Conducting a sensitivity analysis

---

131. Rothman et al., *supra* note 61, at 129; *see also supra* Section II.A.

Table 4. Hypothetical Emphysema Study Data[a]

| Drinking Status | Total Cohort | | | | Smokers | | | | Nonsmokers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | Cases | Incidence | RR | Total | Cases | Incidence | RR | Total | Cases | Incidence | RR |
| Nondrinkers | 471 | 16 | 0.034 | 1.0[b] | 111 | 9 | 0.081 | 1.0[b] | 360 | 7 | 0.019 | 1.0[b] |
| Drinkers | 739 | 41 | 0.069 | 2.0 | 592 | 48 | 0.081 | 1.0 | 147 | 3 | 0.020 | 1.0 |

[a] The incidence of disease is not normally presented in an epidemiologic study, but we include it here to aid in comprehension of the ideas discussed in the text.
[b] RR = relative risk. The relative risk for each of the cohorts is determined based on reference to the risk among nondrinkers; that is, the incidence of disease among drinkers is compared with nondrinkers for each of the three cohorts separately.

594

entails repeating the analysis using different assumptions (e.g., alternative corrections for missing data or for classifying data) to see if the results are sensitive to the varying assumptions. Such analyses can show that the assumptions are not likely to affect the findings or that alternative explanations cannot be ruled out.[132]

### *1. What techniques can be used to prevent or limit confounding?*

Choices in the design of a research project (e.g., methods for selecting the subjects) can prevent or limit confounding. In designing a study, the researcher must determine other risk factors for the disease under study. When a factor or factors, such as age, sex, or even smoking status, are risk factors and potential confounders in a study, investigators can limit the differential distribution of these factors in the study groups by selecting controls to "match" cases (or the exposed group) in terms of these variables. If the two groups are matched, for example, by age, then any association observed in the study cannot be due to age, the matched variable.[133]

Restricting the persons who are permitted as subjects in a study is another method to control for confounders. If age or sex is suspected as a confounder, then the subjects enrolled in a study can be limited to those of one sex and those who are within a specified age range. When there is no variance among subjects in a study with regard to a potential confounder, confounding as a result of that variable is eliminated.

### *2. What techniques can be used to identify confounding factors?*

Once the study data are ready to be analyzed, the researcher must assess a range of factors that could influence risk. In the hypothetical study, the researcher would evaluate whether smoking is a confounding factor by comparing the incidence of emphysema in smoking alcohol drinkers with the incidence in nonsmoking alcohol drinkers. If the incidence is substantially the same, smoking is not a confounding factor (e.g., smoking does not distort the relationship between alcohol drinking and the development of emphysema). If the incidence is substantially different, but still exists in the nonsmoking group, then smoking is a confounder, but does not wholly account for the association with alcohol drinking. If the association disappears, then smoking is a confounder that fully accounts for the association observed.

---

132. Kenneth Rothman & Sander Greenland, Modern Epidemiology (2d ed. 1998).
133. Selecting a control population based on matched variables necessarily affects the representativeness of the selected controls and may affect how generalizable the study results are to the population at large. However, for a study to have merit, it must first be internally valid; that is, it must not be subject to unreasonable sources of bias or confounding. Only after a study has been shown to meet this standard does its universal applicability or generalizability to the population at large become an issue. When a study population is not representative of the general or target population, existing scientific knowledge may permit reasonable inferences about the study's broader applicability, or additional confirmatory studies of other populations may be necessary.

### 3. What techniques can be used to control for confounding factors?

A good study design will consider potential confounders and obtain data about them if possible. If researchers have good data on potential confounders, they can control for those confounders in the data analysis. There are several analytic approaches to account for the distorting effects of a confounder, including stratification or multivariate analysis. Stratification permits an investigator to evaluate the effect of a suspected confounder by subdividing the study groups based on a confounding factor. Thus, in Table 4, drinkers have been stratified based on whether they smoke (the suspected confounder). To take another example that entails a continuous rather than dichotomous potential confounder, let us say we are interested in the relationship between smoking and lung cancer but suspect that air pollution or urbanization may confound the relationship. Thus, an observed relationship between smoking and lung cancer could theoretically be due in part to pollution, if smoking were more common in polluted areas. We could address this issue by stratifying our data by degree of urbanization and look at the relationship between smoking and lung cancer in each urbanization stratum. Figure 5 shows actual age-adjusted lung cancer mortality rates per 100,000 person-years by urban or rural classification and smoking category.[134]

Figure 5: Age-adjusted lung cancer mortality rates per 100,000 person-years by urban or rural classification and smoking category.



*Source:* Adapted from E. Cuyler Hammond & Daniel Horn, *Smoking and Death Rates—Report on Forty-Four Months of Follow-Up of 187,783 Men: II, Death Rates by Cause*, 166 JAMA 1294 (1958).

134. This example and Figure 4 are from Leon Gordis, Epidemiology 254 (4th ed. 2009).

For each degree of urbanization, lung cancer mortality rates in smokers are shown by the dark gray bars, and nonsmoker mortality rates are indicated by light gray bars. From these data we see that in every level (or stratum) of urbanization, lung cancer mortality is higher in smokers than in nonsmokers. Therefore, the observed association of smoking and lung cancer cannot be attributed to level of urbanization. By examining each stratum separately, we, in effect, hold urbanization constant, and still find much higher lung cancer mortality in smokers than in nonsmokers.

For each degree of urbanization, lung cancer mortality rates and smokers are shown by the dark-colored bars, and nonsmoker mortality rates are indicated by light-colored bars. For these data we see that in every level (or stratum) of urbanization, lung cancer mortality is higher in smokers than in nonsmokers. Therefore, the observed association of lung cancer cannot be attributed to level of urbanization. By examining each stratum separately, we are, in effect, holding urbanization constant, and we still find much higher lung cancer mortality in smokers than in nonsmokers.

Multivariate analysis controls for the confounding factor through mathematical modeling. Models are developed to describe the simultaneous effect of exposure and confounding factors on the increase in risk.[135]

Both of these methods allow for adjustment of the effect of confounders. They both modify an observed association to take into account the effect of risk factors that are not the subject of the study and that may distort the association between the exposure being studied and the disease outcomes. If the association between exposure and disease remains after the researcher completes the assessment and adjustment for confounding factors, the researcher must then assess whether an inference of causation is justified. This entails consideration of the Hill factors explained in Section V, *infra*.

# V. General Causation: Is an Exposure a Cause of the Disease?

Once an association has been found between exposure to an agent and development of a disease, researchers consider whether the association reflects a true cause–effect relationship. When epidemiologists evaluate whether a cause–effect relationship exists between an agent and disease, they are using the term causation in a way similar to, but not identical to, the way that the familiar "but for," or sine qua non, test is used in law for cause in fact. "Conduct is a factual cause of

---

135. For a more complete discussion of multivariate analysis, see Daniel L. Rubinfeld, Reference Guide on Multiple Regression, in this manual.

# References on Epidemiology

Causal Inferences (Kenneth J. Rothman ed., 1988).

William G. Cochran, Sampling Techniques (1977).

A Dictionary of Epidemiology (John M. Last et al. eds., 5th ed. 2008).

Anders Ahlbom & Steffan Norell, Introduction to Modern Epidemiology (2d ed. 1990).

Robert C. Elston & William D. Johnson, Basic Biostatistices for Geneticists and Epidemiologists (2008)

Encyclopedia of Epidemiology (Sarah E. Boslaugh ed., 2008).

Joseph L. Fleiss et al., Statistical Methods for Rates and Proportions (3d ed. 2003).

Leon Gordis, Epidemiology (4th ed. 2009).

Morton Hunt, How Science Takes Stock: The Story of Meta-Analysis (1997).

International Agency for Research on Cancer (IARC), Interpretation of Negative Epidemiologic Evidence for Carcinogenicity (N.J. Wald & R. Doll eds., 1985).

Harold A. Kahn & Christopher T. Sempos, Statistical Methods in Epidemiology (1989).

David E. Lilienfeld, *Overview of Epidemiology,* 3 Shepard's Expert & Sci. Evid. Q. 25 (1995).

David E. Lilienfeld & Paul D. Stolley, Foundations of Epidemiology (3d ed. 1994).

Marcello Pagano & Kimberlee Gauvreau, Principles of Biostatistics (2d ed. 2000).

Pharmacoepidemiology (Brian L. Strom ed., 4th ed. 2005).

Richard K. Riegelman & Robert A. Hirsch, Studying a Study and Testing a Test: How to Read the Health Science Literature (5th ed. 2005).

Bernard Rosner, Fundamentals of Biostatistics (6th ed. 2006).

Kenneth J. Rothman et al., Modern Epidemiology (3d ed. 2008).

David A. Savitz, Interpreting Epidemiologic Evidence: Strategies for Study Design and Analysis (2003).

James J. Schlesselman, Case-Control Studies: Design, Conduct, Analysis (1982).

Lisa M. Sullivan, Essentials of Biostatistics (2008).

Mervyn Susser, Epidemiology, Health and Society: Selected Papers (1987).

# References on Law and Epidemiology

American Law Institute, Reporters' Study on Enterprise Responsibility for Personal Injury (1991).

Bert Black & David H. Hollander, Jr., *Unraveling Causation: Back to the Basics*, 3 U. Balt. J. Envtl. L. 1 (1993).

Bert Black & David Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation*, 52 Fordham L. Rev. 732 (1984).

Gerald Boston, *A Mass-Exposure Model of Toxic Causation: The Content of Scientific Proof and the Regulatory Experience,* 18 Colum. J. Envtl. L. 181 (1993).

Vincent M. Brannigan et al., *Risk, Statistical Inference, and the Law of Evidence: The Use of Epidemiological Data in Toxic Tort Cases,* 12 Risk Analysis 343 (1992).

Troyen Brennan, *Causal Chains and Statistical Links: The Role of Scientific Uncertainty in Hazardous-Substance Litigation,* 73 Cornell L. Rev. 469 (1988).

Troyen Brennan, *Helping Courts with Toxic Torts: Some Proposals Regarding Alternative Methods for Presenting and Assessing Scientific Evidence in Common Law Courts,* 51 U. Pitt. L. Rev. 1 (1989).

Philip Cole, *Causality in Epidemiology, Health Policy, and Law,* 27 Envtl. L. Rep. 10,279 (June 1997).

Comment, *Epidemiologic Proof of Probability: Implementing the Proportional Recovery Approach in Toxic Exposure Torts,* 89 Dick. L. Rev. 233 (1984).

George W. Conk, *Against the Odds: Proving Causation of Disease with Epidemiological Evidence,* 3 Shepard's Expert & Sci. Evid. Q. 85 (1995).

Carl F. Cranor, Toxic Torts: Science, Law, and the Possibility of Justice (2006).

Carl F. Cranor et al., *Judicial Boundary Drawing and the Need for Context-Sensitive Science in Toxic Torts After* Daubert v. Merrell Dow Pharmaceuticals, Inc., 16 Va. Envtl. L.J. 1 (1996).

Richard Delgado, *Beyond Sindell: Relaxation of Cause-in-Fact Rules for Indeterminate Plaintiffs,* 70 Cal. L. Rev. 881 (1982).

Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause-in-Fact,* 7 Harv. Envtl. L. Rev. 429 (1983).

Jean Macchiaroli Eggen, *Toxic Torts, Causation, and Scientific Evidence After* Daubert, 55 U. Pitt. L. Rev. 889 (1994).

Daniel A. Farber, *Toxic Causation*, 71 Minn. L. Rev. 1219 (1987).

Heidi Li Feldman, Science and Uncertainty in Mass Exposure Litigation, 74 Tex. L. Rev. 1 (1995).

Stephen E. Fienberg et al., *Understanding and Evaluating Statistical Evidence in Litigation,* 36 Jurimetrics J. 1 (1995).

Joseph L. Gastwirth, Statistical Reasoning in Law and Public Policy (1988).

Herman J. Gibb, *Epidemiology and Cancer Risk Assessment*, in Fundamentals of Risk Analysis and Risk Management 23 (Vlasta Molak ed., 1997).

Steve Gold, Note, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion and Statistical Evidence,* 96 Yale L.J. 376 (1986).

Leon Gordis, *Epidemiologic Approaches for Studying Human Disease in Relation to Hazardous Waste Disposal Sites,* 25 Hous. L. Rev. 837 (1988).

Michael D. Green, *Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of Agent Orange and Bendectin Litigation,* 86 Nw. U. L. Rev. 643 (1992).

Michael D. Green, *The Future of Proportional Liability, in* Exploring Tort Law (Stuart Madden ed., 2005).

Sander Greenland, *The Need for Critical Appraisal of Expert Witnesses in Epidemiology and Statistics,* 39 Wake Forest L. Rev. 291 (2004).

Khristine L. Hall & Ellen Silbergeld, *Reappraising Epidemiology: A Response to Mr. Dore*, 7 Harv. Envtl. L. Rev. 441 (1983).

Jay P. Kesan, *Drug Development: Who Knows Where the Time Goes?: A Critical Examination of the Post-*Daubert *Scientific Evidence Landscape,* 52 Food Drug Cosm. L.J. 225 (1997).

Jay P. Kesan, *An Autopsy of Scientific Evidence in a Post-*Daubert *World,* 84 Geo. L. Rev. 1985 (1996).

Constantine Kokkoris, Comment, DeLuca v. Merrell Dow Pharmaceuticals, Inc.: *Statistical Significance and the Novel Scientific Technique,* 58 Brook. L. Rev. 219 (1992).

James P. Leape, *Quantitative Risk Assessment in Regulation of Environmental Carcinogens,* 4 Harv. Envtl. L. Rev. 86 (1980).

David E. Lilienfeld, *Overview of Epidemiology*, 3 Shepard's Expert & Sci. Evid. Q. 23 (1995).

Junius McElveen, Jr., & Pamela Eddy, *Cancer and Toxic Substances: The Problem of Causation and the Use of Epidemiology,* 33 Clev. St. L. Rev. 29 (1984).

Modern Scientific Evidence: The Law and Science of Expert Testimony (David L. Faigman et al. eds., 2009–2010).

Note, *Development in the Law—Confronting the New Challenges of Scientific Evidence,* 108 Harv. L. Rev. 1481 (1995).

Susan R. Poulter, *Science and Toxic Torts: Is There a Rational Solution to the Problem of Causation?* 7 High Tech. L.J. 189 (1992).

Jon Todd Powell, Comment, *How to Tell the Truth with Statistics: A New Statistical Approach to Analyzing the Data in the Aftermath of* Daubert v. Merrell Dow Pharmaceuticals, 31 Hous. L. Rev. 1241 (1994).

Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 28, cmt. c & rptrs. note (2010).

David Rosenberg, *The Causal Connection in Mass Exposure Cases: A Public Law Vision of the Tort System,* 97 Harv. L. Rev. 849 (1984).

Joseph Sanders, *The Bendectin Litigation: A Case Study in the Life-Cycle of Mass Torts,* 43 Hastings L.J. 301 (1992).

Joseph Sanders, *Scientific Validity, Admissibility, and Mass Torts After* Daubert, 78 Minn. L. Rev. 1387 (1994).

Joseph Sanders & Julie Machal-Fulks, *The Admissibility of Differential Diagnosis to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law,* 64 L. & Contemp. Probs. 107 (2001).

Palma J. Strand, *The Inapplicability of Traditional Tort Analysis to Environmental Risks: The Example of Toxic Waste Pollution Victim Compensation,* 35 Stan. L. Rev. 575 (1983).

Richard W. Wright, *Causation in Tort Law*, 73 Cal. L. Rev. 1735 (1985).