Pages 1 - 97

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
IN RE:  ROUNDUP PRODUCTS        )
LIABILITY LITIGATION,           )   NO. M. 16-02741 VC
_____ )
```

                              San Francisco, California
                              Wednesday, March 14, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    The Miller Firm LLC
                    108 Railroad Avenue
                    Orange, VA  22960
                    (540) 672-4224
                    (540) 672-3055 (fax)
            BY:  **MICHAEL J. MILLER**

For Plaintiffs:

                    Andrus Wagstaff PC
                    7171 West Alaska Drive
                    Lakewood, CO  80226
                    (720) 255-7623
            BY:  **AIMEE H. WAGSTAFF**
                 **DAVID JACKSON WOOL**

For Plaintiffs:

                    Andrus Wagstaff PC
                    6315 Ascot Drive
                    Oakland, CA  94611
                    (720) 255-7623
            BY:  **KATHRYN MILLER FORGIE**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

```
 1   APPEARANCES:

 2   For Plaintiffs:
                          Weitz & Luxenberg PC
 3                        700 Broadway
                          New York, NY 10003
 4                        (213) 558-5802
                      BY:  ROBIN L. GREENWALD
 5
     For Plaintiffs:
 6                        Baum Hedlund Aristei and Goldman, P.C.
                          12100 Wilshire Boulevard, Suite 950
 7                        Los Angeles, CA  90024
                          (310) 207-3233
 8                    BY:  MICHAEL L. BAUM
                          PEDRAM ESFANDIARY
 9                        ROBERT BRENT WISNER

10   For Plaintiff Sioum Gebeyehou:
                          Law Offices of Tesfaye Tsadik
11                        1736 Franklin Street, 10th Floor
                          Oakland, CA  94612
12                        (510) 839-3922
                          (510) 444-1704 (fax)
13                    BY:  TESFAYE WOLDE TSADIK

14   For Defendant Monsanto Corporation:
                          Hollingsworth LLP
15                        1350 I Street, NW
                          Washington, DC  20005
16                        (202) 898-5800
                      BY:  JOE G. HOLLINGSWORTH
17                        ERIC GORDON LASKER

18

19

20

21

22

23

24

25
```

1  **Wednesday - March 14, 2018**                    **10:32 a.m.**

2                    **P R O C E E D I N G S**

3                         ---oOo---

4       **THE CLERK:**  Please be seated.  Calling Case Number

5  16-MD-2741, In Re Roundup® Products Liability Litigation.

6       Do you want appearances?

7       Counsel, please step forward and state your appearances

8  for the Record.

9       **MR. LASKER:**  Eric Lasker for Monsanto.  And

10  Joe Hollingsworth is with me, as well.

11       **THE COURT:**  Good morning.

12       **MS. WAGSTAFF:**  Good morning, Your Honor,

13  Aimee Wagstaff for the plaintiffs.  And I have David Wool,

14  Robin Greenwald, Kathryn Forgie, Michael Baum,

15  Pedram Esfandiary, and Brent Wisner.

16       **THE COURT:**  Hi.

17       Okay.  Mr. Lasker, maybe I'll start with you.

18       **MR. LASKER:**  Yes.

19       **THE COURT:**  Feel free to take a seat.

20       First of all, I wanted to mention I see these cameras are

21  still out here.  We are not recording this.  The Order that I

22  put out was to record the actual evidentiary hearings.  I

23  didn't include the oral argument, so just to let you know that,

24  in case anyone was planning on doing any grandstanding in front

25  of the cameras.

1          MR. LASKER:  I combed my hair and everything.

2          THE COURT:  Okay.  So I think -- I think there are a

3   couple of fairly easy questions, and then there's a hard

4   question.

5          MR. LASKER:  Okay.

6          THE COURT:  I think the first easy question or the

7   first easy issue is, you know:  Does the IARC's conclusion that

8   glyphosate is a probable carcinogen, you know, get the

9   plaintiffs where they need to go?

10        Answer:  No.

11        And that is one of, I think, the biggest problems with the

12   plaintiffs' presentation -- right? -- is that for a good

13   portion of it they have sort of assumed that because the IARC

14   has concluded that glyphosate is a probable carcinogen, that

15   means that that gets them over the general causation hurdle in

16   this litigation.  The problem is, of course, that although the

17   IARC's conclusion is not entirely untethered from human

18   experience, the IARC makes it very clear that what it is doing

19   is reaching a conclusion about whether the chemical is capable

20   of causing cancer; and that they -- that it will conclude that

21   a chemical is a probable carcinogen or even a known carcinogen,

22   even if human beings are not currently being exposed to the

23   chemical at levels high enough to give them cancer.  Right?

24        So the IARC's conclusion is not enough.  And to suggest

25   that the IARC's classification of glyphosate as a probable

1  carcinogen is enough is misleading.  That's, I think, easy.

2      Number two.  I think that the plaintiffs' experts'

3  opinions are shaky.

4      I think that the evidence that glyphosate is currently

5  causing non-Hodgkin's lymphoma in human beings at the levels of

6  exposure they are currently experiencing is pretty sparse.  And

7  I do -- I admit that I have a difficult time understanding how

8  an epidemiologist could conclude, in the face of all of the

9  evidence that we heard and saw last week, that glyphosate is,

10  in fact, causing non-Hodgkin's lymphoma in human beings.

11      I also question whether anybody could legitimately

12  conclude that glyphosate is not currently causing non-Hodgkin's

13  lymphoma in human beings.

14      I mean, it seems to me that, you know, there's at least a

15  strong argument that the only reasonable conclusion one could

16  draw right now is that we don't yet know.

17      So I actually think those two concepts are fairly easy;

18  but you know, the problem is that -- the potential problem for

19  you is that my role is not to decide whether glyphosate causes

20  cancer.

21          **MR. LASKER:**  Right.

22          **THE COURT:**  My role is to decide whether the opinions

23  offered by the plaintiffs' experts are, you know, for lack of a

24  better term, within the range of reasonableness, you know.  And

25  the courts tell us that even a shaky opinion can be admissible,

1  because it will then be -- you know, that expert will then be

2  subject to cross-examination.  And the jury, you know, will get

3  to hear all of the evidence, and decide who's right and who's

4  wrong.

5      And so, you know, at least as applied to Dr. Ritz, I think

6  I will say also that I think that for the most part, the

7  plaintiffs and their experts don't get them where they need to

8  go, because they -- because the opinions are too similar to the

9  IARC conclusion.  Right?  And that doesn't -- you know, it's a

10  different inquiry.  And it doesn't get them, I think, where

11  they need to go for the most part.

12      Dr. Ritz, however, did conduct an independent analysis.

13  She didn't try to piggyback on the -- on IARC classification.

14  And her focus, of course, was on the epidemiological studies.

15  And she, you know, has reached this conclusion that I do think

16  is dubious that, you know, glyphosate is currently causing NHL

17  in human beings.

18      But is it outside the range of reasonable -- of reasonable

19  scientific conclusions that epidemiologists can draw?

20      That's -- that, I think, is the hard question.

21          MR. LASKER:  Well, if I could, Your Honor, last night

22  I'd been focusing on Dr. Ritz.  And what I'd like to do

23  actually is walk you through --

24      And I have -- (indicating) for you, as well.

25          MS. WAGSTAFF:  Thanks.

1    (Whereupon a document was tendered to the Court.)

2         MR. LASKER:  -- a copy of the transcript of Day One,

3    because I want to be as sort of concrete about this as I can

4    with respect to Dr. Ritz's methodology, because I agree that is

5    the relevant issue.

6         I would state sort of at the outset that with respect to

7    Your Honor's role in this, it is important to keep in mind --

8    and this is something that is stated, for example, in *In Re*

9    *Bextra* -- that it's important to keep in mind the plaintiffs

10   have the burden of proof.  And, in fact, in the *Bextra* case the

11   Court made clear the absence of evidence is not enough, simply

12   stated.  And, for example --

13        THE COURT:  I understand that.  Okay.

14        MR. LASKER:  So what I'd like to do is walk through

15   Dr. Ritz's testimony and actually proffer it in front of the

16   Court, because I think it helps identify some of the

17   methodological flaws in her analysis, and I want to be sort of

18   as concrete about that as I can.  So I'd like to start,

19   Your Honor, with, again, the beginning of her direct

20   examination.  And at page 20 through 22, I guess, she is

21   presenting her forest plot, if you'll recall.

22        THE COURT:  The forest plot is ridiculous.

23        MR. LASKER:  Okay.

24        THE COURT:  You don't need to tell me about the

25   forest plot.  I understand that the forest plot is ridiculous.

1   And it causes one to question her objectivity.  I understand

2   that.

3          MR. LASKER:  Well --

4          THE COURT:  So you don't have to worry.  If I rule

5   that Dr. Ritz's testimony is admissible, it is definitely not

6   going to be because of the forest plot.

7          MR. LASKER:  Okay.  The point, though, that I think

8   goes with that is not only that it's ridiculous, but it talks

9   about methodology.  And the broader issue -- sort of forest

10  plot identifies it, but it's not the only way it comes into her

11  testimony -- is this issue of confounding with other

12  pesticides.

13      And Dr. Ritz does not present and did not present, in this

14  hearing or in her Expert Reports, an opinion that was

15  predicated on the adjusted Odds Ratios.  She repeatedly went to

16  the unadjusted Odds Ratios as providing a basis for her

17  opinions.  So we don't have an opinion from her that is based

18  upon the properly adjusted Odds Ratios.

19      And there is a long line of legal authority, Your Honor --

20  and I can cite the cases, and I will try to do it slowly --

21  that talk about the fact that an epidemiologist who relies upon

22  confounded data is not presenting reliable expert opinion, and

23  those opinions have been excluded.

24      The *In Re Bextra* case dealt specifically with this.  And I

25  would refer Your Honor to 524 F. Supp. 2nd at 1172, -73, and

PROCEEDINGS

1    1178, -79.

2         The *In Re Denture Cream* case, which we also cite,

3    addressed that issue.  It's an unpublished Westlaw cite.  2015

4    Westlaw 392021.  And the pinpoint cite there is 24.

5              **MS. WAGSTAFF:**  Did you say "24"?

6              **MR. LASKER:**  24.  Yes.

7         *Nelson v. Tennessee Pipeline*.  243 F. 3d. at 253.

8         And also the Reference Manual for Federal Courts on

9    Scientific Evidence, Your Honor, at page 591 states, *It is*

10   *critical to determine whether an association is causal or the*

11   *result of confounding*.

12        And the issue is not only that Dr. Ritz presented

13   confounded data, but her explanations for why she did that just

14   did not hold up.  And specifically, for example, on page 27 --

15   and this is at line 15 through 18 -- this is where we're

16   talking about the Eriksson Study.  And as you will recall,

17   there was an issue there about the phenoxyacetic --

18             **THE COURT:**  I'm sorry.  Did you say page 27?

19             **MR. LASKER:**  27, lines 15 through 18.

20             **THE COURT:**  Okay.  Thanks.

21             **MR. LASKER:**  Actually, it's -- 15 and 16 is her

22   testimony.

23        And if you'll recall, there was the issue of phenoxyacetic

24   acid, and particularly -- particularly MCPA, and whether or not

25   that was a confounder or a potential confounder in that study.

1        THE COURT:  Mm-hm.

2        MR. LASKER:  And when this issue first came up,

3   Dr. Ritz's response was, *I don't see literature that told me*

4   *that MCPA was truly an NHL risk factor.*

5        THE COURT:  So one major problem with that is that

6   you don't have to be told that it actually is a risk factor

7   before you adjust for it.  Is that correct?

8        MR. LASKER:  I agree with that.

9      There's another major and even more concrete problem here.

10       THE COURT:  That it is a risk factor?

11       MR. LASKER:  Well, Dr. Ritz acknowledged in

12   cross-examination -- and it's at page 153 in the transcript,

13   when I took her -- she didn't have to look far.  It was in the

14   Eriksson Study, itself.  So if you go to page 153 --

15       THE COURT:  Uh-huh.

16       MR. LASKER:  -- you will see that -- and it is on

17   line 11 through 16.  I am showing her, from the Eriksson Study,

18   where the authors state that they have, through this study and

19   prior work, confirmed that the phenoxyacetic herbicides are

20   risk factors for NHL; and MCPA in particular yields the highest

21   Odds Ratio.

22      And you may recall we also asked Dr. Weisenburger about

23   this.  And this is at page 230.  And I don't have Day Two of

24   the transcript, but Dr. Weisenburger also confirmed he had

25   concerns about arsenic.  But MCPA -- he said that's a risk

1    factor for NHL.  We all know that.

2        And for this reason, you'll recall -- and you had asked a

3    question to Dr. Weisenburger.  And this was at page 237/238 of

4    the transcript.  *Would it be reliable for an epidemiologist to*

5    *rely upon the confounded unadjusted Odds Ratio for Eriksson?*

6        And -- and he said, *No*.

7        I don't think I've ever seen exactly that question and

8    answer in a *Daubert* hearing before.

9        And Dr. Neugut, at pages 395 and 396 at the end of his

10   cross-examination, also agreed that, except for the

11   multivariate Odds Ratio, which was the only one that attempted

12   to adjust for other pesticides, all of the other Odds Ratios in

13   those -- in that paper could not be relied upon.  So he also

14   stated, *You cannot rely upon this Odds Ratio*.

15       Dr. Ritz is the only one who, at least at some point --

16   and it's not clear where she ended up on that, but at least

17   initially stated that she would.

18       The -- the other key study -- the case-control study, as

19   Your Honor knows, was the NAPP.

20           **THE COURT:**  Before you get to that, let me -- I just

21   want to go back to page 27 of her testimony --

22           **MR. LASKER:**  Yes.

23           **THE COURT:**  -- and determine:  Is she really saying

24   that it's appropriate to rely on the unadjusted Odds Ratio in

25   Eriksson?

PROCEEDINGS

1          Yeah.  Okay.  All right.

2              MR. LASKER:  And the next study, Your Honor, is the

3   NAPP, which, as you'll recall, pools together all of the

4   case-control studies.  There was a lot of testimony about the

5   fact that this study supersedes the earlier case-control

6   studies, because it contains all of the data.

7          There's actually a case on point on how you handle that

8   situation for epidemiologist under *Daubert*.  It's *In Re Zoloft*,

9   858 F. 3d. at 799.  That had a very similar situation, where

10  there were earlier studies that suggested an association; a

11  subsequent pooled analysis.  And that adjusted for potential

12  confounders that did not.  And the Court held that the expert

13  was he unreliable because they were still trying to rely on

14  those earlier studies.

15             THE COURT:  That can't be true as a categorical

16  matter.  That's going to depend on the quality of the pooled

17  analysis compared to how the individual studies were done.

18  Right?

19             MR. LASKER:  I think --

20             THE COURT:  There can be a problem with the pooled

21  analysis that causes an epidemiologist to say, *Well, I'm not*

22  *going to rely on that.  I'm going to rely on the underlying*

23  *studies*.  Right?

24             MR. LASKER:  I would agree with that.

25         In this case, though, there was no testimony that the

1   pooling was a problem.  So in this scenario, that doesn't

2   exist.

3        And in fact, there's various points that go through this,

4   where Dr. Ritz says the pooling was great.  That helps to

5   adjust for other confounders.

6        And, you know, while she states in her testimony at page

7   28 --

8        And, you know, one of the things that was -- and this may

9   be a minor point, but I think it's worth noting.  As you were

10  going through this with Dr. Ritz, she was always uncertain as

11  to whether or not she was presenting the adjusted or the

12  unadjusted Odds Ratio.

13        And, Your Honor, I went through the exact same exercise

14  with her during her deposition.  At her initial deposition -- I

15  think you have a copy of that -- at page 155 through 157, I

16  walked her through this.  Our experts pointed it out.  This was

17  not new information to her; but again, for the NAPP Study she

18  presented the unadjusted Odds Ratio.

19        And as a bit of context for Your Honor, at the time

20  Dr. Ritz presented her initial Expert Report, she had not seen

21  the adjusted Odds Ratios from the NAPP.  She had not seen those

22  slide decks.  And she acknowledged that in her deposition at

23  277, 278.

24        But when you -- when you asked her --

25            THE COURT:  But that wasn't her fault she didn't --

PROCEEDINGS

1          MR. LASKER:  No.  I mean, it was available to her,

2     but I don't know why she didn't receive it.  We got it from

3     Dr. Blair in his deposition months earlier.

4          But the issue is that she did know about it.  After her

5     Expert Report I deposed her on those data.

6          She then came into this court and presented her forest

7     plot again.  She actually changed it, because she added

8     Andreotti.  So it wasn't the exact same forest plot; but again,

9     she continued to use the unadjusted Odds Ratios.

10         And when I walked her through this -- and you actually

11    jumped in, to sort of -- to get the final Q and A on this, at

12    pages 138 and 139 of her testimony --

13         THE COURT:  Okay.

14         MR. LASKER:  And there was a long line of questions

15    before this where I was getting at this point.  And she was

16    raising issues with the Agricultural Health Study and other

17    issues she was identifying as possible issues for adjusting for

18    pesticides in this study; but then you began asking her

19    questions.  And at page 138, line 11 through 15, you asked her,

20    *Was it a good idea for the NAPP investigators to adjust for*

21    *these confounders or possible confounders?*

22         And she said, *Yes.*

23         And then continuing through to lines 1 -- page 139 at line

24    2 through 4, she even said, *I would recommend that you look at*

25    *the adjusted Odds Ratios for the NAPP Study.*

1     And again, plaintiffs' other epidemiologist provided the

2   same testimony -- Dr. Weisenburger -- at pages 239 -- at pages

3   254 and 255.  And as you'll recall, he was one of the

4   authors/investigators in the NAPP.  He agreed that the adjusted

5   Odds Ratios were the proper Odds Ratios.

6     Dr. Neugut never looked at the NAPP, so I can't testify to

7   what he would say specifically; but at page 367 he made clear

8   his general view that you should adjust for pesticides in this

9   analysis.

10     So Dr. Ritz, for some reason, knowing what the adjusted

11   Odds Ratios showed, was raising a whole bunch of explanations,

12   I guess, for why she wasn't showing that data, that then did

13   not bear out.  We actually looked at the analysis of what was

14   done.

15     And I think another important point on this is you asked

16   her, you know, *Why wouldn't you just adjust?  What would happen*

17   *if you don't?  You know.  What's the problem?*

18     And on page 26 --

19             **THE COURT:**  Give me a sec.

20             **MR. LASKER:**  Yep.

21             **THE COURT:**  Okay.

22             **MR. LASKER:**  And this is line 1.  And then her answer

23   goes through to page 15.

24             **THE COURT:**  You mean line 15?

25             **MR. LASKER:**  Sorry.  Yeah.  Sorry.

1        And what she explains here is if you adjust, you need to

2    be careful, because the confidence intervals could widen.  You

3    lose precision.  And this is exactly what Dr. Mucci testified

4    to, as well, at page 937.

5        Now, what's important here is she's not saying that the

6    Odds Ratio had moved; it's just the confidence intervals would

7    widen in position.  And that's something you would need to bear

8    in mind.  You could look at what happens when you adjust, but

9    you're still going to have a point estimate.

10        And what happened in these studies, again and again, is

11    that the point estimate went down.  And the only thing she was

12    able to say in connection with that is, *Maybe you're splitting*

13    *the variance; that everything causes it, and so maybe*

14    *everything causes a little bit*; but she didn't really explain

15    why, given that, you don't present that data.

16        And if she had, Your Honor, presented the unadjusted Odds

17    Ratios, and tried to make an opinion or present an opinion

18    based upon that, then we'd have a different opinion that we'd

19    be addressing here.  I think there would be problems -- and

20    we'll talk about that in a bit -- given the case law with that

21    type of opinion as being viable; but the fact is she did not

22    present that opinion to the Court.

23        So if we could continue, because there are other issues

24    that come up in her testimony that also speak to the

25    reliability and the consistency of her opinions, because that

1   was also sort of a recurring issue, certainly, for me in trying

2   to respond to her opinions during the depositions and for

3   various Expert Reports.

4        One thing that she also talked about and we also talked

5   about quite a bit last week was latency; and the issue of

6   latency, and how that impacts the earlier North American --

7   particularly the U.S. -- case-control studies.

8        And in her Expert Report at page 17 --

9        And I don't know if you have that.

10            **THE COURT:**  I've got it.  Let me just pull it up real

11   quick.  You're talking about her original?

12            **MR. LASKER:**  Her original Expert Report.  I'm sorry.

13   Her original Expert Report.

14            **THE COURT:**  At what page?

15            **MR. LASKER:**  It's at page 17, Your Honor.  That's

16   where I'm going to start.

17            **THE COURT:**  All right.

18            **MR. LASKER:**  And just for context, in her trial

19   testimony at page 36 -- and this is line 23 to 24 --

20            **THE COURT:**  Okay.

21            **MR. LASKER:**  -- she is discussing latency here.  And

22   she's stating that for blood cancers, one year, two years could

23   be a minimum latency we'd want to see.

24        And in her Expert Report in the first sentence, perhaps

25   not completely contrary to this, but at sort of the seventh

1  line of -- on page 17, she's talking about:  Typically, we

2  would generally expect a five- to ten-year minimum latency

3  between exposure and disease onset for blood system with

4  cancers.  And then she goes on to state, *In individual cases,*

5  *maybe it would go down to one year, or as long as fifty-plus*

6  *years.*

7       So perhaps that can be not completely -- but where it

8  becomes a real problem with the methodology is on page 18 of

9  her Expert Report, because at the very bottom of page 18 she's

10 talking about the Cantor Study.  And if Your Honor will recall,

11 the Cantor Study was one of the individual case-control studies

12 that was pooled into De Roos; and it was the largest.  It was

13 about 60 percent of the De Roos case.

14      And we walked through with Dr. Neugut a bit.  We went back

15 to -- there's a table in De Roos which shows which states the

16 various cohort members' case-control observations came from.

17 About 60 percent was from De Roos.  There was another

18 20 percent from another study.  And 20 percent from --

19           **THE COURT:**  You mean 60 percent was from Cantor?

20          **MR. LASKER:**  Was from Cantor.  Yes.

21      And the -- the Cantor Study -- and we didn't talk a great

22 deal about this, but it's in -- it is in evidence, Your Honor.

23 And I might have to find the exhibit number.  Cantor is in

24 evidence as Exhibit 635.

25      The issue for Dr. Ritz with the Cantor Study is that it

PROCEEDINGS

1    recorded a 1.1 Odds Ratio.  It was not statistically

2    significant.  And you can look at the study to see how they

3    analyzed that and came to that conclusion, but it was not an

4    Odds Ratio that was helpful to the plaintiffs' case.

5        And Dr. Ritz, in her Expert Report, says, *Well, true, but*

6    *this is not informative, because of the latency*.  There's only

7    6 to 10 years of possible time that could have elapsed in this

8    study.  And the issue, of course, is:  Why would that same

9    analysis not apply, then, to De Roos?

10       I asked her that in her deposition.  And she didn't really

11   give a very clear answer.  She stated that there was people

12   from Nebraska who could have had NHL, up until 1986.  Provides

13   a little more time.  That's only about 20 percent of the

14   population.  And she never really responded to that question.

15       And, Your Honor, there isn't -- I'll state, at least, as

16   far as I know -- a lot of case law on this issue of latency;

17   but if you go to the Reference Manual of Scientific Evidence --

18   and here, they are talking in the context of specific

19   causation.  But at page 601 one of the things they point out

20   is:  If your exposure is outside the latency period, that's

21   sort of conclusive evidence against causation.

22       So that's a methodological issue.  It's an issue about the

23   reliability of her approach to this.  You know.  Consistency.

24   And what, in the *In Re Zoloft* case, the District Court referred

25   to as situational science, where the scientific analysis

1  changes depending on what the result is of an individual study.

2      There are some other issues.  And this is perhaps not, in

3  and of itself, as big of a substantive deal, but I think also

4  speaks to something that happened again and again in her

5  testimony.  And this is on page 40.  And this is line 20 to 21.

6  And she's talking here about the Eriksson Study.  And, as

7  you'll recall, there was an analysis of less than 10 days or

8  greater than 10 days.

9      And everyone, at least, in this Record, including IARC,

10  including plaintiffs' other experts -- you asked

11  Dr. Weisenburger about this at page 181, 182.  The study,

12  itself, states that the analysis was cumulative days.

13      Dr. Ritz -- and this is the first time she offered this

14  opinion.  I didn't have any -- she'd never offered this opinion

15  before -- all of a sudden starts argues that it's days per

16  year.  Again, this is minor, but there are various places in

17  the testimony where she just sort of changes things.

18      And I can point to others; sort of a litany of situations

19  like that, where things all of a sudden just change a little

20  bit, with no basis in the actual study language or in the data.

21  That can give one pause.

22      **THE COURT:**  Yeah.  Point them out.  Point out the

23  other ones.

24      **MR. LASKER:**  Okay.  I will.

25      **THE COURT:**  That would be helpful.

1          **MR. LASKER:**  I will continue to do that.

2       At page 42 she's talking about the -- whether or not the

3    data there -- greater than 10 days or less than 10 days --

4    shows a statistically significant difference.  And she said she

5    doesn't know, but there's patterns in the data.  And this is at

6    lines 13 through 22.  She talks about, you know, *I teach my*

7    *students to look at patterns in the data*.

8       And this also is consistent with some of the testimony she

9    provided that was the basis for her forest plot, where she

10   said, *You know, everything is to the right of the line.  And so*

11   *we look to see if there's a pattern -- a trend -- that would*

12   *therefore be evidence of causation*.

13      And this issue has come up, Your Honor, in a number of

14   cases under *Daubert*, as to whether or not there is a reliable

15   methodology.  And the courts repeatedly have --

16          **THE COURT:**  When you say "this," let me make sure I

17   understand what "this" is.  Are you talking about a number of

18   studies having an Odds Ratio of higher than one, but not

19   statistically significant?

20          **MR. LASKER:**  Correct.

21          **THE WITNESS:**  Okay.

22          **MR. LASKER:**  And if you look at -- and this also is

23   Dr. Neugut's testimony, as you'll recall.  He put a lot of

24   stock in this, as well.  If you look at *In Re Zoloft*, 858 F.

25   3d. at 797.  If you look at *In Re Lipitor*.

PROCEEDINGS

1              THE COURT:  Sounds like you like the *In Re: Zoloft*

2    case.

3              MR. LASKER:  All of the seem to be pretty on point,

4    Your Honor.

5         *In Re Lipitor* is 174 F. Supp. 3d. at 926.

6         *In Re Nexium*.  I'm sorry.  Hold on.

7              THE COURT:  No.  You can keep going.  Thank you.

8              MR. LASKER:  *In Re Nexium*.  And this is an

9    unpublished Ninth Circuit opinion, but it was published in Fed.

10   App. -- Appendix -- 652, Fed. Appendix 528 at 530.

11        In all of those cases, the courts dealt with this exact

12   issue of sort of a trend, you know, of non-significant

13   findings, but they look in one direction; and is that a

14   reliable methodology?

15        And in each of those cases the courts held it was not, and

16   excluded the expert witnesses.

17        If we then move on to page 42 --

18             THE COURT:  Okay.

19             MR. LASKER:  And this is with respect to

20   dose-response.  And she's talking about the McDuffie Study.

21        And the testimony here was in support of the fact that

22   McDuffie shows a dose-response.  And this was the

23   greater-than-two-times-per-day/less-than-two-times-per-day

24   analysis.  And she stated here that this was evidence of a

25   dose-response.

1    I asked her about this in cross-examination at page 142,

2   because they talk -- I asked her about this in her deposition,

3   as well.  And if you start at sort of the beginning of page

4   141, you'll see we're talking about the McDuffie Study, and the

5   analysis that they did.

6         **THE COURT:**  Okay.

7         **MR. LASKER:**  And I asked her about, as we go down

8   that page.  And then the question -- I read to her from her

9   deposition testimony, starting at page -- line 16 on page 141.

10  Her answer continues through line 5 on page 142.  And I ask

11  her, *At your deposition you stated this wasn't a dose-response,*

12  *and that wasn't the intent of this analysis.*

13       And she agreed that it was not the intent of the analysis

14  to provide a dose-response.

15       And the the reason that's important, Your Honor, is, you

16  know, when you get to the Bradford Hill analysis -- and all of

17  plaintiffs' experts at least purport to rely upon

18  Bradford Hill -- dose-response is one of those factors.  And

19  we'll return to this in a little bit in some of her other

20  testimony.

21       But Dr. Neugut --

22       **THE COURT:**  But I think -- I mean, on that point, I

23  mean, I wonder if you're being a little too nitpicky on that

24  point, because she -- I took her to be saying that sort of

25  routine user -- you know, distinguishing between routine users

1    and occasional users is a sort of reasonable proxy for

2    dose-response.

3              MR. LASKER:  Well, I think --

4              THE COURT:  And why wouldn't it be?

5              MR. LASKER:  Well, I think -- well, the issue, I

6    guess, is:  There are two analyses that were being presented.

7    One is sort of the ever/never analysis.  And that is -- you

8    heard a lot about ever/never.  And I think part of the issue

9    there is if there's misclassification, maybe you're not exactly

10   calculating ever/never.  And that is -- for Bradford Hill,

11   that's an important -- that's the first step.  You have to show

12   association.

13        The second issue under Bradford Hill, which is a separate

14   evaluation, is dose-response.

15        And I think the issue here is whether or not McDuffie

16   provides evidence of a dose-response or not, or how it does.

17        And Dr. Neugut actually testified at page 212 that the

18   McDuffie data does not provide evidence of dose-response.  And

19   we'll get a little bit further on that actual page -- I'm

20   getting to it -- where one of the issues that was raised, and

21   I'd talked to Dr. Ritz about, as well, was the fact that

22   greater-than-two-days-a-year/less-than-two-days-per-year is

23   sort of an odd analysis, because it doesn't consider duration.

24        And she acknowledged later -- and we'll get to this --

25   that that would create a possibility of misclassification for

1   dose-response if you have somebody who uses glyphosate ten

2   years, but only once or twice a year; and somebody who uses it

3   once, four times a year.  You sort of have an issue, depending

4   on how you look at this, of misclassification.  And we'll get

5   to that in a second.

6        But -- so there was -- there's other issues here that she

7   acknowledges, but only on cross-examination when we discussed

8   that.

9        If we could continue -- and this is, again, just sort of

10  an inconsistency on page 46.  Well, actually, let me back up,

11  because -- no.  I'll do this other -- I'll do it out of

12  sequence a little bit, but on page 47 --

13            THE COURT:  Mm-hm.

14            MR. LASKER:  -- at line 8, through 48, line 5, this

15  is actually the follow-up to what we were just talking about.

16  And I raised this issue with Dr. Ritz.  And she acknowledged,

17  *Well, yes, there might be some misclassification because we're*

18  *not accounting for duration.*

19        And then what she explains as you go through this is she

20  states, *But this will likely be nondifferential, and so*

21  *therefore that number we have for greater than two days is*

22  *probably too low.  If we were to account for duration, it would*

23  *probably be higher.*

24            THE COURT:  Mm-hm.

25            MR. LASKER:  Sort of the import of her testimony

1    here.

2         A problem with that is we're not dealing in the abstract.

3         I'd asked her.  There was a bit of question and answer,

4    you might recall, when I asked her whether we should be looking

5    at data rather than opinions.  And she agreed we have the data,

6    because the NAPP did this analysis.  And we know from the NAPP

7    that when you do actually look at duration and you look at

8    cumulative days, these numbers don't -- aren't -- it's not

9    higher; it's lower.  And she knows that.  She's seen that data.

10        So the question, again, is:  Why is she presenting an

11   abstract hypothesis, instead of looking at the actual data that

12   she had?

13            THE COURT:  Well, but I guess I can -- I mean,

14   there's no question that she was cherry-picking numbers to a

15   degree, but I guess I can understand why -- at least, I can see

16   an argument for focusing at least as much on the, you know,

17   more than two times a year of use as the, you know, greater

18   than -- you know, more than seven total days' exposure,

19   because, as you know, one thing we all agree on is that

20   glyphosate is ubiquitous.  Right?  And if you're farming,

21   you're going to be using glyphosate.

22        So it would only be somebody who quit farming, I would

23   think, that --

24        Or if you're farming particular -- you know, particular

25   products.

PROCEEDINGS

1      If you're a farmer and you're using glyphosate, we can

2  probably assume that you're continuing to use glyphosate.

3  Right?

4          MR. LASKER:  Well, no.  Actually, Your Honor, I mean,

5  we didn't talk a lot about farming; but as I think maybe

6  Dr. Weisenburger explained, these case-control studies in

7  particular were population studies.  They weren't solely

8  farming studies.

9          THE COURT:  Right.

10         MR. LASKER:  And glyphosate -- I expect you have it

11  in your garage.  Glyphosate is used for a variety of different

12  purposes.  I don't know if you've heard about it.  There are a

13  variety of different uses for glyphosate.  It's not just

14  agricultural.  So that's not necessarily the case:  The

15  population-based study.

16         THE COURT:  Okay.

17         MR. LASKER:  And in any event, while I appreciate

18  Your Honor identifying explanations for that and comparing one

19  versus the other, that's -- you're not the expert here.

20  Dr. Ritz, you know, could be presenting that.  Again, she could

21  have presented the adjusted Odds Ratios and explained why that

22  was an important opinion, but that's not the opinion she

23  proffered in this case.

24      If we could go back a bit to page 46.  And this is on line

25  20 to 25.  And this is one of our favorite topics:  Arsenic.

1  It sort of popped up in the litigation.

2      You will recall Dr. Weisenburger explained that you

3  wouldn't want to adjust for arsenic, because we know it does

4  not cause non-Hodgkin's lymphoma.  And so it should not have --

5  it should not really be associated in this study.  It should

6  have an elevated Odds Ratio.  And that's why he testified there

7  might be a problem with the multivariate adjustment in

8  Eriksson.

9      Dr. Ritz had sort of the contrary approach to this.  Her

10  testimony was, *We know that arsenic does cause cancer.  And*

11  *therefore, since in a multivariate analysis the Odds Ratio goes*

12  *down, there must be something wrong with a multivariate*

13  *analysis* --

14          **THE COURT:**  Huh.

15          **MR. LASKER:**  -- which, again -- I mean, at one point

16  Dr. Ritz said -- and I'll get here.  Certainly at one point she

17  says, *In my science, you're never right.  Whichever way you do*

18  *it, you're wrong.*  That came up a lot in this litigation.

19          **THE COURT:**  Well, I mean, you know, I've been

20  pondering that a lot -- right? -- because I've sort of come to

21  the same opinion about epidemiology.  Right?

22      I mean, as often as Dr. Ritz tried to characterize it as a

23  quantitative science, it doesn't seem like a correct

24  characterization of epidemiology.  I mean, it seems like a very

25  highly subjective field, where there is a lot of room for

1    people, depending on their perspective, to, you know, pick

2    which, you know, formulations they want to emphasize, and pick

3    which -- you know, make decisions -- subjective decisions --

4    about which, you know, adjustments are important, and which are

5    not, and which studies are more flawed, and which studies are

6    less flawed.

7        But how does that cut for you -- right? -- in this

8    context?

9        Because, you know, if we assume that it's a bit of a

10   loosey-goosey field -- epidemiology -- sort of means there's

11   more room to operate within the field.  And maybe Dr. Ritz,

12   despite some of the problems with her testimony, is operating

13   within the mainstream of the field.  And may be that means it's

14   for the jury to decide whether to buy her presentation, as

15   opposed to me excluding her presentation.

16           MR. LASKER:  Well, Your Honor, I think --

17           THE COURT:  I mean, it's sort of weird to say.  Like,

18   the worse the science -- you know, the less precise the

19   science -- you know, the more leeway an expert has to, you

20   know, cherry-pick the data, or whatever.

21       But that -- that was my one big takeaway from last week,

22   is that the science of epidemiology is not -- you know, is a

23   very subjective science.

24           MR. LASKER:  Well, if I could, I guess, provide more

25   perspective on that, one of the points that Dr. Mucci tried to

1 make in her testimony was, you know, there are -- and

2 epidemiologists are trained to criticize studies.

3      But as part of that -- and particularly this happened in

4 the Agricultural Health Study -- rather than just having this

5 abstract criticism, there are validation studies.  There are

6 Sensitivity Analyses that have actual data that are a way of

7 sort of testing the criticism to see if it stands up to any of

8 the various ways of looking at it.

9      And one of the things that was also continually

10 problematic for Dr. Ritz is she never addressed -- she doesn't

11 do it in her testimony.  She didn't do it in her Expert Report.

12 She never did it even in the Supplemental Expert Report after

13 Andreotti.  She never addresses any of the Sensitivity Analyses

14 that were conducted that try to take out the imputed data or

15 that cuts off the exposure date.  She doesn't explain why.  She

16 just never addresses that.

17      And again, maybe an epidemiologist could come in and

18 provide an opinion that provides an analysis -- and a reasoned

19 analysis -- of why you would or would not consider those

20 Sensitivity Analyses.  And that would be a different opinion

21 for Your Honor to be addressing, as to whether or not it's

22 reliable, and meets *Daubert*; but that's not what Dr. Ritz did.

23 That's not the opinion she proffered.

24      And I would also state, again, if you look at the case

25 law, some of the cases that we cite -- the cases that dealt

1   with epidemiologic evidence -- the courts don't throw up their

2   hands with epidemiology.  They look at the various specific

3   issues we have been discussing.

4        Does the expert address confounding?

5        Does the expert rely upon nonstatistical findings to sort

6   of do a trend analysis?

7        And when those characteristics are found in the expert's

8   opinion, those are the methodologies the expert proffers, the

9   courts have repeatedly thrown those opinions out; held they

10  don't meet *Daubert* standards.

11       So I think you have at this point a pretty solid body now

12  of case law under *Daubert* that makes it clear that the Judge's

13  role with epidemiology is not to throw up his hands and say

14  "It's subjective"; but to look to see if the expert did the

15  various things you would expect the expert to do in proffering

16  their opinion.

17       And in this case -- and as we continue to go through

18  this -- repeatedly documents that it does not.

19       If we could go on, this is somewhat making the same point,

20  but I think it's informative.  Again, at pages 49 to 50, and

21  sort of starting at line 15 on page 49, she presents --

22  Dr. Ritz presents another -- again presents a forest plot.

23  This, as I recall, was for the subtypes of non-Hodgkin's

24  lymphoma.  And this was after, obviously, Your Honor had walked

25  her through and asked her about confounded versus unconfounded

1 data.  We'd had a lot of discussion about whether you adjust

2 for pesticides, or not adjust for pesticides.  And she presents

3 this data again these Odds Ratios.

4      And when my colleague, Mr. Griffis, talked to

5 Dr. Weisenburger and brought -- showed him this exact same

6 forest plot, Dr. Weisenburger acknowledged these are not

7 adjusted for other pesticides.

8      Dr. Ritz never states that anywhere here.  They sort of

9 present this data.  And again, if she wanted to explain why she

10 was relying upon that data, she could have; but she didn't.

11 She just sort of presented these numbers as if these are the

12 numbers that everybody would look at.  And that's -- that's not

13 reliable.

14      And again at page 51, this goes back to line 14 through --

15 I guess it continues.  Her answer continues on page 52.

16 Starting at line -- page 51, line 14, she's talking about --

17 they're talking about this methodology, if everything is on the

18 right side of the 1; if that is sort of a standard methodology

19 for reaching an opinion.

20      And again, this is the same sort of analysis we talked

21 about before that a number of cases have rejected.  This is

22 sort of methodology.  If it's all to the right of the 1, that's

23 also informative of causation.

24      And the courts have rejected that methodology repeatedly.

25      There was testimony -- I don't know that I need to go

1   through this, because I think Your Honor recognized this --

2   where she was explaining why the AHS questionnaire wouldn't be

3   reliable.  And she basically started talking about how the

4   farmers just didn't care.

5        And again, she has no basis for -- for that opinion.

6   She's offering speculation.

7        And it's one thing to say, Well, she's offering

8   speculation.  Your Honor, that's wrong.

9        But the other is:  Why is she doing that?  Why is --

10  instead of -- when we had the Blair 2002 Study, which, as

11  you'll recall, tested as 4,000 questionnaires, before and

12  after.  We have that data.  There's an actual study on this.

13  Why is she instead just sort of offering up these hypotheses

14  and speculation, instead of looking at the actual studies?

15       And that, I think, again, speaks to her methodological

16  approach here in how she was looking at this data.

17       And another sort of perhaps minor point, but sort of

18  illustrative of how she was trying to present the data in ways

19  that are not really consistent with what she, I think,

20  understood were the facts is on page 58.  And this is line 4 to

21  line 8.

22            THE COURT:  Okay.

23            MR. LASKER:  And she's talking about the size of the

24  Ag Health Study.  And she's trying to make a point that it's a

25  small study.  They only have 575 NHL cases.  The case-control

PROCEEDINGS

1  studies start with 500 subjects -- sort of suggesting AHS is

2  just a small study compared to the case-control studies.

3      And when I asked her on page 114 in my cross -- and this

4  is at line 14 to 16 -- what is the more relevant point, as far

5  as power of an epidemiologic study, which is, *How many exposed*

6  *cases were there that you could do an analysis on?* -- she

7  agreed that the 2018 *JNCI* study had more exposed cases than all

8  of the case-controlled studies combined.

9          MS. WAGSTAFF:  Would you tell me what page that was

10  again?  I missed it.

11          THE COURT:  Page 114, lines 14 through 16.

12          MR. LASKER:  And again, maybe, you know, there are

13  issues.  And you could talk about why the number of people

14  going into a study is also a relevant factor.  It doesn't

15  translate -- I mean, I think it was fairly clear in the

16  testimony that while the plaintiffs' experts had concerns about

17  the *JNCI* study, at various points they acknowledged that it was

18  the most powerful study.  It was the largest study to address

19  this question.

20      Why is Dr. Ritz saying things that to the contrary?

21      If we go, then, to -- and I touched on this a bit -- line

22  66 --

23          THE COURT:  Page 66?

24          MR. LASKER:  Page 66.  Thank you.

25          THE COURT:  Okay.

1          **MR. LASKER:**   And this is starting at line 17 through

2    line 25.   And plaintiffs' counsel raises the issue of

3    Sensitivity Analyses and validation studies.   And at this

4    point, I was expecting Dr. Ritz then to go through all of the

5    studies and all of the Sensitivity Analyses that were done that

6    Dr. Mucci walked us through, that I walked Dr. Ritz through

7    during her deposition.

8          And as you read through this -- and she has a long answer

9    here -- she refers in general to the biomonitoring studies --

10   and I'll come back to that in a moment -- but that's it.   She

11   doesn't mention any of the other --

12         And she had -- again, maybe there is a reliable opinion

13   that could be proffered that would address those validation

14   studies and address those Sensitivity Analyses, and explain

15   why, that don't show what the investigators thought they showed

16   or what the authors of the *JNCI* study thought that they showed;

17   but she doesn't address it, at all.   She just sort of lets it

18   go.   And again, that's not sound epidemiologic methodology.

19         On page 69, line 17 --

20         And this is, again, sort of a not -- perhaps not a major

21   substantive point, but it was an interesting point.   This map

22   that you put up -- we never saw it before.   It was not in her

23   earlier Expert Reports.   And what immediately struck me when

24   she put the map up -- well, there are two things.

25         The first thing was that in her Rebuttal Report -- and

 1  this is at page 11 -- she criticizes one of Monsanto's experts,

 2  Dr. Fleming, because in his Expert Report he used these maps.

 3  And his maps were -- one was NHL incidence over time; and the

 4  other was where glyphosate is found.  And -- very similar to

 5  her prevalence map.

 6      And he was sort of using maps to make a broader point

 7  about what that might show with respect to glyphosate, and

 8  whether or not it was associated, or the timing sort of

 9  matched.

10      They were using maps for different reasons.  I don't want

11  to suggest it was the same reason.  But it was just odd to see

12  her now using a map, where -- without sort of explaining why,

13  in this situation, it was okay to do that.

14      And it was also sort of telling, I think, was that she

15  used a map for 2014.  And if you'll recall the NCI study, not

16  only was it that the exposure data went through 2005, but they

17  did a Sensitivity Analysis where they brought it back to 2005,

18  so that 2005 to 2014 wouldn't matter.

19      And she doesn't sort of explain that.  She doesn't show a

20  map for 2005.  And the map was sort of hard, at least, for me

21  to understand, anyway.  It was just lot of colors.  And okay.

22  You know.  I don't know.  I -- she sort of suggested that

23  everybody in Iowa uses glyphosate, and everyone in Iowa is

24  all --

25      There's actually data on that.

PROCEEDINGS

1    This didn't get into evidence, so I believe it's in the --

2         THE COURT:  Well, but so let me just ask you.  I

3  mean, are there -- let me ask you.  I mean, I think I can sort

4  of get the thrust of your overall critique of her testimony.

5  Are there any other kind of big points you want to make about

6  sort of analytical issues with her testimony --

7         MR. LASKER:  Yeah.  Let me just see --

8         THE COURT:  -- before I turn to the other side?

9         MR. LASKER:  Right.  Let me see if there are any

10  others.  And there are a number here -- but for analytical.

11    So I would also take you to her Bradford Hill analysis.

12  This is at page 85 --

13         THE COURT:  Yeah.

14         MR. LASKER:  -- to 86.

15    And there were a couple of issues with Bradford Hill; with

16  the use of Bradford Hill in this case.  And again, if you look

17  at -- I'll give you -- it's another *In Re*, Your Honor; but

18  *In Re Lipitor*, 174 F. Supp. at 924 to 926.  And that cites a

19  number of cases that also addressed Bradford Hill in context of

20  *Daubert* and expert testimony.

21    The Reference Manual at 598, 599 also discuss how you are

22  supposed to apply Bradford Hill.  And one point that they both

23  make is, you know, there's a threshold step of statistically

24  significant unbiased associations before you get to the other

25  factors.

PROCEEDINGS

1     Dr. Ritz doesn't address that, although I guess with her

2  presentation she would present unadjusted Odds Ratios, and

3  maybe some of those she thought, since they were statistically

4  significant, allowed her to get there.

5     But then when she walks through the Bradford-Hill

6  Criteria, there is one of the criteria that is generally viewed

7  as pretty significant among that list, which is strength of

8  association.  That's on a standard list.

9     And Dr. Neugut, at page 313, acknowledged that even if you

10  looked at the epidemiological data before NAPP and before

11  Andreotti, where they had those earlier meta-analyses about

12  1.3, 1.4 -- even though he had sort of pluses -- and that was 2

13  plus -- he said that's not really very -- it's not really very

14  powerful for strength in the Bradford Hill.

15     Dr. Ritz doesn't mention strength, at all.  She talks

16  about statistical significance instead, on line 9, which I

17  think --

18          THE COURT:  In her testimony --

19          MR. LASKER:  In her testimony.

20          THE COURT:  -- not in her report.

21          MR. LASKER:  In her report I think she probably

22  points to some of the unadjusted Odds Ratios.  I'd have to go

23  back to that.

24          THE COURT:  But that actually leads me to a question,

25  which is:  We have, you know, the transcript of her testimony

1   and the other experts' testimony at the hearing.  And we have

2   the reports.  And in some cases, you know, the testimony at the

3   hearing was different from what was in the report, or there was

4   a supplement to what was in the report, or there are different

5   points of emphasis, or whatever.

6        Am I to be sort of analyzing the totality of Dr. Ritz's

7   presentation:  Her testimony at the hearing, her report, her

8   Rebuttal Report, all of that stuff?

9            **MR. LASKER:**  I think that's right, Your Honor.

10           **THE COURT:**  Okay.

11           **MR. LASKER:**  But I also, with that, think that you

12  need to be looking at the consistency of the opinions.  I mean,

13  so it's a large part of the issue here.

14           **THE COURT:**  I understand.  Yeah.

15           **MR. LASKER:**  And Your Honor asked me -- and I don't

16  know if we want to get to this, but there is another

17  illustration in her Expert Reports where she changes her

18  statement of the evidence from her Rebuttal Report to her

19  Supplementary Report, sort of.  And I can point you to that, if

20  you want.

21           **THE COURT:**  Sure.

22           **MR. LASKER:**  And this goes to the issue of whether or

23  not the -- the data in the initial questionnaire was reliable;

24  and second, to whether the imputation was reliable.

25           **THE COURT:**  Okay.

PROCEEDINGS

1      **MR. LASKER:**  So in her Rebuttal Report -- and this is

2   at page 3.  And this was at the point in time where we had the

3   unpublished 2013 analysis of the AHS data.  So the issue of

4   imputation had arisen, although we didn't have the 2018 study

5   yet.  And sort of towards the bottom of that paragraph in the

6   rollover paragraph, she talks about the fact that the original

7   AHS enrollment preceded the tremendous increase in agricultural

8   use of glyphosate, and was never captured in the members of the

9   cohort who now responded to the follow-up.  So that was her --

10   the point she was trying to make in her Rebuttal Report.

11      In her Supplemental Report she had a different take on

12   this.  And it's at page 5 through 6.

13      **THE COURT:**  Okay.

14      **MR. LASKER:**  And if you go to the last paragraph on

15   page 5 and read through on to page 6, her opinion here is that

16   actually, the increase happened in the middle of Phase 1, and

17   so therefore you have a misclassification problem during that

18   first phase.

19      Now, maybe both of these are -- either of these are

20   arguments; analytically sound arguments.

21      But both of them -- they're not the same argument.  And

22   they're making claims about the data that are different.

23      And, you know, the Benbrook Study -- Benbrook Paper

24   actually answered the question, but answered it only one way.

25   And I -- again, it's in evidence.  And there's actually tables

1    you can look at if you're so inclined, but the point here is:

2    She's changing her characterization of the data, you know, from

3    one report to the next, to try and make different points to

4    support whichever argument she's trying to present, which is

5    not, you know, again, what you would want.

6        I would also -- and I know I'm going to leave stuff out,

7    but I think you've gotten the point in any event.

8        But I would also refer Your Honor to another case that's

9    not an "In Re" case.  It's *Pritchard versus Dow Agro Sciences*.

10   It's interesting because it is a pesticide/NHL case dealing

11   with chlorpyrifos, and it's dealing with the Agricultural

12   Health Study.  And in that case the expert tried to rely upon a

13   positive but non-significant finding in the AHS for

14   chlorpyrifos, and the Court excluded that as not being a

15   reliable opinion.

16       The last point I'd make, although there's some document in

17   my head I'm forgetting -- it's driving me crazy -- but the

18   *In Re Bextra* case, if you'll recall, the Court in that case was

19   looking at 20 milligrams, I think, dose level; the lower dose

20   level.  And they said, *There's a series of experts here who*

21   *have not given the type of testimony you would need to rely*

22   *upon.  They have equivocal testimony*.  And one of them was --

23       You know, he sort of goes through -- the Court goes

24   through the testimony that those experts provided.  One of them

25   said, *It would be harder to make a case with the lower dose*.

1   And some said, *I'm excluding it*, but it's not quite as strong.

2       Now, Your Honor went through with a number of the experts

3   and asked them, you know, *Does the epidemiology provide you the*

4   *data you need?*

5       And they -- there was a variety of different answers.

6       I think Your Honor's probably correct that Dr. Ritz, of

7   the experts, was sort of the closest to saying that the

8   epidemiology is strong enough, but she didn't say that.

9       **THE COURT:**  Well, I mean, I don't think she -- I

10   don't think she has to say that.  I mean, I don't think that

11   there's a requirement that the epidemiology, alone, be the

12   basis for the expert opinion.

13       I mean, but what I do think is that, you know, what the

14   IARC does is not enough.  And nor -- it's not that it's not

15   enough.  I think what the IARC does is actually quite good and

16   useful.  And -- but --

17       Oh, I just saw my ridiculous presentation on the poster

18   board over there.

19       But you need -- and I take for granted -- I mean, we could

20   bicker a lot about the animal studies and the mechanistic data.

21   And I think you have some good criticisms of that data, too.

22   But the way I'm approaching this is I sort of take as a given

23   what the IARC says about the mechanistic data.  And I take as a

24   given what the IARC says about the animal data; and that it is

25   carcinogenic in animals.  And I take it as a given what IARC

1  says about the epidemiological data, which your expert does

2  also, by the way; but I think it's just not enough.  And what

3  you need to get past the general causation hurdle in this case

4  is more epidemiology, I think.

5          **MR. LASKER:**  Right.

6          **THE COURT:**  And so that's really the question:

7  Whether there is more epidemiology.

8      There is -- you can get more out of the epidemiology, but

9  I don't -- I think it's -- the question that I was asking those

10  experts, I think, probably was not a good one, because I don't

11  think it -- you would have to limit them to epidemiology.

12          **MR. LASKER:**  Well, Your Honor, I would put to the

13  side, sort of, the *Daubert* issue there; but again I think you

14  have to focus on the testimony of the individual expert, and

15  how they presented that.

16      Dr. Ritz did talk about genotox studies -- genotoxicology

17  studies, sort of, in general; but she didn't actually provide

18  any analysis of how she applied that data to humans.  She just

19  sort of stated that.

20      And so I would state that even if it is the case that an

21  expert can sort of pool all of that data together, you have to

22  explain how you're doing that or why you're doing that.  You

23  can't just state it.

24      One final issue that I wanted to raise, because it comes

25  up in her deposition but did not come up in the hearing -- it

1  relates to the chart here (indicating) -- which is this issue

2  of the math for nondifferential misclassification.  And

3  Dr. Ritz, during her deposition -- it was her supplemental

4  deposition at page 129 to 132 -- was discussing this

5  possibility of random error.  And she acknowledged -- and we

6  recited in our briefs -- that, as a general matter, you're not

7  expected to cross the line, but with random error sometimes it

8  will happen.  And that is --

9          THE COURT:  It's different from what your expert

10  said, which is that it's mathematically impossible.

11          MR. LASKER:  I agree with that.

12          THE COURT:  So do you agree that she's wrong when she

13  says that?

14          MR. LASKER:  No.  I think Dr. Ritz is wrong.

15  However, Dr. Ritz's testimony is not --

16          THE COURT:  You believe that it is mathematically

17  impossible to cross the line?

18          MR. LASKER:  Given the size of the study.

19          THE COURT:  That's not mathematically impossible,

20  though.  I mean --

21          MR. LASKER:  Well, I think what Dr. Mucci said is

22  that it's just -- with that size study, it's not how you get

23  there.

24          THE COURT:  Okay, but that's different from

25  mathematical impossibility; isn't it?

PROCEEDINGS

1          **MR. LASKER:**  I don't know that Dr. Mucci said

2   impossible or just extremely unlikely.

3          **THE COURT:**  She said "impossible."

4          **MR. LASKER:**  I will yield to the Record on that.

5      But the issue, again, is:  Plaintiffs have the burden of

6   proof here.  And what Dr. Ritz is relying upon is something

7   that she acknowledges is not likely as a basis for dismissing

8   the Ag Health Study; and not only that it's unlikely, but she

9   then doesn't consider all of the validation studies, all of the

10  Sensitivity Analyses.  And, you know, in her deposition she

11  said, *I'd give it no weight, whatsoever.*

12      And it's -- again, that's not --

13         **THE COURT:**  That's pretty --

14      I mean, to give weight to the Eriksson Study, and not to

15  the AHS, is pretty amazing.

16      Okay.  I get -- I think I get where you're coming from.

17      Why don't we take a quick five-minute break, and then

18  we'll turn to the plaintiffs.

19         **MS. WAGSTAFF:**  Your Honor, could we take a break

20  until -- for about 15 minutes, just so that we can check some

21  of the things that Mr. Lasker said, and --

22         **THE COURT:**  I -- you can have your people checking it

23  at counsel table while we're arguing; but unfortunately my time

24  is somewhat limited, so I don't think that would be a good idea

25  for you to take that long a break.

1          **THE CLERK:**  Court is in recess.

2  (Recess taken from 11:45 a.m. until 11:50 a.m.)

3          **THE COURT:**  Sorry.  I think I might have come in a

4  little bit early.

5          **MS. WAGSTAFF:**  That's okay.  I have a couple of

6  things for you.  So I'm going to hand you what is in the Record

7  as Exhibit 31.

8  (Whereupon a document was tendered to the Court.)

9          **MS. WAGSTAFF:**  Are you ready?

10         **THE COURT:**  Yep.

11         **MR. WISNER:**  I don't have 31.

12         **MS. WAGSTAFF:**  That's okay.  Got it.

13      So I think we appreciate Your Honor's comments.

14         **THE COURT:**  And let me just say, you know, I mean,

15  you're free to try to talk me out of the idea that, you know,

16  the IARC's classification of glyphosate as a probable

17  carcinogen does not get you there, because it does not -- the

18  IARC is conducting a very different inquiry than the one we're

19  conducting here; and the IARC inquiry is much less connected to

20  actual exposure in humans; and the IARC's conclusion is not

21  that glyphosate is probably causing cancer -- causing NHL in

22  humans today; rather, it's that it's kind of more of a probable

23  carcinogen in general, in the abstract.

24      If you want to try to talk me out of that, go ahead; but I

25  will tell you that I think, you know, what you need -- the main

1  thing that you need to accomplish here is to convince me that

2  Dr. Ritz's opinion gets you that extra distance --

3          MS. WAGSTAFF:  Sure.

4          THE COURT:  -- that the IARC classification does not

5  take you.

6          MS. WAGSTAFF:  Sure.

7      How do I roll that (indicating) up?

8          MR. WISNER:  Where do you want to go?

9          MS. WAGSTAFF:  All right.  So first I will spend just

10  a minute on the IARC question that you have.  And I think that

11  the confusion is in the definition of what a hazard assessment

12  was.  And I think Dr. Jameson and Dr. Portier, to a certain

13  extent, as well, handled this issue quite well.

14      And what Dr. Jameson testified to --

15      -- who has been on, I believe, around 14 IARC panels; and

16  Dr. Portier has been on some, as well.

17      -- is that the IARC definition of what they were doing is

18  to consider all chemicals.  And it's a broad, encompassing

19  definition.  Right?

20      And so you have some chemicals that you will look at that

21  do not have epidemiology.  And so therefore it would be

22  impossible to classify them as a probable carcinogen, if they

23  do not have --

24          THE COURT:  But that's not what the IARC says.  What

25  the IARC says is that the distinction between a hazard and risk

1   is important; and what we are doing is hazard assessment.   And

2   when the monographs identify cancer hazards -- excuse me.   And

3   the monographs identify cancer hazards, even when the risks are

4   very low at current exposure levels, because new uses or

5   unforeseen exposures could engender risks that are

6   significantly higher.

7        So it may be that Dr. Jameson and others offer an

8   additional opinion, above and beyond what IARC gives us; but

9   the IARC makes very clear that it's conducting a hazard

10  assessment.   And it can classify something as a probable

11  carcinogen or even a known carcinogen, even if it might not be

12  causing cancer in humans currently.

13            MS. WAGSTAFF:   Sure.   I appreciate that.

14            THE COURT:   And by the way, Dr. Jameson effectively

15  confirmed that during his testimony.

16            MS. WAGSTAFF:   Okay.

17        And I would just point you to Exhibit 149, where, as

18  you -- I don't know if you know or not, but Monsanto has

19  brought the Monograph 112 under attack.   And so in response,

20  the IARC Director issued a statement two months ago:

21  Exhibit 149.   I don't know if you have it in front of you.

22            THE COURT:   I have it right here.

23            MS. WAGSTAFF:   But I would just point you to the part

24  where it talks about -- that they do take into account, quote,

25  "real-world exposure."

1          THE COURT:  I understand it has a connection to

2    real-world human experience to the extent it relies on

3    epidemiology, but again, in this response to Monsanto's

4    attacks, they make clear that they see a qualitative difference

5    between hazard identification and risk assessment.  And they

6    make clear that what they're doing in hazard identification is

7    simply identifying whether something is a hazard.

8          And then they say, in contrast to hazard identification,

9    *The specific exercise of risk assessment typically involves*

10   *extrapolation beyond the observed data, employs a variety of*

11   *statistical models, and is based on anticipated levels of*

12   *exposure and background cancer incidence rates that are often*

13   *specific to a population or a region.*

14         And they say that our -- they explain -- I mean, they do a

15   good job of explaining why what the IARC does is very

16   important.  It's very important to identify hazards.  And the

17   reason it's important to identify hazards is because, as they

18   put it, it's a necessary first step in risk assessment and

19   management.  It should be a red flag to those charged with

20   public health.

21         I assume all of that is true.  I assume the IARC's

22   classification that -- of glyphosate as a probable carcinogen

23   is legitimate, based on the definition that they provide, based

24   on the description that they provide of what they are doing

25   with their classification and what they are not doing with

PROCEEDINGS

1  their classification; but as they say, it's a necessary first

2  step.

3      But to get past general causation, you need to take a

4  second step.  And so how do you get to that second step?  How

5  does Dr. Ritz get you to that second step?

6          MS. WAGSTAFF:  Sure.  And so let's move -- let's move

7  to the point of confounding, which seems to be on topic today.

8      And first, I think it should be understood by the Court

9  that Dr. Ritz did consider the adjusted Odds Ratios.  They are

10 in her report.  They are in her deposition testimony.

11         THE COURT:  Show me where.  Let's look at it in her

12 report.

13         MS. WAGSTAFF:  Okay.  The adjusted Odds Ratios in her

14 report.

15         THE COURT:  Because that was -- that was something

16 that I was concerned about, actually, is that.

17         MS. WAGSTAFF:  Sure.

18         THE COURT:  Did she -- and I hadn't thought of that,

19 but did she actually offer an opinion that if you look at all

20 of the data with the adjusted -- properly adjusted or

21 better-adjusted ratios, it points to the conclusion that, to a

22 reasonable scientific certainty, glyphosate causes

23 non-Hodgkin's lymphoma in humans, based on current exposure

24 levels?

25     (Discussion off the record.)

PROCEEDINGS

1          MS. WAGSTAFF:  Yeah.  So yeah.  So she -- okay.  So

2    she -- throughout her report she -- she --

3          THE COURT:  Are you looking at her initial report?

4          MS. WAGSTAFF:  Yeah.

5          THE COURT:  Okay.  What page?

6          MS. WAGSTAFF:  Okay.  Okay.  Page 19, and then on to

7    her Supplemental Report, as well.

8          THE COURT:  All right.

9          MS. WAGSTAFF:  Throughout her report she discusses

10   the different Odds Ratios.

11         THE COURT:  Where are you pointing me to on page 19?

12         MS. WAGSTAFF:  Page or -- she's discussing De Roos

13   '03, which is adjusted Odds Ratios.

14   (Discussion off the record.)

15         MS. WAGSTAFF:  Right.  And she's discussing the

16   confounding issue throughout.

17         THE COURT:  Okay.  I see where she --

18         MS. WAGSTAFF:  And also on page --

19      Oh, sorry.

20         THE COURT:  I was just going to say I see where she

21   says that De Roos reported an increased risk with glyphosate

22   use.

23         MS. WAGSTAFF:  And also if you'll turn to page 18,

24   Your Honor, the middle paragraph.  Tell me when you're there.

25         THE COURT:  I'm there.

1        MS. WAGSTAFF:  Talking about, *Pesticides sometimes*
2  *exert stronger health risks when mixed with other pesticides*
3  *than when used alone*.
4     She's discussing confounders there.  If you --
5        THE COURT:  Okay, but where is her -- where is her
6  opinion that the fully adjusted or properly adjusted Odds
7  Ratios and confidence intervals show that glyphosate is causing
8  non-Hodgkin's lymphoma in people?
9        MS. WAGSTAFF:  Sure.  If you go to her Supplemental
10 Report on page 9, it starts with, *Similarly, the issue of*
11 *confounding control is raised* --
12        THE COURT:  Wait.  Hold on.
13        MR. LASKER:  Where on page 9?
14        THE COURT:  Her Supplemental Report.
15        MS. WAGSTAFF:  Yeah.
16        THE COURT:  And page 9 and where?
17        MS. WAGSTAFF:  Subparagraph B, where it says,
18 "Similarly," comma.
19        MR. LASKER:  Subparagraph B?
20        THE COURT:  I don't see a subparagraph B on page 9 of
21 the Supplemental Report.
22        MR. WISNER:  It starts with B.  Sorry.
23        MS. WAGSTAFF:  Sorry.  It starts with, *In terms of*
24 *meta-analysis*, about halfway down.  There's a "B."  Do you see
25 it?

1          THE COURT:  I think I've got a different document

2    than you do.

3          MS. WAGSTAFF:  Okay.  They just told me this is her

4    Rebuttal Report.  Sorry.  We have a lot of cooks in the

5    kitchen.

6          THE COURT:  Too many cooks in the kitchen.

7          MS. WAGSTAFF:  Yeah.  Rebuttal Report.

8          THE COURT:  Okay.  Her Rebuttal Report; not her

9    Supplemental.

10         MS. WAGSTAFF:  Yeah.

11         THE COURT:  Okay.  Okay.  Page 9.

12         MS. WAGSTAFF:  Yeah.  And if you --

13         THE COURT:  Okay.  I see it.

14         MS. WAGSTAFF:  I've got it like (indicating).  So

15   that's where she discusses the confounding issue.  And she

16   discusses it in her deposition, as well.  And I think that

17   what's important here.  And I've handed Your Honor and opposing

18   counsel Exhibit -- well, 31.

19         THE COURT:  But what she seems to be saying here in

20   her Rebuttal Report --

21         MS. WAGSTAFF:  Mm-hm.

22         THE COURT:  -- is that we shouldn't be considering

23   these confounders, which -- I mean, if that's what she's saying

24   in her Rebuttal Report, she's clearly wrong.

25       I mean, that's -- I don't think that's -- I don't think

 1  that's debatable.  I mean --

 2          **MS. WAGSTAFF:**  No.  Right.

 3          **THE COURT:**  And to the extent that she's arguing we

 4  shouldn't be adjusting for other pesticides, that is junk

 5  science, if that's what she's arguing.

 6          **MS. WAGSTAFF:**  Right.  I don't think she's saying

 7  that.

 8      If you look at the sentence where it says, *Rather, the*

 9  *question would be how strong a confounder we would need to*

10  *change the results* --

11          **THE COURT:**  Okay.

12          **MS. WAGSTAFF:**  -- *we observe, and in what direction*

13  *this change would be, and what variables would qualify as*

14  *confounders*, I think she's saying, along the lines of what

15  Your Honor was saying earlier, with quantitative and

16  qualitative, there is probably aspects of both.

17      The quantitative nature is, you know, trying to decide how

18  big of a change each confounder has.  And that's the

19  quantitative part.  Right?

20      And so that's what she's saying in here in her opinion, is

21  that you do consider confounders, but you need to consider the

22  effect they have on the study.

23      I don't think --

24          **THE COURT:**  Okay.  So she's saying she's

25  acknowledging that you need to consider confounders, but where

PROCEEDINGS

1  is her opinion -- you know, either in any one of her three

2  reports or in her hearing testimony, where is her opinion that

3  when you adjust for other pesticide use, these studies show to

4  a reasonable degree of scientific certainty that glyphosate

5  causes cancer?

6          **MS. WAGSTAFF:**  Sure.  Well, I think that when she --

7  when you asked her about the epidemiology, and she said that

8  she can't unlearn what she already knows -- right?  And De Roos

9  2003 is fully adjusted.  And it shows a statistically

10  significant Odds Ratio.

11      Now, I don't think necessarily --

12      And the case law with that case, alone, if you look at

13  *Bextra* --

14          **THE COURT:**  But I'm -- sorry to interrupt.

15          **MS. WAGSTAFF:**  Sure.  Yeah.

16          **THE COURT:**  But I want to see if I can get an answer

17  to my question.

18          **MS. WAGSTAFF:**  Sure.

19          **THE COURT:**  You know, I remember what she said about,

20  you know, *I can't unlearn what I already know*.  And she is said

21  that in a different context from what you're describing right

22  now.  She said that in response to, you know, questions about

23  whether you could reach the same conclusion, taking away the

24  animal studies and the mechanistic data.

25      But my question to you is:  Show me in her --

PROCEEDINGS

1    And I'll ask this of your entire team.  You know.  Please

2 spend the next 45 minutes looking through her reports and her

3 hearing testimony, and show me where she offers an opinion that

4 the data, adjusted for pesticides, shows to a reasonable degree

5 of scientific certainty that glyphosate causes non-Hodgkin's

6 lymphoma, because I think that if all she offered was an

7 opinion that the data not adjusted for other pesticide use

8 shows that glyphosate causes non-Hodgkin's lymphoma, you have a

9 real problem.  So I would urge you to spend these 45 minutes

10 not listening to anything else I discuss with your co-counsel,

11 and just finding that opinion if it's in there.  Okay?

12    **MS. WAGSTAFF:**  All right.  And, Your Honor, you know,

13 as we do this, I just want to caution all of us from atomizing

14 the scientific data, and pulling one case out or another;

15 because as you know, and as all of our experts testified,

16 Dr. Ritz did look at all of the epidemiological data.  And she

17 did consider all of the toxicology data, and the mechanistic

18 data.

19    And what I believe that she said was that the multivariate

20 or the adjusted Odds Ratios continued to be elevated.  Right?

21 And so that shows a trend or a continued elevation that shows

22 that when you couple it with everything else, that gets you

23 sort of to causation.

24    And so I think that pulling out that specific opinion,

25 where she's asked, *If you look at these cases in isolation* -- I

1  don't think that's the right question to ask.

2          THE COURT:  Yeah.  But you have to look --

3      I mean, the concern I have with Dr. Ritz is that, you

4  know, you're supposed to look at the totality of it.

5          MS. WAGSTAFF:  Right.

6          THE COURT:  And, you know, she gave us this forest

7  plot, which sort of was the centerpiece of her conclusion

8  that -- or appeared to be the centerpiece of her conclusion

9  that glyphosate causes non-Hodgkin's lymphoma.

10         MS. WAGSTAFF:  Mm-hm.

11         THE COURT:  And I believe all of the data that she

12 put on there was not -- was unadjusted; unadjusted for other

13 pesticide use, I believe.

14         MS. WAGSTAFF:  Well --

15         THE COURT:  And I just -- I don't see how any -- if

16 that's all she's offering us --

17         MS. WAGSTAFF:  Right.

18         THE COURT:  -- I don't see how any responsible

19 scientist could reach that conclusion.

20         MS. WAGSTAFF:  And that's not all she's offering us.

21 And maybe that was a bad decision on our part to offer that

22 forest plot.  And I asked her this morning when I spoke to her

23 again why she just included the univariate.

24     First of all, she did have adjusted Odds Ratios on there.

25 She had the De Roos 2003; and she had the NAPP on at least one

1  of them; and she had the AHS, I believe, as well.

2      And she said that she was she was trying to show -- it was

3  just a demonstrative exhibit.  It doesn't replace her opinions.

4      **THE COURT:**  Okay.  And defending the forest plot is

5  not going to get you anywhere.

6      **MS. WAGSTAFF:**  Right.  And I don't want to spend a

7  lot of time doing that.

8      I just saying that the Court should not consider that to

9  be the cornerstone, end-all be-all of her --

10      I mean, if you want to strike the forest plot, which it

11  sounds like you might want to do, that's fine.  That doesn't

12  change at all her opinions.  And that doesn't change the fact

13  that she did, in fact, rely on the multivariates.

14      What she was trying to do is just show an illustrative

15  demonstrative, where she was kind of comparing apples to

16  apples.  Okay?  And so we don't have to spend a lot of time on

17  the forest plot, but what I'd like you to --

18      **THE COURT:**  But considering the multivariates, I

19  mean, how -- I mean, let's consider the multivariates.  Okay?

20      **MS. WAGSTAFF:**  Okay.

21      **THE COURT:**  I mean, there's still this lingering

22  issue of whether this is contained in Dr. Ritz's opinion or any

23  of your experts' opinion; but putting that aside for the

24  moment --

25      **MS. WAGSTAFF:**  Okay.  Which one do you want to look

1  at?

2          THE COURT:  Let's -- okay.  So let's -- so the

3  NAPP Study.

4          MS. WAGSTAFF:  Okay.

5          THE COURT:  So one set of numbers we have from the

6  NAPP -- is from the NAPP Study.  And the NAPP Study, which, as

7  you know, is a pooled analysis of all these North American

8  case-control studies, shows that overall there is a

9  statistically -- it shows that the data is statistically

10  insignificant.  The Odds Ratio is statistically insignificant.

11  It's a 1.13 Odds Ratio, with a confidence interval of .84 to

12  1.51.

13      And you take from the NAPP Study the Odds Ratio for people

14  who have used or been exposed to glyphosate more than seven

15  times in their life, and the Odds Ratio actually goes down.  I

16  don't think it matters that it goes down, because it's

17  statistically insignificant; but the Odds Ratio is 1.06, with a

18  confidence interval of .62 to 1.81.  Okay?

19      And then you have the -- the figure from the NAPP Study

20  of -- that touches on people who use --

21          MS. WAGSTAFF:  Your Honor, are you on the June or the

22  August one?

23          THE COURT:  This is -- I believe this is the August

24  one.

25          MS. WAGSTAFF:  Okay.

PROCEEDINGS

1        **THE COURT:**  People who use glyphosate more than two

2   days per year, or used glyphosate more than two days per year.

3   That is --

4        Yes, this is from the August one, because I remember that

5   the August one was barely under statistically significant.

6        **MS. WAGSTAFF:**  Mm-hm.

7        **THE COURT:**  Right?  Because the confidence interval

8   was .99 to 3.17, if you use the June data.  If I'm recalling

9   correctly, it's slightly above -- it's barely statistically

10  significant.

11       Let's give you that one.  Let's say that one is

12  statistically significant.

13       **MS. WAGSTAFF:**  Okay.

14       **THE COURT:**  Let's say the Odds Ratio is 1.77, and the

15  confidence interval is -- the Odds Ratio is statistically

16  significant, barely.

17       Then you have the Andreotti Study.  And the Andreotti

18  Study shows that with low dose -- low -- people in the lowest

19  quartile of exposure, the Odds Ratio is .83; statistically

20  insignificant.

21       And the people in the highest quartile of exposure, the

22  Odds Ratio is .87; statistically insignificant.

23       And then the two middle quartiles, the Odds Ratio is

24  similarly in the high eights; statistically insignificant.

25       And then you have the meta-analyses:  The IARC

1   meta-analysis, and Chang, and Delzell.  And I think those are

2   barrel statistically significant; but of course, those are

3   meta-analyses of the same data that the NAPP Study is

4   examining.

5           MS. WAGSTAFF:  Mm-hm.

6           THE COURT:  In the face of all of those numbers, how

7   can you just take -- how can you just pick the one, basically,

8   the -- you know, from the NAPP Study -- the 1.77 Odds Ratio for

9   people who use glyphosate more than two days per year -- and

10  say -- how can you --

11      I mean, let me put the question a different way.

12          MS. WAGSTAFF:  Sure.

13          THE COURT:  You've got all of these numbers, the vast

14  majority of which are statistically insignificant.  And how can

15  you focus on that one number and conclude that, to a reasonable

16  degree of scientific certainty, glyphosate is causing

17  non-Hodgkin's lymphoma in human beings?  That sounds highly

18  questionable at best, highly shaky at best, and may be junk

19  science.

20          MS. WAGSTAFF:  Okay.  So first of all, you know,

21  Dr. Ritz and all of our experts looked at all of the data.  And

22  they looked at all of the numbers that you've just mentioned,

23  except obviously Dr. Neugut didn't consider NAPP, for reasons

24  he explained on the stand.

25          THE COURT:  As a side note, are you still relying on

1  Dr. Neugut, or are you withdrawing his testimony and opinion?

2          MS. WAGSTAFF:  I believe we're still relying on him.

3          THE COURT:  Okay.  I just wanted to check.

4          MS. WAGSTAFF:  Okay.  And so secondly, the ever/never

5  analysis -- the analyses are weighted by our experts, which

6  they testified to in different ways.  Right?  And the

7  ever/never analysis is a very low-weighted analysis, I would

8  say, by our experts, because if you have one day's use, you're

9  now a user.  Right?

10      And so we are not suggesting that anybody who just was

11  exposed one time in their life, which takes them out of the

12  "never," would get non-Hodgkin's lymphoma.  Right?  I mean,

13  plaintiffs even agree there is some threshold that you probably

14  need to be exposed to.  And one -- the ever/never, therefore,

15  has really lower value and weight than the other tests.

16      And if we could look at -- I just wanted to make sure that

17  Your Honor and I are on the same page with the effect that the

18  multivariate has on the numbers, and why a lower

19  nonstatistically significant Odds Ratio still is an indicator

20  for our experts, from what they testified to.

21      So if we can just look at the Eriksson, do you have that

22  in front of you?

23          THE COURT:  You mean the actual Eriksson Study, or

24  the numbers from it.

25          MS. WAGSTAFF:  Well, the actual -- I mean, I'm going

1  to use the numbers from this little chart.

2       **THE COURT:**  Okay.  Let me pull it up.

3       **MS. WAGSTAFF:**  I think -- I don't want to say for

4  certain, but I think probably almost every expert has testified

5  to this.

6       **THE COURT:**  Oh, the one with the arsenic.  The famous

7  arsenic.

8       **MS. WAGSTAFF:**  Yeah.

9       **THE COURT:**  Let me just pull up the study.  Hold on.

10  (Discussion off the record.)

11       **MS. WAGSTAFF:**  And while you're doing that, my

12  sous-chef just pointed out something to me that is a good point

13  here.  You know, you mentioned the NAPP numbers, and you ran

14  through some of the numbers.  And as we all know, there's a

15  June PowerPoint, and there's an August PowerPoint.  Right?

16       **THE COURT:**  Mm-hm.

17       **MS. WAGSTAFF:**  And they have different numbers, and

18  they were presented for different reasons.

19       And, you know, this NAPP Study is not yet published.

20  Right?

21       **THE COURT:**  What do you mean:  They were presented

22  for different reasons?

23       **MS. WAGSTAFF:**  Well, they were -- one was presented

24  two months after the other one.

25       **THE COURT:**  But I --

 1          **MS. WAGSTAFF:**  One was in Brazil, and one was in

 2    Canada.  I maybe don't attach significance to --

 3          **THE COURT:**  I didn't understand what you meant by

 4    "reasons."

 5          **MS. WAGSTAFF:**  Well, different presentations.

 6          **THE COURT:**  Right.

 7          **MS. WAGSTAFF:**  But what we can agree on is that after

 8    both of those presentations, there was a draft manuscript,

 9    which is September '15.  So it's after both of them.  It

10    supersedes both drafts.  Right?

11      And it's of the -- it's Exhibit 106.  And in that, on page

12    12, the authors conclude that there's an increased risk of NHL

13    in association with glyphosate exposure.  So the authors also

14    state -- wasn't there a conclusion?

15          **THE COURT:**  Where's -- I want to see if I have that

16    on my -- go to that.

17          **MR. LASKER:**  It's Exhibit 1277, Your Honor, if that

18    helps.

19          **MS. WAGSTAFF:**  At 106.

20          **MR. WISNER:**  106 yeah.

21          **MR. LASKER:**  Or 106.

22          **THE COURT:**  Okay.  I'm not sure.

23          **MS. WAGSTAFF:**  And it's -- it's -- date of last

24    revision:  September 21st of '15.  106 is the exhibit -- is the

25    *Daubert* hearing exhibit.

1           THE COURT:  Okay.

2           MS. WAGSTAFF:  On page 12, under the "Discussion

3    Group," there are four paragraphs on that page.  The second

4    paragraph says, *This report confirms previous analyses*

5    *indicating increased risks of NHL in association with*

6    *glyphosate exposure.*

7           And then it states in the next paragraph, *Our results are*

8    *also aligned with findings from epidemiological studies of*

9    *other populations that found an elevated risk of NHL for*

10   *glyphosate exposure with greater number of days per year of*

11   *glyphosate use, as well as a meta-analysis of glyphosate use*

12   *and NHL risks.  From an epidemiological perspective, our*

13   *results were supportive of the IARC evaluation of glyphosate as*

14   *a probable 2A carcinogen for NHL.*

15          So these numbers -- and relying on the numbers in NAPP --

16   is anything but junk science.  It's -- I wouldn't even say that

17   it's shaky ground.

18          And although this hasn't been published, this is the most

19   updated, recent, from the authors and investigators,

20   themselves -- independent people who aren't being paid by any

21   party to opine.  And that's what they opine.

22          THE COURT:  Is there anybody left out there who's not

23   being paid by either party?

24          MS. WAGSTAFF:  Well, that's a good question.

25          THE COURT:  But let me ask you a question, though,

1   about that paper.

2            MS. WAGSTAFF:  Sure.

3            THE COURT:  It's not just a question about that

4   paper.  It's also a more general question about the NAPP data.

5   Right?

6            MS. WAGSTAFF:  Mm-hm.

7            THE COURT:  Which is -- I mean, it sounds like you're

8   kind of agreeing with me.  Maybe I'll take a step back, and ask

9   a prefatory question.

10            MS. WAGSTAFF:  Don't trick me.

11            THE COURT:  It sounds like you're agreeing with me

12   that that NAPP data -- that's, like, your best number.  Right?

13        The people who use glyphosate or are exposed to glyphosate

14   more than two times per year have -- there's a statistically

15   significant -- let's use the June numbers, and say there's a

16   statistically significant increased risk.  And it's 1 point --

17   the Odds Ratio is 1.77.

18            MS. WAGSTAFF:  Well, I don't want to say it's our

19   best, because we're not atomizing the science; but it's a

20   strong piece of evidence for us, yes.

21            THE COURT:  So do the -- that's fair enough.

22        So in that paper do they talk about the latency issue?  Do

23   they talk about the fact that the majority of people studied in

24   this pooled analysis could not have been exposed to glyphosate

25   more than eight or so years?  I don't remember what the exact

1   numbers are, but -- could not have been exposed to glyphosate

2   more than seven or eight years before developing NHL?

3          MS. WAGSTAFF:  Okay.  We'll look at that in just a

4   minute.

5       But with respect to latency, Your Honor, plaintiffs

6   brought in --

7          THE COURT:  We'll look at what?  Whether the paper

8   discusses that?

9          MS. WAGSTAFF:  He's finding -- sorry.  I was talking

10  to him.  I didn't mean to say it in the microphone.

11         THE COURT:  No worries.

12         MS. WAGSTAFF:  So with respect to latency,

13  Your Honor, plaintiffs brought in the Dr. Nabhan.  You remember

14  Dr. Nabhan from Friday morning, who testified that, as early as

15  .4 years, you could start developing sort of the unregulated

16  cell division -- right? -- because cancer's not like --

17         THE COURT:  Yeah, but he was talking about when you

18  go through organ transplants or when you go through

19  chemotherapy.  And he tried to sort of elide the distinction

20  between getting non-Hodgkin's lymphoma from chemotherapy or

21  organ transplants on the one hand, and getting it from

22  glyphosate exposure on the other.  And I think that was

23  preposterous, frankly.  I mean --

24         MS. WAGSTAFF:  Sure.  And --

25         THE COURT:  I mean, I couldn't believe my ears when

1  he tried to analogize getting NHL from organ transplants and

2  chemotherapy, to getting NHL from glyphosate.

3      MS. WAGSTAFF:  Sure.  And I think the point of that

4  was that NHL and cancer is not like a heart attack.  Right?

5  You can't say you had this event on February 14th, or something

6  like that.  Right?  It is a progressional [sic] event.

7      And so what happens is you have a triggering event --

8  right? -- that starts sort of the unregulated cell division.

9  That's what cancer really is in its most general concept.

10      And so his analogies were not necessarily that it was --

11  an organ transplant and exposure to glyphosate are one-on-one.

12  He was using it to say it was a triggering event; and this

13  triggered this cause here.

14      THE COURT:  Right.  When you have a triggering event

15  like organ transplants or chemotherapy, you can come down with

16  non-Hodgkin's lymphoma in six months, perhaps; as soon as six

17  months.

18      But how that is relevant to, you know, glyphosate exposure

19  and non-Hodgkin's lymphoma, I don't understand.

20      MS. WAGSTAFF:  Sure.  Okay.  And so I've handed you

21  Exhibit 31.  I don't know if you've had a chance to look at it,

22  but this we would like to move into evidence.  And what

23  Exhibit 31 is, is --

24      THE COURT:  It didn't come in already?

25      MS. WAGSTAFF:  It may.  I don't know if it is or not,

1   actually.

2           **THE COURT:**  I think it did.

3           **MS. WAGSTAFF:**  But if it's not, we'd like to put it

4   in.

5           **THE COURT:**  Okay.  Any objection?

6           **MR. LASKER:**  No, Your Honor.

7           **THE COURT:**  Okay.  It's admitted.

8   (Trial Exhibit 31 received in evidence.)

9           **MS. WAGSTAFF:**  And so what this article is -- and

10  Your Honor can read it more at your leisure when you have more

11  time, but this is an article by Dr. Blair.  And if you will

12  look at it, if you look at -- if you go to page 205, just to

13  point you to the Conclusions section -- all right?  And the

14  Conclusions section says, *We believe of the two -- We believe*

15  *of the two* -- there's a typo in that sentence, or I'm just

16  reading it wrong -- *the two major methodological issues raised*

17  *in epidemiologic studies of occupational exposures* -- which is

18  what we're doing right now.  Right? -- *that is, confounding and*

19  *exposure misclassification, the latter is of far greater*

20  *concern*, which means exposure misclassification.

21          Then it says, *It's rare to find substantial confounding in*

22  *occupation studies or in the other epidemiological studies, for*

23  *that matter, even by risk factors that are strongly related to*

24  *the outcome of the interest.  On the other hand, exposure*

25  *misclassification probably occurs in nearly every*

1    *epidemiological study.*

2        So I think when you read this article, you'll see that

3    while -- you know, I think that the main point of what we were

4    doing here last week and what we're doing here today is to

5    determine if our experts looked at sort of the touchpoints of

6    what's important in epidemiology, and they accounted for them

7    one way or the other.  And this article, I think, will give a

8    little bit of background as to -- as to why it's -- why

9    confounders were properly accounted for here.

10           **THE COURT:**  But -- so are you citing this to make the

11   point that it's not a big deal to rely on the unadjusted

12   numbers; the numbers that are not adjusted for other pesticide

13   exposure?

14           **MS. WAGSTAFF:**  Yeah, but what's important that I hope

15   Your Honor realizes is that --

16           **THE COURT:**  Because the IARC -- I mean, this is by

17   Dr. Blair -- right? -- who's the head of the IARC Working

18   Group.

19           **MS. WAGSTAFF:**  Right.

20           **THE COURT:**  And if you read through the

21   IARC Monograph, they focus on the studies that are adjusted for

22   pesticide use.

23           **MS. WAGSTAFF:**  Sure.  And what I hope that Your Honor

24   understands and -- is that you're using the word "rely."

25       And our experts considered both adjusted and unadjusted --

PROCEEDINGS

1   all of them did -- when they were doing their epi --

2   epidemiological analysis.

3         And so it's not as if Dr. Ritz looked at the unadjusted --

4   the unadjusted numbers, and said, *That's the end-all be-all,*

5   *and I'm not going to consider the adjusted numbers.*  Right?

6         And what's -- what's -- why I've offered this article is

7   to show you:  This is where you go into the quantitative part

8   of epidemiology.  Right?  How big of an issue is this?

9         And one thing that I found interesting, as well -- and

10  Your Honor had no way of knowing this, because you're fortunate

11  enough not to be dealing with sort of our outside

12  discoveries -- is you know we asked Monsanto these issues in

13  discovery back in April of '17, before discovery closed.

14        We -- we -- they -- you know, if you look at this --

15             **THE COURT:**  What issues?  What issue?

16             **MS. WAGSTAFF:**  I'll explain to you.  If you look at

17  this chart in Eriksson on page 2 -- and I think you were

18  pulling it up.  Right?

19             **THE COURT:**  Yeah.  I was pulling it up, and then I

20  got distracted.  Hold on a sec.  I did pull it up.  Okay.

21  Here.  Yeah.

22             **MS. WAGSTAFF:**  Okay.  So, you know, if we're looking

23  at this --

24             **THE COURT:**  This is the one on --

25             **MS. WAGSTAFF:**  With the MCPA.  2,4-D.

```
 1              THE COURT:  Page 1661?

 2              MS. WAGSTAFF:  Yeah.  Chart 7.

 3              THE COURT:  Yeah.

 4              MS. WAGSTAFF:  Okay.  So, you know, we talked a lot.

 5   At different times we've talked about arsenic.  We've talked

 6   about MCPA.

 7         But one of the ones we didn't really talk about was 2,4-D

 8   at length.  Monsanto's counsel seems to be focusing on the

 9   other ones.  And maybe that's because in April of 2017 --

10         So Monsanto actually manufactures 2,4-D.  And we asked

11   them in their discovery, in some requests for admission, to

12   admit that 2,4-D causes or contributes to non-Hodgkin's

13   lymphoma.  We asked them.  It's right here.

14         And their response was, *Monsanto objects to this request*

15   *because 2,4-D is a non-glyphosate-containing herbicide*.  *And in*

16   *this phase, which is limited to general causation, the Court*

17   *will decide only whether there is sufficient admissible*

18   *evidence that glyphosate and/or Roundup® is capable of causing*

19   *cancer -- specifically, non-Hodgkin's lymphoma -- in humans*.

20   *Monsanto objects to this request, because the herbicide 2,4-D*

21   *is irrelevant to the matter before the Court, and exceeds the*

22   *bounds of possible discovery*.

23         So until we got to recently, this was an irrelevant issue

24   to Monsanto; and they refused to answer discovery about it.  So

25   I don't know if you want to call this "situational litigating"
```

PROCEEDINGS

1  or whatever, but it is -- it is a concern for us that these

2  tactics are going on outside of the Court's knowledge.  And so,

3  you know, we have watched this confounding issue --

4        **THE COURT:**  But I guess I don't understand how that

5  discovery response that you just read to me is relevant to what

6  we have to work on here today, which is:  Are your experts --

7  did your experts offer opinions about the link between

8  glyphosate and NHL that are admissible?

9        **MS. WAGSTAFF:**  And so why it's relevant is -- I'll

10  tell you -- is that our experts did consider confounding.  Each

11  one of them considered confounding.  Each one of them

12  considered the unadjusted and the adjusted Odds Ratios.

13     Monsanto has spent the entire week, or maybe the past year

14  leading up to this, trying to convince the Court that

15  confounding is the end-all be-all issue, and that plaintiffs

16  did not -- plaintiffs' expert did not meet their burden for

17  doing that; but they, in fact, did.

18     And why I showed you that was because --

19        **THE COURT:**  So show me where -- I mean -- and maybe

20  this is a good time to ask you again.  Where in Dr. Ritz's

21  reports or in her testimony last week did she offer an opinion

22  that, you know, *Based on my review of the adjusted number, I*

23  *conclude that the adjusted numbers show to a reasonable degree*

24  *of scientific certainty that glyphosate causes NHL*?

25        **MS. WAGSTAFF:**  Sure.  And I think we have to get

1  there in steps.  Right?  I mean, you know that that's her final

2  opinion.  She's stated that that's her opinion.  And in --

3       **THE COURT:**  I don't know that she has, because

4  there's all this forest plot with all of these unadjusted

5  numbers.  And there's -- you know, there was a lot -- you know,

6  there was a very unsatisfying answer that she gave regarding

7  this chart that you just asked me to look at, Table 7, in

8  Eriksson --

9       **MS. WAGSTAFF:**  Mm-hm.

10       **THE COURT:**  -- where it -- my impression from the

11  answer that she gave was that she thought it was not a good

12  idea to look at the multivariate numbers.

13       **MS. WAGSTAFF:**  Okay.

14       **THE COURT:**  I know that it's really hard for you to

15  listen to me when your co-counsel is --

16       **MS. WAGSTAFF:**  You are way more important, too.

17       **THE COURT:**  Well, I don't know about that.  If you

18  want to take a time-out and huddle --

19       **MS. WAGSTAFF:**  Can we have 30 seconds?

20       **THE COURT:**  That's fine.  I think it's never a good

21  idea when a Judge is trying to ask something of somebody to be

22  whispering in their ear.  Then they can't hear the Judge's

23  question.

24       **MR. WISNER:**  I was telling her let's take a break.

25       **THE COURT:**  Go ahead.

PROCEEDINGS

1   (Discussion off the record.)

2           **MS. WAGSTAFF:**  All right.  I'm going to put on

3   earplugs.

4       All right.  So do you have Dr. Ritz's report in front of

5   you?

6           **THE COURT:**  Let me pull it up.

7           **MS. WAGSTAFF:**  And also --

8           **THE COURT:**  The initial report?

9           **MS. WAGSTAFF:**  Yes, sir.

10          **THE COURT:**  Give me one sec.  Okay.

11          **MS. WAGSTAFF:**  And so if you look at page 16 of her

12  report, she talks about -- well, let me actually -- yeah.

13  We'll start with page 16 in the last paragraph, where it talks

14  about the IARC Working Group's monograph on glyphosate.  Do you

15  see that paragraph?

16          **THE COURT:**  Yeah.

17          **MS. WAGSTAFF:**  Okay.  If you --

18      They're talking about highly adjusted estimates -- she

19  is -- also known as, quote, *Fully adjusted models* --

20      Are you following me on that?

21          **THE COURT:**  Yeah.

22          **MS. WAGSTAFF:**  -- *are the estimates that adjust for*

23  *as many confounding variables as possible, such as adjusting*

24  *for age, sex, race, and also sometimes other pesticide*

25  *exposures.*

1      Right?

2      So she introduces the concept of confounders.

3           THE COURT:  Okay.

4           MS. WAGSTAFF:  And then the next sentence, I think,

5   is important.  It talks about why there's a proper and good

6   thing to do.  Right?

7           THE COURT:  Okay.

8           MS. WAGSTAFF:  And then if you look at -- if you turn

9   to pages 18, and then we'll get to 19, where she talks about

10  when she's -- she's kind of doing a paragraph per study,

11  almost.  On the -- where it says "the Canadian studies."

12          THE COURT:  Mm-hm.

13          MS. WAGSTAFF:  McDuffie and whatever.

14          THE COURT:  Yeah.

15          MS. WAGSTAFF:  She's listing in there.  She lists the

16  adjusted and unadjusted Odds Ratios and data, to sort of

17  illustrate to the Court that she did, in fact, consider those.

18      And it goes down to the next paragraph, where she lists,

19  also, adjusted and unadjusted data.

20      And then if you move on to page --

21          MR. LASKER:  Which paragraph?  The one -- the --

22          MS. WAGSTAFF:  Yeah, yeah.

23          MR. LASKER:  Thank you.

24          THE COURT:  And then if you move on to page 19, with

25  the paragraph starting "De Roos 2003" -- and this is sort of

1   what we'd already talked about.  Yeah.  And then if you -- that

2   lists those adjusted numbers.

3       And then if you go to page 20, she talks about De Roos

4   2005, which bleeds on to page 21, and has sort of the adjusted

5   Odds Ratios, as well.

6       And then if you couple that with page --

7           THE COURT:  Hold on.  Can you give me one second to

8   glance at that?

9           MS. WAGSTAFF:  Oh, sure.  Look at the last sentence,

10  right before that pictograph --

11          THE COURT:  Okay.

12          MS. WAGSTAFF:  -- where it says that they were

13  adjusted for age demographic, lifestyle factors, and other

14  pesticides.

15          THE COURT:  Okay.

16          MS. WAGSTAFF:  And then if you look at page 152 of

17  her deposition --

18          THE COURT:  I don't think I have her depo with me.

19  You can go ahead and quote it.

20          MS. WAGSTAFF:  Okay.  No.  Didn't you give it?  Oh,

21  no.  That was the *Daubert*.  Okay.  I'll give it to you.

22  Where's that?

23          THE COURT:  What page did you say it was?

24          MS. WAGSTAFF:  It's on 152.  And this is her original

25  deposition that was taken on September 18th, 2017.

1    And it's -- I believe it was Mr. Lasker taking this.  152,

2  line 8, through 153, 18.

3    She talks about -- that it's relevant.  It says, *You state*

4  *in the second sentence that the most highly adjusted estimates,*

5  *also known as 'fully adjusted models,' are the estimates that*

6  *adjust for as many confounding variables as possible, such as*

7  *adjusting for age, sex, race, and also other pesticide*

8  *exposure.  Correct?*

9    She says, *Yes.*

10    And then she's asked, *And then you state this is relevant*

11  *because these fully adjusted models give the reader confidence*

12  *that the findings are most likely due to glyphosate/Roundup®*

13  *exposure, instead of other potential causes that act as*

14  *confounders.  Correct?*

15    *Correct.*

16    *And on page 14 of your Report you present what's called a*

17  *'forest plot' of the various Odds Ratios or Rate Ratios in some*

18  *of the epidemiological studies for glyphosate.  Correct?*

19    And it just talks a little bit about her forest plot.  And

20  it says, *In your visual depiction of the results from different*

21  *studies, you do not provide or list the most highly adjusted*

22  *Odds Ratios or Risk Ratios from the studies.  Correct?*

23    *Not correct.  De Roos 2003 is very highly adjusted for 43*

24  *different pesticides.*

25    And what I think that shows is that she considered the

1   concept of confounding.  She listed that in her -- in what she

2   considered.  It's in her reliance list as the data considered.

3   And then her ultimate conclusion comes after that.

4        And if we can just sort of -- maybe we could just withdraw

5   the forest plot.  And -- because that's really just a

6   demonstrative exhibit.  It wasn't meant to be the end-all

7   be-all of her conclusion on that.  And this shows the

8   underlying considerations that she had.

9        You know, in her -- on page 25 of her Report she even

10  states the epidemiological studies, as a whole, support an

11  increased risk of NHL.

12          **THE COURT:**  Okay.  So can I -- okay.  So that may

13  be -- maybe that's enough.

14       The next -- I guess the next question is, since, you know,

15  the De Roos 2003 number or the -- or the number from, you know,

16  NAPP that is kind of similar to the De Roos 2003 number -- is,

17  you know, one of the -- if not the best number for you, one of

18  the best numbers for you, I guess what I want to ask again is

19  -- you know, the latency issue seems to be a big problem with

20  those numbers.

21       So, like, if you look at all of the studies, as the

22  epidemiologists seem willing to admit, there's never a perfect

23  study.  There are flaws, problems, potential problems in every

24  study.

25       But the latency problem for NAPP seems to be qualitatively

1    a really significant problem.

2        And if that -- and just to kind of try to restate the

3    problem, you know, we know that farmers had elevated NHL

4    numbers before glyphosate ever came on the market.  Farmers had

5    increased incidence of NHL before glyphosate ever came on the

6    market.  And we know that glyphosate came on the market in,

7    like, 1975 or 1976.  Did I get that right?

8            MS. WAGSTAFF:  Something like that.  Yeah.

9            THE COURT:  And we know that a lot of these --

10   there -- seems there is a significant possibility that a lot of

11   people in this study in the NAPP data got non-Hodgkin's

12   lymphoma from something other than glyphosate, because the --

13   because they hadn't been exposed to glyphosate for longer than

14   a few years:  Five years; six years; seven years; something

15   like that.

16       And so my concern is that if that's your best number -- if

17   that's Dr. Ritz's best number -- then to focus on that to give

18   such great weight to that compared to the weight that

19   you/Dr. Ritz give to the other studies -- that's a real

20   problem.  That seems to me to be a real problem.

21       And so what is Dr. Ritz's response to this concern; this

22   "latency concern," as we've been calling it, with the NAPP

23   numbers?

24           MS. WAGSTAFF:  Sure.  And so, Your Honor, I think at

25   one point we're getting pretty close to starting to weigh the

1  evidence, as far as what's more important, than something else,

2  which is obviously --

3          **THE COURT:**  Maybe, but if she didn't consider that at

4  all --

5          **MS. WAGSTAFF:**  Sure.

6          **THE COURT:**  I mean, if an epidemiologist is weighing

7  different studies --

8          **MS. WAGSTAFF:**  Yeah.

9          **THE COURT:**  -- and fails to consider, at all, a very

10  significant concern with one of the studies --

11          **MS. WAGSTAFF:**  Mm-hm.

12          **THE COURT:**  -- then that, I think, is a problem.

13      And so does Dr. Ritz have a good answer for this latency

14  problem?  Because, as Mr. Lasker pointed out, at -- there

15  were -- there were other points at which she was criticizing

16  data that was not helpful to her opinion because of this

17  latency issue.

18          **MS. WAGSTAFF:**  Yeah.

19          **THE COURT:**  And -- and so the question is:  Does she

20  similarly take the latency issue into account for the NAPP

21  data; and if so, how does she address it?

22          **MS. WAGSTAFF:**  Yeah.  So this Cantor -- the Cantor

23  Study. as you probably know, is incorporated into the

24  NAPP Study.  And if you look at page 18 of her Expert Report --

25          **THE COURT:**  Initial?

PROCEEDINGS

1          MS. WAGSTAFF:  Initial.  Yep.

2          THE COURT:  Okay.

3          MS. WAGSTAFF:  And it goes over to 19.

4          THE COURT:  Right.  That's my point, is that when

5    she's talking about the Cantor Study, she says it's less

6    informative because only six to ten years could have elapsed

7    between a potential first glyphosate exposure, and NHL

8    diagnosis.

9          MS. WAGSTAFF:  Right.

10         THE COURT:  So only six -- what she says in her

11   opinion is when only six to ten years could have elapsed

12   between initial glyphosate exposure and NHL diagnosis, that's

13   less helpful.  Okay?

14      But the primary number that you are relying on and that

15   she seems to be relying on is a number that is generated from a

16   significant number of NHL cases where the exposure -- the

17   initial exposure to glyphosate was six to ten years from the

18   diagnosis.

19         MS. WAGSTAFF:  Sure.  And, Your Honor, just to be

20   clear, we are looking at -- and by "we" I mean our experts --

21   are looking at sort of the totality of the evidence.  I mean,

22   that's the first line of her expert conclusion.  So to say that

23   there's this one study, and sort of pick apart --

24         THE COURT:  Okay, but she places great weight on

25   NAPP --

 1          MS. WAGSTAFF:  Sure.

 2          THE COURT:  -- and on De Roos.  She places great

 3  weight on that.

 4          MS. WAGSTAFF:  Sure.

 5          THE COURT:  And the one question about her

 6  methodology is:  How can she place great weight on that,

 7  without considering this latency issue that she has invoked to

 8  criticize other studies?

 9      So where does she explain why this latency issue is not a

10  big deal, or why it's appropriate to place such great weight on

11  this study notwithstanding this latency issue?

12          MS. WAGSTAFF:  I'm going to let Mr. Wisner answer

13  this, who is our latency gentleman.

14          THE COURT:  Sure.

15          MR. WISNER:  Your Honor.

16          THE COURT:  Have you ever been called a "latency

17  gentleman" before?

18          MR. WISNER:  Not to my knowledge.

19      Your Honor, I believe one of the big confusions that

20  happened during the testimony this week was a conflation of

21  cohort and case-control studies.  And the reason why that's

22  important is in a case-control study you start off with people

23  who are already sick.

24      So in De Roos '03 --

25          THE COURT:  She's not talking about the -- put aside

1   the cohort study for a moment.

2           MR. WISNER:  Sure.

3           THE COURT:  She's not talking about the cohort study

4   here when she identifies the latency concern.  She's talking

5   about a case-control study.

6           MR. WISNER:  Precisely.  And -- and --

7           THE COURT:  In Eriksson -- when she talks about

8   Eriksson, she's talking about a case-control study.

9           MR. WISNER:  Yes.  And exactly with Cantor,

10  Your Honor, it's specifically included in NAPP.

11          THE COURT:  Okay.

12          MR. WISNER:  So her criticisms of Cantor are included

13  in NAPP.  So she did consider this issue of latency, clearly;

14  but NAPP was a pooled analysis, so it's not just Cantor.  So

15  you actually have --

16          THE COURT:  But if I recall correctly, it's this

17  latency concern exists with respect to, like, 60 or 70 percent

18  of the people who are part of the NAPP analysis.  Right?

19          MR. WISNER:  That's correct, but the remaining

20  percentages have exposures upwards of 20 years.

21          THE COURT:  Okay.

22          MR. WISNER:  Okay.  So when you have a case-control

23  study, and you're looking backwards based upon people who are

24  sick, what they did in De Roos is they actually controlled for

25  everything else that could be causing it.  Okay?  They

PROCEEDINGS

1   literally just looked at those people who were only exposed to

2   glyphosate, and there was still an elevated risk.

3        So what you have to --

4        **THE COURT:**  What do you mean:  Only exposed to

5   glyphosate?

6        **MR. WISNER:**  So when you're doing the adjustments for

7   confounding, you are removing people who are exposed to both.

8   So you're looking at -- okay -- if you had dicamba, you're out.

9   If you had 2,4-D, you're out.  And then all you're left with,

10  then, are the people were just us exposed to glyphosate, and

11  nothing else.

12       And in that fully adjusted model, there's still an

13  elevated risk.  So you say, *Well, it seems like something else*

14  *is causing this risk of cancer in De Roos '03.*  Well, that's

15  fine, but then you have to explain:  What is that one thing

16  that is only affecting farmers that only use glyphosate?

17       And you can come up with some hypothesis or some weird

18  ideas, but ultimately in the end what we have a correlation

19  that can't really be explained with numbers.  Just -- there's a

20  risk there, and there's nothing we can say about it.

21       The fact that the latency is so short and you see that

22  risk is actually the strength of De Roos, because what you're

23  saying is, *Notwithstanding the fact we don't have so much time*

24  *to look at cancer accumulations, we're still seeing this risk.*

25  And I think the real explanation to this is, because De Roos is

1   looking in those early years, what we have are the early

2   adopters of glyphosate.  Right?  These are the people who

3   decided to use it right from the get-go.  And that is a unique

4   population, because we know after the '90s and all of these

5   other studies, it's ubiquitous.  And so De Roos actually gives

6   an insight into some more reliable, stable data.  It's one of

7   the few case-controls that just has glyphosate, and allows us

8   to really see:  What is glyphosate, by itself, doing?

9        And in the face of that particular study -- and I think

10  the *Bextra* analysis and in the *In Re Silicone* analysis was

11  quoting.  It says, *If you do have an epidemiological study, and*

12  *it's controlling for confounders, it's statistically*

13  *significant* -- all these of those things fit De Roos '03 -- *you*

14  *overcome the general causation hurdle*.

15       I'll submit, Your Honor.  I hope I have explained that

16  latency issue as well as I could.

17       And ultimately, Your Honor, latency's a bell curve.  All

18  right?  And so what the median latency year is, we don't know.

19  It could be 10 years.  It could be 20.  But it doesn't mean you

20  won't get it early.  Right?  It doesn't mean you won't get it

21  late.

22       And so if you're cutting off the bell curve really early

23  in the analysis, you're actually reducing your ability to see a

24  risk.  So if you're reducing your ability, and still see a

25  risk, that's very powerful evidence.  And that's actually what

1  Dr. Ritz says repeatedly in her deposition and during -- during

2  her testimony, to the best of my recollection.

3          **THE COURT:**  But isn't it weird that -- that the --

4  you know, the studies that focus on the people who have shorter

5  period of exposure to glyphosate produce the -- quote,

6  unquote -- "best numbers" for you?

7      I mean, whereas you have this -- you know, you have -- I

8  know all of your criticisms of the AHS -- of AHS, of the cohort

9  study.  I understand those criticisms.  And they seem, on some

10 level, valid.  I'm not sure if it's as big a problem as this

11 latency problem, but you know -- whereas those, you know,

12 don't -- you know, they don't have that latency problem, and

13 the numbers are lower.

14         **MR. WISNER:**  But what we have in those later studies

15 is misclassification of exposure.  We have the ubiquitous

16 proliferation of glyphosate as it ramps up in the late '80s and

17 the '90s and so forth.  So what you will see is an attenuation

18 of risk estimates, as the noise-to-signal ratio decreases.  So

19 that's the answer to that.

20     And that's one of -- the greatest weakness that people

21 keep saying with De Roos '03 is, in some ways, actually its

22 greatest strength.  It's the most accurate, highly specific

23 data of glyphosate-only exposure.

24     And to answer the "why" that we're seeing that, it just

25 might be that the early adopters used a lot of it.  And that

PROCEEDINGS

1  exposure to glyphosate over a couple of years of heavy exposure

2  -- not just one or two days or one week, but I'm talking about

3  repeated exposures over time, which is what the two days per

4  year shows us.  That's how we understand cancer, anyway.

5  Right?  If I get exposed to one potential carcinogen one time,

6  my immune system can recover.  It's the repeated insults to the

7  immune system that allows for the mutation to occur that leads

8  to cancer later on.

9      So there are scientifically biologically plausible reasons

10  to explain this issue.  And I believe Dr. Nabhan and some other

11  testimony helps support that, Your Honor.

12          THE COURT:  Could I ask you another question.  We've

13  focused a lot on the Expert Reports.  We've focused a lot on

14  the testimony that was given last week.  We've focused some on

15  the deposition testimony.

16      There are also a lot of papers written by people who

17  didn't do the studies.  Right?  And we haven't focused so much

18  on those yet; like, you know -- such as the Blair Paper.

19      Maybe -- I won't put you on the spot and ask you to do

20  this now, but what I'd like you to do is, by the end of the day

21  today I would like you to file a list of your -- of the five

22  published papers that you want to make sure that I read.  Your

23  top five.  Can you give me even the top 10?  All right?  Both

24  sides.  The top 10 published papers that are not the studies

25  that we've already looked at, not the Expert Reports, not

1  the -- but just published papers talking about this issue, just

2  to make sure that I've read those.

3          **MR. WISNER:**  Can I throw in something there,

4  Your Honor?

5          **THE COURT:**  Sure.

6          **MR. WISNER:**  Can we highlight them for you, as well?

7  Instead of arguing, we'll just see this slide, because --

8          **THE COURT:**  Sure that's fine.

9          **MR. WISNER:**  There was a lot of stuff happening

10  yesterday or last week.  There was a lot of discussion about

11  the Blair validation study; about how accurate it was.

12          **THE COURT:**  Mm-hm.

13          **MR. WISNER:**  We kept reading the footnote of Table 2.

14  And I was sitting here, going crazy at counsel table, because I

15  said, *Look at Table 2.  It says that* --

16          **MS. WAGSTAFF:**  Let's look at that.

17          **MR. WISNER:**  You know, for duration it's 50 percent

18  off.  For number of days of exposure, it's 50 percent off.  And

19  that's rampant misclassification exposure.  And the entire AHS

20  is built on the stratification of exposure.

21      And we also know from De Roos '05 that the people who were

22  exposed and unexposed at the beginning of the study are socio-

23  and economically different.  They're less educated.  They have

24  different age ranges.  They have different propensities for

25  cancer.

1        And so that's why in De Roos '05 for the AHS, they

2    actually didn't compare the unexposed.  They compared the lower

3    exposed.  And that was to avoid what they call "residual

4    confounding."  And that's actually in the Record.  And Judge --

5    and I'm sorry.  Not "Judge."  Dr. Ritz explained that at

6    length.

7        And so I just wanted to point that out.  So I want to

8    highlight the portions that we think were sort of avoided

9    during that testimony.

10        **THE COURT:**  I guess one last question that I have.

11    And then you can feel free to wrap up anything you want to make

12    sure I hear.  What is it -- what do the experts mean when they

13    say, to a reasonable degree of scientific certainty, that

14    glyphosate is causing -- is currently causing non-Hodgkin's

15    lymphoma in human beings?

16        **MS. WAGSTAFF:**  So what our -- so this is a general

17    causation proceeding.  Right?  So they haven't looked at any

18    medical records.  They haven't looked at the specific causation

19    or dosing of a particular plaintiff.

20        And I don't know if you recall, but when we were having

21    these bifurcation proceedings -- gosh -- I was in front of you

22    before the MDL, with Plaintiff Hardeman.

23        And then I think when we did it again -- I can't remember

24    when the date was, but I know it was me standing up here and

25    saying, *Can we at least attach some plaintiffs to this, so that*

1   *we can get some, you know, like, dosing?*  And it was -- it

2   was -- it was opposed, and not ordered.

3        So what they are saying is that it can cause non-Hodgkin's

4   lymphoma, and that it is causing non-Hodgkin's lymphoma, and

5   that they believe that, based on the methods that they used.

6   And, you know, some of that is legal jargon that you have to

7   put in there, but that's --

8        **THE COURT:**  So is "reasonable degree of scientific

9   certainty" legal jargon?  Is that what you're saying?

10       Because I -- I'm gathering that maybe that's not actually,

11  like, a phrase that's scientists use in their work.  Like, they

12  just use it when they come to court?

13       **MS. WAGSTAFF:**  Yeah, that's probably correct.

14       **THE COURT:**  All right.  So -- but what does it mean?

15  Is it just -- is it just some -- is it just some fancy words to

16  sound impressive to a jury?  Or, like, what does it mean?

17       **MS. WAGSTAFF:**  It means -- I mean, we could have

18  asked them when they were here, but I would say that it means

19  more likely than not that it causes -- you know, that their

20  statement's that exposure to glyphosate causes non-Hodgkins

21  lymphoma based on the methodologies they used.  Yeah.  And it's

22  based on valid scientific methodologies.

23       **THE COURT:**  Okay.  Anything else you want to say

24  in -- sort of to wrap up?

25       **MR. WISNER:**  I've been asked to say one quick thing

1   for the Record.

2           THE COURT:  Sure.

3           MR. WISNER:  The first thing is in regard to the

4   other experts we haven't really been discussing today, it's one

5   thing to exclude, for example, a person's opinion that it

6   causes NHL; but within those opinions are a very detailed

7   subset opinions.  So, for example --

8           THE COURT:  It causes -- it's carcinogenic in

9   animals.  I get that.

10          MR. WISNER:  And so if there are going to be any

11  rulings on exclusions, we'd like the Court to carefully dissect

12  those issues --

13          THE COURT:  I get that.

14          MR. WISNER:  -- because if you strike an entire

15  opinion, that's a problem.

16      The other thing is Dr. Portier specifically has a lot

17  about epidemiology.  And he takes it from a statistical

18  perspective that we haven't discussed here.  And we didn't

19  present that, because we just, frankly, didn't have the time.

20  His reports were very lengthy.

21      But I think one principal point that I think has been lost

22  this week -- and that is:  Calculating the probability that you

23  would be seeing all of these estimates when there's really no

24  risk, because what we think of when there's really no risk is

25  you see it hugging the null on both sides.  Some spurious

1 chance results to the left.  Some to the right.  Some to the

2 left.  Some to the right.

3     And what we see consistently is --

4     **THE COURT:**  Well, no.  It's what we see consistently

5 only when we take out the studies that you guys don't like.  We

6 actually do see the studies are hugging the null, except when

7 we take out the studies that you guys don't like:  AHS.  And

8 then we see studies and that mostly fall on the -- on the right

9 side of 1.

10     **MR. WISNER:**  I don't think that's accurate,

11 Your Honor.  I think that you're right that AHS is lower.  I

12 mean, AHS -- just for what it's worth, the newest one says that

13 it is protective, essentially -- although you can't rule out

14 chance -- for every cancer.  I mean, it should be taken with

15 our eggs in the morning as a vitamin supplement.

16     That's -- I mean, obviously, I don't think anyone's saying

17 that; but I mean you have to look at that with that rubric.  So

18 that's to the left.

19     **THE COURT:**  No, it's not saying that.  It's --

20     **MR. WISNER:**  I know.  I know.  We can't rule out

21 chance.

22     **THE COURT:**  It's saying that it's statistically

23 insignificant Odds Ratio.

24     **MR. WISNER:**  I agree.  I agree.  I don't want to

25 misstate that.  You're right, Your Honor.

1    But if you actually include AHS -- and what we have done

2  in several of the forest plots -- and we're not -- Dr. Ritz

3  isn't the only one who does that.  Portier does, as well.  They

4  include all of the adjusted numbers, and they include all of

5  those.  And it's still to the right.  We still see it to the

6  right.

7    And the probability -- if you just look at the six main

8  studies, Your Honor, that Portier discusses, he did a

9  probability calculation.  And we all agree that they're

10  written.  And the authors, themselves, who are closest to the

11  data -- they say it's to the right.

12    Now, some of them aren't statistically significant -- I

13  appreciate that -- but they're all to the right.

14    The likelihood of that happening is 1.6 percent.  Right?

15  Two out of -- one out of fifty, basically.  And that's a pretty

16  powerful piece of evidence when you're trying to look at it

17  from a holistic perspective.

18    In any event, I just wanted the Court to pay attention

19  that Dr. Portier does a very sophisticated epi analysis.  And

20  he really understands this stuff.  Unfortunately, we didn't

21  have time to get into it during testimony.  I'd like the Court

22  to consider that in ruling out any of his epidemiological

23  opinions.

24    **THE COURT:**  Okay.

25    **MS. WAGSTAFF:**  And lastly, just based on a comment

PROCEEDINGS

1  that you made at the beginning, I'd like to reiterate that

2  Dr. Jameson and Dr. Portier, while they were at the IARC

3  meeting, they did, you know, rely on the underlying data and

4  the underlying studies, and not just what the IARC did.

5      In fact, Dr. Jameson went back and read some more data

6  that wasn't considered by IARC in full detail.  And so his --

7  while you can't separate him from IARC, because he was there,

8  he -- he definitely did re-look at or look at more data and all

9  of the epidemiological data.

10     And I would request that the Court look Seroquel opinion,

11  which is 2009 Westlaw 38064.

12         THE COURT:  How do you spell that?  What is it?

13         MS. WAGSTAFF:  S-e-r-o-q-u-e-l.  2009 Westlaw

14  3806435.

15         MR. LASKER:  3806 --

16         MS. WAGSTAFF:  38065435 -- where the Court was

17  considering an epidemiologist who didn't look at data that was

18  adjusted for confounders, and found that that was not the

19  reason for exclusion in that case.

20     And do you have any other questions for us?

21         THE COURT:  I mean, we could spend the whole weeks on

22  this.  And by the way, as I, you know, continue to look at it,

23  you know, I may put out questions, or I may ask for briefing on

24  something if there's some hole -- important hole in what has

25  been presented so far.

1          **MS. WAGSTAFF:**  One thing that's probably important

2    that Your Honor appreciates is that the two epidemiologists

3    differ on the effect of adjusting on Odds Ratios.  Mr. Lasker

4    said this morning that, you know, if you adjust, it doesn't

5    affect the Odds Ratio; it just affects the confidence interval.

6    And that's just not the case.  If you figure just doing a --

7          **THE COURT:**  No.  It affects both.  It affects both.

8          **MS. WAGSTAFF:**  Okay.  All right.

9          **THE COURT:**  Okay.

10          **MS. WAGSTAFF:**  Excellent.  Thank you.

11          **THE COURT:**  Thank you.

12          **MR. LASKER:**  Your Honor, a few clarifications.  We

13    may not need them, but I just wanted to make some factual

14    clarifications for the record on a few points.

15          **THE COURT:**  Just two minutes --

16          **MR. LASKER:**  Two minutes is all it will take.

17          **THE COURT:**  -- or less.

18          **MR. LASKER:**  The NAPP manuscript on page 12 that

19    plaintiffs' counsel pointed you to has a 1.13 Odds Ratio on

20    that page for adjusted for pesticides, so I wanted that to be

21    clear on the record.

22      Two.  McDuffie, which plaintiffs' counsel stated Dr. Ritz

23    provided adjusted data for -- McDuffie did not adjust for other

24    pesticides.  The adjustment was for something else.

25      And, third, with respect to the claim that De Roos 2003

PROCEEDINGS

1  adjusted for every possible other cause of NHL, so only

2  glyphosate was left -- Dr. Nabhan, at page 826 in the hearing

3  testimony, testified that 70 percent of all cases of

4  non-Hodgkins lymphoma have unknown causes.

5      That's it.

6          **THE COURT:**  Great.  Thank you.

7          **THE CLERK:**  Court is adjourned.

8      (At 1:02 p.m. the proceedings were adjourned.)

9  I certify that the foregoing is a correct transcript from the

10 record of proceedings in the above-entitled matter.

11

12 *Lydia Zinn*

13 _____   March 15, 2018

   Signature of Court Reporter/Transcriber   Date

14 Lydia Zinn

15

16

17

18

19

20

21

22

23

24

25