Pages 1  -  177

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

IN RE:  ROUNDUP PRODUCTS          )  No. M-16-2741 VC
LIABILITY LITIGATION,             )  San Francisco, California
_____)  Wednesday
                                     April 4, 2018.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**        ANDRUS WAGSTAFF, PC
                          7171 West Alaska Drive
                          Lakewood, CO  80226
                          (720) 255-7623
                    BY:  **AIMEE H. WAGSTAFF, ESQ.**
                          **DAVID JACKSON WOOL, ESQ.**


**For Plaintiffs:**        ANDRUS WAGSTAFF, PC
                          6315 Ascot Drive
                          Oakland, CA  94611
                          (720) 255-7623
                    BY:  **KATHRYN MILLER FORGIE**


**For Plaintiffs:**        BAUM HEDLUND ARISTEI AND GOLDMAN, PC
                          12100 Wilshire Boulevard, Suite 950
                          Los Angeles, CA  90024
                          (310) 207-3233
                    BY:  **ROBERT BRENT WISNER, ESQ.**


                          WEITZ & LUXENBERG, PC
                          700 Broadway
                          New York, New York 10003
                          (213) 5578-5802
                    BY:  **ROBIN L. GREENWALD, ESQ.**

         (APPEARANCES CONTINUED ON FOLLOWING PAGE)


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

**APPEARANCES:  (CONTINUED)**

**For Defendant**            HOLLINGSWORTH, LLP
**Monsanto Corp.:**          1350 I Street, NW
                             Washington, DC  20005
                             (202) 898-5800
                             **ERIC GORDON LASKER, ESQ.**
                             **HEATHER ANN PIGMAN, ESQ.**
                             **GRANT HOLLINGSWORTH, ESQ.**


**ALSO PRESENT:  The Honorable Ioana Petrou**

                          _   _   _

<u>**Wednesday - April 4, 2018**</u>                                    <u>**10:05 a.m.**</u>

<u>P R O C E E D I N G S</u>

---o0o---

**THE CLERK:**  Calling Case No. 16-MD-2741, In Re

Roundup Products Liability Litigation.

Counsel, please state your appearances for the record.

**MS. WAGSTAFF:**  Good morning, Your Honors.  Nice to

see you both again.  Aimee Wagstaff for the plaintiffs.

And with me I have Robin Greenwald, David Wool, Brent

Wisner and Kathryn Forgie.

**MS. FORGIE:**  Good morning, Your Honor.

**MS. GREENWALD:**  Good morning.

**THE COURT:**  Hello.

**MR. LASKER:**  Yes, your Honor.  Eric Lasker for

Monsanto.  And I have Heather Pigman and Grant Hollingsworth.

**THE COURT:**  Hello.

**MR. HOLLINGSWORTH:**  Good morning.

**THE COURT:**  Okay.  So this is the day to continue

hearing from Dr. Ritz.  As I think I mentioned to you-all when

I got you on the phone recently, I wanted to start with my own

follow-up questions of Dr. Ritz and any questions of course

that Judge Petrou has, but after that, happy to give both sides

an opportunity to, you know, follow up with her as well.

Who do you-all think should go first -- or go second after

me?

PROCEEDINGS

1          **MS. WAGSTAFF:**  Your Honor, we were sort of thinking

2     that plaintiffs would go second.

3          **THE COURT:**  Okay.  That's fine.

4          **MR. LASKER:**  I'm not sure I understand.  Second after

5     the judge or second after us?

6          **MS. WAGSTAFF:**  I assume -- we were thinking that it

7     would go judge, judge; judge, judge, judge; and then

8     plaintiffs.

9          **MR. LASKER:**  That's fine.

10          **THE COURT:**  Okay.  That sounds good.  And we'll try

11     not to disappoint you.  And we'll take -- we'll take as much as

12     time as we need with Dr. Ritz.

13          I think one of the problems, you know, one of the problems

14     is that Dr. Ritz went first, and I personally did not -- you

15     know, I was -- I was not in as good a position to ask her

16     questions as I would have had she testified on Friday at the

17     end.  And I think also everybody was a little rushed because of

18     the time constraints that we had.

19          On reflection I think, you know, we -- we did not schedule

20     enough time during that week to talk to the experts, and so

21     that's why I wanted to have a couple more days.

22          So anyway, with that, why don't we go ahead and have

23     Dr. Ritz take the stand.

24

25

PROCEEDINGS

1                    **BEATE RITZ**,

2    called as a witness for the Plaintiff, having been duly sworn,

3    testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.  Please be seated.

6              **THE COURT:**  Welcome back.

7              **THE CLERK:**  Judge, can I get --

8              **THE COURT:**  You're going to go ahead and get her name

9    and spelling?

10             **THE CLERK:**  Yes.

11             **THE COURT:**  Thank you.

12             **THE CLERK:**  For the record, please state your first

13   and last name and please spell both.

14             **THE WITNESS:**  Beate Ritz.  B-E-A-T-E, R-I-T-Z.

15             **THE CLERK:**  Thank you.

16             **THE COURT:**  Thank you for coming back.  I know you

17   were in Europe until very recently, so I hope you're not too

18   jet lagged.

19             **THE WITNESS:**  It's all right.  But if I start

20   speaking German, you'll remind me.

21             **THE COURT:**  So one of the big concerns I have still

22   after hearing all the testimony the other week is about the

23   issue of latency.  And it seems to me that all of the numbers

24   that the plaintiffs are relying on, all of the numbers that the

25   plaintiffs view as favorable to them come from these, you know,

PROCEEDINGS

```
 1   pools of people in the United States and in Canada.  I guess

 2   particularly the pool -- I'm concerned about the pools from the

 3   United States.  Come from pools of people who were diagnosed

 4   with NHL in the late '70s, early '80s, maybe spanning til the

 5   mid-'80s.  And glyphosate was only introduced onto the market

 6   in '75 or '76, something like that.  I don't remember --

 7             THE WITNESS:  '75 I think.

 8             THE COURT:  '75.  And so their initial exposure to

 9   glyphosate in many, many of those cases was less than ten years

10   before being diagnosed with NHL.  I think in a number of cases

11   less than eight years, less than seven years.

12        And as I said, that appears -- it appears that all of the

13   numbers that the plaintiffs rely on to support their argument

14   that glyphosate is causing NHL come from those pools of people,

15   or primarily from those pools of people.  And that strikes me

16   as a significant concern about the reliability of those

17   numbers.

18        And so that's the first issue that I -- I'd love for you

19   to address.  And keep in mind -- I mean, give me as long and as

20   detailed an answer as you want with as much background as you

21   want, keeping in mind I'm a layperson.  I'm not a scientist.

22        So go ahead.

23             THE WITNESS:  Yeah.  So latency is interesting, as

24   you said.  Generally when we do an epidemiologic study, we

25   would like to follow people for cancer for a very long time.
```

PROCEEDINGS

```
 1        However, when I say that, that's usually a study
 2   designed -- we call it cohort study design.  We start with
 3   people who are exposed and unexposed, and we are actually
 4   excluding everyone who has the disease at baseline.  We even
 5   exclude people who would get the disease one or two years after
 6   baseline --
 7             THE COURT:  You're talking about in a cohort.
 8             THE WITNESS:  In a cohort, right.
 9             MS. FORGIE:  Doctor, just to interrupt for a second.
10   Could you speak a little bit slower for the court reporter and
11   a little louder, please?  Thank you.
12             THE WITNESS:  And -- and that is for exactly that
13   reason that we are assessing exposure at baseline.  And what we
14   are knowing about it at baseline is probably not reflecting the
15   causative type of exposure in the first year or what already --
16   I mean, the cancers that we are harvesting at baseline or in
17   the first two or three or sometimes five years.
18        So in a case-control study, that's why in a cohort we
19   definitely want to make sure that we have a minimum of five
20   years of follow-up, because we are very concerned about, you
21   know, do we have the timing right and have we waited long
22   enough to actually see an increase in cancer.
23             THE COURT:  But, I mean, I was -- my primary concern
24   is about --
25             THE WITNESS:  The case control.
```

1          **THE COURT:**  -- the case control studies.  But since

2     you bring up the cohort studies, let's take a quick detour and

3     let me ask you about the cohort studies.

4          I mean, let's say we start following these people in year

5     one, right, and we follow them for five years.

6          I understand why that would be a problem if we are only

7     looking at what they are being exposed to beginning in year

8     one, but if we start following people in year one and we have

9     information about their exposure the last 10 or 20 years, why

10    is it a problem that we're only following them for five years?

11         **THE WITNESS:**  It is a problem if we don't see

12    anything, because it could mean that what they reported at

13    baseline is not really a good reflection of the exposure.

14    Because what we are after is the best exposure contrast we can

15    get.

16         And the further these people have to remember backward --

17    and remember, they have no reason to really, you know, want to

18    remember or make a big effort.  They are just being asked:

19    Hey, do you want to be in the study?  And, you know:  Here is a

20    questionnaire, please fill it out.  Then we are quite concerned

21    when that time period goes too long backward that they are not

22    making that effort.

23         So I'm -- I'm probably not comfortable about what they are

24    reporting for the last few years and for a long time period

25    back.  So that's one reason.

1        The other reason is that I really would be concerned about

2   the timing.  Sometimes cancers take a little bit of -- longer

3   to be diagnosed, depending on the patient really picking up on

4   symptoms.  So you may be picking up some that, you know, in the

5   first few years that really are -- have already a longer

6   history, but you -- it took awhile to come to diagnose.  So the

7   temporality is really not all that clear as to when the

8   exposure first started.

9        Of course, if it's 10 years or 20 years ago, that's not a

10  problem.  But if it's really in that last five years, then it's

11  a little bit more wishy-washy.  So it's more cleaner if we have

12  a follow-up in a cohort study, we generally agree on that.

13       Some cohorts actually make rules of, well, the first five

14  years we really don't count anyone and then after the five

15  years we start because we have a clean slate.  So that's the

16  cohort.

17       But in a case-control study we go the other way around.

18  We accumulate the cases and at the time when the case occurs,

19  we then go out and find controls from the population and we ask

20  them about their exposures.

21       So in this case if you have an exposure that only reaches,

22  let's say, five to seven years back -- and that was, I think,

23  the time in one of the studies, was five to seven years, and

24  the other 8 to 11 years maximum, 11 years -- then my worry is

25  that depending on when the exposure actually happened, but also

1    how long it took for the cancer to develop.  I'm only seeing

2    the early birds of the cancers.

3        So those would be the cases where the exposure was either

4    strong enough to have initiated a -- a cancer event or the

5    cases that were the most aggressive.

6        So I'm actually harvesting the most aggressive cases in

7    the very early period and exposures that are maybe more

8    moderate but cumulative over time wouldn't have had a chance

9    yet to show the cases that come later.  So I think the concern

10   with the early studies is that assuming that, you know, I did

11   my job right with the exposure assessment, those were probably

12   the most aggressive cases.

13       Does that make sense for these early studies?  It could be

14   if we think about how farmers at the time used pesticides and

15   what they were used to.  They were used to pesticides that were

16   quite toxic.  The pesticides in the 1960s, a lot of them were

17   quite toxic and they were warned, or they had slight symptoms

18   of fever or of any flu-like symptoms when they exposed

19   themselves, these organophosphates.  And then glyphosate came

20   along and they were not considered to be really very toxic to

21   human beings.

22       So we could see that, you know, these farmers were

23   possibly not taking the same precautions as they should have.

24   And so what it might mean, these early studies, is that we have

25   a lot more not protected exposure in people who did not -- who

 1   did not really think about glyphosate being very harmful.

 2            **JUDGE PETROU:**  Dr. Ritz, would it be fair to say then

 3   that it's your opinion that NHL could develop within the 5- to

 4   11-year time frame in these studies --

 5            **THE WITNESS:**  Yes.

 6            **JUDGE PETROU:**  -- based on your assumption,

 7   presumption, you tell me what it is, that the workers were

 8   using glyphosate in an unprotected manner?

 9            **THE WITNESS:**  Absolutely.  We generally -- I mean

10   for -- for solid cancers, I would pause.  But for blood-related

11   cancers, we know that two years might be enough.  Five years

12   might be enough.  And I did a radiation worker study.  For the

13   leukemias and lymphomas we could go back to 2- and 5-year

14   latency.  We would not go to 10 years.  But for the solid

15   tumors you would pause and say, well, maybe ten years.  But,

16   really, for blood-related cancers they are faster.

17            **THE COURT:**  Well, so if I could -- if I could ask you

18   a follow-up question on that point, Dr. Ritz.

19       I'm looking at your expert report, your report that you

20   submitted, and I -- I have to say that it seems like you said a

21   number of things in that report that contradict what you're

22   saying now about the issue of latency.

23       I'm looking at -- do you have your report in front of you?

24            **THE WITNESS:**  Which one?  Yes.

25            **THE COURT:**  Your original expert report.

PROCEEDINGS

```
 1              THE WITNESS:  Yes.

 2              MR. WISNER:  Exhibit 1.

 3         It's also in the binders if you want a hard copy, Your

 4    Honor.

 5              THE WITNESS:  What page?

 6              THE COURT:  Start on Page 17.

 7              THE WITNESS:  Yes.

 8         Oh, I have a deposition here.  Exhibit 1, yes.  Sorry.

 9              MS. FORGIE:  Do you need help finding it?

10              THE WITNESS:  No, I've got it.

11              JUDGE PETROU:  Just a side note, though, because I am

12    looking at the binder.  It says Exhibit 1 is the expert report,

13    but then Exhibit 1 does appear to be the deposition transcript,

14    as Dr. Ritz just noted.

15              MR. WISNER:  In the tab it should say Exhibit 1

16    after --

17              JUDGE PETROU:  I see how you did it.

18              THE WITNESS:  I got it.

19              MR. WISNER:  The deposition transcripts are

20    technically not exhibits.

21              MS. FORGIE:  Is that clarified enough?  Thank you.

22              THE COURT:  So I'm looking at the middle of Page 17,

23    and in this report of your report you're talking about the

24    Eriksson study; right?

25              THE WITNESS:  Yes.
```

1          **THE COURT:**  And you're talking about the part of the

2    Eriksson study that analyzed -- that focused on people who were

3    diagnosed more than ten years after they started using

4    glyphosate; right?

5          **THE WITNESS:**  Yes.

6          **THE COURT:**  You say:

7          "These results are more convincing due to

8      biological plausibility; in the group in which less

9      than ten years had elapsed since exposure, the effect

10     estimate was much lower, as would be expected since

11     these exposures are less likely to contribute to

12     disease onset."

13         And then if you go to the bottom of Page 18, when you're

14   talking about the Cantor study.  And the Cantor study, that's

15   the cases in Iowa and Minnesota; is that right?

16         **THE WITNESS:**  Yes.

17         **THE COURT:**  You -- you say that:

18         "Less informative for the current evaluation is

19     the Cantor study because, although it was carefully

20     conducted, cases were included that were diagnosed

21     1980 to 1983.  Hence, only six to ten years could have

22     elapsed between a potential first glyphosate exposure

23     and NHL diagnosis, which for cancer epidemiologic

24     studies is considered an inadequate latency period and

25     one would want to see at least the median latency

PROCEEDINGS

1    period of ten years."

2         And then you say:

3              "Again, for an individual the latency period may

4         vary (one year to many decades), but on average for a

5         study one would prefer a minimum latency period of on

6         average ten years."

7         So it -- it seems to me at least as a lay person that what

8    you are now saying about latency is different from what you

9    said in your report.  If that's true, can you explain why

10   you're changing; and if it's not true, explain to me why it's

11   not, not true?

12        **THE WITNESS:**  You asked me to explain why I say this

13   here.  Well, I'm generally a conservative human being and this

14   report I consider the conservative way.

15        So the Cantor study wasn't what I base my opinion on, and

16   I wanted to make that very clear.  And so I'm -- I'm phrasing

17   here very carefully what usually would be expected in cancer

18   studies.  And I apologize if I didn't qualify that for

19   blood-related cancers.  I thought I did, but I guess I didn't.

20        But my saying that for any individual it could be one year

21   or 20 years or 50, whatever I said, is actually true.  We want

22   the average latency to be covered by the study.  If the average

23   latency is really ten years, then what I'm saying is Cantor

24   actually underestimates.  It's not the best study to base this

25   on.

PROCEEDINGS

```
 1         However, I wouldn't be too concerned because they are
 2   actually seeing something.  But if we want to be conservative,
 3   we would actually want to do these studies later.
 4              THE COURT:  But, so I -- so a question about that
 5   last point.  You say they are seeing something.
 6              THE WITNESS:  Right.
 7              THE COURT:  Right?  And I guess -- I don't yet
 8   understand whether they really are seeing something.
 9         In other words, these studies, depending on how you look
10   at the numbers, show a -- potentially show a statistically
11   significant association between NHL and glyphosate use.
12              THE WITNESS:  Right.
13              THE COURT:  But the question is that -- we're trying
14   to answer is whether it's merely an association or there is
15   causation.
16              THE WITNESS:  Correct.
17              THE COURT:  Right?
18              THE WITNESS:  Uh-huh.
19              THE COURT:  And I think the concern with the latency
20   issue, right, is that when somebody has NHL -- or if somebody
21   is diagnosed with NHL and they only began being exposed to
22   glyphosate five years prior, the sort of automatic question we
23   all would ask, I think, given what we've been told by you and
24   others about latency, is that -- is, well, is something else
25   causing the NHL?  Is -- is something that these people were
```

PROCEEDINGS

1   exposed to more than ten years ago causing the NHL?

2       And so my question is:  How do we know that it wasn't

3   something else that was causing the NHL that the people in

4   these groups were being exposed to before they started being

5   exposed to glyphosate given particularly that we know that

6   farmers have always had elevated cases of NHL?

7           THE WITNESS:  Right.  I would be completely of your

8   opinion if I would base my opinion on Cantor.  I wouldn't know.

9           However, Anneclaire De Roos did something very beautiful.

10  She combined these studies.  And by combining these early

11  studies she was then able to do a lot of analyses, including a

12  47 pesticide adjusted analysis that still found a significant

13  and a multiply adjusted significant result.

14      None of the early studies could have done that because of

15  the number of cases exposed to glyphosate.  They did not -- it

16  wasn't enough in any one of the studies to actually properly

17  adjust for other pesticides.  So that question could not be

18  solved or answered in the early studies.

19      So the -- the De Roos study is really so beautiful because

20  it allows us this pooling of data and then it allows us to do

21  exactly that.

22      So I would be completely with you if it was just Cantor.

23  And that's what I also was trying to say in my expert report.

24  I would dismiss it.  But after De Roos, pooling all of this

25  data and then being able to adjust for all of these different

PROCEEDINGS

1    pesticides and still finding an increased risk and multiply

2    adjusted increased risk, I find that convincing.

3        **THE COURT:**  Okay.  And so I think you may have

4    answered this, but I'll -- let me just make sure.

5        So by adjusting for other pesticide use, that addresses

6    the concern that I am expressing about latency.  That is to

7    say, the -- the adjusting for other pesticide use in this

8    context tells us, okay, you don't have to worry about whether

9    this association that we're seeing between glyphosate use and

10   NHL is actually attributable to these farmers' use of MCPA, you

11   know, 15 years prior or whatever; is that right?

12       **THE WITNESS:**  That is correct.  Because you would

13   assume that if really it was just an indicator, glyphosate was

14   just an indicator of prior MCPA use, then putting that variable

15   into the model would have taken care of it.

16       And that would not have been possible in the Cantor study

17   because of the numbers, but it was possible in De Roos.  And,

18   therefore, because you have now a lot more cases and a lot more

19   exposed cases, but you also have a lot more controls.  So

20   you're filling up these cells in a way that you're actually now

21   allowing your model to work for adjustment.

22       When you have any one of these studies, you can't do it

23   without generating, pooling or having zero cells or your model

24   collapses.  It basically collapses.  So you're stuck with not

25   being able to adjust.

PROCEEDINGS

```
 1        Or if you adjust, what can also happen -- and that's
 2   actually one thing I was trying to do with my visual
 3   recommendation, one of them on Hardell, the early Hardell
 4   study.  We can see that we generate something called sparse
 5   data bias, meaning we have so few cases and we throw so many
 6   variables into the model that I know there must be a lot of
 7   zero cells, so the model misbehaves.
 8        And then you actually have a bias introduced that
 9   increases the risk.  And it looks like glyphosate has a
10   five-fold risk when the univariant model only shows you 2.3
11   fold.  And I would then go with the 2.3 fold because I know
12   this model must have not behaved.
13        That's not the case in De Roos.  De Roos was actually able
14   to have enough numbers to do the proper adjustment.
15             THE COURT:  Another thing I'm curious about, this may
16   be a dumb question, but we have these case-controlled studies
17   and they are on -- all look at people -- McDuffie was later.
18             THE WITNESS:  Yes, '92.
19             THE COURT:  McDuffie looked at people who were
20   diagnosed with NHL in the early 90's.
21             THE WITNESS:  Early 90's, uh-huh.
22             THE COURT:  But these other North American pools are
23   looking at people who were diagnosed with NHL late '70s, early
24   80's, mid-80's.
25        Sorry.  Were you going to...
```

1          THE WITNESS:  They were actually -- there was only

2    one study that started in 1979.  The others were '80 through

3    '86.

4          THE COURT:  Okay.  And we're now in 2018; right?

5          And we have had many papers written about these studies of

6    people who were diagnosed with NHL in the 80's and people are

7    crunching the numbers and re-crunching the numbers and

8    re-crunching the numbers.

9          But why have there not been any -- why have there not been

10   any case-controlled studies of people who were diagnosed with

11   NHL in the late 90's or in 2005 or 2010 or whatever?

12         THE WITNESS:  I can venture some guesses.  One was

13   the Hardell study in 1993, and everybody thought that would

14   give us the answer.  So it's actually NIH.  One, they invest in

15   one study that they believe is the Cadillac.  Reviewers are

16   very reluctant to spend more money on something that they

17   consider may be inferior, which is a case-controlled study;

18   right?  And I disagree with those reviewers.

19         There was also -- when I started as a young professor in

20   1995, there was almost no money in occupational and

21   environmental epidemiology.  And the Hardell study was funded

22   within NIH, but for external funds.  There was no money.  And I

23   struggled for four years to get money, and I finally got the

24   State of California to give me my first cancer study in 1999.

25         So it was really hard to convince reviewers at NIH that

PROCEEDINGS

1    occupational and environmental exposures were important.  And,

2    unfortunately, I have to say it didn't change much.  It was the

3    genomic era and it was the nutrition era and everybody wanted

4    to study just that.  And when you came with a proposal saying:

5    Oh, I want to study pesticides, you really had an uphill

6    battle.  And on top of it, you had the Hardell study that

7    everybody was pointing to saying:  They will answer it.  Right?

8    We just have to wait.

9         Yeah, I wish that hadn't happened, but that's how research

10   is, unfortunately, funded.

11              THE COURT:  There are currently no case-controlled

12   studies being done on the link between glyphosate and various

13   cancers?

14              THE WITNESS:  I would doubt it.  For the U.S. I don't

15   know.  Of course, the Swedes then started up, so there might be

16   other countries who are now investigating this; right?  Yes.

17   And definitely the Scandinavian countries are forerunners of

18   this kind of research.  So I hope they will put out more

19   research.

20              THE COURT:  Speaking of which, that reminds me of

21   some testimony you gave when you were last here on the

22   Eriksson study.  And let me see if I can remember the concept

23   you were articulating, but I think maybe you didn't have enough

24   time to fully explain.

25         You have had a criticism of the Eriksson study and the

PROCEEDINGS

1   criticism, if I recall correctly, was that the Ericksson study

2   compared people who were exposed to glyphosate and other

3   pesticides to people who were not exposed to any pesticides at

4   all.  And you explained -- it seems rather obvious why that's a

5   real problem, and you explained to us that that's a problem.

6        And then you said during your testimony that you were able

7   to adjust for that and still extract some value from the

8   Ericksson study and -- but that part of your testimony was

9   pretty quick and I don't think you had enough of a chance to

10  explain what you did and why what you did resulted in helpful

11  numbers.

12            THE WITNESS:  I totally agree.  That wasn't clear.

13  So what you can do is when you -- when the authors actually

14  provide you with some raw data, which is the numbers exposed

15  and unexposed, you can actually reconstruct the number of

16  unexposed that you should have who were also exposed to other

17  pesticides from those tables.

18        So I was able to reconstruct that number --

19            THE COURT:  Let me stop you right there and ask a

20  clarification question.

21        So you're saying that in the pool of people that Ericksson

22  looked at, there were -- there were cases.  Those people were

23  exposed to glyphosate and other pesticides.  There were

24  controls, and some of the controls were not exposed to any

25  pesticides and other of the controls were exposed to other

PROCEEDINGS

 1    pesticides?

 2              THE WITNESS:  Correct.

 3              THE COURT:  So what Ericksson did in the paper was to

 4    remove the controls who were not exposed to glyphosate, but

 5    exposed to other pesticides?

 6              THE WITNESS:  Yes, exactly.  And so they had a group

 7    of controls that had no other pesticide exposure.  It may sound

 8    like a good idea.  I think that's why they tried it.  But when

 9    you -- when you do a formal analysis in --

10              THE COURT:  I don't understand why that would ever

11    sound like a good idea to anybody.

12              THE WITNESS:  That's good.  I agree.  I totally

13    agree.

14         But sometimes clinical colleagues think it's a cleaner

15    control group if they are not exposed to other pesticides.  And

16    these arguments, I've seen them being made, that that's a

17    cleaner control group; right?  They have no other pesticide

18    exposures.

19         So we're really only comparing the glyphosate exposure in

20    the controls to the glyphosate exposure in the cases, and we'll

21    ignore that the cases have maybe also some other pesticide

22    exposure; right?

23         It's not a good idea, but I was able to reconstruct the

24    control numbers with other types of pesticide exposure.  So,

25    and then to calculate what we call a crude odds rate ratio,

PROCEEDINGS

 1   which is just a cross product.  And that crude odds rate ratio

 2   was about ten percent different from the one that they

 3   reported.  That could be because I couldn't adjust for age

 4   because I didn't have the raw data, and I couldn't adjust for

 5   sex and province, all the variables they adjusted for.

 6        But when I did this -- and we were too fast last time.

 7   You remember that visual representation that we call forest

 8   plot, but I don't want to call it forest plot?  At the bottom

 9   there were all these other subtypes of NHL listed.  And that --

10   I did that for a purpose, because actually the Ericksson

11   subtypes -- and when you read that paper carefully, it says in

12   those analyses he used all controls.  So they don't have that

13   problem, these subgroup analyses.  And they are adjusted for.

14   Age and sex and everything else he adjusted for.

15        So when you then kind of scan along and you look at the

16   largest group, which I think was B-cells, and it was 800 out of

17   the 900 about, then you can actually see that that estimate is

18   also about 1.8 something, 1.9.  And it is the largest group of

19   NHL.  And so that would really then weigh the heaviest in the

20   overall estimate.

21        So I was quite comfortable with my crude estimate being

22   very close to an adjusted estimate when you're including every

23   single control and not just the ones who -- or excluded the

24   ones who had any other pesticide exposure.

25             THE COURT:  Is there -- do you recall, is there any

 1    explanation of the numbers you came up with or the estimate you

 2    came up with in your reports?

 3            THE WITNESS:  An explanation on the Ericksson study?

 4            THE COURT:  Yeah.

 5            THE WITNESS:  An explanation in this way?

 6            THE COURT:  Yeah.  An explanation of how you

 7    addressed the problem of Ericksson deciding to use only the

 8    controls who hadn't been exposed to other pesticides and how I

 9    think you said that, you know, the numbers -- your estimate is

10    that they were within ten percent of the numbers.  Is there

11    anything sort of laying out --

12            THE WITNESS:  I'm not sure I was as explicit because

13    it becomes very technical and -- to explain this.  And then you

14    could say:  Well, you didn't adjust for age, and that's a

15    problem.

16       So I could have hesitated to really do that, but I

17    convinced myself that the numbers that Ericksson reports are

18    not too far off the truth.  If they are within ten percent,

19    epidemiologists are generally happy.  That's kind of the rule

20    of thumb.

21       So it might be that I haven't really explained how I got

22    to that -- how I convinced myself that that's correct, but I do

23    remember that one reason I put in this visual graph, I put all

24    those numbers was because I then found that they had actually

25    used the full cohort set and not a subgroup.  So that bias

PROCEEDINGS

 1   could not have been in the subgroup.

 2            THE COURT:  For the subtypes.

 3            THE WITNESS:  Yes.

 4            THE COURT:  Before I ask you a follow-up question

 5   about the subtypes, for the overall number where you sort of

 6   put the -- put the controls back in, who had been exposed to

 7   pesticides and then sort of did your -- did your estimate where

 8   you were unable to adjust for age and gender and things like

 9   that, were those -- was all that stuff adjusted for other

10   pesticide use or were these the numbers that were not adjusted

11   for other pesticide use?

12            THE WITNESS:  They don't report -- oh, they report

13   the multi-variant analysis as well.  So I couldn't do that;

14   right?  I didn't have age.  I also didn't have -- and so that's

15   why I hesitated; right?  That is a problem.

16        However, you remember that when you're adjusting, what

17   you're actually trying to do is simulate a clinical trial where

18   you are taking care of confounding by randomizing.  Meaning,

19   you're assigning the treatment to the two groups in a random

20   way.

21        And the reason why we do this in medicine, randomly

22   assigning treatment, is because then confounding in the long

23   run is actually taken care of because you are distributing all

24   risk factors across the treated and untreated group or the

25   exposed and unexposed group fairly.

PROCEEDINGS

 1          So you still have other risk facts that are causing the
 2     outcome, but they are kind of distributed randomly so they can
 3     not influence the outcome in one group more than in the other.
 4          So what we are trying to do with adjusting for confounding
 5     is recreate this kind of evenness in all other risk factors
 6     except for the exposure.  So that's -- that's really what we're
 7     after.
 8               THE COURT:  And so on the -- on these numbers up here
 9     on the screen, the break it down by subtypes, you say that
10     these -- these numbers are based on all of the controls?
11               THE WITNESS:  Yes.
12               THE COURT:  Not just the controls who were unexposed
13     to other pesticides?
14               THE WITNESS:  Correct.
15               THE COURT:  But these numbers are also not adjusted
16     for exposure to other pesticides; correct?
17               THE WITNESS:  They couldn't do that because of the
18     number game.  Again, they would have run --
19               THE COURT:  In other words, the pool -- the pool of
20     people in each subtype is too small --
21               THE WITNESS:  Yes.
22               THE COURT:  -- to adjust for other pesticide use.
23               THE WITNESS:  Right; right.
24               THE COURT:  Okay.
25          Does this -- I mean, discussion about Ericksson, does that

PROCEEDINGS

 1    leave you feeling that, you know, the De Roos 2003 study is

 2    much more useful study than Ericksson?

 3         **THE WITNESS:**  I find De Roos very, very useful.

 4    Definitely I would prefer her.

 5         However, I think there is a lot to Ericksson.  There

 6    really is a lot to Ericksson.  It's a large study.  It's one

 7    outside the U.S.  And it's otherwise quite well done because

 8    they have such wonderful data, cancer data, as well as the way

 9    they do their studies is very solid.  I wish they had tried to

10    adjust more.

11         However, I think they present their results in that

12    multi-variant model very fairly, fair and square.  And I am

13    still okay with the 1.5, a 50 percent increased risk after

14    adjustment.  I'm fine with that.  Especially since they then

15    later also did the ten days per year analysis and, you know --

16    and that kind of confirmed it for me.

17         **THE COURT:**  That reminds me of another question I

18    have about Ericksson.  But first Kristen has asked that we take

19    a break because of a technical issue.

20         To give you extra time, why don't we take an extra break

21    and come back in at five minutes to 11:00.

22         (Whereupon there was a recess in the proceedings

23          from 10:44 a.m. until 11:06 a.m.)

24         **THE COURT:**  Okay.  Let me ask you a couple other

25    questions about latency maybe and then we can -- we can move

PROCEEDINGS

1    on.

2        By the way, was there anything that you wanted -- that

3    we've discussed so far that you wanted to clarify or elaborate

4    on or anything?

5            THE WITNESS:  Actually, while I was sitting here, I

6    realized that I hadn't made it very clear what latency means in

7    terms of biology.

8        So when we think about latency, it is not only a question

9    of when the exposure happened, but at what age the exposure

10   happened.  And we now know that there are actually periods that

11   are much more sensitive.

12       So, for example, it could be very different if I expose a

13   55- or 60-year-old farmer than a 35- or 40-year-old.  And in a

14   case-controlled study that is kind of a given.

15       So if I only have five to ten years of latency, it means

16   the exposure actually happened in the five to ten years prior

17   to the onset of the disease, which naturally, because all of

18   these individuals are older, means they were exposed at an

19   older age.

20       In a cohort studies that is not -- and I presume -- I do

21   elderly studies --

22           THE COURT:  So when you say because all these people

23   are older --

24           THE WITNESS:  On average.

25           THE COURT:  -- you mean in the case-controlled

PROCEEDINGS

 1   studies, because we are looking at people who have already been

 2   diagnosed with NHL --

 3            THE WITNESS:  Yes.

 4            THE COURT:  -- by -- by definition or by logic, they

 5   are going to be older --

 6            THE WITNESS:  Yes.

 7            THE COURT:  -- than people we're looking at in a

 8   cohort study.

 9            THE WITNESS:  Correct.  Because in a cohort study we

10   actually are enrolling everyone; right?  So sometimes we set a

11   limit and say they have to be 25 or 35, especially when I want

12   to see cancer.  Because we all know, even though the people may

13   be exposed at 35, we have to wait until 60 on average to see

14   the cancer.

15        So the latency actually depends on how -- whether that

16   person reaches 60 or above.  So for lung cancer we know that,

17   you know, it's around 62, and for NHL, too, is the peak of the

18   cancer incidents.  So even though the exposure may have

19   happened at age 35, your immune system was able to keep it in

20   check.

21        And then with the weakening, we think now, with the

22   weakening of the immune system surveillance with aging, that's

23   what then brings it all on.

24        So I know when I do a study where I enroll 25-year-olds, I

25   probably should wait 30 years before I see something really

PROCEEDINGS

1    happening.

2        In the early years all I see are the very aggressive young

3    age cases that are unusual; right?  So in a case-controlled

4    study I don't have that problem because everybody who would

5    become a case already is a case.  And so if I only go five or

6    ten years back, then I know that was the exposure prior to that

7    event happening and probably during a lifespan that was more

8    susceptible or sensible.

9            THE COURT:  And so in the -- in the -- for the people

10   who De Roos looked at, do we know what the average or median

11   age was of the cases and the controls?

12           THE WITNESS:  Yes.  That is actually usually in

13   Table 1.  She may not have represented, but I just looked back

14   at one of them and it was about 62.

15           THE COURT:  Was the average --

16           THE WITNESS:  The average age.

17           THE COURT:  -- average or median?

18           THE WITNESS:  That's the average age.  It was

19   reported as the average age.

20           THE COURT:  For the cases?

21           THE WITNESS:  Cases.  And the controls are usually

22   matched by age, so they are about the same.

23           THE COURT:  Okay.  And then since we -- since we

24   bounced back to De Roos, let me ask you one more question about

25   that.  And this is sort of a more general question to make sure

PROCEEDINGS

 1   I understand the effect of adjusting for other pesticide

 2   exposure, okay?

 3        So what that means for De Roos, for example, is when we

 4   have these numbers showing an association between NHL and

 5   glyphosate exposure, the fact that adjustments were made for

 6   MCPA and other pesticides can give us confidence that the

 7   exposure to the other pesticides is not responsible for this

 8   association that we're seeing in the numbers for -- for NHL and

 9   glyphosate.

10            THE WITNESS:  Correct.

11            THE COURT:  We still are left to wonder whether

12   something else might have -- might be responsible for this

13   association, such as exposure to diesel fumes or excess

14   exposure to the sun or something like that; right?

15            THE WITNESS:  Yes.  We are left with everything that

16   we haven't adjusted for, assuming that those were similarly

17   distributed among the exposed and non-exposed.

18        So if I can come up with a reason why that's not the case,

19   and really every farmer who used glyphosate took sun baths

20   every day, and the ones who did something and used other

21   pesticides, you know, wore sunscreen or didn't go out in the

22   middle of the day, then that suspicion has a grounding in

23   reality.

24        So that's actually the job of the investigator, to think

25   about all the potential other risk factors that not only are

PROCEEDINGS

1    risk factors for the outcome, but also different among the

2    exposed and the unexposed and would, therefore, explain that

3    pattern that I see for glyphosate.

4         And I didn't read that the investigators thought that any

5    of that would be the problem.  What we usually hope is that

6    it -- yeah, there are all these other risk factors, but they

7    are kind of evenly distributed among the exposed and the

8    unexposed, unless I can come up with a true reason that that's

9    not the case.  Like, they did not allow smoking on the farms

10   that used glyphosate, or -- that's a bad example, but it's

11   actually true for woodworkers; right?

12        Woodworkers can't go and smoke in the wood shop.  So they

13   are likely not smokers and, you know, they have dust exposure,

14   but they have less smoking.  So there -- there a kind of

15   reason.  Even if I don't have smoking data, I should be worried

16   because the distribution would be different.  But if I can come

17   up with a reason why that would be the case, then I'm not so

18   concerned.

19        **JUDGE PETROU:**  I just want to go back one moment to a

20   make sure that I understand your testimony regarding age of

21   exposure and latency, since you raised that issue.

22        So is your point or one of your points that the age of

23   exposure is relevant in the sense that people who were using

24   glyphosate would be more susceptible to its potentially

25   deleterious impacts if they were older because of a weakened

1   immune system over time?

2       **THE WITNESS:**  It's actually both.  You caught that

3   right.

4       So one thing I -- I suppose could be that we say, yes,

5   with aging we know the immune system ages and the immune system

6   has issues in aging; right?  We see all of the herpes zoster

7   outbreaks in the elderly for good reason, because the immune

8   system can't check it anymore.

9       So yes, definitely when I am exposed at an older age, my

10  system may not be capable of coping with it.  And we call that

11  a susceptible group in terms of age of exposure.

12      But the other factor is really also the distinction

13  between the case control and the cohort studies, where in the

14  cohort studies I have a mixture of ages and for only the small

15  group that is close enough to the peak age of NHL can I expect

16  within a short period of follow up to see the cancers.  For the

17  others, even though they might have that cancer cell already

18  sitting somewhere, I might have to wait 20 years to see it

19  emerge, or 30 years.

20      **JUDGE PETROU:**  And the -- the individuals that we

21  commonly think that -- potentially being particularly

22  susceptible, such as in utero, infancy, puberty, periods of

23  time, right, when your body is going through very quick

24  cellular change in growth, those are not groups that we have at

25  issue here, because of the -- because of the item at issue

PROCEEDINGS

 1    basically.

 2              THE WITNESS:  Correct.  Correct.  Because it's

 3    occupational exposure.

 4         Yeah, I wish somebody had done a study on children who

 5    help on farms.

 6              THE COURT:  The one other question I had about the

 7    Ericksson study that I was mentioning before the break, can you

 8    talk to me in a little bit more detail the significance of

 9    Ericksson's conclusion about people who were exposed for

10    greater than ten years or longer than ten years before

11    diagnosis?

12         And then there was also some discussion you had in your

13    previous testimony about people, I believe -- I may be

14    misremembering this, but people who were exposed even longer,

15    like greater than 20 years, and how numbers dropped off for

16    that.

17              THE WITNESS:  Yes, yes.

18              THE COURT:  And I didn't -- I think that was, again,

19    another example of something that was gone through pretty

20    quickly in your prior testimony, and so I wanted to hear more

21    about that.

22              THE WITNESS:  Right.  So in Ericksson it seems that a

23    lot of the farmers they actually enrolled in the studies had

24    actually stopped farming.  So I don't think they really had the

25    exposures close to the onset of their -- their disease.

1          So they must have stopped when they were 60 and maybe

2    gotten the disease at 65.  So that's at least five years.  Some

3    got the disease at 70.

4          So that they saw most of the effect between 10 and 20

5    years, I think, was probably a reflection of them -- it taking

6    them a little longer to get to the disease because they may

7    have stopped farming earlier.

8          And I'm saying that because it looked from the patterns

9    of, you know, when they last farmed, et cetera, it seemed to

10   make sense that a lot of the --

11              THE COURT:  So they had -- sorry.  Let me interrupt

12   real quick.

13              THE WITNESS:  Yeah.

14              THE COURT:  So they had data about when they last

15   farmed?

16              THE WITNESS:  Yes, yes.

17              THE COURT:  Okay.

18              THE WITNESS:  I think so.  That's what -- I think

19   they asked them actually when they had used and the years they

20   had used.  And so that's the only way they can actually look at

21   latency.

22         They didn't explicitly say it, I think, but the only way

23   they could have actually constructed these variables was by

24   asking them; right?

25         And so 20 years-plus is probably harder for Ericksson to

PROCEEDINGS

1    get to because people used other pesticides, and I think the --

2    the glyphosate use came in vogue in Sweden in the '80s, more in

3    the mid-'80s.  So we kind of have that span of 20 years where

4    glyphosate exposure could have had happened.

5        So just because of that data structure, it is unlikely

6    that you find a lot of people who have more than 20 years'

7    latency just because the exposure couldn't have happened so

8    early.

9        You're restricted in your data.  I mean, you want to

10   really estimate this as good as you can, but you're restricted

11   by real-world situations where, okay, when did the exposure

12   happen?  How long did I follow these people?  When did they get

13   sick?  At what age were they exposed?  And you kind of deal

14   with it by looking at your data in different ways.  And I

15   thought they actually did a pretty good job of doing that.

16       **THE COURT:**  I'm kind of ready to turn away from the

17   issue of latency.  Is there anything else that you wanted to

18   say about that?

19           **THE WITNESS:**  I think we covered it.  Yeah.

20       **THE COURT:**  Okay.  Now, this -- this is an issue

21   we've talked about a little bit today and we've talked a little

22   bit about during your last testimony, but I want to explore it

23   further.

24       In the opinions that you provide in your reports and in

25   your testimony, you -- you place very heavy emphasis on numbers

PROCEEDINGS

```
 1   that are not adjusted for other pesticide use.  And I wanted to
 2   ask you sort of a methodological question, I guess, which is:
 3   Is it okay in, you know, forming an opinion like this to place
 4   such heavy emphasis on numbers that are not adjusted for other
 5   pesticide use when you have numbers that are adjusted for other
 6   pesticide use that you could be emphasizing instead?
 7            THE COURT:  I'm actually a little shocked that you
 8   say that because I didn't feel that I did that.  And I feel
 9   very misunderstood if that's what you read.
10            Definitely, I want to look at adjusted estimates.  I
11   looked at adjusted estimates.  But for the early studies, as I
12   said, I would be just as worried about that sparse data bias
13   which you throw everything in to the model.  And sometimes with
14   the multiply adjusted estimates, I'm a little worried about
15   them putting things in there that they shouldn't be putting in
16   there.
17            So if my critique came across as if I'm not -- I'm asking
18   not to adjust for other pesticides, that's not what I meant.  I
19   just -- what I tried to convey is that even though we are
20   generally having a knee-jerk reaction of, oh, just put
21   everything into the model, that is probably the wrong approach.
22   You have to think about which of the pesticides are risk
23   factors, are associated with glyphosate.  The number issue.
24   Can I adjust without introducing bias?  And all of that goes
25   into my evaluation.
```

PROCEEDINGS

1      And, yes, if I'm able to adjust for as much as I want to,

2   I definitely want to see those numbers, and I think that the

3   De Roos paper did a really good job in that.

4      So if it came across like I didn't look at those, that's

5   not what I intended.

6      THE COURT:  If you were asked to look only at numbers

7   that are adjusted for other pesticide use, and kind of assume

8   for the sake of argument that numbers that are not adjusted for

9   other pesticide use are not particularly useful, would that

10  change your conclusion about glyphosate causing non-Hodgkin's

11  lymphoma?

12     THE WITNESS:  Actually, I did put a plot together

13  where I just put the adjusted ones on.  And I still have all of

14  the estimates except for the AHS study on the right side of

15  that graph, that one.  Some of the confidence levels straddle

16  the one or go across.

17     However, those are the plain numbers that I could extract

18  where they did not do dose-response analyses, for example, or

19  where they didn't exclude the occasional users.

20     So as a scientist, I want to put that into the perspective

21  of what also happens if I try to exclude the occasional users

22  and only use the heavy users or if I try to get at a

23  dose-response like Ericksson actually did.  And if I put all of

24  that together, then, yes, I still believe that what I said is

25  correct; that even after fully adjusting, or maybe even

PROCEEDINGS

1    over-adjusting in my book, I would see that there is a risk

2    increase, except for the Andreotti study and the AHS.

3            THE COURT:  But is that -- but the numbers become

4    less stark when you adjust for other pesticide use.  And so the

5    question is, you know, you see an association, you query to

6    what extent it's statistically significant; right?

7            THE WITNESS:  Right.

8            THE COURT:  Is that enough, you know, when -- if you

9    combined it with the animal studies and the mechanistic data,

10   is that enough to conclude that glyphosate is currently causing

11   NHL in human beings?

12           THE WITNESS:  Well, when I put it all together, it

13   was enough.  And I have done a lot of pesticide studies and I

14   know what happens when you put a lot of pesticides in the same

15   model.  The estimates always shrink because farmers don't just

16   use one agent; right?  We wish we could do those studies.  We

17   really wish, but they don't exist.

18       So in human populations I just have to deal with the

19   reality of what's out there.  And sometimes, yes, they use two

20   carcinogens.  Sometimes one uses one and the other uses the

21   other.  And my -- my model can only do what it does.  And I

22   know what it does when I put two very highly colinear or

23   collated variables into the same model.  The estimates will

24   shrink towards the one.  That's just -- that's how it works.

25   So that doesn't concern me too much.

1      What really concerns me is is there a systematic bias I

2   can figure out that would explain all of these increased

3   estimates, and that I did not see.

4      And the other thing I also didn't see was reversals of

5   trends or, you know, something that all of a sudden didn't make

6   sense anymore and jump around.  The whole picture was still

7   quite consistent.

8           THE COURT:  I guess another way to get at this

9   question is to put it in the context of the Bradford Hill

10  analysis; right?  And what we're talking about here is strength

11  of association, I guess.

12          THE WITNESS:  Right.

13          THE COURT:  And as I understand, I don't remember

14  whether you said this or other witnesses, but I -- I think

15  everybody agreed that strength of association is a very

16  important factor in the Bradford Hill analysis.

17          THE WITNESS:  It is one criterium or one guideline.

18          THE COURT:  And the -- and so -- sorry to interrupt,

19  but so -- so it -- I mean, obviously -- I mean, I think in your

20  report you already -- I can't remember what you said.  I'll

21  pull it up.

22      Let me get out of the Ericksson study here.  One moment.

23      (Brief pause.)

24          THE COURT:  You talk about the strength criterion in

25  your report on Page 23, and you refer to it as having been

PROCEEDINGS

 1   partially met and you describe a weak to moderate size

 2   association.

 3          THE WITNESS:  Yes, but that's for the ever/never.  So

 4   the weak to moderate size is really the ever/never.  And I

 5   consider that the worst analysis or the weakest analysis you

 6   can do.

 7      So I -- I then continued to say that, you know, for the

 8   studies that actually looked at heavy exposure, you see odds

 9   ratios of 2 and 3, and that was what convinced me.

10          THE COURT:  But those are -- those numbers that you

11   are giving are numbers that were not adjusted for other

12   pesticide use, correct?

13          THE WITNESS:  That is correct.

14          THE COURT:  And so my question is:  How does -- you

15   know, if you're being asked to place heavy emphasis on the

16   numbers that are adjusted for pesticide use -- for other

17   pesticide use, as opposed to the numbers that are not adjusted

18   for other pesticide use, how does that affect your assessment

19   of that -- that Bradford Hill criterion, the strength of

20   association?

21          THE WITNESS:  First of all, I think a 50 percent

22   increase, we call it moderate, is actually quite a warning sign

23   in occupational and environmental epidemiology because we know

24   that we are underestimating due to exposure assessment issues

25   all the time.  So 50 percent is really a warning sign.

PROCEEDINGS

```
1        If I then go to the dose-response -- and, yes, I wish that
2    some of them had been adjusting for other pesticides, but I can
3    see how the estimates behave.  And generally when we break up
4    from ever/never into different categories, you can kind of see
5    how these estimates become either unreasonable or if you would
6    combine them, they would give you back the adjusted estimate.
7    And that's how I assessed it.
8        And I -- I did not see anything totally unreasonable
9    happening.  It was as I, from what I know about data
10   analysis -- and I've done a lot -- it was very reasonable and
11   it was something that I would expect.
12           THE COURT:  Can you talk to me a little more about
13   how one sort -- sort of mechanically how you adjust for other
14   pesticide use?
15           THE WITNESS:  Yes.  So there are two ways.  One is
16   you stratify, but that's -- or standardize.  That's not what's
17   done here.
18       What they -- what most of these analysts are doing is they
19   use a regression model.  So they use a regression model and
20   they add these variables into the regression.  So they are
21   making assumptions about the association that these variables
22   have with the outcome, and that is what we are usually calling
23   adjustment, is adding these variables into the regression
24   model.
25           THE COURT:  Is there any issue with -- let's say --
```

PROCEEDINGS

```
 1    let's take De Roos, for example.  Is there any issue with how
 2    the adjustment for other pesticide use is done?  I haven't -- I
 3    haven't seen any criticism of -- I haven't seen anything like
 4    that; right?  Well, this study adjusted for other pesticide
 5    use, but they didn't do in it a --
 6              THE WITNESS:  In the proper way.
 7              THE COURT:  -- proper way.
 8         I mean, the one thing I recall is your -- your discussion
 9    of adjusting for all 47 other pesticides.  And maybe that's not
10    particularly reliable, but other than that, I don't recall any
11    criticism of any of the studies for the way in which they
12    adjusted for other pesticide use.  Is that an issue in the --
13    with these studies at all?
14              THE WITNESS:  It is always an issue, how well you
15    measure everything.  And the better you measure covariates --
16    we call them covariates -- the higher your chance to actually
17    adjust properly.
18         But, I mean, reality again hits you in the face.  I mean,
19    how many variables in how many different ways can you put in?
20    And I think what they mostly did is say yes or no exposed or
21    high or medium exposed.  And that's how far it went.
22         Because even for glyphosate, that's mostly what they did;
23    right?  They used a ever/never.  So most of these studies
24    probably used ever/never for the covariate adjustments in the
25    same way.
```

PROCEEDINGS

```
 1            THE COURT:  On the issue -- since you raised

 2   dose-response, on that issue, talking about the NAPP data, I --

 3   I recall you -- I believe it was you who focused on the -- the

 4   numbers associated with people who used -- who exposed -- were

 5   exposed to glyphosate more than two days per year.

 6            THE WITNESS:  Correct.

 7            THE COURT:  And you referred to those folks as

 8   routine users.

 9            THE WITNESS:  Uh-huh.

10            THE COURT:  And as I recall, the -- the odds ratio

11   for people who were exposed to glyphosate more than two days

12   per year was either statistically significant or barely not

13   statistically significant, depending on which slides you're

14   looking at; right?

15            THE WITNESS:  Yeah.

16            THE COURT:  But, in any event, noteworthy odds

17   ratios.

18            THE WITNESS:  Correct.

19            THE COURT:  And then, if I recall, there was also a

20   category of users, and it was people who -- who were exposed to

21   glyphosate more than seven days in their lifetime?  Do you

22   recall that?

23            THE WITNESS:  I think it was -- I think it was a

24   multiplication of years and days.  Could that be?

25            THE COURT:  Yeah, that sounds right.  I'm looking at
```

PROCEEDINGS

```
 1   this -- I'm looking at -- here, maybe I'll hand you this.  This
 2   is a chart.  I don't remember who testified about it.  I think
 3   you probably did.  But it's Exhibit 1278.
 4        Kristen, do you want to hand this down?
 5        (Whereupon document was tendered to the witness.)
 6             THE COURT:  So I don't remember exactly where this
 7   came from, but this is the -- this is the chart that delineates
 8   between proxy and self-respondents; right?
 9             THE WITNESS:  Right.
10             THE COURT:  And it has these different categories.
11   And one of the categories is called Lifetime Days.
12             THE WITNESS:  Right.
13             THE COURT:  And they are looking at people -- people
14   who had between zero and seven lifetime days of exposure and
15   greater than seven.
16        So I wanted -- my question for you is, I guess, first, can
17   you explain what this Lifetime Days category means?
18        And, second, can you explain why you think the previous
19   category that we just discussed, greater than two days per
20   year, is a more illuminating category than this one?
21             THE WITNESS:  Right.  So, actually, what you want to
22   do is also look at duration, number of years.  And you can see
23   that there is absolutely no increase in the -- by duration,
24   right, by those two categories, between zero and 3.5 years and
25   then greater than 3.5 years.
```

PROCEEDINGS

1    And so I'm not surprised to see that the lifetime number

2  of years times days per year, greater than seven, also show no

3  great increase at all.  And what that tells you when you then

4  compare to it frequency of days per year, more than two, that

5  this is about intensity and not duration of exposure.

6    So I've seen this before for silica, where you can where

7  you can find lung cancers in silica-exposed workers for peak

8  exposure per day in fibers, but you don't see it for duration

9  of exposure or average or cumulative fibers over a lifetime.

10    In the silica we know it's a biologic principle that our

11  lungs, the cilia of the bronchial system, can actually clear

12  dust when it's not overwhelming them.  So if you have fibers

13  under a certain threshold, your lungs take care of it.  If you

14  overwhelm them, then, you know, you get inflammation and you

15  get the process of cancer going.

16    And so what this suggests, we should really look at

17  intensity of exposure and not at duration because it seems like

18  your body can handle it if you get exposed here and there.

19  It's actually nice to -- to look at.  I mean, it's interesting

20  to look at, but if you overwhelm your system, you use it day

21  after day after day and the system has no way to recover,

22  that's maybe where we should be looking.

23    **THE COURT:**  What do we know about the range of days

24  per year that this group covers?

25    **THE WITNESS:**  All they are telling us here is more

 1  than two.

 2          THE COURT:  But do we know -- I mean, looking at the

 3  data, do we know anything about --

 4          THE WITNESS:  They -- the NAPP study didn't tell us

 5  that.  But we could ask the authors, yeah.  They would have the

 6  data.  It's not published yet and there is only a draft, a

 7  draft manuscript, and it's not explained.

 8          THE COURT:  This may be a weird question, but I want

 9  to give you a hypothetical.

10      So let's say you have four case-controlled studies.  Take

11  it out of the realm of glyphosate and NHL.  Let's say you have

12  four case-controlled studies.  One of the things that is clear

13  from all of the testimony we've heard in this case is that

14  there are always going to be concerns, problems, potential

15  problems with studies, case-controlled studies, cohort studies,

16  epidemiological studies; always concerns about ways in which

17  the studies might err or the numbers might be off; right?

18          THE WITNESS:  Right.

19          THE COURT:  Just hypothetically let's say you have

20  four case-controlled studies and you have about the same level

21  of confidence in their reliability; right?  You have -- there

22  are questions about all of them.  There are concerns about all

23  of them.

24      But let's say you think they are within the range of

25  reliability and they are all about the same in that regard.

PROCEEDINGS

 1    And two of the studies show a slightly statistically

 2    significant odds ratio, and two of them are close to the null.

 3    All right?

 4        What do you -- what conclusion do you draw from that

 5    about -- I mean, is that -- will you -- do you conclude that we

 6    don't have enough information to know whether this particular

 7    substance causes this particular disease?

 8            THE WITNESS:  This is not how I look at studies,

 9    really.  I -- I rarely would rank every study the same.  And I

10    really would want to look at dose-response patterns, at, you

11    know, latency, at exposure assessment, at, you know, everything

12    they did.  And sometimes one well-done study can convince me

13    that there is something, and nine other studies that didn't see

14    something, I know exactly why they wouldn't see it.  And then

15    that one study makes me want to go out there and do more

16    studies and, you know -- and show with additional studies.  And

17    I wish somebody had done that, but we don't often have second

18    and third chances.

19        And then all we have to do is use the data that we have in

20    front of us and say:  Well, you know, are these weighing

21    heavily enough in my scientific assessment together with the

22    animal data, together with the mechanistic data, and I can wish

23    as I want for better studies in humans.  I won't get them, but

24    I have to make a decision.  And that's how I do it.

25        And, yes, I might be frustrated with the process.  I often

1    are -- am, and wish I had better data.  We all wish.  My

2    students always try to conclude at the end, and future studies

3    should.

4        I say:  There might not be a future study.  Could you

5    maybe conclude something from yours?  They have a hard time

6    doing that.  It's amazing.  Because we teach them so well to be

7    skeptical.  One thing we teach in epidemiology is to be really

8    skeptical.  And sometimes a bit too much because they then have

9    a hard time concluding.  But we have to, as -- you know, as

10   public health people, we have to conclude something.

11            THE COURT:  I think this is probably a relatively

12   minor issue, but one of the issues that Monsanto brings up is

13   the issue of publication bias.  And they -- and as I understand

14   it -- and maybe I'm not understanding it correctly, but as I

15   understand the argument, you know, your study is more likely to

16   be published if you show an association, and your study is less

17   likely to be published if you don't -- if it doesn't show an

18   association.  Because people are more interested in reading

19   about associations than non-associations.

20       Is -- do you think that that could be a concern in this

21   case?  And why or why not?

22            THE WITNESS:  I really doubt it.  Because I don't

23   think -- especially the 1980s studies.  They didn't go out

24   there to investigate glyphosate.  They were worried about

25   farmers and what farmers were using.  And they published no

PROCEEDINGS

1    matter what they saw.  And they usually found at least one

2    pesticide causing something; right?

3        So in this case when they find glyphosate, if they found

4    another pesticide causing NHL, they would still put the

5    glyphosate data in there.  So we would have accrued a lot of

6    null glyphosate results if that was the case and other

7    pesticides were causing NHL.  Because I get my study published

8    whether it's MCPA, 2,4-D, malathion or glyphosate.

9        And I always tell my students:  Well, you only get this

10   chance, so please put all your data in there.  And that's how

11   we do it.

12       And we're actually asked by the reviewers as well.  You

13   know:  Didn't you have these other pesticides?  What's the

14   result for them?  Because they also know about publication

15   bias.

16       So we say -- nowadays we can say, well, there is a lengthy

17   appendix.  We put all that data in the appendix, like we saw in

18   Andreotti.  So I wouldn't be as worried -- in the realm of

19   pesticide research that I'm familiar with, I wouldn't be

20   worried about that.

21           THE COURT:  And then another sort of general

22   question, what do we know about, you know, the association or

23   lack of association between glyphosate and other types of

24   cancer, and does that knowledge affect your view of the link

25   between glyphosate and NHL?

1          **THE WITNESS:**  It affects my view and so far, as I can

2     exclude, recall bias.

3          And I think Dr. Weisenburger was one of the them who

4     explained that very nicely; that if really all farmers believed

5     that glyphosate was causing cancer, they would all report it

6     for every cancer; right?  So it relieves me of that worry.

7          On the other hand --

8          **THE COURT:**  Tell me more about that.  Remind me --

9          **THE WITNESS:**  Of the discussion?  Yeah.  It was the

10    first day, I know.

11         **THE COURT:**  Background information behind what you

12    just said.

13         **THE WITNESS:**  Right.  So if there is the general

14    knowledge among farmers that they are handling a carcinogen,

15    then no matter what the cancer is they will suspect that agent

16    to have caused it.

17         And recall bias would be if the farmers would say:  Ahh, I

18    used a carcinogen.  I know that -- my suspicion is it must be

19    glyphosate because somebody told me it's a carcinogen; right?

20    And the people who developed the cancer would, therefore,

21    report it much more accurately or just recall it more than

22    people who don't have cancer.

23         And that seems to not be the case, because if all the

24    other cancers didn't show that result, it didn't -- it means

25    that farmers, at least the farmers who developed other cancers,

 1  didn't think that glyphosate was a carcinogen and, therefore,

 2  reported, it more heavily.  So that -- that worry I don't have.

 3      On the other hand --

 4      THE COURT:  So are these -- just a clarification

 5  question on that.  Are these in the same studies that we have

 6  been talking about or are these in different case-controlled

 7  studies about other cancers?

 8      THE WITNESS:  Other cancers, but in the same areas.

 9  Like, for example, the same -- I mean, these researchers are

10  not just interested in NHL; right?  They do the -- I mean, the

11  ALGA health study would not have been funded if they had looked

12  at all cancers.

13      So these same authors, actually I know, have a lot of

14  other case-controlled studies going on that they do in the same

15  way for other cancers and they do them in the same regions for

16  the same reasons.  Because they are regions where farmers were

17  using pesticide.  So if I want to learn about pesticides,

18  that's where I'm going; right?

19      And I do all of my cancer studies in those areas about the

20  same time periods, about the same questionnaires; right?  I use

21  what I learned works, so I use it in all of my studies.  And

22  that's why I'm saying that.

23      THE COURT:  And so --

24      THE WITNESS:  But they are definitely different

25  studies.

1          **THE COURT:**  They are different studies.  And so --

2     but what -- what people are saying, what farmers or the people

3     who have these other cancers in these other studies are saying

4     about their glyphosate exposure is not resulting in increased

5     odds ratios for glyphosate and these other cancers, is that --

6          **THE WITNESS:**  Correct.  Absolutely right, yes.

7          **THE COURT:**  Okay.  And so the -- so is it right to

8     say that the only utility of that information is that it causes

9     you to be much less worried about recall bias in the NHL

10    studies?  I get the point.

11         **THE WITNESS:**  Yeah, yeah.

12         **THE COURT:**  I understand.  And, in fact, I think

13    Dr. Mucci eventually agreed that recall bias is not a real

14    concern here with these case-controlled studies; right?

15         **THE WITNESS:**  Correct.

16         **THE COURT:**  So I get that point.  But is that the

17    only utility of these conclusions in these other studies --

18         **THE WITNESS:**  Actually, there is another one, and

19    that's specificity.  And that's a Bradford Hill criteria.

20         So if we have an agent that causes all cancers, I'm much

21    more suspicious.  Of course, we know that smoking causes a lot

22    of different cancers; right?  And now we know -- we start to

23    understand the biology of that as well.  It causes cervical

24    cancer and, you know, who would think so.  But the biology is

25    there.

1          But, actually, the fact that it causes one cancer and not

2     all of the others --

3          THE COURT:  The fact that there is an association

4     between studies in cancer and not this one.

5          THE WITNESS:  Right.  So presumed causation in

6     that -- from those studies.  In that case I would say:  Well,

7     there must be something about the immune system and what we

8     really need to do is study what is happening in a human immune

9     system that's aging.

10          And, yeah, for me that's -- that's another specificity

11     issue that these studies point to.

12          THE COURT:  The rest of my questions I think are

13     probably kind of less significant, but I'm going to ask them

14     anyway since I have you here.

15          You talked about -- at one point in your testimony when

16     you were last here you talked about collider bias.  And I think

17     you were discussing that in the context of the Ericksson study.

18          THE WITNESS:  Right.

19          THE COURT:  And I couldn't figure out when I was

20     looking back over your testimony what collider bias is and what

21     its significance may or may not be in this case.

22          THE WITNESS:  It's just a fancy word for what we

23     already described.  What happens when you are excluding the

24     other people, the people with other pesticide exposure from the

25     control group.  That's what we call a collider bias.  And it

PROCEEDINGS

 1    is --

 2              **THE COURT:**  Say that one more time.

 3              **THE WITNESS:**  It is exactly the -- we also call it

 4    selection bias, collider or selection bias.  It is exactly what

 5    we did when we selected out from the control group the

 6    individuals with other pesticide exposure.

 7         And why we call it "collider" is because we draw these

 8    nice little graphs and then two arrows go into one variable

 9    selection by that factor.  That's all.  And so these arrows

10    collide on that variable.  That's all.  It's technical.

11              **THE COURT:**  Okay.

12         (Brief pause.)

13              **THE COURT:**  There was another part of your testimony

14    that Monsanto criticized you for and I wanted to point to it

15    and give you a chance to address it.  And this is -- I don't

16    know.  You have your testimony there, yeah?

17              **THE WITNESS:**  Yes.

18              **THE COURT:**  This is on Page 27.

19              **THE WITNESS:**  Is that the expert --

20              **THE COURT:**  No, the --

21              **THE WITNESS:**  Rebuttal?

22              **THE COURT:**  Your testimony here in court.

23              **THE WITNESS:**  In court.

24              **THE COURT:**  Do you have that in your binder?

25              **MR. WISNER:**  Yes.  It says *"Daubert* Day One."

PROCEEDINGS

```
 1        May I approach, Your Honor?

 2             THE COURT:  Sure.

 3        (Whereupon document was shown to the witness.)

 4             THE WITNESS:  Got it.

 5             THE COURT:  Page 27?

 6             THE WITNESS:  Yes.

 7             THE COURT:  You were talking about adjusting for

 8   MCPA?

 9             THE WITNESS:  Yes.

10             THE COURT:  And let me also go back -- take a second

11   to go back over it, and I'm going to do the same.

12        I think you were saying here, and I may be wrong, and this

13   is why I want -- wanted to give you a chance to address it.  I

14   think you may have been saying that it's -- it would not be a

15   good idea to adjust for MCPA use, and you said that you didn't

16   see any literature that told you that MCPA was truly an NHL

17   risk factor.

18             THE WITNESS:  Yes.

19             THE COURT:  So it may be that I'm misstating your

20   testimony, but Monsanto was criticizing you for saying that and

21   so I thought I would ask you to address it.

22             THE WITNESS:  Right.  That brings back this issue of

23   how do I select confounders.  And confounders are -- first of

24   all, have to be risk factors for the outcome.  So I have to

25   convince myself -- and they have to be strong risk factors for
```

PROCEEDINGS

1   the outcome.  And then they have to be strong --

2          THE COURT:  Sorry to interrupt, but I just want to

3   ask one clarification question about that.

4       I'm not sure that I understand the concept that you need

5   to know that something is a risk factor before you adjust for

6   it.

7       I mean, I would think that you would -- if something is a

8   possible risk factor or if there is a -- you know, if there is

9   a reasonable -- if there is a reasonable possibility that this

10  might be a risk factor, that we would just for it to see what

11  happens.

12         THE WITNESS:  That's the second point.

13      So we -- we don't always have the data.  So, for example,

14  we might have forgotten to ask about MCPA in my study; right?

15  Could have happened.  So that doesn't excuse me if it -- if

16  it's truly known to be a risk factor.

17      And so the first thing that we teach is, you have to know

18  the literature.  Go to the literature and see whether anybody

19  established risk factors for this disease.  If they have,

20  please plan your study accordingly and measure those; right?

21      But if we are not sure that something is a risk factor,

22  then we have a second tool.  And the second tool is I measure

23  it and I look whether it's distributed between the exposed and

24  non-exposed, the exposure of interest, in a way that is

25  differential; meaning, everybody who is exposed to glyphosate

1   is also exposed to MCPA.  Nobody who is not exposed to

2   glyphosate is exposed to MCPA.

3        Then I have 100 percent colinearity.  If I now put MCPA

4   into my model, what happens is something that we formerly

5   call -- or technically call splitting of the variants, because

6   both predict -- both are predictors of each other; right?  They

7   are 100 percent correlated.  So they must -- if one of them is

8   truly a risk factor, the other one will be as well.  It's the

9   breath mint -- if we say breath mints are only taken by people

10  who smoke, and I measure breath mint chewing and I measure

11  smoking, both will explain NHL or lung cancer in this case.

12       So at that point my data doesn't help me anymore.  So I

13  have to go back and actually decide:  Is that truly a risk

14  factor and should I truly adjust for it, or is it just a breath

15  mint?  That's it.

16       And that's why, you know, we go back and forth.  We play

17  with our data and we test things in our data, our hypothesis.

18  But we also need to put it back into the context of what we

19  know about biology and what we know about other studies and

20  what we know about the real world.  And that's where we go back

21  and forth and back and forth.  And that's where this comment

22  comes from.

23            THE COURT:  But -- but you seem to -- seem to be

24  saying in this testimony that -- and, again, it's quite

25  possible that I'm misunderstanding it, but you seem to be

 1   saying that it's not a good idea to adjust for MCPA use.

 2          THE WITNESS:  At least if you do it, be aware.  And

 3   the aware is, you can say:  Well, I wanted to be absolutely

 4   conservative.  I believe MCPA is causing NHL, and all I want to

 5   do is estimate glyphosate adjusting for MCPA, but you have to

 6   then really say my assumption.  You have to state that very

 7   clearly, is that MCPA is a true confounder.  If I say that,

 8   then it means it's a true risk factor for NHL.

 9       I'm not excused -- I'm not excused by my data because the

10   data doesn't tell you the truth.  The data just tells you there

11   is a high colinearity.  It does not help you distinguish

12   between it being truly a risk or a cause for NHL or being just

13   an indicator of glyphosate use.  That is something we have to

14   decide how we look at it.

15       However, when we put them both in the model and there's

16   still an effect for glyphosate, then I would say:  Hmm, okay.

17   No matter what, even if MCPA is a true risk factor for NHL, it

18   doesn't remove all of the effect of glyphosate.

19          THE COURT:  But you adjust for the MCPA use?

20          THE WITNESS:  Yes.  Yes.

21          THE COURT:  I guess maybe what I should ask you now

22   is:  Should one adjust for MCPA use in these studies?

23          THE WITNESS:  I would try it and see what happens.

24   And as long as the estimate that I get for glyphosate is then

25   not going to one, I would still be concerned.

PROCEEDINGS

1    **THE COURT:** So were you saying -- I mean, if you want

2    to take time to look at the transcript, you should feel free,

3    but I thought you were saying here that one shouldn't -- that

4    it was not a good idea to adjust for MCPA use, partly because

5    you didn't see any literature that told you that MCPA was truly

6    an NHL risk factor.

7    So if I'm misunderstanding your prior testimony, please

8    take your time and look at it and tell me.

9    **THE WITNESS:** Yes. From what I know, I would think

10   MCPA has not convincingly been shown to be an NHL risk factor.

11   So if I go by my rules, I really shouldn't put it into the

12   model.

13   However, if I want to be careful and say maybe we don't

14   know enough about MCPA yet, then I would do what I just said,

15   which is test it in my model and put it in and see what happens

16   to the effect estimate for glyphosate. And if that is still --

17   but do it very consciously because I know what I'm doing. I'm

18   putting two very highly colinear variables into the same model.

19   So I expect both estimates to reduce towards the null. The

20   MCPA one, if there is one, as well as glyphosate.

21   And that's actually what Ericksson showed. They had a

22   MCPA estimate of 2.6, and I think it went to 1.8. And the

23   glyphosate one went from 2.1 or something like that to 1.5.

24   **THE COURT:** But if you adjust for breath mint use, it

25   shouldn't affect your number for cigarette use.

PROCEEDINGS

1          **THE WITNESS:**  It will.

2          **THE COURT:**  It will?

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  There is something I'm missing.

5          **THE WITNESS:**  It will.  Absolutely.

6          **THE COURT:**  Explain that to me.

7          **THE WITNESS:**  So if you had a -- for heavy smokers,

8    let's say, an odds ratio of 5 for lung cancer, and if truly

9    everybody who smokes -- or 80 percent of the smokers also

10   always use breath mints and maybe only 20 percent of the

11   non-smokers do, because they have bad breath, then that high

12   correlation with smoking guarantees you that the estimate for

13   cigarettes will reduce to the -- towards the one.  Because they

14   are positively associated.

15       If -- if the breath mint was negatively associated, then

16   something else would happen.  But if they are positively

17   associated, I can guarantee you that that 5 would end up being

18   maybe a 2.5.  And you would also see an odds ratio of about 2

19   or 2.5 for breath mints.

20       So both would kind of look like they are predictors of the

21   outcome.

22       (Brief pause.)

23          **THE COURT:**  Last topic, at least for metrics I think.

24   I can't guarantee.

25          **THE WITNESS:**  That's fine.

PROCEEDINGS

1          **THE COURT:**  Non-differential exposure

2    misclassification.

3          **THE WITNESS:**  Good one.

4          **THE COURT:**  So we have these AHS numbers, right, that

5    sort of -- regardless of which sort of quartile exposure you're

6    looking at, the numbers -- the odds ratio comes out in the

7    eights, usually; right?  .8 -- .83, .87, somewhere around

8    there; right?

9          **THE WITNESS:**  Right.  Uh-huh.

10          **THE COURT:**  And, you know, we have this statement

11    that everybody intones that non-differential exposure

12    misclassification will bias you towards the null; right?

13          In other words, if there is something else -- if there is

14    an association or if there is causation, it's going to be

15    concealed by non-differential exposure misclassification;

16    right?

17          **THE WITNESS:**  By making the exposed and unexposed

18    more similar.

19          **THE COURT:**  Right.  And it's always going to -- what

20    everybody intones is it's always going to bias you towards the

21    null.

22          **THE WITNESS:**  Correct.

23          **THE COURT:**  And so the -- you know, one of the points

24    Monsanto seems to be trying to make is that if you have the .87

25    number and you have non-differential exposure

PROCEEDINGS

 1   misclassification, that's going to bias you towards one, and

 2   it's not going to -- it's not actually, like, concealing any

 3   true odds ratio that might be 1.5 or 1.7 or something like

 4   that.  That -- that is a concept I think that primarily came up

 5   after you testified.

 6        Is that something that you would like to address?

 7             THE WITNESS:  Yes.  It's actually very important to

 8   understand.  And I -- yeah, I thank you for bringing it up.

 9        We are always taking biases out of context.  And I teach

10   it that way too.  I'm guilty as -- as charged.

11        When I start teaching about biases, I start confounding,

12   most important, exposure misclassification; really important,

13   disease misclassification, et cetera, et cetera.  And we are

14   using examples to show how this works.  And what I then in the

15   end tell my students:  But this only works this way as long as

16   we assume no other biases.  In the real world, that's a wrong

17   assumption.

18        So while it is true that most of the time, in just about,

19   you know, all examples you can -- but also theoretically, if

20   you do the numbers, non-differential exposure misclassification

21   biases towards the null.  So you are getting something very

22   close to the null.  It wouldn't necessarily bring you on the

23   other side of the null.

24        So if we are saying that, well, we are coming from the

25   other side, we, first of all, have to assume that's actually

PROCEEDINGS

 1    true.  So we would be reducing the risk of NHL by exposing

 2    farmers to glyphosate.  And under that scenario, we would move

 3    that the estimate closer to the one, but then the true one

 4    would be .6, .5; 50 percent reduction in NHL due to glyphosate

 5    use.  I truly don't believe that.

 6        What I believe is that more than one bias is actually

 7    happening here.  First of all, there is also randomness, a

 8    little bit is randomness.

 9        But, most importantly, we have an additional bias.  And

10    the additional bias comes probably from the way that they are

11    comparing the AHS, the people with glyphosate exposure in

12    categories to people that have never used glyphosate.  That's

13    one group that seems to be consistently used in Andreotti, but

14    hasn't been used by De Roos.

15        When you look back at the De Roos 2005 study, she gives

16    you the numbers for the people who never -- it's a smaller

17    group, something like 9,000 people I think, who reported never

18    using glyphosate.  And then she has a low and a high exposure

19    group.  And when she does her comparisons, her dose-response,

20    she actually compares to the lowest exposed group.  She never

21    compares to the never users.  And that gave me an ah-ha, when I

22    saw what she did.  And I realized why she did it.

23        The only reason an investigator would do that is because

24    they believe the counterfactual is not met; meaning, that the

25    comparison group is truly giving you the rate you would see if

PROCEEDINGS

```
1   the others weren't exposed to glyphosate; meaning every other
2   risk factor is the same in that group except for glyphosate
3   use.
4        So these -- and actually that has been discussed in the
5   AHS.  The group who never used glyphosate had a lot of other
6   characteristics that were different from the people who were
7   using.  And so my guess is there is residual confounding by
8   other risk factors for NHL that they couldn't control for.  And
9   the only way to do that is what Anneclaire De Roos did, is by:
10  Let's ignore the people who never used, and let's just look at
11  the spectrum of users and use the lowest exposed group.
12           THE COURT:  And that reminds me of another question I
13  had, not about non-differential exposure misclassification, but
14  about the De Roos study.  And you -- you said that she was
15  comparing low-dose users to higher-dose users.  And what was
16  her definition of lower dose and higher dose there?
17           THE WITNESS:  Yeah.  She used -- remember that I
18  explained this very complex algorithm that Dosemeci came up
19  with?
20           THE COURT:  No.  Sorry.
21           THE WITNESS:  So what she did is -- or better,
22  Dosemeci, who is a very, very good exposure assessor, he -- he
23  used that one question that they ask farmers in the
24  questionnaire about.  After they asked them about 22
25  pesticides, they asked:  How did you apply it?  Did you use
```

1   personal protective equipment?  Did you clean your clothes.

2   When you used it, did you use a cab that was, you know,

3   pressurized?  Et cetera.

4       And that -- and then they constructed a very complex

5   algorithm from that one variable to come to intensity of

6   exposure.  And they used that intensity to weigh the exposures,

7   all of the exposures, the day of exposures that the farmers

8   reported using.  And from that they -- they categorized low and

9   high exposure.

10      And that's really my problem with the study, is that

11  this --

12          **THE COURT:**  The study you're talking about --

13          **THE WITNESS:**  Is the AHS.

14          **THE COURT:**  -- is the AHS study.

15          **THE WITNESS:**  Right.

16          **THE COURT:**  Okay.

17          **THE WITNESS:**  And so the problem I have with that is

18  that they did not ask after every pesticide.  They asked after

19  22, what did you do.  So it was left to the farmer to decide on

20  what pesticide to report or on what practice to report.  And my

21  guess was that they probably reported the most inclusive or the

22  most average they did.  They didn't necessarily report what

23  they were doing for glyphosate.

24      And, therefore, by definition you would actually introduce

25  a lot of misclassification by using this algorithm for a

PROCEEDINGS

1   pesticide that farmers at baseline in the '90s still didn't

2   believe was very toxic.

3       So they probably reported their, you know, use of

4   equipment, their use of washing -- their washing of hands and

5   their suiting up and their whatever, repairing equipment for a

6   lot of pesticides that were a lot more toxic than glyphosate.

7       So what they really did when they sprayed glyphosate, I

8   don't know, but it was presumed it was the same as if they, you

9   know, applied malathion or anything else.

10          THE COURT:  Okay.  Let's see.  It's a little bit

11   after 12:00.  We can turn to your presentation or we can take a

12   lunch break.  Maybe would now be a good time to take a lunch

13   break?

14          MS. FORGIE:  That's fine.

15          MR. LASKER:  If I could just ask, how long do we have

16   Your Honor for today?

17          THE COURT:  Til midnight if you want.

18          MR. LASKER:  That's fine.

19          MS. WAGSTAFF:  Do not say that.

20          THE COURT:  Why don't we take a lunch break and we'll

21   return at 1:00 o'clock?

22          MS. FORGIE:  Thank you, your Honor.

23          THE WITNESS:  Thank you.

24          THE CLERK:  Court is in recess.

25       (Whereupon at 12:10 p.m. until 1:09 p.m. proceedings

PROCEEDINGS

```
 1        were adjourned for noon recess.)

 2           THE COURT:  I mentioned we were available until

 3   midnight.

 4           THE CLERK:  One of us is.

 5           THE COURT:  I forgot to consult with Judge Petrou

 6   about this.  She has to leave at 2:45.

 7           JUDGE PETROU:  I'm going to leave at 2:45, which is

 8   not an issue at all, because everything is being recorded.  I

 9   will have an opportunity to do it.  I wanted you to know I was

10   on Court Call when the oral argument took place, so I did have

11   an opportunity to hear that as well.

12           THE COURT:  We don't have to stop at 2:45 p.m., but

13   we will take a break at that time -- if we're still going, we

14   will take a break around that time to let Judge Petrou go.

15           MS. FORGIE:  Thank you, your Honor.

16      Dr. Ritz actually has a flight, too, that she has to

17   catch.  I'll try to be pretty fast and pretty limited.

18           THE COURT:  I think you should take as much time as

19   you think you need to flesh everything out.

20           MS. FORGIE:  Thank you, your Honor.

21           MS. WAGSTAFF:  I didn't know if Judge Petrou if any

22   questions or not.

23           JUDGE PETROU:  No.

24

25
```

| | |
|---|---|
| 1 | <u>**DIRECT EXAMINATION**</u> |
| 2 | **BY MS. FORGIE** |
| 3 | **Q.**   Dr. Ritz, the first think I wanted to do, please, is just |
| 4 | clarify a couple of things that you were asked about. |
| 5 |         One is, you keep mentioning, or at least I kept hearing |
| 6 | you say, convince yourself, convince yourself.  Can you explain |
| 7 | what you mean by that? |
| 8 | **A.**   Yeah.  Since I am a teacher, and I just come out of |
| 9 | teaching my big methods class at UCLA, it's actually some -- |
| 10 | it's a teaching tool that I use to professionalize |
| 11 | epidemiologists in the way that we are thinking critically |
| 12 | about our subject matter.  So it's really the method.  So |
| 13 | applying the method of epidemiology in a critical way to -- and |
| 14 | come to a conclusion. |
| 15 |         So convincing myself doesn't mean myself, but, you know, |
| 16 | it means be critical.  Look at all the evidence.  Look at it |
| 17 | from different angles.  And when you're then convinced that the |
| 18 | study is valuable, then come to a conclusion. |
| 19 | **Q.**   Okay.  Thank you. |
| 20 |         And you were asked some questions about latency with |
| 21 | regard to the 2003 De Roos study.  Do you remember those |
| 22 | questions? |
| 23 | **A.**   Yes. |
| 24 | **Q.**   And notwithstanding the relatively short latency in |
| 25 | De Roos 2003 study, do you believe that the NHLs that were |

1   observed with glyphosate use could, from a biologically

2   plausible perspective, have been caused by exposure to

3   glyphosate?

4   **A.**   Yes, I do.

5   **Q.**   Okay.  And your concerns about latency in De Roos are --

6   apply equally to all the studies, even the so-called positive

7   studies; is that correct?

8   **A.**   Yes.

9   **Q.**   Okay.  And would you expect to see even stronger

10   associations in De Roos 2003 if latency were longer?

11   **A.**   I would guess, yes.  I mean, when I say "guess," I mean, I

12   would expect -- I would expect stronger effects.

13   **Q.**   And can you explain why that is?

14   **A.**   Because we are really harvesting the earliest cases in

15   De Roos.  And if we -- if we think that we did not hit the peak

16   onset in terms of age, as well as timing of the exposures, then

17   the longer we are waiting, the more we are actually inclusive

18   in terms of the kind of cases that occur.  So right now we are

19   probably just seeing the tip of the iceberg.

20   **Q.**   Okay.  And I want to go back a little bit to some -- just

21   some basics on confounding and adjustment and proper

22   adjustment.  So could you explain briefly what confounding

23   actually means?

24   **A.**   Right.  So confounding is a principle in which we are

25   first assessing whether a factor is a true risk factor for the

RITZ - DIRECT EXAMINATION / FORGIE

1   outcome.  Because all true risk factors for the outcome, we

2   have to consider if and only if they also are related to the

3   exposure, meaning -- related means are these risk factors

4   distributed in the same way in the exposed and non-exposed or

5   are, for example, the unexposed exposed to everything else and

6   the exposed only exposed to the factor I'm investigating.

7   Clearly, if the unexposed are only exposed -- are exposed to

8   everything else, then their risk would be higher due to all the

9   other exposures.

10       And then I'm comparing exposed to exposed, right?  So what

11  I'm hoping to get is an equal distribution of all the other

12  risk factors for the outcome among the exposed and non-exposed,

13  but, really, only for the risk factors for the outcome that

14  actually influence the risk of disease.

15  **Q.**   Okay.  And I'd like you to please --

16       **MS. FORGIE:**  Mr. Wisner, could you please pull up a

17  new exhibit --

18  **A.**   I'm not seeing anything on this.

19  **BY MS. FORGIE**

20  **Q.**   We're just pulling it up.

21       **MS. FORGIE:**  Exhibit 460, please.

22       **THE WITNESS:**  It's not up.

23       **MS. FORGIE:**  It's up on ours.

24       **MR. WISNER:**  May I approach, Your Honor?

25       **THE COURT:**  Sure.

RITZ - DIRECT EXAMINATION / FORGIE

```
 1          (Brief pause.)

 2              MS. FORGIE:  Would that be okay?  We'll give her a

 3      hard copy?

 4              THE COURT:  Of course.

 5          (Whereupon document was tendered to the witness.)

 6      BY MS. FORGIE

 7      Q.   Turn to the chart.

 8      A.   Uh-huh.

 9          (Witness complied.)

10      Q.   Do you have it, Doctor?

11      A.   Yes.

12      Q.   Okay.  Can you explain what is the difference between --

13      well, how do you define "properly adjusted"?

14      A.   So properly adjusted means I'm identifying the actual

15      confounders, meaning the risk factors for the outcome that also

16      are associated with the exposure of interest.  And then I'm --

17      I am putting those and only those in the model.

18          And I'm not putting proxies for the exposure in the model.

19      I'm not putting intermediates in the model.  I'm actually just

20      putting true risk factors for the outcome in that are related

21      to the exposure.

22      Q.   Okay.  And can you tell me what this chart on Exhibit 460,

23      what it shows you and explain what is the top part, and then

24      afterwards what is the bottom part please?

25      A.   Right.  So this is another plot, a visualization of data
```

1  in which we see on the -- on first the upper part the

2  ever/never exposed, not adjusted for other pesticides.  And

3  below we have the ever/never exposed -- in addition -- I mean,

4  the ones on the top are adjusted.  They are not crude ratios.

5  They are justed for age and sex and some of them medical

6  history, et cetera, but the ones on the bottom are also

7  adjusted for other pesticides.

8  Q.   Okay.  I'd like you to look at the -- let's talk about the

9  Hardell study.  Okay?

10      At one point --

11           THE COURT:  I'm sorry.  Could I ask a quick question?

12  On this slide, where did this come from?

13           THE WITNESS:  I made that.

14           THE COURT:  You mean in anticipation of today?

15           THE WITNESS:  Yes, yes.

16           THE COURT:  Okay.  Thank you.

17           MS. FORGIE:  After so many questions from the *Daubert*

18  hearing about adjusted and not adjusted.

19           THE COURT:  Got it.

20  BY MS. FORGIE

21  Q.   So with regard to the Hardell odds ratios, at one point is

22  there a very high odds ratio in Hardell?

23  A.   Yes, it's extremely high.  You can see that the point

24  estimate approaches 6.  The confidence intervals are quite

25  wide.  They also straddle the one.  And you can see from the

1   whole graph that this odds ratio seems like an outlier, and it

2   truly is an outlier.

3       And the reason why that is is if you compare it to the not

4   adjusted for other pesticides, you can see that that odds ratio

5   was around 2.3.  Also, wide confidence intervals.

6       But what happens now when you're putting all the other

7   pesticides, and Hardell had a lot of other phenoxies, but also

8   some others in there, into the model, exactly what I tried to

9   explain at the beginning happens, and that is we have now

10  sparse data bias.

11      So the fully or the most adjusted estimate is actually the

12  wrong estimate, or better the improper adjusted estimate.  We

13  cannot adjust in Hardell for these other pesticides without

14  introducing this kind of sparse data bias.

15  Q.   Okay.  Let me break it down a little bit slower for me,

16  for a layman.  You see this odds ratio that's almost 6;

17  correct?

18  A.   Right.

19  Q.   And that was adjusted for other pesticides; is that

20  correct?

21  A.   That is correct.

22  Q.   So can you explain -- and would you call this a fully

23  adjusted for other pesticides odds ratio?

24  A.   Absolutely, yes.

25  Q.   Okay.  And so can you explain how sometimes you add in

RITZ - DIRECT EXAMINATION / FORGIE

 1   what might be confounding factors and then you take them out?

 2   And can you explain why you do that and how you make that

 3   decision?

 4        And then after you do that in a general sense, we'll do it

 5   specifically with Hardell.

 6   **A.**   Yes.  So -- so that was one way if you're not convinced or

 7   if you -- if you are thinking, well, maybe this pesticide also

 8   causes NHL, so I better take care of it.  Right?  I better

 9   adjust for it so that I get the true causal odds ratio for

10   glyphosate after adjusting.

11        And in this case Hardell did that.  They knew that

12   phenoxyherbicides are suspected at the time.  Now we know some

13   of them are actually causing NHL.  So we should be adjusting

14   for pesticides.  And then they throw all of these pesticides

15   into the model.  And what happens is what we call it explodes

16   the model.

17        So the data was not sufficient to do this kind of

18   adjustment.  And you can see that it actually creates a bias

19   away from the null.  And this is very well known.  It's called

20   sparse data bias.  And it's something I -- I warn my students

21   against.  You cannot just throw everything in a model and

22   expect to know the truth or to -- you can't expect that that

23   kind of fully adjustment is proper adjustment.  It's really

24   not.

25   **Q.**   And, in fact, Dr. Rider agreed with you with regard to

RITZ - DIRECT EXAMINATION / FORGIE

1   this particular issue in terms of throwing in the kitchen sink

2   and everything else for adjustment; is that correct?

3   **A.**   That is correct.

4   **Q.**   Okay.  So in the --

5        **MS. FORGIE:**  And can we just put up that one section

6   up from Dr. Rider's deposition?

7        (Document displayed)

8   **BY MS. FORGIE**

9   **Q.**   Is it -- you don't have a screen.  Hold on.  Let me get

10  you a hard copy.

11       (Brief pause.)

12       **MR. WISNER:**  Don't have a hard copy.

13  **BY MS. FORGIE**

14  **Q.**   Okay.  Well, in any event, you're familiar with the

15  deposition testimony of Dr. Rider; correct?  And you're aware

16  after having read that deposition testimony that she agrees

17  with your position on that; correct?

18  **A.**   Yes.

19  **Q.**   And, in fact, in Hardell, what happened was you put in --

20  you adjust for all these other pesticides.  The odds ratio goes

21  up very high; is that correct?

22  **A.**   Correct.

23  **Q.**   And then you make a determination as to whether or not you

24  should leave in all those adjusting for pesticides or take it

25  out; is that correct?

RITZ - DIRECT EXAMINATION / FORGIE

1    **A.**    That is correct.  Actually, when you read the Hardell

2    study, you see that the univariate analysis, meaning where just

3    one pesticide at a time is in the model, is represented in a

4    table.  This estimate of 5.8, you can find in the text, but the

5    authors never refer to it again.

6        They do it because reviewers ask for it.  They ask for a

7    fully adjusted odds ratio, but they also interpret the

8    univariate as the most reliable one.

9    **Q.**    Okay.  So in other words, it was fully adjusted for other

10   pesticides.  And then they removed those because of the reasons

11   you just explained; correct?

12   **A.**    Correct.

13   **Q.**    So in that case -- in that sense Hardell actually is fully

14   adjusted; correct?

15   **A.**    Yes.

16   **Q.**    It's just not referred to that way because they actually

17   ended up taking out the pesticides after they determined it

18   wasn't appropriate to throw in the kitchen sink; is that

19   correct?

20   **A.**    Right.  Otherwise we would believe it's a six-fold risk

21   increase; right?

22   **Q.**    Right.

23   **A.**    And they did not want to believe that.  They said, well,

24   2.3 is -- is scary enough and it's probably the better model.

25   **Q.**    And do you agree with the Hardell authors and co-authors

RITZ - DIRECT EXAMINATION / FORGIE

1  that it's appropriate -- that the almost 6 odds ratio is

2  inappropriate and that it was appropriate to take out the

3  pesticides; is that correct?

4  A.  Absolutely.

5  Q.  Okay.  And then turning to the McDuffie study briefly,

6  which is Exhibit No. 21.  Can you please turn to that?  I

7  believe it's in your book.  I'll wait until everyone gets

8  there.

9       And I'd like you to turn to Page 1160, and looking at

10 Tables 6 and 7.

11 A.  Right.

12 Q.  Are you there?

13 A.  Yes.

14 Q.  And you see the -- they are not really footnotes, but the

15 explanations right in between the actual table and where it

16 says Table 6 and Table 7.  Do you see that?

17 A.  Yes.

18 Q.  Can you tell me what exactly they mean when they say --

19 for example on Table 7 it says:

20          "Among individual pesticides, carbaryl, lindane,

21      DDT and malathion insecticides and captan fungicide

22      user/nonuser were included in the initial multivariate

23      model and found not to contribute significantly to the

24      risk of NHL."

25      Do you see that?

RITZ - DIRECT EXAMINATION / FORGIE

1   **A.**   Yes.

2   **Q.**   Can you explain what that means and ultimately what they

3   did in the McDuffie study in terms of the univariate model and

4   removal of pesticides?

5   **A.**   Yeah.  What they do is describe the mechanics of fitting

6   models.  And in this case it's a regression model again.  And

7   so they are watching the estimates of the exposure of interest

8   and then putting other pesticides into the same model.  And

9   they see all of these pesticides in the multivariate model are

10  not significantly contributing to NHL, which then justifies

11  removing them from the model.

12      So if they are not risk factors for NHL, then they are

13  not -- then they are not subclassing one criterion for being

14  actually a confounder, but they go beyond that.  They don't

15  just say:  Oh, they are not confounders because in our models

16  they are not predicting NHL.  But they actually tested it out

17  and that's what we usually do.

18      We first think about:  Is it a risk factor?  Is it related

19  to the exposure?  But then we go the next step and put a

20  variable in.  Put the pesticide in.  If it doesn't change

21  anything, we can take it out.

22      And then the appropriately adjusted model is the one

23  without control for the other pesticide.

24  **Q.**   So in that sense McDuffie, as it's ultimately published,

25  isn't adjusted for other pesticides, but, in fact, it is

RITZ - DIRECT EXAMINATION / FORGIE

1    because they put it in and then took it out; is that correct?

2    A.    That's correct.

3    Q.    Would it be fair to say, for example, if you have other

4    pesticides -- for example, malathion, just because that's one

5    that was used in Table 7.  If both the cases and the controls

6    are using malathion -- which is often the case; correct, as

7    they are farmers?

8    A.    Correct.

9    Q.    -- then it's fair to take it out because you know it's not

10   affecting the outcome because they are both -- cases and

11   controls are using it, just as an example; is that correct?

12   A.    Actually, what -- what you're saying is that in my study

13   it's not a risk factor for NHL, but more importantly, it is not

14   related to glyphosate exposure.

15        So whether or not you're exposed to glyphosate, you may or

16   may not be co-exposed to malathion, but not in a way that is

17   different in terms of exposure.  So the exposed to glyphosate

18   and the exposed -- the unexposed to glyphosate may have

19   malathion exposure, but kind of at a comparable rate.

20   Q.    And so in that sense, McDuffie is also adjusted for other

21   pesticides; is that correct?

22   A.    Yeah, appropriately adjusted.

23   Q.    And we've already talked about De Roos and that being

24   adjusted; is that correct?

25   A.    In the same manner.

RITZ - DIRECT EXAMINATION / FORGIE

1    **Q.**   So McDuffie, Hardell, De Roos and NAPP are all adjusted

2    for other pesticides; is that correct?

3    **A.**   They all went through this procedure, yes.

4    **Q.**   Okay.  And then one of the things that was talked about a

5    fair amount in the *Daubert* argument, which you weren't present

6    for, but you actually read the transcript of that hearing; is

7    that correct?

8    **A.**   Yes.

9    **Q.**   And there was some discussion in there about what you call

10   a visual representation and what others have called the forest

11   plot.  Do you remember that discussion?

12   **A.**   Yes.

13   **Q.**   Okay.  And, in fact, on Page 153 of your original

14   deposition --

15            **MS. FORGIE:**  Which I'd like you to pull up, please.

16       (Document displayed)

17            **MR. LASKER:**  Just a second.  Where is that?

18            **THE WITNESS:**  The September one, right?

19            **MS. FORGIE:**  Let me know when you've got it.

20            **MR. LASKER:**  I'm asking where it is.

21            **MS. FORGIE:**  Oh, 153 of the original.

22            **MR. WISNER:**  It says "Deposition of September 17."

23            **THE COURT:**  The depositions are not in the index.

24            **MR. LASKER:**  What page?

25            **MS. FORGIE:**  Oh, 153.  It's okay.  There's lot of

RITZ - DIRECT EXAMINATION / FORGIE

```
 1  documents flying around.
 2            THE COURT:  So it's in the binder?
 3            MS. FORGIE:  Yes.
 4            THE COURT:  What tab is it?
 5            THE WITNESS:  Second tab.
 6            MS. FORGIE:  Exhibit --
 7            MR. WISNER:  It's not --
 8            MS. FORGIE:  Oh, it's not in there.
 9            MR. WISNER:  It just says "Depo."
10            MS. FORGIE:  It's the first one, where it says --
11            MR. WISNER:  No, second one.
12            MS. FORGIE:  It says "Deposition September 17."
13       Everybody have it?  Okay.
14  BY MS. FORGIE
15  Q.   On Page 153 of the deposition, do you see where you were
16  asked about whether or not it was a -- you were asked questions
17  about the forest plot.  And then on Line 4 through 6 can you
18  read what you said there?
19  A.   Yes.  My answer was:
20       "ANSWER:  You can call it a forest plot.  I would just
21       call it a visual representation of results from
22       different studies."
23  Q.   Okay.  And can you explain -- I mean, that's just not
24  semantics, calling it a visual representation versus calling it
25  a forest plot; is that correct?
```

RITZ - DIRECT EXAMINATION / FORGIE

1   **A.**   That is very much correct, yes.

2   **Q.**   Okay.  And can you explain -- let's start with first

3   explaining what a forest plot is.

4   **A.**   So technically we use forest plots in meta-analyses.  And

5   what meta-analyses strive to do is summarize estimates across

6   studies.  In order to be able to do that, we have to pull out

7   of every study the odds ratios or rate ratios that are most

8   similar to each other; meaning, the lowest common denominator

9   odds ratio is being pulled out.  So we're striving for

10  similarity, right?  We want the estimate that are most

11  comparable.

12       In fact, a forest plot often on the side has something

13  called a measure of heterogeneity that actually indicates how

14  much these individual estimates differ from each other.  And we

15  hope that that's not statistically significant, because if they

16  really are heterogeneous, we shouldn't be summarizing them.

17  Okay?

18       And then at the bottom you see a summary estimate.  And

19  that is the one that summarizes all of these -- these

20  individual study estimates with weights to one common estimate.

21  And that's a meta-analytic tool that strives to represent the

22  most common denominator you can pull out of studies.  That's

23  not what I did with my visual representation.

24  **Q.**   Okay.  Can you explain what was the purpose of your visual

25  representation, please?

1    A.    Yes.   I actually used it as a reminder for myself to talk

2    about the individual studies and estimates that I was taking

3    from these studies as making points about the validity of the

4    study.

5         For example, is the 5.8 a valid estimate or should I take

6    the 2.3 instead from Hardell?   And I wanted to remind myself

7    that that's an issue.   I wanted to remind myself that Lee

8    actually distinguished between asthmatics and non-asthmatics

9    and that both estimates are kind of the same.

10        I also wanted to show that individual studies that later

11   were summarized by other studies showed estimates that were

12   quite comparable to the study that then summarized these

13   estimates, but used slightly different methods.   Or better, if,

14   in the smaller studies, you couldn't adjust for other

15   pesticides, see what happens when De Roos actually summarized

16   them into one study.   She was able to adjust for other

17   pesticides.   She did it and the result was still positive and

18   it was statistically significant and it was in the range, of

19   course, of the other studies, but now it was fully adjusted.

20   Q.    So would it be fair to say that the purpose of your visual

21   representation was actually to remind you of some of the

22   differences between the various studies and, also, some of the

23   high points of the different studies?

24   A.    Indeed.

25   Q.    And was there anything else about your visual

1    representation that you were trying to assist yourself with in

2    creating that graph?

3    **A.**    I definitely didn't intend it to be a tool for a

4    meta-analysis.  It really was a tool to remind myself to talk

5    about these different studies in a certain way, critical way,

6    but also a way of comparing results against each other and

7    reminding myself what I thought was most important about these

8    studies.

9    **Q.**    Is there any reason why -- it might have been simpler if

10   you had just told everyone at the hearing that it wasn't a

11   forest plot.  Is there any reason you didn't tell us that at

12   the time?

13   **A.**    Well, it wasn't my first time and I was told to just

14   answer questions.  And I thought that a memory tool would not

15   make such a big splash.

16   **Q.**    Anything else?

17   **A.**    That's it.

18            **THE COURT:**  So when you called it a forest plot in

19   your expert report, you made a mistake?

20            **THE WITNESS:**  I used that word and I might not -- I

21   should probably not have used it.  It was really a -- did I

22   call it a forest plot?  Then, yeah, that was a mistake.

23            **THE COURT:**  Okay.

24            **MS. FORGIE:**  Go ahead.

25            **THE COURT:**  Okay.

1    BY MS. FORGIE

2    Q.   So then a couple other questions from your earlier

3    testimony today.

4        You were asked questions about ever/never use in some of

5    the studies and heavy exposure, particularly with regard to the

6    De Roos study.  Do you remember that?

7        Let me see if I can rephrase it.  You look confused.

8    Let's turn to Page 23 of your expert report.

9    A.   Where is it?  Oh, my expert report, yes.

10   Q.   Which I believe is --

11             MR. WISNER:  Exhibit 1.

12   BY MS. FORGIE

13   Q.   -- Exhibit 1 in your book.

14   A.   Yes.

15   Q.   On Page 23 you mention that it's a weak to moderate

16   association with regard to ever/never use.  Do you remember --

17   oh, I'll wait till you find it.

18   A.   23.  Yes, I see it.

19   Q.   Okay.  And you mention there that it's a weak to moderate

20   association for ever/never use with regard to De Roos; is that

21   correct?

22   A.   Yes.

23   Q.   Okay.  And when you look at odds ratios for more heavy

24   exposure, what do you find there?

25   A.   Well, we see that whenever I get rid of the occasional

1    users and are able to look at data that actually distinguishes

2    occasional and heavy users, the odds ratios behave in the way

3    that you would expect if there was a causal association;

4    meaning, that the heavier users are showing the effect, which

5    is generally above 2, while the occasional users don't or show

6    less effect.

7    **Q.**   Okay.  And I think you were asked earlier whether or not

8    those adjusted -- I mean, whether or not those numbers, those

9    odds ratios, for example, in the De Roos study were adjusted or

10   not.  And I think you said that they weren't adjusted, but let

11   me -- let's just clear that up.

12       With regard to De Roos, are the numbers adjusted for other

13   pesticides?

14   **A.**   De Roos 2003, yes, they are adjusted.

15   **Q.**   And as we just discussed, the same is true for McDuffie,

16   Ericksson and Hardell; is that correct?

17   **A.**   That's correct.

18           **THE COURT:**  Yeah, but -- if I could just follow up on

19   that.  That sentence that says:

20           "However, the effect estimates for longer or more

21       extensive use in several studies were larger, i.e.,

22       between 2 and 3, and this can be considered a stronger

23       endorsement of a causal relation."

24       You told me that that -- those numbers were not adjusted

25   for pesticide use.  Did you misspeak?

RITZ - DIRECT EXAMINATION / FORGIE

1        THE WITNESS:  The Hardell one, as far as I know, is

2    not adjusted.

3        THE COURT:  Let me ask --

4        THE WITNESS:  But the De Roos one is.

5        THE COURT:  Let me ask the question this way.  When

6    you wrote that sentence -- or when that sentence was written,

7    was it -- what were -- what is the -- what are those numbers

8    referring to?  "The several studies being larger, i.e., between

9    2 and 3."

10       THE WITNESS:  McDuffie and Hardell and De Roos.  And

11   NAPP, actually.

12       THE COURT:  Okay.  So -- and which of those numbers

13   are -- that are between 2 and 3 are adjusted for other

14   pesticide use?

15       THE WITNESS:  So in the sense that McDuffie actually

16   tried to adjust and found that, you know, it didn't matter, we

17   can consider that the most appropriately adjusted estimate.

18   De Roos is definitely an appropriately adjusted estimate.

19       THE COURT:  But where is the number from De Roos

20   that's between 2 and 3?

21       THE WITNESS:  Which De Roos -- we are talking 2003?

22       THE COURT:  Yeah.

23       THE WITNESS:  Can we look at it?

24       THE COURT:  Sure.  What exhibit is it?

25       MS. FORGIE:  It's 21 -- no, no, no.  It's 15.  Sorry.

RITZ - DIRECT EXAMINATION / FORGIE

```
 1          (Brief pause.)
 2    A.    I have the De Roos wrong.  It's the 2005.  But that's
 3    not -- that's not appropriate.
 4    BY MS. FORGIE
 5    Q.    And -- well, I'll wait until your -- let me know when
 6    you're finished, please.
 7          (Brief pause.)
 8    A.    So the adjusted one in De Roos is actually the overall
 9    one.
10    Q.    And do you -- can you give us a reference of the page and
11    number, please?
12    A.    It is on Page 5.
13    Q.    And then also with regard to the NAPP --
14          THE COURT:  Wait.  Hold on.
15          MS. FORGIE:  I'm sorry.
16          THE COURT:  I'm trying to understand what we're
17    looking at on Page 5 of De Roos.
18          MS. FORGIE:  I'm sorry, Your Honor.
19          THE COURT:  Where are you pointing us to?
20          THE WITNESS:  Where are we?  We're looking at
21    glyphosate.  That's a 2.1.
22          THE COURT:  Okay.
23          THE WITNESS:  With a 1.1 to 4 confidence interval in
24    the logistic regression.
25          THE COURT:  And you said that is the overall number?
```

1          THE WITNESS:  Yes, that's the overall one, exactly.

2          THE COURT:  Okay.  And then where is the number for

3   longer or more extensive use?

4          THE WITNESS:  She did not do this.  She just counted

5   pesticides after that.  So we do not have it for specific

6   glyphosate.  She just counts pesticides and she has all the

7   potentially carcinogenic ones, and she explains in the text how

8   she categorized those.  And you can see that we get a very

9   strong increase with the number of those pesticides.

10      So 25.9, I wouldn't believe that one.  But it goes from

11  1.6 to 2.7 to 25.9.  That's a dose-response, but it includes

12  all of -- potentially carcinogenic pesticides, which she

13  defines in her text.  That was her attempt at getting at

14  dosage.  But it wasn't specific to glyphosate.  But the one

15  that's specific to glyphosate is a 2.1, and it's fully

16  adjusted.

17          THE COURT:  Okay.  And then the ones -- so this

18  sentence:

19          "However, the effect estimates for longer or more

20      extensive use in several studies were larger."

21          THE WITNESS:  That is McDuffie and Ericksson and the

22  NAPP.

23          THE COURT:  Okay.  And so -- and those are -- just to

24  make clear, are those numbers that you are referring to

25  adjusted for use of other pesticides?

1     **THE WITNESS:**  As we discussed before, that was

2   actually -- they tried these pesticides in the models and then

3   took them out again.

4      So I consider that appropriate, but they didn't do what

5   De Roos did in her ever/never analysis, which is keep them all

6   in there.  De Roos could do it because she had enough data to

7   do it, and that's why she did it.

8     **THE COURT:**  And which were the -- for McDuffie, which

9   were the pesticides that they -- the other pesticides that they

10   looked at?  Did they look at --

11     **THE WITNESS:**  Malathion, DDT.  Yeah, they list them

12   in that table, 6 and 7.

13     **THE COURT:**  And what about, like, 2,4-D and dicamba?

14     **THE WITNESS:**  Let's look.  Where is it?  They list

15   them.

16     **MS. FORGIE:**  It's Page 1160.

17     **THE COURT:**  Which tab is --

18     **MS. FORGIE:**  I'm getting it right now.

19     **THE WITNESS:**  They actually did two different

20   things --

21     **MS. FORGIE:**  Hold on.  It's -- let's get there.  It's

22   Exhibit 21, Your Honor.

23     **THE WITNESS:**  In Table 6 they use

24   phenoxyherbicides --

25

RITZ - DIRECT EXAMINATION / FORGIE

1  BY MS. FORGIE

2  Q.   Hold on.  Let's make sure everybody is there.

3  A.   They use phenoxyherbicides as a group.  So they say any of

4  these.  Or carbamates as a group.  Or organophosphate

5  insecticides as a group.  Fungicides as a group.  And then

6  also, added carbon tetrachloride.

7       And then in Table 7 they say they also tried this kind of

8  adjustment with individual pesticides.  So not just doing

9  groups, but then using carbaryl, lindane, DDT, malathion,

10 captan.

11 Q.   On 2,4-D is an phenoxyherbicide; correct?

12 A.   It's an phenoxyherbicide.  So it's under that group.

13 Q.   Correct.  Because I think the judge was asking about that

14 one.

15           THE COURT:  Okay.

16 BY MS. FORGIE

17 Q.   And then, Doctor, just to be clear, you believed to a

18 reasonable degree of scientific certain that the epidemiology

19 as a whole provides evidence that glyphosate exposure causes

20 non-Hodgkin's lymphoma even based on the numbers that are fully

21 adjusted to exposures to other pesticides; is that correct?

22 A.   Yes.

23 Q.   Okay.  And then to be clear, I think -- I think we covered

24 that, but the NAPP study is also fully adjusted and -- is that

25 correct?

RITZ - DIRECT EXAMINATION / FORGIE

1   **A.**   That is correct.

2   **Q.**   Okay.

3   **A.**   That's why they pooled it.  They wanted to be able to

4   adjust.

5   **Q.**   Exactly.  Okay.  And then, Doctor, I would like you to --

6   I want to show you some things about your testimony that were

7   also discussed in the *Daubert* argument.

8          **MS. FORGIE:**  So, Mr. Wisner, can you please pull up

9   Page 20 from the transcript of the hearing?  And the exhibit

10  number for that -- oh, no.  It's not an exhibit number.

11         **THE WITNESS:**  Which one?

12         **JUDGE PETROU:**  It is simply entitled *"Daubert*

13  Argument."

14         **MS. FORGIE:**  Thank you.

15         **THE WITNESS:**  Got it.

16  **BY MS. FORGIE**

17  **Q.**   And go to Page 20, please.

18  **A.**   Yes.

19  **Q.**   Okay.  Let me know when you're there, please.

20  **A.**   I'm there.

21  **Q.**   Okay.  In looking at Lines 9 through 21, talking about the

22  Ericksson study.  Do you see that?

23  **A.**   Yes.

24  **Q.**   And do you see where Mr. Lasker says:

25          "And everyone, at least in this record, including

```
 1          IARC, including plaintiff's other experts, you asked
 2     Dr. Weisenburger about this at Page 181, 182.  The
 3     study, itself, states that the analysis was cumulative
 4     days.  Dr. Ritz -- and this is the first time she
 5     offered this opinion.  I didn't have any -- she never
 6     offered this opinion before -- all of a sudden starts,
 7     argues that it's days per year.  Again, this is minor.
 8     But there are various places in the testimony where
 9     she just sort of changes things.  And I can point to
10     others, sort of a litany of situations like that,
11     where things all of a sudden just change a little bit,
12     with no basis in the actual study language or in the
13     data, and that can give one pause."
14          Do you see that?
15 A.    Yes.
16 Q.    Doctor, I'd like to have Mr. Wisner pull up your original
17 deposition testimony, which is --
18 A.    September?
19          MR. WISNER:  September 2017.
20 BY MS. FORGIE
21 Q.    It just says Ritz depo, 9-17-17.  And I would like you to
22 look at Page 340, please.
23          (Witness complied.)
24 A.    I have it.
25 Q.    Okay.  Hold on.  I'm getting there.
```

RITZ - DIRECT EXAMINATION / FORGIE

```
 1        All right.  And please look at --
 2             MS. FORGIE:  Is the Court there as well?
 3   BY MS. FORGIE
 4   Q.   All right.  Please look at Lines 9 through 19.  And do you
 5   see where Mr. Lasker asked:
 6        "QUESTION:  The two data points we have from
 7        Ericksson, it was ten days -- more than ten days or
 8        less than ten days; correct?"
 9        And then you answered:
10        "ANSWER:  Yes, but I'm not sure that it was ten days
11        per year or ten days cumulative."
12        And then Mr. Lasker asked you:
13        "QUESTION:  Okay.  I'll represent, and if I'm wrong,
14        the Court will know and everybody will know that it
15        was ten days cumulative?"
16        Do you see that?
17   A.   Yes.
18   Q.   Okay.  And do you know whether the Ericksson study is ten
19   days cumulative or ten days per year?
20   A.   Ten days per year.
21   Q.   And how do you know that?
22   A.   Well, I went back to the study and looked at the
23   statistics section, and where it talks about exposure
24   assessment they say days per year.
25   Q.   So Mr. Lasker's representation to you that the Ericksson
```

RITZ - DIRECT EXAMINATION / FORGIE

1  study was based on ten days cumulative is not correct, is it?

2  A.    No.

3  Q.    And then I'd like you to go back to the *Daubert*

4  proceedings again and look again back to Page 20.  The one we

5  were just looking at.

6        Let me know when you're there.

7  A.    Yes.

8  Q.    On Line 9, again, Mr. Lasker says:

9             "And everyone, at least in this record, including

10        IARC, including plaintiff's other experts, the study

11        itself states the analysis was cumulative days."

12        Do you see that?

13 A.    Yes.

14 Q.    And is that representation correct?

15 A.    No, it's not.

16 Q.    And with regard to IARC, do you know -- are you familiar

17 with what IARC says about Ericksson and whether it's cumulative

18 or days per year?

19 A.    Yes.  It says days per year.  There is clearly a table in

20 IARC where they are specifying the methods.  And in that table

21 they clearly state days per year.

22        **MS. FORGIE:**  Okay.  Mr. Wisner, can you pull that

23 table up, please?

24        And it is, I believe Exhibit 57.  57 in your books, Your

25 Honor.  And then Page 23, I believe.

RITZ - DIRECT EXAMINATION / FORGIE

1    BY MS. FORGIE

2    Q.    Are you there, Doctor?

3    A.    Yes, I am.

4    Q.    And can you just identify for the record where the IARC

5    states that it's ten days?

6    A.    The first column is labeled exposure category or level.

7    And it says one -- the less equal to ten days per year and

8    greater than ten days per year in, like, the fifth or sixth

9    line.

10    Q.    Okay.  And so, Dr. Ritz, just to be clear, was it ten days

11    per year or ten days cumulative with regard to the Ericksson

12    study?

13    A.    According to the authors and according to IARC it's ten

14    days per year.

15    Q.    And you didn't testify anywhere that it was ten days

16    cumulative with regard to the Ericksson study, did you?

17    A.    No, no.

18    Q.    Okay.  Now, I'd also like you to look at something else

19    again from the *Daubert* testimony.  And -- or *Daubert* argument.

20          MS. FORGIE:  And I'd like you, Mr. Wisner, to please

21    pull up Page 45 of those proceedings.

22          And those are marked, so please let me know when everybody

23    is there.  Page 45 of the *Daubert* proceedings.

24          THE WITNESS:  Oh, that's the argument.

25          MR. WISNER:  That's correct.

RITZ - DIRECT EXAMINATION / FORGIE

1    BY MS. FORGIE

2    Q.    That's correct.  If you've got the *Daubert* argument,

3    that's correct.

4    A.    45.

5    Q.    Page 45.

6    A.    Yes.

7    Q.    Okay.  And I'd like you to look, please, at Lines 4

8    through 15.  Do you see that?

9    A.    Yes.

10   Q.    Or 5 through 15.  It says:

11           "But the issue again is plaintiffs have the

12        burden of proof here.  And what Dr. Ritz is relying

13        upon is something that she acknowledges is not likely

14        as a basis for dismissing the Ag Health study, and not

15        only that it's unlikely, but she then doesn't consider

16        all of the validation studies, all of the sensitivity

17        analyses.  And, you know, in her deposition she said:

18        I'd give it no weight whatsoever.  And it's again --

19        that's not" --

20        And then the Court says:

21           "That's pretty -- I mean, to give weight to the

22        Ericksson study and not to the AHS is pretty amazing."

23        Do you see that testimony, Doctor?

24   A.    Yes, I do.

25   Q.    Okay.  Now, I would like you to look, please, at your

 1    deposition, your original deposition --

 2            **MR. WISNER:**  January.

 3            **MS. FORGIE:**  I'm sorry, your January deposition.

 4        Nice to have somebody that's on top of it.

 5    **BY MS. FORGIE**

 6    **Q.**   On page -- hmm.

 7        The January deposition was the deposition that was all

 8    about the Agricultural Health Study; correct?

 9    **A.**   Yes.

10    **Q.**   Okay.  Let me just find the page number here.

11        (Brief pause.)

12            **MR. WISNER:**  Page 160.

13            **MS. FORGIE:**  Hold on.  I've got it.

14        I guess you beat me to it.

15    **BY MS. FORGIE**

16    **Q.**   It's 160 through 162.

17    **A.**   Yeah, I got it.

18            **MS. WAGSTAFF:**  January 2018 deposition, first tab.

19            **MR. WISNER:**  I believe it says "Depo January 2018" on

20    the tab.

21        I apologize.  This is so confusing.

22        (Brief pause.)

23            **MS. FORGIE:**  Are you there?

24            **MR. LASKER:**  Yeah.

25            **MS. FORGIE:**  Okay.

RITZ - DIRECT EXAMINATION / FORGIE

1    **BY MS. FORGIE**

2    **Q.**   So on Page 160 at the bottom, starting with Line 24, do

3    you see where it says:

4         "**QUESTION:**   Okay.   You were also asked a question

5         about what weight you would give the AHS study, the

6         2018 AHS publication with regard to your opinions in

7         this case?   Do you remember that question?"

8         And you answered:

9         "**ANSWER:**   Yes."

10        And then you were asked:

11        "**QUESTION:**   Can you clarify or expand upon what weight

12        exactly you would give the 2018 AHS study?"

13        Do you see that?

14   **A.**   Yes.

15   **Q.**   Because you had previously been asked questions about

16   weight to give the AHS study, and this whole deposition was

17   about the AHS study; is that correct?

18   **A.**   Correct.

19   **Q.**   Can you just read your answer please?

20   **A.**   Yeah.   So I said:

21        "**ANSWER:**   It definitely has to be reviewed, and it

22        definitely needs to be considered.   However, I tried

23        to explain there is some weight to every study.   Some

24        studies have a larger weight than others.   The way I

25        determine that is by looking at the potential biases

1          that these studies may have as well as the size of the

2          study and sensitivity analyses that do help me or

3          don't helpful me to determine whether these biases

4          have been taken care of.  And overall I feel these

5          sensitivity analyses done in this 2018 publication --

6          let's call it 2018 -- all make a lot of assumptions

7          under which I wouldn't -- under which I wouldn't agree

8          with.  Each of the sensitivity analyses make another

9          assumption that would only give you a piece of the

10         puzzle.  It never considers the whole realm of biases

11         that you have to actually consider."

12  **Q.**  Okay.  So actually you did give some weight to the AHS

13  study; is that correct?

14  **A.**  Yes.

15  **Q.**  And you still give some weight to the AHS study; is that

16  correct?

17  **A.**  Absolutely, yes.

18  **Q.**  And then Mr. Lasker, as we just read on Page 45 of the

19  *Daubert* argument, also stated that you didn't consider the --

20  all of the validation studies and all of the sensitivity

21  analyses.  Do you remember that section that I just read you?

22  **A.**  Yes.

23  **Q.**  Did you actually look at the validation studies?

24  **A.**  Extensively.

25  **Q.**  And just to refresh everybody's understanding, what are

RITZ - DIRECT EXAMINATION / FORGIE

1   the validation studies and what did you look at?

2   **A.**   Well, I looked at Dr. Blair's study.   That was the study

3   where he repeated the questionnaire assessments in some of the

4   participants.

5       I looked at lots of studies that I'm not sure conducted in

6   the field with urine sampling.   I looked at the Heltshe study.

7   And I looked at Monsanto's own study of glyphosate, urine

8   levels and questionnaire data.

9   **Q.**   And on Page -- let me just find this.

10      Going to your original deposition, which is tabbed in your

11  book.   It's the first tab, where it says "Ritz Depo,

12  January 18th, 2018."

13  **A.**   Yes.

14  **Q.**   Okay.   Turning to Page 74, please.

15          **MS. WAGSTAFF:**   That's not her original deposition.

16          **MS. FORGIE:**   I'm sorry, you're right.   It's the

17  second one, second tab dated 9/17/17.

18  **A.**   Got it.

19  **BY MS. FORGIE**

20  **Q.**   Turning to Page 74, please.

21  **A.**   Uh-huh.

22  **Q.**   And you see Lines 16 through 22?

23  **A.**   Yes.

24  **Q.**   Do you see that?   And can you just -- and you see where

25  you talk about the sensitivity analyses in that; correct?

RITZ - DIRECT EXAMINATION / FORGIE

1    **A.**    I might have the wrong one.

2    **Q.**    Okay.  It should be -- I'm sorry.  That's my fault.  Your

3    original -- it's January 19th.

4    **A.**    Yes.

5    **Q.**    So it is the first tab, but I gave you the wrong date.

6    I'm so sorry.  So go to the first tab.

7    **A.**    Yes.

8    **Q.**    And go to Page 74?

9    **A.**    Yeah, I got it.

10   **Q.**    And look at Lines 16 through 22.

11   **A.**    Uh-huh.

12   **Q.**    Do you see that?

13   **A.**    Uh-huh.

14   **Q.**    And you said that this is discussed on Page 4 of the

15   paper, a number of sensitivity analyses.  Do you see that?

16          **THE COURT:**  She didn't say that.  That's Mr. Lasker's

17   question.

18          **MS. FORGIE:**  I'm sorry.  I'm befuddled here.  Let me

19   rephrase this.

20        **"QUESTION:**  Now the investigators then -- and this is

21        discussed on Page 4 of the paper -- do a number of

22        sensitivity analyses.  I want to walk through them and

23        make sure we have a common understanding of what was

24        done.  So we'll mark this -- this is now 30-12."

25        Do you see that?

RITZ - DIRECT EXAMINATION / FORGIE

1   **A.**   Yes, I do.

2   **BY MS. FORGIE**

3   **Q.**   Okay.  And so you talked about sensitivity analyses there,

4   and later you talked about validation studies; is that correct?

5   **A.**   That's correct.  I actually remember Mr. Lasker having

6   made these charts, where he explicitly walked with me through

7   the different sensitivity analyses on the chart.  And I think

8   we also discussed it the first day I testified in court so you

9   should have those charts.

10  **Q.**   Okay.  Can you explain briefly about validation, what you

11  mean by validation reports and validation analysis?

12  **A.**   Yes.  So validation analysis is a sub-analysis in a larger

13  study in which I try to assess how valid my exposure assessment

14  has been.  Of course this has to be taken with a grain of salt

15  because I'm doing this in realtime now, but I'm trying to

16  estimate exposures in the past.

17       So I'm trying to evaluate whether what I'm learning from

18  field trials where I'm watching farmers applying pesticides and

19  then go and collect their urine and make them fill out the same

20  questionnaire that the AHS -- the Agricultural Health Study

21  made them fill out, comparing the urine level with the

22  self-reported use of protective equipment, use of equipment,

23  et cetera and then say:  Well, my algorithm of generating this

24  exposure, this exposure measure is actually valid because I now

25  have a golden standard, which is the urinalysis.  And I watched

1   these farmers doing the applications.

2       However, I make a lot of assumptions when I do this kind

3   of validation.  I'm assuming that what the farmers did under

4   observation on that day represents what they have done for the

5   last 20 years or they reported to me.  That's a large

6   assumption to make.

7   **Q.**   Okay.  And then, finally, could you turn please to

8   Exhibit 301.

9       (Witness complied.)

10  **Q.**   And there is a section there at the bottom -- let me know

11  when you're at 301.

12  **A.**   Yes.

13  **Q.**   And then at the bottom you see some numbers.  MONGLY, do

14  you see those?

15  **A.**   MONGLY, yes.

16  **Q.**   If you go to 494.

17  **A.**   Yeah.

18  **Q.**   Okay.  Just a quick question.  This is a presentation in

19  the NAPP study; correct?

20  **A.**   That's correct.

21  **Q.**   And I just want to ask you:  Does this show that for more

22  than two days of use that the -- that this was adjusted for

23  other pesticides?

24  **A.**   Yes.  Actually the odds ratio has a little star.  And it

25  refers to the footnote in which they actually say it was

RITZ - CROSS EXAMINATION / LASKER

1   adjusted for.  And you can see that it was actually adjusted

2   for a lot of different variables, including 2,4-D, dicamba and

3   malathion.

4   Q.   And what is the odds ratio?

5   A.   The odds ratio --

6   Q.   The adjusted odds ratio.

7   A.   The odds ratio is 1.98 with a confidence interval 1.16 to

8   3.4, for the overall NHL.

9           MS. FORGIE:  Okay.  I don't have anything else, Your

10  Honor.

11      (Brief pause.)

12          THE COURT:  It's being suggested that we take a

13  five-minute break to see if we can fix the witness's screen.

14          MR. LASKER:  Thank you.

15      (Whereupon there was a recess in the proceedings

16       from 2:03 p.m. until 2:08 p.m.)

17                    **CROSS EXAMINATION**

18  BY MR. LASKER

19  Q.   Good afternoon, Dr. Ritz.

20          MR. LASKER:  Could we put up Exhibit 460 again?  That

21  was the exhibit that we showed which was the new --

22          MR. WISNER:  Are you talking to me?

23          MR. LASKER:  Yes.  One of you.

24          MR. WISNER:  I'm not set up.

25          MR. LASKER:  Exhibit 46 is the new depiction of

RITZ - CROSS EXAMINATION / LASKER

1    forest plot.

2            **MS. WAGSTAFF:**  Hold on.  He has to turn it on.

3            **MR. WISNER:**  I didn't know you needed my help.

4        (Brief pause.)

5            **MR. WISNER:**  What page?

6            **MR. LASKER:**  Second page.  Thank you.

7    **BY MR. LASKER**

8    **Q.**    And I just want to make sure that I understand what we're

9    looking at here.  You have depicted in this forest plot, first

10   you have Hardell 1999 and you also have Hardell 2002; correct?

11   **A.**    That's correct.

12   **Q.**    And Hardell 1999 was pooled into Hardell 2002; correct?

13   **A.**    Not that I -- Hardell -- it was -- wasn't it in Ericksson?

14   No, no.  2002, yes.  Right.  Yes.

15   **Q.**    So the Hardell data from 1999 is part of Hardell 2002;

16   correct?

17   **A.**    Yes.

18   **Q.**    You also have listed here separately McDuffie and De Roos

19   2003.  That data is pooled into NAPP; correct?

20   **A.**    Part of that data.

21   **Q.**    The -- you have the two versions of NAPP.  You have the

22   version from Canada and that was in June.  And then you have

23   the version from Brazil that was in August; correct?

24   **A.**    Right.

25   **Q.**    So you have both of those in there as well.

RITZ - CROSS EXAMINATION / LASKER

1          And you also have the first AHS study, De Roos 2005.  And

2    then you have the Andreotti 2018 study in there; correct?

3    **A.**   That's correct.

4    **Q.**   Okay.  And so we went through this, a similar analysis of

5    the prior visual aid that you had for us.  But if we were to

6    take out the -- the studies that are sub-studies of pooled

7    analyses and only look at the pooled data and the most recent

8    data, then we would have Hardell 2002, which only had eight

9    cases, right?

10   **A.**   Eight cases of what?

11   **Q.**   Well, either non-Hodgkin's lymphoma or hairy cell

12   leukemia; is that correct?

13   **A.**   There were more than eight cases in Hardell 2002.

14   **Q.**   Okay.  Well, let's take this a little bit -- in terms --

15   **A.**   That was, what was it, several hundred cases.

16   **Q.**   I'm sorry, exposed to glyphosate.

17   **A.**   I would have to look that up.

18   **Q.**   Okay.  If you want to do that, it's in your scientific

19   binder.

20             **THE COURT:**  You don't have the smaller binder there,

21   Dr. Ritz?

22             **MR. LASKER:**  They are right over there.

23             **THE CLERK:**  You don't have another copy for the Law

24   Clerk?

25             **MR. LASKER:**  Oh, I'm sorry.

1            **JUDGE PETROU:**  Counsel, since there is no index on

2    this one, which exhibit number is it?

3            **MR. LASKER:**  If we're doing the scientific binder,

4    it's Tab 9.

5         (Whereupon binder was tendered to the witness.)

6    **BY MR. LASKER**

7    **Q.**   And I can direct you if you want to Page 1044, that's

8    Table 1, where it presents the glyphosate data.  It's the

9    fourth row on the table.  Glyphosate number of exposed cases,

10   eight.

11   **A.**   Yes, the number of exposed cases and exposed controls is

12   eight, too.

13   **Q.**   Okay.  All right.  And then -- so going back to your plot

14   here.  Then we would also have the NAPP study as the most

15   recent pooled analysis.  We would have Andreotti 2018.  We

16   would have Orsi and we would have Ericksson; correct?

17   **A.**   Yes.

18   **Q.**   And you provided some testimony in response to questions

19   from plaintiff's counsel about the Hardell study and the

20   impact, the problem that that study had for -- in adjusting for

21   exposures to other pesticides.  You talked about sparse data.

22   Do you recall that testimony?

23   **A.**   Yes.

24   **Q.**   And the Hardell 1999 study only had four exposed

25   glyphosate cases with three controls; correct?

1    **A.**    That's correct.

2    **Q.**    And that was why there was a problem of sparse data,

3    because the numbers were so, so small in that study; correct?

4    **A.**    They were too small to adjust for these other pesticides,

5    yes.

6    **Q.**    And with our other studies, certainly with the NAPP, we

7    have much other larger numbers of exposed cases and controls;

8    correct?

9    **A.**    That's why we pool, yes.

10    **Q.**    Let me ask you a bit about -- about latency.  And I want

11    to -- you discussed a lot of this with Judge Chhabria so I

12    don't want to repeat all of that discussion, but I would like

13    to turn you to Page 25 of your expert report.  And that is

14    Tab 1 -- not in our science binder, but in our -- I think we're

15    done with the science binder.

16         Tab 1 in the binder we provided you.

17         **THE COURT:**  Page 25 of her original expert report?

18         **MR. LASKER:**  That's it.

19         **THE WITNESS:**  The big one?

20    **BY MR. LASKER**

21    **Q.**    Not -- I'm sorry.  It's going to be that one.  I'm sorry.

22         (Whereupon binder was tendered to the witness.)

23         **MR. WISNER:**  Your Honor, can I approach to get the

24    big one off --

25         **THE COURT:**  Feel free.  You don't need to ask

RITZ - CROSS EXAMINATION / LASKER

 1   permission.

 2        (Brief pause.)

 3   **BY MR. LASKER**

 4   **Q.**   Are you in Tab 1?

 5   **A.**   Uh-huh.

 6   **Q.**   So Page 21.

 7        And the very -- right before the final paragraph in your

 8   report, the last sentence in the first paragraph of your

 9   conclusion, you state:

10        "Studies that assess those also generally found a

11        higher level of exposure associated with increased

12        risk, and importantly in the one study that did assess

13        the importance of having been exposed more than ten

14        years prior to a diagnosis of cancer, the results

15        clearly pointed to those exposures as the relevant one

16        as compared to more recent exposures within ten years

17        increasing the plausibility of associations greatly."

18   Correct?

19   **A.**   Uh-huh.

20   **Q.**   Do you see that?

21   **A.**   Yes.

22   **Q.**   And that's still your opinion today; correct?

23   **A.**   It is one argument, yes, for plausibility.

24   **Q.**   And that is your opinion today; correct?

25   **A.**   I don't understand.

 1   Q.   You stated that it's one argument.  I just want to make

 2   sure that that's still your opinion today.

 3          THE COURT:  What is still the opinion?  The sentence

 4   that is written in that -- in that -- that you just read?  Is

 5   that what you're asking?

 6          MR. LASKER:  Yeah.  The sentence that says that

 7   exposures -- that the findings -- I assume you're referring to

 8   the Ericksson study here; correct?

 9   A.   I would have to read through this to make sure.

10   BY MR. LASKER

11   Q.   Okay.  Well, let me just ask this question, and if you

12   can't answer it, we can move on.

13          But is it your opinion that the exposures that took place

14   more than ten years prior to the diagnosis of cancer as

15   compared to more recent exposures are the relevant ones?

16   A.   This is taken out of context.  I'm making an argument for

17   validity across studies looking at them in different ways.  In

18   one of the ways is to look at the recency or non-recency of

19   exposure.

20   Q.   Okay.  And with regard to the De Roos study, and I -- I

21   think -- I asked you this question in your deposition and I

22   think you gave a similar answer, but I want to just confirm.

23          Is one of your -- one of the issues that you believe may

24   be at play in the De Roos study the fact that the individuals

25   who were the first users of glyphosate may have been heavier

RITZ - CROSS EXAMINATION / LASKER

1    users of glyphosate?

2    **A.**    Are you referring to what I said today?

3    **Q.**    Well, I'm asking you -- we can go to your deposition,

4    because I asked you that in your deposition; do you recall?

5    **A.**    No, I don't.

6    **Q.**    Okay.  So then let's go to your deposition.  It's Tab 2.

7    It's Page 209, Line 9 through Page 210 -- Page 210, Line 6.

8         And for context, and you can read before and after, we're

9    talking during this part of the deposition about the De Roos

10   2003 study and the issue of latency.

11        And you can read the question and answer yourself, but as

12   I understand it, and correct me if I'm wrong, one of the

13   arguments you were making was that the latency might not be an

14   issue because the early users of glyphosate may have been using

15   it more heavily.

16        Am I understanding that correctly?  Or if I'm not, maybe I

17   misunderstood this.

18   **A.**    Well, that would be one argument you might want to make.

19   However, as I said this morning --

20             **THE COURT:**  Well, let's -- if I can direct you?

21             **THE WITNESS:**  Yeah.

22             **THE COURT:**  Maybe we can just take a little time to

23   look at the deposition testimony.

24        And I think Mr. Lasker is first trying to establish that

25   you were testifying to a certain point; that you made a certain

RITZ - CROSS EXAMINATION / LASKER

1   point in your deposition and he is characterizing the point

2   that you -- that he says you were making.

3        But I want you to look at it, and you should agree or

4   disagree with him about what point you were making in the

5   deposition.

6             THE WITNESS:  So which page would you like me to --

7   BY MR. LASKER

8   Q.   Again, we're on 209 Line 9 through 210, Line 6.  And my

9   question -- I guess my first question --

10            THE COURT:  Why don't you let her read through it and

11  then you can ask the question?

12            MR. LASKER:  Okay.

13       (Brief pause.)

14  A.   Okay.

15  BY MR. LASKER

16  Q.   And my question to you is:  Am I understanding, at least

17  your testimony at your deposition correctly, that one of the

18  issues you raised with respect to latency and the De Roos 2003

19  study was that the individuals in that study who first used

20  glyphosate may have been heavy users of glyphosate and,

21  therefore, latency would not be as much of a problem?

22  A.   That's not what this is about.  It's not about De Roos.

23       This is about one study or two studies that had cases in

24  the very early -- end '79 and early '80s, and when I read

25  through this, I mean, that's what you have been asking me

1    about, to talk about the latency with respect to 1974 or '-5

2    out to the studies that looked at cases in 1979 through '86.

3    Right?

4         But De Roos actually included a lot -- included all of

5    them and had, therefore, a median latency that was much longer,

6    on average.

7         So it was just not five years, is that what you're saying?

8    **Q.**   No.  We may be miscommunicating.

9         My question was -- and I think we've already established

10   what years the NHL diagnosis were in De Roos 2003.

11        My question is:  Is it your testimony or is it your

12   opinion -- and we can ask it now.  If it's not, we will move

13   on.

14        Is it your opinion that the issue of latency in those

15   North American studies might not be a problem because the early

16   users of glyphosate were very heavy users of glyphosate?

17   **A.**   Actually, I'm saying in my testimony here it might be the

18   case, but I don't know.  I did not investigate that.

19             **JUDGE PETROU:**  Counsel -- finish your answer and then

20   I'd like to jump in.

21             **THE WITNESS:**  What was that?  Sorry.

22        Yeah, yeah.  I had proposed that that could be a

23   possibility.  However, I said here clearly I don't know.  I did

24   not investigate that.

25             **JUDGE PETROU:**  All right.  So this morning you were

RITZ - CROSS EXAMINATION / LASKER

1  answering some questions along the same lines, and I thought we

2  had established that you, in fact, said that the cases that

3  showed input that 6- to 11-year time period after 1975 were due

4  most likely to either heavy use --

5          THE WITNESS:  Yes.

6          JUDGE PETROU:  -- and/or use without adequate safety

7  precautions; is that correct?

8          THE WITNESS:  Yes.  Those were two hypotheses that we

9  can have.

10     And the third one was that it was really in a vulnerable

11 period of their life because these individuals, of course, got

12 their NHL in their 60s.  So they were clearly exposed at a

13 later age.

14         JUDGE PETROU:  And did you also have another theory

15 that was not discussed this morning, but which I seem to see

16 here in the deposition transcript around Page 208, that there

17 were users, potentially, of glyphosate prior to it being

18 approved?

19         THE WITNESS:  Correct, yes.

20         JUDGE PETROU:  So you have four different theories?

21         THE WITNESS:  Yes.

22         JUDGE PETROU:  And am I correct that we don't

23 actually have evidence as to these four different theories.  We

24 don't know, was it heavy usage?  Were they not using safety

25 equipment?  Were they using it pre-approval?

1          **THE WITNESS:**  Correct.  We don't know this.  However,

2    we see increases in risk.  So some of this must be the case.

3          **JUDGE PETROU:**  Okay.  So of the four theories, the

4    one that we have some actual concrete information about, has to

5    do with the age at time of exposure.

6          **THE WITNESS:**  That's correct.

7          **JUDGE PETROU:**  All right.  Thank you.

8    **BY MR. LASKER**

9    **Q.**   And with respect to the level of use during that time

10   period in the early years, in your rebuttal expert report you

11   actually did address that question about when there was heavy

12   use of glyphosate during -- over the time period that

13   glyphosate has been approved.  Do you recall that in your

14   expert report?

15   **A.**   Would you mind showing me?

16   **Q.**   Sure.  It's Tab 8.  It's your rebuttal report at Page 3.

17   **A.**   Yes.

18   **Q.**   And if you can look about seven lines from the top, you

19   talk about the usage of glyphosate during these first 13 years

20   of approval; correct?

21   **A.**   Yes.

22   **Q.**   And you talk about the fact that during that period there

23   was only about 6 to 8 million pounds applied by farmers and

24   ranchers as of 1987; correct?

25   **A.**   That's correct.

RITZ - CROSS EXAMINATION / LASKER

1   Q.   And you note that during those first 13 years, glyphosate

2   was approved only for -- well, glyphosate was only used to kill

3   weeds before planting of crops or spraying for weed control in

4   pastures and non-crop areas; correct?

5   A.   That's correct.

6   Q.   And that's because this was prior to the adoption,

7   development of Roundup Ready crops; correct?

8   A.   That's correct.

9   Q.   And you make the point that the usage of glyphosate

10  actually became far greater in later years after the approval

11  of Roundup Ready crops; correct?

12  A.   Yes.  And I mean it's reflected in all of the studies.

13  The exposure problems and controls was about 5 percent or less

14  in the early years, and it was 85 percent and more in the AHS.

15  Q.   Okay.  And with respect to the De Roos 2003 study and

16  these early North American case-controlled studies, these were

17  population-based studies; correct?

18  A.   Yes, population-based case-controlled studies.

19  Q.   So as people came into the hospital and they had NHL, they

20  would identify them and they would then become the cases in the

21  study; correct?

22  A.   No, that's not exactly how they do it.  They actually have

23  cancer registries and they use the cancer registries.  It's not

24  hospital based.

25  Q.   Unlike the AHS study, though, this is not a study limited

RITZ - CROSS EXAMINATION / LASKER

1   to farmers.  It is a population-based study; correct?

2   **A.**   It is a population-based study in areas that were heavily

3   farming.  So if you go to Cantor, you actually see the

4   60 percent of these individuals were farmers.

5   **Q.**   And when Judge Chhabria was asking you questions about

6   other exposures, such as diesel or sun, with respect to these

7   individuals, there have been studies and there have been

8   studies in, for example, with the AHS, that found that farmers

9   are at an increased risk of NHL because of -- or at least

10  associated with diesel and sun and I think also certain types

11  of farming; correct?

12  **A.**   There are some diesel studies on farmers, but there are a

13  lot more diesel studies on other types of workers that are part

14  of a population-based study.

15  **Q.**   And you would agree -- well, let me ask you if you agree.

16      Dr. Weisenburger testified last month that 70 percent of

17  NHL cases have no known cause.  Do you agree with that?

18  **A.**   I wouldn't venture in that direction.

19  **Q.**   Okay.  Do you have an opinion one way or the other on

20  that?

21  **A.**   No.

22  **Q.**   Let's talk about the Ericksson study.  And if I'm -- I

23  want to go back to this issue of days per year in the Ericksson

24  study.

25          **MR. LASKER:**  What tab is that, Grant?

1             MR. HOLLINGSWORTH:   Tab 23.

2    BY MR. LASKER

3    Q.   Tab 23.  So it's the last tab.  And -- I'll wait until

4    you're there.  I'm sorry.

5         (Brief pause.)

6    Q.   Are you there?

7    A.   Yeah.

8    Q.   Okay.  And you mentioned that the authors in the

9    Statistical Analyses section of this paper state -- first of

10   all -- well, they state that their exposure assessment is in

11   days per year.  Do you recall that testimony?

12   A.   Yes.

13   Q.   Can you point me to that statement in this study?

14   A.   Under assessment of exposure, middle paragraph.

15   Q.   Yes.

16   A.   (As read):

17          "For all pesticides, not only number of years and

18        number of days per year, but also maximum lengths of

19        exposure per day was questioned."

20   Q.   Okay.  Is there anything necessarily in this study that

21   you're relying upon in support of your view that the exposure

22   assessment was in days per year?

23   A.   IARC concluded that it was days per year.

24   Q.   Okay.  I'm ask in this study.  Is there any other language

25   anywhere in this publication that you rely upon for your

RITZ - CROSS EXAMINATION / LASKER

1   opinion that the analysis that's presented in the tables is in

2   days per year?

3   A.    This is what I relied upon.

4   Q.    And all of the studies, I believe, that we have been

5   talking about, including the NAPP, including the AHS studies,

6   they all ask for information about exposure for a number of

7   years and also days per year; correct?

8   A.    You're saying all studies?

9   Q.    All of the glyphosate studies that we're dealing with in

10  this case.

11  A.    No.  Cantor didn't.  And there were some others who

12  didn't, who didn't specify this.

13  Q.    How is it your understanding that cumulative days of

14  exposure was calculated in the NAPP?

15  A.    They did not calculate cumulative days.

16  Q.    In the NAPP.  Remember, we have seven days.  We had the

17  number of years --

18  A.    That was number of years times days per -- days per year.

19  Q.    Okay.  And Cantor is pulled into the NAPP; correct?

20  A.    But not for those analyses because they wouldn't have had

21  the data.

22  Q.    Is it your understanding that they don't have days per

23  year of data in Cantor?

24  A.    They only use those analyses for the studies where they

25  must have had those numbers.

RITZ - CROSS EXAMINATION / LASKER

1   Q.   Let me -- let me ask you to look at Tables 2 and Tables 4

2   in the Ericksson study.

3   A.   Where is it?

4   Q.   We're still in Ericksson.

5   A.   Okay.

6   Q.   And, again, this is a population-based study; correct?

7   A.   Ericksson, yes.

8   Q.   So there would be some farmers and some not farmers in

9   this study; correct?

10  A.   That's correct.

11  Q.   Is it your understanding then that the median exposure in

12  this study for this -- this population-based study for

13  phenoxyacetic acids was 45 days per year?

14  A.   It says 45 days.

15  Q.   I understand.  But this is the same table where we have

16  glyphosate as ten days.

17  A.   Right.  But they don't specify so I wouldn't know.

18  Q.   Okay.  So you don't know if phenoxyacetic acids are days

19  per year or cumulative days?

20  A.   Well, all they give us here is days.  It doesn't say

21  cumulative.

22  Q.   Okay.  But for glyphosate, which is on the same table,

23  that you believe is days per year?

24  A.   Because I looked at IARC and in IARC it says more than ten

25  days per year, and I imagine when IARC does an evaluation they

RITZ - CROSS EXAMINATION / LASKER

 1   actually go back to the original authors and ask them.

 2   Q.   Do you have any information to -- upon which to -- you

 3   base that opinion --

 4   A.   No.

 5   Q.   -- that they went back and talked to the original authors?

 6   A.   I haven't talked to them.

 7   Q.   So you're relying upon IARC for your opinions in this

 8   case, at least with respect to the Ericksson study?

 9   A.   No.  Just to clarify, there are two places where days per

10   year are mentioned.  One is in Ericksson itself and the other

11   is in the IARC monograph.

12   Q.   Let's talk some more about adjustments for the pesticides.

13   And you testified earlier today that you relied upon, if I

14   could understand you correctly, the adjusted odds ratios in

15   reaching your expert opinion in this case; is that correct?

16   A.   Yes.

17   Q.   Okay.  And when I asked you about this issue during your

18   deposition, you testified that you -- you used the unadjusted

19   odds ratios because you believed them to be the most valid

20   data; correct?

21   A.   Can I see that?

22   Q.   Sure.  If we could go to your original deposition.  And

23   this is Tab 10 in our binder, which is your September 18, 2017

24   deposition.

25        MR. HOLLINGSWORTH:  Tab 2.

1          MR. LASKER:  I'm sorry, Tab 2.  My mistake.  Thank

2    you.  It says that right there.

3    BY MR. LASKER

4    Q.   And starting at Page 152, Line 24.  This is starting --

5    just to give you context, this is where we're talking about

6    your -- the slide that you presented in the last hearing with

7    all of the different odds ratios.  And we're walking through

8    sort of like we did in your testimony in March.

9          And I would like to -- I want to just position you because

10   I'm going to take you a little bit further in to Page 157,

11   where we start talking about using adjusted versus unadjusted,

12   but I wanted you to at least have a grounding of what we're

13   talking about here.  But I'm then going to ask you to turn to

14   Page 157, starting at Line 20.

15   A.   What did you want me to read now?  53?

16   Q.   So at Page -- if you are situated at Page 157 at Line 20,

17   we're talking about the Hardell study.  Do you see that?

18   A.   Yes.

19   Q.   And my question is that you do not present the most

20   adjusted, highly adjusted odds ratios reported by the authors

21   in that study; correct?

22   A.   It says, yes.

23   Q.   And your answer was that you're presenting the odds ratio

24   that you believe has the most validity given what they present

25   in their paper; correct?

RITZ - CROSS EXAMINATION / LASKER

1   A.   Yes.

2   Q.   Okay.  And just to put this in context, you mentioned that

3   you have done research independent of this litigation where

4   you've published your own studies looking at pesticides and

5   certain cancers or other health outcomes; correct?  You've done

6   your own studies?

7   A.   Yes, yes.

8   Q.   In your own studies that you have published, you have

9   presented -- when you've presented your odds ratios, you've

10  presented odds ratios that were adjusted for exposure to other

11  pesticides; correct?

12  A.   We tried to adjust as much as we can, yes.

13  Q.   Okay.  So if I could take you, for example -- and this is

14  at Tab 14 in your binder.  This is a study that you published

15  with Dr. Clary.  And it is entitled "Pancreatic Cancer

16  Mortality and Organochlorine Pesticide Exposure in California,"

17  correct?

18  A.   Yes.

19  Q.   And if you turn to Page 309, Table 3 --

20  A.   Yes.

21  Q.   -- you present your odds ratios; correct?

22  A.   Yes.

23  Q.   And there is a footnote on that table, on Page 310 --

24  A.   Right.

25  Q.   -- where you note that all of the odds ratios that you

1  present, and I think it's all the odds ratios that you present

2  in your study, are adjusted for all 17 pesticides used in this

3  study simultaneously; correct?

4  **A.**    That's correct.

5  **Q.**    And you do not present anywhere in your paper actually

6  odds ratios that are not adjusted for exposure to other

7  pesticides; correct?

8  **A.**    They are not in this paper in the main -- I don't know.

9  Was there a supplement?  If not, then --

10  **Q.**    Not that I'm aware of.

11  **A.**    If not, then that's all we did.

12  **Q.**    And you adjusted these odds ratios for other pesticides

13  despite the fact that you did not know whether these other

14  pesticides were, in fact, risk factors for pancreatic cancer;

15  correct?

16  **A.**    We actually have 640 different pesticides to choose from.

17  We chose 17 because they were considered due to the literature

18  as carcinogenic in some way.  And this was an exploratory

19  study.  This was not a confirmative study so we wanted to use

20  all possible carcinogens and test them out, and that's what we

21  did.

22  **Q.**    Okay.  And we heard about exploratory studies and -- in

23  connection with Dr. Neugut's testimony last month.

24        But just so I'm clear, is it your testimony that we know

25  that every other pesticide in this study causes pancreatic

RITZ - CROSS EXAMINATION / LASKER

1  cancer?

2  **A.**   We don't know this.  I said we had 640 agents to choose

3  from and we chose most used -- okay.  There might be a

4  carcinogen where only one case or two cases are exposed.  I

5  have no way to estimate that odds ratio in a study like this.

6  So we made two distinctions.

7       We first said what is out there in any study, because this

8  is exploratory.  This is not a confirmative study, right?  This

9  is hypothesis generating.

10       So what we're doing is we say we have all this data.  We

11  cannot put 640 agents into the model.  That won't work.  And it

12  won't make any sense to do that.  So what we're doing is we are

13  looking at all the literature that suggests that a pesticide

14  might be a carcinogen, and then we're putting those in the

15  model, yes.

16  **Q.**   Let me ask you to turn to Tab 16.  And this is a more

17  recent publication of yours from 2014 entitled "The Association

18  Between Ambient Exposure to Organophosphates and Parkinson's

19  Disease Risk;" correct?

20  **A.**   Yes.

21  **Q.**   And if you could turn -- are you there?

22  **A.**   Yes.

23  **Q.**   If you could turn to Table 2, and it's at the back of this

24  publication in the appendix.  This is the author's manuscript

25  so they put them at the end.  It's Pages 16 and 17.

RITZ - CROSS EXAMINATION / LASKER

 1  A.    Yes.

 2  Q.    And here you are presenting your odds ratios for, again,

 3  the pesticides that you were looking at --

 4  A.    16, 17?

 5  Q.    Yes.  You have to -- oh, it goes past the --

 6  A.    Oh, pass it.  Yeah.  Yes.

 7  Q.    And for your analysis in this study, again, if you look at

 8  the footnote for all the odds ratios that you present in this

 9  study they are adjusted for exposure to other pesticides;

10  correct?

11  A.    Well, this is not pesticides, this is OPs.  This is just

12  in the class of organophosphate pesticides.

13  Q.    I understand.  The footnote, though, the bottom of the

14  table, the asterisk, notes that all of the odds ratios are

15  adjusted for other pesticides; correct?

16  A.    Other pesticides in this table.

17  Q.    Okay.  And do we know that all these other pesticides

18  cause Parkinson's disease?

19  A.    We suspect since they are OP pesticides that all of them

20  contribute in the same way because they have the same

21  mechanism, yes.  That was actually the part of this exercise,

22  to see whether, you know, all of the OPs have that effect.

23        We actually showed in another publication that there is a

24  gene environment interaction with OP pesticides.  And we have

25  also have methylation data and other data that show that all of

RITZ - CROSS EXAMINATION / LASKER

1    these OPs actually contribute.

2    **Q.**   If I could take you back now to your testimony with regard

3    to adjusting for the pesticides in this case.  And we talked

4    about -- we were talking about your testimony with regard to

5    the Hardell.  So if I could take you back again to Tab 2.  And

6    this is your September 2017 deposition.

7    **A.**   I would like to point out these had hundreds of cases

8    exposed, and this is a heavily exposed population in the

9    Central Valley where 60 percent of all cases are actually

10   exposed.

11   **Q.**   So are you back in your September 2017 deposition,

12   Page 158?

13   **A.**   Yes.

14   **Q.**   And at Lines 7 through 21, I asked you about your use of

15   the unadjusted odds ratios from the NAPP.  And, again, you

16   explain that you were presenting what you believed to be the

17   most valid model, and that that does not necessarily mean the

18   most fully adjusted model; correct?

19   **A.**   Yes.  Not necessarily.

20   **Q.**   And then continuing on, at Page 158, Line 23 through

21   Page 159, Line 9, you explain that while IARC had concluded --

22   or we're discussing about the fact that IARC had concluded that

23   it should look at the most highly adjusted odds ratios in these

24   epidemiologic studies, that was based off their criteria not

25   yours; correct?

1  **A.**   That's correct.

2  **Q.**   And then if we continue at 159, Line 11 through 160,

3  Line 2, you testified that you did not consider what IARC had

4  done, which was look at the most adjusted odds ratios as being

5  the most valid approach; correct?

6  **A.**   Not necessarily.  And I think I explained that multiple

7  times, that you can actually create bias by throwing too many

8  pesticides in a model that can't take it.

9  **Q.**   And we also talked in your deposition, your first

10  deposition about the NAPP, and you testified then that you had

11  validity concerns about the NAPP analysis that adjusted for

12  dicamba, malathion and 2,4-D; correct?

13  **A.**   Well, indeed, you could argue whether all three should be

14  in the same model.  Not because they are or aren't carcinogens,

15  but because you have multi-colinearity and you want to examine

16  what happens when you put even four pesticides that are highly

17  correlated into the same model.

18     It's different from the analyses that I did in my

19  population because my population wasn't farm workers.  It was

20  home and ambient exposure.  So the correlations aren't as

21  strong as in farmers.

22  **Q.**   And, Dr. Ritz, in your initial expert report when you

23  presented data from the NAPP and from Ericksson, from Hardell,

24  you did not mention in your expert report anywhere any of the

25  adjusted odds ratios; correct?

RITZ - CROSS EXAMINATION / LASKER

1   A.   Oh, I would -- I would doubt that.  That's -- that can't

2   be.

3   Q.   Okay.  Well, let's take a look.

4        Let's go to your expert report.  It's Tab 1.  And we can

5   start at Page 15 to 16.  And this is your discussion of the

6   NAPP data; correct?

7   A.   Yes.

8   Q.   And here you are talking about the June data not the

9   August data; correct?

10  A.   Yes, but this was actually before I had been presented

11  with these tables (indicating).

12  Q.   Okay.  So you can -- you'll agree that none of the data

13  that you provided for the NAPP in your initial expert report

14  are adjusted for other pesticides; correct?

15  A.   Let's see.  I would have to compare that.  So does it

16  quote 2.12?

17       It's different numbers.  Oh, yeah.  We have multiple

18  versions.  It's different numbers, so I can't confirm that

19  right now.

20  Q.   You don't know one way or the other?

21  A.   I can't confirm that these numbers are from the adjusted

22  or unadjusted.  I have to look back at the document.

23  Q.   Let's look at Ericksson.  Page 17 of your initial expert

24  report.

25  A.   Yes.

RITZ - CROSS EXAMINATION / LASKER

1  Q.    You represent a number of odds ratios in -- on that page

2  for Ericksson; correct?

3  A.    Yes.

4  Q.    And we know that the multivariate adjusted odds ratio is

5  1.51 for Ericksson; correct?

6  A.    That's what he represented in that model, yes.

7  Q.    And you present in your expert report, I believe it is

8  every odds ratio in the Ericksson study for glyphosate except

9  for that 1.51 number; correct?

10  A.    I'm talking here about subgroups, and I'm making the

11  argument about the subtypes of NHL.  And he never -- he never

12  adjusted for any of the pesticides, other pesticides in these

13  subgroup analyses.  So on Page 17 you can see that.

14  Q.    I'm sorry, Dr. Ritz, if you look a little bit higher on

15  the page you have about, halfway through the first paragraph:

16          "Ericksson reported a two-fold increase in NHL

17       risk with glyphosate exposure.  OR equals 2.02."

18       Correct?

19  A.    Yes.

20  Q.    That's the unadjusted ever/never odds ratio; correct?

21  A.    Yes.

22  Q.    And you do not report anywhere on this page or in this

23  expert report or in any of your expert reports the 1.51 odds

24  ratio that was adjusted for other pesticides; correct?

25  A.    This comparison is made, because I then go on saying:

RITZ - CROSS EXAMINATION / LASKER

1              "There's evidence for a dose-response, and that

2       more than ten days use has that dose-response."

3       And I wanted to make those estimates be comparable.

4    Q.   Okay.

5    A.   So you cannot compare 1.53 multiple adjusted that even

6    Ericksson says is probably the wrong way.  And you can read the

7    conclusions of Ericksson.  It actually says we have

8    multi-colinearity.  We shouldn't be adjusting for MCPA and

9    glyphosate at the same time.  So they actually recommended to

10   use this odds ratio.

11            Plus, you cannot compare two differently adjusted odds

12   ratios when you're comparing an ever/never to a dose-response.

13            So the -- the exercise here I'm making is actually doing

14   exactly that, comparing apples to apples and not to oranges.

15   Q.   Okay.  I'll ask it one more time and we can move on.

16            Do you ever in any of your expert reports in this

17   litigation mention the 1.51 adjusted odds ratio for Ericksson?

18   A.   For Ericksson?  I don't know.

19   Q.   Okay.

20   A.   I have to look it up.  But I definitely have De Roos in

21   there.

22   Q.   Okay.  We're going to talk about De Roos in a second.

23            But let's talk about the Hardell study, and this is the

24   Hardell study that was two -- two studies that was pooled into

25   a larger study --

RITZ - CROSS EXAMINATION / LASKER

1  **A.**   Yes.

2  **Q.**   -- that had a multivariate analysis when the data was

3  pooled.  You report the 3.04 odds ratio that was statistically

4  significant in the pooled data.  And that's at the top of

5  Page 18.

6  **A.**   Right.

7  **Q.**   Do you see that?

8  **A.**   Yes.

9  **Q.**   There was a multivariate odds ratio in that study that was

10  somewhere around 1.6 or so that was not statistically

11  significant.  You put it up earlier today.  You don't include

12  that anywhere in your expert report; correct?

13  **A.**   Again, I am comparing it to an earlier report.  And,

14  again, if you want to make those comparisons, you have to use

15  the same kind of estimates.

16  **Q.**   You mention -- I'm sorry.

17  **A.**   If you read this it says, likely limitations, et cetera.

18  And then I'm comparing these 3.04 and 3.1 estimates that are

19  similarly adjusted.

20  **Q.**   And -- skip over to the Cantor study, because you do

21  mention -- you do talk about the Cantor study in your expert

22  report; correct?

23  **A.**   Yes.

24  **Q.**   And the Cantor study actually adjusted for the pesticides

25  in their analysis; correct?

RITZ - CROSS EXAMINATION / LASKER

1   A.   I believe so.

2   Q.   And if you look at your expert report, and I believe it's

3   at Page 18 and 19, the Cantor study had a 1.1 odds ratio that

4   was not statistically significant, correct, for glyphosate?

5   A.   It's not stated here.

6   Q.   Okay.  Well, that was my point.  You didn't mention the

7   odds ratio -- the adjusted odds ratio for Cantor anywhere in

8   your expert report; correct?

9   A.   I don't mention any odds ratio because I refer to this

10  study as being very preliminary, and then the Lee study as

11  utilizing Cantor and the Nebraska data and actually doing

12  proper analysis.

13  Q.   And you talked about the McDuffie paper, and I want to go

14  back to that because I -- I thought that we had discussed this

15  previously.  But for the glyphosate data in McDuffie, that --

16  and the odds ratios they present for glyphosate, that was not

17  adjusted for exposures to other pesticides; correct?

18  A.   Well, as we discussed here previously, they actually tried

19  out adjustments and then decided what to adjust for and not.

20  So after seeing that in their study, all these other pesticides

21  did not predict NHL.  They kept them out of the model.  And

22  they explain that in their -- in their discussion.

23  Q.   Okay.  Let's look at that.  And this is --

24            MR. LASKER:  What tab are we at?  I'm sorry.

25            MR. HOLLINGSWORTH:  12.

RITZ - CROSS EXAMINATION / LASKER

1    BY MR. LASKER

2    Q.    Tab 12.  And -- I'm sorry.

3         At Page -- you were referring to Page 1160 in your

4    testimony earlier today and the fact that they tried adjusting

5    for other pesticides in these analyses; correct?

6    A.    Well, what they are saying is they are using the groups,

7    and then they are using individual pesticides and see whether

8    or not they are actually associated with NHL to see whether in

9    their data there is a risk increase due to these groups.

10   Q.    What they are looking here at in Table 6 and Table 7 is

11   whether exposure to those other pesticides impacted the odds

12   ratios that are reported in that -- in those tables; correct?

13   A.    No.  What this footnote actually says is that they are

14   putting these exposures into the model, and then they are

15   looking -- and they are finding in these multivariate models

16   that they do not contribute significantly to the risk of NHL.

17        So in multivariate models, these groups phenoxies,

18   carbamates, organophosphates, as well as these individual

19   pesticides, carbaryl, DDT, malathion, captan, are not

20   contributing to NHL.

21   Q.    If we look at Table 8, which is the next page where they

22   present the data on glyphosate, they have a description at the

23   top of that table with respect to the models they used in that

24   analysis; correct?

25   A.    Yes.

1  Q.   They do not state in Table 8 where they present the data

2  for glyphosate anything about other individual pesticides and a

3  multivariate model; correct?

4  A.   What they are saying is:

5          "Models that included the time variable 'days per

6       year' and stratification for age and province of

7       residence were also assessed for the individual

8       herbicide compounds, bromoxynil 2,4-DB, diallate,

9       MCPA, triallate and treflan.  No significant

10      associations were found."

11      So they tried these out in all of these analyses with

12  days.  And they found them not to be significant.

13  Q.   Just to be clear, it's 2,4-DB.

14      And because of that they didn't present data in Table 8

15  with respect to those pesticides where they did not find

16  associations; correct?

17  A.   They did what?

18  Q.   They did not report those individual herbicides that they

19  mentioned at the top.  What they did by association is they are

20  explaining we did not put them in the table because we did not

21  find associations; correct?

22  A.   That is correct.

23  Q.   There some nothing in Table 8 where the glyphosate data is

24  presented that states that they did any adjustments for

25  exposures to other pesticides; correct?

1    A.    Well, in this table is glyphosate and -- in Table 8.    And

2    it has an unexposed group, a more than zero and less than two

3    days per year use, and more than two days per use.    And in

4    those analyses they tried out these other pesticides.    MCPA is

5    one of them.

6    Q.    And it's your understanding --

7    A.    And it did not change anything according to what they say.

8    Q.    Is your understanding that they did that?    Because in

9    Table 6 and Table 7 they say they did that, but in Table 8 they

10   don't say they did that.    Is that -- am I understanding your

11   opinion here?

12   A.    That's convoluted.    I don't know.

13   Q.    I agree with that.

14   A.    Sorry.

15   Q.    I'm trying to understand where in Table 8 -- and maybe it

16   doesn't say it in Table 8, it says it somewhere else.    But

17   where in this study do you see that they adjusted the odds

18   ratio for glyphosate in Table 8 for exposure to other

19   pesticides?

20   A.    Because it states:

21           "Models that include the time variable days per

22       year and stratification for age and province were also

23       assessed for the individual herbicides compounds."

24       So that I read as meaning they put that in the model and

25   it wasn't significant so we don't see it.

 1   Q.   And with respect to all the herbicides that are listed in

 2   this table then, 2,4-D, mecocrop, glyphosate, dicamba,

 3   malathion, going down the list, they didn't adjust for those

 4   herbicides?

 5   A.   I'm not sure because they are not specific about that.

 6   Q.   Let's talk about the De Roos 2003 study.

 7           THE COURT:   Should we take a break before we do that?

 8   So why don't we return at 10 after 3:00.

 9           THE CLERK:   Court is in recess.

10      (Whereupon there was a recess in the proceedings

11        from 2:59 p.m. until 3:17 p.m.)

12           THE COURT:   Okay.   You can resume.

13   BY MR. LASKER

14   Q.   Dr. Ritz, before we turn to De Roos 2003, I wanted to ask

15   you a bit about the exposure measurements in the NAPP.   You

16   talked about that earlier, I think both with Judge Chhabria and

17   with your counsel, and they had years and they had days per

18   year and they had cumulative days.   Do you recall that?

19   A.   Yes.

20   Q.   Now, there has been testimony in this case -- and my first

21   question will be whether you're aware of this, but there was

22   testimony in the hearing in March by Dr. Weisenburger, and the

23   record will reflect if I've stated this correctly, but I think

24   something along the lines of that he would expect that it would

25   be about 8.5 years of cumulative exposure of glyphosate, that

1  glyphosate would be needed before there could be a risk of

2  non-Hodgkin's lymphoma.

3       My first question to you is:  Are you familiar with that

4  testimony?

5  **A.**   No.

6  **Q.**   Okay.  Do you have any opinion with regard to how many

7  years of cumulative exposure to glyphosate would be necessary,

8  in your opinion, to cause non-Hodgkin's lymphoma?

9  **A.**   I wouldn't venture to say anything about cumulative

10  exposure.

11  **Q.**   Let's turn to De Roos 2003.  And the De Roos study

12  actually presents two odds ratios.  It presents -- and its

13  Tab 6 in your binder.

14       And if you look at Table 3, De Roos presents two odds

15  ratios for all the pesticides, a logistic regression and a

16  hierarchical regression analysis; correct?

17  **A.**   That's correct.

18  **Q.**   And for glyphosate, for the logistic regression analysis

19  it was a 2.1, which was statistically significant; and for the

20  hierarchical regression, it was a 1.6 odds ratios that was not

21  significant; correct?

22  **A.**   Yeah.  The confidence level is .9 to 2.8.

23  **Q.**   You discussed the hierarchical regression approach

24  generally in your initial expert report; do you recall that?

25  **A.**   Yes.

RITZ - CROSS EXAMINATION / LASKER

1  Q.   So let's turn to that.  This is Tab 1, and Page 5 of your

2  expert report.

3       And you have a section for Hierarchical Regression;

4  correct?

5  A.   Yes.

6  Q.   And you start off your discussion by noting that farmers

7  and pesticide applicators generally have many correlated

8  exposures to different pesticides; correct?

9  A.   Yes.

10  Q.   And you discuss a hypothetical of co-exposure to

11  glyphosate and dicamba, where both of them have odds ratios of

12  2.0 because they are correlated even if dicamba is not a

13  carcinogen; correct?

14  A.   Yes.

15  Q.   And that theoretically could work the other way, of

16  course; correct?  You could have dicamba and glyphosate having

17  odds ratios of 2.0 even though glyphosate is not a carcinogen;

18  correct?

19  A.   Well, if we ignore prior knowledge, yes.

20  Q.   And you then discuss the possibility that both of the

21  pesticides have some effect and that adjusting for co-exposure

22  could lower the odds ratios for each so that you no longer see

23  an association.

24       I think you were talking with Judge Chhabria about that

25  earlier today; correct?

RITZ - CROSS EXAMINATION / LASKER

 1   **A.**   Correct.

 2   **Q.**   And you explain that hierarchal regression is used to

 3   tease apart such correlations in order to determine which

 4   pesticides are the ones driving the increase in NHL and narrow

 5   down the long list of pesticides to find the bad actors which

 6   are increasing the risk of NHL; correct?

 7   **A.**   Yes.  But I also say that:

 8          "This approach makes a number of assumptions, for

 9          example, that either all pesticides considered or

10          pesticides within certain groups have similar effects

11          on the outcome and that these assumptions may be quite

12          incorrect."

13   **Q.**   And you have used hierarchal regression in your own

14   epidemiologic research outside of this case; correct?

15   **A.**   Correct.

16   **Q.**   And let's -- if you could turn to Tab 17 in your binder?

17          (Witness complied.)

18   **Q.**   And for the record, this is a study that you published

19   with Drs. Rull and Shaw in 2016 entitled "Neural Tube Defects

20   and Maternal Residential Proximity to Agricultural Pesticide

21   Applications;" correct?

22   **A.**   Yes.

23   **Q.**   And you are familiar with this study; correct?

24   **A.**   Oh, yes.

25   **Q.**   And if you turn to Page 748 in your publication, in the

RITZ - CROSS EXAMINATION / LASKER

```
1    statistical --

2               MR. LASKER:  I'm sorry, Your Honor.

3               THE COURT:  You're fine.

4    BY MR. LASKER

5    Q.   On the left-hand column, the Statistical Analyses section,

6    the second paragraph you state:

7               "We used hierarchical multi-level logistic

8         regression" -- and then you explain the program you

9         used -- "to reduce the possibility of false-positive

10        results when simultaneously evaluating a large number

11        of pesticides."

12        Correct?

13   A.   Yes.

14   Q.   And "false-positive" means that a pesticide is reported as

15   being associated with a health outcome when, in fact, it's not

16   associated, correct, or not causally associated?

17   A.   Correct.

18   Q.   And then you cite -- you have Footnotes 30 and 31, and

19   those are citations, if you look at the back, to two papers by

20   Dr. De Roos, the 2003 study that we have been talking about,

21   and then an earlier 2001 study; correct?

22   A.   Yes.

23   Q.   So I want to take a look at earlier 2001 study.  It's

24   Tab 18 in your binder.

25   A.   Yes.
```

1  Q.   And for the record, this is entitled "An Application of

2  Hierarchical Regression in the Investigation of Multiple

3  Paternal Occupational Exposures and Neuroblastoma in

4  Offspring;" correct?

5  A.   Yes.

6  Q.   And if you turn to page -- or if you actually start at the

7  first page of her study at 477, in the Introduction, and

8  starting in that first paragraph and then carrying over to the

9  next page, she's talking about the hierarchical method,

10 methodology that she's using; correct?

11 A.   She's talking about conventional and hierarchal

12 regression, yes.

13 Q.   And she starts off by discussing some of the problems that

14 exist with respect to doing logistic regression analyses;

15 correct?

16 A.   Yes.  And I think I explained those already.

17 Q.    Yes.  And, in fact, she mentions the same as you did.

18 The third -- the third point she raises is the same point you

19 made, the possibility of false-positives; correct?

20 A.   Right.

21 Q.   And in her next full paragraph on Page 478 in that same

22 column, starting "Hierarchal regression," Dr. De Roos states:

23         "Hierarchal regression, also known as multilevel

24     or random-coefficient modeling, is a statistical

25     method that can greatly improve the accuracy of

1    unstable estimates, especially when studying effects

2    of multiple exposures with limited data."

3    Correct?

4  **A.**   Yes.

5  **Q.**   If we go back to your study, which is Tab 17, you present

6  the results of your analyses in this paper in Table 2, which is

7  Page 746, and carries over to Page 747; correct?

8  **A.**   Yes.

9  **Q.**   And for your logistic regression analysis you actually

10  have two models, a single pesticide model and a multiple

11  pesticide model.  And that's indicated in the -- at the top of

12  the table; do you see that?

13  **A.**   Uh-huh.

14  **Q.**   And in the single pesticide model, and we can -- I'm going

15  to be referring to the abstract, but you can look throughout

16  the entire study.  I don't know if that helps.

17    But if you go to the beginning of the study on 743 and you

18  look in the abstract, you explain the single pesticide model.

19  **A.**   It's one by one, yes.

20  **Q.**   So in the abstract at 743 about halfway down you state

21  that:

22    "In the single pesticide models several

23    pesticides were associated with NTDs after adjustment

24    for study population, maternal ethnicity, educational

25    level, cigarette smoking and vitamin use."

1       Correct?

2   A.   Yes.

3   Q.   And you did not adjust in the single pesticide model for

4   exposures to other pesticides; correct?

5   A.   That's what a single pesticide model is, yes.

6   Q.   So you can do a logistic regression analysis.  That

7   doesn't answer the question whether or not you are adjusting

8   for other pesticides.  You can do it either way; correct?

9   A.   Exactly.

10   Q.   And --

11   A.   But it doesn't tell you which model is the better one.

12   Q.   Right.  In the conclusion of the your paper -- we're

13   talking about your paper right now -- when you present the

14   results of your study, it's the last paragraph.

15   A.   Uh-huh.

16   Q.   The pesticide that you cite, which is benomyl by name --

17   A.   Benomyl.

18   Q.   Benomyl, I'm sorry.

19       That is the one pesticide that the came out of your

20   hierarchal regression analysis; correct?

21   A.   It came out of all analyses -- no.  Actually, in the

22   hierarchical it's not statistically significant any more.

23   Q.   If you can go to Page 748 in your paper.  In the Results

24   section in the second paragraph.

25   A.   Yes.

RITZ - CROSS EXAMINATION / LASKER

1    Q.   You in this paper had a different definition that you were

2    using to identify exposures to pesticides that were at least of

3    interest to you, which was an odds ratio of greater than 1.4

4    with a confidence interval lower limit greater than 0.9;

5    correct?

6    A.   Yes.

7    Q.   And then at page --

8    A.   As possibly associated.

9    Q.   Right.  And then at Page 749 the left column, the top, you

10   discuss that the:

11           "The hierarchical multiple-pesticide model drew

12       the effect estimate for each pesticide toward the mean

13       of all agents in the category, and only benomyl was

14       still associated with neural tube defects."

15       Correct?

16   A.   Yes.

17   Q.   And then, again, as we mentioned in the conclusion, your

18   concluding paragraph, the only pesticide you identify, despite

19   the fact that you had a number of pesticides that popped out in

20   the earlier analysis, the only one that you mention in your

21   conclusion is benomyl; correct?

22   A.   Well, I mentioned that because I then put it into the

23   context of teratogenicity for lab animals.

24       So I'm putting this in the conclusion, back into prior

25   knowledge and in laboratory animal biologic plausibility that

RITZ - CROSS EXAMINATION / LASKER

1   we have for benomyl and not for other agents.

2   Q.   Okay.  And you don't identify any of the other agents that

3   came out of your analysis in any of the other models that you

4   used.  Benomyl is the only one that comes out in the hierarchal

5   regression analysis and it's the only one that you discuss?

6   A.   As a singular pesticide.  However, I make a lot of

7   statements about multiple exposures and exposures in certain

8   categories of pesticides.

9   Q.   Again, this is another study that you published in which

10  you again adjusted for exposures to other pesticides; correct?

11  A.   We did single pesticide models, multiple pesticide models

12  and hierarchical models.

13  Q.   Okay.  So let's look back now at De Roos 2003.

14  A.   But, again, these -- all these pesticides were

15  pre-selected.

16      I can tell you again, we have 640 agents.  We did not put

17  640 agents in here.  We used prior knowledge to select classes

18  of pesticides.

19  Q.   Okay.  If we can go back to Tab 6, and this is De Roos

20  2003.  Are you there?

21  A.   Yes.

22  Q.   And you testified both here and in the March hearing that

23  both, in your opinion, the logistic regression analysis and the

24  hierarchal regression analysis are adjusted for exposure to

25  other pesticides; correct?

1   **A.**   Correct.

2   **Q.**   I'd like to ask you to look at the Statistical Analyses

3   section of the De Roos paper.  It's on Page 2.

4   **A.**   Yes.

5   **Q.**   And if you look about halfway down that first paragraph

6   in -- under Statistical Analyses there is a line that starts,

7   paren, 75.2 percent.  Do you see that?

8   **A.**   Yes.

9   **Q.**   The author states:

10          "We employed two approaches to our analyses;

11       standard logistic regression analysis and hierarchal

12       regression."

13       Correct?

14   **A.**   Yes.

15   **Q.**   And they state that:

16          "Each model included variables for age and

17       indicator variables for study site."

18       Correct?

19   **A.**   Yes.

20   **Q.**   They then state that:

21          "Other factors known or suspected to be

22       associated with non-Hodgkin's lymphoma, including

23       first degree relative with haematopoietic cancer,

24       education, and smoking, were evaluated and found not

25       to be important confounders of the associations

RITZ - CROSS EXAMINATION / LASKER

 1          between NHL and pesticides."

 2          Correct?

 3   A.     Right.

 4   Q.     And there is no mention, in this first paragraph at least,

 5   about adjusting for potential confounding effects of other --

 6   of exposure to other pesticides; correct?

 7   A.     No.  Because the next sentence actually gives that away:

 8              "The standard logistic regression model did not

 9              assume any prior distribution of pesticide effects, in

10              contrast to the hierarchal regression modeling."

11          So I am --

12   Q.     Right.  And --

13   A.     Yeah.

14   Q.     And then the hierarchal regression model is where they

15   talk about hierarchical regression of multiple pesticide

16   exposures; correct?

17              THE COURT:  Wait.  Hold on a second.

18          Dr. Ritz, you just said the last sentence gives it away.

19              THE WITNESS:  Yes.

20              THE COURT:  I didn't understand what was being given

21   away by the last sentence.  Can you explain that?

22              THE WITNESS:  That they are using multiple pesticide

23   models, not singular pesticide models, because they are talking

24   about the assumptions they are making for the pesticide

25   effects.

1        THE COURT:  So in other words, they are not in the

2   logistical regression -- logistic regression analysis, they are

3   not making assumptions about --

4        THE WITNESS:  The distributions, yeah.

5      In the hierarchical they are making assumptions about

6   that.  That's what they are saying.

7        THE COURT:  What does it mean to make assumptions

8   about prior distribution of pesticide effects?

9        THE WITNESS:  That's exactly what hierarchical

10  regression does that logistic regression doesn't do.  Logistic

11  regression treats the data as is.  Hierarchical regression

12  says, well, what do you think the effects are?

13     And then you put weights for that belief into your model.

14  And the weights are actually given in Table 1.  And you can see

15  it's the carcinogenic probability that they are assigning, and

16  each single pesticide has a probability for causing NHL.  And

17  you can see that glyphosate here is among the lower probability

18  agents.

19     So -- which one is this?  There is one with a one.

20  Chlordane, I guess.  It's hard to see.  But that last -- that

21  last column is Carcinogenic Probability.  And when you look at

22  glyphosate, you see that it -- they give it a 30 percent

23  probability  .3 is a 30 percent probability to be carcinogenic,

24  which is the lowest -- one of the lowest.

25     There is one that has even less, and that's bentazon, with

RITZ - CROSS EXAMINATION / LASKER

1    a 10 percent.

2        But there are lots of agents that they rate much higher in

3    terms of carcinogenicity.  And that's the distribution that

4    they are putting across these pesticides.

5        **THE COURT:**  It says here:

6        "Carcinogenic probability value is created by

7        combining the classifications from the IARC Monographs

8        Programme and the U.S. EPA Integrated Risk Information

9        System."

10       **THE WITNESS:**  Right.

11       **THE COURT:**  So at this time, of course, we don't have

12   the IARC classification.

13       **THE WITNESS:**  Exactly.  Yes.  So they are just going

14   with what they have, which is all we can do; right?

15       Prior knowledge is time dependent.  So they are giving a

16   time dependent estimate of what the carcinogenicity is.  And

17   they are telling you that they are actually weighing down the

18   carcinogenicity probability for glyphosate considerably when

19   they run the hierarchical model.  And that may be wrong and you

20   can dispute.

21       Now, you know, if they would redo this, they would

22   probably give it a much higher probability.  What then happens

23   is, and I've done this before in my other studies, as we have

24   seen, you're actually -- the hierarchical model -- if you give

25   it a one, the hierarchical model will actually give you

RITZ - CROSS EXAMINATION / LASKER

1    probably exactly the same as the logistic.

2        But when you down weigh these probabilities, these

3    distributions, then you will get less and less influence from

4    what your data tells you and more and more influence from this

5    prior probability.  That's all.

6        So what we're actually doing when we're running

7    hierarchical regressions is arguing with the reviewers all the

8    time about these assumptions, and there are lots of opinions

9    and it's actually why it hasn't caught on.

10       So the papers that Mr. Lasker is actually citing were from

11   the early 2000s, where we tried to do this and convey the

12   messages by putting this prior information in and it didn't

13   come across very well.  The reviewers generally don't like it.

14   They just want to see what the data says.

15   Q.    And if we can, though, go back to the issue we were

16   discussing.  This issue of prior covariates is not discussing

17   adjustment for other pesticide exposures.  It's a separate --

18   in fact, there are two steps in the hierarchical regression

19   analysis in this paper; correct?

20   A.    Two steps?

21   Q.    Well, if you look at the hierarchical regression of

22   multiple pesticide exposures, again where we were --

23   A.    Uh-huh.

24   Q.    -- that's hierarchical regression of multiple pesticide

25   exposures; correct?

RITZ - CROSS EXAMINATION / LASKER

1        I'm sorry.  Page 2, where you were on the Statistical

2   Analyses.

3   A.    Yes.

4   Q.    And they talk about hierarchical regression of multiple

5   pesticide exposures; correct?

6   A.    Yes.

7   Q.    (As read)

8            "In the first-level model of the hierarchical

9            regression analysis NHL disease status was regressed

10           simultaneously on the 47 pesticide exposures, age, and

11           study site."

12           Correct?

13   A.    Yes.

14   Q.    So they are adjusting for all 47 of the other pesticides

15   in this first-level middle for the hierarchical regression;

16   correct?

17   A.    They are estimating, yes, in a multi-pesticide model.

18   Q.    Okay.  And then just so we can continue on to the top of

19   the second column, on Page 2 of 9, they talk about, the third

20   line, the second-level model then incorporates these prior

21   covariates; correct?

22   A.    Yes, but you actually -- you can explain it this way, but

23   the model runs together.  It doesn't run individually.  You get

24   one estimate.

25           So that's -- it's called hierarchical, but it is really

1   going back and forth between these two levels.

2   Q.   And just so we are clear then though, at least in the

3   Statistical Analyses section of this paper, they first discuss

4   adjusting for other pesticides in the hierarchical regression

5   analysis?

6   A.   The hierarchical regression analysis automatically adjusts

7   because of the way you set it, the model up.

8   Q.   There is nothing --

9   A.   It's just adding a second level, which is -- and the

10  second level kind of weighs these prior probabilities.

11  Q.   Okay.  And with respect to your testimony that the

12  logistic regression analysis adjusts for exposure to other

13  pesticides, first of all, let's take this in steps, that's not

14  stated in the Statistical Analyses section that we just looked

15  at; correct?

16  A.   Well, it's also stated at the -- in the footnote of

17  Table 3.

18  Q.   Yeah, and I want to get there.  I do have questions about

19  that, but I first want to find out from you if -- other than

20  that footnote in Table 3, if there is anything in the

21  Statistical Analyses discussion that states that there was

22  adjustments for other pesticide exposures in logistic

23  regression analysis?

24          THE COURT:  She testified that the last sentence of

25  that first paragraph in Statistical Analyses shows that the

RITZ - CROSS EXAMINATION / LASKER

1   logistic regression includes adjustment for the pesticides.

2          MR. LASKER:  Let me go back to that, because I want

3   to make sure I'm clear on that.

4   BY MR. LASKER

5   Q.   The issue that's being raised in that last sentence talks

6   about prior distribution of pesticide effects, which is

7   Table 1; correct?

8   A.   Okay.  There is actually another sentence in Statistical

9   Analyses.

10         "Because these analyses of multiple pesticides

11      modeled themselves" --

12   Q.   I'm sorry.  Where are you?

13   A.   Under Statistical Analyses.

14          THE COURT:  The paragraph immediately under that

15   heading?

16          THE WITNESS:  Yeah.

17   A.   And about the fourth or fifth line.

18         "Because these analyses of multiple pesticides

19      modeled the pesticides simultaneously, any subject

20      with missing or 'don't know' response for any one of

21      the 47 pesticides of interest was excluded from all

22      analyses."

23   BY MR. LASKER

24   Q.   Okay.  So there were analyses that were of multiple

25   pesticides and there were analyses that were not of multiple

1   pesticides?

2   **A.**   No, they were all of multiple pesticides.  That's why you

3   actually have to exclude everybody who doesn't have all data.

4   It's a complete data analysis.

5   **Q.**   I understand that.  I'm just trying to figure out what in

6   that sentence you read as stating that all of the models

7   adjusted for multiple pesticides.

8        I mean, maybe I'm misunderstanding.  It seems to read that

9   there were different models --

10  **A.**   No.

11        "Analyses of multiple pesticides, modeled the

12       pesticides simultaneously."

13        That means you're putting them all in the model.  When you

14  put them all in the model, you -- your model throws out any

15  person who has a missing value.

16       So this is a complete subject analysis based on all

17  pesticides simultaneously.  That's what this says.

18  **Q.**   I understand.  And they state that because of that they

19  excluded those responses from all analyses.

20       And my question is:  There is other analyses, at least as

21  I'm reading that, that don't adjust for other pesticides.  Am I

22  not reading that correctly?

23  **A.**   No, you don't.

24  **Q.**   Okay.

25  **A.**   This is very technical and, you know, this is how we

1    write.  Unfortunately.  But my reading of this technical text

2    is exactly what I just said.

3        They did simultaneous adjustment and because they had to,

4    therefore, use only data for complete -- for all -- I mean,

5    they needed the data for every single pesticide in order to do

6    these analyses, so they had to exclude the people who didn't

7    provide that data for each and every single pesticide.  So

8    that's why they reduced the number to these 650 and 1933.

9    **Q.**    Is there anything else in the text -- I want to turn to

10   Table 3 next, but is there anything else in the text that you

11   rely upon for your opinion that the logistic regression

12   analysis was adjusted for other pesticides?

13   **A.**    Well, I find that very clear, the explanation.

14   **Q.**    Is there anything else in the text though, or is that --

15   that's what you rely upon?

16   **A.**    When we write these papers, we have very limited space.

17   So we usually become very technical in the Methods section and

18   we don't repeat ourselves because then we have no -- you know,

19   no space to discuss.

20   **Q.**    Okay.

21   **A.**    So that's where you usually put this kind of information

22   and that's where I find it.

23   **Q.**    Let's look to Table 3, because you also mentioned the

24   footnote on the asterisk that appears in Table 3.

25            **MR. LASKER:**  And that is on Page 5, Your Honor, of

RITZ - CROSS EXAMINATION / LASKER

1    De Roos.

2    **BY MR. LASKER**

3    **Q.**    And this asterisk, which is in the table that presents

4    logistic regression and hierarchical regression, states that:

5             "Each estimate is adjusted for use of all

6        pesticides listed in Table 3, age, and study site."

7        Correct?

8    **A.**    Yes.

9    **Q.**    And am I correct in my understanding that you interpret

10   this as indicating that the logistic regression odds ratio in

11   this table adjusted for exposure to other pesticides?

12       (Court reporter clarification.)

13   **Q.**    Am I correct in my understanding that you rely, in part,

14   on this footnote in Table 3 as evidence that the logistic

15   regression analysis in De Roos 2003 was adjusted for the use of

16   other pesticides?

17   **A.**    Yes, because it says "each estimate" and the header is for

18   all estimates.

19   **Q.**    And if I could ask you to turn back to Tab 17, which is

20   your paper, the Rull publication.

21       And Table 2 presents, as we discussed, a single pesticide

22   model that did not adjust for other pesticides in the logistic

23   regression analysis, a multiple pesticide model that does

24   adjust for other pesticides, and then the hierarchical

25   regression that adjusts for other pesticides; correct?

RITZ - CROSS EXAMINATION / LASKER

1    **A.**    Correct.

2    **Q.**    And there is a footnote, a very similar footnote asterisk

3    to Table 2 in the title, that goes down to the bottom of

4    Table 2 that states:  "Each estimate" -- are you with me, the

5    asterisk?

6    **A.**    Yes.

7    **Q.**    (As read)

8              "Each estimate was adjusted for the other

9         pesticides listed, study population, maternal,

10        education..."

11        And then they go on to list some other items; correct?

12   **A.**    Yes.

13   **Q.**    So at least in this instance that footnote, which likewise

14   says each estimate was adjusted for other pesticides listed,

15   does not mean that all the odds ratios in that table were

16   adjusted for other pesticides; correct?

17   **A.**    Well, this table is differently structured.  It actually

18   has a single pesticide, and that's a very clear description,

19   and a multiple pesticide model.

20   **Q.**    I understand that, but I'm correct that while there's a

21   footnote that states identical -- very similar to the 2003

22   De Roos study, while there is a footnote to this table that

23   states "Each estimate was adjusted for the other pesticides

24   listed," at least in this table, in your paper that does not

25   mean that all the odds ratios reported in that table are

1   adjusted for other pesticides; correct?

2   **A.**   As I said, this is a different kind of table.  It actually

3   lists single pesticide and multiple pesticide models, and they

4   are very carefully labeled.

5   **Q.**   And let's turn to the issue of --

6   **A.**   And, by the way, I'm not the first author of this paper.

7   It's my student.

8   **Q.**   Okay.  The last issue I want to talk to you about is

9   non-differential exposure and misclassification.  I want to

10   make sure I understood your testimony here this morning.  And

11   maybe -- these are, for me at least, to sort of think about the

12   terms we have been using and that IARC used, for example, of

13   "bias," "confounding" and "chance."

14       And if I understand correctly, you're also looking at all

15   three of those issues with respect to the potential impact or

16   the potential issues in the -- risk ratios in the Andreotti

17   study.

18       Is that -- in explaining what happened with those odds

19   ratios, to get those odds ratios below one; correct?

20   **A.**   Well, I generally look at every single study in that way.

21   **Q.**   Okay.  So with respect to non-differential

22   misclassification, that's a bias that biases the rate ratio

23   towards the one; correct?

24   **A.**   Generally, yes.

25   **Q.**   But that bias itself, putting for the moment chance and

RITZ - CROSS EXAMINATION / LASKER

1    confounding to the outside, but non-differential

2    misclassification by itself cannot push the rate ratio past

3    one; correct?

4    **A.**    Well, there could be random fluctuation so you get an

5    estimate slightly under one, but the confidence intervals

6    conclude.

7    **Q.**    Okay.  But that -- maybe I'm misunderstanding, but random

8    is the confidence intervals concluded that's a play of chance;

9    correct?

10   **A.**    Yes.

11   **Q.**    Okay.  So there is chance and there is confounding, but

12   for the non-differential misclassification, non-differential

13   misclassification biases towards the null but not beyond the

14   null; correct?

15   **A.**    I explained that the beyond the null must be a different

16   kind of bias.  It's not non-differential misclassification.

17   It's a different bias.

18   **Q.**    Okay. I understand.

19   **A.**    It's confounding.

20   **Q.**    Okay.  And I want to get to that because there is also --

21   I want to walk through these just to help me understand.

22        There is the issue of chance, or random movements.  And

23   the play of chance with respect to the Andreotti study is

24   limited because of the size of the study and the tightness of

25   the confidence intervals; correct?

RITZ - CROSS EXAMINATION / LASKER

1   A.   We wouldn't be as worried about chance, but we're

2   certainly worried about bias.

3   Q.   I understand that.  But, again, I'm trying to take this --

4   because I'm going to get to the confounding issue, which I know

5   is a separate issue.

6        But you have the non-differential bias and then you have

7   the play of chance.

8        And with respect to the play of chance, because of the

9   size of the Andreotti study, that is not going to have as big

10  of an effect to be able to get the odds ratio -- sorry, the

11  relative risk down to that .85 range; correct?

12  A.   I haven't done the analyses, but I would think it's bias,

13  not chance.

14  Q.   And when you say "bias," and I know this is different --

15  probably the same terminology for epidemiologists, but the bias

16  that you have mentioned is residual confounding.  Am I

17  understanding that correctly?

18  A.   That's one of the biases, yes.

19  Q.   Okay.  And so with respect to residual confounding, we'll

20  just break this down, the -- and I think you explained in your

21  rebuttal report that just claiming that something is a

22  confounder is not enough; correct?

23  A.   Correct.

24  Q.   And the 2018 Andreotti study in its analysis -- and let's

25  actually -- I'm sorry.  Let's pull that up, Tab 3.

RITZ - CROSS EXAMINATION / LASKER

1           And we can actually -- if you could turn to Page 2 of the

2     Andreotti study?  We could actually put some slides up here.

3     Slide 62 is where we're going to start.

4           And we are about two-thirds of the way, three-quarters of

5     the way down the page on the second column in Andreotti 2018;

6     correct?

7     A.    Where are you?

8     Q.    On Page 2, I'm sorry.  The second column under Statistical

9     Analyses.

10    A.    Yes.

11    Q.    And if you go down, about three-quarters of the way down

12    you will see a sentence that starts "Continuous variable

13    period," and then "Risk estimates were adjusted."

14    A.    Yes.

15    Q.    So in the Andreotti study first they explain that risk

16    estimates were adjusted for age, cigarette smoking, alcoholic

17    drinks, family history of cancer, state of recruitment, and

18    five pesticides most highly correlated with glyphosate use;

19    correct?

20    A.    Yes.

21    Q.    And then moving down for a few more lines, they have some

22    other adjustments that they looked at which -- where they

23    start -- we can put it up.  It's Slide 63, if I recall

24    correctly.  I can't see the slides.

25          It starts:

RITZ - CROSS EXAMINATION / LASKER

1              "We evaluated other potential confounding

2         factors."  Do you see that?

3    A.    Yes.

4    Q.    (As read)

5              "...including body mass index, pack-years of

6         cigarettes smoked."

7         Correct?

8    A.    Yes.

9    Q.    They also mention that because women and non-whites,

10   because the numbers are small, making it hard to -- making

11   it -- precluding adjustment, they ran sensitivity analyses to

12   assess the risks of men and whites alone; correct?

13   A.    Uh-huh.

14   Q.    And they continue to state:

15             "For lymphohematopoietic cancers, we additionally

16        adjusted for occupational exposure to solvents,

17        gasoline, x-ray radiation, engine exhaust, and

18        pesticides linked to lymphohematopoietic

19        malignancies."

20        Correct?

21   A.    Yes.

22   Q.    And then if you look in the Results section on Page 3,

23   when they are talking about, sort of towards the bottom, right

24   towards the end of that second paragraph.  Second paragraph

25   talks about:

RITZ - CROSS EXAMINATION / LASKER

```
 1              "Risk ratios for unlagged intensity-weighted
 2        lifetime days."
 3        Correct?
 4   A.   Where are you?
 5   Q.   So on Page 3, the first column on the left -- column on
 6   the left.   There is only one.
 7        Under Results, and there is the second paragraph that
 8   starts:
 9              "Risk ratios for unlagged intensity-weighted
10        lifetime days."
11        Do you see that?
12   A.   Yes.
13   Q.   And if you go down towards the bottom of that paragraph
14   they state -- and it's about one, two, three, four, five -- six
15   lines from the bottom of the paragraph:
16              "These findings were unchanged in sensitivity
17        analyses, including further adjustments for additional
18        potential confounders or by exclusion of women and
19        non-whites."
20        Correct?
21   A.   Yes.
22   Q.   So the Andreotti investigators looked at a large number of
23   potential confounders and ran sensitivity analyses to determine
24   whether those potential confounders impacted their results;
25   correct?
```

1   A.   Yes.  They tried to do what they could.

2   Q.   And they didn't find in their analyses any issue of

3   confounding that would explain their results; correct?

4   A.   They did not have a variable that adjusted for -- we see,

5   for example, high school or less is 70 percent among the never

6   glyphosate users.  And the median, the less than median, more

7   than median days, we have 60 and 50 percent less than high

8   school.  And we know that less than high school education goes

9   along with a lot of lifestyle factors they probably don't have

10  any information on.

11  Q.   All right.  You don't have any information or data of

12  specific confounders that you can point to that would -- that

13  you can show push that relative risk numbers down below one, do

14  you?

15  A.   Well, as I explained, De Roos actually suggests this in

16  her analyses, where she is not using the never glyphosate users

17  for good reason.  And the good reason -- unless you want to

18  tell me the true effect as to it should be below one, there has

19  to be confounding.

20  Q.   Well, again, the relative risks here are not statistically

21  significant --

22  A.   Well, but your argument goes into the true risk ratio is

23  below one.

24  Q.   Let me clarify one point on that.  With respect to

25  non-differential misclassification of exposure -- I think we

1  talked about this last time -- if there is, in fact, no

2  association between an exposure and an outcome,

3  non-differential misclassification does not move the rate ratio

4  or odds ratio at all; correct?

5  A.   Does not move it -- I didn't hear that last.

6  Q.   If there is no association or no causal association

7  between an exposure and an outcome, non-differential

8  misclassification --

9  A.   By definition, then it's one.

10  Q.   And non-differential misclassification then does not move

11  the odds ratio in either direction?

12  A.   Below one, no.

13  Q.   And with respect to the De Roos 2005 study, they had a

14  Table 1 that looked at the characteristics of never used and

15  used as of 2005, and they had a comparison?

16  A.   Uh-huh.

17  Q.   And in this study they have different numbers because they

18  are looking at different -- people at different periods of time

19  and different people are exposed and not exposed in the 2018

20  analysis as compared to the 2005 analysis; correct?

21  A.   But the never users are pretty similar.

22  Q.   And the same authors -- many of the same authors in the

23  2005 paper are authors in the 2018 paper; correct?

24  A.   Many, but not all.

25  Q.   And let me ask one more time:  Do you -- can you point to

1  any confounder, any specific thing that you believe is a

2  confounder where you have data that shows that that confounding

3  drove the odds ratio lower?

4  **A.**   I don't have too tell you that, because I don't believe

5  that glyphosate is a healthy agent that we should put into our

6  cereal.  So I don't believe the true estimate is below one.

7       If this study shows an estimate below one, there is bias.

8  And one of the explanations is unmeasured confounding.  And

9  De Roos had exactly that suspicion and that's why she did the

10 kind of analyses she did.

11           **MR. LASKER:**  I have no further questions.

12           **THE COURT:**  Okay.  Any re-whatever-it-is before we --

13 before we wrap up?

14           **MS. FORGIE:**  I have three whatever-it-is things, Your

15 Honor.

16           **THE COURT:**  Okay.

17                      <u>**REDIRECT EXAMINATION**</u>

18 **BY MS. FORGIE**

19 **Q.**   Can you turn to Exhibit 12, please?

20           **MR. LASKER:**  This is in your book?

21           **MS. FORGIE:**  In her book, De Roos.

22           **MR. LASKER:**  Tab 12.

23           **MS. WAGSTAFF:**  Yes, our book.

24 **A.**   Yes.  Andreotti?

25

RITZ - REDIRECT EXAMINATION / FORGIE

1    **BY MS. FORGIE**

2    **Q.**   No.   De Roos 2003.

3        (Brief pause.)

4            **MS. FORGIE:**  I'm sorry.  It's Exhibit 15.  Somebody

5    else got it wrong besides me.

6    **A.**   Too many binders.

7    **BY MS. FORGIE**

8    **Q.**   Okay.

9    **A.**   Okay.

10   **Q.**   Okay.  Dr. Ritz, you were asked several questions by Mr.

11   Lasker about the De Roos 2003 publication.  Do you remember

12   some of those questions?

13   **A.**   Yes.

14   **Q.**   Okay.  And the implication of some of those questions is

15   that De Roos did not adjust for other pesticides; correct?

16   **A.**   That's what I understood.

17   **Q.**   Okay.

18            **THE COURT:**  In the logistic regression.

19   **BY MS. FORGIE**

20   **Q.**   In the logistic regression.

21   **A.**   Yes.

22   **Q.**   Thank you.

23       If you look at Page 7 of the De Roos paper, the authors

24   state that:

25            "The large number of exposed subjects allow" --

1              MR. LASKER:  Where are you?

2              MS. FORGIE:  Page 7.

3              THE COURT:  Where?

4              MS. FORGIE:  Top of -- first paragraph.  First full

5    paragraph, the top.  Sorry.  "The large number."

6              THE WITNESS:  Yes.

7    BY MS. FORGIE

8    Q.    So there the authors state that the large number of

9    exposed subjects allow for the use of other pesticides for the

10   adjustment; correct?

11   A.    Yes.

12   Q.    Okay.  So at least the authors of the 2003 De Roos study

13   state that they adjusted for other pesticides; is that correct?

14   A.    Obviously, yes.  And as far as I know, Anneclaire De Roos,

15   she would never present a single pesticide model and compare

16   that to a hierarchical model and then draw any exclusions from

17   it.  That's not what we do.

18   Q.    Okay.  And then the epidemiologic studies that we

19   discussed today and two weeks ago are peer-reviewed

20   publications; correct?

21   A.    Yes.

22   Q.    And with regard to the epidemiological methods, it's not

23   considered in epidemiology methodologically sound to rely on

24   peer-reviewed literature; is that correct?

25   A.    That is correct.

RITZ - REDIRECT EXAMINATION / FORGIE

1   Q.   And, finally, Dr. Ritz, Mr. Lasker asked you questions

2   about whether you copied various odds ratios into your expert

3   report.  Do you remember those questions?

4   A.   Yes.

5   Q.   And just for clarification, did you consider all of the

6   odds ratios, both adjusted and not adjusted, in all of the

7   studies in forming your opinions as you've given them here

8   today and two weeks ago?

9   A.   Yes, I did.  That's what I usually do.  In order to

10  understand the study, I use every single data point that the

11  study has.

12       However, when I described the study, especially in a

13  report that shouldn't be 500 pages long, then I just pull out

14  the estimates that makes sense for the argument I'm trying to

15  make and the argument depends on what the argument is.

16       Is it that there is a dose-response?  Then I pull out the

17  overall estimate that most likely reflects the dose-response

18  and, also, an estimate maybe that is comparable, most

19  comparable to those.

20  Q.   Okay.  Thank you.

21            THE COURT:  Any follow up?

22            MR. LASKER:  No.

23            THE COURT:  Okay.  Congratulations.  You're completed

24  your second day.  We'll see you again in a couple weeks.

25       (Laughter.)

PROCEEDINGS

```
 1              THE WITNESS:  I really like San Francisco, but...
 2              THE COURT:  Thank you.
 3         You can have some more water and then you can step down.
 4         (Witness excused.)
 5              THE COURT:  Okay.  So we meet again on Friday; right?
 6    What time, 10:00?
 7              MR. LASKER:  I think 10:00.
 8              THE COURT:  10:00 o'clock.
 9              MS. WAGSTAFF:  Your Honor, is there any possible way
10    we could start earlier if it's going to go as long, just
11    because it's a Friday afternoon and people may be wanting to
12    leave?  If your schedule and your schedule and your schedule
13    arise?
14              THE COURT:  Yeah.  I think that's fine.
15              MR. LASKER:  And Judge Petrou's schedule.
16              THE COURT:  I haven't checked with her, but I think
17    she probably prefers starting earlier as well.
18         When do you want to start, 9:00?
19              MS. WAGSTAFF:  9:00 o'clock would be great.
20              MR. LASKER:  9:00.
21              THE COURT:  Let's plan on starting at 9:00, unless
22    that doesn't work with Judge Petrou, and in which case we will
23    get back to you and tell you we're starting at 10:00.  But as
24    of now, plan on starting at 9:00 notation.
25              MS. GREENWALD:  Just so you know, your Honor,
```

PROCEEDINGS

```
 1   Dr. Portier is available to stay the whole day.  He's study not
 2   flying ought until Saturday morning.
 3              THE COURT:  Oh, that actually reminds me.  I mean, I
 4   may --
 5              MS. GREENWALD:  I understand that it's not --
 6              THE COURT:  We may start off on Friday with me -- you
 7   know, so it's pronounced Dr. Portier?
 8              MS. GREENWALD:  Correct.
 9              THE COURT:  I may start off, like we did today, with
10   me asking Dr. Portier questions, but maybe not, because he --
11   he never -- if I recall correctly, he did not testify at all
12   about the aspect of his opinion that discussed the
13   epidemiology, which is what we want him here for on Friday.
14        So -- so it -- if I have any questions at the outset, it
15   will probably be far fewer and you can go ahead and jump in and
16   have him present his opinion on the epidemiological studies.
17              MS. GREENWALD:  That's very helpful.  Thank you.
18   Appreciate it your Honor.
19              THE CLERK:  Court is adjourned.
20        (Proceedings adjourned.)
21
22
23
24
25
```

**I N D E X**

Wednesday, April 4, 2018 - Volume 1

| PLAINTIFF'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **RITZ, BEATE** | | |
| (SWORN) | 5 | 1 |
| Examination by the Court | 5 | 1 |
| Direct Examination by Ms. Forgie | 69 | 1 |
| Cross Examination by Mr. Lasker | 106 | 1 |
| Redirect Examination by Ms. Forgie | 169 | 1 |

—   —   —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Debra L. Pas_
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, April 4, 2018