Pages 1 - 190

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA

IN RE:  ROUNDUP PRODUCTS      )  No. M16-2741 VC
LIABILITY LITIGATION,         )  San Francisco, California
_____)  Friday
                                 April 6, 2018

### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiffs:**          ANDRUS WAGSTAFF, PC
                             7171 West Alaska Drive
                             Lakewood, CO  80226
                             (720) 255-7623
                        BY:  **AIMEE H. WAGSTAFF, ESQ.**
                             **DAVID JACKSON WOOL, ESQ.**


**For Plaintiffs:**          ANDRUS WAGSTAFF, PC
                             6315 Ascot Drive
                             Oakland, CA  94611
                             (720) 255-7623
                        BY:  **KATHRYN MILLER FORGIE**


**For Plaintiffs:**          BAUM HEDLUND ARISTEI AND GOLDMAN, PC
                             12100 Wilshire Boulevard, Suite 950
                             Los Angeles, CA  90024
                             (310) 207-3233
                        BY:  **ROBERT BRENT WISNER, ESQ.**


                             WEITZ & LUXENBERG, PC
                             700 Broadway
                             New York, New York 10003
                             (213) 5578-5802
                        BY:  **ROBIN L. GREENWALD, ESQ.**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

1    **APPEARANCES:   (CONTINUED)**

2

3    **For Defendant**          HOLLINGSWORTH, LLP
     **Monsanto Corp.:**        1350 I Street, NW
                                Washington, DC  20005
4                               (202) 898-5800
                                **ERIC GORDON LASKER, ESQ.**
5                               **HEATHER ANN PIGMAN, ESQ.**
                                **GRANT HOLLINGWORTH, ESQ.**

6

7

8    **ALSO PRESENT:  The Honorable Ioana Petrou**

9                             _   _   _

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Friday - April 6, 2018                        9:07 a.m.

 2                    P R O C E E D I N G S

 3                        ---oOo---

 4        MR. LASKER:  I have a preliminary matter, Your Honor.

 5        Plaintiffs have just provided with us a slide deck that I

 6   take it they are planning on presenting through Dr. Portier.

 7   It's 30 slides, which I have had just had a chance to look at.

 8   There is one slide that's from his expert report.  The other 29

 9   slides are new.  They are new analyses.  They're are new

10   opinions.  I've never seen those numbers before.  There is

11   calculations I've never seen before.

12        Obviously, I have had no idea -- I have not had a chance

13   to depose him.  I have no idea where we are going on this, but

14   my ability to cross-examine him on any of this is going to be

15   extremely limited.  And I thought we had addressed with Your

16   Honor on the call when these were being -- these presentations

17   were being scheduled, the question about whether or not either

18   Dr. Ritz or Dr. Portier would be presenting new opinions.  And

19   our understanding from Your Honor was that that was not the

20   intention of this hearing.  So we object very strongly to

21   virtually all of the slides in this slide deck.

22        THE COURT:  I mean, for -- for the sort of -- I know

23   that sometimes it may be difficult to figure out exactly where

24   the line is, but I've been operating under the assumption that

25   this testimony would be, you know, further elaboration of,
```

PROCEEDINGS

1  further explanation for, further detail regarding the opinions

2  that were previously offered.  So -- as opposed to new

3  opinions.

4      So, you know -- do you want to show me a certain example

5  of a slide that you think reflects a new opinion as opposed to

6  further explanation of, further elaboration of, further detail

7  about, you know, the existing opinion?

8          MR. LASKER:  Yes, Your Honor.  And, I mean, we can go

9  through them because all of them are new in different ways.

10  There are a series of new forest plots that we've never seen.

11  But if we can just walk through, I guess, the slide deck,

12  the -- and some of them are of more concern to me than others.

13          MS. GREENWALD:  Your Honor, can I just make one

14  comment before?  I don't mean to interrupt, Erik, I apologize.

15      But I just want to make it clear, because we have gone

16  through this with Dr. Portier.  These slides are literally

17  illustrative of what's in his report.  There is, I assure you,

18  no new opinion here.  These are helping to explain some of the

19  questions that Your Honors have been asking from the bench,

20  both the *Daubert* one --

21          THE COURT:  That's fine.  But let me hear from

22  Mr. Lasker about his concerns.

23          MS. GREENWALD:  Okay.

24          MR. LASKER:  So some of these I'm less concerned

25  with, although they are new.  The forest plot on Slide 2 I've

PROCEEDINGS

1   never seen before but they are numbers we've dealt with.  And

2   I'm less concerned also with 3 and 4 just seem to be

3   explanatory of basic concepts.

4        5 is actually -- I'm sorry.  Slide 5 is actually from his

5   forest plot.

6        Slide 6 I think seems consistent, although it's a

7   different visual, so I'm not sure.

8             THE COURT:  Different visual --

9             MR. LASKER:  I don't think I object.  That was my

10  point there.

11       Slide 7 is dealing with latency, and there are a variety

12  of opinions now that are being expressed about factors that can

13  affect latency that are new.  We can hear what those are, and

14  I'll sort of take it as it comes, but those opinions were not

15  offered in his expert report.

16       Slide -- I'm sorry.

17            THE COURT:  But there will be a question, he

18  mentioned latency briefly in his expert report.  He testified

19  about latency a bit more extensively the other week --

20            MR. LASKER:  Right.  And as I said, I think some of

21  these are more -- some of these I have to sort of wait for the

22  testimony.  I'm sort of walking you through in order.

23       Slide 8, I've never seen before.  This is an analysis

24  comparing numbers that I've never seen before with calculated

25  odds ratios that I've never seen before with a case-controlled

PROCEEDINGS

 1    study versus a cohort study.  None of these analyses or

 2    opinions were expressed.  If I can walk through this --

 3         MS. GREENWALD:  Can I stop you there for a minute?

 4    Number 8 is a hypothetical, just to help explain.  It's nothing

 5    to do with any of the data in this case.

 6         THE COURT:  One of the things that's a little

 7    annoying about this is that you only gave the slide deck to

 8    Mr. Lasker this morning.  I would think that you could have

 9    given it to him earlier.

10         MS. GREENWALD:  Your Honor, there is a real problem.

11    I mean, Dr. Portier lives in Switzerland and he flew in, as you

12    know -- well, you don't know this.  He flew in -- well, he got

13    in at 1:00 a.m. the night before Dr. Ritz testified.  He was in

14    court --

15         THE COURT:  There is -- there is email and you can

16    email slide decks back and forth, and you can talk on the

17    phone, and you can talk by video conference.  I mean, anyway --

18         MS. GREENWALD:  I assure you, we did this yesterday.

19    But, okay.  I understand.

20         MR. LASKER:  If I could just continue.

21         Slide 9 I'm not as concerned about.  It's a new forest

22    plot, but I've seen all these numbers before.

23         Slide 10, I'm not concerned about.

24         And Slide 11, just is an introductory slide.

25         Slide 12 and 13, again, seem to be introductory.  So I

PROCEEDINGS

1    don't have as concerns -- as many concerns about those, but

2    there's a lot of steps that he discusses in here, going into

3    detail about the imputation method and how it was done that he

4    did not have in his expert report.  I have -- I'm sort of at a

5    loss of where he is going with these.

6         THE COURT:  But did he -- I may be misremembering

7    this, but in his supplemental report did he not criticize AHS

8    for the manner in which it imputed exposure information and the

9    like?

10        MR. LASKER:  He did.  And as I'm looking at Slide 13

11   and 14, I think these are just describing the Heltshe

12   methodology.  I'm reading this as we go along.  I don't think

13   those are issues, but I'm sort of doing this on the fly.

14        THE COURT:  I understand.

15        MR. LASKER:  And Slide 16, he had talked about this

16   issue before.  We had not had this graphic, but I'm at least

17   familiar with the issue.  These numbers and calculations of

18   absolute bias that he has here, I've never seen before.  And

19   I'm not sure, sitting here, how they are calculated or whether

20   or not I would have an issue with them if I had had time to

21   look at them.  They are just new numbers for me.

22        He had talked about the fact that the predictions were

23   below the -- the general issue he had raised, but I've not seen

24   any of these calculations before.

25        The slides from 17 to, I guess it's -- I think these --

PROCEEDINGS

1   I'm not sure where they end, maybe through 25 --

2            **MS. GREENWALD:**  Yes, that's right.

3        **MR. LASKER:**  -- I take it may be going to be a

4   hypothetical that is -- that is presenting different

5   calculations based upon different types of non-differential

6   exposure classification.  That's what it looks like to me.  And

7   then he is going to have some calculations on how that would

8   impact.

9        Again, I don't know if these calculations are right or

10  wrong.  I have not seen them before.  And I'm not going to be

11  able to do anything with them today other than just --

12           **THE COURT:**  You might be able to do something with

13  them today.  Thus far, it appears that you know the material

14  better than a number of the experts, so perhaps you will be

15  able to do something with it today.

16           **MR. LASKER:**  The issue, though, Your Honor, is the

17  calculations.  I don't -- these are numbers that he's

18  presenting.  He's got calculations and percentages.  And I do

19  understand the materials, but I can't do the math and I don't

20  know how he's done the math and I'd have to explore it here

21  today.  I have not had a chance to question him about that.

22           **THE COURT:**  I understand your concern.  And I think

23  there is always going to be difficulty in, you know, sort of

24  drawing the line between what's a new opinion and what's an

25  elaboration of an existing opinion.

PROCEEDINGS

```
 1          I've sensed that this is going to be an issue for you.

 2    You know, sort of once we wrap up today, that's going to be an

 3    issue for you.  And I was sort of expecting you to say, you

 4    know:  We would like the opportunity to file a brief on what

 5    is -- you know, what opinions -- what aspects of the opinions

 6    that Dr. Ritz and Dr. Portier offered this week are new

 7    opinions and unclosed opinions.

 8              MR. LASKER:  Right.

 9              THE COURT:  And if you want, you can do that.  You

10    would have to do it quickly.

11              MR. LASKER:  Yes.

12              THE COURT:  But if you want to do that by, say,

13    Monday, you know, you can file a brief sort of objecting to

14    what you believe are new opinions from these witnesses as

15    opposed to elaborations, I would invite you to do that.

16              MR. LASKER:  Okay.

17              THE COURT:  And explain why it was unfair for

18    Dr. Portier to testify about X or Y on this day.

19              MR. LASKER:  Yes.

20              THE COURT:  And, but one other thing.  If you take me

21    up on the invitation to file that brief, I would like you to

22    address something that is related to that, which is -- it's one

23    thing for an expert to disclose an opinion in a report and then

24    testify at deposition in support of that opinion, and then get

25    up on the stand in front of a jury at a trial and testify to
```

 1   something different, where the -- you know, the -- the other

 2   side is entirely sandbagged by that and hasn't had an

 3   opportunity to address it.  You know, that is the classic sort

 4   of scenario where, you know, a judge would exclude testimony

 5   because it was an undisclosed opinion.  Right?

 6        One question I have been wondering about is -- you know,

 7   is the analysis a little bit different in a context like this

 8   when we're -- you know, we're engaging in this phase one

 9   inquiry that is still far, far away from any jury trial, right?

10   You know, what -- you know, how -- how does a judge deal with

11   arguments about undisclosed opinions in a context like that?

12   And should a judge be thinking about it differently in a

13   context like that?  And you could -- you could address that

14   question in your brief.

15            MR. LASKER:  Yes, Your Honor.  And there is case law

16   on that that we would be happy to point you to.

17            THE COURT:  If I recall -- I mean, I'm just -- I

18   don't remember the name of the case, but there was a case that

19   the plaintiffs cited, I believe.  And I believe it was a

20   District Court opinion from somewhere in the 11th Circuit,

21   maybe Florida or something like that, maybe Miami.

22            MR. LASKER:  Yes.

23            THE COURT:  Where the -- although I wasn't actually

24   that -- it's been awhile since I've read it, but I wasn't that

25   impressed with the judge's conclusion in that case to allow the

PROCEEDINGS

1   expert opinion in.  You know, the judge also discussed, you

2   know, this issue that I'm talking about, at least a little bit,

3   and that -- that discussion seemed at least somewhat persuasive

4   to me.

5        So if you could address that, that would be helpful.

6            MR. LASKER:  Yeah.  We will, Your Honor.

7        And just one more thing and then I'll sit down before...

8        But Slide 27, Dr. Portier is presenting numbers from the

9   NAPP.  And Dr. Portier never mentioned the NAPP in any of his

10  expert reports, so this is not expansion on opinions.  It's he

11  had not offered opinions.

12       And I had asked him briefly whether he looked at it and he

13  said:  I was shown some slides, but I don't remember them.  So

14  that's a completely new opinion.

15           THE COURT:  And I recall that as well, and that may

16  be a concern.  We can let him testify about it now, but I may

17  not consider it.

18           MR. LASKER:  Thank you, Your Honor.

19           MS. GREENWALD:  Can I make one -- couple of

20  clarification points?

21       So as to the Andreotti, which is Slides 11 through 26,

22  Mr. Lasker deposed Dr. Portier on this very study in London,

23  according to your Honor's order, when you had supplemental

24  depositions and supplemental reports.

25       I just want to let you know he did have an opportunity.

PROCEEDINGS

1    For example, 16, which Mr. Lasker suggested he's never had an

2    opportunity to talk to Dr. Portier about, which is the Heltshe

3    study.  He spent probably almost half of the deposition talking

4    to him about Heltshe.  So I just want to let you know.  It

5    wasn't fun at all.

6        And, also, he did elicit questions from Dr. Portier about

7    NAPP.  But with that said, I just wanted to clarify that.

8        And can we talk a little bit maybe at the end of the day

9    about whether we have an opportunity to respond?  Because I

10   don't know what they are going to --

11            THE COURT:  You can file a response to them, but,

12   again, it's going to have to be very quick.

13            MS. GREENWALD:  I understand.  You're doing Monday,

14   by the end of the day.

15       Can we do Wednesday morning?  Wednesday afternoon?  Is

16   that okay?

17            THE COURT:  Wednesday is fine.

18            MS. GREENWALD:  Okay.  Thank you.

19            THE COURT:  Okay.  Dr. Portier, do you want to come

20   on up?

21            MS. GREENWALD:  Your Honor, do you want to start?  Do

22   you want me to start?

23            THE COURT:  I'll let you go ahead and start.  I have

24   some questions, but I will have fewer because he hasn't

25   provided the testimony.

 1            **MS. GREENWALD:**  I understand.  That's what I assumed.

 2            **THE COURT:**  So I'll let you go ahead and start.

 3                        <u>**CHRISTOPHER PORTIER**</u>,

 4    called as a witness for the Plaintiff, having been duly sworn,

 5    testified as follows:

 6            **THE WITNESS:**  I do.

 7            **THE CLERK:**  Thank you.  Please be seated.

 8         And for the record, please state your first and last name

 9    and spell both of them.

10            **THE WITNESS:**  Christopher Portier.

11    C-H-R-I-S-T-O-P-H-E-R, P-O-R-T-I-E-R.

12            **THE COURT:**  It sounded like you just said Portier.

13            **THE WITNESS:**  Good morning, Your Honor.  I'm afraid

14    you were told wrong on Wednesday.

15            **MS. GREENWALD:**  It was my fault.  At the end of the

16    day, I was not thinking clearly, so I apologize.

17            **THE COURT:**  No problem.

18         Sorry about that, Dr. Portier.

19                        <u>**DIRECT EXAMINATION**</u>

20    **BY MS. GREENWALD**

21    **Q.**   Good morning.

22         Can you just briefly tell the Court about your

23    epidemiological background?

24    **A.**   I have some education in epidemiology.  My PhD had a minor

25    in epidemiology, an application in biostat.

1       Early in my career I did a little bit of epidemiology.

2  Throughout my career I've spent a lot of time reviewing

3  epidemiology as part of my job and for other reasons.

4       Recently I've started publishing epidemiology papers

5  again.  I had one come out three months ago looking at exposure

6  in Oakland, exposure to air pollution in Oakland.  We drove

7  Google Street View cars around Oakland for two years looking at

8  how much air pollution there is.  We have another paper coming

9  out in the very near future --

10       THE COURT:  Can you tell me a little bit more about

11  that Oakland paper?

12       THE WITNESS:  Well, this is the same thing, because

13  what we're also doing is following up that up with Kaiser

14  Permanente and our exposure from the City and trying to see

15  what it means to the health of the people in the city --

16       THE COURT:  I am curious.  So -- so what exposure are

17  you looking at?  Just air pollution generally?

18       THE WITNESS:  Different components of air pollution,

19  NOx, SOx, carbon black, PM2.5.  These are things that we worry

20  about.

21       THE COURT:  So you're -- so how are you measuring air

22  pollution?

23       THE WITNESS:  Oh, the Street View cars have

24  instruments --

25       THE COURT:  What cars?

1        THE WITNESS:  Street View.  These are the Google cars

2   that go around and measure, take pictures of everything.  They

3   have equipment in the trunk that -- GC mass specs and things,

4   and little tubes on the roof that suck in air into the trunk

5   and measure it and send the information to Google, who stores

6   it, and then comes back to us and we analyze it and made a

7   paper about it.

8        THE COURT:  Huh.  And so what are you -- what did

9   that paper conclude?

10       THE WITNESS:  Oh, we were interested in the -- the

11  purpose is to see how well we can measure air pollution using a

12  car for -- with cheap systems and compare that to what the

13  regulatory monitors do, and we concluded we did a better job.

14  And we can pick up hot spots in the city and show you why those

15  are hot spots, why they have elevated levels simply because of

16  traffic flow or things that could be fixed.

17       So the whole purpose was to try to see if there was a way

18  to understand how to use this data to better design cities like

19  Oakland.  We're now doing the whole Bay Area.  We have now six

20  cars driving around the whole Bay Area.

21       THE COURT:  So does that -- does that -- did that

22  study seek to identify different sources of pollution or just

23  measure the amount of pollution in particular parts of Oakland?

24       THE WITNESS:  We measured the amount of pollution

25  that was predominant, but -- we spent some time looking at

PORTIER - DIRECT EXAMINATION / GREENWALD

1    sources of pollution.

2         I mean, you know you've got the port right there.  That's

3    a huge source of pollutants, but both -- all the interstates

4    around the city are extreme sources of pollutants for Oakland.

5    West Oakland is worse than East Oakland.  Yeah.

6              THE COURT:  Okay.  And where -- and you said that's a

7    paper that's published?

8              THE WITNESS:  Yeah.  Journal of Environmental Science

9    and Technology.

10             THE COURT:  Okay.  Thank you.

11             THE WITNESS:  I will be happy to get you a copy, if

12   you would like it.

13             THE COURT:  That's okay.

14   BY MS. GREENWALD

15   Q.   Okay.  If we can go to the first slide, please?

16             THE COURT:  But I actually -- were you done talking

17   about his epidemiology experience?

18             MS. GREENWALD:  I didn't want to -- yes, but I can

19   more than happily --

20             THE COURT:  I would like to hear a little more detail

21   about your experience in epidemiology.

22        I mean, I was going back through your expert report last

23   night.  There is not really -- I mean, there is not really any

24   discussion of epidemiology in your qualifications, is there?

25   In the section of your report on qualifications?

PORTIER - DIRECT EXAMINATION / GREENWALD

1    I mean you talk about your jobs --

2         THE WITNESS:  Correct.

3         THE COURT:  -- and you -- you know, you talk -- you

4    talk about the things you've studied, but when -- it looked to

5    me like whenever -- whenever you get into specifics about

6    things that you studied, it's always a focus on animal studies.

7         And so I -- after reading that, I was left wanting to know

8    a little bit more about, you know, in your -- in your various

9    jobs, like at NTP and, you know, at the National Center for

10   Environmental Health, you know, how much of your work focused

11   on epidemiology as opposed to toxicology?

12        THE WITNESS:  Okay.

13        THE COURT:  If you could kind of walk me through your

14   history of that.

15        THE WITNESS:  I'll give you a few examples, and maybe

16   that will help better understand.

17        It's -- it's a fair statement that most of my personal

18   research is, indeed, in toxicology and mechanisms of cancer,

19   mechanisms of immunotoxicity and other areas like that.  That's

20   a fair statement.

21        In the 1990s, as an example, 1990s I was asked by the

22   U.S. Government to start a research program with Vietnam,

23   U.S.-Vietnam research program on Agent Orange and its effects

24   on people in Vietnam.  Brought together a team, designed some

25   studies.  Worked through the State Department to try to get it

1    together.  Eventually after seven years ended up funding such a

2    study.

3          So even though I didn't do the study, I was intimately

4    involved in its design, its organization and getting it put

5    together.

6          Later, '98, 1998, I was asked by Congress, again, to

7    review the health and safety of power lines and whether or not

8    they caused childhood leukemia.  That involved a predominantly

9    epidemiology study.  There was very little toxicology worth

10   looking at.  There were 18 epidemiology studies that we had to

11   review and comment on and come to some sort of conclusion that

12   would help Congress and regulatory agencies decide to what

13   agree they needed to address that question.  So I had to know

14   all the epidemiology in that situation.

15         At the NTP I was responsible for the report on

16   carcinogens.  So even though Dr. Jameson ran the day-to-day

17   operations of the report, when it came down to it, I have to be

18   the one who said:  Yes, I agree with the decision that the team

19   has come up with; or:  No, I don't.  So, again, I have to be

20   able to read and understand all of the epidemiology in detail.

21         At CDC I had several divisions that were entirely

22   epidemiology that I had to interact on a daily basis looking at

23   their papers and what they were doing.  We had a major study

24   going on in Camp Lejeune, North Carolina, where the Marines had

25   been exposed to water, underground water that had been

PORTIER - DIRECT EXAMINATION / GREENWALD

1   contaminated with toluene and other things.  I helped design

2   that study.  I negotiated with the Navy to allow us to do the

3   study.  I had to be able to put forth to them why it was an

4   important study, that the design was appropriate and everything

5   else.

6        That's -- then I've worked on reviews myself for WHO, for

7   IARC, where I've sat on the panels and had to review data.

8   When I worked --

9            THE COURT:  You sat on epidemiology panels?

10           THE WITNESS:  Only once have I sat on an

11  epidemiology -- and only partly sat on the epidemiology panel.

12  I was chairing the meeting.  It was on diesel exhaust.

13       When I was with EPA Science Advisory Panel, they had a

14  meeting on the use of human studies in pesticide approval

15  process.  There had been a push to be able to expose people to

16  pesticides and look at not toxicity of it, but the metabolism

17  and everything in people that I had to chair that -- I chaired

18  that meeting and we had a very lively discussion about it.

19  But, again, that's clinical epidemiology, but it's the same

20  thing.

21       Is that enough?

22           THE COURT:  Yeah.  Although it prompted a couple

23  other questions that crossed my mind as you were talking.

24       Diesel exhaust, so you chaired the IARC Working Group for

25  diesel exhaust?

PORTIER - DIRECT EXAMINATION / GREENWALD

1            THE WITNESS:  Yes.

2            THE COURT:  What was the conclusion?

3            THE WITNESS:  Diesel is a known human carcinogen.

4            THE COURT:  And --

5            THE WITNESS:  Diesel exhaust, sorry.

6            THE COURT:  Diesel exhaust.

7        And is that -- what -- did your working group reach any

8    conclusions about what types of cancer the diesel exhaust

9    causes?

10           THE WITNESS:  Yes.  Certainly lung cancer.  I'm not

11   sure whether there were some smaller other cancers in there,

12   but certainly lung cancer.

13           THE COURT:  What about NHL?

14           THE WITNESS:  That, I do not recall.

15           THE COURT:  Okay.  And I -- and then one -- back to

16   your Oakland paper.

17       Why is that an epidemiology study?  I mean, so you --

18   you've talked so far about the amount of pollution in the air,

19   but just studying the pollution in the air does not strike me

20   as an epidemiology study, unless I don't have the -- you know,

21   I have the wrong definition in my head of epidemiology.

22           THE WITNESS:  There's a -- the purpose of the

23   exposure study was to do epidemiology.  So we have -- I built a

24   collaboration with Kaiser Permanente, who provides health

25   services to most of northern California, or about half the

1    people in northern California.  And it was about 45,000 people

2    in and around the Oakland area.  And so what we then did was a

3    retrospective cohort study.

4         Given the exposures, we backed them up in time and said:

5    What if the City looked like this for the last ten years?  Now

6    let's look at the health records of all these people, pull them

7    apart and see if we see a pattern, in this case, for

8    cardiovascular disease.

9         We were able to show that even in this little area of West

10   Oakland, we can detect differences in cardiovascular disease

11   risks across that small population if we do this good of a job

12   with an exposure evaluation.  And that is an epi study.

13            THE COURT:  Okay.  All right.  Thank you.

14   BY MS. GREENWALD

15   Q.   Can I just ask you one follow-up about the Camp Lejeune?

16   You were looking at health outcomes of service people who lived

17   at Camp Lejeune?

18   A.   Yes.

19   Q.   Were you focusing on the breast cancer association?

20   A.   That was one thing looked at, the male breast cancer risk,

21   yes.

22   Q.   So that was, again, health outcomes in that case as well?

23   A.   I left before they finished.

24   Q.   Okay.

25   A.   And I don't remember.  I read the paper when it was done,

 1   but I don't remember.

 2   **Q.**   Okay.  Okay.  All right.  Thank you.

 3        So should we --

 4        **MS. GREENWALD:**  If you can go to the first slide now?

 5   **BY MS. GREENWALD**

 6   **Q.**   Can you please explain your methodology for evaluating the

 7   causality between glyphosate and non-Hodgkin's lymphoma?

 8   **A.**   Certainly.  In any evaluation like this, it's common

 9   methodology to review all of the data, the studies in the human

10   populations, the studies in the animal populations, and the

11   other mechanistic studies as well.

12        So my evaluation of causality here really went through all

13   of that data in great detail looking at it very carefully.

14        The studies of the human population, which I'll now spend

15   some time on, that's a straightforward methodology that most

16   people use.  Those methodologies are followed by EPA, followed

17   by the International Agency for Research on Cancer, followed by

18   the European Chemical Agency and the U.S. Report on Carcinogens

19   and others in terms of how you look at that data, how you

20   evaluate it.

21        You assess study quality to make sure that you really want

22   to include this study in your overall evaluation.  And then you

23   have to evaluate the degree to which the study supports a

24   finding of cancer in humans.

25        And typically that can range from "I don't know if this

1  study tells me anything" to "the study clearly tells me that

2  there is nothing going on," to "this study clearly tells me

3  there is something here."  And there is all the ways in between

4  of that, and I hope to try to express the -- my understanding

5  of that with these data today.

6      The guidelines, the methodology used by EPA, IARC, U.S.

7  Report on Carcinogens and to some degree EChA, I was involved

8  in the development of all those guidelines so I do have some

9  knowledge of the methodologies that they use.

10          THE COURT:  What is EChA again?

11          THE WITNESS:  European Chemical Agency.

12          MS. GREENWALD:  If you would go to the next slide,

13  please?

14  BY MS. GREENWALD

15  Q.  What is this summary plot showing?

16  A.  I'm sorry if this appears to be something new.  After

17  seeing most of the presentations, I wanted to bring up a plot

18  that puts everything up there.  So we're looking at it -- I am

19  a holistic sort of guy.  I want to see all of it up there at

20  one time.

21      So this is the -- in my expert report I identified six

22  core studies I was interested in:  The McDuffie study, the

23  Hardell 2002 study, the De Roos 2003 study, the De Roos 2005

24  study, and the Ericksson 2008 study, and the Orsi 2009.  Is

25  that six?  Yes, six.

1        And I mentioned the meta-analysis that I looked at, the

2    analysis Model 1, from Chang and Delzell.  This shows you which

3    ones were adjusted for other pesticide exposures, which ones

4    were not.  Shows you the exact range in the chart so you can

5    look at it all at once and see how they differ from each other.

6        We'll come back to this plot.

7    **Q.**  So do you want to go to the next slide and see if you can

8    explain?

9    **A.**  Yeah.  I'd like to make sure we're all on the same page of

10   what these plots really are.

11       So if you look at the next page, this is hypothetical

12   confidence bounds.  It's what you have been seeing.  It's a dot

13   and whisker plot.  You get the little whiskers and the dot in

14   the middle.

15       I changed it slightly because I'm using a log scale from

16   the bottom instead of a linear scale.  So it's slightly

17   different, but I do that because I need to be able to show you

18   a distribution.

19       So here the point estimate of the odds ratio is 1.5 and

20   the range is .9 to 5.0.

21       Now, these confidence bounds, they are derived from an

22   underlying statistical distribution.  I don't know if you --

23   you've seen these bell curves before and know what a bell curve

24   is, a normal distribution.

25       So if I could have the next slide?

PORTIER - DIRECT EXAMINATION / GREENWALD

1      So there is this underlying normal distribution that leads

2   to these curves.  What you're looking at with the whiskers on

3   this plot is the 95 percent confidence interval.  And that

4   means 2.5 percent of the mass under this distribution is to the

5   left of the lower one and 2.5 percent of the mass under this

6   curve is to the right of it.  And then 95 percent of the mass

7   of the curve is covering that whole area.  So that's what this

8   means.

9      Now, when it crosses the bound of 1, which is the area

10  where people talk about whether it's significant or not

11  significant, if the lower bound crosses 1 or not.  We're

12  talking here -- if you look at this plot, you see where there

13  is the -- the red on the left.  And then the red line that is

14  1, there is that little bit of white area right in there.

15  That, in this case, this theoretical case, is about one and a

16  half percent of the mass of this distribution.

17      So even though this crosses over -- I'm going to give you

18  some other characteristics of this -- only 4 percent of this

19  distribution is below 1.  96 percent of it is above 1.

20      So even though that 95 percent confidence interval touches

21  it, there is still a lot of distribution, a lot of probability

22  on the right side of this curve pushing you towards seeing

23  potentially an effect with this type of -- of response.

24      Is that clear?  Good?

25      If we could go back to 2.

1           **MS. GREENWALD:**  Go back to 2, please.

2    **A.**    So part of my interpretation in looking at these studies

3    is maybe slightly different than how most people expressed it

4    or I missed it.  But I'm going to use the Ericksson paper as an

5    example here.

6           Now, you might ask yourself, I certainly asked myself:

7    Why do you always see the paper, virtually all of the papers,

8    to an unadjusted analysis and then an adjusted analysis for

9    pesticides?  Why do they do that?  Why not just give you the

10   adjusted analysis for the pesticides?

11          It's because one way to interpret this is with the no

12   pesticide adjustment -- remember, it's still adjusted for age

13   and all kinds of other stuff, but with the no pesticide

14   adjustment, I'm looking to see if there is any association.

15          And then by adding in the pesticide adjustments, I'm

16   looking to see if part or all of this association can be

17   explained by other pesticides.  And those other pesticides push

18   this curve back down because they are taking some of that

19   explanation away from the, in this case, glyphosate.

20          So I look at these two and I don't say it's not

21   statistically significant when it's adjusted.  I say in this

22   case the adjustment took about -- it looks like about half of

23   the explanation -- half of the association seen for glyphosate

24   away from that chemical because of the other pesticides were

25   predicting about 50 percent of it themselves.

1          In epidemiology they talk about something called

2     "attributable fraction."  You sort of -- you've heard this.

3     It's -- we heard Weisenburger say that 70 percent of the NHL is

4     unexplained.  That means the attributable fraction is

5     30 percent.  I can attribute 30 percent -- for 30 percent of

6     the NHLs out there, I can find something that probably caused

7     it.

8          So here I'm looking at something like an attributable risk

9     as well when I think of these things.  It's a little bit over.

10    If it goes a lot over, I'm not -- I'm going to figure that the

11    pesticides completely washed out the effect.

12         But if it moves just a little, even if it becomes

13    non-significant, I'm still going to be recognizing that as

14    probably an effect by glyphosate.

15         Excuse me, my mouth is dry.

16         Okay?

17    BY MS. GREENWALD

18    Q.   Okay.

19    A.   Unless there is a question?  Good.

20              MS. GREENWALD:  If we can go now to Slide 5, please?

21    BY MS. GREENWALD

22    Q.   You mentioned just a few minutes ago that you looked at

23    six core studies.  Can you explain Slide 5 for the Court

24    please?

25    A.   Yes.  This is directly from my expert report.  It's

1    directly from Chang and Delzell's 2016 paper.

2        These are all of the studies that were looked at by Chang

3    and Delzell, and I think it's most of the ones I commented on

4    in my original expert report.

5        The red studies are the studies that went into Model 1 of

6    the meta-analysis done by Chang and Delzell.  And those are the

7    McDuffie study, unadjusted.

8        The Hardell study -- I can't remember if that's

9    adjusted -- that's the unadjusted number.  I'd have to look --

10   no, that is an adjusted number.

11       The De Roos number, that's a fully adjusted number.  And

12   that's the De Roos study using the hierarchical model.  The

13   De Roos 2005 study, fully adjusted.

14       The Ericksson study, fully adjusted.

15       And the Orsi study, which is not adjusted for other

16   pesticides.

17       And when they did their meta-analysis, they came up with a

18   meta risk of 1.3 with a lower bound 1.03 and upper bound of

19   1.6.  So they saw a positive effect.

20       The weights that you see on the side are the weights that

21   are given to these papers in the meta-analysis based on their

22   variance and based on the size of the study.  So big studies

23   with tight variance get more weight than little studies with

24   wide variance.

25       The studies with zero weight here just simply were not in

```
 1   this meta-analysis.  So they get no weight.
 2       Meta-analysis Model Number 2 switched the hierarchical
 3   model from De Roos and used just the logistic regression model
 4   from De Roos 2003.  And, again, you see a significant
 5   meta-analysis.
 6       Meta-analysis 3, took Hohenadel, 2011, and switched it for
 7   Ericksson, 2008.  And again you see a significant effect.
 8       And I forget what four is, I'm sorry.  I can't remember
 9   them all.
10       THE COURT:  Those four models are from Chang and
11   Delzell?
12       THE WITNESS:  Correct.
13       THE COURT:  Okay.
14       THE WITNESS:  They are meta-analyses that Chang and
15   Delzell did and provided the results for.
16       They did meta-analyses on a number of the individual
17   lymphomas, and I covered that in my expert report as well.
18       THE COURT:  Can I ask a question about that?
19       There were -- if I'm recalling correctly, there were three
20   meta-analyses of -- or pooled analyses of the case-controlled
21   studies.  There were Chang and Delzell.  There was the IARC
22   one.  And there was one other one I'm not remembering as I sit
23   here.
24       THE WITNESS:  That was Delzell -- I'm blanking on his
25   name.
```

1          MS. GREENWALD:  Schinasi?

2          THE WITNESS:  Yes, Schinasi.  That was done first.

3      The reason IARC decided to do their own was because

4  Schinabi somebody -- Schinasi --

5          MS. GREENWALD:  Schinasi.

6          THE WITNESS:  Schinasi.

7      They went ahead and they used the unadjusted for other

8  pesticides.  That's all they used.  And the IARC group felt

9  that they wanted to see the comparison with the adjusted

10  pesticides to see if it made a difference.

11      And so that's what they did.  And that is, indeed, what

12  Chang and Delzell did.  Chang and --

13          THE COURT:  So did IARC use McDuffie, for example?

14          THE WITNESS:  Yes.

15          THE COURT:  Because the McDuffie numbers, as I

16  recall, were not adjusted for other pesticides.

17          THE WITNESS:  That is correct.  Chang and Delzell's

18  meta-analysis Model Number 1 is exactly the same as the IARC

19  meta-analysis Model 1 -- or model, period.  They only did one.

20      This here, Chang and Delzell did a good job of looking at

21  a sensitivity analysis.  How sensitive is the finding to

22  pulling one paper out and putting another paper in, or pulling

23  one evaluation out and putting a different evaluation in from

24  these papers?  So you can see how sensitive it is.  That's a

25  very common thing with a meta-analysis.

 1              THE COURT:  So Chang and Delzell was post-IARC?

 2              THE WITNESS:  That is correct.

 3              MS. GREENWALD:  Your Honor, the Schinasi paper is

 4     Exhibit Number 23 in the book, in case you want to know where

 5     that is.

 6     BY MS. GREENWALD

 7     Q.   Anything else on this slide before we move on?

 8     A.   No.  I think this is covered.

 9     Q.   Okay.  So I'd like you to just walk through Slides 6, 7

10     and 8, which were the slides that -- you were here,

11     Dr. Portier, right, correct, during the various discussions on

12     latency?

13     A.   Yes, I was.

14     Q.   Okay.  And I believe you put together Slides 6, 7 and 8 to

15     try to explain to the Court your methodology and how you use

16     latency in your evaluations, is that right?

17     A.   Yes.

18     Q.   Okay.  So if you can walk through those, please?

19     A.   Thank you.

20          In the last time I testified, in the first *Daubert* round,

21     I tried to explain that there were three different pieces to

22     latency and I wasn't sure I got a good -- I did a good job of

23     it.

24          This is a CDC job, CDC picture from *Principles of*

25     *Epidemiology*, a 1992 book that they put out.  They redo it

 1    every few years, but they continue to use the 1992 picture for

 2    this.

 3         You start with exposure, and during the time that you're

 4    being exposed, you're susceptible to something from that

 5    exposure.  And it could be right at the beginning or it could

 6    happen after five years of exposure, but sooner or later there

 7    is a subclinical change that occurs in your body somewhere.

 8    This is for any disease.  And that subclinical change, you

 9    don't know it's there.  But it's starting to work its way

10    through.

11         At some point if you had someone looking very carefully at

12    you, you could probably detect these changes, pathologically,

13    but very seldom does that happen unless you're in autopsy.

14         So it does become detectable at that point, but you don't

15    know it's there until you start getting symptoms.  When you

16    start getting symptoms, when they get bad enough, you go to the

17    doctor and then you have the time of diagnosis.

18         So latency refers to the stage of susceptibility, stage of

19    subclinical disease and part of the stage of clinical disease.

20    It involves all of those various pieces and parts.

21              MS. GREENWALD:  Next slide.  Thank you.

22    BY MS. GREENWALD

23    Q.   This is also from that same CDC *Principles of Epidemiology*

24    book.  These are factors that they say can affect latency.  We

25    talked about most of these.

PORTIER - DIRECT EXAMINATION / GREENWALD

1    The important ones here are age at exposure, gender,

2    genetic susceptibility, other cancer risk factors and other

3    medical conditions, like immunosuppression.  You talked quite a

4    bit about that.

5    The thing I want to make important with this slide is that

6    there are many different latency patterns that you see in

7    people.  It's not just there is a latency.  There are people

8    who have a very short exposure period before they get to a very

9    short pre-clinical period, before they get to a very short

10   chronic disease period, and then they die.

11   And you've got people who get exposed for a very long time

12   and nothing happens and then they go through a fast path.  And

13   you get people who get exposed, the pre-clinical damage begins,

14   but it takes a very long time before it comes out.

15   So there's many different types of latency here.

16       THE COURT:  Asbestos would be an example of that last

17   one, right?

18       THE WITNESS:  The "last one" meaning?

19       THE COURT:  Exposed.  And you have a long period of

20   pre-clinical damage before you're diagnosed.

21       THE WITNESS:  That's correct.

22   Black lung would be the same.  Any of those types of

23   diseases tend to be longer term, but they -- they start and

24   develop over a long period of time.  Debilitating you over much

25   of that period.

1   BY MS. GREENWALD

2   Q.    Next slide?

3   A.    Yes, next slide.

4        Now, this is -- this is entirely -- I understand

5   Mr. Lasker's concern with this.  I'm not trying to make any

6   statements whatsoever about NHL in this.  This is still dealing

7   with the latency issue.  And I just wanted to make a couple

8   points about case-controlled studies versus cohort studies, and

9   so I made up these.  They are sort of supposed to look like the

10  De Roos 2003 study and the Agricultural Health Study, but they

11  are just sort of to look like that.

12       In a case-controlled study you have an underlying

13  population.  Let's take the De Roos case.  They did western

14  Nebraska, all of Iowa and parts of Minnesota, excluding the big

15  cities.  It was white males above the age of 19 predominantly,

16  although one of them did above the age of 30.  You can actually

17  go, look at the population registries for those states, those

18  areas, and you come up with about 2 million people.  So they

19  actually drew non-Hodgkin's lymphoma cases from an underlying

20  population of 2 million people.

21       Now, if -- this is the theoretical part.  If NHL occurs in

22  the general population at 15.2 cases per 100,000 population,

23  then -- this is drawing cases for three years:  1995, '96, '97.

24  Each year, just by chance, you would expect to get 274 cases.

25  That's the blue.

 1        Now, some of those cases would be exposed to glyphosate,

 2   but they would just be -- the glyphosate didn't cause it.   It's

 3   just because people were there, they get exposed.   I chose a

 4   10 percent exposed here at random, 10 percent of the people

 5   were exposed.

 6        So you get 274 unexposed randomly occurring NHLs, and

 7   30 -- is that 30? -- 30 exposed randomly occurring NHLs.   And

 8   then I choose here an odds ratio of 1.6 just to illustrate what

 9   happens if that's the case.   You get 18 additional NHLs that

10   were -- that were not spontaneous, that didn't come from other

11   sources.   Those were really due to glyphosate in this

12   theoretical situation.

13        And if you do that, at the end you end up with 55 cancers

14   that are due to the glyphosate, 91 that are exposed to

15   glyphosate but not due to it, and 832 cases that are not

16   exposed to glyphosate at all.   So that's how a case-controlled

17   study comes up.   The important thing is there is this base

18   population of 2 million people.

19        So you're sampling from a lot of people; some of which

20   have very short latencies, some of which have very long

21   latencies.   And because you're pulling from that large

22   population, you're looking at an entire latency picture.

23        If we could now go to the cohort study?

24        This is the same basic thing.   But this -- because it's a

25   cohort, it's typically now an occupational exposure.   So more

1    of the people are exposed.

2            In this case I chose 50 percent of the people were

3    exposed, but it's the same thing.  Every year you get some

4    spontaneous NHL cases.  Every year you get some NHL cases that

5    are also spontaneous but exposed to glyphosate.  And then you

6    get some that are really done because of glyphosate.

7            And you start accumulating them over the years such that

8    in the end with this example you end up with almost the same

9    number of cases caused by glyphosate in the two examples, the

10   case-control and the cohort study.

11           But the reason this pertains to latency is that in this

12   cohort study it has to go long enough for you to statistically

13   be able to detect an increase in cases due to glyphosate if

14   it's really there.

15           And so many times when we were discussing latency from

16   some of the papers, that -- that's -- latency and lag, and it's

17   a combination of being able to see something versus the other

18   latency, which was the theoretical one I laid out for you.

19           So I just wanted to point out that there are these two

20   different things that play a role in your thinking as you look

21   at these and decide about the latency issue.

22           **THE COURT:**  I'm not sure I totally understand what

23   you're saying.

24           I mean, for the cohort study example that you give, the

25   example that you give involves beginning to follow people in

```
 1   1995, is that right?  And so you start to follow people in '95.
 2   But is this example -- is this example a prospective cohort
 3   study?
 4            THE WITNESS:  Yes.
 5            THE COURT:  So this is not an example of the cohort
 6   study where they start following people in '95, but they ask
 7   them about their past exposures?
 8            THE WITNESS:  So I --
 9            THE COURT:  Only looking at their exposures from '95
10   going forward, is that right?
11            THE WITNESS:  Yes.
12            THE COURT:  In this example?
13            THE WITNESS:  Correct.
14            THE COURT:  Okay.  I understand now.
15            THE WITNESS:  That would be normal.
16            THE COURT:  Okay.
17            THE WITNESS:  The reason you do the two different
18   studies, the case-control study, if you recall, is specific to
19   the disease.  So you're only looking at NHL patients in the
20   case-control study.
21       The Agriculture Health Study, the reason the AHS funded it
22   is because they are looking at the health of 57,000 farmers and
23   pesticide.  So they are looking at everything, cardiovascular
24   disease, et cetera, et cetera.  You can't do that in a
25   case-controlled study.
```

1          But a case-controlled study is less expensive.  It covers

2    a broader base of people.  2 million population in this one

3    study.  And that's got some advantages over the expensive

4    long-term cohort study.  It's not one is better than the other.

5    It's they are used in different contexts to do different

6    issues.

7    **Q.**   Anything else on that?

8    **A.**   So in my evaluation I didn't weight one more than the

9    other.  I was looking at what they were trying to tell me more

10   than this study is so much better than that.

11   **Q.**   In the cohort study, Dr. Portier, I understand that you

12   picked this 1.6 number and, therefore, it would take 20 years

13   of following them to see all the true NHL, what you believe to

14   be the true NHL due to glyphosate exposure.

15         But is that your opinion, that it would take about 20

16   years if you were to start from day one and look forward?

17   **A.**   No.  This is strictly theoretical.  Clearly, the

18   Agricultural Health Study in the De Roos paper in 2005 had

19   already seen some indications of what was going on in that

20   cohort.  So no, I don't believe it would have to go that long.

21   I'm using this strictly for lag.  Just strictly for this

22   latency question.

23              **THE COURT:**  But why -- I mean, I guess -- I guess

24   I'm -- I'm trying to understand why you're making this point in

25   the context of this case.  Because we have one cohort study in

1  this case, and it's the AHS study, and it was not -- forgive

2  me.  I may be using the terminology wrong, but as I understand

3  it, it's not a prospective cohort study.  It's a retrospective

4  cohort study.  And they ask about people's exposure to

5  glyphosate and various other potential hazards going way back.

6      And I understand -- one thing I understand was the

7  criticism of that.  We've heard a lot about -- from Dr. Ritz,

8  about what the problems are with asking people to look back and

9  the context in which they were asked.

10      But because AHS did look back, I'm having trouble

11  understanding why you are -- what is the relevance of the point

12  that you just made about cohort studies, about prospective

13  cohort studies.

14          THE WITNESS:  Again -- suppose every year I went back

15  and asked them about their exposure.  I couldn't publish a

16  paper every year because I wouldn't have enough cases.  It

17  takes a long time before I get enough cases where now I'm

18  comfortable with reporting out what I'm seeing.

19      Okay.  So we had a lot of discussion about latency, and

20  other sources that came in and said:  Well, the latency for

21  solid cancers is this.  And the latency for hemapoietic cancers

22  is something like this.  And much of that is drawing from

23  cohort studies, where people have gone into the cohort study

24  and done lagged analyses.  But those lagged analyses were not

25  only dealing with low latencies, they are dealing with the

1    potency and how fast you get a big enough cohort to publish on.

2        So we have to be careful in interpreting whether it's a

3    short latency or a long latency in looking at the context in

4    which that term is being given to us.  That's what I'm trying

5    to point out here.  It's a minor term, a latency.  It was

6    something we discussed when I was here last time.  I didn't

7    think I got a very good picture of it for you.

8    **BY MS. GREENWALD**

9    **Q.**    Let me ask you one quick question before we move on.  At

10   baseline in the Agricultural Health Study they excluded NHL,

11   correct?

12   **A.**    Included?

13   **Q.**    At baseline they excluded NHL, is that correct?

14   **A.**    In the -- yes.

15   **Q.**    In the AHS?

16   **A.**    Anybody who had any type of hemapoietic tumor before was

17   excluded.

18   **Q.**    What's the consisting of that?

19   **A.**    Of what?

20   **Q.**    Of the fact that they excluded the NHL.

21   **A.**    They are only following new cases that would appear after

22   this point in time when they started the cohort study.

23   **Q.**    So if you can move to the next slide, please?

24   **A.**    Again, for completeness, I showed you the ever/never

25   pictures.

1       These, for those six core studies that I looked at, three

2   of them had other evaluations.  And we've talked about them.  I

3   don't necessarily need to go over them with you again and

4   again.

5       But the McDuffie study did less than two years, greater

6   than two years.  De Roos did tertiles of exposure.  And

7   Ericksson did greater than ten days exposure and greater than

8   ten years of exposure -- exposure starting greater than ten

9   years ago.  And what you see here was the patterns you saw from

10  that.  The McDuffie study was positive, unadjusted for any

11  other exposures.  That's all of McDuffie.

12      Ericksson was positive for their two exposure metrics that

13  are climbing or trying to indicate exposure response.

14      And the De Roos study had nothing on any of those.

15  **Q.**   As to this Slide Number 9, the intensity of response in

16  De Roos, that was not specific to glyphosate, is that correct?

17  **A.**   The De Roos measure unfortunately was not directly for

18  glyphosate.  In order to get the intensity of exposure, they

19  used personal protective equipment as one of the things that

20  changed the intensity.  They measured it.  But they asked that

21  question only once.

22      And these are pesticide sprayers and farmers.  Glyphosate

23  has no -- at the time there are no requirements to protect

24  yourself from glyphosate spraying.  There are for others.

25      And so when they just ask the question in general, Do you

1  use PPE, it probably pertains to the other pesticides, not so

2  much to glyphosate.  And so the intensity exposure might be a

3  little bit off.

4        MS. GREENWALD:  Okay.  Next slide, please.

5  BY MS. GREENWALD

6  Q.    This is your Bradford Hill criteria analysis, correct?

7  A.    That is correct.

8  Q.    Okay.  Can you explain why you want this up here now?

9  Since you're going to have it up again.

10  A.    This is from my expert report.  My final conclusions on my

11  Bradford Hill aspects of epidemiological data and related

12  science.

13        I will go through this again at the end.  So I'm not going

14  to go through it now, other than to say I -- I have looked at

15  this point, at all of that epidemiology, and at this point from

16  my viewing it, I found the consistency strong and I found the

17  strength of the observed association strong.

18        Part of that is the meta-analysis.  Part that is just

19  looking at the multiple studies and seeing that they are indeed

20  all greater or equal to 1 in their mean odds ratio.  Seeing

21  very little heterogeneity when we do the overall meta-analysis.

22  They are done by different research teams on different

23  continents.  They have different questionnaires.  And while

24  there is potential for bias or confounding, there is no obvious

25  bias or confounding in these data.

1    So I'll go through all of this when we get to the end.

2  **Q.**   So now Slides 11 through 15 are on the Andreotti study and

3  the imputation issues that you foresee.  And am I correct that

4  you did a supplemental report on the Andreotti study?

5  **A.**   Yes, I did.

6  **Q.**   And you were deposed on that as well, is that correct?

7  **A.**   Yes, I was.

8  **Q.**   If you could walk the Court through 11 through 15, if you

9  could explain why you believe Andreotti is methodologically

10  unsound?

11  **A.**   I will assure the Court everything in here is, indeed,

12  part of my opinion and was used in making my opinion.  Whether

13  every single slide and graph is the same as it was in the

14  supplemental, that is not the case because I -- I'm presenting

15  it to you as carefully and as in depth as I possibly can.

16    So I'm going to explain two things that I find with the

17  Andreotti study that I find method- -- methodologically

18  unsound.  I'm going to stumble over that word every time.  I

19  think the evaluations that they did with the imputed exposures

20  are entirely unreliable and shouldn't be used.  I believe that

21  the only reliable numbers are a complete case analysis.  And

22  I'll explain what that is next.

23    So why are they doing their imputation?  You've heard this

24  before.  20,968 participants did not respond to the survey.

25  8 percent had died.  15 percent refused to participate.  And

 1  14 percent just could not be found.

 2      You can do one of two things here.  The first thing you

 3  can do is say:  I don't have those 37 percent people.  I don't

 4  have their responses.  I'm going to throw them out and analyze

 5  the data without them.

 6      That can produce selection bias, and you have to be

 7  careful and look at that.  It reduces your cohort size, so it

 8  reduces your statistical power.

 9      The other thing you can do is imputation.  You can use

10  what you know about the exposures at the beginning and from the

11  people who responded and try to guess at what the exposures for

12  the others were.

13      In this case they chose to do a multi-step multiple

14  imputation.  Now, multiple imputation is a well-known technique

15  in epidemiology for doing missing values.  Multi-step multiple

16  imputation, I couldn't find another case where they used it.

17  So I don't know that it's been used anywhere else, but I want

18  to explain to you what that is.

19          MS. GREENWALD:  Next slide.

20  BY MS. GREENWALD

21  Q.  So it's a four-step process.  In the first step -- I'm

22  going to break these up for you.  You've got -- and I'm going

23  to use simpler numbers.  60 percent have responded to both;

24  40 percent have not.

25      So now in the 60 percent that responded to both, I'm going

1   to take 20 percent of those people and I'm going to put them

2   off to the side.  Because I need -- I need to check my work and

3   see how well I've done.  And the remaining people, I create

4   this model and it's a relationship between any pesticide use,

5   the thing I'm trying to predict, and the survey responses from

6   the people who answered both surveys, who are not my 20 percent

7   who are sitting off to the side, and I build this regression

8   model.  And it might use things like age, and were you exposed

9   to pesticides back at the first evaluation, and things like

10  that.

11       And then for -- then they will take the 20 percent dataset

12  and they will apply that model to that dataset as if you don't

13  know what the people's answer to whether there were any

14  pesticide exposure or not is.  And then you compare it to what

15  they actually did.  So you can see how often you got it right

16  and how often you got it wrong.

17       In this case for any pesticide use, 85.68 percent were

18  what they observed in this 20 percent, and they predicted

19  85.25 percent.  So the -- you would think the bias here is

20  .43 percent.  But that is the minimum bias, and I'll explain

21  that in a minute.  But that's how they do the first stage.  You

22  predict if you had any pesticide exposure for the people who

23  don't have the -- haven't responded.

24            **MS. GREENWALD:**  Okay.  Next slide.

25

1    BY MS. GREENWALD

2    **Q.**   This is almost the same thing.   Again, 20 percent are

3    pulled off to the side.   Now you would model the relationship

4    between pesticide use ever/never for each pesticide using the

5    same process, survey responses and logistic regression for the

6    80 percent that I had from the 60 percent that responded to

7    both.   I apply the model to the holdout dataset.

8         This is a little more complicated because this is multiple

9    imputation.   So they apply the model to the holdout dataset and

10   they get a probability that each individual used each

11   pesticide.   So I may get a probability of .9.   You may get a

12   probability of .1.   But I -- for me to do my regression

13   analysis, my logistic regression analysis and understand what's

14   going on here, I have to turn that into a:   Yes, you were

15   exposed; or:   No, you were not exposed.

16        So they then flip a weighted coin.   Let's put it that way.

17   If you're at 90 percent and they flip this weighted coin, which

18   half of the time -- 90 percent of the time is heads, 10 percent

19   of the time is tails.   If they flip that coin and it's heads,

20   then you're going to have the -- you're going to have the

21   exposure.   If it's tails, you're in the 1 percent -- 10 percent

22   chance group that even though you had a high probability, we're

23   going to tell you you didn't have the exposure.

24        They do that five times.   So that -- you now have five

25   datasets for each person.   Then they average those datasets to

 1   come up with -- they analyze each one separately.  They get an

 2   evaluation.  And they give you the average of your evaluations.

 3   That's why it's multiple imputation.  You try to avoid the

 4   problem of just doing it once and getting a randomly weird

 5   answer.

 6       So they applied it to the 20 percent holdout people.  And

 7   for glyphosate use there they observed 52.73 percent had

 8   glyphosate exposure, but they only predicted 45.42 percent.  So

 9   now the minimum imputation bias is 7.31 percent.  That means if

10   this holds in the larger dataset, 7.3 percent of the people who

11   really are exposed are being put into the unexposed group.

12       So you have misclassification bias, not just -- not

13   undifferentiated misclassification error.  You now have

14   misclassification bias because you are specifically moving

15   people only in one direction.

16       They also calculated this thing called a Brier score.  And

17   I got a lot of questions in the deposition about Brier scores

18   and I felt I really hadn't done a very good job of noting what

19   Brier scores were, so I spent more time on it.

20       A Brier score is -- for the 20 percent that I held out,

21   each person in that group has either glyphosate exposure or

22   does not have glyphosate exposure.  But they also predicted a

23   probability that they had glyphosate exposure or not.  And so

24   what they do with a Brier score is they subtract either one --

25   I'm sorry.

1    You've got this probability.  If you had the tumor, they

2    subtract -- the exposure, I'm sorry.  They subtract that

3    probability from one.  If you didn't have the exposure, they

4    subtract that probability from zero.  They do that for every

5    person.  Each time they do that, they raise that to the second

6    power, they add them all together and take the mean.  And

7    that's what a Brier score is.

8         Now, let me give you an example of a Brier score.  If --

9    if instead of going through all this fancy modeling, I give

10   every person .5 chance of having the exposure.  So right in the

11   middle.  Completely uninformative.  Then I would be subtracting

12   .5 from 1, or I would be subtracting .5 from zero, squaring

13   that, which is .25 in every case.  Adding it all up and

14   averaging it and I would get .25.  That is a random -- a

15   perfectly random Brier score.

16        Follow?

17             THE COURT:  I'm not sure.  But I'm starting to think

18   maybe the point of this is to not be able to follow it.

19             THE WITNESS:  No.  I'm sorry.  That wasn't my point.

20        It's hard to explain.  One thing I was asked in deposition

21   was:  Is this Brier score, .225, bad or good?

22        And Brier scores typically, you want them to be small.

23   The smaller the Brier score, the better you are in your

24   prediction.

25        But I couldn't tell if this was -- this .225 was really

1  bad, marginally bad, what is it?  The .25 for the random case

2  and .225 are very close to each other.  So you've only done

3  slightly better than just giving everybody a 50 percent

4  probability of being exposed.  That was the point.

5      Good?

6          MS. GREENWALD:  Okay.  Next slide.

7  A.  Yes.

8      There are two more steps in the multiple imputation.  Once

9  you've assigned somebody exposure, you have to figure out how

10 many days per use they are going to be exposed and they use

11 something called "stratified random sampling" to generate that.

12 And while I have concerns about that, I have less concerns.

13     So I -- I will explain it to you, if you want to know what

14 it is, but it seems to be okay.

15     And for first year of use, they also use stratified random

16 sampling.  A little more complicated this time.  But, again, I

17 don't have a lot of concerns with that.  I have much more

18 concern with yes, no exposure.

19          MS. GREENWALD:  Next slide.

20 A.  This is data straight out of Heltshe.

21 BY MS. GREENWALD

22 Q.  So what is the Heltshe paper, just for context for the

23 Court, please?

24 A.  I was going to go there.

25     The Heltshe paper is the paper where the Agricultural

1  Health Study puts out their imputation approach.  They apply it

2  to the dataset and show you how well it worked.  So that's what

3  all of that holdout dataset was and everything else.

4      And if you remember, I told you for glyphosate they

5  observed 5. -- 52.73 percent.  Predicted was 45.42 percent.

6  The difference between those is minus .731 percent.  And this

7  little dot on the right-hand side all the way at the bottom

8  circled with a circle and glyphosate on top is that data point.

9      What I have on the X-axis is the percentage of

10  participants with glyphosate exposure and on the Y-axis this

11  bias term, which is the difference between the observed and the

12  predicted for glyphosate.

13      THE COURT:  I take it that all these other dots, all

14  these other points, are all of the other chemicals that AHS

15  looked at?

16      THE WITNESS:  That's correct.  And the X-axis is

17  labeled incorrectly when I go to the others because it's the

18  percentage of participants with at exposure.  Okay?  You can

19  see atrazine, 2,4-D and glyphosate clearly have the biggest

20  bias terms, and the others have much smaller numbers in their

21  bias.

22      The thing to note with this slide is that if, indeed, this

23  data were unbiased, the dots would go up and down on top of the

24  line that's running horizontal.  That's zero.  They would just

25  be above and below it at random.

1        But what you have is a systematic bias.  The line that

2   I've drawn through the data shows the curve.  And so what

3   happens is the bias gets bigger, the larger the exposure.  And

4   since glyphosate is the largest exposure in this dataset, it's

5   got the biggest bias.

6        Okay.  So what does that mean in terms of exposure

7   misclassification?

8        If we can go to the next slide?

9        I tried to explain this to several people and they didn't

10  understand it.

11  **BY MS. GREENWALD**

12  **Q.**  I was one of them.

13  **A.**  So I'm going to do something simple, a little cartoon.

14  So here I've got ten people and they are observed to have no

15  glyphosate exposure or glyphosate exposure, five observed

16  without and five observed with.

17       I go to predict the exposure using my imputation method.

18  If the imputation method is perfect, really good, I get the

19  five unexposed exactly right and I get the five exposed exactly

20  right.  So that's perfect agreement.  Okay?

21       Now, I can't do this with 47,000 people, but I can do it

22  in a table.

23       And if I could have the next slide?

24       And the table looks like this.  You have the observed

25  exposure --

1  **Q.**   Slide 19.  I'm sorry, I just want to make sure we are on

2  the right slide.  Slide 19.

3           **THE COURT:**  19?

4           **MS. GREENWALD:**  Yes.  18 was just the perfect

5  agreement box.

6  **BY MS. GREENWALD**

7  **Q.**   Sorry, Chris.

8  **A.**   You have got observed exposure; yes, no.  It's 50 percent.

9  50 percent were exposed; 50 percent were not posted.

10      You have the imputed exposure; yes, no.  50 percent were

11  yes; 50 percent were no.

12      And every "yes" that was observed is also a "yes" for

13  imputed.  And every "no" that was observed is also a "no" for

14  imputed.  Perfect agreement.

15      Next slide.

16      Now, let's look at what happens when it doesn't work.  So,

17  again, we've got observed five with, five without exposure.  My

18  predicted exposure for the unexposed, I predicted three of

19  those to be exposed and two to be unexposed.  So I missed

20  three.  And for the exposed, I missed two.  I said they were

21  not exposed when in truth they were exposed.

22      Next slide.

23      So this is some agreement.  I -- I misspecified five of

24  the people basically.  And this table looks as follows.

25      There.  So there is the -- whatever slide we are on.

1  Q.   22.

2  A.   Now, the thing here that's interesting with this table, so

3  you have observed exposure 50 percent yes, observed exposure

4  50 percent no.  The imputation exposure is 60 percent yes and

5  40 percent no.

6       So you think they only missed 10 percent.  But, of course,

7  that's not true.  For the yes, the truly observed yes,

8  20 percent were predicted as no.  And for the truly observed

9  no, 30 percent were predicted as yes.  So you actually got five

10 of the people wrong, which is 50 percent were actually wrong.

11 Even though the difference between the margins, the 50/50,

12 60/40 is only 10 percent.

13       JUDGE PETROU:  And does it matter at all that you've

14 got two wrong on each side of it?  We have been having

15 endless -- not endless.  We have been having extensive

16 conversations regarding differential bias, regarding

17 non-clinical bias, and that question pops in my head as you're

18 going through this.

19       THE WITNESS:  Exactly where I'm going next.  But I'll

20 explain in it this picture, because it's simpler with this

21 picture.

22 A.   I've got three on the no, yes; two on the yes, no.  So

23 that's approximately the same.  So this is about -- this would

24 be pretty much non-differential exposure misclassification.

25 I'm flipping them back and forth.  And this would work you to

1    the null.

2         Next slide.

3         Okay.  Let's look at the exposure to any pesticide case

4    from Heltshe, et al.  And I don't know why this came up this

5    way.

6         Could you go to the next slide?

7         Okay.  We'll do it here.  Sorry.  That was supposed to be

8    also circles and stuff, but that's okay.  We'll just do it this

9    way.

10        If you remember, they told us that there was 85.68 true

11   observed exposure, and 85.25 percent imputated exposure as to

12   yes.  And that leaves 14.75 percent for imputed and

13   14.32 percent were observed for the nos.

14        Now, the best-case scenario is where virtually all of the

15   observed yeses are imputed yeses.  And we get 85.25 percent in

16   that hole.  And then all of the observed nos are predicted nos.

17   Hopefully, as many as you can get.  And that tells me that this

18   one block up here, the observed yeses that are imputed as no,

19   has to be .43 percent.  And if I do it that way, I get exactly

20   the numbers they gave me:  85.68 and 85.25.

21        But that's just one case.  I can get the exact same

22   numbers by doing it a different way.  The worst-case, I'm going

23   to put as much weight as I can in the observed nos being

24   imputed yes and the observed yeses being imputed nos.  And this

25   is the worst-case here.

1          Now, in this case you've got 14.32 percent observed yeses

2     that are predicted as no and 13.89 observed nos that are

3     predicted as yes.  So when you add those two numbers up, that's

4     28 percent error, not .43 percent error.  28 percent.  But both

5     of these numbers, these percentages, are approximately equal.

6     This is going to be non-differential exposure

7     misclassification, almost certainly.

8          Okay?  Now let's look at glyphosate, which is the next

9     slide.  Here we go.

10         So same thing for glyphosate.  52.73 percent observed as

11    having glyphosate exposure.  45.42 percent predicted.  Fill out

12    the rest of those edges of this box.  Now let's make it as good

13    as it possibly can be.

14         Again, you force as many as you can into yes observed, yes

15    imputed, as many as you can into no observed and no imputed.

16    And you end up with only 7.31 percent error in the observed

17    that are imputed to be no.  That is non-differential exposure

18    misclassification.  7.31 percent are being put in the wrong

19    place.  And only one way, not both ways.

20              **THE COURT:**  So it's non-differential or differential?

21              **THE WITNESS:**  It's differential.

22    **A.**   But what's the worst-case?

23         Next slide.

24         Again, same numbers at the margins, but now you can see

25    the yeses that are really imputed as nos and the nos that are

1    imputed yeses are much bigger.  And you've got roughly

2    98 percent error here.

3         Now, I don't believe that's what they had.  I really

4    don't.  It's somewhere in between here.  I'm pretty certain

5    it's not the best case and I'm pretty certain it's not the

6    worst case.  If it were the worst case, they shouldn't have

7    even published the paper.  But it's somewhere in between.  I

8    don't know what it is.

9         But even still, the difference in the yeses that are

10   imputed nos and the nos that are imputed yes is still

11   7.31 percent.  And so you still have differential exposure

12   misclassification and you could have a lot of non-differential

13   exposure misclassification error.

14        Next slide.

15        So that covers the imputation, so if you have any

16   questions about the imputation, we should do them now.

17        **JUDGE PETROU:**  Can we go back -- let's actually go

18   back.  In my head I'm going back to the part where you had all

19   the numbers underneath the line where you were saying that if

20   it were random, there would be some above and some below, and

21   the most severe one was glyphosate.

22        So did I read that chart correctly or not to basically say

23   that it's your opinion that this multi-step imputation process

24   led to a differential exposure misclassification, all of which

25   skewed on the side of fewer people who actually had glyphosate

 1   exposure being shown as having glyphosate exposure?

 2          THE WITNESS:  That's correct.  But the bigger problem

 3   is the people that actually had glyphosate exposure are in the

 4   control group.

 5          JUDGE PETROU:  Got it.

 6          THE WITNESS:  And the unexposed population.

 7          MS. GREENWALD:  I didn't know if that was the slide

 8   you wanted up.

 9          JUDGE PETROU:  I don't need it up.

10          MS. GREENWALD:  Okay.  All right.  Thank you.

11          THE COURT:  So this looks like your last slide on

12   Andreotti.

13          MS. GREENWALD:  Correct.

14          THE COURT:  Do you want to go through this and then

15   we'll take a break?

16          MS. GREENWALD:  Sure.

17   BY MS. GREENWALD

18   Q.   So we're on Slide 26.

19   A.   So there were other problems with the Andreotti study.  As

20   mentioned by Dr. Ritz, the exposed responses for the lifetime

21   days and intensity weighted days were compared to the controls,

22   rather than to the lowest quartile.  And in the -- if you

23   recall in the De Roos 2005 study, they compared to the lowest

24   quartile because -- tertile in that case, because they felt the

25   unexposed were different than the exposed groups in key

PORTIER - DIRECT EXAMINATION / GREENWALD

1    characteristics.

2        And so they -- they wanted to avoid having a problem by

3    going to the unexposed group when they were doing

4    dose-response.

5        If they had done that in this case -- let's look at it.

6    For lifetime days, they show an odds ratio of in quartile 1,

7    .76; quartile 2, .87; quartile 3, .85; and quartile 4, .80.

8        Now, it's a funny thing about these odds ratios.  You've

9    got -- you've got something on the top and something on the

10   bottom.  The bottom is the referent population.  The top is the

11   group that you're comparing it to.  So, for example, to get the

12   odds ratio for quartile 1, you're looking at the odds in

13   quartile 1 of the exposure, divided by the odds in quartile 1

14   of the unexposed group.

15       Now, if I take the odds of quartile 1 -- of quartile 2 and

16   divide it by the odds ratio of quartile 1, I cancel out the

17   control odds ratios and now I'm looking at an estimate of the

18   odds ratio where I'm using quartile 1 as the referent

19   population.  I can't do the confidence bounds that way.  It's

20   much too complicated.  I can't actually do it.  But I can show

21   you what the middle number would look like.

22       And when you do that you now see an odds ratio, the

23   modified odds ratio -- that's what MOR is -- of 1.1, 1.12 and

24   1.05.

25       Now, that partly might reflect upon the bias, the exposure

 1    bias that is caused by the imputation, but it's also -- there

 2    was considerable difference between this control group and the

 3    exposed group in this population as well.

 4         And so I would have liked to see them do the same thing

 5    that De Roos did in 2005.  I think it would have given us a

 6    completely different picture.

 7         The same is true with the intensity weighted odds ratios,

 8    so I just did the exact same thing there.  We talked about

 9    the -- you talked with Dr. Ritz and others about the

10    dramatically increasing use from 2000 to 2010 of glyphosate in

11    these populations in the United States.  I would have liked to

12    see the analysis using the incidents up until 2005, not all the

13    way to 2013.

14         Now, they did give me that number.  They gave me one

15    number.  The 1.04 in the highest quartile for the intensity

16    weighted value was 1.04 with a range of .7 to 1.57.  This is

17    the complete case.  This is where they threw out everybody who

18    didn't have exposures, that didn't answer the second

19    questionnaire, and just worked with the ones who did answer the

20    second questionnaire.

21         There was a lot of discussion about undifferentiated

22    exposure misclassifications pulling you to the null.  If this

23    number were the correct number -- I don't know the rest of

24    them.  I can't tell you anything else.  But it's above 1 and

25    you're pulling it to the null.  That's exactly what I would

1   expect to see.

2         So that entire business about the Andreotti paper being --

3   having odds ratios below 1, I think is partially due to the

4   bias in the imputation and I think it's partially due to, as

5   Dr. Ritz said, potential unused confounders, potential for

6   confounders that you did not put into the model.  I think both

7   of those play a potential role in bringing it down to 1.

8         I think the exposure misclassification in this is severe.

9   I would have expected that the odds ratios from this would all

10  be near 1.  I see exactly what I expected in this study, and

11  it's null.  I think it was going to be null, given all the

12  problems with it.  And so it doesn't enter into -- with a lot

13  of weight into my overall evaluation.  It gave me exactly what

14  I expected to see from a study with these problems.

15        Okay?  And I think that's it for Andreotti.

16              MS. GREENWALD:  It's break time.

17              THE COURT:  Okay.  Why don't we take a ten-minute

18  break?  We'll be back at ten minutes to the hour.

19        (Whereupon there was a recess in the proceedings

20         from 10:36 a.m. until 10:53 a.m.)

21  BY MS. GREENWALD

22  Q.   I just have a couple of follow-up and then I want to talk

23  a little bit about Slide 27.

24        Dr. Portier, if you could look at De Roos 2005, which is

25  up on the screen?  It's also Exhibit No. 23 in your notebook.

1    Oh, your screen is not working?

2        It was.  Okay.

3    **A.**    There it is.

4    **Q.**    Now, you testified earlier before the break about the

5    follow-up on exposed and unexposed group, correct?

6    **A.**    Correct.

7    **Q.**    Can you explain what you meant by that using De Roos 2005

8    in Table 1?

9    **A.**    Yes.  This is -- so there were a lot of things in the

10   survey questionnaire that are asked about:  State of residence,

11   age, sex, et cetera.

12       This table is all of the -- or some of the characteristics

13   from the applicators in the AHS study that were significantly

14   different between the most exposed group and the never exposed

15   group.  And this was the justification that De Roos gave for

16   not using the control, the never exposed population, in their

17   evaluation of intensity and length of exposure, and instead

18   using the low exposure group.  Because it looks more like the

19   high exposure group than the never exposed group.

20       And so I just wanted to illustrate that it's not just a

21   few things.  There are a number of key characteristics here

22   that could play an important role in that type of comparison:

23   Use of other pesticides, alcohol use, smoking use.  They are

24   all different between these groups.

25           **JUDGE PETROU:**  I'm sorry, because I should understand

 1   this and I don't.

 2        What was the justification, therefore, for using the

 3   lowest exposed group as opposed to the never exposed?

 4        What are the differences that we see within those two

 5   groups that would lead them to say:  We're going to use the low

 6   exposed rather than the control never exposed?

 7             THE WITNESS:  Let's just take one, for example, 2,4-D

 8   use.  In the control population, 53.3 percent used 2,4-D.  In

 9   the lowest exposed 75.2, in the highest exposed 85.1.  The

10   lowest and the highest are much closer to each other than that

11   than is the controls, the unexposed.

12        Beyond high school, 31.3 percent in the unexposed, 42.1,

13   49.9.  That's the pattern that they saw that concerned them.

14   It looked like the exposed groups were much more closely

15   related to each other than the unexposed in things that should

16   not matter.  And in doing these types of studies, you want

17   those things that should not matter to be about the same in all

18   the groups.  That way it makes your assessment of the exposure

19   response stronger because everything else is about the same.

20             JUDGE PETROU:  And things like the use or exposure to

21   2,4-D should not matter?

22        I mean, you just said that what you want is that -- the

23   things that do not matter to be similar in the group that

24   you're using as the control, which is not necessarily the

25   control group, and the high exposed group, right?  And we went

PORTIER - DIRECT EXAMINATION / GREENWALD

 1  through a number of factors, including high school degrees and

 2  all the rest of that.

 3       But the first one that you pointed out was 2,4-D.  Is

 4  2,4-D in that group of things that should not matter?

 5            THE WITNESS:  I guess I didn't explain it right.  In

 6  order to compare apples and oranges -- let's take an example.

 7  Suppose the -- 2,4-D is not a good one.

 8       What you would like to see in a laboratory study, when I

 9  was talking about the toxicology study, we control everything

10  except dose.  And the reason is that makes it a very clean

11  hypothesis.

12       In an epi study, you, of course, can't control everything,

13  but you match your cases to your controls.  You try to make

14  them as similar as possible so that when you make comparisons

15  across the thing you're interested in, glyphosate, those other

16  things aren't confounding it.  Even if you take them into

17  effect --

18            JUDGE PETROU:  Or if they are confounding it, it's

19  equally on both sides of the table?

20            THE WITNESS:  Yeah.  And if you take them into effect

21  in confounding -- if you see such stark differences across

22  multiple, multiple characteristics, then you start worrying

23  about are there things I missed that are messing up my

24  unexposed group.  You -- it's not -- it's not unheard of to use

25  the lowest exposure group as your referent group when doing

1   these types of analysis.

2           **JUDGE PETROU:**  And when you looked at this chart,

3   it's your opinion that it was appropriate here to use the

4   lowest exposed group as the control group essentially?

5           **THE WITNESS:**  Yes.

6   **BY MS. GREENWALD**

7   **Q.**   So I want to ask you a question about AHS again.

8       You testified that there could be potential selection bias

9   on the complete response in the AHS, is that right?  Did you

10  not hear me?  I'm sorry.

11  **A.**   Yes.

12  **Q.**   Maybe I could ask it another way.

13      What was the significance to you in the -- in the

14  Agricultural Health Study not allowing people who had NHL into

15  the study?

16  **A.**   Okay.  So when you do a cohort study like this one, a

17  prospective study, you start at one point and start following

18  people who get the disease.

19      Now, let's say there was exposure prior to the start of

20  the study, so people have been in this industry for 15 years.

21  Some of them could have been exposed for 15 years.

22      Some of those people might have gotten NHL and died

23  because of that exposure, or quit working.  They are no longer

24  in the field.

25      So by the time you start the study, you've selected out a

1    subpopulation of those who would have been susceptible to the

2    NHL.  So you've got a population which already has some degree

3    of selection on it in -- that's directly related to the thing

4    you're interested in.

5         So you generally don't go back and use their past exposure

6    history to do the analysis of the current cohort study.  You

7    move it forward from day one, hoping that any selection bias

8    that came in because you selected people, as time goes on

9    disappears and you -- you're getting a real good picture of

10   what's happening in this population.

11   **Q.**   One last clean-up question.

12        Can you explain why the lag issue for the Agricultural

13   Health Studies is -- is not solved by the retrospective

14   history?

15   **A.**   I -- I guess I thought I did.

16   **Q.**   I think -- well, I just want to make sure there isn't

17   anything you want to add to that.  I mean, I realize you just

18   somewhat addressed that?

19   **A.**   If I was asked the question:  Can you design a cohort

20   study, prospective study, where you take a retrospective

21   history of somebody's exposure and we go five or six or seven

22   years, and then let's look at it.  It still has that selection

23   bias issue, but my -- my response would be:  No, I do a

24   case-controlled study.  It's more powerful.  It's less

25   expensive.  I can do it faster.  It would be the more

1  appropriate study when I have to rely upon past historical

2  exposure.

3  **Q.**   Okay.  So by the way, the slide deck is Exhibit No. 461.

4        **MS. GREENWALD:**  I think, Your Honors, we're going to

5  skip past Slide Number 27, which is the NAPP, because it's not

6  in his report and it's not in his supplemental deposition

7  either.  So we're going to just skip that.  We'll replace that.

8        We'll take that slide out in the final version for the

9  Court and we're going to move on to Slide 28.

10 **BY MS. GREENWALD**

11 **Q.**   So what does this summary plot show?

12 **A.**   We should take this one out and the next one as well.

13 Well, we will take the NAPP part out of it.

14 **Q.**   Right.  Because I think the plot is still relevant, and

15 then we'll replace that.

16 **A.**   So the -- I've added the Andreotti ever/never to this

17 picture.  And they didn't provide it, so I actually can't add

18 it to the picture.  So it doesn't change the plot summary of

19 the ever/never exposures.

20       The next slide.

21       So now looking at the Andreotti study within the context

22 of all of the other studies looking at exposure, time,

23 response, type, pictures.  You can see it clearly is much lower

24 in terms of the response, the odds ratios, than the other

25 studies were, and some below, some above the 1 odds ratio.

1    But as I said before, this is exactly what I would expect

2    to see.  Because of the flaws of the study, I would expect to

3    see uniform odds ratios and because of that, and it's given me

4    what I expected, it doesn't change my opinion.  It doesn't

5    contribute to a change in my opinion.

6    **Q.**    When you say it doesn't show what you expected -- sorry,

7    that it shows what you expected, do you mean by that that

8    because you expected it to have the results it has and you

9    expected it to -- to bias the numbers to the null, that you do

10   not believe that it's relevant to your ultimate overall opinion

11   in this case?

12   **A.**    So, yes.  The numbers were appearing biased towards the

13   null, potentially even below the null.  It's still important to

14   my decision.  I want to be clear.  This is -- this is a good

15   study.  Regretfully, a bad exposure metric, but it's a good

16   study.  But the problems with the study in the last round make

17   it have such poor statistical power you would expect it to be

18   odds ratios around 1.  And that's exactly what you're seeing.

19       So it's not that I'm discounting the study or throwing it

20   away.  I'm evaluating all aspects of the study, seeing what I

21   expect to see, which is nothing, and that has no change on what

22   I already have concluded.

23   **Q.**    And that comports with your Slide Number 1 on how you

24   evaluate causality, is that right?

25   **A.**    That's correct.

1           **MS. GREENWALD:**  And so if you can go to the last

2     slide?

3     **BY MS. GREENWALD**

4     **Q.**  You had this up before on Bradford Hill, and you wanted to

5     look at it again and explain to the Court how this factored

6     into your overall causality opinion.

7     **A.**  So after looking at Andreotti and everything else, but in

8     looking at Andreotti, I was willing to reconsider Table 18, but

9     nothing changed.  This is from my expert report.

10           I still believe the observations in the epidemiology

11    studies are consistent.

12           I believe that the strength of the observed association is

13    high enough to warrant a strong opinion there, mostly driven by

14    the meta-analyses.

15           The biological plausibility is very strong.  There is no

16    doubt about it.  Multiple cancers, multiple species, not due to

17    chance, increased risk of rare tumors; all the things that make

18    this a very strong category.

19           Biological gradient, that's moderate.  The De Roos 2005

20    study doesn't see much of a gradient.  The other two studies

21    that did this do.  That's not a lot of information to drive a

22    statement about biological gradient, so I gave that a moderate.

23           The temporal relationship of the observed association is,

24    of course, satisfied.  The exposure came before the cancers.

25           Specificity is not needed because NHL has many other

```
 1    causes.

 2        The coherence here is strong.  "Coherence" means can it

 3    get into the body?  Is it --

 4            THE COURT:  Can I have you rewind to specificity for

 5    a minute?

 6            THE WITNESS:  Yes.

 7            THE COURT:  So what you say in this summary is I

 8    think different from what you said in your expert report on

 9    specificity.  In your expert report you said there are other

10    causes of NHL, so this group of cancers is not specific to

11    glyphosate.  There is little support for specificity.

12        So here you say not needed.  Here you say -- in your

13    expert report you say there is a little support for.

14        So I have a couple questions about that.  The first

15    question is:  Are you defining specificity correctly in the

16    apparently, no.

17        And so she says that specificity -- if I recall correctly,

18    she says that specificity is actually strong.

19            THE WITNESS:  If we could go to my expert report?

20            THE COURT:  Page 75.

21        MS. GREENWALD:  It's Tab 162.

22            THE WITNESS:  162.  I would like to look at the

23    definition of "specificity."

24            THE COURT:  Sure.

25            THE WITNESS:  It is -- here.  Page 5.  Take a minute
```

1    to look at what I wrote.

2          THE COURT:  I'll get there as well.  Page 5?

3          THE WITNESS:  Yes.  Bottom of Page 5.

4       (Brief pause.)

5          THE WITNESS:  To the best of my knowledge, that is

6    the definition I used.  And as far as I understood the Hill

7    criteria, that is the definition he was looking at.

8       If you see a disease that only one chemical, one exposure,

9    seems to cause, mesothelioma and asbestos is a good example of

10   that, then it's very, very specific to that disease.  And so

11   causality for that disease is more strongly established because

12   it's the only cause you have.

13         THE COURT:  So if Dr. Ritz says that there is strong

14   specificity because in the studies of glyphosate there is no

15   association shown with other types of cancer, there are only

16   associations shown with NHL, she's using the incorrect

17   definition of specificity within the Bradford Hill criteria.

18         THE WITNESS:  I would have to look at her -- her

19   report and go through the definition that she had in the

20   report.

21         THE COURT:  Okay.  Forget about Dr. Ritz.  If I

22   articulated the specificity criterion in that way, am I

23   articulating it incorrectly?

24         THE WITNESS:  I -- I would -- I would say probably

25   yes.  The issue with -- the criteria are intended to walk you

PORTIER - DIRECT EXAMINATION / GREENWALD

1   through what would add to a causality argument.

2       So if I have benzene, and benzene exposure causes five

3   separate cancers, and all of a sudden I'm looking at benzene

4   and it causes a sixth cancer, the fact that it only causes the

5   one cancer doesn't give me nearly as much added weight as

6   saying:  Look, it causes five other cancers.  This is one

7   that's like it.  So I would add more weight.

8       So that definition, as you've expressed it, would not be

9   my definition of specificity.

10      My definition is, if it's really specific, if NHL has no

11  other causes and all of a sudden you've got one, I don't have

12  to worry about confounders, I don't have to worry about other

13  things, because I don't know any.  It strengthens the finding.

14          THE COURT:  Okay.

15  BY MS. GREENWALD

16  Q.  Would the example that the Court gave fall under

17  consistency -- would it fit under the category of consistency

18  of the observed association of Bradford Hill?

19  A.  Partially.  I think partially.

20          THE COURT:  Why?  I mean, that's -- I mean, I thought

21  that was about multiple studies.

22          THE WITNESS:  But, again, you're -- multiple studies,

23  but also all of them giving you the same result, the same

24  direction.  And even if -- if they all deal with -- suppose I

25  have five cohort studies and the only thing I saw in the cohort

 1   study was NHL in all five.  It's multiple studies pointing to

 2   the same thing.  That's -- that's as close as I can come.

 3           THE COURT:  It's multiple studies pointing to the

 4   same thing, but it's not -- that doesn't --

 5           THE WITNESS:  Only thing.

 6           THE COURT:  -- that doesn't incorporate the concept

 7   of showing an association between the substance and NHL and not

 8   showing an association between the substance and other cancers,

 9   right?

10           THE WITNESS:  Yeah.  That would be right.

11           THE COURT:  So are -- is that to say that it's not

12   particularly useful to learn that, you know, these studies are

13   showing no association between glyphosate and other cancers

14   while they are showing association, potentially showing

15   association between glyphosate and NHL?

16           THE WITNESS:  I haven't thought about it.  I would

17   really have to sit back and give that some thought.

18           THE COURT:  Okay.  Thanks.

19   BY MS. GREENWALD

20   Q.   So Slide Number 30, is that the same table that you have

21   on Page 77 of your report?  If you can turn to Page 77,

22   Table 18?

23   A.   Yes.

24   Q.   Okay.  If you can turn to Page 78, please.

25        (Witness complied.)

 1   **Q.**   Can you read what you -- the section that starts -- the

 2   paragraph that starts "In my opinion," please.  It's the next

 3   page after 77.

 4   **A.**   (As read)

 5          "In my opinion, glyphosate probably causes NHL

 6          and given the human, animal and experimental evidence

 7          I assert that to a reasonable degree of scientific

 8          certainty the probability that glyphosate causes NHL

 9          is high."

10   **Q.**   What do you mean by "high"?

11   **A.**   That's -- that's -- it's a hard question.  In my own

12   opinion of what I mean by "high," 100 percent would be

13   absolutely undeniably certain it causes glyphosate -- it causes

14   NHL.  50 percent would be, ahh, maybe.  I would give high 90

15   percent chance.  So this sits at about 90 percent in my scale.

16   **Q.**   And when you say "your scale," is that based on, again,

17   going back to Slide Number 1 in your evaluation of causality

18   and how you've looked at the totality of the evidence here?

19   **A.**   Yes, of course.  In any evaluation like this, there has to

20   be some statement at the end that summarizes the degree to

21   which you believe there is a relationship between this and NHL.

22   There is a variety of scales and methods that are used, most of

23   them are about the same as what I'm saying here.  Words like

24   "very strong," "strong," "high probability."  Those are typical

25   things to use.

1   Q.   Okay.  And when you are reaching this conclusion on

2   Page 78, you're using all the different factors, such as

3   epidemiology -- all the evidence, I should say, and the data,

4   epidemiology toxicology and mechanistic data in reaching that

5   conclusion?

6   A.   Yes.  Absolutely.

7           MS. GREENWALD:  I don't have any other questions,

8   Your Honors.

9        (Discussion held off the record between plaintiff's

10        counsel.)

11          MS. GREENWALD:  I might.  I'm sorry.

12          THE WITNESS:  Your Honor, if I could respond to one

13   of your questions we didn't get back to?

14          THE COURT:  Sure.  Why don't you give them a chance

15   to confer real quick and then you're free to do that?

16       (Brief pause.)

17   BY MS. GREENWALD

18   Q.   An important question.

19       So just to clarify one thing on specificity.  Now, you

20   stated -- while you stated that non-Hodgkin's lymphoma is not

21   specific to glyphosate, we understand that, is it your opinion

22   that glyphosate exposure is specific to NHL?  In other words,

23   the reverse of that?

24   A.   I have to go through my head and see if I've really taken

25   the time to look at all the literature on this for glyphosate,

PORTIER - DIRECT EXAMINATION / GREENWALD

1    the broader array.

2        Yeah.  I would say I don't see any other strong cancer out

3    there that appears to be associated with glyphosate in my

4    experience in looking at this literature.

5    **Q.**   Other than non-Hodgkin's lymphoma?

6    **A.**   Other than NHL.  Well --

7    **Q.**   So you wanted to --

8    **A.**   -- that's not totally correct because -- that's changed.

9    The classification is now NHL.

10   **Q.**   It's multiple myeloma?

11   **A.**   Yes, NHL.

12   **Q.**   So multiple myeloma is now in Lymphoma Society considered

13   a subset -- a subpart, subset non-Hodgkin's lymphoma, correct?

14   **A.**   Yeah, under ICD-10.

15   **Q.**   Okay.  You wanted to clarify something.

16   **A.**   You asked me to look at Page 75 and the statement "there

17   is little support for specificity," under "specificity."

18   That's my jargon for saying it's not needed.  It doesn't add to

19   the causation argument.  I just wanted to close that loop.

20            **THE COURT:**  One question I have.

21        So I was going back through your testimony from last time,

22   and you talked a little bit about the IARC's conclusion, the

23   IARC classification.  And you make the point that it's

24   important to the folks at IARC that people know that, you know,

25   if IARC says something is a probable carcinogen, it does not

PORTIER - DIRECT EXAMINATION / GREENWALD

1    follow that if you are exposed to it, you will probably get

2    cancer.  Right?

3        That -- and just to use -- you look like you had a little

4    doubt on your face, so I'll just read exactly what you said so

5    there is no ambiguity.  You said:

6            "What IARC is saying is that when they" -- and by

7        the way, I'm on Page 542 now.

8            "What IARC is saying that when they say it's a

9        probable human carcinogen, they don't want the public

10       to think that means if you're exposed to glyphosate,

11       you'll probably get cancer.  That's not what it

12       means," is what you said.

13           "It means that the literature is so strong that

14       we think it's probable that humans will get cancer at

15       some level of exposures to glyphosate."

16       That's what you said in your testimony.

17       And we know from the material that the IARC puts out,

18   right, from the preamble, and also from the paper that it put

19   out in response to all of Monsanto's attacks on its

20   classification, that, you know, IARC draws this firm

21   distinction between hazard, assessment and risk assessment,

22   right, and explains that what it does is hazard assessment.

23       You are offering an opinion that is beyond a hazard

24   assessment opinion, as I understand it, is that correct?

25           THE WITNESS:  There were great discussion on this

1  between you and several of the others.

2      Let me give you my definition of hazard assessment, my

3  definition of risk assessment, and why this is slightly

4  different from what -- what I heard in the discussion.

5      Hazard identification is exactly what you were talking

6  about a minute ago.  Is this a hazard to humans under some

7  exposure condition?  How much weight of evidence can we put in

8  that statement?

9      The risk assessment is then much more specific under these

10  exposure -- this exposure scenario.  What is the risk to the

11  population of this, of exposure to this compound?

12      Now, when agencies and many groups do those types of

13  evaluations --

14          THE COURT:  What types of evaluations?

15          THE WITNESS:  Hazard and risk assessments.

16      They most of time don't even talk about the cancer,

17  because most of the time it's driven by animal data and not

18  epidemiology data.  It's -- it's seldom that they include

19  epidemiology data as strong as you have here.

20      In this exercise, as I understand it, we're not just

21  saying it could be a carcinogen, but I have to speak directly

22  to NHL.  And so that is kind of outside of the usual hazard

23  assessment.

24      But IARC does speak directly to NHL.  Their limited

25  evidence in humans is not only that there is an association,

 1   but that a causal association is credible.  And the only cancer

 2   they looked at is NHL.

 3       So that's clearly, they believe, a causal association is

 4   credible for NHL, and so do I.

 5           THE COURT:  And so your opinion on the epidemiology

 6   is the same as the opinion articulated by IARC on the

 7   epidemiology?

 8           THE WITNESS:  It hasn't changed.  IARC has very rigid

 9   classification rules, the limited evidence of carcinogenicity.

10   That is an accurate description of the data.

11       I think we could have gone further in describing other

12   things, or they could have gone further in describing it, but

13   that's an accurate description of the data.

14           THE COURT:  Okay.  So I mean, I think you've

15   testified to this already, but your -- you know, one could view

16   that phrase "limited evidence of carcinogenicity in humans,"

17   and we know that in this context when they are talking about

18   carcinogenicity, they are talking about NHL because that's what

19   the studies show us, but when you -- when you -- when you think

20   about that phrase, "limited evidence," you know, you might say:

21   Well, that doesn't sound very powerful, "limited evidence."

22       And so I gather that what you have said and what you would

23   still say today is that we have this -- this limited evidence.

24   You can't rule out chance, confounding bias, but the -- when

25   you combine it with the animal evidence and the mechanism

 1  evidence that causes us to conclude that the possibility of
 2  chance, bias, confounding in the epidemiology data is lower?
 3  Is that a fair way to think of your opinion?  And if not, feel
 4  free, obviously, to correct me.
 5          THE WITNESS:  I would more carefully say that my
 6  concern for the chance, the bias and the -- the potential
 7  chance, the potential bias and the potential confounding in the
 8  epidemiology is lowered.  My concern for it is lowered.  It's
 9  still there, if it's there at all, because we can't really
10  measure it.
11      But my concern for it is less because now I've got all
12  this other evidence saying it's really biologically active.  It
13  looks biologically active in the same system, hemapoietic
14  system, with a very similar tumor in the mice.
15      So, yeah, I'm much more comfortable to say that I'm much
16  more believing to human evidence.
17          THE COURT:  Okay.  And I'll let Mr. Lasker take over,
18  but I want to say now, while it's on my mind, that I do want
19  you to address the animal stuff a little bit after the lunch
20  break.  I don't know if you spent any time preparing to talk
21  further about the animal stuff.
22      So I want to kind of flag for now a couple of the things
23  that I want you to address after the lunch break on the animal
24  stuff so you can, you know, sort of gather your thoughts on it.
25          And, one, I guess this is probably the biggest question

1    that I have for you, is:  If we took out -- if you took out all

2    of the stuff you did on pooling in the animal context, what

3    would your opinion be and what would be the basis of it?

4        You don't need to go back and repeat everything that

5    you've said, but if you could just sort of summarize that for

6    us.

7        And then maybe a -- a smaller question that I had on the

8    animal stuff is, you know, in epidemiology, you know, there is

9    this emphasis on, you know, focusing on published studies.  And

10   I -- and I think the IARC says we only look at the published

11   studies, the published data, right?

12       And I wanted to explore whether that -- that same emphasis

13   is supposed to be placed on published studies for the animal

14   data, or if it's sort of more common in the toxicology context

15   to be relying on unpublished but regulatory studies from the

16   agencies.

17       So those are the two questions I can think of right now

18   that I want you to address after lunch.

19       But I'll turn it over to Mr. Lasker right now.

20            MS. GREENWALD:  Could I ask one question on the IARC,

21   a closing question?

22            THE COURT:  Sure.  Go ahead.

23            MS. GREENWALD:  It's up to you, Your Honor.

24            THE COURT:  Go ahead.

25

1    BY MS. GREENWALD

2    Q.   Chris, if I could -- Dr. Portier, if I could just ask a

3    question to wrap up the IARC issue.

4         Although IARC could determine that a substance is a

5    probable carcinogen even at exposures not occurring in the real

6    world, is that what IARC found in regard to glyphosate here?

7    A.   No.  Of course not.  The epidemiology studies are evidence

8    of an effect in the real world.

9    Q.   In real people?

10   A.   In real people at current exposures.

11            MS. GREENWALD:  Thank you.

12                         CROSS EXAMINATION

13   BY MR. LASKER

14   Q.   Dr. Portier, you won't need that binder.  We'll give you a

15   new binder so you don't have all that stuff on your desk.

16        (Brief pause.)

17            MR. LASKER:  Your Honors ready?  Okay.

18   BY MR. LASKER

19   Q.   Dr. Portier, you talked already about your epidemiological

20   experience, so I don't want to rehash that, but in your expert

21   report -- and that's at Tab 1 in your binder and it's at

22   Page 6 -- when you begin your discussion about the

23   epidemiology, and in particular sort of the last sentence of

24   that first paragraph under "Relevant Epidemiologic Studies,"

25   you state there that:

1              "Other experts will be discussing these studies

2         as well as their strengths and weaknesses."

3         Correct?

4    A.    That's what it says.

5    Q.    And am I correct in my understanding that you were

6    referring there to the epidemiology experts who submitted

7    reports in this case?

8    A.    Probably.

9    Q.    And then you explain that for the purposes of your opinion

10   in your report, you are focusing on using the results of the

11   studies in evaluating causality and because of that you only

12   briefly describe each study, correct?  It's in your report.

13   A.    It says:

14             "I will focus on using the results of these

15        studies in evaluating causality, so I will only

16        briefly describe each study."

17   Q.    And when the new 2018 Andreotti study was published, you

18   relied upon the expert reports that were prepared by Dr. Ritz

19   in communications you had with journalists and some government

20   officials in Europe, correct?

21   A.    I don't know what you're -- you're asking me.

22   Q.    Okay.  Well, maybe it will help if we can turn to Tab 4 in

23   your binder.  And this is one email that you produced to us in

24   preparation for your supplemental deposition after the

25   Andreotti study.  And this is an email dated November 9, 2017,

PORTIER - CROSS EXAMINATION / LASKER

1    which is the day the Andreotti study came out in electronic

2    form.  Do you recall that?

3    **A.**   I don't know that that's the exact date, but I do recall

4    that email.

5    **Q.**   And you explained -- I'm sorry.

6    **A.**   I do recall the email.

7    **Q.**   And you explained to me in your deposition that Martin

8    Pigeon is a reporter of some type?

9    **A.**   He works for the Corporate Europe Observatory and he also

10   wrote a book.

11   **Q.**   And so he raised questions with you about the Andreotti

12   study and you forwarded to him Dr. Ritz's, I take it, original

13   expert report and her rebuttal expert report in this

14   litigation, correct?

15   **A.**   That was on the Right to Know website.  I sent it to him.

16   He asked for it.

17   **Q.**   Well, he -- he asked you for your views of the new AHS

18   study, and in response you sent Dr. Ritz's expert reports,

19   correct?

20   **A.**   No.  We talked on the phone and I asked him if he had seen

21   her expert report, and I sent it to him.

22   **Q.**   Okay.  And then if you look at Tab 5, this is on

23   November 12, 2017.  You received an inquiry from a Robert --

24   and I don't know if I'm pronouncing it correctly -- Bellé.  And

25   he is a government official in Europe, an advisor to the French

1   deputy in Europe, correct?

2   **A.**    I believe that's his position.

3   **Q.**    And in response to his requests, again, you forwarded the

4   expert reports of Dr. Ritz, correct?

5   **A.**    That's correct.

6   **Q.**    And I'm going to get back to some other points you make in

7   this email, but just to continue on the next page behind Tab 5,

8   you also sent Dr. Ritz's report to a Tiffany Stecker, and she

9   is also a reporter, correct?

10  **A.**    That's correct.

11  **Q.**    And you also present some other opinions or some opinions

12  you had at that time in both your emails to Mr. Bellé and to

13  Ms. Strecker that are -- or Stecker, I'm sorry, that are set

14  forth in your expert report, correct?

15  **A.**    No.

16  **Q.**    Maybe I misspoke.  Let me say that again --

17  **A.**    The opinion as expressed here, as I told you in the

18  deposition, is wrong.

19  **Q.**    Okay.  And I did misspeak.  You're going to where I was,

20  and I said expert report.  I'm sorry.

21        You provided some opinions that you had reached with

22  regard to the Andreotti study as of that date, and as we talked

23  about in your expert report -- I'm sorry, I said it again -- in

24  your deposition, you agree with me now that the opinions that

25  you shared at that time based upon your review of the Andreotti

PORTIER - CROSS EXAMINATION / LASKER

1    study were, in fact, incorrect; is that right?

2    **A.**    One specific part of those opinions were indeed incorrect,

3    in the way in which I describe the imputation.

4    **Q.**    Okay.  And I was going to walk through those and we can do

5    that now.

6         The first opinion that you offered in this email is

7    similar to or the same as one of the opinions you've offered

8    today, which is your recalculation of the odds ratios in the

9    Andreotti study by comparing them to the low exposure group,

10   correct?

11   **A.**    That's correct.

12   **Q.**    In your expert opinions here today and in your expert

13   report you actually provide a second calculation in which the

14   numbers are a little bit higher than the numbers you have here,

15   correct?

16   **A.**    I don't think so.  These are numbers for one of the two

17   areas.  I don't remember which one this is.

18   **Q.**    Okay.  We'll turn to that in a minute.

19        The second opinion you offered is that -- is with respect

20   to the sensitivity analyses that were set forth in the

21   Andreotti study, correct?  That's, I guess, the fourth

22   paragraph or third paragraph, depending on -- which starts:

23            "In addition in their discussion of their

24            sensitivity analyses."

25   **A.**    Uh-huh.

PORTIER - CROSS EXAMINATION / LASKER

1  Q.   And you were offering an opinion there as to the impact of

2  the sensitivity analyses on your interpretations of the

3  Andreotti study, correct?

4  A.   Yes.

5  Q.   And in my deposition I asked you -- and we walked through

6  some of the findings of the sensitivity analyses, and you

7  agreed with me that the risk ratios that were calculated with

8  the three different sensitivity analyses conducted in Andreotti

9  were all in the same ballpark as the primary analyses, correct?

10 A.   That is correct.

11 Q.   And then the third issue, and I think this is the one you

12 were referring to previously, was with respect to how the

13 imputation methodology works, correct?

14 A.   That's correct.

15 Q.   And in your emails both to Mr. Bellé and to Ms. Stecker,

16 you expressed your view, your understanding, based upon your

17 review of the paper when it first came out, that through the

18 imputation method if an individual was not exposed to

19 glyphosate or indicated they had not been exposed to glyphosate

20 in the phase one questionnaire, and then did not respond to the

21 second phase questionnaire, the imputation methodology would

22 treat them as unexposed in that second phase time period.

23      That was the opinion you offered in your -- in these

24 emails, correct?

25 A.   And I was correct, and that is wrong.

1  Q.   Okay.  And you understand now that that's not how the

2  imputation methodology works, correct?

3  A.   Correct.  And my supplemental report is correct in that.

4  I would also point out the reason they are getting Beate Ritz's

5  expert report is because in her expert report she covered the

6  Andriutus.

7  Q.   Andreotti?

8  A.   No, no.  She covered the preliminary document that had

9  been obtained from Dr. Blair in that.  And they were asking my

10  opinion on that and I really didn't offer an opinion.  Here is

11  an opinion you can look at.

12  Q.   You have in a variety of forums --

13        THE COURT:  Can I ask a question about this email?

14        MR. LASKER:  Yes.

15        THE COURT:  You asked this question finally:  I

16  wonder why Aaron Blair is not a coauthor on this manuscript.

17     Why do you ask that question?  What's the point of asking

18  that question?

19        THE WITNESS:  Well, his -- his name was on the

20  original draft manuscript, it was from his office.  It's

21  unusual to drop a senior researcher like him from the final

22  manuscript.  I -- I do not why he was not on the manuscript.

23  BY MR. LASKER

24  Q.   Dr. Portier, you have -- sorry.  Let me drink first.

25     You have, not including in this litigation, defended the

 1   IARC Working Group's conclusion with respect to glyphosate in a

 2   number of different forums and publications and then

 3   communications to regulators, correct?

 4   **A.**   I guess I would have to say that's incorrect.

 5   **Q.**   Okay.  Well, let me -- let me ask you about --

 6   **A.**   Can I explain why it's incorrect?

 7            **THE COURT:**  Sure.

 8   **BY MR. LASKER**

 9   **Q.**   Go ahead.

10   **A.**   So because of the IARC Monograph report there have been a

11   lot of back and forth from various groups of -- of what was

12   done and what was not done.

13        At first, I was defending the IARC Monograph report.  But

14   when it got to the point where I was talking to the German

15   Bundestag or other groups about this, it had gone beyond that

16   because I was really focused on the European Food Safety

17   Authority risk assessment on glyphosate and not so much

18   defending IARC as pointing out some of the limitations to the

19   way they did things.

20        So, yes, I defended IARC, but that was not the primary

21   issue.

22   **Q.**   Okay.  If I could ask you to turn to Tab 6 in your binder?

23        (Witness complied.)

24            **THE COURT:**  Can I ask a follow-up question about

25   that?

1       You're talking about the limitations in the way they did

2   things.  What did you mean by that?  Can you explain that a

3   little more?

4              THE WITNESS:  Yes.  It's -- there were so many of

5   them.

6       Their evaluation of the human evidence once they got down

7   to all of their arguments about it, they called it very

8   limited.

9              THE COURT:  Who is "they"?

10             THE WITNESS:  The European Food Safety Authority.

11             THE COURT:  You're talking about the limitations of

12  the way they did things --

13             THE WITNESS:  Correct.

14             THE COURT:  Not IARC.

15             THE WITNESS:  Correct.

16             THE COURT:  I misunderstood.  I don't need to hear

17  about that.

18             THE WITNESS:  Okay.

19  BY MR. LASKER

20  Q.   So, Dr. Portier, are you at Tab 6 in your binder?

21      And this is another email that you provided to -- or this

22  may be actually something that was on a FOIA request.  It was

23  a -- it was a public document, a FOIA request that we have,

24  which is communications -- I think we talked about this in your

25  deposition, your initial deposition; that this is

1   communications you had after you became aware of the fact that

2   the European Food Safety Authority had reached a conclusion or

3   was prepared to reach a conclusion that glyphosate had no

4   carcinogenic potential, correct?

5   **A.**   This letter occurred after I had some information that it

6   looked like they were going to do that, that is correct.

7   **Q.**   Okay.  And on November 9, 2015 you sent an email to all of

8   the IARC 112 working group members, correct?

9   **A.**   I don't believe it's all of them.

10  **Q.**   Many of them?

11  **A.**   Many of them.

12  **Q.**   And you also copied Kate Guyton?  She's at IARC.  What's

13  her to role again?

14  **A.**   She's one of the people in the Monograph program.  And in

15  the review of glyphosate each person in the Monograph program

16  does one Monograph a year, where they run the meeting.  It's

17  not always the head of the program that runs the meetings.  She

18  ran the glyphosate meeting.

19  **Q.**   And you're sending them this email to warn them of the

20  fact that the European Food Safety Authority was about to

21  release this conclusion that glyphosate had no carcinogenic

22  potential, correct?

23  **A.**   No.

24  **Q.**   In the first -- I'm sorry.  If we can go on the bottom

25  half of the front page, which is the email that you sent, the

PORTIER - CROSS EXAMINATION / LASKER

1    first sentence is:

2         "This week the European Food Safety Agency will

3         release their reassessment of glyphosate.  In this

4         review they will conclude that glyphosate has no

5         carcinogenic potential."

6         So you were alerting them to that fact, correct?

7    A.   That's correct.

8    Q.   And you state that this creates two problems.  One is that

9    it will weaken the strength of the IARC Monograph program to

10   stimulate change and how some of these agents are reviewed and

11   addressed.

12        And the second is that:

13        "It suggests we did not do our assessment

14        adequately and that, had we seen all the data that

15        they saw, we would have gotten a different answer."

16        Correct?

17   A.   That's what it says.

18   Q.   And you state:

19        "I do not intend to let that happen."

20        Correct?

21   A.   Without -- yeah, without somehow addressing it.

22   Q.   And as a result of that, you were defending and you have

23   been defending the IARC working group analysis of glyphosate in

24   a variety of different forum outside of this litigation, in

25   front of regulators and in various other communications,

1    correct?

2    **A.**    As I already mentioned, that's not the case.   In most

3    cases I was addressing what I saw as efficiencies in those

4    agencies' review of the glyphosate information.   I was not

5    writing to those agencies to defend the IARC evaluation.

6    **Q.**    You've also explained outside of this litigation, and

7    Judge Chhabria was asking you about this just a moment ago,

8    that the disagreement between IARC's conclusion regarding

9    glyphosate and the regulator's conclusions is about all between

10    hazard and risk, correct?

11    **A.**    Not at all.   In the European system, the European Food

12    Safety Authority is required to ban any pesticide that is a

13    hazard for a carcinogen.   So the European Food Safety Authority

14    does not do a risk assessment on pesticides.   They do a hazard

15    assessment just like IARC.

16        So it's not a battle in Europe between risk assessment and

17    hazard assessment.   The United States EPA does a risk

18    assessment, even if it's a carcinogen.   So that's a different

19    issue.

20    **Q.**    Okay.   Well, then, let me ask it that way.   In the United

21    States -- let me start again.

22        You've explained outside of this litigation that the

23    disagreement between IARC's conclusions regarding glyphosate

24    and the U.S. EPA's conclusions regarding glyphosate is a battle

25    between hazard and risk, correct?

PORTIER - CROSS EXAMINATION / LASKER

1   A.   No, not -- if that's all I said, then it's absolutely

2   wrong.

3   Q.   Okay.  Let me ask you to turn to Tab 7 of your binder.

4   And this is a newspaper story that came out and it's discussing

5   the scientific advisory panel that the EPA impaneled to review

6   their initial OPP evaluation that concluded that glyphosate is

7   not likely to cause cancer, correct?

8   A.   This was before the beginning of that meeting.

9   Q.   And if you can turn to page -- or the second page of this

10   article.  And one fact that for us is somewhat peculiar, but

11   for you probably it is not, your brother actually was on the

12   advisory panel because he's also a biostatistician or a

13   toxicologist?  Biostatistician, correct?

14   A.   Biostatistician.  He was chair of the EPA Science Advisory

15   Panel for seven years.

16   Q.   Okay.  And about two-thirds down the second page there is

17   this discussion about the fact that you and your brother --

18   that your brother was on this advisory panel and there is a

19   statement, again, that starts:

20         "Asked whether he had spoken with his brother

21      about glyphosate" --

22      Do you see where I am?

23   A.   Yes.

24   Q.   (As read)

25         "...Christopher Portier said, in broad terms:  I

1          told him it's a battle between hazard and risk, and

2          that he does understand."

3          Is it your testimony that that is not an accurate quote

4     that you gave to this reporter?

5     **A.**     It says "in broad terms."  It's an accurate quote when you

6     say "in broad terms."

7          But there is much more specifics here in terms of the

8     quality of the science.

9     **Q.**     Okay.

10              **THE COURT:**  What was happening with your brother?

11              **THE WITNESS:**  I'm sorry.  He was -- he was on the EPA

12     Science Advisory Panel and EPA created a document for their

13     risk assessment of glyphosate, a draft document.  And because

14     it's such a high profile, they wanted to bring it to their

15     scientific advisory panel.

16          There was an argument put forth that my brother couldn't

17     be on the panel because he was, obviously, my brother.  And I

18     have been, obviously, vocal about the science used by EPA and

19     used by EFSA in evaluating glyphosate, so he would go my way.

20          But my brother and I never discussed glyphosate, except

21     that very broad term of saying, you know, it's one of these

22     things where there is a battle going on between hazard and risk

23     and how it's done.

24     **BY MR. LASKER**

25     **Q.**     Now, Dr. Portier, outside of this litigation and in a

PORTIER - CROSS EXAMINATION / LASKER

1  submission that you gave to EPA, you have taken the position

2  that causality for glyphosate and non-Hodgkin's lymphoma is

3  plausible, but it clearly has not been demonstrated, correct?

4  **A.**   Say that again.

5  **Q.**   You have taken the position -- and this was prior to the

6  Andreotti study.

7        You took the position in a submission to EPA that

8  causality for glyphosate and non-Hodgkin's lymphoma is

9  plausible, but that it clearly has not been demonstrated,

10  correct?

11  **A.**   I'd have to see the statement and the context in which I

12  used it.

13  **Q.**   Okay.  So this is one of the attachments to your expert

14  report, and it is Tab 1B.  You actually identify it as

15  Document 2 in your appendices, but then we would have two

16  different numbers in the tabs.

17  **A.**   Okay.

18  **Q.**   And if I could direct you to -- and this is comments that

19  you made to -- that you submitted to EPA on October 4th, 2016,

20  correct?

21  **A.**   That's what it looks like, yes.

22  **Q.**   And if you could turn to Page 7, starting at Line 116,

23  you're talking about:

24        "EPA's conclusions with respect to glyphosate

25        exposure" -- "EPA's conclusions at that time with

PORTIER - CROSS EXAMINATION / LASKER

```
 1            respect to glyphosate exposure and the risk of

 2            non-Hodgkin's lymphoma."

 3            Do you see that?

 4    A.   Yep.

 5    Q.   And at the bottom of that paragraph at Lines 125 to 126,

 6    you state:

 7                 "So is causality plausible here?

 8                 "Yes, absolutely.

 9                 "Is it demonstrated?

10                 "No, clearly not.

11                 "Are the findings possibly the results of chance,

12            bias and/or confounding?

13                 "Yes, but more unlikely than likely."

14            Correct?

15    A.   This talks specifically only to the epidemiology data, and

16    that is correct.

17    Q.   Okay.  And that is still your opinion today, that the

18    epidemiology data clearly does not demonstrate that glyphosate

19    causes non-Hodgkin's lymphoma?

20    A.   That's not what it says.  It says it's "plausible."  And

21    it does not, by itself, clearly demonstrate that glyphosate

22    causes NHL.

23    Q.   Okay.  So just so I'm clear, we have been clear a number

24    of times now on this question, so it's --

25                 THE COURT:  Sorry, what?  I didn't hear a word you
```

PORTIER - CROSS EXAMINATION / LASKER

1    said.

2              MR. LASKER:  I know.  I starting saying "clear" and

3    then I realized the sentence was going to be awkward.  I'll ask

4    it again.  I'm sorry, your Honor.

5    BY MR. LASKER

6    Q.   Is it still your opinion, based upon the epidemiology,

7    that a causal association between glyphosate and non-Hodgkin's

8    lymphoma, if the question is whether that's been demonstrated,

9    the answer is clearly not, correct?

10   A.   Using only the epidemiology data, I cannot come to the

11   conclusion without any reasonable doubt.  I can't take myself

12   to the 100 percent.  That it is causal for NHL.

13   Q.   Okay.  And just -- just to be clear.  If you look at your

14   discussion before that conclusion, or those -- the final

15   statement that you make about causality, leading up to that

16   statement you do discuss the animal evidence, correct?  And

17   that's at Line 24 -- 124, I'm sorry.  Still on Page 7.

18   A.   Umm, yes.

19   Q.   And, in fact, you were going through what looks like an

20   abbreviated version of your Bradford Hill criteria in that

21   sentence from Lines 120 through 125, correct?

22   A.   Umm, it covers some aspects of it.

23   Q.   Now, you've also -- excuse me.  Staying in the same

24   document.  If you could turn to page -- just a prior page,

25   Page 6?

PORTIER - CROSS EXAMINATION / LASKER

1        And actually from Page 5 to Page 6, you are talking about

2    your opinions with regard to the human evidence for glyphosate,

3    correct?

4    A.   Yes.

5    Q.   And --

6            JUDGE PETROU:   I just want to be clear.

7        Is it your opinion, because I'm just noting on Page 5 at

8    Lines 15 to 16 you write:

9            "The agency provides many reasons for this

10       finding.  I would summarize them as follows."

11           THE WITNESS:   Yeah.  The bulleted points were what

12   the agency has said.

13           JUDGE PETROU:   And then the commentary is your

14   commentary, yours, on it?

15           THE WITNESS:   My commentary is on what the agency has

16   said.

17   BY MR. LASKER

18   Q.   And just to be clear.  Going back to Page 7, Line 120 to

19   125, where you state "I would note," these are your -- these

20   are your opinions as to the various Bradford Hill criteria and

21   how you believe they have been met or not met with respect to

22   glyphosate and non-Hodgkin's lymphoma, correct?

23   A.   I'm sorry.  I drifted looking at this while you were

24   asking it.

25   Q.   All right.  On Page 7, Line 120 to 127, you are providing

PORTIER - CROSS EXAMINATION / LASKER

```
 1   your observations, your opinions based upon the Bradford Hill
 2   criteria or at least some of those criteria?
 3   A.   I'm countering what EPA did with their criteria.
 4   Q.   And offering your view --
 5   A.   It's difficult to follow this without the EPA document in
 6   my hand as well.  Because this is really commenting heavily
 7   back to EPA on their document.
 8   Q.   Right.
 9   A.   And this is clearly not my opinion currently on the
10   evidence here.  So I don't know in what context I was making
11   these statements relative to words that were being written by
12   EPA.
13        THE COURT:  Well, what does -- when you say "Is it
14   demonstrated?  No, clearly not."  I mean, what do you mean by
15   "demonstrated"?
16        THE WITNESS:  Again, I thought here I was talking
17   about the human evidence.
18        THE COURT:  But it doesn't seem like it from the
19   sentences that precede that.
20        THE WITNESS:  I see that.  But that's -- this is
21   under my human evidence section here from EPA -- oh, if you go
22   to Page 5 at the very top, this is the detailed technical
23   review of what they wrote.  It's human evidence.  That's the
24   category.  All of these comments are on the human evidence.
25   Until I get to Page 7 at the very bottom and then I do animals.
```

1     I -- I'm finding it very difficult to get the context of

2   these comments on a document from two years ago.

3          THE COURT:  Is there a conclusion -- is there kind of

4   an overall conclusion that you articulate at the end of this

5   document?

6          THE WITNESS:  Not -- not for the carcinogenicity.

7   It's an overall conclusion for the quality of the evaluation

8   done by EPA, and it's at the very beginning.  Because I have

9   this outlined, but there are the general comments at the very

10  beginning, and each one of these bullets is a comment on their

11  overall evaluation.

12         THE COURT:  Okay.  Thanks.

13         THE WITNESS:  If you look on Page 1 of bullet

14  number 8, that's a more credible statement of what I meant

15  with the human data.

16         THE COURT:  Okay.

17  BY MR. LASKER

18  Q.   Dr. Portier, if I could direct your attention to Page 5,

19  starting at Line 47?

20       And if I'm understanding correctly how this document is

21  set up, the statement after -- on Page 5, Line 47 through

22  Line 48, which is on Page 6, is EPA's assessment, which is

23  that:

24            "Control for confounding varied across studies

25        and there was a strong potential for confounding by

1          co-exposure to other pesticides."

2          So that would be EPA's finding, is that correct?

3     **A.**   As I understand this set of comments two years later, yes.

4     **Q.**   And then the comments starting on Line 50 is your

5     response, in which you state:

6               "This is correct with some studies doing better

7          than others."

8          Correct?

9     **A.**   That's what it says.

10    **Q.**   And then you go through and discuss the findings with

11    respect to each of the -- the core studies that you've

12    discussed in your testimony here today, as far as which of the

13    findings in those studies were adjusted for other pesticides

14    and which were not adjusted for other pesticides, correct?

15    **A.**   It seems.

16    **Q.**   And now you have opined in this -- in your testimony in

17    this court and in your expert report that the logistic

18    regression analysis for De Roos 2003 with a 2.1 odds ratio was

19    adjusted for other pesticides, but at this point what you're

20    stating to EPA was your understanding that the 2.1 odds ratio

21    in De Roos 2003 was unadjusted, correct?

22    **A.**   It's a mistype, misspelled.  I clearly -- clearly, it's

23    adjusted.

24    **Q.**   And if you could turn to Tab C, which is another

25    submission in your expert report?

1        THE COURT:  Would you mind, before we go off of this

2   document --

3        MR. LASKER:  I was going to say topic, but --

4        THE COURT:  So I want to ask another question about

5   this document, but it's a slightly different --

6        MR. LASKER:  I'll come back to this document.

7        THE COURT:  Okay.

8   BY MR. LASKER

9   Q.   If you look at Tab C, which is the third attachment to

10  your expert report, you have a Table 1.  It's the first page of

11  the document, "Human Epidemiology Studies."  Do you see that?

12  A.   Yes, I do.

13  Q.   And, again, for each of those studies you have different

14  odds ratios reported, and then you have a code of "U" or "C"

15  next to each of the odds ratios, correct?

16  A.   Correct.

17  Q.   And as I'm looking at these -- and we can put De Roos 2003

18  to the side for a moment -- but "C" refers to controlled and

19  "U" refers to uncontrolled, if I'm reading these numbers

20  correctly, correct?  Is that -- am I correct in that?

21  A.   Probably.

22  Q.   Okay.

23  A.   I -- I, again, can't be certain.  It's a slide deck I used

24  sometimes ago.

25  Q.   And in this slide deck, again at this point in time, it

PORTIER - CROSS EXAMINATION / LASKER

1    was your understanding that the 2.1 odds ratio in De Roos 2003

2    was unadjusted, correct?

3    **A.**   It's a mistake.  It's incorrect.  I don't know if that was

4    my view at that time or not or if it's simply a mistake.

5    **Q.**   And I'm not going to walk through this.  You have similar

6    tables in other PowerPoint slides that you presented in other

7    venues.

8    **A.**   I'm sure they are cut and paste from one to the next

9    without any critical review.

10   **Q.**   Do you recall at what point in time you came to the

11   contrary conclusion that the 2.1 odds ratio in De Roos 2003 was

12   adjusted?

13   **A.**   Why is that the contrary conclusion?  I haven't -- I'm --

14   I'm not committing to the fact that I didn't believe it was

15   controlled then.  I really don't know why this "U" is here,

16   other than it's probably a mistake.  Clearly, it's controlled

17   for other pesticides.

18   **Q.**   Okay.  Just to conclude your discussion, I'm going back to

19   the document, Judge Chhabria, back to Tab B on Page 6, at

20   Line 68, concluding this section dealing with confounding you

21   state:

22          "It is fair to say that confounding could not be

23      ruled out in these studies?"

24      Correct?

25   **A.**   That's what it says.

PORTIER - CROSS EXAMINATION / LASKER

1   Q.   And that's consistent with the opinion you've expressed

2   here today?

3   A.   That's correct.

4           MR. LASKER:  Your Honor, I will be coming back to

5   this document for other issues, including latency, but I'm

6   moving off of it right now.  So if you have further questions.

7           THE COURT:  Yeah.  While it's fresh on my mind, if

8   you don't mind.

9           MR. LASKER:  No.

10          THE COURT:  So I -- something that caught my eye in

11  this document was on the bottom of Page 4.  And at the bottom

12  of Page 4 you say -- and I think this is -- this is sort of a

13  summary of your position on the matter.  It's the last sentence

14  in this section called "General Comments and Overall Summary."

15  And it says:

16          "EPA should declare glyphosate a probable human

17      carcinogen and go on to do a risk assessment to

18      determine if human exposure is significant to warrant

19      concern."

20          MR. LASKER:  "Sufficient."

21          THE COURT:  Sufficient.  Did I misspeak?

22          MR. LASKER:  Yeah.  You stated "significant."

23          THE COURT:  Sorry.  Let me read it again:

24          "EPA should declare glyphosate a probable human

25      carcinogen and go on to do a risk assessment to

PORTIER - CROSS EXAMINATION / LASKER

1     determine if human exposure is sufficient to warrant

2     concern."

3         Now, this is something that was written after the IARC

4     Monograph was published, right?

5         **THE WITNESS:**  That is correct.

6         **THE COURT:**  And so, to me, like the most natural

7     reading of this sentence is:  Okay, it's a probable human

8     carcinogen for the reasons stated by the IARC, and now we have

9     to go on and figure out if it matters in real-world -- in

10    real-world conditions.

11        And to me, that sentence seems inconsistent -- that does

12    not seem like a sentence that would be written by somebody who

13    has already decided that glyphosate is currently causing

14    non-Hodgkin's lymphoma in human beings in real-world

15    conditions.

16        And so I want to give you one more chance to address that.

17        **THE WITNESS:**  Sure.  First of all, the -- the EPA has

18    categories who are how they describe the carcinogenic

19    potential, the strength of evidence for carcinogenicity of

20    chemicals, and one of them is probable human carcinogen.  The

21    same language as used by IARC.  They have a definition for it.

22    And my opinion was that the data I looked at satisfied that

23    definition, and that's where it belonged.

24        It's not -- was not my intention in this document to tell

25    EPA that the human evidence is already -- that there is already

 1   something happening in the human population.  That's their job.

 2   And they didn't do it.

 3        What they did was they did the hazard evaluation,

 4   concluded there was no reason to be worried about

 5   carcinogenicity at all, and they didn't go on and do the risk

 6   assessment because they declared in the hazard assessment

 7   there's nothing there.

 8        And so this declarative statement is telling them to do

 9   their job.

10            THE COURT:  Okay.

11   BY MR. LASKER

12   Q.   Now --

13            THE COURT:  Should we take a lunch break?

14            MR. LASKER:  Sure.  We can do that.

15            THE COURT:  Why don't we break for lunch and come

16   back at 1:00 o'clock?

17            MR. LASKER:  Thanks.

18        (Whereupon at 12:10 p.m.proceedings

19         were adjourned for noon recess.)

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2   April 6, 2018                          1:17 p.m.
 3                  ---oOo---
 4        THE COURT:  You can resume.
 5        THE WITNESS:  Your Honors, before we start, can I
 6   address the specificity issue again?
 7        THE COURT:  Sure.
 8        THE WITNESS:  It seems I was wrong and I want to make
 9   sure it's correct on the court record.
10     I went back and looked at the Hill paper.
11        THE COURT:  Sorry, at the what?
12        THE WITNESS:  Hill, Bradford Hill's paper on
13   specificity.  It's somewhat vague as to what he actually means.
14     So then I looked at EPA's draft risk amendment guidelines
15   on how they interpret specificity.  They interpret it the same
16   way I do and the same way that Dr. Ritz does.  They use either
17   one in their evaluation.
18     When you look online in the literature some people use
19   mine, some people use the one Dr. Ritz used.
20     So I want to make it clear that I didn't -- I hope I did
21   not insult Dr. Ritz by saying she had done something that
22   wasn't part of the criteria.  In fact, it surprised me.  It is
23   part of the overall criteria.
24        THE COURT:  So is the idea that either way of looking
25   at it gives you an answer on specificity or is the idea that
```

PORTIER - CROSS EXAMINATION / LASKER

 1   different people disagree about what -- what the specificity

 2   criterion means?

 3           THE WITNESS:  So in the case of EPA, it's either.  If

 4   either criteria is met it increases the argument for causality.

 5       I didn't have enough time to go into why this group said

 6   this and that group said that.  So I don't know if they are

 7   arguing with each other or not.  I just want to make sure I

 8   understood the issue after you brought it up because it

 9   confused me.  I thought I knew the criteria well.

10   BY MR. LASKER

11   Q.   Dr. Portier, if I could take you -- if you would go to

12   Tab 1, which is your expert report.  And at Page 16 we have the

13   forest plot.

14       And we can put this up on the screen as well.  It's

15   Slide 24.

16       And this is the forest plot that you also presented -- one

17   of the forest plots you presented here this morning, correct?

18   A.   Technically that's the only forest plot that I presented,

19   but yes.

20   Q.   And for -- on Page 16 in your expert report --

21           JUDGE PETROU:  Sorry.  Where was it in the other

22   binder?  It's a lot clearer to look at.

23           MR. WISNER:  It's Exhibit 162.

24           JUDGE PETROU:  162?

25           MR. WISNER:  Yes.

1          **THE COURT:**  All right.  Thank you.

2          **MR. WISNER:**  Page 16.

3          **JUDGE PETROU:**  All right.  Thank you.

4          **MR. LASKER:**  Is Your Honor's copy in color?

5          **JUDGE PETROU:**  No, but I can tell which ones are the

6    red.  It's fine.

7          **MR. LASKER:**  Okay.

8    **BY MR. LASKER**

9    **Q.**    So, Dr. Portier, in discussing this Figure 1 you state --

10   or that you set forth the most-fully-adjusted risk estimates

11   from selected epidemiology studies and from the meta-analysis

12   of Chang and Delzell, correct?

13   **A.**    That's what it says.

14   **Q.**    And those are the six -- six items or six lines in red,

15   correct?

16   **A.**    That's correct.

17   **Q.**    And as you explained -- and this is on Page 15, the top of

18   Page 15.

19         If we could put up Slide 54 as well, but it's the top four

20   lines on Page 15 in your expert report.

21         Both the IARC Working Group and Chang and Delzell, when

22   comparing studies used the most-fully-adjusted risk estimates,

23   correct?

24   **A.**    Say that again.

25   **Q.**    Page 15.  The top of Page 15.  I'm reading from your

1    expert report on the first line:

2           "As noted by both the IARC Monograph 112 and by

3       Chang and Delzell, when comparing studies, the most

4       reasonable comparison is to use the

5       most-fully-adjusted risk estimates."

6       Correct?

7    **A.**    That's what it says, but the keyword there is

8    "comparison."

9    **Q.**    And you state:

10          "I will mostly limit my comments to these

11      most-fully-adjusted risk estimates."

12      Correct?

13   **A.**    That's what it says, yes.  But, again, I want to make sure

14   it's clear.  The word "comparison" is important there.

15      This is the most fully adjusted were the most appropriate

16   for the meta-analysis.

17   **Q.**    Okay.  And none of these most-fully-adjusted risk

18   estimates in the six glyphosate epidemiologic studies that were

19   the core studies that existed at the time of the IARC Working

20   Group showed a statistically significant increased risk of

21   non-Hodgkin's lymphoma, correct?

22   **A.**    None of them had confidence bounds that did not include 1.

23   **Q.**    And we now have, of course, the 2018 Andreotti study.  And

24   that study, although they don't separately break it out from

25   the data we have, has an ever/never relative risk that would be

PORTIER - CROSS EXAMINATION / LASKER

1   extra below 1, correct?

2   **A.**   I don't know.  They didn't provide it.

3   **Q.**   Okay.  But you could -- using the data, and you've done

4   some other calculations with the data, certainly you could

5   calculate an unadjusted odds ratio for ever/never and it would

6   be below 1, correct?

7   **A.**   A crude odds ratio.  I haven't done it, so I -- I can't

8   answer the question, but -- I can't answer it.

9        **MR. LASKER:**   Okay.  Well, if we could put up

10  Slide 26.

11  **BY MR. LASKER**

12  **Q.**   And that is Tab 3 in your binder, Dr. Portier.  It's from

13  your deposition in January.  I can't remember the exact date,

14  but your supplemental deposition.

15       And it's at Page 50, Lines 10 to 19.  So if you'd like to

16  go and look at that in your expert report?

17  **A.**   Tab?

18  **Q.**   Tab 3.

19       **THE COURT:**   Tab 3, Page 50, you said?

20       **MR. LASKER:**   Yes.

21  **BY MR. LASKER**

22  **Q.**   And in your deposition you testified that an unadjusted --

23  and uncorrected unadjusted rate ratio can be calculated from

24  these data, and we're talking about the Andreotti study, in

25  that the ever/never risk ratio would be less than 1, correct?

PORTIER - CROSS EXAMINATION / LASKER

1  **A.**   I have to say likely less than 1, since I didn't do it.

2  **Q.**   The 2018 Andreotti study looked at more exposed cases of

3  non-Hodgkin's lymphoma than all of the glyphosate

4  case-controlled studies combined, correct?

5  **A.**   You've asked me that question before.  I believe it is

6  correct.

7  **Q.**   The 2018 Andreotti study also allowed for a longer latency

8  period for non-Hodgkin's lymphoma development than any other

9  published glyphosate epidemiological study, correct?

10  **A.**   It depends on what you mean by "latency."  But if you're

11  saying the people in that study could have been exposed much

12  longer than the others, the answer is yes.

13  **Q.**   Okay.  And just so we're clear, if you could look at,

14  again, in your deposition at Tab 3, Page 16, Lines 23 through

15  17, Line 2.

16          **MR. LASKER:**  And we can put that up on the screen.

17  It's Slide 20.

18  **BY MR. LASKER:**

19  **Q.**   And my question is to you, starting on line 23:

20          **"QUESTION:**  The 2018 National Cancer Institute study"

21          -- and that refers to Andreotti -- "allows for a

22          longer cancer latency period for non-Hodgkin's

23          lymphoma than any other published glyphosate

24          epidemiologic study, correct?"

25          And your answer was:

PORTIER - CROSS EXAMINATION / LASKER

1        "**ANSWER:**  Correct."

2   **A.**    That's what it says.

3          **THE COURT:**  Didn't he just say that in his actual

4   testimony?

5          **MR. LASKER:**  I wasn't clear if he was --

6          **THE COURT:**  I was pretty clear.

7          **MR. LASKER:**  Okay.

8          **THE WITNESS:**  I would like to point out that this was

9   not an NCI study.  It was a study by Andreotti and coworkers.

10       An NCI study would be much more carefully reviewed.  It

11  becomes the opinion of the agency.  So it's really the

12  Andreotti study.

13  **BY MR. LASKER**

14  **Q.**    You would agree that the bottom line from the analysis

15  that was conducted by the investigators in the 2018 study with

16  respect to glyphosate and non-Hodgkin's lymphoma from the

17  analyses they conducted is that they saw nothing, correct?

18  **A.**    From the faulty analysis that they conducted, they saw

19  nothing.

20  **Q.**    And the 2018 Andreotti study had no impact on your

21  evaluation of the glyphosate epidemiologic literature, correct?

22  **A.**    That's not true.  It -- it had impact.  I've read it.  I

23  considered it.  I looked at it.  It didn't change it.

24  **Q.**    Okay.  If we could -- if I could direct you to Page 53 of

25  your deposition, starting at Line 23.

1          MR. LASKER:  And if we can put up Slide 22?

2   BY MR. LASKER

3   Q.   And my question to you, starting at Line 22 on Page 53:

4        "QUESTION:  Let me ask you this in general.  Do you

5        believe that the 2018 National Cancer Institute

6        Journal study strengthens or weakens the epidemiologic

7        evidence in support of your opinion that there is an

8        association between glyphosate-based herbicides and

9        non-Hodgkin's lymphoma?"

10       There is an objection.

11       And then your answer:

12       "ANSWER:  I believe that the 2018 Andreotti study had

13       no impact on my evaluation of the epidemiology data.

14       It is neither good nor bad.  What was seen is almost

15       what one would have expected to see, because of the

16       exposure misclassification."

17       That was my question and your answer in your deposition,

18   correct?

19   A.   Yes, it was.

20          MR. LASKER:  If you could put back up on the screen

21   the forest plot?  That was Slide 24 and is in the expert report

22   at Page 16.

23   BY MR. LASKER

24   Q.   So we now have the Andreotti study that updated the

25   De Roos study.

1      So if we were to be looking at the published epidemiology

2    literature now for the core studies, you would have Andreotti

3    instead of De Roos 2005, correct?

4    **A.**    Not at all.  I would not put the Andreotti study in a

5    meta-analysis partly because of the failures, partly plus of

6    the imputation.  It's completely different than the other

7    studies in those regard.

8      When you do a meta-analysis, you try to bring studies

9    together that will at least have something in common.

10   **Q.**    So you believe it's appropriate to include the 2005

11   De Roos AHS study in the meta-analysis --

12      (Court reporter clarification.)

13   **Q.**    ...2005 AHS study in the meta-analysis, but it is not

14   appropriate to include the 2018 Andreotti study, is that

15   correct?

16   **A.**    The De Roos study had all of the exposures for all of the

17   people involved.  They didn't have to impute for 37 percent of

18   the people.

19      Yes, it would be correct epidemiologically to include the

20   De Roos study and not include the Andreotti study.

21   **Q.**    And you believe that it would be appropriate to include

22   the Ericksson study in a meta-analysis, but not to include the

23   Andreotti study, is that correct?

24   **A.**    Ericksson analysis and not include the Andreotti.  That's

25   correct.

PORTIER - CROSS EXAMINATION / LASKER

1   **Q.**   And you believe that it would be appropriate to include

2   the Hardell study in a meta-analysis but not the Andreotti

3   study, correct?

4   **A.**   The 2002 Hardell saw, correct.

5   **Q.**   And you believe it would be appropriate to put the Orsi

6   studied in a meta-analysis but not the Andreotti study, is that

7   correct?

8   **A.**   That is correct.

9   **Q.**   And in your expert report where there was data for

10   epidemiologic studies that were combined into pooled analyses,

11   you no longer consider the earlier studies in your analyses,

12   correct?

13   **A.**   I -- I didn't consider them in making my decision.   I

14   mean, I read them.

15   **Q.**   Okay.

16   **A.**   But, yes, I used a pooled analysis as my main driver.

17   **Q.**   So, for example, for the Cantor study and the Nordstrom

18   study and the Hardell and Ericksson study, those you did not

19   consider or you considered the later pooled analyses for each

20   of those datasets, correct?

21   **A.**   Well, let's be correct.   To make sure we're very correct

22   here.   Cantor only -- Cantor did an analysis of glyphosate

23   unadjusted and whether it relates to NHL.   The other two did

24   not do glyphosate analyses.   So I couldn't have used them in

25   this evaluation.

PORTIER - CROSS EXAMINATION / LASKER

1    They were pooled and De Roos was able to get that

2    information on glyphosate use and put it in to the evaluation.

3    And then she adjusted for all the other exposures.  So, yes, I

4    would use De Roos.

5    **Q.**    Okay.  I think we may have some confusion on the names of

6    the studies, so let me just go back to your expert report.

7    It's at Tab 1, again.  And if you could go to Page 7 of your

8    expert report?

9         And this is a continuation that starts on Page 6 where

10   you're talking about Cantor.  And as we discussed, and as you

11   just stated, the last line of that first page you note with

12   respect to Cantor:

13        "This study will not be included separately into

14        the evaluation since it overlaps with De Roos 2003."

15        Correct?

16   **A.**    That's correct.

17   **Q.**    And then with respect to the Nordstrom study, that's

18   Page 9 of your expert report.  Do you see Nordstrom 1998?

19   **A.**    Yes, I do.

20   **Q.**    And the last sentence in that paragraph you note that:

21        "This study was later used in a pooled analyses

22        of HCL and NHL" -- I think that's the Hardell 2002

23        study -- "and will not be considered independently in

24        this evaluation."

25        Correct?

1    **A.**    In this evaluation for causation, but will be used in the

2    context of the pooled analysis.

3    **Q.**    Correct?

4    **A.**    Correct.

5    **Q.**    And then the same thing with regard to the Hardell and

6    Ericksson study, which is the next study in your report.  And

7    go to the last line.  Because that was pooled into another

8    analysis, you used the pooled analysis in your evaluation

9    rather than the earlier studies, correct?

10   **A.**    That is correct.

11   **Q.**    And I know that -- and I appreciate that you're not

12   offering any opinions with respect to the North American pooled

13   project, but you are aware that that is a pooled analysis that

14   includes data from the McDuffie study and De Roos 2003,

15   correct?

16   **A.**    Actually, it's more than that.  It's when you -- when you

17   look at the studies, they have a lot more cases and controls

18   than any of the -- than all of the studies individually.

19        So it's not exactly just taking over what was done by

20   De Roos, because De Roos has some other evaluations in here

21   that -- that you can't ignore.  It's, to some degree, a unique

22   study, even with the NAPP.

23   **Q.**    That's fine.

24        The data that's in the U.S.-based case-controlled studies

25   and Canadian-based case-controlled studies, you understand that

1  was pooled for the NAPP analysis, correct?

2  **A.**   I understand that was pooled.  But, again, let's see if I

3  can be clear on what I'm saying here.

4      If you look -- could I have my table?  No, it's not there.

5  No.

6          **THE COURT:**  Page 16 of your report?

7          **THE WITNESS:**  It's not there.  It's not in that

8  table, so I'll let it go.

9  **A.**   The individual studies, and I don't know the numbers right

10  off my back, but they each had X number of cases and X number

11  of controls according to the individual write-up.  And when you

12  add those up and you go look at De Roos, she says that's what

13  they had, 995 cases and some number of controls.

14      And then De Roos restricted her set.  She didn't use

15  women.  She didn't use people who had worked on a farm before

16  the age of 17, et cetera.  She had some restrictions.  So she

17  ended up with 800-something.

18      Yet, when you add those things up and look at the North

19  American pooled project, there is still 200 cases and 600

20  controls that are not accounted for that I'm sure were

21  originally there but were not listed in the original paper or

22  in the De Roos paper.  So they have something else they have

23  included.

24      And because I don't know that, I'm concerned with just

25  telling you I could get rid of the De Roos paper because this

PORTIER - CROSS EXAMINATION / LASKER

1    supersedes it.

2    **BY MR. LASKER**

3    **Q.**   And, Dr. Portier, in your forest plot, which is still on

4    the screen, you include weights for each of those six

5    epidemiologic studies that were published as of the IARC

6    Monograph, correct?

7    **A.**   Those weights are provided in the paper by Chang and

8    Delzell.  They are automatically generated by the

9    meta-analysis.

10   **Q.**   And just so the record is clear -- and we can go to the

11   Chang and Delzell study.  It's at Tab 12 in your binder.

12       And if you look at Page 404, which is the third page in

13   Chang and Delzell, I believe this is the table that -- from

14   which you pulled your numbers, correct?

15   **A.**   Give me a minute to look.  I'm just looking to see if they

16   are correct.  But I believe, yes, that's the table I -- that's

17   the plot I pulled it from.

18   **Q.**   And just, again, so the record is clear, you have, it

19   appears, a typo in your expert report with respect to the

20   weight for Orsi.

21       And Orsi, in fact, would have a weight of 9.5, which is

22   just -- which comes in just below the 11.6 weight for

23   Ericksson, correct?

24   **A.**   Give me a minute.  Excuse me.  There is another table I

25   need to look at.

PORTIER - CROSS EXAMINATION / LASKER

```
 1        (Brief pause.)
 2  A.    There is a typo, but yes.
 3  BY MR. LASKER
 4  Q.    And you testified --
 5             JUDGE PETROU:  Are you moving to something else?
 6  Because if so, I would like to ask a question about this chart
 7  that we're just looking at right now.
 8             MR. LASKER:  I'm kind of still on it for a few more
 9  questions.  I'm not sure where your question will be.
10  BY MR. LASKER
11  Q.    But, Dr. Portier, you testified during your direct that
12  your view of the strength of causation under the Bradford Hill
13  criteria for glyphosate and non-Hodgkin's lymphoma, and I
14  believe I wrote this down exactly, is mostly driven by the
15  meta-analysis.  Do you recall that?
16  A.    I might have said something like that, yes.
17  Q.    And you cited in your testimony this morning to the
18  meta-analysis that we're looking at right here by Chang and
19  Delzell with the 1.3 relative risk and the confidence
20  intervals, and there were a few more that you have on your
21  forest plot that are roughly similar, correct?
22  A.    Say that again, the last part?
23  Q.    There are a few other models that Chang and Delzell used
24  that are roughly similar in their findings for a meta-analysis,
25  correct?
```

PORTIER - CROSS EXAMINATION / LASKER

1   **A.**   That is correct.

2   **Q.**   And you have not calculated a meta-analysis that

3   incorporates the reported findings from the Andreotti paper or,

4   I take it, from the NAPP, correct?

5   **A.**   I have not done such a meta-analysis, that is correct.

6          **JUDGE PETROU:**  Simple, but probably easy for you to

7   answer the question, but I'm curious just looking at the

8   relative weights here.

9          We have six studies, right, totaling 100 percent.  So if

10  they are equally weighted, that's,  what, something like 16 and

11  two-thirds percent each.

12         We've got one study here, McDuffie, which clocks in at

13  38 percent of the total.

14         Is there anything about that in and of itself that's

15  troubling or problematic to you when you see a meta-analysis

16  and one out of the six has such a disproportionate percentage

17  of the total?

18         **THE WITNESS:**  You would look at the heterogeneity.

19  You would look at other issues.  In this case there was nothing

20  else.  It was strictly driven by the low confidence bounds,

21  small confidence backgrounds and the large number of cases and

22  controls.

23         **JUDGE PETROU:**  I understood that that's how you got

24  to the 38 percent.  I was just wondering if that was a red flag

25  of any kind, so much out of this analysis.

1        **THE WITNESS:**  So if I had been doing this

2   meta-analysis, I probably would have pulled that study out and

3   looked at sensitivity to the inclusion of that study, the

4   McDuffie study.  People do that in epidemiology.  That's a

5   standard thing to do when you see something carrying a lot of

6   wait.

7        **JUDGE PETROU:**  We don't know or do we know whether

8   that was done here?

9        **THE WITNESS:**  They did not do it here in one of the

10  models that I'm aware of.

11       **JUDGE PETROU:**  Thank you.

12       **THE WITNESS:**  I want to correct something, a minute

13  ago.

14       The strong statement for the strength of the evidence is

15  mostly driven by the meta-analysis.  If it was not the

16  meta-analysis, then the individual studies would have taken me

17  a little lower.  Not as strong.

18       I want to be clear it's not the whole review.  It's taking

19  it up to that too level.

20       **JUDGE PETROU:**  I understand.

21       **THE COURT:**  Could I ask a question about this table,

22  this table on Page 16 of your report that comes from Chang and

23  Delzell.  I guess Chang and Delzell chose to use the

24  hierarchical regression model from De Roos 2003 rather than the

25  logistic regression analysis and you -- it sounds like you buy

 1    into that choice.  Can you explain why?

 2              THE WITNESS:  Actually, they used both.  The

 3    Model 2 --

 4              THE COURT:  "They" being Chang --

 5              THE WITNESS:  Chang and Delzell.  The Model 2 that

 6    they put forward --

 7              THE COURT:  Wait.  Let me go back to Chang.  Are you

 8    pointing me to something in their paper?

 9              THE WITNESS:  We can go to their paper.  That would

10    be great.

11              THE COURT:  Okay.

12              THE WITNESS:  On Page 416 of their paper, their

13    Table 3.

14              THE COURT:  416.  Give me a minute.

15        Okay.

16              THE WITNESS:  So if you look at the seventh or eighth

17    line where it says "meta-analysis model" under Model 1, they

18    are using 1A, 2, 3, 4, 6, 7.  And so 1A is the De Roos

19    hierarchical regression.  That's all the way in column -- under

20    RR.  That's one, two, three, four -- five when you look at

21    Model 1.

22        And then the second one is 1b, and that's using the

23    logistic regression.  So they looked at the sensitivity of the

24    meta-analysis to both of those evaluations.  I --

25              THE COURT:  But it seems like they emphasize and you

PORTIER - CROSS EXAMINATION / LASKER

 1   emphasize the hierarchical regression analysis and I'm curious

 2   what -- why they and you decided to do that.

 3       What's the rationale behind their decision and your

 4   decision to do that?

 5           THE WITNESS:  So I do not favor the hierarchical

 6   model over the logistic regression model.  They are both

 7   legitimate reasonable ways to analyze the data.  It's like

 8   doing a sensitivity analysis on your analysis method.  I could

 9   use logistic regression.  I could use hierarchical regression.

10       The problem with the hierarchical regression here, my only

11   minor problem with it is they used a fairly uninformative Brier

12   in their evaluation.  It's a -- it's a different area of

13   statistics.  It's called Baseyian statistics.

14       And Dr. Ritz kind of explained this.  You have to make

15   some assumptions about how carcinogenic glyphosate is before

16   you do the analysis, and then it goes through this mark-off

17   chain --

18           THE COURT:  Do you have make an assumption about how

19   carcinogenic glyphosate is or how carcinogenic the other

20   pesticides are?

21           THE WITNESS:  All of them.  Every individual one of

22   them had a prior for how carcinogenic they were.

23       And it's known with the technique.  If you choose a

24   non-informative prior, it will pull down the regression from

25   what you would get with a logistic regression.

PORTIER - CROSS EXAMINATION / LASKER

1    And so, again, you're sort of seeing what you would

2 inspect to see with that analysis compared to what you see

3 against the logistic regression.

4         THE COURT:  But when you pool it with all these other

5 studies, with all this other data, it looks like it's

6 inconsequential from looking at the Chang and Delzell Table 3

7 that you just showed me, it's the -- am I right that it's the

8 exact same numbers?

9         THE WITNESS:  Chang and Delzell should have given you

10 two significant digits.  The U.S. EPA Science Advisory Panel

11 redid this analysis.  And so they do differ in the third digit,

12 but that's it.

13    I think Model 2 is 1.04 is the lower bound and Model 1 is

14 1.03, but I would have to go back and double-check that.

15         THE COURT:  Okay.  Thanks.

16 BY MR. LASKER

17 Q.   Dr. Portier, I'd like to turn now to some of your

18 testimony about the imputation method that was used in the 2018

19 Andreotti study.

20    First, Dr. Portier, you do not have sufficient experience

21 in the field of epidemiology to speak to whether imputation,

22 multiple imputation is a widely accepted methodology in

23 epidemiologic studies, correct?

24 A.   No.  At this point I feel I do.

25 Q.   Well, if we could turn to your deposition in January at

1    Page 82.  And this, again, is Tab 3 in your binder.

2    **A.**    What page?

3    **Q.**    Page 82, starting at Line 15.

4    **A.**    Yes.

5    **Q.**    And my question to you was:

6         **"QUESTION:**  Do you agree in general" --

7              MR. LASKER:  I'm sorry.  We can put this up on the

8    screen.  It's Slide 38.

9    **BY MR. LASKER**

10   **Q.**    (As read)

11        **"QUESTION:**  Do you agree in general -- and we'll get

12        to the 2018 NCI study in a second, but do you agree in

13        general that multiple imputation is a widely accepted

14        methodology for use in the epidemiologic research?"

15        There was an objection to form.

16        And your answer:

17        **"ANSWER:**  I am not sure I have the history in the

18        field sufficient to be able to say it's widely

19        accepted.  I just don't think I can answer that

20        appropriately."

21        Correct?

22   **A.**    At that point, yes.  But as I pointed out in my direct,

23   I -- these questions made me go back and look at this very

24   carefully.

25   **Q.**    And you had some testimony in direct about trying to find

1  other studies that used a multiple imputation, correct?

2  **A.**   No, multi-step multiple imputation.  Instead of just --

3  there's lots of multiple imputation studies out there.  This is

4  a very specific twist on that that I -- I couldn't find.

5  **Q.**   During your direct examination, you testified about a bit

6  about the Brier score that was calculated as part of the

7  Heltshe analysis.  Do you recall that testimony?

8  **A.**   Yes.

9  **Q.**   Prior to reading the Heltshe paper, you had never heard

10  the term "Brier score," correct?

11  **A.**   I think that's probably true.

12  **Q.**   And you had never calculated a Brier score, correct?

13  **A.**   That is true.

14  **Q.**   You testified during your deposition that it was your

15  understanding after reading Heltshe that a Brier score of zero

16  shows perfect accuracy, correct?

17  **A.**   That is correct.

18  **Q.**   And if we can look to the Heltshe paper, it's Tab 13.  And

19  if you could turn to Table 3, which is on Page 413?

20         **MR. LASKER:**  We can put this up on the screen also.

21  It's Slide 41.

22         **JUDGE PETROU:**  Before you ask a question about that,

23  is it your testimony today that a Brier score of zero means

24  perfect?

25         **THE WITNESS:**  Yes.

PORTIER - CROSS EXAMINATION / LASKER

```
 1              JUDGE PETROU:  Okay.

 2              THE WITNESS:  As far as I'm aware.

 3              THE COURT:  I take it it wasn't a change because your

 4   question was specific to your deposition testimony.

 5        Go ahead.

 6   BY MR. LASKER

 7   Q.   If we look at Table 3, the very first pesticide that is

 8   named, which is methyl bromide.  Do you see that?

 9   A.   Yes.

10   Q.   And that pesticide has a Brier score, which is the

11   second-to-last column in this table, of 0.004, correct?

12   A.   That's what it -- that's what it says.

13   Q.   And the Heltshe investigators on Page 412 --

14   A.   Where?

15   Q.   On Page 412.

16   A.   Okay.

17   Q.   And this is in the second column right above "Days Per

18   Year Use of Specific Pesticides," there is six lines at the

19   very bottom.  They state:

20              "For only a few of the rare pesticides, less than

21        1 percent usage, used in phase two does the imputed

22        prevalence differ from the true prevalence by more

23        than 20 percent."

24        Do you see that?

25   A.   I see that, yes.
```

1  Q.   And one of the pesticides that they identify where the

2  imputed prevalence is more than 20 percent different from the

3  imputed prevalence is methyl bromide, correct?

4  A.   That's correct.  But we discussed that in the deposition

5  as to why that occurs.  I would be happy to discuss it again.

6  Q.   We can.  I understand -- and I think we'll be getting to

7  that.

8       But just to continue with this analysis or this

9  discussion.  The investigators, the Heltshe investigators, also

10 used their imputation methodology, and I think you discussed

11 this a bit in your direct examination, to look at any pesticide

12 exposure; not just specific pesticides but a category for any

13 pesticide exposure, correct?

14 A.   That is correct.

15 Q.   And for the any pesticide exposure, and you mentioned this

16 in your direct and it's in the abstract on the first page of

17 this paper.

18         MR. LASKER:  And you can put this up.  It's Slide 44.

19 BY MR. LASKER

20 Q.   The investigators noted that:

21         "The observed and imputed prevalence of any

22         pesticide use in the holdout dataset were 85.7 percent

23         and 85.3 percent, respectively."

24         Correct?

25 A.   That's what it says, yes.

PORTIER - CROSS EXAMINATION / LASKER

1   Q.   And you agree, though, that the Brier score for their any

2   pesticide imputation was among the highest of all the Brier

3   scores that they calculated in their analysis, correct?

4   A.   Can you show me where that is?

5   Q.   Well, we can go first of all to your deposition.  And this

6   is again, Tab 3, Page 104.  It's Line 1 through Line 5.

7            MR. LASKER:  You can put this up on the screen as

8   Slide 45.

9   BY MR. LASKER

10  Q.   And we were discussing the Brier score here for any

11  pesticide use, correct?

12  A.   No, we're talking about relative Brier scores.  We're

13  not -- we're not -- you were talking -- never mind.  Ask the

14  question again.

15  Q.   We're talking about -- I don't know what relative Brier

16  scores are.  We're talking about the Brier score here, correct,

17  for the any pesticide use imputation?

18  A.   There is no Brier score that I know of for any pesticide

19  use.  The numbers you have in your question, starting at

20  Line 11:

21          "QUESTION:  In fact, the Brier scores for the -- the

22          Brier score for any pesticide use which we just talked

23          about, the 85.3 and 85.7" --

24          Which are not Brier scores.  Those are the estimated

25  prevalences.

1        **"QUESTION:**  The Brier score for any pesticide use is

2        higher than the Brier score for almost all of the 38

3        individual pesticides, correct?

4        **"ANSWER:**  Where is that Brier score?"

5        So I'm asking the same question again.  Where in the text

6   is that Brier score?

7   **Q.**   Okay.  Let's go to Tab 13.

8   **A.**   Thank you.

9   **Q.**   And in that first column, and this is where we went during

10  your deposition as well, on the left they have the -- I'm

11  sorry.

12             **THE COURT:**  Page?

13             **MR. LASKER:**  I'm sorry.  Page 412.

14             **THE COURT:**  Okay.

15  **BY MR. LASKER**

16  **Q.**   The column, the left-hand column they have "Results,"

17  "Imputation Assessment," correct?

18  **A.**   Oh, the titles, yes.

19  **Q.**   And they are discussing here the any pesticide imputation,

20  correct?

21       Do you see the 85.25 and the 85.68, which rounds out to

22  85.7 and 85.3?

23  **A.**   Correct.

24  **Q.**   And then as we talked about during your deposition at the

25  bottom of the column they provide, and it's about one, two,

1   three, four, five, six, seven -- seven lines from the bottom of

2   that column they have the Brier score and the Brier reference

3   score.  Do you see that?  1.0 -- .1092 for the Brier score and

4   .1227 for the Brier reference -- or the reference Brier,

5   correct?

6   **A.**   No.  I'm not seeing it.  Where is this?

7   **Q.**   It is, if you go above Figure 1 and you count up seven

8   lines.

9   **A.**   Oh, yes.  Now I see it.

10  **Q.**   And so that was the Brier score for any pesticide use?

11  **A.**   Correct.

12  **Q.**   And that Brier reference score, as we discussed in your

13  deposition, was among the highest of all the Brier scores that

14  were calculated if you look at the list of all 38 individual

15  pesticide Brier scores, correct?

16  **A.**   The Brier reference score?

17  **Q.**   The Brier score.

18  **A.**   Oh, the Brier score.  Let me take a look again.

19       (Brief pause.)

20  **A.**   Yes, it's one of the higher.

21  **Q.**   And so we have an imputation of 85.3 percent versus

22  85.7 percent with one of the highest Brier scores that were

23  calculated in the Heltshe paper, correct?

24  **A.**   That's correct.  The Brier score is affected by the

25  prevalence of the exposure in the population you're looking at.

PORTIER - CROSS EXAMINATION / LASKER

1   So it would not be surprising that the Brier score for any

2   pesticide use would be large, just like it is for glyphosate,

3   malathion and 2,4-D.

4   **Q.**   And just because the Brier score was large for any

5   pesticide use and for the specific pesticides like glyphosate

6   that had the highest exposure rate does not mean, as we see for

7   any pesticides, that the imputation method does not provide an

8   estimate that, in the case of any pesticide, was an almost

9   complete match, correct?

10   **A.**   It does not indicate it's almost a complete match.   That

11   is what I showed with the tables during my direct.

12        It indicates the best you can do is .41 -- point, what is

13   it?   The difference?   .4-something percent difference.   But it

14   could be as high as, I forgot, a 28 percent difference.   And so

15   you could easily get that Brier score with a 28 percent

16   difference.

17   **Q.**   And so you testified during your deposition that you

18   believe that the proper comparison for the imputation of

19   pesticides should be based upon absolute error, correct?

20   **A.**   Between the -- yes.

21   **Q.**   The authors and the investigators of the Heltshe paper,

22   however, presented the data based upon relative error as

23   between the imputation and the actual prevalence, correct?

24   **A.**   They reported it as well as reporting the individual

25   numbers.

PORTIER - CROSS EXAMINATION / LASKER

1    Q.   And they have a table, Figure 2, on Page 414 where they

2    list out all of the individual pesticides based upon relative

3    error, correct?

4    A.   Correct.

5             THE WITNESS:  Just for the judges, your Honors.

6    Relative error means that you take the error that I was looking

7    at and divide it by the prevalence of the exposure in the

8    population.  So as glyphosate has the largest exposure, it has

9    the largest divisor.  And since methyl bromide has the lowest

10   exposure, it has the smallest divider.

11   BY MR. LASKER

12   Q.   When the Heltshe investigators looked at relative error

13   and reported it, as they did in their paper, they reported that

14   glyphosate fell basically in the middle of the pack, correct?

15   A.   It -- the bottom third or something.  Right at the edge of

16   the bottom third.

17        But as I pointed out, when you're doing the logistic

18   regression that you're going to do to evaluate these data, it's

19   the absolute that's going to make a difference in terms of the

20   bias and not the relative.

21   Q.   I understand the opinion you were offering earlier today,

22   but I want to just make sure we're clear on what the authors of

23   this paper stated.

24        And if you look at Figure 2 and we're talking about

25   relative error, there is relative error both on the high side

 1  and on the low side, correct?

 2  A.    That's correct.

 3  Q.    And glyphosate -- if you include also the relative error

 4  on the high side, glyphosate falls right in the middle of the

 5  pack for these pesticides, correct?

 6  A.    I'm sorry.  Say that again?  Of the ones on the high side,

 7  it falls towards the middle of the high side?  It's still

 8  toward the bottom.

 9  Q.    Okay.

10  A.    Bottom third.

11  Q.    Let's just be clear.  If I could direct you to your

12  testimony at your deposition again.  And this is at Page 106,

13  Line 13.

14  A.    106?

15  Q.    Uh-huh.  Yes.

16        MR. LASKER:  And we can put this up on the screen.

17  It's Slide 49.

18        MS. GREENWALD:  Your Honor, my objection is that he

19  asked and answered all these questions already.  I just want to

20  make that clear, that maybe Dr. Portier can look above that as

21  well.

22        MR. LASKER:  We can go -- what do you want, 105/19?

23  He can start reading from there.  It's basically the same

24  discussion we just had.

25        MR. WISNER:  Specifically Page 105 starting at

PORTIER - CROSS EXAMINATION / LASKER

```
 1   Line 19.
 2              MR. LASKER:  Yeah, that's fine.
 3        (Brief pause.)
 4              THE COURT:  Can we move on to something, please?
 5              MR. LASKER:  We can, Your Honor.  That's fine.
 6   BY MR. LASKER
 7   Q.   Dr. Portier, I'd like to ask you about your calculations
 8   of -- or your recalculations of the relative risks in the 2018
 9   NCI study.  And you presented some of this data during your
10   direct examination.  I just want to make sure I understand how
11   you did these calculations.
12              MR. LASKER:  So if we could put up Slide 29.
13              JUDGE PETROU:  Just to be clear, because he's already
14   said it's not an NCI study.  When you say 2018, you're
15   referring to?
16              MR. LASKER:  Yeah, the JNCI study or the Andreotti
17   study.  I'll say Andreotti study, Your Honor.
18        If you could put up Slide 29?
19   BY MR. LASKER
20   Q.   This is the relative risks that were reported in the
21   Andreotti study for cumulative days of exposure for
22   non-Hodgkin's lymphoma.  And if you have --
23              MR. LASKER:  Do we have the science binder up there
24   for him to look at the Andreotti study?
25
```

PORTIER - CROSS EXAMINATION / LASKER

1   BY MR. LASKER

2   Q.   Do you need to look to the study to confirm these data

3   points or do you recognize them?

4   A.   I will reserve the right to go look when you tell me what

5   you want to tell me.  How is that?

6   Q.   That's fine.

7   A.   It's slowing you down.  Let's --

8   Q.   I'm just going to confirm that these were the numbers from

9   the study.

10        My next question is:  If I understand how you calculated

11   your -- your recalculated odds ratios or relative risks, if we

12   can go to Slide 55, you did not -- you took out the unexposed

13   control numbers of people who are unexposed, you took the

14   lowest exposure group and made that your reference and then you

15   calculated your relative risks compared to that lower exposure

16   group, correct?

17   A.   Yes.

18   Q.   And similarly for intensity of exposure.

19        MR. LASKER:  We could put you have Slide 56.

20   BY MR. LASKER

21   Q.   This is from the primary analysis that's in the paper for

22   cumulative -- for intensity weighted cumulative days, correct?

23   A.   That is correct.

24   Q.   With all the relative risks reported as below 1.  And then

25   you did the same calculation.

1          MR. LASKER:  And we can put up Slide 57.

2    BY MR. LASKER

3    Q.    You removed, or you no longer considered the unexposed

4    group and you recalculated the relative risks using the lower

5    exposed group as your reference, correct?

6    A.    And it's an approximate calculation.  I will say that

7    right upfront.

8    Q.    Right.

9    A.    I can't do the adjustments or anything because I don't

10   have the real data.  This is approximately what would happen.

11   Q.    Okay.  And obviously -- well, let me ask.

12         Your recalculation does not change the number of farmers

13   that are in each of these five groups, correct?

14   A.    No, it wouldn't.

15   Q.    And it doesn't change the fact that there is a higher

16   incidence of non-Hodgkin's lymphoma, at least as adjusted, in

17   the unexposed group than there is in any of the four exposed

18   groups, correct?

19   A.    Say that again.

20   Q.    Your recalculation does not change the fact that there was

21   a higher incidence, at least as adjusted, of non-Hodgkin's

22   lymphoma in the group that is not exposed than there was in any

23   of the groups Q1 through Q4 where there was exposure?

24   A.    In the adjusted analysis the incidents in the unexposed

25   was larger than the incidents in the exposed, yes.

1   Q.   And you did not say that any of your related relative

2   risks comparing higher exposure to lower exposure shows a

3   statistically significant positive association between

4   glyphosate and non-Hodgkin's lymphoma, correct?

5   A.   I can't use -- I can't create confidence bounds.  That's

6   correct.

7   Q.   And you also are not saying that your recalculated

8   relative risks show evidence of a dose-response, correct?

9   A.   That is correct.

10  Q.   Dr. Portier, last topic.  Latency.

11       You agree that because the latency period for cancer can

12  take years, evaluation of epidemiologic studies should consider

13  whether the exposure occurred sufficiently long ago to be

14  associated with cancer development, correct?

15  A.   Say it again?  I'm sorry, it's...

16  Q.   Okay.  You agree that the cause, the latency period for

17  cancer take years, evaluation of epidemiologic studies should

18  consider whether the exposure occurred sufficiently long ago to

19  be associated with cancer development, correct?

20  A.   Correct.

21  Q.   You agree that cancer latency is one of the things that

22  you must consider in evaluating the epidemiologic literature,

23  correct?

24  A.   Must?  Umm -- umm, not really.  Not always.

25  Q.   Okay.  If I could ask you to turn again to Tab 3, which is

PORTIER - CROSS EXAMINATION / LASKER

```
 1   your deposition in January of 2018.

 2   A.   Which tab is that?

 3   Q.   Tab 3.

 4   A.   Okay.

 5   Q.   And if you could look at Page 11, starting at Line 6.

 6   A.   11?

 7   Q.   Page 11, yes.

 8        (Witness complied.)

 9   Q.   And I asked you the question:

10        "QUESTION:   It is your opinion that because the

11        latency period for cancers can be long by years,

12        evaluation of studies should consider whether the

13        exposure occurred sufficiently long ago to be

14        associated with cancer development, correct?"

15        And then your answer:

16        "ANSWER:   I will put it in my own words.   Cancer

17        latency is one of the things you must consider in

18        evaluating the epidemiological literature."

19        Correct.

20   A.   That's what it says.

21   Q.   And that's what you said, correct, obviously?

22   A.   That's what I said.

23   Q.   And you also then state that:

24        "ANSWER:   In this case I referenced a paper that

25        looked at the estimates of how long it took for
```

PORTIER - CROSS EXAMINATION / LASKER

```
 1         non-Hodgkin's lymphoma to form, and 6.7 years was a
 2         little short."
 3         Correct?
 4    A.   That's correct.
 5    Q.   And in your submission to EPA, and we can look at --
 6    A.   Can I do one thing in here, just tell you why I said no
 7    today about --
 8              THE COURT:  Sure.
 9              THE WITNESS:  Good.  I was a little too soft here.
10         If I have an epidemiology study of a constant exposure
11    chemical that's been in the environment for 50 years and people
12    were looking at it and I am now going to do a case-control
13    study, I don't worry about latency.  So I don't necessarily
14    have to look at it in situations where I have long-term
15    exposure.
16              THE COURT:  But you have to at least look at whether
17    latency is an issue when they are doing such a study, right?
18              THE WITNESS:  Correct.  You look at whether it's an
19    issue or not, but you don't necessarily have to know what the
20    latency is.
21    BY MR. LASKER
22    Q.   And if I could direct you again to Tab 1B, which was -- to
23    your expert report.  Your submission to EPA, which we were
24    discussing earlier today.
25    A.   Tab 1B.
```

1  Q.   B as in "boy," I'm sorry.

2       And on Page 6 starting at Line 89, you refer to a study by

3  Kato in 2005, correct?

4  A.   Which line do you start on?

5  Q.   Line 89.

6  A.   Yes.

7  Q.   And you state that:

8          "This is a high quality population-based

9          incidence case-control study looking at the

10         relationship between organic solvent exposure and NHL

11         in women."

12         MR. LASKER:   And I'm sorry.   We can also put this up.

13  It's Slide 36.

14  **BY MR. LASKER**

15  Q.   And continuing:

16         "Looking at the relationship between organic

17         solvent exposure and NHL in women found statistical

18         significance only for women occupationally exposed

19         prior to 1970.   And then note that cases and controls

20         were recruited between 1995 and 1998.   And cited two

21         other studies with similar results (no reference

22         given).   They concluded this long latency was either

23         due to higher exposures prior to 1970 or at least a

24         25-year latency period is required for NHL induction

25         by these exposures."

PORTIER - CROSS EXAMINATION / LASKER

1      Correct?

2  **A.**    That's what it says.   That's correct.

3  **Q.**    And you also cited to two studies that looked at NHL

4  latency for patients who received radiation or chemotherapy for

5  Hodgkin's disease, correct?   And you talk about that on Page 7.

6  **A.**    Yes.

7  **Q.**    And you explain that one of these studies reported

8  latencies ranging from one year to 11 years, with a median

9  latency of 5.5 years.   And that the other reported latencies of

10  up to 16 years, correct?

11  **A.**    Can I have a minute to read this to make sure I know what

12  I'm looking at?

13  **Q.**    Sure.

14      (Brief pause.)

15  **A.**    Okay.   That's what it says, yes.

16  **Q.**    And you state that:

17          "These types of radiation and chemotherapy

18      exposures are rather extreme relative to those from

19      glyphosate, and it would not be surprising for the

20      glyphosate lag time to be longer than that that from

21      chemotherapy and radiation treatment."

22      Correct?

23  **A.**    That's what it says.

24          **MR. LASKER:**   I have no further questions, Your Honor.

25          **THE WITNESS:**   But it says "lag time."   I want to be

 1    clear what we're talking about here.

 2         There's -- again, we're playing this game with the latency

 3    term.  The shortest time from exposure to getting NHL is one

 4    year.  That's quite clear in this literature.  Not everybody

 5    will get that in one year.  That's also clear from this

 6    literature.

 7         The first part about the 1970 study, I'd have to go back

 8    and look at that again to explain it to you, but my

 9    recollection is that in that study this is a prospective study,

10    very long prospective study with a small group.  They were

11    looking for statistically significant increases.  It look a

12    very long time for it to get there.

13         They interpreted it as latency, and that's all I'm

14    reporting here.

15              **MR. LASKER:**  Thank you.

16         No further questions, Your Honors.

17              **MR. WISNER:**  Your Honor, I'm going to be doing the

18    redirect.

19              **THE COURT:**  Okay.

20                     <u>**REDIRECT EXAMINATION**</u>

21    **BY MR. WISNER**

22    **Q.**  Good afternoon, Doctor.

23         Just since it's right in front you, you're looking at the

24    EPA submission that you made as a comment to the EPA, is that

25    right?

1    **A.**    Yeah, that's right in front of me here.

2    **Q.**    Okay.  In that section --

3              **MR. LASKER:**  Is this in your binder now?

4              **MR. WISNER:**  It's the document you were just reading.

5    **A.**    Tab B.  Is that it?  Tab B?

6    **BY MR. WISNER**

7    **Q.**    Now, Doctor, in this submission there is some discussion

8    of latency and lag.  Are you referring to cohort studies in

9    this section or are you referring to case-control studies?

10   **A.**    Case-controlled study.

11   **Q.**    What -- why is that important, if at all?

12   **A.**    Well, again, as I stated this morning, you have to

13   accumulate enough patients to see a statistically significant

14   effect, to talk about:  Okay, we've got an effect here.  That's

15   a function of how big the cohort is and how long you wait.

16        The smaller the cohort the longer you have to wait; the

17   bigger the cohort the faster you see that statistical

18   significant.

19   **Q.**    Specifically you discussed earlier today this issue about

20   latency and how case-control studies have access to a very

21   large population to pull cases from, is that right?

22   **A.**    That's correct.

23   **Q.**    Specifically you have discussed De Roos '03, is that

24   right?

25   **A.**    I discussed a theoretical looking one of those, yes.

PORTIER - REDIRECT EXAMINATION / WISNER

1   Q.   Let's just talk about De Roos 2003.

2   A.   Okay.

3   Q.   What was of the size of the population they pulled cases

4   from?

5   A.   Approximately 2 million.

6   Q.   And when you're pulling from millions of potential people

7   versus in a cohort study which, for example, in the AHS, you

8   know, we're talking about 50-, 60-, 70,000, how does that

9   affect your interpretation of the results as it relates to the

10  lag issue?

11  A.   I certainly -- if -- if we go to the picture I had this

12  morning about latency time, and recognize that a single

13  exposure could send somebody who's susceptible into that

14  pathway to getting disease, then by choosing such a large

15  population, you should pick up some of those.  And so you stand

16  a better chance of seeing those types of things.

17       So latency becomes less of a problem in a big study like

18  that than in a cohort study where, especially one like this,

19  this is an outdoor population.  So they are healthy -- the AHS,

20  they are generally healthier than the rest of it.  So it could

21  even take longer in that cohort because they are generally

22  healthier.

23       And so it's hard to make these easy judgments on latency

24  between any of these studies.  I just look for the minimum and

25  see if it makes sense.

1   Q.   Would it be fair to say that in an assessing the latency

2   issue with any epidemiological study, you're not just looking

3   at the potential lag in the study, but you're also looking at

4   the size of the study as well?

5   A.   Correct.

6   Q.   And so, for example, if the AHS followed 2 million people

7   from day one, would there be as much of a concern about latency

8   in that context?

9   A.   No, no.  Not at all.  You would probably see something

10  much sooner.

11  Q.   We talked specifically just now about AHS and you said

12  that these people are healthy --

13          THE COURT:  Can you hold on a second?

14          MR. WISNER:  Sure.

15          THE COURT:  I want to ask a follow-up question about

16  the latency issue.

17       I had a chance to discuss this with Dr. Ritz, but I don't

18  think we've quite discussed this question yet, or maybe we have

19  and I'm just not remembering.

20       But with the case-controlled studies, as you saw and we

21  discussed with Dr. Ritz the other day, you do have these

22  situations where people have been diagnosed with NHL in the

23  early '80s and glyphosate didn't come on the market or wasn't

24  introduced or wasn't approved until '75.  And Dr. Ritz said --

25  and so there is automatically, I think, an alarm bell or a

PORTIER - REDIRECT EXAMINATION / WISNER

 1    warning sign about latency.

 2        Would you agree with that, that it's something that you

 3    need to look into?

 4            THE WITNESS:  Definitely you want to look at it very

 5    carefully.

 6            THE COURT:  Okay.  And Dr. Ritz said that as it

 7    relates to exposure to other pesticides, the latency is not a

 8    concern in De Roos 2003 because she adjusted for other

 9    pesticide use.

10        Do you agree with that, or is there anything that you

11    can -- you would like to say about that?

12            THE WITNESS:  I don't think I understood.  If you

13    could try me again.

14            THE COURT:  Sure.  So you might say:  Let's look at

15    these pools of people who were diagnosed with NHL in 1981.  And

16    glyphosate didn't come on the market until '75.

17        We -- with these studies we tended to prefer a longer

18    period between exposure and diagnosis.  And if we don't have a

19    longer period between exposure and diagnosis, we are concerned

20    that perhaps the disease was caused by something else.

21        And so the first question you might ask when you see the

22    numbers that I just described, the dates that I just described

23    is:  Well, maybe the pesticide that the people were using

24    before they started using glyphosate is what caused the

25    non-Hodgkin's lymphoma rather than glyphosate, because after

1    all, they were presumably exposed to that, you know, in the 5-

2    to 15-year-period before diagnosis.

3              **THE WITNESS:**  Now I understand your question.

4              **THE COURT:**  And so, you know, the -- and so Dr. Ritz

5    had a response to that and I wanted to hear your response to it

6    as well.

7         You know, is that a concern with these studies?  Is it a

8    concern that maybe some other pesticide exposure that occurred

9    during the 5- to 15-year-period before diagnosis is more likely

10   to have caused NHL in these people than glyphosate.

11             **THE WITNESS:**  Okay.  Now I -- now I get it.

12        Because De Roos adjusted for every other pesticide she

13   could possibly adjust for, unless there is a phantom pesticide

14   out there or a phantom exposure causing the NHL, then seeing

15   NHL should worry you.

16        If you hadn't seen NHL in that study you might argue:

17   Okay, the latency wasn't long enough.

18        But having seen it and having adjusted for everything, I

19   would have to conclude that that's a real NHL finding.

20             **THE COURT:**  I mean, you said having adjusted for

21   everything.  I mean, it -- so I get the point about pesticides,

22   right?  She adjusted for all these other pesticides.

23        But there are other things that could be causes of

24   non-Hodgkin's lymphoma that are not pesticides, right?  And

25   I -- I don't know what they are.  But a couple of -- a couple

1    of the ones that have been thrown out are excessive sun

2    exposure, exposure to diesel fumes.  Who knows what else.

3         I mean, given the dates on which these people were

4    diagnosed and given the date that glyphosate was introduced

5    into the market, don't we -- isn't it still an alarm bell?  I

6    mean, isn't it still a real concern that, you know, geeze, we

7    normally want there to be, like, a ten-year latency period at

8    least for an epidemiological study.

9         Don't we need to be really concerned that, you know, these

10   cases of NHL were caused by something else that we haven't

11   thought about and not glyphosate?

12        **THE WITNESS:**  I would argue not in this case.

13   Given -- given the body of evidence -- I can't look at one

14   study at a time.  I have to look at the body of evidence.

15        So let's take a theoretical case.  Five years after the

16   introduction of a pesticide, I do a case-controlled study and I

17   see something.  That flags.  The latency period clearly flags

18   on that and I would mention it at the end of my study.

19        Five years later I do a new case-controlled study and it's

20   still there.  Well, I might not comment on latency anymore

21   because now I've seen it twice in two studies.

22        And then I do a third study five years later and I see it

23   there as well.  Now, I'm not worried about latency in the first

24   study because I've got a consistent picture coming across here.

25   And so --

1          THE COURT:  We don't really have that for glyphosate,

2   right?  I mean, we don't really have -- we don't have -- we

3   don't have a group of people that were diagnosed in, you know,

4   the first happen of the '80s and then a group of people that

5   were diagnosed five years later, and then five years after

6   that, and then five years after that, right?

7       I mean, the case-controlled studies stopped before we

8   could get to the point that you're describing, right?

9          THE WITNESS:  I wouldn't say that, no.  I would say

10  that you have 10, 12 years of exposure for some of the people

11  in these cohorts, in these case-controlled studies.

12      And when you look again at the size of the population --

13         THE COURT:  I guess Ericksson would be an example of

14  that.

15         THE WITNESS:  Yeah.

16      But, again, when you look at the size of the base

17  population that these case-controlled studies represent, all of

18  them as a conglomerate -- I don't know what it is, but it's

19  going to be in excess of 2 or 3 or 4 million people.  And from

20  such a large draw, you can get the people who have really short

21  latencies and you can actually see the effects.

22      Because, I mean, it's clear to me that even if somebody

23  comes in and says the latency should be six years on average

24  for glyphosate, that's -- for NHL, that's still average.  50

25  percent of the people were less, 50 percent of the people were

PORTIER - REDIRECT EXAMINATION / WISNER

 1   more, if it's a bell curve.  And so when you get that big

 2   population, you can see those short latency people.

 3            THE COURT:  Okay.  Thank you.

 4   BY MR. WISNER

 5   Q.   I would like to follow up on two little points the judge

 6   raised.  The first is we talked about diesel, sunshine, things

 7   like that.

 8        While those -- putting aside whether or not those, in

 9   fact, are something that can cause NHL, that's the first aspect

10   of a confounder.

11        Let's look at the second one.  Is there any reason to

12   believe in De Roos 2003, that the control group was being

13   exposed to less diesel or less sunshine than the study group?

14   A.   No.

15   Q.   And so when we talk about potential other causes of a

16   signal that we're seeing in De Roos 2003, can you think of

17   anything that would have differentially impacted just

18   glyphosate users in the study?

19   A.   Other than pesticides.  Farm use, farm -- working as a

20   farmer might have made a difference, but that was controlled

21   for in some of the studies.

22        No, I -- I can't think of anything right off the bat.

23   Right there.  Just doesn't come out.  No.

24   Q.   So conceivably we could sort of conjure up other potential

25   explanations for things that cause NHL.  But unless we can show

1  that it's differentially impacting these two groups, it's a

2  non-issue because we would expect to see it in both?

3  **A.**  It would be non-differential, that's correct.

4  **Q.**  And the second issue on this latency point, and I think

5  this came out with Dr. Ritz but I want to get your thoughts on

6  it.

7      When we're talking a risk that we're seeing in a study, if

8  there is insufficient latency and we see no risk, does that

9  mean we should study it longer?

10 **A.**  It depends on how much you believe that there is other

11 data suggesting you really need to study this, this agent.

12 Then you would indeed study it some more.

13 **Q.**  But if it's the opposite, where in a relatively short

14 period of time you see a fully adjusted risk, does latency in

15 that context invalidate the data you're seeing?

16 **A.**  No.  I -- even if I was told the latency was a median of

17 six years or ten years, I still don't think it would invalidate

18 it because it's an entire distribution.

19     And if I'm corrected for everything I really need to just

20 for, then I have to believe it's the exposure that I'm really

21 looking at.  That has to be my hypothesis moving forward.

22 **Q.**  And while we're talking about De Roos, a couple of

23 follow-ups on it.

24     Mr. Lasker asked you some questions about whether or not

25 NAPP sort of subsumes De Roos.  Do you recall that?

PORTIER - REDIRECT EXAMINATION / WISNER

1   **A.**   Yes.

2   **Q.**   In De Roos, how many pesticides did she control for?

3   **A.**   Forty-eight I think, something in that neighborhood.

4   **Q.**   How many did the NAPP control for?

5   **A.**   I don't really recall -- oh, I think it was on -- it was

6   in the draft manuscript, it was three, I believe.

7   **Q.**   So it would be fair to say then that the adjusted estimate

8   in De Roos is fundamentally different than the adjusted

9   estimates in the NAPP study?

10   **A.**   That's correct.

11   **Q.**   I also understand that in De Roos 2003 the researchers

12   actually excluded anybody who said I don't know about their

13   exposures to the 47 different pesticides, is that right?

14   **A.**   That is correct.

15   **Q.**   And so what they were left with in the De Roos study is

16   just those people where they had complete exposure information

17   for every single person, is that right?

18   **A.**   That's correct.

19   **Q.**   Did they do that in NAPP?

20   **A.**   Don't know.

21   **Q.**   Okay.  Assuming they didn't, would that also make the

22   De Roos analysis different?

23   **A.**   Assuming they threw out people who --

24   **Q.**   Sorry.  I'll ask that question again.

25        Assuming they didn't do that in NAPP, that they just used

 1   everybody, regardless if they used -- said I don't know --

 2   A.   And then imputed some sort of exposure?

 3   Q.   Precisely.

 4   A.   They would be different.

 5   Q.   Okay.  Would it be fair to say then that De Roos 2003

 6   stands on its own?

 7   A.   Yes.  That would be fair to say.

 8   Q.   And would it be fair to say that you should ignore De Roos

 9   2003 because of NAPP?

10   A.   I didn't -- I've not looked at NAPP close enough to be

11   able to say that.  Other than the characteristics of the NAPP

12   study are different in terms of analysis, interpretation, and

13   cases and controls than in De Roos.  And so I would be

14   extraordinarily cautious in ruling out, throwing way De Roos

15   and keeping NAPP.

16   Q.   Okay.  Let's take a look quickly at the Andreotti study.

17   I believe it's Tab 13 in the binder in front of you -- or is it

18   12?

19        Let me find it.  One second.

20             THE COURT:  Your binder or --

21             MR. WISNER:  My binder.  I was trying to keep it

22   simple.  I will give you my binder.

23   A.   13 is Heltshe.

24   BY MR. WISNER

25   Q.   Here is my binder --

PORTIER - REDIRECT EXAMINATION / WISNER

1    A.    I have a copy.

2    Q.    Do you have Andreotti in front of you?

3             MR. WISNER:   In our binder, Your Honor, it's

4    Exhibit 12.   It's the first thing.

5    BY MR. WISNER

6    Q.    Do you have it, Doctor?   Do you have Andreotti in front of

7    you?

8             THE COURT:   Do you want to take a break?

9             THE WITNESS:   No, no.   We're moving along.

10   BY MR. WISNER

11   Q.    I know you just got back from Europe a few days ago.

12   A.    I'm ready to go home.

13   Q.    Okay.   So if you look at Andreotti, there is actually --

14   if you just go to Table 1, I believe it's on Page 3 of 8.   Do

15   you see that, Doctor?

16   A.    Yes, I see it.

17   Q.    Okay.   And so one of the things that we talked about on

18   direct and was alluded to by Mr. Lasker was that there was

19   different characteristics between the -- to people who never

20   used glyphosate in the AHS and the people who did, right?

21   A.    Correct.

22   Q.    And in De Roos 2005 they actually, because of those

23   differences, chose to analyze the -- the risks relative to the

24   lower exposed than to the unexposed, is that right?

25   A.    That is correct.

PORTIER - REDIRECT EXAMINATION / WISNER

1  Q.  All right.  So if we look in Andreotti on Table 1, we also

2  have a list of the characteristics of the two -- of the

3  different groups.  Do you see that?

4  A.  That's -- yes.

5  Q.  And one thing that I want to just point out here, you see

6  highest level of education.  Do you see that?

7  A.  Yes.

8  Q.  High school or less.  And it looks like about 70 percent

9  of the never users of glyphosate had high school or less, is

10  that right?

11  A.  That is correct.

12  Q.  Whereas, about 60 percent, or 57.9 percent of the median

13  users had a high school or less.  Do you see that?

14  A.  Correct, yes.

15  Q.  And for the heavy users that's less than 50 percent,

16  right?

17  A.  Right.

18  Q.  Now, putting aside issues of pesticide exposures or

19  whatnot, are there such things like socioeconomic differences

20  that might lead certain groups of people to be more prone to

21  cancer?

22  A.  Oh, absolutely.  It's certainly well known.  The people

23  with high school or less education tend to have worse jobs,

24  truck drivers, offloading and onloading things.  So if we talk

25  about diesel exposures, they are probably going to have more

1    than those with a high school education.

2    **Q.**    And so would you agree then that when you have really

3    different groups of people and the cases and the controls are

4    so different, that it makes sense to sort of try to find a

5    group that are more similar so you can actually see a fair

6    comparison?

7    **A.**    When -- when you're doing an exposure response comparison,

8    yes.

9    **Q.**    Now, you tried to calculate the crude -- the crude odds

10   ratios, in doing that sort of approach with the Andreotti

11   numbers, correct?

12   **A.**    I wouldn't call them true, but the odds ratios against a

13   different -- the lowest quartile.

14   **Q.**    I meant "crude," not "true."

15   **A.**    Oh, crude.

16   **Q.**    You generate some crude numbers based on what was in the

17   paper, is that correct?

18   **A.**    Correct.

19   **Q.**    Obviously, you can't generate odds ratios because you

20   don't have the data and you can't look at the variances and the

21   standard deviations and stuff, right?

22   **A.**    Correct.

23   **Q.**    But you can kind of get a sense of what the numbers would

24   be, is that right?

25   **A.**    Yes.

1  Q.   Now, you recall during the cross-examination Mr. Lasker

2  showed you some emails that you sent to reporters?

3  A.   Yes.

4  Q.   Do you remember that?

5  A.   Yes.

6  Q.   And he pointed out -- if you have their binder -- is his

7  binder up there or no?

8  A.   I have their binder.

9  Q.   You have their binders?  Go to, like, Tab 5.  This is one

10  of the emails they showed you.

11        (Witness complied.)

12  Q.   Do you see the email right here, Doctor?

13  A.   Yes.

14  Q.   I don't believe this has an exhibit number, but it's Tab 5

15  in the binder.

16              MR. LASKER:  We will have to do the exhibits, but go

17  ahead.

18  BY MR. WISNER:

19  Q.   Here you have list Q1 1, Q2 1, Q3 1.6.  Do you see that?

20  A.   Yes.

21  Q.   And Mr. Lasker suggested that those numbers were

22  incorrect.  Do you recall that?

23  A.   He had questions about them and he stopped questioning.  I

24  don't know where he was going with it, but he did mention it.

25  Q.   He said we'll get back to it and we never got back to it,

PORTIER - REDIRECT EXAMINATION / WISNER

1  did we?

2  **A.**   Yes, correct.

3  **Q.**   Okay.  Well, let's take a look.  Let's go to your

4  supplemental report, which is Exhibit 164 in our binder.

5  **A.**   I don't have "our" binder.

6          **MS. WAGSTAFF:**  We should do a joint binder next time.

7          **THE COURT:**  There is never going to be a next time.

8      (Whereupon document was tendered to the witness.)

9  **A.**   Thank you.

10  **BY MR. WISNER**

11  **Q.**   Do you have Exhibit 164?  Do you find it?  164?

12  **A.**   Yes.

13  **Q.**   Okay.  All right.  And if you turn to page -- do you know

14  where you calculated the numbers?  I think it's on Page 2,

15  second-to-the-last paragraph on Page 2.  Do you see that?

16  **A.**   Yes, I do.

17  **Q.**   And you list the numbers, and the second-to-the-last

18  sentence says:

19          "This would lead to rate ratios for the quartile

20      analysis of lifetime days."

21      And then you list the lifetime days numbers.  Do you see

22  that?

23          **JUDGE PETROU:**  I'm sorry.  Where are you?

24          **MR. WISNER:**  I'm sorry.  The second paragraph,

25  Page 2, bottom of that paragraph.  It's "This would lead to

```
 1   rate ratios."  Second-to-the-last sentence on Page 2.

 2              THE COURT:  Exhibit 164?

 3              MR. WISNER:  Yes, Supplemental Expert Report of

 4   Dr. Chris Portier.

 5              THE COURT:  No.  This is Dr. Ritz's supplemental

 6   report.  Exhibit 164?

 7              MR. WISNER:  Oh.

 8              THE WITNESS:  Not mine.

 9              MR. WISNER:  There was a printing error.  I

10   apologize.

11   BY MR. WISNER

12   Q.   Doctor, can I just approach you with your report?

13              THE COURT:  It sounds like he has it and we do not

14   have it.

15              MR. WISNER:  Your Honor, may I approach?

16              THE COURT:  Sure.

17              MR. WISNER:  This is the supplemental report.

18         (Whereupon document was tendered to the Court.)

19   BY MR. WISNER

20   Q.   Do you see the part where you discuss the numbers, Doctor?

21   A.   Second paragraph from the bottom, last of that paragraph.

22   Q.   Yeah, last two sentences.  Do you see that?

23   A.   Yes.

24   Q.   And then you list the numbers for the -- can you just read

25   those last two sentences?
```

PORTIER - REDIRECT EXAMINATION / WISNER

1  **A.**   This would lead to rate ratios for the quartile analysis

2  of lifetime days of Q1 equal 1; Q2 equals --

3       (Court reporter clarification.)

4  **A.**   Q1 equals 1; Q2 equals 1.096; Q3 equals 1.118; and Q4

5  equals 1.053.   And for intensity Q2 equal 1; Q3 equal 1.06; and

6  Q4 equals 1.048.

7       Do you want the last sentence too?

8  **Q.**   That's fine, Doctor.

9       So those are actually the numbers, although I believe in

10 the email you rounded 1.048 to 1.05, is that right?

11 **A.**   Yes.

12 **Q.**   Okay.  So have you ever reported different numbers to the

13 best of your knowledge?

14 **A.**   No.

15 **Q.**   Okay.  I'd like to go back to --

16      **THE COURT:**  Can I ask?  I'm trying to figure out if

17 we should take a break or plow ahead.  Do you have a rough

18 estimate of how much longer you have?

19      **MR. WISNER:**  In my head, ten minutes.  But

20 realistically 20.

21      **THE COURT:**  Let's take a break then.  We'll take a

22 break until 3:00 o'clock.

23      (Whereupon there was a recess in the proceedings

24       from 2:47 p.m. until 3:00 p.m.)

25      **MR. WISNER:**  May I proceed, Your Honor?

PORTIER - REDIRECT EXAMINATION / WISNER

```
 1              THE COURT:  Sure.
 2   BY MR. WISNER
 3   Q.   Let's address some quick points from De Roos, 2003.
 4   Please turn to Exhibit 15 in our binder.
 5        (Witness complied.)
 6   Q.   Do you have in it front of you, Doctor?
 7   A.   Sorry?
 8   Q.   Do you have it in front of you?
 9   A.   Yes.
10   Q.   All right.  So this is the 2003 De Roos publication, is
11   that right?
12   A.   That's correct.
13   Q.   All right.  I just want to talk about a couple quick
14   points just to clean up the record on this.  On Page 3 do you
15   see Table 1?
16   A.   Yes.
17   Q.   And this reflects the Bayesian assumptions made in doing
18   the hierarchical analysis, right?
19   A.   Yes, that's correct.
20   Q.   And to be clear, Bayesian statistics takes the approach
21   that we take what we know in the world and then see how the
22   data comports with what we know, is that fair?
23   A.   Yeah, to some degree.
24   Q.   Whereas, logistical regression, which is sort of more
25   commonly used, just says what does the data show me, is that
```

PORTIER - REDIRECT EXAMINATION / WISNER

1  right?

2  **A.**   Yeah.  That's a good simple explanation, yes.

3  **Q.**   That's what my statistics professor taught me.

4      So if we look at this carcinogenic probability, it says

5  for glyphosate .03.  Do you see that?

6  **A.**   .3.

7  **Q.**   Yes, sorry.  .3, I apologize.  0.3.

8      And based on the footnote here, that assumption about the

9  potential carcinogenicity of glyphosate is based on the

10  assertion that it's not assessed by IARC or U.S. EPA IRIS or

11  deemed unclassifiable in one or both assessments.

12      Do you see that?

13  **A.**   Yes.

14  **Q.**   Now, we know today that that assumption is wrong, right?

15  **A.**   Yes.

16  **Q.**   And classified by IARC, right?

17  **A.**   But it used this paper to do it so it gets a little

18  circular, but yes.  It's now classified by IARC.

19  **Q.**   Fair enough.

20      But if we were to redo this analysis today, that

21  assumption about the carcinogenicity of glyphosate would be a

22  higher number, right?

23  **A.**   Yes.

24  **Q.**   And I mean, I don't know what number it would be, but it

25  would probably be somewhere between .8, which is a probable

1  human carcinogen in one assessment and possible human

2  carcinogen in another assessment, or .6, probable human

3  carcinogen in one assessment and unclassifiable in the other.

4  Is that fair to say?

5  A.   Yeah, that's the weight they would give it.

6  Q.   Okay.  And if you make the assumption that there is a much

7  higher probability that, in fact, glyphosate is a carcinogen,

8  does that increase -- would that likely increase the odds ratio

9  that we see for the hierarchical analysis?

10 A.   Yes, it would, likely.  It would almost certainly.

11 Q.   Okay.  Now, there has been some questions about whether or

12 not De Roos 2003 controlled for other pesticides in the

13 logistic regression, is that right?

14 A.   There were some questions, yes.

15 Q.   Let's just first be very clear.  Do you have any doubt

16 that De Roos 2003 controlled for other pesticides in the

17 logistical regression?

18 A.   None at all.

19 Q.   Okay.  And if we turn to -- we read some portions of it

20 earlier, so I'm not going to read those portions.  But I want

21 to point out a few more sentences in here that might be

22 helpful.

23      If you turn to Page 7, and we're looking at the left

24 column, the paragraph -- the second full paragraph, this is

25 adjustment.  Do you see that?

PORTIER - REDIRECT EXAMINATION / WISNER

 1   A.   Second full -- yes.

 2   Q.   And it reads:

 3            "Adjustment for multiple pesticides suggested

 4        that there were few instances of substantial

 5        confounding of pesticide effects by other pesticides."

 6        Do you see that?

 7   A.   Yes, I do.

 8   Q.   What do you understand that sentence to be saying?

 9   A.   That you adjusted for all of the multiple pesticides they

10   were looking at.

11   Q.   And if you turn the page, Page 8, again the first sentence

12   of the first full paragraph, do you see that?

13   A.   Yes.

14   Q.   And it reads:

15            "This pooled study of multiple agricultural

16        pesticides provided an opportunity to estimate the

17        effect of each specific pesticide and certain

18        pesticide combinations on NHL incidents adjusted for

19        the use of other pesticides."

20        Do you see that?

21   A.   That's what it says.

22   Q.   And what do you understand that sentence to mean?

23   A.   They adjusted for other pesticides.

24   Q.   Okay.  You were at IARC, correct?

25   A.   I have been at IARC several times.

1  Q.   Let me be more specific.  You were at the IARC meeting

2  that assessed glyphosate, right?

3  A.   The working group meeting, yes, I was.

4  Q.   And to the best of your knowledge, did people within IARC

5  when they were looking at this data think that De Roos had

6  adjusted for other pesticide use?

7  A.   Yes.

8  Q.   Okay.  All right.  Let's turn to Exhibit -- Tab 1B in

9  their binder.  It's this EPA submission that you made.

10  A.   Okay.

11  Q.   And actually before we go there, I just want to clarify

12  something, Doctor.

13       The opinions that you've given about what IARC concluded

14  and what it did not conclude as it relates to glyphosate, is

15  that based both on your reading of the monograph as well as

16  your own personal experience at the actual working group?

17  A.   Would you say the question again?

18  Q.   Sure.  You've offered some opinions about what the IARC

19  classification means, specifically with related to real world

20  exposures.

21  A.   Correct.

22  Q.   Okay.  That opinion, is that not just based on how you

23  read the IARC Monograph, but also based on the fact that you

24  were actually there in the discussions when they were making

25  this decision?

PORTIER - REDIRECT EXAMINATION / WISNER

1    **A.**    Yes.  I have been to roughly eight IARC Monographs and I

2    helped to draft the preamble that sets the rules for what they

3    are doing and how they express it.  So, yes, I do understand

4    what they intend this to mean.

5    **Q.**    And just putting aside your personal opinion for a second.

6    The IARC classification of glyphosate, just by itself, does

7    that support the conclusion that, in fact, glyphosate can cause

8    non-Hodgkin's lymphoma?

9    **A.**    Yes.

10   **Q.**    And does it support the conclusion that it can cause

11   non-Hodgkin's lymphoma as it's occurring and being used in the

12   real world today?

13   **A.**    Yes.

14   **Q.**    Now, turning to Exhibit 1B in the -- sorry, Tab 1B in

15   their binder.  Do you see this, Doctor?

16   **A.**    Yes.

17   **Q.**    And this is an attachment that was included as part of

18   your expert report, is that right?

19   **A.**    That is correct.

20   **Q.**    Now, I notice this is dated October 4th, 2016, right?

21   **A.**    Correct.

22   **Q.**    And your expert report, that's dated -- well, it's dated

23   afterwards, right?

24   **A.**    Yes.

25   **Q.**    So to be clear, what exactly are you doing in this EPA

PORTIER - REDIRECT EXAMINATION / WISNER

1  submission or comment?

2  **A.**   So EPA was evaluating the carcinogenicity of glyphosate,

3  and I spent almost my entire work career writing up how to

4  evaluate and how to interpret studies.  I helped EPA write

5  their guidelines.  And when I saw the document they had put

6  together, I knew it was not following their guidelines, which

7  are good scientific guidelines.  And I have concern that they

8  are not doing what they had said they were doing, what the law

9  requires them to do.

10      And so my comments here are specific to that document and

11  the deficiencies in that document.

12  **Q.**   I notice on the first page of this submission you have a

13  disclaimer.  Do you see that?

14  **A.**   Yes.

15  **Q.**   It says essentially that you're doing this on your own

16  dime, is that right?

17  **A.**   That's correct.

18  **Q.**   Why?

19  **A.**   Because I care.  Science -- science is supposed to be

20  there to improve the decision-making process; to protect public

21  health, if at all possible.  It wasn't being used here in a

22  proper way.  It was being used to -- I don't know why they were

23  doing it, but it was clearly the wrong way to evaluate the

24  data.  I felt I had to comment.

25  **Q.**   Now, the time you prepared this comment to the EPA, had,

1  you conducted a full Bradford Hill analysis of causation?

2  A.  No, no.

3  Q.  What were you doing then when you submitted this to the

4  EPA?

5  A.  Again, I'm commenting specifically on what EPA did in

6  certain parts of their report.  It's certainly not this -- this

7  is not an entire evaluation of all the literature for

8  glyphosate.  This is a very specific document.

9  Q.  After you submitted this, did you then sit down and do

10  that full Bradford Hill analysis?

11  A.  Yes, I did.

12  Q.  And in doing it, did you look at a lot more material and a

13  lot more studies and data than you looked at for preparing this

14  comment?

15  A.  Yes.  That is true.

16  Q.  Okay.  So would it be fair to say then that your opinions

17  as they exist today are accurately described in your expert

18  report but they aren't fully encapsulated in the attachments to

19  it?

20  A.  That is correct.

21  Q.  Okay.  Now, in this document there was a couple questions

22  that were asked of you, and I just want to sort of explore them

23  a little bit more.

24       Now, turning to Page 6 -- I'm sorry, Page 7 of the

25  document.  Starting at Lines 116 through Lines 127, you kind of

PORTIER - REDIRECT EXAMINATION / WISNER

1   do a summary of the human evidence section, is that right?

2   **A.**    116 to 127?

3   **Q.**    Yes.

4   **A.**    Yes.

5   **Q.**    At the very end of it you ask some rhetorical questions

6   and then answer them, is that right?

7   **A.**    Yes, that is right.

8   **Q.**    Okay.  And you said here:

9           "So is causality plausible here?"

10          And you write:

11          "Yes, absolutely."

12          Right?

13  **A.**    Correct.

14  **Q.**    What does that mean?

15  **A.**    That means that there is no reason to suspect from these

16  data in the humans that it is not causal for glyphosate causing

17  non-Hodgkin's lymphoma.

18  **Q.**    And when you say here yes, that it's absolutely plausible,

19  causation is, can you give me a weight of what you believe that

20  would be, if you can?

21  **A.**    Based upon my current understanding of all of this and --

22  I -- I thought I said it this morning.  It's about 90 percent.

23  I'm 90 percent there for -- of the way there for absolute

24  undeniable causation.

25  **Q.**    But you're not 100 percent?

1   **A.**   I'm not at 100 percent.

2   **Q.**   And the 100 percent is exactly what the next sentence

3   refers to, when it says:  Is it demonstrated?  No, clearly

4   not."

5        Is that right?

6   **A.**   That clearly refers to the 100 percent.

7   **Q.**   Okay.  And this is also in the context of the human

8   evidence, right?

9   **A.**   Correct.

10  **Q.**   Now, when you take the human evidence, which is

11  epidemiology, and you start combining it with the extensive

12  amount of toxicology data, the mechanism data, and what we know

13  about cancer in humans, how does that affect your opinion?

14  **A.**   That's what got me to the 90 percent, was using all of the

15  information in front of me.

16       Again, the animal data supports what you're seeing in the

17  human data.  The mechanism data supports what you're seeing in

18  the human data.  All of it pushes you in the direction of

19  causality.

20  **Q.**   Now, on Page 4 of this submission, the last sentence -- we

21  talked about it briefly on cross -- it says:

22            "EPA should declare glyphosate a probable human

23       carcinogen?"

24       Do you see that?

25  **A.**   Yes.

PORTIER - REDIRECT EXAMINATION / WISNER

1   **Q.**   And then you go on to say:

2           "And then conduct a risk assessment."

3       Right?

4   **A.**   That is correct.

5   **Q.**   All right.  What exactly is an EPA risk assessment?  I

6   think there has not really been a lot of testimony about that.

7   What is that?

8   **A.**   Okay.  So EPA's mission is to protect the public health

9   from exposure to environmental issues, and chemicals are one of

10  them.  Pesticides are one of them.

11          When EPA does a risk assessment, they -- ignoring anything

12  to do about human exposure at this point, they are going to

13  look at the evidence they have in front of them and they are

14  going to try to make a dose-response curve, something they

15  believe links human exposure to the probability of getting

16  cancer for -- sometimes specific cancers, but very seldom is it

17  a specific cancer because most times they build those curves

18  from and animal data.

19          The reason for that is because very few times do you have

20  human epidemiology data with enough exposure information that

21  you can do a good dose-response curve.  So they use other kinds

22  of extrapolations to do that.

23          So they build that curve.  Human dose across the bottom.

24  Probability of cancer across the Y-axis.

25          Then they say:  What are we willing to accept as risk to

PORTIER - REDIRECT EXAMINATION / WISNER

1    the population?  One in 100,000?  One in a million?  And so

2    they take their curve and they estimate what dose will give

3    them that level of risk in the population.  And that's probably

4    where they set their standard.

5         Standards can be very different in this field because it

6    might be in an eight-hour workday no more than this.  Over a

7    month no more than that.  So standards get a little

8    complicated.  But that's the basic gist of it.  They are trying

9    to set a standard.

10   **Q.**   And in setting that standard they look at stuff like

11   absorption rates and how -- how it's being used in an

12   occupational setting and stuff like that?

13   **A.**   Correct.

14   **Q.**   Is that really relevant to the question we have here,

15   which is:  Does this stuff cause cancer?

16   **A.**   I -- I guess.  I'm always a little vague on what the

17   question is here.  But if it's -- if it's an issue of does it

18   cause cancer or not, that is different than the risk assessment

19   issue, absolutely.

20   **Q.**   And to be clear, even in the context of a risk assessment,

21   I mean the EPA is actually assuming people are going to get

22   cancer, is that right?

23   **A.**   The expectation is that one in a million people in the

24   country would get cancer if a million people were exposed to

25   this.

PORTIER - REDIRECT EXAMINATION / WISNER

1  Q.   So really what they are doing is they are setting a policy

2  of what we're willing to accept people's exposures to this

3  otherwise known carcinogen?

4  A.   It's -- sort of.  It's a policy.  It's a regulation.

5  It's -- it's society's way of trying to protect themselves.

6  Q.   Now, you understand that, obviously, governments in Europe

7  do things a little differently, right?

8  A.   That's correct.

9  Q.   In fact, you've helped develop some of those standards as

10  well, is that right?

11  A.   Some of the ways they do things, yes.

12  Q.   Are you familiar that the State of California has a set of

13  standards as well?

14  A.   Some of them.  I'm familiar with some of them.

15  Q.   You do understand that the State of California has

16  determined that glyphosate is a substance known to cause

17  cancer.  Are you aware of that?

18  A.   I was aware of that.

19  Q.   And you are aware that they are currently looking at

20  exactly the question you brought up.  What exposure is the

21  minimum allowed?  Do you understand that?

22  A.   Yes.

23  Q.   In fact, I believe you submitted a comment to the Office

24  of Environmental Health and Human Hazard Assessment here in

25  California, is that right?

PORTIER - REDIRECT EXAMINATION / WISNER

1   **A.**   That's correct.  It was a very short note.  They were only

2   considering the animal cancer data that was considered by IARC,

3   and I wanted to suggest that they look a little broader.

4   **Q.**   And that's because you wanted to make sure they were

5   getting the right exposure levels adjusted for -- in the mice

6   and rat studies as it relates to, for instance, humans, right?

7   **A.**   Correct.

8   **Q.**   But that was, to be clear, after they had determined that

9   it, in fact, causes cancer?

10   **A.**   I don't know that process well enough.

11   **Q.**   Fair enough.

12   **A.**   I can't answer that question.

13   **Q.**   Fair enough.

14           **THE COURT:**  You don't know how they came to the

15   determination -- whoever "they" is in California, you don't

16   know how they came to the determination that glyphosate is,

17   quote/unquote, known by the State of California to cause

18   cancer.

19           **THE WITNESS:**  Oh, I do know that.

20           **THE COURT:**  Okay.  How is that?

21           **THE WITNESS:**  If a -- what's the term they use -- a

22   respected entity or something along those lines declares it,

23   then they will put on it their list for Prop 65.  And IARC is

24   on that list.  And so when IARC declared it, they took the

25   action of putting it on the list.

1          THE COURT:  I was always a little confused about

2     that.  I mean, if a respected body like the IARC concludes

3     something is a probable carcinogen or a possible carcinogen,

4     then the State of California all of a sudden announces that the

5     chemical or the substance is known by the State of California

6     to cause cancer.

7          How did -- do you have any idea how the State of

8     California makes that leap from "possible carcinogen" or

9     "probable carcinogen" to "known by the State of California" to

10    cause cancer?

11         THE WITNESS:  If I understand California bureaucracy,

12    and I might not, Prop 65 set up a committee that decides who

13    these respected entities are.  And once that's done, the rest

14    of the process becomes somewhat regimented.

15         The actual wording for California has -- knows this,

16    whatever it is.

17         THE COURT:  "Known by the State of California."

18         THE WITNESS:  I think that's in the law.  I think

19    that's in the Prop 65.

20         THE COURT:  So this law says that when the IARC

21    concludes that something is possibly carcinogenic or probably

22    carcinogenic, the requirement then is that companies have to

23    declare that it's known by the State of California to be a

24    carcinogen?

25         THE WITNESS:  I think it's almost that.  I think when

1    a respected entity defined by this committee and the committee

2    also decides is it probable or possible, I don't know if

3    Prop 65 works for possible human carcinogen.

4            THE COURT:  It does.

5            THE WITNESS:  I don't remember.  I don't know.  But I

6    know it is probable.

7            MR. WISNER:  I would be happy to brief the issue if

8    the Court would like.

9            THE COURT:  You don't need to.

10           MR. WISNER:  There is good case law on it.

11       Okay.  Sorry, I went down this rabbit hole of the

12   California EPA.  I apologize.

13   BY MR. WISNER

14   Q.   But I -- I just kind of want to point out something that I

15   think came out just now, this idea of IARC being a respected

16   organization.

17       You actually -- this came up in cross-examination.  There

18   was about this publication that you were looking to have

19   published relating to the glyphosate analysis and comparing it

20   to what EFSA did, is that right?

21   A.   The emailed referred to a letter that we were writing that

22   eventually got published as a publication.  But it referred to

23   the letter criticizing EFSA on the way they did their

24   evaluation.

25   Q.   How many people signed that letter with you?

PORTIER - REDIRECT EXAMINATION / WISNER

1    A.    I think it was 96.

2    Q.    We've heard a lot of testimony that when you have four

3    epidemiologists you'll have 25 opinions or something.  Is there

4    any significance to you, Dr. Portier, that 95 other

5    world-renowned scientists would join you in your statement?

6    A.    They all agreed with the statement.  They very carefully

7    looked at it.  I don't know what more to say about that.

8          It was -- we all feel the same way.  We spend a lot of

9    time and effort developing methods and evaluating literature.

10   We want our governments to do the same -- we want them to do it

11   right.  And so, yeah, they were all very much into this.

12   Q.    I guess my last question or my last follow-up question --

13   I never say last one because you never know if it will be your

14   last.

15         When IARC's 17 scientists, the voting members, got

16   together to discuss glyphosate in 2015, did they have anything

17   to gain or lose by classifying glyphosate as a probable human

18   carcinogen?

19   A.    No.

20   Q.    Now, let's contrast that to, for example, the EPA.  The

21   EPA has classified glyphosate as a non-carcinogen since the

22   '70s, right?

23   A.    Yes.  That's its current classification.  In fact, it's

24   slightly different.  I think it's unlikely to be carcinogenic

25   in humans.

PORTIER - REDIRECT EXAMINATION / WISNER

1  Q.   We talked briefly about the SAP, or the Scientific

2  Advisory Panel, in the EPA's recent assessment.

3       If, in fact, the EPA were to say tomorrow:  You know what?

4  It does cause cancer.  They would have to effectively say that

5  they were wrong for 40 years, is that right?

6  A.   I guess that's correct.

7            MR. WISNER:  No further questions, Your Honor.

8            THE COURT:  What about my questions?

9            MS. GREENWALD:  Toxicology.

10           THE COURT:  Just go ahead and answer those questions?

11           MR. WISNER:  I can lead you a little bit.

12  BY MR. WISNER:

13  Q.   The first question was if you get rid of the pooled

14  analysis, how does that effect your toxicology opinions?

15  A.   The pooled analysis is just a tool for me to better

16  understand the strength of the evidence across multiple

17  studies.  Like a meta-analysis or the pooled analysis in

18  epidemiology.

19       Not having it doesn't change the core meaning of the data.

20  And so my opinion of the animal carcinogenicity data wouldn't

21  change just because I couldn't use the pooled analysis.

22           THE COURT:  I don't have a good memory of the

23  discussion that you had with the lawyers about this last time,

24  but there was -- I seem to recall there was some suggestion

25  that this pooling in this context is like unprecedented.  And I

1   think you said:  Well, one of the reasons it's rare or

2   unprecedented -- I can't remember the words that were used, but

3   one of the reasons it's rare or unprecedented is that we have

4   so many studies in this context and it's very rare to have so

5   many animal studies regarding the same chemical or substance.

6        Am I remembering that correctly?

7        **THE WITNESS:**  That's correct.

8        **THE COURT:**  Is there really no other, you know,

9   substance that people study for carcinogenicity, where, you

10  know, a similar number of animal studies have been done?

11       **THE WITNESS:**  Radiation.  But radiation is already so

12  heavily regulated nobody changes it.  So ionizing radiation.

13       That's the one that pops to mind.  I'm not sure a lot more

14  will pop to mind.  DDT and DDE, there were a good many studies

15  on that a long time ago.

16       Dioxin.  There are now two studies on dioxin.  Someone

17  could do a pooled analysis there.

18       But other than that there aren't that many.

19       **THE COURT:**  So as far as you know, nobody has done a

20  pooled analysis for any of those other chemicals that you just

21  identified?

22       **THE WITNESS:**  That's correct.

23       **THE COURT:**  Okay.  And what about -- I mean, so every

24  once in a while during this case I get a flashback to a case

25  that I had when I was a lawyer.  It was a case -- I represented

 1    the City of San Francisco, and San Francisco passed this law

 2    requiring retailers to warn customers about RF energy from cell

 3    phones.  And there was a challenge to that and I defended that,

 4    not successfully.

 5        And I seem to remember there were a lot of studies of both

 6    human animal on RF -- on the effects of RF energy.

 7        And, as a matter of fact, if I recall correctly, your

 8    friends Hardell and Ericksson did some epidemiological studies

 9    on RF energy from cell phone use.

10        But would that be an example of something where there were

11    lots and lots of animal studies done?  Or do you not know?

12            THE WITNESS:  First, to be absolutely above-board on

13    this, I have been retained by a law firm about RF radiation.  I

14    don't know if that changes -- you want me to give you the

15    answer?

16            THE COURT:  Not at all.

17            THE WITNESS:  Okay.

18            THE COURT:  Although I'm curious who retained you,

19    what case.

20            MR. WISNER:  Dr. Portier, I would just advise you if

21    you're not violating any confidentiality issues.

22            THE WITNESS:  No, no.  I'm just as an expert.  I'm

23    not testifying.  Just to help in background.

24            THE COURT:  Oh, okay.

25            THE WITNESS:  So in answer to your question, there

PORTIER - REDIRECT EXAMINATION / WISNER

1    are five or -- five or so animal studies.  The problem is you

2    can't pool them.  One study is in transgenic animals, so it's a

3    completely different type of animal.  It's a genetically

4    modified animal.

5         One study was done --

6              THE COURT:  Monsanto modified the animal?

7         (Laughter.)

8              THE WITNESS:  One study was done with the animals in

9    a giant wheel pushing their heads towards the middle of the

10   wheel and exposure right on the back of their heads in the

11   middle of the wheel.

12        One study was done with antennas in the roof of the cage,

13   so they get a uniform exposure to the animals.

14        And, finally, a third one was done with little antennas

15   glued to the back of the head of the animal.

16        It would be impossible to pool those together and feel you

17   were doing something reasonable.

18   BY MR. WISNER

19   Q.   Quick follow-up to the Court's question, although, as you

20   stated, it's not commonly done.

21        The scientific principles and procedures that you used in

22   conducting the pooled analysis with this unique glyphosate

23   database, are those the same that others use in your field?

24   A.   Yeah.  The methodology is the same when you're looking at

25   studies that you can pool.

1      THE COURT:  Again, I don't want to get into the --

2  whether the methodology is sound or not.  I just want to -- my

3  main question was what -- what was left if we took that out?

4      MR. WISNER:  Just wanted a clear question on the

5  record and then I'll move on.

6  BY MR. WISNER

7  Q.   And the second question related to publications and

8  relying on data that is not published in the context of

9  toxicology.

10      I mean, I guess if you remember his question, if you could

11  answer it to the best of your ability.

12  A.   Certainly.  Certainly.

13      So first of all, IARC accepts all publicly available

14  information, not necessarily just peer reviewed.  The --

15      THE COURT:  Just overall or just in the context of

16  toxicology?

17      THE WITNESS:  Overall.

18      THE COURT:  Okay.

19      THE WITNESS:  Overall.  The reason for it is they

20  have in this case 17 experts sitting in a room.  They can peer

21  review anything.

22      And so if somebody gives them a document with far enough

23  lead time, they can peer review that document and decide to use

24  it or not use it.  As long as it's publicly available, that's

25  good.

1      In general, regulatory issues are handled with

2  non-publicly available data.  And they -- they do it as best

3  they possibly can or with some definite problems based upon my

4  comments to them.  But they do get into it.

5      Now, different regulatory agencies do it different ways.

6  EPA sometimes actually goes in and looks at the individual

7  animal data and redoes the analysis.  But most of the time they

8  take the analysis that's given to them by the contractor that

9  worked for industry and they use that in their risk assessment,

10  as well as all the peer reviewed data.

11      The same holds true in Europe.  They seldom go and look at

12  the actual studies.  They take the analysis done by industry

13  and use that to generate their evaluation.

14      Most people outside of that proprietary framework don't

15  have access to those studies, so they wouldn't use them.

16      If they were available and I were doing something,

17  publicly available, then I would definitely use them.  And I

18  would think that's a sound methodology, to use something you

19  can look at and somebody else can look at it and say:  You got

20  this right or you got this wrong.

21      That's the scientific way.  That's -- so transparency is

22  important to scientists like me.  But in the real world, the

23  regulatory authorities toe a line between transparency and

24  privacy.

25

1  BY MR. WISNER

2  Q.   Doctor, you mentioned briefly industry-sponsored studies.

3  Did you look at the Greim article in this case?

4  A.   Yes, as well as the individual reports from many of the

5  industry-sponsored studies.

6  Q.   That's actually my next question.  Did you just rely on

7  the summary estimates in the Greim article?

8  A.   No, because the -- the Greim article was very wrong.  The

9  bottom line is, I went in and analyzed everything all over

10  myself to make sure that I fully understood what the animal

11  evidence was telling us.  And I think that's normal for anybody

12  wanting to do this type of work who has the time.  That would

13  be the methodology you use.

14         THE COURT:  So the only thing you didn't do, it

15  sounds like, was go to the reading room.

16         THE WITNESS:  I'm -- I'm not a big fan of wasting my

17  time.  And that was my opinion of the reading room.

18  BY MR. WISNER

19  Q.   I guess my last question is, and this has sort of been

20  covered already, but I just want to make it very clear:  The

21  procedures used by IARC, are those procedures and methodologies

22  generally accepted in the scientific community?

23  A.   Definitely.

24  Q.   And the procedures and methodologies that you used in

25  arriving at your opinion, did you use those methods that are

PROCEEDINGS

```
 1  generally accepted in your scientific community?
 2  A.   Yes.   Generally accepted in the scientific community,
 3  except it seems they don't like my pooling, some of them.
 4      I'm joking.  I think they are generally accepted in the
 5  scientific community.
 6          MR. WISNER:  Thank you, your Honor.  No further
 7  questions for real this time.
 8          THE COURT:  Anything further?
 9          MR. LASKER:  Nothing further, Your Honor.
10          THE COURT:  Thank you very much, Dr. Portier, for
11  coming back.  I appreciate it.
12          THE WITNESS:  Thank you.
13      (Witness excused.)
14          THE COURT:  Okay.  I think you don't have to deal
15  with us again for quite a while probably.
16      Is there anything else anybody needs to discuss before we
17  head out and try to catch our airplanes and whatnot?
18          MS. GREENWALD:  I have one question.  Do you want any
19  page limits on the submissions for next week or -- I didn't
20  know.  We didn't ask that earlier.
21          THE COURT:  I really would prefer that you not
22  address anything other than the issue that I asked you to
23  address.
24          MS. GREENWALD:  Correct.
25          THE COURT:  So I can't imagine that it will take you
```

PROCEEDINGS

```
 1    a lot --

 2              MS. GREENWALD:  I agree.

 3              THE COURT:  -- to do that.  But I will let you take

 4    the space that you need, okay?

 5              MS. GREENWALD:  Have a nice vacation.  Thank you.

 6              THE COURT:  Thank you.

 7              THE CLERK:  Court is adjourned.

 8         (Proceedings adjourned.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## I N D E X

Friday, April 6, 2018 - Volume 1

**PLAINTIFF'S WITNESSES**                                      **PAGE**   **VOL.**


**PORTIER, CHRISTOPHER**
(SWORN)                                                          13      1
Direct Examination by Ms. Greenwald                             13      1
Cross Examination  Mr. Lasker                                   81      1
Redirect Examination by Mr. Wisner                             145      1

—   —   —

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Debra L. Pas_

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, April 6, 2018