**HOLLINGSWORTH LLP**
Joe G. Hollingsworth (*pro hac vice*)
Eric G. Lasker (*pro hac vice*)
Martin C. Calhoun (*pro hac vice*)
Heather A. Pigman (*pro hac vice*)
1350 I Street, N.W.
Washington, DC  20005
Tel.:    (202) 898-5800
Fax:    (202) 682-1639
Email:  jhollingsworth@hollingsworthllp.com
          elasker@hollingsworthllp.com
          mcalhoun@hollingsworthllp.com
          hpigman@hollingsworthllp.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: | |
| ALL ACTIONS | |

**MONSANTO COMPANY'S SUPPLEMENTAL MEMORANDUM REGARDING NEW OPINIONS DISCLOSED AT *DAUBERT* HEARING**

**INTRODUCTION**

"The orderly conduct of litigation demands that expert opinions reach closure."[1]  Both Dr. Ritz and Dr. Portier offered new opinions at the *Daubert* hearing held on April 4 and 6, 2018 to respond to concerns raised by the Court at oral argument on March 14, 2018, without disclosing *any* of these opinions prior to their testimony in Court.  These new opinions were not timely disclosed, and they should be excluded under *Daubert*.

**I.     Plaintiffs' Experts' New and Untimely Opinions Must Be Excluded Under *Daubert*.**

Under *Daubert*, a court has broad discretion to exclude opinions that are not timely disclosed.[2]  Opinions based upon evidence available to the expert at the time of his or her report but not disclosed until the *Daubert* hearing are untimely and routinely excluded.  *See Miller*, 356 F.3d at 1334 ("The Millers offer no reasons why Dr. Healy could not have produced his analysis long before.  The day of the hearing was a bit late to try to buttress the theory of their case by producing a new analysis by their retained expert of long-available data").[3]  *In re Seroquel Products Liability Litigation*[4] is not to the contrary.  Although that court permitted plaintiff's expert to offer new opinions at a *Daubert* hearing that were not contained in her initial expert report, the opinions had been disclosed to defendants in a declaration that was provided to

---

[1] *Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1334 (10th Cir. 2004) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

[2] *Pride v. BIC Corp.*, 218 F.3d 566, 578-79 (6th Cir. 2000) (citations omitted) (denying five motions submitted by plaintiffs to allow additional expert testimony after the magistrate judge issued his report and recommendation).

[3] *See also Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 823-25 (11th Cir. 2009) (granting defendant's motion to strike plaintiffs' expert because they had failed to disclose in a timely way the bases for his opinion; the expert had offered new opinions during the *Daubert* hearing that were not included in his expert report or deposition); *In re Bausch & Lomb, Inc. Contact Lens Solution Prods. Liab. Litig.*, No. 2:06-MN-77777-DCN, 2009 WL 2750462, at *13 (D.S.C. Aug. 26, 2009) (noting plaintiffs' expert's opinion changed during the hearing and excluded the expert's opinions); *Brumley v. Pfizer, Inc.*, 200 F.R.D. 596, 603-04 (S.D. Tex. 2001) (granting defendant's motion to exclude plaintiffs' expert's affidavit submitted after his expert report as well as his new opinion offered at the *Daubert* hearing as untimely).  Similarly, where an expert has had "ample opportunity to develop their theories" and test them prior to the *Daubert* hearing, they should be excluded.  *See Pride*, 218 F.3d at 579.

[4] No. 6:06-md-1769-Orl-22DAB, 2009 WL 3806435 (M.D. Fla. June 23, 2009).

defendants a week or more before the *Daubert* hearing.[5]  Defendants accordingly had time to prepare to question the expert on those opinions in advance of the hearing.  In sharp contrast here, plaintiffs did not provide Monsanto with *any* notice of Drs. Ritz's and Portier's new opinions until the experts' hearing testimony (or, at most, until moments before the witness took the stand when they provided counsel with copies of the experts' slide decks).

The new opinions offered by Drs. Ritz and Portier at the *Daubert* hearing further illustrate the improper "moving target" methodology that plaintiffs' experts have employed throughout this litigation when confronted with contrary information.[6]  But, in any event, the time for plaintiffs' experts to commit to their final opinions has long since passed.  As the United States Supreme Court observed in *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000), "[i]t is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail."  Plaintiffs' experts' new opinions should be excluded.

### A.   Dr. Ritz's New Opinions Regarding Confounding and Latency Offered at the *Daubert* Hearing Should Be Excluded as Untimely.

During the oral argument on March 14, 2018, the Court expressed significant concerns about Dr. Ritz's reliance on confounded epidemiologic risk ratios and her inconsistent discussion of the impact of latency on the U.S.-based glyphosate case control studies.  In response to each, Dr. Ritz during her April 4, 2018 testimony did not justify her earlier opinions but rather offered new opinions to try to get around the Court's concerns.  Dr. Ritz's new opinions (described below)

---

[5] *See id.* at *1, *13.

[6] Monsanto previously addressed the "moving target" approach of plaintiffs' experts in its supplemental *Daubert* brief and thus, will not repeat those arguments in depth here.  *See* Monsanto Co.'s Supp. Mem. Of P. & A. Regarding Andreotti, et al., *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, Journal of the National Cancer Institute (2018) In Supp. of Its *Daubert* and Summ. J. Mot. at 11-13 (Feb. 16, 2018), ECF No. 1137; *see also In re Bausch & Lomb, Inc.*, 2009 WL 2750462, at *13 (excluding general causation expert whose "changing opinions, and willingness to abandon or qualify her opinions when faced with further facts, undermines the reliability of her opinions"); *Haller v. AstraZeneca Pharm. LP*, 598 F. Supp. 2d 1271, 1296-97 (M.D. Fla. 2009) (excluding expert whose "veritable moving target" opinion "smacks of post-hoc-rationalization and is devoid of the intellectual rigor that *Daubert* demands").

should not be admitted under *Daubert*. They are improper post-hoc-rationalizations[7] made in an untimely attempt to "cure" fatal weaknesses in her expert methodology identified by the Court.

> **1.  Dr. Ritz should not be allowed to answer the Court's concerns about her causation methodology by proffering a new causation opinion based on pesticide-adjusted risk ratios.**

With respect to confounding, the Court at the March 14 oral argument pressed plaintiffs' counsel to identify any causation opinion offered by Dr. Ritz that relied solely upon properly adjusted risk ratios.[8] The Court explained: "I think if all she offered was an opinion that the data not adjusted for other pesticide use shows that glyphosate causes non-Hodgkin's lymphoma, you have a real problem."[9] Plaintiffs' counsel were unable to identify the requested causation opinion because Dr. Ritz had offered no such opinion. Indeed, as confirmed during her April 4, 2018 testimony, Dr. Ritz never even mentioned the pesticide-adjusted risk ratios in the NAPP, the Eriksson study, or the Hardell study in her expert reports.[10] To the contrary, as plaintiffs' counsel inadvertently highlighted in attempting to respond to the Court's inquiry, Dr. Ritz's expressed opinion in her rebuttal expert report was that the defendant's epidemiologists *were wrong in relying on adjusted risk estimates*.[11] And during the initial *Daubert* hearing on March 5, 2018, Dr. Ritz began her testimony by presenting the Court with what she described as a "forest plot"[12] of risk ratios from the glyphosate epidemiology studies, which she subsequently acknowledged during questioning from the Court and from Monsanto's counsel relied heavily on unadjusted risk

---

[7] *Haller*, 598 F. Supp. 2d at 1296-97.

[8] Transcript of Proceedings, at 50:18-24, 56:1-11, 73:19-24 (Mar. 14, 2018) ("Oral Argument Tr.").

[9] *Id.* at 56:6-9; *see also id.* at 54:3-5 ("to the extent that she's arguing we shouldn't be adjusting for other pesticides, that is junk science, if that is what she is arguing").

[10] Transcript of Proceedings, at 124:4-125:1 (Apr. 4, 2018) ("Suppl. Daubert Hr'g Day 1") (admitting she did not present the pesticide-adjusted risk ratio in Hardell); 129:2-19 (admitting she did not present the pesticide-adjusted risk ratio in the NAPP); 132:1-133:21 (claiming she did not know whether she mentioned the 1.51 pesticide-adjusted risk ratio in Eriksson). In her expert report Dr. Ritz did not report the 1.51 pesticide-adjusted risk ratio from Eriksson anywhere. *See* Expert Report of Beate Ritz at 17 (May 1, 2017), ECF No. 546-9 ("Ritz Report").

[11] Oral Argument Tr. at 53:3-54:5.

[12] Amended Transcript of Proceedings, at 18:17-19:4 (Mar. 5, 2018) ("Daubert Hr'g Day 1").

1   ratios.[13]

2          During her testimony on April 4, 2018, Dr. Ritz sought to distance herself from her prior

3   opinion based on confounded data, proffering a new forest plot that she had prepared for the

4   hearing that included pesticide-adjusted risk ratios.[14]  This new forest plot was provided to

5   Monsanto's counsel in Court immediately before Dr. Ritz's testimony.  Dr. Ritz also claimed that

6   the forest plot of unadjusted risk ratios that she had proffered in support of her causation opinion in

7   her initial expert report (and that plaintiffs relied on prominently in their *Daubert* opposition brief)

8   was merely a visual depiction intended to remind her to discuss each of the studies.[15]  Dr. Ritz did

9   not answer the Court's question whether it was acceptable to place such heavy emphasis as she had

10  in her expert report on unadjusted risk ratios where adjusted risk ratios exist, responding instead

11  that she had been "misunderstood."[16]

12         Dr. Ritz then opined for the first time that the pesticide-adjusted risk ratios in the

13  glyphosate epidemiologic studies were sufficient to show causation, citing to the new forest plot

14  she had created for her April 4 testimony.[17]  But Dr. Ritz did not point to anything in her expert

15  reports or prior testimony in which she had offered any opinion based on these adjusted risk ratios.

16  She remarkably feigned ignorance about the readily ascertainable fact that she had not even

17  mentioned the pesticide-adjusted risk ratios for NAPP, Eriksson and Hardell in her expert reports.

18  *See* Suppl. Daubert Hr'g Day 1 at 130:22-131:2 ("that can't be").  In cross-examination, she

19  conceded that she had opined during her deposition that she disagreed with the approach of others

20  (including IARC) who relied on the most adjusted risk ratios.[18]  And during redirect, she candidly

21  acknowledged why she had not included the adjusted risk ratios in her expert reports, stating that

22  she "just pull[ed] out the estimates that make sense for the argument I'm trying to make."[19]  Dr.

23  Ritz's about-face testimony at the April 4 *Daubert* hearing that she relies on adjusted risk ratios in

24

25  ---

    [13] *Id.* at 23:1-29:5, 100:22-104:10.
    [14] Suppl. Daubert Hr'g Day 1 at 73:11-19.
26  [15] *Id.* at 84:20-85:23.
    [16] *See id.* at 36:20-38:5.
27  [17] *See id.* at 38:12-13 ("Actually, I did put a plot together where I just put the adjusted ones on.").
    [18] *Id.* at 129:20-130:8.
28  [19] *Id.* at 172:12-15.

1    reaching her general causation opinion comes far too late, and that opinion should be excluded.[20]

2           The Court likewise should exclude two ancillary new opinions proffered by Dr. Ritz to

3    address the Court's concerns about her reliance on confounded data.  First, Dr. Ritz testified at the

4    most recent hearing that the McDuffie study adjusted for pesticide use in its analysis of glyphosate,

5    in sharp contrast to her own deposition testimony (and the deposition and hearing testimony of

6    every other plaintiff or defense expert who discussed the study).[21]  Second, Dr. Ritz opined that

7    what she acknowledged was a flaw in the Eriksson study in restricting the unexposed comparison

8    groups for cases and controls to individuals without any pesticide exposure did not materially

9    impact the study results, citing to a "calculation" that she admitted she had not discussed in any of

10   her expert reports.[22]  Again, each of these opinions was proffered far too late to be considered in

11   the Court's *Daubert* analysis.

### 2.    Dr. Ritz's new opinions to address the Court's concerns about her treatment of latency likewise should be excluded.

14          During the March 14, 2018 oral argument, the Court also expressed concern about Dr.

15   Ritz's inconsistent methodology in dealing with NHL latency, which she herself initially had

16   raised as a problem for the Cantor study[23] but then ignored in relying heavily for her causation

17   opinion on the later pooled analyses in De Roos (2003) and the NAPP.  The Court explained,

18   "there … seems there is a significant possibility that a lot of people in this study in the NAPP data

19   got non-Hodgkin's lymphoma from something other than glyphosate … because they hadn't been

20   exposed to glyphosate for longer than a few years:  Five years; six years; seven years; something

21   like that."[24]  The Court again challenged plaintiffs' counsel to explain how Dr. Ritz had addressed

---

[20] Dr. Ritz in any event never explained how she could reach a causation opinion based solely upon pesticide-adjusted data in the glyphosate epidemiology studies, which in their updated and pooled analyses show non-significant risk ratios that straddle both sides of the null.

[21] Contrast Suppl. Daubert Hr'g Day 1 at 79:24-80:22 with Dep. of Beate Ritz at 248:19-24 (Sept. 18, 2017), ECF No. 546-13.  *But see* Suppl. Daubert Hr'g Day 1 at 138:15-139:5 (cannot say that McDuffie adjusted for any of the pesticides with reported positive association with NHL).

[22] Suppl. Daubert Hr'g Day 1 at 23:25-25:3 ("[s]o it might be that I haven't really explained how I got to that …").

[23] Ritz Report at 18-19.

[24] Oral Argument Tr. at 80:10-15.

this concern in her opinions: "So where does she explain why this latency issue is not a big deal, or why it is appropriate to place such great weight on this study notwithstanding this latency issue."[25]  Plaintiffs' counsel had no response at argument.

At the *Daubert* hearing, Dr. Ritz offered a number of new opinions regarding latency in an attempt to respond to the Court's concerns.  First, Dr. Ritz opined that latency would only be an issue for solid tumors and apologized if she hadn't qualified that for blood-related cancers.[26]  But, of course, the opinions set forth in her expert report were expressly focused on latency for blood-related cancers.[27]  Second, Dr. Ritz claimed for the first time at the April 4, 2018 *Daubert* hearing that the latency problem in the Cantor study was "fixed" in De Roos (2003) by the study authors' methodology adjusting for all other pesticides for their analyses.[28]  Dr. Ritz's new opinions, however, are a contrast to her earlier opinions – including her opinion at the earlier *Daubert* hearing in March – that the adjustment for all other pesticides in De Roos 2003 was poor and that she would have "argued" with the author about the approach.[29]  It was only to get around the issues with latency in De Roos 2003 that Dr. Ritz belatedly adopted the study's adjustment approach.  Third, Dr. Ritz presented a new theory regarding latency, speculating that individuals who are exposed later in life would be more susceptible to cancer due to age or weakened immune systems -- ignoring the fact that she had raised the latency concern in her expert report with regard to the exact same individuals (in Cantor) for whom she was discounting latency in De Roos (2003) and the NAPP.[30]

Again, "[t]he day of the hearing was a bit late to try to buttress the theory of their case by producing a new analysis" by Dr. Ritz that contradicted her previously and timely disclosed

---

[25] *Id.* at 83:9-11.
[26] Suppl. Daubert Hr'g Day 1 at 14:15-19.
[27] Ritz Report at 17.
[28] Suppl. Daubert Hr'g Day 1 at 16:7-17:25.  Dr. Ritz does not explain how that same explanation would not have addressed her previously opined concerns about Cantor, which likewise adjusted for other pesticide exposure and found no association between glyphosate and NHL.  Suppl. Daubert Hr'g Day 1 at 134:24-135:5.
[29] Daubert Hr'g Day 1 at 22:24-24:6.
[30] Suppl. Daubert Hr'g Day 1 at 28:5-21; 116:6-13 (speculating that age of exposure matters for latency because individuals who are exposed later in life are more susceptible to developing cancer).

MONSANTO CO.'S SUPPL. MEM. RE NEW OP. DISCLOSED AT *DAUBERT* HR'G (3:16-md-02741-VC)

latency opinions.[31]  Dr. Ritz's new latency opinions should be excluded.

**B.   Dr. Portier's New Opinions Offered at the Daubert Hearing Should Be Excluded as Untimely.**

As discussed during the *Daubert* hearing, minutes before Dr. Portier took the stand on April 6, 2018, plaintiffs' counsel presented Monsanto's counsel with a 30-page slide deck containing a number of new and never-previously disclosed opinions.  Plaintiffs' counsel subsequently agreed to withdraw slides and new forest plots discussing the NAPP, which Dr. Portier had never discussed in any of his expert reports.  However, Dr. Portier proceeded to offer other new opinions that should be excluded as untimely.

First, Dr. Portier presented a series of complicated, hypothetical calculations regarding what he opined were possible biases created by the imputation methodology used in the 2018 Andreotti study.[32]  This testimony spans a full fifteen pages of hearing transcript, during which Dr. Portier opined (for the first time) that an imputation methodology that independent investigators found had almost exactly predicted the prevalence of "any pesticide" exposure in fact (by his new calculations) could have had a 28% error rate[33] and that what those same investigators reported as a 7.31% error for glyphosate could in fact be as high as 98% error.[34]  Dr. Portier conceded that he had come to these opinions based upon further research he had conducted after his last deposition.[35]  And his calculations were not disclosed to Monsanto until moments before he took the stand, leaving Monsanto with no ability to meaningfully cross-examine him on the many mathematical machinations underlying his testimony.  Second, Dr. Portier proffered new, undisclosed opinions seeking to distinguish between latency concerns in cohort and case control studies.[36]  While Dr. Portier initially portrayed these new opinions as being only illustrative hypothetical calculations,[37] during his redirect, plaintiffs' counsel used the previously-undisclosed

---

[31] *Miller*, 356 F.3d at 1334.
[32] Transcript of Proceedings at 43:2-57:6 (Apr. 6, 2018).
[33] *Id.* at 54:10-55:7.
[34] *Id.* at 55:8-56:2.
[35] *Id.* at 126:20-127:24.
[36] *Id.* at 34:4-40:7, 146:7-148:10.
[37] *Id.* at 34:4-11.

1  calculations to solicit specific new opinions seeking to explain away the latency problem in the De

2  Roos 2003 study.[38]

3          Both of these opinions are based upon materials that were available to Dr. Portier well

4  before the *Daubert* hearing and before his initial or supplemental (with regard to the 2018

5  Andreotti study) expert reports.  These untimely opinions should be excluded.

6                                        **<u>CONCLUSION</u>**

7          For the foregoing reasons, this Court should exclude the above referenced new opinions

8  proffered by Drs. Portier and Ritz at the April 4 and April 6 *Daubert* hearing.

9  DATED:  April 9, 2018                           Respectfully submitted,

10

11                                                  /s/ Joe G. Hollingsworth
                                                   Joe G. Hollingsworth (*pro hac vice*)
12                                                 (jhollingsworth@hollingsworthllp.com)
                                                   Eric G. Lasker (*pro hac vice*)
13                                                 (elasker@hollingsworthllp.com)
                                                   Martin C. Calhoun (*pro hac vice*)
14                                                 (mcalhoun@hollingsworthllp.com)
                                                   Heather A. Pigman (*pro hac vice*)
15                                                 (hpigman@hollingsworthllp.com)
                                                   HOLLINGSWORTH LLP
16                                                 1350 I Street, N.W.
                                                   Washington, DC  20005
17                                                 Telephone:     (202) 898-5800
                                                   Facsimile:     (202) 682-1639
18
                                                   *Attorneys for Defendant*
19                                                 *MONSANTO COMPANY*

20

21

22

23

24

25

26

27

28  [38] *Id.* at 146:23-147:25.