Pages 1 - 105

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS )<br>LIABILITY LITIGATION ) | |
| ) | **NO. 16-md-02741 VC** |
| )<br>_____ ) | |

San Francisco, California
Thursday, September 13, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        ANDRUS WAGSTAFF PC
        7171 W. Alaska Drive
        Lakewood, Colorado  80226
  BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
       **VANCE R. ANDRUS, ATTORNEY AT LAW**

        THE MILLER FIRM LLC
        108 Railroad Avenue
        Orange, Virginia  22960
  BY:  **MICHAEL J. MILLER, ATTORNEY AT LAW**

        WEITZ & LUXENBERG PC
        700 Broadway
        New York, New York  10003
  BY:  **ROBIN L. GREENWALD, ATTORNEY AT LAW**

        BAUM HEDLUND ARISTEI GOLDMAN PC
        12100 Wilshire Blvd. - Suite 950
        Los Angeles, California  90025
  BY:  **MICHAEL L. BAUM, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
           Official Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

                        LUNDY, LUNDY, SOILEAU & SOUTH LLP
                        501 Broad Street
                        Lake Charles, Louisiana  70601
              BY:  **HUNTER W. LUNDY, ATTORNEY AT LAW**

                        LOCKRIDGE GRINDAL NAUEN PLLP
                        100 Washington Avenue S. - Suite 2200
                        Minneapolis, Minnesota  55401
              BY:  **YVONNE M. FLAHERTY, ATTORNEY AT LAW**

                        LAW OFFICES OF TESFAYE W. TSADIK
                        The California Building
                        1736 Franklin Street - 10th Floor
                        Oakland, California  94612
              BY:  **TESFAYE W. TSADIK, ATTORNEY AT LAW**

                        AUDET & PARTNERS LLP
                        711 Van Ness Avenue - Suite 500
                        San Francisco, California  94102
              BY:  **MARK E. BURTON, ATTORNEY AT LAW**

For Defendant Monsanto Company:
                        HOLLINGSWORTH LLP
                        1350 I Street NW
                        Washington, D.C.  20005
              BY:  **ERIC G. LASKER, ATTORNEY AT LAW**
                    **JESSICA BOYLAN, ATTORNEY AT LAW**

**Thursday - September 13, 2018**                                    **2:04 p.m.**

## P R O C E E D I N G S

---000---

**THE CLERK:**  Calling Case Number 16-md-2741, In Re Roundup Products Liability Litigation.

Counsel, please step forward and state your appearances for the record.

**MR. LASKER:**  Good afternoon, Your Honor.  Erik Lasker from Monsanto, and I have Jessica Boylan from my firm with me as well.

**THE COURT:**  Hello.

**MS. WAGSTAFF:**  Hi.  Good afternoon.  Aimee Wagstaff on behalf of plaintiffs.

**THE COURT:**  Hello.

**MS. GREENWALD:**  Good afternoon, Your Honor.  Robin Greenwald for the plaintiffs.

**MR. MILLER:**  Good afternoon, Your Honor.  Michael Miller for plaintiffs.

**MR. BAUM:**  Good afternoon.  Michael Baum for plaintiffs.

**THE COURT:**  Good afternoon.

**MR. LUNDY:**  Good afternoon, Your Honor.  Hunter Lundy for the plaintiffs.

**THE COURT:**  Hello.

**MS. FLAHERTY:**  Good afternoon, Your Honor.  Yvonne

```
 1  Flaherty for plaintiffs.

 2          MR. ANDRUS:  Good afternoon, Your Honor.  Vance Andrus

 3  for the plaintiffs.

 4          THE COURT:  Good afternoon.

 5      All right.  Mr. Miller, your office is in North Carolina;

 6  is that right?

 7          MR. MILLER:  And Virginia, Your Honor, yes.

 8          THE COURT:  So is everything -- how is your office?

 9          MR. MILLER:  Thank you for asking, and right now okay

10  but the storm is hitting some good friends to the south.

11  They're in our prayers.  Thank you.

12          THE COURT:  And, Mr. Lasker, has anything happened in

13  the state court since we last saw each other?

14          MR. LASKER:  Nothing I can think of, Your Honor.

15          THE COURT:  No?  Blocked it out?

16          MR. LASKER:  Yeah.  Not done yet.

17          THE COURT:  I'm sure you're not.

18      On the issue of the leadership structure, I mean, I know

19  on some level you don't have a dog in the fight, but I did want

20  to give you a chance to speak on it briefly.

21      I will tell you that my concern -- I mean, obviously my

22  previous ruling was that the Baum Hedlund firm should be out in

23  the second phase.  Do you believe that the plaintiffs would be

24  adequately represented in the second phrase if the Baum Hedlund

25  firm was out based on how things went in the first phase?
```

1          **MR. LASKER:**  Yes, Your Honor, we do.  There's lots of

2    attorneys here in the courtroom for the plaintiffs; and from

3    our purposes going forward in the MDL and for the litigation to

4    go forward in a way that will be -- that the MDL will be

5    properly managed, having the Baum Hedlund firm come back into

6    litigation after the issues Your Honor's aware of will just

7    raise issues about management going forward and would not be

8    the proper next step in this litigation.

9         But, as you can see, they have lots of very fine attorneys

10   here.  I don't see any reason why they can't manage the

11   litigation with the leadership team they have and the different

12   firms that they have.

13         **THE COURT:**  I mean, a potential alternative would be

14   sort of to say this is Baum Hedlund's last chance.  If anybody

15   does anything like that again, they will be sanctioned very

16   severely.

17         **MR. LASKER:**  Well, Your Honor, I suppose it is, but my

18   sense of this, and not going into too many of the details of

19   how things were resolved last time, but there was the

20   opportunity for further actions to be taken by the Court that

21   were not taken by the Court.

22         And so I think that -- that discretion has already been

23   exercised by the Court, if you will, and at this point to then

24   say, "Okay, well, forget it," that just strikes me as being --

25   taking a step as far as how the MDL is going to be managed that

1    would not be fruitful going forward.  We're going to have lots

2    of other issues coming up in this litigation I expect in the

3    MDL.

4         **THE COURT:**  Okay.  I don't know.  Mr. Baum, do you

5    want to speak to this?

6         **MR. BAUM:**  Sure.

7         We would like to stay on, and we think that there have

8    been changes in circumstances since we last addressed this.

9         **THE COURT:**  And what's that?

10        **MR. BAUM:**  Well, number one, we participated quite a

11   bit in the discovery and the prep of the experts that were part

12   of the *Daubert* hearing.  So we prepped them and helped present

13   them -- and I think you saw our involvement with that -- and we

14   also helped with drafting the briefing in both the MSJ and in

15   the *Daubert* briefing.

16        In the meantime, we also have been appointed as the

17   lead -- co-lead in the JCCP.  Brent Wisner in particular is the

18   co-lead of the JCCP and has specifically been appointed as the

19   liaison between the JCCP and the MDL, and so that's -- and

20   those two things together --

21        **THE COURT:**  I mean, I don't -- that last issue I'm not

22   sure how much that matters; but, I mean, my concern is that,

23   you know, we have people who -- you know, my concern is about

24   depriving the plaintiffs of lawyers who will do a good job

25   examining and cross-examining witnesses and depriving the

1   plaintiffs of lawyers who have real expertise in the science.

2        **MR. BAUM:**  And I think that's exactly what we are, and

3   we demonstrated here in the *Daubert* hearing and in the trial in

4   San Francisco.

5        And I think there's probably a reason that Monsanto's

6   counsel wouldn't want us there, because it would be harmful to

7   the plaintiffs; and our position --

8        **THE COURT:**  Well, or Monsanto doesn't want lawyers

9   across the aisle who engaged in the kind of misconduct that I

10  found your firm to have engaged in during Phase I.

11       **MR. BAUM:**  Well, it seems like --

12       **THE COURT:**  It's a legitimate reason to not want you

13  across the aisle.

14       **MR. BAUM:**  Well, I think -- not to relitigate that,

15  Your Honor, but I think there was a difference of opinion about

16  what the order actually authorized us to do; and from our

17  perspective, we did follow that order to the letter.  And you

18  have modified the order, and that order has not created a

19  problem yet and we have not had a problem since then.

20       **THE COURT:**  All right.  Well, what I'm going to do is

21  I'm going to reverse myself and allow your firm to remain in

22  the leadership structure going forward subject to the following

23  condition:

24       When in doubt on an ethical question, if you have even the

25  slightest doubt, take the conservative route.  And if there is

1   anything even approaching what happened last time, if your firm

2   is involved in conduct that even approaches what happened last

3   time, there are going to be very, very severe sanctions and no

4   warnings.

5       So as long as you're comfortable with that guidance, when

6   in doubt on an ethical question take the conservative route and

7   there will be no warnings before major sanctions are issued, as

8   long as you're comfortable with those conditions, I will

9   reverse myself and allow your firm to remain in the leadership

10  structure.

11          MR. BAUM:  Thank you, Your Honor.  We agree with that.

12          THE COURT:  Okay.

13      What should we discuss next?  The fact sheets?  You know,

14  I would be fine -- so we got this updated fact sheet from

15  you-all last night.  I would be fine just using that if both

16  sides are fine using that and if they feel that that is an

17  appropriate fact sheet to use in this case.

18      What I sent out last night was kind of my attempt to start

19  doing it myself since nobody had proposed any fact sheet to me

20  in the case management statement, but I would be fine, you

21  know, using yours or working off of yours in a discussion here

22  today.

23      I'll sort of take your guidance on that.  What did you-all

24  think we should do?

25          MR. LASKER:  Well, Your Honor, I guess there's two

```
1    points I'd say on that.  First, the plaintiffs' fact sheet is

2    the fact sheet we're using in Missouri and we are using it

3    after meeting and conferring in that litigation.

4              THE COURT:  The one you-all sent last night?

5              MR. LASKER:  Yes.

6              THE COURT:  The updated version of the fact sheet that

7    the plaintiffs had sent over?

8              MR. LASKER:  Right.

9              THE COURT:  Okay.

10             MR. LASKER:  Now, the parties did try to meet and

11   confer just within the last hour -- we didn't have much time --

12   after Your Honor's orders.  The plaintiffs raised some issues

13   they had.  We didn't really have much time to discuss this.

14      We would be happy and perfectly fine with the PFS that's

15   in place.  I think plaintiffs probably have some arguments

16   about that.  And what we had -- what we could do, Your Honor,

17   is meet and confer, submit something to you in a week, and then

18   you just rule.

19             THE COURT:  Why don't we just hash it out right now?

20             MR. LASKER:  Or we can do that as well, Your Honor.

21   That's fine.

22             THE COURT:  All right.  So it sounds like what you're

23   saying is that you're fine with it the way it is.

24      You would propose some changes?

25             MS. GREENWALD:  Correct.  Well, I mean, even --
```

1          THE COURT:  Okay.

2          MS. GREENWALD:  -- Your Honor, even just now --

3    Mr. Lasker, I don't want to speak for you -- he acknowledged

4    that there were certain aspects of the plaintiff fact sheet in

5    Missouri, and these are all for plaintiffs who are potential

6    trial picks in Missouri.  He acknowledged that there's some

7    information that they would not need in the plaintiff fact

8    sheet for this group of MDL.

9          THE COURT:  That was certainly my --

10         MS. GREENWALD:  Right.

11         THE COURT:  I mean, I thought you're asking for a lot

12   of information in here that it seems like you wouldn't need.

13   So I was certainly going to ask about cutting it back.

14         MS. GREENWALD:  Right.  Right.

15         THE COURT:  So let's go through it.  Let's work off

16   it.

17         MS. GREENWALD:  And I think I can also offer, because

18   we have done an awful lot of plaintiff fact sheets in Missouri,

19   some of the problems our clients have responding to some of

20   these, and I can help Your Honor understand where we have some

21   problems that I think can be resolved and clarified.

22         THE COURT:  Great.  So let's just go through it.

23         MS. GREENWALD:  Okay.  I mean, we all already -- when

24   we talked, we agreed that obviously representative capacity,

25   we're okay with filling that out if someone is filling it out

```
 1   on behalf of someone who's incapacitated or deceased.

 2             THE COURT:  Great.

 3             MS. GREENWALD:  That's fine.

 4             THE COURT:  Did you -- before I forget, did you send

 5   me a Word version of this?

 6             MR. LASKER:  I believe we did, Your Honor.

 7             MS. GREENWALD:  You did.  You did.  You did.  I saw

 8   it.

 9             THE COURT:  All right.

10             MS. GREENWALD:  So for us, on number two, obviously

11   someone's name, their gender, their Social Security number,

12   most of this information is okay.

13        I'm not sure why they need the educational history, but

14   it's not a big deal to put it in.

15        Prior addresses --

16             THE COURT:  Well, it may not be a big deal to put it

17   in but it's a long questionnaire.

18             MS. GREENWALD:  It's a huge questionnaire.

19             THE COURT:  Is there -- why do we need educational

20   history?

21             MR. LASKER:  A part of this, and I'm not sure that

22   educational history necessarily goes to that, but part of a lot

23   of these different parts of the questionnaire are to give us a

24   sense of the inventory to be able to understand the full sense

25   of who the plaintiffs are and to be able to pick and figure out
```

1   who are the bellwethers, who are the proper plaintiffs, who are

2   stronger plaintiffs versus weaker plaintiffs.

3          **THE COURT:**  But would education history ever go into

4   picking a bellwether?

5          **MR. LASKER:**  Unless -- I mean, I think that probably

6   the issues I'm coming up with might be covered by other things

7   as well so I don't -- I don't know that that necessarily --

8   that would -- it's pretty standard on PFSs, but I don't have a

9   problem with that.

10         **THE COURT:**  Let's ditch it.

11         **MS. GREENWALD:**  Right.

12         **MR. LASKER:**  That's fine, Your Honor.

13         **THE COURT:**  And then this was one of my questions.  I

14  mean, really, each home address where you've lived for the past

15  25 years?

16         **MS. GREENWALD:**  It isn't --

17         **THE COURT:**  I had to do that for my FBI background

18  check.

19         **MS. GREENWALD:**  Right.

20         **THE COURT:**  Do you know how long it took me to figure

21  out my addresses for the last 25 years?

22         **MR. LASKER:**  One of the things we discussed at lunch

23  is if the plaintiff doesn't remember the street address, just

24  having a city and state or -- the reason we have this issue is

25  it often becomes an issue with venue and understanding where

```
 1  people were at various times in a long exposure history.
 2      So if the plaintiff doesn't recall city -- city -- I mean,
 3  street numbers and that sort of thing --
 4          THE COURT:  Why not just have them say city and
 5  state --
 6          MR. LASKER:  That will be fine, Your Honor.
 7          THE COURT:  -- and year?
 8          MR. LASKER:  That will be fine, Your Honor.
 9          MS. GREENWALD:  So, Your Honor, if I can just point
10  out, though, in number eight of your questionnaire, you already
11  addressed that because you have "Dates of Usage" in the far
12  left column and in the right column you have "Location of
13  Exposure - City and State."  So, in fact, I don't think -- if
14  your number eight stays, I don't think there's any reason we
15  need the addresses at all.
16          THE COURT:  Well, okay.  So this sort of raises a
17  question of just, from a methodology standpoint, how are we
18  going to tackle this working on this questionnaire?  I think we
19  should work off of your questionnaire.
20          MS. GREENWALD:  All right.
21          THE COURT:  If there's anything you like from what
22  I've put out last night, we can incorporate it --
23          MS. GREENWALD:  Okay.
24          THE COURT:  -- into this questionnaire --
25          MS. GREENWALD:  That's great.
```

1          THE COURT:  -- and figure out the best place to do it.

2          MS. GREENWALD:  Fair enough.  That's fine.

3      So as long as we don't have to give individual addresses,

4  that's been a large issue in St. Louis where we get

5  deficiencies when someone can't remember the actual number of

6  the street they lived on.  They just don't remember.

7          THE COURT:  Yeah, yeah.

8          MS. GREENWALD:  Nor can I.

9          THE COURT:  Or even the street name.

10          MS. GREENWALD:  Correct.

11      The same thing for H.  We see no reason that we would need

12  H, all of their employers for the last 25 years.  Again, as

13  long as you have the dates of usage and where you used it, why

14  does it matter if you worked -- we were talking about this with

15  Mr. Lasker.  If you worked for the Gap for 25 years, who cares?

16  That has nothing to do with the use of Roundup.

17          THE COURT:  Well, what I assume Mr. Lasker would say

18  is that it might give you clues about other exposures; right?

19          MR. LASKER:  You're making my job much easier.

20          MS. GREENWALD:  That would be covered in other places

21  because elsewhere in this questionnaire it asks -- it asks

22  about your Roundup use.  And so it would address anyplace that

23  you use Roundup.  And so you could have two jobs.  You could

24  work at the Gap Monday through Friday and you could work at the

25  golf course on the weekends, and so why have to go through 25

1   years of employment history that is completely irrelevant to

2   Roundup use.

3         THE COURT:  Well, what I would propose is, again --

4   you know, what I would propose is just list the -- you know,

5   list the jobs you've had over the past 25 years and, you know,

6   employer, occupation that you had, and rough time frame during

7   which you performed the job.  Like, you know, something that

8   makes it much easier for people to fill out.

9         MS. GREENWALD:  Uh-huh.

10        MR. LASKER:  The only thing I'd add is we will -- in

11  certain circumstances going forward, and part of this also is

12  just preparing us for the case as it goes down the road, having

13  the address of that employer allows us to do whatever efforts

14  we need for third-party discovery.

15      There's also a release at the back of the form.  We've

16  already been in litigation and some of the issues then

17  plaintiffs don't know.  I mean, there's no reason for them to

18  know what types of exposures they have or what types of jobs --

19        THE COURT:  Right.

20        MR. LASKER:  -- and what they were necessarily exposed

21  to at those jobs, and the only way we can get that information

22  often is through the employer.  And, again, that's not -- if

23  there's a situation where they don't remember the street but

24  they say it was in this city and this state, that's the

25  employer, that's probably going to be enough for us.

1          MS. GREENWALD:  Right.  And so --

2          THE COURT:  Employer, job, rough time frame, town.

3          MR. LASKER:  Yeah.

4          MS. GREENWALD:  Town is fine.  Again, it's the street

5     address that is always a problem.

6          THE COURT:  Yeah.  Okay.

7          MS. GREENWALD:  And, also, I guess we'll talk about

8     the authorization at the end because just to footnote what -- a

9     little footnote for what Mr. Lasker said, we don't think

10    there's any reason to have to have employment authorizations

11    for the Gap and those kind of places.  It would only be for

12    relevant employment history, not for all employment history --

13         THE COURT:  Okay.  Well, we'll --

14         MS. GREENWALD:  -- but we'll get there at the time.

15         THE COURT:  We'll get there when we get there.

16         MS. GREENWALD:  Okay.

17    They've already agreed that I is unnecessary.

18         THE COURT:  Yeah.  I was going to ask about that.

19         MS. GREENWALD:  Great.

20         MR. LASKER:  We're not going to --

21         THE COURT:  All right.  Workplace checklist.

22         MR. LASKER:  And this, again, is exactly what

23    Your Honor thinks.  It's alternative exposures.  This is a

24    checklist of -- it's not exhaustive but it triggers the

25    plaintiffs' understanding, and so it's just a yes or no.

```
1            THE COURT:  What's the exposure that you would expect

2      a schoolteacher to have that might be relevant?  Just out of

3      curiosity.

4            MR. LASKER:  It depends on -- it depends on the

5      location.  That one in particular -- each one of these I will

6      say is based upon something, and I know most of them.

7      Schoolteacher at the moment, I don't know what it is but

8      there's a reason it's on here.  I apologize.  I can go back and

9      find out.  That one is not coming to me in my mind right now

10     but there's a reason it's on there.  I just don't know that

11     one.

12           MS. GREENWALD:  Can I propose for this one that we

13     just have a yes/no checklist?  Because if these are --

14     presumably Monsanto wants these because of potential

15     confounders.  And I agree, I never understood the schoolteacher

16     either.  We just didn't argue about it.

17         But the yes/no should be enough to know whether there's a

18     confounder.  They're still going to have to find out more even

19     if they fill out all these lines, these columns, and this just

20     takes a tremendous amount of work.  And so it seems to me the

21     yes/no would be enough for them to decide or help with the

22     bellwether selection process.

23           THE COURT:  On the other hand, but if somebody was --

24     I guess what they might say is, look, if somebody worked, you

25     know, for a maid service for three months during a summer while
```

```
 1   they were in college, or something like that, they're going to

 2   care a lot less about that than if somebody worked for a maid

 3   service using cleaning products and whatnot for, you know,

 4   15 years.  So it would -- I assume for that reason it would be

 5   helpful to them and, therefore, to everybody to have that

 6   information.

 7          MS. GREENWALD:  How about if we add -- put in

 8   approximate dates?  Because, again, it's these specific dates

 9   that cause a lot of concern for our clients.

10          THE COURT:  Oh, yeah.

11          MS. GREENWALD:  So if we can do approximate.  And then

12   does it really matter where their -- their job title and their

13   employer?  Again, I mean, maybe if available.  I don't know.

14   It just -- it is amazing how people don't remember these

15   things, particularly when you have a client who most of whom

16   are pretty sick and still going through chemotherapy.  They

17   have a very hard time filling out this form.

18          THE COURT:  I mean, job title I think you could ditch

19   probably; right?

20          MR. LASKER:  Well, the only reason job title is

21   important is, let's say they worked for a car mechanic for

22   20 years but they were doing clerical work in the front office.

23   That's what we want the job title for, is to know what they

24   were doing there.  I don't know if the title vice VP means

25   anything but it's what their job responsibilities were.  So
```

1    that's the purpose of that column.

2          MS. GREENWALD:  Yeah, but someone working in an

3    office -- that's an interesting question because someone

4    working in an office -- it says "Are you a car mechanic?"  So

5    if they're working in an office, the answer would be, no,

6    they're not a car mechanic.  So --

7          MR. LASKER:  Perhaps.  I don't know if they

8    understand --

9          MS. GREENWALD:  Right.

10         MR. LASKER:  -- how to fill this out --

11         MS. GREENWALD:  These are the complications.

12         MR. LASKER:  -- that's why we need that information.

13         THE COURT:  Yeah, I think it would be helpful.  You

14   know, job -- you could even say "Job Title" or "Rough

15   Description of Your Duties."

16         MR. LASKER:  That's fine, Your Honor.

17      And then, again, this is just understanding where they

18   worked.  If that becomes an issue, we already have them filling

19   out that information, we can then take -- move from that

20   information to discovery very efficiently as opposed to having

21   to go back and say "We just need a little bit more information

22   on each of these."

23         THE COURT:  Okay.  What about all the spouse stuff?

24   Is that -- why is that necessary?

25         MS. GREENWALD:  It's not.

1          **MR. LASKER:**  It can be -- it can be a couple of

2    things.   Sometimes it deals with other exposures of a family

3    depending on what the spouse does.   Sometimes it has to do with

4    loss of consortium claims.

5          **THE COURT:**  I assume there will be -- on the latter, I

6    assume there will be -- there's a place for that -- a place for

7    loss of consortium later on in the questionnaire.

8          **MR. LASKER:**  There is.  I don't know, though -- I'll

9    have to come back on this as far as what the damages claims

10   are, but there's also we're identifying somebody who was there

11   potentially during the periods of time of the alleged

12   exposures.   So if somebody was exposed during a 15-year period

13   or says they were exposed 10 years ago, then the spouse is

14   going to be the person who will know most of all the

15   information.   It's useful for us to know that we have -- you

16   know, we're going to need to get discovery of the spouse.

17        A lot of the times what we've done, for example, in the

18   St. Louis cases where we have multiplaintiff complaints, we

19   have like 90 people on a complaint, and we get discovery of

20   some portion of that.   So we get plaintiff fact sheets for all

21   of the -- all the plaintiffs in the complaint.   We then

22   generally, thus far, have had further discovery of some 20 or

23   30 plaintiffs and sometimes their spouses to be able to gather

24   and fill in that exposure history.

25        A lot of the times the actual plaintiff, their memory is

1    not complete for a variety of reasons.  The spouse is really

2    the next best person.

3          **THE COURT:**  But if you get to the point of

4    discovery -- doing somebody's deposition, having, you know,

5    interrogatories, whatever -- I mean, why can't you just get the

6    spousal information at that time?

7          **MR. LASKER:**  Well, the issue with that actually is

8    there's a couple of reasons for that but part of it is

9    efficiency.  This is in lieu of -- in some ways, in lieu of

10   interrogatories.  We're getting information so that when

11   discovery starts, we have a lot of information.  We don't have

12   to wait to depose the plaintiff, which sometimes is not -- you

13   know, takes time to schedule.  It's not the first thing you do

14   to be able to say, "Okay.  This is what we need to do to plan

15   for discovery.  We're going to take these depositions.  We need

16   these documents."  The plaintiff fact sheet allows us to hit

17   the ground running on discovery without having to wait for the

18   deposition.

19        Usually what we'll do in an individual case, we'll do

20   interrogatories beforehand to get that information.  In this

21   context when we have a fact sheet, that gives us discovery so

22   that we can move forward efficiently.

23        **MS. GREENWALD:**  So, Your Honor, if I can just make a

24   couple of comments.  So, first of all, if a plaintiff -- a

25   spouse has brought a loss of consortium claim, he or she would

```
1    have to fill out this form so that doesn't answer this issue.

2    So this would be for people who do not have a loss of

3    consortium claim and are not a plaintiff, and it is completely

4    irrelevant from a bellwether selection or a trial selection

5    perspective.  It just doesn't add anything because --

6         THE COURT:  The only thing I could imagine it adding

7    is information potentially about other exposure; right?  So

8    just this is not directly relevant to this case but, you know,

9    I've had a couple asbestos cases --

10        MS. GREENWALD:  Okay.

11        THE COURT:  -- and, you know, somebody who works on a

12   ship and is, you know, covered in asbestos comes home and hugs

13   their kids or whatever and the kids are exposed to asbestos.  I

14   don't know if there's anything comparable in this context.

15        MS. GREENWALD:  But in that, that would be like a

16   secondary exposure or second -- but that would be the plaintiff

17   would be filling that out.  So if it's the child who was

18   crawling around while his or her mom or dad was spraying

19   Roundup and that child has non-Hodgkin's lymphoma, that child

20   would be a plaintiff and fill out a plaintiff fact sheet.  So I

21   don't think it is relevant to have spousal information.

22        So, for example, a husband and wife --

23        THE COURT:  Now, what about -- what about -- I mean, I

24   assume -- we spent a lot of time during Phase I talking about,

25   you know, these studies, the agricultural health study, where,
```

1   you know, they sought information from spouses about the amount

2   of exposure somebody with NHL experienced.  And I assume in

3   this litigation we would want to ask questions of spouses about

4   exposure levels --

5           MS. GREENWALD:  In fact, absolutely.

6           THE COURT:  -- and frequency.

7           MS. GREENWALD:  For trial plaintiffs, absolutely they

8   would get this information.

9       So just to give a backdrop to these, these plaintiff fact

10  sheets are only required in Missouri in those cases where there

11  is a trial-selection process.  It is not in any of the

12  petitions that are parked to be used, for lack of a better

13  word.  None at all.  None of those plaintiffs fill out

14  anything.

15      And so if the purpose of this is to have a more

16  streamlined process, to get these done, if they want them done

17  in 90 days for half and almost 900 plaintiffs before Your Honor

18  right now --

19          THE COURT:  We have almost 900 plaintiffs?

20          MS. GREENWALD:  You do.  You do.  You have almost 900

21  plaintiffs.  You're just below 900, and there's going to be

22  more cases.  There's more cases filed, as you know, all the

23  time.

24      And so for us to satisfy that deadline, it's going to take

25  a lot of work.  And so these are the kind of questions that

1    just don't need to be done for so many of the cases that are

2    not going to be ready to have any kind of bellwether either

3    discovery or trial process.

4          And so for those that are picked, of course we will give

5    the information on spouses and children and all those kind of

6    things at the relevant time.

7              **THE COURT:**  So you would propose that this entire

8    page --

9              **MS. GREENWALD:**  Yes.

10             **THE COURT:**  -- family information page, just be

11   ditched for now?

12             **MS. GREENWALD:**  I think it's unnecessary.

13             **THE COURT:**  Okay.

14       **MR. LASKER:**  If I may, Your Honor, before we do that,

15   part of the role, I think, for an MDL court, because these

16   cases are going to be remanded, is to be in a situation where

17   the judge receiving this case has things that have been moved

18   forward so that the case can move much more quickly when they

19   get to the remand court.

20         If we don't have a plaintiff actually that provides us

21   with some of this basic information -- if we do, then we can

22   move forward much more quickly, otherwise we're just going to

23   have to have interrogatories and seek this information to be

24   able to plan out.

25         The first thing you do is not the deposition of the

1   plaintiff.  We're going to then have to go back and do an

2   interrogatory, and that's going to delay all these cases on

3   remand, and that's going to, therefore, send these cases back

4   without that basic information.

5        And so, again, this is not a situation where you have --

6        **THE COURT:**  We're going to send the cases back when

7   they're ready for trial so you will have collected all that

8   information one way or another.

9        You know, I get your point but I think, you know, whether

10  somebody's married and when the spouse was born and if you're

11  divorced, why did the marriage end, you know --

12       **MR. LASKER:**  I mean, those last ones I think I can

13  understand your point, Your Honor, but I guess the issue is,

14  and following up on what Your Honor's saying, if we're going to

15  then be doing --

16       **THE COURT:**  Please provide all this information about

17  your grandparents, your parents, your siblings, and your

18  children.

19       **MR. LASKER:**  That actually is a bit different because

20  that's history -- family history of cancer is to what that's

21  going to.

22       **THE COURT:**  Okay.

23       **MR. LASKER:**  That's a much different -- that's a much

24  more important for causation issue.

25       **THE COURT:**  Yeah.  Yeah.

1        **MR. LASKER:**  But if we are, Your Honor, talking about

2    having all these cases ready for trial when they leave, then

3    it's even more important that we have this information on a

4    plaintiff fact sheet because then we do need to know at some

5    point to figure out a way to sequence the cases for discovery

6    in this court on these issues and if we have 900 plaintiffs,

7    have some way of doing that and then moving forward quickly.

8        And so then if that is Your Honor's intention, it's even

9    more important that we have this basic information at this

10    stage because that will allow us to move more expeditiously

11    when we're doing plaintiff-specific discovery in this court.

12        **MS. GREENWALD:**  Your Honor --

13        **MR. LASKER:**  And this is the point in time when we're

14    doing that, so doing it now is so we don't have to do it again

15    later strikes me as much more efficient.

16        **THE COURT:**  Okay.  I'll think about -- I've heard

17    you-all a lot on this.  I'll think about it a little more.

18        **MS. GREENWALD:**  If I could just say one thing on C.

19    I'm sorry.  It's fine if we limit it to people -- family

20    members who had cancer.  You don't need all this information

21    for family members who didn't have cancer.

22        So if the purpose of C is to find out whether there were

23    family members who were diagnosed with non-Hodgkin's lymphoma

24    or some other type of cancer, then we could limit it that way,

25    if Your Honor was considering that.  But there's no other

```
 1   reason to have all those family members in a plaintiff fact
 2   sheet.
 3           MR. LASKER:  And if I could, cancer is not the only
 4   background medical history.  Immunological diseases could be a
 5   risk factor for somebody going forward.  There are other
 6   medical conditions in a family history that could be relevant
 7   here.  Cancer is certainly one of them but it's not the only
 8   one.  Cause of death for other reasons could be relevant.
 9           THE COURT:  Okay.
10      All right.  The next page is personal medical history.
11           MS. GREENWALD:  So I'd like to address A in particular
12   because we give Monsanto a medical authorization form.  So they
13   are going to get all this information.  So there's really no
14   reason to list all of --
15           THE COURT:  Talk me through that a little bit more.
16   When you say "we give Monsanto a medical authorization form" --
17           MS. GREENWALD:  Right.
18           THE COURT:  -- that means authorizing all of my
19   providers --
20           MS. GREENWALD:  Correct.
21           THE COURT:  -- to release information to Monsanto?
22           MS. GREENWALD:  Correct.
23           THE COURT:  So through the authorization itself,
24   Monsanto will learn who the providers were?
25           MS. GREENWALD:  Of course, yes.
```

1         THE COURT:  Is that what you're saying?

2         MS. GREENWALD:  So we fill it out.  So we put on the

3    top line saying "Name of Medical Provider."  So it might be

4    their diagnosing doctor, their treating doctor, their family

5    doctor, all of whom would have some interaction with that

6    plaintiff's care.

7         THE COURT:  And as part of that authorization, do you

8    identify who these providers --

9         MS. GREENWALD:  Yes.

10        THE COURT:  -- were?

11        MS. GREENWALD:  Yes.  And sometimes -- I want to be --

12   as we all know, plaintiffs won't remember them all so they

13   won't know, for example, that -- just to give you an example,

14   they won't know that their blood work was sent to a particular

15   blood lab and Monsanto will want that.  So they -- once they

16   have looked at the records when they get it back, they

17   frequently ask for additional authorizations because they go

18   way down the chain.

19        But, again, to have to list it, it's a lot of work for our

20   plaintiffs so they typically know the main people, but they

21   don't know all the small individual pieces.  And so if we do

22   the authorizations -- and we've never had a problem ever when

23   they want additional ones.  We've never had a problem getting

24   them to them, and so it just seems to me that we don't have to

25   list them.  It just doesn't add anything and it's a lot of work

1   for the plaintiffs.

2           **MR. LASKER:**  If I could, Your Honor.  There are

3   authorization forms actually attached and I assume is attached

4   to the copy that we sent you; but if it's not, I have a copy

5   here that we can hand up.  All the authorization form provides

6   is the name of the healthcare provider, their address, city,

7   state, and zip, and then it's sort of a blanket authorization

8   to disclose.

9           **THE COURT:**  So hold on a second.  I don't actually

10  have it with me.  Do you want to hand it to me?

11          **MR. LASKER:**  Yes.  I can hand it.

12          **MS. WAGSTAFF:**  I've got a blank copy.

13          **THE COURT:**  Here.  Do you want to just bring it around

14  here?

15          **MR. LASKER:**  Sure.

16          **MS. GREENWALD:**  It's Exhibit A.

17                      (Pause in proceedings.)

18          **MR. LASKER:**  So these are forms necessary under HIPAA

19  for us to get the documents.  It does not provide us with any

20  information about what the nature of the care -- medical care

21  is that was provided.

22          **THE COURT:**  So could we revise this form to include

23  that information?  Is that something --

24          **MR. LASKER:**  I mean, I don't -- I don't know that we

25  have --

1          **THE COURT:**  It sounds like their point is simply "We

2    need to make this easier on the plaintiffs.  We help them fill

3    out these authorization forms.  If we could just add, you know,

4    "type of care provided," or something like that.

5          **MR. LASKER:**  If we got information that's on the PFS

6    and putting it on the medical authorization forms, I suppose

7    that's fine.  It's a little bit more cumbersome.

8          **THE COURT:**  Slow down a little bit.

9          **MR. LASKER:**  I'm sorry.

10          **THE COURT:**  Slow down a little bit here.

11          **MR. LASKER:**  If we're getting the information that

12    we're asking for in the PFSs and just putting them on the

13    medical authorization forms, I guess the one -- I mean, the

14    medical authorization forms are compliant with HIPAA, and so

15    they provide authorization for us to get all the records.

16          **THE COURT:**  Right.

17          **MR. LASKER:**  What I'm a little bit concerned about is

18    if you start putting other information onto that form, how that

19    impacts what documents or what medical records we can obtain

20    from that medical care provider.

21          So let's say and it happens there's a healthcare provider

22    and they remember them giving them treatment for X and, in

23    fact, they gave them treatment for X, Y, and Z.  If on the

24    HIPAA form itself they're identifying the scope and then we

25    can't get those other medical records, that would defeat the

```
1   purpose.
2           THE COURT:  Right.
3           MR. LASKER:  And if we're getting -- if we're going to
4   get that information anyway if you put it on the plaintiff fact
5   sheet, then we identify those providers and we can also
6   determine which of those providers we even care about.  You
7   know, we're not going to care about a lot of them.  Some of
8   them.
9           THE COURT:  Well, why don't we -- could I ask one dumb
10  question?  Is this set up in a way where people can fill out a
11  form online?
12          MS. GREENWALD:  No.
13          MR. LASKER:  We -- well, that's one of the things we
14  want to talk about with plaintiffs' counsel.  It would actually
15  be more efficient but we've not had the opportunity to meet and
16  confer to set this up in a way that, either through native
17  files or something along those lines, we can both then take the
18  data and then also be able to tabulate, you know, also for
19  understanding the inventory.  So we would like to set that up
20  in a way that we can do that.
21      I don't -- we don't have right now -- and we've not talked
22  about it, but I think it's a good idea -- how we can best
23  effectuate that, but I do think that would be useful.
24          MS. GREENWALD:  I'd just like to go back to A for a
25  minute, though, because if Your Honor -- if the way this has
```

1    played out, if you are a plaintiff in this case but you went to

2    urgent care 10 years ago because you had a sinus infection and

3    then you got a prescription to go to the CVS, you have to fill

4    that out.  It asks for all healthcare providers, not all

5    relevant healthcare providers to your non-Hodgkin's lymphoma.

6       It's just -- it has proven to be way too broad, just way

7    too broad.  I mean, some people go to the doctor a lot, some

8    people rarely do.  So I could fill this out in five minutes.  I

9    don't go to doctors.  But our plaintiffs sometimes have gone to

10   many doctors for many different health issues, and so -- and it

11   goes back 25 years.  Imagine having to go back 25 years and

12   remember when you had a sinus infection.  It's just not -- it's

13   not possible to do it.  And so the way this is -- the way this

14   is written now has proven to be extraordinarily overly broad.

15       **THE COURT:**  That makes sense.  But is there a way that

16   we could maybe have people, you know, provide a list that's a

17   little easier to put together, a list of all the health

18   insurance you've had, a list of -- try to list all your primary

19   care physicians, any serious medical issues you've had, you

20   know, where have you got treatment?  I don't know, a way to

21   maybe reword it to make it easier for them to list it?

22       **MS. GREENWALD:**  Yeah, I mean, I think that it could

23   be -- pharmacies is I think a nonstarter, but it could be all

24   medical providers related certainly to your non-Hodgkin's

25   lymphoma.  That makes sense.

And it could be your primary care doctor; right?  So the doctor who you go to as your general doctor.  I don't know that it matters -- if you were diagnosed five years ago, I don't know that it matters who your primary care doctor was 25 years ago if you can even remember.  For people who haven't moved, they might have the same primary care doctor for 25 years.

Again, the difficulty of this is going to depend in large measure on the individual plaintiff.  For some people who don't move and they stay with the same physicians, it would be fairly straightforward.  For people who move around, this has proven to be incredibly laborious and, frankly, the subject of so much back and forth with Monsanto over deficiencies because plaintiffs can't remember.

**MR. LASKER:**  I think, Your Honor, just from our purposes -- and, again, this goes back in some ways to the same discussion about other exposures and other risk factors -- plaintiffs aren't going to necessarily understand which medical conditions are relevant.

Obviously with all of these things plaintiffs will be able to remember some and not remember others.  But to the extent that plaintiffs recall their medical care providers and can provide that information, they would have to do that.  I mean, that's part of discovery.  They've brought a claim.

I don't -- you know, I can't conceive of an approach that would -- that would put upon the plaintiffs the burden of

```
 1   deciding which healthcare provider is going to be relevant or

 2   not.

 3           THE COURT:  What if we just said "To the best of your

 4   ability, list the healthcare providers you've seen over the

 5   past 25 years.  Provider, City and State, Reason for Visit"?

 6           MR. LASKER:  That will be fine, Your Honor.

 7           THE COURT:  And, you know, people are not going to

 8   remember everything obviously, but people tend to remember the

 9   more important stuff.

10           MR. LASKER:  I think that will be fine, Your Honor.

11           THE COURT:  Okay.

12           MS. GREENWALD:  We'll get rid of pharmacies?

13           THE COURT:  Yes.

14           MS. GREENWALD:  Okay.  Good.

15           THE COURT:  Just providers.

16           MS. GREENWALD:  Okay.

17           THE COURT:  The other question I had was:  Is it

18   useful to list the health insurance that they've had over the

19   years?

20           MR. LASKER:  That can be.  I mean, we have an

21   authorization form, I believe, for that as well.

22           MS. GREENWALD:  Yeah.

23           THE COURT:  Oh, you do?  Okay.  All right.

24      Okay.  And then what about B, the medical history?  It

25   seems relevant.
```

1            MR. LASKER:   Yeah.

2            THE COURT:   It seems like that would be helpful.

3    Everybody agree?

4            MS. GREENWALD:   Yeah, that's just Xs.   That's not a

5    problem.

6            THE COURT:   Yeah.   Okay.

7            MS. GREENWALD:   Again, sometimes they don't know, but

8    to the extent -- again, all of these have to be to the extent

9    they know.   We've had clients who don't know whether they've

10   had these things and they later update them.   As long as

11   there's an opportunity to update.

12           THE COURT:   So the next section, "Cancer History,"

13   this again might be a silly question, but why is the first

14   question "Have you ever been diagnosed with cancer?" as opposed

15   to "Have you ever been diagnosed with NHL?"

16       I mean, I know on one level we presume that they've been

17   diagnosed with NHL because they filed this lawsuit.   On the

18   other hand, you know, part of the reason for requiring this

19   questionnaire to be filled out by all these plaintiffs is you

20   weed out some bogus lawsuits; right?   And I wouldn't be

21   surprised if some percentage of plaintiffs answered no to that

22   question.   So why are we -- why is the first question about

23   cancer as opposed to being about non-Hodgkin's lymphoma?

24           MS. GREENWALD:   I agree.   I'm fine with NHL.

25           MR. LASKER:   I think it's correct that we would want

```
 1   to make sure they've been classified with NHL, but we have two

 2   issues in which other cancers can become relevant.  One is that

 3   treatment for other cancer has been a risk factor or, frankly,

 4   the treatments they received for the other cancers can be risk

 5   factors for NHL.  We also have issues with NHL becoming risk

 6   factors or leading to other conditions, and so it sort of goes

 7   both ways and that's why the broader question was asked.

 8       I do agree that finding out what NHL they have, which is

 9   subsumed but you're right not specifically asked here, would be

10   a useful addition to this.

11          THE COURT:  So why don't we just say "Have you ever

12   been diagnosed with NHL and have you ever been diagnosed with

13   any other type of cancer?"

14          MR. LASKER:  That will be fine, Your Honor.

15          MS. GREENWALD:  So under A(2), why would it make any

16   difference what their symptoms were for non-non-Hodgkin's

17   lymphoma cancers?  It would have nothing to do with this

18   lawsuit at all.  And, again, for people who have been diagnosed

19   with multiple cancers, it seems to me that -- first of all, I

20   don't think a lot of plaintiffs even know that they have

21   symptoms until they see a lump.  Some do, some don't.  But

22   certainly number two if it stays should be limited, I believe,

23   to non-Hodgkin's lymphoma.

24          THE COURT:  That sounds sensible.

25          MR. LASKER:  Yeah.  I guess the only -- we do want to
```

```
 1  know when they were diagnosed with other cancer.  I know
 2  because if it's before or after is relevant.
 3       And I --
 4           THE COURT:  Yeah, when they're diagnosed.  But what
 5  about when they first started?
 6           MR. LASKER:  When they first had symptoms I think it
 7  makes sense for NHL.  When they were diagnosed for other
 8  cancers I think would be fine.
 9           THE COURT:  Okay.  So -- okay.
10           MS. GREENWALD:  So I would --
11           THE COURT:  Hold on one second.
12           MS. GREENWALD:  Okay.  Sorry.
13           THE COURT:  Let me just...
14                       (Pause in proceedings.)
15           THE COURT:  So now we get into the order that I put
16  out yesterday, and I guess what I will ask you is:  Do you
17  think that the way I proposed it -- like, looking at just the
18  first four questions -- we're not looking at exposure yet --
19  right? -- we're talking just about, you know, diagnosis,
20  non-Hodgkin's lymphoma and the diagnosis and what type they
21  have and all that stuff.  I mean, do you think it's better to
22  ask it the way I've done it in those first four questions?
23           MR. LASKER:  We're fine with those four questions,
24  Your Honor.
25           MS. GREENWALD:  Yeah, I think that is more direct and
```

```
1    less of a burden on the plaintiffs for this first phase.  So I
2    would stay with your four and I would get rid of five.
3              MR. LASKER:  No.  Five is --
4              MS. GREENWALD:  I'm sorry.  Roman numeral V.
5              MR. LASKER:  Well, again, subject to the discussion we
6    just had about cancer.
7              THE COURT:  Cancer.
8              MS. GREENWALD:  Correct.
9              THE COURT:  Yeah.  So, in other words --
10             MS. GREENWALD:  We'd add that question.
11             THE COURT:  -- for this, all four questions plus
12   cancer; right?
13             MS. GREENWALD:  Uh-huh.
14             MR. LASKER:  And then when they were diagnosed.  And
15   then we would want to have the diagnosing and treating
16   physicians.
17             THE COURT:  Diagnosing physician?
18             MR. LASKER:  That's C(1) and (2).  Now, hopefully
19   we'll have gotten that in the prior place but this also just
20   triggers it.
21             MS. GREENWALD:  We don't need it again.  We already
22   have under four, Roman numeral IV, "To the best of your
23   ability, list healthcare providers you have seen in the last
24   five years.  City and State."  So they're already going to have
25   that so it's duplicative to have to do it again here.
```

1          **THE COURT:**  Yeah, but maybe just to make real clear

2   who diagnosed the NHL at a minimum.  That shouldn't be hard.

3          **MS. GREENWALD:**  I'm fine with that.  It's all the

4   other issues here that are the problem.

5          **MR. LASKER:**  Well, then there's -- okay.  Let me just

6   break that down so I understand it.

7      We have the diagnosing physician, we have the treating

8   physician, so we'd want to know who those -- the treating

9   oncologist.  We'd want to know who those individuals were.

10         And I guess the other issue she's talking about -- and

11  this is, again, going to alternative causation and

12  understanding who is in the inventory -- is plaintiffs who have

13  been told by their physician that they have a genetic

14  predisposition to NHL or cancer.  That is obviously relevant

15  for us in understanding the inventory, and they either have or

16  they haven't been.  I don't know if that's a lot of burden.  If

17  they have, they say yes.  If they haven't been, you know, I

18  don't think that's a hard question to answer.

19         **MS. GREENWALD:**  Right, but then it should just be the

20  name.  I mean, why do they have to give the address and the

21  occupation?  Again, they're getting the authorizations.  At

22  some point in time there's just so much triple work on behalf

23  of our clients, it doesn't make any sense.

24         **THE COURT:**  Yeah, I think that sounds -- I think both

25  of you sound right on this one.

```
 1            MR. LASKER:  Yeah.  So certainly if they name the

 2    physician and we have the address, we don't need to get the

 3    address again.

 4            THE COURT:  Okay.

 5            MS. GREENWALD:  Okay.  So --

 6            THE COURT:  Okay.  So for cancer -- for this

 7    section -- and, by the way, I will -- what I'll do is revise

 8    this and put it out and give you an opportunity to comment on

 9    it.

10            MS. GREENWALD:  That's great.

11            THE COURT:  I'm mildly reluctant to do that because I

12    can't imagine all the comments I'm going to get but I think I

13    should.

14       So it would be our four questions plus cancer and

15    diagnosing and treating physician plus genetic predisposition.

16            MS. GREENWALD:  Uh-huh.

17            MR. LASKER:  Yes.

18            THE COURT:  Okay.

19            MS. GREENWALD:  And then not all the other subparts to

20    that; right?

21            THE COURT:  Right.

22            MS. GREENWALD:  Okay.  Great.

23       So before we came here today, we agreed that number six

24    was not necessary, so you can jump ahead.

25            MR. LASKER:  I think there's parts of six I don't
```

```
 1    think are necessary, but I'm looking back at alternative
 2    conditions here and I'm just thinking actually back to what
 3    other litigation as I'm looking at this.  So --
 4            THE COURT:  Wait.  So --
 5            MR. LASKER:  -- it depends on what the claim is.  I
 6    was sort of thinking, I mean, if there was somebody who
 7    sprained an ankle, that's not going to be relevant at all; but
 8    if there are people who had -- this is to identify for us other
 9    types of exposures or workplace conditions.
10            THE COURT:  Are you talking about workers' comp claims
11    right now?
12            MR. LASKER:  Yeah.
13            MS. GREENWALD:  Uh-huh.
14            THE COURT:  Okay.
15            MR. LASKER:  So this, again, identifies for us, at
16    least potentially, and it's only going to be for people who
17    filed them and so I don't think this is -- for the broad
18    majority of the plaintiffs, they're just going to say no; but
19    if there are plaintiffs who have had injuries on the job, some
20    of those may be relevant to other exposures.
21            THE COURT:  Well, could we narrow it down and say
22    "Have you filed workers' comp claims relating to an exposure to
23    substance on the job?"
24            MR. LASKER:  I think that probably would work,
25    Your Honor.  I'm trying to think of anything that would not
```

1    cover.  I think that would do it, though.  I mean, if we can

2    caveat all of this, all of these sections on -- well, at least

3    going through to the -- so it would be A, B, and C all deal

4    with those issues.  D and E I think are different.

5          MS. GREENWALD:  So for people who have filed them --

6    for people who haven't filed them, this takes one second.  For

7    people who have filed them, it seems to me that all they need

8    to know is yes or no; and if there's a yes, then they shouldn't

9    have to fill out all this information.  They can provide a copy

10   if they have it.

11        Just there's so many questions here that are unnecessary

12   for any type of bellwether selection.

13        MR. LASKER:  Well, again, they just say yes and we

14   don't have any information about what that means.  We're asking

15   for the date, the nature of the injury, and whether or not

16   there's going to be documentation relating to it.  I don't --

17   there's not --

18        MS. GREENWALD:  But, Your Honor --

19        MR. LASKER:  This is for us to be able to understand

20   what the claim was about and to be able to get information

21   about it.  There's not a lot of details that I'm -- unless I'm

22   missing something.

23        MS. GREENWALD:  There actually is.  Clients have had a

24   tough time with this.

25        Exhibit C, which is on page 14 of the document that we

1   handed up to you, it's an authorization for release of workers'

2   compensation records.  So they'll get this and they'll find all

3   that information in the file.

4        And so for the plaintiffs to have to fill out all these

5   subquestions doesn't make any sense if we're going to give them

6   an authorization, and they'll get that.

7              MR. LASKER:  Well, I mean, I guess it's the same issue

8   we had before.  We would like to understand what we're getting

9   files about.

10             THE COURT:  Well, the authorization for release of

11  workers' compensation records, is that only if somebody has

12  filed a workers' compensation claim or is just everybody

13  filling out this authorization?

14             MS. GREENWALD:  No, no.  Just for people who have

15  filed a workers' compensation.

16             THE COURT:  Okay.

17             MS. GREENWALD:  So they're the only people who would

18  fill one of these out.

19             THE COURT:  Okay.

20             MS. GREENWALD:  And so it seems to me that if we go

21  back to --

22             THE COURT:  And then just let Monsanto go through it.

23             MS. GREENWALD:  Right.

24             THE COURT:  Yeah.  That's fine.

25        So does that mean we don't even need to ask the question

```
 1   at all?
 2        MS. GREENWALD:  Well, yeah, I think you do because, I
 3   mean, Monsanto wouldn't know if someone should have filled out
 4   an authorization unless they answer it.  So I'm okay with them
 5   saying "Have you filed" -- I think Your Honor's language was
 6   "Have you ever filed a workers' compensation claim for
 7   accidents or injuries," I have down, "which occurred in the
 8   workplace relating to substance exposure?"  My notes are not
 9   great, but you modified it to have it relate to substance
10   exposure on the job versus you broke your leg because something
11   fell on it, which would be irrelevant.
12        So, then, all the plaintiffs who answer yes to that
13   question would have to fill out the Exhibit C, the workers'
14   compensation authorization, and then Monsanto will get those
15   records.
16        THE COURT:  But if at that point we're asking them to
17   answer that question, what's the harm in making them describe a
18   little bit what their claim was?
19        MS. GREENWALD:  Because you have to -- I mean, these
20   questions, there's a lot here:  What happened, when you
21   notified your employer of the accident.  There's just -- there
22   is -- this is a tremendous amount of information they have to
23   fill out when it's all going to be in the file.
24        MR. LASKER:  And, Your Honor, if I may, for our
25   purposes, when we go to the employer and say we want the
```

workers' comp claim and they say "When was this?  What was it
about?" because they don't necessarily just have it at their
fingertips, we need to be able to say "It was on this date, it
was for this purpose," and then that helps them find it.  And
that's why we ask those questions.

     **MS. GREENWALD:**  So you could have which job and the
month and year, approximate month and year, and then that would
give you what you need to go to the employer.

     And, again, remember, this is not -- we're not saying that
Monsanto can't ask more questions when a bellwether pool is put
together.  This is for all plaintiffs that have filed in the
MDL and will file in the future.  And so it's overkill to have
plaintiffs filling out all these questions for some plaintiffs
that won't ever have any discovery done because they're not
going to make it into a pool of bellwethers.

     So, again, no one -- we're not -- plaintiffs aren't saying
here that Monsanto is not entitled to this information for
plaintiffs who end up being discovery bellwether or trial
bellwether.  We're just saying that for the totality of
plaintiffs that file in the MDL, there's just too much detail
here.

     **THE COURT:**  Okay.  I understand your arguments.

     So did you agree that D could go away?

     **MR. LASKER:**  No.  D and E are different.  These are --
generally life insurance is finding out their medical

```
 1   conditions.  It's another way of finding out --

 2             THE COURT:  You should slow down for the court

 3   reporter a little bit.

 4             MR. LASKER:  I'm sorry.

 5      -- finding out other conditions when you're denied medical

 6   insurance, your life insurance.

 7             THE COURT:  So D and E should stay in?

 8             MR. LASKER:  Yeah.  Those are for other medical

 9   conditions.

10             THE COURT:  Okay.

11             MR. LASKER:  That's another way of prompting because,

12   as counsel has noted, sometimes plaintiffs don't remember about

13   the life insurance forms and the health insurance records will

14   show that.

15             THE COURT:  Okay.

16             MS. GREENWALD:  So one thing it seems to us that if

17   you are not claiming any type of emotional distress in your

18   lawsuit, whether or not someone has insurance for psychiatric

19   or emotional conditions is not relevant to this lawsuit.  So

20   this should only be for people who are -- I don't think they

21   need to have it at all; but if it stays in, it should be

22   limited to those people who are bringing claims for emotional

23   distress.

24             MR. LASKER:  Well --

25             THE COURT:  Then we're overcomplicating the form by
```

1   limiting it to those people, I think.

2      Okay.  "Have you been denied medical insurance?"  Same

3   concept I suppose.

4           **MR. LASKER:**  Yes.

5           **THE COURT:**  Okay.  F?

6           **MR. LASKER:**  F can be relevant particularly with

7   bankruptcy claims, Your Honor, and we have discovery that takes

8   place in those lawsuits; but some of these -- and, again, it

9   goes back to what is the individual plaintiff's request as far

10  as damages are concerned, and we could complicate this part as

11  well by trying to distinguish between plaintiffs but this is

12  just sort of a one-stop shop.

13          **THE COURT:**  I mean, is the idea -- is part of the idea

14  at least to weed out people who sue everybody under the sun?

15          **MR. LASKER:**  Part of it is that.  Part of it is

16  understanding what the value of a claim is going to be, what is

17  this person's employment history and future employment

18  prospects.  That gives us a sense of the valuation of a claim.

19  So there are a variety of different ways that this comes into

20  factoring and evaluating the inventory.

21          **MS. GREENWALD:**  So, Your Honor, we were just

22  downstairs in the cafeteria before we came up here and

23  Mr. Lasker told us they didn't need F, G, or H.  Now we're here

24  and I'm hearing they do need F, G, and H for this purpose.  It

25  doesn't make any sense that it would matter --

1              THE COURT:  We haven't talked about G or H.

2              MS. GREENWALD:  Well, no, but I'm just telling you I

3      have an X through it because he just got through telling us we

4      can get rid of six.  Now I understand he's backing off --

5      backtracking on that, but these questions in particular, why

6      would it matter for any type of bellwether selection whether

7      you have filed for bankruptcy or unemployment claims?  It is

8      getting so far afield from the epicenter of these lawsuits

9      here.

10          Again, these are perfectly valid questions to ask of a

11     discovery or a trial pool, but to have every plaintiff in the

12     MDL answer these questions, it just -- it's just not relevant

13     for the purpose that we believed Your Honor wanted to have

14     everybody file some type of what I would call a short form

15     plaintiff fact sheet, which is clearly what Your Honor has sent

16     to us yesterday recognizing that there will be a few questions

17     added.  But these are the kind of questions that seem so far

18     afield for the purpose that we're doing these for now.

19             MR. LASKER:  And, Your Honor, if I may.  First of all,

20     with respect to the meet and confer, we were trying to

21     negotiate give and take and so there was give-and-take

22     discussions, but that's not where we are now and plaintiffs

23     aren't giving anything either.

24          The issue with respect to the plaintiff fact sheets,

25     there's a number of reasons for them.  One is to get a sense of

1    the value of the inventory as a whole.  The other is to move

2    the litigation along, particularly with the idea that this

3    litigation could continue and other cases that Your Honor may

4    not try would move forward for discovery and there would have

5    to be some way of deciding which of those cases and how we're

6    going to do that.

7              And so we need to have some set of information with

8    respect to all the plaintiffs to be able to make those

9    decisions also:  Which cases are going to be remanded, how

10   they're going to be remanded, how they're going to be worked up

11   for remand.  So we need to have basic information and while

12   we're going through the process of providing these plaintiff

13   fact sheets to the plaintiffs, that is the opportunity to

14   gather that information as opposed to then having to redo

15   because we took questions out that we're going to need to ask

16   these people later on anyway.

17             **THE COURT:**  Okay.  What about G?

18             **MR. LASKER:**  G we can -- we agree to drop.

19             **THE COURT:**  What about H?

20             **MR. LASKER:**  H would be prior health conditions,

21   Your Honor.

22             **THE COURT:**  Yeah, but --

23             **MR. LASKER:**  And also --

24             **THE COURT:**  But, I mean, we're getting a lot of

25   information from them about their health conditions.  Why

1    does --

2         **MR. LASKER:**  It is correct that we're asking them

3    different questions to be able to prompt their memories about

4    their medical conditions.  But, again, if they have, they can

5    say yes and they remember it; if they haven't, they say no.

6    It's two questions on the form.

7         And, again, it provides an additional way for us to make

8    sure that we are getting the accurate information.  It's not --

9    again, I don't think for most plaintiffs the answer is going to

10   be no.  If it is yes, it's going to be relevant so we should

11   get the information.

12        **THE COURT:**  Okay.  And then on the next -- so the next

13   subject is Roundup and other glyphosate-based herbicides.  And

14   I guess what I'll start off by asking you, again, is:

15   Comparing what you have in this questionnaire to what I

16   proposed, what do you think?

17        **MS. GREENWALD:**  I think number eight, your eight in

18   your chart, is a more efficient way to do it than these

19   questions, particularly just -- so from a perfect -- from a

20   simply organizational structure, this doesn't really give you

21   much of an opportunity to very clearly answer what you did at

22   various times; whereas, your chart, which I wish I had had the

23   benefit of this when we were first doing this plaintiff fact

24   sheet, actually has the buckets and the boxes in a much -- I

25   think we all, all the plaintiffs' lawyers, thought in a more

1    straightforward, usable manner than having to answer all these

2    questions individually, which basically get to the same

3    information, Your Honor.

4         It's not very different what you did from what's here.  It

5    just is more efficient.  And, again, it gives Monsanto plenty

6    of information to help select and understand -- help select

7    bellwethers and/or understand -- I don't like to use the word

8    "inventory," frankly.  These are individuals.  They're people.

9    But it certainly helps Monsanto to understand the people in

10   this litigation.

11        And so they don't need any more than what would be put in

12   the chart on page 8.

13              MR. LASKER:  Your Honor, we actually like your

14   proposed questions as well.  The only thing we would suggest, I

15   think it addresses the issues --

16              THE COURT:  So starting here at five; right?  We would

17   ask them five --

18              MS. GREENWALD:  Uh-huh, right.

19              MR. LASKER:  Yes.

20              THE COURT:  -- six, seven.

21              MR. LASKER:  Yes, Your Honor.

22              THE COURT:  Actually, seven, do we need seven because

23   seven is part of the chart; right?

24              MS. GREENWALD:  No.  We -- right.  You put it in the

25   chart so I think seven can go.

1            THE COURT:  Okay.

2            MS. GREENWALD:  It's the last column.

3            MR. LASKER:  I'm sorry.  I just lost track of the

4    questioning.  I'm sorry, Your Honor.

5            THE COURT:  Seven was "Identify the location where you

6    used Roundup or other glyphosate," but it's also in the chart.

7            MS. GREENWALD:  It's duplicative.

8            MR. LASKER:  No, that's fine.

9            THE COURT:  Okay.

10           MR. LASKER:  The --

11           THE COURT:  So you say we should start with what we

12   put out last night and then you think some stuff should be

13   added again?

14           MR. LASKER:  Yeah.  The only thing that we would -- I

15   think it's actually only one additional question, which is B on

16   page 10.  We have circumstances in which plaintiffs can't

17   recall the specific type of product that they used but they may

18   have receipts; and if they have those, that will allow us to

19   identify the product.  If they don't, they don't.

20           THE COURT:  I mean, who keeps their Roundup receipts?

21           MR. LASKER:  Some people do.  Farmers certainly will

22   keep their records.

23           THE COURT:  How many plaintiffs do we have who are

24   farmers?

25           MR. LASKER:  There's a significant portion of the

1    inventory that is.  We only have -- I mean, there's limits to

2    what we know because it happens to be in the complaints, but in

3    the complaints there are people who identify themselves as --

4         THE COURT:  I tend to agree that "inventory" is rather

5    an unseemly way to describe plaintiffs.

6         MR. LASKER:  Among the plaintiff population.  Among

7    the plaintiff population we know that there's a significant

8    portion that are farmers.  There's also a significant portion

9    that are licensed pesticide applicators and they also keep

10   records of their use.

11       I agree with residential sort of home-and-garden use it's

12   much less likely, although with my wife maybe not, but for most

13   I think it may be much less likely; but for a significant

14   portion of the plaintiff population, we would expect they would

15   have these records.

16        MS. GREENWALD:  So many of the commercial users,

17   Your Honor, are people who work for employers and so they won't

18   have the receipts.  They know what they applied, but they don't

19   buy it.

20        THE COURT:  They can just say no.

21        MS. GREENWALD:  Right.

22        THE COURT:  It's an easy question to say no to.

23        MS. GREENWALD:  They have -- exactly.  I don't have a

24   problem with that.

25        THE COURT:  So let's add that question.

```
 1              MS. GREENWALD:  It's not a big deal.

 2              MR. LASKER:  And we are fine dropping C.

 3              THE COURT:  Okay.  Wait.  Let me look back.

 4         So...  Okay.

 5                        (Pause in proceedings.)

 6              THE COURT:  Okay.  Now -- oh, what about -- so my

 7    question nine should also be on there?

 8              MR. LASKER:  Yes.

 9              MS. GREENWALD:  Uh-huh.

10              THE COURT:  Okay.

11              MR. LASKER:  And, I mean, we -- we had had -- and

12    this, again, is just to prompt the plaintiff -- we had sort of

13    asked, you know, sort of prompted them on gloves, respirator

14    masks, protective clothing, just to give them a sense of what

15    we would like them to identify.

16              THE COURT:  What are the best couple of prompts?

17    Obviously wearing protective gear is number one; right?

18              MR. LASKER:  Right, wearing protective gear.  For some

19    people they might not know what that means, wearing gloves,

20    wearing a mask.  And I think that --

21              THE COURT:  Gloves, mask, and what else?

22              MR. LASKER:  We have "other protective clothing," but

23    that's the same thing as -- I don't know if the plaintiffs will

24    understand what "protective gear" means, but it's just --

25    that's just a terminology.  We had asked for gloves, respirator
```

```
 1    masks, or other protective clothing.

 2            MS. GREENWALD:  That's fine.

 3            THE COURT:  Okay.

 4            MR. LASKER:  And then your question nine we also agree

 5    is a good question.

 6            MS. GREENWALD:  We just talked about nine.  Do you

 7    have a different -- did you mean nine or did you mean --

 8            THE COURT:  Did you mean 10?

 9            MR. LASKER:  No, no, no.  Your question nine also went

10    a little bit beyond that as described by the precautions.

11            THE COURT:  Yeah.  That's what we were just talking

12    about.

13            MR. LASKER:  Right.

14            THE COURT:  I thought that's what we were just talking

15    about.

16            MR. LASKER:  Right.  Yeah.

17            MS. GREENWALD:  Okay.

18            THE COURT:  So it will say "Describe any precautions

19    you took while using these products.  Examples:  Wearing

20    gloves, masks, or other protective gear"?

21            MR. LASKER:  That will be fine.

22            THE COURT:  And then 10?

23            MR. LASKER:  Your question 10 we agree with.

24            THE COURT:  Is what?

25            MR. LASKER:  We agree with that, that's a good
```

1  question.  We don't have any changes we would propose on that

2  one.

3          THE COURT:  Was there a question along those lines in

4  your questionnaire?  Not really.

5          MS. GREENWALD:  No.

6          THE COURT:  I mean, the closest you came --

7          MR. LASKER:  Yeah.

8          THE COURT:  -- was the chart about the different

9  occupations.

10         MR. LASKER:  Right.  And we agreed this is a more

11 effective way of getting this information.  It is in other

12 herbicides and pesticides, as you know, and is a directly

13 relevant issue and we think this is a good addition.

14         THE COURT:  Okay.  Hold on one second.

15                  (Pause in proceedings.)

16         THE COURT:  Okay.  So that takes us to damages, I

17 guess.

18         MS. GREENWALD:  Uh-huh.

19         MR. LASKER:  Yes, Your Honor.

20         THE COURT:  Anything you want to say about that?

21         MR. LASKER:  Well, from Monsanto's perspective,

22 obviously that's essentially important to understand the value

23 of the claims that are being brought against us.

24         MS. GREENWALD:  So I would say that -- again, going

25 back to these are for all plaintiffs, not trial plaintiffs or

```
 1   discovery plaintiffs -- I understand the need or the desire for
 2   Monsanto to have some of this.  I don't think we need as much
 3   detail as is in this chart.
 4       It seems to me that, again, people who say yes to this --
 5   so let's say you worked for XYZ Company and you applied Roundup
 6   and you missed a month and a half of work and so you're
 7   claiming that lost wages.  You're going to fill out an
 8   employment authorization form and you're going to get a lot of
 9   this information.  So you're going to get --
10           THE COURT:  I think -- I mean, I'm sorry to
11   interrupt --
12           MS. GREENWALD:  That's all right.
13           THE COURT:  -- but just in terms of framing this
14   discussion, I think it's important for plaintiffs in these
15   cases to have an understanding of their damages claims and to
16   be able to articulate what their damages claims are.  So this
17   is an area where I'm not -- you know, I'm sort of less
18   interested in cutting.
19       That said, I'm happy to explore, you know, making these
20   questions easier to answer or really only asking the questions
21   that need to be asked, but I do think that this may be an area
22   where less is not more.
23           MS. GREENWALD:  So, for example, the third column,
24   "Work Schedule, Hours Per Week," just hours per week.  It
25   doesn't matter what their work schedule is.  It doesn't matter
```

1    whether if they work 7:00 to 3:00 or 6:00 to 10:00.  Those

2    things don't matter, but it matters your hours per week.

3        So if you work 20 hours a week, that's fair.  If you work

4    40 hours a week -- there's some detail here that is difficult

5    for people to -- and plus your shifts change.  It's just not

6    necessary.  So if we're going to keep that, I would suggest it

7    just be "Hours Per Week."

8            MR. LASKER:  This actually is -- sort of segues into

9    causation for reasons dealing with IARC because IARC has

10   determined that people who work the night shift have increased

11   risk of cancer.  I think it said it's either 2A or 2B as far as

12   IARC is concerned.

13           THE COURT:  People who work the night shift in any

14   job?

15           MR. LASKER:  In any job.

16           THE COURT:  Well, okay.  So -- but it should be -- I

17   mean, if you really need to know the work -- so, then, why

18   don't you -- you know, why don't you ask "Do you work at night

19   or during the day?"

20           MR. LASKER:  We can do that.

21           MS. GREENWALD:  Okay.  "Work/Hours, Day/Night," how

22   about that?  Would that work?

23           MR. LASKER:  Yeah, "Hours Per Week" and then --

24           MS. GREENWALD:  Right.  "Hours/Week, Day/Night."

25           THE COURT:  In a separate column.

1          **MS. GREENWALD:**  Right.  Right.  Right.

2          **MR. LASKER:**  Yeah.

3          **THE COURT:**  Okay.  So this question I was having --

4     one of the things I'm going to do is, you know, I think that a

5     lot of these questions are worded in a less user-friendly way

6     than they could be so I am going to do some wordsmithing on

7     this stuff just to make it more sort of plain English.

8          **MS. GREENWALD:**  Right.

9          **THE COURT:**  I had a hard time understanding -- I mean,

10    I had to read this question, like, five times to understand it.

11         So this is not -- you're not asking them to set forth the

12    lost work that they're claiming.  You're just asking them to

13    describe their entire work schedule over the last 10 years.

14         **MS. GREENWALD:**  No.  Just if you're --

15         **MR. LASKER:**  If they are claiming loss of income,

16    that's going to be future work opportunities.  So part of this

17    is understanding what their earnings history was and future

18    potential earning stream is.  And so these are -- it's also --

19    it's loss of income, that's part of it, backwards.  It may also

20    be lost future earnings forwards.  So it goes to both.

21         **THE COURT:**  But it's asking them to describe their

22    entire work history for the last 10 years.

23         **MR. LASKER:**  Yes.  Yes.

24         **MS. GREENWALD:**  Uh-huh.  And so, like, for example,

25    total overtime pay received during employment, a lot of clients

```
 1    don't have this.  Again, I think that we have to put some
 2    approximation in here because I don't think any of us want our
 3    clients to be in a situation where they -- I mean, they won't
 4    have all those records so they can give an approximation of
 5    whether they got overtime.
 6          THE COURT:  Well, like I said, I mean, now is going to
 7    be the time for them to get a grip on their damages claims.  So
 8    this is an area where the plaintiffs are going to need to spend
 9    some time doing some research to be able to articulate their
10    damage claims with some precision.
11          MS. GREENWALD:  I understand that, Your Honor, and
12    that's fine.  And then I think if that's going -- if those kind
13    of details stay in here, they're going to need some time to get
14    that information on those details.  If it's really going to be
15    how much overtime have you had at each of your jobs for the
16    past 10 years and what all your bonuses were and other
17    compensatory structures for the past 10 years for every job you
18    had, it's going to take them some time to get that.
19          THE COURT:  Well, that -- I mean, this is an area of
20    law that I don't know very much about, but why do you need
21    those details?  I mean, why can't you just ask them how much
22    money did they make --
23          MS. GREENWALD:  I agree.
24          THE COURT:  -- over the course of the last 10 years in
25    their various jobs?
```

1          **MR. LASKER:**  It bears upon how the economists value

2     future earnings, and they base that on not only base salary but

3     overtime and what the likelihood is of additional overtime.

4          I'm not the -- so that's the answer to that question,

5     trying to figure out the future cash stream.  These are the

6     factors that the economists tell us that they need.

7          **THE COURT:**  Okay.

8          **MS. GREENWALD:**  So just if I can help Your Honor

9     understand where I'm coming from on this.

10         So take a worker who is a landscaper who works for someone

11    different every year; right?  Or they maybe have sometimes two

12    or three different people in the summer, and sometimes they

13    have long hours, sometimes they don't.  They would have to go

14    back 10 years.  And I'm not saying -- I understand Your Honor,

15    I hear you loud and clear that we need to get this information.

16    I just want us all to be sensitive to the timing then.  It's

17    going to be difficult for some people to get this in 90 days.

18         **THE COURT:**  Yeah, some people are not -- I mean, I

19    assume somebody who works for my gardener and goes around to

20    different houses throughout the week is not going to be able --

21    there's going to be no distinction between overtime and

22    bonuses.  Maybe they'll be able to estimate their year-end --

23    some year-end bonuses, you know, that they get from individual

24    clients or whatever, but a lot of times it's just going to have

25    to be estimates by necessity.

1           **MS. GREENWALD:** Right.  And I think that's right.  And

2    I think that's why what concerns me about this is it's total

3    overtime pay received during employment, by employment, by

4    year.  It's -- I think as long as we have -- if we're going to

5    have to give it in this type of detail, we're going to need a

6    lot of time.

7           **THE COURT:** What would be wrong with saying, you know,

8    how much money did you make, you know, per month, or whatever,

9    from this job and how much of that was overtime pay and how

10   much of that was bonuses?

11          **MR. LASKER:** I think that would be fine.  I think

12   that's what we are trying to get, and I think we did base

13   salary, daily/weekly; but if you want to do salary per month,

14   that's fine with us, Your Honor.

15          **THE COURT:** Well, I mean, I don't care whether it's

16   monthly or weekly.

17          **MR. LASKER:** Yeah.  I think they will be in the same

18   objectives.  So if you think there's --

19          **THE COURT:** It may just be a slightly better way of

20   wording it.

21          **MR. LASKER:** Exactly.

22          **THE COURT:** Okay.  All right.

23       And then I assume B is okay; right?

24          **MS. GREENWALD:** Yes.

25          **THE COURT:** And C?

1              **MS. GREENWALD:**  This has been -- this is a terrible

2    question.  So if you are -- many of the clients don't pay this

3    out of their pocket.

4              **THE COURT:**  Right.

5              **MS. GREENWALD:**  They have no idea what their medical

6    expenses are, frankly.  They are -- one day they go and they

7    find out they have non-Hodgkin's lymphoma and they frequently

8    start treatment the next day, the next week.  They have no idea

9    how much this costs.  They know insurance picks up some.  They

10   don't have that information.  That's the last thing they've

11   thought about is saving details.  Again, this all comes out in

12   the medical records.  Over time we get this.

13        I agree that when we are putting our cases on, we must

14   present this information, but we cannot get this in 90 days.

15   To get medical records sometimes takes well over 90 days.  And

16   so C really needs to either be a question that we answer later

17   when we get the information --

18              **THE COURT:**  What about asking them for medical

19   expenses they've incurred out-of-pocket and then letting

20   Monsanto go figure out how much the insurance companies paid

21   for their treatment?

22              **MS. GREENWALD:**  Much better.  Much better.  And,

23   again, they'll have to approximate that because they don't

24   always have an exact number.  But, yes, much better than having

25   to give the full amount of their medical expenses, which they

1    just truly don't know.

2         **MR. LASKER:**  If we have that, Your Honor, as we're

3    going through this, I am seeing that the question is not there,

4    then what I would request is, in addition, if they have

5    expenses that have been paid by insurance, they should just

6    list the insurers who've paid for the medical expenses.  So

7    "This is how much I paid out-of-pocket and these are the

8    insurers who have provided me -- who have provided."

9         And then we do have the authorization form that is

10   specific to that and we'll know where to go.

11        **THE COURT:**  Sounds like a good idea.

12        Why don't we -- well, let's ask -- let me ask you about D,

13   and then let's take a little break.

14        **MS. GREENWALD:**  D.  Didn't we do D?

15        **THE COURT:**  If you are making claims for other

16   out-of-pocket --

17        **MS. GREENWALD:**  I thought we did D.  We agreed.

18        **THE COURT:**  Other than medical I think is what --

19        **MS. GREENWALD:**  Correct.

20        **THE COURT:**  -- you're talking about here; right?

21        **MS. GREENWALD:**  Okay.  Right, uh-huh.

22        **THE COURT:**  So we need to specify --

23        **MS. GREENWALD:**  Nonmedical.

24        **THE COURT:**  -- other than medical.

25        **MS. GREENWALD:**  Right.

```
 1              THE COURT:  Okay.

 2       All right.  So why don't we take a little break and then

 3    we'll finish going through this and talk about bellwethers and

 4    whatever else we need to talk about.  Okay?

 5              MR. LASKER:  Thank you, Your Honor.

 6              THE COURT:  Thank you.

 7              MS. GREENWALD:  Thank you.

 8                    (Recess taken at 3:21 p.m.)

 9                 (Proceedings resumed at 3:30 p.m.)

10              THE COURT:  Sorry.  I don't think I set a resumed

11    time.  Is everybody back?

12              MS. GREENWALD:  I'm sorry?

13              THE COURT:  I said I don't think I set a resumed time.

14    Is everybody back who needs to be back?

15              MS. WAGSTAFF:  Yes.

16              THE COURT:  Okay.

17              MS. WAGSTAFF:  For plaintiffs.

18              MR. LASKER:  Yes, Your Honor.

19              THE COURT:  As always, Monsanto is outgunned in these

20    proceedings.

21       Okay.  So what about the documents?  Is there anything

22    further to discuss about that?

23              MS. GREENWALD:  Can we just make sure, Your Honor,

24    before we get to that -- I'm sorry, I don't mean to jump

25    ahead -- can we make sure these do not have to be notarized?  A
```

```
 1   lot of our plaintiffs live in the middle of nowhere.
 2            THE COURT:  Hold on.  Let me just cut you off.  I
 3   think they should be submitted under penalty of perjury --
 4            MS. GREENWALD:  Uh-huh, of course.
 5            THE COURT:  -- but I don't -- I mean, we're in the
 6   21st century now.
 7            MS. GREENWALD:  Yeah.
 8            MR. LASKER:  There was no request for notarization.
 9            MS. GREENWALD:  In your letter, in your CMC statement.
10   Anyway, that's fine.
11            MR. LASKER:  I don't think --
12            MS. GREENWALD:  In the CMC statement.  Okay.  That's
13   fine.
14            MR. LASKER:  Okay.
15            MS. GREENWALD:  So on authorizations, so medical is
16   straightforward I think.  I don't think we have any controversy
17   on medical authorization.
18            THE COURT:  Okay.
19            MS. GREENWALD:  And we give those and we fill them
20   out, and then we -- Monsanto tells us if there's additional
21   providers and then we provide them to them.  So --
22            THE COURT:  Okay.
23            MS. GREENWALD:  -- we have a good system in place for
24   that.
25        Mental health records should only be required for people
```

 1    who are asserting mental health claims in this lawsuit.

 2             **THE COURT:**  That's what it says --

 3             **MS. GREENWALD:**  Right.

 4             **THE COURT:**  -- on this.

 5             **MS. GREENWALD:**  I just want to make sure.

 6             **THE COURT:**  Okay.

 7             **MS. GREENWALD:**  Because that was pretty heavily

 8    negotiated in the state cases.

 9         B, employment records.  I think we have a disagreement

10    here.  Our thought was that there's no reason to have an

11    authorization for employment records.

12         I guess we could have two different ways to look at this.

13    One is, unless they were -- except for those employments where

14    they were exposed to Roundup obviously and/or employment that

15    they claim they missed because of treatment for non-Hodgkin's

16    lymphoma.  So, for example, maybe you were exposed 10 years ago

17    but now you work at something else but you missed five months

18    of work because you were going through chemotherapy.

19         So we agree that for the people who missed work and

20    they're claiming lost wages and/or for people who worked in an

21    industry where they were exposed to Roundup, we would give them

22    employment authorizations.  But, again, going back to the

23    person who works for the Gap, there is absolutely no reason to

24    have an employment authorization for people who are working in

25    places where they're not exposed to any chemicals.

1          **THE COURT:**  Would the idea be that, again, it's

2     necessary to verify their assertions about how much money they

3     made in past years so that the experts can do an evaluation of

4     future earnings loss?

5          **MR. LASKER:**  That would be part of it, Your Honor, and

6     the second part of it would be exposures to something other

7     than Roundup or herbicides.  And sometimes the only way --

8     sometimes it's obvious they will have those exposures; they

9     worked at a gas station or something like that.  Sometimes we

10    won't find out until we find out their employment records

11    because --

12         **THE COURT:**  Well, what are the employment records?  Is

13    it -- I mean, is it all employment records, like personnel

14    file, discipline records?  I mean --

15         **MS. GREENWALD:**  It's a lot.

16         **THE COURT:**  Is there a way to kind of either narrow

17    the category of people who are turning this over or the types

18    of records that are being turned over?

19         **MS. GREENWALD:**  It asks for their entire personnel

20    file.  I think this is very, very broad, vacation days,

21    everything.

22         **MR. LASKER:**  And just to be clear, I mean, these forms

23    are not invented for this MDL or for this litigation as you

24    imagine.  It's pretty standard.

25         There are -- there's information in the personnel files

```
 1   that's going to go to their employment history, going to go to

 2   their likelihood of advancement, that are going to go to

 3   medical conditions that they had during the time period.  This

 4   is pretty standard stuff for an employment authorization form.

 5   I don't think we even need -- I don't know that we negotiated

 6   the terms of these.  We just used authorizations that we've

 7   used in other litigation.

 8        MS. GREENWALD:  We didn't but we also recognize that

 9   they should only be used for those employments that related to

10   the plaintiffs' claims in the litigation.  So, again, going

11   back to someone who works for the Gap, does it really matter

12   whether that person, you know, didn't do a good job folding up

13   the clothes at the end of the day?

14        There's a lot of information in here that is completely

15   irrelevant to the litigation so it seems to me that for

16   Monsanto's purposes, as long as they get the releases for

17   employments that either relate to their use of the substance,

18   going back to the way you revised that one question, so it

19   could be herbicides or other chemicals and/or places that they

20   missed work because of their diagnosis or treatment, then they

21   get what they need and it shouldn't matter for the others.

22        MR. LASKER:  And, again, Your Honor, that does not

23   give us what we need.  It does not give us what we need to be

24   able to evaluate any claims for future earning streams.  It

25   does not give us what we need to identify other potential
```

1    sources of exposures that the plaintiffs very well may not be

2    aware of based upon those employment records.  The only way we

3    can identify that and what is standard in this type of

4    litigation --

5         THE COURT:  How are you -- like, if the plaintiff is

6    not aware of something they were exposed to --

7         MR. LASKER:  Right.

8         THE COURT:  -- how will the plaintiffs' employment

9    records reflect what they were exposed to?

10        MR. LASKER:  Because the employer will understand what

11   the job entails and will have -- and it may be medical records

12   within those personnel files that identify information that the

13   plaintiff may or may not be aware of, and that --

14        THE COURT:  There's going to be something in their

15   personnel file that says, you know, "So and so was exposed to

16   tons of diesel fumes yesterday and he might get NHL"?

17        MR. LASKER:  So and so comes in complaining of eye

18   irritation who has provided this, this, this, and this, and

19   then we'll find out why that was.  Somebody comes in with, you

20   know, short of breath -- I'm not -- you know, there's a variety

21   of circumstances that come up.  Plaintiffs are not the experts

22   on their medical conditions a lot of times and so, you know,

23   again that is one of the purposes for these.

24        The other is for the economists in valuing future earning

25   streams or past earning -- future earning streams to understand

1   what their job history was.

2        Again, we're not in this reinventing the wheel.  This is

3   sort of the standard part of these, and I'm not sure why it's

4   become a bone of contention here.  Again, this wasn't even a

5   negotiated provision here.  We just added these as we do in

6   MDLs and have in lots of MDLs.

7        **MS. GREENWALD:**  It's not a bone of contention.  We're

8   just saying that it should only go to employers that are

9   relevant.

10       So it is fairly preposterous for a plaintiff not to know

11  if they were exposed to something in the workplace.  They work

12  there.  They know if they work at a car mechanic shop or if

13  they're carrying -- if they're applying some type of chemical

14  or they're making a product that requires that they use some

15  type of chemical like TCE or something, they're going to know

16  that; and so it seems that they would get the employment

17  records that are relevant.

18       And to the extent that Monsanto wants these for down the

19  road for trial plaintiffs for their expert who's going to be

20  putting on expert testimony for lost wages and future earnings,

21  they get that then if that's the case; but for all 800 or 900

22  people, it doesn't make any sense.

23       **THE COURT:**  Okay.  I understand the arguments.

24       What about C?

25       **MR. LASKER:**  C, I think relates --

```
 1              MS. GREENWALD:  Yes.

 2              MR. LASKER:  -- to the questions previously about

 3    whether there are claims.  If there are claims, this just --

 4              MS. GREENWALD:  If they have a claim, they'll fill it

 5    out.

 6              THE COURT:  Okay.

 7         And D?

 8              MS. GREENWALD:  That's fine.

 9              THE COURT:  And E is fine I assume?

10              MS. GREENWALD:  I'm sorry?

11              MR. LASKER:  That's just the death certificate, yes.

12              MS. GREENWALD:  Wait, wait.  So I see there's one that

13    doesn't have a letter.  This isn't my case so I don't know, but

14    there's also insurance records and for some reason I thought

15    that was D.  So insurance records are here but there's no

16    exhibit label.  Your Honor, it's on page 16.

17              THE COURT:  C is workers' comp --

18              MS. GREENWALD:  Right.

19              THE COURT:  -- Social Security disability, and

20    insurance claims releases.

21              MS. GREENWALD:  Oh, you put them all together, okay.

22    I didn't -- okay.

23              THE COURT:  And then D is tax records and Social

24    Security income releases.

25              MS. GREENWALD:  So tax -- tax -- even in our cases we
```

```
 1   only have to fill out tax authorizations for people who are
 2   alleging lost income.  If they're not alleging lost income,
 3   they don't fill out tax authorizations.  That's in the JCCP.
 4   It's in Missouri.
 5            MR. LASKER:  That's fine.
 6            MS. GREENWALD:  That's it.
 7            THE COURT:  Okay.
 8        All right.  So I will play around with this -- implement
 9   what we discussed, play around with it, make some final
10   decisions on some of the issues you argued about, I'll put it
11   out, and then I'll ask for you to file any objections.  You
12   don't need to repeat any objections or arguments that you've
13   already made in this hearing.
14            MS. GREENWALD:  Okay.
15            THE COURT:  Just if there's anything kind of glaring
16   or -- in terms of either the wording or some argument that you
17   forgot to make today that you want to, you know, reference,
18   that's fine.
19            MS. GREENWALD:  Okay.  Can we just raise one other
20   thing while we're here?  And, again, not knowing what it's
21   going to ultimately look like, this is perhaps premature.
22        But we had -- from your short form, which has now gotten
23   longer, we had agreed with Monsanto that 90 days for the first
24   half and 90 days for the second half was okay.  As this gets
25   longer and with the number of plaintiffs, that may be a bit
```

```
1    ambitious and we might ask for 120 and 120, an extra 30 days,

2    because of the breadth of the information.  But I don't know

3    what it's going to look like so I just want to put that out

4    there that we can raise that maybe when you --

5             THE COURT:  Okay.  Do me a favor.  So I want to --

6    let's talk about timing --

7             MS. GREENWALD:  Uh-huh.

8             THE COURT:  -- and I also want to talk about what the

9    consequences are of not filling one of these out and the

10   process for -- you know, are these served, are they filed --

11   are the questionnaires served, are they filed.  I assume

12   they're served.

13            MS. GREENWALD:  And not filed.

14            THE COURT:  And then what's the process by which --

15   but let's hold off on that discussion for a second.  I want to

16   turn to bellwethers first.

17            MS. GREENWALD:  I'm going to sit down then.

18            THE COURT:  Because our discussion about bellwethers

19   might inform -- you know, bellwethers *Lexecon* might inform the

20   process that we adopt for getting these questionnaires filled

21   out.

22            MS. GREENWALD:  Okay.  Thank you.  Ms. Wagstaffe is

23   going to cover bellwethers.

24            THE COURT:  Okay.  So the first question I posed, I

25   mean, you-all said nobody's willing to waive *Lexecon*.
```

1          **MR. LASKER:**  Correct, Your Honor.

2          **THE COURT:**  We only have, as far as I can tell thus

3    far, four cases that could be tried in this district.

4          **MR. LASKER:**  Well, that, Your Honor, we don't think is

5    correct.  So let's --

6          **THE COURT:**  Because there may be some people who

7    used -- well, sorry to interrupt.  Go ahead.

8          **MR. LASKER:**  So I think we've identified the four

9    cases that Your Honor is aware of that have been filed and were

10   filed prior to -- maybe prior to the MDL being formed.

11         We have gone through the complaints that are in the MDL

12   and the complaints provide -- generally they only provide

13   information about current residence, which is not a direct

14   answer to the question; but by our count, there were at least

15   88 plaintiffs who reside in California.

16         **THE COURT:**  Okay.

17         **MR. LASKER:**  Of those, there were 12 that had

18   identified themselves as residing somewhere in the

19   Northern District of California.

20         There are, I think --

21         **THE COURT:**  Sorry.  There are 88 California

22   plaintiffs?

23         **MR. LASKER:**  Right.  And as you're writing this down,

24   that may be off by a little bit but that was the count.

25         **THE COURT:**  Sure.  And then you said there are how

many who identified themselves as residing in Northern

California?

          **MR. LASKER:**  12.

          **THE COURT:**  Okay.

          **MR. LASKER:**  And then there were 29 of that group that

just said California so we don't know where within California

they resided.

          **THE COURT:**  Okay.

          **MR. LASKER:**  And then, obviously, as we go through the

PFS process, generally the determining factor or one of the

determining factors is going to be where they were exposed, and

we may -- we just don't know that information right now.  So

there may be additional ones and it's possible some of these

could flip out.

          **THE COURT:**  Okay.  So help me understand the *Lexecon*

issues here.  Okay?

   So obviously anything that was filed here can be tried

here; right?

          **MR. LASKER:**  Well, it would depend on venue I think.

It's anything that's properly venued here can be tried here.

          **THE COURT:**  Well, anything that was filed here, you

haven't objected on venue grounds; right?

          **MR. LASKER:**  Right, because we don't have the

information yet.  But if, for example, one of the cases that

we're currently thinking of is a Northern District of

```
 1   California case, we get discovery and they were exposed in
 2   Texas and then moved to San Francisco afterwards, then we would
 3   object on venue grounds.
 4           THE COURT:  Okay.
 5           MR. LASKER:  But at the current time, we don't know
 6   that.
 7           THE COURT:  Okay.  So anything that was properly filed
 8   in the Northern District --
 9           MR. LASKER:  Correct.
10           THE COURT:  -- can be tried here.
11           MR. LASKER:  Right.
12           THE COURT:  But if a case was properly filed somewhere
13   else and could have been also properly filed here -- right? --
14   somebody was exposed, you know, in both Northern California and
15   Southern California and they filed their lawsuit in
16   Southern California but they could have filed their lawsuit in
17   Northern California, does that mean that can be tried here or
18   is that still subject to an objection -- to a *Lexecon*
19   objection?  I was assuming that that would still be subject to
20   a *Lexecon* objection, but maybe I'm wrong about that.
21           MR. LASKER:  Right.  And I'm hesitating because I'm
22   not positive, as I stand here, the answer.  I do believe if --
23   and, again, there are lots of other cases that were filed in
24   California that went here, and I don't know and I don't have
25   the count of how many cases may have also -- and maybe you
```

1    already know -- that were filed in this court.  Maybe it was

2    just those four.

3            THE COURT:  I think it was just those four.

4            MR. LASKER:  Yeah.  I don't have those statistics with

5    me so I'd have to go back.  But I believe that Your Honor would

6    be able to try cases that are properly venued here even if

7    those cases were transferred in, but I would want to confirm

8    that with folks who are --

9            THE COURT:  What's your view of that?

10           MS. WAGSTAFF:  Well, if we're talking about just

11   California and --

12           THE COURT:  I'm talking about any case -- I don't

13   understand why it matters whether it's California or Nevada.  I

14   would think the question would be could the case -- the first

15   question is:  Was the case properly brought in the

16   Northern District of California?

17           MS. WAGSTAFF:  Right.

18           THE COURT:  If so, obviously it can be tried here.  If

19   it was not originally brought in the Northern District of

20   California, whether it was brought in San Diego or Las Vegas,

21   if it could have been brought in the Northern District of

22   California, then the question is:  Could it be tried here?

23       And I don't understand -- look, why would it matter

24   whether it was originally brought in Southern California or in

25   Nevada?  Why would that make a difference on this issue?

1          **MS. WAGSTAFF:**  I'm not sure that it would if you're

2     saying that it could properly have been filed into the

3     Northern District of California.  I'm not sure how many of

4     those cases exist.  It seems a very specific fact pattern.

5          I was considering more cases that were properly venued in

6     the Southern District of California or Eastern District, if

7     you -- if the *Lexecon* --

8          **THE COURT:**  But I'm asking why are you focusing on

9     that, on cases that were brought in other districts in

10    California as opposed to cases that were brought in any other

11    district but -- let me back up.

12         I don't think -- if a case was properly brought in

13    Southern California --

14         **MS. WAGSTAFF:**  Uh-huh.

15         **THE COURT:**  -- and there was no waiver -- there was no

16    venue to bring it in the Northern District of California, the

17    fact that it was brought in California I don't think matters.

18    I think you still have a *Lexecon* objection if the case was

19    brought -- it doesn't matter that it was brought in the same

20    state, I think.  I don't know, but I think.

21         **MS. WAGSTAFF:**  So we would -- I think we put in here

22    too that we would like to brief this issue on just being in

23    California because we think it's a jurisdictional --

24         **THE COURT:**  But what is it based on?  Like, what

25    language in *Lexecon* or what is this theory based on that --

1          **MS. WAGSTAFF:**  It matters?

2          **THE COURT:**  -- merely bringing the lawsuit in

3     California as opposed to Nevada could preclude a *Lexecon*

4     objection.

5          **MR. BURTON:**  Good afternoon, Your Honor.  Mark Burton.

6     I'm co-liaison counsel.

7        The whole basis of *Lexecon* is the transfer statute.  So

8     whether or not the case comes from Nevada or

9     Southern California, the case has been transferred under let's

10    just call it the MDL transfer statute.

11         **THE COURT:**  Right.

12         **MR. BURTON:**  And that transfer statute says that the

13    MDL court can handle the case for pretrial purposes only.

14         **THE COURT:**  Right.

15         **MR. BURTON:**  That's what prevents the MDL court from

16    trying any case that came from another district because --

17         **THE COURT:**  Right.  So what you're saying is it

18    doesn't matter whether --

19         **MR. BURTON:**  Exactly.

20         **THE COURT:**  -- it's transferred from some other

21    district in California or some other state?

22         **MR. BURTON:**  Correct.

23         **THE COURT:**  Is that consistent with your

24    understanding?

25         **MR. LASKER:**  Yes, Your Honor.

1          **THE COURT:**  Okay.

2          **MR. LASKER:**  Then a separate issue is it doesn't -- if

3     it's transferred from Nevada or California or Texas and the

4     exposure took place in California in the Northern District and

5     you have proper venue, then you have proper venue and I believe

6     that you'd have -- that the case can be tried here because you

7     have venue here.  You'd have to decide that issue to determine

8     venue, but my understanding is -- and that's why --

9          **THE COURT:**  So, in other words, there would be no

10    *Lexecon* objection to trying the case in the Northern District

11    if it was filed in Texas but it could have been filed in the

12    Northern District?

13         **MR. LASKER:**  Yeah.  If the proper venue is in the

14    Northern District, I think then you would -- you'd have --

15         **THE COURT:**  There could be more than one proper venue;

16    right?

17         **MR. LASKER:**  Right.  Well, I think that the issue,

18    then, would be there would have to be a venue determination.

19         So there are cases where -- so if you have a choice of

20    venue -- for example, and we had one of these early on, where

21    plaintiff had exposure in various places and had diagnoses in

22    various places -- there still -- there, then, is a choice of

23    venue analysis that goes on.

24         I don't think it's correct, but I would have to go back to

25    this.  I don't know that you could say you could venue it --

```
 1    you could try it in four different districts.  I don't believe

 2    that's --

 3            THE COURT:  You're talking about some special

 4    MDL-specific rule you're talking about?

 5            MR. LASKER:  No.  I want to hesitate here because I

 6    just think I'd have to look at that more closely.

 7            THE COURT:  Because there are lots of civil cases that

 8    could be filed in more than one district.

 9            MR. LASKER:  Yes.

10            THE COURT:  Venue is proper in more than one district

11    and, therefore, the trial -- not taking it out of the MDL

12    context; right?

13            MR. LASKER:  Right.

14            THE COURT:  And, therefore, it could be tried in more

15    than one district.  And I assume that there is some subset of

16    these cases in this MDL that could have been brought in more

17    than -- where venue is proper in more than one district.

18            MR. LASKER:  I would agree with that.

19            THE COURT:  And so there is probably some subset -- it

20    may be a small subset, it may be a medium-sized subset, I don't

21    know -- but there's probably some subset of plaintiffs who

22    filed in a different district, whether it's Central District of

23    California or the District of Nevada or whatever, where they

24    could have filed here because there was some exposure here.  So

25    that, I think, is the question, is:  Can those cases be tried
```

1  here or do the parties have an objection, have a *Lexecon*

2  objection?

3      I thought that the answer was that there is an objection,

4  that there is an objection but the solution to it, which may,

5  as a practical matter, cause the objection to be waived, is

6  that the MDL court can remand it to the court where it was

7  filed and then the court where it's filed can transfer it back

8  to the MDL court for a trial.

9      **MR. LASKER:**  Right.  And that's the same analysis that

10  I would go through, and I don't know if you have to go through

11  those steps.

12      So when we reviewed the complaints, we were looking for

13  cases that would be properly venued here based upon the facts

14  of the case.  And, again, we don't have that information from

15  the complaints.  All we have are the residence.

16      What we might be able to do, and this is not a perfect

17  solution, but we could prioritize those cases so that we get

18  the PFSs in those perhaps more quickly so that we then know the

19  pool of potential bell -- you know, potential bellwether

20  plaintiffs that are before Your Honor, and that may be a way we

21  can then move forward and be able to select bellwethers because

22  I think it's very unlikely that we're just going to have four.

23      And we won't capture all of the plaintiffs because there's

24  some that, as you said, reside in Nevada and there's just no

25  way we're going to know until the PFSs are filed, but then

1    maybe at that point we add them into the pool.  But certainly

2    if we start with the folks who live in California, they're more

3    likely or at least that, you know, seems like that's a

4    possibility and we can prioritize those PFSs and then we can

5    add those to the pool for bellwether selections.

6             **THE COURT:**  You said there were 88 cases filed in

7    California?

8             **MR. LASKER:**  No.

9             **THE COURT:**  88 people who indicated that they reside

10   in California?

11            **MR. LASKER:**  Yes, and maybe they were all filed in

12   California.  I just don't know but that allege that they were.

13        And we actually have some -- some of those individuals I

14   think are in -- we have two, I think, complaints that have over

15   100 plaintiffs and were removed because of that, and so some of

16   those people reside in California.  I have no idea where those

17   cases -- complaints were filed.  I just don't remember.  But,

18   in any event, we've counted up the folks who allege residence

19   in the state.

20            **THE COURT:**  I mean, I think that we should work -- we

21   should figure out a way to get the -- it sounds like there will

22   be a relatively small number of cases that are properly venued

23   here and can be tried without objection.  And if neither side

24   is willing to waive their *Lexecon* objections, then I think we

25   should focus on those cases and work on getting them to trial

1    quickly.

2              **MR. LASKER:**  No, that makes sense, Your Honor.  And

3    with respect to we can identify -- and we've already talked

4    with plaintiffs' counsel about the list of plaintiffs we have

5    that we've identified as being -- as living in California, and

6    they can put those people in the front of the line for their

7    PFSs, and then we can have that ability to move forward, and

8    that makes sense, Your Honor.

9              **MS. WAGSTAFF:**  So might it be worth adding to the PFS

10   a question on whether or not they have been exposed to Roundup

11   in the Northern District?

12             **THE COURT:**  That should be in there.  I mean, we were

13   thinking about that as we were putting this together.

14             **MS. WAGSTAFF:**  Or received medical treatment?

15             **THE COURT:**  "Location of Exposure, City and State."

16             **MS. WAGSTAFF:**  Okay.

17             **MR. LASKER:**  Yeah, that's why we did that, yeah.

18             **THE COURT:**  It's in the chart.

19             **MS. WAGSTAFF:**  Okay.  So our numbers prior to coming

20   into this hearing were different than Monsanto's because some

21   of the plaintiffs' complaints have multiple plaintiffs on it,

22   and so we didn't pull every complaint.  We just did the numbers

23   by complaints.

24        But perhaps we could start with you giving us a list of

25   the 88 --

1          **MR. LASKER:**  Yeah.  That makes sense.

2          **MS. WAGSTAFF:**  -- and then we maybe could propose a

3   plan or go from there.

4          **MR. LASKER:**  Yeah.  I think we can --

5          **THE COURT:**  Well, I would say let's come up with a

6   tentative plan now.

7          **MS. WAGSTAFF:**  Okay.

8          **MR. LASKER:**  We know it will be a number of 88.  It's

9   going to be somewhere around there.

10         **THE COURT:**  Sending you people off to negotiate is

11  only going --

12         **MR. LASKER:**  Slow things down.

13         **THE COURT:**  So why don't we say that those 88 -- or, I

14  mean, we don't have to specify that it's 88, but anybody who

15  identifies themselves in the complaint as residing in

16  California has to submit this fact sheet within 30 days.

17         **MR. LASKER:**  That makes sense, Your Honor.

18         **MS. WAGSTAFF:**  Your Honor, I would ask that we have

19  more time than 30 days to do that, especially because some of

20  these people aren't on the leadership.  We're going to have to

21  track them down and sort of help them with that; and then if we

22  have to order medical records or do whatever, 30 days is very

23  difficult to complete it in.  I mean, we're asking for 120 on

24  the other ones.  I would ask for 90 days.

25         **THE COURT:**  What do you know about the four plaintiffs

```
 1  who originally filed their cases here in the Northern District?

 2           MS. WAGSTAFF:  Well, one of them is mine.

 3           THE COURT:  Okay.

 4           MS. WAGSTAFF:  Hardeman is mine, so I know a lot about

 5  them.  Two of them are Mike Miller's and the fourth one is his.

 6           THE COURT:  Okay.

 7           MS. WAGSTAFF:  So the four of us are prepared to do

 8  discovery on those cases.

 9           THE COURT:  Okay.  And those four people were exposed

10  to glyphosate in the Northern District of California?

11           MS. WAGSTAFF:  Mr. Hardeman was?

12           MR. MILLER:  I believe all -- yes, Your Honor, for our

13  two, I believe, yes.

14           MR. TSADIK:  Yes, Your Honor.

15           THE COURT:  Okay.  Why don't we set trial dates for

16  those plaintiffs right now?

17           MS. WAGSTAFF:  Okay.  We would ask that we have the

18  opportunity for a multiplaintiff trial or at least reserve the

19  right to brief that later.

20           THE COURT:  You can brief it later.  I'm very

21  skeptical of that, but you can brief it later.

22       But why don't we set a trial schedule for those four

23  plaintiffs who filed their lawsuits here and were apparently

24  exposed here, and we can make those four plaintiffs fill --

25  submit their fact sheets very quickly and we'll set a trial
```

1   date for, like, the springtime.

2           **MR. LASKER:**  So that goes to a separate issue, which

3   we also have in our case management statement, which is any

4   additional discovery that needs to be taken.

5           **THE COURT:**  Okay.

6           **MR. LASKER:**  And then maybe we need to move to that as

7   well to be able to get a sense of what the schedule would be

8   for when we would move forward with trials of the plaintiffs.

9       I think it would be useful, first, to talk about discovery

10  and what sort of discovery -- Phase II discovery.  And we had a

11  proposal in our -- in the case management statement for

12  plaintiffs to provide us with discovery requests they had for

13  anything else in 30 days, and that would provide us with the

14  understanding of what additional discovery they're going to

15  want.  And that would at least give us --

16          **THE COURT:**  Yeah.  So what I'm saying is:  Why don't

17  we set a pretrial and trial schedule for those four plaintiffs?

18  And we can set all the deadlines now.

19          **MR. LASKER:**  Let me get my notebook.

20          **MS. WAGSTAFF:**  I just got my calendar.

21      So I probably need your guys' calendars too.

22          **MR. LASKER:**  And, Your Honor, I do know obviously

23  we're going to want to proceed with cases in this court

24  expeditiously regardless of our other calendars.  We do have

25  other calendars also, though, that puts some constraints on us.

1           **THE COURT:**  Yeah, I read about that, but it sounds

2    like we could do trial in the spring based on what you said

3    about the other cases.

4           **MR. LASKER:**  No.  We have trials on schedule.  We have

5    two trials in -- we may have --

6           **THE COURT:**  Your trials that were scheduled this fall

7    got kicked; right?

8           **MR. LASKER:**  Right.

9           **THE COURT:**  So you don't have anything for the rest of

10   the year; right?

11          **MR. LASKER:**  Right.  Right now we have a trial in

12   February.  Plaintiffs have asked for a, and we will be

13   briefing, for a preferential trial schedule in a state court

14   case in California, which would also be in February.

15       I believe we have cases in Missouri County in April and

16   June or July, and then maybe -- I'm doing this on memory, so

17   September.  We have three cases in a row in Missouri in

18   St. Louis County.

19          **MS. WAGSTAFF:**  You have me with April, June, and

20   September.

21          **MR. LASKER:**  April, June, and September.  I can't

22   remember if there's another one in between those.

23          **THE COURT:**  So --

24          **MR. LASKER:**  Then I think -- then I think the

25   calendar -- I mean, we have dates beyond that, but at that

1    point those dates are --

2         THE COURT:  So what I would propose is that perhaps we

3    have another status conference very soon, like maybe in a week

4    or something like that, and we set a trial schedule, and I'll

5    allow you to meet and confer on what works for you.  I'll allow

6    Kristen to communicate with you about what works for us.

7         But we'll set a trial date in the spring for -- and what I

8    would propose we do is we set a trial date for all four of

9    these California -- of these Northern District of California

10   cases, and we will decide which one goes first among the four

11   at a later time.  But for now, let's set all four of those for

12   trial, and we can hear argument from you about whether they

13   should all go together but, again, I'm sort of skeptical of

14   that.  But I would propose we set a discovery schedule, a

15   pretrial schedule, and a trial date, and the same trial date

16   for all four of those plaintiffs, and let's just get going.

17   Let's do it.

18        MR. LASKER:  Okay, Your Honor.  Well, obviously

19   there's only one of me.  They can confer right here with their

20   colleagues.  I do want to talk to folks because, as I said, we

21   have a very packed trial schedule, but I understand Your Honor

22   wants to go forward and I recognize that.

23        THE COURT:  And I have sympathy -- I do have sympathy

24   for that, but what I find is that, you know, whenever I try to

25   accommodate people and their trial schedules in state court,

1    the state court trial ends up getting continued and I'm sitting

2    here saying "Why didn't we just go ahead and schedule this

3    trial for this date?"  Because we would have gone --

4              **MR. LASKER:**  Right.

5              **THE COURT:**  -- and the state court trial is likely not

6    to go, it seems like.  It often seems to be the case.

7         So I don't like to -- you know, if we have a case that can

8    be tried in the spring and you tell me that, "No, we should

9    wait until the fall or the winter, the following winter,

10   because in the spring we have three state court trials," I

11   don't think it's a good idea to accommodate that because then

12   those three state court trials don't happen and we've gone a

13   year and a half and there's been no trial.

14        So what I want you-all to do is to meet and confer on a

15   trial schedule for those four cases.  I want a trial date in

16   the springtime.  Kristen will communicate with you about

17   possible dates for us.  Springtime, late winter, February

18   maybe.  I don't know.  Kristen looks like she might be cringing

19   at the moment.

20             **MR. LASKER:**  That's two of us, Your Honor.

21             **THE COURT:**  But, in any event, there are four cases

22   who were filed here who we feel very confident there's no

23   objection -- there will be no objection to trying them here,

24   and so let's go.

25             **MR. LASKER:**  And the only thing I would add, and we'll

1    obviously confer and we'll get back to you next week, and I
2    recognize and obviously based upon history, it happened in this
3    litigation as well, that cases in state court get bumped.  The
4    problem we have, though, is we don't know that either and we
5    have to use lots of resources preparing for trials.  So there
6    is other time commitments.
7         And, for example, one of the issues we have is in
8    providing discovery from Monsanto, we have discovery requests
9    and requirements coming in from the other cases.  One of the
10   things we want to talk with Your Honor about is -- and
11   obviously you don't have any authority or jurisdiction over how
12   discovery proceeds in other cases outside of your courtroom,
13   but we have an issue of coordination where discovery demands in
14   one jurisdiction can create problems for scheduling in other
15   jurisdictions and create conflicts or discordant rulings and
16   discordant discovery obligations in different cases.
17        So something we'd also want to discuss and want to discuss
18   with Your Honor was trying -- and you already have to a certain
19   extent in some of your earlier orders dealt with this issue of
20   trying to promote coordination among the courts.  And I think
21   that may also be something that can help provide efficiencies
22   that would expedite the schedule and allow us to move forward
23   more quickly where, otherwise, we're having conflicting things,
24   and it would really create significant complications for us.
25        So, for example, we're going to need to get discovery and

```
 1   if they have discovery they want from Monsanto and that's

 2   subject to another court's rulings, that becomes -- that

 3   becomes an issue here as well.

 4        But we can talk about that amongst ourselves as part of

 5   our trying to think about a schedule.

 6            THE COURT:  Do you know who the judges are who are

 7   going to be trying the cases in these other State Courts?

 8            MR. LASKER:  We do.  I don't have -- we actually

 9   have -- in the city, in St. Louis city, it will be

10   Judge Mullen.  If it's going to be a JCCP case, it -- obviously

11   I assume it will be Judge Petro.  There are cases in the county

12   and there are currently three different judges who we believe

13   are assigned to those cases.  I don't have those names off the

14   top of my head or on a piece of paper in front of me.

15        So we have, I guess, five judges right now who have

16   potential trials, and then moving beyond that there may be some

17   others that are in the mix but those are the ones that come to

18   mind right now.

19            THE COURT:  Okay.  Now, for the -- so should we get

20   together again, like, maybe on Wednesday of next week?

21            THE CLERK:  I'm not here.

22            THE COURT:  You're not here?

23            THE CLERK:  No.  Maybe Thursday afternoon?

24            MS. WAGSTAFF:  Wednesday is Yom Kippur.

25            THE COURT:  Oh, sorry.
```

```
 1        Does anything work for next week?
 2             MR. LASKER:  That's a difficult week, although --
 3    that's going to be a difficult week for us.
 4             MS. WAGSTAFF:  Yeah.  How about the first week of --
 5             THE COURT:  What about Monday the 24th?
 6             MR. LASKER:  Could we do the --
 7             MS. WAGSTAFF:  Could we do the first week of October?
 8             THE COURT:  No, no.  I want to get this going.
 9             MR. LASKER:  I was going to ask for the 26th.  I don't
10    know if that's possible.
11             THE CLERK:  We're in jury selection.
12             MR. LASKER:  Oh.
13             MS. WAGSTAFF:  How about next Tuesday?
14             MR. LASKER:  The 25th?
15             MS. WAGSTAFF:  The 18th.
16             MR. LASKER:  No.  The 25th would work for me.
17             THE COURT:  When would we do the 25th?  We have a
18    pretty busy CMC and criminal calendar that day, don't we?
19             THE CLERK:  The 18th is atrocious, but the 25th,
20    depending upon how long this is.
21             MS. WAGSTAFF:  How about the 27th?
22             THE COURT:  Let's do the 25th.  We can do it at,
23    like -- it looks like we could do it --
24             THE CLERK:  Shall we just say 2:00?
25             THE COURT:  I was going to suggest --
```

1          MS. WAGSTAFF:  So Robin and I can't do the 25th.

2          THE COURT:  Oh.  What's wrong with the 24th?

3          MS. WAGSTAFF:  Well --

4          MR. LASKER:  I can make that work, Your Honor, if I

5    need to.

6          MS. WAGSTAFF:  I can't make that work, but I'm

7    guessing one of you guys can.

8          MR. MILLER:  If I can't personally be here, I'll have

9    an attorney here but I think I can be here.

10         MS. WAGSTAFF:  I've got a commitment on the 23rd to

11   the 25th.

12         THE COURT:  What about --

13         MS. WAGSTAFF:  I could do it by telephone.

14         THE COURT:  Yeah, I was going to propose what if we

15   did it on the 24th --

16         MS. WAGSTAFF:  Yeah, it would be helpful if we

17   could -- are you okay with doing it by phone?

18         MR. LASKER:  I would have to find out whether or not

19   we'd want to come or not, but obviously there's difficulties in

20   scheduling here.

21         THE COURT:  Let's do the 24th.  We can do it

22   telephonic.  I think we can do it telephonically, but

23   regardless we'll do it the 24th.

24      So what I want before the 24th, what I want done before

25   the 24th is I want to have received any objections to the

1    plaintiffs' fact sheet before the 24th.  I want the parties to

2    have proposed a trial and pretrial schedule for the four

3    plaintiffs before the 24th.

4         **MR. LASKER:**  And, Your Honor, just to be clear, for

5    our purposes, would that be plaintiff one, plaintiff two,

6    plaintiff three, plaintiff four, as opposed to determining

7    which plaintiff is on which date?

8         **THE COURT:**  We'll set a trial date as of now.  What I

9    was thinking, and I'm happy to hear other suggestions, but what

10   I was thinking is we will set a trial date and we will decide

11   at a later time which of those plaintiffs goes to trial on that

12   date.

13        **MR. LASKER:**  Okay.

14        **MS. WAGSTAFF:**  So all four will be subject to the same

15   CMO?

16        **THE COURT:**  Yes.

17        And then what I would propose for the questionnaire is

18   that we have the four plaintiffs fill it out really fast, we

19   have the 88 -- or I guess 84 -- the other 84 California

20   residents be the next wave, and then we have everybody after

21   that be the next wave.

22        So what I would propose is that the four Northern -- the

23   four ND Cal plaintiffs have 21 days, the remaining 84

24   California plaintiffs have 60 days, and the remaining

25   plaintiffs have 120 days to fill out the fact sheets from when

```
 1    they're served.

 2            MS. WAGSTAFF:  And if we need an additional time on

 3    the 21 days, we can just work that out with Monsanto?  We don't

 4    have to come back to the Court?  Because 21 days is -- we've

 5    been doing a lot of these.  We've done hundreds of them, and --

 6            THE COURT:  We're talking about just for four

 7    plaintiffs.

 8            MS. WAGSTAFF:  Right, but --

 9            THE COURT:  And presumably there's more intensive

10    assistance that those four plaintiffs can be provided from

11    you-all.

12            MS. WAGSTAFF:  Sure, but gathering information, such

13    as the damage -- you know, the damages and the amounts and all

14    of that stuff that we went through earlier today sometimes

15    takes longer than the 21 days.  Sometimes the clients won't

16    even call you back for four or five days so, you know, you lose

17    a week here or there.  So --

18            THE COURT:  Okay.

19            MS. WAGSTAFF:  -- we'll definitely try to --

20            THE COURT:  We'll say 28 days.

21            MS. WAGSTAFF:  We'll definitely try to meet 28 days,

22    but just -- I'm just forewarning that --

23            THE COURT:  Okay.  No, I want -- if you need an

24    extension, I want you to request it from me --

25            MS. WAGSTAFF:  Okay.
```

1          **THE COURT:**  -- because I want to know that this is

2    moving along.

3          What are going to be the consequences for not filling out

4    the fact sheet?  How does that work?  I saw -- I was reading

5    one of Jesse Furman's orders about that and reading a couple

6    other orders.  Some of them seemed a little bit complicated.

7          I mean, why not if a fact sheet is not submitted by a

8    plaintiff by the deadline, Monsanto can move to dismiss for

9    failure to prosecute?

10         **MS. GREENWALD:**  So I guess a couple of thoughts on

11   that.

12         So as we sit here now -- we've just said that, like, 800

13   or so plaintiffs need to have their plaintiff fact sheet done

14   in 120 days.  As I sit here now, I have no idea whether some of

15   those people are in the hospital having chemotherapy.  We may

16   not be able to do that for some plaintiffs so I feel --

17         **THE COURT:**  But they all have lawyers.

18         **MS. GREENWALD:**  Right.

19         **THE COURT:**  Right.

20         **MS. GREENWALD:**  But some of that is information that

21   only they can give us and it is.  And, I mean, understand, we

22   have a lot of this information but we won't have it all, and so

23   I think that there needs to be some flexibility that some

24   people are in harm's way right now and they just can't do it.

25   It's not that they don't want to.  It's not that they're trying

1    to violate the Court's order.

2        So what we've done in the past -- I mean, we've done this

3    with Monsanto quite -- in a very sort of cooperative way -- is

4    there are some plaintiffs who did not make the deadline, for

5    example, in our state cases and we worked out a 60-day

6    extension or a 45-day extension for those individual people.

7    And it's on us to let Monsanto know and the Court, if you'd

8    like to know, that these individual plaintiffs can't meet these

9    deadlines for these reasons.

10       And I think that's fair and -- but we need to have some

11   opportunity for people who really can't do it.  You know, I

12   mean, I have a plaintiff right now who's going through an

13   experimental treatment.  He's either going to make it or he's

14   not, and I don't want to bother him in these next 30 days.  I

15   wouldn't want to.  I don't think it's fair to him.

16       And so I think that we have to have some flexibility, but

17   I agree for the majority that should be okay.  And then we have

18   this -- I think what Monsanto proposed is 45 days to cure --

19           THE COURT:  Okay.

20           MS. GREENWALD:  -- so that there's some understanding

21   that, you know, some people just kind of mess up, don't get it

22   done, they don't really understand.

23       And then at the end of the 45 days, that would be subject

24   to dismissal or some type of motion by Monsanto.

25           THE COURT:  Okay.  So can you-all propose -- can

1   you-all meet and confer and propose language along those lines?

2        **MS. GREENWALD:**  Yes.

3        **THE COURT:**  So I want that before the 24th also --

4        **MS. GREENWALD:**  Sure.

5        **THE COURT:**  -- language sort of governing the

6   procedures for submitting these fact sheets and the procedures

7   for dealing with plaintiffs who fail to submit their fact

8   sheets or fail to properly complete them, or whatever, if you

9   could just propose some language.

10       In other words, I'll put out an order that says "Here's

11  the fact sheet and here are all the procedures governing the

12  fact sheet," put together language, proposed language, for all

13  the procedures governing the fact sheet that I can incorporate

14  into the order.

15       **MS. GREENWALD:**  Okay.  The other thing we probably

16  need to have, Your Honor, is for cases that are filed going

17  forward, we should probably have some system that they have to

18  file them within 90 days or something.

19       **THE COURT:**  Right.

20       **MS. GREENWALD:**  So just to make sure.  It's just a

21  placeholder that we should probably have there because cases

22  are being filed all the time.

23       **THE COURT:**  Right.

24       **MS. GREENWALD:**  And we don't want them to think that

25  they only have 40 days.  It's just a chilling effect.

1          THE COURT:  Yeah.  90 days I assume from when it gets

2     transferred over here.

3          MS. GREENWALD:  Correct.  Correct.

4          THE COURT:  And they -- yes, and the order should make

5     clear that -- so once the case gets transferred over here, it's

6     on them to read this order and they have 90 days to fill out

7     the fact sheet.

8          MS. GREENWALD:  Right.

9          THE COURT:  Yeah.  That sounds good.

10       Is there anything else that we should discuss right now?

11         MR. LASKER:  We're going to be back here in 10 days, I

12    don't --

13         MS. GREENWALD:  Oh, right.

14         MR. LASKER:  -- believe so.

15         THE COURT:  So we --

16         MR. LASKER:  A lot of stuff will be in the proposed

17    case management order that we'll be discussing as well.

18         THE COURT:  Yeah.  So why don't you file all of that

19    stuff by Thursday.  That is a week from today; right?  Why

20    don't you file all of that stuff.  So objections to my proposed

21    fact sheet, which I will file tomorrow or Monday at the latest,

22    a proposed trial and pretrial schedule from you for the four

23    Northern District of California plaintiffs, and proposed order

24    regarding the fact sheet.  Was that it?

25         MS. GREENWALD:  Yeah.

1    One other thing that we had raised in our case management

2    statement that would particularly relate I think most

3    importantly to the four that are going to be on a fast track,

4    is we need a defendant fact sheet as well.  Now, we don't have

5    one prepared yet, but we think it's going to be important to

6    get certain information from Monsanto in a fast fashion; right?

7    So --

8         **THE COURT:**  Yeah.  I read your reference to that, and

9    I was scratching my head a little bit about what you would want

10   or what you would need in a defendant fact sheet in a case like

11   this, but I'm more than happy to entertain it.

12       If you want to submit a proposed defendant fact sheet or

13   competing -- you know, I'll have you -- I'll ask you to meet

14   and confer about that and submit something on a defendant's

15   fact sheet by Thursday as well.

16       **MS. GREENWALD:**  Fine.

17       **THE COURT:**  And then in the proposed order that you

18   submit governing the fact sheets, if you can include the

19   deadlines that I just specified, which is 28 days for the four

20   Northern District of California plaintiffs, 60 days for the

21   other 84 California plaintiffs --

22       **MR. LASKER:**  Whatever the number is.

23       **THE COURT:**  -- or whoever they turn out to be, however

24   many they turn out to be.

25       **MR. LASKER:**  And anybody who resides in California per

```
 1   their complaint.
 2        THE COURT:  Right.  And then 120 days for the
 3   remaining plaintiffs.
 4      Okay.  Anything else to discuss right now?
 5        MR. MILLER:  Your Honor, very briefly.
 6        THE COURT:  For the case management conference, I
 7   think, you know -- I think we can go ahead and make it
 8   telephonic and let's have it be at 10:00 a.m.  Okay?
 9        MS. GREENWALD:  Great.
10        MR. MILLER:  Thank you, Your Honor.
11      Just very briefly, I appreciate the Court's speed with
12   which you are handling this.
13      I'm hoping that we can get some direction from the Court
14   on remand for cases that clearly cannot be tried here.  People
15   are sick.  People have a very serious disease.
16        THE COURT:  Yeah.  I mean, so we're going to work them
17   up -- we're going to work them up until they're ready for trial
18   and then we'll remand them.  So if there's a subset of
19   plaintiffs that need to be prioritized because of their
20   condition, absolutely let's prioritize those and get those
21   worked up first, including any, you know, specific summary
22   judgment motions, plaintiff-specific summary judgment motions
23   that Monsanto may have regarding those.
24      Absolutely, let's put those cases on a fast track, the
25   ones that you identify as people whose conditions are -- you
```

1    know, are particularly bad.

2            **MR. MILLER:**  Very well, Your Honor.  Thank you.

3            **MR. LASKER:**  Thank you, Your Honor.

4        And, Your Honor, just on that, and this is something that

5    we'll work out going forward, part of this process for us is to

6    have representative cases being worked up and that's part of

7    the plaintiff fact sheet process as well.  So if we are going

8    to be working up cases for trial that will be remanded, we'd

9    obviously like to have the ability to speak to that as well as

10   to which cases could be prioritized.

11           **THE COURT:**  Understood.  But since we only have four

12   cases that we know can be tried here --

13           **MR. LASKER:**  No, I understand that.

14           **THE COURT:**  -- I don't think we should make process

15   the enemy of progress.  We should just go forward on those four

16   cases.

17           **MR. LASKER:**  No, I wasn't speaking about the four

18   cases.

19           **THE COURT:**  Oh, okay.

20           **MR. LASKER:**  I was speaking about if there are other

21   cases.  Mr. Miller was raising the issue of plaintiffs

22   identifying cases that are going to be remanded that will be

23   worked up more quickly; and Monsanto, we would also want to

24   have the opportunity so that we have a more representative set

25   of cases, and that's part of the PFS process --

1              THE COURT:  Okay.

2              MR. LASKER:  -- where we might be able to do that as

3    well and identify cases we would like to have worked up.

4              THE COURT:  Okay.

5              MR. MILLER:  Thank you.

6              THE COURT:  Okay.  We'll talk to you next Monday.

7                   (Proceedings adjourned at 4:23 p.m.)

8                              ---oOo---

9

10

11                        __CERTIFICATE OF REPORTER__

12         I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:   Wednesday, September 19, 2018

16

17

18

19    _____

20         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

21

22

23

24

25