**WEITZ & LUXENBERG, P.C.**
Robin L. Greenwald
700 Broadway
New York, NY 10003
Tel: (212) 558-5802
Fax: (646) 293-4921
Email: rgreenwald@weitzlux.com

**THE MILLER FIRM LLC**
Michael Miller
108 Railroad Avenue
Orange, Virginia 22960
Tel: (540) 672-4224
Fax: (540) 672-3055
Email: mmiller@millerfirmllc.com

**ANDRUS WAGSTAFF, PC**
Aimee H. Wagstaff (SBN 278480)
7171 W. Alaska Drive
Lakewood, CO 80226
Tel: (303) 376-6360
Fax: (303) 376-6361
Email: aimee.wagstaff@andruswagstaff.com

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: ALL ACTIONS | |

**PLAINTIFFS' RESPONSE TO PRETRIAL ORDER NO. 49**

1

Plaintiffs respectfully provide the following and attached responses to this Court's Pretrial Order No. 49.  The responses below respond to each of the five items in the order they appear in PTO 49. Objections to the Proposed Plaintiffs Fact Sheet

1.  **Objections to Proposed Plaintiff Fact Sheet (PFS).**

Below are objections to the Proposed Plaintiff Fact Sheet that plaintiffs did not directly address at the September 13, 2018, status conference:

A. Section II, D:  There is no need for driver's license information in this case; defendant uses this information to hire investigators to identify information about plaintiffs that have no relevance to the lawsuit and is intended to harass and/or embarrass the plaintiffs.  In any instance, this is not needed to identify potential bellwether plaintiffs.

B. Section IV, A: The Personal Medical History section continues to be too broad and seeks information that is irrelevant to the claims in this case.  For example, as currently written, a female plaintiff would have to identify the name of her gynecologist who she sees for birth control; a plaintiff would have to identify any doctor he or she saw during a 25 year period for antibiotics for a cold or flu, and other such irrelevant doctor visits to the underlying issues in this case.  Thus, plaintiffs believe that the medical history should be limited to listing only those medical providers seen either for cancer or for one of the other conditions set forth in section IV, B, a list specifically provided by Monsanto; thus, it is not credible for Monsanto to suggest that medical history related to any other conditions are relevant to this case.  Further, this information is not necessary to select potential bellwether plaintiffs.

C. Section IV, B: Monsanto has informed Plaintiffs that it is adding conditions to the current list.  As a preliminary matter, Plaintiffs assert that they do not agree that the existing or the additional conditions they seek to be included are, in fact, risk factors.  As to the additional risk factors Monsanto seeks to add, one of them we are informed is "ulcers."  Plaintiffs contend that this condition is unclear and will cause confusion among the Plaintiffs.

D. Section V, I: Plaintiffs are aware of no genetic test for lymphomas; thus, this question seeks information that is not possible to produce and should be deleted.

E. Section VI, F:  This section is overly broad.  It asks for any and all claims, without any requirement that such a claim could, in any way, have relevance to this lawsuit.  It also has no time frame.  For example, if a plaintiff sued a prospective buyer of his or her home for pulling out of the contract before the sale became final, that would have no relevance to this lawsuit and would provide no relevant information to Monsanto for the claims asserted here. Similarly, if a plaintiff sued a driver for rear ending the plaintiff and damaging his vehicle ten years ago, that lawsuit would similarly be irrelevant to the claims in this case.  There are, of course, countless other examples of irrelevant claims that have no relevance to this lawsuit. Thus, this section

should be limited in scope to require plaintiffs to identify only those lawsuits and/or claims they have brought that relate to personal injury, exposure to substances, personal bankruptcy if after the plaintiff's diagnosis with NHL, unemployment claims if after the plaintiff's diagnosis with NHL, or any other lawsuit that would relate to the claims asserted in this case. Even so, this information is not necessary to identify potential bellwether plaintiffs and should be reserved for discovery *after* a plaintiff has been selected as bellwether.

F. VIII, A:  The second column should read "Average Hours Per Week", as many plaintiffs might not have regular weekly hours.

G. IX, A: Similar to No. 2 above, medical authorizations should be limited only to cancer treatment and treatments for the conditions set forth in section IV, B.

H. IX, B:  An employment authorization for the past 25 years is overbroad and should be required only for trial plaintiffs.  These records are highly unlikely to contain exposure evidence; they are burdensome and designed to obtain information about the plaintiffs to which Monsanto is not entitled.  In any event, at the very least it should be clear that the **only** records an employer should have to provide are records related to direct or indirect on-the-job exposure to substances.

I. IX, D:  It must be made clear that tax records and social security income authorizations are only necessary for plaintiffs who are asserting lost wages as an element of damages. Further, due to their invasiveness, they should be limited to trial plaintiffs who are asserting lost wages.

Finally, the final order regarding the PFSs and associated authorizations should require that Monsanto must provide to Plaintiff's counsel any records that Monsanto obtains pursuant to the authorizations within 30 days of receipt of such records by Monsanto.

**2.     Online completion of PFSs.**

The parties are exploring online completion of PFSs and are in agreement that Brown Greer would be the best situated to work with the parties to develop an online PFS.  Both parties have spoken to Brown Greer independently and have agreed to set up a joint call with Brown Greer within days after the September 24th conference with the Court.  The plaintiffs sent the Proposed PFS to Brown Greer, and Brown Greer informed the plaintiffs that they would need approximately two weeks to modify the PFS into an online format once it is in final form.

The plaintiffs also note that some of the plaintiffs do not have computer access, have difficulty using computers, or are not English speaking.  Thus, as to these plaintiffs it is likely that online completion will not be possible.  Any online PFS would need to be optional.

Plaintiffs believe that the deadlines set forth in PTO 49, Section 4, should not commence until the PFS is available for online completion, except for the three trial plaintiffs who will complete their PFSs in paper form.

3. **Proposed pretrial and trial schedule for the three[1] Northern District of California.**

The Court expressed its desire to commence MDL trials from the group of NDCA Plaintiffs identified at the September 13, 2018 status conference on February 25, 2019 and May 6, 2019.  In either instance, given that liability discovery has yet to commence in the MDL and given representations by Monsanto in other Courts, general liability discovery will not be complete by either date.  Even so, the NDCA Plaintiffs identified at the September 13, 2018 status conference are prepared to ready their particular case for trial to commence February 25, 2019 as requested by the Court.  Attached to this Statement as Exhibit A are proposed pre-trial deadlines for February 25 and May 6, 2019 trial dates. An important deadline is Monsanto's next document production that is currently being negotiated by Brent Wisner in the JCCP.  Plaintiffs will need time to review that production and identify deponents and additional discovery, if any.  The close of discovery deadline identified in the proposed schedule should only be interpreted to apply to the particular NDCA plaintiffs.  Plaintiffs will continue to pursue general liability discovery before, during and after these trial dates.

Given the Court's trial schedule as set forth in its Standing Order, Plaintiffs believe that each trial will take between five to six weeks.

4. **Completion of PFSs and associated issues regarding non-compliance and deficiencies.**

Plaintiffs believe there should be two separate procedures for addressing PFSs that are not timely completed and served.  Those positions are set forth below.

A. Plaintiffs who originally filed their cases in the NDCA (see PTO No. 49, para 4 (a)).

Regarding the three plaintiffs who originally filed their cases in the Northern District of California, if a plaintiff is not able to complete his PFS within 28 days, counsel for that plaintiff should be required to seek leave of court setting forth the reasons why the PFS cannot be completed and the extra time needed to complete the PFS.

B. Other plaintiffs subject to either the 60 days or 120 days deadline or whose cases are later filed and subject to the 90 day deadline (see PTO No. 49, paras 4 (b)-(d)).

The plaintiffs in the MDL have had liability discovery stayed since November 2016. Many plaintiffs have, of course, wondered over this time when their case might be set for trial. Without waiving any privileged communication among plaintiffs' counsel and their attorneys, counsel has informed their clients for nearly two years that there is not, and cannot be any, plaintiff specific discovery in the federal cases. And even now, when counsel contacts the plaintiffs in the MDL who have no nexus to the Northern District of California, counsel will once again have to explain that, while they now have to fill out a PFS within a certain time

---

[1] Pursuant to Mr. Miller's email to Ms. Melon on September 18, 2018, the lawsuit brought by plaintiff    Barton Penrod is likely to be dismissed in the next several weeks.

frame, there is still no schedule in place to set their cases for trial and that there likely will not be until their cases are remanded to their home jurisdiction.  Further, several of the Plaintiffs are very sick, some terminally sick. With this backdrop, it might be difficult for some plaintiffs to respond timely and gather all the information required within the proposed deadlines.  While, of course, plaintiffs' counsel will make best efforts to ensure that all plaintiffs file timely PFSs and explain the requirement that they complete the PFSs timely, it is almost certain that some plaintiffs will not complete the PFS within the allotted time frames.  Given these circumstances, it would be nothing short of punitive to dismiss plaintiffs from the case if they fail to meet the deadline, without any built in time to cure.  Instead of a harsh and unjust dismissal sanction, plaintiffs propose that any plaintiff who fails to meet the deadline be provided an automatic 30 day extension.  If that plaintiff still does not submit his or her PFS after the additional 30 days, the parties will provide the court with a list of plaintiffs who did not submit a PFS and, at that time, the court would issue an order to show cause why that plaintiff's case should not be dismissed for failure to complete their PFSs.  This will allow counsel sufficient time and just and fair procedures to ensure that no plaintiff is dismissed who wishes to have his or her case continue.  Monsanto will suffer no prejudice by this request.

Regarding PFS deficiencies, plaintiffs stress that only substantial deficiencies are contemplated. In St. Louis City cases, the deficiencies are often over minor, unimportant matters. What is more, Monsanto's alleged deficiencies are often wrong. With respect to the deficiency process, Plaintiffs and Monsanto are generally in agreement.  The plaintiff proposes that Monsanto provide what it believes are deficiencies in a completed PFS and that the plaintiff respond to those deficiencies according to the below time frames:

(1) For Plaintiffs who are required to complete their PFSs within 60 days, Monsanto would have 45 days from receipt of a plaintiff's PFS to identify what it believes to be deficiencies and the plaintiff would have 30 days to respond.
(2) For Plaintiffs who are required to complete their PFSs within 120 days, Monsanto would have 45 days from receipt of a plaintiff's PFS to identify what it believes to be deficiencies and the plaintiff would have 45 days to respond.
(3) If a plaintiff needs more time to respond to a deficiency, the parties will meet and confer on an alternative schedule, and if they cannot reach agreement they will seek the Court's assistance.

**5. Defendant Fact Sheet (DFS).**

Attached as Exhibit B is plaintiffs' proposed DFS.  There are numerous reasons why plaintiffs are entitled to a DFS and the information contained in the proposed DFS, many of which dovetail with the very issues set forth in the PFSs that this Court is requiring of the plaintiffs.  As set forth above, the 3 NDCA Plaintiffs will need to tailor its shortened liability discovery to just their cases set forth trial in February or May 2019.  For the other plaintiffs, the information provided in the DFS will help the parties tailor the general liability discovery overall for the MDL plaintiffs, which will assist with eventual remand:

A. Roundup Product Formulations.  Monsanto regularly makes adjustments to its formulations; over the years it has consistently made variations to a product's surfactant load and chemistry.  Not all products use POEA, or the same percentage of POEA, and not all products have the same surfactant manufacturer.  Plaintiffs need to know the type and source of the surfactant in the Roundup formulation they used because toxicity levels among the surfactants differ among the formulations.  For example, certain formulations have higher levels of 1,4 dioxane and ethylene oxide as impurities (both are carcinogenic).  Additionally, plaintiffs are entitled to determine which surfactant is used in order to determine what, if any, testing Monsanto conducted for the surfactant.

B. Roundup Sales Representative Material: Most plaintiffs will not have interacted directly with Monsanto to learn about the products' safety.  Plaintiffs who use Roundup at work is in the same situation, although his or her employer might have interacted with a third-party regional distributor who provided safety information and material to the employer.  The distributor may also have conducted training sessions.  Plaintiffs are entitled to obtain discovery on the source of the distributor's information to determine what, if any, information Monsanto provided to employers and/or whether the distributor also developed product safety information.  For example, in the *Johnson v. Monsanto* case, Mr. Johnson received training from the regional distributor and Monsanto provided the training materials to the regional distributor.  If Plaintiffs purchased Roundup from a hardware store, those plaintiffs are entitled to learn the source and type of information provided in store displays and/or through store employees.

C. Plaintiffs generally will not remember advertisements in sufficient detail to precisely determine what advertisement they viewed and the date they viewed it.  Plaintiffs are therefore entitled to learn from Monsanto exactly which advertisements the Plaintiff would have been exposed to and when they would have been exposed.  This is particularly important with respect to Plaintiffs who may not have worn protective gear.  Monsanto has repeatedly over the years run print and/or television advertisements with actors spraying Roundup® while wearing shorts, short-sleeve shirts and no protective gear.  To the extent that Monsanto claims that such use is not in compliance with the label, these advertisements are directly relevant to Plaintiffs' case.

D. Adverse Event Reports.  If a plaintiff called the Missouri Poison Control Center or Monsanto directly to make any inquiries regarding his/her injuries, Plaintiffs certainly are entitled to any records of those calls.  Plaintiffs are also entitled to any records with respect to whether Monsanto complied with EPA regulations in reporting lawsuits brought against it to the EPA.

E. Healthcare Professionals: Monsanto maintains a network of paid consultants who are deployed to write op-eds supporting the safety of glyphosate.  It is also common in mass torts such as this case for both parties to contact oncologists across the country for expert consultation in the litigation far in advance of trial.  As there are a limited pool of oncologists who specialize in non-Hodgkin lymphoma, it is certainly plausible that a plaintiff's treating physicians might have been contacted, or even retained, by Monsanto

with respect to Roundup and NHL. Each Plaintiff is entitled to discover whether Monsanto has had prior contact with one of more of his or her diagnosing or treating physicians.

Dated: September 20, 2018                    Respectfully submitted,

/s/ Robin Greenwald
Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY 10003

/s/ Aimee Wagstaff
Aimee Wagstaff
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, P.C.
7171 West Alaska Drive
Lakewood, CO 80226

/s/ Mike Miller
Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960

*Co-Lead Counsel for Plaintiffs
in MDL No. 2741*

PLAINTIFFS' RESPONSE TO PRETRIAL ORDER NO. 49
16-MD-02741-VC