**THE MILLER FIRM LLC**
Michael Miller
108 Railroad Avenue
Orange, Virginia 22960
Tel: (540) 672-4224
Fax: (540) 672-3055
mmiller@millerfirmllc.com

**WEITZ & LUXENBERG, P.C.**
Robin L. Greenwald
700 Broadway
New York, NY 10003
Tel: (212) 558-5802
Fax: (646) 293-4921
Email: rgreenwald@weitzlux.com

**ANDRUS WAGSTAFF, PC**
Aimee H. Wagstaff (SBN 278480)
7171 W. Alaska Drive
Lakewood, CO 80226
Tel: (303) 376-6360
Fax: (303) 376-6361
aimee.wagstaff@andruswagstaff.com

*Co-Lead Counsel for Plaintiffs*

**HOLLINGSWORTH LLP**
Joe G. Hollingsworth (*pro hac vice*)
Eric G. Lasker (*pro hac vice*)
1350 I Street, N.W.
Washington, DC  20005
Tel:     202-898-5800
Fax:     202-682-1639
Email: jhollingsworth@hollingsworthllp.com
          elasker@hollingsworthllp.com

*Attorneys for Defendant*
*MONSANTO COMPANY*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 3:16-md-02741-VC |
| This document relates to: | |
| ALL ACTIONS | |

## JOINT CASE MANAGEMENT STATEMENT

**JOINT CASE MANAGEMENT STATEMENT**

Pursuant to the Court's Pretrial Order No. 53, ECF No. 1926, the parties submit this Joint Case Management Statement in anticipation of the October 29, 2018 Case Management Conference ("CMC").

## I.    IDENTIFYING GROUP 2 PLAINTIFFS WHO CAN GO TO TRIAL IN MAY

**Plaintiffs' Position:**

PTO No. 52 required Group 2 Plaintiffs to file a completed Venue Questionnaire. Attached as Exhibit A is a chart prepared by Plaintiffs' counsel that summarizes the responses as of October 22, 2018.  Plaintiffs will be prepared to discuss the responses and any additional Plaintiffs that might be triable in the Northern District of California at the October 29, 2018 status conference and disagree with Monsanto that none of the Group 2 Plaintiffs can be tried in this Court. Further, the "condition" that Monsanto suggests to the Plaintiffs and to this Court is nonsensical.  If a Plaintiff's case is properly tried in the Northern District of California based on his or her relevant contacts with the District, then it can be tried in this Court regardless of Monsanto's position regarding *Lexecon*.  Regarding the other Plaintiffs who consent to trial in the Northern District of California, even though they do not have relevant contacts in the District, Monsanto can decide whether to waive *Lexecon* as to those Plaintiffs, and those Plaintiffs who waive *Lexecon* can brief whether this Court has jurisdiction to try their cases if the Court so orders.

**Monsanto's Position:**

Monsanto does not believe that there are any Group 2 plaintiffs who can go to trial in May.  As agreed by both sides in the *Lexecon* briefing, the possible trial pool is limited to cases originally filed in N.D. Cal., absent consent by all parties.  Monsanto does not consent to trials in

any Group 2 cases filed outside N.D. Cal.[1]  The potential trial pool for May is therefore limited to any Group 1 cases that remain active after discovery, dispositive motions, and any February trial.

## 2. DEFENSE FACT SHEET

**Plaintiffs' Position**:

There are numerous reasons why Plaintiffs are entitled to a Defendant Fact Sheet (DFS) in the form attached as Exhibit B.  Indeed, many if not most of the information requested in the proposed DFS, dovetail with the very issues set forth in the PFS that this Court ordered every MDL Plaintiff to complete.  The information provided in the DFS will help the parties tailor the general liability discovery to the actual MDL Plaintiffs, which will help for eventual remand, for the following reasons:

1.      Roundup® Product Labels and Formulations

Monsanto regularly makes adjustments to its formulations; over the years it has consistently made variations to a product's surfactant load and chemistry.  Not all products use POEA, or the same percentage of POEA, and not all products have the same surfactant manufacturer.  Plaintiffs need to know the type and source of the surfactant in the Roundup® formulation they used because toxicity levels among the surfactants differ among the formulations.  For example, certain formulations have higher levels of 1,4 dioxane and ethylene oxide as impurities (both are carcinogenic).  Additionally, Plaintiffs are entitled to determine which surfactant is used in order to determine what, if any, testing Monsanto conducted for the surfactant.

2.      Roundup® Sales Representative and Distributor Materials

---

[1] If Monsanto were inclined to consent—which it is not, for the reasons set forth in the section on jury selection—it would be conditional on MDL plaintiffs' counsel securing 95% or more consent from the relevant plaintiffs, so that the majority of the Group 2 pool would actually be available for selection, rather than the very few for which plaintiffs have indicated consent.  If plaintiffs can control the content of the pool by selective waivers, Monsanto is essentially written out of the case selection process.

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

Most Plaintiffs will not have interacted directly with Monsanto to learn about the products' safety.  A Plaintiff who uses Roundup® at work is in the same situation, although his or her employer might have interacted with a third-party regional distributor who provided safety information and material to the employer.  The distributor may also have conducted training sessions.  Plaintiffs are entitled to obtain discovery on the source of the distributor's information to determine what, if any, information Monsanto provided to employers and/or whether the distributor also developed product safety information.  For example, in the *Johnson v. Monsanto* case, Mr. Johnson received training from the regional distributor and Monsanto provided the training materials to the regional distributor.  If Plaintiffs purchased Roundup® from a hardware store, those Plaintiffs are entitled to learn the source and type of information provided in store displays and/or through store employees.

3.      Advertising Materials

Plaintiffs generally will not remember advertisements in sufficient detail to precisely determine what advertisement they saw and relied on and the date they viewed it.  Plaintiffs are therefore entitled to learn from Monsanto which advertisements the Plaintiff would have been exposed to and when they would have been exposed.  This is particularly important with respect to Plaintiffs who may not have worn protective gear.  Monsanto has repeatedly over the years run print and/or television advertisements with actors spraying Roundup® while wearing shorts, short-sleeve shirts and no protective gear.  Particularly to the extent that Monsanto claims that such use is not in compliance with the label, these advertisements are directly relevant to Plaintiffs' case.

4.      Adverse Event Reports

If a Plaintiff called the Missouri Poison Control Center or Monsanto directly to make any inquiries regarding his/her injuries, Plaintiffs certainly are entitled to any records of those

calls.  Plaintiffs are also entitled to any records with respect to whether Monsanto complied with

EPA regulations in reporting lawsuits brought against it to the EPA.

5.     Healthcare Professionals

Monsanto maintains a network of paid consultants who are deployed to write op-eds

supporting the safety of glyphosate.  It is also common in mass torts such as this case for both

parties to contact oncologists across the country for expert consultation in the litigation far in

advance of trial.  As there are a limited pool of oncologists who specialize in non-Hodgkin

lymphoma (NHL), it is certainly plausible that a Plaintiff's treating physicians might have been

contacted, or even retained, by Monsanto with respect to Roundup® and NHL.  Each Plaintiff is

entitled to discover whether Monsanto has had prior contact with one of more of his or her

diagnosing or treating physicians.

Defendant argues that there should not be a Defendant Fact Sheet at all, but its arguments

fall flat.  First, Monsanto opposes individual Plaintiffs asking whether Monsanto has had

contacts with their treating physicians, information that is clearly relevant to each individual

Plaintiff.  Their counter-proposal is, simply put, absurd.  As a preliminary matter, there is no way

the Plaintiffs or their counsel would know if Monsanto had communications with Plaintiffs'

treating physicians.  Monsanto's proposal would effectively deprive Plaintiffs of this important,

relevant plaintiff-specific information.  And any burden claimed by Monsanto is suspect as most

Plaintiffs have one, or at most a limited number of, treating physicians, and Monsanto would

only need to run a search for those physicians' names.

Second, Monsanto opposes individual Plaintiffs asking about sales representative and

distributor information specific to his or her case.  Monsanto's argument misses the point.

Plaintiffs are entitled to learn the identify of sales representatives and distributors responsible for

their relevant region and product(s) so that the Plaintiffs will be ready to conduct relevant

discovery of the materials Monsanto provided to those sale representatives and distributors as

well as what those sales representatives and distributors, in turn, provided to the regional retailer

or wholesaler.  Moreover, it is not possible for the Plaintiffs to propound such discovery on Monsanto by Group 2 Plaintiffs.  Plaintiffs are represented by dozens of individual law firms.  It would be an unreasonable, and probably impossible burden, on the MDL counsel to obtain such information for all of the nearly 1,000 Plaintiffs in the MDL from over 100 law firms.  What is more, if all of the Plaintiffs in the MDL, despite the fact that they are not scheduled for trial and are not yet being remanded, must respond to Plaintiff Fact Sheets in advance of remand so that the cases will have undergone discovery and be closer to trial ready at the time of remand– a request made by Monsanto and ***not*** the Plaintiffs – then Monsanto also must provide basic information, such as relevant regional sale representative and distributor information, that is necessary for each Plaintiff to be ready to conduct further discovery when their cases are remanded.

Third, Monsanto opposes individual Plaintiffs asking information about product labels and formulations for the products they used.  For the same reasons stated above, Monsanto must be required to provide this basic information for each Plaintiff so that when his or her case is remanded the case will be ready for further case specific discovery and trial shortly thereafter.

Fourth, Monsanto opposes individual plaintiffs asking information about advertising materials used in the relevant market where the Plaintiff purchased and used Roundup® products.  In addition to Plaintiffs' arguments above, Plaintiffs further note that Monsanto's proposal for obtaining such information would place an absurd burden on Plaintiffs to ***produce*** discovery in order to obtain discovery from Monsanto.  Plaintiffs should not have to tell Monsanto which advertisements they saw or might have seen – some of it over 30 years or longer ago – in order to obtain critically important information about their cases.  Such a standard is unprecedented, and the Court should reject it out of hand.

Finally, Monsanto misunderstands Plaintiffs' coordination argument.  Contrary to Monsanto's claim, Plaintiffs' leadership has coordinated discovery in this case for over two years on all issues, including fact and expert discovery of Monsanto, and has fulfilled the role that this Court ordered them to assume.  Monsanto is also wrong that most of the cases filed in the MDL are cases filed by the firms in leadership or that leadership is in some other way involved in the

cases.  The fact remains that, other than plaintiffs represented by leadership, it would be virtually impossible for leadership to gather all the information for all of the MDL plaintiffs for the convenience of Monsanto.

**Monsanto's Position:**

Individual Defendant Fact Sheets (DFS) are not an efficient way to achieve coordinated pretrial proceedings in this MDL given the nature of the product and this litigation.  Instead, as detailed below, Monsanto suggests that it provide aggregate discovery to meet the needs of each group of plaintiffs as a whole, providing the same kind of information sought by plaintiffs in their proposed DFS but without the need for multiple overlapping and duplicative searches, many staggered dates of production, and other inefficiencies.  Plaintiffs' leadership claims that it would be difficult for them to coordinate discovery across all cases, but that argument fails on several levels.  First, between them, they are involved directly in many of the cases in this MDL. Further, as plaintiffs' leadership committee, this Court has tasked them – at their request – for doing just that.  *See* PTO 4, ECF No. 62, at 2 (noting plaintiffs' leadership has a "duty" to "coordinate and conduct discovery on behalf of the plaintiffs, consistent with the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California").  There is nothing unreasonable about asking plaintiffs' leadership to collect and provide basic information about the individuals they represent.

Overall proposal

Monsanto proposes that, rather than provide an individual DFS in each case, keyed to when a PFS is provided, Plaintiffs identify the relevant collective information needed by each group of plaintiffs and any particular needs for information due to the individual circumstances of the particular plaintiffs in that group.  Once the parameters are worked out, Monsanto will then make one disclosure of information for the entire group.  The non-exhaustive categories below illustrate how this approach would work, and why individualized DFS are inappropriate and inefficient.

Communications with plaintiffs/their healthcare providers

Plaintiffs are requesting information regarding any communications and/or relationships Monsanto had with the plaintiffs or their treating physicians.  (Proposed DFS at C(1)-(3)).  Monsanto proposes that it will conduct such searches only where the plaintiff alleges with reasonable specificity—based on information received—that there were such contacts or relationships.  This litigation is not one where contacts with physicians—at least prescribing physicians—is likely; for example, unlike in a pharmaceutical case, sales representatives do not visit with or call on physicians with samples of medication or engage physicians in human clinical trials for their products.  It is also unlikely that Monsanto has had contact with more than a few of the thousands of plaintiffs.

For Monsanto to comply with automatic, individual DFS requests in every case would require Monsanto to conduct time-consuming searches in multiple locations for the name of every plaintiff and treating physician primarily in an attempt to prove a negative, with the chances of a finding anything very low, but the chance of false positives that would have to be assessed (*i.e.* "Dr. Jones") very high.

Instead, Monsanto proposes that, by Group, plaintiffs collectively provide a list of plaintiffs and a list of treating physicians whom they believe to have had contact with Monsanto, as well as the specific means of alleged contact and a specific timeframe for each contact.  For each name, Monsanto will conduct a reasonable search for responsive documents within 60 days for the Group 2 plaintiffs (with time frames for later groups to be determined later).

Sales Representative and Distributor Information

Plaintiffs are requesting information regarding sales representatives and distributors "responsible for the sale or distribution of" of the glyphosate-containing herbicide(s) allegedly purchased, including the name and business address of any such representative or distributor as well as numerous types of related documents.  (Proposed DFS at B(1)-(3)).  Most of the plaintiffs are home users, who will generally have purchased their products from a retail establishment.  They are very unlikely to have come into contact with a Monsanto sales representative or distributor.  Even most users of agricultural or commercial products most likely would have had contact solely with an independent distributor, not with Monsanto sales personnel or distributors.

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

1   Accordingly, searching for sales representative information in each case would be inefficient and

2   wasteful.

3          Monsanto proposes that, by Group, plaintiffs will collectively provide specific locations

4   (store names and address) where they purchased the identified particular products and the

5   approximate date(s) of such purchase(s).  For Group 2, Monsanto will conduct a reasonable

6   search for the name of and business contact information for any relevant Monsanto sales

7   representative and provide available information within 60 days.

8   Product labels and information on formulations and surfactants

9          Plaintiffs' proposal regarding labels and formulations/surfactants (Proposed DFS at A(1)-

10  (2)) would have Monsanto on different response and production schedules for each plaintiff

11  based on when each plaintiff completes his or her PFS.  Monsanto proposes that, by Group,

12  plaintiffs collate the information they need: a list of the particular products[2] they allege are

13  involved in that Group, along with alleged dates of use.  Monsanto could then make one search

14  of all products at issue in that Group for the full date range at issue.  For example, for Group 2,

15  Monsanto will within 60 days of receiving plaintiffs' list provide the Master Labels for each

16  specific product at issue during the specified timeframe, and will conduct a search (a single

17  search for each Group, rather than one for each plaintiff) of relevant print labels.  Monsanto will

18  also provide the Confidential Statements of Formula ("CSF") for each EPA-registered product

19  during the specified timeframe (this contains the surfactant information requested by plaintiffs,

20  including percentage and source).

21  Advertising materials

22         Plaintiffs seek information regarding advertising/marketing materials for the various

23  Roundup formulations plaintiffs allegedly purchased and used including the specific

24  advertisements available for viewing in each plaintiff's area of residence during the timeframe of

25  purchase and usage.  (Proposed DFS at (A)(4).)  Monsanto does not  maintain a centralized

26  advertising/marketing file from which it could generate the types of materials and information

27  _____

[2] "Roundup" is not a product, but a group of products—plaintiffs will have to identify specific products

28  for Monsanto to be able to provide specific product information.

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

that plaintiffs are seeking.  Monsanto has, however, made voluminous document productions from custodians selected by plaintiffs in this MDL and state court lawsuits and additional productions are in progress.  There are many advertising and marketing materials available to plaintiffs through those keyword searchable productions.  In addition, Monsanto produced certain collections of advertising and marketing material that it was able to locate in its files.

Monsanto proposes that, by Group, plaintiffs collectively identify with reasonable specificity any specific advertising/marketing materials that they saw, the approximate timeframe, and the medium and location of the advertisement.  Monsanto will conduct a reasonable search for such advertising within 60 days for the Group 2 plaintiffs.  If plaintiffs cannot recall any advertising materials, that material is neither germane nor relevant to the issues in this litigation.

### 3. DISCOVERY ON MONSANTO

**Plaintiffs' Position:**

Group 1 Plaintiffs are scheduled for trial to commence February 25, 2019.  As such, case specific discovery is ongoing relating to the Group 1 Plaintiffs.  Given the short window between the ordering of the February 2019 trial and trial itself, Plaintiffs believe that a later discovery cut off date than is typical is warranted.  Plaintiffs propose January 28, 2019, which is 28 days prior to trial and the date on which motions *in limine* are due according the Court's Standing Order for Civil Trials ("Standing Order).

Monsanto's response to the Group 1 Plaintiffs' case specific discovery on Monsanto again returns to arguments why the Plaintiffs should not get case specific information in the form of a DFS or any other mechanism.  Certainly the Group 1 Plaintiffs must propound case discovery now if they are to be trial ready in less than four months.  To suggest otherwise is absurd.  There are only three Group 1 Plaintiffs and it should not be unduly burdensome for Monsanto to respond to their individual, case specific discovery.

Regarding the remainder of the MDL Plaintiffs, as stated above, it is not possible to coordinate Plaintiff-specific discovery by Group.  It would place an unreasonable burden on

Plaintiffs' counsel in the MDL, especially at a time when they are preparing for trial with only five months notice, Monsanto is still producing voluminous relevant documents, many of which are not yet produced and will need to be reviewed, an aggressive deposition schedule, expert disclosures and myriad other tasks to prepare for the February 2019 trial.  Monsanto's proposal would prejudice Plaintiffs while alleviating Monsanto of discovery obligations that are typically required in MDLs.

Monsanto is incorrect that coordinated discovery is not ongoing.  The facts below belie its assertion.  To date, Monsanto has produced approximately 1.2 million documents, largely in response to discovery that has been coordinated by the Plaintiffs' MDL Executive Committee. Document production has been custodian and term based. As the litigation evolved, however, it became apparent that there are "gaps" in the production. For example, the original search terms did not contain terms such as the "Agricultural Health Study", "epidemiology", or "Freedom to Operate" and other terms relevant to the issues in these cases.  To remedy these gaps, Plaintiffs in the JCCP (and now MDL) proposed a supplemental search, using 64 custodians (most of whose files are already collected) and 122 new search terms. According to Monsanto, this supplemental search would produce approximately 1 million new documents.  Monsanto indicated that this volume of production would not be possible prior to the first bellwether trial. At most, Monsanto indicated that it could produce 125,000 new documents before the first trial (and, of course, that does not include time necessary to review them).

Although Plaintiffs believe that all one million new documents should be produced, in an effort to get "some" relevant documents before trial, Plaintiffs worked to reduce the supplemental search without prejudice to seeking the remaining documents later. To that end, Plaintiffs proposed a search using only 30 custodians and 55 new subject-specific terms. This, according to Monsanto, would yield approximately 350,000 new documents. Monsanto has asked Plaintiff to reduce this search even further. Plaintiffs do not believe a further reduction is possible, although counsel is currently considering on it. Plaintiffs hope to resolve this issue without Court intervention; however, getting informal guidance from the Court would be helpful. Plaintiffs will bring copies of the search proposals should the Court wish to review them.

1    In addition, there are case-specific document requests that have been served. Monsanto

2    expressed concern over these document requests and the parties are meeting-and-conferring

3    about how to deal with them prior to trial.

4    **Monsanto's Position:**

5    Discovery on Monsanto should be coordinated through the MDL and should be

6    coordinated among the plaintiffs by the Plaintiffs' MDL Executive Committee.  That is not what

7    is currently happening.

8    For example, in *Hardeman* and *Stevick*, plaintiffs' counsel have served separate corporate

9    document production requests and other written discovery requests, many of which overlap (or

10   even copy) previous requests from other cases.[3]  *See* Exhibits E-H.  The documents produced in

11   those other cases should be readily available to the plaintiffs through their MDL leadership (and

12   it is MDL leadership that filed the requests in *Hardeman* and *Stevick*).  Monsanto should not be

13   required to respond to duplicative requests.

14   Monsanto proposes that any generic discovery not addressed by the DFS procedures

15   above be served upon it one time, not piecemeal and in duplicative fashion by multiple plaintiffs'

16   counsel.  As to case-specific discovery not covered by the DFS, if any, Monsanto proposes that

17   plaintiffs coordinate that by Group and serve a coordinated set of requests.

18   Discovery should not close so close to trial, and on the same day that motions *in limine*

19   are due, but instead on December 20, 2018.

20   **4.  JURY SELECTION PROCESS**

21   **Plaintiffs' Position:**

22   Plaintiffs will be prepared to discuss jury selection issues of interest to the Court at the

23   October 29, 2018 status conference.  Plaintiffs believe, however, that there is no reason for the

24

25   _____

26   [3] The discovery is largely not case-specific.  For example, the *Stevick* Request 1 seeks "the entire OEHHA correspondence/registration file for glyphosate-containing products manufactured and/or sold by Monsanto, including but not limited to proposed labelling, proposed changed [*sic*] or supplements to

27   labeling, and correspondence to or from OEHHA."  Exhibit G, attached.  Request 2 seeks the same information but with regard to California's DPR.  *Id*. This is generic information, and has been sought

28   and produced previously.

Court to deviate from its normal procedures for jury selection in civil cases as set forth in the Court's Standing Order.

Plaintiffs submit that special procedures for jury selection are not required to obtain a fair and impartial jury.  Jury selection in the *Johnson* trial actually proves this point.  In support of its proposal, Monsanto quotes *itself* for the proposition that the venire held a "different level" of bias and hostility toward Monsanto.  The trial court did not agree.  The court found that, for the majority of the venire, statements regarding Monsanto did not rise "to the level that required a private chambers discussion."  If there was any question that a juror held a significant bias towards Monsanto, those individual jurors were questioned outside the presence of the other jurors. Furthermore, the parties stipulated to excuse those jurors that referenced that the company "is evil" or "has killed people" prior to any questioning.

In *Johnson*, a fair and impartial jury was selected from a panel of approximately 100 prospective jurors after only 10 hours of *voir dire* over the course of 3 ½ days. Prior to the verdict, Monsanto agreed that the standard procedure for jury selection in *Johnson* resulted in an excellent, non-biased jury. As Monsanto remarked during closing argument:

> I agree with Mr. Wisner on this, you've been remarkably attentive and you've paid very close attention and we very much appreciate that.  *One other thing about you folks is we view you as a special group... You could put sympathy aside. You could put prejudice against Monsanto, its products, whatever, aside.* And you could decide the case fairly and on the facts, applying the law that Her Honor has told you and the facts as you see them in this courtroom and no place else. And we really appreciate your ability to do that and we know you'll continue to do that.

Exhibit C (emphasis added).

Monsanto cannot reasonably argue that the jurors in *Johnson* were inflamed by a contaminated jury pool. The jury, selected from a similar geographic area, was highly educated with 8 of the 12 members possessing post-graduate degrees, including a software engineer with a PhD in operations research and a cell biologist with a PhD in pharmacology. And all of the jurors

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

directly affirmed that any biases could be put aside in rending their verdict. As one of the jurors wrote on the jury questionnaire, regardless of bias, "it is scientific data that matters in this case. Real, un-doctored thorough scientific data. I can be a fair and impartial juror when faced with science, whether that science favors the Defendant or the Plaintiff."[4]

Monsanto proposes gross deviations from normal jury selection procedures, many of which Plaintiffs oppose.  As a preliminary matter, it is important to note that until Monsanto's recent buyer's remorse, it took early and affirmative steps to have Roundup® cases tried before this Court.  Indeed, the Northern District of California was Monsanto's venue of choice.  At the time of the JPML hearing, Monsanto argued that the Roundup® cases should be centralized in the Northern District of California.  Once centralized in this Court, Monsanto stated it would not waive *Lexecon*, which guaranteed that the first MDL Roundup® trial would be in the Northern District of California.  It cannot credibly say now that it suffers prejudice when Roundup® cases are tried before a jury in this District.

What is more, Monsanto has certainly changed its tune since the *Johnson* trial verdict. The jury selection in that trial worked well and resulted in an excellent, civic-minded jury.  The Court and all parties in the *Johnson* trial complimented the jury accordingly.  The Johnson court acknowledged: "I know that you all paid very close attention. You were taking copious notes, and you took your time in carefully considering all of the issues in arriving at your verdict. So I'm very impressed with all of you. You were an excellent group of jurors." Exhibit D.  And, as stated above, Monsanto's counsel similarly extolled the jury's virtues in his closing argument. *See* Exhibit C.

---

[4] There were jurors in the *Johnson* case that described potential biases towards *Plaintiff*.  One juror was an active user of Roundup®; another stated that Plaintiff was "possibly" require more evidence to prove his case because the EPA approved Roundup®; and yet another was entering the case believing that Roundup® was probably safe and that Plaintiff was starting off a little bit behind Monsanto.

But now, after the verdict, Monsanto decries the fairness of San Francisco prospective jurors and it proposes some measures, or as it terms it "precautions", that are not only unnecessary but highly improper.  The extraordinary "precautions" Monsanto proposes are unnecessary, unreasonable, and would waste judicial time and resources.  As to the need for a large venire, there is no need for such a pool of 500 prospective jurors; the Court can reasonably handle jurors with particular strong biases against either party on an individualized basis.

Specifically, regarding Monsanto's proposed questionnaire that includes questions of Monsanto and media coverage, such questions are overly broad and would result in a lopsided jury if such jurors were struck.  Prospective juror awareness of Monsanto, or even the *Johnson* verdict for that matter, standing alone, does not disqualify a juror.  For example, it would be highly unlikely that a juror would not know of the existence of Monsanto; what would be the possible relevance of such an inquiry?

Regarding Monsanto's proposed two-phase procedure for jury questioning, such a procedure is unnecessary, unorthodox and would unreasonably, and for no good reason, substantially lengthen the time to select a jury.  Just as jurors might respond that they do not trust Roundup® and would never use it use, other jurors might respond that they believe Roundup® is safe to use and do not believe it causes cancer. Such divergent views are commonplace in jury selection and do not result in a bifurcated selection process as Monsanto proposes.

Finally, Monsanto's fourth and final proposed "precaution" amounts to a gag order and is unfounded, premature, and *per se* improper.  Such an order would qualify as "prior restraint" and, thus, would need to be fully briefed.  See, e.g., Levine v. U.S. Dist. Court for Cent. Dist. of California, 764 F.2d 590, 598 (9th Cir. 1985).  Moreover, there is no reason for such a restriction.  There was considerable media during the Johnson trial--from both sides--and there is no evidence that media coverage influenced or was even seen by any juror.  The trial Judge routinely instructed the jury to stay away from media and, by all accounts, the jurors heeded that

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

1    instruction.  Finally, such an order would likely be futile. Regardless of whether the attorneys in

2    this case respond to media inquiries, there will be substantial media coverage of the trial. Each

3    side should be allowed to represent their client's interest in responding to questions and, absent

4    some compelling reason, basic First Amendment rights should not be displaced.

5         Monsanto's "gag order" argument is also belied by the fact that following the *Johnson*

6    verdict, Monsanto or its surrogates issued tweets and other social media about the lack of

7    veracity of Mr. Johnson's expert witnesses.  While Monsanto would like to make this Court

8    believe that the only post-*Johnson* verdict public campaign has been against Monsanto, the facts

9

10   suggest otherwise.[5]

11   **Monsanto's Position:**

12        Based on the experience of the *Johnson* trial in state court in San Francisco, Monsanto

13   respectfully submits that the Court will need to implement special procedures for jury selection

14   to mitigate potential bias and ensure that the parties can receive a fair trial from an impartial jury.

15        Jury selection in the *Johnson* case—which took six days, and involved a venire drawn

16   from a similar geographic area—revealed systemic bias and prejudice against Monsanto.  To

17   provide just one example, counsel conducting jury selection for Monsanto informed the court,

18   upon reading the juror questionnaires, that there was a "different level" of bias and hostility

19   toward Monsanto in the venire compared to other cases she had tried, with jurors remarking that

20   the company "is evil" and "has killed people."  Individual juror questioning revealed similar

21   sentiments from a significant number of potential jurors.  And as Monsanto has explained in its

22   post-trial briefing, the size of the verdict and the lack of evidence supporting it confirms that the

23   jury lost its way.

24

25

26        [5] Monsanto references an advertisement in the San Francisco Chronicle and boldly states that it
     was "paid for by a private company that partners with plaintiffs' firms in generating leads for tort
27   litigation."  MDL leadership is not aware of the advertisement to which Monsanto refers, despite the fact
     that it requested a copy of it when it received Monsanto's proposed CMC statement, and it has had no
28   such involvement in the alleged advertisement.

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

The jury pool likely has grown even more hostile since then due to the public campaign for denial of Monsanto's motions for JNOV and new trial.  Among other things, that campaign has included op-eds by celebrities, multiple juror letters which were both sent to the court and promoted in the media, and a full-page advertisement in the San Francisco Chronicle titled "Dear Judge Suzanne Ramos Bolanos, What Is A Life Worth?"—which was paid for by a private company that partners with plaintiffs' firms in generating leads for tort litigation.  These media materials often contain inaccurate descriptions of evidence from the *Johnson* trial, or describe evidence that was properly excluded from that trial.  These developments further inflame public sentiment against Monsanto and further contaminate the potential jury pool.

Accordingly, Monsanto submits that the Court will need to take additional precautions during jury selection to mitigate this potential bias.  Those precautions could include:

1)   A large venire of potential jurors.  Monsanto predicts that at least 500 jurors may be necessary to account for both hardships and bias.  As the Court knows, having too few jurors could result in a mistrial and further delay in the litigation.

2)  A jury questionnaire that includes, among other things, questions about jurors' knowledge of Monsanto, exposure to media coverage, and potential prejudice.  The specific questions could be decided closer to trial, based on a meet-and-confer process between the parties prior to the Court's involvement.

3)  A two-phase procedure for questioning jurors.  In the first phase, the Court and counsel would be permitted to question each juror individually, outside the presence of others, regarding potential bias or prejudice about Monsanto.  Jurors who display bias or prejudice would be excused from further service.  In the second phase, the Court and counsel could question the remaining jurors as a group.

4)  An order that counsel—including associated counsel, whether officially of record in the particular case or not—be instructed not to comment to the press during jury selection and the trial.

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

Jury selection in *Johnson* took six days, and these additional precautions may result in an even longer process here.  But Monsanto submits that such precautions are necessary to ensure that the parties receive a fair trial from an impartial jury.

Plaintiffs' opposition to these special procedures acknowledges that some of them were actually in place, in one form or another, during *Johnson*.  For example, the parties did work together on a jury questionnaire that helped the parties identify potentially biased jurors.  The court also permitted individual voir dire of jurors where there was some risk of bias.  And as Monsanto has explained, developments since trial underscore the need for *more*, rather than *fewer*, procedural protections to ensure that prospective jurors are not biased toward either party and that the venire in this and further cases is not contaminated by developments that have already occurred or that could occur absent Court intervention.

## 5.   OTHER ISSUES

### a.   Identifying the February Trial Case

<u>**Plaintiffs' Position**</u>:

### A.   Plainitff Gebeyehou's request to be relieved from the February 2019 Group 1 trial date

Counsel for Plaintiff Gebeyehou, Tesfaye Tsadik, Esq., has requested that MDL counsel ask that  he and his client be relieved from the February 2019 pretrial and  trial schedule.  The reasons for his request are as follows.  Mr. Tsadik is not a member of the MDL leadership, although he has attended most conferences on behalf of his client. He has not been part of the document review process or the expert report, deposition and Daubert hearing process, he has not partaken in depositions of Monsanto employees, and he represents this single Roundup® Plaintiff.  While the MDL leadership, of course, will assist Mr. Tsadik at trial, Mr. Tsadik and his client understandably want Mr. Tasadik to be active trial counsel.   Mr. Tasadik needs more time to review discovery materials and to work with specific causation experts.  As a result, Mr. Tasadik needs more time to prepare for trial than five months.  Finally,

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

Mr. Tasadik has a previously scheduled trial starting on February 21, 2019 in Santa Cruz County Superior Court (*Wofford v. Inner Light Church*).  Thus, scheduling Mr. Gebeyehou for trial in February 2019 would prejudice Plaintiff Gebeyehou. Furthermore, the Gebeyehou case need not be trial ready in February 2019 for the Court to ensure that a Group 1 case will be trial ready on February 25, 2019.

### B.  Selection of First Trial Plaintiff for Group One Trials

Plaintiffs understand the Court's prior order that all three Group 1 Plaintiffs – Mr. Hardeman, Ms. Stevick and Mr. Gebeyehou - be ready for trial on February 25, 2019, and if the Court does not grant the request of Plaintiff Gebeyehou for the later trial date all three cases will be trial ready on that date.  Even so, it is in the parties' best interest to determine the trial order now should all three cases remain active on February 25, 2019, which Plaintiffs believe is highly likely to be the case.  As such, the parties, their witnesses, and their counsel need to begin confirming the trial schedule and letting the applicable witnesses know to reserve time for trial in February.  Plaintiffs request that the Court select Mr. Hardeman as the first Plaintiff to be tried for the reasons set forth below.

Mr. Hardeman is represented by MDL Co-lead counsel Aimee Wagstaff and is the oldest Roundup® case filed in this Court.  As such, discovery in the *Hardeman* case is currently the most advanced of the Group 1 Plaintiffs.  Third, primary counsel for Ms. Stevick  (MDL CO-Lead counsel Mike Miller) and Mr. Gebeyehou  (Tesfaye Tsadik, Esq.) have other trials in February 2019, while Mr. Hardeman's counsel does not.  Again, while the other case or cases will be trial ready, it would be beneficial to Plaintiffs' counsel to know at this time that, barring any changes in the status of the cases, Mr. Hardeman's case will be tried in this Court in February 2019.  Finally, there is no good reason not to select the likely first trial at this time and that Mr. Hardeman's case be selected.  And while it should not matter to Monsanto which Group

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

One Plaintiff is tried first – and indeed Plaintiffs should be able to select the order of the cases as the party carrying the burden of proof.

Monsanto's response curiously suggests that it should be allowed to select the first case to be tried in February.  There is no basis for that suggestion, and it is in fact contrary to the procedures typically followed.  There are only three potential cases, and counsel for two of them have scheduling issues that would make a May trial date preferable.  Indeed, when Plaintiffs informed the Court that it could meet the February 2019 trial date, it was on the assumption that the Hardeman case would be tried first.

**Monsanto's Position:**

Monsanto is willing to agree to an expedited procedure for picking a case to be set for trial in February.  At this early juncture, however, Monsanto cannot consent to the selection of a particular case.  Plaintiffs' arguments for selecting the *Hardeman* case turn entirely on the schedules of each Plaintiff's trial counsel.  But critical information about the Plaintiffs themselves remains undisclosed.  For example, none of the Plaintiffs have even been made available for depositions, and Monsanto has not yet received a complete set of medical records for any plaintiff.  Without such information, it is impossible to evaluate which of the cases is appropriate for trial.

### b.  Treater Depositions in *Hardeman*

**Plaintiffs' Position:**

Plaintiffs oppose Monsanto's request to delay the depositions of Mr. Hardeman's treating physicians.  At all times relevant, Mr. Hardeman has been treated by Kaiser. Even though his HIPPA release was not due until October 22, 2018 (today), in the spirit of cooperation and to expedite the case, Mr. Hardeman provided all relevant medical records in his possession and his Kaiser HIPPA release to Monsanto on October 1, 2018.   As additional records become available, Plaintiff's counsel has sent them immediately to Monsanto.  The parties are on tight deadlines and delaying these depositions (which have been noticed by both sides) would

prejudice Mr. Hardeman.  Further, Plaintiff first learned of this delay request this morning, when

Monsanto sent to MDL leadership its draft CMC Statement. Importantly, these depositions are

scheduled for *the day after* the October 29, 2018 status conference – which would mean, as a

practical matter, that Monsanto is requesting we cancel the depositions with less than 24-hour

notice to the doctors who have cleared their schedules for these depositions. To be clear,

scheduling the doctor depositions was not an easy task and re-scheduling them could end up in

three separate dates, meaning three separate trips for counsel that Mr. Hardeman would

eventually have to fund.  Such prejudice to Mr. Hardeman and his counsel is unwarranted.

**Monsanto's Position:**

Monsanto respectfully submits that the currently-scheduled depositions of three treating

physicians, currently set for October 30 and 31 (*Hardeman*) should be postponed for at least ten

days.  Plaintiffs disclosed both Plaintiffs' PFS, which contains important information about their

cases, today (Monday, October 22, 2018).  Defendants do not yet have a complete set of either

Plaintiff's medical records.  To take *Hardeman* as an example, Plaintiffs initially disclosed a

very limited set of medical records.  Through discovery, Monsanto obtained thousands of pages

of additional records from Kaiser Permanente last Thursday, October 18.  It appears likely that

there are still more medical records that have not yet been produced. A full set of medical

records, as well as an opportunity to depose the plaintiff himself prior to deposing his treating

physicians, is necessary in order for Monsanto to have a full and fair opportunity to depose the

treating physicians on critical issues of causation, particularly in the case Plaintiffs are requesting

to have set for trial. The only alternative would be for Monsanto to leave the depositions open

until after Monsanto has received all the relevant information described above—an approach that

needlessly wastes time not only for the parties, but third party physician witnesses.  The better

course is to delay the depositions until the factual record is complete.  In addition, Monsanto

believes that it should be able to depose the plaintiff before the treating physicians.

### c.  Naming Additional General Causation Expert Witnesses

**Plaintiffs' Position:**

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

Monsanto raised for the first time today that it believes it should be allowed to identify new general causation experts.  Plaintiffs strongly disagree and respectfully request that the Court reject its proposal out of hand.  As a preliminary matter, Monsanto does not represent that any of its general causation experts are unavailable for the February 2019 trial.  What is more, even if one of them is not available, Monsanto identified two epidemiologists and toxicologists at the general causation phase.   But, at its root, Monsanto's argument is nonsensical.

Over Plaintiffs' strong objection, Monsanto requested that the Roundup® cases be phased, with general causation discovery going first, followed by *Daubert* and summary judgement motions.  Monsanto got its way.  Now, after focusing on general causation for two years and a trial date only four months away, Monsanto asks this Court to allow it to name other general causation experts.  What was the point of the past two years of work, including seven days of this Court's and the parties' time at *Daubert* hearing, if that process is going to start anew?  It would be impossible for the Group 1 Plaintiffs to be trial ready in February 2019 if Monsanto is permitted to name new general causation experts, to submit new general causation reports, and to conduct new *Daubert* challenges as to these experts.   Monsanto's request should be denied.

**Monsanto's Position:**

Monsanto's counsel has learned through the meet and confer process that plaintiffs' leadership believes neither party should be permitted to name additional general causation experts, including in the three Group 1 cases.  The Court's assistance is needed in resolving this dispute and Monsanto therefore requests that it be added to the agenda for discussion at the October 29, 2018 case management conference.  Monsanto proposes that the parties be allowed to disclose additional general causation witnesses as well as specific causation experts in connection with the upcoming February 2019 trial and further trials.

Monsanto designated seven general causation experts on July 31, 2017.  Since then, the experts have continued to analyze relevant literature and further develop their opinions.  Many of these experts have been disclosed more recently on either the same topics or a broader array of

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

topics than reflected in the 2017 MDL disclosures.  And members of plaintiffs' leadership in the MDL either have taken or had the opportunity to take additional depositions of these experts.

The Court never ordered—and Monsanto never contemplated—that those would be the only general causation experts permitted to testify at trial in any case that is or becomes a part of this MDL, which currently involves hundreds of plaintiffs.  And any such requirement would be impractical and illogical—the experts are accomplished professionals with a variety of academic, scientific, and personal responsibilities outside of their early roles in this litigation, and requiring them to be available through the May 2019 setting and beyond is more than could reasonably could be expected from any expert.  Ample precedent from other MDL proceedings recognizes this same point, and courts and parties accordingly have developed procedures allowing the designation of new experts.  *See, e.g.,* Stipulation and Order Regarding Expert Disclosures, *In re: Phenylpropanolamine (PPA) Prods. Liab. Litig.*, MDL No. 1407 (W.D. Wash. Sept. 9, 2002) (court approved stipulation that party could designate new general causation experts so long as later-designated experts relied "upon the same or substantially the same evidence, opinions, and/or theories relied upon by the expert disclosures" and opinions had not previously been determined to be scientifically unreliable or otherwise inadmissible, with parties retaining right to challenge admissibility of new testimony); Pretrial Order No. 21, *In re: Bextra & Celebrex Marketing Sales Practices & Prods. Liab. Litig.*, MDL No. 1966 (N.D. Cal. March 16, 2007) (defining "general causation experts" as "experts who will opine as to whether ingestion of Celebrex can increase the risk of serious cardiovascular events and, if so, under what circumstances," and that order "shall not preclude any parties from designating experts on issues not deemed inadmissible or otherwise decided as a matter of law by the Court in connection with this Order.").

Nor would permitting additional general causation witnesses render the past "two years of work" pointless, as Plaintiffs suggest.  The purpose of the first phase of this litigation was to determine where Plaintiffs had adduced sufficient, reliable science to get to a jury on the issue of general causation.  For present purposes, that issue has been resolved and Monsanto does not intend to renew its previously filed and decided motions.  The relevant question is simply

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

whether the parties should be able to bring forward additional experts on similar topics prior to the close of expert discovery—a topic the Court has not yet addressed.  Allowing additional experts makes sense given the scope of this litigation and its expected duration, and under Monsanto's proposal, both parties would be able to file additional *Daubert* motions targeted at the new experts if any are necessary.

To accommodate both the schedule set for a February 2019 trial and the need for flexibility going forward, Monsanto requests an order setting forth the following:

- On the dates specified in Pretrial Order 53 ("PTO 53"), each party shall designate its experts and provide the required report for the Group 1 cases.  In addition to new experts addressing any aspect of the specific plaintiff's claim, this deadline would include the naming of new general causation experts (if any) and/or the disclosure of additional areas of testimony to be offered by previously-disclosed experts.

- To the extent that any new experts are named, their depositions would take place within the period set forth in PTO 53.  If an existing general causation expert intends to broaden the areas covered in his/her testimony, then a deposition would be permitted on the new areas only during the same time frame.  Any challenges to any expert would be made in accordance with the existing *Daubert* schedule.

- After the February trial, either party should be permitted to substitute general causation experts in the remaining Group 1 cases as needed.  To the extent that additional general causation experts are named or existing experts are designated with a broader scope of testimony, depositions and targeted motions practice would be permitted on a schedule determined by the Court with input from the parties.

- In all future cases beyond Group 1, the parties should not be limited to the existing general causation experts.  This would apply whether trial is scheduled in this court or another upon remand.  Issuing this order now for all future trials involving MDL plaintiffs will limit disputes after remand.

### d.  Specific Causation Daubert Briefing and Summary Judgment Page Limits

**<u>Plaintiffs' Position</u>:**

Given the truncated schedule between scheduling the Group 1 trial for February 2019 and the commencement of that trial, Plaintiffs request that the Court set page limits on the specific causation *Daubert* and summary judgment briefing.  Pursuant to the pretrial order for the February 2019 trial, Plaintiffs have only seven days to oppose Monsanto's motion.  What is more, the motion should only be permitted to address specific causation expert witnesses.  Thus, it is appropriate to set limits on that briefing as follows:

Monsanto's specific causation *Daubert* and summary judgment brief: 35 pages

Plaintiffs' opposition and affirmative specific causation *Daubert* and summary judgment brief: 40 pages

Monsanto's opposition and reply brief: 10 pages

Plaintiffs' reply brief: 5 pages

**<u>Monsanto's Position</u>:**

Monsanto has no objection to the proposed page limits, but notes that any new general causation experts would require additional briefing.

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC

DATED: October 22, 2017                    Respectfully submitted,

                                           /s/ Michael Miller
                                           Michael Miller
                                           mmiller@millerfirmllc.com
                                           The Miller Firm LLC
                                           108 Railroad Ave
                                           Orange VA 22960
                                           Ph 540 672 4224
                                           F 540 672 3055

                                           /s/ Aimee Wagstaff
                                           Aimee Wagstaff
                                           aimee.wagstaff@andruswagstaff.com
                                           Andrus Wagstaff, P.C.
                                           7171 West Alaska Drive
                                           Lakewood CO 80226
                                           Ph 303-376-6360
                                           F 303-376-6361

                                           /s/ Robin Greenwald
                                           Robin Greenwald
                                           rgreenwald@weitzlux.com
                                           Weitz & Luxenberg
                                           700 Broadway
                                           New York NY 10003
                                           Ph 212-558-5500
                                           F 212-344-5461

                                           Co-Lead Counsel for Plaintiffs


DATED: October 22, 2017                    Respectfully submitted,

                                           /s/ Joe G. Hollingsworth
                                           Joe G. Hollingsworth (*pro hac vice*)
                                           (jhollingsworth@hollingsworthllp.com)
                                           Eric G. Lasker (*pro hac vice*)
                                           (elasker@hollingsworthllp.com)
                                           HOLLINGSWORTH LLP
                                           1350 I Street, N.W.
                                           Washington, DC  20005
                                           Telephone:  (202) 898-5800
                                           Facsimile:  (202) 682-1639

                                           Attorneys for Defendant
                                           MONSANTO COMPANY

JOINT CASE MANAGEMENT STATEMENT
3:16-md-02741-VC