Pages 1 - 105

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS          )
LIABILITY LITIGATION            )   Case No. 16-md-02741
_____)
                                    San Francisco, California
                                    Monday, October 29, 2018


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        WEITZ & LUXENBERG, P.C.
        700 Broadway
        New York, New York 10003
    BY: **ROBIN L. GREENWALD, ESQ.**

        ANDRUS ANDERSON LLP
        7171 West Alaska Drive
        Lakewood, Colorado 80226
    BY: **AIMEE WAGSTAFF, ESQ.**

        BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
        12100 Wilshire Boulevard, Suite 950
        Los Angeles, California 90025
    BY: **R. BRENT WISNER, ESQ.**
        **MICHAEL L. BAUM, ESQ.**

        THE MILLER FIRM LLC
        108 Railroad Avenue
        Orange, Virginia  22960
    BY: **BRIAN BRAKE, ESQ.**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
           Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

For Plaintiffs:

           LAW OFFICES OF TESFAYE TSADIK
           1736 Franklin Street 10th Floor
           Oakland, California 94612
     BY: **TESFAYE WOLDE TSADIK, ESQ.**

           LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
           501 Broad Street
           Lake Charles, Louisiana 70601
     BY: **HUNTER WILLIAM LUNDY, ESQ.**
          **NADINA ANN BEACH, ESQ.**

           BRADY LAW GROUP
           1015 Irwin Street
           San Rafael, California 94901
     BY: **STEVEN J. BRADY, ESQ.**
          **STEVEN B. STEIN, ESQ.**

           AUDET & PARTNERS, LLP
           711 Van Ness Avenue, Suite 500
           San Francisco, California  94102
     BY: **MARK BURTON, ESQ.**

           LOCKRIDGE GRINDAL NAUEN PLLP
           100 Washington Avenue S.
           Minneapolis, Minnesota 55401-2179
     BY: **YVONNE M. FLAHERTY, ESQ.**

For Defendant:

           HOLLINGSWORTH LLP
           1350 I Street, N.W.
           Washington, DC 20005
     BY: **ERIC G. LASKER, ESQ.**
          **KIRBY T. GRIFFIS, ESQ.**

           ARNOLD & PORTER
           777 South Figueroa Street, 44th Floor
           Los Angeles, California  90017
     BY: **PAMELA J. YATES, ESQ.**

           WILKINSON WALSH ESKOVITZ
           2001 M Street, NW, 10th Floor
           Washington, DC 20036
     BY: **BRIAN L. STEKLOFF, ESQ.**

<u>Monday, October 29, 2018</u>                          <u>2:11 p.m.</u>

**P-R-O-C-E-E-D-I-N-G-S**

**---000---**

**THE CLERK:**  Calling case number 16-md-2741, In re

Roundup Products Liability Litigation.

Counsel, please state your appearances for the record.

**MS. GREENWALD:**  Robin Greenwald for the plaintiff.

**MS. WAGSTAFF:**  Good afternoon, Your Honor.  Aimee

Wagstaff for the plaintiffs.  And if I may, I'd like to

introduce you to my clients, Mr. and Mrs. Hardeman, who

traveled down here from Santa Rosa.

**MR. HARDEMAN:**  Nice to meet you.

**MS. WAGSTAFF:**  They've read all your orders.  And I

thought I'd come introduce you to them.

**THE COURT:**  Welcome.

**MR. BRAKE:**  Good afternoon, Your Honor.  My nine is

Brian Brake.  I'm here with the Miller Firm.  Pleasure to meet

you.  Thank you.

**MS. FLAHERTY:**  Good afternoon, Your Honor.  Yvonne

Flaherty, from Lockridge.

**MR. LUNDY:**  Good afternoon, Your Honor.  Hunter Lundy,

from Lundy, Lundy, Soileau and South for Plaintiffs.

**MR. BURTON:**  Good afternoon, Your Honor.  Mark Burton

for Audet Partners.

**THE COURT:**  Anybody else on the plaintiffs side want

1  to make an appearance?

2          **MR. TSADIK:**  Yes.  Good afternoon, Your Honor.

3  Tesfaye Tsadik, spelled T-s-a-d-i-k, for plaintiff

4  G-e-b-e-y-e-h-o-u.

5          **THE COURT:**  Could you pronounce it one more time.

6  I've been wondering how to pronounce it.

7          **MR. TSADIK:**  Gebeyehou.

8          **THE COURT:**  Gebeyehou?

9          **MR. TSADIK:**  Yes.

10          **THE COURT:**  Great.  Thank you.

11          **MR. WISNER:**  Brent Wisner on behalf of plaintiffs,

12  Your Honor .

13          **THE COURT:**  Hello.

14          **MR. LASKER:**  Good afternoon, Your Honor.  Eric Lasker

15  on behalf of Monsanto.

16          **MR. GRIFFIS:**  Kirby Griffis on behalf of Monsanto.

17          **MR. STELKOFF:**  Good afternoon, Your Honor.  Brian

18  Stekloff, from Wilkinson Walsh, on behalf of Monsanto.

19          **MS. YATES:**  Good afternoon, Your Honor.  Pamela Yates,

20  from Arnold & Porter, on behalf of Monsanto.

21          **THE COURT:**  Hello.  I'm sorry that we came out late.

22  We just finished up a trial.  We had a jury verdict in a civil

23  case, and we were in there talking to the jurors.  Defense

24  verdict.  That happens sometimes in San Francisco, actually.

25      So I have -- I have a list of things to talk about.  And

```
 1   what I would suggest that I do is -- let me rattle off the list
 2   of things, just topics to discuss, to make sure you don't have
 3   anything to add to it before we dive in.
 4       And I cannot guarantee you that this is in a good order or
 5   the most sensible order in which we should discuss things.  But
 6   the depos of the doctors, the discovery letter that you-all
 7   sent, is that resolved?
 8          MS. WAGSTAFF:  It wasn't in the discovery letter, but
 9   in the CMC statement for Mr. Hardeman, that's been resolved.
10          THE COURT:  The deposition of -- yeah, I couldn't
11   remember if it was discovery letter or the CMC.  We're talking
12   about the deposition of the doctors that were going to start
13   tomorrow?
14          MS. WAGSTAFF:  Yes.  That's been resolved.
15          THE COURT:  That's been resolved.  Okay.  So that's
16   good.  Cross that off.
17       All right.  One for one.
18       The Bailey case, the case that there's -- there's this
19   case that I think is a potential to include in Group 1, the
20   Bailey case.  I'll talk to you about that later.
21       There's the Wieland stipulation, the issue about Stevick?
22   Have I pronounced that correct?
23          MR. BRAKE:  Yes, sir.  I represent Stevick, is how you
24   say it.
25          THE COURT:  Stevick?
```

```
 1          MR. BRAKE:  Yes, Chris and Elaine Stevick.

 2          THE COURT:  Okay.  The issue of filling out the fact

 3   sheet for -- I guess it would be Elaine Stevick?

 4      (Inaudible response)

 5          THE COURT:  I'm sorry?

 6          MR. BRAKE:  Her husband has the loss of consortium

 7   claim.

 8          THE COURT:  Oh, okay.

 9          MR. BRAKE:  She has the actual claim.  Thank you.

10          THE COURT:  And then the authorizations for

11   plaintiff -- the plaintiff, whose name I've already forgotten

12   to pronounce, even though you told me how to pronounce it.

13          MR. TSADIK:  Gebeyehou.

14          THE COURT:  Gebeyehou?

15          MR. TSADIK:  Yes.

16          THE COURT:  Okay.  So the authorizations for

17   Gebeyehou.

18      We'll talk about how to handle -- I've got some thoughts

19   about how to handle the Group 2 plaintiffs and the issue of

20   getting them into Group 1.  I'll probably start with that,

21   actually.

22      The issue of jury selection that you-all raised.

23      The issue of when we're going to identify the first case

24   of the bellwether group to go to trial.

25      The issue of adding general causation experts.
```

1        The briefing -- *Daubert* summary judgment briefing.

2        The defense fact sheet, whether there should be one and,

3  if so, what should be in it.

4        Other -- other discovery that might be permissible for the

5  plaintiffs to take of Monsanto, and what the timeline should be

6  for that.

7        That's -- that's what I have that -- those are the items

8  that I have for discussion today.

9        Does anybody have anything else that I should be adding to

10  that list?

11            MS. GREENWALD:   I don't believe so, Your Honor.

12            MR. LASKER:   I don't believe so either, Your Honor.

13            THE COURT:   Okay.   Maybe let me start with the issue

14  that we've been talking about for a few months, a couple months

15  now, which is the issue of the Group 2 plaintiffs, and is there

16  any way to get any of the Group 2 plaintiffs into Group 1

17  absent a *Lexecon* waiver from both sides.

18        I think that, as a legal matter, that is something that

19  could probably be done.   But I have given it some thought and

20  I've decided that, at least at this time, I do not want to use

21  that process that I floated with you-all earlier of sending --

22  sending cases back to the MDL panel, to get sent back to the

23  transferor court, with an idea that they may transfer those

24  cases back to me under 1404(a) for trial.   I've decided that I

25  do not, at least at this time, want to utilize that process.

1       And even if it may be appropriate as a legal matter, I'm

2   not sure yet whether I would be comfortable doing it --

3   whether, as a matter of discretion, I would be comfortable

4   doing that.

5       So where does that leave us?  I mean, when we spoke

6   previously, I was talking about how I very much wanted to get

7   other cases into Group 1, right, to avoid the risk of these

8   three cases, possibly four cases -- we'll talk about the Bailey

9   case in a second -- disappearing and then not having a trial.

10      It might mean -- I guess what I want to do for now is just

11  press the pause button on that, not worry too much about that,

12  focus more on the cases that could be bellwether trials, and

13  hope that -- well, I don't know if it's right to say that I

14  hope that one of them goes, but aim for one of them -- one or

15  more of them going to trial early next year on the dates that

16  we've discussed.

17      As for the -- what we have now identified as the Group 2

18  plaintiffs, the placement of these 80-some cases into Group 2

19  has now become somewhat artificial; right?  Because,

20  originally, they were placed in Group 2 because the thought was

21  they're the most likely to have enough of a nexus to the

22  Northern District of California where we could undergo this

23  process to get them tried here.  Right?

24      On the other hand, the fact that the delineation is

25  somewhat artificial, I'm not really sure it matters.  We've set

a schedule for these Group 2 cases, and you've got to pick a

certain group of cases to move along faster than others.

So I'm happy to hear thoughts from anybody about whether

we should engage in some sort of recategorization process, but

my gut is that we may as well just keep the cases categorized

the way they are categorized even though it may be a little bit

artificial at this point.

Without yet asking you for your views on that, I just want

to ask:  Did it make sense what I just said?

**MS. GREENWALD:**  Yes.

**THE COURT:**  Are you-all with me on what I have tried

to articulate?

**MR. LASKER:**  I understand what you're saying.

**THE COURT:**  All right.  That's not always the case

that people understand what I'm saying, so don't be shy about

saying that you don't.

Okay.  So one possibility, with respect to these

plaintiffs who are in Group 2 -- I know that all the fact

sheets have not been submitted on behalf of those plaintiffs,

but one thing that we may consider -- if we are unable to take

any of the Group 1 cases to trial early next year, one thing we

may consider is my going there and everybody going there.

In other words, a lot of these cases are in the Eastern

District of -- a lot of these cases in Group 2 are in the

Eastern District of Missouri; right?  So I would have no

1    objection -- as long as it works for our schedule and whatnot,

2    I would have no -- or at least I don't think I would have an

3    objection.

4         We'll see where we are at the time, but I don't think I

5    would have any objection to going to the Eastern District of

6    Missouri to try a case or two if that would help advance the

7    ball.  I even notice that one of the cases is in Hawaii.

8         (Laughter)

9              THE COURT:  I'm sure everybody would prefer, however,

10   to go to the Eastern District of Missouri.  And there are --

11   many more of the cases are in the Eastern District of Missouri.

12        So, anyway, that is -- that may be one way to advance the

13   ball on Group 2, but I think for the most part we should just

14   be focusing primarily on getting the Group 1 cases ready for

15   trial.

16        So those are my -- Christine Shepherd is the name of the

17   plaintiff in Hawaii, by the way, in case anybody is curious.

18        Does anybody here represent Ms. Sheppard?

19              MS. WAGSTAFF:  I'm sure it's Mr. Miller.

20              THE COURT:  So, anyway, we can talk about all of that

21   later.

22        So I think that may -- so that's what I wanted to tell you

23   about how I want to approach Group 2.

24        Now, does anybody have any comments or questions or issues

25   specifically about that before we turn to the other issues?

1          **MR. LASKER:**  I don't think at this time, Your Honor,

2    no.

3          **MS. GREENWALD:**  Same for the plaintiffs, Your Honor.

4          **THE COURT:**  Okay.  So that, of course, may inform the

5    discussion we have about some of these other issues.

6          Now, this Bailey case that I'm referencing, I'm going to

7    try to pull up the case number for you in case you need it.

8    Here we go.

9          Well, I'm having a little bit of an iPad glitch and the

10   document is loading, so I don't have the case number in front

11   of me.  But, anyway, the plaintiff is --

12        Do you have the case number?

13         **MS. GREENWALD:**  I do.  I can give it to you, Your

14   Honor.  It's 3:18-cv-05827.

15         **THE COURT:**  Can you give me that one more time?

16         **MS. GREENWALD:**  Sure.  I'm sorry.  New York talking.

17   3:18-cv-05827.

18         **THE COURT:**  This is a case, as I understand it, that

19   was filed in state court, and the -- the defendants, who were

20   named, were Monsanto as well as a distributor, a California

21   distributor.

22        And so there was, I think -- I don't know -- I think the

23   plaintiff is from California, and I think, therefore, that

24   there may not be diversity.  But it was removed to federal

25   court.

```
1          Monsanto removed the case, and there was not a motion to

2    remand.  So I -- I think maybe that was -- I think maybe that

3    issue was waived.  I'm not sure.  I may not be remembering

4    correctly.

5          MS. WAGSTAFF:  Your Honor, I believe the plaintiff is

6    from Nebraska.

7          MR. LASKER:  Yes.

8          THE COURT:  The plaintiff is from Nebraska.

9          MS. WAGSTAFF:  That's what I believe, yeah.

10         THE COURT:  So there is diversity.

11         MS. WAGSTAFF:  That's my understanding.

12         THE COURT:  So that was filed here.  Oh, I remember

13   what it was.  Now, I remember.  It was that Monsanto did not

14   make a jurisdiction argument, and Monsanto at least has not yet

15   made a venue argument as relates to that case.  I'm not sure

16   Monsanto has made a venue argument at all in its answer.

17         MR. LASKER:  Right.  I don't think the jurisdictional

18   issue has been addressed yet either.  We haven't waived either

19   of those arguments.  We don't know yet.  All we have is the

20   complaint.  So we would need to --

21         THE COURT:  Well, I think you answered.  And so I

22   think if you answered and you didn't include any sort of

23   argument about jurisdiction -- personal jurisdiction, I assume

24   it's waived, but I'm not up to date on the rules of waiver of

25   personal jurisdiction.
```

 1          **MR. LASKER:**  I'm fairly certain we did not waive

 2   jurisdiction, because that would be a big issue in the case.

 3          **THE COURT:**  Okay.  Or maybe you determined that there

 4   was jurisdiction, there was personal jurisdiction.

 5      And then -- but, anyway, the long and the short of it is I

 6   don't think we need to get into the details right now

 7   necessarily, but it seems like this Bailey case could become

 8   part of Group 1 if we -- or at least we could tee it up for

 9   trial in May potentially.

10          **MS. WAGSTAFF:**  I spoke with the lead counsel, who

11   filed that case, and just as a practical matter there's no real

12   way they could catch up on the deadlines we're currently at.

13   Meaning close of discovery is in a month, expert disclosures is

14   in a month.  And, like I said, there's still jurisdictional

15   issues and things like that.

16      We could perhaps talk about teeing it up in May.  I'm not

17   sure what sort of objections Monsanto is going to have, but I

18   know that she would be willing to sort of get that case going

19   but certainly not the deadlines we have now.

20          **THE COURT:**  Who is it?

21          **MS. WAGSTAFF:**  Arias, Sanguinetti out of -- where are

22   they?  Oakland.  Los Angeles.

23          **THE COURT:**  What's the firm again?  Sorry.

24          **MS. WAGSTAFF:**  Arias, Sanguinetti, Wang & Torrijos.

25          **THE COURT:**  Okay.  And what's the name of the lawyer?

1          **MS. WAGSTAFF:**  Elise Sanguinetti.

2          **THE COURT:**  Okay.  What I would propose we do is that

3    we set a schedule for that case.  I mean, I guess she's not

4    here right now, so we maybe won't do it today, but what I would

5    propose we do is we get that case ready to go to trial in May,

6    on May 5th.

7          **MS. WAGSTAFF:**  Okay.  So how about in two weeks,

8    perhaps we could spend two weeks meeting and conferring with

9    Monsanto on what that would look like and submit something to

10   you?

11         **THE COURT:**  Sure.  That would be fine.  Would it --

12   would it make sense to have a CMC on that case specifically?

13         **MS. WAGSTAFF:**  Sure.

14         **THE COURT:**  And set it -- you know, set a schedule for

15   it and set it for trial in May?

16     I mean, it may be like if we get to late February and

17   there are still more than one -- there's still more than one

18   plaintiff in the -- of the three plaintiffs who are currently

19   in Group 1, it may be that we set one of those cases for May.

20   But I think we should work on getting this case ready for May

21   also.

22         **MS. WAGSTAFF:**  The only thing I would say to bring to

23   the Court's attention is, in this chart that we created as

24   Exhibit A to our filing, this is the fourth from the bottom.

25         **THE COURT:**  Okay.  Wait hold on a quick second.

```
 1              MS. WAGSTAFF:  On the last page, page 4 of 4.

 2              THE COURT:  Hold on one second.  Exhibit A?

 3              MS. WAGSTAFF:  Yeah.

 4              THE COURT:  Hold on.  You said page 4?

 5              MS. WAGSTAFF:  Yeah.  If you go to the fourth row from

 6    the bottom is the case we're talking about.

 7              THE COURT:  Okay.  Bailey.

 8              MS. WAGSTAFF:  Yeah.

 9              THE COURT:  Okay.

10              MS. WAGSTAFF:  Now, I know it's a little different

11    because they named Wilbur-Ellis, but they have put that they

12    have no to every answer and then they put yes that they

13    consented.  So I don't know if Monsanto is not consenting.  I

14    just don't know how that will all play out.

15         I guess that's something that Mr. Lasker and I will

16    discuss over the next couple weeks.

17              THE COURT:  But this case was brought -- the case was

18    brought here.  So --

19              MS. WAGSTAFF:  Right.  I believe that's because they

20    named Wilbur-Ellis, which gives them the jurisdiction.  But

21    there's otherwise no contact with it, what this chart shows me.

22              THE COURT:  Otherwise no what?

23              MS. WAGSTAFF:  I think everything happened in

24    Nebraska.

25              THE COURT:  Okay.  But it may still be that the case
```

1   can be tried here.

2          **MS. WAGSTAFF:**  Right.  Right.  I just wanted to bring

3   that to the Court's attention.

4          **THE COURT:**  I mean, the *Lexecon* issue comes up when a

5   case was filed in another district.  This case was filed in

6   this district.

7          **MS. WAGSTAFF:**  Right.

8          **THE COURT:**  But that's for you-all to work out.

9      And so when should we have -- when should we have a

10  further CMC?  If it's only going to be about the Bailey case,

11  we could, I suppose, potentially do it by phone, if that would

12  be easier for you-all.

13         **MS. GREENWALD:**  It would.

14         **MR. LASKER:**  It would, Your Honor.  Thank you.

15         **THE COURT:**  When should we do that, Kristen?  21 days?

16  14 days?

17         **THE CLERK:**  Want to do the 14th of November?  In the

18  morning?  In the afternoon?

19         **THE COURT:**  I'd say we -- why don't we do the 15th?

20  Why don't we just put it on the law and motion calendar for the

21  15th.  We'll just do it by -- because even when we do a

22  telephonic case management conference in these cases, we do it

23  in open court because of the public interest involved.

24      So we'll just do it to kick off our law and motion

25  calendar on the 15th.

1        (The Court and courtroom deputy confer off the record.)

2        **THE COURT:**  Let's do Thursday, November 15, at

3   2:00 p.m., because actually we might end up moving some of the

4   other matters to 2:00 p.m. anyway.

5        **MS. WAGSTAFF:**  Your Honor, are you wanting us to file

6   anything beforehand?

7        **THE COURT:**  Yeah.  Seven days prior, file a case

8   management statement.

9        **MS. WAGSTAFF:**  Okay.

10        **THE COURT:**  The main thing I want -- you can include

11   whatever aspects of the typical Northern District case

12   management statement that you want, exclude whatever you think

13   needs to be excluded.

14        The main thing is I just want to know if we can -- I want

15   a proposal -- a scheduling proposal for setting the case,

16   getting the case trial ready by May 5th or whatever was the

17   date in May that we've identified as the trial date in this

18   case.  Okay.  So it's Bailey.

19        Oh, there was a stipulation in this Wieland case that was

20   filed directly here, and you submitted a stip to -- to dismiss

21   it and allow it to be refiled in the Eastern District of

22   Missouri and then have the panel consider whether it be

23   transferred here.  That's fine.  I will go ahead and grant that

24   stip.

25        Okay.  Let's talk about -- is it Mr. Tsadik?

1              MR. TSADIK:  Tsadik.

2              THE COURT:  Tsadik.  I'm sorry.  Let's talk about your

3     case.

4          So I think there are, Mr. Tsadik, there are two issues --

5     at least two issues for us to discuss regarding your case.   If

6     there are more, let me know.

7              MR. TSADIK:  Sure.

8              THE COURT:  But one issue is -- is the issue of these

9     authorizations, right?  And it's the signing of the

10    authorizations for -- to access employment records --

11             MR. TSADIK:  Yes.

12             THE COURT:  -- and workers' comp records.

13             MR. TSADIK:  Not really workers' compensation.  It's

14    social security records.

15             THE COURT:  Social security.

16             MR. TSADIK:  Yes.  Social security.

17             THE COURT:  Okay.  I thought -- okay.  So has your

18    client signed the other authorizations?

19             MR. TSADIK:  They have signed all the authorizations

20    that you ordered, and served them on the same day, October 4th.

21    The question is, after a few days he represented to me that

22    he's not interested in making a claim of wage loss, revenue

23    loss.

24         And then I notified the defendant, you know, that you

25    cannot have any access or disclosure of the personnel file

because there's no wages claim in this case.  Nor would there

be a claim for disclosure of tax returns of Mr. Gebeyehou, and

as well as, also, the social security disability benefit,

because he never received any social security disability

benefit.

     **THE COURT:**  Okay.  So the issue is -- so he has

already signed the authorization for -- about workers' comp

claims?

     **MR. TSADIK:**  Yes.

     **THE COURT:**  He has.

     **MR. TSADIK:**  Yes.

     **THE COURT:**  Okay.  So we're just talking about the

employment records authorization and the SSDI records

authorization and the tax records authorization?

     **MR. TSADIK:**  Yes.

     **THE COURT:**  Is that right?

     **MR. TSADIK:**  That's correct.

     **THE COURT:**  Okay.  And so the -- so let me hear

from -- and you take the position that he should not be

required to sign those authorizations simply because he's not

making a lost wages claim.

     **MR. TSADIK:**  Exactly.  And also, at the same time,

those records really have no relevance to any claim or defense

the defendant is making in this case.  We contend that the

employment file, you know, personnel file includes promotion,

```
1    evaluation of his performance, and all those things.  Really
2    has nothing to do with a claim here.
3             THE COURT:  I'm sorry, I haven't -- I haven't reviewed
4    the responses that Mr. Gebeyehou has made to the fact sheet
5    here.  I don't know anything about the specific facts of
6    Mr. Gebeyehou's case yet.
7         What does he allege about his exposure?  Was it a
8    work-related exposure?
9             MR. TSADIK:  He's exposed on his property, residence
10   in Oakland.  And he was exposed from the period of '87 all the
11   way through 2014.
12            THE COURT:  Okay.
13            MR. TSADIK:  Almost 25 years, 26 years.  And he was
14   spraying Roundup at least every three months on his property,
15   one and a half gallon every year.
16            THE COURT:  Okay.
17            MR. TSADIK:  He provided those information in the fact
18   sheet.
19            THE COURT:  So he doesn't make any allegations that he
20   was exposed to glyphosate on the job --
21            MR. TSADIK:  No.
22            THE COURT:  -- or anything?  Okay.
23        So -- and you've filled out all the remaining parts of the
24   fact sheet, about his employment history and all that stuff?
25            MR. TSADIK:  Yes.
```

```
 1              THE COURT:  Okay.

 2              MR. TSADIK:  Yes.

 3              THE COURT:  Okay.  So in light of that, what's the

 4   point of having him sign the employment records authorization

 5   and the SSDI and the tax records authorization?

 6              MR. LASKER:  Yes, Your Honor, we addressed this at the

 7   last case management conference.

 8         The reason for those records has to do with potential

 9   alternative causes, potential exposures in the workplace.  And

10   that was the basis for seeking those authorizations.  We

11   actually addressed that back and forth.

12              THE COURT:  Well, my recollection of our discussion --

13   and I will admit to you that I didn't go back and read the

14   transcript or anything, but my recollection of that discussion

15   was that the primary purpose of getting the employment records

16   were -- was to explore whether there were any particular

17   incidents of exposure or any particular instructions about, you

18   know, using safety precautions that may or may not have been

19   used, things along those lines.

20         Not necessarily to look behind whether there were

21   exposures to other substances on the job.  I don't recall us

22   contemplating that that was really the purpose of looking

23   through the employment records.

24         Am I misremembering that?

25              MR. LASKER:  I believe so, Your Honor.  I mean, the
```

1   big issue -- and these are why these records are provided, and

2   we have some citations that Your Honor, I expect, has seen, why

3   these types of authorizations are provided in these cases.

4       It's specifically to be able to determine whether or not

5   there were workplace exposures that may give rise and may be

6   relevant to the issues of medical causation.

7           THE COURT:  Have you reviewed his -- Mr. Gebeyehou's

8   employment history?  And do you have any reason to believe that

9   he might have had some exposures?

10          MR. LASKER:  We don't have -- and let me just -- I

11  will say, as a general matter, there's no way to tell from the

12  information we get from a plaintiff fact sheet.  It's not going

13  to have that level of detail to allow us --

14          THE COURT:  I don't agree.  I mean, the fact sheet was

15  designed to give you, sort of, keys to signal when you needed

16  to look more closely at somebody's employment activities to see

17  if there was another exposure there.

18      That was the whole -- that was the whole point of

19  requiring such detail about people's employment history and

20  whether -- and past exposures and all that stuff.

21          MR. LASKER:  If I could have just a second, Your

22  Honor.

23      Again, we had, if you'll recall, at our last case

24  management conference a discussion of some of the issues as to

25  why we would want to be able to have further information from

     1    the employers themselves as far as what exposures might be

     2    relevant.

     3         I'm looking right now, though, at -- so all the -- what we

     4    know is that he worked at PG&E.  And we know when he worked

     5    there.  But, again, to be able to tell from that information --

     6    we just know the name of a company -- that's not going to

     7    provide us with any information that would be -- allow us to

     8    determine -- and, frankly, the name of an employer may give --

     9    gives us some limited information, but doesn't provide us with

    10    a lot of information, frankly.

    11         And that's why these authorizations.  And courts have

    12    upheld in MDLs, particularly Plaintiff's Fact Sheet, routine

    13    authorizations that are provided in all these litigations,

    14    because that allows us to find that information out.

    15         So I do -- at least my recollection of our conversation,

    16    and certainly my understanding of other cases where we

    17    routinely get these authorizations, and courts have upheld the

    18    right for a defendant to get these authorizations as part of a

    19    PFS process, is exactly for that reason, to be able to find

    20    out -- and, of course, if there's nothing in those employment

    21    records that go to that issue, then it sort of ends there.  But

    22    that is the purpose of providing these authorizations --

    23              **THE COURT:**  In this case, I mean, obviously, you are

    24    allowed to conduct discovery.  You're allowed to take the

    25    plaintiff's deposition.  You can make document requests.

1        In this case, I assume that Mr. Tsadik is not going to

2   dispute that any employment records relating to exposure to

3   other substances at the job site or on the job would be

4   relevant to this case.

5        You don't dispute that; right?

6            MR. TSADIK:  That's absolutely correct, Your Honor.

7            THE COURT:  So if they gave you a request for any

8   documents, any employment-related documents, or they asked PG&E

9   for any employment-related documents that bear on exposure to

10  any substances at the workplace, you would support that

11  request, yes?

12           MR. TSADIK:  I would support, Your Honor.  The only

13  problem is in this case what they are trying to get is the

14  entire personnel file.

15           THE COURT:  Right.  That's why I'm narrowing it.  I'm

16  trying to narrow it down now.

17       So you're saying what you would support, you would support

18  them getting any employment records, any records from -- it's

19  PG&E or any other employer that would relate to exposure to any

20  substances at the job site.

21           MR. TSADIK:  That's fine.

22           THE COURT:  Agree?

23           MR. TSADIK:  Yes, I agree.

24           THE COURT:  Okay.  All right.  So that seems like a

25  more efficient way to take care of it in this case.

1      What else would you need?

2          MR. LASKER:  Well, Your Honor, again, I don't know,

3   depending on what his -- part of this also, of course, is

4   workers' comp or any illnesses that are in those records,

5   anything along those lines.  Those are going to be relevant as

6   well.

7          THE COURT:  Well, he said he signed the authorization

8   for the workers' comp claims; right?

9          MR. TSADIK:  Yes.

10         MR. LASKER:  He has signed all of the authorizations,

11  Your Honor.  He has asked us, after signing the authorizations,

12  not to actually proceed with getting those documents.  And

13  given his objection, we haven't done that.

14         THE COURT:  But I thought -- okay.  So which --

15  which -- I thought you were not taking issue with them

16  proceeding to get the workers' comp documents.

17      Am I wrong about that?

18         MR. TSADIK:  You're not wrong.  But the problem is he

19  has not taken any workers' -- his testimony here in the fact

20  sheet stated that he never received any workers' compensation

21  benefits.

22         THE COURT:  Yeah, right.  So then in the cases where

23  somebody says under penalty of perjury that they've never filed

24  any workers' comp claims, then they don't need to sign that

25  authorization form.

1          **MR. TSADIK:**  That's correct.  Yes.

2          **THE COURT:**  And there's no need to go through that

3     process.

4          **MR. TSADIK:**  Yes.  I agree with you.

5          **THE COURT:**  Okay.  So, all right.  So we have

6     agreement, now, that Mr. Gebeyehou is not going to oppose

7     Monsanto's acquisition of any employment-related records that

8     relate to exposure to substances at the job site or in

9     connection with work.

10        So can you explain, again, to me what else you might need?

11         **MR. LASKER:**  Well, again, depending on whether or not

12    any medical leave was taken during his employment, doesn't have

13    to be a workers' comp case, that also is going to potentially

14    relate to his medical condition.

15         **THE COURT:**  But he just said that he didn't file any

16    workers' comp claims.

17         **MR. LASKER:**  Right, but workers' comp is not

18    necessarily the only medical condition that -- if he took a

19    leave of absence unrelated to an injury at the job, that still

20    is medical --

21         **THE COURT:**  Medical leave.

22        Okay.  Do you have any objection to Monsanto getting any

23    documents from your client's employers regarding taking medical

24    leave?

25         **MR. TSADIK:**  As long as they're not related to any

1  medical leave for some entirely different reason.  As long as

2  they're for chemical exposure, that's fine.

3      **THE COURT:**  Well, that's fair enough, but in terms

4  of -- and you're not asserting a lost wages claim --

5      **MR. TSADIK:**  No.

6      **THE COURT:**  -- so it wouldn't be relevant to that.

7      But might that be relevant to -- I mean, I assume that

8  other medical conditions might have correlation with

9  non-Hodgkin's lymphoma.  And so, you know, I would think that

10  if there were any -- if there were any -- and they may also

11  have relevance to the extent to which your client is suffering

12  in a damages sense from non-Hodgkin's lymphoma as opposed to

13  other conditions.

14      So what would be the problem -- I mean, if this were a

15  regular case and there were no authorization forms involved and

16  you just received a discovery request saying, "We want

17  information about other health problems that you've had," I'm

18  guessing you probably wouldn't object to that in a different

19  context.

20      **MR. TSADIK:**  Your Honor, his medical condition

21  manifested itself in 2012 and 2014.

22      **THE COURT:**  Okay.

23      **MR. TSADIK:**  And he retired from PG&E in 1996.

24      **THE COURT:**  Okay.

25      **MR. TSADIK:**  So, I mean, they're really trying to get

```
 1    20 years or so back.

 2          THE COURT:  Okay.  But is there any harm?  I mean, it

 3    may end up not being relevant, but is there any harm with -- is

 4    there any reason to object if we -- so one issue is employment

 5    records that relate to exposure.  Another issue is employment

 6    records relating to taking medical leave.

 7         What's the big deal?  It may end up they're not being

 8    relevant, and they can obviously be protected by a protective

 9    order; right?  Their confidentiality can be protected.

10         In the interest of advancing the ball here, what's the

11    problem?

12          MR. TSADIK:  I will do that, Your Honor, if you

13    insist.  I mean, I will do that because the procedure should

14    usually be, is this information in the file relevant to this

15    issue they raise?  There's no relevancy.

16          THE COURT:  I understand, but I'm just trying --

17          MR. TSADIK:  Number two, can they get it from other

18    source?  They could get it from the employer.

19          THE COURT:  I understand what you're saying, but I'm

20    just trying to be efficient about it here.  Trying to make it

21    easier for everybody.

22         Okay.  So employment records relating to exposure.

23    Employment records related to taking medical leave.

24         Is there any other -- anything else, Mr. Lasker?

25          MR. LASKER:  I think it would just be -- and I don't
```

 1   want to -- because sometimes there is healthcare provided

 2   through the job.  They have nurses come in.  I would just say

 3   anything related to medical care.

 4          THE COURT:  But they've already -- they're going to be

 5   providing you that through the responses to the fact sheet and

 6   in any discovery you do specifically of the plaintiff.

 7          MR. LASKER:  Well, I mean, we have medical

 8   authorizations from his healthcare provider.  If they had a

 9   nurse's clinic or something coming in, I don't know we would

10   get it that way.

11          THE COURT:  We're not going to expand this to that.

12      So, anything else?

13          MR. LASKER:  No, Your Honor.

14          THE COURT:  Okay.  So we now have an agreement on

15   that.

16      The plaintiff will -- I assume that you'll be getting

17   these records from the employer.  You'll be seeking these

18   records from the employer or can -- because he hasn't worked

19   there since 1997, you say; right?

20          MR. TSADIK:  1996, yeah.

21          THE COURT:  So what we have now is an agreement on the

22   record that the plaintiff is going to consent, the plaintiff is

23   going to authorize Monsanto obtaining records from the

24   plaintiffs' employer that relate to exposure to any substances

25   or taking any medical leave.

 1          **MR. TSADIK:**  That will be fine.

 2          **THE COURT:**  Okay.  Everyone is in agreement on that;

 3  right?

 4          **MR. LASKER:**  I understand.

 5          **THE COURT:**  Mr. Lasker?

 6          **MR. LASKER:**  I understand, Your Honor.

 7          **THE COURT:**  Okay.  So that's that issue.

 8      And then so it will be up to Monsanto to get that, to seek

 9  that information from the employers.

10      Now, let's -- since I have you, Mr. Tsadik, it is not --

11  it seems to me -- so the plaintiffs in the leadership group and

12  defense counsel, I believe, are both suggesting -- correct me

13  if I'm wrong, forgive me if I'm wrong about this, but I think

14  both were suggesting that we ought to knock your case out of

15  the bellwether group.

16      And perhaps you have also taken the position that this

17  case should not be in the bellwether group.  What is your --

18          **MR. TSADIK:**  The only thing, Your Honor, I mean, I

19  know the plaintiff is part of the [unintelligible] committee.

20  I took his case, and I'm not part of this leadership group.  I

21  mean, there has been almost no discovery done, no part of it.

22      So I'm suggesting, you know, that the case be at least,

23  you know, be moved to May or something around that time so I

24  can be up to snuff in time to help the leadership group in the

25  case.

```
 1              THE COURT:  Well, why can't you help the leadership

 2    group -- I mean, there are a lot of resources behind the

 3    leadership group.  Why can't you help them get the case ready

 4    to be tried in -- on February 25th?

 5              MR. TSADIK:  That is because I am solo practitioner,

 6    and the plaintiffs really wants me to be part of the case, but

 7    my schedule really doesn't allow me.  I have a trial already

 8    set in Santa Cruz, which is continued second time, for sure

 9    will go forward.

10              THE COURT:  Is that a criminal case?

11              MR. TSADIK:  It's a civil case.

12              THE COURT:  And what is the case about?  What's the

13    subject matter?

14              MR. TSADIK:  It's a premises liability case, somebody

15    who was injured at the property of a church.

16              THE COURT:  Okay.

17              MR. TSADIK:  So I represent them.  And we're ready to

18    go to trial in February.  So that's --

19              THE COURT:  Okay.  And has that case been assigned to

20    a judge already for trial?

21              MR. TSADIK:  Yes.

22              THE COURT:  It has.

23              MR. TSADIK:  Yes, it has.

24              THE COURT:  Do you know the judge -- do you know who

25    the judge is who's going to try the case?
```

1        **MR. TSADIK:**  I believe -- I don't remember, but it's

2   in my records.   The name is given from case management judge,

3   it was transferred to the trial judge.

4        **THE COURT:**  Okay.  So what I'm going to ask you to do

5   is file a letter with the name of the judge who's assigned to

6   the case --

7        **MR. TSADIK:**  Okay.

8        **THE COURT:**  -- and the name of the case, and the case

9   number, and the contact information for the judge in Santa

10  Cruz.

11       **MR. TSADIK:**  Yes.

12       **THE COURT:**  In Santa Cruz; right?

13       **MR. TSADIK:**  Yes.

14       **THE COURT:**  And we'll -- if it's a real problem for

15  this case -- to go to trial for your case, your Roundup

16  Monsanto case to go to trial in February, then maybe we'll tee

17  it up for May.  But you should plan on this case,

18  Mr. Gebeyehou's case --

19       **MR. TSADIK:**  Yes.

20       **THE COURT:**  -- being in the group of cases that's

21  ready to be tried on February 25th.

22       **MR. TSADIK:**  The only thing, Your Honor, is, also, I

23  mean, the enormity of the material I have to review in this

24  case to be prepared for a trial, participate in the discovery,

25  expert discovery, I mean, that really will taken entirety of my

```
 1   practice into --
 2          THE COURT:  Well, there are a lot of lawyers here who
 3   have spent a lot of time on this issue, and they will be
 4   participating in the prosecution of the case as well.  And so
 5   that will be -- it will be for you to determine which tasks to
 6   give to them and which tasks to keep yourself.
 7          MR. TSADIK:  That's --
 8          THE COURT:  Strikes me that you seem -- at first
 9   glance you seem like a very competent and effective lawyer,
10   well spoken.  And I'm sure that you'll make it work.
11          MR. TSADIK:  It really is going to be a big challenge.
12   I just don't want to compromise my personal relationship with
13   my professional responsibility on this case.  Really tough
14   balance to keep.
15          THE COURT:  I understand.
16          MR. TSADIK:  That's why I bring it to your attention.
17          THE COURT:  So file that information on the case --
18          MR. TSADIK:  Sure.
19          THE COURT:  -- with the judge's name and everything.
20   And, you know, for now plan on the case going to trial in
21   February.  But if it doesn't go -- if it doesn't go to trial in
22   February, plan on it going to trial in May.
23          MR. TSADIK:  Sure.  Thank you.
24          THE COURT:  Okay.  Is there anything -- now, I think
25   that's probably almost everything that we need to discuss for
```

1    Mr. Gebeyehou's case.  Although I'll ask you to maybe stay up

2    here for one more second while we discuss the issue of ordering

3    the three or potentially four plaintiffs for trial.

4        Because I think it was the plaintiffs who suggested

5    that -- you said, well, we understand that we have to have all

6    three bellwether cases ready for trial, but we think it would

7    be a good idea to identify now the case that goes first so we

8    can kind of focus a little bit more on that one.  Is that the

9    gist of what you suggested?

10        **MS. WAGSTAFF:**  Yes, Your Honor, that's exactly what we

11   suggested.  And so I represent the Hardemans, who are here

12   today.

13        **THE COURT:**  And you suggested that the Hardeman case

14   go first.

15        **MS. WAGSTAFF:**  Correct.  It's the oldest case in

16   your -- before your court.  We actually -- the preemption order

17   and other things came in that before the MDL.

18        He has a conflict that you've just heard.  Mr. Stevick is

19   represented by Mr. Miller.  And their law firm also is lead

20   counsel on a case going to trial in February of 2019, in

21   St. Louis City.

22        **THE COURT:**  Let me cut you off there for a second.

23        **MS. WAGSTAFF:**  Sure.

24        **THE COURT:**  So you believe that the Hardeman case

25   should go first.

1    You believe that one of the other two cases should go

2  first, your client should not go first.

3        **MR. TSADIK:**  That's correct.

4        **THE COURT:**  Which case do you believe, Mr. Lasker,

5  should go first?

6        **MR. LASKER:**  We are in the position of not knowing as

7  much about either of the cases.  So, as we said in the case

8  management conference, or case management statement, we're just

9  not in a position to say anything.  We want discovery to go

10  forward in these cases.

11        **THE COURT:**  Remind me, when is the discovery cutoff as

12  it relates to the plaintiffs?

13        **MS. WAGSTAFF:**  November 20th.

14        **THE COURT:**  November 20th?

15        **MS. WAGSTAFF:**  Three weeks.

16        **THE COURT:**  All right.  So what I would -- and then so

17  are depositions scheduled and stuff?

18        **MR. LASKER:**  There have been depositions scheduled in

19  the Hardeman case.  As you know, tomorrow we are in

20  conversations with the plaintiffs from the Stevick case, and

21  some of those treaters, we've lined those up.  We have not had

22  discussions, up to this point, on Mr. Gebeyehou's case.

23        **THE COURT:**  Okay.

24        **MR. LASKER:**  We're not -- we have not lined those up

25  yet, as far as I know.

```
1              THE COURT:  Okay.  But we set a schedule for
2    Mr. Gebeyehou's case; right?  I mean, it's subject to this
3    discovery cutoff; right?
4              MR. LASKER:  That's correct, Your Honor.
5              THE COURT:  And we set that schedule a while ago now;
6    right?
7              MR. LASKER:  Yes, Your Honor.  And we have the
8    Plaintiff Fact Sheets as of, I guess it was last week.  And
9    then we had this issue that was raised by -- about whether the
10   Gebeyehou case would go forward.  And that's, I think, in the
11   last week, been the issue that we've been faced with.
12             THE COURT:  Okay.  I guess what I would propose is
13   that at some point we can figure out when the right time is,
14   both of you make a filing proposing an order for the three or
15   possibly four cases.
16       And you can -- you can make that filing.  You can make it
17   a separate filing.  And I'll look at -- I'll look at them and
18   I'll decide which cases go first and which case is going to go
19   second and which case is going to go third.
20        So the only question now is, when should you file that and
21   when should I decide it?
22             MS. WAGSTAFF:  So we filed that last week.  So I don't
23   know.
24             THE COURT:  Basically, you don't have anything more to
25   say on the topic, in other words?
```

1          MS. WAGSTAFF:  We certainly can, but we would stand on

2     our papers as well.

3          THE COURT:  Okay.

4          MS. WAGSTAFF:  We think that the discovery -- preMDL

5     discovery for Mr. Hardeman is further along, for example.  The

6     discovery we just served was the fifth set of written discovery

7     that we've served in that case.  The treaters are set for

8     tomorrow and Wednesday.  We have --

9          THE COURT:  You don't need to argue it now.  I mean,

10     I've read your reasons why you think the Hardemans' case should

11     go first.

12          But, Mr. Lasker, when can you file something with a

13     proposal for which case should go first, second, and third, and

14     possibly fourth?

15          MR. LASKER:  Right.

16          THE COURT:  I think part of it is we want to sort out,

17     you know, Bailey, and we want to figure out if Bailey is going

18     to be part of this group.  Although, as I said, you know, it

19     probably makes the most sense to be setting Bailey for --

20     having a schedule for Bailey for May rather than February.

21          So Bailey is sort of part of this group, but I think it's

22     probably unrealistic to say that Bailey will go to trial in

23     February.

24          MR. LASKER:  Right.

25          THE COURT:  So, yeah, so when do you want to file

1    something explaining which case you want first, second, and

2    third, and why?

3          **MR. LASKER:**  Right.  The simple answer would be

4    November 22nd, but I don't know we need to wait that long.

5    It's just going to depend on how quickly discovery goes in

6    these cases.

7          **THE COURT:**  November 22nd is Thanksgiving.

8          **MR. LASKER:**  Whatever the deadline was, I'm sorry,

9    Your Honor.

10         **MS. WAGSTAFF:**  20th.

11         **MR. LASKER:**  November 20th for fact discovery.  But we

12    may be in a position earlier.  What I'm trying to figure out,

13    and I just don't have the information now to know this, is

14    whether -- and it may be that we wouldn't have filed something

15    a week ahead of time.  It may be that on November 15th we just

16    happen to be at a point that we can file something a day in

17    advance or something.

18         **THE COURT:**  Well, why don't I ask you to file

19    something -- I'm going to require you to file something by no

20    later than November 16th.

21         **MR. LASKER:**  November 16th.

22         **THE COURT:**  Okay.  And that's filing something on the

23    order in which the cases should be teed up for trial, the

24    Group 1 cases.

25       And then if the plaintiffs want to file any response to

1  that, they can file something by no later than November 19th,

2  and you'll have your answer before Thanksgiving.  Okay.

3           MS. WAGSTAFF:  Thank you, Your Honor.

4           MR. LASKER:  That's fine, Your Honor.

5           THE COURT:  Not a particularly hard decision.  Okay.

6           MR. TSADIK:  Thank you, Your Honor.

7           THE COURT:  All right.  Let's see.  That's that.

8      Okay.  Is it Stevick or --

9           MR. BRAKE:  Stevick, Your Honor.

10          THE COURT:  Stevick, I'm sorry.

11          MR. BRAKE:  Yes, sir.

12          THE COURT:  So in the Stevick case, this issue about

13  filling out a fact sheet for loss of consortium, I don't think

14  we need to discuss this much.  It seems like there are two

15  issues or two types of cases; right?

16      There's a type of case where there are two plaintiffs.

17  One is the person who has NHL, and the other person is the

18  spouse who's asserting a loss of consortium claim.  It seems

19  quite obvious to me that the -- in that type of case -- so

20  that's one type of case.

21      And then the other type of case is the case where the

22  person with NHL has passed away.  And I guess the only -- I

23  mean, even in that case there would still be, presumably, the

24  spouse who would be asserting a claim on behalf of the estate,

25  right, and then might also be asserting a loss of consortium

1    claim.

2         In either scenario there's always going to be a fact sheet

3    filled out by the plaintiff or by a representative of the

4    plaintiff -- by the person with NHL or a representative of the

5    person with NHL, about the person with NHL and their exposure

6    and their employment history and all that stuff; right?

7         So then this is only a question about whether the spouse

8    who's asserting a loss of consortium should also be filling out

9    the fact sleet and should also be signing the authorizations.

10   The answer to that question is no.

11        I think that we may have had a passing assumption that

12   maybe that would happen, but it doesn't make any sense for it

13   to happen.  If there's any specific discovery that needs to be

14   done of a spouse that's asserting a loss of consortium claim,

15   you can do more specific and sensible discovery directed at the

16   spouse asserting the loss of consortium claim.

17        So neither the Stevick spouse -- Chris Stevick?

18             **MR. BRAKE:**  Yes, sir, that's correct.

19        **THE COURT:**  -- nor any other spouse who falls in this

20   category needs to fill out a separate Plaintiff's Fact Sheet.

21        **MR. BRAKE:**  Thank you, Your Honor.  Brian Brake, for

22   the record.

23        There was a proposed order attached to the joint letter we

24   sent to the Court, which is --

25        **THE COURT:**  Does it capture what I just said?

1          **MR. BRAKE:**  Not exactly, but it's pretty darn close.

2          **THE COURT:**  Okay.

3          **MR. BRAKE:**  So you may want to look at that.  Thank

4     you.

5          **THE COURT:**  All right.  Somewhere in the case

6     management statement you asked about the briefing -- the length

7     of briefs.  That sounds fine.  That's approved.

8          Adding general causation experts, the answer to that

9     question is basically no.  You cannot add general causation

10    experts.

11         If there is an emergency-type situation, if Loralei Mucci

12    has a medical emergency or, you know, something like that, and

13    you want to seek permission to sub somebody in to provide, you

14    know, substantially the same testimony, I will entertain it.

15    I'm not saying I will grant it, but I will entertain it.

16         But the basic answer is, no, I don't think it's

17    appropriate, given everything we've been through already as a

18    team, to be adding general causation experts.

19         **MR. LASKER:**  If I may, Your Honor?

20         **THE COURT:**  Sure.

21         **MR. LASKER:**  There's a separate issue there, and I'd

22    like to invite either Brian to step up, or Pamela Yates to come

23    up.  They'll be trial counsel for the first case.

24         **THE COURT:**  Sure.

25         **MR. LASKER:**  And the issue, just to tee it up, and

1    they can continue, is these experts have continued to be

2    working as the litigation has gone forward.  So we have experts

3    who have expanded what they have looked at and, in many cases,

4    been deposed on additional issues.

5         If I could ask one of my colleagues to stand up about

6    that.

7              **THE COURT:**  Sure.

8         **MR. LASKER:**  Thank you.

9         **MR. STEKLOFF:**  Thank you, Your Honor.  Brian Stekloff.

10        I don't think there's much to add beyond what Mr. Lasker

11   said, other than it might come up in the context of

12   supplementing an expert's reliance list.  For example, if

13   there's additional epidemiology or other scientific literature

14   they wanted to rely upon.

15        We would, of course, give the other side notice of that.

16   I think that's different than adding a new general causation

17   expert and having --

18             **THE COURT:**  Yeah, I was assuming -- I mean, if anybody

19   has any disagreement with this, you can let me know, but I was

20   assuming, just by the nature of this topic, there would have to

21   be additional reliance on new materials, either materials that

22   played a key role in the state court trial, that maybe didn't

23   play a key role in our *Daubert* hearings, or in something that

24   is newly published, or something like that, and that experts

25   would supplement their disclosures.

1    You know, sort of mildly hopeful that not everybody's

2  deposition is going to be taken again and that most people's

3  depositions will not be taken again.  But if there's a --

4  hopefully, you can all work it out if there's a good reason to

5  take -- you know, do a further deposition, you know, that's

6  potentially permissible.

7          MR. STEKLOFF:  Thank you, Your Honor.

8          THE COURT:  Okay.  Any disagreement from the

9  plaintiffs?

10          MS. GREENWALD:  Not at all.  Not at all, Your Honor.

11          THE COURT:  Okay.  Jury selection.  There was some

12  discussion in the case management statement about jury

13  selection.

14    I see that Mr. Wisner has gotten up for that part of the

15  discussion.

16    (Laughter).

17          THE COURT:  I also saw Mr. Wisner in the back of the

18  courtroom today watching closing arguments.

19          MR. WISNER:  Yes, Your Honor.

20          THE COURT:  Please don't try anything remotely like

21  what the EEOC lawyer did in closing argument, because --

22          MR. WISNER:  Yeah.

23          THE COURT:  -- I will come down on you if you do.

24          MR. WISNER:  Well, I mean, I think you telling the

25  jury that she misrepresented it twice was well done, Your

```
 1    Honor.

 2            THE COURT:  You won't be saying that if I do it to

 3    you.

 4        (Laughter)

 5            MR. WISNER:  I won't misstate the facts, Your Honor.

 6            THE COURT:  One of the things I'm going to do is I'm

 7    going to read the transcript of closing arguments in the state

 8    court case in an effort to help set some ground rules about the

 9    closing arguments in this case.

10            MR. WISNER:  If Your Honor would like, we can even get

11    you a video of it.  It was videotaped.

12            THE COURT:  How long were they?

13            MR. WISNER:  I believe we had a cap of two hours each.

14    My original closing was an hour and a half followed by a 15-,

15    20-minute rebuttal.

16            THE COURT:  Yes, why don't you get us the videotapes.

17    I'd appreciate that.  And the transcripts.  We probably don't

18    have the transcripts right now, so why don't you submit the

19    transcripts as well.

20            MR. WISNER:  Sure.  I can even attach the PowerPoints

21    if you want to take a look.

22            THE COURT:  Sure.

23            MS. WAGSTAFF:  Do you want to just do it right now?

24                        (Laughter)

25            THE COURT:  On the issue of jury selection, I mean, I
```

 1   will make a general comment, which is:  Monsanto appears to

 2   want to proceed with jury selection as if this is a death

 3   penalty case.  And we're not going to proceed with jury

 4   selection as if this is a death penalty criminal case.

 5       What I would propose, subject to -- I mean, I'll see what

 6   you-all think of this, but normally in criminal -- normally, in

 7   criminal cases I use a written questionnaire.  And, normally,

 8   in civil cases I do not use a written questionnaire.  The jury

 9   pool just comes and sits, and we all have a nice conversation,

10   and then we pick a jury.

11       In this case I was assuming that, at a minimum, we would

12   prequalify the jury for time availability; right?  That we

13   would send out a communication to prospective jurors in

14   advance, to make sure that they are available, you know, in the

15   month of March for a trial.

16       Now, how long did the trial last in -- how long did the

17   Johnson trial last?

18           **MR. WISNER:**  We have the hours and we have the days.

19           **THE COURT:**  Okay.

20           **MR. WISNER:**  So they were pretty short trial days.  We

21   had basically an hour and a half lunch, ended at 4:30 sharp.

22           **THE COURT:**  When did you start?

23           **MR. WISNER:**  9:30.

24           **THE COURT:**  So 9:30 to 4:30, with an hour and a half

25   lunch.

1          **MR. WISNER:**  And we usually started at 10:00 because

2    we were arguing about stuff.

3          **THE COURT:**  That's not going to happen in this trial,

4    I assure you.

5          **MR. WISNER:**  I'm very good with that, Your Honor.  It

6    was usually not us raising stuff, for what it's worth.

7          So days, it stretched out about six weeks.  And there was

8    even a week-long break after the jury was selected before we

9    actually started taking testimony.

10          **THE COURT:**  So the six weeks includes the week of jury

11    selection and the week-long break?

12          **MR. WISNER:**  No.  If you do that, it's about seven

13    weeks.  Six weeks of jury selection and trial.  There was a

14    break though during the July 4th break because we knew we'd

15    have too many hardships for that; people's vacations and

16    whatnot.

17          **THE COURT:**  So a five-week-long trial, basically?

18          **MR. WISNER:**  Yes, Your Honor.  And that was much

19    shorter, I think, than both sides anticipated.

20          We didn't call quite a few witnesses that we were ready to

21    call, and defendants also did not call quite a few witnesses,

22    expert witnesses.

23          I think part of it was that we had an agreement with the

24    jury, essentially, that we would have them out of there by

25    August 10th, so we were just sort of making it work.  I don't

```
 1   know if that will happen this time.
 2        If they modify experts, that simplifies things, I think.
 3             THE COURT:  How many experts total testified?
 4             MR. WISNER:  We had five.  They had four.
 5             MR. STEKLOFF:  I'm relying on Mr. Wisner.  I was
 6   not --
 7             MR. WISNER:  Yeah, if I'm wrong, I'm sorry.
 8             MR. GRIFFIS:  That sounds correct.
 9             MR. WISNER:  Mr. Griffis was there.
10             THE COURT:  Okay.  We will time qualify them.  Our
11   trial days, as you probably know, we go from 8:30 to between
12   2:00 and 2:30, with a 45-minute lunch break.  And we go -- we
13   run things very efficiently.  We start right at 8:30.  We're
14   always going between 2:00 and 2:30.
15        And I was sort of envisioning a four-week trial on that
16   schedule.  So I was sort of envisioning that we would be done
17   by, you know, the end of March.
18        We can have further discussions about that as we get
19   closer.  It's not necessary to decide that firmly right now.
20   But --
21             MR. WISNER:  Is there a dark day as well, Your Honor,
22   or no?
23             THE COURT:  Well, that's a good question.  In this
24   trial that just ended today, we did not have a dark day last
25   week.  We went all five days.  I would think, since we're going
```

```
 1   a month, or if we're going a month or longer or only a little

 2   bit less, we would want to consider having --

 3        I think we'd probably have to have dark days, right,

 4   Kristen?  We'd have to have Thursday be dark.  Probably move

 5   our case management conferences to Thursdays, as well, so we

 6   don't have them on Tuesday afternoon.

 7             MR. WISNER:  I think it also helps, Your Honor, with

 8   jury hardships as well.  They know there's a day they can go

 9   back to work to answer emails or whatnot.

10             THE COURT:  Yeah.  So, anyway, we can talk more about

11   how long we anticipate the trial to be later on, but I was --

12   as I was saying before I got sidetracked -- or before I

13   sidetracked myself, was that we -- you know, we should

14   definitely prequalify them for time availability.

15        I would also be open to -- I have some concerns about it,

16   but I would be open to doing a questionnaire that they fill out

17   in advance from home or -- or having them come in, you know,

18   several weeks in advance and fill out the questionnaire.

19   That's another -- that's maybe better.

20        You're both nodding your heads to that.  So maybe we could

21   prequalify people for availability, have them come in and fill

22   out a questionnaire like a couple of weeks in advance.  I'm

23   just thinking out loud here at this point.  Okay.

24        And then decide how many people we want to have fill out

25   the questionnaires, go through them, figure out who we can
```

1    disqualify.

2         But then, at that point, after we've gone through the

3    questionnaires and figured out who should be disqualified, I

4    would propose to just have people in and do jury selection as

5    we normally do jury selection, which is that I -- you know, for

6    whoever is the prospective juror who is in the courtroom, I ask

7    them to stand and -- or I don't know if we ask them to stand,

8    actually, but we ask them to just answer a few questions about

9    themselves out loud so we can start to get a feel for them.

10        Speaking out loud, just like ten basic biographical

11   questions.  Those are on my website.  And then we go through.

12   They ask questions, sometimes I interrupt and ask follow-up

13   questions.  And then -- and then I do some raise-your-hand

14   questions usually.  Maybe I wouldn't do it in this case because

15   we already have the benefit of the questionnaire.

16        Then I turn it over to the lawyers and let you do voir

17   dire for a time, and that's it.  It's not clear to me why we

18   would need -- those are already very -- sort of extra

19   procedures for jury selection in a civil case that we don't do

20   in your typical civil case.

21        I understand why we might need to, given who the defendant

22   is and given the subject matter, but -- and that's fine, but

23   all this business of individually voir diring jurors, I

24   don't -- I would be -- I have a pretty strong reaction against

25   that.  Nor do I think that it will take longer than a day to

1    pick a jury.  So those are my thoughts.

2        I'm happy to hear from either of you, get your reaction on

3    those thoughts.

4        **MR. STEKLOFF:**  If I may, Your Honor.  We would like a

5    questionnaire because we think there is a level of bias and

6    hostility toward Monsanto that is unique given this litigation,

7    given the company, given the jurisdiction.

8        I think the parties did see that in the Johnson

9    litigation.  They had a questionnaire there and then had some

10   level of individual voir dire.

11       I also think what's unique --

12       **THE COURT:**  I'd like to see at some point, doesn't

13   have to be anytime soon, but I would like to see the

14   questionnaire that was used in the state court trial.

15       I would think we would keep it relatively simple and

16   short, I mean, that we could craft six or seven questions that

17   we could ask them.  But, anyway.

18       **MR. STEKLOFF:**  I think our concern, beyond just having

19   a questionnaire that might expose some hostility or biases in

20   either direction, but maybe more likely toward Monsanto, is

21   that if you --

22       **THE COURT:**  Oh, I think definitely towards Monsanto.

23       **MR. STEKLOFF:**  If you proceed with group voir dire,

24   especially given the verdict and the amount of publicity that

25   has occurred in the jurisdiction regarding the verdict, if a

juror starts to talk in the group -- in front of the group

about the verdict or even about his or her hostility toward

Monsanto, it can taint and pollute the entire venire.

**THE COURT:**  Let me just stop you for a second.

Putting aside the verdict and just talking about hostility

toward Monsanto, I mean, we pick juries every day in courtrooms

across America where people express hostility toward the

police, in a criminal case where somebody's liberty is at

stake.

We don't do individual voir dire just because somebody has

hostility towards the police.  The hostility they have towards

the police might be rational, it might be irrational.  It might

be based on personal experience, it might be based on what

they're reading in the paper.

None of that is ever thought, typically -- unless it's a

death penalty case or something, none of that has ever been

thought typically to require one-on-one questioning of

prospective jurors.

And so I understand this case is very important to you,

but every case is important to everybody who's involved in

trying it.  And I don't see why this case should be different.

**MR. STEKLOFF:**  I agree with the premise.  I was an

assistant public defender for four years, so those people, I

wish that they -- they usually were excused by the government.

I think the difference is that people come in to court,

everyone has a view on police officers that they come in with

naturally.  And no one is going to tell something about a

police officer, the general profession, that someone hasn't

thought of.

I mean, they may talk about one incident that has made

them particularly biased, for example, against police officers,

or the opposite.  They may be a spouse of a police officer

or -- and then have biases in favor that they would believe the

police officers.  But it's just sort of a natural part of life.

**THE COURT:**  But I just did an employment

discrimination case, and it was a case involving a transgender

male.  The plaintiff was a transgender male.  We had a very

nice, productive discussion in open court with the prospective

jurors about -- and some had very strong preconceived notion

about -- notions about gender reassignment one way or the

other.

Most people didn't have any strong preconceived notions

about it.  People shared their opinions.  Some people had

strong preconceived notions about employees taking advantage of

their, you know, disadvantaged status to get more stuff from

their employer.  Others had strong feelings that employers

systematically discriminate against disadvantaged groups.

I mean, what's the difference here?

**MR. STEKLOFF:**  I think the difference is that here

people -- there may be jurors who come in with -- I mean, we

```
 1   would say misconceptions, but preconceived notions about
 2   Monsanto, about things like GMOs, about Roundup, and about
 3   science or what they think is science.
 4       There is a lot of false publicity or false information out
 5   there about Monsanto.  And then you could have --
 6           THE COURT:  No, no, sorry.  Go ahead.
 7           MR. STEKLOFF:  I was going to say then you could have
 8   jurors providing, with a lot of emotion, misinformation to
 9   other jurors about the company and about those --
10           THE COURT:  I understand your point, but I actually
11   wonder if this -- it might be more effective to deal with this
12   problem that you are identifying by having regular open court
13   jury selection, because, you know, I'm pretty good about
14   cutting people off when they start going on a rant about
15   something that is not relevant to, you know, the -- you know,
16   is not relevant to the trial and might be prejudicial to a
17   party.
18       And I'm pretty good about explaining to people that, you
19   know, you have to -- the question is not whether your views are
20   correct or not.  Everybody has different views.  People are
21   right, people are wrong about stuff.  But the issue is, can you
22   put you aside any information you may believe is true, that
23   you've learned previously, and decide the case on the evidence
24   that comes in the four walls of this courtroom?
25       And by me saying that and having that group discussion
```

```
 1   with people, I feel like sort of the gravity of that sort of
 2   comes across better, potentially, than the process you're
 3   describing.
 4        MR. STEKLOFF:  I think there's a place for individual
 5   voir dire and group voir dire, but I think there are some
 6   things that could be so prejudicial that, by the very nature of
 7   them coming out -- and I would put the Johnson verdict, the
 8   post trial publicity about -- these are just -- just the
 9   factual -- the facts; that jurors have written letters that
10   people may have reviewed, jurors have been on the news.
11   There's been a lot of publicity about the tentative ruling, a
12   lot of publicity about the final ruling, and someone stating
13   those things publicly, whether you -- and I understand that
14   people --
15        THE COURT:  Anybody friends with Neil Young and Daryl
16   Hannah?
17        MR. WISNER:  I am now.  It's pretty cool, Your Honor.
18        MR. STEKLOFF:  They may be here watching, Your Honor.
19   And I think that someone talking about those types of events --
20   I mean the numbers, the dollars associated with the verdict,
21   and I think some of the other scientific things, if it comes
22   out before Your Honor can sort of explain that that's not part
23   of the trial and that's not relevant, can have such an impact
24   on other jurors and can bias them toward -- I mean, they should
25   not know about the verdict or what happened in this other
```

1    trial.

2        And I -- and then I think there could be a balance where

3    at least bringing some jurors up sidebar, if they expressed

4    hostility in the questionnaire or raise their hand to one of

5    your yes-or-no-type questions, I think there's at least a

6    combination of things that can be done, both individually and

7    through group voir dire, that --

8            **THE COURT:**  Why couldn't I just --

9            **MR. STEKLOFF:**  -- federal courts and certainly state

10   court.

11           **THE COURT:**  Why couldn't I just say, look, some of you

12   may have heard about the prior litigation involving this issue.

13   The prior litigation involving this issue is not relevant to

14   this case.  It is not for your consideration.

15       And, therefore -- first of all, we can ask them in the

16   questionnaire whether they've heard about prior litigation

17   involving this issue, so we know who knows about it and who

18   doesn't.

19       I actually have another question about that, that I'll get

20   to in a second, but why can't I just say during jury selection,

21   you know, there has been prior litigation involving this issue

22   and that is not relevant and it should not be -- anything you

23   know about, that should not be discussed in open court.

24           **MR. STEKLOFF:**  Because -- well, if some -- I guess the

25   concern is that if there are people -- I think it depends on

1   the details.

2        If we know about who knows about it in the jury

3   questionnaire, and those people are not struck, for example,

4   ahead of time, I think we would have to question them

5   individually, not in front of the group, about what they know

6   and whether they could be fair in light of what they know.

7        If there are people who say that they don't know about it,

8   I'm not sure that that would be -- we would probably oppose an

9   instruction to tell them that there's other litigation because,

10  I mean, it depends which way it goes.

11       Often we deal with this issue in mass tort cases of not

12  trying to talk about the overall scope of the case and having

13  the jury focus on the single plaintiff and the single trial.

14       **THE COURT:**  Okay.  Do you want to briefly give me your

15  view on this?

16       **MR. WISNER:**  Yeah, Your Honor.  I'll be very quick.

17       Regarding the questionnaire, I don't think we have a

18  problem with that principle whatsoever, as we stated in our

19  papers.  That was very effective in the Johnson case.

20       We didn't need 500 jurors.  We had 120.  Twenty-seven of

21  them were struck for cause because when you asked them, "Can

22  you be impartial towards Monsanto?" they said, "I couldn't."

23       **THE COURT:**  Are you saying that there were 120 jury

24  questionnaires?

25       **MR. WISNER:**  That's correct.

1          **THE COURT:**  120 people filled out their

2     questionnaires, and you said 20-some people were struck on the

3     basis of their questionnaire responses alone?

4          **MR. WISNER:**  No.  It was based on that with a

5     combination of open-air questioning and a handful, probably

6     maybe 7 or 8, back chambers ones.  And those ones were

7     situations where they said on their questionnaire stuff like

8     Monsanto is evil, or, I gave a presentation about Monsanto's

9     agricultural practices in college.

10         **THE COURT:**  I would think that both sides would

11    consent to those people being excused based on the

12    questionnaire response.  I would think that we wouldn't even

13    drag them into the courtroom.

14         **MR. WISNER:**  Well, the first one, yes.  Evil, right,

15    that's clearly bias.  If they gave a presentation, I think we

16    want to know what that presentation was about; right?

17         If it was a presentation about the economics of the

18    agricultural industry, that might not be so bad.  If it was a

19    presentation about Monsanto being evil, okay, that's another

20    conversation.

21         So I think that's where the --

22         **THE COURT:**  I suppose in your mind there would be no

23    difference between those two things.

24         (Laughter)

25         **MR. WISNER:**  I try to eat organic, but I'm not

1   perfect.

2        I guess what I'm trying to say is, I think that I sort

3   of -- a rule set in stone that we're going to have a two-phase

4   voir dire would be needless.  Ferreting out the obvious biased

5   people, I think, can be done through a questionnaire.

6        And I actually think you're right about open air

7   questioning about these issues.  I think it actually -- it

8   actually gives Monsanto a chance to fix any misstatements made

9   by a juror or explore --

10            THE COURT:  Or it gives me a chance.

11            MR. WISNER:  Yeah, that's correct.

12            THE COURT:  And I'll tell you again, I mean, you know,

13   I'm not sure anyone is an expert on this topic.  I've done the

14   trials that I've done in the last five years.  Every time, I go

15   sit in my chambers with the jurors afterwards and I talk to

16   them.

17        And this jury today, all they talked about was how they --

18   you know, yeah, my own personal experience and bias starts to

19   creep in, and I had to tell myself not to allow that, and I did

20   a really good job at it, and we all did a really good job at

21   it, and we were all very careful to listen to your instructions

22   that you told us over and over and over again that you've got

23   to limit your consideration to the evidence that comes in in

24   the trial.

25            MR. WISNER:  I agree, Your Honor.  Actually, I have

1    picked a jury with Mr. Stekloff before for trial in Virginia,

2    which I lost.  My first trial ever.  And, you know, we picked a

3    jury in a morning.  And that was a pharmaceutical case which

4    had a bunch of biases.

5        There was actually a juror who was impaneled who had

6    previously represented the defendant 30 years prior, and I

7    couldn't get him off for cause.

8        So I think, you know, there's biases that go both ways,

9    and you have to deal with that as part of trial work.  So

10   that's our position.

11       And, obviously, our last issue, the gag order didn't come

12   up.  We strongly oppose that.

13          THE COURT:  I'm not issuing any gag orders.

14       But that relates to, sort of, a question I have for

15   you-all about jury selection.  And that is, I'm not sure I've

16   really had a trial before where, you know, a significant

17   portion of the jury pool is going to come -- you know, is going

18   to potentially have read about the issue or potentially have

19   some familiarity with the issue through media exposure and the

20   like.

21       When I read about other cases that have that, I always --

22   so, my sense -- this is not really something I've really

23   studied, so what I'm saying may be incorrect now, but my sense

24   is that, oftentimes, if the person has been exposed to any --

25   any information at all in the media about a particular -- that

 1   particular issue, that, like, disqualifies them; right?

 2        So if somebody were to say -- as applied to this case, if

 3   somebody were to say, you know, oh, yeah, I remember reading an

 4   article about how the World Health Organization thinks that

 5   glyphosate causes cancer and that the Environmental Protection

 6   Agency thinks that it doesn't -- let's just say as an

 7   example -- I mean, you know, it's not obvious to me that that

 8   person should be disqualified from being on the jury for the

 9   reasons that I just articulated, that you -- you follow up and

10   you ask them, well, okay, you read that.

11        You know, there are things that are accurate in the news

12   and there are things that are inaccurate in the news.  And, you

13   know, you -- the point is, to have a fair trial, you need to be

14   able to put aside whatever sort of media coverage you've been

15   exposed to and consider the case based on the evidence that

16   comes in.

17        Or even, potentially, there was another verdict in this

18   case, you know, and -- but anything you know about the prior

19   verdict in this case, you should not give that any

20   consideration.  You've got to decide the case based on the

21   evidence.

22        And then you ask them questions designed to discern

23   whether they are capable of doing that and they think they're

24   capable of doing that.

25        My gut reaction is that somebody like that should remain

on the jury if they answer those questions to your

satisfaction.

So I wanted to let you know that, A, that's my gut

reaction; B, it is not an issue that I've studied; C, my sense

is that in other high-profile trials perhaps judges do it

differently and are more quick to excuse people.

So I wanted to invite you to submit briefing on that

issue, briefing on, you know, the extent to which exposure to

media coverage of the issue of Roundup causing or not causing

cancer would automatically disqualify somebody from being on a

jury.

**MR. GRIFFIS:**  Your Honor, may I say one thing that

doesn't answer the question you just asked?

**THE COURT:**  That's always a good way to introduce a

comment.

**MR. GRIFFIS:**  I'm one of the lawyers who tried the

case for Monsanto, and I just stood up to make one point in

clarification of something Mr. Wisner said.  He said 120 jurors

were put into the venire and then we picked a jury from that.

That was the first venire.  We had 120 jurors, and Judge

Bolanos's thought was we would successfully impanel a jury from

those 120, and we did not.  She had to bring another 100-plus.

I don't remember if it was 100, 110 or 120, but at least a

hundred more jurors in order for to us get to a jury.  And

there's been a lot more publicity since then.  That's the

 1  reason for the number.  That's all I wanted to say.

 2          **THE COURT:**  Thank you.

 3          **MR. STEKLOFF:**  And, Your Honor, may I respond to your

 4  hypothetical?

 5          **THE COURT:**  Sure.

 6          **MR. STEKLOFF:**  I think there's a difference -- and I

 7  don't want to concede that a juror's heard about, using your

 8  hypothetical, IRARC and World Health Organization and EPA.

 9      There's a difference between that because I would feel

10  confident that within, you know, five minutes of the case

11  starting in opening that there will be talk on the plaintiffs'

12  side about what the World Health Organization found and

13  probably on the defense side about the EPA.

14      So that seems different than the other example --

15          **THE COURT:**  Although that may be -- I mean, I touched

16  on that issue in my *Daubert* ruling.

17          **MR. STEKLOFF:**  Yes.

18          **THE COURT:**  We may have further discussions about

19  that.  But, anyway, go ahead.

20          **MR. STEKLOFF:**  I agree.  And I'm not conceding that

21  they should be allowed to talk about the World Health

22  Organization and IARC.  We'll where that goes.  But it's a

23  little bit different, I guess, is my point, than something that

24  is totally irrelevant to the jury's consideration, that they've

25  been exposed to, which is that a group of jurors viewing what

```
 1    they will assume is similar evidence to what they are seeing,

 2    whether it will be similar evidence or not, based on that

 3    evidence, came to a unanimous decision that Monsanto, one,

 4    caused someone's cancer to the amount of, I think, $29 million

 5    in compensatory damages; and, two, engaged in such malice and

 6    oppressive conduct -- I guess it was $39 million --

 7              MR. WISNER:  20.

 8              MR. STEKLOFF:  -- add a $250 million punitive verdict.

 9    And so that is just completely irrelevant to what is going to

10    happen in the courtroom and will never be explained to them one

11    way or another.

12              THE COURT:  I understand what you're saying, and I

13    would like to get briefing on this topic.  But, I guess, my gut

14    reaction is, people are exposed to irrelevant information

15    outside the courtroom with some regularity, and we tell them

16    not to consider it.  And so where is the line?

17        I mean, maybe the line is with the verdict.  Maybe you

18    draw the line at the verdict and you say, well, if they've been

19    exposed to other information, maybe that's okay, maybe they can

20    be rehabilitated, or maybe we can ask them questions about

21    whether they can decide the case fairly.  Maybe if they know

22    about the verdict, maybe they can't.  You know, maybe that's

23    too much.

24        I don't know.  I'm just saying that I don't know where the

25    line is.  And my gut is that my instinctual reaction -- my
```

1    sense is that my instinctual reaction about where the line

2    should be is maybe different from other judges' reaction about

3    where the line should be and, therefore, I want to understand

4    the scope of my authority on this issue, on -- on that topic.

5         **MR. STEKLOFF:**  Thank you.

6         **THE COURT:**  Does that make sense?

7         **MR. STEKLOFF:**  Absolutely.  And that's helpful, and we

8    can brief that.

9         **THE COURT:**  When should you file those briefs?

10         **MR. STEKLOFF:**  We can be flexible.

11         **MR. WISNER:**  Your Honor, would you like concurrent

12    briefing or would you like sequenced briefing?

13         **THE COURT:**  In this case you can just each file a

14    brief, I think, and no replies or anything like that.

15         **MR. WISNER:**  Two weeks works for me.  I don't know

16    what your -- this is not a rushed thing.  We have some time

17    before February.

18         **THE COURT:**  Why don't we just say -- what if I told

19    you -- why don't you get through the discovery cutoff and stuff

20    and why don't you file it on -- why don't you file it on

21    November 30th.  How about that?  Friday, November 30th.

22         **MR. STEKLOFF:**  That's acceptable, Your Honor.

23         **THE COURT:**  Okay.

24         **MR. WISNER:**  I would also point out, Your Honor, I

25    think this is important, and you'll see it in our brief,

```
 1   although it really won't address the issue you just raised,

 2   which is the scope of your authority.

 3        For example, excluding anybody who's read the news

 4   essentially creates its own bias.

 5        THE COURT:  Well, that's the difficulty I have with

 6   this issue.  That's kind of my concern.

 7        MR. WISNER:  Okay.

 8        THE COURT:  Yeah.  Okay.  So what I would like to do

 9   is maybe take a short break.

10        And then I think that the only things remaining on the

11   list that I rattled off at the beginning -- the only thing

12   remaining is the Defendant Fact Sheet and then any other

13   discovery on the defendant.

14        I have different thoughts about different subjects that

15   you-all raised within that, so I may have to take a little bit

16   more time; hopefully, not too long.

17        So why don't we take a break and come back at ten to 4:00.

18             (Recess taken at 3:39 p.m.)

19             (Proceedings resumed at 3:54 p.m.)

20        THE COURT:  Before I forget, should we schedule

21   another case management -- I know we earlier today scheduled a

22   telephonic CMC for the Bailey case, but should we schedule

23   another case management conference for a longer multi-issue

24   discussion like the one we're having now?  And if so, when

25   should that be?
```

1          **MS. WAGSTAFF:**  Your Honor, that's probably a good

2     idea.  And we would propose the week after Thanksgiving.  Maybe

3     the 28th, 29th, or 30th.

4          **MR. LASKER:**  Just a second, Your Honor.

5          **THE COURT:**  Sure.  Take your time.

6               (Discussions held off the record.)

7          **MR. STEKLOFF:**  Your Honor, only because we're going to

8     submit those jury selection briefs on November 30th, we thought

9     maybe the following week might be better, after you've had a

10    chance to review those, so we can potentially continue to have

11    discussion about jury selection.  So we were going to throw out

12    the 3rd or 4th, which is the following week.

13         **THE COURT:**  In terms of when I would most likely --

14    when it would most likely -- when I could be most helpful to

15    you, does that sound like an appropriate time?

16         **MR. STEKLOFF:**  I think sometime in early to mid

17    December makes the most sense because it will give us enough

18    notice before trial on those types of issues.  Doesn't have to

19    be the 3rd or 4th.

20         **MS. WAGSTAFF:**  Yeah, if it turns out that we don't

21    have anything substantive, we can request it be telephonic or

22    request it be cancelled altogether.

23         **THE COURT:**  I guess, you know, my preference would

24    be -- my preference actually would be to do it on the 28th,

25    just for our schedule.  And you could file your -- file your

1    brief on -- briefs on jury selection on -- well, you know what?

2    Sorry.  Scratch that.

3         So we have jury selection on the 5th in a case that's

4    definitely going to go.  What about -- oh, what's this

5    evidentiary hearing on the 6th?

6         (The Court and courtroom deputy confer off the record.)

7              THE COURT:  Give me just one second here.  Let's do

8    Wednesday afternoon, at about 2 o'clock, because we'll have

9    that jury picked by lunchtime.

10             MR. BRAKE:  I'm sorry.  Your Honor, what day?

11             THE COURT:  Sorry.  December 5th.  Let's say 1:30,

12   actually.

13        And so why don't you file a case management statement on

14   the 30th, along with your briefs that are due on the -- on the

15   jury selection issue.  Why don't you also file proposed

16   questions for a jury questionnaire, because that will help us

17   inform the discussion.

18        So on the 30th, file questions that you would propose.  I

19   would try to keep it light, if you could.  But file questions

20   for the proposed jury questionnaire.  And then, obviously, in

21   the case management statement you can tee up whatever else you

22   want to tee up.

23        Okay.  So that's good.  Now, fact sheet.  Let me pull

24   those papers up.

25             MS. WAGSTAFF:  Your Honor, while you're pulling that

1    up, I just wanted to bring to your attention something that I

2    will be filing in the next week, which is a -- one of my

3    client's, Richard Giglio, his case number is 3:15-cv-02279, in

4    the Southern District of California, he's actually the second

5    oldest federal complaint.  He's dying, and so we're going to be

6    filing a motion for a preferential trial date.  That will

7    probably come in the next week or so.  I haven't had time to

8    confer with Monsanto yet, but I just wanted to give you a

9    heads-up that we will be filing that.

10          **THE COURT:**  Okay.  And so what are you going to be

11   requesting, that he kind of go into Group 1 or something?

12          **MS. WAGSTAFF:**  I don't think that he could be ready

13   by -- well, maybe he could.  We're kind of working out --

14          **THE COURT:**  He would have to be tried down in the

15   Southern District then, under the current circumstances anyway?

16          **MS. WAGSTAFF:**  Yeah.

17          **THE COURT:**  Okay.

18          **MS. WAGSTAFF:**  And Judge Moscowitz is the judge that

19   he was assigned.

20          **THE COURT:**  Okay.  So I assume that what that will

21   mean is that you will want to -- we'll want to work up any

22   summary judgment motions on that case on an expedited basis

23   even though it's not in Group 1?

24          **MS. WAGSTAFF:**  That's right, Your Honor.  We'll be

25   asking for something like that, pretty much a CMO for a trial

1  date and remand.  And it's been Your Honor's communication to

2  us that you want him to be trial ready before remand, so we

3  would be asking that his case be released from the stay and get

4  trial ready.

5       **THE COURT:**  Consider whether you want to put it on the

6  same schedule -- I was proposing that you set a schedule for

7  Bailey, you know, to be ready to try in May.  Consider whether

8  you want to put this case on the same schedule and the same

9  discovery schedule, the same summary judgment schedule, with

10  the idea that it would, I guess, be transferred after that.

11     Of course, Monsanto may oppose this motion, and I'll --

12       **MS. WAGSTAFF:**  Yes.

13       **THE COURT:**  -- obviously consider that.

14       **MS. WAGSTAFF:**  To be fair, this is the first time

15  they've heard about it.

16       **THE COURT:**  All right.  Let's see here.

17     Pull up your case management statement.  Okay.  So here

18  is -- let me give you my kind of tentative view on each of

19  these topics that you have flagged for a Defendant Fact Sheet.

20       **MR. LASKER:**  If I could, Your Honor, there are some

21  issues that I think as in further looking at this may inform

22  your thinking, that I think will be useful, because we've been

23  trying also to get our hands around what would be the most

24  efficient way of addressing some of these issues.

25     And one of the big problems we have comes out, as well, in

```
 1    the Plaintiff Fact Sheets that we've received for the first
 2    three plaintiffs, is that the Plaintiff Fact Sheets don't
 3    actually identify information that would even allow us in any
 4    theoretical world to provide information that plaintiffs are
 5    requesting.  In part because plaintiffs don't identify the
 6    product they used accurately.
 7        I mean, for example, Mr. Hardeman identifies having used
 8    Roundup concentrate.  There is no product named Roundup
 9    concentrate.  And we don't -- so we can't respond with respect
10    to that particular product.
11        And, similarly, we have an issue of -- we don't have
12    identification, and maybe this is something that we could have
13    done differently in Plaintiff Fact Sheet, but we don't know
14    where they purchased the product.
15        We know sometimes there was a town where they used it or
16    where they claim they were exposed, but there are three, for
17    example, different markets entirely.  There is a residential
18    market, there is an IT&O market, and there's an agricultural
19    market.
20        And it's possible, certainly with the IT&O and the
21    residential, depending on which store you go to, they may be
22    parts of different markets.
23        I'm not sure if there's agricultural co-ops, those would
24    also be something a person would go and get a product.  I don't
25    know.  But we don't know -- based on the information they've
```

1  given us, we wouldn't be able to get that information either.

2      Now, we do, for individual plaintiffs, based upon their

3  Plaintiff Fact Sheet, we have produced already to the

4  plaintiffs all the labels we have -- those were produced a long

5  time ago -- for our products.  We have also produced the

6  formulation sheets for all of the products.  That was produced

7  a long time ago.

8      **THE COURT:**  On the labels, you produced all the labels

9  you've used.  Does it come with any explanation of where and

10  when these labels appeared?

11      **MR. LASKER:**  Right.  That's what I'm going to get

12  into, because what we think is the most efficient way of doing

13  this is some summary document as opposed to trying to do this

14  plaintiff by plaintiff, which we can't do anyway.

15      And we're looking at -- I know in our case management

16  statement we were trying to figure out a way of doing this, but

17  the problem that we're seeing is that it still relies upon the

18  plaintiffs to have information they can give us that's actually

19  accurate.

20      So there are a number of formulations that have been

21  marketed in the United States.  It's actually fairly lengthy.

22  Probably about 50 different formulations of products that have

23  been marketed in the United States.

24      And what we would propose doing is to be able to provide

25  information with respect to those products in a summary fashion

1    so that each individual plaintiff, to the extent they can

2    identify the product -- or if not, it doesn't, I guess,

3    matter -- we will have that information provided to the

4    plaintiffs so that that would sort of cover the universe.

5         We would not have to respond plaintiff by plaintiff in a

6    way that is not going to work anyway.

7              THE COURT:  So what information would come with the

8    list of the 50 products?

9              MR. LASKER:  Okay.  So it would be the formulation,

10   the statement of formulation, which is what they are

11   requesting.  We already have produced those, so we would be, I

12   think, pointing plaintiffs to where those are in the -- in the

13   document production we already have.

14        And I think --

15             THE COURT:  You were saying, We want to provide all

16   this information in one place.  And so you're going to provide

17   all this information in one place whether they have it already

18   or not.  And you're going to -- you're going to identify the

19   product, each product.

20             MR. LASKER:  Correct.

21             THE COURT:  You're going to identify each formulation

22   for each product.

23             MR. LASKER:  Well, we can -- I mean, there's two ways,

24   I suppose, we can do this.  And I haven't really thought it

25   through.

1          We have produced documents that actually have the

2    formulation on them.  So, as opposed to us writing a

3    interrogatory response, we would either identify where that is

4    in the production set for them or --

5          **THE COURT:**  Okay.  So forgetting, for the moment,

6    about the format the information comes in, the information that

7    you're -- is there a tapestry that you're proposing to provide

8    to the defendants -- I mean, the plaintiffs?

9          The product, the formulation.  What else?

10          **MR. LASKER:**  The labels.  Again, we have a document

11    production --

12          **THE COURT:**  Forgetting, for a moment, about whether

13    you have a document production --

14          **MR. LASKER:**  Right.

15          **THE COURT:**  -- or not, just the information that we

16    want to make sure is conveyed to the plaintiffs in some form.

17    Product, formulation, labels.

18          **MR. LASKER:**  Right.

19          **THE COURT:**  What else?

20          **MR. LASKER:**  I think with respect to the --

21          **THE COURT:**  The formulation, that includes what

22    surfactant was used.

23          **MR. LASKER:**  Yes.

24          **THE COURT:**  All right.  What about where it was

25    available and when it was available?

1          **MR. LASKER:**  Well, I'm not sure that we have products

2     that were only available in certain locations.  I'm not exactly

3     sure of the answer to that.  The statement of formulation, the

4     labels have dates on them, so those dates will be provided with

5     those documents.

6          **THE COURT:**  So we know when certain formulations were

7     available on the market, you're saying; right?

8          **MR. LASKER:**  Right.

9          **THE COURT:**  Is that right?  Okay.  So when available.

10     So the product, the formulation, the labels that came with

11     that product, when that product was available.  What else?

12     You don't have any information about where certain

13     products were available and not available?

14          **MR. LASKER:**  I don't believe we would have that

15     information.  It's generally marketed.  I don't know that we

16     would know --

17          **THE COURT:**  If something was available in Northern

18     California but not in North Carolina or vice versa.

19          **MR. LASKER:**  I have to admit I don't even know whether

20     that type of market segmentation happened.  I have to go back.

21     And I'm not prepared on that issue.  I don't believe we would

22     have that information, but I don't know specifically.

23          **THE COURT:**  Okay.  What else?

24     Is there any other information that could be provided on a

25     product-wide basis that would be helpful to sort of -- to help

```
 1   the plaintiffs zero in on the particular products that a

 2   particular plaintiff might have been likely to be exposed to?

 3              MR. LASKER:  Not that I'm aware of, Your Honor.

 4              MS. WAGSTAFF:  So, Your Honor, the other things that

 5   we asked for in our -- and this is just -- sounds like what you

 6   all are talking about right now is Capital A on page 2 of our

 7   proposed DFS.

 8              THE COURT:  Seems like it, yeah.

 9              MS. WAGSTAFF:  Yeah.  And so the other things that we

10   asked for would be the source of the surfactant, if Monsanto

11   could provide that, and the percentage of concentration.

12       And I'm not -- I guess I'm just not familiar enough with

13   the date on the label, but --

14              THE COURT:  I mean, I assumed that the word

15   "formulation" would have included percentage of --

16              MS. WAGSTAFF:  Okay.

17              THE COURT:  -- the surfactant.  Is that right?

18              MR. LASKER:  It is, Your Honor.

19              THE COURT:  Okay.

20              MS. WAGSTAFF:  Okay.  And we want to know not just

21   when they became available but when they were no longer

22   available.

23              THE COURT:  I was assuming that that was included.

24              MR. LASKER:  I'm not sure we'll be able to pinpoint

25   all of those dates.  That -- I don't know that we have a date
```

```
 1   that it was no longer available on the market.  That's based

 2   upon -- I don't think -- I don't think we track that

 3   information.

 4        THE COURT:  Surely you have dates about when a

 5   product -- a particular product or formulation was

 6   discontinued.

 7        MR. LASKER:  We have dates upon which new products

 8   were -- formulations became available on the market.  But to be

 9   able to say as of this date this product was no longer sold, I

10   don't think we retained any of that information, no, Your

11   Honor.

12        Again, the issue here is we have -- and it depends, I

13   guess, upon how you define the product and how -- because we

14   have the same formulation that might have slight labeling

15   changes, and so those new labels would go out.  Might be

16   renamed, so you would have the new name of the product that

17   goes out.

18        THE COURT:  Right.

19        MR. LASKER:  And that would be authorized as of a

20   certain date.  When that -- whether that's exclusive or when

21   the other product is no longer, under that name, available we

22   wouldn't have that information.  We have EPA approvals to

23   market the new product.

24        THE COURT:  Right.  But I guess I would be surprised

25   to learn that a company like this doesn't have information
```

1   about when it stopped producing a particular formulation of

2   this product.

3       Why wouldn't they have that information?

4       **MR. LASKER:**  Your Honor, there is -- I mean, the way

5   this market works with different formulations and different

6   changes in the labeling, as long as the product was approved

7   for sale by the EPA, if there was a market that wanted that,

8   the product might be available.

9       We -- under the regulatory scheme that is imposed, we need

10  to get authorization to be able to sell products and to sell

11  new products.  But it's not like when you have a prescription

12  drug case where you have one drug and then it ends off the

13  market and it's sort of a clear situation.  That's not the way

14  this market works.  That's all I can tell you.

15      We have looked to see what information we have.  We have

16  this information on labels and formulations.  Obviously, to the

17  extent that there is a dispute if a plaintiff says that they

18  used it, we're not going to be able to say they didn't by

19  saying, No, we stopped.  That's an issue for us.

20      **THE COURT:**  You don't -- it sounds like you're saying

21  you haven't really investigated yet whether one particular

22  product or one particular formulation might have been available

23  in North Carolina but not in Northern California.

24      **MR. LASKER:**  I'm going to have to speak for myself.  I

25  don't know the answer to that.  I'll have to go back and talk

 1   to other folks.

 2        As far as -- I mean, there are certain products that, by

 3   their nature, are specific to certain types of -- particularly

 4   in the agricultural space, but even in the potentially IT&O

 5   space where there are formulations that are designed for

 6   certain times of crops or certain types of weeds, then, by the

 7   nature of the products, they may be more -- you know, more of a

 8   demand in certain areas than in others.  But beyond that, we

 9   wouldn't have any information, Your Honor.

10        **THE COURT:**  Okay.

11        **MS. WAGSTAFF:**  So with respect to, again, just talking

12   about one, and we talked about marketing as well, but just the

13   concept of what Mr. Lasker is talking about, I think plaintiffs

14   would be okay with -- the way I'm kind of thinking about it in

15   my mind is a big chart where a plaintiff who used a

16   particular -- you know, in three years could come in and point

17   and say, Here I am on this chart.

18        Mr. Lasker is saying that he's given us a lot of this

19   information.  I'm not sure if that's true or not, but you told

20   to us put that aside.  And I just want to make it clear that

21   the labels don't always say the surfactants in the formulation,

22   so I want to make sure you're going beyond --

23        **THE COURT:**  Well, I --

24        **MS. WAGSTAFF:**  -- different documents.  Okay.

25        **THE COURT:**  I think that this situation calls for

```
 1   Monsanto to put together the kind of chart -- you referred to
 2   it as kind of an interrogatory response.  I think this
 3   situation calls for that.
 4            MS. WAGSTAFF:  Okay.
 5            THE COURT:  So even if Monsanto has -- even if the
 6   information could be gleaned from the millions of documents
 7   that Monsanto has been asked for in this case, I think Monsanto
 8   needs to put together this information so it's all in one place
 9   and the plaintiffs can do what you're describing.
10            MR. LASKER:  And that was our proposal.
11            THE COURT:  Okay.
12            MS. WAGSTAFF:  Okay.  And so then going on -- and this
13   is, again, just going on --
14            THE COURT:  Hold on.
15            MS. WAGSTAFF:  Oh, sorry.
16            THE COURT:  Were you going on to the like sales rep
17   and distributor info?
18            MS. WAGSTAFF:  No.  I was on page 3, now, of our
19   proposed DFS number 4.  We captured marketing along with the
20   labeling, so the labeling was 1 and formulation was 2.
21        3, we had asked for --
22            THE COURT:  I actually haven't -- you'll have to
23   forgive me.  The one thing I forgot to look at -- I read your
24   discussion in the case management statement about the different
25   topics, but I actually haven't looked at the proposed
```

 1   Defendant's Fact Sheet.  I think I looked at it back at the

 2   last one.

 3           MS. WAGSTAFF:  It's the same one, yeah.

 4           THE COURT:  But I haven't looked at it anew.

 5           MS. WAGSTAFF:  So in the chart that we're all

 6   contemplating, we've talked about numbers 1 and 2.  So A1 and

 7   A2.  That's a hard copy of it.

 8        And then the next topic would be marketing material for

 9   each of these products.

10           THE COURT:  Right.  And I would think that the same --

11   that that needs to be included as part of this package.

12           MS. WAGSTAFF:  Yeah.

13           THE COURT:  Something that can be readily accessed,

14   that allows the plaintiffs to link a particular product to

15   particular marketing materials.

16           MR. LASKER:  Yeah.  So, Your Honor, on that issue,

17   again, we have different markets.  With respect to -- I guess

18   there's two points to this.  There are -- there was questions

19   about sales representatives and those materials.

20        So for the residential products, those have been, since

21   19- --

22           THE COURT:  Well, let's put aside sales reps for a

23   minute.  It sounds like a slightly different discussion talking

24   about sales reps as opposed to advertising materials.

25        Or are you saying sales reps carried with them marketing

1    materials?

2          **MR. LASKER:**  The distinction then comes in marketing

3    and advertising and not necessarily in Monsanto speaking the

4    same as you're envisioning.  So let me just sort of lay out

5    what our issues are and how we think we can go about this.

6          So with respect to the residential -- or consumer, I

7    guess, residential market, since 1998, that has been handled by

8    Scotts.  They have been in contract with Monsanto to handle all

9    of the marketing of those materials.  We don't have --

10          **THE COURT:**  Scotts?

11          **MR. LASKER:**  Scotts, like the Scotts Home-Gro.  So we

12    don't have that in house.  That's been handled by Scotts.  We

13    don't have any information pre-1998.  That's 20 years ago.  We

14    just don't have that information retained.

15          There has been discovery already with respect to -- from

16    Monsanto with respect to that relationship.  The contract has

17    been produced.  There's been lots of documents that have

18    already been pulled into the document production.  But that

19    should cover the residential home user market.

20          With respect to the IT&O market, there are regional sales

21    managers.  And, in fact, for California, that is a Pool [sic]

22    who's already been deposed and whose documents has already been

23    produced.

24          There are two others, Tim Ford and -- I'm blanking on the

25    last name, I'm sorry -- Jack Conway, whose documents have

1    already been produced, who already have -- plaintiffs already

2    have their depositions as well.

3            THE COURT:  Which market is this?  Sorry.

4        MR. LASKER:  This is for the IT&O, which is

5    landscapers.  Industrial turf and ornamental is what that

6    stands for.

7        We do have territory maps going back to 2004, so we've

8    looked at that to identify who had responsibilities for which

9    regions in the country.  We can produce those maps, and I'll

10   have the names of those individuals.

11       Again, with respect to the cases that will be tried here,

12   Your Honor, for the IT&O market, that's Steve Gould, whose

13   documents were already produced.  And he was deposed in

14   connection with the D. Johnson case.  So that discovery has

15   been had.  Again, that's IT&O.

16       I don't know that any of the plaintiffs in your Group 1

17   trials, the first three are all residential, so those would all

18   be covered by Scotts.  I don't know if the other two will have

19   any IT&O component to them.

20       The final category is the agricultural products.  And,

21   again, we have territory maps that we can provide that I think

22   also go back to 2004.  Those are much more complicated.

23           THE COURT:  You're talking about territory maps for

24   sales reps now?  Is that what you're talking about?

25       MR. LASKER:  Yeah.  They would be chemistry account

1    managers, which is the same thing.

2              **THE COURT:**  Okay.

3              **MR. LASKER:**  And we can produce some information.  We

4    have -- let me take that back.  I'm going through my notes

5    here.

6         We have a current version of the map for various

7    territories, and the chemistry account managers in those areas

8    we can produce.

9         We do not have historical maps that lay out that

10   information to be able to identify those people, but we do have

11   a current map that we can produce to the plaintiffs.

12        Again, that's not going to affect the current trials we

13   have lined up here.  None of them were agricultural, but going

14   into the future, something down the road, if we have -- I'm not

15   even sure in Group 2, but if we have Group 3 and we have

16   plaintiffs in other parts of the country, although I assume we

17   have some agricultural in California as well.

18             **THE COURT:**  But, again, I do think that in -- perhaps

19   in this area, too -- when you're talking about sales reps and,

20   I guess, distributor materials, you know, it should all be kind

21   of in one place where the actual plaintiffs can look and try

22   and figure out where they fall on that.

23             **MR. LASKER:**  Okay.  So the way that -- and this is --

24   as you'll recall, when we went through this for discovery in

25   phase 1, Monsanto didn't have central files as such.  These are

1   custodial-based files.

2       That's why, for example, with the D. Johnson case, Steve

3   Gould was made available, all the documents were made

4   available, and the deposition made available of the IT&O

5   manager in this part of the country.

6       We -- you know, to be able to -- and I think, as I said,

7   for IT&O we've already done that for three of the people who

8   cover large parts.  We also have the midwest because we have

9   cases out there.  That's already been handled.

10      For the residential side, Scotts' documents have already

11  been produced.  And there's a number of, through custodian,

12  records again, because we've had discovery that's been ongoing

13  and not as quite -- quite as clear from the case management

14  statements as it could be, Your Honor.

15      We have been continuing to produce documents at our

16  ongoing production of documents.  Through meet-and-confer we've

17  had with some of the same plaintiffs' counsel in the St. Louis,

18  Missouri litigation, we just produced 400,000 documents, I

19  think, at the end of October.

20      And we have another production with respect to maybe

21  400,000 pages, six custodians.  We have another four custodians

22  whose documents we are producing at the end of November or

23  sometime in the next -- sometime in November.

24      So we've been doing that same sort of approach in getting

25  those documents out.  And so that is the way -- you know, we

1   would propose we have those identified, the people who would

2   have the information.

3         **THE COURT:**  I'm left with a very abstract

4   understanding of what you're -- that description leaves me with

5   a very abstract picture of what's being provided to the

6   plaintiff.

7         So I'll ask you:  What do you think you need that you

8   don't have that you can't readily cull from the stuff that you

9   already have?

10        **MS. WAGSTAFF:**  Yeah, I was completely on board

11  following it until he started talking about the sales rep

12  stuff.

13        Just going back to the marketing material, what I would

14  like to include in the chart is -- he says he has 50

15  formulations.  I'd like to look at the chart and say product 43

16  had these marketing materials associated with it, these TV

17  commercials, these pamphlets, these newspaper ads, whatever it

18  was that they marketed for this period of time.

19        If it's localized by region -- which it may be in the

20  marketing, maybe not with the formulations, but by region, you

21  know, they probably target their ads differently in San

22  Francisco than they do in New York City or wherever -- that's

23  what we would want.

24        And to the extent that Scotts has them, I would think

25  that's in Monsanto's control.  I think they could probably get

1    those from Scotts.  Or if they've been produced -- or if we

2    need to get them from Scotts because Monsanto doesn't have

3    control over them, I guess we would do that.

4        But to complete that chart and this Capital A that was in

5    our DFS, that's sort of what we would be thinking that we

6    wanted, was just, you know, a chart where it said, you know, in

7    these particular years this brochure was in circulation.  Very

8    simple.

9            **THE COURT:**  And here's where.

10           **MS. WAGSTAFF:**  And here's where, yeah.

11           **MR. LASKER:**  And just to be clear, Your Honor,

12   Monsanto does not have those types of records, and that's not

13   the way the product marketing was handled.

14       There was advertising agencies who did have the

15   responsibility.  It was contracted with advertising agencies

16   who we've identified for plaintiffs.

17       One of them is in the course of producing documents right

18   now.  That's Osborn & Barr.

19           **THE COURT:**  In the course of producing documents what?

20           **MR. LASKER:**  I'm sorry, the name of the advertising

21   agency is Osborn & Barr.  And so plaintiffs have requested

22   discovery on Osborn & Barr, and that production is underway, I

23   believe.

24           **THE COURT:**  Okay.  Let me just cut this off for a

25   second and ask you a question.

1      One of the things I was going to propose for this is

2   perhaps -- I don't know if this is the right answer, but

3   perhaps taking a different approach to the Group 1 plaintiffs

4   and the remaining plaintiffs.

5           MR. LASKER:  Okay.

6           THE COURT:  Okay.  Now, for the Group 1 plaintiffs,

7   first of all, let me just say that, on a couple of the issues

8   that the plaintiffs have flagged, adverse event reports and

9   communications with healthcare providers, I don't think that is

10  the subject of a -- of a Defendant Fact Sheet.

11      I don't see what -- those seem like both -- probably it's

12  very unlikely that in most situations either of those two

13  things are going to be hits.  And you can ask questions in

14  discovery about them as to specific plaintiffs if you want to.

15      It's also information the adverse event report issue,

16  that's something that should be in the plaintiffs' -- plaintiff

17  should possess some -- you know, if they called the emergency

18  hotline or whatever, they'll probably remember that.

19      So that's number one, is I didn't think those should be

20  part of Defendant's Fact Sheets.  Those two issues.

21      So then that would leave us with, I think, pretty much all

22  the stuff we have at least started talking about, right?

23  Product labels, formulations, surfactants, advertising, sales

24  reps, distributor information.

25      That stuff, I wonder if it would be better to zero in on

these three plaintiffs, or potentially four plaintiffs if you
include Bailey, right, and you say, okay, Monsanto, you need to
identify -- like, based on the information you have about these
three plaintiffs or these four plaintiffs, you need to identify
the products they may have been exposed to and, based on the
information they've given about when they were exposed, where
they were exposed, where they got the stuff, et cetera, et
cetera, okay, you need to give us information on, you know, the
products they were potentially exposed to, the labels attached
to those products, the formulations -- the different
formulations that those products might have had, any sales reps
who were involved in distributing that information, any
materials that were given to the sales reps, any material that
the sales reps may have given to sellers, any advertisements
that were associated with those products.  Just for those three
or four, all of that information just comprehensively and
clearly provided to the plaintiffs in one document or
understandable set of documents in the form of an interrogatory
response or something like that, whatever you think makes the
most sense.  Charts, whatever.  Okay.  And then we could have
further discussion about what's the best way to present this
comprehensively in a way that can be used by the remaining
plaintiffs.

        So let me ask first, does that make sense?  Because I'm
focused, again, primarily on getting these three or four cases

 1   ready for trial in short order.

 2         MR. LASKER:  And I think that does make sense, Your

 3   Honor.  We will need to get, though, more information from the

 4   plaintiffs because -- and I'm not exactly sure what we'll do.

 5         As I said, Mr. Hardeman, in his PFS, stated he was exposed

 6   to Roundup Concentrate.  We don't have a product named Roundup

 7   Concentrate.

 8         THE COURT:  Right.  But that's an easy --

 9         MR. LASKER:  There are numerous other products that --

10         (Unreportable simultaneous colloquy.)

11         THE COURT:  But you know where Hardeman was exposed,

12   you know when he was exposed.  So at that point, based on -- so

13   what I'm saying -- and I may not have made this clear --

14         MR. LASKER:  Right.

15         THE COURT:  -- it's not going to be on the defendant

16   to remember precisely what Roundup or what glyphosate product

17   or Roundup product -- pardon me, it's not going to be on the

18   plaintiff to know precisely what Roundup product he was exposed

19   to back in 1997.

20         It's going to be on Monsanto to figure out what are the

21   likely products that the plaintiff was exposed to back in 1997.

22   And any information that you need from the plaintiffs to get a

23   clue about that, did you get it -- you know, how did you

24   acquire this stuff, where did you use it, when did you use it,

25   any questions that we need to ask of the plaintiffs to allow

```
 1   Monsanto to provide that information, obviously we can ask the
 2   plaintiffs those questions.
 3           MR. LASKER:  Sure.
 4           THE COURT:  But the plaintiffs are going to provide
 5   that general information, information that we could reasonably
 6   expect to be in their possession.  And then Monsanto is going
 7   to figure out what products were available to that plaintiff,
 8   and here is all the information about advertising,
 9   formulations, et cetera, et cetera, labels, about these
10   products that were available -- we could reasonably expect to
11   have been available to the plaintiff at that time.
12           MR. LASKER:  Yeah.
13           THE COURT:  So that's how that's going to go.
14           MR. LASKER:  That makes sense, Your Honor.  And I'll
15   need to find out -- I think -- obviously, we have a very fast
16   time frame, so we'll need to get to the plaintiffs very quickly
17   about the specific questions we need beyond what we have in the
18   Plaintiff Fact Sheets right now to be able to --
19           THE COURT:  Okay.  So as to those three plaintiffs --
20           MR. LASKER:  Yes.
21           THE COURT:  -- any additional information you need,
22   you must -- you must tell them about it by Wednesday of this
23   week.  And they must respond to you with that information by
24   Friday of this week.
25       And then Monsanto can get to work on providing -- whether
```

1   you want to call it a fact sheet or a interrogatory response or

2   summary or a chart, I don't care what you call it.  All that

3   information that we have just discussed needs to be provided in

4   a readily available and readable and understandable format to

5   the plaintiffs.

6           **MR. LASKER:**  That makes sense, Your Honor.

7           **MS. WAGSTAFF:**  So, Your Honor, I think that works for

8   those three, but I -- I want to take us back to our last CMC

9   when plaintiffs were requesting that a PFS not be on every

10  single plaintiff.  And I believe it was Your Honor's position

11  that the information in the PFS helped Monsanto to pick

12  bellwether cases.  This information obviously will help us pick

13  bellwether cases, which --

14          **THE COURT:**  I'm not saying to put off --

15          **MS. WAGSTAFF:**  Okay.

16          **THE COURT:**  -- figuring out how to get Monsanto to

17  provide you the other information you need.

18          **MS. WAGSTAFF:**  Okay.

19          **THE COURT:**  To me, the most important thing is I want

20  it done for these three plaintiffs very quickly.  Okay.

21      So now we can turn back to the discussion of the format in

22  which all this other information is provided.  And it sounds

23  like we were making some progress on there.

24      We've sort of knocked out adverse event reports and

25  communications with healthcare providers, and the remaining

```
 1    information.  The question is whether all of that

 2    information -- I mean, I guess, basically -- are we talking

 3    about Group 2 here or are we talking about everybody?

 4         MS. WAGSTAFF:  So, you know, the way we proposed this

 5    was that Monsanto would respond to every plaintiff when they

 6    filed the Plaintiff Fact Sheet.

 7         THE COURT:  Right.

 8         MS. WAGSTAFF:  And so that's obviously our preferred

 9    method.  I do see the --

10         THE COURT:  It doesn't seem that practical.

11         MS. WAGSTAFF:  I do see that the -- the benefits of

12    doing a big chart.  So it would be for every plaintiff, it

13    wouldn't just be for Group 2 plaintiffs just like we're doing

14    PFS for every plaintiff.

15         THE COURT:  Well, one thing I was curious about,

16    Group 2, we were originally trying to zero in on people who

17    were likely exposed in California; right?

18         And, again, that is somewhat artificial now, based on what

19    I've told you, that I'm not comfortable, at least at this

20    point, pursuing the approach that I was considering pursuing

21    with respect to Group 2.

22         But perhaps a solution is just -- like, that would be

23    useful to virtually every Group 2 plaintiff, would be to focus

24    on California and just say, all right, Monsanto, we're going to

25    make you focus on California.
```

1      And for every Monsanto product that was available in

2   California from this time to that time, or maybe all time, I

3   don't know, you know, identify the label, identify the

4   formulation, identify the surfactants -- I guess that's part of

5   identifying the formulation.

6      Tell us -- you know, tell us where these products were

7   available, if not everywhere.  Tell us when they were available

8   in California.  Give us information about where they -- where

9   in California they were available, if they were available in

10  some part of California but not other part of California.  Give

11  us all the sales reps who were involved.  Give us all the, you

12  know, marketing material or distributor material that they had

13  and all the advertising associated with all the products sold

14  in California.

15          MS. WAGSTAFF:  So if the purpose --

16          THE COURT:  And when those ads ran, if you have that

17  information.

18          MS. WAGSTAFF:  So if the purpose of these information

19  exchange is to pick bellwethers, which I think it is, and we're

20  only going to focus on California with a defense fact sheet,

21  then I would request that nonCalifornia plaintiffs don't have

22  to do the Plaintiff Fact Sheet.

23          THE COURT:  We're not going to go back and revisit

24  whether -- all the plaintiffs have to do the fact sheet, okay.

25  And my question for you is not whether we should go back and

revisit what the plaintiffs have to do.   The plaintiffs have to

do what they have to do.

    The question is:  Does it make sense right now to limit it

to California?  Does that make it more manageable for Monsanto?

Or is there really no difference between doing that for, you

know, people who we can assume were exposed in California as

opposed to other parts of the country?

        **MR. LASKER:**  Yeah, I believe it would be more

manageable, they'll that in phases.

        **THE COURT:**  I mean, you're going to have to do it for

every --

        **MR. LASKER:**  I know.  I mean, it really is just a

timing issue and doing this as efficiently as possible, because

certainly, we are, over the course of this litigation, going to

provide that discovery.  We have already been providing

discovery along those lines in other jurisdictions as well.

    Frankly, it's in our interest to be able to do this and be

done.  And so I think what Your Honor is proposing as a way of

doing this more efficiently in stages makes sense.  I -- I --

so I'm going to say yes.

    I know there's a knowledge basis here I don't have in my

head right now, but I do think that would be a useful way of

structuring this.  And --

        **THE COURT:**  So can this be -- can we -- could we

agree, at this point, that -- or could we walk away at this

```
 1   point sort of agreeing that we have come up with a concept or

 2   agree that I'm forcing upon you a concept that, you know,

 3   for -- that there is going to be this comprehensive response

 4   from Monsanto on these topics that gives the plaintiffs the

 5   ability to figure out what products the plaintiffs were exposed

 6   to and advertising and labeling and sales reps and all that

 7   stuff maybe for California, and then have you all work together

 8   on precisely what format that's going to take and discuss it at

 9   the next case management conference, which we're having, I

10   think, in early December?  Does that make sense?

11        And in the meantime you can kind of pilot it, if you will,

12   with these three and possibly four plaintiffs who are in

13   Group 1.

14        MR. LASKER:  That's fine.  Just for clarification,

15   this deadline for Wednesday and Friday would just be for the

16   three.  We only have the three Plaintiff Fact Sheets.

17        THE COURT:  Correct, because we don't know yet if

18   Bailey's going to be in the group.

19        MS. WAGSTAFF:  And, Your Honor, that works for

20   plaintiffs.  You gave us a deadline of Wednesday, Friday.  And

21   then what's the deadline for Monsanto to give us the

22   information?

23        THE COURT:  That's a good question.  What's the

24   deadline for Monsanto to give them the information?

25        MS. WAGSTAFF:  And I'll tell you that Mr. Hardeman has
```

1   already asked for this information in an interrogatory about

2   two weeks ago.

3           MR. LASKER:  Well, yeah.

4           MS. WAGSTAFF:  Or a week ago.

5           MR. LASKER:  So, two things.  First of all, I'm

6   assuming we'll have the information for Mr. Hardeman to be able

7   to answer it.

8       I would say that we should be able to get that in, I would

9   think, for the -- I'm going to put the advertising to one side

10  for a moment.  For the rest of it, I would think within a

11  couple of weeks we should be able to get -- at least, I'm

12  saying that because I don't -- so I'd say two weeks from this

13  Friday.

14      For the advertising, these are all going to be, as I

15  understand it, residential.  So there's going to be Scotts that

16  handles the marketing of that.  So we'll have to talk about --

17  I think we've already produced a lot of Scotts materials.

18      So I'm just going to have to figure out how we're going to

19  identify for plaintiffs -- to the extent that that is an issue,

20  I don't know that it is, but if it's all residential, then --

21  we've produced documents from Scotts already.

22          THE COURT:  Okay.  What you're going to put

23  together --

24          MR. LASKER:  Is what those are.

25          THE COURT:  -- is here are the advertising materials

1   that the plaintiffs may have been exposed to based on what we

2   know about where they were and what they were using and when

3   they were using it.

4           **MR. LASKER:**  Right.  The only reason I have any

5   hesitancy here is Monsanto didn't handle that.  Scotts handles

6   that.  So that's been that way since 1998.  So I'm a little bit

7   at a disadvantage to be able to say how Scotts has got those

8   documents already.

9           **THE COURT:**  Okay.  Well, what the order is going to be

10  is that Monsanto provide all of that information to the

11  plaintiffs by November 16th.

12          **MR. LASKER:**  Okay.

13          **THE COURT:**  Including the advertising information as

14  it relates to the three plaintiffs in Group 1.  So that's an

15  order you can take back to Scott and your clients -- Scotts and

16  your clients.

17          **MR. BRAKE:**  Your Honor, may I interject one moment, if

18  I may?  Our expert -- the plaintiffs' experts are due on

19  November 20th.  And I imagine that a lot of the information

20  that you're requiring Monsanto to produce is going to be

21  relevant to their opinions, perhaps to specific causation.

22          **MR. LASKER:**  I think, with respect to formulation, we

23  can get it to you earlier, actually.  So that's an issue of

24  the -- what's in the product.

25          **MR. BRAKE:**  Yes.  I'm just saying if we were not to

1  get that specific formulation information until the 16th,

2  that's going to be really hard to have our experts incorporate

3  that into the reports by the 20th.

4          THE COURT:  Shall we accelerate the formulation

5  information?

6          MR. LASKER:  Yeah, I think we can probably do that,

7  because all we're going to do that for that -- it really is as

8  soon as we get the actual product names.  We already have it,

9  and it's searchable.  As soon as we get exact names, we can do

10  that more quickly.  It's already been produced.

11          THE COURT:  So how about the formulation information

12  by November 9th?

13          MR. LASKER:  That's fine.

14          THE COURT:  And the remaining information by

15  November 16th?  Is that what I said, November 16th?

16          MR. BRAKE:  Yes, sir.

17          MR. LASKER:  Yes, Your Honor.

18          MR. BRAKE:  Thank you, Your Honor.

19      Your Honor, I didn't mean to interject, but I thought that

20  was an important point.

21          THE COURT:  Fine.  Okay.

22      So is that -- have we made sufficient progress today on

23  the Defendant's Fact Sheet?

24          MS. WAGSTAFF:  We have.  And it's my understanding

25  that the CMC statement for next time, we will include a

1   proposal for the California plaintiffs.

2       **THE COURT:**  Or if you determine that -- if you

3   determine that it doesn't make sense to limit it to the

4   California plaintiffs for whatever reason, if we should include

5   the Hawaii plaintiff, that's fine.  Or the -- you know,

6   whatever.

7       **MR. LASKER:**  Right.

8       **THE COURT:**  But the point is that Monsanto is going to

9   need to sort of collect and provide all of this information.

10  And whether it has already included the information at

11  different points in different cases or the same cases, I don't

12  care about any of that.

13      **MR. LASKER:**  Right.

14      **THE COURT:**  You just need to put that information

15  together.

16      **MR. LASKER:**  Right.

17      **THE COURT:**  And that's what you were proposing as

18  well, and so that's what you need to work on, is the format and

19  the precise content of the information and stuff, and so you

20  need to work on that for the next case management conference.

21      **MR. LASKER:**  Very good, Your Honor.

22      **MS. WAGSTAFF:**  Thank you, Your Honor.

23      **THE COURT:**  Okay.  Is there anything else for us to

24  discuss right now?

25      I had on my notes the issue of other discovery on

 1 | Monsanto, but I don't -- I no longer remember why I have that

 2 | on my notes.

 3 |          **MR. LASKER:**  We are in the process and we've been

 4 | discussing with Mr. Wisner because we're coordinating through

 5 | different litigations.  So as I stated previously in the

 6 | St. Louis litigation, we had through meet-and-confer agreed to

 7 | ten documents.  Those are documents we are producing pursuant

 8 | to certain search terms.  And we are doing that.  And we

 9 | produced, I think, 400,000 pages at the end of last month.  We

10 | have four more custodians who are geared up for this month.  We

11 | have been engaged in a similar meet-and-confer process with

12 | Mr. Wisner, which I agree has been on for a long period of time

13 | for a variety of reasons on both sides.

14 |     We've been moving in the right direction in fits and

15 | starts, I think it's fair to say.

16 |     Where we are right now, as I understand it, is we've made

17 | a lot of progress.  We have -- the real situation we have and

18 | it was somewhat similar to a situation we had in phase 1, is

19 | the issue of the number of custodians and the extent to which

20 | some of those are potentially duplicative.

21 |     And as Your Honor recalled, in phase 1 of the MDL we ended

22 | up actually going through a process of plaintiffs proposing

23 | certain custodians, and we walked through which custodians Your

24 | Honor believed we should produce.

25 |          **THE COURT:**  I remember that with great fondness.

 1          **MR. LASKER:**  And I think, Your Honor, and the hope,

 2     Your Honor, is that we don't have to go through that process

 3     again with you.  Although I'm sure you're willing to offer your

 4     services.  But we have been going through that process to try

 5     and do the same thing here and, as I said, we've been making

 6     progress, but we're not there yet.

 7          And I -- Mr. Wisner will tell you where he is now.  I know

 8     there was a conversation, I think last week, on this.  I think

 9     we're waiting for Mr. Wisner's responses, I think here now.

10          **MR. WISNER:**  Well, Your Honor, it's not so much a

11     response as much as here's where we stand.  Monsanto believes

12     we've made a lot of progress because it's essentially been me

13     agreeing to things for several months.

14          What happened is, as part of the JCP proceeding, I have

15     gone through all of the search terms and all the custodians

16     that were ever done.  And I found some pretty big gaps in

17     document production.  Search terms that I think -- I don't

18     think anybody would dispute would probably hit on relevant

19     documents.

20          And I put together a sort of comprehensive search --

21     additional search of the same custodians plus a couple of extra

22     that we've come to know about over time.  And each person I can

23     actually speak to intelligently.  These aren't just willy-nilly

24     decisions.  And the search terms were pretty extensive.  And in

25     trying to work through that in the JCP, to sort of supplement

1    general -- not just general causation but general liability

2    discovery across the company.

3        So it does involve causation, but it also involves

4    liability issues.  For example, the AHS was never searched in

5    these custodial files.  That obviously was relevant since it

6    was an important part of the trial.

7        So what I did, I proposed this list and I said, listen,

8    before we can talk intelligently about removing things or not,

9    I need you to tell me what's causing the problem.  You know, is

10   there some search term that's causing a crazy number of hits

11   that we really don't need?

12       And we've run through that process.  That's taken a long

13   time.  I've systematically gone through it, and I've kind of

14   boiled it down to what I thought were the ones that were

15   hitting on the most important stuff.  And that was going to

16   yield a production of about a million new documents.  Not

17   repeats.  These are new documents hitting on what I believe are

18   fairly relevant search terms.

19       Monsanto has told me that there is just no humanly

20   possible way for them to get us those documents before trial in

21   February.  And I said, Okay, what is your threshold?  And they

22   said 125,000 documents.  That's reasonably what we could do.

23       So I went back again and I tried to short -- you know, I

24   did the hard choices and it's down to about 350.  And I'm at a

25   place where I really don't know how much more I can negotiate

1    against myself on documents production.

2        And so that's why I wanted to bring it to the Court's

3    attention, because last time we sort of reached this impasse

4    you said, well, make it happen.  And then they made it happen

5    in the original production.

6        And so I don't know if I'm sort of haphazardly doing that

7    here, but I sort of am.  And so that's the situation I'm in.

8    And I'm in a bit of a bind because I do want to complete this

9    document production before the first trial.

10       And I'm sort of the document sleuth as part of this

11   litigation, so it's really something that's important, I think,

12   for trial.  It's really what the Johnson case was about, was

13   about the documents and testimony.

14       So that's where we're at.  And I don't really know what to

15   do beyond, say, you know, I've tightened my belt as much as I

16   think I can.

17       **THE COURT:**  So it sounds like, at least from your

18   standpoint, what you're saying is we are at the point where we

19   have a ripe discovery dispute.

20       **MR. WISNER:**  That's correct.

21       **THE COURT:**  That we have -- that Monsanto is saying

22   this is not doable and you are saying, I need it to be done.

23   And you need to articulate why it is that you need it.  You've

24   done it a little bit in your case management statement.

25       **MR. WISNER:**  Sure.

1        **THE COURT:**  But you need to tee it up as a discovery

2    dispute and articulate in your letter why it is that these new

3    documents are documents that are likely to be important.  And,

4    you know, you need -- Monsanto needs to articulate why they're

5    not likely to be important or why it would be too difficult to

6    produce them.

7        And it sounds like, based on what you're saying, you

8    should tee that up sooner rather than later.

9        **MR. WISNER:**  Yeah.

10        **THE COURT:**  And so why don't you tee it up, why don't

11    you all submit a discovery letter by Friday.

12        **MR. WISNER:**  Not a problem, Your Honor.

13        **MR. LASKER:**  That's fine, Your Honor.

14        **THE COURT:**  Okay.

15        **MR. LASKER:**  And as part of that same process, put

16    that in the same discovery letter, we have --

17        **THE COURT:**  I mean, unless you feel you've adequately

18    set forth the issue in the case management statement, and I'm

19    just not remembering.

20        **MR. LASKER:**  I don't think we have, Your Honor.  I

21    think you're right on that.

22        **THE COURT:**  Okay.

23        **MR. LASKER:**  The other issue -- and we can tee this up

24    in the discovery letter as well -- is we have been receiving

25    separate document requests by plaintiff that are general.

1    They're not -- I mean, certainly not as opposed to

2    documents that are specific to Mr. Hardeman or documents that

3    are specific to Mr. Stevick.

4    But we received general documents.  Last time some were

5    received before, some of which are overlapping.  We would want

6    to be able to get discovery, sufficiently have this all

7    coordinated so we can talk --

8        **THE COURT:**  Are these plaintiffs represented by people

9    in leadership?

10        **MR. LASKER:**  This is for Mr. Hardeman and Stevick.

11    These are the case -- I think it's those two cases.

12        **THE COURT:**  Okay.

13        **MR. LASKER:**  So we can include that in the same

14    discovery dispute, so Your Honor can address that as well.

15        **THE COURT:**  Okay.

16        **MR. LASKER:**  Thank you, Your Honor.

17        **THE COURT:**  Great.  Anything else anybody needs to

18    discuss right now before we say good-bye?

19    No?  All right.

20        **MR. LASKER:**  Thank you, Your Honor.

21        **THE COURT:**  Thank you.

22    (Counsel thank the Court.)

23    (At 4:54 p.m. the proceedings were adjourned.)

24                        -  -  -  -

25

```
1

2

3                      CERTIFICATE OF REPORTER

4           I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Wednesday, October 31, 2018

8

9

10

11   _____

12        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```