

2001 M STREET NW
10th Floor
WASHINGTON, DC 20036

WWW.WILKINSONWALSH.COM
—
A LIMITED LIABILITY PARTNERSHIP

WASHINGTON, D.C. | LOS ANGELES

November 30, 2018

**VIA ECF**

Hon. Vince Chhabria
San Francisco Courthouse, Courtroom 4
450 Golden Gate Avenue
San Francisco, CA 94102

    Re:    *In re Roundup Prods. Liab. Litig.*, **No. 3:16-md-02741-VC**

Dear Judge Chhabria:

    As requested by the Court at the October 29, 2018 Case Management Conference ("CMC"), Defendant Monsanto Company ("Monsanto") submits (1) this letter brief addressing the standard for striking jurors for cause in light of exposure to pre-trial publicity, and (2) a proposed juror questionnaire, attached as Exhibit A.

    As explained below, the risk of prejudice from pre-trial publicity here is substantial. This is not simply a case where a substantial percentage of the jury pool bears some general animus against one of the parties. Here, there is substantial animus toward Monsanto, which is compounded by publicity surrounding the *Johnson* verdict. At the first MDL trial, Monsanto will face the ***same claims***, in the ***same city***, with jurors drawn from the ***same jury pool***, where barely six months prior, a jury unanimously found against it in a highly publicized ***$289 million*** verdict.

    Given this risk of prejudice, Monsanto requests that the Court use a short, written juror questionnaire designed in part to identify those prospective jurors with knowledge of the *Johnson* verdict. Given the prejudicial nature of that verdict and the implications it could have on a juror's mindset, any prospective juror who reveals particularized knowledge about the verdict (as described below) should be automatically struck for cause. If the Court is not inclined to automatically strike those prospective jurors, at a minimum, the Court should allow individualized voir dire of those with knowledge of the *Johnson* litigation—regarding topics including, but not limited to, the verdict—outside of the presence of the panel. Monsanto also renews its request that broader individual voir dire be permitted as generally appropriate given the animus in the jury pool.

> **1. There is substantial reason to believe that a significant number of prospective jurors know about the Johnson verdict and are biased against Monsanto.**

At the CMC, the Court commented that "I'm not sure I've really had a trial before" where "a significant portion of the jury pool" is "going to potentially have read about the issue or potentially have some familiarity with the issue through media exposure and the like."[1]

The Court's concern is well-founded. On August 10, 2018, a jury in San Francisco Superior Court—just blocks from this courthouse—awarded Dewayne Johnson $289 million against Monsanto on his claim that Roundup caused his non-Hodgkin's lymphoma. The *Johnson* verdict, and the subsequent motions and hearings that ultimately led to a reduced award of $78 million, received considerable media attention.

Just using the San Francisco Chronicle and its 22 million monthly readers as an example, the case was in the headline of eleven articles, including four in the month of October 2018 alone. And the trial received inflammatory news coverage in outlets across the country. A CNN article was one of many to include vivid images of the lesions on Mr. Johnson's skin.[2] That article also included a photograph of Mr. Johnson crying, with the caption: "Doctors weren't sure Johnson would live long enough to see his trial."[3] The Periscope Group, who advocates and provides legal advice for those alleging injuries from drugs and medical devices, published a paid advertisement in the San Francisco Chronicle entitled, "Dear Judge Suzanne Ramos Bolanos, What is a Life Worth?," urging Judge Bolanos to uphold the verdict.[4]

The high-profile nature of the verdict is obvious not just from the scope of the coverage but also from celebrity advocacy for Mr. Johnson. Robert F. Kennedy Jr. was quoted in the Associated Press as saying that Monsanto was acting "with reckless disregard for human life."[5] Neil Young and Daryl Hannah, who labeled themselves "among the millions of citizens who felt a surge of optimism that justice might actually prevail" following the *Johnson* verdict, penned an op-ed in the San Francisco Chronicle warning that "[a]ll of us should be concerned" by a potential reduction of the verdict as it would "signal to Americans" that "corporations like Monsanto are above the law."[6]

The *Johnson* case was also widely publicized and discussed online, including on major social media platforms such as Facebook and Twitter and on the websites of major news outlets such as CNN, Bloomberg News, NPR, and Reuters.[7] On the SFGate Facebook page, one article

---

[1] Exhibit B, 10/29/18 CMC Tr. at 59:17-60:1.
[2] Holly Yan, Jurors Give $289 Million to a Man They Say Got Cancer from Monsanto's Roundup Weedkiller, CNN, Aug. 11, 2018, available at https://www.cnn.com/2018/08/10/health/monsanto-johnson-trial-verdict/index.html.
[3] *Id.*
[4] Attached as Exhibit C.
[5] Daniel Arkin, Jury Orders Monsanto to Pay Nearly $290M in Roundup Trial, NBC News, Aug. 10, 2018, available at https://www.nbcnews.com/news/us-news/jury-orders-monsanto-pay-290m-roundup-trial-n899811.
[6] Neil Young and Daryl Hannah, Let $289 Million Jury Award Stand in Monsanto Case, San Francisco Chronicle, Oct. 14, 2018, available at https://www.sfchronicle.com/opinion/openforum/article/Let-289-million-jury-award-stand-in-Monsanto-case-13303640.php.
[7] *See, e.g.*, Yan, CNN; Joel Rosenblatt and Robert Burnson, Monsanto Loses $289 Million Verdict in Roundup Cancer Trial, Bloomberg, Aug. 10, 2018, available at https://www.bloomberg.com/news/articles/2018-08-

2

received 911 "likes" and 340 shares.[8]  A Facebook post referencing the trial by the Organic and Non-GMO Report, a publication dedicated to "focus[ing] on the risks of genetically modified foods and the growing trend toward non-GMO foods,"[9] received 4,000 reactions and 1,687 shares.[10]

As further evidence of the impact of the *Johnson* verdict on the jury pool, Monsanto retained Dr. Alex Simonson, a marketing research expert, to conduct a survey of a representative sample of the jury pool.[11]  As the Court predicted at the CMC,[12] Dr. Simonson found that a substantial percentage of survey respondents were generally hostile to Monsanto, with 49% of respondents indicating that they had negative thoughts regarding the company[13] and 40% of those respondents who were aware of Monsanto indicating that they would rule against Monsanto in a hypothetical lawsuit.[14]

More significantly, Dr. Simonson also found that a substantial percentage of the respondents were aware of the *Johnson* verdict.  Of those respondents asked about Monsanto, 33% were aware of a prior suit, including which side won, and of that number, 48% believed that the verdict was for $100 million or higher.[15]  Not surprisingly, respondents with knowledge of the *Johnson* verdict were more likely to harbor animus toward Monsanto.  60.2% of the individuals who had heard of a recent verdict against Monsanto said that they distrusted the company, in contrast to 45.8% of the total survey population, amounting to a 31.4% increase.[16]  The open-ended questions in the survey further support Monsanto's concern, as individuals who knew of *Johnson* had some of the following thoughts about Monsanto:

- "an evil and greedy company that makes people sick"
- "toxic & poisoning the food supply"
- "Bad, bad company.  They hurt family farms and poison consumers."
- "They poison the environment. And they cruelly tried to not pay for that sick janitors [sic] cancer payment"

---

10/monsanto-s-roundup-caused-groundskeeper-s-cancer-jury-finds; Vanessa Romo, Jury Awards Terminally Ill Man $289 Million In Lawsuit Against Monsanto, NPR, Aug. 10, 2018, available at https://www.npr.org/2018/08/10/637722786/jury-awards-terminally-ill-man-289-million-in-lawsuit-against-monsanto; Tina Bellon, Monsanto Ordered To Pay $289 Million In World's First Roundup Cancer Trial, Reuters, Aug. 10, 2018, available at https://www.reuters.com/article/us-monsanto-cancer-lawsuit/monsanto-ordered-to-pay-289-million-in-worlds-first-roundup-cancer-trial-idUSKBN1KV2HB.

[8] SFGate, Monsanto Case: Bay Area Man with Cancer Awarded $289 Million in Damages, Aug. 10, 2018, available at https://www.facebook.com/SFGate/posts/10160798095230594.  These numbers are as of November 29, 2018.

[9] The Organic & Non-GMO Report Facebook "about" page, available at https://www.facebook.com/pg/The-Organic-Non-GMO-Report-98397470347/about/?ref=page_internal.

[10] The Organic and Non-GMO Report, Monsanto Trial: Judge Rejects Bid to Overturn Landmark Cancer Verdict, Oct. 22, 2018, available at https://www.facebook.com/permalink.php?story_fbid=10157484926020348&id=98397470347.  These numbers are as of November 15, 2018.

[11] Dr. Simonson's Report is attached as Exhibit D.

[12] CMC Transcript at 50:18-22 ("I think [the bias or hostility will be] definitely towards Monsanto.")

[13] Simonson Report, Exhibit D, at 3.

[14] *Id.* at 19.

[15] *Id.* at 3.

[16] *Id.* at 21, 24.

- "They are a chemical company with no morality or social conscience. They are willing to sacrifice the well-being of people for their own maximum profits."
- "evil. They are out for profit, at the expense of health, environment and respect for their workers, or the people who come in contact with their products."
- "promoting/forcing its poisonous products on an unsuspecting public for decades. it's a known hazard to both human and wildlife."
- "[M]onsanto has known for years that round up causes cancer and, like the tobacco companies, continues to lie and deny."
- "I can't imagine having to use the vile weed-killer they sell, on a daily, monthly and yearly basis, and be exposed to such toxins."
- "They are a dire threat to the well being of planet Earth and all of its inhabitants."
- "Monsanto has a long history of tampering with science and studies and using political influence to get regulators to rule in their favor and against the well being of people and beings."
- "I am aware that Monsanto makes Roundup and that a man who used roundup to perform his job got cancer. This man just won a large settlement from Monsanto. I do Not [sic] know the details of this case, but it makes me unsure if one can trust [Monsanto]."
- "They make Roundup, and have lost a court case that because the principle ingredient causes cancer."
- "Monsanto has a history of hiding test results and fighting lawsuits, paying lawyers and not victims."[17]

At the same time, however, Dr. Simonson's survey also found that it would be possible to select a jury comprised of individuals unaware of the *Johnson* verdict. Of those individuals who had heard of Monsanto, 66.8% indicated they had not heard of the *Johnson* verdict.[18] This means that the above-referenced quotes come from a subset of roughly 26% of the total survey population. Additionally, 20% indicated that they had not heard of Monsanto and of those respondents who had heard of Monsanto,[19] 51% indicated they did not have negative feelings about the company.[20]

In sum, Dr. Simonson's survey makes clear that the challenge is not the sheer number of prospective jurors who are biased against Monsanto – in fact, a significant portion of respondents did not report having any preconceived views – but rather the *strength* of the bias for those individuals who are biased against the company. Monsanto's concern is that voir dire should be structured to take into account the strength of these biases to ensure that such individuals (1) are not ultimately empaneled on the jury, or (2) taint the remainder of the jury pool with their statements during voir dire.

---

[17] *Id.* at 22-23.
[18] *Id.* at 18.
[19] An additional 2.5% of respondents indicated they were not sure whether or not they had heard of Monsanto.
[20] *Id.* at 18.

4

### *2. The Court should exclude jurors with particularized knowledge of the* Johnson *verdict.*

As Dr. Simonson's survey confirms, many prospective jurors will come to court with some general exposure to issues in this litigation. Prospective jurors might have heard, for example, that Roundup has been alleged to cause cancer. Monsanto is not suggesting that such general exposure alone is sufficient to trigger automatic disqualification for cause. As the Supreme Court has explained, "[p]rominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling v. United States*, 561 U.S. 358, 381 (2010). Instead, the appropriate course is to question these individuals further to determine whether they can put aside their prior knowledge and impartially consider the evidence. *See United States v. Polizzi*, 500 F.2d 856, 879 (9th Cir. 1974) (holding that court must "adequately probe the possibility of prejudice," and cannot simply rely on a juror's self-assessment in case with substantial pretrial publicity).

The Ninth Circuit, however, has recognized that bias may be "presumed when 'the juror is aware of highly prejudicial information about the defendant,' which no ordinary person could be expected to put aside in reaching a verdict." *United States v. Gonzalez*, 906 F.3d 784, 797 (9th Cir. 2018 (quoting *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000)). Accordingly, courts have found that there are circumstances where the bell cannot be unrung – *i.e.*, the information is so prejudicial that the prospective juror should be struck automatically. *See, e.g.*, *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963) (holding that due process was violated because jury was drawn from community that had seen a film of the defendant's interrogation on television); *Irvin v. Dowd*, 366 U.S. 717, 725 (1961) (determining that prospective jurors were prejudiced by publicity "unleashed against [the defendant] during the six or seven months preceding his trial").

Monsanto believes that specific knowledge of the *Johnson* verdict is precisely the type of highly prejudicial information for which bias should be presumed. Knowledge that another San Francisco jury recently returned a plaintiff verdict in a nearly identical case and assessed hundreds of millions of dollars in actual and punitive damages suggests both that the jury here should find against Monsanto and provides the jurors with an improper yardstick by which to measure damages in this case. Monsanto does not suggest that a juror's mere awareness of other lawsuits involving Roundup is sufficient for exclusion, although parties in mass tort litigations typically agree not to reference other lawsuits, other trials, and other verdicts. But where a prospective juror (1) knows that Monsanto recently lost in a similar lawsuit, and (2) has some understanding of the magnitude of the award, that juror should be struck for cause.

Monsanto is not aware of any decision that addresses whether bias should be presumed under analogous facts. Arguably the most instructive case, therefore, is *Skilling*, 561 U.S. 358. There the former CEO of Enron argued that the pre-trial publicity about Enron's bankruptcy was sufficient to create a presumption of bias for the entire jury pool, requiring a change in venue. *See id.* at 368, 375-76. Although the Supreme Court rejected the argument, *id.* at 385, its reasoning supports Monsanto's far more limited request to strike prospective jurors with specific knowledge of *Johnson*.

In *Skilling*, the Supreme Court stressed that "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information." *Id.* at 382. The

5

Court determined that the "decibel level of media attention [had] diminished somewhat," given that "over four years [had] elapsed between Enron's bankruptcy and Skilling's trial." *Id*. at 383. Moreover, the trial court had conducted extensive voir dire designed to identify biased jurors, including jurors with knowledge of the alleged fraud. *Id*. at 389. "[T]he court examined each prospective juror individually, thus preventing the spread of any prejudicial information to other venire members." *Id*. And the parties "were accorded an opportunity to ask followup questions of every prospective juror brought to the bench for colloquy." *Id*. As a result of this extensive and individualized voir dire, of the 16 jurors and alternates, 14 "had paid scant attention to Enron-related news." *Id*. at 390.

By contrast, here, the news relates to a jury determination that Monsanto is liable in the amount of hundreds of millions of dollars and only six months will have passed between the *Johnson* verdict and the trial, with only four months having passed since there was significant additional media attention surrounding the reduced verdict. And Monsanto is not arguing that the entire jury pool is so tainted that there needs to be a change in venue. Rather, Monsanto seeks only to strike those with specific knowledge of *Johnson* – the very types of jurors that have been struck in other cases after extensive, individual voir dire. *See United States v. Giese*, 597 F.2d 1170, 1184 (9th Cir. 1979) (affirming district court's voir dire, in part, because it ensured that "[a]lmost every juror had little or no prior knowledge of appellant's indictment, arrest, and pending trial" and that prospective jurors who had already formed opinions about the case did not serve on the jury). Dr. Simonson's survey indicates that there is a sufficient pool of prospective jurors to ensure that those who have already formed an opinion do not serve on this lead trial.

### 3. *The Court should use the questionnaire to identify jurors with specific knowledge.*

The Court has contemplated "ask[ing] [prospective jurors] in the questionnaire whether they've heard about prior litigation."[21] Monsanto agrees that a written questionnaire is the best means of identifying these prospective jurors, because it allows the Court and the parties to elicit the information in an efficient manner that does not risk tainting the venire.

Accordingly, Monsanto's proposed juror questionnaire (Exhibit A) asks questions to determine whether potential jurors are aware of a prior recent verdict against Monsanto, the details of the case, or the amount of the damages award.

---

[21] Ex. B, CMC transcript at 55:15-17.

6

> 4. Have you heard or read anything about a recent trial in San Francisco involving Monsanto?
>
>    Yes___ No___
>    If yes,
>
>    (1) Do you know the outcome of the trial?     ____ Yes      ____ No
>
>        If yes, please write everything you remember about the outcome. _____
>        _____
>
>    (2) Please write anything else you remember about what you heard or read. _____
>        _____
>        _____
>
>    (3) Do you recall if any damages were awarded to any party in the lawsuit? _____
>
> 5. Do you have any opinions or feelings about Monsanto, or a manufacturer of herbicide (weedkillers), that may make it difficult for you to be a completely unbiased juror in a trial where an individual is claiming that the company's product caused their cancer?
>
>    Yes___ No___
>    If Yes, please explain: _____
>    _____
>    _____

### *4. At a minimum, the Court should allow individualized voir dire of jurors with knowledge of the* Johnson *verdict.*

In the event the Court is unwilling to presume bias for prospective jurors with knowledge of the *Johnson* verdict, Monsanto alternatively requests special voir dire procedures for those individuals. At a minimum, the Court should employ a process similar to what occurred in *Skilling*: prospective jurors who express knowledge of *Johnson* on the questionnaire should be examined separately by the Court and the parties. *See Skilling*, 561 U.S. at 385 (describing individualized voir dire of prospective jurors and noting that jurors aware of a plea in a related case did not serve on the jury). The Ninth Circuit has endorsed such an approach for cases with extensive pretrial publicity, explaining that the "court should make a careful individual examination of each of the jurors involved, out of the presence of the remaining jurors, as to the possible effect of the articles." *Silverthorne v. United States*, 400 F.2d 627, 639 (9th Cir. 1968) (quoting *Coppedge v. United States*, 272 F.2d 504, 508 (D.C. Cir. 1959)); *see also Giese*, 597 F.2d at 1183 ("The district court should conduct a careful, individual examination of each prospective juror, preferably out of the presence of the other jurors. A general question directed to the entire group of prospective jurors is inadequate.").

Monsanto requests that the Court follow this individualized voir dire procedure not only for those individuals that indicate in the questionnaire that they are aware of the *Johnson* verdict, but also those that have a bias against Monsanto and are not struck for cause based on their questionnaire answers alone. Dr. Simonson's survey affirms Monsanto's concern that a substantial percentage of the jury pool harbors animus against Monsanto. Given the stakes of this lead trial, the safer course is to conduct the additional voir dire to ensure an unbiased jury.

7

Respectfully submitted,

/s/ Brian L. Stekloff

Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
WILKINSON WALSH + ESKOVITZ LLP
2001 M St. NW, 10th Floor
Washington, DC 20036
Tel: 202-847-4030
Fax: 202-847-4005

Pamela Yates (CA Bar No. 137440)
(Pamela.Yates@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017
Tel: 213-243-4178
Fax: 213-243-4199

Eric G. Lasker (pro hac vice)
(elasker@hollingsworthllp.com)
HOLLINGSWORTH LLP
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

Attorneys for Defendant
MONSANTO COMPANY

Cc: Counsel of Record (via ECF)