# EXHIBIT B

Pages 1 - 105

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

```
IN RE ROUNDUP PRODUCTS          )
LIABILITY LITIGATION            )  Case No. 16-md-02741
_____ )
                                   San Francisco, California
                                   Monday, October 29, 2018
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:

```
                    WEITZ & LUXENBERG, P.C.
                    700 Broadway
                    New York, New York 10003
           BY:  ROBIN L. GREENWALD, ESQ.

                    ANDRUS ANDERSON LLP
                    7171 West Alaska Drive
                    Lakewood, Colorado 80226
           BY:  AIMEE WAGSTAFF, ESQ.

                    BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
                    12100 Wilshire Boulevard, Suite 950
                    Los Angeles, California 90025
           BY:  R. BRENT WISNER, ESQ.
                MICHAEL L. BAUM, ESQ.

                    THE MILLER FIRM LLC
                    108 Railroad Avenue
                    Orange, Virginia  22960
           BY:  BRIAN BRAKE, ESQ.
```

(Appearances continued on next page)

```
Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court
```

Page 47

1   know if that will happen this time.

2       If they modify experts, that simplifies things, I think.

3           THE COURT:  How many experts total testified?

4           MR. WISNER:  We had five.  They had four.

5           MR. STEKLOFF:  I'm relying on Mr. Wisner.  I was

6   not --

7           MR. WISNER:  Yeah, if I'm wrong, I'm sorry.

8           MR. GRIFFIS:  That sounds correct.

9           MR. WISNER:  Mr. Griffis was there.

10          THE COURT:  Okay.  We will time qualify them.  Our

11  trial days, as you probably know, we go from 8:30 to between

12  2:00 and 2:30, with a 45-minute lunch break.  And we go -- we

13  run things very efficiently.  We start right at 8:30.  We're

14  always going between 2:00 and 2:30.

15      And I was sort of envisioning a four-week trial on that

16  schedule.  So I was sort of envisioning that we would be done

17  by, you know, the end of March.

18      We can have further discussions about that as we get

19  closer.  It's not necessary to decide that firmly right now.

20  But --

21          MR. WISNER:  Is there a dark day as well, Your Honor,

22  or no?

23          THE COURT:  Well, that's a good question.  In this

24  trial that just ended today, we did not have a dark day last

25  week.  We went all five days.  I would think, since we're going

1   a month, or if we're going a month or longer or only a little

2   bit less, we would want to consider having --

3       I think we'd probably have to have dark days, right,

4   Kristen?  We'd have to have Thursday be dark.  Probably move

5   our case management conferences to Thursdays, as well, so we

6   don't have them on Tuesday afternoon.

7       MR. WISNER:  I think it also helps, Your Honor, with

8   jury hardships as well.  They know there's a day they can go

9   back to work to answer emails or whatnot.

10      THE COURT:  Yeah.  So, anyway, we can talk more about

11  how long we anticipate the trial to be later on, but I was --

12  as I was saying before I got sidetracked -- or before I

13  sidetracked myself, was that we -- you know, we should

14  definitely prequalify them for time availability.

15      I would also be open to -- I have some concerns about it,

16  but I would be open to doing a questionnaire that they fill out

17  in advance from home or -- or having them come in, you know,

18  several weeks in advance and fill out the questionnaire.

19  That's another -- that's maybe better.

20      You're both nodding your heads to that.  So maybe we could

21  prequalify people for availability, have them come in and fill

22  out a questionnaire like a couple of weeks in advance.  I'm

23  just thinking out loud here at this point.  Okay.

24      And then decide how many people we want to have fill out

25  the questionnaires, go through them, figure out who we can

Page 49

1    disqualify.

2        But then, at that point, after we've gone through the

3    questionnaires and figured out who should be disqualified, I

4    would propose to just have people in and do jury selection as

5    we normally do jury selection, which is that I -- you know, for

6    whoever is the prospective juror who is in the courtroom, I ask

7    them to stand and -- or I don't know if we ask them to stand,

8    actually, but we ask them to just answer a few questions about

9    themselves out loud so we can start to get a feel for them.

10       Speaking out loud, just like ten basic biographical

11   questions.  Those are on my website.  And then we go through.

12   They ask questions, sometimes I interrupt and ask follow-up

13   questions.  And then -- and then I do some raise-your-hand

14   questions usually.  Maybe I wouldn't do it in this case because

15   we already have the benefit of the questionnaire.

16       Then I turn it over to the lawyers and let you do voir

17   dire for a time, and that's it.  It's not clear to me why we

18   would need -- those are already very -- sort of extra

19   procedures for jury selection in a civil case that we don't do

20   in your typical civil case.

21       I understand why we might need to, given who the defendant

22   is and given the subject matter, but -- and that's fine, but

23   all this business of individually voir diring jurors, I

24   don't -- I would be -- I have a pretty strong reaction against

25   that.  Nor do I think that it will take longer than a day to

1  pick a jury.  So those are my thoughts.

2      I'm happy to hear from either of you, get your reaction on

3  those thoughts.

4          MR. STEKLOFF:  If I may, Your Honor.  We would like a

5  questionnaire because we think there is a level of bias and

6  hostility toward Monsanto that is unique given this litigation,

7  given the company, given the jurisdiction.

8      I think the parties did see that in the Johnson

9  litigation.  They had a questionnaire there and then had some

10  level of individual voir dire.

11      I also think what's unique --

12          THE COURT:  I'd like to see at some point, doesn't

13  have to be anytime soon, but I would like to see the

14  questionnaire that was used in the state court trial.

15      I would think we would keep it relatively simple and

16  short, I mean, that we could craft six or seven questions that

17  we could ask them.  But, anyway.

18          MR. STEKLOFF:  I think our concern, beyond just having

19  a questionnaire that might expose some hostility or biases in

20  either direction, but maybe more likely toward Monsanto, is

21  that if you --

22          THE COURT:  Oh, I think definitely towards Monsanto.

23          MR. STEKLOFF:  If you proceed with group voir dire,

24  especially given the verdict and the amount of publicity that

25  has occurred in the jurisdiction regarding the verdict, if a

1   juror starts to talk in the group -- in front of the group

2   about the verdict or even about his or her hostility toward

3   Monsanto, it can taint and pollute the entire venire.

4          THE COURT:  Let me just stop you for a second.

5   Putting aside the verdict and just talking about hostility

6   toward Monsanto, I mean, we pick juries every day in courtrooms

7   across America where people express hostility toward the

8   police, in a criminal case where somebody's liberty is at

9   stake.

10      We don't do individual voir dire just because somebody has

11  hostility towards the police.  The hostility they have towards

12  the police might be rational, it might be irrational.  It might

13  be based on personal experience, it might be based on what

14  they're reading in the paper.

15      None of that is ever thought, typically -- unless it's a

16  death penalty case or something, none of that has ever been

17  thought typically to require one-on-one questioning of

18  prospective jurors.

19      And so I understand this case is very important to you,

20  but every case is important to everybody who's involved in

21  trying it.  And I don't see why this case should be different.

22         MR. STEKLOFF:  I agree with the premise.  I was an

23  assistant public defender for four years, so those people, I

24  wish that they -- they usually were excused by the government.

25      I think the difference is that people come in to court,

1    everyone has a view on police officers that they come in with

2    naturally.  And no one is going to tell something about a

3    police officer, the general profession, that someone hasn't

4    thought of.

5        I mean, they may talk about one incident that has made

6    them particularly biased, for example, against police officers,

7    or the opposite.  They may be a spouse of a police officer

8    or -- and then have biases in favor that they would believe the

9    police officers.  But it's just sort of a natural part of life.

10           THE COURT:  But I just did an employment

11   discrimination case, and it was a case involving a transgender

12   male.  The plaintiff was a transgender male.  We had a very

13   nice, productive discussion in open court with the prospective

14   jurors about -- and some had very strong preconceived notion

15   about -- notions about gender reassignment one way or the

16   other.

17       Most people didn't have any strong preconceived notions

18   about it.  People shared their opinions.  Some people had

19   strong preconceived notions about employees taking advantage of

20   their, you know, disadvantaged status to get more stuff from

21   their employer.  Others had strong feelings that employers

22   systematically discriminate against disadvantaged groups.

23       I mean, what's the difference here?

24           MR. STEKLOFF:  I think the difference is that here

25   people -- there may be jurors who come in with -- I mean, we

1  would say misconceptions, but preconceived notions about

2  Monsanto, about things like GMOs, about Roundup, and about

3  science or what they think is science.

4       There is a lot of false publicity or false information out

5  there about Monsanto.  And then you could have --

6          THE COURT:  No, no, sorry.  Go ahead.

7          MR. STEKLOFF:  I was going to say then you could have

8  jurors providing, with a lot of emotion, misinformation to

9  other jurors about the company and about those --

10          THE COURT:  I understand your point, but I actually

11  wonder if this -- it might be more effective to deal with this

12  problem that you are identifying by having regular open court

13  jury selection, because, you know, I'm pretty good about

14  cutting people off when they start going on a rant about

15  something that is not relevant to, you know, the -- you know,

16  is not relevant to the trial and might be prejudicial to a

17  party.

18       And I'm pretty good about explaining to people that, you

19  know, you have to -- the question is not whether your views are

20  correct or not.  Everybody has different views.  People are

21  right, people are wrong about stuff.  But the issue is, can you

22  put you aside any information you may believe is true, that

23  you've learned previously, and decide the case on the evidence

24  that comes in the four walls of this courtroom?

25       And by me saying that and having that group discussion

1   with people, I feel like sort of the gravity of that sort of

2   comes across better, potentially, than the process you're

3   describing.

4           MR. STEKLOFF:  I think there's a place for individual

5   voir dire and group voir dire, but I think there are some

6   things that could be so prejudicial that, by the very nature of

7   them coming out -- and I would put the Johnson verdict, the

8   post trial publicity about -- these are just -- just the

9   factual -- the facts; that jurors have written letters that

10  people may have reviewed, jurors have been on the news.

11  There's been a lot of publicity about the tentative ruling, a

12  lot of publicity about the final ruling, and someone stating

13  those things publicly, whether you -- and I understand that

14  people --

15          THE COURT:  Anybody friends with Neil Young and Daryl

16  Hannah?

17          MR. WISNER:  I am now.  It's pretty cool, Your Honor.

18          MR. STEKLOFF:  They may be here watching, Your Honor.

19  And I think that someone talking about those types of events --

20  I mean the numbers, the dollars associated with the verdict,

21  and I think some of the other scientific things, if it comes

22  out before Your Honor can sort of explain that that's not part

23  of the trial and that's not relevant, can have such an impact

24  on other jurors and can bias them toward -- I mean, they should

25  not know about the verdict or what happened in this other

Page 55

1   trial.

2        And I -- and then I think there could be a balance where

3   at least bringing some jurors up sidebar, if they expressed

4   hostility in the questionnaire or raise their hand to one of

5   your yes-or-no-type questions, I think there's at least a

6   combination of things that can be done, both individually and

7   through group voir dire, that --

8            THE COURT:  Why couldn't I just --

9            MR. STEKLOFF:  -- federal courts and certainly state

10  court.

11           THE COURT:  Why couldn't I just say, look, some of you

12  may have heard about the prior litigation involving this issue.

13  The prior litigation involving this issue is not relevant to

14  this case.  It is not for your consideration.

15       And, therefore -- first of all, we can ask them in the

16  questionnaire whether they've heard about prior litigation

17  involving this issue, so we know who knows about it and who

18  doesn't.

19       I actually have another question about that, that I'll get

20  to in a second, but why can't I just say during jury selection,

21  you know, there has been prior litigation involving this issue

22  and that is not relevant and it should not be -- anything you

23  know about, that should not be discussed in open court.

24           MR. STEKLOFF:  Because -- well, if some -- I guess the

25  concern is that if there are people -- I think it depends on

Page 56

1   the details.

2       If we know about who knows about it in the jury

3   questionnaire, and those people are not struck, for example,

4   ahead of time, I think we would have to question them

5   individually, not in front of the group, about what they know

6   and whether they could be fair in light of what they know.

7       If there are people who say that they don't know about it,

8   I'm not sure that that would be -- we would probably oppose an

9   instruction to tell them that there's other litigation because,

10  I mean, it depends which way it goes.

11      Often we deal with this issue in mass tort cases of not

12  trying to talk about the overall scope of the case and having

13  the jury focus on the single plaintiff and the single trial.

14          THE COURT:  Okay.  Do you want to briefly give me your

15  view on this?

16          MR. WISNER:  Yeah, Your Honor.  I'll be very quick.

17      Regarding the questionnaire, I don't think we have a

18  problem with that principle whatsoever, as we stated in our

19  papers.  That was very effective in the Johnson case.

20      We didn't need 500 jurors.  We had 120.  Twenty-seven of

21  them were struck for cause because when you asked them, "Can

22  you be impartial towards Monsanto?" they said, "I couldn't."

23          THE COURT:  Are you saying that there were 120 jury

24  questionnaires?

25          MR. WISNER:  That's correct.

1          THE COURT:  120 people filled out their

2    questionnaires, and you said 20-some people were struck on the

3    basis of their questionnaire responses alone?

4          MR. WISNER:  No.  It was based on that with a

5    combination of open-air questioning and a handful, probably

6    maybe 7 or 8, back chambers ones.  And those ones were

7    situations where they said on their questionnaire stuff like

8    Monsanto is evil, or, I gave a presentation about Monsanto's

9    agricultural practices in college.

10          THE COURT:  I would think that both sides would

11    consent to those people being excused based on the

12    questionnaire response.  I would think that we wouldn't even

13    drag them into the courtroom.

14          MR. WISNER:  Well, the first one, yes.  Evil, right,

15    that's clearly bias.  If they gave a presentation, I think we

16    want to know what that presentation was about; right?

17      If it was a presentation about the economics of the

18    agricultural industry, that might not be so bad.  If it was a

19    presentation about Monsanto being evil, okay, that's another

20    conversation.

21      So I think that's where the --

22          THE COURT:  I suppose in your mind there would be no

23    difference between those two things.

24      (Laughter)

25          MR. WISNER:  I try to eat organic, but I'm not

1   perfect.

2       I guess what I'm trying to say is, I think that I sort

3   of -- a rule set in stone that we're going to have a two-phase

4   voir dire would be needless.  Ferreting out the obvious biased

5   people, I think, can be done through a questionnaire.

6       And I actually think you're right about open air

7   questioning about these issues.  I think it actually -- it

8   actually gives Monsanto a chance to fix any misstatements made

9   by a juror or explore --

10          THE COURT:  Or it gives me a chance.

11          MR. WISNER:  Yeah, that's correct.

12          THE COURT:  And I'll tell you again, I mean, you know,

13   I'm not sure anyone is an expert on this topic.  I've done the

14   trials that I've done in the last five years.  Every time, I go

15   sit in my chambers with the jurors afterwards and I talk to

16   them.

17       And this jury today, all they talked about was how they --

18   you know, yeah, my own personal experience and bias starts to

19   creep in, and I had to tell myself not to allow that, and I did

20   a really good job at it, and we all did a really good job at

21   it, and we were all very careful to listen to your instructions

22   that you told us over and over and over again that you've got

23   to limit your consideration to the evidence that comes in in

24   the trial.

25          MR. WISNER:  I agree, Your Honor.  Actually, I have

1   picked a jury with Mr. Stekloff before for trial in Virginia,

2   which I lost.  My first trial ever.  And, you know, we picked a

3   jury in a morning.  And that was a pharmaceutical case which

4   had a bunch of biases.

5       There was actually a juror who was impaneled who had

6   previously represented the defendant 30 years prior, and I

7   couldn't get him off for cause.

8       So I think, you know, there's biases that go both ways,

9   and you have to deal with that as part of trial work.  So

10  that's our position.

11      And, obviously, our last issue, the gag order didn't come

12  up.  We strongly oppose that.

13          THE COURT:  I'm not issuing any gag orders.

14      But that relates to, sort of, a question I have for

15  you-all about jury selection.  And that is, I'm not sure I've

16  really had a trial before where, you know, a significant

17  portion of the jury pool is going to come -- you know, is going

18  to potentially have read about the issue or potentially have

19  some familiarity with the issue through media exposure and the

20  like.

21      When I read about other cases that have that, I always --

22  so, my sense -- this is not really something I've really

23  studied, so what I'm saying may be incorrect now, but my sense

24  is that, oftentimes, if the person has been exposed to any --

25  any information at all in the media about a particular -- that

1    particular issue, that, like, disqualifies them; right?

2         So if somebody were to say -- as applied to this case, if

3    somebody were to say, you know, oh, yeah, I remember reading an

4    article about how the World Health Organization thinks that

5    glyphosate causes cancer and that the Environmental Protection

6    Agency thinks that it doesn't -- let's just say as an

7    example -- I mean, you know, it's not obvious to me that that

8    person should be disqualified from being on the jury for the

9    reasons that I just articulated, that you -- you follow up and

10   you ask them, well, okay, you read that.

11        You know, there are things that are accurate in the news

12   and there are things that are inaccurate in the news.  And, you

13   know, you -- the point is, to have a fair trial, you need to be

14   able to put aside whatever sort of media coverage you've been

15   exposed to and consider the case based on the evidence that

16   comes in.

17        Or even, potentially, there was another verdict in this

18   case, you know, and -- but anything you know about the prior

19   verdict in this case, you should not give that any

20   consideration.  You've got to decide the case based on the

21   evidence.

22        And then you ask them questions designed to discern

23   whether they are capable of doing that and they think they're

24   capable of doing that.

25        My gut reaction is that somebody like that should remain

Page 61

1   on the jury if they answer those questions to your

2   satisfaction.

3        So I wanted to let you know that, A, that's my gut

4   reaction; B, it is not an issue that I've studied; C, my sense

5   is that in other high-profile trials perhaps judges do it

6   differently and are more quick to excuse people.

7        So I wanted to invite you to submit briefing on that

8   issue, briefing on, you know, the extent to which exposure to

9   media coverage of the issue of Roundup causing or not causing

10  cancer would automatically disqualify somebody from being on a

11  jury.

12           MR. GRIFFIS:  Your Honor, may I say one thing that

13  doesn't answer the question you just asked?

14           THE COURT:  That's always a good way to introduce a

15  comment.

16           MR. GRIFFIS:  I'm one of the lawyers who tried the

17  case for Monsanto, and I just stood up to make one point in

18  clarification of something Mr. Wisner said.  He said 120 jurors

19  were put into the venire and then we picked a jury from that.

20       That was the first venire.  We had 120 jurors, and Judge

21  Bolanos's thought was we would successfully impanel a jury from

22  those 120, and we did not.  She had to bring another 100-plus.

23  I don't remember if it was 100, 110 or 120, but at least a

24  hundred more jurors in order for to us get to a jury.  And

25  there's been a lot more publicity since then.  That's the

1   reason for the number.  That's all I wanted to say.

2          THE COURT:  Thank you.

3          MR. STEKLOFF:  And, Your Honor, may I respond to your

4   hypothetical?

5          THE COURT:  Sure.

6          MR. STEKLOFF:  I think there's a difference -- and I

7   don't want to concede that a juror's heard about, using your

8   hypothetical, IRARC and World Health Organization and EPA.

9       There's a difference between that because I would feel

10  confident that within, you know, five minutes of the case

11  starting in opening that there will be talk on the plaintiffs'

12  side about what the World Health Organization found and

13  probably on the defense side about the EPA.

14      So that seems different than the other example --

15         THE COURT:  Although that may be -- I mean, I touched

16  on that issue in my Daubert ruling.

17         MR. STEKLOFF:  Yes.

18         THE COURT:  We may have further discussions about

19  that.  But, anyway, go ahead.

20         MR. STEKLOFF:  I agree.  And I'm not conceding that

21  they should be allowed to talk about the World Health

22  Organization and IARC.  We'll where that goes.  But it's a

23  little bit different, I guess, is my point, than something that

24  is totally irrelevant to the jury's consideration, that they've

25  been exposed to, which is that a group of jurors viewing what

1    they will assume is similar evidence to what they are seeing,

2    whether it will be similar evidence or not, based on that

3    evidence, came to a unanimous decision that Monsanto, one,

4    caused someone's cancer to the amount of, I think, $29 million

5    in compensatory damages; and, two, engaged in such malice and

6    oppressive conduct -- I guess it was $39 million --

7            MR. WISNER:  20.

8            MR. STEKLOFF:  -- add a $250 million punitive verdict.

9    And so that is just completely irrelevant to what is going to

10   happen in the courtroom and will never be explained to them one

11   way or another.

12           THE COURT:  I understand what you're saying, and I

13   would like to get briefing on this topic.  But, I guess, my gut

14   reaction is, people are exposed to irrelevant information

15   outside the courtroom with some regularity, and we tell them

16   not to consider it.  And so where is the line?

17       I mean, maybe the line is with the verdict.  Maybe you

18   draw the line at the verdict and you say, well, if they've been

19   exposed to other information, maybe that's okay, maybe they can

20   be rehabilitated, or maybe we can ask them questions about

21   whether they can decide the case fairly.  Maybe if they know

22   about the verdict, maybe they can't.  You know, maybe that's

23   too much.

24       I don't know.  I'm just saying that I don't know where the

25   line is.  And my gut is that my instinctual reaction -- my

1    sense is that my instinctual reaction about where the line

2    should be is maybe different from other judges' reaction about

3    where the line should be and, therefore, I want to understand

4    the scope of my authority on this issue, on -- on that topic.

5            MR. STEKLOFF:  Thank you.

6            THE COURT:  Does that make sense?

7            MR. STEKLOFF:  Absolutely.  And that's helpful, and we

8    can brief that.

9            THE COURT:  When should you file those briefs?

10           MR. STEKLOFF:  We can be flexible.

11           MR. WISNER:  Your Honor, would you like concurrent

12   briefing or would you like sequenced briefing?

13           THE COURT:  In this case you can just each file a

14   brief, I think, and no replies or anything like that.

15           MR. WISNER:  Two weeks works for me.  I don't know

16   what your -- this is not a rushed thing.  We have some time

17   before February.

18           THE COURT:  Why don't we just say -- what if I told

19   you -- why don't you get through the discovery cutoff and stuff

20   and why don't you file it on -- why don't you file it on

21   November 30th.  How about that?  Friday, November 30th.

22           MR. STEKLOFF:  That's acceptable, Your Honor.

23           THE COURT:  Okay.

24           MR. WISNER:  I would also point out, Your Honor, I

25   think this is important, and you'll see it in our brief,

Page 65

1    although it really won't address the issue you just raised,

2    which is the scope of your authority.

3        For example, excluding anybody who's read the news

4    essentially creates its own bias.

5        THE COURT:  Well, that's the difficulty I have with

6    this issue.  That's kind of my concern.

7        MR. WISNER:  Okay.

8        THE COURT:  Yeah.  Okay.  So what I would like to do

9    is maybe take a short break.

10        And then I think that the only things remaining on the

11   list that I rattled off at the beginning -- the only thing

12   remaining is the Defendant Fact Sheet and then any other

13   discovery on the defendant.

14        I have different thoughts about different subjects that

15   you-all raised within that, so I may have to take a little bit

16   more time; hopefully, not too long.

17        So why don't we take a break and come back at ten to 4:00.

18                  (Recess taken at 3:39 p.m.)

19                  (Proceedings resumed at 3:54 p.m.)

20        THE COURT:  Before I forget, should we schedule

21   another case management -- I know we earlier today scheduled a

22   telephonic CMC for the Bailey case, but should we schedule

23   another case management conference for a longer multi-issue

24   discussion like the one we're having now?  And if so, when

25   should that be?

Page 106

1

2

3                        CERTIFICATE OF REPORTER

4           I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Wednesday, October 31, 2018

8

9

10

11     _____

12           Katherine Powell Sullivan, CSR #5812, RMR, CRR
                        U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25