Pages 1 - 96

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | |
|---|---|
| IN RE ROUNDUP PRODUCTS )<br>LIABILITY LITIGATION. )<br>)<br>)<br>_____ )<br>EMANUEL RICHARD GIGLIO, )<br>)<br>      Plaintiff, )<br>)<br> VS. )<br>)<br>MONSANTO COMPANY, )<br>)<br>      Defendant. )<br>_____ ) | **NO. 16-md-02741 VC**<br><br><br><br><br>**NO. C 16-05658 VC** |

San Francisco, California
Wednesday, December 5, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        ANDRUS WAGSTAFF PC
        7171 W. Alaska Drive
        Lakewood, Colorado  80226
   **BY: AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
        **DAVID J. WOOL, ATTORNEY AT LAW**

        ANDRUS WAGSTAFF PC
        6315 Ascot Drive
        Oakland, California  94611
   **BY: KATHRYN M. FORGIE, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
           Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiffs:
                          WEITZ & LUXENBERG PC
 3                        700 Broadway
                          New York, New York  10003
 4                   BY:  ROBIN L. GREENWALD, ATTORNEY AT LAW

 5                        THE MILLER FIRM LLC
                          108 Railroad Avenue
 6                        Orange, Virginia  22960
                     BY:  MICHAEL J. MILLER, ATTORNEY AT LAW
 7                        BRIAN BRAKE, ATTORNEY AT LAW
                          NANCY G. MILLER, ATTORNEY AT LAW
 8
                          LAW OFFICES OF TESFAYE W. TSADIK
 9                        The California Building
                          1736 Franklin Street - 10th Floor
10                        Oakland, California  94612
                     BY:  TESFAYE W. TSADIK, ATTORNEY AT LAW
11
                          AUDET & PARTNERS LLP
12                        711 Van Ness Avenue - Suite 500
                          San Francisco, California  94102
13                   BY:  MARK E. BURTON, ATTORNEY AT LAW

14                        LUNDY, LUNDY, SOILEAU & SOUTH LLP
                          501 Broad Street
15                        Lake Charles, Louisiana  70601
                     BY:  RUDIE R. SOILEAU, JR., ATTORNEY AT LAW
16
                          BAUM HEDLUND ARISTEI GOLDMAN PC
17                        12100 Wilshire Blvd. - Suite 950
                          Los Angeles, California  90025
18                   BY:  ROBERT BRENT WISNER, ATTORNEY AT LAW

19   For Plaintiff Emanuel Richard Giglio:
                          GOMEZ TRIAL ATTORNEYS
20                        655 West Broadway - Suite 1700
                          San Diego, California  92101
21                   BY:  JOHN H. GOMEZ, ATTORNEY AT LAW
                          KRISTEN K. BARTON, ATTORNEY AT LAW
22

23

24

25
```

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant:

                     HOLLINGSWORTH LLP
 3                   1350 I Street NW
                     Washington, D.C.  20005
 4            BY:  KIRBY T. GRIFFIS, ATTORNEY AT LAW
                   ERIC G. LASKER, ATTORNEY AT LAW
 5
                     ARNOLD & PORTER KAYE SCHOLER LLP
 6                   777 S. Figueroa Street - 44th Floor
                     Los Angeles, California  90017
 7            BY:  PAMELA YATES, ATTORNEY AT LAW

 8                   ARNOLD & PORTER KAYE SCHOLER LLP
                     250 West 55th Street
 9                   New York, New York  10019
              BY:  ANDREW K. SOLOW, ATTORNEY AT LAW
10
                     WILKINSON  WALSH ESKOVITZ LLP
11                   2001 M Street, NW - 10th Floor
                     Washington, D.C.  20036
12            BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  **<u>Wednesday - December 5, 2018</u>**                    **<u>1:36 p.m.</u>**

2                     **<u>P R O C E E D I N G S</u>**

3                         **---oOo---**

4      **THE CLERK:**  Calling Case Numbers 16-md-2741, In Re

5  Roundup Products Liability Litigation and 16-cv-5658, Giglio

6  versus Monsanto Company.

7      Counsel, please step forward and state your appearances

8  for the record.

9          **MS. WAGSTAFF:**  Good afternoon, Your Honor.

10 Aimee Wagstaff on behalf of MDL plaintiffs and plaintiff

11 Giglio.

12         **THE COURT:**  Good afternoon.

13         **MS. GREENWALD:**  Good afternoon, Your Honor.  Robin

14 Greenwald for the plaintiffs.

15     **MR. MILLER:**  Good afternoon, Your Honor.  Michael

16 Miller on behalf of the plaintiffs.

17         **THE COURT:**  Mr. Miller.

18     If somebody wants to introduce everyone, they're perfectly

19 welcome to.

20     **MR. BRAKE:**  Good afternoon.  Brian Brake for the

21 plaintiffs.  Pleasure to be here.

22     **MR. WOOL:**  Good afternoon, Your Honor.  David Wool on

23 behalf of plaintiffs and Mr. Giglio.

24         **THE COURT:**  Hello.

25     **MR. GOMEZ:**  Good afternoon, Your Honor.  John Gomez

 1   for Mr.Giglio.

 2         **MR. BURTON:**  Good afternoon, Your Honor.  Mark Burton,

 3   liaison counsel for the plaintiffs.  Brent Wisner is also here.

 4   And I'll let -- sorry.  I tried to --

 5         **MR. SOILEAU:**  I don't know that it's necessary, but I

 6   suddenly feel like the odd man out.  Rudie Soileau appearing on

 7   behalf of the MDL plaintiffs as well, Your Honor.  Thank you

 8   very much.

 9         **MR. GRIFFIS:**  Good afternoon, Your Honor.  For

10   Monsanto Kirby Griffis, Eric Lasker, Brian Stekloff, Pamela

11   Yates, and Andrew Solow.

12         **THE COURT:**  Hello.

13         **MR. STEKLOFF:**  Good afternoon.

14         **MS. YATES:**  Good afternoon, Your Honor.

15         **THE COURT:**  Okay.  So some fun stuff to talk about

16   today.

17         On my list of things to talk about in no particular order

18   is we have potentially a bunch of discovery disputes, or

19   perhaps you've resolved them all this morning and I don't know,

20   but I'm happy to help you with any discovery issues; this issue

21   of live testimony at the *Daubert* hearings; the motion for trial

22   preference; and then a discussion about jury selection.

23         Is there anything that I'm missing of those?  Are there

24   any other topics we need to discuss today?

25         **MS. WAGSTAFF:**  I don't think so, Your Honor.

**THE COURT:**  Okay.  Why don't we start with a couple that hopefully will be short.  Let's talk about the motion for trial preference and I want to hear, I think, probably only from the plaintiffs on this one I'm guessing.

And my main question for you is:  I mean, has there ever been a case in a federal MDL where the transferee court has granted a motion for trial preference and sent a case back because somebody was dying?

Even if the answer is no, it may be that, you know, the MDL courts have been doing it wrong for all these years and there may be a reason to reconsider that, but has it ever happened before in the history of federal multidistrict litigation?

**MR. WOOL:**  To the best of my knowledge, there's no such case that I'm aware of, Your Honor.

**THE COURT:**  Okay.  So the standard operating procedure with federal MDLs is that -- and, of course, we have many products liability cases where people are dying; right?  The standard mode of operation is that we may do something within the MDL to move that person's case along more quickly, but we don't transfer that person out for trial ahead of everybody else.  We don't have them jump the line, so to speak.

**MR. WOOL:**  Right.  That's understood, Your Honor.  And in this case I think there are a couple of reasons why it makes sense to do so here.  First, I think that the Court provided

1   some guidance where I believe Your Honor -- at least we

2   interpreted it as suggesting that plaintiffs who were

3   terminally ill might have an opportunity to have their cases

4   remanded.

5           **THE COURT:**  What I suggested or what I recall

6   suggesting is that I'd be happy to do whatever makes sense to

7   help ensure those cases move along the fastest, not send them

8   back for trial -- not have them jump ahead and send them back

9   for trial.

10      I mean, I would -- you know, it's not that I'm dead-set

11  against it.  I just -- I want to sort of figure out the playing

12  field we're on right now, and the playing field we're on right

13  now is that it never happens in federal MDLs; right?

14      It's just people have decided -- the people involved in

15  MDLs have decided that's not the way it's going to work; and if

16  you allow one person to jump the line and go back for trial,

17  then there's going to be a big fight among who's going to

18  die -- among the plaintiffs about who's going to die first and

19  who gets to go have their trial first; right?

20          **MR. WOOL:**  Your Honor, here I don't think that -- at

21  least to the best of my knowledge, there are not a number of

22  other plaintiffs who are fighting for this.  This is only

23  Mr.Giglio, who is the second case, to my knowledge, who has

24  ever filed.

25      And with respect to how this kind of impacts MDLs overall,

1  the charge that the panel gave your court was to facilitate the

2  just and efficient resolution of these actions.

3      Mr. Hardeman's case is a residential case.  I know that

4  the Johnson trial involved an ITNO case, but I think there is

5  an efficiency to be gained here because Mr. Giglio was an ITNO

6  user, he had diffuse large B-cell lymphoma, and he was

7  diagnosed with that disease when he was in his early 60s.  So

8  he's representative of a fairly large swath of the plaintiffs

9  in these cases.

10      So I understand that there might not be --

11      **THE COURT:**  Mr. Hardeman is too; right?

12      **MR. WOOL:**  Is in his 60s?

13      **THE COURT:**  Is fairly representative of a large swath

14  of these cases --

15      **MR. WOOL:**  Yes, but he's --

16      **THE COURT:**  -- and residential exposure; right?

17      **MR. WOOL:**  Right, with residential exposure and

18  Mr. Giglio is ITNO exposure.  He used it --

19      **THE COURT:**  Oh, I'm sorry.  I thought you said

20  Mr. Giglio was a residential user.

21      **MR. WOOL:**  No, no.  He was predominantly landscaping

22  use.  So I think that that would provide a data point for all

23  of the parties that would teach us a lot about the case that we

24  wouldn't learn from Hardeman alone.

25      **THE COURT:**  Okay.  I understand your argument.  The

1    motion is denied --

2            **MR. WOOL:**  Okay.

3            **THE COURT:**  -- but I'm perfectly happy, as Monsanto

4    proposed, to adopt procedures to ensure that this case moves

5    along particularly quickly.  I think a preservation deposition

6    is, of course, a good idea.  It sounds like Monsanto will agree

7    to that.  If you have any problems getting that to happen, you

8    know, you can let me know.

9            **MR. WOOL:**  Okay.  Thank you, Your Honor.

10           **THE COURT:**  Okay.  Thank you.

11       Now, the question came up about live testimony at the

12   *Daubert* hearing.  The answer is if Monsanto wants to

13   cross-examine one of the plaintiffs' experts as part of its

14   effort to get the plaintiffs' expert's testimony excluded, it

15   can.  So those witnesses need to be available.

16       Similarly, if Monsanto has any experts that it is using to

17   rebut the plaintiffs' experts' testimony, and these are sort of

18   priority experts for Monsanto -- I mean, Monsanto called some

19   of its experts in during Phase I and it didn't call some of its

20   experts in.  Call your best experts in.  You don't have to call

21   all of them in; but if you want to attack the plaintiffs'

22   expert testimony on the issue of specific causation, you know,

23   you want to make sure to get your best testimony -- you want

24   the best expert testimony to be presented to me live.

25       However, I do want to make one thing clear in terms of

 1    ground rules for the *Daubert* hearings on specific causation.

 2    Now, I assume that at trial, assuming we go to trial, there

 3    will be experts who will be testifying that "I believe

 4    Mr. Hardeman's non-Hodgkin's lymphoma was caused by

 5    glyphosate," and part of that opinion will be the general

 6    causation stuff that we spent so much time talking about before

 7    and part of that opinion will be information that's specific to

 8    Mr. Hardeman; right?

 9        It's not like you're going to be putting up separate

10    general causation experts and specific causation experts, I

11    assume, or are you?  Is that the plan?  What are you planning

12    on presenting at trial by way of expert testimony?

13              MS. WAGSTAFF:  Yeah.  So we were actually scheduled to

14    discuss that this morning with Monsanto's counsel, and we

15    haven't really come to a consensus on that because we have our

16    general causation experts that have passed through *Daubert* that

17    you've just talked about.  We'll just say Dr. Weisenburger is

18    one example.  We have proffered him as general causation and as

19    specific causation.

20        If you remember, Dr. Nabhan, who did not pass through the

21    general causation phase but your order suggested that he would

22    be able to provide specific --

23              THE COURT:  I said he may be able to.

24              MS. WAGSTAFF:  Exactly.

25        -- he may be able to provide specific causation testimony,

1    we have proffered him for specific causation testimony.

2         And then to complicate it, we have a third category that

3    is a new expert, Dr. Shustov, that is offering what we believe

4    just to be specific causation testimony.

5         Monsanto has a version that's similar with their own

6    experts of what they had passed as well.

7         So me and Mrs. Yates were just talking about this moments

8    ago, and we haven't really come to a consensus on how we handle

9    the general causation portion of a new expert.

10        What we thought Your Honor wanted, but we would love more

11   guidance from you, is that we were not allowed to proffer new

12   general causation opinions from any expert.  So, for example,

13   Dr. Weisenburger would be able to testify obviously about

14   general causation pursuant to Your Honor's order.  We will

15   proffer him for specific causation.  However, the new expert,

16   Dr. Shustov, it's our opinion would not be able to proffer

17   general causation opinions, would rely on the general causation

18   opinions subject to Your Honor's order.  That's what we have

19   been operating on.

20        **THE COURT:**  In other words, when that expert comes and

21   testifies -- what's their name again?

22        **MS. WAGSTAFF:**  Dr. Shustov.

23        **THE COURT:**  Dr. Shustoff?

24        **MS. WAGSTAFF:**  Stov with a V.

25        **THE COURT:**  Stov?

1          MS. WAGSTAFF:  Uh-huh.

2          THE COURT:  Shustov.

3      So they will get up on the stand and they will say, "I'm

4  adopting the assumption that glyphosate is capable of causing

5  cancer in human -- in doses that we would expect humans to

6  experience" --

7          MS. WAGSTAFF:  Uh-huh.

8          THE COURT:  -- "and adopting that assumption, I

9  conclude that Mr. Hardeman's NHL was caused by glyphosate --

10  it's far more likely that glyphosate caused his NHL than any

11  other potential factor out there."  Something along those

12  lines?

13          MS. WAGSTAFF:  Yeah, something along those lines.

14      And just to be clear on sort of our opinion and what we're

15  planning on doing, you know, Weisenburger is sort of a

16  different base because he passed through your order; but with

17  Dr. Shustov, we aren't proffering him to say that exposure to

18  glyphosate and Roundup can cause it, but we will proffer

19  opinions that Mr. Hardeman is within the relevant epidemiology

20  that he is assuming has proved general causation, if that makes

21  sense.

22          THE COURT:  That makes sense, yeah.

23          MS. WAGSTAFF:  So the way that we understand

24  Your Honor to want this procedure to go is that we will not get

25  up here and have Dr. Shustov go through the testimony that Ritz

1  and Dr. Jameson and Dr. Weisenburger all went through.  It will

2  be much shorter, much tighter:  This is the exposure.  This is

3  what happened.  We're going to go through the diagnosis just

4  like you said.  That's how we believe you want it, and so

5  that's how we've tailored our expert reports.

6         THE COURT:  And so, then, give me an overall list of

7  the experts you plan to have testify.

8         MS. WAGSTAFF:  Okay.  So the experts that we have

9  designated, and this is just in Hardeman, we have designated

10  Dr. Ritz.  We have designated Dr. Weisenburger.  We have

11  designated Dr. Shustov.  We've designated Dr. Nabhan,

12  Dr. Portier.

13         THE COURT:  Doctor who?

14         MS. WAGSTAFF:  Portier.

15         THE COURT:  Oh, okay.

16         MS. WAGSTAFF:  Dr. Sawyer and Dr. Benbrook.

17         THE COURT:  Ben?

18               (Conferring with co-counsel.)

19         MS. WAGSTAFF:  And then Dr. Mills is an economist.

20         THE COURT:  Dr., you said, Benbrook?

21         MS. WAGSTAFF:  Benbrook, yeah.

22         THE COURT:  And Mills?

23         MS. WAGSTAFF:  And Mills, yep.

24         THE COURT:  Okay.  So Ritz would testify only about

25  general causation?

```
 1            MS. WAGSTAFF:  Yeah.

 2            THE COURT:  And Weisenburger would testify about both?

 3            MS. WAGSTAFF:  That's correct.

 4            THE COURT:  And Weisenburger, am I remembering

 5     correctly, was he the one whose testimony was the subject of a

 6     very recent Ninth Circuit opinion where his testimony was

 7     excluded and then the Ninth Circuit --

 8            MS. WAGSTAFF:  That's correct, Your Honor.

 9            THE COURT:  -- reversed?

10        Okay.  I remember that case.

11            MS. WAGSTAFF:  And Dr. Shustov was actually in that

12     opinion as well.

13            THE COURT:  Oh, yeah?  And so Shustov is going to --

14     it's just going to be specific?

15            MS. WAGSTAFF:  That's correct.

16            THE COURT:  And then Nabhan specific?

17            MS. WAGSTAFF:  Correct.

18            THE COURT:  And Portier both?

19            MS. WAGSTAFF:  Portier is just general causation.

20            THE COURT:  Okay.  And Sawyer and Benbrook and Mills

21     are specific?

22            MS. WAGSTAFF:  Correct.

23        And did we designate --

24                    (Conferring with co-counsel.)

25            MS. WAGSTAFF:  Mills is on punitive damages, company
```

1  warnings --

2          **MR. MILLER:**  Worth.

3          **MS. WAGSTAFF:**  -- worth, company worth.

4          **THE COURT:**  Oh.  Mills is not on the science?

5          **MS. WAGSTAFF:**  Correct.

6          **THE COURT:**  Okay.

7                    (Conferring with co-counsel.)

8          **MS. WAGSTAFF:**  Benbrook is not science either.

9          **THE COURT:**  He's damages?

10         **MS. WAGSTAFF:**  He is more liability.

11         **MR. MILLER:**  Liability, Your Honor.

12         **MS. WAGSTAFF:**  Yeah.  Regulatory liability, yeah.  And

13  Sawyer is exposure.

14         **THE COURT:**  What does "regulatory liability" mean?

15         **MS. WAGSTAFF:**  Mr. Wisner is going to talk about

16  Dr. Benbrook.

17         **THE COURT:**  I mean, obviously we're not adjudicating

18  anything now, but I'm just curious.

19         **MR. WISNER:**  Sure.  His testimony is primarily

20  historical.  He talks about the history of glyphosate, its

21  regulatory history in the United States, the science and the

22  approvals and what those approvals actually mean.

23      A lot of his testimony will be subject to a lot of

24  *motions in limine* so we'll see what actually comes in and what

25  doesn't, but he has a lot of expertise in that area.

1        **THE COURT:**  Well, I'm glad you brought that up because

2   I wanted to bring up a topic that is closely related to that,

3   but I will -- let's hold off on it just a second.

4        Okay.  And then Sawyer you said is on exposure?

5        **MS. WAGSTAFF:**  Yeah.  Sawyer is on exposure, yeah.

6        **THE COURT:**  So which is related -- you mean on

7   Mr. Hardeman's exposure?

8        **MS. WAGSTAFF:**  Yeah.  And then he also was designated

9   as a rebuttal expert just on exposure in general.

10       **THE COURT:**  Okay.

11       All right.  And so the main thing, I guess, that I wanted

12   to say about the expert testimony regarding specific causation

13   is that, as I said, I assume that at trial there's going to

14   be -- you know, at least with Dr. Weisenburger, there's going

15   to be -- you know, you're not going to be able to tell when --

16   you're not always going to be able to tell when he's talking

17   about general versus specific causation.  There's some overlap

18   there.

19       But the point is that for purposes of the *Daubert*

20   hearings, obviously we're not going to have any relitigation of

21   whether glyphosate is capable of causing NHL in human relevant

22   doses; right?

23       And so to the extent that Monsanto's experts are attacking

24   the plaintiffs' experts, Monsanto's experts need to adopt for

25   the purposes of the testimony that they're giving at the

1    *Daubert* hearings, of course they don't have to do this at

2    trial, but for the purposes of the *Daubert* hearings, they need

3    to buy into the assumption that glyphosate is capable of

4    causing non-Hodgkin's lymphoma at human relevant doses.

5        And to the extent that they are pushing back against that

6    in their attempt to -- in Monsanto's attempt to get the

7    plaintiffs' specific causation experts excluded, that's going

8    to be a waste of time.  So I just wanted to make sure everybody

9    gets that.  Are we kind of on the same page on that?

10           **MS. WAGSTAFF:**  (Nods head.)

11           **THE COURT:**  I see nodding heads from the plaintiffs'

12   side.  I see some sort of blank stares from Monsanto's side.

13           **MS. YATES:**  Ms. Yates approaching the podium,

14   Your Honor.

15           **THE COURT:**  And Ms. Yates approaching the podium.  So

16   what have you got?

17           **MS. YATES:**  So, yes, in part, and I just wanted to

18   clarify.

19       We understand that this *Daubert* hearing is to attack the

20   specific causation methodology; right?

21           **THE COURT:**  Right.

22           **MS. YATES:**  The prior hearing -- we're going to do

23   battle over the general at trial so everybody understands that,

24   but we understand that the *Daubert* hearing will be on their

25   methodology for how it caused it in Mr. Hardeman, et cetera,

 1   et cetera.

 2          THE COURT:  Yeah.  And any testimony that questions

 3   the assumption that glyphosate is capable of causing NHL will

 4   be useless.

 5          MS. YATES:  I hear you loud and clear, Your Honor.

 6          THE COURT:  Okay.

 7          MS. YATES:  I do want to clarify a couple of points,

 8   though.  We do have some slightly different scenarios involving

 9   case-specific experts, and I want to make sure that we are all

10   on the same page.

11        As you know from -- heard from Ms. Wagstaff,

12   Dr. Weisenburger crosses general and case specific.

13   Dr. Nabhan, who did not pass muster on the general, will be

14   addressing case specific.

15        Our experts at Phase I, our goal was not to have our

16   general causation experts necessarily be our case-specific

17   experts.  We went and found clinicians; right?  But as part of

18   their opinions, they have a foundation of the science in

19   general; right?  So they're going to fulfill sort of the

20   Weisenburger role addressing both.  Obviously the focus is

21   their methodology.

22          THE COURT:  Who is "they"?

23          MS. YATES:  So, for example, Dr. Alexandra Levine,

24   who's an oncologist.  We have several, but they are not -- the

25   only reason there's general opinion is it's foundation for them

1     to then offer their case specific.  They're not new.

2          **THE COURT:**  Yeah, and I just -- I don't like -- it's

3     hard to discuss this in the abstract and say anything

4     definitive in the abstract, but my gut is that that is not --

5     that we do not really want them building that kind of

6     foundation that you're talking about; that we want them to get

7     on the stand and just say "I'm relying on the foundation built

8     by Dr. Mucci, and explain -- that's the general, and now I'm

9     going to explain to you why even if it did -- you know, even

10    if -- you know, that's part of my opinion for why it can't be

11    that Mr. Hardeman's NHL was caused by glyphosate; but even if

12    you reject Mucci, here are some specific reasons.  Even if you

13    adopt the assumption that it can cause NHL, here are some

14    reasons why it didn't happen with Hardeman."  That's what I was

15    assuming it would be.

16         **MS. YATES:**  I'm going to refer to the Court's

17    distinction; right?  We understand that for the *Daubert*

18    hearing, but at trial our experts, just picking on Dr. Levine,

19    an oncologist who's case specific for Dr. Hardeman, in

20    concluding no causation specific to him, she also relied -- she

21    has to have some general foundation and general science.

22         **THE COURT:**  Right.

23         **MS. YATES:**  I understand that's not coming in at the

24    *Daubert* hearing.

25         **THE COURT:**  No, but, I mean, even at trial, I mean you

```
 1   didn't offer Levine -- is it Levine?
 2          MS. YATES:  Yes.
 3          THE COURT:  -- you didn't offer Levine as a general
 4   causation expert; right?
 5          MS. YATES:  Correct.  And it was never our intention.
 6   Now, I'm relatively new to this but, as I understand, our goal
 7   was never to have our general causation experts be our
 8   case-specific experts.  For example, Dr. Mucci, an
 9   epidemiologist, I want a clinician testifying as to medical
10   cause, not an epidemiologist.
11      So --
12          THE COURT:  So you weren't planning on having
13   Dr. Mucci testify?
14          MS. YATES:  By the way, I'm not sure that I will --
15          THE COURT:  Okay.
16          MS. YATES:  -- which is why we gave enough foundation
17   in these reports.  They're not stand-alone general cause, and I
18   can highlight a difference, Your Honor.
19      With Dr. Sawyer, the plaintiffs' toxicologist, not
20   designated as a general expert in the MDL, case-specific in the
21   Stevick case only but designated generally in Hardeman and
22   Gebeyehou, that, I think, is an apples and orange situation.
23          THE COURT:  I'm sorry.  I lost you.
24          MS. YATES:  Okay.  So Dr. Sawyer, who is a
25   toxicologist, has been designated and was identified here today
```

1    as case specific.  He is case specific in the Stevick case.  He

2    has dose latency and some other opinions.  But there's a

3    general part of his report, and plaintiffs say he will also

4    offer those opinions in the two other cases, Hardeman and

5    Gebeyehou.  We think that crosses the line of a new general

6    causation expert, and we're not going to object to Sawyer

7    talking specifically about Stevick.

8         That seems to be -- it's not the foundation for Stevick.

9    It's offering general opinions.  It's a new general expert two

10   years after in two cases where he's not designated as case

11   specific.

12        THE COURT:  I think the reason I'm having trouble

13   following you is because I don't have any idea what Sawyer is

14   going to testify about.

15        MS. YATES:  Okay.

16        THE COURT:  I don't have any familiarity with his

17   expert report or his deposition testimony.  I don't even know

18   if it's a he.

19        MS. YATES:  It is.

20        THE COURT:  So I'm having trouble following you, but

21   why don't we focus on your expert, Levine, who we were talking

22   about just a second ago.

23        MS. YATES:  Sure.

24        THE COURT:  Okay.  And what you're saying is, "We want

25   to call Levine to testify on both general causation and

1    specific causation"?

2          **MS. YATES:**  Yes, as it relates to Mr. Hardeman, the

3    foundation for her case-specific opinions at trial.

4          **THE COURT:**  But why wouldn't the foundation for her

5    case-specific opinions be given by the general causation

6    experts who you put up at Phase I?

7          **MS. YATES:**  Because, candidly, I'm not sure I'd like

8    to call an epidemiologist unless I want my jurors sleeping.

9    That's as honest as I can be, Your Honor.

10         **THE COURT:**  But the point of Phase I was for the

11   parties to put up their experts on general causation --

12         **MS. YATES:**  Right.

13         **THE COURT:**  -- and give them an opportunity to have at

14   each other to determine if any of them would be excluded.

15         **MS. YATES:**  Right.

16         **THE COURT:**  And there was a motion to exclude their

17   experts and there was a motion to exclude your experts, and we

18   adjudicated those motions and we decided whose experts general

19   causation testimony would be allowed at trial and whose expert

20   causation testimony would not be allowed at trial -- whose

21   general causation testimony would not be allowed at trial.

22         And now you're telling me that you have somebody else who

23   you want to come in and testify on general causation who was

24   not put to the test at Phase I, and that's I guess what I'm not

25   understanding.

 1          I thought we all understood that the purpose of Phase I is

 2     to figure out who would be able to testify about general

 3     causation.  So that's the assumption I was operating under.

 4          **MS. YATES:**  And I think that's correct within certain

 5     parameters.

 6          I don't believe we ever intended for our general experts

 7     to then carry that forward at trial.  We understand a *Daubert*

 8     hearing, Your Honor.  We understand that we have to -- if we're

 9     going to put our experts on, "Dr. Levine, you understand this

10     Court has found, now explain your methodology as to why that's

11     not correct in Mr. Hardeman," but how much general causation

12     evidence and which witnesses I put on at trial is a vastly

13     different decision.

14          **THE COURT:**  So who are the experts that you've

15     designated for the Hardeman trial?

16          **MS. YATES:**  So there's Dr. Alexandra Levine.

17          Hold on a second, Your Honor, because we have three cases

18     and somewhat different experts.

19          So we have Dr. Levine, Dr. Arbor.

20          **THE COURT:**  Arbor?

21          **MS. YATES:**  Yes.

22          **THE COURT:**  Okay.

23          **MS. YATES:**  We have Dr. Grossbard.

24          **THE COURT:**  Gross what?

25          **MS. YATES:**  Bard, B-A-R-D.

1          We have -- and, I'm sorry, this is for all cases.  I don't

2     have them designated by case name.  If you give me a moment,

3     Your Honor, I'll find my specifics.

4               **THE COURT:**  Sure.

5               **MS. YATES:**  Because there are different types of NHL.

6     So, for example, Dr. Bello is case-specific in the Stevick

7     case.  So let me know if you would like that detail.  I'll

8     go --

9               **THE COURT:**  Sure, I would.

10              **MS. WAGSTAFF:**  And, Your Honor, while she's looking

11    for that, I would just like to take a moment to respond to

12    that.

13         And, of course, plaintiffs completely oppose new general

14    causation experts --

15         I'm sorry about that.  That was my fault.

16              **THE COURT:**  I think you've just got to avoid getting

17    too close.  The microphones are terrible in here, but you've

18    just got to avoid getting too close or too far from them.

19              **MS. WAGSTAFF:**  Okay.  So, you know, as you recall,

20    Monsanto asked for this bifurcation and here we are two years

21    later; and if Dr. Levine is to give general causation opinions,

22    we're going to have to put her through a full *Daubert* and do

23    this whole thing all over again.  And I ask the Court:  What

24    was the purpose of the last two years?

25         And you're absolutely right that all the parties were

 1   operating under the assumption that no general causation

 2   testimony would be given anew, and that's what we decided again

 3   at the last hearing.

 4        So I think that what Ms. Yates is trying to do is

 5   circumvent what we've been doing for the last couple years, and

 6   she's trying to get in new general causation testimony because

 7   she doesn't like the testimony that her experts currently are

 8   giving.

 9             **MS. YATES:**  No, Your Honor, that's actually simply not

10   the case.

11             **THE COURT:**  Yeah, I doubt that's the case.  But can I

12   get a list?

13             **MS. YATES:**  Yes, of course.

14             **THE COURT:**  So Levine, Arbor, Grossbard?

15             **MS. YATES:**  Steidl, S-T-E-I-D-L; and Al-Khatib, A-L

16   hyphen K-H-A-T-I-B.  Those are Hardeman.

17             **THE COURT:**  So those are the only experts you've

18   designated for Hardeman?

19             **MS. YATES:**  And I think there's a Dr. Sullivan as

20   well.

21             **MS. WAGSTAFF:**  Those are the only case-specific.  They

22   designated about six or seven other experts.

23             **THE COURT:**  So you're saying you didn't designate

24   Mucci and like the other epidemiologists who you put up at

25   Phase I?

1              MS. YATES:  Yes, Your Honor.  These are case specific,

2      yes.

3              THE COURT:  Those are the case-specific ones.

4              MS. YATES:  Yes.

5              THE COURT:  I was asking who you designated, all the

6      witnesses.

7              MS. YATES:  All of them.  I'm sorry.  So I'm going

8      with depositions and I don't have our designations.  But, yes,

9      we designated Dr. Mucci and we may or may not call him.

10             MS. WAGSTAFF:  So, Your Honor --

11             THE COURT:  Well, I think you better because I don't

12     think there's any other way you can get in general causation

13     testimony.

14             MS. YATES:  Well, let me slow this down a little bit,

15     Your Honor, because I feel as if we're talking a little bit in

16     a vacuum here.

17         I would like you to see the reports because I think it's

18     been a little bit out of context in terms of what they have in

19     terms of general causation, and I'm very concerned that we're

20     getting pushed into this quagmire that when you see the

21     reports, we don't need to go there.

22             THE COURT:  Okay.

23             MS. YATES:  It's not starting over.  It's not anew.

24     It's the foundation for their case-specific methodology, which

25     is based on a differential diagnosis.  How do you rule things

```
1    in?  How do you rule things out?

2         And I think if we take a step back, I think you'll see

3    that we take very seriously what went on and we take those

4    rulings seriously.  We fully understand the Court's opinion as

5    to what our experts will say at a Daubert hearing.  And then I

6    think you will see -- once you see the reports, you'll

7    understand what our goals are with them being case specific at

8    trial.

9         THE COURT:  Well, that statement is fine for now, but

10   the idea that you -- I'm skeptical of the idea that you will be

11   able to do much in the way of general causation without

12   bringing to trial experts who testify on general causation.

13        If you don't bring any of the experts you used at

14   Phase I on general causation, then I think you are going to

15   have -- if you are operating under the assumption that you

16   could pull that off, I'm telling you now that I think you're

17   going to have a problem because it would seem, then, that you

18   would be planning to bring in through other witnesses' perhaps,

19   you know, testimony that seeks to rebut what Dr. Weisenburger

20   testifies to on the general causation front.

21        MS. YATES:  Your Honor, if I'm bringing in an expert

22   to really get into the general science, I understand what the

23   Court is saying.  Why can't I put on a defense that is just one

24   case-specific expert with the foundation for that testimony?

25        THE COURT:  Well, you could, but -- you certainly
```

1   could, but if it's -- as long as it is not using the

2   case-specific experts who were not put to the test at

3   Phase I to get in testimony that is similar to the testimony we

4   considered at Phase I.

5            **MS. YATES:**  I understand, but at the same time the

6   ruling went against us in Phase I and clearly if I call someone

7   at trial, they're not going to abide by your Phase I ruling

8   because they are going to say "no general cause" at trial.

9            **THE COURT:**  I don't understand what you're saying.

10           **MR. LASKER:**  Your Honor, I just want to make one point

11  because I'm a bit confused.

12       With a differential diagnosis, let's posit it this way,

13  there are numerous risk factors.  Okay?  And let's say you're

14  selecting among risk factors and saying which is more likely,

15  and let's say that there is one risk factor that has an arch

16  ratio of five.  A specific causation expert, for example, on

17  the defense would have to discuss what they understand about

18  the Actel study and the epidemiology with respect to glyphosate

19  in order to explain how they make a differential.

20       So to that extent, it's impossible, frankly, to be able to

21  testify to a differential diagnosis without providing that type

22  of testimony, and that's the issue I think that's confusing

23  things.

24           **THE COURT:**  Right.  And I was assuming that it would

25  be impossible to have a strict delineation between the concept

1    of general causation and the concept of specific causation.

2         I suppose you could just call somebody, as they apparently

3    plan to do, to testify only about general causation --

4    right? -- and just not get into Hardeman, but I understand the

5    concept that when you're testifying about specific causation,

6    you know, concepts from general causation are going to bleed

7    into it; right?

8         But if -- and this is not something we're going to resolve

9    now, but it's just important for me that you know the concerns

10   that I have about this discussion.  If you're going to put up a

11   specific causation expert and they're going to testify about

12   the different risk factors and they're going to get to the risk

13   factor of glyphosate and as part of explaining why they don't

14   think glyphosate caused Mr. Hardeman's cancer, they're going to

15   do a repeat of everything that Dr. Mucci said, that's not

16   appropriate.

17             MR. LASKER:  Right.

18             THE COURT:  Because you should have had that person

19   testify to that at the Phase I proceeding.

20             MR. LASKER:  Right.  I don't think -- I think that may

21   be where the confusion is.  I don't think we have --

22             THE COURT:  Or even half of what Dr. Mucci said.

23             MR. LASKER:  I'm sorry.  I misspoke.

24             THE COURT:  If they spent half the time saying what

25   Dr. Mucci said.

```
 1              MR. LASKER:  No, I understand that.  I don't think we
 2    have an expert who, for instance, is going to be talking about
 3    all the issues of epidemiology or an expert talking about all
 4    the issues of avenue, all that stuff.  That's not the issue
 5    with our experts.
 6              MS. YATES:  And apparently I'm just not being very
 7    clear.
 8              THE COURT:  You're not going to bring somebody to
 9    testify about -- what was it?  The vault?  Where one of your
10    experts went to, like --
11              MR. LASKER:  Yes.  Right.
12              THE COURT:  What was that room called?  It wasn't the
13    vault.
14              MR. LASKER:  It was a glyphosate --
15              MS. WAGSTAFF:  The glyphosate reading room.
16              MR. LASKER:  The reading room in Europe, yes.
17    Dr. Steidl is not going to --
18              THE COURT:  That's like up there with the
19    Eiffel Tower.
20              MS. YATES:  Yeah.  No, Your Honor.  No, Your Honor.
21       And I do think that --
22              THE COURT:  Glyphosate reading room.  I forgot -- I
23    went to Spain in the spring.  I forgot to go to the glyphosate
24    reading room.
25              MR. LASKER:  You missed that one, Your Honor.
```

1          THE COURT:  Sorry.

2          MS. YATES:  That's why I think the reports will make

3   clear what we're doing.  I am not going to have my

4   case-specific expert adopt, repeat, say what Dr. Mucci said.

5   If I feel I need that part of the science, Your Honor, in front

6   of a jury, we will call Dr. Mucci.  There won't be.  And I

7   think the reports will clear this up.  It's part of their

8   differential diagnosis, their methodology.

9          THE COURT:  Okay.  Well, I think, nonetheless, this

10  discussion was worth having so that it sort of lays a marker

11  for what I assume will be future discussions.

12         MS. YATES:  Would you like me to continue down the

13  list of experts, Your Honor?

14         THE COURT:  I mean, I don't know.  You listed to me

15  your case-specific experts.

16         MS. YATES:  Yes.

17         THE COURT:  You designated some of the general

18  causation experts.

19         MS. YATES:  Yes, many of whom you'll be familiar with,

20  Your Honor.

21         THE COURT:  That's probably all I need to know at this

22  point.

23         MS. YATES:  Okay.  Okay.

24         THE COURT:  Okay.  But, anyway, so there will be, you

25  know --

1          **MS. WAGSTAFF:**  Your Honor, before we move past this

2    topic, could we have a little bit more guidance on the live

3    testimony that you have on February 4th, 6th, and 11th?

4          **THE COURT:**  Uh-huh.

5          **MS. WAGSTAFF:**  You know, we put in our papers that

6    we're not planning on bringing anyone.  Between now and then,

7    they are going to be -- Monsanto will be deposing every single

8    one of these experts.  They've deposed several of them before.

9          So if we could have a deadline of when they declare

10   whether or not we need to bring them.  Scheduling the experts

11   is not just like a phone call.  It takes a lot of coordination,

12   and so we'd like some flexibility on if we can bring them on

13   the 4th, the 6th, or the 11th; or we'd like some guidelines how

14   long you're going to let each one -- Monsanto cross-examine

15   each one, or is it going to be similar format as the last time.

16   Or whatever Your Honor is thinking, I'd like some guidance.

17         **THE COURT:**  Well, I mean, I guess I would be inclined

18   to use an approach somewhat similar to the approach we used

19   last time where we give each side a certain number of hours.  I

20   guess it will be -- you know, we will -- it will be -- you

21   know, it will be full days, I assume, on those three days and

22   each side will have a certain number of hours, and you can kind

23   of decide how to use those hours.

24         How many hours should we assume in a court day, Kristen,

25   for these purposes?  Like, six?

 1          **THE CLERK:**  Let me look back at the minutes from --

 2          **THE COURT:**  It will probably be, like, you know, six

 3   hours a day total of airtime, which means three hours per day

 4   per side of airtime, nine total hours of airtime.  Figure out

 5   how to use it.  Figure out who your most important experts are.

 6   Figure out who Monsanto really wants to challenge and who you

 7   really want to challenge.

 8       If you need further help from me in sort of setting it up,

 9   I'm happy to provide it; but as I sit here today, I'm not sure

10   what else to say about it.

11          **MS. WAGSTAFF:**  Okay.

12          **MS. YATES:**  And I assume, Your Honor, that the *Daubert*

13   challenges will relate to all three cases.  We're not going to

14   do them one at a time.  We do have some different experts on

15   specific cause.  The plaintiffs experts do line up the same.

16   There will be a lot, but you do one and then you have to do

17   another one and another one.  I'm not sure that's appealing to

18   the Court or anyone else.

19          **THE COURT:**  If you-all think it makes more sense to do

20   the challenges for all three cases at the same time, that's

21   fine.

22          **MS. YATES:**  We can meet and confer.

23          **MR. MILLER:**  Your Honor, speaking on behalf of

24   Stevick, we'd like to do all three at the same time.

25          **THE COURT:**  Okay.

 1              **MS. YATES:**  That's fine, Your Honor.  And I can tell

 2       you where are the possible or likely challenges.  The

 3       plaintiffs know.

 4              **THE COURT:**  I mean, it seems to me that what you

 5       should be doing for each other, and I can help you do this if

 6       you want, is maybe -- I mean, it seems like well before the

 7       *Daubert* hearings you guys should be paring down and announcing

 8       who you're going to call at trial so that the *Daubert* hearings

 9       are more efficient and so that the deposition process is more

10       efficient.

11              **MS. WAGSTAFF:**  So I haven't had a chance to talk with

12       Monsanto's counsel about this except for briefly on a phone

13       call a couple weeks ago, but at some point we need to get a

14       more granular trial calendar schedule for these cases and have

15       deadlines like exchanging witness lists and things of that

16       nature.

17            So I would ask that I be afforded the opportunity to meet

18       and confer with Ms. Yates and see if we can find a more

19       granular trial schedule that allows us to do all this sort of

20       stuff and maybe present it to the Court next week, if that

21       works with her.  I haven't talked to her about it yet.

22              **MS. YATES:**  That works.

23              **THE COURT:**  That sounds fine.  That sounds fine.  If

24       you need to come back to hash things out more, hopefully we

25       won't have to waste your time bringing you back in December,

1   but if you need to come back in December, let us know.

2       But why don't you try to hash that out, and what I would

3   suggest is that you try to hash out a process by which you are

4   paring down possible experts.  Like, you know, agree to some

5   process where you, you know, take turns eliminating experts

6   from, you know, your own queue or something.  I don't know.

7       But I know -- I'm looking at this list.  I know you're not

8   going to call all these experts.  I know Monsanto is not going

9   to call all the experts it's designated.  So it certainly seems

10  like it's in everybody's interest, including but not limited to

11  mine, for you to narrow down the list before you file -- before

12  the *Daubert* hearings and before you file the motions to exclude

13  each other's experts.

14          **MS. YATES:**  Understood, Your Honor.

15          **THE COURT:**  So why don't you try to include a process

16  along those lines.

17          **MS. YATES:**  Okay.

18          **MS. WAGSTAFF:**  Okay.  And then one last question on

19  the *Daubert* hearing.  At the previous *Daubert* hearings, we were

20  each assigned a room, sort of a prep room.  Can we have the

21  same rooms?  And if so, do we talk to Ms. Mellen about

22  scheduling that, or --

23          **THE COURT:**  Is there any problem with that?

24          **THE CLERK:**  No.  I will work that out with the

25  parties.  I assume we're going to stay in here, or do you want

1    to go back up to Courtroom 8?

2              THE COURT:  Oh, up to the -- I don't know.

3              THE CLERK:  I think the only reason you were in there

4    before was --

5              THE COURT:  We had a request that it be videoed;

6    right?  Didn't we have a request that it be --

7              THE CLERK:  Yeah.

8              THE COURT:  Or maybe the request came from me actually

9    because I wanted to refer back to it, which, by the way, it was

10   very useful.  I went back and I watched a lot of that testimony

11   as we were preparing our ruling --

12             MS. WAGSTAFF:  And our request --

13             THE COURT:  -- as you may have seen from the ruling.

14             MS. WAGSTAFF:  Our request would extend on through the

15   trial as well.  If we could sort of have the same room for the

16   *Daubert* hearing and then the trial.

17             THE COURT:  So those rooms were up on 19; is that the

18   deal?

19             THE CLERK:  Yes.  We have two on this floor as well.

20   However, I think we have a little bit more access to those

21   rooms up there if we're going to be doing it up there, but I

22   can still work it out with the parties and we'll figure it out.

23   I just need to know whether it will be here or there.

24             MS. WAGSTAFF:  Okay.

25             THE COURT:  Do the parties -- do you want the -- I may

```
 1   want the Daubert testimony recorded.  I don't care as much

 2   about the trial, but does anybody have any objection to the

 3   trial being recorded?

 4        MS. WAGSTAFF:  Your Honor, we actually would prefer

 5   that parts of the trial be recorded, and in fact the whole

 6   thing, just simply so that we can have some

 7   cross-examination --

 8        THE COURT:  Wait.  Can you say that again?  You prefer

 9   that parts of the --

10        MS. WAGSTAFF:  Sorry.  No, we have no objection to the

11   trial being recorded.

12        THE COURT:  Okay.  You don't have to decide now if you

13   don't want to.

14        MR. STEKLOFF:  I think we might need to get back to

15   you on that, Your Honor.

16        THE COURT:  Yeah, that's fine.

17     Okay.  So is that all we need to discuss right now

18   regarding the Daubert hearings?

19        MR. STEKLOFF:  I had one additional -- good afternoon,

20   Your Honor.  Brian Stekloff.

21     I had one additional question about the Daubert hearings.

22   I know that they'd been teed up focusing on specific causation.

23   I anticipate we will be filing motions on other experts.  So,

24   for example, Dr. Benbrook was raised, who I think was described

25   more as a liability-regulatory-type expert.  I feel very
```

1  confident we will be filing a *Daubert* motion on him.

2      And my only question is whether --

3      **THE COURT:**  You may decide it's not necessary to haul

4  him in to cross-examine him.  I mean, it will be sort of up to

5  you to use your time.

6      **MS. YATES:**  Right.

7      **MR. STEKLOFF:**  Okay.

8      **THE COURT:**  You may decide that's one I should decide

9  on the papers.

10     **MR. STEKLOFF:**  I agree.  I just wanted to understand

11  we could ask to bring him in.

12     **THE COURT:**  Sure.  Yeah.

13     **MR. STEKLOFF:**  Okay.  That's all I wanted to ask.

14     **THE COURT:**  If it's important to you, yeah,

15  absolutely.

16     **MR. STEKLOFF:**  Okay.  Thank you.

17     **MS. YATES:**  Thank you, Your Honor.

18     **THE COURT:**  Okay.  Jury selection.  Let's talk about

19  jury selection.

20     Is it Stekloff?

21     **MR. STEKLOFF:**  Yes, Your Honor.

22     **THE COURT:**  Is that how it's pronounced?

23     **MR. STEKLOFF:**  Stekloff, yes.

24     **THE COURT:**  So let's start this discussion with a

25  little exercise.  Let's go to your brief on the issue of jury

1   selection.  Let me pull it up.

2           MR. WISNER:  Your Honor, ours or theirs?

3           THE COURT:  Theirs.

4           MR. WISNER:  Okay.

5           THE COURT:  Okay.  Eight pages, lots of cases cited.

6   Can you point me to any noncriminal case that you cited in this

7   brief?

8           MR. STEKLOFF:  I don't believe so, Your Honor.

9           THE COURT:  Okay.  So every single case you cited to

10  me was a case about jury selection in a criminal trial, and

11  what I said to you at the last hearing was this is not a death

12  penalty case.  It's also not a criminal case.

13      And so I guess the first overarching question I would ask

14  you is:  Why should all of these principles that you've pulled

15  from these cases about jury selection in criminal cases where

16  somebody's liberty is at stake and the issue is, you know,

17  salacious allegations in the press about somebody confessing to

18  a crime or, you know, the DNA evidence that the police gathered

19  or whatever, why should those principles governing jury

20  selection apply here in this civil case?

21          MR. STEKLOFF:  The answer to that, Your Honor, is that

22  I think the case law comes from primarily or exclusively from

23  criminal law because those are the instances in which there is

24  pretrial publicity of the extent that we have seen here.

25      This is a unique civil case given the circumstances of the

1   pretrial publicity in this context, and so we conceded I think

2   in our paper that -- I mean, this is unique.  Most of these

3   cases that both parties have cited, if not all of them, involve

4   change of venue motions and then the Supreme Court or other

5   courts have weighed in to say whether the change of venue was

6   necessary given the pretrial publicity.

7       This is very unique in that there's only been one trial.

8   It was in the same jurisdiction.  It was very recent.  There

9   was a large verdict, and there was unique publicity that, I'm

10  not that old, but that in my experience even in trying several

11  mass tort litigations have never seen the type of publicity

12  that we've seen here, particularly around a verdict.

13      And so I think that that's --

14          **THE COURT:**  But I think the problem is that you're

15  adopting certain assumptions.  You're adopting a number of

16  assumptions that I think are incorrect.  Okay?  The first

17  assumption is that knowledge of a jury verdict is more likely

18  to make people believe that Monsanto should be liable.

19      I mean, you know, I'm guessing that all of us have been

20  involved in conversations, "Did you hear about the big jury

21  verdict?"  And all of us have heard people react differently to

22  that.  Some people have said -- some people just say, "Wow,

23  that's a big verdict."  Other people say, "Right on.

24  Monsanto's evil."  Other people say, "That was ridiculous.

25  That's an out of control jury."  Right?  People react in

1    different ways to a verdict.

2         So the fact that a verdict -- lawyers and nonlawyers.   And

3    so the fact that a verdict was handed down in favor of a

4    plaintiff in a case against Monsanto I think is a lot less kind

5    of prejudicial than you think.   I don't think it's

6    categorically different from other types of publicity than you

7    think.

8         And just like, for example, somebody might have learned

9    about Judge Shubb's ruling in the Eastern District of

10   California saying that California is not allowed to require

11   Monsanto to put a label on its product saying that it's known

12   by the State of California to cause cancer and you should stay

13   away from it, or whatever the label says.   Right?   And somebody

14   might have seen an article and interpreted it as there was a

15   judge who said that Roundup is safe in California, whatever.

16        But it doesn't follow that that person believes that

17   Roundup is safe in California.   It follows that the person --

18   the only thing that follows is that -- the only thing we know

19   is that the person is aware that some judge said that.

20        And that sort of gets me to the second assumption that I

21   think you're incorrectly adopting, which is that people aren't

22   capable of making their own decisions.   And we have jury

23   selections all the time in which, you know, we sit around as a

24   group -- judge, lawyers, prospective jurors -- and we have a

25   good healthy conversation about things you might presume,

things you might have heard, and we talk about how it's
important as jurors to not decide the case based on things you
might assume or things you might have heard but only on the
evidence that comes on inside the four walls of the courtroom.

And the jurors who express serious reservations about
being able or willing to do that are excused, and the jurors
who say that they think they can do that and will try their
hardest are not excused.

And then the third thing I guess I want to say about this
is that after trial, in my own experience, jurors are even more
serious about fidelity to that role than they are when they
first come into the courtroom.  By the time they're done with a
trial, they've spent all this time in the sort of soaking in
the gravity of the situation and spending all this time
examining the evidence and deliberating with their jurors, boy,
they really take their job seriously and they really take
seriously the admonition that they are supposed to limit their
consideration to the evidence that comes into the courtroom.

And so I think that your request to treat this like a
death penalty trial -- I mean, I think -- number one, I think
that a lot of the criminal -- a lot of the cases from the
criminal law context adopt these incorrect assumptions about
juror behavior also, but I think the assumptions are -- it's
particularly important for us to avoid falling into those
assumptions in a civil case when somebody's liberty is not at

1    stake.

2         And just to give you one recent example -- I brought my

3    phone out because I was Googling it before we came out here.

4    Just to give you one recent example of the kind of juror I'm

5    talking about, I'm guessing you know who I'm going to bring up,

6    headline:  "Manafort juror Paula Duncan:  Manafort is guilty,

7    but Mueller probe is a witch hunt."  Next headline:  "Manafort

8    juror wanted him to be innocent, but he wasn't."  Right?

9         This is a woman who wore a "Make America great again" hat

10   in her car to court every day sitting on a jury on a criminal

11   trial of Paul Manafort, and she voted guilty because -- and

12   that sort of goes to the third point that I was making, which

13   is that however prospective jurors might feel about it at the

14   beginning, jurors, after going through the gravity of a trial,

15   take their responsibility very, very seriously.  And whatever

16   knee-jerk tendencies they might have had at the beginning are

17   usually excised by the end because of how seriously they take

18   their jobs.

19        And so, frankly, I don't see anything wrong -- we might

20   not do this, but I don't see anything wrong with just getting

21   everybody together in a room and having a fulsome discussion

22   about Monsanto.  And if some jurors say, "Well, I heard about

23   this verdict," and some other prospective juror hadn't heard

24   about the verdict before the discussion, I don't think there's

25   anything wrong with that because the discussion among all of us

would be, "Yeah, but that prior verdict is irrelevant because your job is to decide the evidence on your own, and juries come out differently across the country all the time.  And your job is to consider the evidence individually and not to make any assumptions about how this case should come out based on another jury's verdict or about Judge Shubb's ruling or based on anything that the IARC said or that the EPA said.  This is going to be your job.  Are you comfortable doing that?  Can you put aside -- can you make your best effort to put aside all that stuff and just consider the evidence that came in here?"

        "Well, I really don't think I can, Your Honor."  Okay. That person's excused.  And if they say, "Yes, I believe I can, I will do my absolute best to -- we're not robots but I will do my best to consider -- to put aside all assumptions and all knowledge I have and consider all the evidence, absolutely, Your Honor," then that person stays on unless you exercise a peremptory challenge.

        I don't think there's anything wrong with that.  I think that is a perfectly fair jury -- even if some members of the prospective jury learn about the verdict and they didn't know about it before, I think that's a perfectly fair jury selection process.

        What I would consider is some sort of mechanism where, you know, we're going to have the questionnaires -- and I've looked at the questionnaires that you-all -- the proposed jury

1    questions that you-all have submitted.  Overall they looked

2    pretty good.  I'll put together a draft questionnaire taking

3    the material that you've given me, and I'll circulate it and

4    get comments from you.  We'll put together a questionnaire, and

5    we'll have an opportunity to see who has strong feelings about

6    Monsanto and about the verdict.  We can ask them a question

7    about the verdict kind of "Have you heard about a verdict

8    involving Monsanto," similar to the one you drafted.

9        And some of those people will give answers that will

10   probably require their excusal before they even set foot in the

11   courtroom, others we'll need to talk to them; and we'll figure

12   out a way during jury selection maybe to have a group

13   discussion with only the people who have heard about the

14   verdict or have other sort of special knowledge about Monsanto.

15       We'll probably have everybody -- here's what I'm thinking

16   now is we'll have everybody in.  We'll do hardships.  Welcome

17   everybody.  Introduce everybody.  Do hardships.  We will have

18   screened people for time availability but even after doing

19   that, there will still be some people who have something going

20   on that they say that prevents them from serving.

21       And then I'll probably have the prospective jurors

22   introduce themselves by answering a list of, you know, 10

23   questions like the one on our Web page, something along those

24   lines.

25       And then after that, maybe we will preselect the people

 1   who we want to stay and have a half-hour discussion with them,

 2   people who have demonstrated knowledge of the verdict or some

 3   other aspect of this case.  And we'll excuse everybody else,

 4   tell them they have a half-hour break.  We'll talk to the

 5   subset of people.  I will explain to them that they have to --

 6   you know, if they want to be a juror, they have to be able to

 7   put that stuff aside and consider only the evidence that comes

 8   in in the case, and we'll get a sense from people whether they

 9   can do that.  Excuse those who can't.  Leave in the jury pool

10   those who can.  Call everybody back in, and then we'll do --

11   you know, we'll continue with the normal jury selection

12   process.

13        That's what I think we will do.  I may also write an

14   opinion on this topic because I think, you know, like I said,

15   there are a lot of erroneous assumptions about juror behavior

16   out there in the case law.

17        But, anyway, so that's what I'm very strongly inclined to

18   do.  If you want to say anything else about it, feel free.

19        **MR. STEKLOFF:**  I face an uphill battle, so I'm not

20   sure how far to go into the details.  Just if I can make a few

21   points, Your Honor.

22        I agree that there will be jurors who know about things

23   other than the verdict.  Some I think will probably -- we would

24   argue would be negative toward Monsanto.  Some the plaintiffs

25   might argue would be adverse toward their position.

1      We are not asking -- I mean, I agree with you that the

2  normal process applies to those people.  The very core group

3  that we are focused on is a group that would have knowledge of

4  the Johnson verdict, as I think you've articulated.

5          THE COURT:  I know you're focused on that, but I

6  just -- I don't have -- I don't -- I haven't yet wrapped my

7  brain around why you're so focused on that.

8      I mean, I think you've adopted this assumption that people

9  cannot think for themselves and that somehow knowledge of a

10  prior verdict against Monsanto means that they're not going to

11  be able to assess the -- or means that there's a serious risk

12  they're not going to be able to assess for themselves the

13  evidence, and I just think that's wrong.  I don't think it's --

14  I don't see why it's qualitatively different from any other

15  knowledge that somebody might bring into the courtroom as a

16  prospective juror.

17          MR. STEKLOFF:  I was trying to think of the criminal

18  analogy of this before the hearing, and I had a case where it

19  was a high-profile criminal case.  There were underlying

20  predicate charges and then a series of 924(c) charges of using

21  a firearm in furtherance of those underlying charges, and there

22  was a verdict.  The jury was hung on all of the underlying

23  charges.

24      There was a question during the deliberations about the

25  924(c) charges, a big dispute with the judge about how to

instruct the jury.  The jury came back and convicted on all of
the 924(c) charges in part because we had conceded during the
trial that my client, the defendant, had had a gun during the
alleged events, and then media came out where the jurors
explained that that was their rationale.

The judge then reversed the verdict or dismissed the
verdicts, and we had a retrial from scratch.  And I will
concede that I don't remember the details of the jury selection
process there, but I think that's more analogous to what we're
dealing with here is, in that second trial, if there were --
and none of these cases, I will concede on both sides, involved
those facts.  They involved different types of pretrial
publicity in jurisdictions where parties were aimed at seeking
change of venue.

In that second trial you don't -- my position in that case
would be you wouldn't want those jurors who knew about the
prior verdict, maybe they didn't understand all the legal
ramifications of the jury instructions, but that there was a
conviction of the client who was then going back to trial.

So I sort of use that in that what we are trying to argue
here is that this type of knowledge -- I don't -- I agree with
you.  Are there jurors who know about the Johnson verdict who
can come in and be fair and put that to the side?  I will
concede that the answer is, yes, there are some jurors like
that; but I think one of the reasons we did the survey, and we

 1    didn't know the results beforehand, was to see if there was

 2    objective data to demonstrate that there is a serious risk.

 3         THE COURT:  But the survey is -- I mean, come on.

 4    Like, you have to control for the possibility that people who

 5    are aware of the verdict are more likely to be predisposed

 6    against Monsanto from the beginning.  I mean, that survey is

 7    not worth anything.

 8         MR. STEKLOFF:  But I think the same problem -- whether

 9    you control for that or not -- even accepting your view on the

10    survey, if people here -- I think people here who may come in

11    and have knowledge of the verdict may be predisposed to have

12    bias against Monsanto.  And so I guess our position -- my

13    position is:  Why introduce this into the trial?

14         If --

15         THE COURT:  We're not introducing it into the trial.

16    It's not going to be admissible at trial.

17         MR. STEKLOFF:  Well, why --

18         THE COURT:  It's going to be -- again, in juries

19    across America, every day topics come up during jury selection

20    that are inadmissible at trial.

21         MR. STEKLOFF:  I articulated that poorly.  I think

22    even if you subconsciously know that a group of your peers

23    viewing similar evidence from a lot of overlapping experts -- I

24    don't know if that will come out or not, but they might gauge

25    by when there's impeachment that you previously testified.

1  They might assume that it was part of the Johnson trial if they

2  know about the Johnson trial.

3      So if that -- it is different to say, "Okay.  I heard

4  about some issue with Roundup in the news.  I heard about some

5  issue with Monsanto."  That, I think, we want to address

6  through your process.

7      The Johnson verdict subconsciously, if you know that a

8  prior version of your peers gauged this evidence and not only

9  ruled against Monsanto but did so in the amount of

10  $289 million, I think that's -- even a potentially subconscious

11  view, I agree with you, by the end of trial -- I mean, I have a

12  lot of faith in the jury system so why -- I guess our point is

13  where approximately a quarter of the jurors, at least in the

14  survey, which you may view is worthless, but we're not talking,

15  I don't think, about 80 percent of the jurors, if we excused

16  the minority of the jurors who have this knowledge, I don't

17  think it would slow down the trial at all.  We would have

18  opening at the same time.

19          THE COURT:  Right.

20          MR. STEKLOFF:  And we would be able to get a jury --

21          THE COURT:  And my only point is that we can explore

22  those issues, but I don't believe it's necessary to do

23  individualized questioning to explore those issues, and I don't

24  believe there's any harm caused if, you know, some prospective

25  jurors who were not aware of the verdict became aware of the

verdict during jury selection as long as everybody made clear
that they're willing to make their best effort not to consider
anything other than the evidence that comes in in the case.
That's my only point.

It's totally appropriate to explore that stuff, but I'm
not -- I don't believe it's appropriate to waste multiple days
of people's time -- and by "people" I mean members of the
community -- doing individualized questioning of prospective
jurors in a civil case.

Like I said, what I will be willing to do is have a
separate session with the group of people who have some
specific knowledge, and we can figure that out based on the
questionnaires.

But I will tell you that if during the jury selection
process jurors who were not aware of the Johnson verdict become
aware of the Johnson verdict, I don't think that's a big deal
at all as long as they make clear during jury selection that
they are willing to not consider it and focus only on the
evidence that comes in at trial.

I was going to make one more point, one more comment.  I
can't remember what it is.

So, anyway, we're not doing a multiday jury selection
process.  We will pick the jury in a day.  It probably won't
take the whole day.  We will get their questionnaires and we'll
go through their questionnaires, and we'll spend some time

1    figuring out who should be excused just on the paper and who

2    needs to come in, and we'll pick a jury, I'm confident, in less

3    than a day.

4           MR. WISNER:  Would the expectation be that we would

5    open that day?

6           THE COURT:  No.  Probably open the next morning.

7           MR. WISNER:  Okay.

8           THE COURT:  Just to preserve everybody's sanity.

9           MR. WISNER:  Two comments, Your Honor.  I'm waiting

10   because my colleague --

11          MS. WAGSTAFF:  Just on that, you currently under

12   PTO 53 have jury selection scheduled for the 20th of February

13   and then opening statements the 25th.  So should --

14          THE COURT:  It sounds like a good idea.

15          MS. WAGSTAFF:  So we're going to just keep that and

16   not do opening the next day?

17          THE COURT:  Yeah.

18          MS. WAGSTAFF:  Okay.

19          THE COURT:  That should -- yes.

20          MR. WISNER:  Good catch.

21      Your Honor, two comments.  One is actually sort of

22   amusing.  One of my clients was actually selected for this

23   survey, and she sent me a link to it and I actually considered

24   going into it and writing something really salacious so that I

25   can show the e-mail that I actually did it to invalidate the

1    survey, but I decided not to and they didn't complete the

2    survey either.

3         The second issue, Your Honor, and this is something that

4    we'll probably have to address closer to trial, is this idea

5    that the Johnson verdict is wholesale inadmissible, and I think

6    there's some truth to that except for one really important

7    fact.  I'm not sure if the decision has been made to

8    bifurcate --

9              THE COURT:  The Neil Young and Daryl Hannah letter?

10             MR. WISNER:  No, Your Honor.  Those we're not going to

11   be seeking any admission of.

12        But immediately after the Johnson verdict, the CEO for

13   Bayer went and spoke, we have the recording of it, and said

14   that the $250 million in punitive damages changes nothing.  And

15   one of the primary purposes of punitive damages is actually to

16   deter future wrongful conduct, and so this is actually a

17   corporate admission that $250 million is insufficient to change

18   corporate conduct.

19             THE COURT:  Okay.  Well, we'll talk about that at the

20   *motion in limine* stage --

21             MR. WISNER:  Sure.

22             THE COURT:  -- but it does lead directly into the next

23   topic that I wanted to discuss, which is this is sort of an

24   introductory discussion to help us dive into the discovery

25   disputes, to the extent that any remain.  Hopefully you're

1  going to tell me at some point that no discovery disputes

2  remain.

3       But the general topic that I want to discuss that I think

4  will inform the discussion on a number of discovery disputes is

5  a topic that, you know, we've been discussing for many months,

6  which is the relevance and admissibility of exclusions by

7  agencies that Roundup is dangerous or is not dangerous or is

8  potentially dangerous or whatever.  Okay?

9       And I guess --

10                    (Counsel conferring.)

11       MR. WISNER:  Sorry, Your Honor.

12       THE COURT:  That's okay.

13       I guess I've developed a tentative view on this, not a

14  strong tentative view, a very tentative view.  I think my very

15  tentative view is that certainly there is at least a strong

16  argument that what the agencies have done, what the EPA has

17  done is relevant on the issue of punitive damages.

18       I mean, I would think that if I were Monsanto, on the

19  issue of punitive damages, I would want to parade in front of

20  the jury all of the agencies that have concluded -- have signed

21  off on use of glyphosate or have concluded that glyphosate is

22  safe, or whatever it is their conclusions were.

23       But on the issue of causation, I think that while you

24  can't say that the EPA's decision or the IARC's decision or the

25  European Union's decision is irrelevant, it's relevant, but I

wonder if all of that stuff should be excluded under 403 on the issue of causation because the jury's job, again, is to consider the actual evidence that is presented in the courtroom about whether glyphosate caused Mr. Hardeman's non-Hodgkin's lymphoma.

And, yes, it's relevant that the EPA concluded that it's safe.  It's relevant that the IARC concluded that it's a probable carcinogen, but under 403, I wonder if allowing evidence in at all about those conclusions on the issue of causation will create too much of a distraction from what is the more important inquiry, which is:  What did the epidemiological studies show?  You know, what are the risk factors for NHL?  And how big of a risk factor was glyphosate compared to the other risk factors to which Mr. Hardeman was exposed?

I think -- and, you know, I kind of want to go back and look at how the state court trial went.  I haven't done that yet.  But, you know, all that stuff came in in the state court trial, am I right?  IARC --

**MR. WISNER:**  Define "come in," Your Honor.

**THE COURT:**  What was the rule governing the state court trial about the IARC's conclusions and the EPA's decision and the European Union and all that?

**MR. WISNER:**  So there was quite a bit of litigation about this.  The IARC monograph came into evidence.  The 2016

issue report by the EPA, the most recent one, did not come into

evidence for the truth of the matter asserted but was admitted

for the purposes of showing Monsanto's state of mind

specifically to this punitive damages idea --

        **THE COURT:**  Punitive damages, uh-huh.

        **MR. WISNER:**  -- which we objected to strenuously, and

I can get into that later because there's a logical fallacy in

that.

        **THE COURT:**  Yeah.

        **MR. WISNER:**  And the reason why the IARC monograph

came into evidence was because they didn't object to it at the

beginning of the trial, and so that's -- I think the judge made

it clear that if they had objected under hearsay grounds, it

never would have come in, the document itself.

    Now, the other issue is the existence of IARC's

determination altogether and EPA's classifications over the

years.  I don't think either side ever contemplated those as

being off limits completely.

    For what it's worth, when I tried the case, I focused

primarily on the studies because when you go down to what do

the authorities say, I have IARC and they have the rest of the

world.  We couldn't talk about California but they were allowed

to talk about the EPA, Federal EPA.  So there was a lot of

hands tied behind our back in that regard.  And for what it's

worth, a lot of their experts based a lot of their opinions on

1    the EPA documents and, in fact, that was the bulwark of their

2    testimony.  So it would be hard to see how it unbuckles.

3         The problem that I would see --

4         **THE COURT:**  Why?  I mean, when we did the general

5    causation phase, it seemed to me certainly it came up.  You

6    know, certainly it was part of everybody's testimony, but the

7    bulk of the testimony was about the studies themselves.  And,

8    you know, we didn't -- and I excluded expert testimony whose

9    methodology was "I adopt the analysis of the IARC"; right?  I'm

10   sure you disagree with that, but I excluded it.  It would,

11   therefore, be excluded -- such testimony would, therefore, not

12   be admissible at trial.

13        And so I guess I'm thinking back to the testimony that,

14   like, Dr. Ritz provided, Dr. Portier provided, Dr. Mucci

15   provided; and I'm thinking, well, if the EPA and the IARC were

16   off limits to them, they would have given substantially the

17   same testimony.

18        **MR. WISNER:**  Absolutely.

19        **THE COURT:**  Their testimony would not have been that

20   different, and so that makes me wonder why we should be getting

21   into it at all.

22        **MR. WISNER:**  Because the case is not just does this

23   cause cancer.  There's a lot more involved in the liability

24   context.  And let me give you some very specific examples;

25   right?

1          Monsanto's conduct following the IARC monograph or even

2    before it came out is very clear evidence of punitive intent.

3    It shows a desire to manipulate scientists to orchestrate -- I

4    mean, it's our position.  I'm sure they disagree.  I'm just

5    giving our pitch.

6          And it shows --

7               THE COURT:  Hold on.  I think I understand all those

8    arguments.

9               MR. WISNER:  Okay.

10              THE COURT:  So you and I are pretty much on the same

11   page here, but then the question is:  Why not bifurcate the

12   trial?

13              MR. WISNER:  So --

14              THE COURT:  And why not do a punitive damages phase,

15   if necessary, after the jury conducts an inquiry into causation

16   that is not muddied up by all of this stuff that you are

17   talking about right now?

18              MR. WISNER:  So there's a couple of important parts of

19   this; right?  So, for example, the IARC participation,

20   Dr. Portier is an important part of the cross-examination.

21   They tried to impeach his credibility saying he went there to

22   influence IARC so he wanted to make money as a plaintiffs'

23   lawyer -- expert; right?  There's a whole bunch of sideshows

24   that are part of it; but I think the core issue, Your Honor, is

25   this statement.

1          **THE COURT:**  Let's assume for the sake of argument that

2     I said you can't cross-examine Dr. Portier about that.

3          **MR. WISNER:**  So this is a statement that's the

4     problem.  The first words that will come out in opening

5     statement -- and I know this because this is what happened in

6     the Johnson case -- "Roundup has been on the market for 40

7     years.  It has a demonstrated record of safety."  And there's

8     so much untruth about that that we have to unpack.  We will do

9     that with evidence, but a lot of it involves IARC because what

10    IARC did is it's the change in the narrative.

11         Because every single juror that I've interviewed, and

12    we've done a lot of jury science, they go, "Well, it's been on

13    the market for 40 years.  It must be safe."  They said the same

14    thing about tobacco.  They said the same thing about asbestos.

15         The simple fact is IARC was a game changer; right?  It was

16    the first time a group of independent scientists -- this is our

17    viewpoint; you don't have to agree -- looked at it with no dog

18    in the fight and made a decision, and that's why -- and the way

19    they responded to it and the way they generated junk science.

20    Science, by the way, that their experts rely upon; for example,

21    the Intertek manuscripts; for example, these are all sort of

22    integrated into the case.

23         And if we did this sort of hermetic look at just does it

24    generally cause cancer, I think that really creates a lot of

25    problems.  We'd have to bring back the experts afterwards.  For

example, Dr. Jameson.  He's one of our experts.  He's also a

fact witness and so is Dr. Portier; right?  He was at IARC.

     And part of his process of understanding the science was

the science that he had to do, the discussions he had with his

fellow scientists at the IARC monograph program, his in-depth

analysis that he's done after the fact looking at the tumors

and all the rodent studies.  I mean, it's unbelievable the

amount of work that he's done.  And all of that really is

framed around IARC.  If it's not, then it looks like he's just

out there just doing all this crazy stuff by himself, and he

isn't.  He's actually joined by hundreds of scientists that

support his position.

     And under California law, the jury instruction

specifically contemplates whether or not the science was

generally knowable at the time when the warning should have

been given.  And so that --

          **THE COURT:**  You're talking about on the issue of

punitive damages?

          **MR. WISNER:**  No.  That's just general failure to warn

liability.

          **THE COURT:**  Okay.

          **MR. WISNER:**  And so the context and quality of the

science and whether or not it is supported by an authority is

part of the case, and I don't think looking at it in isolation

can possibly work or be fair to us or them.

1          And I don't know how their opening or closing would even

2    look like without the EPA because that was their case, and it's

3    a strong case.  You know, it's hurtful for us, but IARC is also

4    very important to our case, and I think we would not want to

5    bifurcate, at least that issue.

6          Now, the issue of bifurcating punitive damages, which is a

7    little different because that's talking about Monsanto's

8    conduct ratification by managing agents, et cetera, I think we

9    would oppose that, but I think that would be something we'd

10   need to brief more in depth.

11         But the issue of bifurcating just general causation I

12   think would not be useful.  I also think it would really extend

13   the length of the trial because --

14             **THE COURT:**  It would extend the length of the trial?

15             **MR. WISNER:**  Yeah, considerably.  Because, let's say,

16   we -- and this is what we actually argued against bifurcation

17   in discovery at the very beginning -- right? -- is when you do

18   that, you have all this time and energy spent we bring in

19   Portier and Ritz and whoever, they bring in Mucci or Ryder,

20   whoever they decide to call or not call, the jury decides the

21   issue.  We have closing arguments --

22             **THE COURT:**  I want to make sure we're on the same

23   page.  I'm not saying bifurcate general causation.

24             **MR. WISNER:**  Okay.

25             **THE COURT:**  I'm saying bifurcate causation and damages

 1    or maybe causation and damages and then punitive damages.

 2          **MR. WISNER:**  Okay.

 3          **THE COURT:**  That's what I'm saying.

 4          **MR. WISNER:**  So then when it comes to the punitive

 5    issue, this is something we run into in all products liability

 6    cases, and that is a lot of the evidence that's probative to

 7    punitive damages is also probative to negligence.  And so

 8    that's the argument we always make.

 9          And then typically in California the way it's done, if

10    there is bifurcation, it's just bifurcation on punitive

11    damages, not punitive liability.  So you ask the jury in the

12    initial "Do you believe by clear and convincing evidence that

13    they acted with malice as defined by these instructions," or

14    whatever the verdict form says; and if they click "yes," then

15    typically the bifurcation -- and this has happened in every MDL

16    that I've participated in where punitive damages were on the

17    table -- then there's an argument about damages.  It usually

18    goes about 10 minutes.  It may be like 5, 10, 15, 20 minutes of

19    testimony from Dr. Mills who says "Their net worth is X" and,

20    you know, we try to get in that they said 250 wasn't enough or

21    whatever.

22          **THE COURT:**  But you're saying that typically in the

23    first phase the jury is asked whether the conduct was malicious

24    so most of that evidence, but why does that have to be the

25    case?  I mean, why does the jury have to answer that question

1     in the first phase of the case?

2          MR. WISNER:  Because it is almost impossible to say

3     that this is solely going to malice and not -- or solely going

4     to negligence.  Very often those things coincide.  And, in

5     fact, you know, malice is a higher standard so negligence is in

6     many ways subsumed in the violation of the duty that is imposed

7     upon the manufacturer.  So it really becomes an intellectual

8     exercise that will lead to just hours and hours of us arguing

9     about whether or not that's negligence or punis or both and if

10    it needs to be dissected, and that's just not how we typically

11    do trials.  And that's why we would oppose that, Your Honor.

12         THE COURT:  I mean, I understand.  Those are fair

13    points, but I'm still left feeling that on the issue of whether

14    Hardeman's cancer was caused by glyphosate, in large part

15    whether the EPA signed off on it, whether the IARC raised

16    concerns about it is kind of a sideshow.  It's kind of, as the

17    judges like to say, you know, a minitrial about something that

18    is a bit peripheral to the primary inquiry, and that's the

19    concern that I have and that's the concern I have of a lot of

20    these discovery requests.

21         MR. WISNER:  And I totally understand that,

22    Your Honor, and I appreciate that issue.  I think that for us,

23    our viewpoint on it is really not so much about 403 but more

24    under hearsay rules under Rule 8 -- the 800 series.  Because,

25    you know, for example, IARC, they're going to have the benefit

1    of actually having members of the IARC panel testify and

2    cross-examine them about what they did, didn't do, et cetera,

3    what they considered, what they didn't.

4         The EPA document comes in without a witness; right?  We

5    don't have the author to cross-examine and say, "Well, why

6    didn't you follow your guidelines?  And here's what the SAP

7    said."

8         All of that, Your Honor, was actually part of the Johnson

9    trial.  We actually did it, and I think we navigated that

10   complicated issue pretty well, you know, and we ended up, you

11   know, presenting both sides and Monsanto ultimately didn't call

12   all of their experts I think because they knew it would open

13   doors it didn't want, and so that's sort of how it proceeded.

14        But, I mean, the simple fact is, you know -- like here's

15   an example --

16             **THE COURT:**  Well, it's going so well for them.  I

17   mean --

18             **MR. WISNER:**  Here is a great example.  Dr. Mucci takes

19   the stand in Johnson -- okay? -- and she has a textbook about

20   epidemiology where she discusses examples of carcinogens that

21   she believes are proper carcinogens where there's no

22   insufficient epidemiology, and the basis of that list in her

23   textbook is IARC.  It's not EPA.  It's IARC.

24        And I had the privilege of cross-examining Dr. Mucci and

25   saying, "Well, you're saying epidemiology doesn't support

causation here, but you agree that you don't need epidemiology

to prove cancer.  In fact, here's a list that you created

saying that, and it's based on IARC; right?  And you haven't

looked at tox and you haven't looked at all these other things,

and so you don't know if that stuff would actually change your

mind.  So really you're just sitting here looking in isolation

at it."  So that was my cross-examination.

     And I think it was --

          **THE COURT:**  It sounds like you're enjoying reliving

that cross-examination.

                    (Laughter)

          **MR. WISNER:**  Few things do I enjoy more than

cross-examining experts, Your Honor, or directing for that

matter.

     But all that said, at the end of the day, it's part of the

case and I think that when California law specifically looks to

whether or not these are generally accepted scientific --

knowable in the scientific community, what the EPA did and what

IARC did, it has to be part of that.  It seems like it would be

very difficult.  For example, on appeal it would just create --

I think it would create lots of issues on both sides if none of

that stuff came in.

     I mean, just I'm saying for us we're looking at this long

term, not just the verdict but also, you know, getting all

these cases towards resolution at some point.  And so, you

1   know, for example, if it went up on appeal and it was

2   overturned on that issue because both sides should have been

3   allowed, then we have to retry the case and we're back to

4   square one.

5       And so -- sorry.  I'll let you speak.  I've been talking

6   for a long time.

7           **THE COURT:**  Why don't you address this kind of general

8   topic that we've been discussing, then we'll take a little

9   break and we'll get into whatever discovery disputes.  I'll

10  take a break.  You get together and resolve the rest of your

11  discovery disputes.

12          **MR. STEKLOFF:**  Yes, Your Honor.

13      So there is precedent for what you're describing, which I

14  think is known as reverse bifurcation, in which the jury --

15          **THE COURT:**  Sorry.  Could you say that again?

16          **MR. STEKLOFF:**  Sure.

17          **THE COURT:**  What bifurcation?

18          **MR. STEKLOFF:**  Reverse bifurcation.

19          **THE COURT:**  Okay.

20          **MR. STEKLOFF:**  And that is a procedure under --

21          **THE COURT:**  I've never heard that phrase.

22          **MR. STEKLOFF:**  It is exactly what you, I think, are

23  contemplating, which is that causation, both general and

24  specific, is addressed first --

25          **THE COURT:**  Okay.

1          **MR. STEKLOFF:**  -- and the jury makes a determination

2   on whether or not the plaintiffs have satisfied their

3   scientific causation requirements.

4          And only if the jury does so does the case then go to

5   liability in terms of corporate conduct, corporate

6   responsibility, all the internal e-mails and documents that the

7   plaintiffs will want to show through their various experts or

8   confront our witnesses with.

9          And so there is precedent for that, and that I think is

10  exactly what you're contemplating.  Because in the initial

11  phase -- I understand on the margins there are arguments where

12  Mr. Wisner has now made that IARC somehow is even relevant to

13  the causation point.  I mean, he raised Portier.  I'm happy to

14  not cross Dr. Portier about IARC in a world in which IARC is

15  excluded.

16         And so I think that that's a good idea, would be to

17  proceed in a world in which the plaintiffs have to establish

18  both general causation under the -- you know, within what

19  you're discussing, which is Dr. Ritz would come on and talk

20  about the epidemiology, and Dr. Weisenburger would come on and

21  do the same, but then also they would present their

22  case-specific experts.  We would call, you know, potentially

23  Dr. Mucci, Dr. Ryder, and our case-specific experts.  This is

24  all assuming we get past the *Daubert* stage.

25         And then the jury would have to decide does -- I mean, I

1  don't know what the exact questions would be sitting here now,

2  but essentially:  Roundup or glyphosate, is it capable of

3  causing cancer?  And then if the answer is yes in

4  Mr. Hardeman's case, was that a substantial contributing factor

5  to this?

6          THE COURT:  You don't even have to ask those two

7  questions.  You can just ask whether it caused his cancer.

8          MR. STEKLOFF:  Sure.  If the answer is no, then we're

9  done.  That actually, talk about efficiency, is much more

10 efficient.  That would be a much shorter trial if the answer is

11 no.

12      If the answer is yes, then witnesses come on the stand and

13 they talk about -- again, I am confident that there are

14 internal e-mails or other documents that they want to show.  I

15 think we would have lots of disputes about how much beyond that

16 we go, and even IARC and EPA I think we might debate whether

17 those come in in the second stage; but let's assume for

18 purposes here they do, it would be a different question that

19 the jury was asking, which is did Monsanto -- I mean, I don't

20 have the exact claims here, but essentially, like, failed to

21 warn -- you know, meet their responsibilities to warn

22 Mr. Hardeman about -- about the -- about glyphosate and its

23 potential to cause cancer.

24          THE COURT:  What about the concern that sort of

25 leaves -- by taking all of that out, it leaves the impression

1  that anybody who might be in charge of assessing whether

2  glyphosate is dangerous has not done anything to -- not taken

3  any measures with respect to glyphosate?

4           MR. STEKLOFF:  Well, if --

5           THE COURT:  In other words, that was a very

6  inarticulate way of repeating Mr. Wisner's point, which is it's

7  been there for 40 years, it must be safe.

8           MR. STEKLOFF:  But if we are not allowed to argue what

9  the EPA -- so what the EPA did or what another foreign

10 regulatory agency -- governmental agency did, I don't really

11 think it does leave that impression in the sense that -- I

12 mean, this happens, for example, where -- I don't have a ton of

13 examples off the top of my head, but where it's happened before

14 you have an FDA-approved pharmaceutical that's on the market

15 and there isn't a lot of -- the FDA regulatory experts, for

16 example, that the plaintiffs like to bring, in those cases

17 don't testify in this first phase about causation.

18      The question is:  Does that medicine cause, both generally

19 and specifically, the injury that plaintiffs are claiming?  And

20 so this is -- courts are able to resolve that issue in a

21 reverse bifurcation context.

22           THE COURT:  Well, I think for now -- I mean, how --

23 for purposes of your trial planning, when should we decide

24 whether there is going to be a bifurcation of this?  I mean, I

25 want to seriously entertain the possibility of doing this, but

1   I understand it's a very important decision.  I don't want to

2   decide it off-the-cuff now.

3       When would you need a decision on whether we're going to

4   bifurcate, you know, along these lines for your planning

5   purposes?

6           **MR. WISNER:**  That's something we really kind of needed

7   to know already.  I don't mean to say that coyly, Your Honor.

8   It's just --

9           **THE COURT:**  So I should make a decision on that very

10  quickly?

11          **MR. WISNER:**  Yes, and I think that we should brief it

12  immediately if that's going to be really a potential issue.  I

13  think that it raises a lot of serious problems for us,

14  particularly, for example, that every single juror that sits in

15  that box is going to know it's on the market and, therefore,

16  the EPA has approved it.  So it's implicit in every single

17  juror's knowledge so this products approach --

18          **THE COURT:**  You are in San Francisco so maybe half the

19  jurors think that --

20          **MR. WISNER:**  Monsanto is evil and whatever.

21          **THE COURT:**  -- the fact that EPA approved it, means

22  that it's dangerous.

23          **MR. WISNER:**  Maybe but that fact will be there if we

24  can't counter that fact that the IARC which, you know -- for

25  what it's worth, IARC in the realm of academics is like the

1  Blue Bloods of scientists, you know.  So it's, like, the fact

2  that our guys have all been on panels and they were there, I

3  mean, that's really an important part of the gravitas of their

4  opinion.

5        There's a reason why when Dr. Portier took the stand in

6  our trial, it was basically done.  His opinion is so thoughtful

7  and in depth that they have to -- I don't know.

8        So, anyway, that's our position.  I don't want to wax

9  emotion about it, but we'd like to brief this issue immediately

10  because this really, really kind of goes to the core of

11  everything and would make our trial significantly more

12  expensive because we'd have to bring back Portier, for example,

13  after and he's in Europe, and -- I mean, I know you shake your

14  head, Your Honor, but this is going to be costs borne by

15  Mr. Hardeman.  It's not being borne by a thousand plaintiffs;

16  right?  And Mr. Hardeman, it's going to be reduced from his

17  judgment.

18        And so it's something -- that's one of the reasons why we

19  were so concerned about bringing live testimony is we can't

20  ethically have another person pay for it.  It has to be the

21  person whose case is going up for trial, and so it's a lot of

22  money.

23              THE COURT:  Is that true?  Really?

24              MR. WISNER:  I think it's over $200,000.

25              THE COURT:  But, I mean, the plaintiff group, that

1   can't be funded by the group as a whole?

2          MR. WISNER:  The general causation, absolutely, and

3   that was applied to everyone.

4          THE COURT:  Right.

5          MR. WISNER:  Specific causation is by definition not

6   general.  We can talk about this.  I'm not going to say --

7          MR. MILLER:  We can talk about it later.

8          MR. WISNER:  We can talk about it later and we can

9   work it out.  I think it's a tricky issue, Your Honor.

10          THE COURT:  I mean, I'm obviously no expert and so

11   don't quote me on anything I say, but my gut commonsense

12   reaction is everybody in the group has a very strong interest

13   in how this trial goes, you know.

14      But, anyway, you were going to say something?  And then

15   we'll take a break.

16          MR. STEKLOFF:  I mean, first, Dr. Portier is not

17   specific causation.

18      Second, I think what we're hearing here, and I would say

19   sort of regardless of where you --

20          THE COURT:  But he would have to come back twice.

21          MR. STEKLOFF:  I agree.

22          THE COURT:  Okay.

23          MR. STEKLOFF:  Regardless -- but I don't think that

24   would actually happen with a lot of people.  Like, I don't

25   think Dr. Ritz would have to come back twice.  I don't think

```
 1  Dr. Weisenburger would have to come back twice.  I think the
 2  second phase would be very different if we went to it, which
 3  would be Dr. Portier and then I think Dr. Benbrook, who they
 4  told you before, we're going to have challenges to him, but is
 5  sort of a liability regulatory expert.  So I think the phases,
 6  with Dr. Portier being an exception, would be very different.
 7  So I will throw that out there.
 8      I also -- I want to clarify an issue about Johnson before
 9  I forget, but I think -- the other thing I just want to point
10  out is what we are hearing, and this came up at the last
11  hearing, is even if you allow IARC in at any phase, you I think
12  in your general causation *Daubert* opinion have -- I don't
13  want -- have made comments about the relevance of IARC.
14      And what we are hearing now time and time and time again
15  is that IARC needs to be held up as the Holy Grail here, and so
16  I just want to say I don't think that the Court should be moved
17  by that argument given what you've already said about IARC, but
18  that can be maybe something we brief.
19          THE COURT:  Yeah, and maybe that there needs to be a
20  limiting instruction about IARC.
21          MR. STEKLOFF:  Or a limit of how much we hear about
22  IARC.
23          THE COURT:  Or both.
24          MR. STEKLOFF:  Yes.
25      And then I just want to clarify on this Johnson issue, and
```

1  I was not part of the Johnson trial, Mr. Wisner was, others

2  were, but this is my understanding and my ultimate conclusion

3  is that -- I don't know that it will provide much guidance for

4  you on how to handle this from an evidentiary standpoint -- is

5  that the defense did not move to exclude the admission of IARC

6  and it was then admitted.

7      The plaintiffs moved to exclude as hearsay the various

8  regulatory findings, so EPA but also others.  The judge granted

9  that.  The judge said that those documents and exhibits did not

10  meet the public records exception.  So in limited instances she

11  allowed some of the -- and we have red ribbons and if we have

12  to get to this in front of Your Honor, I think we will be able

13  to meet our burden of proving that they do meet the public

14  records exception.

15      But then there were limited cross-examinations of some of

16  the plaintiffs' experts by the defense in which they were able

17  to read from an EPA document.  That is where the limiting

18  instruction came in that Mr. Wisner noticed, which is that the

19  judge instructed the jury that it could come in for a limited

20  purpose but not for the truth of the matter asserted because of

21  her view on hearsay.

22      And so here whatever Your Honor rules we think we will now

23  address this before the trial as opposed to having one ruling

24  on IARC and then a different ruling on the regulatory

25  documents, but I think there should be -- there will be, I

suspect, hopefully a goose/gander approach on that.

So I just wanted to give you that background so you had it as you go to look at the Johnson -- the way that these documents or exhibits or issues were handled in Johnson because I think it was very complicated and sort of a result of a nonchallenge to IARC, which, as Mr. Wisner said, the judge said after the fact had the defense moved to exclude IARC on hearsay grounds, at least the exhibit, the monograph, she would have granted that motion. And I just wanted to try to make that as clear as possible as you consider that issue.

**THE COURT:** Okay. So why don't we do this: I can rule on this issue of bifurcation before Christmas. Why don't we have Monsanto file a brief on bifurcation in seven days. Is that okay?

**MR. STEKLOFF:** Sure.

**THE COURT:** And then the plaintiffs can file a brief on bifurcation seven days after that. No. We better make it sooner. Let's hold on a second. Let's -- what's today? Wednesday?

**MR. STEKLOFF:** Wednesday the 5th.

**THE COURT:** So let's have Monsanto file a brief on bifurcation by the 10th and let's have the plaintiffs file a brief on bifurcation by the 12th.

Are those dates -- I mean, I know you-all have a gazillion things you have to be doing right now. Are those dates -- none

1    of it's going to make sense considering all that you have to

2    do, but are those dates as good as any given all the things

3    that you have to do?

4           MR. WISNER:  I don't know why they would get five days

5    and we'd get two.  That just seems on its face unfair,

6    Your Honor.

7           THE COURT:  You can start thinking about it now.

8           MR. WISNER:  Okay.

9           MR. STEKLOFF:  I think I've announced our position.

10          THE COURT:  And I think this is probably something

11   that you both are expert in so I'm not too worried about that.

12      Okay.  So those will be the deadlines, and I'll give you a

13   decision -- I'm not going to promise definitively, but I will

14   almost certainly give you a decision before Christmas.

15      And then why don't we take a break, come back at 3:30.

16   All right.

17                    (Recess taken at 3:16 p.m.)

18                (Proceedings resumed at 3:31 p.m.)

19          THE COURT:  Okay.  All right.  Any discovery disputes?

20   What's so funny?

21          MS. WAGSTAFF:  Your Honor, I think that the discovery

22   disputes fall into three categories:  Ones that are sort of

23   general to all three cases, one that relates to Hardeman, and

24   some that relate to Stevick.

25      With respect to the Hardeman ones that we've outlined, one

1    of them was satisfied by Your Honor's order last Friday with

2    the depositions.  Those are all -- they gave us new dates.

3    We've accepted every date.  So that issue is taken care of.

4        Monsanto has served amended discovery responses two days

5    ago, and we're going through those and the meeting and

6    conferring is still happening with respect to Hardeman on

7    those; and to the extent we need further attention from you, we

8    will let you know.

9            THE COURT:  Okay.

10           MS. WAGSTAFF:  With Stevick --

11           MR. BRAKE:  We have some outstanding disputes,

12   Your Honor.

13           THE COURT:  Okay.

14           MR. BRAKE:  For the record, Brian Brake for plaintiffs

15   Elaine and Christopher Stevick.

16       Your Honor, we -- I sent actually on December 3rd a

17   discovery letter, which I don't know if Your Honor has had an

18   opportunity to look at or not.  I've got an extra copy here if

19   you'd like to see that.

20           THE COURT:  I have it.  I don't remember whether I

21   looked at it.  Let's see here.

22                       (Pause in proceedings.)

23           THE COURT:  Yeah, I started looking at this, but I

24   don't believe that I've been through the whole thing so go

25   ahead.

1          **MR. BRAKE:**  Yes, sir.

2      Here's where we are.  We filed that letter on

3  December 3rd.  There were the interrogatories that I wanted

4  answered more specifically and then Monsanto's responses; and

5  then after that letter was filed, Monsanto filed amended

6  responses to the interrogatories, which resolved the discovery

7  dispute regarding Interrogatory Number 5, 8, and 13 on net

8  worth.  And so what that leaves us with, I'll go over those

9  interrogatories now and ask Your Honor to rule on them.

10      I only propounded 17 interrogatories, and I chose them

11  fairly carefully based upon what I needed to prepare.

12          **THE COURT:**  What are they?

13          **MR. BRAKE:**  Yeah.  Number 1, basically asking if you

14  think glyphosate was not a substantial factor in causing Elaine

15  Stevick's cancer, tell me all facts, witnesses, documents to

16  support your contention.  The answer is "See our expert

17  reports."  In my view, that's not adequate.  I'd like to know

18  who you're saying is going to say it, what they're relying

19  upon, and what documents they're relying upon.  That's

20  Number 1.

21      The next one is Interrogatory Number 4, identifying people

22  with personal knowledge.  Basically the answer is "We'll tell

23  you sometime" --

24          **THE COURT:**  Personal knowledge of?

25          **MR. BRAKE:**  Personal knowledge of the allegations in

1  the complaint --

2        **THE COURT:**  Okay.

3        **MR. BRAKE:**  -- and the issues in dispute.  And rather

4  than a list of people, the response was "We'll basically tell

5  you later and/or it's overly broad."

6        The next one is number -- oh, I'm sorry.  I missed one.

7        Number 2, this is a very important one.  It's asking for

8  all people who may provide testimony at trial, and Your Honor's

9  pretrial order does not include a date to exchange witnesses

10  for trial; and the response to this from Monsanto is "We'll

11  tell you when the order says we should tell you."

12        **THE COURT:**  Okay.  But Ms. Wagstaff just told me that

13  they were going to negotiate --

14        **MR. BRAKE:**  Yes, sir.

15        **THE COURT:**  -- still more dates, a more complicated,

16  detailed set of deadlines between the parties.  Why is that not

17  going to take care of this?

18        **MR. BRAKE:**  That may very well take care of this.  The

19  reason I'm bringing it up now is if there are people that are

20  identified by Monsanto to testify at trial, I'd like to know

21  that before the discovery cutoff of December -- or the next

22  discovery cutoff, otherwise we may not be able to be prepared

23  for trial.  But I agree with what you're saying on that.

24        The next one is Number 6, which is "List all potential

25  factors other than Roundup that you will assert as a potential

 1  contributing cause."  The answer is "Refer to the expert
 2  reports" rather than a specific answer.
 3       The next one is 7, "When do you contend that Mrs. Stevick
 4  developed non-Hodgkin's lymphoma?"  The answer "Refer to expert
 5  reports" as opposed to a specific answer.
 6       The answer to Number 8 and the amended responses.
 7       And then the last two are Numbers 14 and 15.  14 is asking
 8  if any scientist, physician, or government employee basically
 9  has stated to Monsanto the belief that glyphosate products
10  cause cancer; and if so, identify the specifics of that
11  interaction, when it happened, who said it, et cetera.  And I
12  did not get a specific answer to that.  Basically objections.
13       And then the last one is 15, which is basically asking for
14  any discussions or meetings in which Monsanto's officers,
15  agents, or contractors participated in discussions about
16  whether the public should be warned about the potential dangers
17  of glyphosate.  I did not get a specific answer to that.
18       So we'd ask the Court to order answers to those specific
19  interrogatories ASAP.
20       **THE COURT:**  Okay.  Does Monsanto want to briefly
21  respond on any of these?
22       **MR. GRIFFIS:**  Yes, Your Honor.
23       I'd like to raise a procedural point for starters and ask
24  that Mr. Brake follow Your Honor's rules with regard to both
25  meeting and conferring about these issues and filing discovery

1    letters.

2        I've had no oral communication with him about this.  He

3    sent me a written discovery letter and then filed that as

4    his -- he sent me a demand letter, to which I responded by

5    e-mail; and then he sent you that and attached my e-mail as the

6    discovery letter rather than incorporating my responses into a

7    filing to Your Honor.  I think it would go more smoothly and be

8    more intelligible to you, if not to all of us, if it was filed.

9            **THE COURT:**  Do you want me to deny it?  I'll deny it

10   on that basis and let you put together a discovery letter and

11   tee it up for me.  I think it's totally appropriate to simply

12   deny the motion to compel on that basis.

13           **MR. GRIFFIS:**  All right, Your Honor.

14           **THE COURT:**  Do you want me to do that?

15           **MR. GRIFFIS:**  Yes.

16           **THE COURT:**  All right.  When will be the deadline for

17   a discovery letter?

18           **MR. GRIFFIS:**  Since we have all the material for it,

19   we can get that on file this week easily.

20           **THE COURT:**  Okay.  Why don't you file the discovery

21   letter by Friday --

22           **MR. GRIFFIS:**  Okay.

23           **THE COURT:**  -- and I'll address it next week.

24           **MR. GRIFFIS:**  Thank you.

25           **THE COURT:**  Okay.  What next?

1          **MR. WISNER:**  Your Honor, late yesterday evening we

2    filed a discovery letter related to the Rule 30(b)(6)

3    deposition.  I don't know if you've had a chance to review it

4    yet.

5          **THE COURT:**  Let me pull it up.  I probably have not

6    reviewed it, but you never know.

7                    (Pause in proceedings.)

8          **THE COURT:**  Feel free if you-all want to have a little

9    chat.  Don't feel rushed.  My sense is that your chat with each

10   other is productive so go ahead.

11         **MR. WISNER:**  No, it was just do I have an extra copy,

12   Your Honor.  It wasn't -- we talked about it during the break,

13   and we could not reach agreement on the disputes on these five

14   topics.

15         **THE COURT:**  Okay.  No, I haven't really looked at

16   this.

17         **MR. WISNER:**  Okay.  Do you want to discuss it now or

18   would you like to not do that?

19         **THE COURT:**  Sure.

20         **MR. WISNER:**  So really there's five topics,

21   Your Honor.  The first two are very related and they relate

22   specifically to Monsanto's lobbying efforts after October of

23   2014, which is when we became -- we knew that IARC was going to

24   investigate glyphosate.  That's when everyone found out about

25   it.  At least that's when Monsanto found out about it I should

1    say.

2         They relate to GBFs or glyphosate-based formulations and

3    they relate to IARC specifically.  I can give you a lot of

4    background, but I'll just keep it very brief.  These are all

5    top -- this is -- we have a lot of documents by Monsanto to

6    FTI Consulting.  We actually describe some of those.

7              THE COURT:  What's FTI Consulting?

8              MR. WISNER:  It is the lobbying firm for Monsanto on

9    Congress.

10             THE COURT:  Okay.

11             MR. WISNER:  And we have a lot of documents showing

12   through them that Monsanto did certain things in light of IARC

13   that I think are relevant even to general causation.

14        Specifically they got a congressman to write a letter

15   threatening the NCI for not having published the HS data update

16   and why haven't they and demanding that they do so by

17   October 22nd.  On that date, NCI submitted it for publication.

18        And so we want to explore exactly what communications,

19   what conduct Monsanto's lobbyists did or did not do in sort of

20   creating that effect.  There was also a full congressional

21   hearing aimed to defund IARC based upon a Reuters article that

22   was -- actually we have the documents to support this -- that

23   was largely not written but put together in a PowerPoint for

24   Monsanto that was then published.  That same Reuters article

25   was the sole basis for the congressional hearings that accused

Dr. Blair of hiding data from its IARC panelists, and they threatened to defund it.

It actually required IARC to come and testify before Congress, and it was stuff that actually has formed the basis of some of our general causation briefing, specifically a letter by Director Wild of IARC talking about what they did and did not do vis-a-vis exposure, for example.

The conduct that Monsanto engaged in in response to the IARC monograph, both prior to its actual release and subsequent to it, goes directly to punitive damages. It goes to malicious intent and that's why we want to discover it.

Now, obviously, what testimony we get will be subject to admissibility decisions later; but for the purposes of discovery, we think we should be allowed to inquire into that.

So those are the first two topics, Your Honor. I'll just take them up -- I think you should -- it would be probably easier to respond topic by topic unless you want me to go through all of them.

**THE COURT:** Okay. So this would be topics 11 and 12 that we're talking about?

**MR. WISNER:** That's correct, Your Honor.

**THE COURT:** Okay. Go ahead.

**MR. STEKLOFF:** Sure, Your Honor.

Just I want to give a little bit of background. We're talking about a notice that was issued of a 30(b)(6) witness.

1    There were 26 topics.   It's Exhibit A to that in that notice.

2    During the meet and confer, the plaintiffs withdrew I believe

3    five topics.   So there were 21 topics left.

4         We have agreed to produce a corporate representative under

5    Rule 30(b)(6) on 16 of those topics; and if you look at those

6    topics in Exhibit A on which there's no dispute, they are very

7    broad.   I mean, they talk about the company's overall position

8    on, you know, the science related to glyphosate and NHL.   They

9    talk about all of our regulatory interactions.   So I want to

10   give that context to try to show that this is a more narrow

11   dispute.

12        With respect to these issues on Congress, I actually think

13   that there's a lot of similarity.   I know we'll talk about

14   topics 19 and 26, but in some ways I think topics 11, 12, 19,

15   and 26 all have a lot of overlap.   They all involve plaintiffs'

16   efforts to seek discovery about Monsanto's interactions with

17   either government -- you know, Congress or other legislative

18   bodies or with the media.

19        A few other sort of background points for Your Honor.   I

20   mean, Mr. Wisner and his colleagues are going to depose some

21   fact witnesses before the Hardeman trial where we've agreed to

22   produce witnesses, and I think that some of those witnesses are

23   custodians on the documents that he's talking about.   So my

24   sense is that they will explore a lot of these topics through

25   fact witnesses.

 1        With respect to FTI, the third party that he referenced,

 2   he has served -- the plaintiffs have served a subpoena on FTI

 3   both seeking documents and a corporate representative from FTI

 4   to testify.

 5        So there's a lot of other discovery going on on these

 6   issues.  I mean, I think that -- you know, and so -- and absent

 7   sort of privilege issues that might come up, there is nothing

 8   precluding him from, for example, showing fact witnesses the

 9   documents that he referenced that have been produced in the

10   litigation.

11        With respect to these topics, I think the danger of sort

12   of opening -- our fundamental position really on topics 11, 12,

13   19, and 26 is that there have been a lot of -- there have been

14   efforts -- and I'm not imputing anyone, but I am confident that

15   the plaintiffs' attorneys have also had interactions with

16   Congress, with governmental agencies, with European

17   governmental agencies, with media, that they have been doing

18   things.  There have been promotional efforts on the Internet.

19   If you look at topic 26, that they have been doing things in

20   the media both through advocacy groups, through celebrities,

21   through jurors in the Johnson case.

22        And I -- there's a goose/gander thing here, and I raised

23   it with the plaintiffs during the meet and confer, which is

24   there's no need to open up this can of worms because if they

25   are entitled, for example, to a company witness deposition

1    about these topics --

2         **THE COURT:**  I mean, I'll cut you off for a second to

3    just say that I do not think -- I mean, if we were just

4    having -- if this case was only about causation, I would

5    probably say "No further discovery on this stuff."

6         But when it comes to punitive damages, it's not a

7    goose/gander thing.  I mean, there is a responsibility that

8    Monsanto has to ensure that its product is safe and to the

9    extent there are serious concerns about the safety of its

10   product, Monsanto has a responsibility not to try to snuff out

11   those concerns but to investigate them.

12        And it seems to me that documents or information that -- I

13   know we're talking about a 30(b)(6) deposition -- documents or

14   information that speak to these topics, these four topics --

15   you keep bracketing 18 so I guess we'll talk about that

16   separately, but topic 11, 12, 19, and 26 -- it seems like those

17   are potentially relevant to, you know, the question whether

18   Monsanto should have been trying to snuff out concerns or, you

19   know, investigate concerns in a more objective fashion.

20        And in saying what I'm saying I'm not casting any -- I'm

21   not suggesting that I have an opinion either way about that,

22   but it's an inquiry that it seems to me is relevant to the

23   punitive damages part of the case.

24        So I'm going to allow topics 11, 12, 19, and 26.

25        What about topic 18?

1              **MR. STEKLOFF:**  Can I make one comment --

2              **THE COURT:**  Sure.

3              **MR. STEKLOFF:**  -- on 11, 12, 19 and 26, which is that

4      even punitive damages have to be relevant to the conduct

5      associated with the plaintiffs; and certainly with respect to

6      Mr. Hardeman but I think with respect to all three plaintiffs,

7      they were all diagnosed with their NHL prior to the events that

8      the plaintiffs are alleging took place.

9              **THE COURT:**  Okay.

10             **MR. STEKLOFF:**  And so I think that that is a second

11     problem, which is that, you know, for example, 26, things that

12     were happening in the last, I don't know, six months in the

13     San Francisco area have nothing to do even with punitive --

14     even -- have no bearing on punitives as it relates to these

15     three plaintiffs, and I think that that is true with respect

16     really actually to 11, 12, 19, and 26, because all of this

17     conduct so far -- alleged conduct so far postdates their injury

18     and the warnings that could have been given to them.

19         So I understand that if punitives are available, if it

20     goes to the jury, that may occur, but that should be based on

21     conduct tied to the allegations that relate to the plaintiffs'

22     claims, and the plaintiffs' claims all predate that.

23             **THE COURT:**  It strikes me that it's at least possible

24     that they would be allowed to make an argument, "Look, they're

25     still doing it.  Even now they're still doing it."  So I'm

1    allowing those four topics.

2         Obviously it's a separate issue whether anything

3    discovered through that is admissible at trial, but I'm

4    allowing those four topics.

5         Now, what about topic 18?

6         **MR. WISNER:**  Topic 18, Your Honor, is a little

7    different insofar as it involves something called "Let Nothing

8    Go."  It was a promotional scientific campaign, it's unclear

9    exactly what it is, that was managed and supervised by people

10   working out of St. Louis in Missouri for Monsanto; but it was,

11   according to defense counsel's representations to me, it was

12   limited to conduct in Europe.  So that's their big objection,

13   is that it relates to Europe and, therefore, is irrelevant to

14   our case.

15        And our position is, well, no, if they're attacking IARC

16   in Europe, that goes to the same exact issue as if it was done

17   attacking the IARC from the U.S.  And so while -- you know, I

18   don't know what we'll learn, but it's reasonably calculated to

19   lead to potentially admissible information.  So I think asking

20   questions about it, learning what the corporation has to say

21   about it will give us an insight into answering this question.

22        **THE COURT:**  Well, I mean, I don't know anything about

23   this "Let Nothing Go" campaign, but it seems to me that even

24   aside from IARC, to the extent that Monsanto wants to argue, as

25   I think it should have the right to do, "Look, how can you say

1   that our conduct is malicious when not only in the

2   United States have they approved it but in Europe, that place

3   where they're really careful, you know, the regulators have

4   allowed glyphosate on the market?"

5       You know, that even putting aside IARC, to the extent

6   there is, you know -- there were efforts by Monsanto to sort of

7   obtain that result in the face of evidence, you know, that that

8   result shouldn't have been obtained, it seems to me that you

9   would have the right to explore that.

10      But go ahead.

11          MR. STEKLOFF:  I think this is more -- I think there

12   is a relevance aspect to this.  I also think there's just a

13   proportionality argument here under Rule 26 --

14          THE COURT:  Yeah.  Okay.

15          MR. STEKLOFF:  -- which is really -- again, my

16   understanding is that this "Let Nothing Go," they describe it

17   as a campaign, was taking place in Europe.  They have -- one of

18   their other topics --

19          THE COURT:  What is the -- can you give me kind of a

20   neutral description of what does "Let Nothing Go" mean?

21          MR. STEKLOFF:  If I could, I would.  I can give you a

22   description -- so the topic 17, I think, was something called

23   "Freedom to Operate," which is I think potentially -- I don't

24   want to bind myself to this, but they asked for a 30(b)(6)

25   representative about what they would describe as a "Freedom to

 1   Operate" campaign.

 2           **MR. WISNER:**  I believe Monsanto describes it as that.

 3           **MR. STEKLOFF:**  Well, no, it's called "Freedom to

 4   Operate" within Monsanto, I'm not denying that, and we are

 5   producing a witness on that.  That was a U.S. endeavor, and so

 6   I think it is -- I would describe it neutrally as an effort to

 7   put accurate science -- make sure that accurate science is

 8   being communicated about Monsanto's products.

 9       Nothing precludes --

10           **THE COURT:**  But "Let Nothing Go" means -- does it mean

11   like respond to everything, don't let anything go unresponded

12   to?

13           **MR. STEKLOFF:**  I haven't talked to any company

14   witnesses --

15           **THE COURT:**  Okay.  All right.

16           **MR. STEKLOFF:**  -- about "Let Nothing Go" to be able to

17   tell you, Your Honor, so I don't want to try to be able to

18   characterize it.

19           **THE COURT:**  Okay.

20           **MR. STEKLOFF:**  What I would say here is, again I have

21   not looked at the documents myself but I've been told that

22   there are documents of U.S.-based employees in which "Let

23   Nothing Go" comes up.  Even assuming, which I think is

24   accurate, it is a European, to use their word, campaign,

25   nothing precludes them from asking fact witnesses about those

1   documents, but we would now need to go get someone from Europe

2   to come here potentially or have them go there.

3       We have a lot going on and so our position here was really

4   under Rule 26, given that it -- even if it -- I'm not sure it's

5   relevant to punitive damages here where they are asking lots of

6   witnesses about what they were doing with IARC in the

7   United States.  What was happening in Europe I'm not sure is a

8   central issue; but then when you throw in sort of I think the

9   burden and the concept of proportionality under the Federal

10  Rules, that was our position in asking them to consider

11  withdrawing this and why we are raising it in front of

12  Your Honor.

13          **THE COURT:**  Okay.

14          **MR. WISNER:**  Just for the record, I will be in France

15  for the Christmas holidays so if that makes anything easier on

16  your end.

17      No, joking aside, Your Honor, I think proportionality

18  argument sort of rings hollow when you actually listen to

19  opposing counsel's comment.  He doesn't even know what it is,

20  and that's literally our problem.  That's why we're conducting

21  discovery, to learn what it was, to learn how it was used.

22      And I can't imagine this testimony would be longer than

23  15, 20 minutes.  I have about 10, 15 documents at most that I

24  could even conceivably use for this, and I just need to know

25  what it is, and I need the testimony.

```
 1        And it's an important distinction between a fact witness

 2   and Monsanto -- right? -- because in the Johnson case their big

 3   argument was Donna Farmer, Bill Heydens, all of the main

 4   witnesses that we've taken, none of them are managing agents,

 5   none of their conduct can be imputed to the corporation.

 6        Okay.  So give me the corporation and I'm going to ask

 7   about their conduct and let's see if you ratify it or not.  And

 8   so in a "Let Nothing Go" context, I need the testimony from the

 9   corporate representative so it's binding on the corporation for

10   trial.

11             THE COURT:  Okay.  I'll allow topic 18.

12        Anything else?

13             MR. STEKLOFF:  I don't think the defense has any other

14   agenda items, Your Honor.

15             MS. WAGSTAFF:  Your Honor, nothing else from the

16   plaintiffs.  We will continue to meet and confer on the

17   Hardeman discovery issues and submit a discovery letter by the

18   end of the week if we need to.

19             THE COURT:  Okay.  Sounds good.  So, good.  That was

20   fairly efficient.

21        You're going to get together, you're going to talk about

22   putting together a more detailed pretrial schedule with

23   deadlines, exchanges of this and that and the other thing.  Do

24   you want to come see us again in the month of December or would

25   you rather be doing trial preparation?
```

```
 1                    (Counsel conferring.)
 2          THE COURT:  Or early January.
 3          MS. WAGSTAFF:  All right.  I'm told by my colleague
 4   that we would like to put something on calendar and then cancel
 5   it if we need to.
 6          THE COURT:  Okay.  Do you want to come --
 7          MS. WAGSTAFF:  Because we only have 45 depos in the
 8   next two weeks.
 9          THE COURT:  Right.
10          MR. WISNER:  One other request, Your Honor.  We
11   actually would request oral argument on the reverse
12   bifurcation.
13          THE COURT:  I'll let you know if I need it.
14          MR. WISNER:  Okay.
15          MS. WAGSTAFF:  So I would propose either the week
16   between Christmas and New Year's or the first week of January.
17          THE COURT:  We can do the first week of January.  How
18   about --
19          MS. WAGSTAFF:  January 2nd?
20          THE COURT:  I was going to suggest the 4th.
21      Let me see, what's that?  Pretrial conference in what?
22      We could do the afternoon -- yeah, that's Morgovsky.
23   That's gone.  And then, let's see here, I think we could
24   probably do Thursday afternoon.  We could do Friday.
25          MS. WAGSTAFF:  The 3rd or 4th work for plaintiffs,
```

1    Your Honor.  I will note that Monsanto has their *Daubert* briefs

2    due on the 3rd so I don't know if they want to be traveling

3    that day.

4              THE COURT:  Oh, okay.  I want to ask Gordon too.

5                        (Pause in proceedings.)

6              MR. STEKLOFF:  The 4th works for Monsanto, Your Honor.

7              THE COURT:  The 4th is better than the 3rd?  Oh, you

8    said you have *Daubert* briefs.

9              MR. STEKLOFF:  Our briefs are due on the 3rd and we

10   usually fly out the night before so there's no flight issues so

11   the 4th might be safer.

12             THE COURT:  Okay.  How about 10:30 a.m. on the 4th, or

13   would you prefer the afternoon?

14             MR. STEKLOFF:  The morning is better so we can try to

15   catch non-redeyes out.

16             THE COURT:  All right.  10:30 a.m. on the 4th.

17             MS. WAGSTAFF:  Great.  Thank you, Your Honor.

18             MR. STEKLOFF:  And, then, just to be clear, this is to

19   really focus on -- I mean, there might be other issues that

20   come up, I recognize, but this is right now to focus on

21   pretrial scheduling and if we don't need it, we'll let

22   Your Honor know?

23             MS. WAGSTAFF:  Pretrial and also a lot of the

24   discovery that Mr. Wisner was discussing is happening in

25   January.  So if there's any hiccups along the way, we can at

1    least have a venue to bring them to your attention.

2              **THE COURT:**  Sounds good.

3              **MS. WAGSTAFF:**  All right.

4              **THE COURT:**  All right.

5              **MR. STEKLOFF:**  Thank you, Your Honor.

6              **THE COURT:**  Thank you.

7                   (Proceedings adjourned at 3:58 p.m.)

8                         ---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Saturday, December 8, 2018

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter