**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 16-md-02741-VC |
| This document relates to: | Hon. Vince Chhabria |
| *Hardeman v. Monsanto Co., et al.*, 3:16-cv-0525-VC<br>*Stevick v. Monsanto Co., et al.*, 3:16-cv-2341-VC<br>*Gebeyehou v. Monsanto Co., et al.*, 3:16-cv-5813-VC | **PLAINTIFFS' OPPOSITION TO ISSUE BIFURCATION** |

# **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ...........................................................................................................1

LEGAL STANDARD......................................................................................................1

ARGUMENT ...................................................................................................................2

    I.     Bifurcating a Trial Around a Defendant's Favored Defense in the Context of a
         Bellwether Trial Undermines the Purpose of a Bellwether Trial ...................................2

    II.    Monsanto Has Not Established Why Bifurcation Is Justified .......................................7

        A.    Monsanto Presents No Evidence, Beyond Bald Assertions, that a Typical Trial
            Would Prejudice Monsanto.......................................................................................7

        B.    Bifurcation on Causation Creates Structural and Substantive Prejudice ...........9

        C.    Separating Probative Causation Evidence from Probative Liability Is Nearly
            Impossible ...............................................................................................................10

            •    The Credibility of Monsanto-Generated Science: ................................10

            •    Monsanto's Admissions:.......................................................................11

            •    Monsanto's Manipulation of Science: ..................................................12

            •    Credibility of Plaintiffs' Experts:.........................................................14

            •    Plaintiffs' Treating Doctors: ................................................................14

        D.    Bifurcation Defies Judicial Efficiency and Economy.......................................15

CONCLUSION.................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Cooper Indus., Inc.*,
No. CIV.A. 03-476-JBC, 2007 WL 1075647 (E.D. Ky. Apr. 4, 2007)...........................................9

*Bates v. United Parcel Service*,
204 F.R.D. 440 (N.D. Cal. 2001)...........................................................................................7

*Broad v. N. Pointe Ins. Co.*,
No. 5:11CV2422, 2012 WL 12894227 (N.D. Ohio Aug. 30, 2012) ........................................2

*Collazo v. WEN by Chaz Dean, Inc.*,
No. 215CV01974ODWAGR, 2018 WL 3424957 (C.D. Cal. July 12, 2018) .............................2

*GEM Acquisitionco, LLC v. Sorenson Grp. Holdings, LLC*,
No. C 09–01484 SI, 2010 WL 1729400 (N.D. Cal. Apr. 27, 2010)........................................2

*Gravity Defyer Corp. v. Under Armour, Inc.*,
No. LACV1301842JAKJCGX, 2013 WL 12138987 (C.D. Cal. July 23, 2013).......................2, 7

*Hangarter v. Provident Life and Assoc. Ins. Co.*,
373 F.3d 998 (9th Cir. 2004) .................................................................................................2

*In re "Agent Orange" Prod. Liab. Litig.*,
611 F. Supp. 1223 (E.D.N.Y. 1985) ........................................................................................9

*In re Bendectin Litig.*,
857 F.2d 290 (6th Cir. 1988) .............................................................................................5, 6

*In re Beverly Hills Fire Litig.*,
695 F.2d 207 (6th Cir. 1982). .........................................................................................5, 6, 8

*In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig.*,
123 F. App'x 465 (3d Cir. 2005) ...........................................................................................4

*In re Hanford Nuclear Reservation Litig.*,
534 F.3d 986 (9th Cir. 2008) .................................................................................................2

*In re Heparin Prod. Liab. Litig.*,

No. 1:08HC60000, 2011 WL 1097637 (N.D. Ohio Mar. 22, 2011) ..................................3, 6, 7, 9

*In re New York Cty. DES Litig.*,

211 A.D.2d 500 (1995). ...................................................................................................................4

*In re Prempro Prod. Liab. Litig.*,

586 F.3d 547 (8th Cir. 2009) ...........................................................................................................5

*In re Rhone-Poulenc Rorer, Inc.*,

51 F.3d 1293 (7th Cir. 1995) ...........................................................................................................5

*In re Sortwell, Inc.*,

No. C 08-05167 JW, 2011 WL 4896475 (N.D. Cal. Oct. 12, 2011) .............................................1, 2

*Jenkins v. Raymark Industries, Inc.*,

782 F.2d 468 (5th Cir. 1986) .......................................................................................................3, 12

*MySpace, Inc. v. Graphon Corp.*,

732 F. Supp. 2d 915 (N.D. Cal. 2010) ............................................................................................9

*Nye v. Ingersoll Rand Co.*,

No. CIV. 08-3481 DRD, 2011 WL 4017741 (D.N.J. Sept. 8, 2011) ...........................................3

*Simon v. Philip Morris Inc.*,

200 F.R.D. 21 (E.D.N.Y.2001) .......................................................................................................3

*Spectra–Physics Lasers, Inc. v. Uniphase Corp.*,

144 F.R.D. 99 (N.D. Cal. 1992) ...................................................................................................2, 7

*STC UNM v. Intel Corp.*,

No. 10-CV-1077 RB/WDS, 2011 WL 7562686 (D.N.M. Dec. 22, 2011) ..................................3

*United Air Lines, Inc. v. Wiener*,

286 F.2d 302 (9th Cir. 1961). .........................................................................................................5

**Rules**

Fed. R. Civ. P. 42 ...........................................................................................................................1

**Treatises**

MANUAL FOR COMPLEX LITIGATION (Fourth) § 22.315 (2004) ...........................................2

### INTRODUCTION

The type of reverse bifurcation proposed by Monsanto—where the defendant is permitted to have a trial on its favored defense before reaching any other issue—is unheard of in the modern MDL bellwether process.  Indeed, Monsanto has not and cannot cite any MDL implementing such an approach for a bellwether trial.  It is simply never done, and for good reason.  The purpose of a bellwether trial is to allow each side to test their theories and evidence against a real-world jury and, hopefully, learn important information about the strengths and weaknesses of the case to inform collective resolution.  Imposing a one-sided procedural hurdle—one that would be a *de facto* outlier for the 10,000 cases proceeding around the country—does not accomplish that goal.  It renders any verdict in this MDL, no matter which side prevails, unhelpful.

The bifurcation Monsanto proposes also fails under the law.  Under Rule 42, bifurcation should not be permitted if it will prejudice the non-moving party or if the issues to be bifurcated are inseparable.  Here, Monsanto's proposed bifurcation would create structural and substantive prejudice against Plaintiffs, discussed in detail below.  Even Monsanto acknowledges in its Seventh Amendment jury discussion, *see* Mot. At 9-10, that both trial phases would have to be tried by the same jury because each phase is sufficiently overlapping that the Seventh Amendment would prohibit different juries hearing the different parts. It would also be, as a practical matter, impossible to separate evidence that is probative of causation from evidence that is probative of liability.  There is simply too much overlap in light of Monsanto's pervasive manipulation, fabrication, and intimidation of the very science underlying causation.

There are circumstances where bifurcation on a specific issue makes sense, albeit it is the rare exception.  This is not one of those circumstances.  Indeed, if anything, these bellwether cases should be treated as "typical" as possible.  This case has already been bifurcated once, over Plaintiffs' objection, and there is no benefit to bifurcating it again when the same jury would have to hear each phase.  Plaintiffs oppose bifurcating the Group 1 bellwether trials.

### LEGAL STANDARD

"In the Ninth Circuit, '[b]ifurcation ... is the exception rather than the rule[.]'" *In re Sortwell, Inc.*, No. C 08-05167 JW, 2011 WL 4896475, at *2 (N.D. Cal. Oct. 12, 2011) (quoting *GEM*

*Acquisitionco, LLC v. Sorenson Grp. Holdings, LLC*, No. C 09–01484 SI, 2010 WL 1729400, at *3 (N.D. Cal. Apr. 27, 2010)); *see Hangarter v. Provident Life and Assoc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (Trying issues together is "normal trial procedure."). And rightly so—"[i]n general, a single proceeding will be a more efficient and reasonable means of resolving the action." *Gravity Defyer Corp. v. Under Armour, Inc.*, No. LACV1301842JAKJCGX, 2013 WL 12138987, at *2 (C.D. Cal. July 23, 2013). This why the Advisory Committee specifically cautions that "separation of issues for trial is not to be routinely ordered[.]" Fed. R. Civ. P. 42 advisory committee's note (1966).

Thus, while Monsanto is correct that the decision to order bifurcation is discretionary, it should only be ordered when justified—that is, when bifurcation promotes "convenience … avoid[s] prejudice, or … expedite[s] and economize[s.]" Fed. R. Civ. P. 42. And, importantly, the party seeking bifurcation "has the burden of proving that bifurcation is justified." *Sortwell*, 2011 WL 4896475, at *2 (quoting *Spectra–Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992)). Unsubstantiated claims of jury confusion, prejudice, or efficiency are not enough. *E.g.*, *Broad v. N. Pointe Ins. Co.*, No. 5:11CV2422, 2012 WL 12894227, at *1 (N.D. Ohio Aug. 30, 2012) ("Simply complaining of prejudice without producing evidence … is not sufficient.").

## ARGUMENT

### I. Bifurcating a Trial Around a Defendant's Favored Defense in the Context of a Bellwether Trial Undermines the Purpose of a Bellwether Trial

Before delving into the factors the Court should weigh in deciding whether to bifurcate, there is an overriding practical consideration this Court should consider. A bellwether trial is supposed "to produce reliable information about other mass tort cases." MANUAL FOR COMPLEX LITIGATION (Fourth) § 22.315 (2004). Specifically, "[b]ellwether trials can guide future settlement negotiations by showing how similar claims may fare before juries." *Collazo v. WEN by Chaz Dean, Inc.*, No. 215CV01974ODWAGR, 2018 WL 3424957, at *2 (C.D. Cal. July 12, 2018); *see In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 995 (9th Cir. 2008) (Bellwether "trial was designed to produce a verdict that would highlight the strengths and weaknesses of the parties' respective cases and … promote settlement[.]"). Thus, for a bellwether to mean anything in the context of an MDL, the trial should approximate what one would expect in a "normal trial procedure." *Hangarter*, 373 F.3d at 1021. Otherwise, there is no practical value of a verdict, one

way or the other.  Reverse bifurcation is anything but normal; it is "extraordinary" and "drastic."  *Nye v. Ingersoll Rand Co.*, No. CIV. 08-3481 DRD, 2011 WL 4017741, at \*3 (D.N.J. Sept. 8, 2011).  This is especially true when bifurcation is on an issue that is the defendant's favorite defense.

If this Court elects to bifurcate the specific issue of causation, then these bellwether cases—the only three available to this Court because of Monsanto's refusal to waive *Lexicon*—lose their precedential value.  For Plaintiffs *and* Monsanto, any verdict—whether in favor of Plaintiff or Monsanto—will be discounted because of this unorthodox procedure.  The logic behind this is obvious.  "'Reverse bifurcation' originated in the Third Circuit as a means of processing that circuit's backlog of asbestos-related cases."  *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 473 n. 8 (5th Cir. 1986).  It only makes sense, as it did in asbestos, when the parties "have excellent information about the likelihood of success on the issue of liability and the real sticking points are the individual issues of causation and damages."  *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 32 (E.D.N.Y.2001).  That is not the case here. "Liability in this case is a hotly-contested issue" and "there is nothing to suggest [Monsanto] has any intention of abandoning its defenses."  *STC UNM v. Intel Corp.*, No. 10-CV-1077 RB/WDS, 2011 WL 7562686, at \*2 (D.N.M. Dec. 22, 2011).  Absent a verdict on *all* defenses, *tried together*, the Parties will not be aided, for the 10,000+ cases nationwide, in moving toward resolution.  *E.g.*, *In re Heparin Prod. Liab. Litig.*, No. 1:08HC60000, 2011 WL 1097637, at \*4 (N.D. Ohio Mar. 22, 2011) (rejecting bifurcation on the issue of causation for first bellwether trials because, in part, "for the bellwether process to be of any real use, jury verdicts as to all contested issues appear desirable.").

Monsanto cites cases where reverse bifurcation was utilized.  But, these cases are the exception, *not* the rule, and all of them occurred after years of litigation and/or settlements, or involved unique circumstances.

- **Asbestos**:  In asbestos, as discussed above, reverse bifurcation emerged as a way to promote settlement by front-loading causation and damages, where liability was largely resolved by numerous prior trials.  *See STC*, 2011 WL 7562686, at \*2.

- **DES**:  The DES (diethylstilbestrol) case cited by Monsanto occurred after thirty years of DES litigation, including trials, where the reviewing court addressed the issue in one sentence.  *See*

*In re New York Cty. DES Litig.*, 211 A.D.2d 500, 500 (1995).  Similar to the asbestos situation, the courts did not employ reverse bifurcation in DES cases until many trials occurred; reverse bifurcation was not employed at the beginning of the litigation..

- **Diet Drugs**:  In the Diet Drug cases, Monsanto lists two federal and fifteen state court proceedings where courts elected to reverse-bifurcate the trials.  But, those cases were tried after the entry of class wide settlement, where opt out plaintiffs were permitted to seek trial in state court, provided, they were "ENJOINED from arguing to the state trial court that the reverse bifurcation procedure or jury instruction that they stipulated to … should not be used." *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Prod. Liab. Litig.*, 123 F. App'x 465, 472 (3d Cir. 2005).  And, "[i]f asked by the state trial court whether reverse bifurcation is appropriate, advisable or should otherwise be implemented, plaintiffs, their agents, attorneys and derivative claimants must answer 'I am directed by the United States District Court for the Eastern District of Pennsylvania to stipulate to the use of a reverse bifurcated trial and I am not permitted to argue or otherwise make statements against this court's discretionary use of that procedure." *Id.*  Looking to those cases as evidence that reverse bifurcation is common, or even advisable, is misleading and inaccurate.

- **Hormone Replacement Therapy**:  Monsanto cites to a few hormone replacement therapy cases tried in Philadelphia City Court, where a judge elected to trifurcate the jury trials. These orders were apparently entered by the same judge, who explained that he had a personal preference for reverse bifurcation as "the appropriate way to go," and routinely required it.  *See* Monsanto's Exh. 4 at pg. 9-10 of 12 (discussing his general rule for reverse bifurcation); Monsanto's Exh. 3 at pg. 5-7 of 9 (*sua sponte* ordering reverse bifurcation, without notice to either party because that is what he normally does).  In other words, these Philadelphia orders reflect the opposite application of law—where reverse bifurcation is the rule, and regular trials are the exception.  This incorrect application of the law, led the Court to change its rules to prevent reverse bifurcation absent consent of both parties.  Gen. Court Regulation No. 2012-01 at 2, *In re: Mass Tort & Asbestos Programs* (C.P. Phila. Cty. Feb. 15, 2012), *available at* https://www.courts.phila.gov/pdf/regs/2012/cpajgcr2012-01.pdf.

Tellingly, the MDL proceeding involving these hormone replacement drugs did *not* bifurcate causation. *See In re Prempro Prod. Liab. Litig.*, 586 F.3d 547, 553 (8th Cir. 2009) (noting liability and causation were tried together).

- **Beverly Hills Fire**:  In *In re Beverly Hills Fire Litig.*, the Sixth Circuit affirmed a trial court's decision to bifurcate the issue of causation.  695 F.2d 207, 216-17 (6th Cir. 1982).  But the circumstances of that case were unique, involving "a class action on behalf of approximately 200 persons against 23 defendants who have been grouped together" and centered around whether a specific aluminum wire malfunctioned and caused the fire that harmed all the plaintiffs—a causation trial that, itself, took thirty-two days. *Id.* at 216, n.14. The bifurcated trial was designed to try the issue of causation for everyone, not just a single bellwether, and was specifically designed to "enhance the likelihood of settlement[.]" *Id.*  And, it was *because* of these facts that the court did not find an abuse of discretion.

- **Bendectin**:  *In re Bendectin Litig.*, 857 F.2d 290, 309 (6th Cir. 1988) is a thirty-year-old relic of a time when MDL courts experimented with consolidated trials on common issues.  In *Bendectin*, the district court consolidated 818 cases and ordered a trial on general causation for all cases. *Id.* at 295.  Under this approach, the verdict would bind all parties in the 818 cases, with separate resolution of individual issues to be resolved by different juries. *Id.*  This approach has fallen into disfavor and violates the Seventh Amendment. *See, e.g.*, *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303-04 (7th Cir. 1995) (holding that consideration of liability and damages issues by two different juries violates the Seventh Amendment); *see United Air Lines, Inc. v. Wiener*, 286 F.2d 302, 304, 306 (9th Cir. 1961), *cert. denied*, 366 U.S. 924 (1961).

Considering the thousands of mass tort dockets that have been litigated over the last thirty years, Monsanto's inability to cite a single example of an MDL bifurcating on the issue of causation for early bellwether trials is a reflection of how ill-advised and unorthodox the procedure is.  It is just not done in MDL mass torts.  This point is underscored by the nature of Monsanto's proposed bifurcation.  Monsanto is asking to have a trial to exclusively address Monsanto's favorite defense— general and specific causation—and to do so in a sterile, artificial courtroom, completely detached

from any evidence relating to Monsanto's wrongful conduct, IARC, or any explanation as to why Roundup has managed to be on the market for over forty years without a carcinogenicity warning. Such an exercise is not only fundamentally unfair but, for the purposes of case evaluation, it would be ignored.

The most recent attempt by an MDL defendant to invoke bifurcation on causation for a bellwether was in *In re Heparin Prod. Liab. Litig.*, No. 1:08HC60000, 2011 WL 1097637, at *2-4 (N.D. Ohio Mar. 22, 2011). And there, the MDL court correctly rejected it. In *Heparin*, like Monsanto here, the defendants sought to "divide the bellwether trials into two phases" where the "first phase would address whether the plaintiff was exposed to contaminated heparin, whether that exposure caused that plaintiffs' injuries, and compensatory damages" and the "second phase would address the defendants' liability, punitive damages and any other legal issues." *Id.* at *2. And, like Monsanto here, the defendants cited the asbestos cases, *Beverly Hills Fire*, and *Bendectin*, arguing that "this division will serve judicial economy … prevent introduction of irrelevant and unfairly prejudicial evidence about the defendants' culpable conduct during the causation phase of the trial" and "avoid presentation of a substantial amount of evidence relating to liability and reduce the time and costs related to pretrial disputes about the evidence."[1] *Id.*

In rejecting this argument, the MDL court stated first that "causation and liability are neither separate and distinct issues nor readily severable" and, thus, attempting to bifurcate was not possible. *Id.* The court recognized the simple fact that, unlike bifurcation between liability and damages, in situations where there is an obvious and natural division of evidence, parsing evidence related to liability and causation is near impossible in most cases. Most evidence is probative of both elements. Second, the MDL court held that "the interests of judicial economy will not be served by bifurcation" because even "[a] verdict for defendant on causation in one case will not dispose of the issue of liability in all cases[.]" *Id.* The MDL Court explained that:

> Circumstances here are quite unlike those in the cases defendants cite in support of bifurcation. There courts addressed general causation and disposed of litigation wholesale because the verdicts were binding on all plaintiffs. … In this case, however, defendants are not proposing a single, consolidated trial to dispose of the

---

[1] In *Heparin*, the defendants also claimed the bifurcation process would promote settlement. Monsanto, however, does not take that position here. *Heparin*, 2011 WL 1097637, at *2.

litigation wholesale. Rather, defendants propose bifurcating each bellwether trial into two phases. Even if this approach potentially might save time and money, it is not likely to have the cumulative effect that motivated bifurcation in the cases noted above.

*Id.* at *3-4.   Third, the MDL court noted that bellwether cases need to be tried on all defenses if they are going to offer information to the parties to drive settlement.  *Id.* at *4.  Finally, the MDL Court noted that "any potential for prejudice to defendants can be avoided with appropriate limiting instructions."  *Id.*  The *Heparin* court correctly realized that bifurcating the issue of causation and liability did not promote efficiency, especially in the context of a bellwether trial.  These practical considerations, by themselves, counsel against engaging in the type of bifurcation proposed by Monsanto.

## II.   Monsanto Has Not Established Why Bifurcation Is Justified

"Factors to be considered when determining whether to bifurcate include: avoiding prejudice, separability of the issues, convenience, judicial economy, and reducing risk of confusion."  *Bates v. United Parcel Service*, 204 F.R.D. 440, 448 (N.D. Cal. 2001).  Monsanto "has the burden of proving that bifurcation is justified given the facts in this case[.]"  *Spectra-Physics*, 144 F.R.D. at 101. Here, none of the factors supports bifurcating the case between the issues of causation and liability.

### A.  Monsanto Presents No Evidence, Beyond Bald Assertions, that a Typical Trial Would Prejudice Monsanto

Taken to its logical conclusion, Monsanto's approach would have all product liability cases against large corporate defendants bifurcated between causation and liability.  Monsanto fails to explain why *this* case, as opposed to every other product liability case tried in California or elsewhere, should be treated differently.  Its argument is generic: "bifurcation would avoid the risk that the jury becomes distracted or misled by extraneous evidence of corporate conduct or by the complex regulatory record."  Mot. at 7.  But, corporate conduct and regulatory history are part of all products cases.  And yet, the type of bifurcation envisioned by Monsanto is almost never done.  This is because the proper way to address potential juror confusion—as done in nearly all cases—is to instruct the jury, not alter the way trials are conducted.  *E.g.*, *Gravity Defyer*, 2013 WL 12138987, at *3 ("As to Defendants' suggestion of jury confusion in a liability and damages trial, jury instructions are adequate to address this issue, which is presented in almost every civil action.").  Trying

causation along with liability is an important part of the trial process; without it "[t]here is a danger that bifurcation may deprive plaintiffs of their legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action which they have brought into the court, replacing it with a sterile or laboratory atmosphere in which causation is parted from the reality of injury." *Beverly Hills Fire*, 695 F.2d at 217.

This Court recently acknowledged the ability of jurors to follow instructions and take their obligations seriously. That is exactly what happened in the *Johnson* case, a point underscored by the questions asked by the jurors during trial.[2] Exh. 1, Juror Questions, *Johnson v. Monsanto*. These questions were technical—focused on the underlying science and other scientific issues:

- "In animal studies, how is glyphosate formulated? What is the vehicle?" *Id.* at 1.
- "Clarify glyphosate method of action? Does it bind to the enzyme making it nonfunctional? Does it compete with another substance?" *Id.*
- "How are micronuclei related to cancer? Supporting data?" *Id.*
- "In De Roos 2005 study, is it known what the exposure is? … Same for NAPP, what are the exposures? Acute/chronic/mix?" *Id.* at 2.
- "What were the controls in "Genetic Potential of Glyphosate Formulation" publication which included D. Farmer + Heydens?" *Id.* at 6.
- "CD1 mice—are these mice more prone to cancer than other strains?" *Id.* at 9.
- "Were control animals given vehicle solvent alone? Were they given what glyphosate was dissolved in?" *Id.*
- "How would AHS numbers/results (RR) be affected if a percentage of those who have responded passed away from some form of NHL?" *Id.* at 11.
- "What is the general progression and timeframe of NHL? Are there different stages? How long does a patient typically start manifesting NHL before it is diagnosed?" *Id.* at 12.

These questions demonstrate that the jury, despite hearing evidence of corporate conduct and regulatory history, were fully capable of evaluating the scientific issues with impartiality.

The only specific "prejudice" identified by Monsanto centers on the International Agency for Research on Cancer ("IARC") and the EPA. Mot. At 6-7. It is undisputed that IARC and EPA are relevant to causation—even if, by themselves, they are not dispositive.[3] PTO No. 15 at 2 ("[T]he

---

[2] The jurors in the *Johnson* trial were permitted to submit written questions to the court and, with the court's permission, those questions were answered by the testifying witness.

[3] For example, the IARC determination lends credibility to Plaintiffs' experts' opinions, provides important peer-reviewed data concerning the strengths and weaknesses of various studies, including IARC's own meta-analysis, and is probative as to whether the risk of NHL was "known or knowable in light of the scientific knowledge that was generally accepted in the scientific community at the time[.]" Judicial Council Of California Civil Jury Instruction 1205 (Strict products liability).

IARC and EPA reports are relevant. Any expert testifying about general causation will, for his opinion to be admissible, almost certainly need to account for the conclusions reached by these agencies."); *see, e.g.*, *Adams v. Cooper Indus., Inc.*, No. CIV.A. 03-476-JBC, 2007 WL 1075647, at *4 (E.D. Ky. Apr. 4, 2007) (holding EPA and IARC classifications relevant, not unduly prejudicial, and admissible for trial).  Monsanto, however, raises a concern that the IARC and EPA reviews of glyphosate might unduly influence the jury on the issue of causation—potentially influencing the jury to defer to one agency or the other instead of weighing the evidence.  *See* Mot. at 7.  Fundamentally, that makes no sense because even the bifurcation Monsanto proposes would necessitate this evidence for general and specific causation.  But even in some artificial world in which it would not be introduced in evidence, Monsanto's suggestion is just speculation.  Regardless, the solution is *not* bifurcation; its juror instruction.  The Court would simply need to instruct the jury that it may consider IARC and EPA in assessing the evidence and testimony in this case, but that it should not *defer* to either agency.  Such an instruction would allow the jury to consider the probative value of IARC and EPA, put in the proper context, and avoid the wholesale exclusion of otherwise relevant information.  After all, even under Rule 403, "[t]rial courts properly are reluctant to exclude relevant evidence unless there is a powerful and compelling reason to do so."  *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1223, 1255 (E.D.N.Y. 1985).

## B. Bifurcation on Causation Creates Structural and Substantive Prejudice

Bifurcation should not be ordered if doing so would prejudice the non-moving party. *MySpace, Inc. v. Graphon Corp.*, 732 F. Supp. 2d 915, 917 (N.D. Cal. 2010).  Here, Monsanto's proposal to bifurcate causation creates fundamental structural and substantive prejudice against Plaintiffs.  Structurally, if jurors are told that there will be two phases to the trial, "jurors might decide in favor of the defendants to avoid having to sit through the second phase."  *Heparin*, 2011 WL 1097637, at *3, n.1.  And, if they are not told about the second phase beforehand, "and return with a plaintiffs' verdict, making them unexpectedly have to continue on would be, at best, unwelcome and probably burdensome."  *Id.*  Indeed, it could create considerable hostility within the jury.  This point "is a reason for bifurcating only when clearly appropriate."  *Id.*

Moreover, this problem is compounded by the fact that Plaintiffs would be required to recall

certain experts and corporate witnesses who will be asked to provide information they had concealed from the jury during the first phase.  This will cause jurors to wonder why, for example, Dr. Portier did not discuss the EPA's errors or his participation in IARC panel in the first phase—topics any lay juror would consider relevant to their task in the first phase—potentially leading jurors to improperly discredit his testimony during the second phase.  And, even if the Court were to instruct the jury to "not hold it against him or plaintiff" such an instruction, itself, would unfairly cast a cloud over his testimony.

Substantively, if Plaintiffs are prevented from presenting evidence about how Monsanto influenced and corrupted science and regulators, then the jury will be left with a nagging question—if this product can cause cancer, why has it been on the market for over forty years with no warning? This "status quo" defense will infect any causation phase.  Plaintiffs have an answer to this question, but that answer implicates liability evidence.  Preventing Plaintiffs from proffering evidence to rebut this insidious bias—one many jurors will likely bring into the jury box—is severely prejudicial.

**C. Separating Probative Causation Evidence from Probative Liability Is Nearly Impossible**

Whether issues can be separated is an important consideration in determining whether bifurcation is justified.  Monsanto suggests that evidence relating to causation and damages does not overlap with liability evidence.  But, that is simply not true.  There are considerable overlaps between causation and liability evidence.  Here are a few examples:

- **The Credibility of Monsanto-Generated Science:**

A number of studies and publications considered by Plaintiffs' and Monsanto's experts in rendering their opinions were created or generated by Monsanto.  Monsanto's wrongful conduct related to those studies goes to credibility of that data and, in turn, the experts' opinions.  For example:

   o In one early long-term carcinogenicity rodent study paid for by Monsanto, EPA scientists unanimously concluded it showed that glyphosate was oncogenic, i.e., caused tumors. However, in response to this finding, Monsanto paid a doctor to find a tumor in the control group—a tumor no pathologist had ever seen—and that tumor undermined the EPA's finding. Plaintiffs have evidence that this "magic" tumor was fabricated by Monsanto's consultants

and used to mislead the EPA and, ultimately, the academic community.  Remarkably, when the EPA requested that Monsanto redo the study, so that the controversy over this "magic" tumor could be resolved, Monsanto refused—indeed, it has not been done to this day.

o  There is evidence that Monsanto commissioned a dermal absorption study by TNO Laboratories.  Monsanto was hoping to show 3% or less dermal absorption. The early findings of the study showed a staggering 10% absorption rate in formulated product.  At that point, Monsanto terminated the study, worried that it would undermine Monsanto's corporate objectives.  Monsanto also accused TNO of doing the study poorly.  So, TNO offered to redo the study, for free.  Monsanto refused.  The results of the study were then buried and never submitted to agencies or Monsanto's experts.  Monsanto's various admissions about the results of the test are relevant to refuting Monsanto's exposure expert and supporting Plaintiffs'.

- **Monsanto's Admissions:**

Because Monsanto developed, researched, and sold Roundup for over forty years, as a company it *should* know more about the product's safety than anyone else.  However, there are numerous documents and associated testimony, wherein Monsanto scientists make admissions about causation and the underlying studies.  For example:

o  Dr. Donna Farmer admits, on multiple occasions, that Monsanto cannot say that Roundup does not cause cancer because Monsanto has not done the necessary testing on formulated Roundup.  In assessing whether the scientific evidence is sufficient to show causation, the jury should be allowed to know that Monsanto, for over a decade, has refrained from studying the formulated product in laboratory settings.

o  At various points, Dr. Farmer makes admissions regarding epidemiology and genotox studies and provides opinions about the importance and content of those studies.  She also, in early 2000s, attacks the Agricultural Health Study as being "junk science" and inaccurate, when she believes it will reveal a risk for glyphosate.  This stands in contrast to her testimony about the AHS today.

o  Dr. William Heydens admitted in 2014, upon learning that IARC was going to review

glyphosate, that Monsanto is vulnerable in epidemiology, toxicology, and mechanism, and that IARC could string the evidence together to find a risk.  Dr. Heydens' (and others) anticipation of a carcinogenicity classification from IARC, provides circumstantial evidence that Monsanto knew glyphosate and Roundup were carcinogenic.

o   In 1999, Monsanto commissioned a report by Dr. James Parry to review the genotoxicity of glyphosate and Roundup.  Dr. Parry reviewed the data and concluded that glyphosate and Roundup were clastogenic, i.e., mutagenic by causing breakages of chromosomes.  Dr. Parry recommended numerous studies that Monsanto should conduct to explore this problem.  In response, various Monsanto employees acknowledge his findings, express concern about its implications, and decide they will not do the studies Dr. Parry recommends.  Monsanto, in turn, buries the report and does not send it to any regulator.

o   Daniel Jenkins worked with the EPA's Jess Rowland to "kill" the US Agency for Toxic Substances and Disease Registry ("ATSDR") review of glyphosate because they were concerned that ATSDR would reach conclusions like IARC's.  Dr. Rowland later went on to draft the EPA's recent report on glyphosate.  He also spread a false rumor that one of mouse studies that showed elevated rates of malignant lymphoma in the glyphosate-exposed mice (Kumar), was infected with a virus.  Later review, by other scientists, confirmed there is no evidence of a virus.  Monsanto's experts still spout this false virus theory.

o   Dr. Daniel Goldstein testified on behalf of Monsanto, that positive findings in case-control epidemiology studies are likely spurious, going so far as to testify that its more likely that coffee causes spontaneous abortion than a pesticide causes cancer.

- **Monsanto's Manipulation of Science:**

There is considerable evidence that Monsanto engaged in various forms of scientific manipulation, including ghostwriting and academic bullying.  These actions have infected the body of scientific work considered by the Parties' experts, regulatory agencies, and overall academic community.  In this context, the line between "liability" and "causation" evidence does not exist.

o   Dr. William Heydens stated in an email that Monsanto ghost-authored the Williams, Kroes, & Munro (2000) article, which for approximately a decade served as the seminal piece about

glyphosate and Roundup's genotox profile.  Plaintiffs also have the various drafts and emails by Dr. Heydens relating to the development of the article.  This article was published immediately after Monsanto secretly received (and then buried) a report, about the same topics, from Dr. Parry (discussed above).  All of Monsanto's experts rely on the Williams article, and it is frequently cited in peer-reviewed epidemiology studies published on glyphosate and Roundup, as a "counter" to their positive findings.  For example, in De Roos 2003, the authors conclude their "findings provide some impetus for further investigation into the potential health effects of glyphosate, even though one review concluded that the active ingredient is non-carcinogenic and non-genotoxic." (citing Williams).  Thus, this ghost-authored paper, which reflects misconduct by Monsanto, is woven into the issue of causation.  There are numerous other examples of ghost-authorship, with similar ties to causation.

o   In 2012, Monsanto orchestrated an attack against Dr. Gilles-Éric Séralini for publishing the results of a two-year feeding study in rats, which reported an increase in tumors among rats fed genetically modified corn and Roundup.  The study was originally designed by Monsanto as a short-term analysis and, in turn, its protocol was adopted by Dr. Séralini but for a period extending to the full life time of rats.  Monsanto orchestrated a letter campaign, careful not to show its hand, to make it look like it was independent scientists conveying criticism of Séralini's study. Then, Monsanto recruited the editor of the journal to be a paid "consultant" who, a few weeks later, retracted the study. It was subsequently republished in another journal.  The reliability of the study was questioned by both Plaintiffs' and Monsanto's experts, but recent revelations and publications about the study have brought its relevance into new light, and it is evidence the jury should consider, through the testimony of Monsanto's corporate witnesses, Monsanto's experts, and third-party witnesses.  The Séralini affair is one of many examples where Monsanto attempted to intimidate independent scientists.

o   When glyphosate was originally approved for use in 1974, Monsanto submitted the results of a single long-term mouse oncogenicity study. That study was conducted by Industrial Bio-Test Laboratories, Inc. ("IBT").  At the time, a former Monsanto toxicologist, Paul Wright, worked at IBT overseeing toxicology.  Then, after IBT's oncogenicity test on glyphosate was

submitted to the EPA, Dr. Wright returned to Monsanto.  *United States v. Keplinger*, 776 F.2d 678, 684 (7th Cir. 1985).  A few years later, Dr. Wright was indicted for creating fraudulent science while at IBT and, after a six-month trial, found guilty.  *Id.* at 683-84.  It is Plaintiffs' understanding that Dr. Wright remained employed by Monsanto during his criminal prosecution.  Upon learning of this fraud, EPA declared the study invalid and requested that Monsanto redo it. It was not until 1983, a decade after Roundup first entered the market, that Monsanto submitted a new study (the one that involved the "magic tumor" described above).  Remarkably, despite this well-known fraud, Monsanto's experts, to this day, rely on IBT data.  The IBT fiasco, therefore, is relevant to Monsanto's experts' credibility.

- **Credibility of Plaintiffs' Experts:**

Evidence showing Monsanto's extreme efforts to suppress scientific development are also relevant to assessing Plaintiffs' experts' credibility.  For example, in *Johnson*, Monsanto argued:

> Dr. Portier not only disagreed with everybody, but thought that everybody was astonishing wrong, amazingly wrong, completely wrong, totally illogical. Everybody in the world except Dr. Portier is astonishing, illogical, completely wrong, amazingly wrong. ECHA, EFSA, BfR, EPA …

> Now, does that sound like a guy who is an objective expert? Is that the way an objective expert would talk about people? And it ends up that Dr. Portier actually has skin in the game. Dr. Portier is not objective at all. He's part of the story of this case. He was at IARC as an invited observer, not a participant. Very shortly thereafter, he was hired by plaintiff's lawyers, and since then, he's been going around pushing his theory of glyphosate unsuccessfully.

> … So Dr. Portier is a partisan in the process.  Dr. Portier is part of the story of this case. He's not an objective outside observer. And I ask that you consider that when you evaluate his credibility.

Exh. 2, Tr. Closing Arguments, *Johnson v. Monsanto*, at 5178-80 (emphasis added).  Monsanto intends to attack the credibility of Plaintiffs' experts, like Dr. Portier, by characterizing them as an apostate to the scientific community.  How Monsanto has helped cultivate, manipulate, and fabricate that "scientific" community is, therefore, highly relevant to Dr. Portier's credibility—in whatever phase it is challenged.  Similarly, the findings by IARC and Monsanto's reaction to it help elucidate whether Dr. Portier, or any of Plaintiffs' experts, are truly outside of the "mainstream" of scientific knowledge. Trying to unpack these issues and confine them to separate phases of a trial is not viable.

- **Plaintiffs' Treating Doctors:**

One of Monsanto's defenses in refuting specific causation focuses on the plaintiff's treating physicians and attempting to characterize Plaintiffs' specific-cause expert as an outlier.  Here is how that played out in the *Johnson* trial:

> We also talked about Mr. Johnson's treating doctors. …  These are the people who know Mr. Johnson the best. ....
>
> And not one of these people, not one of these people, told Mr. Johnson that his cancer was caused by [Roundup]. … There's only one medical doctor you heard from that purported to know the cause of mycosis fungoides. And that was Dr. Nabhan. … And how did he come to that conclusion? … what he said was, "I'm just going to go through every risk factor I can think of for mycosis fungoides. And I eliminated everything," he said. "I eliminated all of these except for Roundup." … If it were that easy, why didn't we figure it out a long time ago? … [I]f Dr. Nabhan is actually the guy … this would be a huge medical accomplishment, discovering the cause of mycosis fungoides, the first person in the world to do that. If Dr. Nabhan had actually done that, wouldn't he have been in here showing you an article telling the scientific community about it? Wouldn't he be collecting awards for having done it?

Exh. 2, Tr. Closing Arguments, *Johnson v. Monsanto*, at 5159-63.  This attack on Dr. Nahban's credibility is a species of the "40 years of safety" argument because it assumes the status quo is right and anything going against it, i.e., Plaintiffs' experts, is wrong.  The only way to rebut this attack and explain why treating physicians do not know about the risk of Roundup, is to explain that Monsanto has systematically suppressed the dissemination of this information within the medical community.  Monsanto would undoubtedly argue that bifurcation precludes Plaintiffs from offering that evidence.

Plaintiffs could go on for over a hundred pages, explaining the various ways liability evidence and causation evidence overlap and the difficulty, if not impossibility, of untangling this evidence into two phases of a trial.  What is more, bifurcation would require rulings by this Court for nearly every piece of evidence to determine whether a piece of evidence could be used in one phase or the other, or both.  The sheer amount of time spent engaging in those nuanced arguments—distinct from whether any evidence is generally admissible—would eviscerate any potential efficiency.

**D.  Bifurcation Defies Judicial Efficiency and Economy**

Finally, bifurcation means that a four-week trial becomes two trial phases lasting six.  It would also increase the cost of the trial as many, if not most, of the same witnesses would be called in both phases.  There is nothing efficient or economical in bifurcating the Group 1 Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny bifurcation.

DATED:  December 13, 2018

Respectfully submitted,

By:  /s/ R. Brent Wisner
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
10940 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90024
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

Aimee Wagstaff
aimee.wagstaff@andruswagstaff.com
ANDRUS WAGSTAFF, P.C.
7171 West Alaska Drive
Lakewood CO 80226
Telephone: (303) 376-6360
Facsimile:  (303) 376-6361

Robin Greenwald
rgreenwald@weitzlux.com
WEITZ & LUXENBERG, P.C.
700 Broadway
New York NY 10003
Telephone: (212) 558-5500
Facsimile: (212) 344-5461

Michael Miller
mmiller@millerfirmllc.com
THE MILLER FIRM, LLC
108 Railroad Ave
Orange VA 22960
Telephone: (540) 672 4224
Facsimile:  (540) 672-3055

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that I have served a copy of the foregoing PLAINTIFFS' OPPOSITION TO ISSUE BIFURCATION upon all opposing counsel of record by electronic mail and/or by placing a copy of same in the U.S. Mail, first class, postage prepaid, this 13th day of December, 2018.

By: /s/ R. Brent Wisner
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@baumhedlundlaw.com
BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
10940 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90024
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444