# EXHIBIT 12

Page 449

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

STATE OF MISSOURI

———————————————————————————————————

RONALD PETERSON and JEFF HALL,      )
                                    )
              Plaintiff(s),         )
                                    )
      vs.                           )   1622-CC01071
                                    )
MONSANTO COMPANY; OSBORN &          )
BARR COMMUNICATIONS, INC.;          )
OSBORN & BARR HOLDINGS, INC.,       )
                                    )
              Defendant(s).         )

———————————————————————————————————

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

CHARLES BENBROOK, Ph.D.

VOLUME II

**CONFIDENTIAL**

———————————————————————————————————

7:48 A.M.

AUGUST 14, 2018

612 SECOND AVENUE, 15TH FLOOR

SEATTLE, WASHINGTON

REPORTED BY:  PATSY D. JACOY, CCR 2348

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL              August 14, 2018              CONFIDENTIAL

Page 450

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4      TIMOTHY LITZENBURG
        JEFFREY TRAVERS (Appearing telephonically)
 5      The Miller Firm LLC
        The Sherman Building
 6      108 Railroad Avenue
        Orange, VA 22960
 7      540.672.4224
        tlitzenburg@millerfirmllc.com
 8      jtravers@millerfirmllc.com
 9
     FOR THE DEFENDANTS OSBORN & BARR:
10   (Appearing telephonically)
11      JENNIFER E. HOEKEL
        Armstrong Teasdale LLP
12      7700 Forsyth Blvd., Suite 1800
        St. Louis, MO 63105
13      314.621.5070
        jhoekel@armstrongteasdale.com
14
15   FOR THE DEFENDANT MONSANTO:
16      GRANT W. HOLLINGSWORTH
        Hollingsworth LLP
17      1350 I Street N.W.
        Washington, DC 20005
18      202.898.5800
        ghollingsworth@hollingsworthllp.com
19
20   ALSO PRESENT: DANNY GADD, Video Operator
21
22
23
24
25
```

Page 452

```
 1   EXHIBITS FOR IDENTIFICATION (cont')     PAGE
 2   Exhibit 5   Expert Report of Charles      496
 3       Benbrook
 4   Exhibit 6   5/3/16 email from Jim Jones   498
 5       to Jack Housenger
 6   Exhibit 7   EFSA Statement regarding the  525
 7       EU assessment of glyphosate
 8       and the so-called "Monsanto
 9       papers"
10   Exhibit 8   Roundup ProMax label         540
11   Exhibit 9   11/9/15 email from Consolato  560
12       Sergi to Chris Portier
13   Exhibit 10   Article entitled Impacts of  567
14       genetically engineered crops
15       on pesticide use in the U.S.
16       - the first sixteen years
17
18
19
20
21
22
23
24
25
```

Page 451

```
 1        I N D E X
 2
 3   EXAMINATION BY:          PAGE(S)
 4      BY MR. HOLLINGSWORTH        455
 5      BY MS. HOEKEL          598
 6      BY MR. HOLLINGSWORTH        599
 7
 8   EXHIBITS FOR IDENTIFICATION     PAGE
```
```
 9   Exhibit 1   Guidance for Considering and  457
10       Using Open Literature
11       Toxicity Studies to Support
12       Human Health Risk Assessment
13   Exhibit 2   Notice of Continued         475
14       Videotaped Deposition
15   Exhibit 3   Revised Glyphosate Issue     486
16       Paper: Evaluation of
17       Carcinogenic Potential, EPA's
18       Office of Pesticide Programs,
19       December 12, 2017
20   Exhibit 4   Abstract titled Effects of   488
21       Glyphosate and Its
22       Formulations on Markers of
23       Oxidative Stress and Cell
24       Viability in Heparg and Hacat
25       Cell Lines
```

Page 453

```
 1       SEATTLE, WASHINGTON; AUGUST 14, 2018
 2           7:48 A.M.
 3           --oOo--
 4
 5
 6
 7       VIDEO OPERATOR:  This is the video
 8   deposition of Charles Benbrook, Ph.D.  Today's date is
 9   August 14, 2018.  The time is 7:48 a.m.  This is the
10   case of Ronald Peterson and Jeff Hall, plaintiffs,
11   versus Monsanto Company, et al., defendants, Case
12   Number 1622-CC01071.  This case is pending in the
13   Circuit Court of the City of St. Louis, State of
14   Missouri.  My name is Danny Gadd and I represent
15   Paszkiewicz Court Reporting.  The court reporter is
16   Patsy Jacoy also representing Paszkiewicz Court
17   Reporting.  This deposition is taking place at
18   Courtyard Seattle Downtown, 612 Second Avenue, Seattle,
19   Washington 98104.
20       Counselors, will you please state your
21   appearance.
22       MR. HOLLINGSWORTH:  Yes, this is Grant
23   Hollingsworth from Monsanto.
24       MR. LITZENBURG:  Tim Litzenburg for the
25   plaintiff.
```

2 (Pages 450 to 453)

Page 454

1      VIDEO OPERATOR:  Will the court reporter
2  please swear in the witness.
3
4      CHARLES BENBROOK, Ph.D.,
5  sworn as a witness by the Certified Court Reporter,
6      testified as follows:
7
8      MR. HOLLINGSWORTH:  Before we get
9  started here, I'd just like to mark this deposition as
10  confidential until we get a chance to review the
11  transcript and determine which portions we may want to
12  maintain confidentiality.
13      Having said that, I'd like to state one more
14  thing.  We are starting about an hour earlier than this
15  9:00 noticed deposition today.  This is to try to help
16  counsel who has a plane that he needs to catch around
17  1:30.  Counsel has told me that he may need to leave at
18  11:30 today, but that another attorney may be able to
19  call in.
20      If that's the case, then we hope we can go
21  forward here without any objections, but this was a
22  noticed deposition for four hours, so from now until
23  11:30 isn't sufficient for that, so I'd just like to
24  note that on the record.
25

Page 455

1      EXAMINATION
2  BY MR. HOLLINGSWORTH:
3      Q. Dr. Benbrook, how are you doing this morning?
4      A. I'm fine, sir.
5      Q. We spoke a little bit at your last deposition
6  about the EPA toxicology requirements, specifically the
7  toxicology testing requirements.  Do you remember some
8  of that questioning?
9      A. Yes.
10      Q. And that's the 1 -- 158.500 data table that we
11  went over in some detail.  Do you recall that?
12      A. Yeah.
13      Q. But EPA also considers data from the open
14  literature in making its safety decisions, correct?
15      A. They consider it some, yes.
16      Q. EPA has developed procedures to ensure the
17  quality and integrity of the open literature that it
18  reviews, correct?
19      A. I don't -- I don't believe there -- there are
20  any written review procedures for peer-reviewed
21  publications.  Their GLPs don't apply necessarily to
22  studies carried out by independent scientists, and they
23  certainly would evaluate the methods section and the
24  statistics of the study in making their evaluation of
25  it, but I don't believe there's a formal review

Page 456

1  process.
2      Q. Okay.  You haven't reviewed the US EPA's
3  guidance for considering using open literature toxicity
4  studies to support human health risk assessment?
5      A. No, not -- I may have seen it at some point,
6  but no, I don't know it well.
7      Q. Okay.  But I think you mentioned GLP?
8      A. Yeah.  Sure.
9      Q. That stands for good laboratory practices?
10      A. Right.
11      Q. And it's your understanding that these sort of
12  guidance materials for considering using open
13  literature toxicity studies to support the human health
14  risk assessment, that would be akin to the GLP
15  procedure for reviewing industry toxicology studies,
16  correct?
17      A. Well, not -- not precisely.  The -- the GLPs
18  are detailed descriptions of the protocols for carrying
19  out a study that include a number of methodological
20  details that go way beyond what would be in the methods
21  section in a peer-reviewed publication.  So, you know,
22  they -- they -- in EPA's review of open literature
23  studies, they strive to understand what was done and
24  the relevance of the study and the quality of the
25  study, but it's a -- it's a quite different process and

Page 457

1  challenge than a GLP study that's carried out precisely
2  in accord with protocols that the agency itself has set
3  out.
4      Q. Well, let's take a look at this guidance for
5  considering and using open literature toxicity studies
6  to support human health risk assessment, and we'll mark
7  it as Exhibit 1.
8      (Deposition Exhibit 1 was
9      marked for identification.)
10      Q. (BY MR. HOLLINGSWORTH)  And, sir, this is
11  dated August 2012.  Do you see that?
12      A. Yes, I do.
13      Q. Okay.  So this is guidance that -- at least
14  this version was put in place while the glyphosate
15  registration review was still pending, correct?
16      A. Uh-huh, correct.
17      Q. And that review is still pending today,
18  correct?
19      A. Correct.
20      Q. Okay.  If you look at this document, I just
21  want to go to the purpose section, 1.1.  Are you there?
22      A. Yep.
23      Q. Okay.  It notes there:  In addition to the
24  information submitted by the registrants, effects data
25  from studies published in the open literature may also

3  (Pages 454 to 457)

HIGHLY                 Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL              August 14, 2018             CONFIDENTIAL

Page 458

1  be considered and risk assessments conducted in the
2  Office of Pesticide Programs.
3        You agree with that statement, correct?
4  **A. I agree that you read it correctly, yes.**
5  Q. Okay.  But you're familiar that -- that
6  scientists may publish studies in the open literature
7  that is considered by EPA in conducting their risk
8  assessments, correct?
9  **A. That's -- that's correct.**
10  Q. Lower down in the purpose section of the
11  guidance document notes:  This guidance draws from
12  OPP's longstanding experience and guidance for review
13  of registrant-submitted studies submitted in response
14  to 40 CFR part 158 data requirements.
15        Do you see that?
16  **A. Yes.**
17  Q. Okay.  And that's what we were just discussing
18  earlier.  It's the fact that these guidances for open
19  literature are drawing from the part 158 toxicology
20  study data requirements that are conducted pursuant to
21  GLP, correct?
22  **A. Correct.**
23  Q. Okay.  It goes on:  It is intended to ensure
24  consistent consideration, use and documentation of
25  information in the open literature by OPP scientists

Page 459

1  and risk assessors when evaluating the potential
2  adverse effects of human health.
3        Do you see that?
4  **A. Yeah, on human health.**
5  Q. On human health, thank you, Doctor.
6        So you're generally familiar with this
7  process, correct?
8  **A. Yes.**
9  Q. The next sentence in the purpose section
10  notes:  This document is also intended to make
11  transparent how OPP judges the scientific quality of
12  open literature publications of relevance and
13  importance to human health risk assessment.
14        So this is another example of EPA and OPP
15  trying to be as transparent as possible in conducting
16  its risk assessment, correct?
17  **A. That's a fair statement.**
18  Q. The guideline provides those EPA reviewers
19  conducting the risk assessments guidance on screening
20  the open literature, reviewing open literature studies
21  and using open literature studies in risk assessments,
22  correct?
23  **A. Correct.**
24  Q. If you go down to the screening the open
25  literature studies, 2.1?

Page 460

1  **A. Okay, got it.**
2  Q. So 2.1 provides the screening criteria for
3  accepted journals, articles and publications for review
4  by EPA in their risk assessments.  Do you see that?
5  **A. Correct.**
6  Q. Okay.  The first criteria for screening
7  journal articles or publications in the open literature
8  is that the toxic effects are related to the defined
9  chemical exposure.  Why is that important,
10  Dr. Benbrook?
11  **A. In the case of most toxic chemicals, the**
12  **exposure level plays a direct role in determining**
13  **whether an adverse effect occurs and/or the severity of**
14  **the effect.**
15  Q. The fourth criteria for screening journal
16  articles or publications in the open literature is that
17  a chemical concentration or dose or application rate is
18  required.  Why is that important, Dr. Benbrook?
19  **A. It would be -- it would not be possible to**
20  **estimate the exposure without that information.**
21  Q. Right.  If you don't know the exact dose of
22  the active ingredient being studied, then you cannot
23  active -- you cannot effectively tell if the adverse
24  event is associated specifically with that chemical
25  formulation; is that correct?

Page 461

1  **A. Not -- not, no, not really.  You have to know**
2  **the dose levels, and typically these sorts of studies**
3  **have multiple dose levels.  You need to know what those**
4  **are to determine whether there's a dose response**
5  **relationship in any adverse effects that are observed.**
6  **Knowing accurately what those dose levels are is**
7  **essential in assessing the dose response in any given**
8  **study.  Some studies where there's not precise**
9  **information about often single dose levels will and**
10  **have in the past reported a positive effect without**
11  **great clarity on what the dose level is.**
12  Q. So --
13  **A. To do a quantitative assessment you have to**
14  **know the dose levels.**
15  Q. So this fourth EPA criteria for screening
16  journal articles or publications in the open literature
17  with respect to dose levels is important because first
18  off, when you note there's a dose response
19  relationship, is that what you said?
20  **A. That's certainly an important factor, yes.**
21  Q. Okay.  If there's not a dose response
22  relationship then we are not going -- we are not
23  certain that the toxic effect is associated with the
24  chemical being studied, correct?
25  **A. Well, the -- the agency or any scientist would**

4 (Pages 458 to 461)

Page 462

1  want to know the dose level at which the organism or
2  the cells were exposed in order to evaluate the -- you
3  know, whether the -- whether the effect was just caused
4  by overwhelming the animal.  You can drown an animal in
5  water and make water toxic for -- so -- but the dose
6  level is important for -- for many reasons.
7      Q.  Okay.  This fourth criteria for EPA reviewing
8  the open literature with respect to dose levels allows
9  EPA reviewers to get clarity because often single dose
10  levels may report a positive effect without us having
11  anything to compare it to; is that correct?
12      A.  A study with a single dose level that reports
13  a positive effect will -- can be interpreted and -- and
14  useful in their evaluation.  However, it -- it
15  certainly is not as valuable as a similar study that
16  had -- that included multiple dose levels and which
17  provided some insight on whether there was a dose
18  response relationship, although it's also true that for
19  some chemicals there -- there are relationships --
20  monotonic relationships or different relationships
21  between dose levels and outcomes.  So it's not -- it's
22  not an ir -- an irrefutable law of nature that higher
23  doses result in -- in more serious impacts, but it's
24  certainly often the case in -- in animal studies.
25      Q.  You'll agree at least that if you don't know

Page 463

1  the doses being studied then you are missing key
2  information analyzing toxicity?
3      A.  The -- the dose to which the test organism is
4  exposed -- of course, that's a -- as you know, that's a
5  complicated thing.  You have a certain amount in the
6  feed or in water that the organism is exposed to and
7  you have to -- you can't calculate the dose rate to the
8  organism without also knowing how much feed or water
9  was ingested.  So there's quite a -- often quite a
10  complicated calculation involved in actually coming up
11  with the quantity of the test substance that the test
12  organism was exposed to or ingested in a given period
13  of time.
14      Q.  Right.  And although it may be a -- a
15  complicated calculation, if you don't know the dose to
16  which the test organism is exposed, then you are
17  missing key information in analyzing toxicity.  You'll
18  agree with that, won't you?
19      A.  Sure.
20      Q.  You're missing key information in analyzing
21  risk, correct?
22      A.  Correct.  I mean, there -- there are many
23  other things that a risk assessor would have to know to
24  carry out a complete risk assessment, yes.
25      Q.  The fifth criteria for screening journal

Page 464

1  articles or publications in the open literature
2  according to EPA is that there's an explicit duration
3  of exposure included.  Why is that important?
4      A.  Because the time of exposure between a test
5  organism and a test substance can -- can play a
6  significant role in whether any adverse effects
7  materialize.
8      Q.  And besides that, if you do not know the exact
9  duration of exposure, then EPA reviewers wouldn't know
10  whether it was an acute, subchronic, chronic or
11  lifetime test in the case of animal studies, correct?
12      A.  Not -- not necessarily.  I mean, it -- it
13  would depend on how the doses were -- how the test
14  substance was administered, whether it was given in one
15  dose on five days during -- during the pregnancy of a
16  pregnant animal.  It would depend on how the study was
17  conducted in the methods section which would spell out
18  how the test substance was administered to the organism
19  in the assay.
20      Q.  Okay.  But certainly if you were reading the
21  methods section of a publication in the open literature
22  you would want to know the exact duration of exposure,
23  correct?
24      A.  For -- for sure you would want to know the
25  duration of exposure.  If it's an in vivo experiment in

Page 465

1  a live animal you would definitely want to know that.
2  If, however, it was a -- an in vitro genotox exposure
3  where there's a -- single administration of the dose
4  perhaps at different levels then it -- the time of
5  exposure would not be a critical variable because of
6  the design of the study.
7      Q.  So your opinion is that if you're reading the
8  methods section of a publication in the open literature
9  you would want to know the dur -- the exact duration of
10  exposure certainly for animal studies, correct?
11      A.  That would be important information to have,
12  yes.
13      Q.  And your opinion is that with respect to
14  genotoxicity studies, it wouldn't be necessary to know
15  the exact duration of exposure; is that correct?
16      A.  No, no, that's not what I said.  I said given
17  the way many genotox studies are designed, there's a
18  single administration of the dose in a -- typically in
19  a petri dish or in lab equipment and the -- and then
20  the response of the cells in the assay system are
21  tracked over a particular period of time and that's --
22  that particular time really doesn't correspond directly
23  to the time of exposure as it would, say, in an animal
24  study where the animal is given a dose once a day for
25  seven days.  It's different -- it's different

5 (Pages 462 to 465)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  August 14, 2018                    CONFIDENTIAL

Page 466

1  circumstance.
2      Q. Okay. But with the genotoxicity study, what
3  you would want to know would be dose that's given at
4  the start of the study and then how long the study was
5  conducted; is that correct?
6      A. Sure, that would be an essential part of the
7  methods section of any study, the duration of -- of
8  time during which the scientist observed any response
9  in the assay system.
10     Q. And that's part of the minimum criteria here
11 as laid out in this EPA guidance document, correct?
12     A. Sure, correct.
13     Q. The sixth criteria for screening journal
14 articles and publications in the open literature is:
15 The toxicology information is reported for the chemical
16 of interest or of its structural analog.
17         Did I read that correctly?
18     A. Yes.
19     Q. Why is that important?
20     A. Well, it's -- it's a bit of a strange criteria
21 within this list. Toxicology information is a very
22 broad term. In the case of a chemical like glyphosate
23 that's -- that's been subjected to substantial testing
24 over many years, you know, it's -- it's not feasible to
25 expect any single journal article to review all the

Page 467

1  toxicology information. Depending upon the nature of
2  the study, toxicology information may not be important.
3  Certain studies are designed to assess exposure, and
4  the actual biological impact of the exposure isn't
5  important in such a study, a biomonitoring study, for
6  example.
7         So I think in general it's good for a study to
8  report toxicological information, but it's certainly
9  not an absolute necessity in every study and -- and no
10 study can cover all the toxicology information on a
11 widely tested chemical. Clearly most scientists
12 publishing in the open literature would make an effort
13 to review the most relevant study of similar
14 experiments using similar organisms, similar design to
15 see if the results of the present study confirm or are
16 not consistent with earlier reported findings.
17     Q. Sure. But how about knowing the toxicology
18 information with respect to the amount of an active
19 ingredient of glyphosate, for example, would that be
20 toxicology information you would want to know?
21     A. I certainly wouldn't consider that toxicology
22 information. Toxicology is about the response of -- of
23 organisms to a -- to a xenobiotic. Information on the
24 concentration of glyphosate in a -- in a test ration or
25 in a particular test, that's information that is

Page 468

1  necessary to assess the dose level. So, you know,
2  it's -- it depends on what -- what the -- you know,
3  whether -- whether and what toxicology information is
4  in a paper in the peer-reviewed literature will be
5  determined or driven by the nature of the study being
6  carried out.
7      Q. Okay. So the percentage of the active
8  ingredient that is being studied is part of the key
9  dose information that's required for studies on the
10 open literature, correct?
11     A. It would -- it's -- certainly the scientist
12 would have to know that, but it's not uncommon for
13 scientists in the methods section to simply report the
14 amount of glyphosate in terms of pure active ingredient
15 that was used in a particular study, and sometimes they
16 don't -- they don't report where that glyphosate came
17 from. They simply report the amount. And, as you
18 know, there's a -- there's considerable variation in
19 the accuracy and completeness of this sort of
20 methodological information across the peer-reviewed
21 literature.
22     Q. How can a regulator determine exactly what's
23 being studied if the scientist doesn't report exactly
24 what type of glyphosate is being studied?
25     A. This -- the EPA scientists would have to --

Page 469

1  would have to see if adequate information was presented
2  by the scientists publishing the study to quantify the
3  amount of pure glyphosate that the test organism was
4  exposed to. If the scientist was convinced that
5  that -- that those calculations are credible and
6  accurate, it wouldn't matter that much the -- the --
7  which form of glyphosate the -- the scientists
8  conducting the study used in their experiment.
9         What they do have -- what does have to be
10 accurately reported is if it's a -- if it's a test
11 focused on pure glyphosate and not on formulated
12 product, but if the purpose of the test is to quantify
13 some aspect of the toxicity of glyphosate, then the --
14 the scientists need to report how they -- how they
15 established the dose level and the dose timing in
16 the -- in the test system.
17     Q. Okay. So in order for EPA to properly screen
18 articles in the open literature, they have to at least
19 know the amount or the percentage of the active
20 ingredient that is being studied, correct?
21     A. No. They would need to know the amount of the
22 dose delivered to the test organism. They would have
23 to feel confident that that -- that amount was
24 adequately reported.
25     Q. If you go to the 13th criteria, this may be

6 (Pages 466 to 469)

Page 470

1    what we were getting at here.  It says:  Adequate data
2    provided on the chemical tested, i.e., test article
3    characterization.
4             Why is it important, Dr. Benbrook, for there
5    to be adequate data provided on the chemical tested for
6    a regulator screening open literature?
7        **A.  Because this -- this information is essential**
8    **to the calculation of the dose delivered to the test**
9    **organism.**
10       Q.  Sir, if you turn to Section 3.2.1, a couple
11   pages back?
12       **A.  3.2.1, study characterization?**
13       Q.  Yeah, it specifically says:  Guidance for
14   evaluating the acceptability of open literature
15   studies.
16            Do you see that?
17       **A.  I see study characterization, 3.1.**
18       Q.  3.2.1.
19       **A.  Okay.  I'm there now.**
20       Q.  Okay.  It notes:  Information that should be
21   considered as important in determining the reliability
22   and utility of an open literature study and risk
23   assessment includes the following, the first of which
24   is the nature of the test substance, correct?
25       **A.  Correct.**

Page 471

1        Q.  Okay.  It notes:  The study needs to indicate
2    the exact nature and source of the pesticide, the
3    percent active ingredient and/or the purity of the test
4    compound should be reported.
5             Why is that important, Dr. Benbrook?
6        **A.  It would -- it would always be important to**
7    **know in calculating the dose delivered in a particular**
8    **study the percent of the active ingredient in -- in the**
9    **chemical that was used in a particular study, and since**
10   **EPA is aware of the possible presence of one or more**
11   **toxic contaminant or metabolite in glyphosate-based**
12   **herbicides, it certainly would want to know if -- if**
13   **there was any information about levels of impurities,**
14   **although it's certainly -- there's a great number of**
15   **peer-reviewed papers on the toxicity of all pesticides**
16   **that don't include any information on -- on impurities**
17   **or -- or metabolites.**
18       Q.  Okay.  But you agree that if a study does not
19   indicate the exact nature and source of the pesticide
20   or the percent of the active ingredient or the purity
21   of the test compound that's reported that it will have
22   difficulty using that study in assessing human health
23   risk, correct?
24       **A.  I would agree that in general the more**
25   **information that's available on the -- the source of**

Page 472

1        **the test substance, the purity of the test substance,**
2    **the manufacturing process used, which chemical plant it**
3    **came from, even the lot number can all be important**
4    **information in -- in precisely identifying the -- the**
5    **presence of any impurities or particular**
6    **characteristics of a batch of a -- of a pesticide,**
7    **sure.  All of that is -- is relevant.**
8             **But in -- in general, most of the**
9    **glyphosate -- the pure glyphosate that's been used in**
10   **toxicology studies are purchased from a handful of**
11   **laboratory supply companies that make such pure**
12   **glyphosate available and -- and have appropriate**
13   **quality control and testing procedures in place to**
14   **assure that the product that they're selling to**
15   **scientists is as pure as -- as is technically feasible.**
16       Q.  The EPA guidance materials on reviewing open
17   literature go on to note:  If a solvent vehicle is
18   used.
19            Do you see that?
20       **A.  Yeah.**
21       Q.  First of all, what's a solvent vehicle?
22       **A.  Well, it could -- it's no doubt liquid in**
23   **which the active ingredient is -- is mixed or carried.**
24       Q.  It notes:  If a solvent vehicle is used, the
25   vehicle should not interfere with the absorption,

Page 473

1    distribution, metabolism or the elimination of the test
2    substance nor alter the behavior/response of test
3    organisms.  Studies which use a solvent vehicle should
4    also include solvent vehicle controls.
5             Why is that important?
6        **A.  They want to -- the EPA wants to be able to**
7    **differentiate between the innate toxicity of the pure**
8    **active ingredient relative to the solvent in which the**
9    **active ingredient is mixed, and so this is a -- this**
10   **would be a standard protocol for doing just that.**
11       Q.  Down on the next page it notes that the open
12   literature studies should include the statistical
13   method used to derive end points.
14       **A.  Where -- where are you at?**
15       Q.  Sorry.  If you go to the next page, sorry,
16   page 8.
17       **A.  All right.**
18       Q.  Okay.  So at page 8 of this EPA guidance
19   document for considering open literature.
20       **A.  Second bullet?**
21       Q.  Yeah, for considering open literature studies
22   it notes that it is important to know the statistical
23   method used to derive the test end points.  You agree
24   that's important, correct?
25       **A.  Yes, sir.**

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL              August 14, 2018              CONFIDENTIAL

Page 474

1    Q. And you agree that one statistical method used
2  to derive end points may not be appropriate in any or
3  all circumstances, correct?
4    **A. Correct.**
5    Q. If you skip down to 3.2.3?
6    **A. 3.2.3, okay, I'm there.**
7    Q. There's a -- there's a special note on
8  epidemiologic data.  Do you see that?
9    **A. Yes, sir.**
10    Q. Okay.  It notes:  Recently OPP has developed
11  draft guidance for incorporating epidemiologic research
12  into the risk assessment process.  OPP anticipates
13  increased use of these types of data in our risk
14  assessment process as epidemiologic cohorts such as the
15  National Cancer Institute's Agricultural Health Study,
16  among others, continue to mature, increased time on
17  study, and associations between pesticide use and
18  adverse cancer and noncancer outcomes are refined and
19  clarified.
20     Were you aware that OPP has increasingly used
21  epidemiology studies in its risk assessment process?
22    **A. Yes, that's a general trend.**
23    Q. Okay.  You're aware that EPA is going to
24  review epidemiology studies and then weight them
25  accordingly based on the quality of study, correct?

Page 475

1    **A. There's a considerable debate about the way**
2  **that EPA incorporates the results of epidemiology**
3  **studies in their risk assessment process.  The**
4  **principal focus of the debate over the last five years**
5  **as you probably know has been the epidemiological**
6  **studies on prenatal and early life exposures to the**
7  **insecticide chlorpyrifos.**
8    **I -- I think it's fair to say that the agency**
9  **is -- is still working to refine how it's going to use**
10  **and rely on epidemiological studies.  It's a -- it's an**
11  **area of considerable controversy within the broader**
12  **pesticide regulatory and public health arena.**
13    Q. In its open literature guidance the EPA
14  specifically mentions the National Cancer Institute's
15  agricultural health study as an epidemiology study that
16  may refine and clarify cancer associations, correct?
17    **A. Yes, it does.**
18    Q. Dr. Benbrook, before we move on, I want to
19  mark as Exhibit 2...
20     (Deposition Exhibit 2 was
21     marked for identification.)
22    **A. Are we done with 1?**
23    Q. (BY MR. HOLLINGSWORTH)  Yeah.  Exhibit 2 is a
24  notice of deposition for today's deposition.  Do you
25  see that?

Page 476

1    **A. Yes.**
2    Q. And have you seen this before today?
3    **A. Yes, I believe I have.**
4    Q. Okay.  When did you see it?
5    **A. It was -- it was probably before -- is this**
6  **the final one that -- I know there was ongoing**
7  **discussions about this over a period of time.**
8    Q. This is one that you would have received
9  within the last week.
10    **A. I -- I may have gotten it.  I knew I had to be**
11  **here on Tuesday and here I am.**
12    Q. Okay.  Within this is a document request
13  at the -- starting at page 4.  Do you see that?
14    **A. Yes.**
15    Q. And you're familiar with these document
16  requests.  In fact, you've produced responses to these
17  document requests in the past, correct?
18    **A. Correct.**
19    Q. Okay.  And did you re-review these document
20  requests prior to your deposition today?  And there's
21  some new ones in here.  Did you review those?
22    **A. No.**
23    Q. Okay.  Do you have any of your billing
24  statements from the last deposition that's from May
25  23rd going forward?  You kept those, correct?

Page 477

1    **A. I have them.  I don't have them with me.**
2    Q. Okay.
3    **A. I'm sure Mr. Litzenburg can get them sent in**
4  **the next few minutes.**
5    Q. Okay.  Along with those, you would also be
6  willing to produce the other documents that are
7  requested in this that you have not yet reviewed; is
8  that correct?
9    **A. It's my understanding from my discussions with**
10  **Mr. Litzenburg that we already went over all of this in**
11  **the last deposition.  This is really a continuation of**
12  **the earlier one so I didn't -- I'm not aware that**
13  **I'm -- I'm supposed to provide anything new.  You can**
14  **take it up with Tim.**
15    Q. Sure.  If you look at Number 12 on page 5, is
16  it your testimony that since May 23rd, including since
17  the last trial you testified at, that you haven't had
18  any communications with Dr. Robin Mesnage, Dr. Michael
19  Antoniou, Dr. Philip Grandjean, Dr. --
20    **A. I -- I can read it.**
21    Q. Dr. Bruce Blumberg -- let me just read it for
22  the record -- Dr. Anthony Samsel, Dr. Phillip
23  Landrigan, Dr. Stephanie Seneff or Carey Gillam
24  regarding glyphosate, glyphosate-based herbicides or
25  anything of that matter?

8 (Pages 474 to 477)

HIGHLY                  Charles Benbrook, Ph.D.                  HIGHLY
CONFIDENTIAL               August 14, 2018               CONFIDENTIAL

Page 478

1     THE WITNESS: Tim, you want me to
2 respond?
3          MR. LITZENBURG: You can respond. I'll
4 stop it at some point.
5     A. Let's see. I've had short exchanges of emails
6 a couple of times with Robin Mesnage. He was the
7 editor of a -- of a journal article that I published in
8 Frontiers of Public Health. He was the person who was
9 running the peer review, and I got an email from him
10 just the other day with his -- a new paper that he has
11 published with colleagues on comparing the toxicity of
12 a variety of herbicides to the -- to the liver.
13     Q. (BY MR. HOLLINGSWORTH) Including glyphosate?
14     A. Yes, including glyphosate. It's -- it's out.
15 It's a published paper now. And I've had a couple of
16 emails with Phil Landrigan. He -- Phil is the
17 chairperson of the science committee of a project that
18 I'm involved with on herbicides in the Midwest.
19     Q. Including glyphosate, correct?
20     A. Including glyphosate. And I sent Carey Gillam
21 an email after learning of the verdict because I knew
22 she was in Australia, and I've had no communications
23 with any of the other individuals in this list.
24     Q. Okay. So you sent Carey Gillam an email
25 regarding the glyphosate trial verdict recently,

Page 479

1 correct?
2     A. Yeah, about 3:15 on Friday.
3     Q. Okay. So I'll ask you not to erase any of
4 these emails and to eventually produce those emails as
5 requested in this notice of deposition.
6          MR. LITZENBURG: We'll stand on our
7 objections from the prior one.
8     Q. (BY MR. HOLLINGSWORTH) Besides Carey Gillam
9 as an individual, have you had, if you look at 13,
10 communications with the US Right to Know, for example,
11 regarding glyphosate?
12     A. No.
13     Q. Okay. Have you had any communications with
14 the Organic Consumers Association with respect to
15 glyphosate?
16     A. No.
17     Q. Okay. And have you had any communications
18 with any of those groups with respect to glyphosate?
19     A. No.
20     Q. Okay. And how about communications with
21 Dr. Blair, have you had any communications with
22 Dr. Blair since our last deposition?
23     A. Who?
24     Q. Dr. Aaron Blair.
25     A. Let's see. I had an email exchange with him a

Page 480

1 few -- maybe three weeks ago, I don't know, I don't
2 remember exactly, when I had asked him a couple
3 technical questions about the IARC working group
4 process, and I had a short phone conversation with him
5 where he basically just said, you know, read the --
6 read the monograph. That's it.
7     Q. Okay. So you had emails and a short phone
8 conversation with Dr. Blair prior to giving testimony
9 at trial with respect to glyphosate, correct?
10     A. Yes.
11     Q. In those emails and conversations he gave you
12 various advice and pointed you to references that
13 provide further detail on IARC and the IARC process; is
14 that correct?
15     A. Actually I called him after -- yeah, I called
16 him after I had testified and I specifically asked him
17 about one passage in the IARC monograph, and he -- he
18 sent me an -- the citation to a 1990 journal article
19 that he had done with a colleague at NCI talking about
20 the method that they use -- that they used in the
21 agricultural health study in the early years to refine
22 their assessment of exposure to various pesticides.
23     Q. Okay.
24     A. Which I've --
25     Q. Sorry.

Page 481

1     A. -- I've subsequently gotten a copy of but I
2 haven't read yet.
3     Q. Okay. And have you spoken with Dr. Aaron
4 Blair about his thoughts on the recently released 2018
5 JNCI study, a cohort study on glyphosate?
6     A. No.
7     Q. Okay. You haven't spoken to Dr. Blair about
8 why his name doesn't appear on that publication?
9     A. No. I -- I knew why his name didn't appear on
10 the publication. I didn't need to ask him.
11     Q. Okay. And with respect to these other experts
12 listed here, plaintiffs' experts, you haven't had
13 any --
14     A. This is in 13?
15     Q. This is in 10.
16     A. Oh.
17     Q. You haven't had any communications with
18 plaintiffs' other experts in this case?
19     A. Well, I -- I met Dr. Sawyer at trial. He
20 testified before me. That's the only time I'd ever met
21 him, and I don't -- I don't know any of the other -- I
22 don't think I've ever met Dr. Portier. He was -- he
23 had left by the time I was down in San Francisco for
24 the trial.
25     Q. Okay. Is it fair to say you're not relying on

9 (Pages 478 to 481)

HIGHLY                Charles Benbrook, Ph.D.                HIGHLY
CONFIDENTIAL              August 14, 2018              CONFIDENTIAL

Page 482

1  the opinions of any of these expert witnesses in
2  forming your own opinions in this case?
3       A.  Correct.  I mean, I certainly read the journal
4  articles that Dr. Portier or -- and/or others wrote
5  about the differences in the IARC and EPA assessments,
6  so to the extent that I have read them and that has
7  informed my thinking, I guess I relied on it, but
8  it's -- these are publicly available peer-reviewed
9  publications, including publications that Dr. Blair is
10  part of.
11       Q.  Okay.  And in preparing for trial, were you
12  exposed to any additional Monsanto Company documents
13  that you had not seen prior to trial?
14       A.  There was a -- there was a second batch of
15  documents that Mr. Travers put on the -- sent to you in
16  the reliance documents that was -- that occurred after
17  my -- certainly after my expert report and before the
18  trial, so that -- that was the last batch of internal
19  Monsanto Bates-numbered documents that I received.
20       Q.  Okay, thank you.  You can put that aside,
21  Dr. Benbrook.
22          Dr. Benbrook, you're familiar with the U.S.
23  Government agency NTP, correct?
24       A.  Yes.
25       Q.  National Toxicology Program?

Page 483

1       A.  Correct.
2       Q.  Okay.  It's independent from EPA and other
3  regulators; is that your understanding?
4       A.  Yes.
5       Q.  You cite the NTP in your expert report,
6  correct?
7       A.  Oh, I would imagine in some extent.
8       Q.  Okay.  In your prior publications you've
9  recommended that entities independent of regulators
10  such as NTP prioritize glyphosate and glyphosate-based
11  herbicides for hazard assessments, correct?
12       A.  Correct.
13       Q.  Okay.  And you've been scanning the literature
14  I believe as you testified previously for new articles
15  that come out on -- with respect to the science
16  surrounding glyphosate, especially genotoxicity
17  articles.  Is that fair?
18       A.  Well, certainly genotox, any animal bioassays
19  and any epidemiological studies.  In fact, there was a
20  brand new one today in my inbox.
21       Q.  And you agree that the National Toxicology
22  Program, the NTP, does an -- excellent work in
23  toxicology.  Is that fair?
24       A.  Their work is -- is highly regarded.  It's
25  played a role in the regulation of many pesticides in

Page 484

1  the past, although they have -- they have not played as
2  significant a role in, say, the last decade as they
3  did, say, in the decade of the '80s, but yes, their --
4  I think their science is held in -- generally in quite
5  high regard.
6       Q.  If NTP released a study on glyphosate and
7  glyphosate-based herbicides, that certainly would be
8  something you're interested in as an expert in the
9  field, correct?
10       A.  Yes.
11       Q.  Okay.  Are you aware that NTP previously
12  reviewed glyphosate back in 1992?
13       A.  Yes, vaguely.
14       Q.  Okay.  And they concluded that glyphosate was
15  not mutagenic in any tests they ran?
16       A.  Correct.
17       Q.  Okay.  And they concluded glyphosate was not
18  genotoxic in any tests they ran?
19       A.  Right, correct.
20       Q.  And they concluded that in a rodent model I.V.
21  dose glyphosate was mainly secreted via the urine,
22  right?
23       A.  Correct.
24       Q.  And those findings like all the findings from
25  NTP underwent peer review, correct?

Page 485

1       A.  Yes, their internal process, yes.
2       Q.  Okay.  And the IARC findings, those didn't
3  undergo peer review, did they?
4       A.  No.  The IARC process entails a working group
5  of -- I think in this case it was 15 or 16 scientists.
6  In effect, I guess they sort of serve as their own peer
7  review.
8       Q.  Right.  But they don't -- the IARC -- IARC
9  findings don't undergo formal peer review in the sense
10  that independent scientists are reviewing the quality
11  of the work and making comments and suggestions and
12  ultimately determining whether or not that work gets
13  published, correct?
14       A.  Correct.
15       Q.  And, in fact, NTP decided it wasn't necessary
16  to do a two-year bioassay.  Do you recall that?
17       A.  No.
18       Q.  Okay.
19       A.  I don't remember the -- the details of the NTP
20  decision process relative to continuing to do more work
21  on glyphosate back in the early '90s when they did the
22  limited amount of genotox work on it that they did.
23       Q.  Did you review the section from the 2017
24  OPP-issued paper on the carcinogenic potential of
25  glyphosate with respect to EPA's collaboration with NTP

10 (Pages 482 to 485)

HIGHLY                  Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL               August 14, 2018                     CONFIDENTIAL

Page 486

1  to study the genotoxicity of glyphosate formulations?
2      A.  The 2017 or the 2016?
3      Q.  I believe they both refer to it, but either,
4  you're familiar with that generally?
5      A.  I spent by far the most time with the 2016
6  paper because it's by far the most thorough, but I also
7  read the 2017.
8      Q.  Okay.  You'll recall that the 2016
9  carcinogenic issue paper on glyphosate, that that
10  discusses EPA working with NTP to study glyphosate
11  formulations?
12      A.  It's a very short discussion, yeah.
13      Q.  You recall that?
14      A.  A couple sentences.
15      Q.  Okay.
16      A.  And the NTP genotox work appears in the
17  tables, the detailed tables in the 2016 paper, but
18  with -- you know, no more -- no more attention than any
19  of the other 40-plus reverse bacterial mutagenicity
20  assays done at the time.
21      MR. HOLLINGSWORTH:  Let's go ahead and
22  mark this now as Exhibit 3.
23      (Deposition Exhibit 3 was
24      marked for identification.)
25      Q.  (BY MR. HOLLINGSWORTH)  This is the OPP-issued

Page 487

1  paper on the carcinogenic potential of glyphosate,
2  correct, Dr. Benbrook?
3      A.  Yes, sir.
4      Q.  Okay.  If you turn to page 145.
5      A.  Okay.
6      Q.  That is the section titled Collaborative
7  Research Plan for Glyphosate and Glyphosate
8  Formulations.  Do you see that?
9      A.  Correct.
10      Q.  And that's talking about the NTP studies that
11  we were just mentioning in the last testimony, correct?
12      A.  That presumably have been ongoing for a while.
13      Q.  Okay.  The first objective of the NTP research
14  mentioned there is to compare the toxicity of
15  glyphosate vs. formulations as well as compare
16  formulations vs. formulations.  Were you aware of that
17  objective?
18      A.  Yes.
19      Q.  So in lay terms, NTP and EPA are going to
20  study if glyphosate alone is more or less toxic than
21  the formulated product; is that correct?
22      A.  Yes.
23      Q.  Okay.  Are you familiar with the Society of
24  Toxicology?
25      A.  Yes.

Page 488

1      Q.  And what is that?
2      A.  It's a professional organization that -- whose
3  membership is principally composed of toxicologists
4  both from industry and in public service and regulatory
5  agencies, and they -- their mission is to improve and
6  refine the -- the art of the toxicological sciences.
7      Q.  Have you ever attended one of their annual
8  meetings?
9      A.  I don't think so.
10      Q.  Are you aware that NTP conducted some of the
11  studies discussed in this 2017 issue paper and
12  presented some of those studies at the 2018 Society of
13  Toxicology annual meeting?
14      A.  No, I haven't seen that.
15      MR. HOLLINGSWORTH:  We'll mark as
16  Exhibit 4 an abstract titled Effects of Glyphosate and
17  Its Formulations on Markers of Oxidative Stress and
18  Cell Viability in Heparg and Hacat Cell Lines.
19      (Deposition Exhibit 4 was
20      marked for identification.)
21      Q.  (BY MR. HOLLINGSWORTH)  First off,
22  Dr. Benbrook, do you know any of these authors listed,
23  these study authors?
24      A.  No.
25      Q.  Okay.  This study conducted by NTP would be

Page 489

1  conducted according to GLP specs, correct?
2      A.  You know, I -- I have not seen or read
3  anything about the study.  I assume this is an abstract
4  that was presented at the Society of Toxicology
5  meeting.  Is that what you're representing it as?
6      Q.  Correct.  And I can mark another exhibit to
7  show you that if you would like.
8      A.  No, I'll take your word for it.  Let me read
9  it, please.
10      Q.  Sure.
11      A.  (Witness reading document.)  Geez.  Okay.
12  I've read it.
13      Q.  Having read this abstract on the NTP study,
14  you're generally familiar with what it's about,
15  correct?
16      A.  Well, to the -- it's not a lot of details on
17  the methodology or the -- there's no real information
18  on the statistics, but in general they've described
19  what they've done in I assume the early stages of their
20  work in -- on glyphosate and glyphosate formulations.
21      Q.  Okay.  In general it's what we were talking
22  about earlier, it's the research to compare the
23  toxicity of glyphosate vs. formulations, correct?
24      A.  Right.
25      Q.  And what NTP concluded after running their own

11 (Pages 486 to 489)

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL              August 14, 2018              CONFIDENTIAL

Page 490

1    GLP experiments was that glyphosate did not induce
2    oxidative stress, correct?
3       **A.  In this -- in these cell lines, yes.**
4       Q.  And what NTP scientists concluded after
5    running experiments was that glyphosate formulations
6    only induced oxidative stress at doses high enough to
7    induce cytotoxic effects, correct?
8       **A.  That's not stated in this -- you're saying**
9    **that that's what they reported?  If they reported it,**
10   **it's not in this abstract.**
11      Q.  Okay.  At the bottom of the abstract it notes:
12   In addition, the formulations marginally increased
13   oxidative stress only after significant loss of cell
14   viability.
15      Do you see that?
16      **A.  Yep, yep.**
17      Q.  Okay.  So what NTP concluded in this 2018
18   study is that glyphosate formulations only induced
19   oxidative stress at doses high enough to include
20   cytotoxic effects, right?
21      **A.  Okay, all right, I'll accept that**
22   **characterization.**
23      Q.  Okay.  And those findings are contrary to the
24   IARC working group findings, aren't they?
25      **A.  Well, the IARC working group findings are**

Page 491

1    **based on a -- much broader array and diversity of**
2    **genotox assays, several of which did report oxidative**
3    **stress, indications of oxidative stress.  And you,**
4    **know, there are no -- no -- no scientists nor the EPA**
5    **would -- would rely on a single genotox assay to -- in**
6    **reaching a determination.  Each of these assay systems**
7    **is sensitive to a particular type of cellular or**
8    **metabolic response, and none of them is capable of**
9    **detecting all such responses.**
10      **So it's a -- in evaluating the genotoxicity of**
11   **both pure glyphosate and glyphosate formulations, it is**
12   **important to look at the full array of in vivo and in**
13   **vitro assays of which this work by the NTP will -- will**
14   **be a part -- part of.**
15      **It also states based on GLY concentrations**
16   **these mixtures were over 1,000 times more potent than**
17   **GLY alone.  I'm not exactly sure, I assume that's**
18   **referring to the altered microchondrial [phonetic]**
19   **membrane potential impact or mechanism of genotoxicity.**
20   **So it's -- it's certainly clear that while this**
21   **particular assay run by NTP did not produce evidence of**
22   **an impact on oxidative stress or reactive oxygen**
23   **species, it -- it did report other evidence of**
24   **heightened toxicity of the formulations.**
25      Q.  And these findings are contrary -- these

Page 492

1    findings by NTP in 2018 based on studies that they ran
2    are contrary to the overall conclusion by the IARC
3    working group, correct?
4       **A.  They -- I don't know if the IARC working group**
5    **had -- I'd have to go back and look to see if there**
6    **were assays done with these particular cell lines.  I**
7    **can't -- I can't answer that question, but in general,**
8    **the IARC working group felt based on the totality of**
9    **the studies that it reviewed, and as Dr. Parry also**
10   **concluded earlier, that there's evidence that a**
11   **glyphosate and in particular formulated glyphosate**
12   **herbicides can induce genotoxicity through oxidative**
13   **stress mechanism.**
14      Q.  Right.  These findings by NTP in 2018 based on
15   studies they conducted are contrary to IARC's
16   conclusion that there's evidence that a glyphosate and
17   in particular formulated glyphosate herbicides can
18   induce genotoxicity through oxidative stress mechanism,
19   correct?
20      **A.  They are -- this is a -- a preliminary report**
21   **on some genotox assay systems carried out by NTP that**
22   **did not report any oxidative stress except at very high**
23   **doses where they suggest that the -- the impact may be**
24   **caused by loss of cell viability.  That is what this**
25   **study is, it is -- it does not refute the overall**

Page 493

1    **judgment of the IARC working group, however, if that's**
2    **what you're suggesting.**
3       Q.  But the IARC working group didn't conduct its
4    own studies, did it?
5       **A.  No.**
6       Q.  But NTP did conduct its own study here,
7    correct?
8       **A.  Correct.**
9       Q.  EPA's final report on the carcinogenic
10   potential of glyphosate, that's - that's not out yet,
11   is it?
12      **A.  Not that I'm aware of.**
13      Q.  Okay.  But as we've seen in the two draft
14   reports from 2016 and 2017, EPA's position is that
15   glyphosate is not likely to be carcinogenic, correct?
16      **A.  Its conclusion is that exposure to glyphosate**
17   **for the general public at expected levels of exposure**
18   **is not likely to pose an oncogenic risk.**
19      Q.  You testified at your last deposition that
20   EPA's final report may be different based on its review
21   of modern genotox tests on the formulated product.  Do
22   you recall that generally?
23      **A.  Yes.**
24      Q.  Would you -- would you not consider this NTP
25   study from 2018 to be one of those modern genotox

12 (Pages 490 to 493)

Page 494

1    studies on the formulated product?
2        A.  I would, and it's one of -- I would say in the
3    last month I'm aware of four or five new genotox
4    studies that have been published.  This has not been
5    published to my knowledge.  So, you know, the -- the
6    database on which EPA and other regulators and
7    independent scientists can draw and should draw in
8    evaluating the genotoxicity and carcinogenic potential
9    of glyphosate is rapidly expanding, both in scope and
10   quality.
11       Q.  Okay.  So this NTP study on glyphosate and
12   glyphosate-formulated products is one of the modern
13   genotox studies that you discuss in your report,
14   correct?
15       A.  Yes, yes.
16       Q.  Okay.  And EPA is certainly going to consider
17   this NTP study on glyphosate and glyphosate
18   formulations based on what they've noted here in the
19   2017 issue paper, correct?
20       A.  I certainly would expect them to, yes.
21       Q.  Did you submit a comment to EPA to make sure
22   the modern genotoxicity tests on the formulated product
23   that you discuss in your report should be considered
24   with great importance with respect to glyphosate's
25   registration review?

Page 495

1        A.  I remember submitting an email comment at some
2    point in the process and I probably did talk about the
3    importance of the genotox database and the differential
4    toxicity, but it was certainly a while ago.  I don't
5    recall the details.
6        Q.  The email comment, are you referring to a
7    comment that was submitted directly to an EPA employee
8    or --
9        A.  Yeah -- no, no, to a -- the comment on a
10   proposed rule or something.
11       Q.  Okay.  It was a proposed rule whether it's
12   something to do with the registration review or
13   something else?
14       A.  Yeah, it was a -- it was a while ago.  I
15   don't -- I don't remember the exact circumstance.
16       Q.  Okay.  It may have been a tolerance, proposed
17   tolerance?
18       A.  Could have been a tolerance proposal, yeah.
19       Q.  Okay.  Dr. Benbrook, let's -- do you have a
20   copy of your report with you?
21       A.  No.
22       Q.  Let's mark this as Exhibit...
23           COURT REPORTER:  5.
24           MR. HOLLINGSWORTH:  5.
25           (Deposition Exhibit 5 was

Page 496

1            marked for identification.)
2        Q.  (BY MR. HOLLINGSWORTH)  Allow you to refer to
3    it.  Now, Dr. Benbrook, this is your report for the
4    glyphosate litigation, correct?
5        A.  Correct.
6        Q.  Okay.  And you are relying on this report with
7    respect to this case here that you're testifying in,
8    correct?
9        A.  Certainly.
10       Q.  Okay.  So certainly the time that you put in
11   to drafting this report, reviewing this report would go
12   towards your deposition here today for this
13   Peterson/Hall case, correct?
14       A.  In what sense do you mean "time"?
15       Q.  The time that you spent drafting and reviewing
16   your report you're using today as foundational
17   expertise for your testimony in the Peterson/Hall case,
18   correct?
19       A.  Correct.
20       Q.  Okay.  Now, if you go to paragraph 614 of your
21   report, are you there, Doctor?
22       A.  Yes.
23       Q.  Okay.  That paragraph talks about EPA employee
24   Jess Rowland, correct?
25       A.  Correct, yeah.

Page 497

1        Q.  Okay.  And specifically it talks about Rowland
2    with respect to the October 2015 Cancer Assessment
3    Review Committee or CARC conclusion.  Do you see that?
4        A.  Correct.
5        Q.  Okay.  And your statement here is that EPA
6    violated their own cancer assessment guidelines in
7    conducting -- in concluding that glyphosate was not
8    likely to be carcinogenic to humans; is that correct?
9        A.  Correct.
10       Q.  Okay.  And you specifically cite a May 2, 2016
11   email with Jim Jones, assistant administrator to EPA,
12   and Gina McCarthy, administrator to EPA, correct?
13       A.  Correct.
14       Q.  Okay.  And in that email it states the
15   assessment was not consistent with the agency's
16   guidelines, correct?
17       A.  Correct.
18       Q.  Okay.  That opinion is based on an email
19   between EPA employees from May of 2016, correct?
20       A.  Well, it's certainly one of the -- one of the
21   sources that I took into account in making that
22   statement, but there are many people that have made the
23   point that in various aspects of EPA's assessment of
24   the animal carcinogenicity database the agency has not
25   followed their -- their own guidelines.  It's a --

13 (Pages 494 to 497)

HIGHLY    Charles Benbrook, Ph.D.    HIGHLY
CONFIDENTIAL    August 14, 2018    CONFIDENTIAL

Page 498

1 that's an issue that's come up in multiple SAP
2 meetings. It's covered in multiple peer-reviewed
3 articles. It's discussed in a variety of different
4 places and debated.
5    MR. HOLLINGSWORTH: Let's mark as
6 Exhibit 6.
7    (Deposition Exhibit 6 was
8    marked for identification.)
9  Q. (BY MR. HOLLINGSWORTH) This is an email you
10 discussed in your report, Dr. Benbrook?
11  A. Okay. I didn't see these "Exhibit 5 -
12 Deliberative Process" on it, but I'll take your word
13 for it.
14  Q. Okay. Have you ever spoken with any of the
15 EPA employees on this email since May of 2016?
16  A. No.
17  Q. Have you ever spoken with any of the employees
18 on this EPA email since you wrote your report?
19  A. No.
20  Q. Okay. And you haven't spoken with these
21 employees about any of the issues in this litigation
22 since you wrote your report, correct?
23  A. That's correct.
24  Q. Okay. Now, in your expert report at paragraph
25 614 you note: In conducting this review apparent

Page 499

1 EPA -- Rowland apparently violated EPA's own cancer
2 assessment guidelines in concluding that glyphosate was
3 not likely to be carcinogenic to humans.
4    How do you -- how are you coming to the
5 conclusion that it was Rowland that violated EPA's
6 guidelines?
7  A. Well, I suppose -- I suppose you could lay the
8 responsibility on the full CARC of which I think he was
9 the staff leader for, but there's certainly other
10 evidence in the discovery record that Rowland played
11 a -- a significant and leadership role in the agency's
12 assessment and ultimate decision on the carcinogenicity
13 of glyphosate.
14  Q. Okay. But there's nothing in this email on
15 which you're relying for your opinion that specifically
16 notes that Rowland violated guidelines in any way, does
17 it?
18  A. No. It doesn't say -- it doesn't specifically
19 highlight Mr. Rowlands as the individual responsible
20 for that.
21  Q. Okay. And there's no materials cited in your
22 expert report that definitively say that Mr. Rowland
23 violated any EPA cancer assessment guidelines with
24 respect to the 2015 CARC report, correct?
25  A. Well, the -- the record is very clear that

Page 500

1 Rowlands managed the CARC process in a -- to a
2 significant degree, that he -- in some of his email
3 communications with Monsanto, he made it pretty clear
4 that he had that process, you know, under control. So
5 I -- you know, I -- to me, the record seems pretty
6 clear that Rowland had a -- for one thing, he was
7 the -- the chair, the convener of the CARC and -- and
8 he was clearly an important driver of the outcome.
9 Certainly he felt that he was in some of his
10 communications, and as did some of the other EPA staff.
11 They seemed to, for better or worse, give Rowland
12 considerable credit or blame, depending upon your point
13 of view, for the outcome of that review.
14  Q. Right. But nowhere in the record that you
15 reviewed have you seen it explicitly stated that
16 Mr. Rowland violated any EPA guidelines when he and the
17 CARC concluded that glyphosate is not likely to be
18 carcinogenic in 2015, correct?
19  A. The -- all of the statements about EPA's
20 failure to follow its own guidelines are relative to
21 the agency's evaluation of the animal bioassay studies.
22 It's not just Rowland's evaluation, it's the EPA's.
23 But given Rowland's direct and managerial role in -- in
24 the CARC and both his and the statements of other
25 people about the importance that he -- that his -- his

Page 501

1 contributions to that -- in that process, to me it's --
2 it's clear that he played a -- you know, an outsized
3 and important role in the agency actions that many
4 people regard as inconsistent with their guidelines.
5  Q. And, Dr. Benbrook, I'm asking an explicit
6 question. Nowhere in the materials you reviewed have
7 you seen it stated that Mr. Rowland violated EPA's
8 guidelines in any way, have you?
9  A. I don't recall seeing that specific statement.
10  Q. Nowhere in the email that you rely on here
11 does it state that EPA violated its guidelines by
12 concluding that glyphosate was not likely to be
13 carcinogenic to humans, correct?
14  A. Well, Jim Jones states that the assessment was
15 not consistent with the agency's guidelines. I don't
16 know what could be clearer than that.
17  Q. Well, the email that you're relying on for
18 that opinion doesn't explicitly state that EPA violated
19 guidelines in concluding that glyphosate was not likely
20 to be carcinogenic to humans, does it?
21  A. Well, I interpreted the statement "assessment
22 was not consistent with agency's guidelines" as the
23 functional equivalent of violated the guidelines.
24  Q. EPA has tons of guidelines for all different
25 issues and scientific reviews, correct?

14 (Pages 498 to 501)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   August 14, 2018                   CONFIDENTIAL

---

Page 502

1      A. Correct.
2      Q. EPA has guidelines for mundane purposes such
3  as how to format various reports, right?
4      A. Yes.
5      Q. EPA has guidelines with respect to layers of
6  bureaucratic review of a scientific report like the
7  CARC has to go through, correct?
8      A. Correct.
9      Q. EPA has guidelines that provide instruction
10 and guidance for EPA scientists in determining whether
11 or not something may be carcinogenic or not, correct?
12     A. Correct.
13     Q. We reviewed some of those at your last
14 deposition, correct?
15     A. And this one.
16     Q. Okay. But specifically the 2005 cancer
17 guidelines, we reviewed those at your last deposition,
18 correct?
19     A. Correct.
20     Q. This EPA email on which you're relying, it
21 doesn't state what guidelines were violated with
22 respect to the release of the CARC report, does it?
23     A. I would agree with that, yes.
24     Q. This EPA email from Tim Burke to the EPA
25 administrator does not state that the cancer guidelines

---

Page 503

1  were violated with respect to the release of the CARC
2  report, does it?
3      A. This -- the email was from Jim Jones.
4      Q. Who did I say, Tim Burke?
5      A. Yeah.
6      Q. Let me restate the question. This email from
7  Jim Jones to the EPA administrator does not state that
8  the Cancer Assessment Review Committee guidelines were
9  violated with respect to the release of the CARC
10 report, does it?
11     A. No, it just says agency guidelines.
12     Q. Okay. This email from Jim Jones to the EPA
13 administrator does not state that the cancer guidelines
14 were violated with respect to the CARC report, correct?
15     A. That's what you just asked.
16     Q. I asked about the Cancer Assessment Review
17 Committee guidelines.
18     A. Okay. I would give the same answer.
19     Q. This email from Jim Jones to the EPA
20 administrator does not state that any specific
21 procedural guidelines were violated with respect to the
22 release of the CARC report, does it?
23     A. It just states agency guidelines.
24     Q. Okay. This email from Jim Jones to the EPA
25 administrator does not state that any EPA employees

---

Page 504

1  violated any EPA regulations or guidelines with respect
2  to the scientific review of the 2015 CARC report on
3  glyphosate, does it?
4      A. It doesn't refer to any specific employee, no.
5      Q. It could be any or none of those things with
6  respect to the guidelines discussed in this email on
7  which you rely, correct?
8      A. I suppose.
9      Q. Okay. So you're speculating when you testify
10 in your report that EPA apparently violated its
11 guidelines in concluding that the CARC report -- and in
12 the CARC report that glyphosate was not likely to be
13 carcinogenic to humans, weren't you?
14     A. No.
15     Q. The fact that you state in your expert report
16 that EPA apparently violated its own cancer assessment
17 guidelines speaks to the fact that you don't know
18 exactly what guidelines are being discussed in this
19 email on which you relied, doesn't it?
20     A. It's a relatively brief email from Jim Jones
21 to the administrator of EPA noting with some alarm that
22 the -- a draft of this CARC assessment had been
23 released that was, quote, not consistent with agency
24 guidelines. I think it's -- any reasonable person
25 reading this email would surmise that it's got

---

Page 505

1  something to do with agency guidelines about the cancer
2  assessment process or the managing of documents about
3  the cancer assessment process. The email in the
4  earlier part of it notes, for example, that the EPA had
5  not had the -- appropriate consultations with the USDA
6  and would not -- would not release the final assessment
7  until it had gone through various interagency
8  communication processes that are -- are standard.
9          But this -- this statement, it does not exist
10 in a vacuum. There is substantial discussion
11 throughout the record, substantial discussion in the
12 open literature, there was substantial discussion of
13 adherence to agency guidelines in at least two SAP
14 meetings about the fact that, for example, the -- one
15 of the issues of debate was whether the maximum
16 tolerated dose was exceeded in the 1983 biodynamics
17 mouse study or any of the other two-year chronic
18 oncogenicity feeding studies.
19         It's an issue of -- that had been under debate
20 between the agency, Monsanto and -- and independent
21 scientists that the EPA had sought advice of for 15
22 years and it continues to be, I think, a debate to this
23 day of whether the top dose rate in the -- in either
24 the 1983 mouse study or other oncogenicity studies
25 exceeded the maximum tolerated dose. Several people

---

15 (Pages 502 to 505)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                 August 14, 2018                    CONFIDENTIAL

Page 506

1    argue that it did not because the survival rate in the
2    top row -- in the high dose group was either the same
3    or actually better than some of the lower dose groups,
4    and there was also clear evidence supported by some of
5    the SAP meetings that some of the animal bioassays did
6    not approach the maximum tolerated dose and, therefore,
7    were -- were -- should -- not as much weight should be
8    placed on them.
9         So adherence to the agency guidelines around
10   the design of a -- of two-year cancer feeding studies
11   and assuring that the maximum dose is at or close to
12   the maximum tolerated dose was a -- an agency guideline
13   that has been extensively discussed in the record for
14   15 years.
15        Q. Are you finished?
16        A. Yeah.
17        Q. With respect to this email and Jim Jones'
18   statement to the administrator that agency guidelines
19   may have been violated, it might have just referred to
20   the fact that the final report was released prior to
21   another part of the agency or another agency within the
22   U.S. Government having a chance to review that study,
23   correct?
24        A. I suppose that might be possible, yes.
25        Q. Okay. And just because the report was

Page 507

1    released on a certain date doesn't mean that when it
2    was signed on October 1, 2015, that that report wasn't
3    final as of that time, correct?
4         A. Can you restate that question. It's a little
5    convoluted.
6         Q. Sure. You've reviewed -- you've reviewed
7    plenty of EPA memoranda, risk assessments, CARC
8    reports, correct?
9         A. Yes.
10        Q. Okay. And the date that those CARC reports
11   are signed, that's final as of that group of CARC
12   scientists reviewing the product, that's final
13   according to them, correct?
14        A. Yeah, the date -- the date a particular action
15   is completed.
16        Q. Okay. So the fact that other branches of the
17   EPA or other agencies within the U.S. Government might
18   review a report, that doesn't make it any less final as
19   far as the CARC committee goes?
20        A. I suppose that may be true, but again, this
21   statement in the Jim Jones email refers to agency
22   guidelines, and I think it's clear from the use of
23   those terms that he's referring to the cancer bioassay
24   guidelines and not some internal decision or signoff
25   process which is, I think, what you're suggesting.

Page 508

1         Q. Nowhere in this email does it note that he's
2    referring to the cancer bioassay guidelines in any way,
3    correct?
4         A. It's not explicitly stated, but I think it's
5    quite clear from the construction of the sentence.
6         Q. So you make several allegations in your report
7    about Mr. Jess Rowland at EPA, correct?
8         A. There's a few, a short section.
9         Q. You specifically say that he violated agency
10   guidelines in some way, correct?
11        A. I suggest that his stated effort to discourage
12   the ASTDR [sic] from putting out its assessment of
13   glyphosate oncogenicity in his email to Monsanto
14   officials where he says he should get a medal if he
15   could kill that study was a -- very inappropriate, and
16   I don't think I've ever seen anything quite like that
17   in my years of tracking developments in OPP.
18        Q. Right. But you haven't seen an email like
19   that from Jess Rowland where he states, "If I kill this
20   I should get a medal," you've never seen that email,
21   have you?
22        A. Oh, yes, I have.
23        Q. Okay. So it's your testimony that Jess
24   Rowland wrote an email to somebody at Monsanto stating,
25   "If I kill this, I should get a medal." Is that

Page 509

1    correct?
2         A. That's what Jess Rowland states.
3         Q. Okay.
4         A. And I'm quite sure you know the email.
5         Q. Okay. So your statement is that he wrote that
6    email, correct?
7              MR. LITZENBURG: Asked and answered.
8         A. Yeah, it's cited in here.
9         Q. (BY MR. HOLLINGSWORTH) Okay. And
10   specifically in your report, besides the allegations
11   you're making about ATSDR, you note that Rowland
12   apparently violated EPA's own cancer assessment
13   guidelines, correct?
14        A. To the extent that Rowland was responsible for
15   the work, the -- the final CARC report, and as I said,
16   there's a number of items in the record that suggest to
17   me that he had a significant role in managing and --
18   and guiding the outcome of that committee, so yeah, I
19   think it's fair to credit him with the contribution he
20   made to that outcome.
21        Q. All right. And there's 13 other scientists,
22   13 scientists in total from the EPA who signed the CARC
23   report, correct?
24        A. I'd have -- I think that's about the correct
25   number of which I think ten -- ten or so concurred and

16 (Pages 506 to 509)

HIGHLY
CONFIDENTIAL

Charles Benbrook, Ph.D.
August 14, 2018

HIGHLY
CONFIDENTIAL

Page 510

1  two didn't and one didn't sign or something like that.
2  I don't remember the exact details. I'm sure you're
3  going to probably pull it out later and we can --
4       Q. If all 13 scientists concurred on the report,
5  then you would be willing to take back that testimony,
6  correct?
7       A. No.
8            MR. LITZENBURG: Objection to form.
9       Q. (BY MR. HOLLINGSWORTH) No, you wouldn't?
10      A. No.
11      Q. So if all 13 EPA scientists on the CARC report
12  concurred, then you would still testify that two of
13  them did not concur, correct?
14      A. I would be glad to discuss the document. I
15  remember quite clearly, and it's -- it's certainly not
16  my memory of the document that all of the scientists
17  who were participating in that review concurred. I
18  believe that there was -- there were a few that did
19  not.
20      Q. Is it important to you that all the scientists
21  on a CARC panel concur with the conclusion?
22      A. Certainly in most of the -- most of the CARC
23  reviews that I -- I've studied in detail over the
24  years, unanimity is typically the -- the outcome. It's
25  unusual -- it's unusual for there to be some scientists

Page 511

1  that -- that disagree with the judgment of the rest of
2  the committee. It happens, but it's unusual.
3       Q. Okay. But you've certainly reviewed some CARC
4  reports in which they are reviewing a pesticide and not
5  all the scientists on that CARC panel agree that it's
6  noncarcinogenic, correct?
7       A. I -- I cannot think of another example sitting
8  here today other than glyphosate.
9       Q. You echoed and provided some more detail on
10  the allegations about Mr. Rowland both in your last
11  deposition and at trial; is that correct?
12      A. No, there was nothing at trial about
13  Mr. Rowland.
14      Q. Okay, sorry. At your last deposition,
15  correct?
16      A. I --
17      Q. That's from May 23rd?
18      A. It was a very long deposition, sir. I don't
19  remember if Rowland came up or not.
20      Q. Okay. That's fair. It's been about three
21  months since your last deposition, correct?
22      A. Yeah, about that.
23      Q. Okay. And you recently testified at trial in
24  one of these Roundup cases, correct?
25      A. Correct.

Page 512

1       Q. And you prepared extensively for trial,
2  correct?
3       A. I did.
4       Q. Mr. Rowland is not a party to this case,
5  correct?
6       A. Yes, that's correct.
7       Q. He did not -- that's correct?
8       A. Yeah.
9       Q. He does not work for Monsanto, right?
10      A. I have no knowledge of whether he works for
11  Monsanto or not either directly or indirectly, I don't
12  know.
13      Q. Okay. At the time he was at EPA here he did
14  not work for Monsanto, correct?
15      A. No, he wasn't paid by Monsanto to my
16  knowledge.
17      Q. Okay. And you have no knowledge indicating
18  that Mr. Rowland has at any time worked for Monsanto,
19  correct?
20      A. I -- I have no knowledge about whether he did
21  or did not.
22      Q. Okay. I take it you still haven't read
23  Mr. Rowland's deposition in this case?
24      A. No, I didn't.
25      Q. Okay. So you disparage this lifelong public

Page 513

1  employee in your report and in your testimony, but you
2  don't have -- think he deserves the time for you
3  reviewing his testimony before making those
4  allegations?
5       A. Absolutely not, given what I read in the
6  record about his actions and his statements and -- and
7  the role that he played in the review of glyphosate
8  oncogenicity. I didn't -- I felt there was more than
9  enough in the record that I reviewed to determine that
10  Mr. Rowlands was exceedingly deferential to Monsanto
11  and doing everything he could to support an outcome from
12  the EPA review that aligned with Monsanto's hopes and
13  desires. To me, the -- Rowland's role in this is quite
14  clear without reading his deposition.
15      Q. Do you claim that Mr. Rowland manipulated the
16  CARC to get a favorable result for Monsanto?
17      A. It's -- you know, it's hard to say exactly
18  what he did, but the -- it's clear from the record that
19  he defended the -- the agency's position and
20  classification of glyphosate throughout the process,
21  and in particular, you know, when -- you know, as the
22  IARC working group came out he -- you know, he was part
23  of the communications between Monsanto and EPA to try
24  to assure that EPA was quite public in its disagreement
25  with the IARC classification. There was a rapport and

17 (Pages 510 to 513)

Page 514

1 a familiarity evidenced in the communications between
2 Rowlands and Monsanto officials that to me spoke to
3 a -- a relationship that was very unusual and in my
4 opinion inappropriate for a public servant working in
5 the Office of Pesticide Programs.
6     Q. So there's certainly nothing wrong with the
7 EPA or EPA employees defending their position and
8 scientific review and classification of a pesticide
9 they're reviewing, is there?
10    A. No, nothing wrong with it at all.
11    Q. Do you claim that Mr. Rowland somehow
12 manipulated the CARC or other aspects of EPA's review
13 of glyphosate for money or for the expectation of some
14 reward from Monsanto?
15    A. I have no way to make that -- that judgment.
16 It's clear that Monsanto officials anticipated that
17 upon Jess Rowland's retirement he could be helpful to
18 them as a consultant of some sort in future defense
19 of -- of glyphosate. The level of both familiarity and
20 confidence in Rowland's views about glyphosate
21 expressed by Monsanto officials based on the
22 interactions between those officials and Rowlands
23 pointed to a -- a relationship that I found to be very
24 troubling and unusual.
25    Q. There's nothing in the record that explicitly

Page 515

1 states that Mr. Rowland received any sort of
2 compensation for his review or EPA's review of
3 glyphosate, correct?
4     A. I'm not aware of any such evidence.
5     Q. Do you claim that Mr. Rowland violated his
6 professional duties as an EPA employee and reached the
7 scientific conclusions on glyphosate in order to
8 benefit Monsanto rather than because he believed that
9 they were the correct scientific conclusions?
10    A. It's clear that he was quite determined to
11 assure that the agency's judgment of the oncogenicity
12 of glyphosate was aligned with the position advocated
13 by Monsanto and that he often interacted with Monsanto
14 officials and gave rise to a level of confidence in
15 those officials that in Jess's hands the CARC review
16 would remain -- would remain unchanged from the -- in
17 terms of the classification of glyphosate.
18    So it -- the -- the record is, as I said, to
19 me quite clear about the closeness of the relationship
20 between Jess Rowlands and -- and some of the Monsanto
21 officials and obviously in particular the ones in the
22 Washington office that often visited with various EPA
23 officials and staff, and, you know, whether -- whether
24 there had been any implied future benefits to Rowlands
25 after his retirement, I wasn't privy to those

Page 516

1 conversations.
2     Q. But you haven't reviewed Mr. Rowland's
3 deposition, correct?
4     A. That's what I previously answered, yes.
5     Q. And if he testified in his deposition that he
6 hardly had any interactions with employees from
7 Monsanto, you wouldn't credit that testimony; is that
8 correct?
9     A. No, I think the -- the record is -- is clear
10 that he did have extensive interactions with Monsanto.
11 After all, one of the heads of the Washington office in
12 an email to colleagues said that, quote/unquote, "We
13 all know Jess," which certainly implied to me a level
14 of familiarity and comfort with communicating with
15 Rowlands about what's going on in the agency and in the
16 review, and, you know, I think that there's -- that the
17 record speaks for itself about the position that
18 Rowland took relative to the oncogenicity of glyphosate
19 and relative to the EPA's ongoing role in that
20 scientific assessment.
21    Q. So your opinion that Rowland and Monsanto had
22 extensive interactions is based entirely on Monsanto
23 Company emails rather than Mr. Rowland's testimony,
24 correct?
25         MR. LITZENBURG: Object to form.

Page 517

1     A. Well, there's certainly other -- other
2 evidence in the -- in the record. There was a letter
3 that a former EPA staff scientist wrote, a woman that
4 had worked with Rowland that pleaded with him to follow
5 the science in the -- in the CARC reassessment of
6 glyphosate oncogenicity and certainly implied that --
7 that this staff scientist colleague of Rowland was
8 not -- was not confident that the CARC review process
9 was going to be managed in a -- in a fair and
10 unbalanced way.
11    Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, have you
12 done anything to check for yourself with respect to the
13 authenticity of that letter that you're referring to?
14    A. I -- I certainly queried where it came from in
15 the record. I've heard no -- I'm not aware of any
16 information that suggests it was a fake or a figment of
17 someone's imagination. So, you know, I -- I have no
18 reason to question the fact that this woman actually
19 wrote the letter, so I take it at its word.
20    Q. Okay. But you haven't spoken to anyone at EPA
21 who reviewed the letter or the person who you claim
22 drafted the letter herself, you haven't spoken with any
23 of them, correct?
24    A. No, I haven't.
25    Q. And you're not aware of anybody having spoken

18 (Pages 514 to 517)

Charles Benbrook, Ph.D.
August 14, 2018

Page 518

1  with them, correct?
2      A. No, I'm not aware of conversations that were
3  had between this woman and her EPA colleagues.
4      Q. Do you claim that Mr. Rowland manipulated the
5  other scientists on the CARC to reach scientific
6  conclusions in order to benefit Monsanto rather than
7  because those scientists themselves believed that they
8  were the correct conclusions?
9      A. I don't think I wrote that. I think
10  Rowlands -- Rowlands clearly played a -- a direct role
11  in managing the CARC review process. I think he
12  concurred with the findings, and I can't speak to the
13  details of the internal debates that went on during the
14  meetings leading up to the -- to their final
15  determination.
16      Q. Okay. So you aren't willing to impugn the
17  character and the credibility of the 12 other
18  scientists who signed on to the CARC report; is that
19  correct?
20          MR. LITZENBURG: Object to form.
21      A. That's correct.
22      Q. (BY MR. HOLLINGSWORTH) Okay. But you are
23  willing to do that to Mr. Rowland?
24      A. If you interpret my statements and opinions
25  relative to his role in the process as impugning his

Page 519

1  character, then yes, I guess I would agree with that.
2      Q. Okay. But you agree also that the CARC panel
3  could not issue a report based on just one person's
4  signature, correct? They need the signature of
5  numerous scientists across the EPA, correct?
6      A. Yes.
7      Q. Okay. So -- but your statement is that
8  Mr. Rowland somehow convinced all these other
9  signatures that they should sign off on the
10  noncarcinogenicity of glyphosate despite some
11  scientific evidence showing otherwise. Is that your
12  testimony?
13      A. No.
14      Q. Do you know how long the process the CARC went
15  through with respect to glyphosate was?
16      A. Well, it was almost nonstop from 1985 to this
17  day. I mean, it's -- the issues around the
18  oncogenicity of glyphosate and glyphosate-based
19  herbicides is -- as you know, it's still -- it's still
20  ongoing. So the -- the CARC convened, has convened a
21  few times over the last 25 years to assess the
22  oncogenicity of glyphosate and the proper
23  classification of glyphosate and -- and that -- and no
24  doubt there will be future CARC meetings. So yeah, the
25  CARC has been in -- has been involved in that

Page 520

1  assessment process for -- for many years.
2      Q. That's fair. EPA is always reviewing the
3  science with respect to pesticides that are on the
4  market in the United States, correct?
5      A. Yes.
6      Q. Do you know how many scientists on the CARC
7  panel specialize in epidemiology evidence?
8      A. I don't remember.
9      Q. Do you know how many scientists on the CARC
10  panel specialize in animal toxicology?
11      A. Certainly several of them.
12      Q. Do you know how many scientists on the CARC
13  panel specialize in exposure assessment?
14      A. No, I don't.
15      Q. But there's certainly going to be experts from
16  across the EPA with respect to the different bodies of
17  science that are relevant to assessing cancer risk,
18  correct?
19      A. I would agree with that, yes.
20      Q. And Mr. Rowland is just one of those experts
21  on the CARC panel, correct?
22      A. Correct.
23      Q. Did you talk to anyone on the CARC or at EPA
24  about what guidelines the CARC may have violated?
25      A. No.

Page 521

1      Q. Do you have knowledge of the communications
2  between members of the CARC on glyphosate either during
3  their review or afterwards?
4      A. Well, only to the extent that the CARC
5  deliberations are described in their report.
6      Q. Do you have -- so you haven't spoken with
7  anybody on the panel?
8      A. Correct.
9      Q. Okay. Do you have -- strike that.
10          How do you get chosen to serve on a cancer
11  assessment peer review committee?
12      A. I don't -- I don't know much about the EPA
13  process that they follow, but I'm sure they have one.
14      Q. In your long career you've never been asked to
15  serve on a CARC panel, correct?
16      A. Correct.
17      Q. In your long career have you been asked to
18  serve on any EPA panels?
19      A. No.
20      Q. You have a lot of opinions about what EPA
21  should or should not be doing, but just to be clear,
22  you aren't one of those people, correct?
23      A. Correct.
24      Q. Are you aware that Mr. Rowland retired from
25  EPA in May of 2015?

19 (Pages 518 to 521)

HIGHLY               Charles Benbrook, Ph.D.            HIGHLY
CONFIDENTIAL              August 14, 2018           CONFIDENTIAL

Page 522

1    A. I -- I know that he retired around that time.
2    Q. Okay. Are you aware that he retired due to
3  bladder cancer?
4    A. No.
5    Q. Okay. Given Mr. Rowland retired in May of
6  2015, he certainly wasn't responsible for the September
7  2016 OPP-issued paper on the carcinogenic potential of
8  glyphosate, correct?
9    A. Well, other than the fact that the 2016 paper
10  and the more recent 2017 paper cover the same body of
11  science in a very similar way, these EPA documents
12  evolve in an iterative way and -- and often much of the
13  content of a new version of a -- of a health risk
14  assessment of glyphosate, as an example, is -- is very
15  similar to if not verbatim what appears in an earlier
16  document.
17    Q. Right. But the carcinogenic issue papers on
18  glyphosate are over 200 pages, and the CARC report is
19  just one of the numerous citations within that report
20  with respect to glyphosate and carcinogenicity,
21  correct?
22    A. Yes, sir.
23    Q. So Jess Rowland certainly wasn't responsible
24  for the 2017 OPP-issued paper on the carcinogenic
25  potential of glyphosate, correct?

Page 523

1    A. Correct.
2    Q. And Jess Rowland wouldn't be responsible for
3  whatever final decision with respect to glyphosate's
4  registration review that the EPA comes out with?
5    A. Correct.
6    Q. Do you want to take a break?
7    A. I'm all right.
8    Q. Okay.
9    A. I might get some more water at some point.
10    Q. Go ahead and get some more water right now.
11  Sorry about that, Dr. Benbrook. Sir, let's pull out
12  your report again.
13    A. Okay.
14    Q. And section -- I guess it's VI D.
15    A. How about a page and a paragraph?
16    Q. Yeah, looks like it starts at 151.
17    A. Okay. Section D, Attacks on scientists or
18  organizations producing adverse data on glyphosate?
19    Q. Sorry. I think it starts at 135, that's where
20  VI D starts.
21    A. 135?
22    Q. Page 135, sorry about that.
23    A. It's all right. We're talking about
24  ghostwriting?
25    Q. Yeah, that section's titled Monsanto Reliance

Page 524

1  on Ghostwriting. Correct?
2    A. Yes, sir.
3    Q. Okay. And you claim to be an expert on
4  ghostwriting, correct?
5    A. I suppose, yes.
6    Q. If EPA has the primary studies available to
7  it, then EPA conducts its own systematic review of
8  those studies and comes to its own conclusions, they do
9  that rather than relying on a review article, correct?
10    A. Well, certainly a review article in the -- in
11  the peer-reviewed literature wouldn't be the primary
12  basis of EPA judgment on an individual study for which
13  they have all the raw data, no.
14    Q. You're familiar with EFSA, correct?
15    A. Yes.
16    Q. And you're familiar with the European
17  commission, correct?
18    A. Yes.
19    Q. Okay. You've reviewed generally EFSA's review
20  of glyphosate for its carcinogenicity, correct?
21    A. Yes, the -- certainly the more recent ones.
22    Q. Okay.
23        MR. HOLLINGSWORTH: Let's mark Exhibit
24  8.
25        COURT REPORTER: 7.

Page 525

1        MR. HOLLINGSWORTH: 7.
2        (Deposition Exhibit 7 was
3          marked for identification.)
4    Q. (BY MR. HOLLINGSWORTH) Sir, are you familiar
5  with this EFSA statement regarding the EU assessment of
6  glyphosate and the so-called Monsanto papers? I
7  believe we went over that in your last deposition a
8  little bit.
9    A. Yes, sir.
10    Q. Okay. So the EU commission wants EFSA to
11  conduct an investigation and respond to four questions
12  it has on the matter of ghostwriting potentially
13  impacting the regulatory review of glyphosate, correct?
14    A. In general, yes, that's the goal here.
15    Q. Okay. And EFSA came out with this publication
16  that generally provides their statement with response
17  to those allegations about the Monsanto papers,
18  correct?
19    A. Correct.
20    Q. Okay. The first question you'll see noted in
21  the first bullet point on page 1 that the European
22  commission has for EFSA is, quote: What impact the
23  allegations about Monsanto ghostwriting scientific
24  review articles would have on the overall EU assessment
25  of glyphosate if they were confirmed.

20 (Pages 522 to 525)

Page 526

1     Do you see that?
2     A. Yes, sir.
3     Q. Yeah. So EFSA is investigating the question
4  of whether even if these publications were ghostwritten
5  by Monsanto, would the fact that they were ghostwritten
6  have an impact on EFSA's assessment of glyphosate,
7  correct?
8     **A. Yes, that's what it states.**
9     Q. Okay. But they first answer a few ancillary
10 questions about scientific review papers and the role
11 those types of papers play in the regulatory assessment
12 process, correct?
13    **A. Correct.**
14    Q. Turn to page 2. EFSA talks about a guidance
15 document there in the first section. It says: An EFSA
16 guidance document on the submission of scientific
17 peer-reviewed open literature.
18    Do you see that?
19    **A. Are we in the section How Member State and**
20 **EFSA experts --**
21    Q. It's right above that, sir, in the first
22 paragraph there.
23    **A. Okay. All right. Let me read it, please.**
24    Q. Sure.
25    **A. (Witness reading document.) Okay. I read the**

Page 527

1  paragraph.
2     Q. If you look at this -- this document at page 2
3  it notes that the open literature guidance document
4  also provides instructions on how to minimize bias in
5  the identification, selection and inclusion of
6  peer-reviewed open literature and dossiers according to
7  the principles of systematic review.
8     Do you see that?
9     **A. Yes.**
10    Q. So EFSA has guidance in place sort of like the
11 EPA guidance that we talked about earlier for its
12 regulatory employees with respect to how to
13 systematically and appropriately review and determine
14 the reliability of these open literature studies,
15 correct?
16    **A. Correct.**
17    Q. If you turn to page 3 there's a section down
18 there at the bottom titled Open Scientific Literature.
19 Do you see that?
20    **A. Yes, I do.**
21    Q. It breaks up the dossier. Just to be clear,
22 the dossier is a regulatory file for pesticide
23 registration review, correct?
24    **A. Correct.**
25    Q. It notes: There are different types of

Page 528

1  scientific publications in the open literature that may
2  contain relevant information.
3     Do you see that?
4     **A. Yes.**
5     Q. Okay. Then it distinguishes between two
6  different types of studies. The first one is numbered
7  1, and that's original studies, and the second one is
8  numbered 2, that's scientific review papers, do you see
9  that?
10    **A. Correct.**
11    Q. Okay. And how is an original study different
12 from a scientific review paper?
13    **A. An original study reports on the purpose of a**
14 **particular study, the questions that the scientists are**
15 **trying to resolve or the hypothesis they're trying to**
16 **develop evidence in support of or -- or against and**
17 **typically focuses on one particular study or a cluster**
18 **of related studies on a particular agent or -- or**
19 **issue. Some original studies can also include**
20 **meta-analyses of epidemiological evaluations where data**
21 **from several different cohorts or -- or studies are**
22 **pooled together. But in general, under Number 1, the**
23 **focus is on a distinct scien -- piece of scientific**
24 **work that strives to generate new insights into some**
25 **phenomena.**

Page 529

1     **Number 2 refers to review papers that try to**
2  **integrate and summarize the -- a body of literature**
3  **addressing a particular topic on which many studies**
4  **have provided evidence. So there -- the review papers**
5  **typically don't report any original research results**
6  **but rather try to integrate and summarize the results**
7  **of existing published studies or studies that are**
8  **submitted to regulatory agencies by registrants.**
9     Q. Okay. So in general, an original study is a
10 study focusing on a distinct piece of scientific work
11 that strives to generate new insights or new data into
12 some phenomena, correct?
13    **A. Yeah, correct.**
14    Q. And a review article is, in general, a body of
15 literature. It's -- it's a -- it's a review paper that
16 tries to integrate and summarize a body of literature
17 addressing a particular scientific topic, correct?
18    **A. Yes.**
19    Q. Okay.
20    VIDEO OPERATOR: Excuse me, Counsel. We
21 have about four minutes left on Media Number 1.
22    MR. HOLLINGSWORTH: Okay, thank you.
23    Q. (BY MR. HOLLINGSWORTH) And the EFSA
24 publication here makes it clear that the Monsanto
25 papers that were allegedly ghostwritten are all review

21 (Pages 526 to 529)

HIGHLY                  Charles Benbrook, Ph.D.                  HIGHLY
CONFIDENTIAL                  August 14, 2018                  CONFIDENTIAL

Page 530

1  papers, correct?
2      A.  Yes.  That's what they -- that seems to be the
3  implication of this Point Number 2.
4      Q.  Okay.  And there are not any scientific
5  publications in your report that you -- that you allege
6  are ghostwritten that are properly categorized as
7  original studies, correct?
8      A.  Not -- no, I don't recall any.
9      Q.  Okay.  If you turn to page 4?
10     A.  Okay, I'm there.
11     Q.  It notes -- I guess it would be the second
12  paragraph that starts "as regards."
13     A.  I see it, yeah, third line.
14     Q.  In there it says:  As regards the second type
15  of publication mentioned above, scientific review
16  papers, the weight of review papers is very limited in
17  the overall risk assessment because member state and
18  EFSA experts have access to, and rely primarily on, the
19  original safety studies themselves to verify the
20  interpretation of the authors and to produce their
21  final conclusions.
22      Do you see that?
23     A.  Yes.
24     Q.  And you're aware that regulators such as EFSA
25  put very limited weight on scientific review papers,

Page 531

1  correct?
2      A.  In general, yes.
3      Q.  And that makes sense, right?  If a regulator
4  has access to the primary document, then it will want
5  to confirm for itself that the studies and the data
6  within those studies, what that stuff says, rather than
7  what a summary of those studies say, correct?
8      A.  In general, that's -- that's true.
9      Q.  It goes on to note:  Some review papers are
10  based exclusively on publicly available information.
11      You're aware of that, correct?
12     A.  Yes.
13     Q.  Okay.  That would apply, for example, to the
14  glyphosate epidemiology review publication by Intertek,
15  right?  All of those epidemiology publications
16  discussed in that review paper were publicly available,
17  right?
18     A.  Yep, I agree, I think that's true, yeah.
19     Q.  Okay.  A few sentences down it notes:  Where
20  review studies are based on unpublished industry
21  studies it is clear that the author's work has been
22  facilitated by industry as it is only through that
23  connection that authors would be able to access
24  unpublished results.
25      Do you see that?

Page 532

1      A.  Yes.
2      Q.  Okay.  So regulators like EFSA are clearly
3  aware that a review paper discussing unpublished
4  industry data had been facilitated by industry, right?
5      A.  Correct.
6      Q.  That would apply to publications like Kier and
7  Kirkland 2013 as well as the Greim 2015 publication,
8  correct?
9      A.  Yeah, sure.
10     Q.  Going down a paragraph there is an italicized
11  heading titled Concluding Remarks on How EU Experts
12  Ascertain the Reliability of Studies During the Peer
13  Review Process.
14      Do you see that?
15     A.  I do see that.
16     Q.  It notes:  It is not unusual for member state
17  and EFSA experts to disagree with industry on how the
18  results that the studies that they submit in the
19  dossiers should be interpreted for the risk assessment.
20      Do you agree with that general proposition?
21     A.  Yes.
22     Q.  Does the same apply to your understanding of
23  the interaction between EPA and US industry?
24     A.  Yes.
25     Q.  If you go down to the last paragraph, it

Page 533

1  provides EFSA's conclusion.  Do you see that?
2      A.  Starting with "there is no"?
3      Q.  Correct.
4          VIDEO OPERATOR:  Excuse me, Counselor.
5          MR. HOLLINGSWORTH:  Oh.
6          VIDEO OPERATOR:  One minute.
7          MR. HOLLINGSWORTH:  Let's go off the
8  record.  I'm sorry.  I forgot.
9          VIDEO OPERATOR:  We're going off the
10  record.  This is the end of Media Number 1.  The time
11  now is approximately 9:48 a.m.
12          (Recess taken.)
13          VIDEO OPERATOR:  This is the beginning
14  of Media Number 2.  We're going back on the record.
15  The time now is approximately 9:55 a.m.
16     Q.  (BY MR. HOLLINGSWORTH)  Dr. Benbrook, we're
17  discussing this EFSA statement regarding the EU
18  assessment of glyphosate and the so-called Monsanto
19  papers, correct?
20     A.  Yes.
21     Q.  Okay.  And if you go down to this last
22  paragraph in the concluding remarks section it starts
23  with "There is no information," do you see that?
24     A.  Yes.
25     Q.  And it's:  There is no information contained

22 (Pages 530 to 533)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                 August 14, 2018                    CONFIDENTIAL

Page 534

1   within the Monsanto papers or that EFSA is otherwise
2   aware of that indicates that industry attempted to
3   falsify or manipulate the findings and raw data of the
4   regulatory guideline studies used in the glyphosate
5   assessment.
6       Do you see that?
7   A. Yes.
8   Q. So EFSA determined that Monsanto did not
9   attempt to falsify or manipulate any of the findings
10  and raw data found in the primary studies in their
11  review publications, correct?
12  A. That's what it states, yeah.
13  Q. Okay. And you're not aware -- have you
14  conducted any independent analysis or investigation
15  like EFSA has to determine that Monsanto did not
16  attempt to falsify or manipulate any of the findings or
17  raw data in the primary studies they relied upon for
18  glyphosate's registration?
19  A. Well, I -- I would have no basis to be able to
20  do that, no, so of course not.
21  Q. So you're not aware of Monsanto having
22  falsified or manipulated any of the raw data in its
23  primary studies on which these review publications are
24  based, correct?
25  A. I'm not aware of any such information pointing

Page 535

1   to such manipulation.
2   Q. Okay. If you go to the next page, there's a
3   section titled Details of the Scientific Review
4   Articles Mentioned --
5   A. Are we on page 5 now?
6   Q. Correct. Do you see the section titled
7   Details --
8   A. Oh, sure, yeah.
9   Q. Okay. So the various review papers that you
10  and others allege were ghostwritten, only two of them
11  are considered in this EU assessment of glyphosate,
12  correct?
13  A. Correct.
14  Q. And that's Kier and Kirkland 2013, Williams
15  2000, correct?
16  A. Correct.
17  Q. Okay. Just above the bulleted section it
18  notes: Following this investigation EFSA can confirm
19  that even if the allegations regarding ghostwriting
20  prove to be true there would be no impact on the
21  overall assessment as presented in the EFSA conclusion
22  on glyphosate.
23      Do you see that?
24  A. Yes.
25  Q. Okay. Were you aware that the European

Page 536

1   regulatory group conducted this investigation of the
2   allegedly ghostwritten Monsanto studies and determined
3   that even if they were ghostwritten it would have no
4   impact on their regulatory assessment and conclusions
5   on glyphosate's carcinogenicity?
6   A. Yes, I was aware of that.
7   Q. Okay. Did you talk to anyone at EFSA about
8   this investigation?
9   A. No.
10  Q. Okay. If you look at the bullets, the first
11  one says: The two review articles in question are an
12  analysis of regulatory guideline studies already
13  included in the applicant's dossier. The weight of
14  these two review papers in the overall scientific
15  assessment of glyphosate was therefore very limited
16  because EU experts had access to and relied primarily
17  on the findings of the original guideline studies and
18  the underlying raw data to produce their own
19  conclusions.
20      So EFSA is saying there with respect to the
21  glyphosate review articles that they are of very
22  limited value because they had reviewed the underlying
23  primary studies on glyphosate, correct?
24  A. That's what they state, yes.
25  Q. The next bullet says: Notwithstanding the

Page 537

1   fact that these two review papers might have been
2   ghostwritten by Monsanto, their provenance was evident
3   from the Declarations of Interest and Acknowledgements
4   in the papers themselves. For example, the Kier and
5   Kirkland paper states that the authors were paid by the
6   glyphosate task force to carry out the review and the
7   Williams, et al., paper acknowledges that Monsanto
8   facilitated the authors' work by providing them with
9   original and unpublished studies.
10      Do you see that?
11  A. Yes.
12  Q. Okay. EFSA states that their experts were
13  under no illusion about the links between the study
14  authors and the companies that funded or facilitated
15  their work when the experts carried out this risk
16  assessment.
17      Do you see that?
18  A. Yes, I do.
19  Q. Okay. So EFSA very clearly states here that
20  first off, the review papers you allege were
21  ghostwritten were of very little weight to their
22  scientific review of glyphosate and that they were
23  entirely clear and certain about Monsanto's involvement
24  with those review papers, correct?
25  A. I wouldn't agree that it was entirely clear

23 (Pages 534 to 537)

Page 538

1   what Monsanto's involvement was because Monsanto
2   scientists that contributed substantially to the papers
3   as coauthors were not listed as coauthors.
4       Q.  As it pertains to EFSA's review of the papers
5   in question, the only thing that's important is whether
6   they are aware that the work is or is not associated
7   with Monsanto.  Wouldn't you agree with that?
8       A.  That's certainly one of the things that's
9   important, but I think the veracity of all of -- of the
10  information, whether it's registrant commission studies
11  submitted to EFSA or EPA or scientific papers in the
12  open literature, the -- it is important that the
13  individuals responsible for writing the papers are --
14  are accurately identified.  This is a -- a primary
15  pillar of the integrity of the peer-reviewed scientific
16  literature and I -- you know, I think that -- I think
17  if EFSA is -- is acknowledging that they are aware that
18  Monsanto and Monsanto scientists contributed
19  significantly to the studies by making available the
20  results, but what is not appropriately acknowledged in
21  the Kier and Kirkland and Greim paper and several other
22  ghostwritten papers is the extent to which the
23  interpretation of the studies and the general
24  conclusions about a body of studies were, in fact,
25  written by Monsanto scientists to reflect Monsanto's

Page 539

1   view of the literature.  That is the -- the aspect of
2   these ghostwritten studies that is of great concern to
3   many people.
4       Q.  Right.  But Greim 2015 cannot be ghostwritten,
5   sir, because Dr. Saltmiras is an author on that paper
6   and explicitly references that he's associated with
7   Monsanto, correct?
8       A.  I believe that's correct.  Do you have the
9   Greim paper with you?  I don't remember the list of
10  authors.
11      Q.  We've gone over it previously at other
12  depositions.
13      A.  Okay.
14      Q.  I don't want to --
15      A.  Okay.
16      Q.  -- waste your time on that.
17      A.  All right.
18      Q.  So what EFSA is saying here is that EFSA
19  experts were under no illusion about the link between
20  the study authors and the companies that funded or
21  facilitated their work when the experts carried out
22  their risk assessment.  So whether it's funded or
23  facilitated by Monsanto, EFSA is fully aware of the
24  connection with respect to these review papers you
25  claim are ghostwritten, correct?

Page 540

1       A.  Yeah, that's a fair statement.
2       Q.  Okay.  I want to look at a Roundup ProMax
3   label.  You're familiar with Roundup ProMax, right,
4   Doctor?
5       A.  In general, yes, it's one of the branded
6   products sold by Monsanto.
7           (Deposition Exhibit 8 was
8           marked for identification.)
9       Q.  (BY MR. HOLLINGSWORTH)  Dr. Benbrook, you
10  reviewed glyphosate-based herbicide labels like this,
11  not this exact one before, correct?
12      A.  Yes.
13      Q.  Okay.  At page -- paragraph 34 of your report?
14      A.  34?
15      Q.  Yes, sir.
16      A.  Okay, getting there.
17      Q.  Paragraph 34, not page.
18      A.  Okay.
19      Q.  There you note that the responsibility to warn
20  and mitigate extends to the full range of foreseeable
21  circumstances and situations in which a pesticide label
22  can be applied in accord with the directions on the
23  label.  There's no citation for that statement,
24  correct?
25      A.  Yeah, you misread it.  It's in which a

Page 541

1   pesticide can be applied.  You said in which a
2   pesticide label can be applied, but I -- I understand
3   what you're getting at.
4       Q.  Okay.  There's no citation for that statement,
5   correct?
6       A.  Correct.
7       Q.  Okay.  What is the basis for that opinion?
8       A.  The responsibility of the registrant to
9   provide sufficient label directions for users of a
10  pesticide product to assure that there are no
11  unreasonable adverse effects on man and environment and
12  that when the pesticide is used in accord with the
13  label, EPA has reason to believe that there won't be
14  any adverse effects on human health or the environment.
15      Q.  Right.  But it's with respect to the pesticide
16  itself, correct?
17      A.  Yes.
18      Q.  Okay.  Because you cite as examples a leaky
19  hose spitting on a backpack sprayer.  Is it your
20  contention that a pesticide company has a duty to warn
21  that a defect may occur with another product that it
22  does not manufacture or sell?
23      A.  Well, for -- for any common application
24  method, it's certainly important for the registrant to
25  address what a user should do or be aware of in the

24 (Pages 538 to 541)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  August 14, 2018                   CONFIDENTIAL

Page 542

1    event of common and unavoidable exposures of which
2    people using backpack sprayers do sometimes experience
3    these exposure episodes by the very nature of the way
4    that the product is being applied.
5        Q. Okay. But can you point to any regulation or
6    EPA guidance documents that provide support for the
7    claim that a pesticide company has a duty to warn for
8    defects that may occur with some other product beside
9    the pesticide that's at issue?
10       A. "Some other product." I don't understand your
11   question.
12       Q. Sure. Do you have any -- are you aware of any
13   regulation or other EPA guidance documents that provide
14   support that a backpack sprayer manufactured by another
15   company -- that Monsanto has a duty to warn for defects
16   that may occur with some other product besides Roundup?
17       A. Oh, I understand your question now. No.
18       Q. You cite as one example of the duty to warn
19   application on a windy day. Do you recall that?
20       A. Yes.
21       Q. Okay. Is it your contention that Monsanto did
22   not warn about the use of glyphosate-based herbicides
23   on a windy day?
24       A. It didn't warn in the directions to
25   applicators relative to minimizing their exposure and

Page 543

1    risks from use of the pesticide. There are provisions
2    in the label that govern when it's appropriate and
3    inappropriate to make an application based on the wind
4    velocity.
5        Q. Right. If you turn to page 2 of the label,
6    under the "attention" word on the right column?
7        A. Page 2, attention?
8        Q. Yeah, in the right-hand column.
9        A. Okay, got it.
10       Q. It says: Avoid drift. Do you see that?
11       A. Yes.
12       Q. And then below that in the next paragraph it
13   states: The likelihood of injury occurring from the
14   use of this product increases when winds are gusty, as
15   wind velocity increases, when wind direction is
16   constantly changing or when there are other
17   meteorological conditions that favor spray drift. When
18   spraying, avoid combination -- do you see that?
19       A. Yes.
20       Q. So Monsanto's label here for Roundup ProMax is
21   certainly a warning about the use of the product in
22   windy conditions, correct?
23       A. Yes.
24       Q. Okay. And it's saying actually that the
25   product can be more dangerous when used in windy

Page 544

1    conditions, correct?
2        A. Well, I think the implication is clear that in
3    windy conditions the likelihood of exposures increases,
4    yes.
5        Q. Okay. So you certainly cannot say that
6    Monsanto didn't warn of increased exposures when it's
7    windy outside, correct?
8        A. That's true, yes.
9        Q. Okay. The next sentence says: When spraying,
10   avoid combinations of pressure and nozzle type that
11   will result in splatter of -- or fine particles, in
12   parenthesis mist, that are likely to drift. Avoid
13   applying at excessive speed or pressure.
14       Do you see that?
15       A. Yes.
16       Q. So that is a part of the label where Monsanto
17   is warning about how to apply the pesticide in a way
18   that avoids drift, correct?
19       A. That's certainly the intent, yes.
20       Q. Okay. And specifically, Monsanto warns that
21   you should use specific pressures and nozzles that will
22   reduce any chance of drift, correct?
23       A. Correct.
24       Q. Okay. And if you go to the directions of use
25   on the left column?

Page 545

1        A. Yes.
2        Q. Second paragraph there states: Do not apply
3    this product in a way that will contact workers or
4    other persons, either directly or through drift.
5        Do you see that?
6        A. Yes.
7        Q. So Monsanto certainly warns that the product
8    should not be applied in a way that will lead to
9    contact with workers applying it either directly or
10   through drift, correct?
11       A. Is this a -- is this an agricultural label or
12   an IT&O label?
13       Q. Well, it's a label in which glyphosate is 48.7
14   percent active ingredient.
15       A. Okay. So just let me look at it, please. So
16   Section 8 identifies a number of nonagricultural use
17   sites and so I'm assuming somewhere in here it's going
18   to talk about hand-held sprayers and backpack sprayers.
19       Q. So to answer my question, Monsanto certainly
20   warns that the product should not be applied in a way
21   that will lead to contact with workers applying it
22   either directly or through drift, correct?
23       A. I think it -- will contact workers or other
24   persons, you know, in an agricultural setting, I'm
25   guessing that would be farm workers or people in and

25 (Pages 542 to 545)

Charles Benbrook, Ph.D.
August 14, 2018

Page 546

1  around the field that -- that's treated.  In these
2  other settings, you know, I suppose it could be a
3  variety of different workers.  The -- the steps that
4  the actual applicator should take will be -- are
5  spelled out in the -- I'm sure in the section on
6  personal protective equipment, which is on the first
7  page of the label under 3.1, hazards to humans and
8  domestic animals.
9      Q.  Right.  And with respect to agricultural use
10  requirements there's a box right below there that
11  states -- that discusses some of the PPA -- PPE
12  required for those agricultural uses, correct?
13     A.  Yes.
14     Q.  And it notes that PPE required for early entry
15  to treated areas includes coveralls, shoes plus socks
16  and chemical-resistant gloves made of any waterproof
17  material.  Do you see that?
18     A.  Yes.
19     Q.  Okay.  So Monsanto provides for instances in
20  which there is increased PPE required for certain uses,
21  correct?
22     A.  Well, for people entering treated areas, yeah,
23  that's what this refers to.
24     Q.  So Monsanto certainly considered increased
25  exposure with respect to treated areas and provided for

Page 547

1  a warning on the label that speaks to that increased
2  exposure, correct?
3      A.  There is -- there is some discussion of that
4  and some provisions of the label that are intended to
5  both warn and try to mitigate potentially risky
6  exposures, yes.
7      Q.  If you go to the first page -- sorry to work
8  backwards here.
9      A.  It's all right.
10     Q.  It discusses some more of the -- there's a
11  user safety recommendation box?
12     A.  Yes.
13     Q.  And there's a warning that states:  Users
14  should wash hands before eating, drinking, chewing gum,
15  using tobacco or using the toilet.
16         So is that another example wherein Monsanto
17  has provided a warning to try to mitigate potentially
18  risky exposure scenarios?
19     A.  Correct.
20     Q.  Okay.  The next one states:  Remove clothing
21  immediately if pesticide gets inside then wash
22  thoroughly and put on clean clothing.
23         Okay.  So is that another instance in which
24  the Roundup ProMax label provides a warning with
25  respect to mitigating potentially risky exposure

Page 548

1  scenarios?
2      A.  It is an attempt in that direction, yes.
3      Q.  Okay.  And Monsanto also provides various
4  numbers that a user of the product can call at any time
5  day or night if they have any sort of exposure issue
6  associated with the herbicide, correct?
7      A.  Yes, for emergency medical treatment
8  information.
9      Q.  Okay.  You can put that aside, sir.
10         Can you provide any other, quote, foreseeable
11  circumstances that you talk about in your expert report
12  besides the two you note in parentheses there in
13  paragraph 34 that you claim a manufacturer has a duty
14  to warn about?
15     A.  Do I discuss anything else in the -- in the
16  report?
17     Q.  Do you have any other foreseeable
18  circumstances besides the leaky hose spitting on a
19  backpack sprayer or application on a windy day that you
20  claim a manufacturer is under the duty to warn about?
21     A.  I think the -- there certainly is several
22  items.  There is what PPE is required, personal
23  protective equipment, PPE, is required on the label,
24  the steps that a mixer/loader or applicator should take
25  in the event of a -- of a significant exposure, whether

Page 549

1  it's from wind and drift or a leaky hose.  That's a
2  important area of providing clear instructions and
3  guidance to applicators.
4         The management of heavily contaminated
5  clothing after an exposure episode is another area
6  where what's on the ProMax label and other labels is
7  not in accord with the -- certainly the recommendations
8  of EPA at various points for managing the -- such
9  heavily contaminated clothing.
10         So -- and then there's, you know, certainly
11  other aspects of particular use patterns, specific use
12  patterns that are important to provide clarity about
13  the steps that users should take.  An example would be
14  the addition on various labels in the United Kingdom
15  when Roundup formulations are being sprayed in trees
16  where the direction of the spray is upward.  The --
17  there's a need in that type of application scenario for
18  more extensive protection of the -- the face and head
19  area.
20         So it's -- there are some unique exposure
21  scenarios that occur with specific uses.  The tree and
22  stump use, again, is different from other ones and
23  there might be -- and there often is some sort of
24  specialized either precautions or steps that
25  applicators should -- should take.

26 (Pages 546 to 549)

HIGHLY        Charles Benbrook, Ph.D.        HIGHLY
CONFIDENTIAL        August 14, 2018        CONFIDENTIAL

Page 550

1       And so it -- it's a -- because of the vast
2 number of -- of uses of different Roundup products,
3 there are a variety of worker protection provisions and
4 steps that are -- that need to be taken to avoid
5 excessive exposures.
6      Q. Right. But this Roundup ProMax label and
7 other labels would be in accord with the recommendation
8 of the EPA at the time that the label was approved,
9 correct?
10      A. Yes.
11      Q. You've heard of the phrase "spot treatments,"
12 correct?
13      A. Yes.
14      Q. What is a spot treatment?
15      A. It's a treatment of a limited spatial area
16 where a particular pest is known to exist and it's a --
17 spot treatments are made in an effort to reduce the
18 overall use of pesticides and to reduce costs. If
19 treating one acre out of a ten-acre field is effective
20 in controlling a pest that's just on one acre, it makes
21 sense both in terms of the cost to the farmer or the --
22 or the pest management company as well as the
23 environment and human health to just treat the one acre
24 as opposed to the ten.
25      Q. So with respect to a backpack sprayer or a

Page 551

1 hand-held sprayer, spot treatment would be where you
2 target a specific weed with an applicator wand or the
3 spray, and you spray the pesticide just on that weed
4 and not the surrounding area; is that correct?
5      A. That would be an example of a -- of a spot
6 treatment, yes.
7      Q. Okay. When using a pesticide application
8 wand -- - do you call it that?
9      A. Sure.
10      Q. When using a pesticide application wand that's
11 associated with the backpack sprayer or some sort of
12 pump sprayer and you use it -- you use it as indicated
13 on the label, there should be minimal opportunity for
14 exposure, correct?
15      A. Well, certainly that's the hope, yes, that's
16 the hope, but that's not always the case.
17          MR. HOLLINGSWORTH: Can we go off the
18 record for a second?
19          VIDEO OPERATOR: Yes. Going off the
20 record. The time now is approximately 10:21 a.m.
21          (Discussion off the record.)
22          VIDEO OPERATOR: Going back on the
23 record. The time now is approximately 10:22 a.m.
24      Q. (BY MR. HOLLINGSWORTH) Sir, you don't
25 actually believe that EPA would refuse to change a

Page 552

1 glyphosate cancer classification from Category E to
2 Category D or C based on the fact that it has
3 repeatedly determined glyphosate is not carcinogenic
4 since 1991, do you? I can restate it if you like.
5      A. Yeah, that's kind of a convoluted question.
6 Break it down.
7      Q. Dr. Benbrook, you've testified previously and
8 the records show that EPA has repeatedly classified
9 glyphosate as not likely to be carcinogenic since 1991,
10 correct?
11      A. Correct.
12      Q. And that's a Category E determination,
13 correct?
14      A. Yes.
15      Q. And there's Category A through E with respect
16 to the EPA cancer guidelines for which a -- EPA can
17 classify a chemical as carcinogenic, correct?
18      A. Correct.
19      Q. Category A would be the most carcinogenic and
20 Category E would be the least carcinogenic, correct?
21      A. Correct.
22      Q. Okay. You don't actually believe that EPA
23 would refuse to change the glyphosate cancer
24 classification from Category E downgrading it to
25 Category C or B?

Page 553

1      A. You mean downgrading or up -- well, I suppose
2 it depends on your perspective, but you just change the
3 classification.
4      Q. Yeah, let me restate it. You don't actually
5 believe that EPA would refuse to change the glyphosate
6 cancer classification from Category E to something else
7 based on the fact that it has repeatedly determined
8 that glyphosate is noncarcinogenic since 1991, do you?
9      A. I -- I really don't understand your question.
10 I mean -- you're asking do I believe that they --
11 whether they would or would not change the
12 classification based on the fact that they've
13 classified it in a particular way?
14      Q. Correct. Want me to ask it again?
15      A. Yeah, I don't understand the question.
16      Q. Okay. Do you believe that -- that the EPA
17 would change glyphosate's cancer classification from E
18 to C or B or A even though it has classified it as
19 Category E from 1991 forward?
20      A. EPA is certainly free to change its
21 classification at any time if it feels that it has a
22 reason to do so, and I -- I think another critical
23 point in -- in this case and the other cases that --
24 that are arising as part of this litigation is the fact
25 that different -- different people face significantly

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  August 14, 2018                   CONFIDENTIAL

Page 554

1  different levels of exposure to Roundup herbicides, and
2  the level of cancer risk is -- is certainly related to
3  the level of exposure.  And I have opined in my report
4  that for certain of the high-exposure scenarios such as
5  backpack sprayers and hand-held sprayers, it would --
6  it would have been appropriate and even consistent with
7  EPA's classification of glyphosate after 1991 as not
8  likely to be a human carcinogen for the general public,
9  that -- that a warning of both oncogenicity, risk of
10 oncogenicity and genotoxicity for -- at mixer/loaders
11 and applicators in high-exposure scenarios would not
12 only be appropriate but was important to -- to assure a
13 level of care in -- in reducing exposures.
14     Q.  Right.  But with respect to the cancer
15 classification, if new science tipped the weight of the
16 evidence and showed that glyphosate-based herbicides
17 were carcinogens, the EPA would certainly protect the
18 American public and change the cancer classification if
19 necessary, right?
20     A.  I would suspect so, yes.
21     Q.  And with respect to there being a different
22 cancer classification with respect to a certain
23 pesticide, maybe a pesticide like glyphosate having
24 Category E for one method of application or one group
25 of people and then Category C for people who are more

Page 555

1  exposed, are you with me?
2      A.  Uh-huh.
3      Q.  Do you know of any other pesticide in the
4  country where it has -- the pesticide has two different
5  cancer classifications, that is, one for less-exposed
6  people and one for more-exposed people?
7      A.  No.
8      Q.  Okay.  You're aware that EPA has downgraded
9  pesticides from Category E, evidence of
10 noncarcinogenicity, before, right?
11     A.  Downgraded pesticides to Group E before, is
12 that what you mean?
13     Q.  No.  Let me re-ask it.  You're aware that EPA
14 has initially labeled pesticides as Category E and then
15 changed their classification to something that
16 indicates it is more carcinogenic.  You're aware of
17 that, correct?
18     A.  Correct.
19     Q.  And with respect to glyphosate, EPA hasn't
20 done that, correct?
21     A.  Correct, not since 1991.
22     Q.  EPA has never changed glyphosate from a
23 Category E to something less, in your opinion; isn't
24 that correct?
25     A.  Well, technically that's correct.  The 1985

Page 556

1  classification as a possible human carcinogen was done
2  at a time when the classification was insufficient
3  evidence to classify because of the absence of valid
4  two-year chronic feeding studies.
5      Q.  And the Category C classification in 1985,
6  that was done pursuant to the 1986 proposed guidelines
7  on carcinogenic risk assessment, correct?
8      A.  Well, the current form of them, yes.
9      Q.  There were no guidelines that contained A
10 through E categories with respect to carcinogenic risk
11 assessment before the 1986 proposed guidelines,
12 correct?
13     A.  Right.  They changed the terminology, but
14 from -- you know, functionally the categories were --
15 were very similar.
16     Q.  So when you say EPA initially categorized
17 glyphosate as Category C, that's just with respect to
18 the 1986 proposed guidelines, correct?
19     A.  Correct.
20     Q.  So to say that EPA will not downgrade a cancer
21 classification from Category E to something below
22 Category -- like Category B, that just isn't true,
23 right?
24     A.  I don't understand your use of the word
25 "downgrade."

Page 557

1      Q.  I'm sorry.  To say that EPA will not change
2  their classification of a pesticide from Category E to
3  something like Category C, Category B, that just isn't
4  true, is it?
5      A.  Yeah, and I never made that statement.  I
6  don't know what -- I don't know why you're asking that.
7      Q.  To say that EPA will not downgrade glyphosate
8  because it has skin in the game due to the fact it has
9  classified glyphosate as noncarcinogenic since 1991,
10 that just isn't true, is it?
11     A.  I don't understand what you mean by that
12 statement and so I really don't know how to answer.
13     Q.  Dr. Benbrook, you don't believe that IARC --
14 strike that.
15         Dr. Benbrook, do you claim that IARC has no
16 dog in the fight, so to say, with respect to the
17 classification of glyphosate as a probable carcinogen?
18     A.  If you mean by "dog in the fight" a financial
19 interest or concern about the financial ramifications
20 of their -- their work and their classification, no, I
21 would agree -- I would agree that IARC has no,
22 quote/unquote, dog in the fight.
23     Q.  But you're aware that Dr. Portier was heavily
24 involved with the classification of glyphosate at the
25 IARC monograph meeting 112, correct?

28 (Pages 554 to 557)

Page 558

1    A. He served as a -- as a technical expert that
2    was given the opportunity to interact with the working
3    group, that's my understanding, yes.
4        Q. And you're aware that Dr. Portier has since
5    tried to become the head of IARC. Are you aware of
6    that?
7    A. No, I'm not -- not aware of that.
8        Q. Okay. Are you aware that Dr. Portier,
9    plaintiffs' primary expert witness, signed on to be an
10   expert with plaintiffs just days after the IARC
11   announcement and before the monograph came out?
12   A. I -- I don't know the timing of that, of -- of
13   Dr. Portier's interactions with plaintiff attorneys, I
14   have no knowledge of that.
15       Q. Okay. But if Dr. Portier had signed on with
16   plaintiffs before the monograph came out, wouldn't you
17   say that Dr. Portier does have a financial interest
18   when he's serving on IARC?
19       MR. LITZENBURG: Object to form.
20   A. No. I mean, he -- unless he owned Monsanto
21   stock or somehow would be impacted, Dr. Portier as a --
22   a scientist who had spent many years and many hours
23   assessing the data on glyphosate oncogenicity and was
24   intimately familiar with the IARC process and the basis
25   for the IARC classification, he was uniquely qualified

Page 559

1    to provide testimony in this case, and it doesn't
2    surprise me that the plaintiffs' attorneys reached out
3    to him. There were very few people that were as
4    familiar with the animal carcinogenicity database as he
5    was, so he was the type of individual that the
6    plaintiffs' attorneys would reach out to, as was I,
7    having published a number of papers on glyphosate use
8    and regulation and -- and possible risks. So I -- I
9    don't find it at all unusual that plaintiffs' attorneys
10   would have approached Dr. Portier. I can't speak to
11   the timing of it because I wasn't -- I'm not aware of
12   what that was.
13       Q. (BY MR. HOLLINGSWORTH) Are you aware of
14   Dr. Portier's efforts to lobby government agencies in
15   Europe and other parts of the world including in the
16   United States to convince them to require
17   glyphosate-based herbicides be some sort of carcinogen?
18   A. I'm aware that Dr. Portier was a part of a
19   number of peer-reviewed publications and letters to the
20   editor and other scientific dialogue around the review
21   of the carcinogenicity database on -- on glyphosate and
22   Roundup herbicides. His views are well known and I
23   think consistently stated -- have been consistently
24   stated in a variety of venues. Now, I'm not -- I've
25   never -- I have no knowledge one way or another of

Page 560

1    whether -- what other steps Dr. Portier has taken to
2    meet with European regulators. I have no knowledge of
3    that.
4        (Deposition Exhibit 9 was
5        marked for identification.)
6        Q. (BY MR. HOLLINGSWORTH) Dr. Benbrook, have you
7    seen this email between Dr. Portier and Dr. Sergi
8    before?
9    A. I don't think so.
10       Q. Okay.
11   A. I've seen a lot of emails though. I assume
12   you're going to ask me about it, right?
13       Q. Yes.
14   A. So let me read it, please.
15       Q. Sure.
16   A. (Witness reading document.) Okay. I've read
17   it.
18       Q. Okay. So this is an email from Dr. Portier
19   discussing EFSA, European regulators' reassessment of
20   glyphosate, correct?
21   A. Correct.
22       Q. And he's stating the fact that EFSA is
23   concluding that glyphosate has no carcinogenic
24   potential, quote: Suggests we did not do our
25   assessment adequately and that had we seen all the data

Page 561

1    they saw, we would have gotten a different answer.
2    Correct?
3    A. Correct.
4        Q. Okay. And he's -- by "we," he's referring to
5    IARC, correct?
6    A. Correct, the working group.
7        Q. Okay.
8    A. Who is -- I think those are the members of the
9    working group if I -- if I remember all their names
10   correctly.
11       Q. Right. He's referring to -- when he says it
12   suggests that "we" did not do our assessment correctly,
13   he's referring to the working group IARC monograph 112
14   on glyphosate, correct?
15   A. Correct, yeah.
16       Q. Okay. And he states: I do not intend to let
17   this happen.
18       Do you see that?
19   A. Yes.
20       Q. Okay. So Dr. Portier in this email is not --
21   strike that.
22       And then the next paragraph he sort of states
23   what he intends to do. Do you see that?
24   A. Yes.
25       Q. And he states down there: I intend to send it

29 (Pages 558 to 561)

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                  August 14, 2018                   CONFIDENTIAL

Page 562

1   as an open letter to the European commission.
2        Do you see that?
3        A. Right, I see that. But above that it says
4   that he's -- his preference is to publish a
5   peer-reviewed article in the Journal of Carcinogenesis
6   that goes over the scientific issues that are raised in
7   the BFR review and in particular the differences
8   between the judgment of the BFR and the IARC working
9   group.
10       It's a -- it's a scientific -- it's a set of
11  scientific issues that he -- he obviously feels very
12  strongly about and wants to try to assure that -- that
13  he and other scientists that share his view of the data
14  have an opportunity to share their -- their views
15  openly in the peer-reviewed literature and -- and other
16  venues.
17       Q. Right. Besides various publication interests
18  though Dr. Portier is also intending to write an open
19  letter to the European commission, correct?
20       A. Yeah, that's what he -- that's what he says.
21       Q. Okay. And are you aware that Dr. Portier
22  actually emailed hundreds of scientists and scientific
23  organizations to try to get him -- them to back his
24  position on glyphosate-based herbicides.
25       A. I'm aware that the peer-reviewed statement or

Page 563

1   paper that was led by Dr. Portier, I think -- I can't
2   remember the exact number of signatories, it was 97, it
3   was close to 100, and he no doubt probably invited more
4   than that to join in coauthoring that -- that
5   statement. So yes, I would assume he would have to
6   reach out to a number of scientists to determine
7   whether they were willing to contribute to such a
8   paper.
9        Q. Okay. And you're not aware that at that time
10  Dr. Portier was actually on the payroll of plaintiffs'
11  counsel in this case?
12       A. Well, these events were going on in 2015.
13  I -- I have no knowledge that Dr. Portier had been in
14  touch with any of the law firms involved in this
15  litigation at that time. I mean, I know obviously
16  later he became involved, but I don't know when he
17  actually started.
18       Q. But given his influence at IARC and his
19  lobbying of various governments afterwards and his
20  payment by plaintiffs' counsel, it wouldn't be right to
21  say that Dr. Portier has no dog in the fight with
22  respect to glyphosate's cancer classification, correct?
23       A. There's a -- a distinction -- in the
24  assessment of bias in the scientific community, there
25  is a distinction between sources of bias that arise

Page 564

1   from an individual or an organization's or a company's
2   direct financial benefit from selling a product, owning
3   a patent, having in some way a direct financial tie to
4   the -- the fate, the commercial fate of a technology, a
5   chemical or a company or an invention. That is one
6   component of financial interest that is of importance
7   and concern in the scientific community.
8        Dr. Portier's work for plaintiff counsel in
9   this case, as is my work, is a -- it's a fee for
10  service where time is spent, analytical work is done,
11  records are reviewed and individuals like Dr. Portier
12  and I are -- are asked based on our experience and
13  knowledge of the area to -- to render opinions.
14       Do we do that for free? No, no. Sir, are you
15  working for free today in this deposition? No, you're
16  not. So when -- when scientists are asked to become
17  engaged in litigation, whether they're testifying on
18  behalf of plaintiffs or defendants, it -- it is typical
19  and normal for them to be paid for that -- that
20  engagement. Some people -- certainly some people view
21  that as coloring the -- the analytical work or the
22  testimony and -- and other people look at the -- at the
23  work of an individual based on the substance of the
24  science.
25       So I -- I draw a distinction between the --

Page 565

1   the type of financial conflict of interest or bias that
2   an individual might have if they were a shareholder in
3   a company or owned a patent or somehow directly
4   benefitted from the sale of a chemical versus a -- an
5   expert who has developed over a long career often
6   in-depth knowledge of an area of science that -- that
7   then agrees to serve in litigation to try to bring
8   their knowledge of that science to the proceedings at
9   trial.
10       Q. And that's fair. Let's put expert witness
11  litigation to the side. Okay?
12       A. Okay.
13       Q. Putting that aside, given Dr. Portier's emails
14  stating that he is going to do whatever he can to not
15  let EFSA in some way show that IARC did not do its
16  assessment adequately and given that he went out and
17  lobbied European and US regulators to try to convince
18  them about the carcinogenicity of glyphosate, don't you
19  think it's unfair to say that Dr. Portier doesn't have
20  a dog in the fight?
21       A. Dr. Portier has a dog in the fight to the
22  extent that he has carried out extensive research and
23  analysis and -- on the question of glyphosate
24  oncogenicity, he participated in the IARC working group
25  process, I'm quite sure that he supported fully the

HIGHLY                    Charles Benbrook, Ph.D.                    HIGHLY
CONFIDENTIAL                   August 14, 2018                   CONFIDENTIAL

Page 566

1  classification of -- of glyphosate and glyphosate-based
2  herbicides as probable human carcinogens as -- as
3  released by the IARC working group, and he felt and has
4  openly stated in innumerable venues that he feels that
5  it's very important that regulators get the science
6  right on this question and he felt and laid out the
7  reasons -- the scientific reasons very clearly, he felt
8  that EFSA in their review and EPA in its review have
9  got the science wrong.  And he has worked to present
10  the -- the scientific arguments in support of his
11  position in a -- in -- in a thorough and professional
12  way that I think -- I think is a -- it is totally
13  appropriate.
14      Q.  So while you may think that it's totally
15  appropriate, you cannot say -- strike that.
16          So you don't deny that Dr. Portier has a dog
17  in the fight with respect to glyphosate and its cancer
18  classification, but you think it's totally appropriate;
19  is that correct?
20      A.  I think Dr. Portier's efforts and work through
21  peer-reviewed publications, through his work with the
22  IARC working group, through his engagement in public
23  venues that I'm aware of has been professional and
24  appropriate and focused on the science in -- with the
25  goal of assuring that these regulatory agencies get it

Page 567

1  right.  Because there -- there's a lot at risk, a lot
2  at stake in the assessment of the world's most heavily
3  used pesticide.
4          MR. HOLLINGSWORTH:  Let's mark an
5  exhibit.
6          (Deposition Exhibit 10 was
7          marked for identification.)
8      Q.  (BY MR. HOLLINGSWORTH)  Sir, you're familiar
9  with Exhibit 10, it's an article you wrote, correct?
10      A.  Yes.
11      Q.  Okay.  It's in Environmental Sciences Europe,
12  it's titled Impacts of Genetically Engineered Crops on
13  Pesticide Use in the US, the First 16 Years, correct?
14      A.  Correct.
15      Q.  On page 3, second full paragraph there, you
16  note -- and this is with respect to glyphosate:  In
17  light of its generally favorable environmental and
18  toxicological properties, especially compared to some
19  of the herbicides displaced by glyphosate, the dramatic
20  increase in glyphosate use has likely not markedly
21  increased human health risk.
22          Do you see that?
23      A.  Yes.
24      Q.  Okay.  What are some of the older herbicides
25  that were displaced by glyphosate?

Page 568

1      A.  Well, the ones that took the biggest hit were
2  the imidazolone family of chemistry, certainly several
3  of the sulfonylureas lost considerable market share.
4  Those were the -- those were the most directly and
5  heavily impacted herbicides.  There's probably 15
6  active ingredients in those two families of chemistry.
7  There certainly was some impact on the acetanilides,
8  A-C-E-T-A-N-I-L-I-D-E-S, herbicides, although not to
9  the same extent as some of the others.
10      Q.  So the last one you mentioned, would that
11  include acetochlor?
12      A.  Acetochlor and metolachlor at this point in
13  time.
14      Q.  Okay.  And both acetochlor and metolachlor are
15  Category C, correct?
16      A.  Yes.
17      Q.  Okay.  They're both -- acetochlor specifically
18  suggested evidence of carcinogenic potential, correct?
19      A.  Correct.
20      Q.  Okay.  So you certainly don't claim that
21  metolachlor or acetochlor have more favorable risk
22  profiles than glyphosate, correct?
23      A.  No.
24      Q.  Okay.  And, you know, you'll excuse me if I
25  don't trace all of these actual pesticides to the

Page 569

1  classes that you just discussed, but diquat, does
2  diquat apply to any of those classes that you just
3  discussed?
4      A.  No, diquat doesn't fall in any of them.
5  Diquat is a very old herbicide.  It's -- I don't
6  believe it's -- it's -- it wasn't a significant corn or
7  soybean or cotton herbicide and I -- you know, it -- I
8  would have to go back and look at the data, but
9  remember, this is a paper that came out in 2012, and I
10  think the last year that I had use data was either 2010
11  or 2011, so it reflects what was known at -- at that
12  time about the shift in the pounds of different
13  herbicide active ingredients applied on these 3G crops.
14      Q.  Sure.  And feel free to bring it forward to
15  today if you have, you know, knowledge about, you know,
16  how any of these use products have changed.  But I'm
17  just kind of asking general questions about these
18  pesticides.
19          How about glyphosate compared to diquat, you
20  wouldn't say that diquat has a more favorable risk
21  profile than glyphosate, would you?
22      A.  Well, you know, I -- I am -- I'm
23  reluctant to make any statements about specific
24  comparisons without, you know, refreshing my memory
25  about the extent of use and the level of exposure.  You

31 (Pages 566 to 569)

Page 570

 1    know, one of the reasons that I and most other people
 2    in -- at this time in the 2010, '11, 2012 when this
 3    paper came out were -- felt that compared to some of
 4    the other herbicides in use that glyphosate had a
 5    favorable toxicological environmental profile was that
 6    at that time there was relatively little data about
 7    glyphosate showing up in food as residues.  There was
 8    relatively little evidence of glyphosate being in
 9    drinking water or beverages.  There was relatively
10    little information about glyphosate biomonitoring --
11    from biomonitoring studies reporting levels in human
12    urine or blood.  And at the time for -- at this point
13    for, you know, two decades glyphosate had been
14    classified by EPA as not likely to pose oncogenic risk.
15        When I did this paper -- this is a paper on
16    use.  The purpose of this paper was to address the
17    claim that was often made that genetically engineered
18    crops had and were reducing pesticide use measured by
19    pounds of active ingredient applied.  I was fairly
20    confident that that was not the case based on my annual
21    work with the pesticide use data collected and released
22    each year by the National Agricultural Statistics
23    Service which is part of the USDA.  That's what the
24    focus of this paper was.  At this time I wasn't
25    actively looking at new science coming out on

Page 571

 1    glyphosate toxicity, although I -- that began fairly
 2    soon after the publication of this paper.
 3        Q.  The glyphosate biomonitoring data that you
 4    refer to, there certainly was some that came out prior
 5    to 2012, for example, that came out of the farm family
 6    exposure study, correct?
 7        A.  Right.  The John Acquavella study and the -- a
 8    couple of studies out of Iowa by a scientist whose name
 9    starts with H, I can't remember exactly his name, but
10    yeah, there had been a few studies, but only a very
11    few.
12        Q.  All right.  And those glyphosate biomonitoring
13    studies prior to this publication in 2012, they don't
14    raise any cause for concern with respect to glyphosate
15    and human health effects, correct?
16        A.  Well, I wouldn't -- I wouldn't go -- go quite
17    that far.  I mean, I think the -- whenever there's
18    evidence of exposure to pesticides in people and -- and
19    detecting a pesticide in a person's urine is clear
20    evidence of exposure, that's important information that
21    should be taken into account by the companies and
22    registrants, should be taken into account by
23    registrants, and I -- at -- when -- when Monsanto did
24    their biomonitoring study, it was early 2000s, right,
25    published in like 2004 or something?  That was, I

Page 572

 1    think, one of the very first.  There had been one or
 2    two studies of -- of Iowa farm families, and so that --
 3    so those studies reported that at least for people
 4    living on farms or in farming areas there was exposure
 5    occurring.
 6        But what -- what came later were -- was
 7    biomonitoring of the general population, not people
 8    that had been handling or applying or living in an area
 9    where substantial Roundup herbicide was -- was being
10    sprayed, and of course evidence of -- of glyphosate
11    exposure in the general population, you know, is
12    important and -- and should be of concern to EPA and
13    other regulators and the company.
14        Q.  But, Dr. Benbrook, you know just as well as
15    anybody that just monitoring urine in the -- sorry.
16    Strike that.
17        Dr. Benbrook, you know as well as anybody
18    that -- that the fact that there's glyphosate in
19    someone's urine doesn't mean that it's there at a level
20    which it causes any human health effects, correct?
21        A.  Right.  One would have to evaluate that.
22        Q.  And just because there's levels of glyphosate
23    in a general population's urine, that does not mean
24    that the general population is at any increased risk of
25    cancer based on that, correct?

Page 573

 1        A.  Well, it may -- it may or may not, but, you
 2    know, I think it's important for the record to note
 3    that at this -- at the time I wrote this paper, the --
 4    the general -- general knowledge in the pesticide
 5    regulatory community was that certainly up until the --
 6    when GE crops came on the market it was very unusual
 7    for any glyphosate to be detected in food because it --
 8    it had to be applied before seeds even germinated
 9    because it would -- it would kill the crop once it
10    started to grow.
11        So for the first approximate 30 years of the
12    history of use of Roundup herbicides, despite the fact
13    that the -- you know, millions of pounds were being
14    applied and use was growing fairly steadily over three
15    decades, there had been essentially no reports of
16    glyphosate being detected in any food, particularly not
17    any food as eaten, and nor was it showing up in water.
18    So the -- the -- one of the reasons that regulators,
19    including the EPA, was not terribly concerned about
20    general population genotox or cancer risk was because
21    they -- they had no evidence that there was any
22    significant exposures happening.
23        But this changed in 1996 with the registration
24    and approval of the first GE crops because the time
25    period when glyphosate could be applied on in

HIGHLY                 Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL              August 14, 2018              CONFIDENTIAL

Page 574

1    particular soy beans changed in a way that resulted in
2    substantial residues in the soy beans at harvest. So
3    the first significant dietary exposure for the general
4    public resulted from the planting of Roundup-ready soy
5    beans and -- and really was starting to occur at the
6    time I wrote this paper, but -- and I think that's --
7    that the fact that some of -- that about this time the
8    USDA did the first testing of soy beans and reported in
9    95 percent of the samples a fairly high level of
10   glyphosate and an even higher level of AMPA, A-M-P-A,
11   the primary metabolite.
12        So at about this time in -- early in the
13   decade of -- of 2010, several things were changing
14   rapidly about how glyphosate was used, levels of
15   exposure of -- to glyphosate in food and water and
16   on -- on the risk front. There were starting to be
17   a -- a number of studies published on the genotox front
18   and, you know, additional epidemiological studies were
19   being published. So it was a time of -- of changing
20   attitudes about glyphosate-based herbicides.
21        Q.  Right. But you don't know of any glyphosate
22   biomonitoring studies that show human health cancer
23   risks specifically with respect to the glyphosate
24   levels at which they appear in those biomonitoring
25   studies, correct?

Page 575

1        A.  The -- because of EPA's classification of
2    glyphosate as a -- as a Group E carcinogen not likely
3    to pose carcinogenic risk, the EPA has not conducted a
4    cancer risk assessment of glyphosate and nor has -- has
5    any other regulatory agency to my knowledge done a --
6    you know, a -- what -- you know, a contemporary dietary
7    risk assessment based on actual residue data of
8    glyphosate in different foods of which we now know that
9    there are a substantial number of foods in which
10   glyphosate is present as residue. So the -- that --
11   that assessment has not been done.
12        Q.  That assessment can be done by someone other
13   than EPA, correct?
14        A.  Well, it could be, yes.
15        Q.  And you don't know -- you do not know of any
16   glyphosate biomonitoring studies that show human health
17   cancer risk specifically with respect to the glyphosate
18   levels at which they appear in those biomonitoring
19   studies, correct?
20        A.  I'm not aware that anyone has made such an
21   assessment or conducted such a cancer risk assessment.
22   And there's a -- reasons why they can't. You know,
23   there -- there is no comprehensive database of actual
24   levels of glyphosate and AMPA in a variety of foods.
25   There's only a small number of foods -- in fact, in the

Page 576

1    US the only food crop that has been tested to -- to any
2    significant degree is the two years that USDA sampled
3    around 300 samples a year of soy beans. That's a --
4    that sort of work to do a cancer dietary risk
5    assessment, there would have to be hundreds of samples
6    of wheat and oats and barley and a variety of other
7    crops, edible beans that -- on which glyphosate is now
8    used as a pre-harvest desiccant.
9        That -- it's fairly clear certainly to me that
10   it's -- that it's those uses of glyphosate that are
11   likely the source of residues in the urine of the
12   general public which -- which there -- there certainly
13   are a number of studies now that have reported
14   widespread exposures to glyphosate in the general
15   public as evidenced by residues in urine.
16        Q.  And according to you, in some of your
17   publications I believe you say soy beans are the crop
18   on which glyphosate is most used; is that correct?
19        A.  Well, certainly the volume of glyphosate used
20   on soy beans is -- it's probably a bit higher than in
21   corn, but you'd have to look at it. I mean, it's -- I
22   did a second paper in 2016 on trends in glyphosate use
23   in the US and globally that has detailed tables with
24   overall use as well as use by crop, and if -- if you
25   want -- if you want to discuss precise information, I'd

Page 577

1    like to pull that study up and we can talk about it.
2        Q.  No need, Doctor, but soy beans are one of the
3    crops that glyphosate is most used on, top three
4    probably, right?
5        A.  Oh, certainly top three, definitely.
6        Q.  Okay. And when the USDA sampled around 300
7    samples a year and conducted that cancer
8    dietary risk assessment, the USDA did not express any
9    concern that there was a cancer risk associated with
10   glyphosate being sprayed on those soy beans, correct?
11        A.  Well, I -- I really don't accept a premise in
12   your question. The USDA nor the EPA has never
13   conducted a cancer dietary risk assessment of
14   glyphosate. They've never done that. Now, were they
15   to conduct a study, the residue data from the USDA
16   monitoring of glyphosate and AMPA in soy beans would
17   have been an important data point, but they -- because
18   the -- you know, the general public doesn't eat a lot
19   of soy beans directly, soy beans are fed to animals and
20   they're used in a number of processed foods, it's a
21   very complicated process to come up with quantitative
22   estimates of actual human exposures even when you know
23   that 95 percent of the soy beans contain a -- one and a
24   half parts per million of glyphosate which was roughly
25   the results of the USDA monitoring. That -- that very

33 (Pages 574 to 577)

Page 578

1  detailed assessment of actual dietary exposures has not
2  been done.
3        What has been done is periodic sampling of
4  human urine which has shown progressively higher levels
5  of glyphosate and AMPA from the -- the mid 2000s to
6  today.  So what that body of evidence says is that
7  exposure levels in the general public have
8  incrementally gone up because of the rising mean levels
9  of urinary metabolites of glyphosate and AMPA in urine.
10       Q.  Okay.  But the biomonitoring studies that show
11  progressively higher levels of glyphosate and AMPA from
12  the mid 2000s to today, that doesn't say anything about
13  the risk to the general public associated with
14  glyphosate used on those crops, correct?
15       A.  Yes.  It's simply important information on the
16  exposure side of the risk assessment equation.
17       Q.  And EPA nor any other regulator has determined
18  that that exposure scenario that they're well aware of
19  creates any increased risks to the general public with
20  respect to glyphosate and cancer, correct?
21       A.  I think in general, the EPA and most
22  regulators expect that rising exposure is likely
23  associated with rising risk.  Now, whether -- whether
24  the -- the increment in risk following an increase in
25  exposure reaches a threshold of concern is, of course,

Page 579

1  a -- a separate issue, but in general, scientists agree
2  that rising levels of exposure are -- are likely to
3  increase whatever risks might be associated with the
4  exposure to a particular chemical.  Whether those risks
5  are very modest or whether they're high, they're likely
6  to go up roughly proportional to exposure.
7        MR. LITZENBURG:  How much time on the
8  record?
9        VIDEO OPERATOR:  3 hours and 15 minutes.
10       Q.  (BY MR. HOLLINGSWORTH)  Sir, we discussed the
11  2017 issue paper earlier in the deposition, correct?
12       A.  Yes.
13       Q.  Okay.  I want to open that back up again.
14       A.  The 20 -- you've given me the 2016 one, not
15  the 2017 one.
16       Q.  I think I gave you the 2017, but let's take a
17  look at whatever I gave you.
18       A.  Okay.  I got the 2016.  I think it was Number
19  2, Exhibit Number 2.
20       Q.  It's the 2017.
21       A.  It's Number 3 is the one I've got.  Oh, okay,
22  all right.  You're right.
23       Q.  So 2017, can you please turn to page 15?
24       A.  Boy, it looks just like the 2016 one, doesn't
25  it?  Page 15, okay.

Page 580

1        Q.  Okay.  There's a section entitled Summary of
2  the Exposure Profile in the United States.  Do you see
3  that?
4        A.  Yes.
5        Q.  Okay.  The second paragraph notes:  Labeled
6  uses of glyphosate include over 100 terrestrial food
7  crops as well as other non-agricultural sites, such as
8  greenhouses, aquatic areas and residential areas.
9        Do you see that?
10       A.  Yes.
11       Q.  So EPA is certainly aware that
12  glyphosate-based herbicides are used on a variety -- a
13  wide variety of areas and a wide variety of crops
14  according to this 2017 EPA document, right?
15       A.  Right.
16       Q.  The next paragraph notes:  Dietary, in
17  parenthesis food and water, exposures are anticipated
18  from applications to crops.
19        Do you see that?
20       A.  Yes.
21       Q.  So EPA is certainly aware that
22  glyphosate-based herbicide use in the United States
23  will lead to some dietary exposure according to this
24  2017 EPA document, correct?
25       A.  Correct.

Page 581

1        Q.  The paragraph goes on to note -- goes on to
2  discuss residential and occupational exposure.  Do you
3  see that?
4        A.  Yes.
5        Q.  According to this 2017 document, EPA is aware
6  of glyphosate use in residential settings, correct?
7        A.  Correct.
8        Q.  According to this document, EPA is also aware
9  of occupational or commercial workers who may be
10  exposed to glyphosate while handling the pesticide
11  prior to application during mixing and loading,
12  correct?
13       A.  Correct.
14       Q.  Okay.  And that's two uses of pesticide
15  products, that is, mixing and loading, which you say
16  that applicators are subject to increased exposure; is
17  that correct?
18       A.  Compared to the general public, yes.
19       Q.  Okay.  And EPA is aware of that, correct?
20       A.  Yes.
21       Q.  EPA is also aware of occupational or
22  commercial exposure that may occur during application
23  of the pesticide, correct?
24       A.  In general, yes.
25       Q.  Okay.  EPA is also aware of occupational or

34 (Pages 578 to 581)

HIGHLY          Charles Benbrook, Ph.D.          HIGHLY
CONFIDENTIAL          August 14, 2018          CONFIDENTIAL

Page 582

1   commercial exposure that may be experienced by those
2   entering treated sites, correct?
3      **A. In general, yes.**
4      Q. Okay. And we saw that the Roundup ProMax
5   label warned about that type of increased exposure,
6   correct?
7      **A. Yes, we did.**
8      Q. This 2017 EPA document on the carcinogenic
9   potential of glyphosate states that EPA considers all
10   of the anticipated exposure pathways as part of their
11   evaluation for human health. You agree with that,
12   don't you?
13      **A. Well, to the extent that they have any**
14   **information on them, yes.**
15      Q. Okay. Were you aware that this EPA -- 2017
16   EPA document actually cites one of your publications on
17   exposure and pesticide use?
18      **A. Yes.**
19      Q. Okay. Please turn to the next page.
20      **A. Okay.**
21      Q. It says: At the time of initial registration,
22   1974, total use of glyphosate in the United States was
23   approximately 1.4 million pounds according to Benbrook
24   2016.
25      I assume you agree with that?

Page 583

1      **A. Yes.**
2      Q. Okay. Then this 2017 EPA document tracks the
3   increase of glyphosate since that time through at least
4   2014, correct?
5      **A. Correct.**
6      Q. For example, EPA was aware in 2017 that by
7   1995 total use of glyphosate increased to approximately
8   40 million pounds, correct?
9      **A. Yes, yep.**
10      Q. Okay. EPA in 2017 was certainly aware that by
11   2000, the total use of glyphosate in the United States
12   was approximately 98.5 million pounds, right?
13      **A. What year?**
14      Q. By the year 2000.
15      **A. Yes, okay, yeah, okay, yes.**
16      Q. So then also the EPA was certainly aware that
17   by 2014 the total annual use of glyphosate was
18   approximately 280 to 290 million pounds, correct?
19      **A. Correct.**
20      Q. So EPA has tracked the increase in exposure to
21   glyphosate from 1974 forward, correct?
22      **A. Yes.**
23      Q. And they've done so in this 2017 issue paper
24   on the carcinogenic potential of glyphosate, correct?
25      **A. Correct.**

Page 584

1      Q. And they've considered that data in coming to
2   the conclusion that glyphosate is not likely to be
3   carcinogenic, correct?
4      **A. No. They -- that data didn't play a role**
5   **in -- in that judgment. The EPA judgment on**
6   **oncogenicity was based on -- primarily on the animal**
7   **bioassays and secondarily on the -- the genotox studies**
8   **and with I think -- in -- light weight on the**
9   **epidemiological evidence. The EPA never carried out --**
10   **never -- it just -- it didn't take into account the --**
11   **the trends in the overall pounds applied in -- in**
12   **reaching that classification.**
13      Q. Sir, when EPA made its classification of
14   glyphosate in 2017 as noncarcinogenic, they certainly
15   made that determination based on an understanding of
16   the glyphosate exposure metrics that you cite in your
17   own paper, correct?
18      **A. No, I don't -- I don't agree with that**
19   **statement.**
20      Q. So EPA, despite having a section in the issue
21   paper on the carcinogenic potential of glyphosate that
22   goes over at least five pages of this exposure profile
23   of glyphosate, tracking it from 1974 forward, including
24   the increase in glyphosate as expressed in your
25   publication, they're not aware of that? Is that what

Page 585

1   you're -- is that what you're stating? They didn't --
2      **A. No, that's --**
3      Q. -- consider that?
4      **A. -- not what I said.**
5      Q. Okay. You're stating that EPA didn't consider
6   glyphosate use from 1974 forward, increased glyphosate
7   use all the way through 2014 in this carcinogenic issue
8   paper? Is that what you're stating?
9      **A. No, it's not what I said.**
10      Q. Okay. You're stating that EPA didn't take
11   notice of this exposure profile of glyphosate when it
12   determined that glyphosate is noncarcinogenic, correct?
13      **A. You're -- you're mischaracterizing the**
14   **session -- section. This is not an exposure profile**
15   **section. It's a section on the use, the pounds**
16   **applied. The pounds applied of glyphosate is important**
17   **in determining exposure, but it's not a direct measure**
18   **of exposure, and it's the exposures that EPA would --**
19   **would have to have in order to conduct a -- a**
20   **carcinogenic risk assessment.**
21      Q. Sir, just to be clear, you say I'm
22   mischaracterizing the section, but the section is
23   actually titled Summary of the Exposure Profile in the
24   United States. Correct?
25      **A. Yes.**

35 (Pages 582 to 585)

HIGHLY                  Charles Benbrook, Ph.D.                  HIGHLY
CONFIDENTIAL                August 14, 2018                  CONFIDENTIAL

Page 586

1    Q. Okay.
2    A. But there -- you know, there is -- in
3 discussing the exposure profile, the EPA appropriately
4 feels that it's helpful to look at the available
5 information on the overall pounds applied, but the
6 agency is well aware that there's no direct way to
7 estimate exposure based on pounds applied because there
8 are many factors that give rise to differences in
9 exposure, especially through food and water, relative
10 to what crops the -- the herbicide is applied on, what
11 stage of the crop growth the herbicide is applied on,
12 etcetera.
13    Q. Sir, you just testified that what EPA would
14 have to have is -- is the exposures listed here in
15 order to conduct the carcinogenic risk assessment. How
16 does EPA not have exposures to glyphosate from 1974
17 forward? We just read several pages where they're
18 listing out that information explicitly.
19    A. We just referenced some paragraphs in which
20 EPA is citing data on the pounds of glyphosate active
21 ingredient applied principally by farmers. That --
22 that is different from estimates of exposure to
23 glyphosate for the general public.
24    Q. Okay. But EPA in 2017 in this carcinogenic
25 issue paper certainly took into account the exposure

Page 587

1 profile of glyphosate in the United States, correct?
2    A. To the extent that they had residue data on
3 glyphosate in -- in foods and in drinking water, but
4 EPA did not conduct a carcinogenic risk assessment on
5 glyphosate because the agency classified in 1991 and
6 has not changed the classification that glyphosate does
7 not pose a significant risk of cancer based on
8 contemporary uses and -- and the best knowledge about
9 exposure levels for the general public. Because they
10 reached that judgment, they did not carry out a
11 oncogenic risk assessment.
12    Q. But when EPA makes a decision in 2017 that
13 glyphosate is not carcinogenic, they aren't making that
14 decision in a vacuum. They have exposure data from the
15 1970s. They're considering the most up-to-date
16 exposure data through 2017.
17    A. I guarantee you they didn't have any exposure
18 data from the '70s or they had very little. I'd have
19 to refresh my memory on -- to what extent this document
20 gets into any -- let me -- let me look, please. So
21 exposure members -- measures are addressed on page 28.
22 Exposure numbers -- measures.
23    Q. That's looking at exposure in epidemiology
24 studies, correct, sir?
25    A. Is that in the epidemiology section?

Page 588

1    Q. Yes, it is. Let's just move on. We don't
2 have a lot of time here.
3       EPA would certainly consider the most
4 up-to-date exposure metrics with respect to dietary
5 glyphosate in the water and occupational use when
6 conducting its 2017 carcinogenic risk assessment,
7 correct?
8    A. No, I don't agree with that. There -- there
9 is no occupational carcinogenic risk assessment in this
10 document, nor has EPA carried out one because they have
11 classified glyphosate in 1991 and have retained that
12 classification as not likely to pose oncogenic risk.
13 So based on that judgment, they -- they have concluded
14 that it's unnecessary to do a cancer risk assessment.
15    Q. EPA is well aware of the amount of pounds of
16 glyphosate that's sprayed across the country as
17 outlined in this issue paper in which they cite your
18 publication, correct?
19    A. I -- I think there's a fairly high level of
20 agreement among all people including people in Monsanto
21 that information available is roughly accurate at
22 the national level on total glyphosate use. I don't
23 think that's an issue in -- in dispute in this case.
24    Q. And if you look at the next page -- sorry, two
25 pages over under the map of the United States?

Page 589

1    A. Are we on 18?
2    Q. Yes, sir.
3    A. Okay.
4    Q. This 2017 EPA document notes: Using HED's
5 standard occupational exposure assessment methodologies
6 which are based on peer-reviewed and validated exposure
7 data and models, mixer/loaders result in the highest
8 potential exposure estimates.
9       Do you see that?
10    A. Yes.
11    Q. So EPA in 2017 is using the most up-to-date
12 exposure metrics and inputting them into their
13 peer-reviewed and validated exposure models in
14 assessing occupational exposure to glyphosate in the
15 United States, correct?
16    A. That's what they -- they say, yes.
17    Q. Okay. So it goes on: Assuming no personal
18 protective equipment, PPE, exposure estimates for
19 mixer/loaders range from 0.03-7 mg/kg/day using the
20 maximum application rate for high acreage crops.
21       Do you see that?
22    A. Yes.
23    Q. So EPA is conservative in its exposure
24 calculation in this 2017 cancer risk assessment by
25 assuming no PPE and maximum application rates, correct?

36 (Pages 586 to 589)

Page 590

1    A.  Certainly the maximum application rates would
2   be regarded as a -- as a worst-case scenario.  I --
3   there really is not any -- there's very little PPE
4   required on the label, so I don't think that's a
5   worst-case scenario.  Worst-case scenario would be
6   somebody applying glyphosate with a T-shirt on without
7   long sleeves because the label says you should have
8   long sleeve -- a long-sleeved shirt and -- and
9   long-sleeved pants on.  So I -- I wouldn't regard that
10   as a -- as a -- a worst-case scenario.
11        Q.  Sir, this says no -- assuming no personal
12   protective equipment.  What -- how can you get any more
13   than zero?
14        A.  Very easily.  You could wear gloves, you could
15   wear a face shield.
16        Q.  I'm saying they're assuming no gloves, no skin
17   protection at all, so how can you get any worse than
18   that in terms of a worst-case scenario?
19            MR. LITZENBURG:  Object to the form.
20        A.  You could have a short-sleeved shirt on.  You
21   could have shorts on, be spraying in sandals.
22        Q.  (BY MR. HOLLINGSWORTH)  This -- this exposure
23   assessment is assuming that.  It's assuming no PPE at
24   all, correct?  That's what it states here.
25        A.  I can -- I'm quite sure that -- that this

Page 591

1   assessment is -- is based on adherence to the -- the
2   minimum clothing requirements that are on the label
3   which are long-sleeved shirts and pants, long-sleeved
4   pant, full-leg pants, that's -- you know, I would --
5   I'm quite -- quite sure that they would have -- they
6   had assumed that in -- they wouldn't regard that as
7   added PPE is what I'm saying.
8        Q.  Sir, you testified previously that
9   long-sleeved shirt and pants are actually types of PPE,
10   correct?
11        A.  There are -- they do reduce applicator
12   exposure.  They're really not equipment.  They're
13   clothing and they're -- they are -- they certainly
14   are -- if we go back to -- and look at the ProMax
15   label, I'm quite sure it will include the requirement
16   that applicators should wear long-sleeved shirts and
17   -- and -- and pants.  I don't regard that as added PPE.
18   That's sort of minimum requirements, and I would guess
19   that that's what's reflected in this statement by
20   the -- by the EPA relative to their applicator exposure
21   assessment.
22        Q.  And it goes on to note:  The maximum potential
23   exposures from currently registered uses of glyphosate
24   in residential and occupational settings in the United
25   States are used in the current evaluation to aid in the

Page 592

1   determination of whether findings in laboratory studies
2   are relevant for human risk assessment.
3            Do you see that?
4        A.  No, I don't.  Where are you at?
5        Q.  The next paragraph.
6        A.  Starting with "the maximum potential
7   exposures"?
8        Q.  Correct.
9        A.  Okay.  Okay, yes, I'm sorry.
10        Q.  Do you see that?
11        A.  Yeah.
12        Q.  Okay.  So EPA uses the most up-to-date
13   exposure metrics and calculations for humans in the
14   real world in order to assist its interpretation of the
15   relevant animal studies, correct?
16        A.  No.
17        Q.  Why not?
18        A.  You said they use that to assist their
19   interpretation of the animal studies.  They base their
20   interpretation of the animal studies on the design of
21   the study and the results in the animal studies,
22   period.  Now, they -- they use the results of the
23   animal studies in their effort to quantify their risk
24   based on their best estimate of human exposures.
25        Q.  This document states that EPA is using the

Page 593

1   most up-to-date exposure metrics in calculations for
2   humans in the real world in order to insist -- assist
3   in the interpretation of the relative laboratory
4   studies that are relevant for human health risk
5   assessment, correct?
6        A.  Assist in the interpretation.  Are -- is that
7   a direct quote from in here?
8        Q.  Yes, sir.  It says:  The maximum potential
9   exposures from currently registered uses of glyphosate
10   in residential and occupational settings in the United
11   States are used in the current evaluation to aid in a
12   determination of whether findings in laboratory studies
13   are relevant for human health risk assessment.
14        A.  Okay, correct.
15        Q.  Okay.  So EPA is certainly considering the
16   most up-to-date exposure figures in determining whether
17   findings in laboratory studies are relevant for human
18   health risk assessment, correct?
19        A.  Right.  They're -- they're implying that
20   they -- they took the toxicological thresholds from the
21   animal studies and compared those to estimated levels
22   of exposure, and based on that, they reached their --
23   their judgment about the absence of oncogenic risk --
24        Q.  EPA is periodically reevaluating those animal
25   studies, correct?

37 (Pages 590 to 593)

HIGHLY                  Charles Benbrook, Ph.D.                  HIGHLY
CONFIDENTIAL                 August 14, 2018                CONFIDENTIAL

Page 594

1    A. Yes.
2    Q. Okay. It goes on to note specifically that
3  results from these studies, particularly --
4  particularly those administering high doses, are put
5  into context with the human exposure potential in the
6  United States. Do you see that?
7    A. Yes.
8    Q. So EPA is looking at the most up-to-date
9  exposure data and putting the animal studies in which
10  those rats and mice are tested at extremely high doses
11  into context when conducting its risk assessments,
12  right?
13    A. Correct. How much time we got?
14        MR. HOLLINGSWORTH: Let's go off the
15  record.
16        VIDEO OPERATOR: Going off the record.
17  The time is 11:31 a.m.
18        (Discussion off the record.)
19        VIDEO OPERATOR: Going back on the
20  record. The time now is approximately 11:32 a.m.
21    Q. (BY MR. HOLLINGSWORTH) Sir, you are familiar
22  with the glyphosate registration review process,
23  correct?
24    A. Yes.
25    Q. At any point during that year's long

Page 595

1  registration process as EPA is collecting data, if EPA
2  comes across exposure data or toxicity data that it
3  feels may be a cause for concern, EPA has the power to
4  suspend a pesticide's registration, correct?
5        MR. TRAVERS: Objection, form, compound.
6    A. It's a long process, but yes, ultimately it --
7  it does have that authority.
8    Q. (BY MR. HOLLINGSWORTH) If EPA sees exposure
9  data or toxicity data --
10        THE WITNESS: Jeff is on the phone, Tim.
11        MR. LITZENBURG: Okay.
12    Q. (BY MR. HOLLINGSWORTH) If EPA --
13        THE WITNESS: You need to bolt.
14    Q. (BY MR. HOLLINGSWORTH) I'll start again. If
15  EPA comes across exposure data or toxicity data it
16  feels there's a cause for concern, EPA may require the
17  registrant to provide more studies or data to satisfy
18  EPA's concern, correct?
19    A. Correct.
20    Q. And ultimately at the end of registration
21  review, EPA will come out with an agency-wide
22  determination regarding the carcinogenic potential of
23  glyphosate, correct?
24    A. That would be one element of it, yes.
25        MR. TRAVERS: Objection, form.

Page 596

1    Q. (BY MR. HOLLINGSWORTH) The most recent
2  registration review determination takes precedent over
3  any prior EPA determination because it is considering
4  the most up-to-date science, correct?
5    A. Yes, in general.
6        MR. TRAVERS: Objection, form.
7    Q. (BY MR. HOLLINGSWORTH) The most recent
8  registration review determination takes precedence over
9  any EPA determination -- prior EPA determination
10  because it is reviewing the pesticide based on the most
11  recent cancer review guidelines, correct?
12        MR. TRAVERS: Objection, form.
13    A. That would be a component of it, the
14  assessment of oncogenicity based on its current
15  guidelines, yes.
16        MR. LITZENBURG: Grant, are you
17  reserving any time for redirect?
18        MR. HOLLINGSWORTH: I'm reserving some
19  time.
20    Q. (BY MR. HOLLINGSWORTH) The most recent --
21        MR. LITZENBURG: Hang on one second.
22  What are we at on the record, please?
23        THE WITNESS: 22 minutes to go.
24        VIDEO OPERATOR: 3 hours, 38 minutes, 57
25  seconds.

Page 597

1        MR. LITZENBURG: All right. I am going
2  to let Jeff Travers take over for plaintiffs here at
3  this point and I'm leaving.
4        THE WITNESS: Fly safe.
5        MR. LITZENBURG: Talk to you soon,
6  Chuck.
7        (Mr. Litzenburg exits proceedings.)
8    Q. (BY MR. HOLLINGSWORTH) The most recent
9  registration review determination will supplant all
10  prior determinations about the pesticide's
11  carcinogenicity, correct?
12    A. Yes.
13    Q. Restrictions on use, if any are called for in
14  the final registration review determination, will also
15  supplant any prior use restrictions, correct?
16    A. If they're translated in changes in labels,
17  yes.
18    Q. The most recent registration review decision
19  will effectively approve all labeled uses after
20  consideration of the full database on glyphosate and
21  glyphosate-based formulations at EPA's disposal,
22  correct?
23        MR. TRAVERS: Object -- object to form.
24    A. It may or may not. It's not out yet. We have
25  to wait.

38 (Pages 594 to 597)

HIGHLY                 Charles Benbrook, Ph.D.                 HIGHLY
CONFIDENTIAL               August 14, 2018                CONFIDENTIAL

---

Page 598

1          MR. HOLLINGSWORTH:  Jeff, do you plan on
2   asking any questions?
3          MR. TRAVERS:  Not at this point.
4          MS. HOEKEL:  Grant, I have one.
5          MR. HOLLINGSWORTH:  Okay, go ahead.  Is
6   this Jennifer Hoekel?
7          MS. HOEKEL:  It is.
8          MR. HOLLINGSWORTH:  Okay.
9
10          EXAMINATION
11   BY MS. HOEKEL:
12      Q.  Dr. Benbrook, this is Jennifer Hoekel.  I was
13   at your deposition when we were in Clarkston earlier
14   this summer.
15      A.  Hello, Jennifer.
16      Q.  How are you?
17      A.  I'm fine.
18      Q.  Good.  You had talked earlier with
19   Mr. Hollingsworth about the -- about the duty to warn
20   issues with respect to the manufacturer, and my
21   question is do you have any opinion on the obligations
22   or the duty to warn by an ad agency for labeling
23   products?
24      A.  Ad agency.  No, no, I really don't.  I mean,
25   ad agencies are putting information in advertisements

---

Page 599

1   that are provided by their -- their clients, so I -- I
2   don't have any opinions about the responsibility of the
3   ad agency to verify the accuracy of content of ads that
4   they're asked to run.
5          MS. HOEKEL:  Thank you, Dr. Benbrook,
6   that's all I have.
7
8          FURTHER EXAMINATION
9   BY MR. HOLLINGSWORTH:
10      Q.  Sir, I want to get back to some of the
11   pesticides that glyphosate displaced as referred to in
12   your publications and just your general knowledge about
13   the issue, okay?
14      A.  Okay.
15      Q.  Okay.  Do you think that glyphosate displaced
16   the use of Atrazine at all?
17      A.  Not to any significant extent.  The Atrazine
18   labels went through some substantial changes, you know,
19   maybe six or eight years ago.  The maximum application
20   rate was cut.  There were a number of restrictions
21   placed on areas where Atrazine couldn't be used, and
22   it -- it did have a discernible impact -- these label
23   changes had a discernible impact on the overall pounds
24   applied principally on corn.  That's by far the main
25   use of Atrazine.  But it was -- it was modest, you

---

Page 600

1   know, 15 percent, 10 or 15 percent, and I'm quite --
2   I'm pretty sure that to this day Atrazine is the Number
3   2 herbicide used behind glyphosate.
4      Q.  And do you claim Atrazine has a more favorable
5   risk profile than glyphosate?
6      A.  Well --
7          MR. TRAVERS:  Objection, beyond the
8   scope of his expert disclosure.
9          THE WITNESS:  Do you want me to -- can I
10   still answer, Jeff, or you --
11          MR. HOLLINGSWORTH:  Yes.
12          MR. TRAVERS:  That is beyond the scope
13   of your expert opinion in this case.
14      Q.  (BY MR. HOLLINGSWORTH)  Sir, do you not
15   discuss other herbicides at all in your expert report?
16   I believe you mention them in several places.
17      A.  There's certainly a few others that I -- that
18   I mentioned.
19      Q.  Do you not mention Atrazine anywhere in your
20   expert report?
21      A.  It's no doubt mentioned in the use profile
22   where Atrazine was the Number 1 herbicide up through
23   2000, but by 2001 or '2 was displaced by glyphosate.
24   So I -- I know I talk about the -- the use of Atrazine,
25   but I say nothing about the toxicological profile of

---

Page 601

1   Atrazine or -- or comparative risk assessment between,
2   say, an acre of corn sprayed with Atrazine versus an
3   acre of corn sprayed with glyphosate.  That's a whole
4   another complicated analysis which was not pertinent
5   to -- to this case.
6      Q.  In several paragraphs in your report including
7   on page -- paragraph 944 --
8      A.  944.
9      Q.  -- you discuss Atrazine exposures via drinking
10   water and their association with breast cancer,
11   correct?
12      A.  Let me see what section we're in.  We're in --
13   okay.  Yes, okay.
14      Q.  Okay.  So is it your opinion that Atrazine has
15   a more favorable risk profile than glyphosate?
16          MR. TRAVERS:  Objection, asked and
17   answered.
18      A.  The -- the risk profile of both glyphosate and
19   Atrazine is very complicated.  It depends on to whom
20   you're -- we're referring and what risk, and at this
21   point I'm not prepared to -- to make any statements
22   regarding in general which herbicide poses the more or
23   less risk.  They -- they pose some similar risks and
24   raise some of the similar concerns, but I'm not
25   prepared to do a -- on -- off the top of my head a

---

39 (Pages 598 to 601)

Page 602

1 comparative risk assessment, sorry.

2   Q. (BY MR. HOLLINGSWORTH) Sir, you don't have

3 the expertise to conduct a comparative risk assessment

4 between one pesticide and another; is that what you're

5 saying?

6   A. No, that's not what I'm saying.

7   Q. So you do claim to have that expertise?

8   A. Yes, I do.

9   Q. Okay. So if someone comes in at the next

10 deposition after you've had time to prepare and asks

11 you about that, you'll be ready for -- to testify as to

12 that?

13    MR. TRAVERS: Objection. This case is

14 not about Atrazine. If we -- and he's not been asked

15 to do a comparative assessment between Atrazine and

16 glyphosate and he's not being asked to do that in this

17 case, so it's beyond his expert disclosure in this case

18 and I would object to that question.

19   Q. (BY MR. HOLLINGSWORTH) Okay. Well, I'll ask

20 you a question specific to glyphosate. How are

21 glyphosate's environmental and toxicological profiles

22 safer or better than Atrazine?

23    MR. TRAVERS: Objection, asked and

24 answered. He has not done that comparative analysis in

25 this case. He just told you that.

Page 603

1   Q. (BY MR. HOLLINGSWORTH) Are you not going to

2 respond?

3   A. As I said, you know, discussing in general the

4 risk profile of a -- of a herbicide like glyphosate

5 that's used on over 100 crops in a vast different set

6 of ways exposing different cohorts of people to

7 different risks from cancer risk to reproductive risk,

8 birth defects, liver toxicity, it's -- it's extremely

9 complicated and difficult to actually compare risk

10 levels. It's a little easier in the case of Atrazine

11 because it's only used to a substantial extent on a

12 small number of crops. It rarely, rarely, if ever,

13 shows up as a residue in food, but the big concern with

14 Atrazine are the levels in drinking water because it's

15 a -- it's a herbicide that leaches down into ground

16 water aquifers.

17    One could do a comparative risk assessment of

18 Atrazine versus glyphosate exposures via drinking water

19 based on some of the recent USGS monitoring data

20 that -- that I'm aware of, but I haven't -- I haven't

21 done that analysis recently, and it's not -- you know,

22 I -- I saw no reason to do so in the context of this

23 case.

24   Q. Sir, your opinion is that glyphosate-based

25 herbicides cause NHL; is that right?

Page 604

1   A. I -- yes, I believe that there's clear

2 evidence in the scientific record that exposure to

3 glyphosate-based herbicides is a -- is a risk factor

4 for non-Hodgkin's lymphoma.

5   Q. Am I also correct that you reached that

6 opinion by relying on epidemiology, genotoxicity and

7 animal studies in combination?

8   A. Yes.

9   Q. It is not your opinion that the genotoxicity

10 database on glyphosate and glyphosate-based herbicides

11 by itself provides sufficient evidence to say

12 glyphosate-based herbicides cause NHL, right?

13   A. I would -- I would agree with that.

14   Q. It is not your opinion that the glyphosate

15 epidemiology database by itself provides sufficient

16 evidence to say glyphosate-based herbicides cause or

17 are associated with NHL, correct?

18    MR. TRAVERS: Objection to form.

19 There's a big difference between cause and associated.

20   A. Yeah. I think there's -- there's important

21 evidence suggesting a link in the epidemiological data,

22 but it -- there's no reason or need to base such a

23 judgment only on that data because there's a lot of

24 other data that is relevant and should be taken into

25 account.

Page 605

1   Q. (BY MR. HOLLINGSWORTH) Okay. It's not your

2 opinion that glyphosate epidemiological database by

3 itself provides sufficient evidence to say that

4 glyphosate-based herbicides cause NHL, right?

5   A. I -- I guess I would agree with that, yeah.

6   Q. Okay. But it is your opinion that the

7 epidemiological database by itself provides sufficient

8 evidence to say that glyphosate-based herbicides are

9 associated with NHL?

10   A. Yes.

11   Q. Okay. So when IARC says that the epidemiology

12 evidence is limited, you're disagreeing with IARC; is

13 that correct?

14   A. No, no, not really.

15    MR. TRAVERS: Objection to form.

16   Q. (BY MR. HOLLINGSWORTH) Okay. How are you not

17 disagreeing with IARC?

18   A. You know, I -- I think IARC's -- IARC's

19 analysis is -- is quite sound. It's actually not that

20 different from the analysis of several of the Monsanto

21 scientists. There's multiple statements in the record

22 from Acquavella and -- and Strahan, the -- the man that

23 actually participated in the IARC working group

24 process, that IARC evaluation of the epidemiological

25 database was fairly consistent with their own. So I --

HIGHLY                Charles Benbrook, Ph.D.              HIGHLY
CONFIDENTIAL              August 14, 2018               CONFIDENTIAL

Page 606

1    you know, it's -- it's not sufficient evidence in and
2    of itself, it's not as strong as the genotox evidence
3    taken as a whole, but it's -- you know, it certainly
4    adds to the -- to the knowledge base for anyone trying
5    to reach a judgment on whether exposure to glyphosate
6    and glyphosate-based herbicides poses an NHL risk.
7        Q.  It is not your opinion that glyphosate animal
8    carcinogenicity database by itself provides sufficient
9    evidence to say that glyphosate-based herbicides cause
10   NHL, right?
11       A.  I would agree with that, yes.
12       Q.  It is your opinion that when you combine all
13   three of those bodies of science, that is when you have
14   sufficient evidence to say that glyphosate-based
15   herbicides cause NHL, correct?
16       A.  Well, certainly contribute to non-Hodgkin's
17   lymphoma risk, yes.  I think that's the -- that was
18   the -- the basic judgment of the IARC working group was
19   that it -- there are -- there are -- that there is a --
20   a probable cancer risk following exposures to
21   glyphosate-based herbicides based on the totality of
22   the evidence that they reviewed.
23       Q.  Okay.  But you have no formal training in
24   genotoxicity, correct?
25       A.  Correct.

Page 607

1        Q.  You have no formal training in epidemiology,
2    correct?
3        A.  Correct.
4        Q.  You have no formal training in animal
5    carcinogenicity, correct?
6        A.  Correct.
7            MR. HOLLINGSWORTH:  That's all the
8    questions I have.
9            VIDEO OPERATOR:  This concludes the
10   deposition of Charles Benbrook, Ph.D. on August 14,
11   2018.  The time now is approximately 11:48 a.m.
12           (Deposition concluded at 11:48 a.m.)
13           (Signature was reserved.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 608

1            CORRECTION & SIGNATURE PAGE
2    RE:  RONALD PETERSON vs. MONSANTO COMPANY
         CITY OF ST. LOUIS, STATE OF MISSOURI;
3        1622-CC01071
         CHARLES BENBROOK, Ph.D., VOLUME II
4        TAKEN AUGUST 14, 2018
             REPORTED BY:  PATSY D. JACOY
5
         I, CHARLES BENBROOK, Ph.D., have read the within
6    transcript taken August 14, 2018, and the same is true
     and accurate except for any changes and/or corrections,
7    if any, as follows:
8
9    PAGE/LINE       CORRECTION        REASON
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22    Signed at _____, Washington,
23   on this date: _____.
24           _____
25           CHARLES BENBROOK, Ph.D.

Page 609

1            REPORTER'S CERTIFICATE
2
3        I, PATRICIA D. JACOY, the undersigned Certified Court
4    Reporter, pursuant to RCW 5.28.010 authorized to administer
5    oaths and affirmations in and for the State of Washington, do
6    hereby certify that the sworn testimony and/or proceedings, a
7    transcript of which is attached, was given before me at the
8    time and place stated therein; that any and/or all witness(es)
9    were duly sworn to testify to the truth; that the sworn
10   testimony and/or proceedings were by me stenographically
11   recorded and transcribed under my supervision, to the best of
12   my ability; that the foregoing transcript contains a full,
13   true, and accurate record of all the sworn testimony and/or
14   proceedings given and occurring at the time and place stated
15   in the transcript; that a review of which was requested; that
16   I am in no way related to any party to the matter, nor to any
17   counsel, nor do I have any financial interest in the event of
18   the cause.
19       WITNESS MY HAND AND DIGITAL SIGNATURE this 15th day of
20   August, 2018.
21
         _____
22   PATRICIA D. JACOY
     Washington State Certified Court Reporter, #2348
23
24
25

41 (Pages 606 to 609)