# EXHIBIT 13

CONFIDENTIAL

Page 1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2               FOR THE COUNTY OF SAN FRANCISCO

3    _____

4    DEWAYNE JOHNSON,

5           Plaintiff,

6

        -vs-                        Case No. CGC-16-550128

7

8    MONSANTO COMPANY,

9           Defendant.

     _____

10

11

12          CONFIDENTIAL VIDEOTAPED DEPOSITION OF

13                DR. CHARLES M. BENBROOK

14                9:04 a.m. to 7:45 p.m.

15                 February 8, 2018

16                 Orange, Virginia

17

18

19

20

21

22

23

24   Job No. 137478

25          REPORTED BY:  Rhonda D. Tuck, RPR, CRR

CONFIDENTIAL

Page 2

1    Confidential Videotaped Deposition of
2  DR. CHARLES M. BENBROOK, taken and transcribed on
3  behalf of the Defendant, by and before Rhonda D.
4  Tuck, RPR, CRR, Notary Public in and for the
5  Commonwealth of Virginia at large, pursuant to the
6  Rules of Civil Procedures for the State of
7  California, and by Notice to Take Depositions;
8  commencing at 9:04 a.m., February 8, 2018, at The
9  Round Hill Inn, 750 Round Hill Drive, Orange,
10  Virginia.

12  APPEARANCES OF COUNSEL:

14  THE MILLER FIRM
15  The Sherman Building
16  108 Railroad Avenue
17  Orange, Virginia 22960
18  BY: TIMOTHY LITZENBURG, ESQUIRE
19  JEFFREY TRAVERS, ESQUIRE
20  Counsel for the Plaintiff

Page 3

1  APPEARANCES OF COUNSEL CONT'D:

3  ANDRUS WAGSTAFF
4  19 Belmont Street
5  South Easton, Massachusetts 02375
6  BY: KATHRYN FORGIE, ESQUIRE
7  Counsel for the Plaintiff

12  HOLLINGSWORTH
13  1350 I Street, N.W.
14  Washington, DC 20005
15  BY: WILLIAM COPLE, III, ESQUIRE
16  GRANT HOLLINGSWORTH, ESQUIRE
17  Counsel for the Defendant

Page 4

1  APPEARANCES OF COUNSEL CONT'D:

3  WINSTON & STRAWN
4  35 W. Wacker Drive
5  Chicago, Illinois 60601
6  BY: SARAH KRAJEWSKI, ESQUIRE
7  Counsel for the Defendant

13  ALSO PRESENT:
14  Matthew Henry - Videographer

Page 5

1         I N D E X

2  WITNESS: DR. CHARLES M. BENBROOK

3  Examination by Mr. Cople.............................10

4  Examination by Mr. Litzenburg.......................573

CONFIDENTIAL

E X H I B I T S

Benbrook Exhibit Number 1.............................11
"Time Spent on Miller Glyphosate Case"

Benbrook Exhibit Number 2.............................66
"Supplemental Reliance List: Dr. Benbrook"

Benbrook Exhibit Number 3.............................81
"Resume for Charles M. Benbrook"

Benbrook Exhibit Number 4.............................83
"Expert Report of Charles Benbrook"

Benbrook Exhibit Number 5.............................99
"Defendant Monsanto Company's Notice of Videotaped
   Deposition of Charles M. Benbrook Via Deposition
   Subpoena"

Benbrook Exhibit Number 6.............................103
Title 40 Code of Federal Regulation, Section 158.500

Benbrook Exhibit Number 7.............................143
"Revised Glyphosate Issue Paper: Evaluation of
   Carcinogenic Potential, EPA's Office of Pesticide
   Programs, December 12th, 2017"

E X H I B I T S

Benbrook Exhibit Number 8.............................150
U.S. EPA Memorandum, 12/12/17, Subject: Glyphosate
   Draft Human Health Risk Assessment in Support of
   Registration Review

Benbrook Exhibit Number 9.............................198
Testimony of Anna B. Lowit before House Committee on
   Science, Space and Technology, 2/6/18

Benbrook Exhibit Number 10.............................202
U.S. EPA Memorandum, 3/4/85, Subject: Consensus Review
   of Glyphosate Caswell No. 661A

Benbrook Exhibit Number 11.............................231
"Guidance for the reregistration of pesticide products
   containing glyphosate as the active ingredient"

Benbrook Exhibit Number 12.............................267
Verbatim transcript of 2/11/86 SAP meeting

Benbrook Exhibit Number 13.............................269
U.S. EPA Memorandum, 2/24/86, Subject: Transmittal of
   the Final FIFRA Scientific Advisory Panel Reports on
   the February 11-12, 1986 Meeting

Benbrook Exhibit Number 14.............................286
U.S. EPA Memorandum, 6/19/89, Subject: Glyphosate -
   EPA Registration Nos. 524-318 and 524-333 - Historical
   Control Data for Mouse Kidney Tumors

Benbrook Exhibit Number 15.............................310
U.S. EPA Memorandum, 10/30/91, Subject: Second Peer
   Review of Glyphosate

Benbrook Exhibit Number 16.............................321
EPA Reregistration Eligibility Decision for Glyphosate

Benbrook Exhibit Number 17.............................367
EPA Label Review Manual

(9:04 a.m., February 8, 2018)

        THE VIDEOGRAPHER:  This is the start of
Media Label Number 1 of the video-recorded
deposition of Dr. Charles Benbrook, in the
matter of Dewayne Johnson versus Monsanto
Company, in the Superior Court of the State of
California, for the County of San Francisco,
Case Number CGC-16-550128.
        This deposition is being held at
750 Round Hill Road, Orange, Virginia, on
February 8, 2018, at approximately 9:04 a.m.
        My name is Matthew Henry, legal video
specialist with TSG Reporting.  The court
reporter is Rhonda Tuck, in association with TSG
Reporting.
        Counsel, please introduce yourselves.
        MR. LITZENBURG:  Timothy Litzenburg and
Jeff Travers, for The Miller Firm, for the
plaintiff.
        MS. FORGIE:  Kathryn Forgie, Andrus
Wagstaff, for the plaintiff.
        MR. COPLE:  William Cople and Grant
Hollingsworth, both of Hollingsworth LLP, for
Monsanto Company.

CONFIDENTIAL

## Page 10

1    MS. KRAJEWSKI:  Sarah Krajewski, for
2  Monsanto Company.
3    THE VIDEOGRAPHER:  Will the court
4  reporter please swear in the witness.
5
6    DR. CHARLES M. BENBROOK
7  was first duly sworn and testified as follows:
8    E X A M I N A T I O N
9  BY MR. COPLE:
10   Q.   Good morning, Dr. Benbrook.
11   A.   Good morning, Mr. Cople.
12   Q.   We haven't met before, have we?
13   A.   I don't think so.
14   Q.   I don't think so either.  We'll spend a
15  good amount of time today talking and probably a
16  good amount of time tomorrow, as well.  We have your
17  expert report in the Dewayne Johnson case, and our
18  understanding is that you've been retained to be an
19  expert on his behalf in that lawsuit.  Correct?
20   A.   Yes.
21   Q.   We have your expert report, which is, as
22  I recall, 207 pages and 1,096 individual numbered
23  paragraphs.  Does that sound about right?
24   A.   About right, yes.
25    MR. COPLE:  All right.  We also have what

## Page 11

1  was handed to me just at the outset of this
2  deposition.  Let's mark this as an exhibit for
3  the deposition, Exhibit 1.  We'll do it as a
4  single deposition.
5    (Benbrook Exhibit Number 1 is marked for
6  identification.)
7  BY MR. COPLE:
8   Q.   Just for identification, I have what
9  looks like a time sheet or time spent by yourself,
10  Dr. Benbrook, on various aspects of a glyphosate
11  case from The Miller Law Firm, and I'll ask you in a
12  moment to explain what this is, but I've got one,
13  two, three, four, five, six, seven separate pages.
14    Are these all time sheets for your work
15  spent?
16   A.   Yes, sir.
17   Q.   How many hours does it take you to
18  research and write and edit what ends up to be your
19  final expert report, which we haven't marked yet,
20  but we will a little later, your expert report in
21  this case?
22   A.   It would be the majority of the hours
23  listed for October, November, and December in the
24  billing records.  That's when I was actively
25  writing.

## Page 12

1   Q.   Can you give us an approximate number for
2  those months?
3   A.   Yeah, sure.  Between 320 and 350.
4   Q.   Okay.  Between 320 and 350 hours that you
5  spent just researching information and writing your
6  expert report.  Is that right?
7   A.   Those hours were predominantly writing
8  the report.  I had done significant research prior
9  to that.
10   Q.   Also to support the writing of the
11  report?
12   A.   Well, I suppose any effort I made to read
13  EPA documents, scientific literature on
14  glyphosate-based herbicides could and probably did
15  feed into my knowledge that I brought to the task of
16  writing the report, which I -- as I said, I started
17  actually creating a file that became the report in
18  October.
19   Q.   What's the hourly rate that you charge
20  The Miller Firm for your work for Mr. Johnson's
21  case?
22   A.   About $300 an hour.
23   Q.   Is that the same rate for testifying
24  today at the deposition?
25   A.   Yes, sir.

## Page 13

1   Q.   Is it the same rate as for testifying at
2  trial?
3   A.   Yes, sir.
4   Q.   So $300 an hour times 320 to 350 hours
5  spent researching and writing the report would
6  reflect the amount of compensation you received for
7  preparing your expert report, right?
8   A.   Yes.
9   Q.   Were there additional hours beyond the
10  320 to 350 hours you just described?
11   A.   No.
12   Q.   So that's the total figure for the amount
13  of time you spent on the case?
14   A.   No.  That is the time that I spent on the
15  case from October, when I started actively writing
16  the report, until, what -- it was filed
17  December 23rd or early -- a few days before
18  Christmas.
19   Q.   When did -- when did you start working on
20  this case?
21   A.   I was contacted by Mr. Litzenburg in late
22  September of 2016, by phone.  A few days later, it
23  so happened I was in Baltimore.  I had been in some
24  meetings at Johns Hopkins University, and I had to
25  go to National Airport.  And Mr. Litzenburg was

CONFIDENTIAL

Page 14

1   driving through Baltimore to D.C., and we met -- met
2   at the hotel I stayed at, and he gave me a ride to
3   National Airport.  That was the first time I met him
4   in person, and we discussed the case then.  Sometime
5   in the next week or so, we formally agreed that I
6   would work on the case.
7       Q.    And what month was this?
8       A.    September.  Late September.
9       Q.    2017?
10      A.    2016.
11      Q.    2016.  Did you know Mr. Litzenburg before
12  he called you?
13      A.    No.
14      Q.    Did you know anybody at The Miller Firm
15  before he called you?
16      A.    No, sir.
17      Q.    Did you know any of the lawyers involved
18  in litigation filed against Monsanto regarding
19  glyphosate before Mr. Litzenburg called you?
20      A.    Oh, jeez, I don't know all the lawyers
21  that have been involved in litigation involving
22  Monsanto.
23      Q.    Do you know how Mr. Litzenburg came to
24  contact you or reach out to you?
25      A.    Let's see if I can remember.  I don't.  I

Page 15

1   don't recall.
2       Q.    You've been deposed a great many times;
3   is that right?
4       A.    Well, I've been deposed 15 --
5   approximately 15 times.
6       Q.    And you've given trial testimony a number
7   of times too, right?
8       A.    Twice.
9       Q.    So twice in a courtroom in front of a
10  jury?
11      A.    Yes, sir.
12      Q.    And 15 or up to as many as 20
13  depositions?
14      A.    I don't think 20, no, but around 15.  My
15  litigation history is in my resume, and I'm sure
16  you'll go over it, so we'll get the right number.
17      Q.    Everything in your resume is current and
18  up to date; is that correct?
19      A.    The only thing I didn't add is I've had a
20  new peer-reviewed paper accepted just a few days
21  ago.  It's not published yet, but it will be.  It's
22  on the nutritional value of different types of milk.
23  I didn't feel it was necessary for me to update it
24  as accepted.  It's not published yet.  But that's
25  the only thing I would add.

Page 16

1       Q.    Does it have anything to do with
2   glyphosate?
3       A.    No.
4       Q.    Does it have anything to do with
5   Monsanto?
6       A.    Not a thing.
7       Q.    Does it have anything to do with EPA
8   regulations?
9       A.    No, sir.
10      Q.    The report, your final expert report in
11  this case, which, as I said, we have, does that
12  represent all of the opinions that you have formed
13  and are intending to give in this -- in this lawsuit
14  for Mr. Johnson?
15          MR. LITZENBURG:  Objection to form.
16      You can answer.
17          THE WITNESS:  Certainly all of the
18      opinions that I hold at this time.
19  BY MR. COPLE:
20      Q.    You intend to do additional work where
21  you might form additional opinions?
22          MR. LITZENBURG:  Objection to form.
23          THE WITNESS:  Well, I -- I will continue
24      to read the literature that comes out on
25      glyphosate.  I really don't think anything

Page 17

1   that -- anything new that's published will be
2   material to this case, given the facts of the
3   case, but I'm not going to stop thinking or
4   reading or tracking developments involving
5   glyphosate-based herbicides.
6   BY MR. COPLE:
7       Q.    Sitting here right now, you expect that
8   the opinions that you would give at a trial of
9   Mr. Johnson's case would all be included in the
10  current version of your expert report; is that
11  right?
12      A.    I would suspect so, yes.
13      Q.    And if you form additional opinions,
14  you're going to let us know?
15      A.    Sure.
16          MR. LITZENBURG:  Form.
17  BY MR. COPLE:
18      Q.    That's great.  Now, you're an economist
19  by education and training, aren't you?
20      A.    My degree was in economics, correct.
21      Q.    And you -- as I understand, when I say
22  Dr. Benbrook, I'm referring to a Ph.D. you have in
23  agricultural economics, correct?
24      A.    Right.
25      Q.    So that's also training and education as

CONFIDENTIAL

Page 18

1   an economist, correct?
2       A.   Correct.
3       Q.   Economics is a social science?
4       A.   Correct.
5       Q.   You're not a scientist by education or
6   training, right?
7       A.   Well, that would depend whether you are
8   among the people that feel that field of study such
9   as economics is a science or whether it's something
10  else; but in general and in all academic
11  institutions, degrees awarded in the field of
12  economics are granted a doctor of philosophy degree.
13      Q.   You are not educated or trained in any
14  field of medicine, right?
15      A.   Correct.
16      Q.   And that would include oncology or
17  anything pertaining to the diagnosis or treatment of
18  cancer?
19      A.   Correct.
20      Q.   You have no education or educational
21  degree recognizing you as an epidemiologist, right?
22      A.   Correct.
23      Q.   And how about toxicology?  Do you have
24  education in toxicology that's granted you a degree?
25      A.   No, sir.

Page 19

1       Q.   Chemistry?
2       A.   No, sir.
3       Q.   Is there any physical science in which
4   you have received education that has recognized you
5   with a degree?
6       A.   No.
7       Q.   What about the field of regulation,
8   specifically the U.S. Environmental Protection
9   Agency?  Are you trained and certified by any
10  organization as someone who has expertise in EPA
11  regulations?
12           MR. LITZENBURG:  Form.
13           THE WITNESS:  I don't know of any
14  organization that does that.  If one had
15  existed, I perhaps might seek such
16  certification, since my -- throughout my entire
17  career I've worked on federal pesticide
18  legislation, regulation issues, but I don't know
19  of any such certification.
20  BY MR. COPLE:
21      Q.   Well, let's just --
22      A.   So I have none.
23      Q.   Well, let's just talk about what you just
24  said for a brief moment:  Throughout your career
25  that you've worked on pesticide legislation and

Page 20

1   regulation.
2            When you say "legislation," are you
3   referring to the job you had back in 1981 through
4   1983 with the committee -- subcommittee of the House
5   Agricultural Committee?
6       A.   That was my first significant
7   introduction to the Federal Insecticide, Fungicide,
8   Rodenticide Act, otherwise known as FIFRA, which is
9   the primary federal statute governing the use of
10  regulation of pesticides in the United States.
11           The subcommittee on which I served as the
12  staff director was named Subcommittee on Department
13  Operations Research and Foreign Agriculture.  And
14  within that subcommittee's jurisdiction in the House
15  of Representatives fell this federal pesticide law,
16  or FIFRA, and hearings and legislative activity
17  involving FIFRA was, as it turned out, the issue
18  that commanded the largest percent of time in the
19  subcommittee for the three years that I served as
20  the staff director.  So it was -- it was a full body
21  immersion in the law and regulations and issues at
22  that time, and I have remained active and involved
23  with legislation impacting the regulation of
24  pesticides since that time.
25      Q.   When you say you've served on the

Page 21

1   committee or on the subcommittee, you mean you've
2   served for the subcommittee, correct?
3       A.   Yes, I served on the subcommittee staff.
4       Q.   You were not a member of the
5   subcommittee?
6       A.   I was not an elected member of Congress,
7   no, sir.
8       Q.   And you were the staff director, as I
9   recall from your resume, right?
10      A.   Correct.
11      Q.   And so that would suggest that there were
12  staffers other than yourself for the subcommittee,
13  right?
14      A.   There were some interns from time to
15  time, but I was the sole professional staff member,
16  and I was hired into a job for which there was a job
17  title before I took it, and the job title was staff
18  director.
19      Q.   Not to be glib, Doctor, but are you
20  saying you were a staff director without a formal
21  staff?
22      A.   Yes, sir.
23      Q.   All right.  As the staff director, you
24  were not asked to investigate scientific questions
25  regarding, for example, toxicity of pesticides,

CONFIDENTIAL

Page 22

1  right?
2      A.   Yes, I was.
3      Q.   As a scientist?
4      A.   As the staff director of that
5  subcommittee, when the members of the subcommittee
6  felt there were issues pertaining to the regulation
7  of pesticides, the risk of pesticides, the quality
8  of data supporting pesticide regulations, the risk
9  of cancer from use of and exposure to pesticides --
10  when members had concerns about issues of that
11  nature, as is the case with all congressional
12  subcommittees and committees, they work with the
13  staff to request information from federal agencies,
14  from other impacted parties, from stakeholders.
15  They request assistance from the staff in setting up
16  hearings, identifying knowledgeable people who can
17  speak to the issues of concern, to members of the
18  subcommittee or their constituents.  And throughout
19  the time I served as the staff director of the DORFA
20  subcommittee, pesticide risks and, in particular,
21  cancer issues were of primary concern.
22      Q.   So you organized hearings, right?
23      A.   Correct.
24      Q.   And you identified individuals that were
25  knowledgeable about different scientific or

Page 23

1  regulatory aspects of pesticides, correct?
2      A.   Yes, sir.
3      Q.   And you reached out to different federal
4  agencies that had legal responsibility for the
5  regulation of pesticides, correct?
6      A.   Yes.
7      Q.   My question to you was, did you conduct
8  scientific investigations of toxicity of pesticides?
9      A.   Define "scientific investigation."
10      Q.   Did you do scientific research?  Did you
11  do bench experiments with rodents?  Did you do
12  epidemiology reviews of study of disease and human
13  populations?  Did you do anything that a scientist
14  does?
15      A.   No.  I did not have a lab.  I did not
16  conduct any animal experiments.  I did not collect
17  any original data supporting an epidemiological
18  assessment.  No, I didn't do any of those
19  activities.
20      Q.   You worked for Congressman George Brown;
21  is that right?
22      A.   Correct.  He was the chairman of the
23  subcommittee.
24      Q.   That's former Congressman Brown from
25  California; is that right?

Page 24

1      A.   Yes, sir.
2      Q.   Is there anyone else you've worked for as
3  staff director besides Congressman Brown?
4      A.   Well, I really worked for the full
5  committee, the full subcommittee.  This was back at
6  a time when the Congress still functioned in a
7  largely bipartisan basis.  There was a high degree
8  of cooperation between both the majority and
9  minority members of the subcommittee and the staff.
10      I worked very closely with William
11  Wampler, the ranking Republican on the subcommittee,
12  a very distinguished congressman from the great
13  state of Virginia.  After Mr. Wampler left the
14  Congress, Pat Roberts from Kansas became the ranking
15  minority member.  I worked very close with
16  Mr. Roberts.  I think everyone on the subcommittee
17  was pleased and proud that we worked in such a
18  collegial and collaborative way.
19      Q.   You worked closely with Congressman
20  Wampler of Virginia, Congressman Roberts of Kansas,
21  Congressman Brown, and maybe others to do the things
22  you just described: organize hearings, identify
23  knowledgeable individuals, and reach out to federal
24  agencies, correct?
25      A.   Yes, sir.

Page 25

1      Q.   Now, the federal agencies that you
2  reached out to, which ones were they?
3      A.   The Environmental Protection Agency, the
4  U.S. Department of Agriculture, the Food and Drug
5  Administration, the Department of Health and Human
6  Services, the National Cancer Institute, various,
7  various subagencies within -- USDA, of course.
8  Those were the primary federal agencies that we
9  interacted with.  We also had substantial
10  interaction with some state agencies.
11      Q.   And each of those agencies that you
12  reached out to have had responsibility or still have
13  responsibility, direct or indirect, for regulation
14  of pesticides in the United States, correct?
15      A.   No, not all of them.  The National Cancer
16  Institute, for example, has no direct responsibility
17  in conducting and acting upon regulatory proposals
18  or petitions to establish tolerances or set
19  acceptable levels of exposure.  The National Cancer
20  Institute is, as you know, a science agency that
21  conducts studies of factors impacting human health.
22      So the National Cancer Institute did not
23  have a direct role in the regulation of pesticides,
24  but clearly did have an important role in
25  contributing to the body of scientific knowledge

CONFIDENTIAL

Page 26

1    that the EPA and other federal agencies and the
2    Congress, for that matter, drew upon in making
3    decisions about -- about pesticide regulation and
4    use.
5        Q.    You never worked for the National Cancer
6    Institute, correct?
7        A.    Correct.
8        Q.    You're not a scientist, so there would
9    not have been an appropriate place for you to work
10   there, right?
11       A.    I am a scientist.  I have a doctor of
12   philosophy in economics.  I publish in scientific
13   journals.  I publish on a wide range of issues that
14   arise in the regulation and use of pesticides from
15   agronomic, integrated pest management impacts, to
16   human health impacts, to drift and damage to crops.
17   Gaining expertise in these various aspects of the
18   use, risk and benefits of pesticides, is -- it's
19   necessary for people that become heavily involved in
20   the regulation of pesticides.
21       Q.    You have no degree in any physical
22   science, correct?
23       A.    Sir, you already asked me that question.
24       Q.    Well, you said you're a scientist.  I
25   want to be clear that you have no degree in any

Page 27

1    physical science.
2             MR. LITZENBURG:  Asked and answered.
3             THE WITNESS:  Correct.
4    BY MR. COPLE:
5        Q.    And you have no formal training in any
6    physical science, right?
7             MR. LITZENBURG:  Asked and answered.
8             THE WITNESS:  Correct.
9    BY MR. COPLE:
10       Q.    Now, these other agencies -- you
11   distinguished NCI as not a regulator, and these
12   other agencies that you would reach out to, did they
13   all -- did they have direct or indirect
14   responsibility for pesticide regulation in the
15   United States?
16       A.    The Environmental Protection Agency is
17   the primary and lead agency with primary
18   responsibility over most aspects of pesticide
19   regulation.  The statutory authority for EPA's
20   regulatory actions arise from two different
21   statutes.  The Federal Insecticide, Fungicide, and
22   Rodenticide Act, which was passed in the '50s and
23   has been significantly amended perhaps four or five
24   times since its initial passage, directs most
25   provisions to the Environmental Protection Agency.

Page 28

1        However, a critical part of the
2    regulation and use of all agricultural pesticides
3    applied on food crops is the setting of tolerances
4    governing legal levels of pesticides -- and often
5    there are breakdown products -- in food at the time
6    the food is harvested and moves off of the field
7    where it was produced.
8        The authority for setting such tolerance
9    levels is contained in the Food, Drug, and Cosmetic
10   Act, which is the primary authorizing statute for
11   the food, drug -- for the Food and Drug
12   Administration, the FDA.
13       Prior to the formation of the EPA in
14   1972, the FDA was the agency with primary
15   responsibility over setting tolerances and assessing
16   pesticide residues in food.  The FDA's role and
17   responsibility in setting tolerances under Sections
18   408 and 409 of the Food, Drug, and Cosmetic Act were
19   transferred to the EPA in 1972 upon the formation of
20   that agency by then President Nixon.
21       As part of that transfer, the underlying
22   statutory authority in the Food, Drug, and Cosmetic
23   Act in effect shifted to governing the actions of
24   the EPA in reviewing petitions from pesticide
25   manufacturers for the establishment of tolerances

Page 29

1    under these two operative sections of the Food,
2    Drug, and Cosmetic Act.
3        Since 1972, FDA's role in pesticide
4    regulation has been minimal.  They do conduct
5    ongoing annual assessments of pesticide residues in
6    the food supply through what's called the Total Diet
7    Study, and they become involved in pesticide
8    regulatory issues from time to time, especially when
9    the heart of the issue arises from some conflict
10   between provisions in the Food, Drug, and Cosmetic
11   Act and operating regulations thereto, compared to
12   provisions in the FIFRA statute and regulations that
13   have been promulgated in response to the provisions
14   of that law.
15       So that's the EPA/FDA interface.
16       The U.S. Department of Agriculture has no
17   direct authority but is in pesticide regulation, but
18   it is often consulted.  And there are varying
19   degrees of formal advisory roles that the U.S.
20   Department of Agriculture has played over the last
21   40 years with often the EPA and the FDA in various
22   interagency committees and councils, et cetera, to
23   try to assure that the different federal agencies
24   with some responsibility or some role or
25   interactions with impacted stakeholder groups remain

CONFIDENTIAL

## Page 30

1   more or less on the same page relative to policy
2   issues, the need for new legislation, budget issues,
3   responding to various crisis, et cetera.
4       The Department of Agriculture's important
5   direct roles in pesticide regulatory program at this
6   time arise out of the activities in the agriculture
7   marketing service, which administers the pesticide
8   data program, which is a congressionally authorized
9   and funded pesticide residue testing program carried
10  out on an annual basis, through which between 15 and
11  25,000 samples of foods that play an important role
12  in the diets of infants and children are tested for
13  the presence and levels of several hundred
14  pesticides and their isomers and metabolites so that
15  the data, the data on actual residues in food as
16  eaten, can be provided on an annual basis to the
17  Environmental Protection Agency for incorporation in
18  its dietary risk assessments.
19      Congress established that program in 1990
20  and has funded it ever since in the interest of
21  assuring that EPA pesticide dietary risk assessments
22  are based on real-world, accurate, and up-to-date
23  data, particularly for those foods that play a
24  significant role in the diets of infants and
25  children.

## Page 31

1       The Department of Agriculture also has a
2   pest management office, which works on the impacts
3   of a broad spectrum of USDA programs on agricultural
4   practices and, in particular, an approach to pest
5   management called "integrative pest management,"
6   which is universally regarded as the most
7   sustainable and safest way for farmers on an ongoing
8   basis to deal with pests.  And that office of pest
9   management within USDA plays a number of different
10  roles in the pesticide regulatory process.  Although
11  ultimately, at the end of the day, the major
12  decisions remain with EPA.
13      Q.   So your answer is yes?
14          MR. LITZENBURG:  Objection.  That was the
15      answer.
16          THE WITNESS:  I -- my -- I just gave you
17      my answer.  You asked for the role of different
18      federal agencies.
19  BY MR. COPLE:
20      Q.   No, I didn't.  I asked you if any of the
21  three agencies, other than NCI, that you reached out
22  to had direct or indirect responsibility for
23  regulation of pesticides in the United States.  So
24  your answer is yes, correct?
25      A.   That is not a question that can be

## Page 32

1   answered with a yes-or-no answer, sir.  Sorry.
2       Q.   So you don't know the answer?
3       A.   I just gave you the answer.
4           MR. LITZENBURG:  Just gave you a lengthy
5       answer.
6   BY MR. COPLE:
7       Q.   Now, you've never worked for -- you've
8   been employed by EPA, correct?
9       A.   No, I've never been a full-time employee
10  of the EPA.
11      Q.   You've never been employed by FDA,
12  correct?
13      A.   Correct.
14      Q.   Never been employed by USDA, correct?
15      A.   Correct.
16      Q.   And those are the agencies you just gave
17  that long answer describing their responsibilities,
18  correct?
19      A.   Correct.
20      Q.   All right.  When we received your expert
21  report, we also received subsequent to it a
22  supplemental reliance list for you, Dr. Benbrook,
23  with a list of documents.  Are you familiar with the
24  supplemental reliance list?  Do you know what that
25  is?

## Page 33

1       A.   No.  I haven't seen it.
2       Q.   You didn't prepare it?
3       A.   No, I didn't.
4       Q.   Did you prepare in your report the --
5   Dr. Benbrook's -- there's another supplemental
6   reliances.  Did you prepare that, as well?
7       A.   I'd need to see what you're talking
8   about.
9       Q.   You don't know what that is without
10  having a document in front of you, a supplemental
11  reliance?
12      A.   I can't read your mind, sir.
13      Q.   My question was, you don't know what that
14  is without having a document in front of you,
15  correct?
16      A.   Correct.
17      Q.   All right.  Now, according to the
18  supplemental reliance list, you reviewed what looks
19  like around 257 items that are identified with a
20  prefix of MONGLY, M-O-N-G-L-Y, followed by a series
21  of numbers.
22          Do you know what those signify?
23      A.   Yes.
24      Q.   What?
25      A.   Pardon me?

CONFIDENTIAL

Page 34

1     Q.   What?
2     A.   They're Bates numbers assigned to
3  documents provided by Monsanto's part of the
4  discovery in this case.
5     Q.   All right.  So you reviewed, according to
6  the supplemental reliance list that we have for you,
7  about 257 individual documents that were, according
8  to you, given -- produced by the company; is that
9  right?
10     A.   No, that's not right.
11     Q.   That's not right?  You didn't review
12  them?
13     A.   I reviewed more than 257 documents.  The
14  ones that I directly relied on are referenced in my
15  expert report by number, but there were many other
16  documents that I reviewed as part of preparing my
17  expert report.  And in addition, there were many
18  documents that I already had, that I had read and
19  reviewed prior to becoming involved in this case
20  that also appear among the documents in the
21  discovery file.  The exact number of documents that
22  I reviewed and played a role in forming my opinions
23  is substantially higher than the number of
24  Bates-numbered documents that I was provided by
25  counsel over the several months that I worked on the

Page 35

1  case.
2     Q.   So we don't have a complete list of all
3  of the MONGLY Bates-numbered documents that you
4  reviewed and relied on in forming your opinions; is
5  that right?
6     A.   I'd have to look at your list and compare
7  it to what I have.
8     Q.   All right.  These MONGLY Bates-numbered
9  documents -- you seem to have some familiarity with
10  the Bates numbering system.  You're not a lawyer,
11  are you?
12     A.   No, sir.
13     Q.   You're not trained in the law, right?
14     A.   Correct.
15     Q.   You're not trained in the legal
16  interpretation or enforcement of regulations as part
17  of the law, right?
18     A.   No.  I don't have a college or advanced
19  degree in that field.
20     Q.   Now, these MONGLY documents, according to
21  these Bates numbers, these were internal documents
22  of Monsanto that you reviewed, right?
23     A.   Certainly, for the most part, yes.
24     Q.   These were emails between company
25  officials or scientists or various persons employed

Page 36

1  by the company, correct?
2     A.   Certainly many of them were, yes.
3     Q.   And they were documents relating to
4  information provided or asked for, received by EPA
5  as the U.S. pesticide regulator, correct?
6     A.   Some of them were.
7     Q.   And your methodology in coming to your
8  opinions as an expert consisted of reviewing these
9  documents, trying to understand what they say and
10  mean to you, and then telling us in your expert
11  report what your interpretation of these documents
12  is; is that correct?
13          MR. LITZENBURG:  Objection to form.
14          THE WITNESS:  That was part of my
15  methodology.
16  BY MR. COPLE:
17     Q.   What else is there -- regarding the
18  company's documents, what else is there?
19     A.   Regarding my review of Bates-numbered
20  documents received from counsel, that was the sole
21  purpose I used those for, was to try to better
22  inform my understanding of the actions of Monsanto
23  Company over the years that glyphosate and
24  glyphosate-based herbicides were moving through the
25  EPA registration process, as well as other

Page 37

1  documents, reports, peer-reviewed literature that
2  address the issues that I felt were central to the
3  case.
4     Q.   So you reviewed these corporate documents
5  with the MONGLY Bates-numbering in order to inform
6  yourself what they say and then to tell us in your
7  expert report what they mean to you, correct?
8     A.   Yes, sir.
9     Q.   And when you do that, you also, in your
10  expert report in many places, characterize what you
11  believe in your personal opinion is the conduct of
12  Monsanto or its employees or its consultants and
13  whether you in your personal opinion believe the
14  conduct is acceptable or not in some way, correct?
15          MR. LITZENBURG:  Objection to form.
16          THE WITNESS:  Sure.  Correct.
17  BY MR. COPLE:
18     Q.   And when you do that, did you inform
19  yourself with respect to any of the individuals that
20  were on these various internal company
21  communications by meeting with them or talking with
22  them or finding out if there were other
23  communications beyond those you had looked at?
24     A.   I did not make an effort to contact any
25  of the Monsanto employees whose name appears in one

CONFIDENTIAL

Page 38

1 or more of those documents.  No, I did not.
2      Q.    Your expert report comments or provides
3 your personal opinion on what you believe to be the
4 ethical or not ethical conduct of the company based
5 on your looking at these various company documents,
6 correct?
7      A.    My report contains several opinions
8 relative to the actions taken by Monsanto Company
9 relative to what a responsible company in the
10 pesticide manufacturing industry would do in
11 circumstances like those that arose over the history
12 of discovery, registration, regulation, and use of
13 Roundup and other glyphosate-based herbicides.
14      Q.    And you've compared Monsanto's actions
15 based upon your review of these company documents
16 that are listed for you in comparison to what other
17 companies?
18           MR. LITZENBURG:  I object to form.
19           THE WITNESS:  Not really.  This case
20      is -- it's quite clear what brand of glyphosate
21      herbicides were used in this case.  That's where
22      I placed my focus, and all -- you know, my
23      opinions as expressed in the report really
24      reflect what a company like Monsanto, who has
25      made many statements and representations over

Page 39

1 the years about the safety and properties and
2 efficacy of glyphosate-based herbicides, and in
3 particular its brands of glyphosate-based
4      herbicides -- I contrast those sorts of
5      statements and what any science-driven,
6      supposedly science-driven company, would do
7      relative to any of its products, whether they're
8      a major product like Roundup or a less widely
9      sold product relative to the information that
10      users of the product should be provided,
11      information that the regulatory agencies should
12      be provided, as well as the information from the
13      company that's made available through the
14      peer-reviewed scientific literature.
15 BY MR. COPLE:
16      Q.    So all of this information leading up to
17 your opinions about Monsanto's conduct based on your
18 review of these corporate emails and other documents
19 was in comparison by you to a hypothetical
20 responsible company; is that right?
21      A.    No.  It was in comparison to Monsanto's
22 responsibility as a company, not a hypothetical
23 company.
24      Q.    So there was no standard you compared
25 Monsanto to by virtue of how other companies are

Page 40

1 expected to conduct themselves before EPA, correct?
2           MR. LITZENBURG:  I object to form.  The
3      report speaks for itself.
4           THE WITNESS:  You know, I would think
5      that while I did not do a comparison of
6      Monsanto's stewardship of Roundup-based
7      herbicides to other companies specifically for
8      my work on this case, because this case involves
9      only Monsanto brand glyphosate-based herbicides,
10      as someone who has worked in this field for many
11      years and has worked on the registration
12      activities of many companies on many different
13      products, there are norms and standards in the
14      industry that Monsanto pledges that it adheres
15      to, as do most of the other major companies, as
16      well as statements that Monsanto has made over
17      many years about the safety and properties of
18      Roundup herbicides and their commitment to doing
19      everything possible to assure that they are as
20      effective and as safe as possible.  That's the
21      standard to which Monsanto and all pesticide
22      companies ultimately are held in questions and
23      matters such as this one.
24 BY MR. COPLE:
25      Q.    So this is your standard; is that right?

Page 41

1      A.    No.
2           MR. LITZENBURG:  Objection to form.
3           THE WITNESS:  It's the standard that
4      anyone active and experienced in this field is
5      aware that all companies aspire to.
6 BY MR. COPLE:
7      Q.    Where do we look up this standard?  Where
8 is it published so that anyone who wants to know
9 what the standard is can review it?
10           MR. LITZENBURG:  I object to form.
11           THE WITNESS:  I'm not aware of a single
12      place where the standard is articulated.
13 BY MR. COPLE:
14      Q.    What about this idea of corporate ethics
15 for a company like Monsanto or any company?  Do you
16 have a degree in corporate ethics from an
17 educational institution?
18           MR. LITZENBURG:  Asked and answered.
19           THE WITNESS:  No.
20 BY MR. COPLE:
21      Q.    What about the issue of what a
22 responsible company should do with respect to
23 activities in the registration or reregistration of
24 a pesticide?  Do you have training in that
25 specifically?

CONFIDENTIAL

Page 42

1    A.    There is no such training available in
2  that. I have a lot of on-the-job training.
3    Q.    So you're self-taught?
4    A.    Sure, I'll say that characterization.
5    Q.    Now, on this issue of registration and
6  review of a pesticide in the United States, you've
7  never done a registration review for EPA for a
8  pesticide, right?
9    A.    Correct.
10   Q.    You've never done a reregistration review
11 for a pesticide, correct?
12   A.    Yes. Correct.
13   Q.    And you've never -- you've never done an
14 enforcement review for EPA on the FIFRA regarding
15 pesticide registrants and clients with FIFRA
16 requirements, right?
17   A.    Correct.
18   Q.    The list of materials that is the second
19 supplemental list for you, it says, for example, on
20 that list, IARC Monograph 112.
21         Now, was this a piece of information you
22 reviewed after you had come to your conclusions in
23 your expert report?
24   A.    No.
25   Q.    You reviewed that previously?

Page 43

1    A.    That's a public document that came out
2  in -- sometime in 2016. It's the full report of the
3  IARC working group that classified glyphosate-based
4  herbicides as probable human carcinogen.
5    Q.    But it was left off the list that we
6  originally received. Do you know why?
7    A.    Well, it's talked about multiple times in
8  my expert report.
9    Q.    Well, let's talk about the March 2017
10 minutes of the glyphosate SAP panel. Was that
11 talked about multiple times in your report?
12   A.    What year?
13   Q.    March 2017.
14   A.    What year? 2017?
15   Q.    March 2017.
16   A.    No, I did not review in detail that SAP
17 meeting, nor talk about it in the report, because it
18 occurred after the use of Roundup-brand herbicides
19 by Dewayne Johnson in this case. I really didn't
20 focus on any new information after 2016.
21   Q.    Well, what about the revised glyphosate
22 issue paper, "Evaluation of Carcinogenic Potential,
23 EPA's Office of Pesticide Programs," dated
24 December 12th, 2017? Did you review that?
25   A.    I've reviewed it, but I did not -- I

Page 44

1  haven't done a thorough review. I haven't compared
2  it to the draft version that was posted for a few
3  days about a year before. No, I didn't spend a lot
4  of time on that.
5    Q.    What about the glyphosate issue paper,
6  "Evaluation of Carcinogenic Potential, EPA's Office
7  of Pesticide Programs," dated September 12th, 2016,
8  did you review that?
9    A.    Yes.
10   Q.    That's mentioned in your report?
11   A.    I don't think so.
12   Q.    So you didn't rely upon that in coming to
13 any of your conclusions, correct?
14         MR. LITZENBURG: Objection to form.
15         THE WITNESS: No, I did not.
16 BY MR. COPLE:
17   Q.    And you also didn't rely, even though you
18 say you reviewed it -- we'll take your word for
19 that, but you say you reviewed the December 2017
20 paper. That's not mentioned, so you didn't rely on
21 that in coming to your conclusions, right?
22         MR. LITZENBURG: Objection to form.
23         THE WITNESS: Correct.
24 BY MR. COPLE:
25   Q.    Have you talked to Mr. Johnson?

Page 45

1    A.    No.
2    Q.    Have you asked to talk to Mr. Johnson?
3    A.    No.
4    Q.    Have you read Mr. Johnson's deposition?
5    A.    No.
6    Q.    Have you read anybody's depositions?
7    A.    I've read a few, yes.
8    Q.    Who did you read?
9    A.    Let's see. I read some of the early
10 ones. Let's see here. I usually wrote them down.
11 Dodson and Ozimkiewicz. I read fairly quickly
12 Canessa's deposition. I read parts of Donna
13 Farmer's deposition, not carefully. I just -- I
14 didn't have time to read everything that I would
15 have liked to. And really, none of the other more
16 recent depositions that I know of have been carried
17 out, so I -- I don't think I cited a single
18 deposition in my expert report. So while I made an
19 attempt to read some of them, I certainly did not
20 have time to fully digest them.
21   Q.    Did you ask for these particular ones
22 that you said you looked at but maybe not in any
23 deep degree?
24   A.    I'm not sure I asked for them
25 specifically, but I asked for any depositions in the

CONFIDENTIAL

Page 46

1    case that were relevant or might be relevant to the
2    issues that I've been asked to opine on.
3        Q.    And those depositions you just mentioned
4    are the ones that were given to you by counsel in
5    response to your request?
6        A.    They were among those that were given to
7    me.
8        Q.    Oh, so there were others, as well?
9        A.    I think, yeah.  I have a box of them.
10       Q.    You can't recall, sitting here, what the
11   names of any other persons were who were deposed?
12       A.    Not all of them, no.  Sorry.
13       Q.    And you did not cite and we assume
14   therefore did not rely on any deposition for
15   supporting your expert report; is that right?
16           MR. LITZENBURG:  Objection to form.
17           THE WITNESS:  That's correct.
18   BY MR. COPLE:
19       Q.    And you're concluding that the deposition
20   of Mr. Dewayne Johnson would not be relevant,
21   because you did not ask for that one, correct?
22           MR. LITZENBURG:  Objection to form.
23           Cited in the report.
24           THE WITNESS:  To the extent that I needed
25   to know and understand Mr. Johnson's use of the

Page 47

1    herbicide products that he sprayed, that's what
2    I felt was -- that was important, and I think
3    there's a number of items in the record that
4    talk about Mr. Johnson's use of Roundup
5    herbicides, including the record of his call to
6    the poison control center.  I reviewed a lot of
7    different documents that spoke to Mr. Johnson's
8    specific uses of Roundup herbicides, and
9    probably that was a part of his deposition that
10   I -- that I paid attention to when I -- when I
11   read it, skimmed it.
12   BY MR. COPLE:
13       Q.    You did review Mr. Johnson's deposition?
14       A.    Yeah, I'm sure I looked through it.
15       Q.    Did you review all three days of his
16   deposition?
17       A.    I only had -- my understanding is, my
18   memory is I only had a record of one of the times
19   that he was deposed.
20       Q.    So you have an understanding from
21   Mr. Johnson's sworn testimony as to his own
22   activities as a pesticide applicator and his
23   exposure, as he claims, to glyphosate and his
24   personal protective equipment that he wore, correct?
25       A.    Yes.  Certainly in general, yes.

Page 48

1        Q.    In general, or specifically as to what he
2    said?
3        A.    The only information I have about
4    Mr. Johnson's use of pesticides is, and in this case
5    of course, the Roundup herbicides that he applied,
6    is -- is from the records that I cite in my report
7    and -- and were provided to me as part of my
8    background work in forming opinions in this case.
9        Q.    What about the 14 long-term animal
10   carcinogenicity studies of the active ingredient
11   glyphosate that have been reviewed by EPA and other
12   regulators in the world?  Did you review those?
13           MR. LITZENBURG:  I object to the
14   testimony by counsel.
15           THE WITNESS:  I spent considerable time
16   in my review of the records in this case on the
17   1983 BioDynamics mouse study, which I knew,
18   before this case came along, was really the
19   central controversy between Monsanto and the EPA
20   over the oncogenicity of glyphosate.
21           I had studied and been aware of that, the
22   controversy over the interpretation of that
23   particular study, for years.  And actually, in
24   this approximate six months before
25   Mr. Litzenburg contacted me to seek my help in

Page 49

1    this case, I had been doing substantial research
2    on the regulatory history of glyphosate, 2,4-D
3    and dicamba for another project that I was
4    involved with.  And I had obtained maybe 1,000
5    pages of documents from the EPA specifically on
6    glyphosate, on the regulatory history of
7    glyphosate, all pertinent tolerance actions
8    involving tolerance levels on glyphosate, which
9    I used in the research and writing and work that
10   I was doing for other projects, and that -- all
11   that work was done and completed before I became
12   involved in this case, before I got any of the
13   documents with a Bates number on them from the
14   EPA, which I think there may have been one or
15   two documents, EPA documents, with a Bates
16   number that I hadn't already received and read.
17           So none of the EPA side of the record in
18   this case was new to me.
19   BY MR. COPLE:
20       Q.    Is your answer you did not review the 14
21   long-term animal carcinogenicity studies that the
22   EPA and other regulators have reviewed?
23       A.    I did not review all 14 of them, no.
24       Q.    How many of them did you review?
25       A.    I reviewed the full report submitted by

CONFIDENTIAL

Page 50

1  BioDynamics to EPA that is a part of the record of
2  this case. I certainly didn't get all the
3  appendices with the detailed information on
4  documentation of how the study was conducted.
5       So I didn't conduct a full assessment of
6  all of the documentation of any of the long-term
7  chronic feeding studies, but have reviewed the
8  summary reports, the EPA evaluations, the discussion
9  of all of the studies in the IARC monograph and
10  discussion of all the studies in various
11  Monsanto-generated peer-reviewed papers, and in the
12  many other places and venues where the oncogenicity
13  database on glyphosate is discussed.
14     Q.   So you only reviewed the 1983 long-term
15  chronic toxicity study on mice, correct?
16         MR. LITZENBURG: Objection to form.
17         THE WITNESS: No, that's not correct.
18  BY MR. COPLE:
19     Q.   Well, then which ones did you review out
20  of the 14, other than the 1983 BioDynamics mouse
21  study?
22     A.   I -- I have read a number of reports both
23  by the EPA and IARC and scientists publishing in the
24  peer-reviewed literature that discuss and review the
25  results of several of the now 14 long-term chronic

Page 51

1  feeding studies done on glyphosate.
2       I have not read or reviewed any of the
3  original reports, the full 1,000-plus-page reports
4  that are done routinely and submitted to the
5  regulatory agencies, because for one thing, they're
6  not publicly available; but I am aware of and have
7  reviewed the reported results of certainly most, if
8  not all, of those studies.
9     Q.   Are you aware that the 14 long-term
10  animal carcinogenicity studies on glyphosate safety
11  active ingredients are now available to be reviewed?
12         MR. LITZENBURG: I object to the
13  continued testimony, Counsel.
14         If you can answer these questions with
15  these assumptions, fine. If you need to parse
16  them apart, go ahead.
17         MR. COPLE: I'm going to object to the
18  speaking objection.
19         Go ahead, Doctor.
20         THE WITNESS: Repeat the question,
21  please.
22  BY MR. COPLE:
23     Q.   Are you aware that the 14 long-term
24  animal carcinogenicity studies on glyphosate are now
25  available, have been made available for review?

Page 52

1         MR. LITZENBURG: Same objection.
2         THE WITNESS: I am not aware that the
3  full studies and all the supporting information
4  is publicly available. No, I'm not aware of
5  that.
6  BY MR. COPLE:
7     Q.   Did you ask to see them?
8     A.   No.
9     Q.   What about the genotoxicity studies on
10  glyphosate that were reviewed by EPA and other
11  regulators around the world? Have you reviewed all
12  of those genotoxicity studies?
13         MR. LITZENBURG: I object to the
14  testimony. Form.
15         THE WITNESS: I'm quite certain I have
16  not reviewed all of them, because certainly a
17  significant number of them are -- were conducted
18  by registrants and submitted to the agencies and
19  have not been publicly disclosed. So for that
20  part of the genotoxicity database, the -- my
21  knowledge of the studies come from, for example,
22  Dr. Parry's review of studies conducted by
23  Monsanto and provided to Dr. Parry as part of
24  his review of the then current genotoxicity
25  database.

Page 53

1  BY MR. COPLE:
2     Q.   You're talking about company documents,
3  Monsanto referring to Dr. Parry, correct?
4     A.   Correct.
5     Q.   Now, these company documents, whether
6  it's the 250 or so -- and I don't want to represent
7  to you, Dr. Benbrook, that it's 257, but my rough
8  count puts it at about 250 or a little bit above of
9  that. But however many you reviewed, did you select
10  these documents among a greater repository of
11  company documents for your specific review?
12         MR. LITZENBURG: Form.
13         THE WITNESS: It's my understanding that
14  the full discovery record in this case is some
15  millions of documents. I unfortunately didn't
16  have time to read them all, so as I carried out
17  my work, I asked counsel to send me documents in
18  certain areas that I felt were germane to the
19  assessment.
20         And so documents came in sort of waves,
21  and I reviewed them as I got them. And where I
22  felt that there likely was additional
23  information somewhere in the record, I would
24  send an email or do a phone call with either
25  Mr. Litzenburg or Mr. Travers and say, "Can you

CONFIDENTIAL

Page 54

1    send me more information on the worker health
2    provisions in the 1986 registration standard?"
3    or "Can you send me more information on the back
4    and forth between Monsanto and the editor of the
5    critical reviews in toxicology special issue on
6    the IARC monograph?" or whatever specific issue
7    I felt I needed a deeper understanding of what
8    Monsanto had done or not done relative to
9    understanding the risk associated with the use
10   of glyphosate-based herbicides and informing the
11   user public, the people that buy and apply
12   Roundup-based herbicides about the potential
13   dangers associated with such uses.
14   BY MR. COPLE:
15        Q.    So when you made these requests to
16   Mr. Travers and Mr. Litzenburg, they would give you
17   even more company documents for you to look at,
18   right?
19        A.    Correct.
20        Q.    And none of these company documents were
21   specifically selected by you, correct?
22        A.    Some were, yes.
23        Q.    How did you go about selecting them?
24        A.    Because in one of the documents that I
25   received and reviewed, there would be reference to a

Page 55

1    PowerPoint or reference to a paper or reference to a
2    meeting or discussion about the position some
3    scientist took on a matter or a strategy that
4    Monsanto invited guests at an SAP meeting would
5    pursue in trying to influence the members of the
6    committee.
7         When I saw and felt that there had to be
8    further discussion or action or meeting notes or
9    some kind of follow-up or also preparatory material
10   for something, I would ask for them to conduct a
11   search or however they were -- dealt with this
12   massive record to try to find other pertinent
13   information.  Sometimes it was very specific what I
14   asked for, and other times I described in general
15   what I felt I needed more information on.
16        Q.    And this more information you needed was
17   additional company documents that you reviewed to
18   inform yourself and come to your own personal
19   opinions set forth in your report about what you
20   think these documents mean, correct?
21        A.    Correct.
22        Q.    Now, did you review the agricultural
23   health study in its most recent publication in
24   collaboration with the National Cancer Institute?
25        A.    Please describe what you refer to as the

Page 56

1    most recent.
2         Q.    The one that was published in December of
3    2017 or early 2018.
4         A.    Yes.  I think I know what you're talking
5    about, and yes, I read that.
6         Q.    And that's not mentioned in your expert
7    report, correct?
8         A.    No, it's not.
9         Q.    So you didn't rely upon any of the
10   methodology or findings or conclusions of the study
11   authors in that report; is that right?
12        A.    No, I did not.
13        Q.    What about the earlier 2014 draft
14   manuscript of the agricultural health study
15   follow-up, did you read that?
16        A.    Yes, I did review that.
17        Q.    And that's not mentioned either in your
18   report, correct?
19        A.    Well, in my discussion of the
20   epidemiology database, it's one of the documents,
21   one of the studies that played a role in that.  It
22   was one of the studies included in various
23   metanalyses that had been done on the epidemiology
24   database.  So it was one of the several epidemiology
25   studies that I reviewed and relied upon in coming to

Page 57

1    my overall conclusion about what the epidemiological
2    data suggests, and also in understanding the
3    conclusion that other scientists have reached and
4    expressed in various form.
5         Q.    Did you review all the epidemiology
6    studies that EPA and other regulators of the world
7    have reviewed regarding glyphosate and its
8    formulated product Roundup and other names?
9         A.    I would imagine that there are some
10   epidemiological studies that I did not review.  For
11   example, epidemiological studies that were done in a
12   foreign language and published in a journal that
13   does not have an English version of the journal.
14   There has to have been some other studies done in
15   Japan or China or other countries.  But I have read
16   and reviewed certainly the majority of the
17   peer-reviewed, properly designed epidemiological
18   studies that have shown up in the open scientific
19   literature and which are at the heart of the ongoing
20   consideration of the body of epidemiological studies
21   on the impact of use and exposure to
22   glyphosate-based herbicides and various adverse
23   health outcomes.
24        Q.    How many epidemiological studies did you
25   review?

CONFIDENTIAL

Page 58

1    A.    Well, let's see.  Two Hardell and
2  Eriksson, two McDuffies, two or three De Rooses, an
3  Agricultural Health Study mix of authors, a couple
4  by -- one or two by teams from Asia -- I don't
5  remember their names -- and two or three, in effect,
6  metanalyses of the existing published studies.  So
7  maybe eight or ten, something like that.
8    Q.    Do you know how many peer-reviewed
9  epidemiology studies on glyphosate-based
10  formulations are available in the scientific
11  literature right now?
12        MR. LITZENBURG:  Objection to form.
13        THE WITNESS:  Well, are you talking about
14  primary studies?  Metanalyses?  Review articles?
15  Commentaries?  What category are you speaking
16  about?
17  BY MR. COPLE:
18    Q.    Right now I'm talking about any of the
19  peer-reviewed, published studies in the literature,
20  how ever many there are, regarding epidemiology and
21  non-Hodgkin's lymphoma and exposure to
22  glyphosate-based formulations.
23    A.    Well, I think the relevant question, what
24  you're probably asking for is how many primary
25  studies are there reporting the results of an

Page 59

1  epidemiology study involving a new cohort of exposed
2  people compared to a similar cohort of nonexposed or
3  less exposed people.  I think there's -- I am aware
4  of seven or eight, maybe nine of those in English
5  language, peer-reviewed journals.  There are
6  probably at least -- there's perhaps a half dozen
7  metanalyses that are either on pesticides in general
8  or herbicides in general and sometimes specifically
9  glyphosate-based herbicides, on cancer, of which
10  non-Hodgkin's lymphoma or other forms of lymphatic
11  cancers are among the endpoints considered.  And
12  then there's a number of review articles that talk
13  about the database and what's known about the
14  potential of glyphosate-based herbicides to pose
15  health risks including cancer, and those review
16  articles, to varying degrees of detail, go over this
17  set of original epidemiological studies in the open
18  scientific literature.
19    Q.    So your testimony is that as it pertains
20  to primary studies regarding NHL and exposure to
21  glyphosate-based formulations, there are 10 to 12
22  peer-reviewed published studies; is that correct?
23        MR. LITZENBURG:  I object to form.  His
24  testimony is on the record.
25        THE WITNESS:  I am aware of seven or

Page 60

1  eight studies that -- in the peer-reviewed
2  literature that involve unique populations of
3  people that reported a use of -- various levels
4  of use of glyphosate-based herbicides or other
5  herbicides compared to a -- a similar population
6  cohort group that did not report use.  Some of
7  them are focused solely on the linkage between
8  use of glyphosate-based herbicides and
9  non-Hodgkin's lymphoma.  There are two or three
10  specifically focused on just that, but the
11  larger number are focused on either pesticide
12  use or herbicide use and cancers in general.
13  And in that group of studies, another half dozen
14  of them report results for non-Hodgkin's
15  lymphoma.
16  BY MR. COPLE:
17    Q.    How many of those studies in total,
18  primary studies published peer-reviewed literature,
19  deal specifically with glyphosate and non-Hodgkin's
20  lymphoma?
21    A.    Relatively -- when you say
22  "specifically," do you mean "exclusively"?
23    Q.    I don't know exclusively.  I mean
24  specifically evaluate non-Hodgkin's lymphoma.
25    A.    As an endpoint.  Well, I've already

Page 61

1  answered that question.
2    Q.    So it's now seven to eight.
3    A.    There are -- I am aware of seven or eight
4  studies in the open, peer-reviewed literature that
5  report results, odds ratios for glyphosate-based
6  herbicide use and non-Hodgkin's lymphoma, among
7  other results.
8    Q.    Now, you did not review the NAPP study,
9  correct?
10    A.    What does NAPP stand for?
11    Q.    You did not review the North American
12  Pooled Project published study, correct?
13    A.    Could you put it in front of me?
14    Q.    If you don't remember, you don't
15  remember.  Do you not remember?
16    A.    I'm not sure whether I did or not.  I
17  would need to see the paper.
18    Q.    Okay.  You did not mention the NAPP study
19  in your expert report, correct?
20    A.    I don't know to what study that acronym
21  refers.  So I can't answer your question.
22    Q.    Well, it refers to the North American
23  Pooled Project study.  It's the name of the study.
24  But if you don't remember, that's fine.
25        Now, on these cohorts, you agree that the

CONFIDENTIAL

Page 62

1   Hardell study that you mentioned out of Sweden is
2   not a prospective cohort study, correct?
3       A.   Well, first of all, there's two of them,
4   and if we're going to speak about them, can you pull
5   it out and let me refresh my memory?
6       Q.   Well, either one.  Either of the Hardell
7   studies that you reviewed for your expert report --
8   neither one is a prospective cohort epidemiologic
9   study, correct?
10          MR. LITZENBURG:  Objection as to the
11  answer.
12          THE WITNESS:  I think that that would be
13  a fair characterization of them.  They've looked
14  at two cohorts of individuals that some of whom
15  reported use of glyphosate-based herbicides and
16  another group didn't and statistically analyzed
17  the difference in the risk of contracting the
18  disease.
19  BY MR. COPLE:
20      Q.   In your expert opinion, sitting here
21  today, is that the Hardell studies out of Sweden,
22  both of them, were both prospective cohort
23  epidemiologic studies?
24          MR. LITZENBURG:  Objection.  Asked and
25  answered.  Third, fourth time.

Page 63

1          THE WITNESS:  I just described to you the
2   base of methodology.  I -- I wouldn't -- I'm not
3   exactly sure how epidemiologists would
4   characterize the methodological design, but I
5   certainly recall very clearly that that was
6   how -- as I described them, that was how they
7   were designed and carried out.
8   BY MR. COPLE:
9       Q.   Do you know what a case control study is?
10      A.   Yes.
11      Q.   Do you know the difference between a case
12  control study retrospectively and a prospective
13  cohort study?
14      A.   Well, a retrospective case control study
15  would be where individuals, as I -- as I said, two
16  populations -- a population of people that share
17  many demographic characteristics, to eliminate
18  confounding factors based on their past use of a
19  pesticide or a chemical or a drug, are -- that
20  population is analyzed to see if there is a
21  difference in the frequency or sometimes the
22  severity of a given disease outcome in that
23  population group based on earlier exposures to the
24  chemical of interest.  So those are -- those would
25  be called a retrospective study.  They look

Page 64

1   backwards.
2       Q.   And your testimony is that the Hardell
3   studies, both of them, are not retrospective case
4   control studies?
5       A.   They looked -- they looked -- they looked
6   at -- backwards in time at people that had reported
7   use of glyphosate-based herbicides, and then they
8   tracked the records in the cancer registry of Sweden
9   on which of those people had contracted either
10  cancer, non-Hodgkin's lymphoma, or whatever -- what
11  other disease endpoints they were interested in.
12      Q.   If the Hardell studies, both of them, out
13  of Sweden, are retrospective case control studies,
14  then they're not by definition prospective cohort
15  studies, right?
16          MR. LITZENBURG:  Objection.  Asked and
17  answered, four or five times.
18          You can keep answering if you have
19  different answers.  Otherwise, you have
20  answered.
21          THE WITNESS:  The two Hardell studies
22  looked retrospectively at populations of Sweden
23  that had reported use of various pesticides,
24  including Roundup, and assessed the impact on
25  the frequency of various cancers, including

Page 65

1   non-Hodgkin's lymphoma.  So yeah, that's what
2   they did.
3   BY MR. COPLE:
4       Q.   And you agree that a prospective cohort
5   study is preferred by epidemiologists over a
6   retrospective case control study, correct?
7          MR. LITZENBURG:  Object to form.
8          THE WITNESS:  I -- there are a number of
9   different designs of epidemiological studies,
10  some of which are regarded as more sensitive and
11  reliable in certain applications than others.
12  The best type of study to use at a given
13  instance is situation specific.  And it's also,
14  of course, driven by what kind of data is
15  available.
16  BY MR. COPLE:
17      Q.   "Situation specific" means prospective
18  cohort?
19      A.   Well, in the case of the two Hardell
20  studies, the data was collected on a specific
21  individual.  For certainly the positive controls,
22  they searched the Swedish registry for individuals
23  that had reported contracting non-Hodgkin's lymphoma
24  and selected a set of those people, and then, based
25  on the demographics of those people, they aspired to

CONFIDENTIAL

Page 66

1  pick other people in the population that were as
2  similar as possible to the individuals that were
3  identified in the disease registry. And that's how
4  they -- that's how they and other people conducting
5  this kind of retrospective study -- that's how in
6  general they're done.
7      MR. LITZENBURG: Hang on. When you're
8  done asking identical questions about Hardell, I
9  need a break.
10     MR. COPLE: I'm going to object to that
11 testimony by counsel, but a break is fine.
12     THE WITNESS: I could use some water.
13     THE VIDEOGRAPHER: The time is now 10:22.
14 We are off the record.
15     (Break in proceedings.)
16     (Benbrook Exhibit Number 2 is marked for
17 identification.)
18     THE VIDEOGRAPHER: The time is 10:34. We
19 are on the record.
20 BY MR. COPLE:
21     Q.   Dr. Benbrook, you're aware that the
22 Agricultural Health Study that we referenced once or
23 twice already is the largest prospective cohort
24 study of pesticide applicators exposed to glyphosate
25 that's ever been done, correct?

Page 67

1      MR. LITZENBURG: I object to form.
2      THE WITNESS: It's certainly, I think,
3  one of the largest ones in the United States.
4  I'd have to compare the populations in all of
5  them to say it's the absolute largest ever, but
6  it's certainly regarded as one of the most
7  significant studies of pesticide applicators
8  ever conducted in the U.S., yes.
9  BY MR. COPLE:
10     Q.   And you know -- you think you know that
11 the most recent updated publication evaluating the
12 Agricultural Health Study was published in
13 collaboration with NCI, correct?
14     A.   Correct.
15     Q.   Now, do you know approximately how many
16 pesticide applicators were originally enrolled in
17 the AHS study?
18     A.   If we're going to talk about the details
19 of the study, could you please provide me with a
20 copy of the most recent paper? I know in the
21 methodology section, the exact numbers are there,
22 and I won't have to rely on --
23     Q.   If I have specific questions, we'll
24 certainly do that, Doctor. I just want to know if
25 you recall approximate number.

Page 68

1      A.   80,000.
2      Q.   And your recollection is there might be a
3  larger prospective cohort study of pesticide
4  applicators, larger than 80,000 or so, whatever the
5  number you think it might be, outside the United
6  States?
7      MR. LITZENBURG: Asked and answered.
8      THE WITNESS: I'd have to pull out my
9  file and go through them and check the total
10 number of people, but I'm pretty sure that the
11 Agricultural Health Study is -- it's certainly
12 one of the largest ever conducted.
13 BY MR. COPLE:
14     Q.   And the most well respected by
15 epidemiologists, correct?
16     MR. LITZENBURG: I object to form.
17     THE WITNESS: I guess it depends on who
18 you talk to. Scientists have a lot of different
19 opinions about studies. But I think in general
20 the Agricultural Health Study is regarded as one
21 of the more rigorously designed and conducted in
22 the United States.
23 BY MR. COPLE:
24     Q.   And done in collaboration with NCI,
25 correct?

Page 69

1      A.   Yes. It's an NCI study.
2      Q.   Have you ever designed an epidemiology
3  study?
4      A.   No.
5      Q.   Have you ever conducted one that somebody
6  else has designed?
7      A.   No.
8      Q.   Have you ever been trained in
9  epidemiology?
10     A.   No.
11     Q.   You mentioned earlier that you were never
12 a full-time employee of EPA, suggesting maybe that
13 at some point you were a part-time employee of EPA.
14 Were you?
15     A.   I did a -- I did a project for the Office
16 of Inspector General of the EPA, under contract with
17 member consulting services.
18     Q.   You were a contractor?
19     A.   Correct.
20     Q.   You were not a part-time employee?
21     A.   Correct.
22     Q.   You also mentioned previously that you,
23 at some point and maybe today, have been dealing
24 with maybe 1,000 or more documents relating to
25 dicamba and glyphosate; is that correct?

CONFIDENTIAL

---

Page 70

1    A.   I don't remember saying anything about
2  dicamba, sir.
3    Q.   Is there a project that you were dealing
4  with more than 1,000 or 1,000 documents dealing with
5  glyphosate?
6    A.   Well, yes.  I have -- I am part of the
7  science team on a project by the Children's
8  Environmental Health Network assessing the impact of
9  rising herbicide use in the Midwest, which would
10  include, of course, glyphosate-based herbicides,
11  2,4-D and dicamba, on reproductive problems and
12  birth defects in the Midwest.
13    Q.   So it does involve dicamba?
14    A.   Dicamba is part of that project's
15  purview, yes, of course.
16    Q.   But you're not working on dicamba?
17    A.   Dicamba, the use of dicamba, the
18  regulation of dicamba, the possible health risks of
19  dicamba are among the issues being addressed by that
20  project, yes.
21    Q.   Are you involved in that aspect of the
22  project?
23    A.   Yes, I am.
24    Q.   Are you involved in the glyphosate aspect
25  of the project?

---

Page 71

1    A.   Yes, I am.
2    Q.   Who hired you to do that?
3    A.   Who hired me to do that.  Well, I guess
4  the project is -- it's a Children's Environmental
5  Health Network project, which is a small
6  nongovernmental organization based in Washington,
7  D.C. that is focused on environmental health risks
8  and other aspects of childhood development and the
9  health of children, and that's -- they are -- that
10  is the organization that I work for in carrying out
11  the work on that project.
12    Q.   Who hired you to do that work, who
13  specifically?  Is there a person?
14    A.   Nsedu Witherspoon, the executive director
15  of the Children's Environmental Health Network.
16    Q.   Anyone else besides that person?
17    A.   No.  She's the executive director of
18  the -- of that organization.
19    Q.   When were you hired?
20    A.   Let's see.  October -- October, November
21  of 2016, something like that.
22    Q.   What have you been doing as part of the
23  science team, as you described it?
24    A.   Conducting research and contributing to
25  the project's website, developing some timelines and

---

Page 72

1  presentations on the key herbicides, the use of
2  which is rising in the Midwest, tracking and writing
3  about new literature, appearing in peer-reviewed
4  journals about the use of and exposure to these
5  herbicides.
6    Q.   Are you conducting, yourself, original
7  scientific research?
8    A.   Let's see.  Yes, to the extent that I am
9  largely responsible for analytical work on trends in
10  the use -- use of and reliance on various herbicides
11  in predominantly corn -- corn, soybean production in
12  the principal Midwestern states.
13       I download raw data from the
14  pesticide-use surveys conducted by the National
15  Agricultural Statistics Service, which is an agency
16  of the USDA.  I develop original methodologies for
17  analyzing that data across space and time.  I
18  conduct original scientific assessments of trends in
19  the use of these products as well as factors
20  contributing to changes in reliance to a specific
21  product or all herbicides together.
22       So yes, I conduct original scientific
23  research on pesticide-use trends and what drives
24  them.
25    Q.   You yourself are investigating through

---

Page 73

1  scientific experiment toxicity of pesticides?
2    A.   No, sir.
3    Q.   Are you yourself investigating
4  carcinogenicity of pesticides?
5    A.   I don't conduct the laboratory studies.
6  Generating original data on the toxicity of an
7  original chemical, agent, pesticide to a given
8  organism -- I don't do that part of the scientific
9  assessment of pesticide risk.  I do use the results
10  of those studies as reported in the open scientific
11  literature and as reported in EPA documents in
12  original research on trends in the level of risk
13  arising from use of pesticides in agriculture.
14    Q.   So you study literature published by
15  other scientists and evaluate it to come up with
16  your own opinions?
17    A.   Yes.
18    Q.   Now, these thousand or so documents that
19  you have that involve glyphosate in this project --
20  where did you get those documents from?
21    A.   From the -- predominantly from the
22  internet.  All of the documents and all of the raw
23  data on pesticide use comes from the USDA through
24  their Quick Stats Program.  All of the data on
25  pesticide residue levels in food which I use in my

---

CONFIDENTIAL

Page 74

1   research and scientific work on pesticide dietary
2   risk levels comes from the agricultural marketing
3   service via their pesticide data program. Each year
4   they release their raw data through a series of very
5   large files.
6           Most of the information that I have on
7   regulatory actions and decisions impacting
8   glyphosate-based herbicides are documents downloaded
9   from various parts of the EPA website. As I'm sure
10  you know, there is a -- there is a section of the
11  EPA website that includes previously screened and
12  released documents on glyphosate-based herbicides
13  and EPA actions relative to glyphosate herbicides.
14          There's, I'm going to guess, something on
15  the order of 200 documents in that prescreened and
16  publicly released file. I would say essentially all
17  of the critical EPA documents that I reference in my
18  expert report, sometimes saying from my files and
19  other times given the Bates number that's attached
20  to the document, that's where I -- that's where I
21  located and downloaded the majority of those
22  documents. Although, some of them I had even from
23  work many years ago.
24          I have a very substantial file on all of
25  the tolerance actions involving glyphosate-based

Page 75

1   herbicides and glyphosate active ingredient and its
2   principal metabolite, AMPA. As you know, I'm sure,
3   there have been several dozen specific tolerance
4   actions involving glyphosate, going back to the mid
5   to late '70s. I have a reasonably comprehensive
6   file of all of those actions and -- as published in
7   the Federal Register, as well as many EPA documents
8   discussing the residue chemistry branch and hazard
9   evaluation division, or toxicology branch in earlier
10  days, reviews of those tolerance petitions.
11          So that -- those are sort of the core
12  documents that anyone who conducts in-depth original
13  research on glyphosate use and risks would
14  originally retain and refer to.
15      Q.   Are any of these documents Monsanto
16  Company documents?
17      A.   I would say every single one of the EPA
18  reviews, the EPA registration standard, the RED,
19  most of the tolerance petitions probably are in the
20  record, the discovery record of this case; but as I
21  said earlier, I have not had the opportunity to
22  review all 6 million documents at this time.
23      Q.   I'm talking about the thousand or so
24  glyphosate documents you just described that you had
25  obtained largely through your own research and

Page 76

1   downloading. Are any of those Monsanto Company
2   documents?
3       A.   They were generated by Monsanto Company.
4   They were generated by one of these government
5   agencies.
6       Q.   Are they internal emails of the company,
7   memos of the company, PowerPoint presentations of
8   the company, or anything that is not generated for
9   an EPA submission?
10      A.   I include no such documents in this
11  general figure of a thousand documents involving
12  glyphosate that I have in my possession and have
13  reviewed and worked with.
14      Q.   Are you supplementing your work on that
15  glyphosate project with documents that you have
16  received and reviewed in Mr. Johnson's lawsuit?
17      A.   No.
18      Q.   Did you sign a confidentiality agreement
19  with Mr. Johnson's counsel not to disclose company
20  documents that have been provided to you for review?
21      A.   I was provided a copy of the protective
22  order, and I don't remember if I sent back a signed
23  document, a signed version of it. If I was asked to
24  do that, I'm sure I did.
25      Q.   Have you ever worked as a commercial

Page 77

1   pesticide operator?
2       A.   No, sir.
3       Q.   You never received training in it?
4       A.   No, sir.
5       Q.   Do you have expertise as an industrial
6   hygienist?
7       A.   No, sir.
8       Q.   Do you have expertise with Tyvek suits?
9       A.   No.
10      Q.   Have you ever peer-reviewed a scientific
11  publication on carcinogenicity studies, long term,
12  of glyphosate in rodents?
13      A.   I have never peer-reviewed an original
14  article reporting the results of a long-term cancer
15  study on glyphosate or glyphosate-based herbicides.
16  No, I've never done that.
17      Q.   And you've never been part of conducting
18  such a study, correct?
19      A.   No, sir. You asked that earlier, and I
20  answered it earlier.
21      Q.   You have no expertise on skin disorders,
22  correct?
23      A.   I don't have an advanced degree in that.
24  It wasn't part of my education, and I haven't
25  conducted any laboratory experiments on skin

CONFIDENTIAL

Page 78

1 diseases.
2    Q.    That would include by definition mycosis
3 fungoides?
4    A.    Correct.
5    Q.    What about eye irritation?  Do you have
6 expertise on that?
7    A.    No, sir.
8    Q.    In these depositions that you've given --
9 and I apologize if I can't remember the number.  I
10 think you said around 15; maybe it was a little more
11 than 15 -- in how many cases have you testified for
12 the plaintiff?
13    A.    I believe all of them.
14    Q.    You've never testified in anyone's
15 defense or any company's defense in any of those
16 depositions?
17    A.    I -- I participated in a case that
18 involved two chemical companies against each other,
19 and in that case, I suppose it might be difficult to
20 characterize which was the plaintiff and which was
21 the defendant; but I did work for the chemical
22 company that brought the case, so they would -- they
23 would be regarded as the plaintiff in that case.
24    Q.    Well, was the client, your client?
25    A.    It was a me-too manufacturer of

Page 79

1 chlorpyrifos home-use insecticide products, and the
2 case was brought against Dow, Dow AgroSciences.  It
3 was several years ago.  It's -- the exact name of
4 the case -- it's in my -- it's in my resume.
5    Q.    And how about trial?  You said you
6 testified in two trials.  Were they both for the
7 plaintiffs?
8    A.    Yes, sir.
9    Q.    What percentage of your income is derived
10 from testifying as an expert witness or providing
11 consulting services for litigating?
12    A.    It's highly variable over time.  It has
13 varied from zero percent for months at a time to a
14 significant portion.
15    Q.    What about 2017?  Approximately how much
16 were you compensated from all sources for expert
17 testimony or litigation?
18    A.    2017.  Probably close to half of total,
19 Benbrook Consulting Services income.
20    Q.    Approximately how much was the
21 compensation total?
22    A.    A lot of my projects entail, in fact,
23 pass-through funds, where I have other people that
24 work for me.  So on a gross basis when I file my
25 taxes this year, my gross income will be somewhere

Page 80

1 on the order of $250,000, and my net income will be
2 well under -- well under $200,000.
3    Q.    This is all from litigation consulting or
4 expert?
5    A.    No.  No.  As I said, about half.
6    Q.    Half.  Half of that total?
7    A.    Yes.
8    Q.    Let's mark -- this is Exhibit 2.  It's
9 already marked for the deposition.  Let me show you.
10 We talked about some questions earlier.  This is
11 titled as a supplemental reliance list.
12         MR. LITZENBURG:  Do you have a copy?
13         MR. COPLE:  Is it there?  Hold on.
14 BY MR. COPLE:
15    Q.    Have you seen this document before?
16    A.    No.
17    Q.    Did you have anything to do with the
18 preparation of this document?
19    A.    No.
20    Q.    Did you know the document had been
21 prepared?
22    A.    When I met with Mr. Litzenburg and
23 Mr. Travers yesterday, they said it would be
24 appropriate to provide you with a list of any other
25 documents that I had been provided by them since the

Page 81

1 expert report was filed or any other documents that
2 either I flagged to them as important, whether I
3 received it as part of the earlier emails from them
4 or had obtained it in my own right.  For example,
5 IARC Monograph 112.  I had that.  I downloaded it
6 off the internet soon after it became available, but
7 they felt it was appropriate to put it on the list.
8    Q.    And this list, now that you have it in
9 front of you, because you had asked before about
10 this list, are they all of these documents that you
11 have reviewed in coming to your opinions in this
12 case?
13    A.    I don't specifically remember, for
14 example, what MONGLY07480802 is.  I don't remember
15 what that document is.  Or, for that matter, I don't
16 have memorized the documents associated with any of
17 the MONGLY numbers.  So to speak specifically to
18 whether I relied on it, whether it was important in
19 my opinion, you'd need to put the document in front
20 of me.
21         (Benbrook Exhibit Number 3 is marked for
22         identification.)
23 BY MR. COPLE:
24    Q.    I'm showing you what's marked as Exhibit
25 3.  Is this your current CV?

CONFIDENTIAL

Page 82

1    A.   You're handing me this.  It's not
2 attached to my expert report.  Is this the one taken
3 from my expert report?
4    Q.   I represent to you that it is.
5    A.   Yes.  This will be my current resume,
6 with the exception, as I said, there's one
7 additional paper that I've had accepted.
8    Q.   Noted.
9         Go to the second page where you
10 describe --
11    A.   No, this is not my current resume.  It's
12 got my old email.  Maybe I've -- maybe I've had my
13 wrong email on my resume for years.  Could we just
14 take a peek?  It's right on the first page.
15
16 ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17    Q.   That's what we have here.
18    A.   This is not my current resume.
19    Q.   All right.  We'll set this aside.
20    A.   You know, it kind of bothers me that you
21 would represent it as it is.
22    Q.   Well, this is a resume that we received
23 from counsel that you are working for.  So if it's
24 not current and it's not the same as --
25    A.   I don't believe you.

Page 83

1    Q.   You don't believe me?
2    A.   Yeah.  I never provided that resume to
3 counsel I'm working for.
4         MR. COPLE:  Okay.  Let's go off the
5 record.
6         THE VIDEOGRAPHER:  The time is now 10:59.
7 We are off the record.
8         (Break in proceedings.)
9         (Benbrook Exhibit Number 4 is marked for
10 identification.)
11         THE VIDEOGRAPHER:  The time is now 11:00.
12 We are on the record.
13 BY MR. COPLE:
14    Q.   We went off the record, Dr. Benbrook, and
15 we have cleared up my confusion about your resume,
16 and Exhibit 3 that I had shown you is not the
17 resume, as you pointed out, attached to your expert
18 report, which we have now marked as Exhibit 4.
19         Can you confirm whether or not Exhibit 3
20 is a resume of yours, even if it's not the current
21 one right now?
22    A.   I suspect it was, but it's maybe a decade
23 old.
24    Q.   And we can set that aside, since that's
25 obviously not relevant to your expert opinions here.

Page 84

1    A.   I assume we're going to talk about the
2 resume now?
3    Q.   We are going to talk about it.
4    A.   Okay.  I am going to detach it from the
5 rest of the report.
6    Q.   Now, if you go to -- well, let's first be
7 sure we're all on the same page.
8         This is your current resume, is that
9 right?
10    A.   Yes, sir.
11    Q.   And again, that was my confusion, sir.
12         Go to the second page, and there's a
13 description on the second page of your
14 responsibilities.  Back when you were at the
15 Subcommittee on Department Operations Research and
16 Foreign Agriculture -- I believe you called that
17 DORFA previously, correct?
18    A.   Correct.
19    Q.   And this shows that you were staff
20 director from April '81 to January '84.  That's
21 correct?
22    A.   Yes, sir.
23    Q.   In the responsibilities, the first one
24 that you list among three responsibilities, to
25 prepare and analyze legislation, that's within the

Page 85

1 jurisdiction of the subcommittee, correct?
2    A.   Correct.
3    Q.   Now, the legislation that you're
4 referring to here, as I think you previously
5 testified, has some bearing on your relationship to
6 pesticide regulation; is that right?
7    A.   A significant component of it did, yes,
8 sir.
9    Q.   Your responsibilities did not include the
10 direct regulation of pesticides itself, right?
11    A.   Correct.
12    Q.   And the second thing that you -- that you
13 point to is organizing subcommittee hearings and
14 business meetings.  And this is in the capacity as a
15 staff director to support the members of the
16 subcommittee, right?
17    A.   Correct.
18    Q.   And that's not pesticide regulation,
19 right?
20    A.   No, it's not.
21    Q.   And the third one is to brief members and
22 staff on legislation and oversight activities.  I
23 believe you previously testified that some of that
24 also had a bearing or relationship to pesticides or
25 pesticide regulation, correct?

CONFIDENTIAL

Page 86

1    A.    Yes, sir.
2    Q.    And that also was not direct regulation
3  of pesticides itself, right?
4    A.    Correct.
5    Q.    You are familiar, I think according to
6  your report, with the activities and organization of
7  EPA's OPP; is that correct?
8    A.    Yes.
9    Q.    And what is OPP?
10    A.    Office of Pesticide Programs.
11    Q.    Are you familiar with the information
12  that is submitted to OPP as part of the registration
13  process by applicants of registration for pesticides
14  on the FIFRA?
15    A.    Yes, I am.
16    Q.    Do you know what that information
17  consists of?
18    A.    Certainly the primary data requirements,
19  yes.
20    Q.    And have you been involved with any
21  submission of information to EPA's OPP as part of a
22  registration application?
23    A.    Yes, I have.
24    Q.    For whom?
25    A.    Appropriate Technology Limited.

Page 87

1    Q.    What was the pesticide?
2    A.    The company had two
3  bioinsecticides/bionematicides, Sincocin and -- I
4  can't remember the name of the other one, but there
5  were two, two insecticide/nematicides that were
6  registered by the EPA, and I assisted the company in
7  developing the registration packages in interactions
8  with EPA for maybe four or five years.
9    Q.    Did you generate the scientific data that
10  was part of the registration packet submission?
11    A.    No.
12    Q.    There were scientists that were retained
13  by that company directly or indirectly that did
14  that; is that correct?
15    A.    Correct.
16    Q.    Have you been involved with the review of
17  surfactants as part of a pesticide formulation --
18  part of the pesticide formulation that's submitted
19  as the part of registration application to EPA?
20    A.    Yes.
21    Q.    For which company was that?
22    A.    The surfactants and other inert
23  ingredients in the ATL products were part of the --
24  the registration package.
25    Q.    These products you're talking about,

Page 88

1  these were not herbicides, correct?
2    A.    Correct.
3    Q.    I think you said insecticides?
4    A.    Insecticides and nematicides.
5    Q.    And so by definition, they did not
6  involve glyphosate, correct?
7    A.    Correct.
8    Q.    You indicated in your expert report that
9  you had been in contact with Dr. Aaron Blair,
10  correct?
11    A.    Correct.
12    Q.    And you said that you considered him to
13  be a colleague of yours; is that right?
14    A.    Correct.
15    Q.    How is Dr. Blair a colleague of yours?
16    A.    When we were conducting oversight in the
17  Subcommittee on Department of Operations Research
18  and Foreign Agriculture on a variety of pesticide
19  issues -- back in that era, as you may remember, it
20  was the first term of the new Reagan presidency.
21  The new political appointees in EPA included a
22  gentleman named Dr. John Todhunter, who was
23  advocating some substantial changes in EPA pesticide
24  regulatory policy and risk assessment standards
25  applicable to the pesticide controversies of the

Page 89

1  day.
2    As a result of that, the subcommittee --
3  in several of the hearings that we designed and
4  carried out on pesticides, there was one or more
5  witnesses that were invited to address issues of --
6  issues arising from the potential oncogenic risks
7  posed by pesticides to the American population.
8    In one of those hearings, the
9  subcommittee asked for testimony from the National
10  Cancer Institute.  I called up the National Cancer
11  Institute and asked them who they would be able and
12  willing to designate to come and testify before the
13  subcommittee on the program and roles of the
14  National Cancer Institute relative to understanding
15  the cancer use associated with use of and exposure
16  to pesticides.  The NCI designated Dr. Aaron Blair.
17    So he came to the subcommittee, presented
18  testimony.  There was some follow-up questions that
19  I had to submit to him on behalf of the
20  subcommittee, that he answered.  And I stayed in
21  touch with Dr. Blair ever since.  I only met with
22  him, over the whole span of time, maybe two or three
23  times, but I talked with him many more times or
24  exchanged emails with him.
25    So he was one of the people that I had a

CONFIDENTIAL

Page 90

1  high regard for, and I knew he was very
2  knowledgeable on the activities of the National
3  Cancer Institute relative to pesticides.  So over
4  the years, if some issue came up about an NCI study
5  on pesticides, I'd just call him up or email him,
6  and he'd answer my question.  That's why I consider
7  him a professional colleague.
8      Q.   So you called him -- you called Dr. Blair
9  with respect to the expert report you were preparing
10  on behalf of Mr. Johnson, right?
11     A.   No.  No.  I -- I -- when I read the news
12  about the classification of glyphosate and
13  glyphosate-based herbicides as a probable human
14  carcinogen by IARC in March of 2015, as I explain in
15  my report, that was as -- even more surprising to me
16  than apparently it was to Monsanto.
17          And so I downloaded the Lancet story,
18  which was where the results were originally
19  released, and looked at the membership of the
20  working group and saw that Aaron was the chair of
21  it.  So I sent him an email and said, "Can I talk to
22  you about this?  This is just really surprising,
23  shocking news."
24          I think I sent that email on the Friday
25  after the release.  I think the release was on a

Page 91

1  Thursday.  I don't remember exactly the day of the
2  week, but he said that I could call him on Sunday at
3  his house.  And so I did.  And I had a conversation
4  about the basis for the working group classifying
5  glyphosate as a probable carcinogen.
6      Q.   You're aware that the working group
7  classified glyphosate, the active ingredient, as a
8  probable human carcinogen, not glyphosate-based
9  formulations, correct?
10     A.   No, I'm not aware of that.  That's a
11  nonaccurate characterization of what an IARC review
12  is.  They look at all of the published data on the
13  active ingredient by itself as well as any published
14  data on the use of glyphosate-based herbicides.
15          If you read their monograph, you will see
16  extensive discussion of the epidemiological
17  literature and data, which of course is exclusively
18  on glyphosate-based herbicides, because no one has
19  ever to my knowledge sprayed straight glyphosate in
20  an agricultural setting.
21          And also the working group placed
22  considerable weight on the several genotoxicity
23  studies collected with glyphosate-based herbicides.
24     Q.   So as an expert for Mr. Johnson, sitting
25  here today, your expert opinion is that the IARC

Page 92

1  Monograph 112 classified glyphosate-based herbicides
2  as probably carcinogenic; is that your opinion?
3      MR. LITZENBURG:  Objection to form.
4      THE WITNESS:  Yes.  That's my opinion.
5  The -- it's very clear that the classification
6  by IARC of all of the pesticides that they
7  reviewed then and all of the ones that they have
8  done historically refer to the active ingredient
9  as well as the formulated products in which the
10  active ingredient is actually sprayed.
11          From the perspective of IARC, their
12  responsibility is to assess the potential cancer
13  risk for the use of formulated, ready-to-use
14  herbicides, but of course they have to rely on
15  many of the studies done just on the active
16  ingredient.  So it's really -- it's not accurate
17  or appropriate to say that IARC's classification
18  was solely in reference to 100 percent pure
19  glyphosate active ingredient.
20  BY MR. COPLE:
21     Q.   Did Dr. Blair tell you in your
22  conversations with him in 2015 about Monograph 112
23  that IARC had concluded that glyphosate-based
24  herbicides were probably human carcinogens?
25     A.   Well, at the time, they were still

Page 93

1  working on the monograph, which as you know, it's a
2  much longer document that came out many months after
3  the release of the actual classification decision
4  and the short paper and the Lancet oncology journal.
5  And it wasn't necessary for Dr. Blair to explain
6  that aspect of their review to me.  That is common
7  knowledge among anyone that assesses or follows the
8  scientific literature or, for that matter,
9  regulatory decision making.  People understand the
10  difference between the study conducted on a pure
11  pesticide active ingredient relative to a study
12  conducted on a formulated product.  That's -- that's
13  just part of what is done, and people understand the
14  distinction.
15     Q.   How much time did you spend reviewing
16  IARC Monograph 112?
17     A.   I think I've read it twice, three or four
18  hours total.
19     Q.   When was the last time you read it?
20     A.   Probably in early December, so three
21  months ago.
22     Q.   So just to be clear, your testimony is
23  that the monograph itself states that IARC has
24  classified as a probable human carcinogen, not only
25  glyphosate the ingredient, but also glyphosate-based

CONFIDENTIAL

Page 94

1  herbicides?
2       MR. LITZENBURG:  Objection to form.  The
3  document speaks for itself.
4       THE WITNESS:  IARC monographs classified
5  certain chemicals relative to available evidence
6  on their potential to cause cancer in humans.
7  They report those results by naming the
8  chemical -- benzene, glyphosate, diazinon,
9  2,4-D, acrylamide.  They don't -- they don't
10  refer to brand-name products.  They don't refer
11  to the form that the active ingredient or the
12  chemical of interest is actually introduced into
13  commerce or used in the real world.
14       It is common knowledge that if IARC
15  classifies glyphosate active ingredient as a
16  probable human carcinogen, that it has also
17  classified glyphosate-based herbicides as an
18  active ingredient -- as a probable human
19  carcinogen.  And as I said earlier, some of the
20  scientific data that the working group relied on
21  was -- reflected the impacts of use of and
22  exposure to glyphosate-based herbicides.
23  BY MR. COPLE:
24       Q.    Does the monograph say that?
25       A.    Yeah.  Yes.

Page 95

1       Q.    What is this common knowledge based on?
2  What do you base the common knowledge on that when
3  IARC classifies an active ingredient as probably a
4  human carcinogen, that it also is classifying
5  glyphosate-based herbicides as probably human
6  carcinogens?
7       MR. LITZENBURG:  Objection to form.
8       THE WITNESS:  If I remember correctly, I
9  actually think that issue came up in our hearing
10  in 1981 or 1982 with Dr. Blair.  This is -- this
11  is an aspect of pesticide use and risk and risk
12  assessment that it's just -- it's just common
13  knowledge that what -- what ultimately is
14  important is the chemical to which people are
15  exposed, and so there -- there -- it's a -- it's
16  a -- it's really a -- to try to separate them in
17  the -- in the IARC classification or review
18  is -- is not appropriate.
19  BY MR. COPLE:
20       Q.    What about the EPA classification and
21  review of active ingredients?  Does EPA do the same
22  thing, in your opinion?
23       A.    No.  The EPA -- the EPA data
24  requirements, the vast majority of them are based on
25  studies using the pure active ingredient.  All of

Page 96

1  the long-term cancer studies, the vast majority of
2  the genotox studies, the vast majority of the
3  toxicological database that's relevant to this case
4  has been done using the pure active ingredient
5  glyphosate.
6       This is one of the major reasons why
7  scientists around the world are much more concerned
8  about real-world exposures and risks, because people
9  in the real world apply a formulated
10  glyphosate-based herbicide which is -- behaves
11  different in the environment and is more toxic than
12  pure glyphosate.
13       So the EPA does very limited testing on
14  formulated products and is well aware that many
15  scientific bodies, scientists are encouraging it to
16  expand its testing, particularly in a case like
17  glyphosate-based herbicides where there's
18  substantial data in the open, peer-reviewed
19  literature showing increased toxicity, more serious
20  adverse effects when an organism is exposed to the
21  formulated product compared to the active
22  ingredient.
23       Q.    IARC does not itself test active
24  ingredients to determine whether there is a
25  carcinogenicity hazard, correct?

Page 97

1       A.    Correct.
2       MR. LITZENBURG:  Objection to form.
3  BY MR. COPLE:
4       Q.    And IARC conducts its review to determine
5  whether there is a hazard involving a potential
6  carcinogenic property of a chemical, correct?
7       A.    Correct.
8       Q.    And IARC, in making its determination of
9  a hazard assessment, does not do, as you put it, a
10  real-world risk assessment, correct?
11       MR. LITZENBURG:  Objection to form.
12       THE WITNESS:  Correct.
13  BY MR. COPLE:
14       Q.    Did you keep the email you sent to
15  Dr. Blair in 2015?
16       A.    No.
17       Q.    Did Dr. Blair respond to you after you
18  emailed him?
19       A.    Yeah.  He sent me a one- or two-line
20  email, said have time to talk to you midday on
21  Sunday, and gave me his phone number.
22       Q.    Since that exchange of emails, have you
23  continued to communicate by email with Dr. Blair?
24       A.    Once.
25       Q.    When did that happen?

CONFIDENTIAL

Page 98

1    A.   About -- it would be mid-December, before
2  I filed my expert report.  I had read in some of the
3  voluminous media coverage and scientific debate
4  about the IARC decision that IARC had released an
5  updated version of Monograph 112.  I wondered if the
6  updated version included new data or changed
7  anything in particular that I should know about.
8       So I emailed Dr. Blair and asked him if I
9  could give him a call, and we set up a time.  And I
10 called him, and he told me that the changes that had
11 been made in the IARC Monograph 112 were formatting,
12 typos, and some corrections in some of the
13 references, but there was no substantive change in
14 the monograph.
15    Q.   Did you talk about anything else with
16 Dr. Blair on that call?
17    A.   I think I asked him how he was holding up
18 to the criticism that he had been getting, and he
19 said that they -- he and IARC were weathering the
20 storm.
21    Q.   How long was the conversation?
22    A.   Twelve minutes, 15 minutes, something
23 like that.
24    Q.   Did you discuss the Agricultural Health
25 Study that was released in December, 2017, with

Page 99

1  Dr. Blair?
2    A.   No.
3    Q.   Did Dr. Blair email you back in December
4  when you contacted him?
5    A.   Just to set up the time to call.
6    Q.   Did you keep the email that you sent to
7  Dr. Blair?
8    A.   I don't -- I don't think so.  I'll be
9  glad to look in my computer and see if I can find
10 it.
11       MR. COPLE:  Let's mark this as Exhibit --
12 I think we're up to 5.
13       (Benbrook Exhibit Number 5 is marked for
14 identification.)
15 BY MR. COPLE:
16    Q.   I'm handing you, Dr. Benbrook, what's
17 been marked Exhibit 5 for the deposition.  It says
18 it's Defendant Monsanto's Notice of Videotaped
19 Deposition of Dr. Benbrook Via Deposition Subpoena.
20 Have you seen this document before?
21    A.   Yes.  Well, I received a version -- I
22 received a document that looks like this.  I haven't
23 had a chance to read it.
24       MR. LITZENBURG:  Objection.  Defense
25 counsel specifically asked us to accept the

Page 100

1  subpoena on behalf of Dr. Benbrook, and we have
2  filed responses to it.
3  BY MR. COPLE:
4    Q.   If you go to the top of 3 on Exhibit 5.
5    A.   In this?
6    Q.   Yes, sir.  About four or five pages in.
7    A.   What paragraph number?
8    Q.   There's a list of numbered paragraphs.
9    A.   Yes, I have it.
10    Q.   The first question I have, have you seen
11 any of these paragraphs in any form, either this
12 document or something similar, given to you by
13 counsel for Mr. Johnson?
14    A.   I think -- I believe it was Mr. Travers
15 sent me a document that I haven't compared to see if
16 there's any changes, but, yeah, this was sent to me.
17    Q.   Did you review all of these different
18 paragraphs that were in the whatever the similar
19 document was that Mr. Travers sent you?
20    A.   Yes, I did.
21    Q.   Did you confirm whether you had documents
22 that matched up with any of these categories?
23       MR. LITZENBURG:  The same objection.
24 Responding formally to subpoena.
25       THE WITNESS:  I read through this, and I

Page 101

1  made an effort to locate documents that I still
2  had in my possession that seemed responsive to
3  what was being requested, yes.
4  BY MR. COPLE:
5    Q.   And what did you do with those that you
6  found that you thought were responsive?
7    A.   I found a declaration that I wrote, and I
8  provided it to the counsel.
9    Q.   Did you find any communications, either
10 to or from any of the various individuals that are
11 listed in some of the numbered paragraphs,
12 specifically Paragraph 9 and Paragraph 10,
13 Paragraph 11, Paragraph 12, Paragraph 13?  There's a
14 lot of people.
15    A.   A lot of people.  None that are
16 responsive to what was being asked about, which is
17 obviously this case, glyphosate.
18    Q.   Did you have any -- did you find
19 documents representing any communications by you to
20 or from any of these individuals?
21       MR. LITZENBURG:  The same as original,
22 aware of formal responses and objections to this
23 attachment.
24       THE WITNESS:  I didn't locate any.
25 BY MR. COPLE:

CONFIDENTIAL

Page 102

1    Q.    Does that include Dr. Blair?
2    A.    Correct.
3    Q.    You looked for email communication
4  between you and him in December?
5    A.    I did, and I could not find any.
6    Q.    Have you ever done a label review for a
7  pesticide?
8    A.    Yes.
9    Q.    For who?
10   A.    For many purposes, many projects, many
11 clients.
12   Q.    Have you done a label review for EPA, for
13 a pesticide?
14   A.    At the request of EPA and being paid by
15 EPA? Is that what you're asking?
16   Q.    Yes, sir.
17   A.    No.
18   Q.    So you have not been involved working
19 with OPP as it would carry out a label review for a
20 registered or pending registration for a pesticide?
21   A.    At their request?
22   Q.    Yes. Either with them or for them.
23   A.    I have not.
24   Q.    In connection with preparing your expert
25 report, have you reviewed Title 40 Code of Federal

Page 103

1  Regulation Section 158.500?
2    A.    Please put it in front of me, and I'll
3  let you know.
4    MR. COPLE:  Let's mark this.
5    (Benbrook Exhibit Number 6 is marked for
6    identification.)
7  BY MR. COPLE:
8    Q.    All right, Dr. Benbrook. Exhibit 6 is
9  the Code of Federal Regulation part that I just
10 referenced to you. My question is, did you review
11 it in connection with your work in compiling your
12 expert report for Mr. Johnson?
13   A.    This is the Standard Part 158 data
14 requirements, and yes, this was among the documents
15 that I reviewed and have worked with for 30 years.
16   Q.    All right. Now, this outlines a number
17 of testing, and the first thing is the acute
18 testing, correct?
19   A.    Yes, sir.
20   Q.    There are also columns on the table on
21 the right side that talk about whether testing is
22 conducted on technical grade active ingredient or
23 end use of the product or both; is that right?
24   A.    Correct.
25   Q.    What's the difference between technical

Page 104

1  grade AI and end-use product?
2    A.    Technical grade AI is what we've been
3  referring to as a hundred percent pure glyphosate or
4  just glyphosate, and end-use product is a formulated
5  herbicide as sold to farmers, applicators, the
6  general public, which would include various
7  surfactants and adjuvants.
8    Q.    So for a registered pesticide active
9  ingredient, under this table, there would be eight
10 different types of acute toxicity tests done on an
11 AI, correct?
12   A.    Well, let's count them. Correct.
13   Q.    For the end-use product, there would be
14 six different types of acute toxicity tests that are
15 covered on that, on the formulated product, correct?
16   A.    Yes, sir.
17   Q.    And this would be done in terms of
18 testing for acute toxicity on every glyphosate-based
19 herbicide formulation that is reviewed and approved
20 by EPA, right?
21   A.    Well, there are many very modest changes
22 in some labels, and I am aware that Monsanto and
23 other companies request a waiver of conducting a
24 fresh set of acute toxicity studies when there's a
25 very minor change in a formulation. So I don't

Page 105

1  believe every single Monsanto, Roundup, or other
2  brand-name herbicide, has had these six different
3  acute toxicity tests done, but I would suspect a
4  significant number of them would have them done.
5    Q.    Are you aware that Ranger Pro had six
6  different acute toxicity tests conducted on it?
7    MR. LITZENBURG:  Object to form.
8    THE WITNESS:  I didn't look at that
9    specific aspect of the Ranger Pro database. No.
10 I just don't know.
11 BY MR. COPLE:
12   Q.    Do you know what the acute toxicity
13 six-pack is?
14   A.    It's these studies.
15   Q.    And you're not aware as part of your work
16 in coming up with your expert opinions whether the
17 six-pack tests were required and done for Ranger
18 Pro?
19   A.    I fully expect that they were done either
20 on Ranger Pro or another brand-name product that had
21 such a similar formulation, similar surfactants and
22 adjuvants, that EPA agreed with Monsanto in a
23 request to waive the six-pack for a minor change in
24 a -- in a formulation or a label.
25   Q.    Are you saying that your review of the

CONFIDENTIAL

Page 106

1  registration record showed that Monsanto had
2  requested a waiver of the six-pack for Ranger Pro.
3      A.   No.  That's not what I testified.
4      Q.   Okay.  Did you review the registration
5  file for Ranger Pro?
6      A.   No.
7      Q.   Now, the six-pack testing that is
8  required for a herbicide formulation like Ranger Pro
9  tests acute toxicity on oral route of exposure,
10  right?
11      A.   Among others, yes.
12      Q.   And dermal?
13      A.   Yes.
14      Q.   Inhalation?
15      A.   Correct.
16      Q.   Skin?
17      A.   Yes.
18      Q.   Eye irritation?
19      A.   Correct.
20      Q.   Skin sensitization?
21      A.   Yes.
22      Q.   This would be required for any herbicide
23  that is being reviewed for registration or renewal
24  purposes by OPP, correct?
25      A.   As I said, certainly any significant

Page 107

1  change in a formulation; but as I testified earlier,
2  it wouldn't surprise me if a thorough review of the
3  registration file of the 50-plus, brand-name,
4  glyphosate-containing herbicides registered by
5  Monsanto, a few of them did not have a fresh set
6  of six-pack data associated with them because of
7  relatively minor and insignificant changes in the
8  formulation.
9      Q.   But you have no information on whether
10  there was any waiver involved with Ranger Pro?
11      A.   I didn't -- I didn't conduct a
12  comprehensive assessment of the six-pack study
13  requirements across the 50-plus glyphosate herbicide
14  labels, all of which have been changed on a fairly
15  regular basis, certainly every other year or two or
16  three times a decade.  That would be an enormous
17  number of changes.
18      Q.   These acute toxicity tests the EPA
19  requires for herbicide registration are done over
20  various timeframes in order to mimic different
21  exposure conditions that might result to humans
22  during different types of uses, correct?
23          MR. LITZENBURG:  Objection to form.
24          THE WITNESS:  I don't understand the
25  question.

Page 108

1  BY MR. COPLE:
2      Q.   The tests are carried out under different
3  timeframes in order to try and mimic those
4  real-world conditions in which humans might be
5  exposed?
6      A.   You're referring to the exposure time
7  period?
8      Q.   Yes.
9      A.   Yes.  Correct.
10      Q.   And acute toxicity studies are used to
11  determine the warning information that's listed on
12  the product label with respect to each formulated
13  product, right?
14      A.   Correct.
15      Q.   The acute toxicity studies also are used
16  by EPA to determine what the personal protective
17  equipment is that should be listed on the product
18  label, correct?
19          MR. LITZENBURG:  Form.
20          THE WITNESS:  It's certainly one of the
21  components of the overall toxicology
22  exposure-related database that EPA will take
23  into account in making those judgments.  It's
24  not the sole -- it's not the sole basis for PPE
25  decisions.

Page 109

1  BY MR. COPLE:
2      Q.   What else is in the regulations of EPA
3  that says there are other factors besides the acute
4  toxicity testing?
5      A.   Well, they would look at the method of
6  application, the equipment used, the volumes used,
7  the concentration of the active ingredient, the
8  subacute toxicity, evidence of any reproductive
9  effects.  There would be a number of factors that
10  EPA would take into account in determining the
11  personal protective equipment that is required on
12  any given label.
13      Q.   And it's EPA that makes this
14  determination as to what PPE, personal protective
15  equipment, must be on the label based on the facts
16  you just mentioned, right?
17      A.   Well, when a pesticide manufacturer like
18  Monsanto submits an application for a new
19  registration of a pesticide like glyphosate, let's
20  say, Ranger Pro, for example, purposes -- is that
21  acceptable?  We talked about Ranger Pro as an
22  example?
23      Q.   We can talk about Ranger Pro, but my
24  question is more general.  EPA makes the
25  determination as what goes on the label about PPE,

CONFIDENTIAL

Page 110

1  correct?
2      A.    Not entirely.  The companies, in their
3  proposed label or amendments to the label, will
4  place in that proposal, in that application to EPA
5  the PPE that they feel is necessary.  Sometimes the
6  EPA will accept those judgments and not require any
7  additional PPE; and in other cases EPA, will engage
8  in a dialogue with the company about the potential
9  need for additional PPE, which is often one of the
10  many issues that require a lot of interaction back
11  and forth between a pesticide registrant and the
12  EPA.  But at the end of the day -- at the end of the
13  day, the EPA certainly has the authority to require
14  additional PPE if it feels that such additional
15  protective equipment is necessary.
16      Q.    EPA has the final say, correct?
17          MR. LITZENBURG:  Object to form.
18          THE WITNESS:  Correct.
19  BY MR. COPLE:
20      Q.    And EPA has the enforcement authority on
21  the FIFRA to enforce the label requirements for any
22  registered manufacturer of herbicide, correct?
23      A.    Well, of course EPA delegates the
24  authority to the states and Indian tribes, but
25  ultimately, the authority initially rests with the

Page 111

1  EPA, yes.
2      Q.    There is also subchronic testing required
3  by EPA for each of the active ingredients for a
4  pesticide, right?
5      A.    Correct.
6      Q.    What does that consist of?
7      A.    I assume we're going to -- are we going
8  to work through this?  Does this document --
9      Q.    You can refer to the document, or you can
10  just tell me what your understanding is.
11      A.    Well, subchronic -- there are a variety
12  of subchronic tests that assess the reproductive,
13  metabolic, physiological, developmental effects of
14  pesticides.  There are certainly -- I think there's
15  substantially more than six, and certainly in
16  current data requirements -- there were fewer back
17  in the day when glyphosate was first registered by
18  EPA in the mid to the late '70s, but, yeah, there
19  are a number of subchronic testing requirements.
20      Q.    And "subchronic" means what?
21      A.    Typically, seven -- exposures that might
22  be expected to last from several days to a few
23  weeks.
24      Q.    Up to 90 days, in some cases?
25      A.    Yes.  A lot of subchronic studies are 90

Page 112

1  days.
2      Q.    It could be 21 days, could be 28 days,
3  could be up to 90 days?
4      A.    Correct.
5      Q.    And subchronic testing would have been
6  done for glyphosate-based formulations by EPA's
7  requirement, correct?
8      A.    Most of the subchronic testing was almost
9  certainly done on the active ingredient.  There are
10  probably a few subchronic tests that have been
11  conducted on formulated product, but it would be
12  a -- it would be a small fraction of the total
13  subchronic database.
14      Q.    But all subchronic testing would be
15  prescribed by EPA, would be able to determine what
16  subchronic testing it wants from the registrant,
17  correct?
18      A.    Correct.
19      Q.    In forming your opinions for your expert
20  report, you do not have any information that
21  Monsanto did not conduct all the necessary
22  subchronic testing that EPA required, right?
23      A.    No.  I mean, that was not a factor, a
24  significant factor in my report, other than just
25  acknowledging that most of the initial subchronic

Page 113

1  studies were conducted by IBT and were later judged
2  to be either invalid or fraudulent and had to be
3  repeated.  That was in the early history of
4  glyphosate.
5      Q.    You're talking about the IBT laboratory
6  fraudulent activity, correct?
7      A.    Correct.
8      Q.    That was fraud, or alleged fraud, that
9  was committed by a laboratory that many
10  manufacturers and EPA itself used, correct?
11      A.    Many, many different manufacturers used
12  the IBT laboratory.  Correct.
13      Q.    This occurred to me at the last break --
14  if you need a break, Doctor --
15      A.    I just want to get more water.  I don't
16  want to slow things down.  We've got 14 hours to get
17  through.
18      Q.    I'm just reminding you, if you need a
19  break at any time, that's fine.
20          Let me go back, to be sure the record is
21  clear about what your views are with respect to
22  subchronic testing.
23          You have no information suggesting to you
24  that the subchronic testing for glyphosate or
25  glyphosate formulation wasn't complied with by

CONFIDENTIAL

Page 114

1    Monsanto as dictated by EPA, right?
2         MR. LITZENBURG:  Object to form.
3         THE WITNESS:  Correct.  And in
4    particular, after they replaced the early batch
5    of studies done by IBT.
6    BY MR. COPLE:
7         Q.    Which all manufacturers or federal
8    agencies that have used IBT were required to do for
9    their particular registrations, right?
10        A.    That is correct.
11        Q.    There's also chronic testing that's
12   required by OPP for pesticide registration, correct?
13        A.    Correct.
14        Q.    And chronic testing is not just a
15   different nomenclature from subchronic.  It's an
16   actual different type of test that's required,
17   right?
18        A.    Correct.
19        Q.    And EPA requires oral chronic testing in
20   two types of rodents, right?
21        A.    Correct.
22        Q.    And rats and mice are the typical
23   preferred animal models?
24        A.    Correct.
25        Q.    Part of the chronic toxicity testing in

Page 115

1    the two animal models, rats and mice, that EPA
2    requires is to evaluate long-term carcinogenicity
3    with respect to the active ingredient, correct?
4         A.    Correct.
5         Q.    And those tests were required by EPA for
6    glyphosate, and they were done for glyphosate,
7    correct?
8         A.    Yes.
9         Q.    EPA, according to its regulations and
10   guidance, does not require chronic animal
11   carcinogenicity animal bioassay testing to be done
12   on formulated products, right?
13        MR. LITZENBURG:  Object to form.
14        THE WITNESS:  No, it does not.
15   BY MR. COPLE:
16        Q.    So that would be the case for Ranger Pro
17   or for Roundup, as well; EPA would not have required
18   long-term carcinogenicity testing on formulated
19   product, right?
20        A.    It certainly wouldn't typically require
21   them, and I'm not aware that they ever did require
22   them.
23        Q.    There are two long-term animal bioassays
24   required by EPA to evaluate carcinogenicity of the
25   active ingredient glyphosate, right?

Page 116

1         A.    Yes.
2         Q.    Do you know sitting here today how many
3    long-term carcinogenicity tests in animal models
4    have been done by registrants and submitted to EPA?
5         A.    I think it's -- it's pushing ten now.
6    There's a -- yeah, there's a substantial number
7    beyond the ones that were conducted and submitted by
8    Monsanto.
9         Q.    Would you agree it's 14?
10        MR. LITZENBURG:  Object to form.
11        THE WITNESS:  I -- I can definitely look
12   up and find that number.  I have no reason to
13   argue with you if you represent that is the
14   correct number.
15   BY MR. COPLE:
16        Q.    Are you aware that out of the 14, or
17   whatever the number is -- and you agree it's at
18   least ten -- but you're aware that out of the ten to
19   14 long-term carcinogenicity tests in animal models
20   that only three were conducted by Monsanto?
21        A.    The original IBT, the '93 BioDynamic, and
22   the new rat study, so three, yep.
23        Q.    So the majority of registrant testing of
24   glyphosate for long-term carcinogenicity in animal
25   models has been done by companies other than

Page 117

1    Monsanto, right?
2         A.    Correct.
3         Q.    You talked at some length in your expert
4    report about the 1983 oncogenicity study in mice for
5    glyphosate, correct?
6         A.    Yes.
7         Q.    And that study is one of the three that
8    was done by Monsanto, right?
9         A.    Correct.
10        Q.    And that study is one of the maybe ten or
11   perhaps as many as 14 that were done by all
12   registrants combined, correct?
13        A.    Yes, sir.
14        Q.    EPA also requires developmental and
15   reproductive testing to be done on active
16   ingredients, right?
17        A.    Yes, sir.
18        Q.    And that testing was done with respect to
19   glyphosate?
20        A.    Over the years, yes, sir.
21        Q.    Are you aware of what the three tests are
22   that EPA requires for developmental and reproductive
23   testing of active ingredients in pesticides?
24        A.    I don't remember the methodological
25   details, no, but I know where to find them.

CONFIDENTIAL

Page 118

1    Q.    You would have heard of the bacterial
2 reverse-mutation assay?  Do you recall that?
3    A.    You're speaking about the mutagenicity
4 aspect?
5    Q.    Yes, I am.
6    A.    Okay.  Yeah, that would be one of them.
7    Q.    And it would include the in vitro
8 mammalian cell assay?
9    A.    Like I said, I would want to go and refer
10 to the table and make sure that you're accurately
11 identifying the test organisms and the names.  I
12 don't have that memorized.
13    Q.    Okay.  Do you recall if it would require
14 in vivo cytogenetics testing?
15    A.    Certainly tests that would fall in that
16 category, yes.
17    Q.    So all of these category of testing,
18 assuming that I am describing them to you correctly,
19 Dr. Benbrook, would have been required by EPA for
20 glyphosate as a condition of approving the
21 registration, right?
22    A.    Correct.  And those study requirements
23 and the methodologies used have evolved with the
24 science over the years.
25    Q.    Are you aware that over the years, that

Page 119

1 146 cell testing studies were done by registrants in
2 order to comply with EPA registration, review, and
3 approval?
4        MR. LITZENBURG:  Object to form.
5        THE WITNESS:  No, I'm not aware of that
6    total number, but glad to know it.
7 BY MR. COPLE:
8    Q.    You wouldn't be aware that Monsanto
9 conducted around 33 or 34 of those 140 or so cell
10 tests?
11        MR. LITZENBURG:  I object to all this
12    testimony.
13        THE WITNESS:  I wouldn't -- I wouldn't
14    have been able to identify the exact number, but
15    I would have guessed about that many.
16 BY MR. COPLE:
17    Q.    Are you an expert on acute toxicity
18 testing?
19    A.    No, sir.
20    Q.    How about subchronic testing?
21    A.    No.
22    Q.    How about chronic toxicity?
23    A.    No.
24    Q.    And that would include long-term
25 carcinogenicity?

Page 120

1    A.    Correct.
2    Q.    EPA also requires testing for active
3 ingredients on metabolism and pharmacokinetics; is
4 that right?
5    A.    Yes, sir.
6    Q.    Do you have expertise on metabolism or
7 pharmacokinetics or what I think is referred to in
8 your report as "ADME"?
9    A.    I have never conducted those types of
10 laboratory studies, no, sir.
11    Q.    And ADME would be absorption and
12 distribution and metabolism and excretion?
13    A.    Correct.
14    Q.    That's not an area of your expertise?
15    A.    Well, as I have said before, I don't
16 conduct the studies in the laboratory, but I
17 certainly am qualified to read the results of
18 studies and understand the interpretation of them as
19 explained in various regulatory documents, and to
20 the extent that they play -- results from ADME
21 studies play a role in the risk assessment process
22 and regulatory decisions, I'm -- I'm very
23 comfortable and familiar with the science at that
24 level.
25    Q.    Is this one of the areas regarding

Page 121

1 science that you previously described as
2 self-taught?
3    A.    Sure, I'll accept that characterization.
4    Q.    And dermal penetration is also a testing
5 that's required for active ingredient to pesticides
6 by EPA, right?
7    A.    I -- I didn't review any thermal
8 penetration.
9    Q.    Dermal.
10    A.    Oh, dermal.  Oh, yes, of course.
11    Q.    I actually think I said "dermal."
12    A.    I misheard you.  My apologies.  So
13 restate the question.
14    Q.    Yes.  EPA also required dermal
15 penetration studies for active ingredients in
16 pesticides?
17    A.    Yes, they do.
18    Q.    So that would also have been required and
19 done by Monsanto to EPA's satisfaction?
20    A.    Correct.
21    Q.    There's also special testing which might
22 include such things as immunotoxicity testing; is
23 that right?
24    A.    Yes.  There's a number of other often
25 more specialized or targeted studies that EPA ends

CONFIDENTIAL

Page 122

1   up requesting pesticide registrants to conduct.
2        Q.    And if EPA requests immunotoxicity
3   testing, for example, on glyphosate, any registrant
4   wanting glyphosate to be approved as an active
5   ingredient in pesticide would have to do that to
6   EPA's satisfaction, right?
7        A.    Well, if EPA insisted on it and expressed
8   to the company that in the absence of the study,
9   they would either not grant a new registration or
10  cancel a registration because of a data gap.
11  There's many times that EPA asks a company for
12  studies when the company disagrees and ends up not
13  doing the study.  So it's not necessarily just
14  because EPA asks that the study gets done.  There's
15  certainly examples of that in the record of this
16  case.
17       Q.    Under FIFRA, in order to meet the
18  standard for EPA to approve a registration for a
19  pesticide, there is a specific language standard
20  that's used.  Are you familiar with that?
21       A.    Yes.
22       Q.    What is that?
23       A.    Unreasonable adverse effect on man or the
24  environment is the standard, the basic standard in
25  FIFRA, and the newly established standard for

Page 123

1   pesticide residues in food or in the tolerance
2   setting process established by the Food Quality
3   Protection Act in 1996 is a reasonable certainty of
4   no harm.
5        Q.    And that takes into account, in addition
6   to the various testing that you've been talking
7   about right now under this regulation, other aspects
8   of the use of a pesticide, in terms of economics, in
9   terms of the use and the benefit of the pesticide,
10  correct?
11       A.    The FIFRA standard, unreasonable adverse
12  effects on man and the environment, does; but the
13  reasonable certainty of no harm standard is
14  generally referred to as health-based standard that
15  does not include a balancing of risk and benefit.
16  So in the first case, the answer to your question is
17  yes; but in reference to the Food quality Protection
18  Act, the answer is no.
19       Q.    EPA may want testing on how well -- how
20  efficacious a pesticide is, correct?
21       A.    EPA, in the early days, did require
22  companies to submit efficacy data, but that data
23  requirement for new registrations or label
24  amendments was dropped many years ago, and EPA does
25  not routinely carry out a use and benefits

Page 124

1   assessment for either new registrations or label
2   amendments for existing registered products.
3        Q.    Any EPA required product performance
4   testing would have to have been done by a registrant
5   to EPA's satisfaction in order to be approved for
6   registration or reregistration, right?
7        A.    Well, back in the day when they required
8   the studies, yes.
9        Q.    And EPA requires testing on potential
10  hazards to nontarget organisms, correct?
11       A.    Yes.
12       Q.    What's a nontarget organism?
13       A.    It's any organism other than the pest
14  organism for which the manufacturers develops and
15  markets the pesticide and for which a farmer or a
16  pest control operator applies the pesticide.  So in
17  the case of glyphosate-based herbicides, nontarget
18  organisms are anything that's alive that's not a
19  growing weed.
20       Q.    So EPA would take into account, for
21  example, the potential exposure of pesticide
22  applicators for other persons that might be exposed
23  to a pesticide?
24       A.    Correct.
25       Q.    Any testing EPA requires for such

Page 125

1   exposures would have to be conducted to EPA's
2   satisfaction by a registrant as a condition of
3   registration or reregistration approval by EPA,
4   right?
5        A.    That would certainly be EPA's hope.
6        Q.    There's also environmental fate studies;
7   is that right?
8        A.    Yes, sir.
9        Q.    What are those?
10       A.    They're studies that are required to
11  establish the physiochemical properties, the
12  environmental fate of the pesticide once it's
13  applied in the environment.  These studies would
14  include such things as the soil half-life, the
15  half-life on plant tissue, which would get at the
16  persistence of the pesticide and, hence, how long
17  residues might remain on food or in a cropping
18  system where farmworkers that are harvesting a crop,
19  for example, might be exposed to it.
20            They entail a number of physical and
21  chemical properties that are required to apply
22  standard EPA models for estimating the risk of
23  groundwater, leaching into groundwater and
24  groundwater contamination, which is, of course, an
25  important part of the overall risk assessment of the

CONFIDENTIAL

Page 126

1  pesticide, because EPA -- especially in the case of
2  herbicides, one of the primary routes of exposure to
3  human beings is through drinking water.
4          So there is a quite substantial list of
5  these physical and chemical properties that need to
6  be established in order to run the risk assessment
7  models that EPA uses to establish expected levels in
8  surface and groundwater, potential risk to aquatic
9  organisms, amphibians, fish, birds, and people.
10     Q.    So EPA would require studies,
11 environmental fate studies on degradation?
12     A.    Yes, sir.
13     Q.    And on metabolism?
14     A.    Yes.
15     Q.    And on mobility?
16     A.    Yes.
17     Q.    And on dissipation?
18     A.    Correct.
19     Q.    And as you said specifically groundwater
20 monitoring, right?
21     A.    An important -- important role of the
22 agency, yes, sir.
23     Q.    And also EPA would require testing
24 regarding residue chemistry, correct?
25     A.    Correct.

Page 127

1      Q.    What is that?
2      A.    That is the assessment of the fate of a
3  pesticide when applied on a food crop, an agronomic
4  crop from which something is being harvested that's
5  going either directly into the human food supply or
6  into the livestock sector by virtue of feeding to a
7  pig, a cow, a chicken.
8          The residue chemistry dataset that all
9  companies are required to submit prior to the EPA
10 approving a tolerance petition entails the
11 information that the EPA needs to attract, not just
12 the level of the pesticide active ingredient that is
13 likely to remain in or on the harvested food stuff,
14 but also the -- any breakdown products that would be
15 expected to be in or on the crop that might
16 contribute to the toxicological profile or risk
17 profile from use of the pesticide.
18     Q.    In addition to crop residue testing and
19 evaluation, EPA also requires pesticide testing on
20 spray drift, right?
21     A.    Yes, to a -- I mean, pesticide drift,
22 it's received -- it receives some focus.  It's not a
23 -- not a -- it hasn't traditionally been a major
24 area of EPA evaluation.
25         However, in the case of herbicides like

Page 128

1  dicamba, for example, that have had a long history
2  of drift and triggering nontarget crop damage, the
3  EPA definitely requires studies to try to help the
4  agency and the registrants and farmers get a better
5  handle on what the risks are and whether there's
6  some way to mitigate the risks by altering the
7  formulation, altering the application methods,
8  eliminating aerial application, or various other
9  proven and practical ways to reduce the risk of
10 off-target movement of a herbicide.
11     Q.    EPA requires spray drift testing to
12 characterize the droplet size or the spectrum of
13 droplet size of potential spray drift, right?
14     A.    For some pesticides, yes.
15     Q.    And EPA requires this testing so that an
16 evaluation can be made in terms of whether a
17 potential detrimental effect on a nontarget organism
18 would be exceeded?
19     A.    That's a primary reason for them
20 requiring such data, correct.
21     Q.    In the case of all of these tests that
22 are required by EPA regulation that you have been
23 telling us about, in each instance, Monsanto and the
24 other registrants did the testing that EPA -- all of
25 the testing that EPA required for glyphosate, right?

Page 129

1      A.    Well, Monsanto responded to and did
2  testing over the years that was required by the
3  agency to receive an answer on either registration
4  applications or tolerance petitions.  It's an --
5  it's an ongoing, iterative process that leads to the
6  regulatory agency recognizing some additional
7  concern or question, which might then trigger an
8  additional data request or study, which sometimes
9  the registrants will just do and submit to EPA, and
10 other times there's a dialogue among agency
11 scientists and registrant scientists to try to
12 figure out the best way to fill what the agency
13 feels is a data gap.
14         So it's a -- certainly the standard data
15 requirements have to be fulfilled, but often that's
16 not the end of the requirements placed on
17 registrants to answer additional questions that
18 agency scientists have that they feel must be
19 answered prior to then completing a risk assessment
20 and reaching a determination that there are in fact
21 no unreasonable adverse effects on man or
22 environment associated with either an existing or
23 proposed use of a pesticide, or in the case of a
24 tolerance petition, to establish a new tolerance or
25 increase an existing tolerance, whether now under

CONFIDENTIAL

---

Page 130

1    the new standard of the Food quality Protection Act
2    there's a reasonable certainty of no harm.
3        Q.    Once this dialogue that you just
4    described occurs between EPA and any registrant
5    about testing or data requirements, EPA ultimately
6    decides what the agency wants the registrant to do
7    by way of additional testing as a condition of
8    receiving ultimately registration approval by the
9    agency, right?
10       A.    Well, certainly the EPA will communicate
11   and impose additional data requirements on the
12   registrant as the agency feels necessary, but the
13   registrant also has an ongoing obligation to submit
14   any new information that becomes available to the
15   registrant, irrespective and independent of any data
16   requirement from the agency through the Section
17   6(a)(2)(B) process.
18       Q.    And EPA Section 6(a)(2) process is a
19   process that gives EPA the enforcement authority
20   over the continuing submission of new information,
21   correct?
22       A.    Not really.  It's a -- it's a requirement
23   on any registrant of a pesticide to submit to the
24   agency in a timely way, and I think it's 90 days,
25   any new information that the registrant comes in the

---

Page 131

1    possession of that would assist or inform the EPA's
2    assessment of the risk associated with a given,
3    already registered pesticide.
4        Q.    EPA enforces Section 6(a)(2)
5    requirements, right?
6        A.    Yes, they do.
7        Q.    Have you been involved in advising EPA in
8    its enforcement of 6(a)(2)?
9        A.    No.
10       Q.    Have you been involved in assessing for
11   EPA whether 6(a)(2) submission requirements have
12   been met?
13       A.    No.
14       Q.    Now, IARC is part of the World Health
15   Organization; is that right?
16       A.    Yes, sir.
17       Q.    And the World Health Organization is an
18   international body, but it is not a foreign
19   regulator of pesticides or active ingredients in
20   pesticides, right?
21       A.    I would agree with that characterization.
22       Q.    So that would be by definition correct
23   for IARC.  IARC is not a regulator, either in the
24   U.S. or anywhere else in the world, right?
25       A.    Correct.

---

Page 132

1        Q.    The current EPA determination on
2    glyphosate and carcinogenicity is that glyphosate,
3    according to EPA's judgment, is not a carcinogen,
4    right?
5        A.    Correct.
6        Q.    Are you familiar with the regulatory
7    reviews and determinations made by foreign
8    regulators on the same question that EPA has
9    decided, as to whether glyphosate is a human
10   carcinogen?
11       A.    Well, some of them, yes.
12       Q.    Did you review them for purposes of
13   formulating your opinions in your expert report,
14   which is now -- I think it's 4?
15       A.    Exhibit 4.  I didn't review the European
16   reviews as part -- specifically part of this case.
17           As you know, glyphosate and Roundup-based
18   herbicides have been progressing through a European
19   Union reregistration process roughly comparable to
20   the reregistration review that's been going on in
21   EPA since, what, 2008 now?  Several years, in any
22   event.  And I have kept up with and read a number of
23   documents and reports about the status and the
24   issues and the consideration of the same cancer risk
25   assessment controversies that are at the heart of

---

Page 133

1    this case as a course of my normal tracking of
2    developments.
3           And as a matter of fact, I peer-reviewed
4    a paper submitted to a scientific journal on the
5    plane coming here that is specifically about the
6    procedural aspects of the overall European review of
7    glyphosate-based herbicides.  In fact, I've
8    peer-reviewed three different papers now.  It's
9    something that a lot of people are writing about in
10   the scientific community.
11       Q.    Did you review the Canadian Pest
12   Management Regulatory Agency review in determination
13   of glyphosate and carcinogenicity?
14       A.    No.
15       Q.    Are you familiar with Canada's review and
16   determination?
17       A.    No, I'm not.
18       Q.    You're not aware that Canada has reviewed
19   glyphosate and carcinogenicity and determined that
20   it is not a human carcinogen?
21           MR. LITZENBURG:  I object to testimony,
22   Counsel.
23           THE WITNESS:  I just -- I already said I
24   was not -- I -- I am not aware of the most
25   recent action of the Canadian government on

---

CONFIDENTIAL

Page 134

1    glyphosate, so no, I don't know what they did.
2    I didn't look at it as part of this case.
3    BY MR. COPLE:
4        Q.    Do you know what the Federal Institute
5    for Risk Assessment is?
6        A.    Pardon me?
7        Q.    Do you know what the Federal Institute
8    for Risk Assessment is?
9        A.    I believe that would be English
10   translation for the German regulatory authority that
11   was the rapporteur country for the EU review.
12       Q.    Are you familiar with that agency's
13   review of glyphosate and potential carcinogenicity?
14       A.    Well, not all 40,000 pages of it, but
15   certainly I've tracked the evolution of that review.
16   I've look at some of the technical documents from
17   it, and I'm certainly generally aware of the process
18   and the data that the German regulatory authority
19   relied upon and, ultimately, the judgments that they
20   made.
21       Q.    And so if you're aware of the judgments,
22   you're aware that that German regulatory institute
23   has determined that glyphosate is noncarcinogenic,
24   right?
25           MR. LITZENBURG:  Objection to form.

Page 135

1            THE WITNESS:  That's not precisely what
2    the German institute concluded.  They concluded
3    that it's unlikely that glyphosate-based
4    herbicides and glyphosate active ingredient
5    itself poses a significant cancer risk based on
6    the expected levels of exposure through the
7    diet.
8    BY MR. COPLE:
9        Q.    You're aware that the German institute
10   took into account the IARC Monograph 112 in doing
11   its review, correct?
12       A.    I'm sure that -- that -- I don't recall
13   exactly the status of the German review as of
14   March 2015.  I don't believe it was done, and
15   certainly I am aware that not only the German
16   regulatory authority by virtue of its role as the
17   rapporteur country for the EU, but all of the
18   relevant and scientific bodies and other health
19   bodies that played a role in the EU review debated
20   at great length the IARC classification and what it
21   meant relative to the decisions that the European
22   Union faced relative to the reregistration of
23   Roundup and glyphosate-based herbicides.
24       Q.    And are you aware that IARC is the only
25   organization in the world that to date has

Page 136

1    determined that glyphosate is probably a carcinogen
2    to humans?
3            MR. LITZENBURG:  I object to gross
4    misrepresentation.
5            THE WITNESS:  I'm not -- I didn't do a
6    comprehensive assessment of the regulatory
7    position of agencies around the world.  I --
8    I -- so I can't really answer that question.
9    BY MR. COPLE:
10       Q.    Well, if you didn't do a comprehensive
11   look, did you look at Australia?
12       A.    No.
13       Q.    New Zealand?
14       A.    No.
15       Q.    EFSA?
16       A.    EFSA is one of the primary agencies in
17   Europe that played a central role in the overall
18   evaluation of glyphosate and glyphosate-based
19   herbicides.  And, yes, I've tracked and I'm aware of
20   the judgment ultimately that EFSA made.
21       Q.    That judgment was?
22       A.    Essentially the same as the German
23   regulatory authority; that they did not feel that
24   use of and exposure to glyphosate-based herbicides
25   posed a significant increased risk of cancer based

Page 137

1    on the routine or expected levels of exposure
2    through the diet, which would include drinking
3    water.
4        Q.    And do you know what the JMPR is?
5        A.    It's the -- it's the operational
6    committee of the WHO that sets and reviews the codex
7    internationally applicable pesticide tolerance
8    levels.  MRLs is what they call them.
9        Q.    What does JMPR stand for?
10       A.    Joint pesticide management?  I don't
11   remember the acronym.
12       Q.    And are you aware that JMPR also concluded
13   that exposure to glyphosate is unlikely to be a
14   carcinogenic risk to humans?
15       A.    Based on typical expected levels of
16   exposure through the diet.  All -- all of the
17   European agencies predicated their judgment on a
18   phrase to that effect.
19       Q.    Did you review the CARC report?
20       A.    I don't know what report you're referring
21   to.  Could you put it in front of me, and I'll tell
22   you?
23           MR. HOLLINGSWORTH:  Counselor, do you
24   need a copy of the CARC report?
25           MR. LITZENBURG:  Yes.

CONFIDENTIAL

Page 138

1    THE WITNESS:  Oh, you said CARC, not
2  Clark.
3    MR. COPLE:  Yes, I'm sorry.
4    THE WITNESS:  I thought you said Clark,
5  C-L-A-R-K.
6  BY MR. COPLE:
7    Q.  Let's talk about the CARC report, then.
8    A.  Which year?
9    Q.  2015.
10   A.  Yes, I'm familiar with that.
11   Q.  And you reviewed it as part of forming
12  your expert opinions; is that right?
13   A.  I did.
14   Q.  And you reviewed the entire report; is
15  that right?
16   A.  Again, with all EPA reports, there are
17  often multiple addendums and attachments, which
18  often are not included in either the version of the
19  document that I obtained through this EPA website or
20  the version of the CARC report that is
21  Bates-numbered; but I believe the version of the
22  CARC report that you're referring to, the copy that
23  I reviewed spans maybe 30 pages, something like
24  that.
25    MR. COPLE:  Let's just go off the record

Page 139

1  for a second.
2    THE VIDEOGRAPHER:  The time is now 12:20.
3  We are off the record.
4    (Break in proceedings.)
5    THE VIDEOGRAPHER:  The time is now 1:06.
6  We are on the record.
7  BY MR. COPLE:
8    Q.  Dr. Benbrook, before we broke, we were
9  starting to talk a little bit about the CARC report,
10  which you heard me say "Clark," and I'll try to
11  speak more clearly.
12   A.  We're on the same page now.
13   Q.  Okay.  Good.  Can you tell us what the
14  CARC report is?
15   A.  The one you're referring to as a -- why
16  don't you -- since we're going to talk about it,
17  give me a copy.
18   Q.  I just have a few questions.  We may go
19  through it in detail later.  I just want to see what
20  you remember.  You mentioned it in your report.
21   A.  It's a meeting of the group of EPA
22  scientists that is responsible for making judgments
23  about the classification of pesticides with respect
24  to oncogenic potential, and this was a report
25  articulating the determination of that committee

Page 140

1  after their assessment or reassessment of the
2  database on glyphosate.
3    Q.  There were multiple scientists on that
4  CARC, correct?
5    A.  Correct.
6    Q.  Are you familiar with the CARC process?
7  Is that something you know about?
8    A.  Yes.
9    Q.  All right.  So this is not the first CARC
10  report you've seen come out of EPA?
11   A.  Nor is it the only one on glyphosate.
12   Q.  Do you recall that there were 11
13  long-term, chronic toxicity studies concerning
14  carcinogenicity in animal models that that CARC
15  committee looked at?
16   A.  I believe that's the correct number.
17   Q.  All right.  Do you also recall that there
18  were somewhere around 50 or 55 genotoxic studies
19  that that CARC also looked at?
20   A.  I don't recall the exact number.  If you
21  share the report with me, I'll refresh my memory.
22   Q.  Do you recall that the conclusion that
23  the CARC committee reached in that case was that
24  based on weight of the evidence, glyphosate should
25  be classified as not likely to be carcinogenic to

Page 141

1  humans?  Do you remember that?
2    A.  Yes.
3    Q.  What is the weight of the evidence that
4  CARC is referring to?  Do you know?
5    A.  Yes.
6    Q.  What is that?
7    A.  It's a term of art that describes the
8  body of evidence that regulatory agencies,
9  scientific institutes, individual experts assess and
10  draw upon in reaching a judgment about an issue like
11  the classification of glyphosate and
12  glyphosate-based herbicides relative to oncogenic
13  risk.
14   Q.  That's exactly what the CARC committee
15  report said, correct?
16   A.  Yes.
17   Q.  There was a subsequent EPA review after
18  the CARC report in 2015 that was done in September
19  of 2016.  You took that into account in forming your
20  opinions?
21   A.  Again, there's a lot of EPA memos on
22  oncogenicity of glyphosate.  I'd like to have what
23  you're referring to in front of me to place it into
24  context and accurately describe it.
25   Q.  Offhand, you don't recall the 2016 issues

CONFIDENTIAL

Page 142

1    paper that OPP put out?
2         MR. LITZENBURG:  Asked and answered.
3    It's a reasonable request.  You're welcome to
4    stand on it.
5         THE WITNESS:  Again, I'm sure I read it,
6    and I -- if I -- if you provide me a copy and
7    let me refresh my memory, I'll tell you the
8    extent to which I relied on it in reaching my
9    opinions.
10   BY MR. COPLE:
11        Q.   Well, let me just ask you this question.
12   Do you recall that the 2016 review by OPP made the
13   same conclusion as the 2015 CARC report, which was
14   glyphosate is not likely to be carcinogenic to
15   humans?  Do you remember that they ended up with
16   that conclusion?
17        A.   I'd have to read the report to describe
18   their conclusion.  It was kind of a moving target.
19        Q.   What was a moving target?
20        A.   EPA's judgment and determination on the
21   carcinogenicity of glyphosate.
22        Q.   Do you recall that the 2016 report was
23   different in its conclusion than the 2015 report?
24        A.   Again, I'd be glad to talk about the
25   differences when I have them in front of me.

Page 143

1         MR. COPLE:  Mark this as an exhibit.
2         (Benbrook Exhibit Number 7 is marked for
3    identification.)
4    BY MR. COPLE:
5         Q.   We've marked as Exhibit 7 for the
6    deposition, Dr. Benbrook, what's called "Revised
7    Glyphosate Issue Paper: Evaluation of Carcinogenic
8    Potential," by the EPA's OPP, dated December 12th,
9    2017.
10        You reviewed this OPP report?
11        A.   As I believe I testified earlier, I read
12   it very quickly.  I didn't do a thorough review.  It
13   came out three years after the use of Roundup
14   herbicides by Mr. Johnson in this case.  And I -- I
15   didn't feel it was as germane to the applicable
16   record that should legitimately form my opinions
17   about this particular case.
18        Q.   You don't think, as an expert in this
19   case, that it's germane regarding EPA's conclusion
20   in December of 2017, whether glyphosate is
21   carcinogenic to humans?
22        MR. LITZENBURG:  Asked and answered.
23        THE WITNESS:  The EPA has issued a number
24   of reports addressing the oncogenicity of
25   glyphosate.

Page 144

1         From approximately 1983 until 1990 or
2    early 1991, the EPA regarded glyphosate as a
3    possible human carcinogen based primarily on the
4    renal tubular adenomas in the BioDynamic mouse
5    study, as I discuss in great length in my
6    report, between the CARC report of 1985, the
7    consensus report signed by -- I think at that
8    time it was seven EPA scientists, and the 1990
9    or '91 meeting, where they changed the
10   classification.  There had been a series of
11   negotiations, exchanges of data and debates, and
12   I'm aware of the evolution of EPA's position on
13   glyphosate oncogenicity.
14        So the December 12, 2017, report is the
15   most recent articulation of the agency's
16   judgment.
17   BY MR. COPLE:
18        Q.   You don't think that's germane, as an
19   expert in this case?
20        A.   Well, this case is about the label
21   provisions and warnings associated with Ranger Pro
22   and Roundup Concentrated Pro herbicides in 2012 to
23   2014.  That was what my opinion -- my opinions as
24   expressed in my expert report are based on my
25   understanding of the record and the actions of

Page 145

1    Monsanto as a responsible steward of this chemical
2    up into and including the 2012 to 2014 period,
3    recognizing that the fundamental issue of EPA's
4    classification of glyphosate was, you know, still in
5    play, if you will, or still under debate within the
6    agency, and obviously, the debate broadened after
7    March 2015, when the IARC classification came out.
8         Q.   You don't think that the -- as an expert
9    in this case, you don't think the germane issue is
10   whether EPA has concluded that exposure to
11   glyphosate is a human carcinogen?
12        MR. LITZENBURG:  Objection.  Asked and
13   answered.  Same question.
14        THE WITNESS:  All of the CARC reports and
15   all of the judgments rendered by EPA and about
16   which this case focuses on, and the debate
17   around the world, has on glyphosate
18   oncogenicity, is focused on the potential cancer
19   risks to the general population, typically from
20   dietary and/or drinking water exposures.
21        The vast majority of the focus of the
22   risk assessments in the public debates have been
23   on this general population, under general
24   conditions of use, generally expected exposures
25   to the average person.  That has been the focus

CONFIDENTIAL

Page 146

1   and the -- the meaning of these versus cancer
2   classifications reached by -- by EPA, frankly,
3   other -- other regulatory authorities around the
4   world.
5   BY MR. COPLE:
6   Q.   You agree that between 2012 and 2014,
7   that EPA classified glyphosate as not having -- as
8   no evidence of human carcinogenicity, correct?
9       MR. LITZENBURG:  Asked and answered.
10      THE WITNESS:  As I said before, that was
11   their position relative to expected typical
12   levels of exposure through the diet, drinking
13   water; yes, that was their conclusion.
14   BY MR. COPLE:
15   Q.   And EPA has not changed that conclusion
16   that exposure to glyphosate is not a human
17   carcinogen, right?
18   A.   Not -- not to my knowledge.
19   Q.   All right.  Now, in this Exhibit 7, if
20   you go to Page 13 of the document, it says that in
21   December of 2016, the FIFRA SAP -- SAP, was convened
22   to evaluate the agency's issue paper regarding human
23   carcinogenic potential of glyphosate.
24       First of all, what is SAP under FIFRA?
25   A.   Scientific advisory panel.

Page 147

1   Q.   What does a scientific advisory panel
2   consist of?
3   A.   It's a set of invited experts in the
4   relative scientific disciplines that the office of
5   pesticide program -- programs presents a set of
6   questions to, to help the agency resolve complex
7   issues of risk assessment, data collection,
8   modeling, or other technical issues that arise in
9   the course of regulating pesticides.
10   Q.   And an SAP is comprised of scientists in
11   the relative disciplines who are independent or
12   supposed to be independent of EPA itself, right?
13   A.   Correct.
14   Q.   And in December 2016, according to this
15   document, on Page 13, EPA convened this SAP in order
16   to evaluate EPA's issue paper on human
17   carcinogenicity and glyphosate as set forth in its
18   September 2016 issue paper, right?
19   A.   That's what it says, yes, sir.
20   Q.   Now, is that 2016 issue paper the one
21   that you said you saw but you didn't spend much time
22   with?
23   A.   I didn't spend much time with that one.
24       Are you speaking about the one that was
25   posted prematurely on the EPA website and then taken

Page 148

1   down?  Is that what you're referring to, or a
2   subsequent one?
3   Q.   I don't know what premature posting is,
4   but I'm talking about the one that was published by
5   EPA's OPP formally in 2016, as is referenced in this
6   document.
7   A.   Again, put it in front of me, and it will
8   trigger my --
9   Q.   You have -- you have the --
10   A.   This is 2017 document.
11   Q.   Correct.  And it says right on Page 13 of
12   the document that it asks for an SAP to evaluate the
13   2016 issue paper.  The CARC was in 2015.
14   A.   Right.  Okay.
15   Q.   If you go to Page 143 of Exhibit 7,
16   you'll see there's a subheading called 6.7, Proposed
17   Conclusions Regarding Carcinogenic Potential of
18   Glyphosate.  And if you go right above that, there's
19   a paragraph, and the last sentence of the paragraph
20   says, "The strongest support is for not likely to be
21   carcinogenic to humans."
22       Do you see that?
23   A.   Yes, I do.
24   Q.   So this was the conclusion as of
25   December 12, 2017, by OPP, correct?

Page 149

1   A.   Correct.
2   Q.   That conclusion goes all the way back to
3   1991, in terms of what the cancer assessment peer
4   review committee decided about the classification of
5   glyphosate and carcinogenicity risk, right?
6   A.   That's correct.
7   Q.   Do you know what a cancer assessment peer
8   review committee is?
9   A.   Yes.
10   Q.   What is that?
11   A.   It's the committee that OPP convenes to
12   render final judgments at their -- sort of typically
13   among the toxicologist, statisticians, pathologists,
14   the cancer experts within OPP.  That committee is
15   convened periodically when it comes time for OPP as
16   an institution to render a final judgment about
17   where a particular active ingredient should be
18   classified relative to EPA's classification system
19   for oncogenicity.
20   Q.   So in 1991, the cancer assessment peer
21   review committee looked at carcinogenicity and
22   exposure to glyphosate and concluded that the proper
23   classification was Category E under the cancer risk
24   guidelines, right?
25   A.   Correct.

CONFIDENTIAL

Page 150

1    Q.    And Cancer Risk E means that there is
2  evidence of noncarcinogenicity in humans, right?
3    A.    Correct.
4    Q.    And for 26 years, right up until
5  December 12, 19 -- I'm sorry.  December 12, 2017,
6  EPA's OPP responsible for the review of long-term
7  carcinogenicity of pesticides remained the same on
8  its conclusion about no carcinogenic risk for
9  exposure to glyphosate, right?
10    MR. LITZENBURG:  Objection to form.
11  Compound testimony.  Asked and answered.
12    THE WITNESS:  Yes.  I would agree with
13  that.
14    MR. COPLE:  All right.  Let's pull up the
15  next document.  Let's mark this as Exhibit 8.
16    (Benbrook Exhibit Number 8 is marked for
17  identification.)
18  BY MR. COPLE:
19    Q.    Let me go back.  Before we talk about
20  Exhibit 8, go back to Exhibit 7 for a moment.  We're
21  on the same page that we were just talking about,
22  143 of Exhibit 7.  We had just talked about the
23  sentence above the Subheading 6.7.
24    Below that, below that subheading, in the
25  second full paragraph, is a statement by OPP, and

Page 151

1  again this is December 12th, 2017.
2    It starts out, Dr. Benbrook, by saying
3  that "Since its registration in 1974, numerous human
4  and environmental health analyses have been
5  completed for glyphosate, which consider all
6  anticipated exposure pathways."
7    Did I read that correctly?
8    A.    Yes.
9    Q.    Since 1974, according to OPP, the agency
10  has been conducting numerous human health
11  assessments, including carcinogenicity for
12  glyphosate, which has taken into account all
13  anticipated exposure pathways being exposed to
14  glyphosate, right?
15    MR. LITZENBURG:  Form.
16    THE WITNESS:  That's what it says.
17  BY MR. COPLE:
18    Q.    It goes on to say that "Glyphosate is
19  currently undergoing registration review."
20    Do you see that?
21    A.    Yes.
22    Q.    Did you know that?
23    A.    Yes.
24    Q.    All right.  When did the registration
25  review start?

Page 152

1    A.    It was 2008.  It might have been 2007.
2    Q.    Or maybe 2009, somewhere in that
3  timeframe?
4    A.    Around there.
5    Q.    And that registration review is ongoing?
6    A.    Yes, sir.
7    Q.    So this document issued by OPP in
8  December of the most recent year that's ended, 2017,
9  is part of the registration or the process at EPA,
10  correct?
11    A.    Yes.
12    Q.    In fact, the next sentence in this
13  paragraph goes on to say that "As part of this
14  process," meaning registration review, "the hazard
15  and exposure of glyphosate are reevaluated to
16  determine its potential risk to human and
17  environmental health using current practices and
18  policies," right?
19    A.    Correct.
20    Q.    And current practices and policies at
21  EPA's office of pesticide programs would include the
22  current, most up-to-date cancer risk guidelines that
23  EPA uses, right?
24    A.    Yes.
25    Q.    It goes on to say in the next sentence

Page 153

1  that "The human carcinogenic potential of glyphosate
2  has been evaluated by the agency several times."
3    And you've testified that you're aware --
4  that you've reviewed these various reviews, right?
5    A.    Correct.
6    Q.    And it goes on to say that "As part of
7  the current evaluation for registration review" --
8  this is for glyphosate -- "the agency has performed
9  a comprehensive analysis of available data from
10  submitted guideline studies and the open
11  literature," right?
12    A.    That's what it says.
13    Q.    So EPA has taken into account, according
14  to its own words in this Exhibit 7, all of the
15  available information, data that's submitted from
16  the guideline studies as well as from the open
17  literature, right?
18    A.    That's what it says.
19    Q.    All right.  When you say "that's what it
20  says," do you have a basis to disagree with EPA's
21  own assessment of its registration review?
22    MR. LITZENBURG:  Form.
23    THE WITNESS:  There are a wide array of
24  opinions about the degree to which OPP utilized
25  and relied upon data published in the open

CONFIDENTIAL

Page 154

1   scientific literature in reaching its judgment,
2   not just on glyphosate, but all pesticides.
3   It's an issue that's very much under active
4   discussion.  It comes up in most scientific
5   advisory panel meetings.
6        There is the criticisms of EPA's current
7   judgment and position regarding the oncogenicity
8   of glyphosate, which is diametrically opposed or
9   in opposition to that of IARC.  The reasons for
10  that have been discussed and debated in great
11  detail in a number of fora and peer-reviewed
12  articles and letters to the editor, et cetera,
13  and there is a widely shared view in the
14  scientific community that in general EPA places
15  inadequate weight on peer-reviewed published
16  pesticide safety studies that utilize more
17  current and modern scientific methods than
18  embodied in the Section 40 Part 128 pesticide
19  testing guidelines, which really,
20  methodologically, as -- go back 30 years or so.
21       So there is a very lively debate.  It's
22  been a debate between crop life in Monsanto and
23  the agency, as you know, with a particular focus
24  on how the agency uses epidemiological data.
25       So it is among the issues that are

Page 155

1   typically raised by experts in the field in
2   explaining why EPA reached the judgment that it
3   did relative to the reasons that IARC cited in
4   its report for classifying glyphosate and
5   glyphosate-based herbicides as probable human
6   carcinogens.
7   BY MR. COPLE:
8        Q.   You're not part of this registration
9   review that's been going on since 2009 or 2008 of
10  glyphosate at EPA, right?
11       A.   No, I'm not.
12       Q.   And you have not discussed with the
13  scientists at OPP their registration review of
14  glyphosate, right?
15       A.   No, I have not.
16       Q.   And you're not an expert here today, or
17  at any other time, on the long-term carcinogenicity
18  scientific studies in different animals, right?
19       MR. LITZENBURG:  Objection to form.
20       THE WITNESS:  As we discussed earlier,
21  I'm not trained in the relevant scientific
22  fields.  I have never conducted a study, but I
23  have been reading government reports about
24  oncogenicity.  I've conducted scientific
25  research on the levels and patterns of

Page 156

1   oncogenetic risk in the diet.  I was the staff
2   leader of two reports put out by the National
3   Academy of Sciences focused on the oncogenicity
4   of pesticides.
5        I am very aware and familiar with the
6   criteria and guidelines in EPA for evaluating
7   oncogenicity studies and making these
8   classification decisions.  I'm equally very
9   aware and understand the classification system
10  used by IARC in reaching its judgments, and I
11  understand why there is this mammoth debate that
12  is ongoing about how to classify glyphosate and
13  glyphosate-based herbicides.
14       It's just -- I do not accept the notion
15  that this particular report or any report by EPA
16  or any regulatory authority is necessarily the
17  last word on this -- this question.
18       Yes, I can read the words in this report,
19  and I will agree with you if they're read
20  correctly, but this is a very complex issue that
21  has been assessed, and there's many places in
22  the record where scientists that have spent a
23  lot of time looking at all the studies say
24  it's -- it's a -- it's a difficult call; the
25  evidence is not compelling in one way or the

Page 157

1   other.
2        So that's my -- that's my sense of the
3   state of play and how this particular EPA
4   document, which is part of a series of EPA
5   documents, how it sort of -- what it adds and
6   how it fits in.
7   BY MR. COPLE:
8        Q.   So you're self-taught on this complex
9   issue of long-term carcinogenicity and glyphosate
10  exposure, right?
11       A.   Correct.
12       Q.   By self-taught, you mean that you find
13  research materials online or hard copy or wherever
14  you get it; you review it, and you form your own
15  personal opinion about it; is that right?
16       MR. LITZENBURG:  Objection to form.
17       THE WITNESS:  And I interact with other
18  scientists that have more technical expertise in
19  the field.  I remember multiple meetings with
20  Reto Engler, Lois Rossi, Adrian Gross, Bert Litt
21  and -- and some of the other scientists in OPP
22  in the mid-1980s that made the judgment that
23  glyphosate was a possible human carcinogen.
24       Yeah, I've talked to them.
25

CONFIDENTIAL

## Page 158

1  BY MR. COPLE:
2      Q.    Which of the scientists that you've
3  talked to in the 1980s are involved right now for
4  OPP's registration review of glyphosate?
5      A.    I don't think any of them now.  I don't
6  think any of the signatories on the 85 consensus
7  statement memo -- I don't believe any of them are
8  still working at the agency, '85.
9      Q.    So you base your research and your
10 activities, which you have self-taught yourself
11 about long-term carcinogenicity in glyphosate, based
12 on whatever you found to read, plus conversations
13 with OPP individuals from 35 years ago?
14      MR. LITZENBURG:  Objection to form.
15      THE WITNESS:  And other -- my
16 conversations with OPP staff scientists in the
17 1980s and subsequently -- although I had less
18 interaction with them later -- are among the
19 many conversations and interactions that I have
20 with other scientists who have played some role
21 or another or have varying levels of expertise
22 in pesticide risk assessment and specifically
23 cancer risk assessment.
24      I've worked with and had the privilege to
25 interact with many people that have helped me in

## Page 159

1  my self-education and understanding of the
2  design of cancer studies, issues that come up in
3  them, use of historical controls,
4  histopathology, statistical analysis of the
5  tumor data, interpretation of the studies, and
6  ultimately, making a weight of the evidence
7  judgment about the potential of the chemical to
8  pose cancer risks using either the IARC
9  classification system or the EPA classification
10 system or, for that matter, the European
11 classification system, which is fairly similar
12 to both U.S. EPA and IARC.
13 BY MR. COPLE:
14      Q.    And in each of those fields you just
15 mentioned, you're self-taught by your reading and
16 personal opinions and talking with OPP individuals
17 from the 1980s; is that right?
18      A.    Correct.
19      Q.    Now, this finishes up and says in the
20 last sentence by OPP that this includes, meaning
21 this comprehensive analysis that the agency has
22 done, performed, this includes epidemiological,
23 animal carcinogenicity, and genotoxicity studies.
24      And for each of these areas,
25 epidemiology, animal carcinogenicity and

## Page 160

1  genotoxicity, you're not an expert in any of those
2  areas, right?
3      MR. LITZENBURG:  Object.
4      THE WITNESS:  I have not been trained in
5  the art of conducting such studies, nor have I
6  ever carried out such studies.
7  BY MR. COPLE:
8      Q.    So you're not an expert in those areas?
9      MR. LITZENBURG:  Asked and answered.
10      THE WITNESS:  I will give the same answer
11 if you want to keep asking me.
12 BY MR. COPLE:
13      Q.    Have you ever testified as an expert on
14 epidemiology?
15      A.    No.
16      Q.    What about animal carcinogenicity?
17      A.    Nope.
18      Q.    How about genotoxicity?
19      A.    No.
20      Q.    What about the SAP that was conducted --
21 convened and conducted by EPA to take an independent
22 look at the conclusions on carcinogenicity and
23 glyphosate?  Did you go to the SAP hearing?
24      A.    Which one are you talking about?
25      Q.    The SAP hearing that was held on the

## Page 161

1  September 2016 OPP issues paper.
2      A.    No, I didn't attend it.
3      Q.    Did you know about it?
4      A.    Yes.
5      Q.    You just chose not to go?
6      A.    It's a long trip.
7      Q.    Did you obtain the transcript and review
8  it?
9      A.    No.  I did not obtain the transcript of
10 that meeting, because it occurred, again, after the
11 events of this case, use of Ranger Pro and
12 glyphosate concentrated herbicide by Dewayne
13 Johnson.
14      I did, however, pay particular attention
15 to the transcript of the SAP meeting in 1986 that
16 was convened to address and resolve issues related
17 to the -- what EPA at the time considered a
18 statistically significant increase in renal tubular
19 adenomas in the 1983 BioDynamic mouse study.
20      That SAP meeting was clearly relevant to
21 the judgments of the EPA on glyphosate oncogenicity
22 and led to the classification for eight, nine years
23 that has a Group (2)(B) or possible human
24 carcinogen.
25      Q.    So you pay particular attention to the

CONFIDENTIAL

Page 162

1   FIFRA SAP hearing in 1986 on oncogenicity and
2   glyphosate, but you ignore the SAP hearing held in
3   2016 on the same subject; is that right?
4           MR. LITZENBURG:  Objection.  Asked and
5   answered.
6           THE WITNESS:  No.  I didn't ignore the
7   latter SAP meeting, but I was asked to conduct
8   as thorough review as I could in a given amount
9   of time in a case with a record.  And, sir, I
10  wouldn't suspect you've read all 6 million
11  documents either.
12          And I made some judgments about which
13  were the most important documents that should
14  have informed Monsanto as a responsible company
15  in its labeling, education material, outreach to
16  the user community about the risks associated
17  with use and exposure of then-marketed,
18  Roundup-based, glyphosate-based herbicides,
19  including the products that Dewayne Johnson
20  applied in the 2012 to 2014 period.
21          I felt that was the most important part
22  of the record for me to focus on, and there are
23  many parts of this record that I would have
24  liked to have had time to review in more depth,
25  because it would, I am sure, more sharply focus

Page 163

1   and inform my opinions.  But I did the best with
2   the amount of time that I had.
3   BY MR. COPLE:
4       Q.   So you're the professional witness in
5   this case for Mr. Johnson, and you chose what you
6   thought was important to look at, right?
7           MR. LITZENBURG:  Objection.  Asked and
8   answered.  Argumentative.
9           THE WITNESS:  Yes.  I -- I tried to
10  understand the underlying issues in the case.



That's what
24  I focused on.
25

Page 164

1   BY MR. COPLE:
2       Q.   But you didn't review Mr. Johnson's three
3   days of deposition transcripts, right?
4           MR. LITZENBURG:  Asked and answered.
5           THE WITNESS:  I -- no, I did not.  I did
6   not review three days of deposition transcripts.
7   BY MR. COPLE:
8       Q.   So as -- as the professional witness
9   testifying for Mr. Johnson, you made the
10  determination what to review and what not to review,
11  right?
12          MR. LITZENBURG:  Objection.  Asked and
13  answered.  Argumentative.
14          You can choose whether to answer these
15  for 14 hours or not.
16          THE WITNESS:  We've talked about it.
17          MR. COPLE:  Are you instructing the
18  witness not to answer the question?
19          MR. LITZENBURG:  Not instructing
20  anything.
21          THE WITNESS:  I already did.
22          MR. LITZENBURG:  Not what I said.
23  BY MR. COPLE:
24      Q.   You're declining to answer?
25      A.   No.  I'm not declining to answer.  I'm

Page 165

1   declining to repeat my answer.
2           MR. LITZENBURG:  He just answered it
3   several times.  The record I think is pretty
4   clear.
5   BY MR. COPLE:
6       Q.   All right.  Now, you keep repeating what
7   a responsible company would do.
8           Are you certified by any organization to
9   speak to the question of whether what a company does
10  is consistent with what a responsible company would
11  do in any circumstance?
12      A.   There is no one to my knowledge in the
13  world that carries such a certification because none
14  is granted by any organization I'm aware of.
15          So no, I do not have such a
16  certification.
17      Q.   Do you have an educational degree in what
18  a responsible company is required to do under any
19  circumstance?
20      A.   No, I do not.
21      Q.   So your understanding of what a
22  responsible company should do in a particular
23  circumstance is also self-taught by you, based on
24  your reading and your reading of what is in the
25  literature, plus documents of the company that you

CONFIDENTIAL

Page 166

1  were given; is that right?
2      A.   That's certainly among the information
3  that I would draw upon.
4      Q.   All right.  Let's go now to -- I think I
5  marked this other document, this one; it's Number 8.
6          We've marked as Exhibit 8 to the
7  deposition, Dr. Benbrook, a document which is also
8  dated, coincidentally, December 12, 2017, which is
9  an EPA Draft Human Health Risk Assessment in Support
10 of Registration Review.
11         You've reviewed this EPA document in
12 forming your opinions in this case?
13     A.   I was aware of it.  I looked briefly at
14 it to see if there was any reason why it would play
15 a role in my opinions, and I didn't see any.
16         Again, it came out in December of 2017, a
17 couple months ago, after the events in this case.
18 I -- I knew in general what it was.  It's the
19 updated human health risk assessment as part of the
20 registration review process for glyphosate.
21     Q.   What's the HED?
22     A.   Hazard evaluation division.
23     Q.   And they have responsible -- it says,
24 health effects division.
25     A.   Well, the health effects division is the

Page 167

1  part of HED -- now, OPP divisions and departments,
2  they've gone by a lot of different names over the
3  years, but the hazard evaluation division or health
4  division has two major branches; one that looks at
5  the toxicological database; and the other is the
6  residue chemistry branch.  And they look at all the
7  environmental fate and the science relative to the
8  evaluation of pesticide tolerance levels and whether
9  they're detectable and whether the breakdown
10 products are adequately understood.  And that kind
11 of basic structure in OPP has remained in place over
12 the years of this case.
13     Q.   So this is the health effects division,
14 correct?
15     A.   Correct.
16     Q.   Not the hazard evaluation division?
17     A.   Correct.
18     Q.   In fact, the document is called a "Draft
19 Human Health Risk Assessment in Support of
20 Registration."  Not a hazard evaluation, right?
21     A.   Correct.
22     Q.   If you go down -- and before we go down
23 to any of the discussion by the health effects
24 division, there's a listing here of individuals in
25 the "from" line.  There's a Dr. Perron, or Perron,

Page 168

1  toxicologist; Dr. Dunbar, pharmacologist; Mr. Bloem,
2  a chemist; a Mr. or a Ms. Venkateshwara -- I don't
3  know if I pronounced that correct, my apologies to
4  that individual -- a chemist.
5          Do you know any of those individuals?
6      A.   No, I do not.
7      Q.   Did you speak to any of them in the
8  context of this document or forming your opinions in
9  this case?
10     A.   No, I did not.
11     Q.   And their particular views are forwarded
12 through the branch chief, Christine Olinger, as well
13 as the senior chemist, Dr. Kramer.  Do you know
14 those folks?
15     A.   No, I don't.
16     Q.   You didn't talk to them in connection
17 with your expert opinions?
18     A.   No, I don't.
19     Q.   And the same question about the ultimate
20 recipients, the chemical review manager,
21 Ms. Newcamp, as well as the branch chief,
22 Mr. Anderson.  Do you know those folks?
23     A.   No, I don't.
24     Q.   And I assume you didn't talk to them
25 either?

Page 169

1      A.   I did not.
2      Q.   All right.  Did you ignore the discussion
3  in this document as part of your review?
4          MR. LITZENBURG:  Objection.  Form.  Asked
5  and answered.
6          THE WITNESS:  As I said, when I became
7  aware that the document had come out, I actually
8  think when I got a copy of this I had already
9  filed my expert report.  I knew this was coming.
10 I had a pretty good idea of what it would cover.
11 And because of the time that this came out and
12 the date of this analysis, it had no bearing or
13 no impact on the worker safety provisions or use
14 directions or PPE requirements on the Ranger Pro
15 or Roundup Concentrated Pro herbicides that
16 Dewayne Johnson applied.  So I -- I didn't
17 conduct an in-depth review of it for those
18 reasons.
19 BY MR. COPLE:
20     Q.   Is your testimony that nothing that EPA
21 has done after the period of time that Mr. Johnson
22 has testified he was exposed to glyphosate in Range
23 Pro would be relevant to your opinions?
24         MR. LITZENBURG:  Objection.  Asked and
25 answered.

CONFIDENTIAL

Page 170

1          THE WITNESS:  No.  If there was -- if,
2    for example, Monsanto had conducted the
3    cancer -- the two-year mouse cancer study
4    requested by EPA in 1986 to clear up the
5    unresolved questions about the renal tubular
6    adenomas, this cancer study requested by OPP in
7    a memorandum from Bert Litt, which it's cited in
8    my expert report, requested that Monsanto
9    conduct a two-year mouse study with 200 animals
10   per group, only in males, because it's the male
11   rats were the ones that displayed the clearly
12   statistically significant increase in renal
13   tubular adenomas, and that -- not only that, EPA
14   instructed Monsanto to include two different
15   dose levels to more accurately characterize the
16   dose response curve, which presumably would have
17   clarified some of the statistical issues that
18   remained difficult to resolve, under debate
19   between the agency and Monsanto, and in
20   addition, the request from OPP to Monsanto for
21   the conduct of the study said that Monsanto
22   could do a tiered histopathological assessment
23   of the results focused first on the liver and
24   kidney tumors or impacts or histopathology, and
25   if that aspect of the histopathology was clean,

Page 171

1    the agency would not require Monsanto to do any
2    further histopathology on the results from that
3    study.
4          A responsible company who truly felt that
5    the results of the BioDynamic study were not
6    treatment-related would have conducted that
7    study as requested by OPP; and if it was clean
8    and showed no adverse effects, that would have
9    settled the issue, and life would have gone on
10   without the lingering questions about the
11   results of that important and early mouse
12   oncogenicity study.
13   BY MR. COPLE:
14   Q.    And that issue was settled for EPA in
15   1991, when their cancer assessment peer review panel
16   concluded Category E was the appropriate
17   classification for glyphosate, right?
18   A.    That was the action that they took at the
19   time, as codified in that memorandum, but, you know,
20   I -- I -- it is my professional opinion that there
21   still were at that time questions in the minds of
22   some EPA scientists about the renal tubular adenomas
23   in the BioDynamic mouse study.
24          And I think that -- I think it's very
25   unfortunate that the replacement study that first

Page 172

1    OPP recommended and then required as part of the
2    registration standard that was issued in 1986 --
3    it's a shame that they weren't done, because if
4    Monsanto had done those studies as requested by
5    OPP -- and I think a responsible company who did not
6    -- who wanted to rule out any chance that a product
7    which by then was, if not the most widely used
8    herbicide in the world, it was getting pretty close
9    by the mid-'80s, they should have done the
10   additional testing, and they never did, and still
11   have not to this day.
12   Q.    This is your self-taught expertise on
13   what a responsible company is supposed to do under
14   any particular circumstance?
15          MR. LITZENBURG:  Objection.  Asked and
16   answered.  Harassing.  Argumentative.
17          You can answer.
18          THE WITNESS:  When the EPA identifies a
19   set of scientific issues that are central to a
20   critical human health issue, like whether use of
21   and exposure to glyphosate-based herbicides pose
22   a cancer risk to people, yes, I would regard
23   that as an important matter and a relevant
24   matter.
25          When the agency requests better, more

Page 173

1    sophisticated, more accurate science from a
2    company who has pledged in multiple forms and
3    multiple ways that it always bases its actions,
4    its products on the best possible science, they
5    should have done -- they should have done
6    studies, period.
7    BY MR. COPLE:
8    Q.    And since 1991, EPA has in fact received
9    and reviewed better and more accurate scientific
10   data on animal carcinogenicity studies on
11   epidemiology and on genotoxicity, correct?
12          MR. LITZENBURG:  Objection in terms of
13   testimony.  Asked and answered.  Argumentative.
14          THE WITNESS:  Did you tick off
15   oncogenicity, genotox, and epidemiology, or just
16   the last two?  I didn't hear you.
17   BY MR. COPLE:
18   Q.    I ticked off exactly what EPA says on
19   Exhibit 7, which was animal carcinogenicity,
20   studies, epidemiology, genotoxicity, in which the
21   agency -- we just looked at it -- the agency said
22   they did a comprehensive analysis.
23   A.    By the way, you'll find a very similar
24   sentence to that in the IARC monograph, as well.
25          But the EPA required in the 1986

CONFIDENTIAL

Page 174

1  glyphosate registration document a repeat mouse and
2  a repeat rat oncogenicity study. Fairly soon after
3  the issuance of the -- this registration document,
4  registration standard document, Monsanto agreed to
5  conduct a replacement rat oncogenicity study, which
6  was done, and I don't remember the exact year it was
7  submitted to the agency, but I think maybe '88, '89,
8  maybe '90, but they refused to do any additional
9  long-term chronic feeding studies, oncogenicity
10 studies in the mouse.
11     Q.   And today, EPA has 14 of those long-term
12 chronic toxicity and carcinogenicity studies in
13 animal models from both Monsanto as well as other
14 registrants, right?
15          MR. LITZENBURG:  Asked and answered.
16          THE WITNESS:  I believe that number is
17     roughly accurate, and that would include the rat
18     studies and the mouse studies.
19 BY MR. COPLE:
20     Q.   Now, in the text of this Exhibit 8, it
21 starts off by saying that OPP HED, the health
22 effects division, assesses the risk exposed to
23 humans from exposure pesticide chemicals.
24          And it goes on to say in the second
25 sentence, "The PRD of OPP asked HED to evaluate

Page 175

1  hazard and exposure data and conduct dietary,
2  occupational, residential, and aggregate exposure
3  assessments as needed to estimate the risk to human
4  health that would result from all registered uses of
5  glyphosate --" and then there's the chemical
6  description of glyphosate -- "in support
7  registration review."
8          What is a PRD?
9     A.   It's the pesticide reevaluation division.
10 It's the part of OPP that manages the registration
11 review process, the RED process, the reregistration
12 process.  It's been called a lot of things over the
13 years, but it's basically the part of OPP that
14 updates and reevaluates pesticide uses in this.
15          I'm sorry, I should have turned this off.
16 My apologies.
17     Q.   So PRD asks the health effects division
18 to evaluate both hazard and exposure data from all
19 sources in order to do an aggregate exposure
20 assessment for human health risks from glyphosate
21 exposure, correct?
22     A.   Yes.  That's what it says.
23     Q.   And this is the most recent human health
24 risk assessment board of registration review
25 regarding glyphosate that has come out of EPA's OPP,

Page 176

1  right?
2     A.   Correct.
3     Q.   All right.  On Page 3 of 41 -- this is a
4  41-page document, but on Page 3 of Exhibit 8, under
5  Hazard Characterization -- this is the executive
6  summary; it's a 1.0 Executive Summary.  The
7  subheading is Hazard Characterization.  It says,
8  "Glyphosate exhibits low toxicity across species,
9  durations, life stages, and routes of exposure."
10          Correct?
11     A.   Correct.
12          MR. LITZENBURG:  Objection.
13 BY MR. COPLE:
14     Q.   It goes on, if you skip the next full
15 paragraph, and go to the third paragraph below
16 Hazard Characterization, it says, "Glyphosate is
17 categorized as having low acute toxicity for the
18 oral, dermal, and inhalation routes."
19          That's the routes of exposure, correct?
20     A.   Correct.
21     Q.   And it goes on to the next paragraph, and
22 in the last sentence, it says, "As a result, there
23 was no impact on hazard characterization or draft
24 human health risk assessment for glyphosate from
25 open literature studies."

Page 177

1          Is that correct too?
2     A.   You lost me on the jump from the end of
3  the paragraph beginning "glyphosate is categorized."
4  Where did you go then?
5     Q.   Yeah.  I just went to the next full
6  paragraph.  The last sentence says, basically, that
7  there was no impact on the risk assessment or the
8  hazard characterization from open literature review.
9     A.   Hang on, let me read it.
10          Okay.  What did you want to ask me about
11 this?
12     Q.   I just wanted to know if you agree what
13 the agency is saying is that the open literature
14 studies had no impact on the EPA's assessment of
15 hazard or human risk.
16     A.   Yeah.  That's unfortunately probably
17 true, because the agency really didn't place much
18 weight on the significant number of genotoxicity
19 studies on formulated glyphosate-based herbicides
20 that show concern about damage to DNA, damage to
21 cells through at least two different mechanisms of
22 action.
23          Again, this is one of the reasons that
24 EPA's current assessment of risk associated with the
25 use of glyphosate-based herbicides is criticized by

CONFIDENTIAL

Page 178

1    the scientific community, and it's one of the most
2    important and fundamental differences between review
3    undertaken by IARC and the judgments reached by that
4    group of scientists in contrast to the judgment
5    reached by EPA scientists and this EPA risk
6    assessment process, which is focused predominantly
7    on studies and toxicological data from laboratory
8    work focused on pure glyphosate and not formulated
9    glyphosate herbicides.
10       Q.    And you're aware that EPA's OPP reviewed
11   54 genotoxicity studies in assessing human health
12   risk of glyphosate, right?
13       A.    There may be a sentence in this report
14   that says that that's how many they reviewed at this
15   time.  The number is rapidly changing.  Another one
16   I read about today.
17       So particularly in the last few years,
18   the number of published, peer-reviewed genotoxicity
19   studies using often glyphosate and glyphosate-based
20   herbicides has gone up very substantially, and it is
21   certainly not true that most scientists, including
22   myself, agree that EPA has thoroughly assessed those
23   and given them adequate weight in their overall
24   judgment.
25       Q.    You're aware that EPA's OPP actually

Page 179

1    reviewed the open literature where a formulated
2    product involving glyphosate was the subject of
3    various published studies.  You're aware of that,
4    right?
5        A.    They make that claim in various of these
6    documents, that they are aware of or reviewed the
7    open public literature.  Yes, I know that they make
8    that claim.
9        Q.    And you're not part of this registration
10   review, and you haven't talked to anybody who is
11   part of it, right?
12       A.    That's correct.
13       Q.    The scientific community that you say is
14   critical of EPA -- are you in personal communication
15   with the scientific community on this?
16       A.    Yeah.  I call them up all the time.
17       Q.    Who are these people you call up all the
18   time who are critical of EPA?
19       A.    There are a number of scientists that
20   take a different view of the genotoxicity data,
21   which is what we've been talking about, and
22   certainly, I placed the most weight in forming my
23   opinion in the IARC review of the genotoxicity data
24   as well as my read of many of the underlying
25   original genotox studies and the very clear, and I

Page 180

1    felt compelling, report by Dr. William Parry,
2    commissioned by Monsanto in 1999, when several
3    senior officials in Monsanto became aware that they
4    had serious issues and concerns about questions.
5        Regulators around the world, but in
6    particular in Europe, were asking about recently
7    published data on the genotoxicity of either
8    glyphosate or glyphosate-based herbicides.
9        Monsanto knew from its own internal
10   studies, the vast majority of which had been
11   conducted in the late '70s or 1980s, when the tools
12   of mutagenic-- study mutagenicity, the so-called
13   Ames test, the technical methodologies available for
14   assessing genotoxic risk were crude and not nearly
15   as sensitive as the testing methodologies, the
16   validated testing methodologies, that are available
17   today.
18       So I think that for over 20 years, the --
19   there's been clear evidence that the capacity of
20   glyphosate-based herbicides, certainly, and to a
21   lesser extent pure, 100 percent glyphosate, to
22   trigger genotoxic changes in a vast array of test
23   systems and organisms.
24       And as I said, Monsanto was aware of
25   concerns being raised.  They were aware of positive

Page 181

1    studies in the literature, and they commissioned an
2    in-depth review of published studies at the time as
3    well as all of the studies from their internal work
4    that were not in the open literature that they felt
5    appropriate to share with Dr. Parry.
6        I don't know if they shared all of their
7    mutagenicity and genotox studies with Dr. Parry or
8    not.  They certainly shared a number of them, but
9    they were older and cruder, and I suspect he placed
10   less weight on them, because he was one of the
11   scientists developing some of the new systems.
12       Q.    Today, EPA's OPP and certainly the health
13   effects division, according to this memo, has the
14   most up-to-date scientific information on animal
15   carcinogenicity, epidemiology, and genotoxicity
16   regarding glyphosate exposure, correct?
17           MR. LITZENBURG:  Form.
18           THE WITNESS:  In all of the regulatory
19   documents that I have reviewed from EPA on
20   glyphosate from the late '70s, the very
21   beginning, through to today, the vast majority
22   and studies and data on which EPA's evaluation
23   is based are company-submitted studies done in
24   compliance with GLPs, or good laboratory
25   practices, and deploying study designs that

CONFIDENTIAL

## Page 182

1   adhere to the study guidelines put forth in EPA
2   regulations.
3         And over the years, EPA has placed and
4   continues to place very low weight on other
5   studies done predominantly in academic labs
6   using more modern and often sensitive
7   methodologies.
8         This is a longstanding issue, challenge,
9   concern that has faced EPA, the SAP, the
10  regulatory community, registrants, and it's a --
11  it's a challenge that has yet to be resolved.
12        It is my opinion that this and earlier
13  risk assessments issued by the -- by OPP have
14  almost exclusively been based on studies on the
15  pure active ingredient.  They have ignored
16  published studies showing that formulated
17  product is substantially more toxic and leads to
18  additional -- could lead to additional adverse
19  effects, and that -- that is a concern and a
20  criticism that remains to this day.
21  BY MR. COPLE:
22  Q.   You're not an expert on genotoxity,
23  right?
24  A.   I believe I answered that question.
25  Q.   I'll take that as you're not.

## Page 183

1         MR. LITZENBURG:  I object to form.
2   BY MR. COPLE:
3   Q.   Now, back to the questions I asked,
4   Doctor, which is I asked you who you're in personal
5   communication with in the scientific community that
6   you've referred to that's critical of EPA, and the
7   name you gave us was Dr. Parry.
8         So you're in communication with
9   Dr. Parry?
10  A.   Dr. Parry is dead.
11  Q.   Well, then why did you bring him up?
12  A.   Because Dr. Parry prepared a very
13  in-depth and I think professional and scholarly
14  assessment of the genotoxicity database on
15  glyphosate, pure glyphosate and glyphosate-based
16  herbicides in 1999, under -- as a consultant to
17  Monsanto, as part of Monsanto's effort to gauge the
18  opinions and attitudes among experts in the field,
19  recognized experts in the field, given that there
20  was starting to be peer-reviewed papers published in
21  respected journals reporting the capacity of
22  glyphosate-based herbicides and, in some cases,
23  glyphosate alone, to damage DNA, trigger cellular
24  changes, and increase oxidative damage, which are
25  two of the important mechanisms that can lead to

## Page 184

1   cancer.
2         This evidence of the genotoxicity of
3   glyphosate-based herbicides, it was very important
4   and very threatening to the regulatory position
5   taken by EPA and other regulators around the world,
6   and Monsanto was fully aware of it.  And their
7   statements to that effect are -- there's probably
8   five or six of them cited in my report, and if I had
9   time to review the full record, I'm sure there will
10  be many more than five or six.
11  Q.   And your knowledge of all of this,
12  Dr. Benbrook, is by reading the Monsanto internal
13  documents that counsel gave you and telling us your
14  opinion as to what the company did or did not do,
15  right?
16        MR. LITZENBURG:  Objection.  Asked and
17  answered.  Argumentative.
18        THE WITNESS:  My understanding and
19  opinions about the testing of glyphosate and
20  glyphosate-based herbicides genotoxicity and the
21  role of Monsanto in investigating genotoxicity,
22  in reporting results to the agency, and in
23  assuring that labels for their products and any
24  instructions for use reflected current
25  scientific understanding have been informed by

## Page 185

1   the documents that were provided to me by
2   Mr. Litzenburg and Mr. Travers, as well as my
3   reading of most of the frequently discussed and
4   debated genotoxicity studies that began
5   appearing -- really, the first one I believe was
6   in 1998; there were three or four in '99; there
7   were another three or four by 2002; and since
8   2002 there are -- and certainly up to now, now
9   there are literally dozens.
10        I haven't read all of them, but I've read
11  a significant number of them, and I've read a
12  number of reviews of them done by experts in the
13  field.  I have talked to some of those experts,
14  and if you want me to go through my memory to
15  name some of them, I'd be glad to.
16  BY MR. COPLE:
17  Q.   This is your self-taught expertise by
18  doing your reading of documents, right?
19        MR. LITZENBURG:  Counselor, if you want
20  to ask him that question 400 times, I would save
21  it until tomorrow or risk us walking out.  I
22  would ask him questions that you need the answer
23  to, or we'll get the judge on the phone or walk
24  out.  If you want to save those to the end,
25  that's my advice.

CONFIDENTIAL

BY MR. COPLE:

Q. I'll ask it a different way.

A. Okay.

Q. This is based upon -- is your knowledge of this information based upon anything other than reading corporate documents or doing your own research?

MR. LITZENBURG: Asked and answered.

THE WITNESS: I don't know what you mean by my own research. My own research entails reading scientific literature, reading regulatory documents, going to scientific meetings and speaking with scientists, or reading posters, or running into scientists in other venues, or calling them up if I have a specific question about something, or any other opportunity that I happen to have to broaden and deepen my understanding of these complex questions.

From the very beginning of my career, I have been a bit of a sponge for expert information, and I've been very blessed to have had an opportunity to talk to and learn from many very talented scientists. So that's -- if that's what you mean by research, then the

answer to your question is yes.

BY MR. COPLE:

Q. Well, obviously you were not in communication with the deceased Dr. Parry as one of the persons in the scientific community that you have been regularly in touch with.

So I ask again, who are the scientists that you have been in touch with in the scientific community that are critical of EPA's review and determination of glyphosate?

A. Bruce Lanphear, Phil Grandjean, Paul Winchester, Routt Reigart, Richard Jackson, Melissa Parry, Jennifer Sass.

I assume you want to restrict it to the tox side of things and not the ag side of things. Let's see. I spent a lot of time talking to Theo Colburn before she passed away. Let's see, who else. Those would be the people that in the last four or five years I have had one or more conversations with about this.

Q. You've had one or more of these conversations in the last four or five years, including since the time that you were hired as a professional expert witness for Mr. Johnson?

A. All of the people that I just mentioned I

met and began discussing pesticide regulatory and risk issues with well before my assignment in this case, and for many of those people, 30 years before.

Q. So you've been having these -- you said four or five years, but now it goes back 30 years?

A. I don't -- I don't trust my memory much more than four years ago, and it's not even that good four years ago. So no, I'm not going to testify to you, sir, that I can remember everybody that I talked to about cancer risk.

For example, during the two National Academy of Science studies that I was the staff overseer, we had three or four cancer risk assessment specialists -- and if I pulled out the reports and looked at the committee, I would remember -- Bernie Weiss and other cancer specialists that served on those committees.

You know, I -- if counsel, my counsel, says be responsive to you, I have to go back and compile a list of all the experts that I've talked to in the last 30 years that are knowledgeable about pesticide cancer risk, I will do that, but it will take some time.

Q. I can narrow this down for you, Dr. Benbrook. In the last four or five years, the

individuals that you just mentioned in your testimony, have you been discussing with them their criticism of EPA's specific review and determination that exposure to glyphosate is not a human carcinogen?

A. Absolutely. The debate between IARC and EPA and FSA and other -- and the German regulatory authority, it's the hottest topic in the world of pesticides globally right now. Anybody that's involved is talking about it.

Q. And you've been talking to these individuals since the time you were retained as an expert here?

A. Some of them since the time. All of them well before.

Q. And you exchanged emails with them about this issue of glyphosate and carcinogenicity and EPA's review?

A. Probably not. Most of my -- most of my interactions with these people are on conference calls or when we have meetings. Some of them I've coauthored papers with, served on panels with, and none of them -- none of the conversations were specifically about the issues in this case or addressed any information that I became privy to

CONFIDENTIAL

Page 190

1  because of my access to the Bates documents in this
2  case. All of my conversations have been part of an
3  ongoing discussion that's been underway very
4  actively since March of 2015 and no doubt will
5  continue for a long time to come.
6      Q.   Since you were retained to be an expert
7  in this case, Dr. Benbrook, have you deleted any
8  emails that you exchanged with any of the
9  individuals you mentioned today?
10     A.   The way my system works is I get a couple
11 hundred emails a day. After I've read it, I click
12 delete. It goes in the trash, and every 90 days, my
13 trash is emptied. At any one point in time, I would
14 have emails from approximately the last 90 days in
15 my system. And I don't remember the last time I --
16 once in a while I'll empty trash. When I bought a
17 new computer, anything that was resident in the
18 computer would be deleted.
19     Q.   So you may have deleted emails from these
20 individuals that you sent or received since the time
21 you were hired?
22     A.   I'm sure my computer did every 90 months;
23 it's programmed to do that.
24     Q.   Will you agree today not to delete emails
25 you send or receive to any of these individuals

Page 191

1  between now and trial?
2      A.   I know that this matter of what parts of
3  my communications have to be provided to you is
4  something counsel is --
5      MR. LITZENBURG: We'll take care of it.
6      THE WITNESS: -- actively in discussion
7  with, and when Mr. Litzenburg tells me that
8  based on the outcome of your discussion of what
9  I'm required to do, I'll be glad to do it.
10     MR. LITZENBURG: We all have had motions
11 denied by Judge Chhabria on this. Just move on
12 from the document production. We're not going
13 to let him answer any more.
14     MR. COPLE: You're directing him again
15 not to --
16     MR. LITZENBURG: I'm not going to have
17 him answer any more questions about the document
18 production, litigation holds, stuff like that,
19 so move on to stuff --
20     MR. COPLE: I haven't asked a single
21 question about that.
22     MR. LITZENBURG: You just asked him to
23 make agreement to preserve things for
24 litigation. You didn't say that?
25     MR. COPLE: I asked Dr. Benbrook if he

Page 192

1  would agree --
2      MR. LITZENBURG: "Will you agree today
3  not to delete emails you send or receive between
4  these individuals between now and trial" -- do
5  you think that's a proper thing to ask opposing
6  expert at deposition?
7      MR. COPLE: I just asked him.
8      MR. LITZENBURG: Then you said you
9  didn't. Go on. Ask him questions that are
10 permissible so we can leave at the end.
11 BY MR. COPLE:
12     Q.   Let's go to Page 3.
13     A.   Of what?
14     Q.   Of Exhibit 8. Additionally -- I'm on the
15 last paragraph, Page 3, Exhibit 8.
16     A.   Yep.
17     Q.   It says, "Additionally, the agency
18 reevaluated the human carcinogenic potential of
19 glyphosate, which included weight of the evidence,
20 evaluation of data from animal toxicity,
21 genotoxicity, and epidemiological studies."
22     It goes on to say that that evaluation is
23 presented to the FIFRA SAP. Now, the last
24 sentence -- I read all that correctly, Doctor?
25     A.   Yes, sir.

Page 193

1      Q.   The last sentence says, "The agency
2  concluded that glyphosate should be classified as
3  not likely to be carcinogenic to humans."
4      Do you see that?
5      A.   Yes, I do.
6      Q.   Is this the current position of EPA with
7  respect to carcinogenicity and human exposure to
8  glyphosate?
9      A.   Yes. Glyphosate active ingredient.
10 That's correct.
11     Q.   There is nothing in this particular
12 assessment by the health effects division of OPP
13 that limits the opinions or conclusions about
14 carcinogenicity and exposure to glyphosate to just
15 the route of exposure through diet, correct?
16     A.   Well, certainly the aspect of the overall
17 risk assessment by EPA and other regulatory
18 authorities is general population risk primarily
19 through the diet and drinking water, in the case of
20 pesticides that are known to be found in water
21 resources. That's the major risk concern that
22 receives by far the most in-depth scientific
23 treatment.
24     Q.   It doesn't say this in this document by
25 HED, does it?

CONFIDENTIAL

Page 194

1    A.    It's obvious, if you read it.
2    Q.    It's obvious?
3    A.    Yeah.
4    Q.    Is it obvious that on Page 1, in the
5  second sentence, it says that "The PRD asked HED to
6  evaluate hazard and exposure data and conduct
7  dietary, occupational, residential, and aggregate
8  exposure assessments, as needed, to estimate the
9  risk to human health that will result from all
10 registered uses for glyphosate in support of
11 registration review."
12          MR. LITZENBURG:  Objection.  It says what
13     it says.  Do you want us to stipulate that
14     written things say what they want to say -- say
15     what they say?  We'll stipulate that every
16     document that you hand him is in the English
17     language and says what it purports to say.
18          You need to ask him questions about the
19     things you're reading or having him read into
20     the record, because I will shut that down if
21     you're just having him read things verbatim.
22     That's not a question.
23          MR. COPLE:  Another direction to the
24     witness not to answer.
25 BY MR. COPLE:

Page 195

1    Q.    Are you refusing to answer that question?
2          MR. LITZENBURG:  There's not a direction
3     or refusal.  We have a stenographer, which is
4     the great thing about this.
5          THE WITNESS:  Would you like me to answer
6     again?
7  BY MR. COPLE:
8    Q.    You can answer it again, sure.
9    A.    The vast majority of the science reviewed
10 by EPA relative to the human health risks of
11 glyphosate-based herbicides, glyphosate active
12 ingredient, were done in the course of assessing
13 tolerances, which would be allowable levels in food
14 and estimating dietary exposure to glyphosate from
15 residues in food and drinking water and other
16 beverages.  That -- so -- you know, and no, I cannot
17 imagine you could find an expert anywhere in the
18 world that would claim that risks other than general
19 population, dietary and drinking water exposures at
20 risk are the aspect of pesticide regulatory
21 assessments and decision making that receives more
22 attention than any other area, such as environmental
23 effects or mixer/loader exposures and risks or
24 applicator risks.
25          I'm just stating a fact that most of the

Page 196

1  science generated through this, the regulatory
2  process, most of the science that EPA is reviewing
3  and summarizing in this latest 2017 document is
4  focused on and based on their dietary risk
5  assessment for levels of exposure expected in the
6  U.S. population.
7    Q.    EPA, you would agree, took into account
8  all routes of exposure in doing its assessment,
9  right?
10          MR. LITZENBURG:  Asked and answered.
11          THE WITNESS:  No, I don't think they
12     really take into account some of the unusual
13     routes of exposure.
14          They take into account certainly the
15     major routes of exposure, two of which I have
16     been emphasizing for the last five or so minutes
17     with you, which would be exposures through food
18     on a day-to-day basis, that essentially no
19     American can avoid unless they buy organic food,
20     as well as exposures through drinking water,
21     which are a considerable and increasing concern
22     in the case of glyphosate-based herbicides and
23     Roundup because of how ubiquitous this herbicide
24     has become in water resources in the United
25     States in recent years.

Page 197

1  BY MR. COPLE:
2    Q.    You would agree that EPA in its
3  assessment took into account all of the animal
4  carcinogenicity, genotoxicity, and epidemiology that
5  was available, right?
6    A.    They certainly paid attention to and
7  listed the studies that had been submitted to
8  them -- to them by registrants, of which I think
9  we've agreed there's 14 of them.  So those studies
10 were evaluated, but it is certainly not clear to me
11 that the EPA considered other studies published in
12 the open scientific literature that other scientific
13 bodies including, of course, as I said before, the
14 IARC working group felt were germane and relevant in
15 their overall assessment.
16    Q.    EPA's position today, as we sit here,
17 Dr. Benbrook, is that based on its weight of the
18 evidence reviewed, EPA has concluded glyphosate is
19 classified as not likely to be carcinogenic to
20 humans.  That's the position right now, correct?
21    A.    Correct.
22    Q.    And that position has not changed since
23 1991, correct?
24          MR. LITZENBURG:  Asked and answered.
25          THE WITNESS:  Yeah.  You've asked that

CONFIDENTIAL

## Page 198

1   several times now, sir.
2        MR. COPLE:  Let's go to...
3        THE VIDEOGRAPHER:  Counsel, I just want
4   to let you know we have about 15 minutes left on
5   this tape.
6        MR. COPLE:  Mark this as Exhibit 9.
7        (Benbrook Exhibit Number 9 is marked for
8   identification.)
9   BY MR. COPLE:
10       Q.    We've marked as Exhibit 9 for the
11  deposition a prepared statement called "Testimony of
12  Anna B. Lowit, Science Advisor, OPP, EPA, before the
13  House Committee on Science, Space, and Technology."
14  This document is dated February 6th, 2018.
15       Is that all correct, Doctor?
16       A.    Yes, sir.
17       Q.    Do you know who Anna Lowit is?
18       A.    No, I don't.
19       Q.    Have you ever come across the name?
20       A.    No.
21       Q.    Do you know what the House Committee on
22  Science, Space, and Technology is?
23       A.    Yes.
24       Q.    What is it?
25       A.    It's the House Committee on Science,

## Page 199

1   Space, and Technology in the U.S. House of
2   Representatives chaired by Lamar Smith.  His
3   testimony was deliberated in a hearing, what, two
4   days ago on IARC, I would assume.
5        Q.    And this is a prepared statement of what
6   would be the spokesperson for EPA with respect to
7   whatever this hearing was called for, right?
8        A.    I would be surprised if EPA sent more
9   than one person, so if you represent to me that this
10  was the only person that testified on behalf of the
11  EPA, I'll take your word for it.
12       Q.    Let's go to Page 7 of the prepared
13  statement by Anna Lowit.
14       A.    Yes.
15       Q.    And there is a long second, full
16  paragraph.  It starts out by referencing that "In
17  2015, IARC released its final conclusions that
18  glyphosate is probably carcinogenic to humans."
19       And it says Group 2A.  That's the IARC
20  classification of probably carcinogenic to humans,
21  right?
22       A.    That's correct.
23       Q.    Right after that, "In 2016," according to
24  Anna Lowit, she says that "the EPA conducted a
25  comprehensive analysis of all the available

## Page 200

1   laboratory animal carcinogenicity, mutagenicity, and
2   epidemiological data to inform the human
3   carcinogenic potential of glyphosate."
4        Do you see that?
5        A.    Yes.
6        Q.    And this is an official statement before
7   a committee of the House of Representatives by Anna
8   Lowit from EPA, right?
9        MR. LITZENBURG:  Counsel, at the break,
10  let's call the court and read some of these
11  questions back.  I understand he's going to have
12  to change the tape out.  You all went to the
13  court last week and argued you need an
14  additional day to depose this witness.  And you
15  just asked him again if the piece of paper he's
16  never seen reads in the way that you read it.
17       Is that what the question was?  Was
18  there a question at the end of that?
19  BY MR. COPLE:
20       Q.    Do you agree that's EPA's position?
21       A.    Yes.
22       Q.    All right.  And it goes on, a couple of
23  sentences down, it says that "Based on the
24  comprehensive analysis, EPA concludes that
25  glyphosate is not likely to be carcinogenic to

## Page 201

1   humans."
2        Would you agree that's EPA's position
3   right now?
4        A.    That is their position.
5        Q.    Let's go to -- let's go to Farber.
6        MS. FORGIE:  Is that an exhibit?
7        MR. COPLE:  It should be 9.
8        THE WITNESS:  The statement before the
9   committee was 9.
10       MS. FORGIE:  Thank you.
11       THE VIDEOGRAPHER:  The time is now 2:33.
12  We are off the record.
13       (Break in proceedings.)
14       THE VIDEOGRAPHER:  The time is now 2:45.
15  We are on the record.
16       MR. LITZENBURG:  I just want to note for
17  the record that defense counsel represented to
18  the court last week that it needed two days to
19  ask questions because of the length of
20  Dr. Benbrook's report, and four and a half hours
21  in, we have yet to have a single question about
22  his expert report.
23       MR. COPLE:  Counsel is testifying.  We
24  don't agree.
25       All right.  Let's mark as Exhibit 10 to

CONFIDENTIAL

Page 202

1    the deposition.
2         (Benbrook Exhibit Number 10 is marked for
3    identification.)
4    BY MR. COPLE:
5         Q.    We've marked as Exhibit 10 to the
6    deposition, Dr. Benbrook, a March 4, 1985 document
7    with the subject line "Consensus Review of
8    Glyphosate."
9              Are you familiar with this document?
10        A.    Yes.
11        Q.    When did you first become familiar with
12   this document?
13        A.    Twenty years ago.  I don't know, a long
14   time ago.
15        Q.    So you've known about this consensus
16   document for two decades; is that correct?
17        A.    Approximately.
18        Q.    And this is a document that's discussing
19   the 1983 mouse study that you've referenced a number
20   of times in your expert report, correct?
21        A.    Yes, sir.
22        Q.    Before we talk about this particular
23   document, did you review the complaint that was
24   filed on behalf of Mr. Dewayne Johnson against
25   Monsanto?

Page 203

1         A.    Complaint?
2         Q.    Yes.
3         A.    Oh, you mean the legal --
4         Q.    Yes.
5         A.    No.  Certainly not in any detail.  I
6    think I saw it.  I might have skimmed it, but it's
7    pretty lengthy.  I didn't study it in detail.
8         Q.    But you think you've looked at it?
9         A.    Yes.
10        Q.    All right.  Do you recall or are you
11   aware that in his complaint, Mr. Johnson does not
12   allege exposure to glyphosate through a route of
13   exposure involving his diet or drinking water?
14             MR. LITZENBURG:  I object to the
15        characterization.
16             THE WITNESS:  I don't know if he said
17        that or not.
18   BY MR. COPLE:
19        Q.    Did you look for that in his complaint?
20        A.    No.
21        Q.    With respect to the exposures that
22   Mr. Johnson alleged, you said you looked at least
23   one of his deposition transcripts; is that right?
24        A.    Correct.
25        Q.    Do you know what Mr. Johnson was wearing

Page 204

1    when he did his job applying glyphosate as a
2    constituent of Ranger Pro?
3         A.    Let's see.  I think he had some sort of a
4    Tyvek suit.  I think he had boots on, and he had
5    some kind of a face shield.
6         Q.    So you know that he had a full-body, at
7    least up to the neck, Tyvek suit?
8         A.    Yeah.  That's -- that's I believe how it
9    was described.
10        Q.    And you know that he wore
11   chemical-resistant boots that were provided to him
12   by his employer?
13        A.    I knew he had -- I knew he wore boots.  I
14   didn't know if they were his or provided by his
15   employer.
16        Q.    Did you know that he wore gloves that
17   were about the thickness or perhaps a little bit
18   thicker than the type of gloves you might wear that
19   are rubberized for washing dishes?
20        A.    I do recall that he reported wearing
21   gloves, yes, sir.
22        Q.    And that the gloves were disposable and
23   were not to be worn twice?
24        A.    I don't recall that detail, but if that's
25   in his deposition, I would accept that as true.

Page 205

1         Q.    Do you recall that his Tyvek suit was
2    also disposable and not to be worn twice?
3         A.    I don't recall that detail.
4         Q.    Were you aware that in addition to a face
5    shield of some sort that he would wear, that he had
6    a cotton hoodie he would use to pull up over his
7    head and pull the drawstring as tight as would allow
8    him to continue to work?
9         A.    I don't recall that.
10        Q.    Were you aware that Mr. Johnson wore
11   goggles each time that he applied glyphosate
12   formulated Ranger Pro?
13        A.    I guess I don't know exactly whether the
14   goggles were part of the face shield, but he had
15   some eye and face protection.  I am aware of that.
16        Q.    Are you aware he said he read the label
17   for Ranger Pro each time that he would go out and
18   apply the Ranger Pro pesticide?
19        A.    I don't recall him saying that, and I'd
20   be surprised if he read the whole label.  It's
21   pretty long.
22        Q.    Well, I'm not suggesting to you that's
23   what he said, but he said that he read the label.
24        A.    Okay.
25             MR. LITZENBURG:  Form.

CONFIDENTIAL

1   BY MR. COPLE:
2       Q.    Now, were you aware that Mr. Johnson has
3   said in his deposition that he would not spray
4   Ranger Pro on windy days?
5           MR. LITZENBURG:  I object to
6   mischaracterization.
7           THE WITNESS:  I don't recall reading
8   that, no.
9   BY MR. COPLE:
10      Q.    Do you recall that he had said in his
11  deposition that he would not apply Ranger Pro during
12  rain or for a period preceding or following a period
13  of rain?
14          MR. LITZENBURG:  I object to the
15  characterization.  We have a transcript of his
16  precise testimony.
17          THE WITNESS:  I don't recall what he had
18  to say about rainy days, but I think from what I
19  did read and other documents in the case, he
20  seemed to be quite diligent in trying to protect
21  himself and apply the product in a way that
22  reduced his chance of exposure to the full
23  extent possible.
24  BY MR. COPLE:
25      Q.    Including wearing personal protective

1   equipment?
2       A.    That wasn't required on the label, yes.
3       Q.    But he wore it?
4       A.    He wore it.
5       Q.    In this 1985 document dated March 4,
6   which we've marked Exhibit 10, can you tell us
7   generally what this document is?
8       A.    It's the final assessment by the EPA's
9   toxicology branch, the appropriate scientific
10  experts who were involved in the initial review of
11  the BioDynamic mouse study starting in 1983, and the
12  ongoing debate and back and forth with Monsanto over
13  the interpretation of the results of that study.
14          It provides their evaluation of the
15  26-month -- or 24-month mouse study.  It reviews the
16  dosage ranges, the number of renal tubular adenomas
17  that were observed:  Zero in the control group; zero
18  in the low-dose group; one in the midrange, or 5,000
19  ppm group; and three in the 30,000 ppm treatment
20  group.
21          It goes on to talk about the statistical
22  analysis.  There are some other considerations,
23  including assessment of whether the MTV or maximum
24  quality of dose was exceeded, and there's some
25  assessment of the exposure levels, blah, blah -- in

1   residues and water.  And then they issue their final
2   classification of glyphosate in accordance with EPA
3   proposed guidelines, paren, federal registered
4   notice of November 23rd, 1984.  The panel has
5   classified glyphosate as a Category C oncogen, in
6   normal parlance means a possible human or animal
7   carcinogen.
8       Q.    You're referring to the language under
9   Paragraph E classification of glyphosate in this
10  memo, correct?
11      A.    Yes, sir.
12      Q.    And that Category C oncogen, that's not
13  the classification that the EPA uses today, right?
14      A.    Well, the -- yeah, the numbering system
15  has changed, but they're basically the same.
16  There's a probable class and a possible class.
17      Q.    Let me ask it a different way.  I'm not
18  focusing on the nomenclature of the categories.  You
19  described it means it's a possible carcinogen,
20  right?
21      A.    Yes.
22      Q.    And today's EPA classification is not
23  that it's a possible carcinogen, correct?
24      A.    Oh, I see what you mean.  Correct.
25  That's correct.  Classified as Group E.

1       Q.    And after the date of this memo,
2   subsequently, it was determined in OPP to change the
3   Category C possible carcinogen to Category D,
4   correct?
5       A.    I'm sorry.  I didn't catch your question.
6       Q.    Yes.  Subsequent to this memo, as events
7   unfolded, Category C became Category D, correct?
8       A.    It was -- the reclassification that we
9   already talked about, the CARC meeting in 1990 or
10  '91, when they changed the classification, so it was
11  approximately eight years later.
12      Q.    Eight years later, it was Category E,
13  right?
14      A.    Correct.
15      Q.    And between eight years later and the
16  date of this memo, 1985, there was an interim change
17  to Category D, correct?
18      A.    Well, there were a number of discussions
19  about changes in classification, and it's a bit of
20  an art form to determine exactly when EPA officially
21  changed its classification of glyphosate or any
22  other pesticide.  You know, it's not always entirely
23  clear when there's been a formal agency decision or
24  an OPP decision or a hazard evaluation division
25  decision.  So, you know, it's -- it's difficult

CONFIDENTIAL

## Page 210

1  to -- it's -- between these seminal meetings where
2  it's very clear what the classification is, it can
3  be difficult to tell exactly what it is.
4      Q.    Now, this Category C in this document for
5  possible oncogen was issued by the toxicology
6  branch, right?
7      A.    The memo was, yeah, issued by the
8  toxicology branch to Robert Taylor, then head of the
9  herbicide and fungicide branch within the
10  registration division.
11     Q.    This document does not mean it was an OPP
12  determination, right?
13     A.    Correct.
14     Q.    It doesn't mean it was an agency-wide
15  determination, right?
16     A.    I think that's a fair characterization of
17  it, yes.
18     Q.    And this determination of Category C was
19  not the final determination by EPA, right?
20     A.    It was the final as of this time.
21     Q.    It was the final by the toxicology branch
22  as of this time, right?
23     A.    Right.  And the toxicology branch was the
24  only part of EPA that rendered a judgment on
25  glyphosate oncogenicity at this time.

## Page 211

1      Q.    In your export report on Page 23, I think
2  it's Paragraph 105, it's Exhibit 4, as I recall,
3  which should be in front of you.
4      A.    Paragraph 105?
5      Q.    Paragraph 105, I believe it's on Page 23.
6      A.    Okay.
7      Q.    Your report talks about an oncogen.  That
8  would refer to a chemical that might cause benign or
9  malignant tumors in animals or in humans, right?
10     A.    Correct.
11     Q.    That's different, meaning an oncogen is
12  different than a carcinogen, right?
13     A.    There's a -- there are differences in how
14  different individuals, institutions, agencies use
15  the term "carcinogen" versus "oncogen."
16     Q.    Carcinogen --
17     A.    I -- I talk about earlier in the
18  report -- actually, it's in Paragraph 104.
19     Q.    So you agree that an oncogen is different
20  that a carcinogen?
21     A.    There are some chemicals that have been
22  determined to be an oncogen that do not, in some
23  classification schemes, warrant classification as a
24  carcinogen, which typically are carcinogens in
25  several classification schemes; over time have been

## Page 212

1  a chemical that causes a malignant tumors, as
2  opposed to nonmalignant or benign.
3      Q.    In this particular classification of a
4  category of Group C, it was specifically listed as
5  an oncogen, right?
6      A.    Yes.
7      Q.    These were eight EPA scientists had
8  reached this consensus at least as of March 4, 1985;
9  is that right?
10     A.    I think it's eight -- seven or -- yeah,
11  eight.
12     Q.    We can count them.
13     A.    I'm looking over your shoulder.  It's
14  eight.
15     Q.    There's about eight.
16          Let's look Point Number 3, which I think
17  it's on the second page.
18     A.    We're back into the EPA?
19     Q.    Yeah, we're still in that same document,
20  Exhibit 10, I believe.
21     A.    We're doing a little bit of jumping
22  around here.
23     Q.    We're looking at the tox branch.
24     A.    It's underneath here.  Sorry.
25          MR. LITZENBURG:  What's the number?

## Page 213

1          MR. HOLLINGSWORTH:  Still on 10.
2          THE WITNESS:  It's Exhibit 10.
3  BY MR. COPLE:
4      Q.    Under 3, under Point 3 of this particular
5  evaluation, it starts out with C at the top,
6  Subsection C, "Evaluation of the Facts."  And under
7  C, it says -- it talks about the chronic mouse study
8  carried out by BioDynamics.  That's the 1983 mouse
9  study that you referred to in your report, right?
10     A.    Correct.
11     Q.    It says in Point 3 that in the chronic
12  mouse study done by BioDynamics, renal tubular
13  adenomas were observed in the male mice, right?
14     A.    Correct.
15     Q.    So renal tubular adenomas would be benign
16  growths, correct?
17     A.    Correct.
18     Q.    They would not be carcinomas, or
19  otherwise the report would have said that, correct?
20     A.    I would assume so, yes.
21     Q.    So this classification that was done by
22  the toxicology branch, as Category C, possible
23  carcinogen, was done based upon adenomas being
24  observed in male mice, not based on any carcinomas;
25  is that right?

CONFIDENTIAL

Page 214

1  A.   Right.  Characterized by EPA as a rare
2  tumor even in Charles River CD1 male mice.
3  Q.   Now, under D, if we flip over to the next
4  page, in Number D, there is a discussion of other
5  considerations by the toxicology branch regarding
6  this 1983 BioDynamics mouse study, right?
7  A.   Correct.
8  Q.   And in Subsection D, it talks about, in
9  the third sentence, that "The panel believes that
10  additional sectioning of new blocks of male kidneys
11  might help in the interpretation of the study
12  results," right?
13  A.   Correct.
14  Q.   So these considerations are being flagged
15  under the toxicology branch as part of its consensus
16  statement in 1985 about a possible oncogen, that if
17  they had additional sectioning of new blocks of the
18  male kidneys in the mice, that that might further
19  assist the toxicology branch in interpreting what
20  these -- what these adenomas might mean.  Is that
21  right?
22  A.   Yeah.  That's what the memo says.
23  Q.   So as of this point, which is March 4th,
24  1985, this particular toxicology branch group of
25  scientists is actually suggesting that additional

Page 215

1  data based upon resectioning of new blocks of the
2  mice kidneys would be helpful to them, right?
3  A.   Right.
4  Q.   It goes on to say -- it says, "The kidney
5  tumors as reported were unilateral."  Then it goes
6  on in parenthesis, it looks like "personal
7  communication by Dr. Dykstra after the panel
8  meeting," correct?
9  A.   Correct.
10  Q.   Do you know Dr. Dykstra?
11  A.   I did meet him, but I believe I met with
12  him only once or twice, and certainly -- I didn't
13  stay in touch with him afterwards, so I don't know.
14  I never knew him well.
15  Q.   Well, this memo starts out on the first
16  page saying that on February 11, 1985, that this
17  particular group of scientists in the toxicology
18  branch met to evaluate and discuss the data on
19  glyphosate and potential oncogen response, and the
20  reference to Dr. Dykstra is that he's communicating
21  additional information after that meeting was held.
22  Is that -- am I reading that right?
23  A.   Yes.  Dykstra was the original reviewer
24  of the study.
25  Q.   So he didn't bring that up during the

Page 216

1  panel meeting; he communicated it to somebody
2  afterwards?
3  A.   I think that's a reasonable examination of
4  the memo.
5  Q.   It goes on to say with respect to the
6  communication from Dr. Dykstra that "Additional
7  histopathology could resolve the issue of whether
8  this is a valid observation or due to not finding,"
9  in quotes, "finding the tumors in the particular
10  block analyzed."
11  First of all, what's histopathology?
12  A.   That's the microscopic examination of
13  tissues from various organs to see whether there are
14  any cell masses or growths or tumors that can be
15  identified as a -- as a known benign or malignant
16  tumor.
17  Q.   You're not an expert in histopathology,
18  right?
19  A.   No, sir.
20  Q.   That typically requires a pathologist,
21  right?
22  A.   Correct.
23  Q.   And was there a pathologist on this
24  particular --
25  A.   Yeah.  Dr. Kasza was the leading

Page 217

1  pathologist at the time in OPP.
2  Q.   Okay.  And this language about additional
3  histopathology could resolve this issue of whether
4  this is a valid observation and not finding a tumor
5  in the particular lot analyzed suggests that the
6  branch or someone in this group or the entire group
7  were not sure what they were seeing in the path
8  slides.  Is that right?
9  A.   No, I don't believe that's a fair
10  characterization.  This is a very common sentence to
11  see in an EPA review document of a given study.
12  They're simply saying that there may have been
13  tumorous growths in part of the kidney that was not
14  included in the section slice of the kidney that was
15  done.
16  So one way to deepen the information base
17  available for rendering judgment on a given study
18  like this one would be to do additional sections of
19  the kidney that would provide additional information
20  about whether perhaps a tumor was missed in a
21  treatment group, perhaps a tumor was missed in the
22  control group.
23  If they -- if they looked at the kidney
24  slide from an animal for which there had been no
25  tumors reported by the pathologist who did the

CONFIDENTIAL

Page 218

1    initial read of the slides for BioDynamics -- if the
2    kidneys were resliced and, upon examination of the
3    new slice, a kidney tumor were observed, that would
4    alter the results of the study and trigger a
5    reassessment of the statistical analysis of the
6    result.
7        So it's a very -- it's a common and
8    typical next step in the event of controversy or
9    uncertainty about the histopathology in a study of
10   this nature.
11       Q.   So the tox branch consensus group of
12   scientists was anticipating a possible next step due
13   to either controversy or uncertainty, right?
14       A.   I think they were well aware that
15   Monsanto would push for resectioning in the slides
16   or rereading of the slides until they got the answer
17   that they wanted.
18       Q.   The consensus group of scientists in this
19   document themselves said that the panel believes
20   that additional sectioning might help in
21   interpreting the study results.  The panel said
22   that, right?
23       A.   Where are you seeing that?
24       Q.   I'm in the same paragraph, sir.  It says,
25   at the beginning -- we talked a little bit about it.

Page 219

1    I'm just asking you again because you said the panel
2    thought Monsanto might want resectioning.
3        But in this sentence, the panel itself is
4    saying that "The panel believes that additional
5    sectioning of new slides of male kidneys might help
6    in the interpretation of the study."
7        A.   Sure.  And that sentence would apply to
8    slides of any organ in any study.  It's a -- it's
9    a -- something that often came up in discussions
10   between OPP scientists and registrant scientists
11   when there was a disagreement over the
12   interpretation or analysis of the results of a
13   particular study.  It always -- it's always an
14   option to either reread the existing slides or do a
15   new sectioning to have a look at another part of the
16   kidney.  And as you know -- and I'm sure you're
17   going to ask me about in the case of glyphosate and
18   these tumors -- both of those additional steps were
19   carried out.
20       Q.   So the panel kept their options open to
21   take additional steps and have more data provided to
22   them, right?
23       A.   I suppose you could characterize it that
24   way, yeah.
25       Q.   All right.  Let's go to -- this list of

Page 220

1    scientists that have formed the consensus -- this
2    was on the first page.
3        A.   Yes.
4        Q.   You had mentioned earlier that there were
5    a number of EPA scientists you had been in
6    communication with during the 1980s.  Which of these
7    scientists on this census panel were you in
8    communication with?
9        A.   I met several times, probably not more
10   than six, with Bert Litt and Reto Engler, probably a
11   few more times with Reto than Bert.  And I met a
12   time or two with Ted Farber.
13       Q.   What was your -- what was your job at the
14   time that you were meeting with those individuals
15   who were serving as scientists for the
16   toxicology branch?
17       A.   I was the staff director of the
18   congressional subcommittee with oversight
19   responsibilities for implementation of the Federal
20   Insecticide, Fungicide, and Rodenticide Act.  And
21   our subcommittee was assessing EPA policies and
22   procedures relative to cancer-causing pesticides and
23   the evaluation of the potential of pesticide
24   exposures to cause cancer.
25       Q.   You were staff director for that

Page 221

1    subcommittee in March of 1985?
2        A.   Yes, sir.  No, not in 1985.  This was --
3    my work in -- in OPP was predominantly in 1982 and
4    1983.
5        Q.   You said "predominantly."  After 1983,
6    you were no longer staff director for that
7    subcommittee?
8        A.   Correct.
9        Q.   This particular occasion, February 11,
10   1985, meeting of this group of scientists occurred
11   after you had already left your position, right?
12       A.   Oh, sure.  Yes.  That's correct.
13       Q.   So any conversations that you might have
14   had during this timeframe were not in your capacity
15   as staff director?
16       A.   Correct.
17       Q.   What was the reason that you were having
18   conversations with -- I think you said Dr. Engler
19   and Dr. Litt, Bertram Litt?
20       A.   Bert Litt and Reto Engler were two of the
21   senior scientists.  They had both been with the
22   agency for a number of years at that point.  They
23   were two of the scientists that then director of
24   OPP, Ed Johnson, assigned to work with me to compile
25   information that the subcommittee felt it wanted to

CONFIDENTIAL

Page 222

1  have an opportunity to review.
2        We were doing, as I said, a routine
3  congressional subcommittee investigative report on
4  the activities and impacts and issues arising around
5  the regulation of pesticides by EPA/OPP, and at the
6  time, a number of cancer-causing pesticides, such as
7  EDB, a fumigant; alachlor, a herbicide; atrazine,
8  another herbicide; benomyl, a fungicide were in the
9  news, being debated in the scientific community,
10  discussed in the media.
11        And so we, among the things that we
12  looked at -- I remember permethrin was very much in
13  play at the time.  I was given the opportunity by Ed
14  Johnson to sit down with a number of OPP staff
15  scientists to let them explain to me the process by
16  which they make evaluations of pesticide risk, how
17  they get their data, what concerns they have with
18  the data that they have to rely on, what their
19  concerns were relative to ambiguity in the law or
20  the regulations, what concerns and issues they had
21  with the way the registrants were able to interact
22  with them and influence their decisions.
23        We also met multiple times with
24  representatives of registrants.  As I say in the
25  report, I had a very cordial and professional

Page 223

1  relationship with Dr. Chester Dickerson, a Monsanto
2  employee who was based out of the Monsanto
3  Washington office, and he was -- he was one of the
4  many Washington reps of major pesticide companies
5  that took it upon themselves to educate the new
6  staff director of the subcommittee with jurisdiction
7  over pesticides that had at the time I started
8  essentially no knowledge or professional experience
9  in the federal law or the art of pesticide risk
10  assessment.
11        Q.    Did you meet with Monsanto's
12  representative about this February 11, 1985, meeting
13  of the toxicology branch scientists?
14        A.    No.
15        Q.    Did you meet with any of these toxicology
16  branch scientists about their February 11, 1985,
17  memo?
18        A.    I doubt it.  My opportunity to sit down
19  and have those kinds of in-depth discussions with
20  the senior EPA scientists ended at the time of my
21  leaving the subcommittee.
22        However, I went -- my next job, which I
23  started immediately after my tour of duty in the
24  Congress, was serving as the executive director of
25  the Board on Agriculture in the National Academy of

Page 224

1  Sciences.  One of the first major projects that the
2  Board on Agriculture was given the opportunity to do
3  was sponsored by Jack Moore, who was the assistant
4  administrator for pesticides and toxic substances at
5  the time.
6        Jack Moore had, towards the end of my --
7  I don't -- so he must have come in -- so Jack must
8  have come in right at -- when -- at the end of
9  the -- the two terms of President Reagan.  And so we
10  started in -- oh, what was -- it's in my -- it's in
11  my -- my report.
12        I believe we got the request from EPA to
13  do the paradox report in 1984, towards the end of
14  1984, the work on that project, which was focused
15  largely on cancer-causing pesticides and risk and
16  the impact of the standard in the FIFRA statute
17  relative to the standard in the Food, Drug, and
18  Cosmetic Act, which were actually in conflict, as I
19  explain in the expert report.
20        This was a major issue for registrants
21  for the EPA that arose in the oversight that we did
22  and was addressed in the community -- the
23  subcommittee report that was issued in 1983, before
24  I left.  I was recruited into the job at the
25  National Academy of Sciences at the end of 1983, and

Page 225

1  our subcommittee report had come out earlier that
2  fall or summer.  I don't remember the exact date
3  that it was issued.
4        But after I went and took my new job at
5  the National Academy of Sciences, I knew there was
6  this acknowledged conflict in two federal statutes
7  that was tying EPA up in knots and also posing major
8  concerns for registrants, including Monsanto.  And I
9  definitely spoke with Chester Dickerson many times
10  about this conflict in the two federal statutes.
11  And so I don't -- I don't remember how the first
12  conversation with EPA happened in '84, but basically
13  I said to the people that I had worked with
14  previously, in my capacity as the staff director of
15  DORFA -- I said, Well, I'm working now at the Board
16  of Agriculture in the National Academy of Sciences,
17  that you, EPA, could commission the National Academy
18  of Sciences to figure out how to resolve this
19  conflict between the two federal statutes that were
20  in some cases telling EPA to jump -- the FIFRA
21  statute would say jump to the left, and the Food,
22  Drug, and Cosmetic Act statute would say jump to the
23  right.  They couldn't make a decision on some
24  tolerance petitions without violating one or the
25  other statute.

CONFIDENTIAL

Page 226

1   So this is kind of a classic scenario for
2   a federal agency to ask the National Academy of
3   Sciences to sort of analyze the statutory,
4   regulatory, scientific issues relating to the
5   regulation of cancer-causing pesticides.
6   So the EPA agreed that such a National
7   Academy of Science report would be very helpful to
8   them. A contract was let. I don't remember -- it
9   was $400,000 or something on that -- in that
10  magnitude.
11  The Board on Agriculture, for which I
12  served as executive director, we recruited a
13  committee of experts, about 12 or 13 individuals
14  that joined the committee on -- I don't remember
15  exactly what we called the committee.
16  The final report is effectually known as
17  the Delaney Paradox Report. It came out in 1986 or
18  1987 and was very well received by all of the
19  constituencies and by the agency, because we really
20  explained in detail very clearly what is it -- it's
21  a very complicated problem embedded in statutes that
22  evolved over a 30-year period, and we explained the
23  statutory basis of the problem and recommended
24  changes in law that would harmonize the regulatory
25  standard that would apply to EPA decision making on

Page 227

1   cancer-causing pesticides.
2   And during the course of the first
3   Delaney Paradox Report, we did extensive original
4   scientific research and analysis of dietary
5   exposure, general population exposure to 53
6   cancer-causing pesticides. We did the first ever
7   what is now known as cumulative risk assessment ever
8   done by anybody. It's in that report. It was done
9   under contract by a guy named Dr. John Wargo,
10  scientist at Yale that worked in the risk assessment
11  arena.
12  And because that report was being done
13  under contract to the EPA and specifically focused
14  on cancer causing pesticides, that was why I
15  continued to interact with various EPA scientists to
16  get the latest Q stars, which are the cancer potency
17  factor, and the latest OPP assessments of
18  cancer-causing pesticides.
19  So the work on -- the work on the Delaney
20  Paradox Report, most of it occurred in 1985, 1986,
21  into 1987; and in 1988, the Board on Agriculture was
22  asked to do a follow-up study on pesticides in the
23  diets of infants and children. That basically was
24  recommended in the Delaney Paradox Report to EPA
25  that they take a fresh and deep look at the unique

Page 228

1   risks of pesticide exposures for pregnant women,
2   infants, and children. So that led to the also
3   quite important and influential 1993 report,
4   "Pesticides in the Diets of Infants and Children."
5   I helped the Board on Agriculture and the
6   academy recruit and begin that study. I left that
7   academy at the end of 1990. The Pesticides in the
8   Diets of Infants and Children Committee had
9   approximately two years of work under its belt, and
10  it was another three years before its report came
11  out.
12  So by virtue of continuing to work on
13  understanding and analyzing pesticide dietary risk
14  including cancer risk, I remained in contact with a
15  number of these individuals in OPP.
16  Q.    None of your communications that you just
17  described or the work you just described had
18  anything to do with this toxicology branch group of
19  scientists in March of 1985, right?
20  A.    Well, yes. Some of the meetings I had
21  with Bert Litt and Reto Engler were in this period
22  of time, but none of them were specific to the
23  agency's assessment of glyphosate herbicides,
24  because at the time, there was essentially no
25  evidence of glyphosate being in food. There was not

Page 229

1   much concern in the agency. There wasn't much
2   concern in the general scientific community about
3   exposures to glyphosate through the diet. There was
4   a little bit of concern, you know, through drinking
5   water, and it was beginning in the mid-'80s, but
6   glyphosate cancer risks were not among those that
7   received a lot of attention, a lot of analytical
8   work in the '80s and '90s.
9   Q.    You didn't discuss with Dr. Engler or
10  with Mr. Litt the issues they had under review as
11  part of the February 11, 1985, meeting?
12  A.    No, I did not.
13  Q.    That's the same for Chester Dickerson;
14  you never discussed these issues with him either?
15  A.    Not -- no, I didn't discuss the issues
16  addressed in the March 4, 1985, consensus review of
17  glyphosate.
18  Q.    If you go to under, again, C, Evaluation
19  of the Facts, there's a Subsection 2 called
20  "Mutagenicity Assays." The first thing it says in
21  that paragraph under that subheading is "Glyphosate
22  was tested for mutagenic activity."
23  That's part of what they did as part of
24  this evaluation, right?
25  A.    Correct.

CONFIDENTIAL

Page 230

1  Q.   In the middle of that paragraph, there's
2 a statement by the consensus group that all of these
3 tests, meaning the mutagenicity assays, "All these
4 tests were negative, Tests 1-3 are fairly well
5 predictive of oncogenic response, while 4-6 are less
6 appropriate."
7       But all of them are negative, correct?
8  A.   Yes.  These are the genotox studies
9 conducted by Monsanto that had been submitted in
10 response to the standard OPP data requirements.
11  Q.   And the conclusion, the consensus
12 conclusion of these eight scientists in the tox
13 branch in 1985 is -- regarding mutagenicity assays,
14 is in the final sentence.
15       It says, "In summary, several appropriate
16 and scientific acceptable tests are supportive of
17 nononcogenic potential of glyphosate," right?
18  A.   That's correct.  That's what it says.
19  Q.   So from a mutagenicity assay standpoint,
20 this consensus group found supportive evidence of
21 nononcogenic characterization or activity for
22 glyphosate, right?
23  A.   Well, what they -- what they found was
24 from the set of studies that the registrant Monsanto
25 was required to do, there was no evidence of

Page 231

1 mutagenic or genotoxic activity.  And that was their
2 judgment at this time.  And it's, you know -- that's
3 what they're reporting in this memo.
4       MR. COPLE:  Let's mark this next as
5 Exhibit 11 to the deposition.
6       (Benbrook Exhibit Number 11 is marked for
7 identification.)
8 BY MR. COPLE:
9  Q.   You rely on the 1986 EPA registration
10 standard document for glyphosate for your expert
11 opinions in your report, right?
12  A.   Yes, sir.
13  Q.   And this particular document says it's
14 "Guidance for the reregistration of pesticide
15 products containing glyphosate as the active
16 ingredient."
17       What is this document?
18  A.   It's the registration standard document
19 issued in June of 1986 providing guidance and
20 instructions to registrants of glyphosate-based
21 herbicides regarding the additional studies that
22 they would need to do to fulfill any existing data
23 gaps to assist the EPA in sharpening up its
24 assessment of exposures through water or residues in
25 food.

Page 232

1       It addresses any required changes in the
2 label, warnings or cautions.
3       It addresses any necessary changes in the
4 worker safety provisions, the requirements for
5 personal protective equipment.
6       It addresses a number of issues relative
7 to how the crops that are included on different
8 labels, crops and crop groupings and rates of
9 applications and total number of applications and
10 total amount of ingredient allowed per year, and in
11 general discusses all of the steps that registrants
12 must take in order to maintain existing
13 registrations for glyphosate-based herbicides or
14 successfully petition or apply the EPA to obtain new
15 registrations.
16  Q.   This document was issued by the OPP
17 registration division for pesticide registration,
18 right?
19  A.   Correct.
20  Q.   And the document was issued by the OPP
21 registration division on behalf of the agency,
22 meaning on behalf of EPA, right?
23  A.   Correct.
24  Q.   And go to Page 1 on the top, on this
25 particular registration standard document.

Page 233

1  A.   Okay.  The introduction?
2  Q.   Yes, the introduction.
3       If you go to the second full paragraph,
4 it starts out with a statement that "The
5 registration standards program involves a thorough
6 review of scientific database underlying a
7 pesticide's registration."
8       It goes on to say that "The purpose of
9 the agency's review is to reassess potential hazards
10 arising from the currently registered uses of the
11 pesticide to determine the need for additional data
12 on health and environmental effects; and to
13 determine whether the pesticide meets the no
14 unreasonable adverse effects criteria FIFRA."
15       This is what the registration document's
16 purpose in part is, right?
17  A.   Correct.
18  Q.   Now, this -- this is issued in 1986,
19 June 1986, according to the coversheet.
20  A.   The official release date was August 11,
21 1986, according to Rick Tinsworth.
22  Q.   After the February 11, 1985, meeting and
23 the March 4, 1985, memo of the toxicology branch and
24 the Category C oncogen classification for
25 glyphosate, this is the review that the registration

CONFIDENTIAL

Page 234

1   division is undertaking for the agency at this
2   point, right?
3        A.    Well, it's the outcome of the review.
4        Q.    So they're reassessing the potential
5   hazard, right?
6        A.    Yeah, they have reassessed what is known
7   about the hazards and has a number of -- makes a
8   number of requests to registrants for further
9   information and changes in the labels.
10       Q.    If you go to Page 6 of the registration
11  standard document --
12       A.    Okay.
13       Q.    -- that first full long paragraph talks
14  about the chronic feeding oncogenicity study in mice
15  tested at dosages --
16       A.    BioDynamics study, correct.
17       Q.    -- 1,000, 5,000, and 30,000 parts per
18  million.
19             You're getting ahead of me, sir.  That's
20  my question.  This is the BioDynamic study, right?
21       A.    Yes.
22       Q.    It goes on to say as part of this that
23  "Glyphosate produced an equivocal oncogenic response
24  in the mouse, causing a slight increase in the
25  incidence of renal tubular adenomas (a benign tumor

Page 235

1   of the kidney) in males at the highest dose tested
2   at 30,000 parts per million."
3             So this reflects in August 1986, the
4   release date as you said for the registration
5   statement document, that it was being viewed -- the
6   BioDynamic 1983 study was being reviewed as an
7   equivocal oncogenic response, correct?
8        A.    I'm sorry.  I was -- I was trying to get
9   my mind around that paragraph.
10       Q.    That's fine.
11       A.    Reask the question.  I'm sorry.
12       Q.    I'll refocus my question.  This is
13  actually pretty simple.
14             At this point, August 1986, when this
15  document has been released by the registration
16  division, the registration division is
17  characterizing the results or the interpretation of
18  the BioDynamic '83 mouse study as producing an
19  equivocal oncogenic response, right?
20       A.    That's correct.
21       Q.    So equivocal, meaning not certain, not
22  clear?
23       A.    Correct.
24       Q.    All right.
25       A.    Subject to interpretation.

Page 236

1        Q.    Subject to interpretation.  And it
2   repeats what was observed by the consensus -- the
3   consensus toxicology group of scientists in the tox
4   branch from February 11, 1985, which is that it
5   showed a slight increase -- that the BioDynamics '83
6   mouse study showed a slight increase in the
7   incidence of renal tubular adenomas and specifically
8   says a benign tumor.  So no -- no carcinomas were
9   observed here, correct?
10       A.    Correct.
11       Q.    This goes on to say in this document by
12  the registration division, which is again, according
13  to Page 1, which we looked at that paragraph, is
14  announcing the reassessment for the agency itself.
15             On Page 6, it goes on to say that "The
16  studies were reexamined by a consultant pathologist,
17  and data were submitted indicating that an
18  additional kidney tumor had been found in control
19  males," correct?
20       A.    Correct.
21       Q.    So there's more data now that's
22  available, according to this registration standard
23  document, right?
24       A.    Well, they're referring to the -- both
25  the rereading and the resectioning of the slides

Page 237

1   that had been carried out by this time.
2        Q.    Which was suggested in 1985 by the
3   consensus group in the tox branch, right?
4        A.    Well, it was one of the further steps
5   that the tox branch personnel noted that could be
6   undertaken to try to resolve the disagreement
7   between the EPA pathologists and the Monsanto
8   pathologists.
9        Q.    As another consideration, right?
10       A.    Well, a next step to take to get some --
11  shine some new light, if you will, on the underlying
12  scientific issues that were not in agreement between
13  Monsanto and the EPA.
14       Q.    The sentence before this reexamination of
15  resections by consulting pathologist says, "The
16  toxicology branch ad hoc oncogenicity committee
17  tentatively classified glyphosate as a Class C
18  oncogen."
19             That means that according to the
20  registration division, what the consensus group out
21  of the tox branch did in 1985 was a tentative
22  classification, right?
23       A.    I don't think they used that word in
24  their memo.  We can -- it's right here.
25       Q.    Well, I'm not suggesting to you, sir,

CONFIDENTIAL

Page 238

1    that that word was used.  I'm talking only about how
2    it's being characterized by the registration
3    division here in this document.
4           MR. LITZENBURG:  You asked what it means,
5    and he answered you.
6           THE WITNESS:  So March 4th, 1985, under
7    E, classification of glyphosate, the memo reads,
8    "In accordance with EPA proposed guidelines (FR
9    of November 23, 1984) the panel has classified
10   glyphosate as a Category C oncogen."
11          The word "tentative" does not appear in
12   the sentence.
13   BY MR. COPLE:
14   Q.    And on Page 6 of the registration
15   division's announcement of the registration standard
16   review, the registration division characterizes that
17   same classification as being tentative, right?
18   A.    Show me where you are with that word.
19   Q.    It's right in the middle of that
20   paragraph.  It's right after -- if you follow right
21   after the second time 30,000 ppm is mentioned.
22   A.    Okay.  I see it now.  Give me a second.
23   Q.    Sure.
24   A.    I have reviewed this material in great
25   depth.  I just want to make sure where we're at in

Page 239

1    the evolution of EPA's understanding of the results
2    of the BioDynamic mouse study.
3           Okay.  I've read that paragraph now.  I'm
4    ready to talk about it.
5    Q.    Okay.  My question was just simply,
6    according to the registration division, that
7    division characterized the '85 consensus document of
8    oncogen Class C as being a tentative classification?
9    A.    That's the word used in this paragraph,
10   yes.
11   Q.    Have you talked to anyone -- you said a
12   number of times you communicated with individuals in
13   OPP during the 1980s.  Did you talk to anyone at OPP
14   about this registration standard document?
15   A.    No.
16   Q.    Did you know this registration standard
17   document had been issued at the time?
18   A.    Yes.
19   Q.    Had you read it at the time?
20   A.    I don't remember when I first read it,
21   but it was almost certainly within a year or two of
22   its release.
23   Q.    It goes on in the next sentence, well,
24   the very next sentence, the one that says that
25   consulting pathologist found a control group tumor,

Page 240

1    but in parenthesis it says that "no renal tumors
2    were found in controls in the original examination."
3           So there's a difference being observed
4    here from the original assessment from 1985 by the
5    tox branch, right?
6    A.    Yes.  Monsanto hired Dr. Kuschner to read
7    the slides.  He was not involved in the original
8    reading of the slides by BioDynamics, and he
9    reported observing the one additional renal tumor
10   adenoma in Control Mouse 1028.
11   Q.    Do you know Dr. Kuschner?
12   A.    No, never met the man.
13   Q.    Do you know who he is?
14   A.    Yes.
15   Q.    Do you know he's a pathologist from Stony
16   Brook University -- was at the time from Stony Brook
17   University?
18   A.    Correct.  He's passed away.
19   Q.    Now, you've never discussed
20   Dr. Kuschner's work in terms of being a consulting
21   pathologist on this issue, right?
22   A.    Discussed?
23   Q.    Yes.  Talked to him, communicated with
24   him.
25   A.    No, I never -- never spoken with the man.

Page 241

1    Q.    And as a consulting pathologist,
2    Dr. Kuschner was not an employee of Monsanto, right?
3    A.    No.
4    Q.    He was being paid for his professional
5    advice and opinion, right?
6    A.    Correct.
7    Q.    Just like you are today, correct?
8    A.    No.  I'm not going to go there.
9    Q.    You're not being paid for your
10   professional opinions?
11   A.    I am being -- well, I will agree that I
12   am being paid for my work on this case, yes.
13   Q.    And Dr. Kuschner was paid for his work as
14   a consulting pathologist, right?
15          MR. LITZENBURG:  Form.
16          THE WITNESS:  Would you like to get into
17   the details of Dr. Kuschner's assessment of the
18   slides?  I'm more than prepared to talk about
19   them in detail.
20   BY MR. COPLE:
21   Q.    So you don't know the answer that.  You
22   don't know what Dr. Kuschner's arrangement was as a
23   consultant; is that correct?
24   A.    Actually, I think I've seen his invoice.
25   It's in the documents.  I know that Monsanto was

CONFIDENTIAL

Page 242

1   already talking about the results of Dr. Kuschner's
2   review of the slides two days before he received the
3   slides.
4      Q.   This is based on your review of corporate
5   documents --
6      A.   Correct.
7      Q.   -- that you reviewed and have formed your
8   own personal opinion about what they mean, right?
9      A.   It's quite clear to me there was very
10  little uncertainty on Monsanto's part about what the
11  results of Dr. Kuschner's review were, because
12  they openly talked about what they expected.
13     Q.   Did Monsanto tell you that at some point?
14     A.   No.  It's in their -- they didn't tell me
15  that.  They wrote it in emails to other people in --
16  inside the company.
17     Q.   Did you have communications at any point
18  with Monsanto before or after your work on this case
19  regarding what Monsanto's intent was at the time in
20  retaining Dr. Kuschner?
21        MR. LITZENBURG:  Form.
22        THE WITNESS:  No.
23  BY MR. COPLE:
24     Q.   Now, if you go to the next paragraph, and
25  it continues the registration division's --

Page 243

1      A.   You're talking about the last paragraph
2   on Page 6?
3      Q.   Actually, the middle paragraph, much
4   shorter paragraph.  And it says that, "However, the
5   apparent oncogen response was a marginal response at
6   best.  The doses tested were quite high, 3 percent
7   of the diet, and there was no corresponding increase
8   in the incidence of preneoplastic changes, such as
9   hypoplasia or dysplasia in the target tissues."
10        Now, is this an objection that was made
11  by the consensus group that convened on February 11,
12  1985?
13        MR. LITZENBURG:  Form.  Speaks for
14  itself.
15        THE WITNESS:  This paragraph is a short
16  summary of a set of issues about the
17  interpretation and design of the BioDynamics
18  mouse study that had been debated in great
19  detail through multiple rounds between OPP and
20  Monsanto and also placed -- these were the core
21  issues, in addition to the historical control
22  issue, that were put before the scientific
23  advisory panel to get further guidance on.
24        So these -- these were -- these were the
25  difficult questions about this particular study

Page 244

1   that kept it a matter of ongoing discussion and
2   debate between EPA and Monsanto from 1983 to --
3   I'm not even sure the debate is completely
4   resolved at this point.
5   BY MR. COPLE:
6      Q.   And you recognize that in your report on
7   Page 72, numbered paragraph 375, right?
8      A.   I'll get there.
9      Q.   Back and forth here.
10     A.   What's the page number?
11     Q.   Page 72.
12     A.   Paragraph what?
13     Q.   375.
14     A.   Okay.
15     Q.   You talk in your report about "A
16  February 22nd, 1985, memo from Dr. Gingerich to
17  Monsanto colleagues characterized the meeting" -- it
18  talks about "relaxed, informal, and open.  The memo
19  states that Dr. Farber" -- from EPA, correct,
20  Dr. Farber?
21     A.   Yes.
22     Q.   "Dr. Farber called the February 11, 1985,
23  decision by OPP to classify glyphosate as a possible
24  oncogen," as, quote, "an extremely close call and
25  that EPA remains open to any new information that

Page 245

1   would make their decision easier," with a closed
2   quote.
3         This is all correct in terms of recounted
4   by Dr. Gingerich, right?
5      A.   Yep.
6      Q.   Did you ever talk to Dr. Farber about his
7   view of "an extremely close call" for the
8   February 11, 1985, decision?
9      A.   No.
10     Q.   Have you ever talked to Dr. Gingerich
11  about his conversation with Dr. Farber?
12     A.   No.
13     Q.   Do you know Dr. Farber?
14     A.   I've met him a time or two.
15     Q.   Did you ever talk to Dr. Farber about the
16  consensus group memo and review that was done in
17  February 1985?
18     A.   As I said to you in response to similar
19  questions, at the time, in the '80s, issues around
20  glyphosate oncogenicity, while very important to
21  Monsanto and also important to EPA, they weren't --
22  they weren't on the radar screen of most people
23  following developments in OPP related to potential
24  cancer risks and exposure to pesticides, because
25  there were other pesticides that were involved in

CONFIDENTIAL

Page 246

1    those discussions, and there was -- at this time,
2    there was little evidence of significant dietary or
3    drinking water exposures to glyphosate.  So it -- it
4    wasn't an issue that we specifically assessed or
5    addressed in either of the two National Academy of
6    Science reports that we did in the 1980s on the
7    topic of cancer and pesticides.
8       Q.    On Page 6 of the registration division
9    standard document on glyphosate, in that middle
10   paragraph, the registration division is calling or
11   characterizing, at least on Page 6, the oncogen
12   Class C characterization by the toxicology branch as
13   an apparent oncogenic response, right?
14      A.    Yes.
15      Q.    So the registration division is not
16   confident that this is a real response, right?
17      A.    Well, it would come as no great surprise
18   that there were differences of opinion even within
19   the agency about the interpretation of the study.
20          So some of the scientists felt fairly
21   strongly that it was a clear oncogenic response and,
22   I think, maintained that position throughout the
23   assessment, and others adopted a different view in
24   response to Monsanto's determination to keep
25   bringing up new data, new arguments, resection of

Page 247

1    the slides.
2          As we're going to get to, the final
3    position of EPA in this reregistration standard was
4    to follow the advice of the scientific advisory
5    panel and require Monsanto to do a new mouse study
6    and a new rat study.  And then, of course, as I
7    testified earlier, OPP provided Monsanto with a very
8    detailed explanation of a rigorous protocol for a
9    new male mouse feeding study designed to
10   specifically resolve the apparent tentative,
11   equivocal issues related to whether the
12   statistically increased incidence of renal tubular
13   adenomas in this study were treatment related.
14          That's the -- that was the underlying
15   controversy, and the identification of this -- what
16   I call it, a magic tumor in the Male Mouse
17   Number 1028 was -- if that had not occurred and if
18   we -- there wouldn't have been a reassessment of
19   this study.
20          It was really Monsanto's ability to
21   interject Dr. Kuschner's assessment of the slides
22   that kept the debate opened, kept requiring the EPA
23   to spend staff and scientific resources in
24   responding to Monsanto's ongoing submissions,
25   arguments, information data on the question.

Page 248

1          So that's -- that would have -- that was
2    the appropriate and proper way for this underlying
3    uncertainty to be resolved.  It's what EPA put in
4    the registration standard document, which is the
5    appropriate place for such a request or requirement
6    to be imposed on the registrant.
7          In my opinion, a responsible company, a
8    company that really wanted to be sure that the most
9    heavily used and widely sold herbicide in the world
10   surely did not contribute to increased cancer risk,
11   they would have done the study as EPA had requested
12   and required.
13      Q.    And EPA has resolved the uncertainty
14   today by concluding that glyphosate is not a human
15   carcinogen, correct?
16      MR. LITZENBURG:  I object to form.
17      THE WITNESS:  The EPA changed the
18   classification of glyphosate because they --
19   they didn't -- were unable to convince Monsanto
20   to do the requested additional studies, and the
21   agency felt that it was time to move on to other
22   things.  And it just -- they didn't -- they
23   didn't want to continue the assessment of that
24   particular cancer study.
25          I -- it is my opinion that some of the

Page 249

1    EPA scientists that signed the document in March
2    of 1985 still felt when this registration
3    standard came out that the BioDynamic mouse
4    study caused a treatment-related, statistically
5    significant increase in renal tubular adenomas.
6    That's my opinion.
7    BY MR. COPLE:
8       Q.    Your opinion about some of the scientists
9    still felt that there was oncogen in 1985, as a
10   statistically significant level, was based upon you
11   speaking with specific members of that review group?
12      A.    No.  It was from reading the EPA
13   documents that have been part of the record for a
14   number of years.
15      Q.    Well, there's eight scientists listed on
16   that memo.
17      A.    Correct.
18      Q.    Which of the ones still felt that way,
19   based on your personal opinion?
20      A.    Well, I place a lot of weight on the
21   transcript of the SAP meeting that Lacayo
22   participated in, Kasza participated in, and
23   Dr. Farber.  Those were the only three members of
24   the OPP scientific staff that attended the meeting,
25   but it's clear from my reading of the resume -- of

CONFIDENTIAL

Page 250

1  the transcript of that SAP meeting that the -- the
2  EPA pathologists had not changed their view on
3  whether Control Mouse 1028 had a renal tubular
4  adenoma.
5      They did not agree with Dr. Kasza's --
6  with Dr. Kuschner's observation, nor did they agree
7  with the other 11 or 12 pathologists that Monsanto
8  hired and brought to the meeting to back up their
9  position.
10     Q.   EPA has changed the classification that
11  it stands by today based on the 14 animal
12  carcinogenicity studies that it has, right?
13         MR. LITZENBURG:  I object to form.
14         THE WITNESS:  You're asking me if they
15     have done that?
16  BY MR. COPLE:
17     Q.   Well, they have done that, and it's based
18  on the 14 animal carcinogenicity studies.  That's
19  now their database, correct?
20         MR. LITZENBURG:  I object to testimony by
21  counsel.
22         THE WITNESS:  Certainly, the 14 animal
23     feeding studies on glyphosate active ingredient
24     were an important part of EPA's more
25     contemporary review of glyphosate oncogenicity,

Page 251

1  yes.
2  BY MR. COPLE:
3      Q.   As well as the 54 genotoxicity studies
4  the EPA has reviewed, right?
5      A.   Throughout the record of review of
6  glyphosate oncogenicity, the genotoxicity or
7  mutagenicity data has been very important.  If
8  the -- if the modern assays that have been used to
9  confirm the genotoxicity of glyphosate and
10  glyphosate-based herbicides -- had they been
11  available and applied to glyphosate and
12  glyphosate-based herbicides in the '80s as opposed
13  to 20 years later, the EPA would have been aware of
14  genotoxicity data, and I think it quite likely would
15  have altered the -- altered the course, the
16  regulatory course of glyphosate going forward.
17     Q.   You never discussed that issue with
18  anyone at EPA at the time?
19     A.   Not at the time, no.
20     Q.   And EPA's current position is also based
21  upon its review of all available epidemiology
22  including the published Agricultural Health Study,
23  right?
24     A.   We've already talked about that.
25     Q.   All right.  And Page 6 of this

Page 252

1  registration, we're still in the middle paragraph,
2  and one of the concerns raised by the registration
3  division that somehow contributed to an apparent
4  oncogenic response which -- regarding glyphosate was
5  the quite high doses that were tested; is that
6  right?
7      A.   Of pure glyphosate, correct.
8      Q.   Yes.  And that includes a high-dose group
9  of 30,000 parts, right?
10     A.   That was the high-dose group, correct.
11     Q.   And that's an appropriate reason for the
12  registration division to be concerned about a
13  marginal response at best, correct?
14     A.   Well, the EPA guidelines applicable
15  pretty much over this whole period required
16  registrants to design studies so that the high-end
17  treatment group approached the maximum tolerated
18  dose, and there is substantial discussion of whether
19  the 30,000 ppm treatment group of mice in the
20  BioDynamic study exceeded that level.
21     Again, Monsanto felt that it had EPA
22  scientists, and certainly a number of the members of
23  the various SAPs that looked at it felt that it
24  hadn't, because actually, the survival was higher in
25  the maximum control group than in the -- in the

Page 253

1  maximum treatment group than in the control group.
2      The hallmark of the maximum tolerated
3  dose being exceeded in the chronic feeding study is
4  lower survival in the maximum or high level
5  treatment group, and that didn't happen in this
6  study.  So, you know, that's why there's been
7  ongoing debate about whether the top-level dosage
8  group in this particular study was excessive or not.
9      Q.   The OPP registration division was
10  specifically concerned that the doses tested were
11  quite high?
12     A.   Well, they acknowledged that they were
13  quite high.  Yes, they were high.
14     Q.   They were also concerned in the
15  registration division that they didn't see
16  corresponding increase in the incidence of
17  preneoplastic changes such as hyperplasia or
18  dysplasia, right?
19     A.   Correct.  That's noted in the report.
20     Q.   What's hyperplasia?
21     A.   Undifferentiated cell mass.  It would
22  be -- a pathologist would consider it as a possible
23  evidence of cells progressing towards a tumor.
24     Q.   And what is dysplasia?
25     A.   Gosh, I can't give you the technical

Page 254

1  definition.
2      Q.   You're not an expert on preneoplastic
3  changes?
4      A.   No.
5      Q.   And preneoplastic changes are an
6  important consideration in evaluating whether there
7  is an oncogenic response to exposure to a chemical,
8  right?
9      A.   It's discussed specifically in the case
10 of these glyphosate chronic feeding -- it's
11 discussed as among a range of other issues.
12     Q.   And the registration division, in the
13 last sentence of this middle paragraph, repeated the
14 observation that the consensus group made in the tox
15 branch, which is that glyphosate was negative in a
16 number of acceptable mutagenicity studies;
17 therefore, the compound, meaning glyphosate, is not
18 known to be genotoxic, right?
19     A.   That's what it says.
20     Q.   And nothing has changed EPA's viewpoint
21 about that conclusion in all of the ensuing years
22 since August 1986; it still concludes that
23 glyphosate is not genotoxic, right?
24          MR. LITZENBURG:  Form.  Asked and
25 answered.

Page 255

1          THE WITNESS:  I'm -- I'm not prepared to
2  agree with that until I do a detailed review of
3  their final reregistration document.  That's
4  when they're going to articulate their final
5  judgments.  They're about to put this
6  December 2017 human health risk assessment out
7  for public review and comment.  It's subject to
8  ongoing technical reviews within the agency.
9  It's not their final position.
10         And I can assure you that there will be a
11 number of comments submitted by scientists
12 outside the agency in reference to the growing
13 body of scientific evidence showing that
14 glyphosate and glyphosate-based herbicides are
15 in fact genotoxic.
16 BY MR. COPLE:
17     Q.   So after you review the document put out
18 for public comment, will you have new opinions that
19 you'll form about glyphosate and carcinogenicity?
20     A.   I -- I don't know.  I doubt it, but I
21 need to do that -- to do that review.  There's many
22 aspects about the regulatory view and actions taken
23 by EPA about glyphosate and glyphosate-based
24 herbicides that are important, that I've either
25 studied or have opinions on.  By virtue of the

Page 256

1  assignment that I agreed to take on, on behalf of
2  plaintiff's attorneys in this case, I spent a lot of
3  time reading the full record of back and forth
4  between Monsanto and EPA on the interpretation of
5  this particular BioDynamic mouse studies, and it's
6  my professional opinion that if the agency had
7  access to and been aware of the results of modern
8  contemporary genotoxicity assays, that they most
9  likely would not have changed the classification of
10 glyphosate from the then applicable possible human
11 carcinogen classification.
12         So the question of genotoxicity was in
13 fact very important in the history of this
14 assessment, and given that, by the end of 1999,
15 Monsanto was fully aware of the positive evidence in
16 the open scientific literature.  They were fully
17 aware and very concerned about the heightened
18 toxicity of glyphosate-based herbicides, herbicides
19 with the surfactants that altered the toxicity,
20 altered the ability of glyphosate to inner cell
21 membranes.
22         They knew they had a serious regulatory
23 problem.  That's why they commissioned Dr. Parry to
24 do the assessment.  They were hoping they could
25 cultivate him as a glyphosate-friendly scientist,

Page 257

1  and they were very disappointed, obviously, that
2  Dr. Parry's assessment of the genotoxicity database
3  as of late 1999 led him to feel that there was in
4  fact evidence of genotoxicity through two different
5  modes of action.
6          Furthermore, Dr. Parry provided to
7  Monsanto a detailed memorandum of the additional
8  genotoxicity studies that he felt were justified and
9  needed to clear up any ambiguity about the results
10 of existing and then published peer-reviewed
11 genotoxicity studies.  He outlined the recommended
12 studies in considerable detail and made it quite
13 clear to Monsanto that he was prepared to conduct,
14 certainly, some of them, because he actually had
15 developed some of these new modern studies.
16         But unfortunately, Monsanto at the time
17 decided that they were not going to accept and act
18 on Dr. Parry's recommendations, and in fact, they
19 basically over a period of about six months ended
20 their association with Dr. Parry, because they
21 didn't like the answers they got from him.
22     Q.   You never discussed Dr. Parry's opinions
23 with him, did you?
24     A.   No.  I just read them.
25     Q.   You read them in the company documents?

CONFIDENTIAL

## Page 258

1    A.   Correct.
2    Q.   And have formed a personal opinion about
3  what those documents mean, right?
4         MR. LITZENBURG:  Form.
5         THE WITNESS:  I read Dr. Parry's detailed
6  analysis of the existing published genotoxic
7  studies as well as all of the genotox studies --
8  proprietary genotox studies that Monsanto
9  decided to share with him.  I do not know -- and
10  I am fairly certain that Dr. Parry was not
11  provided all of them.  I think he was provided
12  several of them, but I can't answer the question
13  of which ones and what percent of the Ames test,
14  mutagenicity assays, genotox studies that
15  Monsanto had submitted to EPA from 1974 to 1999
16  that Dr. Parry was asked to review.
17         But I do know what Dr. Parry said in his
18  report.  It's a very straightforward report.  He
19  went through each study and said whether he felt
20  that there was evidence of a genotoxic impact of
21  either exposure to glyphosate or
22  glyphosate-based herbicides.  Some of the
23  studies looked at and assessed the response to
24  both.
25         Dr. Parry highlighted, as most scientists

## Page 259

1  that looked at this same body of literature,
2  that there was a much more frequent and more
3  serious and worrisome genotoxic response to
4  exposures to glyphosate-based herbicides as
5  opposed to pure glyphosate; and because of that,
6  Dr. Parry suggested a number of genotox studies
7  and advanced new tests that were coming out at
8  the time of both glyphosate-based herbicides and
9  the pure active ingredient to get a quantitative
10  handle on how much higher the genotox risks were
11  actually in the real world where people applied
12  formulated glyphosate-based herbicides, because
13  nobody applies straight glyphosate.
14  BY MR. COPLE:
15    Q.   So you read Dr. Parry's communications in
16  the company documents, and you formed your personal
17  opinion about what it means, right?
18         MR. LITZENBURG:  Objection.  Asked and
19  answered.
20         THE WITNESS:  In the list of documents --
21  BY MR. COPLE:
22    Q.   That's a yes-or-no question.  Did you do
23  that or not?
24    A.   No.  No.
25         MR. LITZENBURG:  He's answering the

## Page 260

1  question.
2         THE WITNESS:  I heard your question, sir.
3  There are many communications between Dr. Parry
4  and Monsanto.  I know I read some of them.  I'm
5  quite certain I didn't see them all.
6  BY MR. COPLE:
7    Q.   Whatever you read, you read in the
8  company documents and then you formed your personal
9  opinion about what they mean, right?
10         MR. LITZENBURG:  Asked and answered.
11         THE WITNESS:  I didn't form a personal
12  opinion.  I read Dr. Parry's opinion.
13  BY MR. COPLE:
14    Q.   So you have no personal opinion?
15         MR. LITZENBURG:  I object to form.
16         THE WITNESS:  My understanding --
17  BY MR. COPLE:
18    Q.   I don't need the answer to that question.
19    A.   May I answer, sir?  You asked the
20  question.
21         MR. LITZENBURG:  Don't interrupt.  All
22  right.  Wait for the question.
23         MR. COPLE:  I'll withdraw the question.
24         MR. LITZENBURG:  Don't answer the
25  question.

## Page 261

1  BY MR. COPLE:
2    Q.   These modern methods of genotoxicity that
3  you're referring with Dr. Parry, you're not an
4  expert who has expertise to judge the utility or the
5  modernity of those methods, right?
6    A.   I don't present myself as an expert in
7  genotoxicity testing methodologies.  I don't have an
8  advanced degree in the relevant scientific
9  disciplines, and I've never worked in a lab
10  conducting such studies.
11         However, I have read many of the studies,
12  and I have an understanding of how they're carried
13  out, how they're interpreted, and I have a fairly --
14  I'm fairly confident of my understanding of the
15  genotoxic database and genotoxicity of glyphosate
16  and glyphosate-based herbicides over time as that
17  area of scientific assessment evolved.
18    Q.   And that would include that in 1986, in
19  August, the registration division concluded that
20  glyphosate is not known to be genotoxic, right?
21    A.   That's -- that was part of the
22  registration standard document, correct.
23    Q.   And today, in 2018, EPA's position is
24  unchanged and has concluded that glyphosate is not
25  genotoxic, correct?

CONFIDENTIAL

Page 262

1    MR. LITZENBURG:  Asked and answered.
2    THE WITNESS:  As I said, I and many other
3  people are waiting for the final glyphosate
4  reregistration document to come out.  It's still
5  in the, hopefully, final stages of the process.
6  It's been almost ten years now.  And I am quite
7  certain that the discussion of genotoxicity in
8  the final glyphosate reregistration document
9  that comes out later this year, maybe next year,
10 will be quite different from the discussion in
11 the 1986 registration standard.
12    The science has moved on.  There are
13 dozens of additional studies, and one of the --
14 one of the components of the final document that
15 would be looked at in considerable detail by a
16 number of people that are concerned about the
17 health risks associated with glyphosate-based
18 herbicides will be the interpretation and weight
19 placed on peer-reviewed published studies
20 documenting clear genotoxic effects from
21 exposure to glyphosate-based herbicides.
22    That will be one of the issues of
23 considerable concern and no doubt controversy
24 once that final reregistration document is
25 issued.

Page 263

1  BY MR. COPLE:
2    Q.    EPA has already discussed its views on
3  genotoxicity and glyphosate, concluded there is none
4  in its 2017 update of the OPP issues paper, right?
5    A.    Right.  That draft, human health risk
6  assessment, will be the document published in the
7  Federal Register and for which public comments will
8  be solicited.
9    I don't believe they've taken that step
10 yet, and it is almost inevitable that there will be
11 a number of comments addressing some of the -- well,
12 many of the peer-reviewed published genotoxicity
13 studies that report adverse -- adverse impacts from
14 primarily glyphosate-based herbicides, but some of
15 the studies also report genotoxicity from pure
16 glyphosate.  And I -- I think it will -- it will be
17 incumbent upon EPA given that this is probably one
18 of the -- there's really three -- there's three
19 primary reasons that explain the difference between
20 the IARC classification of glyphosate and
21 glyphosate-based herbicides and EPA's, and one of
22 the three is the interpretation of the public -- the
23 published scientific literature on genotoxicity,
24 which, according to IARC, provides strong evidence
25 of two mechanisms of action that are indicative of

Page 264

1  and can lead to cancer.
2    Q.    The EPA disagrees with IARC on that
3  point, and IARC is not a regulator.  I would agree.
4    A.    IARC is not a regulator.  I would agree.
5  And I look forward to, as do many people, EPA's
6  final assessment and how much weight they put on the
7  peer-reviewed literature showing genotoxic effects
8  of glyphosate-based herbicides.
9    Q.    Now, in 1986, the registration division
10 concluded that after reviewing all the available
11 evidence, the scientific advisory panel proposed
12 that glyphosate be classified as Class D, or having,
13 quote, "inadequate animal evidence of
14 carcinogenicity."
15    That's what the registration division
16 concluded, right?
17    A.    Well, they are simply reporting what the
18 SAP said in its report, and the SAP also said that
19 EPA should require Monsanto to redo the mouse and
20 rat oncogenicity studies to provide a firmer
21 scientific basis to resolve the tentative equivocal
22 uncertain interpretation of the BioDynamic mouse
23 study.
24    Q.    Which EPA now has 14 of those studies on
25 carcinogenicity on animal models?

Page 265

1    A.    The EPA has 14 studies conducted on
2  100 percent pure glyphosate that include dosage
3  ranges from clearly well below the MTD and others
4  that are certainly up in the range of the MTD.  Yes.
5  There's 14 of those studies on pure 100 percent
6  glyphosate.  None on, by the way, on formulated
7  glyphosate-based herbicides, which is really what
8  needs to be done and what a responsible company
9  would have done to resolve once and for all this
10 ongoing controversy about the potential of
11 glyphosate-based herbicides to cause cancer.
12    Q.    The SAP determined that the oncogenic
13 potential of glyphosate could not be determined from
14 existing data in 1986 and proposed that the study be
15 repeated in order to clarify the equivocal findings,
16 right?
17    A.    Correct.
18    Q.    And all these years later, decades later,
19 what EPA has to make its determination are the 14
20 studies you just referenced, right?
21    A.    I'm sorry, I missed the last part of your
22 question.  Could you restate it?
23    Q.    Yes.  As the SAP said in 1986, that there
24 was insufficient data to determine oncogenicity
25 based on the existing data, and decades later now,

CONFIDENTIAL

Page 266

1  as we sit here today, EPA has the 14 carcinogenicity
2  studies which it uses to reach its determination of
3  not carcinogenic to humans?
4          MR. LITZENBURG:  Form.  Asked and
5  answered.
6          THE WITNESS:  That is a -- that correctly
7  states the current stated EPA position.  And
8  it's a scientific judgment that the EPA has made
9  based on a set of data that differs dramatically
10  from the scientific judgment reached by IARC
11  after the review of a different set of studies
12  that did not include the old, mostly old and
13  outdated industry-submitted studies that are not
14  published, for the most part didn't include
15  them, but did include published studies that had
16  been done and have come out; and that's
17  really -- as I said, there's three -- three
18  scientific explanations for the difference in
19  the judgment reached by the IARC working group
20  and the EPA relative to the potential of
21  glyphosate-based herbicides to cause cancer.
22          THE VIDEOGRAPHER:  Excuse me, Counselor.
23  Can we take a short break?
24          MR. COPLE:  Why don't we take five
25  minutes.

Page 267

1          THE VIDEOGRAPHER:  The time is 4:19, and
2  we are off the record.
3          (Break in proceedings.)
4          (Benbrook Exhibit Number 12 is marked for
5  identification.)
6          THE VIDEOGRAPHER:  The time is now 4:27,
7  we are on the record.
8  BY MR. COPLE:
9      Q.    Dr. Benbrook, we've marked as Exhibit 12
10  to the deposition the verbatim glyphosate SAP
11  transcript, which is dated April 3, 1986.
12          Have you seen this document before?
13      A.    Yes.
14      Q.    Have you read it?
15      A.    Yes.
16      Q.    You read it in forming your opinions?
17      A.    Yes, I did.
18      Q.    Now, on the second full page after the
19  coverage page, there's a list of the panel members.
20          Do you see that?
21      A.    Yes, sir.
22      Q.    It's got a Dr. Kilgore; executive
23  secretary is Mr. Johnson; Dr. Bergman; Dr. Clarkson;
24  Dr. Grisham; Dr. Lech; Dr. von Rumker; and
25  Dr. Swenberg.

Page 268

1          Do you know any of these individuals?
2      A.    No.
3      Q.    Have you heard of any of these
4  individuals?
5      A.    Dr. Kilgore was on multiple SAPs.  Some
6  of these other folks were on some others.  They were
7  some of the outside scientists that EPA asked to
8  serve on the SAP.  I knew Steve Johnson quite well.
9  He was one of the senior managers in OPP that I
10  interacted with quite a bit in the '80s and on into
11  the '90s.
12      Q.    So you do know Steve Johnson as the
13  executive secretary?
14      A.    Yeah.  He wasn't a member of the SAP.
15  He's the executive secretary.  He's an EPA employee.
16      Q.    All right.  All of these members of the
17  SAP are selected by EPA; is that correct?
18      A.    Yes.
19      Q.    And these members are not or would not
20  have been affiliated with Monsanto, right?
21      A.    I don't have any detailed information on
22  whether they consulted with Monsanto in the past or
23  had any involvement with the company.  I didn't -- I
24  have no information on that.  I can't say whether
25  they did or did not.

Page 269

1      Q.    The EPA would have selected these eight
2  individuals in order to provide independent review
3  and advice to the agency on glyphosate and
4  carcinogenicity, right?
5      A.    That's certainly the hope.
6      Q.    None of the employees would have been --
7  I'm sorry.  None of the members of the SAP as listed
8  here would have been employees of EPA at the time,
9  right?
10      A.    Of EPA, no, they would not have been.
11      Q.    So this is an independent panel, like
12  other SAPs are, and back in 1986, established or
13  assembled by EPA so we could get an independent
14  evaluation of the issues that were before the
15  registration division; is that correct?
16      A.    As I said, that's certainly what EPA
17  strives for in deciding upon the composition of an
18  SAP panel.
19          MR. COPLE:  Let's mark this document as
20  Exhibit 13 for the deposition.
21          (Benbrook Exhibit Number 13 is marked for
22  identification.)
23  BY MR. COPLE:
24      Q.    Have you seen this document previously?
25      A.    Yes.

CONFIDENTIAL

Page 270

1    Q.   Did you review it as part of the work you
2  did in preparing your expert report?
3    A.   Yes.
4    Q.   This is a transmittal by EPA of the final
5  FIFRA scientific advisory panel meeting reports from the
6  February 11 to 12, 1986, meeting, which included as
7  Number 1 a set of scientific issues being considered
8  by EPA as the agency in regard to the registration
9  standard for glyphosate.
10        We're in agreement about that, right?
11   A.   Yes, sir.
12   Q.   All right.  If you could go to the -- not
13 counting the cover page of the EPA-archived
14 document, if you go to the second page, there's a cc
15 list, and the first one, it says the "Panel
16 Members."  That would be the SAP members, correct?
17   A.   Correct.
18   Q.   Then there's a series of individuals:
19 Moore, Lamb, Heier, Sherman, Melone, Campt.
20        Do you know any of those individuals?
21   A.   I know John or Jack Moore.  I know Jim
22 Lamb.  I knew Susan Sherman.  I know John Melone,
23 and I know Doug Campt.  I don't know who the EPA
24 participants were.
25   Q.   Did you discuss back in this timeframe

Page 271

1  the SAP panel review of glyphosate as part of the
2  registration standard that occurred February 11 to
3  12, 1986?
4    A.   I certainly don't have any recollection
5  of doing so.  I doubt that I did.
6    Q.   Have you discussed your work on this case
7  since the time of this SAP meeting -- SAP hearing?
8    A.   Discussed?
9    Q.   With these individuals.
10   A.   No, sir.
11   Q.   The ones that you said that you know.
12        This is a unanimous panel report
13 according to the next -- if you turn to the next
14 page, after the signature page by Mr. Johnson.
15        I think you said you know Mr. Johnson
16 somewhat well.
17   A.   Yep.
18   Q.   But he was not a member.  He was just the
19 executive secretary.
20   A.   Right.
21   Q.   On the next page after that, it says --
22 in the last full paragraph above the heading that
23 says "Report of SAP Recommendations," it says, "In
24 consideration of all matters brought out during the
25 meeting and careful review of all documents

Page 272

1  presented by the agency," meaning EPA, "the panel
2  unanimously submits the following report."
3        And if you go onto the following -- the
4  following page, there is a continuation of issues
5  being described by the panel.  This is in the
6  unanimous report.
7        Now, first of all, at the top, there are
8  two numbered paragraphs, and what do these
9  paragraphs represent?
10   A.   Those were the two specific scientific
11 questions or clusters of issues that EPA asked the
12 scientific advisory panel to review and comment on
13 and help the agency work through.
14   Q.   So these are sometimes called the "charge
15 questions," is that right?
16   A.   Sure.  Yeah.
17   Q.   This is what the panel was asked by EPA
18 to take a look at and hear evidence on, correct?
19   A.   Correct.
20   Q.   And the first one was the "Based on the
21 agency's weight of the evidence assessment with
22 emphasis on the mouse kidney tumors, the agency has
23 classified glyphosate as Class C (possible human)
24 carcinogen."
25        Do you see where it says that?

Page 273

1    A.   Yes, sir.
2    Q.   All right.  And it goes on to say, "The
3  agency specifically requests any comment from the
4  panel that the panel may wish to present regarding
5  its assessment of the weight of evidence and
6  subsequent determination of carcinogenicity
7  according to the agency's cancer guidelines."
8        All of this is based upon that 1983
9  BioDynamic mouse study, right?
10   A.   And the renal tubular adenomas, yes, sir.
11   Q.   Yes.  And it also involves the -- what
12 was found to be, by independent pathologists that
13 were obtained by Monsanto -- to have an additional
14 tumor in the control group for the mice tested in
15 that study, right?
16   A.   I'm not comfortable with the
17 characterization of Dr. Kuschner as an independent
18 pathologist.  He was a pathologist hired and paid
19 for by Monsanto, who I think fully understood what
20 the expectation was in his review.  I don't believe
21 that -- necessarily that it was a truly independent
22 review.
23   Q.   This charge question was to look at all
24 aspects of the weight of the evidence in that
25 BioDynamics mouse study, right?

CONFIDENTIAL

Page 274

1    A.    Okay.
2    Q.    And that includes the tumor that was
3  identified in the control group, right?
4    A.    The additional magic tumor in Control
5  Mouse 1028, yes.
6    Q.    You used the term "magic tumor," not only
7  in your testimony today, but in a number of places
8  in your report.  Is that a term that EPA has used to
9  describe the control group tumor?
10    A.    No.
11    Q.    Is that a term that is used in the
12  scientific evaluation of pathology slides, "magic
13  tumor"?
14    A.    I haven't encountered it.
15    Q.    So you came up with that phrase?
16    A.    Yeah.  I came up with it.
17    Q.    It has no scientific significance or
18  relevance, right?
19    A.    I think the -- my discussion of the --
20  the process that led to the identification of an
21  additional tumor in this control animal is spelled
22  out in considerable detail in my report, and my
23  opinions about it are also spelled out.
24        In short, and basically, the EPA
25  pathologists that looked at the same slides as the

Page 275

1  Monsanto-hired or BioDynamic-hired pathologists did
2  not see and did not agree that there was an
3  additional tumor in that control mouse; but
4  surprisingly, perhaps, all of the pathologists that
5  were hired by Monsanto to look at the original
6  slides or the resection slides did see the tumor.
7    Q.    And this was convincing to the
8  independent SAP that convened on February 11 and 12,
9  1986, right?
10    A.    Well, as Dr. Gingerich noted in one of
11  his emails to Monsanto colleagues there, Monsanto
12  had observed, over a series of scientific advisory
13  panel meetings, a tendency to kind of count the
14  votes of the scientists present.  And Monsanto --
15  part of their strategy for influencing the outcome
16  of the scientific advisory panel meeting was to hire
17  a number of scientists with expertise in the area to
18  bring to the meeting to voice their opinion about
19  the study and reinforce and support Monsanto's
20  position on the findings in the BioDynamic mouse
21  study.
22    Q.    Are you contending that the eight
23  independent scientists that sat on the SAP for the
24  glyphosate review were not competent enough to
25  evaluate the various submissions and testimony of

Page 276

1  the pathologist?
2    A.    I wasn't referring to them in my response
3  to your question.  I was referring to the scientists
4  invited to attend the SAP meeting and paid for to
5  attend the SAP meeting by Monsanto, that were in the
6  audience.  I'm not talking about the panel members.
7  I'm talking about people who were invited by
8  Monsanto and allowed by EPA to present their views
9  on the slides in this particular mouse study.
10    Q.    This was not a decision that was made by
11  those pathologists that testified before the SAP; it
12  was a decision made by the SAP as a recommendation
13  of the EPA, right?
14    A.    Correct.
15    Q.    So whatever testimony and whatever
16  submissions were made by the pathologists, all of
17  them, to the SAP, it was the job of the SAP
18  scientists, all eight of them, to evaluate that
19  information, correct?
20    A.    Correct.
21    Q.    The second charge question also said --
22  also requested that the SAP consider what weight
23  should be given to this marginal increase in kidney
24  tumors, the importance of this type of tumor in the
25  assessment of carcinogenicity in glyphosate, and the

Page 277

1  weight placed on historical and current controls for
2  this type of evaluation.
3        This is a second, though in some ways
4  related, charge question to the first one, correct?
5    A.    Correct.
6    Q.    All right.  The panel responded to the
7  charge question in a lengthy -- not a lengthy but a
8  large paragraph on this particular page, and it
9  starts out by saying that "with respect to
10  glyphosate, the SAP concurs that the data of renal
11  tumors in male mice are equivocal."
12        So the panel agreed with the registration
13  division?
14    A.    No.  Well, the registration division
15  doesn't render an opinion on the oncogenicity on
16  glyphosate or any other herbicide.  It's, of course,
17  the hazard evaluation division of the toxicology
18  branch, that part of OPP that at this point in time
19  classified -- tentatively classified, to use a word
20  in the registration standard document, that
21  glyphosate is a Group C, possible human carcinogen.
22  That was the position of the EPA going into the SAP
23  meeting.
24        The justification for EPA reaching that
25  judgment was explained during the SAP meeting in

CONFIDENTIAL

Page 278

1  some detail by Dr. Farber, and I think a couple of
2  the other EPA scientists added some commentary
3  during the actual SAP meetings.  So that was the --
4  so that was the conclusion, the existing conclusion
5  and judgment of the EPA scientists at the beginning
6  of the meeting.
7       Q.    So who was the panel concurring with
8  about the data on renal tumors in male mice being
9  equivocal?
10      A.    Who were they concurring with?
11      Q.    Yes.
12      A.    Well, they were concurring with the 10 or
13 12 scientists that were brought to the meeting by
14 Monsanto, hired as consultants by Monsanto, and I
15 guess they were acknowledging that Dr. Kuschner had
16 identified this additional tumor in the one control
17 mouse.
18           I think there's considerable discussion
19 among the SAP in the transcript about that
20 particular tumor, and as the SAP said very clearly
21 in its report, the interpretation of that one tumor
22 is equivocal.  Some pathologists saw it; other
23 pathologists didn't see it.  It just so happened
24 that all of the pathologists that saw the tumor and
25 felt it was there were paid for by Monsanto and

Page 279

1  brought to the meeting by Monsanto or were Monsanto
2  employees or had worked for BioDynamics.
3           Dr. McConnell, the principal pathologist
4  for BioDynamics, did not report a renal tubular
5  adenoma in Control Mouse 1028 when he did the
6  original -- his original reading of the slides and
7  reported the results of the study to Monsanto.  The
8  BioDynamic study, as submitted to Monsanto, reported
9  zero renal tubular adenomas in the control group
10 based on his read of the freshly sectioned slides.
11          Upon reassessment, Dr. McConnell changed
12 his finding and agreed with Dr. Kuschner that there
13 was one renal tubular adenoma in that one control
14 mouse.
15          All of the pathologists that were trained
16 and read the slides, that worked for EPA -- and I
17 actually only know of the two of them that read --
18 it's my understanding from the record, and I read it
19 very carefully, that they did -- they did not
20 agree -- at the end of this scientific advisory
21 panel, their views were not changed.  They did not
22 believe that any new information had been brought to
23 bear that changed their interpretation of that study
24 of zero tumors in the control, zero in the low-dose
25 group, one in the mid-dose group, and three in the

Page 280

1  high-dose group.
2           And had that interpretation of the study
3  remained the position of OPP, glyphosate would have
4  remained, in my opinion, classified as a possible
5  human carcinogen until additional data came forward.
6       Q.    The eight scientists that were appointed
7  and served on the independent SAP panel were
8  persuaded by the testimony and the submissions made
9  by the pathologist about a tumor in the control
10 group, correct?
11           MR. LITZENBURG:  I object to form.  Asked
12      and answered.
13           THE WITNESS:  They were persuaded that
14      the results were equivocal; that there was no
15      solid basis or evidence to agree with the EPA
16      pathologists; that felt that there was no tumor
17      in Mouse 1028, or evidence to agree with all of
18      the Monsanto-commissioned or paid-for
19      pathologists, all of which saw and reported
20      agreement that there was a single control mouse
21      with a renal tubular adenoma.
22 BY MR. COPLE:
23      Q.    The panel found that first it was
24 important to them that only small numbers of tumors
25 were found in any of the dose groups, right,

Page 281

1  including those at the highest dose, right?
2       A.    That's a factor that's brought up again
3  throughout the record in the interpretation of the
4  study.
5       Q.    And that was also important to the
6  independent panel, because at the highest dose, it
7  appeared to the panel to have exceeded the maximum
8  tolerated dose?
9       A.    There's a lengthy discussion by the panel
10 involving questions directed to the EPA scientists,
11 questions directed to the Monsanto scientists about
12 that very question of whether the maximum tolerated
13 dose was exceeded.
14          Had there been lower survival in the
15 high-dose group, I think it would have been a fairly
16 straightforward call, and I think there would have
17 been concurrence between the agency and Monsanto
18 that the maximum tolerated dose was exceeded; but
19 the fact that the survival rate in the high-dose
20 group was actually higher than the control group was
21 regarded by several of the scientists as strong
22 contradictory data to a judgment that the MTD had
23 been exceeded.  That's what the reports say.
24      Q.    The higher survival was in the maximal
25 dose levels, 30,000 parts per million.  Is that what

CONFIDENTIAL

Page 282

1  you're saying?
2      A.    Correct, in the males.
3      Q.    And the panel was concerned about the
4  small numbers of tumors overall that were found in
5  any group, right?
6      A.    That point was made, yes.
7      Q.    And the tumors being referred to by all
8  who reviewed this are adenomas, not carcinomas,
9  right?
10     A.    Correct.
11     Q.    The panel goes on to say that "The
12 majority of the pathologists who examined the
13 proliferative lesion in the male control animal
14 agreed that the lesion represented a renal adenoma."
15         So the panel was observing that the
16 majority of those pathologists that looked at it
17 concluded that there was a tumor, an adenoma tumor,
18 in the control group, right?
19     A.    Yes.  And this was because Monsanto had
20 brought -- I don't remember the exact number; it's
21 in my report -- I think there were ten consulting
22 pathologists and three Monsanto pathologists,
23 something like 13 in total.  That -- that's what --
24 that's what the panel members were referring to when
25 they speak about the majority of pathologists that

Page 283

1  voiced an opinion on whether that additional tumor
2  was in the control mouse.  That's what they are
3  noting in their report.
4      Q.    And it's the independent eight scientists
5  on the SAP who decide which of the pathologists'
6  views on existence or the nonexistence of tumors in
7  the control group that the panel is going to listen
8  to and be persuaded by, right?
9      A.    Right.  And as is clear in their report,
10 they were not persuaded by either side; felt that
11 the unresolved issues were important and
12 significant, and recommended to EPA to change the
13 classification to Group D and require Monsanto to
14 conduct a new mouse oncogenicity study and a new rat
15 oncogenicity study following the, you know, best
16 possible study designed to resolve these equivocal
17 issues that were discussed by the panel.
18     Q.    Right after the panel observes in its
19 report, in its response to the charge questions that
20 the majority of pathologists who examined the lesion
21 in the male control animal agreed that it
22 represented a renal adenoma, the panel said
23 immediately, "Therefore, statistical analysis of the
24 data should utilize this datum," right?
25     A.    Correct.  That's what it says.

Page 284

1      Q.    So the panel decided that based upon the
2  views of the majority of pathologists, that the
3  existence of an observed adenoma in the control
4  group for the mice should be taken into account in
5  doing the statistical analysis, right?
6      A.    Correct.  That's what it says.
7      Q.    So the panel did not dismiss it?  They
8  urged EPA to take it into account, right?
9      A.    That's what it says, yes.
10     Q.    The panel goes on to say that when the
11 statistical analysis is age adjusted, that "no
12 oncogenic effect of glyphosate is demonstrated using
13 concurrent controls."
14         This was the next observation of the
15 panel, right?
16     A.    Right.  Which is why the debate over this
17 one tumor in Male Mouse 1028 really -- the debate
18 over it held in balance the likely regulatory
19 history and future sales of glyphosate-based
20 herbicides.  If -- if EPA were convinced that one
21 tumor was in the control group, it turned a positive
22 study for oncogenicity into a negative study.  It's
23 just that simple.
24     Q.    The debate in front of the SAP panel was
25 decided and resolved by the independent scientists

Page 285

1  on the panel, not by the testifying pathologists,
2  correct?
3      A.    This is a -- yeah.  This is a report
4  developed by and concurred with by the seven members
5  of the panel.
6      Q.    Ultimately, the panel concluded that it
7  did not believe that it was possible to categorize
8  glyphosate clearly as a possible human carcinogen
9  under Group C or Group E, no evidence of
10 carcinogenicity, correct?
11     A.    Correct.
12     Q.    And the panel proposed that glyphosate be
13 categorized as Group D, not classified at all?
14     A.    Correct.
15     Q.    Therefore, to do a Data Call-In for
16 further studies in rats and/or mice to clarify and
17 unresolved questions, right?
18     A.    Right.
19     Q.    So the panel's -- from the panel's
20 standpoint, additional Data Call-In for studies
21 could be in rats, or they could be in mice, or they
22 could be in both, and that was up to EPA, right?
23     A.    Certainly, it would ultimately be EPA's
24 call on what studies to require and the design of
25 those studies.  We've already discussed in some

CONFIDENTIAL

Page 286

1  detail what EPA requested Monsanto conduct and carry
2  out and submit to the agency.
3      Q.    As far as the SAP was concerned, the
4  follow-up studies could be done in rats, or they
5  could be done in mice, or if --
6      A.    Or both.
7      Q.    -- if EPA decided, they could be done in
8  both, right?
9      A.    Correct.
10      Q.    And 25 years later, almost 35 years
11  later, EPA has looked at all of the existing data
12  and concluded that there is no evidence of human
13  carcinogenicity from exposure to glyphosate, right?
14      A.    That's their current classification.
15  Correct.
16      Q.    Let me go to these other documents first.
17  Let me go to the '89 now.
18          Let's mark as Exhibit 14.
19          (Benbrook Exhibit Number 14 is marked for
20  identification.)
21  BY MR. COPLE:
22      Q.    Have you seen this document before,
23  Dr. Benbrook?
24      A.    Yes.
25      Q.    Did you review it in connection with

Page 287

1  preparing your opinions and expert report in this
2  case?
3      A.    Yes, I did.
4      Q.    Can you tell us what it is?
5      A.    It's one of a series of EPA memoranda
6  addressing the issue of use of and interpretation of
7  this historical control data on the incidence of
8  tumors in male mice that respond to and evaluate
9  historical control data submitted to the agency by
10  Monsanto, along with Monsanto's interpretation of
11  the significance and relevance of that data to the
12  agency's assessment of the results of BioDynamic
13  mouse study.
14      Q.    All right.  Now, this is from a reviewer,
15  William Dykstra.  I think you said you know --
16      A.    I've met him.
17      Q.    You wouldn't say you know him?
18      A.    No.
19      Q.    But you didn't talk to William Dykstra at
20  the time of this memo being written by him, right?
21      A.    No, I did not.
22      Q.    Okay.  This goes to Robert Taylor, PM25.
23  Do you know what PM25 is?
24      A.    It's the mail stop in the registration
25  division, Pesticide Manager 25.

Page 288

1      Q.    Taylor is the herbicide branch chief --
2      A.    Right.
3      Q.    -- in the registration division?
4          And it goes through the acting branch
5  chief of toxicology or branch -- Toxicology Branch
6  I, Edwin Budd.
7          Do you know either Mr. Taylor or
8  Mr. Budd?
9      A.    I met Mr. Taylor three or four times.  I
10  never met Edwin Budd.
11      Q.    And it also went through William Berm,
12  deputy director of the HED, health effects division.
13          Do you know him?
14      A.    Yes, I know him.
15      Q.    All right.  Did you discuss this
16  particular June 19, 1989, memo prepared by
17  Mr. Dykstra with Mr. Berm or with Mr. Taylor?
18      A.    No, I did not.
19      Q.    If you go to Page 2 of this memo, and
20  under the -- there's three-quarters of the page says
21  Conclusions and Recommendations.
22      A.    Where?  Conclusions, Recommendations?
23      Q.    I'm on Page 2, Page Number 2.
24      A.    Oh, okay.
25      Q.    It says Conclusions and Recommendations.

Page 289

1      A.    Gotcha, top of the page.
2      Q.    Top of the page.
3          Now, there is a -- there is in the second
4  to last paragraph, that starts with a statement that
5  "Monsanto cites these data as showing an incidence
6  of 0 to 6 percent in the control or treating
7  groups," and it goes on to say, "the occurrences of
8  renal tubular tumors in treated groups were not
9  considered compound-related, which matches the upper
10  incidence of 6 percent in glyphosate study."  And it
11  concludes that "TB," the toxicology branch, "does
12  not consider these random data as convincing."
13          It goes on to say, "However, based on a
14  meeting held June 7, 1989, between Mr. Dykstra and
15  Mr. Budd and Mr. Berm, the toxicology branch
16  concludes that a repeated mouse oncogenicity study
17  is not required at this time," with the words "at
18  this time" underlined.
19          Do you see that?
20      A.    I do.
21      Q.    Do you know what this meeting was June 7,
22  1989?
23      A.    It was a meeting of these individuals in
24  the toxicology branch.
25      Q.    You have personal knowledge of the

CONFIDENTIAL

Page 290

1  meeting?
2     A.   I may have read a memo on the meeting.
3     Q.   You never spoke to anyone about what this
4  meeting was?
5     A.   No, sir.
6     Q.   It says, based on that meeting, Dykstra,
7  Budd and Berm, who were all employees of EPA in the
8  Toxicology Branch I.  Correct?
9     A.   Yes.
10    Q.   All right.  That they concluded,
11  presumably together, that the mouse oncogenicity
12  study is not required at this time.
13         This is the 1983 study, correct?
14    A.   What they're saying is that they're not
15  going to require or repeat the mouse study at this
16  time and that they're going to wait for the results
17  of the two-year rat study, which was well along at
18  this point in time.
19    Q.   In fact, the concluding sentence says, by
20  Mr. Dykstra, "After the results of the new two-year
21  rat chronic toxicity and oncogenicity study are
22  reviewed, the toxicology branch will reconsider
23  whether the repeat of the mouse oncogenicity study
24  is required."  Right?
25    A.   That's what it says.

Page 291

1     Q.   So at this point in time, it's June 1989,
2  and it's a little more than three years after the
3  SAP of February 11 and 12, 1986, had happened, and
4  three years on, the toxicology branch that had done
5  the initial review of the 1983 mouse study, is
6  considering whether to reconsider the repeating of
7  the mouse study and whether that's required, right?
8     A.   Yeah, that's what this memo is stating.
9     Q.   So this group of scientists had changed
10  their mind at EPA in terms of whether that repeat of
11  the oncology -- oncogenicity study of the 1983 mice
12  done by BioDynamics needed to be repeated or not,
13  right?
14    A.   Well, as it says, they're deferring their
15  final decision on it and waiting for the opportunity
16  to review the results of the rat study at this
17  particular point in time in the evolution of this
18  issue.
19    Q.   The two-year rat study -- the new
20  two-year rat study of chronic toxicity and
21  oncogenicity that's being referred to in this
22  paragraph by Mr. Dykstra, that -- that's the rat
23  study to be conducted -- that was being conducted on
24  behalf of Monsanto, correct?
25    A.   In response to the registration of

Page 292

1  standard document in 1986.  Correct.
2     Q.   And as envisioned by the recommendation
3  that the SAP independent scientists had made in 1986
4  after the SAP hearing, correct?
5     A.   Correct.
6     Q.   So this was the culmination as of
7  June 1989 of the SAP panel that heard the majority
8  of pathologists tell them that there was an adenoma
9  tumor that was found in the mice control group for
10  the 1983 study, right?
11    A.   I don't believe that this memo
12  represented the final end word.  It wasn't the
13  culmination of that.  This memo reflects the
14  position of the toxicology branch as of the date on
15  it -- was it June 1989?
16         There had been multiple letters,
17  meetings, transmission of data between Monsanto and
18  the Office of Pesticide Programs on a -- on a steady
19  basis from 1983 until this point in time.  It was --
20  it was apparent and clear to the Office of Pesticide
21  Program personnel that Monsanto was determined to
22  convince the agency to change its position on this
23  particular mouse study and would do whatever was
24  required to achieve that goal, short of redoing the
25  mouse study, which would have been what a

Page 293

1  responsible company would do given that EPA took the
2  time to develop and provide to Monsanto the
3  protocols for a highly sensitive, very rigorous
4  repeat mouse study, which I think most scientists
5  that are skilled at reviewing study designs would
6  say was much more powerful statistically than the
7  original '93 BioDynamic study.
8         And you never can predict what a new
9  study might show, but certainly EPA's hope and
10  expectation was that when Monsanto conducted that
11  new study following that EPA recommended protocol,
12  that it would have a solid, strong scientific basis
13  to turn the equivocal interpretation of the '83
14  study into one that was widely embraced both within
15  EPA and in Monsanto and by future SAPs.
16    Q.   At the time of this June 7, 1989, meeting
17  that was held between Mr. Dykstra, Mr. Budd, and
18  Mr. Berm and this document of June 19, 1989,
19  prepared by Mr. Dykstra, the classification for
20  oncogenicity for glyphosate was no longer in Group
21  or Category C, right?
22    A.   Well, that classification was -- it was
23  in play.  I don't recall seeing an official EPA
24  memorandum that said that the agency had officially
25  changed the classification as of this date.  I'm not

74

CONFIDENTIAL

Page 294

1  aware of that.
2      Q.   The SAP, however, three years earlier,
3  had recommended, based on the evidence they heard
4  from the majority of pathologists that they had
5  heard, that the classification be changed from C to
6  D, meaning not classifiable, right?
7      A.   That is correct.  That was the SAP
8  recommendation.
9      Q.   All right.  Let's go back to the SAP
10 verbatim transcript.  I don't have marked down the
11 number.  You have it in front of you.
12     A.   It's 12.
13     Q.   Twelve.  Exhibit 12.  Now, do you recall
14 who Dr. Swenberg was?
15     A.   Yes.
16     Q.   Who was he?
17     A.   A member of the panel.
18     Q.   Dr. Grisham?
19     A.   Yes.  He was a member of the panel too,
20 as well.
21     Q.   And Dr. Kilgore was the chairman,
22 correct?
23     A.   Correct.
24     Q.   All right.  Now, you have no reason to
25 doubt the independence of any of these scientists

Page 295

1  that were appointed to serve and did serve on the
2  EPA scientific advisory panel for glyphosate in '86,
3  right?
4      A.   I made no effort to try to track down
5  whether they might have any preconceived ideas,
6  financial conflicts of interest.  I didn't have the
7  time or opportunity to do that, so I can't speak to
8  it.
9      Q.   So you have no information sitting here
10 to suggest that they wouldn't be anything other than
11 independent, right?
12     A.   One way or another, no information.
13     Q.   All right.  If you go to Page 56 of the
14 hearing transcript.
15     A.   Okay.
16     Q.   Chairman Kilgore turns to Dr. Swenberg.
17 It's about two-thirds --
18     A.   Just --
19     Q.   Sure.
20     A.   Let me get a sense of is this after EPA
21 and Monsanto had made their presentations and the
22 open discussion had started?
23     Q.   Well, I'm just going to ask questions
24 about Dr. Swenberg.
25     A.   Okay.  Go ahead.

Page 296

1      Q.   All right.  Chairman Kilgore turns to
2  Dr. Swenberg, and Dr. Swenberg starts by saying,
3  "This is not an easy issue," and he thinks that
4  everybody involved can agree on that, that it's not
5  an easy issue.
6           Then he talks about the 1013 versus 0013
7  as "something that we need to deal with."  He says,
8  "I know Dr. Grisham and I have now had a chance to
9  look at that questionable tumor, and I think it's
10 very understandable why there is some disagreement
11 about it."
12          Now, you would agree that Dr. Swenberg
13 was talking about the adenoma that was observed by
14 the majority of pathologists testifying in the
15 control group for the '83 BioDynamics study?
16          MR. LITZENBURG:  Form.
17          THE WITNESS:  I think Dr. Swenberg is
18 indicating in this passage that he is not
19 convinced that the interpretation of the
20 Monsanto pathologist brought to the meeting is
21 correct.  If he felt that it was correct, he
22 wouldn't have said that it's such a difficult
23 issue.
24 BY MR. COPLE:
25     Q.   Well, he goes on to say, "It's a very

Page 297

1  small lesion but by classic definition, which in
2  differentiating a hyperplastic lesion from a
3  neoplastic lesion that's been used by the National
4  Toxicology Program at least, is if it exceeds the
5  width of -- the diameter of two tubules, this
6  particular lesion in the slide that was -- that is
7  here, it's approximately 5 diameters of the tubule."
8           That's what Dr. Swenberg was now
9  observing, right?
10     A.   That's what he says here, yes.
11     Q.   And he concludes based on that, that "So
12 on that basis, it would fall into the adenoma
13 category where there's going to be a strict
14 classification person," right?
15     A.   I kind of don't understand what he means
16 by "where there is going to be a strict
17 classification person."  I don't understand that.
18     Q.   Dr. Swenberg is now concluding that based
19 upon the diameter of the adenoma, or the lesion that
20 was seen in the slide for the control group, that he
21 sees this falling into the adenoma category, right?
22     A.   Well, as he says, he's making reference
23 to an NTP guideline, I assume, for histopathological
24 assessment of tumors.  And I'm not aware of that,
25 that particular provision, but this is -- yeah, this

CONFIDENTIAL

Page 298

1  is what he says.
2     Q.   You have no expertise on this, correct?
3     A.   No.  I would not present myself as an
4  expert pathologist.
5     Q.   According to this transcript on Pages 56
6  and 57, Dr. Swenberg is saying that he sees, based
7  on the diameter of the tubules for the lesions seen
8  on the control group slide, that it's now in the
9  adenoma category?
10    A.   It's his explanation of one criteria, one
11  test that another government agency, the National
12  Toxicology Program, apparently uses.  He said, if
13  one follows that, believes that, then in his
14  judgment, the tumor, the cell mass observed in 1028
15  -- Mouse 1028 would be an adenoma.  Yeah, that's
16  what it says.
17    Q.   All right.  So Dr. Swenberg continues in
18  his conversation with Chairman Kilgore, or in open
19  session -- he says, "In addition, something which
20  hasn't been mentioned is that one of the control
21  animals also had tubular hyperplasia, and frequently
22  when we're reviewing the NTP studies," National
23  Toxicology Program studies, "we look at a composite
24  of hyperplasia, benign adenomas, and carcinomas."
25         He says that as part of his explanation,

Page 299

1  that there may be a second tumor in the control
2  group, right?
3     A.   Correct.
4     Q.   Because he says specifically, "This then
5  brings us up to a numerator of 2 in the control
6  groups, which puts even additional question, I
7  think" -- he thinks -- "on the statistical validity
8  of whether or not we have a positive result,"
9  meaning a positive oncogenicity, right?
10    A.   That's what he is saying.  Correct.
11    Q.   So Dr. Swenberg is laying out his
12  criteria and his basis for concluding that based
13  upon everything he's seen, everything he's heard at
14  this hearing on February 11 and February 12, 1986,
15  that he now sees that there's not only a -- a lesion
16  that's an adenoma in the control group, but even the
17  possibility of a second one, correct?
18    A.   That's what he's addressing here.  Yes.
19    Q.   And the existence of even a single
20  adenoma in the control group may compromise the
21  outcome and evaluation of the 1983 study by the
22  toxicology branch concluding that there was
23  oncogenicity, right?
24    A.   That is correct.
25    Q.   And here, Dr. Swenberg is saying there's

Page 300

1  a possibility of two bases for a compromise of that
2  conclusion from June 1985, by the -- I'm sorry,
3  February 1985, by the toxicology branch?
4     A.   Right.  He speaks about the possibility
5  that the interpretation of the slides is correct.
6  But he also says it's a difficult to equivocal call.
7     Q.   And you have no -- no basis to disagree
8  with Dr. Swenberg's observations, correct?
9     A.   No.
10    Q.   Now, in your report, you discuss the fact
11  that some of the independent SAP scientists had
12  believed there was a tumor in the control group?  In
13  your expert report, did you discuss that?
14    A.   What paragraph are we talking about?
15    Q.   I'm asking you if you did discuss --
16    A.   Yeah.  I -- there's a lengthy section on
17  this scientific advisory panel meeting and
18  presentations and data discussed.
19    Q.   Well, which members of the independent
20  SAP did you identify in your report as concluding
21  that there was a tumor in the control group?
22         MR. LITZENBURG:  Form.
23         THE WITNESS:  I don't recall if I
24  specifically named any of the individual members
25  of the SAP panel.  I did name the consulting

Page 301

1  pathologist brought to the meeting by Monsanto.
2  I quoted -- I quoted their kind of summary
3  take-home message as recorded in the transcript,
4  but I don't think I attributed any individual
5  discussion item to a single member of the SAP.
6  I don't believe I did, but it's been a while
7  since I read it.
8  BY MR. COPLE:
9     Q.   So you don't think that you made any
10  comment identifying that an independent scientist
11  serving on the SAP itself in 1986 had come to the
12  conclusion like Dr. Swenberg did, that there was a
13  tumor in the control group, right?
14    A.   I'll have to go back and read the
15  section.
16    Q.   Well, we can go to page --
17    A.   You've got it.
18    Q.   We can go to Page 87 of your report.
19    A.   Okay.
20    Q.   And on Page 87, in numbered paragraph
21  456, 456, you talk about the three individuals at
22  the SAP meeting that supported the conclusion of no
23  tumor in Control Animal 1028, and that there were
24  EPA scientists, Farber -- it says Farber, Kasza, and
25  Lacayo, correct?

CONFIDENTIAL

Page 302

1    A.   Correct.
2    Q.   And that the 14 yes votes were the
3  pathologists retained by Monsanto to provide their
4  professional opinions, right?
5    A.   Correct.
6    Q.   And where do you claim -- where do you
7  identify that a member of the SAP independent
8  scientist group on the panel had also reached the
9  same conclusion as the majority of pathologists?
10       MR. LITZENBURG:  Form.
11       THE WITNESS:  I -- I don't believe I made
12    that statement, but in Paragraph 457, I write,
13    "Taking into account the uncertainty over the
14    number of renal tubular adenomas, the use of
15    historical controls and the statistical methods
16    used to judge whether the observed tumors were
17    treatment-related, the SAP's final judgment was
18    equivocal," and then I quote the primary summary
19    statement that we talked about earlier.
20  BY MR. COPLE:
21    Q.   It was equivocal because the panel had
22  suggested or recommended the EPA, in its final
23  report, that oncogen, a possible oncogen, Category C
24  be changed by the EPA to Group D, not classified,
25  right?

Page 303

1    A.   No, that's not right.
2    Q.   That's not right?  That's not what they
3  did?
4    A.   No.  The way you framed the question -- I
5  don't agree with the insertion embedded in your
6  question.
7    Q.   Let me try it again.
8    A.   Okay.
9    Q.   You said that the panel's recommendation
10  was equivocal regarding the continued classification
11  of glyphosate as Category C; is that correct?
12    A.   Correct.
13    Q.   And it was equivocal -- I'm asking, was
14  it equivocal because what the panel recommended was
15  that the classification be moved to D, which is not
16  classified at all?
17    A.   No.  It was equivocal because there was
18  remaining uncertainty about the additional renal
19  tubular adenoma possibly in Control Animal 1028.
20  There was ongoing uncertainty about whether the
21  maximum tolerated dose had been approached or
22  exceeded or whether that affected the results of the
23  study.
24       There was ongoing disagreement between
25  EPA and Monsanto over the appropriate use of

Page 304

1  historical control data in evaluating the specific
2  results of this 1983 BioDynamic mouse study,
3  despite, at this point, over three years of detailed
4  review and assessment and debate about the results
5  of this particular study, the -- I think the clear
6  conclusion of the SAP was that there simply was not
7  clear and convincing and consistent data to reach a
8  final conclusion about whether that particular study
9  was positive for this rare and worrisome kidney
10  tumor; and for that reason, they recommended that
11  additional studies, better data be collected through
12  a Data Call-In, and that in the interim, EPA change
13  the classification from Group C to Group D.
14    Q.   And three years later, Mr. Dykstra, who
15  was part of the original toxicology branch review in
16  1985, the 1983 mouse study, had been part of a
17  three-person meeting that concluded that they should
18  wait for the rat study to come in and then consider
19  whether the mouse, second mouse study was required
20  or not, right?
21    A.   Correct.
22    Q.   All right.  Now, in 456, on Page 87, the
23  Number 456 --
24    A.   Yep.
25    Q.   -- you comment that "The three

Page 305

1  individuals at the SAP meeting supporting the
2  conclusion that there was no tumor in Control Animal
3  1028 were the EPA scientists," as we talked about.
4       You go on to say that "All 14 yes votes
5  were expressed by individuals working for or hired
6  by Monsanto."
7       Well, Dr. Swenberg wasn't working for or
8  hired by Monsanto in any way, right?
9       MR. LITZENBURG:  Form.
10       THE WITNESS:  I'm not aware that he was
11    at the time.
12  BY MR. COPLE:
13    Q.   And Dr. Swenberg had the clear
14  conclusion, according to Pages 56 and 57 of the
15  transcript, that there was not only a control group
16  tumor identified based on the lesion characteristics
17  and the criteria used by NTP, but he also saw the
18  possibility of a second tumor in the control group
19  for the '83 study, right?
20       MR. LITZENBURG:  Form.
21       THE WITNESS:  Correct.  We've gone over
22    that, and he had other comments to make about
23    the difficulty of interpreting the particular
24    study.  And at the end of the day, I based -- I
25    based my review and assessment in a way that

CONFIDENTIAL

1   this SAP meeting affects my opinion about the
2   underlying issues on what the panel concluded
3   after all of its deliberations and taking into
4   account the differing views around the table.
5   To me, that was the important take-home message.
6       As Dr. Swenberg I think makes pretty
7   clear, the histopathological diagnostic criteria
8   that he was talking about were used by some
9   pathologists that worked for the NTP, and I
10  think Dr. Swenberg was one of those
11  pathologists, and he was bringing to the panel
12  that this is one set of criteria used by a
13  pathologist to address this difficult type of
14  question about, you know, whether a particular
15  cell mass is rightfully diagnosed as a renal
16  tubular adenoma or hypoplasia or a carcinoma.
17      I don't think, and I certainly did not
18  read from his comments before the SAP, that he
19  felt that that was the definitive and final
20  assessment of the issue. He was reporting the
21  useful information to the panel, which the panel
22  took into account no doubt in its final
23  judgment.
24  BY MR. COPLE:
25      Q.   Well, you just said you took into account

1   in preparing -- coming to your opinions and
2   preparing your report all of the varying -- all the
3   various viewpoints that were expressed at the SAP
4   hearing on the '83 mouse study that was held in
5   1986, on February 11 and 12.
6       There's nothing in your expert report
7   that identifies Dr. Swenberg's view of there being
8   not only one adenoma control group, adenoma
9   identified in the resectioning of the kidney, the
10  kidney slides, but a possibility of a second one.
11  You don't identify that in your report.
12      A.   And I don't identify any of the other
13  views expressed by other individual members of the
14  committee. I instead focused on the statement of
15  the committee at the end of its deliberations as
16  articulated in its final report.
17      Q.   Were there other members among the eight
18  scientists on the review panel, the independent
19  scientists who are members of the review panel, that
20  agreed with Dr. Swenberg's review that there was not
21  only one adenoma in the control group but possibly
22  two?
23      A.   I was not privy to whatever further
24  dialogues the committee had after the public
25  meeting. It's not part of the transcript. They

1   spend a certain amount of time in writing their
2   report. There's some ongoing dialogue, probably
3   some further interaction with the EPA scientists,
4   possibly some further interaction with some of the
5   consulting pathologists that Monsanto brought to the
6   meeting.
7       I, nor I think anyone in the public, has
8   no way of knowing any further details on why the
9   committee came out with the decision that they did.
10      If all of the members of the committee
11  had agreed or been persuaded that there were two
12  positives in the control group, as Dr. Swenberg laid
13  out a set of criteria that might lead to that
14  judgment -- if they had all been persuaded of that,
15  it's very clear to me that they would not have said
16  in their final report that it would be -- that the
17  panel feels that the data is inadequate to classify
18  glyphosate based on that one study. They would have
19  said it's a negative study. I mean, if there were
20  two positive tumors in the control group, zero in
21  the low treatment group, one in three, there's
22  nobody -- wouldn't need any fancy statistics to say
23  that that's not a positive study. So that is --
24  that's quite clear.
25      There had to have been some members of

1   the panel that were not convinced that there were
2   two renal tubular adenomas in the control group of
3   male mice. And I will venture a guess -- I will
4   venture a guess that Dr. Swenberg wasn't certain of
5   that either.
6       Q.   You had no basis to know one way or the
7   other what Dr. Swenberg was certain of, other than
8   looking at his actual testimony transcript, right?
9       A.   That is an absolutely true statement,
10  sir.
11      Q.   Who is Mr. Harness, can you tell me?
12      A.   Pardon me.
13      Q.   Mr. Harness?
14      A.   He's a Monsanto employee.
15      Q.   Did you talk to Mr. Harness about the
16  views of Monsanto regarding the 1983 mouse study?
17      A.   No, I can't imagine I ever did. I met
18  him a time or two, but I can't imagine this would
19  have come up.
20      Q.   And you never spoke to Dr. Swenberg about
21  the views he expressed on the record verbatim?
22      A.   I'll answer the same way I answered the
23  last time you asked me. No, I did not.
24      MR. COPLE: Let's mark this. Let's mark
25  this document Exhibit 15.

CONFIDENTIAL

Page 310

1    THE VIDEOGRAPHER:  Counsel, I want to let
2  you know we are at the seven hours.
3    THE WITNESS:  What did you say?
4    THE VIDEOGRAPHER:  We hit the seven
5  hours.
6    MR. COPLE:  Let's go off the record for a
7  second.
8    THE VIDEOGRAPHER:  The time is 5:31 p.m.
9  We are off the record.
10    (Benbrook Exhibit Number 15 is marked for
11  identification.)
12    (Discussion off the record.)
13    THE VIDEOGRAPHER:  The time is now 5:32.
14  We are on the record.
15  BY MR. COPLE:
16    Q.   I've marked as Exhibit 15 for the
17  deposition, Dr. Benbrook, a document dated
18  October 30th, 1991, from EPA, and it's called the
19  "Second peer-review of glyphosate."
20    Have you seen this document before?
21    A.   Yes.
22    Q.   Have you considered it in connection with
23  your expert report in forming your opinions in this
24  case?
25    A.   Yes.

Page 311

1    Q.   All right.  This is also from Dr. Dykstra
2  in Tox Branch I in the health effects division,
3  correct?
4    A.   Correct.
5    Q.   And it's also from a Dr. Ghali.  Do you
6  know Dr. Ghali?
7    A.   No.  I've never met him.
8    Q.   And you did say you know Mr. Taylor,
9  correct?
10    A.   Yes.
11    Q.   And there's a Lois Rossi as chief of
12  reregistration branch.  Do you know Ms. Rossi?
13    A.   Yes.  I've had several meetings with Lois
14  Rossi.
15    Q.   Had several meetings with her about this
16  document?
17    A.   No.
18    Q.   About unrelated matters?
19    A.   Correct.
20    Q.   There are signatures on the next page,
21  next to the individuals in attention -- in
22  attendance for the peer review committee.  It lists
23  Fenner-Crisp; Burnam; it looks like Baetcke;
24  Van Gemert; Rinde; Pettigrew; Copley; Brennecke; and
25  Ghali.

Page 312

1    Do you know any of these individuals?
2    A.   I know Penny Fenner-Crisp, Bill Burnam.
3  I met Marcia Van Gemert a time or two.  And none of
4  the others in that first list.
5    Q.   Okay.  And as indicated in the
6  parentheses next to peer review committee, it says
7  the signature indicates concurrence with the peer
8  review report and findings unless otherwise stated,
9  correct?
10    A.   Correct.
11    Q.   And there's also, in the second category,
12  peer review members that were in absentia, because
13  they were unable to attend discussion, but they can
14  indicate concurrence by signature, right?
15    A.   Correct.
16    Q.   So there's -- Engler, you indicated you
17  know, right?
18    A.   Yes.
19    Q.   And Quest, Dearfield, Woo, Sette,
20  Beliles?
21    A.   I met Jean Parker once.
22    Q.   Okay.
23    A.   I remember her very vaguely.  I don't
24  remember any of the others in the Point Number 2
25  list.

Page 313

1    Q.   Okay.  And then Beliles and Du.  The only
2  name I see on here that does not concur is Robert
3  Beliles, correct?
4    A.   And Jean Parker.
5    Q.   And Jean Parker.  Two nonconcurs, right?
6    A.   Right.
7    Q.   On the scientific group reviewers were
8  Dr. Dykstra and Roger Gardner, right?
9    A.   Correct.
10    Q.   They did the data presentation.  Do you
11  know Roger Gardner?
12    A.   No.
13    Q.   If you go to Page 4 of this, and before
14  we go to Page 4, are you familiar with what a peer
15  review is in the health effects -- in the toxicology
16  branch of the health effects division in OPP?
17    A.   Yes, certainly in general.
18    Q.   What is peer review?
19    A.   Well, this is one of them.  It's an
20  assessment by a group of scientists of the technical
21  basis for a judgment that the agency is making about
22  the interpretation of a given study or weight of the
23  evidence evaluation based on several studies or a
24  review of the technical basis for some aspect of the
25  risk assessment process.

CONFIDENTIAL

Page 314

1    Q.    All right.  Now, on Page 4, it starts in
2  the first full paragraph, it says, "The SAP
3  determined that the carcinogenic potential of
4  glyphosate could not be determined."
5    A.    Where are we, sir?
6    Q.    I'm on Page 4 --
7    A.    Page 4.
8    Q.    -- of this document.  Page numbers are at
9  the top.
10    A.    I see it.
11    Q.    The first full paragraph starts with "The
12  SAP."  Do you see that?
13    A.    Uh-huh.
14    Q.    It says, "The SAP determined that the
15  carcinogenic potential of glyphosate could not be
16  determined from existing data and proposed that rat
17  and/or mouse studies be repeated in order to clarify
18  these equivocal findings."  Right?
19    A.    Correct.
20    Q.    So this is a reference back to the 1986
21  hearing that the SAP determined, correct?
22    A.    And intervening meetings.
23    Q.    Is there a different SAP that was
24  involved besides that?
25    A.    No.

Page 315

1    Q.    So it was --
2    A.    We talked about the June 1989 memo
3  already, which was -- addressed this same set of
4  issues.
5    Q.    I understand that you have talked about
6  that, but this particular paragraph is only talking
7  about the SAP itself, right?
8    A.    Correct.
9    Q.    So that would have been the February 11
10  and 12, 1986, hearing that SAP had, right?
11    A.    Correct.
12    Q.    And that would have been the same hearing
13  in 1986 that we just talked about on the verbatim
14  transcript with Dr. Swenberg's views as an
15  independent scientist on the panel, right?
16    A.    Correct.
17    Q.    In the next paragraph, it says, "HED
18  deferred" -- and HED, that's health effects
19  division?
20    A.    Correct.
21    Q.    "HED deferred a decision on the repeat of
22  an additional mouse carcinogenicity study until the
23  1990 rat feeding study had been evaluated by the
24  peer review committee."  Right?
25    A.    That's what it says, yes.

Page 316

1    Q.    All right.  Is that a reference to the
2  earlier deferral of the decision by the three
3  persons involved, Mr. Dykstra, Mr. Berm, and there
4  was a third person?
5    A.    Yes, it is.
6    Q.    On the first page.  This peer review
7  committee reviewed all the data that was available
8  to the EPA in the health effects division up until
9  the point of this peer review, right?
10          MR. LITZENBURG:  Form.
11          THE WITNESS:  I sincerely doubt all the
12    data.  No.  I would imagine that if I read the
13    document, it would be clear what studies they
14    primarily focused on.  I'm sure the underlying
15    issues addressed at the SAP meeting were the
16    most important ones considered, but this was --
17    I'm quite sure this committee didn't do a
18    de novo review of all the relevant studies on
19    glyphosate.
20  BY MR. COPLE:
21    Q.    You have no basis to say that other than
22  looking at this document; is that correct?
23    A.    Well, just, you know, it would be
24  unimaginable to me that the Office of Pesticide
25  Programs would ask 12 or 14 of its senior scientists

Page 317

1  to drop all of its other work to reassess 14 or
2  however many of the 14 chronic feeding studies had
3  been submitted at that time on glyphosate plus the
4  several dozen genotox studies and all the other
5  information that was available to the agency.  They
6  wouldn't have reassessed the entire database.
7    Q.    If you go to the classification section,
8  which is on Page 19 of the peer review committee
9  report.  It's under subsection -- or Paragraph
10  Section G.
11    A.    Okay.
12    Q.    In the first paragraph below the
13  subheading "Classification," it says, "Considering
14  criteria contained in the EPA guidelines for
15  classifying a carcinogen."
16          First, are you familiar with the EPA
17  guidelines?
18    A.    Yes.
19    Q.    These are the 1986 guidelines, correct?
20    A.    Yes.
21    Q.    They've been updated since 1986?
22    A.    Yes.
23    Q.    So currently, EPA uses an updated set of
24  the same carcinogenicity guidelines for classifying
25  chemicals, right?

CONFIDENTIAL

Page 318

1    A.   Correct.
2    Q.   At this time the applicable guideline was
3  based on the 1986 version, even though this is 1991,
4  correct?
5    A.   Correct.
6    Q.   The peer review committee concluded that
7  glyphosate should be classified as a Group E,
8  evidence of noncarcinogenicity for humans.
9       It goes on to say, "based on lack of
10 convincing carcinogenicity evidence in adequate
11 studies in two animal species," correct?
12   A.   Correct.
13   Q.   So at this point in time, October 30,
14 1991, all of the members of the peer review
15 committee except for the two nonconcurring members,
16 neither of whom were in attendance at the
17 discussion, had concluded that the appropriate
18 classification for glyphosate was Category or
19 Group E, right?
20      MR. LITZENBURG:  Form.
21      THE WITNESS:  Yes.  Their signature
22 indicates concurrence with the results of the
23 peer review committee.
24 BY MR. COPLE:
25   Q.   And this is based on the convincing

Page 319

1  carcinogenicity evidence in adequate studies in two
2  animal models, right?
3    A.   That's the criteria that's specifically
4  mentioned in this report.
5    Q.   Now, it goes on in the last paragraph,
6  Dr. Benbrook, to say that "It should be emphasized,
7  however, that designation of an agent in Group E is
8  based on the available evidence at the time of
9  evaluation and should not be interpreted as a
10 definitive conclusion that the agent will not be a
11 carcinogen under any circumstances."  Correct?
12   A.   That's what it says.
13   Q.   And here we are in 2018, and the
14 evaluation that is reached by EPA based on the most
15 recent OPP document, based upon the testimony of
16 Anna Lowit two days ago in front of the House
17 Committee is that there's no basis to conclude that
18 glyphosate is a human carcinogen.  Right?
19      MR. LITZENBURG:  Form.
20      THE WITNESS:  Well, no.  I think that the
21 EPA's basic conclusion is essentially the same
22 as this; that based on the available evidence at
23 the time, the time being 2018 now, the agency
24 does not consider that there is definitive
25 evidence to judge that glyphosate is a

Page 320

1  carcinogen.  And certainly, they, you know --
2  they would continue to add the caveat of under
3  any circumstances, as any scientific
4  organization would.
5  BY MR. COPLE:
6    Q.   As of now, in 2018, the agency's position
7  is based upon all available evidence that glyphosate
8  is not a human carcinogen, correct?
9    A.   Correct.
10      MR. LITZENBURG:  Form.
11 BY MR. COPLE:
12   Q.   The Category E classification that was
13 reached in October, October 30, 1991, by the second
14 peer review committee, has remained in effect since
15 1991.  No evidence or evidence of noncarcinogenicity
16 in humans.  Right?
17   A.   That's my understanding of the position
18 within the EPA.  Yes.
19   Q.   Since 1991's determination by the
20 carcinogenicity peer review committee, any change in
21 labeling would have to -- in the label for
22 glyphosate-based formulations would have to be
23 approved by EPA, correct?
24      MR. LITZENBURG:  Form.
25      THE WITNESS:  Yes.

Page 321

1       MR. COPLE:  Let's mark this document as
2  Exhibit 16 to the deposition.
3       (Benbrook Exhibit Number 16 is marked for
4  identification.)
5  BY MR. COPLE:
6    Q.   This is a document called the
7  "Reregistration Eligibility Decision," or the RED,
8  RED, issued by the EPA for Glyphosate.  Are you
9  familiar with this document?
10   A.   Yes.
11   Q.   Have you reviewed this document in
12 connection with forming your opinions and preparing
13 your expert report?
14   A.   Yes.
15   Q.   And what is the reregistration of a
16 pesticide like glyphosate?
17   A.   It's a periodic review of the scientific
18 database available to the agency to quantify the
19 risks stemming from the use of a pesticide for human
20 beings, for fish, aquatic organisms, other nontarget
21 organisms.
22      The issuance of a RED reflects an update
23 of the agency's review of the -- really the entire
24 database and knowledge base about the toxicity of a
25 pesticide, the use of a pesticide, exposure levels

CONFIDENTIAL

Page 322

1  to the pesticide, the acceptability of estimated
2  risk levels stemming from currently labeled uses,
3  any required refinements or improvements in the
4  label directions that are included on specific
5  end-use product labels, and a restatement of the
6  basis for EPA's judgment that the currently labeled
7  uses of a pesticide do not pose unreasonable adverse
8  effects on man or the environment, and any dietary
9  and water-based exposures of the pesticide comply
10  with the existing standard applicable to the
11  assessment of general population exposures.
12      Q.    The 1988 changes to FIFRA that gave the
13  EPA the authority to be comprehensive pesticide
14  reregistration reviews to completely review the
15  human health and environmental effects of any
16  pesticide that the agency first registered before
17  November 1984, right?
18      A.    Correct.
19      Q.    So under the reregistration review
20  process, the RED, the EPA would hold pesticide
21  registered before November 1984 to updated review
22  and approval standards, correct?
23      A.    Correct.
24      Q.    The RED was completed for glyphosate in
25  1993, right?

Page 323

1      A.    Yeah.  It was probably completed early in
2  the year, and it's got a release date of September
3  of 1993 on it.
4      Q.    So the RED was approved for glyphosate
5  after the time that the classification was changed
6  to Category E by the second peer review committee
7  for glyphosate, right?
8      A.    This came out after that.  Correct.
9      Q.    The RED is a determination by the agency
10  itself and not one of the divisions that a pesticide
11  like glyphosate meets reregistration standards,
12  right?
13          MR. LITZENBURG:  Form.
14          THE WITNESS:  It's a -- yes, it's a
15  document put out on behalf of the entire EPA by
16  the Office of Prevention Pesticides and Toxic
17  Substances of which the Office of Pesticide
18  Programs is one of the operating divisions or
19  programs.
20  BY MR. COPLE:
21      Q.    So the RED is not a recommendation from a
22  particular division within EPA like the toxicology
23  branch or even by OPP, correct?
24      A.    Correct.
25      Q.    Go to the Executive Summary, which starts

Page 324

1  on page, lower case, Roman numeral viii.
2      A.    I don't actually see those Roman numeral
3  numbers.
4      Q.    I'm sorry?
5      A.    I don't see that.  Is it farther in?
6      Q.    Yes, it's farther in.  It's under
7  Executive Summary, after the Table of Contents.
8      A.    I'm sorry.  Got it.
9      Q.    In the second full paragraph, it says,
10  "In June 1986, the agency issued the document
11  Registration Standard for Pesticide Products
12  Containing Glyphosate as the Active Ingredient."
13          Were you aware of that?
14      A.    Yes.  We've talked about it extensively.
15      Q.    And the last sentence of that second
16  paragraph says that "After completing its review for
17  reregistration, the agency now concludes that the
18  database on glyphosate is substantially complete."
19  Correct?
20      A.    That's what it says, yes.
21      Q.    So as of this time in September 1993,
22  under the RED, proof of glyphosate by the agency,
23  the agency concluded it was working from a
24  substantially complete database of information to
25  support glyphosate registration, right?

Page 325

1      A.    That's what it says.
2      Q.    All right.  And the next sentence says
3  that "Based on the results of its reregistration
4  review, EPA has concluded that all registered uses
5  of glyphosate are eligible for reregistration."
6          Do you see that?
7      A.    Yes.
8      Q.    What does that mean that all of them are
9  eligible for reregistration?
10      A.    It means that the existing labels for
11  glyphosate-based herbicides are eligible to be
12  continued, to be reregistered until the next
13  periodic review.
14      Q.    The next sentence under this paragraph
15  says that "The agency has classified glyphosate as a
16  Group E carcinogen (signifies evidence of
17  noncarcinogenicity in humans)."  Correct?
18      A.    Correct.
19      Q.    So in September 1993, the entire agency
20  adopted the position that with respect to glyphosate
21  and human exposure, it was properly classified as
22  Group E, meaning evidence of noncarcinogenicity in
23  humans exposed to that active ingredient, right?
24      A.    That's what the document says, yes.
25      Q.    So any recommendation or suggestion as of

CONFIDENTIAL

Page 326

1 that time for labeling changes coming out of a
2 subset of EPA, a division of EPA, would have been
3 subject to this agency-wide classification of
4 glyphosate as having evidence of noncarcinogenicity
5 in humans, correct?
6          MR. LITZENBURG:  I object to form.
7          THE WITNESS:  I don't really understand
8 the question.  I'm sorry.  Could you rephrase
9 it?
10 BY MR. COPLE:
11     Q.    Yes.  If there is a review being done,
12 for example, by toxicology branch or by health
13 effects division or by OPP itself, it would, at
14 least as of September 1993, be subject to the
15 agency-wide conclusion that the proper
16 classification of glyphosate is Group E?
17          MR. LITZENBURG:  I object to form.
18          THE WITNESS:  It -- I -- it is certainly
19 my understanding that this registration
20 document, this RED, reflects the current
21 judgment and determinations of OPP and its
22 respective branches relative to the oncogenicity
23 and use and risks of glyphosate-based
24 herbicides.  Yes, I would -- I would expect that
25 to be the case.

Page 327

1 BY MR. COPLE:
2     Q.    So nothing recommended by the toxicology
3 branch regarding glyphosate in 1985 would have
4 superseded the 1993 RED determination by the entire
5 agency that glyphosate is noncarcinogenic for
6 humans, right?
7          MR. LITZENBURG:  Object to the form.
8          THE WITNESS:  I'm not sure I understand
9 your question.  Are you asking if a position or
10 judgment of the agency in 1985 would take
11 precedence over something in this document?
12 BY MR. COPLE:
13     Q.    No.  The reverse; that a position taken
14 by toxicology branch, for example, the 1983 mouse
15 study, would not take precedence over the agency's
16 RED decision --
17     A.    Correct.
18     Q.    -- of Group E classification.
19     A.    Correct.
20     Q.    And the Group E classification has
21 remained in effect since September 1993 unchanged by
22 EPA, correct?
23     A.    Correct.
24     Q.    An RED that was issued by EPA
25 establishing Group E classification in

Page 328

1 September 1993 would have been based on EPA's review
2 of the entire database of available evidence on
3 carcinogenicity for glyphosate, right?
4          MR. LITZENBURG:  Form.
5          THE WITNESS:  One would presume so, yes.
6 BY MR. COPLE:
7     Q.    You have no reason sitting here today to
8 believe that it was not, right?
9     A.    Correct.
10     Q.    Let's go back to I think it was marked as
11 Exhibit 7, the revised paper, December 12, 2017.
12     A.    I'm doing a proper job of getting them in
13 order now.  Must be in this pile, I guess.
14     Q.    This is what we're looking for,
15 Dr. Benbrook.
16     A.    I know.  I just can't find my version of
17 it.  Do you think it's in there?
18          MR. HOLLINGSWORTH:  I think I see
19 something clipped.
20          THE WITNESS:  There you go.  You got it.
21 Okay.  Sorry.
22 BY MR. COPLE:
23     Q.    Now, let's -- again, I think you had told
24 us this is a document you looked at and considered
25 in reaching your opinions in the expert report,

Page 329

1 right?
2     A.    Right.  We've already discussed that.
3     Q.    All right.  On Page 13, at the bottom,
4 there's a paragraph.
5     A.    Okay.
6     Q.    And it says in the second sentence that
7 the panel's report was published in March 2017, and
8 the current document incorporates revisions based on
9 the panel's report.  That's your understanding,
10 right, that this was the most current document
11 reflecting the OPP review of glyphosate
12 carcinogenicity?
13     A.    That's my understanding.
14     Q.    It also goes on to say in the last
15 sentence on paragraph -- I'm sorry -- on Page 13
16 that "Additionally, information from a recently
17 published analysis of glyphosate use and cancer
18 incidence in the Agricultural Health Study cohort
19 (Andreotti) with a longer follow-up than the
20 previously published data (De Roos et al., 2005) has
21 been considered in this evaluation."
22     A.    That's what it says, yes.
23     Q.    All right.  You took into account in your
24 formulation of opinions and expert report the
25 Andreotti publication of 2017?

CONFIDENTIAL

Page 330

1    A.   I was aware of it, but as I testified
2  earlier, it's a piece of evidence that came out
3  after the use of Ranger Pro and Round Pro
4  concentrate by Mr. Johnson in this case.  It -- the
5  updated assessment of the Agriculture Health Study
6  data could not inform the EPA's or Monsanto's or the
7  Agricultural Health Study's assessment of glyphosate
8  oncogenetic risk, you know, back in -- when the
9  Ranger Pro and Round Pro concentrate herbicides were
10  manufactured and sold and applied by Mr. Johnson.
11    Q.   Is it your testimony that none of your
12  expert opinions, either in the report or as you're
13  testifying here today, take into account information
14  that has been made available or published since the
15  period of time that Mr. Johnson says he was exposed
16  to Ranger Pro?
17    MR. LITZENBURG:  Form.
18    THE WITNESS:  As I've -- as I've said
19  before, there is an enormous record in this
20  case, many, many documents, many complex issues.
21  I tried to focus on those that I felt were most
22  germane and relevant to the decisions made by
23  Monsanto about what studies it conducted, what
24  label provisions it incorporated into the Ranger
25  Pro and Round Pro concentrate labels and, in

Page 331

1  effect, the extent to which Monsanto fully and
2  accurately provided warnings and guidance about
3  the potential risks associated with the use of
4  those -- of those branded herbicide products
5  based on what was known at the time.
6    The Andreotti study on glyphosate,
7  published in 2017, is one of at least two dozen
8  new studies that have been published in 2017.  I
9  have tried to keep track of most of them.  I'm
10  certain that I have missed some of them, but as
11  I said, the available database in the open,
12  peer-reviewed scientific literature on
13  glyphosate and glyphosate-based herbicides is
14  rapidly expanding.  Some studies point to new
15  and/or higher risks than reflected in EPA's
16  current evaluation, and some studies suggest
17  that the risks may be about what EPA considers,
18  and others, no doubt, could be used to argue
19  that the risks are lower.
20    Because there is such a mammoth dataset
21  on glyphosate-based herbicides and their use,
22  exposures and risks, it's very unlikely that any
23  one study is going to definitively settle some
24  of the ongoing scientific questions.
25    But I would say, in my opinion, the

Page 332

1  peer-reviewed studies as a whole published in
2  2017 or since 2017 or since the release of the
3  IARC March 2015 working group study, on a weight
4  of evidence basis, point to higher risks from
5  exposure use of glyphosate-based herbicides than
6  are reflected in the EPA analysis.
7  BY MR. COPLE:
8    Q.   What are the names of those studies?
9    A.   Pardon me?
10    Q.   What are the names of those studies that
11  have been published?
12    MR. LITZENBURG:  Were you finished with
13  your answer?
14    THE WITNESS:  Yes, I was finished with my
15  answer.
16  BY MR. COPLE:
17    Q.   What are the names of those studies?
18    A.   Well, there's a lot of them.  You know, I
19  don't have them memorized.  I'm not going to try to
20  sit here and recount all of the published studies
21  that I've read either in part or in full.  There
22  have been, I would say, in the last -- well, let's
23  just say since IARC came out, there have been
24  probably ten genotox studies on glyphosate and
25  glyphosate-based herbicides.  Several of them

Page 333

1  designed to answer the question:  Are
2  glyphosate-based herbicides more toxic to humans
3  than the pure 100 percent active ingredient?
4    Like in all areas of science, as
5  additional studies are done, the methodologies that
6  are used, the types of measurements made typically
7  are regarded as more sensitive and more accurate,
8  and the general consensus of people that have looked
9  at this body of research, I suppose beginning with
10  Dr. Parry in 1998, 1999, is that yes, indeed,
11  glyphosate-based herbicides, the products that are
12  actually used, the chemical mixture of chemicals
13  that people have actually exposed to -- and in fact,
14  the reason why we're concerned about use of Roundup
15  herbicides potentially causing non-Hodgkin's
16  lymphoma in human beings, it's from use of and
17  exposure to the formulated product and not the pure
18  active ingredient, the subject of all 14 chronic
19  two-year rat and mouse cancer studies.
20    In fact, one of the principal reasons the
21  IARC working group reached a diametrically opposed
22  judgment regarding the possibility that exposure to
23  glyphosate-based herbicides could cause cancer is
24  because of their careful and thorough assessment of
25  the entire database available to them at that time.

CONFIDENTIAL

Page 334

1    And I am aware that several studies have
2  come out since March 2015 that not only reinforce
3  the judgments and concerns expressed by the working
4  group relative to the genotoxicity of glyphosate,
5  but there have been new studies that have raised
6  entirely new concerns through application of
7  cutting-edge toxicological tools and assessment
8  methods, including proteomics and metabolic studies,
9  the work of Michael Antoniou, for example.
10    There have been two different studies
11  published by Michael Antoniou and his team
12  suggesting the possibility that exposure to
13  glyphosate-based herbicides triggers adverse effects
14  on the liver at levels far below, far below the
15  chronic reference dose, for example, applicable to
16  glyphosate-based herbicides. These are -- the
17  methodologies that Dr. Antoniou has used are
18  admittedly very new. There's many questions which
19  Dr. Antoniou is the first to admit to about the
20  interpretation of some of their results.
21    But it's my opinion that as more and more
22  independent scientists find and receive funding and
23  have the courage to publish their results in this
24  highly contentious area of science, that the general
25  body of published research is heightening my concern

Page 335

1  about ongoing exposures to glyphosate-based
2  herbicides.
3    Q.    These new studies you're talking about
4  include the AHS and the study by Andreotti in 2017,
5  right?
6        MR. LITZENBURG: Objection to form.
7        THE WITNESS: That is one of the -- the
8  Andreotti study is one of the important new
9  pieces of evidence that was published in 2017.
10  Correct.
11  BY MR. COPLE:
12    Q.    And that study, which is the largest
13  study of pesticide applicator exposure to glyphosate
14  that's ever been done, was done by independent
15  scientists having no affiliation with Monsanto,
16  right?
17        MR. LITZENBURG: Form.
18        THE WITNESS: To my knowledge, none of
19  the scientists working for the NCI on the
20  Agriculture Health Study were also working for
21  Monsanto, but perhaps you have better
22  information than I do.
23  BY MR. COPLE:
24    Q.    And the scientists that published that
25  study under the lead author of Andreotti have

Page 336

1  concluded that there is no human carcinogenicity
2  shown in that study with respect to exposure of
3  glyphosate, right?
4    A.    Well, as you are well aware, the studies,
5  reports suggest that evidence just under the -- the
6  standard statistical test for significance that is
7  used in Agricultural Health Studies for another type
8  of cancer -- if you put the study in front of me,
9  I'll -- it's getting late in the day, and I don't
10  want to mispronounce -- it's a myeloma, another form
11  of blood cancer, where there was suggested evidence
12  that the team writing the study says warrants
13  continuing to follow the cohort and further
14  research. So it wasn't a completely negative study.
15    Q.    In the study, Andreotti concluded that
16  there was no statistical significance between
17  exposure to glyphosate and the incidence reported
18  among the pesticide applicators of NHL, right?
19        MR. LITZENBURG: Objection to form. He's
20  asked repeatedly to see it.
21  BY MR. COPLE:
22    Q.    Are you aware of that?
23    A.    I'd like to have a copy of the study.
24    Q.    You can't say one way or the other?
25    A.    I would prefer --

Page 337

1        MR. LITZENBURG: Form.
2        THE WITNESS: -- to have the study in
3  front of me so that I can accurately and
4  succinctly summarize the results for you.
5  BY MR. COPLE:
6    Q.    EPA has in its database all of the
7  available carcinogenicity studies done in animal
8  models on glyphosate, all of the epidemiology
9  studies that have been done on glyphosate, and all
10  the genotoxicity studies, correct?
11        MR. LITZENBURG: Form.
12        THE WITNESS: No. I'm quite sure they're
13  missing one.
14  BY MR. COPLE:
15    Q.    And you know this by talking to the EPA?
16    A.    No. I never asked EPA about it.
17    Q.    All right. Go to Page 144.
18    A.    Are we in this same document?
19    Q.    In the same Exhibit 7. Go to the top of
20  the page on 144.
21    A.    Okay.
22    Q.    It starts out by saying, "An extensive
23  database exists for evaluating the carcinogenic
24  potential of glyphosate."
25    A.    I'm sorry. I was on 114.

CONFIDENTIAL

Page 338

```
 1      Q.   144.
 2      A.   Okay.  144.
 3      Q.   At the top, it says that "An extensive
 4  database exists for evaluating the carcinogenic
 5  potential of glyphosate including 63 epidemiological
 6  studies, 14 animal carcinogenicity studies, and
 7  nearly 90 genotoxicity studies for the active
 8  ingredient glyphosate."
 9           Do you see that?
10      A.   Yes, I do.
11      Q.   And two sentences or three sentences
12  below that, "EPA says in this most recent report of
13  its evaluation of glyphosate," quote, "the available
14  data at this time do not support a carcinogenic
15  process for glyphosate," closed quote.
16           Do you see that?
17      A.   No, I don't.
18           MR. LITZENBURG:  Form.
19           THE WITNESS:  Sorry.  I just -- how
20  many -- I see the sentence, "these studies were
21  evaluated for quality, and results were
22  analyzed."
23  BY MR. COPLE:
24      Q.   Right.
25      A.   Where do I go from there?
```

Page 339

```
 1      Q.   Then there's another sentence that
 2  follows, says, "the modified Bradford Hill
 3  criteria."
 4      A.   Right.
 5      Q.   Then there's a sentence right after that.
 6      A.   Okay.  "Available data at this time do
 7  not support a carcinogenic process for glyphosate."
 8  Yes, I see that.
 9      Q.   So that's the same position the EPA has
10  had since 1991, June 1991, correct?
11      A.   Correct.  The EPA's evaluation of the
12  genotoxicity of glyphosate that's been based on the
13  pure active ingredient.  The vast majority of the
14  industry conducted and submitted studies have
15  focused on the pure active ingredient.  The vast
16  majority of the positive genotoxicity studies in the
17  open scientific literature are based on
18  glyphosate-based herbicides that include the
19  co-formulants or the surfactants that it's quite
20  clear are associated with heightened toxicity from
21  the use of glyphosate-based herbicides.
22      Q.   And the conclusion of the agency is that
23  the available data at this time do not support
24  carcinogenicity for glyphosate, right?
25      A.   For pure glyphosate.
```

Page 340

```
 1      Q.   Now, if you go down, there's a smaller
 2  paragraph afterwards.  It starts with the phrase
 3  "for cancer descriptors."
 4      A.   I see it.
 5      Q.   And last sentence of that says, "the
 6  strongest support is for," quote, "not likely to be
 7  carcinogenic to humans," closed quote.
 8           Do you see that?
 9      A.   Yes.
10      Q.   That's EPA's determination about
11  carcinogenicity and glyphosate exposure as we sit
12  here right now?
13      A.   That is -- that is the EPA's judgment for
14  the carcinogenicity of pure glyphosate technical
15  ingredient.  Yes.
16      Q.   All right.  If you go to Page 94.
17      A.   Back to Page 94?
18      Q.   Yes, please.
19      A.   Okay.
20      Q.   And it says in the first sentence,
21  "Glyphosate has been extensively tested in rodents
22  to evaluate its carcinogenic potential."  Right?
23      A.   Yes.
24      Q.   And so there were 14 rodent
25  carcinogenicity studies that were considered to be
```

Page 341

```
 1  adequate for the analysis, right?
 2      A.   That's what it says.
 3      Q.   And eight conducted in the rat and six
 4  conducted in the mouse, right?
 5      A.   That's what it says.
 6      Q.   So other glyphosate registrants besides
 7  Monsanto have conducted these animal model
 8  carcinogenicity studies, right?
 9      A.   I think approximately 11 of them.
10      Q.   So Monsanto has done three, and other
11  registrants have done 11, ending at 14?
12      A.   I think that's how it works.
13      Q.   And on genotoxicity, the current
14  conclusion of EPA is that glyphosate is not
15  genotoxic, right?
16      A.   Pure glyphosate.
17      Q.   All of these new studies that you are
18  saying have come out about genotoxicity since
19  March 2015, you've identified all these in your
20  expert report?
21      A.   No.
22           MR. LITZENBURG:  Form.
23  BY MR. COPLE:
24      Q.   You have not?
25           MR. LITZENBURG:  Form.
```

CONFIDENTIAL

Page 342

1    THE WITNESS:  No.
2  BY MR. COPLE:
3    Q.    Why not?
4    A.    As I said, given the scope of the record
5  and the mammoth database, both of EPA documents and
6  risk assessments and scientific reviews, coupled
7  with the open, peer-reviewed scientific literature
8  including multiple studies written or ghostwritten
9  by EPA employees, I felt it most important to focus
10  on the scientific documents, the EPA evaluations
11  that governed what was on the Ranger Pro and Roundup
12  Pro concentrate labels from 2012 to 2014, which is
13  the time period during which Dewayne Johnson applied
14  glyphosate-based herbicides as part of his job for
15  the school district that he worked for.
16    Q.    So again, any information that's come out
17  since the time that Mr. Johnson says he was exposed
18  to glyphosate formulations in his job would not be
19  part of the basis of your opinions in this case; is
20  that right?
21    MR. LITZENBURG:  Form.
22    THE WITNESS:  I believe that a weight of
23    the evidence assessment of peer-reviewed
24    published literature on glyphosate-based
25    herbicides actually strengthens the case and the

Page 343

1  conclusions reached, for example, by the IARC
2  working group as articulated in their March 2015
3  judgment.
4    In fact, I unfortunately am concerned
5  that there may in fact be some substantially
6  greater risks than has ever been recognized or
7  assessed by the EPA or Monsanto, because both
8  the agency and Monsanto and other
9  glyphosate-based herbicides registrants, who
10  have conducted their own studies, have continued
11  to predominantly rely on the older, outmoded,
12  often very insensitive testing methodologies
13  that make up the vast majority of the toxicology
14  database that was available to EPA and has been
15  continuously reviewed and analyzed by the EPA
16  and forms the basis for EPA's judgments.
17    And I continue to feel and feel stronger
18  today than I did when I -- when I -- well, when
19  I finished my report -- there's been a half
20  dozen studies that have come out since December
21  of last year.  But certainly in the time period
22  since Dewayne Johnson applied the Roundup
23  herbicides as part of his job, there's a
24  significant body of new science that has come
25  out; and in my judgment, based on the weight of

Page 344

1  the evidence, it heightens concerns that have
2  lingered for many years and been at the heart of
3  what's really been a, you know -- a 10-, 15-year
4  debate about this one BioDynamic study.
5    That's, to the extent that I follow the
6  science, yes, it -- the more recent studies have
7  informed and helped sharpen by concerns, my
8  conclusions.  There's substantial new data in
9  just the last few years on levels of glyphosate
10  in human urine, in blood.  There's much --
11  considerable new data on dietary exposures,
12  which are clearly not fully reflected in the --
13  you know, I will look with great interest at any
14  new residue and dietary exposure data that is
15  contained in the final reregistration document
16  when it's issued, but my suspicion is that there
17  is not substantial new pesticide residue data on
18  glyphosate in soybeans, in corn, in sugar beets,
19  in many of the other crops that it's used on,
20  and in particular the small grain crops where
21  glyphosate is used as preharvest desiccant,
22  where data from the U.K. showed very clearly
23  that residues for glyphosate are both common and
24  at a significant level.
25    So yes, there's all this additional

Page 345

1  information that I'm aware of, that I am
2  tracking, I'm trying to understand and integrate
3  into the body of knowledge that I have been
4  exposed to and tried to simulate on the risk
5  from this herbicide.
6  BY MR. COPLE:
7    Q.    And you've identified all this new
8  information in your written report for this case?
9    MR. LITZENBURG:  Form.
10    THE WITNESS:  No.
11    MR. LITZENBURG:  Can we take a quick
12  bathroom break when you get to stopping point?
13    MR. COPLE:  Sure.
14    THE WITNESS:  I'm close to needing that.
15    THE VIDEOGRAPHER:  The time is now 6:26.
16  We are off the record.
17    (Break in proceedings.)
18    THE VIDEOGRAPHER:  The time is 6:36.  We
19  are on the record.
20  BY MR. COPLE:
21    Q.    We were talking at least in part,
22  Dr. Benbrook, about Exhibit 7.  If you'll turn to
23  Page 97.
24    A.    In the same document?
25    Q.    In the same document.

Page 346

1   A.   Okay.  Got it.
2   Q.   The last paragraph on Page 97 is a
3  discussion of the agency's weight of evidence
4  evaluations and what the agency has concluded.
5        It goes on to say it's concluded that
6  "none of the tumors evaluated in individual rat and
7  mouse carcinogenicity studies are treatment-related
8  due to lack of pairwise statistical significance."
9        Are you familiar with "pairwise
10  statistical significance"?
11   A.   Yes.
12   Q.   So you understand why EPA came to that
13  conclusion based on the absence of that, correct?
14   A.   It's part of their guidelines.
15   Q.   And that guideline supports their
16  conclusion that none of the tumors that were
17  observed in either the rat or the mouse studies are
18  treatment-related, meaning related to the compound
19  of glyphosate, right?
20   A.   That's -- that's what -- they're
21  certainly reporting as a summary statement here on
22  Page 97 in this document, but, you know, there were
23  a number of different tumors across the 14 mouse and
24  rat studies for which there were tumors evaluated,
25  and detailed scientific issues that came up in

Page 347

1  interpretation of those, although clearly the renal
2  tubular adenomas in the BioDynamic study received
3  more attention than any of the other possibly
4  treatment-related tumors assessed in the other 13
5  carcinogenicity studies.
6   Q.   Whatever was observed by the toxicology
7  branch in terms of tumors in the 1983 BioDynamic
8  study was subsequently resolved to EPA's
9  satisfaction when it issued its 1993 RED finding,
10  Category E for glyphosate, right?
11   A.   EPA changed its classification of
12  glyphosate in the 1991, as a result of the second
13  peer review that we talked about, in 1991, and that
14  decision carried over into and was rearticulated in
15  the '93 RED and in this document.
16   Q.   So if there was any lingering concern by
17  EPA at the agency level regarding the significance
18  of tumors observed by the toxicology branch in the
19  1983 mouse study, that was superseded by its
20  classification of Category E in '91 and '93, right?
21   A.   I think that there probably were
22  lingering concerns in the toxicology branch of EPA
23  about the interpretation of that particular study
24  and, no doubt, perhaps about the interpretation of
25  some of the other tumors, among some of the

Page 348

1  scientists that looked at those studies.  I mean,
2  after all, two of the scientists that participated
3  in the second peer review did not concur, and one
4  didn't concur or not concur.  So there was clearly
5  some level of disagreement among EPA staff.
6        And as I testified before, based on my
7  reading of the SAP transcript from 1986, the EPA
8  pathologist, the senior EPA pathologist, did not
9  change his view regarding the presence of a renal
10  tubular adenoma in that one control male mouse.
11   Q.   EPA's peer review, second peer review in
12  1991, determined that there were no remaining issues
13  and therefore was Category E for glyphosate, right?
14   A.   No.  I don't think it's a fair reading to
15  say that there were no remaining issues.  I think
16  what they say and how EPA makes these decisions is
17  that they base their ultimate judgment on a
18  weight-of-the-evidence basis, taking into account
19  all of the studies that are available to them, and
20  that they have analyzed, and that as an agency
21  reflecting a consensus view of a majority of the
22  scientists that are asked to render an opinion about
23  controversial, difficult scientific judgments like
24  those associated with the interpretation of this
25  mouse study, they reach a judgment; but that doesn't

Page 349

1  mean that all of the issues and concerns raised in
2  the assessment and discussion and debate about that
3  particular study have been resolved.
4   Q.   The consensus today, as of this document,
5  Exhibit 7, December 12, 2017, at EPA is that
6  glyphosate is not carcinogenic, right?
7   A.   Well, that's -- it's not exactly the
8  precise language that EPA uses to describe Group E,
9  but it's certainly close.
10   Q.   EPA concludes today that there is no
11  evidence that glyphosate is carcinogenic, right?
12        MR. LITZENBURG:  Asked and answered.
13        THE WITNESS:  Correct.
14  BY MR. COPLE:
15   Q.   All right.  Now, back to Page 97.  We
16  were just talking about the pairwise statistical
17  significance and EPA's observation that that was not
18  found in the rat or mouse studies.  EPA goes on to
19  say also that there was a lack of monotonic dose
20  response.  Do you know what that is?
21   A.   Yes.
22   Q.   What is monotonic dose response?
23   A.   It's a linear, uniform dose response as a
24  function of the dose level.  In other words, the
25  increasing frequency of tumors as the dose goes up.

CONFIDENTIAL

Page 350

1    The dose response curve sort of goes in one
2    direction.
3        Q.    And EPA's conclusion, based on weight of
4    the evidence, was that there was no monotonic dose
5    response in the rat and mouse carcinogenicity
6    long-term studies, right?
7        A.    Well, based on their original evaluation
8    of the infamous '93 mouse study, there was a
9    monotonic dose response based on the original
10   reading of the slides by BioDynamic.  That was a --
11   and it was so reported by Dykstra and the other EPA
12   scientist at the time that there was a dose response
13   pattern in the tumor.
14       Q.    That was --
15       A.    But as we talked about, EPA was presented
16   with additional data, additional arguments; were
17   compelled to convene a scientific advisory panel
18   meeting in 1986 to try to resolve the underlying
19   issues; and again, we've already talked about the
20   events that followed from that decision.
21       Q.    EPA also found, still on Page 97, same
22   paragraph, that there was an absence of
23   preneoplastic or related non-neoplastic lesions.
24             Do you know what that is?
25       A.    Yes.

Page 351

1        Q.    What is that?
2        A.    It's, again, what we talked about
3    earlier.  And these are -- these are summary
4    statements by EPA based on its review of all 14
5    studies and all of the tumors that were observed in
6    either the males or the females in all of those 14
7    studies.
8             I -- I'm not prepared to testify to the
9    number of tumors that were reported in these studies
10   and that were investigated by the EPA, which have
11   been reviewed in various independent assessments,
12   which were reviewed and remarked upon by IARC; but
13   there were a number of tumors observed in the
14   studies that the agency evaluated and took into
15   account, but in -- remarkably, in the event of every
16   one of them, one or more of these reasons have been
17   cited by the agency for reaching the judgment that
18   the increased incidence of the tumors in the control
19   group -- in the treatment groups are not
20   quote/unquote treatment-related.  And these are the
21   most common technical reasons.  These are the most
22   common criteria for evaluating tumor response data
23   in chronic feeding studies that are mentioned or
24   noted in the evaluation of each one of those 14
25   studies and each of the tumors that were observed

Page 352

1    and reported in those studies.
2        Q.    That includes no tumor progression in
3    those 14 studies, right?
4        A.    There -- there were -- I guess perhaps I
5    would feel comfortable saying that in the EPA's
6    judgment, based on these studies involving pure, 100
7    percent glyphosate, there was -- there was no tumor
8    where there was pairwise statistical significance, a
9    clear monotonic dose response, either the presence
10   or absence of preneoplastic lesions.
11            If there were preneoplastic lesions in a
12   positive study, they would determine there was more
13   in the treatment group than the control group.  That
14   evidence of progression of tumors, which would be
15   more preneoplastic tumors in the treatment group as
16   well as more frank tumors and no -- no confounding
17   information from historical controls -- if there had
18   been a tumor in one of the studies that met those
19   criteria, the EPA would have likely judged such a
20   study to be positive.
21            But based on this document and documents
22   in the recent past, and really every document since
23   1991, where EPA has addressed the oncogenicity of
24   glyphosate, it has found one reason or another to
25   explain away evidence of tumors in this growing body

Page 353

1    of studies, which now totals 14.
2        Q.    Have you talked to anybody at EPA that
3    has said they're explaining away evidence of tumors
4    in making its carcinogenicity findings about
5    glyphosate?
6             MR. LITZENBURG:  Form.
7             THE WITNESS:  No.  I haven't spoken with
8    any of the EPA scientists that conducted these
9    studies and wrote their reports and explained in
10   their reports, as they do in this one, why they
11   feel that tumors that were observed in these
12   studies were treatment-related.
13   BY MR. COPLE:
14       Q.    The EPA goes on to say in the last
15   sentence of Page 97, "Tumors seen in individual rat
16   and mouse studies were also not reproduced in other
17   studies, including those conducted in the same
18   animal species and strain at similar or higher
19   doses."
20            Do you understand the point that EPA is
21   making there?
22       A.    Yes.
23       Q.    Do you agree that that's an important
24   consideration in determining whether a compound is
25   related to the observation of the tumors?

CONFIDENTIAL

Page 354

1    A.    Certainly, the consistency of results
2  across similarly designed studies would be a factor
3  in evaluating the database.
4    Q.    And EPA did not find that amongst the 14
5  studies, right?
6    A.    That's what they're stating here.
7    Q.    You have no basis to disagree with what
8  EPA's conclusion is, correct?
9    A.    Well, I am aware that other scientists
10 that have looked at these same studies have reached
11 different conclusions.
12   Q.    Who are the other scientists?
13   A.    Certainly the IARC working group, other
14 scientists that have published reviews. Many of the
15 scientists that published responses or commentaries
16 or reviews of the IARC decision, other experts in
17 this case, working in this case, and other people
18 that have had occasion to review, you know, one or
19 more of the 14 studies or the many review studies
20 that -- metanalyses that try to -- try to come
21 up with some kind of a solid empirical basis to
22 reach the weight of the evidence conclusion --
23   Q.    Have you --
24   A.    -- about this body of work.
25   Q.    Have you talked to any of those

Page 355

1  scientists who you say disagree with EPA's
2  interpretation?
3    A.    I didn't -- I didn't have an opportunity
4  to call any of those scientists as I did my work
5  over the last few months in preparation of my
6  report. No.
7    Q.    So your comment is just based upon your
8  review of the IARC working group monograph?
9    A.    No. No. My comment is based on my
10 review of the IARC monograph, my review of multiple
11 letters, analyses, reports, debates, other agency --
12 the views of other regulatory agencies, including
13 those in Europe. There's been, as you are well
14 aware, very robust in-depth debate about the
15 oncogenicity database on glyphosate, and there are a
16 range of opinions about what that database shows.
17   Q.    Have you talked to these European
18 scientists who disagree with EPA?
19   A.    Some of them.
20   Q.    Who did you talk to?
21   A.    I've talked to Robin Mesnage. I've
22 talked to Michael Antoniou. Let's see, any other
23 Europeans I've talked to. Very briefly with Philip
24 Grandjean. I think he would be regarded as a
25 European. That's all I can remember right now.

Page 356

1    Q.    You spoke with each of these individuals
2  about their disagreement with the EPA interpretation
3  and conclusions in Exhibit 7?
4    A.    Oh. I've talked certainly with
5  Dr. Antoniou and Dr. Mesnage. I've talked with them
6  about their studies. Dr. Mesnage, longstanding work
7  on formulated glyphosate herbicide genotoxicity
8  compared to glyphosate toxicity, about their new --
9  newly published work, two papers on kidney and
10 liver -- adverse kidney and liver effects from
11 exposure to glyphosate-based herbicides.
12       I've talked with them about, in general,
13 about the IARC review and the EFSA review and the
14 trying to understand the technical basis for the
15 range of views that exist on oncogenicity of
16 glyphosate-based herbicides.
17   Q.    Did you speak with any of these European
18 scientists that you identify about their
19 disagreement with EPA's conclusions or
20 interpretation in Exhibit 7?
21   A.    I haven't talked to any of them about
22 this document, for example, because I've really --
23 it just came out a month ago. It's -- so I haven't
24 talked with them about this most recent iteration of
25 EPA's assessment of the science.

Page 357

1    Q.    Have you talked to any of these European
2  scientists about their evaluation of glyphosate in
3  connection with your work on your opinions for
4  Mr. Johnson or report for Mr. Johnson?
5    A.    No, not specifically.
6    Q.    Have you talked to them since the time
7  you were retained to prepare this expert report?
8    A.    Let's see. I think I had one call with
9  Robin six weeks ago, something like that.
10   Q.    What did you call him about?
11   A.    Robin Mesnage.
12   Q.    What did you call him about?
13   A.    His recently published work on the
14 co-formulants in glyphosate-based herbicides. He
15 and other scientists -- I don't remember who his --
16 the other coauthors are published a paper in
17 Frontiers, a quite good paper, up-to-date paper
18 about what is known about the differential toxicity
19 of formulated glyphosate-based herbicides and
20 specifically glyphosate-based herbicides formulated
21 with POEA, the predominant surfactant utilized by
22 Monsanto in most of its most widely selling
23 glyphosate-based herbicides in the United States and
24 in Europe up until a certain point in time.
25       I wanted to talk with Robin about some of

Page 358

1  the details of how they did that work, and that was
2  the focus of the conversation.
3      Q.    None of those conversations you just
4  described had anything to do with your opinions that
5  you formed in this case or the report you prepared,
6  right?
7          MR. LITZENBURG:  Form.  Asked and
8  answered.
9          THE WITNESS:  No.  That's not correct.
10  Dr. Mesnage -- there's probably no scientist --
11  certainly no scientist that I know of that has
12  conducted as many peer-reviewed, high-quality,
13  carefully designed studies of the differential
14  toxicity of glyphosate pure active ingredient
15  compared to glyphosate-based herbicides, which
16  as I've testified earlier was a primary issue of
17  concern from the late '90s inside Monsanto, in
18  discussions between Monsanto and various
19  regulatory authorities, particularly some in
20  Europe.
21          And I have tried to remain current with
22  my understanding of what is known about how the
23  co-formulants in glyphosate-based herbicides
24  alter and in some cases potentiate or increase
25  the toxicity.  And I called Robin.

Page 359

1          One of the questions that I wanted to
2  specifically ask him and I did specifically ask
3  him was did he know when Monsanto in Europe
4  switched out the knowingly high-risk, hazardous
5  surfactant polyethoxylated tallow amine, or
6  POEA, characterized by Monsanto scientists as a
7  hazardous herbicide in one of the documents that
8  I reviewed -- and I'll be glad to find it if you
9  would like me to do so -- as opposed to
10  formulating glyphosate-based herbicides
11  surfactants or other adjuvants that were less
12  toxic and did not potentiate the human health
13  risks associated with the use of
14  glyphosate-based herbicides.
15          So in Robin's paper published in the
16  journal, he has a table and discusses several of
17  the co-formulants that have been included in
18  various glyphosate-based herbicides formulations
19  sold by multiple companies around the world, but
20  I called him to see if he also knew which of
21  those Monsanto had incorporated in
22  glyphosate-based herbicides formulations
23  manufactured for and sold in Europe and assessed
24  and often changed -- the formulations changed in
25  response to requirements from European

Page 360

1  regulatory authorities.
2          I feel that that's an important factor in
3  this case, an important factor that informed my
4  opinion that as I don't feel that a responsible
5  company would acknowledge internally that it was
6  selling a hazardous formulation of
7  glyphosate-based herbicides and could switch to
8  a co-formulant that clearly posed lessened risk
9  and would do so in Europe in several of the
10  European countries, sometimes under the order of
11  a regulatory authority and in other cases in
12  anticipation of such an order, and not make the
13  same changes in the glyphosate-based herbicides
14  sold in the United States or sold in Brazil or
15  sold anywhere else in the world.
16          That is one of the reasons that I reached
17  the opinion in my expert report that Monsanto
18  did not do what a responsible company determined
19  to assure that its products were as safe as
20  possible would have done.
21  BY MR. COPLE:
22      Q.    You relied upon this conversation with
23  this individual in formulating your opinions for
24  Mr. Johnson's case?
25          MR. LITZENBURG:  Asked and answered.

Page 361

1          THE WITNESS:  I -- well, certainly, as I
2  sit here today, that is information that I -- I
3  actually didn't -- he did not have answers to my
4  questions.  I had read the paper before I
5  finished my report.  It came out, you know,
6  perhaps -- I don't know if it was in November.
7  I can certainly get you the paper, and it will
8  say the publication date.
9          And yes, I read that paper, and it
10  confirmed the findings of earlier experiments
11  that Robin and his team and others have done
12  with a variety of formulated glyphosate-based
13  herbicides.
14          It added some new information,
15  particularly in terms of identifying some of the
16  alternatives to POEA, including some of the
17  alternatives that Monsanto had developed and had
18  used.  For example, the co-formulant they call
19  G3, which is what Monsanto had considered for --
20  they were -- there's been discussion both in
21  Europe and in the U.S. of coming out with an
22  ecologically friendly or a green version of
23  glyphosate that would contain one of these lower
24  risk co-formulants, and I felt that I needed to
25  understand what Monsanto had done in other parts

CONFIDENTIAL

Page 362

1  of the world to reduce the risk in
2  glyphosate-based herbicides that arose from the
3  co-formulants so that I could compare what
4  Monsanto has done in other parts of the world
5  with what they have done to date in the United
6  States.
7  BY MR. COPLE:
8       Q.    Did you talk to anyone at Monsanto about
9  this?
10      A.    No.
11      Q.    Did you talk to anyone at EPA about this?
12      A.    No.
13      Q.    Did you talk to anyone at a foreign
14 regulatory authority about this?
15      A.    No.
16      Q.    This publication that you reference that
17 you read and relied upon, what's the name of it?
18      A.    I'll bring you a copy tomorrow.  Would
19 that be okay?
20      Q.    That's fine.  Do you discuss it in your
21 expert report?
22      A.    I don't -- I don't think so.  I don't
23 think I discuss the newest one.
24      Q.    Is it listed in your list of materials
25 that you looked at and relied on?

Page 363

1       A.    I'll have to look.
2       Q.    You can't say one way or the other?
3       A.    No.  It's one of the papers that came out
4  very -- certainly within a month of when I filed my
5  expert report.
6       Q.    So this would have been since the time
7  you filed your expert report?
8       A.    As I said, sir, I don't remember the
9  exact date that it came out.  It sort of gets
10 complicated, because I'm not sure I reviewed that
11 one.  I've reviewed some of his papers, but probably
12 not that one.
13            But it's -- this most recent paper in
14 Frontiers that I'm speaking about, about which I
15 arranged for a Skype call with Robin, it came out,
16 as I said, certainly within the last couple of
17 months.
18      Q.    Robin, is that the same person --
19      A.    R-O-B-I-N.  He's a French man.  The way
20 he and his friends pronounce his name is "Roban."
21      Q.    So your conversation was by Skype?
22      A.    The most recent one.
23      Q.    And he did not give you information that
24 you were looking for; is that right?
25      A.    He didn't -- he didn't know.  He said

Page 364

1  that it's his general sense that Monsanto Roundup
2  products sold in Europe -- Monsanto started to
3  change and shift away from POEA surfactants possibly
4  as many as ten years ago, the first products that
5  were changed; but that certainly in recent years,
6  the pace of change in replacing POE -- POEA
7  surfactants in brand name Roundup products in Europe
8  accelerated.
9            And I believe -- there's documents in the
10 record -- MONGLY documents that said that there were
11 no more Roundup products sold in Europe after 2012
12 containing POEA.  These are Monsanto documents.
13 However, I'm aware that EFSA as a regulatory matter
14 banned or ended the ongoing use of POEA surfactants
15 in any glyphosate-based herbicides manufactured by
16 companies other than Monsanto as of 2015.
17      Q.    Did you have any other communications
18 with Robin in some other form, like email?
19      A.    Well, yeah.  So Robin is the -- he's
20 the -- he was the assigned editor for a
21 peer-reviewed paper that I submitted to one of the
22 Frontiers journals that went through peer review,
23 and I had some email back and forth with him over my
24 responses to the peer-reviewed comments.
25      Q.    Did any of that relate to a discussion

Page 365

1  about Monsanto or its formulation?
2       A.    No.
3       Q.    Do you have a certification or formal
4  training in the preparation of herbicide labels for
5  EPA review?
6       A.    No.
7       Q.    Have you prepared herbicide labels for
8  EPA review under FIFRA?
9       A.    No, I have not.
10      Q.    Do you have any knowledge of labeling
11 requirements under FIFRA as interpreted by the EPA?
12      A.    Yes.
13      Q.    And that's based on your self-taught
14 research; is that right?
15            MR. LITZENBURG:  Form.
16            THE WITNESS:  It's based on the fact that
17 over the last 35 years, I've worked in the area
18 of pesticide use, risk assessment, public health
19 and environmental impacts.
20            One of the essential documents in any
21 specific case involving any pesticide is the
22 label, because as is often said in EPA circles
23 and industry circles, the label is the law.  And
24 so it is always a necessary part of any in-depth
25 assessment of a pesticide use of risk issue to

CONFIDENTIAL

Page 366

1   know what is on the label and what the label
2   requires, because the EPA's evaluation of risks
3   and EPA's judgment about a particular risk not
4   posing an unreasonable adverse effect on man and
5   the environment is conditioned upon the
6   assumption that a particular pesticide product
7   will be used in a manner consistent with
8   labeling.
9        So it is very important to understand
10  what is on the label.  It's also very important
11  to understand what is on the label in any case
12  involving an adverse effect of a pesticide on
13  either human health, as in the case of -- as in
14  this case, or on economic property like another
15  farmer's crop pesticide drift.
16       The provisions and use directions that
17  are on a label are essential pieces of
18  information in assessing whether a company has
19  exercised prudent judgment and adequately warned
20  users of their pesticide product about potential
21  risks and potential harms that either might be
22  experienced by the person mixing and applying
23  the pesticide or by people living in a vicinity
24  near where the pesticide is applied or the
25  general public through residues in food or

Page 367

1   drinking water.  So the provisions on a label
2   are integral to any serious assessment of most
3   pesticide issues.
4   BY MR. COPLE:
5        Q.    So your knowledge of labeling
6   requirements for herbicides under FIFRA that you've
7   gained over the last, I think you said 35 years,
8   that's all self-taught, right?
9             MR. LITZENBURG:  Form.  Asked and
10  answered.
11            THE WITNESS:  I've never attended a class
12  called "EPA labeling," no.  So self-learned,
13  yes.  A fair characterization.
14  BY MR. COPLE:
15       Q.    Have you published in a peer-reviewed
16  journal any work authored by you on labeling
17  requirements for herbicides under FIFRA?
18       A.    Not specifically on labeling
19  requirements, no.
20            MR. COPLE:  Let's mark 17.
21            (Benbrook Exhibit Number 17 is marked for
22  identification.)
23  BY MR. COPLE:
24       Q.    Are you familiar with this document,
25  Doctor?

Page 368

1        A.    Yeah, I know what it is.  I haven't seen
2   this particular rendition of it.  This is the EPA's
3   label review manual, which has continuously evolved,
4   really, over the last 35 years.  Look at the second
5   page, the revision date of the various chapters is
6   listed, and this would only be the last revision
7   date.  It's one of the kind of living documents, if
8   you will, that govern what has to go on a label.
9        Q.    This is EPA's public or published
10  guidance to registrants, or anyone else who's
11  interested, about the labeling requirements under
12  FIFRA, right?
13       A.    Right.
14       Q.    Did you review this document in
15  connection with your -- preparing your opinions in
16  this case?
17       A.    No.
18       Q.    Have you reviewed it in the past?
19       A.    Yes.  Well, I haven't reviewed this
20  version of it, but the entire history of my work on
21  pesticides, there was a document that served the
22  same function as this one.  It wasn't always named
23  the Label Review Manual, but there was a document
24  that communicated to registrants what was required
25  on labels.  And over the years that I've worked on

Page 369

1   pesticide issues, I -- it's been important to
2   understand what is in that document.
3        Q.    When did that prior version of whatever
4   it was called, prior version of the Label Review
5   Manual, come into effect or was issued by EPA?
6        A.    Well, as I said, if you look at the
7   second page, there's a list of the chapters, and it
8   reports in the second column the latest revision
9   date of the 18 chapters.  This gives you a sense
10  they had not updated or changed.  For example,
11  Chapter 14 on identification numbers since November
12  of 2012, but that there was an August 27 update of
13  Chapter 15 on company name and address.
14       Q.    All right.  So on that page that you're
15  referencing, the earliest, the most long ago
16  revision would have been in 2011, correct?
17       A.    That's the -- that is the oldest most
18  recent revision.
19       Q.    That's what I'm saying.
20       A.    But I'm sure that every one of these
21  chapters has gone through many revisions over the
22  last 35 years.
23       Q.    Let's turn to Page 1-2.
24       A.    Okay.
25       Q.    And the Background, it says as an

Page 370

1  introduction that "Pesticide product labels provide
2  critical information about how to safely and legally
3  handle and apply pesticides."
4        It goes on to say that "Unlike other
5  types of product labels, pesticide labels are
6  enforceable and must include the statement, 'It is a
7  violation of federal law to use this product in a
8  manner inconsistent with its labeling.'"  And it's
9  got a citation to the code of federal regulations.
10        And I think you said in your testimony
11  today, in other words, the label is the law; it's
12  something that you've said, right?
13        A.   Correct.
14        Q.   All right.  This is a provision that
15  Monsanto complied with, with respect to its
16  registered and approved herbicides including
17  glyphosate, right?  Glyphosate formulation?
18        A.   Well, Monsanto presents labels, proposed
19  labels, to the agency when it's seeking a new
20  registration, and on a fairly frequent basis it
21  requests label amendments for existing
22  registrations; most of the time which are approved
23  without change by the EPA.
24        Now, if you're asking me when Monsanto --
25  when an employee of Monsanto uses one of Monsanto's

Page 371

1  herbicides do they follow the label, I would presume
2  that they would be inclined to do so.
3        Q.   All right.  Could you review the Ranger
4  Pro label as approved by EPA?
5        A.   Yes.
6        Q.   And the necessary statement indicated in
7  the background, that's included on that label,
8  correct?
9        A.   What -- I don't know what you're talking
10  about.
11        Q.   It says that "Unlike other types of
12  product labels, pesticide labels are enforceable and
13  must include the statement, 'It is a violation of
14  federal law to use this product in a manner
15  inconsistent with its labeling.'"
16        A.   I would be -- I'm quite certain that in
17  all of the versions of the Ranger Pro label and the
18  Roundup Pro concentrate label, you will find that
19  precise quote.
20        Q.   And all of the information that's on a
21  label for a herbicide must be approved by EPA as
22  part of registration review or other review in order
23  to not be misbranded, correct?
24        A.   The way this system works, registrants
25  are primarily responsible for composing their

Page 372

1  labels.  There are certain requirements for
2  provisions that have to be on the label.
3        In some cases, the EPA specifies what has
4  to be on the front part of the label and specifies
5  the fonts, et cetera, but the actual content of the
6  label -- the use directions, the application rates,
7  the types of nozzles to use, whether to apply when
8  the wind is blowing at 3 miles an hour and not over
9  13 miles an hour, the worker safety provisions, the
10  required PPE -- the technical details that go into
11  the label, those are written by, composed by the
12  registrants, and EPA reviews them for compliance
13  with any requirement in the Label Review Manual that
14  typically addresses what has to be where on a label,
15  what kind of information has to be included.  But
16  for the most part, as long as the content of a label
17  doesn't violate something in the Label Review
18  Manual, the EPA generally accepts what the
19  registrants propose as needed to assure that
20  applications of a pesticide consistent with the
21  provisions on the label will not lead to
22  unreasonable adverse effects on man and the
23  environment.
24        That's -- it's the registrant's job to
25  figure out how a pesticide can be used in a safe and

Page 373

1  efficacious manner that doesn't cause human health
2  risks and doesn't harm economic property, and when
3  EPA feels that a label -- when EPA feels that based
4  on its risk assessments or 682 reports or any other
5  source of information that a legally registered use
6  of a pesticide has in fact caused problems, then EPA
7  will assess the label language; will usually engage
8  the company on what's going on with the, for
9  example, with the surprisingly high incidence of eye
10  and skin irritation problems from use of
11  glyphosate-based herbicides, Roundup herbicides in
12  the early '80s in California, which led to a
13  communication from the State of California to the
14  EPA and to Monsanto.
15        When that sort of thing comes up, it
16  directs the attention of the regulators and the
17  registrants to the label instructions, the
18  restrictions, the safety precautions, the worker
19  safety provisions in the PPE that's embedded in the
20  label to see if it can be enhanced or improved to
21  reduce the frequency of exposure episodes that harm
22  people.
23        Q.   FIFRA requires and EPA's own labeling
24  regulation requires that all of the words,
25  statements, graphic representations, designs, or

CONFIDENTIAL

Page 374

1   other information that's required to be on the label
2   must be approved by EPA, right?
3       A.   Correct.
4       Q.   And one of those aspects is talked about
5   in -- if you start on Page 3-1 of this exhibit, 17,
6   3-1.
7       A.   Got it.
8       Q.   3-1, there's a subsection that says,
9   "Container Label Contents When Booklets Are Used."
10      Do you see that?
11      A.   Yes.
12      Q.   There's a bunch of arrows at the bottom
13  pointing to the different labeling information, and
14  if you go to the top of the next page, 3-2, it says
15  specifically, "Precautionary statements, including
16  hazards to humans and domestic animals," correct?
17      A.   Yes.  That's what it says.
18      Q.   That's information that would constitute
19  words or any symbols or graphic representations, if
20  that's what it is that EPA would have to approve,
21  specifically whatever it is the registrant composes
22  for the label, right?
23      A.   Correct.
24      Q.   And if the label -- it you continue down,
25  there's a break between these arrows, the same page,

Page 375

1   3-2.
2       It says, "Other parts of the label may be
3   placed in a booklet or other pull-off type
4   labeling."  It goes on to say, "At a minimum, the
5   booklet or pull-off labeling should include the
6   following."  And you'll see the third arrow from the
7   last one, it says, "Precautionary statements,
8   including hazards to humans and domestic animals."
9       So EPA would have to approve all of that
10  specific words and language, as well, right?
11      A.   Correct.
12      Q.   What is collateral labeling?
13      A.   Collateral labeling?
14      Q.   Yes.
15      A.   I suspect it refers to the booklets that
16  often can be 50, 60, 70 pages for a pesticide that's
17  registered for use in a lot of -- in a wide variety
18  of crops.
19      Sometimes labels have state-specific
20  requirements that would be authorized through a 24C
21  or 24A label, which would have additional or
22  collateral labeling.  So there's a variety of
23  different mechanisms the EPA can use to approve a
24  use of a pesticide, ranging from an experimental use
25  permit at the very beginning of the process, to a

Page 376

1   Section 18, to a 24C or 24A, which is a
2   state-specific label, to a full Section 3 federal
3   label that sanctions use of a pesticide throughout
4   the country.
5       Q.   You suspect that that's what collateral
6   labeling is, but you don't specifically know or
7   recall, sitting here?
8       A.   Collateral labels are described in full
9   in Section C and include the bulletins, leaflets,
10  brochures, fliers, other information about the
11  registered and legal uses of the pesticide; often
12  will address particularly materials designed for the
13  farming community to highlight the pests that the
14  pesticide is particularly good at controlling.
15  Sometimes there's information alerting farmers to
16  the pests that have become resistant to the
17  pesticide and doesn't work.
18      So it's a -- it's an encompassing term
19  for a range of methods that pesticide registrants
20  provide useful information to people using their
21  products.
22      Q.   Which is what EPA calls "collateral
23  labeling"?
24      A.   Correct.
25      Q.   For collateral labeling, under Page 3-2,

Page 377

1   as you say, Section C which describes it, "EPA's
2   requirement in implementing FIFRA is that such
3   labeling may not bear any claim or representation
4   that substantially differs from those that are
5   accepted in connection with the registration of the
6   product," right?
7       A.   Correct.
8       Q.   So anything that is collateral labeling
9   EPA also has to approve whatever is proposed or, as
10  you say, composed by the registrant, right?
11      A.   Correct.
12      Q.   And that would be the case, for example,
13  with respect to Ranger Pro, that EPA would approve
14  all of the label and collateral labeling for Ranger
15  Pro?
16      A.   Correct.
17      Q.   If there was an issue in the mind of EPA
18  about whether labeling complied with those
19  requirements, EPA would require additional
20  information or possibly bring in important steps,
21  right?
22      A.   Yes.  It's certainly possible that they
23  would do so.
24      Q.   And that's not happened with respect to
25  Ranger Pro, correct?

CONFIDENTIAL

Page 378

1      A.   I don't know if it has or not.
2      Q.   You didn't see that in any of the
3  documents that you were provided, correct?
4      A.   No.  I didn't see any discussion of such
5  episodes.
6      Q.   If you go to 12-12.
7      A.   Other than there was a couple of episodes
8  where EPA challenged advertising that had been done
9  for some Roundup herbicides, where EPA felt that
10 some of the claims and assertions in the
11 advertisement were not consistent with what was on
12 the label, and that the individuals shown in the
13 advertisement were applying the pesticide in a way
14 that was not consistent with the requirements on the
15 label.
16     Q.   This -- this was --
17     A.   One episode that I remember in the
18 record.
19     Q.   This was before or prior to the time that
20 Mr. Johnson used Ranger Pro as a pesticide
21 applicator, correct?
22     A.   Correct.  I don't remember the -- Rick
23 Tinsworth was the senior official in EPA that was
24 involved in this, so given that, he was probably
25 mid-'90s era.

Page 379

1      Q.   So a good number of years before
2  Mr. Johnson -- at the period of time he says he
3  applied Ranger Pro, right?
4      A.   Correct.
5      Q.   And to your knowledge, the issue would
6  have been resolved to the satisfaction of EPA,
7  right?
8      A.   I believe it was -- it arose from a
9  Midwestern and Iowa-based advertising campaign, not
10 one in California.
11     Q.   Now, in the Label Review Manual for
12 pesticide programs on page 12-12, there is a
13 section -- and actually a section -- look back at
14 the beginning of Chapter 12 for a moment.  I asked
15 you about 12-12.  If you go to the coversheet on
16 Chapter 12, which is the page before 12-1.  You see
17 it's a nice picture of all different vegetation and
18 circumstances, and it's entitled "Labeling Claims,"
19 right?
20     A.   Yes, sir.
21     Q.   What's a labeling claim?
22     A.   It's a representation on a pesticide
23 label of a target pest that the product is
24 determined to be effective in controlling.  Those
25 would certainly be some of the important label

Page 380

1  claims.  The labels also set forth a variety of
2  technical details about the way that a pesticide
3  should be applied, the equipment that should be
4  used, and the circumstances under which it should be
5  applied.
6          It also -- it also relates to any claims
7  of safety or environmental claimability or
8  environmental friendliness or poses no harm to pets
9  or other aspects of the impact or environmental fate
10 of the pesticide when applied according to the
11 label.
12     Q.   Including precautionary statements on
13 potential hazards to humans or domestic animals,
14 correct?
15     A.   Yes.  I would consider those part of,
16 certainly, the labeling and, certainly, claims, I
17 guess.  The claim would be that a pesticide user
18 that adheres to the precautionary provisions on a
19 label would have a reasonable expectation of not
20 suffering any reasonable adverse effect from a
21 lawful and legal aspect of the pesticide in
22 accordance with the directions on the label.
23     Q.   And right now EPA's take on
24 glyphosate-based herbicides is that there's no
25 evidence it's a human carcinogen, correct?

Page 381

1      A.   Yes.  That's what we've discussed for
2  several hours now.
3      Q.   And it's been that case at least since
4  the second peer review committee determination in
5  1991, right?
6      A.   Correct.
7      Q.   Now, advertising would also be covered
8  under EPA's regulation of a registrant's labeling
9  claim, right?
10     A.   Correct, as set forth on 12-12.
11     Q.   That would include advertising,
12 collateral literature, and verbal claims for the
13 product, right?
14     A.   Correct.
15     Q.   And all of that cannot substantially
16 differ -- all of that, all of such claims if made by
17 a registrant cannot substantially differ from the
18 claims made on the label or labeling that EPA has
19 approved as part of registration, right?
20     A.   Correct.
21     Q.   And EPA can require a registrant to
22 submit advertising that's used in the marketing of
23 an approved registered herbicide to be submitted for
24 review in order to be in compliance, correct?
25     A.   It has the authority to do so, yes.

CONFIDENTIAL

## Page 382

1    Q.    Do you have experience of any type with
2  EPA's review of advertising and collateral
3  literature or verbal claims of labeling claims?
4    A.    In the record of this case, as I
5  mentioned, there are, I think, three specific
6  assertions made in advertising materials, I believe
7  both on the television and in print media that were
8  part of a Midwestern advertising campaign for
9  Roundup brand herbicides, that an individual in Iowa
10  with knowledge about pesticides contacted the EPA
11  and said that he felt that the content of the
12  advertisement was inconsistent with the requirements
13  on the label relative to the clothing that the
14  individual depicted in the ads using Roundup
15  herbicide was using.
16        In addition, in this particular episode,
17  which is in the record that I reviewed -- I don't
18  think I put anything in my expert report about it,
19  because it happened many years before Mr. Johnson
20  used the materials and it involved in advertising
21  campaign that was clearly identified in the record
22  as Midwestern based, so I didn't think it was -- I
23  didn't think it had any way to influence
24  Mr. Johnson's use of the product.
25        But in that, EPA objected to the use of

## Page 383

1  the word "safe."  It object to the use of the word
2  "biodegradable," and there was a third -- there were
3  three specific terms, if my memory serves me
4  correctly, that EPA directed Monsanto to remove from
5  that set of advertising.  I think they gave them 60
6  days to do that or something on that order.
7    Q.    Were you involved yourself personally and
8  professionally in any of these events?
9    A.    No.
10    Q.    Back to my question, do you have any
11  experience or expertise yourself in dealing with
12  EPA's regulation of labeling claims in herbicide
13  labels?
14    A.    Yes, I do.
15    Q.    What's that based on?
16    A.    Let's see.  I would say off the top of my
17  head, probably four or five of the expert witness
18  cases that I've been involved in over the years,
19  certainly one of the major ones that I was heavily
20  involved in for almost three years involved movement
21  of herbicides post application and damage to other
22  agronomic crops.  And one of the essential core
23  issues in the case was the adequacy of the label
24  directions incorporated on the herbicide product
25  applied in this case and whether those label

## Page 384

1  directions truthfully and fully reflected the
2  manufacturer's own understanding of the potential
3  risks posed by that herbicide when applied in the
4  conditions that it was applied in this particular
5  case.
6    Q.    What were the labeling claims that were
7  involved?
8        THE WITNESS:  Can we go off the record
9  for a minute?
10        MR. COPLE:  Sure.
11        THE VIDEOGRAPHER:  The time is now 7:39.
12  We are off the record.
13        (Break in proceedings.)
14        THE VIDEOGRAPHER:  The time is now 7:43.
15  We're on the record.
16        MR. COPLE:  Read back the question.
17        (The court reporter read the record as
18  requested.)
19        THE WITNESS:  In my past expert witness
20  work, correct?
21  BY MR. COPLE:
22    Q.    Yes.
23    A.    That was the question as I understood it.
24    Q.    Yes.
25    A.    Three of the cases that I participated in

## Page 385

1  as an expert witness involved intensive assessment
2  of the provisions on pesticide product labels,
3  in-depth analysis of the data developed by the
4  manufacturers and submitted to the EPA; the
5  completeness of the label directions and whether
6  provisions on the labels were justified.
7        The three cases involved: sethoxydim
8  herbicide, or Oust, a DuPont product; quinclorac,
9  which is a rice herbicide -- I don't remember the
10  company manufacturing that; and a herbicide called
11  Poast, sethoxydim.
12        Assessment -- detailed assessment of what
13  was on the labels were integral to those cases, and
14  I'm not -- I don't feel comfortable saying anything
15  more about them, because in the case of all three, I
16  signed and agreed to abide by a protective order,
17  the details of which I don't remember.
18    Q.    We're not going to ask you questions that
19  might put you at any risk, Dr. Benbrook.  I just
20  have one final question about this one before we
21  adjourn for just today.
22        Those -- those cases in which you have
23  that experience with labeling claims, all of those
24  cases were involved with your work as an expert
25  witness in litigation, correct?

CONFIDENTIAL

## Page 386

1  A.    Correct.
2      MR. COPLE:  We can adjourn until tomorrow
3  morning.
4      THE VIDEOGRAPHER:  The time is now 7:45.
5  We are off the record.
6
7      (Deposition adjourned at 7:45 p.m.)
8
9      (Signature reserved)
10
11
12          * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 387

1          DEPOSITION ERRATA SHEET
2
3  Case Caption:  DEWAYNE JOHNSON -vs- MONSANTO COMPANY
4  Deposition Date:  February 8, 2018
5
6      DECLARATION UNDER PENALTY OF PERJURY
7    I declare under penalty of perjury that I have read
8  the entire transcript of my Deposition taken in the
9  captioned matter or the same has been read to me, and the
10  same is true and accurate, save and except for changes
11  and/or corrections, if any, as indicated by me on the
12  DEPOSITION ERRATA SHEET, hereof, with the understanding
13  that I offer these changes as if still under oath.
14  Signed on the __ day of ____, 20__.
15
16
17      _____
18      DR. CHARLES M. BENBROOK
19
20  Subscribed and sworn before me this ___ day of _____,
21  20__, in _____.
22
23  _____
24  Notary Public
25  My commission expires: _____, 20__

## Page 388

1  Notary Public Registration No. _____
2      DEPOSITION ERRATA SHEET
3
4  Page No.____ Line No.____ Change to:_____
5
6  Reason for change: _____
7  Page No.____ Line No.____ Change to:_____
8
9  Reason for change: _____
10  Page No.____ Line No.____ Change to:_____
11
12  Reason for change: _____
13  Page No.____ Line No.____ Change to:_____
14
15  Reason for change: _____
16  Page No.____ Line No.____ Change to:_____
17
18  Reason for change: _____
19  Page No.____ Line No.____ Change to:_____
20
21  Reason for change: _____
22  Page No.____ Line No.____ Change to:_____
23
24  Reason for change: _____
25  SIGNATURE:_____ DATE:_____

## Page 389

1      DR. CHARLES M. BENBROOK
2      DEPOSITION ERRATA SHEET
3
4  Page No.____ Line No.____ Change to:_____
5
6  Reason for change: _____
7  Page No.____ Line No.____ Change to:_____
8
9  Reason for change: _____
10  Page No.____ Line No.____ Change to:_____
11
12  Reason for change: _____
13  Page No.____ Line No.____ Change to:_____
14
15  Reason for change: _____
16  Page No.____ Line No.____ Change to:_____
17
18  Reason for change: _____
19  Page No.____ Line No.____ Change to:_____
20
21  Reason for change: _____
22  Page No.____ Line No.____ Change to:_____
23
24  Reason for change: _____
25  SIGNATURE:_____ DATE:_____

CONFIDENTIAL

Page 390

1      DR. CHARLES M. BENBROOK
2  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
3      I, Rhonda D. Tuck, RPR, CRR, Notary Public in and
4  for the Commonwealth of Virginia at Large, and whose
5  commission expires on May 31, 2020, do certify that the
6  aforementioned appeared before me, was sworn by me, and
7  was thereupon examined by counsel; and that the foregoing
8  is a true, correct, and full transcript of the testimony
9  adduced.
10      I further certify that I am neither related to nor
11  associated with any counsel or party to this proceeding,
12  nor otherwise interested in the event thereof.
13      Given under my hand and notarial seal at
14  Charlottesville, Virginia, this 12th day of February,
15  2018.
16
17
18
19      _____
20      Rhonda D. Tuck, RPR, CRR
21      Notary Public Registration No. 224847
22      Commonwealth of Virginia at Large
23
24
25