# EXHIBIT 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS MDL No. 2741

LIABILITY LITIGATION

______________________ Case No. 16-md-02741-VC

This document relates to:

Gebeyehou v Monsanto Co., et al.

Case No. 3:16-cv-5813-VC

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEO DEPOSITION OF

CHADI NABHAN, M.D.

December 14, 2018

12:24 p.m.

Chicago Marriott O'Hare

8835 West Higgins Road, Park Ridge, Illinois

Deanna Amore, CRR, CSR, RPR, 084-003999
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff, SIMOUN GEBEYEHOU:

ANDRUS WAGSTAFF
MS. KATHRYN M. FORGIE
1901 Harrison Street
Suite 1101
Oakland, California 94612
(310) 339-8214
kathryn.forgie@andruswagstaff.com
- and -
ANDRUS WAGSTAFF
MS. AIMEE H. WAGSTAFF
7171 West Alaska Drive
Lakewood, Colorado 80226
(303) 376-6360
aimee.wagstaff@andruswagstaff
- and -
WEITZ & LUXENBERG, P.C.
MS. ROBIN L. GREENWALD
700 Broadway
New York, New York 10003
(313) 800-4170
rgreenwald@weitzlux.com
- and -
LAW OFFICES OF TESFAYE TSADIK
MR. TESFAYE TSADIK (via telephone)
1736 Franklin Street
10th Floor
Oakland, California 94612
(510) 839-3922
ttsadik@pacbell.net

APPEARANCES OF COUNSEL

On Behalf of the Defendant, MONSANTO COMPANY:

ARNOLD & PORTER KAYE SCHOLER, LLP
MR. BERT L. SLONIM
250 West 55th Street
New York, New York 10019-971
(212) 836-8572
bert.slonim@arnoldporter.com
- and -
WILKINSON WALSH + ESKOVITZ
MS. CALI COPE-KASTEN
2001 M Street, NW
10th Floor
Washington, D.C. 20036
(202) 847-4030
ccope-kasten@wilkinsonwalsh.com

ALSO PRESENT:
Anthony Micheletto, Videographer

* * * *

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| CHADI NABHAN, M.D. | |
| EXAMINATION BY MR. SLONIM | 6 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Innovative Oncology Consulting, LLC Invoice for Services Rendered in Hardeman v Monsanto; NABHNMDLGROUP100059 | 7 |
| Exhibit 2 | 11.20.2018 Expert Report of Dr. Chadi Nabhan | 9 |
| Exhibit 3 | Key Statistics for Non-Hodgkin Lymphoma - American Cancer Society | 17 |
| Exhibit 4 | Cancers Statistics, 2015 | 21 |
| Exhibit 5 | 11.22.2006 The Permanente Medical Group Medical Record; Confidential-Gebeyehou-SGebeyehou-KPNValley-MD-003815 | 32 |
| Exhibit 6 | Rituxan Label (Revised 10/2018) | 44 |

THE VIDEOGRAPHER: We are now on the record. My name is Anthony Micheletto. I am a videographer for Golkow Litigation Services.

Today's date is December 14, 2018. The time is 12:24 p.m. as indicated in the video screen.

This video deposition is being held in Chicago, Illinois, in the matter of Simoun Gebeyehou versus Monsanto Corporation, et al., being filed in the United States District Court for the Northern District California.

Our witness today is Chadi Nabhan M.D., MBA.

Will counsel please identify themselves for the video record?

MS. GREENWALD: Robin Greenwald for the plaintiff, including Mr. Gebeyehou.

MS. FORGIE: Kathryn Forgie of Andrus Wagstaff for the plaintiff.

MS. WAGSTAFF: Aimee Wagstaff for the plaintiff, and I will be leaving during the deposition.

MR. SLONIM: Bert Slonim from Arnold & Porter on behalf of Monsanto.

MS. COPE-KASTEN: Cali Cope-Kasten from Wilkinson Walsh on behalf of Monsanto.

THE VIDEOGRAPHER: Counsel on the phone.

MS. GREENWALD: Tes, introduce yourself, please.
MR. TSADIK: Tesfaye Tsadik on behalf of Simoun Gebeyehou.
THE VIDEOGRAPHER: Our court reporter today is Deanna Amore. Please swear in the witness.
(Whereupon, the witness was duly sworn.)
THE WITNESS: I do.
MR. SLONIM: Good afternoon, Dr. Nabhan, my name is Bert Slonim. You understand that I represent Monsanto in this litigation; is that right?
THE WITNESS: I do.
MR. SLONIM: Would you please state your full name and business address for the record?
THE WITNESS: Chadi is the first name, and Nabhan is the last name. Business address is 3651 Birchwood Avenue in Waukegan, Illinois 60085.
CHADI NABHAN, M.D.,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. SLONIM:
Q. And Dr. Nabhan, you are a medical doctor;

is that correct?
A. Yes.
Q. Did you review Mr. Gebeyehou's medical condition as part of your work in this matter?
A. I did.
(Whereupon, Exhibit 1 (Gebeyehou) was marked for identification.)
BY MR. SLONIM:
Q. I'm going to hand you what's been marked as Deposition Exhibit No. 1 which has been produced to us as your invoice for your work in this matter.
A. Sure.
This is until December 4.
Q. So, Dr. Nabhan, does this represent the time that you spent working on the Gebeyehou matter through December 4?
A. Through December 4, yes.
Q. Okay. And if I did the addition correctly, is that 22 hours?
A. Until December 4 -- between October 31st and December 4.
Q. And that is -- you charge $550 per hour for your time in doing this work; is that correct?
A. Yes.

Q. Since December 4, can you give us your best estimate of any additional time you spent on the Gebeyehou matter?
A. I have it in my computer. My best estimate, between 10 to 15 additional hours, somewhere like that.
Q. Okay. So -- and I appreciate the fact that it would be an estimate, and if we did some quick addition -- so your estimate would be between roughly 32 and 37 hours total on the Gebeyehou matter; is that correct?
A. Probably closer to 40, something like that.
Q. Okay. Just looking at this time, it looks like you spent a total of about 12 hours reviewing Mr. Gebeyehou's medical records; is that right? Well --
A. A little bit more, I think. 12 hours, a little bit closer, maybe an hour or two after that before I started drafting the report, and then additional reviews and finalizing the report was on the 16th.
Q. Okay. And then you spent another five hours, it looks like, reviewing case-specific reports that were provided by experts retained by

Monsanto in this matter?
A. Yes.
And then between December 4 and now additional reviews and stuff like that.
Q. Okay. Thank you.
(Whereupon, Exhibit 2 (Gebeyehou) was marked for identification.)
BY MR. SLONIM:
Q. I've marked as Deposition Exhibit 2 -- I am going to hand you a copy -- the expert report that you prepared in this matter.
A. Sure.
Q. Can you identify this as your report regarding Mr. Gebeyehou?
A. Yes, it is.
Q. And on the last page, page 8, that's your signature; correct?
A. Yes.
Q. On first page it says prepared by you; is that correct?
A. Yes.
Q. Is it right that -- correct that you authored this report, and, in particular that in terms of the substance, that you authored all of



the substance of the report?
A. I did.
Q. Does this report disclose all of the opinions that you intend to offer in this matter?
A. Yes.
Q. And does it disclose all the bases for your opinions?
A. You know, I can't reference every single thing that you look at in the literature. Some of the references are examples to illustrate the opinion as opposed to all -- every single reference, but for the most part, these are the materials I relied on. There is thousands of references for every particular aspect. So I provide illustration of representative references of what I'm relying on.
Q. Did you come across any medical or scientific literature that was contrary to an opinion that you are offering in this matter?
MS. GREENWALD: Objection. Form.
THE WITNESS: In reviewing some of the epidemiologic literature, there is obviously some studies that have disputed the link between Roundup, glyphosate, and non-Hodgkin lymphoma. So I'm fully aware of that literature, and I reviewed

it as well.
BY MR. SLONIM:
Q. Okay. But you did not list those articles that found the absence of a link between glyphosate and non-Hodgkin lymphoma in your list of materials that you considered?
MS. GREENWALD: Objection. Form.
BY MR. SLONIM:
Q. Is that right?
MS. GREENWALD: It's not part of this report.
THE WITNESS: I do allude to the agricultural health study in -- I mean, I'll have to look where I listed that, and I think that was the major study that has been relied upon as lacking the link between Roundup and non-Hodgkin lymphoma. So I do list that as I was reviewing the literature. I think that is -- I can try to tell you where it is. I am sure you have it.
BY MR. SLONIM:
Q. Did you make an effort to disclose at least in terms of fairly representative materials all of the -- strike that.
Did you make an effort to disclose at least representative materials that you rely on in support of the opinions you intend to offer in this

matter?
A. I have, yeah. I mean that's -- I think you just asked me this question, yes.
Q. You did not intend to offer any opinions regarding Mr. Gebeyehou that are not disclosed in your expert report; is that correct?
A. Everything that I plan on offering regarding this case, for the most part, is enclosed here. Unless there are some emerging information that I need to look at between now and later on when this case goes to trial, that's the opinion I'm planning on providing.
Q. Based -- unless there is new information that comes to light between -- subsequent to today, this report reflects all of the opinions and all of the bases that you intend to offer in this matter; is that right?
A. Correct.
Q. Is it correct that
?
that
A.

Page 14

t

Page 15

Q. Are you familiar with the WHO classification system of lymphomas?
A. Of course. It has been changing over the years. So the last classification we have came out in 2016 by Swerdlow and colleagues.
Q. And is that a classification system that you and other lymphoma specialists rely on in the course of your medical practice?
A. Yes.
Just to give a quick context of classification, how we classify non-Hodgkin lymphoma has evolved over the years since the '70s until now, and they always reflect much more in-depth understanding of the disease and what we know about the molecular subtypes and so forth. So the last classification that we have was 2016, which is the WHO, and prior to that, I think the one that we had was 2008. And every few years, as

Page 16

our understanding of lymphoma improves, the classification gets more complicated, actually. So right now we have over 60 types of non-Hodgkin lymphoma.
Q.
?
Q. And what you did was you relied on the report that was prepared by the treating pathologist and reflected in the medical records; is that right?
A. Yes. Well, not the -- there is no treating pathologist, and I relied on the report provided by the local pathologist in that area. Usually, it's treating oncologist, just to clarify.

Page 17

Q. Okay. I just want to spend a minute and get a little context for non-Hodgkin lymphoma, specifically, the DLBCL subtype. Non-Hodgkin lymphoma is one of the most common cancers in the United States; is that correct?
A. Well, it's about -- I think it's the fifth. So I think in -- you know, I mean, in women, you have lung cancer or breast cancer or colorectal cancer, et cetera. I think these are the most common. In men, you have prostate, colorectal, and lung, and so forth. So I think it's about the fifth most common cause of cancer. About 75,000 new cases of non-Hodgkin lymphoma were diagnosed this past year. That's the latest statistic I recall.
Q. Let me mark as Deposition Exhibit No. 3 a document prepared by the American Cancer Society entitled "Key Statistics For Non-Hodgkin Lymphoma."
(Whereupon, Exhibit 3 was marked for identification.)
THE WITNESS: Thank you.
BY MR. SLONIM:
Q. Dr. Nabhan, could I ask you please to read the first sentence? I yellow-highlighted it.
A. "Non-Hodgkin lymphoma is one of the most



Page 18

common cancers in the United States, accounting for about 4 percent of all cancers. The American Cancer Society's most recent estimates for non-Hodgkin lymphoma are about 74,680 people will be diagnosed with NHL in 2018. This includes both adults and children."

Q. Do those statements agree with your understanding of the frequency with which non-Hodgkin lymphoma is diagnosed in the United States?

MS. GREENWALD: Objection. Form.

THE WITNESS: Which is what I said, about 75,000 cases a year.

BY MR. SLONIM:

Q. Okay. And the -- in the next full paragraph, the first yellow sentence states -- the first sentence, which I've yellow-highlighted states, and I quote, "The average American's risk of developing non-Hodgkin lymphoma during his or her lifetime is about 1 in 47." And do you agree with that statistic?

A. Yes.

, the DLBCL subtype, is it correct

Page 19

that that particular subtype is the most common type of non-Hodgkin lymphoma in the United States?

A. Correct, it represents about one third.

Q. In other words, of the new cases that are diagnosed in the United States per year, which you said was approximately 75,000, of those, approximately 25,000 would be of the DLBCL subtype, which Mr. Gebeyehou had; is that correct?

A. That's pretty fair.

Q. So I wanted to talk about risk factors, and I wanted to just start broadly first with cancer before we drill down into non-Hodgkin lymphoma.

Cancer or the risk of being diagnosed with cancer is a function of age; is that correct?

MS. GREENWALD: Objection. Form.

THE WITNESS: I mean, age doesn't cause cancer, but the older we get, we are more likely to get all diseases, including cancer. So, again, unfortunately, as we age, we could get cancer, heart disease, anything. But you are correct, so more older patients get diagnosed with cancer than younger patients.

BY MR. SLONIM:

Q. In other words, as patients age, their

Page 20

risk of cancer increases over the course of their lifetime; correct?

A. Correct.

Q. And if we focus specifically on non-Hodgkin lymphoma, a person's risk of developing that condition, that increases as they age; correct?

A. Correct.

A. Yes.

Q. And the median age of patients who are diagnosed with that condition, DLBCL, is 70; is that right?

A. 68 to 72, yep.

Page 21

,

)

BY MR. SLONIM:

Q. I've marked as Deposition Exhibit No. 4 an

article entitled "Cancer Statistics, 2015" published by epidemiologists and researchers at the American Cancer Society reporting on the statistics, cancer incident statistics. I know they're cancer statistics.
A. There is a newer one. Each year you get one.
Q. So you are familiar with these reports?
A. Of course.
Q. And you are right, there is a newer one.
A. I understand. I just want to make sure that in case you -- that this is not the last iteration of it.
Q. Thank you.
Let me ask you to turn, please, to Table 4, which is on page 10.
A. Okay.
Q. So this table reports on the probability of a person developing different types of cancer, including non-Hodgkin lymphoma, according to selected age intervals in the United States; is

that correct?
A. Yes.
Q. And to make the table easier to read, I yellow-highlighted the row that's for non-Hodgkin lymphoma and particularly for males. Do you see that?
A. I do.
Q. So according to this data, a man in his 70s -- do you see that? That's the next-to-last column, 70 and greater?
A. Yes.
Q. -- has six times the probability of being diagnosed with non-Hodgkin lymphoma compared with a man who is under age 50. Do you see that?
A. Yes, I do.
Q. And you agree with that?
A. Yes.
Q.
Q. There is an easier way to do. The percentage is three tenths of a percent compared to

1.8 percent; right?
A. Sure.
Q. So there is --
A. I agree with that.
Q.
BY MR. SLONIM:
Q.

Q.

Q. That was the American Cancer Society statistic we just looked at -- right? -- the average risk in the United States, Exhibit 3?

A. I see 1 in 42 here in Table 4.

Q. And what they did -- thank you -- but the American Cancer Society must have averaged the male and the female, the 1 in 47 and the 1 in 52.

MS. GREENWALD: Objection. Form.

THE WITNESS: According to Table 4, yes. That's what I was trying to get at. It wasn't 42, 47. But the average 1 in 47, and this Table 4 that

you provide says 1 in 42 which is aligned with what we know.

BY MR. SLONIM:

Q. ?

Q.

.

Q.

MS. GREENWALD: Objection. Form.

BY MR. SLONIM:

Q. Yes.

A.

Page 30

Q. Okay. Let's move on to another consideration.
A. Sure.
Q. Autoimmune disease is a risk factor for non-Hodgkin lymphoma; correct?
A. Correct.
Q. And you would agree that it's not unusual for patients who have autoimmune disease to develop this particular type of malignancy, non-Hodgkin lymphoma, subtype DLBCL; correct?
MS. GREENWALD: Objection. Form.
THE WITNESS:

Page 31

BY MR. SLONIM:
Q. And now, in your report -- you are welcome to look at it -- on page 5 --
A. Okay.
Q. -- at the top, the first full bullet at the top. Do you see that?
A. Sure.
Q.

Page 32

Page 33

Chadi Nabhan, M.D.

Page 34

Page 36

d.

Page 35

Page 37

:

Q.

MS. GREENWALD: Objection. Form.

THE WITNESS:

Golkow Litigation Services Page 10 (34 - 37)



Page 38

Regardless, I don't believe that Meniere's disease is associated with non-Hodgkin lymphoma. I would like to look at evidence to demonstrate the association between Meniere's, specifically, and non-Hodgkin lymphoma. When we talk about autoimmune disease and non-Hodgkin lymphoma, we are talking about the lupus, the rheumatoid arthritis, the scleroderma, the Sjogren's syndrome, these types of autoimmune diseases that we often describe.

BY MR. SLONIM:

Q. And in your "Materials Considered," it you don't list a single article listing Meniere's disease, do you?

A. No, I don't.

Page 39

Q. In your list of references, you don't list any references discussing autoimmune disease, do you?

A.

Q. Let's move on to another consideration.

You're familiar with a type of viral hepatitis known as viral hepatitis B; is that correct?

A. Of course.

Q. Viral hepatitis B is a risk factor for developing non-Hodgkin lymphoma; correct?

A. Yes.

Q.

Page 40

Page 41

A.

A.

Page 42

.

Page 43

A.

ct

Page 44

Page 45

BY MR. SLONIM:

Q.

correct?

Chadi Nabhan, M.D.

Page 46

A.

Page 47

MS. GREENWALD: Objection. Form.

,

Page 48

Page 49

It's

Golkow Litigation Services Page 13 (46 - 49)



Page 50

BY MR. SLONIM:

Q. Let's move on to another consideration.

A. Which page?

Q. No, I'm looking at my notes.

You've spent a number of years in your medical career dealing with cancer, of course?

A. Yes.

Q. Cancer is a genetic disease, meaning that cancer is caused by changes in genes that control the way cells function; correct?

A. That control the white cell function?

Q. That control the way cells function.

A. The way cells function.

Yeah, I mean, that's the way we tend to believe. The problem is there are situations where you just can't determine any of that. I think most cancers, we still don't know why they are caused and what cause most cancers. For some cancers, we are able to determine the cause.

We tend to believe that at some point cancer is caused by some alteration in the genetic material or cell survival and cell death, but it's not as simple as that because there are many cancers we still don't know what type of cause.

Q. Genetic changes in genes that control how

Page 51

cells grow and divide, if those genes are altered, that could result in cancer; right?

A. It could.

Q. And genes that control how cells get repaired and how they die, those can be important drivers of whether or not there is a malignancy; correct?

A. Of course.

Q. And those types of genetic changes in cells, they can predispose a person to develop cancer; correct?

A. They can.

Q. And that's one of the reasons why physicians often are interested in a person's family history of cancer; correct?

A. In everything.

I mean, you just have -- that's why you do the entire exercise about smoking, tobacco, family, alcohol, occupational exposure. I think all of them are really important, but that's why we ask about family history also because some cancers can be inherited through, particularly, chromosomes from the father and mother to the offspring, and some cancers are just sporadic.

So, you know, I think given how ubiquitous

Page 52

cancer is, pretty much everybody around this table knows a family member of theirs that had, at some point, cancer. That doesn't mean all of us have a genetic predisposition to cancer. So there is a difference; right?

You know, my mother had breast cancer, and my father had melanoma. It doesn't mean these were pass on to me by chromosomes. I think we have to differentiate when we say "genetic predisposition," are you saying that this an actual genetic material passed on from the father, mother to the children or just sporadic. So it's an important distinction, I believe.

Q. Thank you. You anticipated my next question.

You are familiar with something called "germline mutations"?

A. That's what I was trying to get at, so there you go.

Q. So can you please help us out a little bit and explain what germline mutations are?

A. Well, I mean, that's what we just described; right? I mean, I think the idea is that it could be a mutation through the genetic material passed from the father and mother into the

Page 53

children. That's usually what we classify as germline mutations versus somatic mutations. These are mutations that just occur sporadically and has nothing to with the genetic material.

So it's actually a frequent board question on the medical oncology board and internal medicine board, where they give you this family history of, you know, the mother had X cancer, the father had X cancer, the uncle had X cancer, and then the patient in question has this cancer. And you try to figure out is this really something that was passed on by the family that needs genetic testing or simply sporadic? So I think it's important to look at each particular patient separately.

But you are right, that's why we ask about family history, and. In my practice, I've always asked about family history, and when I suspected that there may be something that could be germline mutation or something that was passed on, I used to refer these patients to the genetic counseling clinic so they can decide what type of testing is done.

Q.

Chadi Nabhan, M.D.

Page 54

A.

Page 55

A.

Page 56

Page 57

Golkow Litigation Services Page 15 (54 - 57)



Chadi Nabhan, M.D.

Page 58

Page 59

Page 60

those unknown causes that was responsible for his

e

Page 61

Golkow Litigation Services Page 16 (58 - 61)

Chadi Nabhan, M.D.

Page 62

A.

Page 63

k

Page 64

Page 65

no.

Golkow Litigation Services Page 17 (62 - 65)



ody

Q. Can you tell me what the error rate is of your methodology?

MS. WAGSTAFF: Objection. Asked and answered several times.

THE WITNESS: It depends on the published evidence for each particular thing that you do. This is 101 medical student teaching. That's what you teach you in medical school, that when you face a patient and you are trying to determine what disease they have, you look at the symptoms and signs, and you try to do a differential diagnosis for their disease. If you want to look at causation, you do a differential etiology. You look at each factor and try to determine which factor caused this. This is classic teaching. I don't need to tell you methodology. Any textbook in medicine talks about that.

BY MR. SLONIM:

Q. What is the error rate for the methodology

you applied to Mr. Gebeyehou?
MS. GREENWALD: Objection. Form. Asked and answered.
THE WITNESS: There is not such a thing as an error rate for something called differential etiology. This is not a statistical test. This is what you do when you're dealing with a patient and trying to determine the etiology. You are trying to mix statistical tests of a clinical trial with an alpha error and beta error with something that is done classically in medical school and exam rooms to determine what the patient has.
When somebody has a cough goes to a doctor, they have to determine whether the cough is pneumonia or just a bad cold. What's the error rate of that? Nobody knows. It depends on the experience of the physician, on the literature, on the signs and symptoms of the patient, on the other issues. This is not a statistical test.
BY MR. SLONIM:
Q. So can you point to any published article that says "For purposes of assessing whether Roundup caused or contributed to a patient's non-Hodgkin lymphoma, these are the tests I should -- that should be done, and these are the

protocols that should be followed"?
MS. GREENWALD: Objection. Asked and answered.
THE WITNESS: It's not about Roundup or not Roundup. Any time you are looking at causation of a particular disease, particular ailment, which is cancer or not, this is the standard operating procedure what physicians do in their exam room and in their practice. This is what they actually do. If you literally go to the library and pick a random textbook of medicine and go to how you do physical exam and do differential etiology and differential diagnosis, that's the teaching process of what they teach students and residents. If you are faced with a patient and you are trying to determine what the problem, what caused the cancer of this patient, you look at everything together and do process of elimination.
BY MR. SLONIM:
Q. Can you name a textbook or any publication that tells you how you do an etiology and determine the cause of a particular patient's non-Hodgkin lymphoma?
MS. GREENWALD: Objection. Asked and answered.
THE WITNESS: Literally any medical textbook --

BY MR. SLONIM:
Q. Don't name any one. Give me one.
A. DeVita's textbook, Harrison's textbook, DeVita's textbook, Harrison's textbook.
Q. You are representing -- I want to be clear about this. You are representing to the court that if we pull those textbooks and I hand them to you, you can turn to a page, and it will say "This is the procedure to be used to ascertain the cause of a patient's non-Hodgkin lymphoma"?
MS. GREENWALD: Objection. Form. That's not his testimony. Asked and answered.
Go ahead and answer.
THE WITNESS: This is -- again, let me explain what I've been saying --
BY MR. SLONIM:
Q. No, no, no.
MS. GREENWALD: Let him answer the question you asked.
MR. SLONIM: Don't explain. Answer the question.
Let's have the question read back so it's clear in mind.
THE WITNESS: I said any textbook --
MR. SLONIM: No.

MS. GREENWALD: Just listen to the question again, and I'll pose my objections again and --
BY MR. SLONIM:
Q. Doctor, you need to focus on my question. You need to answer my question. If your counsel has questions to ask, as you know, she will have her opportunity. Now it's my turn. I'll ask the court reporter to read back the question, please.
(Whereupon, the record was read.)
MS. GREENWALD: I'm objecting as asked and answered, on form, and that was not his testimony.
THE WITNESS: Can I answer? Yes?
Okay. When you pull any chapter of non-Hodgkin lymphoma in these textbooks and others, you will have a list of causative factors. It will say etiology, causes or possible causes, and they will go through a list of similar things that we went through, me and you just earlier on.
Now, as a clinician, when you are sitting in front of a patient, you are thinking of these causes, and you are trying to see how these causes apply to this particular patient. Sometimes none of these causes apply to a particular patient, and you are going to tell the patient -- look him in

Page 74

the eye and say, "I don't know what caused your non-Hodgkin lymphoma."

Sometimes, some of these causes, one or two, may apply, and you look at the patient and say, "This is what I believe caused your non-Hodgkin lymphoma." This is what I was trying to say.

BY MR. SLONIM:

Q. So let's be clear. These textbooks may list risk factors for non-Hodgkin lymphoma; correct?

A. Yes.

Q. That's not the question.

The question is --

A. Then I misunderstood.

Q. The question is do these textbooks set forth a procedure, test, or protocol that tells a clinician how to determine the cause of a patient's, specific patient's non-Hodgkin lymphoma?

MS. GREENWALD: Same objection. Asked and answered. Form.

THE WITNESS: This is taught as common sense. There is no -- they don't tell you, "This is the methodology." You put the causative factors, and you look at them. It's common sense. I'm not sure there is an actual -- an actual name of a procedure

Page 75

that we usually do. It's common sense.

You look at the causative factors, and you do process of elimination for each particular patient. It's taught on and on again in every single clinical practice. That's what I taught my students and my fellows when they face a patient. I don't know what methodology we call this. This is just common sense in clinical practice.

BY MR. SLONIM:

Q. I just want to be clear. Can you identify any peer-reviewed medical literature that states, in substance, "This is the test procedure or protocol that can be used to ascertain the cause of a specific patient's non-Hodgkin lymphoma"?

MS. GREENWALD: Objection. Form. Asked and answered.

THE WITNESS: I can't right this minute. This is a common sense procedure that we do every single day. It's like, you know, is there a methodology to tell you when you put the stethoscope on the back of a patient and you listen to them, what's your error rate of whether you're hearing something normal or abnormal.

There is no such thing. You still put the stethoscope on a patient. You still listen to him

Page 76

and determine whether you hear something normal or abnormal. What methodology is this? This is common sense that we do and teach our students.

BY MR. SLONIM:

Q. So, Mr. -- so Dr. Nabhan, if you saw a

Page 77

A.

Page 78

MR. SLONIM: Why don't we take a break and see

Page 79

where we are?

THE VIDEOGRAPHER: We are off the record at 1:53 p.m.

(A short break was taken.)

THE VIDEOGRAPHER: We are back on the record at 2:06 p.m.

MR. SLONIM: Dr. Nabhan, I don't have any further questions. I may, if your counsel has some questions, but otherwise, we are done.

MS. GREENWALD: We have no questions.

MR. SLONIM: Thank you so much, Dr. Nabhan. We really appreciate it.

THE VIDEOGRAPHER: We are off the record at 2:07 p.m. This concludes the videotaped deposition of Chadi Nabhan.

Page 80

C E R T I F I C A T E

I, DEANNA AMORE, a Shorthand Reporter and notary public, within and for the State of Illinois, County of DuPage, do hereby certify:

That CHADI NABHAN, M.D., the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of December 2018.

_____________________________

Deanna M. Amore, CSR, RPR

Page 81

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS MDL No. 2741
LIABILITY LITIGATION
_______________________ Case No. 16-md-2741-VC
This document relates
to:
Gebeyehou v Monsanto Co., et al.
Case No. 3:16-cv-5813-VC

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of
______________, 20__.

_______________________________________
CHADI NABHAN, M.D.

ERRATA SHEET

CORRECTIONS:

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________

Page _____ Line _____ Reason _____
From ________________________ to ______________________