# EXHIBIT 22

Andrei Shustov, M.D.

```
0   01



2                    UNITED STATES DISTRICT COURT

3

4                 NORTHERN DISTRICT OF CALIFORNIA

5

6    _____

7

8    IN RE:  ROUNDUP PRODUCTS              )

9    LIABILITY LITIGATION                  )

10   _____  )  MDL No. 2741

11                                        )

12   This document relates to:           )  Case No. 16-md-02741-VC

13                                        )

14   Hardeman v. Monsanto Co., et al.    )

15   Case No. 3:16-cv-00525-VC            )

16                                        )

17                                        )

18                                        )

19   _____

20

21          VIDEOTAPED DEPOSITION OF ANDREI SHUSTOV, M.D.

22

23                    December 15, 2018

24

25                    Seattle, Washington
```

Andrei Shustov, M.D.

APPEARANCES

For the Plaintiff:

R. BRENT WISNER, ESQ.
Baum, Hedlund, Aristei & Goldman, P.C.
10940 Wilshire Boulevard
17th Floor
Los Angeles, California 90024
310.207.3233
rbwisner@baumhedlundlaw.com

AIMEE H. WAGSTAFF, ESQ. (Via teleconference)
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, Colorado 80226
303.376.6360
aimee.wagstaff@andruswagstaff.com
JENNIFER A. MOORE, ESQ. (Via teleconference)
Grossman & Moore, PLLC
One Riverfront Plaza
401 West Main Street, Suite 1810
Louisville, Kentucky 40202
502.657.7100
jmoore@gminjurylaw.com

For Defendant Monsanto Co.:

AARON H. LEVINE, ESQ.
DAVID KERSCHNER, ESQ.
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, New York 10019
212.836.8000
aaron.levine@arnoldporter.com
david.kerschner@arnoldporter.com

APPEARANCES (Continuing)

For Defendant Bayer:

LINDLEY JAMES BRENZA, ESQ.
Bartlit Beck, LLP
1801 Wewatta Street
Suite 1200
Denver, Colorado 80202
303.592.3100
lindley.brenza@bartlitbeck.com

Also present: Steven Crandall, videographer

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Levine | 10 |
| Mr. Wisner | 276 |
| Mr. Levine | 313 |
| Mr. Wisner | 320 |
| Mr. Levine | 321 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 1 | Monsanto Company's Notice to Take Oral and Videotaped Deposition of Dr. Andrei Shustov. | 11 |
| Exhibit No. 2 | Curriculum vitae of Andrei R. Shustov, M.D. | 22 |
| Exhibit No. 3 | Expert Report of Dr. Andrei R. Shustov. | 26 |
| Exhibit No. 4 | Dr. Shustov Reliance List as of November 19, 2018. | 26 |
| Exhibit No. 5 | IARC monograph regarding glyphosate. | 92 |
| Exhibit No. 6 | IARC Monographs on the Evaluation of Carcinogenic Risks to Humans:  Preamble. | 94 |
| Exhibit No. 7 | IARC monograph regarding hepatitis c virus. | 95 |
| Exhibit No. 8 | IARC monograph regarding hepatitis B virus. | 100 |

EXHIBIT INDEX (Continuing)

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 9 | U.S. News & World Report article:  "Roundup Weed Killer Has Probable Carcinogen, U.N. Says." | 103 |
| Exhibit No. 10 | Expert Report of Dr. Chadi Nabhan. | 107 |
| Exhibit No. 11 | International Journal of Environmental Research and Public Health:  "Non-Hodgkin Lymphoma and Occupational Exposure to Agricultural Pesticide Chemical Groups and Active Ingredients:  A Systematic Review and Meta-Analysis." | 126 |
| Exhibit No. 12 | Expert Report of Dr. Andrei R. Shustov. | 142 |
| Exhibit No. 13 | Expert Report of Dr. Chadi Nabhan. | 147 |
| Exhibit No. 14 | Fred Hutchinson Cancer Research Center Research Integrity Policy. | 153 |
| Exhibit No. 15 | Fred Hutchinson Cancer Research Center Research Misconduct Policy. | 155 |
| Exhibit No. 16 | Hepatitis B Foundation "Hepatitis B Blood Tests" website printout. | 193 |
| Exhibit No. 17 | Cancer Epidemiology, Biomarkers & Prevention. "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men:  Cross-Canada Study of Pesticides and Health." | 226 |

Andrei Shustov, M.D.

Page 6

EXHIBIT INDEX (Continuing)

EXHIBIT NO.    DESCRIPTION                    PAGE NO.

Exhibit No. 18   "Pesticide Exposure As Risk        241
                 Factor for non-Hodgkin
                 Lymphoma Including
                 Histopathological Subgroup
                 Analysis."

Exhibit No. 19   "Glyphosate Use and Cancer          250
                 Incidence in the Agricultural
                 Health Study."

Exhibit No. 20   "Integrative Assessment of          258
                 Multiple Pesticides As Risk
                 Factors for non-Hodgkin's
                 Lymphoma Among Men."

Exhibit No. 21   "Cancer Incidence Among             262
                 Glyphosate-Exposed Pesticide
                 Applicators in the
                 Agricultural Health Study."

Exhibit No. 22   American Cancer Society             264
                 website printout: "Key
                 Statistics for Non-Hodgkin
                 Lymphoma."

Exhibit No. 23   American Cancer Society             266
                 website printout: "Can
                 Non-Hodgkin Lymphoma Be
                 Prevented?"

Exhibit No. 24   American Cancer Society             267
                 website printout: "What
                 Causes Non-Hodgkin Lymphoma?"

Exhibit No. 25   Occupational Cancer Research        303
                 Center: "An Detailed
                 Evaluation of Glyphosate Use
                 and the Risk of Non-Hodgkin
                 Lymphoma in the North
                 American Pooled Project
                 (NAPP)."

Page 7

PORTIONS OF TRANSCRIPT REQUESTED TO BE MARKED

REQUESTED BY          PAGE NO.   LINE NO.

Mr. Levine            164        14

Page 8

1    BE IT REMEMBERED that on Saturday,

2    December 15, 2018, at 1900 Fifth Avenue, Seattle,

3    Washington, at 8:59 a.m., before JOHN M.S. BOTELHO,

4    Certified Court Reporter, appeared ANDREI SHUSTOV,

5    M.D., the witness herein;

6        WHEREUPON, the following

7    proceedings were had, to wit:

8

9             <<<<<< >>>>>>

10

11       THE VIDEOGRAPHER:  We are now on

12   the record.  My name is Steve Crandall, CLVS.  I am a

13   videographer for Golkow Litigation Services.  Today's

14   date is December 15th, 2018, and the time is 8:59

15   a.m.  This deposition is being held in Seattle,

16   Washington, in the matter of Hardeman vs. Monsanto

17   Company, et al., for the United States District

18   Court, Northern District of California.  The deponent

19   is Dr. Andrei Shustov.

20       Will counsel please identify themselves for the

21   record.

22       MR. WISNER:  Brent Wisner on behalf

23   of the deponent.

24       MR. LEVINE:  Aaron Levine for

25   Monsanto.

Page 9

1        MR. KERSCHNER:  David Kerschner for

2    Monsanto.

3        MR. BRENZA:  Lin Brenza with

4    Bartlit Beck for Bayer.

5        MR. WISNER:  And appearing by phone

6    is Aimee Wagstaff as well as Jennifer Moore also on

7    behalf of the deponent.

8        THE VIDEOGRAPHER:  The court

9    reporter is John Botelho, who will now swear in the

10   witness.

11

12   ANDREI SHUSTOV, M.D.,     having been first duly sworn

13                 by the Certified Court

14                 Reporter, deposed and

15                 testified as follows:

16

17       MR. WISNER:  Before we get started --

18   sorry to jump in -- I just want to make the record

19   clear that this witness is being put forward on

20   behalf of the specific cause opinions, and he's not

21   offering any general cause opinions beyond what is

22   contained in his report.  We will object to any

23   question that goes beyond the scope of that purpose.

24       We also understand that today's deposition

25   specifically relates to Mr. Hardeman and that

Andrei Shustov, M.D.

Page 10

1 tomorrow the remaining two plaintiffs will be -- be
2 questioned about. So to the extent you ask questions
3 today about the other two plaintiffs, we will object
4 to beyond the scope.
5      With that said, please get started. Sorry to
6 interrupt.
7           MR. LEVINE: I'll just add that all
8 objections should be to form to the deposition. Any
9 other objections can be reserved for later. But do
10 as you wish.
11
12           EXAMINATION
13 BY MR. LEVINE:
14 Q  Good morning, Dr. Shustov.
15 A  Good morning.
16 Q  My name is Aaron Levine. We met just a couple
17 minutes ago before we went on the record, correct?
18 A  Yes.
19 Q  And you understand that I represent Monsanto in this
20 case?
21 A  Yes.
22 Q  Can you state your full name and business address for
23 the record, please?
24 A  Sure. First name Andrei, A-n-d-r-e-i. Last name
25 Shustov, S-h-u-s-t-o-v.

Page 11

1      And business address, you said?
2 Q  Yeah.
3 A  Yes, it's Seattle Cancer Care Alliance, 825 Eastlake
4 Avenue East, Seattle, 98109.
5           (Exhibit No. 1 marked for
6             identification.)
7
8 Q  (By Mr. Levine) Dr. Shustov, I'm handing you what's
9 been marked as Exhibit 1. This is a notice of your
10 deposition.
11      Have you seen this notice before?
12 A  Yes.
13 Q  And you'll see with that notice, starting on, I
14 think, the third page, there is a Schedule A.
15 A  Okay.
16 Q  And within that part of the notice, it requests
17 production of various documents.
18      Have you reviewed this?
19 A  Yes, I did.
20 Q  And did you bring any materials responsive to the
21 requests in this notice?
22 A  I did not bring them to the deposition, no.
23 Q  Have you gone through the requests and provided
24 counsel with any materials responsive to the notice?
25 A  Whatever I have available on the list, yes.

Page 12

1 Q  Okay.
2           MR. LEVINE: Do you have any --
3 Counsel, do you have anything to produce in response
4 to --
5           MR. WISNER: I believe you received
6 our objections yesterday.
7           MR. LEVINE: Right.
8           MR. WISNER: I think we -- we
9 listed our objections to the various document
10 requests. The only one that I thought had any
11 documents that could be relevant would be invoices.
12           MR. LEVINE: Right.
13           MR. WISNER: However, my
14 understanding, he hasn't submitted any invoices. So
15 I was just mistaken that they even existed, so -- I
16 mean, but you could ask him about that, if you like.
17           MR. LEVINE: Sure. I understood
18 from your objections that invoices would be produced
19 --
20           MR. WISNER: Yeah.
21           MR. LEVINE: -- today, and --
22           MR. WISNER: And I was -- I was
23 I thought they had been submitted, and they just --
24 there just haven't been any.
25           MR. LEVINE: Okay.

Page 13

1           MR. WISNER: Sorry.
2 Q  (By Mr. Levine) So, Dr. Shustov, I'd like you to
3 turn to Request No. 4 on the fifth page of the
4 document. Do you see that?
5 A  Page 4.
6 Q  No. Request No. 4.
7 A  Oh, I -- I apologize. It was Schedule --
8 Q  It's about the --
9 A  Request No. 4.
10 Q  -- fifth page, although --
11 A  It starts with "Words"?
12           THE REPORTER: It's -- sorry.
13      You're talking over each other.
14           THE WITNESS: Starts with, "Words"?
15 Q  (By Mr. Levine) No. So there's a request that
16 starts with "All billing records." Do you --
17 A  Oh, yes.
18 Q  -- see that?
19 A  Yes.
20 Q  And, by the way, the court reporter just reminded me
21 that I will certainly do my best not to talk over you
22 during the deposition, so that we can make it easier
23 for him to transcribe. Likewise, you should just
24 wait until I finish something. We'll probably both
25 mess up at some point. He'll let us know. But let's

Page 14

1    do our best --
2    A  I agree.
3    Q  Just like that.  Let's -- let's do our best to wait
4       until the other one finishes before we respond.
5    A  Understood.
6    Q  Thanks.
7             THE REPORTER:  And what was that
8       you interjected earlier?
9             MR. LEVINE:  He said, "I agree."
10            THE REPORTER:  "I agree."  Thank
11      you.
12   Q  (By Mr. Levine)  So, Dr. Shustov, Request No. 4 is
13      for all billing records, invoices, or other documents
14      reflecting time spent and/or fees charged by you,
15      either directly or through your employer or other
16      entity, in connection with the Roundup/glyphosate
17      litigation and/or consulting work regarding
18      glyphosate, the International Agency for Research on
19      Cancer, Roundup, or Monsanto.
20         Do you see that?
21   A  I do.
22   Q  Have you kept records of your time spent on this
23      litigation?
24   A  I did not submit any invoices.
25   Q  So, all due respect, that was not my question.

Page 15

1         My question is:  Have you kept any records of the
2       time that you've spent working on this litigation?
3    A  I do.
4    Q  And did you provide those to counsel when you
5       reviewed this notice and the request for that
6       information?
7             MR. WISNER:  So to the extent you
8       don't disclose any privileged communication, you can
9       answer the question factually if you gave me anything
10      reflecting that.
11         I just want to make sure he didn't disclose any
12      privileged communication.
13            THE WITNESS:  I'm sorry.  I don't
14      understand --
15   Q  (By Mr. Levine)  So --
16   A  -- what that means.
17   Q  -- let me -- let me explain it.  I'm not entitled to
18      ask you what you've spoken about with your counsel.
19   A  Okay.
20   Q  The substance of any communications.  So I will not,
21      or I will try not to -- and I'm sure there will be an
22      objection if I do -- ask you what you told Mr. Wisner
23      or anyone else about something in particular.  But I
24      can ask you about process, whether you've met with
25      Mr. Wisner, what you gave Mr. Wisner, et cetera.

Page 16

1    A  Sure.
2    Q  Have you provided counsel with the records that you
3       just told me about that you keep of the time spent in
4       this litigation?
5    A  Which is different from invoices?
6    Q  I'm asking about any records of the time that you've
7       spent.
8    A  I believe I did.
9             MR. LEVINE:  I'm going to request
10      production of records of Dr. Shustov's time spent.
11            MR. WISNER:  Sure.  And I represent
12      to you that his notes and partic -- and stuff that
13      he's prepared as note-wise related to his testimony
14      is protected from disclosure under Pretrial Order No.
15      7.  So we do not have to produce that.  And, in fact,
16      discovery related to that is actually specifically
17      prohibited by the court's order.  So I'm going to say
18      "no."
19         That said, if you want to ask him about the time
20      he spent, by all means --
21            MR. LEVINE:  I --
22            MR. WISNER:  -- do.
23            MR. LEVINE:  I know what I can ask
24      him.
25         Are you telling me that notes of time spent are

Page 17

1    protected?
2             MR. WISNER:  I believe --
3             MR. LEVINE:  Is that what you're
4       representing?
5             MR. WISNER:  I believe it says all
6       notes by the expert.  That's what the -- that's what
7       the order says.  So I'm just applying the order as
8       it's written.
9             MR. LEVINE:  So those -- my
10      understanding of that is they are notes as to the
11      substance of his opinions.  We are entitled to
12      information regarding billing.  And I'm going to note
13      that on the record and request that for production.
14      We'll follow up, but --
15            MR. WISNER:  I think we're --
16            MR. LEVINE:  I would --
17            MR. WISNER:  Sorry.
18            MR. LEVINE:  But I would ask that
19      you produce those at a break during this deposition.
20            MR. WISNER:  Okay.  Our position is
21      that it applies to notes.  And the information of
22      billing, by all means, ask away.  But any of his
23      notes related to his preparation of his testimony is
24      specifically prohibited under PTO 7.  So I -- I
25      respectfully disagree.  But we can talk about this

Andrei Shustov, M.D.

Page 18

1  off the record, if you like.
2          MR. LEVINE:  And it's your opinion
3  that PTO 7 applies to these depositions?
4          MR. WISNER:  It says unequivocally
5  that it applies to all expert discovery --
6          MR. LEVINE:  Sure.
7          MR. WISNER:  -- in this MDL.
8          MR. LEVINE:  Okay.  Just making
9  sure --
10         MR. WISNER:  Sure.
11         MR. LEVINE:  -- I understood that.
12         MR. WISNER:  I can show it to you
13  at the break, if you like.
14         MR. LEVINE:  No.  I -- I -- I read
15  it.
16         MR. WISNER:  Okay.
17         MR. LEVINE:  I was just asking.  I
18  agree with you, by the way.
19         MR. WISNER:  Okay.
20  Q  (By Mr. Levine)  Dr. Shustov, how much time have you
21     spent working on the Roundup litigation?
22  A  Specifically on Mr. Hardeman case, somewhere between
23     30 and 40 hours.
24  Q  How about on the entire litigation?
25  A  Could you please define what is entire litigation as

Page 19

1     opposed to Mr. Hardeman?
2  Q  So you've been retained by counsel in -- counsel for
3     various plaintiffs in litigation involving Roundup,
4     correct?
5  A  That's correct.
6  Q  And you've done various work for counsel related to
7     those matters, correct?
8  A  Correct.
9  Q  And in total, how much time have you spent on all of
10    the matters you've worked on?
11  A  Without looking at the sort of track of -- of -- of
12    my time, I'd say roughly 50, 60 hours.
13  Q  And that includes the 30 to 40 hours you've spent on
14    Mr. Hardeman's case?
15  A  That's correct.
16  Q  When were you first contacted by plaintiff's counsel
17    to serve as an expert in this litigation?
18         MR. WISNER:  Again, Doctor, don't
19  reveal any substance of any communication, but the
20  date of contact is appropriate.
21         THE WITNESS:  I honestly don't
22  remember the exact date when I was contacted.
23  Q  (By Mr. Levin)  What do you --
24  A  My recollection is beginning of summer.
25  Q  And to be clear, you're talking about the beginning

Page 20

1  of the summer of 2018?
2  A  That's correct.  '18.
3  Q  '18?
4  A  Yeah.
5  Q  Yeah.
6      Do you recall whether that was -- can you be more
7     specific?  Do you recall whether that was April/May
8     or June/July?
9  A  I honestly don't remember.
10  Q  Do you remember who contacted you?
11  A  Yes.  It was Ms. Kathryn For -- Forgie -- Forge
12    (phonetic).
13         MR. WISNER:  Forgie.
14         THE WITNESS:  Forgie.  Go by
15  "Kathryn."
16         MR. WISNER:  And that's F-o-r-i-g-e
17  [sic].
18         MR. LEVINE:  We can get spelling on
19  a break.  Thank you.
20         MR. WISNER:  I actually spelled it
21  wrong.  F-o-r --
22         MR. LEVINE:  Rough is going to --
23         MR. WISNER:  -- g-i --
24         MR. LEVINE:  -- have a lot of --
25         MR. WISNER:  -- e.

Page 21

1          MR. LEVINE:  -- spelling errors.
2  We can --
3          MR. WISNER:  Sorry.  Just...
4  Q  (By Mr. Levine)  Dr. Shustov, did you know Ms. Forgie
5     before she contacted you?
6  A  No.
7  Q  Did you -- when Ms. Forgie contacted you -- well,
8     strike that.
9      Did you meet with any other attorneys before
10    agreeing to offer opinions in this litigation?
11  A  No.
12  Q  Now, you've met with a few plaintiffs in this
13    litigation as represented in your reports:
14    Mrs. Hardeman and Gebeyehou and Ms. Stevick.
15      Have you met with any other plaintiffs other than
16    those three?
17  A  No.
18  Q  Have you met with any other attorneys besides
19    Mr. Wisner and Ms. Forgie in this litigation?
20  A  No.
21  Q  How much time have you spent meeting with attorneys
22    in this litigation?
23  A  The total time between three visits, roughly 15
24    hours.
25  Q  And do you recall when those visits were?

Andrei Shustov, M.D.

Page 22

1   A  I don't recall specific dates.  The very last one, as
2      was mentioned, was this week.
3   Q  And that was with Mr. Wisner?
4   A  That's correct.
5   Q  Anyone else?
6   A  No.
7   Q  Was anyone else attending by phone?
8   A  No.
9   Q  Okay.  And that was on Wednesday of this week?
10  A  I believe it was Thursday.
11  Q  Thursday.
12         MR. WISNER:  Sorry.
13  Q  (By Mr. Levine)  And how long -- I'm sorry if -- I
14     don't think I asked this.  But for how long did you
15     meet with Mr. Wisner on Thursday?
16  A  About four hours.
17            (Exhibit No. 2 marked for
18               identification.)
19
20  Q  (By Mr. Levine)  Handing you what's been marked as
21     Exhibit 2, which is your CV that was provided to us
22     with your expert report.
23        That is your current CV?
24  A  That's correct.
25  Q  And does it accurately summarize your education and

Page 23

1      professional -- professional experience?  Excuse me.
2   A  It does.
3   Q  Have you ever published -- you've published -- strike
4      that.
5         You've published regarding non-Hodgkin's
6      lymphoma, correct?
7   A  That's correct.
8   Q  Have you given presentations regarding non-Hodgkin's
9      lymphoma?
10  A  Yes, I did.
11  Q  Do you lecture regarding cancer risk?
12  A  In a very minimal capacity.
13  Q  Do you lecture regarding cancer prevention?  That
14     might be the same thing, but...
15  A  No.
16  Q  Have you conducted any scientific research regarding
17     Roundup?
18  A  No.
19  Q  Have you conducted any scientific research regarding
20     glyphosate?
21  A  No.
22  Q  Have you conducted any scientific research involving
23     pesticides?
24  A  No.
25  Q  Have you conducted any scientific research involving

Page 24

1      any herbicides?
2   A  No.
3   Q  Have you authored any articles regarding Roundup?
4   A  No.
5   Q  Have you authored any articles concerning glyphosate?
6   A  No.
7   Q  Have you authored any articles concerning pesticides?
8   A  No.
9   Q  Have you authored any articles concerning herbicides?
10  A  No.
11  Q  Apart from your work in this case, have you ever
12     written or presented information or opinions about
13     non-Hodgkin's lymphoma and Roundup or glyphosate?
14  A  No.
15  Q  Apart from your work in this case, have you had any
16     professional scientific involvement regarding
17     non-Hodgkin's lymphoma and Roundup or glyphosate?
18  A  Could you please repeat that?  As part of this
19     litigation?
20  Q  I'll ask it again.
21  A  Yeah.
22  Q  Apart from your work in this litigation --
23  A  Okay.
24  Q  -- have you had any professional scientific
25     involvement regarding non-Hodgkin's lymphoma and

Page 25

1      Roundup or glyphosate?
2   A  No.
3   Q  You've never given a talk to a profession --
4      professional medical or scientific group about
5      Roundup or glyphosate, correct?
6   A  No.
7   Q  You've never given a talk to a professional medical
8      or scientific group regarding pesticides or
9      herbicides, correct?
10  A  Correct.
11  Q  It's fair to say you've not been involved with the
12     manufacturing, testing, or marketing of chemical
13     products?
14  A  That's correct.
15  Q  You've never worked for the EPA, correct?
16  A  Correct.
17  Q  You've never worked for any foreign regulatory
18     authority, correct?
19  A  Correct.
20  Q  Have you testified as an expert before in litigation?
21  A  I did.
22  Q  How many times?
23  A  Once.
24  Q  And what was that litigation?
25  A  This was Wendell case of hepatosplenic T-cell

Andrei Shustov, M.D.

Page 26

1    lymphoma.
2    Q   Is that the only time you've testified as an expert
3        before?
4    A   Yes.
5                    (Exhibit Nos. 3 and 4 marked
6                     for identification.)
7
8    Q   (By Mr. Levine)  Handing you what's been marked as
9        Exhibit 3, which is your expert report in this case.
10       And I'm handing you Exhibit 4, which is your reliance
11       list in this case as of, I believe, November 19,
12       2018.
13            And I will represent, although I don't have it
14       with me, that we received a supplemental reliance
15       list which lists a few expert reports from
16       defendants' experts.
17            You understand that?
18   A   Yes.
19   Q   Okay.  And those were expert reports of Dr. Levine,
20       Dr. Grossbard, Dr. Steidl, and Dr. Arbor, correct?
21   A   Correct.
22   Q   And so Exhibit 3 I've handed you is your report,
23       correct?
24   A   That's correct.
25   Q   And does that report disclose all of the opinions you

Page 27

1        -- you intend to offer at trial?
2    A   At the time of this report, yes.
3    Q   And today?
4    A   If I'm asked something outside the report, I might
5        offer my opinion on the questions or answers.
6    Q   Understood.
7            But as of today, going into this deposition, that
8        report contains all of the opinions --
9    A   That's correct.
10   Q   -- you -- you intend to offer at trial?
11   A   That's correct.
12   Q   Again, just give me a second to finish the question.
13   A   Sorry.
14   Q   I'd love to speak casually with you.  Now's not the
15       time.
16            And the report, along with the Exhibit 4 reliance
17       list as well as the defendants' expert depositions
18       that you've reviewed, discloses all of the materials
19       you've relied on related to Mr. Hardeman in forming
20       your opinions in that case, correct?
21   A   That's correct.
22   Q   Okay.  Did you review any of the expert reports of
23       Mr. Hardeman's experts?
24   A   Can I ask you what -- what does that mean?
25   Q   Yes.

Page 28

1    A   Mr. Hardeman?
2    Q   So you're one of Mr. Hardeman's experts.
3    A   Okay.
4    Q   So Mr. Hardeman's the plaintiff in this case.  In
5        addition to your report, Mr. Hardeman has put forth
6        various other experts discussing the cause of his
7        cancer.
8            There -- I understand that on your reliance list,
9        there are reports of experts who have submitted
10       general causation opinions.  So I'm not asking about
11       those.
12           Besides those reports, have you reviewed any
13       reports of Mr. Hardeman's case-specific experts in
14       this case?
15   A   There are a lot of reports.  So I reviewed
16       Dr. Weisenburger's report.  I don't know if it counts
17       as his expert.  Then I reviewed Dr. Nabhan's report.
18       I reviewed Drs. Portier and Ritz.  I don't know if
19       they're list -- is it -- I just don't know which
20       qualifies to answer your question, so those.
21   Q   So you reviewed Dr. Nabhan's report, correct?
22   A   Yeah.
23   Q   And you reviewed Dr. Weisenburger's report?
24   A   That's correct.
25   Q   When --

Page 29

1                    MR. WISNER:  Just to be clear, I
2        think there might be some confusion here.  When you
3        say "report" --
4                    MR. LEVINE:  Oh.  So --
5                    MR. WISNER:  -- are you talking
6        about --
7                    MR. LEVINE:  I should --
8                    MR. WISNER:  -- Hardeman's
9        report --
10                   MR. LEVINE:  Yes.
11                   MR. WISNER:  -- or are you talking
12       about reports generally?
13                   MR. LEVINE:  Understood.
14                   MR. WISNER:  Because they did give
15       general causation reports.
16   Q   (By Mr. Levine)  So I'm aware that you've reviewed
17       general causation opinions by Drs. Nabhan and Weisenburger that
18       are listed on your reliance list.
19   A   Mm-hmm.
20   Q   Have you reviewed any reports by Drs. Nabhan or
21       Weisenburger specifically related to Mr. Hardeman?
22   A   No.  I apologize.  It's very confusing, the language,
23       to me.  No.
24   Q   Okay.
25   A   Thanks for clarifying.

Andrei Shustov, M.D.

Page 30

1  Q   Did you review any depositions specifically in
2      Mr. Hardeman's case that relate to Mr. Hardeman?
3  A   I'm trying to remember.  I'm sorry.
4  Q   Let me help you out.
5          Did you review Mr. Hardeman's deposition?
6  A   Yes, I did.
7  Q   Did you review Mrs. Hardeman's deposition?
8  A   Yes, I did.
9  Q   Did you review Dr. Terk's deposition?
10  A   No, I didn't.
11  Q   Did you review Dr. Turley's deposition?
12  A   I don't recall.
13  Q   Did you review Dr. Yi's deposition?
14  A   I don't recall.
15  Q   Do you know who Dr. Turley is?
16  A   I don't remember.  I'm sorry.
17  Q   Do you know who Dr. Yi is?
18  A   I don't remember.
19  Q   Who's Dr. Terk?
20  A   I believe Dr. Terk is one of the treating physicians,
21      if I remember correctly.
22  Q   What can you tell me about Dr. Terk's treatment of
23      Mr. Hardeman?
24  A   I would have to --
25          MR. WISNER:  Objection.

Page 31

1          THE WITNESS:  I would have to look
2      at the records.  I -- it's something I can't
3      memorize.  There's a lot of names of doctors on
4      patient's report, it's my recollection.  I might be
5      wrong.
6          THE REPORTER:  "Objection," what?
7          MR. WISNER:  I didn't get it out.
8      I just said "objection."
9  Q   (By Mr. Levine) How many depositions did you review
10      besides Mr. and Mrs. Hardeman that are specific to
11      Mr. Hardeman's case?
12  A   Well, I remember, as I mentioned, I reviewed
13      Dr. Weisenburger's -- specific to the case again.
14      Not general causation.
15  Q   Correct.
16  A   I have to -- I would have to look at actual
17      materials.  I apologize.  I -- there are many things
18      I reviewed.  So I reviewed Hardemans' both
19      depositions and -- and the depositions that I
20      mentioned are listed.  Off the top of my head, I
21      don't remember.
22  Q   Okay.  There are no depositions specific to
23      Mr. Hardeman's case listed in your -- in any reliance
24      list we've received or in your report.  So I'm just
25      trying to find out whether there's anything you

Page 32

1      reviewed that's not included in those materials.
2  A   Okay.  That's -- maybe that's why I don't remember.
3  Q   Maybe because you didn't read any other --
4  A   Correct.
5  Q   -- depositions, correct?
6  A   Correct.
7  Q   Okay.  So it's fair to say whatever you've read has
8      been listed in the materials you've reviewed?
9  A   That's correct.
10  Q   Okay.  On your report, which I think is Exhibit 3, on
11      Page 1 it says you've reviewed extensive medical
12      records?
13  A   Yes.
14  Q   Which records did you review?
15          MR. WISNER:  I don't mean to --
16      sorry.  I don't mean to be nitpicky.  I just -- so it's clear.
17      Exhibit 3 does it say that?  I just -- so it's clear.
18          MR. LEVINE:  It's on Page 1.  It's
19      in the --
20          MR. WISNER:  Third line?
21          MR. LEVINE:  Yeah.
22          MR. WISNER:  Okay.  Got it.
23      Thanks.
24          MR. LEVINE:  So many copies.  I
25      didn't highlight it in this one.

Page 33

1  Q   (By Mr. Levine)  So on Page 1, in the top paragraph,
2      it says you reviewed extensive medical records.
3          Which medical records did you -- did you review?
4  A   Medical records provided to me on Mr. Hardeman,
5      including his treatment history, CT scans, laboratory
6      studies, pathology reports, other treating
7      physicians' notes, lists of medications, and
8      basically what we call medical chart.
9  Q   So you've reviewed his medical file, his chart?
10  A   That's correct.
11  Q   How extensive was it?
12  A   For the average medical chart, it's extremely
13      extensive.  It was 2,400 pages.  Maybe not exactly
14      24-something, but it was over 2,000 pages of records.
15  Q   Do you -- do you recall when the records you reviewed
16      began in terms of the time frame of medical records
17      you reviewed?
18  A   To my recollection, they begin from roughly 2005.
19  Q   Okay.  Let's talk a little bit about how you prepared
20      your opinions in this case.
21          You prepared your report in this case?
22  A   That's correct.
23  Q   Tell me about the method you used to prepare your
24      report in this case.
25          MR. WISNER:  Objection; vague.

Andrei Shustov, M.D.

Page 34

1       THE WITNESS: So I'm a clinician.
2    And the method that we use in assessing patient,
3    clinical practice, are history taken, physical exam,
4    review of medical records, creating -- creating
5    differential diagnosis, and stating the opinion.
6    Q  (By Mr. Levine) I'm sorry. I forgot to ask you when
7       I was looking at your CV. You mentioned you're a
8       clinician. Do you teach medical students?
9    A  I do.
10   Q  Do you teach medical students about Roundup?
11   A  No.
12   Q  In preparing your report in this case, did you use
13      the same scientific methods and standards as you
14      would in your academic and clinical practice in
15      reviewing and reporting research results?
16   A  I did.
17   Q  Did you -- did you conduct any literature searches?
18   A  I did.
19   Q  What searches did you conduct?
20   A  I had to read on general causation for Roundup and --
21      and glyphosate. And I did literature search on
22      relationship between hepatitis and lymphomas. And I
23      had to review literature on other causations of
24      lymphoma pertinent to Mr. Hardeman. I did search on
25      relationship of obesity and lymphomas. Those are

Page 35

1    searches that I ran.
2          THE REPORTER: What was that?
3          THE WITNESS: Obesity -- those are
4    the searches that I ran.
5    Q  (By Mr. Levine) Okay. So, first, you said you had
6       to read on general causation regarding Roundup,
7       correct?
8    A  Mm-hmm.
9    Q  What type of searches did you perform on general
10      causation regarding Roundup? And I can be more
11      specific if you don't understand that.
12   A  Yeah, please specify. What do you mean what type
13      of --
14   Q  What -- what search engines did you use? What search
15      terms did you use?
16   A  We typically in medicine use something called PubMed.
17   Q  Mm-hmm.
18   A  And I put keywords, and then I select papers that I
19      believe are pertinent based on paper title or brief
20      review of the abstract.
21   Q  Did you conduct any Google searches?
22   A  No.
23   Q  Did the lawyers give you any literature?
24   A  No.
25   Q  Why did you need to do searches regarding general

Page 36

1    causation?
2    A  Because I'm not general causation expert. I'm not
3       epidemiologist. And I have only basic A-B-C-type
4       knowledge on epidemiology, so I had to rely on
5       published literature and opinions of authors and
6       experts in the field. So that would help me, my
7       opinion on the questions that I was addressing.
8    Q  So your general causation searches were necessary for
9       your opinions in this case?
10   A  Correct.
11   Q  Were you -- prior to conducting the general causation
12      searches you did for your opinions in this case, did
13      you have any opinion about whether Roundup or
14      glyphosate causes non-Hodgkin's lymphoma?
15   A  A general opinion.
16   Q  And what was your general opinion prior to
17      conducting --
18   A  The --
19   Q  -- these searches?
20   A  -- general opinion --
21   Q  Again, please just let me finish the question. For
22      the courtesy of the court reporter. So I'll -- I'll
23      ask again.
24         What was your general opinion prior to conducting
25      the searches for this litigation?

Page 37

1    A  The general opinion in field of oncology that the
2       pesticides are a risk factor for developing, in my
3       field, lymphomas. This is something I ask patients,
4       when I see on a daily basis new consults, whether
5       they were exposed to multitude of compounds in their
6       household life, in their military service, in their
7       professional work or growing up, and this is one of
8       the questions I always ask patients, whether they're
9       exposed to agricultural products, whether they grew
10      up on a farm or worked on warehouses that store those
11      type of compounds.
12   Q  So you said you always ask patients whether they were
13      exposed to agricultural products --
14   A  Correct.
15   Q  -- when you see new patients or consults, correct?
16   A  Correct.
17   Q  For how long have you been doing that?
18   A  Since I was trained in oncology, since I became an
19      oncologist. This is something that is -- I can say
20      is a general knowledge in oncology.
21   Q  You said you conducted searches regarding hepatitis
22      and lymphoma, correct?
23   A  That's correct.
24   Q  Did you have an opinion prior to this case, prior to
25      when you've began researching for your opinions in

Andrei Shustov, M.D.

Page 38

1    this case, as to whether hepatitis causes lymphoma?
2    A   I had a general opinion as an oncologist, yes.
3    Q   What were those general opinions?
4    A   That as a general opinion, there is no sufficient
5    evidence or knowledge that hepatitis viruses directly
6    link to development of lymphomas.
7    Q   And that -- that's hepatitis C or hepatitis B,
8    correct?
9    A   Both.
10   Q   You said "both"?  Sorry.
11   A   I did.
12   Q   And how extensively had you researched that prior to
13   this -- strike that.
14       How extensively had you researched whether
15   hepatitis was a cause of lymphoma prior to your
16   opinions in this case?
17   A   Not extensively.
18   Q   But oncolog -- what you're telling me -- and correct
19   me if I misstate this -- is that the general
20   consensus amongst oncologists in terms of your
21   knowledge and training is that there's not sufficient
22   evidence regarding hepatitis and non-Hodgkin's
23   lymphoma, correct?
24   A   The general knowledge that expressed in discussions
25   with my colleagues and tumor boards, that there is

Page 39

1    insufficient evidence and requires further studies.
2    Q   Okay.  So that's the general knowledge in your
3    community at Seattle cancer center and Fred
4    Hutchinson, correct?
5    A   That's a general knowledge outside even my community
6    when discussed at scientific meetings, at
7    investigator meetings, or other panels.
8    Q   Okay.  And so it's a general knowledge at outside
9    meetings.  Is it also a general knowledge, I believe
10   you said at tumor boards, which would be at your
11   institution, correct?
12   A   Correct.
13   Q   So it's a general knowledge at Fred Hutchinson that
14   hepatitis C does -- has not sufficiently been proven
15   to cause non-Hodgkin's lymphoma?
16   A   Well, I cannot say it is a general knowledge at Fred
17   Hutchinson.  I'm telling you our discussion at tumor
18   boards and opinions that they expressed.  And
19   opinions can differ.  But it is my understanding,
20   discussing with my colleagues over the past ten years
21   that I practice oncology, that it might or might not
22   be related and there is insufficient evidence to make
23   a strong statement.
24   Q   How long did you spend reviewing medical records in
25   preparation for your report in this case?

Page 40

1    A   I'd say six, seven hours.
2    Q   Did you review any other documents besides medical
3    records or medical literature in relation to
4    Mr. Hardeman's case, such as any legal documents?
5    A   No.
6    Q   Did you review a plaintiff fact sheet?
7    A   I did.
8        Can I ask a question?  The plaintiff fact sheet,
9    that's what the patients fill out, the questionnaire
10   that -- yes, I did.
11   Q   As -- I believe that is a pretty close description as
12   to --
13   A   Yeah.
14   Q   -- what it is.  And I will assume that you didn't
15   review any other questionnaire that he filled out
16   other than that.
17   A   I apologize.  The legal lingo is just not familiar to
18   me.
19       MR. LEVINE:  I think Mr. Wisner
20   would correct me if my assumption is --
21       MR. WISNER:  That's correct.
22       MR. LEVINE:  -- wrong.
23       MR. WISNER:  I don't believe he's
24   seen anything beyond the plaintiff fact sheet.  I
25   believe his understanding of the fact sheet is the

Page 41

1    same as yours, sir.
2    Q   (By Mr. Levine)  You met with Mr. Hardeman on
3    November 15th, 2018?
4    A   That's correct.
5    Q   Had you reviewed his medical records before you met
6    with him?
7    A   That's correct.
8    Q   And at the meeting, you conducted an interview and a
9    physical exam?
10   A   That's correct.
11   Q   Who was at the meeting?
12   A   Mr. Hardeman, his wife.
13   Q   Anyone else?
14   A   No.
15   Q   Where was the meeting?
16   A   It was at Marriott hotel, Lake Union, Seattle.
17   Q   So the meeting was -- the physical examination was not
18   conducted in a medical facility or examination room.
19   A   No.
20   Q   Correct?
21       MR. WISNER:  Counsel, I'm sorry.
22   Can we go off the record really quickly?
23       MR. LEVINE:  Sure.
24       THE VIDEOGRAPHER:  Please stand by.
25   We're going off the record.  The time is 9:36 a.m.

Andrei Shustov, M.D.

Page 42

1    (Pause in proceedings.)

2

3         THE VIDEOGRAPHER:  We are back on

4    the record.  The time is 9:44 a.m.

5    Q.  (By Mr. Levine)  Dr. Shustov, we were just, before

6    the short break, talking about your meeting and

7    examination of Mr. Hardeman, correct?

8    A.  Yes.

9    Q.  How long did that meeting last?

10   A.  Approximately hour and a half.

11   Q.  Do you have any notes of the meeting?

12   A.  I don't.

13   Q.  Are the -- any -- is the meeting -- strike that.

14        The meeting you had with Mr. Hardeman and the

15   examination is reflected in your report, correct?

16   A.  That's correct.

17   Q.  Did you take notes at the time of the meeting?

18   A.  I did.

19   Q.  And everything that you noted is in your report?

20   A.  That's correct.

21   Q.  Okay.  How long did the physical examination last?

22   A.  20 to 30 minutes.

23   Q.  What did you do in the physical examination?

24   A.  The usual thing that physician would do, examining a

25   patient for 12, 13 body systems, meaning do an exam

Page 43

1    of cardiovascular system, lung system, abdomen, skin,

2    hematologic system, neurologic system.  So we have

3    systematic approach, step to step to step, examining

4    every body part and body system that is amenable to

5    physical exam.

6    Q.  Did you observe anything of concern during the

7    physical examination of Mr. Hardeman?

8    A.  Not at the time of my exam, no.

9    Q.  Okay.  Did you provide any medical care or treatment

10   to Mr. Hardeman?

11   A.  No.

12   Q.  How many times have you spoken with Mr. Hardeman?

13   A.  Only during that meeting.

14   Q.  Okay.  Did you discuss with Mr. Hardeman the

15   treatment that his physicians were giving to him?

16   A.  No.

17   Q.  Do you have any disagreement with the treatments his

18   physicians have given to him?

19        MR. WISNER:  Objection; beyond the

20   scope.

21        THE WITNESS:  Yeah, I wasn't asked

22   to basically opine on whether or not treatment was

23   correct or -- I wouldn't question the treatment by

24   his physician.

25   Q.  (By Mr. Levine)  Sure.  You under -- so you've -- but

Page 44

1    you understand you've examined Mr. Hardeman, correct?

2    A.  That's correct.

3    Q.  And you've reviewed his medical records, correct?

4    A.  That's correct.

5    Q.  And as a physician, if you did observe anything that

6    was improper about the treatment, you would have an

7    ethical obligation to inform Mr. Hardeman about that,

8    correct?

9         MR. WISNER:  Objection.

10        THE WITNESS:  That's not correct.

11   Q.  (By Mr. Levine)  So if there was something wrong

12   being done in Mr. Hardeman, you don't think, as a

13   physician, under the ethical standards of physicians,

14   that you have an obligation to inform him that there

15   is mistreatment going on?

16        MR. WISNER:  Objection; improper

17   hypothetical, speculation.

18        THE WITNESS:  I was not asked to

19   see him as treating physician performing medical

20   visit and medical consultation, so I cannot opine on

21   how his physician treated him.

22   Q.  (By Mr. Levine)  So you didn't treat him as a

23   treating physician, correct?

24   A.  That's correct.

25   Q.  What was the purpose of your examination?

Page 45

1    A.  Production of this report.

2    Q.  Was there anything about the physical examination of

3    Mr. Hardeman that indicated what the cause of his

4    non-Hodgkin's lymphoma was?

5    A.  His physical examination, no.

6    Q.  Going into the meeting with Mr. Hardeman, could there

7    have even been anything about the physical

8    examination that indicated whether Roundup was a

9    cause of his non-Hodgkin's lymphoma?

10        MR. WISNER:  Objection; overbroad,

11   speculation, improper hypothetical.

12        THE WITNESS:  I have to process

13   this question because it's not something that

14   physician even think and weigh.

15        MR. LEVINE:  I can re-ask, if you

16   like.

17        THE WITNESS:  Please do.

18   Q.  (By Mr. Levine)  When you -- you felt it was

19   necessary to conduct a physical examination of

20   Mr. Hardeman to offer your opinions in this case,

21   correct?

22   A.  That's correct.

23   Q.  Again, just try and wait one second before I'm

24   finished.

25        You're being asked in this case to opine on the

Andrei Shustov, M.D.

Page 46

```
 1    cause of Mr. Hardeman's non-Hodgkin's lymphoma,
 2    correct?
 3    A   That's correct.
 4    Q   What were you looking for in the physical examination
 5    of Mr. Hardeman that would indicate the cause of his
 6    non-Hodgkin's lymphoma?
 7    A   I was not looking at anything in physical exam to
 8    indicate the cause.
 9    Q   So there was no reason to do the physical examination
10    in terms of the purpose of identifying the cause of
11    Mr. Hardeman's non-Hodgkin's lymphoma, correct?
12              MR. WISNER:  Objection; misstates
13    his testimony.
14              THE WITNESS:  I cannot opine on
15    anything in the patient as a physician without
16    physical exam and having patient encounter, relying
17    exclusively on records.
18    Q   (By Mr. Levine)  Have you ever been asked to review
19    the records of a patient and offer an opinion to
20    another doctor?
21    A   Yes, I did.
22    Q   I mean, have you done so without examining the
23    patient --
24    A   That --
25    Q   -- in your career?
```

Page 47

```
 1    A   That would not be for straightforward stating my
 2    medical opinion.  That's something that's in medicine
 3    called curbsiding for specific questions that would
 4    not bear any decision on that physician's actual
 5    actions or -- or treatments.
 6    Q   Right.
 7        And you said you're not actually offering any
 8    opinion bearing on the treatment of Mr. Hardeman in
 9    this case, correct?
10    A   That's correct.
11    Q   So it was not necessarily to -- necessary to conduct
12    a physical examination in this case, correct?
13              MR. WISNER:  Objection; misstates
14    his testimony.
15              THE WITNESS:  I disagree.  I'm a
16    physician.  That's my methodology, to examine the
17    patient, take history, and examine medical records.
18    That's the way I conduct my opinions on any aspect of
19    my report.  I cannot imagine being a physician and
20    opining on a patient without a physical exam.  That
21    would go against any sort of basics of clinical
22    practice.
23    Q   (By Mr. Levine)  You mentioned you testified
24    previously in another litigation, correct?
25    A   That's correct.
```

Page 48

```
 1    Q   Did you examine the patient in that litigation?
 2    A   Patient was dead in that case.
 3    Q   Okay.  That's unfortunate.  But you were able to
 4    offer an opinion in that litigation without examining
 5    a patient, correct?
 6    A   That's correct.
 7    Q   Prior to meeting with Mr. Hardeman, had you formed an
 8    opinion as to what caused his non-Hodgkin's lymphoma?
 9    A   I have not formed my opinions until I finished all
10    the examinations, visit, and review of medical
11    records.
12    Q   Excuse me.  Maybe I didn't ask this.  I thought I
13    did.  But you reviewed his medical records prior to
14    meeting with him, correct?
15    A   That's correct.
16    Q   And when you met with him, you conducted a physical
17    examination, correct?
18    A   That's correct.
19    Q   And nothing about the physical examination told you
20    anything about what caused his non-Hodgkin's
21    lymphoma, correct?
22              MR. WISNER:  Objection; misstates
23    his testimony.
24              THE WITNESS:  Not from physical
25    examination, no.
```

Page 49

```
 1    Q   (By Mr. Levine)  Okay.  And you met with Mr. Hardeman.
 2    In addition to the physical examination, you had a
 3    conversation with him, correct?
 4    A   That's correct.
 5    Q   And did anything about that conversation with
 6    Mr. Hardeman indicate to you what the cause of his
 7    non-Hodgkin's lymphoma was?
 8    A   That was the basis of my report.
 9    Q   Basis of your report was your conversation with
10    Mr. Hardeman?
11    A   It was one of the basis of my report.
12    Q   Did you base your report on his deposition testimony
13    as well?
14    A   No.
15    Q   Why not?
16    A   'Cause it was sufficient for me to review his medical
17    records, take comprehensive history, and do my
18    literature review to do the report.
19    Q   But you read his deposition?
20    A   I did.
21    Q   But you decided not to base your report on that?
22    A   No.  I had sufficient information from -- like I just
23    said.
24    Q   Why did you choose your conversation with Mr. Hardeman
25    over his sworn deposition testimony?
```

Andrei Shustov, M.D.

Page 50

1    A   Because for a physician, it is a gold standard to
2        make medical opinion, directly talking to the patient
3        and asking questions that I think are pertinent to
4        his disease and history of his other illnesses.  And
5        I make my opinion from what I would call a primary
6        source, not from other physicians asking questions.
7        That's the reason we have to see patients and not
8        just to rely on other consultants' or other
9        physicians' opinions, otherwise nobody would need to
10       see patients.
11   Q   I think maybe you misunderstood my question.  I was
12       specifically referring to the deposition of
13       Mr. Hardeman.
14   A   Okay.
15   Q   The primary source.
16   A   For me as a physician, the primary source is putting
17       my hands on the patient.  That's how I put my trust
18       in what patients tell me and what I find on physical
19       exam.  In my world, in the medical world, as a
20       physician, I have to see the patient, put my hands on
21       him, listen to his heart, and that's how I make my
22       opinion, not what Mr. Hardeman said under oath or in
23       a different city, in a different town.
24           I do not have his eyes on me.  I don't see if
25       he's changed since that time.  Maybe he develop

Page 51

1        jaundice.  Maybe he had bleeding at the time.  As a
2        physician, I have to have patient in front of me and
3        examine him and make my opinion.
4           I don't think you would want me to make opinion
5        about your life if somebody told me something about
6        you without seeing a patient.  Just trying to
7        understand, as a physician, we live in a different
8        world.  My conscience, my liability is seeing the
9        patient right here.  That's the basis of my report.
10   Q   Explain what happened at the meeting that allowed you
11       to determine the cause of Mr. Hardeman's
12       non-Hodgkin's lymphoma.
13   A   Taking -- I apologize.  Taking comprehensive history,
14       medical history, social history, family history.  And
15       that's the most powerful methodology that clinician
16       can use to diagnose the disease, try to establish the
17       cause of the disease, and come up with a proper
18       treatment plan.  It's called medical history.  That's
19       indispensable.  That we teach from the first year of
20       medical school, and teaching continues throughout the
21       residency, fellowship, and all the other trainings
22       and is being perfected by physicians throughout their
23       career.
24   Q   Did you rely upon Mr. Hardeman's medical records in
25       forming your opinion --

Page 52

1    A   Yes.
2    Q   -- in this case?
3    A   Yes.
4    Q   Did you rely on the history sections in his medical
5        records for forming your opinions in this case?
6    A   I relied on my history taken from the patient to make
7        my opinion.
8    Q   So you relied upon your history that you took on
9        November 15th, 2018, after Mr. Hardeman had filed his
10       lawsuit, over the history in his medical records that
11       was contemporaneous to the doctors' visits and
12       occurred prior to his lawsuit?  Do I understand that
13       correctly?
14               MR. WISNER:  Objection; misstates
15       his testimony, compound.
16               THE WITNESS:  So what you're
17       saying, that I shouldn't trust the patient who's in
18       front of me for what he's saying me [sic] as a
19       physician.
20   Q   (By Mr. Levine)  That's not what I'm saying.  I'm
21       asking you simply whether you reviewed on your
22       history over the history of his medical records --
23   A   I --
24   Q   -- over the 13 years of medical records that you
25       reviewed.

Page 53

1    A   I based it on the history taken personally from
2        Mr. Hardeman.
3    Q   Okay.  How much time did you spend preparing your
4        report in this case?
5               MR. WISNER:  Objection; vague as to
6        "prepare."  Do you mean writing?
7    Q   (By Mr. Levine)  Well, how much time did you spend
8        writing your report?
9    A   Approximately eight hours.
10   Q   Describe the process of writing a report.
11   A   I had medical records in front of me, and notes taken
12       at time of exam in front of me.  And I was typing
13       report on a computer.
14   Q   Okay.  And so that describes the process for the
15       meeting with Mr. Hardeman and his medical history,
16       correct?
17   A   You mean my report?
18   Q   Yeah.
19   A   It does not describe the process.  It describes my
20       conclusion.
21   Q   Strike that.
22           That describes the process of how you wrote that
23       section of your report on Mr. Hardeman's medical
24       history and your meeting with him, correct?
25   A   I don't understand what you're asking.

Andrei Shustov, M.D.

Page 54

1   Q   You said you had medical records in front of you,
2   notes taken at the time of the examination, and then
3   you typed the report on the computer?
4   A   That's correct.
5   Q   That refers to the section on Mr. Hardeman, correct?
6   A   That's correct.
7   Q   And then what about the section on the description of
8   DLBCL that's on Pages 4 to 5 of your report?
9   Describe that process.  It wasn't -- you -- you give
10  information on DLBCL in your report, correct?
11  A   That's correct.
12  Q   Describe the process of how you prepared that.
13  A   I typed it.
14  Q   Did you have literature in front of you?
15  A   I have practiced lymphoma therapy for 11 years.  I
16  wrote chapters on lymphomas, and I published over 60
17  papers.  I can write opinion on lymphomas off top of
18  my head.
19  Q   Okay.  So you wrote the opinions of lymphomas off the
20  top of your head in Pages 4 to 5 of your report?
21              MR. WISNER:  Objection; misstates
22  his testimony.
23              THE WITNESS:  I verified the
24  contemporary numbers for incidence during writing and
25  the rest of it, yes.

Page 55

1   Q   (By Mr. Levine)  Okay.  And that section, it's
2   entitled "General Characterization of Diffuse Large
3   B-Cell Lymphoma (DLBCL)," correct?
4   A   That's correct.
5   Q   The section's about DLBCL specifically, correct?
6   A   Correct.
7   Q   It's not about non-Hodgkin's lymphoma generally,
8   correct?
9   A   Both.
10  Q   This section contains general information on
11  non-Hodgkin's lymphoma?  Is that what you're telling
12  me?
13  A   Which section you're talking about?
14  Q   Like I just said, the section called "General
15  Characterization of Diffuse Large B-Cell Lymphoma."
16  A   Okay.  Yes.  That what I just said pertains to that
17  section.
18  Q   That -- this is a discussion of generally
19  non-Hodgkin's lymphoma is what you're saying?
20  A   This is discussion of diffuse large B-cell lymphoma.
21  Q   Okay.  Where's the discussion of non-Hodgkin's
22  lymphoma in general?
23  A   I did not write discussion of non-Hodgkin lymphoma
24  generally.
25  Q   Okay.  So this section, as I just asked you, is about

Page 56

1   DLBCL specifically and is not about non-Hodgkin's
2   lymphoma generally, correct?
3   A   That's correct.
4   Q   Non-Hodgkin's lymphoma is a heterogeneous disease,
5   correct?
6   A   It is heterogeneous disease.
7   Q   Okay.  Different subtypes have different clinical and
8   prognostic characteristics, correct?
9   A   That's correct.
10  Q   Different subtypes can have different risk factors,
11  correct?
12  A   They can.
13  Q   Okay.  And they can have different causes, correct?
14  A   Hypothetically, they can.
15  Q   They often do, correct?
16  A   Or the same cause can cause any lymphoma.
17  Q   Either way, I mean, the same -- either one could be
18  true, correct?
19  A   Either one can be true.
20  Q   And that would have to be researched in order to know
21  that, correct?
22  A   If possible.
23  Q   Okay.  Do you agree that, for the vast majority of
24  DLBCL, the cause is unknown?
25              MR. WISNER:  Objection; misstates

Page 57

1   his testimony.
2              THE WITNESS:  For vast majority of
3   DLBCLs, we never asked.
4   Q   (By Mr. Levine)  So --
5              THE REPORTER:  Of what?
6              THE WITNESS:  We never asked.
7   Q   (By Mr. Levine)  You disagree with that statement?
8   A   I disagree with that statement.
9   Q   Okay.  Turn to Page 4 of your report, Paragraph 2.
10  Do you see the first sentence in Paragraph 2 on
11  Page 4 of your report?
12  A   I'm sorry.  Where is it at?
13  Q   It says, "The causes of DLBCL are unknown in most
14  patients."
15  A   Sorry.  What page?
16  Q   On Page 4 of --
17  A   Yeah.
18  Q   -- your report, Paragraph No. 2, you state, "The
19  causes of DLBCL are unknown in most patients."
20       Is that true or not?
21  A   It is true.
22  Q   Okay.  So you agree with me, that for the vast
23  majority of DLBCL, the cause is unknown, correct?
24              MR. WISNER:  Objection; misstates
25  what's written right there.

Page 58

1    Q  (By Mr. Levine) I'm asking you:  Do you agree with
2       that or not?
3    A  The cause is unknown for most patients, but it
4       doesn't mean that for most DLBCL there is no cause.
5    Q  I never said there is no cause.  Let me ask you
6       again.
7    A  Okay.
8    Q  Do you agree that for the vast majority of DLBCL, the
9       cause is unknown?
10   A  For vast majority of DLBCL patients, the cause is
11      unknown.  To me, it makes a difference.
12   Q  Okay.  And the same would be true for non-Hodgkin's
13      lymphoma.  For the vast majority of non-Hodgkin
14      lymphoma patients, the cause is unknown?
15              MR. WISNER:  Objection; vague as to
16      "vast majority."
17              THE WITNESS:  The cause for
18      non-Hodgkin lymphoma in majority of patients is
19      unknown because nobody looked.
20              MR. LEVINE:  Okay.  Brent, by the
21      way, you can object to the form.  But if you start
22      throwing in the words in my question to coach the
23      witness, like --
24              MR. WISNER:  I actually was
25      coaching --

Page 59

1              MR. LEVINE:  -- "vast majority" or
2       whatever, I'm going to mark the transcript.  We'll
3       mark that part of the transcript, and we'll send that
4       to the judge.  Speaking objections are not allowed.
5       I have no problem with you objecting to form.
6              MR. WISNER:  Sure.  And, Counselor,
7       to be frank, I was coaching you.  You were --
8              MR. LEVINE:  I don't need to be
9       coached.  I can --
10              MR. WISNER:  Hold on.
11              MR. LEVINE:  -- tell you that --
12              MR. WISNER:  Let me --
13              MR. LEVINE:  -- right now.
14              MR. WISNER:  Let me finish what
15      I'm --
16              MR. LEVINE:  Don't coach me the
17      rest of the deposition.
18              MR. WISNER:  Please let me finish
19      what I'm saying before you interject.  I was simply
20      saying that I was trying to coach you, because I
21      think you kept jumping from a sentence that says
22      something to a sentence that said something else.
23      Hold on.  Let me finish what I'm saying before you
24      interrupt.
25              MR. LEVINE:  I -- I --

Page 60

1              MR. WISNER:  Please let me finish
2       what I'm saying before you interrupt.  And before --
3       I didn't want to have to keep objecting to that, and
4       so I wanted you to know what I was objecting to.  So
5       that was really a signal to you, not to the witness
6       whatsoever.
7              MR. LEVINE:  I don't need to be
8       signaled.  You can object to my questions on form.
9       This is my deposition.  I can ask whatever I want,
10      and --
11              MR. WISNER:  That's -- that's not
12      true, but okay.  If you think so.
13              MR. LEVINE:  I can explore the
14      doctor's opinions in whatever way I want.
15              MR. WISNER:  That's also just
16      factually and legally incorrect, but we can fight
17      that as we get there.  And I don't want to fight with
18      you.  I was really just trying to tell you what my
19      objection was.  So please continue with your
20      deposition.
21   Q  (By Mr. Levine)  Do you agree that DLBCL is most
22      common in patients over the age of 60?
23   A  It is more common over the age of 60 than patients
24      younger than 60.
25   Q  Okay.  And agree the same would be true for

Page 61

1       non-Hodgkin's lymphoma?  It's more common in patients
2       over 60?
3    A  That's not true as a general statement.
4    Q  Okay.  You think it's equally as common in patients
5       under 60, or -- explain to me what's not true about
6       that statement.
7    A  It's a dramatic simplification of 60-plus type of
8       non-Hodgkin lymphomas.  'Cause some of them are most
9       common in children.  Some of them are more common in
10      second decade of life.  Some of them are common in
11      older patients.  And you have to have a look at
12      particular type of lymphoma.  You're talking about 60
13      different types.
14   Q  So when you're considering -- when you're -- again,
15      when you're looking at lymphoma, you really got to
16      look at it by the type in order to state an opinion?
17   A  That's correct.
18   Q  You agree that cancer generally is a function of age,
19      correct?
20   A  It's overly simplification.
21   Q  Do you agree that as people age, the risk of cancer
22      increases?
23   A  General risk of cancer if you take all the cancers
24      together.  But there is such a thing as pediatric
25      oncology, and there are cancers that happen 90

Andrel Shustov, M.D.

Page 62

1  percent of the time in infants, 90 percent of the
2  time in young adults or adolescents, and there are
3  cancers that happen in older people.  If you talk
4  about all the cancers with hundreds of different
5  types, nobody can make a statement that cancers are
6  disease of elderly.  What do you say then --
7          THE REPORTER:  Are what?
8          MR. LEVINE:  Diseases of --
9          THE WITNESS:  Cancer is disease --
10         MR. LEVINE:  -- the elderly.
11         THE WITNESS:  -- of el -- what do
12  you say, then, to mothers of children who have cancer
13  the age of two or five or -- it's -- you're looking
14  at the very broad variety of diseases, and you're
15  lumping in one thing and say, Well, gee, that's
16  common in elderly.  Answer is, as a general
17  statement, it's incorrect.
18  Q  (By Mr. Levine)  Okay.  Do you agree that, as people
19  age, the risk of DLBCL increases?
20  A  The incidence of DLBCL increases.
21  Q  Do you agree that a person's risk of developing DLBCL
22  increases with age?
23  A  Yes, I do.
24  Q  Do you agree that a person's risk of non-Hodgkin's
25  lymphoma increases with age?

Page 63

1  A  I disagree with that statement.  You have to tell me
2  what type of lymphoma it is.
3  Q  Okay.  On Pages 5 to 6, you analyze the patient's
4  risks for developing DLBCL.  That's Mr. Hardeman's
5  risks, in your report, correct?
6  A  Yes.
7  Q  Explain the process of how you prepared this section.
8  A  Do you say Page 6?
9  Q  5 to 6.
10 A  I refer to my records of Mr. Hardeman's prior medical
11    history, his social history, and physical exam in my
12    assessments.  And I created the list of possible
13    factors that might or might not be a causative -- a
14    cause of his lymphoma.  And then I created -- and
15    then I performed, I called it differential diagnosis
16    or differential look into possible causes after --
17    let me rephrase this.
18         I created a list of things that are known to
19    increase the risk of lymphomas.  And I matched that
20    against the information that I collected from medical
21    records and exam:  Whether or not Mr. Hardeman had,
22    as an example, autoimmune disease, whether he was
23    exposed to radiation in the past or other factors.
24    And I, like I said, create sort of differential
25    analysis of what's the most likely cause.

Page 64

1  Q  How long did it take you to prepare that section of
2  your report?
3  A  I can't say that.  Like I said, the report, four or
4  five hours.  And I don't know what part of it was
5  typing this part and looking at his history.  It was
6  a part of the overall report preparation.
7  Q  Sorry.  I thought you said you spent eight hours
8  preparing your report.  Was it four to five or was it
9  eight?
10 A  Well, probably more like eight.
11 Q  Okay.  Pages 7 to 9 of your report discuss -- it's a
12  discussion of Mr. Hardeman's lymphoma causation,
13  correct?
14 A  Yeah.
15 Q  How long did you spend preparing that part of your
16  report?
17         MR. WISNER:  Objection; vague.
18         THE WITNESS:  So when you say
19  preparing the report, typing this part or preparing
20  to -- for this?
21 Q  (By Mr. Levine)  Good question.  How long did you
22  spend typing it?
23 A  Typing this?  Like I said, I was typing report at the
24  same time.  I can't -- I can't really measure what
25  part went into typing this section versus the other

Page 65

1  section.  I -- I just -- it's sort of --
2  Q  How long --
3  A  -- I don't know how --
4         THE REPORTER:  "Sort of," what?
5         THE WITNESS:  I don't know how much
6  exactly I spent on this section versus that section.
7  Q  (By Mr. Levine)  More than ten minutes?
8  A  Of course it's more than ten minutes.
9  Q  Okay.  More than an hour?
10 A  Yes, more than an hour.
11 Q  More than two hours?
12 A  That I can't say.
13 Q  Okay.
14 A  In order to type this, I had to again review their
15  records and look at the references that I -- I
16  mentioned before.  So part of preparation for this
17  report we just discussed.  Doing the search and --
18  and reading the papers that I thought were worthy.
19  But the typing actual report, it was part of a time I
20  spent typing.
21 Q  Turn to Page 9.  That's the conclusions you're
22  offering?
23 A  Sure.
24 Q  These are your opinions in this case?
25 A  That's correct.

Andrei Shustov, M.D.

Page 66

1  Q   It's your opinion that Mr. Hardeman has been exposed
2      to glyphosate in a -- in a manner and with magnitude
3      that fits within the published epidemiological
4      literature and studies where causation and an
5      association have been demonstrated, correct?
6  A   That's correct.
7  Q   And then it's your opinion that, in performing the
8      differential diagnosis into what caused Mr.
9      Hardeman's DLBCL, "I conclude," meaning you conclude,
10     "to a reasonable degree of medical certainty that his
11     exposure to Roundup/glyphosate is a substantial
12     factor contributing to the development of his NHL,"
13     correct?
14 A   That's correct.
15 Q   So I want to focus on your opinion that Mr.
16     Hardeman's exposure to Roundup and glyphosate is a
17     substantial factor contributing to the development of
18     his non-Hodgkin's lymphoma.  Okay?
19 A   Sure.
20 Q   Walk me through your methodology in forming that
21     opinion.
22 A   I reviewed the literature that was the basis of the
23     general causation opinion that I extracted from IARC
24     report and from general knowledge of causation.  And
25     I looked at specific exposures described in those

Page 67

1      papers, and I compared those to the duration and
2      amount of exposure that Mr. Hardeman had based on
3      taking his history.
4          And in my opinion, from what I learned from Mr.
5      Hardeman and what's described in literature on
6      general causation, it was consistent with the fact
7      that he had substantially higher levels of exposure
8      than the exposure described for causing risk of
9      lymphoma.
10 Q   Okay.  So your opinion is you reviewed the literature
11     and studies, determined that Mr. Hardeman's exposure
12     was within those studies, and that it was consistent
13     with the fact that he had substantially higher levels
14     of exposure than described in the literature for
15     causing lymphoma.
16         Did I summarize that correctly?
17 A   That's correct.
18 Q   Did you do anything else as part of your methodology?
19 A   Yes.  I performed what, again, I call the
20     differential diagnosis into other possible causes to
21     exclude other possibilities from his medical history
22     and from -- from his report to see if there are other
23     competing causes for his lymphoma.
24 Q   Did you identify other -- any other competing causes
25     for his lymphoma?

Page 68

1  A   Not to any significant medical degree of certainty.
2  Q   And you said that was a differential diagnosis?
3  A   I called it "differential diagnosis," but you can
4      also -- if you really want to dive into it, it's a
5      hypothetical deductive method.  That's what
6      differential diagnosis is.  So we identify the list
7      of possibilities, and you eliminate them based on
8      probability.
9  Q   So I've -- I don't profess to be an expert on every
10     medical textbook, but when I've looked in medical
11     textbooks, differential diagnosis is described as
12     diagnosing someone's disease that is responsible for
13     the symptoms they have.  Am I correct about that?
14         MR. WISNER:  Objection.  Move to
15     strike counsel's testimony.
16         THE WITNESS:  That's how we use it
17     in medicine, but it does not mean that you cannot use
18     it for anything else.  If you're asking nomenclature,
19     as far as nomenclature goes, I decided -- I chose to
20     use this nomenclature because it would give that
21     understanding how I did the -- how I did my analysis.
22     But your statement is correct.  The most common
23     use of differential diagnosis is to come up with
24     diagnosis of the disease.  I use this terminology
25     as -- as a method looking at causes of lymphoma.

Page 69

1  Q   (By Mr. Levine)  Can you cite me any medical textbook
2      or peer-reviewed publication that describes
3      differential diagnosis in the way that you've used it
4      to determine the cause of a disease?
5  A   No, I can't cite any literature.
6  Q   Okay.  Is differential diagnosis to determine the
7      cause of a patient's disease a method that has been
8      validated in the medical literature?
9          MR. WISNER:  Objection; vague.
10         THE WITNESS:  I cannot answer that.
11     I'm trying to -- to understand this.  But...
12 Q   (By Mr. Levine)  Would you like me to re-ask it?
13 A   No.  I understand what you're asking.
14 Q   Okay.
15 A   Differential diagnosis is a established method of,
16     like I said, selecting the most likely probability
17     out of possibilities most commonly used in medicine
18     to describe how we derive a diagnosis.  Like I said,
19     I liberally used it in my report for -- to give the
20     idea how we derive to the conclusion.  It's a matter
21     -- it's a matter of nomenclature or how I use the
22     term.  It's not -- it's not the -- and, again, it's
23     just -- it's just a weird question to me as being in
24     medicine.
25         Answer is "no."  It's not a method specifically

Andrei Shustov, M.D.

Page 70

1    described to derive etiology of -- of causes. But I
2    believe it's a valid way of looking at potential
3    causes of somebody [sic] disease or somebody's
4    cancer. Not commonly used, but I think it's a valid
5    methodology.
6    Q   So does -- does differential diagnosis, as a
7    methodology for determining cause, a cause of a
8    patient's non-Hodgkin's lymphoma, have an error rate?
9    A   Anything has an error rate.
10   Q   Does it have a known error rate?
11   A   I don't know what a known error -- an error rate is
12   for hypothetical deductive method.
13   Q   Okay. You've explained to me your methodology and
14   with respect to differential diagnosis. Is there a
15   way that I can tell if you're wrong?
16          MR. WISNER: Objection;
17   speculation.
18          THE WITNESS: I don't know how to
19   answer that.
20   Q   (By Mr. Levine) When you use differential diagnosis
21   to diagnose someone's disease, you can perform a test
22   to rule something in or rule something out, correct?
23          MR. WISNER: Objection; improper
24   hypothetical.
25          THE WITNESS: So let me just say

Page 71

1    this. Medicine is not a science. When you diagnose
2    something, obviously we can make a wrong diagnosis.
3    How do we measure that? So when you examine the
4    patient, who's not a science, and we base our opinion
5    on medical clinical judgment. How do you measure
6    that? So you -- you're entering sort of domain where
7    you make the best clinical judgment based on
8    information that you have and -- and go with your
9    decision.
10      I -- I don't know how you measure the mistakes or
11   errors in -- in clinical judgment. And any --
12   nothing in medicine is certain. And for most things,
13   you cannot -- you cannot measure the -- the amount of
14   error. How -- how do you measure if somebody's
15   misdiagnosed? What's the error? What's the
16   measurement for that error?
17      So I don't think there is the answer to the
18   question you're asking, in my opinion. It's -- it's
19   a matter of clinical -- clinical judgment and making
20   the best -- the best decision using this method of --
21   of deriving your conclusion.
22   Q   (By Mr. Levine) Do you remember my question?
23   A   I remember your question. What is the -- how you
24   define "error."
25   Q   That's not my question. It was, like, six questions

Page 72

1    ago. All due respect.
2    A   Would you --
3    Q   I'd rather you --
4          MR. WISNER: Objection.
5    Argumentative. Ask your question. Don't tell him
6    what happened.
7          MR. LEVINE: I'm going to -- move
8    to strike his answer as nonresponsive. I will read
9    back --
10         MR. WISNER: Oppose.
11         MR. LEVINE: -- my question, which
12   he thinks had the word "error rate" in it.
13         MR. WISNER: Objection; misstates
14   his testimony.
15   Q   (By Mr. Levine) Dr. Shustov, when you use
16   differential diagnosis to diagnose someone's disease,
17   you can perform a test to rule something in or rule
18   something out, correct?
19         MR. WISNER: Renew my objection.
20         THE WITNESS: That's not correct.
21   You have to use the test, but it's not the only way
22   how you make a diagnosis. You have to have
23   comprehensive collection of tests and examines and --
24   and -- and clinical history. You do not make disease
25   diagnosis based on just the test.

Page 73

1    Q   (By Mr. Levine) But you can make a cancer diagnosis
2    after an examination based on the test, correct?
3    A   On multiple tests.
4    Q   Okay. With respect to differential diagnosis in
5    determining the cause of someone's non-Hodgkin's
6    lymphoma, do you perform any test?
7    A   I do not perform any physical tests or laboratory
8    tests. For clinician, what I did is a test.
9    Q   If you were -- is it fair to say that if you were to
10   opine that Roundup caused ten different patients'
11   non-Hodgkin's -- strike that.
12      If you were to opine that Roundup caused ten
13   different patients' non-Hodgkin's lymphoma, do you
14   have any way of knowing how many you would get right
15   and how many you would get wrong?
16         MR. WISNER: Objection; improper
17   hypothetical, speculation.
18         THE WITNESS: I can't answer this
19   question.
20   Q   (By Mr. Levine) If I gave you ten sets of medical
21   records with Mr. Hardeman's medical history, where
22   five of those men were exposed to Roundup and five
23   were not, so that's the only thing that's different
24   about the medical history, but the records did not
25   include information regarding Roundup use, you

Andrei Shustov, M.D.

Page 74

1  couldn't tell me which of the five were exposed to
2  Roundup and which of the five were not, correct?
3          MR. WISNER:  Objection; compound,
4  incomplete, and improper hypothetical and
5  speculation.
6          THE WITNESS:  It's such a
7  hypothetical question, I can't answer that.  I have
8  to have medical history in front of me, examine the
9  patient, and derive a best conclusion.  You're asking
10 me hypothetical questions about hypothetical
11 patients.
12 Q   (By Mr. Levine)  I'm trying to understand your
13 methodology.  So what I'm asking you is, if all ten
14 of those scenarios were the same, just like with Mr.
15 Hardeman, with the exception of the fact that you
16 didn't know which of those patients used Roundup
17 versus which ones did, based on all of that
18 information -- your interview, your physical exam,
19 your review of medical records -- you couldn't tell
20 me which of those patients used Roundup and which
21 ones didn't, correct?
22 A   But I know that he used the Roundup.
23 Q   Understood.
24      But without asking the question about Roundup
25 there's nothing you can learn from the medical

Page 75

1  records, from your physical examination, or from any
2  information you have about the cancer that would tell
3  you which patient used Roundup and which ones didn't.
4          MR. WISNER:  Object --
5  Q   (By Mr. Levine)  Correct?
6          MR. WISNER:  Objection; incomplete
7  hypothetical, speculation, assumes facts not in
8  evidence.
9          THE WITNESS:  In hypothetical
10 scenario where you gave me patients and I did not
11 have the history, with this methodology, no, I
12 couldn't say which one used, which one different.
13 Q   (By Mr. Levine)  Okay.  Does it matter to your
14 methodology whether Roundup made contact with a
15 patient's skin?
16 A   I'm not determining how Roundup gets into people's
17 skin.  I'm determining whether people are exposed to
18 it.
19 Q   Right.
20      And in your determination of exposure, does it
21 matter whether a patient had Roundup come in contact
22 with their skin or not?
23 A   In my determination, no.
24 Q   Does it matter, in your determination of whether
25 someone had sufficient Roundup exposure, whether they

Page 76

1  showered after using Roundup?
2  A   In my determination, no.
3  Q   Does it matter to your methodology how large or how
4  small the area was that a patient sprayed during
5  their use of Roundup?
6  A   It would matter in a sense of me trying to determine
7  what was the extent of exposure so I can compare to
8  the published literature.
9  Q   What -- so explain to me what matters in terms of the
10 area sprayed that you compare to the published
11 literature.
12          MR. WISNER:  Misstates his
13 testimony.
14 Q   (By Mr. Levine)  Explain your testimony to me.
15 A   So when I listen to Mr. Hardeman's history of
16 exposure, I ask him for how long and how much and
17 over what extensive areas did he use Roundup.  That
18 allowed me to determine the number of days, number of
19 month, duration of the exposure, and the manner of
20 exposure.  That is a -- numerically the duration of
21 days and number of days per year, number of years,
22 allowed me to compare it to published literature.
23 And the amount of area and hours per day allowed me
24 to make a clinical judgment to the fact that there
25 was significant exposure every time he used it.

Page 77

1  Q   All right.  So my -- my question was:  Does it matter
2  how large or how small the area was sprayed?  The
3  size of the area that Mr. Hardeman sprayed.
4  A   So the size of the area did not contribute to
5  determination whether or not it was sufficient
6  exposure.
7  Q   Okay.  So the -- the size of the area is not part of
8  your methodology in determining whether Roundup
9  causes --
10 A   No, not my methodology, no.
11 Q   Sorry.  I was in the middle of a question.  So just
12 so we have a clean record.
13      The size of the area is not part of your
14 methodology in determining whether Roundup causes
15 someone's cancer, correct?
16 A   Correct.
17 Q   But now let's go back to something you said.
18 A   Sure.
19 Q   I think it does matter to you for how long a patient
20 used Roundup, correct?
21 A   It matters in a sense of being able to compare it to
22 published literature.
23 Q   Okay.  What is your criteria for the duration of
24 exposure necessary in order to determine that Roundup
25 caused an individual's cancer?

Andrei Shustov, M.D.

Page 78

1  A  I do not have any threshold to determine whether or
2     not the exposure caused -- there was sufficient
3     exposure in the individual patient.  It allows me to
4     make determination whether the amount of exposure
5     that the person had exceed the threshold that was
6     published in the literature as posing the risk of
7     lymphoma.
8  Q  Can you explain that to me a little more?
9  A  I don't know what the minimum exposure is.  I don't
10    know whether they need to do five minutes or 20
11    minute.  Nobody does studies like this.  But the
12    epidemiologic studies suggest that certain number of
13    days per year or the duration of exposure of -- of
14    that magnitude increases someone's risk of
15    non-Hodgkin lymphoma.
16 Q  Do those studies establish that the duration of
17    exposure that's stated in them specifically cause an
18    individual's non-Hodgkin's lymphoma?
19 A  So the studies that I've read establish that exposure
20    certain number of days per year, if you use that --
21    that cutoff of that exposure, increases someone's
22    risk of lymphoma.
23 Q  Okay.
24 A  Whether -- whether it's two days or ten days, it's a
25    cutoff that the studies used.

Page 79

1  Q  So what are the cutoffs?  Explain them to me.  What's
2     the two-day cutoff?
3  A  That's what this -- what I saw in -- what I -- I read
4     in the literature on general causation.
5  Q  So explain two days.  Ever?  Explain what the
6     literature says and that goes into your methodology
7     with respect to two days.
8  A  You have to look at the -- at the papers, what they
9     specifically define.
10 Q  I'm just asking you.  You've studied this.  You're
11    offering opinions on this.  What's -- what's the two
12    days mean?  Can you tell me?
13       MR. WISNER:  Objection.  The
14    witness has asked for the paper.  If you're going to
15    ask him questions about it, give him the paper.
16 Q  (By Mr. Levine) Can you tell me what the two days
17    means?
18 A  Two days means that people use it at least two days a
19    year.
20 Q  Okay.  And then you said ten days?
21 A  In another study that I recall, if I recall
22    correctly, was ten days.
23 Q  Per year?
24 A  That's correct.
25 Q  Does it matter to your methodology what the subtype

Page 80

1     was of non-Hodgkin's lymphoma that a patient was
2     diagnosed with in being able to determine whether
3     Roundup caused their cancer?
4        MR. WISNER:  Objection; improper
5     hypothetical, speculation.
6        THE WITNESS:  No, it doesn't.
7  Q  (By Mr. Levine) Can you identify any particular
8     subtype of non-Hodgkin's lymphoma where there is a
9     cluster of cases in patients exposed to Roundup?
10       MR. WISNER:  Objection; vague,
11    incomplete hypothetical, lacks foundation.
12       THE WITNESS:  It's -- it's -- no, I
13    can't.  It's hypothetical question and relying on,
14    again, statements of authorities and published
15    literature.  There is no specification of subtypes of
16    lymphoma --
17       MR. LEVINE:  Okay.
18       THE WITNESS:  -- related to
19    glyphosate.
20 Q  (By Mr. Levine) There's no evidence that there's a
21    cluster of cases of DLBCL in patients exposed to
22    Roundup, correct?
23       MR. WISNER:  Objection; vague,
24    incomplete hypothetical.
25       THE WITNESS:  I haven't seen any.

Page 81

1  Q  (By Mr. Levine) Okay.  Does it matter to your
2     opinion what the -- if somebody -- strike that.
3        MR. WISNER:  Counselor, I don't
4     want to stop you if you're in the middle of a
5     section.  But when you do reach the end of a section,
6     I'd like to take a break first.
7        MR. LEVINE:  Okay.  We can take a
8     break in just a --
9        MR. WISNER:  Yeah.
10       MR. LEVINE:  -- few more minutes.
11       MR. WISNER:  Whenever you're ready.
12       MR. LEVINE:  I'm close.
13 Q  (By Mr. Levine) Does it matter how many bottles or
14    containers of Roundup per year somebody purchased and
15    used, to your methodology?
16 A  To my methodology, no.
17 Q  Does it matter what percentage of glyphosate was in
18    the Roundup that was sprayed?
19 A  My methodology, no.
20 Q  Does it matter if the Roundup was a concentrate or
21    ready-to-use Roundup?
22 A  For my methodology, no.
23 Q  Does it matter what surfactants were included in the
24    Roundup?
25 A  To my methodology, no.

Andrei Shustov, M.D.

| Page 82 |
| --- |

1  Q  Does it matter that there were surfactants at all?
2  A  If you ask me to speculate based on my medical
3     biology and my knowledge, I can speculate.  But not
4     for methodology that I stated.  If you ask me as a
5     biologist, I can offer my opinion on all of those
6     opinions.
7  Q  Do you have an opinion as to whether it matters
8     whether there are surfactants in the Roundup?
9  A  I do have an opinion.  It doesn't matter, in my
10    opinion.
11 Q  Okay.  Does it matter if a patient inhaled the
12    Roundup, to your methodology?
13 A  Not to my methodology.
14         MR. LEVINE:  Okay.  We can take a
15    break.
16         MR. WISNER:  Sure.
17         THE VIDEOGRAPHER:  Please stand by.
18    This concludes Media Unit No. 1.  We're going off the
19    record.  The time is 10:38 a.m.
20         (Pause in proceedings.)
21
22         THE VIDEOGRAPHER:  This begins
23    Media Unit No. 2 in the deposition of Dr. Andrei
24    Shustov.  We are back on the record.  The time is
25    10:45 a.m.

| Page 83 |
| --- |

1  Q  (By Mr. Levine) Dr. Shustov, as an oncologist, you
2     diagnose and treat non-Hodgkin's lymphoma, correct?
3  A  That's correct.
4  Q  And forgive me if I asked this before.  I'm not sure
5     if I did.  But you consult on second opinions
6     regarding diagnosis and treatment?
7  A  That's correct.
8  Q  Do you treat all types of non-Hodgkin's lymphoma or
9     just certain subtypes?
10 A  All of them.
11 Q  And you told me that -- I think you told me --
12    correct me if I'm wrong -- that when treating or
13    consulting with a patient, you attempt to determine
14    the cause of their non-Hodgkin's lymphoma when you
15    can, correct?
16 A  I don't try to determine the cause.  I take medical
17    history to document patients' prior exposures or
18    possible risk factors, but that's not what I do
19    medicine determining the cause.  I treat patients.
20 Q  When treating a patient --
21 A  Yeah.
22 Q  -- do you attempt to determine the cause of their
23    non-Hodgkin's lymphoma?
24 A  No.
25 Q  You don't do that in your practice?

| Page 84 |
| --- |

1  A  It is part of the initial encounter and history
2     taking to document possible exposures, but it's not
3     part of the patient treatment or does not in most
4     cases drive treatment decisions.
5  Q  Okay.  So you document possible causes in their
6     medical history, but you don't determine the cause;
7     am I correct?
8  A  I document exposures.  But my job is not to determine
9     the cause of lymphomas in my everyday practice.
10 Q  Okay.  So you would, in a patient's chart, document
11    whether they were exposed to Roundup, for example?
12 A  Correct.
13 Q  But you wouldn't necessarily opine in your chart as
14    to whether Roundup caused that patient's cancer?
15 A  That's correct.  But that's the reason why we
16    document facts and medical records to state possible
17    risk factors.
18 Q  And I think you said you always ask about pesticides
19    and herbicides like Roundup, correct?
20 A  That's correct.
21 Q  You -- and when you're documenting information in a
22    patient's chart, you document their prior medical
23    history, correct, like you did here?
24 A  That's correct.
25 Q  And you document -- when treating or consulting with

| Page 85 |
| --- |

1     a patient, you document their social history like you
2     did here, correct?
3  A  That's correct.
4  Q  When treating or consulting with a patient -- sorry.
5     I'll -- I was about to ask something I've asked
6     already, so I'll skip that.
7         Have you ever told a patient that Roundup caused
8     his or her non-Hodgkin's lymphoma?
9  A  No.
10 Q  So let's -- if you were treating a patient like Mr.
11    Hardeman, you would ask him as part of your treatment
12    and document in the medical records whether he was
13    exposed to Roundup, correct?
14         MR. WISNER:  Objection; improper
15    hypothetical.
16         THE WITNESS:  I would not ask him
17    when I was treating him.  I would ask him on our
18    first encounter.
19 Q  (By Mr. Levine)  Okay.  Your first encounter with any
20    patient, you would ask them?
21 A  I would not ask specifically every patient were
22    exposed to Roundup.  I would expose them -- I would
23    ask them in general were they exposed to agricultural
24    chemicals or radiation or military carcinogens, et
25    cetera, et cetera.

Andrei Shustov, M.D.

Page 86

1  Q  And you would ask that for a patient that was
2     diagnosed with a form of B-cell lymphoma or T-cell
3     lymphoma, correct?
4  A  Any cancer.
5  Q  Okay.
6              (Exhibit No. 5 marked for
7               identification.)
8
9  Q  (By Mr. Levine)  Handing you what's been marked as
10    Exhibit 5.  Noting that there are certain redactions
11    of personal identifying information here.
12       This is a medical record of yours, correct?  If
13    you look at the last page, it's electronically signed
14    by you.
15 A  Looks weird, but yes.
16 Q  And in this record, you reviewed past medical history
17    like you did here, correct?
18              MR. WISNER:  I have a clarify:  Is
19    this a medical record that's been produced in this
20    litigation?
21              MR. LEVINE:  Yes, it is.
22              MR. WISNER:  Does it relate to a
23    client?  That Mr. Hardeman?
24              MR. LEVINE:  It's not Mr. Hardeman's
25    record.  This goes to his methodology and

Page 87

1     credibility.
2              MR. WISNER:  So this is another
3     person's medical record?
4              MR. LEVINE:  Yep.
5              THE WITNESS:  It is.
6              MR. WISNER:  Don't answer any
7     questions related to this.  That is privileged
8     medical information.  Do not answer any questions --
9              MR. LEVINE:  It's -- any --
10             MR. LEVINE:  -- about this
11    document.
12             MR. LEVINE:  Any privileged
13    information is redacted.  This does not identify
14    whose it is.
15             MR. WISNER:  It doesn't matter.
16    You're asking about a medical record he created in a
17    treatment of another patient.
18             MR. LEVINE:  Yes.
19             MR. WISNER:  That is privileged.
20    Do not answer any questions --
21             MR. LEVINE:  It's not privileged.
22             MR. WISNER:  -- about this
23    document.
24             MR. LEVINE:  It's been turned over.
25             THE REPORTER:  Sorry.

Page 88

1              MR. LEVINE:  It's not privileged.
2              THE REPORTER:  Slow down.
3              MR. WISNER:  You have my objection.
4     Do not answer any questions about the treatment of
5     this patient.
6              THE WITNESS:  This is very, very
7     bizarre.  And like I said, in my world, it -- it
8     would be kind of illegal even to obtain this.  And I
9     feel very, very uncomfortable doing this.  This is --
10 Q  (By Mr. Levine)  Dr. Shustov, I will represent to you
11    that this is a medical record for a plaintiff in the
12    Roundup litigation who alleges in a complaint that
13    she was exposed to Roundup.
14 A  Okay.
15 Q  This patient, therefore, according to her complaint,
16    indicates that she had chemical exposure to
17    pesticides or herbicides.
18 A  Okay.
19 Q  This is a medical record of yours, correct?
20 A  That's correct.
21 Q  You reviewed past medical history in this medical
22    record, correct?
23             MR. WISNER:  Objection.  Do not
24    answer that question.  Calls for privileged medical
25    information.  I will object to any substantive

Page 89

1     question about this document.  It is highly improper
2     and borderline a violation of HIPAA and other federal
3     privacy laws.
4              MR. LEVINE:  Bring it.
5              MR. WISNER:  If you want to go down
6     this road, sir, you're welcome to.
7              MR. LEVINE:  Bring it.
8              MR. WISNER:  But I'd be welcome to
9     call the judge immediate -- immediately, if you like.
10             MR. LEVINE:  Go for it.
11             MR. WISNER:  All right.  Let's go
12    off the record.  Let's call the judge.
13             THE VIDEOGRAPHER:  Please stand by.
14    Going off the record.  The time is 10:52 a.m.
15                (Pause in proceedings.)
16
17             THE VIDEOGRAPHER:  We are back on
18    the record.  The time is 11:02 a.m.
19             MR. LEVINE:  So I will agree to
20    withdraw Exhibit 5.  I don't agree with counsel's
21    objections.  But in the interest of efficiency here,
22    we will withdraw Exhibit 5 from the record.
23                (Exhibit No. 5 withdrawn.)
24
25             MR. WISNER:  I understand that

Andrel Shustov, M.D.

Page 90

1 Ms. Wagstaff would like to put on the record a
2 conversation -- her interpretation of the
3 conversation that happened off the record. Aimee.
4 MS. WAGSTAFF: Yeah. So Monsanto
5 had displayed to Dr. Shustov a medical record that
6 pertains to one of his other patients not involved in
7 the Hardeman case. While some information was
8 redacted, it's my understanding from talking to
9 Dr. Shustov off the record that this patient of his
10 has a very rare subtype, and so it's easily
11 identifiable who the possible patient may be. That
12 information is not redacted, and that Monsanto's
13 counsel told me that they have not contacted this
14 plaintiff to ask for a HIPAA waiver. They have not
15 contacted the plaintiff's attorney. And as we sit
16 here right now, the plaintiff has no idea, as near as
17 I can tell, that Monsanto is injecting its medical --
18 his or her medical history into this litigation which
19 is covered by media, which we feel is a very big
20 violation of the -- the HIPAA laws and other laws,
21 and we object wholeheartedly. So we appreciate
22 Monsanto withdrawing that -- that exhibit.
23 MR. LEVINE: Okay. I don't
24 entirely agree with the complete characterization of
25 what you said, but we are withdrawing the exhibit.

Page 91

1 Q (By Mr. Levine) Dr. Shustov, is it fair to say that
2 you do not ask about pesticide exposure in every
3 patient that you treat for non-Hodgkin's lymphoma?
4 A I'm not going to answer this question. I'm going to
5 say I'm appalled by exposure of my patient to these
6 proceedings. And I feel you're using my patient
7 against my credibility. And I'm -- I feel my sort of
8 patient privacy and my integrity's violated.
9 In the medical world, it's a -- it's a absolutely
10 unethical move. I just want to express that as a
11 physician. You asked me to help you with litigation,
12 and you're using my patient to create an argument
13 against my statements. I -- I resent that, I want to
14 put on the record. And it's despicable for a medical
15 profession. It's despicable to my patient who's
16 suffering from cancer. And I can't explain how
17 appalling it is what was just done. Maybe okay in
18 legal world, but that's despicable and appalling.
19 I'm not going to answer this question.
20 Q Dr. Shustov, you told me earlier that you ask every
21 patient about pesticide exposure, correct?
22 A I ask every patient about exposure to carcinogens,
23 including agricultural, military, household, and
24 occupational.
25 Q And you told me you document that information in

Page 92

1 their medical records, correct?
2 A If patients confirm the exposure, I document in
3 medical records.
4 Q Thank you.
5 Okay. We're going to make this Exhibit 5 since
6 we withdrew the previous Exhibit 5.
7 MR. WISNER: I think that's
8 appropriate.
9 MR. LEVINE: Okay.
10 (Exhibit No. 5 marked for
11 identification.)
12
13 Q (By Mr. Levine) Dr. Shustov, I'm handing you what's
14 been marked as Exhibit 5, which is the IARC monograph
15 No. 112 regarding glyphosate.
16 Dr. Shustov, you're familiar with IARC, correct?
17 A That's correct.
18 Q You cite IARC in your report to support your
19 conclusion that glyphosate caused Mr. Hardeman's
20 non-Hodgkin's lymphoma, correct?
21 A My conclusion that glyphosate most likely has been
22 contributing factor and might have caused his
23 lymphoma.
24 Q Okay. So you cite IARC in your report to support
25 your conclusion that glyphosate most likely has been

Page 93

1 a contributing factor and might have caused his
2 lymphoma?
3 A That's correct.
4 Q So I'm clear, you just made a distinction that I want
5 to ask about.
6 Is it your opinion that glyphosate caused Mr.
7 Hardeman's non-Hodgkin's lymphoma?
8 A In any particular patient, nobody can determine what
9 exactly caused the lymphoma, but my statement is that
10 it is likely that glyphosyte -- glyphosate
11 substantially contributed or might have caused the
12 lymphoma.
13 Q Okay. In your report, on Page 7, you describe IARC's
14 analysis as thorough and rigorous investigation by
15 independent researchers and investigators in the
16 field, correct?
17 A I have no reason to question it.
18 Q Okay. Do you agree that according to IARC, there is
19 limited evidence in humans for the carcinogenicity of
20 glyphosate?
21 A I agree there is evidence, whether it's limited or
22 not limited. The reason it's listed there, there is
23 evidence to support it, and it is up to IARC to
24 decide whether it's limited or definitive.
25 Q You have no reason to disagree that it's limited,

Andrei Shustov, M.D.

Page 94

1    correct?
2                   MR. WISNER:  Objection; ambiguous.
3                   THE WITNESS:  I have no reason to
4    -- to question IARC listing this as limited.
5                   MR. LEVINE:  Okay.
6                   MR. WISNER:  Nice.  I was just
7    thinking, I don't have to print out the preamble.
8                   (Exhibit No. 6 marked for
9                   identification.)
10
11   Q   (By Mr. Levine)  I am handing you what's been marked
12   as Exhibit 6, which is the IARC preamble.  Have you
13   -- are you familiar with this?
14   A   I've come across it.
15   Q   I'll ask you to turn to Page 19.
16   A   I'm here.
17   Q   Do you see the sub-letter "Carcinogenicity in
18   Humans," Sub-letter A, under 6?
19   A   I see.
20   Q   Okay.  And if you look at -- at the very bottom, it
21   refers to "limited evidence of carcinogenicity,"
22   correct?
23   A   I see it.
24   Q   And according to IARC, "limited evidence of
25   carcinogenicity" means a positive association has

Page 95

1    been observed between exposure to the agent and
2    cancer for which a causal interpretation is
3    considered by the working group to be credible, but
4    chance, bias, or confounding could not be ruled out
5    with reasonable confidence.
6    A   I see that.
7    Q   Do you see that?
8        I'm sorry.  We were speaking over each other.
9        Do you see that?
10   A   I see that.
11   Q   Do you have any reason to disagree with IARC's
12   definition of "limited evidence of carcinogenicity"?
13   A   I don't have any reason to disagree with limited
14   evidence.
15   Q   Okay.
16                  (Exhibit No. 7 marked for
17                  identification.)
18
19   Q   (By Mr. Levine)  Handing you what's been marked as
20   Exhibit 7.  This is IARC's monograph 100B regarding
21   the hepatitis C virus, correct?
22   A   That's correct.
23   Q   And if you turn to Page 158 of that monograph, under
24   the evaluation.  Give you a second to do that.
25   A   I'm here.

Page 96

1    Q   Okay.  IARC concluded that there is sufficient
2    evidence in humans for the carcinogenicity of chronic
3    infection with HCV -- meaning hepatitis C -- chronic
4    infection with HCV causes hepatocellular carcinoma
5    and non-Hodgkin's lymphoma, correct?
6    A   That's correct.
7    Q   Do you have any reason to disagree with this finding?
8    A   I don't have any reason to disagree with IARC
9    statements.
10   Q   Now, if you turn back to the -- the preamble for a
11   second, which was --
12                  MR. WISNER:  Exhibit 6.
13   Q   (Continuing by Mr. Levine)  -- Exhibit 6.  Exhibit 6
14   that you have.
15   A   Okay.
16   Q   So if you turn to Page 19, above where we read
17   limited evidence, there is a section regarding
18   sufficient evidence, correct?
19   A   I see it.
20   Q   And under -- according to IARC, the definition for
21   "sufficient evidence of carcinogenicity" states that
22   the working group considers that a causal
23   relationship has been established between exposure to
24   the agent and human cancer.  That is, a positive
25   relationship has been observed between the exposure

Page 97

1    and cancer in studies in which chance, bias, and
2    confounding could be ruled out with reasonable
3    confidence.
4        Do you see that?
5    A   I see that.
6    Q   Do you agree that with respect to hepatitis C, a
7    positive relationship has been observed between the
8    exposure to chronic hepatitis C and cancer in studies
9    in which chance, bias, and confounding could be ruled
10   out with reasonable confidence?
11                  MR. WISNER:  Objection; compound.
12   And ambiguous.
13                  THE WITNESS:  As a general
14   statement, I agree.
15                  MR. WISNER:  I just want to clarify
16   the objection.  You said hepatitis C and then said
17   chronic hepatitis C in your sentence, so that's why I
18   objected to compound and ambiguous.
19                  MR. LEVINE:  Are you educating me
20   again?  I've asked you not to do that.
21                  MR. WISNER:  Well, I just --
22                  MR. LEVINE:  I just -- again.
23                  MR. WISNER:  Okay.
24                  MR. LEVINE:  You have an
25   opportunity for redirect.  Can do that at the end of

Andrei Shustov, M.D.

Page 98

1  the deposition.
2         MR. WISNER:  I just assumed you
3  wanted truth, and so I thought cleaning the record up
4  while we're doing it was the --
5         MR. LEVINE:  Oh.  I know --
6         MR. WISNER:  -- correct approach.
7         MR. LEVINE:  I know what the -- I
8  know what the monograph says.  You can look at the
9  monograph.
10     Give me one second.
11  Q  (By Mr. Levine)  So, Dr. Shustov, IARC concluded that
12  chronic infection with hepatitis C is carcinogenic to
13  humans, correct?
14  A  I can see it in their report.
15  Q  I'm sorry?
16  A  I can see it in their report, yes.
17  Q  IARC classifies Group 1 as a definite carcinogen --
18  sorry.  IARC -- strike that.
19     IARC classified hepatitis C as a Group 1
20  carcinogen, correct?
21         MR. WISNER:  Objection; misstates
22  the document.
23         MR. LEVINE:  I'll re-ask.
24  Q  (By Mr. Levine)  IARC classified chronic hepatitis C
25  as a Group 1 carcinogen, correct?

Page 99

1  A  That's correct.
2  Q  IARC defines Group 1 as a definite carcinogen in
3     humans, correct?
4  A  That's correct.
5  Q  And as you say in your report, glyphosate is Group
6     2A, correct?
7  A  That's correct.
8  Q  So it's fair to say IARC says that evidence that
9  chronic hepatitis C infection is carcinogenic is
10  stronger than evidence concluding that glyphosate is
11  carcinogenic, correct?
12         MR. WISNER:  Objection to form.
13         MR. LEVINE:  I'll re-ask that.  I
14  may have asked a bad -- may have worded that poorly.
15  Q  (By Mr. Levine)  So it's fair to say that IARC's
16  conclusion that chronic hepatitis C infection is a
17  carcinogen is a stronger than its
18  conclusion regarding glyphosate and carcinogenicity,
19  correct?
20  A  Based on their classification of evidence, yes.
21  Q  And you don't include this IARC finding on hepatitis
22     C in your report, correct?
23  A  That's correct.
24  Q  And, in fact, in your report, you -- you say that
25  studies for hepatitis C have not accounted for

Page 100

1  numerous confounding factors, correct?
2  A  That's correct.
3         (Exhibit No. 8 marked for
4         identification.)
5
6  Q  (By Mr. Levine)  I'm handing you what's been marked
7     as Exhibit 14.
8         MR. WISNER:  Oh.  8.
9         MR. LEVINE:  8.  Yeah.  Sorry.  My
10  outline.
11         MR. WISNER:  Happens to me all the
12  time.
13  Q  (By Mr. Levine)  Dr. Shustov, this is the IARC
14  monograph regarding hepatitis B, correct?
15  A  That's correct.
16  Q  And if you turn to Page 123, under the Section --
17  Section 5 regarding evaluation.  I'll give you a
18  minute to do that.
19  A  I'm here.
20  Q  Okay.  IARC concludes there is sufficient evidence in
21  humans for the carcinogenicity of chronic infection
22  with hepatitis B, correct?
23  A  That's correct.
24  Q  Chronic infection with hepatitis B causes
25  hepatocellular carcinoma, correct?

Page 101

1  A  That's correct.
2  Q  Also positive associations have been observed between
3  chronic infection with hepatitis B and
4  cholangiocarcinoma and non-Hodgkin's lymphoma,
5  correct?
6  A  I can see that.
7  Q  Chronic infection with hepatitis B is a Group 1
8  carcinogen according to IARC, correct?
9  A  Correct.
10  Q  You didn't include this finding in your report,
11  correct?
12  A  No.
13  Q  And you would agree that IARC says that evidence that
14  chronic infection with hepatitis C -- I mean, strike
15  that.
16     You would agree that IARC's conclusion regarding
17  chronic infection with hepatitis B is stronger than
18  its conclusion with respect to glyphosate and
19  carcinogenicity, correct?
20  A  Not for lymphoma.  For hepatocellular carcinoma.
21  Q  Okay.  Do you agree, do you believe that their
22  conclusion with lymphoma is stronger, weaker, or the
23  same as with respect to glyphosate?
24  A  I can't compare this.  They state here that positive
25  association for cholangiocarcinoma, non-Hodgkin

**Page 102**

1  lymphoma, while for hepatocellular carcinoma, they --
2         THE REPORTER:  Start over.
3         THE WITNESS:  Start over?
4     What it states here, that for non-Hodgkin
5  lymphoma and cholangiocarcinoma, there is positive
6  association.  And specifically for hepatocellular
7  carcinoma, there is sufficient evidence for carc --
8  carcinogenicity as a cause for hepatocellular
9  carcinoma.
10        So what they're saying is that there is -- HBV --
11  that HBV can cause hepatocellular carcinoma, but for
12  cholangiocarcinoma and Hodgkin lymphoma, there is
13  positive association in their conclusion.
14  Q  (By Mr. Levine)  And then they state that HBV is a
15  Group 1 carcinogen, correct?
16  A  That's correct.  As a general statement.
17  Q  You agree that Mr. Hardeman has two exposures that
18  IARC has identified as sufficient evidence in humans
19  for a Group -- in order to characterize it as a Group
20  1 carcinogen, correct?
21  A  No, I don't.
22  Q  You agree that Mr. Hardeman has one IARC -- one
23  exposure that IARC has identified as Group 1
24  carcinogen, correct?
25  A  I don't.

**Page 103**

1  Q  Okay.  It's your opinion that Mr. Hardeman did not
2  have exposure to chronic hepatitis C?
3  A  He cannot have exposure to chronic hepatitis C.
4  Chronic hepatitis C is a diagnosis.  You can have
5  exposure to the virus.  He was exposed to the virus,
6  but evidence shows that he does not have chronic
7  hepatitis.
8  Q  Did Mr. Hardeman ever have chronic hepatitis?
9  A  There is no evidence he has chronic hepatitis.
10  Q  Did Mr. Hardeman ever have chronic hepatitis?
11  A  There is no evidence he had chronic hepatitis.
12  Q  No evidence that he had chronic hepatitis C?
13  A  That's correct.
14         (Exhibit No. 9 marked for
15          identification.)
16
17  Q  (By Mr. Levine)  Handing you what's been marked as
18  Exhibit 9.  This is an article regarding IARC's
19  findings on Roundup from -- from U.S. News & World
20  Report, correct?
21  A  That's correct.
22  Q  And if you can turn to Page 3 in this article.  Do
23  you see below the -- the part that says "Also"?
24  So --
25  A  I do see.

**Page 104**

1  Q  Where it starts, "The French agency's experts."  Do
2  you see that?
3  A  I do see it.
4  Q  Are you aware that the French agency's experts,
5  meaning IARC's experts, said that the cancer risks of
6  the weed killer were mostly from occupational
7  exposure?
8  A  I am reading it.  But I'm not aware of it.
9  Q  You were not aware of that in forming your opinions
10  in this case?
11  A  No.
12  Q  Do you know who Kate Guyton is?
13  A  No, I don't.
14  Q  Okay.  Do you agree that Kate Guyton -- do you agree
15  with Kate Guyton's comment that, "I don't think home
16  use is the issue.  It's agricultural use that will
17  have the biggest impact.  For the moment, it's just
18  something for people to be conscious of"?
19         MR. WISNER:  Objection.
20  Impeachment through extrinsic hearsay.
21         THE WITNESS:  I don't have opinion
22  on that, no.
23  Q  (By Mr. Levine)  You don't agree or disagree with
24  that?
25  A  I don't have opinion on it.

**Page 105**

1  Q  Okay.  Is it your opinion that home use is a cause of
2  non-Hodgkin's lymphoma?  Strike -- strike that.  Let
3  me be clear.
4     Is your opinion that home use of Roundup causes
5  non-Hodgkin's lymphoma?
6         MR. LEVINE:  Objection; incomplete
7  hypothetical.
8         THE WITNESS:  I don't have an
9  opinion on how people use Roundup, and I don't have
10  an opinion whether it matters they use it at home or
11  in a setting of agricultural profession.
12  Q  (By Mr. Levine)  We discussed --
13         MR. LEVINE:  I'll be just a minute
14  to get back to Dr. Shustov's report.
15  Q  (By Mr. Levine)  We're going to go to your report,
16  which was Exhibit 3.  So you can get that in front of
17  you again.
18         MR. WISNER:  Can I organize these?
19         MR. LEVINE:  Sure.
20         MR. WISNER:  I'm assuming you're
21  not going to go back to them.
22         MR. LEVINE:  No.  Can we take a
23  quick break?
24         MR. WISNER:  Yeah.  Sure.
25         THE VIDEOGRAPHER:  Please stand by.

Andrei Shustov, M.D.

| | Page 106 |
|---|---|
| 1 | We're going off the record. The time is 11:25 a.m. |
| 2 | (Pause in proceedings.) |
| 3 | (Mr. Brenza not present.) |
| 4 | |
| 5 | THE VIDEOGRAPHER: We are back on |
| 6 | the record. The time is 11:33 a.m. |
| 7 | Q (By Mr. Levine) Dr. Shustov, the last thing we were |
| 8 | talking about was the quote from Kate Guyton at IARC, |
| 9 | correct? |
| 10 | A Correct. |
| 11 | Q Can you turn to Page 8 of your report? |
| 12 | A I'm here. |
| 13 | Q Do you see the third-from-last -- or second-from-the- |
| 14 | last bullet point on that page? |
| 15 | A I do. |
| 16 | Q It says, and I quote, "The results of the IARC |
| 17 | investigation were published in the Lancet Oncology |
| 18 | in May 2015 by Guyton, et al." |
| 19 | See that? |
| 20 | A Yeah. |
| 21 | Q You said you didn't know who she was, right? |
| 22 | A I don't know who he is. I didn't remember his name |
| 23 | until looking at my report. I -- |
| 24 | Q Okay. |
| 25 | A -- don't memorize the names, no. |

| | Page 107 |
|---|---|
| 1 | Q I think it's a she, just for clarification. |
| 2 | A Okay. |
| 3 | Q But you cite her in your report, correct? |
| 4 | A Okay. I did. |
| 5 | Q Did you review her paper? |
| 6 | A I looked through her paper. |
| 7 | Q And did you write this section of your report? |
| 8 | A Of course I did. |
| 9 | Q You didn't copy it? |
| 10 | A I typed the section of my report. |
| 11 | Q Okay. I'm going to hand you, put a sticker on this, |
| 12 | what I was reading from, which is Exhibit 10. |
| 13 | (Exhibit No. 10 marked for |
| 14 | identification.) |
| 15 | |
| 16 | Q (By Mr. Levine) I was reading from Page 8 on |
| 17 | Exhibit 10. |
| 18 | A Okay. |
| 19 | Q This is Dr. Nabhan's report in this case. |
| 20 | A Okay. |
| 21 | MR. WISNER: I'm sorry. I'm sorry. |
| 22 | Did you just testify that you were questioning about |
| 23 | an Exhibit 10? |
| 24 | MR. LEVINE: I was reading from |
| 25 | Exhibit 10, which was the exact -- but I'll clarify |

| | Page 108 |
|---|---|
| 1 | what that meant. I was reading from Exhibit 10. |
| 2 | MR. WISNER: Okay. |
| 3 | MR. LEVINE: Which was the exact |
| 4 | same language that was in his report that Dr. Shustov |
| 5 | was looking at the same time, for the record. |
| 6 | MR. WISNER: Okay. Well -- |
| 7 | MR. LEVINE: Okay? |
| 8 | MR. WISNER: -- from my |
| 9 | understanding, he was looking at Exhibit 3 when you |
| 10 | were questioning him. |
| 11 | MR. LEVINE: Correct. |
| 12 | MR. WISNER: Okay. So if you want |
| 13 | to establish they're the same -- |
| 14 | MR. LEVINE: Well -- |
| 15 | MR. WISNER: -- go ahead. |
| 16 | MR. LEVINE: -- we clearly agree |
| 17 | with that on the record. |
| 18 | MR. WISNER: Okay. Okay. |
| 19 | MR. LEVINE: Okay? Thank you for |
| 20 | pointing that out. |
| 21 | Q (By Mr. Levine) What I read you was from |
| 22 | Dr. Nabhan's report. You said -- |
| 23 | A Sure. |
| 24 | Q -- you wrote every word of your report. |
| 25 | A I did. |

| | Page 109 |
|---|---|
| 1 | Q Do you understand that he said he authored his |
| 2 | report? |
| 3 | A Yes. |
| 4 | Q Okay. How did that paragraph get into your report? |
| 5 | A This para -- my report? I was -- I type it -- I used |
| 6 | the same language as Dr. Nabhan used. |
| 7 | Q Okay. Did you copy him or did he copy you? |
| 8 | A I used the same language. I had this report before I |
| 9 | typed mine. And I thought that statement that he had |
| 10 | is definitive. And I did not feel like coming up |
| 11 | with any -- any other language. |
| 12 | Q You said you used the language from Dr. Nabhan's |
| 13 | report? |
| 14 | MR. WISNER: Objection; misstates |
| 15 | his testimony. |
| 16 | Q (By Mr. Levine) Clarify that for me. |
| 17 | A I used the statement, and --- is there a difference? |
| 18 | Q Just clarify for me. I didn't quite understand what |
| 19 | you were saying. |
| 20 | A I used the same language that he used to make a |
| 21 | statement in my report because I felt that it was |
| 22 | relevant and there was nothing else for me to add. |
| 23 | Q So I understand from your reliance materials that you |
| 24 | had reviewed Dr. Nabhan's general causation report, |
| 25 | correct? |

Andrel Shustov, M.D.

Page 110

1  A  Can you repeat this?
2  Q  From your reliance list that we --
3  A  Yeah.
4  Q  -- discussed earlier in this deposition.
5  A  Okay.
6  Q  You had reviewed Dr. Nabhan's general causation
7     report in the MDL, correct?
8  A  Okay.
9  Q  You said you had not reviewed his specific causation
10    report for Mr. Hardeman, correct?
11  A  I don't recall what I said.  If it's in transcripts,
12    then yes.
13  Q  Okay.
14  A  Whatever I --
15  Q  Had you reviewed that report, that Exhibit 10, prior
16    to preparing your opinions?  And for the record, I'll
17    note that that report is dated the same day as your
18    report.
19  A  I do not recall the date specifically when I reviewed
20    the reports.
21  Q  Did you review that report, Dr. Nabhan's report for
22    Mr. Hardeman specifically?  Not his general causation
23    report.  Let me strike what I said just to be clear.
24       Did you review Dr. Nabhan's case-specific report
25    in Mr. Hardeman's case prior to writing your report?

Page 111

1  A  I don't -- I don't remember that.  I reviewed a lot
2     of reports.  I -- I honestly don't remember.
3  Q  So Dr. Nabhan's report -- Dr. Nabhan's report on
4     Page 1 is dated November 20th, 2018.  Can you see
5     that?
6  A  Okay.  I do see that.
7                (Mr. Brenza enters.)
8
9  Q  (By Mr. Levine)  Your report was provided to
10    defendants on November 20th, 2018.  Do you understand
11    that?
12  A  Okay.
13  Q  Did you review Dr. Nabhan's report dated November
14    20th, 2018, prior to writing your report in this
15    case?
16  A  I don't remember.
17  Q  Is that a "yes," "no," or "maybe"?
18  A  I don't remember, honestly.
19  Q  So to be clear, are you saying you may have reviewed
20    his report?
21            MR. WISNER:  Objection; misstates
22    his testimony.
23            MR. LEVINE:  I'm asking.  I'm
24    trying to understand.
25  Q  (By Mr. Levine)  Is it possible that you reviewed his

Page 112

1     report?
2  A  I honestly don't remember.  Is that an acceptable
3     answer, or...?
4            MR. WISNER:  You're assuming a lot
5     of facts here.
6  Q  (By Mr. Levine)  Do -- you don't -- to be clear, do
7     you not remember reading his report, or do you not
8     remember if you read it or not?
9            MR. WISNER:  I don't want to
10    interrupt the question that's pending.
11            MR. LEVINE:  So then don't.
12            MR. WISNER:  However, if you're
13    willing to go off the record, I can explain to you
14    what your confusion is, but --
15            MR. LEVINE:  No.
16            MR. WISNER:  -- it'd be outside the
17    presence of the witness.
18            MR. LEVINE:  No.
19            MR. WISNER:  Okay.  Then you
20    clearly don't want the truth.
21            MR. LEVINE:  I'll get it later on
22    my own.
23            THE WITNESS:  Could you please
24    repeat this again?  I...
25  Q  (By Mr. Levine)  Do you not remember actually reading

Page 113

1     his report, or do you not remember if you read it or
2     not?
3  A  I don't remember either.
4  Q  Do you know whether you got this language from
5     Dr. Nabhan or from the lawyers or from somewhere
6     else?
7            MR. WISNER:  Objection.  Calls --
8     calls for privileged communications so far as it asks
9     for language from lawyers.  To the extent you can
10    answer the question with regards to Dr. Nabhan, which
11    I believe you've answered now twice, please answer.
12            THE WITNESS:  I did not receive any
13    language from the lawyers.  I don't rely on either
14    your guys' or your guys' recommendation how to write
15    it.  As pertaining to Dr. Nabhan, I don't remember.
16    Out of all the reports that I read.
17  Q  (By Mr. Levine)  Just to be clear, who wrote this
18    section of your report?
19  A  I'm sorry?
20  Q  Just to be clear, who wrote this section of your
21    report?
22  A  I did.
23  Q  And is this section complete?
24            MR. WISNER:  Objection; vague.
25            THE WITNESS:  I'm sorry.  What do

Andrei Shustov, M.D.

Page 114

1    you mean it's complete?
2    Q  (By Mr. Levine)  Is this thorough and complete with
3       respect to your opinions about Roundup and
4       non-Hodgkin's lymphoma?
5                MR. WISNER:  Objection; vague.  I
6       don't have to answer this.  This is kind of
7       nonsensical question.  That's what I wrote, and
8       that's what I put in my report and that I felt
9       sufficient.
10   Q  (By Mr. Levine)  Okay.  And this section accurately
11      describes the evidence?
12   A  It describes my opinion.
13   Q  Is it accurate?  Any mistakes?
14               MR. WISNER:  Objection;
15      speculation.
16               THE WITNESS:  I don't understand
17      the question.  What do you mean "mistakes"?
18   Q  (By Mr. Levine)  So if there are sections that are
19      identical to Dr. Nabhan's report in there --
20   A  Okay.
21   Q  -- did you review them to see where they're --
22      they're correct, incorrect, accurate, whether there
23      were mistakes or not?
24   A  I wrote --
25               MR. WISNER:  Objection; misstates

Page 115

1    his testimony.
2                THE WITNESS:  I wrote my report
3       based on my review.
4    Q  (By Mr. Levine)  Okay.  And so as far as you're aware
5       right now, you don't know of any mistakes in that
6       section, correct?
7    A  Could I have made a mistake making my statements?  I
8       don't understand.  But a question --
9    Q  How about --
10   A  -- if I trust my -- my -- my report and my opinion,
11      or I -- I don't understand what it means.
12   Q  Did you review your report for accuracy?
13   A  I wrote it.  I reread it.  I did a spell check.  Can
14      I have some typos here?  I can have some typos.
15   Q  Okay.  How about substantively, though?  Did you
16      review it for accuracy?
17   A  I hope I did.
18   Q  Okay.  Did you review it for omissions, whether you
19      may have left anything out that should have been
20      included?
21   A  That would be part of writing a report.
22   Q  Okay.  Go to the first sub-bullet on Page 7 of
23      Exhibit 3.
24   A  Okay.  I'm here.
25   Q  The sub-bullet.  Not the main bullet, but the sub.

Page 116

1    "In March 2015."
2       Do you see that?
3    A  I see that.
4    Q  Okay.  Now go to Page 6 of Dr. Nabhan's report.  I
5       believe that's Exhibit 10.
6                MR. WISNER:  Page 6?
7    Q  (By Mr. Levine)  Page 6.  Paragraph that starts, "In
8       March 2015."
9    A  Okay.
10   Q  Do you agree these paragraphs are nearly identical?
11   A  They have similar language.  I can't tell they're
12      identical.
13   Q  These sections both say that IARC classified
14      glyphosate as a possible carcinogen, correct?
15   A  I can see that.
16   Q  And they explain that that's Class -- that's Class
17      2A, correct?
18   A  That's correct.
19   Q  It says Class 2A, but really with IARC it was
20      Category 2A, but...
21   A  Okay.
22   Q  And as we've discussed, IARC found that glyphosate
23      has limited evidence in humans, correct?
24   A  What IARC stated was positive association with
25      possible biases, if I remember correctly.

Page 117

1    Q  What IARC stated, as we've discussed before, was that
2       the evidence in -- the evidence in humans was
3       limited, meaning that chance, bias, or confounding
4       cannot be ruled out, correct?
5    A  That's correct.
6    Q  Okay.  You didn't include that in your report,
7       correct?
8    A  Not in this particular language.
9    Q  Okay.  This section, this sub-bullet or your entire
10      report omits the fact that IARC said the evidence was
11      limited, correct?
12   A  Not that language in my report, no.
13   Q  Okay.  And it omits the fact that IARC described
14      limited evidence as meaning can't rule out chance,
15      bias, or confounding, correct?
16   A  It's not included there.
17   Q  Okay.
18               THE REPORTER:  What was the answer?
19               THE WITNESS:  It's not included
20      there, no.
21   Q  (By Mr. Levine)  But in your report, with respect to
22      hepatitis C, you do include the fact that confounding
23      couldn't be ruled out, correct?
24               MR. WISNER:  Objection; vague.
25               THE WITNESS:  Can you please direct

Andrei Shustov, M.D.

Page 118

1  me where, which paragraph you're referring to?
2  Q  (By Mr. Levine)  Sure.  Page 5, Paragraph 5, where
3     you say, "Mr. Hardeman has a history of hepatitis C
4     virus."
5        Do you see that?
6  A  Mm-hmm.
7  Q  In the middle of the paragraph, you said, "However,
8     these studies have not accounted for numerous
9     confounding factors."
10       Do you see that?
11 A  Yes.
12 Q  Okay.  So you point that out about hepatitis C, but
13    you don't point that out with respect to glyphosate,
14    correct?
15 A  That's correct.
16 Q  Okay.  And who wrote that, the paragraph we were just
17    discussing in your report?
18 A  No. 5?
19 Q  Sorry.  No.  Page 7, the paragraph that starts, "In
20    March 2015."
21 A  I wrote it.
22       MR. WISNER:  Objection; asked and
23    answered.
24 Q  (By Mr. Levine)  I'm sorry?
25 A  I wrote it.

Page 119

1  Q  Okay.  Do you think it's possible that you and
2     Dr. Nabhan both independently wrote the same sections
3     of your reports?
4        MR. WISNER:  Objection;
5     argumentative, speculation, lacks foundation.
6        THE WITNESS:  I can't answer that.
7  Q  (By Mr. Levine)  If you turn to Page 8 of your
8     report, the bullet point that starts with "Group 2A."
9        Do you see that?
10 A  Yep.  I'm here.
11 Q  Okay.  And that's substantially similar to this --
12    the top bullet point on Page 8 of Dr. Nabhan's
13    report, correct?
14 A  I can see that.
15 Q  Okay.  These sections -- we'll go by the section in
16    your report -- says that, Category 2A is the highest
17    level short of a "definitive association," which is
18    best established by randomized controlled study,
19    correct?
20 A  That's correct.
21 Q  What's the basis for your opinion that Category 1 in
22    IARC is established by a randomized controlled study?
23       MR. WISNER:  Objection.  Misstates
24    what's written.
25       MR. LEVINE:  Fair enough.

Page 120

1  Q  (By Mr. Levine)  Dr. Shustov, are you -- are you
2     saying that a definitive association by IARC requires
3     randomized controlled evidence?
4  A  What I'm saying is that definitive association in
5     these kind of cases cannot be established in a manner
6     that we consider highest level of evidence in -- in
7     medicine due to inability to perform randomized
8     studies.
9  Q  So I think this report is talking about IARC, not
10    when you say "we."
11       Are you a member of IARC?
12 A  I'm not.
13 Q  You're describing what IARC does, right?  In the
14    third-from-last bullet point on Page 8?
15 A  Okay.
16 Q  And are you saying that Group 2A in IARC is the
17    highest level of evidence that they would give short
18    of -- short of having randomized controlled trial
19    evidence?
20 A  That's what -- what yes, that's what they will do,
21    short of --
22 Q  So --
23 A  -- randomized studies.
24 Q  -- in order to -- in order to determine that
25    something would be a definite carcinogen, a Group 1

Page 121

1  carcinogen, IARC would need randomized controlled
2  trial evidence?
3        MR. WISNER:  Objection; misstates
4  the document --
5        MR. LEVINE:  I'm asking.
6        MR. WISNER:  -- and testimony.
7        THE WITNESS:  The definitive
8  association of high level require unethical clinical
9  trials in humans.
10       MR. LEVINE:  That's not my
11 question.  My question is:
12 Q  (By Mr. Levine)  With respect to IARC's
13 classifications, can IARC determine that something is
14 a definite carcinogen absent randomized controlled
15 trial evidence?
16       MR. WISNER:  Objection; beyond the
17 scope of this witness's opinion.
18       MR. LEVINE:  It directly relates to
19 his opinion as stated in this bullet point on his
20 report.  He is -- he is making a statement.
21       MR. WISNER:  It's fine.  You're
22 asking him to --
23       MR. LEVINE:  I'm asking about the
24 statement.
25       MR. WISNER:  -- talk about the

Andrei Shustov, M.D.

| Page 122 |
| --- |

1    practices of IARC and their standards in a vacuum.
2    So --
3              MR. LEVINE:  I'm asking.
4              MR. WISNER:  -- if you know the
5    answer, answer it.  If you don't, don't.
6              THE WITNESS:  I think IARC would
7    not be able to determine definitive association to
8    the level that we would generally consider in medical
9    practice for -- for other -- other discoveries or
10   other studies where randomized studies are possible.
11   This is the highest that IARC can do.
12   Q  (By Mr. Levine)  What is the basis for your opinion
13      that Group 2A is the highest IARC can do absent
14      randomized controlled evidence?
15             MR. WISNER:  Objection.  That's not
16   what he said.
17   Q  (By Mr. Levine)  Is that --- did I mischaracterize
18      your opinion there?
19   A  So the basis for that is --
20   Q  Just to be clear --
21             MR. WISNER:  Yeah.
22   Q  (Continuing by Mr. Levine)  -- so that we don't miss
23      it.  Did I mischaracterize your opinion in my
24      question?
25   A  That reflects my opinion.

| Page 123 |
| --- |

1    Q  Okay.
2    A  Now can I answer the question?
3    Q  What is the basis for that opinion?
4    A  The basis for that opinion, once again, is that in
5       order to reach any high level of evidence, that
6       require unethical studies in humans.
7    Q  Do you know whether IARC has categorized any
8       carcinogens as Group 1 absent randomized controlled
9       trial evidence?
10   A  I can't answer that question without looking.
11   Q  I'll represent to you -- and you're welcome to look
12      at it, at the hepatitis C monograph.
13   A  Mm-hmm.
14   Q  Where they've identified a Group 1 carcinogen for
15      chronic hepatitis C.  We -- we discussed that one,
16      right?
17   A  Okay.
18   Q  Do you know whether they've -- whether there's any
19      randomized controlled trial evidence in that
20      monograph?
21   A  I don't know without looking.
22   Q  Do you have any basis to disagree with the fact that
23      IARC can categorize a substance as a definitive
24      carcinogen without the need for randomized controlled
25      trial evidence?

| Page 124 |
| --- |

1    A  I don't have any reason to disagree.  But I -- I have
2       a reason to state that this is the best they can do
3       talking about toxic chemicals.
4    Q  By the way, so let's discuss your opinion that it
5       would be impossible and unethical to perform such a
6       study, just real briefly.
7          Is it unethical to herbicides and pesticides?
8    A  That's not what I said.
9    Q  Okay.  You could conceivably design a study
10      determining the effectiveness of two different
11      herbicides that -- as you acknowledged, these
12      chemicals may cause cancer.  You could design a study
13      where people are randomized to two different
14      herbicides in their use for agricultural reasons,
15      correct?
16   A  You cannot normally expose people to even possible
17      carcinogens and try to figure out whether they
18      develop cancer.  That's the --
19   Q  Sorry.  I didn't mean to cut you off.
20   A  No, that's what I meant in my statement.  So in order
21      to definitively prove that something is a carcinogen
22      outside level of evidence that it provide, you would
23      have to expose people if you -- if you pose a
24      question, "Is this a carcinogen?" and you decide to
25      do a study, you will have to approach a person, say,

| Page 125 |
| --- |

1       Well, I'm going give you a chemical that's possibly a
2       carcinogen, and I'm going the see if you develop
3       cancer.  And but half of the people, we're just going
4       to let them drink water.
5          So that's why I say it would be unethical to do a
6       randomized study in a controlled environment where
7       you expose people to something that you believe might
8       be causing cancer.
9    Q  You could never do a study for any substance, a
10      randomized study where the primary question is, is
11      this going to cause someone's cancer, correct?
12   A  That's correct.
13   Q  But you could do a study of two chemicals to
14      determine the benefits of those chemicals where a
15      secondary outcome looks to see whether there's an
16      increased risk of cancer in those chemicals, correct?
17   A  That is correct, but they have to power the study to
18      determine that from -- prospectively power it to
19      determine the secondary outcome.
20   Q  Sure.  But it wouldn't be impossible or unethical to
21      do that, correct?
22             MR. WISNER:  Objection; incomplete
23   hypothetical.
24             THE WITNESS:  You can design a
25   study like that if you -- you can design a study like

Andrei Shustov, M.D.

Page 126

1    that if you inform the -- the subjects that the
2    secondary goal of the study is see if you develop
3    cancer.
4    Q  (By Mr. Levine)  Okay.  To be clear, you said you can
5        design a study like that, right?
6    A  You can design the study.
7    Q  Can.  Not can't.  Can?
8    A  You can design it.  I'm not so sure that the study
9        could be conducted.  I can't see...
10   Q  So, now, to be clear, you understand that -- well,
11       I'll move on.
12       In your report, if you go to Page -- on Page 7,
13       in the top bullet point under "Discussion of
14       Mr. Hardeman's Lymphoma Causation."
15       Do you see that?
16   A  Okay.
17   Q  You discuss the Schinasi and Leon meta-analysis,
18       correct?
19   A  Mm-hmm.
20   Q  Handing you what's --
21   A  Yes.
22   Q  -- been marked as Exhibit 11.
23            (Exhibit No. 11 marked for
24              identification.)
25   ////

Page 127

1            MR. LEVINE:  Here you go.
2            MR. WISNER:  I'm sorry.  Top of
3    Page 7?
4            MR. LEVINE:  Top of Page 7.
5            MR. WISNER:  Where is that?
6            MR. LEVINE:  It says, "The link
7    between exposure to pesticides and lymphoma
8    development has been reported by numerous
9    investigators."
10           THE REPORTER:  Slow down.
11           MR. LEVINE:  Oh, am I -- yeah.  You
12   almost -- you almost made me think I was looking at
13   Dr. Nabhan's report.  No.  Top of Page 7 of
14   Dr. Shustov's report.
15           MR. WISNER:  My bad.  Okay.  I'm
16   on -- I'm with you.
17           MR. LEVINE:  Oh.  You were on
18   Nabhan's.
19           MR. WISNER:  I was on Nabhan's.  I
20   was, like, What are you talking about?
21           MR. LEVINE:  Got it.
22           MR. WISNER:  It's not there.  Okay.
23   Q  (By Mr. Levine)  So I've just handed you --
24   A  Okay.
25   Q  -- Exhibit 11, which is the Schinasi and Leon --

Page 128

1    A  Okay.
2    Q  -- meta-analysis.
3            THE REPORTER:  "Which is," what?
4            MR. LEVINE:  Schinasi and Leon.
5    S-c-h-i-n-a-s-i, and Leon, L-e-o-n.
6    Q  (By Mr. Levine)  Now, in your report, you said this
7        meta-analysis found an association between develop --
8        between glyphosate and development of B-cell lymphoma
9        with an odds ratio of 2.0, 95 percent confidence
10       interval, 1.1 to 3.6, and there was the same odds
11       ratio for DLBCL subtype.
12       Do you see that?
13   A  I do.
14   Q  Now, first of all, turn to Page 4513.
15   A  Okay.
16   Q  Okay.  That contains -- few exposures down, you can
17       see glyphosate there, right?  Top third of the page.
18       Right there.
19   A  Okay.
20   Q  Okay.  And that contains an odds ratio for glyphosate
21       overall and an odds ratio for glyphosate association
22       with B-cell lymphoma, correct?
23   A  Okay.
24   Q  No odds ratio for DLBCL, correct?
25   A  That's correct.

Page 129

1    Q  If you go to the previous page, see under 3.4,
2        "Meta-Analyses"?  See that section?
3    A  Yep.
4    Q  You go to the last paragraph, it says, "The strongest
5        meta relative risk" --
6    A  Yeah, I see that.
7    Q  -- "estimates were associated with subtypes of NHL.
8        There was a positive association between exposure to
9        organophosphorus herbicides glyphosate and B-cell
10       lymphoma."
11       You see that?
12   A  I do.
13   Q  And then it gives the odds ratio that you cite in
14       your report.  You see that?
15   A  I see that.
16   Q  Then it says, "Phenoxy herbicide exposures were
17       associated with B-cell lymphoma, lymphocytic
18       lymphoma, and diffuse large B-cell lymphoma."
19       You see that?
20   A  I see it.
21   Q  That does not include glyphosate, correct?
22   A  Not in this paragraph.
23   Q  Okay.  There's nowhere in this meta-analysis where
24       glyphosate has the same odds ratio for DLBCL as it
25       does for B-cell lymphoma?

Andrei Shustov, M.D.

Page 130

1  A  I would have to look again through the whole thing.
2     This paragraph does not say that.
3  Q  Can you -- I'll represent to you that there is
4     nowhere in this meta-analysis that contains an odds
5     ratio for DLBCL.
6             MR. WISNER:  Objection.
7  Q  (By Mr. Levine)  If you want to look at -- if you
8     want to take a break and look at it --
9  A  Sure.
10 Q  -- and tell me where -- where you found it, by all
11    means, let's go.
12            MR. WISNER:  All right.
13            MR. LEVINE:  Off the record.
14            MR. WISNER:  Want to take a lunch?
15            MR. LEVINE:  Nope.  Not quite yet.
16    But --
17            MR. WISNER:  Okay.
18            THE VIDEOGRAPHER:  Please stand by.
19    We're going off the record.  The time is 12:05 p.m.
20            (Pause in proceedings.)
21
22            THE VIDEOGRAPHER:  We are back on
23    the record.  The time is 12:07 p.m.
24 Q  (By Mr. Levine)  Dr. Shustov, would you be surprised
25    to learn that the Schinasi and Leon meta-analysis

Page 131

1     does not contain an odds ratio for glyphosate and
2     DLBCL?
3  A  I would be surprised to learn and frustrated then
4     that I made a mistake in my report if, in fact, it
5     does not have that.
6  Q  Okay.
7  A  Specifically for DLBCL.
8  Q  Now, Dr. Shustov, can you turn to Page 5 of
9     Dr. Nabhan's report?
10 A  I'm here.
11 Q  Okay.  If you look at the bottom paragraph, it
12    contains the same language about four lines up from
13    the very bottom.  It says, "This meta-analysis found
14    an association between glyphosate and B-cell lymphoma
15    with an odds ratio 2.0, 95 percent confidence
16    interval, 1.1 to 3.6, and this was the same odds
17    ratio for DLBCL.
18       Do you see that?
19 A  I see that.
20 Q  That would be the same mistake that's in your report,
21    correct?
22            MR. WISNER:  Objection; assumes
23    facts not in evidence.
24            THE WITNESS:  It would be if, in
25    fact, this -- this is true.

Page 132

1  Q  (By Mr. Levine)  Okay.  And whose mistake is that?
2     Yours or Dr. Nabhan's?
3  A  It is my mistake in my report.
4  Q  And his --
5  A  It would be if that's, in fact, true, yeah.
6  Q  Did you copy his mistake, or did you make the mistake
7     independently of Dr. Nabhan?
8  A  I would make mistake in my own report.
9  Q  So since you equivocated there and said it would be
10    if that was, in fact, the case in that meta-analysis,
11    I think we do need to break for lunch so you can
12    review it to let me --
13 A  Sure.
14 Q  -- know if you find something that I was --
15 A  Okay.
16 Q  -- not aware of.
17 A  Sure.
18            THE VIDEOGRAPHER:  Please stand by.
19    We're going off the record.  The time is 12:10 p.m.
20            (Pause in proceedings.)
21
22            THE VIDEOGRAPHER:  We are back on
23    the record.  The time is 1:07 p.m.
24 Q  (By Mr. Levine)  Good afternoon, Dr. Shustov.
25 A  Good afternoon.

Page 133

1  Q  When we took a break, you were going to look through
2     the Schinasi and Leon meta-analysis to see if there
3     was a finding regarding DLBCL and glyphosate,
4     correct?
5  A  That's correct.
6  Q  Did you have sufficient amount of time to look
7     through the --
8  A  I did.
9  Q  -- meta-analysis?
10 A  I did.
11 Q  Is there any odds ratio consistent with what you
12    state in your report regarding glyphosate and DLBCL?
13 A  I have not found any other place where it's
14    mentioned.  So I was looking at the same page that
15    you pointed out, and I realize now it's an honest
16    mistake for that particular number.
17 Q  Okay.  So no odds ratio for DLBCL in that
18    meta-analysis, correct?
19            MR. WISNER:  Objection; misstates
20    his testimony.
21            MR. LEVINE:  Fair -- fair enough.
22    Short question, poorly worded.  I will withdraw and
23    ask again.
24 Q  (By Mr. Levine)  No odds ratio for DLBCL with respect
25    to glyphosate in that meta-analysis, correct?

Andrei Shustov, M.D.

1    A   That's correct.

2    Q   And so that was a mistake, correct?

3    A   That's correct.

4    Q   And was that your mistake or Dr. Nabhan's mistake?

5    A   It was, of course, my mistake.

6    Q   Also his mistake, correct?

7    A   Based on this report. That's correct.

8    Q   Do you know whether he copied your mistake or whether

9        he'd made the mistake independently --

10           MR. WISNER: Objection.

11           THE WITNESS: I --

12   Q   (Continuing by Mr. Levine)  -- and used the same

13       words?

14           MR. WISNER: Objection;

15       speculation.

16           THE WITNESS: I can't even answer

17       that. But obviously, I mean, I can see it's easy to

18       make mistake because it's right next to each other.

19   Q   (By Mr. Levine) Can you look at Page 8 of Exhibit 3,

20       which is your report? The bottom, very last bullet

21       or sub-bullet point.

22   A   I'm here.

23   Q   And turn to Page 8 of, I believe it's Exhibit 10,

24       which is Dr. Nabhan's report.

25           The last sub-bullet point on the top of the page

1        would be the third sub-bullet. Do you see that?

2    A   Yep.

3    Q   Do you agree that your report and Dr. Nabhan's report

4        contain nearly identical paragraphs there -- sorry.

5        Strike that.

6            Do you agree that the sub-bullet I just asked you

7        to look at in your report as well as the bullet I

8        asked you to look at in Dr. Nabhan's report contain

9        nearly identical language?

10   A   They're very similar.

11   Q   Now, it says, "Epidemiologic studies were unable to

12       look at subtypes of NHL when assessing epidemiologic

13       causation."

14           Do you see that?

15   A   Yep.

16   Q   But you're aware there are epidemiologic studies

17       regarding glyphosate that do look at sub -- subtypes

18       of NHL, correct?

19   A   Some of them.

20   Q   Okay. So they weren't unable to?

21   A   Some studies looked at that.

22   Q   Okay. Is that your mistake or Dr. Nabhan's mistake?

23           MR. WISNER: Objection. Objection;

24       misstates what it says, and his testimony.

25           THE WITNESS: I don't consider what

1        I said there is a mistake. They looked at it. When

2        I say unable to look, they weren't able to determine.

3        I -- that's what I meant by that.

4    Q   (By Mr. Levine) Okay. Is it fair to say that a more

5        accurate description for that paragraph would be that

6        some epidemiologic studies were unable to look at

7        subtypes of NHL when assessing epidemiologic

8        causation, but others were able to?

9            MR. WISNER: Objection; misstates

10       his testimony.

11           THE WITNESS: That's another way of

12       wording it.

13   Q   (By Mr. Levine) Would that be more accurate?

14   A   It will be more specifying.

15   Q   Okay. In the latter part of that paragraph, which is

16       on Page 9 of your report, you use an analogy that

17       said, "This is analogous to studying epidemiology of

18       breast and prostate cancer, where we now recognize

19       different subtypes, but yet study of epidemiology of

20       these" -- but yet study the epidemiology of these

21       cancers in the totality."

22           You see that?

23   A   I do.

24   Q   Who came up with that analogy?

25   A   It's in my report. I typed it.

1    Q   I understand that. I just read you -- read it from

2        your report. I understand you typed it.

3            Who came up with that analogy?

4            MR. WISNER: Objection. Answer

5        this question to the extent it doesn't call for

6        privileged information.

7            THE WITNESS: I don't remember my

8        train of thought when I was typing it. I can't

9        answer that.

10   Q   (By Mr. Levine) Did you come up with that analogy?

11   A   Well, at the time I typed the report, that's why I

12       came up with it. I don't remember my train of

13       thought at the time. I can't answer this. I -- I

14       was typing report, and that's in front of you.

15   Q   Is it fair to say that the paragraph we discuss in

16       Dr. Nabhan's report contains the same analogy at the

17       very end of that paragraph on the third bullet point

18       on Page 8 of Exhibit 10?

19   A   It's fair to say that.

20   Q   Can you cite me any publication that you considered

21       in forming your opinions which contains this analogy?

22   A   That's a conclusion. It's not citing any

23       publication. It's a general knowledge of oncology --

24   Q   Can you --

25   A   -- in the last ten years.

Andrei Shustov, M.D.

|  | Page 138 |
|---|---|
| 1 | Q  Can you cite me any publication that uses this |
| 2 | analogy? |
| 3 | MR. WISNER: Objection. This isn't |
| 4 | a memory test. |
| 5 | THE WITNESS: Not on the spot, no. |
| 6 | MR. LEVINE: I don't believe that |
| 7 | was a form objection. Again, I'm going to note your |
| 8 | speaking objection for the record. |
| 9 | MR. WISNER: Okay. And I will |
| 10 | object that you're asking him to pull a study out of |
| 11 | thin air on the spot. That's the definition of a |
| 12 | memory test and is improper. So your objection's |
| 13 | noted. Mine is as well. |
| 14 | Q  (By Mr. Levine) Dr. Shustov, you don't cite any |
| 15 | reference for this analogy in your report, correct? |
| 16 | A  That's correct. |
| 17 | Q  And you don't reference Dr. Nabhan's report for this |
| 18 | analogy in your report, correct? |
| 19 | A  That's correct. |
| 20 | Q  And you wrote that in your report? |
| 21 | A  Wrote... |
| 22 | Q  You wrote that analogy into your report? |
| 23 | A  That's correct. |
| 24 | Q  And just to be clear, you did not copy that analogy |
| 25 | from Dr. Nabhan when putting it into your report, |

|  | Page 139 |
|---|---|
| 1 | correct? |
| 2 | MR. WISNER: Objection; vague. |
| 3 | THE WITNESS: I don't recall it. |
| 4 | Q  (By Mr. Levine) So you don't recall whether you did |
| 5 | or did not copy that from Dr. Nabhan when putting it |
| 6 | in your report? |
| 7 | A  I don't recall it. I had multiple sources in front |
| 8 | of me, and I used my typing. And now that with all |
| 9 | this, I don't know where specifically -- why the |
| 10 | language is similar. But I potentially borrowed the |
| 11 | language from what's in front of me to make it proper |
| 12 | sounding. And that's the only reasonable |
| 13 | explanation. |
| 14 | Q  So, so that I'm clear, you had multiple sources in |
| 15 | front of you that you considered in forming your |
| 16 | opinions for this report, correct? |
| 17 | A  That's not what I said. Multiple sources to type my |
| 18 | report, not to form my opinion, but to put my |
| 19 | thoughts -- thoughts on the paper. What I mean by |
| 20 | that, and there -- there is language that I might |
| 21 | have used where I did not -- I didn't know how to |
| 22 | speak in the proper legal terms, and I used -- |
| 23 | potentially I borrowed the -- the -- the verbiage to |
| 24 | express my conclusions. |
| 25 | Q  Where did you borrow the verbiage from? |

|  | Page 140 |
|---|---|
| 1 | A  I don't recall that. And... |
| 2 | Q  List for me all of the sources that you can recall |
| 3 | from which you may have borrowed the verbiage. |
| 4 | A  I cannot list everything in front of me in middle of |
| 5 | typing the report. |
| 6 | Q  Can you list anything? |
| 7 | A  I think we already discussed this. I had the patient |
| 8 | chart open. I had printed papers in front of me. |
| 9 | And I had some of the sources on the -- on the |
| 10 | different page on the website. I had samples of |
| 11 | legal terms provided to me by Kathryn, how to |
| 12 | verbalize things in the proper terms. Not medical |
| 13 | terms, but legal terms. And that's out of -- out of |
| 14 | my memory. |
| 15 | Q  So the sections that we've discussed that are similar |
| 16 | to Dr. Nabhan's report don't involve any legal terms, |
| 17 | correct? At least thus far. |
| 18 | A  It's the form of -- form of verbalizing things and -- |
| 19 | or the -- the conclusions. |
| 20 | Q  But the sections we're discussing are scientific |
| 21 | opinions with respect to the causation of |
| 22 | Mr. Hardeman's DLBCL and the opinions expressed with |
| 23 | regards to the literature, correct? |
| 24 | A  No. This is not Mr. Hardeman's. This is the section |
| 25 | where I spoke some opinions on -- I touched on |

|  | Page 141 |
|---|---|
| 1 | discussion of general causation that I relied on to |
| 2 | then make conclusions specifically about Mr. Hardeman's |
| 3 | case. |
| 4 | Q  So the section in this report is called "Discussion |
| 5 | of Mr. Hardeman's Lymphoma Causation," correct? |
| 6 | A  That's correct. |
| 7 | Q  So once again, this section is discussing scientific |
| 8 | opinions with respect to the causation of |
| 9 | Mr. Hardeman's DLBCL and the opinions expressed with |
| 10 | regards to the literature, correct? |
| 11 | MR. WISNER: Objection; asked and |
| 12 | answered, misstates his testimony. |
| 13 | THE WITNESS: That is correct. But |
| 14 | the basis of the discussion is the reference to |
| 15 | general causation. |
| 16 | Q  (By Mr. Levine) Dr. Nabhan, are you aware of whether |
| 17 | there are any mistakes in this section of your |
| 18 | report regarding -- |
| 19 | MR. WISNER: Wrong doctor. |
| 20 | Q  (Continuing By Mr. Levine)  -- regarding the |
| 21 | discussion -- |
| 22 | MR. LEVINE: Sorry. My apologies. |
| 23 | Thank you, Brent. I'll strike -- strike that. I |
| 24 | knew I was going to do that at some point. |
| 25 | Q  (By Mr. Levine) Dr. Shustov, are you aware as to |

Page 142

1   whether there are any other mistakes in this section
2   of your report regarding the discussion of
3   Mr. Hardeman's lymphoma causation?
4   A   I can't answer that.  I'm not aware of mistakes
5   unless they are pointed out or I re-review it and
6   find that I made a mistake.  I -- to the best of my
7   abilities, I proofread it.  I verified the references
8   when I was writing it in front of me and composed the
9   report.  But we're humans.  If I mistype something,
10   then if you point something out or I reread it, I
11   might find that I made an error.
12   Q   Were any of this the -- well, strike that.
13          (Exhibit No. 12 marked for
14          identification.)
15
16          THE WITNESS:  Could we pause for a
17   second?  Can I ask a question, my counsel?  It just
18   came up to me.  Can we go off record?  Can I ask him
19   something, or it's...?
20          MR. LEVINE:  Sure.
21          MR. WISNER:  Sure.
22          THE VIDEOGRAPHER:  Please stand by.
23   We're going off the record.  The time is 1:22 p.m.
24          (Pause in proceedings.)
25   ////

Page 143

1          THE VIDEOGRAPHER:  We are back on
2   the record.  The time is 1:23 p.m.
3   Q   (By Mr. Levine)  Dr. Shustov, I understand from off
4   the record that you want to clarify something?
5   A   Yes.  So it just occurred to me that when I was
6   trying to remember the records that I was using, the
7   sources and the records to help me type the report,
8   that Ms. Kathryn Forgie provided me with Dr. Nabhan's
9   report from another case.  And it just -- because I
10   couldn't explain all of this until you showed me
11   this.  And potentially if he copied it from one
12   report to another, so that's why you now show me this
13   similarities.
14   Q   So it wasn't Dr. Nabhan's report in Mr. Hardeman's
15   case that was submitted the same day as your -- your
16   report?
17   A   That's correct.
18   Q   Okay.
19   A   So, yes, I think Kathryn, I -- if I remember
20   correctly -- and I can verify with her at some point
21   if -- if you need to -- that she sent me as -- as a
22   template or the verbiage how the legal report's
23   supposed to sound, look, the Dr. Nabhan's expert
24   report on specific causation in another case.
25   Q   Okay.  As far as I'm aware -- and I will even allow

Page 144

1   Mr. Wisner to correct me if I'm wrong -- the only
2   other reports besides Dr. Nabhan's reports and
3   Hardeman, Gebeyehou, and Stevick that are case-
4   specific that Dr. Nabhan submitted was in the Johnson
5   case; am I correct?
6          MR. WISNER:  I don't think that's
7   correct.  I think Dr. Nabhan's prepared quite a few
8   more reports in litigation proceeding --
9          MS. WAGSTAFF:  That's actually --
10          MR. WISNER:  -- in St. Louis.
11          MS. WAGSTAFF:  -- not correct.  I
12   believe he submitted some in St. Louis.
13          MR. WISNER:  That's what I was
14   saying.  Yeah.  So I got it, Aimee.
15          MR. LEVINE:  Okay.  I'm not aware
16   that there were expert reports submitted in St. Louis.
17          MR. WISNER:  I believe in the
18   County there was.  I know for -- I actually defended
19   a deposition for Dr. Weisenberger on a case-specific
20   thing just three weeks ago with Mr. Stetkoff --
21   Steckloff.  I always get his name wrong.
22   Q   (By Mr. Levine)  Can we -- so, Dr. Shustov --
23          MR. LEVINE:  Since that's who we
24   should be asking the question --
25          MR. WISNER:  Yeah.

Page 145

1          MR. LEVINE:  -- to.
2          MR. WISNER:  I was just trying to
3   answer your question.
4          MR. LEVINE:  Yes, you did.  I
5   appreciate that.
6          MR. WISNER:  Sure.
7   Q   (By Mr. Levine)  Dr. Shustov, do you know what case
8   it was that you copied Dr. Nabhan's opinions from?
9   A   I --
10          MR. WISNER:  Objection.
11          THE WITNESS:  -- apologize.  I
12   don't.
13          MR. WISNER:  Misstates his
14   testimony.
15          THE WITNESS:  I -- I don't.  I
16   don't remember.  And the -- again, the -- the reason
17   for supplementing this was to familiarize myself with
18   the structure of legal reports, as I don't do this on
19   a daily basis.  I remember that.  She mention you can
20   use this as a template if you don't know how to
21   write.  This is not something I do.  It doesn't look
22   like medical records.  And I believe that's what
23   happened, because that kind of struck me discussing
24   all this.
25   Q   (By Mr. Levine)  Dr. Shustov, is that your report on

Andrei Shustov, M.D.

Page 146

1    your reliance list in this case?
2    A  I don't believe so.
3              MR. LEVINE:  Can we go off the
4    record so you can identify what report it was of
5    Dr. Shustov?
6              MR. WISNER:  Sure.
7              THE VIDEOGRAPHER:  Please stand by.
8    We are going off the record.  The time is 1:25 p.m.
9              (Pause in proceedings.)
10
11             THE VIDEOGRAPHER:  We're back on
12   the record.  The time is 1:33 p.m.
13             MR. LEVINE:  So for the record --
14   and, Brent, you can correct me if I state anything
15   incorrectly -- Mr. Wisner has agreed to provide the
16   report of Dr. Nabhan that was provided to Dr. Shustov,
17   but we've agreed that to the extent that report was a
18   draft report that has not been submitted in any prior
19   case, that Mr. Wisner can redact any personal
20   identif -- identifying information or any
21   case-specific information with respect to the
22   plaintiff for whom that report was written.  Correct?
23             MR. WISNER:  That is correct.  And
24   we will also provide you the date in which it was
25   provided to the witness.

Page 147

1              MR. LEVINE:  Thank you.  That was
2    going to be the very next point I made.
3    Q  (By Mr. Levine)  Dr. Shustov, I'm handing you
4    Exhibits 12 and 13, which are yours and Dr. Nabhan's
5    reports in the Hardeman case with highlighting.
6              (Exhibit No. 13 marked for
7              identification.)
8
9    Q  (By Mr. Levine)  Those are highlighted copies of your
10   reports.
11             MR. WISNER:  Which one's 12?  Which
12   one's --
13             MR. LEVINE:  Top is 12, so...
14             MR. KERSCHNER:  Shustov is 12.
15   Q  (By Mr. Levine)  And, Dr. Shustov, I will represent
16   to you that all the yellow highlighting are the
17   identical words that were used in the two reports.
18   A  Okay.
19   Q  And if you want to take a look and confirm that
20   that's the case, you're more than welcome to.
21   A  One in the greens?
22   Q  The green highlighting is language that is
23   substantially similar in the two reports.
24             MR. WISNER:  Based on who?
25   Q  (By Mr. Levine)  You can tell me if you disagree with

Page 148

1    that assessment.  Take a look at the green language,
2    and tell me if you disagree that it is substantially
3    similar.  First let's start with the yellow.
4              MR. WISNER:  I know.  I guess I
5    just want to make sure we understand what we're doing
6    here.  So you want him to go through and compare the
7    green to the green and the yellow to the yellow to
8    see if they're both substantially similar or
9    identical?
10             MR. LEVINE:  Why don't we just
11   start.
12   Q  (By Mr. Levine)  Do you agree that the yellow
13   highlighting is identical language in the two
14   reports?  Whether it be in different orders of
15   paragraphs, the paragraphs are identical with respect
16   to any yellow highlighted language?
17             MR. WISNER:  All of it?
18             MR. LEVINE:  Let the witness look
19   at it and --
20             MR. WISNER:  Okay.  It's just,
21   like...
22             MR. LEVINE:  You're saying it's a
23   lot?
24             MR. WISNER:  You've highlighted a
25   lot.

Page 149

1              THE WITNESS:  Okay.  I agree.
2    Q  (By Mr. Levine)  Okay.  The green highlighting is
3    just for your reference.  I won't ask any questions
4    about it.  Don't need -
5              MR. WISNER:  I'm just going to
6    object that it's actually not accurate.
7              MR. LEVINE:  I'm not making any --
8    I'm stating on the record I am only asking about the
9    yellow highlighting.
10             MR. WISNER:  I know the yellow's
11   inaccurate.  I have examples of it right now.
12             MR. LEVINE:  Oh.
13             MR. WISNER:  I've found some.  So,
14   I mean, I just -- this is a tough, tough thing --
15             MR. LEVINE:  Sure.  My apologies.
16   Why don't you tell me --
17             MR. WISNER:  I mean, it's --
18   it's ---
19             MR. LEVINE:  -- what's inaccurate.
20             MR. WISNER:  --- it's -- it's
21   ticky-tack, but I'm just walking you through it.  So,
22   like, on Page 6 of Dr. Shustov's -- sorry --
23   Dr. Nabhan's report --
24             MR. LEVINE:  Mm-hmm.
25             MR. WISNER:  -- you have

Andrel Shustov, M.D.

Page 150

1  highlighted, "IARC is a division of the World Health
2  Organization (WHO)." Do you see that? And then the
3  actual language in Page 7 is, "IARC represents a
4  division of the World Health Organization." So
5  that's actually not identical.
6          MR. LEVINE: Okay. We'll
7  acknowledge that one. And if there are any other
8  mistakes, I apologize.
9          MR. WISNER: And I guess my other
10  objection --
11          MR. LEVINE: It'll speak for --
12          MR. WISNER: It's fine. It'll
13  speak for itself. But my -- my other objection I
14  just want to be clear is, you know, the word "IARC,"
15  for example, is used in both reports. And suggesting
16  that that somehow means it's copied or pasted, I
17  think, is an incorrect assertion. So we'll make our
18  arguments when we make them, but I just --
19          MR. LEVINE: Sure. And --
20          MR. WISNER: -- I object to that
21  kind of stuff.
22          MR. LEVINE: And I'll just let you
23  know, it's the combination of words that are put
24  together that suggest that, but that's for another
25  time.

Page 151

1  Q  (By Mr. Levine) Just to be clear, by the way,
2     there's no highlighting at the beginning of your
3     report in that document, correct?
4  A  That's correct.
5  Q  And through the -- up until -- up until Page 7 of
6     your report, you use a format of numbered paragraphs,
7     correct? I should say, on Pages 4 to 6 of your
8     report, you use a numbering format for the
9     paragraphs?
10  A  Okay.
11  Q  Okay. And you wrote those pages, correct?
12  A  That's correct.
13  Q  And then when you do begin to use the same language
14     as Dr. Nabhan's report, you switch to bullet points,
15     correct?
16  A  That's correct.
17  Q  Dr. Nabhan uses bullet points in his report, correct?
18  A  That's correct.
19  Q  So the language you copied is just in the bullet
20     point section, correct?
21  A  That's correct. It appears this way.
22  Q  Okay. And that includes, if you go to Page 9 of your
23     report, the "Conclusions" section, correct?
24          MR. WISNER: Objection.
25          THE WITNESS: They're also on the

Page 152

1  bullets, yes.
2  Q  (By Mr. Levine) Okay. And by the way, that section
3     specifically references Mr. Hardeman, correct? The
4     language that is in your report here that is
5     identical to Dr. Nabhan's report includes language
6     that includes Mr. Hardeman's name, correct?
7  A  That's correct.
8  Q  Whose conclusions are these?
9  A  These are my conclusions.
10  Q  As a -- you're employed at the Fred Hutchinson Cancer
11     Center; am I correct?
12  A  University of Washington.
13  Q  The Fred Hutchinson Cancer Center is part of the
14     University of Washington?
15  A  They're an alliance. They're a part of the alliance.
16     That's correct.
17  Q  Do you practice there?
18  A  Well, they are basically the same institution. I
19     practice at SCCA, but SCCA is a practice used by both
20     institutions.
21  Q  Are you subject to policies of integrity under the
22     Fred Hutchinson Cancer Center?
23          MR. WISNER: Objection; vague.
24          THE WITNESS: I have to see which
25     policy you -- you're referring to.

Page 153

1  Q  (By Mr. Levine) Are you aware of whether the Fred
2     Hutchinson Cancer Center has an academic integri --
3     has academic integrity rules prohibiting plagiarism?
4  A  They might.
5          (Exhibit No. 14 marked for
6          identification.)
7
8  Q  (By Mr. Levine) Handing you what's been marked as
9     Exhibit 14, which is the Fred Hutchinson Research
10     Integrity Policy. Do you see that?
11  A  Yep.
12  Q  Would you be subject to this policy in your
13     professional endeavors?
14  A  I am not sure I can answer this question. I would
15     have to double-check. I am employed by University of
16     Washington and have secondary appointment at Fred
17     Hutchinson Center.
18  Q  Can you please read the policy statement on the first
19     page of the Fred Hutchinson Research Integrity
20     Policy?
21  A  I just make a statement I don't represent Fred
22     Hutchinson in this case. I represent myself as
23     independently practicing physician. And I refuse to
24     implicate Fred Hutchinson name in this because I
25     don't act on behalf of Fred Hutchinson.

Andrei Shustov, M.D.

Page 154

1  Q  I assure you I am not implicating Fred Hutchinson.
2  A  I understand.  But you're asking me about Fred
3     Hutchinson policies and rules, and I act here on
4     behalf of myself.
5  Q  Okay.  And you know what?  Let me ask you:  Do you
6     agree that in all of its activities, Fred Hutchinson
7     Cancer Research Center expects the highest standards
8     of professional conduct from each employee?  Do you
9     understand that?
10 A  Fred Hutchinson has nothing to do with this case.
11 Q  Are you an employee of Fred Hutchinson?
12 A  No.
13 Q  Okay.  So you do not think that Fred Hutchinson would
14    consider you to be one of its employees?
15 A  I am not employed by Fred Hutchinson.  I have
16    secondary appointment at Fred Hutchinson, but I don't
17    represent Fred Hutchinson in this case.
18 Q  I understand that you don't in this case.
19       Do you understand that the center, meaning the
20    Fred Hutchinson Cancer Research Center, shall process
21    situations that may constitute research misconduct
22    under the center's Research Misconduct Policy and
23    Procedures?
24 A  I refuse to answer that.
25 Q  Do you understand that the Research Misconduct Policy

Page 155

1     and Procedures of Fred Hutchinson include intentional
2     or reckless fabrication, falsification, or
3     plagiarism?
4  A  It has nothing to do with this case.  I refuse to
5     answer that.
6               (Exhibit No. 15 marked for
7                identification.)
8
9  Q  (By Mr. Levine)  Handing you what's been marked as
10    Exhibit 15, which is the Fred Hutchinson Cancer
11    Center Research Misconduct Policy.
12 A  Okay.
13            MR. WISNER:  Is this document
14    available publicly?
15            MR. LEVINE:  Yes.
16            MR. WISNER:  Okay.
17            MR. LEVINE:  In fact, the URL is on
18    the bottom of the page.
19            MR. WISNER:  It just said
20    "extranet," so I didn't know if that was an internal
21    Internet or public one.
22            MR. LEVINE:  It came from a Google
23    search, I will represent.
24            MR. WISNER:  Okay.
25 Q  (By Mr. Levine)  You understand -- I'm reading from

Page 156

1     the section which states "Prevention."  You
2     understand that the Fred Hutchinson Cancer Center
3     expects intellectual honesty in all of its endeavors,
4     correct?
5               MR. WISNER:  Objection;
6     speculation.  This witness can cannot testify about
7     an institution's expectations.
8               THE WITNESS:  I do not consider
9     this under Fred Hutchinson policy.
10 Q  (By Mr. Levine)  Do you consider this to be
11    intellectually honest?
12               MR. WISNER:  What does "this" refer
13    to, Counsel?
14               MR. LEVINE:  This work.  Whatever
15    "this" is that he just referred to in his response.
16               THE WITNESS:  It's absolutely
17    intellectually honest, and I did not conduct research
18    here under Fred Hutchinson policies.
19 Q  (By Mr. Levine)  All due respect.  I asked you at the
20    beginning of this deposition whether you engaged in
21    the -- whether you applied the same intellectual
22    principles in your work here as you do in your
23    professional career for academic research.  And you
24    said "yes."
25 A  But it's different from policies.

Page 157

1  Q  Understood.  But you had told me you were conducting
2     yourself under the same standards as you do in your
3     research.  Is that correct or is it not correct?  Do
4     you -- are you conducting yourself in this case and
5     your research in this case according to the same
6     standards that you use in your practice and research?
7               MR. WISNER:  Okay.  I'm going to
8     object to the compound nature of the question.
9               MR. LEVINE:  Okay.  Then I'll --
10               MR. WISNER:  Answer to the extent
11    you can.
12               MR. LEVINE:  -- just re-ask the --
13    the very last part.
14 Q  (By Mr. Levine)  Are you conducting yourself in this
15    case according to the same standards that you use in
16    your practice and research outside of your testimony
17    here?
18 A  What standards you're referring to?  Standards of
19    what?
20 Q  Standards of academic integrity.
21 A  This is not academic activity.
22 Q  I'm simply asking you a question of whether you're
23    conducting yourself according to the same standards
24    that you hold yourself outside of your expert work.
25    You can answer "yes," you can answer "no," or you can

Andrei Shustov, M.D.

Page 158

1 give me --
2 A  I'm doing this to the best of my abilities and to the
3    best effort I can put forward to help in this case.
4 Q  You're telling me this is the best effort you could
5    have put forward in this case was to copy, I counted
6    about 13 paragraphs from Dr. Nabhan's report?
7            MR. WISNER:  Objection;
8    argumentative, harassment.
9        Do not answer that question.  That has no valid
10   basis to be asked.
11 Q  (By Mr. Levine)  Dr. Shustov, are you -- is it --
12   strike that.
13       Dr. Shustov, is it your testimony that what
14   you've put forth here is the best effort you could
15   have in copying what I count as approximately 13
16   paragraphs from Dr. Nabhan's report?
17           MR. WISNER:  Same objection.
18           THE WITNESS:  This is the best
19   effort I could put -- put out to form my opinions in
20   Mr. Hardeman's case.
21 Q  (By Mr. Levine)  Dr. Shustov, you told me that you
22   teach medical students, correct?
23 A  That's correct.
24 Q  Medical student submitted a research paper to you
25   with 13 paragraphs copied from another student.  Is

Page 159

1    it fair to say you'd flunk the student?
2            MR. WISNER:  Objection; improper
3    hypothetical, speculation.
4            THE WITNESS:  If the student
5    referenced other papers and given examples of certain
6    facts or statements from other researchers or
7    students to help support the conclusion in -- in the
8    student's paper, it would require consideration.  I
9    can't say in a blank statement.  I would have to see
10   exactly what the paper of the student would have and
11   how it's used.
12 Q  (By Mr. Levine)  If the paper was a research paper on
13   the cause of Mr. Hardeman's non-Hodgkin's lymphoma
14   and it contained 13 paragraphs with the yellow
15   highlighting that is identical to another student's
16   paper in that class with the exact same language,
17   would you pass that student?
18           MR. WISNER:  Objection; improper
19   hypothetical, incomplete hypothetical, speculation,
20   and vague.
21           THE WITNESS:  I would have to sit
22   down with the students and discuss what is the
23   specific -- what specific paper is and why he or she
24   quoted work with statements of other researchers,
25   physicians, or colleagues, or if you wish.

Page 160

1 Q  (By Mr. Levine)  You would also, under the University
2    of Washington's academic integrity policies, be
3    required to report that plagiarism, correct?
4            MR. WISNER:  Objection; incomplete
5    hypothetical.
6            MR. LEVINE:  Just asking.
7            THE WITNESS:  I don't know that.  I
8    never had the situation.
9 Q  (By Mr. Levine)  Would you report it?
10           MR. WISNER:  Objection; incomplete
11   hypothetical, speculation.
12           THE WITNESS:  Again, it depends on
13   what I find talking to the student, and I have to
14   have example of specific paper and why the statements
15   were used to support --
16 Q  (By Mr. Levine)  This --
17 A  -- conclusions.
18 Q  So this is the paper.  You're -- you're the student
19   I'm referring to.  Dr. Nabhan is the student that I'm
20   referring to that was copied.  Would you report this?
21           MR. WISNER:  Objection.  Incomplete
22   hypothetical.  Misstates the testimony and exactly
23   what we're doing here.
24           THE WITNESS:  I don't know what I
25   would do in this situation.

Page 161

1 Q  (By Mr. Levine)  Is it fair to say you would consider
2    reporting this?
3            MR. WISNER:  Objection; incomplete
4    hypothetical, speculation.
5            THE WITNESS:  It would not be my
6    first thought, no.
7 Q  (By Mr. Levine)  Would you question the reliability
8    of this -- this student's work?
9            MR. WISNER:  Objection; incomplete
10   hypothetical, speculation.
11           THE WITNESS:  I would raise
12   questions.
13 Q  (By Mr. Levine)  As to the reliability of the work?
14 A  And not reliability.  I would ask the student what
15   was the reason for using the language, if I truly
16   suspected this was copied from another source.
17 Q  Would you have to assess the reliability of the other
18   student's report that it was copied from in order to
19   be able to determine whether this student's work was
20   reliable?
21           MR. WISNER:  Objection; incomplete
22   hypothetical, misstates what happened here.
23           MR. LEVINE:  Enough with the
24   speaking objection.  Just object to form.
25           MR. WISNER:  Okay.  To be clear, we

Page 162

1 objected to a seven-hour deposition because you would
2 waste our time. You are asking a hypothetical
3 question about whether or not if his expert report
4 was a paper that he was grading against another
5 student's paper and what he would do with regard to
6 reporting it under an undisclosed and yet
7 unidentified academic policy. The absurdity to which
8 this question has reached is really beyond the pale.
9                 MR. LEVINE: The absurdity --
10                 MR. WISNER: Now --
11                 MR. LEVINE: -- to which --
12                 MR. WISNER: Let me finish my --
13                 MR. LEVINE: No.
14                 MR. WISNER: -- objection.
15                 MR. LEVINE: The absurdity --
16                 MR. WISNER: Let me finish.
17                 MR. LEVINE: No. No.
18                 MR. WISNER: Let -- you cannot --
19                 MR. LEVINE: No.
20                 MR. WISNER: -- interrupt me.
21                 MR. LEVINE: No.
22                 MR. WISNER: I've not interrupted
23 you. Share the same respect to me.
24                 MR. LEVINE: No.
25                 MR. WISNER: Okay?

Page 163

1                 MR. LEVINE: You're not -- this is
2 not --
3                 MR. WISNER: You are interrupting
4 me.
5                 MR. LEVINE: -- your deposition.
6                 MR. WISNER: You are interrupting
7 me.
8                 MR. LEVINE: You're --
9                 MR. WISNER: You are interrupting
10 me.
11                 THE REPORTER: I can't get this.
12                 MR. WISNER: Cut it out.
13                 MR. LEVINE: We --
14                 MR. WISNER: I let you do your
15 thing. You let me do mine. That's how it works.
16                 MR. LEVINE: No, it's not.
17                 MR. WISNER: You asked for it.
18                 MR. LEVINE: Not during my
19 questioning.
20                 MR. WISNER: Okay.
21                 MR. LEVINE: We'll go off the
22 record.
23                 MR. WISNER: No. We are staying on
24 the record. Because you asked me the question, and
25 I'm answering it straight-up. You've asked for this,

Page 164

1 sir.
2                 MR. LEVINE: Go for it.
3                 MR. WISNER: Okay? So let me
4 finish what I'm saying.
5                 MR. LEVINE: I'm going to --
6                 MR. WISNER: The absurdity to which
7 this question has reached is beyond the pale. And if
8 you want to ask him, "Sir, is your paper honest? Is
9 your paper correct?" go ahead. But the absurdity of
10 the -- the speculative questions that you're asking
11 are ridiculous. So, yes, I'm objecting because
12 you're wasting our time. Please respond or ask your
13 next question.
14                 MR. LEVINE: I will ask the court
15 reporter to mark this part of the transcript and
16 Mr. Wisner's speaking objection, and we will note it
17 for the court.
18                 MR. WISNER: Please. And may the
19 record reflect --
20                 MR. LEVINE: And --
21                 MR. WISNER: -- that I was
22 responding to a question asked directly by you to me
23 on the record.
24                 MS. WAGSTAFF: I would also -- this
25 is Aimee Wagstaff. I would like to put on the

Page 165

1 record, I know you're new to the case, but early in
2 the MDL, we being the plaintiffs actually made a
3 motion to limit objections to object to form. We
4 actually attached a proposed order to our CMC
5 statement requesting that. Monsanto adamantly
6 opposed that, saying that speaking objections were
7 proper. This went to the court, and the court sided
8 with Monsanto, saying that objections were not
9 limited to form.
10    So I will cut you some slack because you are --
11 you were not here at the beginning of the case, but
12 that is absolutely the law of the case.
13                 MR. LEVINE: Thank you, Aimee. I
14 appreciate that. And we can certainly bring that to
15 the court's attention if the situations are
16 analogous. I appreciate your advice.
17    Continue?
18                 MR. WISNER: Absolutely.
19 Q  (By Mr. Levine) Dr. Shustov, are you a member of the
20 American Medical Association?
21 A  No, I'm not.
22 Q  So do you think it would be appropriate to follow
23 their code of conduct as it relates to medical expert
24 testimony?
25                 MR. WISNER: Objection;

Andrei Shustov, M.D.

Page 166

1    speculation, lacks foundation.
2         THE WITNESS:  I have not reviewed
3    the American Medical Association code of conduct as
4    relates to testimonies.
5    Q   (By Mr. Levine)  Dr. Shustov, were you under the
6    impression that the legal rules applicable to this
7    case permitted you to copy someone else's opinions
8    and submit them as your own?
9         MR. WISNER:  Objection; misstates
10   the record.  Speculation.  Calls for a legal
11   conclusion.
12        Answer if you can, sir.
13        THE WITNESS:  I did not copy
14   anybody's opinion in my report.
15   Q   (By Mr. Levine)  Okay.  Let's turn to Page 3 of your
16   report.
17        MR. LEVINE:  Actually, you know
18   what?  Since I'm switching topics and I just got a
19   timing signal on the tape, now is a good time for a
20   quick break.
21        MR. WISNER:  Sure.
22        THE VIDEOGRAPHER:  Please stand by.
23   This concludes Media Unit No. 2 in the deposition of
24   Andrei Shustov.  We're going off the record.  The
25   time is 1:58 p.m.

Page 167

1         (Pause in proceedings.)
2
3         THE VIDEOGRAPHER:  This begins
4    Media Unit No. 3 in the deposition of Dr. Andrei
5    Shustov.  We are back on the record.  The time is
6    2:04 p.m.
7    Q   (By Mr. Levine)  Dr. Shustov, can you turn to Page 3
8    of your report?  I'm not sure I asked -- if I asked
9    you to do that.
10   A   I'm here.
11   Q   You have a section that -- on Page 3 that refers to
12   special exposure history.  You see that?
13   A   I do.
14   Q   And you say in this section that Mr. Hardeman
15   endorses significant prior exposure to Roundup
16   products.  You see that?
17   A   I see that.
18   Q   What is your criteria for significant exposure?
19   A   For the purpose of this report, I compare that to
20   levels of exposure published in literature.  And in
21   my assessment of Mr. Hardeman's history, it was
22   significant using this as a basis for subsequent
23   discussion.  In a different level, in the medical
24   world, the continuous use of something that is a
25   known carcinogen for years, multiple times during the

Page 168

1    year, is considered significant exposure as a general
2    knowledge in oncology, regardless of what carcinogen
3    is.
4    Q   What is your criteria for the minimum amount of
5    exposure that would quantify significant exposure?
6    A   There is no minimum amount that was ever studied for
7    Roundup.  And when it comes to carcinogen for an
8    oncologist or expert in cancer, there is really
9    biologically no such a thing as minimum amount.  But
10   for epidemiologic purposes, comparing it to published
11   literature and evidence, minimum amount was never
12   established.  I have not seen a study that titrated
13   Roundup and tries to establish the level below which
14   humans would not be developing genotoxic changes in
15   their genome and above certain level it starts
16   happening.  I have not seen studies like that.
17   Q   You state that Mr. Hardeman -- I think it's the
18   last -- second-to-last sentence, in that -- in the
19   paragraph on special exposure history.  You state
20   that Mr. Hardeman diligently sprayed both roads
21   including high embankments, parking area, and garage
22   walls, and areas around, for over 25 years with
23   Roundup without using any protective equipment or
24   barriers; i.e. gloves, face shield, respirator, et
25   cetera, and that when -- well, first of all, is that

Page 169

1    correct?
2         MR. WISNER:  Objection.  What's
3    correct?  You read it correctly?
4    Q   (By Mr. Levine)  Is that correct that you state that?
5         MR. WISNER:  Okay.
6         THE WITNESS:  Yes.
7    Q   (By Mr. Levine)  Okay.  And when you say "both
8    roads," you're referring to a property that he bought
9    around 1988 in Sonoma County, correct?
10   A   That's correct.
11   Q   Okay.  And you say, "He describes frequent spill on
12   his hands, and inhalation if" -- "if the wind were
13   present while he was working," correct?
14   A   That's what I stated.
15   Q   Then you state, "His use of Roundup was especially
16   aggressive' in the last three years before he
17   stopped at the time of lymphoma diagnosis," correct?
18   A   That's correct.
19   Q   According to your report, his diagnosis was around
20   February 2015, correct?
21   A   That's correct.
22   Q   And he stopped around that time.  Is that what you're
23   saying?
24   A   That's what I stated.
25   Q   Okay.  And what's your basis for that opinion?

Andrei Shustov, M.D.

Page 170

1   A   For what opinion?
2   Q   Or what's your basis for the information you included
3       there regarding Mr. Hardeman's exposure?
4   A   This is documentation of what patient tells me.
5   Q   Do you rely on anything else other than what he told
6       you?
7   A   That is physician's job to trust the patient.
8   Q   Okay.
9   A   I do not investigate Mr. Hardeman.  I didn't hire a
10      private investigator.  Job of the physician is to
11      listen to the patient and try to help him out.
12      That's exactly what Mr. Hardeman told me on November
13      15 when I saw him.
14  Q   What is the significance to your opinions and
15      methodology in this case of the fact that
16      Mr. Hardeman's use of Roundup was especially, quote,
17      "aggressive" in the last three years before he
18      stopped at the time of his diagnosis?
19  A   This particular statement is documentation of
20      patient's history.  I don't believe it has any impact
21      on my conclusion in this case.
22  Q   Doesn't -- doesn't have any impact on your conclusion
23      that he sprayed Roundup aggressively in the last
24      three years prior to diagnosis?
25  A   It would not make any difference in my conclusion

Page 171

1       whether it was aggressive in last three years or it
2       was the same as in the past 25 years.
3   Q   Okay.  Does it matter to your conclusion that he used
4       Roundup in the last three years prior to his dia --
5       and stopped at the time of his diagnosis?
6   A   I don't understand even the -- the structure of this
7       question because I document what a patient told me.
8   Q   So let me re-ask it, then, just to make it clear.
9           Does it matter to your opinions that he was
10      actually using Roundup for the three years leading up
11      to his diagnosis?
12  A   He used it for 25 years.
13  Q   I understand.
14          Does it matter when he stopped using Roundup?
15  A   Does it matter when he stopped using it for the --
16      for his diagnosis?
17  Q   Suppose he -- if he used it for 25 years and then
18      stopped for 25 years and then was diagnosed with
19      lymphoma, would that matter to your opinion?
20  A   No, it wouldn't.
21  Q   You would still say that Roundup caused his
22      non-Hodgkin's lymphoma?
23  A   That's correct.
24  Q   Even with 25 years from the last time he used it
25      until his diagnosis of non-Hodgkin's lymphoma?

Page 172

1   A   That's absolutely correct.
2   Q   What's your basis for that opinion?
3   A   There is no such a thing as washing out genomic
4       breaks in the DNA.
5   Q   Okay.
6   A   They stay with you for life.
7   Q   And is that -- is that true with respect to whatever
8       the carcinogen is that would create a genomic break
9       in the DNA?
10  A   No.  This is specific to actual damage to DNA
11      structure by chemical carcinogens.
12  Q   And what's your basis -- what's your basis for that
13      opinion, that it's only specific with respect to
14      chemical carcinogens?
15  A   Because genomic changes that happen with DNA breaks
16      that are caused by carcinogens persist for life and --
17      and only accumulate.  They don't go away.
18  Q   Does -- does HIV cause genomic breaks in DNA?
19          MR. WISNER:  Objection; outside the
20      scope.
21          MR. LEVINE:  Just trying to
22      understand his general understanding of oncology.
23          THE WITNESS:  Well, HIV is not part
24      of oncology in the sense of HIV infection.  It has
25      some relation to oncology, but I would have to review

Page 173

1       the literature and see exactly which HIV virus does
2       to human DNA.
3   Q   (By Mr. Levine)  Do you know whether any viruses
4       cause genomic breaks in DNA?
5   A   Once again, I have to do a search and look, but there
6       is possibility of viral agents incorporating into
7       DNA, and would their functioning continue generating
8       DNA changes.  It would be very specific to viruses,
9       and one has to look at viral biology and see what
10      they do.
11  Q   And just so I understand, when you say a genomic
12      break in the DNA, is that the same as saying causing
13      a mutation?
14  A   That's correct.
15  Q   Does the hepatitis C virus cause mutations?
16  A   When it's active and present in the cells, there
17      are -- to my knowledge, there are studies to suggest
18      that when it's active, it can cause mutational
19      changes.
20  Q   So if Mr. Hardeman had active hepatitis C for 40
21      years, then regardless of when that virus was
22      treated, you still, under the methodology you just
23      told me about, wouldn't be able to rule out hepatitis
24      C as contributing to his non-Hodgkin's lymphoma,
25      correct?

Andrel Shustov, M.D.

Page 174

1  A  No, the statement is not correct.  Mr. Hardeman, to
2  my knowledge, with evidence we have, did not have
3  chronic hepatitis C or presence of the virus for a
4  number of years after documentation of negative
5  sensitive testing in 2000 -- starting 2007.
6  Q  Did Mr. Hardeman at any point have chronic hepatitis
7  C?
8  A  I don't know that.  He had hepatitis C infection that
9  was for practical purposes effectively cured.  Virus
10  was eliminated.  And there is no evidence since 2007
11  that there are traces of viruses in his system.
12  Q  Do you -- so to be clear, you don't know whether
13  Mr. Hardeman at any point had chronic hepatitis C?
14  A  No.  He was diag --
15  Q  No, I'm not correct?  Or, no, you don't know?
16  A  I don't have any evidence of him having chronic
17  hepatitis C.  He was diagnosed with hepatitis C
18  infection that was effectively treated between, I
19  believe 2005 and 2006.  And December 2006, from that
20  time, his molecular testing demonstrated no evidence
21  of infection.
22  Q  When was he diagnosed with that hepatitis C
23  infection?
24  A  The earliest record to my recollection is in 2005.
25  Again, to my best recollection.

Page 175

1  Q  Did you ask Mr. Hardeman when he would have been
2  exposed to that hepatitis C virus and acquired that
3  infection?
4  A  I did.
5  Q  And what information do you have regarding that?
6  A  He had no idea.  He said it was found by accident.
7  That's what he told me.
8  Q  Did you read his deposition?
9  A  I did.
10  Q  And did you gain any information from his deposition
11  that would be relevant --
12  A  I don't recall.
13  Q  Sorry.  We're really upsetting the court reporter.
14  Both of us are, so...
15     Did you obtain any information from his
16  deposition that would be relevant towards your
17  understanding of how long Mr. Hardeman would have
18  been exposed to hepatitis C?
19  A  His --
20     MR. WISNER:  Objection; calls for a
21  legal conclusion.
22     THE WITNESS:  His deposition was
23  not basis of my report, but I would have to look at
24  his deposition, specific areas or read his deposition
25  again, to remind myself what he answered to those

Page 176

1  questions.  I can speculate when he might have been
2  exposed, but he did not have specific recollection
3  when I met him on November 15th.
4  Q  (By Mr. Levine)  So you said Mr. Hardeman had
5  frequent spills.  We were talking about that a minute
6  ago.  You remember that?
7  A  That's correct.
8  Q  What's the significance of that to your opinions and
9  methodology?
10  A  This is a descriptive paragraph of his usage of
11  glyphosate, and it does not have specific impact on
12  my opinion but to demonstrate that he was exposed to
13  glyphosate directly while doing work in his yard.
14  Q  Did you ask Mr. Hardeman how many times he spilled on
15  himself in the 25-plus years you say he used Roundup?
16  A  That would be kind of nonsensical question.  No, I
17  didn't ask him that.  He said "multiple times."
18  Q  Do you have any information as to how many times he
19  spilled on himself?
20  A  I don't have any information.  I don't think any
21  human can remember how many times they spilled it.
22  "Multiple times" was good enough to me as a physician
23  to demonstrate how it was used and how he was
24  exposed.
25  Q  Did you consider, in forming your opinions, whether

Page 177

1  Mr. Hardeman would wash off the Roundup if he spilled
2  it?
3  A  I did not ask him that specific question, to my
4  recollection.
5  Q  Did you consider whether Mr. Hardeman showered after
6  using Roundup?
7  A  No, I didn't consider that.  I consider it
8  irrelevant.
9  Q  You do agree that Mr. Hardeman's medical history is
10  significant for the hepatitis C infection, correct?
11  A  He had hepatitis C in his past medical history, yes.
12  Q  Does it matter for how long Mr. Hardeman was infected
13  with hepatitis C?
14  A  Does it matter for what?
15  Q  Does it matter to your opinions in this case for how
16  long Mr. Hardeman was infected with hepatitis C?
17  A  No, it doesn't.
18  Q  Why not?
19  A  Because to the best of my clinical judgment, based on
20  his record, Mr. Hardeman had no evidence of hepatitis
21  virus in his system by most sensitive techniques so
22  far available to medicine for at least eight years.
23  Q  Are you aware of medical literature that indicates
24  that hepatitis C causes mutations?
25  A  There are several reports in the literature that

Andrei Shustov, M.D.

Page 178

1    Indicate that hepatitis C virus -- that implicates
2    hepatitis C virus in genomic instability.
3    Q   So I'm not sure whether -- I'm not -- I don't
4    understand what you mean by "genomic instability"
5    with respect to my question.  So maybe you can
6    explain this to me.
7        But are you aware of medical -- I don't know
8    whether that answered my question.  So let me just
9    re-ask:
10       Are you aware of medical literature that
11   indicates that hepatitis C causes mutations?
12   A   The literature that I reviewed and I'm aware of
13   indicated that hepatitis C virus was found in the
14   cells that at the same time that there was virus
15   present had mutations.  That's right.
16   Q   And when someone has mutations, can't rule them out
17   as contributing to non-Hodgkin's lymphoma regardless
18   of how long ago that was, right?
19   A   First of all, I did not see evidence that hepatitis
20   has caused those mutations.  They were identified at
21   the same time.  The causality of mutations from a
22   virus is a different question, but that's virology
23   question.
24       Secondly, the instability caused by hepatitis C
25   virus were only present at the time of virus was

Page 179

1    present in the system.  I did not see any studies
2    that documented persistence of mutations after viral
3    eradication.
4    Q   So just so I understand, are you saying that the
5    mutations get better?  They fix themselves once
6    they've occurred?
7    A   I did not say that.
8    Q   Okay.  So once mutations have occurred, they stay as
9    mutations, correct?
10   A   As long as cells remain viable.  As long as they're
11   living.  That's correct.
12   Q   And that's why you would say that if someone stopped
13   Roundup 25 years ago, it still could have contributed
14   to their cancer?
15   A   That's correct.
16   Q   And that same thing would apply to anything that
17   caused mutations, correct?
18   A   Not necessarily.
19   Q   Why not?
20   A   Again, the cells have to survive all this time to
21   carry those mutations.
22   Q   And how are you able to determine that they do
23   survive all this time after using Roundup but that
24   they don't survive all this time after other things
25   that cause mutation?

Page 180

1    A   Well, the other things you're asking about hepatitis,
2    I can answer your specific question.  So cells
3    infected with viral agents, if virus get -- gets
4    eliminated, are eliminated by immune cells.  So cells
5    that infected by the virus, with effective immune
6    response, do not survive.  That's how our body
7    eliminates the viral infection.  So if you had cells
8    with mutations with the virus in it, those cells
9    would be gone from his system.
10   Q   But if the virus can cause mutations, that doesn't
11   mean that the mutations continue with the virus,
12   correct?
13   A   If virus causes mutations within the cells that virus
14   infects, they would stay with those cells as long as
15   the cells survive.  They don't spread to other cells
16   without virus going to other cells and causing other
17   mutations.
18   Q   So if that -- if that's -- so let me ask you
19   something.
20       Does treating hepatitis C cure all cases of
21   cancer that would have been caused by hepatitis C?
22   A   Well, if cancer already occurred, what you're saying,
23   that you have a patient who has hepatitis C and
24   develop cancer while having hepatitis C.  Treating
25   hepatitis C infection, if it was caused by hep C

Page 181

1    virus, hypothetically should cure cancer if you
2    eliminate infection.  There are examples of that in
3    oncology that clearly -- in cases where the cause of
4    cancer is clearly linked to the viral agent.
5    Q   Can you cite any literature that says that you can
6    cure cases of cancer that are caused by hepatitis C
7    by simply treating hepatitis C?
8    A   Yes.  So it can cure marginal zone lymphoma of the
9    spleen --
10   Q   Right.
11   A   -- with treating hepatitis C.
12   Q   And that's one subtype of non-Hodgkin's lymphoma,
13   correct?
14   A   Correct.
15   Q   But there's evidence that hepatitis C plays a role in
16   other subtypes of non-Hodgkin's lymphoma, correct?
17   A   There is association, but I cannot say reliably that
18   hepatitis C is the agent that exactly caused
19   transformation of lymphocyte into the cancer cell.
20   Q   Can't say one way or the other?
21   A   Based on my understanding and general understanding
22   of virally driven cancers, you have to have cancer --
23   you have to have virus present in the cancer cells
24   and virus present in the body to drive the cancerous
25   process.  And if you eliminate the virus, you should

Andrei Shustov, M.D.

Page 182

1  not have any other reasons for -- for cancer cells
2  to -- to persist.  There are other examples in other
3  lymphomas of treating viral -- of treating infectious
4  agents that cures the lymphoma.
5  Q  Can you cite any peer-reviewed publication or medical
6  literature that states that removing the hepatitis C
7  virus will cure any case of non-Hodgkin's lymphoma
8  that was caused by hepatitis C?
9            MR. WISNER:  Objection; misstates
10 his testimony.
11           THE WITNESS:  I just mentioned a
12 splenic marginal zone lymphoma.
13           MR. LEVINE:  Right.
14 Q  (By Mr. Levine)  And just to be clear, you're saying
15 that treating hepa -- treating hepatitis C cures all
16 cancer -- all cases of splenic marginal -- I'm sorry?
17 A  Splenic marginal zone lymphoma.
18 Q  Are you saying that treating hepatitis C cures all
19 cases of splenic marginal zone lymphoma that are
20 caused by the hepatitis C?
21 A  I don't know if it cures all the cases, but this is
22 the specific subtype of non-Hodgkin lymphoma where
23 association has been proven by virtue of curing
24 lymphoma in cases that are published in the
25 literature.

Page 183

1  Q  This is the only subtype of non-Hodgkin's lymphoma --
2  strike that.
3     I think I understand what you just said.  You
4  said this is the only subtype where curing the
5  lymphoma is published in the medical literature,
6  correct?
7  A  Correct.
8  Q  But it's not the only type -- subtype that's been
9  associated with the hepatitis C virus in the medical
10 literature, correct?
11 A  So to me as a clinician in cancer societies, this is
12 the strongest association you can find between virus
13 and lymphoma, as opposed to epidemiologic studies
14 where the causative -- the causation can be proved by
15 eliminating the virus as a source of the lymphoma.
16 I'm not sure in other cases this association is
17 proven to such a significant degree based on these
18 factors.  There are other facts in virally driven
19 lymphomas that strongly argue the -- the direct
20 biologic role of hepatitis virus in cause of
21 lymphomas.
22 Q  Just to be clear, I'm going to call it "SMZL" for
23 short.
24 A  Sure.  Yeah, I know what it means.
25 Q  So I don't have to say the full term.  But you

Page 184

1  understand that I'm referring to splenic marginal
2  zone lymphoma, correct?
3  A  You got it.
4  Q  SMZL is a nonaggressive form of lymphoma, correct?
5  A  That's correct.
6  Q  It might be harder to cure an aggressive form of
7  lymphoma that would have been caused by hep C,
8  correct?
9  A  Here's the thing.  If people believe that particular
10 case, that diffuse large B-cell lymphoma is cased and
11 driven by hep C, there wouldn't be any reason not to
12 try it and cure it with eliminating hepatitis C, but
13 it's never been done.  The reason we don't have any
14 other case is because it hasn't been tried.  And then
15 the question becomes whether we believe that this
16 diffuse large B-cell lymphoma is caused by virus if
17 we are not treating this with viral elimination.
18 Q  Okay.  Just a few questions with regards to
19 Mr. Hardeman's hepatitis C history.
20    You said you read his deposition, right?
21 A  Yes.
22 Q  Are you aware that he testified that he possibly
23 first contacted the virus back when he was around 17
24 years old?
25 A  I would have to read his very long deposition, but

Page 185

1  I'm aware that he was at risk for that.
2  Q  That was in the 1960s, correct?
3  A  If he stated that, it would be consistent with my
4  social history I took from him.
5  Q  Okay.
6  A  But I have to look at his deposition to see if that's
7  exactly what he said.
8  Q  Mr. Hardeman testified that in the 1960s, he used
9  intravenous drugs, correct?
10 A  That's correct.
11 Q  You agree that intravenous drug use is a risk for
12 developing hepatitis C, correct?
13 A  That's correct.
14 Q  Are you aware that Mr. Hardeman also received a
15 homemade tattoo around that same time, somewhere in
16 the 1960s?
17 A  Yes.
18 Q  Do you agree that getting homemade tattoos are a risk
19 factor for developing hepatitis C?
20 A  Yes.
21 Q  Are you aware that Mr. Hardeman may have also been
22 exposed to hepatitis C by a girlfriend of his in the
23 1960s?
24 A  I would have to trust his word for it.  It's not in
25 my report.  I don't recall him telling me this.

Andrei Shustov, M.D.

Page 186

1  Q  Did Mr. Hardeman identify any other possible times to
2     you when he would have first contact -- contracted
3     hepatitis C?
4  A  No.
5  Q  Do his medical records identify any other possible
6     times when he would have first contracted hepatitis
7     C?
8              MR. WISNER:  Objection; overbroad.
9              THE WITNESS:  Nothing that I saw in
10    his medical records provided to me would indicate
11    other possible times or evidence that he was -- at
12    what time he was exposed.
13 Q  (By Mr. Levine)  You have no basis to disagree with
14    the fact that Mr. Hardeman contracted hepatitis C
15    back in the 1960s, right?
16             MR. WISNER:  Objection.
17             THE WITNESS:  I don't know he
18    contracted that.  He was at a risk at the time, but
19    he was diagnosed when I first saw his positive test
20    and he was treated.
21 Q  (By Mr. Levine)  To be clear, do you have any basis
22    to disagree with the fact that Mr. Hardeman
23    contracted hepatitis C back in the 1960s?
24 A  I don't know when he contracted it.  I agree with the
25    fact that activities that he did in 1960s were the

Page 187

1     ones that show risk for contracting hepatitis C, but
2     I don't have any documentation.  If you ask me when
3     he contracted it, I don't know.
4  Q  Do you have any basis to disagree with the fact that
5     Mr. Hardeman had untreated chronic hepatitis C for
6     over 40 years?
7              MR. WISNER:  Objection; asked and
8     answered.
9              THE WITNESS:  I don't have any
10    records of him having chronic hepatitis since his use
11    of intravenous drug in 1960s.  So I -- this is all
12    speculative when he contracted it.  How long he had
13    it, we can speculate about this, but I'm talking
14    about medical evidence presented to me in this case.
15 Q  (By Mr. Levine)  No medical evidence that he had
16    chronic hepatitis C?  Is that what you're saying?
17 A  Since those times, I did not see any definitive test
18    results or any records suggesting that he had -- he
19    was diagnosed with hepatitis C before 2005 or 2006.
20 Q  Mr. Hardeman had cirrhosis of the liver, correct?
21 A  That's correct.
22 Q  And that's from his hepatitis C, correct?
23             MR. WISNER:  Objection; beyond the
24    scope.
25             THE WITNESS:  It is one of the

Page 188

1     possibilities.
2  Q  (By Mr. Levine)  Years of untreated hep -- hepatitis
3     C can cause cirrhosis of the liver, correct?
4  A  Hypothetically, yes.  But there are other causes.
5  Q  Have you identified any other causes of Mr. Hardeman's
6     liver cirrhosis in your review of his records or in
7     your meeting with Mr. Hardeman?
8  A  Yes.  He also has history of alcohol consumption
9     around the same time.  And there is a thing called
10    alcoholic cirrhosis.
11 Q  Did Mr. Hardeman have alcoholic cirrhosis?
12 A  I don't know the etiology or reason for his
13    cirrhosis, but those are both risk factors for
14    cirrhosis.
15 Q  How much alcohol consumption do you need in order to
16    cause hepatitis C?
17             MR. WISNER:  Objection; irrational
18    question.
19             THE WITNESS:  There is no answer to
20    this question.  It depends on a liver status at the
21    time of consumption of alcohol.  It depends on
22    genetics of the person.  And it depends on whether
23    there are some other secondary damaging agents to the
24    liver.
25             MR. WISNER:  You asked it causing

Page 189

1     hepatitis C.
2              MR. LEVINE:  I appreciate the
3     clarification.
4              MR. WISNER:  Hence my objection.  I
5     wasn't just being weird.
6              MR. LEVINE:  I appreciate that
7     clarification.
8              MR. WISNER:  You're welcome.  You
9     see, I'm not always mean with my coaching to the
10    opposing counsel.
11 Q  (By Mr. Levine)  How much -- so just to be clear, how
12    much consumption of alcohol is necessary in order to
13    cause cirrhosis of the liver?
14 A  There is no minimum amount of alcohol to cause
15    cirrhosis in a person.  And it depends on person's
16    genetics, underlying liver condition, concurrent
17    liver injury, or other chemical or genetic factors.
18 Q  Have you identified any genetics or underlying liver
19    conditions or concurrent liver injury in Mr. Hardeman
20    that would make him susceptible to cirrhosis of the
21    liver other than exposure to hepatitis C?
22 A  So we do not have genetic markers to identify people
23    at risk for alcoholic cirrhosis rather than people
24    developing alcoholic cirrhosis sometimes after very
25    minimal alcohol use.  On the contrary, there are

Page 190

1  people who drink alcohol heavily for decades and
2  never develop cirrhosis, which again is to a medical
3  professional suggest that there are genetic
4  susceptibility and alcohol itself is not the only
5  factor that can induce cirrhosis.
6  Q   Would you say that hepatitis C was likely a
7  substantial contributing factor to his cirrhosis?
8         MR. WISNER:  Objection;
9  speculation.
10         THE WITNESS:  If we assume that he
11  had chronic hepatitis since the time that you stated,
12  then yes.
13  Q   (By Mr. Levine)  Now I want to turn to hepatitis B.
14  How did you rule out Mr. Hardeman's exposure to the
15  hepatitis B virus as a substantial contributing
16  factor to his non-Hodgkin's lymphoma?
17         MR. WISNER:  Objection; lacks
18  foundation.
19         THE WITNESS:  First, I didn't rule
20  out that he had a positive test.  But in my opinion,
21  reviewing his medical records, I don't see any
22  evidence he ever had infection or lasting infection
23  to hepatitis B.  The only thing we have definitive
24  from his medical records, he has a test that is
25  suggestive of exposure to hepatitis B, not hepatitis

Page 191

1  B infection.  As a matter of fact, the testing for
2  hepatitis B infection was always negative in his
3  case.  There is not a single test that was definitive
4  in his medical history to prove that he had hepatitis
5  B.  The positive HBc antibody is the test suggestive
6  of immune system encounter with hepatitis B but not
7  suggestive of hepatitis B infection.
8  Q   (By Mr. Levine)  Do you agree that there are studies
9  that show that a person with HBV core antibody
10  positive and surface antigen negative is -- is at an
11  elevated risk for non-Hodgkin's lymphoma compared to
12  someone with no hepatitis B exposure?
13         MR. WISNER:  Objection; memory
14  test.
15         THE WITNESS:  As a matter of fact,
16  in my recollection, in literature I reviewed, the
17  hepatitis B Ag antigen negative, virus negative, and
18  only HBc positive, the association could not be
19  established.
20  Q   (By Mr. Levine)  So that I'm clear, is it your
21  testimony that you're not aware of any studies that
22  show that a person with HBc antibody positive but is
23  surface antigen negative is at an elevated risk for
24  non-Hodgkin's lymphoma?
25  A   I'm saying that, to my recollection of reading

Page 192

1  literature on hepatitis B and non-Hodgkin lymphoma, I
2  do not recall finding any evidence that HBc positive
3  hepatitis B antigen negative patients definitively
4  have a risk of developing lymphoma.
5  Q   When you say "definitively," what do you mean?  Are
6  there studies that go both ways?  Just trying to
7  understand what you mean by that.
8  A   I did not have a proof.  I did not see proof that
9  patients who are HBc positive but HB Ag negative are
10  at risk of developing non-Hodgkin lymphoma.
11  Q   Did you see studies that indicate that they're at
12  increased risk?
13  A   I would have to look again at the papers that I
14  reviewed, and to my -- best of my recollection, no.
15  Q   Are you aware that Dr. Nabhan testified there were
16  such studies yesterday?
17  A   No, I'm not aware of that.
18  Q   You disagree with Dr. Nabhan?
19         MR. WISNER:  Objection.  You're
20  assuming facts not in evidence.  Show him the
21  testimony if you want to ask him about it.
22         THE WITNESS:  My opinion, again,
23  that I would have to confer, opening up the papers
24  again, I do not recall the studies that, in antigen
25  negative patients, showed the association with

Page 193

1  lymphoma but suggested that it has to be further
2  evaluated.
3         As a matter of fact, my recollection is -- one of
4  the recollection is from a review on hepatitis and
5  Hodgkin lymphomas by -- I'm not going to try to
6  remember, but -- but it's a -- it's a review paper on
7  hepatiti -- on hepatitis B and hepatitis C and
8  non-Hodgkin lymphoma risk, if I remember correctly.
9         (Interruption by reporter.)
10
11  Q   (By Mr. Levine)  You agree that Mr. Hardeman has a
12  positive HBV core antibody test, correct?
13  A   That's correct.
14  Q   But in your opinion, he's never been diagnosed with
15  clinical HBV infection, correct?
16  A   That's correct.  It's also correct he never been
17  diagnosed with positivity with HB antigen or
18  hepatitis B RNA.
19  Q   Are you saying Mr. Hardeman never had an HBV
20  infection?
21  A   I'm saying there's no evidence he had infection
22  except for possible exposure to hepatitis B virus.
23         (Exhibit No. 16 marked for
24         identification.)
25  ////

Andrei Shustov, M.D.

Page 194

1  Q  (By Mr. Levine)  Handing you Exhibit 16.  This is
2     from the Hepatitis B Foundation website.
3  A  You guys are aware that this is not medical evidence.
4     This is stuff for patients.
5  Q  Okay.  I was just trying to understand it, so I went
6     to the website, and you can tell me --
7  A  Sure.
8  Q  -- whether you dis -- agree or disagree with this.
9  A  Sure.
10 Q  Okay?
11        MR. WISNER:  What exhibit is this?
12        MR. KERSCHNER:  16.
13 Q  (By Mr. Levine)  If you look at the bottom of the
14    second page, it talks about the hepatitis B core
15    antibody.  You see that?
16 A  Yeah.
17 Q  States that, "A 'positive' or 'reactive' anti-HBc (or
18    HBcAb) test result indicates a past or current
19    hepatitis B infection."
20        You see that?
21 A  What I would point out, what you really need to see
22    is the test can only be fully understood by knowing
23    the results of the first tests --
24        THE REPORTER:  "Can only be," what?
25    Sorry.

Page 195

1         THE WITNESS:  I would point out
2     that the most important statement here for patients
3     is that this test can only be fully understood by
4     knowing the results of the first two tests, meaning
5     hepatitis B antigen and antihepatitis B surface.
6     Meaning without those tests, it's meaningless.
7  Q  (By Mr. Levine)  So your -- it's your opinion that
8     without those tests, this indicates nothing, the
9     anti-HBc test?
10 A  It indicates that he might have had exposure to
11    hepatitis B.  As a matter of fact, if you go to his
12    medical records, and if you see how Kaiser
13    determines -- defines the results of this testing, in
14    Kaiser medical records, their website says might
15    indicate exposure to hepatitis.  It doesn't have
16    definitive statement in the core lab interpretation
17    of the results.
18 Q  Okay.  You agree that injection drug use is a risk
19    factor to hepatitis B, correct?
20 A  I agree with that.
21 Q  You agree, I think we established that Mr. Hardeman
22    has a history of injection drug use, correct?
23        MR. WISNER:  Objection; misstates
24    the record.
25        THE WITNESS:  I agree.

Page 196

1  Q  (By Mr. Levine)  Are you aware that Mr. Hardeman was
2     treated with lamivudine to prevent the recurrence of
3     hepatitis B?
4  A  I agree.
5  Q  Do you agree that hepatitis B can persist in a
6     patient for seven years after they've been
7     successfully treated?
8  A  Did you say hepatitis B?
9  Q  Yes.
10 A  But he was never treated for hepatitis B.
11 Q  Just generally asking.
12        MR. WISNER:  Objection; beyond the
13    scope.
14        MR. LEVINE:  I'll -- you know what?
15    I'll withdraw.
16 Q  (By Mr. Levine)  Are you able to rule out hepatitis B
17    as a substantial contributing factor to Mr. Hardeman's
18    non-Hodgkin's lymphoma?
19 A  I just can't find any evidence that he had hepatitis
20    B infection.  Therefore, I cannot say it was a factor
21    in his lymphoma.  I don't have any evidence
22    Mr. Hardeman having hepatitis B infection for any
23    period of time.
24 Q  So you agree that his doctors treated him with
25    lamivudine to prevent recurrence of a hepatitis B

Page 197

1     infection, correct?
2  A  His doctor treated him with lamivudine
3     prophylactically, not to treat hepatitis B infection.
4  Q  Not to treat the infection.  To prevent a recurrence
5     of the infection.
6  A  He --
7  Q  There's medical records that indicate that, correct?
8  A  He treated him for possibility of him having
9     hepatitis B virus.
10 Q  And the medical records indicate that he treated him
11    to prevent a recurrence of the hepatitis B virus,
12    correct?
13 A  I would have to look medical records, but that's not
14    how I would state this if I treat a patient like
15    that.  If -- if his doctor stated that, I would
16    disagree with that statement.  Because recurrence
17    mean that he had infection.
18 Q  So either way, if it's -- if the record said it, you
19    disagree with it?
20 A  I disagree with it.
21 Q  Okay.
22 A  Can I say something?  It's a good practice to do, and
23    it's an established practice to do.  But it's not to
24    treat the recurrence in somebody who never had
25    documented infection.  That's the definition of

Andrei Shustov, M.D.

Page 198

1    recurrence.
2  Q  Why is it a good practice?
3  A  Because in medicine, we try to be very conservative
4    and overtreat patients for any possibilities.  When
5    you come to emergency room with a chest pain, if your
6    chest pain is from reflux, I would treat you heart
7    attack.  If I have any indication that there is some
8    test that might indicate that somebody had hepatitis
9    or encounter with hepatitis, then it's a good
10   practice to overtreat such patient just in case he
11   had hepatitis.
12 Q  But you would only overtreat them in the situation
13   where you have some indication that the patient might
14   have had hepatitis, correct?
15 A  That there is possibility that he had hepatitis.
16 Q  Right.  I mean, you wouldn't overtreat someone
17   with -- who had no test indicate they may have
18   hepatitis.
19 A  That's correct.
20 Q  Correct?
21 A  That's correct.
22 Q  Because there are side effects to treatment?
23 A  That's correct.
24 Q  And you -- rule is first do no harm, correct?
25 A  That's correct.

Page 199

1  Q  Okay.  So you would only overtreat someone if they
2    had tests to indicate that they may have had an
3    infection to hepatitis, correct?
4             MR. WISNER:  I'm going to object to
5    this as beyond the scope.  You're asking him that as
6    a medical opinion.  But go ahead.
7             THE WITNESS:  That's correct.  By
8    treating this patient is not proof he had hepatitis.
9  Q  (By Mr. Levine)  But you would agree that you cannot
10   rule out the fact that Mr. Hardeman had hepatitis B,
11   correct?
12            MR. WISNER:  Objection; vague.
13            THE WITNESS:  I could not rule out
14   him having hepatitis B with hundred percent
15   certainty.  But it is highly unlikely he had either
16   active hepatitis or history of actual hepatitis
17   infection, because, first, he was never treated for
18   hepatitis B, and his virus never resurfaced even when
19   his immune system was suppressed.  And without
20   treatment, since the time you're suggesting that he
21   was infected in 1960s, his virus never emerged.
22 Q  (By Mr. Levine)  You said it's highly unlikely --
23            MR. LEVINE:  I'm going to switch
24   gears here.  Don't want to surprise you.
25 Q  (By Mr. Levine)  You said it's highly unlikely that

Page 200

1    obesity had a significant impact on Mr. Hardeman's
2    lymphoma, correct?
3  A  That's correct.
4  Q  Can you rule out obesity as a contributing factor?
5  A  I do not consider obesity a strong contributing
6    factor.  And I think that studies of obesity are not
7    informative in any disease except maybe
8    cardiovascular.
9  Q  Can you rule out obesity as a contributing factor in
10   Mr. Hardeman's case?
11            MR. WISNER:  Objection; asked and
12   answered, vague.
13            You can answer it again, sir.
14            THE WITNESS:  I can rule out
15   obesity as a contributing factor by my conclusion
16   from -- or by my assessment that I do not think
17   obesity is a contributing factor to begin with or
18   does not pose a risk of lymphomas.
19 Q  (By Mr. Levine)  So, so that I understand, did you --
20   do you put obesity on your differential in this
21   differential diagnosis of the cause of his cancer?
22 A  I did.
23 Q  So you ruled it in as something to consider, correct?
24 A  I -- I listed it's something to consider.  Because in
25   the medical literature, there are studies looking at

Page 201

1    obesity to be inclusive.
2  Q  Okay.  So maybe you can help me understand this.
3        What's your criteria for ruling something in, in
4    a differential diagnosis when determining causation?
5  A  Including factors that, to the best of my knowledge,
6    were either described, whether they're proven or not
7    proven in medical literature to be a risk factor for
8    lymphoma.
9  Q  And then what's your criteria for ruling something
10   out in a differential diagnosis when determining
11   causation?
12 A  Something I don't know is a risk of lymphoma.  I
13   don't rule things out.  I -- whatever factors and
14   causative factors that I'm aware of as a lymphoma
15   physician, I consider creating exclusive list and
16   then ruling them out based on either findings in a
17   particular patient or my conclusion reviewing
18   literature on that particular factor.
19 Q  So you would rule something in if there's -- if
20   there's -- strike that.
21        You would rule something in if it's described in
22   the literature as being a risk factor, whether it's
23   proven or not proven.  Did I state that correctly?
24 A  The factor that I'm aware of, yes.
25 Q  So if it's a risk factor, you rule it in?

Andrei Shustov, M.D.

Page 202

1   A   If this is the risk factor that I'm aware of was
2       interrogated for being risk factor for lymphoma, for
3       the purpose specifically of generating this report,
4       yes.
5   Q   But in order for you to rule something in, it doesn't
6       have to be proven as a cause, correct?
7   A   To generate the list of possibilities.
8   Q   Right.
9           So your ruling in does not require you to have
10      established that something is generally a cause --
11  A   That's correct.
12  Q   -- of non-Hodgkin's lymphoma, correct?
13  A   That's correct.  For the purpose of this report.
14  Q   That's how you rule things out, correct?
15          MR. WISNER:  Wait.
16  Q   (By Mr. Levine)  Am I -- sorry.  I'll strike that.  I
17      think -- I think temperatures are starting to go up
18      when I say that.
19          MR. WISNER:  No, no.
20          MR. LEVINE:  Let me -- let me --
21          MR. WISNER:  I think --
22          MR. LEVINE:  -- see if I --
23          MR. WISNER:  -- you jumped --
24          MR. LEVINE:  -- understand.
25          MR. WISNER:  -- from in to out.

Page 203

1           THE REPORTER:  What was that?
2           MR. WISNER:  You jumped from in to
3       out.  That's why.
4           MR. LEVINE:  Right.
5           MR. WISNER:  I just wanted to
6       object.  Okay.
7   Q   (By Mr. Levine)  So let me -- let me -- let me
8       clarify.
9           We were just discussing how you rule things in.
10      You rule in risk factors, but something doesn't have
11      to be established as a cause to rule it in; am I
12      correct?
13  A   To generate a list of possibilities for -- for my
14      elimination method to come up with the best plausible
15      scenario.
16  Q   And then part of your method for ruling out, do a
17      couple things, from what I understand you said.  One
18      is you can rule it out if somebody didn't have it,
19      right?
20  A   Correct.
21  Q   So risk factor might be smoking, let's say.  Not
22      proven as a cause.  But if someone didn't smoke, you
23      could easily rule that out, right?
24  A   Correct.
25  Q   But the other part of ruling it out under your

Page 204

1       methodology is to determine whether or not it's a
2       cause, right?  It's an established cause?
3           MR. WISNER:  Objection; vague.
4           MR. LEVINE:  Sorry.  I'm going to
5       re-ask that because it may look vague in the
6       transcript as well.
7   Q   (By Mr. Levine)  So the other part of ruling
8       something out under your methodology, if you can't
9       exclude its presence in that patient -- like, for
10      instance, a patient didn't smoke.  You with me so
11      far?
12  A   Yes.
13  Q   Okay.  So the other part of ruling it out under your
14      methodology if it is present in the patient is -- is
15      to determine whether or not that exposure or risk
16      factor can be a cause, correct?
17  A   In this particular patient.  Correct.
18  Q   In a particular patient that you're evaluating?
19  A   That's correct.
20  Q   So your general causation analysis comes in the
21      ruling-out part, correct?
22          MR. WISNER:  Objection; vague.
23      Calls for a legal conclusion.
24          THE WITNESS:  That's correct.  I'm
25      trying to process what you're asking.  Yes.

Page 205

1   Q   (By Mr. Levine)  Okay.  Was age a contributing factor
2       to Mr. Hardeman's non-Hodgkin's lymphoma?
3   A   I don't believe so.
4   Q   You don't discuss age in your report, correct?
5   A   I don't.  I think it's a silly thing to attribute
6       risk because age is -- aging, itself, does not cause
7       problems.  Aging is a reflection of factors and
8       exposures that people accumulate through lifetime.
9       The longer you live, the more exposures or more
10      damages you accumulate.  And it's a reflection of
11      that.  I think it's a silly factor to interrogate
12      because it doesn't have any mechanistic underpinning.
13          MR. LEVINE:  Can we take a break;
14      bio break?
15          MR. WISNER:  Yeah.  Sure.
16          THE VIDEOGRAPHER:  Please stand by.
17      We're going off the record.  The time is 3:01 p.m.
18          (Pause in proceedings.)
19
20          THE VIDEOGRAPHER:  We're back on
21      the record.  The time is 3:09 p.m.
22          MR. WISNER:  If someone comes in,
23      just if you're -- try to avoid questions about
24      Mr. Hardeman's medical treatment.
25          MR. LEVINE:  If someone comes in,

Andrei Shustov, M.D.

Page 206

1     you can let me know --
2              MR. WISNER:  I'll let you know.
3              MR. LEVINE:  -- immediately.
4              MR. WISNER:  Yeah.
5              MR. LEVINE:  Because I have never
6     noticed somebody come in.
7              MR. WISNER:  Okay.
8              MR. LEVINE:  So I won't notice it.
9              MR. WISNER:  Okay.
10             MR. LEVINE:  It would be
11    unintentional, but I agree --
12             MR. WISNER:  Sure.
13             MR. LEVINE:  -- that we should keep
14    that within the confines of those that are in this
15    room.
16    Q   (By Mr. Levine)  Dr. Shustov, if an expert in this
17    case were to testify that Mr. Hardeman's first 26
18    years of Roundup use did not cause any cancer cells
19    in Mr. Hardeman, would you agree with that or
20    disagree with that?
21             MR. WISNER:  Objection; improper
22    hypothetical, lacks foundation.
23             THE WITNESS:  It would be, in my
24    opinion, proper way of putting it.  But it's hard to
25    me to answer this because it's an improper question,

Page 207

1     biologically improper question, as the exposure for
2     25 years to Roundup could have caused cancer at any
3     time during the exposure.  And the transformation to
4     cancer when the first cells emerged was very close to
5     the time that he was diagnosed.
6     Q   (By Mr. Levine)  Okay.  So when did Roundup cause
7     Mr. Hardeman's non-Hodgkin's lymphoma?
8     A   So when it caused the lymphoma is the time it was
9     diagnosed.  But the damage was accumulating, in my
10    opinion, through his continuous use of Roundup for 25
11    years.
12    Q   Can you say when Roundup began causing mutations in
13    Mr. Hardeman?
14    A   As a physician and cancer specialist, the second
15    Roundup enters the human body, and based on
16    understanding of genotoxicity, that mutations start
17    accumulating from first exposure.
18    Q   Do you have any evidence in Mr. Hardeman that
19    indicates that cancer mutations started accumulating
20    from the beginning of his exposure?
21    A   You cannot produce evidence like this.  It's a
22    general medical knowledge.  The exposure to
23    carcinogen of chemical nature that is shown to cause
24    genotoxicity starts immediately upon exposure.
25    Q   Did hepatitis C cause any mutations in Mr. Hardeman?

Page 208

1              MR. WISNER:  Objection;
2     speculation.
3              THE WITNESS:  I don't know.
4     Q   (By Mr. Levine)  You cannot say that the hepatitis C
5     virus did not cause any mutations in Mr. Hardeman,
6     correct?
7     A   I don't know what hepatitis C did when it was in his
8     body in whatever period he was harboring the
9     hepatitis C virus.
10    Q   Did hepatitis B virus cause any mutations in
11    Mr. Hardeman?
12             MR. WISNER:  Same objection.
13             THE WITNESS:  Once again, I don't
14    have any proof that he had hepatitis B virus in his
15    system for any significant amount of time.
16             MR. LEVINE:  We're going to stay
17    quiet for a second.  Definitely using the name.
18    Q   (By Mr. Levine)  Do you agree that a patient with the
19    same medical history as Mr. Hardeman, but who did not
20    have exposure to Roundup, could have still been
21    diagnosed with non-Hodgkin's lymphoma?
22             MR. WISNER:  Objection; improper
23    and incomplete hypothetical.
24             THE WITNESS:  It's very hard for me
25    to speculate.  Can you repeat the question?

Page 209

1     Q   (By Mr. Levine)  Patient with the same medical
2     history as Mr. Hardeman but had never used Roundup
3     could still have been diagnosed with non-Hodgkin's
4     lymphoma, correct?
5              MR. WISNER:  Same objection.
6              THE WITNESS:  I think that the
7     patient with the same medical history without
8     exposure to Roundup would have significantly lower
9     risk of developing lymphoma.  Could he have been
10    diagnosed?  Sure.  But his risk of developing
11    lymphoma would be significantly lower.
12    Q   (By Mr. Levine)  So I'm clear:  If Mr. Hardeman had
13    never been exposed to Roundup, he still may have been
14    diagnosed with non-Hodgkin's lymphoma, correct?
15             MR. WISNER:  Objection.  Incomplete
16    hypothetical.  Sorry.  Improper hypothetical, and
17    actually speculation.
18             THE WITNESS:  So I'm saying anybody
19    can be diagnosed with non-Hodgkin lymphoma.
20    Q   (By Mr. Levine)  Is there any part of your
21    methodology that would rule out the possibility that
22    Mr. Hardeman could still have been diagnosed with
23    non-Hodgkin's lymphoma had he not been exposed to
24    Roundup?
25    A   I never --

Andrei Shustov, M.D.

Page 210

1    MR. WISNER:  Objection; vague.
2    THE WITNESS:  I never said that he
3    could not have had lymphoma without the Roundup.  My
4    conclusion is that Roundup significantly increased
5    his risk.  And in medical world, for medical
6    professional, is the same as saying that might have
7    caused his lymphoma.  I never stated that if he did
8    not have Roundup, that by chance he could have been
9    diagnosed with lymphoma.  But you're talking about
10   hypothetical patient where we discussed all those, we
11   don't know the causes; lymphomas can happen to any of
12   us.
13          MR. LEVINE:  Correct.  Then --
14          THE WITNESS:  What I --
15          MR. LEVINE:  Oh.  Sorry.
16          THE WITNESS:  What I stated is that
17   his exposure significantly increased his risk, which
18   for medical profession says likely caused his
19   lymphoma.
20   Q   (By Mr. Levine)  In -- strike -- excuse me.  I'm
21   like, fumbling over my next word.
22          Dr. Shustov, same patient as Mr. Hardeman, but no
23   Roundup exposure, yet still was diagnosed with
24   non-Hodgkin's lymphoma.  Would you be able to say
25   what caused his non-Hodgkin's lymphoma?

Page 211

1          MR. WISNER:  Objection; incomplete
2    hypothetical, speculation.
3          THE WITNESS:  In a hypothetical
4    patient, with any hypothetical patient with lymphoma,
5    looking at pathology of this patient, no, nobody can
6    say what caused his lymphoma.  But doing the same
7    methodology that I just used in my report, if I
8    identified factors that are known to be high risk for
9    cancer lymphoma, I would have -- say that I could
10   have determined what caused his lymphoma.
11          As an example, patients exposed to radiation.
12   Looking at his lymphoma, I wouldn't say what caused
13   the lymphoma.  But going to the patient history and
14   he says that, I lived on power plant or work at power
15   plant for 20 years, I would be able to say that was
16   substantial risk.
17   Q   (By Mr. Levine)  Okay.  But I'm talking about the
18   same patient as Mr. Hardeman.  No -- no known
19   radiation exposure.  Same risk factors as Mr. Hardeman
20   except for Roundup.
21   A   Okay.
22   Q   Would you be able to say what caused or substantially
23   contributed to his non-Hodgkin's lymphoma?
24          MR. WISNER:  Objection; incomplete
25   hypothetical, speculation, and actually beyond the

Page 212

1    scope of his opinion.
2          Answer if you can, sir.
3          THE WITNESS:  I'm just trying to --
4    to process this.
5          I would -- applying the same methodology, I
6    would -- probably would say that there is a possible
7    risk of -- his risk of lymphoma possibly might have
8    been heightened by if we had proof of prolonged
9    exposure to hep C virus that could have increased his
10   risk.
11   Q   (By Mr. Levine)  You agree that the same type of
12   non-Hodgkin's lymphoma that occurred in Mr. Hardeman
13   occurs in patients who are not exposed to Roundup,
14   correct?
15   A   Sure.
16   Q   Do you have any measurement of Mr. Hardeman's
17   glyphosate levels before he used Roundup?
18   A   No.
19   Q   Do you have any measurement of Mr. Hardeman's
20   glyphosate levels while he was using Roundup?
21   A   No.
22   Q   Do you have any measurements of Mr. Hardeman's
23   glyphosate levels at any time before he was diagnosed
24   with lymphoma?
25   A   No.

Page 213

1    Q   Do you have any measurements of Mr. Hardeman's
2    glyphosate levels at any time after he was diagnosed
3    with lymphoma?
4    A   No.
5    Q   Do you have any measurements of Mr. Hardeman's
6    glyphosate levels any time after he stopped using
7    Roundup?
8    A   No.
9    Q   And in your examination of Mr. Hardeman, you did not
10   conduct any tests to determine what his glyphosate
11   levels were.
12   A   No.
13   Q   Correct?
14   A   That's correct.
15   Q   You agree the most common type -- common subtype of
16   lymphoma is DLBCL, the type that Mr. Hardeman was
17   diagnosed with?
18   A   That's correct.
19   Q   Do you agree that the vast majority of cases of
20   non-Hodgkin's lymphoma occur in patients who are
21   never exposed to Roundup?
22          MR. WISNER:  Objection;
23   speculation.
24          THE WITNESS:  I don't know the
25   answer to that.  I don't know how many people are

Andrei Shustov, M.D.

Page 214

1     exposed to Roundup and how many patients diagnosed
2     with lymphoma exposed to Roundup.
3   Q   (By Mr. Levine)  Do you have any basis one way or the
4     other to agree or disagree that the vast majority of
5     cases of lymphoma occur in patients who were never
6     exposed to Roundup?
7   A   I have no information to answer this, because you
8     have to surveil or survey every lymphoma patient who
9     is diagnosed and ask 60,000 new diagnosis per year
10    whether or not they use Roundup.  That would be the
11    basis for my answer.
12  Q   Do you have any basis to disagree that the vast
13    majority of cases of DLBCL occur in patients who were
14    never exposed to Roundup?
15            MR. WISNER:  Same objection; asked
16    and answered as well.
17            THE WITNESS:  I think nobody can
18    say that.  I'm not saying it yes or no.  But nobody
19    can answer this question if you want objective answer
20    without surveying every patient who was diagnosed
21    with DLBCL and asking them whether they were exposed
22    to Roundup.  That would be the proper answer.
23  Q   (By Mr. Levine)  Would you disagree with any expert
24    who testified that the vast majority of cases of
25    DLBCL occur in patients who were never exposed to

Page 215

1     Roundup?
2            MR. WISNER:  Objection; incomplete
3     hypothetical.
4            THE WITNESS:  I would ask for --
5            MR. WISNER:  Speculation.
6            THE WITNESS:  I would ask for basis
7     of that opinion, because I don't have any information
8     how can somebody reliably say that.  Once again,
9     every year, surveying every diagnosis of DLBCL,
10    whether or not they were exposed to Roundup.
11  Q   (By Mr. Levine)  Is it your opinion that if a patient
12    was exposed to Roundup for more than two days or ten
13    days according to the studies that you recite, that
14    Roundup was a cause of their non-Hodgkin's lymphoma?
15            MR. WISNER:  Objection; incomplete
16    hypothetical, speculation.
17            THE WITNESS:  It is my opinion that
18    exposure to Roundup increased this person's risk of
19    lymphoma.  And whether or not it directly caused the
20    lymphoma, contributed to his lymphoma, it's very
21    hard -- it's -- it's impossible to determine in
22    any -- every particular patient.  But increased risk
23    of lymphoma suggests that it is a possible,
24    substantial factor in this patient's diagnosis.
25  Q   (By Mr. Levine)  And when you say "this patient," are

Page 216

1     you referring to Mr. Hardeman or just in general to
2     any patient?
3   A   I thought you asked me general question.
4   Q   I was.
5   A   Yeah.
6   Q   That's why I was just trying to --
7   A   Yeah.
8   Q   -- make sure that our -- nothing was lost in
9     translation.
10            What about Mr. Hardeman's use allows you to
11    determine that in his case it was a substantial
12    contributing factor compared to, say, some other
13    patient, generally, that you were just referring to?
14            MR. WISNER:  Objection;
15    speculation, incomplete hypothetical.
16            THE WITNESS:  The basis for that is
17    the general causation of -- the general causation
18    conclusion from experts in general causation and the
19    exposure to glyphosate that matches the, again, the
20    exposure defined in the literature for fitting the
21    definition of increased risk for non-Hodgkin
22    lymphoma.
23  Q   (By Mr. Levine)  And how would -- how is it that that
24    applies in Mr. Hardeman's case but would be any
25    different for anyone else's case?

Page 217

1            MR. WISNER:  Objection; incomplete
2     hypothetical, speculation.
3            THE WITNESS:  What everybody else's
4     case?
5   Q   (By Mr. Levine)  Anybody else who is sufficiently
6     exposed to Roundup.
7            MR. WISNER:  Again.
8   Q   (By Mr. Levine)  Where -- where in your methodology
9     are you able to say in Mr. Hardeman's case that it
10    is -- that it's a substantial contributing factor,
11    but somebody else who had sufficient exposure, you
12    would not say that?
13            MR. WISNER:  Again, objection;
14    incomplete hypothetical, speculation.
15            THE WITNESS:  I'm sorry.  Did I say
16    somebody else would not be affected if they're
17    sufficiently exposed?
18  Q   (By Mr. Levine)  I'm asking you.  That's exactly what
19    I'm asking you.  If somebody is sufficiently exposed,
20    is Roundup a substantial contributing factor?
21            MR. WISNER:  Objection; misstates
22    his testimony, incomplete hypothetical.
23            THE WITNESS:  If you pose question
24    directly in a similar situation, anybody who is
25    substantially exposed, I would state the same -- I

Andrei Shustov, M.D.

Page 218

1  would make the same statement, that in this
2  particular patient, who had sufficient or substantial
3  exposure, based on general causation literature, that
4  Roundup has increased the risk of lymphoma.
5  Q   (By Mr. Levine)  Increased the risk.  Is that what
6  you're saying here, or is there something more you're
7  saying here?  In Mr. Hardeman's case.
8         MR. WISNER:  Objection; vague.
9         THE WITNESS:  To me, the increased
10  risk of lymphoma based on general causation
11  literature or established the risk factor indicates
12  that it is likely contributed or more likely
13  contributed than not to cause this person lymphoma or
14  be one of the substantial contributing factors.
15  Q   (By Mr. Levine)  And would that be the case for
16  anyone who had sufficient exposure to Roundup?
17         MR. WISNER:  Again, objection;
18  incomplete hypothetical, speculation, and asked and
19  answered, like, five times.
20         THE WITNESS:  For anybody who had
21  sufficient exposure to Roundup, based on the
22  published literature, answer is, yes, it will be
23  substantial contributing factor.
24         MR. LEVINE:  Thank you.
25  Q   (By Mr. Levine)  You agree there is no pathology test

Page 219

1  that can be done on a lymphoma to determine whether
2  Roundup caused the patient's cancer, correct?
3  A   That's correct.
4  Q   You agree there's no examination that can be done on
5  a lymphoma to determine whether Roundup caused a
6  patient's cancer, correct?
7  A   That's correct.
8  Q   There's no medical test that can be done on a
9  lymphoma to determine whether Roundup caused a
10  patient's cancer, correct?
11  A   That's correct.
12  Q   You cannot tell just by looking at Mr. Hardeman's
13  lymphoma under the microscope whether he used Roundup
14  or not, correct?
15  A   That's correct.
16  Q   Do you agree that there are rare specific mutations
17  that can indicate the cause of a person's DLBCL?
18  A   With pretty high degree of certainty, as a lymphoma
19  expert, I can tell there are no specific mutation
20  that would directly point out to the specific cause
21  of lymphoma in that patient.
22  Q   There are no specific mutations that can indicate the
23  cause of any patient's DLBCL whether they use Roundup
24  or not.  You're following me?
25  A   I'm following you.  That's correct.

Page 220

1  Q   Okay.  And you can't identify any specific mutations
2  in Mr. Hardeman's DLBCL that indicate Roundup was the
3  cause, correct?
4  A   That's correct.
5  Q   In your examination of Mr. Hardeman, you didn't
6  observe anything specific about Mr. Hardeman that
7  indicated Roundup caused or contributed to his
8  cancer, correct?
9  A   That's correct.
10  Q   In your examination of Mr. Hardeman, you didn't
11  perform any diagnostic test or biomarker that
12  indicated Roundup caused or contributed to his
13  cancer, correct?
14  A   That's correct.
15  Q   You agree that there's no genomic signature for
16  non-Hodgkin's lymphoma that's associated with Roundup
17  use, correct?
18  A   That's correct.
19  Q   Do you agree that the cause of non-Hodgkin's lymphoma
20  is multifactorial?
21         MR. WISNER:  Objection; incomplete
22  hypothetical.
23         THE WITNESS:  I agree that there
24  are multiple causes of non-Hodgkin lymphoma.  And in
25  some patients, they collide together.  There is a

Page 221

1  cumulative impact of multiple substantial factors.
2  Q   (By Mr. Levine)  In Mr. Hardeman's case, are there
3  multiple causes that collide together or just one
4  cause?
5  A   I cannot answer that.  I can identify factors that,
6  in my opinion, increase his risk and might have
7  caused the lymphoma.  Whether they were the single
8  fact -- substantial factor or they collided with
9  other substantial factors is unknown.  But factors
10  that I interrogated in my report, in my opinion, were
11  unlikely to be additional substantial factors.
12  Q   Can you say what the mechanism was by which Roundup
13  caused Mr. Hardeman's non-Hodgkin's lymphoma?
14  A   I can't.
15  Q   Can you say whether Roundup caused the initial cancer
16  mutation in Mr. Hardeman?
17  A   No, I can't say that.  It wouldn't matter.
18  Q   Let's go back to your report.
19         MR. WISNER:  Exhibit 3?
20         MR. LEVINE:  3 or the highlighted
21  copy.  Either way.  Your call.
22  Q   (By Mr. Levine)  Why don't we go with the highlighted
23  version.  Was that --
24         MR. WISNER:  You mean the ones that
25  have your highlights on them?

Andrei Shustov, M.D.

Page 222

1    MR. LEVINE:  Yeah.
2    MR. WISNER:  If you'd like to.
3    MR. LEVINE:  Well --
4    MR. WISNER:  What do you prefer,
5  Doctor?
6    THE WITNESS:  I don't have a
7  preference.
8    MR. WISNER:  Let's just use yours,
9  then.
10    THE WITNESS:  Sure.
11    MR. WISNER:  I'd rather not have
12  his work product in --
13    THE WITNESS:  Okay.
14    MR. WISNER:  -- the report.
15    MR. LEVINE:  Okay.  We'll use
16  Exhibit 3.
17  Q   (By Mr. Levine)  On Page 5, in Paragraph 5, you
18    discuss the hepatitis C virus as a risk in
19    Mr. Hardeman, correct?
20      Let me be a little more clear because I don't --
21    you just -- in Page 5, Paragraph 5, you discuss
22    Mr. Hardeman's history of hepatitis C and whether it
23    was a risk in his case?
24  A   That's correct.
25  Q   And you state -- you state in there that epidemio --

Page 223

1    epidemiologic studies have -- and it's in the middle
2    of the paragraph.  It says, "Other epidemiologic
3    studies have suggested the association of HCV
4    infection and NHL overall and DLBCL in particular."
5      Do you see that?
6  A   Yep.
7  Q   You can't cite any epidemiologic studies that have
8    found an association between Roundup and DLBCL in
9    particular, can you?
10  A   I'm sorry.  You're jumping from hepatitis C to
11    Roundup, so...
12  Q   Yeah.  So, yes, I'm switching to Roundup now and
13    asking you:  Can you cite -- do you cite in your
14    report -- we've gone through Schinasi and Leon, which
15    didn't happen to find that.
16  A   Yeah.
17  Q   Can you cite any epidemiological studies that found
18    an association between Roundup and DLBCL?
19  A   My conclu -- my conclusion or basis on Roundup is
20    based on general causation establishment by expert in
21    general causation.  But I have looked at couple of
22    the reports that identified Roundup as a risk factor
23    for NHL.  In two of them, I believe it was 2.0, 2.1
24    odds ratio, and -- and I don't remember the couple
25    other ones I looked.  Again, I relied on

Page 224

1    epidemiologist and general causation knowledge to
2    make a statement specifically pertaining to
3    Dr. Hardeman.
4  Q   Are you aware of any epidemiological studies that
5    have found an association between Roundup and DLBCL?
6  A   Yes.  So the studies that I reviewed -- let me just
7    try and make sure I remember the -- the -- I believe
8    it was De Roos paper.  So the studies I reviewed, De
9    Roos, Eriksson.  And they're listed in my report
10    where I looked to confirm the conclusions stated in
11    IARC or in -- in epidemiology expert reports.
12  Q   So it's your testimony that in the studies that are
13    discussed in your report, there are statistically
14    significant findings that associate Roundup or
15    glyphosate with DLBCL?
16  A   I didn't have a reason to question epidemiologist
17    reports that I read and question the studies on
18    general causation by De Roos and Eriksson and
19    McDuffie.
20  Q   So I may not be understanding with you, but are
21    you -- understanding you.  But are you telling me
22    that the studies that you're mentioning -- De Roos,
23    Eriksson, McDuffie -- contain findings on DLBCL?
24  A   I have to go back and look.
25  Q   We'll look at --

Page 225

1  A   Okay.
2  Q   We'll look at them.
3  A   Okay.
4  Q   But I'm just...
5  A   When I look at the studies by those authors and
6    groups, for me as a clinician, it didn't really
7    matter whether it was DLBCL or other lymphoma because
8    I believe that exposure to chemical carcinogens do
9    not discriminate the type of lymphoid cells that they
10    affect and can give rise to any type of lymphoma.
11  Q   Do you have any authority -- peer-reviewed
12    publication, medical textbook -- that says chemical
13    carcinogens do not discriminate to the subtype of
14    non-Hodgkin's lymphoma and that they can give rise to
15    any type of non-Hodgkin's lymphoma?
16  A   If we're -- if I were to look, again review the
17    papers, some of them did look at the subtypes of
18    lymphomas.  But the statement that I'm making is
19    based on my knowledge of general carcinogenesis of
20    chemical agents on producing mutations, and I do not
21    see any reason in this mechanistic pathway --
22      THE REPORTER:  "In this"...?
23      THE WITNESS:  -- why --
24      THE REPORTER:  "In this," what?
25      THE WITNESS:  And I do not see any

Andrei Shustov, M.D.

Page 226

1 reason why considering the mechanism of simple
2 chemicals to again discriminate between the type of
3 cells that transform to cancer.
4 Q (By Mr. Levine) Do you have any textbooks, peer-
5 reviewed publications, or medical authorities that
6 you can cite that support the point you're making
7 that chemical carcinogens don't discriminate between
8 the subtypes of non-Hodgkin's lymphoma?
9 A I cannot cite off top of my head any specific papers.
10 Again, this is basic scientific knowledge that I
11 would employ as a -- somebody who has expertise in
12 oncology. If I were to do a search and I would be
13 able to answer the question whether there is specific
14 studies indicating that.
15 Q So, Dr. Shustov, just so you know, I'm going to
16 actually suggest to Mr. Brenza that he ask you the
17 same question tomorrow, and we'll see whether you can
18 find any support --
19 A Sure.
20 Q -- for that statement.
21 (Exhibit No. 17 marked for
22 identification.)
23
24 Q (By Mr. Levine) Handing you what's been marked as
25 Exhibit 17, which is the McDuffie study. This is, I

Page 227

1 think, one of the ones you just mentioned, correct?
2 A Okay.
3 Q You cite -- you're familiar with this study, right?
4 A I'm familiar with this publication, yes.
5 Q You cite it on the top of Page 8 of your report?
6 A Yeah.
7 Q This is one of the paragraphs that was copied from
8 the version of Dr. Nabhan's report that you have.
9 MR. WISNER: Objection.
10 Q (Continuing by Mr. Levine) Correct?
11 MR. WISNER: Misstates the record.
12 (Interruption by reporter.)
13
14 MR. WISNER: I think he's expecting
15 you to answer the question.
16 THE WITNESS: Oh, I'm sorry. I
17 was -- I was going to say --
18 MR. LEVINE: There was a little
19 talking over each other. I'll forgive Mr. Wisner,
20 but he came in with the objection right in the middle
21 of the end of my question. So let's start this over.
22 Q (By Mr. Levine) You're familiar with this study,
23 correct?
24 A I believe I looked at the study.
25 Q Yes.

Page 228

1 A I'm not familiar with details of this study. I refer
2 to it as a general causation. I did not study this
3 paper in detail, but just to confirm the statements
4 and expert reports --
5 Q Yeah.
6 A -- on general causation.
7 Q You cite this study on the top of Page 8 in your
8 report, correct?
9 A That's correct.
10 Q And this is one of the paragraphs that -- in your
11 report that you copied from the version of
12 Dr. Nabhan's report that you were given, correct?
13 MR. WISNER: Objection; misstates
14 the record.
15 THE WITNESS: That's one of the
16 paragraphs I included in my report.
17 Q (By Mr. Levine) Can -- can you clarify that report?
18 A Yeah. This is the paragraph I included in my report.
19 Q From Dr. Nabhan's report, correct?
20 MR. WISNER: Objection; misstates
21 the record.
22 THE WITNESS: This is my report.
23 Q (By Mr. Levine) Okay. How did this paragraph get
24 into your report?
25 A I obviously placed it in my report.

Page 229

1 Q From somewhere else, correct?
2 A I used the language of Dr. Nabhan to state that,
3 but --
4 Q Okay.
5 A -- I put it in there.
6 Q This study -- the McDuffie study looked at pesticide
7 use in Canada, right?
8 A That's correct.
9 Q On Page 1155, which is the first page of this study,
10 if you look at the end of the abstract, it says, "We
11 concluded that NHL was associated with specific
12 pesticides after adjustment for other independent
13 predictors."
14 You see that?
15 MR. WISNER: First page?
16 MR. LEVINE: Yep. End of the
17 abstract.
18 MR. WISNER: Yeah.
19 MR. LEVINE: Right column, last
20 bolded sentence.
21 THE WITNESS: Yeah, I see it.
22 Q (By Mr. Levine) Okay. So they're saying
23 non-Hodgkin's lymphoma was associated with some
24 specific pesticides, right? Not all of them?
25 A Let me see where it says that.

Andrei Shustov, M.D.

Page 230

1    Yes, I see it.
2  Q  Okay.  So you understand they're saying non-Hodgkin's
3    lymphoma was associated with some specific
4    pesticides, right?
5  A  Correct.
6  Q  Not all of them.
7    Now, Page 1158, Table 2, looked at herbicides,
8    right?
9  A  Okay.
10  Q  And there's a finding for glyphosate there, correct?
11  A  Yeah, I can see that.
12  Q  And so this -- this table presented adjusted odds
13    ratios, correct?  Two adjusted odds ratios, correct?
14  A  Yes, I believe so.
15  Q  Odds Ratio A was calculated with strata for variables
16    of age and province of residence, correct?
17  A  That's correct.
18  Q  Odds Ratio B controlled for additional confounders as
19    it was adjusted for statistically significant medical
20    variables, such as history of measles, mumps, cancer,
21    allergy desensitization shots, and a positive family
22    history of cancer in a first-degree relative, and
23    with strata for the variables of age and province of
24    residence, correct?
25  A  That's correct.

Page 231

1  Q  Do you agree with this method in the McDuffie study?
2  A  I don't have any reason to disagree with it, but this
3    is paper on general causation and that I am not an
4    expert in.
5  Q  Okay.  Glyphosate, in the adjusted odds ratios in
6    Table 2, showed no significantly increased risk of
7    non-Hodgkin's lymphoma, correct?
8  A  So in this table, the odds ratio of 1.26.
9  Q  Not significantly increased, correct?
10  A  Yes, I can see this in this table.
11  Q  Okay.  And that was Odds Ratio A you were referring
12    to, which had strata for variables of age and
13    province of residence, correct?
14  A  I have to -- I have to look.  Sorry.
15  Q  When you said 1.26, you were citing from Odds Ratio A?
16  A  That's correct.
17  Q  And then there's Odds Ratio B, which controlled for
18    more factors, and that's 1.20, correct?
19  A  Yeah, I can see that.
20  Q  Just clarifying, when you said 1.26, which one you
21    were referring to.
22  A  Yeah.
23  Q  Okay.  Now, what you cite in your report is from
24    Table 8 on Page 1161, correct?
25    (Discussion off the record.)

Page 232

1    THE WITNESS:  That's correct.
2  Q  (By Mr. Levine)  I'm sorry.  Just to clarify, 'cause
3    I kind of started speaking on my own while you were
4    looking at that.
5    What you cite in your report is from Page 8 on
6    1161, correct?
7  A  That's correct.
8  Q  Oh.  Table 8 on -- excuse me.  What you -- try this
9    again and again.
10    What you cite in your report is from Table 8?
11  A  That's correct.
12  Q  The finding you cite here from Table 8 for greater
13    than two days' exposure did not control for
14    statistically significant medical variables such as
15    history of measles, mumps, cancer, allergy
16    desensitization shots, and a positive family history
17    of cancer in a first-degree relative, correct?
18  A  In this table, yes.
19  Q  This was Odds Ratio A, not Odds Ratio B, correct?
20  A  In Table 8, yes.
21  Q  And you don't note that in your report, right?
22  A  Correct.
23  Q  That this is the less-adjusted finding?
24  A  Correct.
25  Q  Okay.  Now, if you turn to the conclusion on Page

Page 233

1    1162, if you turn to the very last paragraph of
2    substantive text in this paper where that starts
3    with, "Our results."
4    Do you see that?
5  A  Very last paragraph?
6  Q  Yes.  See that?  See --
7  A  "In our final results."  I see that.
8  Q  Mm-hmm.  "In our final results"?
9    MR. WISNER:  Nope, you're not on
10    the right page.
11    THE WITNESS:  "In our final
12    results" here?
13  Q  (By Mr. Levine)  No.  Very -- so Page 1162.
14  A  Yes.
15    MR. WISNER:  He's starting in the
16    middle of the paragraph.
17    MR. LEVINE:  Oh.  Okay.
18  Q  (By Mr. Levine)  I was just pointing out the
19    paragraph.  The paragraph, itself, starts with, "Our
20    results."
21  A  Okay.  Got it.
22  Q  Do you see that?
23  A  Yep.
24  Q  And it says, "Our" -- so it says, "Our results
25    support previous findings of an association between

Andrei Shustov, M.D.

Page 234

1    NHL and specific pesticide exposures."
2        You see that?
3  A  Yep.
4  Q  And then we're going to go to where you were a second
5    ago.  Says, "In our final models, NHL was associated
6    with a personal history of cancer, a history of
7    cancer in first-degree relatives, and exposure to
8    dicamba-containing herbicides, to mecoprop, and to
9    aldrin.  Personal history of measles and of allergy
10    desensitization treatments lowered risk."
11        Do you see that?
12  A  Yeah.
13  Q  This study does not conclude that Roundup or
14    glyphosate was associated with non-Hodgkin's
15    lymphoma, correct?
16  A  I have to go back and basically reread this because I
17    don't want to jump to the conclusion.  This is
18    general causation paper, and this is -- this
19    methodology is not my expertise.  I don't want to
20    make a wrong statement.
21  Q  So that I understand.
22  A  Yeah.
23  Q  You're using this paper for your specific causation
24    method --
25  A  Right.

Page 235

1  Q  -- ology.
2  A  Yeah.
3  Q  Correct?
4  A  Yeah.
5  Q  And you're using the finding for greater than two
6    days that's reported in Table 8, correct?
7  A  That's correct.
8  Q  And you're using a finding that is not fully
9    adjusted, correct?
10        MR. WISNER:  Objection; vague.
11        THE WITNESS:  I'm using the
12    findings from -- from -- yes, from Table 8.
13  Q  (By Mr. Levine)  And that doesn't -- Table 8 doesn't
14    include the full adjustment Odds Ratio B that's
15    contained in the earlier table, correct?
16  A  That's correct.
17  Q  Can you cite anywhere in this study where the authors
18    conclude that more than two days' exposure of Roundup
19    or glyphosate is sufficient to determine that that
20    exposure can cause an individual patient's
21    non-Hodgkin's lymphoma?
22        MR. WISNER:  So I'm going to object
23    to overbreadth.  Do you want him to go through the
24    whole study and look through it?  Because we can do
25    that, or we can take a break and have him do it

Page 236

1    during the break.
2        MR. LEVINE:  Get your objection.
3        THE WITNESS:  So my statement in my
4    report is taken from Table 8.  And that's what I use
5    to make my conclusion and to support general
6    causation statements from statisticians.  So I looked
7    at the -- I looked at the paper, and it -- to me, it
8    looked like it's an appropriate piece of information.
9    Whether or not statisticians want to argue that
10    whether it's adjusted or not adjusted is not area of
11    my expertise.
12        And my -- my -- the primary purpose of my report
13    is the specific causation in Mr. Hardeman's case, not
14    to argue general causation.  And I used the
15    information that I saw in the table to support the
16    statement that I relied on from IARC and statistical
17    experts.  And I started my report from assumption and
18    knowledge that glyphosate is a risk factor for
19    non-Hodgkin's lymphoma for a specific purpose to make
20    conclusions about Mr. Hardeman, not for general
21    causation arguments for which I would have to spend
22    more time and probably would be an inappropriate
23    expert to argue points in this paper.
24        You -- you guys have epidemiologic experts to
25    debate these points because I'm not an expert in

Page 237

1    herbicide epidemiology.  I use the general causation
2    conclusion that glyphosate is a risk factor for
3    lymphoma.  And I'm -- I can't make statements or
4    testify towards general causation, so I pulled the
5    paper that was referenced in -- I believe in IARC,
6    and I looked at specific exposure for two days.  And
7    I used it as a basis of my report.
8        So what we started doing here is to figure out
9    the general causation, whether it's a true -- a true
10    number or not which require review, detailed review
11    of this by a person with higher expertise.  This is
12    not my expertise to debate this question, the
13    validity of this, of this table.
14        MR. LEVINE:  Okay.  I'm not sure
15    that that -- I'm certain that didn't answer my
16    question.  I move to strike as nonresponsive, but...
17        MR. WISNER:  I oppose.
18  Q  (By Mr. Levine)  Dr. Shustov, is this paper relevant
19    to your specific causation methodology?
20        MR. WISNER:  Objection; calls for a
21    legal conclusion.
22        THE WITNESS:  I believe this paper
23    is relevant to general causation.  But to do due
24    diligence, to fact-check the conclusion of IARC, I
25    looked at my references and several reports,

Andrei Shustov, M.D.

1    including this, to identify specific -- specific
2    facts pertaining to glyphosate.
3    Q   (By Mr. Levine) Dr. Shustov, to be clear, you
4    believe this paper is relevant to general causation.
5    Do you believe this paper is relevant to your
6    methodology for determining specific causation?
7                MR. WISNER:  Objection.  Move to
8    strike your testimony about what he thinks.  And I
9    also object that this calls for a legal conclusion.
10                MR. LEVINE:  First of all, you
11   can't move to strike the question, but you can
12   object --
13                MR. WISNER:  You testified.
14                MR. LEVINE:  -- to the question.
15                MR. WISNER:  So I -- I move to
16   strike your testimony about --
17                MR. LEVINE:  You can object to the
18   question, but --
19                MR. WISNER:  -- what he thought.
20                MR. LEVINE:  I'm not going to teach
21   you the law.
22                THE REPORTER:  Repeat what you
23   said.
24                MR. LEVINE:  I'll re-ask my
25   question.

1    Q   (By Mr. Levine) Dr. Shustov, to be clear:  I
2    understand that you've testified this paper is
3    relevant to general causation.  Do you believe this
4    paper is relevant to your methodology for determining
5    specific causation?
6                MR. WISNER:  Renew my objection;
7    calls for a legal conclusion.
8                THE WITNESS:  To the best of my
9    ability to answer this, I -- I don't understand this
10   terminology.  The specific information from this
11   paper is relevant to specific causation in
12   Mr. Hardeman case, very specifically the extent of
13   exposure and risk of lymphoma.  That's the most
14   pertinent information to specific causation, but the
15   entirety of this paper is relevant to general
16   causation, which I'm not arguing.
17   Q   (By Mr. Levine) Okay.  And, Dr. Shustov, can you --
18   can you cite any statement from the authors from this
19   paper that concludes that greater than two days of
20   exposure in a year is sufficient to determine the
21   cause of an individual patient's non-Hodgkin's
22   lymphoma?
23                MR. WISNER:  Objection; misstates
24   the record.  Overbreadth too.
25                THE WITNESS:  Once again, I

1    extracted specific information, not the statements
2    from the author, but they are findings in the paper,
3    that exposure more than two days increase the odds
4    ratio of non-Hodgkin lymphoma with odds ratio of --
5    increase the risk with odds ratio of 2.06.
6    Q   (By Mr. Levine)  And from what I understand, you take
7    that finding and then put that towards a methodology
8    that says, in patients who are exposed for greater
9    than two days per year, that's sufficient exposure to
10   be able to say Roundup caused their cancer, right?
11   A   Based on this specific finding in a paper.  So as
12   a -- as a research paper, I do not see a controversy
13   or a problem where specific findings could be
14   extracted if they are primary source and used for
15   making certain conclusions, because other things in
16   the papers might support conclusions and -- to other
17   statements.
18        But you cannot also argue the fact that this is
19   not a conclusion, but it's actual data.  So I took
20   the data from this paper that pertains to
21   Mr. Hardeman's specific causation question, more
22   specifically to his extent of exposure, as a -- and I
23   use this as -- as a comparator to make a statement it
24   had significant exposure to increase his risk.
25   That's how we use this information from the paper.

1                MR. WISNER:  If this is a good
2    moment, I'd like to take a break because --
3                MR. LEVINE:  Sure.
4                MR. WISNER:  -- we've been going
5    for an hour.
6                MR. LEVINE:  Sounds good.
7                THE VIDEOGRAPHER:  Please stand by.
8    This concludes the Media Unit No. 3 in the deposition
9    of Dr. Andrei Shustov.  We're going off the record.
10   The time is 4:01 p.m.
11               (Pause in proceedings.)
12
13               THE VIDEOGRAPHER:  This begins
14   Media Unit No. 4 in the deposition of Dr. Andrei
15   Shustov.  We are back on the record.  The time is
16   4:17 p.m.
17               (Exhibit No. 18 marked for
18               identification.)
19
20   Q   (By Mr. Levine) Dr. Shustov, I'm handing you
21   Exhibit 18, which is the Eriksson paper.  Are you
22   familiar with this study?
23   A   I -- I looked at that study.
24   Q   It's cited in the third bullet point paragraph on
25   Page 8 of your report.

Andrei Shustov, M.D.

Page 242

1  A  Mm-hmm.
2  Q  Correct?
3  A  That's correct.
4  Q  You rely on this study for your opinions?
5  A  I reviewed this study again for purpose of supporting
6     or confirming statement on general causation, yes.
7  Q  Okay.  So this is -- this paper's for general
8     causation?
9  A  Well, it's listed in my report in the statements
10    where I discuss general causation.
11 Q  Do you use this paper for specific causation?
12 A  In one of these papers, one of the papers, two
13    papers --
14        THE REPORTER:  "One of the," what?
15        THE WITNESS:  In -- in one of the
16    two papers, I also remember using information about
17    duration of exposure.  I have to look at the paper,
18    see if it was Eriksson or De Roos.
19 Q  (By Mr. Levine)  No, it's -- so I think what you're
20    referring to is in the third bullet point of your
21    report, you say, "In a population-based case
22    controlled study, Eriksson, et al., and give the
23    citation, reported 910 cases and --
24 A  Yeah, there we go.
25 Q  -- 1,016 controls showed an odds ratio of 2.36 for

Page 243

1     developing non-Hodgkin's lymphoma in individuals
2     exposed to glyphosate more than ten days in their
3     lifetime.
4         Is that what you were just trying to find?
5  A  That's correct.
6  Q  Okay.  So let me ask again.
7         This paper you said you cited for general
8     causation, correct?
9  A  That's correct.
10 Q  Do you use this paper for your methodology -- for
11    your specific causation methodology in this case?
12 A  I use specific fact referred in this paper as a
13    ten-day exposure when I compared Mr. Hardeman's
14    exposure to a published data on the amount associated
15    with increased risk of lymphoma.
16 Q  You cite, I believe it's Table 2 on Page 1659, for
17    your opinion that glyphosate increases the risk in
18    patients who are exposed for greater than ten days
19    lifetime, correct?
20 A  That's correct.
21        MR. WISNER:  Objection; misstates
22    his testimony.
23 Q  (By Mr. Levine)  This table with respect to
24    glyphosate doesn't look at anything other than either
25    less than or equal to ten days or greater than ten

Page 244

1     days, correct?
2  A  That's correct.
3  Q  And this finding doesn't say anything about subtype,
4     correct?
5         THE REPORTER:  "This," what,
6     "doesn't"?
7         MR. LEVINE:  Doesn't say
8     anything --
9         THE REPORTER:  "This"...?
10        MR. LEVINE:  -- about -- with
11    respect to subtype.
12        THE REPORTER:  "This" -- "this,"
13    something, "doesn't" --
14        MR. LEVINE:  Table.
15        THE WITNESS:  This particular --
16        MR. LEVINE:  Or sorry.  This
17    finding.
18        THE WITNESS:  This particular table
19    and this particular finding does not cite the
20    sub-cites.
21        MR. LEVINE:  Okay.
22        THE WITNESS:  Subtypes.
23 Q  (By Mr. Levine)  And if you look at Table 3, the
24    table below, that table includes information with
25    respect to glyphosate and various subtypes, correct?

Page 245

1  A  That's correct.
2  Q  And Table 3 shows no significantly increased risk for
3     glyphosate and DLBCL, correct?
4  A  In Table 3.  Correct.
5  Q  And you don't cite that in your report for your
6     specific causation analysis, correct?
7  A  I did not cite it in the report.
8  Q  Now, if you look at Page 1660, the authors conducted
9     what's referred to as a multivariate analysis.  And
10    I'm referring to the top right -- top right column on
11    Page 1660, correct?
12 A  Okay.
13 Q  And they explain that they did this because mixed
14    exposure to several pesticides was more of a rule
15    than an exception in the study, and all single agents
16    were analyzed without adjusting for other exposure,
17    correct?
18 A  That's correct.
19 Q  Other pesticides is a potential confounder that can
20    affect the results irrespective of Roundup use,
21    correct?
22 A  I cannot answer this question.  That's a very general
23    term, "pesticides."  And, again, I would have to look
24    in the literature of different pesticides and their
25    risk of NHL and that that really goes to the realm of

Andrel Shustov, M.D.

Page 246

1  general causation.  I -- I can't really answer the
2  question.
3  Q  When you treat patients, you ask about exposure to
4  pesticides, correct?
5  A  That's correct.
6  Q  And you do that because you're asking about
7  substances that can increase the risk of
8  non-Hodgkin's lymphoma, correct?
9          MR. WISNER:  Objection; misstates
10  his testimony.
11          THE WITNESS:  That's correct.
12          MR. WISNER:  Guess not.
13          MR. LEVINE:  I was just asking a
14  question.  I wasn't trying to state his testimony,
15  but...
16  Q  (By Mr. Levine)  And so it's fair to say that
17  exposure to other pesticides is a potential
18  confounder that can affect the results irrespective
19  of Roundup use, correct?
20          MR. WISNER:  Objection.  Outside
21  the scope of this witness's testimony.  He's here to
22  offer specific cause testimony.  This is clearly in
23  the realm of general cause epidemiology.
24     Answer if you can, sir.
25          THE WITNESS:  I was going to say

Page 247

1  the same thing.  I'm not an expert in herbicide
2  epidemiology, and this requires really an expert who
3  can adjust for all the variables amongst all the
4  pesticides.
5          MR. LEVINE:  It would definitely be
6  less of a coincidence if you said the same thing
7  before Mr. Wisner did, but fair enough.
8  Q  (By Mr. Levine)  The authors state that a
9  multivariate analysis was made to elucidate the
10  relative importance of different pesticides, correct?
11  A  I see that.
12  Q  Now, if you look at Table 7.  You with me?
13  A  Yep.
14  Q  After adjusting for the use of other pesticides,
15  glyphosate showed no significantly increased risk,
16  correct?
17  A  In this particular table, yes, multivariate.
18  Q  Okay.  And the finding you cite from Table 2 is not
19  the multivariate analysis, correct?
20  A  That's correct.
21  Q  Okay.  So to be clear, you cite the finding that does
22  not adjust for other pesticides in your specific
23  causation analysis, right?
24  A  That's correct.
25  Q  But in your specific causation analysis, you don't

Page 248

1  cite the finding that does adjust for other
2  pesticides, correct?
3  A  That's correct.
4  Q  This -- Eriksson, the study we're looking at, does
5  not conclude in their paper that greater than ten
6  lifetime days is sufficient to determine that Roundup
7  causes an individual's non-Hodgkin's lymphoma, do
8  they?
9          MR. WISNER:  Objection; overbroad.
10          THE WITNESS:  I have to really find
11  where it says that.  And, again, this is starting to
12  get in the realm of general causation.  I have to
13  read this entire paper.  And I would not be an expert
14  to really answer this question intelligently without
15  analyzing all the analysis in the paper for which I
16  don't have specific expertise.  I use the information
17  specifically about the amount of exposure to -- for
18  my specific causation.
19  Q  (By Mr. Levine)  So let me clarify that question.
20     To be clear, Eriksson doesn't conclude that you
21  can use their finding of greater than ten lifetime
22  days to determine specific causation in an individual
23  patient, correct?
24          MR. WISNER:  Same objection.
25          THE WITNESS:  I have to read this

Page 249

1  paper, then, and -- and really -- I cannot just out
2  of my memory refer to all the conclusions that they
3  have and whether or not there is validity behind it
4  and analyze it.  I can't really say that.
5  Q  (By Mr. Levine)  If they made that conclusion, would
6  you have cited in it in your report?
7          MR. WISNER:  Objection;
8  speculation.
9          THE WITNESS:  From this particular
10  paper, I would rely on opinion of epidemiologists to
11  really state the oral analysis of general causation,
12  whether or not this paper in conjunction with other
13  papers indicate increased risk of lymphoma.
14  Q  (By Mr. Levine)  So we've gone through, I think, the
15  only two studies that you cite in the report -- in
16  your report that relate to a specific duration of
17  exposure that would be sufficient for you to
18  determine cause, right?
19  A  Correct.
20  Q  That's McDuffie, and that's Eriksson, correct?
21  A  Correct.  That's correct.
22  Q  Did you consider whether there's any data that's
23  inconsistent with the findings in McDuffie or
24  Eriksson?
25          MR. WISNER:  Objection; calls for

Andrei Shustov, M.D.

| | Page 250 |
|---|---|
| 1 | general cause opinion. |
| 2 | MR. LEVINE: And sorry. Let me be |
| 3 | specific. |
| 4 | Q (By Mr. Levine) Did you consider whether there's any |
| 5 | data that's inconsistent with the two-day-a-year |
| 6 | finding for McDuffie and ten-day-a-year finding from |
| 7 | Eriksson that you apply to your specific causation |
| 8 | opinion? |
| 9 | MR. WISNER: Same objection. |
| 10 | THE WITNESS: I do not recall |
| 11 | finding any inconsistent data that I would not be |
| 12 | able to use for that specific question of duration of |
| 13 | exposure in Mr. Hardeman's case. I, again, extracted |
| 14 | analysis specifically about the duration. That's the |
| 15 | only way it was pertaining to specific causation. |
| 16 | MR. LEVINE: Okay. |
| 17 | (Exhibit No. 19 marked for |
| 18 | identification.) |
| 19 | |
| 20 | Q (By Mr. Levine) Handing you what's been marked as |
| 21 | Exhibit 19. |
| 22 | MR. WISNER: The one and the only. |
| 23 | Q (By Mr. Levine) Study by Andreotti. Are you |
| 24 | familiar with this study? |
| 25 | A I have looked at that study. |

| | Page 251 |
|---|---|
| 1 | Q You cite this study on Page 8 of your report after |
| 2 | you discuss the Eriksson study, correct? |
| 3 | A That's correct. |
| 4 | Q You rely on this for your -- you cite this -- strike |
| 5 | that. |
| 6 | Do you cite this for your general causation |
| 7 | opinions or specific causation opinions? |
| 8 | A General causation. |
| 9 | Q You agree that this study found no association |
| 10 | between glyphosate and non-Hodgkin's lymphoma, |
| 11 | correct? |
| 12 | A That's correct. |
| 13 | MR. WISNER: Is this Exhibit 20? |
| 14 | I'm sorry. I missed it. |
| 15 | MR. KERSCHNER: 19. |
| 16 | MR. WISNER: 19. Sorry. Thank |
| 17 | you. |
| 18 | Q (By Mr. Levine) And this study also found no |
| 19 | association with DLBCL specifically, correct? And |
| 20 | you can turn to Table 3 on Page 514 if you -- you |
| 21 | want to look at that finding. |
| 22 | A That's correct. |
| 23 | Q Now, can you turn to supplementary Table 1? It's |
| 24 | just after Page 516. |
| 25 | A Okay. |

| | Page 252 |
|---|---|
| 1 | Q So this table looks at cancer incidence in relation |
| 2 | to lifetime days of glyphosate use, correct? |
| 3 | A That's correct. |
| 4 | Q So they're doing in this table what you were using |
| 5 | from McDuffie and Eriksson, correct? |
| 6 | A That's correct. |
| 7 | Q And if you turn to the second page of that |
| 8 | supplementary table, it contains findings for |
| 9 | glyphosate and non-Hodgkin's lymphoma, correct? |
| 10 | A I can see that. |
| 11 | Q And it contains findings for glyphosate and diffuse |
| 12 | large B-cell lymphoma, correct? |
| 13 | A That's correct. |
| 14 | Q And those findings for each of those outcomes are |
| 15 | broken down into four quartiles, correct? |
| 16 | A That's correct. |
| 17 | Q The first is 0 to 13.74 days, correct? |
| 18 | A That's correct. |
| 19 | Q The second quartile is 13.75 to 38.74 days, correct? |
| 20 | A That's correct. |
| 21 | Q The third quartile is 38.75 to 108.4 lifetime days, |
| 22 | correct? |
| 23 | A That's correct. |
| 24 | Q And the fourth quartile is greater than 108.5 |
| 25 | lifetime days of exposure, correct? |

| | Page 253 |
|---|---|
| 1 | A That's correct. |
| 2 | Q So the fourth quartile is almost 11 times greater |
| 3 | than the amount of exposure of the ten-day period you |
| 4 | cite from Eriksson with respect to lifetime days, |
| 5 | correct? |
| 6 | MR. WISNER: Objection; misstates |
| 7 | the document. |
| 8 | THE WITNESS: Sorry. |
| 9 | MR. WISNER: Answer the question. |
| 10 | THE WITNESS: That's correct. |
| 11 | Q (By Mr. Levine) And with respect to the findings of |
| 12 | the four quartiles as they relate to non-Hodgkin's |
| 13 | lymphoma, this study found no significantly increased |
| 14 | risk for any of those quartiles in terms of lifetime |
| 15 | days of exposure, correct? |
| 16 | A That's correct. |
| 17 | Q And with respect to the four quartiles for diffuse |
| 18 | large B-cell lymphoma, the study found no increased |
| 19 | risk with respect to the each of the four quartiles |
| 20 | studied, correct? |
| 21 | A That's correct. |
| 22 | Q And you don't cite this in your -- these findings in |
| 23 | your report when you're discussing the lifetime |
| 24 | exposure days or exposure days per year, correct? |
| 25 | A That's correct. |

Andrei Shustov, M.D.

Page 254

1  Q  Now, let's go back to your report in terms of what
2     you say about this study. I think one of your
3     criticisms of this study -- you say this study
4     suffered several critical flaws, right?
5  A  That's correct.
6  Q  Dr. Nabhan actually said the same thing, right?
7        MR. WISNER: Show him the document.
8        MR. LEVINE: Feel free to go look
9     at Dr. Nabhan's report. Feel free to use your
10    highlighted copy.
11       MR. WISNER: So we're on Exhibit 10?
12 Q  (By Mr. Levine) Take a look at Exhibit 10, and you
13    can tell me whether this section was taken from
14    Dr. Nabhan's report.
15       MR. WISNER: Okay. Do you
16    understand what you're doing, sir?
17       THE WITNESS: Yeah.
18       MR. WISNER: Okay. Got Exhibit 10
19    in there? That's Exhibit 10.
20       THE WITNESS: There we go. That's
21    12.
22       MR. WISNER: 12. Okay. All right.
23    So you have 10.
24       THE WITNESS: That's 10. Yeah.
25       MR. WISNER: Okay. Great. And you

Page 255

1     have your report?
2        THE WITNESS: I do.
3        MR. WISNER: Okay. Do your thing.
4  Q  (By Mr. Levine) 10 is yours or Dr. Nabhan's?
5  A  10 --
6        MR. WISNER: Is Nabhan's.
7        THE WITNESS: 10 is Nabhan's.
8        MR. WISNER: And 3 is his.
9        THE WITNESS: 3's mine. Okay.
10 Q  (By Mr. Levine) All right. So in Dr. Nabhan's
11    report, we're talking about Page 7, last bullet
12    point.
13 A  Okay.
14 Q  And in your report, we're talking about Page 8.
15 A  Okay.
16 Q  And you both say this study -- this study suffered
17    several critical flaws, correct?
18 A  That's correct.
19 Q  One of the flaws you cite is that this study included
20    farmers in the control group, right?
21 A  Correct.
22 Q  And you say that's a flaw because farmers have an
23    increased risk for non-Hodgkin's lymphoma, correct?
24 A  That's correct.
25 Q  Do you have an understanding as to why farmers have

Page 256

1     an increased risk of non-Hodgkin's lymphoma?
2        MR. WISNER: Objection as
3     definitely is outside the scope.
4        THE WITNESS: The hypothesis
5     speculation is because of the exposure to various
6     agricultural compounds.
7  Q  (By Mr. Levine) Like pesticides?
8  A  Including pesticides.
9  Q  Okay. And but you're not saying that this study
10    didn't control for pesticides, right?
11 A  I have to look at the study again.
12 Q  Okay. Look at the study and tell me whether this
13    study controlled for the use of pesticides.
14       MR. WISNER: We're on Exhibit 19?
15       MR. LEVINE: Yes.
16       MR. WISNER: Do you want to direct
17    him to a page, or do you just want him to flounder?
18       MR. LEVINE: I'm pretty sure he
19    should be able to find it quickly.
20 Q  (By Mr. Levine) Sorry. Maybe it is taking you a
21    little too long. It's in the abstract, Dr. Shustov,
22    under "Methods." Thought if you started at the
23    beginning, you'd find it pretty quickly.
24 A  Yes, it controlled for other pesticides.
25       THE REPORTER: "It," what?

Page 257

1        THE WITNESS: It did control for
2     other pesticides.
3        THE REPORTER: "Did control"...?
4     I'm sorry.
5        THE WITNESS: For other pesticides.
6        THE REPORTER: Oh. "For other."
7     Thank you.
8  Q  (By Mr. Levine) So in Eriksson and McDuffie, you
9     rely on two findings we discussed that you admitted
10    did not control for other pesticides, right?
11 A  Correct.
12 Q  And you didn't state that as a criticism of those
13    studies in your report, correct?
14 A  Not for general causation. I extracted, again,
15    specific information from Eriksson and McDuffie
16    for -- for the case-specific causation.
17 Q  But here this study addresses your criticism of
18    including farmers by controlling for other
19    pesticides, correct?
20 A  I don't think -- and, again, I cannot say with
21    certainty that pesticides are the only confounding
22    factors in farmers' environment. That's a well --
23    that's the generally accepted factor. But I don't
24    know -- and, again, one has to be expert in
25    epidemiology of agriculture -- whether besides

Andrei Shustov, M.D.

Page 258

1  pesticides there are other confounding factors.
2  Q  You're enough of an expert to have included this
3  criticism in your report, right?
4        MR. WISNER: Objection;
5  argumentative, speculation.
6        THE WITNESS: That's -- but
7  that's --
8        MR. WISNER: Calls for a legal
9  conclusion.
10      Answer.
11       THE WITNESS: But that's exactly
12  what I stated, that I don't know whether they
13  controlled for other factors in agricultural
14  profession.
15  Q  (By Mr. Levine)  Do you know whether Eriksson or
16  McDuffie controlled for other factors in -- with
17  respect to the agricultural profession?
18  A  I don't.
19  Q  All right.
20       (Exhibit No. 20 marked for
21       identification.)
22
23       MR. WISNER: 20?
24       MR. LEVINE: Yep.
25  Q  (By Mr. Levine)  I'm handing you what's been marked

Page 259

1  as Exhibit 20.  This is De Roos 2003, which I believe
2  you answered De Roos earlier, and this may have been
3  one of the De Roos papers you mentioned.
4  A  Yep.
5  Q  Right?
6  A  Yep.
7  Q  Do you know De Roos?
8  A  Do I know De Roos person?
9  Q  Yes.
10  A  No.
11  Q  Do you know that she was at the Fred Hutchinson
12  Cancer Center?
13  A  I had no idea.
14       MR. WISNER: Is she really?
15       MR. LEVINE: She was.
16       MR. WISNER: Oh.
17       MR. LEVINE: They've overlapped.
18       MR. WISNER: I didn't know that.
19       MR. LEVINE: Yeah.
20  Q  (By Mr. Levine)  You're familiar with this study,
21  right?
22  A  I looked at it.
23  Q  You cite this, I believe, on Page 8 of your report?
24  Yes.  Second bullet point.
25  A  That's correct.

Page 260

1  Q  Paragraph in the second bullet point is identical to
2  the one in Dr. Nabhan's report, correct?
3  A  The paragraph is not identical.  Has half a page
4  paragraph, and I have three lines of that.
5  Q  Your -- what's written in your report is identical to
6  what's written in Dr. Nabhan's report?
7  A  In the first -- first part of his paragraph, yes.
8  Q  Right.  He writes more, but you left out part of what
9  he writes?
10  A  It matches, yeah, first four full lines, yes.
11  Q  To be clear, everything in your report is copied from
12  his report?
13       MR. WISNER: That's objection;
14  overbroad.  Everything in his report?
15       MR. LEVINE: Every -- to be clear:
16  Q  (By Mr. Levine)  Everything in the bullet point with
17  respect to De Roos 2003 in your report is copied from
18  Dr. Nabhan's report, correct?
19       MR. WISNER: Objection.
20       THE WITNESS: I used, again, some
21  of the Dr. Nabhan's language to state my opinions in
22  general causation, which I confirmed -- to -- again,
23  to -- to use appropriate language to write legal
24  report, number one; and number two, to save time
25  writing report of Mr. Hardeman.

Page 261

1  Q  (By Mr. Levine)  You rely on this paper, De Roos
2  2003, for your general causation opinions or specific
3  causation opinions or both?
4  A  All of these papers listed here are mentioned to
5  support statements in general causation except
6  extraction on the timing of exposure for specific
7  causation.
8  Q  So you do -- you do not rely on De Roos 2003 for your
9  specific causation opinion, correct?
10  A  Give me a minute to look at if I extracted any
11  pertinent information.
12      On my quick review, I don't see any specific
13  information I use for specific causation for
14  Mr. Hardeman's case and used this for -- to support
15  general causation.
16  Q  Okay.  And I think all you're citing -- the only odds
17  ratio you're citing from this paper, De Roos 2003, is
18  an odds ratio for glyphosate increasing the risk of
19  developing NHL of 2.1 that was statistically
20  significant, correct?
21  A  That's correct.
22  Q  That odds ratio comes from Table 3 in De Roos,
23  correct?  That's on Page 5 of 9.
24  A  That's correct.
25  Q  And that odds ratio comes from the column that states

Andrei Shustov, M.D.

Page 262

1    "Logistic Regression," correct?
2    A  That's correct.
3    Q  And there's another column that refers to a
4      hierarchical regression, correct?
5    A  That's correct.
6    Q  And that shows -- that finding under the
7      "Hierarchical Regression" does not show any
8      statistically significant association for glyphosate
9      and non-Hodgkin's lymphoma, correct?
10   A  That's correct.
11   Q  But you don't cite that finding in your report,
12     correct?
13   A  I didn't.
14   Q  I'm...?
15   A  I did not.
16   Q  Okay.  Why not?
17   A  I cannot answer that question.  I make comments
18     towards general causation to support statements and
19     Dr. Ritz/Portier conclusions and make sure that
20     there's basis for those conclusions, but I did not
21     specifically study this analysis.  So this is, again,
22     a question to general causation experts.
23                    (Exhibit No. 21 marked for
24                      identification.)
25   ////

Page 263

1    Q  (By Mr. Levine)  Handing you what's been marked as
2      Exhibit 21.  This is De Roos 2005, which you cite in
3      the fourth bullet point on Page 8 of your report in
4      the paragraph that we were discussing where you also
5      discuss Andreotti, correct?
6    A  That's correct.
7    Q  And just for everybody's fun fact information here,
8      this is the paper that says De Roos was from Fred
9      Hutchinson Can --
10   A  I can see that.
11   Q  -- Cancer Center.
12            MR. WISNER:  Is it?
13            MR. LEVINE:  It is.
14   Q  (By Mr. Levine)  And --
15            MR. WISNER:  Should go track her
16     down.
17   Q  (By Mr. Levine)  Do you rely on this for your general
18     causation opinions or specific causation opinions or
19     both?
20   A  This is the fact check again for general causation
21     that is not purpose of my report, but take a look at
22     paper cited in IARC and do the general analysis of --
23     or extract information to correlate with -- with
24     conclusions of general causation experts in IARC.
25   Q  And you agree that De Roos 2005 found no association

Page 264

1      between glyphosate and non-Hodgkin's lymphoma,
2      correct?
3    A  That's correct.
4            MR. LEVINE:  Let's take a short
5      break.  We actually are getting substantially close
6      to being done.
7            THE VIDEOGRAPHER:  Please stand by.
8      We're going off the record.  The time is 4:55 p.m.
9                    (Pause in proceedings.)
10
11           THE VIDEOGRAPHER:  We are back on
12     record.  The time is 5:08 p.m.
13   Q  (By Mr. Levine)  Hello, Dr. Shustov.
14   A  Hello.
15                    (Exhibit No. 22 marked for
16                      identification.)
17
18            MR. WISNER:  22.
19            MR. LEVINE:  Yeah.
20   Q  (By Mr. Levine)  I'm handing you what's been marked
21     as Exhibit 22.  You are familiar with the American
22     Cancer Society, correct?
23   A  Yes, I am.
24   Q  You cite -- you reference them in your reliance list
25     in this case, correct?

Page 265

1            THE REPORTER:  What was the answer?
2            THE WITNESS:  Yes.
3    Q  (By Mr. Levine)  I'm just going to ask you if you
4      agree with a few things.
5      Do you agree that non-Hodgkin's lymphoma is one
6      of the most common cancers in the United States,
7      accounting for about 4 percent of all cancers?
8    A  Yes.
9    Q  Do you agree that the average American's risk of
10     developing non-Hodgkin's lymphoma during his or her
11     lifetime is about 1 in 47?
12   A  That's what they said, yes.
13   Q  And I think you've said this before, but you agree
14     that non-Hodgkin's lymphoma can occur at any age,
15     right?
16   A  Correct.
17   Q  Do you agree that the risk of developing
18     non-Hodgkin's lymphoma increases throughout life and
19     more than half of patients are 65 or older at the
20     time of diagnosis?
21   A  That's correct.
22   Q  Do you agree that the aging of the American
23     population is likely to lead to an increase in
24     non-Hodgkin's lymphoma cases during the coming years?
25   A  It's a reasonable prediction.

Andrei Shustov, M.D.

| Page 266 |
|---|

1            (Exhibit No. 23 marked for

2            identification.)

3

4   Q   (By Mr. Levine) Handing you Exhibit 23. It's also

5     from the American Cancer Society regarding what

6     causes non-Hodgkin's lymphoma. Do you see that?

7   A   Yeah.

8   Q   Do you agree --

9            MR. WISNER: I'm sorry. I think

10   you might have given me something else. Oh. You

11   said, "What causes non-Hodgkin's lymphoma?"

12            MR. LEVINE: That's what it says on

13   top.

14            MR. WISNER: I have "Can

15   Non-Hodgkin's Lymphoma Be Prevented?" Is this what

16   you have?

17            MR. LEVINE: That's not what I'm

18   looking at.

19            MR. WISNER: Okay. That's not what

20   he's looking at either.

21            MR. LEVINE: Hold onto that. We'll

22   use -- we'll go there next.

23            MR. WISNER: That's 23, so...

24            MR. LEVINE: Hold onto that. We'll

25   go there too. But thank you for clarifying.

| Page 267 |
|---|

1            MR. WISNER: No, I was just -- I

2   was lost, 'cause...

3            MR. LEVINE: Yep.

4            (Exhibit No. 24 marked for

5            identification.)

6

7            MR. WISNER: This is 24.

8            (Discussion off the record.)

9

10   Q   (By Mr. Levine) So now we're looking at the American

11     Cancer Society "What Causes Non-Hodgkin's Lymphoma?"

12     correct?

13   A   Correct.

14   Q   Do you agree that researchers have found that

15     non-Hodgkin's lymphoma is linked with a number of

16     risk factors, but the cause of most lymphomas is not

17     known?

18   A   Is unidentified, yes.

19   Q   Do you agree that this is complicated by the fact

20     that lymphomas are actually a diverse group of

21     cancers?

22   A   Correct.

23   Q   Now let's turn to the previous exhibit, 23, which is

24     also from the American Cancer Society. And this is,

25     as Brent mentioned, "Can Non-Hodgkin's Lymphoma Be

| Page 268 |
|---|

1   Prevented?"

2     Got that?

3   A   Yep.

4   Q   Do you agree that there is no sure way to prevent

5     non-Hodgkin lymphoma?

6   A   As a general statement, yes. I'm trying to think of

7     particular examples can be excluded, but as a general

8     statement, yes.

9   Q   Do you agree that most people with NHL have no risk

10     factors that can be changed, so there is no way to

11     protect against these lymphomas?

12   A   I think it's a very broad statement. It's -- it's

13     really -- can't be said this way because we never

14     looked in most of the people's exposures in their

15     lives.

16   Q   So just to be clear, you're saying the American

17     Cancer Society statement is wrong?

18   A   I'm not saying wrong. I think it is too broad to

19     apply to -- to general to apply to this topic. The

20     statement is too general.

21   Q   So let me see if I can articulate that the way that I

22     understand it. And maybe you'll agree to it. Maybe

23     you won't.

24   A   Okay.

25   Q   But do you agree that most people with non-Hodgkin's

| Page 269 |
|---|

1   lymphoma have no risk factors that can be changed?

2     Start with that part.

3            MR. WISNER: Objection;

4   speculation.

5            THE WITNESS: I only partially

6   agree with that statement.

7   Q   (By Mr. Levine) What do you disagree with?

8   A   I disagree with the fact that you cannot make

9     statements for most people because most people were

10     not questioned whether they're exposed to known risk

11     factors, and it's just a general statement from the

12     fact that when people diagnosed with non-Hodgkin

13     lymphoma come to their doctors and those who end up

14     in SEER registry or all these registries, the

15     information about their specific exposure is not

16     collected.

17     So if somebody did the study and ask every

18     lymphoma patient carefully what they expose, actually

19     did research into that specific topic, I am not so

20     sure that in most people we would not have suspected

21     risk factors.

22   Q   In your clinical practice, with respect to the

23     patients that you treat for non-Hodgkin's lymphoma,

24     are you able to identify risk factors in most

25     patients?

Andrei Shustov, M.D.

| | Page 270 | | | Page 272 |
|---|---|---|---|---|

Page 270

1  A  I do not -- it's not the purpose of my clinical
2  practice to identify the risk factors.  The purpose
3  of me taking care of patients is treat and cure their
4  lymphoma.  I do not do comprehensive questioning and
5  research into what patients were expose to through
6  lifetime, the details of their households, besides
7  the general questions, as I stated, to document
8  whether they think or they know they were exposed to.
9        The -- the purpose of general practice is not to
10  identify what cause patient's lymphoma, but help them
11  or try to save their life.
12  Q  You can put that away.  But you're welcome to go to
13  the exhibit, or just you can agree with what I'm
14  asking.  But --
15        MR. LEVINE:  I don't think you're
16  going to object to this.
17        MR. WISNER:  Okay.  Okay.
18  Q  (By Mr. Levine)  Your CV lists professional societies
19  of which you're a member, right?
20  A  Okay.
21  Q  Am I correct that you're -- you're a member of the
22  American Association of Hematology?
23  A  Correct.
24  Q  And you're a member of the American Association of
25  Clinical Oncology?

Page 271

1  A  That's correct.
2  Q  And you're a member of the Lymphoma Steering
3  Committee Southwest Oncology Group?
4  A  Correct.
5  Q  And you're a member of the U.S. Cutaneous Lymphoma
6  Society?
7  A  Correct.
8  Q  Just to be clear, is that U.S. -- that's what it says
9  in your CV.  Do you mean, by any chance, the U.S.
10  Cutaneous Lymphoma Consortium?  I ask because I
11  Googled...
12  A  I think that's the proper name.  You're correct.
13  Yeah.
14  Q  Okay.  Just minor typo in your report.
15  A  Sure.
16  Q  But --
17  A  Thank you.
18  Q  -- just trying -- was trying to figure it out.
19        And you're a member of the T-cell Lymphoma
20  Leukemia Foundation, correct?
21  A  Correct.
22  Q  Are there any other cancer organizations which you're
23  a member?
24  A  I don't think so.
25  Q  Okay.  Are you aware of any statements from any of

Page 272

1  the cancer professional societies of which you're a
2  member that states glyphosate is an established cause
3  of cancer?
4  A  I would have to go to their websites and see exactly
5  how they address this issue.
6  Q  Okay.  As a member, have you been involved in
7  anything where you've seen a -- either presentation
8  or materials provided to you or anything else within
9  your scope of the membership of these organizations
10  that has stated that glyphosate or Roundup is a cause
11  of cancer?
12        MR. WISNER:  Objection; outside the
13  scope.
14        THE WITNESS:  As part of activities
15  in those societies, no.
16        MR. LEVINE:  Okay.
17        THE WITNESS:  It was not topic of
18  my involvement in society's function and activities.
19  Q  (By Mr. Levine)  Have you ever told a medical society
20  of which you're a member that Roundup causes
21  non-Hodgkin's lymphoma?
22  A  Have I told any member of the society that glyphosate
23  causes lymphoma?
24  Q  Have you -- have you told any medical society of
25  which you are a member that Roundup causes

Page 273

1  non-Hodgkin's lymphoma?
2  A  That's a very odd question.  There's -- that's kind
3  of very nonsensical, how that --
4  Q  Let me be more specific, then.
5  A  Okay.
6  Q  I don't want you to --
7  A  Okay.
8  Q  -- answer a question that doesn't make sense.
9  A  Okay.
10  Q  In your involvement with these medical societies,
11  have you publicly stated in any way at any of
12  these -- at any meetings or in any statements to the
13  medical society that Roundup is a cause of
14  non-Hodgkin's lymphoma?
15  A  No, I haven't.
16  Q  Have you ever gone to an oncologist or pathologist at
17  your hospital and told them to assess his or her
18  patients for Roundup or glyphosate exposure in
19  treating a patient's non-Hodgkin's lymphoma?
20  A  No.  That would be also nonsensical.
21  Q  Have you ever gone to an oncologist or pathologist at
22  your hospital and told him to tell a patient to stop
23  using Roundup or glyphosate if that patient is
24  diagnosed with non-Hodgkin's lymphoma?
25  A  That's also absolutely implausible scenario that I

Andrei Shustov, M.D.

Page 274

1    find out somehow that some of these patients using
2    glyphosate outside HIPAA law and say, Hey, your
3    patient is using glyphosate.  This is just -- I can't
4    just imagine plausible scenario how that would
5    happen.
6    Q   Tumor boards?  I think you told me you participate
7    in --
8    A   Correct.
9    Q   -- tumor boards, right?
10   A   Correct.
11   Q   Do you discuss the facts of patients' cases in tumor
12       boards?
13   A   Correct.
14   Q   Have you ever stated in a tumor board, to other
15       members when discussing a patient's non-Hodgkin's
16       lymphoma, that they should tell their patient to stop
17       using Roundup or glyphosate?
18   A   No, that's not a function of tumor boards.
19   Q   Okay.  Have you in any tumor board stated to your
20       colleagues that they should assess their patients for
21       Roundup or glyphosate use?
22   A   No.
23   Q   You've never published that Roundup causes
24       non-Hodgkin's lymphoma, correct?
25   A   Correct.

Page 275

1    Q   You've never presented at a medical society that
2        Roundup causes non-Hodgkin's lymphoma, correct?
3    A   Correct.
4    Q   You've never informed any regulatory organization
5        that concluded glyphosate is not carcinogenic that
6        they're wrong, correct?
7    A   Correct.
8    Q   Do you agree that Mr. Hardeman responded well to
9        chemotherapy?
10   A   I agree.
11   Q   He was in complete remission by July 2015, correct?
12   A   Correct.
13   Q   Subsequent examinations have found no evidence of
14       cancer recurrence, correct?
15   A   Up to date, yes.
16   Q   You're not a pathologist, right?
17   A   That's correct.
18   Q   You're not an epidemiologist?
19   A   That's correct.
20   Q   You're not a toxicologist?
21   A   That's correct.
22   Q   You're not a radiation oncologist?
23   A   That's correct.
24   Q   You're not a hepatologist?
25   A   That's correct.

Page 276

1    Q   You're not an infectious disease doctor?
2    A   That's correct.
3    Q   You're not an immune -- immunologist, correct?
4    A   I did extensive research in immunology and publish in
5        immunology, but my current specialty is not
6        immunology, per se.  But I am very familiar with
7        field of immunology and doing research in immunology.
8                MR. LEVINE:  Okay.  Right now, I
9        have nothing further.
10               MR. WISNER:  Are you passing the
11       witness, sir?  Great.  Let's get started.
12
13
14               EXAMINATION
15   BY MR. WISNER:
16   Q   Dr. Shustov, before we begin, how are you doing
17       physically right now?
18   A   Tired.
19   Q   Okay.
20   A   Exhausted.
21   Q   It's been a long day.
22       I apologize for this bizarre procedure, but we
23       have to get through it.  I'm going to ask you a few
24       questions to follow up specifically on questions that
25       Mr. --

Page 277

1                MR. WISNER:  Is it "Levine" or
2        "Levine"?
3                MR. LEVINE:  "Levine."
4    Q   (Continuing by Mr. Wisner)  -- Levine asked during
5        your deposition today.
6        I'm going to jump around on a lot of different
7        topics, because that's kind of how the deposition
8        unfolded today.  Let's start off with the issue of
9        general causation.
10       Now, should you testify in Mr. Hardeman's trial
11       next -- in February or March of next year, are you
12       going to offer to that jury any opinions about
13       general causation?
14               MR. LEVINE:  Objection.
15               THE WITNESS:  No.
16   Q   (By Mr. Wisner)  Okay.  Why?
17   A   Because I'm not expert in epidemiology or general
18       causation, and my expertise is in clinical practice
19       and clinical research in lymphomas.  And --
20               THE REPORTER:  "Research," what?
21               MR. LEVINE:  Clinical research and
22       lymphomas.
23               THE REPORTER:  Oh.  Thank you.
24               THE WITNESS:  And the questions of
25       general causations, with all fairness, should be

Andrei Shustov, M.D.

| Page 278 |
| --- |

1   addressed to epidemiologists who have expertise to
2   analyze the complexity of epidemiologic studies.
3   I...
4   Q  (By Mr. Wisner)  So it would be fair to say, then,
5   that if or when you do testify, you plan to tell the
6   jury that you're assuming that general causation has
7   been established by other experts?
8               MR. LEVINE:  Objection.
9               THE WITNESS:  That's correct.
10  Q  (By Mr. Wisner)  And then having made that
11  assumption, you then engage in a specific cause
12  analysis; is that right?
13              MR. LEVINE:  Objection.
14              THE WITNESS:  That's correct.
15  Q  (By Mr. Wisner)  And the methodology of that analysis
16  is how you characterize as a differential diagnosis;
17  is that right?
18              MR. LEVINE:  Objection.
19              THE WITNESS:  That's correct.
20  Q  (By Mr. Wisner)  Now, a differential diagnosis, there
21  was some questions about whether or not it's used to
22  treat -- used to diagnose patients.  Is it also a
23  system of deductive reasoning?
24  A  It is.
25  Q  Please explain what you mean by that.

| Page 279 |
| --- |

1   A  So differential diagnosis outside particular use in
2   clinical practice and every day in my opinion is a
3   general method of hypothetical deductive way of
4   establishing priority of certain factors you're
5   looking at by eliminating the alternatives.
6   Q  And to know if Roundup for Mr. Hardeman is a proper
7   risk factor to consider, is that where you then
8   consult epidemiology?
9               MR. LEVINE:  Objection.
10              THE WITNESS:  Correct.
11  Q  (By Mr. Wisner)  And in consulting epidemiology,
12  having already assumed that, in fact, it can cause
13  cancer, having consulted epidemiology, what are you
14  looking for to inform your specific cause analysis?
15  A  I'm looking for answer whether Roundup is a risk
16  factor for causing non-Hodgkin's lymphoma.
17  Q  And are you looking specifically for whether or not
18  Mr. Hardeman had exposure sufficient to fit within
19  the epidemiological literature?
20              MR. LEVINE:  Objection.
21              THE WITNESS:  That's true.
22  Q  (By Mr. Wisner)  Now, if there's an epidemiological
23  study that doesn't show any association at all -- for
24  example, the agricultural health study -- does that
25  aid you in that analysis in any way?

| Page 280 |
| --- |

1               MR. LEVINE:  Objection.
2               THE WITNESS:  No, it doesn't.
3   Q  (By Mr. Wisner)  Why not?
4   A  Because Mr. Hardeman was exposed to glyphosate, and I
5   already assumed from epidemiologic studies that it is
6   a causative factor in non-Hodgkin lymphoma.  So the
7   study shows that it's not a factor.  It -- it doesn't
8   help me.
9   Q  There was a question, a couple questions earlier in
10  the deposition specifically about why you asked
11  Mr. Hardeman about his use of Roundup.  Do you
12  recall?
13  A  Yes, I do.
14  Q  Can you please explain generally why you asked those
15  questions of Mr. Hardeman?
16  A  So first of all, in a -- any evaluation of cancer
17  patient or lymphoma patients that I perform in
18  regular clinical practice, I explore the social
19  history, which includes potential risk factors for
20  developing cancer; in my particular case, lymphomas.
21  And secondly, the purpose of my evaluation of
22  Mr. Hardeman was to look into specific causation of
23  his lymphoma and opine on whether Roundup was a
24  substantial contributing factor.
25  Q  And when you determine -- if you're trying to

| Page 281 |
| --- |

1   determine whether or not Roundup was a substantial
2   contributing factor for Mr. Hardeman, what other
3   factors do you have to look at to see if it, in fact,
4   is the or one of the causes of Mr. Hardeman's cancer?
5   A  So I created a list of factors with either known
6   association with lymphoma or that were interrogated
7   for potential or possible role in causing lymphomas.
8   Q  And if we go to your report, that's Exhibit 3.  You
9   don't have to look at this, because you'll know it
10  already, Doctor.  But you interrogated a bunch of
11  potential risk factors; is that right?
12  A  That's correct.
13  Q  You looked at whether or not he had any family
14  history of non-Hodgkin's lymphoma?
15              MR. LEVINE:  Object.
16              THE WITNESS:  Correct.
17  Q  (By Mr. Wisner)  You looked at whether or not he'd
18  had any immunoficient -- immunodeficient states or
19  diseases; is that right?
20              MR. LEVINE:  Objection.
21              THE WITNESS:  Correct.
22  Q  (By Mr. Wisner)  You looked at whether or not he had
23  any autoimmune diseases; is that right?
24  A  Correct.
25              MR. LEVINE:  Objection.

Andrei Shustov, M.D.

## Page 282

1   Q   (By Mr. Wisner)  You examined whether or not he had
2       been exposed to any other carcinogens such as
3       ionizing radiation?
4                   MR. LEVINE:  Objection.
5                   THE WITNESS:  Correct.
6   Q   (By Mr. Wisner)  You looked at whether or not he was
7       exposed to other carcinogens in his military service?
8   A   Correct.
9                   MR. LEVINE:  Objection.
10  Q   (By Mr. Wisner)  You looked at whether or not he, you
11      know, was using -- what are the -- what are some of
12      the chemicals in the military context that you would
13      be concerned about?
14  A   The known chemicals with known -- for which known
15      exposure was associated with development of cancer
16      lymphomas, like Agent Orange and exhausts and other
17      defoliants.  Those kind of questions I would ask
18      patients.  And, again, when you -- when you ask have
19      I looked into it, so my method of looking is asking
20      the patient.  That's --
21  Q   Sure.
22  A   -- the only source of information I can use.
23  Q   And, by the way, do you know who manufactured Agent
24      Orange?
25  A   I have no idea.

## Page 283

1                   MR. LEVINE:  Objection.
2   Q   (By Mr. Wisner)  So you also examined whether or not
3       he had any viral -- viruses that could have affected
4       his non-Hodgkin's lymphoma; is that right?
5                   MR. LEVINE:  Objection.
6                   THE WITNESS:  Correct.
7   Q   (By Mr. Wisner)  You looked at did he have HIV, for
8       example?
9   A   Correct.
10                  MR. LEVINE:  Objection.
11  Q   (By Mr. Wisner)  You also looked at whether or not he
12      had hepatitis C, right?
13  A   Correct.
14                  MR. LEVINE:  Objection.
15  Q   (By Mr. Wisner)  Hepatitis B?
16                  MR. LEVINE:  Objection.
17                  THE WITNESS:  Correct.
18                  MR. WISNER:  Are these leading
19      objections?
20                  MR. LEVINE:  Yeah.
21                  MR. WISNER:  Okay.  I don't care.
22                  MR. LEVINE:  Good.  Yeah.
23                  MR. WISNER:  It's not going to be
24      played at trial, so --
25                  MR. LEVINE:  Okay.

## Page 284

1                   MR. WISNER:  -- we can make them
2       all day.
3   Q   (By Mr. Wisner)  All right.  You looked at whether he
4       smoked; is that right?
5                   MR. LEVINE:  Objection.
6                   THE WITNESS:  Correct.
7   Q   (By Mr. Wisner)  And did he?
8   A   He, I think, has history of smoking.  I can refer to
9       my report.
10  Q   And you actually assessed whether or not that history
11      was a potential risk factor for his non-Hodgkin's
12      lymphoma?
13                  MR. LEVINE:  Objection.
14                  THE WITNESS:  I considered it.
15  Q   (By Mr. Wisner)  And you concluded it just wasn't?
16                  MR. LEVINE:  Objection.
17                  THE WITNESS:  Correct.
18  Q   (By Mr. Wisner)  Okay.  You examined whether or not
19      his -- his -- well, okay.  What is the definition of
20      obesity?
21  A   It's determined by body mass index, and it's graded
22      by different degree of obesity.
23  Q   Now, I understand none of Monsanto's experts have had
24      this opportunity, but you actually got a chance to
25      look at Mr. Hardeman, right?

## Page 285

1   A   Correct.
2   Q   And did he look like a person who we would call
3       obese?
4   A   He --
5                   MR. LEVINE:  Objection.
6                   THE WITNESS:  He would look -- he
7       does not look like morbidly obese by just physical
8       exam.
9   Q   (By Mr. Wisner)  And in assessing obesity, did you
10      decide whether or not it could have contributed to
11      his non-Hodgkin's lymphoma?
12  A   I considered it.
13  Q   Now, when we talk about risk factors, a risk factor
14      like obesity, is that any way different than a risk
15      factor like Roundup?
16  A   It is very different, in my opinion.
17  Q   Why is that?
18  A   Obesity by itself does not have a proven mechanistic
19      way of causing any type of cancer.  But obesity also
20      is a reflection of numerous factors in people's
21      lifestyle, like overeating, eating low-quality foods,
22      eating foods that might contain more pesticides or
23      preservatives like meats, and as well as associated
24      with sedentary lifestyle, with -- you can come up
25      with multiple factors that separate obese, sedentary

Andrei Shustov, M.D.

Page 286

1  person versus nonobese person.
2      In addition, obesity creates a higher repository
3  for lipophilic substances, and something that has
4  lipophilic nature would accumulate in the body of
5  obese person at much higher levels than somebody who
6  has very small amount of fat in their body.  So
7  obesity in -- in a opinion of -- of a
8  physician/oncologist/clinician is a reflection of
9  other factors that can lead to certain consequences.
10 Q  If you -- in your regular practice, if you had a
11 patient who essentially has no risk factors but just
12 is moderately overweight, okay, would you tell that
13 patient, You have non-Hodgkin's lymphoma because
14 you're moderately obese?
15          MR. LEVINE:  Objection; improper
16 hypothetical.  Exactly the same as everything you
17 objected to in terms of hypotheticals throughout this
18 entire deposition.
19          MR. WISNER:  Thank you for
20 conceding that, in fact, it was improper.
21      If you'd answer the question, sir.
22          THE WITNESS:  No, in my everyday
23 practice, I would not tell the patient that he likely
24 had lymphoma because he's obese.
25 Q  (By Mr. Wisner)  Let's say we took something else,

Page 287

1  like ionizing radiation.  How about in that
2  circumstance?  We did no risk factor but significant
3  exposure to ionizing radiation.  Would you tell them
4  that it might be associated with the ionizing
5  radiation?
6  A  Absolutely.
7          MR. LEVINE:  Objection.
8  Q  (By Mr. Wisner)  Okay.  So it'd be fair to say, then,
9  in assessing risk factors, certain factors like
10 obesity, age, are just characteristically different
11 than risk factors like an environmental exposure?
12 A  That's correct.
13          MR. LEVINE:  Objection.
14 Q  (By Mr. Wisner)  That's something that you considered
15 in your assessment and during your differential
16 diagnosis?
17 A  Definitely.
18          MR. LEVINE:  Objection.
19 Q  (By Mr. Wisner)  All right.  At one point during this
20 examination, there was a medical record shown to you
21 that belonged to a patient that's not at issue in
22 this lawsuit.  You remember that?
23 A  I do.
24 Q  And you got pretty upset from that; is that right?
25 A  That's correct.

Page 288

1  Q  In fact, you're getting upset right now just thinking
2  about it.  I'm sorry.  I don't mean to upset you.
3      The reason why I asked it is, immediately after
4  that sort of episode, you said something to the
5  effect of the Roundup might have caused Mr. Hardeman's
6  cancer.  Do you recall that?
7  A  I do.
8  Q  I just want to be clear.  When you say it might have
9  caused, are you saying it was a substantial
10 contributing factor or are you saying it's something
11 less?
12          MR. LEVINE:  Objection.
13          THE WITNESS:  It is a substantial
14 contributing factor.
15 Q  (By Mr. Wisner)  There was a question about whether
16 or not you examine the IARC monograph for hepatitis
17 C -- sorry.  Strike that.
18      There was a question about whether or not you
19 cited the IARC monograph on hepatitis C in your
20 report.  Do you recall that?
21 A  Vaguely.
22 Q  It was a long time ago.
23      Let's be clear.  Did you look at the monograph
24 before you wrote your report?
25 A  I did.

Page 289

1  Q  Okay.  And you didn't cite it; is that right?
2  A  That's right.
3  Q  Why?
4  A  In my review of this particular causation literature,
5  it was not -- there was no -- no sufficient evidence
6  to correlate the findings to Mr. Hardeman's specific
7  case.  I was not using discussion of hepatitis C as a
8  general causation.  But pertaining to Mr. Hardeman's
9  case, nothing in the monograph would reflect his
10 particular situation.
11 Q  The monograph refers to chronic hepatitis C
12 infection, right?
13 A  That's correct.
14 Q  Did Mr. Hardeman have chronic hepatitis C infection?
15 A  There is no evidence in my opinion, since he was
16 cleared of the virus, he has chronic hepatitis c
17 infection.
18 Q  And that's something I wanted to ask you, Doctor.
19 If, in fact, his non-Hodgkin's lymphoma was caused by
20 an active hepatitis C infection, would you have
21 expected that infection to emerge during
22 chemotherapy?
23          MR. LEVINE:  Objection.
24          THE WITNESS:  I would absolutely
25 expect, based on multiple other models and diseases.

Andrei Shustov, M.D.

Page 290

1  to find that during development of lymphoma, his
2  viral titers would increase and subsequently clear
3  after cure of his lymphoma. And I would not expect,
4  like in his case, to find no evidence of virus in his
5  body by extremely sensitive methods during
6  development of his cancer.
7  Q. (By Mr. Wisner) During the examination, there was
8  questions about whether or not hepatitis C can cause
9  mutations. Do you recall that?
10 A. I do.
11 Q. All right. I want to make sure I understand
12 something. A mutation can actually be removed from a
13 person; is that right? By the immune system?
14 A. The --
15         MR. LEVINE: Objection.
16     THE WITNESS: The mutation -- if I
17 recall correctly, I stated that by immune system
18 eliminating the virus-infected cells would
19 effectively eliminate cells that have undergone
20 mutations under influence of that virus.
21 Q. (By Mr. Wisner) So to put in layman's terms, if a
22 person doesn't have an active hepatitis C infection,
23 there is no way that hepatitis C infection can cause
24 that cancer?
25         MR. LEVINE: Objection.

Page 291

1         THE WITNESS: It would be highly
2  unlikely.
3  Q. (By Mr. Wisner) And that's the other question. We
4  talk about certainty here. When you say you don't
5  think hepatitis C caused it, what are you saying?
6  A. I'm saying it's -- it's very unlikely, that with
7  history of Mr. Hardeman's infection and treatment of
8  hepatitis, that it was a significant contributing
9  factor.
10 Q. And with regard to hepatitis B -- strike that.
11     Do you have a similar opinion with regard to
12 hepatitis B?
13 A. Regarding hepatitis B, I -- I think the argument is
14 even weaker for case of his lymphoma. Because
15 besides a single test that does not prove the
16 presence of infection, duration of infection, but
17 suggests that he might have had infection, does not
18 make any case for considering hepatitis B in causing
19 his lymphoma. And as a matter of fact, the other
20 tests to try to find and confirm whether or not he
21 had hepatitis B infection were always negative.
22 Q. Do you know if there's any evidence that the military
23 diagnosed Mr. Hardeman with hepatitis C or B?
24 A. I have not seen any evidence in his records.
25 Q. And, of course, he joined the military after his

Page 292

1  experiments with intravenous drug use when he was 17?
2  A. That's correct.
3  Q. As well as that girlfriend that was mentioned by --
4  well, actually, you don't know about that, so strike
5  that.
6      As well as the -- the homemade tattoo that was
7  referenced in his youth?
8  A. Yes, so if I recall his history correctly, he joined
9  the military after all of this transpired, in his own
10 words, after he cleaned up.
11 Q. And is there any evidence either from Mr. Hardeman or
12 from the medical records that indicates that between
13 his military service and up until 2005, that
14 Mr. Hardeman was suffering from a hepatitis C
15 infection?
16 A. I have not seen any evidence in the records.
17 Q. Now, if a person has a full-blown hepatitis C
18 infection, like one that could lead to cancer, would
19 it be reasonable to assume that they would be
20 experiencing symptoms?
21 A. It is likely.
22         MR. LEVINE: Objection.
23 Q. (By Mr. Wisner) Similarity, with hepatitis B, if
24 they had a full-blown hepatitis B infection
25 sufficient enough to cause cancer, would you expect

Page 293

1  that person to have symptoms?
2  A. Even more --
3         MR. LEVINE: Object.
4         THE WITNESS: -- so than hepatitis
5  C.
6  Q. (By Mr. Wisner) And yet when they discovered the
7  hepatitis C in Mr. Hardeman's system, it -- it was on
8  accident; is that right?
9  A. That's correct.
10        MR. LEVINE: Objection.
11 Q. (By Mr. Wisner) During a routine blood test?
12 A. That's --
13        MR. LEVINE: Objection.
14        THE WITNESS: -- my recollection.
15 Q. (By Mr. Wisner) Okay. Now, there was a question
16 asked of you, and it was getting pretty complicated
17 with the number of hypotheticals. But let me see if
18 I can put it simply.
19     If Mr. Hardeman had never been exposed to
20 Roundup, do you believe it is likely or unlikely that
21 he would have gotten non-Hodgkin's lymphoma when he
22 did?
23        MR. LEVINE: Objection.
24        THE WITNESS: I believe it much --
25 much less likely he would develop it.

Andrei Shustov, M.D.

Page 294

1  Q  (By Mr. Wisner)  So the opposite of that.  Do you
2     think that it is more likely or less likely that his
3     exposure to Roundup caused him to get non-Hodgkin's
4     lymphoma when he did?
5  A  It is certainly more likely.
6  Q  And when you say "more likely" and "less likely," are
7     we talking about probability?
8  A  That's correct.  Nothing in medicine can prove with
9     certainty, but we can certainly determine the
10    likelihood.
11 Q  And when we say something's likely, that means more
12    likely than not?
13 A  That's correct.
14 Q  And when we say something is unlikely, we're saying
15    it's less likely than not?
16 A  That's correct.
17 Q  Okay.  Now, there was a question about whether or not
18    Roundup initiated a mutation or a cancer cell 25
19    years ago.  Do you recall those questions?
20 A  I do.
21 Q  I think at one point you said, "I don't know, and it
22    doesn't matter," or something to that effect.  Do you
23    recall that?
24 A  I think so.
25 Q  What did you mean by that?

Page 295

1  A  I meant that even if Roundup initiated mutation or
2     cause mutation way before the diagnosis, this
3     mutation was a substantial contributing factor for
4     subsequent lymphoma development, because it persisted
5     in his body from the development.
6  Q  And your knowledge of this, this latency period for
7     Roundup, is that based in part upon your review of
8     the epidemiological literature?
9  A  This is -- these are basic oncologic principles of
10    exposure to carcinogen and latency based on biology
11    of cancer development, that mutations can be latent
12    for years and then subsequent hits based on now new
13    genetic risk finally pushes it to development of
14    lymphoma.
15 Q  Now, I understand that there are -- that genotoxicity
16    is one of the mechanisms through which Roundup can --
17    can cause cancer, right?
18             MR. LEVINE:  Objection.
19             THE WITNESS:  That's what I learned
20    from conclusions from genotoxic studies.
21 Q  (By Mr. Levine)  Okay.  And when you look at genotox
22    studies that -- strike that.
23       All right.  I'm going to do it quickly.  All
24    right.  Turn to Exhibit 17.
25             MR. LEVINE:  Which -- what exhibit

Page 296

1     are you on?
2             MR. WISNER:  McDuffie.
3  Q  (By Mr. Wisner)  Are you there, sir?
4  A  Yes.
5  Q  Okay.  I'd like you to turn to Page 1160.
6  A  Okay.
7  Q  You there?
8        You see the paragraph in the left-hand column
9     that reads Table 8?
10 A  Yes.
11 Q  All right.  Look at the last sentence there.  It
12    reads, "The exceptions were 2,4-D, for which there
13    was no dose-response relationship, and glyphosate,
14    which was not significant for exposure, but for which
15    we demonstrated a dose-response relationship."
16       Do you see that?
17 A  I do.
18 Q  Opposing counsel was asking for you for some
19    statement in this study that -- that validated this
20    greater-than-two-days number from the authors.
21       What is a dose-response relationship?
22             MR. LEVINE:  Objection.
23             THE WITNESS:  It means that the
24    higher the dose of exposure, the higher the risk of
25    consequence; in this case, developing lymphoma.

Page 297

1  Q  (By Mr. Wisner)  Is that something you're
2     specifically looking for in the context of -- of
3     whether or not Mr. Hardeman was sufficiently exposed?
4  A  For case-specific causation, yes.
5  Q  All right.  Now, turn to the next page.  It's 1161,
6     Table 8.
7  A  Okay.
8  Q  All right.  This was a table where that greater-than-
9     two-days number was reflected, right?
10 A  Correct.
11 Q  And Mr. Levine, he kind of accused you that this
12    wasn't a fully adjusted number.  Do you recall that?
13 A  Vaguely.
14 Q  Okay.  And one of the things that was raised was
15    whether or not it was adjusted for exposure to other
16    pesticides, right?
17 A  That's correct.
18 Q  Okay.  Well, let's look at Table 8.  And there's
19    actually a sentence right under Table 8.  Do you see
20    that?
21 A  I do.
22 Q  It reads, "Models that included the time variable,
23    days per year, and stratification for age and
24    province of residence" -- I'll stop right there.
25       Days per year, that's -- that's -- that's the

Andrei Shustov, M.D.

| | |
|---|---|
| Page 298 | Page 300 |

Page 298

1  number we're talking about with glyphosate, right?

2  A  Correct.

3  Q  Okay.  Says, "Were also assessed for individual

4  herbicide compounds."  It lists a bunch of them.  Do

5  you see that?

6  A  That's correct.

7  Q  "No significant associations were found."

8      Do you see that?

9  A  I do.

10  Q  Okay.  So it looks like the authors actually did look

11  for other associations but just didn't see any?

12  A  That's correct.

13  Q  Okay.  And if you actually turn to the previous page,

14  1160, if you look at Table 7.  Do you see that?

15  A  I do.

16  Q  And if you read the sentence underneath it, it goes,

17  "Among individual pesticides," and it lists a bunch.

18  Do you see that?

19  A  I do.

20  Q  "User," slash, "nonuser were included in the initial

21  multivariate model and found not to contribute

22  significantly to the risk of NHL."

23      Do you see that?

24  A  I do.

25  Q  So these authors actually looked to see if there was

Page 299

1  any substantial confounders and determined that there

2  wasn't?

3          MR. LEVINE:  Objection.

4          THE WITNESS:  I can see that.

5  Q  (By Mr. Wisner)  Now, there was a discussion also

6  about De Roos 2003.  And I actually want to show you

7  that study very quickly.  That's No. 20.

8  A  Yeah.

9  Q  You got it?  I don't.  Do you have it?  Yes, that's

10  right.

11      Okay.  And in De Roos 2000 and -- the 2003 study,

12  there's Table 3.  Do you see that?

13  A  Yes, I do.

14  Q  And as you see, that has a listing for logistical

15  regression as well as hierarchical regression.  Do

16  you see that?

17  A  Yes, I do.

18  Q  And if you look in the footnote of that table, it

19  actually specifies that all of the risk ratios raised

20  in this table were, in fact, adjusted for exposure to

21  47 different pesticides?

22  A  I can see that.

23  Q  Now, that shows you, despite the fact that it was

24  adjusted for 47 other pesticides, there's still a

25  doubling the risk using logistical regression?

Page 300

1          MR. LEVINE:  Just -- do you mind

2  showing me where you are?  I just -- moving a little

3  fast.

4          MR. WISNER:  Sure.  I actually

5  don't have it in front of me.  I just have it by

6  memory.  If you actually look at Table 3, in the --

7  in the footnote to it.

8          MR. LEVINE:  Maybe Dr. -- since

9  Dr. Shustov agreed with you, maybe he can show me,

10  where --

11          MR. WISNER:  Sure.

12          MR. LEVINE:  -- it is.  The 47

13  pesticides column.

14          MR. WISNER:  That's the number of

15  pesticides there.  Let me find this document.

16          THE WITNESS:  In the bottom.

17          MR. WISNER:  What's your confusion,

18  Counselor?  I don't want to --

19          MR. LEVINE:  Sorry.  I was looking

20  for the number 47.  I didn't realize you were the one

21  that counted it.

22          MR. WISNER:  Oh.

23          THE WITNESS:  It's also here in the

24  body.

25          MR. LEVINE:  Got it.

Page 301

1  Q  (By Mr. Wisner)  All right.  What, if anything, does

2  this De Roos 2003 paper tell you about potential

3  confounders for glyphosate?

4  A  That -- that they did adjustment for confounding

5  factors.

6  Q  Great.

7      And if you actually turn to the last page --

8  sorry.  Page 7 of -- 7 of 9 -- and you look at the

9  column to the left, third paragraph from the top

10  starts with, "Adjustment."

11      Do you see that?

12  A  Yes.

13  Q  It says, "Adjustment for multiple pesticides

14  suggested that there were few instances of

15  substantial confounding of pesticide effects by other

16  pesticides."

17      Do you see that?

18  A  I do.

19  Q  Okay.  Now, just to clear something up.  One of the

20  things that Mr. Levine kind of raised was that you

21  cited that the logistical regression in your paper,

22  not the hierarchical regression.  Do you recall that?

23  A  I do.

24  Q  Now, the De Roos 2003 article, that was published in

25  2003?

Andrei Shustov, M.D.

Page 302

1  A  Correct.
2  Q  So let's look at De Roos's 2005 article. It's
3    Exhibit 21. It might be folded up. There it is.
4    It's right there.
5      You there? You got it, sir?
6  A  Yeah.
7  Q  All right. Turn to Page 53.
8      All right. Now, this is kind of hard to find,
9    but on the third column on the left, so the first
10    column. You see that?
11  A  Okay.
12  Q  All right. Go all the way down through that first
13    paragraph, and there is a sentence that says, "A more
14    extensive study conducted."
15      Do you see that?
16  A  Yes.
17  Q  All right. Now, the next sentence starts,
18    "Similarly."
19      Do you see that?
20  A  Yeah.
21  Q  All right. Goes, "Similarly, increased NHL risk in
22    men was associated with having ever used glyphosate,
23    (odds ratio 2.1, confidence interval 1.1 to 4) after
24    adjustment for other commonly used pesticides in a
25    pooled analysis of National Cancer Institute-

Page 303

1    sponsored case-control studies conducted in Nebraska,
2    Kansas, Iowa, and Minnesota (De Roos 2003)."
3      You see that?
4  A  I do.
5  Q  So even Dr. De Roos, when she reports the -- the
6    results of her own study, she reported the logistical
7    regression?
8  A  That's correct.
9  Q  Okay. All right. I want to mark as an exhibit --
10      MR. WISNER: What's our next
11    exhibit number?
12      (Discussion off the record.)
13      (Exhibit No. 25 marked for
14      identification.)
15
16  Q  (By Mr. Wisner) All right. Handing you Exhibit 24
17    [sic]. I will just --
18      MR. LEVINE: We have a stapler, if
19    you want.
20      (Discussion off the record.)
21
22  Q  (By Mr. Wisner) All right. Doctor, I'm handing you
23    Exhibit 24 [sic].
24  A  Thank you.
25  Q  Now, I understand -- on your reliance list, I

Page 304

1    understand you cite Dr. Ritz's expert report, right?
2  A  Yes.
3  Q  And Dr. Ritz, she looked at something called a North
4    American Pooled Project, right?
5  A  Yeah.
6  Q  And that was discussed at length actually in her
7    expert report, right?
8  A  That's correct.
9  Q  And this is one of the citations in her report.
10    It's -- it's -- it's a document that's titled "A
11    Detailed Evaluation of Glyphosate Use and the Risk of
12    Non-Hodgkin Lymphoma in the North American Pooled
13    Project," dated June 3rd, 2015.
14      Do you see that?
15  A  Yeah.
16  Q  All right. Now, if you turn -- I put four onto a
17    page just so I could save some paper. But if you
18    turn specifically to the page that has, the top left,
19    "duration (number of years)."
20      Do you see that? Keep going.
21  A  4. Yeah.
22  Q  All right. And this study, by the way, the pooled
23    study is actually pooling data from De Roos 2003 and
24    McDuffie, correct?
25  A  Correct.

Page 305

1  Q  All right. So if you look at the "frequency (number
2    of days per year)" on the right, top right. Right
3    here. You see that?
4  A  Yeah.
5  Q  Okay. So we look at this slide here. It reflects
6    the overall as well as various subgroups of
7    non-Hodgkin's lymphoma. Do you see that?
8  A  Yeah.
9  Q  And we have the overall. It's a 1.98 statistically
10    significant for greater than two days' use. Do you
11    see that?
12  A  Yeah.
13  Q  Now --
14      MR. LEVINE: Sorry. I lost you.
15    Which? Oh. Okay.
16  Q  (By Mr. Wisner) Now, opposing counsel asked you to
17    point off the top of your head to an epidemiological
18    result specifically related to DLBCL. Do you recall
19    that?
20  A  I do.
21  Q  All right. Well, let's look at what it says about
22    DLBCL. It says 2.49 statistically significant
23    result. Do you see that?
24  A  I do.
25  Q  And it also has a P trend of 0.02?

Andrei Shustov, M.D.

1　A　Yeah.
2　Q　And that's reflecting the increase from 0 to 2 to
3　　　greater than 2, right?
4　A　That's correct.
5　Q　All right.  It also says what is adjusted for at the
6　　　bottom.  Do you see that?
7　A　I do.
8　Q　Adjusted for age; sex; state, slash, province;
9　　　emphatic or hematopoietic cancer in a -- in a first-
10　　degree relative; use of a proxy respondent; use of
11　　any personal protective equipment; use of 2,4-D; use
12　　of dicamba; and use of malathion.
13　　　　Do you see that?
14　A　I do.
15　Q　So this is a fully adjusted number that even
16　　considered exposure to other pesticides; is that
17　　right?
18　A　That's correct.
19　Q　And it relates specifically to DLBCL?
20　A　That's correct.
21　Q　And it shows a more than doubling of the risk that is
22　　statistically significant?
23　A　Yeah.
24　Q　Okay.  All right.  I want to touch on one last one.
25　　And there was a study that Mr. -- Mr. Levine showed

1　　　you, the Eriksson study.  I believe it is Exhibit 18.
2　　　Got it?
3　A　Yeah.
4　Q　Okay.  And he asked you to point to somewhere in this
5　　　study where the authors indicate you can use this
6　　　study to establish specific causation for a patient.
7　　　Do you recall that question?
8　　　　　　　MR. LEVINE:  Objection;
9　　mischaracterizes the prior testimony.
10　　　　　　THE WITNESS:  I think I do.
11　Q　(By Mr. Wisner)  I mean, it was generally.  Do you
12　　recall that general --
13　A　Yeah.
14　Q　-- questioning?
15　A　Yeah.
16　Q　Okay.  Is that the purpose of a epidemiological study
17　　published in a peer-reviewed literature?
18　A　No.
19　Q　Okay.  But let's see what the authors did say about
20　　glyphosate.  Because they actually wrote about it.
21　　Let's turn to the last page of the written text.
22　　It's 1662.
23　　　　We're almost done, Doctor.  I know you look --
24　　you look exhausted.
25　A　I'm there.

1　Q　Okay.  All right.  The top of the paragraph, it
2　　　reads, "Glyphosate was associated with a
3　　　statistically significant increased odds ratio for
4　　　lymphoma in our study, and the result was
5　　　strengthened by a tendency to dose-response effect as
6　　　shown in Table 2."
7　　　　Do you see that?
8　A　I do.
9　Q　So what does that sentence mean to you?
10　A　That the -- the high exposure produces the higher
11　　risk of developing non-Hodgkin lymphoma.
12　Q　And that was the results reflecting greater-than-ten-
13　　days-per-year use?
14　A　That's correct.
15　Q　Okay.  Now, there was a question about whether or not
16　　these authors sufficiently adjusted for other
17　　confounders.  Do you recall that?
18　A　I think I do.
19　Q　Okay.  Well, let's see what the authors had to say
20　　about potential confounding for glyphosate.  It's the
21　　next paragraph.  It says, "Glyphosate has succeeded
22　　MCPA as one of the most used herbicides in
23　　agriculture, and many individuals that used MCPA
24　　earlier are now also exposed to glyphosate.  This
25　　probably explains why the multivariate analysis does

1　　　not show any significant odds ratios for these
2　　　compounds."
3　　　　Do you see that?
4　A　I do.
5　Q　So the authors actually openly considered potential
6　　　risk for confounding.  Do you see that?
7　A　I do.
8　　　　　　　MR. LEVINE:  Objection.
9　Q　(By Mr. Wisner)  And they dis -- they -- they
10　　discredit it?
11　　　　　　MR. LEVINE:  Objection.
12　　　　　　THE WITNESS:  I see that.
13　Q　(By Mr. Wisner)  In fact, their conclusions as stated
14　　in the previous paragraph is that there is, in fact,
15　　a statistically significant increased odds ratio for
16　　lymphoma which was strengthened by a tendency to
17　　dose-response?
18　　　　　　MR. LEVINE:  Objection.
19　　　　　　THE WITNESS:  I can see that.
20　Q　(By Mr. Wisner)  Okay.  There was a question about
21　　whether or not you go to these medical societies to
22　　tell them that Roundup can cause cancer.  Do you
23　　recall that?
24　A　I do.
25　Q　Would you -- I mean, is that something that you would

Andrei Shustov, M.D.

| Page 310 | Page 312 |
|---|---|

**Page 310**

1  do?

2  A  That -- just nonsensical in the medical world to --

3  it's not a function of society.  It's -- it's just, I

4  can't even sort of -- it just -- it's just an odd

5  question to go to 35,000-person society and jump on

6  the podium and announce something.  It just kind

7  of -- it's an odd -- to envision the scenario.

8  That's not the function of the society.  So you don't

9  go to the society to make announcements.

10  Q  Well, Doctor, do you stand out on the sidewalk and

11  shout at people walking by you that glyphosate causes

12  cancer?

13  A  No.

14  Q  Why not?

15  A  That's kind of odd thing to do.

16          MR. WISNER:  Okay.  One second,

17  Counselor.  I'm almost done.

18  Q  (By Mr. Wisner)  Okay.  Some other quick questions

19  that came up.

20      There was a question asked to you about whether

21  or not the surfactants in Roundup contribute to its

22  carcinogenicity.  Do you recall that?

23  A  I think I do.

24  Q  Did you ever study this issue?

25  A  No.

**Page 311**

1  Q  So any opinion you have on this is not based on any

2  sort of study of the surfactants?

3          MR. LEVINE:  Objection.

4          THE WITNESS:  No.

5  Q  (By Mr. Wisner)  Okay.  There was a question about

6  the ethical implications of doing a randomized

7  control trial on glyphosate.  Do you recall that?

8  A  I do.

9          THE REPORTER:  You do or you don't?

10          THE WITNESS:  I do.

11  Q  (By Mr. Wisner)  And I just want to be clear.  Would

12  it ever be appropriate to intentionally expose a

13  human being to glyphosate when there's no known

14  benefit to that human being?

15          MR. LEVINE:  Objection.

16          THE WITNESS:  Can you re -- if

17  there's no known benefit or there is a potential

18  harm?

19  Q  (By Mr. Wisner)  Well, if there's no known benefit

20  and a potential harm, would it be ethical to

21  deliberately expose a human being to glyphosate?

22          MR. LEVINE:  Objection.

23          THE WITNESS:  No.

24  Q  (By Mr. Wisner)  Would that sort of randomized

25  controlled trial protocol be approved by an IRB?

**Page 312**

1  A  Never.

2  Q  Why not?

3  A  Because you're deliberately putting a patient to

4  possible risk of developing cancer.

5  Q  In fact, that's a -- that's a violation of the Geneva

6  Convention, isn't it?

7          MR. LEVINE:  Objection.

8          THE WITNESS:  Just general medical

9  ethics and Geneva Convention and just general

10  humanity rules.

11  Q  (By Mr. Wisner)  Now, there was some confusion about

12  IARC and whether or not IARC can issue a -- or

13  classify a compound in a Group 1 carcinogen.  Do you

14  recall that?

15  A  I do.

16  Q  And I think it got a little confusing with the

17  questions.  And to be clear, you understand that IARC

18  can classify something as a Group 1 carcinogen even

19  without a randomized control trial?

20  A  That's true.

21  Q  Okay.  However, the best evidence, in your opinion,

22  would be a randomized control trial?

23          MR. LEVINE:  Objection.

24          THE WITNESS:  For any impact on

25  human, yes.

**Page 313**

1          MR. WISNER:  Okay.  No further

2  questions.  Pass the witness.

3

4

5          FURTHER EXAMINATION

6  BY MR. LEVINE:

7  Q  Just a few questions, Dr. Shustov.

8      I believe you were asked a question about whether

9  you looked at Mr. Hardeman to see whether he was

10  obese, correct?

11  A  Well, I had encounter with him and examined him, yes.

12  Q  How many years after his diagnosis of non-Hodgkin's

13  lymphoma did you look at Mr. Hardeman?

14  A  It would make it three years.  Is that right?  I

15  think about three.

16  Q  Okay.  I mean, he was -- he was diagnosed in February

17  2015, right?

18  A  That's correct.

19  Q  Started experiencing symptoms --

20  A  Correct.

21  Q  -- around December of 2014, correct?

22  A  That's correct.

23  Q  So three to four years, correct?

24  A  That's right.

25  Q  Okay.  You did not look at Mr. Hardeman at the time

Andrei Shustov, M.D.

| Page 314 |
|---|

1    that he was diagnosed with non-Hodgkin's lymphoma to
2    determine whether he was obese, correct?
3    A  I did not.
4    Q  Okay.  And you didn't look at him any time prior to
5    his diagnosis of non-Hodgkin's lymphoma, correct?
6    A  That's correct.  It could be deducted, though.  I did
7    not look at it specific issue.  But if I were asked
8    to really try to estimate, you can go back in medical
9    records and look at his BSA.
10   Q  At his -- I'm sorry?
11   A  Body -- his -- his height and weight at the time of
12   diagnosis.  That should be part of medical records.
13   Q  Have you done that?
14   A  No.
15   Q  Okay.  Does inflammation -- can inflammation cause
16   cancer?
17   A  It's a very broad statement.
18   Q  Just curious.
19   A  As a -- as a hypothetical possibility, yes.
20   Q  You said -- does obesity cause inflammation?  Let me
21   ask you that.
22   A  That's, again, generally broad statement.  And to --
23   in a judgment of a clinician/physician, it is
24   unlikely to be sufficient to reflect a knowledge that
25   inflammation causes cancer.

| Page 315 |
|---|

1    Q  I'm sorry.  My question was:  Does obesity cause
2    inflammation?  Yes or no?
3    A  Not in a clinical sense, no.
4    Q  Dr. Shustov, I think you told me earlier that you
5    reviewed extensive medical records.  Do you remember
6    I was asking you about that?
7    A  I do.
8    Q  Extensive records, or...?
9    A  That's correct.
10   Q  And I think you told me that they started around
11   2005, correct?
12   A  That's correct.
13   Q  You don't have any military records of Mr. Hardeman,
14   correct?
15   A  No.
16   Q  So when you were asked by Mr. Wisner whether you saw
17   any military records that indicated he was diagnosed
18   with hepatitis C or hepatitis B when serving in the
19   military, you hadn't seen any military records,
20   period, correct?
21   A  No.
22   Q  You were asked about probabilities.  Do you remember
23   that?
24   A  I do.
25   Q  By Mr. Wisner.

| Page 316 |
|---|

1    Did you do any probability calculations in
2    Mr. Hardeman to determine what percentage risk he had
3    for developing non-Hodgkin's lymphoma based on his
4    Roundup use?
5    A  I did not do mathematical calculations, no.
6    Q  And you were shown Exhibit 25, I believe, by
7    Mr. Wisner, correct?  Looks like a PowerPoint
8    presentation?
9    A  Yeah.
10   Q  Correct?
11   A  That's correct.
12   Q  Is this -- do you know if this was peer reviewed?
13   A  I don't.
14   Q  Does this publication look like it's from a peer-
15   reviewed journal?
16   A  It looks as a PowerPoint presentation.
17   Q  Okay.  And let's go to the page that you were
18   discussing.
19   A  Okay.
20   Q  It's the one at the top left box, started with
21   "duration," and we were looking at the box that said
22   "frequency."
23       You see that?
24   A  Yes.
25   Q  Now, before I ask you questions about this, you

| Page 317 |
|---|

1    were -- you recall Mr. Wisner was asking you some
2    questions before about a dose-response relationship,
3    correct?
4    A  Correct.
5    Q  And that was with respect to, I believe, the McDuffie
6    study, correct?
7    A  I think so.
8    Q  He pulled out a quote from the McDuffie study and
9    read it to you about how it said they didn't find a
10   significantly increased risk for exposure, but they
11   found dose-response, correct?
12   A  That's correct.
13   Q  Okay.  Now, you -- he showed you this slide on the
14   top right-hand corner regarding frequency and
15   discussed evidence of a dose-response relationship,
16   correct?
17   A  Correct.
18   Q  Now, if you look at the slide on the left side
19   regarding duration, number of years of glyphosate use
20   and NHL risks.  Do you see that?
21   A  I do.
22   Q  And you see the column for DLBCL?
23   A  Yeah.
24   Q  And for greater than 0 and less than 3.5 years of
25   glyphosate use, there's a statistically significant

Andrei Shustov, M.D.

Page 318

1  increased risk there, right?
2  A  For -- say it again.
3  Q  Under DLBCL.  In this PowerPoint.
4  A  Yeah.
5  Q  That is not peer reviewed or published.  But there is
6     a odds ratio of 1.77 --
7  A  Yeah.
8  Q  -- for greater than 0 and less than 3.5 --
9  A  Yeah.
10 Q  -- years' use, correct?
11 A  That's correct.
12 Q  And then for greater than 3.5 years' use, there is an
13    odds ratio of 1.03 that's not statistically
14    significant, correct?
15 A  I can see that.
16 Q  And that would be evidence against the dose-response
17    relationship, correct?
18 A  It would, again, depend on detail of this analysis,
19    that just looking at numbers, I might not be able to
20    answer very intelligently.  Looking just to the
21    number, there is -- it's a not significant number for
22    more than three and a half years.
23 Q  Now, Mr. Wisner said something a minute ago about
24    benefits.  Do you recall that?  Doing a study and
25    whether Roundup doesn't have any benefits?

Page 319

1  A  Yes.
2  Q  Okay.  Are you saying -- you're not testifying in
3     this litigation that Roundup has no benefits,
4     correct?
5  A  I just don't -- I honestly -- I need to -- more
6     definition what benefits are.  That's why I asked the
7     question and he added the risks, so --
8  Q  You're not offering any testimony with respect to the
9     benefits of Roundup use, correct?
10 A  Can you define bene -- benefits to participant
11    health, or benefits to what?
12 Q  Just asking you if it's within the scope of your
13    opinions in this litigation that you intend to
14    discuss as to whether Roundup has benefits.
15          MR. WISNER:  Objection.
16          THE WITNESS:  No.
17          MR. WISNER:  Vague.
18          THE WITNESS:  No.
19          MR. LEVINE:  Okay.  Nothing
20    further.
21          MR. WISNER:  Just very short thing
22    just on what he just talked about;
23    ////
24    ////
25    ////

Page 320

1          FURTHER EXAMINATION
2  BY MR. WISNER:
3  Q  On Exhibit 25, in that -- that greater than three and
4     a half years that you looked at.
5  A  Okay.
6  Q  Now, you understand that if it's -- if someone had
7     used Roundup three times over the course of four
8     years, that would put them in the greater than three
9     and a half years.  You understand that?
10          MR. LEVINE:  Objection.
11          THE WITNESS:  That's correct.
12 Q  (By Mr. Wisner)  So you can actually have people with
13    relatively low exposure in that high group?
14 A  Potentially.
15 Q  Whereas if you're doing frequency, number of days per
16    year, that's guaranteeing that you're going to find
17    people who are at least using it more than two days,
18    cumulative days per year?
19          MR. LEVINE:  Objection.
20          THE WITNESS:  That's correct.
21 Q  (By Mr. Wisner)  And, you know, that's what we talk
22    about when we talk about -- when we talk about dose,
23    we talk about the volume of exposure?
24 A  That's correct.
25 Q  Okay.  And then on that -- that question about

Page 321

1  benefits that he just asked, I just want to be clear,
2  Doctor.  Is it your opinion that exposing a human
3  being to glyphosate has a health benefit?
4  A  No.
5          MR. WISNER:  Okay.  No further
6  questions.
7
8
9          FURTHER EXAMINATION
10 BY MR. LEVINE:
11 Q  Doctor, let's go back to Exhibit 25 for a second, in
12    that "frequency (number of days per year)" table.
13 A  Okay.
14 Q  That "frequency (number of days per year)" table
15    doesn't tell you anything about whether somebody used
16    gallons of Roundup per day or whether they used one
17    squirt of Roundup per day, correct?
18 A  Not in this table.
19          MR. LEVINE:  Nothing further.
20          MR. WISNER:  Thank you, Dr. Shustov.
21          THE VIDEOGRAPHER:  Please stand by.
22 This concludes the videotaped deposition of
23 Dr. Andrei Shustov.  There were four media units used
24 today.  We are going off the record.  The time is
25 6:17 p.m.

Page 322

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

(Signature reserved.)
(Deposition concluded at 6:17 p.m.)

---

Page 323

1    STATE OF WASHINGTON )   I, John M.S. Botelho, CCR, RPR,
                         ) ss a certified court reporter
2    County of Pierce    )   in the State of Washington,
                   do hereby certify:
3
4
5          That the foregoing deposition of ANDREI SHUSTOV,
     M.D., was taken before me and completed on December 15,
6    2018, and thereafter was transcribed under my direction;
     that the deposition is a full, true and complete transcript
7    of the testimony of said witness, including all questions,
     answers, objections, motions and exceptions;
8          That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature;
10
           That I am not a relative, employee, attorney or
11   counsel of any party to this action or relative or employee
     of any such attorney or counsel and that I am not
12   financially interested in the said action or the outcome
     thereof;
13
           IN WITNESS WHEREOF, I have hereunto set my hand
14   this 17th day of December, 2018.
15
16
17
18
19
20         _____
           John M.S. Botelho, CCR, RPR
21         Certified Court Reporter No. 2976
           (Certification expires 5/26/19.)
22
23
24
25

---

Page 324

1            CERTIFICATE OF DEPONENT
2
3          I hereby certify that I have read and examined the
     foregoing transcript, and the same is a true and accurate
     record of the testimony given by me.
4
5          Any additions or corrections that I feel are necessary,
     I will attach on a separate sheet of paper to the original
     transcript.
6
7          _____
           Andrei Shustov, M.D.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 325

1    WITNESS:  Andrei Shustov, M.D.
2    DATE:  December 15, 2018
3    CASE:  Hardeman v. Monsanto Co.
4    Please note any errors and the corrections thereof on this
5    errata sheet.  The rules require a reason for any change or
6    correction.  It may be general, such as "To correct
7    stenographic error," or "To clarify the record," or "To
8    conform with the facts."
9
10   PAGE  LINE  CORRECTION              REASON FOR CHANGE
11   ____  ____  _____    _____
12   ____  ____  _____    _____
13   ____  ____  _____    _____
14   ____  ____  _____    _____
15   ____  ____  _____    _____
16   ____  ____  _____    _____
17   ____  ____  _____    _____
18   ____  ____  _____    _____
19   ____  ____  _____    _____
20   ____  ____  _____    _____
21   ____  ____  _____    _____
22   ____  ____  _____    _____
23   ____  ____  _____    _____
24   ____  ____  _____    _____
25   ____  ____  _____    _____