# EXHIBIT 23

Andrei Shustov, M.D.

```
 0   01



 2                    UNITED STATES DISTRICT COURT

 3

 4               NORTHERN DISTRICT OF CALIFORNIA

 5

 6    _____

 7

 8    IN RE:  ROUNDUP PRODUCTS              )

 9    LIABILITY LITIGATION                  )

10    _____      )

11                                          ) MDL No. 2741

12    This document relates to:             )

13                                          ) Case No. 16-md-02741-VC

14    Stevick v. Monsanto Co., et al.       )

15    Case No. 3:16-cv-2341-VC              )

16                                          )

17                                          )

18                                          )

19    _____

20

21         VIDEOTAPED DEPOSITION OF ANDREI SHUSTOV, M.D.

22

23                    December 16, 2018

24

25                    Seattle, Washington
```

Andrei Shustov, M.D.

---

Page 2

APPEARANCES

For the Plaintiff:

   R. BRENT WISNER, ESQ.
   Baum, Hedlund, Aristei & Goldman
   10940 Wilshire Boulevard
   17th Floor
   Los Angeles, California 90024
   310.207.3233
   rbwisner@baumhedlundlaw.com

For Defendant Monsanto Co.:
   AARON H. LEVINE, ESQ.
   DAVID KERSCHNER, ESQ.
   Arnold & Porter Kaye Scholer, LLP
   250 West 55th Street
   New York, New York 10019
   212.836.8000
   aaron.levine@arnoldporter.com
   david.kerschner@arnoldporter.com

For Defendant Bayer:
   LINDLEY J. BRENZA, ESQ.
   Bartlit Beck, LLP
   1801 Wewatta Street
   Suite 1200
   Denver, Colorado 80202
   303.592.3100
   lindley.brenza@bartlitbeck.com

Also present: Allison Borgida, videographer

---

Page 3

EXAMINATION INDEX
EXAMINATION BY:                           PAGE NO.
Mr. Brenza                    6
Mr. Wisner                   80

EXHIBIT INDEX
EXHIBIT NO.   DESCRIPTION                 PAGE NO.
Exhibit No. 36   Monsanto Company's Notice to      4
   Take Oral and Videotaped
   Deposition of Dr. Andrei
   Shustov.

Exhibit No. 37   Expert Report of Dr. Andrei      4
   R. Shustov.

Exhibit No. 38   Expert Report of Dr. Chadi     18
   Nabhan.

Exhibit No. 39   Clinical Summary for Elaine     56
   M. Stevick dated 9/6/2018.
   Labeled
   Confidential-Stevick-EStevick
   -KPNValley-MD-000010.

Exhibit No. 40   Decision/Reason, dated      60
   7/14/2016.  Labeled
   Confidential-Stevick-EStevick
   -PPR-000158.

Exhibit No. 41   Office visit for Elaine M.      62
   Stevick dated 8/2/2018.
   Labeled
   Confidential-Stevick-EStevick
   -KPNValley-MD-005067.

---

Page 4

1    BE IT REMEMBERED that on Sunday,
2  December 16, 2018, at 1900 Fifth Avenue, Seattle,
3  Washington, at 2:35 p.m., before JOHN M.S. BOTELHO,
4  Certified Court Reporter, appeared ANDREI SHUSTOV,
5  M.D., the witness herein;
6    WHEREUPON, the following
7  proceedings were had, to wit:
8
9    <<<<<< >>>>>>
10
11    (Exhibit Nos. 36 and 37
12    marked for identification.)
13
14    THE VIDEOGRAPHER:  We are on record
15  at 2:35 p.m. on Sunday, December 16, 2018, in the
16  matter of Stevick vs. Monsanto.  The deponent today
17  is Dr. Andrei Shustov.
18    Will counsel and -- counsel please identify
19  themselves for the record, and then the court
20  reporter may swear in the witness.
21    MR. WISNER:  Brent Wisner on behalf
22  of the deponent and the plaintiffs in this case.
23    MR. BRENZA:  Lin Brenza with
24  Bartlit Beck on behalf of Bayer.
25    MR. KERSCHNER:  David Kerschner

---

Page 5

1  from Arnold & Porter on behalf of Monsanto.
2    MR. LEVINE:  Aaron Levine from
3  Arnold & Porter on behalf of Monsanto.
4    MR. WISNER:  Technically Bayer is
5  not a party to this case.
6    MR. BRENZA:  I don't know.
7    MR. WISNER:  Okay.
8    MR. BRENZA:  I'll be on behalf of
9  Monsanto if you want me to be.
10    MR. WISNER:  Okay.
11    MR. BRENZA:  So -- I'm sorry.  Go
12  ahead.
13
14  ANDREI SHUSTOV, M.D.,      having been first duly sworn
15    by the Certified Court
16    Reporter, deposed and
17    testified as follows:
18
19    MR. WISNER:  Before you begin, sir,
20  just the same objections as last time.  He's being
21  offered for a specific cause only, not general cause,
22  and this is related specifically to Mrs. Stevick's
23  case.
24  ////
25  ////

Andrei Shustov, M.D.

Page 6

1    EXAMINATION
2    BY MR. BRENZA:
3    Q   Doctor, I know it's been long, a long --
4    A   Yes, it has been.
5    Q   -- two days.  We're -- hopefully we're getting near
6        the end here.  We have one more plaintiff to talk
7        about.  It's Ms. Stevick.
8            Did you -- well, let me just ask you before we
9        get into Ms. Stevick:  Did you do the same procedures
10       to prepare your report for Ms. Stevick that you did
11       for the other plaintiff that we talked about today?
12   A   I did.
13   Q   Did you examine Ms. Stevick?
14   A   I did.
15   Q   Did you examine her at a hotel conference room?
16   A   That's correct.
17   Q   Was that also at the Marriott?
18   A   Correct.
19   Q   In Seattle?
20   A   That's correct.
21   Q   When did you examine her?
22   A   I met with Ms. Stevick on November 7th, 2018.
23   Q   And who else was there?
24   A   She was accompanied by her husband.
25   Q   Anybody else?

Page 7

1    A   No.
2    Q   What did you do?
3    A   I, once again, collected a comprehensive history
4        according to standards of medical practice, including
5        her recollection of history of present illness,
6        social history, family history, exposures, specific
7        exposure pertaining to glyphosate.  Performed
8        physical exam.  And prior to examine, I reviewed her
9        medical records provided to me.
10   Q   How -- how long did you spend reviewing Ms. Stevick's
11       medical records, examining her, and preparing your
12       report about her?
13   A   I'd say, altogether, I would estimate about 20 hours.
14   Q   What kind of physical exam did you perform?
15   A   I performed a standard comprehensive physical exam
16       that includes major body systems and organ systems
17       and body anatomical locations.
18   Q   Did you conclude that Ms. Stevick had been -- her
19       cancer had been cured?
20   A   I've concluded that she, as of my date of my exam, is
21       in remission.
22   Q   And remission means there's no detectable cancer?
23   A   With standard techniques that we use to look for
24       cancer, yes.
25   Q   And Ms. Stevick has been in remission for close to

Page 8

1    five years, right?  Close to four years?  Sorry.
2    A   That's correct.
3    Q   Is -- Ms. Stevick had a different type of lymphoma
4        than others that you've evaluated, right?
5    A   Histologically, she had the same type of lymphoma.
6        By anatomical location, she had a sub-subtype of
7        diffuse large B-cell lymphoma called primary CNS
8        lymphoma.
9    Q   You said histologically?
10   A   That is correct.
11   Q   What is -- what is histologically?
12   A   It means that --
13   Q   What does that mean?
14   A   -- if somebody looks in the microscope on diffuse
15       large B-cell lymphoma extracted from the brain and
16       from any other location, it would appear the same on
17       the microscope.  And pathologist would not be able to
18       determine whether this is primary CNS lymphoma versus
19       diffuse large B-cell lymphoma from the lymph node
20       except for the fact that there'll be some brain
21       tissue around it as opposed to lymph node tissue
22       around it.  If you isolate specific lymphoma cells
23       and present it to pathologist, they would not be able
24       to say the difference.
25   Q   So it's -- would it be right to say it's a species of

Page 9

1    DLBCL, or is it -- is it just exactly DLBCL but in a
2    different physical location?
3    A   So, once again, histologically defined by appearance,
4        it's exactly DLBCL.  Clinically, it is subspecies of
5        DLBCL that happen to arise in the brain.  So when you
6        talk about our current classification of lymphomas,
7        we define it as clinical and pathologic
8        classification.  So a subtype of lymphoma defined
9        there, two things that go into definition of the
10       entity to say this is the species of lymphoma are
11       pathologic characteristics and clinical
12       characteristics.
13   Q   So pathologically it's DLBCL.  Clinically it's
14       something unto its own; is that right?
15   A   Clinically it is DLBCL of the -- of the central
16       nervous system.
17   Q   What's -- what's the clinical significance of noting
18       that it's in the central nervous system?
19   A   The approaches to treatment of primary brain diffuse
20       large B-cell lymphoma are different from those that
21       arise outside central nervous system.
22   Q   So it's a different treatment regimen?
23   A   That is correct.
24   Q   And is that because PCNS, chemotherapies have to
25       cross the blood-brain barrier?

Andrei Shustov, M.D.

Page 10

1  A  That is correct.
2  Q  And what's the consequence of that?
3  A  In what sense?
4  Q  How does it affect your treatment regimen?
5  A  Oh.  So there are defined chemotherapeutic agents
6     that chemically are known to have capacity to
7     penetrate something called blood-brain barrier.  And
8     examples of drugs like that would be methotrexate at
9     very high doses that we do not use for other
10    malignancies, and high doses of a drug called
11    cytarabine.  And those, used again in high doses, as
12    well as other regimens, knowing that their capacity
13    to penetrate into the brain and kill lymphoma cells
14    in the brain.  The standard CHOP components not
15    believed to penetrate into the brain tissue with
16    enough concentrations to provide cure or put
17    remission in PNC -- primary CNS DLBCL.
18 Q  Is the expected prognosis of somebody like
19    Ms. Stevick who has PCNS similar to what we discussed
20    with respect to another patient who had DLBCL, in the
21    sense that if it's going to recur, the most likely
22    time is within two years of the treatment?
23 A  It is more likely early after treatment than later
24    after treatment.
25 Q  And then every year that goes by after that, it gets

Page 11

1     a little bit more unlikely that the person will ever
2     have a recurrence of that cancer, right?
3  A  That is correct.
4  Q  Okay.  So at this point, Ms. Stevick is -- should
5     expect to have no further recurrence if you had to
6     make a guess about what's in the future for her?
7  A  She has more likelihood of being cured than have
8     recurrence in the future.
9  Q  When you examined her, did you -- she was -- she had
10    been cured for a number of years by then.  Was there
11    anything to observe that had to do with her PCNS?
12 A  Let me consult.  I do not recall specifically.  And
13    let me confirm with my documentation of her exam
14    before I make definitive statement.
15       I did not see any evidence of recurrent or
16    residual lymphoma or lymphoma-associated symptoms on
17    my exam.
18 Q  But did she appear to be energetic and mentally
19    engaged?
20 A  Yes.
21 Q  Were there any other sequelae from her PCNS or -- or
22    the treatment?
23 A  I don't believe so.  She had slight abnormality on
24    one of the cerebellar tests, I believe, when -- so
25    cerebella is the part of the brain that controls the

Page 12

1     balance.  And there is specific cerebellar tests that
2     we perform in the exam to look for balance or
3     coordination.  And to my recollection -- I'll try to
4     confirm with my note -- she had slight difficulty
5     in -- we ask patients to walk tippy-toe and -- and in
6     a straight line, and she had a little bit of
7     imbalance there, but it was minor.  Other than that,
8     I believe I did not detect any impairments.
9  Q  And is that degree of imbalance that you observed
10    within the range of normal?
11 A  Well, it's not normal to detect it.  But, no, because
12    I demonstr -- I had to say, demonstrate to her how I
13    do it.  I ask her husband, like, see how he does it.
14    And so it was a slight deviation.  So I would say
15    it's a mild, a residual sequela of most likely
16    treated tumor because of the location would make
17    clinical sense to me because it was cerebella
18    location.
19 Q  Did you form an opinion from your physical
20    examination, review of medical records or any other
21    way, as to when Ms. Stevick's tumor may have first
22    formed?
23 A  It's -- I don't think it's possible from, again,
24    physical exam performed, or actually any cases to say
25    when first it appeared.  So it did not give me any

Page 13

1     conclusions when her tumor first arose, on either my
2     clinical exam or review of records besides when she
3     clinically presented with her diagnosis.
4  Q  The type of cancer that Ms. Stevick had progresses
5     rapidly if untreated, right?
6  A  That is correct.
7  Q  Did that in any way allow you to retrospectively
8     evaluate when that tumor might have first occurred?
9  A  It might give a physician or lymphoma specialist the
10    range roughly.  The best I can -- patient ask this
11    question all the time -- that I can estimate, Well, I
12    can tell you with certain degree of certainty that it
13    is most likely, say, within last six months or very
14    likely not more than one year.  But that's the
15    physician estimate.  It's not based on evidence.
16 Q  We'll get back to your report in a minute.  I just
17    want to just deal with some of the other housekeeping
18    items.
19       I've handed you your deposition notice for this
20    deposition, marked as Exhibit 36.  Do you see that?
21 A  It is notice of deposition.  Is that what you're
22    asking?
23 Q  Yes.
24 A  Yeah.
25 Q  And have you had a chance to look at that before the

Andrei Shustov, M.D.

Page 14

1   deposition?
2   A  I did.
3   Q  And I'll ask you the same questions. Have you
4      provided all the documents to your counsel that are
5      responsive to the documents requested in this notice?
6              MR. WISNER: Objection. Answer
7      that question to the extent that doesn't disclose
8      privileged communications with counsel.
9              THE WITNESS: To the best of my
10     ability, yes.
11  Q  (By Mr. Brenza) And like the -- well, let me strike
12     that.
13         Was the list of materials that you relied on the
14     same list that we've previously marked in depositions
15     that we've taken today and yesterday? Do you need me
16     to --
17  A  Can I verify?
18  Q  Yeah. It's going to be in --
19  A  Exhibit 4.
20  Q  -- that stack. It's Exhibit 4.
21  A  It's for previous case or for...?
22  Q  It's a previ -- we marked it previously, so I'm --
23  A  Is it --
24  Q  -- asking if we need to remark another copy or if
25     it's the same exact copy and we'll just -- you can

Page 15

1   just say that.
2              MR. WISNER: Are the medical
3      records listed on there? Is that --
4              MR. BRENZA: No.
5              MR. WISNER: Oh.
6              MR. BRENZA: It's maybe in the
7      supplemental one, but then this one -- it's --
8              MR. LEVINE: --
9              MR. BRENZA: It's just articles and
10     expert reports.
11             THE REPORTER: What was that,
12     Mr. Levine, you said?
13             MR. LEVINE: I said medical records
14     are not in the supplemental either.
15  Q  (By Mr. Brenza) Do you have Exhibit 4?
16  A  Yes. That's what I'm looking for, looking at.
17  Q  You're just verifying. Okay. Good.
18  A  Do you -- do you have the actual list for this case?
19     I want to verify something.
20  Q  I may.
21             MR. LEVINE: There wasn't a list
22     for this case other than the expert reports you
23     reviewed.
24             MR. WISNER: That's right. I'm
25     thinking of the expert disclosures that we did.

Page 16

1              MR. BRENZA: It was one -- it was
2      one for all, wasn't it?
3              MR. WISNER: Yeah, it was one for
4      all, and then we stated plus any references cited in
5      the expert report.
6              MR. LEVINE: Right.
7              MR. WISNER: This is what we said.
8              MR. LEVINE: Yeah.
9              MR. BRENZA: Okay. So --
10             MR. LEVINE: That's -- I'm just
11     clarifying that also.
12             MR. WISNER: Yeah.
13             MR. LEVINE: Yeah.
14             THE WITNESS: Okay.
15  Q  (By Mr. Brenza) So the answer is this is the same
16     list of materials that you relied on for this case as
17     previously?
18  A  Yes, the same list. Except I'm looking for
19     references. There's an additional references I added
20     for primary CNS lymphoma where they were listed.
21     They were not relevant to prior two cases, where they
22     were added -- because that's the only --
23  Q  I think those may be in the text of your report.
24             MR. WISNER: Exactly.
25             THE WITNESS: Okay. So that --

Page 17

1      that answers my question.
2   Q  (By Mr. Brenza) So if you'll look at Paragraph 6 of
3      your -- oh, we haven't marked your report. So I've
4      previously handed you what I've marked as Exhibit 37.
5   A  36. There we go.
6              MR. WISNER: It's in your hand.
7              THE WITNESS: Yeah.
8   Q  (By Mr. Brenza) Do you see that that's your expert
9      report prepared in Ms. Stevick's case?
10  A  That is correct.
11  Q  If you'll look at the Paragraph 6, do you see that
12     there are some references that had to do with PCNS?
13  A  Are you talking about Page...?
14  Q  Page 5.
15  A  Yes, I do see that.
16  Q  And are those the references that you were looking
17     for on the materials relied upon?
18  A  That's correct.
19  Q  Okay?
20  A  Because that's a different type of lymphoma. Making
21     sure that we covered this in references.
22             THE REPORTER: "We covered," what?
23             THE WITNESS: We covered them in
24     the references.
25             ///

Andrei Shustov, M.D.

Page 18

1           (Exhibit No. 38 marked for
2               identification.)
3
4   Q   (By Mr. Brenza)  And I also have marked, I think it
5       says 38.  Dr. Nabhan's report --
6   A   Mm-hmm.
7   Q   -- in the Stevick case.  Do you see that?
8   A   I do.
9   Q   And is this -- do we have the same situation here
10      where you borrowed language from Dr. Nabhan's report
11      and used it in your report for Ms. Stevick?
12  A   I see the same language in general causation section
13      that I used.
14  Q   Okay.  Did Ms. Stevick provide to you a history that
15      you were -- you used to try to identify risk factors
16      she may have had?
17  A   She did.
18  Q   Did you -- did you write -- and did you write it
19      down?  Did you have to take notes at the time?
20  A   At the time, yes.
21  Q   Do those notes still exist?
22  A   I don't believe so.
23  Q   What did Ms. Stevick tell you?
24  A   So when I asked her about standard set of questions,
25      that when I question cancer patient about prior

Page 19

1       exposures to typical carcinogens like radiation and
2       agricultural, industrial, military chemicals, her
3       answers that I document in my report were that she
4       did not have specific exposures to known
5       agricultural, household, military carcinogens,
6       ionizing radiation, except for using glyphosate.
7   Q   Did you conclude that the -- the sole known risk
8       factor Ms. Stevick had was her use of glyphosate to
9       kill weeds in her garden?
10  A   That was my conclusion, that exposure to glyphosate
11      was the main substantial contributing factor.
12  Q   Did you do that by eliminating other factors that you
13      believed were risk factors for non-Hodgkin's
14      lymphoma?
15  A   That is correct.  In her case, there were not many
16      factors that I brought to bear except for generally
17      discussed risk factors.
18  Q   Ms. Stevick's family had extensive history, an
19      extensive history of cancer, right?
20  A   She has significant history of colon cancer.
21  Q   Was her paternal uncle diagnosed with aggressive
22      lymphoma?
23  A   That is correct.
24  Q   And he died of that?
25  A   At the age of 90.  I'm sorry.  98.  He was diagnosed

Page 20

1       at the age of 90, yes.
2   Q   Both her -- her father and her mother had colon
3       cancer?
4   A   That is correct.
5   Q   Her maternal grandmother had colon cancer?
6   A   That is correct.
7   Q   Her paternal uncle had throat cancer?
8   A   That is correct.
9   Q   Her paternal cousin had breast cancer?
10  A   That is correct.
11  Q   Are some -- are there genes passed through families
12      that cause cancer?
13  A   For very specific types of cancer, to the best of
14      medical knowledge as of today.  So there are very few
15      hereditary cancers so far identified, and I think I
16      mentioned them earlier today.  Best examples would be
17      breast/ovarian cancer, hereditary colon cancer like
18      Lynch syndrome, and a few others.
19  Q   And are those cancers caused by single gene
20      mutations?
21  A   That is correct.
22  Q   Isn't it true that most cancer is probably not caused
23      by single gene mutations?
24  A   That is correct.
25  Q   And to the extent that it's a multifactorial genetic

Page 21

1       cause, it wouldn't necessarily be known what genes
2       are causing cancer at this time?
3   A   We don't consider it multifactorial genetic cause.  I
4       would not state that.
5   Q   Is that -- is that based on any research you've done
6       or just your personal feeling?
7   A   It is based on lack of evidence that cancers outside
8       those defined hereditary cancers have any genetic
9       markers that pass through the germ line.
10  Q   That just means you don't know what genes are causing
11      it.
12  A   Well, that's what I'm --
13  Q   -- the cancer.  It doesn't mean that genes aren't
14      causing it?
15  A   Well, until we know that, that's the knowledge that
16      we possess as an oncologic community, that there are
17      very few hereditary cancers.  We can speculate about
18      in the future what we find, but as of today, as I
19      mention, there are few defined hereditary cancer
20      syndromes, but outside that, we in general do not
21      consider majority of cancers as passed through the
22      germ line mutations.
23  Q   So is it your opinion that the fact that
24      Ms. Stevick's paternal uncle, mother and father,
25      grandmother, grandfather, paternal uncle, and

Andrei Shustov, M.D.

Page 22

1  paternal cousin all had cancer, that's just chance?
2  A   It might not be chance.  And in this kind of
3  situation, if she developed colon cancer, the GI
4  oncologist would initiate screening for known genetic
5  mutations that cause hereditary colon cancer
6  syndromes.  And if none of those mutations are found,
7  then we say it might be specifically for colon
8  cancer, be genetic predisposition.
9         It also plays a substantial role in hereditary
10  cancers, whether cancers are diagnosed in early age
11  or they're diagnosed in late stages.  So in most of
12  the hereditary cancers, one of the ways we suspect
13  them, if cancer is diagnosed at early age, whether
14  it's breast cancer, ovarian cancer, or colon cancer,
15  if you have history of -- let's say the best known
16  situation, breast cancer hereditary syndromes.
17         If you have two, three family members diagnosed
18  with breast cancer above the age of, I believe, 55 or
19  50, then we do not even initiate screening of the
20  patient related to those relatives.  If you have a
21  single or two relatives or immediate family relatives
22  diagnosed with breast cancer at the age of, say, 30
23  or 35, that immediately raises the red flag that it
24  is not the age group we diagnose breast cancer that
25  triggers the screening for known genetic -- genetic

Page 23

1  cancers.
2         The same thing with colon cancers.  If it's
3  diagnosed over the age of 55, it does not necessarily
4  trigger the investigation into hereditary colon
5  cancer.  If she had even half of that amount of
6  relatives diagnosed in early stage -- I'm sorry --
7  early age and she had colon cancer, that would
8  trigger investigation into the colon cancer.
9         But having a variety of cancers in the family of
10  different age and unrelated histology cancers do not
11  trigger automatic thought that her lymphoma could be
12  related to colon cancer in her immediate family.  At
13  least not in oncologist's mind.
14         Is it possible that she -- that her family has
15  some predisposition?  It is possible.  But to the
16  best available evidence, the only information we
17  have, yeah, she has several family members, but we
18  also do not know the family members were growing up
19  in conditions that are predisposed to cancer.
20         So to answer your question simply, there is no
21  direct correlation between that history and her being
22  diagnosed with lymphoma later in life.
23  Q   In your experience, is that a substantial history,
24  family history of cancer, what Ms. Stevick has?
25  A   I don't know what to -- how to define substantial

Page 24

1  cancer.
2  Q   It's an unusual amount of cancer in one family, in
3  your experience?
4               MR. WISNER:  Object to the
5  speculation.
6               THE WITNESS:  I'd say it is more
7  than average.  'Cause cancer is, as we established, a
8  common human condition especially with aging.  And as
9  an example, I don't recall the ages for most of these
10  family members.  But as you probably aware -- or we
11  can just discuss that -- 1 in 11 men, 1 in 10 women,
12  or maybe not excatpercentage, but close, will
13  develop prostate and breast cancer, respectively.
14  It's a very common cancer if we take people in their
15  80s and 90s.  Then -- and if your family members were
16  diagnosed at that age, and say, Wow, this is the
17  appropriate age group for this type of cancer.
18         So it would be much less impactful to me to
19  consider family history as opposed to early age of
20  diagnosis.  Once again, when we talk about hereditary
21  cancers, that in oncologist's mind pertains to
22  diagnosis of the same type of cancer in a patient in
23  front of you.  There are several defined cancer
24  syndromes where single gene mutations like
25  retinoblastoma gene can give rise to several

Page 25

1  different cancers, but there was a usually well-
2  defined histologic type of cancer.
3  Q   You mentioned age as being a relevant factor in
4  evaluating the significance of the family history of
5  cancer of Ms. Stevick.
6         How old was Ms. Stevick when she was diagnosed
7  with PCNS?
8  A   So she was diagnosed in late 2014.  If you could
9  remind me her date of birth.  I don't have it in my
10  records, or can calculate that.
11  Q   Well, we may find it in some medical records.  I'm
12  not going to testify for you.
13         But is it safe to say that she was in her mid 60s
14  when she was diagnosed?
15  A   It is -- it is fair to say.
16  Q   And by mid 60s, the incidence of cancer in people
17  that age has started to increase?
18  A   That is true, compared to 50s and 40s, yes.
19  Q   And that's true for non-Hodgkin's lymphoma and its
20  subspecies?
21  A   It is true.
22  Q   By the way, is -- is PCNS, is it a -- is it assumed
23  that it originates in the brain, or is it cancer
24  that's migrated there and -- and that's where it's
25  first found?

Andrei Shustov, M.D.

Page 26

1   A   It is a -- how should I put it? -- internal question
2       so far in oncologic community or in the lymphoma
3       community.  So we -- we don't know the answer to
4       that.  It is reasonable to assume it originates in
5       the brain because we don't find evidence of it
6       outside the brain at the time of diagnosis.  However,
7       we also do know that patients who are treated with
8       primary CNS lymphomas sometimes relapse outside CNS.
9       That begs the question that there were small amount
10      of cancer outside CNS that was treated concurrently,
11      and then the treatment for CNS was not enough to cure
12      it and they just manifest themselves.  So there's no
13      definitive answer to that question.  But it is a
14      reasonable speculation in the medical community.
15  Q   Would you expect that the same mechanisms that are
16      responsible for DLBCL in the body are responsible for
17      PCNS in the brain?
18  A   I do not have reasons to exclude it.  That's
19      possibility.
20  Q   And would you expect that, if it's the same cancer,
21      that it's going to have the same cause?
22  A   When you say the same cancer, the same diagnosis?
23  Q   No.  I'm now talking about what might cause this
24      cancer.  Right?  So we talked about DLB -- DLBCL as
25      being a very common form of non-Hodgkin's lymphoma.

Page 27

1       And you've said it's -- there are various things that
2       can cause it.
3           What I'm wondering is:  Is it the same case with
4       PCNS, or is it so different that it has different
5       causes, different probabilities, different
6       everything?
7   A   I would expect it to have similar causations to other
8       type of -- or subtype of diffuse large B-cell
9       lymphoma.  It might have in the future identifiable
10      additional risks specific for this lymphoma, but as
11      of today, I would say based on my knowledge of
12      lymphomas in published literature, that I would
13      assign the same risk factors for primary CNS, DLBCL.
14  Q   And when you say you'd assign the same risk factors,
15      would you also assign the same probabilities to those
16      risk factors?
17  A   I wouldn't have any reasons to believe that would be
18      different.
19  Q   Is it -- is it true for PCNS, as it was for DLBCL,
20      that the vast majority of the cases, the cause is
21      unknown?
22  A   I would have some difficulty answering that because a
23      proportion of primary CNS DLBCLs are known to arise
24      in the setting of HIV infection and infection with
25      Epstein-Barr virus.  So in those cases, we do know

Page 28

1       the -- the -- the causation that likely related to
2       viral agent, specifically EBV.  But in cases of
3       nonimmunocompromised host or the patient and non-HIV
4       infected and EBV negative primary CNS lymphomas, I
5       would make the same statement, that for majority of
6       those, we have not identified a reliable -- reliable
7       cause.  And I would apply the same risk factors that
8       we do to other lymphomas.
9   Q   Would you say the same thing you said about other
10      lymphomas, that the amount of cause that's not
11      attributable to any known cause is greater than all
12      the causes that are known?
13          MR. WISNER:  I'm going to object.
14          MR. BRENZA:  Do you understand the
15      question?
16          THE WITNESS:  I'm trying to process
17      it.
18          MR. BRENZA:  Do you want me to --
19      I'll ask it again, if you like.
20          THE WITNESS:  Could you?
21          MR. BRENZA:  Sure.
22  Q   (By Mr. Brenza)  If -- if you look at all the causes
23      that are known for PCNS and you add up all those
24      probabilities, it's -- it's true that the amount of
25      PCNS that's caused by other things still unknown is

Page 29

1       greater than the amount that's caused by the known
2       risk factors?
3           MR. WISNER:  I'll object as to
4       improper hypothetical.
5           THE WITNESS:  Outside clinical
6       scenario just described in HIV patient,
7       immunocompromised patients, I would say that for
8       majority of diagnosis, we do not have or we cannot
9       identify with hundred percent certainty what caused
10      primary CNS lymphomas.
11  Q   (By Mr. Brenza)  And I'm just trying to get a little
12      bit more precise of a statement.
13          I know that you can't say with a hundred percent
14      certainty.  But isn't it true that the majority of
15      cases, even accounting for all the known risk
16      factors, remain unexplained by those risk factors?
17  A   I think if you -- I would just consider the risk
18      factors, if -- as possible causes of lymphoma as we
19      discussed before.  So you -- you cannot lump the
20      lymphomas where we know that patients possess risk
21      factors into unknown causes.  Because by definition,
22      having the risk factor increases their risk of
23      developing lymphoma.
24          Then we're getting into the same discussion:  Is
25      it hundred percent certainty or not?  In patients who

Andrei Shustov, M.D.

Page 30

1  do not have identifiable risk factors for lymphomas,
2  let's say there -- that there we're in a situation
3  where we don't know what -- what could have
4  potentially caused the lymphoma.
5  Q   Well, this kind of goes to that statement that we --
6  that was on the Seattle website we talked about.
7  Exhibit 29.  Seattle Cancer Care Alliance website.
8  A   Yes.
9  Q   So my -- and my question is:  With respect to the
10  risk factors for PCNS, is it true that many people
11  who get the disease don't have any of those risk
12  factors, and most people with the risk factors don't
13  get PCNS?
14              MR. WISNER:  Objection; compound.
15              MR. BRENZA:  Let me break it apart.
16  Q   (By Mr. Brenza)  Is it true with PCNS that many
17  people who get the disease don't have any of the
18  known risk factors?
19  A   I don't know what propor -- yes, there will be
20  patients that will --
21              THE REPORTER:  It will, what?
22              THE WITNESS:  Yes, there will be no
23  -- there will be patients with no known risk factors
24  for lymphomas, and there'll be patient with PCNS who
25  have, again, risk factors like exposure to radiation,

Page 31

1  industrial chemicals, military compounds as we
2  discussed, pesticides.  So there'll be a proportion
3  of patients with primary CNS lymphomas who are
4  exposed to known factors that can cause lymphomas.
5      And what is the relationship between those
6  proportions?  I don't know.  You would have to
7  basically ask all the P -- primary CNS DLBCL patients
8  whether or not they have all of those.  I don't know
9  whether it's majority or minority, but there'll be
10  patients where you say, Well, there's no risk factors
11  for lymphoma, period, and patients who have primary
12  CNS lymphoma who have risk factors for lymphoma.
13  Q   (By Mr. Brenza)  And it's also true that most people
14  that have risk factors for PCNS don't develop PCNS,
15  right?
16  A   That is true.
17  Q   Did Ms. Stevick have Epstein-Barr virus?
18  A   Not to my knowledge.  And I would have to also
19  qualify my remark when I linked Epstein-Barr virus to
20  primary CNS lymphoma.  The Epstein-Barr virus has to
21  be present in the central nervous system.  So it's
22  not just exposure to Epstein-Barr virus like
23  mononucleosis where you're young or having mono in
24  later age is a risk factor for primary CNS lymphomas.
25  It's specific situation; in most cases, HIV positive

Page 32

1  patients with immunosuppression where EBV causes
2  specifically primary CNS lymphoma.
3  Q   Is it -- is it the combination of HIV and EBV that
4  cause it, or can either one?
5  A   HIV on its own does not cause primary CNS lymphoma.
6  It provides, in that setting, immunosuppression for
7  EBV virus to proliferate.  EBV on its own, without
8  evidence of HIV infection or the immunosuppression,
9  would be an unusual cause of primary CNS lymphoma,
10  but there are described cases.
11  Q   And in those cases, do they actually test the tumor
12  and find the virus in the tumor?
13  A   That is correct.  So in those cases, we do testing on
14  spinal fluid to look for CN -- for EBV particles.
15  And in those cases, tumor cells would uniformly be
16  infected with EBV.
17  Q   There's no comparable verification test for other
18  causes of PCNS, right?
19  A   No.
20  Q   So, for example, you can't test a tumor and see if it
21  was caused by a pesticide or a particular herbicide?
22  A   That is correct.
23  Q   Are you aware of any evidence that Ms. Stevick ever
24  had detectable levels of glyphosate in her body?
25  A   I'm not aware of any test results or any testing of

Page 33

1  glyphosate levels in Ms. Stevick.
2  Q   Are you aware of any medical testing that could
3  confirm whether glyphosate played a role in
4  Ms. Stevick's PCNS?
5  A   I'm not.
6  Q   Can you exclude the possibility that Ms. Stevick's
7  PCNS was primarily cased just by her age?
8  A   Well, as I stated before, I did not consider age as a
9  causative factor for any lymphoma, but a reflection
10  of other factors that are more prevalent in older
11  population.  And to answer your question in that
12  setting, I cannot exclude possibility that her
13  primary CNS lymphoma was caused by other factors
14  than, say, glyphosate exposure.
15  Q   What's referred to by idiopathic causes?
16  A   Idiopathic causes are causes that we cannot identify.
17  Q   Is the knowledge about PCNS and NHL in general still
18  evolving?
19  A   Of course.
20  Q   Is there still a lot to learn about what causes it?
21  A   Sure.
22  Q   Apologize if I've already asked this.  But is the
23  majority of PCNS caused by idiopathic causes, causes
24  that to date are still unknown?
25              MR. WISNER:  Objection; vague.

Andrei Shustov, M.D.

Page 34

1         THE WITNESS: I can't speculate on
2 a proportion of lymphomas caused by unknown causes.
3 As I stated before, the reason in many patients they
4 are unknown, because we do not really look for them.
5 And I make distinction between causes that we are not
6 even aware of or causes we do not consider when we
7 treat patients with lymphomas.
8      I believe that if part of medical care was to
9 take a very deep look what caused patients' cancer,
10 we would -- we would have a higher proportion of
11 lymphomas and other cancers that we would document
12 possible risk factors. But because it's not part of
13 the standard medical practice especially outside
14 academic practice, we say we don't know what caused
15 it.
16      Now, there are also causes that we -- don't even
17 aware of. But the proportion between those sectors
18 of causes I cannot comment on. As a simple statement
19 to the public and to the patients, as you saw on the
20 website, say majority is unknown. But within that
21 unknown, as an academic physician, like I said, I
22 define unknown because we never would make an effort
23 to look at that. And those that, if we look, we
24 don't find anything, then we don't know at all what
25 caused it.

Page 35

1 Q (By Mr. Brenza) Now, you keep saying that, We don't
2 look for causes of non-Hodgkin's lymphoma. But
3 somebody does, right? I mean, there are -- you've
4 looked at studies in this -- in your report that look
5 at certain causes?
6 A Sure.
7 Q Why do you think that other studies exploring a wider
8 range of possible causes of non-Hodgkin's lymphoma
9 aren't done?
10 A That goes to a completely nonmedical discussion.
11 Because those studies are expensive. You need
12 resources to do populational studies or any kind of
13 studies in medicine. And there is very limited
14 amount of patient information time that we have.
15     If we have capacity to study, as an example,
16 every candidate drug and lymphoma in realtime and
17 perform 500 trials a year as opposed to 30 trials a
18 year, we would be much better off curing lymphomas.
19 If we were able to do ten times more studies looking
20 at the causes of lymphoma, we would be much better
21 off having more causes on our list when I create my
22 differential etiology.
23     So that's not a medical -- that's the real,
24 real-life scenario. So, but I think it doesn't
25 change the fact that -- it will never change that we

Page 36

1 will have a cluster -- out of all the lymphoma
2 patients, we will have patients that, even if we look
3 on all known causes, we won't see identifiable out of
4 current list and it will be patients where we say,
5 Well, there was a known cause, but if you really
6 start asking, this patient had something growing up.
7 This parent is, okay, this is a cluster of patients
8 where we have known risk factors, but we never
9 questioned before. And then we have patient that we
10 say, Well, in this category, we know most likely what
11 caused it.
12 Q So with respect to PCNS and non-Hodgkin's lymphoma
13 generally, there aren't any clusters?
14 A Of cases?
15 Q Of cases.
16 A The only cluster that I know is in the HIV
17 population.
18 Q And isn't there -- isn't another reason why this kind
19 of question isn't answered that you can't just look
20 at the people who present with the disease in order
21 to figure out what's causing it? You have to look at
22 people who didn't get the disease as well?
23 A In a -- in a -- epidemiologic studies, yes.
24 Q And that involves looking at more people, large
25 numbers of people?

Page 37

1 A As we discussed, the, in general, larger studies are
2 better than smaller studies, but that's not an only
3 criteria that make the study reliable.
4 Q Is ionizing radiation a risk factor for PCNS?
5 A It is a risk factor for any type of cancer, including
6 lymphomas.
7 Q What exposure to ionizing radiation did Ms. Stevick
8 tell you when you interviewed her?
9 A She did not identify any history of ionizing
10 radiation in her life.
11 Q Would it have mattered to you if she had?
12 A I would have to look at exactly what the exposure was
13 and the doses of radiation she received, and -- and
14 then I would make my determination.
15 Q How much would it take for you to conclude that
16 exposure was a potential risk factor for her?
17 A So in a -- what we deal with in the medical world is
18 the level of radiation that people receive during
19 cancer treatment, like in radiation oncology, where
20 they receive anywhere from 20 to 60 gray of radiation
21 for treating their cancer. And the other example
22 would be, once again, are patients occupationally
23 exposed to situations like nuclear power plants or --
24 work in nuclear submarine if it's military, or other
25 accidental exposure to ionizing radiation in amounts

Andrei Shustov, M.D.

Page 38

1    that are considered significant.
2    Q   Is -- is the same standard, 20 to 60 gray, applicable
3    to occupation exposures, or is it a higher --
4    A   Well, hopefully --
5    Q   -- or different threshold?
6    A   -- people will not have that amount of exposure.
7    Because that's really harmful levels of radiation
8    that are employed out of necessity to treat cancer.
9    I think there are defined levels and different scales
10   by other industries for people who work in, like I
11   said, ionizing radiation occupational environment.
12   And I don't know off the top of my head what the --
13   it -- it might be EPA standards or the -- their
14   industry standards that define safe and unsafe.
15   That's why folks wear dosimeters in those facilities.
16   There is, I know, 20 to 40 gray, it's the medical
17   world.  That's something I deal with.
18   Q   Well, and so by 20 to 40 gray, clearly you've taken
19   on some risk.  Is there a risk of PCNS before you get
20   up to a level that high?
21   A   The studies in medicine, when the studies pertaining
22   to radiation therapy treatment have instructed us
23   that the dose of radiation matters.  'Cause over
24   time, we started employing lower doses of radiation,
25   say, to treat Hodgkin lymphoma, non-Hodgkin lymphoma.

Page 39

1    And long-term studies indicate that the incidence of
2    secondary cancers are lower if you use 20 versus 40
3    or even 30 versus 40.  And at that level of radiation
4    makes a difference.
5    Q   And my question was:  Are there levels below 20 gray
6    that still increase the risk of PCNS?
7    A   I do not have information on that.  So, again, I
8    operate on the facts.  And clinical trials, we know
9    exactly the dose of radiation patients receive, but
10   the -- any information about levels lower than that
11   were not studied at least in my medical world, so I'm
12   not aware.
13   Q   Well, and I guess my question is:  Based on the
14   analysis you're using in this case, would you --
15   would you find exposures less than 20 gray to
16   nevertheless add to the risk of PCNS in Ms. Stevick's
17   case?
18   A   I -- I don't recall her being exposed to radiation.
19   Q   My question was simply:  What -- what would you
20   conclude if -- if she told you that she'd been
21   exposed?  And you said, Well, that would depend on
22   how much.  And so I'm now telling -- now trying to
23   find out where -- how much do you need before it
24   becomes a risk factor?
25   A   So I -- I cannot answer this question.  I don't have

Page 40

1    knowledge of minimum amount of radiation that's --
2    that becomes non, basically, carcinogenic.  I have to
3    be complete sort of unfounded hypothesis, say, well,
4    I can't quantify it, but potentially you could have
5    additional impact from whatever radiation you
6    received.
7    Q   With respect to chemical causes of -- or chemical --
8    chemicals that increase the risk of PCNS, did you
9    find any chemical exposures of Ms. Stevick that you
10   thought were significant risk factors that you would
11   consider?
12   A   I just want to kind of make the, first of all,
13   defining statement that I would consider this
14   discussion of this causation in the setting of
15   diffuse large B-cell lymphoma because primary CNS
16   lymphomas are very rare.  And so when you -- when you
17   define this, I would fall back on discussions of
18   DLBCL.
19      We can continue to say risk factors for primary
20   CNS lymphoma, but that would not sort of change my
21   determination whether we call it DLBCL or primary CNS
22   lymphoma.
23   Q   And are you saying that with respect to chemical
24   causes only or all the causes that we've talked
25   about?

Page 41

1    A   All of the causes.  Except for EBV.  That's a very
2    specific cluster.
3    Q   And EBV is specific to PCNS?
4    A   EBV in the setting of HIV infection.  But EBV is not
5    specific only to primary CNS lymphoma.  It's also a
6    known cause of so-called extranodal nasal NK-cell
7    lymphoma.  And if you really want to dive into it,
8    NK-cell lymphoproliferative disorder with childhood
9    or aggressive NK-cell leukemia.  So there's a cluster
10   of lymphoid cancers that specifically associated with
11   EBV.  In a -- and also post-transplant
12   lymphoproliferative disease.  Again, I can -- I
13   don't --
14   Q   Yeah.
15   A   -- want to spend time if you don't -- yeah.
16   Q   That's enough.  Unless you want to add more.  But
17   what I really want to do is get to something that has
18   to do with Ms. Stevick.
19      So with respect to chemical exposures, obviously
20   you've made a conclusion about Roundup.  Were there
21   any other chemical exposures that you found were a
22   risk factor for Ms. Stevick?
23   A   I don't recall identifying, based on her statements
24   and our encounter that she mentioned, I would
25   consider her a significant risk.

Andrei Shustov, M.D.

Page 42

1  Q  And you said earlier that chemical exposures do not
2     discriminate as to the types of non-Hodgkin's
3     lymphoma they cause.  Is that your view?
4  A  It is my view.
5  Q  And when you -- when you said that, was it your
6     position that, if a chemical causes one kind of
7     non-Hodgkin's lymphoma, it would cause all the types
8     of non-Hodgkin's lymphoma?
9  A  Mechanistically that would be my -- my impression, my
10    conclusion.  Statistically epidemiologically, we
11    already discussed there might be interesting
12    variations, and my curiosity in those cases is
13    whether those also have other significant
14    contributing factors in specific subtypes that
15    separate those out in the setting of chemical
16    exposure.  Because mechanistically I can't identify
17    the pathway or path why would -- a chemical exposure
18    would increase the risk of a particular type of
19    lymphoma based on mechanistic impact of carcinogenic
20    chemicals.
21 Q  Are you saying that because the same mechanism could
22    work on any lymphocyte, that something that employs
23    that mechanism should be able to cause cancer in any
24    lymphocyte?
25 A  In terms of chemical exposure and radiation exposure,

Page 43

1  Q  Is that true for not just for all types of
2     non-Hodgkin's lymphoma but all types of cancer?
3                 MR. WISNER:  Objection;
4     speculation, overbroad.
5                 THE WITNESS:  As a -- as a
6     broader -- I'm stating my opinions, my hypothesis.
7     Right?  So this -- I don't have literature to
8     basically state that.  I say this as a lymphoma
9     physician, investigator, that a mechanistic path that
10    causes DNA breakdown by, say, ionizing radiation and
11    chemical exposure would have, in my mind, capacity to
12    cause cancer of any type.
13       Now, having said that again -- and this is a
14    broad statement -- give an example:  Radiation put --
15    we know that would have potentially a different
16    threshold of causing different types of cancers.
17    That is suggested from just the radiation --
18    radiation therapy world.  But mechanistically I would
19    imagine that the chemical factors and radiation
20    factors would have capacity for DNA breakage in any
21    type of cells unless there is particular biologic
22    reason that this chemical is restricted from
23    particular type of cell.
24 Q  In thinking about the mechanisms of certain
25    chemicals, is there a test called the Ames test

Page 44

1     that's used?
2  A  I'm not familiar with the Ames test.
3  Q  Is there any literature that supports your view that
4     a chemical cause of -- a certain type of
5     non-Hodgkin's lymphoma can cause all forms of
6     non-Hodgkin's lymphoma?
7  A  No.  As I stated, this is my view, hypothesis, based
8     on how I imagine mechanistic impact on living cell.
9     I cannot cite any literature on that.
10 Q  Okay.  And so when you say it's you're hypothesis,
11    you're not necessarily saying it's true.  It's just
12    an idea that you have?
13 A  That is correct.
14 Q  How much Roundup or glyphosate did you find Ms. Stevick
15    had been exposed to?
16 A  First on my finding is based on questioning the
17    patient, which I didn't have reason to doubt what
18    Ms. Stevick informed me, that she was using Roundup
19    from 1989 through 2014 and that she was spraying
20    Roundup once a month for ten month a year, March
21    through December.  She did not use -- yes, so this
22    was the amount of -- in duration.
23 Q  And the use that Ms. Stevick told you she made of
24    Roundup was for her garden, home and garden?
25 A  That's what she said.  In her own words, quote, she

Page 45

1     loved gardening, and in 1989 she started using
2     Roundup to control unwanted vegetation in her garden
3     and some areas around her property, including the
4     lawn, as was suggested by her landscaper.
5  Q  Did you make any calculation of how much Roundup
6     Ms. Stevick may have absorbed over the course of her
7     entire use of Roundup?
8  A  No, I have no means of calculating that.
9  Q  Did you make any assumptions about how she applied
10    it?
11 A  I did not make assumptions.  I -- she -- when I asked
12    her how she applied it, she used this by hand
13    spraying, and she also, herself, used to dilute
14    Roundup concentrate, with frequent spills.  But I
15    cannot have -- I do not have means to confirm that.
16    This is from patient's words.  So she stated that
17    she was using the sprayer, hand sprayer.
18 Q  And you don't have any means to quantify it, right?
19 A  I don't have any means qualifying how many gallons
20    she used or how much she sprayed as far as volume or
21    quantity.
22 Q  Or how much she got on her hands or -- or any other
23    means of exposure?
24 A  No, I don't have means of quantifying that.
25 Q  Just going back to something I asked earlier.  When

Andrei Shustov, M.D.

**Page 46**

1  you physically examined Ms. Stevick, how long did you
2  spend on the exam?
3  A  20 to 30 minutes.
4  Q  How long did you interview her for?
5  A  Our whole encounter was around an hour and a half.
6  Q  So about an hour of talking?
7  A  Yes.
8  Q  Have you had any further dealings with her since
9  then?
10  A  Any further encounters?
11  Q  Yes.
12  A  No.
13  Q  Had you ever treated Ms. Stevick prior to that event?
14  A  No.
15  Q  Had you ever met her or talked to her in any way
16  prior to the day that you met her at the Marriott to
17  examine her?
18  A  No.
19  Q  Did you -- who set up the meeting?
20  A  The counselor's group.
21  Q  So one of Ms. Stevick's lawyers in this case?
22  A  I don't actually know who set it up.  I received the
23  e-mail that I was asked to see the patient and
24  e-mail, I believe, with -- from Kathryn Forgie.  I --
25  I don't remember who was copied on it, but I don't

**Page 47**

1  know who actually set it up.
2  Q  Were you provided any materials to prepare for the
3  meeting?
4  A  I was provided with medical history of Ms. Stevick.
5  Q  And when you say a medical history, what -- what do
6  you -- was it a summary, or...?
7  A  I'm sorry.  Medical records.
8  Q  Medical records.  Okay.
9     So you reviewed her records before you met her?
10  A  That is correct.
11  Q  Do you still have all those records?
12  A  Yes.  I have electronic file of her medical records.
13  Q  In Paragraph 5 of Page 4 of your report, you talk
14  about a variant of R-CHOP that Ms. Stevick received.
15  What was the -- what was the precise regimen that
16  Ms. Stevick was given?
17  A  Paragraph 5.  What page are you talking about?
18  Q  Page 4, Paragraph 5.  It's the paragraph beginning
19  with the word "R-CHOP."
20     Do you see it?
21  A  The very last paragraph?
22  Q  Yes.
23  A  Can I have a minute to review it?
24     Okay.  So what's the question?  I'm sorry.
25  Q  What was the variant of R-CHOP, if there -- if there

**Page 48**

1  was one, that was used for Ms. Stevick?
2  A  Ms. Stevick received a different therapy for primary
3  CNS lymphomas that I describe in her treatment
4  history.  I can't really call it a variant of R-CHOP.
5  Q  Well, the paragraph you wrote refers to R-CHOP or,
6  quote, "similar combination chemotherapy regimes,
7  including the one that Ms. Stevick received."
8     Do you see that?
9  A  I do.
10  Q  So what was the -- was the treatment she received a
11  similar combination chemotherapy regime, or regimen?
12  A  It is not very similar but has some of the same
13  components that R-CHOP, specifically vincristine and
14  rituximab.  And she had --
15     THE REPORTER:  "Specifically,"
16  what?
17     THE WITNESS:  Vincristine and
18  rituximab.
19  Q  (By Mr. Brenza)  Could you spell those?  Just
20  because we'll never get them right otherwise.
21  A  Sure.  Rituximab spelled as r-i-t-u-x-i-m-a-b.  And
22  the second, V-i-n-c-r-i-s-t-i-n-e.
23     And the remainder of the agents were different
24  from R-CHOP.
25  Q  Do you know what the other ones were?

**Page 49**

1  A  Yes.  It's as stated in my --
2  Q  Where?
3  A  -- treatment history on Page 2 of my report.  The
4  third full paragraph.
5  Q  Okay.  I see it.
6  A  Could I request a bathroom break?
7  Q  Sure.
8  A  Okay.
9     THE VIDEOGRAPHER:  All right.
10  We're going off record.  The time is 3:48 p.m.
11     (Pause in proceedings.)
12     (The following held off the
13     videotape record.)
14
15     MR. WISNER:  At this time the
16  plaintiffs designate this deposition, the one before,
17  and the one before that, all related to Dr. Shustov,
18  as confidential pursuant to the protective order.
19     (The following held on the
20     videotape record.)
21
22     THE VIDEOGRAPHER:  We are back on
23  record.  The time is 4:03 p.m.
24  Q  (By Mr. Brenza)  Doctor, just to verify something
25  that I think you'll agree with as just consistent

Andrei Shustov, M.D.

## Page 50

1   with how you've testified:  The method you're using
2   for Ms. Stevick is the same as you've used in the
3   past, which is the differential diagnosis method,
4   right?
5   A   That is correct.
6   Q   And that's the method where you identify what you
7   consider to be the universe of risks and then
8   eliminate all the risks until the remaining risks
9   account for the cancer, in your mind?
10  A   That is correct.
11  Q   And like when I've asked you before, there's no --
12  there's no study or protocol that validates that kind
13  of procedure for determining the cause of a cancer or
14  a tumor, right?
15              MR. WISNER:  Objection; vague.
16              THE WITNESS:  I am not aware of a
17  study that would use such methodology to determine
18  cause of cancer in -- in the research study, per se.
19  But that's the methodology that is frequently used by
20  practicing physicians in daily practice and for
21  specific reasons to identify most probable syndrome
22  or diagnosis, or in this case, as I would apply to --
23  to causes of person's cancer.
24  Q   (By Mr. Brenza)  And there's no protocol that you're
25  aware of for conducting causal analyses that would

## Page 51

1   recommend or validate the procedure that you've used
2   in this case of -- of differential diagnosis?
3              MR. WISNER:  Objection; vague.
4   Q   (Continuing by Mr. Brenza)  Right?
5   A   I am not aware of any.
6              THE REPORTER:  What was that,
7   Doctor?
8              THE WITNESS:  I am not aware of
9   any.
10  Q   (By Mr. Brenza)  And I'm going to ask you the same
11  question I asked before.  If ten people showed up
12  with exactly Ms. Stevick's history and medical
13  background and exposures, how many of those ten
14  people would you say had PCNS caused by glyphosate?
15  A   As -- as we -- as I stated before, that I would make
16  the statement and all those ten people I would
17  conclude that glyphosate was the -- more likely was
18  the contributing factor than it wasn't.
19  Q   And when you say more -- more likely it was a
20  contributing factor, are you saying that in all ten
21  people you'd say that glyphosate was the -- more
22  likely than not the cause of the PCNS?
23  A   That's correct.
24  Q   Would this be true if it were a hundred or a thousand
25  people with exactly the same background?

## Page 52

1   A   I don't see why I would discriminate any other
2   patient with exactly the same history to state the
3   probability based on, again, my methodology.
4   Q   And with respect to any of those thousand patients
5   presenting with identical medical backgrounds, would
6   there be any way to prove that you were wrong about
7   what actually caused their PCNS?
8              MR. WISNER:  Objection; incomplete
9   hypothetical, speculation, vague.
10             THE WITNESS:  Well, from your
11  question, I understand that saying that we assume
12  that -- let me rephrase that.
13      So the way I understand the question, that you're
14  saying that in those thousand patients, I stated that
15  glyphosate caused their lymphoma, which is not my
16  statement, unless I understand it incorrectly.  For
17  same number of people, say hundred or thousand, I
18  would say, in the identical situation, that if they
19  had same exposure of glyphosate, that more likely
20  than not to cause it, I cannot with hundred percent
21  certainty say what caused their cancer.
22  Q   (By Mr. Brenza)  But you would say it, more likely
23  than not, it was caused by glyphosate?
24  A   I'm just processing hypothetical situation.  It's not
25  every -- it's not usual way of thinking.

## Page 53

1      Yes, so more likely than not that it either
2   contributed or caused the lymphoma.
3   Q   And when you say contributed or caused, you're
4   talking about more likely than it?
5   A   More likely than not either contributed or caused.
6   When I say contributed, I cannot with hundred percent
7   certainty exclude other significant contributing
8   factors.
9   Q   And with respect to those thousand identical
10  patients, there's no way to show that you were wrong
11  about any of them in terms of what actually caused
12  their tumor, right?
13             MR. WISNER:  Objection; overbroad,
14  vague, speculative.
15             THE WITNESS:  I guess the way to
16  show I'm wrong would be if somebody comes up with a
17  test on biopsy that shows definitively the
18  causative --
19  Q   (By Mr. Brenza)  Some sort of --
20  A   -- sort of --
21  Q   -- a tag, around that tag or whatever, like a
22  definitive mutation or something?
23  A   Something like that, yeah.
24  Q   But short of that, which isn't known right now,
25  right?  There's no such thing as a test?

Andrei Shustov, M.D.

Page 54

1    A   There's no such thing.
2    Q   Short of that, there's no way any of those thousand
3        diagnoses that you would have made could be
4        challenged?
5                    MR. WISNER:  Objection.
6                    THE WITNESS:  Well --
7                    MR. WISNER:  Improper --
8                    THE WITNESS:  What I'm --
9                    MR. WISNER:  -- hypothetical.
10                   THE WITNESS:  What I'm making is,
11       it's my assessment of probability that I believe that
12       it's as precise I can get, as vague as I can get with
13       not having definitive tag, which you called it, to
14       identify the source, that based on information
15       discussed in all these depositions, that it's more
16       likely than not.  It does not mean hundred percent it
17       was caused by glyphosate.  But information at hand,
18       I'm just stating probability.
19   Q   (By Mr. Brenza)  And that probability would -- would
20       hold with respect to all 1,000 of those patients?
21                   MR. WISNER:  Objection; improper
22       hypothetical, speculative.
23                   THE WITNESS:  Identical scenario.
24       I don't see why I would discriminate any of those
25       thousand patients compared to other.  They have the

Page 55

1        same exact story.
2    Q   (By Mr. Brenza)  Have you ever used Roundup?
3    A   No.
4    Q   Do you know that Roundup is commonly used?
5                    MR. WISNER:  Objection; beyond the
6        scope, speculation.
7                    THE WITNESS:  I don't know how
8        widely it's used.  I've seen walls of Roundup at
9        Lowe's when I go shopping there.  But I don't know
10       how extensively -- what the -- what the sales are or
11       how extensively used.
12   Q   (By Mr. Brenza)  It's not something that comes up
13       with your patients?
14           Let me ask it --
15   A   It's not something frequently comes up in a
16       discussions, first encounter, unless patients point
17       out specifically.  And like I said, I do elicit as
18       diligently as I can, every new encounter, whether
19       patients are exposed to agricultural, herbicides,
20       pesticides, et cetera.  It -- no, it does not come on
21       -- come up that often.
22   Q   Okay.  And it comes up in the context of all kinds of
23       chemical exposures?
24   A   I don't know if patients, themselves, lump it into --
25       I don't specifically ask about Roundup.  My usual

Page 56

1        line of questioning in medical practice is:  Do --
2        are you exposed to any significant amount, in your
3        mind, to pesticides, agricultural chemicals, and risk
4        that we discussed.  If patients say "no," I don't dig
5        into the specifics.  If patients -- I can assume that
6        if patients don't know what Roundup is, some -- you
7        know, they're oblivious to it, they would say "no" to
8        these questions.  So I do not in regular daily
9        practice dig into details.
10   Q   Have you ever told one of your patients to stop using
11       Roundup?
12   A   I don't recall discussions about Roundup with
13       patient.  Like I said, it doesn't come up.  I don't
14       remember last time we even -- it was brought up in
15       the discussion in my -- in my clinic.
16                   (Exhibit No. 39 marked for
17                    identification.)
18
19   Q   (By Mr. Brenza)  If you would direct your attention
20       to what I've previously marked as Exhibit 39.  Do you
21       see that that's a medical record concerning Ms.
22       Stevick dated November -- sorry -- September 2018?
23   A   Yes, I do.
24   Q   And I just have this record to review Ms. Stevick's
25       medical history.  And do you see under "Family

Page 57

1        Medical History," there's a list of relations and the
2        problems that they've experienced?
3    A   I do see it.
4    Q   And do you see it refers to a cousin who had breast
5        cancer?
6    A   Yeah.
7    Q   Father who had colon cancer?
8    A   Yep.
9    Q   Maternal grandmother who had colon cancer?
10   A   Yep.
11   Q   Another maternal grandmother who that colon cancer?
12   A   Yep.
13   Q   Mother that had colon cancer?
14   A   Yep.
15   Q   Father had melanoma?  That's skin cancer, right?
16   A   That's correct.
17   Q   And then the maternal aunt who had multiple myeloma?
18   A   Yep, I see that.
19   Q   And is multiple myeloma a lymphatic cancer?
20   A   It's -- it's in the larger subfamily of lymphocytic
21       cancers.
22   Q   Is that medical history consistent with what you
23       understood Ms. Stevick's family history of cancer
24       was?
25   A   Well, we can compare it to my report from her

Andrei Shustov, M.D.

Page 58

```
1    recollection at the time.  I would document
2    everything she told me.
3        Paternal uncle, aggressive lymphoma.  We can
4    match this if -- one by one.  So additional cancer.
5    Colon cancer, both her dad and mom, maternal
6    grandmother, grandfather.  So that's four.  Is that
7    correct?  One, two, three, four.  So we captured
8    that.  We capture aggressive lymphoma in her uncle.
9  Q  I'm not sure that's on the 39, Exhibit 39.  Do you
10   see it?
11 A  That's what I'm trying to match with my records,
12   yeah.  So paternal uncle.  I actually don't see that.
13   Do you see that?  That's what she told me.
14 Q  They don't match up exactly.  There's some that are
15   on Exhibit 39 that are not in her --
16 A  Okay.
17 Q  -- report.  Some that are in her report that are not
18   on Exhibit 39.
19 A  Okay.  Most of them match, yeah.  Breast cancer in
20   her cousin, right?  So we have that.  Cousin, breast
21   cancer.  And so the only thing that mismatched or I
22   don't have in my report that she might have
23   forgotten, melanoma.  Do I have that there?  I don't
24   think so.  And multiple myeloma, maternal aunt.  I
25   don't recall that.  Okay.
```

Page 59

```
1  Q  Do any of the new items of family history concerning
2    cancer affect your view of whether her family history
3    of cancer was an independent risk factor?
4  A  No.
5        MR. WISNER:  Just for the record,
6    there was a throat cancer in your report as well.  We
7    didn't get that far.
8        THE WITNESS:  Where is that?
9        MR. WISNER:  At the very end.
10       THE WITNESS:  Okay.  Okay.
11   Paternal uncle.
12 Q  (By Mr. Brenza)  Is Exhibit 39 consistent with your
13   prior view that this is a above-average amount of
14   cancer to have in one family?
15 A  It's a vague statement.  It just -- my sort of
16   general perception how many members of families can
17   be affected by cancer, say above average.  The most
18   concerning this history for me would be one, two,
19   three -- four members of immediate family affected by
20   colon cancer.  So that's somebody that, if I saw
21   this, her in my clinic as a treating physician,
22   besides her lymphoma, I would say, I'd like you to
23   see our genetic counselor or the colon cancer
24   physician intake department to see if they want to
25   screen you for hereditary colon cancer conditions.
```

Page 60

```
1        (Exhibit No. 40 marked for
2        identification.)
3
4  Q  (By Mr. Brenza)  Exhibit 40 is a decision on
5    benefits -- I forget who it was from -- California
6    Insurance Department.
7        MR. WISNER:  Where do you see that?
8        MR. BRENZA:  I see it on the --
9    second to last -- page, or last page.  But I'm not
10   sure if that's --
11       MR. WISNER:  No.
12       MR. BRENZA:  -- where we're looking
13   at.
14       MR. WISNER:  I think that's --
15   that's if you want a report.  Yeah.
16 Q  (By Mr. Brenza)  Did you discuss with Ms. Stevick
17   her -- her work history?
18 A  Yes.
19 Q  Did you discuss with her the time you met with her
20   whether she was able to go back to work?
21 A  I do not recall that specific discussion.  I can
22   check my -- I -- I don't recall discussing that.
23 Q  We'll come back to this one later.
24       MR. WISNER:  For what it's worth, I
25   looked at the record, and it looks like there's a --
```

Page 61

```
1    her first two are a company called Unum.  I don't
2    know if that's...
3        MR. BRENZA:  This could be, like,
4    supplemental insurance benefits or something.
5        MR. WISNER:  Yeah.
6        MR. BRENZA:  It's produced by you
7    guys, I think.  Is that --
8        MR. WISNER:  Yeah.
9        MR. BRENZA:  -- what PPR is?
10       MR. WISNER:  That would make sense.
11   On Page 4 of 6, though, it says, "After 24 months of
12   payments, Unum defines another occupation as."  So I
13   don't know if that's a proper noun or not.
14 Q  (By Mr. Brenza)  Based on your examination of
15   Ms. Stevick, did you see any reason why she could not
16   return to work?
17       MR. WISNER:  Objection; beyond the
18   scope.
19       THE WITNESS:  As a general
20   oncologist or oncologist specializing in lymphomas, I
21   never do these determinations when specifically asked
22   by board compensation groups or -- we refer patients
23   to special physical therapy department.  But as a
24   clinician's assessment, I did not see significant
25   reasons for her to return to work at the time I
```

Andrei Shustov, M.D.

Page 62

1  examined her.
2      But, again, I'm not -- this determination is
3  typically done by specialized professionals who test
4  patients for their strength and for their -- it's --
5  even in my practice, it's beyond the skills besides
6  me just saying, Medically, I clear you for work.  You
7  don't have infections.  You don't have particular
8  medical conditions that I'm concerned about, bleeding
9  or what have you, low platelets.  But as far as her
10  abilities to perform duties, that requires special
11  testing, and they do strength assessment and their
12  endurance and how they walk steps and all that.  So
13  from medical standpoint, I did not see, in my
14  opinion, contraindications to going back to work.
15  Q  (By Mr. Brenza)  Okay.  So just to make sure.  I
16  think you may have misspoke earlier.  Did you find
17  any reason that she couldn't go back to work if she
18  wanted to?
19  A  In my capacity, no.
20          (Exhibit No. 41 marked for
21           identification.)
22
23  Q  (By Mr. Brenza)  Okay.  If you look at Exhibit 40 --
24  sorry -- 41.
25  A  I have it.

Page 63

1  Q  This is a medical record dated August 2018 from her
2  provider, Jerome Kim.  See that?
3  A  Yes, I do.
4  Q  And you know Mr. Kim, Dr. Kim, was a doctor who
5  treated Ms. Stevick for her illness?
6  A  I think I recall his name from medical records.
7  Q  Do you see that he's given a subjective evaluation of
8  Ms. Kim on August of 2018?
9  A  That's the clinic note from the visit on that date,
10  yes.
11  Q  And his assessment is:  Energy good; no limitations
12  in daily activities; no headaches; no vision changes;
13  no focal weakness or numbness; no night sweats,
14  unintentional weight loss, fatigue.
15      Do you see that?
16  A  I do.
17  Q  Is that consistent your examination of Ms. Stevick
18  that she had good energy and no limitations on her
19  daily activities?
20  A  That is correct.
21  Q  Okay.  That's all I've got on that one.
22      Are there any epidemiological studies on which
23  you rely that specifically relate to PCNS?
24  A  No.
25  Q  Do you rely on -- to the extent you do rely on

Page 64

1  epidemiological studies, do you rely on those studies
2  that deal with diffuse large B-cell lymphoma?
3  A  That is correct.
4      MR. BRENZA:  Can we take a few
5  minutes?  I might be -- I might be done.  I just want
6  to make sure.
7      THE VIDEOGRAPHER:  All right.
8  We're going off record.  The time is 4:25 p.m.
9          (Pause in proceedings.)
10
11      THE VIDEOGRAPHER:  We are back on
12  record.  The time is 4:33 p.m.
13  Q  (By Mr. Brenza)  Coming down the homestretch.  If you
14  would take out Exhibit 37, your expert report in the
15  Stevick matter, please.  And I just want to verify
16  which sections you borrowed from you borrowed from
17  Dr. Nabhan and which sections you were the original
18  author.
19      Can we go page by page and you just tell me
20  whether you authored them or you borrowed them from
21  Dr. Nabhan?
22  A  Okay.  I would like to say I -- I'm an author of this
23  report, and I used the language from Dr. Nabhan's for
24  some of the statements to save me time, but I stand
25  by the statement, and I -- I feel I authored this

Page 65

1  report.  And it's not uncommon practice in even our
2  academic world to borrow each other's slides to save
3  time.  So it does not undermine my standing behind
4  any word in this report.
5  Q  So which -- are the portions of your report that you
6  used Dr. Nabhan's language for the parts that have to
7  do with general causation?
8  A  That's correct.
9  Q  And is that the part that begins under "Discussions
10  of Ms. Stevick Lymphoma Causation" on Page 6 of
11  Exhibit 37 and continues to the end?
12  A  Well, I can't really -- again, this was not
13  subconscious or unconscious cut and copy.  I was
14  generating the report.  I would have to look where I
15  inserted my own words or where I did, and I don't
16  have sort of memory, Oh, this is mine; this is not
17  mine.  Because, to me, it's all -- I generate this
18  report by typing and using the language as we
19  established with Dr. Nabhan report and typing
20  something in.  So I -- we can look at it, so I don't
21  know exactly.
22  Q  Are you saying that you don't know which portions of
23  your report you actually wrote versus which portions
24  you took language from Dr. Nabhan?
25  A  I --

Andrei Shustov, M.D.

Page 66

1      MR. WISNER:  Objection; misstates
2   his testimony.
3          THE WITNESS:  I -- I wrote all of
4   my report.  Like I said, the -- some of the sections.
5   I used the language as saving time to state the --
6   exactly the same facts.
7   Q   (By Mr. Brenza)  And are those sections that have
8   to do with general causation? is my other question.
9   A   Yes, I believe so.
10  Q   So is that the section beginning on Page 6,
11  "Discussion of Ms. Stevick Lymphoma Causation,"
12  portion that's under that?
13  A   Well, it would help me to go, then, and see what
14  exactly portions I put.  And I -- I don't remember
15  that.  It's -- like I said, it's --
16  Q   Well, do you know, was it the Dr. Nabhan's report in
17  this case that you were using, in Ms. Stevick's case?
18  A   I believe I stated yesterday, that when I was writing
19  all three reports at the same time and Mr. Hardeman's
20  report was first, I generate Mr. Hardeman's report,
21  then I was typing the other two reports and composing
22  them as I go using, you know, the first report I
23  generated, and...
24  Q   Okay.  So it would be the portion that doesn't have
25  to do specifically with Ms. Stevick, then, since you

Page 67

1   copied it from the Hardeman report?  Is that what
2   you're saying?
3   A   Say it again.
4   Q   Is it -- is the portion of Exhibit 37, your report on
5   Ms. Stevick that traces back to Dr. Nabhan, the
6   portion that doesn't have to do specifically with
7   Ms. Stevick, the general causation --
8   A   Correct.  So these -- these are general facts, but
9   not my specific assessment of Ms. Stevick or specific
10  causation or anything that relates to specific
11  causation.
12  Q   And, again, just trying to identify what part of this
13  report that would be.  Is that the part on Page 6
14  under "Discussion of Ms. Stevick Lymphoma Causation"
15  to the end of the report?
16  A   I believe this is the portion that had most overlap,
17  as other counsel highlighted yesterday.  But, again,
18  to verify that, you have just to open Mr. Nabhan's
19  report, and we can go --
20  Q   And you have it.  So if you want to look --
21  A   Okay.
22  Q   -- at it, you're welcome to.  I just didn't -- I
23  thought you said that this is not the report that
24  you've used, but --
25  A   I'm sorry?

Page 68

1   Q   I thought you had said that Dr. -- the report we've
2   marked from Dr. Nabhan with respect to Ms. Stevick
3   wasn't the report that you -- that you used.  But if
4   it'll help you, refer to it.
5   A   I used Mr. Nabhan's report to use the language in my
6   first report on Mr. Hardeman, so -- and as you
7   stated, by default, I have my Hardeman's report, and
8   I'm typing other two reports.  And because it's the
9   same type of lymphoma and the same description of
10  general education about lymphoma.  So I transfer
11  this, as you can see also, discussion of lymphoma in
12  general from other reports, my reports, that I was
13  typing all at the same time.
14  Q   Okay.  So can you verify which parts you -- which
15  parts derive to Dr. Nabhan and which parts do not?
16         MR. WISNER:  Counselor, I think the
17  -- I think the confusion here -- I'm just going to
18  throw it out there -- might be that -- are you asking
19  for, like, each word or are you looking for just --
20         MR. BRENZA:  No.
21         MR. WISNER:  -- general section?
22         MR. BRENZA:  General sections.
23  Large -- general sections that -- that are largely if
24  not entirely derived from Dr. Nabhan.
25         THE WITNESS:  Okay.  Can we

Page 69

1   identify -- this is Stevick's report.  I don't
2   believe I have Stevick's report from Dr. Nabhan.  We
3   would have to find the --
4          MR. BRENZA:  So --
5          THE WITNESS:  -- report that I
6   used.
7          MR. WISNER:  And, Counsel, this was
8   the -- the document that we said we would agree to
9   produce --
10         MR. BRENZA:  Right.
11         MR. WISNER:  -- once we found...
12         MR. BRENZA:  So, Doctor, I don't
13  have that report to show you right now.
14         THE WITNESS:  No, I was asking for
15  the documents where other counsel highlighted.  This
16  was, I think...
17         MR. BRENZA:  Those will be in the
18  exact.
19         MR. WISNER:  Exhibit 13.
20         MR. LEVINE:  Exhibit 10.
21         MR. WISNER:  13.
22         MR. LEVINE:  Oh.  13?
23         MR. BRENZA:  Every exhibit we
24  talked about yesterday is in this stack.
25         THE WITNESS:  Okay.  That's why I'm

Andrei Shustov, M.D.

Page 70

1   asking.
2            MR. WISNER:  I believe it's memory.
3   See if my memory is...
4            THE WITNESS:  Give me a moment to
5   find that report.
6       It is 10, is it?
7            MR. WISNER:  No.  It's 13, the
8   highlight.
9            THE WITNESS:  13.  Sorry.
10           MR. WISNER:  It's nice to have a
11  eidetic memory.
12           THE WITNESS:  I have it.
13           MR. WISNER:  So, Dr. Shustov, what
14  I would do is I would take this one and then look at
15  yours and just kind of go through them.
16           THE WITNESS:  Take this and this?
17           MR. WISNER:  Yeah.  And just
18  compare them.  And just for what it's worth, he just
19  wants to know if the general causation section in
20  your report is the portion that has the information.
21  And if so, then I think that would satisfy you.
22           MR. BRENZA:  Yeah, I meant, let's
23  start with that and see if -- what he says.
24           THE WITNESS:  Yes, it is in the
25  section on general causation that I see the overlap,

Page 71

1   yes.
2   Q   (By Mr. Brenza)  So taking out Exhibit 37, if you
3   would, can we just go -- can we just show me,
4   identify by page and paragraph the portions that are
5   substantially derived from Dr. Nabhan?
6            MR. WISNER:  I'm just going to
7   object to "substantially derived."  But is that the
8   phrase we're using to characterize what he said
9   earlier?
10           MR. BRENZA:  I'm trying not to say
11  "copied," or --
12           MR. WISNER:  Yeah.
13           MR. BRENZA:  -- I'm trying to give
14  him the room to say it's not word for word.
15           MR. WISNER:  Okay.  Are you writing
16  on your report?
17           THE WITNESS:  Oh.
18           MR. WISNER:  It's okay.  The
19  markings on Exhibit 37 were written by the doctor.
20  Just make that clear.  It's fine.
21           THE WITNESS:  I'm sorry.
22           MR. WISNER:  No.  It's okay.  Just
23  had to make sure there was a record of it.
24           MR. BRENZA:  Do you just want to go
25  off the record while --

Page 72

1            MR. WISNER:  Sure.
2            MR. BRENZA:  -- doctor does this?
3            THE VIDEOGRAPHER:  All right.
4   We're going off record.  The time is 4:45 p.m.
5                 (Pause in proceedings.)
6
7            THE VIDEOGRAPHER:  We're back on
8   record.  The time is 4:47 p.m.
9   Q   (By Mr. Brenza)  Doctor, have you had the opportunity
10  to review your report in the Stevick matter and
11  compare it to whatever you wanted to look at
12  concerning Dr. Nabhan's reports?
13  A   I did.
14  Q   And did you identify in your Stevick report the
15  portions that were substantially derived from
16  Dr. Nabhan?
17  A   The -- yes I did.
18  Q   And could you identify those for me by page and
19  paragraph, going through Exhibit 37?
20  A   So at Page 6, portions or significant portions of
21  Paragraph 1.
22  Q   And it's a bullet point, right?
23  A   Correct.
24  Q   First bullet point.  "The link between"?
25  A   That paragraph.

Page 73

1   Q   Okay.
2   A   And I found "In March 2015" paragraph.
3   Q   What about these other two bullet points on Page 6?
4   A   Either I missed them or I couldn't find them.  I
5   apologize.  I thought I identified all of them.
6            MR. WISNER:  Want to go off the
7   record again?
8            MR. BRENZA:  Sure.
9            THE WITNESS:  I'm sorry.
10           MR. BRENZA:  It's okay.
11           MR. WISNER:  It's okay.
12           THE VIDEOGRAPHER:  All right.
13  We're going off record.  The time is 4:49 p.m.
14                (Pause in proceedings.)
15
16           THE VIDEOGRAPHER:  We are back on
17  record.  The time is 4:55 p.m., and this marks the
18  beginning of Media Unit 2.
19  Q   (By Mr. Brenza)  Doctor, let's -- let's go through.
20  Did the portions of your Stevick report marked as
21  Exhibit 37 that are substantially derived from
22  Dr. Nabhan begin on Page 6 of your report?
23  A   Yeah, the language that I used from Dr. Nabhan on
24  Page 6 and 7 -- 6, 7, and 8, in general causation
25  section.

Andrei Shustov, M.D.

## Page 74

1  Q  And what I want to do is go through page and
2     paragraph, and you tell me if --
3  A  Okay.
4  Q  -- this paragraph substantially derives from
5     Dr. Nabhan or not.
6        Let's start with the paragraph with the first
7     bullet point on Page 6 of your report we've marked as
8     Exhibit 37. Paragraph beginning, "The link between."
9  A  Yes.
10 Q  Is that one borrowed from Dr. Nabhan?
11          MR. WISNER: Objection to
12     "borrowed."
13          MR. BRENZA: Well --
14          THE WITNESS: I use the language
15     from Dr. Nabhan's report.
16 Q  (By Mr. Brenza) Okay. The next bullet point,
17     paragraph beginning, "Most of American cancer
18     centers"?
19 A  Yes.
20 Q  Is that borrowed from Dr. Nabhan?
21 A  Yes.
22          MR. WISNER: Standing objection to
23     "borrowed," but --
24          MR. BRENZA: What would you like me
25     to say?

## Page 75

1          MR. WISNER: I don't know the word
2     that I'm ever going to like, so just --
3          MR. BRENZA: Okay. And I'm just --
4     I'm not -- I'm not trying to jam you.
5          MR. WISNER: I like "substantially
6     derived." That was a good term -- phrase.
7  Q  (By Mr. Brenza) The third bullet point, beginning
8     with the words "The association between," on Page 6
9     of Exhibit 37, is that language substantially derived
10     from Dr. Nabhan?
11 A  Yes.
12 Q  And is the first hollow bullet point on Page 6,
13     paragraph beginning, "In March 2015," is that
14     substantially derived from Dr. Nabhan?
15 A  Yes.
16 Q  Page 7 of your report we've marked as Exhibit 37,
17     first hollow bullet, the paragraph beginning, "As of
18     the last update," do you see that paragraph?
19 A  Yes.
20 Q  Is that one substantially derived from Dr. --
21 A  Yes.
22 Q  -- Nabhan?
23        The next hollow bullet, paragraph beginning "IARC
24     reviews"?
25 A  Yes.

## Page 76

1  Q  Is that one from Dr. Nabhan?
2  A  Yes.
3  Q  And then there are -- rather -- we can do a few of
4     these at once.
5        Do you see there are four square bullets
6     following?
7  A  Yes.
8  Q  Are each of those from Dr. Nabhan?
9  A  Language that I borrowed from Dr. Nabhan, yes.
10 Q  And then on Page 7, the last hollow bullet beginning,
11     "Group 2A," paren, "(probable)," close paren, is that
12     language substantially derived from Dr. Nabhan?
13 A  Yes.
14 Q  Last page of your report we've marked as Exhibit 37,
15     Page 8, first hollow bullet, paragraph beginning,
16     "The results of the IR" -- "IARC investigation," is
17     that paragraph substantially derived from Dr. Nabhan?
18 A  Yes.
19 Q  The next hollow bullet, beginning, "Epidemiological
20     studies," is that one from Dr. Nabhan?
21 A  That's correct.
22 Q  And the conclusions at the end with two bullet
23     points, first one beginning, "Ms. Stevick has been
24     exposed," and the next one beginning, "In performing
25     the thorough differential diagnosis," are both of

## Page 77

1     those substantially derived from Dr. Nabhan?
2  A  I use similar language of Dr. Nabhan, yes.
3  Q  Does that cover all the portions of your report
4     concerning Ms. Stevick that we've marked as
5     Exhibit 37 that are in whole or in part derived from
6     Dr. Nabhan?
7  A  I believe so.
8  Q  I have one more line of questioning on the substance
9     of your report. This has to do with Page 6, your --
10     your opinions that are expressed concerning the
11     meta-analysis by Schinasi and Leon. Do you see that
12     paragraph?
13          MR. WISNER: The first bulleted
14     paragraph?
15          MR. BRENZA: Correct.
16          THE WITNESS: Yeah, I see it.
17 Q  (By Mr. Brenza) Okay. And do you see -- at the end
18     of that paragraph, you state, "Furthermore, I have
19     observed that several of the case control studies
20     cited above adjusted for other pesticides as
21     potential confounding factors; whereas some did not.
22     I have taken this issue into account in my analysis."
23        Do you see that?
24 A  I do.
25 Q  How did you take the issue of confounding pesticides

Andrei Shustov, M.D.

Page 78

1    in the studies relied on in the Schinasi
2    meta-analysis, how did you take that into account in
3    your analysis?
4  A  I gave to go again.  It's -- at the time of writing,
5    I had -- I decided that this was the, again, proper
6    way of state how I adjusted my impression from those
7    studies.
8  Q  Are you done?
9  A  I don't -- what?
10  Q  You still answering, or...?
11  A  Yes, I'm trying to still think how to answer your
12    question.
13  Q  Okay.
14  A  I can't tell you specifics how exactly I adjusted
15    that without, again, opening discussion of those
16    publications.  'Cause I don't explain specifically
17    how I did it.
18  Q  And you don't remember, as you sit here now, how you
19    took account of whether they control or didn't
20    control for confounding pesticides?
21  A  I don't recall my train of thought at the time.
22  Q  Do you recall your analysis, how you took it into
23    account in your analysis?
24  A  As we discussed before for general causation
25    analysis, I performed very brief review of the

Page 79

1    literature that we went over several times and looked
2    at the limited amount of information in tables, and
3    without having a deep dive into general causation,
4    that really is not my area of expertise.  So I
5    don't -- I can't give you specifically, without
6    looking at the studies again in area of general
7    causation, what specific terms or what specific
8    factors I looked at.
9  Q  Do you remember what method you used to conduct your
10    analysis?
11  A  I read the papers.  Again, for general causation, I
12    used as a reference just to familiarize myself with
13    general causation.
14  Q  Did you do any mathematics or anything to satisfy
15    yourself that you could rely on studies that didn't
16    adjust for pesticide use?
17  A  I didn't do any calculations on my own.
18  Q  Did you receive calculations from anyone else?
19  A  No.
20  Q  Do you remember anything else about the method you
21    used?
22  A  Method of...?
23  Q  Of taking into account whether the studies did or
24    didn't adjust for confounding pesticides.
25  A  Again, I've taken into consideration reading the

Page 80

1    paper.  I did not do any specific considerations or a
2    specific analysis on...
3         MR. BRENZA:  Okay.  That's all I
4    have.  Thank you.  Pass the witness.
5         MR. WISNER:  Thank you.
6
7
8             EXAMINATION
9  BY MR. WISNER:
10  Q  Couple quick questions, Doctor.  We'll get you out of
11    here.  It's been a long --
12  A  Sure.
13  Q  -- couple of days.
14  A  Appreciate it.
15  Q  The first is on the confounding issue that we were
16    just talking about.  When you say "taking into
17    account," does that just mean you looked and see if
18    those studies did adjust or did not adjust?
19  A  At the level that I looked at those papers, I did not
20    do any specific analysis on general causation papers.
21  Q  Sure.  And yesterday I believe we actually discussed
22    one of the articles.  It was De Roos 2003.  I believe
23    it was Exhibit 20?
24  A  I remember the paper.  I don't remember the number of
25    exhibit.

Page 81

1  Q  Okay.  It was Exhibit 20.  And that was the study
2    where they adjusted for 47 other pesticides.  Do you
3    recall?
4  A  I remember that.
5  Q  Okay.  And you remember we discussed there's language
6    in there showing that these other pesticides, for
7    example, didn't confound.  Do you recall?
8  A  I do remember that.
9  Q  Okay.  The phrase "idiopathic causes," is that a
10    cogent sentence or phrase?
11  A  In a way, "idiopathic causes" is kind of an oxymoron
12    because it means we don't know the cause.  We use
13    this kind of liberally just to say we don't know the
14    cause.  It's kind of, I'd say, almost inappropriate
15    to call it "the cause" because we don't know the
16    cause.  I -- you know, we can call it unidentified --
17    uni -- unidentifiable causes, but the "idiopathic
18    causes," it's kind of nonsensical, but it's very
19    frequently used.
20  Q  Is it possible to rule out an unknown cause?
21  A  Well, technically you cannot rule out something you
22    don't know what you're ruling out.
23  Q  Okay.
24  A  So if...
25  Q  All right.  And then there was some discussion about

Andrei Shustov, M.D.

Page 82

1  ionizing radiation. I just want to get a sense of --
2  you discussed how much radiation would be required in
3  a medical context to -- to start being worried about
4  it being a cause of cancer. Do you recall that?
5  A  Yeah.
6  Q  What was that measurement that you gave?
7  A  Well, the -- to any reliable degree, we sort of
8  reduce the amount of treatment level radiations to
9  about 20 gray, where studies have shown substantial
10  reduction even in a realm of high-dose radiation in
11  incidence of secondary cancers.
12  Q  So 20 grays.
13      For me, I'm not a -- I'm not a medical doctor,
14  but my experience with ionizing radiation would be
15  x-rays. Okay? Just give me a context. How many
16  x-rays would I have to get to experience just 1 gray
17  of radiation?
18  A  That'd be thousands.
19  Q  Okay. So if -- I mean, so I guess my question is:
20  In assessing all these plaintiffs -- but specifically
21  we'll talk about Mrs. Stevick. Absent an extreme
22  number of x-ray exposures, would that be an issue
23  that you would have to consider in doing a
24  differential?
25  A  You mean radiation?

Page 83

1  Q  Yeah.
2  A  No.
3  Q  Okay. So when you talk about ionizing radiation as
4  potential cause, what are you talking about?
5  A  I'm talking about radiation of significant doses that
6  are, in the literature and experience of in oncology,
7  known to pose risk of secondary malignancies or
8  secondary cancers. And, again, what's close to -- to
9  home in my field, that would be measured in tens of
10  grays. So 20 gray of radiation is substantial dose
11  to cause cellular damage and kill cells, because we
12  use this dose to kill cancer. And, unfortunately,
13  the way -- the way radiation kills cancer is by
14  damaging its DNA. And that does the same thing to
15  normal cells. And the usual -- the more common dose
16  of radiation used to treat lymphomas is about 40
17  gray. In some more resistant cancers like head and
18  neck cancer, patients receive radiation 50 to 60
19  gray. This is the highest we go in therapeutic
20  realm. So those are doses that we are concerned
21  about in a -- in a reasonable level of concern that
22  patients can develop secondary malignancies. But
23  even reduction from 40 to 20 substantially reduce
24  that risk.
25  Q  If, for example, Mrs. Stevick had received 50 x-rays

Page 84

1  in her life, would that be a potential substantial
2  contributing factor?
3  A  That would be negligible.
4          MR. WISNER: Okay. Pass the
5  witness.
6          MR. BRENZA: Nothing further.
7          THE VIDEOGRAPHER: All right. That
8  concludes the video deposition of Dr. Andrei Shustov.
9  We're now going off record at 5:09 p.m.
10          (Signature reserved.)
11          (Deposition concluded at
12          5:09 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 85

1  STATE OF WASHINGTON )  I, John M.S. Botelho, CCR, RPR,
                        ) ss a certified court reporter
2  County of Pierce   )  in the State of Washington,
                        do hereby certify:
3
4      That the foregoing deposition of ANDREI SHUSTOV,
5  M.D., was taken before me and completed on December 16,
   2018, and thereafter was transcribed under my direction;
6  that the deposition is a full, true and complete transcript
   of the testimony of said witness, including all questions,
7  answers, objections, motions and exceptions;
8      That the witness, before examination, was by me
   duly sworn to testify the truth, the whole truth, and
9  nothing but the truth, and that the witness reserved the
   right of signature;
10
11      That I am not a relative, employee, attorney or
   counsel of any party to this action or relative or employee
12  of any such attorney or counsel and that I am not
   financially interested in the said action or the outcome
13  thereof;
14      IN WITNESS WHEREOF, I have hereunto set my hand
   this 18th day of December, 2018.
15
16
17
18
19
20
                _____
                John M.S. Botelho, CCR, RPR
21              Certified Court Reporter No. 2976
                (Certification expires 5/26/19.)
22
23
24
25

Andrei Shustov, M.D.

Page 86

1          CERTIFICATE OF DEPONENT
2
            I hereby certify that I have read and examined the
3    foregoing transcript, and the same is a true and accurate
     record of the testimony given by me.
4
            Any additions or corrections that I feel are necessary,
5    I will attach on a separate sheet of paper to the original
     transcript.
6
          _____
7          Andrei Shustov, M.D.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1    WITNESS:  Andrei Shustov, M.D.
2    DATE:     December 16, 2018
3    CASE:     Stevick v. Monsanto Co., et al.
4    Please note any errors and the corrections thereof on this
5    errata sheet.  The rules require a reason for any change or
6    correction.  It may be general, such as "To correct
7    stenographic error," or "To clarify the record," or "To
8    conform with the facts."
9
10   PAGE  LINE  CORRECTION        REASON FOR CHANGE
11   ____  ____  _____   _____
12   ____  ____  _____   _____
13   ____  ____  _____   _____
14   ____  ____  _____   _____
15   ____  ____  _____   _____
16   ____  ____  _____   _____
17   ____  ____  _____   _____
18   ____  ____  _____   _____
19   ____  ____  _____   _____
20   ____  ____  _____   _____
21   ____  ____  _____   _____
22   ____  ____  _____   _____
23   ____  ____  _____   _____
24   ____  ____  _____   _____
25   ____  ____  _____   _____