# EXHIBIT 25

Dennis Weisenburger, M.D.

1        UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3

4  IN RE:  ROUNDUP PRODUCTS ) MDL No. 2741

    LIABILITY LITIGATION,    )

5                       ) Case No.

  _____ ) 16-md-02741-VC

6                       )

  This document relates   )

7  to:                  )

                       )

8  Hardeman v. Monsanto    )

  (3:16-cv-00525-VC)      )

9  _____ )

10

11

12

13

14

15       Video Deposition of DENNIS

16  WEISENBURGER, M.D., held at 700 West

17  Huntington Drive, Monrovia, California,

18  commencing at 8:35 a.m., on Thursday,

19  December 20, 2018, before Lisa Moskowitz,

20  California CSR 10816, RPR, CRR, CLR, NCRA

21  Realtime Systems Administrator.

22             - - -

23      GOLKOW LITIGATION SERVICES

    877.370.3377 ph | 917.591.5672 fax

24        Deps@golkow.com

25

Dennis Weisenburger, M.D.

---

Page 2

APPEARANCES:

ANDRUS WAGSTAFF
BY: KATHRYN M. FORGIE
    kathryn.forgie@andruswagstaff.com
1901 Harrison Street, Suite 1100
Oakland, California 94612
(310) 339-8214

Counsel for Plaintiff

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: JULIE DU PONT
    julie.dupont@arnoldporter.com
250 West 55th Street
New York, New York 10019-9710
(212) 836-8572
Counsel for Defendant Monsanto

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: KATHRYN M. PODSIADLO
    kathryn.podsiadlo@apks.com
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
(213) 243-4273

Counsel for Defendant Monsanto

VIDEOGRAPHER:

RYAN SCHAEFER,
GOLKOW LITIGATION SERVICES
– – –

---

Page 3

I N D E X

EXAMINATION OF                      PAGE
DENNIS WEISENBURGER, M.D.
    By Ms. Du Pont          6, 113
    By Ms. Forgie           106

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Monsanto Company's Notice to Take Oral and Videotaped Deposition of Dr. Dennis Weisenburger | 7 |
| 2 | Dr. Weisenburger Materials List, November 13, 2018 | 8 |
| 3 | Curriculum Vitae | 8 |
| 4 | Handwritten Notes | 15 |
| 5 | Retention Agreement Expert Opinions and Testimony | 18 |
| 6 | Addendum to Dr. Weisenburger's Reference List | 19 |
| 7 | Expert Report of Dr. Dennis Weisenburger | 21 |
| 8 | IARC Monograph on Hepatitis C | 54 |
| 9 | Study by Dal Maso | 62 |
| 10 | Article by Mahale | 70 |

---

Page 4

DEPOSITION EXHIBITS (Cont'd)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Castillo Article | 87 |
| 12 | Zuckerman Article | 100 |

---

Page 5

MONROVIA, CALIFORNIA

THURSDAY, DECEMBER 20, 2018, 8:35 A.M.

THE VIDEOGRAPHER: We're now on record. My name is Ryan Schaefer. I'm a videographer for Golkow Litigation Services.

Today's date is December 20, 2018, and the time is 8:35 a.m. This video deposition is being held at 700 West Huntington Drive, Monrovia, California, in the matter of Hardeman versus Monsanto Company, case number 3:16-cv-00525-VC for the U.S. District Court, Northern District of California. The deponent is Dr. Dennis Weisenburger.

Counsel will be noted on the stenographic record and will counsel please identify themselves.

MS. FORGIE: Kathryn Forgie of Andrus Wagstaff for the plaintiff Mr. Hardeman.

MS. DU PONT: Julie du Pont of Arnold Porter on behalf of Monsanto.

MS. PODSIADLO: Kathryn

---

Dennis Weisenburger, M.D.

Page 6

1   Podsiadlo on behalf of Monsanto.
2       THE VIDEOGRAPHER:  The court
3   reporter is Lisa Moskowitz and will now
4   swear in the witness.
5
6       DENNIS WEISENBURGER, M.D.
7   called as a witness, having been duly
8   sworn, was examined and testified as
9   follows:
10
11          EXAMINATION
12  BY MS. DU PONT:
13      Q.  Good morning, Dr. Weisenburger.
14      A.  Good morning.
15      Q.  It's nice to see you again.  We met
16  the other day.  I'm Julie du Pont, and I
17  represent Monsanto.
18      Do you understand that?
19      A.  Yes.
20      Q.  Can you go ahead, for the record,
21  and just state your name and business
22  address, please?
23      A.  Dennis Weisenburger, 1500 East
24  Duarte Road, Duarte, California.  I work at
25  City of Hope Center.

Page 7

1       Q.  Thank you.  And you've previously
2   given sworn testimony on behalf of
3   plaintiffs in the Roundup litigation against
4   Monsanto; correct?
5       A.  Yes.
6       Q.  And you stand by that prior
7   testimony as truthful and accurate?
8       A.  Yes.
9       Q.  Nothing you want to correct today
10  from that prior testimony?
11      A.  No.
12      Q.  Okay.  So why don't we go ahead.
13  I've marked as Exhibit 1 the notice of your
14  deposition in the Hardeman case.
15      (Exhibit Number 1 was marked
16   for identification.)
17  BY MS. DU PONT:
18      Q.  Do you see that in front of you?
19      A.  Yes.
20      Q.  And this notice asked you to bring
21  with you -- and your counsel has actually
22  provided to us -- a number of materials to
23  the deposition.  I'm going to go ahead and
24  mark those as well.  They include your
25  materials considered list, an updated

Page 8

1   list -- sorry, a list dated November 13,
2   2015.  2013.  Sorry.  November 13, 2018.
3       A.  Yes.
4       Q.  And we've marked that as Exhibit 2.
5       (Exhibit Number 2 was marked
6    for identification.)
7   BY MS. DU PONT:
8       Q.  You can set that aside.  You've
9   also brought with you your current CV from
10  August, 2018, that we have marked as
11  Exhibit 3.
12      (Exhibit Number 3 was marked
13   for identification.)
14  BY MS. DU PONT:
15      Q.  Do you see that?
16      A.  Yes.
17      Q.  There's nothing on this CV that you
18  need to update at this time; correct?
19      A.  Correct.
20      Q.  Okay.  Why don't we just take a
21  look, then, at your materials list dated
22  November 13.  This includes a number of
23  medical references, but it also includes a
24  number of case-specific materials on the
25  last two pages; is that right?

Page 9

1       A.  Yes.
2       Q.  And it looks like you've reviewed
3   Mr. Hardeman's medical records; is that
4   right?
5       A.  Yes.
6       Q.  And have you reviewed select
7   records of Mr. Hardeman?
8       A.  All available records.
9       Q.  Right.  And you've reviewed his
10  fact sheet?
11      A.  Yes.
12



Page 10

1

Page 12

1

11    Q.  You also reviewed the testimony of
12  several of Mr. Hardeman's doctors, Dr. ███,
13  ███, and ███; is that right?
14    A.  Yes.
15    Q.  You had the opportunity to review
16  the depo transcript of Mr. Hardeman; right?
17    A.  Yes.
18    Q.  Did you review the deposition
19  transcript of his wife's deposition?
20    A.  Yes.
21    Q.  That just wasn't listed here, but
22  you did, in fact, review it?
23    A.  Yes.
24        MS. FORGIE:  We'd like to add
25    it.

Page 11

1

Page 13

1        MS. DU PONT:  Okay.
2        MS. FORGIE:  I thought it was
3    on there.
4  BY MS. DU PONT:
5    Q.  Since you received -- since you
6  wrote your report, you've also had the
7  opportunity to review the reports of
8  Dr. Arbor, Grossbard, Levine and Steidl; is
9  that right?
10    A.  Yes.
11    Q.  Do you know Dr. Levine?
12    A.  Yes.
13    Q.  You worked together at the City of
14  Hope; right?
15    A.  She was my boss.
16    Q.  She was your boss but now she isn't
17  your boss?
18    A.  Yes.  She stepped down from her
19  position.
20    Q.  Did you respect her?
21    A.  Yes.
22    Q.  Did you consider her to be a highly
23  qualified oncologist?
24    A.  Yes.
25    Q.  And you mentioned you also know



Page 14

1  Dr. Arbor and you respect him as well?
2      A.  Yes.
3      Q.  And, again, you believe him to be a
4  highly qualified pathologist?
5      A.  Yes.
6      Q.  And how do you know Dr. Arbor?
7      A.  Just we move in the same circles.
8  He does the same thing I do.  We always see
9  each other at meetings.  He also did his
10 training at the City of Hope.  We have kind
11 of a common bond there.
12     Q.  Okay.  Do you know Dr. Michael
13 Grossbard?
14     A.  I don't.
15     Q.  And do you know Dr. Steidl?
16     A.  Yes.
17     Q.  I may be pronouncing his name
18 wrong.
19     A.  Steidl.
20     Q.  How do you know him?
21     A.  Sort of the same way, through just
22 we do -- we've done research together.  You
23 know, we see each other at meetings.  He's
24 visited City of Hope.  So we know each other
25 through our academic endeavors.

Page 15

1      Q.  Okay.  And do you respect him?
2      A.  Yes.
3      Q.  Do you consider him to be highly
4  qualified in his field?
5      A.  Yes.
6      Q.  Okay.  You can set that aside.
7  We've marked as Exhibit 4 your invoice for
8  your work in the Hardeman matter.
9          (Exhibit Number 4 was marked
10      for identification.)
11 BY MS. DU PONT:
12     Q.  Can you take a look at that?
13     A.  Yes.
14     Q.  It looks like between October 20,
15 2018, and November 20, 2018, you billed
16 32-and-a-half hours; is that right?
17     A.  Yes.
18     Q.  At $500 an hour?
19     A.  Yes.
20     Q.  And so as of November 20, 2018 you
21 had made $16,250?
22     A.  Yes.
23     Q.  And have you worked on
24 Mr. Hardeman's case since November 20, 2018?
25     A.  Yes.

Page 16

1      Q.  How many hours have you billed?
2      A.  32.5.  35.5.
3      Q.  So you worked an additional three
4  hours or you --
5      A.  35 hours.  35½ hours.
6      Q.  In addition to the 32.5 you already
7  billed.  Okay.
8          MS. PODSIADLO:  17,750.
9  BY MS. DU PONT:
10     Q.  You've earned an additional $17,750
11 on Mr. Hardeman's case since November 20?
12     A.  If the math is correct, yes.
13     Q.  So in total you've made $34,000
14 working on Mr. Hardeman's case to date?
15     A.  Sounds right.
16     Q.  Okay.  And that additional
17 35½ hours, how did you spend that time?
18     A.  Mostly reading additional materials
19 on hepatitis C and hepatitis B and other
20 topics.
21     Q.  And why did you feel the need to
22 read additional materials on hep C and hep B
23 and other topics?
24     A.  It's not an area I'm particularly
25 an expert in; so I had to go back and learn

Page 17

1  a lot about hepatitis C and hepatitis B.
2  When I read the Monsanto expert reports,
3  there were some issues that I needed to
4  research and understand.
5          So I pulled additional articles
6  that were referenced in their reports.
7      Q.  Did counsel for plaintiff provide
8  you with any additional articles on hep B
9  and hep C?
10     A.  No.
11     Q.  ████████████████████████████████
   ██ ████████████████████████████████████████
14     A.  We looked at -- into autoimmune
15 disease.  I looked into eczema.  I guess
16 those were the main things.
17     Q.  Okay.  Now, you can set your
18 invoice aside.  We've marked as Exhibit 5
19 your retention agreement with Andrus
20 Wagstaff.
21          Do you see that?
22     A.  Yes.
23     Q.  Do you understand this to be your
24 retention agreement in the Roundup
25 litigation as well as your W-9 which is on

Dennis Weisenburger, M.D.

Page 18

1  the second page?
2      A.  Yes.
3          (Exhibit Number 5 was marked
4  for identification.)
5  BY MS. DU PONT:
6      Q.  You can set that aside.
7          MS. FORGIE:  I'd like to
8  redact.  I didn't realize his social
9  security number was in there.  I'd like
10  to redact that from the deposition.
11          Can we do that on the exhibit?
12          MS. DU PONT:  Sure.
13          MS. FORGIE:  Can we do that
14  now?
15          MS. DU PONT:  Yeah.  Do you
16  want to take a brief break?
17          MS. FORGIE:  Yeah, that's kind
18  of a big deal.
19          THE VIDEOGRAPHER:  The time is
20  8:49 a.m., and we are off the record.
21          (Recess taken from 8:50 a.m.
22  to 8:50 a.m.)
23          THE VIDEOGRAPHER:  The time
24  is now 8:50 a.m., and we are back on
25  the record.

Page 19

1          MS. FORGIE:  Just for the
2  record, we -- by agreement of all
3  counsel, we had the court reporter
4  redact Dr. Weisenburger's social
5  security number from Exhibit 5.  Thank
6  you.
7          MS. DU PONT:  Okay.
8  BY MS. DU PONT:
9      Q.  Moving on, marked as Exhibit 6 is
10  your addendum to your reference list.
11          (Exhibit Number 6 was marked
12  for identification.)
13  BY MS. DU PONT:
14      Q.  When did you prepare this addendum?
15      A.  It would have been last week.
16      Q.  So it was prepared after you wrote
17  your report and your report was served on
18  Monsanto; correct?
19      A.  Yes.
20      Q.  Is it fair to say that the articles
21  on this list you did not rely on in
22  preparing your report?
23          MS. FORGIE:  Objection.
24          THE WITNESS:  Well, many of the
25  articles on this are articles I pulled

Page 20

1  to learn about hepatitis B and hepatitis
2  C.  I didn't include them all in my
3  report, although I read them all.  I
4  guess I don't really need to rely on
5  them for purposes of my testimony.
6  BY MS. DU PONT:
7      Q.  So the main references that you are
8  relying on for purposes of your testimony
9  are those references that you included in
10  the Hardeman specific report itself?
11      A.  Yes.
12      Q.  And you had reviewed some of the
13  references on this addendum prior to serving
14  your report, and you believe that you
15  considered those materials but you are not
16  necessarily relying on them for your
17  opinions; is that accurate?
18      A.  Yes.
19      Q.  Okay.  I think you can set that
20  aside.
21          Now, did counsel for Mr. Hardeman
22  provide you with any memo or memos regarding
23  Mr. Hardeman's Roundup exposure?
24      A.  No, just the fact sheet.  The fact
25  sheet.

Page 21

1      Q.  Okay.  Let's take a look now at
2  your report that you served in the Hardeman
3  matter.  We have marked Dr. Dennis
4  Weisenburger's report under Hardeman versus
5  Monsanto as Exhibit 7.
6          (Exhibit Number 7 was marked
7  for identification.)
8  BY MS. DU PONT:
9      Q.  And is this your report in the
10  Hardeman matter, Dr. Weisenburger?
11      A.  Yes.
12      Q.  And this report discloses all the
13  opinions that you intend to offer at trial
14  in Mr. Hardeman's case?
15      A.  Yes.  There are a couple errors in
16  the report.  I don't know whether you want
17  to talk about them now or later.
18      Q.  You can go ahead and tell me what
19  the errors are now.
20      A.  So on the third written page at the
21  end of the second paragraph, I see the
22  latency is 29 years.  It's actually
23  26 years.  The first sentence of the
24  paragraph says 26 years.  The end
25  paragraph says 29 years.  It should be

Dennis Weisenburger, M.D.

Page 22

1 26 years.
2    Q.  You're saying his exposure to
3 Roundup in this case should be 26 years and
4 not 29 years?
5    A.  Yes.
6        MS. FORGIE:  It's a typo
7 because the top says 26 years.
8        MS. DU PONT:  Yes.
9        THE WITNESS:  The other
10 correction is the odds ratio for BMI.  I
11 put down the wrong odds ratio.  I wrote
12 down 1.14.  It should be 1.27.
13 BY MS. DU PONT:
14    Q.  And is the confidence interval,
15 does that also need to be corrected?
16    A.  Yes.  The confidence interval is
17 1.09-1.47.
18    Q.  And what I'll do later is we can
19 take a look at the reference that you're
20 relying on and understand where you're
21 getting those numbers.
22    A.  Okay.
23    Q.  Do you have any other corrections
24 that you want to make to your report at this
25 time?

Page 23

1    A.  No.
2    Q.  And your report along with your
3 reliance list discloses all of the bases for
4 the opinions you intend to offer in
5 Mr. Hardeman's case?
6        MS. FORGIE:  Objection.
7        THE WITNESS:  Yes.
8 BY MS. DU PONT:
9    Q.  Did you, in your preparation of
10 this report, review any case-specific expert
11 reports for Mr. Hardeman's other
12 case-specific experts?
13    A.  No.
14    Q.  Did you review any of
15 Mr. Hardeman's other case-specific expert
16 reports after you prepared the report?
17    A.  I did review the rough draft of the
18 Nabhan deposition.
19    Q.  Did you review the case-specific
20 report in the Hardeman matter?
21    A.  No.
22    Q.  And anything you disagreed with
23 that Dr. Nabhan said at his deposition?
24    A.  Not that I remember.
25    Q.  Had you actually, prior to writing

Page 24

1 your Hardeman-specific report, reviewed
2 Dr. Nabhan's generic testimony in the MDL?
3    A.  You mean his general causation
4 testimony?
5    Q.  Yes.
6    A.  I did review some of -- I don't
7 remember exactly what I reviewed, but I did
8 review some materials from him, yes.  I
9 don't know whether it was his report or a
10 deposition.  I don't remember.
11        MS. FORGIE:  I'm going to
12    object to this.  It's going into general
13    causation.
14        MS. DU PONT:  I'm just
15    inquiring whether he read other
16    testimony from Dr. Nabhan who's a
17    case-specific expert in his report.
18 BY MS. DU PONT:
19    Q.  On Exhibit A, if you want to refer
20 to Exhibit 2 which was your supplemental
21 list, I'll just note that you did list under
22 76 on that supplemental list that you
23 disclosed as part of the Hardeman record the
24 deposition transcripts and exhibits of
25 Dr. Nabhan taken on August 23, 2017.

Page 25

1    A.  Where is that?  Oh, okay.
2    Q.  Take a look at Reference Number 76.
3 Just confirm for me that you did, in fact,
4 review his August, 2017, testimony.
5        MS. FORGIE:  Objection.
6        THE WITNESS:  Yes, I did.
7 BY MS. DU PONT:
8    Q.  Okay.  Do you generally agree with
9 the testimony that Dr. Nabhan gave in the
10 Hardeman matter, the rough draft that you
11 reviewed?
12        MS. FORGIE:  Objection.  Asked
13    and answered.
14        THE WITNESS:  Yes.
15 BY MS. DU PONT:
16    Q.  You don't intend to offer at trial
17 any opinions that are not disclosed in the
18 expert report that we've marked as
19 Exhibit 7; correct?
20        MS. FORGIE:  Objection.
21        THE WITNESS:  Correct.
22 BY MS. DU PONT:
23    Q.  Let's talk about how you prepared
24 your report in this case.  Am I correct that
25 you prepared the report yourself?

Dennis Weisenburger, M.D.

Page 26

1    A. Yes.
2    Q. And how long did you spend drafting
3 the report?
4    A. Hours. Many hours.
5    Q. Do you remember how many?
6    A. Well, most of my first --
7    Q. 32 hours were spent?
8    A. -- 32 hours were spent researching
9 it and writing it and correcting it.
10   Q. Describe your process for drafting
11 your report.
12   A. ████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
24   Q. Okay.
25   A. Considered the literature on

Page 27

1 obesity and overweight.
2    Q. Okay. So let's talk a little bit
3 about the telephone interview that you had
4 with Mr. Hardeman. That took place on
5 November 1, 2018; is that right?
6    A. Yes, yes.
7    Q. And do you understand that was
8 prior to when Mr. Hardeman was deposed in
9 this matter?
10   A. Yes.
11   Q. How long did the telephone call
12 last that you had with Mr. Hardeman?
13   A. It was about an hour, more or less.
14 I don't remember exactly.
15   Q. If you billed for an
16 hour-and-a-half on November 1, would that
17 hour-and-a-half have been for your phone
18 call with Mr. Hardeman, or was it additional
19 work as well?
20   A. It's probably additional work.
21 Maybe preparation before the phone call. I
22 didn't spend an hour-and-a-half on the phone
23 with him. I believe it was 45 minutes to an
24 hour.
25   Q. Was anyone else on the call besides

Page 28

1 yourself and Mr. Hardeman?
2    A. No.
3    Q. And did you take notes of that
4 phone call?
5    A. Yes.
6    Q. And did you rely on those notes in
7 preparing your report in this case?
8        MS. FORGIE: Objection.
9        THE WITNESS: Yes.
10 BY MS. DU PONT:
11   Q. And did you review those notes
12 prior to this deposition today?
13   A. Yes.
14   Q. And I would just request at this
15 time that counsel for Mr. Hardeman produce
16 the notes from Dr. Weisenburger's telephone
17 interview with Mr. Hardeman?
18       MS. FORGIE: I'm inclined not
19 to, but I'll talk to him at the break
20 about it and make a final addition.
21       MS. DU PONT: Thank you.
22       MS. FORGIE: Pursuant to
23 Pretrial Order Number 7 which states we
24 don't have to produce drafts.
25       MS. DU PONT: I would just

Page 29

1 maintain I'm not sure telephone
2 interview notes are drafts, but would be
3 more a reflection of the interview that
4 took place and not a draft report.
5       MS. FORGIE: It includes notes
6 as well.
7 BY MS. DU PONT:
8    Q. It looks like you spent about ten
9 hours prior to your phone call with
10 Mr. Hardeman working on his case based on
11 the invoice you provided. If you want to
12 take a look at it, feel free. It's
13 Exhibit 4.
14   A. That's correct.
15   Q. And what did you do for those ten
16 hours?
17   A. It was mainly reviewing the medical
18 record and the fact sheet, which at that
19 time, I think that's all I had.
20   Q. Okay. You mentioned already that
21 your telephone conversation, one of the
22 things you talked to him about was his
23 exposures. What did you mean by that?
24   A. His use of Roundup, how did he use
25 Roundup.

Dennis Weisenburger, M.D.

Page 30

1    Q.  On the call with Mr. Hardeman, did
2  he have any trouble remembering the facts
3  about his Roundup use?
4    A.  No, I don't think so.  He was
5  pretty straightforward.
6    Q.  Okay.  And you said you asked him
7  about -- when you said exposures, did you
8  also consider other exposures to other
9  chemicals or any viruses?
10   A.  Yes, yes.  I asked about other
11  chemicals, solvents.
12   Q.  What did he tell you about those
13  other chemicals and solvents?
14   A.  That pretty much he only used
15  Roundup.  There were a few instances where
16  they had used something for ants, and there
17  were a few instances where they had sprayed
18  wasps or bees, I can't remember, but those
19  were very infrequent.
20   Q.



Dennis Weisenburger, M.D.



Page 34

Page 35

MS. FORGIE: Objection.

Page 36

Page 37

MS. FORGIE: Objection. Asked and answered. You can answer it again.



**Page 38**

3       MS. FORGIE:  Objection.

**Page 39**

1       MS. FORGIE:  Objection.

4  say.

5       MS. FORGIE:  Objection.

**Page 40**

7    Q.  Would you agree with me that
8  Mr. Hardeman -- let me start that again.  I
9  just lost my microphone.

13      MS. FORGIE:  Objection.

**Page 41**

17     MS. DU PONT:  I'd ask that you
18  object to form.  That's what the rules
19  are.
20     MS. FORGIE:  I'll make whatever
21  objections I think are appropriate.  I
22  would ask that you stop asking the same
23  question three or four times.
24     MS. DU PONT:  I'm not asking it
25  three or four times.

Page 42

1    MS. FORGIE:  Yes, you are.
2    MS. DU PONT:  Let's move to a
3  different topic.
4  BY MS. DU PONT:
5    Q.  Mr. Hardeman's Roundup use.  You
6  agree that he was using it as a home user;
7  correct?
8    A.  Yes.
9    Q.  He was not a farmer spraying it on
10  his crops; correct?
11    A.  Correct.
12    Q.  And in your report, you discuss for
13  a couple pages what his Roundup use was and
14  what his exposure was; correct?
15    A.  Yes.
16    Q.  And you mention that much of that
17  discussion in your report came from the
18  interview that you had with him in November
19  of -- November 1, 2018; correct?
20    A.  Yes.
21    Q.  But you also read his deposition;
22  right?
23    A.  I did.
24    Q.  And do you understand that there's
25  some inconsistencies in what he said at his

Page 43

1  deposition versus what he told you at that
2  interview on November 1?
3    MS. FORGIE:  Objection.
4    THE WITNESS:  Yes.
5  BY MS. DU PONT:
6    Q.  Do you remember any of those
7  inconsistencies right now, sitting here
8  today?
9    A.  Yeah.  So the main ones were that
10  he told me he used the Roundup all
11  year-round, pretty much every month.  He
12  used it intensively for about eight months
13  and less intensively for the other four
14  months.
15    At his deposition, he changed that
16  and said he used it intensively for about
17  six months out of the year and that he used
18  it less intensively only two months out of
19  the year.
20    So, yeah, there's some
21  discrepancies that occurred.  I can't
22  explain those things.  I didn't call him
23  back and ask him what the truth was because
24  by that time I had written my report.
25    So, you know, sometimes people have

Page 44

1  difficulty remembering things.  ████████
2  ████████████████████████████████
3  ██████████████████████████
4    I don't know what happened.  When I
5  questioned him, I was very careful to be as
6  precise as I could, and this is the history
7  that he gave to me.  So whether it was one
8  or the other, he still had significant
9  exposures to Roundup.
10    Q.  So it's your understanding that
11  when he gave his deposition under oath on
12  November 8, 2018, that he testified that
13  when he was spraying on the Forestville
14  property, he was only spraying for about
15  eight months per year; correct?
16    MS. FORGIE:  Objection.
17    THE WITNESS:  That's what he
18  said.
19  BY MS. DU PONT:
20    Q.  You did not note that discrepancy
21  between his deposition transcript and your
22  interview in your report; right?
23    A.  No, because I read his transcript
24  after I wrote my report.  So my report was
25  already written and submitted.

Page 45

1    Q.  Got it.  So you reviewed his
2  deposition transcript after the report was
3  served on Monsanto?
4    A.  Yes.
5    Q.  Would you agree with me, though,
6  that if we go by his testimony at his
7  deposition, that in your report, you
8  overestimated the amount of spraying that
9  Mr. Hardeman was doing?
10    MS. FORGIE:  Objection.
11    THE WITNESS:  That's correct.
12  BY MS. DU PONT:
13    Q.  ████████████████████████
14  ██████████████████████████████
15  ██████████████████████████████████
16  ██████████████████████████████
17  ██████████████████████████████████
18  ██████████████████████████████
19  ██████████████████
20    MS. FORGIE:  Objection.
21    THE WITNESS:  No.
22  BY MS. DU PONT:
23  ██████████████████████████████

Dennis Weisenburger, M.D.

Page 46



10  Q.  Now, you wrote in your report that
11  he would often get the spray on his hands,
12  arms, face and sometimes mouth and sometimes
13  he inhaled the mist while spraying.
14      Do you recall writing that in your
15  report?
16  A.  Yes.
17  Q.  Did you actually ask Mr. Hardeman
18  in the interview how many times he got the
19  spray on his arms, face, and mouth?
20  A.  It was frequent.
21  Q.  But did you also review
22  Mr. Hardeman's deposition to see how many
23  times he had spilled on himself?
24  A.  I can't remember the numbers, but
25  it was less than what he told me.

Page 47

1  Q.  So if he testified at his
2  deposition that he spilled on himself about
3  ten times, does that sound right?
4  A.  I don't remember what the
5  deposition says.  It was considerably less
6  than what he told me.
7  Q.  But, again, if we went by what he
8  said in his deposition, that would have been
9  less exposure to Roundup; correct?
10      MS. FORGIE:  Objection.
11      THE WITNESS:  Well, I think
12  people get exposed to Roundup when they
13  use mist, whether they know it or not.
14  Okay?  So the fact that he -- what he
15  told me was that he frequently got it on
16  his hands and his arms when he was
17  spraying from the truck and over the
18  fence.  It was common.  That's what he
19  told me.
20      I don't understand him changing
21  his story in the deposition.  I wrote my
22  report based on what he told me, and I
23  believed it was true.  If you deposed
24  him today, he might tell you something
25  totally different.  I don't know.

Page 48

1  BY MS. DU PONT:
2  Q.  If we go by what he said in his
3  deposition and what you've written in your
4  report overestimates his exposure to
5  Roundup; right?
6      MS. FORGIE:  Objection.
7      THE WITNESS:  Probably,
8  although I think by him telling you that
9  he only got it on his hands ten times,
10  he's grossly underestimating his
11  exposure.
12  BY MS. DU PONT:
13  Q.  How do you know that?
14  A.  Because of the story.  When you
15  spray Roundup in a mist, you're going to get
16  it on your hands.  You're going to get it on
17  your arms.  You're going to get it on your
18  clothes, just by the nature of what you're
19  doing.
20  Q.  Have you sprayed Roundup before?
21  A.  No.  I prefer 2,4-D, thank you.
22  Q.  What's your basis for saying that
23  when you spray Roundup, you're going to get
24  it on your hands?
25  A.  Because it happens to me when I

Page 49

1  spray 2,4-D.
2  Q.  But you don't have any personal
3  experience spraying Roundup; correct?
4  A.  I don't.
5  Q.  Now, you understand that at his
6  deposition, he also testified that he only
7  inhaled Roundup about two or three times;
8  correct?
9      MS. FORGIE:  Objection.
10      THE WITNESS:  I believe that's
11  what he said.  What did I say?
12  Sometimes.
13  BY MS. DU PONT:



22  A.  Yes, I do.
23  Q.  Mr. Hardeman also explained to you
24  that he would wash his hands if he spilled
25  on himself; correct?

Page 50

1    A. So if he was mixing and he got it
2  on his hands, he would wash it off with a
3  hose.  If he was out in the field spraying
4  and he got it on his hands, he waited until
5  he got back, which could have been one, two,
6  three, four hours later.
7    Q. But he would take a shower after
8  that happened, if he spilled it on himself;
9  correct?
10      MS. FORGIE:  Objection.
11      THE WITNESS:  Yes, he usually
12   took a shower after spraying.
13 BY MS. DU PONT:
14   Q. Does the fact that someone washes
15 the Roundup off of them after they've gotten
16 it on their skin, does that decrease their
17 exposure in your mind?
18   A. Yes.
19   Q. You agree that hepatitis C is a
20 risk factor for non-Hodgkin's lymphoma;
21 correct?
22   A. Yes.
23   Q. And it's also a risk factor for
24 diffuse large B-cell lymphoma; correct?
25   A. Yes.

Page 51

1    Q. In fact, in your report you mention
2  that there's a 2 to 2.6-fold increased risk
3  of diffused large B-cell non-Hodgkin's
4  lymphoma with the infection of hepatitis C;
5  correct?
6    A. Yes.
7    Q. Do you know what the latency is
8  between exposure to hepatitis C virus and
9  development of diffuse large B-cell
10 lymphoma?
11   A. There's one study that actually was
12 able to look at that.  It's probably
13 somewhere between 6 and 8 years.  These are
14 in people with active hepatitis.  So it's
15 not very long, actually.  Between 6 and
16 8 years.
17   Q. What study is that that you're
18 referring to?
19   A. It's one of the ones that I
20 reference.  I can't remember which one.
21   Q. You can't remember, sitting here
22 today, what reference it is that says the
23 latency for hep C in development is 6 to
24 8 years?
25   A. I can't.  It's one of the ones you

Page 52

1  reference, but I can't remember which one it
2  was.
3    Q. Is that the median?
4    A. Yes, that's the median.
5    Q. So if there's a bell curve, it can
6  be much -- it could be shorter or it could
7  be longer than 6 to 8 years; correct?
8    A. Yes.
9    Q. And do you recall what that
10 reference says the bottom and the top of the
11 bell curve are, sitting here right now?
12   A. I can't remember whether they give
13 that information.
14   Q. Do you consider hepatitis C
15 infection to be a causative risk factor for
16 non-Hodgkin's lymphoma?
17      MS. FORGIE:  Objection.
18      THE WITNESS:  Yes, active
19   hepatitis C infection.  Chronic active
20   hepatitis C infection.
21 BY MS. DU PONT:
22   Q. And do you consider chronic, active
23 hepatitis C infection to be a causative risk
24 factor for diffuse large B-cell lymphoma?
25      MS. FORGIE:  Objection.

Page 53

1      THE WITNESS:  Yes.
2  BY MS. DU PONT:
3    Q. There are medical studies out there
4  that actually discuss that infection with
5  hepatitis C is not really a risk factor, but
6  that it is a cause of diffuse large B-cell
7  lymphoma; correct?
8    A. Yes.
9    Q. Are you familiar with the monograph
10 from the International Agency for Research
11 on Cancer regarding hep C?
12   A. Yes.
13   Q. But you did not cite that on any of
14 your reference lists; correct?
15   A. I didn't think I needed to.
16   Q. And that's because it's redundant
17 of your belief that hep C is a causative
18 risk factor for non-Hodgkin's lymphoma?
19      MS. FORGIE:  Objection.
20      THE WITNESS:  It would be for
21   the support.  I've already accepted that
22   as a fact in my report.
23 BY MS. DU PONT:
24   Q. Okay.
25   A. I could have referenced it, but I

Dennis Weisenburger, M.D.

Page 54

1  didn't.
2      Q.  I'm going to go ahead and mark as
3  Exhibit 8 the IARC monograph on hepatitis C.
4          (Exhibit Number 8 was marked
5  for identification.)
6          MS. FORGIE:  Whenever you're
7  ready for a break.
8          MS. DU PONT:  We can finish
9  this document, and we'll take a break.
10         MS. FORGIE:  Thanks.
11  BY MS. DU PONT:
12     Q.  If you turn to page 158 of the
13  monograph under Section 5, "Evaluation," do
14  you see that there is sufficient -- that
15  IARC writes, "There is sufficient evidence
16  in humans for the carcinogenicity of chronic
17  infection with HCV"?
18         Did I read that correctly?
19     A.  Yes.
20     Q.  And they note, "Chronic infection
21  with hepatitis C virus causes hepatocellular
22  carcinoma and non-Hodgkin's lymphoma."
23         Do you see that?
24     A.  Yes.
25     Q.  And then they go on to say,

Page 55

1  "Chronic infection with HCV is carcinogenic
2  to humans Group 1."
3         Do you see that?
4     A.  Yes.
5     Q.  So IARC concluded that there was
6  sufficient evidence that chronic infection
7  with the hepatitis C virus causes
8  non-Hodgkin's lymphoma; correct?
9     A.  Yes.
10     Q.  And that chronic infection with the
11  HCV or the hepatitis C virus is carcinogenic
12  to humans Group 1; correct?
13     A.  Yes.
14     Q.  And we know that Mr. Hardeman had
15  anywhere between 25 and 40 years of chronic
16  hepatitis C infection prior to his diagnosis
17  of non-Hodgkin's lymphoma; correct?
18         MS. FORGIE:  Objection.
19         THE WITNESS:  Correct.
20  BY MS. DU PONT:
21     Q.  And do you understand that when
22  IARC concludes that there is sufficient
23  evidence of carcinogenicity with respect to
24  a virus or any substance, that that means
25  that there's a positive relationship that

Page 56

1  has been observed between the exposure and
2  the cancer in studies in which chance, bias,
3  and confounding could be ruled out with
4  reasonable confidence?
5         Do you understand that that's their
6  definition?
7     A.  Yes.
8     Q.  So with respect to hepatitis C, a
9  positive relationship has been observed
10  between exposure to chronic hepatitis C and
11  cancer in studies in which chance, bias, and
12  confounding could be ruled out with
13  reasonable confidence; correct?
14     A.  Yes.
15     Q.  So is it fair to say that IARC's
16  conclusion that chronic hepatitis C
17  infection is a carcinogen is a stronger
18  conclusion than IARC has put forth regarding
19  glyphosate and carcinogenicity findings in
20  humans?
21         MS. FORGIE:  Objection.
22         THE WITNESS:  Yes, they said
23  HCV's a Group 1 and glyphosate is a
24  Group 2A.
25  ///

Page 57

1  BY MS. DU PONT:
2     Q.  And IARC has noted, with respect to
3  glyphosate, that there is limited evidence
4  of carcinogenicity in humans; correct?
5     A.  Yes.
6     Q.  And that's a lower standard than
7  what they found here, which is sufficient
8  evidence in humans with HCV infection and
9  non-Hodgkin's lymphoma; correct?
10     A.  Correct.
11         MS. DU PONT:  We can take a
12  break now.
13         MS. FORGIE:  Thank you.
14         THE VIDEOGRAPHER:  The time is
15  9:30 a.m., and we are off the record.
16         (Recess taken from 9:31 a.m.
17  to 9:41 a.m.)
18         THE VIDEOGRAPHER:  The time is
19  now 9:41 a.m., and we are back on the
20  record.
21  BY MS. DU PONT:
22

Dennis Weisenburger, M.D.





Dennis Weisenburger, M.D.

Page 66

1
2          THE WITNESS:  It's not really
3   clear to me what they're trying to say.
4   Are they trying to say that one is
5   better than the other?  It's clear that
6   the viral RNA is a better test than the
7   other, based on the other studies that I
8   cite.
9          So it just depends on your
10  methodology and what -- in some studies,
11  how much money you have to do the
12  testing.
13         So you have to make -- you have
14  to make decisions based on a variety of
15  parameters.  They could have done a
16  meta-analysis on the smaller group that
17  just had the RNA.  And they could have
18  done that.  They didn't do it.
19  BY MS. DU PONT:
20  Q.  So the authors actually looked at
21  whether or not just having the HCV RNA
22  findings impacted the results.
23         I'll refer you to page 2083, the
24  last paragraph on the right-hand column.
25  The authors state, "Another possible

Page 67

1   source" -- do you see where I'm reading
2   from?
3   A.  2083 where?
4   Q.  The last paragraph.
5   A.  Yeah, okay.
6   Q.  "Another possible source of
7   heterogeneity between studies could be the
8   definition of HCV infection that was not
9   consistent across studies or different
10  illicit generations used."
11         Then they note that some studies --
12  they basically say various studies are
13  defining HCV positivity differently.
14         They note that when only studies
15  using third-generation ELISA were included,
16  the pooled relative risk was 2.5, suggesting
17  that the HCV definition and ELISA generation
18  neither explained the heterogeneity between
19  studies nor adduced substantial bias; right?
20  A.  I don't know.  I'd have to reread
21  this again.
22  Q.  Basically when they tried to --
23  when they did further analysis and
24  controlled for the different types of
25  studies, they didn't see inconsistent

Page 68

1   results when they were only looking at
2   sub-groups within their meta-analysis;
3   correct?
4          MS. FORGIE:  Wait.  Objection.
5   Asked and answered.  You just asked that
6   question.
7          You can answer it again.
8          THE WITNESS:  So I'd like to
9   read the paragraph.
10  BY MS. DU PONT:
11  Q.  Okay.
12  A.  I have to read it to understand it.
13         MS. FORGIE:  You can read as
14  much as you need.  You can read the
15  whole study if you need to.
16         THE WITNESS:  So what they're
17  saying is that they had substantially
18  the same finding, whether they looked at
19  just the antibody or they looked at just
20  the RNA.
21  BY MS. DU PONT:
22  Q.  Right.
23  A.  But they didn't do the critical
24  thing and look at the risk for those that
25  had the antibody but didn't have the RNA.

Page 69

1   Okay?
2          So you would expect that both risk
3   ratios would be increased because a subset
4   of those with the antibody, maybe a
5   substantial subset, have the RNA.  Okay?
6          So this doesn't really address the
7   question that's posed in some of the other
8   studies.  Okay?
9   Q.  Okay.
10  A.  It's saying you can measure both,
11  and you'll pretty much find the same thing
12  because everybody -- because many people who
13  have the antibody also have the DNA -- or
14  the RNA.
15         So it doesn't really -- it doesn't
16  really -- they could have done this.  They
17  could have taken the cases that had just the
18  antibody and didn't have the RNA and they
19  probably would have found what the other
20  papers I cite found, that the people with
21  just the antibody do not have an elevated
22  risk.
23  Q.  Okay.  You can put that aside.
24         Now, you also cite an article by
25  Mahale entitled, "The Effect of Sustained

Page 70

1 Virological Response on the Risk of
2 Extrahepatic Manifestations of Hepatitis C
3 Virus Infection."
4     A. In my report?
5     Q. In your supplemental list.
6     A. Okay.
7         MS. FORGIE: Is this 10?
8         MS. DU PONT: Yes, sorry. This
9 is Exhibit 10.
10         (Exhibit Number 10 was marked
11 for identification.)
12 BY MS. DU PONT:
13     Q. And this was included on your
14 supplemental list. Now, do you know if you
15 had reviewed this article prior to drafting
16 your report or after you had drafted your
17 report?
18     A. I don't know. I don't remember.
19     Q. Okay. And the results of this
20 paper in the conclusions on the second page,
21 they say, "Risks of several extrahepatic
22 manifestations of HCV infection are reduced
23 after antiviral therapy with sustained viral
24 response" -- sorry, "sustained virological
25 response. However, early initiation of

Page 71

1 anti-viral therapy may be required to reduce
2 the risk of glomerulonephritis,
3 non-Hodgkin's lymphoma, and stroke."
4     Do you see that?
5     A. Yes.
6     Q. And if we take a look at Figure 2
7 on page 16, the authors are looking at
8 several of what they call extrahepatic
9 manifestations, one of which is not
10 non-Hodgkin's lymphoma; right?
11     A. Right.
12     Q. What Figure 2D, which is referring
13 to non-Hodgkin's lymphoma, is showing, is
14 that over time, the longer you go without
15 anti-viral treatment, there is no reduction
16 in your risk of non-Hodgkin's lymphoma
17 because of that treatment; correct?
18         MS. FORGIE: Objection.
19         THE WITNESS: Well, what they
20 showed is that the most effective time
21 to institute therapy is shortly after
22 the diagnosis. Then you see actually a
23 decrease in risk.
24 BY MS. DU PONT:
25



Page 72

Page 73

1
3       MS. FORGIE: Objection.
4
15       MS. FORGIE: Objection.
16



Page 74

Page 76

1
2  BY MS. DU PONT:
3     Q.  And in your report, you note that
4  the hepatitis B virus increases the risk of
5  non-Hodgkin's lymphoma by approximately
6  twofold; right?
7     A.  Right.
8     Q.  And you cite some articles to
9  support that in your report?
10    A.  Correct.
11    Q.  And are you aware that the
12 International Agency For Research on Cancer
13 has looked at the hepatitis B virus and
14 whether or not it is a human carcinogen for
15 non-Hodgkin's lymphoma?
16       Are you aware of that?
17    A.  I know they looked at it for a
18 cellular carcinoma, but I don't believe
19 they've looked at it for non-Hodgkin's
20 lymphoma.
21    Q.  Okay.
22    A.  I think they actually do mention in
23 their conclusions that there were some
24 studies that showed increased risk for
25 non-Hodgkin's lymphoma, but they didn't --

Page 75

Page 77

1  the firm conclusion was really about
2  hepatocellular carcinoma.
3     Q.  They also noted positive
4  association between chronic infection with
5  HPV and non-Hodgkin's lymphoma; fair?
6     A.  Yes, they did.
7     Q.  And they classify hepatitis B as a
8  Class 1 human carcinogen; correct?
9     A.  Yes.
10       MS. FORGIE:  Objection.
11

Dennis Weisenburger, M.D.





Page 82

Page 84

Page 83

Page 85

21 BY MS. DU PONT:
22    Q.  And you corrected your report
23 earlier, and I think it's based on a
24 Castillo study, but I need to take a break
25 because I have no more exhibit stickers.

Dennis Weisenburger, M.D.

Page 86

1    So can we go off the record for a
2  second?
3         (Discussion off the record.)
4         THE VIDEOGRAPHER:  The time is
5  now 10:15 a.m., and we are off the
6  record.
7         (Recess taken from 10:15 a.m.
8  to 10:29 a.m.)
9         THE VIDEOGRAPHER:  The time is
10  now 10:29 a.m., and we're back on the
11  record.
12  BY MS. DU PONT:
13    Q.

16

25  ///

Page 87

1         (Exhibit Number 11 was marked
2

9    Q.  And can you just refer me to the
10  number that you are correct -- where in this
11  article you've gotten the new number that
12  you've corrected in your report?
13    A.  Yeah, it's page 126, Table 3, which
14  is the table on overweight.  If you go down
15  on the second column, about the middle, it
16  says, "Male," and then you go across, it's
17  1.27.  With odds ratio -- 1.27 with a
18  95 percent confidence interval load of 1.09
19  to 1.47.
20         That's what I was quoting.
21  Actually, the paper confuses the odds
22  ratios.  In some places, it reverses them.
23  So it's hard to know what to rely on.
24         But I think this agreed with the
25  text so that's, in the end, what I used.

Page 88

1  The abstract, I think, is --
2    Q.  It flips them in the abstract.
3    A.  It flips them in the abstract; so
4  that's an error.  There's an error
5  somewhere, and we don't really know for sure
6  where the error is.
7    Q.  So are these based on Table 3, the
8  relative risk -- the unadjusted relative
9  risk for males that are overweight with
10  diffuse large B-cell lymphoma is 1.27 and
11  the adjusted relative risk is actually 1.34;
12  correct?
13    A.  Yes.
14    Q.  And explain to me why you are
15  relying on the unadjusted number and not the
16  adjusted number.
17    A.  I could have relied on either one.
18  It doesn't truly matter to me.
19    Q.  Okay.  And elsewhere, in this
20  paper, it notes that the relative risks of
21  diffuse large B-cell lymphoma in obese men
22  and women was 1.4 and 1.34, respectively.
23  That's in the abstract.
24         Do you see that?
25    A.  It says, "The relative risk of

Page 89

1  diffuse large B-cell lymphoma in overweight
2  men and women was 1.22 and 1.27,
3  respectively."
4         The number for men is wrong.
5    Q.  Right.
6    A.  So they just flipped those two, I
7  think, is what they did.
8    Q.  But I'm actually referring to later
9  in the text where they're talking about
10  obese men and women with diffuse large
11  B-cell lymphoma, and they report relative
12  risks of 1.4 and 1.34 in the abstract.
13         Do you see that?
14    A.  Yes, yes.  They didn't report the
15  adjusted odds ratios either in the abstract.
16    Q.  Right.  So the -- and in Table 4,
17  the relative risk for obese -- this is on
18  page 127, "The relative risk for obesity and
19  diffuse large B-cell lymphoma in males is
20  1.4"; correct?
21    A.  Yes.
22    Q.  Okay.  You can set that aside.
23         We talked at your deposition the
24  other day about how age is a risk factor for
25  non-Hodgkin's lymphoma.

Dennis Weisenburger, M.D.

Page 90

1      Do you remember that?
2    A.  Yes.
3    Q.  And you stand by the fact that age
4  is a risk factor for non-Hodgkin's lymphoma?
5    A.  Yes.
6    Q.  And you -- let me withdraw that.
7      You agree that diffuse large B
8  cells is most common in patients over 60?
9    A.  Yes.
10    Q.  And that cancer, in general, is a
11  function of age; right?
12    A.  Most cancers.
13    Q.  But with respect to diffuse large
14  B-cell lymphoma, that particular cancer is a
15  function of age?
16      MS. FORGIE:  Objection.  Asked
17  and answered.
18      THE WITNESS:  Yes.
19

Page 92

1    A.  Yes.
2    Q.  But, again, we don't really know
3  why it is that men are more likely to
4  develop non-Hodgkin's lymphoma than women;
5  correct?
6      MS. FORGIE:  Objection.
7      THE WITNESS:  Correct.
8

13      MS. FORGIE:  Objection.
14

19  BY MS. DU PONT:
20    Q.  We can't control some causative
21  risk factors either, can we?
22      MS. FORGIE:  Objection.
23      THE WITNESS:  We can control
24  some.
25

Page 91

1      MS. FORGIE:  Objection.
2

23    Q.  And we know that males are more
24  likely to develop non-Hodgkin's lymphoma
25  than females; correct?

Page 93

1    Q.



Dennis Weisenburger, M.D.



**Page 94**

16    MS. FORGIE: Objection. Even
17  though you phrased it as hard, it's a
18  general causation.
19    THE WITNESS: It's a study
20  of -- I'm trying to remember, skin,
21  tumors in mice, where they initiated the
22  tumors with a chemical other than
23  glyphosate and then they introduced
24  glyphosate. So there's one study that
25  suggests glyphosate is a promoter.

**Page 95**

1  BY MS. DU PONT:
2    Q. Sitting here today, other than that
3  one study, you cannot reference for me an
4  additional study that suggests that
5  glyphosate is a promoter; correct?
6    MS. FORGIE: Objection.
7  General causation.
8    THE WITNESS: No, but there are
9  many studies that have now demonstrated
10  that glyphosate or Roundup are genotoxic
11  agents and so certainly has the
12  potential to be an initiator or a
13  promoter, or both.
14  BY MS. DU PONT:
15    Q. But because something is genotoxic,
16  that suggests it is causing DNA damage;
17  correct?
18    MS. FORGIE: Objection.
19  Causation.
20    THE WITNESS: Right.
21  BY MS. DU PONT:
22    Q. And that's different from
23  promotion; correct?
24    MS. FORGIE: Objection.
25  General causation.

**Page 96**

1    THE WITNESS: Well, promotion
2  is just what happens after initiation to
3  make the cell move to become a true
4  cancer cell, and that could be things
5  that initiate proliferation, genetic
6  events that prevent the cell from dying,
7  or additional genotoxic events that give
8  additional mutations that eventually
9  move the cell along to becoming a cancer
10  cell.

16    MS. FORGIE: Objection. Asked
17  and answered.

**Page 97**

25  ///

Dennis Weisenburger, M.D.



Dennis Weisenburger, M.D.



Dennis Weisenburger, M.D.



Page 106

14    MS. DU PONT:  Objection.

Page 107

10    MS. DU PONT:  Objection.  Form.

Page 108

4     Q.  Do you consider yourself an expert
5  in the causes of non-Hodgkin's lymphoma?
6     A.  Yes.
7     Q.  In fact, you've published over 50
8  papers in peer-reviewed journals about the
9  causes of non-Hodgkin's lymphoma; correct?
10    A.  Yes.
11        MS. DU PONT:  Objection.  Form.

Page 109

Dennis Weisenburger, M.D.



Page 110

MS. DU PONT:  Objection.  Form.

Page 112

MS. DU PONT:  Object to form.

Page 111

Page 113

1    MS. FORGIE:  That's all I have.
2    MS. DU PONT:  Just give me one
3  minute.
4    THE VIDEOGRAPHER:  The time is
5  now 10:55 a.m., and we are off the
6  record.
7    (Recess taken from 10:55 a.m.
8  to 10:57 a.m.)
9    THE VIDEOGRAPHER:  The time is
10 now 10:57 a.m., and we are back on the
11 record.
12
13  FURTHER EXAMINATION
14
15

Dennis Weisenburger, M.D.

Page 114



20     MS. DU PONT:  Okay.  I have no
21 further questions.
22     MS. FORGIE:  Nothing else.
23     THE VIDEOGRAPHER:  The time is
24 now 10:58 a.m., and we are off the
25 record.

Page 115

1     (Whereupon the deposition
2 concluded at 10:58 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 116

1     REPORTER'S CERTIFICATE
2
3     The undersigned Certified Shorthand
4 Reporter licensed in the State of California
5 does hereby certify:
6     That the foregoing deposition was
7 taken before me at the time and place
8 therein set forth, at which time the witness
9 was duly sworn by me;
10     That the testimony of the witness
11 and all objections made at the time of the
12 examination were recorded stenographically
13 by me and were thereafter transcribed, said
14 transcript being a true copy of my shorthand
15 notes thereof.
16     I further declare that I have no
17 interest in the outcome of the action.
18     In witness whereof, I have
19 subscribed my name this 20th day of
20 December, 2018.
21
22
23     LISA MOSKOWITZ
       CSR 10816, RPR, CRR, CLR
24 NCRA Realtime Systems Administrator
25

Page 117

1     INSTRUCTIONS TO WITNESS
2
3     Please read your deposition over
4 carefully and make necessary corrections.
5 You should state the reason in the
6 appropriate space on the errata sheet for
7 any corrections that are made.
8     After doing so, please sign the
9 errata sheet and date it.
10     You are signing same subject to the
11 changes you have noted on the errata sheet,
12 which will be attached to your deposition.
13     It is imperative that you return
14 the original errata sheet to the deposing
15 attorney within thirty (30) days of receipt
16 of the deposition transcript by you.  If you
17 fail to do so, the deposition transcript may
18 be deemed to be accurate and may be used in
19 court.
20
21
22
23
24
25

Page 118

E R R A T A   S H E E T

- - - - - -

PAGE   LINE   CHANGE

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

_____   _____   _____

REASON: _____

Page 120

LAWYER'S NOTES

PAGE   LINE

_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____
_____   _____   _____

Page 119

ACKNOWLEDGMENT OF DEPONENT

I, DENNIS WEISENBURGER, M.D., do
hereby certify that I have read the
foregoing pages, 1-119, and that the same is
a correct transcription of the answers given
by me to the questions therein propounded,
except for the corrections or changes in
form or substance, if any, noted in the
attached Errata Sheet.

_____  _____

DENNIS WEISENBURGER, M.D.   DATE