# EXHIBIT 28

Dennis Weisenburger, M.D.

1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   IN RE:  ROUNDUP PRODUCTS      ) MDL No. 2741

    LIABILITY LITIGATION          )

5                                 )

    _____)

6                                 ) Case No.

    This document relates to:     ) 16-md-02741-VC

7                                 )

    Gebeyehou v. Monsanto Co.,    )

8   et al.,                       )

    Case No. 3:16-cv-5813-VC      )

9   _____)

10

11

12

13      VIDEOTAPED DEPOSITION OF DENNIS WEISENBURGER, M.D.

14

15        WEDNESDAY, DECEMBER 19, 2018, 8:34 A.M.

16             MONROVIA, CALIFORNIA

17

18

19

20

21

22

23

24

                  Reported by Serena Wong

25            CSR #10250, RPR, CCRR #200

Dennis Weisenburger, M.D.

---

Page 2

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3
 4  IN RE:  ROUNDUP PRODUCTS    ) MDL No. 2741
          LIABILITY LITIGATION     )
 5                                  )
                                    )
    _____)
 6                    ) Case No.
    This document relates to:  ) 16-md-02741-VC
 7                                  )
    Gebeyehou v. Monsanto Co.,   )
 8  et al.,                         )
    Case No. 3:16-cv-5813-VC     )
 9  _____)
10
11
12
13
14        THE VIDEOTAPED DEPOSITION OF DENNIS
15  WEISENBURGER, M.D., taken at 700 West Huntington Drive,
16  Monrovia, California, on Wednesday, December 19,
17  2018, 8:34 a.m., before Serena Wong, CSR #10250,
18  RPR, CCRR #200, Certified Shorthand Reporter, in and
19  for the State of California.
20
21
22
23
24
25
```

---

Page 3

```
 1  APPEARANCES:
 2
    For the Plaintiff:
 3
        ANDRUS WAGSTAFF
 4      BY:  KATHRYN M. FORGIE, ESQ.
        1901 Harrison Street
 5      Suite 1100
        Oakland, California  94612
 6      310.339.8214
        kathryn.forgie@andruswagstaff.com
 7
        LAW OFFICES OF TESFAYE TSADIK
 8      BY:  TESFAYE TSADIK, ESQ.
          (appearing telephonically)
 9      1736 Franklin Street
        10th Floor
10      Oakland, California  94612
        ttsadik@pacbell.net
11
12  For the Defendants:
13      BARTLIT BECK LLP
        BY:  MARK S. OUWELEEN, ESQ.
14        IGNACIO SOFO, ESQ.
        54 West Hubbard Street
15      Courthouse Place
        Chicago, Illinois  60654
16      312.494.4435
        mark.ouweleen@bartlit-beck.com
17
        ARNOLD & PORTER KAYE SCHOLER, LLP
18      BY:  JULIE DU PONT, ESQ.
          (appearing telephonically)
19      250 West 55th Street
        New York, New York  10019-971
20      212.836.8572
        julie.dupont@arnoldporter.com
21
22  Also Present:
23      Ryan Schaefer, videographer
24
25
```

---

Page 4

```
 1                    INDEX
 2
 3  WITNESS:  Dennis Weisenburger, M.D.
 4
 5  EXAMINATION                      PAGE
 6  Mr. Ouweleen                      7
 7  Ms. Forgie                       139
 8
 9
10        INSTRUCTIONS NOT TO ANSWER
11            None.
12
13
14
15        INFORMATION REQUESTED
16            None.
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
 1                INDEX TO EXHIBITS
 2  EXHIBITS                        MARKED
 3  Exhibit 1  Expert Report of Dr. Dennis    10
              Weisenburger
 4
 5  Exhibit 2  10/19/18 letter        11
 6
    Exhibit 3  Hours billed for work      12
 7
    Exhibit 4  Hours billed for work      15
 8
    Exhibit 5  Materials List, 11/13/18    16
 9
    Exhibit 6  Addendum to Dr. Weisenburger's  16
10            Reference List
    Exhibit 7  Materials List, Case Specific  16
11  Exhibit 8  Supplemental Reliance List    16
              For Dr. Weisenburger
12
    Exhibit 9  Specific Causation Report for   20
13            Sioum Gebeyehou (sic)
14  Exhibit 10  Monsanto Company's Notice to   25
              Take Oral and Videotaped
15            Deposition of Dr. Dennis
              Weisenburger
16
    Exhibit 11  Pathological Classification of  30
17            Non-Hodgkin's Lymphoma for
              Epidemiological Studies
18
    Exhibit 12  Non-Hodgkin's Lymphoma and    59
19            Specific Pesticide Exposures
              In Men:  Cross-Canada Study of
20            Pesticides and Health
21  Exhibit 13  An Detailed Evaluation of      63
              Glyphosate Use and the Risk of
22            Non-Hodgkin's Lymphoma in the
              North American Pooled Project
23
    Exhibit 14  Pesticide Exposure as Risk     67
24            Factor for Non-Hodgkin
              Lymphoma Including
25            Histopathological Subgroup Analysis
```

Dennis Weisenburger, M.D.

---

Page 6

1                    INDEX TO EXHIBITS
2    EXHIBITS                        MARKED
3    Exhibit 15 ███████████████        82
4    Exhibit 16  Tables for Non-Hodgkin's    97
           Lymphoma
5
     Exhibit 17  A Comprehensive Immunization  110
6           Strategy to Eliminate
           Transmission of Hepatitis B
7           Virus Infection in the United
           States
8
     Exhibit 18  Article, "Meniere's Disease   119
9           Might be an Autoimmune
           condition?"
10
     Exhibit 19  Article, "Roundup Weed Killer  136
11          Has Probable Carcinogen, U.N.
           Says."
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 7

1        WEDNESDAY, DECEMBER 19, 2018, 8:34 A.M.
2             MONROVIA, CALIFORNIA
3
4        THE VIDEOGRAPHER:  We're now on the
5    record.  My name is Ryan Schafer.  Videographer for
6    Golkow Litigation.  Today's date December 19, 2018,
7    time 8:34 a.m.  This is being held 700 West
8    Huntington Drive in Monrovia in the matter of
9    Gebeyehou versus Monsanto Company, Case
10   No. 3:16-cv-5813-VC for the U.S. District Court,
11   Northern District of California.
12       The deponent is Dr. Dennis Weisenburger.
13   Counsel will be noted on the stenographic record.
14       Will counsels please identify themselves.
15       MR. OUWELEEN:  Mark Ouweleen for Monsanto.
16       MR. SOFO:  Nacho Sofo for Monsanto.
17       MS. FORGIE:  Kathryn Forgie from Andrus
18   Wagstaff for the Plaintiff Gebeyehou.
19       MR. TSADIK:  Tesfaya Tsadik for Plaintiff
20   Gebeyehou.
21       MS. DU PONT:  Julie du Pont on behalf of
22   Monsanto.
23       THE VIDEOGRAPHER:  The court reporter is
24   Serena Wong, and will now swear in the witness.
25       THE COURT REPORTER:  Please raise your

---

Page 8

1    right hand.
2        Do you solemnly swear or affirm that the
3    testimony you're about to give in this deposition
4    shall be the truth, the whole truth, and nothing but
5    the truth, so help you God?
6        THE WITNESS:  I do.
7        MS. FORGIE:  As a preliminary matter, I'll
8    just state that we are producing Dr. Weisenburger
9    only for case specific testimony in the Gebeyehou
10   case.
11
12          DENNIS WEISENBURGER, M.D.,
13   was called as a witness, and having been first
14   duly sworn, was examined and testified as
15   follows:
16
17              EXAMINATION
18   BY MR. OUWELEEN:
19   Q   Good morning, Dr. Weisenburger.
20   A   Good morning.
21   Q   We've been introduced off the record, and
22   we met yesterday.  My name is Mark Ouweleen, and I
23   represent Monsanto.
24       You've previously given sworn deposition
25   testimony and sworn testimony at a Daubert hearing

---

Page 9

1    in cases involving Roundup; right?
2    A   Yes.
3    Q   And the testimony that you gave was
4    truthful and accurate to the best of your ability?
5    A   Yes.
6    Q   You stand by the prior testimony that
7    you've given before today in the Roundup cases?
8    A   Yes.
9    Q   Is there anything in that testimony that
10   you'd like to correct as you sit here now?
11   A   Not that I can think of.
12   Q   I understand you may offer general
13   causation testimony in Mr. Gebeyehou's case.  Is it
14   fair to say that the general causation testimony
15   that you would offer in Mr. Gebeyehou's case is
16   consistent with the testimony you've previously
17   offered in your other Roundup depositions and at the
18   Daubert hearing?
19   A   Yes.
20   Q   Is there any reason that you're aware of
21   that you may not be able to give truthful and
22   accurate testimony today?
23   A   No.
24       MS. FORGIE:  The only thing I would add is
25   there's also a general causation expert report.

---

Dennis Weisenburger, M.D.

Page 10

1      (Exhibit 1 was marked.)
2    Q   BY MR. OUWELEEN:  I've marked that as
3  Exhibit 1, your expert report of Dr. Dennis
4  Weisenburger in the Gebeyehou case.
5      Do you have that in front of you?
6    A   Yes.
7    Q   ███████████████████
    ███████████████████
    ███████████████████
11   Q   Does this report -- but as we sit here
12  now, you disclosed all of the opinions you intend to
13  offer in this case in your report; correct?
14   A   Yes.
15   Q   ███████████████████
    ███████████████████
    ███████████████████
    ████████████   I mean, I reviewed a lot
20  of other articles that are listed in my references,
21  my reference lists, which, you know, I'm also
22  relying on.  But I -- I listened to the most
23  important documents in the report.
24   Q   Okay.  We'll review those materials relied
25  on lists in a moment.

Page 11

1      But you understood you had an obligation
2  to set out in your report the bases for your
3  opinions in this case; right?
4    A   Which I've done.
5    Q   And you did that to the best of your
6  ability?
7    A   Yes.
8      (Exhibit 2 was marked.)
9    Q   BY MR. OUWELEEN:  Exhibit No. 2 is a
10  letter to you from Mr. Tesfaya Tsadik dated October
11  19, 2018.
12      Is this a letter that Mr. Tsadik sent to
13  you?
14   A   Yes.
15   Q   Is it your understanding that Mr. Tsadik
16  is Mr. Gebeyehou's lawyer?
17   A   Yes.
18   Q   Did he retain you to offer opinions in
19  this case?
20   A   Yes.
21   Q   And he retained you on or around October
22  19, 2018?
23   A   Yes.
24   Q   Did he pay you a retainer of $5,000?
25   A   Yes.

Page 12

1      (Exhibit 3 was marked.)
2    Q   BY MR. OUWELEEN:  Exhibit 3 appears to be
3  a time sheet prepared -- do you want any exhibits,
4  Kathryn, or no?
5      MS. FORGIE:  I'm going to have to -- there
6  may be a few that I want.  Thank you.
7    Q   BY MR. OUWELEEN:  Exhibit 3 appears to be
8  a time sheet or a bill prepared by you, followed by
9  another letter from you -- or from Mr. Tsadik to
10  you; is that right?
11   A   Yes.
12   Q   You prepared the bill, which is the first
13  page of Exhibit 3?
14   A   Yes.
15   Q   Does Exhibit 3 reflect all the hours that
16  you worked on Mr. Gebeyehou's case from the
17  beginning until November 19, when you finished your
18  expert report in this case?
19   A   Yes.
20   Q   And that was 21 hours?
21   A   Yes.
22   Q   Including the retainer that you were paid
23  originally when you were hired by Mr. Tsadik, you
24  were paid $10,500 for your work on Mr. Gebeyehou's
25  case through December 7; right?

Page 13

1      MS. FORGIE:  Objection.
2      THE WITNESS:  Through November 19.
3    Q   BY MR. OUWELEEN:  On December 7, if you
4  look at the second page of Exhibit 3, you received a
5  check from Mr. Tsadik for $5,500; right?
6    A   Correct.
7    Q   As of December 7, you had been paid a
8  total of $10,500; right?
9    A   Yes.
10      MS. FORGIE:  Excuse me.  I will take that
11  exhibit, because I don't have a second page of the
12  invoice.  Sorry.  Thank you.
13   Q   BY MR. OUWELEEN:  Have you spent
14  additional hours on Mr. Gebeyehou's case since
15  November 19?
16   A   Yes.
17   Q   Have you billed for those hours?
18   A   No.
19   Q   How many hours have you spent since
20  November 19?
21   A   Ten.
22   Q   When did you spend that time?
23   A   Over the last week.
24   Q   Can you be any more particular than that?
25   A   Well, last weekend and a few hour this is

Dennis Weisenburger, M.D.

Page 14

1 week.
2    Q   What were you doing in those ten hours?
3    A   I was reviewing the medical records again.
4 I was reviewing the deposition of Mr. Gebeyehou.
5 ███████████████████████████████████
6 ██
7    Q   Did any of the work that you did in the
8 last -- in the ten hours since you sent your last
9 bill change any of your opinions in the case?
10    A   No.
11    Q   Do you keep records -- did you keep
12 records of that time that you spent similar to the
13 records shown on Exhibit 3?
14    A   Yes.
15    Q   Do you have a copy of those records?
16    A   I do, actually.  But it's not the official
17 copy.  It's my messed up copy.
18    Q   Okay.  Can we mark your messed up copy as
19 an exhibit just so we have it for the record?
20    A   Sure.
21       MS. FORGIE:  Yeah, that's fine.
22       MR. OUWELEEN:  Thanks.  We won't have a
23 copy of this one.
24       MS. FORGIE:  We can get copies at the
25 break.

Page 15

1       MR. OUWELEEN:  Yeah.  So this is Exhibit
2 4.
3       THE WITNESS:  Because I need that back, a
4 copy of it back.
5       MR. OUWELEEN:  Certainly.  Otherwise you
6 won't get paid; right?
7       (Exhibit 4 was marked.)
8    Q   BY MR. OUWELEEN:  Does Exhibit 4 reflect
9 all of the time that you've spent working on
10 Mr. Gebeyehou's case other than the time reflected
11 in Exhibit 3?
12    A   Yes.
13    Q   So if we add up Exhibit 3's time and
14 Exhibit 4's time, that's a total of all the time you
15 spent on the case?
16    A   Yes.
17       MS. FORGIE:  Let's put this over here just
18 so we can remember to copy.
19    Q   BY MR. OUWELEEN:  For the record, I'm
20 marking the exhibits today because you've been
21 deposed several times as Weisenburger Gebeyehou
22 Exhibit 1, 2, 3, 4, 5, so on, just so we can keep
23 straight the exhibits from the different
24 depositions.  But I'll just refer to them as
25 Exhibits 1, 2, 3, 4, 5.  Understood?

Page 16

1    A   Sure.
2       (Exhibit 5 through 8 were marked.)
3       MR. OUWELEEN:  So Exhibit 5 is
4 Dr. Weisenburger's materials list dated November 13,
5 2018.  Exhibit 6 is addendum to Dr. Weisenburger's
6 reference list.  This one is undated, but it has 123
7 references listed on it.  Exhibit 7 is case specific
8 materials list that you produced to us.  And Exhibit
9 8 is a supplemental reliance list for
10 Dr. Weisenburger that you also produced to us.
11       MS. FORGIE:  Can I see a copy of that just
12 to make sure?
13    Q   BY MR. OUWELEEN:  You have before you,
14 Dr. Weisenburger, Exhibits 5, 6, 7, and 8; right?
15    A   Yes.
16       MS. FORGIE:  Can I just ask a question?
17 Exhibit 7 is the materials list, case specific?  And
18 then this is Exhibit 8?
19       MR. OUWELEEN:  Seven is Dr. Weisenburger's
20 materials list, and eight is a supplemental reliance
21 list for Dr. Weisenburger.
22       MS. FORGIE:  Thank you.
23       MR. OUWELEEN:  Are we all on the same
24 page?
25       MS. FORGIE:  I think we are.  So many

Page 17

1 supplements and addendums.
2       MR. OUWELEEN:  No worries.
3    Q   BY MR. OUWELEEN:  Let's start with Exhibit
4 5.  Exhibit 5 was all of the material that you
5 considered up through the preparation of your expert
6 report in this case other than the case specific
7 materials listed on Exhibit 7; is that right?
8       MS. FORGIE:  Objection.
9 ████████████████████████████████
10 █ ████████████████████████████████████
11 █ █████████████████████████████████
12 █ ██████████████████████████████
13 █ ████████████████████████████
14 █ ██████████████████████████████
15 █ ████████████████████████
16    Q   BY MR. OUWELEEN:  Your expert report is
17 dated November 19; right?
18    A   Right.  Expert report is dated --
19 actually, yeah, November 27, it's dated.
20    Q   BY MR. OUWELEEN:  Your expert report?
21    A   Yes.
22    Q   If you look at the last -- the signature
23 page of Exhibit 1, it says -- it's got your
24 signature there, and it says "date 11/19/18";
25 correct?

Dennis Weisenburger, M.D.

Page 18

1    A    You know, there was an amended specific
2  causation report.  It was a week later because there
3  were some errors in my original report, so it's
4  substantially the same report.  The only thing that
5  was different was that in the original report, I
6  said that he used it -- used Roundup three times a
7  week, and it turned out that he only used it once
8  every three weeks.  So that was the change I made
9  between the original report and the amended report.
10       You should have the amended report.  I
11  sent it to Mr. Tsadik, and I don't know whether I
12  sent it to you or not.  But I sent it back to the
13  original lawyers because they're the ones who
14  corrected me.
15       MR. OUWELEEN:  Understood.  I do not have
16  a copy of the supplemental report.
17       MS. FORGIE:  Neither do I.
18    Q    BY MR. OUWELEEN:  Would you happen to have
19  a copy of that with you, Doctor?
20    A    Yeah.  It's marked up a little bit, but
21  you can have it if you want it just to copy.
22       MR. OUWELEEN:  Yeah, so we could do that,
23  or if you all could readily get a clean copy.
24       MS. FORGIE:  I think it's better to get a
25  clean copy.  Let me ask.  Tesfaya?  Hello?

Page 19

1       MR. TSADIK:  Yes.
2       MS. FORGIE:  Is there any chance that you
3  could e-mail me this amended report, please?
4       MR. TSADIK:  Okay.  Let's see.  I can do
5  that.
6       MS. FORGIE:  And do you have anything
7  indicating it was served on Monsanto, please?
8       MR. TSADIK:  I think you should probably
9  -- I don't know if Robin did it.  I think she was
10  going to do it.
11       MS. FORGIE:  Okay.  I'll talk to her.  Why
12  don't we do this.  If you can e-mail it to us right
13  away, I think it's important enough that maybe we
14  take a five-minute break?
15       MR. OUWELEEN:  Yes.  Let's go off the
16  record.
17       MS. FORGIE:  If you can e-mail it to me
18  right away, please.
19       MR. TSADIK:  Okay.
20       MS. FORGIE:  Thank you.
21       THE VIDEOGRAPHER:  Time is 8:50 a.m., and
22  we are off the record.
23       (Recess taken.)
24       THE VIDEOGRAPHER:  The time is now 9:11
25  a.m., and we are now back on the record.

Page 20

1       (Exhibit 9 was marked.)
2    Q    BY MR. OUWELEEN:  All right.
3  Dr. Weisenburger, I've marked as Exhibit 9 a revised
4  copy of your specific causation report for
5  Mr. Simoun Gebeyehou dated November 27, 2018.
6       Do you have that in front of you?
7    A    Yes.
8    Q    All right.  And this was just provided to
9  us today, and --
10       MS. FORGIE:  And I do apologize for that.
11  I did not know about it, but I have confirmed that
12  it was not -- it was inadvertently not served.
13    Q    BY MR. OUWELEEN:  Dr. Weisenburger, I'll
14  just reask you the questions I asked earlier about
15  Exhibit 1, the older version of your expert report
16  so the record is clear.
17       Does Exhibit 9, rather than Exhibit 1,
18  fully disclose all the opinions that you may offer
19  concerning Mr. Gebeyehou?
20    A    Yes.
21    Q    And does Exhibit 9, rather than Exhibit 1,
22  disclose all the bases for your opinions that you
23  may offer concerning Mr. Gebeyehou?
24    A    Yes.
25    Q    All right.  And the difference -- we'll go

Page 21

1  through the differences in a bit.  But one
2  difference, at least, between the November 19th
3  version of your expert report and Exhibit 9 was the
4  calculation of how many times Mr. Gebeyehou used the
5  Roundup herbicide; right?
6    A    Yes.  It changed from three times a month
7  in the original report to once every three weeks in
8  the corrected report.
9    Q    And that, therefore, changed the totals
10  that you calculated for the total number of times
11  that he used Roundup and the number of gallons that
12  he used; right?
13    A    Yes.
14    Q    Are there any other changes to your report
15  between Exhibit 1 and Exhibit 9?
16    A    No.
17    Q    And we'll come back to those calculations
18  in a little bit.
19       If we could now -- if you could set aside
20  Exhibit 9, we'll come back to it.  But we were
21  talking about Exhibits 5, 6, 7, and 8.  When did you
22  -- if you would pick up Exhibit 6, which is the
23  addendum to your reference list.
24    A    Okay.
25    Q    When did you prepare Exhibit 6?

Dennis Weisenburger, M.D.



Page 22

1    A    It was prepared last week on Thursday and
2  submitted to Kathryn on Friday, last Friday.
3    Q    These are materials that you considered
4  after November 13, 2018?
5        MS. FORGIE:  Objection.
6        THE WITNESS:  No.  Some -- after what
7  date?  I'm sorry.  The 28th?
8    Q    BY MR. OUWELEEN:  No.  I'm looking at
9  Exhibit 5, which is your original materials list.
10    A    Right.
11    Q    And that was dated November 13, 2018.
12    A    So it was submitted after that, right.
13    Q    And so is it fair to say that Exhibit 6
14  reflects materials that you identified and
15  considered after November 13, 2018?
16        MS. FORGIE:  Objection.
17
25        MS. FORGIE:  Hold on a second.  Should we

Page 23

1  answer that?  Is somebody trying to call in.
2        MR. OUWELEEN:  Why don't you finish.
3        THE WITNESS:
15    Q    And then additional materials that you've
16  reviewed since reviewing the expert reports from
17  Monsanto's experts.
18        Is that fair?
19    A    Yes, that's fair.
20    Q    And is it fair to say that Exhibits 5 and
21  6 together disclose all of the materials that are
22  you considered and relied on in forming your
23  opinions in the case?
24    A    Yes.
25    Q    All right.  And then we have Exhibits 7

Page 24

1  and 8.  Let's look at Exhibit 7, and it lists case
2  materials list -- withdrawn.
3        Exhibit 7 has a list of case specific
4  materials related to Mr. Gebeyehou that you
5  reviewed; right?
6    A    Yes.
7    Q    Are those all of the case specific
8  materials concerning Mr. Gebeyehou that you
9  reviewed?
10    A    Yes.
11    Q    You did not read any other deposition
12  transcripts from Mr. Gebeyehou's case?
13    A    Only the expert reports that are on the
14  next exhibit.

Page 25

9    A    No.
10    Q    Okay.  Exhibit 8 you have produced as a
11  supplemental reliance list for Dr. Weisenburger.
12  Did you rely on the expert reports of Drs. Fleming,
13  Grossbard, and Zukerberg in forming your opinions in
14  this case?
15    A    No.
16    Q    So when you say it's a supplemental
17  reliance list, you read the reports, but you're not
18  relying on them in any way.
19        Is that fair?
20    A    That's correct.
21        (Exhibit 10 was marked.)
22    Q    BY MR. OUWELEEN:  Exhibit 10 is a Notice
23  of Deposition to you in this case.
24        Have you seen Exhibit 10 before?
25    A    Yes.



Page 26

1   Q   Did you read it?

2   A   Yes.

3   Q   Do you see that it has attached to it as

4 Exhibit A a set of requests for production; right?

5   A   Yes.

6   Q   Did you produce any documents or bring

7 with you any documents in response to these

8 requests?

9   A   Yes.

10   Q   What documents are those?

11   A   My CV, my bill.  I guess that's all.

12   Q   Your current curriculum vitae and your

13 billing records that we've already reviewed; right?

14   A   Yes.

15   Q   Were there other documents that you have

16 that are responsive to these requests for production

17 that you have refrained from bringing today or

18 otherwise produced them to us?

19   A   Well, I have handwritten notes of -- that

20 I've taken from the medical record and handwritten

21 notes from the telephone interview.

22   Q   Anything else?

23   A   No.

24   Q   The handwritten notes from the interview,

25 that's the interview with Mr. Gebeyehou on November

Page 27

1 5th, 2018?

2   A   Yes.

3       MR. OUWELEEN:  And I understand that

4 counsel is asserting an objection under the pretrial

5 order seven to producing those notes?

6       MS. FORGIE:  Correct.  And we stated so in

7 our objections to the notice.

8   Q   BY MR. OUWELEEN:  In your expert report,

9 Exhibit 9,

18       MS. FORGIE:  Objection.

19       THE WITNESS:

20   Q   BY MR. OUWELEEN:

Page 28

14   Q   When you say "low-dose repeated

15 exposures," it's important when you're evaluating

16 risk to take into account both the dose -- or the

17 amount and the duration of exposure; right?

18   A   Yes.

19   Q   If you know just a dose, but you don't

20 know how long, you cannot evaluate the risk; right?

21       MS. FORGIE:  Objection.

22       THE WITNESS:  Well, you need to know the

23 dose.  You need to know how many times, for example,

24 per year a person was exposed, and then you need to

25 know the number of years to determine the latency.

Page 29

1   Q   BY MR. OUWELEEN:  To determine the risk,

2 you need to know not just the dose, but also the

3 frequency and duration of the exposure.  Fair?

4       MS. FORGIE:  Objection.

5       THE WITNESS:  Well, that's one way to

6 determine risk, yes.

7   Q   BY MR. OUWELEEN:  Is there any way to

8 determine risk if you know a dose but have no idea

9 for how long someone was exposed to it?

10   A   Well, so -- no, you need to know how long

11 it is, but there are different ways to calculate

12 risk.  So if you see in the NAPP study, they look at

13 number of days per year, they look at number of

14 years, they look at number of lifetime days.

15       These are different parameters that

16 epidemiologists use to determine risk.  And it's my

17 opinion that intensity of exposure is probably a

18 better parameter to determine risk than number of

19 years because, in my experience, when we did our

20 research on 2,4-D we found the same thing.  It was

21 frequency of use rather than number of years of use.

22       So I think intensity of exposure is more

23 -- is a better parameter of measuring risk than the

24 number of years of use.  And, actually, there's a

25 very nice example in the article that I cite of

Dennis Weisenburger, M.D.

Page 30

1  animal studies where they showed that.
2    Q   When you're referring to the article, are
3  you referring to your 1992 article?
4    A   Yes.
5    Q   And when you're saying "intensity of use,"
6  are you referring to the dose?
7    A   Well, you know, a surrogate for dose is
8  number of times used per month or number of times
9  per year.  That would be a surrogate for dose, a
10  crude surrogate for dose.
11    Q   If you can, it's important to know the
12  dose as well as how often someone is exposed; right?
13    MS. FORGIE:  Objection.
14    THE WITNESS:  Yes.
15    Q   BY MR. OUWELEEN:  All right.  So let's
16  have a look at that animal study you were referring
17  to.  This is Exhibit 11.  And this is --
18    MS. FORGIE:  I'd like a copy.
19    (Exhibit 11 was marked.)
20    Q   BY MR. OUWELEEN:  This is a copy of an
21  article you wrote and published in 1992 called
22  "Pathological Classification of Non-Hodgkin's
23  Lymphoma for Epidemiological Studies"; right?
24    A   Yes.
25    Q   And at page 54 of 61, there you show --

Page 31

1  well, you talk about a study looking at the
2  incidence of lymphoma in mice to butadiene; correct?
3    A   Correct.
4    Q   Is that how you say it?
5    A   Butadiene, yes.
6    Q   Is that the study you were referring to a
7  moment ago?
8    A   Yes.
9    Q   And what you found in that study was that
10  even if you knew the exposure concentration and you
11  knew the exposure duration, you could calculate a
12  cumulative dose like the mice received, but that
13  dose did not predict the incidence of lymphoma in
14  the mice; right?
15    A   Well --
16    MS. FORGIE:  Objection.
17    THE WITNESS:  -- what the study showed is
18  that the mice that were -- received a high dose over
19  a short period of time developed more lymphomas than
20  the mice that received a smaller dose over a longer
21  period of time, which makes the point that the
22  intensity of exposure is probably a better predictor
23  than the length of exposure.
24    Q   BY MR. OUWELEEN:  Yes.  So for those mice,
25  it was important to know the dose and not just how

Page 32

1  long they were exposed to this -- to the chemical;
2  right?
3    MS. FORGIE:  Objection.
4    THE WITNESS:  For the mice, you could
5  calculate the dose because you know what you gave
6  them, right.
7    Q   BY MR. OUWELEEN:  Right.  And if you had
8  just looked at the length of time for the mice, it
9  would have misled you about the risk; right?
10    MS. FORGIE:  Objection.
11    THE WITNESS:  Well, it would have been
12  hard to understand why a shorter exposure would give
13  you more lymphomas than the longer exposures, so it
14  wouldn't fit with the way most people think about
15  this.  So you have to know -- you had to know the
16  dose to understand the results here.
17    Q   BY MR. OUWELEEN:  Right.  For the mice,
18  knowing just the length of time they were exposed
19  was not sufficient to determine the risk of
20  lymphoma; right?
21    MS. FORGIE:  Objection.
22    Q   BY MR. OUWELEEN:  You needed to also know
23  the dose; correct?
24    A   That's correct.
25    Q   Now, this was not a paper generally about

Page 33

1  mice, was it?
2    A   No.  It was a paper that talked about the
3  use of -- the use of pathology as part of
4  epidemiology.
5    Q   Okay.  For studying lymphoma in humans;
6  right?
7    A   Yes.
8    Q   And one of the things that you talk about
9  there on that same page of Exhibit 10 is different
10  latency curves; right?
11    A   Right.  I drew some sort of idealized
12  latency curves.
13    Q   And those latency curves do not reflect
14  real data.  They're depicting different ideas of
15  what latency curves might look like; right?
16    A   Right.
17    Q   And when you were drawing those curves,
18  they took into account both the duration of use,
19  which is the time axis and also the dose of
20  carcinogenic exposures; right?
21    A   Right.
22    Q   And that's because just like for mice, to
23  understand the risk of lymphoma in people, if you
24  can, it's important to know both the duration and
25  frequency of exposure and the dose; right?

Dennis Weisenburger, M.D.

Page 34

1    A    So the curve actually just shows the
2  effect of different doses over time.  So what the
3  curve shows, Curve A shows if you give high doses,
4  the median latency is going to be shorter than if
5  you give low doses, the median latency will be
6  longer.
7    Q    Right.  My question is a little different.
8  My question is:  In human beings, just like in mice,
9  to understand the risk of lymphoma, it's important
10  to know not just the duration of exposure, but also
11  the dose or how much people are exposed to.
12          Isn't that fair?
13          MS. FORGIE:  Objection.
14          THE WITNESS:  Right.  But we don't usually
15  know that in humans, so epidemiologist develop these
16  other parameters that I mentioned to try to estimate
17  dose.
18    Q    BY MR. OUWELEEN:  Well, there are ways of
19  measuring doses in people, aren't there?  You've
20  seen those studies?
21    A    There are, sure.
22    Q    And so if you can know the dose, it's
23  important to take that into consideration.  Fair?
24          MS. FORGIE:  Objection.  Asked and
25  answered.

Page 35

1          THE WITNESS:  Well, there are studies of
2  farmers that -- where they've looked at exposure and
3  they've looked at practices -- different practices
4  in applying pesticides, and they've measured urine
5  levels to sort of get an understanding of how
6  different methods of application affect dose.  So
7  there are studies like that in farmers and -- I
8  think mainly in farmers.  Probably in some
9  horticulturists, too, but mostly in farmers.
10    Q    BY MR. OUWELEEN:  My question was:  If you
11  can know the dose, it's important to take that into
12  consideration.  True?
13          MS. FORGIE:  Objection.  Asked and
14  answered.
15          THE WITNESS:  ████████████████████
████  █████████████████████████████████
████  ███████████████████████████████████
████  ████████████████████████████
19    Q    BY MR. OUWELEEN:  Now, when you say, "We
20  don't have that kind of data," we don't perhaps have
21  urine samples measuring the data, but it's possible
22  to estimate dose through various techniques; right?
23    A    Yes.
24    Q    Now, you're not a toxicologist, are you?
25    A    I'm not a toxicologist.

Page 36

1    Q    You're not an expert in measuring or
2  calculating a person's exposure to a substance?
3          MS. FORGIE:  Objection.
4          THE WITNESS:  Well, you can see that I've
5  done that here, but I -- you know, I'm not an expert
6  in measuring levels in urine and extrapolating to
7  total dose, no.
8    Q    BY MR. OUWELEEN:  Well, what you've done
9  here is you've -- you've estimated the number of
10  days or the duration of exposure, but not a dose;
11  correct?
12          MS. FORGIE:  Objection.
13          THE WITNESS:  Correct.  But there are
14  surrogates for dose here in terms of the fact that
15  the individuals applied the pesticides without any
16  protection.  They didn't wear gloves.  They got it
17  on their skin.  So, you know, those things all help
18  you understand what kind of dose they most likely
19  got, but it's not a precise calculation.  It's a
20  qualitative determination rather than quantitative
21  determination.
22    Q    BY MR. OUWELEEN:  It's a ballpark
23  determination that he was exposed to a lot of
24  glyphosate?
25          MS. FORGIE:  Objection.

Page 37

1          THE WITNESS:  Yes.
2    Q    BY MR. OUWELEEN:  But you are not an
3  expert.  There are experts out there in calculating
4  people's exposures to various chemical substances,
5  aren't there?
6    A    Yes.
7    Q    And you're not one of those people, are
8  you?
9    A    I'm not.
10    Q    And you're not -- you've never been
11  qualified by any court as an expert in exposure, I
12  take it?
13          MS. FORGIE:  Objection.
14          THE WITNESS:  Well, you know, again, I
15  give opinion on exposure, so I don't know how to
16  answer that question.
17    Q    BY MR. OUWELEEN:  Have you ever been
18  qualified by a court of law as an expert in
19  determining a person's exposure to a chemical?
20          MS. FORGIE:  Objection.  Asked and
21  answered.
22          You can answer it again.
23          THE WITNESS:  I don't know the answer to
24  that.  I've testified about exposures to various
25  chemicals in many of my cases.

Dennis Weisenburger, M.D.

Page 38

1    Q   BY MR. OUWELEEN: Have you ever been hired
2 by anybody outside of this litigation to determine
3 chemical exposures or advise on chemical exposures?
4       MS. FORGIE: Objection.
5       THE WITNESS: For litigation like this, I
6 have, yes.
7    Q   BY MR. OUWELEEN: Outside of litigation,
8 have you ever been retained to determine chemical
9 exposures or advise on chemical exposures?
10    A   No.
11    Q   You've never published on the subjects of
12 toxicology or exposure assessment?
13       MS. FORGIE: Objection.
14       THE WITNESS: No.
15    Q   BY MR. OUWELEEN: Prior to this
16 litigation, do you have any experience developing
17 dose estimates for individuals exposed to chemicals?
18 I'm talking specifically about dose.
19    A   Not other than what I've already told you.
20    Q   And you're talking about duration of
21 exposure; right?
22       MS. FORGIE: Objection.
23       THE WITNESS: Well, we've also talked
24 about dose.
25    Q   BY MR. OUWELEEN: Have you ever calculated

Page 39

1 a person's dose to a -- of exposure to a chemical
2 before?
3       MS. FORGIE: Objection. Asked and
4 answered.
5       THE WITNESS: As I said, I've done it
6 qualitatively, but not in a specific quantitative
7 way.
8    Q   BY MR. OUWELEEN: You have never
9 determined a person's quantity of exposure to any
10 chemical; correct?
11       MS. FORGIE: Objection.
12       THE WITNESS: Not in precise numerical
13 terms, no.
14    Q   BY MR. OUWELEEN: When I say "quantity,"
15 you understand that refers to numbers; right?
16       MS. FORGIE: Objection.
17       THE WITNESS: Now I understand that.
18    Q   BY MR. OUWELEEN: Do you have a different
19 meaning for "quantity" than numbers?
20    A   "Quantity" can be qualitative or
21 quantitative; right? I can say a lot. I can say a
22 little. I could say 10.4 gallons.
23    Q   So you've never prepared any quantitative
24 assessment of anybody's exposure to any chemical;
25 right?

Page 40

1       MS. FORGIE: Objection. Asked and
2 answered. You can answer again.
3       THE WITNESS: Same answer I gave you
4 before. I have done qualitative evaluations of dose
5 in cases such as this where individuals are exposed
6 to chemicals.
7    Q   BY MR. OUWELEEN: But you've never
8 calculated a number of -- reflecting somebody's
9 dose?
10       MS. FORGIE: Objection.
11       THE WITNESS: Not a specific number in
12 terms of milligrams per kilogram per day or -- no,
13 I've not done that.
14    Q   BY MR. OUWELEEN: And you've also not
15 calculated a range of numbers of anybody's dose in
16 terms of milligrams per kilograms per day?
17    A   That's correct.
18    Q   You understand there are established
19 equations that some scientists use to calculate in
20 numbers a person's exposure to a chemical; right?
21    A   Yes.
22    Q   And there are regulatory guidelines that
23 talk about those equations.
24       Have you seen those?
25    A   I'm sure there are.

Page 41

1    Q   And you've never calculated exposure using
2 an equation like that?
3    A   No.
4    Q   You did not use any equation in this case
5 or any other method to put any sort of number on
6 Mr. Gebeyehou's exposure to glyphosate or Roundup?
7       MS. FORGIE: Objection. Asked and
8 answered.
9       You can answer.
10       THE WITNESS: I have not.
11    Q   BY MR. OUWELEEN: Now, you did calculate
12 the number of days that Mr. Gebeyehou used Roundup;
13 right?
14    A   Yes.
15    Q   And you calculated -- or estimated the
16 number of gallons that he sprayed on his yard over
17 the years; correct?
18    A   Yes.
19    Q   And the way you did that was you took the
20 number of years that he was using Roundup and
21 multiplied it times the number of times per year,
22 based on his estimate, that he did it about every
23 three weeks; right?
24    A   Yes.
25    Q   ████████████████████████████

Dennis Weisenburger, M.D.

Page 42

Page 44

1  per month, and then the number of months, and then
2  you have to know the number of years.  So if you
3  take 17 divided by 12, you get 1.4, which is the
4  number of times per month.
5     Q   Uh-huh.
6     A   So I should have probably brought the
7  calculations with, but that's how I did it.
8     Q   So you took 1.4 times per month times five
9  months times 1.5 gallons, plus --
10    A   Times the number of years.
11    Q   Times the number of years.  And that was
12 the 1.5 gallon number.  And then you took one gallon
13 times 1.4 times seven months times the number of
14 years, and then you summed all those gallons up?
15    A   Yes.
16    Q   In your original report, Exhibit 1, you
17 had made a mistake and used a different estimate of
18 how often you used it.  And as a result, at that
19 time, you had calculated 1,188 times.
20       (Telephone interruption.)
21    MS. FORGIE:  Do you need a break?
22    MR. OUWELEEN:  No.
23    MS. FORGIE:  We never checked to see --
24    MR. OUWELEEN:  They're on --
25    MS. FORGIE:  Okay.  Thank you.

Page 43

Page 45

1     MR. OUWELEEN:  I'll start over.
2  Withdrawn.
3     Q   BY MR. OUWELEEN:  In your original report,
4  which is Exhibit 1,
5
7     A   Yes.
8     Q   And as a result, the numbers that you
9  calculated were different.  But you used the same
10 method to calculate what was in that report; right?
11    A   Yes.
12    Q   And there you had calculated a total 1,188
13 times and 1,400 gallons?
14    A   Yes.
15    Q

23

24    A   That's how I did it.  So you have to know
25 the number of gallons per month, the number of times



Dennis Weisenburger, M.D.



Page 46

19    Q

22        MS. FORGIE:  Objection.
23        Q    BY MR. OUWELEEN:  So is it fair to say

Page 47

3        MS. FORGIE:  Objection.
4        THE WITNESS:  Well, as long as it was an
5    extensive and significant exposure, it didn't really
6    matter whether it was 500 gallons or 1,500 gallons.
7        Q    BY MR. OUWELEEN:  Was there any number of
8    gallons, in your mind, that you had to find that he
9    had used over the years for you to conclude that
10   there was substantial exposure?
11       A    No, I don't have a precise number.
12       Q    Do you have a general number?
13       A    No.
14       Q    And similarly with respect to the number
15   of times or the number of years, was there any
16   threshold that you used to determine whether his
17   exposure was substantial enough?
18       A    Well, you know, the parameters I gave are
19   the risks from the two epidemiologic studies greater
20   than ten days or greater than two days per year, and
21   he's far above either of those parameters of risk.
22       Q    Right.  So once you determined that he had
23   had more than two days per year of exposure or more
24   than ten days, you had all you needed to know in
25   terms of his exposure.  Fair?

Page 48

1        MS. FORGIE:  Objection.
2        THE WITNESS:  Well, no.  I looked
3    carefully at actually how much.

7        Q    BY MR. OUWELEEN:  But you have no data on
8    whether being well over the two days or ten days per
9    year or just above those thresholds increased the
10   risk at all, do you?
11       MS. FORGIE:  Objection.
12       THE WITNESS:

15   So it's conclusion based on my general knowledge and
16   common knowledge in toxicology and epidemiology.
17       Q    BY MR. OUWELEEN:  But there is no linear
18   relationship between the number of years and amount
19   of dose and the amount of risk?  It doesn't just
20   keep going up and up and up, does it?
21       A    I have no answer on that for glyphosate.
22       Q    You have no data on that; right?
23       MS. FORGIE:  Objection.
24       THE WITNESS:  No.
25       Q    BY MR. OUWELEEN:  What I said was correct;

Page 49

1    right?  You have no data?
2        A    I have no data on that specific chemical,
3    yes.
4        Q    Now, when you calculated the number of
5    gallons, you did not use that number in any
6    calculation; right?
7        A    500 gallons?  I didn't use that in any
8    additional calculations, no.
9        Q    And you did not compare the number of
10   gallons that he sprayed on his yard to any data from
11   any studies about number of gallons he used; right?
12       A    No.
13       Q    And you would agree that only a tiny
14   fraction of the gallons that Mr. Gebeyehou sprayed
15   ended up on his skin?
16       MS. FORGIE:  Objection.
17       THE WITNESS:  I would agree with that.
18       Q    BY MR. OUWELEEN:

21       A

22       Q    The amount deposited on his body can be
23   affected by whether he's wearing long sleeves or
24   short sleeves; right?
25       A    Yes.

Dennis Weisenburger, M.D.

Page 50

1    Q    And the amount deposited is lower for a
2  person wearing long pants, probably, than for a
3  person wearing shorts?
4        MS. FORGIE:  Objection.
5        THE WITNESS:  Yes.
6    Q    BY MR. OUWELEEN:  And the amount deposited
7  on the skin might be different for different methods
8  of application, whether he's spraying it or using a
9  mist?
10   A    Yes.
11   Q    And now you mention in your report his
12 clothing and his method of application, but you have
13 not used those facts in any way to quantify or
14 estimate how much glyphosate actually got on
15 Mr. Gebeyehou's skin, have you?
16       MS. FORGIE:  Objection.
17       THE WITNESS:  No.  But one can, again,
18 surmise that the fact that he didn't wear any
19 protective clothing, that he wore shorts, that he
20 wore short-sleeve shirts, that he continued to wear
21 the clothes for the whole day, all these things are
22 parameters that have been shown to increase dose.
23   Q    BY MR. OUWELEEN:  You report those facts
24 as background for your conclusion that he had
25 substantial exposure.  Fair?

Page 51

1    A    Yes.
2    Q    Now, you understand that exposure experts
3  can estimate or calculate the amount of a substance
4  that lands on a person's skin over time.  You've
5  seen calculations like that; right?
6        MS. FORGIE:  Objection.
7        THE WITNESS:  I probably have.  I don't
8  specifically remember.  But people can do any kind
9  of calculations they want.
10   Q    BY MR. OUWELEEN:  Well, you understand
11 there are experts, there are scientists who actually
12 have scientifically validated ways of estimating the
13 amount of chemicals that are deposited on people's
14 skin; right?
15       MS. FORGIE:  Objection.
16       THE WITNESS:  Yeah, sure.
17   Q    BY MR. OUWELEEN:  And you're not one of
18 those experts who does that; right?
19   A    I'm not.
20   Q    And so you made no attempt here to
21 determine how much Roundup actually landed on
22 Mr. Gebeyehou's skin, did you?
23   A    I did not.
24   Q    Now, you also understand that to determine
25 a person's dose of a chemical, it's important to

Page 52

1  know how much of that chemical that lands on his
2  skin actually makes it into his body as opposed to
3  being washed off; right?
4    A    Yes.
5    Q    And scientists call that absorption;
6  right?
7    A    Yes.
8    Q    And you understand that only a tiny
9  fraction of the glyphosate that lands on a person's
10 body is absorbed into the body; right?
11       MS. FORGIE:  Objection.
12       THE WITNESS:  I'm not sure it's a tiny
13 fraction.  It's a fraction.
14   Q    BY MR. OUWELEEN:  Do you know what the
15 fraction is?
16   A    I don't.  Most of the studies have been
17 done with glyphosate as a chemical rather than with
18 Roundup.  And the absorption rates would be
19 different for Roundup than they would for
20 glyphosate.
21   Q    You don't know what the absorption rates
22 for Roundup or glyphosate are you, do you?
23       MS. FORGIE:  Objection.
24       THE WITNESS:  Not off the top of my head.
25 I have papers on it in my reference list.

Page 53

1    Q    BY MR. OUWELEEN:  You did not use any
2  assumptions about what the absorption rate is for
3  glyphosate or Roundup in forming your opinions in
4  this case.  Fair?
5        MS. FORGIE:  Objection.
6        THE WITNESS:  Well, I made the assumption
7  that the absorption rates would be higher for
8  Roundup than they would be for glyphosate.
9    Q    BY MR. OUWELEEN:  Based on what?
10   A    Based on my knowledge of the chemicals.
11 The whole purpose of putting surfactants into --
12 into the formulation is to allow the glyphosate to
13 penetrate through the cell walls of the plants.  And
14 it's the same principal that would be used in the
15 cell walls of the human skin.
16   Q    Do you have any data at all on the
17 absorption of Roundup into the skin?
18       MS. FORGIE:  Objection.
19       THE WITNESS:  I don't know -- I don't
20 believe I do, but I don't actually know that.  I
21 don't remember that.  I don't know whether there
22 have been studies.  The studies that I remember have
23 been done with glyphosate rather than Roundup.
24   Q    BY MR. OUWELEEN:  Did you make any
25 assumption about what the actual absorption of

Dennis Weisenburger, M.D.

Page 54

1 Roundup or glyphosate into the skin is in forming
2 your opinions in this case?
3      MS. FORGIE: Objection. Asked and
4 answered.
5      THE WITNESS: I would assume that Roundup
6 would facilitate the absorption of glyphosate so
7 that there would be more glyphosate absorbed from
8 the Roundup than there would be from just using the
9 generic chemical glyphosate.
10     Q   BY MR. OUWELEEN: What percentage of
11 glyphosate did you assume was absorbed into
12 Mr. Gebeyehou's body?
13     A   I don't know.
14     Q   Do you have any assumption that you made
15 on that score?
16     A   No.
17     Q   And same with Roundup. You do not make
18 any assumption or have any data about what
19 percentage of the Roundup that landed on
20 Mr. Gebeyehou's skin got into his body, did you?
21     A   No.
22     Q   You have no idea how much glyphosate or
23 Roundup Mr. Gebeyehou's body absorbed at any time.
24 Fair?
25     MS. FORGIE: Objection.

Page 55

1      THE WITNESS: That's correct.
2      Q   BY MR. OUWELEEN: You have not estimated
3 or determined the doses or amounts of glyphosate or
4 Roundup -- withdrawn.
5      You understand that various regulatory
6 agencies have established reference doses and
7 acceptable daily intake levels for glyphosate?
8      A   Yes. But those are also based on the
9 generic chemical rather than Roundup.
10     Q   My question was: Do you understand that
11 various regulatory agencies have established safe
12 reference doses or acceptable daily intake levels
13 for glyphosate?
14     MS. FORGIE: Objection. Asked and
15 answered.
16     THE WITNESS: Yes.
17     MS. FORGIE: You may answer again.
18     THE WITNESS: I give you the same answer.
19     Q   BY MR. OUWELEEN: My question was not
20 about Roundup. I was asking about glyphosate.
21     Do you understand that?
22     MS. FORGIE: Well, wait a minute. He can
23 answer the way he thinks is appropriate.
24     THE WITNESS: Glyphosate is part of
25 Roundup.

Page 56

1      Q   BY MR. OUWELEEN: My question is: Did
2 regulatory agencies establish safe reference doses
3 or acceptable daily intake levels for glyphosate?
4      MS. FORGIE: Objection. Asked and
5 answered.
6      You can answer again.
7      THE WITNESS: Yes.
8      Q   BY MR. OUWELEEN: And the doses are
9 specified in terms of milligrams of glyphosate per
10 kilogram of body weight per day; right?
11     A   Yes.
12     Q   No regulatory agency specifies safe
13 exposure in terms of just number of days, do they?
14     A   No.
15     Q   And you're aware that studies have been
16 done to determine exposure to glyphosate?
17     A   Yes.
18     Q   You cite, for example, in your materials
19 considered list an Acquavella paper on the Farm
20 Family Exposure study.
21     You remember that one; right?
22     A   Yes.
23     Q   And in that study, they calculate numbers
24 of milligrams per kilogram per day that farmers
25 actually received into their bodies; right?

Page 57

1      A   I don't specifically remember. I know
2 they measured urine excretion of glyphosate. So I
3 -- you could extrapolate back, I guess, from that to
4 calculate dose, yes. I don't remember that they did
5 that.
6      Q   And you read the Solomon 2016 paper that
7 was summarizing the various exposure studies.
8      Do you remember that one?
9      A   Yes.
10     Q   And that, too, was looking at various
11 studies in terms of milligrams per kilogram per day
12 that was actually absorbed into people's bodies;
13 right?
14     A   Yes.
15     Q   Are you aware of any exposure study
16 anywhere than assessed anyone's exposure just by
17 counting the days on which they used the product?
18     A   Well, that's -- that's a parameter that
19 epidemiologists use as accrued estimate of dose.
20     Q   Those are epidemiological studies, like
21 the McDuffie paper, NAPP exposure studies; right?
22     MS. FORGIE: Objection.
23     THE WITNESS: Right.
24     Q   BY MR. OUWELEEN: Is it sufficient to say
25 that you don't have any opinion about -- withdrawn.

Dennis Weisenburger, M.D.

Page 58

1    You don't know how Mr. Gebeyehou's
2 exposure to glyphosate or Roundup compares to the
3 regulatory reference doses or acceptable daily
4 intake levels; right?
5    A   I don't.
6    Q   Now, you remember telling -- do you want
7 to take a break?
8       MS. FORGIE:  I was just thinking that.
9       (Off-the-record discussion.)
10      THE VIDEOGRAPHER:  The time is now 9:59,
11 and we are off the record.
12      (Recess taken.)
13      THE VIDEOGRAPHER:  The time is now 10:13
14 a.m., and we are back on the record.
15    Q   BY MR. OUWELEEN:  You determined that --
16 Dr. Weisenburger, you determined that Mr. Gebeyehou
17 used Roundup for 460 times for 45 to 90 minutes each
18 time; right?
19    A   Yes.
20    Q   And you compared it to the days of use or
21 days per year of use in three epidemiological
22 studies; right?
23    A   Yes.
24    Q   When you said 460 times, did you equate
25 that to 460 days?

Page 59

1    A   Yes.
2    Q   And if you used it for 45 minutes, you
3 counted that as a day; right?
4    A   Yes.
5    Q   And if you used it for 90 minutes, you
6 counted that as a day; right?
7    A   Yes.
8       (Exhibit 13 was marked.)
9    Q   BY MR. OUWELEEN:  In the North American
10 Pooled Project -- let me give you this exhibit,
11 actually.  Exhibit 13 is a PowerPoint of a
12 presentation from the North American Pooled Project,
13 and you cite this in the references.  It's reference
14 No. 3 to your expert report; right?
15    A   Yes.
16    Q   You were an investigator on this -- on at
17 least the American part of this study; right?
18    A   Yes.
19    Q   And you're relying on the data from this
20 study; right?
21    A   Yes.
22    Q   It's reliable data?
23    A   Yes.
24    Q   How were the days per year calculated in
25 the NAPP study?

Page 60

1    A   I think the same way that I did it in this
2 report, that if he used it on one day, it was
3 counted as a day.  If he used it on a second day, it
4 was counted as a second day.
5    Q   So they were just calendar days on which
6 somebody used glyphosate; right?
7    A   I believe so.
8    Q   Without any adjustment or consideration of
9 how much time per day they used it; right?
10    A   I believe so.
11    Q   And so a person who used Roundup for an
12 hour on a day would be counted as one day; right?
13    A   Yes.
14    Q   And a person who used Roundup for eight
15 hours in a day would be counted as one day; right?
16    A   I believe so.
17    Q   Was there any minimum amount of time that
18 somebody had to use Roundup for it to count as a
19 day?
20    A   I don't know the answer to that.
21    Q   So it's possible that if somebody used
22 Roundup for a minute, they counted it as a day?
23      MS. FORGIE:  Objection.  Asked and
24 answered.
25      THE WITNESS:  It would have depended on

Page 61

1 what the applicator said in the interview.  So it's
2 unlikely, but it's possible, certainly.
3    Q   BY MR. OUWELEEN:  The NAPP study involved
4 both agricultural workers and nonagricultural users
5 like home users; right?
6    A   I think the NAPP study mainly dealt with
7 farmers, so they were agricultural users.  I don't
8 remember the details about home use.  I think I did
9 ask questions about home use, but I don't -- I don't
10 remember the details of that.
11    Q   Your recollection is that the NAPP study
12 -- most of the people whose data is reflected in the
13 NAPP study were farmers who used glyphosate
14 professionally, not just somebody using it in their
15 backyard; right?
16    A   That's my belief, yes.  I mean, they were
17 case control studies, so in fact the cases would
18 have been farmers and nonfarmers.  So they would
19 have asked the questions of everyone.  But I think
20 most of -- most of the usage was in farmers.
21    Q   And you'd agree that farmers are using
22 Roundup generally more intensively than home users?
23      MS. FORGIE:  Objection.
24      THE WITNESS:  Generally, yes.
25    Q   BY MR. OUWELEEN:  They're generally

Dennis Weisenburger, M.D.

Page 62

1  spraying it for longer periods; correct?
2  A   Yes.
3  Q   And they're spraying lots more Roundup
4  than a home user would use; right?
5      MS. FORGIE:  Objection.
6      THE WITNESS:  Yes.
7  Q   BY MR. OUWELEEN:  They're spraying it from
8  big machines that they're pulling from behind their
9  tractor; right?
10  A   Yes.
11  Q   Would you agree that the actual exposure
12  of a person spraying Roundup for a little while in
13  your yard from a spray bottle is likely much less
14  than for a farmer spraying it for eight hours?
15      MS. FORGIE:  Objection.
16      THE WITNESS:  Well, we don't really know
17  that.  I mean, farmers in general, I think, are much
18  more perceptive about the effects of pesticides so
19  they tend to take more precautions.  And a lot of
20  the farmers now apply from tractors with cabs that
21  protect them from a lot of the exposure.  So that's
22  a complex question.
23      I mean, I think that people use it for
24  personal use in their yards.  If they don't provide
25  -- if they don't take proper precautions, they can

Page 63

1  have significant exposure, probably more than a
2  farmer would be in a cab where he's protected.
3  Q   BY MR. OUWELEEN:  The NAPP study does not
4  have any data on the extent to which the farmers
5  were using protective measures like you described,
6  does it?
7      MS. FORGIE:  Objection.
8      THE WITNESS:  Well, certainly in the
9  Nebraska study we asked questions about whether they
10  wore protective clothing or not.  And the risks were
11  always higher in the individuals who didn't wear
12  protective clothing.  I don't think that data was
13  incorporated into the NAPP because it made -- those
14  questions may not have been asked in all the
15  studies.  But that was -- that was the experience we
16  had in the Nebraska study with 2,4-D and other
17  chemicals.
18      (Exhibit 12 was marked.)
19  Q   BY MR. OUWELEEN:  I'm giving you what's
20  been marked as Exhibit 12, and that's the McDuffie
21  2001 paper that you rely on to show that using
22  glyphosate for more than two days per year is
23  associated with an increased risk of Non-Hodgkin's
24  Lymphoma; right?
25  A   Yes.

Page 64

1  Q   There's no data in this study showing that
2  any number of days' exposure was associated with an
3  increased risk of diffuse large B cell lymphoma;
4  right?
5      MS. FORGIE:  Objection.
6      THE WITNESS:  That's correct.  I don't
7  think they looked at subtypes in this paper.
8  Q   BY MR. OUWELEEN:  ███████████████████
   ███████████████████████████████
   ███  ██████████████████
   ████  ██  ████
12  Q   What counted as a day in the McDuffie
13  study, Exhibit 12?
14  A   The same as we've discussed, used during
15  the day would be counted as a day.
16  Q   Calendar day?
17  A   Yes.
18  Q   So they counted -- and is there -- how do
19  you know that the McDuffie study used calendar days
20  as their measure of days of exposure?
21  A   Well, I don't think it specifically says
22  it there, but that's how we did the Nebraska study.
23  And these studies were all done in a similar design.
24  Q   Is the Nebraska study reflected in the
25  McDuffie paper?

Page 65

1  A   No.  But it's reflected in the NAPP data.
2  Q   But just to be clear --
3  A   The studies had the same design.  They had
4  the same design.  So I suspect that they used the
5  same parameters.
6  Q   The McDuffie paper was the Canadian arm of
7  the study; right?
8  A   Yes.
9  Q   And what your point is, is that both the
10  Canadian arm and the U.S. arm that were pulled
11  together in the NAPP work both used similar study
12  designs; right?
13  A   Yes.  And there was -- the people from the
14  National Cancer Institute were involved in designing
15  all these studies, so they used very similar
16  parameters that allowed them to pool the studies.
17  Q   As far as you know in the McDuffie study,
18  somebody who used glyphosate or Roundup for eight
19  hours was counted the same as someone who used it
20  for an hour?
21  A   Yes, I think that's correct.
22  Q   And the McDuffie study or paper indicates
23  on page 1156 in the left column kind of midway down,
24  "Nonoccupational use of pesticides, home, garden,
25  hobby was included."

Dennis Weisenburger, M.D.

Page 66

1    Do you see that?
2    A   I don't see it, but I accept it.
3    Q   It's in the little -- it's in the
4 paragraph that says "pilot study" about the sixth
5 line down from there.
6    A   On page --
7    Q   1156.
8    MS. FORGIE:  It's here.
9    THE WITNESS:  I see.  I was in the wrong
10 column.
11    MS. FORGIE:  Yeah, I see that.
12    THE WITNESS:  Okay, yes.
13    Q   BY MR. OUWELEEN:  So did the McDuffie --
14 or the Canadian study reflected in the McDuffie
15 paper include both agricultural users and home
16 users?
17    A   Yes, I think all the studies did.
18    Q   Do you have any idea -- for the McDuffie
19 study, like, for the NAPP study, is it your
20 understanding that the majority were agricultural
21 users rather than home and hobby users?
22    A   That's my guess, yes.
23    Q   And then the third paper that you rely on
24 for an increased risk of Non-Hodgkin's Lymphoma with
25 certain number of days of use is the Eriksson paper

Page 67

1 of 2008; right?
2    A   Yes.
3    (Exhibit 14 was marked.)
4    Q   BY MR. OUWELEEN:  And we marked that as
5 Exhibit 14.  Exhibit 14 is the source of your
6 relying on exposure of greater than ten days of
7 putting somebody at an increased risk of
8 Non-Hodgkin's Lymphoma; right?
9    A   That's what the Eriksson study says.
10    Q   And you're relying on that; right?
11    A   Yes.
12    Q   You don't have any other data that you're
13 relying on to show that exposure to Roundup for a
14 certain number of days leads to an increased risk of
15 Non-Hodgkin's Lymphoma other than Exhibits 12, 13,
16 and 14; right?
17    MS. FORGIE:  Objection.
18    THE WITNESS:  That's correct.
19    Q   BY MR. OUWELEEN:  And Exhibit 14, the
20 Eriksson paper, does not have any data about whether
21 there's an increased risk of diffuse large B cell
22 lymphoma associated with any number of days of
23 exposure to Roundup or glyphosate; right?
24    MS. FORGIE:  Objection.
25    THE WITNESS:  No, they didn't look at

Page 68

1 subtypes for that specific parameter.
2    Q   BY MR. OUWELEEN:  So the answer to my
3 question was, "Yes, that's correct"; right?
4    MS. FORGIE:  Objection.  Asked and
5 answered.
6    You can answer again.
7    THE WITNESS:  Ask the question again.
8    Q   BY MR. OUWELEEN:  Yeah.  I'm reasking it
9 because I think you were agreeing with me, but you
10 said "no."  And so I want to be sure that the record
11 is clear.
12    A   Okay.
13    Q   So Eriksson, Exhibit 14, has no data about
14 whether there's an increased risk of diffuse large B
15 cell lymphoma associated with any number of days of
16 exposure to Roundup or glyphosate; is that correct?
17    MS. FORGIE:  Objection.
18    THE WITNESS:  Yes.
19    Q   BY MR. OUWELEEN:  Now, Eriksson does have
20 some data, although not about numbers of days,
21 concerning diffuse large B cell lymphoma on page
22 1659 -- right? -- in table 3?
23    A   Yes.
24    Q   And what it shows is that for glyphosate,
25 there was not a statistically significant increased

Page 69

1 risk of diffuse large B cell lymphoma, according to
2 their data; correct?
3    A   That's correct.
4    Q   Now, the Eriksson -- is the Eriksson paper
5 related to the NAPP study?
6    A   No.
7    Q   In this study, did it use people who used
8 glyphosate in their jobs, as well as home users?
9    A   I believe so because it had a
10 case-controlled design.  So I would assume so, yes.
11    Q   Do you know how they counted days of
12 exposure in the Eriksson study, Exhibit 14?
13    A   I assume the same way the others did.  Do
14 they say so here?  I'd have to look and see what
15 they say specifically how they counted days.
16    Q   I did not see that.
17    A   I don't think they say it.
18    Q   Your assumption is that they were counting
19 days in terms of calendar days?
20    A   Yes.
21    Q   As we've discussed with the other papers?
22    A   Yes.
23    Q   Let's go back to Exhibit 13 for a moment,
24 please, which is your -- the presentation of data
25 from the NAPP study.

Dennis Weisenburger, M.D.

1      Now, the number that you cite in your
2  report is on -- I think we determined yesterday it
3  was on the 13th page of this report, but I'm going
4  to flip through it.  I think it's actually the 14th
5  page.
6      So are you on the page of Exhibit 14 that
7  says at the top, "Frequency.  Number of days per
8  year of glyphosate handling and NHL risks"?
9      A   Yes.
10      Q   That's the source of the number that you
11  cite in your expert report where you say, "The risk
12  estimate for diffuse large B cell Non-Hodgkin's
13  Lymphoma was 2.49 for use greater than two days per
14  year"; right?
15      A   Yes.
16      Q   Why is that number shown in red in the
17  table?
18      A   I think because it's statistically
19  significant.
20      Q   Is that important?
21      MS. FORGIE:  Objection.
22      THE WITNESS:  Is it important for it to be
23  statistically significant?
24      Q   BY MR. OUWELEEN:  Yeah.
25      A   Yes, it's important.

1      Q   Why is it important?
2      A   Well, because the likelihood of some sort
3  of statistical error is much less if -- you know, if
4  the numbers meet the criteria for statistical
5  significance.
6      Q   So when numbers are not statistically
7  significant, then there's a chance that the numbers
8  are -- that the shown difference is just due to
9  chance; is that correct?
10      MS. FORGIE:  Objection.  This goes --
11      THE WITNESS:  It's more --
12      MS. FORGIE:  Wait.  Let me get this for
13  the court reporter.
14      Objection.  This goes into general
15  causation.
16      MR. OUWELEEN:  You can answer.
17      THE WITNESS:  So it's more likely due to
18  chance.  But we do look at odds of ratios that
19  aren't statistically significant to see whether
20  there's a consistency, so we do use those numbers.
21  But, in general, it's -- the numbers are more
22  reliable if they're statistic -- if they've been
23  found to be statistically significant, yes.
24      Q   BY MR. OUWELEEN:  On the previous page,
25  the data presented in terms of the number of years

1  of glyphosate use as opposed to the number of days;
2  right?
3      A   Yes.
4      Q   And these data -- this page's data is
5  based on the same data as the 2.49 number we were
6  just looking at.  It's just presented in a different
7  -- looking at a different aspect; correct?
8      MS. FORGIE:  Objection.
9      THE WITNESS:  Right.  It's looking at
10  number of years rather than number of days per year.
11      Q   BY MR. OUWELEEN:  But it's based on the
12  same data set; right?
13      A   Yes.
14      Q   And it's equally reliable as the number of
15  days presentation; correct?
16      A   Yes.
17      Q   And this page shows that people with
18  between 0 and 3.5 years of glyphosate use had higher
19  risk of diffuse large B cell lymphoma than people
20  with more than 3.5 years of use; right?
21      A   Yes.
22      Q   And according to these data, the people
23  with more than 3.5 years of use had no statistically
24  significant increase in risk of diffuse large B cell
25  lymphoma; right?

1      A   Correct.
2      Q   ███████████████████████
3  █  ████████████████████████████████
4  █  █████████
5      A   Yes.
6      Q   If you look two pages later in Exhibit 14
7  -- 13, the data are presented in terms of lifetime
8  days.  So the heading on the page is "Lifetime days
9  (number of years times number of days divided by
10  year) of glyphosate use and NHL risks"; right?
11      A   Yes.
12      Q   And these data, too, are representing --
13  or this presentation is representing the same data
14  as shown on the page that you're relying on for your
15  2.49 number; right?
16      A   It's the same data.
17      Q   And so this presentation is equally
18  reliable to the one that shows the 2.49 risk; right?
19      A   Yes.
20      Q   And this one shows that people who have a
21  total number of days of use of glyphosate greater
22  than seven, their risk is not -- there's no
23  statistically significant increased risk of diffuse
24  large B cell lymphoma; right?
25      A   That's correct.

Dennis Weisenburger, M.D.

Page 74

1    Q   And there's a 1.25 risk that's shown there
2   that's not statistically significant; right?
3    A   Yes.
4    Q   That's much lower than 2.49.  You'd agree?
5        MS. FORGIE:  Objection.
6        THE WITNESS:  Yes.
7    Q   BY MR. OUWELEEN:  ████████████████████
████  ████████████████████████
████  ████████████████
10   A   So this gets to my point about intensity
11  versus number of times because -- and we saw the
12  same thing in the Rasmus study with 2,4-D, that it
13  was the people who used it frequently, they had a
14  higher risk than the people -- frequently over a
15  period of time, a short period of time, like one
16  year, versus people who used it for many years.
17       So it sort of comes back to the logic that
18  I explained to you in the mouse study, where if you
19  give higher doses over a short period of time, the
20  risk is higher than if you give lower doses over a
21  long period of time.  That's how I'd interpret this
22  data.
23   Q   I can't tell from the rough transcript.
24  So in the 2,4-D study, which group of people had a
25  higher risk?

Page 75

1    A   The people who used it more frequently per
2   year.  We had the same findings in the 2,4-D study.
3   That is, people who used it frequently had a higher
4   risk than people who used it for more years, but
5   less frequently.  So use it once a year for 20
6   years, your risk may not be very high.  But if you
7   used it five times a year or ten times a year for
8   five years, your risk would actually be higher.
9    Q   I see.
10   A   It gets to the point of intensity of
11  exposure rather than length of exposure.
12   Q   Right.  But the data shown on the lifetime
13  days slide in Exhibit 13 is just looking at the
14  total number of days added up over a lifetime;
15  right?
16   A   Divided by years of use.
17       MS. FORGIE:  Objection.
18   Q   BY MR. OUWELEEN:  So looking at -- no,
19  it's looking at the total number of days in the
20  lifetime, isn't it?
21       MS. FORGIE:  Objection.
22   Q   BY MR. OUWELEEN:  You take how many years
23  you use it times the number of days per year, and
24  that gives you a total number of days; isn't that
25  correct?

Page 76

1    A   Well, if you look at the parenthesis,
2   number of years times the number of days divided by
3   years.
4        MS. FORGIE:  Let him finish, please.
5        THE WITNESS:  So, yeah, lifetime days
6   would be the number of years times the number of
7   days, so I don't know why they expressed it that
8   way, unless there is one.
9    Q   BY MR. OUWELEEN:  Well, I think in order
10  of operations, the way you do it is -- well, is it
11  your understanding that what they're doing here is
12  taking the number of days per year that somebody
13  uses it, multiplying it times the number of years
14  that they use it, and that gives you the total
15  number of days over their lifetime?
16   A   I think that's what they're doing, yes.  I
17  don't understand why they express it like this, but
18  I think you're right.
19   Q   I think if we were to imagine an open
20  parenthesis between the number of days, that might
21  explain it; right?  It's not divided --
22   A   I see what you're saying, yeah.
23   Q   So you take the days per year somebody
24  uses it, say, four times a year, four days a year,
25  and they've used it for ten years, that would add --

Page 77

1   that would multiply out to 40 lifetime days; right?
2    A   Yes.
3    Q   That's your understanding of this data?
4    A   Yes.
5    Q   So greater than seven is somebody who in
6   their lifetime just used it for a total of more than
7   seven days; right?
8    A   Yes.
9    Q   All right.  And Mr. Gebeyehou used it for
10  460 days; right?
11   A   Right.
12   Q   In calculating Mr. Gebeyehou's days of
13  Roundup use, did you assume that he used it 12
14  months out of the year?
15   A   That's what he told me, yes.
16   Q   Did you read his testimony that for --
17  from 1997 until 2003 or 2004, he went to Ethiopia
18  every year for up to two months?
19   A   I don't remember that testimony.
20   Q   You read his whole deposition?
21   A   I did.
22   Q   You don't remember him talking about going
23  to Ethiopia over a period of years and doing some
24  consulting work?
25   A   I don't specifically remember it.  I know

Dennis Weisenburger, M.D.

1  he did go back and forth to Ethiopia, but I don't
2  remember the specifics.
3      Q   Did you have any reason to believe that he
4  was spraying Roundup when he was in Ethiopia?
5      A   He probably wasn't.
6      Q   But you did not make any effort to
7  subtract any months or weeks and days when he was in
8  Ethiopia when you were calculating the days that he
9  used Roundup?
10     A   I didn't.
11     Q   So probably the number of days, if he did
12  in fact go to Ethiopia for two months a year for
13  those years, it's somewhat lower than what you
14  estimated?
15     A   Yes.
16     Q   Do you know what any of the ingredients
17  were in the Roundup that Mr. Gebeyehou used other
18  than glyphosate?
19     A   I don't know specifically.
20     Q   You do not know what surfactant was in the
21  product he used?
22     A   I don't.
23     Q   You did not take the particular type of
24  surfactant into account in forming your opinions,
25  then?

1      A   I did not.
2      Q   Do you know whether the same surfactant
3  that was in Mr. Gebeyehou's product or surfactants
4  were present in the Roundup formulations that the
5  folks used in the Eriksson, McDuffie, or NAPP
6  studies that were Exhibits 13, 14, and 15 -- 12, 13,
7  and 14?
8      A   I don't know.
9      Q

12     MS. FORGIE:  Objection.
13     THE WITNESS:

15     Q   BY MR. OUWELEEN:

1      A   It's an actual glass slide.
2      Q   It is?  So you put it under a microscope
3  and look at it?
4      A   Yes.
5      Q   And you did that?
6      A   Yes.
7      Q   Did you take any pictures of it?
8      A   No.
9      Q   You still have that slide?
10     A   No.  It's been returned.
11     Q   And that was --
12     A   I may have taken a Xerox picture of it.  A
13  Xerox copy of it just to document the slide.  I may
14  have done that.  I usually do that, actually.
15     Q   So you take the slide itself and you just
16  put it on a Xerox machine and take a picture of it?
17     A   Yeah, just to document the specific slide
18  because you can see the -- you can see the label and
19  you can see the shape of the tissue, and so you can
20  know that that was the slide you looked at.  I
21  probably did that.  I usually do that.
22     Q   Okay.  But you can't tell from that Xerox
23  what's actually going on in the cells?
24     A   No.
25     Q   It's just more for recordkeeping of what

1  slide you looked at?
2      A   Yes.
3      Q

Dennis Weisenburger, M.D.



Page 82

1
11      (Exhibit 15 was marked.)
12      Q   BY MR. OUWELEEN:
18
23          MS. FORGIE:  Objection.
24

Page 83

1

Page 84

1
18          MS. FORGIE:  Objection.  Asked and
19   answered.
20          You can answer again.
21          THE WITNESS:  You don't look for it, you
22   won't find it; right?
23      Q   BY MR. OUWELEEN:  There was nothing in the
24   medical records that you point to as evidence that
25   he was exposed to Roundup; right?

Page 85

1          MS. FORGIE:  Objection.  Asked and
2    answered.
3          You can answer again.
4          THE WITNESS:  There's no evidence in the
5    medical record to that.
6      Q   BY MR. OUWELEEN:
19          MS. FORGIE:  Objection.
20          THE

Dennis Weisenburger, M.D.



**Page 86**

**Page 87**

5  Q   Are there some causative risk factors
6  where we don't understand how they cause
7  Non-Hodgkin's Lymphoma?
8      A   Off the top of my head, I can't think of
9  one.  Usually we have some understanding of it, but
10 we don't always understand precisely how it happens.
11 We have hypothesis.  We have some evidence.  I don't
12 know.  I've never been asked that question before so
13 I have to think about it.
14     Q   Examples of causative risk factors for
15 Non-Hodgkin's Lymphoma are things like autoimmune
16 disease, viral infections, immunodeficiency, other
17 infections, and radiation; right?
18     A   Radiation is not a known cause of or risk
19 factor for Non-Hodgkin's Lymphoma, in general.
20     Q   High-dose radiation?
21     A   Well, very high-dose like atomic bomb
22 survivors or people with massive doses of radiation,
23 yes, but --
24

**Page 88**

6  Q   Well, you called noncausative risk factors
7

**Page 89**

15

Dennis Weisenburger, M.D.



Page 90

10    Q    And it's like during the Civil War,
11  doctors did not know that bacteria caused
12  infections; right?
13    A    I can't remember exactly when they knew
14  that, but they didn't have any treatment for the
15  infections during the Civil War.
16    Q    And there was a time when doctors did not
17  understand -- there was no germ theory of infection;
18  right?
19    A    That's correct.
20    Q    And so people -- lots of people, lots of
21  soldiers were getting infections and dying, and
22  something was causing that, but the doctors just did
23  not know what it was yet; right?
24        MS. FORGIE:  Objection.  I think this is
25  really going into general causation.  I'm trying to

Page 91

1  allow a lot of leeway on that, but I think at some
2  point it's going too far into general causation.
3        THE WITNESS:  That's true in the distant
4  past.  I'm not sure during the Civil -- I can't
5  remember exactly when the germ theory was proposed.
6  But it was -- yeah, I don't know whether it was
7  before the Civil War or after, but it's irrelevant
8  to your question, I think.
9    Q    BY MR. OUWELEEN:

22    Q    And it's possible that some day doctors
23  will find some thing that causes older folks to get
24  Non-Hodgkin's Lymphoma,

Page 92

18    Q    BY MR. OUWELEEN:  And so let's -- and you
19  interviewed Mr. Gebeyehou over the telephone; right?
20    A    Yes.
21    Q    And part of the reason for that was to
22  find out, No. 1, about how and how often he used
23  Roundup; right?
24    A    Yes.
25    Q    And that's reflected in your report;

Page 93

1  right?
2    A    Yes.

Dennis Weisenburger, M.D.



Page 94

s?

---

Page 95

18    THE VIDEOGRAPHER:  Five minutes.
19    MR. OUWELEEN:  Let's take a break, switch
20  the tape.
21    THE VIDEOGRAPHER:  Time is now 11:02 a.m.,
22  and we are off the record.
23    (Recess taken.)
24    THE VIDEOGRAPHER:  The time is now 11:16
25  a.m., and we are back on the record.

---

Page 96

1    Q   BY MR. OUWELEEN:  How long has it been
2  known that age is a risk factor for Non-Hodgkin's
3  Lymphoma?
4    A   Many years.
5    Q   Can you be any more precise than that?
6    A   No.
7    Q   Has it been known since the '60s?
8    A   Yes.
9      MS. FORGIE:  Objection.  Asked and
10  answered.
11    Q   BY MR. OUWELEEN:  And is the magnitude of
12  the increased risk of Non-Hodgkin's Lymphoma for
13  older folks, say, over 65, has that been known since
14  the '60s?
15    A   Probably, yes.
16    Q   So even before glyphosate or Roundup was
17  on the market, it was a fact that folks older than
18  65 had an increased risk for Non-Hodgkin's Lymphoma;
19  right?
20    A   That's probably correct.
21    Q   And that obviously had nothing to do with
22  Roundup; right?
23    A   Right.
24

---

Page 97

1
3    A   You're talking about the 1960s now?
4    Q   Sure.
5    A   Yes.
6    Q   That was known in the 1960s; right?
7    A   Yes.
8    Q   And that's known today?
9    A   Yes.
10    Q   You're familiar with the Surveillance
11  Epidemiology and End Results program, also called
12  SEER?
13    A   Yes.
14    Q   Are those generally understood to be
15  reliable data?
16      MS. FORGIE:  Objection.
17      THE WITNESS:  Yes.
18    (Exhibit 16 was marked.)
19    Q   BY MR. OUWELEEN:  I'm marking as Exhibit
20  16 a printout of the SEER Cancer Statistics Review,
21  1975 to 2015 for the National Cancer Institute.
22    Have you seen this before?
23    A   I've seen similar reports.
24    Q   This is SEER data; right?
25    A   Yes.

Dennis Weisenburger, M.D.

Page 98

1    Q   On Table 19.26 of Exhibit 16, there are
2  data for all lymphoid neoplasms with detailed
3  Non-Hodgkin's Lymphoma subtypes.
4       Do you see that, 19.26?
5       MS. FORGIE:  Where is 19.26?
6       MR. OUWELEEN:  It's about half way through
7  the document.
8       MS. FORGIE:  It doesn't go between two and
9  three, is what I would expect to see.
10      MR. OUWELEEN:  No.
11      THE WITNESS:  Okay.  19.26.
12   Q  BY MR. OUWELEEN:  So are you at Table
13  19.26 of Exhibit 16?
14   A   Yes.
15   Q   And that reports data for all lymphoid
16  neoplasms with detailed Non-Hodgkin's Lymphoma
17  subtypes; right?
18      MS. FORGIE:  I'm going to object to this.
19  It goes to general causation.
20   Q  BY MR. OUWELEEN:  Is that correct?
21   A   Yes.
22   Q   About half way down there are data shown
23  for diffuse large B cell lymphoma; right?  Under
24  2(a), 2.3.
25      Do you see that?

Page 99

1    A   Yes.
2    Q   ████████████████████████
███████████████████████████████
████████████████
6    Q   And it states that the rate in the
7  population of diffuse large B cell lymphoma was
8  seven, and that stands for seven cases out of
9  100,000 people; is that right?
10   A   I suspect.  I don't --
11      MS. FORGIE:  Can I just have a standing
12  objection to the use of this document as going to
13  general causation?
14      MR. OUWELEEN:  No.
15      MS. FORGIE:  Okay.  I'll keep objecting,
16  then.
17      THE WITNESS:  That's probably correct.  I
18  don't see -- I don't see the parameters here, but
19  that's generally how they express incidents.
20   Q  BY MR. OUWELEEN:  If you have a look at
21  page -- the third paper in Exhibit 16 --
22   A   The third page?
23   Q   Well, the third piece of paper.  I printed
24  it on both sides.  So Table 19.5 --
25   A   Yeah.

Page 100

1    Q   -- it's got a footnote, and it says "rates
2  are per 100,000"?
3    A   Yes.
4    Q   Do you see that?
5    A   Yes, I see it.
6    Q   So in Table 19, and then you look on the
7  next page, Table 19.7, again, it says rates are per
8  100,000?
9    A   Okay.
10   Q   ███████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████
17   Q   BY MR. OUWELEEN:  And so it's unlikely,
18  you'd say, that any person is going to get diffuse
19  large B cell lymphoma; right?
20      MS. FORGIE:  Objection.  Goes to general
21  causation.
22      THE WITNESS:  Right.  It's not very
23  common.
24   Q   BY MR. OUWELEEN:  It's less than one
25  percent; right?

Page 101

1       MS. FORGIE:  Objection.  General
2  causation.
3       THE WITNESS:  Yes.
4    Q   BY MR. OUWELEEN:  And even if you were to
5  double the risk of Non-Hodgkin's Lymphoma, it's
6  still unlikely that a person would get it; right?
7       MS. FORGIE:  Objection.  General
8  causation.
9       THE WITNESS:  That's true.
10   Q   BY MR. OUWELEEN:  Now, for folks over age
11  65, the rate is 33.5 people out of 100,000; right?
12   A   That's correct.
13   Q   And if you compare that to the folks
14  between 20 and 64 years of age, their rate was 4.6
15  of those folks out of 100,000; right?
16      MS. FORGIE:  Objection.
17      THE WITNESS:  That's correct.
18   Q   BY MR. OUWELEEN:  ██████████████
███████████████████████████████
████████████████████████████████████
███████████████
████████████████████████
24   Q   BY MR. OUWELEEN:  And some unknown cause
25  or causes is making the folks over 65 years old get

Dennis Weisenburger, M.D.



Page 102

1  diffuse large B cell lymphoma seven times as much as
2  younger people; right?
3       MS. FORGIE: Objection.
4       THE WITNESS: That's correct.
5    Q   BY MR. OUWELEEN: And for most of those --
6  and most of those people, you would assume, never
7  used Roundup; right?
8       MS. FORGIE: Objection.
9       THE WITNESS: I don't know the answer to
10 that. I would say that's probably true.
11   Q   BY MR. OUWELEEN: And do you have any idea
12 what the percentage of the population is who have
13 been exposed to Roundup?
14      MS. FORGIE: Objection.
15      THE WITNESS: I don't.
16   Q   BY MR. OUWELEEN: In the NAPP study, did
17 you see percentages of folks who reported ever being
18 exposed to Roundup?
19      MS. FORGIE: Objection.
20      THE WITNESS: Yeah, one could -- one could
21 calculate it from the cases in the controls. You
22 could calculate that. I didn't do it, but it was
23 fairly low because --
24   Q   BY MR. OUWELEEN: Lower than ten percent;
25 right?

Page 103

1       MS. FORGIE: Objection.
2       THE WITNESS: Probably, yeah, because it
3  was early -- early when -- it was not too long after
4  Roundup was introduced, so the usage was fairly low
5  among the population.
6    Q   BY MR. OUWELEEN: And is it your
7  expectation that if we looked at the data back from
8  around 1960, it would show a similar increased risk
9  for the folks older than 65 compared to the folks
10 under 64 for diffuse large B cell lymphoma? That
11 is, the folks older than 65 would have five or seven
12 times higher risk?
13      MS. FORGIE: Objection.
14      THE WITNESS: Probably. It's probably
15 true.
16   Q   BY MR. OUWELEEN: And that was probably
17 true even before Roundup was ever even available?
18      MS. FORGIE: Objection.
19      THE WITNESS: It was probably true. I
20 haven't done it, but it's probably true.
21   Q   BY MR. OUWELEEN: Did you say you would
22 doubt it?
23   A   I said I haven't done it.
24   Q   Oh, you haven't done it. But it's
25 probably true?

Page 104

1       MS. FORGIE: Objection.
2       THE WITNESS: Probably true.
3    Q   BY MR. OUWELEEN:

Page 105

1

Dennis Weisenburger, M.D.



Page 110

1    A   I don't know.  I don't know.
2    Q   █████████████████████████
█   ████████████████████████
█   ██ █████████████
5        (Exhibit 17 was marked.)
6    Q   BY MR. OUWELEEN:  Exhibit 17 is an article
7  or a report entitled "Comprehensive Immunization
8  Strategy to Eliminate Transmission of Hepatitis B
9  Virus Infection in the United States."  And it says
10 in the summary that it's a report from the Advisory
11 Committee on Immunization Practices.
12       Have you seen this before?
13   A   I have not.
14   Q   Are you familiar with the Advisory
15 Committee on Immunization Practices?
16   A   No.
17   Q   If you flip to the third page of Exhibit
18 17, there is a map there showing the geographic
19 distribution of chronic Hepatitis B virus infection
20 as of 2005.  And it's chronic Hepatitis B virus
21 infection that you were saying increases the risk of
22 Non-Hodgkin's Lymphoma; right?
23       MS. FORGIE:  Objection.
24       THE WITNESS:  Yes.
25   Q   BY MR. OUWELEEN:  ███████████████



Page 112

Dennis Weisenburger, M.D.



Page 118

1    MS. FORGIE:  Objection.

2

8    A   Well, it's generally autoimmune diseases
9    that are severe and systemic.  So things like
10   rheumatoid arthritis, systemic lupus.  I don't know
11   any other ones, off the top of my head, but there's
12   a half a dozen or more at increased risk for diffuse
13   large B cell lymphoma.  So there are some -- some
14   that are risk factors and others that are not.

15

19   Q   Is it your view that autoimmune Meniere's
20   disease is not -- that's an autoimmune disease, for
21   starters; right?
22   A   Well, some people think that a portion of
23   Meniere's disease has an autoimmune etiology, I
24   think.  It's not well-established and not proven,
25   but I think some people believe that.

Page 119

1        (Exhibit 18 was marked.)
2    Q   BY MR. OUWELEEN:  Exhibit 18 is an article
3    entitled "Meniere's Disease Might be an Autoimmune
4    Condition?"
5    A   You're paraphrasing me.
6    Q   By Greco and others.
7        Have you seen this article before, Exhibit
8    18?
9    A   No, I haven't seen this article.  I've
10   seen other ones, but not this one.
11   Q   Okay.  If you would flip to 733, in the
12   upper right corner.  Down at the bottom -- and just
13   in general, Meniere's disease is an inner ear
14   disease that can cause hearing loss and dizziness;
15   right?
16   A   Yes.
17

25   Q

Page 120



Dennis Weisenburger, M.D.



Page 122

Page 123

Page 124

12    MS. FORGIE:  Objection.
13
14
22    Q   BY MR. OUWELEEN:  And without any data,
23  can you rule something out?
24        MS. FORGIE:  Objection.  Asked and
25  answered.

Page 125

1        THE WITNESS:  Based on my medical
2  judgment, yes, I think I can.
3    Q   BY MR. OUWELEEN:  So you're ruling it out
4  in the absence of any data; is that correct?
5        MS. FORGIE:  Objection.
6        THE WITNESS:  The absence of any data does
7  tell you something about the importance of this as a
8  risk factor.  Okay?  Because we have lots of data on
9  other autoimmune diseases.  We have no data on this
10  disease.  So it's unlikely that -- it's unlikely
11  that it would cause Non-Hodgkin's lymphoma and
12  nobody would know about it and have studied it.
13  Okay.
14    Q   BY MR. OUWELEEN:  Is that true?  Isn't it
15  true that 70 percent of Non-Hodgkin's Lymphoma cases
16  are due to an unknown cause?
17    A   Yes.  Something like that.
18    Q   And so we have no data on the causes of 70
19  percent of Non-Hodgkin's Lymphoma; isn't that right?
20    A   It's true.
21    Q   And so the fact that we have no data on
22  them has no bearing one way or the other on whether
23  they're a cause of Non-Hodgkin's Lymphoma, does it?
24        MS. FORGIE:  Objection.
25        THE WITNESS:  I don't understand that

Dennis Weisenburger, M.D.

Page 126

1  question.
2      Q   BY MR. OUWELEEN: 70 percent of the causes
3  of Non-Hodgkin's Lymphoma are things that we have no
4  data on; right?
5          MS. FORGIE: Objection. Asked and
6  answered.
7          THE WITNESS: That's an odd way to ask the
8  question. So what I would say is in 70 percent of
9  the people with Non-Hodgkin's Lymphoma, we don't
10 know the cause. Okay?
11     Q   BY MR. OUWELEEN: Yeah. And so there are
12 lots of causes out there for Non-Hodgkin's Lymphoma
13 for which we do not yet have any data, aren't there?
14         MS. FORGIE: Objection. Asked and
15 answered three times.
16         You can answer again.
17         THE WITNESS: I don't know if there are
18 other causes out there. There probably are some
19 other causes that we don't know.
20     Q   BY MR. OUWELEEN: And the fact that we do
21 not have any data on them does not tell us that
22 those things are not causes of Non-Hodgkin's
23 Lymphoma, does it?
24         MS. FORGIE: Objection.
25         THE WITNESS: Again, we're talking about

Page 127

1  hypothetical things, which we can't know anything
2  about. We don't know anything about.
3      Q   BY MR. OUWELEEN: Doctors are out there
4  right now as we speak looking for data on many
5  things that have not yet been identified as a cause
6  of Non-Hodgkin's Lymphoma, aren't that?
7      A   Well, usually they have a hypothesis that
8  arises from a case or an ecologic study or some
9  other reason. They aren't out there studying every
10 possible thing. They usually have a hypothesis and
11 then they design a study to address their
12 hypothesis.
13         Nobody has designed a study to address
14 whether autoimmune -- whether -- first of all,
15 whether Meniere's is an autoimmune disease; and if
16 it is, whether it increases risk for Non-Hodgkin's
17 Lymphoma because nobody has seen any association, as
18 far as I can tell. Otherwise, it would have been
19 studied, just like Rheumatoid Arthritis and Lupus
20 and a dozen other autoimmune diseases.
21     Q   You're not testifying, are you, that every
22 possible real cause of Non-Hodgkin's --
23 Non-Hodgkin's Lymphoma has already been identified
24 as a candidate, are you?
25     A   No.

Page 128

1      Q   There are things out there that are
2  causing folks to get Non-Hodgkin's Lymphoma that no
3  one has identified yet; right?
4          MS. FORGIE: Objection. Asked and
5  answered.
6          You can answer again.
7          THE WITNESS: It's possible.
8      Q   BY MR. OUWELEEN: And we don't have any
9  data on those causes as potential causes of
10 Non-Hodgkin's Lymphoma; right?
11     A   We couldn't have any data because we don't
12 know what they are.
13     Q   So we do not have any data?
14     A   Right.
15     Q   And the fact that we do not have any data
16 does not turn the cause of Non-Hodgkin's Lymphoma
17 into a noncause, does it?
18         MS. FORGIE: Objection.
19         THE WITNESS: No. But to say something is
20 a cause, you have to have data.
21         (Indiscernible crosstalk.)
22         THE WITNESS: And we don't have data.
23     Q   BY MR. OUWELEEN: And to say something is
24 not a cause, you also have to have data, don't you?
25         MS. FORGIE: Objection. Asked and

Page 129

1  answered.
2          You can answer again.
3          THE WITNESS: Right. To say something is
4  not a cause, you should also have data, exactly.
5      Q   BY MR. OUWELEEN:

Dennis Weisenburger, M.D.



Page 130

4      MS. FORGIE:  Objection.  Asked and
5   answered three times.  You're badgering the witness.
6   This isn't fair.
7      MR. OUWELEEN:  You can answer the
8   question.

Page 132

5   Q   Reading from page 108, line 17 through 20
6   of Mr. Gebeyehou's deposition -- I think this is a
7   rough draft --

25      MS. FORGIE:  Objection.

Page 131

Page 133

11   A   I don't know that.  I didn't read any of
12   the depositions of these doctors.

Dennis Weisenburger, M.D.



Page 134

```
 6        MS. FORGIE:  Objection.
```

```
12        MS. FORGIE:  Objection.  Asked and
13   answered.
14        You can answer again.
```

Page 135

Page 136

```
14        (Exhibit 19 was marked.)
15   Q   BY MR. OUWELEEN:  I'm going to mark as
16   Exhibit 19 a document that I think you saw
17   yesterday, but don't know if you saw before that.
18   And this was that U.S. News article, and it reported
19   a quotation from IARC.
20        And you've read the IARC monograph; right?
21   A   Yes.
22   Q   And the IARC monograph was one that
23   identified Roundup as a probable human carcinogen;
24   is that correct?
25   A   Yes.
```

Page 137

```
 1   Q   And this article quotes a Kate Guyton of
 2   IARC who says, "I don't think home use is the issue.
 3   It's agricultural use that will have the biggest
 4   impact" and that the cancer risks of the weed killer
 5   were mostly from occupational exposure.
 6        When you were forming your opinions about
 7   Mr. Gebeyehou, did you at all take into account the
 8   different circumstances in which home users versus
 9   agricultural users are exposed to the product?
10        MS. FORGIE:  Objection.  Goes to general
11   causation.
12        You can answer.
13        THE WITNESS:  I consider those -- I
14   consider that as an issue, yes.
15   Q   BY MR. OUWELEEN:  Did you -- so do you
16   disagree with what Ms. Guyton from IARC is quoted as
17   saying in this article, that home use is not the
18   issue, but it's agricultural use that's the bigger
19   concern?
20        MS. FORGIE:  Objection.  Goes to general
21   causation.
22        You can answer.
23        THE WITNESS:  I do disagree because
24   farmers who use pesticides are much more savvy about
25   how to use pesticides and what precautions to take.
```

Dennis Weisenburger, M.D.



Page 138

1
2
3
4
5
6
7
8
9
10
11
12
13
14    Q   BY MR. OUWELEEN:  How much time do you
15  spend on a farm?
16         MS. FORGIE:  Objection.
17         THE WITNESS:  Well, I live in a farming
18  community, but not on a farm.
19    Q   BY MR. OUWELEEN:  And you have not
20  undertaken any study or survey or anything else of
21  farmers to see how careful they are, what their
22  Roundup use are, have you?
23         MS. FORGIE:  Objection.
24         THE WITNESS:  Not recently, no.  I've
25  talked to lots of farmers when I was in Nebraska,

Page 139

1  and I can tell you there were days the farmers were
2  not very savvy about how to use pesticides either.
3  So their exposures were much higher in the '50s and
4  '60s and '70s than they are today because they
5  understand now that pesticides have toxic side
6  effects.
7         And so they're -- they tend to be -- they
8  tend to take -- have to take courses.  They tend to
9  be much more savvy about the effects of pesticides
10  than the average homeowner who just uses it in their
11  yard and garden.
12    Q   BY MR. OUWELEEN:  Are you an expert in
13  farming practices?
14         MS. FORGIE:  Objection.
15         THE WITNESS:  Well, I -- I grew up and
16  lived in farming states for most of my life, so I
17  know lots of farmers and I've talked to farmers.
18  I've talked to extension agents.  And so I -- you
19  know, I have a reasonably good idea of how farmers
20  have handled pesticides in the past.
21    Q   BY MR. OUWELEEN:  Are you offering
22  opinions in this case about the practices of farmers
23  in handling pesticides?
24         MS. FORGIE:  Objection.
25         THE WITNESS:  No.  I'm just responding to

Page 140

1  your question.
2         MR. OUWELEEN:  Let's go off the record.
3         THE VIDEOGRAPHER:  The time is now 12:12
4  p.m., and we are off the record.
5         (Recess taken.)
6         THE VIDEOGRAPHER:  The time is now 12:18
7  p.m., and we are back on the record.
8         MR. OUWELEEN:  Thank you.
9         Dr. Weisenburger, I don't have any other
10  questions at this time.
11         MS. FORGIE:  Okay.  We need about five
12  minutes, then.  I didn't know you were finished, so
13  I just want to talk to him for five minutes and see
14  if we have any questions, and we'll come back on.
15         THE VIDEOGRAPHER:  The time is 12:18 p.m.
16  and we are off the record.
17         (Recess taken.)
18         THE VIDEOGRAPHER:  The time is now 12:26
19  p.m., and we are back on the record.
20
21         EXAMINATION
22  BY MS. FORGIE:
23    Q   I just have a few quick questions for you
24  Dr. Weisenburger.  You were asked several questions
25  by Monsanto's lawyers about diffuse large B cell and

Page 141

1  the risk of development of Non-Hodgkin's Lymphoma.
2         Do you recall those questions?
3    A   Yes.
4    Q   And you were asked whether the three
5  studies you cited in your report, the McDuffie and
6  the NAPP and the Eriksson study, to what effect they
7  provided you with information about increased risk,
8
9
10         Do you recall those questions?
11    A   Yes.
12    Q   Do those three studies, McDuffie, the
13  NAPP, and Eriksson, do they discuss Non-Hodgkin's
14  Lymphoma?
15    A   Yes.
16    Q   And is large -- diffuse large B cell
17  lymphoma a subtype of NHL?
18    A   Yes.
19    Q
20
21
22
23
24
25

Dennis Weisenburger, M.D.

Page 142

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 144

```
1
2  PAGE   LINE   CORRECTION/REASON
3  _____  _____  _____
4  _____  _____  _____
5  _____  _____  _____
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25
```

Page 143

```
1
2
3       MR. OUWELEEN:  Object to form.
4       MS. FORGIE:  That's all I have.
5       MR. OUWELEEN:  No further questions.
6       THE WITNESS:  Thank you.
7       THE VIDEOGRAPHER:  The time is now 12:29
8  p.m. and we are off the record.
9       MS. FORGIE:  Send our copy to the Denver
10 office.  And then, secondly, the bill for the
11 transcript should go to Tesfaya.
12      THE COURT REPORTER:  Do you want a rough?
13      MS. FORGIE:  Sure.
14      MR. OUWELEEN:  We'd like a rough, too.
15      (Proceedings adjourned at 12:32 p.m.)
16
17
18
19
20
21
22
23
24
25
```

Page 145

```
1       DECLARATION UNDER PENALTY OF PERJURY
2
3
4       I do hereby certify under penalty of perjury
5  that I have reviewed the foregoing transcript of my
6  deposition; that I have made such corrections as
7  appear noted herein in ink; that my testimony
8  contained herein, as corrected, is true and correct.
9
10      DATED _____
11 in _____, California.
12
13
14
15
16           _____
17           Dennis Weisenburger, M.D.
18
19
20
21
22
23
24
25
```

Dennis Weisenburger, M.D.

Page 146

1
2                    CERTIFICATE
3
4
5        I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
         It was requested before
8    completion of the deposition that the
     witness, DENNIS WEISENBURGER, M.D., have
9    the opportunity to read and sign the
     deposition transcript.
10
11
     _____
12   Serena Wong, CSR No. 10250
     Certified Reporter
13   Notary Public
     Dated:  December 28, 2018
14
15
16
         (The foregoing certification
17   of this transcript does not apply to any
18   reproduction of the same by any means,
19   unless under the direct control and/or
20   supervision of the certifying reporter.)
21
22
23
24
25