# EXHIBIT 4

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS LIABILITY    )

     LITIGATION                           )

5                                         )

     This Document Relates To:           ) MDL NO. 2741

6                                         )

     Hardeman v. Monsanto Co., et al.    ) Case No.

7    Case No. 3:16-cv-00525;             ) 3:16-md-02741-VC

                                          )

8    Stevick v. Monsanto Co., et al.     )

     Case No. 3:16-cv-02341; and         )

9                                         )

     Gebeyehou v. Monsanto Co., et al.   )

10   Case No. 3:16-cv-05813              )

11

12

13                    CONFIDENTIAL

14    VIDEOTAPED DEPOSITION OF CHARLES BENBROOK, Ph.D.

15

16              Confidential videotaped deposition upon oral

17   examination of CHARLES BENBROOK, Ph.D., taken at the

18   request of the Defendants before Amy J. Brown, RMR, CRR,

19   CLR, a Certified Court Reporter, WA CCR No. 2133, at the

20   Quality Inn & Suites Conference Center, 700 Port Drive,

21   Board Room, Clarkston, Washington, commencing at or

22   about 9:03 a.m. on December 28, 2018, pursuant to the

23   Federal Rules of Civil Procedure.

24

25

Confidential - Charles Benbrook, Ph.D.

## Page 2

```
 1        APPEARANCES
 2
 3  FOR THE PLAINTIFFS:
 4        Weitz & Luxenberg, P.C.
          By:  JERRY KRISTAL, ESQUIRE
 5        220 Lake Drive East
            Suite 210
 6        Cherry Hill, NJ 08002
          (856) 755-1115
 7        jkristal@weitzlux.com
 8        Baum Hedlund Aristei Goldman, PC
          By:  PEDRAM ESFANDIARY, ESQUIRE
 9        10940 Wilshire Boulevard
            17th Floor
10        Los Angeles, CA 90024
          (310) 820-6252
11        pesfandiary@baumhedlundlaw.com
12
13  FOR THE DEFENDANTS:
14        Arnold & Porter Kaye Scholer, LLP
          By:  ZACHARY FAYNE, ESQUIRE
15        Three Embarcadero Center
            10th Floor
16        San Francisco,CA 94111
          (415) 471-3114
17        zachary.fayne@arnoldporter.com
18        Hollingsworth LLP
          By:  GRANT HOLLINGSWORTH, ESQUIRE
19        1350 I Street NW
          Washington, DC  20005
20        (202) 898-5887
          ghollingsworthi@hollingsworthllp.com
21
22  ALSO PRESENT:   VLADIMIR KORNEYCHUK, Videographer
23
24
25
```

## Page 3

```
 1        T E S T I M O N Y:
 2  CHARLES BENBROOK, Ph.D.            PAGE NO.:
 3    EXAMINATION BY MR. FAYNE             8
 4    EXAMINATION BY MR. KRISTAL          282
 5    FURTHER EXAMINATION BY MR. FAYNE       322
 6    FURTHER EXAMINATION BY MR. KRISTAL     343
 7    FURTHER EXAMINATION BY MR. FAYNE       345
 8
 9        E X H I B I T S:
10
    NO.:                   PAGE NO.:
11
    1A    Plaintiffs' Responses and Objections to    6
12      Monsanto Company's Notice to Take Oral
        and Videotaped Deposition of Dr.
13      Charles Benbrook
14  1   Monsanto Company's Notice to Take Oral      10
        and Videotaped Deposition of Dr.
15      Charles Benbrook
16  2   Benbrook Consulting Services invoice       17
        letters
17
    3   Expert Report of Dr. Charles Benbrook     23
18
    4   Updated Reference List of Dr. Charles     31
19      Benbrook
20  5   Dr. Benbrook's curriculum vitae      33
21  6   Glyphosate Issue Paper: Evaluation of     42
        Carcinogenic Potential, EPA's Office of
22      Pesticide Programs, September 12, 2016
23  7   IARC Monographs Volume 112 - Glyphosate    43
24  8   IARC Q&A on Glyphosate dated 3/1/16      68
25
```

## Page 4

```
 1  9    Monsanto fax re Dr. Parry dated        124
        10/2/99, MONGLY01312093 - 12104
 2
    10   Dr. Parry Evaluation of the potential    127
 3      genotoxicity of Glyphosate, Glyphosate
        mixtures and component surfactants,
 4      MONGLY01314233 - 4283
 5  11   CFR Title 40, Part 159        144
 6  12   Final TNO Report, MONGLY01285806 - 5848   156
 7  13   Draft TNO Report, MONGLY00888353 - 388   168
 8  14   EPA R.E.D. Glyphosate         203
 9  15   2/24/86 Memo re Final FIFRA SAP      211
        Reports, FIFRA report,
10      MONGLY00235515 - 5519
11  16   10/31/91 memo re Second Peer Review of   212
        Glyphosate, MONGLY00232477 - 2495
12
    17   6/19/89 EPA memo re Glyphosate - EPA     226
13      Registration Nos. 524-318 and 524-333 -
        Historical Control Data for Mouse
14      Kidney Tumors, EPA_06191989-001 - 031
15  18   10/1/15 EPA memo re Glyphosate: Report   230
        of the Cancer Assessment Review
16      Committee
17  19   COPE Report - How to handle authorship   262
        disputes: a guide for new researchers
18
    20   Errata in the 11/22/18 Expert Report of   282
19      Dr. Charles Benbrook: MDL No. 2741,
        Case No. 16-md-02741-VC
20
    21   The International Code of Conduct on     283
21      Pesticide Management
22  22   International Code of Conduct on the     283
        Distribution and Use of Pesticides
23
    23   Monsanto webpage "Product Stewardship    342
24      and The Pledge"
25
```

## Page 5

```
 1  24   Monsanto.com link to International Code   348
        of Conduct
 2
    25   1985 Crop Chemical Sample Label Guide -  293
 3      Monsanto
 4  26   4/99 e-mail string, [redacted] to Kier, et   301
        al., Re: Meeting Minutes 2/25
 5
    27   3/16/17 EPA Memo re meeting minutes and   318
 6      final report of 12/13 to 12/16/16 FIFRA
        SAP meeting; FIFRA SAP Meeting minutes
 7      and Final Report No. 2017-01
 8  28   EPA R.E.D. Facts re Alachlor     323
 9  29   2/01 e-mail string,           341
        MONGLY02626553 - 6554
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Confidential - Charles Benbrook, Ph.D.

Page 6

1     (Exhibit 1A marked for identification.)
2     VIDEOGRAPHER:  We are now on the record.  My
3 name is Vladimir Korneychuk.  I am a videographer for
4 Golkow Litigation Services.  Today's date is
5 December 28th, 2018, and the time is 9:03 a.m.
6     This video deposition is being held in the
7 Quality Inn in Clarkston, Washington, in the matter of
8 In Re:  Roundup Products Liability Litigation, for the
9 United States District Court, Northern District of
10 California.  The deponent is Charles Benbrook, Ph.D.
11     Would counsel please identify themselves.
12     MR. KRISTAL:  Jerry Kristal from Weitz and
13 Luxenberg on behalf of plaintiffs.
14     MR. ESFANDIARY:  Pedram Esfandiary for the
15 plaintiffs.
16     MR. FAYNE:  Zach Fayne, Arnold & Porter, for
17 defendant Monsanto Company.
18     MR. HOLLINGSWORTH:  Grant Hollingsworth of
19 Hollingsworth LLP for defendant Monsanto.
20     VIDEOGRAPHER:  The court reporter is Amy Brown.
21 Will you please swear in the witness.
22          CHARLES BENBROOK, Ph.D.,
23     called as a witness on behalf of the Plaintiff,
24     who, having been first duly sworn, was then and
25     there examined and testified as follows:

Page 7

1     MR. KRISTAL:  Before we get started, I would
2 state for counsel that, as I'm sure they know, based on
3 virtually the identical report that Dr. Benbrook has
4 written and has been served in other cases, he's been
5 deposed five times in the last ten months.  So I would
6 just ask that you please not ask repetitive questions of
7 things that have already been asked.
8     MR. FAYNE:  I --
9     MR. KRISTAL:  We don't want to get in a fight.
10 I'm just saying at some point it really becomes an
11 exercise more in harassment than legitimate discovery.
12 I'm not accusing you of anything.  I'm just giving you a
13 heads-up.
14     MR. FAYNE:  I understand your concern.  I'll
15 state that there are going to be some questions that
16 are -- appear similar to questions asked in prior
17 depositions.
18     We just want to make sure nothing has changed
19 and confirm that in his new report, which is a new
20 report, that he still has the opinions he's expressed in
21 the past, and we'll do our best to avoid repetition.
22     MR. KRISTAL:  Thank you.  I appreciate that.
23 And certainly asking if his opinions have changed
24 are -- those are legitimate questions.
25     MR. FAYNE:  And before we get started, we'd

Page 8

1 also like to state for the record that we are
2 designating this deposition confidential pursuant to the
3 court's con -- case management order.
4     MR. KRISTAL:  Now, my understanding, also, just
5 in housekeeping matters -- I don't have it with me --
6 was there a three-hour time limit on people that have
7 already been deposed?  Do you recall that?
8     MR. FAYNE:  There's a three-hour time limit, I
9 believe, for specific causation experts.  The -- I
10 believe the timeline for this deposition is the normal
11 seven hours.
12     MR. KRISTAL:  All right.  Well, if we approach
13 we will check what you say, and if that's correct, then
14 seven hours it is.
15     MR. FAYNE:  Sure.
16          EXAMINATION
17 BY MR. FAYNE:
18     Q.  Dr. Benbrook, could you please state your name
19 for the record.
20     A.  Charles Benbrook.
21     Q.  And you've been deposed many times before,
22 correct, Dr. Benbrook?
23     A.  Yeah, several times.
24     Q.  So you're aware of the ground rules for
25 depositions?

Page 9

1     A.  I am.
2     MR. KRISTAL:  Can we go off the record for a
3 second?
4     VIDEOGRAPHER:  Off the record at 8:06 a.m.
5     (A brief recess was had.)
6     VIDEOGRAPHER:  Back on the record at 8:07 a.m.
7     Q.  (BY MR. FAYNE:)  So, Dr. Benbrook, I'm going to
8 dispense with the preliminary instructions for
9 depositions.  Is that okay?
10     A.  That's fine.
11     Q.  And there's nothing that would prevent you from
12 giving accurate testimony; is that correct?
13     A.  Not that I'm aware of.
14     Q.  And you've given several days of deposition
15 testimony in the Roundup litigation in the past year; is
16 that correct?
17     A.  That's correct.
18     Q.  Two days in the Johnson case in February 2018?
19     A.  I believe that's the accurate date, but I don't
20 have them memorized.
21     Q.  Sure.  I'll represent to you --
22     A.  Okay.  Fine.
23     Q.  -- that your depositions were in February.  You
24 don't have any reason to believe that that's incorrect?
25     A.  No.

Confidential - Charles Benbrook, Ph.D.

Page 10

1    Q.   And you had two days in the Peterson and Hall
2    case; correct?
3    A.   Correct.
4    Q.   And that was May and August, respectively?
5    A.   Yes.
6    Q.   Also one day in the Adams case in September?
7    A.   Correct.
8    Q.   And you also testified in the Johnson trial in
9    California on July 27th?
10   A.   Correct.
11   Q.   You gave all of that testimony under oath;
12   correct?
13   A.   Yes.
14   Q.   You told the truth when you gave that
15   testimony?
16   A.   To the best of my ability, yes.
17   Q.   Testified as accurately as you could?
18   A.   To my understanding of the record that I've
19   been asked to review, yes.
20   Q.   And you stand by all the testimony you gave
21   during those depositions and at trial?
22   A.   Yes.
23   Q.   We've marked as Exhibit 1 the deposition notice
24   for this deposition.
25        (Exhibit 1 marked for identification.)

Page 11

1    A.   Yeah.
2    Q.   I believe you have it in front of you.
3        MR. KRISTAL:  And just for the record, we had
4    marked as 1A -- and I'll put it in the pile -- the
5    plaintiff's responses and objections to the dep notice
6    that had been served on counsel for Monsanto on
7    December 18th.  Thank you.
8    Q.   (BY MR. FAYNE:)  Have you seen this document
9    before?
10   A.   Yes.
11   Q.   And if you look on page -- it starts on page 4,
12   I believe.  There are a number of requests for
13   production.  Do you see that?
14   A.   I don't see a page 4, but I'm sure you'll
15   direct me right to where you want to ask something
16   about.
17   Q.   Yeah.  There are -- there are no page numbers
18   on here, I apologize, but if you flip to it looks like
19   the fourth page, the heading that says "Request for
20   Production."
21   A.   Yes.
22   Q.   Did you check your files for responsive
23   materials?
24   A.   I did.
25   Q.   And I believe you produced a handful of e-mails

Page 12

1    with other experts in the case; is that correct?
2    A.   Right.  I did.
3    Q.   Other than the e-mails that you produced, have
4    you had any other communications with the individuals
5    listed in Request Number 18?
6    A.   Number 18?
7    Q.   Yes.  Paragraph 18.  I'm sorry.
8    A.   Let's see.  The only person that I've had any
9    communications with was Aaron Blair, and I believe I
10   disclosed the e-mails to him.
11   Q.   Other than the e-mail communications, have you
12   had any telephone conversations with Dr. Blair since
13   your last deposition?
14   A.   Yes, I did.  I've had, I think, two.
15   Q.   When was the first one?
16   A.   It was -- do you have the e-mails?  Because
17   that will give me the date.
18   Q.   I don't have them with me.  I'm sorry.
19   A.   Okay.
20   Q.   I e-mailed Dr. Blair.  The e-mail has been
21   disclosed to you.  And asked him a technical question
22   about the glyphosate portion of the Volume 122
23   monograph.
24        MR. KRISTAL:  I think the question was when was
25   it.

Page 13

1        THE WITNESS:  It was in November sometime.
2    That's as close as I can recall.
3    Q.   (BY MR. FAYNE:)  And what was the subject of
4    that conversation?
5    A.   I asked him a question about why certain
6    genotox studies in the glyphosate section of Volume 122
7    were discussed only in the narrative portions of the
8    volume and not included in the core tables in which the
9    majority of genotoxicity studies were presented in that
10   report.  I wasn't clear why some studies appeared only
11   in the narrative text and others were in the tables.
12   Q.   Did Dr. Blair have an answer for that question?
13   A.   Yes.
14   Q.   What was his answer?
15   A.   That the -- his recollection was that those
16   studies assessed genotoxic mechanisms of action that
17   were not covered by the core tables, and in particular
18   assays on impacts on sex hormones and oxidative stress.
19   Q.   Did he explain why those types of assays were
20   not covered in the core tables?
21   A.   Just that they didn't fit.  If you look at
22   the -- the taxonomy of the way IARC did their tables,
23   that answer made sense to me.  I understood it.
24   Q.   Do you recall how long your conversation with
25   Dr. Blair was?

Page 14

1    A.  15 minutes.
2    Q.  You testified that you had two conversations
3  with Dr. Blair.  Do you recall when the second one was?
4    A.  Let's see.  Maybe I only had one phone call
5  with him.  I sent him an e-mail and asked him if I could
6  talk to him, and then I -- I had the phone conversation.
7  And then I -- he expressed an interest in what I was
8  doing, and I told him I was doing an assessment of the
9  genotox database relied on by IARC and relied on by EPA.
10      And he asked me a little bit about what I was
11  doing, and then I sent him a subsequent e-mail with just
12  a few of the results which are actually, I think, also
13  in my report.  And there might not have been a second
14  phone call.  I can't really remember.
15    Q.  Any in-person conversations with Dr. Blair?
16    A.  No.
17    Q.  And no telephone calls or in-person
18  conversations with any of the other individuals listed
19  in --
20    A.  The only time I've ever met, been with any of
21  them was Dr. Sawyers, and it was just momentarily at the
22  trial.  He testified before me.  I spent a little time
23  with him there.
24    Q.  And for the court reporter's benefit, if you
25  could wait until I finish my question, and I'll --

Page 15

1    A.  Oh.
2    Q.  -- I'll try to do the same as well.  I know
3  it's -- in typical conversation, it's hard to.  And if
4  we could try to do that.
5    A.  Just keep reminding me.
6    Q.  Absolutely, I will do that.  And I am sure she
7  will keep reminding me, as well.
8      At your first deposition in February, you
9  testified that you spent approximately 3 -- 320 to
10  350 hours reviewing materials in preparation for your
11  role as an expert witness; do you recall that?
12    A.  I recall discussing it.  I don't recall the
13  exact hours.  I'm sure I produced the invoices that had
14  been submitted up until that time, and the number came
15  from adding them up.
16    Q.  In May you testified that you spent another
17  50 hours or so at your deposition.  Does that sound
18  about right?
19    A.  Yeah.
20    Q.  Do you recall roughly how much time you spent
21  working on the Roundup-related litigation between your
22  deposition in May and the end of August?
23    A.  No.  I'd have to look at my invoices.
24    Q.  More than 100 hours?
25    A.  I'd have to look at the invoices.  There were

Page 16

1  months when I spent a lot of hours and a few months when
2  I didn't spend a lot.
3    Q.  In preparing your expert report for this
4  case -- and by "this case," I'm referring to the MDL
5  cases of Stevick, Hardeman and Gebeyehou.
6      MR. KRISTAL:  That's as good as any of us are
7  going to get.  We'll take it.
8      THE WITNESS:  I hope I don't have to try that
9  one.
10    Q.  (BY MR. FAYNE:)  I'll keep working on it
11  throughout the day.  I'm going to start that question
12  over.
13      In preparing your expert opinion for these
14  cases of Stevick, Hardeman and Gebeyehou, did you rely
15  in part on the work that you've done prior to August?
16    A.  Yes.
17    Q.  And that's the work you were doing in the
18  Johnson case?
19    A.  Yes.
20    Q.  And the Peterson and Hall case?
21    A.  Yes.
22    Q.  And the Adams case?
23    A.  Yes.
24    Q.  So you were able to take advantage of that
25  earlier work in preparing your expert opinion for this

Page 17

1  case; correct?
2    A.  That is -- that is correct.
3        (Exhibit 2 marked for identification.)
4    Q.  (BY MR. FAYNE:)  In front of you, you have an
5  exhibit that's marked as Exhibit Number 2, and these are
6  your invoices from -- I believe it's September, October,
7  and November of 2018; is that correct?
8    A.  Yep.  That's correct.
9      MR. KRISTAL:  Thank you.
10    Q.  (BY MR. FAYNE:)  And so if we can quickly flip
11  through them.  It looks like you spent 19 and a half
12  hours in September working on this case; is that
13  correct?
14    A.  Correct.
15    Q.  63 hours in October; is that correct?
16    A.  Yes.
17    Q.  And 82 hours in November; correct?
18    A.  Yes.
19    Q.  So in total you've spent over 500 hours on
20  Roundup-related litigation.  Does that sound about
21  right?
22    A.  Sounds about right.
23    Q.  More than 600 hours?
24    A.  I -- I'd have to add them up.
25    Q.  And you're being paid $300 an hour to testify

Confidential - Charles Benbrook, Ph.D.

Page 18

1 for the plaintiffs in these cases; is that correct?
2    A.  Yes, sir.
3    Q.  So over the course of the Roundup litigation,
4 you've been paid more than $150,000. Does that sound
5 right?
6    A.  I -- yeah, I'm sure it's a bit more than that,
7 yep.
8    Q.  More than $200,000?
9    A.  I don't think so.
10    Q.  So you think it's somewhere between 150 and
11 $200,000?
12    A.  Yeah.
13       MR. KRISTAL: Also assumes the invoices have
14 been paid.
15    Q.  Have the invoices been paid?
16    A.  Well, not all of them. Most of them.
17    Q.  And your expectation is that the invoices will
18 be paid; correct?
19    A.  Yes.
20    Q.  At your -- some of your earlier depositions,
21 you testified that it's a very large record and you hope
22 to have the opportunity to dig deeper into it as the
23 case went on; is that correct?
24    A.  That is correct.
25    Q.  And you've now produced a new expert report for

Page 19

1 the Stevick, Hardeman and Gebeyehou cases; correct?
2    A.  That is correct.
3    Q.  In preparing that new report, have you had the
4 opportunity to dig deeper into the record?
5    A.  Yes.
6    Q.  Did that include review of Bates-numbered
7 documents -- I'll refer to them as "MONGLY documents."
8    A.  Yes.
9       MR. KRISTAL: It's M-O-N-G-L-Y, all caps.
10       MR. FAYNE: Thank you.
11       MR. KRISTAL: I always notice when the court
12 reporters wince.
13    Q.  (BY MR. FAYNE:) How did you find the new
14 documents that you reviewed?
15    A.  Documents have come to me in a variety of
16 different ways. I have had for many years extensive
17 files of my own, particularly EPA documents. Some of
18 those also appear in the record as MONGLY documents.
19       I -- as I have worked through the record, I
20 have identified particular issues that I have felt are
21 important for me to address thoroughly, the issues I've
22 been asked to look at, and I -- when I feel that there's
23 likely more in the record or when there's a reference to
24 a document in a -- in a MONGLY e-mail and I want to see
25 the base document or see what happened as a result of

Page 20

1 something, an event that's being discussed, I would ask
2 for more documentation either before or after a
3 particular date on a MONGLY document.
4       Typically I would send those requests to either
5 Jeff Travers of The Miller Firm, or Jerry Kristal. I
6 believe I sent a few such requests to David Wool with
7 Andrus Wagstaff. And usually within a day or two I
8 would get a dump of documents and I would go through
9 those, and often the new documents would lead to
10 additional questions for further material.
11    Q.  The testimony that you just gave, you're
12 referring to the course of the entire -- your
13 entire -- your work on this entire litigation; correct?
14    A.  Well, yes. In the -- throughout my work on the
15 Johnson case, the person that I typically requested to
16 do searches and send me new documents was Jeff Travers
17 at the Miller group, but in the last six or eight
18 months, Jerry Kristal has served that role in helping
19 me.
20    Q.  So I'd like to focus you on the period of time
21 since the Johnson trial; okay?
22    A.  That would be fine.
23    Q.  In that period of time, have you asked
24 Mr. Kristal for additional documents on topics relevant
25 to this litigation?

Page 21

1    A.  Yes.
2    Q.  Do you recall what topics you asked for
3 additional documents on?
4    A.  Oh, well, at least a dozen. Most of the major
5 areas that are covered in my report. Stewardship, the
6 assessment of the cancer assays and genotoxicity, the
7 sum of the incident report documents, a variety of
8 documents involving surfactants.
9       I've asked multiple times for documents
10 relating to studies done on skin penetration. And as I
11 said, pretty much in almost all of the substantive
12 sections of my expert report there are some new material
13 that I accessed and reviewed and has helped inform my
14 opinions in the current version of my report.
15    Q.  To the extent you're relying on any of those
16 new documents, are they cited either in your report or
17 in your reliance list?
18    A.  They are.
19       MR. KRISTAL: And to a certain extent in the
20 reference list, as well, that was provided subsequent to
21 the report.
22       MR. FAYNE: I understand, Counsel. I'd
23 appreciate it if -- I'm asking for his testimony, not
24 yours. But I appreciate the --
25       MR. KRISTAL: It was more to help you, but...

Confidential - Charles Benbrook, Ph.D.

Page 22

1       MR. FAYNE: I understand.
2       MR. KRISTAL: Okay.
3    Q. (BY MR. FAYNE:) You also had a supplemental
4    reference list that you produced --
5    A. Correct.
6    Q. -- in connection with this deposition; correct?
7    A. Yes.
8    Q. So they might also be listed there, as well?
9    A. And there might be one or two that didn't
10   make the list.
11   Q. So there might be documents that you're relying
12   upon for your expert opinion that you have not disclosed
13   in any of your reliance lists?
14   A. There might be. I'd -- it would be very hard
15   to tell. I've looked at thousands of documents up until
16   now.
17   Q. In preparing for your deposition today, did you
18   review transcripts from your prior depositions?
19   A. Yes.
20   Q. Did you review transcripts from the Johnson
21   trial?
22   A. No.
23   Q. Which deposition transcripts did you review, if
24   you recall?
25   A. You're speaking about my depositions?

Page 23

1    Q. Yeah. I'm sorry. Yes. So you testified that
2    you reviewed some of your prior deposition transcripts;
3    correct?
4    A. Correct.
5    Q. Which ones?
6    A. All of them.
7    Q. Did you review any other deposition transcripts
8    in preparation for today?
9    A. Yes.
10   Q. Which ones?
11   A. Several. Sitting here right now, I probably
12   won't remember all of them. And in addition, sometimes
13   when I review a deposition transcript, there's certain
14   issues that I'm looking for, so I don't do an absolutely
15   thorough read.
16      But Donna Farmer, David Saltmiras,
17   Dan Goldstein, Dr. Sawyers -- two of Dr. Sawyers'
18   depositions. Let's see. Who else? Acquavella, I
19   believe I've looked at. I don't recall any others at
20   this time, although there are probably a few others.
21      (Exhibit 3 marked for identification.)
22   Q. (BY MR. FAYNE:) I'd like to turn now to what's
23   marked Exhibit 3 --
24   A. Yep.
25   Q. -- which is before you. And this is your

Page 24

1    expert report that you produced in the Hardeman, Stevick
2    and Gebeyehou cases; correct?
3    A. Yes.
4    Q. And it's approximately 166 pages, 787 numbered
5    paragraphs. Does that sound about right?
6    A. Sounds about right.
7       MR. FAYNE: This is not the only -- I'm sorry,
8    Counsel. Let me give you a copy.
9       THE WITNESS: And I believe you've been
10   provided the errata sheet. It was e-mailed to you -- or
11   e-mailed to you, maybe.
12      MR. ESFANDIARY: Yes. I sent it to you last
13   night. Sent them to --
14      THE WITNESS: Just typos, errata sheet.
15      MR. FAYNE: I have not received that, but we
16   can talk about that off the record.
17      THE WITNESS: Okay. We'll get it to you.
18      MR. KRISTAL: I may have a copy, actually.
19   This had been e-mailed to I'm not sure which counsel
20   last night.
21      MR. ESFANDIARY: E-mailed to Pamela Yates and
22   Julia DuPont, I believe, at Arnold Porter.
23      MR. FAYNE: Yes. Thank you.
24   Q. (BY MR. FAYNE:) So Exhibit 3 is your expert
25   report in these cases; correct?

Page 25

1    A. Yes.
2    Q. And when I refer to "these cases," you'll
3    understand that I mean the Hardeman, Stevick and
4    Gebeyehou cases?
5    A. Yes, sir.
6    Q. If I'm not referring to those specific cases,
7    I'll be sure to say so during the deposition; is that
8    okay?
9    A. Yep.
10   Q. This is not the only report that you've
11   produced in the Roundup litigation; correct?
12   A. Yes.
13   Q. You also produced a report in the Johnson case;
14   correct?
15   A. That is correct.
16   Q. Have you produced any other expert reports in
17   the Roundup-related litigation?
18   A. No.
19   Q. Who wrote the first draft of this report?
20   A. I did.
21   Q. Did the attorneys provide comments on your
22   draft?
23      MR. KRISTAL: Objection. Privileged.
24      THE WITNESS: No.
25      MR. KRISTAL: You don't have to answer those

Confidential - Charles Benbrook, Ph.D.

Page 26

1  questions.
2      THE WITNESS: Oh, okay.
3      MR. KRISTAL: I'll instruct you not to -- I'll
4  instruct you next time.
5      Q. (BY MR. FAYNE:) Your expert report in these
6  cases covers topics that are similar to those addressed
7  in Johnson; correct?
8      A. Yes.
9      Q. And as we discussed previously, the work that
10 you did in the Johnson case was useful as you prepared
11 this expert report; correct?
12     A. Of course it was.
13     Q. And you were able to reuse certain sections?
14     A. Yes.
15     Q. Presumably that meant that you were able to
16 draft this expert report in less time than your Johnson
17 report; correct?
18     A. It was --
19     THE WITNESS: Did you want to say something?
20     MR. KRISTAL: No. No. No.
21     THE WITNESS: It was somewhat less work, but
22 I -- between the filing of my Johnson report and the
23 completion of this one, just off the top of my head, I
24 would say I probably have spent a roughly comparable
25 amount of time delving deeper into the record.

Page 27

1      So while not all of this report is new, all of
2  the sections are, I think, substantially refined, and
3  I -- feel that I've been able to document and support
4  my reviews of these matters of my opinions in a more
5  thorough and effective way in the current version of the
6  report, and that took a lot of time.
7      Q. (BY MR. FAYNE:) In other words, you were able
8  to build off your Johnson report; is that a fair
9  characterization?
10     A. Build off and also extend in some significant
11 ways, yes.
12     Q. Does this report contain all of the expert
13 opinions that you intend to offer in this -- in these
14 cases?
15     A. As I've done it in every case that I've been
16 involved with, I will try to respond to any questions
17 placed to me as thoroughly as I can. This report
18 codifies opinions that I've reached based on my review
19 of the record to date, and it is what I will testify to
20 at trial, but I don't know what I'll be asked.
21     Q. Understood. But if you intended to testify
22 about additional topics, you understand that you would
23 have to amend your report; is that fair?
24     A. Yes, I understand that, sir.
25     Q. You were designated as an expert witness in the

Page 28

1  Stevick, Hardeman and Gebeyehou cases; correct?
2      A. Yes.
3      Q. Have you ever met Mr. and Mrs. Stevick?
4      A. No, I have not.
5      Q. Have you ever met Mr. Hardeman?
6      A. No.
7      Q. What about Mr. Gebeyehou?
8      A. No.
9      Q. Ever spoken to any of them?
10     A. No.
11     Q. Have you reviewed the legal complaints that
12 they filed in these lawsuits?
13     A. Perhaps scanned them. I don't recall if I
14 reviewed it in any detail.
15     Q. So fair to say that you're not relying upon
16 them in issuing your expert opinion?
17     A. No, I'm not.
18     Q. Have you ever reviewed the transcripts of their
19 depositions?
20     A. No.
21     Q. What about their responses to discovery
22 requests?
23     A. No.
24     Q. Your report did not include any opinions that
25 are specific to Mr. and Mrs. Stevick; correct?

Page 29

1      A. That is correct.
2      Q. Same for Mr. Hardeman?
3      A. Yes.
4      Q. Same for Mr. Gebeyehou?
5      A. Yes.
6      Q. Is it fair to say that you do not intend to
7  offer testimony that is specific to any one of those
8  plaintiffs?
9      A. That is correct.
10     Q. Also fair to say that you're not basing your
11 expert opinions on any facts that are unique to any of
12 their individual cases; correct?
13     A. That is also correct.
14     Q. I would like to turn to Exhibit 4. Actually,
15 before we get to Exhibit 4, if you could turn to your
16 reliance list in your expert report.
17     A. Okay. Okay.
18     Q. So your reliance list includes four categories
19 of documents; correct?
20     A. Yes.
21     Q. And that's documents with a Bates number,
22 published scientific studies and technical documents,
23 depositions, deposition exhibits, Johnson trial
24 documents and genotoxicity documents; correct?
25     A. Correct.

Confidential - Charles Benbrook, Ph.D.

Page 30

1    Q.  I also understand that you're relying on a few
2  documents that are cited in your report that might not
3  be on this reliance list; is that correct?
4    A.  That's -- that's likely true.
5    Q.  And to the extent you're relying on those
6  documents, they're cited in the report; correct?
7    A.  Correct.
8    Q.  Are you relying on any documents that were
9  cited in the prior version of your report that are not
10  cited in this report?
11    A.  Oh, geez.  It -- possibly.
12    Q.  You can't say one way or the other sitting here
13  today?
14    A.  Well, I know that in the interest of trying to
15  shorten the report and especially in light of the added
16  material, there are -- there is some substantial
17  passages from the Johnson expert report that are not in
18  this report.
19        And there may have been some MONGLY documents
20  cited in the Johnson report, but I would
21  still -- because I read them and they helped inform my
22  opinions, they still form the basis of the opinions in
23  the current report even though they're not cited.
24    Q.  Do you know whether those documents are cited
25  in your reliance list or updated reliance list?

Page 31

1    A.  Probably are.  I've tried to be cumulative with
2  it.
3    Q.  And over the past 30 years, I understand that
4  you've also reviewed a number of documents that have
5  informed your general thinking on pesticides and
6  glyphosate; is that correct?
7    A.  More than 30 years, yes.
8    Q.  I think I took that number from your report,
9  but I apologize if I got that wrong.
10        So now if we could turn to Exhibit 4, which is
11  your supplemental reliance list.
12        (Exhibit 4 marked for identification.)
13    A.  Okay.  Back to this one.
14    Q.  Yep.  And this -- I apologize.  I referred to
15  it as supplemental.  It's your updated reference list;
16  correct?
17    A.  Yes.
18    Q.  And this lists additional Bates-numbered
19  documents that you've relied upon in forming your
20  opinions; correct?
21    A.  And one journal article.
22    Q.  And one journal article, correct.
23        Is it fair to say that all of the documents
24  that you're relying upon to support your opinion are
25  cited either in your report, on your reliance list, or

Page 32

1  on your updated reference list?
2    A.  Yes.  And it would include the documents
3  presented as exhibits during my trial testimony and
4  various exhibits in my depositions and the depositions
5  of other parties to the -- to the case that I've read.
6    Q.  Could you turn to page 8 of your reliance list?
7    A.  This is back in the report?
8    Q.  Back in the report, yes.  So this is Exhibit 3,
9  page 8 of the reliance list.
10    A.  Yeah.  Yeah.  Yeah.  Got it.
11        MR. KRISTAL:  Did I steal yours?  I apologize.
12        MR. FAYNE:  No problem.  This one seems to be
13  working.
14    Q.  (BY MR. FAYNE:)  So you'll see towards the
15  bottom of this list, there are a number of documents
16  listed as public document; correct?
17    A.  Correct.
18    Q.  And that goes on to page 9, as well?
19    A.  Correct.
20    Q.  Would you agree that it would be difficult for
21  someone looking at this list to identify which documents
22  you're referring to?
23    A.  It would be indeed.  My apologies.
24    Q.  Are you able to identify which documents these
25  are referring to?

Page 33

1    A.  I know I can describe them in general.  Would
2  that be helpful?
3    Q.  I don't need you to do that sitting here today,
4  but you'd be able to update this list so that it would
5  be easier for someone to understand what you're
6  referring to; correct?
7    A.  I'll endeavor to do that, yes.
8    Q.  Thank you.  Appreciate that.
9        THE WITNESS:  Can you help me remember to do
10  that?
11        MR. KRISTAL:  Uh-huh.
12        (Exhibit 5 marked for identification.)
13    Q.  (BY MR. FAYNE:)  And then the last exhibit we
14  had pre-marked is just Exhibit 5, which is your updated
15  résumé.
16    A.  Okay.
17        MR. KRISTAL:  Thank you.
18    Q.  And the only question I have for you about this
19  right now is that this is your current résumé; is that
20  correct?
21    A.  No.  Oh, yes.  Yes, it is.  I'm sorry.  I had
22  to check the last change, and the last change is in
23  there.
24    Q.  Thank you.
25    A.  Glad we got beyond the résumé part of this.

Confidential - Charles Benbrook, Ph.D.

Page 34

1    Q.  We're not quite done yet.

2        MR. KRISTAL:  See?  You spoke too soon.

3    Q.  So I'd like to ask you some questions now about

4  your credentials.  I understand that some of these have

5  been asked in the past, but I just want to confirm that

6  nothing has changed.  I'll try to get through this

7  section as quickly as possible.

8    A.  Thank you.

9    Q.  I understand counsel's concern.

10       You've never been employed by the Environmental

11 Protection Agency; correct?

12       MR. KRISTAL:  Don't answer that question.

13       If you want to ask since the last deposition

14 when he was asked that exact question whether he's been

15 employed, that's a good question.  Otherwise we're not

16 going to go through every single thing that's been

17 already asked.

18       MR. FAYNE:  Are you --

19       MR. KRISTAL:  Yes, I'm instructing him not to

20 answer that.  But I'm not -- I think it would be proper

21 for you to ask him since the last time he's answered

22 that question.  That's fair.

23    Q.  (BY MR. FAYNE:)  You've never been employed by

24 the FDA; correct?

25    A.  Same.

Page 35

1        MR. KRISTAL:  Same objection.  And it's the

2  same request.  You can get the information you need if

3  you want it.  Just ask him since the last time.

4        MR. FAYNE:  So just for the record, you're

5  instructing the witness not to answer?

6        MR. KRISTAL:  Yes, because it's harassment at

7  this point.  He's answered those questions.  You know

8  that he hasn't been employed by EPA or FDA certainly up

9  to the date of the last time he was asked that, which is

10 within the last couple of months.  So if you want to ask

11 since then, that's fair.  Otherwise, it is harassment.

12    Q.  (BY MR. FAYNE:)  Since your last deposition, I

13 assume you've not received any training in medicine;

14 correct?

15    A.  Correct.

16    Q.  Since your last deposition, you've not received

17 any formal training or degree in any physical science;

18 correct?

19    A.  No.

20    Q.  And you are not being designated as an expert

21 in this case in any physical science; is that correct?

22    A.  No.

23    Q.  Since your last deposition, you haven't

24 received any formal training or degree in toxicology;

25 correct?

Page 36

1    A.  No.

2    Q.  And you are not a toxicologist; correct?

3    A.  I'm not a practicing toxicologist.  I am an

4  expert in the role of toxicology data in the assessment

5  of pesticide risk and the types of studies that are

6  done, the way that they are translated into quantitative

7  estimates of risk and the role that they play in

8  pesticide regulation.  So from -- for that aspect of the

9  field of toxicology, I am an expert.

10    Q.  How did you become an expert in that aspect of

11 toxicology?

12    A.  Through research.

13    Q.  Reviewing public literature?

14    A.  Public literature, some -- some studies done by

15 registrants, interactions with scientists, and

16 engagement with the issues and other scientists over the

17 last four decades.

18    Q.  Have you ever designed a toxicology study?

19    A.  No.

20    Q.  Have you ever conducted a toxicology study?

21    A.  No.

22    Q.  You're not an epidemiologist; correct?

23       MR. KRISTAL:  Not since the last time he's

24 asked that question.

25    A.  Sir, if I had training in a field of that

Page 37

1  nature, it would be on my résumé.

2    Q.  So since your last deposition, you have not

3  received any formal training or degree in epidemiology;

4  correct?

5    A.  As you will note, there's been no update in my

6  résumé that indicates that I've had such training.

7    Q.  So you've received no formal training or degree

8  in epidemiology?

9    A.  Correct.

10    Q.  Since your last deposition, you've not received

11 any formal training or degree in pathology; correct?

12    A.  Correct.

13    Q.  You're not a pathologist?

14    A.  I am not a pathologist.

15    Q.  Do you have any formal training or degree in

16 exposure assessment?

17    A.  No.

18    Q.  You do not claim to be an expert in exposure

19 assessment; correct?

20    A.  Other than the role that exposure assessment

21 methodologies play in the pesticide risk assessment

22 process, the data that's generated by registrants in

23 compliance with data requirements on the exposure side.

24       I've done extensive research on the

25 biomonitoring data that's in the public literature.  I

Confidential - Charles Benbrook, Ph.D.

Page 38

1  understand the tools and the methods. I am -- have a
2  deep background in the evolution of analytical chemistry
3  methods used to quantify the levels of pesticides in a
4  variety of matrices and regard myself as an expert in
5  the general tools and methods utilized to estimate
6  exposure -- exposures to pesticides, including an
7  herbicide like glyphosate.
8      Q.  Have you ever been qualified as an expert in
9  any other litigation on exposure assessment?
10     A.  I've been qualified as an expert in cases where
11 exposure assessment was one of the issues that was
12 entailed in the case, but I wasn't specifically
13 designated as a -- as an expert in exposure assessment,
14 as least I don't remember ever being.
15     Q.  Do you have any formal degree or training in
16 ADME, which, as you know, stands for absorption,
17 distribution, metabolism and excretion?
18     A.  I'm not aware of any formal degrees in that
19 particular field, but -- and no, I have none.
20     Q.  And you don't claim to be an expert in ADME;
21 correct?
22     A.  Again, I do have extensive expertise in the
23 importance of studies falling within that area of
24 pesticide risk assessment and feel quite capable of
25 understanding the record in this case that relates to

Page 39

1  the behavior of glyphosate herbicide and formulated
2  herbicides in plant matrices, human skin, et cetera, and
3  the environment.
4      Q.  Since your last deposition, you haven't
5  received any formal training in -- or degree in
6  corporate ethics; correct?
7      A.  Correct.
8      Q.  What about law?
9      A.  No, I haven't gone through law school in the
10 last four months.
11     Q.  It would be pretty impressive if you had.
12         Have you ever conducted a scientific exposure
13 assessment?
14     A.  No.
15     Q.  Have you ever designed an assessment of
16 exposure?
17     A.  I -- I've participated and am -- and continue
18 in some of my work to develop the methodologies to
19 estimate exposure to pesticides. Yes, I -- I do.
20     Q.  In what context?
21     A.  Primarily in a dietary exposure from residues
22 in food. I've developed proprietary models that
23 quantify dietary exposures as a result of residues in
24 food. That's been a -- that's been a major focus of my
25 work for over 20 years.

Page 40

1      Q.  Other than dietary exposures, have you designed
2  risk assessment for any other types of exposures?
3      A.  I haven't designed an exposure assessment
4  study, but I've certainly reviewed and worked with
5  several of them and several exposure assessments in EPA
6  regulatory documents which has given me a firm grounding
7  in the way that the agency approaches exposure
8  assessment.
9      Q.  So you have never designed a dermal exposure
10 study, for instance?
11     A.  Correct.
12     Q.  What about a dermal penetration study, in case
13 you view those as different?
14     A.  Same answer.
15     Q.  I'd like to turn now to your expert report
16 which we've marked as Exhibit 3.
17     A.  Okay.
18     Q.  Would you turn to page 21? I'm sorry, page 20
19 of your expert report.
20     A.  Okay.
21     Q.  And in this section you've conducted an
22 analysis of genotoxicity studies relied on by EPA as
23 compared to those relied on by IARC; is that a fair
24 characterization?
25     A.  Yes.

Page 41

1      Q.  For your comparison you used EPA's
2  September 2016 report titled "Glyphosate Issue Paper:
3  Evaluation of Carcinogenic Potential"; is that correct?
4      A.  Yes.
5      Q.  You're aware that EPA has published an updated
6  version of that issue paper in December 2017; correct?
7      A.  Yes, I am.
8      Q.  Why did you use the 2016 report instead of the
9  2017 report?
10     A.  It's the one that I had done the vast majority
11 of my analysis with, and I check to -- to -- when the
12 new -- newer report came out, I didn't recognize very
13 many changes, and so I just continued to work
14 with -- with that one.
15         It also, given that my -- the focus is a
16 comparison of the genotox database that EPA used and
17 referred to in their September 2016 report to the IARC
18 report which came out a few months -- the full Volume
19 122 monograph that came out roughly at the same time.
20         So I was -- I felt it was most appropriate
21 analytically to focus on what those reports said at the
22 time that they were issued.
23     Q.  Did you check to see whether EPA cited any new
24 or additional genotoxicity studies in their 2017 report?
25     A.  I think they did a few new ones, yes.

Confidential - Charles Benbrook, Ph.D.

Page 42

1    Q.   That wasn't important to your analysis?
2    A.   No.  I didn't see enough differences to redo
3  the whole analysis.
4        MR. FAYNE:  I'll mark as Exhibit 6 EPA's 2016
5  OPP report.
6        (Exhibit 6 marked for identification.)
7        MR. KRISTAL:  Was this 6, did you say?
8        MR. FAYNE:  6.
9    Q.   (BY MR. FAYNE:)  Is this the EPA report that
10  you used for your analysis?
11    A.   I can't tell if it's the original or the
12  updated one, but you'll tell me, I'm sure.
13    Q.   If you look at the front cover, it says
14  "September 12th, 2016."
15    A.   Yeah.
16    Q.   And that's the version that you used; correct?
17    A.   Yes, that's the version I used.
18    Q.   And in your analysis, you were comparing the
19  studies that EPA considered in its genotoxicity
20  assessment in this 2016 report to those considered by
21  IARC in Volume 112 of its monographs; correct?
22    A.   Correct.
23    Q.   So let's mark Volume 112 as well just so we
24  have them both in front of us.
25        MR. FAYNE:  So we'll mark Volume 112 of IARC's

Page 43

1  monographs as Exhibit 7.
2        (Exhibit 7 marked for identification.)
3        MR. KRISTAL:  Always nice to unburden yourself,
4  when you're taking a deposition, of all the documents.
5        MR. FAYNE:  You have no idea.
6        MR. KRISTAL:  I do have an idea.
7    Q.   (BY MR. FAYNE:)  In comparing the studies that
8  EPA -- let me start over.  Strike that.
9        In comparing the genotoxicity studies that EPA
10  reviewed as compared to those reviewed by IARC, what
11  were you trying to show?
12    A.   I was simply trying to understand the genotox
13  database that formed the foundation of EPA's judgment on
14  genotoxicity, and I also tried to understand the
15  genotoxicity database that IARC relied on in reaching
16  their different judgment, and then I compared the two to
17  see that -- whether the differences in the studies that
18  EPA reviewed and relied upon were different enough to
19  explain why EPA reached a diametrically opposed
20  conclusion on the question of genotoxicity compared to
21  the conclusion reached by IARC.
22    Q.   Were you trying to show that IARC's review of
23  the genotoxicity database was more comprehensive?
24    A.   It was obvious that it was more comprehensive
25  in several ways.  It's -- it's -- it has been clear to

Page 44

1  me for -- since I began working on this case that the
2  difference in judgment reached by EPA on the
3  oncogenicity of glyphosate and glyphosate-based
4  herbicides relative to the judgment reached by IARC is a
5  central controversy in the case.
6        And I -- I wanted to try to understand from a
7  scientific point of view what might have led the EPA to
8  reach a different conclusion than IARC, and I designed
9  my analysis to try to understand what those differences
10  were.
11    Q.   You testified that it was obvious to you that
12  IARC's review was more comprehensive in several ways.
13  What were those ways?
14    A.   They relied -- the IARC working group relied
15  much more heavily on studies on formulated
16  glyphosate-based herbicides, whereas the EPA's analysis
17  did not place really hardly any weight on those.  And
18  also, the IARC working group relied much more
19  extensively on public literature studies appearing in
20  peer-reviewed journals.
21    Q.   Any other ways in which the IARC review was
22  more comprehensive, in your opinion?
23    A.   I think the -- the IARC report is actually a
24  bit more thorough in discussing the strengths and
25  weaknesses of individual studies compared to the EPA

Page 45

1  report, but it may -- it just may be that the EPA, in
2  compiling that report, they didn't put in all of the
3  details in their individual reviews of each of the
4  studies.
5        I'm quite sure that there's a probably an EPA
6  memo in the files of HED, Hazard Evaluation Division, on
7  all the genotox studies from registrants that they
8  reviewed, and that would be a 4,000-page document
9  instead of a 260-page document had they done that.
10        But that -- that is one -- I thought the
11  qualitative assessment of the -- of the studies was more
12  thorough in the IARC review compared to the EPA
13  document.
14    Q.   But you're not testifying that IARC's review
15  was necessarily more thorough, just that its write-up
16  was more thorough.  Is that a fair characterization?
17    A.   No, that's not a fair characterization.
18    Q.   But you testified that you're sure that the
19  health effects division has a memo in its files that's
20  much longer.  So you have no way of knowing one way or
21  another how thorough the review is; correct?
22    A.   I based my assessment -- my comparative
23  assessment on these two reports that are presented by
24  EPA on the one hand and IARC as the culmination of their
25  systematic and quite extensive reviews of the studies

Confidential - Charles Benbrook, Ph.D.

Page 46

1 and the public literature that were available to them
2 and fell within the guidelines for what they relied on.
3    Q.  Let's turn to Appendix C of your report, which
4 I believe lays out your methodology; correct?
5    A.  Okay.
6    Q.  And, sorry, I should be more clear.  Appendix C
7 of your expert report, which we had marked as Exhibit 3.
8    A.  Yeah.  Okay.  I'm there.
9    Q.  So this appendix lays out the methodology used
10 to compare the IARC report to the EPA report; correct?
11    A.  Yes.
12    Q.  Just to make sure I understand exactly what you
13 did, you're counting the number of studies cited by IARC
14 and then counting how many of those studies were
15 considered by EPA; correct?
16    A.  It's not exactly studies.  It's counting the
17 number of assays included in the core tables produced by
18 EPA in their report, and then I did essentially the same
19 analysis of the core tables produced by the IARC working
20 group.
21       Several studies report assay results on -- in
22 more than one cell line.  Some studies report assay
23 results on technical glyphosate and formulated
24 glyphosate-based herbicides.  A few include data on
25 AMPA.

Page 47

1       So the total number of assay results that
2 appear in both the EPA core tables and the IARC core
3 tables exceed the number of studies cited.
4    Q.  So just to confirm that I understand what you
5 just laid out, you're counting the number of assays, not
6 the number of studies; correct?
7    A.  I'm counting the number of assay -- individual
8 assay results that the EPA felt appropriate to include
9 in their core tables based on their review of the
10 studies.
11       And if you read the EPA report, they say that
12 they identified and include in their core tables the
13 primary results of the study, often as highlighted by
14 the authors of the study, whether it's a peer-reviewed
15 study in the literature or a registrant-submitted study.
16    Q.  So you're counting the number of assay results
17 the EPA put in its core tables and comparing it to the
18 number of assay results that IARC put in its core
19 tables; correct?
20    A.  Correct.
21    Q.  To determine how many studies -- or strike
22 that.
23       To determine how many assay results were
24 considered by EPA, you used Tables 5.1 through 5.7 in
25 the EPA report; correct?

Page 48

1    A.  Correct.
2    Q.  You didn't refer to any other information in
3 the report, correct, for purposes of this analysis?
4    A.  Well, in terms of counting the number of assays
5 in the core tables, yeah, I just used the core tables.
6    Q.  And as you just testified, the only input you
7 used for your analysis was the core tables; correct?
8    A.  Well, I do address in my analysis the appendix
9 tables where EPA listed a number of assays on formulated
10 glyphosate-based herbicides, but they also say quite
11 clearly that they -- they didn't place any weight or
12 much weight on them in their analysis.
13    Q.  Could you show me in your analysis where you
14 identified the appendix tables that EPA referred to on
15 formulated products?
16    A.  It's probably in my report somewhere.
17    Q.  We can -- you can look for it at a break.  I'll
18 represent to you --
19       MR. KRISTAL:  He's not going to look for it at
20 a break.  If you want him to do it now, a break is for a
21 break.  But he's happy to look for it now, if you'd
22 like.
23       THE WITNESS:  As you know, I've gone to --
24       MR. KRISTAL:  Is that what you want him to do?
25       MR. FAYNE:  No.  That's all right.

Page 49

1       MR. KRISTAL:  Okay.
2    Q.  (BY MR. FAYNE:)  Tables 5.1 through 5.7 in the
3 EPA report address studies on glyphosate technical;
4 correct?
5    A.  Correct.
6    Q.  Or pure glyphosate?
7    A.  Probably more appropriate to say glyphosate
8 technical.
9    Q.  Sure.
10    A.  Because there's no such thing as pure
11 100 percent glyphosate.
12    Q.  Sure.  So we'll refer to it as glyphosate
13 technical.
14    A.  Yeah.  I think that's appropriate.
15    Q.  And to determine how many studies were
16 considered by IARC, you used Tables 4.1 through 4.6 in
17 the monographs; correct?
18    A.  Correct.
19    Q.  And those tables address studies on glyphosate
20 technical, glyphosate-based formulations, and studies on
21 the glyphosate metabolite AMPA; correct?
22    A.  Correct.
23    Q.  So you're comparing the number of genotoxicity
24 studies on glyphosate technical that EPA considered to
25 the number of studies on glyphosate technical,

Confidential - Charles Benbrook, Ph.D.

Page 50

1  glyphosate-based formulations and AMPA that IARC
2  considered --
3      A.  Correct.
4      Q.  -- is that fair?
5          Can you turn to page 21 of your report,
6  paragraph 63?
7      A.  Back to there, okay.  You said page 21?
8      Q.  Yes, paragraph 63.
9      A.  Got it.
10     Q.  You state, "Of the approximate 120 genotoxicity
11  studies in all categories cited by IARC, EPA cited about
12  50 in its 2016 report or about 42 percent of those
13  considered by IARC."
14         Did I read that correctly?
15     A.  Yes.
16     Q.  When you say "in all categories cited by IARC,"
17  you're referring to glyphosate technical,
18  glyphosate-based formulations, and AMPA; correct?
19     A.  Correct.
20     Q.  Only 55 of those 120 genotoxicity studies cited
21  by IARC fell into mammalian categories; correct?
22     A.  Yeah.  That's in a subsequent paragraph, I
23  assume.
24     Q.  Yep.
25     A.  Yes, sir.

Page 51

1      Q.  Yes.  That's paragraph 64 where you state that
2  "Of the 120 studies" --
3      A.  Right.
4      Q.  -- "reviewed by IARC, 55 fell in mammalian test
5  categories"?
6          MR. KRISTAL:  I think that little squiggly line
7  means approximately.
8          THE WITNESS:  That's correct.
9      Q.  (BY MR. FAYNE:)  Approximately 55; correct?
10     A.  Yes.
11     Q.  You agree that mammalian test categories are
12  the most relevant to the assessment of glyphosate's
13  potential to trigger carcinogenic risk in humans;
14  correct?
15     A.  Yes, I do.
16     Q.  And actually, if you'll turn to page 98 of the
17  EPA report.  And I apologize.  I know I'm asking you to
18  use two different documents here.
19     A.  That's all right.  I know right where you're
20  going.
21         MR. KRISTAL:  Need to ask him about his
22  expertise in mind reading.
23         THE WITNESS:  Okay.  98.
24     Q.  (BY MR. FAYNE:)  So page 98, in the bottom of
25  that second full paragraph, it states that "Studies

Page 52

1  conducted in non-mammalian species (example, worms,
2  fish, reptiles, plants) were excluded because they were
3  considered to be not relevant for informing genotoxic
4  risk in humans."
5          Do you see that?
6      A.  Actually, I don't.  You're talking -- page 98?
7      Q.  Yes, of the OPP report.
8          MR. KRISTAL:  Can you just give us which
9  paragraph?
10         MR. FAYNE:  It's the bottom of the second full
11  paragraph.
12         THE WITNESS:  Oh, okay.  I was in the bottom
13  paragraph.  I'm sorry.
14     Q.  (BY MR. FAYNE:)  So I'll read that again.  It
15  says, "Studies conducted in non-mammalian
16  species (example, worms, fish, reptiles, plants ) were
17  excluded because they were considered to be not relevant
18  for informing genotoxic risk in humans."
19         Do you see that?
20     A.  Yes, I do.
21     Q.  And did I read that correctly?
22     A.  You did.
23     Q.  So EPA excluded studies from its analysis that
24  were on non-mammalian species; correct?
25     A.  That is correct.

Page 53

1      Q.  And that's because it concluded that those
2  studies were not relevant to genotoxic risk in humans;
3  correct?
4      A.  That was the conclusion reached by EPA, yes.
5      Q.  Do you disagree with that assessment?
6      A.  Yes, I do disagree and so does IARC.  And many
7  other scientists in that genotoxicity assays done in
8  non-mammalian species lend further insights into the
9  biological properties and impacts of various chemicals
10  under review.
11         I think it's -- there is -- it is widely
12  accepted that the most relevant studies are done in
13  mammalian systems, but the IARC working group clearly
14  felt that the non-mammalian studies were -- added
15  additional insights and value to the data set.
16     Q.  But you agree that it's widely accepted that
17  the most relevant studies are the ones that are done in
18  mammalian test systems; correct?
19     A.  Yes, I do agree with that.
20     Q.  You state that "Of the approximately 55 studies
21  conducted in mammalian systems that were reviewed by
22  IARC, EPA considered about 40"; correct?
23     A.  Correct.
24     Q.  And again, in making this determination, you
25  were looking at Tables 5.1 through 5.7 of the EPA

Confidential - Charles Benbrook, Ph.D.

Page 54

1 report; correct?
2    A.  Correct.
3    Q.  So if you'll turn to page -- you're probably
4 already there -- page 98 of the EPA report.
5    A.  Back to where we were, okay.
6    Q.  Yes.  And now we're looking in the first full
7 paragraph on that page.
8    A.  All right.
9    Q.  It says, "In the current analysis, a fit for
10 purpose systematic review process was conducted to
11 identify relevant genotoxicity data from regulatory
12 studies and published literature, from open sources
13 (published and unpublished) for both glyphosate
14 technical and glyphosate-based formulations.  Studies
15 conducted with glyphosate formulations that were
16 identified and considered relevant for genotoxicity
17 evaluation are summarized in table form in Appendix F."
18       Do you see that?
19    A.  Yes.
20    Q.  And then if we turn to Appendix F, which is on
21 page 214.
22    A.  Yes.
23    Q.  So in Appendix F, there are a number of tables;
24 correct?
25    A.  Correct.

Page 55

1    Q.  And these list studies on the
2 formulated -- genotoxicity studies on the formulated
3 product that EPA cited in the tables; correct?
4    A.  That they included in the table, correct.  In
5 the tables.
6    Q.  In the tables, correct.
7       And I haven't counted the studies, but there
8 are more than 25 or so studies cited in these tables;
9 correct?
10    A.  Yes.
11    Q.  In reaching your conclusion that EPA considered
12 only 40 of the approximately 55 studies considered by
13 IARC, you did not include studies that were cited in
14 these tables in Appendix F; correct?
15    A.  That's correct.
16    Q.  Had you included those studies, the number
17 considered by EPA would have been larger than 40;
18 correct?
19    A.  It would have been inappropriate to do so
20 because if you continue reading in the same paragraph,
21 that -- that appears on the top of page 98, you finished
22 with "Studies" -- this is the last sentence that you
23 read -- "Studies conducted with glyphosate formulations
24 that were identified and considered relevant for
25 genotoxicity evaluation are summarized in table form in

Page 56

1 Appendix F.  As described in Section 7.0 of this
2 document, glyphosate formulations are hypothesized to be
3 more toxic than glyphosate alone.  The agency is
4 collaborating with NTP to systematically investigate the
5 mechanisms of toxicity of glyphosate and glyphosate
6 formulations.  However, the focus of this section is the
7 genotoxic potential of glyphosate technical."
8       So in this passage, the EPA is fairly clearly
9 saying that they did not place much, if any, weight on
10 the genotoxicity studies on the formulated products, so
11 I felt it would be inappropriate for me to include them
12 as among the studies that EPA considered in its
13 evaluation since they say right here that they didn't
14 consider them.
15    MR. FAYNE:  I'll move to strike that answer as
16 non-responsive.
17    MR. ESFANDIARY:  The answer will stand.
18    Q.  (BY MR. FAYNE:)  The question was, had you
19 included --
20    THE REPORTER:  Could you repeat?
21    MR. ESFANDIARY:  I said the answer will stand.
22    Q.  (BY MR. FAYNE:)  The question was, had you
23 included these studies in the analysis, the number of
24 studies considered by EPA as compared to IARC would have
25 been higher; correct?

Page 57

1    A.  If I had done that, yeah, it would have gone
2 up.
3    MR. KRISTAL:  Are you at a somewhat clear
4 breaking point?  We've been going a little over an hour.
5 I'd like to take a break.  If you have a question or
6 two, that's okay.
7    MR. FAYNE:  Sure.  We can take a break.
8    MR. KRISTAL:  Okay.
9    VIDEOGRAPHER:  Off the record at 9:08 a.m.
10       (A brief recess was had.)
11    VIDEOGRAPHER:  Back on the record at 9:27 a.m.
12    Q.  (BY MR. FAYNE:)  Dr. Benbrook, we've been
13 discussing your analysis of the EPA review of
14 genotoxicity studies as compared to IARC; correct?
15    A.  Yes.
16    Q.  And we had just been talking about the tables
17 in Appendix F of the EPA report; correct?
18    A.  Yes.
19    Q.  I'd like to turn your attention now to
20 Appendix D of the EPA report, and that's on page 196.
21    A.  Yes.
22    Q.  Appendix D of the EPA report is a list of
23 studies assigned a low quality ranking and not evaluated
24 in detail; correct?
25    A.  That's what it says, yes.

Confidential - Charles Benbrook, Ph.D.

Page 58

1    Q.   In reaching your conclusion that EPA considered
2  only 40 of the approximately 55 studies cited reviewed
3  by IARC, you did not include the studies cited by EPA in
4  Appendix D; correct?
5    A.   No, I did not, because the EPA said that they
6  didn't consider them to be of adequate scientific
7  quality.
8    Q.   Would you agree that these are studies that EPA
9  considered but then assessed as low quality?
10    A.   I think the EPA considered that they were low
11  quality, and so they didn't factor in the results of the
12  studies one way or the other.
13    Q.   But you agree that EPA would have had to review
14  and evaluate the studies to determine that they were of
15  low quality; correct?
16    A.   They would have had to do that, correct.
17    Q.   And you testified previously that you're sure
18  that there's other documents in the record, you know, a
19  4,000-page memorandum that might discuss in more detail
20  EPA's underlying reasoning for its review; correct?
21    A.   Of the different genotoxicity studies?
22    Q.   Correct.
23    A.   Yes.
24    Q.   And so in that document or that type of
25  document is where EPA might have set forth its analysis

Page 59

1  as to why these studies were low quality; correct?
2    A.   One would presume that they would do that, but
3  I would need to look at them to see, you know, what
4  precise reason they cited in each one of them.
5    Q.   You do not know one way or the other whether
6  there's a document in the EPA record in which they lay
7  out in detail their review of these studies listed in
8  Appendix D; correct?
9    A.   I made no attempt to find such documents.
10    Q.   So now let's turn to paragraph 65 of your
11  report, which is on page 65.  I apologize.  It's on
12  page 22.  I thought that couldn't be right.
13    A.   Okay.  Paragraph 65.
14    Q.   Paragraph 65, correct.
15        MR. KRISTAL:  I was going to say those are some
16  long paragraphs.
17        MR. FAYNE:  Yeah.
18    Q.   (BY MR. FAYNE:)  You state that of the five
19  studies on, quote/unquote, exposed humans reviewed by
20  the IARC Working Group, three were regarded as positive.
21  These studies were given little or no weight by EPA
22  because they entailed exposures to formulated GBHs --
23  which stands for glyphosate-based herbicides -- not
24  technical glyphosate, the focus of EPA's review.
25        Did I read that correctly?

Page 60

1    A.   Yes, you did.
2    Q.   And I'm correct that "GBHs" refers to
3  glyphosate-based herbicides; correct?
4    A.   Yes, you are.
5    Q.   So turning to the IARC monograph, page 47.
6    A.   Did you say page 47?
7    Q.   Page 47, yes, Table 4.1.
8    A.   Okay.  I have it.
9    Q.   Are these the five studies in exposed humans
10  that you're referring to in paragraph 65 of your report?
11    A.   They are.
12    Q.   And if you look at the list, it shows an assay
13  result from Paz-y-Mino, et al.?
14    A.   Correct.
15    Q.   That's P-A-Z dash Y dash M-I-N-O, et al., 2007.
16  Assay result from Paz-y-Mino, et al., from 2011?
17    A.   Correct.
18    Q.   An assay result from Bolognesi et al., 2009?
19    A.   Correct.
20    Q.   And two more assay results from Bolognesi, et
21  al., 2009; correct?
22    A.   Correct.
23    Q.   If you could look back to Appendix D of the EPA
24  report now.
25        MR. KRISTAL:  What page was that?

Page 61

1        MR. FAYNE:  That was page 196.
2    Q.   (BY MR. FAYNE:)  And again, Appendix D is the
3  list of studies that EPA assigned a low quality ranking
4  to.
5    A.   Okay.
6    Q.   Do you see here that EPA listed in Appendix D
7  the Bolognesi, et al., 2009, the Paz-y-Mino, et al.,
8  2007, and the Paz-y-Mino, et al., 2011?  Correct?
9    A.   I do see that, yep.
10    Q.   So EPA considered these five studies to be of
11  low quality; correct?
12    A.   That's what they say in Appendix D.
13    Q.   In other words, EPA considered these studies
14  but then did not assess them in detail because in EPA's
15  view, they were low quality studies; correct?
16        MR. KRISTAL:  Objection.
17    A.   That's essentially correct, yes.
18    Q.   So now let's look at paragraph 9(a) of your
19  report which is on page 7.
20    A.   9(a)?
21    Q.   Yes.  Of your report.  You'll see on page 7 you
22  have a paragraph 9 -- I'm sorry.
23    A.   All right.  The (a) got me confused.  All
24  right.  So paragraph 9(a) on page 7.  Okay.
25    Q.   So you state here that "IARC placed heavy

Confidential - Charles Benbrook, Ph.D.

Page 62

1  weight on three studies of human populations exposed to
2  glyphosate-based herbicides that displayed, according to
3  the IARC Working Group, strong evidence of direct damage
4  to human DNA."
5      Do you see that?
6  A.  Correct.
7  Q.  Are you referring to those same three or five
8  studies, however you want to characterize it?  The
9  Bolognesi 2009, Paz-y-Mino 2007, and Paz-y-Mino 2011?
10  A.  I'm actually referring to the narrative section
11  in the summary report -- the summary report section of
12  the IARC report where they present their overall
13  analysis of the -- of the -- of the genotox -- or their
14  decision to classify glyphosate or glyphosate-based
15  herbicides as probable human carcinogens.
16      And in its Section 6 of the IARC report that
17  begins on page 78 of IARC Monograph 112, in the
18  Section 6.4 on the rationale, the first bulleted item,
19  "There is strong evidence that exposure to glyphosate or
20  glyphosate-based formulations is genotoxic based on
21  studies in humans in vitro and studies in experimental
22  animals."  And then they go on to say, "One study in
23  several communities in individuals exposed to
24  glyphosate-based formulations also found chromosomal
25  damage in blood cells.  In this study, markers of

Page 63

1  chromosomal damage (micronucleus formation) were
2  significantly greater after exposure than before
3  exposure to the same individuals."
4      This is where the IARC Working Group highlights
5  the studies on DNA damage in exposed human populations.
6  It's not -- it's not -- I'm not able to definitively say
7  which of those -- those positive studies they're
8  referring to, but it's certainly one of them.
9      And because of their highlighting this aspect
10  of the data set in their summary statement, it -- it
11  was -- it was clear to me that they both regarded the
12  studies as adequately conducted and the findings as
13  important.
14  Q.  Perhaps you didn't understand my question.  I'm
15  just trying to understand what are the three studies
16  that you say IARC placed heavy weight on?
17  A.  The three positive studies and the direct
18  damage to DNA table --
19  Q.  And are those --
20  A.  -- that we were just talking about.
21  Q.  So the Bolognesi 2009, the Paz-y-Mino 2007 --
22  A.  Correct.
23  Q.  -- and the Paz-y-Mino 2011?
24  A.  Right.
25  Q.  And as we discussed previously, you agree that

Page 64

1  EPA placed little weight on these studies because it
2  assessed them to be of low quality; correct?
3  A.  No.  I think -- well, I think they -- in
4  addition to them placing them in Appendix D, they say
5  quite clearly in the report that their assessment of the
6  genotoxicity of glyphosate is based on studies on
7  glyphosate technical and they did not review or place
8  weight on the studies on formulated product, whether
9  they were high quality or low quality.
10  Q.  But one reason that they excluded these studies
11  from their analysis is because they assessed them to be
12  low quality; correct?
13      MR. KRISTAL:  Objection.
14  A.  As I -- as I said, you know, they -- they state
15  clearly in their report that their focus was on studies
16  on glyphosate technical, so this certainly suggests to
17  me that their assessment of the studies on -- on
18  formulated glyphosate-based herbicides was not as
19  thorough and certainly there was not as much weight
20  placed on them.
21  Q.  You mentioned previously an NTP review that
22  was -- that EPA was going to partner with NTP to
23  evaluate studies on glyphosate-based formulation;
24  correct?
25  A.  It's not exactly partner.  It's the -- I think

Page 65

1  the EPA has requested that the NTP conduct a set of
2  genotox assays on technical glyphosate and
3  glyphosate-based herbicides to further inform the
4  differential toxicity between glyphosate technical and
5  formulated glyphosate-based herbicides.
6  Q.  If you turn to page 141 of the EPA report.
7  A.  Okay.
8  Q.  The Section 7.0 is labeled "Collaborative
9  Research Plan for Glyphosate and Glyphosate
10  Formulations"; correct?
11  A.  Correct.
12  Q.  And it states in the second paragraph that "The
13  agency has been collaborating with the NTP division of
14  the National Institute of Environmental Health Sciences
15  to develop a research plan"; correct?
16  A.  Correct.
17  Q.  So EPA is working collaboratively with the NTP
18  division to develop a research plan; correct?
19  A.  To develop the research plan, but NTP is
20  doing -- has done the studies.
21  Q.  And then if you turn to page 142.
22      MR. KRISTAL:  Of?
23      MR. FAYNE:  Of the EPA report.  I'm sorry.
24      MR. KRISTAL:  Thank you.
25      THE WITNESS:  Next page, in other words.

Confidential - Charles Benbrook, Ph.D.

Page 66

1  Q.  (BY MR. FAYNE:)  Yes, the next page under the
2  graphic.  The last sentence of that paragraph states
3  that "However, when members of an NTP work group looked
4  at the available data included in the IARC review, the
5  group did not agree with IARC, but the data provided
6  strong or clear evidence for either genotoxicity or
7  induction of oxidative stress given protocol
8  deficiencies that could produce questionable results."
9      Did you see that?
10  A.  Yes.  You read that correctly.
11  Q.  So you agreed that the NTP work group, at least
12  based on this preliminary review, did not agree with
13  IARC on the studies of -- genotoxicity studies of
14  formulated product; correct?
15  A.  This is -- this is EPA's characterization of,
16  I'm assuming, interactions that they had with the
17  scientists at NTP, so take EPA at their word, what they
18  reported.
19  Q.  So you agree that EPA's view, based on its
20  discussions with the NTP group, is that NTP did not
21  agree with IARC's analysis of the genotoxicity data on
22  glyphosate-based formulations; is that fair?
23  A.  Well, there's -- there is -- that -- this
24  assessment and the discussions that the EPA had with NTP
25  was no doubt specific to individual assays or individual

Page 67

1  study results.  It's hard to say exactly what the
2  details of those conversations were, but the -- you
3  know, this -- this states that NTP felt that there was
4  some methodological issues with some of the assays, and
5  they apparently felt that the IARC Working Group reached
6  some judgments based on some of the studies that the NTP
7  scientists reviewed that they didn't have the same level
8  of confidence in.  So that -- you know, that's what I
9  take it to mean.
10  Q.  Okay.  So let's turn back to your report, if we
11  could, and where we left off was paragraph 9(a).  I want
12  to go to the next page, which is paragraph 9(b).
13  A.  Okay.
14  Q.  You state, "I also conclude that EPA's admitted
15  failure to seriously assess the approximate 70 public
16  literature studies on the genotoxicity of formulated
17  glyphosate-based herbicides is why the agency errantly
18  determined that 'glyphosate' is likely not genotoxic."
19      Do you see that?
20  A.  Correct.
21  Q.  Did I read that correctly?
22  A.  Yes, you did.
23  Q.  In other words, your opinion is that a key
24  difference between the EPA review and the IARC review is
25  that IARC reviewed studies on glyphosate-based

Page 68

1  formulations; is that a fair characterization?
2  A.  Several of the studies reviewed and given
3  considerable weight by the IARC Working Group were
4  studies done on formulated glyphosate-based herbicides
5  that were not reviewed or given heavy weight by EPA,
6  yeah.  Correct.
7  Q.  And in your opinion, that explains -- that's
8  part of the explanation as to why EPA and IARC reached
9  different determinations on the genotoxicity of
10  glyphosate and glyphosate-based formulations; correct?
11  A.  Yes, sir.
12  Q.  And just to restate that slightly, that -- in
13  your view, that's a primary reason why IARC found strong
14  evidence of genotoxicity, whereas EPA concluded that
15  glyphosate is not genotoxic; correct?
16  A.  Correct.
17      MR. FAYNE:  Mark this as Exhibit 8.  Yep.
18      (Exhibit 8 marked for identification.)
19  Q.  (BY MR. FAYNE:)  I've marked as Exhibit 8 a Q
20  and A on glyphosate prepared by the International Agency
21  For Research on Cancer in March 2016.
22  A.  Yep.
23  Q.  Have you seen this document before?
24  A.  No.  I don't believe I have.
25  Q.  Can I just look at the copy I gave you?  I'm

Page 69

1  sorry.  I just want to make sure that I gave you the
2  right one.
3      So if you look at the first bold question on
4  page 1.
5      MR. KRISTAL:  Well, I would ask that
6  Dr. Benbrook, since he just said he doesn't think he
7  read it, that he'd like to --
8      THE WITNESS:  May I read it, please?
9      MR. KRISTAL:  He should have the opportunity to
10  read it before fielding your question.
11      MR. FAYNE:  Absolutely.
12      MR. KRISTAL:  Thank you.
13      MR. FAYNE:  And, Dr. Benbrook, you're welcome
14  to read the entire thing, but I'm only going to ask you
15  questions about the first page and the first question on
16  the second page.
17      THE WITNESS:  Okay.
18      MR. FAYNE:  The rest of it doesn't relate to
19  genotoxicity studies, but feel free to take your time.
20      THE WITNESS:  Okay.
21      So you're just going to ask me about the first
22  question on the second page and that's it?
23      MR. FAYNE:  The first page and the first
24  question on the second page, correct.
25      THE WITNESS:  Okay.  I've read them now.

Confidential - Charles Benbrook, Ph.D.

Page 70

1  Q.  (BY MR. FAYNE:)  So the first question on the
2  first page states, "Could the carcinogenic effects of
3  glyphosate be related to the other chemicals in the
4  formulations?"  And IARC responds "No."
5      Did I read that correctly?
6  A.  Yes.
7  Q.  And then if you look at the second paragraph of
8  that answer, IARC explains that "For the experimental
9  studies on 'pure glyphosate,' the monograph concluded
10  that the evidence of causing cancer in experimental
11  animals was sufficient and the evidence for causing
12  genotoxicity was strong."
13      Did I read that correctly?
14  A.  Yes, you did.
15  Q.  And then turning to the next page, the question
16  asks, "Could the co-formulants be the cause of the
17  genotoxic effects reported in the IARC Monograph?"
18      Did I read that correctly?
19  A.  Yes, you did.
20  Q.  And IARC responds, "With regard to
21  genotoxicity, the IARC Working Group evaluated" studies
22  on -- "studies of 'pure glyphosate' as well as studies
23  of glyphosate-based formulations.  The working group
24  reached the same hazard conclusion for glyphosate and
25  for its formulations:  they concluded that the evidence

Page 71

1  for genotoxicity was 'strong' for glyphosate and
2  'strong' for glyphosate formulations."
3      Did I read that correctly?
4  A.  Yes, you did.
5  Q.  In other words, IARC did not find a material
6  difference between the genotoxicity evidence on
7  glyphosate and the genotoxicity evidence on
8  glyphosate-based formulations; is that a fair
9  characterization?
10  A.  No.
11  Q.  Why not?
12  A.  They -- they state clearly here that
13  they -- they characterized and believe that the evidence
14  is strong in both the case of pure or technical
15  glyphosate and in the case of glyphosate-based
16  formulations.  There's no implied sort of comparison
17  between the two that they're both strong.
18  Q.  Okay.  So let me rephrase it.
19      They categorized both glyphosate and
20  glyphosate-based formulations in the same category for
21  genotoxicity risk; is that fair?
22  A.  Not precisely.  They -- they characterized the
23  data that was available to them on the genotoxicity of
24  glyphosate technical as strong in that it pointed to
25  genotoxicity effects.  Independent of that, they

Page 72

1  evaluated the evidence on formulated glyphosate-based
2  herbicides and also concluded that that evidence was
3  strong, and that's what they're saying here.  It's a
4  slight distinction, but...
5  Q.  You would agree that IARC reviewed the evidence
6  on technical glyphosate and determined that the
7  genotoxic risk -- that there was strong evidence of
8  genotoxic risk; correct?
9  A.  Yes.
10  Q.  EPA reviewed the evidence on technical
11  glyphosate and reached the opposite conclusion; correct?
12  A.  The EPA's conclusion is stated clearly, and it
13  says that -- the EPA reported that based on their review
14  of data on the genotoxic effects of glyphosate technical
15  and current typical levels of exposure, that
16  there's -- there's not strong evidence of a mutagenic
17  effect.
18      I think they used the word "via the oral
19  route."  So their conclusion is limited to glyphosate
20  technical, and it's contingent on levels of exposure --
21  typical levels of exposure through the oral route or
22  dietary.
23  Q.  EPA has never found that glyphosate is
24  genotoxic; correct?
25  A.  That's actually a complicated question.  I

Page 73

1  mean, EPA renders judgments about the genotoxicity of
2  pesticides in a lot of different places at a lot of
3  different times.  Sometimes they'll review an individual
4  study and say that there's evidence of genotoxicity in
5  this one study, but then based on other studies and
6  their weight-of-evidence evaluation, they may say that
7  overall their judgment is that it's not.
8      Certainly this September 2016 report that we've
9  been talking about I think is an accurate reflection of
10  EPA's views at the time, and I believe it's still their
11  view.  So this would -- I would certainly agree with you
12  that this is the most relevant contemporary summary of
13  EPA's weight of evidence judgment about the overall
14  database.
15  Q.  You would agree that EPA's current judgment,
16  which is consistent with its longstanding judgment, is
17  that the weight of the evidence does not show glyphosate
18  technical to be genotoxic; correct?
19  A.  Based on typical levels of dietary exposure,
20  that's -- that's the conclusion that they reached, yes.
21  Q.  Or mutagenic?
22  A.  Yes.
23      MR. KRISTAL:  Objection to form.
24  A.  Correct.  The term -- I think EPA and many
25  scientists use the terms "genotoxic" and "mutagenic" as

Confidential - Charles Benbrook, Ph.D.

Page 74

1  roughly comparable.
2  Q.  EPA has never made a weight-of-the-evidence
3  determination that glyphosate is genotoxic; correct?
4  A.  Not that I'm aware of.
5  Q.  Turning back to the Q and A document from IARC.
6  A.  Okay.
7  Q.  As we were discussing previously, IARC reviewed
8  the evidence -- genotoxicity evidence on glyphosate and
9  found that there was strong evidence of genotoxicity,
10  reviewed the genotoxicity evidence on glyphosate-based
11  formulation and found that there was strong evidence of
12  genotoxicity; correct?
13  A.  Correct.
14  Q.  Does that change your opinion that a key reason
15  that IARC found strong evidence of genotoxicity is that
16  it considers studies on glyphosate-based formulations
17  whereas EPA did not?
18  A.  No, it doesn't change my opinion.
19  Q.  Why not?
20  A.  Because the -- the impact in IARC's overall
21  evaluation of the genotox database of the studies in
22  directly exposed human populations and the various in
23  vitro studies with formulated glyphosate-based
24  herbicides were, you know, among the studies that in
25  their narrative discussion and in their summary

Page 75

1  rationale statement, that the IARC Working Group pointed
2  to as very, very important.
3        So, you know, I -- I think it's impossible to
4  read the IARC Working Group discussion of the genotox
5  database without being fully aware that the working
6  group placed considerable weight in its overall judgment
7  on the studies involving the formulated glyphosate-based
8  herbicides.
9        And, you know, I think, you know, as I intimate
10  in my -- in my expert report, had IARC not looked at any
11  of the formulated studies, it still may have -- as it
12  said, they felt that the data was strong on glyphosate,
13  pure glyphosate or glyphosate technical, but still I
14  think it had -- the data on formulated glyphosate-based
15  herbicides, particularly data that arose from sort of
16  real-world studies of exposed populations, were very
17  important in their overall evaluation.
18  Q.  I want to parse that a little bit.  Is it your
19  contention that IARC relied on studies, genotoxicity
20  studies of formulated products, in reaching its
21  conclusion that glyphosate technical was genotoxic?
22  A.  Well, that's an interesting question, and it's
23  a very complex question.  I mean, both in the case of
24  the EPA and in IARC, there -- there is -- there is an
25  appropriate consideration of insights and data from

Page 76

1  studies on glyphosate-based formulations in assessing
2  glyphosate technical and vice versa.  So it's -- it
3  would be artificial to build a fence between the two
4  data sets and say that they're completely irrelevant to
5  assessment of the other one.
6        So I -- you know, I think they -- they
7  were -- they took into account the overall data on both
8  glyphosate technical and formulated glyphosate-based
9  herbicides.
10  Q.  What are you relying upon for your contention
11  that they took into account the overall data on both
12  glyphosate technical and formulated glyphosate herbicides in
13  determining that glyphosate technical was genotoxic?
14  A.  Just reading the report.
15  Q.  So that just comes from this Monograph 112?
16  A.  Volume 112.
17  Q.  That's where your --
18  A.  Correct.
19  Q.  Let's turn back to your report.  I'm sorry,
20  let's turn to the OPP report, page 100.
21  A.  Okay.  I have it.
22  Q.  And what I'm referring to are Tables 5.1
23  through 5.7, and they go from page 100 through --
24  A.  120 --
25  Q.  Looks like page 125, I believe.

Page 77

1  A.  Yeah, I was going to say 126, but my memory was
2  not exactly correct.
3  Q.  If one were to count up all the studies listed
4  in these tables, it would be significantly more than 40;
5  correct?
6  A.  If one were to count up the assays.
7  Q.  The assays, yes.
8  A.  Yes.  Correct.
9  Q.  And the reason I'm referring to 40 is that you
10  state in your report that EPA considered 40 of the
11  approximately 55 studies of glyphosate in mammalian
12  systems that IARC considered; correct?
13  A.  Correct.
14  Q.  So have you counted up how many studies EPA
15  cited in these tables?
16  A.  Yes.
17  Q.  How many?
18  A.  I don't recall the number off the top of my
19  head.  I've done a very thorough analysis of Tables 5.1
20  to 5.7 and a comfortable analysis of the IARC tables.
21  Q.  I'll represent to you that the number is 84,
22  that there are 84 --
23  A.  Assays.
24  Q.  -- assays listed in Tables 5.1 through 5.7.
25  Does that sound about right?

Confidential - Charles Benbrook, Ph.D.

Page 78

1    A.   Uh-huh.  It does.

2    Q.   And by my count, if you look at the comparable

3   tables in the IARC report, they considered 21 assay

4   results on glyphosate technical.

5        Does that sound about right?

6    A.   No.  I don't think so.

7    Q.   Okay.  Do you want to -- we can go to the

8   report, if you'd like.  So if you look at the IARC

9   monograph.

10   A.   Let's see.  I'm going to try to --

11   Q.   And I should say 21 studies on glyphosate

12  technical in mammalian systems.

13   A.   Oh, okay.  Well, that's slightly different.

14   Q.   I apologize, yes.  That was my --

15   A.   That sounds about right.

16   Q.   Okay.  So just to restate that, so IARC looked

17  at approximately 21 studies on glyphosate technical in

18  mammalian systems; correct?

19   A.   Correct.

20   Q.   So EPA reviewed roughly four times as many

21  studies on glyphosate technical in mammalian systems;

22  correct?

23   A.   Correct.

24   Q.   In your analysis, you didn't take into account

25  studies cited by EPA but not by IARC; correct?

Page 79

1        Your analysis didn't look at studies cited by

2   EPA but not IARC; correct?

3    A.   Yes, I did.

4    Q.   Well, when you're counting up the studies and

5   saying EPA considered 40 of the approximately 55, you're

6   only looking at studies that IARC considered and then

7   evaluating whether EPA considered them, as well;

8   correct?

9    A.   Can we parse that out a little bit?

10   Q.   Sure.  In your report you state that

11  IARC -- strike that.

12       In your report you state that EPA considered 40

13  of the approximately 55 studies in mammalian systems

14  that IARC considered; correct?

15   A.   Yes.

16   Q.   Those 40 studies are only ones that IARC

17  considered; correct?

18   A.   Those are 40 studies that IARC considered and

19  predominantly peer-reviewed published studies.

20   Q.   So in that calculation, you're not taking into

21  account studies that EPA considered but IARC did not;

22  correct?

23   A.   I -- I didn't report that number, but I could

24  have.  It's in the -- you know, it would be -- it would

25  come out of the tables I generated, yes.

Page 80

1    Q.   So you didn't report that number in the results

2   of your analysis; correct?

3    A.   Not in -- not in the expert report, no.

4    Q.   Why not?

5    A.   I don't know.  I mean, I was trying to be as

6   thrifty as possible with the length of the report.

7    Q.   So in your opinion, it wasn't important to your

8   analysis that EPA had considered more studies on

9   glyphosate technical in mammalian systems than IARC did?

10   A.   It was certainly not important that EPA had

11  considered approximately 23 or 24 reverse bacterial

12  mutation studies on glyphosate technical.  One of the

13  features of the -- surprising features of the genotox

14  database that EPA reviewed was that bacterial reverse

15  mutation studies account for almost half of the overall

16  number of studies across all categories of genotoxicity

17  when EPA data requirements call for only one study, one

18  bacterial reverse mutation study in technical using a

19  pure -- pure technical active ingredient.

20       So it was clear that, for whatever reason,

21  Monsanto and the other registrants conducted

22  approximately two dozen reverse bacterial mutation

23  studies and included those in the evaluation.  And it's

24  certainly my assessment and, I think, the assessment of

25  the IARC Working Group and others that those additional

Page 81

1   negative bacterial reverse mutation studies didn't add a

2   lot of new information to the database.

3    Q.   I just, while we were sitting here, counted it

4   up and it looks like there are 27 bacterial reverse

5   mutation assays cited in the EPA report.

6        Does that sound about right?

7    A.   Sounds about right, yep.

8    Q.   So that means there's another 57 studies,

9   genotoxicity studies on glyphosate technical, that were

10  cited in the EPA report?

11   A.   I'd have to pull out all my detailed sheets to

12  get the exact number, but -- and don't forget, you know,

13  in -- in some of the questions and some of my analysis,

14  I -- I do include the bacterial reverse mutation studies

15  on the formulated product too.  So it gets -- it's a lot

16  of numbers and a lot of categories and it can be a

17  little confusing.

18   Q.   Understood.  But there are -- would you agree

19  that there are a large number of studies -- strike that.

20       Would you agree that there are more than 40

21  studies that EPA considered on glyphosate technical that

22  IARC did not consider?

23   A.   Yes, I would agree with that.

24   Q.   Would you agree that there are more than 50

25  studies on glyphosate technical that EPA considered that

Confidential - Charles Benbrook, Ph.D.

Page 82

1 IARC did not consider?
2    A.  I'd have to check.  That's getting right up at
3 the precise number.
4    Q.  You state in Appendix C of your report -- and I
5 don't think you need to turn there, but feel free --
6 that you recorded the results in an Excel spreadsheet.
7    A.  Yes.
8    Q.  Do you still have those files?
9    A.  Yes.
10    Q.  Is it a single file or multiple files?
11    A.  It's a single workbook, and there is a
12 worksheet for each of the tables, and the worksheets are
13 linked together analytically so that the counts are
14 automatically done, the summary counts.  And I think I
15 explain in the Appendix C methodology section the
16 information that I moved into the spreadsheets.
17    Q.  Have you produced those spreadsheets in this
18 litigation, as far as you're aware?
19    A.  No.
20    Q.  But you'd be able to do that if asked?
21    A.  Yes.
22    Q.  In your report you also performed what I read
23 as a separate analysis of regulatory genotoxicity
24 studies as compared to genotoxicity studies published in
25 peer-reviewed journals; is that accurate?

Page 83

1    A.  Yes.
2    Q.  You state in your report that you identified
3 registrant-commissioned regulatory studies from EPA's
4 2016 report and Monsanto-commissioned genotoxicity
5 review articles; correct?
6    A.  Yes.
7    Q.  Which Monsanto-commissioned genotoxicity review
8 articles are you referring to?
9    A.  Williams 2000, Kier 2013, Kier and Kirkland
10 2015 and Brusick, et al., 2017.  I think Heydens too,
11 Heydens, et al., 2018.
12    Q.  How did you determine that a study was a
13 registrant-commissioned regulatory study?
14    A.  By a lot of work, a lot of work.  So all of the
15 registrant studies that are in the September 2016 EPA
16 report have a full bibliographic citation, and all of
17 the registrant studies have an MRID number and none of
18 the public studies do.  So that was a primary way.
19        Another way that I did it was that the same
20 scientist has conducted multiple of the registrant
21 studies, so I assumed that if a scientist -- if I had in
22 the bibliography MRID -- MRID numbers for six studies
23 that this particular scientist did and there was another
24 study referenced in the table but it didn't have
25 an -- it didn't cite an MRID number, I assumed that it

Page 84

1 was still a registrant-submitted study, particularly in
2 the absence of a -- in the bibliographic entry, a
3 reference to a journal where it was published.
4        Between the bibliography in the IARC report,
5 the bibliography in the EPA report and in searching on
6 the internet, I -- I was able to accurately identify, I
7 believe, the registrant-submitted studies compared to
8 the peer-reviewed studies.
9    Q.  You're drawing a distinction between
10 registrant-submitted studies and peer-reviewed studies?
11    A.  Yes, sir.
12    Q.  It's possible, right, that a registrant, such
13 as Monsanto or some other company could conduct a study
14 and submit it to a peer-reviewed journal; correct?
15    A.  Yes.
16    Q.  In those cases, did you count that as a
17 registrant study or a peer-reviewed study?
18    A.  As I explained before, the spreadsheets were
19 built off of the core tables in the EPA report and in
20 the IARC report, so if a study was in -- in the
21 bacterial reverse mutation table in the EPA report, I'd
22 move that study in and then I determined whether it was
23 a registrant study, submitted study, or whether it
24 appeared in a peer-reviewed journal.
25        Now, it's possible that there may have

Page 85

1 been -- you know, it's possible that there may have been
2 a study where there was a registrant-submitted version
3 of it and then the scientist also published it, but
4 I -- I don't think that's the case because if that had
5 been the case, such a study would have been referenced
6 in either the Williams, et al., review or the Kier and
7 Kirkland review or the Brusick review, and I'm sure that
8 they would have referenced the peer-reviewed version of
9 it, and I didn't find any -- I don't recall any examples
10 of that off the top of my head.  Although, you know,
11 it's possible that I might have missed one.
12    Q.  And I'm just trying to understand.  If Monsanto
13 conducts a study not for regulatory purposes, they
14 conduct a study and submit it to a peer-reviewed
15 journal, what category did you put it in, the regulatory
16 study side or the published literature side?
17    A.  I know of no such study.
18    Q.  Let's say any registrant, not Monsanto.  Any
19 company conducts a study, they submit it to a
20 peer-reviewed journal, does that go in the registrant
21 side or the peer reviewed?
22    A.  It goes in the peer-reviewed side.  And there
23 would be -- there would be a citation to it with the
24 volume of the journal and it would be a public study.
25    Q.  Are you aware of any studies on the registrant

Confidential - Charles Benbrook, Ph.D.

Page 86

1  regulatory genotoxicity study side that does not have an
2  MRID number?
3      A.  I can't cite any right off the top of my head.
4  The -- I think the EPA is pretty thorough in putting
5  MRID numbers on all registrant-submitted studies.
6      Q.  So would it be fair to say, at least sitting
7  here today, you're not aware of any of the studies that
8  you considered registrant-submitted that did not have an
9  MRID number?
10     A.  Actually, I think there are a few in the
11  bibliography, and these were the ones that I struggled
12  with where, for one reason, in the bibliographic
13  citation in the EPA report there wasn't an MRID number.
14         But in those cases, I searched further, and
15  often I was able to find a citation in usually Williams,
16  et al., because Williams, et al., is a paper that came
17  out in 2000 and summarized the early -- the early
18  studies that Monsanto conducted and submitted to the
19  agency.
20         I think most of these issues about the
21  completeness of the bibliographic citation and the EPA
22  report were on 1980s -- circa 1980s studies that were
23  done and, you know, I think sometimes EPA was reminded
24  of them or became aware of them through the Williams, et
25  al., paper, and they sort of say that in their report.

Page 87

1      Q.  Presumably you have a spreadsheet or other
2  record of which studies you put in the
3  registrant-submitted category and which studies you put
4  in the public literature category; is that correct?
5      A.  Of course.  That's a data field in the -- in
6  the workbook.
7      Q.  So from that report, one would be able to
8  identify how you categorize any particular study;
9  correct?
10     A.  Yes.
11     Q.  And again, that's something that you still have
12  available on your computer?
13     A.  Yes.
14         MR. KRISTAL:  Hasn't been deleted in the last
15  two minutes?
16         MR. FAYNE:  We're talking about a different
17  analysis.  I'm not sure we've established that it's the
18  same spreadsheet.
19         MR. KRISTAL:  Fair enough.
20     Q.  (BY MR. FAYNE:)  Is it the same spreadsheet?
21     A.  It's not the same spreadsheet.  It's in the
22  same workbook.
23     Q.  Different tab of the same workbook?
24     A.  Correct.
25     Q.  So you also state that you've identified

Page 88

1  studies published in the public literature; correct?
2      A.  Correct.
3      Q.  And these are studies that were cited either in
4  EPA's 2016 report or the IARC monograph?
5      A.  Correct.
6      Q.  Did you find any other -- strike that.
7         Other than the studies cited in EPA's 2016
8  report and in the IARC monograph, did you consider any
9  other studies in the public literature as part of this
10  analysis?
11     A.  If you -- if by "this analysis" you mean my
12  comparison of the genotox studies cited in the
13  September 2016 EPA report relative to Volume 122 IARC
14  monograph, the answer would be yes.
15     Q.  No.  That wasn't my question.  So my
16  question -- and maybe it will be helpful to turn to your
17  report.
18     A.  Let me explain.
19     Q.  Please.
20     A.  When you say "this analysis," what do you mean?
21  Do you mean my overall analysis of genotoxicity or my
22  analysis of the comparing the two?
23     Q.  What I'm referring to is your analysis of what
24  you referred to as registrant-commissioned studies
25  versus public-literature studies on genotoxicity.

Page 89

1      A.  Okay.
2      Q.  So I am trying to understand how you identified
3  which studies were, quote/unquote, public-literature
4  studies.
5         MR. KRISTAL:  So do you want to ask the
6  question again --
7         MR. FAYNE:  Yes.
8         MR. KRISTAL:  -- now that --
9      Q.  (BY MR. FAYNE:)  So with that understanding,
10  you cite that -- you state that studies cited either in
11  EPA's 2016 report or the IARC monograph were considered
12  public lit -- strike that.
13         You identified public-literature studies from
14  EPA's 2016 report and the IARC monograph; correct?
15     A.  And the five literature reviews done by
16  Monsanto.
17     Q.  If you could turn to page 68 of your report.
18     A.  Paragraph 68 or page?
19     Q.  Paragraph 68.  Thank you.
20     A.  Okay.
21     Q.  The second sentence of that paragraph states,
22  "Likewise, all studies published in peer-reviewed
23  journals that were cited by EPA and/or the IARC Working
24  Group were analyzed, along with whether they reported
25  'positive' or 'negative' genotoxicity results."

Confidential - Charles Benbrook, Ph.D.

Page 90

1  A.  Correct.

2  Q.  Did I read that correctly?

3  A.  Yep.

4  Q.  If I understand your testimony today, you also

5  looked at the Monsanto review articles to identify

6  public literature studies; is that correct?

7  A.  May I read the first sentence --

8  Q.  Yes.

9  A.  -- in paragraph 68?

10  Q.  Yes.

11  A.  "All regulatory studies cited in the

12  September 26 EPA report or in a Monsanto-commissioned

13  genotoxicity review article were analyzed relative to

14  'positive' or 'negative' results.  Likewise, all studies

15  published in peer-reviewed journals that were cited by

16  EPA and/or the IARC Working Group were analyzed along

17  with whether they reported 'positive' or 'negative'

18  genotoxicity results."

19  Q.  Right.  So, again, this is not a trick at all.

20  I'm just trying to understand.  As I read this, you

21  identified regulatory studies from the EPA report and

22  from Monsanto-commissioned genotoxicity review articles;

23  correct?

24  A.  Yes.

25  Q.  And you identified public literature studies

Page 91

1  from the EPA report and the IARC Working Group report;

2  correct?

3  A.  And I think there were a couple that were also

4  identified in the Monsanto-commissioned reviews.

5  Q.  Okay.  And that's all I'm trying to

6  understand --

7  A.  Okay.  Yeah.

8  Q.  -- is that you also looked to those reviews --

9  A.  Yep.

10  Q.  -- to identify public literature articles;

11  correct?

12  A.  Yes.  It was a comprehensive analysis.

13  Q.  How did you determine whether studies reported

14  a positive or negative genotoxicity result?

15  A.  By what the authors of the study said.  And

16  typically in the abstract.

17  Q.  Did you rely on EPA's or IARC's

18  characterization of the studies to do that?

19  A.  Yes, absolutely, and that's, you know, often

20  what EPA and IARC did.

21  Q.  Were there any instances in which EPA and IARC

22  characterized a study differently in terms of its

23  genotoxic result?

24  MR. KRISTAL:  You mean differently from what

25  Dr. Benbrook characterized it or differently from each

Page 92

1  other had?

2  MR. FAYNE:  Sure.  I'll clarify the question.

3  Q.  (BY MR. FAYNE:)  Are there any instances in

4  which EPA and IARC characterized a genotoxicity study

5  differently than each other?

6  A.  I think there are one or two examples where

7  IARC considered a result indeterminate.  They just

8  couldn't -- couldn't -- weren't -- they weren't

9  convinced that a study reported either positive or

10  negative results, and I -- I can't remember if in maybe

11  one or two cases EPA had reported the study as positive

12  or negative.  There might be one or two cases.

13  Q.  In those cases, how did you resolve the

14  conflict?

15  A.  I stuck with what each -- if EPA said that the

16  study was positive, then I reported it in the EPA table

17  as "positive," and if IARC said it was indeterminate,

18  then I put "indeterminate."

19  Q.  I understand in terms of your EPA versus IARC

20  comparison, but right now we're talking about your

21  registrant-commissioned versus public literature

22  comparison.  I know that was a lot of terminology in

23  that sentence.  But I'm trying to understand -- let

24  me -- strike that.  Let me give you a more precise

25  example.

Page 93

1  Okay.  So if you turn to paragraph 71 of your

2  report.  You state that, "Of the 52 regulatory studies

3  assessing the genotoxicity of glyphosate technical, only

4  one reported a positive result, while 35 of the

5  public-literature studies reported positive evidence of

6  genotoxicity."

7  Other than the parenthetical I skipped, did I

8  read that correctly?

9  A.  Yes.

10  Q.  So if EPA identified a study as having a

11  positive result and IARC identified the same study as

12  indeterminate, did you treat that as a positive result

13  or as indeterminate in this calculation?

14  A.  As I said, the worksheets within the workbook

15  are driven precisely by what's in the tables.  In the

16  case of the EPA worksheets, the September 26th -- 2016

17  report, and in the case of IARC, the Volume 112.  So if

18  there was such an example, I recorded it -- I recorded

19  the information as each of the respective organizations

20  stated it.

21  Q.  But when you're reporting the results of these

22  studies, which you've gathered from two different

23  places, how did you determine whether to report the

24  result as a positive result or, I guess, in this case, a

25  non-positive result?

Confidential - Charles Benbrook, Ph.D.

Page 94

1  A.  I don't think that that situation ever arose.
2 I mean, it's just not a -- it's not something that I
3 dealt with, I had to deal with.  You know, I understand
4 that, you know, there -- I vaguely remember there was
5 one instance, and I don't -- I don't think it affected
6 the analysis in any way because of the way I structured
7 the workbooks.
8  Q.  Okay.  So you're not sure, sitting here today,
9 whether there was an instance where EPA classified a
10 result as negative and IARC classified the same assay as
11 positive?
12  A.  There were no instances of that.  I believe
13 there might have been one instance for one assay where
14 IARC's -- IARC classified it as indeterminate and EPA
15 classified it as I don't remember whether it was
16 positive or negative.  And I actually -- I don't -- I'd
17 have to go back and look.
18      I might have just eliminated that one from the
19 overall count because -- for this -- for this particular
20 part of the analysis because, you know, you're right,
21 there's a conflict there.
22  Q.  Is it possible that you've included in these
23 results a study that EPA characterizes positive that
24 IARC found was indeterminate?
25  A.  No.

Page 95

1      MR. KRISTAL:  And by "these results," you meant
2 the count that we're talking about here?
3      MR. FAYNE:  The counts.
4      MR. KRISTAL:  No.
5      MR. FAYNE:  Yes.  Yes.
6      MR. KRISTAL:  The count in paragraph 71?
7      MR. FAYNE:  Sure.  And again, I don't
8 want -- that was an example, but I'm really referring to
9 the counts in paragraph -- paragraphs 70 through 73.
10      MR. KRISTAL:  Fair enough.
11  Q.  (BY MR. FAYNE:)  And it's your -- the testimony
12 we -- the topics we've been discussing previously, that
13 applies to all these paragraphs; correct?  You weren't
14 referring specifically to paragraph 71?  Strike that.  I
15 can ask a more clear question.
16      When you were indicating that you're only aware
17 of maybe one instance where there was a conflict between
18 the two, that's across all of the different categories
19 of regulatory studies, public-literature studies,
20 glyphosate technical, glyphosate-based formulations;
21 correct?
22  A.  Yes, sir.
23  Q.  In putting together these counts, did you do
24 any analysis -- strike that.
25      In doing these counts, did you take into

Page 96

1 account whether EPA or IARC raised concerns about the
2 reliability of a study?
3  A.  I recorded the information as it was presented
4 in the tables.  You know, there are -- there are
5 comments in -- in the results section of the EPA tables.
6 For example, where it says "results," you will encounter
7 some assays where EPA will say positive or negative, and
8 then there will be some additional information,
9 "positive at the highest dose tested," or something of
10 that nature.
11      I -- I absolutely was thorough in capturing
12 whether EPA or IARC, for a given assay, characterized it
13 as negative or positive, but I did not strive to move
14 into the spreadsheet the sort of the caveats or the
15 additional information.
16  Q.  So if, let's say, EPA and IARC both
17 characterize a certain study as positive, you would, in
18 your results, count that as a positive study; correct?
19  A.  For both, correct.
20  Q.  And you would not go back to look to see
21 whether EPA or IARC said we have concerns about the
22 reliability of this study; correct?
23  A.  It -- if EPA or IARC put a study in one of its
24 tables, I think the -- it's a fair read of the reports
25 that they regarded those studies to be of sufficient

Page 97

1 quality to report a result.
2  Q.  Understood.  But if it was in the tables, you
3 didn't go back to the narrative to see whether they had
4 any commentary about the strength of the results or
5 whether they were reliable; correct?
6  A.  I understand your question now.
7      Well, you know, of course I carefully read the
8 narrative several times.  I didn't strive to incorporate
9 any further discussion or assessment of study quality
10 in -- in my accounting that we've been talking about in
11 these paragraphs.
12  Q.  Correct.  And again, I'm just referring to your
13 counting in these paragraphs.  So in your counting, you
14 didn't go back to the narrative to see if EPA or IARC
15 said there are limitations for this study; correct?
16  A.  Correct.
17  Q.  If it was reported as positive in the table,
18 you included it in your count?
19  A.  Correct, or negative.
20  Q.  Or negative, correct.
21  A.  Right.
22  Q.  Similar question.  Did you yourself perform any
23 assessment of the studies listed in your count to
24 determine whether they were well-designed quality
25 studies?

Confidential - Charles Benbrook, Ph.D.

Page 98

1    A.  Yes, I did.
2    Q.  And did you exclude any studies on the basis
3  that you didn't believe them to be well-designed?
4        MR. KRISTAL:  In the count?
5        MR. FAYNE:  In the count, yes.
6        THE WITNESS:  No.  I stuck with what EPA
7  reported in the tables and what IARC reported in the
8  tables, but I wanted to understand more thoroughly how
9  some of the studies were designed, what some of the
10  issues were.  I was interested in dose levels in some
11  cases.  So I have a printout of essentially every single
12  published genotox study in these tables.  It's quite a
13  thick file.
14        And as you note in my reliance list in the
15  genotox bibliography, all of those studies are included
16  in it.
17    Q.  (BY MR. FAYNE)  But you did not exclude any
18  studies from your count based on your review of the
19  study design; correct?
20    A.  Correct.
21        MR. KRISTAL:  We've been going about another
22  hour.
23        MR. FAYNE:  Give me three more minutes.
24        MR. KRISTAL:  Take five.
25        THE WITNESS:  I'm good.

Page 99

1        MR. FAYNE:  You're good?
2        THE WITNESS:  I'm good.
3        MR. KRISTAL:  Well, if you want to keep going,
4  then I'll hand the microphone to Pedram while I step out
5  for a minute.
6        THE WITNESS:  We could probably power through
7  to lunch.
8        MR. KRISTAL:  That's fine.
9    Q.  (BY MR. FAYNE)  So if you look at paragraph 70
10  through 73 of your report.
11    A.  Okay.
12    Q.  In these paragraphs you report the results of
13  your counting of regulatory studies versus studies
14  published in the scientific journals; correct?
15    A.  Correct.
16    Q.  And just to confirm, in these counts listed in
17  these paragraphs 70 through 73, if a study was included
18  in the IARC and EPA tables, it was included in these
19  counts; correct?
20    A.  That is correct.
21    Q.  You did not exclude any based on your own
22  review of the studies?
23    A.  Correct.
24    Q.  Can you turn to paragraph 75 of your report?
25        So as part of this analysis of regulatory

Page 100

1  studies versus public-literature studies, you also did a
2  review of when the various studies were conducted;
3  correct?
4    A.  I did.
5    Q.  And you state in paragraph 75 that "In terms of
6  in vivo chromosomal aberration studies on glyphosate
7  technical, the most recent registration study was
8  completed in 1994, while two of three public-literature
9  studies were done in 2012."
10    A.  Correct.
11    Q.  If you turn to the EPA or IARC report,
12  whichever your preference -- I'm just trying to identify
13  what those two studies conducted in 2012 are because I
14  wasn't able to find them in the tables.
15    A.  Okay.  So we're in vivo chromosomal aberration.
16  Let's see.  Probably -- let's start here.
17        MR. ESFANDIARY:  Are you referring to IARC or
18  the EPA's report?
19        MR. FAYNE:  Either.
20        MR. ESFANDIARY:  All right.
21        THE WITNESS:  So you want the more recent ones?
22        MR. FAYNE:  I'm just trying to understand what
23  the two in vivo chromosomal aberration studies on
24  glyphosate technical that were done in 2012 --
25        THE WITNESS:  Okay.

Page 101

1        MR. FAYNE:  -- what you're referring to.
2        THE WITNESS:  All right.  So the in vivo test
3  in the EPA report at Table 5.5 -- and you'll see it's
4  1983, 1982, 1994, 1990 and 1992.  So in the -- in the
5  IARC report -- and it gets confusing because of, course,
6  they -- their taxonomy of genotoxicities doesn't track
7  exactly the way that EPA did it.  Whoops.
8        So the -- in Table 4.2 of the IARC report,
9  which is page 49, there's a Koller, et al., 2012.
10        MR. FAYNE:  Uh-huh.
11        THE WITNESS:  And on the next page there's
12  another assay from the -- I assume the same study by
13  Koller, yeah, also published in 2012.
14    Q.  (BY MR. FAYNE)  So you're referring to
15  Table 4.2; correct?
16    A.  Correct.
17    Q.  So the first Koller, et al., study from 2012 is
18  looking at DNA damage and in particular DNA-strand
19  breaks and SCG assay; correct?
20    A.  Yes.
21    Q.  And your contention is that that is an in vivo
22  chromosomal aberration study?
23    A.  These are in vitro.  Did you ask me about in
24  vivo?
25    Q.  I'm just reading paragraph 75 of your report.

Confidential - Charles Benbrook, Ph.D.

Page 102

1    A.  Okay.
2    Q.  Well, yes, in vivo chromosomal aberration.
3    A.  Okay.  Then we got to go to a different table.
4  Sorry.
5        And is it in humans or non-humans?
6  Non-mammalian?  Send me -- oh, okay.  So we're talking
7  about paragraph 75; right?
8        In vivo chromosomal aberration.  Okay.  So that
9  starts here.  Sorry.  It's taking me a little while to
10  remember how they organized all of this.
11        MR. KRISTAL:  Well, it's more important to get
12  it correct than quick.
13        THE WITNESS:  Okay.  Let me use a few minutes
14  of my lunchtime to find them; okay?
15        MR. FAYNE:  Sure.  We can come back to it.
16    Q.  (BY MR. FAYNE:)  So let's turn to paragraph 79
17  of your report.
18    A.  Okay.
19    Q.  You state, "Based on the above analysis, I
20  conclude that the dramatic differences in the results of
21  genotoxicity assays reported in registrant-sponsored
22  studies, in contrast to assay results appearing in
23  peer-reviewed journals, arise from the state-of-science
24  when various studies were conducted, coupled with the
25  generally more sensitive assay systems used by the

Page 103

1  scientists publishing their results in peer-reviewed
2  journals."
3        Did I read that correctly?
4    A.  Correct.
5    Q.  So if I understand your opinion correctly,
6  you're citing two reasons that the genotoxicity assays
7  reported in the registrant-sponsored studies differ from
8  those appearing in peer-reviewed journals; correct?
9    A.  Correct.
10    Q.  And the first is the time when the studies were
11  conducted?
12    A.  Correct.
13    Q.  And the second is that the public literature
14  studies generally use more sensitive assay systems;
15  correct?
16    A.  Correct.
17    Q.  What are the more sensitive assay systems that
18  you're referring to?
19    A.  Any assay system other than a bacterial reverse
20  mutation study, and this is because of the well-known
21  fact that bacteria don't have mitochondria and
22  glyphosate targets mitochondria.
23        So it is no surprise to many scientists in the
24  field that bacterial reverse mutation studies on both
25  glyphosate technical and formulated glyphosate-based

Page 104

1  herbicides are predominantly negative, and so, hence,
2  they're not as sensitive an assay to detect DNA damage
3  of various sorts and other mechanism of genotoxicity.
4        So I would characterize, in effect, all of the
5  other assay systems as more sensitive simply because of
6  this particular quirk of that bacteria don't have
7  mitochondria.
8    Q.  So you would characterize -- just to make sure
9  I understood what you just said, any assay other than
10  the bacterial reverse mutation assay is what you would
11  characterize as more sensitive; correct?
12    A.  Correct.
13    Q.  So just going through the EPA tables, in vitro
14  mammalian gene mutation assays, those would be
15  considered more sensitive?
16    A.  Correct.
17        MR. KRISTAL:  Maybe if we just speak a little
18  more slowly.
19        MR. FAYNE:  Yes, I will do that.
20    Q.  (BY MR. FAYNE:)  In vitro tests for chromosome
21  aberrations in mammalian cells, that would be a more
22  sensitive assay?
23    A.  Yes, sir.
24    Q.  In vitro tests for micronuclei induction in
25  mammalian cells --

Page 105

1    A.  Correct.
2    Q.  -- that would be more sensitive?
3    A.  Yes, more sensitive, certainly.
4    Q.  Is it a fair characterization of your report to
5  interpret the term or the phrase "more
6  sensitive" -- "more sensitive assay system" to mean any
7  assay system other than a bacterial reverse mutation
8  assay?
9    A.  Certainly among the assay systems that are
10  covered in the September 2016 EPA report and the IARC
11  report.  There are other genotox assay systems that
12  haven't been deployed in the assessment of glyphosate
13  technical and GBH and genotoxicity, and I haven't
14  reviewed all those and I'm not prepared to opine whether
15  they're all more or less sensitive.
16        And it obviously becomes very complicated when
17  you start assessing some of the genotox systems in
18  non-mammalian organisms, earthworms and fish and et
19  cetera.
20    Q.  Would you agree that EPA considered all of
21  these more sensitive assay systems in its 2016 and now
22  2017 reports?
23    A.  They considered a few registrant-submitted
24  studies in some of the categories and several in a few
25  others, yes.

Confidential - Charles Benbrook, Ph.D.

Page 106

1  Q. Which categories -- strike that.
2      Which types of more sensitive assay systems did
3  EPA not consider?
4  A. Well, certainly the direct DNA damage in
5  exposed human populations, the EPA didn't consider any
6  of those studies. That's the table we looked at before
7  with the four.
8      In the -- and we can go through each one of
9  them and I'll characterize the differences, if you'd
10 like.
11 Q. Well, I'm just trying to understand. We just
12 walked through a number of more sensitive assay systems
13 the EPA did consider; correct?
14 A. EPA considered at least a few genotox assays in
15 each of the categories, but in several of the categories
16 they -- they considered a far fewer number than the IARC
17 Working Group.
18 Q. Would you agree that EPA considered some
19 studies in each of the more sensitive assay categories
20 on glyphosate technical?
21 A. Yes.
22 Q. You state in paragraph 78 of your report that
23 "In my opinion, assays designed to detect direct damage
24 to DNA in humans following exposure to a formulated
25 glyphosate-based herbicide are the most important in

Page 107

1  evaluating glyphosate and glyphosate-based herbicide
2  genotoxicity."
3      Did I read that correctly?
4  A. Yes.
5  Q. What is the basis of your opinion that assays
6  designed to detect direct damage to DNA are the most
7  important?
8  A. The emphasis placed on them by the IARC Working
9  Group and the fact that they are based on real-world
10 exposure levels that some exposed human population
11 actually incurred.
12 Q. And again, so when we're -- when you're
13 referring to assays designed to detect direct damage to
14 DNA in humans, you're referring to those five assays in
15 the first IARC table?
16 A. Yes.
17 Q. And that's the Bolognesi 2009 and the
18 Paz-y-Mino studies?
19 A. Correct.
20 Q. Can you identify a peer-reviewed journal or
21 other source that suggests that assays designed to
22 detect direct damage to DNA are the most important in
23 evaluating genotoxicity?
24 A. Well, as we -- as we've discussed --
25     MR. KRISTAL: Did you mean -- well, I object to

Page 108

1  the form unless you're tracking paragraph 78. Direct
2  damage to DNA in humans. In other words, are you
3  switching the --
4      MR. FAYNE: No. I'll ask the question again,
5  but I'm tracking paragraph 78.
6      MR. KRISTAL: That's what I thought, but
7  technically the question didn't include "in humans,"
8  so...
9      MR. FAYNE: Sure.
10     THE WITNESS: So could you restate it?
11     MR. FAYNE: I'll repeat the question.
12     THE WITNESS: Thank you.
13 Q. (BY MR. FAYNE:) Can you identify a
14 peer-reviewed journal or other source, other than the
15 IARC monograph, that supports your opinion that assays
16 designed to detect direct damage to DNA in humans
17 following exposure are the most important in evaluating
18 genotoxicity in humans?
19 A. That's a very widely shared view. There are
20 multiple peer-reviewed articles, including some that I
21 am co-author of, that make essentially that statement
22 and say that, to the extent that such studies are
23 available in exposed human populations, they -- they
24 clearly are the most relevant because they -- they avoid
25 trying to interpolate from an in vitro study involving

Page 109

1  cells to an actual human body that's alive and is
2  metabolically and physiologically active. That's
3  obviously the most relevant study system, if you will,
4  to try to understand the impact of any toxic chemical on
5  human beings.
6  Q. As we discussed previously, EPA listed the
7  studies that you referred to that were cited by IARC in
8  Appendix D of its report assigning them a low quality
9  evaluation; correct?
10 A. That's correct.
11 Q. Going back to the peer-reviewed journal
12 question. You testified that there's a whole large
13 number of studies that express that view. Can you
14 identify for me one that you were not an author or a
15 co-author of?
16 A. That expresses that view?
17 Q. Yes.
18 A. Well, let's see. There's a -- if you're going
19 to ask me to, from memory, identify a peer-reviewed
20 study that says that in exactly those words, I'm not
21 prepared to do that, but I will be glad to find several
22 that make that point, you know, but perhaps not in those
23 exact words. It's not a -- it's not a -- I don't think
24 you'll find any expert that would argue with that point.
25 Q. But sitting here today, you're not able to

Confidential - Charles Benbrook, Ph.D.

Page 110

1 identify a study that expresses that viewpoint; correct?
2    A.  Yes, I am able.  If you want to give me the
3 time to do it, I'll get online and I'll find them.
4    Q.  Well, we can look at your reliance list, if
5 you'd like.  You've got a number of studies cited there.
6 Are there any studies cited on your reliance list that
7 express that viewpoint?
8    A.  Again, I know -- I know where this is headed,
9 and you're -- you're going to ask me to identify
10 essentially that sentence, and if it's not there in
11 exactly those words, then you're going to object.
12    So I -- I stand by my statement that it's a
13 widely shared view and there are, you know, several
14 peer-reviewed studies that -- that articulate that in
15 the body of the -- the paper.
16    Q.  And I'll ask the question again just because I
17 don't think you've answered it yet.
18    That sitting here today, you cannot identify a
19 study that you were not the author or --
20    A.  You're kind of eating up my lunch.  I'll pull
21 out my computer.
22    MR. KRISTAL:  No, no.  You don't have to do
23 anything --
24    MR. FAYNE:  I'm not asking you to do that.
25    MR. KRISTAL:  -- on your dime.  If he wants you

Page 111

1 to look it up now as you sit here, we can do that.
2    THE WITNESS:  Okay.  I'll go to my room
3 and I'll do it.
4    Q.  (BY MR. FAYNE:)  No, I don't want you to look
5 it up right now.  I'm just asking you as you sit here
6 right now, without having looked it up, are you able to
7 identify one?
8    A.  No, I'm not.
9    Q.  If you look in Table 5.7 of the EPA report.
10    A.  Page, please.
11    Q.  Page 122.
12    A.  Okay.  I'm there.
13    Q.  This lists a number of assays for detecting
14 primary DNA damage; correct?
15    A.  Correct.
16    Q.  When you refer to direct DNA damage, is that
17 different than primary DNA damage?
18    A.  No.
19    Q.  So when you use the term "direct DNA damage,"
20 that means the same thing as when EPA says "primary DNA
21 damage"; correct?
22    A.  Correct.
23    Q.  And as we've just been talking about, the EPA
24 lists a number of studies that it considered evaluating
25 assays for detecting primary DNA damage based on

Page 112

1 glyphosate technical; correct?
2    A.  Correct.  That's what Table 5.7 is.
3    Q.  You've never designed a genotoxicity study;
4 correct?
5    A.  You already asked me that.
6    Q.  I apologize.  I don't remember the answer.
7 Have you designed a genotoxicity study?
8    A.  No, I have not.
9    Q.  And you've never conducted a genotoxicity
10 study; correct?
11    A.  Correct.
12    Q.  So your understanding of genotoxicity is based
13 on reviewing published literature?
14    MR. KRISTAL:  Are you asking these seriatim or
15 exclusively published literature, or what?
16    MR. FAYNE:  I mean, yeah, I'm going to ask
17 you -- strike that.
18    Q.  (BY MR. FAYNE:)  Your understanding of
19 genotoxicity is based on reviewing published literature
20 and speaking to the experts in the field of
21 genotoxicity; is that a fair characterization?
22    A.  That's certainly the primary basis for my
23 knowledge of genotoxicity assays.
24    Q.  Would you agree that EPA has within its ranks a
25 number of experts in the field of genotoxicity?

Page 113

1    A.  Probably a few.
2    Q.  Within the office of its pesticide programs?
3    A.  Yeah.  Within OPP, yes.  I would -- I would
4 assume that at any one point in time during the record
5 of this case, there would be at least one or two
6 Ph.D.-level scientists trained in some aspect of
7 genotoxicity.
8    Q.  And presumably there were -- some of those
9 experts were involved in the preparation of the 2016 OPP
10 report.  Is that a fair assumption?
11    A.  Well, the -- whoever was on staff at the time,
12 yes.
13    Q.  If you'd turn to page 126 of the OPP report.
14    A.  Okay.  I'm there.
15    Q.  So this is the summary and discussion of EPA's
16 genotoxicity section; correct?
17    A.  Correct.
18    Q.  And about midway through that first paragraph
19 it states, "In the weight-of-evidence analysis, studies
20 evaluating endpoints that measured gene mutations and
21 chromosomal aberration, i.e., permanent DNA damage, were
22 given more weight than endpoints reflecting DNA events
23 that may be transient or reversible, such as primary DNA
24 damage, for example, COMET assays."
25    Did I read that correctly?

Confidential - Charles Benbrook, Ph.D.

Page 114

1    A.  Yes, you did.
2    Q.  So would you agree that EPA's view is that
3 studies of primary DNA damage are less important than
4 studies measuring endpoints such as gene mutations and
5 chromosomal aberrations?
6    A.  I think you might have misstated that.
7    Q.  How so?
8    A.  Well, why don't you redo the question.
9       Or you could reread the question if she took it
10 down, whichever you'd like to do.
11   Q.  I'll re-read it.
12   A.  Maybe I just misheard it.  It could be my
13 fault.
14   Q.  Would you agree that EPA's view is that studies
15 evaluating primary DNA damage are less important in the
16 weight-of-the-evidence analysis than studies evaluating
17 endpoints measuring gene mutations and chromosomal
18 aberrations?
19   A.  In general, yes.
20   Q.  And that's inconsistent with your view that
21 studies of direct DNA damage are the most important; is
22 that fair?
23   A.  Oh, I don't know.  That would take some
24 thought.
25   Q.  What about that statement is not fair?

Page 115

1    A.  What EPA is getting at is that any genotoxicity
2 assay that is capable of measuring or reports permanent
3 inheritable damage to DNA is more worrisome than a
4 genotoxicity assay that produces a response but one
5 that's reversible, and that I agree to -- I agree with
6 that view.
7    Q.  And you agree that studies of direct DNA damage
8 do not necessarily -- necessarily show a permanent
9 response.  They can be transient or reversible; correct?
10   A.  Correct.
11   Q.  So turning back to your report, go to paragraph
12 9(c).  This is on page 8.
13   A.  Going backwards.
14   Q.  Skipping around.
15   A.  9(c).  Are we on page 8?
16   Q.  Page 8, yep.  Actually, let me go back to the
17 questions we were just discussing briefly.  So as I
18 think you just testified -- and I'll read it so that I
19 make sure I get it correct -- is that "Assays that are
20 capable of measuring or reporting permanent inheritable
21 damage to DNA is more worrisome than a genotoxicity
22 assay that produces a response but one that's
23 reversible"; correct?
24   A.  Correct.
25   Q.  So you would agree that endpoints measuring

Page 116

1 direct DNA damage may be transient or reversible and
2 thus not indicative of true genotoxicity; correct?
3       MR. KRISTAL:  Objection.
4    A.  It -- the damage might be heritable and
5 permanent or it might not.  Both can fall under that
6 category of direct DNA damage.
7    Q.  So positive results in those direct DNA tests
8 are not necessarily indicative of true genotoxicity;
9 correct?
10      MR. KRISTAL:  Objection.
11   A.  Well, I don't understand your use of the term
12 "true genotoxicity."
13   Q.  Are not indicative of a genotoxic effect;
14 correct?
15      MR. KRISTAL:  Objection.
16   A.  I don't agree.
17      My understanding is that you've asked me if a
18 genotoxicity assay that measures an impact which may be
19 reversible, if you're asking me if I think that's not a
20 genotoxic effect, then I do not agree with that, and nor
21 do most scientists.
22      It is true that some impacts on DNA are
23 repairable.  It's also true that rarely are repairs
24 fully successful, and that damaged DNA that isn't fully
25 repaired is cumulative over time.  So it's not

Page 117

1 appropriate, in my judgment, to dismiss genotoxicity
2 assay results that are possibly repairable or reversible
3 as not relevant or important.
4    Q.  In your view, such assay results are the most
5 important, is how I understood your report; is that not
6 correct?
7    A.  That's not correct.
8    Q.  So when you say in your report that "Assays
9 designed to detect direct damage to DNA in humans are
10 the most important," how can I reconcile those two
11 statements?
12   A.  I think the problem that we have here is that
13 direct damage to DNA can be permanent inheritable or
14 reversible.
15   Q.  Correct.  And my question is, in light of that
16 fact, isn't it true that studies looking at chromosomal
17 aberrations that are not reversible, aren't those
18 studies more important in evaluating genotoxicity?
19   A.  I -- yes, and I've agreed with you on that
20 multiple times.  I think I have, anyway.  Tried to.
21   Q.  Sure.  So now let's go to paragraph 9(c) in
22 your report, which is on page 8.  And about halfway
23 through that paragraph you state, "I conducted a PubMed
24 search for genotoxicity studies on glyphosate and
25 glyphosate-based herbicides on November 19th, 2018, and

Page 118

1 identified 26 studies published since 2015, of which 25
2 reported positive evidence of genotoxicity in one or
3 more assays."
4    A.  Correct.
5    Q.  Did I read that correctly?
6    A.  Yeah.
7    Q.  How did you perform your search?
8    A.  Well, I went onto PubMed and typed in
9 "glyphosate," "glyphosate-based herbicides,"
10 "genotoxicity," "mutagen," and probably a few other
11 search words, terms.  I've been -- I've done these
12 searches before so I kind of used the same methodology.
13    Q.  Based on that search, you identified 26 studies
14 published since 2015; correct?
15    A.  Correct.
16    Q.  Did you exclude any studies from that number
17 based on your review of the study design or quality?
18    A.  No.
19    Q.  The majority of the studies you identified were
20 in non-mammalian systems; is that a correct statement?
21    A.  I think -- don't I talk about that in the
22 paragraph somewhere?
23    Q.  Yes.  I believe you state that --
24    A.  12 mammalian studies were all positive.  So if
25 there were 25 and 12 of them were mammalian, then about

Page 119

1 half and half.
2    Q.  Yeah.  I believe there were 26 studies total.
3 12 of those were mammalian; is that fair?
4    A.  Yeah.
5    Q.  How did you determine whether the studies were
6 positive or negative for genotoxic effect?
7    A.  By what the authors reported.
8    Q.  So you reviewed the abstract or the body of the
9 report?
10    A.  No.  I downloaded the full studies and often
11 read most of them and certainly read the -- if the -- if
12 the abstract was clear and I felt complete, I may not
13 have read much more of the study, but in several of them
14 I was quite interested in where the science has moved in
15 recent years.
16    MR. FAYNE:  Now is probably a good time for a
17 break if you want to take a quick one and then maybe --
18    THE WITNESS:  Is this lunch break?
19    MR. FAYNE:  Well, it's 11 o'clock.  Let's go
20 off the record.
21    VIDEOGRAPHER:  Off the record at 10:59 a.m.
22    (A brief recess was had.)
23    VIDEOGRAPHER:  Back on the record at 11:10 a.m.
24    Q.  (BY MR. FAYNE:)  I'd like to shift gears now
25 and turn to Dr. Parry's report, which you testified

Page 120

1 about -- or opined about in your report; correct?
2    A.  Yes.
3    Q.  So if we turn to page 477 of your report.
4    A.  Maybe paragraph?
5    MR. KRISTAL:  Paragraph.
6    THE WITNESS:  Maybe paragraph?
7    MR. FAYNE:  I'm really struggling with that
8 today.  Paragraph 477 of your report.
9    THE WITNESS:  That's all right.
10    MR. FAYNE:  Not quite that long.
11    MR. KRISTAL:  Next deposition there will be
12 477 pages.
13    THE WITNESS:  We'll catch up with it.  So 477.
14    MR. FAYNE:  Yes.  Yes.  This is the beginning
15 of the Dr. Parry's section of the report.
16    THE WITNESS:  The good Dr. Parry.
17    MR. KRISTAL:  It's P-A-R-R-Y as opposed to
18 E-R-R-Y.
19    Q.  (BY MR. FAYNE:)  So in paragraph 477, you state
20 that, "In the 1990s, several positive genotoxicity
21 studies were published," and then you cite the Lioi, et
22 al., L-I-O-I, 1998, the Lioi, 1998 -- there are two of
23 those -- the Bolognesi, et al., 1997 and the Clements,
24 et al., 1997; correct?
25    A.  Correct.

Page 121

1    Q.  And as you discuss in your report, because of
2 those studies Monsanto decided to retain Dr. Parry to
3 undertake a review; correct?
4    A.  Of those studies.
5    Q.  Of those studies.
6    A.  That's where they came from.
7    Q.  Exactly.  Correct.
8    A.  Yeah.
9    Q.  And Dr. Parry prepared a number of reports in
10 which he summarized these genotoxicity studies that were
11 in the public literature; correct?
12    A.  And others.
13    Q.  And others, including others in Monsanto's
14 internal database of genotoxicity studies; correct?
15    A.  Yes, sir.
16    Q.  Dr. Parry did not conduct any primary research;
17 correct?
18    MR. KRISTAL:  You mean for Monsanto in this
19 project?
20    MR. FAYNE:  Strike that.  Yes.  Let me be more
21 clear.
22    Q.  (BY MR. FAYNE:)  With respect to this project
23 on behalf of Monsanto in the late 1990s, Dr. Parry was
24 not performing any primary genotoxicity studies;
25 correct?

Confidential - Charles Benbrook, Ph.D.

Page 122

1  A.  Correct.
2  Q.  He was summarizing studies that already
3  existed; correct?
4  A.  Well, reviewing and -- and sharing his
5  assessment of their quality and relevance and findings.
6  Q.  Would you agree that his findings about what
7  those studies showed were consistent with the findings
8  of the study authors?
9  A.  In general, yes.
10  Q.  Are you aware of any instance in which
11  Dr. Parry found a study to show a genotoxic effect when
12  the author of that study had found the study to be
13  negative?
14  A.  I'm not aware of any such cases.
15  Q.  So turning to paragraph 480 of your report, you
16  state that in a letter --
17  A.  Where are we now?
18  Q.  Paragraph 480, just two paragraphs down.
19  A.  480.  I thought you said 4E.  480, okay, I'm
20  there.
21  Q.  So in paragraph 480 you state, "In a letter
22  dated August 18th, 1999, Dr. Parry transmitted his first
23  of three evaluation reports to ███████ --
24  M-A-R-T-E-N-S -- "a Monsanto toxicologist"; correct?
25  A.  Correct.

Page 123

1  Q.  What are you relying upon for your statement
2  that Dr. Parry transmitted three reports?
3  A.  My reading of the three reports.
4  Q.  So you identified three reports in the
5  discovery record --
6  A.  Yes.
7  Q.  -- from Dr. Parry to Monsanto?
8  A.  Yes.
9  Q.  Do you recall when the other two reports were
10  submitted?
11  A.  I don't remember the dates.  I think two of
12  them came together.  There was an assessment of the
13  studies and then a separate report on recommendations,
14  so I counted that as a third report.
15  Q.  Understood.
16  A.  Does that help?
17  Q.  That is helpful.  I think that explains the
18  disconnect.  Thank you.
19      In paragraph 488, so now a couple of pages --
20  A.  All right.
21  Q.  -- further.
22  A.  I'm with you.
23  Q.  You state, "In the next several days, in early
24  July, 1999, Monsanto officials discuss internally
25  whether to commission the new genotoxicity research

Page 124

1  studies Parry recommended."
2      Do you see that?
3  A.  Yes.
4  Q.  Would you agree that it wouldn't be possible
5  for Monsanto to discuss internally the studies that
6  Parry recommended before he had actually submitted his
7  recommendations?
8  A.  Yes.
9  Q.  I'll break this down for you.  So Dr. Parry's
10  report in August 1999, that was not Dr. Parry's first
11  report; correct?
12  A.  Well, can we just pull them all out?
13  Q.  Yes.  And again, it's not a trick.  I'm just
14  trying to understand your timeline.
15  A.  If I -- if I made a mistake in my timeline,
16  I'll readily admit it.
17  Q.  Let's pull them out then, and I think we can
18  clarify.  Thank you.
19  A.  Okay.
20  Q.  So I'll mark this as Exhibit Number 9, and this
21  is a report from Dr. Parry dated February 11th, 1999.
22      MR. KRISTAL:  Thank you.
23      (Exhibit 9 marked for identification.)
24  Q.  (BY MR. FAYNE:)  So I'm showing you a document
25  that's been marked Exhibit Number 9.

Page 125

1      Have you seen this before?
2  A.  Yes.
3  Q.  And is this one of the reports that Dr. Parry
4  submitted to Monsanto?
5  A.  It's my understanding this is the first one.
6  Q.  So just to clarify the record, your
7  understanding in your report that the August 1999 report
8  was the first one is incorrect; correct?
9  A.  Yes, this is the first one.  The one that was
10  just these four papers that I talked about in
11  paragraph 477.
12  Q.  Okay.  You can put that to the side for a
13  second.
14  A.  Okay.  So I got to fix this.  It's probably the
15  second.
16  Q.  So turning to paragraph 80 of your report --
17  and I apologize.  The Parry sections are -- there's a
18  couple of them, so.  Paragraph 80 of your report, which
19  is on page 24.
20  A.  24, you said?
21  Q.  Yes.
22  A.  Okay.  I'm there.
23  Q.  You state that, "Dr. Parry provided 11 specific
24  recommendations to Monsanto following his review of
25  several published and Monsanto-commissioned genotoxicity

Confidential - Charles Benbrook, Ph.D.

Page 126

1 studies."
2      Do you see that?
3   A.  Yes.
4   Q.  And I read that correctly?
5   A.  Yes.
6   Q.  And now I'm going to direct you back to
7 paragraph 484.  And you say --
8   A.  Oh, Jesus.  Hang on a second.  484.  Got it.
9   Q.  You state that, "In addition to his written
10 reports, Dr. Parry provided Monsanto with a detailed
11 list of recommended research activities to clear up
12 lingering questions over the genotoxicity of
13 glyphosate-based herbicides," and you cite MONGLY --
14 M-O-N-G-L-Y -- 01314264; correct?
15   A.  Correct.
16   Q.  And is this the -- are these the
17 recommendations that you're referring to when you say
18 "11 specific recommendations"?
19   A.  It's the last of the Parry reports, by my
20 accounting, and it's the one that spells out a number of
21 recommendations, yes.
22      MR. FAYNE:  So let's pull that out.  So we'll
23 cite -- or we'll mark as Exhibit 10 what I understand to
24 be the second and third Dr. Parry reports, but you can
25 confirm that for me once you have a chance.

Page 127

1      (Exhibit 10 marked for identification.)
2      MR. KRISTAL:  Thank you.
3      THE WITNESS:  Yes, these are -- these are
4 the -- what I understand to be the penultimate and most
5 complete report by Dr. Parry, upon his review of all of
6 the genotoxicity assays that he was asked to review by
7 Monsanto, as well as his recommendations for further
8 research to resolve lingering questions.
9   Q.  (BY MR. FAYNE:)  And to be clear, you're -- the
10 way you framed it in your report is that those are two
11 separate reports?
12   A.  The way that I first obtained these reports,
13 they were referred to in different documents.  I see
14 these are MONGLY-numbered consecutively, but, as I said,
15 they -- they were -- when I first encountered them, they
16 were not a part of the same report.  And I'm not even
17 sure that they were, but, you know, I can probably go
18 back in the record and try to determine that.
19   Q.  Is it your understanding that both the first
20 report setting forth his conclusions and the second
21 report setting forth his recommendations, both of those
22 were submitted to Monsanto in August 1999?  Correct?
23   A.  Yes.  And as far as I know, they were the last
24 reports from him as well.
25   Q.  So I'd like to turn to the page you cite, which

Page 128

1 is --
2   A.  Oh, yeah.  Sure.
3   Q.  -- a page ending in 4264.
4   A.  Yes.
5   Q.  So it looks like page 4264 lists some key
6 questions, and then there's a -- at the bottom it says,
7 "Deficiency in the data set," and then when we get to
8 page 4265, it says "Actions recommended"; correct?
9   A.  This is what I would regard as this third Parry
10 report where he starts out laying out the key questions
11 and then he makes his recommendations on what should be
12 done to address the key questions.
13   Q.  It's this report where he sets forth the 11
14 specific recommendations you referred to?
15   A.  Correct.
16   Q.  Could you explain how you count 11
17 recommendations in this report?
18   A.  Yes.
19   Q.  Please do.
20   A.  Okay.  Well, provide comprehensive in vitro
21 cytogenetic data on glyphosate formulations.
22 C-Y-T-O-G-E-N-E-T-I-C.  That would be one.
23      The second, B, is another one where he's saying
24 conduct these studies with and without antioxidant
25 activities to see if -- if the impact is reversible.

Page 129

1      And then he recommends that these be
2 under -- undertaken in an in vitro micronucleus assay in
3 human lymphocytes.  I'm not sure if I counted that as
4 one or two.  You know, I would have to go through and
5 recreate my thinking.
6   Q.  And again, I'm just trying to understand the
7 basis of your opinion, so I'm trying to understand how
8 you got to 11.
9   A.  Right.  So I took this document and
10 specifically pages 2, 3 and 4 of it, and tried to
11 identify the distinct clusters of work, and I -- I did
12 so fairly carefully and I came up with 11.
13   Q.  Okay.  I think it would be helpful for me or
14 for us to understand what those 11 are.  So if we could
15 keep walking through it.  So I believe you testified
16 that A is one.  We agree on that; correct?
17   A.  A is -- yes.  So let's see if we can...
18   Q.  And your testimony is that B is either --
19   A.  Let --
20   Q.  Please.  Go ahead.  Yeah.
21   A.  Okay.  So the recommendation "I recommend that
22 both a) and b) should be undertaken using the in vitro
23 micronucleus assay in human lymphocytes," that is
24 another one.  And I'll determine later whether it's two.
25 He just says it would be cost effective.

Confidential - Charles Benbrook, Ph.D.

Page 130

1    And then C is another one, "The induction of
2 oxidative damage in vivo and determine the influence of
3 antioxidant status.  Determine the exposure
4 concentrations of glyphosate which overwhelm the
5 antioxidant status."
6    MR. KRISTAL:  Chuck, could I ask you to just
7 slow down a little bit.  Amy's fingers are starting to
8 burn up.
9    THE WITNESS:  Okay.  Sorry, Amy.
10   Q.  (BY MR. FAYNE:)  So just to stop you on -- are
11 you counting C as one study?
12   A.  Yes.
13   Q.  Okay.
14   A.  I believe so.
15   Okay.  Next one -- hang on.  So D is clearly
16 another distinct assay, set of assays.
17   Trying to -- I can't recall as I sit here today
18 whether I counted his number E, which is not to repeat
19 the chromatoid exchange studies, whether I counted that
20 as a recommendation for a new study or not.  I think I
21 didn't.
22   Q.  But sitting here today, you can't say one way
23 or the other whether you did or didn't?
24   A.  Let me -- let me get to the end and if it adds
25 up to 11, then I'll be pretty sure that I didn't.

Page 131

1    So Parry has also recommended the COMET assay
2 in the liver and kidney of mice.
3    Q.  So just to be clear, F is another study;
4 correct?
5    A.  Yes.
6    The in vitro data on surfactants is another
7 recommendation.
8    So these are the distinct new study
9 recommendations in this accounting by Parry, and I'll
10 have to go back and see where I found the other ones,
11 but I know there's 11 in a Parry document and I will
12 find it for you.
13   Q.  Okay.
14   A.  Yeah.
15   Q.  That's something you'll do during your lunch
16 break or?
17   A.  Well, I'll give it a try.
18   Q.  So sitting here today, you're not able to
19 recreate how you came up with 11; is that fair?
20   A.  Right now.  We'll see after lunch.
21   Q.  And just to make sure we're -- to close the
22 loop on this particular document of actions recommended,
23 as I counted -- as you were speaking, I got six studies.
24 Did you have a different number?
25   A.  No.  I had six.  I think perhaps part of the

Page 132

1 explanation is that there are actually some
2 recommendations at the first part of it that aren't
3 addressed in the second part.  That's -- may be.  But
4 I'll let -- give me a few minutes to recreate my
5 thinking.  I'm quite sure I have -- I can explain to you
6 how I got to 11.  I didn't make it up.
7    MR. KRISTAL:  Are you reviewing -- Exhibit 10
8 is actually four documents.  In other words, I don't
9 know if you meant to include it as four.
10   MR. FAYNE:  Excuse me, Counsel.  I know it's
11 not your deposition.  I understand you're trying to be
12 helpful and we can work this out later, but as I
13 understand it right now, he's not able to recreate it --
14   THE WITNESS:  Yeah.  Yeah.  Yeah.
15   MR. FAYNE:  -- and we can come back to it.
16   MR. KRISTAL:  Yeah.  But if you want
17 Dr. Benbrook to review to answer your questions, I don't
18 think it's fair to him to have him do it over lunch.  He
19 should do it during the dep and ask questions.
20   MR. FAYNE:  Okay.  Well, then the answer can be
21 that you don't know sitting here today how you came up
22 with 11 and we can leave it there.
23   Q.  (BY MR. FAYNE:)  Is that -- that's your
24 testimony, correct, right now you can't recreate how you
25 came up with 11 studies?

Page 133

1    A.  Oh, yes, I can.  You know, but, again, it will
2 take a little time.
3    Q.  It makes it difficult for me to ask you
4 questions about it if you can't tell me sitting here
5 today what the 11 studies recommended were, and I'm
6 referring to the document you cited in your report and
7 asking you to count it.
8    A.  Okay.
9    Q.  I understand that right now --
10   A.  I didn't bring my entire Parry file.
11   Q.  I understand.
12   A.  Which is about that thick.  And in that Parry
13 file I have the notes on how I counted these studies,
14 and I'm sure that I have the --
15   MR. KRISTAL:  We'll clear it up when I get a
16 chance to ask questions.  It's a pretty simple
17 explanation, if you don't want me to say anything on the
18 record.  If you really want an accurate count, I can say
19 something and then we can see if we can resolve it.
20   MR. FAYNE:  Sure.  Go.
21   MR. KRISTAL:  If you don't, that's fine.
22   MR. FAYNE:  Please go.
23   MR. KRISTAL:  I'm not trying to --
24   MR. FAYNE:  Please.
25   THE WITNESS:  Can we go off the record?

Page 134

1    MR. FAYNE: Yeah. Let's go off the record.

2    VIDEOGRAPHER: Off the record at 11:31 a.m.

3        (A brief recess was had.)

4    VIDEOGRAPHER: Back on the record at 11:32 a.m.

5    Q. (BY MR. FAYNE:) You state in your report,

6  Dr. Benbrook, that Monsanto refused to conduct new

7  studies in nine of the 11 areas; correct?

8    A. Correct.

9    Q. How did you determine that Monsanto refused to

10  conduct those studies?

11    A. Because they're not in -- there's no evidence

12  of them being conducted, and also in their e-mail

13  exchanges about responses to the Parry report, they say

14  they're not going to conduct the studies that Parry

15  recommended, with the exception of the micronucleus

16  studies that they did to try to refute Bolognesi. They

17  did, I think, four of those.

18    Q. So you agree that they did conduct some studies

19  in response to Dr. Parry's recommendations; correct?

20    A. Yes. Yes. They did several bacterial reverse

21  mutation studies and glyphosate-based formulations, and

22  then they did I believe it was four micronucleus studies

23  in the hope of refuting the Bolognesi findings.

24    Q. How did you become aware that they had

25  conducted the studies to replicate the Bolognesi

Page 135

1  findings?

2    A. Well, they're in -- they're in the EPA

3  document. They're in Kier and Kirkland. They're in

4  Brusick.

5    Q. It's correct, is it not, that earlier in the

6  Roundup litigation your opinion was that they had not

7  conducted any of the studies that Dr. Parry recommended?

8  Is that fair?

9    A. I don't recall if I said that.

10    Q. But at some point you became aware that they

11  had in fact performed at least some of the studies Parry

12  recommended; correct?

13    A. Yes.

14    Q. Have you conducted a search of the discovery

15  record to identify any additional studies that Monsanto

16  may have conducted in response to Dr. Parry's

17  recommendations?

18    A. No. I have assumed that the four Monsanto

19  reviews of genotoxicity studies represent a complete

20  accounting of the studies that Monsanto did. I think

21  the only exception is that there were some bacterial

22  reverse mutation studies done for Brazilian regulators

23  and Argentina regulators on formulated products that may

24  not be in any of the Monsanto reviews. Those studies

25  were brought to my attention in one of the earlier

Page 136

1  depositions.

2    Q. Are you aware whether any of the studies that

3  Dr. Parry recommended already existed either in

4  Monsanto's database or in the public literature?

5    A. Well, surely several of Dr. Parry's

6  recommendations -- other scientists had done studies

7  using those genotox assays, and Parry felt that it would

8  be important to try to replicate them.

9        And so, yes, they're -- there were some

10  published studies reporting the results of the assays

11  that Parry recommended that Monsanto replicate using

12  glyphosate technical and conduct for the first time

13  using formulated glyphosate-based herbicides.

14    Q. If those studies were not cited in Dr. Parry's

15  reports, you're not able to say one way or the other

16  whether he was aware that those studies already existed;

17  fair?

18    A. Yes. I wouldn't have any way to read his mind.

19    Q. So it's possible that Dr. Parry recommended

20  further studies on certain assays that he wasn't aware

21  that they already existed; fair?

22    A. I suppose he may not be aware of some

23  registrant studies that Monsanto chose not to provide to

24  him, yeah.

25    Q. Or public-literature studies; correct?

Page 137

1    A. He may -- he may have missed and not been aware

2  of. Yeah, that's possible.

3    Q. So it's possible that some of the studies he

4  recommended already existed without his knowledge;

5  correct?

6    A. Sure.

7    MR. ESFANDIARY: Anything is possible.

8    Q. As we were discussing previously, Monsanto

9  initially reached out to Dr. Parry because of the four

10  studies that were published in the late 1990s; correct?

11    A. No, that's not correct.

12    Q. What's incorrect about that?

13    A. Monsanto reached out to Dr. Parry because they

14  realized that they were in trouble in terms of the

15  recently published studies reporting a genotoxic effect

16  of both glyphose technical and some other assays on

17  formulated glyphosate-based herbicides.

18        They realized that these published studies in

19  the peer-reviewed literature were in contrast to the

20  universally negative genotoxicity studies that had been

21  submitted to regulators, and they were looking for help

22  from third-party experts, the independent scientists

23  like Dr. Parry, to provide their views to regulators, to

24  other scientists, to the media, relative to and in

25  support of Monsanto's view of the genotox literature.

1    So the purpose of the initial approach to
2  Dr. Parry was vetting him as a potential future member
3  of the Monsanto third-party network of experts
4  who -- who Monsanto turns to from -- would turn to at
5  various times to support their view of both
6  registrant-submitted studies and peer-reviewed studies.
7    Q.  You just testified that the studies that raised
8  concern within Monsanto were those that were published
9  in the peer-reviewed public literature; correct?
10   A.  Those were among them, yes.  This initial four
11 were -- I don't think it was the only studies that they
12 were concerned about at that time, but it was the first
13 set.  They were trying also to keep costs down.  If you
14 look at the e-mail exchanges, they were, you know,
15 concerned about how much time Parry would have to invest
16 in it, so they started with a fairly small assignment.
17   Q.  So so you reviewed the internal Monsanto e-mails
18 and it's your opinion, based on those e-mails, that they
19 were trying to save costs?
20   MR. KRISTAL:  Objection.
21   A.  No.  It's my opinion that they were cognizant
22 of the cost entailed in -- in hiring Dr. Parry to do a
23 thorough review of the genotox literature.  I think they
24 were -- they clearly did not provide Dr. Parry all of
25 the internal genotox studies that they had conducted and

1  submitted to registrants.
2    I think they -- in Dr. Parry's reports, he does
3  identify exactly what studies he was provided, and I
4  doubt it's more than a quarter of the total Monsanto
5  registrant-submitted studies.  For example, they didn't
6  provide him with 20 different bacterial reverse mutation
7  studies that showed the same thing.
8    Q.  And there would have been no reason to do that,
9  correct, because they all show the same thing?
10   A.  Correct.  No -- no controversy on that matter.
11   But as the discussion and interactions between
12 Monsanto and Dr. Parry went on, it was -- it's clear in
13 the record that Monsanto became concerned about the cost
14 of Dr. Parry doing the studies that he felt were needed
15 to clarify some of the questions, the key questions that
16 he identified.
17   In effect, Parry -- Parry was under the
18 impression that as this dialogue went on, that he might
19 be asked to do those studies.  I'm not sure if he was,
20 you know, ever told that directly, but I think he
21 surmised that.
22   But in any event, at the end of the day,
23 Monsanto decided that they would not do the studies and
24 that it would take too much time and cost too much money
25 to -- to allow Parry to do all the things that he

1  recommended to bring them around to their view of
2  genotoxicity of glyphosate and glyphosate-based
3  herbicides.
4    Q.  I'd like to focus on the studies in the public
5  peer-reviewed literature that found a positive genotoxic
6  effect in the late 1990s; okay?
7    A.  Yeah.
8    Q.  Those are studies that Dr. Parry reviewed for
9  Monsanto; correct?
10   A.  I believe there were three different sets of
11 studies.  You know, it was the -- we talked about the
12 first set, which was only four, and then there was
13 another set, and then there was another set.  And
14 this -- the report that we've been talking about here in
15 Exhibit 10, it's my understanding this was the final one
16 that integrated Dr. Parry's review of these three
17 tranches of sets of studies.
18   Q.  So going back to those -- let's just talk about
19 the four studies you cite in paragraph 477 of your
20 report; okay?
21   A.  Okay.
22   Q.  Those are all published in the peer-reviewed
23 literature; correct?
24   A.  Correct.
25   Q.  They would be available to EPA; correct?

1    A.  Yes.
2    Q.  And, in fact, you're aware that those studies
3  were submitted to EPA as part of a 2002 tolerance
4  approval process; correct?
5    A.  I'm not aware of that.
6    Q.  You don't recall that from prior depositions?
7    A.  No, I don't.
8    Q.  Any reason to believe that those studies were
9  not submitted to EPA?  And I'm not -- strike that.
10   Those studies were submitted to EPA by
11 commenters, not by Monsanto; correct?
12   A.  I don't recall.
13   Q.  Any reason to believe that they were not
14 submitted by commenters?
15   A.  No.
16   Q.  So let's turn to paragraph 498 of your report.
17 So you state in paragraph --
18   A.  Hang on.
19   Q.  Oh, sure.
20   A.  498?
21   Q.  498 on page 110?
22   A.  Got it.
23   Q.  You state, "In my opinion, Dr. Parry's reports
24 triggered an obligation to (1) report the information to
25 the EPA; (2) update the Roundup label to disclose the

Confidential - Charles Benbrook, Ph.D.

Page 142

1 potential of genotoxicity risk following significant
2 and/or long-term exposures to Roundup; and (3) conduct
3 the various studies proposed by Dr. Parry to exposure
4 the genotoxicity of formulated glyphosate-based
5 herbicides."
6      Did I read that correctly?
7   A.  Yes.
8   Q.  So if I understand your opinion in this
9 paragraph, there are three separate parts to it;
10 correct?
11   A.  Yes.
12   Q.  So I'd like to break those down and take them
13 one at a time, if that's okay.
14   A.  Fine.
15   Q.  So first you state that Dr. Parry's reports
16 triggered an obligation, presumably from Monsanto, to
17 report the information to EPA; is that correct?
18   A.  Correct.
19   Q.  What is the source of the obligation from
20 Monsanto to report those studies to EPA?
21   A.  FIFRA, Section 6(a)2(B), the adverse health
22 effects reporting requirement.
23      MR. KRISTAL:  That's FIFRA, F-I-F-R-A, all in
24 caps.
25   Q.  So you're aware that EPA has adopted

Page 143

1 regulations implementing FIFRA Section 6(a)(2); correct?
2   A.  Yes.
3   Q.  Have you reviewed those regulations?
4   A.  Yes.
5   Q.  When was the last time you reviewed them?
6   A.  It's been many times.  Probably in the last
7 couple months when I -- there are two of the -- two of
8 the passages from 6(a)2(B) are quoted verbatim in the
9 report, so it would have been in late November.
10   Q.  And just to be clear, you've reviewed the
11 regulations in the 40 CFR Part 158?
12   A.  Yeah.  Yes, sir.
13   Q.  And your opinion, based on your review of those
14 regulations, is that Monsanto had a legal obligation to
15 submit the Parry report; is that correct?
16   A.  Yes.
17   Q.  And when you say in your opinion that it
18 triggered an obligation to report the information to
19 EPA, what information specifically are you referring to?
20   A.  Parry's conclusions that glyphosate technical
21 and formulated glyphosate-based herbicides appear to
22 pose genotoxic risk.
23   Q.  You testified previously that you're not aware
24 of Dr. Parry drawing any conclusions from those studies
25 that were different than the conclusions drawn by the

Page 144

1 authors of the study; is that fair?
2   A.  I don't believe I said that.  I mean, I -- I've
3 taken Dr. Parry's report at its word.
4   Q.  Understood.  But Dr. Parry didn't look at those
5 studies and find a genotoxic effect where the author of
6 the study had not found one; correct?
7   A.  I'm not aware of any episode of that or example
8 of that.
9   Q.  You also testified previously that these
10 studies were in the public literature; correct?
11   A.  Correct.
12   Q.  So EPA had access to them; correct?
13   A.  Correct.
14      MR. FAYNE:  Mark this as Exhibit 11.
15      MR. KRISTAL:  Thank you.
16      (Exhibit 11 marked for identification.)
17   Q.  (BY MR. FAYNE:)  I'm showing you an exhibit
18 marked Number 11, which is 40 CFR Part 159, Subpart D.
19 And it's Reporting Requirements for Risk/Benefit
20 Information.
21   A.  Correct.
22   Q.  You've seen this before; correct?
23   A.  Yes.
24   Q.  And if you look at Section 159.152, it states,
25 in paragraph C, that "Compliance with this part will

Page 145

1 satisfy a registrant's obligations to submit additional
2 information pursuant to Section 6(a)(2)"; correct?
3   A.  Correct.
4   Q.  And these regulations were adopted in the late
5 1990s; correct?
6   A.  Correct.  And changed a couple of times.
7   Q.  Sure.  More -- if you look, for instance, at
8 the very end of this document, you can see that they
9 were adopted initially in September 1997, and then
10 amended in June 1998, correct, at the very bottom?
11   A.  I see --  yes, I see that.  Yep.
12   Q.  If you turn to Section 159.155.
13   A.  Okay.
14   Q.  "When information must be submitted."
15   A.  Yeah.
16   Q.  And Subpart A reads, "The following reportable
17 information must be received by EPA not later than the
18 30th calendar day after the registrant first possesses
19 or knows of the information"; correct?
20   A.  Correct.
21   Q.  And then it lists seven categories of
22 information; correct?
23   A.  Correct.
24   Q.  Which category do you contend Dr. Parry's
25 reports fit into?

Page 146

1   A. Well, the -- in -- I don't remember exactly in
2   my report where I quote from 6(a)2(B). It states
3   clearly that consultant reports are -- including
4   preliminary reports -- are among the data that, and
5   information, that should be provided to the agency
6   if -- and on the understanding that the information is
7   new, has new value. Registrants are not under an
8   obligation to submit over and over again the same
9   information that has been provided to the agency.
10      So the -- the component of Parry's report that
11  in my judgment triggered an obligation to provide the
12  information to EPA under 6(a)(2) was his -- his
13  conclusion that there is valid science suggesting that
14  both glyphosate technical and formulated
15  glyphosate-based herbicides have genotoxic potential,
16  which is not the conclusion or the information that
17  Monsanto had provided to the EPA.
18      Q. Let me -- I'm going to parse what you just
19  said.
20      If I heard you correctly, you stated that
21  Section 6(a)(2) of FIFRA states that expert reports must
22  be submitted.
23      A. That consult -- yeah. Yeah. Reports
24  commissioned by a registrant, done on behalf of a
25  registrant, and I think they actually use the term

Page 147

1   "consultant."
2       Q. So if I look at FIFRA Section 6(a)(2), I'll see
3   language about experts and consultants?
4       A. The passage is in my report. We can find it.
5       Q. Understood. But I'm not asking about your
6   report. I'm asking about the statute itself.
7       Your contention is that the statute itself --
8       A. I can't remember if the passage I quoted is
9   actually from FIFRA or if it's from the implementing
10  regulations. I don't recall exactly where it -- where
11  it is, but it's an official statement of what EPA
12  requires under 6(a)(2).
13      Q. You would agree that the EPA regulations are
14  EPA's official statement about what's required to be
15  submitted; correct?
16      A. Well, they're part of it, yeah.
17      Q. And as we discussed previously, Section 159.152
18  states that compliance with this part satisfies a
19  registrant's obligations; correct?
20      A. Yes.
21      Q. So you would agree that if a registrant
22  complied with 40 CFR Part 159, Subpart D, they've
23  complied with their reporting requirements under
24  Section 6(a)(2) of FIFRA; correct?
25      A. I believe this is the full set of requirements

Page 148

1   under 6(a)(2), yes.
2       Q. And so previously we were discussing
3   Section 159.155; correct?
4       A. Okay.
5       Q. And that section provides when information must
6   be submitted. So my question to you again is: What
7   category of -- which of these seven categories does the
8   Dr. Parry report fit into?
9       A. The first one, scientific studies, I suppose.
10  It's -- Parry's report was a scientific review, review,
11  study.
12      Q. Okay. Well, let's -- let's turn to -- so
13  scientific study is described in 159.165. So why don't
14  we turn to 169 -- 159.165.
15      A. Okay.
16      Q. So 159.165 lists -- it looks like there's
17  toxicological studies, ecological studies, results from
18  a study that demonstrates any toxic effect, and then
19  (d), incomplete studies. Did I state that accurately?
20      A. Yes.
21      Q. I presume you're referring to this as a
22  toxicological study; is that correct?
23      A. Parry's review, it's a review of toxicological
24  studies involving genotoxicity assays, yeah.
25      Q. Okay. So Section 1 under "Toxicological

Page 149

1   studies" states that, "The results of a study of the
2   toxicity of a pesticide to humans or other non-target
3   domestic organisms if, relative to all previously
4   submitted studies, they show an adverse effect under any
5   of the following conditions," and then they list a
6   number of conditions.
7       We discussed previously that Dr. Parry did not
8   conduct a primary genotoxicity study; correct?
9       A. Correct.
10      Q. He was reviewing summaries -- strike that.
11      He was reviewing studies in the published
12  literature and in the Monsanto database; correct?
13      A. Well, he was reviewing and integrating the
14  information to render his expert opinion on whether the
15  existing genotoxicity database confirmed or didn't
16  confirm the potential of glyphosate technical and GBHs
17  to pose a genotoxic risk, and he reached a conclusion
18  that, in fact, the studies taken en masse did, and that
19  a variety of additional studies would be required to
20  clear up ambiguity or uncertainty in the interpretation
21  of the existing studies.
22      Q. Dr. Parry didn't create any new data; correct?
23      A. He didn't carry out any primary studies. We've
24  already agreed to that.
25      Q. And the data that he was summarizing is data

Page 150

1 the EPA already had in its possession and could review
2 itself; correct?
3    A.  I believe all of the studies that Monsanto
4 provided to Parry were either a registrant study that
5 had already been submitted to EPA or a study in the
6 peer-reviewed literature.
7    Q.  You would agree that EPA is capable of
8 reviewing those studies and assessing for itself whether
9 they show a genotoxic risk; correct?
10    A.  Yes.
11    Q.  You testified previously that Dr. Parry's
12 report provided new information that was not previously
13 known to the agency.  What new information?
14    A.  That an internationally recognized expert in
15 genotoxicity that Monsanto reached out to, because of
16 his technical competence and experience, upon
17 examination of a set of studies, reached a different
18 conclusion than Monsanto did about the genotoxic
19 potential of glyphosate and glyphosate-based herbicides.
20       That is -- that is exactly the significance of
21 Parry's work and analysis that is important in the
22 record of this case.
23    Q.  When EPA determines whether or not pesticide
24 poses a genotoxic risk, does it rely on the registrant's
25 characterization of the studies or does it review the

Page 151

1 studies itself and reach a determination?
2    A.  It -- it typically relies on the registrant's
3 characterization of the study.
4       In some times in history, they'd just cut
5 and paste the registrant summaries.  I think it's a
6 matter of considerable uncertainty the degree to which
7 EPA does a true independent assessment of some of these
8 studies.  I think that that's a cluster of issues beyond
9 what we're dealing with in this case.
10       But it is -- it is -- it is clear to me that
11 Parry's integration of the results of the studies that
12 he was asked to look at drew upon his -- his years of
13 experience and knowledge about the various ways that
14 exposures to a chemical can damage DNA, and that his
15 integration, his weight-of-the-evidence judgment, if you
16 will, to use a term of art that is also used by EPA and
17 IARC, that weight-of-the-evidence judgment and
18 integration of that data was in fact a new and important
19 scientific finding.
20       MR. ESFANDIARY:  Zach, it's two minutes to
21 12:00.  Would this be a good time to --
22       MR. FAYNE:  No.  But give me a few more
23 minutes.
24       MR. ESFANDIARY:  All right.
25       THE WITNESS:  Yeah.  Let's finish this -- let's

Page 152

1 finish Parry.
2    Q.  (BY MR. FAYNE:)  Is it your position that the
3 authors of the studies that Dr. Parry reviewed were not
4 experts in genotoxicity?
5    A.  No.
6    Q.  The authors of those studies, you would
7 contend, were experts in genotoxicity; correct?
8    A.  Well, they conducted the studies.  I don't -- I
9 haven't reviewed the résumés of all of the scientists
10 that conducted those studies, and particularly there
11 would be no way to do so on the registrant-commissioned
12 studies.
13    Q.  Let's focus specifically on the studies that
14 were in the published literature, not the
15 registrant-commissioned studies.
16       Would you agree that the authors of those
17 studies that we've been discussing, that they were
18 qualified experts in genotoxicity?
19    A.  Yes.
20    Q.  And the authors of those studies concluded
21 that -- they ran a study.  It showed a genotoxic effect.
22 Correct?
23    A.  Some of them, yeah.
24    Q.  And EPA had access to their conclusions,
25 correct, because they're in the published literature?

Page 153

1    A.  Correct.
2    Q.  We also discussed previously that EPA has
3 experts in genotoxicity; correct?
4    A.  Yes.
5    Q.  They perform a weight-of-the-evidence analysis
6 of the genotoxicity data; correct?
7    A.  That's what they said that they did, yes.
8    Q.  That includes both registrant-submitted
9 studies; correct?
10    A.  Yes.
11    Q.  And published-literature studies; correct?
12    A.  Yes, sir.
13    Q.  And in their most recent evaluation in 2017,
14 EPA considered the studies that Parry relied upon;
15 correct?
16    A.  I believe that's the case, yes.
17    Q.  When I say "Parry relied upon," I mean the
18 studies cited in Dr. Parry's reports; correct?
19    A.  Correct.
20    Q.  So in December 2017, EPA reviewed those studies
21 and concluded that the weight of the evidence did not
22 show glyphosate to be genotoxic; fair?
23    A.  Through the oral route of exposure based on
24 typical levels of residues in the diet, yes.
25    Q.  Did they find glyphosate to be genotoxic

Confidential - Charles Benbrook, Ph.D.

Page 154

1 through any route of exposure?
2 A. They didn't address the other routes of
3 exposure or the other exposure levels.
4 Q. Your understanding is that when EPA assesses
5 the genotoxic potential of a pesticide, it only looks at
6 the oral route of exposure, in the case of glyphosate?
7 A. No, that's not my understanding.
8 Q. So did they evaluate whether glyphosate poses a
9 genotoxic risk through other routes of exposure?
10 A. Not to any significant extent, you know, in
11 terms of the content of the September 2016 report. And
12 had they done such an analysis, they would not have
13 included the additional phrase "through the oral route
14 of exposure." They would have said, "through the oral
15 and inhalation or dermal routes of exposure."
16 They clearly felt that their judgment about
17 genotoxic risk was conditioned upon typical levels of
18 exposure through the diet, and that's why they included
19 that phrase in their summary statement.
20 Q. You've never assisted a pesticide manufacturer
21 or any other company in evaluating whether to submit
22 information under 6(a)(2); correct?
23 A. Some -- you know, I think some 6(a)(2) issues
24 came up in my work for a pesticide manufacturer called
25 Appropriate Technology Limited. I did some work with

Page 155

1 them on registration matters in the '90s.
2 Q. You think or you -- do you recall what those
3 6(a)(2) issues were, sitting here today?
4 A. No, I don't. It's been a long time, but I
5 think they were among the issues that we talked about.
6 Q. But you're not sure sitting here today --
7 A. Yeah.
8 Q. -- whether they were --
9 A. It's been a long time.
10 Q. Have you ever published in a peer-reviewed
11 journal about 6(a)(2) reporting requirements?
12 A. No.
13 Q. Ever assisted EPA in evaluating the 6(a)(2)
14 reporting requirements?
15 A. No.
16 MR. FAYNE: We can take a break now if this is
17 a good time to stop.
18 THE WITNESS: So is this lunch?
19 MR. KRISTAL: Yep.
20 VIDEOGRAPHER: Off the record at 12:04 p.m.
21 (A lunch was had from 12:04 p.m.
22 to 1:13 p.m.)
23 VIDEOGRAPHER: Back on the record at 1:13 p.m.
24 Q. (BY MR. FAYNE) Welcome back.
25 A. Thank you.

Page 156

1 Q. I'd like to turn now to page 96 of your report.
2 A. All right.
3 Q. And this is a section of your report where
4 you're discussing the TNO study; correct?
5 A. Correct.
6 Q. Which was a dermal penetration study?
7 A. Yes, sir.
8 Q. The study was conducted in 2002; correct?
9 A. Correct.
10 Q. And it was conducted in response to some
11 questions from EU regulators; correct?
12 A. That was certainly one of the motivating
13 factors, yes.
14 Q. And by "EU," I should say, European regulators;
15 correct?
16 A. Correct.
17 Q. So performed for compliance purposes in Europe;
18 agree?
19 A. To augment the dossier the Germans were putting
20 together.
21 MR. FAYNE: I'm going to mark as Exhibit 12 the
22 final TNO report.
23 THE WITNESS: Thank you.
24 MR. KRISTAL: Thank you.
25 (Exhibit 12 marked for identification.)

Page 157

1 Q. (BY MR. FAYNE:) Turn to page 25 of 41.
2 Actually, let me strike that.
3 Have you seen this document before?
4 A. Yes, sir.
5 Q. This is the final TNO report; is that correct?
6 A. Final of several, yes.
7 Q. But this was the final --
8 A. As far as I know, this is the final.
9 Q. When you say "final of several," you mean there
10 were several drafts before this --
11 A. Yes.
12 Q. -- final report; correct?
13 A. Correct.
14 Q. And I know, if you could let me finish my
15 question.
16 A. Sorry.
17 Q. And the study is titled "In vitro percutaneous
18 absorption study with C14 glyphosate using viable rat
19 skin membranes"; correct?
20 A. Correct.
21 Q. Would you turn to page 25 of 41.
22 A. Okay. I'm there.
23 Q. The second paragraph states, "In general, the
24 poor recoveries combined with the high variation within
25 the glyphosate test groups make the data generated in

Confidential - Charles Benbrook, Ph.D.

Page 158

1  this study unsuitable for risk assessment."
2       Did I read that correctly?
3    A.  Yes, you did.
4    Q.  And you cite this statement in your report;
5  correct?
6    A.  I do.
7    Q.  In other words, the study authors concluded
8  that the data generated were unsuitable for risk
9  assessment.  Do you agree with that?
10   A.  Certain aspects of it.
11   Q.  Which aspects do you not agree with?  Sorry,
12  were you saying you agree with certain -- you were
13  agreeing with the fact that the study authors stated
14  certain aspects were not reliable for --
15   A.  Correct.
16   Q.  -- regulatory purposes?
17       Let me ask the question again just to make sure
18  the record is clear.
19       The study authors concluded that the data
20  generated are unsuitable for risk assessment; agree?
21   A.  That's -- that's what they wrote, yes.
22   Q.  Do you have any basis to disagree with their
23  conclusion that it was not suitable for risk assessment?
24   A.  Just that there -- there are -- as they say,
25  they're highlighting poor recoveries as one issue.

Page 159

1  There was also a lot of variability in some of the
2  autoradiography aspects of the study, which were
3  highlighted, but there were other aspects of the study
4  that weren't highlighted or discussed as problematic.
5    Q.  For the areas of the study that were
6  highlighted as problematic, do you have any basis to
7  disagree or any reason to disagree with the author's
8  conclusion that those aspects were not suitable for
9  regulatory purposes?
10   A.  I think there's -- there is a history in these
11  sorts of studies of poor recovery.  Some of the
12  Monsanto-commissioned skin penetration studies had very
13  low recoveries.  It's a -- it's a problem in aspect in
14  skin penetration studies that scientists that do this
15  sort of work struggle with.
16       So I agree that the recoveries in this report
17  were -- were low or poor, but they weren't unprecedented
18  in terms of other studies that have been done of this
19  sort.
20   Q.  Do you agree with the study authors that this
21  report -- that this study was unsuitable for risk
22  assessment?
23   A.  That's their judgment of it, yes.
24   Q.  Do you agree with that judgment?
25   A.  I think there are -- there are aspects of this

Page 160

1  study that I think are reliable for risk assessment
2  purposes.
3    Q.  Do you agree that the study overall was not
4  suitable for risk assessment purposes?
5    A.  I think the -- as I said, I think there's
6  aspects of the studies that -- that were not changed
7  through the four drafts I know of that were not
8  highlighted as problematic.  There are certainly other
9  aspects of the study that are highlighted as a problem
10  and a source of concern.
11       So I -- you know, I recognize that -- that TNO
12  in this last version made this statement that they
13  didn't -- they didn't feel that the study was up to
14  snuff for risk-assessment purposes, and in fact it's why
15  they offered to reproduce the study or redo the study at
16  no cost, to clear up any ambiguity about the findings.
17   Q.  You state -- you just testified and you state
18  in your report that TNO agreed to reproduce this study
19  at no cost.
20   A.  Correct.
21   Q.  What are you relying on for that statement?
22   A.  A MONGLY e-mail where -- let's see -- through
23  ▮▮▮▮▮▮▮▮ or ▮▮▮▮, one of the -- one of the
24  Monsanto Europe scientists that were interacting with
25  TNO directly was reporting to his colleagues about a

Page 161

1  recent interaction with TNO over the remaining questions
2  about certain aspects of the study.
3    Q.  So your testimony is that there is an e-mail,
4  internal Monsanto e-mail, in which they report about
5  conversations with TNO; is that correct?
6    A.  Yes.  There's several.
7    Q.  You're not aware of any e-mail from an employee
8  or an agent of TNO suggesting that they would do the
9  study at no cost?
10   A.  No.  Just Monsanto, a Monsanto employee
11  reporting that that's what he was told by TNO.
12   Q.  Would you agree that TNO would not agree to
13  repeat a study at no cost if they didn't believe that
14  there were issues with the first data generated in the
15  first study?
16   A.  You know, I think -- I think TNO was aware of
17  some of the issues with the recovery and the
18  autoradiography.
19       There's a -- this back-and-forth with TNO went
20  on for over a year, and there's multiple e-mails in the
21  record of where Monsanto scientists are explaining to
22  Donna Farmer or Bill Heydens or other Monsanto officials
23  what happened with the TNO study and what they -- what
24  they feel it found and the risks that it posed to the
25  future freedom to operate for glyphosate-based

| Page 162 |
|---|

1 herbicides in Europe. There's a -- yeah, there's a
2 very -- there's an extensive back-and-forth about it.
3    Q. If you turn back to page 25 of the report, it
4 also states that, "The properties of the formulation
5 made it difficult to quantify the exact amount applied
6 onto the skin and to guarantee contact of the fluid with
7 the entire skin surface."
8    A. Yes.
9    Q. And the next sentence states, "These problems
10 may have caused the irregular recovery and the high
11 variation of the absorption data"; correct?
12    A. Correct.
13    Q. So they're identifying a number of problems
14 with the study; correct?
15    A. Yeah. Potential problems, potential
16 explanations.
17    Q. Would you agree that Monsanto was not required
18 to submit this final report? And right now I'm just
19 referring to the final report, that Monsanto is not
20 required to submit this final report to EPA?
21    A. Well, they -- I don't think they would be
22 required to submit the final report had they submitted
23 the first draft report, which they surely were required
24 to submit.
25    Q. We'll get to that in a second.

| Page 163 |
|---|

1    A. Okay.
2    Q. But just relying -- referring just to this
3 final report in which the study authors conclude that
4 the study is unsuitable for risk assessment; correct?
5    A. I think -- I'm not -- so I'm understanding your
6 question to be just about this version of the report,
7 notwithstanding what happened with the earlier versions,
8 and I -- I really don't know the details of the regs
9 well enough to say whether they would be obligated to
10 submit the study anyway given that there were some
11 issues with it. I'd have to look at that in more depth.
12    Q. That's because you're not familiar enough with
13 the regulations to say one way or the other, sitting
14 here today, whether this should have been reported;
15 correct?
16    A. It's just this is a -- a thorough answer to
17 that question would require me to refresh my memory
18 about which aspects of the study they've acknowledged in
19 the body of the report.
20       This is the -- this is the conclusions page.
21 This is the end of it. In the body of the report, they
22 actually talk about in more detail what some of the
23 problems were, and I would have to evaluate whether
24 those -- those problems, you know, rendered the whole
25 report unreliable, or just aspects of it. That would

| Page 164 |
|---|

1 come into play in answering your question.
2    Q. Sir, I'm asking you what testimony you intend
3 to offer at trial of this matter, and my question is
4 whether you intend to testify that Monsanto had a legal
5 obligation to submit this report to EPA?
6    A. I will certainly testify that Monsanto had an
7 obligation to submit one of the TNO reports. They
8 all -- all of them have the same core finding with the
9 exception of the revision of the dermal penetration rate
10 for the technical glyphosate concentrate.
11       There was a revision between the initial draft
12 and the second draft in the skin penetration rate for
13 the technical glyphosate from 1 point something, 1.12,
14 to .52. That was the only change in the core findings
15 of the report, and those core findings are stated in
16 exactly the same way in all four versions, with the
17 exception of that -- that one revision that happened
18 between the first draft and the second draft.
19       After the second draft, so in the third and
20 fourth, that number also did not change. So what I
21 regard as the core findings and the most important
22 findings and certainly the most important findings to
23 Monsanto in terms of the perceived threat to
24 glyphosate's freedom to operate in Europe, was those
25 core findings, which did not change from one version of

| Page 165 |
|---|

1 the report to the final version.
2    Q. We were discussing previously that in this
3 final report, the study authors identified a number of
4 problems with the study that made it unsuitable for risk
5 assessment; correct?
6    A. That is what they say, yes.
7    Q. Were those same issues present in the prior
8 version of the study?
9    A. Not all of them. The discussion of the
10 problems, I don't believe there was really any in the
11 initial draft. I think there was some in the second
12 draft, quite a bit more in the third draft, and
13 not -- not many changes between three and four.
14    Q. And I'm not asking you about the discussion of
15 the problems. I'm asking you about the problems with
16 the data itself.
17       They didn't recreate the study; correct?
18       They generated data once and then wrote several
19 drafts --
20    A. Correct.
21    Q. -- of the report; right?
22    A. Right. It was the interpretation of the same
23 set of analytical results.
24    Q. So the data issues they identified in this
25 final report, those would have been present for the

Confidential - Charles Benbrook, Ph.D.

Page 166

1 first draft, the second draft, the third draft, et
2 cetera; correct?
3 A. Correct. I understand what you're getting at
4 now. Yes.
5 Q. So fair to say that the study authors would
6 have reached the same conclusion with respect to
7 draft one, that it was not suitable for risk assessment
8 purposes; correct?
9 A. No, I can't -- I can't say that. I mean, it's
10 a hypothetical.
11 After this series of communications with
12 Monsanto that extended over a whole year where Monsanto
13 was extremely upset about the findings of the study,
14 didn't want to -- didn't believe them, felt that there
15 was something wrong with the study, at the end of that
16 discussion, the TNO people agreed to put in this
17 paragraph that said they didn't -- they felt that the
18 poor recoveries and some of the other problems with the
19 study render it unsuitable for risk-assessment purposes.
20 That's -- that's what TNO has said. TNO did
21 not retract the empirical findings, the core empirical
22 findings, which I would have expected them to do if they
23 felt they were unreliable.
24 Q. In the final report, TNO identifies poor
25 recoveries; correct?

Page 167

1 A. Correct.
2 Q. Those poor recoveries would have existed at the
3 time of the first draft of that report; correct?
4 A. Correct.
5 Q. TNO also identifies in the final report high
6 variation within the test groups; correct?
7 A. Correct.
8 Q. That high variation would have been present at
9 the time of the first draft of the report as well, too;
10 correct?
11 A. Correct.
12 Q. You've testified today and stated in your draft
13 report -- or, excuse me. Strike that.
14 You testified today and stated in your report
15 that your opinion is that Monsanto should have submitted
16 the draft TNO report; correct?
17 A. Yes, sir.
18 Q. You agree that that draft report did not have a
19 signed GLP compliance statement; is that correct?
20 A. No, I don't agree with that.
21 Q. Okay. Why don't we --
22 A. Yeah. Let's take a look. There's a -- there's
23 a bunch of forms at the beginning of it, at least in the
24 beginning of the one that I...
25 So I guess the signed -- those signed -- wait.

Page 168

1 Yeah, here. Here they are.
2 So there's quality assurance statement on
3 page 6. There's a statement of GLP compliance on
4 page 5. There's a testing facility acknowledgment on
5 page 8, and a GLP compliance monitoring unit statement
6 on page 7.
7 Q. And sorry to -- sorry to interrupt, but you're
8 looking at the final report; correct?
9 A. Oh, okay.
10 Q. I'll --
11 A. Yes.
12 Q. I'm going to mark as Exhibit 13 --
13 A. Now, don't you be tricking me that way.
14 Q. I wasn't trying to, trust me.
15 MR. FAYNE: I'm going to mark as Exhibit 13 the
16 June 14th, 2002, draft TNO report.
17 MR. KRISTAL: Thank you.
18 (Exhibit 13 marked for identification.)
19 THE WITNESS: Okay. I have this in front of
20 me.
21 Q. (BY MR. FAYNE:) So if you turn to page 4 of
22 35, you'll see that there's a statement of GLP
23 compliance. Do you see that?
24 A. Yes.
25 Q. And you see that the statement of GLP

Page 169

1 compliance was not signed by the study director.
2 A. Correct.
3 Q. Correct?
4 A. Correct.
5 Q. You would agree with me that GLP compliance
6 statements are an important part of any GLP study?
7 A. Of course.
8 Q. It allows the -- anyone reading the study to
9 understand that it was conducted pursuant to good
10 laboratory practices; correct?
11 A. Correct.
12 Q. And until the study director signs that
13 statement, there's no guarantee that the study has been
14 conducted in accordance with good laboratory practices;
15 correct?
16 A. Well, certainly not from the laboratory.
17 Q. Can you turn to page 5 of 35? There's a
18 quality assurance statement. Do you see that?
19 A. Yep.
20 Q. And about two-thirds down the page there's a
21 statement about the report being audited; correct?
22 A. Yes.
23 Q. And that section is not filled out yet because
24 this report --
25 A. Right.

Confidential - Charles Benbrook, Ph.D.

Page 170

1  Q.  -- had not yet been audited; correct?
2  A.  Correct.  It states right upfront it's the
3  unaudited draft report.
4  Q.  Would you agree with me that the data that the
5  study authors relied upon in the final report were the
6  same as the data that they were relying upon in this
7  draft report?  Correct?
8  A.  They -- they re-did a few of the calculations,
9  and they -- as I said, they did make an adjustment in
10  one of the core findings, but that was done between
11  draft report number 1 and the second version and did not
12  change in the subsequent two versions.
13  Q.  Between draft report number 1 and the final
14  report, TNO didn't conduct any new primary studies;
15  correct?
16  A.  Yes, sir.  That's my understanding.
17  Q.  As I understand your report, your opinion is
18  that draft reports such as this draft TNO report should
19  be submitted to EPA; correct?
20  A.  Yeah.  It would fall under the category of a
21  preliminary report.  That's the term that EPA uses
22  in -- or maybe it's from the U.S. Congress -- in the
23  6(a)(2) statute.
24  Q.  So based on your review of the statute and
25  presumably EPA's regulations, it's your opinion that

Page 171

1  Monsanto had a legal obligation to submit this report?
2  A.  Yes.
3  Q.  So your view is that EPA would have wanted to
4  rely on this draft report over the final report which
5  said that it was not suitable for risk-assessment
6  purposes?
7  A.  I didn't say that.
8  Q.  So do you agree that the final report is more
9  important to EPA's review of glyphosate?
10  A.  Typically final reports are more refined and
11  often include additional analyses that may have been
12  done between when the initial draft report was done, but
13  I think the critical feature of the TNO -- this TNO
14  project and report was that the core findings, the most
15  important findings, the findings that were of great
16  concern to Monsanto, did not change between the initial
17  draft report and the fourth -- the final version, with
18  the exception of the one number that I mentioned
19  already.
20  Q.  And those core findings are the same findings
21  that TNO said in the final report were unsuitable for
22  risk assessment; correct?
23  A.  They didn't specifically say that those
24  findings were unsuitable.
25  Q.  They did say that the data generated in the

Page 172

1  study were unsuitable for risk assessment; correct?
2  A.  Yeah, they said -- you know, they said data
3  that was generated in the study was unsuitable.
4  Q.  So if the data generated in the study was
5  unsuitable, wouldn't that suggest that the core findings
6  of the study were unsuitable?
7  A.  If TNO had felt all of the data was unsuitable,
8  I think they would have deleted the findings from the
9  study.
10  Q.  What's your basis for speculating that TNO
11  would have deleted the findings from the study?
12  MR. KRISTAL:  Objection to the form.
13  A.  If they felt that they were unreliable and
14  unsuitable for any use, including risk assessment, they
15  would have deleted the -- deleted the findings.
16  Q.  How do you know that TNO would have deleted the
17  findings?
18  A.  How do I know?  Well, I guess I don't.  I'm not
19  part of their organization.  I don't know what their
20  policies are.
21  But just a read of their studies, it is pretty
22  clear the areas of the study where there were issues
23  that were discussed between the Monsanto scientists and
24  the TNO scientists, issues which were identified in the
25  later versions of it as -- in particular, the poor

Page 173

1  recoveries and the -- some issues with the
2  autoradiography.  Those are discussed in increasing
3  detail in the third and then final version of the
4  report.
5  But there's -- there's no discussion in any of
6  the versions of the reports about the core main
7  findings.  And my -- my sense is that, if they had felt
8  that those findings were also incorrect, that they would
9  have changed them or deleted them.
10  Q.  In paragraph 17 of your report, you
11  state -- and you're welcome to turn to it, but you
12  probably don't need to.  I'll read it to you.  You can
13  tell me if you need to turn to it.
14  MR. KRISTAL:  Well, he's not going to be able
15  to acknowledge if you read it correctly unless he's
16  memorized --
17  MR. FAYNE:  Okay.
18  MR. KRISTAL:  -- the report.
19  THE WITNESS:  So are we talking page 17?
20  MR. FAYNE:  Paragraph 17.  Go ahead.
21  THE WITNESS:  Okay.  Won't take me long to get
22  there.  Okay.  I'm there, sir.
23  Q.  (BY MR. FAYNE:)  You state, "At several stages
24  in the regulatory history of glyphosate and Roundup
25  brand herbicides, this report documents episodes in

Confidential - Charles Benbrook, Ph.D.

Page 174

1 which I conclude Monsanto failed to meet obligations
2 imposed on it by federal law and EPA regulations."
3        Did I read that correctly?
4    A.  Yes.
5    Q.  I understand from your prior testimony today
6 that you contend that Monsanto should have submitted the
7 Parry report and TNO study to EPA; correct?
8    A.  Correct.
9    Q.  Other than those two events, can you identify
10 for me any other action that you claim Monsanto took
11 that violated federal law or EPA regulations?
12    A.  In the 1986 registration standard, EPA imposed
13 on glyphosate registrants -- which at the time were only
14 Monsanto -- a requirement to add a number of worker
15 safety provisions onto the label.  They gave them until
16 June of 1988, I believe.  I don't remember the exact
17 date.  It's in my report.  Monsanto refused to add those
18 additional worker safety provisions onto the label, and
19 to this date they're not on the label.
20        EPA requested Monsanto to do a repeat mouse
21 oncogenicity study to resolve the issues in the 1983
22 Bio/dynamics study.  Monsanto refused to conduct that
23 study.  After the resectioning of the slides and the
24 even deeper controversy over the 1983 study, EPA
25 designed a special study designed to resolve the kidney

Page 175

1 tumor issue in the Bio/dynamics mouse study, and
2 Monsanto refused to carry that study out.
3        In the reregistration -- again, the
4 registration standard document of 1986, Monsanto called
5 for a repeat mouse and a repeat rat study, and
6 they -- the mouse study was not done.  There was a rat
7 study underway that was subsequently submitted to EPA
8 and which satisfied that data requirement.  Those are
9 the main ones that I can recall.
10    Q.  So let me just parse that very briefly.  You
11 contend that Monsanto violated EPA regulations by not
12 adding the worker safety provisions set forth in the
13 1986 registration standard; correct?
14    A.  Correct.
15    Q.  You contend that Monsanto violated the EPA
16 regulations by failing to resolve the issues in the 1983
17 Bio/dynamics study; correct?
18    A.  Well, failing to repeat it.  That was the first
19 request that EPA made of Monsanto, but -- and then there
20 was a subsequent request to do this more -- this sort of
21 specially designed and statistically powerful study to
22 settle the issue over the kidney tumors, and those are
23 the primary ones that I spend -- you know, that I
24 discuss in my report.
25    Q.  So just to make sure I'm clear, your contention

Page 176

1 is that by not repeating the mouse study in the 1980s,
2 Monsanto was in violation of EPA regulations; correct?
3    A.  When -- when the agency puts a requirement in a
4 registration standard document and states that it must
5 be done by a particular date, if a registrant doesn't do
6 that, then they haven't followed an EPA requirement,
7 yeah.
8    Q.  Are you aware of whether EPA ever made a
9 finding that EPA was in violation of a regulatory
10 requirement?
11    A.  You mean that Monsanto was in violation?
12    Q.  Yeah.  Let me restate the question.  Thank you.
13    A.  Okay.
14    Q.  Are you aware of whether EPA ever made a
15 finding that Monsanto was in violation of a regulatory
16 requirement?
17    A.  You know, I don't -- I'm not aware of a -- I
18 guess I am aware that there were -- there were formal
19 findings on some inappropriate advertising that the
20 enforcement division of EPA investigated and forced
21 Monsanto to change the content of some advertising which
22 was not in compliance with EPA regulations for truthful
23 advertising.  I think there was maybe four episodes of
24 that; one or two in Iowa, a couple in New York, and
25 maybe one or two others.

Page 177

1    Q.  So I'll come back to that later.  I'm referring
2 specifically to the two violations that you asserted a
3 few minutes ago.  So the first -- strike that.
4        You testified that Monsanto was in violation of
5 EPA regulations by not adding the worker safety language
6 from the 1986 registration standard; correct?
7    A.  When EPA establishes a requirement in a
8 registration standard and states that it should be done
9 by X date, if the registrant doesn't do that, then, yes,
10 they would be in violation of a requirement in a
11 registration standard, and it's part of EPA regulations
12 that registrants have to do what's in a registration
13 standard to maintain their registrations.
14    Q.  Are you aware of whether EPA ever made a
15 finding in connection with that 1986 registration
16 standard that Monsanto was in violation of the labeling
17 requirements?
18    A.  I'm not aware if they did or not.
19    Q.  You also testified that you believe Monsanto
20 was in violation of the EPA regulations for refusing to
21 conduct the repeat mouse study in the 1980s; correct?
22    A.  Correct.
23    Q.  Are you aware of whether EPA ever made a
24 finding that Monsanto was in violation of the EPA
25 regulations in connection with that event?

Confidential - Charles Benbrook, Ph.D.

Page 178

1  A.  No, I don't -- I don't believe they ever made a
2  finding.  It was just a debate over mouse oncogenicity,
3  you know, that has persisted now for 30 years.
4  Q.  Do you have any knowledge of the communications
5  between Monsanto -- strike that.
6     In your report you detail a number of
7  communications between Monsanto and EPA in the 1980s;
8  correct?
9  A.  Yes.
10  Q.  Some of those relate to the 1986 registration
11  standard; correct?
12  A.  Yes.  Yes.
13  Q.  And as we were just discussing in that
14  registration standard, EPA set forth a requirement for
15  certain labeling provisions related to worker safety;
16  correct?
17  A.  Correct.
18  Q.  Other than what you've spelled out in your
19  report, are you aware of any other conversations or
20  communications between EPA and Monsanto regarding the
21  labeling requirements in the 1986 registration standard?
22  A.  Yes.
23  Q.  What communications?
24  A.  Well, dialogue that went on between the 1986
25  registration standard and the 1993 R.E.D.  I mean, it

Page 179

1  was an ongoing discussion about what additional worker
2  safety provisions should be on all of the Roundup
3  labels.
4  Q.  So you agree that there was an ongoing
5  discussion --
6  A.  Oh, yes.
7  Q.  -- between Monsanto and EPA about what language
8  should go on the label; correct?
9  A.  Correct.
10  Q.  And you would agree with me that you're not
11  aware of every conversation or communication between
12  Monsanto and EPA related to that subject; correct?
13  A.  Well, I certainly am sure there were many
14  face-to-face meetings where there's no record of what
15  was -- what transpired, you know, during the meeting.
16  So, yes, I couldn't possibly be aware of all of them.
17  Q.  Would you agree with me that ultimately EPA
18  must approve every label on a formulated pesticide
19  product?
20  A.  Well, every new label that is approved and then
21  eligible to go on a pesticide product, yes.
22  Q.  So Monsanto couldn't label its products with
23  certain language unless it had EPA's approval to do so;
24  correct?
25  A.  Correct.

Page 180

1     MR. KRISTAL:  You mean the actual label?  Label
2  can mean advertising, marketing.
3     MR. FAYNE:  Sure.
4  Q.  (BY MR. FAYNE:)  So EPA -- Monsanto couldn't
5  put language on the label of its pesticide product
6  without EPA approval; correct?
7  A.  Yes.  That's correct.
8  Q.  EPA will not approve a label unless, in its
9  view, the label directions and safety precautions are
10  sufficient to ensure that the pesticide will not cause
11  any unreasonable adverse effect on man or the
12  environment; correct?
13  A.  That's the basic standard in the FIFRA statute,
14  and it's certainly the goal and the hope of EPA and
15  registrants that all provisions that go onto labels will
16  achieve that.
17     But in the case of the worker safety provisions
18  in the 1986 registration standard which EPA felt were
19  required to and justified to reduce applicator,
20  mixer/loader exposures, those -- those were never put
21  onto the label because Monsanto refused to do so, argued
22  that they weren't needed, argued that there was a
23  generic revision of the worker safety standard that was
24  moving through the system and that any final action on
25  additional worker safety provisions on the labels should

Page 181

1  be deferred until that was completed, and on and on and
2  on.
3     And, you know, basically Monsanto disagreed
4  with the EPA over the need for any additional worker
5  safety provision, so there's really no substantial
6  additional worker safety provision put on a -- on a
7  Roundup label that I'm aware of since the mid '80s.
8     So EPA thought additional provisions were
9  justified and said so in the 1986 registration standard,
10  and they were -- and Monsanto did not feel they were
11  justified, and EPA didn't -- did not feel it was
12  warranted to start a cancellation action over that
13  disagreement, and so they never appeared on the label.
14  Q.  You would agree with me that ultimately EPA
15  accepted Monsanto's position.  Otherwise, they would not
16  have approved Monsanto's labels; correct?
17  A.  I can't think of a -- of a single case where
18  EPA cancelled the registration of a pesticide over, you
19  know, a work -- you know, a single worker or a, you
20  know, a half dozen worker safety provisions.  It just --
21  it never was done.  I'm not aware of any example of
22  that.
23     And I clearly don't -- I think it would be hard
24  for me to imagine how EPA could justify or politically
25  withstand the reaction if they had tried to cancel

Confidential - Charles Benbrook, Ph.D.

Page 182

1 Roundup over those -- those -- that page and a half of
2 additional worker safety provisions that Monsanto
3 refused to put on its label.
4     So EPA had a choice, and they -- they were not
5 willing to exercise their legal right to initiate a
6 cancellation action, and so Monsanto prevailed in
7 that -- in that event.
8     Q.  Just to understand -- strike that.
9         Just to make sure I understand your testimony,
10 you're suggesting that if EPA had stated that it was
11 going to cancel the pesticide registration if Monsanto
12 didn't put the worker safety language on the label, that
13 Monsanto would have played a game of chicken and waited
14 for EPA to cancel the registration?
15     A.  Well, that -- that is the only -- that would be
16 the only option that -- given that it's Monsanto's
17 responsibility to generate the labels and to also write
18 any alternative label language in a label amendment, the
19 changes on the label have to come from Monsanto and be
20 submitted to EPA.
21         Monsanto was unwilling to propose adding the
22 additional worker safety provisions on any of the
23 Roundup labels.  EPA could have initiated a cancellation
24 action for Monsanto's failure to comply with a
25 requirement in the 1986 registration standard.  They

Page 183

1 were clearly within their rights to do that.
2         They could have done it, but they did not do
3 it, and in my professional judgment, they did not do it
4 because they felt that it was not a significant enough
5 of a concern to entail the administrative and political
6 cost of trying to cancel a widely-used herbicide.
7     Q.  Is your testimony that if EPA does not agree
8 with the language that a pesticide manufacturer proposes
9 for its label, its only option is to cancel the
10 registration?
11     A.  Well, so you're talking about a situation where
12 there is an existing registration, a valid federal
13 registration for -- for a glyphosate-based herbicide.
14 If -- if Monsanto chose not to add the, say, the worker
15 safety provisions that were in the '86 registration
16 standard onto that label, that label remains in effect
17 and the herbicide could continue to be used until such a
18 point in time when EPA initiated a cancellation action
19 and actually, you know, carried it through to the end.
20     Q.  There are hundreds of Roundup formulations;
21 correct?
22     A.  There are something on the order of 125
23 registered products.  There are clearly not a hundred
24 different formulations.  Many different products have
25 essentially the same formulation.  There's probably --

Page 184

1 at any one time over the history of glyphosate-based
2 herbicides manufactured and sold by Monsanto, there's
3 probably 90 percent of the volume is from six or so
4 different formulations, or very modest changes in them.
5     Q.  Anytime Monsanto, or any pesticide
6 manufacturer, introduces a new end-use product, they
7 have to get approval from the EPA for the label;
8 correct?
9     A.  That's correct.
10     Q.  So any time after 1986 that Monsanto wanted to
11 introduce a new glyphosate-based product, it would have
12 to get approval from the EPA for the label on that
13 product; correct?
14     A.  Correct.
15     Q.  Isn't it the case, Dr. Benbrook, that the EPA
16 could reject any of those applications for a new end-use
17 product if it didn't agree with the worker safety
18 language on the product label?
19     A.  Yeah, technically they could, but what -- what
20 would be the point, because the existing registrations
21 would stay on the books and be active?  It wouldn't end
22 the use of the -- of the herbicide.
23     Q.  But without EPA approval, Monsanto wouldn't be
24 able to introduce new glyphosate-based products;
25 correct?

Page 185

1     A.  Yeah.  If the EPA denied an application for a
2 new version of Roundup, they could do that, yes.
3     Q.  Are you aware of the EPA ever denying an
4 application for a new version of Roundup based on
5 failure to include the worker safety language from the
6 1986 registration standard?
7     A.  I know there were -- there were a few requests
8 that didn't go through.  I can't -- I can't recall
9 whether they were just label amendments or wholly-new
10 products, and I don't recall whether the worker safety
11 provisions or lack thereof was the primary reason or one
12 of the reasons.  I'd have to research the registration
13 file to answer that.
14     Q.  So sitting here today, you cannot say that
15 you're aware of any instance in which EPA denied an
16 application for a new version of Roundup based on
17 failure to include the worker safety language from the
18 1986 registration --
19     A.  Yeah, that's what I said.  I can't -- I can't
20 think of one.  I'm not -- I'm not convinced that there
21 aren't any, but I can't think of them.
22     Q.  I'd like to go to paragraph 391 of your report.
23     A.  I'm there.
24     Q.  So this is your discussion of the new worker
25 safety language --

Confidential - Charles Benbrook, Ph.D.

Page 186

1   A.  Yes.
2   Q.  -- in the 1986 registration standard; correct?
3   A.  Uh-huh.  Correct.
4   Q.  And paragraph 391, you note the EPA's primary
5   concern that led to their decision to include this
6   language in the registration standard document was eye
7   and skin irritation; correct?
8   A.  Correct.
9   Q.  Not cancer; correct?
10  A.  Correct.
11  Q.  Turn to page 398.
12  A.  Paragraph 398.
13  Q.  I'm sorry.
14  A.  It's all right.
15  Q.  I'll get it right one of these times.
16  A.  You got it right the time before.
17  Q.  You quote from the registration standard
18  document; correct?
19  A.  We're talking 399?
20  Q.  398.
21  A.  Oh, okay.  Yes.
22  Q.  And you quote from that document that, "Worker
23  safety rules must appear on end-use products containing
24  glyphosate, except for those labeled for homeowner use
25  only"; correct?

Page 187

1   A.  Correct.
2   Q.  And that is consistent with the current EPA
3   regulations which require worker safety statements only
4   on products that bear directions for use in agriculture;
5   correct?
6   A.  There's a lot in that question.  In the
7   registration standard this language was not required on
8   the home use end-use products that had a very low
9   concentration.  I believe 3 percent was the cutoff,
10  so...
11  Q.  So you agree that under the 1986 registration
12  standard, Monsanto was not required to add the new
13  worker safety language on products labeled for homeowner
14  use only; correct?
15  A.  Correct.  Yes.
16  Q.  Do you know whether the glyphosate-based
17  products used by Mrs. Stevick were labeled for homeowner
18  use only?
19  A.  I didn't -- as I said in the beginning, I've
20  not reviewed any case-specific information.
21  Q.  So you do not know whether the glyphosate-based
22  products used by Mrs. Stevick were labeled for homeowner
23  use only; correct?
24  A.  I don't know what products she used so I can't
25  answer the question.

Page 188

1   Q.  You also don't know what products Mr. Hardeman
2   used; correct?
3   A.  Correct.
4   Q.  Or what products Mr. Gebeyehou used?
5   A.  Also correct.
6   Q.  You agree that EPA has sole authority within
7   the federal government to approve pesticide
8   registrations; correct?
9   A.  What -- EPA does provide some authority to
10  state departments of agriculture to do certain
11  state-specific registrations, but that authority is in
12  effect transferred from the EPA, so I think we're in
13  agreement.
14  Q.  So you agree that EPA has sole authority within
15  the federal government to approve pesticide
16  registrations; correct?
17  A.  Yes.
18  Q.  And that means every pesticide sold and
19  distributed in the United States must be registered and
20  approved by EPA; correct?
21  A.  Correct.
22  Q.  We were discussing previously that EPA has
23  authority to cancel or suspend a pesticide registration;
24  correct?
25  A.  We spoke about that some, yes.

Page 189

1   Q.  And you state in your report at paragraph 179
2   that, "As of 1994, cancer risk was the most commonly
3   cited reason for pesticide cancellation and suspension
4   actions."
5   A.  Correct.
6   Q.  Has the EPA ever cancelled or suspended the
7   registration of glyphosate?
8   A.  No.
9   Q.  Would you agree with me that EPA endeavors to
10  apply a health-protective approach when it evaluates
11  pesticides?
12  A.  Not always.
13  Q.  So your testimony is that EPA does not always
14  apply a health-protective approach?
15  A.  Correct.
16  Q.  In what circumstances does it not apply a
17  health-protective approach?
18  A.  A highly -- in the case of contested regulatory
19  actions, EPA has been forced politically to reach
20  comprises with registrants to bring about a degree of
21  risk reduction when in fact the agency would have
22  preferred and felt that a greater degree of risk
23  reduction was probably warranted.
24      The EPA -- the regulatory process and the
25  interactions with registrants on high-risk pesticides,

Confidential - Charles Benbrook, Ph.D.

Page 190

1  it is a bit of a dance, and EPA doesn't always get
2  everything that it feels is justified or warranted.
3       And so, you know, I -- I do believe that EPA
4  has fallen short of bringing about the degree of risk
5  reduction that -- that certainly their own reports seem
6  to consider justified.
7    Q.  You would agree that under FIFRA, EPA is
8  required to ensure that any pesticide registered for use
9  in the United States does not pose an unreasonable risk
10  to human health or the environment.  Is that fair?
11    A.  That's the basic standard for adverse effect,
12  is the term of art, not risk.
13    Q.  And you would also agree with me that under the
14  Food Quality Protection Act of 1996, EPA must find that
15  a pesticide poses a, quote/unquote, reasonable certainty
16  of no harm before it can be registered for use on food;
17  correct?
18    A.  Correct.  Well, it's actually they have to
19  determine that there's a reasonable certainty of no harm
20  from establishing a pesticide tolerance.  The tolerance
21  must be in place before EPA will consider a registration
22  application authorizing the use of the pesticide on the
23  food crop for which the tolerance applies.
24    Q.  Okay.  In your prior depositions you've been
25  asked about EPA's data requirements; correct?

Page 191

1    A.  Yes.
2    Q.  And I don't want to go through those at length
3  again today, but EPA does have a prescribed set of data
4  requirements for pesticide registration; correct?
5    A.  Yes.
6    Q.  And those cover a number of different areas
7  such as product performance, toxicology, human exposure;
8  correct?
9    A.  They -- there's no longer any requirement for
10  product performance data except in the case of
11  antimicrobial pesticides.  That used to be part of the
12  requirements but it dropped out I think in the '72 or
13  '78 amendments to FIFRA.
14    Q.  And as I understand, both from your expert
15  report and your prior deposition testimony, you do not
16  intend to testify that Monsanto failed to comply with
17  mandatory data requirements that are set forth in the
18  regulations at Part 158; is that correct?
19    A.  With the exception of the circumstances and
20  incidents that I've already discussed relative to the
21  replacement of the mouse onco study, replacement rat
22  study, and the study that was -- the special study that
23  was designed.
24       You know, one could -- certainly the
25  replacement rat study would have been a core -- a core

Page 192

1  data requirement.  The special study that was designed
2  by EPA to resolve the lingering uncertainty over the
3  kidney tumors, that -- that's not a study that was part
4  of the core data requirements.  It would be an
5  additional study.
6    Q.  EPA also has authority to require registrants
7  to submit additional studies and data; correct?
8    A.  Correct.
9    Q.  So EPA is not limited by the data requirements
10  in Part 158; fair?
11    A.  Correct.
12    Q.  If EPA doesn't believe the information required
13  under Part 58 -- 158 is sufficient to evaluate the
14  potential of a product to cause harm, it can require
15  that additional data be submitted; fair?
16    A.  Very -- very true.
17    Q.  And that could be through a formal data call-in
18  or a more informal request to the registrant; correct?
19    A.  Correct.
20    Q.  EPA can also waive data requirements; correct?
21    A.  Correct.
22    Q.  And it might do that if the data might not be
23  useful to the agency's evaluation?
24    A.  Yeah.  Because, for example, they have a very
25  similar study.

Page 193

1    Q.  Right.  So they might have a similar study or
2  it might be an irrelevant route of exposure; correct?
3    A.  Correct.
4    Q.  I'd like to turn now, since we've been talking
5  about it a bit already, to your discussion of the 1983
6  mouse study --
7    A.  Okay.
8    Q.  -- which starts on page 64 of your report.
9    A.  Yes, sir.  I'm there.
10    Q.  So this section refers to the long-term cancer
11  study in mice that Monsanto submitted to EPA in 1983;
12  correct?
13    A.  Yes.
14    Q.  And you state on page 4 of your report that
15  this -- sorry.  Page 4, paragraph 6(b).
16    A.  I'm there.
17    Q.  That this was the first valid chronic -- first
18  chronic -- sorry, first valid chronic oncogenicity study
19  on glyphosate; correct?
20    A.  Yes.
21    Q.  So you agree that the 1983 long-term cancer
22  study in mice was a valid study?
23    A.  Yes.
24    Q.  So going back to Section 6 of your report where
25  we just were.  This is on page 64.

Confidential - Charles Benbrook, Ph.D.

Page 194

1    A.  Got it.
2    Q.  So in this section, you summarize in detail the
3  back-and-forth between Monsanto and EPA.  Is that a fair
4  characterization?
5    A.  Yes.
6    Q.  Summarize documents from the public record and
7  internal Monsanto e-mails; true?
8    A.  Correct.  Most of the material on the 1983
9  Bio/dynamics study is in the public -- in the public
10  domain.  EPA cleared dozens of documents, and I -- I had
11  already downloaded those and studied them for other
12  projects that I've been involved with.
13    Q.  I know you've testified about these events in
14  prior depositions, so I just want to walk through a few
15  aspects of it, if that's okay.
16    A.  That would be fine.
17    Q.  You state in paragraph 277 of your report that
18  "Bio/dynamics concluded in its report that the slightly
19  increased incidence of adenomas in the high-dose males
20  was considered spurious and unrelated to glyphosate
21  administration."
22        Did I read that correctly?
23    A.  Yes, you did.
24    Q.  EPA initially reviewed the Bio/dynamics report
25  and disagreed with that conclusion; correct?

Page 195

1    A.  That's correct.
2    Q.  So EPA did not simply accept Monsanto's
3  interpretation of the results; it pushed back on them?
4    A.  It did.
5    Q.  And then as you summarize here -- and again, I
6  don't want to walk through this in too much detail
7  today, but that set off a long series of back-and-forth
8  between Monsanto and the agency; fair?
9    A.  Absolutely fair.
10    Q.  Monsanto submitted several letters setting
11  forth its position; correct?
12    A.  Correct.
13    Q.  EPA provided responses in various letters and
14  memoranda; correct?
15    A.  Yes.
16    Q.  EPA convened multiple meetings of senior
17  scientists?
18    A.  Correct.
19    Q.  Monsanto representatives met with the EPA on
20  multiple occasions?
21    A.  Yes.
22    Q.  EPA requested that the kidney slides be
23  resectioned and reevaluated; correct?
24    A.  That is an outcome that occurred.  It was not
25  initiated by EPA.

Page 196

1    Q.  So the kidney slides were resectioned and
2  reevaluated; correct?
3    A.  Monsanto took it upon themselves to do it and
4  was hopeful that that would reopen the consideration of
5  the renal tubular adenomas in the mouse study.
6    Q.  The agency also convened a scientific advisory
7  panel to evaluate the study; correct?
8    A.  Actually a couple of them, but yes.
9    Q.  And so over this period of time, which spanned
10  from roughly 1983 through 1986, is it fair to say that
11  EPA engaged multiple experts to review this study?
12    A.  No.  No.  Monsanto did.  Monsanto convened
13  several consultants to support its arguments to the
14  agency, but the number of people inside EPA that looked
15  at the study, that didn't change much.  It was Lacayo
16  and Reto Engler and Kasza, the pathologist, and Dykstra.
17  They were -- and Farber, of course, was the deputy, the
18  head of the division.  That cast of characters didn't
19  change much in the five-year period.
20    Q.  Would you agree with me that EPA as a body
21  devoted a tremendous amount of time and attention to
22  this single study?
23        MR. KRISTAL:  Objection.
24    A.  Absolutely.
25    Q.  Do you contend that Monsanto made any material

Page 197

1  misrepresentation to the agency in connection with the
2  1983 mouse study?
3    A.  What do you mean by "material"?
4    Q.  Let me take out the word "material."  Do you
5  contend that Monsanto misrepresented any fact to the
6  agency in connection with that 1983 mouse study?
7    A.  Well, yeah, they did some.
8    Q.  What did they misrepresent?
9    A.  They clearly -- in Frank Serdy's letter back to
10  I can't remember if it was Doug Campt, but one of the
11  officials in the chain of command, he represented that
12  all of the consulting experts that Monsanto invited to
13  the SAP meeting testified that there was no basis or
14  justification to do a repeat mouse study, when none of
15  them said anything about that.
16    Q.  Other than that incident that you just referred
17  to, can you think of any other misrepresentation that
18  Monsanto made to the agency in connection with the 1983
19  mouse study?
20    A.  I think it's fair to say that Monsanto often
21  provided EPA with information that deviated from what
22  the agency had actually requested.  It was sort of in
23  addition to and not fully responsive, but I don't think
24  that would rise to the threshold that you've embedded in
25  your question of purposely misleading.

Confidential - Charles Benbrook, Ph.D.

Page 198

1    Q.  So other than the statement that you referred
2  to about -- strike that.
3        So other than Frank Serdy's statement about
4  what various members of the SAP testified, you're not
5  aware of any misrepresentation by Monsanto in connection
6  with this mouse study; correct?
7    A.  I think the -- the word "misrepresentation" is
8  a fluid one, and I think the zeal with which Monsanto
9  always represented information about this 1983 mouse
10  study to the EPA was so consistently biased in favor of
11  and in the direction of Monsanto's read of the study and
12  hoped for evaluation of the study by -- by EPA that I
13  think it could be characterized as really getting into
14  the misrepresentation category.
15    Q.  You would agree with me that it's not unusual
16  for registrants to communicate with EPA about a
17  particular study; correct?
18    A.  No, it's -- it's common.
19    Q.  It's also common that registrants would try to
20  persuade the agency that their interpretation of the
21  data was correct?
22    A.  That is also common.
23    Q.  And are you contending today that trying to
24  persuade the agency amounts to misrepresentation?
25    A.  It depends on how far it goes and what tactics

Page 199

1  are used and how -- how willing the registrant is to
2  respond to the request for information that the agency
3  provides to them along the way.
4        Another example would be literally on the day
5  that Monsanto found out that Dykstra's review of the
6  Bio/dynamic study was going to identify oncogenic
7  potential because of the renal tubular adenomas,
8  Dr. Gingerich, who was one of the scientists working in
9  the Washington office of Monsanto, had at least two
10  meetings and I think two phone calls with senior
11  officials in OPP on the very day that he heard about it.
12        And in his conversation with Bill Burnham, who
13  at the time, I believe, was the deputy director of HED,
14  Burnham said, "Well you could provide us additional data
15  on historical controls from the same laboratory and
16  around the same period of time."
17        And, you know, this is -- to me it was sort of
18  extraordinary that on the very day that Monsanto found
19  out about this -- this pending EPA review and conclusion
20  based on the study, that they -- that they had had these
21  conversations.
22        But when Monsanto, five or six months later,
23  submitted historical control data to the EPA in response
24  to Dr. Burnham's request, it included data from other
25  labs and data from outside the time period that had been

Page 200

1  identified.
2        So it's an example of where Monsanto really
3  didn't do what EPA asked it to do and sort of muddied
4  the water by including historical control data from
5  other labs, which basically EPA wasn't going to pay much
6  attention to anyway.
7    Q.  But you don't contend that Monsanto manipulated
8  or misrepresented the historical control data; correct?
9    A.  No, didn't say that.
10    Q.  And my question to you is whether Monsanto
11  misrepresented any fact, and so far I haven't heard one
12  that they've misrepresented, but correct me if that's
13  wrong.
14        MR. KRISTAL:  Objection to the form of the
15  question.
16    A.  I've already discussed the one example in the
17  record that I would -- where there is clear evidence
18  that Monsanto did misrepresent facts.
19    Q.  So you would agree that other than that one
20  example, there's not clear evidence that Monsanto
21  misrepresented a fact; correct?
22    A.  There's not clear evidence that I've had a
23  chance to review yet.  I would certainly not sit here
24  and say that there isn't clear evidence in the record.
25    Q.  Let's turn to paragraph 320 of your report.

Page 201

1        And in this paragraph you describe that
2  Monsanto in the April through May 1985 period --
3    A.  Yes.
4    Q.  And again, I'm going to ask you a very specific
5  question, so I'm just going to set this up, if that's
6  okay.
7        So in April, May, 1985, Monsanto hired
8  Dr. Kuschner, an outside pathologist, to review the
9  kidney slides and he found an additional kidney tumor in
10  the control group; correct?
11    A.  Correct.
12    Q.  And Monsanto submitted that report to OPP;
13  correct?
14    A.  Let's see.  I think the report -- I can't
15  remember if it went from Bio/dynamics directly into EPA,
16  or from Bio/dynamics to Monsanto and EPA, but it was one
17  of those two.
18    Q.  At some point the report was submitted to EPA?
19    A.  Yes.  Yes, it was.
20    Q.  In paragraph 323, you state that, "The Kuschner
21  report delayed EPA's final determination as to
22  glyphosate oncogenicity in the Bio/dynamic study";
23  correct?
24    A.  I'm sorry.  Where are you reading from?
25    Q.  Paragraph 323.

Confidential - Charles Benbrook, Ph.D.

Page 202

1  A. 323. Okay. Yes. Okay. I'm there.
2  Q. So as of May 1985, EPA had not yet made its
3  final determination as to whether the Bio/dynamic study
4  showed that glyphosate was oncogenic; correct?
5  A. Well, the review of Dykstra and the position
6  taken by the CARC was it was still being discussed.
7  They had -- they had reached the decision to classify
8  glyphosate as a possible oncogen, but they were still
9  discussing these aspects of the study with Monsanto.
10  Q. You state in your report that the Kuschner
11  report delayed EPA's final determination; correct?
12  A. Correct.
13  Q. So as of May 1985 when that report was
14  submitted, EPA had not yet made its final determination?
15  A. Distinction between in the context of
16  this -- this whole discussion, there's an OPP
17  determination and there's an EPA determination. OPP had
18  made its determination via the hazard evaluation
19  division and Dykstra's review. I believe at this time
20  the CARC memo, which had been signed by now; right? I'm
21  pretty sure. That represented OPP's position, there
22  had been no action taken at the EPA level of whether EPA
23  management accepted that OPP decision.
24  So it's a little -- it's confusing, and I
25  assure you for someone that's spent as much time with

Page 203

1  the record as I have, it's sometimes hard to tell what's
2  an EPA decision or what's an OPP decision.
3  Q. Is there any other branch within EPA that
4  regulates pesticides other than OPP?
5  A. No.
6  Q. So OPP's decision is the decision of EPA; no?
7  A. No, it's not. No, it's not. Senior-level
8  management in EPA will sometimes overrule an action
9  taken by OPP. In fact, they -- this was part of what
10  happened in the case of glyphosate.
11  Q. When EPA reregistered glyphosate in 1993, would
12  that be an EPA action?
13  A. Yes.
14  Q. You would agree that that was a major
15  regulatory action; correct?
16  A. Yes, sir.
17  MR. FAYNE: I'm going to mark as Exhibit 14 the
18  1993 Registration Eligibility Decision.
19  (Exhibit 14 marked for identification.)
20  Q. (BY MR. FAYNE:) If you could turn to -- strike
21  that.
22  You've seen this document before; correct?
23  A. Yes, sir.
24  Q. You're familiar with it?
25  A. Yes.

Page 204

1  Q. If you could turn to page 14, please.
2  A. First word, "Adenomas"?
3  Q. Correct. And if you go to the second
4  paragraph, it's describing a carcinogenicity study in
5  mice; correct?
6  A. Let me just get a sense of the context here. I
7  take it this is in the toxicology discussion section?
8  Q. That's correct.
9  A. Estimate usage, science assessment, product
10  chemistry...
11  Okay. So you --
12  Q. That second paragraph is discussing the 1983
13  mouse study; correct?
14  MR. KRISTAL: Which paragraph?
15  THE WITNESS: The second one. Starting, "A
16  carcinogenic study"; correct?
17  MR. FAYNE: Correct.
18  THE WITNESS: Yes, okay. Correct.
19  Q. (BY MR. FAYNE:) So you agree that this second
20  paragraph is discussing the 1983 mouse study; correct?
21  A. Correct.
22  Q. And at the bottom of this paragraph, the
23  document states that, "Therefore, glyphosate was not
24  considered to be carcinogenic in this study"; correct?
25  A. Correct.

Page 205

1  Q. So EPA's final determination was that
2  glyphosate was not carcinogenic in this study; correct?
3  A. That says it's stated here, and of course this
4  occurred in 1991 with the reevaluation.
5  Q. And we'll get to the 1991 reevaluation.
6  A. Okay.
7  Q. But I thought you were making a distinction
8  between EPA and OPP. Are you saying that the 1991
9  reevaluation was also EPA's determination, as opposed to
10  OPP?
11  A. No.
12  Q. So this 1993 document, this is EPA's
13  determination; correct?
14  A. This is -- yeah. This is a -- this would
15  reflect EPA's position and judgment.
16  Q. So as of 1993, EPA did not consider glyphosate
17  to be carcinogenic in the 1983 mouse study?
18  A. Correct.
19  Q. You would agree with me that EPA has confirmed
20  that conclusion on multiple occasions since 1993;
21  correct?
22  MR. KRISTAL: Object to the form of the
23  question.
24  A. Well, there have been -- there have been a
25  number of tolerance petitions where EPA has discussed

Confidential - Charles Benbrook, Ph.D.

Page 206

1  the chronic toxicology database, and then there's been
2  all of the documents relative to the rereview of
3  glyphosate that started in, what, 2008 culminating in
4  the 2016 report being the fullest expression, and at
5  multiple times along the way, the EPA expressed its
6  judgment based on the entire animal bioassay data set.
7      And I really don't believe there was anything
8  new or different said about the 1983 Bio/dynamic study
9  from 1991 on. I mean, that was it. That was the end of
10  the story on that study.
11      Q.  So since 1991, EPA's position on the 1983 study
12  has been consistent; correct?
13      A.  Has been consistent, yes.
14      Q.  And consistently found that it did not show
15  carcinogenicity; correct?
16      A.  Well, they -- that's what they determined in
17  1991, and they never revisited that decision or changed
18  it.
19      Q.  So your position is that during the current
20  rereview process, culminating in what you said since the
21  2016 EPA report, but that's been updated since in
22  December 2017, that EPA didn't revisit that study?
23      A.  No. No. I don't think they did at all, yeah.
24      Q.  What's your basis for saying that they haven't
25  looked back at the study?

Page 207

1      A.  They had a final determination of that study,
2  and I don't think they -- they spent a lot of time
3  reassessing their evaluation of many of the old animal
4  bioassays. So I think to the extent that they spent
5  time assessing new studies, it would be the more recent
6  ones.
7      Q.  Did EPA -- I'm sorry. Strike that.
8          Did IARC consider the 1990 -- 1983 mouse study?
9      A.  Yes.
10      Q.  Did it reach any determination about that
11  study?
12      A.  Yes.
13      Q.  Did it find that the tumors in the study were
14  treatment-related?
15      A.  Yes.
16      Q.  You agree that in its most recent evaluation in
17  December 2017, OPP has reviewed the IARC report;
18  correct?
19      A.  Yes.
20      Q.  And that would include the IARC -- the section
21  of that report addressing the 1983 study; correct?
22      A.  Correct. Yeah.
23      Q.  And in the December 2017 OPP report, EPA again
24  found that glyphosate is not likely to be carcinogenic;
25  correct?

Page 208

1      A.  Correct.
2      Q.  It also conducted a review of the animal data;
3  correct?
4      A.  Well, yeah. It reviews the same studies that
5  it reviewed, and going back to the 1993 reregistration
6  document, yeah.
7      Q.  So in the December 2017 report, EPA had
8  reviewed the IARC determination, had reviewed IARC's
9  conclusions about the animal data, and still reached the
10  determination that glyphosate is not likely
11  carcinogenic; fair?
12      A.  OPP had reviewed, not all of the EPA, because
13  there was a disagreement in EPA about the aspects of the
14  evaluation.
15      Q.  OPP had reviewed the IARC determination, IARC's
16  conclusions about the animal data, and reached the
17  determination that glyphosate is not likely to be
18  carcinogenic; correct?
19      A.  EPA reached that conclusion based on a
20  weight-of-the-evidence assessment relative to the five
21  categories in EPA's classification system.
22      You know, there's -- certainly there are
23  differences in the evaluation of the animal data between
24  EPA and IARC, but certainly not as significant as the
25  differences in assessment of the genotox database.

Page 209

1      Q.  Sir, if you could turn to page 85 of Exhibit 6,
2  which is EPA's --
3      A.  Yep. Yep.
4      Q.  -- 2016 --
5      A.  85?
6      Q.  85, yes.
7      A.  Okay. I'm there.
8      Q.  This is OPP's discussion of the 1983 mouse
9  study; correct?
10      A.  Correct.
11      Q.  And this is their -- OPP's 2016 report which
12  follows the IARC evaluation; correct?
13      A.  Follows?
14      Q.  Sorry, came after IARC's determination;
15  correct?
16      A.  Well, I'll -- yes. Yes.
17      Q.  And if you turn to page 87, the --
18      A.  I'm there.
19      Q.  The top paragraph states, "Based on the weight
20  of evidence for this study, the agency concurs with the
21  PWG conclusion, following a thorough examination of all
22  kidney sections, that the renal tubular neoplasms are
23  not treatment-related with a lack of statistical
24  significance in the trend and pairwise test"; correct?
25      A.  Correct.

Confidential - Charles Benbrook, Ph.D.

Page 210

1   Q.   So in 2016, EPA concluded, based on a
2   weight-of-evidence evaluation of this study, that the
3   tumors were not treatment related; correct?
4   A.   That -- that was EPA's position then and I
5   believe it's still to this day.
6   Q.   I'd like to go to -- you can put that down now.
7   Thanks.
8   A.   I was going to say, no more than three
9   documents open at once.
10   Q.   Yes, I understand.
11   A.   Or we'll get hopelessly --
12   Q.   Let's turn to page 78 of your report.
13   A.   Are we done with this '93 R.E.D.?
14   Q.   Yes.  You can put that away.
15   A.   Okay.  Where are we going in my report?
16   Q.   So you don't even need to turn there, actually.
17       In your report you discuss the 1986 scientific
18   advisory panel; correct?
19   A.   Yes.
20   Q.   Which reviewed the 1983 mouse study?
21   A.   Correct.
22   Q.   What is a science advisory panel?
23   A.   It's an ad hoc group of scientists convened by
24   EPA to provide scientific and technical guidance to the
25   agency on issues that arise in the course of regulating

Page 211

1   pesticides.
2   Q.   And an S-A-P, or science advisory panel, is
3   composed of scientists who are independent of EPA;
4   correct?
5   A.   Correct.
6   Q.   They're selected by EPA's Office of Science
7   Policy?
8   A.   Yes.
9   Q.   The 1986 SAP memorialized its findings and
10   recommendations in a February 24th, 1986, memo; correct?
11   A.   Correct.
12       (Exhibit 15 marked for identification.)
13   Q.   (BY MR. FAYNE:)  Marking as Exhibit 15 the
14   SAP's 1986 memo.  You've seen this document before?
15   A.   Yes, but I need to read it.
16   Q.   And I just have a very quick question for you
17   about what the panel concluded.
18   A.   Okay.  Just let me finish reading it, please.
19   Okay.
20   Q.   In this 1986 SAP memo, the SAP recommended that
21   glyphosate be categorized -- categorized as Group D, not
22   classifiable; correct?
23   A.   Correct.
24   Q.   So the SAP did not believe there was sufficient
25   evidence to classify glyphosate as a possible oncogen;

Page 212

1   correct?
2   A.   Correct.
3   Q.   The SAP also recommended that there be a data
4   call-in for further studies in rats and/or mice --
5   A.   Correct.
6   Q.   -- to clarify unresolved questions; correct?
7   A.   Yes.
8   Q.   And you testified previously that Monsanto did
9   conduct a new study in rats; correct?
10   A.   There was a new study ongoing at the time of
11   this meeting.
12   Q.   But since 1986, Monsanto did -- strike that.
13       After the 1986 SAP, Monsanto did complete a new
14   study in rats; correct?
15   A.   They completed it and submitted it to the
16   agency, yes.
17   Q.   And that's the Stout and Rucker study?
18   A.   I don't recall the author's name.
19       (Exhibit 16 marked for identification.)
20   Q.   (BY MR. FAYNE:)  We've marked as Exhibit 16 an
21   EPA memorandum dated October 30th, 1991, subject "Second
22   peer review of glyphosate."
23       You've seen this document before; correct?
24   A.   Yes, sir.
25   Q.   This document is titled "Second peer review."

Page 213

1   The first was the March 1985 memo you mentioned
2   previously; correct?
3   A.   Correct.
4   Q.   If you turn to page -- the second page of the
5   document, it states individuals in attendance; correct?
6   A.   Yes.
7   Q.   And there are a number of individuals listed
8   here.  I haven't counted them up, but it looks like more
9   than ten individuals on the committee; correct?
10   A.   Yes.
11   Q.   And at the top it states that signature
12   indicates concurrence with the peer-review
13   committee -- I'm sorry, strike that.
14       It states, "Signature indicates concurrence
15   with the peer review unless otherwise stated"; correct?
16   A.   Yes.
17   Q.   So on this document and others like it, the
18   signature indicates concurrence; correct?
19   A.   Correct.
20   Q.   Unless something else is indicated on the
21   signature line; correct?
22   A.   Correct.
23   Q.   And as you can see from this report, the
24   majority of members of the committee concurred in the
25   peer review; correct?

Confidential - Charles Benbrook, Ph.D.

Page 214

1    A.  Correct.
2    Q.  Can you turn to page 5.  There's a study, Stout
3  and Rucker study dated 1990, "Chronic study of
4  glyphosate administered in feed to albino rats";
5  correct?
6    A.  Correct.
7    Q.  And that's the -- that's the 1990 study that
8  Monsanto completed; correct?
9    A.  Correct.  That probably was underway in 1986.
10   Q.  So this shows that EPA reviewed the 1990 rat
11  study; correct?
12   A.  Right.  I assume this is a summary of the
13  review.
14   Q.  And if you turn to page 13 --
15   A.  I'm there.
16   Q.  Number 3, that's the 1983 mouse study; correct?
17   A.  I'm sorry, page?
18   Q.  Sorry.  On page 13, where it says --
19   A.  Okay.  Yep.
20   Q.  -- "Hogan, GK" --
21   A.  Yes.
22   Q.  "1983."
23   A.  Yes.  Yes.
24   Q.  So EPA also reviewed the 1983 mouse study in
25  this 1991 peer review; correct?

Page 215

1    A.  It was included, yes.
2    Q.  And they state on page 14, if you turn to
3  page 14, the third paragraph states, "Committee's
4  interpretation.  In their meeting of June 26, 1991, the
5  health effects carcinogenicity peer-review committee
6  concluded that despite the fact that the incidence of
7  renal tubular neoplasm in the high-dose males exceeded
8  that of historical controls, the biological significance
9  of the findings was questionable."
10       Did I read that correctly?
11   A.  Yes.
12   Q.  And then the peer-review committee cites a
13  number of reasons why they thought the review was
14  questionable -- the findings were questionable; is that
15  fair?
16   A.  That's correct.
17   Q.  Finally, if you turn to page 19 --
18   A.  I'm there.
19   Q.  -- it states the peer-review committee's
20  classification that glyphosate should be classified as a
21  Group E (evidence of non-carcinogenicity for humans),
22  based on lack of convincing carcinogenicity evidence and
23  adequate studies in two animal species; correct?
24   A.  Correct.
25   Q.  So in 1991, EPA reviewed the 1990 rat study,

Page 216

1  reviewed the 1993 mouse study, and concluded that
2  glyphosate should be classified as non-carcinogenic to
3  humans; correct?
4    A.  That's correct.
5    Q.  Your report details at length the events from
6  1983 related to this 1983 mouse study up through the end
7  of the 1980s; correct?
8    A.  Correct.
9    Q.  You don't mention that Monsanto performed a
10  study in rats, do you?
11   A.  No.
12   Q.  Why not?
13   A.  There was no -- no disagreement or controversy
14  over the interpretation of that study.  The EPA
15  scientists reviewed and reached the same conclusions as
16  the Monsanto scientists in the contract lab.
17   Q.  In forming your opinions in this case, did you
18  consider the fact that Monsanto performed the rat study
19  as requested by the SAP?
20   A.  I believe the rat study was started before the
21  SAP meeting.
22   Q.  But the SAP stated that there should be a new
23  study --
24   A.  Right.
25   Q.  -- in mice and/or rats; correct?

Page 217

1    A.  Yeah.
2    Q.  And Monsanto performed the study in rats;
3  correct?
4    A.  Yeah.  It was ongoing and they completed it,
5  yeah.
6    Q.  Did you consider that fact in forming your
7  opinions in this case?
8    A.  Yes.
9    Q.  But you didn't consider it important enough to
10  include in your expert report; is that correct?
11       MR. KRISTAL:  Objection.
12   A.  No, I didn't.
13   Q.  Your report also does not mention the 1991 peer
14  review; correct?
15   A.  I'd have to go back and look if it did, but
16  it's certainly a part of the record that I've testified
17  to at length in the earlier depositions.
18   Q.  You would agree with me that the 1991 peer
19  review is an important piece of the regulatory history;
20  correct?
21   A.  Yes.
22   Q.  Okay.  So I want to now move to a discussion of
23  the request for a repeat mouse study, which we've talked
24  about a little already; correct?
25       So you state in your report that in 1986, EPA

Confidential - Charles Benbrook, Ph.D.

Page 218

1 issued the registration standard document; correct?
2    A.   Yes.
3    Q.   And in that document, EPA concluded that the
4 available data were not sufficient to adequately assess
5 whether glyphosate was carcinogenic; correct?
6    A.   Correct.
7    Q.   And EPA requested a repeat of the mouse study
8 with a larger number of animals in each test group;
9 correct?
10    A.   And a rat study.
11    Q.   And a -- but -- sure.  But I'm speaking
12 specifically about the mouse study.  Correct?
13    A.   Okay.  All right.
14    Q.   And you testified that they did do the rat
15 study; correct?
16    A.   Right.  Right.
17    Q.   Monsanto formally requested a waiver, as I
18 understand it from your report; correct?
19    A.   Uh-huh.
20    Q.   If you could say "yes" or "no."
21    A.   Yes.
22    Q.   And it's not uncommon for a registrant to
23 submit a waiver request; correct?
24    A.   No.  It happens.
25    Q.   And in some cases, the agency agrees; in some

Page 219

1 cases it might not agree.  Correct?
2    A.   That's also correct.
3    Q.   In paragraph -- actually, strike that.
4         You also describe a memo that was prepared by
5 Dr. William Dykstra; correct?  And this is the -- sorry.
6 Strike that again.
7         You also describe a memo from Dr. William
8 Dykstra in which he states that, "The toxicology branch
9 does not concur with Monsanto regarding the waiver of
10 the repeat mouse study"; correct?
11    A.   Correct.
12    Q.   That memo was prepared in 1990 -- 1988;
13 correct?
14    A.   I believe that's correct.  Can you just direct
15 me to the paragraph?
16    Q.   Sure.  It's paragraph 380.
17    A.   380, okay.
18    Q.   And actually, if you go to 384, you note that
19 Dr. Dykstra set forth several specific study
20 requirements, including that there should be 200 male
21 mice per group; correct?
22    A.   That was one of them, yes.
23    Q.   So that would be 400 male mice total; correct?
24    A.   No.  No.  There were several groups.  There was
25 a control group and five treatment groups as opposed to

Page 220

1 only three, so it would be 1,200 male mice.
2    Q.   So the study that Dr. Dykstra was requesting
3 would be 1,200 male mice?
4    A.   Correct.
5    Q.   How many mice are typically included in a
6 long-term cancer study?
7    A.   Well, in the original 1983 Bio/dynamic study,
8 there was 50 mice in each of the control and three
9 treatment groups, so 200 male mice, 200 female mice, so
10 a total of 400.
11    Q.   So this would be three times as large as the
12 typical study?
13    A.   Yes.
14    Q.   Are you aware of any pesticide company that has
15 performed a long-term cancer study using that many mice?
16    A.   No, not off the top of my head.  It would be a
17 very -- it would be a very unusual study, a very
18 powerful study that, if there were indeed a problem with
19 renal tube adenomas, that study would have resolved it.
20    Q.   And you've referred to this as a special
21 study --
22    A.   Yeah.
23    Q.   -- because it's unusual; correct?
24    A.   Right.
25    Q.   And you discuss this memo from Dr. Dykstra in

Page 221

1 1988 because it's, in your view, an important piece of
2 the regulatory history; fair?
3    A.   Correct.
4    Q.   So if I understand your report correctly, EPA
5 requested that Monsanto perform this more powerful mouse
6 study in the 1986 registration standard document, and
7 then --
8    A.   No.  No, they didn't -- the request for that
9 more powerful study, I don't believe it was in the
10 registration standard document.  It occurred -- it, you
11 know, two years later in the back-and-forth, after the
12 resectioning of the kidney slides and after the
13 controversy over the magic tumor in control mouse 102A.
14    Q.   So in the registration standard document, EPA
15 requested a repeat mouse study; correct?
16    A.   A repeat mouse study.
17    Q.   Correct.  So EPA requested the repeat mouse
18 study, and then denied Monsanto's request for a waiver
19 in 1988; correct?
20    A.   Correct.  Well, I don't know the date that they
21 denied the waiver, but in between the issuance of the
22 registration standard and Dykstra's request for this
23 special study, there had been the resectioning of the
24 slides and the controversy over whether there was an
25 additional renal tubular adenoma in one of the control

Confidential - Charles Benbrook, Ph.D.

Page 222

1 mice.

2 And OPP and Dykstra felt that the way to

3 resolve this very sharp difference of opinion with the

4 three EPA pathologists that read all the slides saying

5 there's no renal tubular adenoma in control mouse 102A,

6 and all of the Monsanto-hired pathologists saying that

7 there was -- one of the two had to be wrong.

8 And I think it's fair to say that there was

9 never agreement between OPP and Monsanto about whether

10 there was in fact a renal tubular adenoma in control

11 mouse 102A, so EPA designed this very powerful study

12 that had Monsanto done the study and had it produced no

13 evidence of kidney tumors, the debate over the 1983

14 study would have ended at that point.

15 MR. FAYNE: I'm going to move to strike that

16 answer as non-responsive.

17 MR. KRISTAL: I think it was completely

18 responsive, and I'd also remind counsel we're beating

19 dead mice at this point, too.

20 Dr. Benbrook has been asked ad nauseam about

21 this study, and you're really repeating a lot of the

22 same -- it's the same report and you're repeating a lot

23 of the same questions.

24 MR. FAYNE: This is a new report, and I'm

25 walking through it paragraph by paragraph.

Page 223

1 MR. KRISTAL: No. No. I understand it's a new

2 report. The same information was contained in the old

3 report. The same information has been asked --

4 THE WITNESS: Counsel, you didn't do any of the

5 last deposition. I was there, and I will tell you this

6 is very similar to what we went through.

7 MR. FAYNE: I understand.

8 MR. KRISTAL: All I'm saying is I gave you some

9 leeway. I just ask you not to repeat questions on the

10 exact same subjects asking and showing the same

11 documents.

12 MR. FAYNE: I'm trying to understand his

13 opinions that are set forth in this new report.

14 MR. KRISTAL: And I would suggest you look at

15 any one of the five.

16 MR. FAYNE: I've reviewed all five.

17 MR. KRISTAL: And including all five of them --

18 MR. FAYNE: I appreciate it.

19 MR. KRISTAL: -- and you'd understand exactly

20 what you're asking because it's already been asked.

21 MR. FAYNE: Okay. Thank you. I appreciate

22 that.

23 Q. (BY MR. FAYNE:) If you could turn to

24 paragraph 368 of your report.

25 A. We're going -- we're going back now? 368?

Page 224

1 Q. 368.

2 A. Okay. I'm there.

3 Q. You state that, "The 1986 glyphosate RS

4 document states on page 2: 'Failure to comply with

5 these requirements [example, filling data gaps, adding

6 new worker safety rules] may result in the issuance of a

7 Notice of Intent to Cancel or a Notice of Intent to

8 Suspend in the case of failure to submit data."

9 Did I read that correctly?

10 A. Yes, you did.

11 Q. You just testified that Monsanto never

12 conducted the repeat mouse study that EPA requested in

13 the 1986 registration center document; correct?

14 A. Yes.

15 Q. But EPA never issued a notice of intent to

16 cancel the glyphosate registration because of Monsanto's

17 failure to do so; correct?

18 A. That is correct.

19 Q. EPA never issued a notice of intent to suspend;

20 correct?

21 A. Correct.

22 Q. And one more question. If I could turn you

23 back to the 1991 peer review. And I apologize, I

24 don't -- which exhibit is that?

25 A. Exhibit 16.

Page 225

1 Q. Exhibit 16. You testified previously that your

2 understanding is that EPA did not request the additional

3 kidney sections; correct?

4 A. There were -- there were two rounds of

5 reassessment of the kidney slides.

6 Q. But I believe your testimony previously was

7 that EPA did not request that resectioning.

8 A. Correct.

9 Q. If you turn to page 13 of this document.

10 A. I'm there.

11 Q. The last paragraph, the first sentence, states,

12 "The agency then requested that additional kidney

13 sections from the mouse study be prepared and examined."

14 Do you see that?

15 A. Yes.

16 Q. Would you agree with me, then, that your prior

17 testimony was --

18 A. No.

19 Q. -- incorrect?

20 A. So there were two rounds of this, as I said.

21 The first rereading of the kidney slides was actually

22 rereading the original slides. The second round of

23 reassessment entailed actually resectioning the slides,

24 and that -- that is what is addressed in this passage.

25 Q. So you would agree the EPA requested the

Confidential - Charles Benbrook, Ph.D.

Page 226

1  resectioning of the slides; correct?
2     A.  The resectioning of the slides was proposed
3  originally by Monsanto in their ongoing back-and-forth,
4  and ultimately EPA decided to request the resectioning
5  of slides because that -- you know, they had to unthaw
6  the kidneys and slice them again, so it required a
7  request to do that.
8        MR. FAYNE:  17.
9          (Exhibit 17 marked for identification.)
10    Q.  (BY MR. FAYNE:)  I've marked as Exhibit 17 a
11  June 1989 memo from EPA prepared by William Dykstra,
12  subject, "Glyphosate EPA Registration Numbers 524-318
13  and 524-333 - Historical Control Data For Mouse Kidney
14  Tumors."
15        Do you see that?
16    A.  Yes.
17    Q.  Have you seen this document before?
18    A.  Yes.
19    Q.  This is a memo from Dr. Dykstra dated
20  June 1989, which is approximately one year after the
21  Dykstra memo we discussed previously; correct?
22    A.  Correct.
23    Q.  And if you turn to page 2 of the document, the
24  last paragraph before the section that says
25  "Background."

Page 227

1     A.  Okay.
2     Q.  It states that TB -- and "TB" stands for the
3  toxicology branch; correct?
4     A.  Correct.
5     Q.  "The toxicology branch concludes that a repeat
6  of the mouse oncogenicity study is not required at this
7  time.  After the results of the new two-year rat chronic
8  toxicity and oncogenicity study are reviewed, toxicology
9  branch will reconsider whether the repeat of the mouse
10  oncogenicity study is required."
11        Did I read that correctly?
12    A.  Yes, you did.
13    Q.  So in 1989, the EPA toxicology branch agreed
14  that Monsanto did not have to conduct the repeat mouse
15  study; correct?
16    A.  At this time.
17    Q.  At this time; correct?
18    A.  Correct.
19    Q.  EPA further explained that after the results of
20  the rat study were reviewed, it would consider whether
21  to request that repeat mouse study; correct?
22    A.  Yes, sir.
23    Q.  And as we discussed previously, Monsanto did
24  complete that new rat study, and EPA reviewed it in
25  1991; correct?

Page 228

1     A.  Yes, sir.
2     Q.  Do you know whether EPA ever requested that
3  Monsanto repeat the mouse study after 1991?
4     A.  I don't believe they did.
5     Q.  So you stated earlier that at this time, but to
6  your knowledge EPA has not requested that repeat study
7  since 1989; correct?
8     A.  Correct.
9     Q.  You state in your report that Monsanto's
10  refusal to conduct that new repeat mouse study altered
11  the regulatory history; correct?
12    A.  Yes.
13    Q.  You're aware that since the early '90s, there
14  have been four new studies in mice; correct?
15    A.  Yes.
16    Q.  Do you know whether any of those studies found
17  compound related kidney tumors like those reported in
18  the 1983 study?
19    A.  I'd have to refresh my memory, but there's a
20  number of tumors identified in the mice and rat studies
21  that -- where there's difference of opinion between
22  different entities.  IARC read them differently in some
23  respects than EPA.  There were, I think, maybe 14
24  different tumors that are where the results are subject
25  to controversy, depending upon who's reviewing the

Page 229

1  study.
2     Q.  But you're not aware of any of those studies
3  that found compound related kidney tumors; correct?
4     A.  I'm not aware of any that found renal
5  adenomas of the same sort that were in the CD-1 mice in
6  1983, but I do believe the kidney -- the kidney was a
7  target of other adenomas and carcinomas in some of the
8  other studies, and in particular the -- it was the -- a
9  Syngenta study.
10    Q.  You mentioned that there have been many studies
11  in mice and rats since the early '90s; correct?
12    A.  Well, I think the total count is 14.
13    Q.  Correct.  There have been 14 --
14    A.  Yeah.
15    Q.  -- long-term studies in rodents; correct?
16    A.  Yeah.  I think that's the number most people
17  agree to.
18    Q.  EPA has reviewed all 14 of those studies as
19  recently as December 2017?
20    A.  Well, they're discussed in the December 2017
21  report.  They're discussed in the September 2016 report
22  and all the earlier reports, yeah.
23    Q.  And again, since 1991, EPA has consistently
24  classified glyphosate as not likely to be carcinogenic;
25  correct?

Page 230

1    MR. KRISTAL:  Asked and answered.
2    A.  Yeah, it's glyphosate technical based on
3  expected levels of exposure to the general public.
4    MR. FAYNE:  Is now a good time for a break?
5    THE WITNESS:  I'm ready for a bio.
6    VIDEOGRAPHER:  Off the record at 2:57 p.m.
7      (A brief recess was had.)
8      (Exhibit 18 marked for identification.)
9    VIDEOGRAPHER:  Back on the record at 3:19 p.m.
10    Q.  (BY MR. FAYNE:)  Dr. Benbrook, I'm marking as
11  Exhibit 18 the October 1st, 2015, EPA report of the
12  Cancer Assessment Review Committee.
13    A.  Okay.
14    Q.  You've seen this document before; correct?
15    A.  Yes.
16    Q.  The Cancer Assessment Review Committee, or
17  CARC, is a team of interdisciplinary EPA scientists with
18  specific expertise in cancer classification; agree?
19    A.  That's correct.
20    Q.  The CARC must review all food-use pesticides
21  for their carcinogenic potential; correct?
22    A.  I'm not sure that all pesticides come before
23  CARC, but they -- certainly all of the ones where there
24  are technical issues that need to be resolved.
25    Q.  And the CARC recommends a cancer classification

Page 231

1  that ultimately OPP decides whether or not to adopt;
2  correct?
3    A.  That's correct.
4    Q.  If you turn to page 10.
5    A.  I'm there.
6    Q.  The middle paragraph before the bullet states,
7  "In accordance with the 2005 Guidelines For Carcinogenic
8  Risk Assessment, based on the weight-of-evidence,
9  glyphosate is classified as 'Not Likely to Be
10  Carcinogenic to Humans.'"
11    Did I read that correctly?
12    A.  Yes, you did.
13    Q.  So in 2015, as we discussed, the Cancer
14  Assessment Review Committee classified glyphosate as
15  non-carcinogenic; correct?
16    A.  Yes.
17    Q.  If you turn to page 6, it lists the committee
18  members in attendance.
19    A.  I remember seeing the list.  Yes, I see it.
20    Q.  And it shows that there were 13 members of the
21  committee; correct?
22    A.  Yes.
23    Q.  And --
24    A.  I didn't count them, but I'll take your word
25  for it.

Page 232

1    Q.  I'll represent to you that it's 13.
2    A.  Okay.
3    Q.  And each of the members signed; correct?
4    A.  Yes.
5    Q.  None of them indicated they did not concur in
6  the decision; correct?
7    A.  That's correct.
8    Q.  So that means all 13 members of the committee
9  concurred with the classification of glyphosate as not
10  likely to be carcinogenic to humans?
11    A.  Yes.
12    Q.  And I'll note that you testified in August that
13  you thought that maybe not all 13 had concurred, but you
14  now agree that you were not remembering correctly in
15  August; correct?
16    A.  Perhaps we were addressing the 1991.  You know,
17  I don't -- I don't know what part of the deposition
18  you're referring to.
19    Q.  Sure.
20    A.  But I could have gotten one wrong.
21    Q.  But we agree today that --
22    A.  Today.
23    Q.  -- all 13 concur?
24    A.  We are on the same page, sir.
25    Q.  Great.  So turning to -- now I'm in your

Page 233

1  IA -- you can put that aside.
2    A.  Back to the report?
3    Q.  Back to the report.  Paragraph 387.  It's on
4  page 86.
5    A.  I'm there.  387?
6    Q.  You know what?  I'm sorry.  Could we actually
7  pull out the CARC report again?  I'm sorry.
8    A.  This last one?
9    Q.  Yes.
10    A.  Okay.
11    Q.  So you've testified in your report about
12  Jess Rowland; correct?
13    A.  Correct.
14    Q.  And you suggested or you assert in your report
15  that Jess Rowland's involvement with the CARC calls into
16  question its objectivity.  Is that a fair
17  characterization?
18    A.  Not exactly.  The record shows some unusually
19  close and inappropriate communications between
20  Jess Rowland and Monsanto on the general topic of OPP's
21  evaluation of glyphosate oncogenicity.
22    Q.  You state in paragraph 463 -- if you want to
23  turn there in your report.
24    A.  463?
25    Q.  Yep.

Page 234

1  A.  460.  Going the wrong direction.  Okay.  I'm
2  there.
3  Q.  The second sentence of that paragraph you
4  state, "Considering Dr. Rowland" -- I think that should
5  probably be "Dr. Rowland's relationship with Monsanto,
6  it raises, in my opinion, serious questions about the
7  objectivity of that report and the scientific basis of
8  EPA's determination that glyphosate is not likely to
9  pose cancer risk."
10      Do you see that?
11  A.  Correct.
12  Q.  And you're referring to the CARC assessment?
13  A.  Correct.
14  Q.  Do you have any reason to believe that the 12
15  other members of this committee were biased in any way?
16  A.  I found very curious and suggestive an e-mail
17  that Jess Rowland sent to one of the Monsanto people
18  where the topic of discussion was Monsanto had contacted
19  Rowland to see if Rowland and EPA needed any support
20  from Monsanto in sticking to its position that
21  glyphosate poses no oncogenic risk after the release of
22  the IARC classification as a probable human carcinogen.
23      And in the response from Rowland to -- I
24  believe it was Serdy.  I can't remember.  We can no
25  doubt find the MONGLY document, if you want.  Rowland

Page 235

1  says that he's in good shape on epi and exposure, there
2  is an issue about a carcinoma in I believe it was the
3  Syngenta oncogenic feeding study, and he says -- he says
4  that he identifies the CARC as "my people."
5      And that tipped me off to the -- to perhaps an
6  undue influence by Rowland on the members of CARC in
7  that he felt that they were his people and hence would
8  follow his lead.
9  Q.  So you reviewed the e-mails between
10  Jess Rowland and Monsanto and those e-mails led you to
11  question the objectivity of the CARC; is that fair?
12  A.  It suggested to me that there was a
13  Jess Rowland-led effort to try to assure that EPA's
14  statements and reports on the matter of glyphosate
15  oncogenicity stuck to the decision that really went back
16  to 1991, that glyphosate poses no oncogenic risk to
17  humans.
18  Q.  You're not aware of any communications from any
19  of the other non-Rowland members of the CARC and
20  Monsanto; correct?
21  A.  Let me -- no, I'm not.
22  Q.  Each member of the CARC has equal voting
23  rights; correct?
24  A.  I believe that's the case.
25  Q.  And in this case, the vote on glyphosate in

Page 236

1  2015 was unanimous, as we discussed; correct?
2  A.  Correct.
3  Q.  Now let's go to paragraph 387 of your report.
4  A.  387?
5  Q.  Yes.  And just to orient you, this is --
6  A.  Okay.  I'm there.
7  Q.  And to orient you, this is the last paragraph
8  of your discussion of the 1983 mouse study.
9  A.  Oh, okay.  Thank you.
10  Q.  You state, "In my opinion Monsanto should have
11  conducted a special study requested by EPA in response
12  to the agency's request, and in light of the company's
13  commitment to product safety.  I also conclude that, and
14  in the interim, Monsanto should have added an
15  oncogenicity warning to Roundup labels as well as in
16  glyphosate-based herbicide chemical safety data sheets
17  and other information developed for physicians and
18  poison control centers."
19      I omitted a parenthetical, but otherwise did I
20  read that correctly?
21  A.  Yes, you did.
22  Q.  So you state that Monsanto should have added an
23  oncogenicity warning in the interim; correct?
24  A.  Correct.
25  Q.  And by "in the interim," do you mean the period

Page 237

1  of time between the 1986 registration standard document
2  and Monsanto's completion of the repeat mouse study?
3  A.  Well, I think that a prudent company would have
4  moved to add such a warning following the initial CARC
5  classification that occurred I believe in 1985, and that
6  that's when it should have -- it should have been
7  initiated.  It takes time to add that sort of language
8  to all the labels.
9      It wouldn't have happened until probably 1987,
10  at the earliest, given the cycle of label, but that's
11  when it should have begun.
12  Q.  And the reason you contend they should have
13  done that is because at that time, EPA in 1985 had
14  determined that it was a possible carcinogen; correct?
15  A.  Correct.
16  Q.  And then in 1986, EPA had determined that it
17  was a class Category D carcinogen, not classifiable;
18  correct?
19  A.  Now, 1991.
20  Q.  The 1986 registration standard document adopts
21  the Category D classification; correct?
22  A.  I don't believe so.
23  Q.  Regardless, your position as of -- let's start
24  with 1985.  The reason you contend Monsanto should have
25  added the warning is because of EPA's classification of

Confidential - Charles Benbrook, Ph.D.

Page 238

1 glyphosate as a possible carcinogen; correct?
2    A.  As codified in the 1985 CARC meeting.
3    Q.  So by that logic, would you agree that today
4 Monsanto has no obligation to put a cancer warning on
5 its products based on EPA's classification of glyphosate
6 as Category E, non-carcinogenic?
7       MR. KRISTAL:  Objection.  Because Dr. Benbrook
8 is not being offered on causation, and, therefore,
9 there's additional information in the present time other
10 than EPA's classification.
11      MR. FAYNE:  You can answer.
12      THE WITNESS:  Would you please repeat the
13 question?
14   Q.  (BY MR. FAYNE:)  Sure.  By that logic, would
15 you agree that Monsanto has no obligation today to place
16 a cancer warning on its glyphosate-based herbicides in
17 light of EPA's classification of glyphosate as not
18 likely to be carcinogenic?
19   A.  No, I don't agree.  There's much more
20 information and there is a classification by the
21 International Agency For Research on Cancer that
22 glyphosate and glyphosate-based herbicides are probable
23 human carcinogens, which I think raises substantially
24 the justification for a clear cancer warning on labels
25 and material safety data sheets, et cetera.

Page 239

1    Q.  Would you agree that prior to the IARC
2 determination in March 2015, that Monsanto had no
3 obligation to put a cancer warning on its products based
4 on the then existing EPA classification of glyphosate as
5 Category E, non-carcinogenic?
6       MR. KRISTAL:  Same objection.  And he's already
7 been questioned about this.
8       THE WITNESS:  May I answer?
9       MR. KRISTAL:  Sure.
10      THE WITNESS:  I don't believe that Monsanto had
11 a legal obligation under FIFRA.
12      I do believe that they had a moral and ethical
13 obligation as a company with a professed commitment to
14 product stewardship and safety of its users.
15 Given -- given the equivocal oncogenic response data in
16 a number of the animal bioassays, in addition to the
17 positive epidemiological studies that Monsanto was aware
18 of at the time, a responsible company would have alerted
19 its users that there is some chance, some evidence that
20 there may be an oncogenic risk, and I think it was
21 incumbent on the company, by virtue of its stated
22 commitment to product stewardship and its pledge to
23 promote the safe use of its products, to provide users
24 with that information.
25   Q.  (BY MR. FAYNE:)  So your opinion is that

Page 240

1 Monsanto did not have a legal obligation to add a cancer
2 warning to its label, but it had a moral one; is that
3 fair?
4       MR. KRISTAL:  Objection.  Obviously calls for a
5 legal conclusion.
6    A.  I didn't say "legal obligation."  I said an
7 obligation under FIFRA under the requirements that the
8 EPA imposes.  In fact, I do believe that Monsanto at
9 some point had a legal obligation under OSHA regs
10 to -- to accurately include the IARC classification on
11 OSHA chemical safety data sheets or whatever they call
12 them.
13   Q.  Let me -- let me be more clear, then.  You do
14 not believe that Monsanto has a legal obligation under
15 FIFRA to put a cancer warning on its product labels;
16 correct?
17      MR. KRISTAL:  Objection.  Calls for a legal
18 conclusion.
19   A.  I would agree that there -- that there was no
20 OPP requirement or statement of an obligation during
21 this post-1991 period to add a cancer warning on the
22 labels.
23   Q.  You would agree that the 1986 registration
24 standard document did not impose on registrants of
25 glyphosate-based herbicides a requirement to place a

Page 241

1 cancer warning on the product labels; correct?
2    A.  Correct.
3       MR. KRISTAL:  Objection.  Calls for a legal
4 conclusion.
5    Q.  That document also did not impose on
6 registrants a requirement to place an oncogenicity
7 warning on the product labels; correct?
8       MR. KRISTAL:  Objection.  Same objection.
9    A.  Correct.
10   Q.  EPA has never required such warnings on
11 glyphosate-based products; correct?
12   A.  Correct.
13   Q.  So your position that Monsanto should have
14 added an oncogenicity warning on Roundup labels is not
15 based on EPA regulations; correct?
16   A.  Correct.
17      MR. KRISTAL:  Objection.
18   Q.  It's based on your personal opinion about what
19 a moral or ethical pesticide company would do?
20      MR. KRISTAL:  Same objection.
21   A.  It's based on what Monsanto has communicated to
22 its user community, the medical community, regulators
23 through various avenues in the course of describing
24 their commitment to product stewardship.
25   Q.  So based on what Monsanto has communicated,

Page 242

1  it's your personal opinion that they have a moral or
2  ethical obligation to put a cancer warning on their
3  products; correct?
4      A.  Correct.
5          MR. KRISTAL:  Object to the form of the
6  question.
7      Q.  You've reviewed several labels on
8  glyphosate-based products; correct?
9      A.  Yes.
10     Q.  And those labels apply to the formulated
11 product; correct?
12     A.  Correct.
13     Q.  As we've been talking about today, you're aware
14 that since 1991 there have been numerous approvals of
15 glyphosate-based formulations; correct?
16     A.  Yes.
17     Q.  Every time that Monsanto changes a
18 glyphosate-based formulation, it has to submit an
19 application to EPA to get approval of that new
20 formulation; correct?
21     A.  A label amendment, yes.  Correct.
22     Q.  That application for a new formulation would,
23 of course, include any EPA-required studies on the new
24 glyphosate-based formulation; correct?
25     A.  If EPA felt that such a study was necessary.

Page 243

1      Q.  You agree that each new formulation requires,
2  at a minimum, the acute tox six-pack of studies of the
3  product; correct?
4      A.  Depends on how significant the changes are.
5  There's certainly a number of changes in formulations
6  where EPA would waive the requirement for a new
7  six-pack.
8          In particular, when there's some of the
9  antifoaming agents and some of the adjuvants that have
10 been altered as opposed to the surfactants where there
11 was greater concern about some impact on the
12 differential toxicity of the formulated product compared
13 to the technical material.
14     Q.  And certainly to the extent EPA required it or
15 asked for it, those applications for approval of new
16 glyphosate-based formulations would have to include
17 toxicology studies supporting the new approval; correct?
18     A.  Well, most of them didn't, and for most of them
19 there was not a requirement for a new set of toxicology
20 studies.  There -- now, if there was a wholly-new
21 formulation -- and by "wholly new," obviously the
22 glyphosate technical would be the same.
23         Now, it might be a potassium salt versus an
24 isopropanol salt, but EPA would only require, for
25 example, the six-pack studies if there was a substantial

Page 244

1  change in the surfactant, either the mix of surfactants
2  or the concentration of surfactants in the formulated
3  product.
4      Q.  You've reviewed the 2016 EPA OPP report in
5  detail; correct?
6      A.  Yes, sir.
7      Q.  So you're aware that in that report, EPA
8  discusses the IARC findings; correct?
9      A.  Yes.
10     Q.  EPA is certainly aware that IARC found
11 glyphosate-based herbicides are probable carcinogens;
12 correct?
13     A.  Correct.
14     Q.  That's true of the 2015 CARC report, as well;
15 they also discuss the IARC determination.  Correct?
16     A.  I guess it had come out a couple of months
17 before.
18     Q.  If you could pull up the 2016 OPP report.  It's
19 Exhibit 6.
20     A.  Yep.  Got it.
21     Q.  If you turn to page 13.
22     A.  I'm there.
23     Q.  The third paragraph of that section states
24 that, "Recently, several international agencies have
25 evaluated the carcinogenic potential of glyphosate," and

Page 245

1  then they go on to discuss a number of bodies that have
2  reviewed glyphosate; correct?
3      A.  Yes, sir.
4      Q.  And that includes the IARC review; correct?
5      A.  Correct.
6      Q.  If you then go to the next paragraph, it states
7  that, "The recent peer review performed by CARC served
8  as an initial analysis to update the data evaluation for
9  glyphosate at that time."
10         Do you see that?
11     A.  Yes.
12     Q.  So you would agree that CARC was the initial
13 analysis performed by OPP on glyphosate as part of its
14 registration review; correct?
15     A.  Yeah, going back to 1985, actually.
16     Q.  And then if you look at the last sentence of
17 that paragraph, it states, "As such, the current
18 evaluation also provides a more thorough evaluation from
19 the 2015 CARC review."
20         Do you see that?
21     A.  Yes.
22     Q.  Would you agree that the 2016 OPP report is a
23 more thorough evaluation than the 2015 CARC assessment?
24     A.  In certain aspects, yes.
25     Q.  You can put that document down for the time

Page 246

1  being.  Thank you.
2       In other words, EPA doesn't have its head in
3  the sand; correct?  It's aware of what's going on
4  throughout the world with glyphosate?
5       MR. KRISTAL:  Objection to the form of the
6  question.
7       A.  If what you're asking is was the EPA aware of
8  the conclusion reached by the IARC Working Group,
9  absolutely, yes, they were very aware of that.
10      Q.  And in its 2016 review, EPA considered the
11  conclusion of the IARC Working Group; correct?
12      A.  Yeah, both OPP and ORD, and other parts of EPA,
13  no doubt, paid attention to that.
14      Q.  And in its 2016 review, OPP also considered the
15  reviews by other regulators around the world; correct?
16      A.  I don't think they placed much weight on
17  Canada's review and EFSA's review.  They were aware of
18  it.  I think without a doubt, the evaluation of the US
19  EPA on the matter of glyphosate oncogenicity was the
20  most thorough and generally led the pack or was deferred
21  to by most other regulatory agencies.
22      So I would say the only -- the only other
23  assessment that would probably correctly be identified
24  as comparably in depth would be the ones conducted by
25  the Germans as part of the European reregistration of

Page 247

1  glyphosate, the BfR review.
2       Q.  And the BfR review which informed the EFSA
3  determination; correct?
4       A.  Correct.
5       Q.  And by "EFSA," that's the European Food Safety
6  Agency?
7       A.  Agency, yeah.
8       Q.  You've reviewed -- we've discussed already that
9  you've reviewed several glyphosate formulation labels;
10  correct?
11      A.  Yes.
12      Q.  Have you reviewed recent labels?
13      A.  Yes.
14      Q.  Labels that have been issued since the 2015
15  IARC determination?
16      A.  Some of them, yes.
17      Q.  You've already testified that each label for a
18  new glyphosate-based formulation must be approved by
19  EPA; correct?
20      A.  Yes.
21      Q.  Before EPA can approve a label, it must make a
22  determination that the glyphosate-based formulations
23  label is consistent with FIFRA and the regulations
24  implementing FIFRA; correct?
25      A.  Well, that would be the -- the framework in

Page 248

1  which they make a judgment of whether they're going to
2  challenge anything about a particular label or not.
3       Q.  So under FIFRA, EPA is required to make the
4  determination that the label is consistent with the
5  statute and with EPA's regulations that went into the
6  statute; correct?
7       A.  Correct.
8       Q.  You testified previously that in order to
9  change the labeling for a registered pesticide, the
10  registrant must submit it to EPA to review and approve;
11  correct?
12      MR. KRISTAL:  For about the tenth time.
13      THE WITNESS:  Yes.
14      Q.  You also testified that EPA has to approve all
15  labeling and label changes?
16      MR. KRISTAL:  Don't answer that question.  Now
17  you're not only repeating questions that have been asked
18  at every other deposition, you're repeating questions
19  that you asked earlier today.
20      THE WITNESS:  We --
21      MR. KRISTAL:  Don't answer that question.
22      THE WITNESS:  I'm not going to, but...
23      MR. FAYNE:  You're instructing the witness not
24  to answer that question?
25      MR. KRISTAL:  Yes, because it's now in the

Page 249

1  realm of harassment.  We're six hours in and you're
2  repeating questions you asked today, and you're
3  repeating questions that have been asked at the other
4  depositions.  If you don't have any more questions,
5  there's no --
6       MR. FAYNE:  I've got more questions.
7       MR. KRISTAL:  I know.  Well, ask questions that
8  aren't repetitive.  I've had very few objections in this
9  deposition.
10      Q.  (BY MR. FAYNE:)  A registrant can't make a
11  unilateral label change except for minor adjustments to
12  the label; correct?
13      A.  Correct.  There's a long passage in the
14  regulations on what such minor changes that don't
15  require a formal label amendment, and there's actually a
16  process for noting some minor changes.
17      Q.  So a company couldn't just take it up on its
18  own to make a change to precautionary statements without
19  putting that change before EPA for review and approval?
20      MR. KRISTAL:  Don't answer that question.
21      A.  I've answered that question 16 times.
22      Q.  I'll take that as a --
23      A.  No change in my response.
24      Q.  So despite IARC's finding that glyphosate-based
25  herbicides are a probable carcinogen, EPA has continued

Confidential - Charles Benbrook, Ph.D.

Page 250

1  to approve the labels on glyphosate-based formulations
2  for sale and use in the United States; correct?
3  A.  That's correct.
4  Q.  And it has approved labels that -- strike that.
5  Despite EPA's awareness and review of the IARC
6  monograph finding that glyphosate-based herbicides are a
7  probable carcinogen, the agency has continued to approve
8  labels that do not include a warning about
9  carcinogenicity; correct?
10  A.  Correct.
11  Q.  As of today, EPA continues to find -- strike
12  that.
13  As of today, EPA continues to classify
14  glyphosate as not likely to be carcinogenic to humans,
15  notwithstanding IARC's finding; correct?
16  A.  Based on typical and expected exposures for the
17  general population, yes.
18  Q.  So EPA's approval of the product labels on
19  glyphosate-based formulations is consistent with its
20  determination that glyphosate is not likely to be
21  carcinogenic to humans; correct?
22  A.  Yes.
23  MR. FAYNE:  Can we go off the record for just
24  one minute?
25  VIDEOGRAPHER:  Off the record at 3:48 p.m.

Page 251

1  (A brief recess was had.)
2  VIDEOGRAPHER:  Back on the record at 3:48 p.m.
3  Q.  (BY MR. FAYNE:)  I'd like to turn back to your
4  report.  Go to paragraph 87.
5  A.  87?
6  Q.  Yes.
7  A.  That's got to be up front.
8  Q.  Page 26, if I get the paragraph and page right
9  this time.
10  A.  I'm there, sir.
11  Q.  You say, "In my opinion, the failure of EPA to
12  require Monsanto or any other glyphosate-based herbicide
13  registrant, to carry out a chronic oncogenicity feeding
14  study using a formulated glyphosate-based herbicide does
15  not obviate the scientific importance and regulatory
16  risk-assessment relevance of such a study."
17  Did I read that correctly?
18  A.  You did, sir.
19  Q.  You've testified previously, and I just want to
20  confirm that nothing has changed, that EPA has not
21  required Monsanto to conduct a long-term feeding study
22  using a formulated product?
23  A.  That's correct.
24  Q.  And since your last depositions, you would
25  agree that there are -- strike that.

Page 252

1  You agree that there are now many registrants
2  of glyphosate-based products besides Monsanto; correct?
3  A.  Yes.
4  Q.  And agree that as of today EPA has never
5  required any registrant of a glyphosate-based project to
6  conduct a long-term feeding study using a formulated
7  product?
8  A.  That is correct.
9  Q.  Are you aware -- strike that.
10  Are you aware of anyone that has conducted a
11  long-term cancer feeding study with a glyphosate-based
12  herbicide?
13  A.  Yes.
14  Q.  Who is that?
15  A.  A team led by Seralini in France.
16  Q.  Just like to turn your attention to page 6 of
17  your report.  Actually, it starts on page 5.  And it's
18  paragraph 7(b).
19  A.  7(b)?
20  Q.  Yes.
21  Okay.  You state, "Despite knowledge of the
22  differences in toxicity and risks arising from exposures
23  to formulated Roundup in contrast to pure glyphosate,
24  Monsanto has not carried out critical long-term cancer
25  feeding studies with Roundup.  Nor has anyone else."

Page 253

1  Do you see that?
2  A.  Yes.
3  Q.  Are you testifying today that that statement is
4  inaccurate?
5  A.  This is in the context of EPA-required chronic
6  feeding studies.  This passage, if you read the whole
7  thing -- the whole passage, and it's really talking
8  about the data generated by -- by registrants.  And
9  it -- so that's what this statement refers to.
10  I was aware of the Seralini study.  I've had
11  extensive discussions in past depositions about the
12  Seralini study.  It -- I think it is clear from my past
13  testimony I'm aware that it exists.  I just mentioned it
14  to you, but I do not -- I did not include it in this
15  statement because it wasn't a study done in response to
16  a data requirement following the GLP requirements and
17  protocols in Part 158.
18  Q.  You're aware, of course, that EFSA has found
19  the Seralini study to be unreliable; correct?
20  A.  I'm aware of much of the international reaction
21  to the Seralini study, the efforts of Monsanto to
22  undermine -- undermine it.  I know EFSA has questions
23  about it.  I know that EPA has had questions about it.
24  So -- and so I guess the answer to your question is yes.
25  Q.  Are you aware of any pesticides -- sitting here

Page 254

1 today, are you aware of any pesticide manufacturer that
2 has conducted a long-term feeding study on a formulated
3 product?
4     A.  No.
5     Q.  Would you agree then that it's not industry
6 standard to conduct a long-term feeding study on a
7 formulated product?
8         MR. KRISTAL:  Object.
9     A.  Oh, most -- most surely.  It's not industry
10 standard.
11     Q.  Going back to paragraph 87, which is the one I
12 read previously.
13     A.  It's going to be about page 25 or something?
14     Q.  26, yeah.
15     A.  26.  I'm there, sir.
16     Q.  So I had read the preceding sentence, that you
17 state in your opinion Monsanto should have carried out a
18 long-term feeding study; correct?
19     A.  On a formulated --
20     Q.  On a formulated product.
21     A.  Major formulated product, correct.
22     Q.  You then say, "It also does not relieve
23 Monsanto of its obligation, as the dominant manufacturer
24 of glyphosate-based herbicides, to carry out such a
25 study in the interest of assuring its formulated

Page 255

1 products are as safe as the company had been claiming
2 since the late 1970s."
3         Did I read that correctly?
4     A.  Yes.
5     Q.  What is the source of Monsanto's obligation to
6 carry out this study?
7     A.  Their obligation under FIFRA to assure that the
8 pesticide products that it obtains, labels through the
9 EPA process, and sells to users do not pose, in general,
10 a risk of unreasonable adverse effects, of which
11 certainly non-Hodgkin's lymphoma would classify as an
12 adverse effect in humans.
13         It is -- it is the responsibility of
14 registrants under the statute to assure that their
15 products do not pose excessive risk, i.e., an
16 unreasonable adverse effect on man.
17         And when a company has in its possession
18 information that suggests that such risks may actually
19 be occurring, and especially when a registrant has
20 acknowledged that there are valid reasons to expect that
21 their formulated products are more toxic than their pure
22 technical active ingredient, that combination of facts
23 is what leads me to my opinion that Monsanto had an
24 obligation to conduct long-term chronic feeding studies
25 on formulated product, given that it was manufacturing

Page 256

1 and selling the most heavily applied pesticide in the
2 history of the world.
3         This was not just an average pesticide.  This
4 is the most heavily used pesticide in history.  There
5 are more people exposed to it at a higher level than
6 probably any pesticide ever.  Monsanto was fully aware
7 of those facts.  And given that, given their professed
8 statement and commitment to product stewardship and the
9 safety of its users, and given the enormous amount of
10 money that they were making off the product, they surely
11 could have justified doing a chronic mouse and a chronic
12 rat study on one of their major formulations.
13         And had they done that, and if the studies had
14 been clean, then we would not be sitting here.  However,
15 if they did the studies and the results were
16 substantially different than the 14 animal bioassays
17 conducted with technical glyphosate, the
18 regulatory -- as I said in one place in the report, the
19 regulatory history of Roundup would have been changed.
20 It's impossible to predict exactly how, but it would
21 have been changed.
22     Q.  We've discussed that there are other
23 manufacturers of glyphosate-based herbicides; correct?
24     A.  Now there are.
25     Q.  Now there are.  And you state in your report

Page 257

1 that Monsanto, as the dominant manufacturer of
2 glyphosate-based herbicides, had an obligation to
3 conduct this study; correct?
4     A.  Right.  Correct.
5     Q.  Is it your position that other manufacturers of
6 glyphosate-based herbicides don't have an obligation to
7 conduct such a study?
8     A.  Certainly not until Monsanto has done it.
9 Monsanto still is the dominant single company in the
10 world.  It's true that there's -- roughly half of the
11 global supply of glyphosate is manufactured in China,
12 but it's many companies that do it.
13         So in terms of the economic importance of
14 glyphosate-based herbicides to a company, there is no
15 question but that Monsanto is the major global player.
16     Q.  So the obligation you're referring to turns in
17 part on a company's market share; is that a fair
18 characterization?
19     A.  Absolutely.
20         And in all pesticide regulation, the company
21 that typically first registers a pesticide active
22 ingredient, a company that has a proprietary position in
23 it, a company that has the most extensive set of labels,
24 it is looked to by the rest of the industry as bearing
25 the principal responsibility for assuring that the

Confidential - Charles Benbrook, Ph.D.

Page 258

1 database is complete and that any questions that
2 regulators have, any questions that the medical
3 community might have, are being dealt with.
4    Q.  You've never designed a long-term cancer study;
5 correct?
6    A.  Oh, my gosh.  Are we back to that?
7    Q.  We're back to that.
8       MR. KRISTAL:  Yeah.  Don't answer that.
9       THE WITNESS:  Yes.
10       MR. ESFANDIARY:  You've asked it four, five
11 times now.
12       MR. FAYNE:  I'm just setting up the next line
13 of questioning.
14       MR. KRISTAL:  It doesn't matter what you're
15 setting up.
16    Q.  (BY MR. FAYNE:)  Okay.  As someone that's never
17 designed a long-term cancer study, how can you -- strike
18 that.
19       As someone who has never designed a long-term
20 cancer study, do you know whether it's feasible to
21 conduct such a study on a formulated product?
22    A.  Absolutely it's feasible and it should have
23 been done.
24    Q.  What is your -- what are you relying upon to
25 assert that it's absolutely feasible?

Page 259

1    A.  There's no -- no scientific, chemical,
2 biological, physiological reason why a group of mice or
3 rats could not be treated with or exposed to the
4 formulated product as opposed to the technical active
5 ingredient.  There's absolutely no reason why a study
6 couldn't be conducted in exactly the same way.
7    Q.  It's possible that administering the
8 surfactants in formulated products could make the mice
9 ill before you'd be able to obtain any meaningful
10 results on cancer; isn't that correct?
11       MR. KRISTAL:  You're asking if something is
12 possible?  Is that the question?
13       MR. FAYNE:  Yes.
14       THE WITNESS:  That's a -- it's really an
15 irrelevant question.
16       In the design of a cancer study, EPA guidelines
17 call for, first, a range-finding study.  And in that
18 range-finding study, groups of -- we'll use mice as the
19 example -- are fed progressively higher doses to
20 determine a maximum tolerated dose.
21       It is -- it is virtually certain that the
22 maximum tolerated dose in a Roundup study, including the
23 standard POEA surfactant, would have been substantially
24 lower than the maximum tolerated dose in the current
25 animal feeding studies using technical glyphosate.

Page 260

1       Everybody knows that that would be the case.
2 But that -- there's no reason why those range-finding
3 studies couldn't be done and then the registrant would
4 pick typically two intervening dose levels between zero,
5 or the control group, and the maximum tolerated dose of
6 animals fed the formulated product.
7    Q.  (BY MR. FAYNE:)  I'd like to turn now to your
8 discussion of ghost-writing, which starts on page 111.
9       In paragraph 499 of your report -- let me know
10 once you're there.
11    A.  I'm there.
12    Q.  You provide a definition of "ghost-authorship"
13 or "ghost-writing"; correct?
14    A.  Yes.
15    Q.  And you state that, "Ghost-writing
16 refers" -- "refers to three types of contributions to a
17 written document by a person not listed as the author or
18 among the co-authors of a document"; correct?
19    A.  Yes.
20    Q.  "Those three types of contributions include
21 producing the first and original draft of a document or
22 sections of a document"; correct?
23    A.  Correct.
24    Q.  The second is "revising a document or its
25 sections in a way that adds to or alters the substantive

Page 261

1 content of the document"; correct?
2    A.  Yes.
3    Q.  And the third is "providing information and
4 text, either as original writing or text derived from
5 the existing document, that is used by a listed author
6 or co-author or document editor to alter the content of
7 a document and/or respond to comments made during peer
8 review"; correct?
9    A.  These are the circumstances in which
10 ghost-writing could occur in the standard process of
11 publishing a scientific study in a peer-reviewed
12 journal.
13    Q.  How did you come up with this definition of
14 ghost-writing?
15    A.  This is a generally known, generally accepted
16 understanding of what ghost-writing is.
17    Q.  Are you relying on any particular source to
18 come up with the definition?
19    A.  I don't -- I don't -- I can't think of any
20 specific source.  I don't think there's any ambiguity or
21 disagreement.  This is the way Monsanto uses the term
22 "ghost-writing."
23       It's very clear from the many e-mails where
24 Monsanto discusses its use of the technique of
25 ghost-writing.  So, I mean, I don't think

Page 262

1 there's -- that there's any real disagreement that these
2 are examples of ghost-writing.
3     Q.  You derived your definition of ghost-writing in
4 part on the way Monsanto described ghost-writing in
5 internal e-mails.  Is that accurate?
6     A.  No.  No.  No.
7         I mean, I -- before I became involved in this
8 case, I knew what ghost-writing was.  Anybody that
9 publishes in scientific journals understands the
10 importance of accurate authorship.
11         The COPE guidelines, which is one of the
12 standard set of professional guidelines for scientists,
13 discuss appropriate attribution of authorship.  They
14 describe accurate declarations of conflicts of interest.
15 They describe when and how funding should be disclosed.
16         And, you know, I don't think there's really any
17 serious disagreement or ambiguity about each of these
18 three examples of ghost-writing that I've noted in my
19 report.
20         MR. FAYNE:  I'm marking as Exhibit 19 an
21 article from COPE, which you just referred to in your
22 testimony, about authorship disputes.
23         (Exhibit 19 marked for identification.)
24     Q.  (BY MR. FAYNE:)  Have you seen this document
25 before?

Page 263

1     A.  Yes.
2     Q.  If you go to the third paragraph, it states
3 that, "Listing the authors tells readers who did the
4 work and to ensure that the right people get the credit
5 and take responsibility for the research.  Although
6 journal editors do not always agree among themselves on
7 what constitutes authorship, many of them subscribe to
8 the guidance from the International Committee of Medical
9 Journal Editors (ICMJE), also known as the Vancouver
10 group."
11         Did I read that correctly?
12     A.  Yes, you did.
13     Q.  Are you familiar with the International
14 Committee of Medical Journal Editors?
15     A.  I am.
16     Q.  Would you agree that ICMJE is an authoritative
17 source on ethical guidelines for publishing in
18 peer-reviewed journals?
19     A.  It's certainly one of the most widely accepted
20 and aspired to.
21     Q.  Agree that many journal editors rely on it, as
22 described in this COPE article?
23     A.  Yes.
24     Q.  Did you review the ICMJE guidelines in reaching
25 your opinions in this case on ghost-writing?

Page 264

1     A.  Actually, I've had to review them
2 for -- because of my co-authorship of multiple papers
3 over the last four, five years.  Most of the nutrition
4 papers that I've written, the journals rely on the ICMJE
5 guidelines.
6     Q.  So if you look at the paragraph after the one
7 we just read, it restates the ICMJE guidelines as they
8 existed in 2001; correct?
9     A.  Yes.
10     Q.  And they state that, "Authorship credit should
11 be based only on:  (1) substantial contributions to
12 conception and design, or acquisition of data, or
13 analysis and interpretation of data; (2) drafting the
14 article or revising it critically for important
15 intellectual content; and (3) final approval of the
16 version to be published."
17         Did I read that correctly?
18     A.  Yes.
19     Q.  And the next sentence states, "Conditions (1),
20 (2) and (3) must all be met"; correct?
21     A.  Yes.
22     Q.  So under these guidelines, in order to be
23 listed as an author someone must meet all three
24 criteria; correct?
25     A.  Yes.

Page 265

1     Q.  Would you agree that these three criteria are
2 different than the ones that you set forth in
3 paragraph 499 of your report?
4     A.  Modestly.
5     Q.  Modestly?
6     A.  Yeah.
7     Q.  In your report, you state that, "Providing
8 information and text that is used by a listed author or
9 co-author without being listed as an author constitutes
10 ghost-writing"; correct?
11     A.  Let's -- let's review the material under -- on
12 the right-hand side column, "How to reduce the incidence
13 of authorship problems."
14         "People generally lie about authorship in two
15 ways:  By putting" -- First, "by putting down names of
16 people who took little or no part in the research (gift
17 authorship, see below).
18         Second bullet, "By leaving out names of people
19 who did take part (ghost-authorship, see below)."
20         It's my articulation and explanation of what I
21 mean by "ghost-writing" or "ghost-authorship" is fully
22 consistent with these guidelines.
23         MR. FAYNE:  I'm going to move to strike that
24 answer as non-responsive.
25         MR. KRISTAL:  I think it's completely

Confidential - Charles Benbrook, Ph.D.

Page 266

1 responsive, but we don't have to decide that right now.
2 Nor do we have the authority to decide it.
3      MR. FAYNE:  Sure.
4      I'll repeat the question and we can all decide
5 whether that answer was responsive.
6      MR. KRISTAL:  Sure.
7 Q.  (BY MR. FAYNE:)  The question was, you state in
8 your report that providing information and text that is
9 used by a listed author or a co-author without being
10 listed as an author constitutes ghost-writing; correct?
11 A.  Correct.
12 Q.  Somebody could provide information or text
13 that's used in a study or report without having final
14 approval of the study; correct?
15 A.  Presumably, yes.
16 Q.  Somebody could produce the first draft of a
17 document without having final approval of the document;
18 correct?
19 A.  Yes.
20 Q.  Someone could revise a document without having
21 final approval of the document; correct?
22 A.  Yes.  What's your point?
23      MR. KRISTAL:  You don't have to ask -- your job
24 is not to ask, just to answer.
25      THE WITNESS:  Jerry, you're being very nice,

Page 267

1 but I'm getting to the end of my rope on some of this.
2      MR. KRISTAL:  No, I understand.  Be patient.
3 We are now -- we've got less than an hour left of his
4 Monsanto questions.
5 Q.  (BY MR. FAYNE:)  In your view, if somebody
6 provides edits to a document and isn't listed as an
7 author, is that ghost-writing?
8 A.  Depends whether the edits change the substance
9 of the paper or whether they're done by an editor or
10 someone that is proofreading or really not -- not tasked
11 or capable of changing the substantive content of the
12 document.
13      It's very common.  For example, a lot of
14 scientists don't have English as a first language.
15 They -- they write some English, and then
16 one -- somebody, sometimes a person that's not
17 listed as a co-author, will clean up the English so that
18 proper tensive verbs are used, et cetera.
19 Q.  Apart from language translation issues, editing
20 a document for clarity, would that be something that
21 would require somebody to be listed as an author?
22 A.  Probably not, if it's truly just for clarity
23 and it doesn't change the substantive content.  But the
24 decision on how substantial the contributions of an
25 editor are in terms of clarifying the content of a

Page 268

1 paper, you know, it has to be left up to the team.
2      I can -- I can imagine that there are
3 circumstances where, you know, substantial editing and
4 refinement of the clarity of passages, where -- some
5 teams may say, Let's add so-and-so as a co-author.
6 There's no harm in doing that.  There's no -- no reason
7 preventing that from being done.
8 Q.  Understood, but my question is more aimed at
9 when is it required in order to comply with ethical
10 guidelines, not can you do it.
11 A.  Okay.  All right.  Fair enough.
12 Q.  So my question is, at what point is it
13 required --
14 A.  I already answered that.
15 Q.  I under --
16 A.  When the editing changes the substantive
17 content of the document.
18 Q.  By "substantive content," do you mean the
19 conclusions of the document, of the study authors?
20 A.  No, I mean the substantive content of it, as
21 opposed to the words that are chosen to express a given
22 sentence.
23      Do we really need to argue about what
24 substantive content is?
25 Q.  You tell me.

Page 269

1      MR. ESFANDIARY:  Well, Bill Heydens thought he
2 could ghost-write things.  I mean --
3      MR. FAYNE:  Can we not have people who aren't
4 even defending the deposition testifying?
5 Q.  (BY MR. FAYNE:)  In your report you focus
6 primarily on four studies that you contend were
7 ghost-written by Monsanto; is that fair?
8 A.  There's more than four.
9 Q.  But the four that you have independent sections
10 for; correct?
11 A.  Yes.  There's -- I -- I don't remember exactly
12 how many there are independent sections on, but in the
13 "Critical Reviews of Toxicology" special issue, there's
14 five papers.
15 Q.  Okay.  So let me walk through the section.  So
16 there's the Gary Williams, et al., 2000 paper; correct?
17 A.  Correct.
18 Q.  And that was published in the Journal of
19 Regulatory Toxicology and Pharmacology?
20 A.  Correct.
21 Q.  There's the Williams, et al., 2012 paper that
22 was published in the Journal of Toxicology and
23 Environmental Health; correct?
24 A.  Yes.
25 Q.  There's the Kier and Kirkland 2013 paper

Confidential - Charles Benbrook, Ph.D.

Page 270

1 published in the journal Critical Review in Toxicology;
2 correct?
3    A.  Correct.
4    Q.  And then there's the Critical Reviews in
5 Toxicology special issue on glyphosate risks; correct?
6    A.  Correct.
7    Q.  So I'm going to focus on those four, if that's
8 okay with you.
9    A.  Sure.
10    MR. KRISTAL:  Would you do it if it wasn't okay
11 with him?
12    MR. FAYNE:  Yes.
13    Q.  (BY MR. FAYNE:)  You're aware, I imagine, that
14 each of these journals have authorship guidelines;
15 correct?
16    A.  Yes.
17    Q.  Did you review the authorship guidelines in
18 forming your opinions in this case?
19    A.  I don't remember which ones I did and didn't.
20 I had reviewed the Critical Review of Toxicology because
21 I -- I had thought about submitting a paper to it
22 myself.
23       I don't remember which ones I specifically
24 reviewed, but, you know, I'm fairly certain there's not
25 a lot of difference across them, but they are generally

Page 271

1 consistent with the COPE and the International Committee
2 on -- of Medical Journal Editors' guidelines.
3    Q.  Each of these four publications that I just
4 listed -- one of which I understand is a series of
5 articles; correct?
6    A.  Correct.
7    Q.  Each of those publications were reviews of
8 studies in the existing published literature; correct?
9    A.  Yes.
10    Q.  They were not primary studies?
11    A.  Correct.
12    Q.  So I take it you're not contending that
13 Monsanto manipulated the underlying data, scientific
14 data, in any way; correct?
15    A.  I'm not speaking to that.  I'm not saying they
16 did; I'm not saying they didn't.
17    Q.  Do you have any reason to believe that the
18 authors listed in these studies did not agree with the
19 analyses or conclusions set forth in the studies?
20    A.  No.
21    Q.  Any reason to believe that Monsanto or its
22 employees caused the authors to change their
23 conclusions?
24    A.  Yes.
25    Q.  For which study?

Page 272

1    A.  Well, several of them.  There was multiple
2 back-and-forths between Heydens and authors of the
3 Critical Review of Toxicology special issue.  You know,
4 and as I said, there's extensive records that I've
5 reviewed where Heydens was the Monsanto official who was
6 most frequently involved in inserting his personal and
7 presumably Monsanto corporate views in these journal
8 articles as they were in the various stages of
9 preparation.
10    Q.  Is it your testimony that the authors of any of
11 these articles believed that the science showed
12 glyphosate to be carcinogenic?
13    A.  I've never put that question to any of them
14 directly so I have no idea whether they hold that view.
15 The papers in which their names appear does not state
16 that view.
17    Q.  And you're not testifying that they initially
18 stated that view and then Monsanto somehow convinced
19 them to reverse course and say that glyphosate was not
20 carcinogenic; correct?
21    A.  I'm not aware of that occurring.
22    Q.  A little earlier you testified that, I believe,
23 that it was well known by Monsanto that its formulated
24 product was more toxic than glyphosate alone; correct?
25    A.  Correct.

Page 273

1    Q.  You would agree with me that toxic does not
2 necessarily equal carcinogenic; correct?
3    A.  Surely.  There is multiple forms of toxicity
4 that fall short of inducing cancer.
5    Q.  Toxic and carcinogenicity are two different
6 concepts; correct?
7    A.  Well, carcinogenicity would -- is a toxic
8 effect, but there are many other toxic effects.
9    Q.  And many substances can be toxic at certain
10 doses; correct?
11    A.  To certain organisms, of course.
12    Q.  So even water at a high enough dose could be
13 toxic; correct?
14    A.  Well, I don't know if it would be exactly -- it
15 floods the lungs and keeps air from getting in and you
16 die, so it's not -- it's -- that is not a toxic mode of
17 action in inducing death.
18    Q.  So --
19    A.  Nor is getting crushed by an 18-wheeler.
20    Q.  Understood.
21    A.  Okay.
22    Q.  So for the members of the jury, just to be
23 clear, when you say "toxic," you don't mean
24 carcinogenic; correct?
25    A.  A pesticide that is toxic could also be a

Page 274

1 pesticide that is carcinogenic. A pesticide that is
2 carcinogenic is by definition toxic because
3 carcinogenicity is a component of or falls within the
4 realm of toxic responses.
5 Q. But a pesticide that is toxic is not
6 necessarily carcinogenic?
7 A. Correct.
8 Q. So the fact that something is toxic does not
9 mean that it's carcinogenic; correct?
10 A. Not necessarily.
11 Q. In your May deposition you were asked about a
12 number of foreign regulatory determinations; do you
13 recall that?
14 A. EFSA, Canada, yes, I do remember that.
15 Q. So you acknowledge that a number of foreign
16 regulators, including Canada, EFSA, New Zealand,
17 Australia, that they've classified glyphosate as
18 non-carcinogenic; correct?
19 A. We've discussed that, yes.
20 Q. And that's all of those since the IARC
21 determination in 2015; correct?
22 A. Yes. Some of them were before, some of them
23 after, and I don't believe any of them have changed.
24 Q. Are you aware of any foreign regulatory body
25 that has conducted a risk assessment of glyphosate since

Page 275

1 the IARC classification and concluded that glyphosate is
2 carcinogenic?
3 A. Not that -- not a reassessment that's resulted
4 in a final conclusion, no.
5 Q. So you would agree that as of today IARC is the
6 only scientific or regulatory entity in the world that
7 has reviewed the full evidence on glyphosate and
8 concluded that glyphosate is a probable carcinogen;
9 correct?
10 A. Well, I think the Office of Environmental
11 Health's assessment in the state of California has
12 reached that conclusion.
13 Q. And you're -- it's your understanding that -- I
14 believe you're referring to OEHHA in California?
15 A. Yeah, OEHHA.
16 Q. That they conducted a risk assessment and
17 reached that conclusion?
18 A. Yes.
19 Q. And they reviewed studies and data in reaching
20 that conclusion?
21 A. Yes. And, as you know, their regulations also
22 require them to follow IARC determinations.
23 Q. Right. So OEHHA was required by statute to
24 classify glyphosate as a probable carcinogen based on
25 the IARC determination; correct?

Page 276

1 A. Correct. But then they also did their own
2 assessment of the science in an effort to fully
3 implement the requirements of Proposition 65.
4 Q. What assessment was that? Is there -- is there
5 a name for it? I'm not sure what you're referring to,
6 so I'm...
7 A. Under Proposition 65, the OEHHA is responsible
8 for coming up with a NSRL. I can't remember exactly
9 what the acronym refers to, but it's a level of exposure
10 below which there would not be a requirement for
11 listing. So they set a benchmark for exposure.
12 Q. That's a level of exposure below which the
13 state agency does not believe there's any risk of
14 cancer; correct?
15 A. And any need to so label under Prop 65.
16 Q. Right. So no need to label, and that's the
17 level at which the agency believes there's no risk of
18 cancer; correct?
19 A. I don't think it would be accurate to say "no
20 risk of cancer," but it is accurate to say it's a
21 threshold below which the -- the agency would not
22 require the listing of chemicals under Proposition 65.
23 Q. Other than OEHHA in California, would you agree
24 that as of today IARC is the only scientific or
25 regulatory entity in the world that has reviewed the

Page 277

1 evidence and concluded that glyphosate is a probable
2 carcinogen?
3 A. Certainly there's no other one that's done an
4 extensive and independent review as IARC has, no.
5 Q. You state in paragraph 13 of your report that,
6 "Monsanto has failed to meet its obligation by failing
7 to warn about the risks of oncogenicity, genotoxicity,
8 and, most recently, carcinogenicity."
9 A. Correct.
10 Q. Are you aware of any pesticide manufacturer
11 that has placed a warning on its label for oncogenicity?
12 A. Yes.
13 Q. You've seen pesticide labels that include a
14 warning for oncogenicity?
15 A. Yes.
16 Q. Which labels are those?
17 A. Some of the 2,4-D labels have a warning.
18 The -- I think Monsanto put a warning on Alachlor labels
19 at the -- at one point in the history of Alachlor.
20 I think there probably was a warning on the EDB
21 labels, ethylene dibromide, and, you know, I'd have to
22 go through the list of oncogenic active ingredients and
23 look at -- look at the various labels, but I have not
24 done that analysis in preparation for this case.
25 Q. What about genotoxicity? Have you ever seen a

Page 278

1 pesticide label that includes a warning for
2 genotoxicity?
3     A.  Let's see.  I'd have to -- I'd have to do an
4 assessment of different -- different active ingredients
5 to answer that.  I didn't -- I didn't make an effort to
6 do that in preparation for this.
7     Q.  So sitting here today, you're not aware of any
8 pesticide manufacturer that has added a genotoxicity
9 warning on its pesticide product label; correct?
10     A.  Correct.
11     Q.  If you go to paragraph 20 of your report.
12     A.  Page 13?
13     Q.  Sounds right.
14     A.  I'm there.
15     Q.  Have you ever seen -- sorry, before we get to
16 paragraph 20, have you ever seen a pesticide label that
17 includes a warning based on an association found in
18 epidemiological study, an association between the
19 product or its ingredients and cancer?
20     A.  I think -- I certainly know that there's some
21 chemical safety data sheets that do that, and there's
22 some of the OSHA sheets that do that, but on a -- on an
23 end-use product label, I'd have to, again, do an
24 assessment.
25     Q.  So sitting here today, you're not aware of any

Page 279

1 pesticide product label that includes a warning that's
2 based on an association found in an epidemiological
3 study; correct?
4     A.  Solely on that, no.
5     Q.  So now turning to paragraph 20.  You state
6 that, "Two common assertions" -- sorry, I'm skipping to
7 the second sentence of that paragraph.
8     A.  By all means, go for it.
9     Q.  "Two common assertions that have perpetuated a
10 lack of care by some people applying Roundup herbicide
11 are that Roundup is non-toxic and safe enough to drink."
12         Do you see that?
13     A.  Yes.
14     Q.  What are you relying on for your statement that
15 Monsanto has asserted that Roundup is safe enough to
16 drink?
17     A.  I didn't say that Monsanto has asserted that.
18 Many other people have.
19         And what I say in this paragraph is that
20 Monsanto has not done as much as it should have to
21 discourage overstatements of the safety of
22 glyphosate-based herbicides.  And as I -- as I note in
23 paragraph 20, the two most common simple statements are
24 "It's safe enough to drink" and "It's non-toxic."  Those
25 two statements arise fairly regularly in public

Page 280

1 discussions, media discussions, advertising material,
2 promotional meetings.
3         It -- sometimes actual employees of Monsanto
4 make those statements.  Certainly William Heydens has
5 made the statement multiple times.  And I believe that
6 it was part of Monsanto's effort to protect the freedom
7 to operate for glyphosate-based herbicides that they
8 wanted people to believe that glyphosate-based
9 herbicides are non-toxic and they did very little to
10 discourage people who were saying that it was also safe
11 enough to drink.
12     Q.  Your testimony is that Monsanto employees and
13 Dr. Heydens made the statement that Roundup is safe
14 enough to drink.  Did I understand you correctly?
15     A.  No.  I said "non-toxic."
16     Q.  And I'm asking -- I apologize.  I might have
17 misunderstood that.  I'm referring to the statement that
18 it's safe enough to drink.
19         Are you aware of any Monsanto employee or any
20 agent of Monsanto that's made that statement?
21     A.  In the record in writing, I'd have to think
22 about that.
23     Q.  So sitting here today, you're not aware of
24 anything in writing in the record in the Roundup
25 litigation that makes that statement; correct?

Page 281

1     A.  From a Monsanto employee.
2     Q.  Are you aware of it being said by someone other
3 than a Monsanto employee in the discovery record in this
4 case?
5     A.  Yes.
6     Q.  Who's that?
7     A.  I'll have to -- I'll have to search it out.
8 There's multiple instances of that.
9     Q.  So sitting here today, you can't identify for
10 me a document where somebody either at Monsanto or
11 outside of Monsanto made that statement in writing;
12 correct?
13     A.  I'd have to -- I'd have to go back and find it.
14 You know, I can guarantee you that that statement is in
15 the record.
16         MR. FAYNE:  I'll pass the witness for now.
17         THE WITNESS:  Are you done?
18         MR. FAYNE:  I might have more questions for you
19 after --
20         THE WITNESS:  Okay.
21         MR. FAYNE:  -- your counsel has a chance to go,
22 but I'm going to pass him over to you.
23         MR. KRISTAL:  Why don't we take a five-minute
24 break so we can get organized and move forward.
25         THE WITNESS:  And I want to use the boys' room.

Confidential - Charles Benbrook, Ph.D.

Page 282

1    VIDEOGRAPHER:  Off the record at 4:30.
2       (A brief recess was had.)
3    VIDEOGRAPHER:  Back on the record at 4:39 p.m.
4       EXAMINATION
5  BY MR. KRISTAL:
6    Q.  Good afternoon, Dr. Benbrook.  It's
7  Jerry Kristal on behalf of the plaintiffs.  I've got a
8  couple of questions, if that's okay?
9    A.  Yes, sir.
10   Q.  First of all, just housekeeping.  I'll mark as
11 Exhibit 20 the December 26, 2018, errata sheet that we
12 had handed to counsel for Monsanto towards the beginning
13 of the deposition.
14      (Exhibit 20 marked for identification.)
15   Q.  I'm not going to ask you questions about it,
16 but I wanted it to be marked for purposes of the
17 deposition, and it hadn't yet been marked.
18      You were asked by Monsanto counsel about both
19 corporate ethics and sources of Monsanto's obligations
20 to do certain things.
21      Do you generally remember that line of
22 questioning?
23   A.  Yes.
24   Q.  Are you familiar with various international
25 codes of conduct on pesticide management?

Page 283

1    A.  Yes.
2       MR. KRISTAL:  I'm going to mark as Exhibit 21
3  and Exhibit 22 two documents.
4       (Exhibit 21 marked for identification.)
5       (Exhibit 22 marked for identification.)
6    Q.  (BY MR. KRISTAL:)  I'm going to hand them both
7  to you, and I'll give a copy to counsel.
8       Exhibit 21 is the International Code of Conduct
9  on Pesticide Management.  It has a date on the third
10 page inside of 2014, and this is put out by the Food and
11 Agricultural Organization of the United Nations World
12 Health Organization.
13      Are you familiar with this document?
14   A.  Yes, I am.
15   Q.  Okay.  And are you familiar with this document
16 as part of your 30-plus years of experience and
17 knowledge base vis-à-vis corporate stewardship for the
18 pesticide industry?
19   A.  Yes.  I believe this document goes back to the
20 mid '80s.
21   Q.  If you look at Exhibit 22, and if you -- about
22 three-quarters of the way down, it says, "Resolution
23 10/85," and then it has, on the --
24   A.  Oh, okay.
25   Q.  -- second page, "adopted November 28th, 1985."

Page 284

1  Is this the International Code of Conduct on the
2  distribution and use of pesticides that you just
3  referred to as the earlier version of this?
4    A.  Correct.
5    Q.  And through the years, from 1985 through 2014,
6  has this been periodically revised?
7    A.  If my memory serves me correctly, I believe
8  about four times, maybe five.
9    Q.  And do these documents establish stewardship
10 industry standards of care for the pesticide industry?
11   A.  Yes, they do.
12   Q.  Now I'm going to show you -- I apologize to
13 counsel, but I couldn't print this out.
14      So let me first hand my laptop to counsel to
15 take a look.  It's a page from the monsanto.com website
16 entitled "Product Stewardship and the Pledge."
17      And if you want to scroll down, I'm going to
18 ask questions about where Monsanto says it has adopted
19 these international codes of conduct on pesticide
20 management.  And we can print that out at some point and
21 make it a part of the record.
22      So for purposes of recordkeeping, that portion
23 of the monsanto.com website we'll mark as 23.
24      MR. FAYNE:  Counsel, are you representing
25 that -- in this website there are links to two

Page 285

1  documents.  Are you representing that these documents
2  are the linked documents on the website?
3       MR. KRISTAL:  Well, if you scroll down, there's
4  a link to the current version of the International Code
5  of Conduct on Pesticide Management that Monsanto says it
6  adopts.
7       MR. FAYNE:  Right.  I see that link.  I'm happy
8  to click on it, but are you representing that this is
9  that link?
10      MR. KRISTAL:  It's probably the more recent
11 version of that, but we'll -- I'll click on it and hand
12 it back to you after I ask some questions.
13      Is that all right?
14      MR. FAYNE:  Sure.
15   Q.  (BY MR. KRISTAL:)  So let me hand you or at
16 least sit next to you.
17   A.  I know this.
18   Q.  You're familiar with this?
19   A.  I have this printed out in my files.
20   Q.  All right.  On the Monsanto website under the
21 Product Stewardship and the Pledge section, Monsanto
22 writes, "We subscribe to international stewardship
23 standards, including the International Code of Conduct
24 on Pesticide Management issued by the United Nations
25 Food and Agricultural Organization and fully supported

Confidential - Charles Benbrook, Ph.D.

Page 286

1  by Responsible Care Global Charter."
2      So I'm going to click on the link that Monsanto
3  provides, but let me show it to you.  Do they have a
4  number of versions of the international code in
5  different languages?
6  A.  Yes, they do.
7  Q.  All right.  And have you gone through this
8  exercise of actually opening this on the Monsanto
9  website?
10  A.  But only the English version.
11  Q.  Right.  Right.
12  A.  And you're going to get this document.  This
13  is -- I'm almost sure this is the most recent one, 2014.
14  Q.  That's a 2014, is it?
15  A.  Yeah.
16      MR. FAYNE:  Can I see the document?
17      MR. KRISTAL:  It's hopefully opening.  Tell you
18  what, why don't we go off the video record.  When it
19  completely opens, I'll show it to you, then we'll go
20  back on the video record.  Is that all right?
21      VIDEOGRAPHER:  Off the record at 4:46 p.m.
22      (A brief recess was had.)
23      VIDEOGRAPHER:  Back on the record at 4:48 p.m.
24  Q.  (BY MR. KRISTAL:)  We are going to mark, after
25  we print out the linked International Code of Conduct

Page 287

1  that the Monsanto website takes it to, and what version
2  is that?
3      MR. FAYNE:  Object.
4  Q.  What year?
5  A.  2014.
6      MR. FAYNE:  I'm going to object to the
7  characterization of that as the linked international
8  code of conduct document.
9      MR. KRISTAL:  Why is that?
10      MR. FAYNE:  I see it's on the screen, but I
11  don't know that that's where it's linked.
12      MR. KRISTAL:  Okay.  Why don't you go back.
13  We'll go off the record.
14      VIDEOGRAPHER:  Off the record at 4:48 p.m.
15      (A brief recess was had.)
16      VIDEOGRAPHER:  Back on the record at 4:52 p.m.
17  Q.  (BY MR. KRISTAL:)  All right.  While we were
18  off the record, we opened up the link on the Monsanto
19  website in the Product Stewardship Pledge section
20  entitled "International Code of Pesticide Management."
21      And do you have that --
22  A.  I do.
23  Q.  -- open in front of you?
24      And what is the date on the linked
25  international code that's on the Monsanto website?

Page 288

1  A.  2014.
2  Q.  Okay.  So we will print and mark as Exhibit 24
3  the opened linked version.
4      And if you would look at Exhibit 21.
5  A.  21.
6  Q.  Thank you.  And I'll have a couple of questions
7  about this.
8      Does this document establish pesticide industry
9  what are called stewardship standards?
10  A.  Yes.
11  Q.  And if you would turn to page 8.
12  A.  The Article 3, Pesticide Management?
13  Q.  Yes.
14      Does this document, in terms of its general
15  format, lay out both government responsibilities for
16  pesticide management and pesticide industry
17  responsibilities?
18      MR. FAYNE:  Object to form.
19  A.  Yes.
20  Q.  Okay.  And on page 8, Section 3.2, under
21  "Pesticide management," reads, "Pesticide industries
22  should adhere to the provisions of this code as a
23  standard for the manufacture, distribution, sale and
24  advertising of pesticides."
25      Do you see that?

Page 289

1  A.  Yes.
2  Q.  And that is a part of this stewardship for the
3  pesticide industry?
4  A.  Code of conduct, stewardship, yes.
5  Q.  And in the lower right-hand corner -- I'm
6  sorry.  Under 3.5, "Pesticide industry and traders
7  should observe the following practices in pesticide
8  management."
9      Correct?  That's what it says?
10  A.  Yes.
11  Q.  And then under that, 3.5.3, "Pay special
12  attention to the choice of pesticide formulations and to
13  presentation, packaging and labeling in order to
14  minimize risks to users, the public and the
15  environment."
16      Is that part of the stewardship pesticide
17  industry standard adopted by Monsanto?
18  A.  Yes, it is.
19      MR. FAYNE:  Objection to the characterization
20  that it was adopted by Monsanto.
21      MR. ESFANDIARY:  It's on the website.
22      MR. KRISTAL:  It's on their website with a link
23  to it.  Other than that --
24      THE WITNESS:  But the --
25      MR. KRISTAL:  And they said they're adopted.

Confidential - Charles Benbrook, Ph.D.

Page 290

1    Q. (BY MR. KRISTAL:) Okay. The next page, 3.5.6
2  under "Pesticide industry responsibilities," "Retain an
3  active interest in following their products through
4  their entire lifecycle, keeping track of major uses and
5  the occurrence of any problems arising from the use of
6  their products as a basis for determining the need for
7  changes in labeling, directions for use, packaging,
8  formulation, or product availability."
9       Is that also part of this industry standard
10  adopted by Monsanto?
11    A. Yes, it is.
12       MR. FAYNE: Objection. Same objection.
13    Q. Under Section 3.11 of the pesticide management
14  standard, "Governments, pesticide industry and the
15  application equipment industry should develop and
16  promote the use of pesticide application methods and
17  equipment that minimize the risk from pesticides to
18  human and animal health and/or the environment and that
19  optimize efficiency and cost effectiveness, and should
20  conduct periodic practical training in such activities."
21       Is that another part of this standard that is
22  linked to the Monsanto website?
23       MR. FAYNE: Same objection.
24    A. Yes, it is.
25    Q. All right. And if you turn to page -- I'm

Page 291

1  sorry, to Exhibit 22 now, the 1985 standard, does this
2  also set out -- if you'd look, for example, at
3  Section 3.3 -- government standards that should be --
4    A. What page are we on?
5    Q. It's Section 3.3.
6    A. Okay. Get the -- okay. I'm there.
7    Q. Sets out government standards --
8    A. Yeah, 3.3.
9    Q. -- as well as pesticide manufacturing
10  standards?
11    A. Correct.
12    Q. All right. 3.4 of the 1985 International Code
13  of Conduct on the Distribution and Use of Pesticides
14  reads, "Manufacturers and traders should observe the
15  following practices in pesticide management, especially
16  in countries without legislation and the means of
17  implementing regulations."
18       3.4.2, "Pay special attention to formulations,
19  presentation, packaging and labeling in order to reduce
20  hazards to users to the maximum extent possible,
21  consistent with the effective functioning of the
22  pesticide in the particular circumstances in which it is
23  used."
24       Is that part of this 1985 code of conduct?
25    A. Yes, it is.

Page 292

1    Q. And is this part of the reason that -- part of
2  the basis for your opinion that Monsanto should have
3  included an oncogenicity warning on its label as of the
4  time of the 1983 mouse study?
5       MR. FAYNE: Object to form.
6    A. As of the time of the CARC review in 1985,
7  correct.
8    Q. And is it also part of the basis of your
9  opinion in terms of Monsanto's obligation to conduct the
10  chronic feeding study with glyphosate-based herbicides?
11       MR. FAYNE: Object to form.
12    A. Yes.
13    Q. And if you look at Section 3.4.4, "Retain an
14  active interest in following their products to the
15  ultimate consumer, keeping track of major uses and the
16  occurrence of any problems arising in the actual use of
17  their products as a basis for determining the need for
18  changes in labeling, use directions, packaging,
19  formulation, or product availability."
20       Is that part of this standard and part of the
21  basis of your opinion in terms of Monsanto's
22  obligations?
23       MR. FAYNE: Object to form.
24    A. Yes, it is.
25    Q. And under 3.4.3, "A manufacturer should

Page 293

1  provide, with each package of pesticide, information and
2  instructions in a form and language adequate to ensure
3  safe and effective use."
4       Is that also part of the basis of your opinion
5  for Monsanto's obligations?
6       MR. FAYNE: Object to form.
7    A. Yes, it is.
8    Q. You were asked if there was any company that
9  ever put an oncogenicity warning on a product, and you
10  mentioned Alachlor. First of all, what is Alachlor?
11    A. It's a grass herbicide at the time manufactured
12  by Monsanto.
13       MR. KRISTAL: And it's A-L-A-C-H-L-O-R, capital
14  A.
15       (Exhibit 25 was marked for identification.)
16    Q. (BY MR. KRISTAL:) I'm marking as Exhibit 25
17  two pages from the 1985 Monsanto Crop Chemicals Sample
18  Label Guide, and on the second page of the document, up
19  top, it reads, "Important 1985 label changes?"
20       Do you see that?
21    A. Yes.
22    Q. And is this the basis in terms of your
23  understanding that Monsanto itself had put an
24  oncogenicity warning on its Alachlor?
25    A. Yes.

Page 294

1    MR. FAYNE: Object to form.
2    Q.  In the -- under the section "Important 1985
3  label changes," the first bullet point in the left-hand
4  column, "As mentioned earlier, the results of tests in
5  which laboratory animals were fed Alachlor daily
6  throughout most of their lifetimes led to the additions
7  of a warning statement on the label, 'The use of this
8  product may be hazardous to your health. This product
9  contains Alachlor, which has been determined to cause
10 tumors in laboratory animals.'"
11       Is that an oncogenicity warning?
12   A.  Yes.
13   Q.  In this label change announcement from 1985, is
14 there also another change that's being announced for the
15 products that are listed here to "Wear goggles or face
16 shield, rubber gloves, long trousers, long sleeve shirt
17 or jacket of tightly woven material, along with boots
18 high enough to cover ankles when transferring and mixing
19 and when adjusting, repairing or cleaning equipment.
20 Wear rubber boots when pouring from open containers or
21 when re-entry is made into fields where the product has
22 been applied through center pivot irrigation system and
23 the field is still wet."
24   MR. FAYNE: Object to form.
25   Q.  Is that something Monsanto was putting on the

Page 295

1  label for the products listed on the second page of
2  this, similar to what EPA wanted Monsanto to put on the
3  Roundup label in terms of the worker protection
4  provisions?
5    MR. FAYNE: Object to form.
6    A.  Yes, very -- very similar and
7  essentially -- essentially the same time. This is 1985,
8  and the glyphosate registration document was 1986.
9    Q.  And the new label specifies, in addition to
10 what I just read, "Clothing which comes in contact with
11 Lasso must be washed before reuse. Clothing or other
12 materials which has become drenched with the
13 concentrated pesticide must be disposed of in a sanitary
14 landfill by incineration or, if allowed by state and
15 local authorities, by burning. If burned, stay out of
16 smoke."
17       And is that similar to one of the worker
18 protection provisions EPA had requested Monsanto put on
19 the Roundup label regarding clothing which comes in
20 contact and is drenched by Roundup?
21   MR. FAYNE: Object to form.
22   A.  Its -- it's very similar, yes.
23   Q.  Over lunch we had referred to a homework
24 assignment where you were going to be looking at the
25 Dr. Parry-submitted reports to Monsanto to identify the

Page 296

1  11 recommended studies he was proposing.
2        Do you recall that line of questioning?
3    A.  Yes.
4    Q.  And did you go through that exercise over
5  lunch?
6    A.  Yes.
7    Q.  Did Monsanto counsel then not ask you about
8  that?
9    A.  Correct.
10   Q.  Okay. And were you also asked to look up two
11 of the studies that had been referenced in your report
12 regarding genotoxicity and in vivo chromosomal damages?
13   A.  Correct.
14   Q.  And did you do that?
15   A.  Yes, I did.
16   Q.  Over the lunch break?
17   A.  Yeah. Yes.
18   Q.  And were you asked about that by Monsanto
19 counsel?
20   A.  No.
21   Q.  I'd like you to try to find Exhibit 11 that was
22 given to you earlier today by Monsanto counsel.
23   MR. FAYNE: Which exhibit is that?
24   MR. KRISTAL: It's the electronic code of
25 federal regulations regarding recording requirements.

Page 297

1    THE WITNESS: Got it.
2    MR. FAYNE: Could you give me one second?
3    MR. KRISTAL: Sure. Take your time.
4    MR. ESFANDIARY: You got it?
5    MR. FAYNE: Yeah. Thank you.
6    Q.  (BY MR. KRISTAL:) You were asked about certain
7  sections by counsel for Monsanto. Let me ask you about
8  other sections.
9        First of all, on the first page,
10 Section 159.153 entitled "Definitions," do you see that?
11   A.  I see. I do.
12   Q.  If you would turn to the next page and look at
13 the definition of "qualified expert."
14       Do you see it there up top?
15   A.  I do.
16   Q.  Okay. "Qualified expert means one who by
17 virtue of his or her knowledge, skill, experience,
18 training or education could be qualified by a court as
19 an expert to testify on issues related to the subject
20 matter on which he or she renders a conclusion or
21 opinion. Under Rule 702 of the Federal Rules of
22 Evidence, a person may be qualified as an expert on a
23 particular matter by virtue of knowledge, skill,
24 experience, training, or education. In general, EPA
25 wants registrants to report information when a person

Confidential - Charles Benbrook, Ph.D.

Page 298

1 has relevant expert credentials (e.g., a medical doctor
2 giving a medical opinion, a plant pathologist giving an
3 opinion on plant pathology, et cetera)."
4        Do you see that?
5 A.  Yes, I do.
6 Q.  Would Dr. Parry fall under the definition of
7 qualified expert in the field of genotoxicity?
8        MR. FAYNE:  Objection.  Calls for a legal
9 conclusion.
10 A.  Yes, he certainly would.
11 Q.  And if you turn to page 3 of 14,
12 Section 159.158.
13 A.  I'm there.
14 Q.  And that section is entitled "What information
15 must be submitted?"  is it not?
16 A.  Correct.
17 Q.  And it reads, Section A, "General.  Information
18 which is reportable under this part must be submitted if
19 the registrant possesses or receives the information and
20 the information is relevant to the assessment of the
21 risks or benefits of one or more specific pesticide
22 registrations currently or formerly held by the
23 registrant.
24        "Information relevant to the assessment of the
25 risk or benefits also includes conclusions or opinions

Page 299

1 rendered by a person who meets any of the following: (1)
2 who was employed or retained directly or indirectly by
3 the registrant and was likely to receive such
4 information; (2) from whom the registrant requested the
5 opinions or conclusions in question, and, (3), who is a
6 qualified expert in Section 159.153(b).
7        Do you see that?
8 A.  Yes, I do.
9 Q.  Okay.  Would the Dr. Parry reports that were
10 sent to Monsanto at their request on genotoxicity fall
11 under the category 159.158, information that must be
12 submitted to the EPA?
13        MR. FAYNE:  Objection.  Calls for a legal
14 conclusion.
15 A.  Yes, it would.  Or yes, they would.
16 Q.  And would this also apply to the TNO reports
17 and preliminary reports that Monsanto received regarding
18 the dermal absorption experiments?
19        MR. FAYNE:  Objection.  Calls for a legal
20 conclusion.  Also vague as to what "this" is.
21 A.  Yes, it would.
22 Q.  Okay.  If you would be kind enough to go to
23 page 157 of your report, Exhibit 3, where you discuss
24 the FIFRA Section 6(a)(2) reporting requirements.
25 A.  Okay.

Page 300

1 Q.  Page 157?
2 A.  Paragraph 157?
3 Q.  No, page 157, paragraph 734.
4 A.  Way in there.  What did I write such a long
5 report for?  Okay.  I'm there.
6 Q.  And you have a three-paragraph section entitled
7 "Section 6(a)(2) of FIFRA," do you not?
8 A.  Yes, I do.
9 Q.  On paragraph 735, you wrote the following:
10 "The June 1986 registration standard for glyphosate
11 contains this passage: 'Registrants,'" and you wrote at
12 that -- you added "[at this time for glyphosate, only
13 Monsanto] are reminded that FIFRA Section 6(a)(2)
14 requires them to submit factual information concerning
15 possible unreasonable adverse effects of the pesticide
16 at any time they become aware of such information,
17 including interim or preliminary results of studies if
18 those results suggest a possible adverse effect on man
19 or the environment.  This requirement continues as long
20 as your products are registered by the agency."
21        Did the TNO study results that were provided to
22 Monsanto on the dermal absorption fall under that
23 definition?
24        MR. FAYNE:  Objection.  Calls for a legal
25 conclusion.

Page 301

1 A.  Yes.
2 Q.  And is that part of the reason it is your
3 opinion that they had to have been submitted to EPA?
4 A.  Because they contained new information that
5 shed new light on the potential of adverse effects on
6 human beings exposed to glyphosate-based herbicides.
7        (Exhibit 26 was marked for identification.)
8 Q.  (BY MR. KRISTAL:)  I'm marking as Exhibit 26 an
9 e-mail from ▇▇▇▇▇▇▇ M-A-R-T-E-N-S, dated
10 April 19th, 1999.  And it is to a number of people,
11 including Larry Kier, K-I-E-R, William Heydens,
12 H-E-D -- strike that -- H-E-Y-D-E-N-S, Donna Farmer, and
13 others.  And it's entitled "Meeting minutes 2/25."
14        Do you see that?
15 A.  I do.
16 Q.  Are you familiar with this document?
17 A.  Yes.
18 Q.  And is this a document that had been produced
19 by Monsanto in this litigation?
20 A.  Yes.
21 Q.  And ▇▇▇▇▇▇▇ writes, "Donna, thanks for
22 this.  It accurately reflects the situation.  Please
23 take note of the following update.  I received from
24 Professor Parry the signed secrecy agreement.  As a
25 response, I sent him a letter of authorization and all

Confidential - Charles Benbrook, Ph.D.

Page 302

1  relevant reports and publications re mutagenicity of
2  glyphosate, its formulations, and the surfactants for
3  which we have mutagenicity testing data."
4      Do you see that?
5  A.  I do.
6  Q.  So when you were asked earlier whether or not
7  Monsanto had sent Dr. Parry all of the relevant genotox
8  literature, does this indicate that in fact they had?
9      MR. FAYNE:  Objection.
10  A.  Yes, it does.
11  Q.  And on the second page of the document, under
12  "Section 4, Global Experts."
13  A.  I'm just looking down through --
14  Q.  Oh, okay.
15  A.  -- this list.  On page 2?
16  Q.  "Section 4, Global Experts."
17      MR. FAYNE:  Counsel, did -- was this
18  highlighting in the original document, or did you add
19  it?
20      MR. ESFANDIARY:  No, that's added.
21      MR. FAYNE:  What's that?
22      MR. ESFANDIARY:  That's added.
23      MR. FAYNE:  That's added by you-all?
24      MR. ESFANDIARY:  Yeah.
25      MR. FAYNE:  Okay.  Just want to make sure.

Page 303

1      THE WITNESS:  I'm sorry, I'm missing where you
2  are.
3  Q.  (BY MR. KRISTAL:)  Sure.  Page 2, Section --
4  A.  So we're down into the Donna Farmer?
5  Q.  Yes.
6  A.  All right.
7  Q.  Let's state that.  Donna Farmer had meeting
8  minutes dated 2/25 that she had prepared April 17th,
9  1999, which is on the second page of this e-mail; is
10  that correct?
11  A.  Yes.
12  Q.  And she writes, "Please find the meeting
13  minutes and actions from our 2/25 meeting below."
14  A.  Correct.
15  Q.  Does she not?
16  A.  Yes.
17  Q.  And paragraph 4 of the meeting minutes is
18  entitled "Global Experts"?
19  A.  Yes.
20  Q.  And it reads, "Reviewed Dr. Parry's analysis.
21  What is our next step?  Dr. Parry concluded on his
22  evaluation of the four articles that glyphosate is
23  capable of producing genotoxicity both in vivo and in
24  vitro by a mechanism based upon the production of
25  oxidative damage.  The data that Dr. Parry evaluated is

Page 304

1  limited and is not consistent with other better
2  conducted studies.  In order to move Dr. Parry from his
3  position, we will need to provide him with the
4  additional information as well as asking him to
5  critically evaluate the quality of all the data,
6  including the open literature studies."
7      Is that statement, "In order to move Dr. Parry
8  from his position," an example of Monsanto dealing with
9  adverse information obtained by an expert?
10      MR. FAYNE:  Objection.
11  A.  Yes.
12  Q.  With respect to TNO, if you'd go to the
13  Exhibits 12 and 13.  12 is the final report.  13 is the
14  draft TNO report.
15  A.  12 and 13?
16  Q.  Yes, sir.
17  A.  There's 12 and there's 13.  Okay.  I got them.
18  Q.  First of all, did Monsanto choose TNO to
19  conduct the study, the dermal absorption study?
20  A.  Yes, they --
21      MR. FAYNE:  Objection.
22      THE WITNESS:  Yes, they did.
23  Q.  (BY MR. KRISTAL:)  And if you look on what's
24  listed as page 8 of 41 of Exhibit 12, the final study.
25  A.  8 of 41?

Page 305

1  Q.  Yes.
2  A.  Page 8?  Yes.
3  Q.  You're aware that Dr. █████████ --
4  B-R-O-E-C-K-A-E-R-T -- was the study monitor from
5  Monsanto?
6  A.  Correct.
7  Q.  He's listed here as a study monitor?
8      MR. FAYNE:  Objection.  Lacks foundation.
9  A.  Yes.  That's █████████
10  Q.  Okay.  And if you look at Exhibit 13, the
11  draft, that was faxed to whom?
12  A.  To Dr. █████████████
13  Q.  Okay.  The person that was listed as the study
14  monitor?
15  A.  Correct.
16  Q.  And who is he employed by, according to this
17  fax?
18  A.  Monsanto Europe.
19  Q.  Okay.  And on the Exhibit 12, the final report,
20  is there a Good Laboratories Practice Statement of
21  Compliance?
22  A.  Yes, there --
23      MR. FAYNE:  Sorry.  Which page are we on now?
24      MR. KRISTAL:  We are on page 5 of 41 of
25  Exhibit 12.

Confidential - Charles Benbrook, Ph.D.

Page 306

1 THE WITNESS: Yes, there is.
2 Q. (BY MR. KRISTAL:) And it's entitled "Statement
3 of GLP compliance."
4 "We, the undersigned, hereby declare that this
5 report constitutes a true and complete representation of
6 the procedures followed and of the results obtained in
7 this study by TNO Nutrition and Food Research, and that
8 the study was carried out under our supervision. The
9 study was carried out in accordance with the OECD
10 Principles of Good Laboratory Practice."
11 Do you see that?
12 A. Yes, I do.
13 Q. And does that same statement appear in the
14 draft, Exhibit 13, accepted as not signed and dated?
15 A. No, it doesn't.
16 Q. If you look at page 4 of --
17 A. The statement appears, but it's not signed.
18 Q. Right. Exactly. So is that the -- in the
19 draft, the same exact statement of Good Laboratory
20 Practice compliance was sent among Monsanto, it just had
21 not yet been signed and dated?
22 A. That is correct.
23 Q. All right. And if you look on page 8 of
24 Exhibit 30 -- 13, the draft.
25 A. Okay, page 8. I'm there.

Page 307

1 Q. It's entitled "GLP Compliance Monitoring Unit
2 Statement."
3 MR. FAYNE: I'm sorry. You're on Exhibit 13?
4 MR. KRISTAL: Yes. I'm sorry, 6. Looks like
5 an 8.
6 THE WITNESS: 8.
7 Q. (BY MR. KRISTAL:) It does look like an 8, but
8 it's page 6.
9 And it has an endorsement of compliance with
10 good laboratory practices dated December 23rd, 1999; is
11 that correct?
12 A. Yes.
13 Q. And if you turn to the next page, page 7 of
14 Exhibit 13, it's entitled "Testing Facility," and it
15 lists the name and address and phone numbers of TNO,
16 does it not?
17 A. Yes.
18 Q. And then it reads, in the draft, "This unit is
19 operating in full compliance with the OECD GLP
20 principles." Do you see that?
21 A. Yes.
22 Q. So whether or not the good laboratory
23 compliance statement was signed and dated in the draft,
24 is there any question that TNO was operating under good
25 laboratory practices?

Page 308

1 MR. FAYNE: Object to form.
2 A. Not that I'm aware of.
3 Q. Okay. And is the draft, Exhibit 5, does it
4 have that same quality assurance statement that is in the
5 final report, except for the fact that in the draft it
6 had not yet been signed and dated?
7 A. Yes, it does.
8 Q. Okay. Is there any indication anywhere in this
9 draft or final report that the study was conducted under
10 any circumstances other than under good laboratory
11 practices?
12 A. Not that I'm aware of.
13 Q. If you would turn to page 18 of the final
14 study, Exhibit 12.
15 A. Page 18?
16 Q. Yes. Where it says "Deviations of the
17 protocol."
18 A. Yes, I have it.
19 Q. Okay. Monsanto counsel read the second
20 paragraph, which ends with the statement, "Therefore,
21 upon request of the sponsor, the experiment has not been
22 performed using viable" skin -- "human skin membranes."
23 Do you see that?
24 MR. FAYNE: Objection. Mischaracterizes my
25 question.

Page 309

1 A. I see that sentence. You read it correctly.
2 Q. Okay. In the initial protocol of the study,
3 the initial design of the study, was there also going to
4 be a human skin membrane dermal absorption portion of
5 the study?
6 MR. FAYNE: Objection. Lacks foundation.
7 A. That was the original plan. It came out of
8 Dr. Donna Farmer's office. There was $70,000 pledged to
9 the work at TNO. And the rat skin penetration study,
10 this initial one, and the initial human skin penetration
11 study were the first of -- I think there were seven
12 studies that were going to be done on different
13 formulated products.
14 Q. Okay. So the final TNO report indicates that
15 the experiment on the human skin membranes had not been
16 done because of the variations in recovery?
17 MR. FAYNE: Are you reading from the report?
18 Q. I'm summarizing what appears before the
19 sentence that says, "Therefore, upon the request of the
20 sponsor."
21 A. When --
22 MR. FAYNE: Object to the characterization of
23 the document.
24 THE WITNESS: When Monsanto received the draft
25 report, a decision was made to terminate any further

Page 310

1  work with TNO, and that included the human skin membrane
2  study that was going to be a part of the first contract,
3  if you will.
4      Q.  (BY MR. KRISTAL:)  Okay.  And did you write
5  about the reason Monsanto articulated internally for
6  stopping the study?
7      A.  Yes.  It's in my expert report.
8      Q.  Okay.  If you would turn to paragraph 444.
9      A.  Okay.  444.  Okay.  444, I'm there.
10     Q.  Okay.
11     A.  Page 98.
12     Q.  And do you quote in paragraph 444 from an
13  April 4th, 2002, e-mail from the Monsanto study monitor
14  ███████
15     A.  Yes, I do.
16     Q.  Okay.  And could you read the quote that you
17  wrote in paragraph 444 of your report regarding why
18  Monsanto decided to stop the study?
19     A.  "We came to the conclusion that the penetration
20  of glyphosate would have been (probably) greater than
21  the 3 percent already imposed by the German authorities.
22  We decided, thus, to stop" -- in capital letters,
23  bolded -- "the study effective today."
24     Q.  Okay.  And was that statement contained from an
25  e-mail produced by Monsanto in this litigation?

Page 311

1      A.  Right.  The MONGLY number is given in my expert
2  report.
3      Q.  Is the statement of the reason for stopping the
4  study that was articulated internally with Monsanto
5  consistent with the reason that appears in the final
6  study report that we just read?
7      A.  No.
8      Q.  I want to talk to you about the line of
9  questioning regarding the failure of EPA to make
10  findings that Monsanto violated any regulations.
11         Do you generally recall those questions?
12     A.  Yes.
13     Q.  Okay.  This may seem like a silly question, but
14  let me ask it anyway.  If a person robs a bank and
15  doesn't get caught, does that mean that the bank wasn't
16  robbed?
17         MR. FAYNE:  Objection.
18     A.  No.
19     Q.  Okay.  And the fact that EPA did not make a
20  finding of violations of regulations, does that mean
21  that Monsanto did not violate the regulations?
22     A.  Not necessarily.
23     Q.  Okay.  If you look on page 391 -- I'm sorry.
24  The worker safety provision portion of your report.  I
25  believe it's paragraph 399.

Page 312

1      A.  I'm there.
2      Q.  Okay.  What were the worker safety provisions
3  that the EPA was requesting Monsanto add to its label?
4      A.  There were some requirements involving personal
5  protective clothing and equipment, which included either
6  goggles or a face shield, chemical-resistant gloves, a
7  chemical-resistant apron, chemical-resistant shoes or
8  shoe coverings or boots.  That was the required personal
9  protective equipment.
10         There's a provision on when that additional
11  P -- it's PPE is the acronym for personal protective
12  equipment -- a provision that specifies when such
13  equipment is to be worn.
14         And then in terms of the handling, the
15  management of the gloves, there's -- under "Important,"
16  it says, "Before removing gloves, wash them with soap
17  and water.  Always wash hands, face and arms with soap
18  and water before smoking, eating, drinking or
19  toileting."
20         And then there's a provision that refers to the
21  handling of clothing that becomes contaminated or
22  drenched with spray material.
23         "After work, wash protective clothing and
24  equipment with soap and water.  Any personal clothing
25  worn during the application should be laundered

Page 313

1  separately from household articles," and that "Clothing
2  or protective equipment that becomes heavily
3  contaminated or drenched with glyphosate has to be
4  disposed of in accord with state and local regulations,"
5  a language very reminiscent of what we read in the case
6  of the label changes on Alachlor.
7         And it emphasizes, again, in all capitals,
8  "Heavily contaminated or drenched clothing cannot be
9  adequately decontaminated."
10     Q.  Okay.  Now, did Monsanto ever effectuate what
11  EPA was requesting them to do with respect to putting
12  those worker protection provisions in its label?
13     A.  No, it -- no, it has not.
14     Q.  You were asked a question as to whether the
15  reason for that worker protective provisions related to
16  skin irritation and eye irritation; correct?
17     A.  Oh, it would be part of it.
18     Q.  Okay.  Would those worker protector provisions
19  reduce all exposures to Roundup for whatever adverse
20  effect Roundup might cause?
21         MR. FAYNE:  Objection.  Calls for speculation.
22  Beyond the scope of his expert --
23     A.  These worker protection standards were clearly
24  designed to reduce exposure to the eye, calling for
25  goggles or a face shield.  They were also clearly

Page 314

1 designed to reduce exposures through -- through the
2 hands.
3          Why is that making so much noise? I'm sorry.
4 I'm just going to have to let it ring. I'll turn the
5 thing off. Maybe that will do it. Yeah.
6          I'm sorry, could we -- could we go back to
7 where I was --
8     Q.  Sure.
9     A.  -- before I was interrupted by my damn phone,
10 my phone.
11     Q.  I was asking if you remember the line of
12 questioning about eye irritation and skin irritation
13 vis-à-vis the request to put in the worker protection
14 provisions, and I asked you if those provisions would
15 also reduce exposures to Roundup regardless of the
16 adverse effect.
17         MR. FAYNE:  Same objection.
18     A.  Yes, it would.  They're designed to reduce
19 exposure to the eyes, to the hands, to the skin, to the
20 feet, to the legs, to the back and to the torso.
21     Q.  If you would find Exhibit 16, please, in the
22 pile.  It's the October 1991 peer review of glyphosate.
23     A.  16?
24     Q.  Yes, sir.
25     A.  All right.  I'm there.  Making a mess of my

Page 315

1 nice pile.  All right.  Second peer review.
2     Q.  Okay.  And on the third page, Bates number 479.
3     A.  I'm there.
4     Q.  There's a section entitled, "Background
5 information."  Do you see that?
6     A.  Yes.
7     Q.  And the -- after the chemical formula for
8 glyphosate, it reads, "On February 11th, 1985, the
9 carcinogenic potential of glyphosate was first
10 considered by a panel (then called the Toxicology Branch
11 Ad Hoc Committee) comprised of members of the Toxicology
12 Branch of the Hazard Evaluation Division.  The
13 committee, in a consensus review dated March 4th, 1985,
14 classified glyphosate as a Group C carcinogen based on
15 an increased incidence of renal tubular adenomas in male
16 mice."
17         Do you see that?
18     A.  Yes.
19     Q.  Did Monsanto ever put on its label that Roundup
20 or glyphosate had been classified as a Group C
21 carcinogen?
22     A.  No, it did not.
23     Q.  If you turn to Exhibit 15, which is a
24 February 24th, 1986, EPA memo.
25     A.  15.  Okay.  I have it.

Page 316

1         MR. FAYNE:  Give me one second.  Which one is
2 that?
3         MR. KRISTAL:  15.
4         THE WITNESS:  February 24, 1986.  It's the --
5         MR. FAYNE:  Yes, I got it now.  Thank you.
6         MR. KRISTAL:  On the page that ends Bates
7 number 5517.
8     Q.  (BY MR. KRISTAL:)  The first full paragraph
9 also gives a little bit of the history of the review of
10 the database.
11     A.  Correct.
12     Q.  Does it not?
13         And it reads "The Federal Insecticide Fungicide
14 and Rodenticide Act (FIFRA) Scientific Advisory Panel
15 has completed review of the database supporting the
16 Environmental Protection Agency's decision to classify
17 glyphosate as a class C possible human carcinogen."
18         Do you see that?
19     A.  Yes.
20     Q.  Okay.  How long did that classification remain
21 in effect?
22     A.  Through 1991.
23     Q.  Okay.  So in between this date of this
24 classification as possible human carcinogen for the
25 approximately six and a half years through 1991, was

Page 317

1 there ever any information provided by Monsanto on a
2 Roundup label that glyphosate, the active ingredient,
3 was classified as a possible human carcinogen?
4     A.  No, there was not.
5     Q.  Have you seen any information communicating
6 this finding to the public in any way?
7     A.  From Monsanto?
8     Q.  From Monsanto, yes, sir.
9     A.  No, I have not.
10     Q.  Have you seen any advertisements that included
11 a statement between the time in 1985 when it was
12 classified by EPA as a possible human carcinogen until
13 that classification change in 1991 indicating that it
14 was classified as a possible human carcinogen?
15     A.  No, not.
16     Q.  Any brochures or presentations that stated that
17 to users of Roundup?
18     A.  No.
19     Q.  Any sort of press release or announcement by
20 Monsanto to any users of Roundup or the general public?
21     A.  No.
22     Q.  Is this statement of the finding of possible
23 human carcinogen consistent with your opinion in
24 paragraph 387 that as of 1985 Monsanto should have added
25 at least an oncogenicity warning?

Confidential - Charles Benbrook, Ph.D.

Page 318

1    A.  Correct.  And I suggested language that is
2  similar to the language that they -- that Monsanto
3  actually put on the Lasso or Alachlor label.
4       MR. KRISTAL:  Okay.  I'm going to mark as
5  hopefully the last document, Exhibit 27.
6       (Exhibit 27 marked for identification.)
7    Q.  (BY MR. KRISTAL:)  Thank you.  This is an EPA
8  document dated March 16th, 2017.  The subject is
9  "Transmission of meeting minutes and final report of the
10  December 13th through 16th, 2016 FIFRA SAP meeting."
11       Have you reviewed this document before?
12    A.  Yes, I have.
13    Q.  And did the SAP evaluate the environmental
14  protection -- strike that.
15       "SAP" means what?
16    A.  Scientific advisory panel.
17    Q.  Okay.  In this report dated March 16th, 2017,
18  did the scientific advisory panel evaluate the
19  Environmental Protection Agency's review of technical
20  glyphosate?
21    A.  Yes.  That was the part of the focus of it, and
22  there was a series of questions placed to the SAP, as is
23  always done when a scientific advisory panel meeting is
24  scheduled.
25    Q.  And if you would kindly turn to page 18.

Page 319

1    A.  Okay.  I'm there.
2    Q.  Did the entire SAP panel conclude that the EPA
3  did not follow its own guidelines --
4    A.  Yes.
5    Q.  -- from 2005?
6       MR. FAYNE:  Objection.  Lacks foundation.
7    A.  Yes, they did.
8    Q.  Okay.  And the next-to-the-last paragraph
9  begins "Overall, the panel concluded that the EPA
10  evaluation does not appear to follow the EPA 2005 cancer
11  guidelines in several ways, notably for use of
12  historical control data and statistical testing
13  requirements."
14       Is that what the SAP, the scientific advisory
15  panel, wrote in 2017?
16    A.  Yes, that's what they concluded.
17    Q.  Okay.  Does the fact they concluded the EPA did
18  not follow its own guidelines raise any concern in your
19  opinion regarding the quality of EPA's assessment?
20       MR. FAYNE:  Object to form.
21    A.  Yes.
22    Q.  Did the EPA ever explain why it didn't follow
23  its own guidelines?
24    A.  In -- in the September 2016 report, they
25  present their arguments for the statistical tests that

Page 320

1  they relied on and their use of historical control data
2  leading them to dismiss essentially all of the positive
3  tumor data in all of the animal bioassays.  So they --
4  in their document, they do their best to justify the
5  conclusions that they reached based on their review of
6  the animal bioassay data, and that's what -- that's what
7  they then asked the SAP to review.
8    Q.  Okay.  But did the EPA itself explain why it
9  didn't follow its own cancer guidelines?
10    A.  No, they didn't mention that fact.
11    Q.  Okay.  To your knowledge, is there any
12  indication that IARC failed to follow its guidelines as
13  established in its preamble --
14    A.  No.
15    Q.  -- in terms of evaluating the carcinogenicity
16  of glyphosate?
17    A.  In their report, correct.  I -- yes, there was
18  no indication that they deviated from standard IARC
19  protocols.
20    Q.  Okay.  Did the -- if you turn to page 82 of
21  Exhibit 27, the SAP --
22    A.  The same one we're in?
23    Q.  Yes.
24    A.  I'm there.
25    Q.  There's a section entitled "Scientific quality

Page 321

1  of the agency's carcinogenic potential
2  characterization."
3       Do you see that?
4    A.  Yes, I do.
5    Q.  Okay.  And it reads in that first paragraph,
6  "While the issue paper does try to detail the design and
7  data limitation of each study selected, some of the
8  panel believed it does not provide sufficient details to
9  support its conclusions, and this negatively impacts the
10  scientific quality of the report.  In addition, many
11  panel members felt that some of the discussions of study
12  design and data limitations provided in the issue paper
13  introduced and used criteria that were not part of EPA
14  guidelines for these assessments, and this further
15  reduces the credibility of the assessment."
16       Do you agree with the scientific advisory
17  panel's conclusions here regarding the reduction in the
18  credibility of the EPA's assessment?
19    A.  Actually, I do agree with it.
20    Q.  Did IARC consider real-world exposure to
21  glyphosate-based herbicides for its classification of
22  probable carcinogenicity for glyphosate?
23       MR. FAYNE:  Object to form.
24    A.  They did --
25       MR. FAYNE:  And lacks foundation.

Confidential - Charles Benbrook, Ph.D.

Page 322

1    THE WITNESS: They did in the context of their
2 review of the epidemiological evidence, all of which
3 involved exposures to glyphosate-based herbicides and
4 real-world exposures, and they also did in the genotox
5 assays involving exposed human populations who -- who
6 were exposed to a glyphosate-based herbicide under
7 real-world conditions.
8    Q. (BY MR. KRISTAL:) Have there been any
9 questions today by Monsanto's counsel or by myself that
10 leads you to change any of the opinions and conclusions
11 expressed in your report in this case?
12    A. No.
13    MR. KRISTAL: I have no further questions
14 unless --
15    MR. FAYNE: We can go off record for five
16 minutes.
17    VIDEOGRAPHER: Off the record at 5:39 p.m.
18    (A brief recess was had.)
19    VIDEOGRAPHER: Back on the record at 5:47 p.m.
20    FURTHER EXAMINATION
21 BY MR. FAYNE:
22    Q. Dr. Benbrook, you were shown by counsel
23 Exhibit 25, which relates to the chemical Alachlor; is
24 that correct?
25    A. Alachlor.

Page 323

1    Q. Alachlor. Thank you. Is that correct?
2    A. Yes.
3    MR. FAYNE: I'm going to mark this as
4 Exhibit --
5    MR. KRISTAL: 28.
6    MR. FAYNE: -- 28, which is the EPA R.E.D.
7 Facts, which I believe is the Registration Eligibility
8 Decision. Correct?
9    THE WITNESS: Correct.
10    (Exhibit 28 marked for identification.)
11    Q. (BY MR. FAYNE:) Have you seen this document
12 before, Dr. Benbrook?
13    A. Yes.
14    Q. You're aware that in January 1985, EPA
15 determined that Alachlor met or exceeded the agency's
16 oncogenicity criteria?
17    A. They classified Alachlor as a B2 carcinogen.
18 Is that what you're saying? I can't remember the exact
19 date that they did it. It's probably in this document.
20    Q. And B2 carcinogen, that means probable human
21 carcinogen?
22    A. Correct.
23    Q. Did the EPA ever classify glyphosate as a
24 probable human carcinogen?
25    A. No.

Page 324

1    Q. Were you aware that EPA issued a notice of
2 intent to cancel the registration of Alachlor?
3    A. Alachlor.
4    Q. Alachlor.
5    A. It's okay.
6    Q. I'll restate the question.
7    Were you aware that EPA issued a notice of
8 intent to cancel the registration of Alachlor?
9    A. Probably back when I was doing research on corn
10 herbicides I was aware of it, but I haven't gone back to
11 review the record in preparation for this deposition.
12    Q. Were you aware that EPA required a label
13 statement that Alachlor labels include the label warning
14 "Restricted use due to oncogenicity, a tumor hazard
15 warning"?
16    A. Yes.
17    Q. Did EPA ever require that glyphosate-based
18 herbicide labels include a label warning for restricted
19 use due to oncogenicity?
20    A. No.
21    Q. Did EPA ever require that glyphosate-based
22 herbicide labels include a label warning for a tumor
23 hazard?
24    A. No.
25    Q. Are you aware of any company including a cancer

Page 325

1 warning on a pesticide label in a situation other than
2 when EPA required such a warning?
3    A. I can't think of one at this late hour. To
4 say -- to say definitively how many there are, I'd have
5 to go through and look at a lot of labels.
6    Q. Sitting here today, you're not aware of any
7 pesticide company that has voluntarily placed a cancer
8 warning on its pesticide products without being required
9 to do so by EPA; correct?
10    A. I can't -- I can't point to one now.
11    Q. I'd like to direct you to exhibit -- I believe
12 it's 21, the International Code of Conduct on Pesticide
13 Management.
14    A. Okay.
15    Q. You were shown this document by counsel;
16 correct?
17    A. Correct.
18    Q. Had you reviewed this document before today?
19    A. Multiple times.
20    Q. It's not listed in your reference list;
21 correct?
22    A. I -- I don't know if it is or not.
23    Q. So you can't say one way or the other whether
24 this document is listed in your reference list?
25    A. I can't.

Page 326

1    Q.  Did you rely upon this document in forming your
2  opinions in this case?
3    A.  This is a -- this is a document that's been
4  part of pesticide registration and the code of conduct
5  internationally for 35 years, 40 years.  It's -- it's
6  one of thousands of documents that I've used and has
7  informed my understanding of pesticide risk and
8  regulation, stewardship obligations.  And I apologize
9  for not including on my reliance list everything that
10  I've read in the last 40 years on pesticides.
11    Q.  If you could turn to page 11, Article 4,
12  Testing of Pesticides.
13    A.  Page 11.  Okay.  I'm there.
14    Q.  Section 4.1.2 states that, "A pesticide
15  industry should ensure that such tests are conducted in
16  accordance with sound scientific and experimental
17  procedures and the principles of good laboratory and
18  experimental practice"; correct?
19    A.  Correct.
20    Q.  You're not making any claim that Monsanto
21  violated good laboratory practices in conducting studies
22  on glyphosate; correct?
23    A.  No, I have not.
24    Q.  If you turn to 4.1.3, it states that,
25  "Pesticide industries should make available copies or

Page 327

1  summaries of the original reports of such tests for
2  assessment by responsible governmental authorities in
3  all countries where the pesticide is to be offered for
4  sale or use."  Do you see that?
5    A.  Yes.
6    Q.  You would agree with me that IARC is not a
7  governmental authority; correct?
8    A.  Yes.
9    Q.  IARC does not register pesticides; correct?
10    A.  Correct.
11    Q.  So IARC would not fit within the meaning of
12  this paragraph 4.1.3; correct?
13    A.  Correct.
14    Q.  If you'd turn to 4.1.4, states that, "Pesticide
15  industries should ensure that the proposed use, label
16  claims and directions, packages, safety data sheets,
17  technical literature and advertising truly reflect the
18  outcome of these scientific tests and assessments";
19  correct?
20    A.  Correct.
21    Q.  You would agree that the Monsanto label is
22  consistent with the findings of international regulatory
23  bodies; correct?
24        MR. ESFANDIARY:  Which ones?
25    Q.  The -- in general, the labels on Monsanto's

Page 328

1  formulated products today are consistent with the
2  findings of international regulatory bodies; correct?
3        MR. KRISTAL:  Objection.
4    Q.  Glyphosate formulations.  I apologize.  Let me
5  restate the question.
6        In general, the find -- the labels on Monsanto
7  formulations today are consistent with the findings of
8  international regulatory agencies; correct?
9        MR. ESFANDIARY:  Which ones under the
10  formulations?
11        MR. KRISTAL:  It's getting late.  Don't worry.
12    Q.  (BY MR. FAYNE:)  It's getting really late.  I
13  apologize.  I'll restate the question for the third time
14  and this time I'm going to get it correct.  I promise.
15        You would agree with me, Dr. Benbrook, at this
16  late hour, that the labels on Monsanto's
17  glyphosate-based formulations are consistent with the
18  findings of regulatory agencies around the world with
19  respect to cancer; correct?
20    A.  Yes.
21    Q.  You'd also agree that the California state
22  agency OEHHA does not have authority to register
23  pesticides in California; correct?
24    A.  Correct.
25    Q.  Does not have the authority to approve

Page 329

1  pesticide labels; correct?
2    A.  Right.  That's the California Department of
3  Food and Agriculture that does that, DPR.
4    Q.  You've testified that you've reviewed this
5  document many times.
6        Does anywhere in this publication, which was
7  issued by the World Health Organization, does it mention
8  IARC in here?
9    A.  I can't remember.  I'd have to scan through it
10  to give a definitive answer.
11    Q.  You don't recall a statement in this
12  publication by the World Health Organization that says
13  that pesticide labels should be consistent with the
14  findings of IARC; correct?
15    A.  I'd have to look.
16    Q.  So sitting here today, you can't say one way or
17  the other; correct?
18    A.  That's what I just said.
19    Q.  So fair to say that to your knowledge this
20  publication requires that labels be consistent with the
21  findings of regulatory authorities around the world, but
22  not IARC?
23        MR. KRISTAL:  Objection.
24    A.  This document requires that pesticide labels be
25  consistent with what pesticide registrants, pesticide

Confidential - Charles Benbrook, Ph.D.

Page 330

1 regulators, and the scientific community knows about the
2 exposures and risks arising from use of pesticides.
3    Q.   You were asked about worker safety language in
4 the 1986 registration standard document; correct?
5    A.   Yes, I was.
6    Q.   Would you agree that that worker safety
7 language is not present in the 1993 registration
8 eligibility document for glyphosate?
9    A.   I would agree with that, yes.
10    Q.   You were shown a document, I believe it's
11 Exhibit 27, which is a March 16th, 2017, the
12 transmission of meeting minutes and final --
13    A.   Right.
14    Q.   -- report of the SAP?
15    A.   Yep.
16    Q.   You were asked whether -- I believe you were
17 asked whether Monsanto -- strike that.
18         You were asked whether EPA addressed the
19 comments of the SAP; is that correct?
20         Perhaps I'm incorrect.
21         I'm sorry.  You were asked in this report, SAP
22 stated that EPA did not follow its guidelines; correct?
23    A.   Correct.
24    Q.   And you were asked whether EPA ever explained
25 why it didn't follow its guidelines; correct?

Page 331

1    A.   I was asked that, yes.
2    Q.   Have you reviewed the document in which EPA
3 responded to the comments of the SAP?
4    A.   No.
5    Q.   Have you reviewed the 2017 -- December 2017 OPP
6 report which was revised following the OPP -- the SAP
7 meeting?
8    A.   Are you talking about the draft human health
9 risk assessment?
10    Q.   I'm talking about EPA's December 2017 revised
11 issue paper.
12    A.   Please put it in front of me.
13    Q.   I don't have it here today.  This is the
14 updated version of the 2016 report that we've been
15 reviewing today.
16    A.   Okay.
17    Q.   Have you -- do you recall if you reviewed that
18 document?
19    A.   Yes, I have.
20    Q.   Do you recall if that document addresses any of
21 the issues raised by the SAP?
22    A.   I believe it does, yes.
23    Q.   And you're aware that EPA directly responded to
24 the SAP in a formal memo; correct?
25    A.   No, I haven't seen that memo.

Page 332

1    Q.   So you're not aware that they affirmed their
2 understanding that they disagreed with the SAP with
3 respect to the guideline comments?
4    A.   I'm not surprised to learn that they would
5 stick to their guns on this.
6    Q.   Did you review -- strike that.
7         Did you rely on this SAP document in forming
8 your opinions in this case?
9    A.   That -- that's the most recent SAP meeting,
10 and, yes, I was aware of it.  I haven't -- I haven't
11 read the -- I don't think I've ever read it straight
12 through, but I'm aware of it and aware of the major
13 findings of it.
14    Q.   Is it cited in your reliance list?
15    A.   I don't know.  I can't remember.
16    Q.   I'd like to turn now to some questions that
17 counsel asked you about Professor Parry.
18    A.   Okay.
19    Q.   And if I could, I would like to direct you to
20 the EPA reporting requirements.  And I apologize, I'm
21 not sure which exhibit this is.  This is the 40 CFR
22 Part 159, Subpart D.
23    A.   11.
24    Q.   Thank you.  So if I could turn your attention
25 to Exhibit 11.  And as we talked about earlier today, if

Page 333

1 you look at Section 159.155.
2    A.   155?
3    Q.   Yes, 155.
4    A.   Okay.
5    Q.   This section addresses when information must be
6 submitted.  And as we talked about earlier today, it
7 provides seven categories of reportable information.
8         Do you see that?
9    A.   Yes.
10    Q.   So now I'd like to turn to 159.158, which is
11 the section that counsel asked you about.
12    A.   158.  Okay.
13    Q.   Part A states, "Information which is reportable
14 under this part must be submitted if the registrant" --
15 and then it goes on to describe who possesses that
16 information; correct?
17    A.   Yes, sir.
18    Q.   So the information must be reportable under
19 this part; correct?
20    A.   Information that falls into these categories
21 has to be reported, yes.
22    Q.   When this -- the regulation says "Information
23 reportable under this part," do you understand that to
24 mean Part 159 of the Code of Federal Regulations?
25    A.   Yes.

Confidential - Charles Benbrook, Ph.D.

Page 334

1    Q.  So the information must first be reportable
2  under Part 159 of the Code of Federal Regulations;
3  correct?
4    A.  Correct.
5        MR. FAYNE:  Going to mark one last exhibit
6  today and then I'm done, I promise.
7        MR. KRISTAL:  I've heard promises before at
8  depositions.
9        MR. FAYNE:  Number 28?
10        MR. KRISTAL:  I think so.  You marked the last
11  one which was the --
12        MR. FAYNE:  Yeah.
13        THE WITNESS:  The EPA, the SAP report, and it
14  is --
15        MR. KRISTAL:  27.
16        THE WITNESS:  -- it's 27.
17    Q.  (BY MR. FAYNE:)  So I'm marking as Exhibit 28
18  an e-mail chain related to a meeting with
19  Professor Parry, and this is cited in paragraph 492 of
20  your report.
21    A.  Okay.  Just a second.  And do I need to get my
22  report out, too, do you think, or are we just going to
23  talk about this document?
24    Q.  No, we're just going to talk about this
25  document.

Page 335

1    A.  Okay.  Shoot.
2    Q.  So you're aware -- I think you testified
3  earlier that you were not aware of any written reports
4  from Dr. Parry after August of 1999; correct?
5    A.  I would have to go back and check the dates of
6  the various Parry reports.  As what became clear
7  earlier, there's a series of them.
8        It's not exactly clear to me which ones came at
9  the same time, which ones are two parts of one report.
10  And the record -- it's confusing to track the flow of
11  Parry's reports.  I'd have to go back and look at it in
12  detail to give you a definitive answer.
13    Q.  But you're aware that Monsanto and Dr. Parry
14  continued to communicate after August 1999; correct?
15    A.  I am aware of that, yes.
16    Q.  And I'll represent to you that you stated in
17  your report that there was a meeting in February 2001
18  between Dr. Parry and Monsanto; correct?
19    A.  Correct.
20    Q.  And you cite this document, which is an
21  e-mail -- if you turn to the second page, it's an e-mail
22  from ▮▮▮▮▮ to Donna Farmer, William Heydens,
23  ▮▮▮▮▮ and copying ▮▮▮▮▮ dated
24  February 16th, 2001?
25    A.  Right.  Oh, yes, I remember this one now, yeah.

Page 336

1    Q.  So you've seen this document before; correct?
2    A.  Yeah.
3    Q.  And this is summarizing a meeting between
4  Monsanto and Dr. Parry --
5    A.  Right.
6    Q.  -- that occurred in February 2001; correct?
7    A.  Correct.
8    Q.  So starting with the first paragraph, second
9  sentence, it states, "The presentation of the results of
10  the" Monsanto -- or I should say "MON 35050 study
11  changed the mood because it clarified certain effects
12  found in the Bolognesi and Peluso papers."
13        Did I read that correctly?
14    A.  You read it correctly, yes.
15    Q.  Do you know what the MON 35050 study is?
16    A.  It's a study on that numbered Monsanto
17  formulation.  I believe that's original Roundup.
18    Q.  That is the study that was designed to
19  replicate and explain the findings of the Bolognesi and
20  Peluso --
21    A.  Yes.
22    Q.  -- papers; correct?
23    A.  Yeah.  One of -- one of several.
24    Q.  If you go to the "Results" section of the
25  summary, it states that --

Page 337

1    A.  Let me -- I want to read the intervening
2  paragraphs.
3    Q.  Sure.
4    A.  Okay.
5    Q.  So the "Results" section states that,
6  "Acceptance that glyphosate is not genotoxic."
7    A.  That's what it says.
8    Q.  "Broad agreement that genotoxic results in some
9  studies with surfactants arose due to oxidative damage
10  rather than direct genotoxicity"; correct?
11    A.  Correct.  That's what it says.
12    Q.  And then going down to the last bullet in that
13  section, "No longer requested any studies on the final
14  formulation."
15        Did I read that correctly?
16    A.  Yes.
17    Q.  As of February 2001, Dr. Parry agreed that
18  glyphosate was not genotoxic; correct?
19        MR. KRISTAL:  Objection.
20    A.  I'm not willing to accept ▮▮▮▮ summary of
21  this meeting as accurately reflecting Parry's views.
22    Q.  As of February 2001, Dr. ▮▮▮▮ reported from
23  a meeting that Dr. Parry had accepted that glyphosate is
24  not genotoxic; correct?
25        MR. KRISTAL:  Objection.

Confidential - Charles Benbrook, Ph.D.

Page 338

1 A. ▮▮▮▮▮▮▮ is reporting that his
2 interpretation of what Dr. Parry said. And, in fact, if
3 Dr. Parry had total changed his opinions about
4 glyphosate and glyphosate-based herbicides and believed
5 that they were not genotoxic, I'm quite sure that
6 Monsanto would have continued to use him and make him a
7 party of their third-party network, which they did not
8 do.
9     So I do not believe that there was a
10 substantial change in Dr. Parry's assessment of the
11 studies that he reviewed discussed during this meeting.
12 Q. Are you aware of whether Monsanto continued to
13 work with Dr. Parry after this February 2001 meeting?
14 A. I think there were -- I think perhaps even a
15 whole 'nother year, there were some communications back
16 and forth, yes. I don't know if you would -- if that
17 would classify as "work with."
18     I think there was -- there was concern
19 expressed about what Parry, independent of his
20 association with Monsanto might say and do about what he
21 had learned in the course of this consulting assignment
22 that he had done with Monsanto. There's several
23 messages that discuss what happens next in their
24 association with Dr. Parry.
25 Q. You testified that Monsanto would have

Page 339

1 continued to use him. How do you know that Monsanto did
2 not continue to use him?
3     Is that based on your review of the e-mails
4 produced in this litigation?
5 A. Yes.
6 Q. And those e-mails stated that they were no
7 longer using Dr. Parry as of what date?
8 A. I don't -- I don't remember, but certainly by
9 2003, there was -- I'm almost sure there was
10 no -- essentially no more communication, at least not
11 that I've seen in the record.
12 Q. You're not aware of any publication by
13 Dr. Parry suggesting that glyphosate or glyphosate-based
14 formulations were genotoxic; correct?
15 A. In peer-reviewed -- a peer-reviewed journal?
16 No.
17 Q. Correct.
18 A. No, I'm not aware of any.
19 Q. Other than the three reports in 1999 that
20 Dr. Parry produced, are you aware of any written study
21 or publication in which Dr. Parry concluded that
22 glyphosate was genotoxic?
23 A. I'm not aware of any. It could exist.
24 Q. After this February 2001 meeting between
25 Monsanto and Dr. Parry, are you aware of any statement

Page 340

1 or communication from Dr. Parry indicating that he
2 believed glyphosate was genotoxic?
3 A. I -- no, I don't believe I am. I would have
4 to, again, look -- look back at the MONGLY documents
5 that memorialize the interactions between Monsanto and
6 Dr. Parry to give a definitive answer to that question.
7 Q. Same answer for glyphosate-based formulations;
8 correct?
9 A. Yes.
10 Q. You stated that you're not willing to accept
11 ▮▮▮▮▮▮▮ interpretation of this meeting; correct?
12 A. Correct.
13 Q. Do you have any reason to believe that his
14 summary of the meeting was inaccurate?
15 A. It -- it's impossible to, based on this cryptic
16 summary of the meeting that occurred, to understand
17 exactly what was discussed, what date it was presented,
18 what aspects of studies Dr. Parry expressed a view on
19 that ▮▮▮▮▮ interpreted was different from the view
20 that Parry expressed in his earlier reports. It's just
21 -- it's not possible to render that judgment based on
22 this cursory summary of the meeting.
23 Q. So it's not possible to review the e-mail and
24 understand exactly what was said or what people's intent
25 or motivation was; correct?

Page 341

1     MR. KRISTAL: Objection.
2 A. Correct.
3 Q. Under the "Actions" section, it states,
4 "Complete the MON 35050 study with an intraperitoneal
5 injection of the MON" M-O-N, "35035 formulation minus
6 glyphosate."
7     Do you see that?
8 A. Yes.
9 Q. Do you know whether Monsanto completed that
10 study?
11 A. I don't. I don't know if they did or not.
12 Q. You don't know one way or the other?
13 A. Right. Correct.
14     MR. FAYNE: No further questions.
15     MR. KRISTAL: For housekeeping purposes, I have
16 two minutes of questions.
17     I believe you marked Exhibit -- the Alachlor
18 EPA R.E.D. Facts as 28, so the e-mail that you've just
19 been discussing should be 29, so I'll put 29 on that.
20     MR. FAYNE: Thank you. I appreciate that.
21     (Exhibit 29 marked for identification.)
22     MR. KRISTAL: And I'm assuming 28 made its way
23 onto the Alachlor, and if it hadn't, we can do as well.
24     MR. FAYNE: All right. Actually, have you
25 marked that version that you have that's stapled?

Confidential - Charles Benbrook, Ph.D.

Page 342

1    MR. KRISTAL:  That's mine.  We'll make sure for
2  housekeeping.
3    MR. FAYNE:  Okay.
4    MR. KRISTAL:  We don't have to delay
5  Dr. Benbrook while we do the housekeeping.
6    MR. FAYNE:  All right.  Thank you.
7    MR. KRISTAL:  Sure.
8    THE WITNESS:  I'm quite proud of my together
9  pile here.  I've got 27, 28.
10    MR. KRISTAL:  28 is already on there.
11    THE WITNESS:  29, and that's bingo.
12    (Exhibit 23 marked for identification.)
13    MR. KRISTAL:  Real quick.  I marked as
14  Exhibit 23 the printout from the Monsanto website that
15  had the link to the International Code of Conduct on
16  Pesticide Management, and --
17    THE WITNESS:  That's the missing one.
18    MR. KRISTAL:  Right.
19    MR. FAYNE:  Do you mind if I take a quick look
20  at it?
21    MR. KRISTAL:  Sure.
22    MR. FAYNE:  Whenever you're ready.
23    MR. KRISTAL:  And Exhibit 23, just before the
24  link, says, "We subscribe to international stewardship
25  standards including the International Code of Conduct on

Page 343

1  Pesticide Management."  And I want to --
2    THE WITNESS:  It goes there when it's ready.
3    MR. KRISTAL:  Yep.  And I want to follow on
4  Exhibit 21 just in the same section that Mr. Fayne had
5  asked you questions.
6    FURTHER EXAMINATION
7  BY MR. KRISTAL:
8    Q.  Under Article 4, Testing of Pesticides,
9  Mr. Fayne asked you about Section 4.1.2 in terms of good
10  laboratory practices; correct?
11    A.  Correct.
12    Q.  All right.  4.1 says, and 4.1.1 say, "Pesticide
13  industries should ensure that each pesticide and
14  pesticide product is adequately and effectively tested
15  by recognized procedures and test methods so as to fully
16  evaluate its inherent physical, chemical or biological
17  properties, efficacy, behavior, fate, hazard and risk
18  with regard to the various anticipated uses and
19  conditions in regions or countries of use."
20    Do you see that?
21    A.  Yes, I do.
22    Q.  When it says, "ensure that each pesticide and
23  pesticide product," is there a difference between the
24  pesticide as an active ingredient and the pesticide
25  product itself?

Page 344

1    A.  Yes.  The pesticide refers to the testing of
2  the active ingredient, and pesticide product refers to
3  the formulated or end-use product.
4    Q.  Okay.  So the pesticide, the active ingredient
5  for Roundup is what?
6    A.  Glyphosate.
7    Q.  And the pesticide product is what?
8    A.  Roundup and the various brands of Roundup.
9    Q.  Okay.  And has Monsanto ever done any
10  carcinogenicity testing on Roundup itself, the pesticide
11  product?
12    A.  No, it has not.
13    Q.  Okay.  And is that a violation of this industry
14  standard that Monsanto itself has adopted?
15    MR. FAYNE:  Objection.  Calls for a legal
16  conclusion.
17    A.  It falls short of full compliance with it,
18  especially given all of the reasons to do it.
19    Q.  And very briefly, Exhibit 28, the Alachlor EPA
20  registration facts.  It was mentioned that eventually
21  Alachlor was classified as a B2 carcinogen; right?
22    A.  Correct.
23    Q.  Okay.  But in the history here it says, a
24  registration standard was issued for Alachlor on
25  November 20th, 1984, dropping down, "The Registration

Page 345

1  Standard (1) stated that Alachlor was classified as an
2  oncogen."  Do you see that?
3    A.  Yes.
4    Q.  And so that was November 20th, 1984, and we saw
5  from the 1985 --
6    A.  '5.
7    Q.  -- chemical guide that, very shortly after the
8  finding that it was an oncogen, Monsanto put the warning
9  on the Alachlor products; correct?
10    A.  Correct.
11    MR. KRISTAL:  No further questions.
12    MR. FAYNE:  Let's take a one-minute break and
13  then I might have one last question and I think we're --
14    THE WITNESS:  I think I'm done.  Okay?  I mean,
15  this can go on all night.
16    MR. FAYNE:  Well, it can.
17    THE WITNESS:  Let's do the question.
18    MR. FAYNE:  Okay.
19    MR. KRISTAL:  Do you have a question?
20    MR. FAYNE:  Yeah, we're still on the record.
21    FURTHER EXAMINATION
22  BY MR. FAYNE:
23    Q.  You testified previously that testing -- doing
24  long-term cancer studies on a formulated product is not
25  industry standard; correct?

Page 346

1 MR. KRISTAL: Objection.

2 A. Correct.

3 So that's your question? You asked -- you said

4 you were going to ask one question.

5 MR. KRISTAL: Yeah. We're beyond seven hours

6 anyway.

7 MR. ESFANDIARY: Counsel --

8 VIDEOGRAPHER: We can go off the record and I

9 can let you know.

10 MR. FAYNE: That's fine.

11 THE WITNESS: Are we done?

12 MR. FAYNE: Yes, we can be done.

13 THE WITNESS: Thank you.

14 VIDEOGRAPHER: This concludes the videotaped

15 deposition of Charles Benbrook, Ph.D. The time is now

16 6:18 p.m. We're going off the record.

17 (Discussion had off the record.)

18 (Off the video record.)

19 MR. KRISTAL: Earlier I had said that I was

20 going to mark as Exhibit 24 the linked International

21 Code of Conduct from Exhibit 23, the Monsanto website.

22 We agreed that 24 was the 2014 -- well, was going to be

23 marked as 24, was the 2014 international code, which was

24 the same as Exhibit 21.

25 MR. FAYNE: So I --

Page 347

1 MR. KRISTAL: 24 does not get marked.

2 MR. FAYNE: And I would just say that we did

3 not agree that they're necessarily the same document. I

4 understand that you printed out the linked version,

5 but...

6 MR. KRISTAL: Well, it had the same title. It

7 had the same author. The --

8 MR. FAYNE: It had a different cover page, so

9 as far as I'm concerned, not the same document.

10 MR. KRISTAL: Right.

11 MR. FAYNE: I haven't reviewed them in detail

12 to be able to --

13 MR. KRISTAL: Okay.

14 MR. FAYNE: -- agree to that characterization.

15 MR. KRISTAL: Well, everybody can go onto the

16 Monsanto website link.

17 MR. ESFANDIARY: I can send you the link later.

18 You can authenticate it later.

19 MR. FAYNE: I'm sure. All I'm saying is I'm

20 not agreeing --

21 MR. KRISTAL: Would you agree to look whenever

22 you get a chance and then let us know if you agree so we

23 don't have to go back and print it and put a number 24

24 on it? We can print it out after the deposition.

25 MR. FAYNE: I thought that's what you were

Page 348

1 going to -- I thought that's what's you're going to do.

2 MR. KRISTAL: That's fine. We'll do that,

3 then. It's no big deal.

4 We will provide to the court reporter an

5 electronic copy of 24, and we'll provide that to you as

6 well.

7 MR. FAYNE: That would be great. Thank you.

8 MR. KRISTAL: Okay. Fair enough.

9 (Whereupon, the deposition of CHARLES

10 BENBROOK, Ph.D., was concluded at 6:20 p.m.)

11 (Exhibit 24 marked for identification.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 349

1

2 CERTIFICATE

3 I, AMY J. BROWN, Certified Court Reporter in and

4 for the States of Idaho and Washington, Notary Public in

5 and for the State of Idaho, do hereby certify:

6 That the foregoing deposition of CHARLES

7 BENBROOK, Ph.D., was taken December 28, 2018, at the

8 time and place herein stated;

9 That the witness was first duly sworn to testify

10 to the truth, the whole truth, and nothing but the truth

11 in the within-entitled cause;

12 That the foregoing is a true and correct

13 transcription of my shorthand notes of said deposition

14 transcribed by me or under my direction;

15 I further certify that I am not interested in

16 the outcome of said action, nor connected with, nor

17 related to, any of the parties of said action or to

18 their respective counsel.

19 IN WITNESS WHEREOF, I have hereunto set my hand

20 and seal this 29th day of December, 2018.

21

22 _____

23 AMY J. BROWN, RMR, CRR

Notary Public

24 My commission expires: 9/24/24

25

Confidential - Charles Benbrook, Ph.D.

Page 350

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 352

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
CHARLES BENBROOK, Ph.D.        DATE

Subscribed and sworn
to before me this
_____ day of _____, 20_____.
My commission expires:_____

_____
Notary Public

Page 351

- - - - - -
E R R A T A
- - - - - -

PAGE  LINE  CHANGE

____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____
____ ____ _____
REASON: _____

Page 353

## LAWYER'S NOTES
PAGE  LINE

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____