# EXHIBIT 5

1                SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                        COUNTY OF SAN FRANCISCO

3

4    DEWAYNE JOHNSON,

5              Plaintiff,

6         vs.                          Case No. CGC-16-550128

7    MONSANTO COMPANY,

8              Defendant.
     _____/

9

10

11

12

13

14

15               Reporter's Transcript of Proceedings

16                    San Francisco, California

17                    Thursday, May 10, 2018

18

19

20

21

22

23   Reported by:

     SHEILA PHAM

24   CSR NO. 13293

25   PAGES 1 - 79

                                                    Page 1

1     SUPERIOR COURT OF THE STATE OF CALIFORNIA
2          COUNTY OF SAN FRANCISCO
3
4  DEWAYNE JOHNSON,
5       Plaintiff,
6    vs.           Case No. CGC-16-550128
7  MONSANTO COMPANY,
8       Defendant.
   _____/
9
10
11
12
13
14
15     Reporter's Transcript of Proceedings, taken at SAN
16  FRANCISCO SUPERIOR COURT, 400 McAllister Street,
17  Department 304, San Francisco, CA 94102, beginning at
18  9:10 a.m. and ending at 11:00 a.m., on Thursday, May 10,
19  2018, before Sheila Pham, Certified Shorthand Reporter
20  No. 13293.
21
22
23
24
25

Page 2

APPEARANCES OF COUNSEL

For Plaintiff:
    THE MILLER FIRM LLC
    BY: MICHAEL MILLER, ESQ.
    BY: JEFFREY TRAVERS, ESQ.
    BY: TIMOTHY LITZENBURG, ESQ. (on CourtCall)
    108 Railroad Avenue
    Orange, VA 22960
    (540) 672-4224
    mmiller@millerfirmllc.com
    jtravers@millerfirmllc.com
    tlitzenburg@millerfirmllc.com

    AUDET & PARTNERS
    BY: MARK BURTON, ESQ.
    711 Van Ness Avenue, Suite 500
    San Francisco, CA 94102
    (415) 568-2555
    mburton@audetlaw.com

For Defendant:

    HOLLINGSWORTH LLP
    BY: ERIC G. LASKER, ESQ.
    BY: JOE HOLLINGSWORTH, ESQ. (on CourtCall)
    1350 I Street, N.W.
    Washington, DC 20005
    (202) 898-5800
    elasker@hollingsworthllp.com
    jhollingsworth@hollingsworthllp.com
    FARELLA BRAUN + MARTEL
    BY: SANDRA A. EDWARDS, ESQ.
    235 Montgomery Street
    San Francisco, CA 94104
    (415) 954-4428
    sedwards@fbm.com

Page 3

San Francisco, California, Thursday, May 10, 2018
        9:10 a.m. - 11:00 a.m.

        THE COURT: I'm required to read the following:
The parties and counsel are advised in connection with
the June judicial election, a list of contributions is
available on the board outside the courtroom door. The
list is updated weekly.
        Counsel got my written tentative yesterday
perhaps.
        (Counsel nodding.)
        THE COURT: Great.
        MR. LASKER: Yes, Your Honor.
        MR. MILLER: We have, Your Honor.
        THE COURT: My proposal -- and if you've
discussed it among yourselves that you'd like to handle
this differently, that's fine with me. But my proposal
is simply to let perhaps Monsanto go first. They can
use whatever time they want. I've told you I'm going to
give you each just about an hour, maybe a little bit
more than that. You can use it really as you wish. I
think you have a better grip as to what needs time and
what doesn't need time, and I'm happy to do it that way.
I'll turn it over to the plaintiffs and then go back and
forth until your time has expired.

Page 4

Is there any other way you'd like to handle
things? Okay.
        MR. MILLER: That's agreeable, Your Honor.
        MR. LASKER: Thank you, Your Honor. Eric
Lasker for Monsanto. And as Your Honor knows, the
issues that are before you today, particularly on our
Sargon motion and general causation, has been the issue
of a seven-day adventure hearing in front of Judge
Chhabria and also Judge Petrou, who is the JCCP judge.
        And that hearing was continued through until
early April when Judge Chhabria, at supplemental
adventure hearings specifically on the epidemiology,
sort of crystallized the issues and focused the issues
similarly to how Your Honor has with the understanding,
as Judge Chhabria recognized as well, that the
epidemiology really is the key issue here.
        And I think the parties, in their briefing,
also recognized that fact. That to get to causation in
humans and/or Mr. Johnson, general causation, and
frankly, given their experts, also specific causation,
the epidemiology is really the focus of the inquiry that
Your Honor needs to make under Sargon.
        And I'd like to focus obviously on the
questions Your Honor has raised in the tentative ruling
with respect to the epidemiologic issues, how that

Page 5

2 (Pages 2 - 5)

Veritext Legal Solutions
866 299-5127

1 impacts the admissibility of experts' opinions both with
2 general causation and specific causation.
3      And the first point that is obvious, I think,
4 from the briefing but important also in the Sargon
5 analysis is:  There is a significant body of
6 epidemiological evidence that the experts are citing to
7 here and relying upon here.  This is not a case with an
8 absence of epidemiology, in which case, you might resort
9 or need to resort to other types of evidence.
10      THE COURT:  When you say "other types," do you
11 mean Bradford Hill or --
12      MR. LASKER:  One of -- I'm sorry.
13      THE COURT:  Go ahead.
14      MR. LASKER:  Yeah.  The Bradford Hill criteria
15 is actually an analysis assuming epidemiology.
16      THE COURT:  Right.
17      MR. LASKER:  That is an analysis where if you
18 have epidemiological evidence, what Sir Bradford Hill
19 was recognizing in his criteria and as courts have
20 recognized as well --
21      THE COURT:  Excuse me, let's take a break.  Go
22 off the record for a moment.
23      (Off the record.)
24      MR. LASKER:  Under the Bradford Hill criteria,
25 you start with epidemiology.  And as the cites we've

1 determine the admissibility of epidemiological
2 conclusions are identical regardless of whether we're
3 looking at it in isolation or as part of that broader
4 spectrum, or is it different?
5      MR. LASKER:  No, it's the same, Your Honor.  In
6 fact, that, again, is exactly the point made in In re
7 Lipitor, in the cases that are cited in that case, in
8 the Reference Manual.  And, in fact -- we'll get to this
9 point specifically with respect to the 2.0 analysis --
10 the Cooper case also sort of looked at the issue of
11 confounding, and whether or not there's epidemiology
12 that adjusted for those factors in deciding whether or
13 not plaintiffs had gone over the 2.0 bar.
14      So the Bradford Hill criteria is recognizing
15 that you need to start with that, but then you need
16 more.  It's an added -- it's a recognition of how
17 science works.  That epi is necessary and statistically
18 significant -- properly adjusted epi is necessary, but
19 there's also more to get from association to causation.
20      And, Your Honor, with respect to the
21 epidemiology, the other issue that is important
22 particularly where you have a body of epidemiological
23 evidence is that it's not reliable to pick out one study
24 and say, "That's the right study and the others are not
25 correct studies," or "We don't have to consider all the

1 provided and the Reference Manual make clear, and In re
2 Lipitor case, which is in 2016, the cite for that, Your
3 Honor, is -- just a second -- 174 F. Supp. 3d 911 at
4 925.  There's a long citation of cases dealing with how
5 courts address the Bradford Hill in the context of a
6 Daubert analysis or the type of analysis here.
7      What Sir Bradford Hill was presenting was:
8 Even if you have statistical association in an
9 epidemiological study and you do the best you can to
10 deal with confounding and bias, which is epidemiologists
11 can only do so much, you then need to look at other
12 factors to determine whether or not, in fact, you can go
13 from association to causation.
14      So the Bradford Hill criteria is recognizing
15 that epidemiology, even if you have association, is not
16 enough, but it is a threshold to be able to even get to
17 those other criteria.
18      THE COURT:  And if you're going to get to this,
19 just tell me that you will, but is it your view that the
20 admissibility of the epidemiology is exactly the same?
21 Whether we're looking at only it or whether we are
22 looking at it as a piece of a broader Bradford Hill
23 analysis, it's exactly the same issue?
24      So, for example, the 2.0 factor or whatever the
25 other sorts of criteria might be that we use to

1 epidemiology as a whole in reaching an opinion."
2      And, in fact, in the one federal court case --
3 or the one case that has dealt with this exact issue,
4 which is whether or not scientific -- an expert can
5 testify to general causation under Daubert, which is the
6 Arias versus Dyncorp case.  And the cite there is 928 F.
7 Supp. 2d 10, and specifically at Pages 24, 25, the Court
8 specifically focused on the epidemiology and the
9 plaintiff's expert's attempt to rely upon one study and
10 not look to the other study.
11      And the Court held that that was not reliable.
12 You can't just pick out one study as a basis for your
13 opinion in this context where you have a large body of
14 studies unless you can explain why that's the only study
15 you look at.
16      THE COURT:  So if there's some sort of
17 explanation, then it's good enough?  In other words, I'm
18 not going to be the person -- under Cooper, I'm not
19 going to be the person to decide, for example, which
20 studies are worthy of attention and which are not;
21 right?  So an expert is going to do that, and if an
22 expert says, "Look, I think Studies 1, 2, and 3 are the
23 only ones we really need to look at," and if that person
24 has some kind of explanation for why they didn't look at
25 the others, then my inquiry is at an end?

3 (Pages 6 - 9)

1     MR. LASKER:  Well, no, I don't think that's
2  right, Your Honor.  First of all, I would say that none
3  of the experts have opined to that.  All of the experts
4  present all of the studies in their report.  They
5  identify various strengths and weaknesses of the
6  studies.  But the courts, in analyzing epidemiologic
7  evidence under Daubert and also under Sargon, have also
8  looked at various methodological issues as far as how
9  the experts address those studies.
10    So, for example, on the issue of confounding --
11 and this was -- we cited a number of cases in our
12 briefing, but I'll focus on the cases in California.
13 The In re Lockheed case, which is 115 Cal. App. 4th at
14 558, and specifically -- well, 564, 565 is where the
15 Court is addressing the issue of confounding.  And this
16 is the case, Your Honor, as you might recall, that the
17 Supreme Court cited in Sargon in adopting the
18 Daubert-type analysis.  That was a case in which the
19 Court said plaintiff's expert is relying upon a study
20 that is confounded, and that's not a reliable basis for
21 an expert opinion.
22    There's also the In re Bextra case, which is
23 524 F. Supp. 2d 1166 at 1178.  That's the Northern
24 District of California --
25    THE COURT:  Is it your point that the experts

Page 10

1  on the plaintiff's side did not account for confounding;
2  and if so, is it part of your job to say what the
3  confounding variables might have been?
4     MR. LASKER:  Yes, Your Honor, it is our
5  position.  It actually was the focus of the Daubert
6  hearing as well.  That's why Judge Chhabria called
7  plaintiff's experts back because, as we pointed out to
8  Your Honor, Judge Chhabria was of the view that to rely
9  upon confounded epidemiology studies -- epidemiological
10 studies that did not adjust for the pesticides was junk
11 science.  He stated that in the oral argument we had in
12 March.
13    And the issue here is not as it is and, to some
14 extent, was in Cooper.  That there's some potential
15 confounders.  We don't know what they are, but there may
16 be confounders out there, and therefore, the study isn't
17 reliable.  In this case, every one of the
18 epidemiological studies, in the studies themselves, when
19 they adjust for other pesticides -- and they do.  We do
20 have adjustment for other pesticides in all of the
21 studies now -- in every case, the odds ratio goes down,
22 and it is no longer statistically significant when they
23 do those adjustments.  So this is not a hypothetical
24 situation or an abstract issue.  It's a concrete issue
25 based upon the data in the studies.

Page 11

1     And Your Honor focused in your tentative ruling
2  on the De Roos 2003 study.  And that is a study that,
3  frankly, there is dispute even among plaintiff experts
4  as to when adjustments were made for other pesticides.
5  There are two odds ratios presented in that study.  One
6  is a statistically significant finding.  The other,
7  which is the more fully adjusted model, and there's a
8  debate as to what was adjusted to bring it to that fully
9  adjusted model, is no longer statistically significant.
10    And that is set forth in the record.  The
11 argument that plaintiff's expert makes -- Dr. Ritz makes
12 is that there was some adjustment for confounders in De
13 Roos.  And Your Honor cited to her testimony at -- the
14 reply declaration, Exhibit 8, at Pages 22 to 24.
15    And what Dr. Ritz stated is that in the De Roos
16 2003 study, they tried to adjust.  They actually didn't
17 do a very good approach to it.  They adjusted for
18 everything, for all 40 pesticides.  And she said that's
19 not really a reliable way of doing it, but that's what
20 they did.
21    As it happens, though, we're now in a situation
22 again where we have additional analyses.  The De Roos
23 2003 study, and this is not disputed by any of the
24 experts, was pooled, along with McDuffie, into what is
25 known as the North American Pooled Project.  It's also

Page 12

1  referred to as the "Pahwa study," P-A-H-W-A.
2     And that study was able to do a more refined
3  adjustment for other pesticides.  And what the
4  investigators did is:  They looked for other pesticides
5  that were associated -- in other words, correlated use
6  of glyphosate, and that also were risk factors for
7  non-Hodgkin lymphoma independently in that study.
8     And when they adjusted for those three
9  pesticides, and, again, it's not disputed, the
10 calculations that were made, their odds ratio for all of
11 the North American case-control studies, that includes
12 all the data from De Roos 2003 and also from McDuffie,
13 was not statistically significant.
14    THE COURT:  I appreciate that.  The problem,
15 though, is -- maybe it's not a problem, but the issue
16 is:  Even if there could be more persuasive evidence
17 such as what you have just described, maybe it's a
18 meta-study, and I'm not sure if the North American
19 Pooled Project was technically a meta-study or not, but
20 pooling all of that information, even if that's better,
21 is it inadmissible to rely on the 2003 De Roos study?
22 That's a real question; right?
23    MR. LASKER:  Yes, Your Honor.  And we would
24 submit that it is for two reasons.  One, as I said,
25 going back to the Arias decision, there is -- you pick

Page 13

1 out one data, one study, without the other, and we do
2 know with the full analysis of the data and the other
3 studies, for example, the Agriculture Health Study.  I
4 believe that was conducted and published just this year,
5 it's not the case that there is a consistent body of
6 studies that show only one thing.
7 The second case I would refer you to, Your
8 Honor, which is, frankly, directly on point on this
9 issue, is the In re Zoloft case.  And that is a Third
10 Circuit case, 882 F.3d 787.  And the issue that the
11 district court dealt with and then the Third Circuit
12 affirmed on was exactly this:  There were earlier
13 studies that had found reported statistically
14 significant results, but they were not adjusted.  And
15 the investigators then conducted a later analysis in
16 which they pooled that data into a later pooled analysis
17 in which they were able to do the proper adjustments.
18 And the Court in that case, affirmed by the
19 Third Circuit, held it's not reliable when you have --
20 when you know that that same data, when you do the
21 proper adjusting for confounders, does not show
22 association, it's not reliable for you to continue
23 saying, "I'm going to look at that data and put blinders
24 on the fact that it does not show significant
25 association when known confounders are adjusted for."
Page 14

1 MR. LASKER:  We are.  But, Your Honor, the
2 issue also goes into and is relevant to a specific
3 causation --
4 THE COURT:  Because in that latter context of
5 specific causation, would it matter whether or not there
6 was any kind of record in this case that the potential
7 confounding, say, pesticides were actually a source of
8 perhaps damage to the plaintiff, that the plaintiff was
9 actually exposed to them?  Would we care about that
10 being in the record or not if we were looking at this
11 issue in the context of specific causation?
12 MR. LASKER:  Yes, Your Honor.  I can read to
13 you from the Cooper case, which actually addresses this.
14 The question with specific causation, particularly in
15 this case, is:  When a plaintiff's expert for opining on
16 specific causation is basing their conclusion on the
17 existence of epidemiology -- and I'll get into in a
18 moment how that is in this case because it's pretty
19 clear from the testimony of Dr. Nabhan and also from
20 Dr. Sawyer that that's what they're doing -- then the
21 issue is:  Do you have epidemiologic evidence that is
22 reliable that shows a statistically significant
23 association greater than 2.0?
24 And the reasoning, as set forth in the Cooper
25 case, is that this legal standard for plaintiff is more
Page 16

1 And that's the issue that comes up in a lot of
2 the cases that we cite for Your Honor.  And, again, the
3 issue is:  What is the proper methodology for an expert
4 to follow in reaching a causation opinion?  Is it the
5 proper methodology for an expert to rely upon data that
6 they know is confounded, where they know that -- and
7 where data has been adjusted for known confounders and
8 does not show an association, is it reliable for the
9 expert, nonetheless, to rely upon those unadjusted
10 numbers?
11 That's the issue that Judge Chhabria is dealing
12 with right now.  And as Your Honor knows, that his -- at
13 least his initial indication of his view on that.  It's
14 an issue that comes up again in the cases we cite where
15 courts have said not proper methodology to rely upon
16 what you know to be confounded data.  Maybe if you're
17 just sort of speculating as to whether or not they're
18 confounding but you have no evidence of it, then maybe
19 there's a debate among the experts as to whether or not
20 there is confounding.  But if you actually have the
21 analysis that shows that there's no association, you
22 can't then just put blinders on.  That's not a proper
23 methodology.
24 THE COURT:  And we're still talking about
25 general causation right now; right?
Page 15

1 likely than not.  And if the odds ratio is less than
2 2.0, then you're not going to have more likely than not.
3 Because 2.0 is basically a doubling of the background
4 risk.  If you're below 2.0, then the background risk is
5 a greater proportion of the risk for the outcome.
6 And Cooper at 239 Cal. App. 4th 555 at 593
7 states that "When statistical analyses or probabilistic
8 results of epidemiological studies are offered to prove
9 specific causation, under California law, those analyses
10 must show a relative risk greater than 2.0 to be
11 'useful' to the jury."
12 And getting back to what Your Honor was asking
13 about with respect to confounding and what other
14 analyses might be done, when you look at the Cooper
15 court's discussion of the expert's opinion in that case,
16 again, it's at Page 594, these were the steps that the
17 Cooper court pointed to.  I'm quoting.  "Thus, having
18 considered and ruled out other background causes of
19 bladder cancer based on his medical records" -- so the
20 differential diagnosis -- "Dr. Smith could conclude
21 based on the studies that it was more likely than not
22 that Jack Cooper's exposure to Actos caused his bladder
23 cancer.  In other words, because the studies, to varying
24 degrees, adjusted for race, age, sex, and smoking, as
25 well as other known causes of bladder cancer, Dr. Smith
Page 17

5 (Pages 14 - 17)

1 could rely upon those studies to make his differential
2 diagnosis ruling in Actos, as well as smoking, and
3 concluding that Actos was the most probably cause of
4 Jack Cooper's disease."
5       So the issue here is:  Can plaintiff's experts
6 in this case make that same showing?  And the evidence
7 that they presented makes it clear that they cannot.
8 There is no body of adjusted epidemiological evidence
9 that demonstrates a 2.0 odds ratio.  Plaintiffs, in
10 fact, in their brief, point to meta-analyses.  And these
11 are, I think, in their opposition brief at Pages 14 and
12 15.  They point to meta-analyses that were conducted, in
13 fact, prior to the 2018 NCI study and prior to the NAPP,
14 which are numbers that would actually pull those odds
15 ratios down.  But even before those studies, the meta
16 relative risk that they're pointing to were in the
17 vicinity of 1.3, 1.4 as being what the body of
18 epidemiological evidence could show at that point in
19 time, and it's lower now.  But it's clearly below the
20 requisite odds ratio of 2.0.
21       And there's, actually, Your Honor, a very
22 interesting case, a trial court decision in Los Angeles.
23 It's a case called In re Johnson & Johnson.  And this is
24 2017 Westlaw 4780572.  And this was a case that dealt
25 with a very similar issue.  The Court had before it a

1 couple of epidemiological studies that plaintiffs argued
2 had greater than 2.0 odds ratio, but the body of the
3 epidemiological data as a whole was closer to at least
4 1.3, 1.4 odds ratio.
5       And the Court in that case, and it was
6 unfortunately after they had gone through the expense of
7 a trial, but on JNOV, the Court went back and said
8 that's not an odd for specific causation under
9 California law.  You have not reached that 2.0 threshold
10 in the body of epidemiologic data.
11      And if I could focus, Your Honor, specifically
12 -- and, again, that's an issue for Your Honor in Sargon,
13 specifically with respect to what the methodology is for
14 Dr. Nabhan's specific causation opinion.  And the key
15 pages in his deposition -- and his full deposition is in
16 the record.  It was attached by the plaintiffs as
17 Exhibit 76 to their Sargon opposition brief.  But the
18 key passages here are from Pages 138 to 140 -- 141.
19      And Your Honor raised the question whether or
20 not Dr. Nabhan only relies on the fact that the disease
21 developed after the use of the spray as the basis for
22 the conclusion.  And reading, Your Honor, from Page 138,
23 Lines 8 to 16, the question is:
24      "How are you making this argument that the
25 exposure to Roundup caused the plaintiff's mycosis

1 fungoides?"
2       What Dr. Nabhan said is:  "In his situation,
3 that's the only type of risk factor that I was able to
4 gather from looking at his record and his occupational
5 history and what he has done.  The only thing that
6 stares at you in the eye, you know, he was doing well
7 until he started working at the school district, started
8 using glyphosate compounds, and a couple of years later,
9 he developed a skin disease that ultimately was
10 diagnosed as mycosis fungoides."
11      And he goes on to state that it's possible that
12 he would have had the same disease without the exposure,
13 that there's no mechanism -- no mechanism of action here
14 that he can point to.
15      And then on Page 140, Lines 20 to 25, he
16 states, "So there is a known carcinogenic compound, in
17 my opinion, that he was exposed to, and he subsequently
18 developed a malignancy that has shown to be associated
19 and caused by this compound.  So it's hard to dismiss
20 that and assume that he could have developed it without
21 it."
22      And then finally, when we say, "Well, then
23 what's your basis for that," he points to the
24 epidemiologic evidence.  And he says at Page 140,
25 starting at Line 23, going through to the next page,

1 141, Line 10.
2       And the question was:  "How could you say that
3 -- if he had been exposed to some other compound, not
4 glyphosate, if he had been exposed to nicotine, would
5 you say that that was the cause of his mycosis
6 fungoides?"
7       And he answers:  "No, because to my knowledge,
8 there is no epidemiologic studies that have linked
9 nicotine to lymphoma in general.  I think that if -- you
10 know, the reason you would conclude in Mr. Johnson's
11 case is because you have to link this particular
12 individual case, you know, with the body of evidence,
13 with the epidemiologic studies.  To my knowledge, there
14 is no studies to link smoking or nicotine exposure to
15 non-Hodgkin lymphoma, so I would not have linked these
16 together.  But there is epidemiologic evidence with
17 glyphosate and non-Hodgkin lymphoma, and that's why I
18 linked them together."
19      And Dr. Nabhan was also very clear, and he says
20 this, for example, at Pages 124 and 125 of his
21 deposition when he was being asked about individual
22 epidemiologic studies and his opinion with respect to
23 individual studies, and this is 124, Line 23, going on
24 to 125, Line 6.  "As I said several times, I don't
25 believe you can rely on any one particular study versus

1 another to make the association of why glyphosate caused
2 mycosis fungoides in Mr. Johnson's case.  You rely upon
3 the particular individual case of the patient, his
4 exposure, and the collective evidence of epidemiologic
5 studies.  I did not rely on one sole paper versus
6 another.  I relied on all of the literature
7 collectively."
8        And Dr. Sawyer, to the extent that he offered a
9 specific causation opinion, also is relying upon the
10 epidemiologic studies.  And plaintiffs make this point
11 and acknowledge this in their opposition brief at
12 Page 41.
13        So the methodology of plaintiff's specific
14 causation experts in this case is very straightforward.
15 Mr. Johnson was exposed to glyphosate, and I believe two
16 years later -- and there is a big scientific issue there
17 as to whether or not that's long enough, but we'll put
18 that to one side.  Two years later, he developed mycosis
19 fungoides.  And they looked at the collective body of
20 the epidemiologic evidence to then reach their specific
21 causation opinion.
22        And there's no argument in this case that a
23 collective body of the epidemiologic evidence supports a
24 2.0 association between glyphosate-based herbicides and
25 non-Hodgkin lymphoma.  Again, plaintiffs themselves, in

Page 22

1 choosing in a way that has not been countenanced by the
2 Court of Appeal either, you know, in the Cooper case and
3 then the equivalent case that we had out of the Ninth
4 Circuit that had a similar view of the range of
5 flexibility that the judge has in these sorts of
6 motions.
7        I don't know if there's anything more that can
8 be said about that.
9        MR. LASKER:  I guess I'll say one more thing
10 and then I'll move on, Your Honor.
11        THE COURT:  Yeah.
12        MR. LASKER:  It's not a question of picking and
13 choosing among the studies because none of the studies
14 -- the issue is whether or not methodologically,
15 plaintiff's experts can rely upon data that they know is
16 confounding.  That's an overarching methodological issue
17 that applies to all the studies.  It's not picking one
18 study over the other, it's just what is the data that --
19 what do each of the studies show?  Where do you look to
20 in a study to find evidence that an epidemiologist can
21 rely upon?
22        And as we've submitted and as the cases I cite
23 make clear in the Daubert context, under California
24 admissibility rules, the data that you look at each
25 individual study is the study that is properly adjusted.

Page 24

1 the brief, point to 1.3, 1.4 as a meta-analysis, and
2 that number actually is inflated at this point because
3 it doesn't include the more recent studies.
4        So given that body of epidemiologic evidence,
5 as we've argued in our brief, we don't think there is
6 the epidemiologic evidence that would be necessary under
7 the case law that we cited, In re Lockheed, In re
8 Bextra, In re Zoloft, to reach a general causation
9 opinion, but for specific causation, it's even a more
10 difficult hurdle for them here because they need to pass
11 that 2.0 threshold, and they plainly do not.
12        THE COURT:  I'm just concerned that, and maybe
13 there's more to be said about this, but I'm just
14 concerned that what you're asking me to do, at least
15 under the rubric of general causation, is to pick and
16 choose among studies.  That is, for me to say, "Well,
17 these are later studies.  They look better to me because
18 they seem to have accounted for earlier results," "they
19 seem to perhaps have done more work," or "they have been
20 more thorough," or something like that, "and so I'm
21 going to adopt those.  And as a judge, I'm not going to
22 evaluate the earlier studies because I don't think
23 they're very good," "they weren't as advanced," "they
24 didn't account for Factors 1, 2, and 3," or something
25 like that.  I'm just concerned that I'm picking and

Page 23

1 And so you're not choosing between studies at all.
2 You're just asking whether or not the expert applied the
3 appropriate methodology in interpreting the results of
4 all of the studies.
5        And then with respect to specific causation,
6 Your Honor, okay, and which I think is an even easier
7 issue in this context, you are looking at what is the
8 methodology that the plaintiff's expert used.  Not an
9 abstract argument that a counsel, attorney, may make,
10 but what did this expert say?
11        And Dr. Nabhan made very clear he's not relied
12 upon one individual study.  He doesn't believe it's
13 appropriate to point to one study versus another.  You
14 look at the collective body of epidemiologic evidence.
15 And looking at the collective body of epidemiologic
16 evidence, we have the meta-analyses that were dated.
17 Dr. Mucci has, and it's in the record, provided an
18 updated meta-analysis that shows an odds ratio now of
19 about 0.9, actually.  It's not as significant, but it
20 shows absolutely no association whatsoever.
21        But even going back to the old meta-analysis,
22 they don't get to the 2.0 threshold.  So that's
23 undisputed scientific evidence in plaintiff's own brief,
24 and it shows why they don't meet the requirement for
25 specific causation.

Page 25

7 (Pages 22 - 25)

1    Your Honor, I think I'd like to move on now and
2 talk about some of the other issues, specifically with
3 respect to Dr. Sawyer.  And there is the issue of his
4 cancer slope factor and the issue of whether or not -- I
5 think there's two issues that are raised by this.  One
6 is whether or not it is appropriate to extrapolate from
7 animal studies.
8    And I would point Your Honor to Dr. Portier's
9 testimony on this.  In our opening brief, the Edwards
10 declaration, Exhibit 21, at Pages 158 to 159 and
11 Exhibit 31 at Pages 677 to 678, is Dr. Portier
12 explaining why you can't extrapolate from rodent studies
13 to human cancer or to human NHL, which is the issue
14 here.
15    But I think a broader issue also, Your Honor,
16 is:  What did he actually do?  He calculated -- and it's
17 very clear from his report and from his opinions, he
18 calculated a regulatory cancer slope.  And cancer slope
19 as applied by regulators, and Dr. Sawyer states this is
20 not something they can use to establish causation in any
21 individual case.  The purpose of the cancer slope factor
22 is not causation, it's a regulatory tool used for
23 protective purposes.
24    And that's made clear in the Reference Manual,
25 the case that the plaintiffs cite, which is a regulatory

Page 26

1 standard in the level of a monitoring context.  But the
2 Reference Manual on Scientific Evidence at 665 and 666
3 also makes clear that that's a different standard at a
4 different level in a regulatory context than it is in
5 court.
6    Because as Your Honor may be aware, in the
7 regulatory context, you have protective factors.  And
8 Dr. Sawyer acknowledged that his slope factor was the
9 upper bound estimate of risk.  And you want to have
10 protective factors in the regulatory context to protect
11 populations.  You can't take that data point, which is
12 what Dr. Sawyer is -- and that's what we're trying to do
13 here, and say, "Given this cancer slope index, we can
14 say that Mr. Johnson's exposure was above the level that
15 is required to cause cancer."  That's not what a cancer
16 slope factor is for.  It's a protective factor with
17 levels of conservatism in them to set regulatory
18 standards.
19    And there's a long list of cases.  The Rider
20 case -- and the Reference Manual has other cases.  That
21 Rider versus Novartis that we cite in our brief, that
22 made clear that regulatory standards are not the proper
23 standard for causation in a case like this.
24    And the question then is:  Even if one assumes,
25 okay, it was appropriate for him to calculate a cancer

Page 27

1 slope factor the way that he did, and we don't agree
2 with it for reasons we've raised, how does that fit with
3 anything the jury is going to be to asked to decide?
4 And, in fact, wouldn't it confuse the issue?  Because
5 you're putting up a number there in front of the jury
6 that, in fact, is not intended to be related to
7 causation and does not provide evidence of causation.
8 And why are they seeing that number?  How does that fit
9 with the burden of proof the plaintiffs have in this
10 case?
11    So it may be, and, again, we don't think it is,
12 that he calculated this cancer slope factor correctly,
13 but it has no place in this litigation.  So for that
14 reason, we believe that testimony should be excluded.
15    If I could turn briefly, just very briefly, to
16 a question you asked about Dr. Portier and his failure
17 to control for statistically -- for the fact that some
18 statistically significant results could appear in rodent
19 studies by chance.  The issue here very briefly is that
20 there were 12 different animal studies with hundreds of
21 different analyses.
22    And it's well established and not disputed by
23 Dr. Portier that when you have all of these analyses, an
24 individually statistically significant finding actually
25 is not meaningful.  Because what you're looking for when

Page 28

1 you do those statistics is:  What is the chance of this
2 happening -- what is the likelihood of this happening by
3 chance?
4    And to have a statistically significant finding
5 in an individual point, you're saying it's a 1 in 20
6 that this could happen by chance.  If you have hundreds
7 of them, then you are going to have a bunch of these
8 individual analyses that you would expect to have by
9 chance, and Dr. Portier acknowledges that.
10    And the problem he has in his analysis is:
11 There are very well-established methodologies that deal
12 with multiple comparisons to be able to determine
13 whether they are actually statistically significant in
14 this context.  He doesn't apply any of them.  Instead,
15 he presents a table in which he purports to show how
16 many statistically significant findings you would expect
17 to see by chance and how many you actually see.
18    But the problem with that, as we support in our
19 briefing, is:  He doesn't actually count up the number
20 of analyses that were done to be able to determine how
21 much he'd expect to see.  He sort of estimates that.  So
22 he's not doing a calculation that --
23    THE COURT:  Does that table underlie any of his
24 opinions?  I mean, is your pitch here just that the jury
25 shouldn't see that particular table --

Page 29

8 (Pages 26 - 29)

| | |
|---|---|
| 1    MR. LASKER: Well -- | 1    Dr. Benbrook tries to dismiss the fact that the |
| 2    THE COURT: -- or is it -- | 2   EPA has determined that surfactants -- none of the |
| 3    MR. LASKER: I think that certainly, they | 3   surfactants that are used in glyphosate-based herbicides |
| 4   should not see that table and they should not see that | 4   cause cancer. And he goes and says, "Well, they use |
| 5   analysis. It's not a scientifically reliable approach | 5   this structure-activity relationships analysis." That's |
| 6   for looking at the issue. I think without that, he | 6   not particularly reliable. He doesn't have expertise to |
| 7   doesn't have a basis for his opinion. I think his whole | 7   talk about any of those issues. |
| 8   opinion falls apart because he does acknowledge that you | 8    So we would ask that Your Honor also add |
| 9   need to do something to deal with that fact. You can't | 9   language to the Court's order that makes clear that |
| 10   just say, "Okay. There's a p-value less than 25." | 10   Dr. Benbrook does not have the qualifications, and |
| 11    But certainly, that analysis, given his | 11   therefore, should not be speaking to issues that require |
| 12   testimony that he actually just estimated the numbers, | 12   that sort of scientific expertise. |
| 13   is not a reliable methodology. You can't just estimate | 13    And we also believe along the same lines that |
| 14   and then sort of speculate as to what that means. So | 14   Dr. Benbrook does not have expertise on any issues |
| 15   certainly, that analysis, which is his table analysis, | 15   relating to whether Monsanto misled the EPA. Again, a |
| 16   we think should be excluded. | 16   lot of those opinions with respect to, for example, the |
| 17    I'd like to turn now briefly to Dr. Benbrook. | 17   TNO study or for Dr. Perry, depend upon his |
| 18   And for the most part, we are in an agreement with Your | 18   interpretation of what those studies mean. |
| 19   Honor's tentative ruling, but one additional point we | 19    His conclusion as to whether or not the studies |
| 20   wanted to make on this, and I'll reserve my time to | 20   are actually reliable data that the EPA would care |
| 21   respond to plaintiff's counsel on any issues they may | 21   about, or should have been produced, in any event, not |
| 22   have, is that it's very clear from Dr. Benbrook's | 22   to mention the fact that he doesn't have the expertise |
| 23   testimony that he does not have any expertise in any | 23   within the EPA or the legal expertise to talk about |
| 24   scientific discipline. He doesn't have expertise in | 24   whether or not these are the type of data that would be |
| 25   epidemiology, he doesn't have expertise in toxicology, | 25   reported, those are the things that you need to have |
| <div align="right">Page 30</div> | <div align="right">Page 32</div> |
| 1   he doesn't have expertise in exposure science or | 1   expertise in, both scientific and legal. |
| 2   genotoxicology, and he acknowledges that repeatedly. | 2    And a lot of the cases we cite to -- there is |
| 3   He's a PhD, but it's in economics. He doesn't have any | 3   an expert that is sort of infamous, Dr. Parisian, who |
| 4   background in any scientific discipline. | 4   provided testimony and had been excluded in a whole |
| 5    But again and again, the opinions that he seeks | 5   bunch of cases for perfectly appropriate reasons. But |
| 6   to proffer are based upon his opinion of what the | 6   at least Dr. Parisian was a medical doctor. She had |
| 7   science shows. He talks about what the science was as | 7   been a chief medical officer at the FDA. She at least |
| 8   of 2002, and whether or not that scientific evidence was | 8   could purport to have some scientific expertise. Dr. |
| 9   sufficient for Monsanto to now be having to put a | 9   Benbrook does not. And so that, we believe, should be |
| 10   warning on their label. He talks about genotoxicity | 10   noted in Your Honor's opinions to guide the Court going |
| 11   studies, and he raises a lot of argument about Dr. Perry | 11   forward. |
| 12   and how he interprets certain studies. All of these | 12    The final point I'd make, and then I'll yield |
| 13   underlying studies have been in a peer-reviewed | 13   and reserve the rest of my time, is with respect to |
| 14   published literature, and Dr. Benbrook doesn't have any | 14   preemption issues. And as I understand Your Honor's |
| 15   expertise to be able to say what those studies actually | 15   ruling -- or tentative ruling, the Court's view is that |
| 16   say -- what the conclusions are. | 16   because there is an express preemption clause in the |
| 17    The same thing with the TNO study, which is a | 17   different statutes, the Court did not need to reach the |
| 18   study on exposure and how well glyphosate-based | 18   issue of implied preemption. The express preemption |
| 19   herbicides pass through the skin. The actual study -- | 19   clause basically forecloses that analysis. |
| 20   investigators say that that study was not reliable | 20    We believe that's inconsistent with the ruling |
| 21   because they couldn't replicate the results and they had | 21   in the Nathan Kimmel case at 275 F.3d at 1204 where the |
| 22   a bad model. Dr. Benbrook disagrees and says this is a | 22   Court expressly states that in a different context, even |
| 23   significant finding, an important finding, but he | 23   though there is an express preemptive provision, that |
| 24   doesn't have any expertise to opine on any of those | 24   doesn't mean you don't look at the implied preemption |
| 25   issues. | 25   analysis if the facts are sufficient to make out that |
| <div align="right">Page 31</div> | <div align="right">Page 33</div> |

<div align="right">9 (Pages 30 - 33)</div>

1 defense.
2        And if, in fact, we are looking at implied
3 preemption, then the standard we believe, as we've set
4 forth, is the clear evidence standard that was set forth
5 in the Wyatt case.  And I know Your Honor is familiar
6 with that from the Court's ruling in the Plavix case,
7 and also citations to the Fosamax case.
8        In the Fosamax case, the Court ruled that this
9 is a jury issue as to whether or not the level of
10 evidence is such that a jury could conclude that the
11 regulators would not have approved a label.  We think
12 the undisputed evidence here is ridiculously strong on
13 that fact given that we now have, as of December 12th,
14 2017, the EPA's, you know, analysis after a Scientific
15 Advisory Panel, after comments submitted by the
16 plaintiff's experts in this case.
17        We have Dr. Portier, his report was submitted
18 into the record which attaches his admissions to the EPA
19 laying out the exact arguments that the plaintiff's
20 experts are making in this case, and the EPA seeing all
21 that evidence, and then concluding not that -- you know,
22 they have five choices under the regulatory scheme as to
23 the levels of confidence or the levels of evidence for
24 carcinogenicity.  They took the very lowest they could,
25 that there's no evidence of carcinogenicity here.

Page 34

1        So if we honor the clear evidence standard,
2 then we think as a matter of law under Nathan Kimmel,
3 the Court needs to reach that.  The evidence is
4 overwhelming in this case that implied preemption would
5 apply.  And, of course, we have specific approvals of
6 the warning labels well after -- both before and after
7 Mr. Johnson used the product.
8        And with that, Your Honor, I'll reserve the
9 rest of the time.
10        THE COURT:  I appreciate that.  Thank you very
11 much.
12        Does anybody need a recess?  I bet the court
13 reporter does.
14        (Short break.)
15        THE COURT:  Let's continue with plaintiffs.
16        MR. MILLER:  Thank you, Your Honor.  Again,
17 Michael Miller for plaintiff, and good morning.
18        Your Honor, I'll go back to the beginning and
19 review our position on some of the issues raised by
20 defense counsel.  I think defense counsel agreed with us
21 ultimately that the Cooper case is the most controlling
22 case here on the issue.  And what Cooper tells us is,
23 and I'm looking at the holding too, it was a fact issue
24 for the jury, whether epidemiological studies were so
25 flawed as to be unreliable.

Page 35

1        Where I take issue with Mr. Lasker is that
2 Cooper stands for the proposition that all
3 epidemiological studies have to adjust for all
4 confounders that could possibly cause a disease process.
5 Point of fact, Cooper says the opposite.
6        In the Cooper case, and the Court may know I
7 was the lead trial and appellate counsel, and I'm just
8 arguing from the opinion, though, of course, they
9 considered the Azoulay study.  And the defendants there,
10 like the defendants here, screamed mightily that Azoulay
11 didn't adjust for another possible cause of, in that
12 case, bladder cancer.  In that case, everyone agreed
13 smoking was a cause -- risk factor for bladder cancer.
14 And the Azoulay study studied the association between
15 Actos and bladder cancer, but did not adjust for
16 smoking.
17        And the defendants, like Mr. Lasker, said, "You
18 can't even consider the Azoulay study.  And the fact
19 that Dr. Smith considered it, his testimony should be
20 stricken."  And the trial court agreed.  And also, the
21 Neumann study did not adjust for smoking, and the trial
22 court agreed and struck his testimony.
23        And the appellate court tells us no, the trial
24 judge does not go there.  He does not weigh into the
25 validity of the scientific literature and pick and choose

Page 36

1 which studies based upon which side wants to use this
2 study or that study.  As long as there is a
3 peer-reviewed body of epidemiological literature that by
4 the authors and by the peer reviewers is deemed to be
5 reliable, and those experts for that party, for
6 plaintiffs in this case, rely upon that to get to their
7 opinions as part of their opinions --
8        THE COURT:  Is it your view, then, that if a
9 study is published in a peer-reviewed journal and
10 therefore, by definition, is peer reviewed, that's the
11 end of the judge's inquiry, period, we're finished?
12        MR. MILLER:  I think Cooper tells us that, and
13 I can quote it, pretty much, yes.  I mean, unless
14 there is -- let me go to the precise quote.  And I'm on
15 Page -- California Daily Op., Page 9107.  But yes.  "In
16 finding Dr. Smith's testimony unreliable, the Court
17 examined the epidemiological studies upon which
18 Dr. Smith relied and pointed out specific problems and
19 'flaws' in each of them..."  "In doing so," this is
20 quoting the appellate court, "the trial court was
21 substituting its opinion for the opinion of Dr. Smith
22 and the opinions of the authors of the studies.  This is
23 not the proper function of the trial court."
24        THE COURT:  There's a tremendous amount of
25 material out there which is "peer reviewed," which is

Page 37

10 (Pages 34 - 37)

1 terrible, terrible science. Right? I mean, there's a
2 huge amount of these things that have now been withdrawn
3 over the years. There's a lot of these things, let's
4 say that there was, I don't know, if that's your
5 position, that's your position. Let me just repeat your
6 position, I think, and then you'll correct me if I'm
7 wrong. Trial judges do not have the power or the
8 discretion to withhold from the jury peer-reviewed
9 studies.
10          MR. MILLER: I think that court is taking --
11 I'm not doing a good job of explaining to you my
12 position. That would be the extreme case.
13          THE COURT: Okay.
14          MR. MILLER: And whether or not what the Court
15 would do with that, I don't know. But this isn't that
16 case, thank goodness. Right? I can see the Court's
17 consternation if there was -- someone brought you a
18 case. There's one study in a very suspect journal that
19 looks shaky, it might be withdrawn later, sure. But
20 this is -- not this case. This case has an entire body
21 of consistently repeated, well-respected epidemiology
22 that constantly shows a doubling of the risk that has
23 been now reviewed by 17 preeminent scientists at IARC
24 who universally concluded the reliability of that
25 epidemiology. And it is such an impressive body, IARC,

Page 38

1          Now, in the Actos trial, we did not have it at
2 trial because IARC had not promulgated that yet. It was
3 promulgated after trial. And we asked the appellate
4 court to take judicial notice of it, and they did. And
5 we used it at trial -- every other trial after that as a
6 piece of evidence.
7          And invariably, the defense lawyers come back
8 and say, "Sure, they do red meat, they do coffee, and
9 there's signs everywhere." And the jury deals with that
10 and they deal with it the way they see fit. I think
11 that's the way it's been handled and ought to be
12 handled.
13          But that's certainly not this case. I mean,
14 this case has a doubling of the risk in peer-reviewed
15 research and study after study regardless of what
16 defense counsel says. He's simply wrong. And it's
17 here. It starts in Hardell in 2002 with a doubling of
18 the risk for exposure and tripling of the risk.
19          And it's a study that's controlled. It's
20 controlled for age, it's controlled for county, and it's
21 controlled for vital statistics. It's not controlled
22 for other pesticides, but again, in this case, defense
23 counsel has not pointed to one other pesticide that
24 increases a risk, and even if they had, they haven't
25 pointed to one other pesticide that Mr. Johnson has been

Page 40

1 that this state, California, embraced it and now
2 declares it
3          THE COURT: We embraced it for regulatory
4 purposes?
5          MR. MILLER: For the Proposition 65.
6          THE COURT: Yeah.
7          MR. MILLER: That glyphosate is a known cause
8 of non-Hodgkin lymphoma.
9          THE COURT: But you're not suggesting, are you,
10 that everything on the Prop 65 list is, by definition,
11 something which you could present to a jury as,
12 therefore, a potential cause, or a reasonable cause, or
13 a cause with assurance of 2.0 for a disease; right?
14          MR. MILLER: No, Your Honor. I'm not making
15 such a proffer. That's not my job and I wouldn't make
16 that proposition.
17          THE COURT: It doesn't strike me that Prop 65
18 lists -- or things that meets criteria to be on the Prop
19 65 list are something that's going to be useful in a
20 jury trial. Do you think I'm wrong about that?
21          MR. MILLER: I think it's admissible in a jury
22 trial.
23          THE COURT: Really?
24          MR. MILLER: And I think it's a piece of
25 evidence that the jury can consider.

Page 39

1 exposed to that increases the risk.
2          And moreover, when they did, in Hardell, adjust
3 for other pesticides, the odds ratio came down to 1.85,
4 but the authors noted that multivariate analysis, which
5 controlled for other things, should be interpreted with
6 caution. So they thought that the univariate analysis
7 was the more proper of the two. And, again, the classic
8 example of letting the jury, the factfinder, weigh into
9 this with various experts and decide that issue.
10          THE COURT: Are there any other -- as far as
11 the record for today is concerned, within that record,
12 is there any evidence that anything other than the
13 chemical at issue in this case is responsible for the
14 specific disease that your client suffers from?
15          MR. MILLER: I'm sorry, Your Honor, could you
16 repeat that, please.
17          THE COURT: With respect to the record that we
18 have today --
19          MR. MILLER: Yes.
20          THE COURT: -- is there any evidence that
21 anything other than the Monsanto chemical at issue today
22 could be responsible for the disease that your client
23 has, or is it the case that outside of the work that
24 you've identified, pointing to the Monsanto chemical,
25 it's just idiopathic after that, there's nothing else

Page 41

11 (Pages 38 - 41)

1 available?
2     MR. MILLER:  It's idiopathic.  Our expert, Dr.
3 Nabhan, and again, they proffered no expert to say
4 otherwise, has said that there are idiopathic causes.
5     THE COURT:  Right.
6     MR. MILLER:  Mycosis fungoides --
7     THE COURT:  Which is --
8     MR. MILLER:  -- and there is a genetic
9 component possibly, because in the black community,
10 there is a higher risk.  And those are the only two
11 things that he can see.  But he has seen nothing, nor
12 have any defense experts seen anything, that they can
13 say Mr. Johnson was exposed to this chemical and it
14 could be a cause.  There's been no such challenge.
15     So after Hardell -- and this is where defense
16 counsel says, "You have to have a study that's peer
17 reviewed that shows after adjustment" -- "that shows
18 after adjusting for other pesticides, it's doubling the
19 risk."  Here it is.  It's the De Roos study.  In 2003,
20 it adjusted for 41 other pesticides and found a doubling
21 of the risk statistically significant.
22     And Dr. De Roos still to this day -- she wrote
23 a letter with nine other scientists recently that it's
24 still her opinion that, in fact, glyphosate causes
25 non-Hodgkin lymphoma.  So the suggestion that somehow
Page 42

1 some modern study out there has made this less than
2 reliable is just false.
3     THE COURT:  But your position would be that
4 even if -- do you want to hand that note to Counsel?
5     MR. TRAVERS:  Sorry (handing).
6     MR. MILLER:  There's too much tension in the
7 room as you're waiting to hand that note out.
8     MR. MILLER:  I'm sorry, Your Honor.
9     THE COURT:  That's okay.  I don't mind.  I've
10 been in both chairs.
11     So your position, though, is that even if there
12 were a more recent study that cast aspersions on an
13 earlier 2003 study, or even if there was a meta-study,
14 for example, that included the De Roos study but
15 concluded that it was an outlier in some way, your
16 position would still be that the De Roos study and the
17 opinions based on it still get to the jury; right?
18     MR. MILLER:  Yes, Your Honor.
19     THE COURT:  Right.
20     MR. MILLER:  Yes, Your Honor.  And it's
21 certainly not an outlier.  And, in fact -- and I'm going
22 to have to factually disagree with Mr. Lasker because
23 the NAPP study that did incorporate the De Roos study
24 shows a doubling of the risk.  It's not accurate for Mr.
25 Lasker to stand up here and tell you that it doesn't
Page 43

1 because it does.  And it does that after adjusting for
2 other pesticides.
3     And we know that because Mr. Lasker has deposed
4 Dr. Weisenburger, one of our experts, who is one of the
5 authors of this study.  And he knows that.  It shows a
6 dose-dependent response, and this is a 2015 study that
7 incorporated De Roos and incorporated Hardell.  And it
8 shows a peer-reviewed abstract.  NAPP reported an
9 elevated risk of NHL with any glyphosate use
10 statistically significant, 1.14, and a dose-response
11 effect was seen with greater than two days' use with an
12 odds ratio of 2.42, statistically significant.  So if
13 you use glyphosate more than two days a year, you have a
14 2.42 increased risk, and Mr. Johnson used it 20 days a
15 month, six months a year for two years.  So he far
16 exceeds that metric.
17     And so the authors, including our expert, Dr.
18 Weisenburger, go on to say, and this is in our papers,
19 "Our results are also aligned with findings from
20 epidemiological studies of other populations that found
21 an elevated risk of non-Hodgkin lymphoma for glyphosate
22 exposure with a greater number of days/year of
23 glyphosate use, as well as a meta-analysis of glyphosate
24 use and non-Hodgkin lymphoma risk.  From an
25 epidemiological perspective, our results were supportive
Page 44

1 of the IARC evaluation of glyphosate as a probable
2 carcinogen for non-Hodgkin lymphoma."
3     So that's the latest information that we have.
4 That's the newest science we have, except for their
5 reliance on one study.  Their sole reliance is on a 2017
6 study that they claim disproves all of this.  And that's
7 a jury issue.  We're more than happy to talk to the
8 trier of fact about why that study is worthless -- why
9 they said it was worthless before the results came out
10 and only embraced the study after the results came out.
11     And worse still for the defendants, if that
12 study is valid, it shows a quadrupling of the risk for
13 T-cell lymphoma, which is the precise lymphoma that
14 Mr. Johnson has.  He has T-cell lymphoma starting from
15 skin exposure.  It's a follicular form of non-Hodgkin
16 lymphoma.  And that's what they say in their study,
17 which we don't think is that accurate.  But if that
18 study is that accurate, it's a quadrupling of the risk.
19     So that gets -- and we'll make a different
20 argument when we get to a B-cell case because it shows
21 no increased risk for B-cell.  I will argue that one
22 when we get to a B-cell case.  But this one is a T-cell,
23 and it's right on point.  So if their study is good,
24 we've got a quadrupling of the risk, and they have no
25 epi to support them whatsoever.
Page 45

12 (Pages 42 - 45)

**Page 46**

1 So it's not a question of -- and I appreciate
2 the Court's original question, in the extreme, sure.
3 I'm not suggesting every trial judge in California has
4 his hands tied because somebody comes up with one peer
5 review. That's an issue for another day, and I don't
6 think we need to argue that one because it's sure not
7 the issue here.
8 Take a sip of water...
9 Your Honor made the point, and I just want to
10 reiterate because it's in Cooper, it permeates the
11 Cooper opinion. The Court is correct that Cooper does
12 not allow the trial judge to weigh into the validity of
13 studies. And that is precisely what he wants you to do.
14 And he cited to cases from the First Circuit and the
15 Third Circuit that, with all due respect, I don't
16 believe stand for the proposition supported. But I
17 don't think it really matters. I don't think we need to
18 hyperanalyze them because we're not in the First
19 Circuit, we're not in the Third Circuit. We're in San
20 Francisco. So I think we stick with Cooper and its
21 progeny.
22 I want to get to, I think, Dr. Nabhan, unless
23 the Court has any further questions about our general
24 epidemiology and our general causality. And I think I
25 would like to spend one more minute on that, if I could.

**Page 47**

1 I think the Court was very precise and accurate in your
2 tentative in that it's unquestionable from Cooper, it's
3 unquestionable from the scientific manual that the
4 appropriate way to do science is not to look, as Your
5 Honor's example, at one piece of peer-reviewed
6 literature. You've got to look at the whole body of
7 evidence, all the epidemiology, all the animal data, all
8 the carcinogenic mechanistic data, and then you've got
9 to synthesize that data. That's proper science.
10 So that's what all --
11 THE COURT: Suppose that's not what your
12 experts did. Suppose what actually happened was that
13 your experts took one or two studies, and they have no
14 explanation for why they ignored all the other studies
15 that point the other way, so that it looks like, for
16 example, they're cherry picking things they believe help
17 them out and they're ignoring the bad stuff. It may
18 well be that with an explanation, that would be okay.
19 But is it my place to point that out and then say with
20 the failure to explain, that becomes the basis to
21 exclude their opinion?
22 MR. MILLER: I'm not saying there isn't a case
23 in the extreme where that would be appropriate for the
24 trial judge to do, but certainly, it wasn't in Cooper.
25 And this case is stronger than Cooper.

**Page 48**

1 THE COURT: Well, do you think that your
2 experts actually looked at what you call the whole body
3 of evidence? Did they really do that?
4 MR. MILLER: They looked at an enormous amount
5 of evidence. I could start --
6 THE COURT: It's a rhetorical question. I
7 mean, you're free to answer, "Yes, they did."
8 MR. MILLER: I think they did. I mean, I spent
9 a fortune to have them do it, I guess is one honest
10 answer. We gave them all the epidemiology, we gave them
11 all the animal studies, we gave them mechanistic
12 studies. We met with them. They've been deposed.
13 We've got 28 days of depositions or something. They've
14 been torn up one side and down the other. It's in our
15 brief the exact number of days, but it's enormous. And
16 then seven days in front of Judge Chhabria. But yes,
17 they looked at everything reasonably possible.
18 And they say put it all, you know, in one big
19 picture. And that's why I was shocked when I flew to
20 Harvard and deposed the two young nonoccupational
21 epidemiologists that Monsanto proffered and asked them:
22 "What did you look at? Did you look at everything."
23 "No. We didn't look at the animal data."
24 "Were you told not to?"
25 "Yeah, pretty much. We were just supposed to

**Page 49**

1 look at the epi."
2 "Did you look at the mechanistic data?"
3 "No. Uh-uh. It wasn't provided to us."
4 "Did you look at any company documents?"
5 "None. Just looked at some epi studies and
6 commented on them."
7 I'm like, that's not science. That's somebody
8 strategizing from a law firm on what they want an expert
9 to look at. Because if they were to look at everything,
10 I think they were worried they wouldn't like what they
11 would hear. So that, I guess, is one way to handle
12 things. We handled them a whole different way. Our
13 experts looked at everything.
14 And the quality of our experts, just so I could
15 talk about it for a minute, I would think a trial judge
16 -- and they tell that in the Wendell case and they tell
17 us in the Cooper case, if the experts -- the more
18 respectable these experts are, the more deference the
19 trial judge ought to give.
20 Well, Dr. Portier is the number one
21 toxicologist in America, period. He was head of the
22 National Toxicology Program for many years. Every lab
23 in America now follows the protocol that he set out in
24 his PhD thesis for how to handle rat and mice studies.
25 I mean, this man is impressive, and they don't like it.

1      But when IARC did their review of glyphosate,
2  they invited one person to be an invited specialist to
3  observe those events and to make sure the science was
4  followed.  They invited Chris Portier, that's who they
5  invited.
6      And the man who chaired the IARC is also a
7  nonretained expert here, Aaron Blair.  We tried to get
8  him to be a retained expert.  He's like, "No, I don't
9  want to be tainted by money."  So we subpoenaed him and
10  took his deposition.  And he said, "Yeah, after
11  everything that's said and done, everything we looked
12  at, including the new study that the defendants walked
13  way around, I still say glyphosate is the probable cause
14  of non-Hodgkin lymphoma."
15      So that's the number one guy for the National
16  Cancer Institute, the number one guy for the National
17  Toxicology Program.  Let's go to the West Coast.  We
18  have the chairman of epidemiology from UCLA, an
19  occupational epidemiologist.  Unlike the two
20  epidemiologists that they have, this is an occupational
21  epidemiologist.  And she's chairman of UCLA.  And she's
22  been grilled at deposition, been grilled two days in
23  front of Judge Chhabria.  She stood like a rock on her
24  opinions.  This stuff causes non-Hodgkin lymphoma.  And
25  it's just that simple.

1  at the exposure, then looked at the diagnosis, and came
2  to the conclusion.  That's nonsense.
3      And the facts absolutely tell the real story.
4  He read all the literature.  He came to his own general
5  causation opinions.  Looked at the animal data, he took
6  his background, education, and experience, then he
7  demanded to see the patient.  Flew the patient to
8  Chicago where he examined the patient.  He took a
9  thorough history from the patient.  He read the
10  patient's entire deposition.  He ruled in and ruled out
11  various causes of non-Hodgkin lymphoma and reached a
12  differential diagnosis.  That's even more than Dr. Smith
13  did in Cooper.  And you can't do any more than that.
14      And he reached the conclusion.  And in fairness
15  to the defense, he said there was also a genetic
16  component.  We don't know why, but sometimes black folk
17  get mycosis fungoides.  That's a factor.  But the
18  predominant factor, substantial contributing factor, for
19  this man now dying from mycosis fungoides is his
20  constant exposure to glyphosate for over two years.
21  Very admissible evidence.
22      So those are the experts that I think make a
23  general causation case and case-specific causation.
24  They're very powerful evidence that we think we have on
25  our side.  And they're always entitled to put up a

1      Then we go to New York, to Columbia, with Dr.
2  Neugut who's written 500 articles on the causes of
3  cancer, four textbooks on the causes of cancer, is
4  retained as the chief investigator for three countries
5  in Africa -- or two countries, I'm not sure, to set up
6  cancer programs.
7      Before you can call yourself a cancer hospital
8  in America, the Joint Commission for accreditation of
9  hospitals sends in a team to set you up.  That's
10  Dr. Neugut.  He leads those teams.  This man has written
11  articles on hematopoietic cancer, solid tumors.  That's
12  all he does, and he's been doing it for 40 years.
13      So, yes, he testified for us in Actos, turned
14  us down on a bunch of other stuff, but he's agreed to
15  testify on this.  He says he reviewed it all, and it
16  causes cancer.  It causes non-Hodgkin lymphoma.
17      One more, if I could, before we get to the
18  others, but Dr. Nabhan, University of Chicago.  He's the
19  case-specific expert.  Only treats non-Hodgkin lymphoma
20  at University of Chicago, one of the top four schools in
21  the country.  Written over 100 articles, many of them
22  about non-Hodgkin lymphoma.  One of the few doctors in
23  the world that sees more than five cases a year of
24  mycosis fungoides.  I mean, this is -- they're hard to
25  find.  This is a rare disease.  They say he just looked

1  defense, and they will, and the jury will decide it.
2  And I think Your Honor's tentative is correct and I
3  stand by it.
4      Your Honor asked defense counsel, "You're
5  asking me to pick and choose between the studies," and
6  we agree.  That's exactly what he's trying to do.  And
7  not only the Cooper case, I won't go over it again.  We
8  just went over it, but the Wendell case that came after
9  Cooper, it says the same thing.  Don't do that.
10      All right.  Let's move on, if I can, unless the
11  Court has any further questions, to Dr. Sawyer and
12  cancer slope.  It's only a small part of his opinion,
13  but it is a part of his opinion.  And what he did, he
14  used the exact same software used by EPA, used by
15  others.  And what that does, it just shows you how much
16  exposure in some sort of mathematical -- you know, the
17  quantity a person who has this amount of exposure is
18  getting.  And they use dermal absorption studies and
19  that sort of thing.  It's the same software used by the
20  EPA and throughout the world for dose-response analysis.
21      Also, there's a California regulation called
22  quantitative risk assessment at 27 CCR, Section 25703,
23  which prescribes the methods used to determine whether a
24  chemical poses a significant risk to humans.  And the
25  software implemented there was created by the EPA.  And

14 (Pages 50 - 53)

1  it's the standard software used to extrapolate from.
2  That's what he used.
3      THE COURT: I understand. But you understand
4  the argument coming from the other side here, which is:
5  They don't disagree with anything you've just said in
6  the last minute or two.
7      MR. MILLER: Sure.
8      THE COURT: They say, "That's exactly right.
9  That's what all that is used for." But it's going to be
10  very confusing to the jury that has a completely
11  different decision to make in this case, which is
12  whether or not, for example, when it comes to the
13  specific causation, it actually causes disease and the
14  other general causation issues. It's going to be
15  confusing to give them information about how people go
16  about regulating this stuff.
17      I mean, that sounds reasonable, that it's a
18  confusing thing to present to the jury.
19      MR. MILLER: I think as long as the defendants
20  don't say -- I think they're going to say that
21  Mr. Johnson wasn't exposed to this stuff enough to --
22  then I think we have to be able to say he was, and
23  here's some quantifiable numbers that show he was. I
24  wouldn't think it would be fair to have them come up
25  there and say, "Well, he's wearing a Tyvek suit, so he

Page 54

1  didn't really get exposed to this."
2      THE COURT: But the Sawyer cancer slope
3  material and information you're talking about has
4  nothing to do with whether or not there's a risk of
5  exposure when somebody is wearing particular clothing or
6  a Tyvek suit. That's not what any of that stuff is
7  about.
8      MR. MILLER: No, that's true, Your Honor.
9  That's absolutely true.
10      THE COURT: Those two things don't go together.
11      MR. MILLER: That's true.
12      THE COURT: And, you know, certain rulings will
13  come out of today's hearing. Others cannot. And there
14  are always going to be situations at trial where
15  somebody opens up a door, and you go to the trial judge,
16  and you say, "Hey, they just presented this evidence
17  here. We have a right to contradict it."
18      The issue I'm getting at is one that was raised
19  by Monsanto, which is that standards, and calculations,
20  and software which is used to generate regulatory limits
21  could be confusing to a jury which is not being asked to
22  do anything like that at all.
23      MR. MILLER: And I understand the Court's
24  argument. Perhaps I think the best thing to do would be
25  to punt that to the trial judge --

Page 55

1      THE COURT: Okay.
2      MR. MILLER: -- to see what is kind of shaping
3  up there.
4      THE COURT: Say something like if the door is
5  open to these things --
6      MR. MILLER: Yeah.
7      THE COURT: -- that you have a right to
8  re-raise it or something like that?
9      MR. MILLER: I think that seems very
10  reasonable. Yeah.
11      I'll move on then.
12      THE COURT: Okay.
13      MR. MILLER: I believe we've covered that
14  issue.
15      Dr. Portier. And I think Your Honor has issues
16  about the pooling of the mice studies. We can talk
17  about that. But I think defense counsel, in his
18  argument, tried to ram that through and say Portier
19  can't testify at all, which is completely wrong. Dr.
20  Portier spent more time than anyone reviewing this. Had
21  opinions before litigation was ever filed. He's been
22  reviewing this for years. Reviewed all the epi,
23  reviewed the animal data, reviewed the mechanistic data,
24  and has strong opinions about this causing non-Hodgkin
25  lymphoma. What he's done with the pooling of the animal

Page 56

1  data does not affect that in any way, shape, or form.
2  So if the Court is inclined to keep the pooling data
3  out, it doesn't affect his opinion. I'm going to spend
4  a few minutes trying to suggest to the Court that you
5  ought not keep it out.
6      So his pooling data was actually peer reviewed
7  by the Environmental Protection Agency Scientific
8  Advisory Panel, and I think we'll talk a little bit more
9  at the end about the Scientific Advisory Panel. But
10  when they reviewed it, they explicitly approved of Dr.
11  Portier's pooling methodology, noting that it provided
12  "compelling statistical evidence" of animal
13  carcinogenicity. And that's at 59 of our Hoke
14  declaration that is attached to our opposition brief.
15  These members went further and recommended that the EPA
16  adopt Dr. Portier's "pooled analysis approach for
17  combining multiple studies." And that, again, is the
18  same page, 59 of the Hoke.
19      And one last point, his pooling has been peer
20  reviewed. Well, not his, but pooling has been peer
21  reviewed in the article by Dourson, "Update: Mode of
22  Action for Liver Tumors Induced by Oral Exposure." So
23  that's not about Roundup, but it's about the process and
24  methodology of pooling.
25      THE COURT: Pooling across studies, across a

Page 57

15 (Pages 54 - 57)

1 variety of different studies?
2       MR. MILLER:  I believe so, yes.  Yes, yes.  And
3 that's at 88 Regulatory Toxicology and Pharmacology,
4 Pages 45 to 55.
5       Wasn't that in our brief?
6       MR. TRAVERS:  Yeah.
7       MR. MILLER:  Yes, it was in our brief.  Okay.
8       So that's our Portier argument, and obviously,
9 he's admissible irrespective of pooling.  We think
10 pooling has been important and is significant enough.
11       Now, I'll turn to Dr. Benbrook.  I think the
12 Court, in your -- let me -- where is my copy of the
13 Court's tentative?  Excuse me one second, Your Honor.  I
14 apologize.
15       THE COURT:  Of course.
16       MR. MILLER:  There it is.  Thank you, Your
17 Honor.
18       In your tentative, you cite to the four ways
19 that Dr. Benbrook has been previously allowed to
20 testify.  And I understand that by that, you intend to
21 allow him to testify in those areas here.  If I
22 misunderstand, I'd better argue the point.  And then you
23 do go on to limit some things, but I wasn't sure what
24 all those things meant.  I have no intention to have him
25 look at an e-mail and say that proves the corporation is

Page 58

1 bad, or that proves the corporation wanted to put profit
2 over people, or anything of that sort.
3       THE COURT:  What would you do with the e-mail,
4 if anything?
5       MR. MILLER:  Well, that's a good question.  Do
6 you have an opinion as to whether Monsanto sought
7 outside help to determine whether Roundup was genotoxic?
8       THE COURT:  How would he possibly have a basis
9 to know that, and what expertise does he bring to that
10 question?  He would have to know everything that
11 Monsanto ever did during some huge time period.
12       MR. MILLER:  Not if they did it -- I mean, not
13 if they have -- not if we have clear documentation that
14 they asked.
15       THE COURT:  Well, then you give the jury the
16 documentation.  You don't have an expert.  I just don't
17 understand how an expert -- is he an expert in e-mail
18 reading?  Surely not.
19       MR. MILLER:  I'm certainly not.
20       THE COURT:  Do you see my point?
21       MR. MILLER:  But I think when you ask an expert
22 an opinion, I think you're entitled for the jury to hear
23 the basis of it.
24       THE COURT:  Yeah, but you're flipping the
25 issue.  The question is whether you're entitled to ask

Page 59

1 him the opinion.  It's got to be something the jury
2 can't figure out on their own as laypeople, it's got to
3 be an issue that matters to the case, and it has to be
4 that he has a basis -- a factual basis to do it.
5       I just don't understand what he would do with
6 respect to any e-mails at all.  If you think the e-mail
7 shows something dastardly that Monsanto has done and
8 there's, you know, communications there, a smoking gun
9 that you'd really love the jury to read, then wouldn't
10 you just give the jury the e-mails.
11       MR. MILLER:  Well, I'd generally like to have a
12 witness sort of walk through the story.  I think that's
13 --
14       THE COURT:  That's the problem.  That's
15 actually the problem with experts, when people use
16 experts to sort of gild the story.  You have a story,
17 that's the actual evidence.  And then sometimes people
18 just use an expert to try to put sort of a gold patina
19 around a particular story, and that could be problematic
20 unless you meet these criteria as to what experts are
21 really for.
22       So I won't belabor your time, but that's the
23 problem.
24       MR. MILLER:  I understand.  So he can testify
25 about the general rules of the EPA for register -- and

Page 60

1 the statement and registration process for pesticides.
2       THE COURT:  I'm sure he can provide some sort
3 of general overview as to how that works.  I'm not sure
4 where it gets you in the case, but he may have the
5 background to be able to do that.
6       MR. MILLER:  All right.
7       THE COURT:  Do you think industry standards,
8 for example, and stewardship duty, which in Adams versus
9 U.S. were, apparently, in that case held relevant?  Is
10 this a case where industry standards and so-called
11 stewardship duty or ethical obligations -- I'm sorry,
12 industry standards and stewardship obligations are
13 relevant?
14       MR. MILLER:  I think industry standards -- I'm
15 sorry, Your Honor.
16       THE COURT:  That's it.
17       MR. MILLER:  I think industry standards are
18 relevant, and I think there's a standard to warn.  When
19 you know about a risk of cancer and you violate that
20 standard, that is an area uniquely requiring expert
21 testimony.
22       THE COURT:  How does that fit into the specific
23 causes of action that are at stake in this case?
24       MR. MILLER:  Because Monsanto certainly knew by
25 1999 that Roundup was carcinogenic.

Page 61

16 (Pages 58 - 61)

1       THE COURT:  I understand that position.  But
2 why does it matter that that violates or doesn't violate
3 industry standards?  I mean, let's say it turned --
4       MR. MILLER:  I see your point.
5       THE COURT:  Let's say it turned out it doesn't
6 violate any industry standards at all.  The reason
7 being, let's make this up, the industry colluded and
8 made sure there were no such standards, would that then
9 defeat your case?
10      MR. MILLER:  No, Your Honor --
11      THE COURT:  No, I wouldn't care less.
12      MR. MILLER:  -- you're quite correct.  I'm
13 losing this argument, Your Honor.
14      THE COURT:  I mean, I don't care about industry
15 standards.  You're just going to prove that they knew
16 and they didn't tell.
17      MR. MILLER:  Right.
18      THE COURT:  Right.
19      MR. MILLER:  Well, then, now I've been whipped,
20 so I'll move on.
21      THE COURT:  No, I'm just asking --
22      MR. MILLER:  I don't know what else to say,
23 I'll be honest with you.  And we'll be guided by the
24 Court's overall ruling here.
25      Some e-mails -- and I've been handed a note

1 factored this in as well.  The EPA has not said Roundup
2 doesn't cause cancer.  Some people at OPP have said
3 that.  "OPP" being a division within the EPA.  But two
4 of the EPA scientists were on the IARC panel that said
5 Roundup is probably the cause of non-Hodgkin lymphoma.
6 Two of them.
7       So it's not true that -- it's true that there's
8 some people at OPP that wrote a report that said it
9 doesn't cause cancer, that's true.  But it's also true
10 that that report was reviewed by an independent
11 Scientific Advisory Panel, which concluded that OPP, for
12 whatever reason, did not follow their own guidelines.
13      And we don't know what number because the EPA
14 won't tell us the vote, but a significant number of
15 scientists on the SAP said this could be causing cancer.
16 Some said no, but they didn't tell us the actual vote,
17 so we don't know.  But we know that you can buy a book
18 here that has the EPA imprimatur on it, and it's cited
19 in our papers, that tells you product exposure to
20 Roundup studies out there show a risk for non-Hodgkin
21 lymphoma.
22      We also know if you call the EPA hotline,
23 you'll be put over to an operator who will tell you that
24 there are animal studies and some epidemiological
25 studies that shows an association between Roundup and

1 that I'd better bring it up.  Some e-mails are very
2 technical.  And I know he's not an expert in reading
3 e-mails, so I'd ask you to punt it to the trial judge
4 for this e-mail or for that e-mail.
5       Sure, again, a general ruling -- look, we can't
6 just stand up there and gild the case and put e-mails up
7 on the board.  I get it.  But there will be some e-mails
8 that are technical that involve an understanding of the
9 EPA, and he may need to interpret those.  And I'd just
10 ask that you'd punt that to the trial judge for specific
11 instances is all.
12      THE COURT:  And you would tell me that when you
13 disclosed him as an expert, you disclosed him for that
14 purpose as well?
15      MR. MILLER:  Oh, yes, Your Honor.  If it's not
16 on our expert report, I certainly won't talk about it to
17 the jury.
18      THE COURT:  I understand.
19      MR. MILLER:  So just moving on to the last
20 issue, which is preemption.  We agree with the Court's
21 tentative of -- I mean, it's clear from the Bates case,
22 it's clear from the seven Roundup cases where they tried
23 this and lost that the Court's tentative is right in
24 line with all those, and it's quite correct.  And
25 moreover -- and I just want to end with this because we

1 non-Hodgkin lymphoma.  So to say that blanketly and
2 universally, the EPA has concluded that it doesn't cause
3 non-Hodgkin lymphoma is not squaring with the facts.
4       But I think we stand on the Court's tentative
5 for preemption.  Unless something extraordinary is said
6 in the next couple of minutes, I'm about done.
7       THE COURT:  I appreciate your help.
8       MR. MILLER:  Thank you, Your Honor.
9       THE COURT:  Thank you, sir.
10      MR. LASKER:  Thank you, Your Honor.  I just
11 want to revisit a few things that --
12      THE COURT:  Sure.
13      MR. LASKER:  -- Mr. Miller stated in his
14 argument.  I'm going to do them largely sequentially.
15      The first issue that Mr. Miller raised dealt
16 with the Cooper case.  And obviously, we have the
17 opinion in the Cooper case.  And Dr. Miller --
18 Mr. Miller noted that there were a couple of studies in
19 that case where the defense experts argue there could be
20 some confounding with smoking, and you didn't adjust for
21 that.  And that was the issue that I mentioned in my
22 argument.  They were raising a hypothetical situation
23 where you didn't adjust for smoking and we don't know
24 what would have happened if you had.
25      So the first point, as I mentioned initially,

1 is:  We don't have that situation here.  We have a
2 situation where we have studies that were adjusted for
3 confounding for pesticides, and when they're adjusted
4 for confounding for pesticides, did not show an
5 association.  So it's a much different situation here.
6        Secondly, if you look at the Cooper opinion --
7 and I would cite Your Honor again to page 239
8 Cal. App. 4th at 563 and 564 where they're talking about
9 Dr. Smith's general causation testimony.  The Court goes
10 through and discusses the fact that Dr. Smith was
11 relying upon studies that showed statistically
12 significant increased risks, over doubling of the risks,
13 when there was adjustment for smoking.  I'm going to
14 actually go through the fact that there were these
15 studies with adjustments for smoking that doubled the
16 risk.  And there's a number of them that the Court goes
17 through, and then there's one that's 4.3 increased risk,
18 2.5 -- well, you can read it as well, Your Honor.
19        And again, as I mentioned in my initial
20 argument, when you go to the specific discussion at
21 Page 594 of the specific causation opinion and relying
22 upon epidemiology, the Court again talks about the fact
23 that the experts had epidemiological studies that
24 adjusted for these various factors, including smoking.
25        So the Cooper court spent enough time talking

Page 66

1 about where there were studies that did adjust for
2 smoking and continued to find this increased risk.  And
3 the situation we have here is that that's not the case.
4        Now, plaintiff's counsel made a number of
5 statements, representations, about what the various
6 studies showed.  He talked about the NAPP study showed a
7 doubling of the risk after adjustment for pesticides,
8 and he talked about quadrupling the risk of T-cell
9 lymphomas.
10        And this is a situation where the Court is --
11 and we are in sort of an awkward position here, and we
12 suggest maybe we can supplement the record.  Because
13 there is testimony on these exact issues.  Certainly
14 with respect to the NAPP, there was testimony we're now
15 hearing from plaintiff's experts in which they testified
16 directly contrary to what Mr. Miller just said to the
17 Court.  I can, on this record, cite Your Honor to
18 Exhibit 25 in our opening brief in which we're talking
19 with Dr. Ritz about the NAPP study.  And in that
20 context, she's talking about the finding of the NAPP
21 study after adjusting for the pesticides, also a
22 sensitivity analysis for proxy.  And she believes that
23 the final odds ratio from all of the North American
24 case-control studies with that adjustment was 0.95.
25        So that already is in the record in this case,

Page 67

1 Your Honor, but we would suggest, Your Honor, that if
2 the Court is inclined to credit or to rely upon any of
3 the representations that Mr. Miller made about the
4 studies, there is specific testimony that we can
5 supplement Your Honor from plaintiff's experts that
6 contradict what he said.
7        Dr. Nabhan, for example, Mr. Miller stated that
8 there's a quadrupling of the risk of T-cell lymphomas in
9 the 2008 NCI study.  We showed Dr. Nabhan that specific
10 odds ratio in his testimony in the MDL in his
11 deposition.  He said there's nothing there.  It's not
12 statistically significant.  The numbers are too small.
13 He doesn't rely upon that.  So again, if that's an issue
14 for Your Honor, we suggest that you allow us to
15 supplement the record on that.
16        Likewise, with respect to Dr. Portier and his
17 pooling analysis and whether the Dourson studies pool
18 data across studies, we asked Dr. Portier that in front
19 of Judge Chhabria and Judge Petrou in the Daubert
20 hearing.  He acknowledged that Dourson doesn't do that.
21 There is pooling of male and female mice within the
22 study, but there is no pooling across studies.  He
23 acknowledged that what he did has not been done by
24 anybody else.
25        So, again, if Your Honor is interested in those

Page 68

1 issues, you know, we would suggest a supplementing of
2 the record so that you can see the actual testimony of
3 the plaintiff's experts as opposed to the argument of
4 Counsel.
5        With respect to the issue of -- well, the Court
6 -- Mr. Miller mentioned the Wendell case in the Ninth
7 Circuit.  And as Your Honor may recall, having read that
8 case, the issue in Wendell was:  There was no
9 epidemiology -- because it was such a rare cancer, there
10 was no epidemiology.  And in this case, plaintiff's
11 experts, and Dr. Nabhan in particular, all say, "We can
12 rely upon the general epidemiology for NHL," and they do
13 rely upon that.  There is a large body of epidemiologic
14 evidence.  So the Wendell case really doesn't apply in
15 this circumstance.
16        With respect to Dr. Nabhan and his cancer
17 slope, Mr. Miller stated that the cancer slope analysis
18 is just a small part of Dr. Nabhan's opinion, and if
19 that's the case, given the prejudice, as Your Honor
20 recognized, and confusion that would arise from
21 presenting that data to the evidence (sic), clearly the
22 prejudice outweighs what Mr. Miller stated, which is a
23 small part of their case.  There's not a large, if
24 there's any -- and we don't think there's any probative
25 value.  We think that also requires and calls for the

Page 69

18 (Pages 66 - 69)

1  cancer slope opinions to be excluded.
2       Just quickly, with respect also to Mr. Miller's
3  comment that the pooling analysis was somehow accepted
4  or adopted by the EPA through the Scientific Advisory
5  Panel, there is a document in the record, it's
6  Exhibit 10 to the Edwards declaration.  I think this is
7  in connection with the motion for judicial notice --
8  which shows EPA's response to the SAP process and to the
9  materials that were submitted, which included Dr.
10 Portier's pooling analysis in which the EPA expressly
11 rejects that pooling analysis, and that's in the record
12 for Your Honor.
13      A couple of final points.  With respect to Dr.
14 Benbrook and this issue of whether or not there are some
15 e-mails that raise technical issues that Dr. Benbrook
16 could respond to and whether there should be something
17 reserved for the jury on that -- or for the trial judge
18 on that, again here, as we set forth and I think as I
19 disputed, Dr. Benbrook does not have expertise in a wide
20 variety of areas.  When you're talking about technical
21 documents, the e-mail he's talking about dealing with
22 scientific studies, how Monsanto responded to scientific
23 studies, whether they were submitted, whether they were
24 not, these are not issues where Dr. Benbrook has any
25 expertise to be able to read those e-mails in a way that

Page 70

1  would be of any assistance to the jury.
2       So certainly, laying out in your ruling these
3  areas where he does not have expertise, to provide
4  guidance on exactly -- and I frankly can't imagine -- I
5  don't know any document where he does have any
6  expertise -- any e-mail that he has any added expertise
7  above a lay juror, but certainly the Court's ruling
8  should make clear that he does not have expertise in
9  these areas.
10      Finally, with respect to the issue of
11 preemption that Mr. Miller was arguing about and whether
12 there were people within the EPA that disagreed, I think
13 it's kind of interesting to call the document that was
14 submitted, which was a 270-some-odd-page, confining that
15 goes through all the scientific evidence after notice
16 and comment, after the SAP, as an EPA conclusion that
17 some people at OPP said this and just sort of gave it
18 the back of their hand.
19      But, you know, at the very least, all that
20 Mr. Miller is arguing there is that there's something
21 that he would want to argue about as to what exactly the
22 OPP did.  And that's an issue with In re Fosamax, so
23 that's an issue for the jury to decide.  I don't think
24 that argument actually gets him a disputed issue of
25 material fact where you have this document after --

Page 71

1  after notice and comment and after plaintiff's experts
2  have already submitted all of their arguments to the EPA
3  and the EPA rejected them, that strikes me as pretty
4  clearly in line with the clear evidence standard that
5  Your Honor applied in Plavix and that a number of other
6  courts have applied.
7       So we don't think that they even raised a
8  disputed issue of fact on that, but if Your Honor has
9  issues or questions based upon what Mr. Miller said,
10 that then, at most, gets him a fact issue.  I think the
11 legal question is, as we stated, whether or not the
12 Court can just ignore the -- or hold that evidence of
13 the EPA's actions in finding glyphosate not being
14 carcinogenic and approving the labels to be irrelevant
15 as a matter of law on the question of preemption.
16      And we don't think that is appropriate under
17 Kimmel.  The Kimmel court had many of its -- based upon
18 Supreme Court rulings like Geier and I think
19 Freightliner has stated that you can't just say there's
20 an express preemption clause and I'm not going to
21 consider implied preemption.  You have to look at the
22 implied preemption issues.
23      Of course, there is a burden there that would
24 need to be shown for an affirmative defense to make out
25 that implied preemption.  If those facts don't exist,

Page 72

1  you don't have implied preemption, conflict preemption.
2  But those legal standards, you still need to look at
3  those and reach a determination.  So we think that's a
4  legal issue for Your Honor, but I think Nathan Kimmel
5  basically answers that question.
6       And unless you have further questions, Your
7  Honor...
8       THE COURT:  Thank you.
9       MR. MILLER:  Your Honor, may I have just two
10 minutes?
11      THE COURT:  Of course.
12      MR. MILLER:  Thank you.  We both know there's a
13 lot at stake here, but supplemental briefing is just
14 another way to prevent us from trying to get ready for
15 trial.  I would ask the Court not to do supplemental
16 briefing.  You don't need it.  What he wants
17 supplemental on is what he wants to cross-examine our
18 experts upon in trial.  What I represented to be in the
19 studies, Your Honor can look in the studies.  They're
20 there.
21      THE COURT:  I'm going to try to decide this
22 based on the papers I have.
23      MR. MILLER:  Your Honor, thank you.  I said
24 that the NAPP study showed a doubling of the risk.  You
25 can look at the NAPP study.  It's right in there.  It's

Page 73

19 (Pages 70 - 73)

Page 74

1 not my suggestion.  What he's referring to is a
2 cross-examination where there was a subanalysis where
3 they took out proxy responders.  And with a subanalysis
4 without proxy responders, the risk went away.
5        And we could debate forever why that happened.
6 Proxy responders are inherently inaccurate, and we can
7 both debate it back and forth.  There's no bearing on
8 the fact that on the NAPP study, there was a doubling of
9 the risk.  It's right in the study.
10       And on their study, the 2018 study, he's right,
11 there is a quadrupling of the risk, but Dr. Nabhan did
12 not rely upon it.  And that's exactly what I said.  So
13 we agree Dr. Nabhan didn't rely upon that quadrupling of
14 the risk because he doesn't think the study is done
15 right.  But if they want to rely on that study, that
16 study shows a quadrupling of the risk.  That was my
17 point.  And I think we're arguing the same issue.
18       He brought up the Wendell case as after Cooper.
19 And I think that's a very instructive case because
20 there, they allowed Dr. Weisenburger, the same expert
21 that we're using here, to testify without any epi
22 because he's such a highly qualified individual.  He
23 looked at the animal studies and he analyzed it, and
24 they reversed the trial court, right, because he wasn't
25 going to allow Dr. Weisenburger, and Dr. Weisenburger --

Page 76

1 numbers, but there's also a slide that presents it.  The
2 data is not disputed.  There just is no doubling of the
3 risk after adjustments.  Judge Chhabria raised that in
4 the argument that he had with Counsel, and there's no
5 dispute over that fact.
6        I don't know exactly what more to say about
7 that, Your Honor.  It's not a cross-examination point,
8 it's just what the study shows.
9        THE COURT:  Anything else?
10       MR. MILLER:  We disagree.
11       THE COURT:  Okay.  That's what you're here for.
12 Well, thank you.  I appreciate everybody's help.  The
13 matter is submitted.  It will be helpful, I think, to
14 get a transcript of the argument.  It will take me some
15 time to write this up.
16       MR. MILLER:  Your Honor, if I could, unrelated
17 to the merits --
18       THE COURT:  Of course.
19       MR. MILLER:  -- we wanted to ask about one
20 question about page and line, and we also wanted to ask
21 the Court for a phone conference, if we could, next
22 week.  And I'm not going to argue the issue just to sort
23 of alert the Court.  We were deposing Daniel Goldstein.
24 Your Honor allowed us to re-depose him.  You'll recall,
25 he was the Monsanto employee who took in the phone calls

Page 75

1        THE COURT:  She wasn't.  The trial judge was a
2 woman.
3        MR. MILLER:  Excuse me, I'm sorry.
4        THE COURT:  That's okay.
5        MR. MILLER:  I apologize.  I think that's it.
6 I think cancer slope was about Sawyer not Nabhan, but I
7 think that's --
8        MR. LASKER:  My mistake.
9        MR. MILLER:  Yeah, it's all good.
10 Listen, thank you very much, Your Honor.
11       MR. LASKER:  Can I just -- one thing, Your
12 Honor.
13       THE COURT:  You certainly can.  You have more
14 time.
15       MR. LASKER:  With respect to the findings in
16 the NAPP, they are in this record in our Sargon
17 opposition brief, Exhibit 10.  Dr. Mucci, in her report,
18 goes through the various findings in that study, what
19 the numbers were after adjustment for other pesticides,
20 what the numbers were before adjustment for other
21 pesticides.  Mr. Miller was citing to data points
22 particularly for the doubling of risk before adjustments
23 for other pesticides.  That does not exist after.
24       And if the study -- if the full study -- and
25 there's a draft publication that writes up those

Page 77

1 from Wayne Johnson.
2        And during that deposition, we handed him a
3 document from 2004, which we find to be a very important
4 document in this case.  I don't want to say what the
5 document is in open court.  But what happened is:  After
6 about ten questions, I took a break, counsel and witness
7 left the room, they came back and claimed that it was
8 prepared at the request of attorneys, and therefore,
9 they weren't going to talk about it anymore and they
10 wanted to claw him back.
11       We're waiting for them to do the proper
12 procedures, but we're running out of time.  Our argument
13 is:  There's nothing in there about lawyers.  The
14 metadata shows nothing --
15       THE COURT:  We don't have to go into the
16 details.  You have a disagreement about this issue?
17       MR. MILLER:  Yes, we have a disagreement and
18 we'd like to have a few minutes.  Yes, Your Honor.
19       THE COURT:  So why don't we go off the record
20 and pick a date that works for everybody's calendar.
21       MR. MILLER:  Sure.
22       THE COURT:  Off the record.
23       (Off the record.)
24       THE COURT:  The informal conference will be at
25 9:00 on the 16th of May.

20 (Pages 74 - 77)

```
1        Off the record.
2        (Proceedings concluded at 11:00 a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 78

```
1        I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3        That the foregoing proceedings were taken
4  before me at the time and place herein set forth; that
5  any witnesses in the foregoing proceedings, prior to
6  testifying, were duly sworn; that a record of the
7  proceedings was made by me using machine shorthand which
8  was thereafter transcribed under my direction; that the
9  foregoing transcript is a true record of the testimony
10  given.
11        Further, that if the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, review of the
14  transcript [ ] was [ ] was not requested.
15        I further certify that I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or party to this action.
18        IN WITNESS WHEREOF, I have this date subscribed
19  my name.
20
21  Dated: May 14, 2018
22
23        _____
24            Sheila Pham
                CSR No. 13293
25
```
Page 79

21 (Pages 78 - 79)