**WILKINSON WALSH + ESKOVITZ LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonwalsh.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonwalsh.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:     202-847-4030
Fax:     202-847-4005

**ARNOLD & PORTER KAYE SCHOLER**
Pamela Yates (CA Bar No. 137440)
(Pamela.Yates@arnoldporter.com)
777 South Figueroa St., 44th Floor
Los Angeles, CA 90017
Tel: 213-243-4178
Fax: 213-243-4199

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>_____<br><br>*Hardeman v. Monsanto Co., et al.*, 3:16-cv-0525-VC<br>*Stevick v. Monsanto Co., et al.*, 3:16-cv-2341-VC<br>*Gebeyehou v. Monsanto Co., et al.*, 3:16-cv-5813-VC<br>_____ | ) MDL No. 2741<br>)<br>) Case No. 3:16-md-02741-VC<br>)<br>) **MONSANTO COMPANY'S NOTICE OF**<br>) **MOTION AND MOTION TO EXCLUDE**<br>) **TESTIMONY OF DR. WILLIAM R.**<br>) **SAWYER ON *DAUBERT* GROUNDS**<br>)<br>) **Hearing dates: February 4, 6, and 11, 2019**<br>) **Time: 9:30AM**<br>) |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** beginning on February 4, 2018, in Courtroom 4 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its *Daubert* Motion to Exclude the Testimony of Dr. William R. Sawyer. Monsanto seeks an order excluding Sawyer under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).


DATED:  January 3, 2019

                                   Respectfully submitted,

                                   /s/ *Brian L. Stekloff*

                                   Brian L. Stekloff (*pro hac vice*)
                                   (bstekloff@wilkinsonwalsh.com)
                                   Rakesh Kilaru (*pro hac vice*)
                                   (rkilaru@wilkinsonwalsh.com)
                                   WILKINSON WALSH + ESKOVITZ LLP
                                   2001 M St. NW
                                   10th Floor
                                   Washington, DC 20036
                                   Tel:  202-847-4030
                                   Fax:  202-847-4005

                                   Pamela Yates (CA Bar No. 137440)
                                   (Pamela.Yates@arnoldporter.com)
                                   ARNOLD & PORTER KAYE SCHOLER
                                   777 South Figueroa St., 44th Floor
                                   Los Angeles, CA 90017
                                   Tel: 213-243-4178
                                   Fax: 213-243-4199

                                   Eric G. Lasker (*pro hac vice*)
                                   (elasker@hollisworthllp.com)
                                   HOLLINGSWORTH LLP
                                   1350 I St. NW
                                   Washington, DC 20005
                                   Tel: 202-898-5843
                                   Fax: 202-682-1639

- i -

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-0525-VC, 3:16-cv-2341-VC, 3:16-cv-5813-VC

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
COVINGTON & BURLING LLP
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-0525-VC, 3:16-cv-2341-VC, 3:16-cv-5813-VC

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................2

LEGAL STANDARD.............................................................................................4

I.      The Court Should Exclude Dr. Sawyer's General Causation Opinions, And Thus Preclude Him From Testifying In Hardeman and Gebeyehou. ..5

         A.    The Court Should Exclude Dr. Sawyer's General Causation Opinions, Which Are The Vast Majority Of His Report. ...............5

         B.    Because Dr. Sawyer Has No Specific Causation Opinions As To Mr. Hardeman and Mr. Gebeyehou, He Should Not Be Allowed To Testify At Their Trials. ..............................................................7

II.     The Court Should Exclude Dr. Sawyer's Analysis of Specific Causation As To Ms. Stevick........................................................................8

         A.    Dr. Sawyer "Rules In" Roundup Based On His Say-So About Epidemiological Studies He Is Not Qualified To Assess. ...............8

         B.    Dr. Sawyer Provides No Valid Basis For "Ruling Out" Other Potential Causes Of Ms. Stevick's NHL........................................11

III.    The Court Should Exclude Dr. Sawyer's Remaining Opinions. ...............13

CONCLUSION....................................................................................................15

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Cases</u>

3

*Avila v. Willits Envtl. Remediation Tr.*,
4
    633 F.3d 828 (9th Cir. 2011) ...................................................................6, 15

5

*Brown v. Burlington N. Santa Fe Ry. Co.*,
    765 F.3d 765 (7th Cir. 2014) ....................................................................5

6

7

*Chapman v. Proctor & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) ...............................................................5

8

*Claar v. Burlington N.R. Co.*,
9
    29 F.3d 499 (9th Cir. 1994) ...............................................................11, 12

10

*Clausen v. M/V New Carissa*,
    339 F.3d 1049 (9th Cir. 2003) ...........................................................11, 12

11

12

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ....................................................................5

13

*Daubert v. Merrell Dow Pharm., Inc.*,
14
    43 F.3d 1311 (9th Cir. 1995) (*Daubert II*)..............................................5

15

*Daubert v. Merrell Dow Pharm., Inc.*,
16
    509 U.S. 579 (1993)......................................................................1, 4, 11, 15

17

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
    285 F.3d 609 (7th Cir. 2002) ....................................................................9

18

19

*Guinn v. AstraZeneca Pharms. LP*,
    602 F.3d 1245 (11th Cir. 2010) ...............................................................5

20

*Hall v. Conoco Inc.*,
21
    886 F.3d 1308 (10th Cir. 2018) ...............................................................13

22

*In re Aredia & Zometa Prod. Liab. Litig.*,
23
    483 F. App'x 182 (6th Cir. 2012) ............................................................5

24

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices*
    *& Prod. Liab. Litig. (No. II)*, 892 F.3d 624 (4th Cir. 2018)...................5

25

*Kilpatrick v. Breg, Inc.*,
26
    613 F.3d 1329 (11th Cir. 2010) ...............................................................5

27

*Kumho Tire Co., Ltd. v. Carmichael*,
28
    526 U.S. 137 (1999)..................................................................................4

- iv -

*Lust v. Merrell Dow Pharm., Inc.*,
    89 F.3d 594 (9th Cir. 1996) ...................................................................................11, 15

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ....................................................................................5

*O'Conner v. Commonwealth Edison Co.*,
    807 F. Supp. 1376 (C.D. Ill. 1992) .............................................................................11

*Poust v. Huntleigh Healthcare*,
    998 F. Supp. 478 (D.N.J. 1998) ....................................................................................5

*Sims v. Kia Motors of Am., Inc.*,
    839 F.3d 393 (5th Cir. 2016) .........................................................................................5

*Soldo v. Sandoz Pharm. Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003) ...........................................................................5

*Tamraz v. Lincoln Elec. Co.*,
    620 F.3d 665 (6th Cir. 2010) .........................................................................................1

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) .......................................................................................................4


**Other Authorities**

Restatement (Third) of Torts (2010) ¶ 28 ......................................................................13

Federal Judicial Center's Reference Manual on Scientific Evidence .........................13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Group 1 Plaintiffs' exposure expert Dr. William R. Sawyer fails to offer any admissible opinions in support of Plaintiffs' claim that exposure to Roundup, a glyphosate-based herbicide ("GBH") manufactured by Defendant Monsanto Company ("Monsanto"), caused them to develop non-Hodgkin's Lymphoma ("NHL"). The vast majority of Dr. Sawyer's report simply re-ploughs ground from the *general* causation phase, such as the epidemiological, animal, and genotoxicity studies regarding Roundup, and what those studies say about glyphosate's *possible* effects on human beings. The Court should preclude Dr. Sawyer from offering those untimely opinions at trial. And because Plaintiffs have admitted that Dr. Sawyer has no specific causation opinions about Plaintiffs Edwin Hardeman and Sioum Gebeyehou, there is no basis for allowing him to testify at all in those two cases if they proceed to trial.

Further, while Dr. Sawyer has offered a specific causation opinion as to Plaintiff Elaine Stevick, it should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). At his deposition, Dr. Sawyer claimed to have conducted a differential diagnosis of Ms. Stevick's NHL—even though the term differential diagnosis, as well as the elements of such a diagnosis, appear nowhere in his report. But even taking Dr. Sawyer's claim at face value, he has not come close to making a valid application of that methodology. He "rules in" Roundup as a cause of Ms. Stevick's NHL based purely on extrapolations from epidemiological studies, notwithstanding his lack of training in epidemiology and this Court's observation that epidemiology alone cannot establish specific causation. And he fails to "rule out" other actually recognized risk factors for NHL—indeed, he did not address *any* of them in his written report, and discussed them only in vague, conclusory terms at his deposition. Because Dr. Sawyer has not performed a differential diagnosis in any recognizable sense, his conclusions must be excluded. *See, e.g.*, *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010) ("[S]imply claiming that an expert used the 'differential diagnosis' method is not some incantation that opens the *Daubert* gate." (citation, quotation, and alteration omitted)).

For these and other reasons set forth below, the Court should exclude Dr. Sawyer's opinions in their entirety.

## BACKGROUND

Group 1 Plaintiffs have offered Dr. Sawyer, a toxicologist by training, as an expert on two topics. First, they have offered him as an expert "for Plaintiffs Hardeman, Stevick and Gebeyehou relating to his general absorption opinions." Stekloff Decl. Ex. 1, 11/20/18 Ltr. from Pls.' Counsel at 4. Second, they have proffered him to testify "on issues of specific causation, including the comparability of Plaintiffs' exposure with the exposure data from epidemiological studies, for Plaintiff Elaine Stevick." *Id.*

The vast majority of Dr. Sawyer's November 20, 2018 Report ("Sawyer Rpt.") relates to his so-called "general absorption opinions," which is simply a different label for opinions about general causation. Part B of the report (roughly 84 pages, or two-thirds of the report) discusses glyphosate's history; the ingredients in various Roundup formulations; the routes of potential exposure to glyphosate; a summary of various methods, models, and studies for measuring exposure, including a review of the epidemiological literature; and a discussion of factors purportedly affecting dermal absorption. *See* Stekloff Decl. Ex. 2, Sawyer Rpt. at 32-114. This section has nothing to do with any particular plaintiff; indeed, Dr. Sawyer agreed at his deposition that Part B was intended "to address general points . . . regarding glyphosate, dermal exposure, glyphosate exposure, things like that that would apply to anybody." Stekloff Decl. Ex. 3, Tr. of 12/20/18 Sawyer Dep. ("Sawyer Dep. Tr.") 25:9-17. In fact, nearly half of Part B was copied from the report Dr. Sawyer furnished in the *Johnson* case, in which he offered general causation opinions.

Much of the rest of the report likewise addresses how glyphosate allegedly affects humans generally, rather than any particular individual. Part C (roughly 5 pages) provides an overview of the genotoxicity profiles for Roundup and glyphosate and a discussion of latency estimates for NHL—all based on studies the Court has already considered. *See* Stekloff Decl. Ex. 2, Sawyer Rpt. at 115-19. And while Part D (roughly 3 pages) purports to discuss various

considerations Dr. Sawyer took into account "in formulating an objective toxicological assessment of Mrs. Stevick," *id.* at 119-21, Dr. Sawyer admitted that two of the five considerations listed (dermal absorption rates and mechanism of carcinogenicity) would apply to "any human being."   Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 28:12-29:8.   Notably, the foregoing sections rely on interpretations of epidemiological data that Dr. Sawyer agrees are beyond his expertise.  *Id.* at 242:16-19 ("Q  You are going to defer to others all opinions and testimony about the results of the human epidemiological studies; correct?  A  Yes."); *see also id.* 240:18-244:15; Stekloff Decl. Ex. 9, Sawyer *Hall* Dep. Tr. 329:7-14 ("Q. Okay. And in an epidemiology study, if it measured people with exposures to those other things you believe might be associated with NHL in addition to exposure to glyphosate, the findings on glyphosate might be confounded by those other exposures unless they control for them, right?  A.  I'm going to defer that to the epidemiologists in this case.").

It is only Part A of the report (roughly 31 pages, or a quarter of the report) that discusses Ms. Stevick with any specificity.  Part A details Ms. Stevick's medical history; describes her alleged use and application of Roundup products; summarizes her deposition in this case and Dr. Sawyer's telephone interview of her; and provides Dr. Sawyer's exposure and dose calculation.  *See* Stekloff Decl. Ex. 2, Sawyer Rpt. at 1-32; Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 24:4-17.  That factual recitation constitutes the entirety of Dr. Sawyer's report concerning Ms. Stevick.  Crucially, his report does not purport to conduct any "differential diagnosis" of Ms. Stevick—he makes no effort to assess other potential causes for her NHL, and he does not describe how he could reliably rule out any of those other potential causes.

At his deposition, however, Dr. Sawyer purported to expand the scope of his proposed testimony, explaining that he plans to offer a differential diagnosis that considers and rules out all causes of Ms. Stevick's NHL but for glyphosate.  Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 192:13-193:5.  Dr. Sawyer then described a two-step "methodology" that he claims to have used to reach his opinions regarding Ms. Stevick.  First, Dr. Sawyer estimated Ms. Stevick's lifetime exposure days to glyphosate, as well as her average glyphosate dose in milligrams per kilogram

per day using the Predictive Operator Exposure Model ("POEM"), a European regulatory formula used to predict exposure to pesticides in general.  He then compared these figures to thresholds from the epidemiological literature to "rule in" glyphosate as a cause.  *See id.* at 194:12-195:9.  Second, Dr. Sawyer asserted that he had "ruled out" a substantial listing of other potential causes of Ms. Stevick's NHL, such as her ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  *Id.* at 195:10-19.  Again, Dr. Sawyer's report did not address these factors at all, much less meaningfully assess them or offer any science-based justification for ruling them out.  Nevertheless, Dr. Sawyer attempted to backfill this crucial methodological gap on the fly in his deposition by dismissing them out of hand in order to support his *ipse dixit* conclusion "that Mrs. Stevick's exposure to Roundup was a substantial factor that contributed to her development of NHL."  Stekloff Decl. Ex. 2, Sawyer Rpt. at 121.

## LEGAL STANDARD

Under *Daubert* and Federal Rule of Evidence 702, an expert must be qualified and must offer testimony that is both relevant and reliable.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  *Daubert* created "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), which require far "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590.  *Daubert*'s objective "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  Thus, "in determining whether proposed expert testimony amounts to good science, [the court] may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert II*).

In the specific causation context, *Daubert* requires experts who purport to use a differential diagnosis to validly execute both aspects of that methodology—"ruling in" all

- 4 -

possible causes and then "ruling out" causes besides exposure.  *See In re Aredia & Zometa Prod. Liab. Litig.*, 483 F. App'x 182, 188 (6th Cir. 2012) (expert offering a differential diagnosis must "accurately diagnose the nature of the disease, reliably rule in the possible causes of it, and reliably rule out the rejected causes"); *see also, e.g.*, *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496 (D.N.J. 1998); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005) ("[A]n expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient."); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 551 (W.D. Pa. 2003) ("[T]he mere statement by an expert that he or she applied differential diagnosis in determining causation does not *ipso facto* make that application scientifically reliable or admissible.").  Because the inherent malleability of this methodology can shroud what may be little more than subjective guesswork, the district court must "delve into the particular witness's method of performing a differential diagnosis to determine if his or her ultimate conclusions are reliable." *Poust*, 998 F. Supp. at 496.  Courts have consistently held that expert opinions that pay lip service to this methodology but do not reliably apply it should be excluded.  *See, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No. II)*, 892 F.3d 624, 642-45 (4th Cir. 2018).[1]  For the reasons explained below, this Court should do the same here.

## ARGUMENT

### I.   The Court Should Exclude Dr. Sawyer's General Causation Opinions, And Thus Preclude Him From Testifying In *Hardeman* and *Gebeyehou.*

#### A.  The Court Should Exclude Dr. Sawyer's General Causation Opinions, Which Are The Vast Majority Of His Report.

At the current stage of this litigation, the parties have agreed that any new experts on causation must focus on specific causation.  *See* Stekloff Decl. Ex. 4, 10/29/18 MDL CMC Tr. 41:8-10 (THE COURT: "You cannot add general causation experts."); Stekloff Decl. Ex. 5,

---

[1] *See also, e.g.*, *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 401-02 (5th Cir. 2016); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773-74 (7th Cir. 2014); *Chapman v. Proctor & Gamble Distrib., LLC*, 766 F.3d 1296, 1309 (11th Cir. 2014); *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1342 (11th Cir. 2010); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001).

- 5 -

1   12/5/18 MDL CMC Tr. 24:25-25:2 (PLAINTIFFS' COUNSEL "[Y]ou're absolutely right that

2   all the parties were operating under the assumption that no general causation testimony would

3   be given anew . . . ."). That means that expert testimony is admissible only if it speaks to

4   whether Roundup "caused, or was a substantial factor in causing, [each] *specific plaintiff's*

5   *injury*." *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 836 (9th Cir. 2011) (emphasis

6   added). While specific causation experts may need to touch on general causation issues to

7   explain their methodology or to put it in context, it is clear that now is not the time to introduce

8   new experts who are focused on general causation. In the *Hardeman* and *Gebeyehou* cases, Dr.

9   Sawyer is entirely focused on general causation issues.

10       Dr. Sawyer has expressly admitted that the vast majority of his report does not address

11   any particular plaintiff: "[P]art B is almost all general in terms of the toxicological mechanism

12   effects of the glyphosate with respect to absorption, excretion, co-formulants and contaminants

13   and so on which apply to all three plaintiffs." Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 194:2-7.[2]

14   This lengthy discussion, which focuses on epidemiological, animal, and genotoxicity studies

15   and thus applies to any human being, goes beyond any description of glyphosate that plausibly

16   could be described as necessary to lay a foundation for conclusions about specific causation.

17   (Indeed, Dr. Sawyer's observation that the analysis applies to all three plaintiffs confirms this

18   point, as plaintiffs' counsel has made clear that he has no specific causation opinions for two of

19   these plaintiffs. *See supra*.) Because this testimony covers ground that plaintiffs' general

20   causation experts have extensively addressed, it should be excluded. *See* Stekloff Decl. Ex. 5,

21   12/5/18 MDL CMC Tr. 29:2-16.

22       Any remaining doubt on this score is eradicated by a comparison of Dr. Sawyer's opinions

23   in this case with his opinions in *Johnson v. Monsanto*. At the *Johnson* trial, Dr. Sawyer testified

24   regarding both general and specific causation. *See, e.g.*, Stekloff Decl. Ex. 6, *Johnson* Trial Tr.

---

[2] *Accord id.* at 25:9-17 ("Q. . . . But part B was -- starting at page 39 of your report, that was intended to address not Mrs. Stevick in particular but to address general points that you're making regarding glyphosate, dermal exposure, glyphosate exposure, things like that that would apply to anybody; is that right? A. Correct, the mechanisms of absorption, the aspects of co-formulants and surfactants, et cetera.").

3594:25-3595:8 ("Q.  And did you reach an opinion to a reasonable degree of scientific certainty that Roundup and Ranger Pro can cause non-Hodgkin's lymphoma?  A.  Yes.  I have been following the peer-reviewed literature on glyphosate since mid-1990s.  Q.  And what is the opinion you've reached, generally?  A.  That, clearly, glyphosate and with its combinations of adjuvants, is a known carcinogen."); *id.* at 3596:11-13 ("Q.  Okay.  And those are your general opinions.  Did you also look at Mr. Johnson's case specifically?  A.  Yes, I did.").  But as Dr. Sawyer admitted here, he copied and pasted into his MDL report over 40 pages of his *Johnson* report which addressed general causation.  Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 262:1-264:6 (agreeing that vast ranges of his *Johnson* report were nearly identical to his report in these cases).  These pages clearly address general-causation topics that the Court has already evaluated, such as the alleged carcinogenic substances in Roundup, routes of exposure in humans generally, in vitro dermal absorption of herbicides through rat versus human skin, pharmacokinetic studies of glyphosate, and factors that allegedly intensify dermal absorption of glyphosate in general.

Allowing Dr. Sawyer to introduce these opinions at this late stage would undermine this Court's decision to bifurcate discovery and contravene plaintiffs' own representations at the last CMC.  The Court should permit Dr. Sawyer to testify (if at all) only about whether Roundup caused a specific plaintiff's cancer.

### B.  Because Dr. Sawyer Has No Specific Causation Opinions As To Mr. Hardeman and Mr. Gebeyehou, He Should Not Be Allowed To Testify At Their Trials.

Plaintiffs' counsel and Dr. Sawyer have acknowledged that he has no specific causation opinion in the *Hardeman* and *Gebeyehou* cases.  In Plaintiffs' counsel's November 20, 2018 letter containing their Rule 26(a)(2) expert disclosures, Plaintiffs list Dr. Sawyer as offering specific causation opinions about only the Stevick case:  "Dr. Sawyer is providing an expert report for Plaintiffs Hardeman, Stevick and Gebeyehou relating to his general absorption opinions and an expert report relating to his specific causation opinions as they relate to Plaintiff Stevick."  Stekloff Decl. Ex. 1, 11/20/18 Letter from Pls.' Counsel at 4.  Dr. Sawyer's report does not mention "Hardeman" or "Gebeyehou" a single time, and unlike with Ms. Stevick, he

did not meet with either of these other two plaintiffs or do anything to learn about their medical histories.  Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 26:2-22.  Dr. Sawyer also confirmed at his deposition that he was offering specific-causation opinions for Ms. Stevick but was "not opin[ing] specifically as to the cause of cancer among those two other plaintiffs."  *Id.* at 23:5-14.  He added:  "I have no intent of rendering an opinion specific to those two plaintiffs [Hardeman and Gebeyehou] with respect to whether or not the exposures contracted [sic] to their development of NHL.  That's not -- not my opinion."  *Id.* at 23:17-20.

In light of these admissions, there can be no question that Dr. Sawyer has nothing besides general causation opinions to offer in the *Hardeman* and *Gebeyehou* cases.  The Court accordingly should preclude Dr. Sawyer from testifying in those cases.

## II.    The Court Should Exclude Dr. Sawyer's Analysis of Specific Causation As To Ms. Stevick.

At his deposition, Dr. Sawyer claimed—for the very first time—that he had conducted a "differential diagnosis" in concluding that Roundup was a substantial factor in causing Ms. Stevick's NHL.  His analysis does not resemble any valid application of that methodology.  He claims that Roundup should be "ruled in" as a cause for Ms. Stevick based solely on his analysis of epidemiological studies.  But Dr. Sawyer has admitted (repeatedly) that he lacks training or expertise in epidemiology.   And there is nothing "specific" about his causation analysis—it would deem Roundup to be a substantial factor for *any* individual exposed to a threshold amount of glyphosate.  As if to confirm the point, Dr. Sawyer did not analyze *any* of Ms. Stevick's other risk factors in his report, and has offered no valid scientific basis for ruling them out.  Dr. Sawyer's results-driven analysis is not a valid differential diagnosis.  It therefore should be excluded under *Daubert*.

### A.    Dr. Sawyer "Rules In" Roundup Based On His Say-So About Epidemiological Studies He Is Not Qualified To Assess.

Dr. Sawyer's sole basis for ruling in Roundup as a possible cause is his analysis of epidemiology studies, which, according to him, demonstrate that a person with Ms. Stevick's exposure metrics, calculated by Dr. Sawyer as 255 days over 25 years, is at increased risk of

- 8 -

developing NHL.  *See id.* at 198:15-199:10; Stekloff Decl. Ex. 2, Sawyer Rpt. at 120.  This analysis has several flaws that, taken alone or together, require exclusion.

*First*, Dr. Sawyer lacks the requisite expertise to draw conclusions from the epidemiological studies.  Dr. Sawyer based his exposure threshold on his analysis of those studies, but Dr. Sawyer is not an epidemiologist, nor does he consider himself an epidemiology expert.  Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 244:13-15.  In fact, when asked if he would be testifying to information in the epidemiology studies he cites, Dr. Sawyer testified: "None whatsoever except that the way dose was counted[.]"  *Id.* at 241:13-14.  He further acknowledged that he would defer to epidemiologists on virtually every aspect of his analysis, from the big-picture question of "the general causation of NHL supported by the epidemiologic literature," *id.* at 240:18-23, to other matters such as epidemiological study design; statistical analysis of epidemiological studies; results of epidemiological studies; and the validity of epidemiological studies, *see id.* at 241:24-242:15.  The Court should not allow Dr. Sawyer to opine on topics that exceed his expertise, which includes extracting alleged thresholds from studies he is not qualified to evaluate.  *See, e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science.")

*Second*, this epidemiology-based analysis could not in any event justify a finding that Roundup caused *a particular Plaintiff's* cancer.  This Court held as much at the general causation stage, observing that "[w]hether [an] agent *causes* the outcome, however, cannot be proven by epidemiological studies alone. . . ."  Stekloff Decl. Ex. 7, PTO 45, Summ. J. & Daubert Mots., at 13 (emphasis in original).  One of Plaintiffs' own experts confirms the point, agreeing that epidemiologists do not make "hard" conclusions about cause.  Stekloff Decl. Ex. 8, Weisenburger *Adams* Dep. Tr. 11/26/2018 41:19-42:4.  But that is effectively what Dr. Sawyer has done:  He has concluded that because Ms. Stevick allegedly was exposed to Roundup for a certain amount of time—that he concludes meets an exposure threshold

1  established by epidemiological studies—Roundup caused her NHL.  His report does not analyze

2  anything further about Ms. Stevick besides her exposure, nor does it provide any explanation

3  for how Roundup operated to cause her particular NHL.[3]  Moving from general causation (can

4  an agent cause cancer) to specific causation (did it cause the particular plaintiff's cancer)

5  requires more than just say-so—but that is all Dr. Sawyer has provided.

6  *Third*, while the foregoing points suffice to justify exclusion of Dr. Sawyer's threadbare

7  analysis, it is also important to note that his exposure calculations are flawed.  Dr. Sawyer used

8  the POEM model, a European regulatory formula used to estimate pesticide exposure.  But as

9  Dr. Sawyer admitted, POEM is designed to estimate pesticide exposure in pesticide spray

10  operators in the United Kingdom, and because it is a regulatory formula, it systematically

11  overestimates exposure.  Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 205:14-206:12.  Dr. Sawyer

12  further conceded that the model is not calibrated for glyphosate, *see* Stekloff Decl. Ex. 9, Sawyer

13  *Hall* Dep. Tr. 437:7-11 (agreeing that POEM was not based on glyphosate exposure), and was

14  instead created using a "surrogate chemical," *id.*, which is more easily absorbed and less readily

15  excreted than glyphosate, *cf.* Stekloff Decl. Ex. 10, 2015 IARC Monograph on glyphosate at 42-

16  46.[4]  Yet Dr. Sawyer offered no explanation for why it was appropriate to use POEM in this

17  case, with this Plaintiff, and with glyphosate.  *See, e.g.*, *O'Conner v. Commonwealth Edison*

18  *Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992) ("Rules of both science and evidence require a

19  scientist or an expert to have a verifiable scientific basis for his opinion.").

20  Dr. Sawyer also put the wrong inputs into some of his POEM calculations.  Dr. Sawyer

21  acknowledged that the validity of the formula's output depends on the validity of the formula's

22

---

23  [3] While Dr. Sawyer notes that certain studies allegedly show that Roundup can have a genotoxic
effect on human cells, he provides no justification for concluding that Roundup had this kind of

24  effect on Ms. Stevick, and no explanation for how any alleged genotoxic effect led to her
developing NHL.  Indeed, he admitted that his analysis of genotoxicity applies to all three

25  plaintiffs equally.  Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 193:23-194:7.  So here too, Dr.
Sawyer's analysis consists of general causation evidence combined with pure *ipse dixit*.

26  [4] IARC, *Some Organophosphate Insecticides and Herbicides, Monograph Vol. 112 on the*

27  *Evolution of Carcinogenic Risks to Humans* (2015), https://monographs.iarc.fr/wp-
content/uploads/2018/07/mono112.pdf.

28  *(Footnote continued)*

- 10 -

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF WILLIAM SAWYER
3:16-md-02741-VC & 3:16-cv-0525-VC, 3:16-cv-2341-VC, 3:16-cv-5813-VC

inputs.  *See* Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 207:8-15.  Yet in one version of his POEM

calculation, Dr. Sawyer inexplicably increased the glyphosate absorption value by more than

*three hundred percent*, Stekloff Decl. Ex. 2, Sawyer Rpt. at 19-20, relying on a screening study

in rat skin that was deemed unreliable by study investigators.[5]  He took this step despite

conceding that human skin data more closely approximates the human experience.  *See* Stekloff

Decl. Ex. 9, Sawyer *Hall* Dep. Tr. 446:22-447:10 (agreeing that human skin is often less

permeable than animal skin).[6]  This example helps highlight the fact that Dr. Sawyer's opinions

are results-driven, which is yet another basis for exclusion.  *See Daubert*, 509 U.S. at 594;

*O'Conner*, 807 F. Supp. at 1390; *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir.

1996) (affirming exclusion of expert testimony, noting that experts cannot pick and choose from

the scientific landscape).

### B.  Dr. Sawyer Provides No Valid Basis For "Ruling Out" Other Potential Causes Of Ms. Stevick's NHL.

Dr. Sawyer's putative analysis of other risk factors confirms that his specific causation

opinion is pure *ipse dixit*.  Part of conducting a differential diagnosis is "ruling out" other

possible causes.  *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003) (quoting

*Claar v. Burlington N.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)).  Here, it is undisputed that NHL

has several well-established risk factors, including ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

*See* Stekloff Decl. Ex. 11, Shustov *Hardeman* Rpt. at 4; Stekloff Decl. Ex. 12, Nabhan

*Gebeyehou* Dep. Tr. 19:25-20:17; Stekloff Decl. Ex. 13, Nabhan *Hardeman* Rpt. at 3; Stekloff

Decl. Ex. 14, Weisenburger *Hardeman* Dep. Tr. 90:7-12.  It is also undisputed that several of

these risk factors are present in Ms. Stevick's case, such as ████████████████████████

---

[5] Specifically, Dr. Sawyer used a 10 percent absorption value derived from the rat study instead of the POEM-default 3 percent absorption value. Stekloff Decl. Ex. 9, Sawyer *Hall* Dep. Tr. 444:21-445:12.

[6] Additionally, Dr. Sawyer relied on undocumented phone calls with Ms. Stevick for many inputs in his POEM calculation.  *See* Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 65:1-11, 220:9-18. These unverifiable phone calls do not appear in his expert report and were first mentioned in his deposition.

1    ████████  But Dr. Sawyer offers little to no analysis of any of these factors—indeed, he did not

2    analyze them *at all* in his report.

3        What's more, Dr. Sawyer did not offer any convincing explanation for ruling out these

4    factors when confronted with them at his deposition.  For example, Dr. Sawyer acknowledged

5    for the first time at his deposition that Ms. Stevick's ████ is a possible alternative cause of her

6    NHL.   *See* Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 192:24-193:3, 196:17-22.   But while

7    acknowledging this risk, Dr. Sawyer simply said it could not overcome her exposure to

8    Roundup, without providing any further explanation for that determination.  This failure to

9    explain *why* he can attribute Ms. Stevick's NHL to Roundup use and not ████████ factors

10   renders his methodology unreliable.  *See Clausen*, 339 F.3d at 1058 ("[T]he elimination of

11   [alternative cause] hypotheses must be founded on more than 'subjective beliefs or unsupported

12   speculation.'" (quoting *Claar*, 29 F.3d at 502)).

13       Dr. Sawyer's analysis of the other possible risk factors fares no better.  He acknowledges

14   in his report that Ms. Stevick was exposed to ████████ as part of her work as a speech therapist,

15   Sawyer Rpt. at 14, and that ██████ is a known risk factor for diffuse large B-cell lymphoma

16   ("DLBCL"), the umbrella term for the subtype of NHL that Ms. Stevick has.  Stekloff Decl. Ex.

17   3, Sawyer Dep. Tr. 84:24-85:7.  But he eliminated it as a cause at his deposition based only on

18   unidentified and as-yet-unproduced "studies of nurses and dental assistants."  *Id.* at 119:24-

19   120:19.  It is also undisputed that Ms. Stevick was exposed to various ████████████

20   ████████████████ which Dr. Sawyer admits are known risk factors for DLBCL.  *Id.* at

21   85:12-22, 87:14-17, 108:1-110:8.  But Dr. Sawyer ruled out these potential causes at his

22   deposition without doing any calculations to quantify Ms. Stevick's cumulative exposure to ████

23   ██████  *Id.* at 113:18-114:1, 117:12-21.  If Dr. Sawyer ruled in Roundup based on exposure

24   calculations, it is impossible to understand how he could rule out other possible ████████

25   without performing any similar calculations.  Such inconsistent methodology cannot be relayed

26   to a jury consistent with *Daubert*.

27

28

1    Finally, Dr. Sawyer fails to account for the fact that in the majority of NHL and DLBCL

2    cases, the cause is unknown.  *See* Stekloff Decl. Ex. 15, Nabhan *Adams* Dep. Tr. 68:22-69:2;

3    Stekloff Decl. Ex. 16, Shustov *Hardeman* Dep. Tr. 58:10-11; Stekloff Decl. Ex. 8, Weisenburger

4    *Adams* Dep. Tr. 56:18-24.  Dr. Sawyer admits that NHL and DLBCL happens in people who

5    were never exposed to Roundup.  Sawyer Dep. Tr. 196:6-16; *accord* Stekloff Decl. Ex. 15,

6    Nabhan *Adams* Dep. Tr. 191:7-10; Stekloff Decl. Ex. 17, Weisenburger *Stevick* Dep. Tr. 75:16-

7    20.  He also acknowledged at his deposition that he cannot completely rule out idiopathic causes

8    for Ms. Stevick's NHL, and would ultimately defer to epidemiologists for that determination.

9    Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 197:7-13, 198:15-199:25.  Indeed, in the earlier *Hall* case,

10   Dr. Sawyer declined to present a specific causation opinion at least in part because he was not

11   the person to provide an assessment of potential unknown causes.  *See* Stekloff Decl. Ex. 9,

12   Sawyer *Hall* Dep. Tr. 480:24-481:5 ("Q.  Okay.  And so you're not going to tell the jury that

13   you have conducted some evaluation to rule out an idiopathic cause of Mr. Hall's non-Hodgkin's

14   lymphoma?  A.  That's correct.  I'm not the person to provide the idiopathic assessment.  That

15   would be the oncologist.").  Here, he has blown through that previously self-imposed limitation

16   based solely on the odds ratios present in the epidemiological studies (which, again, he has

17   admitted to being unqualified to assess).  That is not a reliable scientific method.[7]

18       Because Dr. Sawyer's analysis is a differential diagnosis in name only, and is not

19   otherwise the product of any valid and accepted scientific method, it should be excluded.

20   **III.    The Court Should Exclude Dr. Sawyer's Remaining Opinions.**

21       The Court should also preclude the remaining portions of Dr. Sawyer's analysis.  There

22   is no basis for allowing Dr. Sawyer to offer any opinion regarding Monsanto's documents,

23   ───────────

[7] Dr. Sawyer's methodology should be excluded for one further reason.  Where, as here, the
24   causes of a disease are largely unknown, a differential diagnosis is "of little benefit."  Federal
Judicial Center's Reference Manual on Scientific Evidence, p. 618; *see also* Restatement (Third)
25   of Torts § 28 (2010) ("When the causes of a disease are largely unknown . . . differential etiology
is of little assistance.").  In such cases, an expert cannot reliably employ a differential diagnosis
26   to determine that the plaintiff's exposure to a substance caused her illness.  *See, e.g., Hall v.
Conoco Inc.*, 886 F.3d 1308, 1314 (10th Cir. 2018) (concluding that "because the evidence had
27   pointed to idiopathic causes in most cases of acute myeloid leukemia," "the district court could
reasonably view the failure to rule out idiopathic causes as a fatal error tainting the differential
28   diagnosis").

conduct, or intent.  Dr. Sawyer agreed at his deposition that he was not qualified to offer an expert opinion on such topics.  *See* Stekloff Decl. Ex. 3, Sawyer Dep. Tr. 264:13-266:18. Indeed, he went so far as to physically cross out portions of his expert report related to corporate intent, said that he would do the same for any other such portions of his report that were brought to his attention, and testified that he would not be offering opinions of that kind at trial in this litigation. *Id.* at 269:25-274:10.  To the extent that any opinions regarding Monsanto's corporate intent have not been excised from Dr. Sawyer's report, or to the extent Dr. Sawyer might be inclined to testify about such topics at trial, those opinions should be struck.

Moreover, Dr. Sawyer should be precluded from offering opinions regarding what might constitute "reasonable conclusion[s]" that the "jury could come to after reviewing the e-mails" that Dr. Sawyer cited in his report, or from attempting to relay to the jury his "expertise on just some of the technical terms of those e-mails." *Id.* at 278:17-22.  Jury inferences are for the jury to make.  Dr. Sawyer's interpretations of those emails in the first instance are, if anything, *less* admissible than his speculation about what the authors of those emails intended.

Finally, the Court should also exclude Dr. Sawyer's untimely rebuttal opinions. Monsanto served its expert reports—including the report of its exposure expert, Dr. Michael J. Sullivan—on Plaintiffs on November 27, 2018.  This Court's Pre-Trial Order No. 53 specified that rebuttal reports were due on or before December 4, 2018.  To this day, Dr. Sawyer has not produced any rebuttal report.  At his deposition, however, Dr. Sawyer attempted to offer testimony rebutting Dr. Sullivan's conclusions.  He testified that he had developed, though not disclosed, expert opinions regarding Dr. Sullivan's report and methodology, and that he intended to offer those opinions in this case.  *See id.* at 10:15-11:17, 19:14-20, 27:21-28:6.  Dr. Sawyer also indicated that he had changed at least one of the inputs to his POEM exposure calculation to better match the inputs used by Dr. Sullivan.  *See id.* at 189:9-17, 204:1-13, 205:3-207:3 ("Sullivan used 50 so I thought it might be wise for the comparison of his dose versus mine since 50 is a reasonable weight to use . . . and I could make a better comparison with his result.").

1    As a general matter, an expert may not modify his opinion solely so that it will be better

2    suited to litigation. *See, e.g.*, *Daubert, Inc.*, 509 U.S. at 590 (holding that admissible scientific

3    knowledge "must be derived by the scientific method"); *Lust*, 89 F.3d at 597 (affirming

4    exclusion of expert opinion because expert was "a professional plaintiff's witness" and his

5    litigation-motivated opinion lacked an objective source).  But even where an expert seeks to

6    modify his opinion for a proper scientific purpose, he must do so in a timely fashion. *See Avila*,

7    633 F.3d at 835-36 (affirming district court's decision to strike Dr. Sawyer's untimely

8    declaration because the late opinions contained therein "could and should have been furnished

9    by the deadline").  Dr. Sawyer should not be permitted to disregard this Court's orders in

10   contravention of Ninth Circuit law.  All of his opinions purporting to respond to Dr. Sullivan's

11   opinions should be precluded.

12   **CONCLUSION**

13   For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude

14   Testimony of Dr. William R. Sawyer.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   DATED: January 3, 2019                    Respectfully submitted,

2                                             /s/ Brian L. Stekloff

3                                             Brian L. Stekloff (*pro hac vice*)
                                              (bstekloff@wilkinsonwalsh.com)
4                                             Rakesh Kilaru (*pro hac vice*)
                                              (rkilaru@wilkinsonwalsh.com)
5                                             WILKINSON WALSH + ESKOVITZ LLP
                                              2001 M St. NW, 10th Floor
6                                             Washington, DC 20036
                                              Tel: 202-847-4030
7                                             Fax: 202-847-4005

8
                                              Pamela Yates (CA Bar No. 137440)
9                                             (Pamela.Yates@arnoldporter.com)
                                              ARNOLD & PORTER KAYE SCHOLER
10                                            777 South Figueroa St., 44th Floor
                                              Los Angeles, CA 90017
11                                            Tel: 213-243-4178
                                              Fax: 213-243-4199
12

13                                            Eric G. Lasker (*pro hac vice*)
                                              (elasker@hollingsworthllp.com)
14                                            HOLLINGSWORTH LLP
                                              1350 I St. NW
15                                            Washington, DC 20005
                                              Tel: 202-898-5843
16                                            Fax: 202-682-1639

17
                                              Michael X. Imbroscio (*pro hac vice*)
18                                            (mimbroscio@cov.com)
                                              COVINGTON & BURLING LLP
19                                            One City Center
                                              850 10th St. NW
20                                            Washington, DC 20001
                                              Tel: 202-662-6000
21

22                                            Attorneys for Defendant
                                              MONSANTO COMPANY
23

24

25

26

27

28
                                   - 16 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of January 2019, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Brian L. Stekloff_____