# EXHIBIT 8

Page 1

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY

STATE OF MISSOURI

JAMES ADAMS JR., et al.,        )
                                )
          Plaintiffs,           )
                                )
VS.                             )
                                ) Case No. 17SL-CC02721
MONSANTO COMPANY,               )
                                )
                                )
          Defendant.            )
_____ )

VIDEOTAPED DEPOSITION OF

DENNIS D. WEISENBURGER, M.D.

Monday, November 26, 2018

Monrovia, California

REPORTED BY:

GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 2

1  IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
2  STATE OF MISSOURI
3
   JAMES ADAMS JR., et al.,        )
4                                  )
       Plaintiffs,      )
5                                  )
   VS.                  )
6                       ) Case No. 17SL-CC02721
   MONSANTO COMPANY,              )
7                       )
8      Defendant.       )
   _____  )
9
10
11
12
13      Videotaped Deposition of DENNIS D.
14  WEISENBURGER, M.D., taken on behalf of Defendant,
15  at 700 Huntington Drive, Monrovia, California,
16  beginning at 9:03 a.m. and ending at 2:57 p.m., on
17  Monday, November 26, 2018, before GRACE CHUNG, CSR
18  No. 6246, RMR, CRR, CLR.
19
20
21
22
23
24
25

Page 3

1
2      A P P E A R A N C E S
3
   For the Plaintiffs:
4
   ANDRUS WAGSTAFF
5  BY: R. BRENT WISNER, ESQ.
      (Appearing on behalf of Andrus Wagstaff)
6  7171 W. Alaska Drive
   Lakewood, Colorado 80226
7  (866) 795-9529
8
9  For the Defendants:
10 WILKINSON WALSH & ESKOVITZ
   BY:  BRIAN L. STEKLOFF, ESQ.
11     KIRSTEN NELSON, ESQ.
   2001 M Street, NW
12 10th Floor
   Washington, DC 20036
13 (202) 847-4030
   bstekloff@wilkinsonwalsh.com
14
15
   Also Present:  DAVID JOHNSTON, Videographer
16
17
18
19
20
21
22
23
24
25

Page 4

1           INDEX
2  WITNESS  EXAMINATION            PAGE
3  DENNIS D. WEISENBURGER, M.D.
4     BY MR. STEKLOFF              6
5     BY MR. WISNER              177
6     BY MR. STEKLOFF            209
7     BY MR. WISNER              217
8     BY MR. STEKLOFF            225
9     BY MR. WISNER              227
10    BY MR. STEKLOFF            227
11    BY MR. WISNER              229
12
13        EXHIBITS
14 NO.      DESCRIPTION          PAGE
15 Exhibit 1  Plaintiff's Expert Witness    11
           Disclosure
16
   Exhibit 2  Curriculum Vitae        14
17
   Exhibit 3  Curriculum Vitae        15
18
   Exhibit 4  Abstract              39
19
   Exhibit 5  Handwritten notes      58
20
   Exhibit 6  Letter dated March 29, 2016    165
21
   Exhibit 7  Web page on Lymphoma from City of    181
22           Hope
23
24
25

Page 5

1           Monrovia, California
2           Monday, November 26, 2018
3               9:02 a.m.
4
5      THE VIDEOGRAPHER:  This is the videotaped
6  deposition of Dennis D. Weisenburger, MD.  Today's
7  date is November 26, 2018.  And the time on the
8  video monitor is 9:03 a.m.  This is the case of
9  James Adams, Jr., et al., versus Monsanto Company,
10 Case Number 17SL-CC02721.  The case is pending in
11 the Circuit Court of St. Louis, County -- State of
12 Missouri.
13      My name is David Johnston, and I am
14 representing Paszkiewicz Court Reporting.  The court
15 reporter is Grace Chung, also representing
16 Paszkiewicz Court Reporting.  This deposition is
17 taking place at Courtyard by Marriott, 700 Huntington
18 Drive, Monrovia, California 91016.
19      Would counsel please state your
20 appearances.
21      MR. WISNER:  Brent Wisner on behalf of the
22 plaintiff.
23      MR. STEKLOFF:  Brian Stekloff on behalf of
24 Monsanto.
25      MS. NELSON:  Kirsten Nelson on behalf of

2  (Pages 2 to 5)

Dennis D. Weisenburger, M.D.
November 26, 2018

## Page 6

1  Monsanto.
2        THE VIDEOGRAPHER:  The court reporter will
3  now swear in the witness.
4        DENNIS D. WEISENBURGER, M.D.,
5     having been first duly sworn, was examined
6        and testified as follows:
7
8              EXAMINATION
9  BY MR. STEKLOFF:
10     Q.  Good morning.  Dr. Weisenburger.
11     A.  Good morning.
12     Q.  As I just said, my name is Brian Stekloff,
13  on behalf of Monsanto.  We just met for the first
14  time this morning; right?
15     A.  That's correct.
16     Q.  And you've been deposed before; correct?
17     A.  Yes.
18     Q.  So I won't belabor the background rules,
19  but a couple of things.  First of all, if you need
20  a break, as long as there is not a question
21  pending, just let me know; we can take a break at
22  any time.
23     A.  Okay.
24     Q.  And second, if you answer a question, can
25  I assume that you understand the question?

## Page 7

1     A.  Yes.
2     Q.  Okay.  You'll let me know if you don't
3  understand something that I ask?
4     A.  Yes.
5        MR. WISNER:  Mr. Stekloff, I just want to
6  note for the record that we designate the entirety
7  of this deposition confidential as it will involve
8  discussion of medical records and information
9  related to our client.
10        MR. STEKLOFF:  Got it.
11     Q.  Now, I wanted to ask first about your
12  retention in the litigation.  Do you recall when
13  you were first retained generally in the
14  glyphosate/Roundup litigation?
15     A.  It was 2015, I believe.
16     Q.  And who retained you?  Or let me ask a
17  different question.  Who first contacted you to see
18  whether you would become part of litigation?
19     A.  I think it was Kathryn Forgie.
20     Q.  Okay.  And when you were retained, I think
21  I have seen that you -- your billing rate is $500
22  per hour; is that right?
23     A.  Yes.
24     Q.  And then, do you charge $5,000 for any day
25  on which you are testifying in court or in a

## Page 8

1  deposition?
2     A.  Yes.
3     Q.  So your rate today is $5,000?
4     A.  Yes.
5     Q.  Regardless of how long I go?
6     A.  Yes.
7     Q.  I will try to go less than seven hours.
8  And I don't have -- this doesn't mean that you
9  haven't produced them, but I don't have any
10  invoices from your work generally in the
11  litigation.  So I wanted to get a sense --
12  approximation is fine -- of how much time you've
13  spent in the litigation.
14        I know you did -- this is not a speech, but
15  I know you did work in the general causation context
16  in front of Judge Chhabria.  And then -- so I just
17  want to get a sense, overall, of how much work you've
18  done.  So however you want, is there any way you can
19  approximate work --
20        MR. WISNER:  Objection to form.
21     A.  I've been paid over $300,000.
22  BY MR. STEKLOFF:
23     Q.  Since 2015.  Okay.
24        And to categorize the work you've done,
25  you've done the general causation work in the MDL in

## Page 9

1  front of Judge Chhabria; correct?
2     A.  That's correct.
3     Q.  Including your reports there and the
4  depositions and your testimony at the Daubert
5  hearing?
6     A.  Yes.
7     Q.  And then you've reviewed, at least,
8  Ms. Gordon's case, and then Mr. Hardeman, Mr.
9  Stevick, and Mr. Gebeyehou in this case; is that
10  correct?
11     A.  Yeah, Mrs. Stevick.  But those are the
12  four cases, yes.
13     Q.  So that -- is that the totality of the
14  work that you've done to --
15     A.  Yes.
16     Q.  -- charge $300,000?
17     A.  Yes.
18     Q.  In Ms. Gordon's case, can you approximate
19  how much -- how many hours you have
20  spent specifically on her case?
21     A.  Over 50 hours.
22  ▪ █████████████████████████████████
   ▪ ██████████████████████████████
   ▪ ████████████████████████████████████
   ▪ █

3 (Pages 6 to 9)

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 10

Page 11

THE REPORTER: Yes, that will help.
BY MR. STEKLOFF:
4
5
6    Q.  Agreed.  Now, let me hand you your -- I'm
7  going to mark -- first of all, I'm going to mark
8  the expert disclosure.  I'm marking as Exhibit 1 an
9  expert -- plaintiff's expert witness disclosure in
10  Ms. Gordon's case.
11          (Deposition Exhibit 1 was marked for
12          identification by the reporter and is
13          attached hereto.)
14  BY MR. STEKLOFF:
15     Q.  Have you seen this document before?
16     A.  Yes, I have.
17     Q.  And if you turn to the bottom of page 3,
18  you are listed as an expert, and it goes on to the
19  top of page 4.  Do you see that?
20     A.  Yes.
21     Q.  And it says that -- if you start in the
22  third line, it says "In addition to his testimony
23  in the area of general causation," and then there
24  is a parenthetical that says "Consistent with his
25  previous expert reports, deposition testimony on

Page 12

1  September 11th, 2017, and January 22nd, 2018, and
2  his Daubert hearing testimony given in MDL 2741 on
3  March 5th through 6th, 2018."  And I want to pause
4  there.
5          Are you offering any additional opinions on
6  general causation that you have not testified about
7  at either the depositions or at the Daubert hearing?
8     A.  No.
9     Q.  And you stand by, I assume, all the
10  opinions that you offered previously?
11     A.  Yes, I do.
12     Q.  And you stand by the testimony that you
13  gave previously?
14     A.  Yes.
15     Q.  And do you have any corrections to any of
16  the testimony that you gave, either at the
17  September 11th, 2017, January 22nd, 2018,
18  depositions, or at the Daubert hearing?
19     A.  I don't believe so.  I mean, I made some
20  corrections to my depositions, which I submitted.
21  There were a few errors in the Daubert testimony.
22  I never did have an opportunity to review those.  I
23  don't know whether I should have or not, but they
24  weren't substantial.
25     Q.  Do you recall any of the errors that

Page 13

1  you --
2     A.  I don't.
3     Q.  Okay.  It's normal not to be able to
4  review Daubert testimony.  It's not -- and have an
5  errata issue.
6          So I don't want to spend a lot of time on
7  general causation today.  Is it fair to say that the
8  scope of the general causation testimony that you
9  would offer in Ms. Gordon's case is consistent with
10  the testimony you've previously offered in your
11  depositions and at the Daubert hearing?
12     A.  Yes.
13     Q.  Now, if we go back to the sentence, it
14  says that you will also testify in the area of
15  specific causation and other case-specific matters.
16  Do you see that?
17     A.  Yes.

4  (Pages 10 to 13)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 14



8          Q.   You can put that aside.
9               Now, I would like to mark as Exhibit 2 at
10   least the most recent copy of your CV that I have.
11          (Deposition Exhibit 2 was marked for
12          identification by the reporter and is
13          attached hereto.)
14   BY MR. STEKLOFF:
15          Q.   And this, Dr. Weisenburger, is dated
16   April 14th, 2017.  Do you see that?
17          A.   Correct.
18          Q.   Is this the most recent copy of your CV?
19          A.   No.
20          Q.   What is the most recent copy of your CV?
21          A.   I submitted it a couple of weeks ago, a
22   more recent copy.
23               MR. WISNER:  Yeah, you should have
24   received that in our -- actually, I have a copy of
25   it --

Page 15

1               MR. STEKLOFF:  Oh, you do?
2               MR. WISNER:  -- if you want.  Let's mark
3    it.
4               MR. STEKLOFF:  Sure.  It may have come
5    over with the most recent MDL reports.
6               MR. WISNER:  That's right.
7               MR. STEKLOFF:  I think this one came from
8    the Gordon reports.
9               I will mark it as Exhibit 3, if that's
10   okay, and I will just give it to you,
11   Dr. Weisenburger, your most recent CV.
12          (Deposition Exhibit 3 was marked for
13          identification by the reporter and is
14          attached hereto.)
15               MR. STEKLOFF:  It's a bit thicker.
16               MR. WISNER:  It's not double-sided.
17   BY MR. STEKLOFF:
18          Q.   Do you -- I mean, first of all, do you
19   know what -- if there were any -- not minor
20   changes, but significant changes between the 2017
21   version and this version?
22          A.   Not with regard to this case.
23          Q.   No new publications that are relevant to
24   this case?
25          A.   No.

Page 16

1          Q.   No work in any organizations that would be
2    relevant to this case?
3          A.   No.
4          Q.   No changes in your responsibilities at
5    City of Hope?
6          A.   So I just recently stepped down as chair.
7    So -- but I'm still on the faculty there.
8          Q.   I just wanted to talk to you about that,
9    your work and not you stepping down as chair.
10              So when did you first start at City of
11   Hope?
12         A.   September 2012.
13         Q.   And can you describe your responsibilities
14   from September 2012 until you -- your recent change
15   in position?
16         A.   So I was the chairman of the Department of
17   Pathology.  So the majority of my responsibilities
18   were administrative in terms of just running the
19   department.  I was in charge of all of the clinical
20   laboratories there.  So I oversaw a faculty of
21   about 20, 25 MDs and Ph.D.s in a department of over
22   300 people.
23              And then a lesser role was actually
24   looking at slides and diagnosing disease in my role
25   as a pathologist.

Page 17

1          Q.   So what percentage of your time in an
2    average week would you say was administrative, as
3    you have described it?
4          A.   Oh, probably 80 percent.
5          Q.   And then what made up the other 20
6    percent?
7          A.   Doing diagnostic work or reviewing cases
8    or teaching.
9          Q.   And when you say "diagnostic work," is --
10   was that in a research capacity or in a clinical
11   capacity?
12         A.   Mainly clinical capacity.
13         Q.   So what would cause -- what would have
14   caused a case of an active patient to be brought to
15   your attention?
16         A.   So I was actually the responsible
17   physician some weeks for reviewing and assigning
18   cases and making the diagnoses.  And then other
19   weeks, I would see cases in consultation from my
20   other pathologists, or I would see them in a daily
21   slide conference where we would review cases.
22         Q.   When you say "other physicians," when you
23   said -- when you used that number 20 to 25, was
24   that 20 to 25 pathologists who were MD -- actively
25   treating patients at City of Hope?

5 (Pages 14 to 17)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 18

1    A.  Pathologists and Ph.D.s, but over 20
2  pathologists.
3    Q.  And there were -- of those 20
4  pathologists, not every single one was generally
5  much more on the clinical side?
6    A.  Yes.
7    Q.  What percentage, if any, would you say
8  that you -- your work from this period,
9  September 2012 until recently, was related to
10  research?
11    A.  Oh, probably 10 percent, 10 to 15 percent.
12    Q.  And was that research at City of Hope or
13  outside of City of Hope?
14    A.  Some at City of Hope, some finishing up
15  research from my previous place of work, and then
16  some national, international collaborations.  So
17  it's a variety of sources.
18    Q.  Okay.  And we will talk about some of that
19  work, I think.  But if we just break it down, at
20  City of Hope, did you do any research -- within
21  your work at City of Hope, were you doing any
22  research that related to this litigation?
23    A.  No.
24    Q.  I assume when you are talking about
25  wrapping up some of your prior research, that's

Page 19

1  your research in Nebraska and the NAPP work?
2    A.  Yes.
3    Q.  And then the third bucket, I think you
4  said, was some national and international
5  organizations?
6    A.  Yes.  So there is a couple of
7  collaborative groups.  One is called InterLymph,
8  which is a group of epidemiologists and some
9  researchers who are mainly trying to better
10  understand the epidemiology and the causes of
11  lymphoma.  I've been in that group for many years.
12    And then there is another group called --
13  it's called LLMPP.  It's leukemia and lymphoma
14  research group.  And we do work on more basic and
15  translational research on, you know, better
16  characterizing the biology and the genetics of
17  various types of lymphoma.  So it's a different kind
18  of research.
19    Q.  So with respect to InterLymph, does
20  that -- any of that work that you've done relate to
21  glyphosate or Roundup?
22    A.  It hasn't, no.
23    Q.  And with respect to LLMPP, has any of that
24  work related to glyphosate or Roundup?
25    A.  No.

Page 20

1    Q.  Have you gone to the epidemiologists and
2  other doctors associated with InterLymph and told
3  them that you believe that glyphosate is a cause of
4  non-Hodgkin's lymphoma?
5    A.  No.
6    Q.  Have you gone to the researchers at LLMPP
7  and told them that you think glyphosate is a cause
8  of non-Hodgkin's lymphoma?
9    A.  No.
10    Q.  Do you think it's important for the
11  members of InterLymph to understand what you know
12  about glyphosate?
13    A.  It would be important.  The issue with
14  InterLymph is that they don't really have many
15  studies that look at pesticides.  So they are
16  studying at other factors, dietary factors.  They
17  are studying other more typical things that
18  epidemiologists study.
19    Q.  And they are associated with the National
20  Cancer Institute, InterLymph?
21    A.  No, not really.  They were -- they were
22  people from the National Cancer Institute who
23  started it and still participate in it, but it's
24  really -- it's really an independent organization.
25    Q.  Do you respect the National Cancer

Page 21

1  Institute?
2    A.  Yes.
3    Q.  You believe that it's an elite
4  institute in order --
5    MR. WISNER:  Objection.
6  BY MR. STEKLOFF:
7    Q.  -- to try and address cancer?
8    MR. WISNER:  Objection.  Vague.
9    A.  Yes.
10  BY MR. STEKLOFF:
11    Q.  And do you respect the researchers and
12  doctors who you've worked with, who are associated
13  the National Cancer Institute?
14    A.  Yes.
15    Q.  Do you respect the doctors and researchers
16  who were part of the 2018 agricultural health
17  study?
18    A.  Yes.
19    Q.  And do you think that they had good
20  intentions in publishing that study?
21    MR. WISNER:  Objection.  Speculation.
22    A.  I don't know what their intentions were.
23  BY MR. STEKLOFF:
24    Q.  Do you have any reason to question their
25  intentions?

6 (Pages 18 to 21)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 22

1      A.  No.
2      Q.  Do you think that they were trying to add
3  independent research to the volume of research out
4  there about glyphosate?
5          MR. WISNER:  Objection.  Speculation.
6      **A.  I think they were trying to publish their**
7  **paper.**
8  BY MR. STEKLOFF:
9      Q.  Okay.  And do you think that that
10  publication -- sorry -- that paper was worthy of
11  publication?
12      **A.  I think -- I think the paper is**
13  **misleading, and I don't object to it being**
14  **published, but I think it's misleading.  I will say**
15  **that.**
16      Q.  Do you think it's intentionally
17  misleading?
18          MR. WISNER:  Objection.  Speculation.
19      **A.  I don't know the answer to that.**
20  BY MR. STEKLOFF:
21      Q.  Sitting here, you don't have a reason to
22  believe that the authors of that paper were
23  intentionally trying to mislead the medical and
24  research communities?
25          MR. WISNER:  Objection.  Speculation.

Page 23

1      **A.  Probably not, but I don't know the answer**
2  **to that.  I'm just speculating.**
3  BY MR. STEKLOFF:
4      Q.  Well, you have criticisms of the paper;
5  right?
6      **A.  Yes.**
7      Q.  But you have criticisms of many papers
8  that are published; correct?
9      **A.  Yes.**
10      Q.  You probably could critique papers that --
11  you've received critiques of papers that you
12  published; right?
13      **A.  True.**
14      Q.  And that doesn't mean you always agree,
15  but one of the valuable things about publishing
16  scientific literature is that it allows for debate
17  and to see if consensus can be reached?
18      **A.  That's correct.**
19      Q.  And agricultural health study is an
20  important part of the debate?
21      **A.  Yes.**
22      Q.  Okay.  Now, as part of your work -- going
23  back to your work at City Hope pre -- we'll get to
24  your recent change in position, but I want to focus
25  on that period 2012 to 2018.

Page 24

1          Did you ever tell the pathologists that
2  you were responsible for -- that you were
3  overseeing -- that you believe glyphosate is a
4  cause of NHL?
5      **A.  No.**
6      Q.  And there is nothing prohibiting you from
7  doing that; right?
8      **A.  No.**
9      Q.  And so you never told the doctors, the
10  pathologists, that you were overseeing that they
11  should consider factoring in glyphosate or Roundup
12  exposure in their clinical work?
13      **A.  No.**
14      Q.  You never told -- you also work with
15  oncologists at City of Hope; correct?
16      **A.  Yes.**
17      Q.  And they also are an important part of
18  diagnosing and treating patients with NHL; correct?
19      **A.  Yes.**
20      Q.  And there are a large number of patients
21  who come to City of Hope who have NHL; correct?
22      **A.  Yes.**
23      Q.  It's an elite cancer institute in the
24  country?
25      **A.  Yes.**

Page 25

1      Q.  And you have never gone to oncologists at
2  City of Hope and have told them that you believe
3  that glyphosate causes cancer; correct?
4      **A.  I have not.**
5      Q.  You have never gone to any oncologist at
6  City of Hope and told him or her that you think he
7  should assess his or her patients' Roundup or
8  glyphosate exposure in trying to treat NHL;
9  correct?
10      **A.  I have not.**
11          MR. WISNER:  Objection.
12  BY MR. STEKLOFF:
13      Q.  You have never gone to any oncologist or
14  pathologist at City of Hope and told him or her
15  that you think he should tell his or her patient to
16  stop using glyphosate or Roundup if he or she is
17  diagnosed with NHL; correct?
18      **A.  I have not.**
19          MR. WISNER:  Objection.
20  BY MR. STEKLOFF:
21      Q.  So to summarize, you've never gone to any
22  of the elite doctors at City of Hope who are
23  dealing with NHL on a daily basis to tell them that
24  they should factor in glyphosate or Roundup use in
25  treating their patients; correct?

7 (Pages 22 to 25)

Page 26

1          MR. WISNER: Objection.
2          **A. It wouldn't have any effect on their**
3   **treatment of patients because the patients already**
4   **have the disease. So it really wouldn't have any**
5   **effect on what they would do with the patient, how**
6   **they would treat the patient.**
7   BY MR. STEKLOFF:
8          Q. I'm going to come back to that answer, but
9   just to -- if you can give a yes-or-no question
10  [sic]. I'm not making any demands. Just listen to
11  my questions -- you can see that -- and I will come
12  back to the answer you just gave.
13         So my question is: You've never gone to
14  any of the elite doctors at City of Hope who deal
15  with NHL on a daily basis to tell them that they
16  should factor in glyphosate or Roundup use in
17  treating their patients; correct?
18         MR. WISNER: Objection. Asked and
19  answered. Give the same answer.
20         **A. I have not.**
21  BY MR. STEKLOFF:
22         Q. Now, going back to your previous answer,
23  you said that it wouldn't have any -- the reason
24  you have never done that is it wouldn't have any
25  effect on the treatment -- on their treatment of

Page 27

1   patients; correct?
2          **A. Correct.**
3          Q. You don't think that oncologists around
4   the country would want to know that glyphosate
5   caused their patient's cancer, if that were true?
6          MR. WISNER: Objection. Misstates his
7   testimony.
8          **A. Yes, but that's not my role.**
9   BY MR. STEKLOFF:
10         Q. Okay. You don't see that as your role, to
11  help them --
12         **A. No.**
13         Q. Help educate them about that?
14         **A. No.**
15         Q. You didn't see that as your role when you
16  were the chairman of pathology at City of Hope?
17         **A. No.**
18         Q. And you don't -- and you don't think it's
19  relevant -- well, let me ask this -- strike that.
20         Do you think that patients who are
21  diagnosed with NHL who are using Roundup should stop
22  using Roundup?
23         **A. Yes.**
24         Q. Why?
25         **A. Well, because in many cases, it's probably**

Page 28

1   the cause of their NHL. So I guess it would make
2   sense, but, you know, in my role as a pathologist,
3   I don't have direct contact with the patients. I
4   don't know which patients might have used Roundup
5   and which hadn't.
6          And I would say probably many of the
7   patients who come to City of Hope have never used
8   Roundup. So it probably -- it probably would not
9   be something that the physicians would be really
10  interested in telling their patients.
11         You know, it's -- oncologists and
12  hematologists usually do take some time to try to
13  understand what caused a lymphoma or another kind
14  of cancer, but once the patients have the lymphoma,
15  they pretty much move on to, how do I treat it, how
16  do I cure the patient, that sort of thing. So --
17  yeah, that's my answer.
18         Q. Well, if doctors know the cause, that
19  might help them in treating their patients' NHL;
20  correct?
21         **A. I don't think it would help them in**
22  **treating the patients.**
23         Q. Well, what are some other causes of cancer
24  that you deal -- it doesn't have to be NHL --
25  cancer that you deal with at City of Hope?

Page 29

1          **A. Smoking.**
2          Q. Okay. If the patient is diagnosed with
3   lung cancer, do oncologists like to tell the
4   patients to stop smoking?
5          **A. They do, but it doesn't usually do any**
6   **good.**
7          Q. Okay. But they still want to know --
8   right? -- whether their patient was smoking --
9          **A. Yes.**
10         Q. -- and whether they are still smoking?
11         **A. Yes.**
12         Q. What are some other -- what's another
13  example?
14         **A. Oh, some bacterial infections.**
15         Q. And do doctors, if they think that that's
16  the cause of the cancer, want to treat the
17  bacterial infection?
18         **A. Yes.**
19         Q. So do you think the same general rule
20  holds true with respect to glyphosate or Roundup if
21  a patient, who you believe that their NHL was
22  caused by Roundup or glyphosate exposure, do you
23  think that a doctor would want to know if they were
24  still using Roundup or glyphosate?
25         MR. WISNER: Objection. Speculation as to

8 (Pages 26 to 29)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 30

1  what the doctor would want.
2      **A.  Yeah, I don't know what they would want to**
3  **know.  I think most of them really -- they really**
4  **wouldn't care, and it wouldn't affect the treatment**
5  **of the patients.  So they are focused on treating**
6  **the patient who already has the disease.**
7  BY MR. STEKLOFF:
8      Q.  Now, you said that probably many of the
9  patients who come to City of Hope have never used
10  Roundup.  Do you have any idea what percentage of
11  patients who come to City of Hope have used
12  Roundup?
13      A.  No.
14      Q.  You have no idea one way or the other?
15      A.  No.
16      Q.  Can't even approximate?
17      A.  No.
18      Q.  And you also said that you, as a
19  pathologist, don't have direct contact with the
20  patients; correct?
21      A.  That's correct.
22      Q.  But you do have direct contact with
23  oncologists; correct?
24      **A.  Yes, yes.**
25      Q.  And in treating a patient, when you are

Page 31

1  involved in the diagnosis as a pathologist, you
2  often interact with the oncologist; correct?
3      **A.  Yes.**
4      Q.  And the oncologists are the ones, with
5  patients who have NHL, who are directly interacting
6  with the patients; correct?
7      **A.  Yes.**
8      Q.  And so it's fair to say, to the best of
9  your knowledge, doctors at City of Hope who are
10  diagnosing and treating NHL don't ask their
11  patients whether they have been exposed to
12  glyphosate or Roundup; correct?
13      **A.  They most likely don't.**
14      Q.  You've never had interaction with an
15  oncologist or a pathologist who discussed whether
16  his or her patient was exposed to glyphosate or
17  Roundup; correct?
18      **A.  Correct.**
19      Q.  When you've done slide reviews, that's
20  never come up with other pathologists; correct?
21      **A.  That's never come up.**
22      Q.  When you've interacted with the
23  pathologists that you are overseeing, they brought
24  a case to you to get your guidance on, it's never
25  come up; correct?

Page 32

1      **A.  Correct.**
2      Q.  Have you ever spoken at -- I'm moving away
3  from -- well, one other question about City of
4  Hope.  You were on a board of chairman -- chair
5  peoples; that right?
6      **A.  Yes.**
7      Q.  Can you describe -- I totally butchered
8  that, but can you describe what your role was
9  there?
10      **A.  The committee of chairs?**
11      Q.  Yes.
12      **A.  So there are two committees.  One is a**
13  **medical group committee, which is more of a**
14  **business of the physicians.  And then one is the**
15  **chairs committee, which is -- deals more with the**
16  **working of the medical center, actually taking care**
17  **of patients.**
18      Q.  And at the chairs committee, how many
19  members were there when you were part of the group?
20      **A.  It's all the chairs and some**
21  **administrators.**
22      Q.  Approximately how many chairs are there?
23      **A.  10, I think.**
24      Q.  And the other chairs, aside from the
25  administrators, have different specialties?  So

Page 33

1  there's probably an oncology chair?
2      A.  Yes.
3      Q.  Radiology chair?
4      A.  Yes.
5      Q.  Et cetera?
6      A.  Yes.
7      Q.  And is it fair to say that within that --
8  how often did that chairs committee meet?
9      **A.  Usually every -- at least every month.**
10      Q.  And is it fair to say that you also never
11  discussed your view that glyphosate or Roundup
12  causes cancer -- causes NHL with that group?
13      **A.  I never did.**
14      Q.  Okay.  And that group was ultimately
15  responsible for overseeing all the doctors at City
16  of Hope; is that right?
17      **A.  Yes.**
18      Q.  You said that you recently stepped down as
19  chair of the pathology group.  When was that?
20      **A.  It was a few weeks ago.**
21      Q.  Maybe congratulations.  I don't know.
22      What was the reason for stepping down?
23      **A.  Well, I turned 70, and it's a difficult,**
24  **stressful job, and I just decided that, you know,**
25  **I'm looking actually toward retirement, and it was**

9 (Pages 30 to 33)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 34

1  time for them to start thinking about recruiting
2  another chair to take over.  So to sort of provide
3  an orderly transition.
4      Q.  Congratulations, then, are in order.  What
5  are your responsibilities now?
6      A.  Well, right now, I'm still director of all
7  the clinical labs, although I hope to hand that off
8  soon.
9          I'm also -- I'm also in charge of the
10 tissue banking for research.  And I'm -- I'm a
11 hematopathologist, so I will be looking -- I'll be
12 spending more of my time looking at cases and
13 diagnosing cases.
14     Q.  What -- this is all confidential, so over
15 the approximately three-year period where you've
16 been retained as an expert, what percentage of your
17 income has been on expert work in litigation?
18     A.  That's a good question.
19         MR. WISNER:  I would just object.
20         Dr. Weisenburger, as Mr. Stekloff knows,
21 because we have litigated this issue, you're not
22 required to disclose your salary with City of Hope.
23 So if answering that question would require that, you
24 don't have to answer the question.
25     A.  I don't mind answering the question.  I'm

Page 35

1  just trying to think.
2          10 percent, maybe.
3  BY MR. STEKLOFF:
4      Q.  You mentioned that you are responsible for
5  the clinical labs.  Are those -- when you say --
6  are those the actual labs where the pathologists
7  are looking at slides and staining them, and et
8  cetera?
9      A.  Or where laboratory technicians are
10 testing blood or urine or other human materials.
11     Q.  So not limited to pathology?
12     A.  It's also laboratory medicine, all the
13 laboratories, hematology, chemistry, microbiology,
14 et cetera.
15     Q.  And then you mentioned tissue banking.  Is
16 that just maintaining the slides and other -- other
17 bio -- I will get the term -- phrase wrong.  But
18 what is being banked in the tissue banking?
19     A.  So it's a bank of what we call "excess
20 tissue."  So if there is a biopsy done and we take
21 material to do the slides to make the diagnosis and
22 other things, and if there is leftover tissue, then
23 it goes into a bank.
24     Q.  Okay.  Now, we have talked about City of
25 Hope, but I want to move outside of City of Hope.

Page 36

1      Q.  Have you ever presented, at a conference or
2  symposium, your views -- at any sort of medical
3  national conference or international medical
4  conference, your views that glyphosate is a cause of
5  NHL?
6      A.  No.
7      Q.  Outside of offering opinions in
8  depositions and in expert reports and in front of
9  Judge Chhabria, have you presented your view that
10 glyphosate is a cause of non-Hodgkin's lymphoma?
11         MR. WISNER:  Objection.
12     A.  No.
13 BY MR. STEKLOFF:
14     Q.  Do you regularly attend any medical
15 conferences?  Again, sort of outside of City of
16 Hope?
17     A.  Yes.
18     Q.  Which medical conferences do you regularly
19 attend?
20     A.  Well, I often go to the American Society
21 of Hematology meeting.  The U.S.-Canadian Academy
22 of Pathology meeting.  InterLymph has regular
23 meetings.  LLMPP has regular meetings.  There are
24 other lymphoma meetings that I've attended or have
25 spoken as part of the program.

Page 37

1      Q.  Okay.  And when you've spoken, it's never
2  been about glyphosate or Roundup; is that true?
3      A.  That's true.
4      Q.  And is it fair to say, also, that at those
5  meetings, you've never heard another presenter
6  present an opinion or a view that glyphosate causes
7  non-Hodgkin's lymphoma?
8      A.  I have not.
9      Q.  And those are elite, important medical
10 organizations?
11         MR. WISNER:  Objection.
12     A.  Yes.
13 BY MR. STEKLOFF:
14     Q.  They meet at least annually, I assume?
15     A.  Yes, most of them do.
16     Q.  And you try to attend annually if
17 possible?
18     A.  Most of the time I do, yes.
19     Q.  Now, if we go to your CV, and we can use
20 the 2018 CV.  I don't think it will impact you,
21 Brent, looking at it -- can you point to me which
22 publications you believe you've published that
23 involve, generally, the issues in this litigation?
24         MR. WISNER:  Objection.  Vague.
25     A.  I would have to actually go through.  I

10  (Pages 34 to 37)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 38

1    think there is -- I think I'm an author on the
2    original pooling study of deRoos.
3    BY MR. STEKLOFF:
4        Q.  Yeah.
5        A.  And I am an author on, I think, a recent
6    paper from NAPP on myeloma --
7        Q.  Okay.
8        A.  -- that was published.  Those are the only
9    two that I remember that specifically looked at
10   glyphosate.
11       Q.  Okay.  That was actually a good objection.
12   You published on lymphoma, generally, but my
13   question was about glyphosate and non-Hodgkin's
14   lymphoma.
15           So I will give you credit where credit is
16   due, Brent.
17           MR. WISNER:  I will take it.
18   BY MR. STEKLOFF:
19       Q.  Now, I also know that there was an
20   abstract of the NAPP group's paper; is that right?
21       A.  Yeah.  There have been two or three
22   abstracts that were submitted on -- I mean a lot of
23   abstracts from the NAPP, but the two or three -- I
24   think three that were submitted on a specific type
25   of glyphosate and NHL.

Page 39

1        Q.  And do you know the status of whether that
2    will be published anytime soon?
3        A.  Yes.  It's been submitted for publication.
4    It's been returned for revisions, so hopefully, it
5    will be published probably next year.
6        Q.  I think, in a previous deposition, you
7    also predicted that it will be within a year.  And
8    more than a year has passed.  Do you know -- and
9    that's not a criticism, but do you know if there is
10   any specific holdup, or what the issue is?
11       A.  No.  I think it's going to move forward,
12   you know, expeditiously.
13       Q.  Well, the last abstract -- well, we will
14   mark the last abstract.  Yeah, "expeditiously" is
15   relative.  So the last one I have, I will show you.
16   We can mark this as Exhibit 4.
17           (Deposition Exhibit 4 was marked for
18           identification by the reporter and is
19           attached hereto.)
20   BY MR. STEKLOFF:
21       Q.  You are familiar with this document;
22   correct?
23       A.  Right.  This is the early draft that was
24   obtained from Aaron Blair; is that correct?
25       Q.  I will defer to you.

Page 40

1        A.  It's one of the drafts.  It's an early
2    draft.
3        Q.  Okay.
4        A.  I did see a previous draft that apparently
5    had been obtained from Aaron Blair.
6        Q.  Okay.  And this is dated September 21st,
7    2015.  So now more than three years have passed; is
8    that right?
9        A.  Yes.
10       Q.  Do you know when a draft was first
11   submitted to a journal?
12       A.  Earlier this year.
13       Q.  That was the first time the draft was
14   submitted to a journal?
15       A.  I think so.
16       Q.  And what journal is it?
17       A.  I don't remember.
18       Q.  Were you part of drafting anything in the
19   article?
20       A.  Yes.
21       Q.  What portions did you generally -- I don't
22   have the draft, but what portions did you draft?
23       A.  Mostly, I corrected English and grammar,
24   and, you know, made some inquiries about why do we
25   want to do this or why don't we do that or -- so

Page 41

1    they were corrections and comments and queries.
2        Q.  Who is the lead author of the article -- I
3    mean, not as opposed to who is listed as the lead,
4    Dr. Pahwa, but who is taking the lead on drafting
5    the article?
6        A.  Pahwa.
7        Q.  And do you know what the -- in the current
8    draft, what the overall conclusion is with respect
9    to glyphosate use and NHL risk?
10           MR. WISNER:  I'm just going to do an
11   objection under academic privilege.  I do believe
12   there is a limit to how far you can go with this.
13   I think you can answer this question, but getting
14   into detailed discussions of peer-reviewed
15   commentary that you have had, I believe is off
16   limits, and you can assert privilege under that.
17       A.  Could you repeat the question.
18   BY MR. STEKLOFF:
19       Q.  Sure.  In the current draft, do you know
20   what the overall conclusion is with respect to
21   glyphosate use and NHL risk?
22       A.  Well, there are still increased risks for
23   NHL and diffuse large B-cell lymphoma in particular
24   with greater than two days' use.  So, you know,
25   like good epidemiologists, they discuss things and

11  (Pages 38 to 41)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 42

1  suggest things, but they don't draw any firm and
2  hard conclusions.
3      Q.  About cause?
4      A.  About cause.
5      Q.  What about as a risk factor?
6      A.  You know, I don't remember this.  I
7  haven't looked at that manuscript in months, so I
8  don't really know the precise language.
9      Q.  Okay.  Do you remember what the odds ratio
10 was, approximately, that they found?
11     A.  For what?
12     Q.  For more than two days' use and the risk
13 of developing NHL?
14     A.  It was close to 2.  I don't remember the
15 number.
16     Q.  Okay.
17     A.  It was above 2 for diffuse large B-cell
18 lymphoma.
19     Q.  And was it statistically significant?
20     A.  Yes.
21     Q.  And I don't want to know any of the
22 details about -- I won't ask you about details of
23 the peer-reviewed comments, but just from a
24 procedural standpoint, it sounds like peer-reviewed
25 comments have been received from the journal back

Page 43

1  to the group.  Is that right?
2      A.  Yes.
3      Q.  When did that occur, approximately?
4      A.  I don't know.  Some weeks ago.
5      Q.  Okay.  And has the group of authors
6  resubmitted the article with the responses to the
7  peer-reviewed comments?
8      A.  I don't know.
9      Q.  Okay.  So maybe that process is still
10 ongoing?
11     A.  Yes.
12     Q.  You don't remember the journal?
13     A.  I don't remember it off the top of my
14 head, no.
15     Q.  Okay.  I think in your alliance list -- I
16 think maybe, actually -- I'm not trying to delve
17 into your reports in other cases, but I think in
18 the three MDL cases of Ms. Stevick, Mr. Hardeman,
19 Mr. Gebeyehou, you cite an abstract; is that right?
20     A.  Right.
21     Q.  Is that something that you typically do,
22 cite abstracts that haven't yet been published?
23         MR. WISNER:  Objection.  Misstates his
24 testimony.
25     A.  Yes.  From time to time, when it's

Page 44

1  appropriate.
2  BY MR. STEKLOFF:
3      Q.  And what do you think makes it appropriate
4  in this circumstance, to cite this -- some version
5  of this abstract?
6      A.  Because I think it's information that
7  people are interested in, and it's supportive of my
8  position.
9      Q.  And what -- do you know what version of
10 the abstract you cited in those reports?
11     A.  I think it was the first abstract.
12     Q.  Did it predate this one that I'm showing
13 you or --
14     A.  I don't remember.
15     Q.  Okay.  Has -- but have things changed in
16 what's been submitted to the journal from that
17 version of the abstract?
18     A.  Yes.  There's been some changes.  The
19 numbers have changed a little bit.
20     Q.  In which way?
21     A.  They've gone down a little bit.
22     Q.  Closer to the null?
23     A.  Closer to 2.
24     Q.  From above 2 to closer to 2?
25     A.  Yeah.

Page 45

1      Q.  And how, if at all, does that impact your
2  opinions in -- generally, in litigation?
3      A.  It really doesn't change my opinion.  I
4  mean, the numbers went down, I think, because -- I
5  don't know why the numbers went down, but I think,
6  in part, because of adjusting for other pesticides
7  is one reason they went down.
8      Q.  Okay.  Do you think that it's appropriate
9  to adjust for other pesticides?
10     A.  Yes.
11     Q.  Do you think that was a necessary step in
12 assessing the data in that NAPP publication?
13     A.  Well, I think it's an important thing.  I
14 think when you have enough data to do that, you
15 should do it.
16     Q.  And I know previously you were asked at a
17 deposition about email communications that you had
18 with Dr. Blair or others regarding this
19 publication.  Do you recall that?
20     A.  Yes.
21     Q.  And I think you walked through the process
22 through which you clear out -- I mean, in any
23 pejorative sense -- clear out your email box for
24 storage purposes?
25     A.  Yes.

12  (Pages 42 to 45)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 46

1    Q.  So since then, have you had email
2  communications with Dr. Blair or the other authors
3  about this publication?
4    **A.  Probably not.  I mean, I emailed Pahwa a**
5  **few weeks ago to ask what the status was.  That's**
6  **why I know what I told you, but otherwise, I**
7  **haven't, no.**
8    Q.  Did you maintain that email?
9    **A.  Yes.**
10    Q.  Will you continue to maintain that email?
11    **A.  Yes.**
12    Q.  So if there is any more cleaning of your
13  email box, can we agree that you won't delete that
14  email?
15    **A.  I won't.**
16    Q.  And this is asked and answered, but only
17  in the sense that I just want to be clear, what
18  exactly -- I didn't know Dr. Pahwa, so what exactly
19  did Dr. Pahwa tell you, to the best of your
20  recollection, about the status of the publication?
21    **A.  So what I told you, that it had been**
22  **submitted and returned, and they were making**
23  **revisions.**
24    Q.  Got it.  And have you had any
25  communications with any of the other authors about

Page 47

1  the publication?
2    **A.  No.**
3    Q.  Have you -- when was the last time you had
4  any communications with Dr. Blair, for example?
5    **A.  It would be two, three years ago.**
6    Q.  Have you had discussions with any other
7  experts who you know have been retained by
8  plaintiffs in litigation in the last year?
9    **A.  Repeat the question.**
10    Q.  Sure.  I will ask a better question.
11  Since -- I mean, I assume at the Daubert hearing
12  you saw different people.
13    Since the Daubert hearing, have you had
14  any discussions with any experts who you know to
15  have been retained by the plaintiffs in litigation?
16    **A.  No.**
17    Q.  So Dr. Ritz.  Have you spoken to Dr. Ritz?
18    **A.  No.**
19    Q.  Emailed with her?
20    **A.  No.**
21    Q.  Dr. Nabhan, have you spoken with him?
22    **A.  No.**
23    Q.  Emailed with him?
24    **A.  No.**
25    Q.  And I assume I could go through any of the

Page 48

1  experts that have been retained by the plaintiffs,
2  and the answer would be no?
3    **A.  No.**
4    Q.  Have you spoken with anyone other than
5  counsel about the litigation -- and the plaintiffs
6  who you've interviewed -- about the litigation
7  since the Daubert hearing?
8    **A.  No.**
9    Q.  Do you have any concerns about the
10  methodology used in this -- in this -- I'm
11  referring to it as "the NAPP paper"?
12    **A.  Yes, I do.**
13    Q.  What are your concerns about the
14  methodology?
15    **A.  Well, they are laid out pretty much in my**
16  **second report for the Daubert hearing, but I think**
17  **my primary concern is the issue of exposure and**
18  **misclassification, which I think is substantial,**
19  **and since it's nondifferential, has lowered the**
20  **risk ratios.  And of course, if the risk ratios**
21  **aren't very high to begin with, they go down, and**
22  **they become nonsignificant.**
23    **And I think that's the major problem with**
24  **the NAPP -- the agricultural health study on**
25  **glyphosate.  And it's probably an irredeemable**

Page 49

1  **flaw.  The reading wasn't ever called out in the**
2  **manuscript or in the editorial.**
3    Q.  And I think we confused each other.  So
4  your answer related to the agricultural health
5  study.  Is that right?
6    **A.  Yeah.  What was your question about?**
7    Q.  It was actually about the NAPP.
8    **A.  Oh, about the NAPP?**
9    Q.  So the one you are the author on.  So I
10  understand -- I'm not going to go --
11    **A.  I'm holding the evidence, so --**
12    Q.  Yeah, yeah, exactly.  And I apologize.  I
13  understand what your answer related to, and I --
14    MR. WISNER:  Just to clarify, Dr.
15  Weisenburger, this actually is the draft of the
16  NAPP manuscript.  It's not the AHS, just to
17  clarify.  It's Exhibit 4.
18    THE WITNESS:  Oh, it is --
19    MR. WISNER:  He thought you were referring
20  to --
21    THE WITNESS:  It is the NAPP.
22    MR. WISNER:  Yeah.
23    THE WITNESS:  You are right.  I'm sorry.
24    MR. WISNER:  That's the confusion.
25  BY MR. STEKLOFF:

13  (Pages 46 to 49)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 50

1    Q.  Okay.  And I may have caused that
2  confusion, which I apologize for.  Yeah, I'm asking
3  about the NAPP paper on which --
4    **A.  That was my confusion.**
5    Q.  -- on which you are an author.
6    Do you have any concerns about the
7  methodology in that paper?
8    **A.  No, I don't.**
9    Q.  Okay.  So you have no -- you know, there
10  are a dozen or so authors on this paper.  You have
11  no criticisms of the paper, at least in its
12  existing form, understanding it's undergoing
13  revision?
14    **A.  No.**
15    Q.  Are you involved, other than this paper,
16  in any ongoing research regarding glyphosate and
17  NHL?
18    **A.  No.**
19    Q.  Are you seeking any grants for research
20  associated with glyphosate -- regarding -- I will
21  start over.
22    Are you seek any grants for research
23  regarding glyphosate and NHL?
24    **A.  No.**
25    Q.  Have you ever sought any -- have you

Page 51

1  personally ever sought any grants for research
2  regarding glyphosate and NHL?
3    **A.  No.**
4    Q.  I'm going to shift topics.  We've gone
5  about an hour.  I'm happy to keep going.  It's your
6  day, so it's up to you.
7    MR. WISNER:  Would you like to take a
8  break, or are you good to go?
9    THE WITNESS:  I'm good.
10    MR. STEKLOFF:  Okay.
11    MR. WISNER:  Why don't we take a
12  five-minute break.  He wanted some coffee.  That
13  will give us a chance to get him coffee.
14    MR. STEKLOFF:  I'm fine with that.  We can
15  go off the record.
16    THE VIDEOGRAPHER:  The time is 9:56 a.m.
17  We will go off the record.
18    (Recess taken from 9:56 a.m. to 10:04
19    a.m.)
20    THE VIDEOGRAPHER:  The time on the video
21  monitor is 10:04 a.m.  We are back on the record.
22  BY MR. STEKLOFF:
23    Q.  Dr. Weisenburger, just going back a little
24  bit to your work, you said that since 2012,
25  approximately 10 percent, 10 to 20 percent of your

Page 52

1  work was clinical.  Is that right?
2    **A.  Yes.**
3    Q.  In that work, I assume what you are doing
4  is reviewing slides and making diagnoses.  Is that
5  correct?
6    **A.  For the most part, yes.**
7    Q.  What else is there?
8    **A.  Sometimes consulting on cases, teaching.**
9  **There are some other things that I do as well.**
10    Q.  In that work, did you ever interact with
11  your patients who were -- let's focus on your
12  patients who were diagnosed with non-Hodgkin's
13  lymphoma.
14    **A.  I don't think so at City of Hope.  I did**
15  **occasionally at Nebraska, but I don't think I've,**
16  **as far as I know, done it here.**
17    Q.  And I wanted to ask you a little bit about
18  before City of Hope.  What institution were you at
19  immediately before City of Hope?
20    **A.  I was at University of Nebraska.**
21    Q.  And what percentage of your work there was
22  clinical, approximately?
23    **A.  Oh, it was 40 to 50 percent.  Probably**
24  **more like 50 percent.**
25    Q.  And what was the other approximate 50

Page 53

1  percent there?
2    **A.  Research and teaching.**
3    Q.  Okay.
4    **A.  Some administration, but not so much**
5  **administration.**
6    Q.  And in the 40 to 50 percent of clinical
7  work at University of Nebraska, was it similar,
8  generally, reviewing pathology on slides, making
9  diagnoses, and then also consulting with colleagues
10  and discussing cases?
11    **A.  Yes, it was very similar.**
12    Q.  And you did interact with patients on
13  occasion at the University of Nebraska?
14    **A.  Yes, occasionally, I would talk to a**
15  **patient on the phone, or I would go to the floor to**
16  **see a patient, to ask some questions or just to see**
17  **what -- if it was a skin lesion, what the skin**
18  **looked like.  So occasionally, I would do that, but**
19  **not frequently.**
20    Q.  And did you have patients at University of
21  Nebraska who you diagnosed with non-Hodgkin's
22  lymphoma?
23    **A.  Yes.**
24    Q.  Did you ever ask a patient at University
25  of Nebraska if he or she had used glyphosate or

14  (Pages 50 to 53)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 54

1  Roundup?
2      A.  No.
3      Q.  Did you ever tell a patient at University
4  of Nebraska that his or her NHL was caused by
5  glyphosate or Roundup?
6      A.  No.
7      Q.  Did you ever tell a fellow doctor, an
8  oncologist or another treating physician, that you
9  thought that one of your patient's NHL was caused
10  by glyphosate or Roundup?
11      A.  No.
12      Q.  And that's all true, understanding you
13  weren't interacting with patients, at City of Hope
14  as well; correct?
15      A.  I haven't.
16      Q.  Okay.  Now, when you are looking at
17  slides, you are looking at tissue, and you are
18  staining it to see what the diagnosis is.  Is that
19  right?
20      A.  Yes.
21      Q.  And in the context of NHL, when you are
22  looking at a slide, that's to determine whether the
23  patient has NHL; is that right?
24      A.  Yes.
25      Q.  And can you approximate -- are you able to

Page 55

1  approximate how many patients you have diagnosed
2  with NHL, say in the past five years?
3      A.  Hundreds.
4      Q.  And you don't know whether any of those
5  patients were -- ever used glyphosate or Roundup;
6  is that correct?
7      A.  That's correct.
8      Q.  And when you look at their tumors, you
9  can't tell whether they ever used glyphosate or
10  Roundup; is that right?
11      A.  Yes.
12      Q.  There is no biomarker for glyphosate or
13  Roundup; correct?
14      A.  Correct.
15      Q.  There is nothing you can see as a
16  pathologist on a slide that tells you whether that
17  NHL was a glyphosate NHL or a nonglyphosate NHL?
18      A.  That's correct.
19  ████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

Page 56

1      Q.  There is no test that doctors can use to
2  tell whether their patients who have NHL used
3  glyphosate at any point in time; right?
4      A.  That's correct.
5      Q.  And there is no unique characteristic of
6  an NHL tumor that you can see as a pathologist that
7  tells you whether or not your patient used
8  glyphosate; correct?
9      A.  There is none.
10      Q.  Okay.  And do you agree that NHL, among
11  cancers, is a common cancer?
12      A.  Yes.
13      Q.  And DLBCL is the most common form of NHL?
14      A.  Yes.
15      Q.  Now, there are many different types of
16  NHL; right?
17      A.  Yes.
18      Q.  Do you agree that the cause of a patient's
19  NHL is unknown in most cases?
20      A.  Yes.
21      Q.  Can you approximate what percentage of NHL
22  cases you cannot tell what the cause is?
23      A.  I think in the past, I've said 70 percent,
24  but, you know, it's a guesstimate.
25      Q.  It's a good memory.  But it's fair to say

Page 57

1  approximately 70 percent of NHL cases are
2  idiopathic; is that right?
3      A.  Yes.
4      Q.  And it is true, even in those cases, that
5  those patients have risk factors -- some of those
6  patients have risk factors; right?
7      A.  Yes.
8      Q.  Okay.  Age is a risk factor; right?
9      A.  Right.
10      Q.  Gender is a risk factor; right?
11      A.  Yes.
12      Q.  Obesity is a risk factor; right?
13      A.  Yes.
14      Q.  And of the 70 percent, is it fair to say
15  that you are saying they are idiopathic, but those
16  patients often still have risk factors like age or
17  gender or weight; correct?
18      A.  Yes.
19          MR. WISNER:  Objection.  Incomplete
20  hypothetical.
21      A.  Yes.
22  BY MR. STEKLOFF:
23      Q.  But in those cases, you still view the
24  cause as unknown; is that right?
25          MR. WISNER:  Objection.  Speculation.

15  (Pages 54 to 57)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 58

1        A.  I would say, in general, you still, yes,
2    review it as unknown because age is a risk factor,
3    but it doesn't actually cause the lymphoma.
4    BY MR. STEKLOFF:
5        Q.  You don't know what causes the lymphoma?
6        A.  No.
7        Q.  We will come back to that.  What I want to
8    do is mark what I was handed this morning by
9    Mr. Wisner.  I will mark it as Exhibit 5.
10           (Deposition Exhibit 5 was marked for
11           identification by the reporter and is
12           attached hereto.)
13   BY MR. STEKLOFF:
14       Q.  We have actually made copies, so whichever
15   you prefer.  You can use your original or --
16       A.  Yeah, I will probably use my original.
17       Q.  -- or you can use the copy.
18           (Miscellaneous comments.)
19       A.  Okay.
20   BY MR. STEKLOFF:
21       Q.  Can you -- actually, can you just verify
22   for me that the copy -- I don't want you to go line
23   by line, but can you just generally verify for me
24   that the copy that Mr. Wisner did -- the job
25   copying, and it matches the original you have

Page 59

1    there?
2        A.  Yes, it does.
3        Q.  And then I see -- and I'm not trying to
4    take your original, but I see on the original there
5    is some red handwriting as opposed to black --
6    sorry, red pen as opposed to black pen.  Is that of
7    any significance or --
8        A.  No, not really.  It's just to help me
9    organize it in my mind a better.  And some things
10   were corrected in red.  You will see that things
11   were crossed out, so --
12       Q.  Got it.
13       A.  You will see where the corrections are.
14       Q.  So can you just tell -- first, just
15   describe for me what this document is.
16       A.  Well, it's two documents, actually.  The
17   first two pages are the notes I took from the
18   medical records about her medical history.
19       Q.  Okay.
20       A.  The third one is notes I took primarily
21   from her deposition when I read it.
22       Q.  Okay.
23       A.  The next page, it says "Exposure
24   Questions."  Those are sort of a list of questions
25   that I asked her and the other -- others that I

Page 60

1    interviewed to sort of get a better idea of her
2    exposure and then a few other specific questions
3    about her medical history.
4



Page 61

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 62

Page 63

24   Q.  And is that because of -- so we previewed
25   my one question.  You're not aware of any

Page 64

13   Q.  And is that approximately 70 percent of
14   cases of NHL?  It's the latter?  We don't know the
15   cause, and we don't understand the cause?
16   **A.  Yes.**
17   Q.  You would agree that there are a lot of
18   people who develop NHL who have never used
19   glyphosate or Roundup; correct?
20   **A.  I think -- I don't know the answer, but**
21   **it's probably true.**
22   Q.  It's probably true that the vast majority
23   of people who develop NHL never used glyphosate or
24   Roundup; right?
25       MR. WISNER:  Objection.  Speculation.

Page 65

1   **A.  Yeah, I don't know.  I mean, I don't know.**
2   **A lot of people use Roundup, but I don't know.  I**
3   **mean, I don't think there is any data on that, so I**
4   **would say -- I would agree that most people don't,**
5   **but I really -- that's just a personal estimate or**
6   **guesstimate.**
7   BY MR. STEKLOFF:
8   Q.  So absent any other causative risk factors
9   other than glyphosate, if a patient has sufficient
10   exposure, would you -- and was exposed to
11   glyphosate, would you say that glyphosate was the
12   cause of his or her cancer in every instance?
13       MR. WISNER:  Objection to form.  I would
14   just let you know my objection -- just so you
15   understand, you keep jumping between glyphosate and
16   Roundup.  And I just want to make sure that you
17   know you are doing that.
18       MR. STEKLOFF:  Okay.  Sure.  Which do you
19   prefer for me to use?
20       MR. WISNER:  I think they're different, so
21   that's your call.
22       MR. STEKLOFF:  Well, let's do both.
23   **A.  I would consider them interchangeable,**
24   **pretty much, because I think when you are talking**
25   **about glyphosate, you really mean Roundup because**

17 (Pages 62 to 65)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 66

1  nobody uses generic glyphosate, so...
2  BY MR. STEKLOFF:
3      Q.  And the surfactants --
4      (Reporter clarification.)
5  BY MR. STEKLOFF:
6      Q.  The surfactants are not relevant to your
7  assessment of specific causation?
8      A.  Well, I think they are.  I mean, I think
9  they are.
10     Q.  We will come back to that later.  But you
11 will use Roundup and glyphosate interchangeably in
12 this context?
13     A.  Yes, unless we specifically just talk
14 about the chemical glyphosate.
15     Q.  Sure.
16     MR. WISNER:  And this realtime is not
17 working.
18     (Miscellaneous comments.)
19     MR. WISNER:  Let's go off the record.
20     THE VIDEOGRAPHER:  The time is 10:22 a.m.
21 We are going off the record.
22     (Recess taken from 10:22 a.m. to 10:23
23 a.m.)
24     THE VIDEOGRAPHER:  The time is 10:23 a.m.
25 We are back on the record.

Page 67

1  BY MR. STEKLOFF:
2      Q.  Okay.  So let's just set this up so we
3  don't run into any confusion.  Do you consider
4  glyphosate a causative risk factor for NHL, using
5  your term "causative risk factor"?
6      A.  Yes.
7      Q.  Do you consider Roundup a causative risk
8  factor?
9      A.  Yes.
10     Q.  And using your term "causative risk
11 factor."
12     And what makes glyphosate and Roundup
13 causative risk factors as opposed to age?
14     A.  Well, that's outlined in my report on
15 general causation, so it's complicated, you know.
16 It depends on the epidemiology.  It depends on the
17 animal studies.  It depends on other mechanistic
18 studies, genotox studies, et cetera.  So I think
19 glyphosate is the active ingredient in Roundup and
20 other glyphosate-based formulations.  So it's very
21 likely both.
22     Q.  What's very likely both?  I just didn't
23 understand the last part.
24     A.  It's very likely either glyphosate or
25 Roundup are causative.

Page 68

1      Q.  Okay.  And you consider, among other
2  things, certain autoimmune diseases or infections
3  also causative risk factors for NHL?
4      A.  Yes.
5      Q.  HIV, for example?
6      A.  Yes.
7      Q.  I know it's another case, hepatitis C in
8  certain circumstances?
9      A.  Yes.
10     Q.  Do you consider diabetes a causative risk
11 factor for NHL?
12     A.  No.
13     Q.  Do you consider Crohn's disease?
14     A.  Crohn's disease by itself, no, but some of
15 the treatments that are used for Crohn's disease
16 are known to cause NHL.
17     Q.  Okay.  Which treatments specifically?
18     A.  Well, some of the cytotoxic agents like
19 Neotrexate, and it's also got some of the
20 immunosuppressive agents as well.  But I think the
21 data is really not very strong for the latter.
22     Q.  Now, you can certainly use Roundup and
23 never develop NHL; correct?
24     A.  Yes.
25     Q.  That you agree is -- the vast majority of

Page 69

1  people who use Roundup don't develop NHL.  Do you
2  agree with that?
3      A.  Yes.  I have no basis for it, but --
4      Q.  You have your expertise; right?
5      A.  Right.
6      Q.  Okay.  Now, I want to go back to my
7  question that -- and I'm not objecting to the
8  objection that Mr. Wisner objected to.  Absent any
9  causative risk factors other than glyphosate, if a
10 patient has -- I'm starting with glyphosate
11 intentionally -- absent any causative risk factors
12 other than glyphosate, if a patient has sufficient
13 exposure to glyphosate, would you say that the
14 cause of his or her cancer in every instance is the
15 glyphosate?
16     A.  I would say it's, more likely than not,
17 the glyphosate.
18     Q.  And if I asked you the same question about
19 Roundup, your answer would be the same?
20     A.  Yes.
21     Q.  So if you look at someone, any plaintiff
22 from, you know -- you joked about how much time you
23 would be spending on this in the hallway, but any
24 plaintiff that is sent to you by Mr. Wisner or the
25 other lawyers, who has no other causative risk

18  (Pages 66 to 69)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 70

1    factors but has sufficient glyphosate exposure, you
2    are going to say that the glyphosate was, more
3    likely than not, the cause of his or her cancer.
4    Is that fair?
5          MR. WISNER:  Objection.  Improper
6    hypothetical.
7          A.  Yes.
8    BY MR. STEKLOFF:
9          Q.  And the same would be true for Roundup;
10   correct?
11         A.  Yes.
12         Q.  You really -- so your methodology, if I
13   sum it up, is to see whether there are any other
14   causative risk factors, and if not -- and there is
15   sufficient glyphosate exposure, glyphosate is, more
16   likely than not, the cause?
17         A.  Yes.
18         Q.  And I want to make sure we exhaust the
19   other causative risk factors that you are looking
20   for.  Which autoimmune diseases can you think of
21   that you are looking for?
22         A.  So rheumatoid arthritis, lupus, celiac
23   disease, Sjvgren's syndrome.  Those would be the
24   main ones.
25         Q.  Okay.  What about -- you said

Page 71

1    "infections."  Which infections?
2          A.  So for viral infections, it would be HIV,
3    Epstein-Barr virus.  There is a virus called HTLV,
4    which causes T-cell lymphomas.  There are other
5    viruses like HHV-8, which is common in HIV
6    patients.  Hepatitis B, hepatitis C.  I'm not sure
7    that's an exhaustive list, but that's the major
8    players.
9          Bacterial infections would be Helicobacter
10   pylori, mainly, causes stomach lymphomas.  There's
11   some other bacterial organisms that have been
12   implicated in other MALT lymphomas.  I think the data
13   on those is less clear, but there are other bacterial
14   organisms.
15         Chronic inflammatory conditions sometimes
16   lead to lymphomas.
17         There's the breast implant-associated
18   lymphoma, which is a recent new entity.  And then
19   there are, you know, drugs that cause
20   immunosuppression.  Neotrexate would be an example or
21   other cytotoxic drugs.
22         Chemotherapy can cause lymphoma.
23         (Reporter Interruption.)
24         A.  Solvents, some solvent exposures,
25   extensive solvent exposures, especially mixed

Page 72

1    solvents, can cause NHL.
2          I think I've covered the major ones.  I may
3    have missed one or two, but I'm sure you'll remind me
4    of the ones I missed.
5    BY MR. STEKLOFF:
6          Q.  Are there other illnesses that you haven't
7    mentioned?
8          A.  Immunodeficiencies of various types.  You
9    know, there is some thought, too, that very elderly
10   people have sort of an immunodeficiency related to
11   age.  I think it's -- it's not usually -- it's not
12   usually considered a risk factor, as I mentioned to
13   you, but some people believe that there is sort of
14   a subtle immunodeficiency that you already have
15   that gives them an increased risk.
16         Off the top of my head, I think those are
17   the ones I can think of.
18         Q.  Now, I want to take an example of one of
19   those.  So let's take -- you said HHV-8.  Is that a
20   virus?
21         A.  Yes, human herpes virus 8.
22         Q.  So let's say that you had a patient who
23   had no other causative risk factors, including
24   glyphosate or Roundup, that never used glyphosate
25   or Roundup, and had HHV-8.

Page 73

1          In every -- and in that instance, would you
2    say that HHV-8 was the cause of his or her
3    non-Hodgkin's lymphoma?
4          MR. WISNER:  Objection.  This witness is
5    not being proffered as an expert in that cause of
6    non-Hodgkin's lymphoma, and I don't know if he's
7    done proper research to answer the question.
8          A.  So there is actually a stain we can do
9    with a tissue to show the presence of the virus in
10   the tumor, so --
11   BY MR. STEKLOFF:
12         Q.  That's not a good example.
13         A.  -- that's what we would do.
14         Q.  Okay.  So that's interesting, but not a
15   good example.
16         Epstein-Barr virus.  Is there a marker
17   associated with that?
18         A.  Yes, there is.
19         Q.  In the tumor?
20         A.  Yes.
21         Q.  Okay.  So that's not a good example.
22   What's a good example off the list you just gave
23   where there is no marker of the tumor?
24         A.  Maybe solvent exposure.
25         Q.  Okay.  So solvent exposure.  What kind of

19  (Pages 70 to 73)

Dennis D. Weisenburger, M.D.
November 26, 2018

1    solvent do you think is a causative risk factor?
2         A.  Well, in my review of the literature, it's
3    usually extensive exposure to mixed solvents
4    like -- I'm trying to think of the name now --
5    mixed solvents.
6         Q.  Okay.  And would your -- the result of
7    your methodology be the same with mixed solvents,
8    that if the patient had no other causative risk
9    factors but had been exposed to mixed solvents,
10   using, more likely than not, the mixed solvent was
11   the cause of her -- his or her NHL?
12        MR. WISNER:  Objection.  Improper
13   hypothetical insofar as the amount of exposure.
14        A.  Yeah.  If they were extensively exposed,
15   that would, yes.
16   BY MR. STEKLOFF:
17        Q.  Okay.  What about -- and I'm not trying to
18   -- and I know you are going to be asked about
19   hepatitis C in a separate deposition, but active
20   hepatitis C, and the patient is diagnosed with NHL.
21   Would you say, in every case, that active hepatitis
22   C was the cause -- with no other causative risk
23   factors, the cause of a patient's -- cause of the
24   patient's NHL?
25        MR. WISNER:  Objection.  Improper

1    hypothetical.
2         A.  Again, it would be more likely than not.
3    You would say that -- you know, the patient with
4    active hepatitis C and got lymphoma, you would say,
5    "Well, that's most likely the cause."
6    BY MR. STEKLOFF:
7         Q.  So if we went through that -- the whole
8    list, if you only had one of those causative risk
9    factors and no exposure or no diagnosis with any of
10   the other ones, you would say, more likely than
11   not, that was the cause of a patient's NHL?
12        MR. WISNER:  Objection.  Improper
13   hypothetical.
14        A.  Yeah, if there was proper demonstration of
15   the organism or where there was significant
16   exposure, yes.
17   BY MR. STEKLOFF:
18        Q.  Okay.  What if there are -- what if there
19   were multiple causative risk factors that you
20   identified?  How would you differentiate between
21   them?
22        A.  Well, sometimes you can't, so you just
23   have to assume that there is more than one
24   causative factor.  And it would be an individual
25   kind of a judgment for each case what -- which one

1    do you think is more likely the cause.
2         But when you have two risk factors, like
3    an active hepatitis C infection and extensive
4    exposure to Roundup, I would probably say well,
5    they are both substantial causes, and I probably
6    couldn't parse one from the other.  But you can
7    have more than one risk factor, and, of course, if
8    you have two risk factors, it increases your risk
9    probably more than the sum.
10        Q.  But if you have a Category 1 IARC
11   carcinogen and a Category 2A IARC carcinogen, would
12   you give more weight to one over the other?
13        MR. WISNER:  Objection.  Improper
14   hypothetical.
15        A.  I don't know.  It would depend on the --
16   it would depend on the exposure and the individual
17   case.
18   BY MR. STEKLOFF:
19        Q.  Now, to be clear, you, in your clinical
20   practice, you've never used this methodology;
21   right?
22        A.  No.  But it's the same methodology we use
23   for the differential diagnosis of pneumonia, for
24   example, or you know, other diseases that have
25   multiple causes.

1         You go through a careful history and
2    physical and laboratory exam, and you make your
3    differential diagnosis, and then you try to
4    eliminate things from the differential diagnosis.
5    And sometimes you have just one thing left.  That's
6    the obvious cause.
7         So it's the same process that physicians
8    go through in their differential diagnosis in
9    trying to decide what is the cause of a specific
10   disease.
11        Q.  Well, that's my question.  In clinical
12   care, isn't it true that a differential diagnosis
13   is used to make a diagnosis as opposed to
14   determining the cause?
15        A.  Well, sometimes it's used to make a
16   diagnosis, and sometimes it's you have the
17   diagnosis, but you are trying to figure out what
18   the cause is.  It's more like what we are talking
19   about.  It's a differential causation.
20        You know, is the pneumonia bacterial, or
21   is it viral, or is it drug-induced, or is it
22   toxin-induced, or is it radiation-induced?  You
23   have to go through what's called a "differential
24   diagnosis" to try to figure out what is the -- what
25   is this more specific diagnosis or what is the

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 78

1  causative factor.

Page 80

1  City of Hope website updated to reference
2  glyphosate or Roundup as a possible -- as a risk
3  factor for NHL; correct?
4      **A.  I haven't.**
5      Q.  And I want to come back to this concept of
6  determining cause in the case of NHL.  That does
7  happen at City of Hope; right?  If a patient has
8  been exposed to benzene, for example?
9      **A.  Yes.  So if it's an obvious cause that's**
10  **either elicited during the -- when the physician**
11  **takes the history of the patient, often they will**
12  **ask, "What's your occupation?"**
13      **If the occupation is a red flag, they**
14  **might ask Well, did you do this or did you do that?**
15  **Did you use this?  But I would have to say**
16  **physicians don't spend a lot of time on trying to**
17  **understand the causes of the cancers.  If it's**
18  **obvious or if it just jumps out in front of them,**
19  **they might list it in the record, but in most**
20  **cases, they aren't asking many questions about**
21  **etiology.**
22      Q.  Well, they are certainly asking all these
23  questions about whether the patients -- trying to
24  determine whether patients have autoimmune diseases
25  or other illnesses or other immune deficiencies or

Page 79

18      Q.  And, also, you said that some patients do
19  research on websites.  You are aware that the City
20  of Hope website doesn't list glyphosate or Roundup
21  specifically as a risk factor for NHL; right?
22      **A.  I haven't looked at it, but I will take**
23  **your word for it.**
24      Q.  You've made no effort, when you were
25  serving on the committee of chairs, to go have the

Page 81

1  other infections; right?
2      **A.  Yes, yes.**
3      Q.  And that is important to their treatment
4  of their patients; correct?
5      **A.  Yes, yes.**
6      Q.  And you consider all of those examples
7  that you listed before as causative risk factors;
8  right?
9      **A.  Yes.  Those are more medical causes.  They**
10  **wouldn't be asked things about occupational or**
11  **environmental causes necessarily.**

22  BY MR. STEKLOFF:
23      Q.  Part.  In the absence of those, you also
24  had to determine whether they had sufficient
25  glyphosate or Roundup exposure; correct?

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 82

1      A.  That's correct.

24     Q.  Well, when you were a pathologist at the
25     lab, you treated patients.  Haven't you?

Page 83

1      A.  No, we don't treat patients.  We just
2      diagnose disease.
3      Q.  Of specific patients?
4      A.  Yes.  Sometimes we tell the doctors how to
5      treat the patient, but we don't actually treat the
6      patient.
7      Q.  You tell the oncologists how you think
8      they should act?
9      A.  Yeah.
10     Q.  And you, in that context, you have never
11     done what you are doing here in this legal context;
12     right?
13     A.  I've never done what?
14     Q.  This differential -- this methodology that
15     we are following here?
16     A.  No, not usually.  Not for that purpose.
17     Q.  Okay.  Now, you mentioned -- so I'm going
18     to ask you about two risk factors.  You mentioned
19     family history is something that you are looking
20     for.  What role did family history play in your
21     methodology?
22     A.  Well, people who have a family history of
23     hematologic cancers like leukemia, lymphoma,
24     myeloma, if they have -- if first-degree relatives
25     have those kinds of cancers, that means that the

Page 84

1      first degree -- the other first-degree relatives
2      have about twofold increased risk of one of those
3      diseases.
4          So, again, it's a risk factor, but it
5      doesn't tell you much about the cause.  It could be
6      genetic.  It could be environmental.  It could be a
7      combination.  So it's a risk factor, but really not a
8      cause, just like age or sex.
9      Q.  So if you have a patient -- sorry.  If you
10     are looking at a plaintiff who has a first-degree
11     family history of NHL, and also has sufficient
12     Roundup exposure, and has no other causative risk
13     factors, do you say that Roundup was, more likely
14     than not, a substantial contributing factor to his
15     or her NHL?
16         MR. WISNER:  Objection.  Incomplete
17     hypothetical.  Speculation.
18     A.  Yeah.  If there was significant exposure,
19     it's probably what I would say.
20     BY MR. STEKLOFF:
21     Q.  So I mean, it sounds like if there is
22     sufficient exposure to Roundup, you are
23     automatically going to say that Roundup, more
24     likely than not, was a substantial factor to a
25     patient's NHL because it might be, at most, it's

Page 85

1      multifactorial.  Is that fair?
2          MR. WISNER:  Objection.  Misstates his
3      testimony.  Incomplete hypothetical.
4      A.  Yeah.  Sometimes it's not multifactorial,
5      but sometimes it is, and then you have to consider
6      all of the factors.
7      BY MR. STEKLOFF:
8      Q.  So there might be -- there might be other
9      factors; right?  Some of these -- active hepatitis
10     C or HIV; right?
11     A.  Yes.
12     Q.  But if I were to bring any case to you of
13     any of the plaintiffs, and they had sufficient
14     Roundup exposure, you would say that Roundup
15     exposure was, A, a substantial contributing factor
16     in his or her -- more likely than not, a
17     substantial contributing factor in his or her
18     development of NHL?
19         MR. WISNER:  Objection.  Incomplete
20     hypothetical.  Misstates his testimony and
21     speculation.
22     A.  I would have to look at each case
23     individually and weigh the factors.
24     BY MR. STEKLOFF:
25     Q.  But sitting here, it's hard for you to

22  (Pages 82 to 85)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 86

1  think of a situation where there was sufficient
2  Roundup exposure, where you wouldn't say it was,
3  more likely than not, a substantial contributing
4  factor; isn't that true?
5         MR. WISNER: Objection. Misstates his
6  testimony. Incomplete hypothetical. Speculation.
7      **A. I really can't answer that. I think it**
8  **would be case-specific. I would have to look at**
9  **each case. So, you know, I would just have to look**
10 **at each case. Some of the risk factors are very**
11 **strong risk factors, like HIV infection, okay. Or**
12 **infections of a specific virus.**
13 BY MR. STEKLOFF:
14     Q. Let's -- so let's use HIV infection.
15     **A. So, yeah, if I had a patient with HIV**
16 **infection, and the lymphoma due to HHV-8, I would**
17 **consider that the primary cause and not the**
18 **Roundup, okay?**
19     Q. But say that there is -- that you -- I
20 want to walk through this hypothetical. You have a
21 patient with active HIV and -- but their tumor has
22 no markers in it for any -- for any virus or
23 infection, and they have sufficient Roundup
24 exposure. You would say in that situation, more
25 likely than not, the Roundup was a substantial

Page 87

1  contributing factor; correct?
2         MR. WISNER: Objection. Incomplete
3  hypothetical. Speculation.
4      **A. I mean, I would have to look at each case**
5  **individually, but if there was substantial Roundup**
6  **exposure, I would say there is more than one**
7  **contributing factor.**
8  BY MR. STEKLOFF:
9      Q. Exactly. Okay.
10         You are doing a very good job of coaching,
11 but I'm not going to fight with you yet.
12     **A. I don't understand what he says most of**
13 **the time. He can't be coaching.**
14         MR. STEKLOFF: When he gets loud. He gets
15 loud.
16         MR. WISNER: Just like you've done a very
17 good job of asking incomplete and inappropriate
18 hypotheticals. I thought we were here for a
19 particular claimant's case.
20         MR. STEKLOFF: We are, and I'm trying to
21 understand the methodology he used to understand
22 Ms. Gordon's cause.
23         MR. WISNER: Ask him.
24         MR. STEKLOFF: That's what I'm doing.
25     Q. Okay. So let's walk through your notes.

Page 88

1  Well, actually, let's talk about obesity just
2  generally, and then we can talk about it in
3  Ms. Gordon's specific case.
4         So when you are asking -- when you were, as
5  part of your methodology, considering obesity, in
6  what way are you considering it?
7      **A. Well, obesity is a difficult one. It is a**
8  **risk factor, a mild to moderate risk factor. We**
9  **don't understand how obesity causes cancer,**
10 **particularly non-Hodgkin's lymphoma. We have some**
11 **ideas. So, you know, it could be considered a risk**
12 **factor and probably a cause, as well.**
13     Q. When you say "mild to moderate," what
14 relative risk are you talking about?
15     **A. Well, there is a nice meta-analysis which,**
16 **I think, was sent to you as part of the list.**
17 **This had actually been a controversial issue for**
18 **many years, but -- because there have been studies**
19 **that have shown increased risk with overweight or**
20 **obesity. There are other studies that haven't.**
21         **So this meta-analysis, I think, was a nice**
22 **study because it took a whole bunch of -- all the**
23 **studies they could find and put them together. And**
24 **you find there was a significant risk of about 30**
25 **percent for NHL -- actually, for diffuse large B-cell**

Page 89

1  **lymphoma -- in obese people over -- BMI over 30.**
2  **This lady has a BMI over 34, so she is clearly**
3  **classified as obese.**
4      Q. When you say "30 percent," are you talking
5  about a 1.3 odds ratio?
6      **A. Yes.**
7      Q. Okay. So you consider 1.3 a mild to
8  moderate risk factor? Is that fair?
9      **A. Yeah. It's -- I would say a weak risk**
10 **factor.**
11     Q. But the 30 percent was just for diffuse
12 large B-cell lymphoma?
13     **A. Yes.**
14     Q. Is it higher -- do you know, is obesity a
15 higher risk factor or more significant risk factor
16 for NHL, more generally?
17     **A. I didn't look carefully at that. I think**
18 **it's considered a risk factor for NHL generally. I**
19 **don't know the level of the risk. I focused mainly**
20 **on diffuse large B-cell lymphoma for this case.**
21     Q. That's fair. And you said that we -- I
22 think meaning the scientific community -- have some
23 idea about how obesity causes cancer. Is that from
24 a mechanistic standpoint?
25     **A. Yes. I mean, there are hypotheses about**

23 (Pages 86 to 89)

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 90

1  how it does it.
2      Q.  And what are the hypotheses?
3      A.  Well, it's thought that obesity creates
4  what's called a "pro-inflammatory state" where
5  certain hormones and cytokines are increased, and
6  these can have sort of secondary effects on
7  hematologic proliferation and differentiation, and
8  could somehow influence the development of a
9  hematologic malignancy.  I mean, that's sort of the
10  basis -- that's sort of what we know.
11      So we know that there is this
12  pro-inflammatory state with increased hormones,
13  increased cytokines.  And we know that some of these
14  hormones and cytokines affect bone-marrow cells,
15  blood cells, and lymphocytes are in the blood.  So,
16  you know, it's -- that's the hypothesis.
17      We don't really have convincing proof that
18  that's what it is, but, you know, in trying to
19  understand it, that's what people are thinking.
20      Q.  Are those hypotheses published in
21  peer-reviewed literature?
22      A.  Yes.
23      Q.  And do you agree -- I'm not going to ask
24  you the details about the mechanisms of action you
25  believe are associated between glyphosate or

Page 91

1  Roundup and NHL, but do you agree that those are
2  also hypotheses?
3      A.  No, no.  I think there is good mechanistic
4  evidence for genotoxicity and for oxidative stress
5  in the glyphosate/Roundup literature.
6      Q.  So you -- I don't know what adjective to
7  use, but you think the evidence is stronger -- the
8  mechanistic evidence is stronger for glyphosate in
9  NHL than it is for obesity in NHL?
10      A.  Yes.
11      Q.  Based on the peer-reviewed literature?
12      A.  The mechanistic information.  I do, yes.
13      Q.  Okay.
14      A.  Although I haven't -- I must say, I
15  haven't looked into obesity and mechanisms in the
16  same depth that I have for glyphosate, so -- but
17  from what I've read, I would say yes.
18      Q.  Okay.  But it's possible there is even
19  more out there about the mechanistic -- the
20  mechanism of action between obesity and NHL than
21  you are aware of?
22      A.  I think people are studying it and trying
23  to understand it.
24      Q.  And so you think that -- just to clarify,
25  you think that with respect to glyphosate and/or

Page 92

1  Roundup and NHL, the mechanism of action is
2  established beyond a hypothesis?
3      A.  Yes.
4      Q.  Okay.  You don't know with respect to
5  obesity and NHL?
6      A.  I don't.
7  

22      Q.  So you would automatically -- if you are
23  comparing causative risk factors, would
24  automatically rank the causative risk factor that
25  has the higher odds ratio in peer-reviewed

Page 93

1  literature?
2      A.  In general, yes.  If there was significant
3  exposure, I mean, I think you would say, "What is
4  the most likely cause?"  In this case, it would be
5  Roundup.
6      Q.  Can someone be exposed to a causative risk
7  factor, develop NHL, and not have the causative
8  risk factor be the actual cause of his or her NHL?
9      A.  It's possible.
10      Q.  So can someone be exposed -- sufficiently
11  exposed to glyphosate or Roundup, develop NHL, and
12  not have glyphosate or Roundup be the, more likely
13  than not, cause of his or her NHL?
14      A.  Probably not, because if glyphosate is the
15  only risk factor, then it's more likely than not
16  the cause.
17  

24  (Pages 90 to 93)

Dennis D. Weisenburger, M.D.
November 26, 2018



## Page 94

5  BY MR. STEKLOFF:
6      Q.  Okay.  Because you are really just saying
7  50.1 percent; is that right?
8      **A.  More likely than not.**
9      Q.  Yeah.  Do you agree with 50.1 percent?
10     **A.  More than 50 percent.**
11     Q.  Yeah.
12     **A.  I didn't write that rule, by the way.**
13     Q.  I'm well aware.
14         MR. WISNER:  Is this a good time for a
15  break, or do you want to keep going at this point?
16         MR. STEKLOFF:  We can go off the record.
17         THE VIDEOGRAPHER:  The time on the video
18  monitor is 10:58 a.m.  This will be the conclusion
19  of Media Unit 1 of the deposition of Dennis D.
20  Weisenburger, MD.
21         (Recess taken from 10:58 a.m. to
22         11:15 a.m.)
23         THE VIDEOGRAPHER:  Here begins Media
24  Unit 2 of the deposition of Dennis D. Weisenburger,
25  MD.  The time on the video monitor is 11:15 a.m.

## Page 95

1  We are back on the record.
2  BY MR. STEKLOFF:
3      Q.  Okay.  Dr. Weisenburger, if we can look at
4  what's been marked as Exhibit 5, which are notes
5  that you walked us through what they were before.
6  I feel, unfortunately, like I just need to go --
7  quickly go through these to understand what you
8  wrote down.  So I would like to do this as quickly
9  as possible.
10         Maybe the best way is just for you, slow
11  enough so that the court reporter can take it down,
12  is to walk me through each page, and then if you go
13  through the whole page -- you don't have to read
14  every word, but if you can just describe what you
15  are writing here and what the notes are, and then I
16  will wait at the end of each page and ask you
17  follow-up questions.  Is that okay?
18     **A.  It will be difficult, but I will do my**
19  **best.**
20     Q.  Difficult because you can't read your own
21  handwriting?
22     **A.  No.  Difficult because it's very**
23  **disorganized.  When you go through the medical**
24  **records, you sometimes get the later records first,**
25  **and then the earlier records later.  So it's a bit**

## Page 96

that was on

.

## Page 97

Dennis D. Weisenburger, M.D.
November 26, 2018



26 (Pages 98 to 101)

Dennis D. Weisenburger, M.D.
November 26, 2018



Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Dennis D. Weisenburger, M.D.
November 26, 2018



Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 110

Page 111

Page 112

3    Q.   And was the primary purpose of reviewing
4   her deposition to determine her exposure to
5   Roundup?
6        A.   That was part of it.  In other words, it
7   was just to find out what she had to say about her
8   medical history.
9        Q.   Okay.  When you are trying to determine
10   whether, as part of your methodology in one of
11   these cases, when you are trying to determine
12   whether a plaintiff has sufficient Roundup exposure
13   for you to be able to say whether or not it was a
14   substantial contributing factor, what is the
15   minimal level of exposure that you are looking for?
16        A.   I'm not sure I have a minimal level.  I
17   mean, it should be significant exposure, that is
18   using it multiple times per year and using it for
19   multiple years.  You know, in my other reports, one
20   of the criteria I use were that -- you know, were
21   the McDuffie and the NAPP data, the greater than
22   two days per year, or the criteria -- or the data
23   from Eriksson which said more than ten days.
24

6        Q.   Okay.  So is it -- just to push a little
7   bit on that, is it fair to say that you would --
8   that your minimum exposure would be at least two
9   times per year and at least a total of ten times
10   for you to be able to determine that the
11   plaintiff's Roundup exposure was a substantial
12   contributing factor to his or her development of
13   NHL?
14

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 114

12  Q.  You would have the exact same opinions?
13  **A.  Yes.**
14  Q.  What if she said that she had used
15  glyphosate two times a year for four years?  Would
16  your opinion be any different?
17       MR. WISNER:  Objection.  Incomplete
18  hypothetical.
19  **A.  I don't know.  I mean, I would have to**
20  **look at -- I would have to look at the case**
21  **carefully.**
22  BY MR. STEKLOFF:
23  Q.  Okay.  So let's go back to page 3.  Does
24  that, in the top left, say "good on depo" or "good
25  on exposure"?  What is that note underlined in the

Page 116

1  that information to form your opinions?
2  **A.  Yes.**

Page 115

1  top?
2  **A.  It says "Gordon depo."**
3  Q.  Oh, Gordon depo.  And you are just
4  summarizing her work --
5  **A.  Right.**
6  Q.  -- cook, waitress, dishwasher, register,
7  et cetera, stopped working 2 to 3 --
8  **A.  2003.**
9
25  Q.  -- for example, it's impossible to rely on

Page 117

22  BY MR. STEKLOFF:
23  Q.  But it's possible that you would determine
24  that it wasn't a cause if the person wore
25  sufficient protective equipment?

30 (Pages 114 to 117)

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 118

1    MR. WISNER: Objection. Incomplete
2  hypothetical. Calls for speculation.
3    **A. It's possible. I don't know.**
4  BY MR. STEKLOFF:
5    Q. And do you recall whether Ms. Gordon --
6  strike that.
7      Does the -- you have here "three lots to
8  maintain, spray large areas, not just spot spraying."
9  How, if at all, did that impact your opinion?
10    **A. Well, it meant that she was spraying a**
11  **mist over broad areas, which is much more likely to**
12  **cause a higher exposure because the mist drifts and**
13  **gets on your skin.**
14    Q. So is it inhalation of the -- is it --
15  what is your opinion? Is it the inhalation of
16  Roundup, or is it exposure to the skin that matters
17  from a mechanistic standpoint?
18    **A. It's primarily exposure to the skin, but**
19  **it could also be inhaled.**
20    Q. Okay. And what is the basis -- you may
21  have testified about this before -- but what
22  studies, if you recall, are you relying on to say
23  that it's exposure to the skin that primarily
24  matters?
25    **A. I'm not sure I'm relying on any specific**

Page 119

1  **study. I mean, it's well known that that's the**
2  **primary mode of exposure in people who buy**
3  **pesticides.**
4    Q. When you say "it's well known," well known
5  by who? How is it well known?
6    **A. It's well known in the pesticide**
7  **literature.**
8    Q. Okay. I just can't read this, actually.
9  I think it says "flower bed." Then it says
10  "sprayed between" -- what words are after that?
11    **A. Yeah, "garage and shed."**
12    Q. Okay.
13    **A. "Sprayed pavers."**
14    Q. "Never mixed."
15    **A. Never mixed -- she never mixed it.**
16  **She always -- herself, she never mixed it**
17  **personally.**
18    Q. "Sprayed mist over" --
19    **A. "Overlapping spray."**
20    Q. "Alley, flower beds, small rock beds."
21    **A. Uh-huh.**
22

Page 120

Page 121

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 122

22  BY MR. STEKLOFF:
23     Q.  And exposure is -- having sufficient
24  exposure is a key element of your methodology;
25  right?

Page 123

1      A.  Yes.
2      Q.  And the only way you have to assess
3  exposure is to make that credibility determination
4  about what the plaintiff says about his or her
5  exposure; correct?
6      MR. WISNER:  Continued objection.  Calls
7  for a legal conclusion.  Speculation.  Improper
8  hypothetical.
9      A.  As I said, I trusted what was in the
10  deposition, that she was under oath.  I trusted
11  what she told me over the telephone because it
12  corroborated her deposition testimony.
13  BY MR. STEKLOFF:
14     Q.  And that was the only way you could assess
15  her exposure, was to go through that process and
16  determine whether you found her credible?
17     A.  Yes.
18     MR. WISNER:  Objection.  Renewed
19  objection.  Speculation.  Calls for a legal
20  conclusion, specifically with the phrase
21  "credibility determination."
22     MR. STEKLOFF:  It's one of my favorite
23  phrases to use in a deposition.
24     MR. WISNER:  I know.  You are going to put
25  it in the Daubert motion.

Page 124

1  BY MR. STEKLOFF:
2      Q.  So let's go to page 4.
3      A.  Okay.  Page 4 is -- so I sat down and made
4  a list of all the questions, sort of issues and
5  questions that I wanted to quiz her about.
6

Page 125

1

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 126

1      A.  Yes.
2      Q.  Why does that matter to your methodology?
3      A.  Well, it gives you an idea of whether they
4  used it for 10 minutes or four hours.  So it gives
5  you -- it's an index of exposure.
6      Q.  Is it the time of the day or --
7      A.  It's a number of hours in the day.
8      Q.  Got it.  Doesn't matter whether it's
9  morning or night or afternoon?
10     A.  No.
11     Q.  "Mixing/spills."  You are trying to
12 determine whether or not they mixed the product and
13 whether or not they had any spills on their skin?
14     A.  Yes.
15     Q.  "Protection, clothing, et cetera."  We
16 talked about that; is that right?
17     A.  Yes.
18     Q.  "Spray on skin, clothes"; is that right?
19 Is that what that says, I guess, is the first
20 question?
21     A.  Yeah.  Did she get it on her skin.  Did
22 she get it on her clothes.
23     Q.  Are you asking that generally or whether
24 the individual can recall specific instances or
25 both?

Page 127

1      A.  Well, generally, generally.  I mean, I
2  would say, "Did you ever get it on your skin?  Did
3  you ever get it on your clothes?  Where on your
4  skin did you get it?"
5      Q.  Okay.  And what does that say to the
6  right?  Is it "smell" or "small" or something else?
7      A.  Smell, yes.  So I can't remember who it
8  was.  One of the candidates -- one of the
9  plaintiffs said that they could smell it.  So I
10 added that there.  But what I found out was that
11 the others didn't smell anything.  So apparently,
12 it doesn't have a smell, but I don't know the
13 answer to that.  So --
14     Q.  Okay.
15     A.  I think one person smelled it, and the
16 others didn't smell it, so I -- okay, who knows
17 what they smelled.  I don't know.
18     Q.  Is that a possible recall bias?
19     A.  I don't know.  So I asked them, "Where did
20 you smell it?" and asked them that.
21     Q.  Next one says "product used."  Does it
22 matter what, in your methodology, what product they
23 used?
24     A.  Not really.  I mean, I wanted to know
25 whether they used Roundup or not, and she had used

Page 128

1  Roundup.  I mean, I usually ask, "What is the name
2  of the product you used?"
3      Q.  But this specific formulation doesn't
4  matter?
5      A.  Probably not, no.
6      Q.  It doesn't matter which surfactants are
7  combined with glyphosate to your methodology?
8      A.  No.
9      Q.  "Method of spray."  We talked about.  What
10 spray -- is that just talking about which air --
11 what they are spraying, like cracks or --
12     A.  Yes.
13     Q.  Okay.  "Amounts sprayed each time in
14 gallons."  Is that what the next one says?
15     A.  Yes.  So I tried to get a handle on how
16 much did they actually spray each time they
17 sprayed.  How many gallons did they use?
18     Q.  Is there any -- we talked before about the
19 number of times they sprayed.  Is there any minimum
20 number of times for you to say that there was
21 sufficient exposure to Roundup to be a cause?
22         MR. WISNER:  Objection.
23     A.  No, no, but it's just another way to
24 quantitate their potential exposure.
25 BY MR. WISNER:

Page 129

1      Q.  Is there anything in the literature that
2  tells you a certain amount of gallons versus
3  another amount of gallons and how that changes
4  their risk?
5      A.  No.
6      Q.  Area sprayed in square feet.  I think
7  we -- is that similar?
8      A.  Yeah.  So in some situations where you
9  could determine what was the square footage you
10 sprayed or if it's a road, how long was the road.
11 So I was trying to get an idea of area sprayed.
12     Q.  Okay.  "Clothes take off."  What are you
13 asking there?
14     A.  So, you know, after they sprayed, did they
15 take their clothes off?  Did they change clothes,
16 or did they wear their clothes for the rest of the
17 day?
18     Q.  Understanding that if they took their
19 clothes off right away, that would lower their
20 exposure, does it really -- does it impact your
21 methodology at all?
22     A.  Well, if they wore their clothes all day
23 and they didn't wash, that would tell me that they
24 had higher exposure than if they took their clothes
25 off right afterwards and took a shower.  So it

33 (Pages 126 to 129)

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 130

1    helps me gauge the level of exposure.

24    Q.  Or I think -- wait.  I skipped "Shower,
25   wash up."  We discussed that; right?

Page 131

1        And the next one is "other pesticides or
2    solvents used"; correct?
3        A.  Yes.  So I wanted to know what other
4    pesticides might -- she had used or what other
5    chemicals might she have used that would be risk
6    factors.
7        Q.  Right.  Let's say you have a plaintiff who
8    used Roundup and also had exposure to benzene.  You
9    wouldn't rule out the Roundup.  You would just say,
10   with no other causative risk factors, that they
11   were both substantial contributing factors?
12       MR. WISNER: Objection.  Improper
13   hypothetical.
14       A.  If the exposures, I thought, were
15   significant, then there would be more than one risk
16   factor, yes.
17       Q.  Okay.  "Spray mist percentage."  What does
18   that refer to?
19       A.  So I tried to get a feeling for how
20   much -- how much of the time was spent spraying a
21   mist, and how much time was spent just
22   spot-spraying a squirt.
23       Q.  Now, you drop down to -- 16, is "medical
24   status at last follow-up.  Other causes of NHL,
25   immune deficiency, autoimmune viral"; is that

Page 132

1    right?
2        A.  Should probably say "et cetera," because I
3    was just trying to say I've got to walk through a
4    list of all these things.

Page 133

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 134

BY MR. WISNER:

14
15    Q.   Okay.  Number 7 says "premixed Roundup
16  1994 on."  Okay, sorry.  I couldn't read that.  But
17  then I did.  Okay.  Your handwriting is very neat
18  on that page.  I have no questions.
19        MR. WISNER:  He used to get As in
20  handwriting.
21        MR. STEKLOFF:  For a doctor, it's
22  especially good.
23        THE WITNESS:  That was low.  It usually
24  looks more like the next page, actually.
25  BY MR. STEKLOFF:

Page 135

1    Q.   Yeah, the next page, I'm going to have
2  some questions.  Number 12, "Wore shorts and tank
3  tops" --
4    A.   "Or swimsuit."
5    Q.   -- "or swimsuit.  Flip flops or sandals.
6  No socks, continued to" --
7    A.   "To wear all day."
8    Q.   "Wear all day."
9    A.   "Showered in the evening."
10    Q.   "Showered in the evening."
11        Okay.  It says "no" -- number 13, "no
12  workup of"?
13    A.   "No washup afterwards, did other yard
14  work."
15    Q.   Okay.  I see in number 14, you asked
16  whether her occasional spray of insects inside and
17  out was a Bayer product.  Why did you ask?
18    A.   She had volunteered that, actually.
19    Q.   Oh, okay.  She was curious whether it was
20  a Bayer product, or she did -- did she not know, or
21  she thought it was a Bayer product?
22    A.   She said it was a Bayer product.  I
23  didn't -- she said that to me.  I didn't ask her
24  that.
25    Q.   Why is there a question mark there?

Page 136

1    A.   Well, she didn't know precisely what
2  product it was.  It was just a Bayer product.
3    Q.   Got it.  Can you just read the next?
4  "Occasionally sprayed" --
5    A.   "Sevin."  It's an insecticide.
6    Q.   Got it.
7    A.   "On fruit trees and veggie garden."  She
8  did that a few times in the -- you know, during
9  this 14 years.
10    Q.   Okay.  And "occasionally used"?
11    A.   "Granular products on the lawn," like Weed
12  & Feed, Scotts Weed & Feed.
13    Q.   And the last part, "Occasional paint
14  thinner and bath and" --
15    A.   "Household cleaners."
16    Q.   Okay.  Did you consider any of those
17  products causative -- potential causative risk
18  factors in her case?
19    A.   I did not because she used them very
20  infrequently.
21    Q.   Do you think, with sufficient exposure,
22  any of them would have been causative risk factors?
23    A.   Well, paint thinner would be because it's
24  a solvent.
25        Sevin, I don't know.  I would have to go

Page 137

1  back and look at what that is -- what that actually
2  is, but that could be a potential risk factor, you
3  know.  But she only did it a few times, so it's not
4  likely to be a substantial factor.
5    Q.   Okay.  And did you go back to look at
6  epidemiology with respect to those other products
7  to see if there is a minimum exposure in
8  epidemiology that makes those a causative risk
9  factor?
10        MR. WISNER:  Objection.  Objection.
11  Objection.  I'm forgetting what it is now.
12  Objection.
13    A.   Well, the solvent paint thinner
14  literature, I know very well because I testified in
15  other cases on that.
16        Sevin, she used it very infrequently, only
17  a few times.  So I just sort of said it's probably
18  not important.  Okay.  I didn't go back and look -- I
19  didn't even go back and look up what it was.  I
20  probably should do that, but I didn't.
21  BY MR. WISNER:
22    Q.   Okay.
23    A.   I use it at home myself.
24    Q.   You use Sevin?
25    A.   I do.

35 (Pages 134 to 137)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 138

1    Q.  Okay.  Do you use paint thinner?
2    A.  I don't paint.
3    Q.  Okay.  Have you ever used Roundup?
4    A.  I use 2,4-D.
5    Q.  Okay.  Do you use 2,4-D today?
6    A.  Well, I -- you know, in our house in Omaha
7    where we have a yard, I used to spot-spray the
8    dandelions with 2,4-D.  That's about it.
9    Q.  Do you still do that?
10   A.  I will.
11   Q.  Is that a second home?  You still have the
12   home, and you go there?
13   A.  Yeah.
14   Q.  And you will spot-spray with 2,4-D?
15   A.  Yeah.
16   Q.  And is 2,4-D a -- with sufficient
17   exposure, a causative risk factor for NHL?
18   A.  It probably is.
19   Q.  You said that you are very familiar with
20   paint thinner -- solvent paint thinner because you
21   testified in that case.  What's the minimum
22   exposure for solvent paint thinner to be a risk
23   factor?
24        MR. WISNER:  Objection.  Incomplete
25   hypothetical.  Speculation.

Page 139

1    A.  I don't have an answer to that.  It would
2    be use -- extensive use over many years.
3    BY MR. STEKLOFF:
4    Q.  Okay.  All right.  15, I can read.
5    A.  So she used a mist 60 to 65 percent of the
6    time spraying over large areas.  So just,
7    basically, areas spraying with a mist, and then,
8    you know, she did spot-spraying 30 to 40 percent of
9    the time.  Just gives me an idea of how much time
10   she used each method.
11   Q.  And then at the bottom, is this you doing
12   calculations to see --
13   A.  So it's kind of fun to do some
14   calculations.  So I took -- if she used it twice a
15   week, every week of the month, 8 months times 14
16   years, it comes to about 900 times that she sprayed
17   Roundup, okay?
18   Q.  Yeah.
19   A.  And if she used 1.75 gallons per month,
20   that's what she said, times 8 months times 14
21   years.  It's about 200 gallons.  So just -- I don't
22   know, it's a way to sort of ballpark what she used
23   and how many times she used it.  It's very crude,
24   but --
25   Q.  Okay.  Now, the next page --

Page 140

1        A.  So the next page are the rough notes of
2    what we have already gone over pretty much.  Okay?
3    These are the rough notes that I took at the time
4    of the interview.  So I basically took this and the
5    stuff I got from the deposition and put it on the
6    previous two pages.  So it's pretty much the same
7    information.



Page 141

Paszkiewicz Court Reporting
(618) 307-9320  /  Toll-Free (855) 595-3577

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 142

21  BY MR. STEKLOFF:
22      Q.  But there is no minimum length of exposure
23  in your methodology?
24          MR. WISNER:  Objection.  Improper
25  hypothetical.  Speculation.

Page 143

1      A.  Length in terms of years, you mean?
2  BY MR. STEKLOFF:
3      Q.  Sure.
4      A.  So, you know, it really depends on the
5  dose.  It depends on all the various things we've
6  talked about.  I don't have any minimum length.
7      Q.  What's the requisite dose that is required
8  for you to say there was sufficient exposure?
9          MR. WISNER:  Objection.  Improper
10  hypothetical.  Speculation.
11      A.  I don't really have a minimum dose either.
12  I mean, it would have to be -- I would expect it to
13  be significant exposure, like we are seeing in this
14  case and the other cases.
15  BY MR. WISNER:
16      Q.  But you can't tell me where below this
17  case, in terms of exposure, you would say it wasn't
18  a cause?
19          MR. WISNER:  Objection.  Improper
20  hypothetical.  Speculation.
21      A.  I would have to look at each case
22  individually and look at all the factors involved
23  to really make that kind of a decision.
24  BY MR. STEKLOFF:
25      Q.  Okay.

Page 144

1          MR. WISNER:  Hey, Brian, if you are done
2  with this document, this might be a good time to
3  take a lunch.  I know he eats lunch a little bit
4  earlier than most, but if you're not done, we can
5  probably finish it up.
6          MR. STEKLOFF:  Okay.  Yeah, just give
7  me -- we can take lunch very soon.  Just give me
8  like a minute to assess where I am, and then we can
9  take lunch.
10          (Pause in proceedings.)
11  BY MR. STEKLOFF:
12

Page 145

1

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 146



BY MR. STEKLOFF:
Q. That was your only intent of the slides?
A. Yes.
MR. WISNER: Okay. All right. Let's go off the record, and we can talk about how long we need for a lunch break.
THE VIDEOGRAPHER: This concludes Media Unit 2 of the deposition of Dennis D. Weisenburger, MD. The time on the video monitor is 12:22 p.m. We are going off the record.
(Recess taken from 12:22 p.m. to 1:14 p.m.)
THE VIDEOGRAPHER: Here begins Media Unit 3 of the deposition of Dennis D. Weisenburger, MD. The time on the video monitor is 1:14 p.m. We are back on the record.
BY MR. STEKLOFF:
Q. I actually wanted to ask you about IARC. Have you ever done work with or for IARC before?
A. No.

Page 147

Q. And I'm not going to ask you your opinions about IARC's conclusion of the glyphosate as a 2A carcinogen, but -- in detail, but I want to ask you a couple of questions. First, you agree that that was a hazard assessment; is that right?
A. Yes.
Q. And you agree that a hazard assessment is different than a risk assessment?
MR. WISNER: Objection. Vague.
A. Yes.
BY MR. STEKLOFF:
Q. Do you agree that there is nothing in the IARC monograph that says that its conclusion could allow a physician to determine the specific cause of an individual's NHL?
MR. WISNER: Objection. Vague.
A. They don't make any statement about that.
BY MR. STEKLOFF:
Q. In other words, you're not relying on the IARC monograph in offering your specific causation opinion about Ms. Gordon; correct?
A. Correct.
Q. And that's true of the other three plaintiffs that you will be deposed about, as well; correct?

Page 148

MR. WISNER: Objection.
A. Correct.
BY MR. STEKLOFF:
Q. Are you -- I know that I touched on this, but I just want to close the loop. Do you have any -- other than the final publication of the NAPP paper that we have talked about, are you involved in any current research regarding glyphosate and NHL?
A. No.
Q. Do you have any lectures about glyphosate and NHL planned?
A. No.
Q. Do you have any presentations, either at City of Hope or a medical conference or anywhere in the world regarding glyphosate and NHL planned?
A. No.
Q. With respect to Ms. Gordon, did you form your opinion about the cause of her NHL before or after your phone interview with her?
A. After.
Q. And do you have an opinion as to whether -- so is it fair to say that in order for Ms. Gordon to have developed NHL, she had to have genetic mutations?

Page 149

A. She had to have some genetic lesions, yes.
Q. Okay. Genetic lesions that resulted from mutations in her genes?
A. Mutations or deletions or translocations, yeah.
Q. Changes in her genes?
A. Yes.
Q. And do you have an opinion as to whether Roundup exposure initiated any of those genetic mutations or deletions or translocations? In other words, the very first one that ultimately led to her NHL?
MR. WISNER: Objection. Vague. There is a technical definition of "initiation." Do you mean that, or are you talking about your common-sense definition?
BY MR. WISNER:
Q. Well, is there a medical definition of "initiation"?
A. As I was telling him yesterday, initiation and promotion are kind of concepts that we don't talk much about anymore. They go back to the '50s and the '60s.
So initiation means that you give -- you give some kind of a chemical to sort of get the

38 (Pages 146 to 149)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 150

1  cancer started, but it doesn't actually usually
2  complete the cancer development, and then you give
3  something else to make the cells divide or cause
4  secondary lesions.  And that's your promoter so --
5  because I think Roundup is a genotoxic agent, it
6  could be an initiator and a promoter.
7     Q.  And in Ms. Gordon's case, do you have an
8  opinion as to whether, more likely than not, it was
9  an initiator, a promoter, or both?
10    A.  I don't have an opinion.
11    Q.  Okay.  You just think that it was at least
12  one?
13    A.  Yes.
14    Q.  Other than -- it sounds like you met -- I
15  will just try to lead and be quick.  So it sounds
16  like you met Mr. Wisner for about an hour and a
17  half yesterday; is that right?
18    A.  Yes.
19    Q.  Other than that, did you do anything else
20  to prepare for this deposition?
21    A.  Well, I spent the last three days kind of
22  going over documents and --
23    Q.  Okay.  What documents -- I don't need a
24  specific one, but what categories of documents did
25  you go over?  Not with Mr. Wisner, but on your own?

Page 152

1    A.  I don't know.
2      MR. WISNER:  I believe you received an
3  updated reliance list that, I believe, it was the
4  other cases.
5      MR. STEKLOFF:  Okay.  That's helpful.

25  BY MR. STEKLOFF:

Page 151

Page 153

14    Q.  In the NAPP paper, when it's published,
15  have you filled out whatever forms necessary from
16  the journal about your -- any conflicts of
17  interest?
18    A.  No, but it's stated somewhere in the
19  paper.
20    Q.  Okay.
21    A.  That I'm a legal consultant.
22    Q.  That was my question.  It states in the
23  paper, you know, with an asterisk next to your name
24  and a footnote, that you are a retained expert on
25  behalf of plaintiffs in this litigation?



39 (Pages 150 to 153)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 154

1    A.  Yes.  Well, the exact word, it says that
2    I'm a legal consultant.  I think it says something
3    like that.
4        Q.  Does it make clear that you are a legal
5    consultant for plaintiffs against Monsanto?
6        A.  I don't believe so.
7        Q.  It just says that you are a legal
8    consultant?
9        A.  (Witness nods head.)
10       Q.  Do you --
11       A.  I would probably have to disclose that to
12   the journal.  The journal doesn't ask you to do
13   that until they have accepted it, so --
14       Q.  You just haven't gone through that process
15   yet?
16       A.  Right.
17       Q.  All right.  So we tried to piece
18   together -- I know you've testified before --
19   served as an expert before your prior testimony.  I
20   don't know that I have a document, but I wanted to
21   just ask you about some of that prior testimony and
22   try to figure out what the cases were about.
23       A.  Okay.
24       Q.  Which side you are an expert for.  I will
25   do my best to refresh your recollection.

Page 155

1        A.  Okay.
2        Q.  So there is a case called Murray versus
3    Chevron that was in L.A. County.  Do you recall
4    that case?
5        A.  I don't recall.  It was a long time ago.
6        Q.  I don't have a year.
7        A.  It was longer than five years.
8        Q.  Yeah, some of them are longer than five
9    years.
10           It says that you testified for the
11   plaintiff against Chevron, but you don't recall what
12   the case was about?
13       A.  I don't.
14       Q.  That's fine.  I'm going to ask and if you
15   don't recall, you don't recall.
16           Okay.  The next case --
17       A.  It was probably a solvent case.
18       Q.  Okay.  And you think you were opining that
19   the solvent caused an injury to the plaintiff?
20       A.  Probably.
21       Q.  Do you know what injury was involved?
22       A.  I don't.
23       Q.  Okay.
24       A.  I don't remember.
25       Q.  The next case I see is something called

Page 156

1    Hirt -- H-I-R-T -- versus Pharmacia, Incorporated.
2    And it looks like you testified for Pharmacia in
3    that case.
4        Do you remember what that case was about?
5        A.  I don't.
6        Q.  Have you ever testified for a corporation,
7    not a hospital, but corporations, a chemical
8    company or a pharmaceutical company, and said that
9    their product did not cause injuries alleged by the
10   plaintiff?
11       A.  So I've done that in quite a few asbestos
12   cases where they alleged that asbestos caused
13   non-Hodgkin's lymphoma, and I've said, "No, it
14   doesn't."  So I have done that in a variety of
15   cases.  Most of those cases -- none of those cases
16   went to trial, actually, but I've been deposed in
17   cases like that.
18       Q.  And of all those cases where you've been
19   on the side of the defense in that context --
20       A.  Yes.
21       Q.  -- involved asbestos?
22       A.  Yes.
23       Q.  And were they all individual plaintiffs
24   saying that their mesothelioma or some other -- you
25   said non-Hodgkin's lymphoma, that their

Page 157

1    non-Hodgkin's lymphoma was caused by asbestos?
2        A.  Yes.
3        Q.  And generally, what was the basis for you
4    to opine that NHL was not caused by asbestos?
5        MR. WISNER:  Objection.  Way outside the
6    scope.
7        A.  There is no evidence that it does.  I
8    actually wrote a review paper on it some years ago.
9    BY MR. STEKLOFF:
10       Q.  So there is no evidence -- to clarify,
11   there is no evidence that asbestos causes NHL?
12       A.  No credible evidence.
13       Q.  Okay.  So it's really a general causation
14   opinion and a specific causation opinion?
15       A.  Yes.
16       Q.  Because your view is than from a general
17   causation standpoint, asbestos does not cause NHL?
18       A.  Yes.
19       Q.  That might expedite some of this.
20           So Hirt versus Pharmacia, you just don't
21   recall?
22       A.  I don't.
23       Q.  It may have been asbestos?
24       A.  I don't know.
25       Q.  There is a case called CAVE versus Exxon,

40  (Pages 154 to 157)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 158

1  which was in West Virginia.  This is back in maybe
2  2001.  And I think it involved a benzene exposure.
3  Do you recall that?
4      **A.  Probably mixed solvents, yeah.**
5      Q.  And were on you the side of the plaintiff
6  on that?
7      **A.  Yes.**
8      Q.  Saying that benzene or mixed solvents
9  caused an individual's non-Hodgkin's lymphoma?
10      **A.  Yes.**
11      Q.  Contreras versus Safety-Kleen Systems,
12  that was in L.A.  It looks like that was benzene
13  exposure, and the plaintiff was alleging multiple
14  myeloma and NHL.  You were testifying for the
15  plaintiff?
16      **A.  I believe so.**
17      Q.  Okay.  Cortez versus Sisters of Charity of
18  the Incarnate Word in Texas.  Do you remember that
19  case?
20      **A.  No, I don't.**
21      Q.  You just don't remember.  You testified
22  for the plaintiff, but you don't remember what the
23  case was about?
24      **A.  I don't remember.**
25      Q.  All right.  Cortez versus Mack -- I won't

Page 159

1  ask you about that.  But it was a medical
2  malpractice case.
3      I will ask just to complete the record.
4  Cortez versus Mack, do you recall where you testified
5  in a medical malpractice case alleging wrongful death
6  that was caused by a failure to diagnose lymphoma in
7  Texas?
8      **A.  I don't remember that case.**
9      Q.  Okay.  Garcia versus Allied Diagnostic
10  Imaging Resources in Los Angeles.  Do you recall
11  testifying for plaintiffs that alleged wrongful
12  death caused by ink products containing harmful
13  chemicals?
14      **A.  I don't remember that one either.  It's**
15  **probably -- it's probably right.  I vaguely**
16  **remember it, but...**
17      Q.  Booth versus Salvarajah,
18  S-A-L-V-A-R-A-J-A-H.  You testified -- this was for
19  the defense in a med mal case alleging wrongful
20  death caused by negligent findings from a -- I'm
21  going to pronounce this wrong -- mediastinal mass,
22  M-E-D-I-A-S-T-I-N-A-L?  Do you remember anything
23  about that?
24      **A.  I don't remember that one.**
25      Q.  Okay.  Hirt versus Bristol-Myers Squibb.

Page 160

1  We had another case, Hirt versus Pharmacia.  It
2  looks like the same plaintiff, and you testified
3  for the defense.
4      Do you remember what that case was about?
5      **A.  I don't.**
6      Q.  Okay.
7      **A.  It's all very old cases.**
8      Q.  Yes, they are.  We are getting closer.
9  2007, Hoffman versus Monsanto.  You testified for
10  plaintiff alleging his NHL, or her NHL, occurred
11  through violations of state safety standards,
12  exposure to xylene, X-Y-L-E-N-E, and other
13  chemicals.  Do you remember that?
14      **A.  (Witness nods head.)**
15      Q.  No.  Have you ever testified at trial, as
16  opposed to in depositions?
17      **A.  Yeah.  Twice, I think.**
18      Q.  What cases do you recall testifying at
19  trial?
20      **A.  It was a West Virginia case that was a**
21  **solvent case.**
22      Q.  Okay.  Regarding a plaintiff who was
23  alleging his or her NHL was caused by a solvent?
24      **A.  Uh-huh.  There was a medical malpractice**
25  **case where they alleged that the primary care**

Page 161

1  physician didn't properly diagnose the patient.
2      Q.  Okay.  There is a series of asbestos cases
3  which I feel like we have covered.
4      Okay.  2009ish, Minnehan, M-I-N-N-E-H-A-N,
5  versus Radiator Specialty Company in Texas, a case
6  alleging physical injury caused by benzene exposure.
7      Do you recall anything about that?
8      **A.  I don't.  A lot of these cases, I wasn't**
9  **even deposed.  I just wrote a letter or wrote a**
10  **report.**
11      Q.  Got it.  Molina, M-O-L-I-N-A, versus
12  Shell, a case involving follicular B-cell NHL
13  caused by exposure to petroleum hydrocarbon
14  solvent.  Do you recall anything about that?
15      **A.  Vaguely.**
16      Q.  You were testifying for the plaintiff in
17  that case?
18      **A.  Yes.**
19      Q.  Page versus Exxon Mobil involving work
20  site issues about whether people -- workers were
21  provided protective equipment when exposed to
22  various chemicals, leading to acute myelogenous
23  leukemia.  Do you recall that?
24      **A.  Not really.**
25      Q.  But you would have been on the side of

41 (Pages 158 to 161)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 162

1    plaintiffs?
2        A.  Probably.
3        Q.  Okay.  I won't go through all of these,
4    but is it fair to say that, putting aside med mal,
5    in any sort of products liability case where there
6    is an allegation that a chemical or another product
7    caused some sort of cancer, with the exception of
8    the asbestos cases, you have always testified on
9    behalf of the plaintiffs?
10       A.  I don't know about always.  Usually,
11   probably, yes.
12       Q.  Is there any instance, other than
13   asbestos, that you can identify where you did
14   not -- where you testified on behalf of the
15   defense?
16       A.  Not that I can remember.
17       Q.  Okay.  Have you done research about
18   asbestos exposure and NHL?
19       A.  Yes.
20       Q.  Have you published on it?
21       A.  Yes.  I wrote a review article.
22       Q.  Do you know -- is it easy to find in this
23   bibliography here?
24       A.  No, but I can look if you want me to.
25   It's somewhere in the middle.

Page 163

1        Q.  It might be -- if you have -- do you have
2    that exhibit in front of you where you can quickly
3    look?
4        (Miscellaneous comments.)
5        MR. WISNER:  Do you recall who any of your
6    coauthors were?
7        MR. STEKLOFF:  Yeah, we can all look.
8        THE WITNESS:  No.  It was Brian Chu, the
9    epidemiologist that I worked with.  But I was the
10   first author, so it should be easy to find.  That
11   was a long time ago.
12       MR. WISNER:  191.
13       THE WITNESS:  191?
14       MR. WISNER:  Uh-huh.
15       A.  That's the one.
16   BY MR. STEKLOFF:
17       Q.  What's it called?
18       A.  Word 191, on page 21.
19       Q.  We're all looking at different versions of
20   this, is the problem.  But what's the -- okay.
21   Thank you.
22       MR. WISNER:  Very appropriately titled.
23   BY MR. STEKLOFF:
24       Q.  Do you believe that there is a scientific
25   consensus that asbestos doesn't cause non-Hodgkin's

Page 164

1    lymphoma?
2        A.  Yes.
3        Q.  I want to ask a few follow-up questions
4    about the idiopathic instances of non-Hodgkin's
5    lymphoma.  In those instances, approximately 70
6    percent of cases where you can't determine a cause,
7    the genetic mutations or deletions or other genetic
8    changes still have to occur; correct?
9        A.  Yes.
10       Q.  And the reason they are idiopathic is
11   because you can't say what is causing those genetic
12   changes; right?
13       A.  Right.
14       Q.  So in a patient -- but something is
15   causing genetic changes in an individual; right?
16       A.  Correct.
17       Q.  And is it possible that those same genetic
18   changes that are occurring without any known cause
19   can occur -- sorry.  Let me rephrase that.
20       Is it possible that the unknown causes of
21   those genetic changes can occur in individuals who
22   are exposed to Roundup and develop NHL?
23       MR. WISNER:  Objection.  Improper
24   hypothetical.  Speculation.
25       A.  It's possible.

Page 165

1    BY MR. STEKLOFF:
2        Q.  And where we talked about that
3    more-likely-than-not standard, is that possibility
4    part of the 49.9 percent?  In other words, it's why
5    you can't say with certainty, a hundred percent
6    certainty or even much greater than 50.1 percent,
7    that Roundup is a cause of an individual's NHL?  Is
8    this possibility of unknown causes causing genetic
9    changes?
10       MR. WISNER:  Objection.  Improper
11   hypothetical.  Compound.  Vague.
12       A.  Yeah, because there is a background risk;
13   right?  There is a background risk.  It's very low,
14   but it's there.
15   BY MR. STEKLOFF:
16       Q.  So the answer is "yes" to my question?
17       A.  Yes.
18       MR. STEKLOFF:  I'm going to mark as
19   Exhibit 6 a letter.  I assume you are familiar with
20   this letter as the author of it?
21       A.  Yes.
22       (Deposition Exhibit 6 was marked for
23       identification by the reporter and is
24       attached hereto.)
25   BY MR. STEKLOFF:

42  (Pages 162 to 165)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 166

1    Q.  What led you to write this letter to Mr.
2    Knott at the EPA?
3        A.  A friend of mine, Peter Infante, contacted
4    me about this issue, and wanted me to clarify.  He
5    was on the -- he was on some committee, maybe the
6    EPA advisory committee.  I'm not sure.  And he
7    wanted me to clarify what I had written in my
8    journal article in terms of how I was quoted.  So I
9    basically wrote this letter to clarify my -- my --
10   to clarify that, what I had written in my journal
11   article.
12       Q.  And other than Dr. -- I assume he's a
13   doctor -- Dr. Infante, did you discuss the subject
14   of this letter with anyone else prior to sending it
15   to the EPA?
16       A.  No.
17       Q.  So I want to ask you about a couple of
18   sentences in this letter.  First of all, when you
19   wrote this letter to the EPA, you wanted to be
20   accurate; correct?
21       A.  Yeah.  I wanted to make sure that they
22   understood what I was saying in my article.
23       Q.  And you wanted the representations you
24   made in this letter to be accurate; correct?
25       A.  Yes.

Page 167

1    Q.  And complete; correct?
2        A.  Yes.
3        Q.  Okay.  And so you stand by everything that
4    you wrote here in this letter; right?
5        A.  Yes.
6        Q.  And so -- your concern -- is it fair to
7    say that your concern was that your article, the
8    1992 paper that you reference here, was being cited
9    for the proposition that the latency period for
10   NHL, in general, is unknown and that estimates
11   range from 1 to 25 years?  You felt that that was
12   inaccurate?
13       A.  Yes, because I think the latency can
14   actually be longer than that.  So, you know, the
15   latency, I think, could go -- I think the median
16   latency is probably for things like chronic
17   exposure to mixed solvents.  The median exposure is
18   probably 20 to 25 years.  So my assumption was that
19   chronic exposure to other chemicals would probably
20   be similar.  Okay?
21           So I think 25 years is probably too short.
22   It probably would be -- if the median is 25 years,
23   there is another 25 years out there or something;
24   right?
25       Q.  Okay.

Page 168

1        A.  So I thought it was really -- it was
2    inaccurate.
3        Q.  And so you wanted to correct the findings
4    of your 1992 paper; correct?
5            MR. WISNER:  Objection.  Misstates the
6    testimony.
7        A.  Yeah.  I can't exactly remember what I
8    wrote in 1992, but I was trying to clarify it to
9    the EPA that I thought that, you know, 20, 25 years
10   is not the upper limit, but it's more like the
11   median for chronic exposures.
12       Q.  Okay.
13       A.  So that's the only reason I wrote it.
14       Q.  And you wrote, about halfway down, for
15   example, "The average latency period for the
16   development of NHL due to long-term low exposure to
17   organic solvents is about 20 years"; right?
18       A.  Right.
19       Q.  And you stand by that statement; correct?
20       A.  I do.
21       Q.  And then you wrote "Since exposure to
22   glyphosate would be expected to be long-term
23   low-level exposure, the citation of my paper for
24   the proposition that a latency period for
25   glyphosate exposure in relation to NHL can range

Page 169

1    from 1 to 25 years would contradict the conclusion
2    of my 1992 paper."  Correct?
3        A.  Right.
4        Q.  You stand by that statement; correct?
5        A.  Right.
6        Q.  Although what you are really clarifying in
7    that statement is that --
8        A.  The latency period could be much longer.
9        Q.  Okay.  And that one year is also very
10   short for a low-level long-term exposure; correct?
11           MR. WISNER:  Objection.  Misstates his
12   testimony.
13           MR. STEKLOFF:  He hasn't testified about
14   it, so I'm asking.
15       A.  I mean, that would be a very short -- that
16   would also be very short for a long-term chronic
17   exposure -- okay? -- one year.
18   BY MR. STEKLOFF:
19       Q.  Right.  You wouldn't expect to see that;
20   correct?
21       A.  No, you wouldn't expect to see that
22   either.
23       Q.  In fact, for short-term -- for -- the
24   latency period for NHL would be short following
25   cancer treatment with chemotherapy and/or

43  (Pages 166 to 169)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 170

1    radiation, for example, five to six years, and for
2    atomic bomb survivors, about nine years; correct?
3        A.  Those are the median latencies.  Those are
4    median latencies that I'm...
5        Q.  So what would you expect is the low -- so
6    you state here the average latency period for
7    glyphosate exposure in relation to potential NHL,
8    you would expect it to be at the upper end of this
9    range, most likely 20 or more years from initial
10   exposure; right?
11       A.  The median, yes.
12       Q.  And you stand by that statement; correct?
13       A.  Yes.
14       Q.  And so that doesn't mean you can't have
15   higher; correct?
16       A.  Right.
17       Q.  That doesn't mean you can't have lower;
18   correct?
19       A.  Right.
20       Q.  But what would you say would be, more
21   likely than not, the reasonable low end of latency
22   with respect to long-term low-level exposure to
23   glyphosate?
24           MR. WISNER:  Objection.  Improper
25   hypothetical.  Calls for speculation.

Page 171

1        A.  I mean, I don't know the answer to that.
2    It's totally -- it's totally a guess.  Probably --
3    I don't know.  It would be a guess.  One year, two
4    years, three years.  It's -- it's a bell-shaped
5    curve, so there is a tail on the curve.
6    BY MR. STEKLOFF:
7        Q.  Right, but in your average case --
8        A.  Your average case, you wouldn't expect it
9    in the first few years of exposure.
10       Q.  And so it would be a complete outlier to
11   have exposure within, say -- the latency within the
12   first three years with glyphosate, is that fair?
13           MR. WISNER:  Objection.  Misstates his
14   testimony.  Calls for speculation.  Improper
15   hypothetical.
16           MR. STEKLOFF:  I'm not characterizing his
17   testimony.  I'm just asking for --
18       A.  For low-dose exposure, is that what you
19   are talking about?
20   BY MR. STEKLOFF:
21       Q.  For long-term low-level exposure, it would
22   be --
23       A.  You would expect a long latency.
24       Q.  Closer to 20 years than 1 to 3 years?
25       A.  Yes.

Page 172

1        Q.  But you can't give an exact cutoff or a
2    range?
3        A.  No, because it's -- you know, this is
4    really kind of hypothetical.
5        Q.  Okay.  Now, you are familiar with SEER
6    data; correct?
7        A.  Yes.
8        Q.  And you are generally familiar with the
9    fact that, in recent years, the NHL diagnoses in
10   the United States have plateaued.  Is that fair?
11       A.  Yes.
12       Q.  And you are also aware that glyphosate use
13   or Roundup use increased dramatically in the 1990s;
14   correct?
15       A.  Yes.
16       Q.  So we are now in the 20- to 25-year range;
17   correct?  In terms of latency?
18       A.  Yeah, 20 years.
19       Q.  So the median of what we just discussed;
20   right?
21       A.  So if it started ramping up in 1996, we
22   are about 20 years out from that.
23       Q.  22; right?
24       A.  Yeah.
25       Q.  Okay.  So the median of what we just saw

Page 173

1    in your letter; right?
2        A.  Right.
3        Q.  And we haven't seen, in the past few
4    years, any meaningful increase in the number of NHL
5    cases diagnosed in a given year; right?
6        A.  That's true.
7        Q.  And so doesn't that give you pause about
8    whether glyphosate or Roundup is a general cause of
9    NHL?
10       A.  No.
11       Q.  Why not?
12       A.  Well, because there are other causes that
13   may have gone away.  For example, people are not
14   using hair dyes anymore with all kinds of chemicals
15   in them that cause lymphoma.
16           So some risk factors have been banned.
17   Some pesticides have been banned.  Some chemicals
18   have been banned, or products have been changed.
19           So, you know, for a disease that's
20   multifactorial, there are all kinds of things in
21   play.  So you might not see an increase in cases from
22   glyphosate because you are seeing a decrease in cases
23   from HIV, for example, or other things.  So, you
24   know, it's the kind of data -- it's the kind of
25   data that you can't really use very well to make a

44  (Pages 170 to 173)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 174

1  point one way or the other.
2      Q.  Okay.  So -- but have you done any
3  meaningful analysis of those other potential
4  causes, like, I think you mentioned -- well, HIV
5  you mentioned.  But you also mentioned, I think,
6  hair dye.  Have you done any sort of analysis to
7  compare use of hair dye or diagnoses of HIV to the
8  increased use of Roundup?
9      A.  Well, the hair dye is interesting because
10  in the early -- well, let's see.  It would be in
11  the '60s and '70s, and probably in the early '80s,
12  the hair dyes had a lot of bad things in them, and
13  there was a whole body of evidence showing that
14  using dark dyes increased risk for non-Hodgkin's
15  lymphoma.  We even had an ICE paper from Nebraska
16  on that.
17      And then what happened is the chemical
18  industry reformulated their dyes, took out all the
19  bad things, and then subsequent studies didn't show
20  anything.  So it's a beautiful example of an
21  intervention that then decreases risk.
22      And the same thing is with HIV.  So there
23  were lots of HIV-associated lymphomas early on in the
24  AIDS epidemic, and then when they found some drugs
25  that they could treat HIV with, the risk of lymphoma

Page 175

1  went down quite significantly, and we see far fewer
2  cases today.  So, you know, it's very dynamic.  It's
3  a dynamic statistic that is very hard to parse out.
4  But we know that these changes have occurred.
5      Q.  In what years did the change in hair dye
6  occur?
7      A.  Oh, it would have been -- I'm not sure if
8  I can tell you the truth.  It probably would be in
9  the '80s -- yeah, in the late 1970s or '80s.
10      Q.  Right.  So that wouldn't be -- that likely
11  wouldn't be impacting SEER data in the 2010s;
12  correct?
13      A.  I was just using it as an example.  I'm
14  not trying to explain what happened.  I'm just
15  trying to give you an example of how the data could
16  be difficult to interpret.
17      Q.  So then -- I asked the question, and I
18  will repeat it.  Have you done any sort of analysis
19  of the SEER data to try to understand why there
20  hasn't been an increase in NHL 22 years out from
21  the drastic increase in Roundup use that started in
22  the mid-'90s?
23      A.  I haven't.
24      Q.  Do you think that that would be a useful
25  analysis?

Page 176

1      A.  It would be a difficult analysis.
2      Q.  Do you think it would be useful?
3      A.  It would be if you could answer questions,
4  but it's -- it's not an easy thing to do.
5      Q.  Epidemiologists face challenges every day;
6  right?
7      A.  That's true.  But it would be a difficult
8  thing to do.
9      Q.  But the plateauing of the SEER data with
10  respect to NHL, you don't factor that in one way or
11  the other with respect to your general causation
12  opinion; is that fair?
13      A.  I don't.
14      MR. WISNER:  Can we go off the record?
15      THE VIDEOGRAPHER:  The time is 1:53 p.m.
16  We are going off the record.
17      (Recess taken from 1:53 p.m. to 1:57 p.m.)
18      THE VIDEOGRAPHER:  The time is 1:57 p.m.
19  We are back on the record.
20  BY MR. STEKLOFF:
21      Q.  Thank you, Dr. Weisenburger.  I may have
22  questions after Mr. Wisner, but I am passing you to
23  him.
24      MR. WISNER:  I'm just going to ask my
25  questions from here.  Is that okay with you?

Page 177

1      MR. STEKLOFF:  Oh, yeah.
2      MR. WISNER:  I didn't want to switch
3  places.
4      (Miscellaneous comments.)
5
6      EXAMINATION
7  BY MR. WISNER:
8      Q.  Good afternoon, Doctor.  I'm going to ask
9  you some questions following up on what
10  Mr. Stekloff was discussing with you on your
11  cross-examination.
12      First, I want to talk about the work you've
13  done in Roundup litigation.  You testified that you
14  have been paid approximately $300,000 for your
15  overall work.  Is that right?
16      A.  Yes.
17      Q.  Now, that included a court-ordered Daubert
18  hearing; correct?
19      A.  Yes.
20      Q.  And that included all the prep associated
21  with that; correct?
22      A.  Yes.
23      Q.  And it also applies to all of the
24  thousands of cases, conceivably, that that opinion
25  could apply to nationwide?

45  (Pages 174 to 177)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 178

1      A.  Yes.
2      Q.  Now, I understand that you said about 50
3  hours for this specific case that you are being
4  deposed in; is that right?
5      A.  Yes.
6      Q.  That's approximately $25,000 before your
7  deposition today; is that right?
8      A.  Yes.
9      Q.  Okay.  I understand that on Exhibit 2, we
10 looked through it, and there's some highlights.
11 You noticed that in your CV?
12     A.  Yes.
13     Q.  Those highlights are not yours?
14     A.  No.
15     Q.  Do you know where they came from?
16     A.  No.
17     Q.  Okay.  I want to talk to you about your
18 role as a pathologist at City of Hope.
19         Would it be appropriate for a treating
20 oncologist to consult with you about whether or not
21 Roundup was a potential causal factor for that
22 particular patient's cancer?
23         MR. STEKLOFF:  Objection.  Leading.
24 Vague.
25 BY MR. WISNER:

Page 179

1      Q.  You can go ahead and answer.
2      A.  Well, in general, no, but as I -- the
3  example I gave you, or gave you about -- so, say, a
4  patient like Mrs. Gordon read on the Internet that
5  Roundup causes non-Hodgkin's lymphoma.  And she
6  says, "Oh, my gosh.  I've got non-Hodgkin's
7  lymphoma, and I use Roundup."
8          So she goes to her oncologist.  He just
9  happens to be one of the guys at City of Hope.  He
10 might say, "Well, I don't know," but people know that
11 I'm very interested in epidemiology, and he might
12 call me and say, "Does Roundup cause NHL?"  I would
13 say, "Yes, it does."
14         So there are situations where that could
15 occur, but in general practice, it doesn't usually
16 occur unless the patient raises the issue.
17     Q.  Well, Dr. Weisenburger, why haven't you
18 gone to City of Hope, got all those doctors into a
19 room and said, "I want to give you a lecture about
20 Roundup causing NHL."  Why haven't you done that?
21     A.  Well, because I don't think they would
22 really be very interested.
23     Q.  Why is that?
24     A.  Well, because they are more interested in
25 treating the patient, not what caused the disease.

Page 180

1      You know, if I got in the room, my lecture would
2  probably be what are all the things that cause
3  non-Hodgkin's lymphoma, and then I could list
4  pesticides as one, and I could give glyphosate as
5  an example of a number of pesticides.
6          But, you know, I would never -- I wouldn't
7  just -- I mean, I think in general, the physicians
8  at City of Hope wouldn't be interested in it
9  because it doesn't impact their practice.  They are
10 not going to prevent disease.  They are trying to
11 treat disease.
12     Q.  Would it be fair to say that by the time a
13 patient comes to City of Hope, diagnosed with
14 cancer, the focus of the treatment of that patient
15 is to cure that cancer, not to prevent, I guess,
16 that cancer again or prevent that cancer from ever
17 recurring?
18     A.  Right, that's correct.
19     Q.  I'm marking as Exhibit 7.  This is -- I
20 only have one copy.  I'm sorry.
21         MR. STEKLOFF:  I know what it is.  I
22 have -- I can pull copies out of the box.
23         MR. WISNER:  Okay.
24     Q.  Doctor, I'm handing you Exhibit 7.  This
25 is a printout from the City of Hope website.  Do

Page 181

1  you see that?
2          (Deposition Exhibit 7 was marked for
3          identification by the reporter and is
4          attached hereto.)
5      A.  I do.
6  BY MR. WISNER:
7      Q.  Let me see it for a second.  I will direct
8  your attention to page 15 of 18.  That's actually a
9  picture of you, isn't it, up on the top left?
10     A.  It is.  I didn't even know it was there.
11     Q.  Okay.  Great.  If you turn to page 5, 5 of
12 18.  So beginning of the document.
13     A.  Okay.
14     Q.  Do you see that heading, talking about the
15 potential causes or sources of NHL?
16     A.  Right.
17     Q.  Now, previously in the deposition, you
18 were asked questions about whether or not City of
19 Hope lists glyphosate or Roundup as a potential
20 cause.  It does not list glyphosate or Roundup,
21 does it?
22     A.  No, but it says chemicals, pesticides, and
23 exposure to other toxins like Agent Orange, which
24 is a herbicide, and benzene may be linked to
25 developing lymphoma.  So it calls out the general

46 (Pages 178 to 181)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 182

1   categories, but it doesn't list specific
2   pesticides.
3        Q.  It says chemicals as well in that same
4   sentence; right?
5        A.  Yes.
6        Q.  If it were to list out every known
7   chemical to potentially cause non-Hodgkin's
8   lymphoma, how long would that document be?
9        MR. STEKLOFF:  Objection.  Calls for
10  speculation.
11       A.  I don't know the answer to that.  It would
12  be -- it would be long.
13  BY MR. WISNER:
14       Q.  Okay.  So the general pesticides, to the
15  best of your knowledge, Roundup is a pesticide; is
16  that right?
17       A.  Right.
18       Q.  Okay.  There was a hypothetical raised
19  during your direct examination about if somebody
20  was diagnosed with lung cancer, you would ask if
21  they were a smoker; right?
22       A.  Correct.
23       Q.  And if they said, "Yeah, I smoke a pack a
24  day for the last 30 years," you would probably
25  advise them to quit smoking; right?

Page 183

1        A.  Right.
2        Q.  Why is that?
3        A.  Well, because smoking causes all kinds of
4   other problems as well.  It causes chronic lung
5   disease.  It causes other kinds of cancers.  So,
6   you know, in general, it's bad.  He may not prevent
7   the lung cancer, but you might be able to prevent
8   some of the other complications of smoking.
9        Q.  Now, if someone came in to you with
10  diffuse B-cell lymphoma, and you were a treating
11  doctor, and they told you that they sprayed, you
12  know, Roundup twice a week, would you advise them
13  to probably stop doing that?
14       A.  No, not unless I was convinced that it was
15  causing a problem.  So, you know, if I wasn't a
16  physician, and I can go on the Internet and do my
17  own search, I might find some information about
18  that.  But most physicians don't do it.
19       Q.  No.  I mean you, if you were a treating
20  physician?
21       A.  If I was the treating physician, knowing
22  what I know today, yes, I would tell them to stop
23  using it, sure.
24       Q.  Okay.  There was a discussion about
25  abstracts.  It was unclear, the direct, whether or

Page 184

1   not abstracts regarding the NAPP were published.
2   To the best of your knowledge, the abstracts that
3   you relied on related to NAPP, have they actually
4   been published?
5        A.  I don't know the answer to that.  Usually,
6   there is a proceedings of the meeting, and that
7   would be published in the proceedings of the
8   meeting.  Some organizations have links to
9   journals, and so they are also published in
10  journals, but it certainly would have been
11  published in a proceedings of the meeting.
12       Q.  And one of those abstracts was in the I --
13  was part of the ICEE annual meeting; correct?
14       A.  Correct.
15       Q.  And you understand that the ICE abstracts
16  are actually subjected to peer review?
17       A.  Yes.  Most abstracts are, that are
18  submitted to meetings like that; they are
19  peer-reviewed.
20       Q.  Now, there was a discussion about, you
21  know, whether or not epidemiological studies should
22  adjust for other pesticides.  Do you recall that?
23       A.  Yes.
24       Q.  And your understanding is that
25  epidemiology is stronger when it adjusts for

Page 185

1   confounders; right?
2        A.  Yes.
3        Q.  And a confounder is something that is both
4   associated with the cancer -- or associated with
5   the cancer and also associated with the use; right?
6        A.  With the -- with the chemical or the risk
7   of interest.
8        Q.  Precisely.  So I should say it's
9   associated with the disease of interest, and it's
10  associated with the exposure of interest?
11       A.  Yes.
12       Q.  It would be inappropriate, from an
13  epidemiological perspective, to adjust for things
14  that were not confounders; right?
15       MR. STEKLOFF:  Objection.
16       A.  Yeah, or potential confounders.
17       Q.  Because that would obscure or water down
18  your data's ability to see a real risk?
19       MR. STEKLOFF:  Object to form.
20       A.  Yes, it could.
21  BY MR. STEKLOFF:
22       Q.  I understand there was a discussion about
23  prior testimony that you've done in other cases.
24  Do you recall that?
25       A.  Yes.

47 (Pages 182 to 185)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 186

1    Q.  I understand that you testified in a case,
2    Wendell versus GlaxoSmithKline?
3        A.  Yes.
4        Q.  And that also was a case where you offered
5    a causation opinion about whether or not the
6    substance could cause non-Hodgkin's lymphoma?
7        A.  Yes.
8        Q.  And the methodology that you used in
9    rendering that opinion, is that the same
10   methodology you used in this case?
11       A.  Yes, it was, uh-huh.
12       Q.  There was a discussion about prior
13   testimony, and when it came to chemicals causing
14   cancer, you had primarily testified on behalf of
15   plaintiffs, with the exception of asbestos cases.
16   Is that right?
17       A.  Yes.
18       Q.  Those other cases, however, those
19   primarily dealt with benzenes and solvents; right?
20       A.  Primarily solvents, mixed solvents, yes.
21       Q.  Was there any other chemicals that you
22   really offered testimony, causing cancer?
23       A.  I've pretty much limited my work to either
24   asbestos or solvents, and then a few miscellaneous
25   medical malpractice things, but I don't usually do

Page 187

1    those, so --
2        Q.  Would it be fair to say, as an expert
3    witness, you have looked at, you know, solvents --
4    and that includes benzene -- asbestos, and Roundup;
5    is that right?
6        A.  Yes.
7        Q.  And only in two of those three litigations
8    have you testified on behalf of plaintiffs?
9        A.  Right.
10       Q.  In fact, with regards to the asbestos, you
11   went out and published an epidemiological review
12   saying, listen, asbestos does not cause
13   non-Hodgkin's lymphoma?
14       A.  Correct.
15       Q.  Now, there was a question asked of you
16   whether or not you would offer any testimony
17   regarding pain and suffering.  Do you recall that?
18       A.  Yes.
19       Q.  You are prepared to offer testimony about
20   the physical requirements and toll that cancer
21   treatment takes on patients; correct?
22       A.  In general terms, yes, I could do that.
23       Q.  And you can testify about what physical
24   symptoms have occurred because of Ms. Gordon's
25   cancer treatment based on the medical records?

Page 188

1        A.  Yes, I could do that.
2        Q.  So when you said you weren't going to
3    offer testimony about pain and suffering, you
4    weren't going to offer testimony about her
5    emotional thoughts or troubles that she may have
6    experienced; is that right?
7        A.  Right.  I'm not going to offer testimony
8    about that, but as I told you, I think the medical
9    oncologists are better experts to provide that kind
10   of testimony than I am.



Page 189

48  (Pages 186 to 189)

Dennis D. Weisenburger, M.D.
November 26, 2018



Page 190

20    BY MR. WISNER:
21        Q.   So there was a lot of, sort of, general
22    categorical questions asked by opposing counsel.
23    Would it be fair to say that all of those questions
24    have the caveat, it depends on the case?
25            MR. STEKLOFF:  Objection.  Leading.

Page 192

1    but if they wore a hazmat suit all the time, they
2    probably didn't get much exposure.

Page 191

1    Mischaracterizes the testimony.  Incomplete
2    hypothetical.  Speculation.  Just --
3        A.   Yes, I actually made that point a few
4    times.
5    BY MR. STEKLOFF:
6        Q.   I know, but you didn't make it each time,
7    so I wanted to cover all question in there.
8            Now --
9            MR. STEKLOFF:  And that's why I object.
10    BY MR. WISNER:
11        Q.   So, for example, if somebody used Roundup
12    for -- aggressively every day for 50 years, let's
13    say hypothetically -- okay? -- without any other
14    piece of information, that sounds like a lot of
15    exposure; right?
16        A.   It does.
17        Q.   But now if I tell you, yeah, but they wore
18    a hazmat suit every time, does that seem like
19    significant exposure?
20        A.   Well, again, that's kind of a limited
21    hypothetical, so it would be hard to know.  I would
22    have to know, you know, the suit.  Did they wear
23    the suit all the time?  Did they wear the suit when
24    they were mixing it?  You know, I don't know.  I
25    would have to look into the case more carefully,

Page 193

11        Q.   Now, I know that there was a discussion
12    about, specifically, dermal exposure and how much
13    dermal exposure occurs with Roundup.  Do you recall
14    that?
15        A.   Yes.
16        Q.   And you said it's generally known that
17    pesticides are absorbed through the skin?
18        A.   Yes.
19        Q.   And he asked you for specific literature.
20    Are you aware if IARC discusses that at all?
21        A.   Yes, they do.  And actually, there's an
22    Acquavella paper on urine levels in farmers, and
23    they have a nice table, and that paper where they
24    show how the urine levels of glyphosate went up
25    when they mixed -- when they didn't wear gloves --

49 (Pages 190 to 193)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 194

1   when they didn't wear gloves, it went up, actually,
2   fivefold.
3        So, you know, whether they wore protective
4   equipment or not, whether they repaired the equipment
5   or not -- so the only way you really get exposed to
6   it is to get it on your skin.  You can inhale it.
7   You can probably eat it.  But by and large, the vast
8   majority of exposure is skin exposure, absorption
9   through the skin.
10       Q.  During the cross-examination, opposing
11  counsel asked you questions about something called
12  "credibility determinations."  Do you recall that?
13       A.  Yes.  I didn't really understand that very
14  well, but...
15       Q.  Okay.  Well, I'm going to represent to you
16  credibility determination is actually a legal
17  artifact.  And I'm going to ask you some questions
18  to sort of flesh out if you guys are both talking
19  about the same thing.  Okay?
20       A.  Okay.
21       Q.  Now, common sensely, credibility
22  determination means:  Do I believe what someone is
23  telling me; right?
24           MR. STEKLOFF:  Objection.  Leading and --
25  leading and nonsensical.

Page 195

1   BY MR. WISNER:
2        Q.  Is that a yes?
3        A.  Yes.

Page 196

1   is false; correct?
2        A.  Right.
3        Q.  So, for example, if someone said, "I never
4   smoke," and they have a pack of cigarettes in their
5   pocket and their breath smells of cigarettes and
6   their teeth are stained by tobacco, you'd probably
7   say, "Well, what is up with the cigarettes in your
8   pocket"; right?
9        A.  Right.
10       Q.  But that's different than assessing or
11  weighing the validity or credibility of a person's
12  testimony; correct?
13       A.  Yes.
22  BY MR. WISNER:
23       Q.  Okay.  Now, my understanding, was there
24  any discrepancies that you saw between what she
25  said in her deposition?

Page 197

1        A.  No.  She was pretty consistent --
2        Q.  Okay.
3        A.  -- in her answers, comparing her
4   deposition to her answers to my questions.
5        Q.  But notwithstanding, you actually reached
6   out to her to ask her a few clarifying questions;
7   isn't that true?
8        A.  Yes.
9        Q.  And you clarified some stuff about what
10  her father was mixing in 1992; is that right?
11       A.  Yes.
12       Q.  Okay.  There was a discussion about IARCs
13  and its conducting of a hazard assessment.  Do you
14  know the difference between a hazard assessment and
15  a risk assessment?
16       A.  Yes.
17       Q.  What is your understanding of the
18  difference?
19       A.  So a hazard assessment basically asks the
20  question:  Can this -- for example, chemical, cause
21  cancer?  And a risk assessment says or tries to
22  determine well, what level -- at what level would
23  it cause cancer?  And at what level, for example,
24  would it not cause cancer?  So it tries to give a
25  real estimate of the effect of the chemical,

50 (Pages 194 to 197)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 198

1  whereas the hazard assessment just says, this
2  chemical can cause this cancer.
3      Q.  And in conducting risk assessments, those
4  are typically done by governmental agencies?
5      A.  Yes.
6      Q.  And they are done to set tolerance levels
7  and residue levels that would be acceptable within
8  the political designs of that institution?
9          MR. STEKLOFF:  Objection.
10     A.  Well, they try to set levels that would
11  protect workers in occupational environments or --
12  mainly, it's workers in occupational environments
13  or levels in food, for example.  Yeah.  That's what
14  they are trying to do.
15  BY MR. STEKLOFF:
16     Q.  But insofar as IARC having determined that
17  glyphosate and Roundup are probably human
18  carcinogens, that's something that -- is that
19  something that you found reliable?
20         MR. STEKLOFF:  Objection.
21     A.  I think the IARC got it right.
22  BY MR. STEKLOFF:
23     Q.  And, in fact, you reviewed the IARC
24  monograph in coming to your opinions; right?
25     A.  Yes.

Page 199

1      Q.  But you also did your independent
2  assessment, independent of IARC?
3      A.  Yes, I did.

24     Q.  It's a process that develops over time;
25  right?

Page 200

8          MR. STEKLOFF:  Objection.  Leading.
9  BY MR. WISNER:
10     Q.  There was a discussion about idiopathic --
11  I guess it was idiopathic causes of cancer.  Do you
12  recall that?
13     A.  Yes.
14     Q.  What does "idiopathic causes" mean?
15     A.  Well, what "idiopathic" means is we don't
16  know what caused it.  So we just don't know the
17  cause.  Maybe it's spontaneous, or maybe there is
18  something we don't know that caused it, but we
19  don't have a cause.  So if there is no cause
20  identified, it's sort of categorized as idiopathic,
21  which means we don't know what caused it.
22     Q.  So when you look at potential causes of a
23  specific person's cancer, and you go through all
24  the risk factors, and you rule out all of them,
25  does that then lead to:  It must be idiopathic?

Page 201

1      A.  Well, it leads to calling it idiopathic
2  because you don't have a cause, okay?
3      Q.  Precisely, but you can't rule out
4  something, for example, that you don't know; right?
5      A.  Right.  You can't -- the only way to rule
6  out idiopathic is if you find a real risk factor.
7      Q.  Exactly, so if you go through the risk
8  factors, and you find one that you can't rule out,
9  that seems to be a legitimate risk factor, does
10  that mean that you effectively ruled out idiopathic
11  causes?
12     A.  Yes.
13     Q.  Okay.
14         MR. STEKLOFF:  Objection.
15  BY MR. WISNER:
16     Q.  You know, there is this statistic that's
17  thrown out at you at the beginning of your
18  deposition.  I believe it was that 70 percent of
19  NHL, we do not know the cause of.  Is that right?
20     A.  Yes.
21     Q.  But that's -- where does that number come
22  from?
23     A.  It just came off the top of my head.  I
24  mean, I don't think anybody really knows.
25  People -- I don't think anybody has looked

51 (Pages 198 to 201)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 202

1  carefully at NHL and said well, we know that X
2  percent is caused by known risk factors, and Y
3  percent is idiopathic.  I don't think anybody has
4  ever done that.
5      People have tried to do that for cancer in
6  general, and there is a lot of debate about how
7  much is environmental and how much is idiopathic.
8  So, you know, those were just guesstimates on my
9  part.
10     Q.  To actually know that number would
11 actually be, doctors would have to systematically
12 engage in differential epidemiology with every
13 single cancer diagnosis; right?
14     A.  Right.
15     Q.  They don't do that, do they?
16     A.  No.  I mean, you would have to do -- you
17 would have to -- it would take an epidemiologist.
18 It would take someone who would do some statistical
19 guesstimating, based on risk factors and prevalence
20 of use or prevalence of, you know, those kinds of
21 things.
22     I mean, people can calculate what they
23 call "attributable risk."  So I know in the hair
24 dye paper, we actually calculated that in women,
25 hair dyes were causing a certain percentage of all

Page 203

1  NHLs in women.
2      So you can do those kinds of calculations
3  when you know how many people are using it and what
4  the actual risk is.  You can do calculations like
5  that.  But people haven't done that for all of
6  non-Hodgkin's lymphoma because, as we talked before,
7  everything is dynamic.  Right?
8      Q.  And -- okay.  There was a discussion about
9  latency, and there was a -- specifically about this
10 letter you wrote in 2016.  It's Exhibit 6.  Do you
11 recall this letter?
12     A.  Yes.
13     Q.  Now, there was a question about whether or
14 not you would expect to see non-Hodgkin's lymphoma
15 within the first few years of exposure, and you
16 said that wouldn't be expected.  Do you recall
17 that?
18     (Reporter Interruption.)
19     A.  It wouldn't be expected if it was kind of
20 low dose.  So -- but you could -- you could
21 anticipate it early on if, for example, the person
22 was using lots of chemical with no protection.  And
23 we know, for example, with regard to oxidative
24 stress, there are certain genetic polymorphisms
25 that predispose people to non-Hodgkin's lymphoma.

Page 204

1      So in a person who might have those
2  polymorphisms combined with glyphosate, you could get
3  the lymphoma probably much earlier than someone who
4  didn't have those polymorphisms.
5      So, again, it's hypothetical, but, you
6  know, getting the lymphoma early doesn't necessarily
7  rule out glyphosate.
8      Q.  And that was kind of where we started,
9  this redirect examination.  In assessing whether or
10 not there was sufficient time between exposure and
11 cancer for any particular person, it depends;
12 right?
13     A.  It depends.  So it can be very short.  For
14 example, if someone has some immunodeficiency, and
15 they get Epstein-Barr's infection, the lymphoma can
16 literally come in weeks or months.
17     Q.  Okay.
18     A.  So it can happen very quickly with a viral
19 infection like that.  But in terms of chemicals, we
20 usually don't see that.  We usually see it longer.
21     Q.  Now, we know there was a discussion -- are
22 you familiar with something called "ecological
23 studies"?
24     A.  Yes.
25     Q.  And that was kind of what Mr. Stekloff was

Page 205

1  talking about, about looking at overall glyphosate
2  use and overall NHL risks and seeing if they are
3  associated.  Do you recall that?
4      A.  Uh-huh, yes, I do.
5      Q.  I want to break into that a little bit
6  because I think it's really important to parse that
7  issue.
8      Let's start off with HIV now.  You
9  understand that the rates of HIV and AIDS have
10 changed dramatically in the last 20 years.
11     A.  Yes.
12     Q.  How have they changed?
13     A.  Well, the number of cases has gone down,
14 and now we have very good treatments, so people are
15 living longer, and they aren't getting lymphomas
16 and other cancers at the same high rates that they
17 were, you know, in the full-blown AIDS epidemics.
18 So it's totally changed the epidemiology of the
19 disease.
20     Q.  And you would expect, based on that
21 dramatic reduction in HIV and AIDS, that there
22 would be a commensurate reduction in non-Hodgkin's
23 lymphoma, wouldn't you?
24     A.  Yes.
25     Q.  But we haven't seen that, have we?

52  (Pages 202 to 205)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 206

1    A.  No, because probably other things are
2    causing -- are going up.  So --
3    Q.  But would it be fair for me to say to you,
4    Doctor, "Aha, that's evidence that HIV doesn't
5    really cause non-Hodgkin's lymphoma"?
6    A.  No.
7    Q.  Why not?
8    A.  Well, because we know -- we know prior to
9    treatment that it was -- it was obviously a cause,
10   okay?
11   Q.  Exactly.  So that's an example where
12   ecological data would actually give you a false
13   negative, wouldn't it?
14   A.  That's the problem with ecological data.
15   You really -- you don't use that kind of data to
16   prove anything.  You use it, at best, to generate
17   hypotheses that you can actually investigate with
18   better tools.
19   Q.  You mentioned hair dye was banned about
20   20 -- certain chemicals in hair dye were
21   reformulated about 20 years ago?
22       MR. STEKLOFF:  Misstates his testimony.
23   A.  I don't remember exactly when it was.  It
24   was probably in the '70s or '80s.  Probably in the
25   1980s.

Page 207

1    BY MR. WISNER:
2    Q.  And so if the median latency is 20 to 25
3    years, we wouldn't really be seeing the
4    reduction -- or you would start seeing the
5    reduction within the first 20 years of NHL by that;
6    correct?
7    A.  Yeah.  I mean, you would see it probably
8    10 or 20 years afterwards, so that's why the more
9    recent studies of hair dyes have all been negative,
10   and you have to say well, what happened?  Well,
11   they changed the formulations.  So suddenly, the
12   risk is no longer there.
13   Q.  Also, to the best of your knowledge, have
14   the methods through which pesticide applicators
15   apply pesticides changed within the last 30 years?
16   A.  They have.  I think at least farmers and
17   probably pesticide applicators as well are much
18   more careful with pesticides today than they were
19   30 years ago.
20   Q.  And you know this because 30 years you
21   were in Nebraska talking to farmers about their
22   pesticide exposures?
23   A.  Exactly.
24   Q.  And if the -- they are more careful
25   nowadays about their exposures, notwithstanding the

Page 208

1    increased volume or usage of it, you could see no
2    change in the illness rate?
3        MR. STEKLOFF:  Objection.
4        MR. WISNER:  Let me withdraw the question
5    and rephrase it.
6    A.  Yeah, I didn't understand the question.
7    BY MR. STEKLOFF:
8    Q.  If, in fact, farmers and pesticide
9    applicators have been taking more precautions for
10   their exposures, how would you expect that to
11   affect the non-Hodgkin's lymphoma rate?
12   A.  The rate should go down.
13   Q.  And that could be something that would be
14   mitigating or hiding a potential increase of
15   non-Hodgkin's lymphomas from glyphosate exposure,
16   is that fair?
17   A.  Yes.
18   Q.  Would it be fair to say, then, that in
19   assessing causation when it comes to a chemical and
20   disease, ecological studies are not particularly
21   reliable?
22   A.  No.  They are, at best,
23   hypothesis-generating.
24   Q.  In rendering your opinion about whether or
25   not Roundup caused Ms. Gordon's non-Hodgkin's

Page 209

1    lymphoma, did you reach those opinions to a
2    reasonable degree of medical certainty?
3    A.  Yes.
4    Q.  Thank you.  Pass the witness.
5        MR. STEKLOFF:  All right.  I have a couple
6    of questions.
7        FURTHER EXAMINATION
8    BY MR. STEKLOFF:
9    Q.  You mentioned spontaneous -- in the
10   discussion about idiopathic conclusions, you
11   mentioned the word "spontaneous."  Do you remember
12   that?
13   A.  I don't, but I could have.  Yeah.
14   Q.  You can have -- what I think you meant is
15   you could have spontaneous changes to someone's
16   genes -- correct? -- that leads to NHL?
17   A.  Yeah.  So that happens all the time.  We
18   have mistakes that are made, that are probably part
19   of the normal physiology, and the body repairs the
20   mistakes or the cells die.  So I think at least
21   some of cancer is really just bad luck.  You have
22   some spontaneous events that occur in the right
23   order to give you cancer.
24   Q.  And those spontaneous events can occur in
25   individuals who are not exposed to Roundup; right?

53 (Pages 206 to 209)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 210

1    A.  Yes.
2    Q.  And those spontaneous events can occur in
3  individuals who are exposed to Roundup; correct?
4    A.  Yes.
5    Q.  And so those spontaneous events can cause
6  cancer in individuals who are exposed to Roundup;
7  correct?
8    A.  That could cause it or contribute to it,
9  yes.
10    Q.  And so it could be that those spontaneous
11  events are the sole cause of an individual's NHL
12  even if he or she had been exposed to Roundup;
13  correct?
14        MR. WISNER:  Objection.  Improper
15  hypothetical.
16    A.  It's possible.  It's unlikely, but it's
17  possible.  It's possible.  So this is the old
18  more-likely-than-not standard.
19    Q.  Okay.
20    A.  But there is a background rate, most of
21  which we don't know what causes it.
22    Q.  Right.  Approximately 70 percent was your
23  guesstimate.
24    A.  Yeah.
25    Q.  So when you say it's "unlikely," it

Page 211

1  doesn't reach 50.1 percent, but it could reach 49.9
2  percent?
3        MR. WISNER:  Objection.  Misstates his
4  testimony.
5    A.  I don't know how to answer that question.
6  I would say if you have an obvious risk factor,
7  then it's more likely than not that the obvious
8  risk factor caused the disease than some unknown or
9  spontaneous event.
10  BY MR. WISNER:
11    Q.  Which is why anytime someone is exposed to
12  glyphosate, you are going to say that the
13  glyphosate was, more likely than not, the cause;
14  right?
15        MR. WISNER:  Objection.  Misstates his
16  testimony.  Improper hypothetical.
17    A.  Well, as I told you before, I would have
18  to look at each case to make that decision.
19  BY MR. STEKLOFF:
20    Q.  Okay.  You also mentioned polymorphisms.
21  Same things there.  People can have polymorphisms
22  that have nothing to do with Roundup; right?
23    A.  Sure.  We all have polymorphisms.
24    Q.  Yeah.  And those polymorphisms can lead to
25  NHL; correct?

Page 212

1    A.  Well, if you have the polymorphism, you --
2  you would be more susceptible to the adverse
3  effects of free radicals from oxygen.
4    Q.  Even if you -- even if you weren't exposed
5  to Roundup?
6    A.  Yes.
7    Q.  The idiopathic percentage Mr. Wisner asked
8  you some questions about, you know, how accurate
9  that 70 percent was, I mean, first of all, you have
10  a lot of experience that we discussed; correct?
11    A.  Yes.
12    Q.  So that's your best estimate; correct?
13    A.  I'm not sure it's a good estimate.  It's
14  the best I can do.
15    Q.  You have treated thousands of NHL patients
16  in your career?
17    A.  I've diagnosed thousands of patients.
18  I've treated a small number.
19    Q.  But you've been involved in the care and
20  treatment of thousands of NHL patients; correct?
21    A.  Yes.
22    Q.  You've been in meetings where oncologists
23  or your fellow pathologists discussed NHL patients;
24  correct?
25    A.  Yes.

Page 213

1    Q.  Thousands in your career?
2    A.  Yes.
3    Q.  Okay.  Is it fair to say that, based on
4  that, you can say that the vast majority of those
5  patients that you have been involved in the care
6  and treatment for, the group of doctors treating
7  those patients have viewed the cause of the NHL as
8  idiopathic?
9    A.  I would say the majority, yes.  Probably
10  70 percent or more.  I don't know.
11    Q.  Okay.  So that's a pretty good basis to be
12  able to make an estimate of 70 percent -- right? --
13  your vast experience in treating thousands of NHL
14  patients?
15    A.  It's just a guess.
16    Q.  Okay.  You talked about the fact that, in
17  your view, City of Hope physicians would not be
18  interested in the prevention of disease.  Do you
19  remember explaining that?
20        MR. WISNER:  Objection.  Misstates his
21  testimony.
22        MR. STEKLOFF:  I don't think it does,
23  which I was shocked by the way.
24    A.  We have a whole division at City of Hope
25  that's involved in epidemiology, research, and

54  (Pages 210 to 213)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 214

1  prevention of disease.  So my statement was that
2  the oncologists treating the patient who comes in
3  the door sick with non-Hodgkin's lymphoma is
4  focused on diagnosing and treating that patient,
5  and not on what caused the disease.
6         I think all physicians are interested in
7  preventing disease if they know how to do it, and
8  they try to counsel patients to prevent disease.  But
9  in that setting, you know, they are not particularly
10 interested in knowing what caused the disease or
11 preventing disease because the patient already has
12 it.



Page 216

1  the quantitative numbers, you don't know how it
2  might impact the trends in the data; correct?
3         A.  Well, I know qualitatively what the
4  numbers would be.  So, I mean, you know, as the
5  AIDS epidemic increased, the number of
6  non-Hodgkin's lymphoma and other AIDS-related
7  cancers increased.  And then there was an area -- a
8  time when they were very high.
9         And then when we found good treatment, the
10 patients stopped dying, and the incidence of
11 lymphoma and other cancers went down.  So we know
12 that.  There are papers written on it.  There are
13 nice graphs showing it.  I just don't know today
14 what the specific numbers are, but --
15        Q.  Right.  I'm not debating with you the
16 trend in AIDS-related or HIV-related non-Hodgkin's
17 lymphomas.  My question is:  You don't know how
18 that would impact the overall data on non-Hodgkin's
19 lymphoma because you don't know what percentage of
20 non-Hodgkin's lymphomas, even at the peak of the
21 AIDS epidemic, were related to HIV; correct?
22        A.  No, but I think it was a major
23 contribution to the marked increase that occurred
24 in the '80s -- in the '80s, and probably into the
25 '90s, until it plateaued.  So I think it was a

Page 215



18        Q.  So you haven't taken any steps -- all
19 these questions that Mr. Wisner asked you about HIV
20 and how it confounds or complicates the ecological
21 studies, you haven't done any research to be able
22 to assess the numbers?
23        A.  Not quantitatively -- quantitatively, but
24 the trends are well known.
25        Q.  Okay.  You have -- because you don't know

Page 217

1  major contributor.
2         Q.  Okay.  I have one last question.  Did you
3  answer all of my questions honestly and accurately?
4         A.  To the best of my ability, yes.
5            MR. WISNER:  All right.  Quick follow-ups.
6
7            FURTHER EXAMINATION
8  BY MR. WISNER:
9         Q.  Let's just start off with where you ended
10 up on the ecological stuff.  We talked about HIV,
11 and we talked about hair dyes; right?
12        A.  Yes.
13        Q.  But if you are willing to do an ecological
14 study, you would have look at all changes in all
15 human exposures of things that can cause
16 non-Hodgkin's lymphoma?
17        A.  You'd have to look at all known risk
18 factors.
19        Q.  You'd have to look at, like, hep C rates,
20 you have to look at hep B rates; right?
21        A.  Yes.
22        Q.  You'd have to look at --
23        A.  Those are recent causes that would
24 increase risk.
25        Q.  Exactly.  You'd have to look at the rate

55  (Pages 214 to 217)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 218

1  of Epstein-Barr viruses; right?
2      **A. Right.**
3      Q. You'd have to look at the reduction or
4  reduced use of other more toxic pesticides from the
5  '50s and '40s; right?
6      **A. Right.**
7      Q. The elimination of things like arsenic,
8  DDT, from our society; right?
9      **A. Yes.**
10     Q. You'd have to look at the obesity rates in
11  the United States, wouldn't you?
12     **A. Yes.**
13     Q. I mean, you'd have to look at all these
14  potential risk factors that would go into
15  non-Hodgkin's lymphoma, and even then, there could
16  be all these idiopathic causes that were not in
17  consideration; right?
18     **A. Well, you'd still have a large group of**
19  **idiopathic cases, exactly.**
20     Q. So do you think that it would be possible,
21  considering the various causes of non-Hodgkin's
22  lymphoma, to conduct a reliable ecological study to
23  try to see if the increased use of glyphosate in
24  the '90s is associated with the plateauing of
25  non-Hodgkin's lymphoma in the 2000s?

Page 219

1      **A. No, I don't think it would be possible. I**
2  **think we will have to design other studies, more**
3  **specific studies, to answer the question.**
4      Q. And that's what case control studies do;
5  right?
6      **A. Yes.**
7      Q. That's what modern epidemiological studies
8  do; right?
9      **A. Yes.**
10     Q. That's what rodent studies do. Isn't it?
11     **A. Yes.**
12     Q. All right. There was a discussion about
13  spontaneous occurrences of mutations in the genes.
14  Do you recall that?
15     **A. Yes.**
16     Q. Now, my understanding of the human body is
17  that when there is a change in a gene or DNA
18  damage, the body has systems to repair it; is that
19  right?
20     **A. Yes. The body has a system to repair it,**
21  **and so either one of three things can happen. It**
22  **can repair it, which often happens, or the cell --**
23  **it's a lethal mutation, and the cell just dies. Or**
24  **the cells can survive with the lesion if it's not**
25  **lethal --**

Page 220

1      Q. And so --
2      **A. -- and pass it on to other cells.**
3      Q. If a cell is experiencing oxidative stress
4  and genotoxic effects, would that potentially limit
5  or inhibit the body's cell to repair DNA damage?
6      **A. Well, normally, we can repair that damage**
7  **at low levels, but if it's increased above the**
8  **level which we can repair it, then the cells would**
9  **begin to accumulate lesions.**
10     Q. So it's possible in that scenario there
11  could be a spontaneous mutation, but the presence
12  of glyphosate causing oxidative stress could
13  actually reduce the body's ability to correct it?
14     **A. By increasing the stress to the point**
15  **where the body couldn't correct it, or -- yeah.**
16     Q. So even in that context, the spontaneous
17  gene -- the emergence of cancer would still be
18  substantially caused by Roundup?
19        MR. STEKLOFF: Objection. Incomplete
20  hypothetical. Calls for speculation.
21     **A. Well, if Roundup caused it, then it would**
22  **be caused by Roundup. It wouldn't be spontaneous,**
23  **so you have both of these things going on.**
24  BY MR. STEKLOFF:
25     Q. But what we are talking about here is the

Page 221

1  promotional effect a compound can have. So even if
2  it didn't initiate the cancer, it potentially could
3  promote it?
4      A. Yes.
5        MR. STEKLOFF: Same objections.
6        MR. WISNER: Okay.
7      **A. So it could cause -- it could cause the**
8  **second lesion or the third lesion in the cell that**
9  **spontaneously had the first lesion. Those things**
10  **can happen.**
11  BY MR. WISNER:
12     Q. That's why when you are doing a
13  differential etiology, you look at known risk
14  factors and see if you can rule them out?
15        MR. STEKLOFF: Same objections.
16     **A. Yes.**
17  BY MR. WISNER:
18     Q. And if you can't, then it's appropriate
19  scientific methodology to assume that was a
20  substantial contributing factor to cancer?
21        MR. STEKLOFF: Same objections.
22     **A. Exactly. That's right.**
23  BY MR. WISNER:
24     Q. All right. He asked you about thousands
25  of patients that you have been involved in

56 (Pages 218 to 221)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 222

1 treatment of. Do you recall that?
2   A.  Yes.
3   Q.  In those thousands of patients that you
4 been involved in, has any physician, to the best of
5 your knowledge, including yourself, ever engaged in
6 etiological differential on that patient to
7 determine causation?
8   **A.  I'm sure we have.  I'm sure we have.  But**
9 **it's centered more around probably organisms,**
10 **viruses, bacteria, other things.  I don't remember**
11 **specific instances, but that's one thing that**
12 **pathologists bring to the table.  They usually**
13 **understand what causes are, and, you know -- and I**
14 **guess I've had a very longstanding interest in**
15 **epidemiology.  You know, I've had those**
16 **conversations with oncologists in meetings.**
17   Q.  And you focus on bacterial and viral
18 infections because those are things that you can
19 treat?
20   **A.  Right.**
21   Q.  In fact --
22   **A.  Or prevent.**
23   Q.  Yeah.  There is actually cancers that if
24 you treat the underlying virus, the cancer goes
25 away, the lymphomas, in fact.

Page 223

1   **A.  Uh-huh.  It's true.**
2   Q.  So that's -- there is a reason to do a
3 differential on the viruses, et cetera; right?
4   **A.  Yes.**
5   Q.  But if someone has cancer caused by
6 Roundup, and they stop using Roundup that day, does
7 that make the cancer go away?
8   **A.  No.**
9   Q.  So would it be fair to say, then, that in
10 the various differential diagnoses/etiologies that
11 you observed at City of Hope, has any physician
12 ever had Roundup on there as a potential risk
13 factor?
14   **A.  I don't think so, because it's not widely**
15 **known in the medical community that Roundup can**
16 **cause non-Hodgkin's lymphoma.  It's not widely**
17 **known.**
18   Q.  So you have no idea what that rate would
19 be if Roundup was in that conversation.  It could
20 be way below 70, couldn't it?
21   **A.  Probably, it would be less than 70.  I**
22 **don't know how far below, but probably -- it would**
23 **be another way to decrease idiopathic; right?**
24   Q.  Because now it's known.
25   MR. STEKLOFF:  I thought patients at City

Page 224

1 of Hope didn't use Roundup.  Which one is it?
2   MR. WISNER:  City doesn't know.  That's
3 what I understand.
4   Q.  Finally --
5   MR. STEKLOFF:  What's good for the goose
6 is --
7   MR. WISNER:  I know.  That's why it's a
8 silly area of cross-examination.
9   Q.  So the other question --
10   **A.  They are very entertained, by the way.**
11   Q.  I know, because they are seeing how silly
12 this is.
13   Okay.  So he asked you questions about
14 whether or not you've gone over to oncologists and
15 told them, "Hey, Roundup causes cancer."  He asked
16 you that question; right?
17   **A.  I think so.**
18   Q.  Have you ever done that with benzene?
19   **A.  No, because people know that benzene**
20 **causes leukemia.**
21   Q.  Have you ever done that with tobacco?
22   **A.  No.**
23   Q.  Have you ever, in your career, gone around
24 to oncologists' offices and told them to consider
25 certain risk factors in assessing the causal -- the

Page 225

1 causation of cancer?
2   **A.  I don't think so.  I mean, I probably have**
3 **said to them once in a while, have you asked about**
4 **this, or you know, have you looked into this.  I'm**
5 **sure I've done that.  But probably not about**
6 **pesticides or Roundup.  It's been other things.**
7   Q.  But if any of those physicians at the City
8 of Hope came to you and said, "Dr. Weisenburger, my
9 patient uses a lot of Roundup.  Is that something
10 that I should look into, whether or not it's a risk
11 factor?"  What would you tell them?
12   **A.  I would just tell them it -- I have looked**
13 **into it, and it is a risk factor.**
14   Q.  Great.  No further questions.
15
16   FURTHER EXAMINATION (CONTINUED)
17 BY MR. STEKLOFF:
18   Q.  Just very briefly.  Towards the end,
19 Mr. Wisner asked you -- I'm getting the exact
20 wording wrong -- but if it's reasonable to, in a
21 case where someone's been exposed to Roundup, to
22 not rule it out because it's a known risk factor.
23 Do you recall that?
24   **A.  Huh?  I -- vaguely I recall it, but.**
█

57 (Pages 222 to 225)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 226



Page 228

1  of Hope; right?
2      **A.  By oncologists, it doesn't happen.**
3      Q.  Right.  So what you are doing here is a
4  methodology that has been created for litigation
5  to determine the cause of someone's NHL; correct?
6          MR. WISNER:  Objection.  Misstates his
7  testimony.
8      **A.  Yes, but it's the same methodology that we**
9  **use to determine what causes pneumonia or what**
10  **causes a brain tumor.  It's -- you look at all the**
11  **potential causes, and then you rule them out one at**
12  **a time until you have one or two left, and then you**
13  **do your best to confirm that one or two, by doing a**
14  **biopsy or a special study.**
15          **So it's the same process that we use in**
16  **medicine every day.**
17  BY MR. WISNER:
18      Q.  But that process is used to make
19  diagnoses; correct?  Or --
20      **A.  Yes.**
21      Q.  Not causes; correct?
22      **A.  Diagnoses or causes of specific illness.**
23      Q.  Causes of specific illness, not NHL;
24  correct?
25      **A.  I would say not NHL, but the other example**

Page 227

1          MR. STEKLOFF:  Done.
2
3          FURTHER EXAMINATION (CONTINUED)
4  BY MR. WISNER:
5      Q.  Sir, before you can make an opinion, an
6  expert opinion, about whether or not Roundup caused
7  someone cancer, do you have to evaluate that
8  person's case?
9      **A.  Yes.**
10      Q.  So he has asked you about every future
11  case.  That's in the context after you've done a
12  full differential diagnosis, etiological
13  examination?
14      **A.  Yes.**
15          MR. WISNER:  Okay.  No further questions.
16          MR. STEKLOFF:  I will ask another
17  question.
18
19          FURTHER EXAMINATION (CONTINUED)
20  BY MR. STEKLOFF:
21      Q.  Based on what Mr. Wisner asked you, it
22  seemed a little different than what you said
23  before.  The differential diagnosis that you are
24  doing in this case is different because you said
25  that doesn't happen with respect to Roundup at City

Page 229

1  **I gave was pneumonia.  Okay?  So you've got**
2  **pneumonia.  What's causing the pneumonia?  So you**
3  **have a differential diagnosis, and then you go**
4  **through and rule out each one until you can rule in**
5  **one.  Okay?  One is left, and then you make sure**
6  **that that's the answer.**
7      Q.  But that's because that is important to
8  the treatment of pneumonia; right?
9      **A.  Right.**
10      Q.  So what you are doing here is not done by
11  doctors, oncologists, and other doctors at City of
12  Hope with respect to non-Hodgkin's lymphoma;
13  correct?
14      **A.  No, it's not done.**
15
16          FURTHER EXAMINATION (CONTINUED)
17  BY MR. WISNER:
18      Q.  And it's not done, Doctor, because Roundup
19  is not a known risk factor?
20      **A.  That, and also that, as I said before, the**
21  **doctors are more interested in treating the patient**
22  **instead of trying to figure out what happened in**
23  **the past that caused the cancer, which most of the**
24  **time, they can't figure out.  So they -- unless it**
25  **just jumps out at them, they don't look into it.**

58 (Pages 226 to 229)

Dennis D. Weisenburger, M.D.
November 26, 2018

Page 230

```
 1          Q.  However, if they were to look at it, if
 2   they were trying to figure out what caused
 3   someone's cancer, would the standard methodology be
 4   the one that you employed in this case?
 5          MR. STEKLOFF:  Objection.  Calls for
 6   speculation.
 7       A.  I think so, yes.
 8          MR. WISNER:  Okay.  No further questions.
 9          MR. STEKLOFF:  We are done.
10          THE VIDEOGRAPHER:  This concludes Media
11   Unit 3 of the deposition of Dennis D. Weisenburger,
12   MD, Volume 1.  The time on the video monitor is
13   2:56 p.m.  We are going off the record.
14          MR. STEKLOFF:  We would like a rough.  We
15   will ask for an expedited copy.  Can we get it by
16   the end of the week?
17          (Proceedings adjourned at 2:57 p.m.)
18
19
20
21
22
23
24
25
```

Page 231

```
 1          DECLARATION UNDER PENALTY OF PERJURY
 2          I, DENNIS D. WEISENBURGER, M.D., do
 3   hereby certify under penalty of perjury that I have
 4   read the foregoing transcript of my deposition
 5   taken on
 6   November 26, 2018; that I have made such
 7   corrections as appear noted on the Deposition
 8   Errata Page, attached hereto, signed by me; that my
 9   testimony as contained herein, as corrected, is
10   true and correct.
11
12       Dated this _____ day of _____,
13   2018, at _____, California.
14
15
16       _____
17          DENNIS D. WEISENBURGER, M.D.
18
19
20
21
22
23
24
25
```

Page 232

```
 1
 2            DEPOSITION ERRATA SHEET
 3   Page No._____ Line No._____
 4
 5   Change:_____
 6   Reason for
     change:_____
 7   Page No._____ Line No._____
 8   Change:_____
 9   Reason for
     change:_____
10   Page No._____ Line No._____
11
12   Change:_____
13   Reason for
     change:_____
14   Page No._____ Line No._____
15   Change:_____
16   Reason for
     change:_____
17   Page No._____ Line No._____
18
19   Change:_____
20   Reason for
     change:_____
21   Page No._____ Line No._____
22   Change:_____
23   Reason for
     change:_____
24   _____
     DENNIS D. WEISENBURGER, M.D.    Dated
25
```

Page 233

```
 1   STATE OF CALIFORNIA    )
                            ) ss.
 2   COUNTY OF LOS ANGELES  )
 3
 4          I, GRACE CHUNG, RMR, CRR, CSR No. 6246, a
 5   Certified Shorthand Reporter in and for the County
 6   of Los Angeles, the State of California, do hereby
 7   certify:
 8          That, prior to being examined, the witness
 9   named in the foregoing deposition was by me duly
10   sworn to testify the truth, the whole truth, and
11   nothing but the truth;
12          That said deposition was taken down by me
13   in shorthand at the time and place therein named,
14   and thereafter reduced to typewriting by
15   computer-aided transcription under my direction;
16          That the dismantling, unsealing, or
17   unbinding of the original transcript will render
18   the reporter's certificate null and void.
19          I further certify that I am not interested
20   in the event of the action.
21   In witness whereof, I have hereunto subscribed my
22   name.
23   Dated.  November 30, 2018
24          _____
25          GRACE CHUNG, CSR NO. 6246
            RMR, CRR, CLR
```

59 (Pages 230 to 233)