# EXHIBIT 12

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

JAMES ADAMS JR., et al., )
                         )
          Plaintiffs,    )
                         )
          vs.            ) Case No. 17SL-CC02721
                         )
MONSANTO COMPANY,        )
                         )
          Defendant.     )


          The videotaped deposition of CHADI
NABHAN, MD, MBA, FACP, called for examination,
taken before KIMBERLY WINKLER CHRISTOPHER, CSR No.
084-002752, a Certified Shorthand Reporter of the
State of Illinois, at 8535 West Higgins Road,
Third Floor, Chicago, Illinois, on the 15th day of
November, A.D. 2018, at 9:58 a.m.

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

## Page 2

```
 1  PRESENT:
 2  ANDRUS WAGSTAFF PC
    1901 Harrison Street
 3  Suite 1100
    Oakland, California 94612
 4  BY:  MS. KATHRYN M. FORGIE
    310-339-8214
 5  kathryn.forgie@andruswagstaff.com
 6  Appeared on behalf of the Plaintiffs;
 7  HOLLINGSWORTH LLP
    1350 I Street, N.W.
 8  Washington, DC 20005
    BY:  MS. SANDRA KACZMARCZYK
 9  202-898-5800
    skaczmarczyk@hollingsworthllp.com
10
          and
11
    ARNOLD & PORTER KAYE SCHOLER LLP
12  250 West 55th Street
    New York, New York 10019-9710
13  BY:  MR. AARON H. LEVINE
    212-836-7586
14  aaron.levine@arnoldporter.com
15  Appeared on behalf of the Defendant.
16  ALSO PRESENT:
17      MR. ROBERT ZELLNER (Videographer)
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              I N D E X
 2  WITNESS              EXAMINATION
 3  CHADI NABHAN, MD, MBA, FACP
 4  Examination by Mr. Levine       5, 271
    Examination by Ms. Forgie         263
 5
 6          E X H I B I T S
 7  NABHAN NUMBER              PAGE
 8  Exhibit 1  (Defendant Monsanto Company's
               Third Amended Notice of
 9             Videotaped Deposition of
               Chadi Nabhan, M.D., M.B.A.,
10             F.A.C.P.)            6
    Exhibit 2  (Invoice for Kathryn M.
11             Forgie, Esq.)        8
    Exhibit 3  (Meeting with the patient
12             and her family member on Friday
               8/10/2018 in Waukegan)   8
13  Exhibit 4  (In vitro evaluation of genomic
               damage induced by glyphosate
               on human lymphocytes)  8
14  Exhibit 5  (curriculum vitae)     16
15  Exhibit 6  (Dr. Nabhan - Reliance List)  30
    Exhibit 7  (Dr. Nabhan Reference List -
16             Case Specific Materials)  30
    Exhibit 8  (Plaintiff's Expert Witness
17             Disclosure)          32
    Exhibit 9  (Cancer Epidemiology,
18             Biomarkers & Prevention)  92
    Exhibit 10 (Office Note)        170
19  Exhibit 11 (Non-Hodgkin's lymphoma - Symptoms
               and causes - Mayo Clinic)  215
20  Exhibit 12 (Non-Hodgkin Lymphoma Risk
               Factors: Age, Race, others)  221
21  Exhibit 13 (Non-Hodgkin Lymphoma
               Risk Factors)        223
22  Exhibit 14 (Revised Glyphosate Issue Paper:
               Evaluation of Carcinogenic
23             Potential)           239
    Exhibit 15 (National Cancer Institute
24             Surveillance, Epidemiology,
               and End Results Program)  245
25  Exhibit 16 (AACR Cancer Progress Report)  247
    Exhibit 17 (Figure 3. Risky Business)  249
```

## Page 4

```
 1       THE VIDEOGRAPHER:  Good morning.  This is the
 2  videotaped deposition of Chadi Nabhan, MD.
 3  Today's date is Thursday, November 15th, 2018; and
 4  the time is 9:58 a.m.
 5       This is the case of James Adams, Jr.,
 6  et al., versus Monsanto Company, bearing Case No.
 7  17SL-CC02721.  This case is pending in the Circuit
 8  Court of St. Louis County, State of Missouri.
 9       My name is Robert Zellner and I am
10  representing Paszkiewicz Court Reporting.  And the
11  court reporter is Kimberly Christopher, also
12  representing Paszkiewicz Court Reporting.
13       This deposition is taking place at
14  Chicago Marriott O'Hare in the Wabash room at 8535
15  West Higgins Road, Chicago, Illinois 60631.  And
16  will counselors please state your appearances for
17  the record.
18       MS. FORGIE:  Kathryn Forgie for plaintiff
19  Gordon.
20       MR. LEVINE:  Aaron Levine for Monsanto.
21       MS. KACZMARCZYK:  Sandra Kaczmarczyk for
22  Monsanto.
23       THE VIDEOGRAPHER:  Thank you.  And will the
24  court reporter please swear in the witness.
25       THE COURT REPORTER:  Please raise your right
```

## Page 5

```
 1  hand.
 2       (Witness sworn.)
 3       CHADI NABHAN, MD, MBA, FACP,
 4  called as a witness herein, having been first duly
 5  sworn, was examined and testified as follows:
 6              EXAMINATION
 7  BY MR. LEVINE:
 8       Q.  Good morning, Dr. Nabhan.
 9       A.  Good morning.
10       Q.  Can you please -- first of all, my name
11  is Aaron Levine.  I'm representing Monsanto in Ms.
12  Gordon's case.
13       A.  Yes.
14       Q.  We've not met before today, correct?
15       A.  We have not.
16       Q.  Could you please state your full name
17  and business address for the record.
18       A.  Chadi Nabhan.  C-h-a-d-i, first name.
19  Last name Nabhan, N-a-b-h-a-n.  ███████
20  ███████
21       Q.  Thank you.  And I know you've previously
22  given sworn testimony and -- sworn deposition
23  testimony and sworn trial testimony in prior cases
24  involving Roundup, correct?
25       A.  I have.
```

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 6

1      Q.   And your deposition and trial testimony
2   in those cases was truthful and accurate, correct?
3      **A.   Yes.**
4      Q.   And you stand by that testimony today?
5      **A.   I do.**
6      MS. FORGIE:  Objection.
7          (Nabhan Exhibit No. 1 marked
8              as requested.)
9   BY MR. LEVINE:
10     Q.   Handing you what's been marked as
11  Exhibit 1, which is the notice of your deposition
12  for today.
13     MS. FORGIE:  Thanks.  I'm going to pass.
14  Thank you for the copy.  I don't want any more
15  paper.
16     MR. LEVINE:  Just -- just leave it there.
17     MS. FORGIE:  Okay.  Thank you.
18  BY MR. LEVINE:
19     Q.   Have you seen this notice before?
20     **A.   I have.**
21     Q.   When did you first see this notice?
22     **A.   Several days ago.  I don't recall the
23  exact date, but several days ago.**
24     Q.   Okay.  And you'll see on about the
25  fourth page there's what's called an Attachment.

Page 7

1   And the attachment makes various document
2   requests.
3          Do you see that?
4      **A.   I do see that.**
5      Q.   And have you reviewed these requests for
6   documents?
7      **A.   I have.**
8      Q.   And do you -- have you brought with you
9   any materials in response to the document request
10  today?
11     MS. FORGIE:  I have them.
12     MR. LEVINE:  Okay.  May I take a look at
13  them?
14     MS. FORGIE:  Oh, did you want to go through
15  them one by one or do you just want me to give you
16  what we have?
17     MR. LEVINE:  Why don't -- well, why don't
18  you -- do you have them labeled by each request
19  or --
20     MS. FORGIE:  I actually don't.  So what I
21  have is his invoice.  I brought you two copies.
22  Although he'll need one of them.  And then I have
23  a three-page document which is his exam, two
24  copies.  And then I have a copy of an article
25  which is -- it's a recent article from October of

Page 8

1   2018 which he's adding to his reference list.
2   Santovito, "In vitro evaluation of genomic damage
3   induced by glyphosate on human life lymphocytes,"
4   published -- accepted October 8th, 2018, and
5   published on-line October 15th, 2018.  So that's
6   in addition to his reference list.  I brought you
7   two copies of that.
8          And then you have our objections which
9   were served on you a couple days ago, correct?
10     MR. LEVINE:  I do, yes.
11     MS. FORGIE:  Okay.  We have previously sent
12  you a CV as well.  I understand --
13     MR. LEVINE:  Okay.  I have -- I have a CV.
14     MS. FORGIE:  Okay.  I just wanted to let you
15  know there's two or three additions to that and
16  we'll e-mail you.  He's just updating it now.  So
17  as soon as we get it finished updating, I'll send
18  it to you; but none of them have anything to do
19  with Roundup or glyphosate.
20          (Nabhan Exhibit Nos. 2
21              through 4 marked as
22              requested.)
23  BY MR. LEVINE:
24     Q.   So, Dr. Nabhan, I'm going to hand you
25  Exhibits 2, 3, and 4, which is what counsel just

Page 9

1   produced to me.
2          Have you seen these before?
3      **A.   Yes.**
4      MS. FORGIE:  Let me just see them for a
5   second so I can put the exhibit numbers on mine.
6   Thank you.
7          So 2 is the invoice?
8      MR. LEVINE:  I'll state it on the record
9   so --
10     MS. FORGIE:  Oh, okay.  Okay, great.  Thank
11  you.
12  BY MR. LEVINE:
13     Q.   Exhibit 2 is your invoice for Ms.
14  Gordon's case, correct?
15     **A.   Through September 30th, 2018.  There are
16  additional hours that I have not billed for at
17  this point.**
18     Q.   Okay.  And about how many hours have you
19  not yet billed for in Ms. Gordon's case?
20     **A.   I can take a look to be very accurate,
21  but it's hard for me to tell.  Maybe 20 additional
22  hours or more, between 20 to 30 additional hours.**
23     Q.   And what did you spend those 20 to 30
24  additional hours doing?
25     **A.   I reviewed depositions of the**

3 (Pages 6 to 9)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 10

1  oncologists that treated Ms. Gordon at the
2  University of Chicago.  I did additional
3  literature review.  I reviewed additional records
4  that were provided to me from the University of
5  Chicago that were not available at that time, and
6  I spent additional time prepping yesterday for the
7  deposition and meeting with counsels.
8      Q.  How much time did you spend preparing
9  for the deposition yesterday?
10     A.  Yesterday?  Between 10 to 12 hours.
11     Q.  And how much time did you spend meeting
12  with counsel yesterday?
13     A.  I don't remember how -- how long.  Five
14  hours maybe.
15     Q.  Who did you meet with?
16     A.  Say again.
17     Q.  Who did you meet with yesterday?
18     A.  Ms. Forgie.
19     Q.  Anybody else?
20     A.  No.
21     Q.  So the 10 to -- 10 to 12 hours spent
22  yesterday includes the 5 hours with --
23     A.  Yes.
24     Q.  (Continuing) -- Ms. Forgie?
25         And that's the 20 to 30 additional hours

Page 11

1  you told me that you've spent on this case
2  includes yesterday's time, correct?
3      A.  Yes, yes.  I mean, I can try to -- if
4  it's really that important, I can try to pull what
5  I have documented on a piece of paper, try to get
6  you more accurate; but that's roughly what I have.
7      Q.  Yeah, let's -- let's do that during a
8  break if you have a --
9      A.  Yeah.
10     Q.  (Continuing) -- more accurate
11  assessment.
12     A.  I usually write everything on a book
13  that I keep the hours on.
14     Q.  Sure.  And, Dr. Nabhan, I suspect we'll
15  both do this to each other during the deposition.
16  And I'll apologize in advance, but let's --
17     A.  Me too.
18     Q.  (Continuing) -- both try to speak one at
19  a time and not speak over each other.  We'll make
20  it easier on the court reporter and on
21  ourselves --
22     A.  Sure.
23     Q.  (Continuing) -- for the record.
24         Now, the invoice you've provided as
25  Exhibit 2 today reflects your work in the case of

Page 12

1  Sharlean Gordon, correct?
2      A.  Yes.
3      Q.  And this doesn't reflect your work in --
4  with respect to other work you've done on the
5  Roundup litigation, correct?
6      A.  No, it does not.
7      Q.  And about how many hours total have you
8  spent working as an expert for plaintiffs in the
9  Roundup litigation?
10         MS. FORGIE:  Objection.
11         THE WITNESS:  I think the invoices have been
12  provided to various counsels over the past year or
13  year and a half.  I don't -- I don't have the
14  accurate number of hours; but for the extent that
15  was being asked of me to provide whatever hours,
16  the various counsels have these hours and they can
17  be pulled.
18  BY MR. LEVINE:
19     Q.  What's your best estimate of how much
20  you have invoiced to date in total as an expert in
21  the Roundup litigation in dollars?
22     A.  Since spring 2016?
23     Q.  Yes.
24     A.  So over two and a half years?
25     Q.  Yes.

Page 13

1      A.  I don't want to guess.  I'm more than
2  happy to --
3         MS. FORGIE:  Well, don't guess then.
4         THE WITNESS:  Well, I can't -- I'm more than
5  happy to get accurate numbers for you.  I mean,
6  that's not very difficult to -- to get.  I just
7  don't want to guess.  But I can go back to the
8  records and try to pull every single case,
9  everything I have done and provide that to you if
10  that's needed.
11         MR. LEVINE:  That would be great.  I'll make
12  that request.
13         MS. FORGIE:  Well, we'll discuss whether
14  that's appropriate or not at the break.
15         MR. LEVINE:  Well, then I'll ask a few more
16  questions about it if you're -- you're not going
17  to agree to produce it at this point.
18         MS. FORGIE:  I didn't say one way or the
19  other.  I said I would think about discussing.
20         MR. LEVINE:  Okay.
21  BY MR. LEVINE:
22     Q.  Dr. Nabhan, would you say it's more
23  than -- would you say you've made more or less
24  than $200,000 as an expert in this litigation?
25         MS. FORGIE:  Objection.

4  (Pages 10 to 13)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 14

1    THE WITNESS:  I really don't know.  I can't
2  guess.  I would say it is likely more than
3  $100,000, but I just can't tell if it's more or
4  less than $200,000.  I would like to be more
5  accurate than guessing.
6  BY MR. LEVINE:
7    Q.  Did you -- how many times have you
8  submitted tax returns since you've been an expert
9  in this litigation?
10   **A.  I was retained, I believe, sometime in**
11  **the spring of 2016.  So that will be year 2016 and**
12  **2017.**
13   Q.  Okay.  And have -- have your tax returns
14  in 2016 and 2017 reflected your work on the
15  Roundup litigation?
16   **A.  Absolutely.**
17   Q.  And do you recall how much you declared
18  on your taxes in terms of your work in the Roundup
19  litigation?
20   **A.  It's not itemized as Roundup or not**
21  **Roundup.  It's usually anything that is done**
22  **outside of my W-2 in consulting basis is usually**
23  **all lumped together.  So that's why I don't have**
24  **the -- if it's Roundup versus not Roundup.  So I**
25  **apologize for that.  But, again, if tax returns**

Page 15

1  **need to be produced and counsel says it's okay,**
2  **that's up to you guys.**
3    Q.  Sure.  And I have not requested your tax
4  returns.  I'm just asking for your -- I'm just
5  trying to get a sense of how much time you've
6  spent and how much money you've made as an expert
7  in the Roundup litigation.
8    Just one second.

Page 16

13   Q.  Did you bring any -- any other materials
14  in response to the attachment on the deposition
15  notice other than what -- what we've already
16  marked?
17   **A.  I have not.**
18   Q.  And we'll come -- come back to the
19  article once I have time to look at it.
20       (Nabhan Exhibit No. 5 marked
21       as requested.)
22  BY MR. LEVINE:
23   Q.  Handing you what's been marked as
24  Exhibit 5, which is a copy of the CV that's been
25  provided to us.

Page 17

1    MR. LEVINE:  Would you like a copy,
2  Counselor?
3    MS. FORGIE:  Sure.
4    MR. LEVINE:  No take-backs.
5    MS. FORGIE:  No what?
6    MR. LEVINE:  No take-backs.
7    MS. FORGIE:  Good one.  Is this Exhibit --
8  I'm sorry -- 5?
9    MR. LEVINE:  Yes.
10   THE WITNESS:  5.
11   MS. FORGIE:  Thank you.
12  BY MR. LEVINE:
13   Q.  And is this your current CV?
14   **A.  As stated, there has been additional**
15  **modifications just with recent scientific articles**
16  **that have been published.  I think the date that**
17  **you have on this one is August 2018.  So I've had**
18  **several publications and presentations that are**
19  **now in print, and I'm updating it.  So we can --**
20  **I'll provide it to counsel tonight or tomorrow**
21  **morning and she can e-mail it to you.**
22   MS. FORGIE:  He's in the process of updating
23  it.
24   MR. LEVINE:  Sure.
25   MS. FORGIE:  So this is the most accurate one

5  (Pages 14 to 17)

Page 18

1  we have.
2      MR. LEVINE:  I'll ask Dr. Nabhan the
3  questions.  You've already stated for the record
4  that there are updates.  And I don't -- all due
5  respect, you can object; but I don't need to have
6  conversations about what you know unless I ask you
7  either on or off the record.
8      MS. FORGIE:  Just trying to help.
9  BY MR. LEVINE:
10     Q.  Dr. Nabhan --
11     MR. LEVINE:  And I appreciate you trying to
12  help, but just would rather ask Dr. Nabhan
13  questions.
14     MS. FORGIE:  Okay.  That's fine.
15  BY MR. LEVINE:
16     Q.  Dr. Nabhan, you said there are
17  additional publications that you have to add to
18  your CV?
19     A.  Yes.
20     Q.  Do you know how many?
21     A.  Probably three to four.
22     Q.  And do any of those publications involve
23  non-Hodgkin's lymphoma?
24     A.  Yes.
25     Q.  So --

Page 19

1      A.  Some of the -- some of the posters that
2  were submitted for the American Society of
3  Hematology at the time have been accepted.  So if
4  you look at -- under abstracts, I believe in
5  August they were just submitted and we got the
6  notifications of their acceptance, and some of the
7  papers that were in press are now in print.  And
8  that's about it.
9      Q.  So the publication -- the additional
10  publications that will be reflected on your CV are
11  already reflected as posters or abstracts?
12     A.  Do you mind if I look so I can make
13  sure?
14     Q.  We'll --
15     A.  Okay.
16     Q.  We'll use a break to do that.
17     A.  More likely than not.  You know, usually
18  whenever I submit something for publication, I try
19  to be accurate at least when it's submitted.  And
20  then I change it if it got accepted or in press or in
21  print once I get the information notification.
22     Q.  Okay.  And do any of the addition --
23  additional publications or any of the other of the
24  additions to your CV involve glyphosate?
25     A.  No, they don't.

Page 20

1      Q.  Do they involve pesticides?
2      A.  No, they don't.
3      Q.  Do they involve herbicides?
4      A.  No, they don't.
5      Q.  Do they involve causes of non-Hodgkin's
6  lymphoma?
7      A.  No, they don't.
8      Q.  And besides the additional publications
9  which will be provided to us with your updated CV,
10  does the CV that you have accurately summarize
11  your educational and professional experience?
12     A.  Yes.
13     Q.  You've never -- sorry.
14         You've published regarding non-Hodgkin's
15  lymphoma, correct?
16     A.  About 80 to 85 percent of my
17  publications are on non-Hodgkin lymphoma and
18  lymphoid malignancies in general.
19     Q.  80 to 85 percent of your publications
20  are on --
21     A.  Lymphoma.
22     Q.  (Continuing) -- lymphoma?
23     A.  Correct.
24     Q.  And about how many publications do you
25  have in total?

Page 21

1      A.  Between actual manuscripts and
2  abstracts, over 300.
3      Q.  Okay.  You've given presentations on
4  non-Hodgkin's lymphoma?
5      A.  I have.
6      Q.  Is it fair to say that the majority of
7  presentations you've given are also involving
8  lymphoma malignancies?
9      A.  Yes.  I've -- I've been doing a little
10  bit more presentations recently on healthcare
11  delivery for patients with cancer as well as cost
12  of cancer care and new entrants to the oncology
13  market such as CAR-T cellular therapy and
14  biosimilars and their application on lymphoma or
15  nonlymphoma.
16     Q.  Okay.  You've lectured regarding cancer
17  risk or risk of lymphomas?
18     A.  Most of the presentations often you --
19  depending on the scope of the presentation and
20  what you're trying to lecture on and your
21  audience.  So some of my presentations would have
22  several slides in terms of known causes of
23  lymphoma and things like that, but obviously not
24  every lecture will -- will involve that particular
25  discussion.

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 22

1      Q.  And have you lectured regarding cancer
2  prevention?
3      A.  Not really.  We have not -- I have not
4  done scientific lectures on cancer prevention per
5  se.
6      Q.  And then all of your publications,
7  presentations, and lectures regarding
8  non-Hodgkin's lymphoma, have any of those
9  materials or presentations discussed Roundup or
10  glyphosate?
11      A.  Not Roundup specifically or glyphosate
12  specifically.
13      Q.  Have they discussed -- when you say "Not
14  Roundup specifically or glyphosate specifically,"
15  have they in any way discussed Roundup or
16  glyphosate?
17      A.  No, they have not.
18      Q.  Okay.
19      A.  That's what I meant by specifically, I
20  guess.
21      Q.  So you've never stated publicly in any
22  published article that glyphosate causes cancer,
23  correct?
24      A.  I have not.
25      Q.  You've never given a presentation to any

Page 23

1  medical society that states glyphosate causes
2  cancer, correct?
3      A.  I have not.
4      Q.  You've never lectured to any -- you've
5  never lectured to any medical students or medical
6  organizations and stated that glyphosate causes
7  cancer, correct?
8      A.  Not glyphosate.  I have discussed the
9  fact that pesticides are risk factors of patients
10  with non-Hodgkin lymphoma.  I did not mention the
11  word "glyphosate" per se.
12      Q.  When did you lecture regarding
13  pesticides?
14      A.  Not -- not lectured specifically
15  regarding pesticides.  In discussing non-Hodgkin
16  lymphoma and lecturing on non-Hodgkin lymphoma, if
17  the scope of the presentation in the audience was
18  pertaining to giving an overview, there are times
19  where I would have a slide or two in terms of
20  causation of or known risk factors for non-Hodgkin
21  lymphoma.  And pesticides would be listed as some
22  of the -- in addition to the other risk factors I
23  have on the slide.
24      Q.  Do you have copies of those
25  presentations?

Page 24

1      A.  I -- I don't.  I mean, these are
2  hundreds of presentations I've given over the past
3  20 years to students, fellows.  I don't keep
4  copies of all of these lectures, no.
5      Q.  You don't save them on a computer?
6      A.  Well, some of them they -- you have
7  to -- I mean, you can't.  I mean, some of them you
8  delete them because you have to update every time
9  you give a lecture.  I mean, the lecture I gave in
10  2004, for example, is not going to be the same
11  lecture I give in 2018.
12      Q.  Sure.  So do you have the most current
13  lecture you've given?
14      A.  The current -- the most recent lecture
15  I've given was not on non-Hodgkin lymphoma.
16  Remember I said I've been giving a lot on
17  healthcare delivery on biosimilars, on CART-T
18  cellular therapy, on other aspects of healthcare
19  for oncology patients.  That has been a lot of
20  area of interest of me as of late.
21      Q.  When is the last time you've presented
22  regarding non-Hodgkin's lymphoma where you would
23  have told any audience, whether it be medical
24  students or otherwise, that pesticides cause or
25  increase the risk of cancer?

Page 25

1      A.  I don't -- again, I don't recall when
2  was the last time I gave a lecture for this
3  particular -- again, it's not a lecture on causes
4  of -- I mean, my areas discuss in broad scopes
5  non-Hodgkin lymphoma.  So depends on the
6  particular lecture and the audience.  There are
7  times where you -- in the introduction you talk
8  about how common it is, the incidence, the
9  prevalence.  And you may put a slide on causes or
10  you may not depending on the scope and the -- the
11  audience that you have.
12      I did lecture last -- the American
13  Society of Hematology meeting in 2017.  I was the
14  chair of a meeting on lymphoma and CLL.  And it
15  was me and two other speakers.  And I talked about
16  large cell lymphoma.  The other speaker talked
17  about follicular lymphoma, and the third speaker
18  talked about CLL.  I'll have to go back to see if
19  that particular lecture had -- did I have a slide
20  on causation or not.
21      I recall I wanted to focus during that
22  lecture more on double-hit lymphoma, which is a
23  particular subset of aggressive non-Hodgkin
24  lymphoma so I may have not put that in.  But that
25  was -- that was a big meeting.  There was probably

7 (Pages 22 to 25)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 26

1  about 200, 250 people in the audience.  And it's
2  one of our national meetings.  The American
3  Society of Hematology is the annual meeting that
4  all lymphoma specialists and hematologists go to,
5  which we have in two weeks.  We're -- I go there
6  on November 29.
7       Q.  And do I understand correctly that
8  you're not sure one way or another whether you had
9  a slide in that presentation regarding glyphosate
10  or pesticides -- let me strike that and ask that
11  again because I think you told me not glyphosate.
12       So do I understand correctly that you're
13  not sure whether in the American Society for
14  Hematology meeting in 2017 -- whether you had a
15  slide that reflected that pesticides cause or
16  increase the risk of cancer?
17       A.  Yes, I don't recall if I had a slide
18  like this.  But that was -- that was a meeting
19  where I remember that I did lecture on non-Hodgkin
20  lymphoma, specifically on diffuse large cell
21  lymphoma.  I don't recall specifically if I had a
22  slide on risk factors of non-Hodgkin lymphoma
23  because the focus of that particular lecture that
24  I had was on DLBCL and a specific subset, which is
25  double-hit lymphoma, a more aggressive form of

Page 27

1  large cell lymphoma.
2       Q.  And at the time of that meeting you had
3  been retained as an expert for plaintiffs in the
4  Roundup litigation, correct?
5       A.  Yes.
6       Q.  Did you disclose -- did you disclose as
7  part of any materials for that meeting that you
8  were serving as an expert for plaintiffs in
9  litigation involving pesticides or herbicides,
10  glyphosate?
11       A.  In -- that was not required and
12  disclosed if I'm -- if there's no conflict in
13  the -- in what I'm presenting, in the material I'm
14  presenting.  I disclosed I'm an employee of
15  Cardinal Health and I own stocks in Cardinal
16  Health.  That was the extent of my disclosure, if
17  I recall correctly.
18       Q.  Sure.  So it's fair to say if you had
19  included any slides that addressed pesticides or
20  herbicides as causes of non-Hodgkin's lymphoma,
21  then that could have represented a conflict,
22  right?
23       MS. FORGIE:  Objection.
24       THE WITNESS:  It is -- it is -- it is fair to
25  say.  I'll have to go back and look whether this

Page 28

1  has been mentioned in my slides.  And if it has
2  been mentioned, I should have disclosed that,
3  you're correct.
4  BY MR. LEVINE:
5       Q.  And -- but you did not disclose -- first
6  of all, we know you did not disclose a conflict,
7  correct?
8       MS. FORGIE:  Objection.
9       THE WITNESS:  As serving in expert testimony,
10  I did not disclose that because I didn't -- I
11  didn't see there was any conflict in the material
12  I'm presenting.  So I'll have to go back and see
13  if -- if I presented anything pertaining to
14  pesticides.  If I did indeed have a slide on
15  pesticides, then I may have -- I should have
16  disclosed this and may have forgotten.
17  BY MR. LEVINE:
18       Q.  Okay.  And we don't know one way or
19  another whether you did or didn't present anything
20  on pesticides at this point, correct?
21       A.  Correct.
22       Q.  You've not conducted any scientific
23  research regarding Roundup, correct?
24       A.  Correct.
25       Q.  You've not conducted any scientific

Page 29

1  research involving glyphosate, correct?
2       A.  Correct.
3       Q.  You've not conducted any scientific
4  research involving pesticides, correct?
5       A.  Correct.
6       Q.  You've not conducted any scientific
7  research involving herbicides, correct?
8       A.  Correct.
9       Q.  You've never been involved with the
10  manufacture or testing or marketing of any
11  chemical products, correct?
12       A.  No.
13       Q.  Never worked for the EPA, correct?
14       A.  Correct.
15       Q.  You've never consulted for the EPA,
16  correct?
17       A.  Correct.
18       Q.  Do you do other expert work in
19  litigation?
20       A.  I have not.
21       Q.  So this is the only -- the Roundup
22  litigation is the only litigation in which you've
23  testified as an expert witness?
24       A.  As of today, yes.
25       MR. LEVINE:  Can we just take a quick break

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 30

1    so I can just quickly look at the materials
2    that --
3        MS. FORGIE:  Sure.
4        MR. LEVINE:  (Continuing) -- were provided?
5        MS. FORGIE:  Like 5 minutes?
6        THE VIDEOGRAPHER:  Going off the record.
7        MR. LEVINE:  Roughly.
8        THE VIDEOGRAPHER:  We're going off the record
9    at 10:26 a.m.
10              (Short recess.)
11       THE VIDEOGRAPHER:  We're back on the record
12   at 10:36 a.m.
13              (Nabhan Exhibit Nos. 6 and 7
14               marked as requested.)
15   BY MR. LEVINE:
16       Q.  Dr. Nabhan, I'm just going to hand you
17   what's been provided to us as your reliance list
18   and reference list.
19       MR. LEVINE:  Would you like copies?
20       MS. FORGIE:  I would actually.  Thank you.
21       MR. LEVINE:  That's -- what I've just handed
22   to you is Exhibit 7 and then here's Exhibit 6.
23       MS. FORGIE:  Oh, they're marked separately?
24       MR. LEVINE:  Yeah.  I've marked as Exhibit
25   6 -- I've marked what's noted as I believe your

Page 31

1    reliance list.
2    BY MR. LEVINE:
3        Q.  And I believe those are general
4    materials or materials that you rely on for your
5    generic opinions in this litigation, correct?
6        A.  These are the papers I've reviewed over
7    the past couple of years.  I've accumulated the
8    list.  So I may not have read some of the papers
9    yesterday or the day before, but I've just added
10   to the list of papers I've been reading.
11       Q.  Sure.  And then as Exhibit 7, what I
12   handed you was provided to us as "Dr. Nabhan
13   Reference List - Case Specific Materials."
14              And am I correct that these are the
15   materials you've reviewed that are specific to Ms.
16   Gordon's case, correct?
17       A.  These are the depositions that I
18   reviewed in addition to the medical records, but
19   some of the -- some of the articles on Exhibit 6
20   obviously I also reviewed for the case specific of
21   Ms. Gordon.
22       Q.  Okay.  Aside from any medical
23   literature, does this list of case specific
24   materials reflect all of the information you've
25   reviewed that's specific to Sharlean Gordon?

Page 32

1        A.  Yes.  I think counsel just gave you
2    another paper.  I mean, every -- she gave you
3    another paper that I looked at over the past
4    couple of weeks that just came out.
5        Q.  Sure.  And that's medical literature.
6        A.  Understand.

20              (Nabhan Exhibit No. 8 marked
21               as requested.)
22   BY MR. LEVINE:
23       Q.  Handing you what's been marked as
24   Exhibit 8, which is "Plaintiff's Expert Witness
25   Disclosure" in this case.

Page 33

1        MR. LEVINE:  A copy.
2    BY MR. LEVINE:
3        Q.  Have you seen that document before?
4        A.  I have.
5        Q.  And if you turn to Page 3 of that
6    document, that's where it lists your name, your
7    disclosure as an expert in this case, correct?
8        A.  Correct.
9        Q.  And in terms of what's being disclosed,
10   it states, "Dr. Nabhan is a board-certified
11   hematologist and medical oncologist, with a
12   specialty in the diagnosis and management of
13   patients with all types of lymphoma, including
14   non-Hodgkin lymphoma (NHL).  He is designated in
15   the areas of human cancers, causes of cancer,
16   including exposure to glyphosate and Roundup,
17   cancer diagnosis, cancer effects, cancer
18   treatments, and the clinical practice of medicine
19   generally and, specifically as to Plaintiff, the
20   cause or causes of her NHL, her clinical course
21   and pain and suffering, the reasonableness and
22   necessity of her medical treatment and expenses,
23   and issues relating to her surviving with the
24   consequences of cancer treatment."
25              Those are the general areas that you'll

9  (Pages 30 to 33)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 34

1  be discussing in this case, correct?
2  **A. Sure.**
3  Q. Now, first of all, you recall that you
4  provided a report in the multidistrict litigation,
5  in the larger MDL regarding general causation as
6  it relates to Roundup and non-Hodgkin lymphoma,
7  correct?
8  **A. Was that the April 2017 report?**
9  Q. The general causation report?
10  **A. I want to make sure we're talking about**
11  **the same report.**
12  Q. I believe it was April 2017, but I --
13  **A. Okay. Just because there are a lot of**
14  **legal terminologies, I want to make sure I --**
15  Q. Sure. Well, what do you recall about
16  that report, and we'll figure out whether it's the
17  same one?
18  **A. I recall that it was a general**
19  **description as to how I reached the conclusion**
20  **that glyphosate causes non-Hodgkin lymphoma.**
21  **There wasn't any discussion of a particular**
22  **patient case in that report so I presume that's**
23  **what you're talking about.**
24  Q. Yes. And you -- and I believe you did a
25  supplemental report after the Andreotti study came

Page 35

1  out with respect to those opinions, correct?
2  **A. Yes. And which also included a report**
3  **that pertains to Mr. Johnson. That was in January**
4  **2018.**
5  Q. Sure. I believe you included that
6  supplemental report with your Johnson report, but
7  you also separately submitted it in the MDL, which
8  is a different litigation than the Johnson case.
9  Do you recall that?
10  **A. I do.**
11  Q. Okay. And you were deposed regarding
12  those general opinions, correct?
13  **A. I was.**
14  Q. And as we've discussed, you stand by
15  those opinions, correct?
16  MS. FORGIE: Objection.
17  THE WITNESS: I do stand by these opinions
18  that I provided previously.
19  BY MR. LEVINE:
20  Q. Sure. And are those the same general
21  opinions that you intend to offer in this case?
22  MS. FORGIE: The same objection.
23  THE WITNESS: Yes. There may be more
24  additional details depending on the questions that
25  you are going to ask me that I may have not

Page 36

1  necessarily written in -- you can't write
2  everything in a report, so it depends on your
3  questions. I may add additional information that
4  I may have not added in the reports.
5  BY MR. LEVINE:
6  Q. Well, so I'm entitled to know what it is
7  you intend to testify about.
8  Is there anything that's not written in
9  those reports -- aside from, of course, the
10  article that you've provided to me today -- that
11  you intend to testify to in this case with respect
12  to general causation that's not reflected in those
13  reports?
14  **A. No. I guess what I meant is if -- if --**
15  **if you ask me about a particular study, I may add**
16  **additional detail about the study that you ask**
17  **based on the information that are provided in a**
18  **particular study, but there's no additional things**
19  **I'm going to testify about.**
20  Q. Sure. So you have no new opinions with
21  respect to glyphosate generally?
22  **A. There is no new -- there are no new**
23  **opinions.**
24  Q. Okay. Besides what we just discussed in

Page 37

1  terms of your prior opinions, what opinions do you
2  intend to offer in this case -- and I'm now going
3  to quote from this expert disclosure -- in the
4  areas of human cancers, causes of cancer,
5  including exposure to glyphosate and Roundup,
6  cancer diagnosis, cancer effects, cancer
7  treatments, and the clinical practice of medicine
8  generally?
21  Q. Sure. And I appreciate that and that
22  probably saves me a question later that I was
23  going to ask you.
24  Just to be clear, I actually stopped
25  reading before it says specifically to Ms. Gordon.

10 (Pages 34 to 37)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 38

1    So I was just asking generally what -- what
2    opinions you intend to offer with respect to those
3    areas.
4         Anything in addition to what we just
5    discussed from your general reports?
6         **A.  I honestly don't understand the**
7    **question.**
8         Q.  Okay.
9         **A.  I just want to make sure I answer it**
10   **accurately.**
11        Q.  I completely understand why you don't --
12        **A.  Sorry.**
13        Q.  (Continuing) -- understand the question.
14   I think I asked a bad question.
15        So it says you're designated in the
16   areas of human cancers, causes of cancer,
17   including exposure to glyphosate, cancer
18   diagnosis, cancer effects, cancer treatments, and
19   the clinical practice of medicine generally.  Then
20   it says "and, specifically as to Plaintiff, the
21   cause or causes of her NHL," and it continues
22   after there.
23        **A.  Sure.**
24        Q.  So now --
25        **A.  Now I understand what you're asking.**

Page 39

1         Q.  (Continuing) -- now you understand where
2    I'm going.
3         **A.  Yes.**
4         Q.  Besides what we've discussed about
5    general opinions that you've already offered, are
6    there any other opinions in these areas that we
7    just discussed that you intend to offer generally?
8         **A.  No.**
9         Q.  Now -- now we'll flip to the other side
10   of that long sentence.
11        You've been designated --
12        **A.  It's a common mistake Giants fans make.**
13        MS. FORGIE:  Don't.
14        THE WITNESS:  Sorry.
15        MS. FORGIE:  That's okay.
16   BY MR. LEVINE:
17        Q.  You've been designated to offer opinions
18   specifically as to -- as to plaintiff, the cause
19   or causes of her NHL, her clinical course and pain
20   and suffering, the reasonableness and necessity of
21   her medical treatment and expenses, and issues
22   relating to surviving with the consequences of
23   cancer treatment, correct?
24        **A.  Correct.**
25        Q.  And I'm going to break those down a

Page 40

1    little bit.
2         What opinions do you intend to offer
3    specifically as to the plaintiff and the cause or
4    causes of her non-Hodgkin's lymphoma?
5         **A.  I plan on explaining the various causes**
6    **of non-Hodgkin lymphoma in general that may lend a**
7    **patient at increased risk of developing such**
8    **disease.  And then I plan on performing a**
9    **differential diagnosis specific for Ms. Gordon and**
10   **explain that she did not have any of the risk**
11   **factors for developing non-Hodgkin lymphoma and**
12   **diffuse large B-cell lymphoma except for the use**
13   **of Roundup and/or glyphosate.**
14        Q.  Okay.  So walk me through your
15   methodology here.
16        **A.  As it pertains to Ms. Gordon?**
17        Q.  As it pertains to the cause of her
18   non-Hodgkin's lymphoma.
19        **A.  Sure.  So I think the -- first we know**
20   **that the majority of non-Hodgkin lymphoma in**
21   **general are of unknown causes.  We -- oftentimes**
22   **in clinic when you meet a patient who has the**
23   **diagnosis of non-Hodgkin lymphoma, you -- more**
24   **likely than not you're unable to identify a**
25   **particular cause for why that patient developed**

Page 41

1    **this disease.  Nonetheless, you always ask a lot**
2    **of questions about the social history of a**
3    **patient, about occupational exposure, about**
4    **employment history.  And really the exercise --**
5    **the reason for that exercise is to try to discern**
6    **if there are any risk factors that may be specific**
7    **for a particular patient versus another.**

18        **So I would go through the known risk**
19   **factors of non-Hodgkin lymphoma.  And I think a**
20   **lot of these are well known and they are, again,**
21   **printed and on the web of major medical centers**
22   **that deal with this disease as well as in any**
23   **textbook and any review article for non-Hodgkin**
24   **lymphoma.**
25        **So as an example, there are known viral**

11  (Pages 38 to 41)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 42

1    association with non-Hodgkin lymphoma, such as
2    HIV.  HIV-positive patients have higher risk of
3    developing this disease.  Autoimmune disease --
4    diseases.  Patients who have autoimmune
5    diseases -- excuse me -- their immune system is
6    suppressed -- is suppressed and that might lend
7    them to develop non-Hodgkin lymphoma.  So it is
8    not unusual for patients who have autoimmune
9    disease to develop this particular type of
10   malignancy.
11   ████████████████████████
12   ████████████████████████
13   █████████████████████████████████
14   ███████████████████████
15   ████████
16        I think pesticides are well known as
17   increasing the risk -- increasing the risk of
18   developing non-Hodgkin lymphoma, and in Ms. Gordon
19   that's the only pesticide that she was exposed to.
20   And her exposure as well as her youth fits within
21   the published epidemiologic literature that
22   support the causation of non-Hodgkin lymphoma by
23   glyphosate.
24        So that's what, you know, usually you go
25   through -- I mean, as I said, not every

Page 43

1    non-Hodgkin lymphoma you're able to identify some
2    cause.  In fact, the majority you don't; and the
3    majority you're unable to find any cause.  Still
4    you try in every particular patient -- frankly,
5    whether old or young, you try to identify any
6    particular risk factor; and you just go through a
7    list.  And most often you find nothing and
8    sometimes you do.  And in her particular case I
9    think the evidence was compelling that this was
10   the cause of her disease.
11   Q.  So let's go through some of that.
12        You were just alluding to, which you
13   mentioned at the beginning as well, more likely
14   than -- more often than not you can't identify the
15   cause of non-Hodgkin's lymphoma, right?
16   A.  Correct.
17   Q.  And sometimes you can't identify any
18   risk factors, correct?
19   A.  Correct.
20   Q.  But then, as you said, sometimes you do?
21   A.  Sure.
22   Q.  When you identify a risk factor, does
23   that mean you would assign it as a cause of
24   non-Hodgkin's lymphoma in a patient with that risk
25   factor?

Page 44

1    A.  I mean, if you have a plausible risk
2    factor and the history is very compelling that you
3    have a known risk factor that has demonstrated
4    association and causation of a disease that
5    usually affects older patients and it's being
6    present in somebody who is close to 30 years
7    younger than the median age of diagnosis, how can
8    you ignore that.  I mean, this is very clear that
9    this is a cause of Ms. Gordon's large cell
10   lymphoma or non-Hodgkin lymphoma.
11   Q.  So what step do you take between the
12   patient that you don't identify the risk factor
13   versus the patient you do identify the risk factor
14   in to be able to say it's the risk factor that
15   caused it?
16   A.  It's the plausibility of the risk
17   factor.  I mean, how strong is the risk factor
18   that is present in a particular patient.  I mean,
19   the strength of the particular risk factor.  And
20   you have to take also into account the strength of
21   the evidence that links that risk factor to the
22   particular disease.
23        There are sometimes certain risks that
24   people state, but the evidence is -- is not as
25   compelling.  So, as I said, I mean, you have to go

Page 45

1    through the process of differential diagnosis or
2    eliminating all of these possible risk factors;
3    and each patient is different.
4        I mean, some patients you will find that
5    there are different risk factors.  I mean, I'll
6    draw an analogy that if somebody has hypertension,
7    which is a known risk factor of cardiac disease,
8    and then they smoke, I mean, you will have to also
9    link that smoking, again, is an additional risk
10   factor for this particular disease.
11        So the strength of the evidence plays a
12   role and the fact that, again, each patient is
13   different.  I think that somebody diagnosed at the
14   age of -- I don't remember if it's 36 or 38.  So
15   pardon me if I don't remember the exact age.  But
16   she was diagnosed at a significantly younger age
17   than the median age of the disease, and to me
18   that's always a red flag.  I mean, you have to --
19   you know, if somebody is much younger than when
20   the disease should occur -- I mean, if somebody in
21   his early 40s gets a heart attack, you have to
22   investigate that.  You can't just say, you know,
23   why -- you know, well, it's just a heart attack.
24   No, you have to look into why would somebody in
25   their early 40s develops a disease that usually

12  (Pages 42 to 45)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 46

1    happens in older folks.  Not to say that older
2    patients can't have these risk factors as well.
3    But I think when you're dealing with a younger
4    patient, you -- it's always a red flag for us as
5    oncologists to try to investigate further.
6        Q.  Okay.  So let's go through some of that.
7            You look at the strength of the risk
8    factors you said?
9        A.  Yes.
10       Q.  Some risk factors are more established
11   than others, right?
12       MS. FORGIE:  Objection.
13       THE WITNESS:  Some, yes.
14   BY MR. LEVINE:
15       Q.  Some are definitive and some are
16   inconclusive, correct?
17       A.  Yeah.  I mean, some are more definitive
18   and some are -- require additional research maybe
19   or additional data.  And, again, it's always --
20   you would have to try to interpret the evidence as
21   well as the strength of the evidence.
22       Q.  So where there's a risk factor that's
23   more definitive and the patient is exposed to that
24   risk factor sufficiently, then you would be able
25   to say that risk factor caused a patient's

Page 47

1    non-Hodgkin's lymphoma, correct?
2        A.  Yes.
3        MS. FORGIE:  Objection.
4        THE WITNESS:  I think if the risk -- if
5    there's -- if the risk factor is very profound in
6    a particular patient and the plausibility of that
7    risk factor in the literature is very strong and
8    the evidence is compelling, you can't really turn
9    your back and say, Well, it's an idiopathic cause;
10   I don't know what caused this disease.
11   BY MR. LEVINE:
12       Q.  And where a risk factor -- I think you
13   said some risk factors additional further study is
14   needed --
15       A.  Sure.
16       Q.  (Continuing) -- correct?
17           With respect to a risk factor where one
18   might say additional study is needed, are you able
19   to assign that as a cause in a particular patient
20   who has no other risk factors?
21       A.  I think it will be a little bit more --
22   more controversial if -- if the evidence is not
23   strong and if there is a lot of controversy over
24   whether a risk factor is associated with a
25   particular disease or not.  So I think it's always

Page 48

1    in the back of your mind, you know, that it's
2    possible; but you may not be able to assign a
3    strong weight of evidence to that particular risk
4    factor as a different risk factor.  That's why you
5    have to go through the process of each particular
6    patient and each particular risk factor.
7        Q.  So where further study is needed, you
8    wouldn't necessarily be able to -- strike that.
9            Where there's a risk factor where you --
10   where it would be classified as further study is
11   needed to establish it, one couldn't say to a
12   reasonable degree of medical certainty that that
13   risk factor is a cause in a particular patient,
14   correct?
15       A.  So as a lymphoma specialist, I'm going
16   to tell you everything requires further studies,
17   everything.  So there is no -- there is no
18   scenario that you could show me where we could say
19   there's no further study that is needed.  I mean,
20   even -- even tobacco use and cancer, further
21   studies are needed to understand how it causes
22   cancer.
23           So -- so my answer to this is that each
24   risk factor might play a different role in each
25   different patient.  So a particular risk factor,

Page 49

1    you know, may not be as strong as another risk
2    factor in that individual patient because, you
3    know, for example, when we talk about Roundup and
4    glyphosate, you know, the exposure and the use in
5    this particular patient fit within what was
6    published.  It wasn't, let's say, a one-time use.
7    It wasn't somebody who just used the -- the agent
8    one time and then she never used it again.  Then
9    despite the link and the causation between Roundup
10   and non-Hodgkin's lymphoma, if somebody used it
11   one time, you can't link that to the disease.
12       Q.  Dr. Nabhan, do you remember my question?
13       A.  I hope I answered correctly; but if I
14   didn't, please repeat.  I'm sorry.
15       Q.  I'll ask you to try and keep your
16   answers to my question.
17       A.  Sure.
18       Q.  Where a risk -- so we first were talking
19   about where a risk factor is established, you can
20   assign it as causation in a patient who has no
21   other risk factors.  Then my last question was
22   with respect to a risk factor where further study
23   is needed -- or let me rephrase that a little bit
24   just to get a little more specific.  But with
25   respect to a risk factor that's inconclusive as a

13  (Pages 46 to 49)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 50

1  cause -- for instance, you mentioned smoking and
2  lung cancer and said further study is needed.  But
3  it's not inconclusive as a cause, correct?
4      **A.  As a cause, no.**
5      Q.  Right.  So with respect to a risk factor
6  that's inconclusive as a cause, would you agree
7  you can't say to a reasonable degree of medical
8  certainty that it is a cause in a particular
9  patient?
10     **A.  If you believe it is inconclusive, it**
11 **may be inconclusive for the general population.**
12 **So if you take a thousand patients with lymphoma**
13 **and then -- not lymphoma.  Let's talk cancer in**
14 **general.**
15         **If you have a particular risk factor**
16 **that is inconclusive, this inconclusivity usually**
17 **applies to broader patient population when you**
18 **talk about population.  So it is possible that a**
19 **particular risk factor is inconclusive for the**
20 **broader population and further studies are needed.**
21        **Now, this does not take away, frankly,**
22 **from the fact that in a particular patient that**
23 **inconclusive evidence is very compelling in this**
24 **particular case and you cannot ignore it and you**
25 **have to act on it.  But I see what you're saying,**

Page 51

1  **yes.  Inconclusive for broader audience,**
2  **absolutely.  You still need to look into it**
3  **further.  But if you have that inconclusive**
4  **evidence and you meet the patient that may have**
5  **it, you should pause as an oncologist and think it**
6  **may apply; it may not.**
7      Q.  Okay.  I think I -- I think I understand
8  you.
9          So when you're talking about a risk
10 factor that's inconclusive, we're talking about
11 general causation.  That's as to a population,
12 correct?
13     **A.  Yes.**
14     Q.  But when we're talking about specific
15 causation, which is causation in a patient, you
16 don't necessarily need to establish general
17 causation in order to determine that it causes it
18 in that patient, correct?
19     **A.  I think you would like to have some**
20 **evidence to suggest that there's something out**
21 **there.  You're not going to -- you're not going to**
22 **take something that has never been studied and**
23 **just -- right, I mean, blame it on -- on the**
24 **particular disease.**
25        **What I'm saying is the inconclusivity**

Page 52

1  **that you mentioned, absolutely correct.  When**
2  **you -- when you take general population, you may**
3  **not be able to establish that generally; but that**
4  **particular inconclusive evidence might still be**
5  **something to think about when you're faced with a**
6  **particular patient that might fit different**
7  **demographics or different criteria than the entire**
8  **population.**
9          **I hope I answered this correctly.**
10     Q.  I think you have.  And let me just try
11 and tell you what I understood from that.
12     **A.  Yeah.**
13     Q.  Which is something doesn't have to be
14 established as a cause -- as a cause in the
15 population under your methodology in order to be
16 able to assign it as a cause in an individual?
17     MS. FORGIE:  Objection.
18     THE WITNESS:  No, it's -- it's not really
19 exactly what I said.
20 BY MR. LEVINE:
21     Q.  Yeah, I think I misphrased that.  May --
22 may I --
23     **A.  No; please.**
24     Q.  Sorry.
25     **A.  Please.**

Page 53

1      Q.  As long as -- I think what you're saying
2  is as long as there is some study out there that
3  indicates something is a risk factor, even if it's
4  not established as a known cause, it can -- it can
5  be assigned as a cause in an -- in an individual
6  patient, correct?
7      MS. FORGIE:  Objection.
8      THE WITNESS:  Even if it's not inconclusive,
9  it's already established, so basically yes.  If
10 you -- if you have studies out there to support a
11 risk factor associated with a particular disease
12 but the studies are inconclusive on a larger
13 population level, that inconclusivity might not
14 apply to a specific patient.  I mean, the risk is
15 out there.  There are studies to establish that,
16 but there are studies that contradicted this.  As
17 a clinician when you're faced with a patient and
18 you have to make a determination, you can't ignore
19 this completely and you have to apply both sides
20 of the evidence on that particular individual
21 you're seeing.  So I think we're saying the same
22 thing right now.
23 BY MR. LEVINE:
24     Q.  Sure.  So there can be studies out there
25 that go both ways?

14  (Pages 50 to 53)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 54

1    A.  Right.
2    Q.  But then you can look at --
3    A.  You have to decide -- sorry.
4    Q.  Let me start over.
5        There can be studies out there that go
6  both ways.  But then when you look at an
7  individual patient, you can still consider whether
8  that caused that patient's cancer even though it's
9  not established as a general cause?
10   MS. FORGIE:  Objection.
11   THE WITNESS:  Even if it is inconclusive,
12  yes.
13   BY MR. LEVINE:
14  ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
    ████████████████████████████████
19   Q.  Age -- the age of patients who are
20  diagnosed with non-Hodgkin's lymphoma kind of --
21  is it like a bell curve?
22   A.  No.  The median age is in the late 60s.
23   Q.  Right.
24   A.  Median age is 68.
25   Q.  Median age is about 68 -- 65 or 68

Page 55

1  roughly?
2    A.  Between 65 to 72 depending on the type.
3    Q.  Right.  And then does the risk continue
4  to go up after that or does it go down after that?
5    MS. FORGIE:  Objection.
6    THE WITNESS:  Actually the -- age is a known
7  risk factor and the risk continues to increase
8  with age.
9    BY MR. LEVINE:
10   Q.  Okay.  So there are -- you get to the
11  median age, which is 65.  That means about half
12  the patients are roughly 65 or above and half the
13  patients are 65 or below?
14   A.  The majority of cancers in the United
15  States of America are diagnosed in patients over
16  65.  So good for us if we are less than 65.  So
17  the majority of cancers happen in older patients
18  over 65.  This is not really particular or unique
19  to patients with non-Hodgkin's lymphoma.
20       So by default if you live until you're
21  80 and 85, you've actually had -- you know, it's
22  like almost -- right, almost, you know, survival
23  bias.  I mean, you must have done something really
24  good that you are going to live longer if you
25  haven't had really a particular disease.  But not

Page 56

1  just non-Hodgkin's lymphoma.  The majority of
2  diseases of cancers, most cancers are diagnosed in
3  over 65.
4    Q.  So when the median age is 65 or 68,
5  let's say -- well, what number do you want to use?
6    A.  68.
7    Q.  When the median age is 68, does that
8  mean the majority of cases are above that age?
9    A.  No, no.  That's not what it means.  It
10  means that most of the cases that you will see,
11  the majority of cases that you will see are going
12  to be around that time.  I mean, if you ask any
13  person who sees patients with non-Hodgkin's
14  lymphoma and you ask them, Well, how many patients
15  with non-Hodgkin's lymphoma have you seen in their
16  30s, they're not going to tell you, I've seen
17  hundreds of patients in their 30s unless they
18  somehow decide to have a practice exclusive to
19  younger folks with non-Hodgkin lymphoma for
20  research purposes.
21       I don't think that's actually a point of
22  contention or argument in the lymphoma literature.
23  Patients in their 30s, A, should not have cancer,
24  period, and should not have non-Hodgkin lymphoma,
25  not just -- so I think we always think of what

Page 57

1  could lead to somebody develop -- any healthy
2  person in their 30s, we'd like to know why they
3  develop any particular malignancy.
4    Q.  You have treated patients under 60 years
5  old who have been diagnosed with non-Hodgkin's
6  lymphoma, correct?
7    A.  I have.
8    Q.  And you've treated patients under 50
9  years old who have been diagnosed with
10  non-Hodgkin's lymphoma?
11   A.  I have had patients in their 30s with
12  non-Hodgkin lymphoma.
13   Q.  You've had patients -- have you had
14  younger patients than in their 30s who have had
15  non-Hodgkin's lymphoma?
16   A.  Well, there's one particular subtype.
17  It's called Burkitt's lymphoma.  And Burkitt's
18  lymphoma does actually occur with -- in the 20s.
19  So I have had -- that's Burkitt's lymphoma, not
20  large cell lymphoma; a different type.  And as you
21  well know, Hodgkin lymphoma, which is a form of
22  lymphoma but non-Hodgkin, is -- often have --
23  occurs in the early 20s, late teens, and then
24  there is another peak over 60 as well.
25   Q.  So you've treated patients in their 30s

15  (Pages 54 to 57)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

1  who have been -- you've -- strike that.
2      You've treated patients in their 30s who
3  were diagnosed with large cell non-Hodgkin's
4  lymphoma, correct?
5      **A.  But I worked at a -- yes, but I worked**
6  **at a major academic referral center where a lot of**
7  **times these patients are referred because folks in**
8  **the community may not be comfortable when they're**
9  **faced with a young patient with this disease; but,**
10  **yes, I have.**
11      Q.  And you've treated young patients in
12  their 30s who have been exposed -- or who have
13  been diagnosed with large cell non-Hodgkin's
14  lymphoma who have not been exposed to pesticides,
15  correct?
16      **A.  Rarely, but yes.**
17      Q.  Are you --
18      **A.  I mean, rare -- rarely that you face**
19  **somebody in their 30s with large cell lymphoma.**
20  **It's not that common even in academic center, but**
21  **I have.  I mean, I've treated thousands of**
22  **patients.**
23      Q.  Right.  So it's rare that you treat
24  patients in their 30s with non-Hodgkin's lymphoma,
25  correct?

1      **A.  Correct.**
2      Q.  But of those patients can you say
3  whether or not the majority of them have been
4  exposed to pesticides?
5      MS. FORGIE:  Objection, asked and answered.
6  You can answer it again.
7      THE WITNESS:  I can't, but I -- I agree that
8  some of these patients did not have exposure to
9  Roundup or pesticides, if that's your question.
10  BY MR. LEVINE:
11      Q.  Yes.  That was part of my question.
12  I'll be a little more specific.
13      Can you say whether most of those
14  patients were exposed to pesticides or not?
15      MS. FORGIE:  Objection, asked and answered.
16  You can answer again.
17      THE WITNESS:  I think -- I think most were
18  not.  The ones that I have seen in terms of
19  patients that were this disease, I believe the --
20  most of these patients I saw were not exposed.
21  BY MR. LEVINE:
22      Q.  Okay.  You mentioned you look for known
23  risk factors.  We discussed a little bit of that.
24  You mentioned HIV, autoimmune, known viral causes
25  as some examples.

1      Do you recall that?
2      **A.  Yeah.**
3      Q.  If a patient has HIV and was exposed to
4  Roundup, would you be able to say that Roundup
5  caused their cancer?
6      MS. FORGIE:  Objection.
7      THE WITNESS:  You'll have to look at -- at
8  the particular patient.  I think -- I think if you
9  have somebody with -- who has HIV-positivity,
10  again, there's -- everybody knows that
11  HIV-positivity, because of the way it suppresses
12  the immune system, it increases the risk of
13  non-Hodgkin lymphoma.  And if that particular
14  person was also exposed to Roundup, you'll have to
15  look at the particular case.  You may not be able
16  to tell.
17      You may be -- depending on the exposure,
18  you may be able to see that there's a -- you know,
19  it's like smoking and hypertension and diabetes.
20  If you have somebody who has diabetes and at
21  increased risk of heart disease, if they smoke,
22  they increase the risk of heart disease.  The same
23  thing.  Somebody is HIV-positive, they have
24  increased non-Hodgkin lymphoma.  If they're
25  exposed to Roundup, then that risk might even

1  increase further.  That's where you'll have to
2  look at the particular case.
3  BY MR. LEVINE:
4      Q.  Is it fair to say in a patient with HIV
5  and non-Hodgkin's lymphoma, you wouldn't be able
6  to say that without Roundup exposure that patient
7  would not have been diagnosed with non-Hodgkin's
8  lymphoma?
9      MS. FORGIE:  Objection, asked and answered.
10      THE WITNESS:  Yeah, you can't say that.
11  BY MR. LEVINE:
12      Q.  You can't?
13      **A.  Yeah, you can't.**
14      Q.  The same with autoimmune disease?
15      **A.  Like I said, each -- I mean, I think the**
16  **same answer.  Each case is -- has to be taken**
17  **separately and you have to really look at each**
18  **case separately.  And, I mean, I hope my example**
19  **or my analogy helps explaining how at least**
20  **oncologists think about this.**
21      **Like I said, I mean, if you have**
22  **somebody who has one risk factor of cardiac**
23  **disease, it doesn't mean that additional risk**
24  **factor does not contribute to the cardiac disease.**
25  **The same thing with lymphoma.  If you have one**

16 (Pages 58 to 61)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 62

1  risk factor of lymphoma, it doesn't mean that an
2  additional risk factor may not contribute to
3  elevated risk of that disease.
4      Q.  So you told me your methodology, I
5  believe you said, is a differential diagnosis,
6  correct?
7      A.  Yes.
8      Q.  And my understanding of a differential
9  diagnosis -- well, first of all, as I understand
10  it's often used to diagnose a disease, right?
11      A.  I learned now the legal term of
12  differential diagnosis, which is what we're
13  talking about, I believe.
14      Q.  Right.  The medical term of differential
15  diagnosis is actually used to determine what the
16  disease a patient has is, correct?
17      A.  Yep.
18      Q.  So someone might come in and you might
19  say does this person have cancer or does this
20  person have an infection or does this person just
21  have a cold or does --
22      A.  Correct.
23      Q.  (Continuing) -- this person have
24  nothing, correct?
25      A.  Correct.

Page 63

1      Q.  And then you would -- you would rule in
2  the possible diseases for that patient's symptoms
3  and then conduct tests or evaluations or
4  examinations to rule out what the possible
5  diagnoses are, right?
6      A.  Yep.
7      Q.  And then you would determine what the
8  diagnoses is if you rule out the other
9  possibilities, correct?
10      A.  Yes.
11      Q.  And what you say is the legal
12  differential diagnosis, it's essentially applying
13  the same principles to the cause of the disease,
14  correct?
15      A.  Yes.
16      Q.  So first you have to rule in the
17  possible causes, correct?
18      A.  Yep.
19      Q.  And then you have to rule out what --
20  those possible causes as causing a patient's
21  disease, correct?
22      A.  A particular patient, correct.
23      Q.  And so I know we just had a little bit
24  between medical and legal.  The differential
25  diagnosis we've just described with respect to

Page 64

1  determining causation, can you cite any medical
2  textbook that describes this form of differential
3  diagnosis for determining the cause of an
4  individual patient's non-Hodgkin's lymphoma?
5      A.  No.  We -- we -- that's what we do it,
6  but we never called it differential diagnosis.  I
7  learned that that's what you guys call a
8  differential diagnosis.
9      Q.  Okay.  Can you cite any medical textbook
10  or scientific publication that discusses that this
11  is what you do whether or not it refers to
12  differential diagnosis?
13      A.  It will have to be a medical/legal
14  publication because that's a legal terminology.
15  As I told you, we don't call it differential
16  diagnosis.  You -- you appropriately described
17  what physicians call differential diagnosis.  And
18  when you look at risk factors, we don't have
19  actually a particular mnemonic to it.  We just do
20  that.  But I learned that this is what -- the
21  legal term of differential diagnosis of ruling in
22  and out the particular causes of a disease, and
23  that's what I used earlier with you.
24      Q.  So in the medical profession there are
25  no publications which describe differential

Page 65

1  diagnosis in the way that you're using it here in
2  terms of using the term "differential diagnosis,"
3  correct?
4      MS. FORGIE:  Objection, asked and answered.
5      THE WITNESS:  I'm not aware of any.  There
6  may be, but I -- personally I'm not aware of any.
7  BY MR. LEVINE:
8      Q.  Okay.  In the medical profession, are
9  there textbooks or publications that describe what
10  you're doing here without using the term
11  "differential diagnosis"?
12      MS. FORGIE:  Objection.
13      THE WITNESS:  Can you rephrase?
14  BY MR. LEVINE:
15      Q.  Yes.  You said you're not going to find
16  it as differential diagnosis in a textbook.
17      A.  Correct.
18      Q.  But this is what you do, correct?
19      A.  Differential diagnosis, you -- you
20  outlined it perfectly early on, right?  I mean,
21  you get a --
22      Q.  Right.
23      A.  (Continuing) -- patient with signs and
24  symptoms and you rule in causes -- diseases and
25  you hopefully reach the proper diagnosis.  So you

17 (Pages 62 to 65)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 66

```
 1    diagnose cancer, not cancer, et cetera.
 2          In each given patient, you know -- in
 3    each particular disease there are risk factors for
 4    particular disease.  I mean, take breast cancer,
 5    for example.  You look at family history; you look
 6    at genetic mutations, et cetera, for a particular
 7    patient and you try to decide if this particular
 8    patient in front of you has any of these risk
 9    factors.  And you may eliminate all of them or you
10    may find one that is more pronounced than another.
11          I don't know if that particular process
12    of eliminating risk factors has a particular
13    medical terminology.  It's commonly done by any
14    good physician; that they have to look at these
15    things.  I just don't know if there's a medical
16    term to it.
17      Q.  Right.  And I'm not -- excuse me.  I'm
18    not asking about a medical term.
19      A.  Okay.
20      Q.  I'm asking whether you can cite for me
21    any medical textbook or scientific publication
22    that describes this process as it pertains to
23    determining causation of an individual patient's
24    cancer?
25          MS. FORGIE:  Objection, asked and answered.
```

Page 67

```
 1    You can answer it again.
 2          THE WITNESS:  Not at this point.  I'll have
 3    to look -- I mean, I'm a hundred percent certain
 4    most textbooks and most epidemiology books will
 5    have that, but I can't cite right now.
 6    BY MR. LEVINE:
 7      Q.  Okay.  Is this -- is this methodology
 8    validated as a method for determining the cause of
 9    an individual's non-Hodgkin's lymphoma?
10      A.  The differential diagnosis -- it depends
11    how you define validation.  How -- what do you
12    mean by "validated"?
13      Q.  Well, let me ask you this:  I'll --
14    you've described your methodology and your
15    opinions.
16          How do I know if you're wrong?
17          MS. FORGIE:  Objection.
18          THE WITNESS:  How -- how -- I mean, you have
19    risk factors.  I mean, again -- I mean, there are
20    certain things that could be controversial and
21    they require validation, absolutely.  And there
22    are certain things you're really -- you're really
23    not doing anything except you're looking at the
24    risk -- risk factors of particular patients and
25    you're saying, Okay.  Well, I have five risk
```

Page 68

```
 1    factors for this particular disease that this
 2    patient has and this patient has none of these
 3    risk factors versus they have one or two.
 4    There's -- you're really not doing anything in
 5    terms of -- what are you going to validate?  This
 6    is just -- it's a common process that physicians
 7    go through.
 8          I mean, why do physicians -- when you
 9    meet a patient for the first time, you take a
10    history and physical and ask, you know -- you
11    know, Do you smoke, do you drink, do you use any
12    drugs, where do you live, do you have any family
13    history.  Why do we do that?  I mean, that's
14    not -- none of this -- nobody validated that
15    taking family history is necessarily helpful, but
16    we do it because you identify certain families at
17    risk of particular disease.  So I don't know --
18    there are certain things that I'm not sure what we
19    would try to validate here.  This is just common
20    practice in medicine.
21    BY MR. LEVINE:
22      Q.  You've told me that the vast majority of
23    non-Hodgkin's lymphoma have no known cause,
24    correct?
25      A.  The majority of non-Hodgkin lymphoma we
```

Page 69

```
 1    are unable to identify a cause.  We hope this
 2    changes in the future, but right now, yes.
 3      Q.  Sure.  So in a patient where you add a
 4    particular risk factor, how do I know if when you
 5    conclude that that risk factor is a cause -- how
 6    do I know whether you're right or wrong and that
 7    it just may not be one of those other cases that
 8    have no known cause?
 9          MS. FORGIE:  Objection.
10          THE WITNESS:  A good question.  You'll have
11    to look at the particular risk factor that was
12    selected.  Does it have -- I mean, did you just
13    take a risk factor off the shelf or this is a risk
14    factor that is well established.  Is there
15    literature to support that this risk factor that
16    you have selected has been linked to this
17    particular disease in question.  Is there anything
18    in the patient's history that support that this
19    risk factor is particularly -- influenced the
20    disease cause or that disease versus not.
21          I mean, again, it is always good to
22    challenge yourself and ask the question, but the
23    reality is each particular patient is going to be
24    different.  So you -- you know, it's -- it's --
25    you're not going to take a risk factor that has no
```

18  (Pages 66 to 69)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 70

1    evidence about it in the literature.  And
2    that's -- that's the only way to know, is looking
3    at the bio plausibility of a particular evidence.
4    BY MR. LEVINE:
5        Q.  So I understand that what you're
6    describing to me right here is the methodology,
7    right?
8        **A.  Yes.**
9        Q.  You're going to look to see if there's
10   literature.  You're going to look to see whether
11   there's evidence -- excuse me -- you're going to
12   look to see whether there's evidence to show that
13   it had an effect on a particular patient?
14       **A.  Yes.**
15       Q.  But those are steps in the methodology,
16   correct?
17       **A.  Yes.**
18       Q.  How do I know whether your conclusion --
19   how can I test whether your conclusion is right or
20   wrong in assigning that risk factor as the cause?
21       MS. FORGIE:  Objection, asked and answered.
22   You can answer it again.
23       THE WITNESS:  Well, I think I -- I think I
24   answered that.
25   BY MR. LEVINE:

Page 71

1        Q.  Can I reask?
2        **A.  Please.**
3        Q.  Can I know whether you're right or
4    wrong?
5        **A.  Okay.**
6        MS. FORGIE:  Objection, asked and answered.
7    You can answer it again.
8        THE WITNESS:  I believe I understood your
9    question.  Maybe I'll rephrase it just to make
10   sure I know what you're asking me.
11       I think your question is asking that in
12   a particular patient, despite these risk factors,
13   despite the presence of risk factors, can you be
14   certain that these risk factors are still a cause
15   versus idiopathic, versus no known cause.  Isn't
16   that --
17   BY MR. LEVINE:
18       Q.  That's one aspect of my question.  You
19   can -- you can answer --
20       **A.  I mean --**
21       Q.  (Continuing) -- that.
22       **A.  (Continuing) -- I believe that's what**
23   **you're asking.**
24       MS. FORGIE:  You have to wait until he asks
25   the question and then answer and the -- so the

Page 72

1    court reporter is recording everything.  So let's
2    make sure that we don't talk over each other,
3    please.
4        THE WITNESS:  Okay.  I apologize.
5        MS. FORGIE:  That's okay.
6    BY MR. LEVINE:
7        Q.  I'm good.  You can answer that -- that
8    question that you just --
9        **A.  Yeah.  It goes back to the fact that, as**
10   **we said before, the majority of non-Hodgkin**
11   **lymphoma that are seen by physicians are of**
12   **unknown causes.  And I don't think any lymphoma**
13   **specialist will tell you otherwise.  This does not**
14   **necessarily take away from the fact that there are**
15   **certain risk factors that lead to the development**
16   **of the disease.  So if there are patients -- if**
17   **there's a particular patient that has some of**
18   **these risk factors or any of these risk factors --**
19   **I mean, a simple example is just because lymphoma**
20   **is -- non-Hodgkin lymphoma is idiopathic and**
21   **somebody who's HIV-positive develops this disease,**
22   **can we tell this patient that HIV did not cause**
23   **your lymphoma and it's idiopathic?  We can't.**
24       **So the same -- by the same process that**
25   **we are just linking HIV-positivity to lymphoma,**

Page 73

1    **there are other risk factors that may not be HIV**
2    **but they are also linked to lymphoma.  There is**
3    **good evidence that HIV causes non-Hodgkin**
4    **lymphoma.  There's good evidence that the immune**
5    **system -- the immune suppression causes**
6    **non-Hodgkin lymphoma.  So you look at every risk**
7    **factor for a particular patient in the same astute**
8    **eye that you need to look at all of these risk**
9    **factors and you reach a conclusion.  People might**
10   **challenge your conclusion, and that's fine; but**
11   **that's how you reach the conclusion.**
12       Q.  So going back to a question I asked you
13   a minute ago, can I know whether you're right or
14   wrong?  Yes or no.
15       MS. FORGIE:  Objection.  Asked and
16   answered --
17       THE WITNESS:  I believe --
18       MS. FORGIE:  (Continuing) -- several times.
19   Wait.  You can answer again.
20       THE WITNESS:  I believe if you look at the
21   methodology and the evidence, you should know that
22   I'm right.
23   BY MR. LEVINE:
24       Q.  What's your basis for that?  Where?
25       **A.  The literature.**

19  (Pages 70 to 73)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 74

1      Q.  The literature on your methodology?
2      A.  The literature on the risk factors that
3  are contributing to the disease.
4      Q.  Well, is there an error rate for your
5  methodology?
6      A.  Every methodology has an error rate so I
7  don't know what that is.
8      Q.  Okay.  You have no idea what the error
9  rate is for your methodology in determining
10  causation, correct?
11      MS. FORGIE:  Objection.
12      THE WITNESS:  I don't know that.
13  BY MR. LEVINE:
14      Q.  You would agree with me that no test in
15  medical science is without some error rate?  I
16  think you just said that.
17      A.  There's no perfect test and there's no
18  perfect epidemiologic study in the world.
19      Q.  And when you apply a test to a patient,
20  it's good to know what the error rate is for that
21  test in order to know whether you're getting,
22  let's say, a false positive or a false negative,
23  correct?
24      A.  Yeah, so when you apply --
25      Q.  I'm sorry.  Did you say yes?

Page 75

1      A.  No, I didn't say yes.
2      Q.  Okay.
3      A.  I'm going to answer that.  When you
4  apply a test, it's important to know the pretest
5  probability.  So I think -- it's like when you
6  order -- when you have a patient and this patient
7  is complaining of a particular symptom and you
8  decide on ordering a test, in your mind as a
9  clinician you have a pretest probability of what
10  is the likelihood of that patient has this
11  particular disease or not ahead of ordering the
12  test because that pretest probability, you need to
13  apply it in interpreting the test results.  If you
14  order the test without any type of clinical
15  pretest probability, you really have very
16  difficulty interpreting the results.
17      Q.  Okay.  If you were to opine that Roundup
18  caused ten different patients' non-Hodgkin's
19  lymphoma, how many would you get right and how
20  many would you get wrong?
21      MS. FORGIE:  Objection.
22      THE WITNESS:  So if you have ten patients and
23  you're claiming that all the ten patients' Roundup
24  caused their non-Hodgkin lymphoma?
25  BY MR. LEVINE:

Page 76

1      Q.  Yeah.
2      A.  You can't answer that question because
3  you have to take each particular patient by -- by
4  him or herself.
5      Q.  Is it your testimony that if you had ten
6  patients with identical medical histories to Ms.
7  Gordon and in all ten of those you concluded that
8  Roundup is the cause of their non-Hodgkin's
9  lymphoma, that you would be right ten out of ten
10  times?
11      A.  You're saying exactly like Ms. Gordon?
12      Q.  Now I am, yes.
13      A.  So they had the same exposure, the same
14  age, no other risk factors, exactly the same.
15  There's absolutely no difference?
16      Q.  Right.
17      A.  Well, how can you -- how can you be
18  wrong if it's exactly the same?
19      Q.  So let me ask you this:  The same
20  patient, the same medical history as Ms. Gordon --
21  a patient with the same medical history as Ms.
22  Gordon -- strike that.
23          You've told me that there are -- that
24  you've treated patients in their 30s with
25  non-Hodgkin's lymphoma who have not been exposed

Page 77

1  to pesticides, correct?
2      A.  Yes, I did.
3      Q.  So -- and I'm asking you something
4  different than what we were talking about a second
5  ago.
6      A.  Okay.
7      Q.  Well, so if I -- if I gave you ten sets
8  of medical records with identical histories of Ms.
9  Gordon with one exception.  Five of those patients
10  used Roundup and five of them did not.
11          Are you with me?
12      A.  Okay.  Five did not use it at all.
13      Q.  Five were not exposed --
14      A.  At all.
15      Q.  (Continuing) -- and five had Ms.
16  Gordon's level of exposure.
17      A.  Okay.
18      Q.  And all ten patients had non-Hodgkin's
19  lymphoma.
20          You agree with me that's possible,
21  correct?
22      A.  Of course, it's possible.
23      Q.  Okay.  If the medical records didn't
24  indicate which of those patients had been exposed
25  to Roundup, you couldn't tell me which -- which of

20  (Pages 74 to 77)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 78

1  those patients were exposed to Roundup and which
2  ones were not, correct?
3  **A.  Without taking a history and knowing the**
4  **exposure, no, I can't tell because there's no**
5  **phenotype specific for -- the lymphoma that**
6  **patients develop because of Roundup is not --**
7  **doesn't have a different phenotype.  Yes, I can't**
8  **tell.**
9  Q.  Okay.  So now I'm asking you that if you
10  had ten patients who are all exposed to Roundup in
11  this scenario, you would conclude that all ten of
12  those were caused by Roundup?
13  **A.  If they are of the same age group and if**
14  **they have the same level of exposure and use as**
15  **Ms. Gordon and if they all had the same exact**
16  **disease, it would be very difficult to argue that**
17  **Roundup did not cause the lymphoma in all ten,**
18  **correct.**
19  Q.  But you would agree that Roundup
20  wouldn't necessarily have caused it in all ten?
21  MS. FORGIE:  Objection, asked and answered.
22  You can answer if you can.
23  BY MR. LEVINE:
24  Q.  Correct?
25  **A.  You know, I mean, I think maybe now I**

Page 79

1  **understand the question.  So, I mean, the question**
2  **is am I going to be -- are all of these ten a**
3  **hundred percent could -- could one of them not be**
4  **caused by Roundup.  That's what you're asking?**
5  Q.  I'm asking how many of them would you
6  get right and how many would you get wrong?
7  MS. FORGIE:  Objection, asked and answered.
8  You can answer it again.
9  THE WITNESS:  I mean, again, I'm not sure --
10  I'm not sure I'll be able to tell.  But, frankly,
11  if all of these patients had the same exposure
12  level and the same use level and they are of the
13  same age and they had none of other risk factors
14  that we just listed -- so, again, no other risk
15  factors whatsoever -- they're all in their 30s and
16  they all develop this type of non-Hodgkin
17  lymphoma, it is more likely than not that Roundup
18  caused all of their non-Hodgkin lymphoma.  Is it
19  possible that one or two of them did not?  It's
20  always possible, but it's -- then you're going
21  against what the history is showing and the
22  exposure is showing and everything.  But I
23  can't -- I really can't answer that question with
24  a hundred percent certainty or accuracy.
25  BY MR. LEVINE:

Page 80

1  Q.  So it's possible that one or two of them
2  did not you said, correct?  It's always possible,
3  right?
4  MS. FORGIE:  Objection, asked and answered
5  like three or four times.  You're starting to
6  badger the witness.  You can answer it again.
7  MR. LEVINE:  You can object and you can state
8  the basis, but any further speaking objection is
9  not proper.
10  MS. FORGIE:  I can make any objection that I
11  think is proper.  When you start asking the same
12  question four or five times, you're badgering the
13  witness.
14  MR. LEVINE:  Mark the -- mark the transcript
15  and send it to --
16  MS. FORGIE:  That's fine.
17  MR. LEVINE:  (Continuing) -- send it to the
18  judge and he'll tell me if I'm badgering.  I'm
19  trying to get an answer to a question.
20  THE WITNESS:  Okay.  I'm sorry.  With this
21  exchange I lost my train of thought.
22  So you are asking about ten patients --
23  MS. FORGIE:  Wait.  Let him --
24  BY MR. LEVINE:
25  Q.  So let me clarify.

Page 81

1  You said -- we were talking about those
2  ten patients.  And you said it's more likely than
3  not that Roundup caused all of their non-Hodgkin's
4  lymphoma.  Is it possible that one or two of them
5  did not?  It's always possible, correct?
6  **A.  Because there's no specific --**
7  MS. FORGIE:  Wait.
8  THE WITNESS:  I'm sorry.
9  BY MR. LEVINE:
10  Q.  Correct?  That's what you said.
11  **A.  Yeah, I just -- I ask for a point of**
12  **clarification.  You're saying all of these ten**
13  **patients are the same age group.  You're saying**
14  **all of these patients have the same exact disease,**
15  **all of these patients have the same exact exposure**
16  **history, and all of these patients have none of**
17  **the other risk factors.**
18  Q.  Correct.
19  **A.  Okay.**
20  Q.  Yeah.  And so you said ten out of ten
21  you would say is more likely than not, but it's
22  possible that one or two -- you know, you never
23  know, right?
24  MS. FORGIE:  Objection.
25  BY MR. LEVINE:

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 82

1      Q.  Is that right; that one or two may not
2  be?
3      MS. FORGIE:  Objection, asked and answered.
4  You may answer again.
5      THE WITNESS:  I think it's possible.
6  BY MR. LEVINE:
7      Q.  Is it possible that more than one or two
8  may not be?
9      MS. FORGIE:  Objection, asked and answered.
10      THE WITNESS:  I don't know the answer to
11  that.
12  BY MR. LEVINE:
13      Q.  And it's possible that none of the ten
14  may be caused by Roundup?
15      A.  That would be impossible.
16      Q.  Impossible?
17      A.  How would you -- I mean, you can't
18  ignore -- again, this is -- this is now you start
19  ignoring -- again, let me -- let me step back
20  and -- and give you an example.
21      So I have ten patients with exactly the
22  same age group, same disease, and all of them are
23  HIV-positive.  I mean, you can apply this to any
24  risk factor.  And all of them are HIV-positive.
25  And we know HIV-positivity is a known risk factor

Page 84

1  Sure.  Are there going to be ten of them smoking
2  had no impact?  It's just not believable from a
3  medical standpoint.
4  BY MR. LEVINE:
5      Q.  Okay.  Now, if you throw in -- if you
6  take that scenario of ten records but you throw in
7  autoimmune disease into those same ten patients'
8  medical history, if you were -- well, actually
9  strike that.  I'll -- I'm not going to go there.
10      A few more questions about your
11  methodology.
12      Does it matter to your methodology in
13  determining the cause of an individual's
14  non-Hodgkin's lymphoma whether that patient --
15  whether in that patient Roundup made contact with
16  the patient's skin?
17      MS. FORGIE:  Objection.
18  BY MR. LEVINE:
19      Q.  Do I need to rephrase?
20      A.  Please, yeah.  I just --
21      Q.  Sure.  I think I asked it poorly, so --
22      A.  That's okay.
23      Q.  In determining whether Roundup caused a
24  patient's non-Hodgkin's lymphoma, does it matter
25  whether that patient's exposure included contact

Page 83

1  for non-Hodgkin lymphoma.
2      Is it possible that one of them had
3  non-Hodgkin lymphoma because -- not because of
4  HIV?  Sure.  Is it going to be all of them HIV had
5  no impact whatsoever in their non-Hodgkin
6  lymphoma?  Then really you're ignoring the entire
7  science.  You can't say that.
8      Q.  What is the relative risk for HIV and
9  non-Hodgkin's lymphoma?
10      A.  I'm -- I'm not sure I know how to answer
11  the relative risk.  What do you mean by that?
12      Q.  What is the increased risk of getting
13  non-Hodgkin's lymphoma in a patient who has HIV?
14      A.  It's significantly increased.  I just
15  don't know what the relative risk is.
16      Q.  More than -- more than three?
17      MS. FORGIE:  Objection.
18      THE WITNESS:  Don't know the answer to that.
19  I don't want to guess, but I'm just talking about
20  the methodology.
21      MR. LEVINE:  All right.
22      THE WITNESS:  Again, you can apply everything
23  on any risk factor.  You can say ten patients who
24  are smokers develop cardiac disease.  Is it
25  possible to have cardiac disease without smoking?

Page 85

1  with the skin?
2      A.  I think contact with the skin would
3  certainly increase the risk further in my -- in my
4  opinion.
5      Q.  Am I correct that you -- you would
6  conclude that Roundup caused a patient's
7  non-Hodgkin's lymphoma where it did not come in
8  contact to the skin as well?
9      A.  It's hard to tell just because I don't
10  think we -- we -- we know a hundred percent all of
11  the details into how -- because as you know,
12  there's -- I mean, there could be, again, spray
13  and aerosols and other method of patients
14  contacting Roundup or glyphosate.  So I don't
15  believe we know a hundred percent yet whether
16  everybody has to have skin exposure or not skin
17  exposure.  So I think when you look at the
18  epidemiologic literature, at least the
19  epidemiologic literature that I saw or that I
20  encountered, you know, it didn't -- you know, it
21  didn't always comment on skin exposure or not skin
22  exposure.  Just, you know, all of the studies that
23  I looked at, they basically included pesticide
24  application, however this being applied.  They
25  don't -- they didn't always go into the details.

22  (Pages 82 to 85)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 86

1  So I think the literature is not very certain
2  whether skin exposure by itself is needed in all
3  Roundup causation for lymphoma.
4      Q.  So you could conclude that Roundup
5  caused the patient's non-Hodgkin's lymphoma in
6  cases where it was exposed to the skin and also in
7  cases where it was not, correct?
8      A.  Depending on the exposure history and
9  the length of exposure and how long it has gone.
10  Just because the epidemiologic literature that I
11  saw, unless I missed something, but I didn't see
12  that they went into detail in every single
13  epidemiologic study that I read in specifically
14  whether there was skin exposure or not.  And a lot
15  of these studies I looked at, in the methods of
16  these studies they did not provide that detail;
17  and that's why it's hard for -- it's hard for us
18  to conclude whether this is needed or not.
19      Q.  Is skin exposure required in your
20  methodology to determine whether a patient's
21  non-Hodgkin's lymphoma was caused by Roundup?
22      A.  It is not always required.  But it
23  depends on the particular -- I mean, there are
24  certain skin lymphomas, for example, that might be
25  very different than nonskin lymphomas that might

Page 87

1  play a role; but it's not always required, no.
2      Q.  Does it matter if the patient showered
3  after using Roundup?
4      A.  Don't know.
5      Q.  Not part of your methodology, correct?
6      A.  The showering part is not part of my
7  methodology.
8      Q.  Does it matter how large and small the
9  area that was sprayed is by that particular
10  patient?
11      MS. FORGIE:  Objection.
12      THE WITNESS:  It's more -- it's more the
13  total exposure, whether it's per year or of
14  lifetime.  I mean, you could have -- you could
15  have a very small lot and you spend three hours
16  spraying.  And you could have the largest lot out
17  there and somehow you spray for like 15 minutes.
18  And so it's really not the lot size or where --
19  you know, how big your house is not really part
20  of the methodology.  It's really more the length
21  of the exposure, the amount of exposure at any
22  given time as well as for how long.
23  BY MR. LEVINE:
24      Q.  So the area -- the size of the area
25  sprayed is not part of your methodology

Page 88

1  specifically, correct?
2      A.  Not the size of the area.  It's how long
3  you spent on spraying, whether the area is small
4  or big.
5      Q.  Okay.  So --
6      MS. FORGIE:  When you get to a good break
7  point, just a quick biological break, please.
8      MR. LEVINE:  Sure.
9      Is 5 minutes okay or do you want to
10  break now and then I'll continue?
11      MS. FORGIE:  Whenever is a good place for
12  you, but I need a biological --
13      MR. LEVINE:  Right.  I'm just -- you can --
14      MS. FORGIE:  Oh, I can wait 5 minutes.
15      MR. LEVINE:  Okay.
16      MS. FORGIE:  Is that the question?
17      MR. LEVINE:  Yes.
18      MS. FORGIE:  Oh, I thought you were asking if
19  I needed only 5 minutes.
20      MR. LEVINE:  No.  I'm asking if you can wait.
21  If not, I'll stop.
22      MS. FORGIE:  Yeah, yeah, I can wait.
23      MR. LEVINE:  Tell me when you --
24      MS. FORGIE:  Sorry.
25  BY MR. LEVINE:

Page 89

1      Q.  So the length of exposure matters --
2      A.  Yes.
3      Q.  (Continuing) -- the duration?
4      A.  Correct.
5      Q.  What duration would be too short to be
6  able to conclude that Roundup caused a particular
7  patient's cancer?
8      A.  You know, I don't think that question
9  has been answered in the literature.  I think
10  there are some studies, as you and I know, that
11  looked at more than two days per year, for
12  example.  And there are other studies looked at
13  more than ten days over lifetime that demonstrated
14  the causation and association between glyphosate
15  and non-Hodgkin's lymphoma.  But I don't think --
16  I couldn't find in the literature what is the
17  absolute minimum needed.  To my knowledge this
18  particular question has not been answered.
19      Q.  So let me see if I understand.
20      For your methodology you cannot tell me
21  what the minimum length of exposure would be in
22  order for you to be able to determine that Roundup
23  caused a particular patient's cancer?
24      A.  I think you would look at the patient's
25  individual case and see if the exposure of that

23 (Pages 86 to 89)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 90

1    patient fits within what is published in the
2    epidemiologic literature.  I thought what you were
3    asking me, is there a minimum by which you would
4    say that this particular patient -- that
5    definitely is not caused by it.  And I said I
6    don't know if we know the minimum -- minimum
7    amount of exposure.  If somebody had exposure one
8    time, it's extremely -- it's extremely unlikely.
9    I mean, I'm not aware of any acute exposures
10   causing non-Hodgkin lymphoma from glyphosate.  So
11   I don't know if we have the answer, if 1.5 days
12   per year could cause it versus two days.  Again,
13   we -- I'm not aware of what is the minimum needed.
14   I'm aware of several studies that looked at
15   several days per year or several -- more than ten
16   days per lifetime.
17        MR. LEVINE:  Okay.  Why don't we take a break
18   here.
19        MS. FORGIE:  All right.  Thank you.
20        THE VIDEOGRAPHER:  Ending Disk No. 1 of the
21   deposition of Dr. Chadi Nabhan.  We're off the
22   record at 11:42 a.m.
23        (Short recess.)
24        THE VIDEOGRAPHER:  And beginning Disk No. 2
25   of the deposition of Dr. Chadi Nabhan.  We're back

Page 91

1    on the record at 11:50 a.m.
2    BY MR. LEVINE:
3        Q.  Dr. Nabhan, we were talking a minute ago
4    or a few minutes ago before the break about
5    duration of exposure.  You said you look at the
6    studies.  And, for instance, if there's a study
7    that says more -- or two day -- two or more days
8    of exposure that -- per year, that would allow you
9    to conclude in an individual patient that two or
10   more days of exposure -- where -- sorry.  I just
11   got all tongue-twisted.
12        MS. FORGIE:  I feel an objection coming on.
13        MR. LEVINE:  I'm going to strike that and
14   start over.
15   BY MR. LEVINE:
16        Q.  In a patient that has two or more days
17   of exposure, you can conclude based on the
18   McDuffie study that Roundup caused that patient's
19   individual cancer, correct?
20        MS. FORGIE:  Objection.
21        THE WITNESS:  Just not in isolation.  I just
22   want to make sure I say it.  So not in isolation,
23   right?  I mean, you have to take other things
24   we've talked about since the morning, risk factors
25   and so forth.

Page 92

1    BY MR. LEVINE:
2        Q.  Understood.  I'm just -- I've been
3    asking you about various things that affect your
4    methodology and whether they're considered and how
5    you consider them.  So right now all we're talking
6    about is duration of exposure.  Understood that
7    there may be other factors to your methodology.
8    Okay?
9        A.  Okay.
10       MS. FORGIE:  Is there a question?
11       MR. LEVINE:  He just said "Okay."  I'm just
12   letting him know that's what I'm talking about in
13   asking if that's okay.
14            Is that objectionable?
15       MS. FORGIE:  I don't know.  I didn't
16   understand it to be a question, to be honest.
17       MR. LEVINE:  Just setting --
18       MS. FORGIE:  I'll wait --
19       MR. LEVINE:  (Continuing) -- the context.
20       MS. FORGIE:  I'll wait for the question.
21            (Nabhan Exhibit No. 9 marked
22             as requested.)
23   BY MR. LEVINE:
24       Q.  So I'm handing you what's been marked as
25   Exhibit 9.  It's a little -- looks like a 19, but

Page 93

1    I'll just make --
2        MS. FORGIE:  Do you have a copy, please?
3        MR. LEVINE:  Yes.
4    BY MR. LEVINE:
5        Q.  So that's the McDuffie study you rely
6    on, correct?
7        A.  One of the studies I relied on, yes.
8        Q.  That's the study that talks about the
9    two days of exposure, correct?
10       MS. FORGIE:  Objection.
11       THE WITNESS:  Yes, this is the one that talks
12   about the two days of exposure.  I thought you
13   said this is the study you relied on.  I want to
14   make sure it's not the only thing I relied on.
15   BY MR. LEVINE:
16       Q.  And I believe in Table 8, if you turn to
17   Page 1161, Table 8.
18       A.  Okay.
19       Q.  Are you with me?
20       A.  I'm with you.
21       Q.  And this is where you get that data
22   from, correct?
23       A.  Yes.
24       Q.  And it says phosphonic acid, glyphosate
25   unexposed would be the baseline odds ratio of 1.

24  (Pages 90 to 93)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 94

1  And then it says greater than zero or less than or
2  equal to 2, also 1.0 odds ratio, correct?
3      **A.  Yes.**
4      Q.  And then it says greater than -- greater
5  than 2, and it has a statistically significant
6  odds ratio, correct?
7      **A.  Yes.**
8      Q.  First of all, does it matter to you
9  whether that is statistically significant?
10     **A.  I mean, I'll --**
11     MS. FORGIE:  Objection.  You can answer.
12     THE WITNESS:  I'll say that there are -- I
13  think it's good that it is statistically
14  significant.  I think it is very important to note
15  that lack of statistical significance does not
16  always equate lack of clinical significance.  So,
17  in fact, the American Statistical Association in
18  the last iteration of their guidelines that is
19  published and available on-line, they specifically
20  emphasized that point that you cannot rely on
21  statistical significance.  You have to take
22  clinical context into consideration.  I mean, the
23  p-value of less than .005, ultimately it was
24  arbitrary chosen.
25          So it is good to note that it is

Page 95

1  statistically significant, but there are other
2  examples in the literature, not just in this, in
3  this and other areas in oncology where there was
4  no statistical significance but the clinical
5  significance was important and vice versa.  There
6  are certain things that are statistically
7  significant, but they may not be clinically
8  significant.
9  BY MR. LEVINE:
10     Q.  Right.  And clinical significance might
11  mean you wouldn't -- well, let me -- let me strike
12  that.
13          In order to be able to determine that
14  Roundup causes an individual's non-Hodgkin's
15  lymphoma in an individual that uses Roundup for
16  greater than two days, does it -- is part of your
17  methodology that makes you able to conclude that
18  based on the fact that this finding is
19  statistically significant?
20     **A.  It solidifies the methodology,**
21  **absolutely, the fact that it is statistically**
22  **significant.  I just -- again, all I was trying to**
23  **say is there are certain things in oncology**
24  **specifically that may not reach the level of**
25  **statistical significance, but they're very**

Page 96

1  **important clinically and cannot be dismissed.**
2      Q.  Sure.  But it solidifies the methodology
3  I think is what you said?
4      **A.  Yes.**
5      Q.  What if a patient is exposed greater
6  than five days.
7          Does this tell you anything about that?
8      MS. FORGIE:  Objection.
9  BY MR. LEVINE:
10     Q.  Does this -- does this result --
11     **A.  I can't -- I can't answer hypothetical**
12  **questions, right?  I mean, you can't -- I can't**
13  **take some -- something out of vacuum.  I need to**
14  **look at the records, see the patient's risk**
15  **factors.  It's --**
16     Q.  I --
17     MS. FORGIE:  Wait.  Let him finish his
18  answer.
19     THE WITNESS:  I'm sure you -- I'm sure you
20  understand the dilemma of answering hypothetical
21  more than five days out of vacuum.
22  BY MR. LEVINE:
23     Q.  Well, what I'm asking you is based on
24  your review of this study, does this study inform
25  whether there is a risk in patients who are

Page 97

1  exposed for more than five days?
2      MS. FORGIE:  Objection, asked and answered.
3  You can answer.
4      THE WITNESS:  Of course, because if you are
5  exposed more than two days per year -- I presume
6  you meant five days per year.  This study suggests
7  if you are exposed for more than two days per
8  year, you have twice the risk than somebody who is
9  not exposed for more than two days per year of
10  developing non-Hodgkin lymphoma.  And despite all
11  of this, we still have to look at each individual
12  patients and the records and the other risk
13  factors.  But -- but, yes, more than five days
14  would obviously be more than two days.
15  BY MR. LEVINE:
16     Q.  Can you turn to Table 9 for me, please.
17     **A.  Table 9?**
18     Q.  Yes.
19     **A.  Okay.**
20     Q.  Do you see where it talks about multiple
21  herbicide use and multiple insecticide use?
22     **A.  Yes, the top two.**
23     Q.  Yes.  Do you see that there's a
24  statistically significant increased risk in both
25  of those groups for people who were exposed two to

25  (Pages 94 to 97)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 98

1  four days a year?
2  **A.  I see that, yes.**
3      Q.  And you see that there is not a
4  statistically significant increased risk for
5  people who were exposed for greater than or equal
6  to five days a year, correct?
7  **I see that, yes.**
8      Q.  Based on this information in this study,
9  do you agree that the information with respect to
10  glyphosate use for over five days is not
11  established?
12     **A.  I don't agree with --**
13     MS. FORGIE:  Objection.
14     THE WITNESS:  (Continuing) -- that at all.  I
15  mean, this is -- you know, this is more of a
16  number issue.  We just -- I mean, I just explained
17  to you that the statistical significance does not
18  always equate clinical significance.  And the
19  statistical significance will always depend on the
20  number --
21     MR. LEVINE:  Sorry.
22     THE WITNESS:  That's okay.
23     MS. FORGIE:  Okay.
24     THE WITNESS:  (Continuing) -- will always
25  depend on the number of patients that we are

Page 99

1  talking about.
2         And, in fact, I'm going to use the same
3  example that you gave me.  And you look at the
4  exposed 2 to 4.  You have 73 patients NHL and 151
5  controls.  You look at more than 5 days, the
6  number is now 25 versus 61.  You look at the
7  multiple insecticide use, 2 to 4 is 86 versus 189;
8  more than 5 days, 17 versus 36.  So really the
9  statistical significance -- and despite this, by
10  the way, the hazard at issue is still more than 1.
11  It's just the confidence interval is different.
12  But the reason you may lose some of the
13  statistical significance is simply a number issue.
14  The number of patients is substantially lower.
15  That's why you weren't able to detect statistical
16  significance --
17     MR. LEVINE:  This --
18     THE WITNESS:  (Continuing) -- but you can't
19  dismiss that.
20     MR. LEVINE:  My apologies.
21  BY MR. LEVINE:
22     Q.  This study doesn't conclude that
23  glyphosate increases the risk of a non-Hodgkin's
24  lymphoma in the author's conclusion, correct?
25     **A.  Where do you see that?**

Page 100

1      Q.  Turn to -- turn to the last paragraph in
2  the study.  Page 1162, the same page we're on.
3      **A.  The last paragraph, it says -- okay.  Do**
4  **you want me to read it or you can read it?**
5      Q.  Well, it says in the -- starting with
6  the next-to-last sentence, see where it says, "In
7  our final models"?
8         Do you see that?
9      MS. FORGIE:  Where?  I'm sorry.
10     THE WITNESS:  Well, let me --
11     MS. FORGIE:  The last paragraph or --
12     THE WITNESS:  I mean, I'm going to start --
13     MR. LEVINE:  The last paragraph.
14     MS. FORGIE:  Okay.
15     THE WITNESS:  But you start in the first
16  paragraph --
17     MR. LEVINE:  Sure.
18     THE WITNESS:  (Continuing) -- that says --
19     MR. LEVINE:  Start with that.
20     THE WITNESS:  (Continuing) -- "Our results
21  support previous findings of an association
22  between NHL and specific pesticide exposure."
23  BY MR. LEVINE:
24     Q.  Okay.  Keep going.
25     **A.  Okay.  I didn't know if you wanted me to**

Page 101

1  read the whole thing.  Do you want me to read the
2  whole thing?
3         **"Our strategy of assessing risk by**
4  **several different approaches, beginning with**
5  **general categories (herbicides) proceeding through**
6  **cumulative pesticide exposure to specific chemical**
7  **classes, and proceeding further to specific**
8  **chemicals, proved effective in delineating complex**
9  **relationships."**
10     Q.  Now, the next sentence states, "In our
11  final models, NHL was associated with a personal
12  history of cancer; a history of cancer in
13  first-degree relatives; and exposure to
14  dicamba-containing herbicides, to mecoprop, and to
15  aldrin."
16        Do you see that?
17     **A.  I see that.**
18     Q.  It does not state that there was an
19  association to phosphonic acid, which is what they
20  analyzed for glyphosate, correct?
21     **A.  I don't know why this is not written in**
22  **that sentence.  I can't speak for the authors, but**
23  **clearly the tables speak for themselves.**
24     Q.  By the way, if you go to Table 2 -- or
25  it should be Table 2.

26 (Pages 98 to 101)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 102

1    A.  Okay.  Table 2.
2    Q.  The finding for -- for glyphosate under
3  "Individual phosphonic herbicides" is an odds
4  ratio -- adjusted odds ratio of 1.2 that's not
5  statistically significant, correct?
6    A.  I see that, yes.
7    Q.  And this -- these are larger numbers
8  than the numbers you're citing from Table 8,
9  correct, with respect to greater than two days
10  obviously?
11    A.  Greater than two days or greater than
12  five days, the one you asked me about?
13    Q.  No.  The greater -- the Table 8 with
14  respect to glyphosate.
15    A.  One second, please.
16    MS. FORGIE:  I'm sorry.  What was the
17  question?
18  BY MR. LEVINE:
19    Q.  The numbers in Table 2 look at a larger
20  population than the -- than the line that you
21  cited to me in Table 8 --
22    MS. FORGIE:  Objection.
23  BY MR. LEVINE:
24    Q.  (Continuing) -- correct?
25    A.  The Table 8, more than two days, the one

Page 103

1  we just were talking about?
2    Q.  Yeah.
3    A.  Yes.  I mean, in fact -- I mean, if
4  you're -- if you're able to find -- I mean, if you
5  are able to find something that is statistically
6  significant with a much smaller number of
7  patients, that's actually -- that's actually very
8  big findings because oftentimes the fact that the
9  numbers are small, that's why you're unable to
10  detect statistical significance.  So being able to
11  find statistical significance with more than two
12  days, despite the small number, is not --
13  something that cannot be ignored.
14    And I think the study -- the McDuffie
15  study supports the fact that you need to have an
16  exposure response type of curve in order to
17  develop this disease and by virtue of the fact
18  that they're showing none exposed less than two
19  days and more than two days.
20    Q.  Okay.  We're done with that exhibit.
21    Let's get back to discussing other
22  factors with respect to your methodology.
23    So we've discussed your opinions --
24  we're just discussing your opinions that it does
25  matter to your methodology for how long a patient

Page 104

1  used Roundup?
2    A.  Yes.
3    Q.  Does it matter to your methodology --
4    A.  It's the -- the length and the
5  intensity, right?  I mean, I think it's -- just to
6  make sure it's not just the duration of time.  I
7  just want to make sure it's clear.
8    You understand what I'm trying to say.
9    Q.  So when you say "length," you're talking
10  about for how long over time someone's using it --
11    A.  Right, over time --
12    Q.  (Continuing) -- correct?
13    A.  (Continuing) -- but also during that
14  time how many hours are you spending.  It's not --
15  it's not just the number of years.  It's what --
16  how often are you working with that compound in a
17  given year?
18    Q.  So how often do you have to work with
19  that compound in a given year?
20    A.  I mean, this study that you just showed
21  me, the McDuffie study, suggested that you have to
22  have an exposure for more than two days in order
23  for you to have doubled the risk of developing
24  NHL.  I think there are some studies that I'm sure
25  we're going to go over that show more than ten

Page 105

1  days over a lifetime.
2    Q.  I'm -- I'm actually asking specifically
3  to your methodology --
4    A.  Yes.
5    Q.  (Continuing) -- and the criteria that
6  you have for your methodology.
7    A.  I understand that.
8    Q.  Okay.  How -- what is the extent of the
9  exposure that someone has to have in order for you
10  to determine that Roundup caused their cancer, not
11  number of days, but whatever you said, the
12  magnitude of exposure or --
13    A.  Yeah.  To me I have to see that the
14  exposure in that particular patient that I'm
15  assessing is in line with what is published in the
16  epidemiologic literature such as the one that you
17  showed me.  So more than two days per year or more
18  than ten days per lifetime.  These are two
19  particular aspects of the exposure that I will
20  need to see in order for me to show that that risk
21  factor is truly impacting the development of
22  disease.
23    Q.  Do those studies on the duration of
24  exposure tell you anything about how much
25  glyphosate needs to be used or sprayed or exposed

27 (Pages 102 to 105)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 106

1  to the patient during those more than two days or
2  ten days of exposure?
3      A.  They're telling you you need to have
4  more -- I mean, this study, as we just reviewed
5  it, tells you you have to have more than two days
6  per year.
7      Q.  So let me clarify.
8      A.  Yes, please.
9      Q.  Someone could use glyphosate potentially
10  for five days a year and get it all over
11  themselves every time they use it, correct?
12      A.  Sure.
13      Q.  Someone else could use glyphosate for --
14  what did I say, more than --
15      A.  Five days you said.
16      Q.  For -- thank you.
17      For five -- more than five days a year
18  and they could get none of it on them, correct?
19      A.  Possible.
20      Q.  So does it matter to your methodology
21  the extent to which the patient has been directly
22  exposed to glyphosate while using it for more than
23  two days or more than five days or more than ten
24  days per year?
25      A.  And I think you've asked me that

Page 107

1  question before the break.  And my answer to that
2  is the same, which is when you look at the studies
3  that I have seen, if you look at the methods of
4  the studies, they do not specify that particular
5  granular detail that you are describing.  So I
6  can't apply different methodology than what is
7  published in the epi literature, which I wasn't
8  able to find that they really went into that
9  granular detail.
10      Even in a lot of the other studies
11  that -- that were published, they don't -- they
12  asked particular questions about wearing
13  protective gear and so forth.  But that doesn't
14  always necessarily reflect the question you're
15  asking of getting everything all over or taking a
16  shower right away and so forth.  I think they're
17  important questions.  I'm just not aware that
18  these have been answered.  So for my methodology
19  I'll have to go by what has been published and
20  peer reviewed and written as it is.
21      Q.  Does it matter to your methodology what
22  the subtype of non-Hodgkin's lymphoma was that the
23  patient was diagnosed with?
24      A.  No, it doesn't matter.
25      Q.  Does it matter to your methodology what

Page 108

1  the latency is from -- let's say in a patient from
2  the last time they used Roundup to the time that
3  they were diagnosed, assuming that someone may
4  have stopped using Roundup before diagnosis?
5      MS. FORGIE:  Objection.
6      THE WITNESS:  The latency of non-Hodgkin
7  lymphoma is, again -- is very, very -- is very
8  variable.  And as somebody who has seen many of
9  these patients with non-Hodgkin lymphoma, it is
10  very difficult to say that you have to be exposed
11  for X number of years before you develop the
12  disease versus not.  I mean, I -- you know, you
13  will see that in clinical practice that this is
14  very variable.  So I've said that before.  It's
15  never a binary thing that less than five years,
16  more than five years, less than ten years, more
17  than ten years.
18      I do think you have to take it into
19  consideration.  I do think it's important.  So, I
20  mean, if you were exposed and, you know, a month
21  later you develop the disease, it's not plausible
22  in my view as a clinician.  It's too short.
23      The second question, the logical
24  question is what's -- what short is too short.
25  And I think, you know, you can -- you know, when

Page 109

1  you look at the literature and what I have seen in
2  practice, it could be as little as six months and
3  then obviously the upper limit is very high.  But
4  I have seen scenarios of lymphoma developing
5  within six months or less from patients being
6  exposed to an offending agent that may cause this
7  particular disease.
8      So it does matter.  I think it's
9  important not to dismiss it.  It's important to
10  take it into consideration and look at at an
11  individual level in every patient.  It's something
12  that you cannot just say I'm not going to look at.
13      Q.  Does your methodology -- in your
14  methodology do you have any -- any latency that
15  would -- do you have any cutoff for latency?
16      A.  Yeah.  I mean, I use the cutoff that at
17  least in my clinical practice that I've seen, and
18  I think that I sometimes contrast to what's
19  written in the PTLD literature, the
20  post-transplant lymphoproliferative disease, which
21  is not immune disease.  But in that particular
22  disease you give patients immunosuppressant drugs
23  to prevent rejection, organ rejection.  And there
24  are patients who can develop the disease within
25  three months of this particular -- obviously this

28 (Pages 106 to 109)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 110

1  is not pesticide; but, again, I'm using this
2  analogy as an offending agent in developing the
3  disease.  So in my mind I think anything less than
4  three to four months, I would question that.
5      Q.  So you've referred to your clinical
6  practice and you've referred to --
7      A.  An example.
8      Q.  (Continuing) -- immunosuppressant
9  literature, correct?
10     A.  Yeah.  That's just an example.
11     Q.  With respect to forming your opinions on
12 latency, correct?
13     A.  Yes.  I mean, again, this was just an
14 example of -- there are other examples in the
15 oncology literature that will show you that the --
16 the latency is very difficult to -- like I said,
17 it's not binary in non-Hodgkin lymphoma.  And
18 there are lots of other literature that is
19 actually on my reliance list that talks about
20 latency.
21         What your question was, is there minimum
22 beyond which you really question whether this is
23 related.  And I told you based on my clinical
24 practice and what I read, I would question -- if
25 something within three to four months, I would --

Page 111

1  I would need to look at that carefully and
2  challenge that.
3      Q.  And it's fair to say that the minimum
4  that you've established for your methodology is
5  based on your clinical practice and literature
6  regarding things like immunosuppressants, but is
7  not based on any particular study regarding
8  glyphosate, correct?
9      A.  No, it's other literature as well, not
10 just immunosuppressant.  I mean, the World Trade
11 Center, as you know, that looked at latency
12 period.  I mean, there are other -- other pieces
13 of literature that looked at latency.
14         The immunosuppressant example I provided
15 you is just an example of an offending scenario,
16 offending hazard situation to a patient,
17 development of a disease after the hazard
18 situation.
19         Just to illustrate that, in this
20 particular scenario there are patients who
21 developed the post-transplant lymphoma disease
22 within one month to two months, and there are
23 others who took them years until develop the
24 disease.  So it's just a simple illustration to
25 the fact that we -- we don't know what the proper

Page 112

1  latency period to developing non-Hodgkin lymphoma.
2  All I can tell you is that it varies.  And I can
3  tell you that personally if it's less than three
4  to four months, I will need to look carefully to
5  see if this is really the case.
6      Q.  And I understand that you're basing this
7  off of literature with respect to various
8  exposures.  But am I correct that your latency
9  cutoff opinions are not based on literature with
10 respect to glyphosate?
11     A.  Based on -- yeah.  I mean, like I said,
12 we don't know a latency period to developing
13 non-Hodgkin lymphoma, whether it's glyphosate or
14 not.  I mean -- I mean, I think it's very clear in
15 somebody who treated thousands of these patients
16 that there is nobody that can tell you what is the
17 minimum and what is the maximum latency period for
18 non-Hodgkin lymphoma, glyphosate or not.  That
19 thing does not exist.  It's not there.
20         Having said that, we have to use our
21 clinical acumen and expertise.  And I told you
22 personally, you know, if it's less than three to
23 four months, I think it's something that I would
24 question whether this hazard, offending compound
25 was related to this person's disease.

Page 113

1      Q.  Does it matter how many bottles or
2  containers of Roundup exposure per year a patient
3  had?
4      A.  It's more the -- again, the duration,
5  like we just described.
6      Q.  So your methodology does not factor in
7  how many bottles or containers of Roundup --
8      A.  You take --
9      MS. FORGIE:  Objection.
10 BY MR. LEVINE:
11     Q.  (Continuing) -- per year a patient was
12 exposed to, correct?
13     MS. FORGIE:  Objection.
14     THE WITNESS:  You take it into account.  You
15 don't dismiss anything.  I mean, you don't -- you
16 don't dismiss the fact that somebody had skin
17 exposure versus not skin exposure.  How many total
18 gallons per year that they have used over a given
19 particular year, that is not something that you
20 dismiss.  But ultimately what you need to rely on
21 is with all of the epidemiologic literature that
22 has been published, how granular that particular
23 piece of data have been collected to be able to
24 link it.
25         So I rely -- I look at how many gallons,

29 (Pages 110 to 113)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 114

1  let's say, being sprayed in a given year based on
2  what the patient tells you.  But ultimately, you
3  know, buying is very different than, you know, how
4  often you're spraying and how much you've been
5  exposed to the particular hazardous material over
6  a given year or even over your lifetime.
7      Q.  So you look at the number of gallons
8  they say they purchased in a year?
9      MS. FORGIE:  Objection.  Asked --
10     MR. LEVINE:  I under -- I under -- sorry.
11     MS. FORGIE:  Were you finished with your
12 question?  I thought you were.  Sorry.  If I
13 didn't --
14     MR. LEVINE:  Let me reask it.
15     MS. FORGIE:  Okay.
16 BY MR. LEVINE:
17     Q.  I understand you take into consideration
18 what they tell you in terms of how much Roundup
19 they purchase in a year.  And you said you take
20 into consideration how much -- how many gallons
21 they tell you they purchased, correct?
22     A.  Yes.
23     Q.  What is the criteria in your methodology
24 that you use with respect to how many gallons a
25 patient purchased per year?

Page 115

1      A.  So I -- I ask the standard question.  I
2  mean, you could buy a hundred gallons.  I mean,
3  you could buy a hundred gallons, but are you
4  spending 15 minutes spraying and that's it or are
5  you spending 5 hours spraying.  It's -- again,
6  it's really the -- the exposure to the particular
7  compound or to the particular hazardous material
8  in my opinion that trumps the number of gallons.
9      Q.  So with respect to your methodology, is
10 it fair to say it doesn't matter whether somebody
11 purchases one bottle of Roundup per year versus
12 whether they purchased 20 bottles of Roundup per
13 year?
14     MS. FORGIE:  Objection, asked and answered.
15 You can answer again.
16     THE WITNESS:  Sure.  Purchasing does not
17 always equate spraying and exposure.  That's all
18 I'm trying to say.
19 BY MR. LEVINE:
20     Q.  My apologies.  I'm sorry.  I'll cut you
21 off because I asked a bad question and I
22 completely understand.
23     A.  Sure.
24     Q.  I'm not talking about purchasing.
25     A.  Okay.

Page 116

1      Q.  So I'll strike that question.
2      MS. FORGIE:  You did say purchase.
3      MR. LEVINE:  I did.
4      MS. FORGIE:  Oh, okay.
5      MR. LEVINE:  And that's why -- forgive me.
6  I --
7      MS. FORGIE:  That's okay.
8      MR. LEVINE:  I don't want to --
9      MS. FORGIE:  That's okay.
10     MR. LEVINE:  (Continuing) -- ask about
11 purchasing.
12     MS. FORGIE:  Okay.
13 BY MR. LEVINE:
14     Q.  So fair to say it doesn't matter to your
15 methodology whether someone uses one bottle of
16 Roundup per year versus 20 bottles of Roundup per
17 year?
18     MS. FORGIE:  Objection, asked and answered.
19     THE WITNESS:  Yeah.
20     MS. FORGIE:  You can answer.
21     THE WITNESS:  I do think it matters.  I think
22 it's important to -- to look at whether you're
23 using a lot of a particular -- I mean, I -- you
24 know, you could take it -- you know, are you
25 taking a lot of a medicine or less of a medicine.

Page 117

1  So if you're using a lot of a particular compound
2  such as Roundup that we are talking about, it does
3  make a different if you -- difference than if you
4  are using very little.  So you do look at that and
5  you look at the duration as well.
6  BY MR. LEVINE:
7      Q.  How many bottles of Roundup in a year
8  does a patient have to have used in order for you
9  to rule it in?
10     MS. FORGIE:  Objection, asked and answered.
11 You can answer again.
12     THE WITNESS:  Yeah.  You -- again, I don't
13 use that alone as the sole factor.  It's -- I
14 can't actually.  There's -- to my knowledge
15 there's no such -- there's no data as to just the
16 particular number of bottles that you are using
17 for spraying.  It's -- to my knowledge the
18 literature supports how long you have been exposed
19 to -- to Roundup in order for you to form an
20 opinion as to whether it caused non-Hodgkin
21 lymphoma.
22 BY MR. LEVINE:
23     Q.  In a patient who's been exposed long
24 enough to fit your duration --
25     A.  Okay.

30  (Pages 114 to 117)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 118

1      Q.  So, first of all, it's fair to say it
2  has to be more than zero bottles, correct?
3      A.  Yes.
4      Q.  Right.  In a patient that's been exposed
5  long enough to fit your duration, is there any
6  number of bottles of Roundup per year that has to
7  have been used in order to rule in Roundup?
8      MS. FORGIE:  Objection, asked and answered.
9  You can answer it again.
10      THE WITNESS:  Yeah.  I mean, I -- you're
11  right.  Obviously it has to be more than zero as
12  we just said.  I don't believe that we know
13  exactly the -- the minimum number of bottles that
14  the person needs to spray in order for the person
15  to get the risk of developing non-Hodgkin
16  lymphoma.
17          I think the literature is more
18  consistent with the duration of exposure as
19  opposed to the number of bottles that are used.
20  And the reason for that is because there's
21  inconsistency sometimes in the bottles that are
22  being purchased in terms of how big they are, how
23  small they are as well as whether they are
24  premixed, some of them are mixed, the -- the user
25  has to mix and so forth.  So I believe that

Page 119

1  particular inconsistency probably what made it
2  very difficult to ascertain a particular number of
3  bottles that may be causing it.  And the
4  literature that I saw really looked more at
5  duration of exposure as opposed to a bottle.
6          So to summarize, in terms of minimum
7  number of bottles, I -- I don't have that
8  particular number at hand because I don't use it
9  as by itself.  I'll have to use the collective --
10  the collective clinical picture and the collective
11  epidemiologic picture.
12  BY MR. LEVINE:
13      Q.  So minimum number of bottles is not part
14  of your methodology?
15      MS. FORGIE:  Objection, asked and answered.
16  You can answer.
17      THE WITNESS:  Yes.  I mean, I think I said
18  that.  I don't believe there is known minimum
19  number of bottles.  So if there's somebody who
20  used one bottle versus somebody who has used three
21  bottles, I believe common sense dictates that the
22  person who used three bottles probably is at more
23  increased risk than the person who used one bottle
24  if they've used both of them for the same
25  duration.  Again, this is just simple common sense

Page 120

1  that we all can agree on.
2      Is it possible -- I mean, the one who
3  has used two bottles is more than one bottle.  So
4  I don't know if there is -- I mean, we agree it
5  has to be more than zero.  So I don't know if it's
6  one would be less than two, two will be less than
7  three.  So the more bottles that you are using,
8  clearly the higher risk you are going to be.
9  BY MR. LEVINE:
10      Q.  All other things being equal, you could
11  determine that Roundup caused the patient's cancer
12  in someone who used one bottle or two bottles or
13  three bottles, correct?
14      MS. FORGIE:  Objection.
15      THE WITNESS:  It's relative risk.  It's
16  relative risk.  I mean, if I -- if I'm faced with
17  two patients and they have the same duration of
18  exposure, they both have been exposed for the same
19  duration, they have the same disease, et cetera,
20  all of these risk factors we talked about and one
21  of them used three bottles, the other one used one
22  bottle, I think all of us can agree that the one
23  who used three bottles probably have higher risk.
24  BY MR. LEVINE:
25      Q.  I'm only talking about one patient.  I'm

Page 121

1  talking about your methodology for determining
2  causation in one patient.
3      You don't -- you don't compare a single
4  patient to other patients when you determine what
5  caused their cancer, right?
6      A.  No, you don't.  You just compare it to
7  what's published in the literature.
8      Q.  Right.  So for you to be able to say
9  Roundup caused a patient's cancer, your
10  methodology doesn't consider whether somebody used
11  one bottle, two bottles, or three bottles,
12  correct?
13      MS. FORGIE:  Objection, asked and answered.
14  You can answer it again.
15      THE WITNESS:  I think I answered that.  It
16  does consider it.  I just don't know what is the
17  minimum.  I think your question was is there a
18  minimum and we all said it's going to be more than
19  zero.  We just don't know if -- I mean, it's very
20  clear that if you use more, you are at higher
21  risk; but there is no established minimum in the
22  literature.
23  BY MR. LEVINE:
24      Q.  Does it matter what percentage of
25  glyphosate was in the Roundup that was sprayed to

31  (Pages 118 to 121)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 122

1    your methodology?
2        A.  As a clinician, I'm not -- I -- I didn't
3    look at that.  I think that's more of a toxicology
4    that needs to look at that.  So I'm not
5    familiar with -- I'm not -- I can't comment on
6    that because I didn't look at it.
7        Q.  Does it matter to your methodology what
8    surfactants were in the Roundup?
9        A.  I know all of the -- the majority of
10   glyphosate-based formulation have surfactants now;
11   but in terms of the percentage-wise, again, that's
12   not my area of expertise in terms of the
13   percentage of surfactants.
14       Q.  Does it matter which surfactants were in
15   the Roundup?
16       A.  Not -- not to my methodology.
17       MS. FORGIE:  Objection, asked and answered.
18   You can answer.
19       THE WITNESS:  Not in my methodology as a
20   clinician.
21   BY MR. LEVINE:
22       Q.  Does it matter if the Roundup was
23   inhaled by the patient to your methodology?
24       A.  You take it into consideration.  It does
25   matter to me.

Page 123

1        Q.  Is it fair to say you could determine
2    that Roundup caused a patient's non-Hodgkin's
3    lymphoma whether that patient inhaled Roundup or
4    did not, correct?
5        A.  So a patient could develop non-Hodgkin
6    lymphoma even if they did not inhale it, if that's
7    your question.
8        Q.  Okay.  So that's not a criteria for
9    ruling in Roundup for your methodology?
10       A.  My point is you don't rule it out just
11   because the person did not inhale.
12       Q.  But you have to rule things in first --
13       A.  That's right.
14       Q.  (Continuing) -- right?
15       A.  Yeah.
16       Q.  And you don't need to -- you don't need
17   a patient to have inhaled Roundup in order to rule
18   it in, correct?
19       A.  Correct.
20       Q.  Does Roundup cause a different type of
21   cancer depending on whether it was inhaled versus
22   whether it was exposed to the skin?
23       A.  I did not look at other cancers, just
24   non-Hodgkin lymphoma.
25       Q.  Sorry.  Does Roundup cause different

Page 124

1    subtypes of non-Hodgkin's lymphoma depending on
2    whether it's inhaled versus whether it's exposed
3    into the skin?
4        A.  That's not clear in the literature.
5        Q.  Because there are carcinogenic agents
6    that can cause different types of cancers or
7    different subtypes of cancers depending on how
8    they are exposed, correct?
9        A.  Such as -- can you just give me an
10   example to --
11       Q.  Sure.
12       A.  (Continuing) -- make sure I know what
13   you're talking about?
14       Q.  Tobacco.
15       A.  In terms of inhaling -- okay.  I see
16   what you're saying, okay.
17       Q.  Right?
18       A.  Uh-huh.
19       Q.  I mean --
20       A.  If you inhale tobacco --
21       Q.  (Continuing) -- if you smoke, you're --
22       A.  (Continuing) -- versus just being
23   exposed.  I just want to make sure I know -- I
24   understand the question.
25       Q.  Right.  If you smoke, you may be more

Page 125

1    likely to get lung cancer.  If you chew tobacco,
2    you may be more likely to get mouth cancer --
3        A.  Got it.
4        Q.  (Continuing) -- things like that, right?
5        A.  Yes.
6        Q.  Okay.  So does Roundup cause different
7    subtypes of lymphoma depending on whether it's
8    inhaled or whether it's exposed to the skin or
9    whether there's some other form of exposure?
10       A.  Yeah, I don't think we know that answer
11   accurately to the level of granularity that you
12   are asking.  I do believe it's a very good
13   question.  I just don't believe we have the answer
14   to that.
15           I think you could make an argument that
16   if a patient is exposed to glyphosate all over his
17   or her skin, for example, they may be at risk of
18   developing certain lymphomas that affect the skin
19   just by virtue of being exposed to the skin.  But
20   as you and I know, there are over 60 types of
21   lymphomas out there; and I don't believe we really
22   know that the type of exposure affects the subtype
23   of lymphoma that the patient has.
24       Q.  Okay.  So let's go back to your opinions
25   in this case for a second.  We were parsing our

32 (Pages 122 to 125)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 126

1    way through them.
2    **A.   Which exhibit?  8?**
3    Q.   Exhibit 8.
4    **A.   Sure.**
5    Q.
8    **A.**

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 134

Page 136

```
12        Q.  Let me switch gears for a second.
13        MS. FORGIE:  I thought you were going to say
14   lunch break.
15        MR. LEVINE:  Do you want to -- want to do a
16   lunch break now?
17        MS. FORGIE:  Well, if it's a good time for
18   you.  I think it's --
19        MR. LEVINE:  Sure.
20        MS. FORGIE:  Well, it's --
21        MR. LEVINE:  Yeah.  I think --
22        MS. FORGIE:  (Continuing) -- almost 1:00
23   o'clock.
24        MR. LEVINE:  I think it's a good time.
25        MS. FORGIE:  Okay.  That sounds good to me.
```

Page 135

Page 137

```
1         THE VIDEOGRAPHER:  Going off the record at
2    12:42 p.m.
3              (Luncheon recess.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

35  (Pages 134 to 137)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 138

1        A F T E R N O O N   S E S S I O N
2        THE VIDEOGRAPHER:  And we're back on the
3    record at 1:38 p.m.
4        CHADI NABHAN, MD, MBA, FACP,
5    called as a witness herein, having been previously
6    duly sworn, was examined and testified further as
7    follows:
8             EXAMINATION (Continued)
9    BY MR. LEVINE:
10       Q.  Good afternoon, Dr. Nabhan.
11       A.  Good afternoon.
12       Q.  A few questions regarding your
13   background.
14           You work at Cardinal Health?
15       A.  Currently I do, yes.
16       Q.  What's Cardinal Health?
17       A.  So I work in a -- you want the entire
18   company because I work in one division of the
19   company called Specialty Solutions.
20       Q.  Yeah.  Why don't you tell me about the
21   division.  I just --
22       A.  Sure.
23       Q.  Admittedly I Googled you and I can't
24   figure out what Cardinal Health is or what
25   division you work in.

Page 139

1        A.  Yeah.  So I work in a division called
2    Cardinal Health Specialty Solutions, which is a
3    sub -- you know, there are various divisions
4    within the big Cardinal Health, the big umbrella.
5            So Cardinal Health Specialty Solutions
6    is about a 1500 to 1600 employees that they are
7    distributed amongst about six various business
8    units.  And what we do is offer solutions, as the
9    name implies, to two major stakeholders; the
10   manufacturers of cancer drugs essentially as well
11   as the providers, the oncologists mainly.  Both
12   types of stakeholders, they have various needs and
13   we work with both of them.  These business units
14   are the regulatory science business unit, which
15   basically deals with regulatory submissions of
16   devices or new compounds that are entering the
17   market.  There's a wholesaler component and
18   distribution of oncology drugs to oncologists, as
19   you know.
20           There's also a business unit that I work
21   closely with which is called real-world evidence
22   and insights.  And essentially it looks at to
23   really what happens in the real world in terms of
24   outcomes of patients.  So I do a lot of work on
25   health economics, outcomes research, real world

Page 140

1    evidence, patients' reported outcomes.  And a lot
2    of this research is usually presented at national
3    meetings.  In fact, at the upcoming American
4    Society of Hematology meeting in two weeks, we
5    have nine -- nine posters or nine presentations
6    that were accepted.
7            And the last two business units within
8    Specialty Solutions, one is the hub services which
9    deals with postmarketing needs of drugs.  So
10   patient assistance programs, free drugs for
11   patients who need to start on therapy but they
12   waiting for insurance approval and so forth.  As
13   well as monitoring for adverse events and
14   pharmacovigilance and things of that sort as well
15   as the 3PL, or third party logistics, which is --
16   again, it's more of the kind of back ship and
17   deliver on time wherever it's needed for a variety
18   of products.
19       Q.  So Cardinal --
20       A.  On the -- on the provider side -- this
21   is on one side.
22           On the provider side we deal with their
23   needs in terms of reimbursement, quality
24   reporting, value-based care.  So that's on the
25   oncology side.  There -- obviously in the

Page 141

1    healthcare market they're dealing with a lot of
2    issues that we provide a lot of solutions for them
3    that help them navigate reimbursement; but also,
4    more importantly, educational components and
5    programs that allows them to understand what's
6    happening in the marketplace.
7        Q.  So Cardinal Health Specialty --
8    Specialty Solutions is where you work?
9        A.  Yes.
10       Q.  All right.  Cardinal Health Specialty
11   Solutions is not a hospital, correct?
12       A.  It's not a hospital.
13       Q.  It's not a doctors office?
14       A.  It is not a doctors office.
15       Q.  Cardinal Health Specialty Solutions does
16   not treat patients, correct?
17       A.  We do not treat patients, no.  We
18   monitor.  We -- we provide patient services, but
19   we do not provide clinical care to patients.
20       Q.  All right.  Cardinal Health Specialty
21   Solutions does not oversee other doctors treating
22   patients?
23       A.  Not the actual treatment, but we help in
24   certain programs with pharmacovigilance, as I told
25   you, and reporting adverse events and so forth;

36  (Pages 138 to 141)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 142

1    but not the clinical care per se.
2        Q.  Okay.  So Cardinal Health Specialty
3    Solutions is not involved in the clinical care of
4    any patients, correct?
5        A.  Correct.
6        Q.  And I believe you've previously
7    testified that you stopped treating patients
8    around August of 2016, correct?
9        A.  Yes.  When I transitioned from
10   University of Chicago, I stopped having clinical
11   practice.
12       Q.  Right.  And you still do not have a
13   clinical practice today, correct?
14       A.  Correct.
15       Q.  You have not clinically treated a
16   patient since August of 2016, correct?
17       A.  Yes.
18       Q.  You still don't have any hospital
19   privileges, correct?
20       A.  By design.  I resigned the hospital
21   privileges that I had.
22       Q.  You don't carry malpractice insurance?
23       A.  I don't need to because I have the -- if
24   you're familiar with tail coverage, I presume, so
25   it's -- you know, I have tail coverage, so --

Page 143

1        Q.  You have no malpractice insurance
2    coverage to treat patients currently?
3        A.  Oh, no, I don't.
4        Q.  Why did you stop treating patients?
5        A.  I've done this for 20 years.  I mean,
6    I've treated thousands of patients and -- and
7    there's nothing truthfully that will ever replace
8    the one-on-one interaction with the patient, the
9    human interaction, the patient thanking you or
10   patient just being -- affecting the patient on
11   an -- on an individual level.  Nothing replaces
12   that in my view.
13       But as you do that day in and day in --
14   day in and day out for as many years as I have,
15   you start realizing there are other aspects of
16   healthcare, frankly, that do affect patient care
17   beyond just having a stethoscope and prescribing
18   chemotherapy.  And nothing more than this is more
19   visible than cancer care.
20       Examples of that is healthcare delivery,
21   the way we deliver healthcare to patients from
22   operational aspects and efficiency aspects.  The
23   cost of cancer therapies and cancer drugs.
24   Financial toxicity is a particular terminology
25   that is recently -- well, not recently.  Over the

Page 144

1    the past couple of years you start hearing about
2    financial toxicity.
3        I was actually part of the initial team
4    at University of Chicago.  We developed a website
5    for financial toxicity and calculating the impact
6    of -- you know, the financial impact on patients
7    treated with cancer.  There are the economic
8    effectiveness with all of these new drugs coming
9    in.
10       So I started realizing there is really
11   more to healthcare of cancer patients than just
12   being in the clinic.  And I felt I've done that so
13   I decided to go back to business school and
14   torture myself in getting a business degree with
15   focus on healthcare management.  So the master's
16   that I have is in healthcare management.  So
17   specific focus on healthcare law; healthcare
18   finance; again, healthcare policy and a lot of
19   these aspects that do impact patient care but not
20   directly, not in the clinic.
21       And I graduated in 2006 and I wasn't,
22   frankly, planning on leaving necessarily clinical
23   practice.  I was planning on maybe still having a
24   little bit of a clinical presence as well as doing
25   the administrative work.  But when this

Page 145

1    opportunity came, it offered me to work with two
2    major stakeholders.  And I -- it took me out of my
3    comfort zone of being in the hospital setting and
4    in the clinic, and it challenged me to do
5    something more for patients that is a little bit
6    different.
7        So I -- as I told you, a lot of my
8    papers and my publications recently have focused
9    on that and the impact on -- on patients.  One of
10   my presentations coming out in the American
11   Society of Hematology is specifically on
12   patient-reported outcomes, which is very
13   important.  It just -- you know, being in clinical
14   practice, you don't get that breadth of ability to
15   do it.
16       So I felt it's something I could help
17   patients with but not necessarily direct clinical
18   care.  And if I -- you know, it's very difficult
19   to do both effectively, frankly, because my
20   schedule is a little bit tight.  If I -- if I can
21   have one day that I would say it's always going to
22   be a clinical day for me, I would try to do it;
23   but it's difficult to do because some of my travel
24   is unpredictable and I would hate to cancel clinic
25   so -- so late on patients.  I know how disruptive

37  (Pages 142 to 145)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 146

1    that is.
2        So I made the choice that I've done
3    clinical care for 20 years and I think I can do
4    good for patients in a different way, and that's
5    why.
6        Q.  Now, you've -- as -- I think you've
7    provided with us -- or you provided us with notes
8    of your meeting with Ms. Gordon, correct?
9        A.  Yes.  These are the notes as written on
10   the day when I saw her.  So as I told you, there
11   are some -- if you read through it, there are some
12   areas that -- I didn't want to go back and change
13   that, but some areas were filled in with gaps the
14   more I learned from the medical records that were
15   provided.
16       Q.  Sure.  And it says, "Meeting with the
17   patient and her family member on Friday
18   8/10/2018," correct?
19       A.  Yes.  Maybe I can look at that so we can
20   look at the same time.
21       Q.  I'm sorry.  We're -- and I'm referring
22   to Exhibit 3.
23       A.  Yes, I understand.  I have it.
24       Q.  When you say "Meeting with the patient
25   and her family member," who -- who attended the

Page 147

1    meeting?
2        A.  I believe her mom.
3        Q.  Did you meet with -- did you meet with
4    them together?
5        A.  Yes, they were both in the room.
6        Q.

Page 148

1        A.  No, I did not measure it, but she -- she
2    did

Page 149

1

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 150

1    Q.  Your office is at Cardinal Health,
2  correct?
3      A.  Yes, yes --
4      Q.  So it's --
5      A.  (Continuing) -- my administrative
6  office.
7      Q.  So that's my next question.  It's an
8  administrative office, not a medical examination
9  room, correct?
10     A.  No, it's not.
11     Q.  Did you -- you mentioned that she was
12  treated at University of Chicago.
13     A.  Yes.
14     Q.  Do you know her doctors at University of
15  Chicago?
16     A.  I do.
17     Q.  Which ones do you know?
18     A.  All of them.  I worked there for almost
19  four years.
20     Q.  Did you discuss Ms. Gordon's treatment
21  with any of her physicians at University of
22  Chicago?
23     A.  I have not.
24     Q.  Prior to meeting with Ms. Gordon, had --
25  had you reviewed her medical records?

Page 152

1      A.  I don't think she had given a deposition
2  at that time.  I got that afterwards.  I'm pretty
3  sure it was afterwards.
4      Q.  Prior to meeting with Ms. Gordon, had
5  you formed an opinion as to what caused her
6  non-Hodgkin's lymphoma?
7      A.  Prior to meeting her?
8      Q.  Uh-huh.



Page 151

1      A.  I had some of her medical records but
2  they were not complete.  And -- so I don't recall
3  which medical records I had prior to meeting her.
4  I had -- I had a good understanding what happened
5  with her.  I think I had more of the records from
6  her local oncologist.  The University of Chicago
7  was pretty delayed in sending the records so it
8  took a while for me to get those.
9      Q.  Okay.  And in the course of your review
10  of her medical records but prior to and meeting
11  with Ms. Gordon, did you review any pathology?
12     A.  Reports, pathology reports.  But I'm not
13  a pathologist so I never looked at the slides or
14  anything like that, but I saw the pathology
15  reports.
16     Q.  Prior to meeting with Ms. Gordon, based
17  on your review of her medical records -- well,
18  strike that.
19         Prior to meeting with Ms. Gordon, did
20  you review her Plaintiff Fact Sheet?
21     A.  I think that was -- I'm not remembering
22  the timing of the Plaintiff Fact Sheet.  I think I
23  did.  I don't remember.
24     Q.  Okay.  And had you -- had you reviewed
25  her deposition at that time?

Page 153

21     Q.  Sure.  And I'm -- I'm now going to focus
22  on your causation opinions here as opposed to,
23  let's say, side effects of treatments and whatnot,
24  okay?
25     A.  Sure.

39 (Pages 150 to 153)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 154

1    Q.  When you met with her, you had time to
2  explore her risk factors, correct?
3    A.  Of course.
4    Q.  And you've reviewed her medical records
5  and explored her risk factors, correct?
6    A.  The medical records I had at the time.
7  Again, just want to be clear I have had before and
8  after, but I reviewed whatever I had prior to
9  meeting her.
10    Q.  Right.  You reviewed what you had prior
11  to meeting with her and you've reviewed additional
12  medical records after meeting her?
13    A.  Correct.
14    Q.  And you told me that your method is to
15  conduct a differential diagnosis in this case,
16  correct?
17    A.  Yeah.  You have to review the medical
18  records.  I mean, I -- you know, it's very
19  important in detail all of the medical records.
20  Get that one on one and try to understand what's
21  going on with the patient hands-on.  I mean, we
22  all -- I mean, every lymphoma person would rely on
23  his clinical expertise, on his knowledge,
24  everything that they've done over the past 20
25  years.  And then you correlate what the patient

Page 155

1  tells you and what you've seen in clinic with
2  what's published in the epidemiological
3  literature.  You look at all of the risk factors.
4  You perform what is called in the legal term
5  differential diagnosis, and you try your best to
6  decide if there's a cause, effect or not.
7    Q.  Right.  And in the general sense you
8  told me that when you perform a differential
9  diagnosis, you look for things like HIV,
10  autoimmune viruses that can cause lymphoma,
11  correct, among other things?
12    A.  Among other things.
13    Q.  Among --
14    A.  Yes.
15    Q.  (Continuing) -- other things.
16    A.  Yes.
17    Q.  Obviously you look for pesticide
18  exposure and other things as well, correct?
19    A.  Sure.
20    Q.  So in going through her medical history,
21  did you -- did you -- you were able to rule out
22  HIV, correct?
23    A.  Yes.
24    Q.  And you were able to rule out autoimmune
25  disease?

Page 156

1    A.  Yes.
2    Q.  And were able to rule out viral
3  exposures, correct?
4    A.  Yes.

Page 157

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 158

Q.   Now, we have no medical records prior to
when she really was diagnosed with lymphoma,
correct?

A.   Prior -- no, I don't have any medical
records prior to her diagnosis.  We have 2006 and
I believe there was some reports of '05

Q.   Right.  So you were not able to review
medical records prior to her diagnosis of lymphoma
in order to rule out viral infections, correct?

A.   You don't need to review medical records
prior to 2006, prior to diagnosis to rule out.
You actually don't need that.  Why -- I mean,
that's not something that you would need because
the viral infections that may be implicated in the
diagnosis of non-Hodgkin lymphoma, they don't
disappear or go away.  You're still able to
actually find evidence of them subsequently.  It's
not like a flu that gets diagnosed and goes away.
These are type of viruses that you always have
evidence that there's some -- something of prior
exposure, if you will.

Page 159

Q.   And the same is true for autoimmune
disease?



MS. FORGIE:  Objection.
THE WITNESS:  So you never dismiss any risk
factors.  And I believe we went over this before
and I tried just to explain it in a way --
sometimes may be difficult to explain when you're
dealing with cancer.

It's -- if somebody has a heart disease
and there's one risk factor, having another risk
factor does not take away the first risk factor.
If somebody has diabetes and they smoke, both of
them are risk factors for heart disease and it's
hard to say that the diabetes contributed more to
the heart disease versus the smoking versus

Page 160

1  what -- the reality is both are risk factors, and
2  likely both of them in some fashion have
3  contributed to the heart disease.
4         So now we take that same example to
5  non-Hodgkin lymphoma.  You have two risk factors.
6  Let's say HIV-positivity and Roundup.  It is -- in
7  my view it's very difficult to say just because
8  the HIV is positive, then Roundup did not and vice
9  versa; just because somebody is exposed to
10 Roundup, then the HIV is not.  I think we can
11 argue whether the weight of the HIV is higher than
12 the Roundup, whether the Roundup weight of
13 contributing to the disease is higher than HIV.
14 And that usually depends on each separate case in
15 terms of exposure and duration, but both of them
16 would be risk factors.
17 BY MR. LEVINE:
18     Q.   So maybe -- maybe I'm a little confused
19 about your method because we discussed
20 differential diagnosis earlier, right?
21     A.   Yes.
22     Q.   And part of differential diagnosis after
23 ruling things in is to then rule things out to
24 land on either a diagnosis in medicine or a cause
25 in this legal term, correct?

Page 161

1     A.   Correct.
2     Q.   And in order to land on -- let's first
3  start with a diagnosis in the medical profession
4  in terms of differential diagnosis.
5         You have to rule out other diagnoses,
6  correct?
7     A.   Of course.
8     Q.   And in order to land on a cause, you
9  have to rule out other causes, correct?
10    A.   Yes.  But sometimes you may end up with
11 two causes.
12    Q.   And then maybe you know one of them is
13 or one of them -- one of them isn't.  Do you --
14 strike that.  That's a comment, not a question.
15        When you end up with two causes, where
16 in your methodology are you able to figure out
17 which one of those or both is the cause?
18 MS. FORGIE:  Objection.
19 THE WITNESS:  But that depends on each
20 particular case.  I mean, I -- all of these are
21 hypothetical scenarios that don't have the medical
22 records of a particular patient, don't have the
23 age of the patient, don't have the exposure or the
24 history of the patient.  So I understand what
25 you're saying, but the reality is you don't make a

41  (Pages 158 to 161)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

## Page 162

1  decision in -- just in -- in isolation of
2  everything else.  You have to look at the entire
3  picture of the patient.
4      So you could end up -- so HIV is a risk
5  factor in my view and in the view of everybody.
6  Roundup is a risk factor.  And if you do -- if you
7  put everything in and then as you rule things out,
8  you end up with these two risk factors as
9  contributing to the diagnosis of non-Hodgkin
10  lymphoma.  It doesn't mean that one risk factor
11  eliminates the other risk.  They are both
12  contributing to the disease.
13  BY MR. LEVINE:
14      Q.  So look, all due -- all due respect, Dr.
15  Nabhan, you said this is a hypothetical; but I'm
16  not asking a hypothetical.  I'm asking about your
17  method.
18      A.  Okay.
19      MS. FORGIE:  Wait.
20  BY MR. LEVINE:
21      Q.  Your method -- you should be able to
22  articulate your method as to every patient.
23      A.  I thought I have.
24      MS. FORGIE:  There's no question.
25  BY MR. LEVINE:

## Page 163

1      Q.  A priori, prior to applying it, correct?
2      A.  Agree.
3      Q.  Where in your method are you able to
4  determine if one risk factor or two risk factors
5  or both or neither are the cause of a particular
6  patient's lymphoma if there are more than one risk
7  factor present?
8      MS. FORGIE:  Objection, asked and answered.
9  You can answer.
10      THE WITNESS:  Okay.  So you start by the
11  process of being all-inclusive, okay?  You put
12  everything in terms of the known risk factors that
13  a clinician is familiar with based on, again, the
14  literature as well as the clinical experience.
15  And then, as you just said, you start eliminating
16  one after the other based on that particular
17  individual, based on that particular patient, and
18  based what you learn on that particular patient.
19  And as you eliminate these factors, you may be
20  left with one; but you may be left with more than
21  one.  And if you are left with more than one as
22  you suggested, then you'll have to look at the
23  literature of each particular causative factor and
24  the weight of evidence and the plausibility of
25  each one of them to determine whether one or the

## Page 164

1  other.



15      Q.  So I don't think that last part had
16  anything to do with my question.
17      A.  Well, I'm trying to explain to you how
18  I -- how I weighed the evidence.

## Page 165

3      MS. FORGIE:  Objection.
4      THE WITNESS:  It's easier, correct.
5  BY MR. LEVINE:
6      Q.  Easier?
7      A.  Right.
8      Q.  When there's more than one, it's not as
9  easy, correct?
10      A.  It's not as easy.
11      Q.  And you just told me you then have to
12  look at the literature, right?
13      A.  And the weight of each risk factor, the
14  literature and the weight of each risk factor in
15  each patient.
16      Q.  But I thought you did that before --
17  before comparing the risk factors.  I thought you
18  need to look at the literature to determine
19  whether that is a risk factor for their
20  non-Hodgkin's lymphoma.
21      A.  Of course.  That's how you -- that's how
22  you have an inclusive list.  Your list that you
23  put in is based on your knowledge of the
24  literature.
25      Q.  Okay.  Is there any literature that you

42 (Pages 162 to 165)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 166

1　can cite that can -- that expresses how to
2　determine which risk factor among two or three is
3　the cause?
4　　　　Do -- do you need me to explain that or
5　do you understand that question?
6　　A.  I understand that.
7　　Q.  Okay.
8　　MS. FORGIE:  Objection, asked and answered.
9　You can answer it again.
10　　THE WITNESS:  The way you determine that, the
11　way you determine that when you are dealing with
12　more than one risk factor is based on your
13　understanding of each risk factor contributing to
14　that particular disease as well as the clinical
15　experience that each one have had for over the
16　past so many years.  I mean, that cannot go
17　unnoticed.  That's where you have to apply that
18　clinical knowledge and clinical expertise into a
19　situation such as this to determine whether both
20　risk factors are causing the disease in the same
21　manner, one is stronger than the other, one is
22　weaker than the other.
23　BY MR. LEVINE:
24　　Q.  In the presence of more than one risk
25　factor, is it fair to say you can't rule out

Page 167

1　either one?
2　　MS. FORGIE:  Objection, asked and answered.
3　　THE WITNESS:  If you have more than one risk
4　factor, it is fair to say that both are
5　contributing to the disease but maybe at varying
6　degree.  That's what I'm trying to say.
7　BY MR. LEVINE:
8　　Q.  Is Crohn's disease an autoimmune
9　disorder?
10　　A.  It is.
11

Page 168

1

Page 169

1

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577



Page 170

1       **(Nabhan Exhibit No. 10 marked**
2        **as requested.)**
3  BY MR. LEVINE:
4      Q.  Handing you what's been marked as
5  Exhibit 10.  It's a record from Dr. Rossi.
6      MS. FORGIE:  10?  I'm sorry.  What was that?
7      MR. LEVINE:  Yes.
8      MS. FORGIE:  Thank you.
9  BY MR. LEVINE:
10     Q.
19     MS. FORGIE:  Objection.
20

Page 171

5     MS. FORGIE:  Objection -- wait -- asked and
6  answered.  You can answer it again.
25  BY MR. LEVINE:

Page 172

1      Q.  You were not familiar with that note
2  prior to my showing it to you?
3      **A.  I don't recall seeing it.**
4      MS. FORGIE:  Objection.
5  BY MR. LEVINE:
6      Q.  I'm sorry?
7      **A.  I don't recall seeing it.**
13     THE WITNESS:  Can I look at my note?
14  BY MR. LEVINE:
15     Q.  Sure.
16     **A.  I'm just trying to remember --**
17     Q.  Look -- look at the third bullet point.
18     **A.  I'm trying to remember this.**

Page 173

4     MR. LEVINE:  Did you get that?
5     MS. FORGIE:  Okay.  Let's all try to wait
6  until he finishes his question before you give
7  your answer so the court reporter can get it.
8     THE WITNESS:  I apologize.
9     MS. FORGIE:  It's okay.  It's hard sometimes.
10  BY MR. LEVINE:
11     Q.  You mentioned that IBS is a known risk
12  factor for lymphoma?
13     **A.  No --**
14     MS. FORGIE:  Objection.
15     THE WITNESS:  (Continuing) -- I didn't say
16  that.  I said IBD, inflammatory bowel disease --
17  BY MR. LEVINE:
18     Q.  Is that --
19
21     Q.  Inflammatory bowel disease is different
22  from inflammatory bowel syndrome?
23     **A.  Yes.  That's not -- IBS is not**
24  **inflammatory bowel syndrome.  It is irritable**
25  **bowel syndrome.**

44  (Pages 170 to 173)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 174

1   Q.  Oh, got it.
2       Can irritable bowel syndrome be a
3   symptom of inflammatory bowel disease?
4       A.  Some of the symptoms of inflammatory --
5   of irritable bowel syndrome, or IBS, could mimic
6   IBD.  So oftentimes patients do -- with IBS do
7   present with diarrhea and so forth, which
8   obviously happens with IBD.

12      Q.  And IBS can also be a symptom of Crohn's
13  disease, correct?
14      A.  So IBS stands for irritable bowel
15  syndrome.  Patients with irritable bowel syndrome,
16  they have intermittent diarrhea and constipation,
17  which is these symptoms mimic the symptoms of
18  patients with Crohn's disease.  So the symptoms
19  could be similar, but you -- we can't say IBS is a
20  symptom of Crohn's disease.  We can say diarrhea
21  is a symptom of Crohn's disease.
22

Page 176

1   and I wanted to read it also -- I mean, it was --
2   it was part of the risk factors that I put on my
3   differential diagnosis.  But the literature was
4   not very supportive.  I went back and I looked at
5   various studies that were positive and negatives.
6   And the largest study I'm aware of was a pooled
7   analysis that actually looked at thousands of
8   patients with lymphoma across the U.S. and ex-U.S.
9   So in Europe, North America, and South America.

13      That's -- because on physical exam,
14  that's the one thing on physical exam that you
15  would note.  There's nothing else on physical exam
16  that would clue you in.  There's really no
17  specific phenotype usually with non-Hodgkin
18  lymphoma, but that's the only thing that I recall
19  that I went through as well.

Page 175

1

25      And so I went back to the literature,

Page 177

1

45  (Pages 174 to 177)



Page 178

1　going on with her, that risk factor was
2　appropriately eliminated in my methodology.
3　　　Q.  So help me understand this.  You put it
4　on the differential because there's some
5　literature, right?
6　　　A.  And based --
7　　　Q.  You rule it in?
8　　　A.  Based on what I know, again, with
13　　　MS. FORGIE:  Objection.
14　　　THE WITNESS:  Do you mind if you repeat the
15　question?
16　BY MR. LEVINE:
17　　　Q.  Sure.  You're evaluating the cause of
18　her non-Hodgkin's lymphoma, right?
19　　　A.  Yes.
20　　　Q.  And we talked earlier about how first
21　you consider what it is -- you know, you consider
22　the risk factors for non-Hodgkin's lymphoma and
23　then you rule them out, right?
24　　　A.  Correct.

Page 179

6　　　MS. FORGIE:  Objection.
7　　　THE WITNESS:  Yeah, now I understand the
8　question.  Thank you.
9　　　　So the first thing that -- at least what
10　I do is, you know, look back in the literature and
11　see if there's anything, again, additional that I
12　may not be aware of that has come out in terms of
13　obesity and non-Hodgkin lymphoma that may have --
14　again, just to refamiliarize myself with -- with
15　what's happening.  So that's really very important
16　to relook at the literature and try to get fingers
17　on the pulse type of understanding of what's the
18　current -- what's the current view of obesity and
19　non-Hodgkin lymphoma.
20　　　　And you have to do that because when
21　there's one risk factor such as obesity that is
22　linked to every single cancer under the sun,
23　you'll have to step back and say, Okay, so I
24　understand that obesity could cause every single
25　cancer we deal with, but maybe we'll have to look

Page 180

1　at every single case separately
4

Page 181

1
15　　　A.  The obesity literature is inconclusive
16　as to being the cause of development of
17　non-Hodgkin lymphoma.  Again, that's -- that's
18　what -- you have to be very inclusive in the
19　beginning and then you have to rule every
20　particular cause out.  It doesn't mean that you
21　don't put it in there.  I mean, you know, you have
22　to put these risk factors.
23　　　　Now, when you look at each one of them,
24　as we went through, the obesity -- as you look at
25　obesity, then you go back to the literature and

46  (Pages 178 to 181)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 182

1  say, Well what's the evidence of obesity in the
2  literature as a causative factor of non-Hodgkin
3  lymphoma.  And it is inconclusive in the
4  literature so there is no reason for it to be
5  conclusive in her situation while it is
6  inconclusive in the literature.
7      Q.  So you just said to me it doesn't mean
8  that you don't put it in there in the first place
9  if it's inconclusive.
10     A.  I put -- I --
11     MS. FORGIE:  Wait --
12     THE WITNESS:  Everything is --
13     MS. FORGIE:  Wait --
14     THE WITNESS:  (Continuing) -- inclusive in
15  the beginning.
16     MS. FORGIE:  (Continuing) -- for a question.
17         Wait for a question.
18  BY MR. LEVINE:
19     Q.  But we discussed this earlier, and you
20  said the only things you put in your differential
21  diagnosis are things that are risk factors.
22     A.  Yes.
23     Q.  So, for instance, you're not just going
24  to put everything.  Like you're not -- you're not
25  going to put the fact that she may have had blue

Page 183

1  or brown eyes in your differential, right?
2      A.  So that's a question I can answer?
3      MS. FORGIE:  Yes.
4      THE WITNESS:  You put the risk factors that
5  have been listed as possible risk factors for
6  non-Hodgkin lymphoma.
7         If you go to the American Cancer Society
8  website or you go wherever, Cleveland Clinic
9  website, wherever it is, there's -- and you go to
10  a web page that is -- that are directed to
11  patients and that web page says, you know, what
12  are the risk factors, you know, you can put all of
13  them in and then you look at the particular
14  patient and start ruling things out or in.
15  BY MR. LEVINE:
16     Q.  Okay.  So you use literature to put it
17  in and you use the same literature to then rule it
18  out, correct?
19     A.  You -- you use the literature that you
20  know and you -- you also use what you've actually
21  seen in clinical practice, and you rule things out
22  based on the literature and based on your
23  expertise.
24  ███████████████████████████████

Page 184

1  ████████████████████████████████
2  ████████████████████████████████
3  ████████████████████████████████
4  ████████████████████████████████
5  ████████████████████████████████
6  ████████████████████████████████
7  ████████████████████████████████
8  ████████████████████████████████
9  ████████████████████████████████
10     Q.  So -- so if you're not convinced it's a
11  cause in her or anybody else, why do you rule it
12  in?
13     A.  You put it in because you want to be
14  more inconclusive so you can -- so your
15  methodology is more sound because if I need to
16  explain this to you or to anybody else, I want to
17  make sure that everything is very clear as to what
18  is put out there because it's possible that
19  somebody may not be aware of the literature or the
20  inconclusivity of the literature.  So it is better
21  to put things out there and then explain why it
22  was ruled out.
23     Q.  So ruling something out doesn't mean
24  confirming that it's not present.
25  ████████████████████████████████

Page 185

1  ████████████████████████████████
2  ████████████████████████████████
3  ████████████████████████████████
4  ████████████████████████████████
5  ████████████████████████████████
6  ████████████████████████████████
7  ████████████████████████████████
8  ████████████████████████████████
9  ██████████o there are several reasons to rule
9  things out.  Either the literature doesn't support
10  it -- if something is very common in the -- if
11  something is just keeps being touted in the media
12  and with everybody as a causative -- cause of
13  cancer, you can't just dismiss it.  You don't
14  ignore it.  You put it out there and you explain
15  then to the public and to other people, Yes, you
16  may have heard about this as a cause of cancer,
17  but let me tell you why it's not.
18     Q.  So, Dr. Nabhan, that's the ruling in
19  part.  That's what you told me earlier.  You don't
20  put everything on your -- on your differential
21  unless it's supported by the literature.
22     A.  Until it's a --
23     MS. FORGIE:  Wait.  There's no question.
24     THE WITNESS:  (Continuing) -- risk factor.
25     MS. FORGIE:  There's no question.  Let's wait

47 (Pages 182 to 185)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 186

1  for a question.
2  BY MR. LEVINE:
3      Q.  You told me earlier that you don't put
4  everything on your differential unless it's
5  supported by the literature, correct?
6      A.  Correct.
7      Q.  Dr. Nabhan, the same type of
8  non-Hodgkin's lymphoma that occurred in Ms. Gordon
9  occurs in patients who are not exposed to Roundup,
10 correct?
11     A.  Yes.
12     MS. FORGIE:  Objection, asked and answered.
13 BY MR. LEVINE:
14     Q.  Did you in -- in meeting with or
15 examining Ms. Gordon take any measurement of her
16 glyphosate levels?
17     A.  No.  I'm not qualified to do that.
18     Q.  And you don't have any measurement of
19 Ms. Gordon's glyphosate levels before she ever
20 used Roundup, right?
21     A.  Correct.  I'm not qualified do so.
22     Q.  You don't have any measurement of Ms.
23 Gordon's glyphosate levels while she was using
24 Roundup, correct?
25     A.  I don't.

Page 187

1      Q.  You don't have any measurement of Ms.
2  Gordon's glyphosate levels any time before she was
3  diagnosed with lymphoma, correct?
4      A.  Correct.
5      Q.  You don't have any measurement of Ms.
6  Gordon's glyphosate levels any time after she was
7  diagnosed with lymphoma, correct?
8      A.  Correct.
9      Q.  You don't have any measurements of Ms.
10 Gordon's glyphosate levels any time after she
11 stopped using Roundup, correct?
12     A.  Correct.
13     Q.  If her glyphosate levels were zero, you
14 would not be able to say that glyphosate was a
15 cause of her non-Hodgkin's lymphoma, correct?
16     MS. FORGIE:  Objection.
17     THE WITNESS:  When?  I'm sorry.  When?
18 BY MR. LEVINE:
19     Q.  If you had tests of her glyphosate
20 levels at the time that -- let's say at the time
21 she was diagnosed with lymphoma.
22     A.  In 2006?
23     Q.  Yeah.  And they -- if they were zero.
24     A.  So there's no -- there's no presence of
25 glyphosate in her body?

Page 188

1      Q.  Yes.
2      MS. FORGIE:  Okay.  Let's wait for a
3  question.
4  BY MR. LEVINE:
5      Q.  That is correct.  If there's no presence
6  of glyphosate in her body at the time she's
7  diagnosed with lymphoma, you wouldn't be able to
8  say that glyphosate was a cause of her lymphoma,
9  correct?
10     MS. FORGIE:  Objection.
11     THE WITNESS:  I would have serious doubts
12 about it, yes.
13 BY MR. LEVINE:
14     Q.  Okay.  So you're assuming that she had
15 positive glyphosate levels at the time she was
16 diagnosed with lymphoma, correct?
17     MS. FORGIE:  Objection.
18     THE WITNESS:  That was not the basis of how I
19 formed the opinion.  I formed the opinion based on
20 the epidemiologic literature.
21     Again, as I told you earlier today, my
22 opinion was not based on toxicology data or
23 measurements of serum levels or skin exposure.  It
24 was based on the fact that, you know, how long was
25 she exposed and how often was she exposed and

Page 189

1  looking at this in view of the epidemiologic
2  literature that looked at that.  I mean, when you
3  look at a lot of the literature, the McDuffie
4  paper and other papers that we just reviewed
5  today, the McDuffie paper, they did not look at
6  the -- to my knowledge they did not look at the
7  glyphosate exposure level.  In fact, the
8  agricultural health study, which was a negative
9  study, as you know, never even looked at the
10 glyphosate level as well.  So to my knowledge the
11 epidemiologic literature did not look at things
12 the way you're asking me so I -- I don't know the
13 answer to that because it was not -- was not
14 addressed.
15 BY MR. LEVINE:
16     Q.  You've already told me if her glyphosate
17 levels were zero, you'd have --
18     A.  Serious doubts.
19     Q.  (Continuing) -- serious doubts.
20     MS. FORGIE:  Wait.  Could I have that
21 question read back, please?
22     MR. LEVINE:  I haven't asked a question yet,
23 but I'll repeat -- I'll repeat exactly --
24     MS. FORGIE:  I thought you just --
25     MR. LEVINE:  (Continuing) -- what I just

48  (Pages 186 to 189)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 190

1    said.
2         MS. FORGIE:  Okay.
3    BY MR. LEVINE:
4         Q.   You already told me that if her
5    glyphosate levels were zero, you'd have serious
6    doubts.
7             So as part of your conclusion about the
8    cause of Ms. Gordon's non-Hodgkin's lymphoma, you
9    are at least making the assumption that her
10   glyphosate levels were not zero, correct?
11        MS. FORGIE:  Objection.
12        THE WITNESS:  Based on her exposure as it
13   compares to what has been reported in the
14   epidemiologic literature.  Again, all of the epi
15   literature that I have reviewed and I'm sure you
16   have reviewed as well, to my knowledge did not
17   look at the glyphosate level in the serum or the
18   blood of these patients.  So what I looked at is
19   her exposure history and how does this compare
20   with the -- with the literature I reviewed.
21   BY MR. LEVINE:
22        Q.   Can you tell me sitting here today what
23   her glyphosate levels would have had to have been
24   in order to cause her cancer?
25        **A.   I cannot --**

Page 191

1         MS. FORGIE:  Objection.
2         THE WITNESS:  (Continuing) -- answer that
3    question.
4    BY MR. LEVINE:
5         Q.   The most common -- so I'm sorry.  I
6    already asked that.
7             You agree that the vast majority of
8    cases of -- of lymphoma occur in patients who were
9    never exposed to Roundup, correct?
10        **A.   Correct.**
11        MS. FORGIE:  Objection, asked and answered.
12   BY MR. LEVINE:
13        Q.   You agree that the vast majority of
14   cases of DLBCL occur in patients who were never
15   exposed to Roundup, correct?
16        MS. FORGIE:  Objection, asked and answered.
17        THE WITNESS:  Correct.
18        MR. LEVINE:  All due respect, I have not
19   asked these questions.
20   BY MR. LEVINE:
21        Q.   You agree that the vast majority of
22   cases of follicular lymphoma occur in patients who
23   were never exposed to Roundup, correct?
24        MS. FORGIE:  Objection.
25        THE WITNESS:  Correct.

Page 192

1    BY MR. LEVINE:
2         Q.   You agree that the vast majority of
3    cases of every subtype of non-Hodgkin's lymphoma
4    occur in patients who were never exposed to
5    Roundup, correct?
6         MS. FORGIE:  Objection.
7         THE WITNESS:  Correct.
8    BY MR. LEVINE:
9         Q.   There is no pathology test, examination,
10   or other medical test that can be done on a
11   lymphoma to determine whether Roundup caused a
12   patient's cancer, correct?
13        **A.   Correct, there is no phenotype.  You
14   treat the same.  The only difference is if you
15   identify that as a factor, it's modifiable; and
16   you can counsel patients on stopping the exposure
17   and stopping the spraying, et cetera.**
18        Q.   You cannot tell just by looking at Ms.
19   Gordon's lymphoma under the microscope whether she
20   used Roundup or not, correct?
21        **A.   You cannot.**
22        Q.   In your examination of Ms. Gordon you
23   didn't observe anything specifically -- specific
24   about her cancer that indicated Roundup caused or
25   contributed to the cancer, correct?

Page 193

1         **A.   No, because there is not such a thing.**
2         Q.   In your examination of Ms. Gordon you
3    didn't perform any diagnostic test or biomarker
4    that indicated Roundup caused or contributed to
5    her cancer, correct?
6         **A.   No, because to my knowledge that doesn't
7    exist today.  And we may find in the future, but
8    today we don't have that.**
9         Q.   Right.  And you're aware that certain
10   lymphomas have genomic signatures which are
11   specifically associated with certain risk factors,
12   correct?
13        ███████████████████████████████████████
     ██   **if I understand your question, like --**
16        Q.   I don't think you do.
17        **A.   Okay.**
18        Q.   If I can --
19        **A.   Go ahead.**
20        Q.   I'm asking generally.
21        **A.   Okay.**
22        Q.   You're aware that certain lymphomas have
23   genomic signatures which are specifically linked
24   to certain risk factors, correct?
25        **A.   Correct.** █████████████████████

49 (Pages 190 to 193)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 194

1 ███████  **Correct.**
2    Q.  Correct.  There is no genomic signature
3 that you can identify that's specifically linked
4 with glyphosate, correct?
5    **A.  To my knowledge, no.**
6    THE VIDEOGRAPHER:  Counsel, about five
7 minutes until tape change.
8    MS. FORGIE:  I'm sorry.  What?
9    THE VIDEOGRAPHER:  Five minutes.
10    MS. FORGIE:  Oh, for the tape change.
11    MR. LEVINE:  Why don't we change it now.
12 It's a good time.
13    THE VIDEOGRAPHER:  Ending Disk No. 2 of the
14 deposition of Dr. Chadi Nabhan.
15    We're off the record at 2:37 p.m.
16    (Short recess.)
17    THE VIDEOGRAPHER:  And beginning Disk No. 3
18 of the deposition of Dr. Chadi Nabhan.
19    We're back on the record at 2:47 p.m.
20 BY MR. LEVINE:
21

Page 195

6    MS. FORGIE:  Okay.  Wait for the question.
7

Page 196

Page 197

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 198

Page 199

Page 200

Page 201

14      A.  To my knowledge and based on my
15  experience, smoking is not a risk factor for
16  non-Hodgkin lymphoma.  It's a risk factor for a
17  lot of cancers, but to my knowledge it's not a
18  risk factor of non-Hodgkin lymphoma.
19      Q.  There's not some literature going either
20  way?
21      A.  I'm sure there is, but not to that
22  extent.  I think the only literature that I am
23  aware of that hinted to the possibility of smoking
24  may be linked or may be a risk factor for
25  non-Hodgkin lymphoma had significantly more

51 (Pages 198 to 201)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 202

1  tobacco consumption than this, not -- not one pack
2  of cigarettes for 20 years.
3      I do recall a couple epidemiologic
4  studies that suggested smoking for more than 40
5  years may be associated or may be a risk factor
6  for non-Hodgkin lymphoma, but not to that extent.
7  And, frankly, in my clinical practice and my
8  seeing patients, I never considered smoking by
9  itself as a risk factor for non-Hodgkin lymphoma.
10  So I guess the one thing that smokers can assume
11  they won't get.
12      Q.  So this is -- this is one of those where
13  there's a little literature one way but more
14  literature the other way, correct?
15      MS. FORGIE:  Objection.
16      THE WITNESS:  You know, as I told you, I -- I
17  really -- I mean, again, I can only recall one
18  article about epidemiologic literature that
19  suggested tobacco use and as a risk factor, but
20  substantially more tobacco consumption than this.
21  Maybe there is more, but that's the one I can
22  remember.
23  BY MR. LEVINE:
24      Q.  If there's more, it might go in your
25  differential?

Page 203

1      MS. FORGIE:  Objection.
2      THE WITNESS:  Yeah, I mean, maybe; but I -- I
3  mean, again, seeing patients with non-Hodgkin
4  lymphoma for so many years, I mean, this has
5  never -- it never stood out as a risk factor
6  for -- for these patients.
7  BY MR. LEVINE:
8  [redacted]
16      Q.  You agree that the cause of
17  non-Hodgkin's lymphoma is multifactorial?
18      A.  I think for the most part it's unknown.
19  For the majority of non-Hodgkin lymphoma, as we
20  talked earlier, is -- is unknown as opposed to
21  multi -- that's very different between unknown
22  versus multifactorial.  Multifactorial assumes
23  there are so many factors causing it.  I would
24  say, as I've testified many times before, most
25  non-Hodgkin lymphoma we are unable to identify a

Page 204

1  cause.
2      Q.  Right.  And I -- I don't have your
3  testimony in front of me, but I thought you also
4  previously testified that the cause could be
5  multifactorial?
6      A.  There could be several causes that may
7  be contributing to non-Hodgkin lymphoma in a
8  particular patient, for example, or in general
9  there are several risk factors -- there's not one
10  risk factor that is linked to non-Hodgkin
11  lymphoma, as we've discussed earlier.
12      Q.  So, for example, different aspects of
13  risk could -- over a person's lifetime could
14  affect whether they get non-Hodgkin's lymphoma,
15  but yet you could still assign cause to a
16  particular risk factor in their case, right?
17      MS. FORGIE:  Objection.
18      THE WITNESS:  Can you give me an example just
19  so I know --
20  BY MR. LEVINE:
21      Q.  Well, let me -- let me ask you this:  Is
22  it your testimony -- well, let me step back.
23  [redacted]

Page 205

1  [redacted]
5      Q.  I'm sorry.  I don't think you understood
6  my question.
7      A.  Probably I didn't.
8      Q.  I apologize for interrupting, but I
9  don't think --
10      A.  No, no; that's fine.
11      MS. FORGIE:  Okay.  Well, let -- let him ask
12  it again --
13      THE WITNESS:  Okay.
14      MS. FORGIE:  (Continuing) -- and then we'll
15  see.
16  BY MR. LEVINE:
17  [redacted]
20      MS. FORGIE:  Okay.  Objection, asked and
21  answered.  You can answer it again.
22  [redacted]

52 (Pages 202 to 205)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 206

1

4      MS. FORGIE:  Objection.
5      THE WITNESS:  Yeah.
6      MS. FORGIE:  Asked and answered.  You can
7  answer it again.
8      THE WITNESS:  So all that we can go by is
9  what has been written and published in the
10  literature on genotoxicity and the DNA damage and
11  the chromosomal aberrations and the chromosomal
12  breakage that patients with -- who are -- that
13  cells are exposed to glyphosate or Roundup have.
14      I think there's -- there's good evidence
15  out there that Roundup causes genotoxicity, causes
16  DNA damage; and it does cause oxidative stress as
17  well.  All of these are possible mechanisms.  I
18  don't think -- I don't believe there's anyone that
19  knows a hundred percent the exact mechanism of
20  action by which Roundup cause non-Hodgkin
21  lymphoma.  In fact, I will argue nobody even knows
22  how tobacco causes lung cancer mechanism of
23  action.
24  BY MR. LEVINE:
25      Q.  Well --

Page 207

1      MS. FORGIE:  Wait.  Let him finish.
2      MR. LEVINE:  Sorry.
3      THE WITNESS:  Right.  I'm just saying it
4  is -- we may not know the actual mechanisms by
5  which a particular compound causes cancer.  All
6  that I can go by is the literature that supports
7  evidence of cellular damage, DNA damage, oxidative
8  stress, all of which can contribute to the
9  development of malignancy and non-Hodgkin
10  lymphoma.  There's actually very good evidence on
11  oxidative stress and non-Hodgkin lymphoma.
12  BY MR. LEVINE:
13      Q.  And some of those mechanisms by which
14  things cause cancer, some can initiate a cancer,
15  some can promote a cancer, correct?
16      A.  Yes.
17      Q

20      MS. FORGIE:  Objection, asked and answered.
21  You can answer again.
22

Page 208

1

Page 209

1

24      Q.  You've read -- sorry.
25      A.  Yeah, yeah.  Go ahead.

53 (Pages 206 to 209)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 210

Page 212

E:

13    Q.  And in a patient that was exposed to
14  Roundup, how do you exclude the possibility that
15  the cause of that patient's non-Hodgkin's lymphoma
16  is idiopathic or unknown?
17        MS. FORGIE:  Objection, asked and answered.
18  You can answer it again.
19        THE WITNESS:  Because idiopathic is -- as you
20  just said, is unknown, right?  Idiopathic by
21  definition is unknown, which means that you
22  exclude all known factors.  So if you have a
23  patient that has a known factor that is plausible,
24  that is supported by the literature, and it fits
25  within what has been published from an

Page 211

17    MS. FORGIE:  Objection.
18

Page 213

1   epidemiologic standpoint, you can't ignore that
2   and say, Well, I'm just going to forget about this
3   and I'm going to say it's unknown.  It's -- it's
4   like having somebody with HIV-positive and say,
5   You know what?  It's idiopathic.  I'm not -- I'm
6   going to ignore the HIV-positivity.  So we can't
7   do that.
8   BY MR. LEVINE:
9        Q.  So I think I understand you.
10        So if a patient was not exposed to
11  Roundup and would have no other risk factors that
12  you would consider to be the cause, then the cause
13  is unknown, correct?
14        MS. FORGIE:  Objection, asked and answered.
15        THE WITNESS:  Correct.
16        MS. FORGIE:  You can answer.
17  BY MR. LEVINE:
18        Q.  And if a patient was -- that same
19  patient was exposed to Roundup, then the cause is
20  known, correct?
21        MS. FORGIE:  Objection, asked and answered.
22  You can answer it again.
23        THE WITNESS:  As long as the exposure is
24  within what has been published in the literature
25  from an epidemiologic standpoint, you know, it's

54 (Pages 210 to 213)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 214

1  very important for me that you -- you take that in
2  the context of what's actually been published. So
3  just somebody tells me, I've been exposed is not
4  enough. I need to know whether it fits within
5  what that -- what the literature supports.
6  BY MR. LEVINE:
7       Q. So in any case where a patient has had
8  sufficient exposure for you to consider it as
9  carcinogenic -- as a carcinogenic level of
10  exposure, you would determine that Roundup was the
11  cause of that patient's cancer?
12       MS. FORGIE: Objection, asked and answered.
13  You can answer it again.
14       THE WITNESS: You have to look -- you have to
15  look at the other risk factors that a particular
16  patient has. You have to look at the medical
17  records of that patient, what, you know, the --
18  we -- we talked about the age as an example. You
19  have to look at every single case differently and
20  separately.
21  BY MR. LEVINE:
22       Q. Understood. I thought I was, I guess,
23  speaking in the context of the last couple
24  questions.
25       In a case where there are no other risk

Page 215

1  factors --
2       A. Okay.
3       Q. (Continuing) -- if there's no Roundup
4  exposure, we said cause is unknown?
5       A. No risk factors, no Roundup, no nothing,
6  which is the majority of what we see in clinic,
7  this is unknown or, quote/unquote, idiopathic.
8       Q. In that same case if there is sufficient
9  exposure to Roundup, then Roundup is the cause?
10       MS. FORGIE: Objection, asked and answered
11  about eight times. You can answer it again.
12       THE WITNESS: If there are no other risk
13  factors whatsoever and there is sufficient
14  exposure of the patient to this known occupational
15  hazard or residential hazard, it is not something
16  that we can ignore. And we will have to look at
17  that particular patient and see if it fits, and
18  it's more likely than not it's going to be the
19  cause of that lymphoma. It's a modifiable risk
20  factor that they would need consultations and
21  modify it and eliminate it because it might help
22  the progression as well as other family members
23  who are in the same household.
24            (Nabhan Exhibit No. 11 marked
25            as requested.)

Page 216

1  BY MR. LEVINE:
2       Q. Handing you what's been marked as
3  Exhibit 11.
4       MS. FORGIE: Thank you.
5  BY MR. LEVINE:
6       Q. This is from the Mayo Clinic, correct?
7       A. Yes.
8       Q. You're familiar with this, right?
9       A. Not this document. I'm familiar with
10  Mayo Clinic.
11       Q. I believe this document is on your
12  reliance list.
13       A. Okay. Then I forgot it was Mayo or
14  Cleveland Clinic.
15       Q. Okay. Do you want to take a look at --
16  I don't remember the exhibit -- exhibit number,
17  but I --
18       MS. FORGIE: Grab that. It should be -- give
19  us just a second to find it. Here it is.
20       MR. LEVINE: Do you know what exhibit number
21  his reliance list is?
22       MS. KACZMARCZYK: It's Exhibit 6.
23       MR. LEVINE: Exhibit 6. I believe it's at
24  the end of --
25       THE WITNESS: Okay.

Page 217

1       MR. LEVINE: (Continuing) -- that list.
2       THE WITNESS: Okay. Yeah, I see that.
3  BY MR. LEVINE:
4       Q. So this is on your reliance list so you
5  have seen it, correct?
6       A. Yes.
7       Q. Okay. Mayo Clinic's a leading medical
8  institution in the United States, correct?
9       A. It is.
10       Q. In fact, in the world probably, correct?
11       A. That's -- that's what -- that's what
12  they think.
13       Q. Is that -- is that not what you think?
14       A. I've always thought the University of
15  Chicago is the leading institution.
16       Q. Fair enough.
17       MS. FORGIE: I'm not surprised.
18  BY MR. LEVINE:
19       Q. Let's take a look at -- I believe it's
20  the second page of the document where it says
21  Causes. You see that?
22       A. I do see that, yeah.
23       Q. So I think you agree, correct me if I'm
24  wrong, that in most cases doctors don't know what
25  causes non-Hodgkin's lymphoma, correct?

55 (Pages 214 to 217)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 218

1    MS. FORGIE:  Objection, asked and answered.
2    THE WITNESS:  You said -- yeah, in most cases
3  we don't know the causes, correct.
4    MR. LEVINE:  Right.
5    THE WITNESS:  I think I've said that.
6  BY MR. LEVINE:
7    Q.  And you agree with the Mayo Clinic that
8  in some cases it's due to a weakened immune
9  system, correct?
10   A.  Of course.
11   Q.  Now, that -- this -- this is all in a
12 section that says Causes.  If you look at the next
13 page, there's a section called Risk Factors.
14   Do you see that?  And it goes on --
15   MS. FORGIE:  What page are you on?
16   MR. LEVINE:  It goes on past that.
17   The third page.
18   THE WITNESS:  Under Risk Factors?
19 BY MR. LEVINE:
20   Q.  Page 3 of 6, yeah.
21   A.  Yeah, I see that.
22   Q.  Do you see there's a section called Risk
23 Factors?
24   A.  Yes.
25   Q.  This is separate from the section that

Page 219

1  says Causes, correct?
2    A.  It's separate, yes.
3    Q.  Okay.  Do you agree with the Mayo Clinic
4  that in most cases people diagnosed with
5  non-Hodgkin's lymphoma don't have any obvious risk
6  factors and many people who have risk factors for
7  the disease never develop it?
8    A.  I think we have addressed that before,
9  yes.
10   Q.  And do you agree with the Mayo Clinic
11 that some factors that may increase the risk of
12 non-Hodgkin's lymphoma include -- and I'm going to
13 go through the list -- medications that suppress
14 your immune system, infection with certain viruses
15 and bacteria, chemicals, and older age, correct?
16   A.  I see that, yes.
17   Q.  You agree with that, correct?
18   A.  Yes.
19   Q.  Now, let's take a look at chemicals.
20   Do you agree with the Mayo Clinic that
21 certain chemicals such as those used to kill
22 insects and weeds may increase your risk of
23 developing non-Hodgkin's lymphoma.  More research
24 is needed to understand the possible link between
25 pesticides and the development of non-Hodgkin's

Page 220

1  lymphoma.
2    Do you agree with that?
3    A.  I think more research is always needed.
4  I agree with that, but that does not apply to
5  every patient -- I mean, for a specific patient is
6  different.  For the general population, of course.
7    Q.  Under the next risk factor, older age,
8  do you agree with the Mayo Clinic that
9  non-Hodgkin's lymphoma can occur at any rate -- at
10 any age, but the risk increases with age?
11   Do you agree with that?
12   A.  I have seen it in younger patients, but
13 I -- I don't recall seeing it in anybody under the
14 age of 30, for example, except for Burkitt's.  But
15 yes, I mean, it does happen in younger folks as
16 well as older folks.  But the last sentence, as
17 you and I can see, it says, It is most common in
18 people over 60.
19   Q.  Okay.  We're done with that.
20   A.  I'm done with this?
21   Q.  Yeah.
22   Are you familiar with Cancer Treatment
23 Centers of America?
24   A.  I know of it.
25   Q.  They have locations in Chicago, right?

Page 221

1    A.  Yes.
2    Q.  You're familiar --
3    A.  That's how I know of it, yeah.
4    Q.  You're familiar with their locations in
5  Chicago?
6    A.  Yes.
7    Q.  Do you know any of their doctors?
8    A.  I know -- I know one of their
9  physicians, yes.  Not just -- cordially through
10 the -- through the oncology world.  It's been a
11 while.  I'm not sure if he's still there or not.
12   (Nabhan Exhibit No. 12 marked
13   as requested.)
14 BY MR. LEVINE:
15   Q.  I'm handing you what's been marked as
16 Exhibit 12.
17   This is from the Cancer Treatment
18 Centers of America, correct?
19   A.  Yes.
20   Q.  And this refers to non-Hodgkin's
21 lymphoma risk factors, correct?
22   A.  Yes, I see that.
23   Q.  And I think because of the difficulty
24 printing this, there's actually the same paragraph
25 twice over here.  You see --

56 (Pages 218 to 221)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 222

1    A. I see.
2    Q. (Continuing) -- on top it says,
3  Non-Hodgkin's Lymphoma Risk Factors, and then
4  right below it says --
5    A. Sure.
6    Q. Do you agree with Cancer Treatment
7  Centers of America that in most cases the exact
8  cause or causes of non-Hodgkin's lymphoma are
9  unknown, correct?
10   A. Yes.
11   MS. FORGIE: Objection, asked and answered.
12   THE WITNESS: I think I've said that even
13 before reading this.
14 BY MR. LEVINE:
15   Q. Do you agree with Cancer Treatment
16 Centers of America that some individuals without
17 any of the known or suspected risk factors may
18 still develop the disease, correct?
19   A. Yes.
20   MS. FORGIE: Where -- oh, I see where it is.
21 Thank you.
22 BY MR. LEVINE:
23   Q. You agree with Cancer Treatment Centers
24 of America that it's not clear why or how certain
25 factors may increase your risk of developing

Page 223

1  non-Hodgkin's lymphoma, correct?
2    A. Yes.
3    Q. And then do you agree with the Cancer
4  Treatment Centers of America, for instance,
5  exposure to certain chemicals such as pesticides
6  may increase your risk but research is
7  inconclusive and ongoing?
8    A. I mean, I -- I agree in a general -- the
9  general concept and general comment. I think it's
10 fair to say just -- I mean, I can -- that's why
11 you have to look at each case differently, but the
12 general sense of that comment is fine.
13   Q. You're familiar with the American Cancer
14 Society, correct?
15   A. Of course.
16      (Nabhan Exhibit No. 13 marked
17       as requested.)
18 BY MR. LEVINE:
19   Q. I'm handing you what's been marked as
20 Exhibit 13.
21   MS. FORGIE: Thank you.
22 BY MR. LEVINE:
23   Q. American Cancer Society is another
24 leading cancer organization in the United States,
25 correct?

Page 224

1    A. Yes.
2    Q. You, in fact, discussed them at this
3  deposition. And you cite them on your reliance
4  list in -- in this litigation, correct?
5    A. Yes.
6    Q. And you agree with the American Cancer
7  Society that having a risk factor or even many
8  risk factors does not mean that you will get the
9  disease, correct?
10   A. Correct.
11   Q. And you agree that -- you agree that
12 with the American Cancer Society that many people
13 who get the disease may have few or no known risk
14 factors, correct?
15   A. Correct.
16   Q. You agree with the American Cancer
17 Society that researchers have found several
18 factors can affect a person's chance of getting
19 non-Hodgkin's lymphoma. There are many types of
20 lymphoma and some of these factors have been
21 linked to only certain types, correct?
22   A. Correct.
23   Q. And then the risk factors they list
24 include age, correct?
25   A. Correct.

Page 225

1    Q. And do you agree with them that getting
2  older is a strong risk factor for lymphoma overall
3  with most cases occurring in people in their 60s
4  or older, but some types of lymphoma are more
5  common in younger people, correct?
6    A. Correct.
7    Q. And you agree that gender is a risk
8  factor, correct?
9    A. Correct. It's just more common in men
10 than women, so --
11   Q. But it occurs in both --
12   MS. FORGIE: Wait. Were you finished with
13 your answer?
14   THE WITNESS: Yeah. I just said it's just
15 lymphoma in general -- non-Hodgkin lymphoma is
16 more common in men than women.
17 BY MR. LEVINE:
18   Q. Right. But non-Hodgkin's lymphoma
19 occurs in both men and women, correct?
20   A. Of course.
21   Q. That wouldn't be part of your
22 differential diagnosis, correct?
23   A. I don't -- no. I don't use that as a
24 part of the -- because you see it really --
25 although it's just more common in men than women,

57 (Pages 222 to 225)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 226

1  I don't think that's something that I usually
2  include --
3  Q.  Okay.
4  A.  (Continuing) -- unless it's substantial
5  difference between men and women.
6  Q.  And risk factors include race,
7  ethnicity, and geography, correct?
8  A.  Correct.
9  Q.  Is that part of your differential
10  diagnosis?
11  A.  Geography, not as much.  The only -- I
12  mean, I think it's really more pertaining to race
13  and ethnicity.  So a lot of -- for example, lots
14  of non-Hodgkin lymphoma is certain -- the majority
15  of B-cell non-Hodgkin lymphoma, as an example,
16  don't occur in Asian patients somehow.  So it's --
17  it's still not clear why you see that.  There are
18  certain types of lymphomas occur more in African
19  Americans and others occur in white or Caucasian
20  patients.
21        Geography is a little bit tough because
22  I think it depends on how much of it is where the
23  person lives versus -- you know, race and
24  ethnicity in my view is a little bit more of a
25  factor of the geography, if you will.

Page 227

1  Q.  So race and ethnicity is a factor in
2  your differential diagnosis?
3  MS. FORGIE:  Objection.
4  THE WITNESS:  I mean, if you see something
5  just -- again, I mean, I've taken care of patients
6  across all races.  But it's just there are certain
7  types of lymphomas that are just very, very
8  uncommon in Asian patients as an example.  So when
9  you -- when you see that as an example, you
10  just -- you think a little bit as to their -- you
11  know, maybe there are more causes, et cetera.
12  BY MR. LEVINE:
13  Q.  Would DLBCL be one of those?
14  A.  No.
15  Q.  Okay.  Is there a particular race or
16  ethnicity that's more likely to be associated with
17  DLBCL?
18  A.  To my knowledge, no, but I think in
19  general like the Asians, generally they have
20  less -- are less likely to develop B-cell
21  lymphomas.
22  Q.  Do you agree with the American Cancer
23  Society that in the United States whites are more
24  likely than African Americans and Asian Americans
25  to develop non-Hodgkin's lymphoma?

Page 228

1  A.  That's what we just said.
2  Q.  Right.  And so, for instance, if you saw
3  glyphosate exposure in an Asian American, that
4  would factor into your differential diagnosis as
5  to determining that glyphosate caused lymphoma in
6  an Asian American because you usually don't see
7  non-Hodgkin's lymphoma in that population,
8  correct?
9  MS. FORGIE:  Objection.
10  THE WITNESS:  Yeah.  It factors in any
11  patient that you see regardless of the race and
12  ethnicity.  It's -- it's not -- again, it's -- I
13  mean, just because non-Hodgkin lymphoma is more
14  common in Caucasians than in Asians, it doesn't
15  mean that if the Caucasians are exposed to an
16  occupational hazard will have different risks than
17  if Asians will.  But you always have to factor
18  that in.  So you take that into context in the
19  particular history.
20  ████████████████████
21  ████████████████████████
22  ████████████████████████
23  ██
24  BY MR. LEVINE:
25  Q.  You agree that family history is a risk

Page 229

1  factor, correct?
2  A.  Family history is a risk factor.  It's
3  really unknown why.  It just happens that if -- if
4  you have family members who have -- and that's
5  scaleable, frankly, to a lot of other
6  malignancies.  If you have family members that are
7  diagnosed with a particular malignancy, offspring
8  or other members have increased risk.  It's not
9  really clear why.
10  Q.  Because we're just -- we're learning a
11  lot about genetics right now, right?
12  A.  Genetics or maybe the same environmental
13  factors, maybe the same diet that they eat.  It's
14  just not clear.
15  Q.  Do you consider family history as part
16  of your differential diagnosis in determining the
17  cause of a patient's --
18  MS. FORGIE:  Objection.
19  BY MR. LEVINE:
20  Q.  (Continuing) -- non-Hodgkin's lymphoma?
21  MS. FORGIE:  Objection, asked and answered.
22  You can answer it again.
23  THE WITNESS:  Yeah, I do ask about it, yes.
24  BY MR. LEVINE:
25  Q.  And would you be able to rule out -- or

58 (Pages 226 to 229)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 230

1    strike that.
2         Would you be able to determine that --
3    that Roundup caused an individual's non-Hodgkin's
4    lymphoma if they have a first-degree family
5    history of non-Hodgkin's lymphoma?
6         A.  A very good question.  It's -- it's been
7    tough when you have the family history.  I think
8    we are getting better.  If you have a lot of folks
9    in the family who have the same disease, we have
10   now genetic counseling and there are panels that
11   you can actually send to detect if the same
12   mutation that is -- you know, is present in the --
13   in all of the patients and so forth.
14   ████████████████████████████████████
     ██████████████████████████████████
     ██████████████████████████████
     █████████████████████████████████
     ████████████████████████████████████
     ██████████████████████████████████████
     ███████████████████████████████████
     █████████████████████████████
23        So I don't think I -- I don't really
24   believe we know exactly when there's a strong
25   family history, if we have a good knowledge of the

Page 231

1    type of genes that are acquired or germ line that
2    may be contributing to this.  I think it's really
3    an evolving field, and I think it's -- it's
4    lagging behind other areas where -- you know, like
5    breast cancer where there's really more
6    understanding of the genes implicated in the
7    disease.
8         Q.  I'm sorry.  What was my question?
9         A.  I think you asked me if -- if there's --
10   if there's somebody with a -- with a first-degree
11   relative, family member with non-Hodgkin lymphoma,
12   are you able to tell that that patient doesn't
13   have the disease because the first-degree family
14   member has the disease.
15        Q.  Sorry.  That was not my question.
16        A.  I apologize.
17        Q.  My question is would you be able to
18   determine that Roundup caused a patient's
19   non-Hodgkin's lymphoma in a patient who has
20   first-degree relatives with non-Hodgkin's
21   lymphoma?
22        MS. FORGIE:  Objection, asked and answered.
23   You can answer it again.
24        MR. LEVINE:  He just told me he answered a
25   different question.

Page 232

1         MS. FORGIE:  He's testified numerous times --
2         MR. LEVINE:  Okay.
3         MS. FORGIE:  (Continuing) -- about what he
4    needs to make those determinations --
5         MR. LEVINE:  Oh, you're --
6         MS. FORGIE:  (Continuing) -- and you know it.
7         MR. LEVINE:  You're telling me that that
8    question was asked at another deposition?
9         MS. FORGIE:  No.  You just asked the question
10   and he gave an answer.
11        THE WITNESS:  No.
12        MR. LEVINE:  Would you like me to reask now
13   that we just --
14        THE WITNESS:  No, no.  I understand your
15   question.
16        I think you could based on the fact that
17   the amount of exposure and the duration.  It
18   becomes a little bit more difficult if you have
19   four family members who have non-Hodgkin lymphoma.
20   I mean, I think that's really where it becomes a
21   little bit tricky.
22        If you have one family member and the
23   patient who is affected has a lot of exposure, you
24   can't rule out the family history per se.  You put
25   it out there as a possibly.  Maybe there's

Page 233

1    something out there that we just don't know and
2    there's a gene that we have not studied yet.  But
3    it's very different than having four family
4    members with the disease versus one.  But you
5    always have to assume there's a family member who
6    had the disease and the patient has the disease.
7    Maybe there's something that we don't know yet and
8    maybe we'll find out in the future.  It's probably
9    the story of how we discovered the BRCA 1 and
10   BRCA 2 in breast cancer.
11   BY MR. LEVINE:
12        Q.  So if I understand correctly, in a
13   patient who has one family member, one
14   first-degree family member with a history of
15   non-Hodgkin's lymphoma, you would still be able to
16   conclude that glyphosate was the cause; but in a
17   patient with four first-degree family members with
18   non-Hodgkin's lymphoma, you would not be able to?
19        MS. FORGIE:  Objection, asked and answered.
20        THE WITNESS:  There is no minimum or maximum
21   number of family members.  I mean, there's no
22   magic number to the four versus three.  I just
23   threw that number out there.
24        I think, again, I understand your
25   question.  What I'm trying to say is that, A, you

59 (Pages 230 to 233)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 234

1  have to look at the particular patient story, the
2  patient story despite that family member, and try
3  to understand whether there are -- there is
4  epidemiologic and occupational evidence to make
5  you decide whether this is related or not.
6         Number 2, it is not clear if both family
7  members have the particular disease, whether
8  there's something in common with them that they
9  have the same -- like we just said, same exposure,
10 same risk factors, they are in the same household
11 that may have led to that particular disease.
12        When you have now -- again, that's where
13 the -- the difficulty in attributing that family
14 history.  And as I just told you, in every single
15 cancer -- you could call American Cancer
16 Society -- every single cancer, not just
17 non-Hodgkin lymphoma, family history will be
18 listed in every single cancer; colorectal,
19 bladder, leukemia.  Family history is always
20 listed because we see that.  It's something that
21 we observe in these patients.  We just don't know
22 why we see that.  In some situations we do.  Most
23 often we don't.
24 BY MR. LEVINE:
25    Q.  I'm just trying to understand your

Page 235

1  methodology.
2         Yes or no.  In a patient with one
3  first-degree family history member, you could
4  still conclude that Roundup caused their cancer,
5  correct?
6    MS. FORGIE:  Objection, asked and answered.
7  And he's not required to give a yes or no answer.
8  You can answer --
9    THE WITNESS:  If the --
10   MS. FORGIE:  (Continuing) -- again.
11   THE WITNESS:  If the occupational exposure --
12 if the hazardous exposure is within the -- what
13 is -- you know, again, the duration, the intensity
14 is within what is published in the epidemiologic
15 literature, you cannot rule out the possibility
16 that Roundup caused that non-Hodgkin lymphoma just
17 because somebody has a family member who had the
18 disease.
19 BY MR. LEVINE:
20   Q.  Right.  And in a patient with sufficient
21 exposure to Roundup who has two members with --
22 two first-degree family members with a positive
23 history of non-Hodgkin's lymphoma, you could still
24 conclude that Roundup caused their cancer,
25 assuming there is sufficient exposure in that

Page 236

1  patient, correct?
2    MS. FORGIE:  Objection, asked and answered.
3  You can answer it again.
4    THE WITNESS:  Sure.  I think I've -- I've
5  answered that actually throughout the day.  That
6  having one risk factor does not preclude other
7  risk factors.  So you're putting in family history
8  as one risk factor.  This does not preclude that
9  this person has other risk factors.
10        So you could have two risk factors for a
11 particular patient.  One of them is family
12 history, the other is occupation.  You can have --
13 you know, again, I drew the analogy several times.
14 If you have somebody with diabetes, which is a
15 risk factor for heart disease, if they smoke,
16 that's an additional risk factor of heart disease.
17 You cannot rule that out.
18        So the hypothetical patient that you
19 provided me has two family members who have
20 non-Hodgkin lymphoma.  That is a risk factor that
21 we have to put it out there.  Roundup -- if that
22 person was also exposed to Roundup, that is an
23 additional risk factor we have to put it out
24 there.  And, you know, again, you'll have to
25 decide and weight the evidence, which one is more

Page 237

1  strong.  Maybe both of them are as strong.  And to
2  do that you have to review the medical records.
3  You have to understand what happened to the
4  patient.  You use your clinical expertise, your
5  knowledge.  You try to figure out if you're trying
6  to decide on the causation.  But having two risk
7  factors does not negate the intensity or the
8  importance of one or the other.  You could have
9  two risk factors of any disease.
10 BY MR. LEVINE:
11   Q.  So looking at the American Cancer
12 Society, they -- see where they discuss exposure
13 to certain chemicals and drugs?
14   **A.  I see that, yes.**
15   Q.  Do you agree with the American Cancer
16 Society, as it's stated here, that some studies
17 have suggested that chemicals such as benzine and
18 certain herbicides and insecticides, weed and
19 insect killing substances may be linked to an
20 increased risk of NHL research.  To clarify these
21 possible links is still in progress?
22        Do you agree with that?
23   **A.  Yes, because they're lumping all**
24 **herbicides together, right?  I mean, there are so**
25 **many herbicides out there.  They did not**

60  (Pages 234 to 237)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 238

1    necessarily talk about one.
2        Q.   Right.  And they do not say anything
3    here about glyphosate, correct?
4        A.   They do not on this document, no.
5        Q.   Okay.  And do you agree that the other
6    risk factors listed here are things that you would
7    have to consider as far as your differential
8    diagnosis in determining the cause of an
9    individual?
10       MS. FORGIE:  Objection.
11       THE WITNESS:  Just the entire page?
12   BY MR. LEVINE:
13       Q.   Yeah, in that --
14       A.   Yes --
15       Q.   (Continuing) -- in that list.
16       A.   (Continuing) -- I do.
17       Q.   And the several pages that list --
18       A.   I wasn't sure if there was something
19   specific you wanted to look at.
20            Yes, I do.
21       Q.   Okay.  Doctor Nabhan, are you aware
22   that -- are you aware that glyphosate exposure has
23   dramatically increased since it was first
24   introduced in 1974?
25       A.   I am.

Page 239

1        Q.   Are you aware that by 2014 the total
2    annual use of glyphosate in the United States was
3    approximately 280 to 290 million pounds?
4        A.   I'm sure that number is accurate.  I
5    don't recall the actual number.  I remember I
6    read -- I don't remember the exact numbers.
7            (Nabhan Exhibit No. 14 marked
8                 as requested.)
9    BY MR. LEVINE:
10       Q.   Handing you what's been marked as
11   Exhibit 14.
12       MR. LEVINE:  I'm guessing you don't want a
13   copy of that?
14       MS. FORGIE:  I'm going to skip.  Thank you.
15   But thank you for the offer.  I always appreciate
16   it, but --
17       MR. LEVINE:  Sure.
18       MS. FORGIE:  (Continuing) -- I've got a copy
19   of that from every single deposition you guys have
20   taken.  But thank you.
21   BY MR. LEVINE:
22       Q.   You're familiar with this document,
23   correct?
24       A.   Yes.
25       Q.   If you'd turn to Page 16 of Page 216.

Page 240

1    If you look at the second full paragraph on the
2    page in the middle, it says, "By 2014, total
3    annual use of glyphosate was approximately 280-290
4    million pounds."
5            Do you see that?
6        MS. FORGIE:  And take your time.
7        MR. LEVINE:  Yes, take your time.
8        THE WITNESS:  No.  Just -- you told me the
9    paragraph and I forgot --
10       MR. LEVINE:  I'm sorry.
11       THE WITNESS:  (Continuing) -- which one.
12   BY MR. LEVINE:
13       Q.   I'll slow down.
14       A.   The third paragraph?
15       Q.   The second full paragraph.
16       A.   The second full paragraph, okay.
17       Q.   The one that starts with "At the time of
18   initial registration."
19            Do you see that?
20       A.   I have a different page.  You said Page
21   16 of Page 216?
22       Q.   I said --
23       A.   Is that the --
24       MS. FORGIE:  Well, maybe I will take a copy
25   if we're having --

Page 241

1        MR. LEVINE:  This paragraph that says "At the
2    time" --
3        THE WITNESS:  Oh, I was looking at the one
4    above.  Okay.  I'm sorry.  No problem.  Yeah, I
5    have it.
6        MR. LEVINE:  It's all yours.
7        MS. FORGIE:  I'll give it back anyway.
8        MR. LEVINE:  No take-backs.
9        MS. FORGIE:  I'll throw it out.  Hold on a
10   second.  Just --
11       THE WITNESS:  I have it; I have it.  I saw
12   it.
13   BY MR. LEVINE:
14       Q.   You see that paragraph, right?
15       MS. FORGIE:  Okay.  Hold on a second.  Let me
16   get there, too, since we're having confusion about
17   this.
18       THE WITNESS:  Now I'm confused.
19       MR. LEVINE:  We're all good now, right?
20       THE WITNESS:  We're good.
21   BY MR. LEVINE:
22       Q.   But you agree that by 2014 the total
23   annual use of glyphosate was approximately 280 to
24   290 million pounds?
25       A.   I have no reason to dispute that.

61 (Pages 238 to 241)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 242

1          Q.   And if you look at the next page, Figure
2    1.2.  You see that?
3          A.   Yes, I do.
4          Q.   Specifically the use of glyphosate began
5    increasing at greater increments since the 1990s,
6    correct?
7          A.   Correct.
8          Q.   And the more glyphosate that's used, the
9    more cancer you would expect to see --
10          MS. FORGIE:  Object.
11    BY MR. LEVINE:
12          Q.   (Continuing) -- correct?
13          MS. FORGIE:  Objection.
14          THE WITNESS:  Not necessarily.
15    BY MR. LEVINE:
16          Q.   Okay.
17          A.   Right?  I mean, we said like, you know,
18    not every -- not every lymphoma is caused by
19    glyphosate and not every -- we -- we went over
20    this.  We don't know -- we don't know all of
21    the -- I only looked at non-Hodgkin lymphoma
22    cancers.  We've got so many cancers.
23          Q.   The more glypho- -- okay.  Fair enough.
24          The more glyphosate that is used -- the
25    more the use of glyph- -- strike that.

Page 243

1    Tongue-twisted again.
2          MS. FORGIE:  Time for a break maybe almost.
3          MR. LEVINE:  No.
4    BY MR. LEVINE:
5          Q.   You agree that as glyphosate use
6    increases, the rate of non-Hodgkin's lymphoma is
7    likely to increase, correct?
8          MS. FORGIE:  Objection.
9          THE WITNESS:  I don't agree with that at all.
10    Because your hypothesis assumes that all of the
11    other risk factors are static and stable, which is
12    not really the case.
13          In the '80s -- in the late '80s, to give
14    you an example, with the HIV epidemic and when HIV
15    was being diagnosed, there was substantial
16    increased risk of non-Hodgkin lymphoma.  And then
17    as we have better therapies for HIV, the risk
18    actually has gone down with non-Hodgkin lymphoma.
19    So it's very possible as the risk of non-Hodgkin
20    lymphoma from glyphosate is going up and the risk
21    of non-Hodgkin lymphoma from HIV is going down,
22    you may not see that increase.  You can't really
23    tell because there are so many other factors that
24    are involved.  Some newer therapies that we are
25    actually treating right now -- immunosuppressive

Page 244

1    therapy.  We talked about Crohn's and IBD.  These
2    therapies were not really -- you know, they
3    change.
4          So it's -- in order for you to use that
5    analogy, you will have to assume that all other
6    risk factors for the particular disease are static
7    and they have not changed.  Then you can use that
8    one small factor and say this is contributing to
9    this.  So non-Hodgkin lymphoma in incidence has
10    not actually increased over the past several
11    years.  It's been 75- to 78,000 new cases a year.
12    BY MR. LEVINE:
13          Q.   It, in fact, since -- it relatively --
14          A.   The last --
15          Q.   (Continuing) -- plateaued in the '90s
16    and then has more or less been slightly decreasing
17    since then, correct?
18          A.   No.  The last --
19          MS. FORGIE:  Objection.
20          THE WITNESS:  Yeah, the last couple of years,
21    according to the -- again, the CR data and the
22    cancer statistics paper that I have and I always
23    cite that in my papers, it has been about the same
24    over the past couple years.  Again, maybe we're
25    talking a few thousands here and there.  I think

Page 245

1    75- to 78,000 cases a year is the figure I usually
2    tell my students and -- and my fellows.
3    BY MR. LEVINE:
4          Q.   And that's been steady since the 1990s,
5    correct?
6          MS. FORGIE:  Objection.
7          THE WITNESS:  You know, I'll have to look
8    back.  I don't know if it's since the 1990s, but I
9    do know it's been steady over the past several
10    years.  It has not changed over the past several
11    years.
12          (Nabhan Exhibit No. 15 marked
13          as requested.)
14    BY MR. LEVINE:
15          Q.   I'm handing you what's been marked as
16    Exhibit 15.  This is from --
17          MS. FORGIE:  Now I'm handing this back.
18          MR. LEVINE:  I'm not taking it.  I told you.
19          MS. FORGIE:  I'm sorry.  What number are we
20    on?
21          MR. LEVINE:  15.
22          MS. FORGIE:  Thank you.
23    BY MR. LEVINE:
24          Q.   Handing you what's been --
25          MR. LEVINE:  Look at how nice I am.  I'm

62  (Pages 242 to 245)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

1  taking this big thing back.
2      MS. FORGIE:  Thank you.
3      BY MR. LEVINE:
4      Q.  I'm handing you what's been marked as
5  Exhibit 15 -- or I just handed you that.
6          This is from the National Cancer
7  Institute, correct?
8      A.  Yeah.  And that says it's about 75,000
9  cases a year, yeah.
10     Q.  Right.  And there's a trend line there
11 that shows new cases of non-Hodgkin's lymphoma
12 since 1992, correct?
13     A.  Yeah, I see that.
14     Q.  And the rate's been steady, correct?
15     MS. FORGIE:  What is?
16     BY MR. LEVINE:
17     Q.  The rate has been steady, correct?
18     MS. FORGIE:  Objection.
19     THE WITNESS:  It has not increased
20 substantially over the past several years, yeah.
21     BY MR. LEVINE:
22     Q.  Okay.
23     A.  Am I done with this or do you want --
24     Q.  Yeah, you're done.
25         Dr. Nabhan, you're familiar with the

1      MS. FORGIE:  Thanks.
2      MR. LEVINE:  Sorry.  I'm losing my place on
3  this one.
4      MS. FORGIE:  That's all right.  There's a lot
5  of documents involved.  I'm sure you'll have to
6  give me the same understanding when I'm deposing
7  your experts.
8      BY MR. LEVINE:
9      Q.  Dr. Nabhan, do you agree in the United
10 States four out of ten cancer cases and almost
11 half of all deaths from cancer are associated with
12 preventable risk factors?
13     A.  I have no reason to dispute it.  I just
14 have -- I wasn't aware of this particular bullet
15 point.
16     Q.  Conversely, the majority of all cancer
17 cases in the U.S. occur in patients with no
18 preventable risk factors, correct?
19     A.  That we know of, yes.
20     Q.  Okay.  If you go to the second page --
21     A.  Okay.
22     Q.  (Continuing) -- it says -- see where it
23 says, "Decades of basic, epidemiologic, and
24 clinical research"?
25     A.  Yes, I do.

1  Ameri- -- the American Association for Cancer
2  Research, correct?
3      A.  Sorry.  Yes, I am.
4          (Nabhan Exhibit No. 16 marked
5          as requested.)
6      BY MR. LEVINE:
7      Q.  You're -- in fact, you're a member,
8  correct?
9      A.  I am.  I have to -- I have to recall if
10 I paid my dues this year, but thanks for the
11 reminder.
12     Q.  You've been paying them for about 18
13 years --
14     A.  A long time.
15     Q.  (Continuing) -- or 17 years prior to
16 this, right?
17     A.  For a long time, yes.
18     Q.  Been a member since 2000, correct?
19     A.  Yeah.
20     Q.  And I've handed -- what I've handed you
21 is a Progress Report from the AACR for 2018.
22         Do you see that?
23     A.  Yes, I do.
24     MS. FORGIE:  This is 16, correct?
25     THE WITNESS:  Yes.

1      Q.  It says, "Decades of basic,
2  epidemiological" -- "epidemiologic and clinical
3  research have led to the identification of several
4  factors that increase a person's chance of
5  developing cancer (see Figure 3)," correct?
6      A.  Correct.
7          (Nabhan Exhibit No. 17 marked
8          as requested.)
9      BY MR. LEVINE:
10     Q.  Handing you what's been marked as
11 Exhibit 17.  This is Figure 3.
12     MS. FORGIE:  Are we finished with 16?
13     MR. LEVINE:  We'll see.
14     MS. FORGIE:  This is Figure 3 to 16?
15     MR. LEVINE:  Yeah, that's Figure 3 --
16     MS. FORGIE:  Okay.  Thanks.
17     MR. LEVINE:  (Continuing) -- to 16.
18     BY MR. LEVINE:
19     Q.  Figure 3 indicates the percentage of --
20 of U.S. cancer cases that are attributable to
21 select factors, correct?
22     A.  Yes.
23     Q.  As of 2018 nearly 20 percent of U.S.
24 cancer cases are attributable to smoking, correct?
25     A.  Yes.

63 (Pages 246 to 249)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 250

1  Q.  As of 2018 between 5 and 10 percent of
2  U.S. cancer cases were attributable to excess body
3  weight, correct?
4  **A.  Yeah.  I mean, this is taking all the**
5  **cancer cases, yes.**
6  Q.  As of 2018 more than 5 percent of U.S.
7  cancer cases are attributable to alcohol, correct?
8  **A.  Yes.**
9  Q.  As of 2018 nearly 5 percent of U.S.
10 cancer cases are attributable to ultraviolent
11 radiation, correct?
12 **A.  Correct.**
13 Q.  As of 2018 nearly 5 percent of U.S.
14 cancer cases are attributable to poor diet,
15 correct?
16 **A.  Correct.**
17 Q.  As of 2018 approximately 3 to 4 percent
18 of U.S. cancer cases are attributable to
19 infections, correct?
20 **A.  Correct.**
21 Q.  As of 2018 approximately 3 to 4 percent
22 of U.S. cancer cases are attributable to physical
23 inactivity, correct?
24 **A.  Correct.**
25 Q.  The AACR does not list Roundup, correct?

Page 251

1  **A.  Does not --**
2  MS. FORGIE:  Objection.
3  THE WITNESS:  Does not list Roundup.  Again,
4  they're not talking about non-Hodgkin lymphoma.
5  As you know, they're talking about cancer in
6  general.
7  BY MR. LEVINE:
8  Q.  Okay.  Non-Hodgkin's lymphoma is cancer,
9  correct?
10 **A.  But, I mean, they're talking about**
11 **the -- the attributable -- first of all, they're**
12 **talking select factors.**
13 Q.  Sure.
14 **A.  So by definition they are deciding which**
15 **factors to select and they're not discussing**
16 **non-Hodgkin lymphoma.  But you're right, they're**
17 **not listing Roundup here.**
18 Q.  Okay.
19 **A.  All I'm saying is that the scope of this**
20 **document is talking about cancer in general, not**
21 **addressing non-Hodgkin lymphoma.**
22 Q.  Can you say where on that chart Roundup
23 would land?
24 **A.  I can't say.**
25 Q.  So if you were to write in at the -- on

Page 252

1  the right side of this graph the word "Roundup"
2  right after "Physical Inactivity," are you -- are
3  you following me?
4  **A.  I'm following the question so far.**
5  Q.  You would put a question mark above
6  that, correct?
7  MS. FORGIE:  Objection.
8  THE WITNESS:  I didn't look at Roundup and
9  cancer in general.  So this is, again, what --
10 what this figure is saying is cancer cases
11 attributable to select factors, but it's cancer
12 cases.
13     What I reviewed and what I looked at is
14 Roundup and non-Hodgkin lymphoma, so I can't
15 comment -- your question is not something I can
16 answer.
17 BY MR. LEVINE:
18 Q.  Okay.  If this were a chart that talked
19 about percentage of cases of non-Hodgkin's
20 lymphoma --
21 **A.  Okay.**
22 Q.  Are you with me?
23 **A.  I'm with you.**
24 Q.  (Continuing) -- would you able to say
25 what percentage of cases of non-Hodgkin's lymphoma

Page 253

1  in the United States are attributable to Roundup?
2  MS. FORGIE:  Objection, asked and answered.
3  You can answer it again.
4  THE WITNESS:  I can't answer that, but I
5  believe we would find out as more information are
6  emerging and as more data is evolving.  I can't
7  answer that today.
8  BY MR. LEVINE:
9  Q.  Okay.  Now, you're a member of other
10 professional societies, but -- by the way, I'll
11 represent to you that nowhere in the AACR report
12 that you have in front of you as Exhibit 16 do
13 they discuss anything about Roundup.
14 **A.  Did they talk about non-Hodgkin lymphoma**
15 **specifically?**
16 Q.  I believe they do.  Let me -- that's a
17 good question.
18 **A.  I will need some time to read this, but**
19 **I don't believe this was addressed for non-Hodgkin**
20 **lymphoma.**
21 Q.  Let's -- it's addressed for --
22 **A.  Cancer in general.**
23 Q.  Cancer in general, correct.
24 **A.  Yes, I understand that.  It's just**
25 **saying --**

64 (Pages 250 to 253)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 254

1    Q.  So that's --
2    A.  (Continuing) -- more common sense.  It
3  says exercise, lose weight, don't smoke, don't
4  drink.  I just don't believe that this was -- this
5  document was addressing what we are talking about
6  today.
7    Q.  So they discuss HIV in this document.
8    A.  As it pertains to lymphoma?
9    Q.  As a risk factor for cancer.
10  Lymphoma is cancer, correct?
11    A.  I understand --
12    MS. FORGIE:  Objection, asked and answered.
13  You can answer it again.
14    THE WITNESS:  I understand that lymphoma is
15  cancer.  I get that.  But all I'm saying is the
16  document that you showed me is talking about risk
17  factors for cancers in general.
18    HIV is a known risk factor for other
19  types of cancer as well such as cervical cancer,
20  such as Kaposi sarcoma.  And I -- again, this is
21  the first time I see this document, so --
22  BY MR. LEVINE:
23    Q.  Fair enough.
24    A.  (Continuing) -- it may -- it may talk
25  about lymphoma; it may not.  I just don't know.

Page 255

1    Q.  Fair enough.
2    Can you -- so you're a member of other
3  professional societies in addition to the AACR,
4  correct?
5    A.  I am.
6    Q.  Including the AACR -- well, first of
7  all, you're a member of the European Hematology
8  Association, correct?
9    A.  Yes.
10    Q.  You're a member of the International
11  Society of Geriatric Oncology, correct?
12    A.  I may need to pay the dues for this one,
13  but yes.  I have to look into this one.  Thank you
14  for reminding me.
15    Q.  Sure.  You're a member of the American
16  Association of Hematology, correct?
17    A.  Yes.  This one is paid.
18    Q.  You're a member of the American
19  Association of Clinical Oncology, correct?
20    A.  American Society of Clinical Oncology,
21  yes.
22    Q.  And, of course, the AACR which we
23  mentioned?
24    A.  Yes.
25    Q.  Can you cite any statement from any of

Page 256

1  the cancer professional societies of which you're
2  a member that states glyphosate is an established
3  cause of cancer or non-Hodgkin's lymphoma?
4    MS. FORGIE:  Objection.
5    THE WITNESS:  ASCO and ASH -- excuse me.
6  ASCO and ASH -- or the American Society of
7  Clinical Oncology, American Society of
8  Hematology -- do acknowledge that pesticides are
9  risk factors -- known risk factors for non-Hodgkin
10  lymphoma.  In fact, any review article that
11  discusses causation or discuss non-Hodgkin
12  lymphoma would -- would mention that.
13    If your question is specifically for
14  Roundup, I'm not aware of that.
15  BY MR. LEVINE:
16    Q.  So --
17    A.  But as you -- as you showed me the Mayo
18  Clinic, other things, the -- you know, they --
19  they talk about pesticides in general.
20    Q.  So my question, first of all, is
21  specifically with respect to Roundup, which I
22  think you've just answered.  And my question was
23  also can you cite any statement from them or any
24  of the -- the societies we just looked at and the
25  various websites we just looked at that say

Page 257

1  glyphosate is an established cause of cancer?
2    MS. FORGIE:  Objection, asked and answered.
3  You can answer it again.
4    THE WITNESS:  I can't.
5  BY MR. LEVINE:
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

65  (Pages 254 to 257)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 258

1

20

Page 259

1
2

9     MS. FORGIE:  Objection.
10

Page 260

Page 261

4

7     MS. FORGIE:  Objection, asked and answered.
8

10    BY MR. LEVINE:
11        Q.  Suppose you have a patient with
12    non-Hodgkin's lymphoma that has sufficient
13    carcinogenic exposure to two IARC Category 2A
14    carcinogens for non-Hodgkin's lymphoma.
15        Are you with me?
16        **A.  Okay.  So another hypothetical question.**
17    **Okay.**
18        Q.  Would you -- would -- in those two
19    patients would they both be --
20        **A.  One patient you said.**
21        Q.  I mean -- sorry.  In the one patient
22    where both exposures meet your criteria for
23    sufficient carcinogenic exposure, would you be
24    able to determine which one caused the patient's
25    non-Hodgkin's lymphoma?

66  (Pages 258 to 261)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 262

1    MS. FORGIE:  Objection, asked and answered.
2    THE WITNESS:  I will have to rely on my
3  clinical experience and on my own research and all
4  the patients I have seen to be able to tell
5  whether one or the other.  I may be able to
6  successfully determine that; I may not.  And I may
7  conclude that both of them were risk factors and
8  I'm not sure whether one is stronger than the
9  other.
10  BY MR. LEVINE:
11    Q.  Okay.  And part of your methodology,
12  what you've told me is you weigh the risk factors,
13  correct?
14    A.  Yes.
15    Q.  So if you have a person exposed to two
16  IARC ranked carcinogens and one is Category 1 and
17  the other is Category 2A, in that circumstance
18  would you be able to determine what caused the
19  patient's cancer?
20    MS. FORGIE:  Objection, asked and answered.
21  You can answer it again.
22    THE WITNESS:  I would say Category 1 would
23  have more weight than Category 2A.
24    MR. LEVINE:  Can we take a quick break?
25    MS. FORGIE:  Sure.  "Quick" meaning 5 or 10

Page 263

1  minutes?
2    MR. LEVINE:  Meaning 1 or 2 minutes.  I might
3  be done.
4    MS. FORGIE:  Okay.
5    THE VIDEOGRAPHER:  Going off the record at
6  4:00 p.m.
7        (Short recess.)
8    THE VIDEOGRAPHER:  And we're back on the
9  record at 4:19 p.m.
10    MR. LEVINE:  Thank you, Dr. Nabhan.  I have
11  no further questions right now.
12    MS. FORGIE:  Okay, Doctor.  I have just a
13  few.
14        EXAMINATION
15  BY MS. FORGIE:



Page 264

18    MR. LEVINE:  Objection.

Page 265

2    MR. LEVINE:  Object to the form.

14    MR. LEVINE:  Objection.

67  (Pages 262 to 265)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 266

22  MR. LEVINE:  Objection.
23  THE WITNESS:  I remember that, yeah.
24

Page 267

14  Q.  Okay.  And is there any way to know when
15  the process of uncontrol -- well, let me ask you
16  this:  Does uncontrolled cell growth from DNA
17  damage -- can that lead to non-Hodgkin's lymphoma?
18  **A.  Of course.  It's one of the mechanisms**
19  **by which this disease develops.**

Page 268

21  Q.  Okay.  And then one last question.
22  Can you pull out Exhibit 12, please,
23  which is the Cancer Treatment Centers of America
24  document.
25  **A.  Sorry.  That's -- here it is.  I have**

Page 269

1  **it.**
2  Q.  Okay.
3  **A.  Yeah.**
4  Q.  You got it.
5  You -- if you look at the -- well, it's
6  the first full paragraph, but the paragraphs are
7  duplicative.
8  **A.  Sure.**
9  Q.  If you look at the last sentence,
10  there's a statement there, For instance, exposure
11  to certain chemicals such as pesticides may
12  increase your risk but research is inconclusive
13  and ongoing.
14  Do you see that sentence?
15  **A.  I do.**
16  Q.  And do you remember being asked whether
17  or not you agreed with that sentence?
18  **A.  I remember that, yes.**
19  Q.  Okay.  And I believe you stated that you
20  agreed with that sentence.
21  Do you recall that testimony?
22  **A.  Yes.**
23  Q.  And why did you make that statement?
24  **A.  Well, again, I mean, I think it's --**
25  **it's a well known fact that pesticides may**

68  (Pages 266 to 269)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018



Page 270

1　increase the risk.  And the research is
2　inconclusive because we don't know if all
3　pesticides cause non-Hodgkin lymphoma.  I don't
4　think that statement was meant specifically for
5　Roundup where the research is very clear and the
6　evidence is very clear.  I think they're talking
7　about pesticides in general.  And there are so
8　many other pesticides.  Some of them may be
9　implicated, others may not be.  So that's why I
10　believe they're saying the research is
11　inconclusive, because they're using this general
12　category of pesticides.
13　　　　Q.  Okay.  I do have one other question.
14　　　　Turning back again to your exam of
15　her -- or the document on Exhibit 3, I believe it
16　is.
17　　　　A.  Yes.
18　　　　Q.  Can you turn to the second page, please,
19　and to the second bullet point from the bottom.
20　　　　A.  Okay.
21　　　　Q.
23　It was used in what looks like 3 city lots;
24　garage, swimming pool area, flowers, etc, etc"?
25　　　　Do you see that?

Page 272

1　　　　Q.  You said -- I guess the third bullet
2　point down you said,
5　　　　Do you see that?
6　　　　A.

Page 271

1　　　　A.  Yes.
2　　　　Q.
6　　　　MR. LEVINE:  Objection.
12　BY MS. FORGIE:
18　　　　MS. FORGIE:  Okay.  That's it.  Thank you.
19　　　　MR. LEVINE:  Doctor Nabhan, just a couple --
20　couple quick questions.
21　　　　FURTHER EXAMINATION
22　BY MR. LEVINE:
23　　　　Q.  On the last page of your notes, Exhibit
24　3, yeah.
25　　　　A.  Okay.

Page 273

4　　　　MR. LEVINE:  Okay.  No further questions.
5　　　　MS. FORGIE:  All right.  Thank you.
6　　　　MR. LEVINE:  Thanks.
7　　　　THE VIDEOGRAPHER:  This concludes the
8　deposition of Dr. Chadi Nabhan.  We're off the
9　record at 4:29 p.m.
10　　　　THE COURT REPORTER:  Is signature waived or
11　reserved?
12　　　　(Discussion off the record.)
13　　　　MS. FORGIE:  We can waive.
14　　　　(Discussion off the record.)
15　　　　FURTHER DEPONENT SAITH NOT
16
17
18
19
20
21
22
23
24
25

69　(Pages 270 to 273)

Chadi Nabhan, MD, MBA, FACP
November 15, 2018

Page 274

1    STATE OF ILLINOIS )
          ) SS:
2    COUNTY OF C O O K )
3         I, KIMBERLY WINKLER CHRISTOPHER, a
4    Certified Shorthand Reporter of the State of
5    Illinois, do hereby certify:
6         That previous to the commencement of the
7    examination of the witness, the witness was duly
8    sworn to testify the whole truth concerning the
9    matters herein;
10        That the foregoing deposition transcript
11   was reported stenographically by me, was
12   thereafter reduced to typewriting under my
13   personal direction and constitutes a true record
14   of the testimony given and the proceedings had;
15        That the said deposition was taken
16   before me at the time and place specified;
17        That I am not a relative or employee or
18   attorney or counsel, nor a relative or employee of
19   such attorney or counsel for any of the parties
20   hereto, nor interested directly or indirectly in
21   the outcome of this action.
22
23
24
25

Page 275

1         IN WITNESS WHEREOF, I do hereunto set my
2    hand this 19th day of November, 2018.
3
4
5    _____
6    C.S.R. Certificate No. 084-002752
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

70  (Pages 274 to 275)