# EXHIBIT 23

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

```
RONALD PETERSON and JEFF      )
HALL,                         )
                              )
            Plaintiffs,       )
                              )
      vs.                     )   No. 1622-CC01071
                              )
MONSANTO COMPANY; OSBORN &    )
BARR COMMUNICATIONS, INC.;    )
OSBORN & BARR HOLDINGS,       )
INC.,                         )
                              )
            Defendants.       )
```

Videotaped deposition of CHADI
NABHAN, M.D., called as a witness herein,
pursuant to the applicable provisions of the
Federal Rules of Procedure governing the taking
of depositions, taken before Karen Shales CSR
No. 84-004177, RPR, on Wednesday, June 6, 2018,
at 10:30 a.m., at 9300 Bryn Mawr Avenue,
Rosemont, Illinois.

Chadi Nabhan, M.D.
June 6, 2018

## Page 2

```
 1    PRESENT:
 2        THE MILLER FIRM, LLC, by
          MR. TAYJES SHAH,
 3        108 Railroad Avenue,
          Orange, Virginia 22960
 4        (540) 672-4224
          tshah@millerfirmllc.com
 5            Appeared on behalf of Plaintiffs;
 6        HOLLINGSWORTH, LLP, by
          MR. DONALD W. FOWLER and
 7        MS. HILARY E. JOHNSON,
          1350 I Street, N.W.,
 8        Washington, DC  20005
          (202) 898-5800
 9        dfowler@hollingsworthllp.com
          hjohnson@hollingsworthllp.com
10            Appeared on behalf of Monsanto Company;
11        WINSTON & STRAWN, LLP, by
          MR. BRYCE A. COOPER,
12        35 West Wacker Drive
          Chicago, Illinois  60601-9703
13        (312) 558-3737
          bcooper@winston.com
14            Appeared on behalf of Monsanto Company;
15        ARMSTRONG TEASDALE LLP, by
          MS. JENNIFER E. HOEKEL,
16        7700 Forsyth Boulevard, Suite 1800
          St. Louis, Missouri  63105
17        (314) 621-5070
          jhoekel@armstrongteasdale.com
18            Appeared on behalf of Osborn & Barr
              Communications, Inc., and Osborn & Barr
19            Holdings, Inc.
20
          Also Present:  Mr. Jeremy Mangan -
21                        Videographer
22
23                --- 
24
25
```

## Page 3

```
 1                I N D E X
 2    WITNESS
 3    CHADI NABHAN, M.D.
 4    EXAMINATION BY:            Page  Line
 5    MR. FOWLER.............................  5    6
      MS. HOEKEL......................... 167    4
 6    MR. FOWLER......................... 172   16
      MR. SHAH.............................. 175    4
 7
 8    EXHIBITS:
 9    NABHAN
10    No. 1   Notice of Deposition..........  6    3
      No. 2   Invoices......................  9   22
11    No. 3   Reliance List.................  16   21
      No. 4   E-Mail......................... 19    7
12    No. 5   Expert Disclosures..........  26   20
      No. 6   Prager Medical Records........  49    5
13    No. 7   Brune Medical Records.........  49   15
      No. 8   Zalduendo Medical Records....  67   19
14    No. 9   Lizer Medical Records.........  68    1
      No. 10  Answers to Interrogatories....  81   22
15    No. 11  9/11 Howard Paper............ 122   11
      No. 12  Berrington Paper............. 125   12
16    No. 13  Land Paper................... 128    3
      No. 14  MDL/Daubert Hearing Excerpt... 136   15
17    No. 15  Wheeler Paper............... 143   14
      No. 16  Weisenburger Paper........... 146   13
18
19
20
21
22
23
24
25
```

## Page 4

```
 1            THE VIDEOGRAPHER:  We are now on the
 2    record.  This is the video deposition of
 3    Dr. Chadi Nabhan.  Today's date is June 6, 2018,
 4    and the time is now 10:32 a.m.  This is the case
 5    of Ronald Peterson and Jeff Hall vs. Monsanto
 6    Company, Inc., Case No. 1622-CC01071.  This case
 7    is pending in the Circuit Court of the City of
 8    St. Louis, State of Missouri.
 9            Will attorneys please identify
10    themselves.
11            MR. FOWLER:  Donald Fowler for
12    defendant Monsanto.
13            MS. JOHNSON:  Hilary Johnson for
14    defendant Monsanto.
15            MR. COOPER:  Bryce Cooper for
16    defendant Monsanto.
17            MS. HOEKEL:  Jennifer Hoekel for
18    defendants Osborn & Barr.
19            MR. SHAH:  Tayjes Shah on behalf of
20    plaintiffs.
21            THE VIDEOGRAPHER:  Will the court
22    reporter please swear in the witness.
23            (Witness sworn.)
24
25
```

## Page 5

```
 1            CHADI NABHAN, M.D.,
 2    called as a witness herein, having been first
 3    duly sworn, was examined and testified as
 4    follows:
 5            [EXAMINATION]
 6    QUESTIONS BY MR. FOWLER:
 7        Q.  Dr. Nabhan, good morning.
 8        A.  Good morning.
 9        Q.  When you and I last spoke, I think it
10    was a couple of months ago in March, you
11    testified that you were with Cardinal Health and
12    had not seen any patients then for roughly 18
13    months.
14            Is that -- is that a fair
15    recollection of our conversation?
16        A.  Yes.
17        Q.  Okay.  Have you seen patients since
18    that time?
19        A.  In clinic, no.
20        Q.  Okay.  And do you still not have
21    hospital privileges currently?
22        A.  I don't, yes, correct.
23            MR. FOWLER:  Okay.  Let's introduce
24    as the first exhibit the notice of deposition for
25    today's deposition.
```

Chadi Nabhan, M.D.
June 6, 2018

Page 6

1          If you can mark that as Exhibit 1,
2    that would be great.
3          (Nabhan Exhibit No. 1 marked.)
4    BY MR. FOWLER:
5      Q.   Dr. Nabhan, what I've handed you as
6    Exhibit 1 is the notice of deposition of today's
7    deposition.
8          Have you seen that before?
9      A.   I have.
10     Q.   Okay.  And you'll note that attached
11   at page 4 of the document there is labeled
12   attachment a series of document requests.
13         Do you see that?
14     A.   I do.
15     Q.   And do you have today any documents
16   with you that respond to the 14 requests on
17   pages 4 and 5?
18     A.   I believe these all have been
19   produced and provided to you.
20     Q.   Is it your testimony then there are
21   no other documents response -- that you have that
22   are responsive to any of these requests?
23     A.   Nothing more than what counsel has
24   provided you before.
25     Q.   Okay.

Page 7

1      A.   It may be that the curriculum vitae
2    has been updated for a few papers.  I'm not sure
3    which is the last version you have, but nothing
4    more.
5      Q.   All right.  Well, let's -- let's
6    quickly run through.
7          We have received in the last ten days
8    and again last night and again this morning
9    documents that I will show you that list of
10   materials relied upon.
11         Have you -- were you -- have you seen
12   those lists that were provided to us?
13     A.   I presume it's enclosed here.  I'm
14   not sure what --
15     Q.   I will attach it as an exhibit in a
16   moment.
17     A.   Sure.
18     Q.   I'm just wondering whether those
19   lists have been cleared with you before they were
20   sent to us.
21     A.   I'm pretty sure they have been.  I
22   just don't know exactly what are the ones that
23   were sent to you yesterday or this morning.

Page 8

15     Q.   Or any other topic?
16     A.   Or any other topic.
17     Q.   Okay.  Paragraph 11 asks for all
18   communications you've had with the Avaaz
19   Foundation or James Mills regarding various
20   topics.
21         Have you had any such communications?
22     A.   I have not.
23     Q.   Paragraph 12 refers to communications
24   with any employee of various organizations
25   concerning the same series of topics.

Page 9

1          Have you had any such communications?
2      A.   I have not.
3      Q.   Excuse me.  Paragraph 14 asks for a
4    list of all organizations with which you have
5    entered into consulting agreements within the
6    past ten years to the extent not protected from
7    disclosure by work product or protective
8    agreement.
9          Have you provided those to us?
10     A.   I don't have any of these.  I don't
11   have any -- any such documents that fulfill what
12   you're asking for.
13     Q.   You have not entered into consulting
14   agreements within the last ten years?
15     A.   Not to the extent that you're asking
16   about.
17     Q.   Okay.  This morning -- actually,
18   literally about 20 minutes ago, half an hour ago
19   we were sent copies of invoices.
20         I'm going to ask the court reporter
21   to mark this as Exhibit 2.
22         (Nabhan Exhibit No. 2 marked.)
23         MR. FOWLER:  And I'll give you a copy
24   of this in a moment.
25

3 (Pages 6 to 9)

Chadi Nabhan, M.D.
June 6, 2018

Page 10

1  BY MR. FOWLER:
2      Q.   And actually, the -- the document
3  that was sent to us actually had four pages, but
4  we had trouble printing it.
5           The fourth page was a copy of a check
6  like the one that is the third page here in the
7  amount of $1,650, which I take it corresponds to
8  your invoice for the work you've done on Jeff
9  Hall; is that correct?
10     **A.   Up until that time.  I did additional**
11  **work since then that I have not billed for it.**
12     Q.   Okay.  Do you maintain time records?
13     **A.   I do.**
14     Q.   Okay.  And do you have such time
15  records with respect to Jeff Hall?
16     **A.   Since that time?**
17     Q.   Since that date?
18     **A.   Of course I do.**
19     Q.   Okay.  And could you produce those to
20  us?  Do you have them?
21     **A.   I have them in my phone.  Do I -- I**
22  **mean, do you want me to -- how do I do this?**
23     Q.   I would -- well, you can --
24     **A.   You mean --**
25     Q.   -- e-mail it to your attorney, you

Page 11

1  could e-mail it to me or you can e-mail it to me
2  right now.  We would like to see it for the
3  deposition.
4      **A.   The time that I have not billed for?**
5      Q.   Correct.
6      **A.   Okay.  Do I take -- do I --**
7           MR. SHAH:  You can send it to me and
8  I'll take care of it and send it to counsel.
9  BY THE WITNESS:
10     **A.   Well, how would I do this?  I was**
11  **going to add what I did today.  Should I do this**
12  **later on today or excluding today?**
13  BY MR. FOWLER:
14     Q.   If by that you mean the deposition
15  time, you can exclude that.
16     **A.   Okay.  All right.  I'll text it to**
17  **you.**
18     Q.   Okay.  Now, what we marked as
19  Exhibit 2 appears to be mostly concerned with
20  things other than Jeff Hall.  That is, I see
21  Daubert-related work.  I see Dewayne Johnson
22  time.  And then on the second page there is an
23  entry for Jeff Hall.
24           Do you see that?
25     **A.   The 1650?**

Page 12

1      Q.   Yes.
2      **A.   Yes, that's correct.**
3      Q.   And that's current as of what date?
4  Actually, let me short-circuit this.
5           I see a March 13, 2018 date.  Is that
6  the date of the work or is that the date of the
7  bill?
8      **A.   Everything that -- I bill for my**
9  **services -- I do this quarterly, in general every**
10  **three or four months.  So I have not billed for**
11  **any services for Jeff Hall since May, so what the**
12  **counsel will send you is May through today.**
13     Q.   Okay.  Just to be clear --
14     **A.   Prior to May, all I've done for Jeff**
15  **Hall is those three hours that I billed for.**
16     Q.   Okay.  And the -- if you look at
17  page 2 of Exhibit 2, it's the second page.  They
18  are not numbered that way, I don't think.
19  Actually, they are.
20           I see a date in the upper left,
21  March 13, 2018.  Is that the date on which you
22  did the work or is that the date on which you
23  billed counsel?
24     **A.   If you just give me two seconds, I**
25  **will give you that exactly.**

Page 13

1      **That is the date of the work.**
2      Q.   March 13th?
3      **A.   Right.**
4      Q.   Okay.
5           MR. FOWLER:  Do you have my e-mail
6  address?
7           MR. SHAH:  Let me take it down.
8           MR. FOWLER:  All right.  Why don't
9  you go off the record for a second.
10          THE VIDEOGRAPHER:  Off the record
11  10:42 a.m.
12          (Discussion had off the record.)
13          THE VIDEOGRAPHER:  Going on the
14  record.  The time is 10:47 a.m.
15  BY MR. FOWLER:
16     Q.   Dr. Nabhan, during the break we were
17  having some technical difficulties getting your
18  time, so you have kindly handed me your phone
19  which has your time records on it for Jeff Hall.
20          If I'm understanding this correctly,
21  on May 4, 2018, you had a conference call with
22  Tim.  I assume that's Mr. Litzenburg, the lawyer?
23     **A.   That's correct.**
24     Q.   On the 28th you spent three hours
25  reviewing Hall records.  Is that medical records?

4 (Pages 10 to 13)

Chadi Nabhan, M.D.
June 6, 2018

Page 14

1      A.   Yes.
2      Q.   The 29th, another three hours
3  reviewing the Hall deposition.  Is that the
4  deposition that was taken in this case?
5      A.   Yes, the patient's deposition.
6      Q.   Of Mr. Hall?
7      A.   Yes.

11      Q.   The 31st, conference call with Tim.
12  Again, that's Mr. Litzenburg, I take it?
13      A.   Correct.
14      Q.   That's for half an hour.
15           On June 4, which is Monday, reading
16  Sawyer, three hours.  What's that?
17      A.   It's the toxicology report that
18  Dr. Sawyer provided.
19      Q.   Now, is that -- is that report --
20           I'm going to direct this to you,
21  Mr. Shah.  Is that the report that was provided
22  to us last week, late last week?
23           MR. SHAH:  Correct.
24  BY MR. FOWLER:
25      Q.   Okay.  It's a roughly 150-page

Page 15

1  document; is that correct?
2      A.   It is.  I mean, I did not read it
3  word by word, but I did my best.
4      Q.   I just want to make sure we know what
5  the document is.
6      A.   It was a very comprehensive report.
7      Q.   June 5, which would be yesterday --
8      A.   Yes.
9      Q.   -- you met TJ, lawyer, for half an
10  hour.  I assume that's Mr. Shah sitting there
11  next to you?
12      A.   Correct.

17      Q.   And then also with no time entry, but
18  there's a meeting with TJ and deposition -- oh,
19  that's dated today, so that's the time you will
20  be entering; is that correct?
21      A.   Correct.
22      Q.   Okay.  So is that time -- and I'm
23  going to request that -- because I've not gotten
24  it on my cell phone, I'm going to request that a
25  copy of this be printed out and provided to us.

Page 16

1      Is that plus the three hours that was
2  reflected on the invoice that we saw earlier as
3  the totality of the work that you have done in
4  connection with Mr. Hall's case?
5      A.   This is what I captured.  I try to
6  put -- usually when I capture my time, I do my
7  best in describing what I do.  Oftentimes if I'm
8  reading the medical records and I need to go back
9  to the literature and look up something, I do
10  that, but I may not say I reviewed literature.  I
11  just put in a general description.
12      But pretty much this is the time I've
13  spent so far on Jeff Hall's case the best of my
14  ability to capture what I did.
15      MR. FOWLER:  Okay.  All right.  Can I
16  have the reliance list that was provided to us.
17      I'm going to ask the reporter to mark
18  this package as Exhibit 4, is it?  I've lost
19  track.  3.  Do you have that?
20      MR. SHAH:  I do.
21      (Nabhan Exhibit No. 3 marked.)
22  BY MR. FOWLER:
23      Q.   And I'll represent to you,
24  Dr. Nabhan, that what I've handed you as
25  Exhibit 3 is an e-mail message that was sent to

Page 17

1  us and a number of other folks from Jeffrey
2  Travers, who's identified as being with
3  Mr. Shah's law firm, which -- technically which
4  says please find reliance list for Dr. Nabhan and
5  Dr. Sawyer.  You can ignore Dr. Sawyer for the
6  moment.
7      And then behind that there were
8  copies of each of the documents that was attached
9  to that e-mail message, do you see that, the
10  first of which was report --
11      A.   I'm sorry.  I can't see the document.
12  Where is it?
13      Q.   The rest of the documents that I
14  handed to you --
15      A.   No problem.
16      Q.   We don't have a stapler to put them
17  all together.  The first of which is the expert
18  report submitted by you in the Northern District
19  of California in the MDL proceeding back in
20  April.
21      The second of which is a supplemental
22  report likewise submitted by you in the MDL at a
23  later date.  I don't have -- I don't see the date
24  on the document.
25      Third of which is a supplemental

5  (Pages 14 to 17)

Chadi Nabhan, M.D.
June 6, 2018

Page 18

1   reliance list which is dated 2/23/2018 from the
2   Daubert MDL proceeding.
3           And then last of which is a third
4   supplemental reliance list of Dr. Nabhan dated
5   May 25, 2018?
6       A.  I can't see the last one.
7       Q.  One more.  There you go.
8       A.  I see.
9       Q.  It's that one.
10      A.  Okay.
11      Q.  The first three documents that are
12  listed on the reliance list are from the MDL
13  proceeding, correct?
14      A.  Correct.
15      Q.  Okay.
16      A.  Except my CV is much older.
17      Q.  But this is what was submitted in the
18  MDL proceeding?
19      A.  Yes, yes.
20      Q.  Okay.  The third supplemental
21  reliance list appears to contain a listing of
22  medical records; is that correct?
23      A.  Looks like it, yes.
24      Q.  Okay.  And these are -- are these the
25  medical records that you reviewed and relied on

Page 19

1   in forming your opinions --
2       A.  Yes.
3       Q.  -- in this case?
4           And then last evening I received
5   another e-mail from your counsel, and I'll ask
6   the court reporter to mark this one as Exhibit 4.
7           (Nabhan Exhibit No. 4 marked.)
8           THE WITNESS:  Thank you.
9   BY MR. FOWLER:
10      Q.  And again, we're printing that on the
11  fly this morning so we don't have it stapled.



20          And, again, the Dr. Sawyer report is
21  the one we just talked about, the 150-page
22  document; is that correct?
23      A.  Correct.

Page 20

13      Q.  And with Exhibit -- between Exhibit 3
14  and Exhibit 4, is that the entirety of the
15  materials that you have relied on in forming your
16  opinions in this case?
17      A.  I mean, of course I had -- I reviewed
18  the original epidemiology studies and so forth,
19  but yes.
20      Q.  But those are listed in your MDL
21  documents --
22      A.  Yes.
23      Q.  -- correct?
24      A.  Correct.
25      Q.  Okay.  You haven't done any

Page 21

1   additional work on the underlying epidemiological
2   literature in addition to the work that you did
3   in connection with the MDL, have you?
4       A.  I have done additional research and I
5   think there were additional papers that were
6   produced to you, but they may not be pertinent to
7   this particular case.
8       Q.  And what papers are those?
9       A.  These were the papers that --
10  epidemiology and association between farmer's
11  work and occupational exposure and development of
12  mycosis fungoides.
13      Q.  Those -- were those papers that
14  were -- that you reviewed in connection with the
15  Hall case?
16      A.  No, no, not in connection.  It's just
17  something -- I mean, over the past couple of
18  months as I'm -- when I review -- you asked me
19  what I relied on in general.  This is not for the
20  Jeff Hall case, no, but these are additional
21  items of literature that I came across over the
22  past couple of months, but they're not pertinent
23  to this particular case.
24      Q.  Okay.  I'll come back to that in a
25  second, if we can.

6 (Pages 18 to 21)

Chadi Nabhan, M.D.
June 6, 2018



Page 22

Page 23

Page 24

Page 25

22    Q.   Well, if I might interrupt you, my
23  question really is narrower than that.
24    A.   That's why I wanted to know.

7 (Pages 22 to 25)

Chadi Nabhan, M.D.
June 6, 2018



Page 26

16      MR. FOWLER: Okay. Do you have the
17  expert disclosures?
18      If we can mark this document as the
19  next in sequence, please.
20      (Nabhan Exhibit No. 5 marked.)
21  BY MR. FOWLER:
22      Q.  And, Dr. Nabhan, I ask you to take a
23  look at what's been marked as Exhibit 5 and ask
24  if you have seen that document before?
25      **A.  I have.**

Page 27

1       Q.  And you'll notice that the very first
2   expert witness described here is you, correct?
3       **A.  Yes.**
4       Q.  And if you'll turn to the second page
5   of the document, the first full paragraph on that
6   page lists some things that you are expected to
7   testify about.
8       Do you see that?
9       **A.  I do.**

Page 28

7       Q.  Okay.  Now, this document was
8   completed and provided to us on March 1, 2018,
9   which is reflected on the certificate of service
10  on the very last page.
11      **A.  Sure.**

Page 29

12      MR. SHAH:  Objection --
13  BY THE WITNESS:
14      **A.  No, that is not what I said,**
15  **actually.**
16      MR. SHAH:  -- asked and answered.
17  BY THE WITNESS:
18      **A.  That is exactly -- that is totally**
19  **not what I said.**
20  BY MR. FOWLER:
21      Q.  Well --

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Page 30

23
24
25
        MR. SHAH:  Object to form, asked and
answered.

Page 31

Page 32

Page 33

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Page 34

2
3      MR. FOWLER:  All right.  To the
       extent, counsel, that he's going to be asked to
4      express opinions about the particular costs that
5      have been incurred at any point in this case up
6      until trial, we're going to want to have him back
7      for another deposition.
8      BY MR. FOWLER:

Page 36

Page 35

Page 37

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Page 42

Page 44

Page 43

MR. SHAH:  Object to form and
foundation.

Page 45

MR. SHAH:  Object to form,
foundation.

MR. SHAH:  Objection to form,
foundation.

12 (Pages 42 to 45)

Chadi Nabhan, M.D.
June 6, 2018



13 (Pages 46 to 49)

Chadi Nabhan, M.D.
June 6, 2018



14 (Pages 50 to 53)

Chadi Nabhan, M.D.
June 6, 2018



Chadi Nabhan, M.D.
June 6, 2018



Page 58

18    MR. SHAH:  Objection to form and
19  foundation.

Page 59

Page 60

Page 61

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Page 62

17          MR. SHAH:  Object to form and
18    foundation.

Page 63

15          MR. SHAH:  Object to form,
16    foundation.

Page 64

Page 65

17 (Pages 62 to 65)

Chadi Nabhan, M.D.
June 6, 2018



Page 66

Page 67

6      MR. FOWLER: Why don't we take about
7  a five-minute break if that's all right with you.
8      THE VIDEOGRAPHER: Going off the
9  record at 11:53 a.m.
10      (Break taken.)
11      THE VIDEOGRAPHER: Going on the
12  record. This marks the beginning of media No. 2.
13  The time is now 12:01 p.m.

19      (Nabhan Exhibit No. 8 marked.)
20  BY MR. FOWLER:

Page 68

1      (Nabhan Exhibit No. 9 marked.)

Page 69

Chadi Nabhan, M.D.
June 6, 2018



Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



**Page 74**

5    Q.   Okay.  Now, I know we have a somewhat
6   older version of your CV, but there are a great
7   many publications on your CV concerning
8   follicular lymphoma, correct?
9       A.   I'm sorry.  Can you rephrase?
10       Q.   Yeah.  You have a number of
11   publications listed on your CV addressing
12   follicular lymphoma, correct?
13       A.   Yes.
14       Q.   But none of those articles relate to
15   cause of follicular lymphoma, do they?
16       A.   Not necessarily cause.  I don't
17   recall.
18       Q.   I was going to -- it's fair to say
19   they're disease characteristics, treatment
20   options, disparities in treatment, treatment
21   outcomes, that kind of thing, correct?
22       A.   Yes.  I believe -- again, and there's
23   been probably at least 10 or 12 papers since --
24   the CV that you have is much older, as you said,
25   along the same lines, toxicities of therapy,

**Page 75**

1   disease patterns, treatment patterns, elderly
2   versus younger and so forth.  And I'll forward to
3   counsel the newest CV to send to you.  But I have
4   not addressed in my research causes of the
5   disease.
6       Q.   Okay.  And you do agree, correct,
7   that glyphosate or Roundup does not cause every
8   case of follicular lymphoma, right?
9       A.   It does not.
10       Q.   And you would agree as well that
11   there are many patients with follicular lymphoma
12   for whom you have no idea what the cause is,
13   correct?
14       A.   The majority we don't.
15       Q.   And not even patients with follicular
16   lymphoma have been significantly exposed to
17   glyphosate, correct?
18       A.   Not every patient with follicular
19   lymphoma is significantly -- yeah, as I said,
20   there are many patients with follicular lymphoma
21   who have absolutely no identifiable risk factors.
22   There are some who do.
23          So I think we try our best,
24   especially in younger patients to -- who usually
25   you don't see the disease in at this age to

**Page 76**

1   investigate and explore if there are any reasons
2   why somebody develops the disease.

**Page 77**

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Page 78

Page 80

Page 79

6    Q.   I'm just trying to understand your
7    thought process.
8        Your review of Dr. Sawyer's -- or is
9    it Mr. Sawyer?  I can't recall now.
10   A.   He's a Ph.D., so do doctor.

Page 81

1            MR. FOWLER:  Do you have the
2    interrogatory answers?
3    BY MR. FOWLER:

17           MR. FOWLER:  Let's mark as Exhibit --
18   is it 10?
19           THE WITNESS:  Maybe 9 -- no, 10.
20           MR. FOWLER:  The court reporter never
21   makes a mistake on that.
22           (Nabhan Exhibit No. 10 marked.)
23   BY MR. FOWLER:
24   Q.   That's a document entitled Jeff
25   Hall's Response to Defendant Monsanto Company's

21  (Pages 78 to 81)

Chadi Nabhan, M.D.
June 6, 2018



Page 82

1    First Set of Interrogatories.
2        So you see that on the first page?
3    **A.  Yes, I do.**
4    Q.   Okay.  And if you go to the last
5    page, you'll see that these were provided --
6    these answers were provided to us at the end of
7    April?
8    **A.  Page 15?  Page 14?**
9    Q.   Yes.  Certificate of service,
10   page 15, April 26, 2018?
11   **A.  Yes.**
12   Q.   Okay.  If you look on page 7,
13   paragraph 6 at the top?
14   **A.  Yes.**

Page 83

10   Q.   Okay.  Well, let's go to the next one
11   then, No. 7.
12   **A.  Okay.**

Page 84

Page 85

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Page 86

Page 87

```
 4        Q.   And what is the threshold that you
 5   think the literature establishes for the
 6   increasing to a meaningful risk -- what is the
 7   threshold of glyphosate use that raises the risk
 8   to above a significant level?
 9        MR. SHAH:  Object to form,
10   foundation.
11   BY THE WITNESS:
12        A.   Do I answer?
13   BY MR. FOWLER:
14        Q.   Yes.
15        A.   It depends on the study that you
16   actually read and study, but I think having more
17   than two days exposure per year is -- again,
18   is -- having more than two days exposure, it
19   significantly increases the risk.
20        Q.   And two days of exposure under what
21   circumstances or does that matter in your view?
22        A.   What do you mean by circumstances?
23        Q.   Well, let's say, for example, the
24   manner in which the Roundup is applied.
25        A.   I'm not sure the studies necessarily
```

Page 88

```
 1   differentiate the manner which it was applied,
 2   per se.  But I think he did not -- when I talked
 3   to him, he said he did not use a backpack.  He
 4   used -- he did not use a backpack and he has some
 5   mist also coming to him and so forth.
 6        But I don't believe the studies that
 7   we looked at and we discussed previously, me and
 8   you, looked specifically at the manner of
 9   application, per se, to my knowledge.
10        Q.   You would agree, would you not, that
11   the manner -- excuse me, that the key determinate
12   would be actual physical contact with the
13   Roundup, correct?
14        MR. SHAH:  Object to form.
15   BY THE WITNESS:
16        A.   It's -- again, the studies did not
17   really look at these manners, per se.  I mean,
18   the studies that I'm describing and we've
19   discussed previously did not look -- did not go
20   back and look at the manner of actual
21   application.
22        They really look -- again, these were
23   case controlled studies and they looked at
24   exposure versus no exposure.  I don't believe
25   they went back and looked at the manner of
```

Page 89

```
 1   exposure.
 2        Q.   Well, let's step back to basic
 3   principle.  For the chemical to have an effect,
 4   it has to come into contact with the individual
 5   in some fashion, correct?
 6        A.   In some fashion.  It could be
 7   sometimes -- again, it could be exposure to the
 8   mist of it.  It could be exposure to the skin.
 9   It could be -- again, that's what I mean.  We
10   really don't know the manner by which these
11   studies establish the association and the
12   causation.
```

```
22        What I'm saying is I don't know what
23   the details of how you deal with it.  Is it
24   really just mixing it?  Is it just mixing it and
25   then spraying it?  When you spray it, is it
```

23 (Pages 86 to 89)

Chadi Nabhan, M.D.
June 6, 2018



Page 90

1　really exposure to the skin or just inhaling some
2　of the mist that might actually come in windy
3　days?
4　　　　This is what I mean by the manners
5　that have not been really clearly elucidated in
6　the epidemiological studies we're talking about.
7　　　Q.　Let me perhaps come at it a different
8　way.
9　　　　　Is it your testimony then that anyone
10　who uses Roundup for more than two days is at now
11　significantly increased risk of non-Hodgkin's
12　lymphoma?
13　　　A.　I think there is a significantly
14　increased risk of developing the disease with
15　continued exposure, with continued exposure to
16　the offending chemical at a minimum threshold of
17　these two days.  And you continue to actually be
18　exposed to it, so whatever problems that could
19　occur on the cellular level, you are continuing
20　to cause these problems repeatedly, so you are
21　definitely going to be at increased risk.
22　　　　　You know, it's -- it's -- you know, I
23　always try to bring it back to tobacco use or
24　smoking.  I mean, again, I'm not sure really
25　there's an actual minimum threshold sometimes

Page 91

1　with tobacco use, but the more exposure and the
2　more smoking, it's going to increase risk of
3　particular cancers.

Page 92

Page 93

21　　　　MR. SHAH:  Objection to form.
22　BY THE WITNESS:

25　BY THE WITNESS:

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



Page 94

16          MR. SHAH:  Object to form.

23      BY MR. FOWLER:
24          Q.   Now, you said that Dr. Sawyer's work
25      had, I forget the word you used, solidified or

Page 95

1      made you feel more confident in your opinion.
2              In what respect is that so?  What did
3      you see in his report that confirmed your
4      opinions?
5          A.   Yeah.  I mean, he did way more
6      detailed toxicology assessment.  I'm not a
7      toxicologist, so I don't -- again, I can't
8      pretend to be one, but what I looked at was one
9      of the ways he calculated the number of hours was
10      very similar to the way I looked at the number of
11      hours, which is looking at the number of hours
12      that you believe the person or the patient has
13      been exposed to by the number of hours you're
14      spraying by the number of years and so forth,
15      which was very similar looking at the exposure
16      days, if you will.
17              And that was very similar calculation
18      to what I did, so that was reassuring to see
19      that.  But I did not really go into the detail of
20      what he did further in terms of the actual doses
21      and the doses of exposure.
22          Q.   Okay.  So, again, I'm --
23          A.   I'll show -- if you have the
24      deposition, I'll show you which is the part that
25      I thought was very similar to my calculation.

Page 96

1          Q.   All right.  I do not have it here.  I
2      didn't know you looked at it until this morning
3      or last night rather.
4          A.   Sawyer I looked at a couple of days
5      ago.
6          Q.   I know.  I didn't know until last
7      night that you looked at it so I don't have it
8      here with me.
9          A.   Okay.
10          Q.   Now, you said that Mr. Sawyer's or
11      Dr. Sawyer's calculation confirmed or at least
12      was consistent with the calculation that you had
13      done, but I thought you just told me the
14      calculation that you were talking about was one
15      you had done just now sitting right here at this
16      table?

Page 97

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018

Page 98



8    Q.   Okay.  And is that math reflected in
9  a document somewhere or did you actually sit down
10  and --

15    Q.   I guess what I'm struggling to get is
16  whether this is a -- really a subjective
17  assessment or whether there's a real mathematical
18  exercise that you undertook to get to your
19  conclusion.
20    A.   I mean, it starts at subjective.  I
21  mean, you know, when somebody is telling me this
22  is how much I exposed, and that's fine.  I mean,
23  it's similar when someone tells you I smoked 5
24  cigarettes a day for 15 years, you just have to
25  sit down and just think, well, how much really of

Page 99

1  that.
2    So, yeah, it was subjective at the
3  beginning and then I just tried to figure out
4  exactly what that really amounts in terms of
5  days, you know, because it just varies.  And like
6  I said, the only difference is the number of
7  hours.  But the math is -- in my view, if I can
8  do it, then it must be simple because it's just
9  number of hours by number of days by number of
10  years.
11    Q.   What factors do you consider to be
12  risk factors for follicular lymphoma other than
13  Roundup?
14    A.   Well, I mean, in non-Hodgkin lymphoma
15  in general, I think it's -- excuse me -- in
16  general, just kind of similar risk factors just
17  broadly, so you first look at infectious
18  etiologies.
19    So there are -- there is well-known
20  association between HIV, for example, and the
21  development of lymphoma.  There's known
22  association between other viruses such as HHV,
23  HTLV, EBV, Epstein-Barr virus.
24    There is also another infectious
25  etiology called Helicobacter pylori, H. pylori

Page 100

1  has been associated with the development of
2  particular lymphomas such as marginal zone
3  lymphomas specifically in the stomach.  So I
4  would, you know, put those in the category of
5  infectious etiology, per se.
6    I would also add anything that
7  suppresses the immune system.  So yes, HIV
8  suppresses the immune system, but there are other
9  things that suppress the immune system.
10    So patients who are receiving
11  immunosuppressive therapy after organ
12  transplantation, so if somebody had a kidney
13  transplant or a liver transplant or whatever it
14  is, they usually receive immunosuppressive
15  therapy to prevent rejection of the transplanted
16  organ.
17    So the immunosuppressive therapies
18  could lead to development of lymphoma.  And, in
19  fact, there's a well-known entity called PTLD,
20  post-transplantation lymphoproliferative
21  disorders.  Some patients will develop that.  Not
22  very common, but certainly common in solid organ
23  transplant.
24    In the same realm, patients with
25  autoimmune diseases, so lupus, rheumatid

Page 101

1  arthritis, Sjogren's syndrome, because they --
2  even if they're not receiving medication, there
3  is autoimmunities, so the immune system could be
4  also affected.  And these patients unfortunately
5  do have an increased risk of developing
6  non-Hodgkin lymphoma.  And I've seen that,
7  actually, in my practice a lot.
8    I think there is a familial history.
9  I'm not aware of a particular gene that gets
10  passed from parents to the offspring, but like in
11  any cancers, if there's a family member that is
12  diagnosed, the other family members are at an
13  increased risk.  That's really all you can say.
14  It's hard to quantify, but oftentimes it doesn't
15  necessarily mean there's an actual gene that is
16  passed.  It's just increased risk because of
17  familial predisposition.
18    I think we -- obviously we know that
19  farmers and pesticide applicators have -- are at
20  increased risk.  I think that's well known that
21  you see more in folks working in agriculture.  I
22  mean, these are the things that we probably know.
23    There's a little bit -- depending on
24  the disease, a little bit of male pre -- male --
25  males have non-Hodgkin lymphoma slightly more

26  (Pages 98 to 101)

Chadi Nabhan, M.D.
June 6, 2018



Page 102

1  than females.  Not clear why, but it's not really
2  by a huge difference.  So in general, these are
3  the things that we just think about when patients
4  have lymphomas.
5      Q.  Any other environmental risk factors
6  that you're aware of?
7      A.  I mean, I'm not aware -- for example,
8  I mean, the ones that come to mind always smoking
9  and alcohol, I mean, because they're associated
10  with other types of cancer, but I'm not aware
11  that there is literature that smoking increases
12  the risk of non-Hodgkin lymphoma or alcohol.
13  Maybe there is.  I have not really looked into
14  that.  But I'm not aware -- to my knowledge, when
15  I last reviewed the subject, I have not come
16  across anything that suggested alcohol or
17  tobacco, increased the risk of non-Hodgkin
18  lymphoma.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018



**Page 106**

**Page 107**

**Page 108**

15    Q.   We have water if you would like some.
16    A.   I don't know if it's water or this.
17    I don't believe -- I'm good.  Thank you.
18         I don't believe there is --
19    Q.   In case you change your mind.
20    A.   I don't believe there is consensus
21    among epidemiologists and researchers that
22    obesity by itself causes non-Hodgkin lymphoma.
23    Contrast this that there is nobody in the world
24    that's going to argue with you that smoking
25    causes lung cancer or causes -- or asbestos

**Page 109**

1    causes mesothelioma or et cetera.
2         So that's what I'm trying to say.  I
3    do believe it's possible that obesity -- if
4    somebody has a risk factor and they are obese,
5    then the risk now increases further because you
6    have an additional factor and so forth.
7         And the response might be different
8    to treatment because the metabolism of particular
9    chemotherapies that we give differ between
10   patients based on their body surface area and
11   based on their body mass index.
12    Q.   You would agree also, would you not,
13   that there is no consensus that glyphosate causes
14   NHL?
15    A.   As I said, glyphosate does not
16   cause -- does not -- I'm sorry, my grammar needs
17   to be corrected -- does not cause all cases of
18   non-Hodgkin lymphoma.  That's why each case has
19   to be assessed individually.  And that's why
20   whenever there's a particular person or a
21   particular patient, you have to look at the
22   exposure, at the risk factor, at their age.
23         I mean, if somebody -- if a disease
24   occurs at the median age of 70 and it happens in
25   somebody who is 45 to 47, you've got to think at

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018

Page 110

1    least why could this actually happen in this
2    young individual.  Why am I dealing with a
3    disease that's occurring 25 years younger than a
4    median age.
5           If somebody had a heart attack at the
6    age of 40 and they are not smoking and they don't
7    have high cholesterol or high blood pressure, you
8    have to look at other reasons, right?  I mean,
9    you're obligated to try to figure this out.
10   Sometimes you find a reason and sometimes you
11   don't.  The only reason you try to look for this
12   because can you really make any modification to
13   mitigate the risk factors.  That's really all.
14         Q.   Yeah, my question was slightly
15   different.
16         My question is, you would agree that
17   there is no consensus that glyphosate is capable
18   of causing NHL, correct?
19         A.   I don't agree with that.  I mean, I
20   think if you look at the IARC recommendations and
21   the IARC classification and the IARC that spent a
22   year looking at all of the evidence, they came up
23   with, again, category 2a that is probably
24   carcinogenic to humans.
25         So I think, you know, this is -- this

Page 111

1    is a well-respected organization that was charged
2    by looking at particular chemical or agents that
3    are used by the general population to try to
4    decipher whether they are carcinogenic or not.
5         Q.   Well, last time you and I were
6    together we went through at least eight other
7    authoritative organizations after IARC that
8    disagreed with IARC, correct?
9         A.   Yeah, there are other organizations
10   that disagree on it.  I see that.
11        Q.   So my question to you is, can you
12   fairly say that there is a consensus that IARC's
13   view is correct?
14        A.   There are other organizations that
15   might disagree with the IARC recommendations.  So
16   in your view, if there is disagreement with the
17   IARC represents lack of consensus, then there is
18   lack of consensus.
19        Q.   What is -- you used the term
20   "consensus" to begin with, so --
21        A.   Right.
22        Q.   -- what is your definition of the
23   term "consensus"?
24        A.   I think it's -- you know, it's
25   basically having the strongest piece of evidence

Page 112

1    that most people would agree on.  That in my
2    opinion is a consensus.  It's oftentimes very
3    difficult to get everyone to agree on everything,
4    but if at least investigators and researchers
5    agree that this is the strongest level of
6    evidence that represents a particular problem,
7    then there is a consensus among those folks.
8         To your earlier point, there are
9    other organizations that we reviewed last time we
10   were together that disagreed with these
11   recommendations and they said we don't
12   necessarily agree with the full recommendations.
13   So it's -- you know, I mean, you could look at
14   this and say some organizations agree, some
15   organizations disagree.  And if that is the
16   definition of lack of consensus, that's fine.
17        For me, I feel that the IARC
18   represents more of an international collaboration
19   and it's not really one -- again, it's really an
20   international collaboration and that's why I feel
21   it's really more consistent with what I describe
22   as consensus.  This is not one region, this is
23   not one area, this is not just one investigator.
24   These are a variety of investigators that
25   represent the international community, not just

Page 113

1    one -- you know, not the U.S. or France or
2    Australia.  And they spent a year looking at
3    things and they came up with this.
4         Q.   Let's see.  If you add in France,
5    Canada, the United States, Australia, New
6    Zealand, pretty much we've got the international
7    community represented, don't we?
8         A.   I'm not sure what --
9         Q.   I'm just having trouble understanding
10   your definition of IARC as international and the
11   consensus of all the other international bodies
12   not being so.
13        A.   So let me rephrase and make sure --
14   hopefully I can clarify.
15        In the medical community whenever
16   you're looking at a particular problem such as
17   whether it's -- again, whether we're looking at
18   this or the previous question that you asked
19   about obesity, it is not unusual to have two
20   sides of a panel that they may disagree or agree
21   on something.
22        So if the definition of us that the
23   consensus has to have 100 percent agreement among
24   all stakeholders of glyphosate causing
25   non-Hodgkin lymphoma, then you are correct, there

29 (Pages 110 to 113)



Page 114

1  is no consensus.
2        In my belief, the majority of people
3  would agree that glyphosate causes non-Hodgkin
4  lymphoma.  There is no 100 percent consensus, so
5  if you want 100 percent consensus, that doesn't
6  exist for anything, including glyphosate.
7        Q.   I guess -- my trouble, I guess, was
8  that the majority opinion is against the IARC
9  since the IARC is the only one of the
10  organizations internationally that have come to
11  that conclusion.  We went through that last time,
12  did we not?
13        MR. SHAH:  Object to form.
14  BY THE WITNESS:
15        A.   We did, and we did not agree.
16  BY MR. FOWLER:
17        Q.   Well, you didn't -- we didn't agree
18  on the merits.  I understand you agree with IARC,
19  but you cannot disagree that are more
20  international bodies that disagree with IARC than
21  agree with it, can you?
22        A.   I think there were -- you cited and
23  you showed me a lot of other bodies that
24  disagreed with this and I tried to explain why I
25  agree with the IARC more than the others.  So --

Page 116

17        Q.   I want to go and talk a little bit
18  about NHL and chronic exposure.  What do you
19  view -- consider to be the latency for NHL
20  following exposure -- chronic exposure to
21  Roundup?
22        A.   I think we've also talked about this
23  before.  It really varies.  I'm not -- this is
24  not necessarily Roundup or -- I mean, any time
25  you are exposed to something that may contribute

Page 115

1  and we can go through it again, but we've gone
2  through it.

Page 117

1  to the development of the disease later on, it
2  varies.  I'm 100 percent certain that there is no
3  consistency or, again, consensus -- we're using
4  this word a lot today -- in terms of what that
5  latency could be.
6        In general I would say, I mean, at
7  least in my mind I have to resolve two particular
8  parameters.  In general, that latency period is
9  shorter as the disease is more aggressive and is
10  a little bit longer as the disease is less
11  aggressive.  I mean, that's how in general I view
12  things.  But that varies.
13        There is -- there are reports of
14  latency period as early as six months for the
15  development of non-Hodgkin lymphoma and more than
16  ten years.  So I don't believe we really know
17  100 percent what the -- what the proper latency
18  period is, but it varies depending on the
19  disease.
20        Q.   Well, for non-Hodgkin's lymphoma,
21  what do you think the latency period is?
22        A.   Again, there are several publications
23  that I looked at several -- a couple months ago,
24  that again, the latency period really varies.
25  One of them was a World Trade Center publication

30 (Pages 114 to 117)

Chadi Nabhan, M.D.
June 6, 2018

Page 118

1 that again cites anywhere from 0.4 years to 20
2 years.
3         In my own experience, in my own
4 clinical experience, it's very difficult to
5 really rely on latency period to look
6 specifically at this causation because it does
7 vary.
8         And again, when you go back and look
9 at the literature, you will see that things also
10 vary in terms of exposure and development of
11 disease.  It could be early, less than a year.
12 It could be much later, more than ten years.  So
13 that's really the best I could answer this
14 question.
15     Q.   Well, you said that the latency in
16 your opinion varied according to the -- I don't
17 remember the word you used, seriousness or
18 aggressiveness of the disease?
19     A.   Sometimes.  I mean, I think if
20 you're, again, developing a very aggressive form
21 of disease or the disease behaving in an
22 aggressive manner and aggressive nature, you
23 would, I think, expect -- again, this is just --
24 this is more logic than science.  You would
25 expect the latency period is shorter just because

Page 119

1 it's just behaving more aggressively.
2         Now, obviously we can debate how
3 short is short and it's very difficult to really
4 tell.  It could be less than one year.  And you
5 know, sometimes when the disease is a little
6 more -- again, not as aggressive, maybe the
7 latency period could be two years, three years or
8 four years.  It's just very difficult to really
9 tell.
10         The best thing you could tell, you
11 could say it's a range.  And most of the epi
12 literature as well as some of the regulatory
13 authorities that try to look at this latency
14 question give a very broad range.  And I think
15 the fact that some of these ranges are from 0.4
16 to more than 10, 20 years should tell you right
17 there that it's very difficult to actually get a
18 latency period.



Page 120

24     Q.   And would latency also be affected in
25 your view by the circumstances of exposure?

Page 121

1     A.   It's hard to factor latency because
2 it varies.  I mean, like I said, there's no --
3 the latency period varies significantly.  There
4 is -- it is very -- I mean, again, you can't say
5 unless ten years have passed, I'm not going to
6 really look at something, and if only two years
7 have passed, then I would look at something.
8 It's very variable in non-Hodgkin lymphoma and a
9 lot of cancers.
10         In a lot of cancers, it's very
11 variable.  It's very difficult to rely on the
12 latency to be certain that something is -- there
13 is a causation here.  You look at it, you -- if
14 somebody started smoking last week and today they
15 get lung cancer, it's probably not tobacco.  But
16 how long do they need to smoke?  Is it a year?
17 Two years?  Ten years?  It's not always
18 consistent with what you see in clinical
19 practice.
20     Q.   Would you agree with the proposition
21 that short-term high-dose exposures generally
22 would be expected to result in a short latency
23 period whereas long-term low-dose exposures would
24 be expected to result in long latency period?
25     A.   I think that in theory, that makes

31 (Pages 118 to 121)

Chadi Nabhan, M.D.
June 6, 2018

Page 122

1    sense. It's probably not what you see in
2    clinical practice or real life. But
3    theoretically, the sentence that you mentioned
4    makes sense. It's just not always what you see.
5    And there's always like there are theories and
6    there is practicality of things.
7            MR. FOWLER:  We can take a look at
8    the Howard.
9            If you would mark this as the next
10   exhibit in sequence.
11           (Nabhan Exhibit No. 11 marked.)
12   BY MR. FOWLER:
13       Q.   You mentioned a paper that involved
14   the World Trade Center that identified a latency
15   as early as .4.  By .4, I take it you meant .4
16   years, right?
17       A.   Yes.
18       Q.   Is that the paper you're talking
19   about?
20       A.   Yeah, this is one of them.  There is
21   a couple others.  Yeah, but this is one of them.
22   This is the one on the World Trade Center I
23   mentioned.
24       Q.   Excuse me.  The author is John
25   Howard, who is the administrator of the health

Page 123

1    program, correct?
2        A.   Yes.
3        Q.   This is a program that's developed to
4    compensate injuries with associated with the
5    World Trade Center collapse, right?
6        A.   Correct.
7        Q.   Okay.  And they attempted to -- in
8    this paper to identify circumstances under which
9    particular disease outcomes would be eligible for
10   compensation, correct?
11       A.   Yes.
12       Q.   Okay.  If we turn to page 5 of
13   Exhibit -- is it 11?
14           THE COURT REPORTER:  Yes.
15   BY MR. FOWLER:
16       Q.   You see a section that's
17   lymphoproliferative and hematopoietic cancers,
18   correct?
19       A.   Yes.
20       Q.   Okay.  And if you go to the page
21   following that --
22       A.   Do you want me to read this first?
23       Q.   You're welcome to read it.
24       A.   Is it No. 5, page 5 out of 9?
25       Q.   5 out of 9.  That's the section in

Page 124

1    which lymphoma would be treated, correct?
2        A.   Yes, I see that.  Lymphoproliferative
3    and hematopoietic cancers.
4        Q.   The thing I wanted to call your
5    attention to is on the next page.  Let me know
6    when you're ready.
7        A.   Sure.  I'll look at the next page
8    first.
9        Q.   Second paragraph?
10       A.   Yes.
11       Q.   Again, it's talking about latencies
12   and modeling.  It says in the second sentence,
13   for these reasons, the administrator decided to
14   rely on the estimate of minimum latency for all
15   lymphoproliferative and hematopoietic
16   malignancies of 0.4 years based on low estimates
17   used for lifetime risk modeling of low level
18   ionizing radiation studies for lymphomas and
19   leukemias, correct?
20       A.   Yes.
21       Q.   Okay.  And the paper that they cite
22   for that, if you flip to the last page, is a
23   paper by Berrington.
24           Do you see that?
25       A.   I do.

Page 125

1        Q.   Okay.  Have you reviewed the
2    Berrington paper?
3        A.   I have not.
4            MR. FOWLER:  Why don't you pull out
5    Berrington for me.
6            The reason I ask about that is
7    because the Howard paper itself doesn't explain
8    any basis for 0.4.  It simply adopts it from
9    Berrington.
10           So if you could mark this as Exhibit
11   12, please.
12           (Nabhan Exhibit No. 12 marked.)
13   BY MR. FOWLER:
14       Q.   And Berrington again is looking at
15   radiation risk assessment tools, correct?  It's
16   not really designed to look at latency periods
17   for NHL -- let me back up.
18           Having seen this now, is this
19   something you've looked at before?
20       A.   I have not, no.  I told you I haven't
21   read Berrington.
22       Q.   Okay.  If you'll -- this is an -- if
23   you look at the abstract on the -- I guess it's
24   the second page of the exhibit, it's using data
25   from Japanese atomic bomb survivors.  You'll see

32 (Pages 122 to 125)

Chadi Nabhan, M.D.
June 6, 2018

Page 126

1  that probably about a third of the way up from
2  the bottom of the abstract paragraph?
3        A.  Yeah, I can't see it exactly.  Okay.
4  That's fine.
5        Q.  Do you see the reference to the
6  atomic bomb survivors?
7        A.  I can't see it, but that's fine.  I
8  mean, it doesn't --
9        Q.  One, two, three, four, five, six,
10 seven, eight, nine lines up from the bottom?
11       A.  Yes, I see it now.
12       Q.  Okay.  That's -- the atomic bomb I
13 think you agree, would you not, is from a
14 paradigm of acute exposure?
15       A.  Of course.
16       Q.  Yeah.  If you turn to page -- there
17 are page numbers at the very top.  If you turn to
18 page 210, there is a section 5, adjustments for
19 minimum latency period?
20       A.  Okay.
21       It says the latency period for
22 radiation-related cancers as introduced as a step
23 function between BEIR VII and two years for
24 leukemia and five years for solid cancers.  To
25 avoid this abrupt change in risk in RADRAT, which

Page 127

1  is I guess the name of the model, we assumed an
2  uncertain latency adjustment that is phased in
3  between 4 and 11 years after exposure for solid
4  cancers and 0.4 and 4.1 years for leukemia.
5        Leukemia is not the same as lymphoma,
6  is it?
7        A.  Not in general.  There are one
8  type -- there is one type that I think is
9  similar.
10       Q.  And that's the only reference to 0.4
11 in this entire paper, which is -- and it itself
12 refers to another paper.  There is a foot -- a
13 10.  If you look again, if you go to the back to
14 the references table, 10 is a paper by Land and
15 others?
16       A.  Yeah, I see that.
17       Q.  Which is the Report of the NCI-CDC
18 working group to revise the 1985 NIH radio
19 epidemiological tables.
20       Would you pull the Land?
21       And I'll ask the same question.  Have
22 you ever looked at the Land paper?
23       A.  I have not.
24       MR. FOWLER:  I'm going to mark this
25 as Exhibit 12.

Page 128

1        THE REPORTER:  13.
2        MR. FOWLER:  13, I'm sorry.
3        (Nabhan Exhibit No. 13 marked.)
4  BY MR. FOWLER:
5        Q.  And the Land paper you'll see is
6  actually kind of a bulky document.
7        If you go to the executive summary
8  which appears on the page that's numbered 1, the
9  bottom right-hand corner?
10       A.  Okay.
11       Q.  Excuse me.  It explains the purpose
12 of the paper, which again is related to
13 compensation claims for cancers diagnosed
14 following exposure to ionizing radiation, mostly
15 veterans -- excuse me.
16       The report has been used mostly by
17 the Department of Veterans Affairs as a guide to
18 adjudicating compensation claims for cancers
19 diagnosed in persons who were exposed during
20 military service.
21       Do you see that?
22       A.  Yes.
23       Q.  And if you continue reading down, you
24 see that the major source of epidemiological data
25 for estimating risk is the cohort of atomic bomb

Page 129

1  survivors, et cetera, again Hiroshima and
2  Nagasaki.
3        Do you see that?
4        A.  Uh-huh, yes.
5        Q.  Again, it fairly describes acute
6  exposures?
7        A.  Of course.
8        Q.  And this paper is the one that's
9  cited by Berrington, which then in turn is cited
10 by the Howard paper that you have seen as the
11 source of the 0.4.
12       I will represent to you that I have
13 read this paper five times.  I can't find 0.4
14 anywhere in here, but whatever they're talking
15 about --
16       A.  This one?
17       Q.  The Land paper, yeah.
18       A.  Uh-huh.
19       Q.  Whatever they're talking about is a
20 latency associated with exposure to the atomic
21 bomb, correct?
22       A.  I mean, that's what they're
23 describing here.
24       Q.  Okay.
25       A.  I have to read -- I mean, you just

33 (Pages 126 to 129)

Chadi Nabhan, M.D.
June 6, 2018

Page 130

1  gave me two papers I've never seen, so I'll have
2  to read them, but if that's what they -- that's
3  what the abstract says and I haven't read them.
4      Q.  One of the other papers that you have
5  talked about in talking about latency was a paper
6  looking at PTLD following solid organ
7  transplants, right?
8      A.  I was using this as an illustration,
9  as an example.  Again, even with this -- by the
10  way, the World Trade Center and all of this, you
11  can't -- you can't study every offending agent
12  and say I'm going to actually give you this drug
13  or this agent, I'm going to expose you to this
14  chemical or I'm going to see how long it will
15  take to possibly developing cancer or not.
16  That's impossible to do and it's unethical to do.
17          Obviously they're able to do it with
18  the atomic bomb because it happened, so there was
19  a model that actually existed already for these
20  unfortunate people or persons to be able to
21  determine how long it takes to develop a
22  particular cancer.  Nobody really exposed them
23  unnecessarily.  It just happened.
24          So they said, okay, well, now we had
25  9/11, now we had the atomic bomb, can we actually

Page 131

1  figure out that latency period.  All what this
2  illustrates that if there's an offending agent,
3  in this situation it was radiation, it could be
4  other offending agents that have not been
5  studied.  If there's an offending agent that
6  people are exposed to, the latency period will
7  vary.  In some situations such as this one that
8  they describe as an example with 0.4 years.  This
9  doesn't take away that other things could
10  actually be 0.4 years or 0.6 years.  It just
11  happened to describe this one because it was an
12  existing model that was easy to describe.
13          The take-home message is really that
14  the latency period varies.  There are examples
15  that we could demonstrate that the latency period
16  is short and there are examples that we could
17  demonstrate that latency period is long.  That's
18  really all what you could say with all of these
19  papers and publications.  That's it.
20      Q.  Let me go back to my question now.
21      A.  Please.
22      Q.  Another paper that you have cited and
23  relied on for your latency opinions was one
24  looking at PTLD following solid organ transplant,
25  correct?

Page 132

1      A.  I'll rephrase.  I provide this as an
2  illustration as an example.  I chose this as an
3  example.  There are many other examples.  I
4  wanted to illustrate a point, so I relied upon
5  this to show an example of how latency period
6  varies.
7          This is not the only paper in the
8  literature on latency period.  I just want to
9  make sure for the record that it's clear why I
10  brought up this paper.  It was an illustration
11  and an example to demonstrate the variation of
12  latency period.  That's really all.  It was not
13  the sole literature available on latency.
14      Q.  It is a paper that you have cited,
15  correct?
16      A.  Yes, and I'm trying to explain why I
17  cited it.
18      Q.  You would agree, would you not, that
19  an organ transplant associated with the kind of
20  immunosuppressive treatment that accompanies that
21  is an acute exposure event, would you not?
22      A.  It's not an atomic bomb.
23      Q.  All right.  That wasn't my question.
24      A.  I understand.  It's acute.  But,
25  again, it's an acute event.  Patients have

Page 133

1  immunosuppression for long period of time, so the
2  immunosuppression -- you know, again, go on
3  usually for life and patients develop these PTLDs
4  afterwards.  But I think we can all agree that
5  it's not the same magnitude of atomic bomb.
6      Q.  It's not a chronic low-dose exposure,
7  correct?
8      A.  Immunosuppression?
9      Q.  Yes.
10      A.  Yes, it is.  Usually you put patients
11  on immunosuppression for life and usually take --
12  depending what they take.  It could be -- you
13  know, again, depending on the medication, the
14  immunosuppression, but sometimes could be one or
15  two pills a day that they take on -- after they
16  get the organ transplant.
17      Q.  Another paper that you have cited was
18  one looking at the development of AML following
19  stem cell transplant, correct?
20      A.  Correct.  That was another
21  illustration of demonstrating that latency period
22  varies.
23      Q.  Again, a procedure that involves, in
24  crude terms, blowing out your immune system in
25  the process, right?

34 (Pages 130 to 133)

Chadi Nabhan, M.D.
June 6, 2018

Page 134

1          A.   It's high-dose chemotherapy.  That's
2    what it is.  It's high-dose chemotherapy that we
3    give patients and then we reinfuse the stem
4    cells.
5          But the point of that was to
6    illustrate that when you give an offending agent,
7    in this situation was high-dose chemotherapy, in
8    the other paper was immunosuppression, the
9    latency of developing the disease varies.  And
10   there are tens of these papers out there.
11         Q.   Forming your opinion on latency, did
12   you consider any literature that looked at
13   chronic low-dose exposures to environmental
14   chemicals?
15         A.   I'm sorry.  I really couldn't hear
16   you.
17         Q.   In forming your opinion on latency,
18   did you consider any literature that looked at
19   chronic low-dose exposures to environmental
20   chemicals?
21         A.   I did not specifically look at this
22   because -- I mean, again -- I'll say it again.
23   The latency period for any offending agent in
24   developing lymphoma varies.
25         Whether that offending agent is

Page 135

1    radiation that you just showed me, whether it is
2    the transplant that I showed you, whether it's
3    immunosuppression that I showed you, whether it's
4    a chemical, whether it's tobacco, whether it's
5    chewing -- whatever it is, the latency period
6    varies.
7          There is no question about it.  It is
8    not a binary situation.  It is not a binary
9    decision that if you are not exposed to this for
10   X number of years, you are not going to get --
11   it's -- it's not.  The latency period varies no
12   matter what the offending agent is --
13   chemotherapy, radiation, chemicals, tobacco,
14   whatever it is.
15         Q.   Are you familiar with the testimony
16   that's been offered by other experts for
17   plaintiffs in the MDL proceeding on the issue of
18   latency?
19         A.   I mean, I've read some of the
20   depositions and I was present in court for part
21   of the proceedings.  It escapes me, frankly, and
22   I don't remember exactly what they offered, but
23   if I can look at them...
24         Q.   Are you aware that any of those
25   experts have said that they would expect a

Page 136

1    difference in latency for NHL following acute
2    exposers such as radiation or chemotherapy as
3    opposed to chronic exposures?
4          A.   I don't know.  I'd have to see that.
5    I don't remember.  But I'm telling you what we
6    see in clinic.  I'm telling you what happens in
7    clinic, so I think it's important to recognize
8    that.
9          MR. FOWLER:  The Weisenburger Daubert
10   transcript.
11         Because the transcripts are large and
12   I'm traveling, I've excerpted it instead of
13   bringing the entire thing.  If you can mark it as
14   the next exhibit.
15         (Nabhan Exhibit No. 14 marked.)
16         THE WITNESS:  What is this?  I'm
17   sorry.
18   BY MR. FOWLER:
19         Q.   This is the transcript of the MDL
20   Daubert hearing.  This is from the testimony of
21   Dr. Weisenburger.
22         A.   Okay.
23         Q.   You're familiar with
24   Dr. Weisenburger, right?
25         A.   I know of him.  I think he was at

Page 137

1    some meetings I was at in the past.
2          Q.   In fact, you cited one of his
3    papers --
4          A.   He's a pathologist.
5          Q.   -- in one of your slides on the
6    Daubert testimony, right?
7          A.   He is a pathologist I'm aware of.
8          Q.   You cited him in one of your slides
9    in your presentation of Daubert testimony,
10   correct?
11         A.   Do you have which citation?  I mean,
12   there's so many papers he's written so I don't
13   know which one you're referring to.
14         Q.   Well, do you recall citing to one of
15   his papers?
16         A.   Yeah, I do recall that.  I just don't
17   remember the actual paper.
18         Q.   Okay.  Well, I will get to that.  I
19   just want --
20         A.   Sure.  No problem.
21         Q.   I'm happy to show you the slide.
22         A.   I have it on my phone.  I just --
23   it's fine.
24         Q.   It's a Weisenburger 1992 paper for
25   which you quote "latency of NHL in some cases was

35 (Pages 134 to 137)

Chadi Nabhan, M.D.
June 6, 2018

Page 138

1  as short as two years."
2       Does that sound familiar?
3       A.  Yes.
4       Q.  Okay.  Now, there are two excerpts of
5  his testimony here that we pulled out.  The first
6  is on page 174.  He's responding to actually a
7  question from Judge Petrou about latency, and
8  he's trying to explain it for different agents.
9       But it says "so, for example, say if
10 you had breast cancer and you got chemotherapy,
11 you would be at increased risk for NHL, and that
12 NHL would probably occur fairly soon after the
13 chemo because chemo is very powerful drugs that
14 would cause DNA damage and so the disease would
15 probably develop within the first five or
16 ten years.  Okay.
17      On the other hand, there's a body of
18 evidence about solvents, for example, in the
19 workplace, and with this exposure to mixed
20 solvents, the latency period is much longer.
21 It's probably in the range of 20 to 25 years.
22      Do you agree with that, by the way,
23 that --
24      A.  Not entirely.
25      Q.  Okay.  Which part don't you agree

Page 139

1  with, do you not agree with?
2       A.  I'm not sure really solvents take 20,
3  25 years.  Again, it's really -- I mean, I'll say
4  it again.  This is not a binary thing by which --
5  so what this implies, if somebody -- if somebody
6  is being exposed to solvents and it's less than
7  20 years, then they would not develop any type of
8  malignancy.
9       And I think it's just -- I mean, it's
10 just not -- I mean, again, it depends on each
11 case and each situation.  Sure, there are some
12 folks that you need exposed 20, 25 years until
13 you probably develop a particular malignancy
14 because you have this slow low exposure that
15 might take a long time to cause any type of DNA
16 damage and so forth.
17      But if you -- if you are exposed to
18 solvents every single day for ten hours for five
19 years, how can we not tell that this is a risk
20 factor?
21      I just think each case is individual.
22 Each particular scenario has to be assessed
23 individually.  And having too much generality
24 would be very difficult.  So that's really --
25 it's very difficult to generalize.

Page 140

1       Q.  Turn to the last page of the exhibit
2  I gave you.  It's another part of
3  Dr. Weisenburger's testimony, page 270.  At the
4  bottom of the page there is a question and
5  answer.
6       You say in your expert report that
7  the average latency period for the development of
8  non-Hodgkin's lymphoma due to long-term exposure
9  to carcinogen and chemicals is about 20 years,
10 with a range of 10 to 30 years, right?  That's
11 from your expert report, slide 13.
12      Answer, or 30 or more years.  So
13 those are very general statements just -- to just
14 state some principles.
15      Do you agree or disagree with that?
16      A.  It's the same answer I just gave you.
17 I mean, again, each -- it's each case is
18 different.  It's very difficult to say you need
19 10 to 30 years to be -- if you are being exposed
20 to a particular carcinogen that's going to take
21 that long.  In some patients it does.  In others
22 it doesn't.  So we really cannot generalize.  And
23 it goes back to the general principle I tried to
24 explain.
25      The latency period varies, and it

Page 141

1  could be short.  It could be long.  What makes it
2  short or long, again, depends on the amount of
3  exposure, the particular patient and the
4  particular disease.  That's why I -- I mean, just
5  look at the range, 10 to 30 years.  One to three
6  decades.  I mean, anybody tells you something
7  from 10 to 30 years is just too long.  So that
8  tells you it just doesn't apply to every patient.
9       Q.  You would agree, would you not, that
10 intensity of exposure to a carcinogen has an
11 impact on latency?
12      A.  Can you describe what that means?  So
13 the intensity of exposure has an impact on
14 latency?  I'm not sure I understand the question.
15      Q.  Well, let's take your example that
16 you gave.
17      A.  You mean if it's more exposure, the
18 latency is shorter?  Is that what you mean?
19      Q.  The example I think you gave was
20 smoking.  We can use that to illustrate the point
21 perhaps.  And I think, if I recall correctly, you
22 contrasted smoking one pack of cigarettes a day
23 for ten years to smoking three packs a day for
24 ten years and suggested the latency would be very
25 different for the second than the first.

36 (Pages 138 to 141)

Chadi Nabhan, M.D.
June 6, 2018

Page 142

1    A. It can be. It can be. Like I said,
2 I mean, latency period will vary. Sometimes
3 depending on the agent that you are using,
4 sometimes based on the intensity of the agent
5 that you're being exposed to, sometimes on
6 additional factors that the host usually might
7 have that predisposes that person to other -- to
8 developing the disease sooner.
9    I mean, I don't know how more I can
10 be -- how I can be clearer. I think it's
11 variable and there are examples that demonstrate
12 short latency period. You provided one of them
13 with the radiation, which is very short. I
14 provided a couple of them with the
15 immunosuppressants and with the transplant. And
16 there are situations which are long. It could be
17 ten years plus.
18    But I don't think and I don't
19 believe -- it's very clear we're not going to
20 come to a consensus here, but it's very difficult
21 to have this just latency period below which you
22 are not going to have the disease, above which
23 you are going to have the disease because that
24 thing doesn't exist in non-Hodgkin lymphoma.
25    Q. Another -- excuse me -- paper that

Page 143

1 you relied on, which I think you described as the
2 De Roos 2011 in your slide, but I think it's
3 probably --
4    A. It's probably a typo.
5    Q. It's probably Wheeler and De Roos is
6 on as a co-author. It's specifically on the
7 issue of latency. Again, I'm happy to show you
8 your Daubert slide if you'd like.
9    A. I would like to see the paper.
10    Q. She's going to pull that up.
11    A. Okay.
12    MR. FOWLER: Can you mark that as the
13 next exhibit.
14    (Nabhan Exhibit No. 15 marked.)
15 BY MR. FOWLER:
16    Q. Is that a paper that you have seen
17 before, Dr. Nabhan?
18    A. I think I may have. I don't remember
19 if I read the entire thing or just focused on the
20 abstract and figures. But it's -- it's been a
21 while, so if you need to ask me specific, I need
22 some time unless your questions are general.
23    Q. Well, my questions won't be very
24 long. It's a paper I think that you included in
25 one of your Daubert slides, which is why I pulled

Page 144

1 it up.
2    A. Sure.
3    Q. The point that you quoted on your
4 slide, I think, really appears in the abstract
5 portion of it, so -- which is the second sentence
6 of the background, which is little is known about
7 the etiology of non-Hodgkin's lymphoma or the
8 latency period that might be relevant for
9 environmental exposures.
10    Do you see that? Do you agree with
11 that?
12    A. I mean, instead of little I would
13 have used, you know, controversy exists about
14 this, I mean, as opposed to little is known. I
15 think there is a lot published, but there is
16 controversy in terms of -- I would have used a
17 different term. You know, little consensus
18 exists among investigators on the etiology,
19 something like that.
20    Q. Well, your Daubert slide that you
21 submitted to the court in MDL --
22    A. Yes.
23    Q. -- you quoted "little is known about
24 the latency period that might be relevant for
25 environmental exposures."

Page 145

1    A. Yes.
2    Q. It's your choice.
3    A. I have to quote how -- well, it's
4 written -- well, when I'm quoting a paper, I have
5 to use the words the paper is using.
6    Q. You didn't paraphrase it, did you?
7    A. I'm just saying if I -- it's
8 referenced. So if I was writing the paper,
9 that's what I would have said. I would have said
10 little consensus exists on the etiology.
11    Q. Let's go to Weisenburger. Let's go
12 to the Weisenburger paper we talked about
13 earlier.
14    By the way, before we do, Wheeler
15 paper --
16    A. Sure.
17    Q. The Wheeler paper, it's a case
18 control study, correct? It's the title of the
19 paper. It looked at risk based on possible
20 environmental exposures for four different
21 periods before diagnosis at 5, 10, 15, and
22 20 years. Actually, it may have been even five
23 time periods.
24    A. It says five different time periods
25 to explore the presence of clusters in a time

Chadi Nabhan, M.D.
June 6, 2018

Page 146

1    frame of etiologic relevance.
2        Q.   The most significant lag time is
3    20 years, correct?
4        A.   The best model fit was for
5    residential locations is 20 years prior to
6    diagnosis in Detroit, Iowa, and Los Angeles.
7        Q.   Not .4 months, right?
8        A.   Sorry?
9        Q.   Not .4 years, right?
10       A.   In this paper, yes, not .4 years.
11           MR. FOWLER:  If you would mark this
12   the next paper in sequence, please.
13           (Nabhan Exhibit No. 16 marked.)
14   BY MR. FOWLER:
15       Q.   The next exhibit --
16           What number is that?
17           THE REPORTER:  16.
18   BY MR. FOWLER:
19       Q.   16.  It's the Weisenburger paper we
20   talked about briefly earlier, correct?
21       A.   1992, yes.
22       Q.   Which is the one you cited on your
23   Daubert slide at the MDL hearing, correct?
24       A.   Yes.
25       Q.   Okay.  And you cited it for -- it

Page 147

1    demonstrated latency as low as two years,
2    correct?
3        A.   Yes.  I mean, but, again, just to be
4    clear, I mean, the latency goes -- it's a very
5    fluid term.  I think I probably said that several
6    times.  There are short to long.  So this paper
7    suggested it could be as early as two years.
8    Others suggested shorter.  Others suggested
9    longer.
10       Q.   Why don't you, if you would, turn
11   to -- the page number is -- this one are in the
12   middle of the bottom.  Turn to page 5460s.
13       A.   Okay.
14       Q.   Are you there?
15           There is a section entitled latency
16   period of non-Hodgkin's lymphoma, correct?
17       A.   Yes.
18       Q.   Okay.  Which reads the latency period
19   for the development of NHL following an
20   environmental exposure is largely unknown.
21           Would you agree with that?
22       A.   I like that.  That's actually true.
23       Q.   And it says one valid source of
24   information on the latency period of NHL can be
25   found in the literature on NHL developing after

Page 148

1    the treatment of Hodgkin's disease with
2    chemotherapy and/or radiotherapy.
3            Did I read that correctly?
4        A.   You did.
5        Q.   Okay.  And in such studies, the
6    median latency period is about five to six, not
7    unlike that for secondary acute leukemia.  In
8    these studies the latency of NHL in some cases
9    was as short as two years, but it may be as long
10   as more than 15.
11       A.   Yes.
12       Q.   That's -- that's where you got your
13   two-year reference, I take it?
14       A.   Yes.
15       Q.   Okay.  Towards the end of that
16   paragraph, he goes on to say that in contrast,
17   the median latency period for acute leukemia
18   associated with chronic low-dose exposure to
19   benzene is 15 to 20 years, and the latency in
20   similar situations would be expected to be
21   similar for NHL.
22       A.   I don't know where you are reading,
23   but these ranges are all over the place.  Okay.
24       Q.   Well, he's making a comparison
25   between acute and chronic exposures, correct,

Page 149

1    distinguishing between latency following
2    treatment with chemotherapy and/or radiotherapy
3    with an environmental exposure to a chemical,
4    correct?
5        A.   I mean, I understand -- you're
6    talking about in contrast, the median latency
7    period for acute leukemia with chronic low-dose
8    exposure to benzene is 15 to 20 years.
9        Q.   Right.
10       A.   That is the sentence you're reading.
11       Q.   Yes.
12       A.   Okay.  I read that as well.
13       Q.   And he says and the latency in
14   similar situations would expected to be similar
15   for NHL, correct?
16       A.   That's what he says.
17       Q.   Okay.  In the following paragraph,
18   the second sentence says based on these data,
19   short-term, high-dose exposures would be expected
20   to result in a short latency period, whereas
21   long-term, low-dose exposures would be expected
22   to result in a long latency period.
23           Do you see that?
24       A.   I think you asked me that before.  I
25   said theoretically this appears okay.

38 (Pages 146 to 149)

Chadi Nabhan, M.D.
June 6, 2018

Page 150

1      Q.   So the two-year latency at least in
2  the -- as discussed by Dr. Weisenburger is an
3  inappropriate low level -- lower end bound for
4  NHL associated with Roundup exposure; would you
5  not agree with that?
6          MR. SHAH:  Object to form.
7  BY THE WITNESS:
8      A.   I mean, I'll say it again.  I don't
9  agree with giving a particular low and high
10  number for latency.  In fact, every single paper
11  that you provided me and you cited, if anything,
12  they all illustrate exactly the point I'm trying
13  to make.
14          There is no consistent evidence,
15  there is no consensus into the actual latency
16  period.  You've actually showed me exactly the
17  papers that demonstrate this.  I mean, from one
18  paper to another, you see latency period, it
19  varies from short to long, acute, chronic
20  low-exposure, high-exposure.
21          If anything, that should underscore
22  the fact that latency periods could be short,
23  could be long, and we have to look at each case
24  individually and each case separately.  So I
25  don't understand --

Page 151

1  BY MR. FOWLER:
2      Q.   Which of the -- I'm sorry.  Are you
3  finished?
4      A.   Yeah.  I'm just saying, I mean, it's
5  kind of all over.
6      Q.   Which of the papers that I gave you
7  provides a short latency period for a chronic
8  low-dose exposure to anything?
9      A.   All of these are theoretical opinions
10  of the authors.  None of them is necessarily -- I
11  mean, when you look at -- again, you showed me
12  the one with the atomic bomb and radiation that
13  goes down to 0.4 years.  The World Trade Center
14  says for lymphoma disorder, could be as early as
15  0.4 years, and you said this is just only for
16  radiation.
17          And what I said, radiation was used
18  as an example for an offending particular agent.
19  There are other examples of chemotherapy and
20  transplant that have the shorter latency period
21  similar to the radiation therapy.
22          And I think we can all agree that
23  immunosuppressive therapy and transplant are not
24  atomic bomb or Hiroshima or Nagasaki.
25          And then the other two papers just

Page 152

1  illustrate the -- you know, it could be 20 years
2  in this paper, the residential one.  It could be
3  two years in Weisenburger's paper.
4          So latency period in the -- in the
5  literature is actually all over.  There is short
6  and there's long.  What I tried to explain is
7  that at least in my mind, I tend to believe that
8  in general, a shorter latency period is
9  associated with a more aggressive disease.
10  That's just a general thing for me at least to
11  understand.
12          And usually if it's a slower disease,
13  maybe it's a longer latency period for the most
14  part, but this is not always the case in all
15  patients.  But, I mean, I think -- I think it's
16  very clear that latency period is not something
17  that -- I said that word again -- before, I'll
18  say it again.  It's not a binary thing, you know,
19  10 years or 20 years or 30 years.  Some of the
20  examples you provided they said it's -- the range
21  is 10 to 30 years.  I mean, that's a very broad
22  range when you're talking about a 30-year span of
23  range.
24          So that's why I just don't think -- I
25  think, you know, in my opinion and I believe

Page 153

1  that's what you are asking me, and I said that
2  before and I'll say it again.  Latency period
3  varies.  It could be short.  It could be long.
4  And accordingly, we have to individualize it.
5          And I don't -- I don't agree
6  necessarily with all of these opinions that you
7  have to be exposed to a chemical or a solvent for
8  20 years before you get diagnosed or before I
9  believe that your diagnosis is associated with
10  this.
11      Q.   Well, two questions, but first I want
12  to make sure I understood you what you last said.
13          You said you don't believe you have
14  to be exposed for 20 years before contracting
15  whatever the adverse disease is.  Is that your
16  understanding of latency period?
17      A.   No, that's not my understanding.
18  This is what these papers are describing that you
19  showed.  I mean, you just showed that, you know,
20  in the atomic bomb you have to -- you know, it
21  could be as early as 0.4 years.  You showed me
22  the other ones and the other papers that describe
23  10 years or 20 years exposure before you start
24  developing the particular disease and so forth.
25          The point I'm trying to make is that

39 (Pages 150 to 153)

Chadi Nabhan, M.D.
June 6, 2018

Page 154

1  latency period in the literature is not something
2  that everyone has agreed upon, including the
3  epidemiologist and folks who do this for a
4  living.
5          So as a clinician, and I'm not an
6  epidemiologist, in my mind when I look at
7  latency, I have to look at individual cases.
8  It's hard for me to say that if you have not been
9  exposed to a particular offending agent or an
10 offending compound for X amount of years, I'm
11 going to dismiss that this may have contributed
12 to the illness.
13         In some situations it's not related.
14 In others it is.  I don't see -- you know, I
15 see -- I know that we want to agree on particular
16 latency period, but I don't believe this thing
17 exists.
18     Q.   The paper -- papers addressing --
19 suggesting a 0.4 period were papers I showed you
20 because 0.4 and two years, for that matter, are
21 ones that you had cited that do not involve
22 circumstances similar to those that we're talking
23 about with low-dose chronic environmental
24 exposures, correct?
25     A.   Yes.  I've cited all of these and the

Page 155

1  other ones just to illustrate --
2      Q.   Can you cite me a single paper, a
3  single paper, just one, that provides a latency
4  period with a range that begins at 0.4 or two for
5  a low-dose chronic environmental exposure to
6  whatever the compound is?  I don't care.
7      A.   I don't -- I don't know at this
8  point.  I'll have to do this.  But just because
9  it doesn't exist doesn't mean that this is not --
10 again, you can't -- you can't look at this
11 particular threshold and say unless you have 0.4
12 to two years, I'm going to dismiss any possible
13 occupational exposure.
14         That's all I'm trying to say.  I
15 mean, I think it's very difficult to study
16 latency, first of all, as you well know in
17 occupational exposures in the work areas and so
18 forth.  It's just not an easy process to study.
19         And that's why you're not going to
20 find these exact numbers that you -- I think the
21 best you can say, that the latency period in the
22 development of non-Hodgkin lymphoma when patients
23 are exposed to offending agents, whether
24 environmental factors or not, vary.
25         I don't see how else you can get to a

Page 156

1  better consensus than this.  It varies.  And all
2  of these papers illustrate that they actually
3  vary.
4      Q.   My question again, can you point me
5  to a single paper which shows the variance
6  includes at the low end a period of time as low
7  as 0.4 or two years for a low-dose chronic
8  environmental exposure?  Not the atomic bomb.
9  Not a transplant.  A low-dose chronic
10 environmental exposure, one paper.
11     A.   I don't have -- I don't have
12 something in my mind right now.
13         MR. FOWLER:  Okay.  Why don't we
14 break here and you can -- you've got a call to
15 take here shortly anyway.
16         THE WITNESS:  In ten minutes.
17         THE VIDEOGRAPHER:  Going off the
18 record at 1:49 p.m.
19         (Break taken.)
20         THE VIDEOGRAPHER:  Going on the
21 record.  This marks the beginning of media No. 3.
22 The time is now 2:31 p.m.
23 BY MR. FOWLER:
24     Q.   Dr. Nabhan, I think I asked you the
25 last time we were together whether you had ever

Page 157

1  evaluated an NHL patient who had been exposed to
2  Roundup and concluded that Roundup was not the
3  cause of their NHL.  And your answer then was no,
4  but it was a small number.
5          Is your answer still the same?
6      A.   Yes.
7      Q.   What is the N as of today?
8      A.   I have not -- as we talked earlier, I
9  have not seen additional patients since the last
10 time we met.



23     Q.   It was four.  Am I correct that you
24 have never published an epidemiology study?
25     A.   You are not correct.  I have several

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018

Page 158

1    papers from this year, data analysis, that we've
2    looked at.  I don't know if that's -- you
3    consider this epidemiology, but we looked at the
4    SEER database and I saw that in my CV on CLL and
5    follicular lymphoma, but -- so that looked at --
6    I think, yeah, you mentioned that, on disparities
7    and differences in outcomes between different
8    races and so forth.  So that probably does not
9    qualify as epidemiology in its sense, so you're
10   correct.
11       Q.   Okay.  And am I correct that you have
12   never peer reviewed an epidemiology study?
13       A.   No, I have peer reviewed.  I do peer
14   reviews at least two papers a month and I know
15   that I peer reviewed some epidemiology studies.
16   I don't really remember the numbers.  I've been
17   peer reviewing for over ten years for many
18   journals.
19       Q.   And how many epidemiology studies
20   have you peer reviewed in that time period?
21       A.   As I said, I don't remember at all.
22   I mean, I peer review at least two papers a
23   month, so you can do the math.  And I peer review
24   for a lot of journals, but I don't remember the
25   number of epi studies.

Page 159

1         Generally not going to be much
2    because really my -- again, as a clinician,
3    oftentimes these epi studies are not sent to me
4    for peer review unless there is some clinical
5    implications.  I have.  I just don't know the
6    number.
7        Q.   Is it fair to say it would be a
8    relatively small percentage of the peer-reviewed
9    studies that you've done?
10       A.   It's fair to say.
11       Q.   Okay.  And am I also correct that you
12   have never published a paper critiquing an epi
13   study?
14       A.   You're correct.
15       Q.   Now, before you were retained by
16   plaintiff's counsel in the Roundup litigation,
17   had you ever read the epidemiology studies that
18   you now rely on for your general causation
19   opinions in this case?
20       A.   No, I have not read these particular
21   studies.
22       Q.   Okay.  Do you agree that one of the
23   disadvantages of a case -- let me back up.
24           Do you know the difference between a
25   case-control study and a cohort study?

Page 160

1        A.   Yes, of course.
2        Q.   Okay.  Would you agree that one of
3    the disadvantages of a case-control study is that
4    they represent the possibility of recall bias?
5        A.   I agree.  It's one of the
6    shortcomings.
7        Q.   And another disadvantage of
8    case-control studies is they represent the
9    possibility of selection bias, correct?
10       A.   Of course.
11       Q.   And you would agree that cohort
12   studies are considered the gold standard for
13   epidemiology, correct?
14       A.   If you can do them, yes.  You would
15   like to do them, but sometimes you can't.
16       Q.   Am I correct that you are not a
17   statistician?
18       A.   You are correct.
19       Q.   And never have been, right?
20       A.   I have never been a statistician.
21       Q.   And never hope to be one, right?
22       A.   I'm not smart enough.
23       Q.   You're familiar with meta-analysis,
24   right?
25       A.   Yes.

Page 161

1        Q.   Okay.  Am I correct that you have
2    never performed or published a meta-analysis
3    yourself?
4        A.   Well, we did one.  I did one
5    meta-analysis that was published in Leukemia
6    Lymphoma, a meta-analysis in systematic review,
7    and you will see that I'm the first author.  I
8    don't know if you have my updated CV, but I can
9    show you which one.
10       Q.   Recently?
11       A.   No, it was several years back.  We
12   looked at the impact of maintenance Rituximab
13   on -- I can try to show you.
14       Q.   This is dated February 2018 so...
15       A.   Oh, that's a pretty good one so I can
16   show you one.  It was meta-analysis and
17   systematic review that we published a while back.
18   So let me show you.  I can't believe I didn't
19   list this.  Let me pull it up on PubMed.  It only
20   took about six months of work.  Do you mind if I
21   pull it for you?
22       Q.   That's fine.
23       A.   Okay.  Why do I -- why do I not have
24   it listed?  Let me just pull it for you.  Do you
25   want to just go off the record for one minute?

41 (Pages 158 to 161)

Page 162

```
 1          MR. FOWLER:  Fine.
 2          THE VIDEOGRAPHER:  Going off the
 3   record 2:38 p.m.
 4          (Break taken.)
 5          THE VIDEOGRAPHER:  Going on the
 6   record at 2:39 p.m.
 7   BY MR. FOWLER:
 8      Q.   Okay.  Dr. Nabhan, when we went off
 9   you're looking for that meta-analysis paper that
10   you had published.  If you would, just read the
11   title and give us the citation for that.
12      A.   So it's Systematic Review of
13   Comparative Schedule Related Toxicities with
14   Maintenance Rituximab in Follicular and Mantle
15   Cell Lymphomas.
16          So again, it's a systematic
17   review/meta-analysis looking at studies that use
18   maintenance Rituximab in patients with follicular
19   lymphoma and mantle cell lymphoma.
20          Maintenance Rituximab is used in
21   different schedules, so at the time when we
22   looked at this, some folks used maintenance
23   Rituximab every two months, some every
24   three months, and others, they use four weekly
25   regiments every six months for two years.
```

Page 163

```
 1          So I was actually very interested in
 2   understanding the impact of these different
 3   schedules on the potential toxicotics that
 4   patients could develop when they received the
 5   therapy.
 6          So in the absence of comparative
 7   studies, the only way we could do this was
 8   systematic review and meta-analysis of these
 9   studies.  And, of course, you know, I worked with
10   a statistician and this was the paper we came up
11   with.  So the N of one pretty much.
12      Q.   Okay.  What publication did that
13   appear in?
14      A.   I'm kind of upset it's not on my CV
15   now.
16          It's -- it was 2014 in Leukemia
17   Lymphoma.
18      Q.   Is there a page cite to it or --
19      A.   It's in the June 2014, volume 55,
20   issue 6, pages 1288 to 94.
21      Q.   Great.  And you said that -- I think
22   I heard you say that there was a second one as
23   well; is that right?
24      A.   No, no.  This is the one.  This does
25   not make me a statistician.  I just want to make
```

Page 164

```
 1   sure that at least you know that I did that work.
 2      Q.   Have you ever peer reviewed a
 3   meta-analysis study?
 4      A.   I have.  I don't remember how many.
 5      Q.   Would that also be a small percentage
 6   of the papers you've reviewed?
 7      A.   Small percentage would be
 8   appropriate.
 9      Q.   And have you ever published a paper
10   critiquing a meta-analysis?
11      A.   I have not.
12      Q.   And before you were retained by
13   counsel for the plaintiffs in the Roundup
14   litigation, had you read the meta-analysis
15   studies you rely on for your opinions in this
16   case?
17      A.   I did not before.
18      Q.   Is it true that meta-analysis combine
19   data from several individual studies and analyze
20   them together using a statistical approach that
21   considers the sample size of each study and the
22   width of the confidence intervals?
23      A.   Yes.
24      Q.   Do you agree that the interpretation
25   of results from meta-analyses is founded on the
```

Page 165

```
 1   individual studies being as free of bias and
 2   confounders as possible?
 3      A.   Yes, of course.  I mean, I think it
 4   always depends on the studies that you're
 5   including and how strong the data that you are
 6   putting in and how you interpret the
 7   meta-analysis.
 8      Q.   A meta-analysis cannot fix the flawed
 9   study, correct?
10      A.   No, it cannot.  You're absolutely
11   correct.  You're the problem is sometimes when
12   you have so many studies that are and you
13   sometimes don't have a consensus in terms of
14   conclusions, doing a meta-analysis might allow
15   you to understand what direction things are
16   going.
17          But you're correct.  If the study is
18   flawed, meta-analysis is not going to fix it.
19   You would like not to include it in the
20   meta-analysis if you believe it's flawed already.
21   So that's what I will usually recommend.  If you
22   don't like the study, then don't include it in
23   the meta-analysis.
24      Q.   And that's -- that's typically what's
25   meant by the term garbage in, garbage out in this
```

42 (Pages 162 to 165)

Chadi Nabhan, M.D.
June 6, 2018

Page 166

1    context, right?
2        A.   **Yes.**
3        Q.   Okay.  Are you aware of any reported
4    individual case reports of glyphosate-induced NHL
5    in the literature?
6        A.   **Case report?**
7        Q.   Yes.
8        A.   **One individual case report?**
9        Q.   Uh-huh.
10       A.   **I'll have to research that.**
11       Q.   As you sit here today, does any -- do
12   any come to mind?
13       A.   **Today nothing comes to mind, but I**
14   **have not really looked at individual cases.**
15       Q.   Okay.  Are you aware of any
16   difference in the symptoms of a
17   glyphosate-induced NHL patient and the symptoms
18   of an NHL patient whose cancer was not caused by
19   glyphosate?
20       A.   **No.  I believe that the symptoms**
21   **could be very comparable.**
22           MR. FOWLER:  I'm going to let you
23   have the good doctor.
24           Subject to the comments I made
25   earlier about needing to return to

Page 167

1    Dr. Nabhan depending on information that we
2    receive, I'm done today.
3           [EXAMINATION]
4    QUESTIONS BY MS. HOEKEL:
5        Q.   Good afternoon, Dr. Nabhan.  How are
6    you?
7        A.   **Good.  How are you?**
8        Q.   Good.  My name is Jennifer Hoekel and
9    I represent the Osborn & Barr defendants in
10   this -- in Mr. Hall's lawsuit.
11           Do you know who Osborn & Barr are?
12       A.   **I do not actually.**
13       Q.   Okay.  That should make this pretty
14   quick then.



Page 168

Page 169

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Chadi Nabhan, M.D.
June 6, 2018

Page 170

1        Q.   Sometime in 2017?
2        A.   Yes.  Early 2017, sometime in the
3    spring.
4        Q.   And just on a very high level, what
5    did you base that conclusion on?  What science
6    did you use to base that conclusion on?
7        A.   Yeah, I mean, you'll have to look at
8    the entire literature to be able to get a
9    conclusion.  So number one was the epidemiologic
10   studies.  I think as a clinician, these are the
11   ones I am drawn to more in terms of looking at
12   these case-control studies and the retrospective
13   analyses that demonstrate the association and
14   potential causation between Roundup and
15   non-Hodgkin lymphoma.
16            I reviewed a lot of animal studies
17   and genotoxicity studies.  I'm not a toxicologist
18   per se, but these studies I reviewed at least
19   helped in explaining some of the observations
20   that were noted in the epidemiological studies.
21            I looked at the meta-analyses that
22   previous counsel has cited as well as the IARC
23   report.  I'm very familiar with the Agricultural
24   Health Studies that I looked at as well and
25   other -- the opinions of other organizations.

Page 171

1            So you really have to take a look at
2    the body of evidence in totality.  And when you
3    look at the body of evidence in totality, I
4    believe there's a strong association and
5    causation between this compound and non-Hodgkin
6    lymphoma.
7        Q.   Are you -- are you aware as to
8    whether or not any sort of governmental agencies
9    have looked at the totality of evidence prior to
10   IARC's conclusion and concluded that glyphosate
11   was a contributing factor to non-Hodgkin's
12   lymphoma?
13       A.   I believe there were after.  I think
14   the EPA looked at this after there was a report
15   from '016.  There was a lot of controversy about
16   that.  There was a scientific advisory committee
17   that looked at the EPA and concluded that the EPA
18   did not look at everything.  Some studies they
19   looked at, some studies they did not.
20            So that I am aware of.  There is also
21   the European agency that -- EFSA that --
22       Q.   And that's all post IARC, correct?
23       A.   I believe it was post IARC.
24       Q.   Okay.  Thank you.
25       A.   I'm not aware -- I think maybe there

Page 172

1    was a report earlier by the EPA before 2015, but
2    I'll have to go back to my notes.
3        Q.   Is that the one --
4        A.   The one I'm more familiar was 2016,
5    September of 2016.  But there may have been one
6    in '013.  I just don't remember 100 percent.
7            MS. HOEKEL:  Okay.  That is all the
8    questions I have.
9            Do you have any follow-up?
10           MR. FOWLER:  I do.  I was reminded I
11   forgot to ask a few questions, if you'll put up
12   with me for a few minutes more.
13           MS. HOEKEL:  Thank you, Dr. Nabhan.
14           THE WITNESS:  You're welcome.
15           [FURTHER EXAMINATION]
16   QUESTIONS BY MR. FOWLER:
17       Q.   Dr. Nabhan --
18           MS. HOEKEL:  I stole that from you.
19   BY MR. FOWLER:
20       Q.   Have you ever spoken with anyone
21   involved in the process undertaken by IARC to
22   evaluate the safety of any substance about their
23   process?
24       A.   No, I have not spoken personally with
25   anyone.  I just read the methodologies and what

Page 173

1    they did.
2        Q.   Have you ever referenced an IARC
3    classification in any of your publications?
4        A.   I have not.
5        Q.   Do you understand that the members of
6    the IARC working group that considered glyphosate
7    were not the authors of the studies that they
8    were being -- that they were evaluating?
9        A.   Yes, I do.  I'm not all -- I mean, I
10   don't know if all of them were never authors, but
11   I do -- I mean, it's the IARC report cited the
12   studies that were done by other investigators.
13   They did not do the epidemiological studies and
14   so forth.
15       Q.   And have you met any of the
16   individuals selected for the IARC working group
17   on glyphosate?
18       A.   I have not.
19       Q.   Am I correct that you do not know how
20   much time any of the individual IARC working
21   group members spent evaluating glyphosate?
22       A.   No idea.  I believe that when you
23   look at the methodology, when you look at the
24   process that they describe in their publications
25   and their monograph, that's really all I can go

44 (Pages 170 to 173)

Chadi Nabhan, M.D.
June 6, 2018

Page 174

1  by, which appears to be a very rigorous process
2  that starts about a year before the live meeting.
3      Q.   But you do not know how much time any
4  of the individual working group members spent
5  evaluating glyphosate, do you?
6      A.   I don't.  Like I said, whatever is
7  described in the papers.
8      Q.   And am I correct also then that you
9  do not know how much time any of the individual
10  working group members spent reading or evaluating
11  materials before the meeting at which they
12  decided to classify glyphosate as a two-way
13  carcinogen?
14      A.   I wouldn't know offhand, but again,
15  these usually are described in the methodologies
16  of the paper as well as the monograph.  I have no
17  reason to doubt what's described in the
18  methodologies.
19      Q.   Okay.  So whatever is there is what
20  you know and nothing more?
21      A.   Yeah.  If they say it's ten hours,
22  then it's ten hours.  If they say one year, it's
23  one year.  I didn't call each one to ask.
24      MR. FOWLER:  Fair enough.  That's all
25  I have.

Page 175

1      MR. SHAH:  I have just got a couple
2  of follow-up questions.
3          [EXAMINATION]
4  QUESTIONS BY MR. SHAH:
5      Q.   Doctor, did you want to just clarify
6  that you're here in an independent capacity
7  instead of as in a capacity for your employer?
8      A.   Yes.  I'd like to go on the record
9  that I'm -- I do not represent my employer.  My
10  opinions are my own and they are only my own.
11  They do not represent the opinion of my employer
12  in any way or shape.
13      Q.   I'll represent that this deposition
14  has also been cross-noticed in the case of
15  Dewayne Johnson.
16          Is it fair to say that you're also an
17  expert in the case of Dewayne Johnson?
18      A.   Yes, I am.  I've been deposed in that
19  case and I've reviewed his records.
20      Q.   And one of the things we were
21  referencing as far as reliance materials was
22  mycosis fungoids, three articles related to that.
23          Is it fair to say that you had
24  reviewed those articles before today?
25      A.   Yes, I did.

Page 176

1      Q.   And you would be prepared to discuss
2  those articles should you have been asked
3  questions about those?
4      A.   Sure.
5      MR. FOWLER:  Let me just, if I could,
6  state for the record here an objection, which is
7  to my knowledge this deposition has not been
8  cross-noticed in any other case.  I'm aware that
9  Mr. Litzenburg offered to do so and we declined
10  the offer.  And if you have a document that shows
11  me otherwise, I'll gladly see it.
12      MR. SHAH:  Objection is noted.
13  BY MR. SHAH:
14      Q.   Last question for you, Doctor.
15      MR. FOWLER:  And let me finish.  And
16  I'll move to strike all of the questions and
17  answers having to do with the D. Johnson case.
18  BY MR. SHAH:
19      Q.   Related to Dewayne Johnson, is it
20  fair to say that you've reviewed the medical
21  bills for Dewayne Johnson?
22      A.   I did.
23      Q.   And is it your opinion that the
24  medical billing for Dewayne Johnson is
25  reasonable?

Page 177

1      A.   I think it's reasonable and I expect
2  it much higher, yes.
3      Q.   Is it fair to say that you've also
4  made an opinion as far as future medical expenses
5  of Dewayne Johnson?
6      A.   Yes.
7      MR. SHAH:  I don't have any further
8  questions, Doctor.
9      MR. FOWLER:  And objection and renew
10  my motion to strike all of the testimony about
11  D. Johnson.
12      MR. SHAH:  Thank you.
13      THE VIDEOGRAPHER:  Going off the
14  record.  The time is 2:56 p.m.
15
16          (Whereupon signature was not waived
17  and the witness was excused.)
18
19
20
21
22
23
24
25

45 (Pages 174 to 177)

Chadi Nabhan, M.D.
June 6, 2018

## Page 178

1    COMES NOW THE WITNESS, CHADI NABHAN,
M.D., and having read the foregoing transcript of
2    the deposition taken on June 6, 2018, acknowledges
by signature hereto that it is a true and accurate
3    transcript of the testimony given on the date
hereinabove mentioned.

4

5    _____
[CHADI NABHAN, M.D.]

6

7         Subscribed to before me this _____
day of _____, 2018.

8

9    _____

10         [Notary Public]

11

My commission expires: _____.

12

13

14

15

16    Case:  PETERSON and HALL vs. MONSANTO COMPANY, et al.
Date Taken:  June 6, 2018
17    Reporter:  Karen Shales, CSR, RPR

18

19

20

21

22

23

24

25

## Page 179

1

2         REPORTER CERTIFICATE

3

I, KAREN SHALES, Certified Shorthand
4    Reporter, do hereby certify that there came
before me at the O'Hare Hyatt Regency, 9300 Bryn
5    Mawr Avenue, Rosemont, Illinois,

6

CHADI NABHAN, M.D.,

7

8    who was by me first duly sworn; that the witness
was carefully examined, that said examination was
9    reported by myself; translated and proofread
using computer-aided transcription, and the above
10    transcript of proceedings is a true and accurate
transcript of my notes as taken at the time of
11    the examination of this witness.

12         I further certify that I am neither
attorney nor counsel for nor related nor employed
13    by any of the parties to the action in which this
examination is taken; further, that I am not a
14    relative or employee of any attorney or counsel
employed by the parties hereto or financially
15    interested in this action.

16         Dated this 11th day of June, 2018.

17

18

19    _____

20         KAREN SHALES, CSR, RPR

21

22

23

24

25

46 (Pages 178 to 179)