# EXHIBIT 24

Andrei Shustov, M.D.

01

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____

IN RE:  ROUNDUP PRODUCTS                )

LIABILITY LITIGATION                    )

_____    ) MDL No. 2741

                                        )

This document relates to:               ) Case No. 16-md-02741-VC

                                        )

Gebeyehou v. Monsanto Co., et al.   )

Case No. 3:16-cv-5814-VC                )

                                        )

                                        )

                                        )

_____

VIDEOTAPED DEPOSITION OF ANDREI SHUSTOV, M.D.

December 16, 2018

Seattle, Washington

Page 2

## APPEARANCES

For the Plaintiff:

R. BRENT WISNER, ESQ.
Baum, Hedlund, Aristei & Goldman, P.C.
10940 Wilshire Boulevard
17th Floor
Los Angeles, California 90024
310.207.3233
rbwisner@baumhedlundlaw.com

For Defendant Monsanto Co.:
AARON H. LEVINE, ESQ.
DAVID KERSCHNER, ESQ.
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, New York 10019
212.836.8000
aaron.levine@arnoldporter.com
david.kerschner@arnoldporter.com

For Defendant Bayer:
LINDLEY J. BRENZA, ESQ.
Bartlit Beck, LLP
1801 Wewatta Street
Suite 1200
Denver, Colorado 80202
303.592.3100
lindley.brenza@bartlitbeck.com

Also present: Allison Borgida, videographer

---

Page 3

### EXAMINATION INDEX

EXAMINATION BY:              PAGE NO.
Mr. Brenza                      6
Mr. Wisner                    145
Mr. Brenza                    167
Mr. Wisner                    175
Mr. Brenza                    177

### EXHIBIT INDEX

EXHIBIT NO.    DESCRIPTION         PAGE NO.
Exhibit No. 26  Monsanto Company's Notice to    5
                Take Oral and Videotaped
                Deposition of Dr. Andrei
                Shustov.

Exhibit No. 27  Expert Report of Dr. Andrei     5
                R. Shustov.

Exhibit No. 28  Expert Report of Dr. Chadi     11
                Nabhan.

Exhibit No. 29  Seattle Cancer Care Alliance   45
                website printout:
                "Non-Hodgkin Lymphoma Facts."

Exhibit No. 30  Encounter record dated          68
                11/22/2006 for Simoun
                Gebeyehou. Labeled
                Confidential-Gebeyehou-
                SGebeyehou-KPNValley-MD-
                003815.

Exhibit No. 31  Office visit record dated       72
                10/8/2006 for Simoun
                Gebeyehou. Labeled
                Confidential-Gebeyehou-
                SGebeyehou-KPNValley-MD-
                000013.

---

Page 4

### EXHIBIT INDEX (Continuing)

EXHIBIT NO.    DESCRIPTION         PAGE NO.
Exhibit No. 32  Encounter record dated          80
                6/22/2016 for Simoun
                Gebeyehou. Labeled
                Confidential-Gebeyehou-
                SGebeyehou-KPNValley-MD-
                003277.

Exhibit No. 33  Critical Reviews in             92
                Toxicology: "Review of
                Genotoxicity Studies of
                Glyphosate and
                Glyphosate-Based
                Formulations."

Exhibit No. 34  Environmental Health           102
                Perspectives: "Glyphosate
                Biomonitoring for Farmers and
                Their Families: Results from
                the Farm Family Exposure
                Study."

Exhibit No. 35  Agricultural Health Study.     118
                Study Update 2018.

---

Page 5

BE IT REMEMBERED that on Sunday, December 16, 2018, at 1900 Fifth Avenue, Seattle, Washington, at 8:49 a.m., before JOHN M.S. BOTELHO, Certified Court Reporter, appeared ANDREI SHUSTOV, M.D., the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

(Exhibit Nos. 26 and 27
marked for identification.)

THE VIDEOGRAPHER:  We are now on the record.  Today's date is Sunday, December 16th, 2018.  And the time is 8:49 a.m.  This video deposition is being held at 1900 Fifth Avenue, Seattle, Washington 98101 in the matter of Gebeyehou vs. Monsanto Company for the United States District Court, Northern District of California.  The deponent is Dr. Andrei Shustov.  My name is Allison Borgida, and I'm the videographer for Golkow Litigation Services.  The court reporter is John Botelho.

Will counsel please state your appearances and affiliations for the record, and then the court

Andrei Shustov, M.D.

Page 6

1    reporter may swear in the witness.
2              MR. WISNER:  Brent Wisner on behalf
3    of the plaintiffs and the deponent.
4              MR. BRENZA:  Lin Brenza with Bartlit
5    Beck for Bayer.
6              MR. KERSCHNER:  David Kerschner from
7    Arnold & Porter for Monsanto.
8              MR. LEVINE:  Aaron Levine from Arnold
9    & Porter for Monsanto.
10
11   ANDREI SHUSTOV, M.D.,     having been first duly sworn
12                by the Certified Court
13                Reporter, deposed and
14                testified as follows:
15
16             MR. WISNER:  Before we get started, I
17   just want to maintain the same objection we discussed
18   yesterday concerning the scope of this deposition being
19   limited to specific causation and specifically for the
20   plaintiff in this case, Gebeyehou.
21
22             EXAMINATION
23   BY MR. BRENZA:
24   Q  What is your name?

Page 7

1    A  Andrei Shustov.
2    Q  Will you spell your last name, please?
3    A  S-h-u-s-t-o-v.
4    Q  Where is your business address?
5    A  Seattle Cancer Care Alliance, 825 Eastlake Avenue East,
6       Seattle, Washington 98109.
7    Q  Do you live in Seattle?
8    A  I live outside Seattle.
9    Q  What's your home address?
10   ███████████████████████████████████████.
11   Q  Are you a medical doctor?
12   A  I am.
13   Q  Did you receive your medical degree in the Ukraine?
14   A  I did.
15   Q  Did you come to the United States to pursue postdoctoral
16      studies?
17   A  That's correct.
18   Q  Are you currently associated with the Seattle Cancer
19      Care Alliance at the University of Washington Medical
20      Center?
21   A  I am.
22   Q  Do you see in front of you a document that I've marked
23      as Exhibit 26?
24   A  I do.
25   Q  Do you see that Exhibit 26 is a notice for your

Page 8

1    deposition today?
2    A  I do.
3    Q  Have you seen Exhibit 26 before?
4    A  I did.
5    Q  Did you review the list of documents requested that's
6       attached to Exhibit 26?
7    A  I did.
8    Q  Did you collect the documents that you had in your
9       possession that were responsive to the deposition
10      notice?
11             MR. WISNER:  Objection.  Answer that
12   question to the extent it doesn't call for any
13   privileged attorney communications.
14             THE WITNESS:  To the best of my
15   abilities.
16   Q  (By Mr. Brenza)  Did that include any e-mails that you
17   received forwarding materials that you used in your
18   expert report?
19             MR. WISNER:  Objection.
20             THE WITNESS:  None that would come
21   from anybody but the attorneys.
22   Q  (By Mr. Brenza)  Did you include any e-mails that you
23   received that provided you materials that you relied on
24   for your expert report?
25             MR. WISNER:  Same objection and

Page 9

1    admonishment.  Answer to the extent it doesn't call for
2    privileged communication.
3              THE WITNESS:  I did include it, the
4    material they relied on, yes.
5    Q  (By Mr. Brenza)  You did include those?
6    A  Yeah.
7    Q  Is -- is the list of all the materials you relied on for
8    your expert report set out in the document we marked
9    yesterday as Exhibit 4?
10             MR. WISNER:  I'd also just note that
11   we submitted a supplemental reliance list as well that's
12   not included in Exhibit 4.
13             THE WITNESS:  Yes, I believe so.
14             THE REPORTER:  What list?
15             MR. WISNER:  Supplemental reliance
16   list.
17   Q  (By Mr. Brenza)  Directing your attention to Exhibit 4,
18   is that a partial list of the materials that you relied
19   on in your expert report?
20   A  To my knowledge, it's a complete list that I relied on.
21   Q  Are the materials listed on Exhibit 4 materials that you
22   found to be reliable for purposes of forming your expert
23   report in this case?
24   A  Yes.
25   Q  Are there any materials on Exhibit 4 that you did not

Andrei Shustov, M.D.

1    rely on in forming your opinions that are set out in
2    your expert report?
3              MR. WISNER:  Objection; vague.
4              THE WITNESS:  I believe I put them
5    there on purpose of disclosing what I used for my
6    report, so I don't think, to the best of my knowledge,
7    that anything listed here I did not rely on.
8    Q  (By Mr. Brenza)  Okay.  Getting back to your deposition
9    notice, you had your deposition taken yesterday, and so
10   you're somewhat familiar with this process now.  But I
11   want to just set out a couple ground rules.
12      If you don't hear or don't understand my question,
13   just let me know, and I'll rephrase it or repeat it.
14   A  Sure.
15   Q  We need to not speak over each other.  There was a
16   problem with that yesterday.  I'll try to finish my
17   question, then let you answer before I start asking
18   another.  Okay?
19   A  Sure.
20   Q  Is the -- let's back up.
21      The document I've marked as Exhibit 27 in front of
22   you, do you see that?
23   A  I do.
24   Q  That's your expert report in the case of Gebeyehou?
25   A  That's correct.

1    Q  Is that how you pronounce the name, or will you
2    understand what I'm talking about if I pronounce it that
3    way?
4    A  Yes.
5    Q  Okay.  Did you prepare Exhibit 27 yourself?
6    A  Yes.
7    Q  Did you write every word of Exhibit 27?
8    A  I wrote most of Exhibit 27 myself, and I used the
9    verbiage from other sources to express my opinion in
10   this report.
11   Q  I'm going to hand you what I've marked -- what I'm
12   marking now as Exhibit 28.
13              (Exhibit No. 28 marked for
14               identification.)
15
16   Q  (By Mr. Brenza)  This is the expert report of Dr. Nabhan
17   in the Gebeyehou case.
18   A  Thank you.
19   Q  Have you seen the expert report of Dr. Nabhan before I
20   just handed it to you?
21   A  I don't recall seeing it.
22   Q  Do you remember yesterday we looked at your report in a
23   different case, and you had confirmed that you used some
24   of the language of Dr. -- of Nabhan's report in your own
25   report?  Do you remember that?

1    A  I do remember that.
2    Q  Did you do the same thing with the Gebeyehou report?
3    Did you use Dr. Nabhan's language in your own report?
4    A  I used -- I type all three reports I was asked to do
5    pertaining to Monsanto case with the same diagnosis at
6    the same time, and I used the language from one report
7    to another that was pertinent from -- for all the
8    plaintiffs to save time.
9    Q  Did you use the language of Dr. Nabhan's report in your
10   own report in the Gebeyehou case?
11   A  In -- to my recollection, Gebeyehou case, I used the
12   report that I created for previous plaintiff that I
13   constructed first in preparing all three reports.
14   Q  Who was the first plaintiff who you prepared a report
15   for?
16   A  If I recall correctly, Mr. Hardeman.
17   Q  So you wrote Dr. Hardeman's report using language from
18   Dr. Nabhan's report, correct?
19   A  That is correct.
20   Q  And then you copied language that you'd used in the
21   Hardeman report for the Gebeyehou report?
22   A  That is correct.  It was appropriate for the same
23   report, for this report.
24   Q  And this is language -- if you look at your own report
25   on Page 6 and the Nabhan report, it's language that has

1    to do with -- this is language that you used from
2    Dr. Nabhan that has to do with general causation issues,
3    right?
4    A  That is correct.
5    Q  Did you use Dr. Nabhan's language for general causation
6    issues because you're not an expert in glyphosate
7    general causation?
8              MR. WISNER:  Objection; calls for a
9    legal conclusion.
10             THE WITNESS:  No.  I used the
11   language from Dr. Nabhan report because it would -- it
12   reflected my conclusion that I drew in reviewing brief
13   evidence -- reviewing briefly papers in general
14   causation to supplement my report, and the language
15   would accurately reflect my understanding of general
16   causation.  So to save time, I used his language.
17   Q  (By Mr. Brenza)  And your understanding of general
18   causation comes from Dr. Nabhan, right?
19   A  No.  My understanding of general causation comes from
20   experts in general causation, Dr. Ritz and Dr. Portier,
21   but I've decided to look at some literature to
22   familiarize myself with -- with the topic.
23   Q  Let me direct your attention to Page 6 and 7 and 8 of
24   your expert report that we've marked as Exhibit 27.
25   Tell me when you're there.



Page 14

1    A   So 6, 7, 8.  I'm here.

5    Q   Is that a discussion of general causation?

6    A   If you read all the bullet points, it is a discussion of

7        general causation.

8    Q   And are these the sections that you ultimately trace

9        back to Dr. Nabhan's report?

10   A   I believe they're the sections for some of which I used

11       the verbiage of Dr. Nabhan report.

12   Q   Do you have the e-mail that you received where you

13       received Dr. Nabhan's report?

14            MR. WISNER:  Objection; assumes facts

15       not in evidence.

16            THE WITNESS:  I must have it

17       somewhere in e-mail that I received from my attorney,

18       yeah.  I received via e-mail, so it must be in my

19       e-mail.

20   Q   (By Mr. Brenza)  And you didn't list that on your

21       materials you relied on?

22   A   I did not rely on that report to make my opinion.  I did

23       not feel this was a document I relied on.  I used the

24       verbiage from that report, but I did not rely on that to

25       make my opinion.  I didn't feel that it's appropriate.

Page 15

1        If I'm erroneous, I apologize.

2    Q   Did you make an independent analysis of all the medical

3        studies that were discussed in Dr. Nabhan's report?

4    A   I made --

5            MR. WISNER:  Objection; scope.  Are

6        you talking about the section on general causation?

7            MR. BRENZA:  Yes.

8            MR. WISNER:  Okay.

9            THE WITNESS:  I made my brief

10       conclusions to familiarize -- familiarize myself with

11       general causation, but I relied on general causation

12       expert to formulate my opinion in specific causation.

13   Q   (By Mr. Brenza)  Have you previously testified for

14       individuals who were claiming to have been injured by

15       glyphosate?

16   A   No.  Not outside current proceedings.

17   Q   Okay.  Have you done any research involving glyphosate?

18   A   No.

19   Q   Have you ever written anything about glyphosate?

20   A   No.

21   Q   Have you ever spoken about glyphosate?

22   A   No.

23   Q   Are you an expert in glyphosate?

24   A   No.

25   Q   Was the first time you opined that glyphosate was a

Page 16

1        possible cause of cancer in this litigation?  First time

2        you ever said that, right?

3    A   In this particular litigation?

4    Q   Yes.

5    A   Yes.

Page 17

Andrei Shustov, M.D.



Page 18

Page 20

Page 21

9   Q   Are the causes of non-Hodgkin's lymphoma unknown in the

10       majority of patients?

11   A   Unknown to the degree that we generally do not look for

12       causes in most of the patients.

13   Q   I'm not sure that answered my question.

14       Are the causes of non-Hodgkin's lymphoma unknown in

15       the majority of patients?

16           MR. WISNER:  Objection; asked and

17       answered.

18           THE WITNESS:  Once again, it's --

19       it's -- the question that can be answered different

20       ways.  It can be stated they're unknown, but it can also

21       be stated that they're unknown because we never made

22       queries into every particular patient and specific

23       investigation into risk factors in general medical

24       practice.

25   Q   (By Mr. Brenza)  But as you sit here today, without

Andrei Shustov, M.D.

---

**Page 22**

1    having done research into what might be the causes, you
2    don't -- you don't know the causes of non-Hodgkin's
3    lymphoma in the vast majority of patients that present
4    with it, right?
5            MR. WISNER:  Objection; vague,
6    speculation.
7            THE WITNESS:  For the majority of
8    patients diagnosed with non-Hodgkin lymphoma, yes, we
9    don't know.
10   Q  (By Mr. Brenza)  And we looked at some studies yesterday
11   on epidemiolog -- epidemiology of non-Hodgkin's
12   lymphoma.  You remember those?
13   A  I do.
14   Q  So somebody's out there trying to find out what causes
15   non-Hodgkin -- non-Hodgkin's lymphoma, right?
16   A  That's correct.
17   Q  And they do that by looking at large numbers of people
18   and trying to find something that they may all have in
19   common or some of them have in common, right?
20   A  Sure.
21   Q  Is that the right way to try to figure out what causes
22   non-Hodg -- non-Hodgkin's lymphoma?
23           MR. WISNER:  Objection; calls for
24   outside the scope.
25           THE WITNESS:  That's probably the

**Page 23**

1    best available way to try to figure that out.  It's not
2    the best way, but it's the best available way.
3    Q  (By Mr. Brenza)  What is the -- what would be the best
4    way?  Or is -- are you referring to the experiment that
5    we concluded was ethically improper yesterday?
6    A  No.  The -- the hypothetical best available way would be
7    to tag a newborn with a chip that would record every
8    single event in his life and record all he eats and
9    where he travels and exposure to radiation through his
10   life, as -- I'm just hypothesizing, giving you an
11   example.  That would be the best way.  And then lymphoma
12   is diagnosed, and you pull up the record and put it all
13   into massive cloud and calculate probabilities.  That
14   would be -- if we could do that, then we would know
15   probably causes for most lymphomas.
16   Q  So if you had perfect information about everybody and
17   then could look at that after the fact, you might be
18   able to figure out what --
19   A  That is --
20   Q  -- factors cause it?
21   A  That is correct.
22   Q  And that's true for all cancer, right?  I mean, the
23   causes of cancer are many and varied, and no -- no one's
24   really sure what they are?
25           MR. WISNER:  Objection; speculation.

**Page 24**

1            THE WITNESS:  That is true for many
2    cancers, but it is also true for many cancers we have
3    identified causes in many patients.  We cannot dismiss
4    those.



23   Q  And non-Hodgkin's lymphoma is made up of about 60 or
24   more different types of cancer, right?
25   A  That is correct.

**Page 25**

1    Q  Each of those types of cancer is different from each
2    other as non-Hodgkin's lymphoma is from other kinds of
3    cancer?
4    A  They're different, and they're similar.  There is a
5    great overlap, and there is certain specific features of
6    these lymphomas.  That is why majority of them are
7    treated the same way, but in some cases we implement
8    slightly different types of treatment.  So they have
9    similarities and overlap sometimes even in molecular
10   pathways that they use, but there is something that
11   defines them separate enough to call them a specific
12   entity.
13   Q  Do the different entities of non-Hodgkin's lymphoma have
14   different risk factors?
15   A  It's a very broad question, and we have -- we think that
16   in some specific type of non-Hodgkin lymphomas, there is
17   a specific cause.  But for majority of them, it is not
18   inconceivable that they have commonalities in what
19   caused them.
20       As an example, patients who are exposed to
21   radiation as professional activities or in any other
22   capacities can develop any type of lymphoma.  Patients
23   who are infected with HTLV-1 virus can develop a very
24   specific T-cell lymphoma.  EBV causes very specific type
25   of lymphoma, but not others.  But exposure to common

---

Andrei Shustov, M.D.

Page 26

1 carcinogens may cause any type of lymphoma. That's a
2 very broad question.
3 Q  So you've set out some of the risk factors.  Is one of
4 the risk factors for DLBCL environmental factors such as
5 exposure to chemicals?
6 A  Again, it's a broad statement, but chemicals that are
7 known carcinogen, yes.
8 Q  And that includes, you mentioned yesterday, military
9 chemicals?
10 A  The chemicals that have been linked, identified as cause
11 of non-Hodgkin lymphomas and potential other cancers,
12 yes, found in military environment, industrial,
13 households.  In the military, examples would be well-
14 known Agent Orange and jet fumes, exposure to asbestos
15 in the Navy in the past.  Those are examples.
16 Q  You also mentioned agricultural-related chemicals,
17 right?
18 A  Did I?
19 Q  Yesterday.
20 A  Yes.
21 Q  And that includes a wide variety of chemicals that might
22 be encountered on a farm, right?
23 A  Potentially.
24 Q  Not just -- it's not just glyphosate.  It's all
25 pesticides, all fungicides, rodenticides, fertilizers,

Page 27

1 diesel fumes, all kinds of chemicals?
2 A  Well, it's a very broad statement as a clinician.  And
3 if I were to look at the cause, I would refer to sources
4 to advise me specifically what chemicals were herbicides
5 and that are specifically linked with development of
6 lymphomas.  I would try not to do a very general, broad
7 statement like that.
8 Q  Well, it's not -- it's not just herbicides, right?  It's
9 all farm chemicals?
10 A  I did say that.  And I don't think it's fair to say --
11 lump everything together.  Once again, I would defer to
12 experts in epidemiology, general causation, toxicology,
13 where I would go to sources and see if this particular
14 chemical is listed as potential carcinogens.
15   And this happens occasionally when patient would
16 bring me the list of, say, chemicals that are provided
17 by the employer and ask me to opine on whether or not
18 this was a occupational hazard, et cetera.  So there is
19 a specific list that is provided by organizations like
20 DOD or -- I -- I can't recall that -- all the, again,
21 antigens that patient use.
22   VA has the list of defined carcinogens that they
23 give to patients diagnosed with cancer that for the
24 particular purpose is defined, so whether or not they
25 cover their services, et cetera.  But there is a list of

Page 28

1 agreed and defined carcinogens for different areas of
2 human activity, military, occupational, et cetera.
3 Q  Do you know that farmers are often exposed to a variety
4 of chemicals related to their work?
5     MR. WISNER:  Objection; lacks
6 foundation, speculation.
7     THE WITNESS:  I do not work with
8 farmers.  I would absolutely have to speculate, and I --
9 I would assume that they have -- they use various
10 chemicals in their practice.  Again, this is assumption.
11 I've never been a farmer.  I grew up in a city.  I
12 didn't study farming.  That's complete speculation on my
13 part.
14 Q  (By Mr. Brenza)  Has the -- do you know that farmers
15 have a higher rate of non-Hodgkin's lymphoma than other
16 professions?
17 A  That is the fact that, to the best of my recollection, I
18 have encountered before.  But if you ask me my -- my
19 general opinion as an oncologist, I would say "yes."
20 And if you ask specific, I'll have to go in literature
21 and look.
22 Q  You haven't done that as you sit here today?
23 A  I have -- I have not specifically did a search on
24 farmers and risk of non-Hodgkin lymphoma.  I have
25 encountered some statements in the reference papers that

Page 29

1 were in the discussions, but I have not done independent
2 search to look into that.
3 Q  And those references that you mention identify exposure
4 to multiple chemicals, right?  They're not just about
5 glyphosate?
6 A  Again, this is very -- we went through the references
7 yesterday.  It's a very general statement.  We looked at
8 some papers yesterday that adjusted for various
9 pesticides, look at various pesticides.  For the -- I
10 feel for sake of current discussions, once again, I
11 believe farmers exposed to multiple chemicals, but I
12 don't believe that all of them can be lumped into
13 carcinogens.  And I would, again, rely on the
14 epidemiologic literature to advise clinicians, and in a
15 very more beneficial way, I would rely on opinion and
16 expertise of epidemiologists and toxicologists to advise
17 clinicians that whether this particular chemical is
18 carcinogen or not.
19 Q  You -- you understand, though, when somebody's exposed
20 to multiple chemicals, you have to control for the
21 effect of those other chemicals to figure out whether
22 any particular one is causing an effect, right?
23     MR. WISNER:  Objection; incomplete
24 hypothetical, vague.
25     THE WITNESS:  As a -- as a research

**Page 30**

1   method, I would say that that's probably what needs to
2   be done in those studies.
3   Q   (By Mr. Brenza)  Has the rate of non-Hodgkin's lymphoma
4   been increasing in the United States for many decades?
5   A   That is true.
6   Q   Did the increase begin in the 1950s and 1960s?
7   A   That is true, and that's the time where epidemiologic
8   studies in the United States really started to become
9   consolidated and reliable information started to be
10  collected.  It does not mean that the rate has not been
11  increasing before that.  It's just the epidemiologic
12  science and reliable correction of data.
13      The answer is, again, it's a broad question for
14  academician.  I would say "yes," but there is a reason
15  for that.  And collection of information was starting to
16  really consolidate in those times, the formation of SEER
17  registry and epidemiologic institution databases, and
18  they were not developed in early 1900s or last century,
19  but -- so we cannot say they were not increasing before
20  that, but in a simple answer is, yes, it was increasing.
21  Q   Has the rate of increase in non-Hodgkin's lymphoma
22  leveled off in the last decade or two?
23  A   I would have to do a quick search to answer that
24  question.  I think so that the rate is -- the -- the
25  curve is not as steep.  But, again, I would have to make

**Page 31**

1   a quick reference.  It's not something I look at
2   every -- in my everyday practice.
3       MR. WISNER:  If you're going to move
4   on to another topic, can we take a quick break off the
5   record?
6       MR. BRENZA:  Sure.
7       THE VIDEOGRAPHER:  All right.  We're
8   going off record.  The time is 9:26 a.m.
9       (Pause in proceedings.)
10
11      THE VIDEOGRAPHER:  We are back on
12  record.  The time is 9:37 a.m.
13  Q   (By Mr. Brenza)  Doctor, what do you consider to be your
14  areas of expertise?
15  A   I'm -- I would consider myself to be expert in cancer,
16  specifically high expertise in lymphoma, lymphoma
17  diagnosis, lymphoma signs, lymphoma treatment, and
18  management of patient with lymphomas.  Designing,
19  executing clinical trials in investigating drugs for
20  non-Hodgkin and Hodgkin lymphoma.  And having background
21  in immunology based on my bench research that I have
22  done at the University of Washing -- University of
23  Maryland before.
24  Q   Did any part of your background in immunology involve
25  the ability of viruses to cause cancer in cells?

**Page 32**

1   A   No.
2   Q   With -- with respect to the areas that you're not expert
3   in -- I'm going to go through a list.  And it's not to
4   disparage the areas that you are an expert in.  I just
5   want to make sure I understand the limits of your --
6   your expertise.
7   A   Sure.
8   Q   Okay?
9       So you're not an expert in toxicology, right?
10  A   No.
11  Q   You're --
12      MR. WISNER:  I'm just going to have a
13  standing objection -- I don't want to do it each time --
14  to legal conclusion on the word "expert."
15      MR. BRENZA:  Got it.
16  Q   (By Mr. Brenza)  You're not an expert in epidemiology,
17  right?
18  A   No.
19  Q   You're not an expert in glyphosate?
20  A   No.
21  Q   You're not an expert in glyphosate-based formulations?
22  A   No.
23  Q   You're not an expert in surfactants?
24  A   No.
25  Q   You are not an expert in cancer caused by -- identifying

**Page 33**

1   cancer caused by radiation?
2   A   That's a nonsensical question.  I can't answer that.
3   Q   Why do you say that?
4   A   It just doesn't make any sense to oncologist and
5   clinician, not being an expert in cancer caused by
6   radiation.  There's no expertise in cancer caused by
7   radiation.  It's one of the cause -- causes of cancer in
8   humans, but there is no such a thing as expertise in
9   cancer caused by radiation.  It's just absolutely
10  nonsensical to oncologist or any medical professional.
11  Q   Is it correct that just looking at the cancer, you can't
12  tell whether it was caused by radiation, chemicals,
13  infection, or something else?
14      MR. WISNER:  Objection; overbroad.
15      THE WITNESS:  In the vast majority of
16  cases, yes.
17  ▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
18  ▇ ▇▇▇▇
19  ▇ ▇▇▇▇▇▇▇▇▇▇
20  Q   Getting back to the list of topics, are you an expert in
21  chemistry?
22      MR. WISNER:  Objection; broad.
23      THE WITNESS:  No.
24  Q   (By Mr. Brenza)  Are you an expert in pathology?
25  A   No.

Andrei Shustov, M.D.

Page 34

1   Q   Are you an expert in chemical exposures?
2           MR. WISNER: Objection; vague.
3   Q   (By Mr. Brenza) Calculating exposures?
4   A   No.
5   Q   Are you an industrial hygienist?
6   A   No.
7   Q   Are you an expert in statistics?
8   A   No.
9   Q   Are you an expert in infectious disease?
10  A   Not in a general definition of expertise, no.
11  Q   Did your method in your report involve something called
12      a -- differential diagnosis?
13  A   That is correct.
14  Q   For a differential diagnosis -- we talked a little
15      yesterday about that -- is -- is usually referred -- you
16      referred to a method used to diagnose a disease in
17      patients, right?
18  A   That is correct.
19  Q   And when you use differential diagnosis to diagnose a
20      disease, you can then go and verify your diagnosis by
21      testing for it, right?
22  A   Well, part of the differential diagnosis in diagnosing
23      the disease is already having all available information
24      at hand to make a diagnosis.
25  Q   So the tests are part of that information?

Page 35

1   A   That is correct.
2   Q   Does differential diagnosis require you to have
3       knowledge about all the possible diseases that the
4       person may have and the probability that disease is
5       the accurate one?
6           MR. WISNER: Objection; vague.
7           THE WITNESS: It is a very broad
8       question. Because as an example, if I created
9       differential diagnosis of enlarged lymph node in
10      somebody, whether or not it is cancer or it is
11      inflammation, information like somebody having psoriasis
12      or somebody having a broken toe is irrelevant.
13          So if you take a regular medical practice and you
14      interview the physician in particular specialty area or
15      asking about particular diagnosis for which differential
16      diagnosis was created, the differential -- listing the
17      differential diagnosis would not include dozens of
18      irrelevant facts, medical facts about this patient.
19  Q   (By Mr. Brenza) When you use differential diagnosis to
20      diagnose a disease, you said you have the results of
21      specific tests for various diseases, right?
22  A   Preferably. And some of the tests then will be
23      triggered based what is in the differential diagnosis.
24  Q   I didn't understand that last part. Some of the -- you
25      said some of the tests will trigger? Just explain it to

Page 36

1       me.
2   A   So differential diagnosis is a continuous process. To
3       give an example, if patient comes in my area of
4       expertise with enlarged lymph node and, say, symptoms of
5       inflammation and also has findings on physical exam of
6       lymphadenopathy, enlarged lymph nodes, or even a CT
7       scan, and I say, Okay, this patient has enlarged lymph
8       nodes. It could be infection. Could be inflammation.
9       Could be sarcoidosis. But then it triggers the biopsy.
10      I don't have results of the biopsy before. Then biopsy
11      might be suggestive of different disease that -- that
12      opens up a -- different possibilities and they need to
13      order tests. So I have -- I would have a set of tests
14      before that help me create differential diagnosis, but
15      then it also triggers subsequent investigation to rule
16      out possibilities on my list or rule something new in
17      that collectively I already refer to as hypothetical
18      deductive method, but it's a continuous process.
19  Q   Okay. So you start with a list of could-be's and
20      then -- is that right?
21  A   That is correct.
22  Q   And then you do additional tests to determine which of
23      the could-be's are wrong. And what's left is what
24      you're going to go with, what you're going to diagnose?
25  A   If the tests are appropriate for the situation. And in

Page 37

1       some situations, there are no additional testing
2       required and you have to think about probabilities and
3       eliminate them based on already available information.
4           Many times there are confirmatory tests. But many
5       times in the clinical situation, we come up with
6       differential diagnosis and then again create this
7       deduction method where this is less likely, this is less
8       likely, this is less likely, until you ideally come to a
9       single diagnosis. But in many cases, medicine being not
10      exact science, you say, This could be this, it could be
11      this, and you make your best clinical judgment call.
12  Q   In order to do the analysis you just described, you have
13      to understand what's less likely, what the probabilities
14      are of the various options you're considering, right?
15  A   That is correct.
16  Q   And that's true for the way that you used differential
17      diagnosis to identify a cause of Mr. Gebeyehou's
18      non-Hodgkin's lymphoma in this case, right?
19  A   That is true.
20  Q   You'd have to know the probabilities of all the other
21      possible causes of non-Hodgkin's lymphoma?
22  A   Causes that either identifiable or are relevant to
23      somebody's case.

Andrei Shustov, M.D.



Page 38

Page 39

Page 40

5  Q  (By Mr. Brenza)  Do you have a specific opinion about
6      how long it takes for any particular chemical to cause
7      cancer?
8              MR. WISNER:  Objection; overbroad.
9              MR. BRENZA:  Let me narrow it.

Page 41

16  Q  (By Mr. Brenza)  Is it generally true that the level of
17      exposure to a potential risk factor is relevant to
18      determining the probability that risk factor caused any
19      cancer?
20  A   It is generally true.
21  Q   So the more radiation you're exposed to, the more likely
22      you're going to have cancer from that radiation?
23  A   It is generally true.
24  Q   And that's true for chemicals too, that the more of a
25      chemical you're exposed to, the more likely it's going

Andrel Shustov, M.D.

Page 42

1    to produce a cancer?
2              MR. WISNER:  Objection; incomplete
3    hypothetical, overbroad.
4              THE WITNESS:  As -- as a general
5    statement, yes.
6    Q  (By Mr. Brenza)  And is the reverse also true?  The less
7    you're exposed, the less likely it's going to cause a
8    problem?
9              MR. WISNER:  Same objection.
10             THE WITNESS:  It is generally true.
11   And it is also true that the single exposure to a factor
12   can produce a single right mutation that might
13   eventually lead to cancer.  But as a general statistical
14   statement, you're correct.  The --
15   Q  (By Mr. Brenza)  The less -- the less you're exposed,
16   the less your risk?
17             MR. WISNER:  Same objection.
18             THE WITNESS:  That is correct.

Page 43

Page 44

17   Q  Is non-Hodgkin's lymphoma a common type of cancer?
18             MR. WISNER:  Objection; vague as to
19   "common."
20             THE WITNESS:  It is a common type of
21   cancer in humans.
22   Q  (By Mr. Brenza)  Is DLBCL the most common form of
23   non-Hodgkin's lymphoma?
24   A  In adults, yes.

Page 45

4              (Exhibit No. 29 marked for
5              identification.)
6
7    Q  (By Mr. Brenza)  I'm going to hand you what I'm marking
8    now as Exhibit 29.  Exhibit 29 is a printout of the
9    material on a website from Seattle Cancer Care Alliance.
10   Do you see that?
11   A  Yes.
12   Q  And that's the -- that's where you work, right?
13   A  Yes.
14   Q  So are you familiar with the material that I've handed
15   you as Exhibit 29?
16   A  Yes.
17   Q  Do you see under the first question on the first page,
18   "What is non-Hodgkin's lymphoma?"
19   A  I do.
20   Q  And the answer -- there are a list of bullet points
21   there --
22   A  Mm-hmm.
23   Q  -- that answer the question?
24      And the last one says, "NHL can be cured."
25      Do you see that?



Andrei Shustov, M.D.



Page 46

1  A  Yes.

10  Q  If you would direct your attention to the second-to-last
11     page.  And your -- I don't know if yours has
12     highlighting on it.  If it does, I'll -- I'll take
13     responsibility for that.  That's not part of the
14     original.
15        You see where it says, "Doctors do not know what
16     causes NHL"?
17           MR. WISNER:  On Page 5 of 6?
18           MR. BRENZA:  Yes.
19           MR. WISNER:  Okay.
20           THE WITNESS:  Yeah, I do see that.
21  Q  (By Mr. Brenza)  And you agree with that, right?
22  A  It is a very broad statement.
23  Q  Broad but true?
24  A  Once again, the problem with broad statements is that
25     they can be true, or if you ask specific questions, they

Page 47

1     are not true.  But as a broad, general statement, it is
2     true.  But general statements do not always apply to a
3     particular person.

Page 48

4  Q  (By Mr. Brenza)  Do you -- do you see the paragraph that
5     follow that sentence that says, "You may be at higher
6     risk if any of these are true"?
7  A  Yes.
8  Q  And there are three bullet points.  Do you see that?
9  A  Yes.
10  Q  First one says, "Your immune system is weakened by an
11     inherited disease, autoimmune disease, human
12     immunodeficiency virus (HIV) or drugs given because you
13     had an organ transplant."
14        Do you see that?
15  A  Yes.
16  Q  Are immune system abnormalities a possible cause of
17     non-Hodgkin's lymphoma?
18  A  As a very broad, general statement, it has the same
19     problems.  You can say "yes," but it would not be true
20     for majority of autoimmune diagnosis.
21  Q  So there are many people who have that risk factor that
22     do not get non-Hodgkin's lymphoma.  Is that what you're
23     saying?
24  A  There are a lot of -- there are a lot of people who have
25     autoimmune disease that has nothing to do with

Page 49

1     non-Hodgkin lymphoma.  Again, for a public -- for a
2     public, it is okay to make a general, broad statement
3     like that.  But it's hard to apply it in many cases to a
4     particular patient situation.  Because autoimmune
5     disease might involve a little patch of eczema on the
6     skin.  It might involve a very minor autoimmune
7     condition like seasonal allergies.  It might involve
8     allergic itching of your eye.  So those are all
9     autoimmune conditions.  But they have nothing to do with
10     lymphoma.
11        But big autoimmune conditions like Crohn's disease
12     and rheumatoid arthritis and lupus have been linked to
13     lymphoma.  So if you make a broad statement, do
14     autoimmune condition associate with lymphoma?  Yes.  But
15     if you start diving in and look at the particular
16     examples, then the answer could also be "no."
17        It's very hard to make broad statement like this if
18     you can imagine.  Again, if you really wanted to make
19     definitive statement about immune conditions and other
20     risk factors, this would be a very, very big document.
21  Q  Do you see the second bullet point that talks about
22     infection with certain viruses?
23  A  That is correct.
24  Q  Is certain viral infections also a potential risk factor
25     for non-Hodgkin's lymphoma?

Andrei Shustov, M.D.

Page 50

1  A  That is correct.

2  Q  Does that include hepatitis c?

3  A  That is correct.

4  Q  Epstein-Barr virus?

5  A  That is correct.

6  Q  Hepatitis B?

7  A  In particular situations.  As a broad statement, yes.

8     As I explained then, it has a caveat of looking at the

9     details of particular patient.

10  Q  Do those include infections with bacteria such as

11     Helicobacter pylori?

12        MR. WISNER:  Well done.

13        THE WITNESS:  Good job.

14     As a broad statement, again, if you say is it --

15     does it involve bacteria, if I say "yes," then the --

16     there are only two or three examples of thousands of

17     bacteria that were associated with -- with lymphoma.

18     But the vast majority of bacteria were not.  That's why

19     it's listed specifically.

20  Q  (By Mr. Brenza)  Is the same thing true about the next

21     one where it talks about chemicals that can be a risk

22     factor for non-Hodgkin's lymphoma?

23  A  Correct.

24  Q  And that includes pesticides, herbicides, solvents, and

25     fertilizers?

Page 51

1  A  Correct.

2  Q  Those are all possible risk factors?

3  A  The same rule applies to me as a scientist/clinician.

4     You have to look at the particular examples of a

5     patient, and particular in this case, pesticides,

6     herbicides.

7  Q  If you take all the risks that are known in connection

8     with non-Hodgkin's lymphoma that have been identified in

9     this document we're looking at and evaluate how many

10     cases of non-Hodgkin's lymphoma they would be expected

11     to produce, is there a large amount of non-Hodgkin's

12     lymphoma that isn't explained by any of these factors?

13        MR. WISNER:  Objection; speculation.

14        THE WITNESS:  That is correct.

15  Q  (By Mr. Brenza)  Is it fair to say that the majority of

16     non-Hodgkin's lymphoma isn't explained specifically by

17     any of the factors we've just discussed?

18        MR. WISNER:  Objection; speculation.

19        THE WITNESS:  This is to me a broad

20     statement that requires clarification.  As a general

21     statement, yes, the majority of cases of non-Hodgkin

22     lymphoma have not had documented cause, with a caveat

23     that in majority of cases, non-Hodgkin lymphomas, we do

24     not look at their causes because 90 percent of patients

25     are treated in the community and it's not a job of

Page 52

1     community physicians to look at causality of cancer, but

2     if you look at just published literature that's skewed

3     towards what comes to academia, and yes.

4  Q  (By Mr. Brenza)  Another risk factor that's not listed

5     here is age, right?

6  A  I do not believe age is a risk factor.

7  Q  Does cancer become more common as people age?

8  A  As people age, everything becomes more common, including

9     cancer.

19  Q  And I think you said yesterday that age, in your

20     opinion, doesn't independently cause cancer, but it

21     signifies the accumulation of insults that your body has

22     withstood over the course of your lifetime, and they add

23     up?

24  A  If I remember correctly -- I would have to look at my

25     deposition -- I did not, or then I should not have

Page 53

1     stated age causes cancer.  Statistically, we identify

2     lymphomas more commonly in older patients.  And it is my

3     opinion -- and I would believe it would be shared with

4     majority of my peer expert -- lymphoma is a reflection

5     of longer times of exposure to either known or unknown

6     carcinogens and accumulation of more diseases as we age.

7     As stated here, in some patients, autoimmune disease

8     also more prevalent with age.

9        But age, itself, does not cause cancer.  It's a

10     reflection of -- it's a surrogate marker for a longer

11     time of exposure to factors that do cause cancer.  And

12     maybe -- just came something to -- let me just give you

13     an example.  We discuss this actually as an exercise at

14     one of the sessions with fellows.

15        Bald people have more prostate cancer.  Does it

16     mean that baldness causes prostate cancer?  It has

17     nothing to do with it.  Right?  People age, and they get

18     bald more frequently, and prostate cancer is more

19     prevalent in old men.  If you do statistical analysis,

20     bald people -- baldness would be associated with

21     prostate cancer.  Does it have anything to do with

22     prostate cancer?  No, it doesn't.

23        Statistically, you have to define the right goal in

24     your research and make a reasonable parameter to look

25     at.  Because you can look at unreasonable parameters and

Andrei Shustov, M.D.

Page 54

1   still find statistical significance.  So for any
2   sensible research oncologist, scientist, you have to
3   have first some mechanistic idea that it could be
4   causing cancer, and then you interrogate in
5   epidemiologic study.
6       If I say we're going to look at cataracts and
7   pancreatic cancer, and pancreatic cancer is common in
8   older people, contacts are common in older people, I can
9   guarantee we'll find association.  Does it mean
10  cataracts cause pancreatic cancer?  It has nothing to do
11  with it.  Right?  So we have to define reasonable goals
12  in the statistical analysis.
13      Because for exercise, we can look at anything.  So
14  to me, age is an exercise where age does not cause
15  lymphomas.  So we have to really identify
16  mechanistically what's likely causing lymphomas and then
17  interrogate it in the epidemiologic studies.
18  Q  Is the effect you've described where -- just taking the
19     first of your examples -- baldness and prostate cancer.
20  A  Mm-hmm.
21  Q  Is that called covariance?
22              MR. WISNER:  Objection; beyond the
23     scope.
24              THE WITNESS:  It depends on the
25     context of how you research that, so...

Page 55

1   Q  (By Mr. Brenza)  It's two things that aren't causing
2      each other but travel together?
3   A  That is correct.  And, again, in my opinion, that
4      reflects the role of age in, as you -- what you stated,
5      causing lymphoma.  I do not think, as a lymphoma
6      scientist and expert, age causes lymphomas.  We see
7      lymphomas more commonly with older people.  But with all
8      the knowledge and experience in lymphomas that I have,
9      to me it means it's a reflection that older people have
10     longer time of exposure or chance to be exposed, move
11     around the country, move different location.  The longer
12     you live, you accumulate risk factors in your life.
13  Q  So it's important, if you're looking for associations,
14     that you make sure you're not picking up two things that
15     travel together that don't necessarily have anything to
16     do with each other?
17  A  Exactly right.
18  Q  And that can happen if you don't define your -- your
19     study correctly?
20  A  As you -- if you -- if you pick your statistical
21     variables incorrectly and randomly, you might find
22     associations, like you said, have nothing to -- to do
23     with one another, but statistically travel together.



Andrei Shustov, M.D.



Andrel Shustov, M.D.

Page 62

Page 64

1   MR. WISNER:  Objection; overbroad.

2   THE WITNESS:  Just like our previous

3   discussions with other causes and statements, it is a --

4   an extremely broad statement that can be answered either

5   way depending on particular situation.  There are

6   cancers for which germ line mutations have been

7   identified and confirmed and proven.  Examples would be

8   BRCA1, BRCA2 in -- in women with breast/ovarian cancer,

9   Lynch syndrome in hereditary colon cancer, and

10  retinoblastoma gene in eyeball cancer.  So there are few

11  or very few defined mutations that you pass to next

12  generation to cause their cancers.

13     Having a cluster of particular diagnosis in a

14  family without identifiable or known germ line mutation

15  raises the suspicion for what we call familial cancer,

16  not hereditary cancer.  There's a big difference between

17  those.  Because familial cancer could be related to

18  common exposure of the family if they drank water from

19  somewhere that source with carcinogen being in the same

20  household, or it could be that this particular family

21  has brand-new, not-yet-identified genetic factor.

22     So there are research that's been done in MD

23  Anderson and now Dow institution looking at those really

24  rare cases of familial lymphomas and leukemias where, on

25  the general platform, we do not believe that lymphoma is

Page 63

Page 65

1   inherited cancer.

2   Q

6   Q  Smoking is a risk factor for non-Hodgkin's lymphoma,

7      right?

8   A  Not to my understanding and not to my knowledge.  It's a

9      much more well-defined risk factor for lung cancer,

10     bladder cancer, leukemias.  But I do not believe that

11     there is a clear association between smoking and

12     lymphomas.

13  Q  Does smoking damage DNA?

14     MR. WISNER:  Objection; vague.

15     THE WITNESS:  As a general statement,

16     yes.  With a caveat that this -- studies, if I remember

17     correctly, were performed in -- in lung cancer setting.

18     This is the question I would have to really do my

19     research to give more detailed answer.  But as a general

20     statement, it can cause DNA breaks.

21  Q  (By Mr. Brenza)  And I believe you testified yesterday

22     that once those DNA breaks occur, the body never repairs

23     them?

24     MR. WISNER:  Objection.

25  Q  (By Mr. Brenza)  Is that right?

24  Q  Is cancer in your parents a risk factor for getting

25     cancer yourself?



Andrei Shustov, M.D.



Page 66

1    MR. WISNER:  Objection.
2    THE WITNESS:  As a broad, general
3  statement, yes.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19    MR. BRENZA:  Okay.  Why don't we take
20  a brief minute and get some stuff together.
21    THE VIDEOGRAPHER:  All right.  We're
22  going off record.  The time is 10:31 a.m.
23    (Pause in proceedings.)
24
25    THE VIDEOGRAPHER:  We are back on

Page 67

1  record.  The time is 10:43 a.m.
2  Q  (By Mr. Brenza)  Doctor, one more question I had on
3    Exhibit 29.  If you would pull that one out.
4  A  I'm here.
5  Q  The last page.  And we just didn't make it all the way
6    to the end.
7    Do you see the sentence that begins with the words,
8    "Keep in mind"?
9  A  I do.
10  Q  It says, "Keep in mind that many people who get the
11    disease have none of these risk factors, and most people
12    with these risk factors do not develop the disease."
13    Do you see that?
14  A  I see that.
15  Q  Is that a true statement about non-Hodgkin's lymphoma
16    with respect to the most common risk factors?
17  A  Well, I believe that this sentence refers to what's
18    listed in this, three bullet points.  And I don't think
19    this is a complete list of things can be -- that can
20    cause non-Hodgkin's lymphoma, first of all.  And
21    secondly -- I think we went through this several
22    times -- in most people, we do not do diligence
23    eliciting this information.  As a general statement for
24    a patient on a public website, it is an acceptable
25    statement, but you really have to look at any particular

Page 68

1  person.
2  Q  The risk factors we did talk about in the three
3    preceding bullet points, those are -- those cover a
4    large and broad array of the risk factors for
5    non-Hodgkin's lymphoma, right?
6  A  They would cover significant proportion.  It don't list
7    a radiation.  It's -- it's very specific.  But it would
8    cover significant proportion of known cause -- causes of
9    lymphoma.
10  Q  Would you say that they encompass the most common risk
11    factors for non-Hodgkin's lymphoma?
12  A  More or less, yes.
13  Q  And the sentence we read before, "Keep in mind that many
14    people who get the disease have none of these risk
15    factors, and most people with these risk factors do not
16    develop the disease," that's a -- that's a true
17    statement with respect to the risk factors that are
18    enumerated above it, right?
19  A  Sure.
20  Q  Okay.  You can put that one aside for a moment.
21    I'm going to hand you what I'm marking as 30.
22    (Exhibit No. 30 marked for
23    identification.)
24
25

Page 69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Andrei Shustov, M.D.



Andrei Shustov, M.D.



Andrei Shustov, M.D.



Page 78

Page 80

Page 79

Page 81

Andrei Shustov, M.D.



Andrei Shustov, M.D.



Page 86

Page 88

14 Q  (By Mr. Brenza)  Okay.  Is the process of -- that you
15    used of, we'll say differential causation, to capture
16    the idea that you're using differential diagnosis to
17    ascribe a cause?  Is that fair?
18 A  It is.
19 Q  Is the process of differential causation a
20    scientifically validated process for identifying the
21    cause of a disease?
22 A  It is not scientifically established, but it's a most
23    common cause used in clinical practice where scientific
24    evidence is lacking for particular questions.  And as a
25    matter of fact, majority of things in medicine are not

Page 87

Page 89

1    hundred percent certain and require a degree of clinical
2    judgment and estimation to either confirm diagnosis,
3    confirm treatment.  And this is the case with
4    differential causation, differential diagnosis
5    methodology.
6 Q  And the method you used of differential causation or
7    differential diagnosis used for a causation and
8    conclusion, there's no study that shows that that's an
9    accurate way of ascribing causation, is there?
10 A  I am not familiar with any study, either with
11    differential causation methodology or differential
12    diagnosis.  It is something that was established by
13    generations of physicians to arrive at diagnosis where
14    we lack a specific test to identify either diagnos --
15    diagnosis or cause of -- of the disease.
16 Q  Is it -- is it -- is it a method you use when you don't
17    really have a -- a scientific way of identifying the
18    cause of a disease?
19 A  Well, again, in a broad sense, any method is, as a
20    degree of science, a hypothetically deductive method.
21    It is a scientific method that is different from
22    performing a chemical test.  It is different from
23    performing statistical analysis on data population, but
24    it is a method that we apply to diagnose or come to
25    conclusion when we have -- we are presented with

Andrei Shustov, M.D.

Page 90

1    multiple options for diagnosis or causation.
2        And like I said, I think it is to certain degree
3    this deductive -- hypothetically deductive method, you
4    might disagree, call it science.  It is -- it is a
5    scientific method to some degree to determine.
6  Q  But it's not proven to be accurate, right?
7              MR. WISNER:  I'm just going to
8    object.  By the way, I think he was actually still
9    testify --
10             MR. BRENZA:  I'm sorry.
11             MR. WISNER:  -- when you spoke.
12             MR. BRENZA:  If I -- if I cut you
13   off --
14             MR. WISNER:  It's not a big deal.  I
15   think he was --
16             MR. BRENZA:  -- please continue.
17             MR. WISNER:  -- coming to the end.
18             THE WITNESS:  Yeah, I was going to
19   end that it came up in a discussion yesterday that is an
20   error rate.  No, we don't know the error rate.  But it
21   would not be difficult to test if somebody were to fund
22   such a study and employ hundred physicians and make
23   hundred physician make a diagnosis based on differential
24   diagnosis and then have another five blinded experts to
25   have specific test.  And you -- you can define error

Page 91

1    rate, right?
2        So it is a method where you can actually come up
3    with scientific evidence.  It's just such study would
4    never be funded, and -- and if there is some interest, I
5    would welcome such a study, and we would have error rate
6    and differential diagnosis in average academic
7    physician.  We have, actually occurred to me, looked in
8    this in some of the studies that I am involved with when
9    we compare the rate of diagnostic error between
10   community pathologists and academic pathologists and
11   identifying very rare types of lymphomas, and we have
12   reported in some of our publications where this rate
13   was, as an example, we'll say 8 percent.  Right.
14       So there is a way to test the error in clinical
15   judgment.  Because pathologist's diagnosis is a clinical
16   judgment.  They also create differential diagnosis.  But
17   the error rate like this can be measured.  We just never
18   measured it in a clinical practice where we test how
19   many times physicians make mistake in making a
20   diagnosis.  So you can make it more scientific if
21   somebody actually invests money and effort looking at
22   what is error rate of this.
23  Q  (By Mr. Brenza)  But that investment hasn't been made,
24   to your knowledge, to -- to date, right?
25  A  To my knowledge, I have not seen a study saying that the

Page 92

1    error rate of differential diagnosis in clinical
2    practice is such-and-such, no.
3  Q  We just don't know what the error rate would be?
4  A  Correct.
5              (Exhibit No. 33 marked for
6              identification.)
7
8  Q  (By Mr. Brenza)  I'm going to hand you what I'm marking
9    now as Exhibit 33.
10             MR. WISNER:  Counselor, can I put the
11   medical records aside?
12             MR. BRENZA:  For the time being,
13   yeah.
14  Q  (By Mr. Brenza)  I've handed you what I've marked as
15   Exhibit 33.  It's a article entitled "Review of
16   Genotoxicity Studies of Glyphosate and Glyphosate-Based
17   Formulations" by Larry Kier and David Kirkland dated
18   2013.
19       Do you see that?
20  A  Yes.
21  Q  And do you see that on Exhibit 4, your list of materials
22   relied upon, it was one of the materials that you relied
23   upon for your report, so Item No. 33?
24  A  Yes.
25             MR. WISNER:  Sorry.  I just had it

Page 93

1    handy.
2  Q  (By Mr. Brenza)  You spoke earlier about the need to
3    ascribe a plausible mechanism to any cause-and-effect
4    variables that you were -- that one might try to analyze
5    with respect to anything including non-Hodgkin's
6    lymphoma, right?
7  A  Correct.
8  Q  Do -- as you sit here today, do you have an
9    understanding of what the mechanism by which glyphosate
10   or Roundup, in your opinion, might cause non-Hodgkin's
11   lymphoma?
12  A  I do not have understanding of intrinsic mechanism.
13   It's a toxicology question.  The way I use this
14   references is the brief review of conclusions from this
15   papers or statements regarding whether or not glyphosate
16   was implicated in genotoxicity.
17  Q  And which page are you looking at?
18  A  I haven't looking at a page.  I'm just --
19  Q  Okay.
20  A  -- saying how I used the literature in -- in
21   genotoxicity.  I'm not an expert in genotoxicity.  So I
22   listed this because I pulled the paper and very briefly
23   looked at facts whether genotoxicity was implicated.  So
24   this -- again, this would be a question to toxicologist
25   to whether or not this is true.  I take this as a -- my

Andrel Shustov, M.D.

Page 94

1    reference point where general toxicity was implicated.
2    I'm not questioning in genotoxicity. I would be a wrong
3    person to argue the mechanism, whether what they report
4    here is true. So that's a...
5  Q  Are you saying, as you sit here today, you have -- you
6    have -- you have no basis to accept or -- or refute the
7    material in this paper? I'm not sure whether you were
8    saying you were accepting it or whether you were
9    questioning it.
10 A  I'm accepting the fact that glyphosate was implicated in
11   genotoxicity as basis -- the basis for my specific
12   causation. So I'm not questioning a general causation
13   whether glyphosate is genotoxic. Yeah, I'm -- I -- I
14   cannot be -- pretend to be an expert on genotoxicity. I
15   would -- I would rely on expert reports on that. And as
16   I stated, basis for my report is acceptance that it has
17   genotoxicity. I have no reason to question that. But I
18   would not be an expert to argue whether findings in
19   papers on genotoxicity are true or not. It's not my
20   expertise.
21 Q  I'll have you direct your attention to the Page 310 of
22   this article. The very last paragraph, where the
23   authors give their conclusion. Tell me when you're
24   there.
25 A  I'm having trouble, so --

Page 95

1  Q  It's just above the word "Acknowledgments."
2  A  "Authors" -- okay.
3  Q  Do you see it?
4  A  The paragraph above the "Acknowledgment"?
5  Q  Yes. It begins with the words, "This evaluation."
6  A  Okay.
7  Q  Do you see that?
8     It says, "This evaluation of the large volume of
9     genotoxicity data available presents a convincing weight
10    of evidence supporting the lack of genetic" --
11    "genotoxic potential for both glyphosate and typical
12    GBFs in core gene mutation and chromosomal effect
13    endpoints."
14    Do you see that?
15 A  I do.
16 Q  Did you accept this paper as establishing that
17    glyphosate and glyphosate-based formulations do not have
18    the potential to be genotoxic?
19 A  I cannot, again, opine on this, because that's not my
20    expertise. If I were reading a paper on lymphomas and
21    lymphoma treatment, I might accept or not accept
22    something that's even published. Because I'm extremely
23    knowledgeable in area of lymphomas. And even if
24    something is published, I can say I disagree with that
25    paper even though it's published. For paper that we

Page 96

1    published, everybody in the field does not have to agree
2    with this, and that's why we have expert review in
3    papers. I would be the wrong person to criticize this
4    paper. I do not have expertise in rendering my opinion.
5    As I mention, I based my opinion in all the cases with
6    the assumption that glyphosate has genotoxicity.
7  Q  Okay. But you'd agree the sentence I just read to you
8    from this paper you relied on concludes that glyphosate
9    doesn't have the potential to be genotoxic, right?
10 A  I did not rely on that specific statement in my --
11   generate my report.
12 Q  And I'm just -- as you sit here today, do you understand
13   what this statement said from this paper you relied on
14   is that -- that -- that glyphosate isn't genotoxic?
15 A  Again, when I reviewing papers and I was -- I would have
16   to read the paper and tell you where I saw the reference
17   that they make. Because as you know, when authors refer
18   in -- make discussion in their papers, they frequently
19   point out deficiencies in their studies and say this and
20   this author confirm genotoxicity, and we think it's not.
21   It takes -- again, this is kind of information, to me,
22   it could be used extracting the paper. Again, I would
23   have to read and see what was the basis of my just
24   assuming that is genotoxic, but...
25 Q  Well, if you --

Page 97

1  A  It would be un --
2  Q  Go ahead.
3  A  It would be unfair for me just point out one piece of
4    the paper and say, Do you accept that? I --
5  Q  Well, this isn't just a random piece of paper. This is
6    the last paragraph where the authors summarize their
7    conclusions, right?
8  A  Once again, I would need to look. Because there might
9    be something in the body of the discussion that says,
10   well, under certain circumstances or what have you, like
11   we -- we demonstrated yesterday that, yeah, the
12   conclusion might apply to as a general statement, but
13   authors themself can say, Well, in these situations, I
14   would have to really read the paper.
15 Q  Let me just direct you to the next couple sentences.
16   You see it says, "Given this conclusion, and for other
17   reasons discussed, the observation of DNA damage effect
18   seems likely to be secondary to cytotoxic effects."
19   Do you see that?
20 A  Okay.
21 Q  And do you see it goes on to say, "The lack of genotoxic
22   hazard potential evidenced by core gene mutation and
23   chromosomal effects studies, coupled with the very low
24   human and environmental species systemic exposure
25   potential discussed above, indicate that glyphosate and

Andrei Shustov, M.D.

Page 98

1    typical GBFs present" -- "present negligible
2    genotoxic" -- "toxicity risk."
3        Do you see all that?
4    A  Okay.
5    Q  Did you accept that the conclusions of the authors was
6       that glyphosate and glyphosate-based formulations
7       present negligible genotoxicity risk?
8    A  Based on few papers that I referred and I briefly
9       reviewed to generate my report, as a cumulative
10      impression that I had, not being expert in genotoxicity,
11      that there is evidence in literature of possible
12      genotoxicity.
13   Q  Well, you'd have to agree that at least based on this
14      paper, there's evidence to the contrary as well, right?
15   A  Well, based on what authors concluded.
16   Q  Is that a "yes" or a "no"?  You want me to ask the
17      question again?
18   A  If I -- if I take for the face value just one paragraph
19      out of this paper, and with absolute belief that
20      everything here is correct, and that's "yes."  But as
21      academician, I generally would need to question any
22      findings without taking this as a bible and saying,
23      Well, what they found is absolute truth.  But I'm not an
24      expert to criticize the paper.
25   Q  But if the -- if the authors are right and glyphosate

Page 99

1    and glyphosate-based formulations present negligible
2    genotoxicity risk, that undermines whether there's a
3    plausible mechanism between glyphosate and non-Hodgkin's
4    lymphoma, doesn't it?
5    A  If toxicity experts conclude and everybody agrees,
6       then that undermines the plausible cause.  But I'm not
7       the right expert to make the determination.
8    Q  By the way, did you -- when you were looking through the
9       literature, did you notice that some of the literature
10      involves Monsanto or Monsanto employees?
11   A  That's a very good question.  I did not pay attention to
12      that.
13   Q  Did you have -- did you notice anything that was written
14      by any Monsanto or Monsanto employees that you thought
15      was inaccurate or -- or false?
16           MR. WISNER:  Objection; overbroad,
17      vague, lacks foundation.
18           THE WITNESS:  Well, that's assuming
19      that authors from maybe scientists from Monsanto were
20      not truthful, which I never hold against the scientists
21      who work for a pharmaceutical company or Monsanto
22      Company.  My -- my belief and hope is that even though
23      they work for Monsanto, they still report true findings.
24      So I -- I generally do not pay much attention to whether
25      authors are -- when I review papers as a reviewer, I

Page 100

1    take into my consideration what papers.  I review papers
2    for many journals.  I briefly take a look at this, but
3    again, in -- in our good-faith academic world, even if
4    coauthors are from a pharmaceutical industry, it does
5    not mean to me the paper's wrong.
6    Q  And that's -- as part of that, that when a paper is
7       published, there's people who check on the accuracy, and
8       you have to jump through some hoops to get things
9       published in many journals?
10   A  There are peer-review process where the paper is sent
11      to, in some cases, two or three or four known entities
12      in the field that review it.  And if it passes the
13      minimum sort of requirements in editor's view, then
14      paper gets published.
15          Having said that, being a reviewer for many
16      journals, just to give you the idea of the process, many
17      times when I reject the paper, it still gets published,
18      or when I accept the paper, it doesn't get published,
19      because it's a cumulative opinion of key opinion leaders
20      in the field.  It -- and -- and we do receive our mutual
21      assessments of the paper.  And I -- I don't know who
22      reviewed it.  It's a confidential process.  But I see
23      that, Oh, we all agreed on it.
24          But few times, say, Well, that -- that reviewer did
25      not really like the paper and reject it and I accept it.

Page 101

1    And sometimes what happens, editor sends it to extra
2    reviewer.
3        So the point I was trying to make, that the
4    published work is not necessarily proof that even
5    reviewers agreed on what's in the paper or the experts
6    in the field agreed with the paper.  That's why if you
7    want to really get to nitty-gritty whether this is
8    really valid study, you have to talk to the experts in
9    that toxicology field.
10       So me not being an expert in toxicology, I don't
11   have reason to doubt the conclusion and also have no
12   reason to believe that's absolute proven fact.
13   Q  Okay.  And just to be clear, when you're referring to
14      reason to doubt or proven fact, you're talking about
15      Exhibit 33, right?
16   A  That would be one of the examples of published
17      literature, yeah.
18   Q  Okay.
19   A  Can I make sort of -- just to make sure that I express
20      all my thoughts about this additional statement, that as
21      an expert in the field, in medicine and medical science,
22      there are a lot of controversial issues that are being
23      published on them.  Some authors disagree with other
24      authors.  And as an expert, then you form opinion
25      knowing the subject really well and looking at multitude

Andrei Shustov, M.D.



Page 102

```
1    of publications.
2        Like, say if somebody was to ask me on whether this
3    type of treatment is good for this type of lymphoma. I
4    can see papers in the literature that say, well, this
5    one says it's not good, this one says it's good, but
6    have very intrinsic knowledge and knowledge about dozens
7    of other publications in the field makes me more of an
8    expert to opine, I still think that this is a good
9    treatment even though that paper says it's not good. So
10   I don't have that expertise in -- in criticizing
11   toxicology paper.
12 Q  Okay. I'm going to hand you what I've marked as 34.
13            (Exhibit No. 34 marked for
14             identification.)
15
16        MR. WISNER: This De Roos '05?
17        MR. BRENZA: No.
18        MR. WISNER: Oh. Oh. 34?
19        MR. BRENZA: 34.
20            (Discussion off the record.)
21
22        MR. BRENZA: Need a break?
23        MR. WISNER: The witness said he
24   needs to take a restroom break. Is that okay?
25        MR. BRENZA: Sure. That's fine.
```

Page 103

```
1         THE VIDEOGRAPHER: All right. We're
2    going off the record. The time is 11:44 a.m.
3            (Pause in proceedings.)
4            (Mr. Kerschner not present.)
5
6         THE VIDEOGRAPHER: All right. We are
7    back on record. The time is 11:50 a.m.
8  Q  (By Mr. Brenza) Doctor, I've handed you what I've
9    marked as Exhibit 34. It's a article --
10           (Mr. Kerschner enters.)
11
12 Q  (Continuing by Mr. Brenza) -- entitled "Glyphosate
13   Biomonitoring for Farmers and Their Families: Results
14   from the Farm Family Exposure Study."
15       Do you see that?
16 A  Yes.
17 Q  And you see it's -- the authors are listed. The first
18   author is Acquavella?
19 A  Uh-huh.
20 Q  And he's an employee for Monsanto. You see that?
21 A  Yes.
22 Q  And it's dated March of 2004, published March of 2004?
23 A  Yes.
24 Q  And do you see that, if you refer back to your list of
25   materials relied on, this is another document that you
```

Page 104

```
1    relied on for the purposes of your expert report. Do
2    you see that?
3  A  Correct.
4
5
6
7
8
9
10
11
12
13 Q  And exposure is important because, as we discussed
14   earlier, the -- the less you're exposed, the lower your
15   risk; the more you're exposed, the greater your risk?
16 A  As a general statement. And as we discussed, as a
17   general statement for carcinogens.
18 Q  And that's a general statement for just about anything,
19   right? That the -- that the -- it's the dose that --
20   that produces the effect. At some dose, there won't be
21   an effect?
22 A  Again, this is very general statement that requires
23   clarification as a general statement because a lot of
24   chemicals and factors would have plateau effect, right?
25   So you might have for certain carcinogens the threshold
```

Page 105

```
1    where it causes toxic effect, and then you can go ten
2    times over, you already reached your plateau effect. So
3    as a general statement, I can't say that it applies to
4    every situation.
5  Q  Not every -- but that's a rare event when -- a plateau
6    effect, right? I mean, take something like salt or
7    water or things like that. You can take enough of those
8    substances that you can hurt yourself, but in small
9    enough doses, they don't hurt you, right?
10 A  I don't know how rare it is. It's, again, you're asking
11   me to make assumptions about dozens and dozens. I mean,
12   it's -- it's --
13 Q  No.
14 A  -- very -- what I'm saying is, there is a plateau effect
15   for scientist and clinician for some of the carcinogens
16   where, be on certain level, say you get radiation at
17   certain level and the -- you already have sufficient
18   amount to cause cancer, and then you can be exposed to
19   radiation ten times and it doesn't matter at that point.
20   You already reached that plateau that already break in
21   the DNA, but...
22 Q  What about the other direction? Isn't it true that
23   there's a small enough dose of almost anything that it
24   won't cause any harm?
25        MR. WISNER: Objection; overbroad.
```

Andrei Shustov, M.D.

| Page 106 | Page 108 |
|---|---|

**Page 106**

1    THE WITNESS: As a -- as a broad
2  hypothetical statement, if you keep going down to very
3  minute level of anything, you -- you lose any kind of
4  impact on whatever you're trying to measure. It's a --
5  it's a very kind of basically hypothetical type -- how
6  should I put it? -- pharmacokinetic or chemical
7  principle.
8  Q  (By Mr. Brenza) So I'm not -- I'm not sure that
9  answered the question. But isn't it true that, for just
10  about anything, there's a dose so small that it won't
11  cause harm?
12 A  Sure. As a broad statement.
13 Q  And do you know what a reference dose is?
14 A  It has to -- well, to be a reference dose, you need to
15  give me reference for what reference dose.
16 Q  Right. Right now I'm just -- I'm just getting the
17  general concept of a reference dose.
18    Do you know what a reference dose is not with
19  respect to any particular chemical?
20 A  I can't give you off the top of my head a definition of
21  reference dose. I have a concept of a reference dose.
22  We operate in kind of my world with MIC50 or minimum
23  inhibitor concentration or optimum biologic dose. Any
24  of those could be reference depending on what the
25  question you're asking.

**Page 107**

1  Q  What about the lowest no-effect level? Is that a
2  concept you're familiar with?
3  A  Not in my world. So, again, and I -- I operate in
4  lymphoma research where we usually push things up, not
5  down. So that's not my kind of...
6  Q  Okay. Did you see that in the Acquavella paper, he and
7  his coauthors analyzed the amount of glyphosate in urine
8  samples from people who apply glyphosate in their
9  families?
10 A  Could you please point to me, for the sake of time,
11  where --
12 Q  Sure.
13 A  -- exactly --
14 Q  Well, I'm just reading right now from the -- the summary
15  paragraph that begins the -- the paper. Do you see in
16  the upper left-hand corner on the first page? It's
17  small?
18    MR. WISNER: It's in blue.
19    THE WITNESS: Yeah.
20 Q  (By Mr. Brenza) It's in blue on your copy.
21 A  Okay. Thank you.
22 Q  It's in italics?
23 A  Mm-hmm.
24 Q  It says, "We evaluated urinary glyphosate concentrations
25  for 48 farmers, their spouses, and their 78 children"?

**Page 108**

1  A  Yes.
2    MR. WISNER: Objection. I think it
3  says "79 children" and not --
4    MR. BRENZA: 79. You're -- you're
5  right. Thank you.
6    MR. WISNER: It's not italicized.
7  It's just...
8    MR. BRENZA: Okay.
9    MR. WISNER: Sorry. I just --
10    MR. BRENZA: It looks like it on
11  mine.
12    MR. WISNER: Okay.
13    MR. BRENZA: But I defer to you.
14 Q  (By Mr. Brenza) And then he goes on to say, "We
15  evaluated 24-hour composite urine samples for each
16  family member the day before, the day of, and for three
17  days after glyphosate application."
18    Do you see that?
19 A  I do.
20 Q  It goes on to say, "60 percent of the farmers had
21  detectable levels of glyphosate in their urine on the
22  day of application. The geometric mean concentration
23  was 3 parts per billion. The maximum value was 233
24  parts per billion, and the highest estimated systemic
25  dose was .004 milligrams per kilogram."

**Page 109**

1    Do you see that?
2  A  Okay.
3  Q  And then if you skip down a few sentences, there's a
4  sentence beginning with the word, "None."
5    Do you see that? It's one, two, three, four -- six
6  lines from the bottom. "None of the systemic doses"?
7  A  Okay.
8  Q  It says, "None of the systemic doses estimated in this
9  study approach the U.S. Environmental Protection Agency
10  reference dose for glyphosate of 2 milligrams per
11  kilogram per day."
12 A  Okay.
13 Q  Do you see that? Do you see that?
14 A  Yeah.

Andrei Shustov, M.D.

Page 110

8  Q  Did you understand this paper to provide evidence that

9    farmers who applied Roundup had hundreds or -- or

10    thousands of times less glyphosate in their body than

11    the EPA reference dose?

12  A  I do not recall my understanding or conclusion from this

13    paper like that.

14  Q  Is it important to you that, in this study, it was shown

15    that farmers had extraordinarily little glyphosate

16    inside their bodies after applying glyphosate?

17  A  For the purpose of my specific causation report, no.

18    Because now we're getting into, in my opinion, to the

19    area of toxicology and genotoxicity, what is the minimum

20    level and what is the correlation between the dose

21    and -- and the -- the toxicity that was not part of my

22    thinking during this report and not part -- not a goal

23    of my report to look at this specific parameters, yeah.

Page 111

Page 112

Page 113



Andrei Shustov, M.D.

Page 114



Page 115

6    Q  (By Mr. Brenza)  Are you aware of any epidemiologic
7       literature that studies home and garden users of Roundup
8       as opposed to agricultural workers?
9              MR. WISNER:  Objection; ambiguous.
10             THE WITNESS:  It's a question I would
11      have to look.  I would again have to go back, and even
12      the reference I made, this is not area where I can off
13      the top of my head identify the study population.  I
14      would have to again look at the references that are
15      listed, and I can't memorize them, whether they included
16      gardeners versus farmers.  Off top of my head, I cannot.
17   Q  (By Mr. Brenza)  How about this.  Can you reference any
18      reference at all that shows that home and garden users
19      had an increased risk of non-Hodgkin's lymphoma from
20      glyphosate?
21   A  Once again --
22             MR. WISNER:  Objection; ambiguous.
23             THE WITNESS:  Once again, in a normal
24      scenario, I would go on PubMed or Amgen and see if
25      there's any reference.  Off top of my head, I -- I

Page 116

1       cannot produce a reference, in the middle of nowhere,
2       something that's not area of my expertise.
3    Q  (By Mr. Brenza)  Well, it's not -- it's certainly not in
4       your report, right?
5    A  You mean the reference?
6    Q  Yeah.  There's no -- I mean, you had opportunity to do
7       all the research you wanted to and put it all in your
8       report, and there's no reference in your report to any
9       study that specifically ascribes risks to home and
10      garden users of Roundup, right?
11   A  Not to my recollection.  And I would say that it's not
12      true I had any opportunity.  If -- if I would take a
13      year off work and study every possible scenario here, it
14      will require very extensive amount of work if you're --
15      if I were to say I had any time in the world to.  I had
16      limited time to address specific question I was asked to
17      address.  I --
18   Q  Is it fair to say that there wasn't enough time to
19      address the question of what the risks actually were for
20      home and garden users of glyphosate?
21   A  I was not asked to address the specific question.  It's
22      not a matter of time.
23   Q  Okay.  And because you weren't asked to address it, you
24      didn't address it, right?
25   A  Specifically looking at home and garden use?

Page 117

1    Q  Yes.
2    A  No, I did not specifically look at home and garden use.
3    Q  Are large statistical studies the best way to identify
4       potential causal factors of non-Hodgkin's lymphoma?
5              MR. WISNER:  Objection; vague.
6              THE WITNESS:  It's a very broad
7       question there.  One of the -- one of the ways and
8       potentially reliable ways of identifying causes of
9       non-Hodgkin lymphoma depending on the -- depending on
10      the factor under study.
11   Q  (By Mr. Brenza)  Isn't it true that when you're trying
12      to identify small increases in risk, that the larger the
13      study, more participants, the more power that study has
14      to tell you the truth about whether there's a causal
15      connection or not?
16             MR. WISNER:  Objection; vague.
17             THE WITNESS:  As a broad statistical
18      question, the larger the study, the higher will be
19      statistical power and more reliable confidence
20      intervals.  But, again, as we discussed, you can make a
21      general statement like this.  I have to look at the
22      study.  And studies might have other flaws, or I would
23      say, yeah, this is a good study.
24   Q  (By Mr. Brenza)  Okay.  But everything else being equal,
25      the bigger the study, the more power it has to tell you

Andrei Shustov, M.D.

Page 118

1    the truth?
2    A   That is correct.
3    Q   Are you familiar with the Agricultural Health Study?
4    A   I believe so. It's one of the things I -- I looked at,
5        if I remember correctly.
6    Q   And it's one of the things you -- you provided a website
7        in your report that links to a place where that study's
8        reported, right?
9    A   I recall that, yeah.
10   Q   I'm going to hand you what I've marked Exhibit 35.
11                  (Exhibit No. 35 marked for
12                  identification.)
13
14   Q   (By Mr. Brenza)  Exhibit 35 is a document entitled
15       "Agricultural Health Study.  Study Update 2018."
16       Do you see that?
17   A   Yep.
18   Q   And I'll represent to you this is one of the pages that
19       you get to when you follow the link provided in your
20       report for the Agricultural Health Study.  I think the
21       link's on Page 7 of your report --
22   A   Mm-hmm.
23   Q   -- you see there.
24       Was the Agricultural Health Study a 25-year study
25       of farmers that have been exposed to various types of

Page 119

1    pesticides?
2    A   I believe so.
3    Q   And, again, we said earlier that the bigger the study,
4        the better.  Is it also true that the longer the study,
5        the better for purposes of establishing whether
6        something causes cancer or not?
7    A   As a general statement.
8    Q   So 25 years is a very long study, isn't it?
9                  MR. WISNER:  Objection; speculation.
10                 THE WITNESS:  Again, if this is the
11       only parameter of the study we're looking at, it's a --
12       it's a good duration study.
13   Q   (By Mr. Brenza)  Okay.  If you look at the next page, it
14       talks about the enrollment of the first participants in
15       the study.  Do you see that?
16   A   Right here?
17   Q   Yep.  Actually, I shouldn't say "yes."
18   A   "Dear Agricultural" --
19   Q   No, at the second page.  It says, "Enrollment ('93 to
20       '97)."
21   A   I see.
22   Q   It says, "A total of 89,655 participants joined the
23       study, including 52,394 licensed private pesticide
24       applicators and 32,345 of their spouses from North
25       Carolina and Iowa."

Page 120

1        I'll stop there.  Do you see that?
2    A   Mm-hmm.  I do.
3    Q   Is 89,655 participants larger than any of the other
4        studies that you referenced in your report?
5                  MR. WISNER:  Objection; ambiguous,
6        vague, speculation.
7                  THE WITNESS:  It looks like it's the
8        largest, but I have to look.  I can't remember all the
9        references.
10   Q   (By Mr. Brenza)  Okay.  It's the largest, not just by a
11       little, but by thousands and thousands and thousands of
12       participants, isn't it?
13                 MR. WISNER:  Objection.
14   Q   (By Mr. Brenza)  I mean, I can show you, if you -- if
15       there's one that -- I think all the studies you relied
16       on are in that stack right in front of you there.
17   A   Right.  I would have to take your word for it.  If I
18       can't do this, I can go through all the studies.  But
19       possibly.  Again, I -- I don't remember all the
20       population numbers in my references, but it appears that
21       this is the largest study.
22   Q   I mean, again, if you -- if you need to, I believe all
23       of your studies are in this pile that we've marked
24       yesterday.  But -- but let's -- let's try to move on for
25       now unless you want to stop and look at them all.

Page 121

1    A   In my opinion as a clinician, it's -- it would have
2        little impact.
3    Q   Actually, there's one study that might help you.
4        Because I think it -- here, let me just make sure before
5        we get it out.  No, I'm wrong.  Okay.  We'll look --
6        we'll get to this in a little while, but...
7        Do you see on the last page of Exhibit 35, there's
8        a summary of the conclusions that have been reached
9        after the 25 years of study being reached in 2018?
10   A   The last page, that paragraph states "2015 to present"?
11   Q   That's part of what's on the page, yes.
12       Do you see the last bullet point under 2015 to the
13       present?
14   A   I do.
15   Q   And it says, "Glyphosate use was not associated with
16       overall cancer risk."
17       Do you see that?
18   A   I do.
19   Q   Do you have any reason to disbelieve the -- that
20       conclusion of the Agricultural Health Study?
21                 MR. WISNER:  Objection; clearly
22       outside the scope.  That is a question about general
23       causation.
24       Answer it, but that's not what he's been proffered
25       to opine about.

Andrei Shustov, M.D.

Page 122

1    THE WITNESS:  Yeah, as person who
2  have very limited to no expertise in populational
3  studies or -- or general causation, as a clinician, I
4  don't have any reason to disbelieve that, but it's -- I
5  would be a wrong person to ask that.  It's not the area
6  of my expertise.



21  Q   (By Mr. Brenza)  So let me just stop you on that.  If
22      you're wrong about that and glyphosate doesn't cause
23      cancer, then your report is wrong, right?
24  A   If -- if it is proven that glyphosate is -- is -- is not
25      carcinogen, I would have to basically rethink my -- my

Page 123

1  entire report.

Page 124

Page 125

Andrei Shustov, M.D.





Page 130

Page 132

Page 131

Page 133

Andrel Snustov, M.D.



## Page 134

18  Q  (By Mr. Brenza)  Do you know the scientific concept of
19     falsifiability?
20  A  I would have to look it up.
21  Q  Well, I'll tell you what it means.  Falsifiability is --
22     is -- is the characteristic of a scientific theory that
23     it could be proven wrong.  Have you ever heard that
24     before?
25  A  I don't recall.  I -- maybe I heard it, but it's not

## Page 135

1     something I use every day.
2  Q   And do you know that statements that are not
3     falsifiable, like they can never be proven wrong, are
4     not generally considered to be science?
5         MR. WISNER:  Objection.
6  Q  (By Mr. Brenza)  They're statements of belief?
7         MR. WISNER:  Objection; speculation,
8     improper hypothetical.
9         THE WITNESS:  Well, I would --
10        MR. WISNER:  Witness --
11        THE WITNESS:  Again --
12        MR. WISNER:  Attorney's testifying.
13        THE WITNESS:  -- in the philosophy --
14        MR. WISNER:  Sorry.
15        THE WITNESS:  In --
16        MR. WISNER:  Attorney's testifying.
17        MR. BRENZA:  I'm asking him what he
18     knows.
19        THE WITNESS:  In the philosophy of
20     science.  But I made a definitive statement in terms of
21     probabilities.  And when I say "definitive," I also
22     point out multiple times it's my judgment.  I did not
23     say you cannot prove me wrong.  I just don't know how
24     it'd prove me wrong.  I would have to think hard about
25     that, what would be the method to dispute physician's

## Page 136

1     clinical judgment.
2         Short of if it turns out to be wrong in my
3     decision, I will accept that I was wrong based that my
4     clinical judgment was wrong.
5         MR. BRENZA:  How much time do we have
6     left?
7         THE VIDEOGRAPHER:  We are three hours
8     and 15 minutes in.
9         MR. WISNER:  And for the record, it
10     is 12:37 p.m.
11        THE VIDEOGRAPHER:  Yes.  I've got
12     about a half hour on this tape too.
13        MR. BRENZA:  Yeah, we'll be done by
14     then.
15        THE VIDEOGRAPHER:  Okay.
16

## Page 137

1         THE WITNESS:  This is the fact
2     that --

Andrei Shustov, M.D.

Page 138



20   Q   Do you see this is the article from Andreotti?
21   A   Yes.
22   Q   And this is also an article based on the Agricultural
23       Health Study.  Do you see that?
24   A   Yes, I do.
25   Q   Everything else being equal, a study that's more current

Page 139

1    has a better chance of being accurate than one that's
2    quite old, right?
3                MR. WISNER:  Objection; rampant
4    speculation.
5                MR. BRENZA:  Well, let me -- let
6    me -- let me ask it a different way.
7    Q   (By Mr. Brenza)  Is -- is Exhibit 19 the -- the most
8        recent word on whether -- what effects glyphosate has on
9        farmers and their families?
10               MR. WISNER:  Objection.
11               THE WITNESS:  It appears very recent,
12   the best I can say.  I don't know if anything was
13   published since that time.  But since it's 2018, I doubt
14   it.  Without excluding it, yes, it looks very recent.
15   Q   (By Mr. Brenza)  And if you'll look at Page 515, first
16       full paragraph.  Tell me when you're there.  You ready?
17   A   I got it.
18   Q   Says, "In our study, we observed no associations between
19       glyphosate use and NHL overall or any of its subtypes."
20       Do you see that?
21   A   Okay.
22   Q   Now, you -- you have some criticisms of the AHS study in
23       your report, correct?
24   A   I believe so.
25   Q   What did you feel was lacking in the Agricultural Health

Page 140

1    Study?
2    A   I think I listed them.  There was -- if I remember
3        correctly, it was significant dropout rate, and we
4        discussed yesterday farmers' exposure.  And there was
5        something else.
6    Q   Feel free to refer to your report, if you want.  It's on
7        Page 7.
8    A   Yes, we've discussed it yesterday.
9    Q   So let me try to take the second one first.  What's your
10       criticism about including farmers with known risk for
11       non-Hodgkin's lymphoma?
12   A   As I believe we discussed for a clinician, farmers --
13       and we mention this also -- are subject to multiple
14       environmental factors and agricultural factors.  And I
15       believe it's hard to account for complexity of it as a
16       clinician perception.  And the multitude of agricultural
17       agents they're exposed to would be very difficult to
18       account for, as well as the use of glyphosate based on
19       self-reporting would be difficult to accurately
20       quantify.  Those were my thoughts when I reviewed the
21       study.
22       Again, this is -- to proper criticize or accept
23   this, it would have to be epidemiologic mind with
24   knowledge of epidemiology going through this, but these
25   are thoughts of the clinician who typically thinks more

Page 141

1    in a -- in a sense of clinical studies.
2    Q   Wouldn't the fact that farmers are exposed to a lot of
3        different chemicals tend to artificially increase the
4        number of cancers attributed to glyphosate?
5                MR. WISNER:  I'm going to object.
6    This is definitely general causation.  But go ahead.
7                MR. BRENZA:  Well, he -- he
8    criticized it in his report.
9                THE WITNESS:  Right.  I would
10   hypothesize from a clinician standpoint, not going into
11   specifics of general causation, that if you have the
12   control arm that expose to other potential carcinogens,
13   your control arm will artificially have increased
14   incidence that would dilute the difference between
15   glyphosate group and non-glyphosate group, that again
16   this is clinician thinking of paper on general causation
17   or epidemiology paper.  I could not do the detailed
18   analysis as well as epidemiologist would do, but this
19   would be my criticism being not an expert in
20   epidemiology.
21       And you can sense that this is a clinician way of
22   thinking about farmers and exposure and potential risk
23   for the control arm.  But I'm not a scientist in
24   agricultural chemistry or agricultural applications.
25   This is a clinician way of looking at this and saying,

Andrei Shustov, M.D.

Page 142

1    Wow, as a clinician, it seems to me that control arm
2    might have a problem with that.
3    Q   (By Mr. Brenza)  Do you know that they had a problem
4       with that, or are you just concerned that they might?
5    A   That is my clinician criticism of paper.  But, again,
6       this would be the question to epidemiologist whether or
7       not findings in this paper are valid or nonvalid, and
8       argument for -- for general causation.  I'm giving you
9       impression and opinion of clinician stating that I'm not
10      an expert at epidemiology.
11   Q   What's your -- what's your other criticism about the
12      dropout rate?
13   A   So in studies that we conduct in my clinical research
14      world, the dropout rate of 40 percent generally
15      invalidates most of the studies by compromising initial
16      statistical design.  So if you have dropout rate,
17      typically when I design studies, my colleague design
18      studies, we incorporate a possible dropout an order of 5
19      to 10 percent not to affect statistical design.
20         The dropout of 40 percent for studies that I'm used
21      to looking at and analyzing is prohibitively large.
22      That would break the interpretation and primary
23      endpoints of the study.  Again, for epidemiologic
24      studies, there might be a way that very skilled
25      statisticians can go around it.  But clinicians look at

Page 143

1       the fact that there was 40 percent dropout rate.  I
2       would say I -- to me, it sounds like the study -- it's
3       the study's biggest flaw.
4          You might ask the statistician and they say, Well,
5       this is okay.  But this is a clinical researcher's
6       criticism of epidemiologic paper.  But I would not
7       pretend that I would take the sort of liberty of
8       analyzing every finding in this paper with expertise
9       that can be offered by epidemiologist.
10   Q   Did you consider the ways that the authors of the
11      Andreotti study accounted for the dropout -- the dropout
12      rate?
13   A   Once again, I did consider this.  I cannot intelligently
14      opine on that.  And I mentioned this paper, and just to
15      make a reference in general causation that I did not
16      pretend to be expert in or was not goal of my report.
17      That would be a good question to -- to epidemiologist.
18   Q   Do you see in the -- on Page 515, is that where you are?
19      Yeah.
20   A   I'm here.
21   Q   In the second column, about halfway down the first full
22      paragraph, sentence beginning, "We imputed glyphosate."
23      Tell me when you see it.
24   A   On the right side, right column, first full paragraph?
25   Q   Yes.  About halfway down.  "We imputed glyphosate

Page 144

1       exposure information."
2    A   Yeah, I see it.
3    Q   So do you see that they describe there that -- how they
4       dealt with the dropout rate?  They write, "We imputed
5       glyphosate exposure information for participants who did
6       not complete the follow-up questionnaire to evaluate
7       cancer risk in the full cohort.  Results for the full
8       cohort (including imputed data) were similar to those
9       that did not include imputed data, but only included
10      people who completed the follow-up questionnaire."
11         Do you see that?
12   A   Yeah, I see that.
13   Q   So you see that they mathematically accounted for the
14      people who didn't complete the follow-up, and even if
15      you just ignore them, they don't change the results?
16   A   I would have to basically take it on faith, because that
17      requires specific epidemiologic knowledge to see whether
18      it's a valid adjustment or not.  I'm not saying that's
19      not a valid adjustment.  I'm saying that it would have
20      to be expert in general causation to accept or say,
21      Well, I disagree with this.
22         I would restrict my opinion to, again, a
23      clinician's statement that I already did, that it
24      concerns me.  It might or might not be addressed in this
25      paper, but it's a question to general causation folks.

Page 145

1              MR. WISNER:  Counselor, we are past
2       the three-and-a-half mark, so...
3              MR. BRENZA:  All right.  Let's go off
4       the record for just a minute, then.  Give me a second.
5       I may wrap up.
6              THE VIDEOGRAPHER:  All right.
7              MR. BRENZA:  I mean, I will wrap up.
8              THE VIDEOGRAPHER:  We're going off
9       record.  The time is 12:52 p.m.
10             (Pause in proceedings.)
11
12             THE VIDEOGRAPHER:  We are back on
13      record.  The time is 12:53 p.m.
14             MR. BRENZA:  I'm going to pass the
15      witness.
16             MR. WISNER:  Thank you.
17
18
19             EXAMINATION
20   BY MR. WISNER:
21   Q   Doctor, can I direct your attention to Exhibit 19, which
22      is the Agricultural Health Study that we were looking
23      at?
24   A   I'm here.
25   Q   Are you there?  Okay.

Andrei Shustov, M.D.

Page 146

1    And there was a -- a statement that counsel showed
2  you on Page 515, first full paragraph on the left
3  column. Do you see that? And it says, "In our study,
4  we observed no associations between glyphosate use and
5  NHL overall or any of its subtypes."
6    Do you see that?
7  A  I see that.
8  Q  What is your understanding of that sentence?
9  A  Just exactly what it says.
10 Q  Okay. So if there was an elevated rate association in a
11 subtype, that sentence would be false?
12 A  That's correct.
13 Q  All right. Say, look, if we look at Page 51 -- well,
14 let's actually look at 514. Are you there, sir?
15 A  Yep.
16 Q  And then you see on the right side, this is a table:
17 "Cancer Incidence in Relation to Lag Intensity Weighted
18 Lifetime Days of Glyphosate Use."
19    Do you see that?
20 A  I see that.
21 Q  And you see on the right, there's a 20-year lag. Do you
22 see that?
23 A  I do.
24 Q  20-year lag. That refers to waiting 20 years to see if
25 cancer developed in a cohort study?

Page 147

1  A  That's correct.
2  Q  All right. If you go down towards the bottom,
3  "Non-Hodgkin lymphoma T-cell."
4    Do you see that?
5  A  I see it.
6  Q  And in the 20-year lag, the lower median has a risk
7  ratio of 2.97. Do you see that?
8  A  I see that.
9  Q  And statistically significant?
10 A  Yes.
11 Q  So that statement that there are no associations in any
12 of the subtypes that counsel read to you is actually a
13 false statement even in its own publication?
14 A  That would be wrong statement.
15 Q  Okay.
16    THE REPORTER: What was the answer?
17    THE WITNESS: That would be the wrong
18 statement.
19 Q  (By Mr. Wisner) Now, there was a question about
20 falsifi -- falsifiability.
21    MR. WISNER: What did you say,
22 Counselor? I want to say it right.
23    MR. BRENZA: Falsifiability.
24 Q  (By Mr. Wisner) Falsifiability of a fact, right?
25 A  Correct.

Page 148

1  Q  All right. So I want to explore that just very briefly.
2    We agree that this symbol here on this speakerphone
3  is red or reddish, right?
4  A  Correct.
5  Q  Is that a falsifiable fact?
6  A  I don't think so.
7  Q  Well, hypothetically, sir, could we all be living in a,
8  you know, world that we're all attached to machines like
9  in "The Matrix," and this is actually not even there;
10 this is just an illusion?
11 A  Hypothetically.
12 Q  Right.



Page 149

7  Q  Okay. There was some discussions and questions about
8  you regarding whether or not farmers' exposure to
9  glyphosate is somehow different than, you called them
10 home and -- home -- home and garden users? Do you
11 recall that?
12 A  Yes.
13 Q  And he asked you, you know, these -- he implied that
14 these epidemiological studies related to farmers. Do
15 you recall that?
16 A  I do.
17 Q  Let's look at one of them. Exhibit 17. Can you pull
18 that up? This is the McDuffie study.
19    Do you have it, sir?
20 A  Yes.
21 Q  And this Exhibit 17, this is one that has the greater
22 than two days' use statistically significant rate?
23 A  I recall that, yeah.
24 Q  Okay. Now, this is a case control study, right?
25 A  Correct.

Andrei Shustov, M.D.

| Page 150 |
|---|
| 1  Q  And it actually -- if you read the title, it says |
| 2     "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures |
| 3     in Men:  Cross-Canada Study of Pesticides and Health." |
| 4        Do you see that? |
| 5  A  Yes. |
| 6  Q  It says "Cross-Canada." |
| 7        Do you see that? |
| 8  A  Yes. |
| 9  Q  All right.  And if we go to the introduction on the |
| 10    first page, close to the bottom of that paragraph, see |
| 11    the sentence that says, "Our study"? |
| 12 A  I'm looking.  First paragraph in introduction? |
| 13 Q  Yeah.  Go down.  The sentence that begins, "Our study," |
| 14    towards the bottom.  "Our study encompassed six" -- |
| 15 A  I see it. |
| 16 Q  Okay.  It reads, "Our study encompassed six provinces of |
| 17    Canada with diverse agricultural practices and a number |
| 18    of different types of occupational and nonoccupational |
| 19    exposures to pesticides." |
| 20       Do you see that? |
| 21 A  I do. |
| 22 Q  What does "nonoccupational exposure" mean? |
| 23 A  Anything that's not related to people's employment.  If |
| 24    I were to sort of describe examples would be in |
| 25    gardening, home use, used in other parts of personal |

| Page 151 |
|---|
| 1     property, et cetera, but outside the professional use |
| 2     such as farming. |
| 3  Q  And so would it be fair to say, then, this |
| 4     epidemiological study was not just on farmers? |
| 5  A  That's correct. |
| 6  ███████████████████████████ |
| ███████████████████████████████ |
| █████████████████████████ |
| █ |
| 10 Q  Okay.  Let me show you another epidemiological study. |
| 11    It was Study 18 -- I'm sorry -- Exhibit 18.  It's the |
| 12    Eriksson study. |
| 13 A  I have it. |
| 14 Q  Okay.  This was a study published in 2008 and relates to |
| 15    a case control study conducted in Sweden, right? |
| 16 A  Correct. |
| 17 Q  All right.  If you read just in the abstract, the second |
| 18    sentence, it says, "Male and female subjects aged 18 |
| 19    through 74 years living in Sweden were included during |
| 20    December 1, 1999, to April 30th, 2002." |
| 21       Do you see that? |
| 22 A  I do. |
| 23 Q  It says the "controls were selected from the national |
| 24    population registry." |
| 25       Do you see that? |

| Page 152 |
|---|
| 1  A  Yeah. |
| 2  Q  So this study, this population-based study was not on |
| 3     farmers, was it? |
| 4  A  It doesn't say that. |
| 5  Q  This was based on populations, right? |
| 6  A  That's correct. |
| 7  Q  Now, one of the things that opposing counsel tried to |
| 8     raise was this idea of the size of the study.  Do you |
| 9     recall that? |
| 10 A  Yeah. |
| 11 Q  Now, in a cohort study, you start off with a specified |
| 12    population and you follow them for a period of time, |
| 13    right? |
| 14 A  That's correct. |
| 15 Q  And that's why in AHS you have 80,000 participants that |
| 16    he discussed with you. |
| 17       Do you recall that? |
| 18 A  I do. |
| 19 Q  Now, in a population-based study, you actually look at |
| 20    those cases that already exist drawn from a population, |
| 21    right? |
| 22 A  That's correct. |
| 23 Q  And the population you're drawing from is in the |
| 24    millions of people, right? |
| 25 A  That's correct. |

| Page 153 |
|---|
| 1  Q  So comparing the 80,000 population in the AHS, it would |
| 2     be dwarfed comparing it to case control studies that |
| 3     draw upon millions of people? |
| 4  A  That's correct.  That's why I made a general statement, |
| 5     or the statement that's -- that's a general assumption |
| 6     but doesn't apply to all the studies. |
| 7  Q  Now, to the best of your knowledge, there's been one |
| 8     cohort study ever conducted on glyphosate and |
| 9     non-Hodgkin's lymphoma? |
| 10 A  To my recollection, yes. |
| 11 Q  Okay.  And so by virtue of that one study existing, it |
| 12    is the largest cohort study, right? |
| 13 A  That's correct. |
| 14 Q  Okay.  There was a discussion about a farm family |
| 15    exposure study.  Do you recall that? |
| 16 A  I do. |
| 17 Q  And I believe it's -- I don't have the exhibit number in |
| 18    front of me, but -- here's 24.  Maybe 25.  No, it would |
| 19    have been higher than that.  It's 20 -- 34. |
| 20 A  Got it. |
| 21 Q  Do you have it, sir? |
| 22 A  I do. |
| 23 Q  Okay.  And in this study, there's a reference to the |
| 24    Environmental Protection Agency reference dose.  Do you |
| 25    notice that? |

Andrei Shustov, M.D.

Page 154

1    A   Yeah, I do.
2    Q   Okay.  Couple of quick general questions.  Do you know
3        what the reference dose refers to?
4    A   In general.  Unrelated to this.  Well, let's --
5    Q   Well, no.  The reference dose that they're specifying in
6        this article.  Do you know what it refers to?
7    A   Let me just --
8    Q   Let me strike that question.  I think you already
9        answered that question.  I think a better question is:
10       Is there any statement in this article saying that
11       the reference dose refers to carcinogenicity?
12   A   That I don't think so.
13   Q   Okay.  Are you aware that the reference dose referenced
14       in this case, in this article, refers to birth defects
15       associated with Roundup?
16   A   I remember seeing that.
17           MR. BRENZA:  Object to form.
18   Q   (By Mr. Wisner)  Okay.  There was also a discussion
19       about them looking at the urine samples in this article.
20       Do you recall that?
21   A   I remember that.
22   Q   Nowhere in this article did they look at the feces of
23       the subjects?
24   A   I don't recall that.  I -- I could confirm looking
25       through it, but I don't recall that.

Page 155

1    Q   And if, in fact, Monsanto, who conducted this study,
2        knew that the majority of Roundup actually was excreted
3        through the feces, measuring the urine would be a bit
4        deceptive, wouldn't it?
5           MR. BRENZA:  Object to form.
6           THE WITNESS:  That would be one of
7        the reasons, and that's why I made a general statement
8        that making decisions on measuring substances and wrong
9        bodily fluids or -- it has to have really proven
10       correlation with actual data and their effect on cancer
11       development or other -- and -- and effect of the
12       substance.
13   Q   (By Mr. Wisner)  Okay.  Look at Exhibit 33.  It's the
14       article by Kier and Kirkland.
15   A   I have it.
16   Q   Okay.  There is a -- I just want to ask you some general
17       questions.
18       Did counsel, when he showed you this document, show
19       you any documents evidencing that this document was
20       prepared by Monsanto in defense of glyphosate
21       litigation?
22   A   He didn't mention that.
23   Q   Did he show you any documents reflecting that this
24       document was, in fact, ghostwritten by Monsanto
25       employees?

Page 156

1           MR. BRENZA:  Object to form.
2           THE WITNESS:  He didn't mention that.
3    Q   (By Mr. Wisner)  Did he discuss with you whether or not
4        the journal that actually published this article has
5        recently issued an expression of concern due to the lack
6        of transparency and honesty of these authors in
7        publishing this document?
8           MR. BRENZA:  Object to form.
9           THE WITNESS:  He did not --
10          MR. BRENZA:  Assumes matters --
11          THE WITNESS:  -- mention that.
12          MR. BRENZA:  -- not in evidence.
13   Q   (By Mr. Wisner)  So did he show you anything about the
14       validity of this document beyond just asking you to
15       assume it's true?
16   A   No.
17          MR. BRENZA:  Object to form.
18   Q   (By Mr. Wisner)  Are you aware or did he explain to you
19       that Monsanto hired a guy by the name of Dr. James Perry
20       in the late 1990s to examine the genotoxicity of
21       glyphosate or Roundup?
22          MR. BRENZA:  Object to form.  Beyond
23       the scope.
24          THE WITNESS:  No, I was not informed.
25   Q   (By Mr. Wisner)  Okay.  And did he tell you that their

Page 157

own internal scientist concluded that, in fact, Roundup
was genotoxic?
        MR. BRENZA:  Object to form.  Assumes
matters not in evidence, beyond the scope.
        THE WITNESS:  I was not informed of
that.



Andrei Shustov, M.D.

Page 158

2   Q  Okay.  Doctor, what is chemotherapy?

3   A  Chemotherapy is the way that we treat and cure cancers,

4     and it defines cytotoxic drugs that were studied and

5     proven to be beneficial in killing cancer cells.  So

6     it's a method of treating cancer.

7          MR. WISNER:  Okay.  Let's go off

8     record.

9          THE VIDEOGRAPHER:  All right.  We are

10    going off record.  The time is 1:08 p.m.

11         (Pause in proceedings.)

12

13         THE VIDEOGRAPHER:  We are back on

14    record.  The time is 1:12 p.m., and this marks the

15    beginning of Media Unit 3.

16   Q  (By Mr. Wisner)  Now, just before we switched over, I

17     asked you what chemo was.  And I guess my next question

18     is:  What does chemotherapy do to the human body?

19   A  Besides killing cancer, it has substantial effect on

20     multiple organ systems in humans.  Because chemotherapy

21     was developed with a single principle in mind to kill

22     rapidly dividing cells.  And it does not discriminate

23     whether those cells are cancerous or healthy.  And there

24     are numerous systems in our body that rely on rapid cell

25     division.  Numerous systems.  So chemotherapy would have

Page 159

1     substantial impact on health of the bone -- bone marrow,

2     gastrointestinal tract, hairs, organ systems.  And

3     besides general effect on rapidly dividing cells, it has

4     multitude of specific organ toxicities demanding --

5     depending on -- on the drug.  So it has substantial

6     detrimental effect on human body.

7   Q  And that -- that sort of broad, sweeping damage that

8     chemotherapy does to the body, can that exacerbate

9     physical conditions that are already present in a

10    person?

11   A  Of course.

12         MR. BRENZA:  Object to form.

13



Andrei Shustov, M.D.

Page 162

Page 164

1  A  I do.

2  Q  And I'm worried that that -- that's -- that phrase could

3     be a little misleading.

4        Is it fair to say that most people get lymphoma?

5  A  No.

6  Q  In fact, it's pretty rare amongst people, right?

7        MR. BRENZA:  Object to form.

8        THE WITNESS:  If you just take

9     population in general, it is a rare occurrence for

10    somebody to develop lymphoma.

11 Q  (By Mr. Wisner)  But in the area of cancer, which is

12    already rare, lymphoma is a common cancer?

13 A  Of course.  If you start narrowing down into specific

14    population and try to determine fraction of that, it's

15    all about denominator.

16 Q  There's also a question about the -- whether or not --

17    of the cancers that are non-Hodgkin's lymphoma, a lot of

18    them more commonly are in people under 70s; is that

19    right?

20 A  Correct.

21 Q  Okay.  But is it fair to say that the majority of people

22    with non-Hodgkin's lymphoma are in their 70s?

23 A  That's correct.

24 Q  Okay.  Does that mean, however, that people who are --

25    well, strike that.

Page 163

Page 165

1        Okay.  Finally, there was some questions that

2     opposing counsel asked you about whether or not you were

3     experts in all these fields.  Do you remember those

4     questions?

5  A  I do.

6  Q  Okay.  And there was a question about whether or not you

7     were, for example, an expert in chemistry, right?

8  A  I remember that.

9  Q  Okay.  How are you defining the word "expert"?

10 A  In -- in my opinion, the word "expert" is somebody who

11    has experience in dealing with particular type of

12    problems, particular type of experiences, has proper

13    education for this type of activity, and has done

14    research, published in this area.  Those are kind of

15    criteria.

16 Q  Now, if I were to define "expert" simply as having

17    specialized training or expertise in something.  Okay?

18    So not what you said.  Use my term.  Would you be an

19    expert in pathology?

20       MR. BRENZA:  Object to form.

21       MR. WISNER:  Let me withdraw that

22    question and put it another way.

23 Q  (By Mr. Wisner)  Do you have specialized training and

24    experience looking at pathology?

25 A  I have studied pathology in medical school.  I have

23 Q  All right.  There was a question about whether or not

24    non-Hodgkin's lymphoma was a common cancer.  Do you

25    recall that?



Andrei Shustov, M.D.

---

**Page 166**

1    reviewed a lot of pathology examples with my pathology
2    colleagues.  And I have general understanding and
3    probably better understanding than, say, general
4    practitioner when I look at the slides of lymphoma
5    patient.  But I would be much less expert compared to
6    somebody who has training in pathology for years and
7    specializes in pathology.
8    Q   Exactly.  And I understand doctors are very hesitant
9        to -- to call themselves experts in fields when there's
10       other experts who do that as a profession.  I understand
11       that.
12           But notwithstanding that, as a person who went to
13       medical school and has done postdoctorate work, for
14       example, you have knowledge about chemistry that most
15       people don't have?
16               MR. BRENZA:  Object to form.
17               THE WITNESS:  I have enough knowledge
18       of chemistry that is probably I would define better than
19       somebody who did not have my level of education.
20   Q   (By Mr. Wisner)  And, I guess, the question I'm really
21       getting at is:  Notwithstanding the fact that you don't
22       consider yourself a, quote/unquote, expert in all those
23       fields listed, do you believe you have sufficient
24       understanding of those topics to be able to offer the
25       opinions you're giving in this case?

---

**Page 167**

1               MR. BRENZA:  Object to form.
2               THE WITNESS:  I believe so.
3               MR. WISNER:  Thank you.  No further
4        questions.
5               MR. BRENZA:  Just got a few more.
6
7
8               FURTHER EXAMINATION
9    BY MR. BRENZA:
10   Q   Let me begin, Doctor, with the Exhibit 19.  I was
11       unclear exactly what you were identifying when you were
12       trying to point out the cancer that had a increased risk
13       under the Agricultural Health Study.
14   A   Okay.
15   Q   Exhibit 19.
16   A   Yeah, I have it.
17   Q   Could you -- could you just point that out to me now?
18   A   What we just discussed?
19   Q   Yes.
20   A   The question that counsel asked me, if you look at
21       Page 515.
22   Q   Yes.
23   A   And you go to the left column, second paragraph, the
24       authors' conclusion in this part state that, "In our
25       study, we observed no association between glyphosate use

---

**Page 168**

1        and NHL overall or any of its subtypes."
2    Q   Yes.
3    A   And he pointed out that in Table 3, there was actually
4        significant association for non-Hodgkin's T-cell
5        lymphoma with 20-year lag, odds ratio 2.97, was
6        statistical significance.  And I believe that he makes a
7        statement which -- which I agreed that T-cell
8        non-Hodgkin lymphoma is a subtype of non-Hodgkin
9        lymphoma.  And if you make a statement there, say that
10       there was no association with any subtype of non-Hodgkin
11       lymphoma, that's a wrong statement.  Because there was
12       association in T-cell lymphoma, which is a subtype of
13       non-Hodgkin lymphoma.
14   Q   Okay.  And so just looking at Table 3, Tables 2 and 3,
15       there are a number of different cancers, right, that are
16       identified?  Different kinds of cancer?
17   A   I see that.
18   Q   So if you go back all the way to the beginning of 2, it
19       lists -- let's see -- 22 types of cancer.  Does that
20       sound right in Table 2?
21   A   2 and 3.
22   Q   Start with Table 2.
23   A   Yeah, but they overlap.
24   Q   Well, Table 2 is intensity-weighted lifetime days.
25       Table 3 -- maybe they do overlap.

---

**Page 169**

1           Well, let's start with Table 2.
2    A   Okay.
3    Q   Table 2, there's 22 types of cancer.  None of them have
4        a statistically significant risk caused by glyphosate,
5        right?
6               MR. WISNER:  Objection.
7               THE WITNESS:  Not in Table 2.
8    Q   (By Mr. Brenza)  And -- and Table 2 not only breaks down
9        22 types of cancer, but it breaks down each type of
10       cancer into four separate exposure levels, right?
11   A   Correct.
12   Q   And, again, none of them shows statistically significant
13       increased risk --
14   A   Okay.
15   Q   -- from glyphosate, right?
16           And then Table 3 lists 12 types of cancer, each of
17       which is broken down into approximately four exposure
18       levels?
19   A   Uh-huh.
20   Q   And of all those findings, the only one that shows a
21       statistically significant increase is the one for
22       non-Hodgkin's lymphoma T-cell 20-year lag, right?
23   A   Correct.
24   Q   Do you know what the definition of "statistical
25       significance" means?

---

Andrei Shustov, M.D.

Page 170

1    MR. WISNER: Objection; well beyond
2    the scope, but...
3    MR. BRENZA: I'm just -- you -- you
4    questioned him about it.
5    THE WITNESS: So statistical
6    significance, again, I -- I can't say that I'll quote
7    the definition from statistic science, but it is the
8    significance proven beyond the established error rate,
9    which in most cases is beyond a P value of .05.
10   Q   Which is 5 percent?
11   A   Correct.
12   Q   So when something is found to be a statistically
13   significant correction, one time out of 20, it's going
14   to be wrong.  It's actually not a true finding, right?
15   MR. WISNER: Objection.
16   THE WITNESS: Well, in a -- in a --
17   in pure statistical discussion, yes.
18   Q   (By Mr. Brenza)  And we've looked at, on Table 2 and 3,
19   there's way more than 20 comparisons being made here.
20   There's hundreds, right?
21   A   Okay.
22   Q   And this many comparisons, you'd expect at least one
23   spurious positive, wouldn't you?
24   MR. WISNER: Objection; speculation.
25   THE WITNESS: I think it would be

Page 171

1    wrong way of looking at it, because they're all
2    different comparisons.  So if you say -- the way I would
3    apply statistical significance, I would look at every
4    particular one and say, within every particular
5    category, we have 5 percent chance of being erroneous
6    results.  Not out of all the categories say, Oh, one of
7    them is not statistically significant.  That's why it's
8    an error.
9    Q   (By Mr. Brenza)  But each category has a 5 percent
10   chance of being a spurious result.  And you look at
11   hundreds of categories.
12   A   Okay.
13   Q   You're going to generate at least one spurious positive,
14   right?
15   A   No.  Because these categories, they were -- they were
16   assessed independently.
17   Q   I understand that.  But even independent observations,
18   if you make enough of them, more than 20 of them, you're
19   going to start to see false positives, right?
20   A   Well, again, you're questioning the level of statistical
21   significance.  That's -- that -- you know, that's a
22   whole different issue.  But with -- within the T-cell
23   lymphomas, there was statistically significant odds
24   ratio, meaning whatever the statistical boundary they
25   defined, within that boundary, they found statistical

Page 172

1    significance.  Had nothing to do with any other
2    categories.
3    Q   Okay.  Is it fair to say that the vast majority of these
4    observations find no connection between glyphosate and
5    non-Hodgkin's lymphoma or any of its subtypes?
6    A   In this paper, in this table, yes.

13   MR. WISNER: I'll object.  This is
14   well beyond the scope of my cross.
15   MR. BRENZA: I'm going to be done in
16   just a second.
17   Q   (By Mr. Brenza)  Do you see that every single entry for
18   every single time period and exposure level for diffuse
19   large B-cell lymphoma shows no significant increase of
20   risk due to glyphosate?
21   A   I see that in this paper, in this table.



Page 173

Andrei Shustov, M.D.



Page 174

Page 176

Page 175

Page 177

```
11          MR. BRENZA:  Okay.  That's it.
12          MR. WISNER:  Thank you for your time,
13     sir.
14          THE VIDEOGRAPHER:  All right.  We are
15     going off record at 1:36 p.m.  And this concludes the
16     video deposition of Dr. Andrei Shustov.
17          (Signature reserved.)
18          (Deposition concluded at
19               1:36 p.m.)
20
21
22
23
24
25
```

Andrei Shustov, M.D.

Page 178

1    STATE OF WASHINGTON )   I, John M.S. Botelho, CCR, RPR,
                         ) ss a certified court reporter
2    County of Pierce    )   in the State of Washington,
                 do hereby certify:

3
4
         That the foregoing deposition of ANDREI SHUSTOV,
5    M.D., was taken before me and completed on December 16,
     2018, and thereafter was transcribed under my direction;
6    that the deposition is a full, true and complete transcript
     of the testimony of said witness, including all questions,
7    answers, objections, motions and exceptions;
8        That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature;
10
         That I am not a relative, employee, attorney or
11   counsel of any party to this action or relative or employee
     of any such attorney or counsel and that I am not
12   financially interested in the said action or the outcome
     thereof;
13
         IN WITNESS WHEREOF, I have hereunto set my hand
14   this 18th day of December, 2018.
15
16
17
18
19
20   _____
     John M.S. Botelho, CCR, RPR
21   Certified Court Reporter No. 2976
     (Certification expires 5/26/19.)
22
23
24
25

Page 179

1           CERTIFICATE OF DEPONENT
2
         I hereby certify that I have read and examined the
3    foregoing transcript, and the same is a true and accurate
     record of the testimony given by me.
4
         Any additions or corrections that I feel are necessary,
5    I will attach on a separate sheet of paper to the original
     transcript.
6
     _____
7    Andrei Shustov, M.D.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

1    WITNESS:  Andrei Shustov, M.D.
2    DATE: December 16, 2018
3    CASE:   Gebeyehou v. Monsanto Co., et al.
4    Please note any errors and the corrections thereof on this
5    errata sheet.  The rules require a reason for any change or
6    correction.  It may be general, such as "To correct
7    stenographic error," or "To clarify the record," or "To
8    conform with the facts."
9
10   PAGE  LINE  CORRECTION          REASON FOR CHANGE
11   ____  ____  _____     _____
12   ____  ____  _____     _____
13   ____  ____  _____     _____
14   ____  ____  _____     _____
15   ____  ____  _____     _____
16   ____  ____  _____     _____
17   ____  ____  _____     _____
18   ____  ____  _____     _____
19   ____  ____  _____     _____
20   ____  ____  _____     _____
21   ____  ____  _____     _____
22   ____  ____  _____     _____
23   ____  ____  _____     _____
24   ____  ____  _____     _____
25   ____  ____  _____     _____