```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3    IN RE: ROUNDUP PRODUCTS      MDL No. 2741

 4    LIABILITY LITIGATION

 5    _____     Case No. 16-md-2741-VC

 6    This document relates

 7    to:

 8    Hardeman v Monsanto Co., et al.

 9    Case No. 3:16-cv-00525

10    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11              VIDEO DEPOSITION OF

12              CHADI NABHAN, M.D.

13

14

15              December 14, 2018

16                 8:39 a.m.

17

18           Chicago Marriott O'Hare

19      8835 West Higgins Road, Park Ridge, Illinois

20

21

22

23      Deanna Amore, CRR, CSR, RPR, 084-003999

24

25
```

Chadi Nabhan, M.D.

Page 2

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff, EDWIN HARDEMAN:

ANDRUS WAGSTAFF
MS. KATHRYN M. FORGIE
1901 Harrison Street
Suite 1101
Oakland, California 94612
(310) 339-8214
kathryn.forgie@andruswagstaff.com
- and -
ANDRUS WAGSTAFF
MS. AIMEE H. WAGSTAFF
7171 West Alaska Drive
Lakewood, Colorado 80226
(303) 376-6360
aimee.wagstaff@andruswagstaff
- and -
WEITZ & LUXENBERG, P.C.
MS. ROBIN L. GREENWALD
700 Broadway
New York, New York 10003
(212) 558-5500
rgreenwald@weitzlux.com

On Behalf of the Defendant, MONSANTO COMPANY:

ARNOLD & PORTER KAYE SCHOLER, LLP
MR. BERT L. SLONIM
250 West 55th Street
New York, New York 10019-971
(212) 836-8572
bert.slonim@arnoldporter.com
- and -
WILKINSON WALSH + ESKOVITZ
MR. BRIAN L. STEKLOFF
MS. CALI COPE-KASTEN
2001 M Street, NW
10th Floor
Washington, D.C. 20036
(202) 847-4030
bstekloff@wilkinsonwalsh.com
ccope-kasten@wilkinsonwalsh.com
ALSO PRESENT:
Anthony Micheletto, Videographer
* * * * *

Page 3

I N D E X

WITNESS                    EXAMINATION

CHADI NABHAN, M.D.

EXAMINATION BY MR. STEKLOFF          6

EXAMINATION BY MS. WAGSTAFF        117

FURTHER EXAMINATION BY MR. STEKLOFF  122

EXHIBITS

NUMBER        DESCRIPTION        PAGE

Exhibit 1    11.20.2018 Expert Report    16

          of Dr. Chadi Nabhan

Exhibit 2    Innovative Oncology    27

          Consulting, LLC, Invoice

          for Services Rendered in

          Hardeman v Monsanto;

          NABHNMDLGROUP100057

Page 4

1    THE VIDEOGRAPHER:  We are now on the record.
2    My name is Anthony Micheletto.  I'm the
3 videographer for Golkow Litigation Services.
4    Today's date is December 14, 2018.  The
5 time is 8:39 a.m. as indicated in the video screen.
6    This video deposition is being held in
7 Chicago, Illinois, in the matter of Hardeman versus
8 Monsanto Company, et al., Case No. 316-cv-00525 in
9 the United States District Court, Northern District
10 of California.
11    Our deponent today is Chadi
12 Nabhan MD, MBA.
13    Will counsel please identify themselves
14 for the video record?
15    MS. WAGSTAFF:  Aimee Wagstaff from Andrus
16 Wagstaff in Denver, Colorado, and I'm here with my
17 partner Kathryn Forgie from Oakland, California.
18    MS. GREENWALD:  Robin Greenwald,
19 Weitz & Luxenberg.  I'm one of the plaintiff
20 attorneys in this litigation.
21    MR. STEKLOFF:  Brian Stekloff, Wilkinson Walsh
22 on behalf of Monsanto.
23    MS. KASTEN:  Cali Cope-Kasten, Wilkinson Walsh,
24 on behalf of Monsanto.
25    MR. SLONIM:  Bert Slonim, Arnold & Porter, on

Page 5

1 behalf of Monsanto.
2    THE VIDEOGRAPHER:  Our court reporter today is
3 Deanna Amore.  Please swear in the witness.
4        (Whereupon, the witness was
5            duly sworn.)
6 THE WITNESS:  I do.
7    MS. WAGSTAFF:  So before we start, I just
8 wanted to put on the record your
9 Plaintiffs Gebeyehou, Hardeman, and Mrs. Stevick
10 are offering Dr. Nabhan today for specific
11 causation opinions, and to the extent that anything
12 in his report goes to general causation, it is
13 either as a background to his -- or in support of
14 his specific causation opinion or it is consistent
15 with the general causation opinions that
16 Judge Chhabria has allowed in this MDL.
17    MR. STEKLOFF:  I just reserve the right to --
18 I mean, it seems like we might be seeing enough
19 issues.  So potentially we can agree in front
20 of Judge Chhabria on how specific causation experts
21 are going to be allowed to delve into or touch on
22 generic causation opinions, and so I think we can
23 explore that a little bit today potentially with
24 the doctor.  But I preserve all rights -- I reserve
25 all rights to challenge any opinions in his report,

Chadi Nabhan, M.D.

Page 6

1  including anything that's general causation or
2  anything that has been excluded under
3  Judge Chhabria's July 1 -- July 10, 2018, opinion
4  on general causation.
5      Good morning, Doctor.
6      THE WITNESS:  Good morning.
7          CHADI NABHAN, M.D.,
8  called as a witness herein, having been first duly
9  sworn, was examined and testified as follows:
10          EXAMINATION
11 BY MR. STEKLOFF:
12     Q.  You've been deposed before; right?
13     A.  I have been.
14     Q.  So you are familiar with the background
15 rules of how these go forward?
16     A.  Yes.
17     Q.  So I'm just going to cover two.  If you
18 need a break for any reason, as long as a question
19 is not pending, just let me know.
20     A.  Sure.
21     Q.  And if you answer a question, I'm going to
22 assume that you understood the question.  Is that
23 fair?
24     A.  To the best of my ability, yes.
25     Q.  You'll let me know if you don't understand

Page 7

1  something that I ask?
2      A.  Yes.
3      MS. WAGSTAFF:  Objection.
4  BY MR. STEKLOFF:
5      Q.  Which may happen, I will tell you.
6          And so I don't get it wrong, how do you
7  pronounce your last name?
8      A.  Nabhan.
9      Q.  Nabhan.  Okay.
10



Chadi Nabhan, M.D.



**Page 10**

(redacted)

**Page 11**

(redacted)

3  Q.  Yes.  I'm not trying to repeat the
4  questions, but I just want to make sure
5  I understand.
6      Based on your expertise and your review of
7  the medical records and your review of
8  Mr. Hardeman's testimony, (redacted)

(redacted)

12      MS. WAGSTAFF:  Objection.  Misstates his
13  testimony.  You've now asked him four or five times
14  the same question.
15  BY MR. STEKLOFF:
16  Q.  You can answer.
17  (redacted)

(redacted)

**Page 12**

(redacted)

13  Q.  Do you know if Mr. Hardeman was using
14  Roundup in 2014?
15  A.  Yes, that's when he stopped, I believe.
16  Q.  When did he stop?
17  A.  In 2014.
18  Q.  When in 2014?
19  A.  I think when he -- he's been asked that
20  question in his depositions, and I've asked him
21  that question.  (redacted)

(redacted)

24  Q.  Does it matter when he stopped using
25  Roundup -- I'll start over.  I'll strike that.

**Page 13**

1      Does when he started using -- story.
2      Does when he stopped using Roundup impact
3  your opinions in any respect?
4  A.  No.
5  Q.  It wouldn't have mattered?
6  A.  Well, I mean, it matters when he started
7  more important; right?  I mean, he started sometime
8  in the '80s, late '80s, and he stopped in 2014.  So
9  what matters to me is the duration of exposure, and
10 so if he stopped in 2014 or middle 2014, late 2014,
11 it doesn't really impact how long he's been exposed
12 to.  But if he started using it in 1987 and he
13 stopped in 1988, one year, it would matter, but in
14 this case, he's been exposed to it for such a long
15 period of time that stopping a couple of months
16 later or earlier would not really impact the
17 opinion.
18 Q.  What if he had stopped in 2013, would it
19 impact your opinion?
20 A.  Again, you'll have to -- this is a very
21 hypothetical question.  You'll have to look at the
22 exposure for every single year of use.  So
23 I will -- you know, I mean, probably 2013, it still
24 wouldn't matter because you have to look at how
25 many hours and exposure he's had in any given year

Chadi Nabhan, M.D.

Page 14

1  and whether that exposure collectively is analogous
2  or similar to what has been published in the
3  epidemiological literature ███████████████
   ██                                     l.
5      Q.  But take Mr. Hardeman's testimony about
6  his use of Roundup.  Let's say he had stopped in
7  December of 2013 with the exact same use he
8  testified to. ████████████████████████████
   ██ ████████████████████████████████
   ██ █████████████████████████████████████
   ██ ██████████████████████████████████████
   ██ █████████████████████████████████████████
   ██ ██████████████████████████████████
   ██ ██████████████████████████████████████████
   ██ ██████████
   ██ ███████████████████████████████
   ██ ██████████████████
20     Q.  Okay.  And so for you to form an opinion
21  that Roundup or glyphosate is a substantial
22  contributing factor in an individual's non-Hodgkin
23  lymphoma, they do not have to be actively using
24  Roundup at the time of ████████████████████
   ██ ██████████████████████████

Page 15

1      A.  Yeah, they don't need to be actively using
2  it at the time of diagnosis, if they have used it
3  enough during their lifetime to a degree that meets
4  what has been published in the epidemiological
5  literature.
6      Q. █████████████████████████████████
   ██ █████████████████████████████████████████
   ██ ██████████████████████████████████████?
9      A.  Yes.  Initially, initially, he used it a
10  little bit, not too much, and I think he got to
11  know about it from his landscaper in the original
12  property he lived in.  I believe he sold that
13  property, and he moved to a much bigger property
14  after that, and that's when he started using it
15  himself for about seven, eight months of the year
16  and several hours each month.
17     Q.  For several years; right?
18     A.  No, for more than -- for about 27 years,
19  until 2014.
20     Q.  Yes.
21         And so it's your testimony, to a
22  reasonable degree of medical certainty, that for
23  the first 26 years of his Roundup use, ██████████
   ██ █████████████████████████████████████
25     A.  Yes.  I mean, there is nothing in the

Page 16

1  ██████████████████████████████████████████
   ██ ██████████████████████████
3      Q.  So I want to shift topics a little bit.
4  I am going to hand you the report in Mr. Hardeman's
5  case, and I'll mark it as Exhibit 1.
6             (Whereupon, Exhibit 1 (Hardeman)
7             was marked for identification.)
8  BY MR. STEKLOFF:
9      Q.  Dr. Nabhan, this is a copy of your report
10  in Mr. Hardeman's case; correct?
11     A.  Yes.
12     Q.  And did you draft this report -- I'm not
13  asking for any attorney-client privileged
14  information -- but did you draft this report
15  yourself?
16     A.  I did.
17     Q.  You took pen to paper and put everything
18  -- you wrote everything yourself?
19     A.  Explains some of the typos, yes.
20     Q.  And does this report contain all of the
21  opinions that you intend to offer in Mr. Hardeman's
22  case?
23     A.  It does.
24     Q.  I saw yesterday -- I don't have it with
25  me -- that counsel provided me with a supplemental

Page 17

1  reliance list where you reviewed some of the
2  reports that Monsanto has offered through its
3  experts; is that correct?
4      A.  Yes, I was provided case specific experts'
5  report in Mr. Hardeman's case, and some of these
6  reports had a lot of references.  Some of them
7  I had reviewed previously, and some of them
8  I reviewed recently at a higher level.
9      Q.  And does that change any of the opinions
10  that you intend to offer in this case?
11     A.  No, they don't.
12     Q.  But understanding if I ask you something
13  new today, I can find anything you're going to say
14  at trial in Mr. Hardeman's case in this document;
15  is that fair?
16     A.  I hope so.
17     MS. WAGSTAFF:  Object to form.
18  BY MR. STEKLOFF:
19     Q.  And you previously provided a general
20  causation report in the MDL in 2017.  Do you recall
21  that?
22     A.  I have.
23     Q.  And you testified in front of
24  Judge Chhabria?
25     A.  I have.



Chadi Nabhan, M.D.

Page 18

1    Q.  And you understand that those opinions
2  that you offered in that report cannot be offered
3  at the trial in Mr. Hardeman's case?
4    MS. WAGSTAFF:  Object to form.  That's not
5  exactly what it said, but that's a legal question
6  that Dr. Nabhan probably has no idea what the
7  Daubert order said or doesn't say.
8    MR. STEKLOFF:  That's fair.  I'll ask a
9  different question.
10 BY MR. STEKLOFF:
11   Q.  Have you read Judge Chhabria's Daubert
12 opinion?
13   A.  I have.
14   Q.  Well, we'll go through this report later.
15     Did you bring any other materials with you
16 today in terms of notes that you might have or
17 anything along those lines?
18   A.  No, I have no more notes.  This is what
19 I have.  My examination of him and meeting with him
20 were incorporated into the report.
21   Q.  So that was one of my questions.  You
22 didn't make any handwritten notes during your
23 examination of Mr. Hardeman?
24   A.  No, I typed.
25   Q.  Yeah.  So everything that you and

Page 19

1  Mr. Hardeman discussed or any part ▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ incorporated into
3  this report?
4    A.  Yes.
5    Q.  I want to talk to you about your current
6  medical practice.  What are you doing now?
7    A.  My current role?
8    Q.  Yes.
9    A.  So I'm currently a chief medical officer
10 at Cardinal Health Specialty Solutions, which is a
11 division within Cardinal Health, and in that
12 capacity, I work with oncologists as well as with
13 various manufacturers to provide strategic health,
14 making sure they are able to survive in an
15 ever-changing health care environment.  So I do not
16 actively see patients at the present time, if
17 that's your question.
18   Q.  How long have you been in that position?
19   A.  About two and a half years, give or take.
20   Q.  So when was the last time you were
21 actively seeing patients?
22   A.  I resigned from the University of Chicago
23 on August 12, 2016.
24   Q.  And what was your medical practice -- what
25 role were you playing when you were at -- what role

Page 20

1  were you playing when you were at
2  University of Chicago?
3    A.  So the University of Chicago, my
4  administrative role was a medical director of the
5  clinical cancer center and cancer clinics.
6  I oversaw the clinical operations of the outpatient
7  cancer center, and we saw at the time when I was
8  there about 48,000 visits.  The last fiscal year we
9  had over 5,000 new patients at the time.  I was
10 also overseeing the international office and the
11 international programs for cancer and strategically
12 helping international patients coming to the
13 University of Chicago for cancer opinions.
14     In addition to that, I had a very active
15 lymphoma practice.  So I was part of the lymphoma
16 group, and I was active in clinical trials for
17 lymphoma, as well as teaching medical students,
18 residents and fellows.
19     My research in lymphoma continued beyond
20 leaving the University of Chicago.  It shifted a
21 little bit into health economics outcomes research,
22 patient-reported outcomes, oncology care delivery
23 with a lot of focus on lymphoma.  At the last
24 American Society of Hematology meeting, which we
25 just finished two weeks ago, actually, in

Page 21

1  San Diego, I had nine posters and nine
2  presentations, all of them on lymphoid
3  malignancies, but that was my role at
4  University of Chicago at the time.
5    Q.  And you've treated a number of patients
6  with non-Hodgkin lymphoma; correct?
7    A.  Hundreds.
8    Q.  And same with diffuse large B-cell
9  lymphoma?
10   A.  Hundreds.
11   Q.  And you've never told a patient that his
12 or her non-Hodgkin lymphoma was caused by Roundup
13 or glyphosate; correct?
14   A.  Not by Roundup.  But I did take care of
15 some farmers where I would discuss pesticide
16 exposure in my clinical practice.
17   Q.  But to answer my question, you've never
18 told a patient that his or her non-Hodgkin lymphoma
19 was caused by Roundup or glyphosate; correct?
20   A.  I did not.
21   Q.  And you've never -- strike that.
22     When you were at the
23 University of Chicago, you never told any of your
24 fellow oncologists that you thought Roundup or
25 glyphosate was a cause -- a general cause of

Chadi Nabhan, M.D.

Page 22

1 non-Hodgkin lymphoma; correct?
2    A.   We talked about pesticides in general.
3 I did not say about Roundup specifically.
4    Q.   Okay.  And that would be true if I asked
5 you about -- beyond oncologists, if I asked you
6 about pathologists that you were working with as
7 well; correct?
8    A.   Yes.
9    Q.   And that would be true of the medical
10 students that you were teaching.  You never told
11 them that you thought Roundup or glyphosate caused
12 non-Hodgkin lymphoma; correct?
13    A.   Yes, I stated we talked about pesticides
14 in general.
15    Q.   That is also true -- you never told
16 residents or fellows that you thought glyphosate or
17 Roundup caused non-Hodgkin lymphoma; correct?
18    A.   Correct.
19    Q.   And as the chief medical officer at
20 Cardinal, you said that you currently work with a
21 number of oncologists; correct?
22    A.   Yes.
23    Q.   And you've never told those oncologists
24 that you believe that Roundup or glyphosate caused
25 non-Hodgkin lymphoma; correct?

Page 23

1    A.   In my current role, this subject would not
2 come up because I work more in oncology and health
3 care delivery and several educational platforms,
4 but the short answer to your question, no, I have
5 not.
6    Q.   But you do work with oncologists who are
7 treating patients?
8    A.   Yes.
9    Q.   And they are treating patients who are
10 diagnosed with non-Hodgkin lymphoma; correct?
11    A.   Yes.
12    Q.   And they care about their patients;
13 correct?
14    A.   Absolutely.
15    Q.   Now, you mentioned that you recently
16 presented at a conference of the
17 American Society of Hematology?
18    A.   Yes, every December we have our annual
19 meeting, and the last meeting we had was two weeks
20 ago.
21    Q.   And did you present at that conference?
22    A.   Yes.
23    Q.   And you did not present on glyphosate or
24 Roundup-related issues; correct?
25    A.   That was not a topic of my presentations.

Page 24

1    Q.   You've never presented, at any conference,
2 your opinions that glyphosate or Roundup causes
3 non-Hodgkin lymphoma; correct?
4    A.   I did not.
5        In many of the prior talks and prior
6 meetings, my focus was mainly on treatment of
7 lymphoma and clinical trials and novel agents.  So
8 it was not a topic that I presented on or lectured
9 upon.
10    Q.   And you've never published any
11 peer-reviewed literature related to the association
12 you claim exists between glyphosate and Roundup and
13 non-Hodgkin lymphoma; correct?
14    A.   I did not publish on that.
15    Q.   You are not in the process of drafting
16 anything; correct?
17    A.   Not right now.
18    Q.   When you were treating patients at the
19 University of Chicago, you never noted in the
20 medical records of any of your patients that
21 glyphosate or Roundup caused a patient's cancer;
22 correct?
23    A.   As I said, we talked about pesticides in
24 general in some of the patients that worked in
25 farming, but I did not write that in the medical

Page 25

1 records on Roundup, no.
2    Q.   And when you say "pesticides in general,"
3 you never spoke even to any of your farming
4 patients, agriculture patients -- patients that
5 were involved in agriculture specifically about
6 Roundup or glyphosate; correct?
7    A.   Not specifically, no.
8    Q.   At Cardinal Health you've never given a
9 lecture to anyone, whether it's administrators,
10 oncologists or other entities that you're working
11 with, regarding your opinions about glyphosate and
12 Roundup and that they cause non-Hodgkin lymphoma;
13 correct?
14    A.   I did not.
15    Q.   And you are not conducting any research,
16 independent research that aren't litigation based
17 about the relationship between Roundup and
18 glyphosate and non-Hodgkin lymphoma; correct?
19    MS. WAGSTAFF:  Object to form.
20    THE WITNESS:  Not at the present time.
21 BY MR. STEKLOFF:
22    Q.   Have you resigned -- this is not a
23 pejorative question, but do you have active
24 credentials at the University of Chicago Hospital
25 or another hospital?

Page 26

1    A.  No, I resigned those.
2    Q.  And so it's been approximately over two
3  years since you've seen patients?
4    A.  In clinical practice.  A lot of my
5  patients actually still call me and text me, and we
6  actually do meet at coffee shops to talk about
7  their cases.  But in clinic, yes.
8    Q.  And with those patients, you haven't
9  discussed any -- that you've continued to talk in
10  the last few years, you haven't discussed
11  glyphosate or Roundup use, have you?
12    A.  We have not.
13    Q.  And some of those patients have had
14  non-Hodgkin lymphoma?
15    A.  90 percent, actually.  I just got a text
16  last week from a patient of mine asking me about
17  their treatment.  When you form a bond with
18  patients over many years, people trust you and they
19  still consult with you even though you are not
20  actively in clinical practice.  And it's humbling,
21  and it's wonderful to see.
22    Q.  That's a great thing.
23       But you don't know if any of those
24  patients have ever used Roundup or glyphosate; is
25  that correct?

Page 27

1    A.  I don't know.
2    Q.  I received some invoices from counsel
3  yesterday about your work in the three cases, and
4  I'm only here to ask about the Hardeman case.  But
5  how many hours have you invoiced thus far in the
6  Hardeman case?
7    A.  I honestly haven't sent.  This is what
8  I collected so far, and there are more hours.
9  I have spent a lot this week but I haven't sent an
10  actual invoice.  I plan on doing that at the end of
11  the year.  Maybe I can --
12    MS. WAGSTAFF:  This one has notes on it.  I am
13  sure he has it.
14  BY MR. STEKLOFF:
15    Q.  I'll hand you what I received yesterday
16  and you can just look at it.
17    A.  Sure.
18       (Whereupon, Exhibit 2 (Hardeman)
19       was marked for identification.)
20  BY MR. STEKLOFF:
21    Q.  Dr. Nabhan, I'm handing you what I have
22  marked as Exhibit 2.  Is this a document that you
23  would have prepared?
24    A.  Yes.
25       Obviously, more hours have been added

Page 28

1  since December 5 to prepare for this, but this is
2  up until December 5.
3    Q.  So I see -- I haven't done the math ahead
4  of time -- 41 hours that you've spent on the
5  Hardeman case; correct?
6    A.  Up until December 5.
7    Q.  At $550 per hour?
8    A.  Yes.
9    Q.  Do you charge the same rate for deposition
10  testimony?
11    A.  Yes.
12    Q.  And trial testimony?
13    A.  Being in trial?
14    Q.  Yeah.  If you were testifying in an actual
15  trial, is your rate different or the same?
16    A.  Usually, if I go to trial and I have to
17  fly there, it's $5,000 for the entire day.
18    Q.  Can you approximate for me, since
19  December 5, approximately how many hours you've
20  worked on the Hardeman case?
21    A.  I do have them somewhere in my computer,
22  maybe add another 10 to 12.
23    Q.  Okay.  So approximately 50 to 55 hours; is
24  that fair?
25    A.  Fair.

Page 29

1    Q.  Do you have -- have you submitted an
2  invoice for all of the work that you did relating
3  to your -- the general causation opinions in the
4  MDL back in 2017?
5    MS. WAGSTAFF:  Object to form.
6    THE WITNESS:  Yes, I have.  I have not
7  submitted anything since August of 2018, but
8  everything else in '017, yes, a while back.
9  BY MR. STEKLOFF:
10    Q.  Sitting here -- and I'll take any
11  approximation.  Can you proximate for me, if you
12  consider all of the work you've done in this
13  litigation, including the Johnson case, how many
14  hours you spent or how much money you've been paid?
15    MS. WAGSTAFF:  Objection.  If you know.
16    THE WITNESS:  I'm not sure I know.  I mean,
17  I'll have to go back to the records.  I'm sure I've
18  been paid less than all of the lawyers, but I'm not
19  really sure how many hours I spent.  I'll have to
20  go back and work.  I mean, you should have these
21  records because everything is submitted to all of
22  the law firms.
23    MR. STEKLOFF:  Okay.  I just want to make sure
24  we have all of his invoices throughout the entire
25  litigation and if we don't, I'm asking for those

Page 30

1  invoices.
2    MS. WAGSTAFF:  I mean, every time you've
3  deposed him, we've produced invoices.  So you would
4  just need to add them up.
5    MR. STEKLOFF:  Okay.  This is not a dispute.
6  I just want to make sure -- and maybe we'll email.
7  I just want to -- I will see all the invoices that
8  we have from the various depositions, and then I'll
9  ask if you can double-check them.  And if we
10  haven't received any, I think we are entitled to
11  them, and I'd ask that we receive them.
12    MS. WAGSTAFF:  Okay.  We can talk about it
13  later.
14  BY MR. STEKLOFF:
15    Q.  Is it -- are you able to approximate,
16  Dr. Nabhan -- well, first of all, when were you
17  retained in the litigation, approximately, if you
18  recall?
19    A.  I was asked to look at the literature just
20  generally on Roundup and glyphosate back in the
21  spring of 2016, somewhere around that, and
22  I requested some time just to go through literature
23  and actually to look through everything that was by
24  the Miller firm out east.  And it took me several
25  months to look at the literature, review a lot of

Page 31

1  the data before saying that this is very
2  convincing, and I'm more than happy to help on this
3  case.
4    Q.  And in the approximately two and a half
5  years that you've been working as an expert for the
6  plaintiffs, can you approximate how much of your
7  total income has been received from your work in
8  the litigation as a percentage?
9    A.  That's actually a good exercise for me to
10  do on a personal level.  I did not think about it,
11  and I don't know the answer to that.  Do I guess?
12  Do I just throw a number?
13    MS. WAGSTAFF:  No, don't guess.  If you don't
14  know the answer, you don't know the answer.
15    THE WITNESS:  I mean, I don't want to say
16  something that is not accurate.  I really can't
17  tell in terms of percentage, but this is the only
18  litigation work I've ever done.  So I don't know.
19  It will be a guess, and if counsel says not to
20  guess, I don't think I'm going to guess.
21  BY MR. STEKLOFF:
22    Q.  We don't want you to guess.  You can't
23  give me an educated estimate, even approximate
24  percentage-wise?
25    MS. WAGSTAFF:  Objection.  He said he doesn't

Page 32

1  know.
2    THE WITNESS:  What does that mean now?
3  BY MR. STEKLOFF:
4    Q.  If you can -- I don't want you to guess
5  out of thin air, but if you can, based on -- take
6  your time.  If you can approximate -- and I'm not
7  saying it needs to be an exact number -- but
8  approximate, I would ask that you do that.
9    A.  Less than 20 percent.
10    Q.  I'm not going to ask the names, but have
11  you reviewed any cases of individual plaintiffs
12  where you have determined that Roundup was not a
13  substantial contributing factor into his or her
14  development of NHL?
15    THE WITNESS:  Is that privileged?
16    MS. WAGSTAFF:  You can --
17    MR. STEKLOFF:  I'm looking for a yes-or-no
18  answer.
19    THE WITNESS:  Yes, I have.
20  BY MR. STEKLOFF:
21    Q.  I want to ask you about ███████████
22    A.  Sure.
23    Q.  You probably knew that would be a topic of
24  today's deposition.
25    A.  It should be.

Page 33

1    Q.  Actually, before I do that --
2    A.  Turn to a page or something or no?
3    Q.  Just in a moment.
4      What did you do to prepare for this
5  deposition?
6      And I'm not asking about any specific
7  conversations you had with counsel.
8    A.  As I always do, I refreshed my memory with
9  all the medical records.  So the past week
10  I reviewed all of the medical records again of
11  ████████████████████████████████████████████
   ██ █████████████████████████ ███████████
14  history.  I reviewed my own report, as well as the
15  literature that I have relied on, and as I told
16  you, I was able to look at the reports of your
17  experts from Mr. Hardeman's case.  And I also
18  reviewed some of the references that they relied on
19  at a high level.
20    Q.  Did you meet with counsel?
21    A.  We met yesterday, yes.
22    Q.  Who was part of that meeting?
23    A.  Counsel Greenwald, Forgie, and Wagstaff.
24    Q.  Was anyone on the phone?
25    A.  No.

Page 34

1    Q.   Have you ever met Dr. Weisenburger?
2    A.   I've never met him personally, but I've
3 heard him speak.  I'm sure he's heard me speak at
4 national conferences.
5    Q.   You've never discussed this litigation
6 with him?
7    A.   No.
8    Q.   Have you reviewed his report in the
9 Hardeman case?
10    A.   I have.
11    Q.   Do you have any criticisms of his report?
12    A.   No.
13    Q.   Have you reviewed -- have you ever met
14 Dr. Shustov?
15    A.   I have.
16    Q.   Have you ever discussed the litigation
17 with Dr. Shustov?
18    A.   I have not.
19    Q.   In what context have you met Dr. Shustov?
20    A.   Only from what people know each other.  So
21 I met him -- I actually even moderated a webinar
22 with him a couple of years ago.  We did a Webex for
23 oncologists as two experts discussing T-cell
24 lymphoma at the time, but we never talked about
25 this litigation at all or any litigation for that

Page 35

1 matter.
2    Q.   Did you review his report in
3 Mr. Hardeman's case?
4    A.   I have.
5    Q.   Do you have any criticisms of his report?
6    A.   No.
7    Q.   But you never discussed his report with
8 him?
9    A.   No.
10    Q.   Okay.  So now let's talk about
11 ███████s C.  I don't need you to turn to anything,
12 but I'm also not trying to restrict you from
13 turning to anything in your report.
14        Do you agree that hepatitis C is a risk
15 factor for non-Hodgkin lymphoma?
16    A.   I do.
17    Q.   Do you agree that hepatitis C can cause
18 non-Hodgkin lymphoma in some individuals?
19    A.   I do.
20    Q.   And do you agree that the mechanism
21 through which hepatitis C can cause non-Hodgkin
22 lymphoma is that the virus causes genetic mutations
23 that become cancerous?
24    A.   I'm not sure we know 100 percent the
25 actual mechanism by which hep C causes the

Page 36

1 non-Hodgkin lymphoma.  It's -- there are a lot of
2 theories when you read the literature.  Some of
3 them, they talk about chronic antigen stimulation
4 of actual lymphocytes that eventually end up
5 developing lymphoma, but this is one of the
6 theories.  I think the exact mechanism by which
7 hepatitis C contributes to the development of
8 non-Hodgkin lymphoma is not 100 percent clear.
9 This is one of them.
10    Q.   But do you agree that the exact mechanism
11 by which glyphosate contributes to the development
12 of non-Hodgkin lymphoma, which is your opinion, is
13 not 100 percent clear?
14    A.   Yeah, I agree with that.
15        I think there are some plausible reasons
16 how Roundup causes non-Hodgkin lymphoma, but nobody
17 can tell you this is 100 percent of mechanism and
18 everything else is not.  So I think there are a
19 variety of theories, similar to hepatitis C.
20    Q.   And with respect to hepatitis C, do you
21 agree that regardless of the exact mechanism,
22 hepatitis C can cause genetic mutations that become
23 cancerous?
24    A.   It can.
25    Q.   And do you agree that the longer an

Page 37

1 individual is exposed to hepatitis C, the more
2 likely he or she is to have those genetic mutations
3 occur?
4    A.   I think that's pretty much with every
5 single known occupational hazard and viral antigen
6 and so forth, yes.
7    Q.   Do you know if IARC has classified
8 hepatitis C as a carcinogen?
9    A.   I do.
10    Q.   And what group has IARC classified
11 hepatitis C as?
12    A.   Group 1.
13    Q.   Do you agree that there is no marker for a
14 lymphoma caused by hepatitis C?
15    A.   Can you --
16    Q.   Like a pathological marker that you could
17 see, say, on a slide.
18    A.   Can you define that for me?
19        Do you mean if I'm looking at the slides
20 can I identify if it's caused by hepatitis C?
21    Q.   Exactly.
22    A.   I don't think you can.  I think pretty
23 much you just see large-cell lymphoma.  I don't
24 think by looking at the slides you are able to tell
25 if it's hepatitis C related or not.

Chadi Nabhan, M.D.

Page 38

1    Q.   And that's true with glyphosate or
2 Roundup; correct?
3    A.   Both the same.
4    Q.   Do you know the latency period for cancer
5 caused by hepatitis C?
6    A.   You're talking cancer or lymphoma?
7    Q.   Let's talk specifically about non-Hodgkin
8 lymphoma.
9    A.   Yeah.  You know, I said that before, and
10 I say that again, the latency period for patients
11 who get diagnosed with non-Hodgkin lymphoma,
12 regardless of the offending agent, really varies.
13 You will see that some patients have shorter
14 latency period to developing non-Hodgkin lymphoma
15 from being exposed to agent X, whatever that X is,
16 and you have others that may have a longer latency
17 period.
18       So I think in non-Hodgkin lymphoma, in
19 general, it's not really a binary formula where you
20 have to have an X number of years or months beyond
21 which you would develop non-Hodgkin lymphoma versus
22 not.  I think, you know, we don't know the actual
23 latency period for any of these, but it's
24 measured -- you know, in hepatitis C, it's probably
25 measured in years because oftentimes patients will

Page 40

1 cirrhosis gets worse, and if the cirrhosis gets
2 worse, they become at higher risk of developing
3 some form of cancer.  So that's why you continue to
4 monitor them.  So that's really the reason why you
5 continue to monitor these patients even though you
6 treat them because they could still develop some
7 form of cirrhosis.
8    Q.

ny

Page 39

No, I'm not a gastroenterologist or
9 hepatologist.  I have had patients who had lymphoma
10 plus hepatitis C or another form of hepatitis, but
11 I have not treated actual hepatitis C.  That is
12 usually treated by a gastroenterologist or
13 hepatologist.
14    Q.

?

19    A.

Page 41

sound



Chadi Nabhan, M.D.



Page 42

1  every couple of years.  Some people say, "Well, you
2  know, the ultrasound has been stable.  We don't
3  need to keep repeating the ultrasound," and
4  etcetera.  I have not seen it standardized after
5  treatment, and after eradication, I see how often
6  these patients are monitored.
7    Q.



Page 49 (partial text):

13  answer that specific question to you.
14  BY MR. STEKLOFF:
15      Q.  Well, there are patients who have diffuse
16  large B-cell lymphoma that -- where the latency has
17  taken 10 years to develop; correct?
18      A.  You're talking after being exposed to a
19  particular pathogen?
20      Q.  Or idiopathic.
21          There are patients that develop diffuse
22  large B-cell lymphoma where the latency period is
23  even 20 years; correct?
24      A.  So I want to make sure we are saying the
25  same thing.  Define "latency" for me.  Because you

Page 50

1  just said two different things.  You know, are you
2  saying latency from the time being exposed to a
3  particular pathogen or an offending agent to the
4  development of clinical disease?
5      Q.  I understand.
6      A.  That would never be 10 years in large-cell
7  lymphoma.
8      Q.  In diffuse large B-cell lymphoma, is it
9  possible to have -- for it to take -- what is the
10  longest it could take from the development --
11  forget about exposure -- from the development of
12  the first cell to a clinically recognizable tumor
13  that can be identified?
14      MS. WAGSTAFF:  Object to the form.
15  BY MR. STEKLOFF:
16      Q.  Do you understand the question?
17      A.  I actually don't understand the question.
18  But let me just make sure --
19      Q.  I'll ask a better question, if you don't
20  understand.
21      A.  Sure.
22

Page 51

13  what your question is.
14      Q.  I understand why I confused you about the
15  latency in terms of exposure to a substance or item
16  and then when it develops.  I think you just
17  answered my question.
18          You think that approximately -- I'm not
19  going to hold you to this exact time frame -- that
20  from the first cell of a diffuse large B-cell
21  lymphoma until it becomes -- to the extent that it
22  can be diagnosed, it takes approximately six
23  months, if you're talking about diffuse large
24  B-cell lymphoma?
25      A.  But that's not the time from the initial

Page 52

1  mutation that may be undetected.  I mean patients
2  can have some genetic damage in their body that
3  goes undetected first; right?  I mean, it just
4  happens.  And then they start developing the
5  clinical disease at the very microscopic level
6  before it becomes detected.
7          So I think, you know, when you talk about
8  latency, either you are talking latency from the
9  time of being exposed to an offending agent, to the
10  first type of mutation that does not get detected
11  at all or latency from the time you get exposed to
12  something until you have clinically overt disease,
13  like lymph node or something you can examine.
14      Q.  Now we are getting on the same page.
15  I want to focus on the former, which is the genetic
16  mutation.
17      A.  I see.
18          That we cannot detect clinically.
19      Q.  Correct.
20          It's in the body, but no one can see it.
21  A pathologist cannot see it.  There is no tumor.
22  There is nothing to see.  That's what I want to
23  focus on is that in these questions.  Okay?
24      A.  Okay.
25      Q.  So what is the length of time with diffuse

Page 53

1  large B-cell lymphoma generally that that first
2  genetic mutation can occur up until the time that
3  it becomes clinically diagnosed -- you can
4  clinically diagnose it?
5      A.  But you just went back to the clinical
6  diagnosis.  You just said -- you just said we are
7  not going to talk about the clinical overt
8  diagnosis, I thought.
9      Q.  So assume the clinical --
10      A.  Again, the -- in this type of lymphoma
11  that is an aggressive form of lymphoma, you go --
12  when you go retroactively, if you have somebody who
13  has this type of lymphoma -- for different types of
14  lymphomas, you can go for several years, the
15  indolent ones, but for this type of lymphoma, the
16  large-cell lymphoma, if you're diagnosing it
17  sometime in the beginning of 2015, really, the best
18  you can tell, as a clinician, because of how
19  aggressive this disease is, that maybe the lymphoma
20  existed for a couple of months before, and now we
21  are diagnosing it, which is exactly what he went
22  through.
23

Chadi Nabhan, M.D.



Page 58

1 three times now.
2 THE WITNESS: Do you want to define "genetic
3 mutations" for me just so I understand?
4 BY MR. STEKLOFF:
5 Q. How would you define a genetic mutation
6 that leads to the development of --
7 A. Well, there is a difference between
8 genetic, like a chromosomal breakage and DNA
9 breakage and actual mutation in a particular gene
10 that actually occurs. When you say "genetic
11 mutation," I just don't know if it occurred or not.
12 I don't think anybody can. I don't know.
13 MR. STEKLOFF: Can we go off the record?
14 MS. WAGSTAFF: Sure.
15 THE VIDEOGRAPHER: We are off the record at
16 9:41 a.m.
17 (A short break was taken.)
18 THE VIDEOGRAPHER: We are back on the record at
19 9:56 a.m.
20 BY MR. STEKLOFF:
21 Q. Dr. Nabhan, I wanted to discuss your
22 methodology with you for a few moments.
23 A. Sure.
24 Q. So I saw recently you were deposed in a
25 case called the Gordon case. Do you recall that?

Page 59

1 A. I do.
2 Q. And understanding that the individual
3 circumstances and medical history and medical
4 records are completely different, was your
5 methodology the same in that case as it is here in
6 Mr. Hardeman's case?
7 A. Yes, it is.
8 MS. WAGSTAFF: Object to form.
9 BY MR. STEKLOFF:
10 Q. So any questions in that deposition that
11 you were asked about your methodology, as a general
12 matter, would apply here; is that fair?
13 A. Right.
14 So essentially what is important any time
15 you are dealing with a disease such as non-Hodgkin
16 lymphoma and you are looking at causation is to
17 look at all of the factors and be very inclusive in
18 investigating all potential contributing factors to
19 this disease, and then you really have to weigh
20 these factors and apply them in every specific case
21 and make a determination whether one of these
22 factors contributed -- more than one of these
23 factors contributed or none of these factors
24 contributed, and when none of the factors
25 contribute, that's what we call "idiopathic."

Page 60

1 And I think it's important to mention
2 that, because in the Johnson case, the defense
3 counsel said I never really mentioned anything
4 about idiopathic. Well, idiopathic, by default,
5 you actually don't know what the cause is. So all
6 that we're talking here about is potential known
7 factors, and we look at all of them, be very
8 inclusive and then do the process of elimination,
9 call it a differential diagnosis, call it
10 differential etiology, whatever you want to call,
11 but then you start looking at all of the causes and
12 try to eliminate the ones that don't stand the
13 rigors -- the test of rigor.
14 Q. Do you agree there is a difference between
15 a "risk" and a "cause"?
16 A. Well, I mean, not every risk factor is
17 going to cause a disease. There is a difference
18 between a "risk" and a "cause." Some risk factors
19 cause the disease, and some of them don't.
20 Q. And when talking just about risk factors,
21 have you ever heard the phrase "causative risk
22 factor" as opposed to "non-causative risk factor"?
23 A. From a clinical standpoint, there are
24 many -- there are risk factors that are inherent
25 and known for a particular disease, and in each

Page 61

1 individual case you have to determine whether these
2 risk factors were causative to the development of
3 this disease versus not. So that's really the best
4 of my ability in answering your question.
5 I believe it did.
6 Q. Yeah. And my question is a little
7 different.
8 When you're looking at -- when you're
9 trying to identify the risk factors that you must
10 consider, do you ever distinguish between -- things
11 that are potential causative risk factors as
12 compared to potential non-causative risk factors?
13 A. I am very inclusive. I have to put all of
14 the risk factors in. You have to look at all of
15 the risk factors that a patient can possibly have,
16 and then you do the process of elimination. Like
17 I said, some of these risk factors will not end up
18 contributing to the actual disease, and some of
19 them end up possibly contributing to the disease.
20 So you really have to look at every single
21 particular risk factor that a specific patient has
22 and anytime you're looking at causation for any
23 disease, not just lymphoma, and obviously, this
24 applies for lymphoma as well.
25 Q. But you don't group them as causative --

Chadi Nabhan, M.D.

Page 62

1  when they are all included, you don't group them as
2  causative risk factors or non-causative risk
3  factors, correct?
4      A.



18     Q.  So if another doctor, not you, as part of
19  a differential etiology said that certain risk
20  factors are causative risk factors and can be
21  considered differently than non-causative risk
22  factors, you would disagree with that methodology;
23  is that fair?
24     MS. WAGSTAFF:  Object to form.
25     THE WITNESS:  No, I would not disagree.  It's

Page 63

1  just semantics how you define it.  Like I said, we
2  are probably both saying the same thing.  That
3  particular physician may want to group the risk
4  factors as causative versus not.  I prefer to put
5  all of them as potentially contributing to the
6  disease.  So I want to look at all of the risk
7  factors.  I don't want to dismiss even the ones you
8  may look at as non-causative.
9      That particular physician may say that's not
10  causative, so I'm not going to look at them
11  critically.  I prefer to look at all of the risk
12  factors critically, all of them, and not dismiss
13  any of them and then look at each one individually
14  and how they apply to this particular case.  My
15  methodology and my opinion is way more inclusive
16  than separating the causative, non-causative and
17  then dismissing non-causative entirely.  I don't
18  like to dismiss any of these risk factors.  I look
19  at each one.
20  BY MR. STEKLOFF:
21     Q.

Page 64

1     MS. WAGSTAFF:  Objection.
2     You're saying the exact same circumstances,
3  everything is the same?
4     MR. STEKLOFF:  Uh-huh.
5     THE WITNESS:  Do you mind repeating the
6  question?
7  BY MR. STEKLOFF:
8     Q.  Sure.
9

Page 65

1



Page 66

1

Page 68

1 don't necessarily need much literature review
2 because, being a lymphoma

11     I did, however, look at the IARC report
12 for              just to familiarize myself with the
13 methodology as well.  I think there was
14 Monograph

16     And what I was really very interested in
17 in reviewing the literature with              is
18 along the lines as what are the risks of developing
19 non-Hodgkin lymphoma in patients who had
20 eradication of the virus or they had treatment of
21 hepatitis C.  I'm less interested in knowing the
22 risk of non-Hodgkin lymphoma in patients who have
23 active hepatitis C because I think we know that's a
24 risk factor.
25     It's more pressing, in this particular

Page 67

1     A.   Whenever you say "hypothetical," I have to
2 think carefully to make sure I understand the
3 hypothesis because it's hypothetical.
4     So 10 patients exactly like Mr. Hardeman
5 in

Page 69

1 patient's case, to understand once you treat the
2     C, once you eradicate the virus in the
3 blood and you're unable to detect the virus, what
4 are the risks of developing non-Hodgkin lymphoma
5 associated with hepatitis C?  And based on the
6 literature that I saw, the risk was negligible.
7

ma

Chadi Nabhan, M.D.



Page 70

1
[redacted]

(lines 1-25 redacted)

?

Page 72

1    Q.  A rabbit hole not worth going down.

2        So you said you reviewed IARC, you

3    mentioned, 100.  Did you review the IARC monograph

4    on that that related to other types of cancers and

5    then the more recent one, which is I think 100B

6    relating to non-Hodgkin lymphoma?

7    A.  I just reviewed the recent one, I believe.

8    I don't think I reviewed more than one.

9    Q.  And --

10   A.  Very high level, though.

11   Q.  And in the materials you that reviewed,

12   were they provided to you by counsel, or did you

13   identify materials related to hepatitis C that

14   formed the basis of your opinions on your own?

15   A.  No, I did all of my literature review.

16   What was provided by counsel to me was the experts'

17   reports of your physicians.

18   Q. [redacted]

[lines 19-21 redacted]

22   A.  I thought I just described it.

23   Q.  I mean, I'm actually asking, like, what

24   you searched for and how you identified articles.

25   A.  Well, I mean, I use a lot of PubMed as a

Page 71

1        We treat this disease to mitigate and

2    eliminate the risk of cancer.  If the theory is

3    treatment or not, doesn't matter, then I'd like to

4    see how these expert would approach their next

5    patient.  Maybe they shouldn't treat them.

6        That's the extent of what I did.

7    Q. [redacted]

[lines 8-12 redacted]

13   You have to have a reason to treat somebody; right?

14   I mean, if you have a virus that you believe

15   eradicating it versus not causes no impact on

16   developing cancer, I make the argument, why are you

17   treating?  What's the goal?

18   Q.  Well, you can decrease the risk without

19   eliminating the risk -- without -- right?

20   A.  You should decrease the risk substantially

21   or eliminate it if you treat.  Otherwise, again,

22   you would make an argument, why would you treat

23   something unless you are convinced that you are

24   decreasing the risk of developing a malignancy

25   substantially or you are near eliminating it?

Page 73

1    search engine and Google Scholar.  I use those, and

2    I looked at some of the -- you know, lots of

3    articles that you end up pulling out, usually, they

4    have references in those articles that they

5    reference to.  So I also looked at the references

6    as they pertain to the actual article.  So

7    that's -- pretty much, that's what I always do when

8    I do a literature search.

9    Q.  With respect to literature that you

10   believe demonstrated [redacted]

[lines 11-13 redacted]  rt?

14   A.  I cited the --

15   Q.  I'm looking at page 4.

16   A.  Yeah, I cited some of it.  I did not put

17   every single paper.  I actually wasn't sure how

18   long the report should be.  So I cited examples to

19   illustrate what -- you know, you are not going to

20   cite, you know, 50 and 60 references.  I personally

21   thought it's way too much to do that.  So I cited a

22   few references that illustrate the points I was

23   trying to make.

24   Q.  After you reviewed the defense expert

25   reports and you went to look at the literature

Chadi Nabhan, M.D.

Page 74

1  that's being cited in those reports, did you look
2  to see whether patients in those studies were --
3  had their HCV eradicated or not?
4      A.  Yeah, there are some -- there are some of
5  the -- some of the references, not all of them,
6  and, again, I apologize, I did not read every
7  single reference, some of them just the abstracts
8  because there were just way too many that was
9  provided to me about 10 days ago.
10      But I did read a lot of these papers.  And
11  some of them do show ███████████████████████
████  ████████████████████████████████████
██████████████████████████  So, in other words,
14  what that means, sometimes you can get rid of a
15  virus and you don't see it by Method A, but if you
16  apply very ultrasensitive ways for detection, you
17  might still be able to detect that virus, but it
18  does not have any clinical correlation.  It didn't
19  necessarily correlate that by detecting something,
20  like a very ultrasensitive method, it means
21  anything on clinical grounds, which is what matters
22  here.
23      There is lots of tests that are happening
24  that you can detect something that may be
25  clinically irrelevant.  Just because a test is able

Page 75

1  detect something at the miniscule or molecular
2  level that other tests have missed may not
3  necessarily imply that this particular detection is
4  leading to particular disease organically.
5      Q.  But did you see studies cited by the
6  defense experts that demonstrated that their
7  findings on odds ratios and other things included
8  patients who may have had an HCV eradicated at the
9  time of their cancer diagnosis?
10      MS. WAGSTAFF:  Objection.  Asked and answered.
11      THE WITNESS:  Can you show me some of these?
12  Do you want me to look at a particular reference so
13  I could answer you or just the general?
14  BY MR. STEKLOFF:
15      Q.  First I want to ask generally if you
16  looked for that in the studies.
17      A.  There are a study -- I recall a study that
18  was a total of nine patients that looked at
19  eradication of hepatitis C and followed patients
20  for a total of 88 weeks, the max, I believe, and
21  what the study said, that if we apply
22  ultrasensitive methods, we can still see -- we can
23  still detect that virus in some of these nine
24  patients.  Of course, that's great.  I don't know
25  what that means in terms of implications

Page 76

1  clinically, development of liver cancer,
2  development of non-Hodgkin lymphoma, or what that
3  study, for example, told me.  This is just one
4  example published by Chen and colleagues in 2013.
5      All that example told me, if you have a
6  supersensitive method, you can detect the virus
7  more, and the less sensitive method may not detect
8  it.  But it didn't really tell me what does that
9  mean on clinical grounds.  Does it really reduce
10  the risk?  Does it continue to have the risk of
11  non-Hodgkin lymphoma?  Does it continue to have the
12  risk of liver cancer?  Nothing whatsoever on that.
13      Q.  What do you think is the relative risk for
14  non-Hodgkin lymphoma in patients who have HCV, but
15  it was eradicated, and it's not detectable by these
16  supersensitive mechanisms?
17      MS. WAGSTAFF:  Object to form.
18      THE WITNESS:  I can't quantify that.  I can
19  tell you if you eradicate the virus, and the virus
20  has not existed for many years, such as this case,
21  the likelihood of this virus contributing to the
22  disease is none to minimal.  I just cannot quantify
23  that for you in a percentage-wise because I'm not
24  aware of literature that quantifies this particular
25  thing in terms of a percentage.  But if you have a

Page 77

1  particular paper that your experts have cited, I'm
2  more than happy to look at it and try to read it.
3  BY MR. STEKLOFF:
4      Q.  I noticed in your report one of the things
5  you relied on -- I'm on page 3 -- and this is with
6  respect to h██████████████████████████████████
██  █████  database.  Do you recall that?
8      A.  I do recall that.
9      Q.  And I think you actually cite the SEER
10  database at another point in your report:  I can
11  probably find the reference.
12      A.  Just to clarify, this is not inclusive of
13  everything I looked at.  I provide just the
14  examples because I didn't think I should put 50 or
15  60 references in the report, but I'll do that with
16  my next report.
17      Q.  I'm not crit- -- I just wanted to know.
18      A.  Just your experts had, like, 70
19  references, which I could have easily done.  I just
20  thought I don't need to bombard people with so many
21  references saying the same thing, but, you know,
22  again, that's why I provide an example because
23  I want to make sure it's clear this is a sample of
24  the references relied on.
25      Q.  You also cite to your data, just so you



Page 78

1 can see, on page 5 in the middle of the first full
2 bullet.
3    A.  One second.  In the BMI bullet?
4    Q.  Yes.
5    A.  Yes.
6    Q.  And so is it fair to say that you find
7 SEER data reliable?
8    A.  I think it has limitations because you are
9 not talking all the United States.  As you know,
10 I think it's probably 9 or 11 states.  I forgot
11 exactly on a percent.  Depending on what you're
12 looking at, I think it's very valuable depending on
13 what you're looking at.  It is missing a lot of
14 details.
15       I actually published a lot of -- my papers
16 used SEER data when I was looking at specific
17 disparities in care between men, women, older,
18 younger in patients with lymphoma, I used SEER
19 database.  But it has a lot of limitations.  So
20 I would say it depends on your objectives.  It
21 could be very valuable depending what you're
22 looking at.
23    Q.  But you've cited it in peer-reviewed
24 published literature before that?
25    A.  And I've used it in my own research as

Page 79

1 well.  Again, it depends what you're looking at.
2    Q.  It certainly can give you a lot of
3 information about the incidence rate of NHL in the
4 United States; correct?
5    A.  I mean, yeah, but I don't think that is --
6 I mean, I don't use SEER for the incidents.
7 I believe it gives you more than just the
8 incidence.  The incidence probably can be used --
9 you can get that from different than SEER.
10    Q.  Okay.  I think I know the answer, but I'll
11 ask.
12       Do you think that Mr. Hardeman's
13 hepatitis B played any role in his development of
14 NHL?
15    A.  I don't believe so.
16    Q.  And beyond what you've written here on
17 page 3 of the report, are there any other bases for
18 that opinion?
19    A.

Page 80

1
2
3
4
5
6
7
8
9
10
11
12
13
14 rry.
15    MS. WAGSTAFF:  I thought we already covered
16 this.
17 BY MR. STEKLOFF:
18    Q.  I'll restate the question just so it's
19 clear on the record.
20

Page 81

1
2
3
4
5
6
7
8
9    Q.  In your interview -- I want to talk about
10 your sort of question-and-answer with Mr. Hardeman
11 and then your actual medical evaluation.  So I want
12 to separate those two things.
13       So what was the purpose of your discussion
14 with him of -- that you reported in your report?
15    A.  Well, I mean, I think it goes without
16 saying that the best source of information, in my
17 opinion, a lot of times, is what the patient tells
18 you.
19
20
21
22 ht.
23       But I strongly believe that they provide a
24 very valuable source of information into what they
25 went through, what they have experienced when they



Page 82

1  were diagnosed, when they underwent therapy and
2  treatment, the type of side effects, the type of
3  toxicities they suffered from, and how they are
4  doing today, how they are doing currently with
5  everything.
6      So, you know, I think it's very important
7  to get that face-to-face time.  I don't think it's
8  ever replaceable.  So if we can and he's able to
9  travel, that's always my preference.
10     Q.  I'm going to ask you to look specifically
11 at page 8 of your report.  You met with
12 Mr. Hardeman in person on Friday,
13 November 16, 2018?
14     A.  Yes.
15     Q.  Did he come here to Chicago?
16     A.  He did.
17     Q.  Where did you meet with him?
18     A.  In my office.
19     Q.  Was anyone else present?
20     A.  No, just myself.
21     Q.  No one else was listening on the phone?
22     A.  No.
23

Page 84

11     A.  I don't.
12     Q.  And have you read their depositions?
13     A.  I read for Dr. Ye and Dr. Turk.  I think
14 there is probably another physician that was
15 deposed.  I did not read his deposition.  I am not
16 sure if I had it or I don't recall, but those are
17 two the depositions I read.
18     Q.  It was quite uneventful we can all say.
19     MS. WAGSTAFF:  Brian and I were there.
20 BY MR. STEKLOFF:
21     Q.  Did any of their testimony change your
22 opinions?
23     A.  No.
24     Q.  But you have no criticisms whatsoever of
25 them?

Page 83

1     A.

Page 85

1     A.  No.
2     Q.  You talked to him about his melanoma in
3  situ in

Chadi Nabhan, M.D.



Page 86

1  contributing factor to his NHL?

2

Page 88

1   Q.  It's a legal standard, I understand.

2   A.   The clinicians don't think this way all

3  the time; right?

14

17   Q.   Is it fair to say that your use of

18  reasonable degree of medical certainty here in

19  50.001 percent is a legal definition?

20   MS. WAGSTAFF:  Object to form.

21   THE WITNESS:  So it's more likely than not.  If

22  that's what you guys usually define, more likely

23  than not, then, yes.

24   MS. WAGSTAFF:  Objection to the legal question.

25

Page 87

1

Page 89

1  BY MR. STEKLOFF:

2   Q.  I want to ask you about page 6 of your

3  report.

4   A.   6?

5   Q.   Yes.

6      So on page 6 you also talk about -- you

7  also describe the discussion you had with

8  Mr. Hardeman about his Roundup and glyphosate use

9  and exposure; correct?

10   A.   Yes, I did.

11   Q.   And when you are having that discussion,

12  are you judging whether you believe him or not?

13   A.   So I started by having an open-ended

14  question of not interrupting the patient.  I just

15  simply say, "Tell me how you used it, when and how

16  and why."  At some point you have to -- at some

17  point you want to make sure that you have the

18  pinpoint question, but really the first five

19  minutes, just trying to listen to the patient what

20  he says in terms of when did he use it, why, and

21  all of these things.

22      And what you're looking for is, again,

23  you're looking with a point of criticism or rigor

24  to see if that type of exposure in that particular

25  patient, in that particular patient, given

Page 90



```
1
2
3
4
5
6
7
8
9
10
```

11      Q.   And I was hopeful to understand how you go
12 about the interview, but my question is as part of
13 that discussion, whether you are asking open-ended
14 question or pinpoint questions, do you have to
15 determine whether you believe what you're hearing?
16          And I'm not suggesting Mr. Hardeman was
17 lying to you, but do you have to judge whether you
18 believe he truly had that amount of exposure?
19      A.   I don't have a lie detector test in --
20 device in my office.  So I will always believe the
21 patient.  There is no reason for me to doubt that
22 the patient is telling me the truth.  I do
23 recognize that some patients do miss dates here and
24 there, they may be forgetful, and they may not
25 really remember exactly the date when he maybe

Page 91

1 bought a property or how many gallons he used or
2 maybe the type of chemotherapy he had.
3          These are things that he may not remember,
4 but there is no reason for me to doubt that the
5 patient is telling me the truth.  I mean, I've done
6 20 years of clinical practice, and I can't assume
7 my patients are lying to me.  Same applies here.
8 Why would I assume he's lying?
9      Q.   So you're judging his credibility, but you
10 believe -- with Mr. Hardeman, specifically, you
11 were judging his credibility, but you believe he
12 was telling you the truth?
13      A.   I had no reason to believe he's lying to
14 me.
15      Q.   And in order to understand his exposure,
16 you had to make a determination about whether he
17 was lying to you or not?
18      A.   I don't -- I didn't have a reason to think
19 he is lying to me.  So I'll have to believe that
20 what he is telling me is the truth, and it was
21 corroborated by reading his deposition.  There are
22 a few missed dates here and there, which I think,
23 we all sometimes would forget, especially somebody
24 who has gone through chemotherapy.  But what he
25 told me was corroborated with what he said in his

Page 92

1 deposition and what he told the other experts as
2 well.  I did not see any significant discrepancy.
3 So, again, there is no reason for me to believe
4 that the patient sitting in front of me and telling
5 me about his story has a reason to lie.  I can't
6 assume that somebody is just lying for the sake of
7 lying.
8      Q.   Right.
9          But he's not your patient; correct?
10      A.   He's not my patient, but I approach him
11 like I approach any patient.
12      Q.   And I'm not suggesting that Mr. Hardeman
13 is lying, but as a -- as part of your methodology,
14 you need to judge his credibility, including by
15 comparing what he tells you to what he's told other
16 experts and what he's testified to under oath;
17 correct?
18      MS. WAGSTAFF:  Objection.  Asked and answered.
19      THE WITNESS:  Yeah, I do hear what he's telling
20 me.  I obviously read his deposition.  I read
21 Mrs. Hardeman's deposition as well.  I read what
22 the other two experts wrote in terms of their
23 conversation and discussion with him, and the
24 differences between what he told me and others are
25 very, very minimal, which are expected in somebody

Page 93

1 that has been using this for several decades.  So
2 I didn't have any reason to doubt his credibility
3 or the accuracy of the facts that he provided.
4 BY MR. STEKLOFF:
5      Q.   And what is the minimal amount of exposure
6 that you would have needed to hear or corroborate



```
7
8
9
10      A.
11
12
13
14          We don't know the answer to that in a
```

15 scientific manner.  What we know is what has been
16 published in the epidemiologic literature, that if
17 you are exposed, for example, you know, more than
18 2
```
19
20
                                                   p.
```
21          But I don't know -- we don't have the
22 minimum answer yet, and in his particular
23 situation, we know that his exposure well exceeded
24 what has been written in the epidemiologic
25 literature.  But the short answer to your question

Page 94

1 is that's actually an unknown, what's the minimum
2 exposure needed.
3    Q. [redacted]

Page 96

1    A.  I mean, eight hours for five years, that's
2 -- I think that's, you know, 40 hours total time.
3 I'm not -- it's hard for me to tell.  I mean, it
4 depends how you define a day.  Is a day two hours?
5 Is a day seven hours?  Because you look at the
6 total number of exposure.  I think in your example,
7 you said, eight hours a year?  That's what you
8 suggested?
9    Q.  Sure.
10    A.  The entire year, eight hours, and you said
11 it's five years.  So that's 40 hours of a lifetime.
12 Am I correct in my assumption?
13    Q.  Yes, under the current hypothetical, yes.
14    MS. WAGSTAFF:  I'm also going to object to you
15 are asking a general causation opinion when we are
16 only offering him on specific causation to Mr.
17 Hardeman's facts.
18    MR. STEKLOFF:  Okay.  Well, I'm asking him
19 about Mr. Hardeman's facts and changing one
20 variable.
21    MS. WAGSTAFF:  Don't answer if you don't know.
22 BY MR. STEKLOFF:
23    Q.  You can answer a hypothetical.  I want to
24 understand if it would change -- I want to
25 understand if it would change your opinion.

Page 95

1    Q.  Yeah, hypothetical.
2    A.  -- of somebody that I don't know his
3 comorbid [redacted]
8    A.  Okay.
9    Q.  Everything is exactly the same.
10    And he uses it two times a year in a large
11 quantity, no protective gear, spraying for four
12 hours, two times a year for five years.  Would it
13 change any of your opinions?
14    MS. WAGSTAFF:  Objection.  Hypothetical.
15    MR. STEKLOFF:  You are allowed to ask experts
16 hypothetical.
17    MS. WAGSTAFF:  I'm allowed to object as well.
18    MR. STEKLOFF:  I agree.
19    THE WITNESS:  I mean, I -- so twice a year each
20 time is four hours.
21 BY MR. STEKLOFF:
22    Q.  In large quantities and spraying across
23 his same property, the large property that you
24 talked about earlier, it took him four hours twice
25 a year for five years?

Page 97

1    A.  So, again, let me explain exactly how --
2 I mean, I think I've already explained how I
3 reached an opinion in terms of looking at all of
4 the factors and so forth.
5    When it comes to Roundup, you look at the
6 exposure of a particular patient, and you look
7 whether that exposure is aligned with what is
8 published in the epidemiologic literature.  Your
9 example is hypothetical, and you are giving me
10 eight hours of high-volume exposure a year for a
11 total of five years. [redacted]
13    Q.  Everything else is exactly the same.



Page 98

1  in some of the epidemiologic literature, they may
2  quantify a day as seven hours, and some might say
3  less than seven hours. But I think, you know,
4  between five to seven hours is usually a fair
5  assessment in terms of how you quantify days in my
6  view.
7      Q.  Okay. So I'll ask a different
8  hypothetical.
9          Eight hours a day, twice a year, five
10  years, and let's say it's between 2007 and 2012.
11  Does it change any of your opinions? Everything
12  else is the same, the time of diagnosis, type of
13  diagnosis, every other risk factor.
14      A.  So eight hours a day for two days a year?
15      Q.  Yes.
16      A.  And for how many years?
17      Q.  Five years.
18      A.  So that's 90 hours total. I just want to
19  make sure that -- I mean, it's 90 hours lifetime
20  exposure?
21      Q.  Yes.
22      A.  Of large quantities and no protective gear
23  and the same disease and so forth?
24      Q.  Yes.
25      A.  I mean, I think it's -- I think that would

Page 99

1  probably meet the threshold. I mean, the threshold
2  that I've gone by looked at more than 10 days of
3  lifetime, regardless of, again, you know, if you
4  divide those 90 hours by seven-hour days or
5  six-hour days, you'd still be above the ten days of
6  a lifetime or two days per year, which is still
7  over the minimum threshold.
8      MS. WAGSTAFF: So I just want to just put
9  something on the record because this hypothetical
10  changing of circumstances is going really fast, and
11  when we read the transcript, we will read it really
12  slow. So you changed it from 40 years to 5 years,
13  and then you told him when the 5 years was in
14  relationship to his diagnosis and everything. And
15  ████████████████████████████████████████
16  ██████████████████████████████████
17  █  ██████████████████████████
18      I just don't know when those five years fit in,
19  and I want to make sure Dr. Nabhan and you are on
20  the same page on that because that happened really
21  fast, that exchange.
22  BY MR. STEKLOFF:
23      Q.  I will read back my exact question, and
24  you can tell me if you'd change your answer.
25          "I'll ask a different hypothetical. Eight

Page 100

1  hours a day" --
2      MS. WAGSTAFF: Same question or different
3  hypothetical?
4      MR. STEKLOFF: I'm reading it back so he can
5  make sure that what he just said is accurate.
6  BY MR. STEKLOFF:
7      ████████████████████████████████
8  █  █████████████████████████████████
9  █  ████████████████████████████████████
10  █  ███████████████████████████████████████
11  █  █████████████████████████████████
12  █  ███████████████████████
13  █  ███████████████████████████████████
14  █  ████████████████████████████████
15  █  █████████████████████████████████
16  █  █████████████████████████████████
17  █  ██████████████████████████████████
18  █  ██████████████████████████████████████████
19  █  ███████████████████████████████
20  █  █████████████████████████████████
21  █  █████████████████
22      You know, again, I've been dividing this
23  number of hours by seven. I was calculating the
24  days as seven hours, but I recognized when
25  I actually looked at -- you know, that particular

Page 101

1  division is not always -- it always depends who is
2  doing it. I'm sure you are aware of this. Some
3  people say a day is considered two or three hours
4  and so forth, and you divide that.
5          But the way I've been doing it, I've been
6  █  █████████████████████████████████████
7  █  ██████████████████████████████
8  █  ████████████████████████████████
9  █  ██████████████████████████████████████████
10  █  ███████████████████████████████
11  █  ████████████████████████████████
12  █  █████████████████████████████████
13  █  ██████████████████████████████
14  █  ███████████████████████████████████
15  █  ███████████████████████████████████
16  █  ██████████████████████████████████
17  █  ██████████████████████████████████
18  █  █████████████████████████████████
19  █  ████████
20      Q.  Okay. Now, let's respond to Aimee's long,
21  speaking objection. Let's say everything is the
22  same except for 2000 to 2005. What opinion do you
23  come to?
24      A.  Do you mind repeating now everything is
25  the same?

Chadi Nabhan, M.D.



Page 102

1    Q.  Everything is the same, what you just
2  said, 80 hours divided by 7, and everything else is
3  the same.  But I'm shifting the time period instead
4  of 2007 to 2012, because this was raised by your
5  counsel, shifting the time period from 2000 to
6  2005?
7    MS. WAGSTAFF:  I was just seeking clarification
8  of your question.  The question and answer was
9  going really fast.  I thought you guys were talking
10  over each other, which wouldn't be shown on the
11  transcript.  So I was trying to clear it up.
12  I wasn't asking questions.
13

21  BY MR. STEKLOFF:
22    Q.  I'm not really trying to get at anything.
23  I just want to know based on --
24    A.

Page 104

1

t?

Page 105

1    A.  Yes.
2    Q.  And I am now done with the exposure
3  bullet, and I want to move to the next bullet.  You
4  previously offered a report on general causation;
5  correct?
6    A.  I did.
7    Q.  And I -- just now I understand the answer
8  to this, but I'm just trying to get us on the same
9  page.  You also have read Judge Chhabria's opinion
10  about -- the general causation Daubert opinion;
11  correct?
12    A.  I mean, a while back.  This was when he
13  provided the opinion.  That was, I think, six or
14  seven months since I read it.  I haven't read it
15  for this case.
16    Q.  And here I just want to try to understand
17  what you're doing.  In applying your differential
18  diagnosis, tell me if this is a fair
19  characterization:  Was it necessary -- did you feel
20  like it was necessary to provide your general
21  causation views of glyphosate or Roundup as a
22  possible risk factor before you could rule it in or
23  rule it out?
24    A.  So I wasn't providing general causation
25  here.  I wasn't providing general causation at all.

Chadi Nabhan, M.D.

Page 106

1  What I was trying to explain -- and that's why
2  these bullet points are sequential to each other.
3  I described his particular exposure to Roundup and
4  what he had told me about his exposure, and then
5  ████████████████████████████████████████
   ████████████████████████████████
   ██  ████████████████████████████████
8      So I wanted to provide the context and
   explain in the report why would I think that
10 ████████████████████████████████████████████
   ██  ██████████████████████████████████████
   ██  ██████████████████████████████
   ██  ██████████████████████████████████
   ██  ██████████████████████████████████ ever.
16     MS. WAGSTAFF:  I am going to object to
17 questioning him about the demarcation between
18 general causation and specific causation.  That is
19 a legal issue that is specific to the MDL, and it's
20 specific to Judge Chhabria's opinion.  And to
21 expect a medical doctor to know and be able to
22 understand a 70-page legal an opinion that even we
23 probably wouldn't agree on, I think, is unfair and
24 inappropriate.
25

Page 107

1  BY MR. STEKLOFF:
2      Q.  I just wanted to go through the bullets to
3  try to understand.
4      A.  Sure.
5      Q.  Your first bullet is about IARC's finding
6  of --
7      A.  Page 6, right?
8      Q.  Page 6, yes, sir.
9          And starting in March 2015, starting with
10 that bullet.
11     A.  Sure.
12     Q.  That bullet is just identifying that IARC
13 found glyphosate to be a probable human carcinogen,
14 Class 2A; correct?
15     A.  Correct.
16     Q.  That was also something that you relied on
17 in your general causation report?
18     A.  I'm not sure I could say "general
19 causation," but, yes.
20     Q.  In your 2017 report?
21     A.  Yes.
22         But, again, I want to make sure that you
23 understand why I have it here.  This is -- I'm not
24 giving any general causation opinion here.  I'm
25 providing an opinion in Mr. Hardeman's case, but in

Page 108

1  order for me to explain how Roundup, in his
2  particular case caused, non-Hodgkin lymphoma,
3  I need to explain where I got this from, what type
4  of epidemiologic literature that links that to this
5  but I'm not providing an opinion in general
6  causation.  I just hope this is clear.
7      Q.  It is clear.  Actually -- that answer is
8  almost exactly what I wanted, so I think we can
9  end.
10     MS. WAGSTAFF:  No.  My objection is because
11 I think that you're trying to set up an argument
12 that I've been having with you and Ms. Yates.  And
13 to be very clear, and I think what Judge Chhabria
14 has said on the record, which is why I objected
15 earlier to you asking him legal questions, is that
16 specific causation experts cannot give new or
17 general causation opinions.  And it's our belief
18 and it's our opinion that Monsanto specific
19 causation opinions are giving new and different
20 general causation opinions.
21     We said at the very beginning of this case or
22 of this deposition that Dr. Nabhan is giving only
23 specific causation opinions, and to the extent he's
24 giving general causation opinions, they are
25 consistent what has been allowed for plaintiffs to

Page 109

1  opine on at Daubert.  And I believe that's what he
2  said at the last status conference, and we can
3  leave it at that.
4      MR. STEKLOFF:  Okay.  I'll save my response for
5  later if we have to go down that road.
6      MS. WAGSTAFF:  You can give it now.
7      MR. STEKLOFF:  I don't need to.
8      MS. WAGSTAFF:  Okay.  And, by the way, when
9  I say "consistent with what has been allowed for
10 plaintiff to opine on," I mean all plaintiffs, all
11 MDL plaintiffs.
12     MR. STEKLOFF:  Actually, can we go off the
13 record?
14     THE VIDEOGRAPHER:  We are off the record at
15 10:53 a.m.
16         (A short break was taken.)
17     THE VIDEOGRAPHER:  We are back on the record at
18 11:07 a.m.
19 BY MR. STEKLOFF:
20     Q.  I think I just have two more topics,
21 Dr. Nabhan.
22 ████████████████████████████
   ██  ████████████████████████████████████
   ██  ██████████████████████████████████
   ██  ████████████████████

Chadi Nabhan, M.D.



**Page 110**

1  Q.  It's a good thing?
2  A.  It's a good thing.
3  Q.
8  Q.
11
m

**Page 111**

**Page 112**

25  Q.

**Page 113**

5  THE WITNESS:  I usually include it, and that's
6  actually why I have it here.  If I didn't really
7  think of it as a risk factor, I wouldn't mention
8  it.  I included all of the risk factors that I'm
9  aware of that possibly contribute or could be
10  linked to non-Hodgkin lymphoma.  As I told you, I'm
11  more inclusive.  It never hurts to put everything
12  that you know is a risk factor in that basket, and
13  then you start the process of elimination and
14  trying to see is obesity as a risk factor causative
15  or not because that's really what we are trying to
16  look at.  And I can't find conclusive evidence to
17  support that obesity causes non-Hodgkin lymphoma.
18  BY MR. STEKLOFF:
19  Q.  What would you need to find conclusive
20  evidence?
21  A.  I just reviewed what I was able to find in
22  the literature, and I think the largest paper that
23  I was able to find that had thousands of patients
24  from the United States, as well as Europe and
25  Australia, came up with the conclusion that it's

Chadi Nabhan, M.D.

Page 114

1 inconclusive. We need more research to do to be
2 able to tell and determine whether obesity could
3 cause non-Hodgkin lymphoma.
4    Q.  So is it fair to say you would never find,
5 therefore, that an individual's obesity was a
6 substantial contributing factor to his or her
7 non-Hodgkin lymphoma?
8    A.  Again, it depends on the individual. So,
9 I mean, you have here somebody who has other risk
10 factors that are clearly more pressing in terms of
11 the literature in terms of the available evidence
12 as causative of non-Hodgkin lymphoma. So you think
13 about it. You put it in and then you decide
14 whether the obesity in this particular individual
15 has lead to the development of non-Hodgkin
16 lymphoma. I think the definition of obesity has
17 changed over the years that, you know, before you
18 know it, everybody around this table will be
19 considered obese. So it's a problem because it all
20 depends on the body mass index, and that definition
21 of body mass index continues to change.
22        So currently in the United States,
23 one third of people -- and I think we are, what,
24 400 million right now -- are considered obese, and
25 about 40 percent are overweight or obese. So that

Page 115

1 means over 100 million people are considered obese
2 or overweight, and the instance of cancer in the
3 U.S., new cancers, is about 1.8 million. So given
4 the fact that everybody says obesity is a risk for
5 all of these cancers, I don't really see that there
6 is, you know, hundreds of millions of patients
7 diagnosed with cancer.
8        You'll have to look -- you can't just
9 take -- you have to look critically at every single
10 risk familiar, like we did at hepatitis C, like we
11 look at hep B, like we look at obesity, and then
12 decide whether obesity in this particular
13 individual has a role or not. And that's what I
14 did in this case.
15    Q.  And I understand every individual is
16 different, but you can't point to me a scenario in
17 which you would find that someone's obesity was a
18 substantial contributing factor to his or her
19 development of non-Hodgkin lymphoma; correct?
20    MS. WAGSTAFF: Objection. Asked and answered.
21    THE WITNESS: It's a very hypothetical -- I'll
22 have to look at each case individually. You'll
23 have to give me medical records. You'll have to
24 give me patient -- actual patient to be able to
25 tell you if that patient will have that. I can't

Page 116

1 create a phantom patient and tell you that obesity
2 was a cause of non-Hodgkin lymphoma.
3 BY MR. STEKLOFF:
4    Q.  But given that what you told me already
5 about all the statistics of cancer, all of the
6 confusion or differing definitions about obesity,
7 all of uncertainty and inconclusiveness about
8 whether it's a risk factor, you would never say --
9 isn't it true that you would never say that
10 someone's obesity was a substantial contributing
11 factor to his or her non-Hodgkin lymphoma in the
12 absence of any other risk factors?
13    MS. WAGSTAFF: Objection. Asked and answered.
14    THE WITNESS: It would be very difficult for me
15 to say that obesity by itself was the cause of any
16 particular cancer, not just non-Hodgkin lymphoma by
17 itself.
18 BY MR. STEKLOFF:
19    Q.  And you've never told a patient that his
20 or her obesity was a cause of his or her
21 non-Hodgkin lymphoma; correct?
22    A.  I've always counseled patients about diet
23 and exercise and losing weight. I think you have
24 to do it, and they either hate you or love you for
25 it. But you always do that, but I have not told a

Page 117

1 patient that just the fact you are overweight is
2 the reason why you had cancer and not just
3 lymphoma. In my opinion, linking obesity to any
4 type of cancer is very, very soft.
5    MR. STEKLOFF: I am done with my questions.
6 I might have more after Ms. Wagstaff, but I pass
7 the witness.
8        EXAMINATION
9 BY MS. WAGSTAFF:
10    Q.  Just following up on Monsanto's lawyer
11 talking about obesity, Monsanto's lawyer talking
12 about obesity, so obesity is a sliding scale;
13 correct?
14    A.  Yes.
15    Q.  Okay. And so somebody could be 100 pounds
16 overweight or 200 pounds overweight, and both could
17 be considered obese; is that right?
18    A.  Absolutely.
19    Q.  And --
20    A.  And then they say also lose weight
21 during -- you know, for a few years, and then they
22 gain weight, and then they lose weight. And the
23 definition of obesity changes. It's just a very
24 soft way to link obesity to cancer, in my opinion,
25 any cancer.



**Page 118**

1    Q.  And I won't ask which half of us in here
2  might be considered obese.  But you could look at
3  somebody, and they could be clinically obese, and
4  the general population wouldn't necessarily
5  consider them obese; is that right?

**Page 119**

11    THE WITNESS:  Well, it's very important.
12  I mean, I think -- you can read the medical records
13  and review the medical records, but ultimately, you
14  have to put these medical records in the context of
15  sitting down with the patient, talking to the
16  patient, listening to the patient and examining the
17  patient.  I just -- in my view, it would be very
18  difficult to form an opinion on that particular
19  patient or any particular individual without having
20  this dialogue and the conversation or understanding
21  from that person how it is.

**Page 120**

8  BY MS. WAGSTAFF:
9    Q.  Okay.  And while we were discussing your
10  meeting with Mr. Hardeman, and I believe it's on
11  page 6 of your report at the very top where the
12  paragraph starts "During my meeting with him"?
13    A.  Yes.
14    Q.  And if you go through, it says -- you've
15  actually reported here that he sprayed between 1988
16  and 2012.  Do you see that?
17    A.  Yes, and I think I misspoke earlier.
18  I said 2014.  That would just -- that was on me.
19  2012 is the accurate thing that he told me.
20    Q.  Okay.  And so all of the questions you can
21  remember -- this deposition hasn't been very long.
22  It's just been a couple hours.  And do you remember
23  at the beginning of the deposition the questioning
24  that Monsanto's lawyer was asking you?
25    A.  Yes, I do.

**Page 121**

1    Q.  Do any of your opinions change if he
2  stopped spraying at 2012?
3    A.  No, they don't.
4    Q.  And when you were going through your
5  opinion, did you consider Mr. Hardeman's age?
6    A.  I did.
7    Q.  Did you consider Mr. Hardeman's gender?
8    A.  I did.
9    Q.  Did you consider Mr. Hardeman's ethnicity?
10    A.  I did.
11    Q.  Did you -- you testified that you have
12  read Monsanto's -- the expert reports provided by
13  Monsanto; correct?
14    A.  I have.
15    Q.  Okay.  I just want to look at one just so
16  I get the actual wording correct.  Dr. Levine,
17  Alexander Levine provided a report.  Did you read
18  that report?
19    A.  I did.

Chadi Nabhan, M.D.



Page 122

17  MS. WAGSTAFF:  Okay.  No further questions.
18      FURTHER EXAMINATION
19  BY MR. STEKLOFF:
20  Q.

Page 124

25  Q   You, in your practice, when you were

Page 123

22      So that's where I needed to do additional
23  talking to him and asking him and then reviewing
24  his depositions and what he was deposed on to be
25  able to form a complete opinion.

Page 125

1  treating patients, you wanted to know if there was
2  a causative factor a specific disease that you were
3  taking care of a patient for, didn't you?
4      A.  I was a lymphoma specialist, and I'm a
5  lymphoma specialist.  And I think there are many
6  general oncologists that may have not the expertise
7  of lymphoma.  I think very different.  I was seeing
8  lymphomas.  I saw thousands of patients with
9  lymphoma.
10
15      Q.  To answer my question, I didn't ask you a
16  single thing about his treaters right there.  Can
17  you answer my question?  You, in your practice when
18  you were treating patients, you wanted to know if
19  there was a causative fact for a lymphoma you were
20  taking care of a patient for; correct?
21      A.  I did ask the appropriate questions to see
22  if I could illustrate a causative factor or not.
23      Q.  If you could find the cause, you would
24  have wanted to know the cause when you were
25  treating patients?

Chadi Nabhan, M.D.

Page 126

```
 1      A.   Absolutely.
 2      MS. WAGSTAFF:  I may have one more question.
 3   Can we take a break, please?
 4      THE VIDEOGRAPHER:  We are off the record at
 5   11:25 a.m.
 6          (Brief interruption.)
 7      THE VIDEOGRAPHER:  We are back on the record at
 8   11:26 a.m.
 9      MS. WAGSTAFF:  No more questions.
10      THE VIDEOGRAPHER:  We are off the record at
11   11:26 a.m.  This concludes the videotaped
12   deposition of Chadi Nabhan MD, MBA.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 128

```
 1         UNITED STATES DISTRICT COURT
 2         NORTHERN DISTRICT OF CALIFORNIA
 3   IN RE: ROUNDUP PRODUCTS   MDL No. 2741
 4   LIABILITY LITIGATION
 5   _____     Case No. 16-md-2741-VC
 6   This document relates
 7   to:
 8   Hardeman v Monsanto Co., et al.
 9   Case No. 3:16-cv-00525
10      DECLARATION UNDER PENALTY OF PERJURY
11     I declare under penalty of perjury that I have
12   read the entire transcript of my deposition taken
13   in the above-captioned matter or the same has been
14   read to me and the same is true and accurate, save
15   and except for changes and/or corrections, if any,
16   as indicated by me on the DEPOSITION ERRATA SHEET
17   hereof, with the understanding that I offer these
18   changes as if still under oath.
19
20      Signed on the _____ day of
21   _____, 20__.
22   _____
23      CHADI NABHAN, M.D.
24
25
```

Page 127

```
 1         C E R T I F I C A T E
 2
 3      I, DEANNA AMORE, a Shorthand Reporter and
 4   notary public, within and for the State of
 5   Illinois, County of DuPage, do hereby certify:
 6      That CHADI NABHAN, M.D., the witness whose
 7   examination is hereinbefore set forth, was first
 8   duly sworn by me and that this transcript of said
 9   testimony is a true record of the testimony given
10   by said witness.
11      I further certify that I am not related to
12   any of the parties to this action by blood or
13   marriage, and that I am in no way interested in the
14   outcome of this matter.
15
16      IN WITNESS WHEREOF, I have hereunto set my
17   hand this 14th day of December 2018.
18
19
20   _____
21      Deanna M. Amore, CSR, RPR
22
23
24
25
```

Page 129

```
 1         ERRATA SHEET
 2   CORRECTIONS:
 3   Page _____ Line _____ Reason _____
     From _____ to _____
 4   Page _____ Line _____ Reason _____
 5   From _____ to _____
 6   Page _____ Line _____ Reason _____
     From _____ to _____
 7   Page _____ Line _____ Reason _____
 8   From _____ to _____
 9   Page _____ Line _____ Reason _____
     From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
     From _____ to _____
13   Page _____ Line _____ Reason _____
     From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
     From _____ to _____
17   Page _____ Line _____ Reason _____
18   From _____ to _____
19   Page _____ Line _____ Reason _____
     From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
     From _____ to _____
23   Page _____ Line _____ Reason _____
     From _____ to _____
24
25
```