Pages 1 - 71

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE

IN RE ROUNDUP PRODUCTS          )
LIABILITY LITIGATION            )   Case No. 16-md-02741
_____)
                                    San Francisco, California
                                    Friday, January 4, 2019


**<u>TRANSCRIPT OF PROCEEDINGS</u>**

<u>**APPEARANCES**</u>:

For Plaintiffs:
                        WEITZ & LUXENBERG, P.C.
                        700 Broadway
                        New York, New York 10003
                  BY:   **ROBIN L. GREENWALD, ESQ.**

                        ANDRUS ANDERSON LLP
                        7171 West Alaska Drive
                        Lakewood, Colorado 80226
                  BY:   **AIMEE WAGSTAFF, ESQ.**

                        BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
                        12100 Wilshire Boulevard, Suite 950
                        Los Angeles, California 90025
                  BY:   **R. BRENT WISNER, ESQ.**
                        **MICHAEL L. BAUM, ESQ.**

                        THE MILLER FIRM LLC
                        108 Railroad Avenue
                        Orange, Virginia  22960
                  BY:   **BRIAN BRAKE, ESQ.**


(Appearances continued on next page)


Reported By:   Marla F. Knox, RPR, CRR
               Official Reporter - U.S. District Court

```
 1  APPEARANCES (CONTINUED):

 2  For Plaintiffs:
                          LAW OFFICES OF TESFAYE TSADIK
 3                        1736 Franklin Street 10th Floor
                          Oakland, California 94612
 4                   BY:  TESFAYE WOLDE TSADIK, ESQ.

 5                        LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
                          501 Broad Street
 6                        Lake Charles, Louisiana 70601
                     BY:  HUNTER WILLIAM LUNDY, ESQ.
 7                        NADINA ANN BEACH, ESQ.

 8                        GROSSMAN & MOORE, PLLC
                          401 West Main Street, Suite 1810
 9                        Louisville, Kentucky 40202
                     BY:  JENNIFER A. MOORE, ESQ.
10
                          AUDET & PARTNERS, LLP
11                        711 Van Ness Avenue, Suite 500
                          San Francisco, California  94102
12                   BY:  MARK BURTON, ESQ.

13                        LOCKRIDGE GRINDAL NAUEN PLLP
                          100 Washington Avenue S.
14                        Minneapolis, Minnesota 55401-2179
                     BY:  YVONNE M. FLAHERTY, ESQ.
15
    For Defendant:
16
                          ARNOLD & PORTER
17                        777 South Figueroa Street, 44th Floor
                          Los Angeles, California  90017
18                   BY:  PAMELA J. YATES, ESQ.
                          ANDREW K. SOLOW, ESQ.
19

20                        WILKINSON WALSH ESKOVITZ
                          2001 M Street, NW, 10th Floor
21                        Washington, DC 20036
                     BY:  BRIAN L. STEKLOFF, ESQ.
22                        RAKESH KILARU, ESQ.

23                        JULIE RUBENSTEIN, ESQ. (via phone)

24

25
```

```
 1   Friday, January 4, 2019              9:30 a.m
 2                    P R O C E E D I N G S
 3        THE CLERK:  Calling Civil Case No. 16-MD-2741, Roundup
 4   Products Liability Litigation.
 5        THE COURT:  Hi, everybody.  Does somebody want to make
 6   appearances for everybody or do you want to line up and make
 7   each individually appear?  I don't really care, whatever you
 8   want to do.
 9        MS. WAGSTAFF:  Aimee Wagstaff on behalf of
10   Plaintiffs.  Good morning, your Honor, and with me I have Brian
11   Brake, Robin Greenwald, Mark Burton, Jennifer Moore, Yvonne
12   Flaherty, Brent Wisner, and a couple people in the box, Michael
13   Baum, Kathryn Forgie.
14        THE COURT:  The rest of you, do want to introduce
15   yourselves?
16        MS. FORGIE: Kathryn Forgie.  Good to see you again.
17        MR. TSADIK:  Good morning, Tesfaye Tsadik.
18        MR. STEKLOFF:  Good morning, your Honor, on behalf of
19   Monsanto, you have Brian Stekloff and Rakesh Kilaru of
20   Wilkinson, Walsh and Pam Yates and Andrew Solow from Arnold
21   Porter.
22        MS. BEACH:  Good morning, Nadina Beach and Hunter
23   Lundy.
24        THE CLERK:  And the parties on the phone?
25        THE COURT:  I bet they forgot to unmute.
```

1          **MS. RUBENSTEIN:**  This is Julie Rubenstein from

2    Wilkinson, Walsh & Esovitz on behalf of Monsanto.

3          **THE COURT:**  Okay.  What do we need to talk about

4    today?  I understand you all had a productive session with

5    Kristen yesterday.  That may have knocked out a lot of stuff,

6    but what else can we discuss?

7          **MS. WAGSTAFF:**  Your Honor, over the last 12 hours

8    something has happened that has really disturbed the

9    Plaintiffs.  We wanted to come in and bring it to your

10   attention.

11         First of all, on October 22nd in the case management

12   statement in preparation for the October case management

13   conference, the parties agreed to a page limit for Daubert

14   briefing and summary judgment of 35 pages.  A couple months

15   later on December 18th I was talking on the phone with

16   Monsanto's attorneys, and they requested that we change that

17   page limit.  We said no.  We didn't agree to that, so they

18   asked you -- asked the Court for an additional page limit.

19   They filed a motion on New Year's Eve requesting additional

20   pages, and their motion requested that you allow them 10 more

21   pages for their summary judgment and Daubert brief, which

22   everyone has always contemplated would be one brief for Phase

23   One and asked -- for additional -- for leave to file additional

24   motions.  You denied it.

25         Last night just around midnight, Monsanto --

1          **THE COURT:**  The last part you said in the New Year's

2     Eve request they asked for leave to file additional motions.

3     What I remember about that -- I mean, I don't have the stuff in

4     front of me.

5          **MS. WAGSTAFF:**  Sure.

6          **THE COURT:**  What I remember about that is they asked

7     for an extension of the page limits, and I denied it; but the

8     thing about filing additional briefs, I don't recall that.

9          **MS. WAGSTAFF:**  Sure.  Yeah, their proposed order

10    requests a specific causation opening brief for 10 extra pages.

11    They requested a specific causation reply brief for 5

12    additional pages.

13         **THE COURT:**  Right.

14         **MS. WAGSTAFF:**  They also requested that you allow them

15    to file Daubert briefs, I guess, in addition to the other

16    ones -- I'm not really sure -- that were 15 pages each and an

17    additional summary judgment for 25 pages.

18         **THE COURT:**  Okay.

19         **MS. WAGSTAFF:**  And you denied them.

20         **THE COURT:**  Okay.

21         **MS. WAGSTAFF:**  And despite that denial of that

22    request, last night they went around and they actually filed

23    somewhere around 96 pages of briefing.  They filed a summary

24    judgment motion that was 25 pages, a Daubert motion on half of

25    our experts that was 35 pages; and then they went ahead --

1    despite the denial -- and filed an additional Daubert on Sawyer

2    for 15 pages, an additional Daubert on Benbrook for 15 pages

3    and a Daubert on our expert Mills for 6 pages.

4         So whether or not we put aside the additional Daubert that

5    we think should be struck in their entirety, their motion for

6    summary judgment and Daubert motion they filed last night was

7    60 pages despite asking you for an additional page limit and

8    you denying the same.  They went ahead and defied the court

9    order and filed that.  So we would ask that those motions be

10   struck in total and the relief denied or they be given 24 hours

11   to cure the page limit problem and that Plaintiffs be given an

12   additional 24 hours in kind to respond.

13        **THE COURT:**  Okay.  I'm trying to pull up the docket

14   and it is not working.  I have to use a different route.

15        **MS. WAGSTAFF:**  I have -- what are you looking for?

16        **THE COURT:**  I just want to pull up the docket

17   generally as we discuss this.

18        **MS. WAGSTAFF:**  All right.

19      (Whereupon, a brief pause was had.)

20        **THE COURT:**  We have 2,422 docket entries in this MDL

21   which is not my highest number.

22        **MR. STEKLOFF:**  Plenty of time, Your Honor.

23        **THE COURT:**  Yeah, it will probably end up being the

24   highest number.  I have a case that I inherited from the 1990s

25   that I think has 4,000 docket entries.  Just give me a second.

```
 1          (Whereupon, a brief pause was had.)
 2          THE COURT:  Okay.  So one preliminary question, so
 3   there was -- there was this brief -- this 35-page opening brief
 4   that was contemplated.  Apparently there was a misunderstanding
 5   about what was going to be included in that 35-page brief, but
 6   it -- at a minimum it was going to include Daubert motions on
 7   specific causation and summary judgment and has that been --
 8   brief been filed yet?
 9          MR. STEKLOFF:  Yes.
10          MS. WAGSTAFF:  That was filed last night, your Honor,
11   and that is what Monsanto requested additional pages on.
12          THE COURT:  Right.
13          MS. WAGSTAFF:  You denied, and then they --
14          THE COURT:  And then what else did Monsanto file?
15          MR. STEKLOFF:  Could I maybe just run through what the
16   briefs were that we filed, your Honor?
17          THE COURT:  Yes.
18          MR. STEKLOFF:  There is a 35-page brief on specific
19   causation, and that addresses both our Daubert challenges on
20   specific causation to three of the experts and our summary
21   judgment argument on specific causation.  Then there is a
22   separate summary judgment brief on non-specific causation
23   issues.  That would be preemption.  There is some California
24   law arguments.  There is some punitive damages arguments where
25   we think we are entitled to summary judgment.  That one is 25
```

1   pages.   There are three separate Daubert motions.

2        **THE COURT:**  Can I ask you a question about that?

3        **MR. STEKLOFF:**  Sure.

4        **THE COURT:**  I thought -- it was a long time ago

5   admittedly -- I thought we had a Motion to Dismiss on

6   preemption that I denied.

7        **MR. STEKLOFF::**  We did, your Honor, and I believe in

8   the colloquy about that motion you spoke with Mr. Lasker about

9   certain arguments that we might make at the summary judgment

10  stage, for example, a clear evidence argument based on the

11  regulatory developments.  That is the nature of the preemption

12  argument we made here.

13       **THE COURT:**  Okay.

14       **MR. STEKLOFF:**  The other Daubert motions are a motion

15  on Dr. Benbrook -- I'm not sure if he is a doctor -- but doctor

16  or Mr. Benbrook as the regulatory expert for Plaintiffs;

17  Mr. Mills, who is the punitive damages expert and then

18  Dr. Sawyer, who is the exposure expert.

19       **THE COURT:**  So you filed a 35-page brief on specific

20  causation.  You filed a 25-page summary judgment brief on

21  preemption California law and punitive damages.

22       **MR. STEKLOFF:**  That's right.

23       **THE COURT:**  And then you filed one other brief --

24       **MR. STEKLOFF:**  There are three briefs, one on each of

25  those experts.  There is one on Sawyer, which is 15 pages.

```
 1   There is one on Benbrook which, I believe, is either 14 or 15;

 2   and there is one on Mills which is less than 15; but I'm not

 3   sure where it ended up.  I think 6.

 4        MS. WAGSTAFF:  Your Honor, this is exactly what they

 5   asked you to do and exactly what you denied, and they did it

 6   anyway.

 7        MR. STEKLOFF:  So I --

 8        THE COURT:  I think the problem is we never really had

 9   a -- at least as I recall -- we never really had a conversation

10   about what issues needed to be teed up for summary judgment

11   other than specific causation and what issues needed to be teed

12   up for Daubert other than specific causation.  At least I don't

13   recall having that conversation.  I suspect that if we had had

14   that conversation and, you know, somebody had said, Okay, look

15   we have -- you know, we have the issue of specific causation

16   that we need to deal with through summary judgment motions and

17   Daubert motions; and then we have these other issues we need to

18   deal with through summary judgment motions and Daubert motions,

19   I probably would have said, Okay, that's fine.  You can have

20   more than 35 pages to deal with that.  I would like you to deal

21   with it all in one brief, so I can have one brief that I can go

22   through.  I would assume I would have allowed more pages for

23   that.

24        Anyway, I don't know if I'm misremembering.  I will tell

25   you that when -- you know, part of it just over the holidays
```

1   maybe you are not focusing on things as carefully as you might

2   usually do -- but when I denied that request for an extension,

3   what I was doing in my mind was saying, No, you can't have, you

4   know, more than 35 pages for this brief on specific causation

5   that we already established would be 35 pages.

6          MR. STEKLOFF:  And that's how we understood it as

7   well, your Honor.  I think in the order -- both in the CMC

8   statement and then in the request -- we noted how we planned to

9   conduct the briefing and how we thought the briefing should

10  unfold, and that was in part based on, you know, comments by

11  Mr. Stekloff at the earlier hearing, the last CMC, about how we

12  would be seeking relief on Dr. Sawyer and Benbrook, who I don't

13  think really relate to specific causation and then also relying

14  on the colloquy I mentioned earlier with preemption being an

15  issue as well, and so we laid out sort of exactly how we

16  planned on filing the briefs.

17      In fact, in the page motion we indicated that we were

18  seeking an extension only for the brief that has been called

19  the specific causation Daubert summary judgment brief I think.

20  Dating back to October I think that's how it was labeled in the

21  actual CMC statement where the initial proposal was made,

22  specific causation Daubert briefing summary judgment page

23  limits.  So we very much understood that to apply only to

24  specific causation.  We actually said at the end of that brief

25  that we were planning to file these other briefs on this

```
 1   timetable.

 2            THE COURT:   The Daubert briefs for each expert, how

 3   long are each of those briefs?

 4            MR. STEKLOFF:   There is one brief that does Daubert

 5   and summary judgment on the three specific causation experts

 6   for Plaintiffs.   That would be Dr. Nabhan, Dr. Weisenburger,

 7   Dr. Shustov.

 8            THE COURT:   Right.

 9            MR. STEKLOFF:   There is a brief of -- on the other

10   brief we basically file the page limits in the pretrial order

11   that Your Honor has.   So I think it's 15 pages for Sawyer, 15

12   for Benbrook and 6 for Mills for those three Dauberts.

13            THE COURT:   Okay.   I mean, at this point, I take the

14   blame for this one because I probably could have worked with

15   you all to provide greater clarity on all of this.   It

16   doesn't -- in the grand scheme of things it does not seem like

17   a big deal, and really what is important is for us to just find

18   the most efficient way going forward to tee up the issues that

19   the parties have a right to tee up for summary judgment and/or

20   motions to exclude.

21        What would you like to do at this point?   These briefs

22   have been filed.   These issues need to be considered.   What do

23   you think is the most efficient, effective, you know, way to

24   deal with this going forward; keeping in mind that your comment

25   at -- your introductory comment to this comment that something
```

1   happened that was very disturbing is, like, totally out of

2   proportion to what is happening here.  It is not very

3   disturbing.  It is not a big deal.  So keeping in mind that it

4   is not a big deal, and it is not very disturbing; and we just

5   need to move forward and figure out how to address these

6   issues, how would you like to proceed?

7          **MS. WAGSTAFF:**  First I would like to say, that it is

8   actually disturbing to us that --

9          **THE COURT:**  I don't want to argue anymore about how

10  disturbing it is.

11         **MS. WAGSTAFF:**  -- a court order --

12         **THE COURT:**  I'm issuing a definitive ruling that it is

13  not disturbing.  That is my ruling.  It is not disturbing.  So

14  now, how are we going to move forward; and what is the best way

15  to deal with this?

16         **MS. WAGSTAFF:**  So we would like extra time to respond.

17  We had planned to respond to 35 pages -- as the parties had

18  agreed and the Court had ordered -- and now we have 96 pages,

19  so if you can let me confer with my briefing team during this

20  conference and perhaps propose a reasonable extension by the

21  end of this conference, I would appreciate that.

22         **THE COURT:**  That's fine.

23         **MR. STEKLOFF:**  Your Honor, if I could just note, one

24  of the things we offered up in the briefing order as a proposal

25  is it would be extra time on the non-specific causation briefs

1    because there was a misunderstanding.

2            **THE COURT:**  That's fine.  All right.  What else?

3            MR. WISNER:  Brad Wisner on behalf of the Plaintiffs.

4    A couple things, Your Honor, I believe there was a letter brief

5    filed last night that we would like to address with the Court.

6    Before we get there, I would like to talk about the order the

7    Court issued for bifurcation yesterday.  Throughout this

8    litigation you have been honest and frank with us about your

9    viewpoints on evidence and law, and I think you deserve our

10   viewpoint on this; and we think that this is wrong.

11       Here is why -- if I may provide the Court with a

12   document, this is the California jury instructions that we have

13   to prove at trial.

14           **THE COURT:**  Okay.

15           **MR. WISNER:**  So in sort of fashioning our case, this

16   is our Bible, right; this is substantive California law about

17   what we actually have to prove at trial to get a verdict that

18   would be enforceable against Monsanto.  If you look at the

19   first one, this is a strict liability failure one.  These are

20   the seven elements we have to prove.  This is what we did in

21   Johnson.  They have to say yes to each one of these for us to

22   prevail.

23       And going through this yesterday, I'm sort of not sure

24   what would be answered in the first phase of the litigation on

25   this -- on these elements that we have to prove.  So obviously

1  the first one I don't think is in dispute.  They made Roundup.

2  The second one, that the product had potential risks that were

3  known or knowable in light of the scientific knowledge that was

4  generally accepted in the scientific community at the time of

5  manufacture.

6       So, I mean, the causation concept that you articulated --

7            THE COURT:  The answers that we are dealing with

8  number 6 first, right?

9            MR. WISNER:  Okay.  That the Plaintiff was harmed.  I

10  don't think that is even in dispute that, in fact, Mr. Hardeman

11  or whoever was diagnosed with cancer, right.  I think it is the

12  one before that or the one after that -- sorry -- that a lack

13  of sufficient instructions or warnings was a substantial factor

14  in causing Plaintiffs' harm.  That is the causation element.

15  Under the California law, the element is the warning causing

16  the injury.  That is the legal cause of the injury.

17            THE COURT:  If Roundup didn't cause the injury, then

18  the lack of warnings wasn't a substantial factor in causing the

19  injury?

20            MR. WISNER:  Without question, that issue is subsumed

21  in that element.  My problem, your Honor, is in Phase One what

22  are they going to answer?

23            THE COURT:  Whether Roundup was a substantial factor

24  in causing Mr. Hardeman's NHL.

25            MR. STEKLOFF:  So let's say we prevail on that; and

1    then we move onto the second phase, they are going to have to

2    answer every one of these questions again.

3            **THE COURT:**  Right.

4        **MR. WISNER:**  So effectively what you would have done

5    by this bifurcation is we have created a new element that we

6    have to prove.

7            **THE COURT:**  It is not a new element.  As you just

8    said, it is subsumed within one or more of the elements.

9        **MR. WISNER:**  Sure, but to create an element that we

10   have to prove and sort of parse it into sub-elements would be

11   creating substantive California law.

12           **THE COURT:**  We do that all the time.  We have special

13   verdict forms.  I mean, there must be -- every day in product

14   liability cases in California there must be special verdict

15   forms for trials that are used that ask whether the product was

16   a substantial factor in causing, you know, the Plaintiffs'

17   cancer, the Plaintiffs' injury.

18       **MR. WISNER:**  That is not entirely accurate,

19   Your Honor.  The special verdict forms -- used in State court

20   at least -- are actually the next page -- they are written for

21   you.  They are not designed -- I mean, the general verdict form

22   is who wins, right?  We are not doing one of those or maybe we

23   will.  I don't know.  A special verdict form is actually

24   written by California code and California substantive law.

25       And the basis behind this, Your Honor, when you look at

```
 1   the origins of this, it comes from the fact that the California
 2   Supreme Court has acknowledged that bringing a products
 3   liability case against a large manufacturer is an onerous
 4   burden as actually how the law is written.  And what you are
 5   doing by the bifurcation approach is you are actually
 6   increasing the burden on the Plaintiffs considerably, both
 7   financially --
 8          THE COURT:  Can I ask you a question real quick?
 9          MR. WISNER:  Yes.
10          THE COURT:  It looks like you might have omitted a
11   page from this.
12          MR. WISNER:  I didn't include the notes, Your Honor, I
13   apologize.
14          THE COURT:  No.  But -- so I'm looking at -- so on the
15   first page --
16          MR. WISNER:  Oh, I see.
17          THE COURT:  -- you have the instruction that says,
18   Strict liability, failure to warn, essential factual elements.
19   And then you said the next page are the model --
20          MR. WISNER:  Verdict form.
21          THE COURT:  -- special verdict questions.
22          MR. WISNER:  That's right.
23          THE COURT:  And there are more than -- and then the
24   bottom of that page, it says:  If the answer to question 5 is
25   yes, then answer question 6; and the next page doesn't have
```

1    question 6.  So what is question 6?

2         **MR. WISNER:**  It tracks exactly the elements on the

3    first page, Your Honor.  If you look at number 5, for example,

4    Did they fail to adequately warn of the potential risks and

5    side effects.  If you look at 5 on the first page, it is that

6    Defendant failed to adequately warn and instruct of the

7    potential side effects.  I apologize.  I missed a page.

8         **THE COURT:**  What does it say?  Are you reading it to

9    me?

10        **MR. WISNER:**  Yes.  If you look at the first page,

11   number 5 --

12        **THE COURT:**  But the special verdict --

13        **MR. WISNER:**  If you turn the page to the special

14   verdict form, it is identical to the yes or no question on the

15   front.

16        **THE COURT:**  Question 6 is what?

17        **MR. WISNER:**  It would be, as you see on the first

18   page, that Plaintiff was harmed, yes or no.  And then number 7

19   would be that its lack of sufficient instructions or warnings

20   was a substantial factor in causing Plaintiffs' harm.  It

21   tracks it verbatim.

22        **THE COURT:**  Let me see if I can pull it up.

23        **MR. WISNER:**  Sure.  It is CACI instruction verdict

24   form 12 of 3.

25        **THE COURT:**  It is CACI instruction what?

1          **MR. WISNER:**  The instruction is 1205. The verdict form

2     is 1203, so it is VF-1203.

3          **THE COURT:**  Here is the elements and the notes.  Okay.

4     I have got the element and the notes.  Where do I find the

5     special verdict form?

6          **MR. WISNER:**  It would be on page 795.  If you type in

7     CACI VF-1203 to Google, you will probably find it.

8          **THE COURT:**  Okay.  So it actually -- okay.  Let me see

9     here.  It doesn't quite exactly track the --

10         **MR. WISNER:**  It appears the damages are different.

11         **THE COURT:**  -- the instruction, but question 6 in the

12    verdict form, was the lack of sufficient instructions or

13    warnings a substantial factor in causing harm.

14         **MR. WISNER:**  Correct.

15         **THE COURT:**  So they can answer that question perfectly

16    well in the second phase of the trial if they conclude in the

17    first phase of the trial that, in fact, Roundup was a

18    substantial factor in causing Mr. Hardeman's cancer.

19         **MR. WISNER:**  I entirely agree with that, Your Honor.

20         **THE COURT:**  So what is the -- I understand you

21    disagree -- and I'm perfectly happy to entertain -- I will

22    consider this a motion to reconsider, and I'm happy to

23    entertain that now; but I'm trying to understand the point you

24    are making.

25         **MR. WISNER:**  Sure.  So 23 USC 2072, the Rules Enabling

1  Act specifically provides that rules shall not abridge in large

2  or modify any substantive right.

3          **THE COURT:**  Okay.

4      **MR. WISNER:**  By forcing Plaintiffs to engage in this

5  expensive and difficult process of proving a subset element

6  that is not actually contained in the substantive jury

7  instruction, we are, in fact, using the bifurcation rule to

8  modify substantive right.

9          **THE COURT:**  I don't understand how that's the case if

10  we all agree that you must prove by a preponderance of the

11  evidence that Roundup was a substantial factor in causing

12  Mr. Hardeman's NHL.

13      **MR. WISNER:**  Well, to be clear, Your Honor, what we

14  have to prove is that Monsanto's negligence was a substantial

15  contributing factor.

16          **THE COURT:**  Right.  But if Roundup was not a

17  substantial factor in causing the NHL, then Monsanto's

18  negligence could not possibly have been a substantial factor in

19  causing the NHL.  Monsanto's failure to warn could not possibly

20  have been a substantial factor in causing the NHL, right?

21      **MR. WISNER:**  Sure.  But you could also say we could

22  have a trial on whether or not the Roundup he purchased was

23  actually the Roundup, right?  There are many issues.

24          **THE COURT:**  You could but that wouldn't make sense.  I

25  think that it does make sense to have a trial on this predicate

1    question first.

2             **MR. WISNER:**  Sure.  I understand the Court thinks that

3    it makes sense.  From my reading of the order, it seems that

4    the principle behind that decision is not efficiency; but it is

5    fairness.  That is what I understood the Court's order to say.

6             **THE COURT:**  I would say it is a little bit of both.

7             **MR. WISNER:**  Well, on the efficiency issue, I think I

8    can diffuse you of that very quickly.  I think it is going to

9    become very clear as we move closer to trial it is not

10   efficient.  I actually spent many hours last night going

11   through our evidence, and I honestly can't tell you if it is on

12   one side of the line or the other.  I'm going to have the Court

13   -- in good faith.  I'm not saying I'm going to burden the Court

14   -- I don't know what side it is going to fall on.  We are going

15   to need multiple days of evidentiary hearings.

16            **THE COURT:**  I don't think we will need multiple days

17   of evidentiary hearings.  I agree with you that it will

18   probably be challenging.  I think regardless of how we ordered

19   the presentation of evidence in this case, the pretrial issues

20   are going to be challenging.  They are going to be challenging

21   if we do it this way.  They are going to be challenging if they

22   do it the other way.  We are all going to have to work hard,

23   and we will.

24            **MR. WISNER:**  Sure.  I'm not adverse to hard work,

25   Your Honor.  That's not where I'm coming from.  What I'm

1    talking about is an overwhelming amount of work in the next six

2    weeks because, for example, there are 23 to 26 depositions that

3    we may, in fact, use as depositions.  I would say about six of

4    them clearly don't fall into the general causation of the

5    causation phase; but 15 or 16 of them do have testimony.

6        Here is a great example:  Monsanto's chief toxicologist,

7    Donna Farmer, she writes in an e-mail:  We can't say Roundup

8    doesn't cause cancer.  We have not done the necessary testing

9    on the formulated product.

10        **THE COURT:**  That would not come in -- my gut reaction

11    is that that would not come in in the first phase.

12        **MR. WISNER:**  So that is literally Monsanto's chief

13    toxicologist -- a person who has more knowledge about Roundup

14    than anyone else in the world -- saying --

15        **THE COURT:**  The question is whether it causes cancer,

16    not whether -- not Farmer's opinion on what Monsanto can say or

17    not say.  It is about what the science actually shows.

18        **MR. WISNER:**  Sure.  She is literally talking about the

19    science that they didn't do.

20        **THE COURT:**  My gut is that that is actually really a

21    fairly easy question, and the answer to that fairly easy

22    question is that that doesn't come in in the first phase.

23        **MR. WISNER:**  I will give you another example.  Bill

24    Heydens, Dr. Farmer's boss --

25        **THE COURT:**  This is not a final ruling.

1          **MR. WISNER:**  I know.  I'm just giving you some sense.

2   I don't think anything here is --

3          **THE COURT:**  Yeah.

4          **MR. WISNER:**  He says, you know, IARC says they are

5   going to be investigating Roundup over glyphosate.  He says,

6   Well, gosh, we are very vulnerable here.  There is a lot of

7   epidemiology and toxicology that you can string together and

8   can find essentially causation.

9          **THE COURT:**  I don't think that's what he said.

10          **MR. WISNER:**  I appreciate, Your Honor, saying that.

11          **THE COURT:**  You like to re-interpret what Monsanto

12   people say in their e-mails, but I don't think that's actually

13   what he's saying.

14          **MR. WISNER:**  Interpretation of what is said --

15          **THE COURT:**  Which highlights the reason why I think it

16   is a more fair trial to bifurcate the question of causation

17   because during the first phase, we want you focusing not on

18   mischaracterizing statements that Monsanto executives have

19   made.  We want you focusing on the science.

20          **MR. WISNER:**  Sure.

21          **THE COURT:**  So you are sort of making my point for me

22   about why I concluded it would make more sense in this peculiar

23   case to bifurcate the matter.

24          **MR. WISNER:**  I would also point out, Your Honor,

25   that -- I'm not trying this case.  You say me, but I'm not the

1  one doing this case.

2          **THE COURT:**  You are not?  Who is trying it?

3          **MR. WISNER:**  No, I'm not.  I'm trying a case in State

4  court starting in March.

5          **THE COURT:**  Who is that going to be in front of by the

6  way?

7          **MR. WISNER:**  It will be in front of our new judge,

8  Judge Winfred Smith from Alameda.

9          **THE COURT:**  When does that start?

10          **MR. WISNER:**  March 18th.  In any event, Your Honor,

11  the reason why I raise this is because of what you just said.

12  Monsanto's knowledge of whether or not it causes cancer -- I

13  mean, there can be no dispute that they of all people should

14  know the answer to that question.

15          **THE COURT:**  The point is that you are

16  mischaracterizing what Monsanto people have said, and you are

17  putting your own spin on what Monsanto people have said.  The

18  question in the first phase is going to be what has the science

19  shown or not shown.

20          **MR. WISNER:**  Sure.  That science has been dictated by

21  Monsanto.  They have chosen to not look at certain things.

22  Specifically if we look at the documents, we know why they

23  haven't.  That is -- I don't know if that is liability or

24  causation.  I mean, their argument is there isn't sufficient

25  evidence to show causation.  Our evidence is there is

1    sufficient evidence.  Plus, if there is any deficiences in the

2    evidence, it is because you have suppressed it and/or refused

3    to do that.  That is a scientific question about causation.

4         **THE COURT:**  If Monsanto did it itself, then you would

5    be saying it is a study that Monsanto did itself or funded

6    itself; and it is not worth the paper it is written on.

7         **MR. WISNER:**  That's not true.  There is plenty of

8    stuff that Monsanto has done that we have no objections to.

9    Monsanto has done numerous studies.  For example, the TNO study

10   done in Europe.  It showed a 10% absorption rate, and they

11   proceeded not to tell anybody about it.  They buried that.  We

12   know that because we have access to the internal documents.

13   That is a Monsanto study that we have no gripes with.

14        They simply say, We are canceling this study because it

15   doesn't comport with our objectives.  That is what it says in

16   the e-mails as clear as day.  We have questioned their

17   witnesses about it, and they give us what they interpret it as.

18   Okay.

19        **THE COURT:**  Well, I mean --

20        **MR. WISNER:**  The jury has a right to look at that

21   testimony and say, You know what, that person is a liar.  I

22   don't believe them.  I actually do think the way Mr. Wisner is

23   describing this -- when you put the pieces together, it does

24   make sense.  That is the job of a trial lawyer.  It is not the

25   job of this Court or anybody really to say, We are not going to

let you misinterpret evidence that has come in because I don't
agree with your interpretation.  That is why we have a trier of
fact, right, to weed out whether or not my interpretation is
right or wrong.  But when they are making opinions and
statements about causation, when this is a company that has
literally created and invented it -- and they are the ones who
have studied it for 40 years -- talking about their statements
about the science surely is relevant.

They are going to have all of their experts -- all of
their internal company witnesses, for example, Dr. Farmer, she
is going to testify.  I was studying this product for 25 years.
It doesn't cause cancer; right.  As soon as that is in, as soon
as that is in, her credibility is an issue.

**THE COURT:**  I don't know if that would come in in the
first phase either.

**MR. WISNER:**  What we are contemplating is a sort of
ivory tower viewpoint of science.  That somehow we can weed out
all of the manipulation.  We can weed out all the suppression,
all the intimidation and put that all aside and just look at
what the science is; but the science, Your Honor, doesn't exist
in some isolated untouched world.  I wish it did.  It just
doesn't.

**THE COURT:**  There have been plenty of independent
studies done.  We have discussed all of them in the first phase
of this case.

1          **MR. WISNER:**  Sure.  There has been plenty of Monsanto

2    studies, and they are going to argue that this is bad and this

3    is good.  That is all part of it.  If you have had a chance to

4    read the closing argument -- have you had a chance, Your Honor?

5          **THE COURT:**  Glance.

6          **MR. WISNER:**  You will see that it is largely a

7    scientific argument.

8          **THE COURT:**  I did notice that.

9          **MR. WISNER:**  It is not me spinning the wheel about how

10   evil Monsanto -- I do get angry at certain points for sure.  It

11   is -- I can argue science all day.  The idea that science is

12   somehow detached from Monsanto's influence is very difficult to

13   unpack, in fact, I think impossible.  I understand your order

14   kind of contemplates that.  I mean, you didn't say all of --

15         **THE COURT:**  What I said is that if there is real

16   evidence that Monsanto influenced or manipulated the science,

17   as opposed to public opinion or regulatory agency decision

18   making or something like that, it would be part of Phase 1; and

19   we are going to have -- I have no doubt we are going to have

20   some difficult questions about what can come in in Phase One

21   and what can't, and you are going to characterize everything as

22   actions by Monsanto to manipulate the science; and Monsanto is

23   going to disagree, and we are going to have to figure that out

24   and we will.

25         **MR. WISNER:**  Let me take this a step further because

this is where I think the rubber really meets the road.  This

is why -- I think we pointed this out in our briefs -- no MDL

has ever done this, ever.  I couldn't find one.  They couldn't

find one that had ever done it.  The only MDL that we found

that had done it was from 1970 that involved a fire that burned

down 200 homes, and they wanted to do a trial on Well, did this

defect with this transformer or whatever caused this fire,

which would then lead to all the other Plaintiffs' cases.  This

isn't this situation, and it just hasn't been done.

     I don't mean to be petty here, Your Honor; but this last

hearing, Ms. Wagstaff comes to you and says, I have a client

who is dying; and their substantive rights are going to be

affected because they are dying.  Can you please remand it so

we can have a trial before the person dies.  And you said, Ms.

Wagstaff, has any MDL ever done that?  She said, I can't think

of any.  You said, Then I'm not doing it.

     This is a substantive right of a person who is dying, and

you said, I'm not doing it because no other MDL has done it.

Now we are in the same situation here, and you are doing it.

It creates a substantive difficulty for the Plaintiffs,

Your Honor.  It really does.  It just doesn't seem fair.  That

is just the reality of it.

     Now, whining about fairness is not really a good argument,

but it is actually a consideration the Court must consider

because even in the bifurcation rule, consideration of

1  prejudice and fairness is central.  If you believe Monsanto

2  can't get a fair trial because these other issues -- I mean,

3  really what you are saying -- if you think about it -- is that

4  Monsanto's terrible conduct -- its terrible conduct is so bad

5  that they can't get a fair trial on the merits of their case

6  because they have acted so bad.  I mean, I don't know where

7  justice comes in on that; and it doesn't seem remotely fair.

8       With that all said, I think there are some substantive

9  issues.

10         THE COURT:  Well, I would characterize my view and the

11 view underlying my ruling somewhat differently.  I would say

12 that the parties have a major dispute about whether Monsanto's

13 conduct has actually been terrible and which aspects of it have

14 been terrible and which aspects of it haven't been terrible,

15 none of which or most of which does not really relate to the

16 question of whether Roundup causes NHL.  I understand your

17 arguments.  I'm happy to entertain your motion for

18 reconsideration.

19         MR. WISNER:  I have one more.

20         THE COURT:  Very briefly if you can just make your

21 final point.

22         MR. WISNER:  I will be very quick, Your Honor.  Under

23 California law, failure to test is actually a cause of action.

24         THE COURT:  Failure to test?

25         MR. WISNER:  Is a cause of action.

1          THE COURT:  Have you asserted that in your --

2          MR. WISNER:  I believe so.  It's constrained within

3     the negligence law, Your Honor.  So even if Phase One were to

4     lose -- I think there is a claim for failure to test that would

5     survive to Phase Two -- I guess, not necessarily if you say it

6     doesn't cause his specific -- never mind.

7          THE COURT:  He has to be harmed by the failure to test

8     I assume.

9          MR. WISNER:  Fair enough.  There is a bunch of

10    causation issues about warnings.  If you look at the sheets in

11    front of you, I just want to show you one last instruction that

12    I think illustrates this point pretty neatly.  It is 431.  It's

13    multiple causation, multiple causes.  It's on page 289 on the

14    bottom.  They are out of order, Your Honor.

15         THE COURT:  Okay.

16         MR. WISNER:  Okay.  So one of the issues that you are

17    going to be square in the middle of as this Daubert proceeding

18    moves forward is multiple causes.  Monsanto has said, for

19    example, with Mr. Hardeman that the prior viral infection he

20    had 15 years ago was actually the cause of his cancer.  It was

21    not actually his exposure to Roundup, okay.  And this

22    instruction is -- it is actually error to not give this

23    instruction, right, when there is an assertion of multiple

24    causes of action.  California case law is very clear on this.

25         THE COURT:  I assume this concept can be covered in

1    the jury instructions in Phase One.

2           MR. WISNER:  Sure.  I'm with you, Your Honor.  We

3    would have to replace negligence, right, with Roundup; right?

4           THE COURT:  Yeah.

5           MR. WISNER:  That is the obvious thing.  If you find

6    that Roundup was a substantial factor in causing Plaintiffs'

7    harm, then Monsanto is responsible for the harm.

8           THE COURT:  I don't know exactly how we would change

9    the wording.  I assume that this concept can be covered in

10   Phase One.

11          MR. WISNER:  Okay.  So in Phase Two they are going to

12   have to find another cause question, right, because then they

13   not only have to find that Roundup is the cause, they have to

14   find the negligence related throughout it was a cause.

15          THE COURT:  Right.

16          MR. WISNER:  We have to prove causation actually in

17   both phases, legal and scientific causation, if you want to

18   call it that.  In that bifurcation of the issue of causation is

19   essentially never been done because the law is constructed

20   around the negligence causing it; right.  That is why reverse

21   bifurcation, Your Honor, if you look at the case law, has the

22   exact opposite of what we are doing here.

23       Reverse bifurcation is you do damages first, and then you

24   do causation and liability; but separating causation from the

25   liability is essentially never done because of this reason.

1    You know, for us to be able to do the first phase, we are going

2    to have to rewrite substantive California jury instructions

3    numerous ones, I mean, all of them essentially.

4           **THE COURT:**  We are going to have to write jury

5    instructions for the trial, which we have to do for every

6    trial.

7           **MR. WISNER:**  Sure.

8           **THE COURT:**  As with every trial, we start with the

9    model jury instructions; and then we adjust them, change the

10   wording, to meet the specifications of the particular trial

11   that is happening; and that's what we will do here.  Okay.  I

12   understand your argument.  The motion for reconsideration is

13   denied.  What else do we need to discuss?

14          **MR. WISNER:**  I would like to discuss the discovery

15   dispute if the Court has time.

16          **THE COURT:**  Okay.

17          **MR. WISNER:**  Pardon me.  I'm going to just go grab the

18   paper.

19       (Whereupon, a brief pause was had.)

20          **THE COURT:**  Okay.  On the first issue which is the

21   interrogatory responses regarding these PR campaigns -- for

22   lack of a better word -- I'm ruling in favor of the Plaintiffs,

23   and I don't need to hear any argument on that.  So the only

24   additional question might be when the responses have to be

25   submitted.

1          MR. WISNER:  We requested January 14th to be

2    sufficient time prior to the deposition.

3          THE COURT:  January 14th it is.  Okay.  I don't really

4    understand why you are bickering on the issue of RFAs 4 through

5    7 regarding the animal and carcinogenicity studies.  I don't

6    understand why any of this is important.

7          MR. WISNER:  May I approach?

8          THE COURT:  Sure.

9          MR. WISNER:  Do you have Exhibit C in front of you,

10   Your Honor?

11         THE COURT:  I have it on my iPad somewhere; but if you

12   want to hand it to me, fine.  Thanks.

13         MR. WISNER:  What I have done is I have highlighted

14   the red and the blue reflecting blue as the responsive aspects

15   of the RFA and red the not responsive.  The way RFAs are

16   typically used at trials is they are read to the jury.

17   Monsanto has effectively injected non-responsive argument into

18   their RFAs making their reading of something to the jury

19   including stuff that has nothing to do with the request.

20         THE COURT:  Hold on.  Let me look at that the way you

21   have presented it here.

22         (Whereupon, a brief pause was had.)

23         THE COURT:  Okay.  I guess what I'm -- taking a step

24   back from the question of whether these responses are

25   consistent with the rules, my question for you is:  Why do you

care about this?  Because what is going to happen at trial,

right, is that you are going to say that Monsanto hasn't

identified any 12 month or longer animal chronic toxicity

studies that it has conducted on glyphosate since 1991 or in

other words Monsanto has not conducted such a study and

Monsanto is going to say, we didn't have to conduct such a

study; and that's what the jury is going to hear.  And whether

this qualification is included in the response to the RFA or

not, that is what the jury is going to hear.  And so it seems

to me that whether this qualification is included in the RFA or

not does not matter at all.  It's like, you know, you are

talking about how much time you have to spend preparing for

trial and how much work it's going to be, this strikes me as

quite possibly the least important thing you could be spending

your time on right now.  So what am I missing?

        **MR. WISNER:**  Okay.  Well, putting aside, you know, how

I decide to spend my time, Your Honor -- I appreciate that

comment -- at trial the request for permissions I had used them

and I anticipate we planned to use them here.  At some point we

are going to read to the jury the admission and the response.

        **THE COURT:**  Right, but what I'm saying is that the

jury is going to be like, yes, and Monsanto says that they

don't have to.  So whether that is in Monsanto's response to

the request for admission or not seems totally inconsequential

to me.

1          **MR. WISNER:**  It is consequential insofar as we want to

2     be able to use it in Cross-Examination if it comes up.

3          **THE COURT:**  You are going to use it, and the Monsanto

4     witness is going to say, Yeah, the reason why we didn't do it

5     is because we are not supposed to do it.

6          **MR. WISNER:**  Fair enough.

7          **THE COURT:**  Significant with the other studies.  And

8     there is no difference between you cross-examining them on the

9     blue part of the response and them providing verbally the red

10    part of the response and the blue and the red part of the

11    response being in the response to the request for admission.

12         **MR. WISNER:**  I think it makes a huge difference; and

13    for what it is worth, this is a violation of the rules.  It is.

14    You can't do this.  You admit it or deny it; and if you have a

15    good faith basis for qualifying, you put it in.  These are not

16    qualifications.  They are just trial things; and while you

17    might not think I'm spending my time wisely, Your Honor --

18    that's fair.  I disagree -- at the end of the day, this is a

19    violation of the rules.  It shouldn't be there.  I ask that it

20    be stricken.

21         **THE COURT:**  Why isn't this an appropriate

22    qualification if the -- if the response to the request for

23    admission threatens to create a misimpression, why isn't it

24    appropriate to qualify it?

25         **MR. WISNER:**  I mean -- admit that Monsanto has not

conducted a long-term animal carcinogenesis study on glyphosate

since 1991, they admit that; and then they proceed to talk

about the other companies that have conducted stuff and then

describe the results of those studies and how it doesn't show

that it causes cancer.  The word cancer -- whether or not it

causes cancer should not even be in the question.  It is just

argument.  It doesn't belong there.

      **THE COURT:**  Okay.  All right.

      **MR. WISNER:**  We have -- I think we have highlighted

all the portions that we thought were wrong.  If the Court can

take a look at it and let us know, that's fine.  For us it is

important for having a clean admission.

      **THE COURT:**  Okay.  I will ask you the same question

why -- I would think if I were in Monsanto's shoes and I got

these requests for admission, I would be like fine.  I admit

it.  We didn't conduct a 12-month study or whatever the

question is; and we will make very clear to the jury at trial

why we didn't do that, and the Plaintiffs will look like fools

if they stand in front of the jury waiving this admission in

front of the jury acting as if it is some major admission

because it is going to be very easy to qualify the answer at

trial.  So why are you -- why are you making a big deal of

this?

      **MR. SOLOW:**  Your Honor, I think you hit the nail on

the head is because of the waiver because this is a statement.

There is a request for admission.

**THE COURT:**  I think it makes them look foolish.  Don't you think it makes them look foolish if they waive this front of the jury without the qualification that you will be able to easily present to the jury?

**MR. SOLOW:**  I rather not comment on the foolishness of opposing counsel, Your Honor; but respectfully, the idea that this standalone statement would be used, and then we would have to come back at a separate time and clarify that point, Federal Rules of Procedure, 36(a 4 talks about with good faith, clarifying -- and as Your Honor noted in the case law we cited including out of the Northern District of California -- it is the very reason is to avoid that implication; and the implication is not only were these studies not done, they needed to be done, right.  The notion that cancer is not in a question that talks about carcinogenicity is absurd, Your Honor, it is the very definition of it.

So the idea that we are going to have a standalone statement that we complied with Rule 36(a)4 and we are not serving up on a silver platter what -- by the way is an improper exhibit to a discovery dispute; supposed to just be the request here, to the extent we are looking at this blue and red -- they don't get to actually write their answers to their requests for admission.  So this is our answer.  They can ask somebody a question, and I'm sure somebody who is actually

trying the case can ask a proper Cross-Examination question and
get the specific point they want; and the witness will or won't
say any additional items; but the idea that this is going to be
a request for admission that is going to be read to the jury
independent of our proper Rule 36(a)4 clarification as some
kind of stipulation is not consistent with the rules.

      THE COURT:  Okay.  I understand the arguments.  I will
think about that one.

    Farm Family Exposure Study.  Did I ever hear about that
study?  I don't recall ever hearing about that study during
Phase One.  Did that study -- did any of the experts talk about
the Farm Family Exposure Study in Phase One?

      MR. WISNER:  Not in -- not in any detail, Your Honor.

      THE COURT:  Did any of the experts rely -- did Laura
La Mucci rely on the Farm Family Exposure Study?

      MR. SOLOW:  I don't know.  I think it is beyond the
scope of the discovery dispute right now.

      MR. WISNER:  It is not an epidemiological study.  I
don't think anyone in their right mind would say it's a
epidemiology -- it doesn't even look at a disease outcome.
Basically farmers were spraying in the field, and they looked
at their urine to see if there was any glyphosate in it.
That's it.  They said there wasn't very much glyphosate in
that.  That's the entirety of the study.  They are saying that
that qualifies as an epidemiological study.

 1          THE COURT:  Now, I remember -- my recollection now is

 2   that none of the epidemiologists testified about this study or

 3   relied on this study.  It came -- I think it was referenced by

 4   the experts who testified on the mechanism issue.

 5          MR. WISNER:  That's correct, and whether or not there

 6   is sufficient exposure in the real world such that it would be

 7   sufficient to cause it; and it talks about a reference dose.

 8          THE COURT:  Has he characterized the study correctly;

 9   that they studied farmers and the content of glyphosate in

10   their urine?

11          MR. SOLOW:  Correct.

12          THE COURT:  That is not an epidemiological study.

13          MR. SOLOW:   Your Honor, if I may for a moment, that's

14   not the purpose of a request for admission in an interrogatory;

15   to determine whether our answer is proper or not.  If they want

16   to cross-examine somebody, they can.  To the extent we are now

17   attaching other items to the discovery dispute, Mr. Wisner has

18   attached the actual study here.

19          THE COURT:  Actually, he didn't attach the actual

20   study.

21          MR. WISNER:  I know.

22          MR. SOLOW:  He attached the jury question and then

23   handed me -- this is supposed to be Exhibit D.  Ironically, the

24   proper Exhibit D -- if he wants to supplement it -- in the

25   abstract on the first page of the study, key words:

1   bio-monitoring, epidemiologic studies.

2          THE COURT:  You want to hand it to up to me?

3          MR. SOLOW:  I would be happy to.

4          MR. WISNER:  I have an extra copy if you would like

5   it.

6          THE COURT:  Hold on a second.  Where did you say the

7   word --

8          MR. SOLOW:  I just handed you my copy.  It is in the

9   last line of the abstract, the upper left-hand corner.

10          THE COURT:  Right.  Great.

11      (Whereupon, a brief pause was had.)

12          MR. WISNER:  If I may, Your Honor, I actually have the

13   sentence that I think hits the nail on the head here.

14          THE COURT:  Sure.  Go ahead.

15          MR. WISNER:  On page 325, farthest right-hand column

16   at the very end of the study, there is a paragraph that says,

17   important rationale.  Do you see that?

18          THE COURT:  Yes.

19          MR. WISNER:  Then there is a sentence:  Obviously this

20   bears consideration for epidemiologic studies that might assign

21   what -- it is specifically saying this is an epidemiologic

22   study.

23          THE COURT:  Right.

24          MR. SOLOW:  This study was conducted in part by an

25   epidemiologist by the company, Dr. arc qua villa.  There are

1   other studies -- which, again, I didn't think this was

2   appropriate to attach to the discovery dispute -- but in

3   studies about the actual Farm Family Exposure Study, the

4   conclusion of the methods and recruitment practices publication

5   of that in conclusion says, Conclusion the Farm Family Exposure

6   Study should provide insights about pesticide exposure under

7   rural conditions and thereby facilitate improved exposure

8   assessment in epidemiologic studies of agricultural

9   populations.

10          THE COURT:  I think that kind of makes his point.

11          MR. SOLOW:  Respectfully, Your Honor, I don't think

12   so, not in the discovery context.  The idea that if he wants to

13   cross-examine Dr. arc qua villa and determine whether a study

14   that is a building block as part of a later epidemiologic

15   study, like AHS, can be considered an epidemiological study or

16   bio-monitoring study in the field of epidemiology.  Let him

17   cross-examine a witness at trial.

18          THE COURT:  I understand the argument.  I will think

19   about it a little bit more.

20          MR. WISNER:  Your Honor, issue 4.

21          THE COURT:  Issue 4 I'm ruling for Monsanto.  I don't

22   need to hear argument.

23          MR. WISNER:  I just want to make sure we are clear,

24   Your Honor, this has a bunch of RFAs as well as an

25   interrogatory response.  We are not going to get any statement

1  from Monsanto about who actually is a managing agent?

2       THE COURT:  I'm sorry.  I thought this was about

3  requests for admission Nos. 43 through 107.  What are you

4  saying about an interrogatory?

5       MR. WISNER:  So interrogatory number 10 does the

6  open-ended.  It says, Please tell us who are the managing

7  agents for Monsanto that related to glyphosate from 1970.

8  Instead of doing it person-by-person, like they did in RFAs,

9  the interrogatory is an open-ended, please just tell us.  So

10  far it appears that no one is a managing agent at Monsanto, and

11  I don't think that is an appropriate legal position to take.

12  For all intents, they just refuse to answer.  They don't

13  actually provide anything.  They say, We are not answering

14  this.

15       THE COURT:  Let me ask you another question, sort of a

16  bigger picture question.

17       MR. WISNER:  Sure.

18       THE COURT:  I mean, isn't this another issue that

19  seems very unimportant in the grand scheme of things?  I mean,

20  Monsanto collectively and universally has taken the position

21  that it doesn't cause cancer and therefore we are going to

22  keep -- we are going to keep it on the market.  If for punitive

23  damages purposes, a jury concludes A, that it actually does

24  cause cancer and B, that Monsanto, writ large, was reckless and

25  malicious in its decision to continue marketing the product,

1    that is the end of the matter.  They are not going to have --

2    is the jury ever really going to have to ask a managing agent

3    question?

4           MR. WISNER:  It is actually part of the jury

5    instruction.  It specifically says, Did they engage in conduct

6    that was in reckless disregard for human health --

7           THE COURT:  Did Monsanto or its managing agents?

8           MR. WISNER:  It asks, Did they engage in any conduct;

9    and then it asks, Was that conduct conducted by a managing

10   agent.  It is a separate question, and then it defines managing

11   agent as we defined it in here.

12          THE COURT:  Right, but what I'm saying is it was the

13   entire company.  So, of course, it was by a managing at, right.

14   If they conclude that the entire company, you know -- that the

15   company knew that this caused cancer or there was a serious

16   possibility that this product caused cancer and insisted on

17   marketing it anyway, that's -- that's going to be the end of

18   the matter, right?

19          MR. WISNER:  No.  They argued -- both in the context

20   of the jury as well as in a motion for judgment notwithstanding

21   the verdict -- that we didn't satisfy our burden of showing

22   that the conduct by Farmer, Heydens, Martin, Goldstein, that

23   these people were not managing agents and therefore their

24   conduct doesn't qualify for punitive damages as a matter of

25   law.  If they haven't taken that position, Your Honor, I

1   wouldn't be fighting this.  They took that position.  I said,

2   Fine.  Tell us who your managing agents are so we can know.

3        **MR. SOLOW:**  Your Honor, just dealing with

4   Interrogatory No. 10, it is asking us in a single interrogatory

5   between 1970 and the present anybody who was a -- who had

6   substantial discretionary authority -- we are talking about a

7   50 year period of time -- with respect to Roundup.  That is by

8   definition an overbroad interrogatory.  As we said in the RFAs,

9   which you just ruled on, it can't be did this person have

10  discretionary authority.  A narrow proper interrogatory --

11       **THE COURT:**  Which would you rather respond to, the

12  RFAs or the interrogatory?

13       **MR. SOLOW:**  Your Honor, I choose option C, which is a

14  proper RFA or a proper interrogatory, which says this

15  particular conduct, this particular action, on this date by

16  this person was this -- did this person have authority -- and

17  if they want to use substantial discretionary authority -- to

18  make this decision, then we can deal with it.  But to talk

19  about somebody had -- Your Honor, with all due respect --

20       **THE COURT:**  Your beef is more with sort of the more

21  generic wording of the question, exercise substantial

22  discretionary authority over decisions that ultimately

23  determined Monsanto's policies regarding glyphosate?

24       **MR. SOLOW:**  To say to lawyers that we are quibbling

25  about the word when that's exactly what we do for a living,

1    Your Honor, I think is a little bit of an overstatement.

2           **THE COURT:**  What I'm asking is:  Would you still be

3    quibbling if the question were a little more targeted at, you

4    know --

5           **MR. SOLOW:**  Date, time, place, action, yes.

6           **THE COURT:**  No.  At the issue of how to handle the

7    issue of possible carcinogenicity with respect to glyphosate.

8    I mean, there has to be a group of people within the company

9    who are responsible for deciding how to handle the issue of

10   carcinogenicity.  In other words, there have to be decision

11   makers within Monsanto -- let me put it this way -- let me ask

12   the question this way:  Mr. Wisner, the question you are trying

13   to ask I think -- correct me if I'm wrong -- is who had the

14   power to do something about possible carcinogenicity of

15   glyphosate.  Is that basically right?

16          **MR. WISNER:**  Close.  I think it is a little broader in

17   the sense that, for example, if somebody went and bullied a

18   scientist to get studies suppressed, let's say, right, was that

19   person a managing agent from Monsanto because that action

20   itself is malicious conduct we would argue to the jury.  So it

21   is not just who had the power to do something about it, but who

22   was given power to do things about glyphosate; and it is not

23   just the carcinogenicity.  It is also the warning, advertising

24   related to it insofar as it discloses carcinogenicity.  Those

25   are all --

1              THE COURT:  Could I ask another question?

2              MR. WISNER:  Sure.

3              THE COURT:  In the State court case were there RFAs or

4    interrogatories on this question?

5              MR. WISNER:  No.

6              THE COURT:  Why not?

7              MR. WISNER:  Because we didn't think -- as,

8    Your Honor, said in the beginning, we didn't think it would be

9    an issue.  We presented the testimony of Dr. Farmer, Dr.

10   Heydens, Dr. Goldstein and Dr. Martins as well as some other

11   company witnesses.  We believe we had testimony from them that

12   showed that they were actually managing agents, and we

13   presented that to the jury; and they said No, they are not.  We

14   said, Okay.  So the jury didn't agree.  It is a factual

15   question.  It goes to the jury.  Instead of having this weird

16   fight, I said, Why don't you just tell us who your managing

17   agents are.  I will make sure to take their deposition, so we

18   don't have this problem.

19             THE COURT:  I understand.

20             MR. SOLOW:  Your Honor, as we stated in our portion of

21   the dispute letter, our position is they should be required to

22   identify the specific actions or statements of the individuals;

23   and then we can answer that as opposed to this blanket

24   statement of Hey, this person was a managing agent for 50

25   years.  Give us the date, the action and tell us this person;

1    and we will give them an answer.

2        **THE COURT:**  Why would that be so hard because I mean

3    you just went through a trial where you said that you had to

4    pitch to the jury that X action by X person was an action of a

5    managing agent.  Y action by Y person was an act of a managing

6    agent.  Why not just structure questions to the Defendants that

7    track the arguments that you made at trial?

8        **MR. WISNER:**  There would be a couple hundred of them

9    if we do that; and also problematically I don't feel I should

10   have to disclose my entire punitive damages Case statement by

11   statement --

12       **THE COURT:**  You already went to trial.

13       **MR. WISNER:**  We used a fraction of the evidence we

14   had.  There was a lot of stuff we couldn't use, not because of

15   the Court's ruling but also because it just wasn't done yet.  I

16   took a lengthy deposition of Dr. Farmer recently that unveiled

17   a lot of misconduct.  It is going to be a problem.  We are

18   going to have to solve it.  It highlights the problem of what

19   we are dealing with here.  None of that stuff had proper

20   foundation laid originally, so we have a lot more to work with

21   here.  It is a much stronger case today, and it is going to be

22   even stronger in this month after we have done the deposition

23   of Monsanto -- the first one, by the way, the actual company, a

24   bunch of other things.

25       So while it is going to be -- having to highlight every

1  single one of our conduct, date, time, place and event for

2  every single thing would be monstrously intense.  Just.

3       So you know, the RFAs said, Donna Farmer, was she a

4  managing agent?  Use the definition from jury instructions.

5  Did she exercise substantial discretionary -- that is verbatim

6  from the jury instruction.  That is California law.  To go

7  through every single person that they have searched for

8  relevant documents -- is this person on medication, is this

9  person, is this person -- and they just denied them all.  When

10 I got on the phone with them, I said, Are you denying stuff so

11 we'd have to fight it or is there something else going on?

12 They said, No.  We are just denying them because they are

13 hopelessly overbroad and therefore we can't answer them.  Okay.

14 Was Donna Farmer a managing agent or not?  If she wasn't, okay,

15 fine.  Was Heydens her boss one?  Was one --

16      THE COURT:  Well, we are already talking about over 50

17 RFAs and a very broad obviously interrogatory.  So we are

18 already dealing with lots of RFAs.  What is the problem with

19 making those RFAs more specific and tied to particular conduct

20 that you believe is conduct that gives rise to punitive damages

21 liability?

22      MR. WISNER:  Okay.  So, for example, it is not just

23 conduct.  It is also lack of conduct, right.

24      THE COURT:  Okay.

25      MR. WISNER:  So there is admissions as well.  Putting

1    that issue aside, for Donna Farmer, we are going to have 50

2    RFAs for her.  For Dr. Heydens, 50 RFAs, for Dr. Goldstein, 50

3    RFAs.  We have 50 individuals we have to go through for

4    specific conduct.  We are talking over a thousand RFAs here.

5    You want to talk about a good use of time.  This is not it,

6    right.  But they can just tell us Hey, listen, these are our

7    managing agents.  Stop bickering about it.  Then we are there,

8    and we can be done.  If we haven't deposed any of them, I will

9    depose them, right.  That's what we need to do, and they just

10   need to tell us without us mindlessly looking for the --

11            THE COURT:  Okay.  All right.  I will think about it.

12   Then let's see.  The issue about glyphosate bands, I mean it, I

13   don't need to hear argument on it.  I'm ruling in favor of

14   Monsanto on that issue.

15        MR. WISNER:  For record purposes, what is the basis of

16   that, Your Honor?  Is it overbroad or what?

17        THE COURT:  That's not -- if Monsanto doesn't have

18   that information in its possession, it doesn't need to gather

19   that information and compile that information.

20        MR. WISNER:  I don't believe that they have put that

21   on the record anywhere; that they don't have that information.

22   At least in the response, that wasn't the objection.  I'm not

23   trying to rehash argument, Your Honor, yet I'm doing it.  I'm

24   sorry.  If they are going to make that position, that's fine.

25   I'm pretty sure I can find them on perjury somewhere.

```
 1           THE COURT:  What they say is they have no central

 2    list.  This is an interrogatory.  Yeah, I don't think this is

 3    the kind of information that is, you know, exclusively in

 4    Monsanto's possession that you need to do discovery on as

 5    opposed to gathering the information itself.  I'm ruling in

 6    favor of Monsanto on that issue.

 7           MR. SOLOW:  Thank you, Your Honor.

 8           THE COURT:  Is there anything else that we need to --

 9    issue No. 2 and issue No. 3 and issue No. 4 will remain

10    pending, and I will give further thought to them.

11           MR. WISNER:  Thank you, Your Honor.  Just for the

12    Court's background, we have that deposition on the 23rd, so you

13    know.

14           THE COURT:  The Monsanto deposition?

15           MR. WISNER:  Yeah, we are taking of them on all these

16    issues, and getting written discovery prior to that is usually

17    helpful.

18           THE COURT:  Is there anything else we need to discuss?

19           MR. WISNER:  Not for me.  I have to let my cocounsel

20    answer that, Your Honor.

21           MS. WAGSTAFF:  Your Honor, I don't know if you wanted

22    to discuss --

23           THE COURT:  Can we just take a 5-minute break because

24    my iPad has died, and I want to get my charger.  Be back at a

25    quarter till.
```

1          (Whereupon, a short break was had.)

2          **THE COURT:**  What else do we need to talk about?

3          **MS. WAGSTAFF:**  We have conferred with Monsanto about a

4     briefing schedule on the motions that were filed last night.

5     We would like to get your approval on them.

6          **THE COURT:**  Okay.

7          **MS. WAGSTAFF:**  So we have -- there is the 35-page

8     motion that was filed last night against Dr. Weisenburger,

9     Dr. Shustov and Dr. Nabhan; and that brief will continue to be

10    subject to the PTO53 deadlines.

11         **THE COURT:**  Okay.

12         **MS. WAGSTAFF:**  And then the remaining four motions

13    which were -- the summary judgment motion and the motion filed

14    against Mills, Sawyer and Benbrook, the Plaintiffs would file a

15    response by January 25th; and Monsanto would file a reply by

16    February 1st.

17         **THE COURT:**  That sounds fine to me.

18         **MS. WAGSTAFF:**  Okay.

19         **THE COURT:**  Let me say one thing about the briefing,

20    though, particularly as it relates to the Daubert issues.  You

21    know, on Phase One if I had to do it over again, I would have

22    required you to file shorter briefs.  After -- you know, the

23    briefs may have been helpful to someone who hadn't actually

24    read the expert reports and hadn't actually sat through all of

25    the expert testimony; but after reading multiple times the

```
 1    expert reports and sitting through the expert testimony, most

 2    of the briefing was a waste of time.  I would urge you to try

 3    to, you know, keep the briefs short and write for somebody who

 4    has read the expert reports and has sat through some expert

 5    company.  Anyway, it will be up to you.

 6         MS. WAGSTAFF:  So, Your Honor, we had a very

 7    productive call with Ms. Melen yesterday; and we discussed the

 8    topic of Dr. Shustov; and we discussed possibly bringing him

 9    live on January 22nd.  I wanted to let the Court know and I let

10    Monsanto know this morning that that does, in fact, work for

11    the parties.

12         THE COURT:  What date was that again?

13         MS. WAGSTAFF:  January 22nd.  She mentioned if the

14    government is still in a shutdown next week, that perhaps your

15    trial will not be going forward.

16         THE COURT:  It's all up in the air; but the main thing

17    is if we can't pay the jurors, we are not going to have a

18    trial.  So -- I don't know the answer to that question yet, and

19    so the trial is currently scheduled for the 14th with jury

20    selection to take place on the 9th.  What I would probably do

21    is bump -- we have doctor -- what is his name again?

22         MS. WAGSTAFF:  Shustov.

23         THE COURT:  We have Dr. Shustov scheduled now to

24    testify by video on the 28th, the afternoon of the 28th; is

25    that right?
```

1          MS. WAGSTAFF:  Yeah.

2          THE COURT:  What I would probably do with this

3   criminal trial -- if the shutdown continues, you know, through

4   the middle of January but then ends after that or if the

5   shutdown continues but we have funding to pay the jurors -- is

6   move the criminal trial to the 28th.  But we could figure out a

7   way -- what is the time -- what time did we schedule for

8   Shustov's video deposition?

9          MS. WAGSTAFF:  So the video deposition was from 2:00

10  to 5:00 on the 28th.

11         THE COURT:  We will make that work.  Even if I move

12  the trial -- if Shustov can't come on the --

13         MS. WAGSTAFF:  He can come.

14         THE COURT:  If Shustov ends up not coming on the 22nd,

15  we will make that work; but he can come on the 22nd.  So

16  basically, just keep him booked right now for both the 22nd and

17  the 28th, and we will let you know what happens with our

18  criminal trial, okay.

19         MS. WAGSTAFF:  Okay.  Excellent.

20         THE COURT:  What else?

21         MR. STEKLOFF:  Just briefly, your Honor, in the case

22  management statement on page 4 we sought relief from your

23  standing order limiting the parties to five motions in limine.

24         THE COURT:  Oh, yeah.  It seems to me that we -- it

25  does not make sense in this case to have a limit of five

1  motions in limine.  What is your proposal for how many motions

2  in limine we should have?

3      MR. STEKLOFF:  We had proposed on our side trying to

4  go through the evidence in advance of the bifurcation ruling

5  for 14.  I think 15 for each side is appropriate limited to

6  five pages.

7      THE COURT:  I think that's fine.  My preference

8  particularly in this case -- and particularly since we will

9  have some difficult issues about what fits into Phase One and

10 what fits into Phase Two -- would be to do as much as we can

11 pretrial.  So I would be fine with a limit of 15 motions in

12 limine for each side.

13     MR. STEKLOFF:  And one question that we had that came

14 up with Ms. Melen yesterday -- I appreciate that Your Honor

15 handed us the proposed jury questionnaire this morning.  We

16 will look through that.  On the summons --

17     THE COURT:  Our jury office never includes the case

18 name on the summons, and I can't imagine why we would do that

19 now.

20     MR. STEKLOFF:  We have nothing else on our side.

21     MS. WAGSTAFF:  I just have one question, PTO62

22 inviting comments, do you have a deadline when you want us to

23 get comments on the questionnaire back to you?

24     THE COURT:  Oh, I was going to ask if you had comments

25 now -- if you wanted to go through it now, but I realize that

1    we just filed it this morning, like half an hour --

2              **MS. WAGSTAFF:**  During this conference.

3              **THE COURT:**  Yeah, so I'm perfectly fine if you want

4    to -- if you want to wait and get us comments.  Why don't

5    you -- I don't think there is any rush on this.  I thought it

6    would just be one thing that we could kind of get ahead of, but

7    I don't think there is any huge rush on this.  So why don't

8    you -- when would you like to submit feedback on the -- my

9    proposed juror questionnaire?

10             **MR. STEKLOFF:**  We can do it by late next week if

11   that's okay.

12             **MS. WAGSTAFF:**  That will work for us.

13             **THE COURT:**  Seven days from today, okay.

14             **MS. WAGSTAFF:**  Your Honor, it might be worth

15   scheduling a day with Your Honor to go through testimony to

16   decide whether it is in or out of Phase One or Phase Two; and

17   that might be helpful to do --

18             **THE COURT:**  Well, could that be part -- so that could

19   be part of the pretrial conference or if you all prefer to have

20   a day before that, because it would make, you know, trial

21   preparation logistically easier to have a day before that to go

22   through it, I would be happy to try to schedule a day before

23   that.

24        (Whereupon, a brief pause was had.)

25             **MR. WISNER:**  Your Honor, one second.

1          **THE COURT:**  Please take your time.  The only other

2    thing I was going to say about that is particularly if this

3    trial doesn't go forward, I will have plenty of availability in

4    the month of January.  I know you all are super busy, but --

5          (Whereupon, a brief pause was had.)

6          **MS. WAGSTAFF:**  Your Honor --

7          **THE COURT:**  Hold on one second.  I'm trying to get

8    some information about the shutdown and funding and stuff.

9    Give me just one second.

10          (Whereupon, a brief pause was had.)

11          **MS. WAGSTAFF:**  So I think as Your Honor noted, there

12    will be a large gray area of evidence that either is or is not

13    in Phase One.  I think it would be beneficial to have some

14    rulings from Your Honor in that regard.  If we can come on the

15    22nd for Dr. Shustov, if the Court is available on the 23rd,

16    perhaps we could schedule --

17          **THE COURT:**  I'm laughing because I have -- hearing on

18    a Motion to Dismiss in my other MDL, the Facebook/Cambridge

19    Analytical MDL on Wednesday, the 23rd; and that's going to

20    be -- that is going to take a long time.  So I --

21          **MS. WAGSTAFF:**  I'm sure Ms. Weaver wouldn't mind

22    moving that.

23          **THE COURT:**  I mean, I guess -- I'm happy to do it.  It

24    is something you think it would be better dealt with not in the

25    regular course of motions in limine but in a separate session

 1  before motions in limine are being considered?

 2       MS. WAGSTAFF:  We are -- just by virtue of your

 3  bifurcation order, we are going to have to re-cut a lot of the

 4  depositions we had used in the Johnson trial.

 5       So as we go through that process, it would be helpful if

 6  we can show you a document -- sort of like Mr. Wisner did just

 7  briefly with a couple of pieces of evidence -- if we can go

 8  through that exercise with you when both parties are prepared

 9  and attach it to deposition testimony and know whether it is

10  going to be in or out, and we will be able to prepare for trial

11  and have the proper testimony.  And the sooner -- ideally this

12  would have happened a couple months ago; but, you know, as soon

13  as we can possibly get it in front of you would be better for

14  Plaintiffs.

15       THE COURT:  What about if we did it -- since the

16  current plan is to have Shustov testifying on Monday afternoon,

17  the 28th; and since there is a possibility that that is what is

18  going to happen because there is a possibility that the -- I

19  think a significant possibility that the criminal trial will go

20  forward, why don't we meet on the 28th, on like the morning of

21  the 28th or something.

22       MR. WISNER:  So, Your Honor, here is the issue:  We

23  have depo designations that we have to exchange, exhibit lists,

24  witness lists; and all that is effectively completely changed

25  by the bifurcation order we got yesterday, at least from the

 1   Plaintiffs side, right.  Just to give you some context, we

 2   might want to play some testimony from Dr. Farmer, for example,

 3   we will have to edit out certain questions and answers because

 4   they are liability questions.  They are not causation

 5   questions.  We have to do all that.  Then in addition to that,

 6   when we go to Phase Two, we are going to have to replay a lot

 7   of portions of that to give context on the liability part.  We

 8   have already spent thousands of hours preparing for our regular

 9   trial.  We have to cram all that in between now and trial.  The

10   sooner we know what is in or not -- it affects -- right now I

11   don't physically know how we are going to be ready for trial.

12   We will do it somehow.  The more guidance we have from the

13   Court, the more we can do that.  The sooner we can do this, the

14   sooner we will be able to move forward.  It also affects the

15   depositions coming up.  Now I have to know when I'm taking the

16   deposition of Monsanto, I'm going to probably have a portion of

17   the deposition that will be in Phase One versus Phase Two.  I'm

18   not really sure what's in Phase One.  I'm already running into

19   thorns.  The sooner we can get some real bear bones clarity,

20   the better we can actually get ready for trial.

21        THE COURT:  Okay.  I think the best thing to do would

22   be for us to figure out what is happening with this trial,

23   which we may know by the end of the day today; and I will have

24   Kristen work with you on scheduling.

25        MR. STEKLOFF:  Your Honor, even after receiving the

order, our view on the approach would be that we should treat

the motions in limine, treat the exhibit lists, treat the

deposition designations as though this was not bifurcated; and

then, yes, there will have to be a separate step, an additional

step, in which we would then say with respect to this exhibit,

whether it comes into Phase One or Phase One Two or with

respect to this portion of a deposition designation whether it

comes into Phase One or Phase Two.

In the case management statement that we submitted to

Your Honor, I mean, we have extensive back and forth to try to

agree.  We are not opposed to trying to give the Plaintiffs as

much notice as possible as to what comes into Phase One and

Phase Two.  I also think we need deadlines so that, for

example, it is very clear that we have enough time to be able

to review things that are now going to have to be much earlier

than contemplated here so we can look at that deposition

testimony and have a position and have meet and confers.  So --

THE COURT:  I think what would probably be helpful is

for us to have a process -- and I'm happy to think of other

creative ways to do this.  I think it might be helpful for

everyone involved to have a process where each side picks their

top three items on which they would like a ruling about whether

it comes in in Phase One or Two.  So find the items that are

important to you and you think there may be ambiguity about in

terms of whether it would come in in Phase One or Two and tee

1    those up in a joint discovery letter, how about -- in the

2    format of our joint discovery process; and then we will meet

3    and talk about it.

4         MR. STEKLOFF:  That makes sense.  I think that

5    approach is a good one.

6         THE COURT:  And it will provide guidance.  We are not

7    going -- there is not going to be an in limine ruling on all of

8    the issues that might come up in the pretrial conference or in

9    the motions in limine.  It will actually provide guidance for

10   you as you tee up motions -- for teeing up the motions in

11   limine.  When are the motions in limine due?

12        MR. STEKLOFF:  The 16th of January.

13        MS. WAGSTAFF:  Two weeks.

14        THE COURT:  Nevermind.

15        MS. WAGSTAFF:  And, Your Honor, one thing that

16   Mr. Stekloff said is with respect to exhibits, that's fine and

17   motions in limine that you would file them for both trials

18   together; but with respect to deposition designations, as

19   Mr. Wisner said, we just don't know what we can put in which

20   phase.

21        THE COURT:  So pick your favorite three.  Each side

22   pick your favorite three.  Tee them up in a --

23        MR. WISNER:  Sorry.  I just want to clarify what you

24   are talking about, three exhibits, concepts --

25        THE COURT:  Exhibits, depo designations, whatever

1    tangible thing you want to put in front of me and get a ruling

2    on that will help provide guidance going forward.

3              **MR. WISNER:**  There is going to be 300 of these.

4              **THE COURT:**  That's fine.  Pick your best three that

5    are really important to you to get into Phase One, and you pick

6    the three that are really important to you to keep out of Phase

7    One; and we will adjudicate them.

8              **MR. WISNER:**  The problem is the 297 other ones, when

9    will those be decided?  Are they going to be decided during

10   trial?

11             **THE COURT:**  The ruling on the six that are teed up

12   will provide you with substantial guidance on what is going to

13   come in in Phase One and what is going to come in in Phase Two.

14             **MR. WISNER:**  This is not to belabor or to bore.  The

15   problem is we vehemently disagree with the bifurcation order,

16   right.  We think that it is unfair.  So us complying and not

17   submitting evidence, we are going to need rulings from the

18   Court on every piece of evidence that is excluded out of Phase

19   One to preserve our record.

20             **THE COURT:**  You will.  As you will in good-faith like

21   in every other trial in response to a pretrial ruling, you will

22   attempt to apply with the pretrial ruling; and you can preserve

23   and you -- by making your arguments against the pretrial

24   ruling, as you have done; and by attempting to comply with the

25   pretrial ruling, you will have preserved your arguments.

1    That's how it works.

2          **MR. WISNER:**  Sure.  I understand.  There might be a

3    piece of evidence that we generally think applies to causation,

4    and there is probably 300 of them that they think no, it is

5    liability.  That will need a ruling.  We can't just say, Well,

6    he didn't like that one, so we are going to assume he won't

7    like this one.  By "him," I mean you, Your Honor.  We actually

8    have to get a ruling on it so on appeal if we lose, we can say

9    This piece of evidence, this piece of evidence, this piece of

10   evidence was in error, et cetera.  That's all I'm trying to

11   say.

12         **THE COURT:**  I doubt that you actually need to do that.

13   Maybe you need to conduct a little further research on

14   preserving your appellate rights; but whatever rulings need to

15   be made to preserve your appellate rights, I'm happy to make

16   them.

17         **MR. WISNER:**  Thank you, Your Honor.

18         **THE COURT:**  So why don't you submit a -- when did you

19   say the motions in limine were due?

20         **MS. WAGSTAFF:**  The 16th.

21         **THE COURT:**  They are due to be filed on the 16th?

22         **MS. WAGSTAFF:**  Served.

23         **THE COURT:**  Served on the 16th.  Okay.  When are they

24   due to be filed?

25         **MS. WAGSTAFF:**  They are due to be filed on the 30th of

1   January.

2          THE COURT:  Okay.  Why don't you file your 5-page

3   discovery letter; attach as exhibits the six items that are

4   teed up in the 5-page discovery letter; and why don't you file

5   that by -- when do you want to file that by?  The 16th is when

6   you have to serve your motions in limine?

7          MR. STEKLOFF:  Yes, Your Honor.

8          THE COURT:  Why don't you file this 5-page letter by

9   January 10th?  Is that not doable?

10          MS. WAGSTAFF:  Your Honor, if we can have until the

11   14th or 15th, we have response to the Daubert motions due on

12   the 11th.

13          THE COURT:  How about the 14th?  The 15th?

14          MS. WAGSTAFF:  15th would be great.

15          MR. STEKLOFF:  That's fine, Your Honor.

16          THE COURT:  In the meanwhile, we will try to find a

17   time to meet and have argument on those items.

18          MR. STEKLOFF:  Yes, I think we can probably do it if

19   Your Honor has time either on the 22nd or the 28th.

20          THE COURT:  Whenever we end up meeting for --

21          MR. STEKLOFF:  Dr. Shustov.

22          THE COURT:  Okay.  That probably sounds like a good

23   idea.  Wait, is there anything else to talk about like -- there

24   might be a small item or two left on the agenda here.

25          MS. WAGSTAFF:  Your Honor, one of the agenda items was

1    the attendance of experts at Daubert hearing.

2            **THE COURT:**  Yes.

3            **MS. WAGSTAFF:**  Just sort of an update, Dr. Shustov

4    will obviously be held separately from the Daubert hearings you

5    currently have scheduled for the 4th, 6th and 11th.  Monsanto

6    told us this morning that it only requests us bring Dr.

7    Weisenburger and Dr. Nabhan.

8            **THE COURT:**  Okay.

9            **MS. WAGSTAFF:**  Which is obviously two experts during

10   those three days.  Our current position -- we haven't finalized

11   our Daubert briefs on them, but our current position is we

12   aren't going to request Monsanto bring any of their experts.

13   That leaves two experts over three days.  We are just giving

14   you a heads-up.  We are not in any position at all to request

15   that it be shortened, but it could be.

16           **THE COURT:**  What days have you calendared Weisenburger

17   and Nabhan?

18           **MS. WAGSTAFF:**  Nabhan needs to come on the 4th, which

19   is the first day; and Dr. Weisenburger needs to come on the

20   11th.

21           **THE COURT:**  Okay.

22           **MS. WAGSTAFF:**  We are going to check to see if

23   Weisenburger can come earlier on the 4th.  It is my

24   understanding from my colleague that that date is pretty set

25   for Dr. Weisenburger.  I don't know.  Monsanto mentioned this

 1 | morning they may bring some of their experts anyway, so I don't

 2 | have a position on that.

 3 |      **MR. STEKLOFF:**  We want to see their Daubert filings on

 4 | the 11th, and then we discussed that we would let them know if

 5 | we plan on bringing any of our experts to help put our

 6 | criticisms of their experts in context and then figure out a

 7 | schedule from there, whether we need all of the days and

 8 | whether the dates might work.

 9 |      **THE COURT:**  And so the idea -- the idea here -- just

10 | to make sure I'm remembering this correctly -- is I left it for

11 | you all to decide which of the other side's experts you wanted

12 | to cross-examine in connection with the Daubert motions; is

13 | that right?

14 |      **MR. STEKLOFF:**  That's correct, and I have -- my

15 | recollection is the last time we were together, you also I

16 | thought left open the possibility even if they didn't request

17 | one of our experts, we might bring one of our experts to

18 | help -- I mean we are going to be criticizing their

19 | differential diagnosis and saying it is not viable.

20 |      **THE COURT:**  That's fine.

21 |      **MR. STEKLOFF:**  They haven't followed methodology

22 | correctly, and we might bring in one of our experts to put that

23 | in context and explain why certain risk factors have improperly

24 | ruled in Roundup, et cetera.

25 |      **THE COURT:**  That's fine.

1          **MR. STEKLOFF:**  We haven't made the final determination

2     on that.  I told Ms. Wagstaff that we could do so shortly

3     after, so we can consider their criticisms of our experts on

4     the 11th and thereafter make a quick decision on who we would

5     bring, what dates they are available on the 4th, 6th or 11th,

6     so we can all then contemplate how many experts there are, how

7     much time we think we need with, Your Honor.

8          **THE COURT:**  All that sounds good.

9          **MS. WAGSTAFF:**  And just sort of to be clear on that --

10    I just wanted to get Your Honor's opinion on this -- several of

11    Monsanto's experts we did not depose.  We are not filing

12    Daubert motions on their expert reports.  So it is our

13    expectation that they don't come in and change their expert

14    reports in anyway at the Daubert hearing.

15         **THE COURT:**  Right.  I mean, there is always an issue

16    about whether somebody is testifying on a topic that was not

17    identified in their report or if they are merely explaining

18    what is in their report.  As always, we will have to deal with

19    those kinds of questions.

20         Okay.  On the issue -- is everybody okay with videotaping

21    the Daubert?  I can't remember -- I think Kristen told you

22    this, but my inclination is that we shouldn't be recording the

23    trial probably but -- mainly for logistical reasons.  I think

24    it would be hard to do in this courtroom, and I think it would

25    be much easier to have the trial in this courtroom; but the

1    Daubert hearings, I found it helpful to record those last time;

2    and so I would like to record them again this time.  Does

3    anybody have a problem with that?

4           **MS. WAGSTAFF:**  No, Your Honor.

5           **MR. STEKLOFF:**  No, Your Honor.

6           **THE COURT:**  Okay.  So they will probably -- I assume

7    it will be the courtroom we used for the Daubert hearings last

8    time.  You can double-check with Kristen if you haven't

9    already.  Anything else to discuss?  Let me go through my notes

10   real quick.

11          On the issue of jury instructions, I understand you asked

12   yesterday about final jury instructions -- given the length of

13   the trial, I was operating under the assumption that we

14   wouldn't go through the process of finalizing jury instructions

15   and probably wouldn't even have argument on jury instructions

16   at the pretrial conference.  That we would just do that, you

17   know, sometime in the middle of trial.  Given, however, that we

18   are bifurcating, I wonder if in connection with -- I wonder if

19   we should hammer out instructions for Phase One or at least if

20   we should figure out -- hammer out the substantive instruction

21   that -- or instructions that we are going to give the jury for

22   Phase One; and I wonder if we should do that at the same time

23   that we have our little hearing on the six items that are

24   disputed about whether they will go into Phase One or Phase

25   Two.

1          **MS. WAGSTAFF:**  Your Honor, for Plaintiffs I think we

2    would prefer that so we know what we have to prove and what we

3    are trying to prove at the trial.

4          **THE COURT:**  You know what you have to prove and what

5    you are trying to prove at the trial at Phase One but it's --

6    even though you already know what you have to prove, it's

7    useful for analytical purposes to figure out the precise

8    language that we are giving to the jury.  So why don't -- on

9    the same day that you are submitting your discovery -- your

10   joint letter regarding whether a particular exhibit or

11   testimony will come in in Phase One or Phase Two, why don't you

12   also each submit proposed substantive instruction or

13   instructions that the jury will be given -- should be given for

14   Phase One only, and why don't you exchange -- when is the due

15   date for your letter?

16         **MS. WAGSTAFF:**  15th of January.

17         **THE COURT:**  Why don't you exchange proposed

18   instructions on the 13th of January, and then see if you can

19   come to an agreement on the instruction to submit to me on the

20   15th.  If not, you can submit competing instructions in a

21   separate document on the 15th.  Does that make sense?

22         **MR. STEKLOFF:**  Just to clarify, these are just the

23   substantive instructions on the issue of causation in Phase

24   One?

25         **THE COURT:**  Correct.

1          **MR. STEKLOFF:**  Then I assume we would -- if evidence

2    plays out through certain expert testimony, we would be able to

3    supplement those or seek additional instructions?

4          **THE COURT:**  Yeah, just --

5          **MR. STEKLOFF:**  Before the jury was instructed at the

6    end of Phase One?

7          **THE COURT:**  Correct.  This is just the substantive

8    causation inquiry that we are asking the jury to engage in in

9    Phase One.

10          **MS. WAGSTAFF:**  So, Your Honor, just one question

11    because this bifurcation is sort of new to us.  Will the

12    jury -- is it your opinion the jury will be told that there are

13    two phases?

14          **THE COURT:**  The way I propose to handle that is -- the

15    way I think most trial courts handle bifurcated trials that

16    take place regularly all around the country everyday, which is

17    to say that we are going to have a trial; and we have budgeted

18    a month for the trial, and from time to time we are going to

19    send you back to deliberate on particular questions.  And, you

20    know, the first question we are going to send you back to

21    deliberate on is this question.  So the parties' opening

22    statements will be directed at that, and they will have an

23    opportunity to give an additional opening statement on

24    additional issues as the trial goes on.  But this is the -- the

25    first phase and the first thing we will have you deliberate

1    about is causation, and the parties are going to give you

2    opening statements about that; and we are going to have -- we

3    are going to hear from witnesses about that.  That is basically

4    what I will tell the jury.

5          MS. WAGSTAFF:  So as far as time for trial, have you

6    decided yet how long you are going to give us?  Ms. Melen told

7    us we will be on a chess clock.

8          THE COURT:  Yes, I think that -- I will be in a better

9    position to assess -- I mean, both sides estimated what, four

10   to five weeks?  Is that what you estimated?

11         MS. WAGSTAFF:  We estimated -- yeah, probably five to

12   six weeks.  I think just receiving the bifurcation order

13   yesterday, we haven't really anticipated how that will cut

14   down.  So --

15         THE COURT:  I will give you a -- I will give you some

16   general comments now, and then I will get into more specifics

17   later.  But the general comment is that typically we use four

18   hours of court time on each trial day.  Often it is a little

19   bit more than four hours, but conservatively we can estimate

20   that it is four hours of court time or airtime per trial day.

21   So if we are going four days a week, that is by my math 16

22   hours of trial time per week.  So if we went for four weeks,

23   what would 16 times 4 be?

24         MS. WAGSTAFF:  64.

25         THE COURT:  So if we went for four weeks, each side

would get 32 hours.  Now, what I always tell people in civil

trials is that if the time is being used efficiently; and I

determine, like a quarter of the way through or a third of the

way through or something, that I have not given you enough

time, I will expand the time.  But it's -- I have done that in

one civil trial.  In every other civil trial I have had, the

time limits that I have imposed have been more than what the

parties needed, and the parties finished before the time

limits, often well before the time limits.

          MS. WAGSTAFF:  So will we have a time for the entire

trial or will you give us time for the bifurcated portion?

          THE COURT:  I think you should think about that.

          MS. WAGSTAFF:  Okay.

          THE COURT:  And I should think about that, and we

should have further discussions about that.

          MR. STEKLOFF:  And just while I can't predict how long

Plaintiffs' case will take, we will -- say this should be three

to four week trial, five to six given the witnesses we have now

briefed about.  We just think this is a shorter trial.

          THE COURT:  I will think about that, and I will be in

a better position to -- obviously by the pretrial conference I

will be in a much better position to assess how long the trial

should be.

          MR. STEKLOFF:  One additional, I guess, request when

we submit the substantive jury instructions to Your Honor on

1  the 15th, can we also submit maybe an agreed to proposed

2  verdict forms?

3          THE COURT:  Sure.

4          MR. STEKLOFF:  I think if we are going to be talking

5  about those, we need the verdict forms at that time.

6          THE COURT:  Generally speaking, I don't like to get

7  into lots of different sub-questions with the jury.  Generally,

8  I like to give them just the general question.  It may be that

9  that is not called for here.  It may be that there needs to be

10  a set of sub-questions relating to causation.  I don't know.

11  My general philosophy is not to ask the jury a whole bunch of

12  sub-questions.

13          MR. STEKLOFF:  I think off the cuff, you proposed a

14  question earlier to Mr. Wiser, which probably would be very

15  close to what we propose, we would like notice of what the

16  question was.

17          THE COURT:  Anything else?

18          MS. WAGSTAFF:  No, Your Honor.

19          THE COURT:  Great.  Thank you.

20          MS. WAGSTAFF:  Thank you, Your Honor.

21          MR. STEKLOFF:  Thank you, Your Honor.

22      (Proceedings concluded.)

23                      ---oOo---

24

25

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   January 6th, 2019

8

9

10

11    _____

12              Marla F. Knox, RPR, CRR
                 U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25