# EXHIBIT B

```
                                        Pages 1 - 105

             UNITED STATES DISTRICT COURT

          NORTHERN DISTRICT OF CALIFORNIA

     BEFORE THE HONORABLE VINCE CHHABRIA, JUDGE
```

IN RE ROUNDUP PRODUCTS         )
LIABILITY LITIGATION           ) Case No. 16-md-02741
_____)
                                 San Francisco, California
                                 Monday, October 29, 2018

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
           WEITZ & LUXENBERG, P.C.
           700 Broadway
           New York, New York 10003
  BY: ROBIN L. GREENWALD, ESQ.

           ANDRUS ANDERSON LLP
           7171 West Alaska Drive
           Lakewood, Colorado 80226
  BY: AIMEE WAGSTAFF, ESQ.

           BAUM, HEDLUND, ARISTEI, & GOLDMAN, P.C.
           12100 Wilshire Boulevard, Suite 950
           Los Angeles, California 90025
  BY: R. BRENT WISNER, ESQ.
     MICHAEL L. BAUM, ESQ.

           THE MILLER FIRM LLC
           108 Railroad Avenue
           Orange, Virginia  22960
  BY: BRIAN BRAKE, ESQ.

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
              Official Reporter - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiffs:
                              LAW OFFICES OF TESFAYE TSADIK
 3                            1736 Franklin Street 10th Floor
                              Oakland, California 94612
 4                       BY:  TESFAYE WOLDE TSADIK, ESQ.

 5                            LUNDY, LUNDY, SOILEAU AND SOUTH, LLP
                              501 Broad Street
 6                            Lake Charles, Louisiana 70601
                         BY:  HUNTER WILLIAM LUNDY, ESQ.
 7                            NADINA ANN BEACH, ESQ.

 8                            BRADY LAW GROUP
                              1015 Irwin Street
 9                            San Rafael, California 94901
                         BY:  STEVEN J. BRADY, ESQ.
10                            STEVEN B. STEIN, ESQ.

11                            AUDET & PARTNERS, LLP
                              711 Van Ness Avenue, Suite 500
12                            San Francisco, California  94102
                         BY:  MARK BURTON, ESQ.
13
                              LOCKRIDGE GRINDAL NAUEN PLLP
14                            100 Washington Avenue S.
                              Minneapolis, Minnesota 55401-2179
15                       BY:  YVONNE M. FLAHERTY, ESQ.

16   For Defendant:
                              HOLLINGSWORTH LLP
17                            1350 I Street, N.W.
                              Washington, DC 20005
18                       BY:  ERIC G. LASKER, ESQ.
                              KIRBY T. GRIFFIS, ESQ.
19
                              ARNOLD & PORTER
20                            777 South Figueroa Street, 44th Floor
                              Los Angeles, California  90017
21                       BY:  PAMELA J. YATES, ESQ.

22                            WILKINSON WALSH ESKOVITZ
                              2001 M Street, NW, 10th Floor
23                            Washington, DC 20036
                         BY:  BRIAN L. STEKLOFF, ESQ.
24

25
```

```
 1   everyone has a view on police officers that they come in with
 2   naturally.  And no one is going to tell something about a
 3   police officer, the general profession, that someone hasn't
 4   thought of.
 5        I mean, they may talk about one incident that has made
 6   them particularly biased, for example, against police officers,
 7   or the opposite.  They may be a spouse of a police officer
 8   or -- and then have biases in favor that they would believe the
 9   police officers.  But it's just sort of a natural part of life.
10             THE COURT:  But I just did an employment
11   discrimination case, and it was a case involving a transgender
12   male.  The plaintiff was a transgender male.  We had a very
13   nice, productive discussion in open court with the prospective
14   jurors about -- and some had very strong preconceived notion
15   about -- notions about gender reassignment one way or the
16   other.
17        Most people didn't have any strong preconceived notions
18   about it.  People shared their opinions.  Some people had
19   strong preconceived notions about employees taking advantage of
20   their, you know, disadvantaged status to get more stuff from
21   their employer.  Others had strong feelings that employers
22   systematically discriminate against disadvantaged groups.
23        I mean, what's the difference here?
24             MR. STEKLOFF:  I think the difference is that here
25   people -- there may be jurors who come in with -- I mean, we
```

1  would say misconceptions, but preconceived notions about
2  Monsanto, about things like GMOs, about Roundup, and about
3  science or what they think is science.
4      There is a lot of false publicity or false information out
5  there about Monsanto.  And then you could have --
6          THE COURT:  No, no, sorry.  Go ahead.
7          MR. STEKLOFF:  I was going to say then you could have
8  jurors providing, with a lot of emotion, misinformation to
9  other jurors about the company and about those --
10         THE COURT:  I understand your point, but I actually
11 wonder if this -- it might be more effective to deal with this
12 problem that you are identifying by having regular open court
13 jury selection, because, you know, I'm pretty good about
14 cutting people off when they start going on a rant about
15 something that is not relevant to, you know, the -- you know,
16 is not relevant to the trial and might be prejudicial to a
17 party.
18     And I'm pretty good about explaining to people that, you
19 know, you have to -- the question is not whether your views are
20 correct or not.  Everybody has different views.  People are
21 right, people are wrong about stuff.  But the issue is, can you
22 put you aside any information you may believe is true, that
23 you've learned previously, and decide the case on the evidence
24 that comes in the four walls of this courtroom?
25     And by me saying that and having that group discussion

1  with people, I feel like sort of the gravity of that sort of
2  comes across better, potentially, than the process you're
3  describing.
4          MR. STEKLOFF:  I think there's a place for individual
5  voir dire and group voir dire, but I think there are some
6  things that could be so prejudicial that, by the very nature of
7  them coming out -- and I would put the Johnson verdict, the
8  post trial publicity about -- these are just -- just the
9  factual -- the facts; that jurors have written letters that
10 people may have reviewed, jurors have been on the news.
11 There's been a lot of publicity about the tentative ruling, a
12 lot of publicity about the final ruling, and someone stating
13 those things publicly, whether you -- and I understand that
14 people --
15         THE COURT:  Anybody friends with Neil Young and Daryl
16 Hannah?
17         MR. WISNER:  I am now.  It's pretty cool, Your Honor.
18         MR. STEKLOFF:  They may be here watching, Your Honor.
19 And I think that someone talking about those types of events --
20 I mean the numbers, the dollars associated with the verdict,
21 and I think some of the other scientific things, if it comes
22 out before Your Honor can sort of explain that that's not part
23 of the trial and that's not relevant, can have such an impact
24 on other jurors and can bias them toward -- I mean, they should
25 not know about the verdict or what happened in this other

1  trial.
2       And I -- and then I think there could be a balance where
3  at least bringing some jurors up sidebar, if they expressed
4  hostility in the questionnaire or raise their hand to one of
5  your yes-or-no-type questions, I think there's at least a
6  combination of things that can be done, both individually and
7  through group voir dire, that --
8           THE COURT:  Why couldn't I just --
9           MR. STEKLOFF:  -- federal courts and certainly state
10 court.
11          THE COURT:  Why couldn't I just say, look, some of you
12 may have heard about the prior litigation involving this issue.
13 The prior litigation involving this issue is not relevant to
14 this case.  It is not for your consideration.
15      And, therefore -- first of all, we can ask them in the
16 questionnaire whether they've heard about prior litigation
17 involving this issue, so we know who knows about it and who
18 doesn't.
19      I actually have another question about that, that I'll get
20 to in a second, but why can't I just say during jury selection,
21 you know, there has been prior litigation involving this issue
22 and that is not relevant and it should not be -- anything you
23 know about, that should not be discussed in open court.
24          MR. STEKLOFF:  Because -- well, if some -- I guess the
25 concern is that if there are people -- I think it depends on

Page 56

1    the details.
2         If we know about who knows about it in the jury
3    questionnaire, and those people are not struck, for example,
4    ahead of time, I think we would have to question them
5    individually, not in front of the group, about what they know
6    and whether they could be fair in light of what they know.
7         If there are people who say that they don't know about it,
8    I'm not sure that that would be -- we would probably oppose an
9    instruction to tell them that there's other litigation because,
10   I mean, it depends which way it goes.
11        Often we deal with this issue in mass tort cases of not
12   trying to talk about the overall scope of the case and having
13   the jury focus on the single plaintiff and the single trial.
14            THE COURT:  Okay.  Do you want to briefly give me your
15   view on this?
16            MR. WISNER:  Yeah, Your Honor.  I'll be very quick.
17        Regarding the questionnaire, I don't think we have a
18   problem with that principle whatsoever, as we stated in our
19   papers.  That was very effective in the Johnson case.
20        We didn't need 500 jurors.  We had 120.  Twenty-seven of
21   them were struck for cause because when you asked them, "Can
22   you be impartial towards Monsanto?" they said, "I couldn't."
23            THE COURT:  Are you saying that there were 120 jury
24   questionnaires?
25            MR. WISNER:  That's correct.

1  perfect.
2      I guess what I'm trying to say is, I think that I sort
3  of -- a rule set in stone that we're going to have a two-phase
4  voir dire would be needless.  Ferreting out the obvious biased
5  people, I think, can be done through a questionnaire.
6      And I actually think you're right about open air
7  questioning about these issues.  I think it actually -- it
8  actually gives Monsanto a chance to fix any misstatements made
9  by a juror or explore --
10         THE COURT:  Or it gives me a chance.
11         MR. WISNER:  Yeah, that's correct.
12         THE COURT:  And I'll tell you again, I mean, you know,
13  I'm not sure anyone is an expert on this topic.  I've done the
14  trials that I've done in the last five years.  Every time, I go
15  sit in my chambers with the jurors afterwards and I talk to
16  them.
17      And this jury today, all they talked about was how they --
18  you know, yeah, my own personal experience and bias starts to
19  creep in, and I had to tell myself not to allow that, and I did
20  a really good job at it, and we all did a really good job at
21  it, and we were all very careful to listen to your instructions
22  that you told us over and over and over again that you've got
23  to limit your consideration to the evidence that comes in in
24  the trial.
25         MR. WISNER:  I agree, Your Honor.  Actually, I have

1  picked a jury with Mr. Stekloff before for trial in Virginia,
2  which I lost.  My first trial ever.  And, you know, we picked a
3  jury in a morning.  And that was a pharmaceutical case which
4  had a bunch of biases.
5       There was actually a juror who was impaneled who had
6  previously represented the defendant 30 years prior, and I
7  couldn't get him off for cause.
8       So I think, you know, there's biases that go both ways,
9  and you have to deal with that as part of trial work.  So
10 that's our position.
11      And, obviously, our last issue, the gag order didn't come
12 up.  We strongly oppose that.
13          THE COURT:  I'm not issuing any gag orders.
14      But that relates to, sort of, a question I have for
15 you-all about jury selection.  And that is, I'm not sure I've
16 really had a trial before where, you know, a significant
17 portion of the jury pool is going to come -- you know, is going
18 to potentially have read about the issue or potentially have
19 some familiarity with the issue through media exposure and the
20 like.
21      When I read about other cases that have that, I always --
22 so, my sense -- this is not really something I've really
23 studied, so what I'm saying may be incorrect now, but my sense
24 is that, oftentimes, if the person has been exposed to any --
25 any information at all in the media about a particular -- that

1  particular issue, that, like, disqualifies them; right?
2       So if somebody were to say -- as applied to this case, if
3  somebody were to say, you know, oh, yeah, I remember reading an
4  article about how the World Health Organization thinks that
5  glyphosate causes cancer and that the Environmental Protection
6  Agency thinks that it doesn't -- let's just say as an
7  example -- I mean, you know, it's not obvious to me that that
8  person should be disqualified from being on the jury for the
9  reasons that I just articulated, that you -- you follow up and
10 you ask them, well, okay, you read that.
11      You know, there are things that are accurate in the news
12 and there are things that are inaccurate in the news.  And, you
13 know, you -- the point is, to have a fair trial, you need to be
14 able to put aside whatever sort of media coverage you've been
15 exposed to and consider the case based on the evidence that
16 comes in.
17      Or even, potentially, there was another verdict in this
18 case, you know, and -- but anything you know about the prior
19 verdict in this case, you should not give that any
20 consideration.  You've got to decide the case based on the
21 evidence.
22      And then you ask them questions designed to discern
23 whether they are capable of doing that and they think they're
24 capable of doing that.
25      My gut reaction is that somebody like that should remain

Page 61

1  on the jury if they answer those questions to your
2  satisfaction.
3       So I wanted to let you know that, A, that's my gut
4  reaction; B, it is not an issue that I've studied; C, my sense
5  is that in other high-profile trials perhaps judges do it
6  differently and are more quick to excuse people.
7       So I wanted to invite you to submit briefing on that
8  issue, briefing on, you know, the extent to which exposure to
9  media coverage of the issue of Roundup causing or not causing
10 cancer would automatically disqualify somebody from being on a
11 jury.
12          MR. GRIFFIS:  Your Honor, may I say one thing that
13 doesn't answer the question you just asked?
14          THE COURT:  That's always a good way to introduce a
15 comment.
16          MR. GRIFFIS:  I'm one of the lawyers who tried the
17 case for Monsanto, and I just stood up to make one point in
18 clarification of something Mr. Wisner said.  He said 120 jurors
19 were put into the venire and then we picked a jury from that.
20      That was the first venire.  We had 120 jurors, and Judge
21 Bolanos's thought was we would successfully impanel a jury from
22 those 120, and we did not.  She had to bring another 100-plus.
23 I don't remember if it was 100, 110 or 120, but at least a
24 hundred more jurors in order for to us get to a jury.  And
25 there's been a lot more publicity since then.  That's the

1    reason for the number. That's all I wanted to say.
2              THE COURT: Thank you.
3              MR. STEKLOFF: And, Your Honor, may I respond to your
4    hypothetical?
5              THE COURT: Sure.
6              MR. STEKLOFF: I think there's a difference -- and I
7    don't want to concede that a juror's heard about, using your
8    hypothetical, IRARC and World Health Organization and EPA.
9         There's a difference between that because I would feel
10   confident that within, you know, five minutes of the case
11   starting in opening that there will be talk on the plaintiffs'
12   side about what the World Health Organization found and
13   probably on the defense side about the EPA.
14        So that seems different than the other example --
15             THE COURT: Although that may be -- I mean, I touched
16   on that issue in my Daubert ruling.
17             MR. STEKLOFF: Yes.
18             THE COURT: We may have further discussions about
19   that. But, anyway, go ahead.
20             MR. STEKLOFF: I agree. And I'm not conceding that
21   they should be allowed to talk about the World Health
22   Organization and IARC. We'll where that goes. But it's a
23   little bit different, I guess, is my point, than something that
24   is totally irrelevant to the jury's consideration, that they've
25   been exposed to, which is that a group of jurors viewing what

```
                                                       Page 106
 1
 2
 3              CERTIFICATE OF REPORTER
 4       I certify that the foregoing is a correct transcript
 5   from the record of proceedings in the above-entitled matter.
 6
 7   DATE:   Wednesday, October 31, 2018
 8
 9
10
11       _____
12          Katherine Powell Sullivan, CSR #5812, RMR, CRR
                         U.S. Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25
```