# EXHIBIT 4

Case 3:16-md-02741-VC   Document 2478-5   Filed 01/03/19   Page 2 of 34
Case 3:16-md-02741-VC   Document 2453-15   Filed 01/03/19   Page 2 of 34
Chadi Nabhan, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3     IN RE: ROUNDUP PRODUCTS        MDL No. 2741

 4     LIABILITY LITIGATION

 5     _____         Case No. 16-md-2741-VC

 6     This document relates

 7     to:

 8     Hardeman v Monsanto Co., et al.

 9     Case No. 3:16-cv-00525

10     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

11                  VIDEO DEPOSITION OF

12                  CHADI NABHAN, M.D.

13

14

15                  December 14, 2018

16                     8:39 a.m.

17

18              Chicago Marriott O'Hare

19       8835 West Higgins Road, Park Ridge, Illinois

20

21

22

23       Deanna Amore, CRR, CSR, RPR, 084-003999

24

25
```

Case 3:16-md-02741-VC   Document 2478-15   Filed 01/10/19   Page 3 of 34
Case 3:16-md-02741-VC   Document 2483-5   Filed 01/03/19   Page 3 of 34
Chadi Nabhan, M.D.

Page 2

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff, EDWIN HARDEMAN:

ANDRUS WAGSTAFF
MS. KATHRYN M. FORGIE
1901 Harrison Street
Suite 1101
Oakland, California 94612
(310) 339-8214
kathryn.forgie@andruswagstaff.com
- and -
ANDRUS WAGSTAFF
MS. AIMEE H. WAGSTAFF
7171 West Alaska Drive
Lakewood, Colorado 80226
(303) 376-6360
aimee.wagstaff@andruswagstaff
- and -
WEITZ & LUXENBERG, P.C.
MS. ROBIN L. GREENWALD
700 Broadway
New York, New York 10003
(212) 558-5500
rgreenwald@weitzlux.com

On Behalf of the Defendant, MONSANTO COMPANY:

ARNOLD & PORTER KAYE SCHOLER, LLP
MR. BERT L. SLONIM
250 West 55th Street
New York, New York 10019-971
(212) 836-8572
bert.slonim@arnoldporter.com
- and -
WILKINSON WALSH + ESKOVITZ
MR. BRIAN L. STEKLOFF
MS. CALI COPE-KASTEN
2001 M Street, NW
10th Floor
Washington, D.C. 20036
(202) 847-4030
bstekloff@wilkinsonwalsh.com
ccope-kasten@wilkinsonwalsh.com
ALSO PRESENT:
Anthony Micheletto, Videographer
* * * * *

Page 3

I N D E X

2 WITNESS                    EXAMINATION

3 CHADI NABHAN, M.D.

4 EXAMINATION BY MR. STEKLOFF            6

5 EXAMINATION BY MS. WAGSTAFF          117

6 FURTHER EXAMINATION BY MR. STEKLOFF  122

8        EXHIBITS

9 NUMBER        DESCRIPTION          PAGE

10 Exhibit 1    11.20.2018 Expert Report   16

11        of Dr. Chadi Nabhan

12 Exhibit 2    Innovative Oncology      27

13        Consulting, LLC, Invoice

14        for Services Rendered in

15        Hardeman v Monsanto;

16        NABHNMDLGROUP100057

Page 4

1    THE VIDEOGRAPHER:  We are now on the record.

2    My name is Anthony Micheletto.  I'm the

3 videographer for Golkow Litigation Services.

4    Today's date is December 14, 2018.  The

5 time is 8:39 a.m. as indicated in the video screen.

6    This video deposition is being held in

7 Chicago, Illinois, in the matter of Hardeman versus

8 Monsanto Company, et al., Case No. 316-cv-00525 in

9 the United States District Court, Northern District

10 of California.

11    Our deponent today is Chadi

12 Nabhan MD, MBA.

13    Will counsel please identify themselves

14 for the video record?

15    MS. WAGSTAFF:  Aimee Wagstaff from Andrus

16 Wagstaff in Denver, Colorado, and I'm here with my

17 partner Kathryn Forgie from Oakland, California.

18    MS. GREENWALD:  Robin Greenwald,

19 Weitz & Luxenberg.  I'm one of the plaintiff

20 attorneys in this litigation.

21    MR. STEKLOFF:  Brian Stekloff, Wilkinson Walsh

22 on behalf of Monsanto.

23    MS. KASTEN:  Cali Cope-Kasten, Wilkinson Walsh,

24 on behalf of Monsanto.

25    MR. SLONIM:  Bert Slonim, Arnold & Porter, on

Page 5

1 behalf of Monsanto.

2    THE VIDEOGRAPHER:  Our court reporter today is

3 Deanna Amore.  Please swear in the witness.

4        (Whereupon, the witness was

5        duly sworn.)

6 THE WITNESS:  I do.

7    MS. WAGSTAFF:  So before we start, I just

8 wanted to put on the record that

9 Plaintiffs Gebeyehou, Hardeman, and Mrs. Stevick

10 are offering Dr. Nabhan today for specific

11 causation opinions, and to the extent that anything

12 in his report goes to general causation, it is

13 either as a background to his -- or in support of

14 his specific causation opinion or it is consistent

15 with the general causation opinions that

16 Judge Chhabria has allowed in this MDL.

17    MR. STEKLOFF:  I just reserve the right to --

18 I mean, it seems like we might be seeing enough

19 issues.  So potentially we can agree in front

20 of Judge Chhabria on how specific causation experts

21 are going to be allowed to delve into or touch on

22 generic causation opinions, and so I think we can

23 explore that a little bit today potentially with

24 the doctor.  But I preserve all rights -- I reserve

25 all rights to challenge any opinions in his report,

Case 3:16-md-02741-VC  Document 2478-5  Filed 01/11/19  Page 4 of 34
Case 3:16-md-02741-VC  Document 2478-1  Filed 01/03/19  Page 4 of 34

Chadi Nabhan, M.D.



Page 6

1 including anything that's general causation or
2 anything that has been excluded under
3 Judge Chhabria's July 1 -- July 10, 2018, opinion
4 on general causation.
5     Good morning, Doctor.
6     THE WITNESS:  Good morning.
7         CHADI NABHAN, M.D.,
8 called as a witness herein, having been first duly
9 sworn, was examined and testified as follows:
10         EXAMINATION
11 BY MR. STEKLOFF:
12     Q.  You've been deposed before; right?
13     A.  I have been.
14     Q.  So you are familiar with the background
15 rules of how these go forward?
16     A.  Yes.
17     Q.  So I'm just going to cover two.  If you
18 need a break for any reason, as long as a question
19 is not pending, just let me know.
20     A.  Sure.
21     Q.  And if you answer a question, I'm going to
22 assume that you understood the question.  Is that
23 fair?
24     A.  To the best of my ability, yes.
25     Q.  You'll let me know if you don't understand

Page 7

1 something that I ask?
2     A.  Yes.
3     MS. WAGSTAFF:  Objection.
4 BY MR. STEKLOFF:
5     Q.  Which may happen, I will tell you.
6     And so I don't get it wrong, how do you
7 pronounce your last name?
8     A.  Nabhan.
9     Q.  Nabhan.  Okay.
10

Page 8

Page 9

Case 3:16-md-02741-VC   Document 2428-13   Filed 01/03/19   Page 5 of 34



Page 10

Page 12

13    Q.  Do you know if Mr. Hardeman was using
14  Roundup in 2014?
15    A.  Yes, that's when he stopped, I believe.
16    Q.  When did he stop?
17    A.

24    Q.  Does it matter when he stopped using
25  Roundup -- I'll start over.  I'll strike that.

Page 11

Page 13

1      Does when he started using -- story.
2      Does when he stopped using Roundup impact
3  your opinions in any respect?
4      A.  No.
5      Q.  It wouldn't have mattered?
6      A.  Well, I mean, it matters when he started
7  more important; right?  I mean, he started sometime
8  in the '80s, late '80s, and he stopped in 2014.  So
9  what matters to me is the duration of exposure, and
10  so if he stopped in 2014 or middle 2014, late 2014,
11  it doesn't really impact how long he's been exposed
12  to.  But if he started using it in 1987 and he
13  stopped in 1988, one year, it would matter, but in
14  this case, he's been exposed to it for such a long
15  period of time that stopping a couple of months
16  later or earlier would not really impact the
17  opinion.
18      Q.  What if he had stopped in 2013, would it
19  impact your opinion?
20      A.  Again, you'll have to -- this is a very
21  hypothetical question.  You'll have to look at the
22  exposure for every single year of use.  So
23  I will -- you know, I mean, probably 2013, it still
24  wouldn't matter because you have to look at how
25  many hours and exposure he's had in any given year

Page 14

1  and whether that exposure collectively is analogous
2  or similar to what has been published in the
3  epidemiological literature ██████████████
█ ████████████████████████l.
5      Q.  But take Mr. Hardeman's testimony about
6  his use of Roundup.  Let's say he had stopped in
7  December of 2013 with the exact same use he
8  testified to.  Would that impact your opinion at
9  all about what caused his lymphoma?
10     A.  I don't believe 2013 would have mattered.
11     Q.  And so for you to form an opinion that
12 Roundup or glyphosate is a substantial contributing
13 factor in an individual's non-Hodgkin lymphoma,
14 they do not have to be actively using non-Hodgkin
15 lymphoma at the time of their --
16     MS. WAGSTAFF:  I don't think you meant to say
17 that.
18     THE WITNESS:  Actively using Roundup.
19 BY MR. STEKLOFF:
20     Q.  Okay.  And so for you to form an opinion
21 that Roundup or glyphosate is a substantial
22 contributing factor in an individual's non-Hodgkin
23 lymphoma, they do not have to be actively using
24 Roundup at the time of -- at the time that their
25 cancer first develops; is that fair?

Page 15

1      A.  Yeah, they don't need to be actively using
2  it at the time of diagnosis, if they have used it
3  enough during their lifetime to a degree that meets
4  what has been published in the epidemiological
5  literature.
6      Q.  And it's your understanding, based on
7  Mr. Hardeman's testimony, that he used Roundup
8  beginning in the late 1980s; correct?
9      A.  Yes.  Initially, initially, he used it a
10 little bit, not too much, and I think he got to
11 know about it from his landscaper in the original
12 property he lived in.  I believe he sold that
13 property, and he moved to a much bigger property
14 after that, and that's when he started using it
15 himself for about seven, eight months of the year
16 and several hours each month.
17     Q.  For several years; right?
18     A.  No, for more than -- for about 27 years,
19 until 2014.
20     Q.  Yes.
21 ███████████████████████████████
█ █████████████████████████████████
█ ███████████████████████████████
25     A.  Yes.  I mean, there is nothing in the

Page 16

1  ███████████████████████████████
█ ██████████████████████
3      Q.  So I want to shift topics a little bit.
4  I am going to hand you the report in Mr. Hardeman's
5  case, and I'll mark it as Exhibit 1.
6             (Whereupon, Exhibit 1 (Hardeman)
7             was marked for identification.)
8  BY MR. STEKLOFF:
9      Q.  Dr. Nabhan, this is a copy of your report
10 in Mr. Hardeman's case; correct?
11     A.  Yes.
12     Q.  And did you draft this report -- I'm not
13 asking for any attorney-client privileged
14 information -- but did you draft this report
15 yourself?
16     A.  I did.
17     Q.  You took pen to paper and put everything
18 -- you wrote everything yourself?
19     A.  Explains some of the typos, yes.
20     Q.  And does this report contain all of the
21 opinions that you intend to offer in Mr. Hardeman's
22 case?
23     A.  It does.
24     Q.  I saw yesterday -- I don't have it with
25 me -- that counsel provided me with a supplemental

Page 17

1  reliance list where you reviewed some of the
2  reports that Monsanto has offered through its
3  experts; is that correct?
4      A.  Yes, I was provided case specific experts'
5  report in Mr. Hardeman's case, and some of these
6  reports had a lot of references.  Some of them
7  I had reviewed previously, and some of them
8  I reviewed recently at a higher level.
9      Q.  And does that change any of the opinions
10 that you intend to offer in this case?
11     A.  No, they don't.
12     Q.  But understanding if I ask you something
13 new today, I can find anything you're going to say
14 at trial in Mr. Hardeman's case in this document;
15 is that fair?
16     A.  I hope so.
17     MS. WAGSTAFF:  Object to form.
18 BY MR. STEKLOFF:
19     Q.  And you previously provided a general
20 causation report in the MDL in 2017.  Do you recall
21 that?
22     A.  I have.
23     Q.  And you testified in front of
24 Judge Chhabria?
25     A.  I have.

Page 18

1    Q.   And you understand that those opinions
2  that you offered in that report cannot be offered
3  at the trial in Mr. Hardeman's case?
4    MS. WAGSTAFF:  Object to form.  That's not
5  exactly what it said, but that's a legal question
6  that Dr. Nabhan probably has no idea what the
7  Daubert order said or doesn't say.
8    MR. STEKLOFF:  That's fair.  I'll ask a
9  different question.
10  BY MR. STEKLOFF:
11    Q.   Have you read Judge Chhabria's Daubert
12  opinion?
13    A.   I have.
14    Q.   Well, we'll go through this report later.
15        Did you bring any other materials with you
16  today in terms of notes that you might have or
17  anything along those lines?
18    A.   ████████████████████



4    A.   Yes.
5    Q.   I want to talk to you about your current
6  medical practice.  What are you doing now?
7    A.   My current role?
8    Q.   Yes.
9    A.   So I'm currently a chief medical officer
10  at Cardinal Health Specialty Solutions, which is a
11  division within Cardinal Health, and in that
12  capacity, I work with oncologists as well as with
13  various manufacturers to provide strategic health,
14  making sure they are able to survive in an
15  ever-changing health care environment.  So I do not
16  actively see patients at the present time, if
17  that's your question.
18    Q.   How long have you been in that position?
19    A.   About two and a half years, give or take.
20    Q.   So when was the last time you were
21  actively seeing patients?
22    A.   I resigned from the University of Chicago
23  on August 12, 2016.
24    Q.   And what was your medical practice -- what
25  role were you playing when you were at -- what role

Page 20

1  were you playing when you were at
2  University of Chicago?
3    A.   So the University of Chicago, my
4  administrative role was a medical director of the
5  clinical cancer center and cancer clinics.
6  I oversaw the clinical operations of the outpatient
7  cancer center, and we saw at the time when I was
8  there about 48,000 visits.  The last fiscal year we
9  had over 5,000 new patients at the time.  I was
10  also overseeing the international office and the
11  international programs for cancer and strategically
12  helping international patients coming to the
13  University of Chicago for cancer opinions.
14        In addition to that, I had a very active
15  lymphoma practice.  So I was part of the lymphoma
16  group, and I was active in clinical trials for
17  lymphoma, as well as teaching medical students,
18  residents and fellows.
19        My research in lymphoma continued beyond
20  leaving the University of Chicago.  It shifted a
21  little bit into health economics outcomes research,
22  patient-reported outcomes, oncology care delivery
23  with a lot of focus on lymphoma.  At the last
24  American Society of Hematology meeting, which we
25  just finished two weeks ago, actually, in

Page 21

1  San Diego, I had nine posters and nine
2  presentations, all of them on lymphoid
3  malignancies, but that was my role at
4  University of Chicago at the time.
5    Q.   And you've treated a number of patients
6  with non-Hodgkin lymphoma; correct?
7    A.   Hundreds.
8    Q.   And same with diffuse large B-cell
9  lymphoma?
10    A.   Hundreds.
11    Q.   And you've never told a patient that his
12  or her non-Hodgkin lymphoma was caused by Roundup
13  or glyphosate; correct?
14    A.   Not by Roundup.  But I did take care of
15  some farmers where I would discuss pesticide
16  exposure in my clinical practice.
17    Q.   But to answer my question, you've never
18  told a patient that his or her non-Hodgkin lymphoma
19  was caused by Roundup or glyphosate; correct?
20    A.   I did not.
21    Q.   And you've never -- strike that.
22        When you were at the
23  University of Chicago, you never told any of your
24  fellow oncologists that you thought Roundup or
25  glyphosate was a cause -- a general cause of

Case 3:16-md-02741-VC Document 2478-15 Filed 01/10/19 Page 8 of 34
Case 3:16-md-02741-VC Document 1478-1 Filed 01/03/19 Page 8 of 34
Chadi Nabhan, M.D.

Page 22

1 non-Hodgkin lymphoma; correct?

2    A.   We talked about pesticides in general.

3 I did not say about Roundup specifically.

4    Q.   Okay.  And that would be true if I asked

5 you about -- beyond oncologists, if I asked you

6 about pathologists that you were working with as

7 well; correct?

8    A.   Yes.

9    Q.   And that would be true of the medical

10 students that you were teaching.  You never told

11 them that you thought Roundup or glyphosate caused

12 non-Hodgkin lymphoma; correct?

13    A.   Yes, I stated we talked about pesticides

14 in general.

15    Q.   That is also true -- you never told

16 residents or fellows that you thought glyphosate or

17 Roundup caused non-Hodgkin lymphoma; correct?

18    A.   Correct.

19    Q.   And as the chief medical officer at

20 Cardinal, you said that you currently work with a

21 number of oncologists; correct?

22    A.   Yes.

23    Q.   And you've never told those oncologists

24 that you believe that Roundup or glyphosate caused

25 non-Hodgkin lymphoma; correct?

Page 23

1    A.   In my current role, this subject would not

2 come up because I work more in oncology and health

3 care delivery and several educational platforms,

4 but the short answer to your question, no, I have

5 not.

6    Q.   But you do work with oncologists who are

7 treating patients?

8    A.   Yes.

9    Q.   And they are treating patients who are

10 diagnosed with non-Hodgkin lymphoma; correct?

11    A.   Yes.

12    Q.   And they care about their patients;

13 correct?

14    A.   Absolutely.

15    Q.   Now, you mentioned that you recently

16 presented at a conference of the

17 American Society of Hematology?

18    A.   Yes, every December we have our annual

19 meeting, and the last meeting we had was two weeks

20 ago.

21    Q.   And did you present at that conference?

22    A.   Yes.

23    Q.   And you did not present on glyphosate or

24 Roundup-related issues; correct?

25    A.   That was not a topic of my presentations.

Page 24

1    Q.   You've never presented, at any conference,

2 your opinions that glyphosate or Roundup causes

3 non-Hodgkin lymphoma; correct?

4    A.   I did not.

5        In many of the prior talks and prior

6 meetings, my focus was mainly on treatment of

7 lymphoma and clinical trials and novel agents.  So

8 it was not a topic that I presented on or lectured

9 upon.

10    Q.   And you've never published any

11 peer-reviewed literature related to the association

12 you claim exists between glyphosate and Roundup and

13 non-Hodgkin lymphoma; correct?

14    A.   I did not publish on that.

15    Q.   You are not in the process of drafting

16 anything; correct?

17    A.   Not right now.

18    Q.   When you were treating patients at the

19 University of Chicago, you never noted in the

20 medical records of any of your patients that

21 glyphosate or Roundup caused a patient's cancer;

22 correct?

23    A.   As I said, we talked about pesticides in

24 general in some of the patients that worked in

25 farming, but I did not write that in the medical

Page 25

1 records on Roundup, no.

2    Q.   And when you say "pesticides in general,"

3 you never spoke even to any of your farming

4 patients, agriculture patients -- patients that

5 were involved in agriculture specifically about

6 Roundup or glyphosate; correct?

7    A.   Not specifically, no.

8    Q.   At Cardinal Health you've never given a

9 lecture to anyone, whether it's administrators,

10 oncologists or other entities that you're working

11 with, regarding your opinions about glyphosate and

12 Roundup and that they cause non-Hodgkin lymphoma;

13 correct?

14    A.   I did not.

15    Q.   And you are not conducting any research,

16 independent research that aren't litigation based

17 about the relationship between Roundup and

18 glyphosate and non-Hodgkin lymphoma; correct?

19    MS. WAGSTAFF:  Object to form.

20    THE WITNESS:  Not at the present time.

21 BY MR. STEKLOFF:

22    Q.   Have you resigned -- this is not a

23 pejorative question, but do you have active

24 credentials at the University of Chicago Hospital

25 or another hospital?

Case 3:16-md-02741-VC  Document 2478-15  Filed 01/10/19  Page 9 of 34
Case 3:16-md-02741-VC  Document 2478-1  Filed 01/03/19  Page 9 of 34
Chadi Nabhan, M.D.

Page 26

1    A.  No, I resigned those.
2    Q.  And so it's been approximately over two
3  years since you've seen patients?
4    A.  In clinical practice.  A lot of my
5  patients actually still call me and text me, and we
6  actually do meet at coffee shops to talk about
7  their cases.  But in clinic, yes.
8    Q.  And with those patients, you haven't
9  discussed any -- that you've continued to talk in
10  the last few years, you haven't discussed
11  glyphosate or Roundup use, have you?
12    A.  We have not.
13    Q.  And some of those patients have had
14  non-Hodgkin lymphoma?
15    A.  90 percent, actually.  I just got a text
16  last week from a patient of mine asking me about
17  their treatment.  When you form a bond with
18  patients over many years, people trust you and they
19  still consult with you even though you are not
20  actively in clinical practice.  And it's humbling,
21  and it's wonderful to see.
22    Q.  That's a great thing.
23      But you don't know if any of those
24  patients have ever used Roundup or glyphosate; is
25  that correct?

Page 27

1    A.  I don't know.
2    Q.  I received some invoices from counsel
3  yesterday about your work in the three cases, and
4  I'm only here to ask about the Hardeman case.  But
5  how many hours have you invoiced thus far in the
6  Hardeman case?
7    A.  I honestly haven't sent.  This is what
8  I collected so far, and there are more hours.
9  I have spent a lot this week but I haven't sent an
10  actual invoice.  I plan on doing that at the end of
11  the year.  Maybe I can --
12    MS. WAGSTAFF:  This one has notes on it.  I am
13  sure he has it.
14  BY MR. STEKLOFF:
15    Q.  I'll hand you what I received yesterday
16  and you can just look at it.
17    A.  Sure.
18      (Whereupon, Exhibit 2 (Hardeman)
19      was marked for identification.)
20  BY MR. STEKLOFF:
21    Q.  Dr. Nabhan, I'm handing you what I have
22  marked as Exhibit 2.  Is this a document that you
23  would have prepared?
24    A.  Yes.
25      Obviously, more hours have been added

Page 28

1  since December 5 to prepare for this, but this is
2  up until December 5.
3    Q.  So I see -- I haven't done the math ahead
4  of time -- 41 hours that you've spent on the
5  Hardeman case; correct?
6    A.  Up until December 5.
7    Q.  At $550 per hour?
8    A.  Yes.
9    Q.  Do you charge the same rate for deposition
10  testimony?
11    A.  Yes.
12    Q.  And trial testimony?
13    A.  Being in trial?
14    Q.  Yeah.  If you were testifying in an actual
15  trial, is your rate different or the same?
16    A.  Usually, if I go to trial and I have to
17  fly there, it's $5,000 for the entire day.
18    Q.  Can you approximate for me, since
19  December 5, approximately how many hours you've
20  worked on the Hardeman case?
21    A.  I do have them somewhere in my computer,
22  maybe add another 10 to 12.
23    Q.  Okay.  So approximately 50 to 55 hours; is
24  that fair?
25    A.  Fair.

Page 29

1    Q.  Do you have -- have you submitted an
2  invoice for all of the work that you did relating
3  to your -- the general causation opinions in the
4  MDL back in 2017?
5    MS. WAGSTAFF:  Object to form.
6    THE WITNESS:  Yes, I have.  I have not
7  submitted anything since August of 2018, but
8  everything else in '017, yes, a while back.
9  BY MR. STEKLOFF:
10    Q.  Sitting here -- and I'll take any
11  approximation.  Can you proximate for me, if you
12  consider all of the work you've done in this
13  litigation, including the Johnson case, how many
14  hours you spent or how much money you've been paid?
15    MS. WAGSTAFF:  Objection.  If you know.
16    THE WITNESS:  I'm not sure I know.  I mean,
17  I'll have to go back to the records.  I'm sure I've
18  been paid less than all of the lawyers, but I'm not
19  really sure how many hours I spent.  I'll have to
20  go back and work.  I mean, you should have these
21  records because everything is submitted to all of
22  the law firms.
23    MR. STEKLOFF:  Okay.  I just want to make sure
24  we have all of his invoices throughout the entire
25  litigation and if we don't, I'm asking for those

Page 30

1  invoices.
2     MS. WAGSTAFF:  I mean, every time you've
3  deposed him, we've produced invoices.  So you would
4  just need to add them up.
5     MR. STEKLOFF:  Okay.  This is not a dispute.
6  I just want to make sure -- and maybe we'll email.
7  I just want to -- I will see all the invoices that
8  we have from the various depositions, and then I'll
9  ask if you can double-check them.  And if we
10 haven't received any, I think we are entitled to
11 them, and I'd ask that we receive them.
12    MS. WAGSTAFF:  Okay.  We can talk about it
13 later.
14 BY MR. STEKLOFF:
15    Q.  Is it -- are you able to approximate,
16 Dr. Nabhan -- well, first of all, when were you
17 retained in the litigation, approximately, if you
18 recall?
19    A.  I was asked to look at the literature just
20 generally on Roundup and glyphosate back in the
21 spring of 2016, somewhere around that, and
22 I requested some time just to go through literature
23 and actually to look through everything that was by
24 the Miller firm out east.  And it took me several
25 months to look at the literature, review a lot of

Page 31

1  the data before saying that this is very
2  convincing, and I'm more than happy to help on this
3  case.
4     Q.  And in the approximately two and a half
5  years that you've been working as an expert for the
6  plaintiffs, can you approximate how much of your
7  total income has been received from your work in
8  the litigation as a percentage?
9     A.  That's actually a good exercise for me to
10 do on a personal level.  I did not think about it,
11 and I don't know the answer to that.  Do I guess?
12 Do I just throw a number?
13    MS. WAGSTAFF:  No, don't guess.  If you don't
14 know the answer, you don't know the answer.
15    THE WITNESS:  I mean, I don't want to say
16 something that is not accurate.  I really can't
17 tell in terms of percentage, but this is the only
18 litigation work I've ever done.  So I don't know.
19 It will be a guess, and if counsel says not to
20 guess, I don't think I'm going to guess.
21 BY MR. STEKLOFF:
22    Q.  We don't want you to guess.  You can't
23 give me an educated estimate, even approximate
24 percentage-wise?
25    MS. WAGSTAFF:  Objection.  He said he doesn't

Page 32

1  know.
2     THE WITNESS:  What does that mean now?
3  BY MR. STEKLOFF:
4     Q.  If you can -- I don't want you to guess
5  out of thin air, but if you can, based on -- take
6  your time.  If you can approximate -- and I'm not
7  saying it needs to be an exact number -- but
8  approximate, I would ask that you do that.
9     A.  Less than 20 percent.
10    Q.  I'm not going to ask the names, but have
11 you reviewed any cases of individual plaintiffs
12 where you have determined that Roundup was not a
13 substantial contributing factor into his or her
14 development of NHL?
15    THE WITNESS:  Is that privileged?
16    MS. WAGSTAFF:  You can --
17    MR. STEKLOFF:  I'm looking for a yes-or-no
18 answer.
19    THE WITNESS:  Yes, I have.
20 BY MR. STEKLOFF:
21    Q.  I want to ask you about ██████████.
22    A.  Sure.
23    Q.  You probably knew that would be a topic of
24 today's deposition.
25    A.  It should be.

Page 33

1     Q.  Actually, before I do that --
2     A.  Turn to a page or something or no?
3     Q.  Just in a moment.
4        What did you do to prepare for this
5  deposition?
6        And I'm not asking about any specific
7  conversations you had with counsel.
8     A.  ████████████████████████████████████
9  █ ██████████████████████████████████████
10 █████████████████████████████████████████
11 █████████████████████████████████████████
12 █████████████████████████████████████████
13 █ █████████████████████████████████████
14 ██████.  I reviewed my own report, as well as the
15 literature that I have relied on, and as I told
16 you, I was able to look at the reports of your
17 experts from Mr. Hardeman's case.  And I also
18 reviewed some of the references that they relied on
19 at a high level.
20    Q.  Did you meet with counsel?
21    A.  We met yesterday, yes.
22    Q.  Who was part of that meeting?
23    A.  Counsel Greenwald, Forgie, and Wagstaff.
24    Q.  Was anyone on the phone?
25    A.  No.



Page 34

1   Q.  Have you ever met Dr. Weisenburger?
2   A.  I've never met him personally, but I've
3 heard him speak.  I'm sure he's heard me speak at
4 national conferences.
5   Q.  You've never discussed this litigation
6 with him?
7   A.  No.
8   Q.  Have you reviewed his report in the
9 Hardeman case?
10   A.  I have.
11   Q.  Do you have any criticisms of his report?
12   A.  No.
13   Q.  Have you reviewed -- have you ever met
14 Dr. Shustov?
15   A.  I have.
16   Q.  Have you ever discussed the litigation
17 with Dr. Shustov?
18   A.  I have not.
19   Q.  In what context have you met Dr. Shustov?
20   A.  Only from what people know each other.  So
21 I met him -- I actually even moderated a webinar
22 with him a couple of years ago.  We did a Webex for
23 oncologists as two experts discussing T-cell
24 lymphoma at the time, but we never talked about
25 this litigation at all or any litigation for that

Page 35

1 matter.
2   Q.  Did you review his report in
3 Mr. Hardeman's case?
4   A.  I have.
5   Q.  Do you have any criticisms of his report?
6   A.  No.
7   Q.  But you never discussed his report with
8 him?
9   A.  No.
10

e

Page 36

1

Page 37

1

t.

Case 3:16-md-02741-VC  Document 2478-5  Filed 01/11/19  Page 12 of 34
Case 3:16-md-02741-VC  Document 24078-7  Filed 11/03/19  Page 12 of 34
Chadi Nabhan, M.D.



Case 3:16-md-02741-VC  Document 2478-5  Filed 01/11/19  Page 13 of 34
Case 3:16-md-02741-VC  Document 2478-5  Filed 01/11/19  Page 13 of 34





Page 46

Page 48

Page 47

Page 49

BY MR. STEKLOFF:

Q. Well, there are patients who have diffuse large B-cell lymphoma that -- where the latency has taken 10 years to develop; correct?

A. You're talking after being exposed to a particular pathogen?

Q. Or idiopathic.

There are patients that develop diffuse large B-cell lymphoma where the latency period is even 20 years; correct?

A. So I want to make sure we are saying the same thing. Define "latency" for me. Because you

Page 50

1 just said two different things. You know, are you
2 saying latency from the time being exposed to a
3 particular pathogen or an offending agent to the
4 development of clinical disease?
5    Q. I understand.
6    A. That would never be 10 years in large-cell
7 lymphoma.
8    Q. In diffuse large B-cell lymphoma, is it
9 possible to have -- for it to take -- what is the
10 longest it could take from the development --
11 forget about exposure -- from the development of
12 the first cell to a clinically recognizable tumor
13 that can be identified?
14    MS. WAGSTAFF: Object to the form.
15 BY MR. STEKLOFF:
16    Q. Do you understand the question?
17    A. I actually don't understand the question.
18 But let me just make sure --
19    Q. I'll ask a better question, if you don't
20 understand.
21    A. Sure.
22

Page 51

1

13
14    Q. I understand why I confused you about the
15 latency in terms of exposure to a substance or item
16 and then when it develops. I think you just
17 answered my question.
18       You think that approximately -- I'm not
19 going to hold you to this exact time frame -- that
20 from the first cell of a diffuse large B-cell
21 lymphoma until it becomes -- to the extent that it
22 can be diagnosed, it takes approximately six
23 months, if you're talking about diffuse large
24 B-cell lymphoma?
25    A. But that's not the time from the initial

Page 52

1 mutation that may be undetected. I mean patients
2 can have some genetic damage in their body that
3 goes undetected first; right? I mean, it just
4 happens. And then they start developing the
5 clinical disease at the very microscopic level
6 before it becomes detected.
7       So I think, you know, when you talk about
8 latency, either you are talking latency from the
9 time of being exposed to an offending agent, to the
10 first type of mutation that does not get detected
11 at all or latency from the time you get exposed to
12 something until you have clinically overt disease,
13 like lymph node or something you can examine.
14    Q. Now we are getting on the same page.
15 I want to focus on the former, which is the genetic
16 mutation.
17    A. I see.
18       That we cannot detect clinically.
19    Q. Correct.
20       It's in the body, but no one can see it.
21 A pathologist cannot see it. There is no tumor.
22 There is nothing to see. That's what I want to
23 focus on is that in these questions. Okay?
24    A. Okay.
25    Q. So what is the length of time with diffuse

Page 53

1 large B-cell lymphoma generally that that first
2 genetic mutation can occur up until the time that
3 it becomes clinically diagnosed -- you can
4 clinically diagnose it?
5    A. But you just went back to the clinical
6 diagnosis. You just said -- you just said we are
7 not going to talk about the clinical overt
8 diagnosis, I thought.
9    Q. So assume the clinical --
10    A. Again, the -- in this type of lymphoma
11 that is an aggressive form of lymphoma, you go --
12 when you go retroactively, if you have somebody who
13 has this type of lymphoma -- for different types of
14 lymphomas, you can go for several years, the
15 indolent ones, but for this type of lymphoma, the
16 large-cell lymphoma, if you're diagnosing it
17 sometime in the beginning of 2015, really, the best
18 you can tell, as a clinician, because of how
19 aggressive this disease is, that maybe the lymphoma
20 existed for a couple of months before, and now we
21 are diagnosing it, which is exactly what he went
22 through.
23



Page 58



13    MR. STEKLOFF:  Can we go off the record?
14    MS. WAGSTAFF:  Sure.
15    THE VIDEOGRAPHER:  We are off the record at
16  9:41 a.m.
17              (A short break was taken.)
18    THE VIDEOGRAPHER:  We are back on the record at
19  9:56 a.m.
20  BY MR. STEKLOFF:
21    Q.  Dr. Nabhan, I wanted to discuss your
22  methodology with you for a few moments.
23    A.  Sure.
24    Q.  So I saw recently you were deposed in a
25  case called the Gordon case.  Do you recall that?

Page 59

1    A.  I do.
2    Q.  And understanding that the individual
3  circumstances and medical history and medical
4  records are completely different, was your
5  methodology the same in that case as it is here in
6  Mr. Hardeman's case?
7    A.  Yes, it is.
8    MS. WAGSTAFF:  Object to form.
9  BY MR. STEKLOFF:
10    Q.  So any questions in that deposition that
11  you were asked about your methodology, as a general
12  matter, would apply here; is that fair?
13    A.  Right.
14      So essentially what is important any time
15  you are dealing with a disease such as non-Hodgkin
16  lymphoma and you are looking at causation is to
17  look at all of the factors and be very inclusive in
18  investigating all potential contributing factors to
19  this disease, and then you really have to weigh
20  these factors and apply them in every specific case
21  and make a determination whether one of these
22  factors contributed -- more than one of these
23  factors contributed or none of these factors
24  contributed, and when none of the factors
25  contribute, that's what we call "idiopathic."

Page 60

1      And I think it's important to mention
2  that, because in the Johnson case, the defense
3  counsel said I never really mentioned anything
4  about idiopathic.  Well, idiopathic, by default,
5  you actually don't know what the cause is.  So all
6  that we're talking here about is potential known
7  factors, and we look at all of them, be very
8  inclusive and then do the process of elimination,
9  call it a differential diagnosis, call it
10  differential etiology, whatever you want to call,
11  but then you start looking at all of the causes and
12  try to eliminate the ones that don't stand the
13  rigors -- the test of rigor.
14    Q.  Do you agree there is a difference between
15  a "risk" and a "cause"?
16    A.  Well, I mean, not every risk factor is
17  going to cause a disease.  There is a difference
18  between a "risk" and a "cause."  Some risk factors
19  cause the disease, and some of them don't.
20    Q.  And when talking just about risk factors,
21  have you ever heard the phrase "causative risk
22  factor" as opposed to "non-causative risk factor"?
23    A.  From a clinical standpoint, there are
24  many -- there are risk factors that are inherent
25  and known for a particular disease, and in each

Page 61

1  individual case you have to determine whether these
2  risk factors were causative to the development of
3  this disease versus not.  So that's really the best
4  of my ability in answering your question.
5  I believe it did.
6    Q.  Yeah.  And my question is a little
7  different.
8      When you're looking at -- when you're
9  trying to identify the risk factors that you must
10  consider, do you ever distinguish between -- things
11  that are potential causative risk factors as
12  compared to potential non-causative risk factors?
13    A.  I am very inclusive.  I have to put all of
14  the risk factors in.  You have to look at all of
15  the risk factors that a patient can possibly have,
16  and then you do the process of elimination.  Like
17  I said, some of these risk factors will not end up
18  contributing to the actual disease, and some of
19  them end up possibly contributing to the disease.
20  So you really have to look at every single
21  particular risk factor that a specific patient has
22  and anytime you're looking at causation for any
23  disease, not just lymphoma, and obviously, this
24  applies for lymphoma as well.
25    Q.  But you don't group them as causative --

Page 62

1  when they are all included, you don't group them as
2  causative risk factors or non-causative risk
3  factors, correct?
4     A.

18    Q.  So if another doctor, not you, as part of
19  a differential etiology said that certain risk
20  factors are causative risk factors and can be
21  considered differently than non-causative risk
22  factors, you would disagree with that methodology;
23  is that fair?
24    MS. WAGSTAFF:  Object to form.
25    THE WITNESS:  No, I would not disagree.  It's

Page 63

1  just semantics how you define it.  Like I said, we
2  are probably both saying the same thing.  That
3  particular physician may want to group the risk
4  factors as causative versus not.  I prefer to put
5  all of them as potentially contributing to the
6  disease.  So I want to look at all of the risk
7  factors.  I don't want to dismiss even the ones you
8  may look at as non-causative.
9     That particular physician may say that's not
10  causative, so I'm not going to look at them
11  critically.  I prefer to look at all of the risk
12  factors critically, all of them, and not dismiss
13  any of them and then look at each one individually
14  and how they apply to this particular case.  My
15  methodology and my opinion is way more inclusive
16  than separating the causative, non-causative and
17  then dismissing non-causative entirely.  I don't
18  like to dismiss any of these risk factors.  I look
19  at each one.
20  BY MR. STEKLOFF:
21    Q.

Page 64

1

9

Page 65

1





Case 3:16-md-02741-VC Document 2478-5 Filed 01/11/19 Page 20 of 34
Case 3:16-md-02741-VC Document 2478-5 Filed 01/03/19 Page 20 of 34
Chadi Nabhan, M.D.



Page 70

Page 71

Page 72

1    Q.  A rabbit hole not worth going down.
2      So you said you reviewed IARC, you
3 mentioned, 100. Did you review the IARC monograph
4 on that that related to other types of cancers and
5 then the more recent one, which is I think 100B
6 relating to non-Hodgkin lymphoma?
7    A.  I just reviewed the recent one, I believe.
8 I don't think I reviewed more than one.
9    Q.  And --
10

Page 73



Page 74

Page 76

Page 77

9    Q.   And I think you actually cite the SEER
10   database at another point in your report:  I can
11   probably find the reference.
12       A.   Just to clarify, this is not inclusive of
13   everything I looked at.  I provide just the
14   examples because I didn't think I should put 50 or
15   60 references in the report, but I'll do that with
16   my next report.
17       Q.   I'm not crit- -- I just wanted to know.
18       A.   Just your experts had, like, 70
19   references, which I could have easily done.  I just
20   thought I don't need to bombard people with so many
21   references saying the same thing, but, you know,
22   again, that's why I provide an example because
23   I want to make sure it's clear this is a sample of
24   the references relied on.
25       Q.   You also cite to your data, just so you

Case 3:16-md-02741-VC   Document 2478-5   Filed 01/11/19   Page 22 of 34
Case 3:16-md-02741-VC   Document 2478-5   Filed 01/03/19   Page 22 of 34
Chadi Nabhan, M.D.

Page 78

1  can see, on page 5 in the middle of the first full
2  bullet.
3      A.  One second.  In the BMI bullet?
4      Q.  Yes.
5      A.  Yes.
6      Q.  And so is it fair to say that you find
7  SEER data reliable?
8      A.  I think it has limitations because you are
9  not talking all the United States.  As you know,
10  I think it's probably 9 or 11 states.  I forgot
11  exactly on a percent.  Depending on what you're
12  looking at, I think it's very valuable depending on
13  what you're looking at.  It is missing a lot of
14  details.
15      I actually published a lot of -- my papers
16  used SEER data when I was looking at specific
17  disparities in care between men, women, older,
18  younger in patients with lymphoma, I used SEER
19  database.  But it has a lot of limitations.  So
20  I would say it depends on your objectives.  It
21  could be very valuable depending what you're
22  looking at.
23      Q.  But you've cited it in peer-reviewed
24  published literature before that?
25      A.  And I've used it in my own research as

Page 79

1  well.  Again, it depends what you're looking at.
2      Q.  It certainly can give you a lot of
3  information about the incidence rate of NHL in the
4  United States; correct?
5      A.  I mean, yeah, but I don't think that is --
6  I mean, I don't use SEER for the incidents.
7  I believe it gives you more than just the
8  incidence.  The incidence probably can be used --
9  you can get that from different than SEER.
10      Q.  Okay.  I think I know the answer, but I'll
11  ask.
12  
19      A.

Page 80

1  
15      MS. WAGSTAFF:  I thought we already covered
16  this.
17  BY MR. STEKLOFF:
18      Q.  I'll restate the question just so it's
19  clear on the record.
20  

Page 81

1  
18  you.







Case 3:16-md-02741-VC  Document 2478-7  Filed 01/11/19  Page 25 of 34
Case 3:16-md-02741-VC  Document 2005  Filed 11/03/19  Page 25 of 34







Page 98

Page 100

1 hours a day" --
2    MS. WAGSTAFF:  Same question or different
3 hypothetical?

Page 101



Page 102

Page 104

24    A.

Page 105

1    A.  Yes.
2    Q.  And I am now done with the exposure
3  bullet, and I want to move to the next bullet.  You
4  previously offered a report on general causation;
5  correct?
6    A.  I did.
7    Q.  And I -- just now I understand the answer
8  to this, but I'm just trying to get us on the same
9  page.  You also have read Judge Chhabria's opinion
10  about -- the general causation Daubert opinion;
11  correct?
12    A.  I mean, a while back.  This was when he
13  provided the opinion.  That was, I think, six or
14  seven months since I read it.  I haven't read it
15  for this case.
16    Q.  And here I just want to try to understand
17  what you're doing.  In applying your differential
18  diagnosis, tell me if this is a fair
19  characterization:  Was it necessary -- did you feel
20  like it was necessary to provide your general
21  causation views of glyphosate or Roundup as a
22  possible risk factor before you could rule it in or
23  rule it out?
24    A.  So I wasn't providing general causation
25  here.  I wasn't providing general causation at all.



Page 106

1 What I was trying to explain -- and that's why
2 these bullet points are sequential to each other.
3 ▮▮▮▮▮▮▮▮▮▮▮▮
4 ▮▮▮▮▮▮▮▮▮▮▮
5 ▮▮▮▮▮▮▮▮
6 ▮▮▮▮▮▮▮
7 ▮▮▮▮
8 ▮▮▮▮▮▮▮
9 ▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮
15 ▮▮▮ ever.
16     MS. WAGSTAFF:  I am going to object to
17 questioning him about the demarcation between
18 general causation and specific causation.  That is
19 a legal issue that is specific to the MDL, and it's
20 specific to Judge Chhabria's opinion.  And to
21 expect a medical doctor to know and be able to
22 understand a 70-page legal an opinion that even we
23 probably wouldn't agree on, I think, is unfair and
24 inappropriate.
25

Page 107

1 BY MR. STEKLOFF:
2     Q.  I just wanted to go through the bullets to
3 try to understand.
4     A.  Sure.
5     Q.  Your first bullet is about IARC's finding
6 of --
7     A.  Page 6, right?
8     Q.  Page 6, yes, sir.
9         And starting in March 2015, starting with
10 that bullet.
11     A.  Sure.
12     Q.  That bullet is just identifying that IARC
13 found glyphosate to be a probable human carcinogen,
14 Class 2A; correct?
15     A.  Correct.
16     Q.  That was also something that you relied on
17 in your general causation report?
18     A.  I'm not sure I could say "general
19 causation," but, yes.
20     Q.  In your 2017 report?
21     A.  Yes.
22         But, again, I want to make sure that you
23 understand why I have it here.  This is -- I'm not
24 giving any general causation opinion here.  I'm
25 providing an opinion in Mr. Hardeman's case, but in

Page 108

1 order for me to explain how Roundup, in his
2 particular case, caused, non-Hodgkin lymphoma,
3 I need to explain where I got this from, what type
4 of epidemiologic literature that links that to this
5 but I'm not providing an opinion in general
6 causation.  I just hope this is clear.
7     Q.  It is clear.  Actually -- that answer is
8 almost exactly what I wanted, so I think we can
9 end.
10     MS. WAGSTAFF:  No.  My objection is because
11 I think that you're trying to set up an argument
12 that I've been having with you and Ms. Yates.  And
13 to be very clear, and I think what Judge Chhabria
14 has said on the record, which is why I objected
15 earlier to you asking him legal questions, is that
16 specific causation experts cannot give new or
17 general causation opinions.  And it's our belief
18 and it's our opinion that Monsanto specific
19 causation opinions are giving new and different
20 general causation opinions.
21     We said at the very beginning of this case or
22 of this deposition that Dr. Nabhan is giving only
23 specific causation opinions, and to the extent he's
24 giving general causation opinions, they are
25 consistent what has been allowed for plaintiffs to

Page 109

1 opine on at Daubert.  And I believe that's what he
2 said at the last status conference, and we can
3 leave it at that.
4     MR. STEKLOFF:  Okay.  I'll save my response for
5 later if we have to go down that road.
6     MS. WAGSTAFF:  You can give it now.
7     MR. STEKLOFF:  I don't need to.
8     MS. WAGSTAFF:  Okay.  And, by the way, when
9 I say "consistent with what has been allowed for
10 plaintiff to opine on," I mean all plaintiffs, all
11 MDL plaintiffs.
12     MR. STEKLOFF:  Actually, can we go off the
13 record?
14     THE VIDEOGRAPHER:  We are off the record at
15 10:53 a.m.
16         (A short break was taken.)
17     THE VIDEOGRAPHER:  We are back on the record at
18 11:07 a.m.
19 BY MR. STEKLOFF:
20     Q.  I think I just have two more topics,
21 Dr. Nabhan.
22 ▮▮▮▮▮▮▮
23 ▮▮▮▮▮▮▮▮▮▮▮▮
24 ▮▮▮▮▮▮▮▮▮
25





Case 3:16-md-02741-VC   Document 2478-7   Filed 01/11/19   Page 32 of 34
Chadi Nabhan, M.D.
Case 3:16-md-02741-VC   Document 2405-4   Filed 01/03/19   Page 32 of 34





**Page 122**

17    MS. WAGSTAFF:  Okay.  No further questions.
18          FURTHER EXAMINATION
19    BY MR. STEKLOFF:
20    Q.

25    Q.  You, in your practice, when you were

**Page 124**

**Page 123**

22

**Page 125**

1    treating patients, you wanted to know if there was
2    a causative factor a specific disease that you were
3    taking care of a patient for, didn't you?
4        A.  I was a lymphoma specialist, and I'm a
5    lymphoma specialist.  And I think there are many
6    general oncologists that may have not the expertise
7    of lymphoma.  I think very different.  I was seeing
8    lymphomas.  I saw thousands of patients with
9    lymphoma.
10

15    Q.  To answer my question, I didn't ask you a
16    single thing about his treaters right there.  Can
17    you answer my question?  You, in your practice when
18    you were treating patients, you wanted to know if
19    there was a causative fact for a lymphoma you were
20    taking care of a patient for; correct?
21        A.  I did ask the appropriate questions to see
22    if I could illustrate a causative factor or not.
23        Q.  If you could find the cause, you would
24    have wanted to know the cause when you were
25    treating patients?

Page 126

```
 1    A.  Absolutely.
 2    MS. WAGSTAFF:  I may have one more question.
 3  Can we take a break, please?
 4    THE VIDEOGRAPHER:  We are off the record at
 5  11:25 a.m.
 6          (Brief interruption.)
 7    THE VIDEOGRAPHER:  We are back on the record at
 8  11:26 a.m.
 9    MS. WAGSTAFF:  No more questions.
10    THE VIDEOGRAPHER:  We are off the record at
11  11:26 a.m.  This concludes the videotaped
12  deposition of Chadi Nabhan MD, MBA.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 127

```
 1          C E R T I F I C A T E
 2
 3        I, DEANNA AMORE, a Shorthand Reporter and
 4  notary public, within and for the State of
 5  Illinois, County of DuPage, do hereby certify:
 6        That CHADI NABHAN, M.D., the witness whose
 7  examination is hereinbefore set forth, was first
 8  duly sworn by me and that this transcript of said
 9  testimony is a true record of the testimony given
10  by said witness.
11        I further certify that I am not related to
12  any of the parties to this action by blood or
13  marriage, and that I am in no way interested in the
14  outcome of this matter.
15
16        IN WITNESS WHEREOF, I have hereunto set my
17  hand this 14th day of December 2018.
18
19
20    _____
21      Deanna M. Amore, CSR, RPR
22
23
24
25
```

Page 128

```
 1          UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3  IN RE: ROUNDUP PRODUCTS   MDL No. 2741
 4  LIABILITY LITIGATION
 5  _____       Case No. 16-md-2741-VC
 6  This document relates
 7  to:
 8  Hardeman v Monsanto Co., et al.
 9  Case No. 3:16-cv-00525
10      DECLARATION UNDER PENALTY OF PERJURY
11    I declare under penalty of perjury that I have
12  read the entire transcript of my deposition taken
13  in the above-captioned matter or the same has been
14  read to me and the same is true and accurate, save
15  and except for changes and/or corrections, if any,
16  as indicated by me on the DEPOSITION ERRATA SHEET
17  hereof, with the understanding that I offer these
18  changes as if still under oath.
19
20      Signed on the _____ day of
21  _____, 20__.
22      _____
23      CHADI NABHAN, M.D.
24
25
```

Page 129

```
 1          ERRATA SHEET
 2  CORRECTIONS:
 3  Page _____ Line _____ Reason _____
    From _____ to _____
 4  Page _____ Line _____ Reason _____
 5  From _____to _____
 6  Page _____ Line _____ Reason _____
    From _____ to _____
 7  Page _____ Line _____ Reason _____
 8  From _____ to _____
 9  Page _____ Line _____ Reason _____
    From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
    From _____ to _____
13  Page _____ Line _____ Reason _____
    From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____to _____
16  Page _____ Line _____ Reason _____
    From _____ to _____
17  Page _____ Line _____ Reason _____
18  From _____ to _____
19  Page _____ Line _____ Reason _____
    From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
    From _____ to _____
23  Page _____ Line _____ Reason _____
    From _____ to _____
24
25
```