# EXHIBIT 32

Michael Joseph Sullivan, Ph.D.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS          ) MDL No. 2741
LIABILITY LITIGATION             ) Case No. 16-MD-02741-VC
                                 )
THIS DOCUMENT RELATES TO:        )
                                 )
HARDEMAN v. MONSANTO COMPANY,    )
Case No.: 3:16-cv-00525-VC       )
_____)

          DEPOSITION OF MICHAEL JOSEPH SULLIVAN, Ph.D., a

          witness herein, noticed by Andrus Wagstaff, PC,

          taken at 777 South Figueroa Street, Los Angeles,

          California at 1:15 p.m. on Wednesday, December 19,

          2018, before Delia M. Satterlee, CSR 9114.

Michael Joseph Sullivan, Ph.D.

Page 2

1    APPEARANCES OF COUNSEL:
2
3    For Plaintiff Edwin Hardeman:
4    Andrus Wagstaff, PC
5    By Aimee H. Wagstaff, Esquire
6    7171 West Alaska Drive
7    Lakewood, Colorado 80226
8    (303)376-6360
9    aimee.wagstaff@andruswagstaff.com
10       -and-
11   Grossman & Moore, PLLC
12   By Jennifer A. Moore, Esquire (present telephonically)
13   401 West Main Street, Suite 1810
14   Louisville, Kentucky 40202
15   (502)657-7120
16   jmoore@gminjurylaw.com
17
18
19
20
21
22
23
24
25

Page 3

1    APPEARANCES (Continued):
2
3    For Defendant Monsanto Company:
4    Hollingsworth LLP
5    By Ranjit Singh Dhindsa, Esquire
6       Joseph F. Altieri, Esquire
7    1350 I Street, NW
8    Washington, D.C. 20005
9    (202)898-5806 (Mr. Dhindsa)
10   (202)898-5896 (Mr. Altieri)
11   rdhindsa@hollingsworthllp.com
12   jaltieri@hollingsworthllp.com
13       -and-
14   Wilkinson, Walsh + Eskovitz
15   By Meghan Cleary, Esquire
16   11601 Wilshire Boulevard, Suite 600
17   Los Angeles, California 90025
18   (424)291-9669
19   mcleary@wilkinsonwalsh.com
20
21   Also Present:  Samuel Ramirez, Videographer
22
23
24
25

Page 4

1                I N D E X
2    WITNESS:  MICHAEL JOSEPH SULLIVAN, Ph.D.
3    EXAMINATION BY:              PAGE
4    MS. WAGSTAFF                 7, 140
5    MR. DHINDSA                  138
6
7
8              E X H I B I T S
9    EXHIBIT     DESCRIPTION           PAGE
10   Exhibit 1  Notice of deposition         22
11   Exhibit 2  Document headed "Opinion on Exposure of  22
                Hardeman to Glyphosate," pages 1 through
12              14 of 52
13   Exhibit 3  Document entitled "Opinion on Exposure  22
                of Hardeman to Glyphosate, Attachment A,
14              List of Documents Considered," pages 15
                through 23 of 52
15
     Exhibit 4  Curriculum vitae of Dr. Sullivan, pages  22
16              24 through 41 of 52
17   Exhibit 5  Document entitled "Opinion on Exposure  23
                of Hardeman to Glyphosate, Attachment C,
18              References Cited," pages 42 through 46
                of 52
19
     Exhibit 6  Document entitled "Opinion on Exposure  23
20              of Hardeman to Glyphosate, Attachment D,
                Timeline OF Plaintiff Glyphosate
21              Herbicide Use," pages 47 through 50 of
                52
22
     Exhibit 7  Document entitled "Opinion on Exposure  23
23              of Hardeman to Glyphosate, Attachment E,
                Exposure Calculations," pages 51 and 52
24              of 52
25   Exhibit 8  Invoices provided by Dr. Sullivan    23

Page 5

1    EXHIBITS (Continued):
2    EXHIBIT         DESCRIPTION          PAGE
3    Exhibit 9  Plot map               21
4    Exhibit 10 Document headed "Guidance for the    52
                Preparation of Human Pesticide Exposure
5               Assessment Documents"
6    Exhibit 11 Document headed "Preliminary          53
                Endangerment Assessment Guidance
7               Manual"
8    Exhibit 12 Report by T.L. Lavy, et al., entitled  102
                "Conifer Seedling Nursery Worker
9               Exposure to Glyphosate"
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Michael Joseph Sullivan, Ph.D.

Page 6

1    THE VIDEOGRAPHER:  We are now on the record.  My
2  name is Samuel Ramirez.  I am the videographer for
3  Golkow Litigation Services.  Today's date is Wednesday,
4  December 19th, 2018, and the time is 1:15 p.m.
5    This video deposition is being held at 777 South
6  Figueroa Street, 44th Floor, Los Angeles, California
7  90017 in the matter of Hardeman versus Monsanto
8  Company, et al., Case Number 3:16-cv-00525-VC for the
9  United States District Court, Northern District of
10  California.  The deponent today is Dr. Michael J.
11  Sullivan.
12    Will counsel please voice identify yourselves for
13  the record.
14    MS. WAGSTAFF:  Aimee Wagstaff from Denver, Colorado
15  on behalf of Plaintiff Hardeman.
16    On the phone is Jennifer Moore from Grossman Moore
17  on behalf of Plaintiff Hardeman.
18    MR. DHINDSA:  Ranjit Singh Dhindsa on behalf of
19  Monsanto Company.
20    MR. ALTIERI:  Joe Altieri on behalf of Monsanto
21  Company.
22    MS. CLEARY:  And Meghan Cleary on behalf of
23  Monsanto Company.
24    THE VIDEOGRAPHER:  Thank you very much.
25    The court reporter today is Delia Satterlee and

Page 7

1  will now swear in the witness.
2
3    MICHAEL JOSEPH SULLIVAN, Ph.D.,
4  a witness herein, having been sworn, testifies as
5  follows:
6
7    -EXAMINATION-
8
9  BY MS. WAGSTAFF:
10  Q. Good afternoon, Dr. Sullivan.
11  A. Good afternoon.
12  Q. When were you retained in this matter?
13  A. It was earlier this year.  I don't have the --
14  I don't recall the exact date of when the paperwork
15  might have been signed.  It was fall.  But if I can --
16  Do you have a -- If there's a copy of my agreement, I
17  would be able to tell you exactly the date.
18  Q. Well, I --
19  A. Sorry.  I just don't recall --
20  Q. Yeah.
21  A. -- exact --
22  Q. And this isn't --
23  A. -- the exact date.
24  Q. -- a memory test.  But I had -- I have a
25  retention letter from you dated October 20th, 2017,

Page 8

1  which was 14 months ago.
2  A. Oh, okay.  So it --
3  Q. Is that --
4  A. It was fall but, yeah, it was a year ago.
5  Q. It was --
6  A. Sorry.
7  Q. -- a year ago.  Okay.
8    And was this retention letter for -- I'm guessing
9  that retention agreement was for the litigation in
10  general?
11  A. That's my understanding, yes.
12  Q. Okay.  So when were you asked to provide
13  opinion in Mr. Hardeman's case?
14  A. I believe I was asked in -- Sometime in the
15  last couple of months they notified me that there might
16  be a case they would ask me to work on.  And then at
17  some point that decision was made, and they sent me the
18  deposition, which would have triggered my -- his dep --
19  Hardeman's deposition, which would have then triggered
20  my evaluation.  So it --
21  Q. Okay.
22  A. -- it was in the last couple of months.  I
23  don't know the exact date but probably in October.
24  Q. Okay.  So -- Okay.  And what were you asked to
25  do in this case?

Page 9

1  A. My specific task is to develop an exposure
2  estimate to glyphosate for the ac- -- for the spray
3  activities that Mr. Hardeman did at his property.
4  Q. Okay.  And so in doing so, you created a
5  exposure equation; is that fair?
6  A. I didn't create the equation.  I've used an
7  equation that is standard in my field, but I then
8  applied it specifically to Mr. Hardeman and his -- and
9  the specifics of his activities.
10  Q. Okay.  And are you -- were you asked to give an
11  opinion on the epidemiology?
12  A. I was not.
13  Q. Okay.  Were you asked to give a op- -- And so
14  you are not giving an opinion on the epidemiology; is
15  that correct?
16  A. That is correct.
17  Q. And were you asked to give an opinion on the
18  toxicology?
19  A. No, ma'am.
20  Q. And so are you giving an opinion on toxicology
21  here today?
22  A. I'm not planning on that.
23  Q. Okay.  And so were you asked to give an opinion
24  on the data related to the mechanism of action?
25  A. Of glyphosate?

3 (Pages 6 to 9)

Michael Joseph Sullivan, Ph.D.

Page 10

1    Q. Mm-hmm.
2    A. Only to the extent that it might relate to
3  ADME, which is Absorption, Distribution, Eliminate --
4  Metabolism, Elimination.  If -- And that's in my -- And
5  that is in my paper because it relates to exposure.
6    Q. Okay.
7    A. So...
8    Q. So other --
9    A. And that would be the aspects of -- of what I
10 would speak about glyphosate.
11   Q. Okay.  And so do you have an opinion on whether
12 or not exposure to glyphosate causes cancer?
13   A. I am -- That's outside the scope of my work.
14   Q. Okay.  And similarly, do you have an opinion on
15 whether or not exposure to Roundup causes cancer?
16   A. Again, that's -- that's outside -- I'm not
17 doing -- I'm not providing any opinion regarding
18 causation.
19   Q. Okay.  Specific causation or general causation;
20 correct?
21   A. That is correct, yes.
22   Q. And by "specific," just because that's a legal
23 term and I want to make sure that we're on the same
24 page, you are not giving an opinion as to whether or not
25 Mr. Hardeman's cancer was caused by exposure to Roundup

Page 11

1  or glyphosate; is that correct?
2    A. That is correct.  I'm offering no causation
3  opinions at all.
4    Q. Okay.  So why don't you state your name for the
5  record, please.
6    A. Sure.
7    First name Michael, middle name Joseph, last name
8  Sullivan.
9    Q. Okay.  And in your -- in connection with your
10 opinion, you conducted a home visit; is that right?
11   A. I went to one of Mr. Hardeman's properties, the
12 Forestville location, yes.
13   Q. Okay.  And why did you do that?
14   A. The process that I follow is to develop --
15 to -- is to attempt to put together an exposure equation
16 that reflects what Mr. Hardeman did, his activities,
17 his -- how he sprayed and where he sprayed.
18   And so I developed that opinion and my assumptions
19 based on his deposition and his fact sheet.  But there
20 are aspects that are not clear in those pieces, and so
21 the site visit allows me to refine my understanding of
22 what he actually did.
23   Q. Okay.  And what did you learn?
24   A. For example, Mr. Hardeman speaks about spraying
25 the fence line above his gravel driveway, but that

Page 12

1  description in a deposition is -- is -- doesn't, you
2  know, describe the topography or, you know, the -- how
3  far below the driveway the fence might be, things like
4  that.  So as -- when he described his spraying, being
5  able to go to the site and see where he actually was
6  allows me, again, to review my -- the -- my assumptions
7  to make sure I'm comfortable with them.
8    Q. Okay.  So was your opinion formed before you
9  did your home visit?
10   A. I would say that a draft opinion was developed
11 prior to the home visit.  And -- And then again at the
12 visit, it allowed me to understand for -- how -- to
13 understand the con -- the conservatism or the
14 overestimate in my evaluation.
15   My -- My strategy when I put together an exposure
16 estimate is to make sure that my numbers are what I read
17 higher than the exposures which have actually occurred.
18   And so seeing the site allows me to have confidence
19 in the parameters I've selected that -- that I -- I
20 believe my numbers are -- would be re- -- be an
21 overestimate.
22   Q. Okay.  And you understand that the property is
23 56 acres; correct?
24   A. I don't know the exact a- -- acreage, but I
25 understand it's large, yes.

Page 13

1    Q. Okay.  And you all were there for a little
2  under an hour; correct?
3    A. It's -- It was right around an hour is my
4  recollection, yes.
5    Q. Okay.  And you were walking on foot; correct?
6    A. That is correct.
7    Q. Okay.  So how much of the 56 acres would you
8  guess that you actually saw during your visit?
9    A. We -- I wouldn't have an -- I'm not sure I
10 could have an acreage estimate, but I do know that we
11 walked in areas that were described by Mr. Hardeman in
12 his deposition as areas that he sprayed.  And so, you
13 know, while it's a large property, there obviously are
14 areas where he said he didn't spray.  And so going there
15 wouldn't provide me any additional information.  But
16 focusing on those areas that he did describe therefore
17 allows me to, like I -- like I mentioned before, gain an
18 understanding of the topography around the driveway.
19 And so -- because that's an area he -- he discussed
20 spraying.
21   Q. Did you go on any of the hiking trails?
22   A. I'm not sure what you mean by "hiking trails,"
23 but there is a road that is unimproved.  It's a dirt
24 road that leads from his property up the hill towards
25 the tanks for his water system.  And we did hike up

Michael Joseph Sullivan, Ph.D.

Page 14

```
 1   there.
 2       Q.  So does -- in -- in Mr. Hardeman's deposition
 3   that you've read -- correct?
 4       A.  Yes, ma'am.
 5       Q.  And you've relied on; correct?
 6       A.  I -- I did utilize that, yes.
 7       Q.  -- does Mr. Hardeman discuss hiking trails
 8   other than what you've just mentioned?
 9       A.  I don't recall.  I'd have to -- I'd have to go
10   back and look.
11       Q.  Okay.  But to the extent he -- he did, you
12   didn't go on any of those; correct?
13       MR. DHINDSA:  Objection.
14       THE WITNESS:  We --
15       MS. WAGSTAFF:
16       Q.  During your home visit.
17       MR. DHINDSA:  Objection.
18       THE WITNESS:  The -- The areas I went on the home
19   visit were areas that were based on where he said he
20   sprayed.  And so whether -- I -- I don't re- -- I don't
21   know what you call that road leaving from his house.
22   Whether he may have called that a trail or not, I don't
23   recall.  But he did describe it, and so that's the area
24   we went to.
25       MS. WAGSTAFF:  Okay.  Excellent.
```

Page 15

```
 1       Q.  So I have -- This was marked as Exhibit
 2   Number 2 in Mr. Hardeman's depo that you relied on.
 3       A.  (Reviews map.)
 4       Q.  A little wrinkly.
 5       THE WITNESS:  Do you want to look at this?
 6       MR. DHINDSA:  Sure (indicating).
 7       MS. WAGSTAFF:
 8       Q.  If you could, with this pen --
 9       If you'd like me to orient you a little, I can.
10       A.  I think I have an understanding of what this
11   map shows.
12       Q.  Okay.  Could you draw, to the best of your
13   ability, on that map where you guys walked?
14       A.  Can I -- Can I make it so it doesn't roll up?
15       Q.  Sure.
16       A.  Ju- -- Just so it's easier to...  Hang on.
17       This would not necessarily be in time sequence.
18   I -- But I could mark the areas we visited.
19       Q.  Sure.  Yeah.
20       A.  Do you -- How would you like me to mark them?
21   Like an X or a line --
22       Q.  Just --
23       A.  -- or...
24       Q.  -- take a pen and just mark the path that you
25   guys walked.
```

Page 16

```
 1       A.  I'll try.  Okay.
 2       (Marks map.)
 3       And this doesn't show all of his -- all the
 4   buildings on the site.  So there are other things on
 5   here that if I -- For example, I could -- I know we
 6   walked around the house and the garage.  Those are not
 7   on this --
 8       Q.  Okay.
 9       A.  -- on this map, so there -- it won't be as
10   accurate as it could be if you had a real plot plan for
11   the property.
12       But we walked -- I walked along ███████████
13   ███  ████████████████████ -- and then up the gravel
14   driveway and into -- he has a fence to his prop-- a
15   gate to his property approximately -- I think it -- he
16   said -- they said it's near the property boundary and up
17   to his -- Now, again, there's -- there's a house, garden
18   area, other fences in here which are not shown, so it
19   would be -- it's going to be -- I don't want to just
20   scribble in there, but I -- maybe I could just do
21   something like this, make a circle --
22       Q.  Okay.
23       A.  -- around those areas around his property.
24       And then walked up this -- I believe this -- if
25   this is the gravel road to the tank, which it does seem
```

Page 17

```
 1   to be, and the spring which was mentioned -- so I'm
 2   assuming that this is the gravel road that goes up to
 3   his property.  We went up to the tank.  And I believe we
 4   were just below the spring (indicating).  So that would
 5   be, to my recollection, where we went.
 6       Now, again, there are a variety -- There's a --
 7   several structures here in this area (indicating).
 8   There's another fence line that fences in the area where
 9   he -- his -- his house was and areas where he sprayed.
10   And so even though I drew a circle there, I walked those
11   areas as well, but I can't -- I can't identify them
12   because the buildings aren't here.
13       Q.  Sure.
14       A.  So...
15       Q.  So of the area that's circled, would you say
16   you spent most of your time in that area?
17       A.  I -- You know, we walked -- walked at a
18   relatively consistent pace, and so we were able to -- I
19   was able to walk from the bottom of the driveway up to
20   the area where you park around the garage and his house,
21   walk the fence line there and also walk all the way up
22   to approximately where the spring is and then back in an
23   hour.  And so --
24       Q.  Okay.
25       A.  -- so it was -- it was a -- pretty much a
```

5 (Pages 14 to 17)

Michael Joseph Sullivan, Ph.D.

Page 18

1    consistent walk.  I'm not sure there was any -- I can't
2    say one area was more --
3        Q.  Okay.
4        A.  -- than another.
5        Q.  And who were you with?
6        A.  I was with a lawyer, Mr. -- Ran was there.
7    And -- And I'm going to blow the name because -- His
8    first name is Kajim.  I don't -- Am I allowed to ask --
9    He's a weed scientist on the project --
10       Q.  Yeah.  I remember.
11       A.  -- but I don't recall his last name.  I'm
12   sorry.
13       Q.  Okay.  And so for Monsanto Company, it was the
14   three of you there; correct?
15       A.  That's my recollection, yes.
16       Q.  And you were on -- There was no one to guide
17   you -- or -- The -- The current owner didn't take you
18   on a tour; right?
19       A.  The current owner greeted us, and he was
20   available to ask some questions.  And he answered
21   those to the extent that he understood the property.
22   Obviously he probably didn't understand spray activities
23   because he's not Mr. Hardeman.  But we did ask him, you
24   know, if the fence, you know -- things like "Was this
25   fence here when you moved in," you know, just to make

Page 19

1    sure there weren't -- he hadn't made changes that
2    might -- what's the word I want to use? -- make changes
3    that -- that would have misguided us in terms of where
4    Mr. Hardeman sprayed.
5        Q.  Okay.  And so you --
6        A.  But -- I'm sorry.  But he didn't -- he did not
7    accompany us on -- on the walk.
8        Q.  Okay.  And Mr. Hardeman wasn't at your meeting;
9    right?
10       A.  He -- He was not there; that's correct.
11       Q.  So it was sort of a self-guided tour?
12       A.  It -- Well, I'm -- I'm not -- I'm not sure.
13   Like I said, we did speak to the owner, but I -- We went
14   in areas -- I went in areas that I felt were important
15   based on the deposition.  So to the extent that I was
16   guided by that information, yes.
17       Q.  And plaintiff's lawyer Paul was there --
18       A.  Oh.
19       Q.  -- right?
20       A.  There was someone else.  But he didn't go --
21   Did he walk with us?  Hmm.  I'd have to think about
22   that.  I don't recall.
23       Q.  Okay.
24       A.  He may -- He may have walked some of it with us
25   and then -- I think he may have walked towards the tank.

Page 20

1    This is a long hike, and -- and I don't know if he made
2    it all the way up to the top or not.
3        Q.  Okay.  And in -- in connection with your
4    report, you submitted roughly 100 or so photos of the
5    property?
6        A.  Yes.  There were -- I -- I don't have the
7    right -- exact number, but there --
8        Q.  Sure.
9        A.  -- were numerous photographs taken, yes.
10       Q.  And who took those?
11       A.  Those were taken by the weed scientist.
12       Q.  Okay.  So you didn't take any photos?
13       A.  I did not take any myself, no.
14       Q.  Did you take any notes?
15       A.  I took no written notes, no photos.  My -- For
16   me, mostly observation is -- is the way that I like to
17   do that.
18       Q.  Okay.  So no notes from that report, no
19   pictures, no -- no nothing; is that correct?
20       A.  Not pictures that I took.  We've --
21       Q.  Yeah.
22       A.  You've already --
23       Q.  Yeah.
24       A.  -- identified that there were pictures taken
25   and -- and --

Page 21

1        Q.  Okay.
2        A.  -- but I didn't take any of those myself.
3        Q.  And you've never met Mr. Hardeman; right?
4        A.  I have not, no.
5        Q.  Okay.  But you've read his deposition?
6        A.  Yes, ma'am.
7        Q.  Okay.
8        You can put away the map.  I'm not going to ask any
9    more about it.
10       A.  This is not an exhibit now (indicating)?
11       Q.  No.  It will.  But --
12       A.  Okay.
13       Q.  We'll mark this as Exhibit 9.
14       (Exhibit 9 identified.)
15       MS. WAGSTAFF:
16       Q.  So you've read Mr. Hardeman's deposition?
17       A.  Yes, I have.
18       Q.  Is there anything in there that you just don't
19   believe?
20       MR. DHINDSA:  Objection.
21       MS. WAGSTAFF:
22       Q.  Do -- I mean, do you have any reason not to
23   believe his testimony?
24       MR. DHINDSA:  Objection.
25       THE WITNESS:  I -- I believe Mr. Hardeman gave his

6 (Pages 18 to 21)

Michael Joseph Sullivan, Ph.D.

Page 22

1    best recollection of what he did.
2        MS. WAGSTAFF:  Okay.
3        Q.  What product did Mr. Hardeman use?
4        MR. DHINDSA:  Objection.
5        THE WITNESS:  I would actually ask then to see
6    my -- my opinions so I can make sure that I'm quoting
7    what I put in my opinion regarding his product.
8        MS. WAGSTAFF:
9        Q.  Sure.
10       A.  Is that okay?
11       Q.  Yes.
12           And -- And for the record, I will -- while you're
13    looking at that, I'll just state for the record the
14    exhibits that we have marked prior to the deposition.
15           The first one was the -- Exhibit 1 is the notice of
16    deposition.
17        (Exhibit 1 identified.)
18        MS. WAGSTAFF:  Exhibit 2 is Dr. Sullivan's report
19    in the Hardeman matter.
20        (Exhibit 2 identified.)
21        MS. WAGSTAFF:  Exhibit 3 is the MCL.
22        (Exhibit 3 identified.)
23        MS. WAGSTAFF:  Exhibit 4 is Dr. Sullivan's CV.
24        (Exhibit 4 identified.)
25        MS. WAGSTAFF:  Exhibit 5 is References Cited.

Page 23

1        (Exhibit 5 identified.)
2        MS. WAGSTAFF:  Exhibit 6 is the timeline created by
3    Dr. Sullivan.
4        (Exhibit 6 identified.)
5        MS. WAGSTAFF:  Exhibit 7 is the Exposure
6    Calculations.
7        (Exhibit 7 identified.)
8        MS. WAGSTAFF:  Exhibit 8 is the invoices provided
9    to us.
10        (Exhibit 8 identified.)
11        MS. WAGSTAFF:  And Exhibit 9 is the plot map.
12        THE WITNESS:  Could you ask the question again?
13        MS. WAGSTAFF:
14        Q.  What product did Mr. Hardeman use?
15        A.  Thank you.
16            On page 9 of my opinion, the second bullet --
17    sorry -- the third bullet on that page, I've summarized
18    what I could glean from the deposition, which was that
19    Mr. Hardeman u- -- purchased a concentrate of Roundup,
20    and then he would dilute that for sp- -- purposes of
21    spraying.
22        Q.  Okay.  So how -- Do you know the size of the
23    glyphosate particles that are in that product?
24        A.  I'm not -- I don't understand that question.
25    I'm sorry.

Page 24

1        Q.  Okay.  So --
2        A.  "Size of the particles."
3        Q.  Is the -- Is -- Are -- Glyphosate is particles;
4    right?
5        A.  (No response.)
6        Q.  Or molecule?
7        A.  Now you're asking a chemistry question.
8        Q.  Okay.
9        A.  Glyphosate in sol- -- is a salt.
10       Q.  Mm-hmm.
11       A.  So in solution, it would exist in the io- -- a
12    form of an ion.
13       Q.  Okay.
14       A.  So to say "particles" --
15       Q.  So --
16       A.  -- I'm --
17       Q.  So --
18       A.  -- not quite --
19       Q.  -- have you given your deposition before?
20       A.  (No response.)
21       Q.  Have you had your deposition taken before?
22       A.  Oh.  E- -- E- -- Ever?
23       Q.  Yeah.
24       A.  Yes.  I have given other depositions, yes.
25       Q.  Okay.  And in the Roundup case, have you been

Page 25

1    deposed before?
2        A.  I was deposed in the case of Mr. Johnson.
3        Q.  Okay.  And did you -- Maybe this is a good time
4    to ask what you did to prepare for this deposition.
5        A.  For this deposition, I reread my opinion, and
6    I -- there were -- I refreshed myself regarding some of
7    the publications that I relied upon.  Those would
8    probably be the two main things that I did.
9        Q.  Did you read any expert reports from other
10    experts in this matter?
11       A.  No.  I have seen no other reports related to
12    this case other than Mr. Hardeman's deposition.
13       Q.  You've -- You haven't read any of plaintiff's
14    expert reports?
15       A.  Oh, I'm sorry.  Are you talk- -- I thought you
16    were talking about experts on -- on the -- this -- on
17    this -- on the -- I'm sorry.  I'm confused.
18           Ask me the question again.
19       A- -- Any reports at all?
20       Q.  So --
21       A.  I thought you were talking --
22       Q.  -- in this --
23       A.  -- about experts --
24       Q.  -- in this --
25       A.  -- like on --

7 (Pages 22 to 25)

Michael Joseph Sullivan, Ph.D.

Page 26

1    Q. -- litigation --
2    A. -- on this side. I'm sorry.
3    Q. -- Monsanto tendered a handful of expert
4    reports.
5    A. Okay.
6    Q. And plaintiff tendered a handful of expert
7    reports. Have you read any of those?
8    A. Ah. Thank you. I -- I was confused.
9    I have not read any reports -- expert reports
10   tendered by Monsanto.
11   I have read, in the Hardeman case -- I don't recall
12   if Dr. Sawyer's report is related -- Dr. Sawyer's report
13   re- -- mentions the Hardeman case, but his -- but his
14   report is focused on another case, and I did read that
15   because it's -- because I'm working -- because he
16   does -- he did mention in his -- in his report the
17   Hardeman -- Mr. Hardeman. And I think that's it. I
18   don't think there's any other -- I want to make sure by
19   looking at my conclusions.
20   That would be it. And for -- for -- that relates
21   to Mr. Hardeman, I -- would be the -- Dr. Sawyer's
22   report.
23   Q. Okay. And you -- you provided this report on
24   November 27th; right?
25   A. That's correct.

Page 27

1    Q. Okay. If you want to pull out Exhibit
2    Number 2, and we're going to talk about it a little bit.
3    A. Okay.
4    Q. Is that your signature on the last page?
5    A. That is an electronic version of my signature,
6    yes.
7    Q. Okay. That you obviously authorized somebody
8    to use; right?
9    A. Yes. I used it myself that day.
10   Q. Okay.
11   A. I put that in there.
12   Q. And are these all the opinions -- Does this
13   report, which -- I understand that your report is
14   comprised of Exhibits 2 through 7. I understand that.
15   A. Okay. Yeah. I was going to say, there's more
16   to my --
17   Q. Right.
18   A. -- opinion than what's here --
19   Q. I --
20   A. -- in front of me.
21   Q. I understand that. It's 52 pages. But
22   contained within those 52 pages, is that all of the
23   opinions that you intend to proffer in this case?
24   A. Those 52 pages generally do, be- -- because
25   they are all focused on issues of exposure, reflect the

Page 28

1    scope of my opinion in this case.
2    There are numerous articles that I've relied upon.
3    And if I'm que- -- asked a question about one of those
4    articles, I may not have described it -- that article in
5    detail in my paper -- in my opinion, but I would -- I would
6    be able to -- I would answer that question.
7    So to the extent that it's related to either what I
8    wrote in my opinion or the -- the references that I've
9    relied upon, that would be the scope of anything I
10   might -- I might offer.
11   Q. Okay. And did you write this report?
12   A. Yes, ma'am, I did.
13   Q. And -- So talking about your -- you have a
14   materials -- a doc- -- actually it's called a "List of
15   Documents Considered," which is separate and apart from
16   your References Cited.
17   A. That's correct.
18   Q. What -- What are the differences in those?
19   A. The References Cited are references I -- that I
20   specifically took information out of and utilized in my
21   opinion. And the proper way then of -- of writ- --
22   of -- of that process would be to recognize the source
23   of that information. And so they are numbered 1 through
24   60. I -- something. I don't know the exact number.
25   And so that's the References Cited.

Page 29

1    There are other ref- -- other papers that I've
2    looked at which don't have any -- I did not -- would --
3    did not cite directly and therefore don't have a -- a
4    direct bearing on my written opinion but may be relevant
5    to the overall issue of glyphosate herbicide use. And
6    so I've listed those in the -- in the considered list.
7    So you saw everything that I looked at.
8    Q. Okay. So everything that you looked at is
9    contained in your List of Documents Considered or your
10   References Cited.
11   A. All my -- If I -- I'll -- If I can clarify it
12   slightly, everything is in the docu- -- in the documents
13   considered and -- including the re- -- cited references.
14   So it's the -- So there -- For example, a cited
15   reference would be appear twice --
16   Q. Oh.
17   A. -- once --
18   Q. Okay.
19   A. -- once in the citation and then once in the --
20   Q. Okay. So if I want to know everything that you
21   looked at for your expert reports and everything that --
22   that you intend to opine on, I would look at the List of
23   Documents Considered.
24   A. Correct.
25   Q. And how did you come up with that list?

Michael Joseph Sullivan, Ph.D.

Page 30

1      A.  So -- That infor- -- Well, that was -- that
2   list is all the information that I looked at.  And so --
3   And there -- And so everything that I -- I kept track of
4   everything that I looked at, and -- and that -- that's
5   how I compiled that list.
6      Q.  Okay.  So how did you decide what to look at?
7      A.  There were probably several sources of getting
8   documents.  One would be doing literature searches
9   myself of the published literature, and a document or
10  documents would come from that pub- -- that list.  And
11  then I would -- The ones that I felt were relevant to
12  exposure I would download and I would review, and if
13  they were -- if I -- once I read them, they get on my
14  considered list; and if I didn't use them, then I
15  don't -- do not reference them.  So that would be one
16  way of finding documents.
17     The other is there are some documents that
18  Monsanto -- of Monsanto studies, and those were provided
19  by counsel.
20     And then the third thing I did is -- is I would
21  o- -- sometimes look through the references -- the
22  reference list of a document that I was utilizing to see
23  if there were other references that I felt were relevant
24  that may not have come up in search.
25     So those were -- those would be the three ways that

Page 31

1   I assembled a list of considered documents in this case.
2      Q.  So the only thing Monsanto's lawyers gave you
3   were Monsanto studies?
4      A.  Generally they -- I bel- -- I -- I believe
5   that's the case.  There may have been a -- a case where
6   I couldn't find something that I wanted, and I may have
7   asked for it and see if they had it.  But mostly they
8   provided the Monsanto studies, which are listed
9   generally as Monsanto authorship in my li- -- in my
10  considered information.
11     Q.  Okay.
12     A.  And --
13     Q.  So --
14     A.  I'm sorry.  Then the deposi- -- Then obviously
15  the Hardeman fact sheet and his deposition, that had to
16  come obviously from counsel as well, so...
17     Q.  Okay.  So you were deposed in March of 2018
18  in -- in the Johnson matter; right?
19     A.  I was deposed in the Johnson matter.  I don't
20  remember the date.  So...
21     Q.  Okay.  It was March 5th, 2018.
22     A.  Okay.
23     Q.  Does that ring a bell?
24     A.  It -- It could be.  I have no reason --
25     Q.  Okay.

Page 32

1      A.  -- to suggest it's not.
2      Q.  Did you review that transcript in preparation
3   of your deposition today?
4      A.  I did not.
5      Q.  You were on the witness list for the Johnson
6   trial; isn't that right?
7      A.  I believe that's correct.
8      Q.  Did you change your opinion at all?  Any of the
9   methods that you were doing to calculate an exposure
10  equation, did you change that at all between the Johnson
11  deposition and today?
12     MR. DHINDSA:  Objection.
13     THE WITNESS:  No.  The methodology I've used is
14  exactly the same.
15     MS. WAGSTAFF:
16     Q.  Did you add any documents to the List of
17  Documents Considered -- Strike that.
18     Did you consider any additional information between
19  giving your deposition in March of '18 and today?
20     A.  The -- Yes, I -- I did.
21     Q.  What did you consider additionally?
22     A.  I wanted to spend more time reviewing the --
23  what's called the A- -- ADME literature, Absorption --
24  which is toxicological -- toxicology literature.  And so
25  I spent a little more time going through that portion of

Page 33

1   my opinion.  And so I -- so that's one area that I know
2   is -- has been -- that I spent more time on since the
3   Johnson -- my Johnson opinion.
4      Q.  Okay.  And when did you do that?
5      A.  I don't recall when I would have started.  It
6   would have been sometime prior to -- It would have been
7   obviously after the Johnson case but sometime prior to
8   today.  And I don't remember.  It may have been over
9   that period of time, but I don't recall the exact time I
10  would have started.
11     Q.  Do you intend to give any opinion on the
12  Agricultural Health Study?
13     MR. DHINDSA:  Objection.
14     MS. WAGSTAFF:  What -- What's the objection?
15     MR. DHINDSA:  It's a vague question.
16     MS. WAGSTAFF:
17     Q.  Do you intend to give a -- an expert opinion on
18  the Agri- -- Do you know what the Agricultural Health
19  Study is?
20     A.  Yes, ma'am, I do.
21     Q.  Do you intend to give an expert opinion on
22  that?
23     MR. DHINDSA:  Same objection.
24     THE WITNESS:  The -- That's an epidemiology study
25  which uses certain procedures to -- for exposure.  And I

9 (Pages 30 to 33)

Michael Joseph Sullivan, Ph.D.

Page 34

1 have -- And so to the extent that I am either asked or
2 others may comment on the use of those types of exposure
3 estimates that are used, for example, in the
4 Agricultural Health Study, I would -- I might -- I could
5 comment on that. But I'm not commenting on the -- the
6 cau- the -- the other aspects of that study just from
7 the exposure standpoint.
8    MS. WAGSTAFF:
9    Q. Well, aren't the other aspects of that study
10 important?
11    A. I -- It's a very important study, but I'm --
12 I -- my scope is exposure.
13    Q. Okay.
14    A. And so I'm -- I'm focused on -- So when I look
15 at the Agricultural Health Study, I'm interested in the
16 exposure aspects of that study. And so that's -- that's
17 why I would limit anything I -- if I was asked, limit
18 anything I might say to -- to the exposure aspects.
19    Q. Okay. Tell me how they collected exposure data
20 in that study.
21    A. I believe -- You know what? I can speculate.
22 It's been awhile since I've looked at it. But if you
23 have the paper, it'd be easier.
24    Q. I don't have it. It's cited in your report,
25 though. I don't have it.

Page 35

1    A. I can give you a general guess, but I -- I --
2 it -- to -- to be exact in terms of how they do it --
3 because there are different -- different ways of
4 collecting data. There are surv- -- There's
5 questionnaire and in-person interviews, and I don't
6 recall exactly if they use either or both of them.
7 And -- But the -- And so I'd have to look at the paper
8 to give you an exact deter- -- exact representation.
9    Q. Okay. Did they use imputation?
10    Did --
11    A. I'm sorry.
12    Q. -- they use imputation in the AHS study?
13    MR. DHINDSA: Objection.
14    THE WITNESS: I -- I don't know what that means.
15    MS. WAGSTAFF: Okay.
16    Q. You don't know what "imputation" means?
17    A. I don't know what -- know what that means.
18    Q. Okay. So what are the limitations of the
19 Agricultural Health Study?
20    MR. DHINDSA: Objection.
21    THE WITNESS: I'm -- Well, I --
22    MR. DHINDSA: Specifically I object to you asking
23 him questions about a study he doesn't have in front of
24 him.
25    MS. WAGSTAFF: Okay. I mean, it's cited in his

Page 36

1 expert report, so I assume he's --
2    Q. I mean, if you tell me you're not going to give
3 any opinions on the AHS study, I won't ask you about it.
4 But it's cited in your report. It's one of the
5 references cited; it's not just on the document list.
6    A. Yes, I -- I understand.
7    Could you ask me the question again?
8    MS. WAGSTAFF: Can you repeat the question?
9    (The question is read by the reporter as follows:
10    "Question: So what are the limitations of the
11 Agricultural Health Study?")
12    MR. DHINDSA: Okay. Same objection.
13    THE WITNESS: Your question uses the phrase
14 "limitations," and I -- what I said was I was -- I would
15 compare -- I would potentially do a comparison of the
16 methodologies of how ex- -- exposure or dose
17 categorization would have been done in an epi study.
18 And so I'm not commenting about whether it's a
19 limitation or not, ju- -- or -- or ju- -- mostly just
20 comparing a procedure like I would use, which is a --
21 just a dose reconstruction based on actual activities
22 compared to what they do in ep- -- epi studies, which is
23 a different -- they use different procedures.
24    MS. WAGSTAFF: Okay.
25    Q. So did the scientists in the Agricultural

Page 37

1 Health Study use the same method of collecting exposure
2 data as you did?
3    MR. DHINDSA: Objection.
4    THE WITNESS: I -- I don't know.
5    MS. WAGSTAFF: Okay.
6    THE WITNESS: I -- I haven't reviewed it to that
7 level of detail nor do I have it in front of me. So --
8    MS. WAGSTAFF: Okay.
9    THE WITNESS: -- when you ask -- That -- That --
10 Those are questions which are --
11    MS. WAGSTAFF:
12    Q. Well, your -- your report is 12 -- Your -- The
13 meat of your report is 12 pages; right?
14    MR. DHINDSA: Objection.
15    THE WITNESS: That -- I -- I don't know. I don't --
16 didn't count the number of pages, but I can --
17    MS. WAGSTAFF:
18    Q. Well, they're numbered --
19    A. -- can look at it.
20    Q. -- so it's pretty easy.
21    A. So -- It looks like there's 13 pages of text.
22    Q. Okay. And you -- you wrote this report?
23    A. Yes, ma'am, I did.
24    Q. And the only epidemiology study that you cited
25 in here is the AHS study; is that correct?

Michael Joseph Sullivan, Ph.D.

Page 38

1    A. Um...
2    MR. DHINDSA: Objection.
3    THE WITNESS: I'd have to go back and look at
4   both -- look at my list to see if I cited another study.
5   I had -- I did cite that study. I don't --
6    MS. WAGSTAFF: Okay.
7    THE WITNESS: -- know if there are o- -- other epi
8   studies in there.
9    MS. WAGSTAFF: Okay.
10    Q. So you just didn't feel that it was important
11   enough, when you prepared for today, to review the AHS.
12    MR. DHINDSA: Objection.
13    THE WITNESS: I re- -- As I indicated earlier, the
14   things I reviewed were my opinion and a few of the
15   studies that would be focused on exposure.
16    And the AHS, as I reference it in my opinion, would
17   be something that you could compare the exposures to,
18   but I did not -- I'm not offering it and a -- I'm not
19   here as an expert in epidemiology, nor am I opining on
20   the epi -- epidemiology studies, only what I -- I
21   reference it as an example. In fact, I even use that --
22   I think I use that language as an example of a study
23   that could be -- co- -- u- -- utilized for -- for
24   comparing doses.
25    MS. WAGSTAFF:

Page 39

1    Q. Do you have an opinion on how glyphosate moves
2   through the body?
3    MR. DHINDSA: Objection; vague.
4    THE WITNESS: I have a section in my report which
5   discusses the -- the aspects of what we call
6   pharmacokinetics or toxicokinetics, depending on how you
7   want to -- what word you want to use. But, as I
8   mentioned before, it -- it addresses the absorption,
9   distribution, metabolism and elimination. I have
10   outlined in my report my -- my review of that literature
11   and my opinions.
12    MS. WAGSTAFF: Okay.
13    Q. Is it -- Is it your opinion that there's a
14   difference based on the route of exposure?
15    A. I -- When you say "difference on route of
16   exposure," I -- I -- that's a little vague. I'm not --
17   difference in.
18    Q. What's a route of exposure?
19    A. A route of exposure generally is considered the
20   portal of entry into a living system, so...
21    Q. Okay. So which routes of exposure did
22   Mr. Hardeman have?
23    A. Mr. Hardeman -- in his deposition he discusses
24   primarily feeling derm- -- having dermal contact with
25   glyphosate during spray activities. So dermal contact

Page 40

1   is -- is the num- -- is the main route of exposure.
2    He could -- Because he re- -- he discusses in his
3   deposition that he felt mist on his face sometimes but
4   not all the time, it is therefore possible he had small
5   inhalation dose. And so those would be the two, based
6   on his own description -- excuse me -- of his work -- of
7   his spraying that I would consider relevant.
8    Q. Okay. So your exposure equation only
9   contemplates dermal and -- and a minimal inhalation
10   exposure; is that right?
11    MR. DHINDSA: Objection.
12    THE WITNESS: As I've described in my opinion, I
13   considered all the routes of exposure to -- and -- and
14   in -- and to make sure that up front I didn't eliminate
15   anything. And then as I reviewed the information that
16   Mr. Hardeman provided, it was clear that he had dermal
17   exposure. That's what he discusses -- references --
18    MS. WAGSTAFF:
19    Q. I --
20    A. -- the most.
21    Q. You -- You're just repeating yourself, and I
22   understand, and I've read your report. If you could
23   just answer my question.
24    A. All right.
25    MS. WAGSTAFF: Can you --

Page 41

1    THE WITNESS: Sorry.
2    MS. WAGSTAFF: -- repeat my question.
3    (The question is read by the reporter as follows:
4   "Question: So your exposure equation only
5   contemplates dermal and minimal inhalation exposure; is
6   that right?")
7    MR. DHINDSA: Objection.
8    THE WITNESS: I was try- -- I was trying to answer
9   your question the best I can.
10    MR. DHINDSA: Objection.
11    THE WITNESS: I considered all the routes of
12   exposure. And since inhalation exposure is very minor
13   and the way that I have addressed my dermal exposure is
14   to overestimate Mr. Hardeman's exposure, I'm very
15   confident that my expo- -- my dose that I calculated is
16   inclusive of any small inhalation exposure he may have
17   gotten. So I don't -- There's not an equation for --
18   That's not -- It's not part of the equation because the
19   equation is -- his exposure is primary dermal. But I
20   did include in- -- the inhalation -- I considered it --
21   to make sure that I -- that I was comfortable that my
22   calculations reflected his total exposure.
23    MS. WAGSTAFF: All right.
24    Q. Your conclusion appears to be in paragraph 12
25   of your report; is that right? Exhibit 2, if you go to

Michael Joseph Sullivan, Ph.D.

Page 42

1  paragraph 12. And what I'm specifically talking about
2  is -- You see paragraph 12? Are you with me?
3      A. I am on paragraph 12 --
4      Q. Okay.
5      A. -- of my opinion, yes.
6      Q. So the second paragraph of paragraph 12 starts
7  with "It is useful." Are you with me?
8      A. Yes.
9      Q. Okay. So the next sentence, "Hardeman's
10  absorbed dose is," that appears to be your ultimate
11  conclusion. Is that fair?
12      A. Oh, I see. "Hardeman's absorbed dose is" --
13  Yes. That's a -- That's a presentation of the
14  quantitative estimate of Mr. Hardeman's dose, which is a
15  result of my calculation. There are obviously other
16  things I've written in here, but for that particular end
17  point, yes.
18      Q. Okay. And so just so that I understand the
19  purpose and the scope of your opinion, would it be fair
20  to say that you -- you -- you have a exposure equation,
21  and you used information you found and that you
22  determined was relevant, and you put that information in
23  your exposure equation, and you came out with this
24  number in paragraph 12. And then you took that number,
25  which in this case was .00000046, and you took that

Page 43

1  number, and you compared it to the doses in the Solomon
2  paper.
3      MR. DHINDSA: Objection.
4      MS. WAGSTAFF:
5      Q. Isn't that what that sentence says?
6      MR. DHINDSA: Objection.
7      THE WITNESS: Yeah. You -- The -- The -- The
8  only reas- -- I -- You've -- You've described my process
9  in very summary fashion, and so I wouldn't want to agree
10  that that describes my entire process because it's more
11  complex than that.
12      But if you're asking about my conclusions, the 4 --
13  the -- the -- that number 00- -- .00000046 milligram per
14  kg-day is my calculated dose for Mr. Hardeman for all
15  his activities considering all routes of exposure. And
16  then in -- look at Section 13. It goes on to say that
17  that dose is likely an overestimate because of the way I
18  pu- -- put my calculations together.
19      MS. WAGSTAFF:
20      Q. I -- I understand that. And I understand that
21  you have -- your process is more complicated than that
22  sentence. But I'm saying when you distill down your --
23  your exposure equation, the whole purpose is to come up
24  with a exposure dose; right? And that -- that's what
25  you're doing.

Page 44

1      A. I would say that is an important a- --
2  conclusion of my -- my opinion. But my opinion is
3  broader than that because there are so many other
4  aspects of -- of -- of coming up with an exposure that
5  are relevant. That's why, for example, as we spoke
6  earlier, I -- I have a discussion of ADME in here
7  because that's an important input into that calculation.
8      Q. I understand that you have all of these moving
9  factors of why you chose to do your exposure equation a
10  certain way. And we will walk through those later.
11      A. Okay.
12      Q. Okay? But for -- for purposes of this
13  question --
14      A. All right.
15      Q. -- your conclusion comes up with a number.
16      A. That is correct.
17      Q. That is your ultimate conclusion, is -- And
18  then you support that number with all -- with your
19  equation.
20      MR. DHINDSA: Objection.
21      THE WITNESS: Yeah. When you use words like
22  "ultimate," it always -- always -- it -- it feels like
23  it's eliminating all the other things I've done. But
24  the purpo- -- But the calculation of dose is a central
25  component of my work.

Page 45

1      MS. WAGSTAFF: Yeah.
2      THE WITNESS: And -- And -- And so -- And that dose
3  is that the end result of that central component is
4  reflected in that number in paragraph 12.
5      MS. WAGSTAFF:
6      Q. Okay. And that -- Good. Now we're on the same
7  page.
8      And what you did was, you took that number, and you
9  compared it to the modeled absorbed doses presented in
10  the Solomon paper; right?
11      MR. DHINDSA: Objection.
12      THE WITNESS: Solomon has a variety of things in
13  his paper. Some of them are biomonitoring based doses;
14  some of them are passive dosimetry doses. And so I did
15  compare to what Solomon presents in his -- his paper.
16      MS. WAGSTAFF: Okay.
17      Q. So why don't you just read -- because maybe I'm
18  not understanding the English language. So why don't
19  you just read that sentence of what you -- how you used
20  the Solomon paper into the record, please.
21      A. You'd like me to read the second sentence --
22      Q. Yes.
23      A. -- of the first paragraph of Number 12?
24      Q. Mm-hmm.
25      A. "Hardeman's absorbed dose is 0.00000046 which

Michael Joseph Sullivan, Ph.D.

Page 46

1    is below the lowest end of the modeled absorbed doses
2    presented in Solomon, reference 17, of .000001 to
3    0.064 milligrams per kg-day."
4        Q.  Okay.  So you took your number that you got in
5    your exposure equation and you compared it to the
6    exposure absorbed doses presented in the Solomon paper;
7    correct?
8        A.  I presented it to -- yes, to what Solomon
9    presents in his paper.  That's correct.
10       Q.  Okay.  So the answer to my question is "yes"?
11       A.  Well, you -- I -- I want to make sure -- I
12   think -- I would say "yes," because I think he does
13   calculate absorbed doses.  So I mean --
14       Q.  I mean, that's what you're saying in the
15   sentence.
16       A.  I understand.  I'm just trying to make sure
17   that I'm ac-- -- being correct in my statement.  The word
18   "abs-" -- I just -- When I looked at the word
19   "absorbed," I just wanted to think through what I --
20   what he calculated because there's two parts.  And so I
21   think that's correct.  He did calculate absorbed doses
22   using two methodologies from other literature, and so I
23   did compare to that.
24       Q.  Okay.  And then the next sentence you say, "It
25   is also useful to compare Hardeman's calculated absorbed

Page 47

1    doses to other published glyphosate doses."
2        Do you see that?
3        A.  I do see that, yes.
4        Q.  What were your other published -- You don't
5    have any cites there.  So what were your other published
6    glyphosate doses that you compared it to?
7        A.  That would be the rest of that paragraph.  And
8    so I cite some things that Solomon has in Figure 3 of
9    his paper, which include some regulatory doses of --
10   called the reference dose or acceptable daily intake.
11       Also Solomon, in his paper, lists the range of
12   animal toxicology study doses, and I -- I compared that
13   as well based on what Hardeman had in that figure.
14       Q.  Okay.  So it's fair to say that -- that the
15   other published glyphosate doses are -- are within the
16   Solomon paper.
17       A.  That's correct.
18       Q.  Okay.  So -- And in the next paragraph, you
19   talk about the Agricultural Health Study, and we've
20   discussed that a little bit.  We may come back to that
21   later.
22       But it's fair to say that -- that that number that
23   you created in your exposure calculator that we
24   discussed, the 00000046, you compared it to the numbers
25   in the Solomon paper, and you compared it to the

Page 48

1    Agricultural Health Study.
2        A.  Well, if I could read what I wrote here, "The
3    dose in this opinion can also be compared to cohorts
4    studied in epidemiological studies of herbicide
5    applicators.  An example of such would be the
6    Agricultural Health Study."
7        So I'm just showing how my dose could be used.
8    And -- And --
9        Q.  But you didn't do that.
10       A.  -- so this -- That's just an example.
11       Q.  Okay.  You said that it can be compared to
12   cohort studies and epidemiology studies of herbicide
13   applicators.  But did you do that?
14       A.  I --
15       Q.  Did you do that step?
16       A.  I did not.
17       Q.  Okay.  You did not.
18       A.  Wait.  Let me -- I want to make sure.
19       There are -- It's possible that within the Solomon
20   paper where he is pulling doses from numerous other
21   studies, there could be some individuals in those
22   studies that are in, for example, the Agricultural
23   Health Study.  And so since I compared to Solomon, I
24   don't want to say there's no comparison to any person
25   who's been in a epi study.

Page 49

1        Q.  That's fair.
2        A.  I personally didn't pick an epi study up and do
3    that comparison, but it is possible that in the
4    Solomon -- in the range of Solomon's paper, there are
5    some epi individuals.  I don't know.  Sitting here today
6    I'm not sure.
7        Q.  Okay.  So the only thing you did was compare it
8    to the Solomon paper.
9        A.  That's correct.
10       Q.  Okay.
11       And if you look at the beginning of paragraph 12,
12   you say, "Compare the calculated absorbed dose of
13   glyphosate for Hardeman to other published applicator
14   doses and other relevant toxicological criteria."
15       Do you see that?  That's your header for
16   paragraph --
17       A.  Oh.
18       Q.  -- 12?
19       A.  That's the title for Section 12, yes.
20       Q.  Okay.  That fits within the -- the discussion
21   we just had.  The only thing, just to sort of drive this
22   home -- The only thing you actually compared your dose
23   calculation to was the Solomon paper.  And that header
24   doesn't change anything?
25       MR. DHINDSA:  Objection.

13 (Pages 46 to 49)

Michael Joseph Sullivan, Ph.D.

Page 50

1    THE WITNESS:  I believe all of the comparisons I
2  made were the comparisons that up to -- were comparisons
3  that are up to criteria presented in the Solomon paper.
4    MS. WAGSTAFF:  Okay.
5    THE WITNESS:  So that's correct.
6    MS. WAGSTAFF:
7    Q.  Let's turn to page 10 of your report.
8  I want to talk a little bit about how you reached
9  your exposure calculation for Mr. Hardeman.  Okay?
10    A.  Okay.
11    Q.  On Number 10, you said that you utilized "an
12  exposure equation consistent with regulatory guidelines
13  and best practices."  Do you see that?
14    A.  Yes, I --
15    Q.  Okay.
16    A.  -- do see that.
17    Q.  Can you tell me which regulatory guidelines
18  your exposure equation is consistent with?
19    A.  You could -- Yes, I can.
20    The federal level, you could look at publications
21  and guidance from the United States Environmental
22  Protection Agency.  And they have a series of documents
23  that are related to this risk assessment work that is to
24  be performed according to their procedures.  It started
25  out related to Superfund risk assessment guidelines

Page 51

1  but -- but is now generally applied across the board.
2    And so there are federal guidelines that discuss
3  the various routes, as we talked about
4  earlier:  inhalation equations, dermal equations,
5  ingestion equations.  And the state of California, also
6  Cal-- published by CalEPA, also has guidance which
7  would describe how they would do -- how an a -- dermal
8  exposure equation would be done.  So my -- my equation
9  is consistent with those two, so those two.
10    Q.  Okay.  Can you pull the -- your list of
11  documents cited and actually show me the regulations --
12    A.  Certainly.
13    Q.  -- please.
14    A.  That looks like that's going to be Exhibit 5.
15  I would point you to References 57, 58, 59 if
16  you're asking about the equation.  And the California
17  EPLay -- EPA Preliminary Endangerment Assessment
18  Guidance Manual, the USEPA Risk Assessment Guidance for
19  Superfund, Volume I and -- Part A, and then Part E,
20  which is Guidance for Dermal Risk Assessment.
21    Q.  Okay.  So I have 57, 58, 59 and then...
22    A.  Those three, when you talk about the equation,
23  which is I --
24    Q.  Okay.
25    A.  -- what I believe you asked --

Page 52

1    Q.  Mm-hmm.
2    A.  -- would be the ones I would refer you to.
3    Q.  Okay.  I was -- If there -- If -- If -- I don't
4  want to narrow my question.
5    On paragraph 10, you -- you cite that your equation
6  is consistent with regulatory guidelines, so I just
7  wanted to -- to know which guidelines you're -- you're
8  referring to when you say it's 5-- your 57, 58 and 59.
9    A.  Right.  And I'm looking now at b.  Let me check
10  and see if -- It looks like I also list 48.  I want to
11  make sure I don't miss something.
12    Ah.  Okay.  Then also Number 48.  I'm looking now
13  at Section 10, paragraph b., which cites -- there's
14  four:  the three I just gave you and also 48.  I -- I
15  did -- I should have looked further up my list of
16  references.
17    Q.  Okay.  I think this is -- We'll mark this as
18  Exhibit 10.
19    (Exhibit 10 identified.)
20    MS. WAGSTAFF:
21    Q.  I think that is what you have marked as 48.
22    MR. DHINDSA:  Do you have a copy?
23    MS. WAGSTAFF:  Yeah.  Let me make sure I have a
24  copy.
25    Q.  Just show me where it -- it -- where in there

Page 53

1  it gives you your -- it talks about equations.
2    This is Number 57.  We'll mark this as 11.
3    (Exhibit 11 identified.)
4    MS. WAGSTAFF:  And I -- We can go off the record if
5  you need to find out where it talks about...
6    Don't go off yet.
7    THE WITNESS:  Well, I -- I don't see the -- and
8  a -- the exact full equation provided in this report,
9  but this does talk about the various parameters that
10  would be considered in thi-- in -- in that equation.
11    And so in this case, I would have been looking at
12  this guidance to make sure that the equation that I was
13  using would be consistent with the par-- the input
14  parameters that -- that would be -- that would be
15  included in an equation.
16    MS. WAGSTAFF:  Okay.
17    Q.  So this number -- Reference Number 48 does not
18  include anything about equations; is that right?
19    A.  No.
20    MR. DHINDSA:  Objection.
21    THE WITNESS:  What I just said was that this
22  equation actually do-- this par-- paper does because
23  it talks about the parameters that would be included in
24  a -- a -- a valuation of dermal exposure.  And -- And so
25  looking -- This would -- This was important for me to

Michael Joseph Sullivan, Ph.D.

Page 54

1  look at because I want -- I would want to see the
2  aspects of dermal exposure that the Cal- -- California
3  EPA would consider important and -- and that would be
4  put into an equation.  So while --
5      MS. WAGSTAFF:  Okay.
6      THE WITNESS:  -- the --
7      MS. WAGSTAFF:
8      Q.  It doesn't talk about equations.  It --
9      A.  Well, it does talk about the parameters that go
10  into an equation.  It's -- This is for use by risk
11  assessors and exposure experts like myself.  And so this
12  is an important -- This does, to me, relate exactly to
13  the equation because it talks about what's important to
14  be in the equation.
15      Q.  Okay.  So this was really important to you
16  in -- in creating your equation?
17      A.  It was one of the documents I used to
18  understand -- make sure that I was using equations
19  consistent with various regulatory guidelines.
20      Q.  Okay.  And then let's talk about Exhibit 11,
21  which --
22      A.  Is this going to being marked?
23      THE REPORTER:  (Indicating.)
24      MS. WAGSTAFF:  Okay.
25      Q.  -- which --

Page 55

1      A.  I'm sorry.
2      Q.  -- is Reference Number 57.
3      And you can tell me how you used --
4      A.  Sure.
5      Q.  -- this document.
6      A.  Got messed up here.
7      This is a...
8      Q.  Show me where it talks about equations about
9  dermal exposure --
10      A.  Certainly.
11      Q.  -- that you think are relevant to this case.
12      A.  (Reviews document.)
13      There are a lot of pages here, so I'll -- I'll just
14  try and flip through to see if --
15      Q.  No, no.  Take your time.  I want to know
16  exactly what part of that exhibit you think is relevant
17  to Mr. Hardeman's case.
18      A.  That's a much broader question than you first
19  asked, and that's a different question because there's a
20  lot of things in here which are relevant to how exposure
21  equations are put together.
22      For example, the development on page 9 of a
23  conceptual site model is -- is a -- you start the
24  process with an understanding of how exposure might
25  occur before you even start developing an equation.  And

Page 56

1  an example would be on page 11.  So -- And that's
2  something that I do as well.  I -- I -- I put together a
3  conceptual site model for a site to help -- help guide
4  me in pulling together an ex- -- an exposure equation.
5  So that -- your second question is far broader than the
6  first question of -- of just an e- -- just an equation.
7      Q.  Okay.  Well, then let me -- let me make it --
8      A.  Which -- Which one should I...
9      Q.  -- get -- go for the more narrow one.
10      Show me where --
11      A.  Okay.
12      Q.  -- it gives an equation about dermal exposure.
13      A.  If you look at page 56, there is a generic
14  exposure equation for contact -- it's actually pages 56
15  and 57.  There are generic exposure equations for
16  contacts to soil.  And so you would -- These parameters
17  are not exactly the same as for Mr. Hardeman because
18  you -- as a risk assessor I would take the generic
19  equation and apply it to the specifics of the case.
20      Mr. Hardeman was exposed to a liquid, not a solid.
21  But the concept, for example, of how much solid might
22  get on the skin is exactly the same concept as to how
23  much liquid could get onto the skin.  And so what I
24  would do is, I would apply these -- apply an equation in
25  a way that is -- is correct for the situation that I'm

Page 57

1  evaluating.  In this case it would be dermal exposure to
2  a liquid.
3      Q.  Okay.  So page 56 of -- of your reference cited
4  number 57; is that correct?
5      A.  For the equation, I would ci- -- I would say 56
6  and 57 --
7      Q.  Okay.
8      A.  -- are both equations that include dermal
9  aspects of exposure.
10      Q.  Okay.  But not to pesticide exposure; correct?
11      A.  This is generic guidance that is applicable to
12  regar- -- to whatever the exposure is.  If it's a -- It
13  doesn't have to be -- It's not -- It's not -- It's
14  generic for all -- all types of exposure.  The
15  anticipation would be that a person would apply this in
16  a -- in a specific way to the eval- -- to the situation
17  being evaluated.
18      Q.  Okay.  So other than your expert report --
19  Well, let's just turn to your exposure equation real
20  quick.  It's Exhibit 7.
21      This is your exposure equation; right?
22      A.  I'm just about to get there.  Okay.
23      Exhibits -- What you have given me as Exhibit 7,
24  I'm assuming what -- what you've done is indeed copied
25  what I put in my -- my opinion.  So this looks like the

15 (Pages 54 to 57)

Michael Joseph Sullivan, Ph.D.

Page 58

1  table that I -- I would have provided for Mr. Hardeman.
2      Q. Okay. Well, look at it, because I don't want
3  you to think I messed with it.
4      Is that your exposure equation?
5      A. I say it looks like it. I would have -- You
6  know, it -- I'm assuming that what you're giving me is
7  my report. I -- I don't have -- I did not bring a copy
8  of -- my own copy of the report, but it -- it loo- -- I
9  said it looks like it.
10     I -- I -- I don't know how you want me to -- How am
11 I supposed to confirm something that I don't have in
12 front of me that's my own that -- when you're providing
13 a copy? So I -- I'm agreeing with you; it looks like
14 it. But are you asking me to --
15     Q. I'm asking you if this is --
16     A. If this --
17     Q. -- your exposure --
18     A. If this is --
19     Q. -- equation. If you can't tell me, then --
20     A. No.
21     Q. -- that's fine.
22     A. You're asking me --
23     Q. I'll move on.
24     A. -- if this is from my report.
25     Q. Okay. Is that your exposure --

Page 59

1      A. It --
2      Q. -- equation?
3      A. It looks like it.
4      Q. Okay.
5      A. I've ask- -- answered that.
6      Q. Okay. So you decided to -- to determine the
7  average daily dose; is that right --
8      A. The --
9      Q. As the primary exposure metric.
10     A. There are two metrics in here. One of them is
11 the average daily dose, which is a very typical exposure
12 metric for exposures that happen over a long period of
13 time. And there's also a single-day exposure that I
14 calculate in case somebody wanted to compare to other
15 single-day exposures.
16     Q. Okay. And what -- And that's what you call the
17 "Largest Single Day exposure"?
18     A. That's correct, because we don't know if a
19 exposure during mixing happened on a day when exposure
20 to drift occurred. There's no -- There's no --
21 Mr. Hardeman provided no details about that. He just
22 talks about sometimes he felt drift, and sometimes he
23 got it on his hand. And that's as much detail as he
24 provided.
25     So to be conservative, I provided this value

Page 60

1  assuming that he had both exposures on the same day.
2  That's why I call it the largest dose because I would
3  be -- that would be -- that would be the worst case,
4  both -- both of them happening at one -- in the same
5  time.
6      Q. So did you have all the information you needed
7  to complete this equation?
8      A. I'm not sure. I don't understand the question.
9      Q. Well, a couple different times you've said
10 Mr. Hardeman didn't provide certain amounts of
11 information or you don't know certain amounts of
12 information. Did you have all the information you need
13 to complete this equation?
14     A. Yes.
15     Q. So it's okay to sort of guess or do
16 assumptions?
17     MR. DHINDSA: Objection.
18     THE WITNESS: Well, it's not a guess. I'm basing
19 my -- this equation on -- This -- First of all, this
20 equation comes out of the regula- -- is consistent with
21 what's in the regulatory literature. And I have been
22 developing exposure assessments for a long time. So
23 this is an area I'm very experienced in.
24     When Mr. Hardeman says something, I look -- I try
25 and take that at face value and put that into the

Page 61

1  equation in a way that makes sense.
2      For example, he -- he -- and -- and he -- and so --
3  so yes. I'm com- -- I'm comfortable with all these
4  values. And not only that, I'm comfortable that these
5  values overestimate his exposure, because when there's
6  any confusion in the -- in the de- -- in his deposition,
7  I take the larger number.
8      MS. WAGSTAFF: Okay.
9      Q. So we'll talk about the largest single-day
10 exposure in a minute.
11     How -- So -- So your main primary exposure
12 metric -- or one of your two main primary exposure
13 metrics is the average daily dose; right?
14     A. The -- I present the average daily dose. I
15 believe that's a good -- That's a reason- -- That's an
16 important estimate of his expo- -- excuse me -- (clears
17 throat) -- of his exposure.
18     Q. Okay. How is the average daily dose reflective
19 of a cancer risk?
20     MR. DHINDSA: Objection.
21     THE WITNESS: Now you're asking me to do something
22 in the realm of causation and risk calculations which
23 are outside the scope of my work.
24     MS. WAGSTAFF: Okay.
25     Q. And I presume that's the same answer -- Well,

16 (Pages 58 to 61)

Michael Joseph Sullivan, Ph.D.

Page 62

1    I'll just ask the question: How is the largest
2    single-day exposure that you calculate reflective of
3    cancer risk?
4        MR. DHINDSA: Objection.
5        MS. WAGSTAFF:
6        Q. Same answer?
7        MR. DHINDSA: Objection.
8        THE WITNESS: Same answer. You're -- You're asking
9    a causation question, which is outside the -- the scope
10   of we've -- we've defined for my opinion.
11       MS. WAGSTAFF: Okay.
12       Q. And so when we're looking at this chart --
13   You created this chart; correct?
14       A. Yes.
15       Q. Okay. It looks like your average daily dose --
16   I- -- If you -- I just want to make sure I understand
17   it, the chart itself, just the -- the actual function of
18   it. That looks like the equation at the top?
19       A. The equation is presented --
20       Q. Starts with --
21       A. -- presented above the parameters.
22       Q. Okay.
23       A. That's correct.
24       Q. Okay. So let's just focus right now on the --
25   the top -- okay? -- the actual equation. We'll -- We'll

Page 63

1    talk about the parameters in a minute. Okay?
2        A. Okay.
3        Q. Are you following me?
4        A. I am following you, yes, ma'am.
5        Q. "ABS" is the absor- -- you describe is the
6    "absorption factor of glyphosate through the skin."
7        In your equation, it is indicated as having the
8    unit "%." Is that correct?
9        A. (No response.)
10       Q. Or is that a --
11       A. I --
12       Q. -- typo?
13       A. I didn't put the percent in the equation. I
14   just using that to be a -- just to show the -- I don't
15   know what I -- what I'm trying to say.
16       I used .02, which is 2 percent. And I ref- --
17   And -- And so I -- It's -- It's not -- .02 is not an
18   exact percent --
19       Q. I'm not talking --
20       A. -- as --
21       Q. -- about --
22       A. -- as -- as --
23       Q. Keep -- Just keep up top of the --
24       A. Okay.
25       Q. -- equation.

Page 64

1        Remember, I started this question by saying let's
2    talk about your actual equation; right? Because the
3    bottom part is just how you fill in that equation; isn't
4    that correct?
5        A. Correct.
6        Q. Okay. So let's just stay up top and talk about
7    your actual equation. Okay?
8        A. Let's do that.
9        Q. Okay. So the ABS is listed as a "%"; right?
10       A. Correct.
11       Q. Okay. Is that correct?
12       A. It's -- It's correct in that equa- -- in that
13   top equation because it's a way to be descriptive of
14   what I've done.
15       Q. Okay.
16       MR. DHINDSA: Is this a good time for a break or
17   whenever is appropriate?
18       THE WITNESS: How long have we gone?
19       MS. WAGSTAFF: Maybe just a few more minutes.
20       MR. DHINDSA: Sure.
21       MS. WAGSTAFF:
22       Q. So now when you go down to the ABS in the
23   parameters -- and you started to talk about this -- that
24   is a proportion? Or is that a percentage? The .02.
25       A. .02 is rep- -- is numerical representation of

Page 65

1    2 percent.
2        Q. So the calculation doesn't really work if it's
3    a percentage. Or does it?
4        MR. DHINDSA: Objection.
5        THE WITNESS: The calculations work just fine. The
6    values that I -- that -- what I -- You've -- You've
7    asked me to start at the top, and that's --
8        MS. WAGSTAFF: Mm-hmm.
9        THE WITNESS: -- a descriptive -- that's a
10   descriptive ex- -- explanation of my equation so someone
11   would know what I'm putting in there.
12       And so then what I put in the val- -- bottom in the
13   table and in the actual calculation would have been .02.
14   I could have put in 2 divided by 100, but that's --
15   it -- it's not necessary. So I wanted to show that .02
16   is 2 percent. And that's based on -- That's the value
17   for the ABS up -- up top.
18       MS. WAGSTAFF: Okay.
19       Q. But you did it differently when you're talking
20   about "D-adj"; right? When you're talking about "D-adj"
21   up top, you did "%"; right? And then you have a percent
22   down below.
23       A. In that case, it looks like I have a percent
24   down below. Whether that -- I'd have to look and see
25   how -- Yes. That's correct. That's correct.

17 (Pages 62 to 65)

Michael Joseph Sullivan, Ph.D.

Page 66

 1     Q. So you did it differently.
 2     MR. DHINDSA:  Objection.
 3     THE WITNESS:  I put a different nu- -- I -- I
 4  presented percentage differently in those two lines,
 5  yes, ma'am.
 6     MS. WAGSTAFF:  Okay.
 7     Do you have like ten more minutes in you, or do you
 8  want to take a break?
 9     THE WITNESS:  I -- Are we -- Are we -- We're going
10  to come back to this?
11     MS. WAGSTAFF:  Mm-hmm.
12     THE WITNESS:  Okay.  That -- Probably a good time
13  just to stand up and stretch just a --
14     MS. WAGSTAFF:  Okay.
15     THE WITNESS:  -- couple minutes --
16     MS. WAGSTAFF:  Yeah.
17     THE WITNESS:  -- if that's okay.
18     MS. WAGSTAFF:  Mm-hmm.
19     THE WITNESS:  All right.  Thank you.
20     THE VIDEOGRAPHER:  Going off the record?
21     MS. WAGSTAFF:  Yeah.
22     THE VIDEOGRAPHER:  Going off the record.  The time
23  is 2:29 p.m.
24     (A recess is taken.)
25     THE VIDEOGRAPHER:  We have concluded Media

Page 67

 1  Number 1.  This marks the beginning of Media Number 2.
 2  The time on the monitor is 2:41 p.m.
 3     MS. WAGSTAFF:
 4     Q. Dr. Sullivan, looking at Ex- -- Exhibit 7,
 5  which is your exposure equation -- and we've talked
 6  about how the top of that chart is the actual equation;
 7  correct?
 8     A. It represents the equation I used, yes.
 9     Q. Okay.  Will I find that equation as written
10  anywhere in peer-reviewed literature?
11     A. I -- Exactly as written on that page, I don't
12  know how to answer that because peer-reviewed literature
13  is -- is huge.  And so I -- I -- I -- I wouldn't want to
14  suppose you would or would not.
15     However, as we've already identified in regulatory
16  guidance, you would find a dermal exposure equation.
17  And what is meant -- what -- what at-risk assessors and
18  exposure experts do is they apply those basic equations
19  to the specific situation.
20     Q. Okay.  Strike as nonresponsive.
21     I'm asking you if I would find that exact equation
22  anywhere in peer-reviewed literature.  And my
23  understanding is that your response is you don't know.
24     MR. DHINDSA:  Objection.
25     THE WITNESS:  If you're asking me anywhere in the

Page 68

 1  peer-reviewed literature, there's no possible way I
 2  could know what's in the entire peer-reviewed
 3  literature.
 4     MS. WAGSTAFF:  Okay.
 5     THE WITNESS:  So the answer is "no."
 6     MS. WAGSTAFF:
 7     Q. Have you looked for that equation anywhere in
 8  the peer-reviewed literature?
 9     A. It wouldn't be necessary to do that because, as
10  I've explained, I utilize a procedure which is based on
11  standard regulatory and risk assessment and exposure
12  assessment practices.
13     Q. So the answer is "no."  You haven't looked for
14  that equation in peer-reviewed literature.
15     A. I did not because there's no reason to.
16     Q. Okay.  So the answer is "no."
17     A. I think I answered it.
18     Q. Okay.
19     A. There's no reason to.  I -- I have not looked.
20     Q. Okay.  Did you create this equation?
21     A. If -- If you're saying did I create -- I -- I
22  typed this equation into the Excel spreadsheet.  I -- I
23  developed this equation based on standard regulatory
24  guidance and other -- and reg- -- and -- and
25  descriptions of re- -- of dermal exposure dose

Page 69

 1  calculations.  So, yes, I put this together to reflect
 2  what's actu- -- what actually happened -- what
 3  Mr. Hardeman actually did.
 4     Q. Prior to being retained in the Roundup
 5  litigation, have you ever utilized this equation before,
 6  this specific equation before?
 7     A. When you -- So when you say "specific," I've
 8  used dermal exposure equations like this thousands of
 9  times in my career.  Did I use this exact one?  I'm --
10  I'm thinking about an exposure of dermal -- dermal
11  exposure to liquid.  And I would probably say "yes"
12  because I've done exposure to -- of individuals taking
13  showers and baths and swimming in contaminated water.
14  And so the -- the very same type of parameters would be
15  in those equations.
16     Q. So your answer is "yes."  Prior to being
17  retained in this litigation, you have used this exact
18  equation before.
19     MR. DHINDSA:  That's actually asked and answered.
20     THE WITNESS:  It's the word "exact" which worries
21  me because, you know, did I -- did I have -- you know,
22  did I call it exactly the same parameters?  I -- I don't
23  recall.  Did I use the same parameters of dermal uptake
24  percentage and time and body weight and average of time?
25  Yes.  Those are standard.  And so I would -- This --

18 (Pages 66 to 69)

Michael Joseph Sullivan, Ph.D.

Page 70

1   This is a standard equation which I would -- which I've
2   used in this case and I've used throughout my entire
3   career.
4         MS. WAGSTAFF:
5         Q.  But this --
6         A.  There's nothing --
7         Q.  -- this is --
8         A.  -- unique --
9         Q.  -- this is --
10        A.  -- about this equation that's different from
11  the -- There's nothing new or unique about this
12  equation.  It's specific -- It's an application of a
13  standard process to Mr. Hardeman.
14        Q.  Okay.  But there -- you've -- But this exact
15  equation is nowhere in the peer-reviewed literature that
16  you -- you haven't looked for it.  But I'll represent to
17  you that it's not in the peer-reviewed literature.
18        That wouldn't surprise you; would it?
19        MR. DHINDSA:  Objection.
20        THE WITNESS:  I'd never -- You can't -- Nobody can
21  look at the entire peer-reviewed literature to answer
22  that question, so...
23        MS. WAGSTAFF:  Okay.
24        Q.  So you keep saying this is a standard equation,
25  but in fact it's not.  You created this equation for

Page 71

1   this litigation.
2         A.  I --
3         MR. DHINDSA:  Objection.
4         THE WITNESS:  That -- That's a -- That's not e- --
5   what I have said.  What I've said is that I went to --
6   I've utilized a standard procedure for dermal exposure
7   to chemicals.  And have I pointed out one in the
8   Preliminary Endangerment Assessment.  And then what is
9   done is that that equation is then applied to the
10  specifics of the case, of the -- of the person I'm
11  looking at exposure.
12        And so I -- This is no different -- This equation
13  is no different than what's in the PEA.  This just has
14  the Ha- -- specific components for Mr. Hardeman.
15        It's not --
16        Q.  Okay.
17        A.  -- some- -- It's not something I made up.  It's
18  something that is -- is a application of a standard
19  practice.
20        Q.  Okay.  I think I have your opinion on that.
21        So I would ask that the e- -- the exposure equation
22  used -- ex- -- exposure equations that you have used in
23  the past that you said are -- are like this one, I would
24  like to see those equations.  You can give them to your
25  attorney, and then they can give them to me.

Page 72

1         A.  I --
2         MR. DHINDSA:  Objection.
3         THE WITNESS:  -- don't have --
4         MS. WAGSTAFF:
5         Q.  I request those.
6         You don't have any?
7         A.  I'm not a -- I -- You made a request.  I...
8         Q.  Do you have any?
9         A.  I -- Do I have any of those equations?
10  Probably not.
11        Q.  Okay.  You said -- You testified you've done
12  thousands of exposure equations --
13        A.  Sure.
14        Q.  -- right?
15        A.  I have done -- Yes.
16        Q.  And you don't have any of the one- -- any
17  exposure equations that you've used in the past that
18  relate to liquid.
19        A.  I -- I explained to you that I probably had
20  done with liquid in -- in contaminated water, either
21  swimming -- my recollections are swimming, showering and
22  bathing.  But those would have been at -- earlier in my
23  career.  I wouldn't have those reports anymore.  I --
24  I -- I'm no longer -- I -- Now -- My work now is full
25  time as -- as a professor, and I don't keep all those

Page 73

1   old reports from -- from years ago.
2         Q.  So have you ever done an exposure equation for
3   pesticides?
4         A.  Yes.
5         Q.  Okay.  So those pesticides would have been
6   liquid; correct?
7         A.  It depends on the scenario.  Sometimes they can
8   be in soil.  Sometimes they could be liquid.  Sometimes
9   they can be powder.  It would depend on the scenario
10  that you're -- you were doing.  But in each of those
11  scenarios, I would use the same equation, and then I
12  would tailor that equation to the specifics.
13        So if it was powder, I would do based on a -- a
14  solid.  If it was in soil, I would use a soil-based type
15  of equation.
16        Q.  So do you have any of your exposure equations
17  for pesticides that I could have?
18        A.  Those would have been from years ago, and I
19  don't have those reports anymore.
20        Q.  Okay.  So you don't have any of your pesticide
21  exposure equations, and you don't have any exposure
22  equations you've done that relate to liquid -- any
23  liquids; is that correct?
24        A.  Not that I'm sitting here today recall because
25  those would have been done years ago.  And -- And

19 (Pages 70 to 73)

Michael Joseph Sullivan, Ph.D.

Page 74

1    there's no reason to keep them because they're based
2    on -- this is all based on standard procedures.
3        Q. So looking at your exposure equation, is the
4    idea that you -- one, two, three. Three columns over to
5    the right it says "Typical Spraying Activities -
6    Guala-" -- "Gualala," "Gualala." That's the first
7    property Mr. Hardeman lived in; correct?
8        A. That's what that represents, yes, ma'am.
9        Q. And then the second one is his spraying
10   activities at the 56-acre Forestville property; correct?
11       A. That's correct.
12       Q. Is the idea that if you multiply going down,
13   you would get the average daily dose? Or how do you get
14   the average daily dose from those numbers?
15       A. In -- In general, if you would apply these
16   numbers in the way that the equation at top
17   represents -- although I didn't -- that is just a -- a
18   typing of the equation. Embedded in the spreadsheet is
19   the same equation as an Excel calculation. But you --
20   It's not a simple multiplication because, as you can see
21   at the top of page, there's bo- -- there's a
22   multiplication of various parameters, a division and
23   then multiplication of several parameters in the
24   denominator.
25       So that -- The equation at the top represents the

Page 75

1    type of calculation that was done, which is more complex
2    than a simple multiplication.
3        Q. And you've checked these numbers. And
4    obviously before submitting them to your -- to Monsanto
5    and tendering them in a federal litigation, you've
6    checked them, and they're -- they're accurate?
7        A. I believe these numbers are accurate, yes.
8        Q. Okay. Which parameter has the biggest effect
9    on the results, if any?
10       A. How would you -- I'm not sure what you mean by
11   "biggest effect."
12       Q. Like which one can swing the -- the average
13   daily dose the most?
14       MR. DHINDSA: Objection.
15       THE WITNESS: They all are important. And if
16   you're talking about a change, if you change any -- if
17   you double any parameter, any of these, you would result
18   in a doubling of the calculated dose. So they all --
19   Because it's a mathematical equation, if you would
20   change any of these, that change, regardless of which
21   parameter you change to the same amount, would have
22   the -- mathematically the same effect on the result.
23       MS. WAGSTAFF: Okay.
24       Q. So let's look at the "D-adj."
25       A. Okay.

Page 76

1        Q. That is the -- Does that mean dose --
2    What's "adj" mean?
3        A. "Adjusted."
4        Q. "Dose adjusted." "Percentage of exposure days
5    when exposure occurred."
6        So does that mean that on some days when
7    Mr. Hardeman sprayed, you do not think he encountered
8    any exposure?
9        A. According to Mr. Hardeman's own description of
10   his spraying, he felt that he only was exposed a small
11   number of days when he sprayed. And so I took those
12   number of days and doubled them, approximately, into
13   this calculation to make sure that I overestimated the
14   exposure that he would have attributed himself to his
15   own activities.
16       Q. So yes, that means there -- in your calculation
17   you have -- I'm not asking you why. I'm asking you if
18   this is what it means and if I understand it.
19       So what this does is, it says that there is a
20   percentage of days.
21       What is the 5 percent? Does that mean 5 percent of
22   the time he was exposed?
23       A. (No response.)
24       Q. 5 percent of the spraying days he was exposed?
25   Or what does -- how does -- what does that 5 percent

Page 77

1    represent?
2        A. I co- -- I would -- I would like to explain it.
3    Can I go to my --
4        Q. Yeah.
5        A. Okay. Because I do describe this in my
6    opinion.
7        Q. Mm-hmm.
8        A. And I'm going to read from pa- -- on page 11 --
9        Q. Mm-hmm.
10       A. -- Section 10.c., Roman numeral --
11   da-da-da-da-da -- where did I put that? Roman
12   numeral viii on page 11.
13       Q. Mm-hmm.
14       A. In Mist- -- In his deposition, Mr. Hardeman
15   reports up to -- actually he says less -- like a -- a
16   number below 10 -- up to 10 days he feels he was
17   exposed. He doesn't specify if those exposures were
18   from -- where -- how those exposures occurred. And so I
19   assigned to him the largest number that he provided,
20   which was 10. The -- So I -- I said 10 -- let's use 10
21   spillage days, which is during mixing, and 10 drift
22   exposure days, which is during spraying. And then I
23   bumped those up to 5 percent, which is essentially 19 --
24   almost 20 -- 19 days of exposure for each type. So
25   while he cited about 10 days of exposure, I -- I doubled

20 (Pages 74 to 77)

Michael Joseph Sullivan, Ph.D.

| | |
|---|---|
| Page 78 | Page 80 |

Page 78

1  that essentially in my calculations. But it's based on
2  my reading of his -- of his own deposition.
3      Q. So in his deposition, he testified that he
4  received exposure on his hands -- right? -- when he was
5  mixing?
6      A. He says that did occur sometimes when he was
7  mi- -- when he was mixing. Yes, that's correct.
8      Q. And then he testified that he sometimes
9  could -- could -- he remembers getting inhalation
10  exposure; right?
11      A. I believe he said that he felt drift on his --
12  on his face. I -- I don't know exactly that's what he
13  said, but he recalls being exposed to drift. I -- If we
14  want to be specific, we should probably pull out his
15  deposition.
16      Q. I'm just wondering what you base these on. I
17  mean, if you -- yeah. If you -- it's not in your
18  report, you don't remember, then I guess that's your
19  opinion. But I don't have his deposition on me.
20      A. Okay. I'll -- I did explain --
21      Q. So --
22      A. -- it. I can explain --
23      Q. No. I un- -- I understood you.
24      A. Okay.
25      Q. And so is it your opinion that 95 percent of

Page 79

1  the time that he sprayed he had no exposure to Roundup
2  or glyphosate?
3      A. Based on what he said, I have -- he said
4  actually less than that. But I -- I bu- -- doubled the
5  exposures that he specified, and so that would calculate
6  out to about -- it's -- if you take 100 and subtract
7  5 percent, that would be 95 percent, yes.
8      Q. So do you think he knows every time he has
9  exposure?
10      A. I would assume he knows when he spills it on
11  his hand, yes.
12      Q. Okay.
13      A. And I would assume he knows when he feels
14  drift.
15      Q. Okay.
16      A. And so I've taken Mr. Hardeman at face value,
17  utilized his description of what he did and -- and then
18  bumped those numbers up in my calculations.
19      Q. Okay. So if he didn't feel the drift or if he
20  didn't have -- feel the chemical on his hand, it's your
21  opinion that he didn't have exposure?
22      MR. DHINDSA: Objection.
23      THE WITNESS: No. I'm saying that I based it on
24  what he said when he was exposed. I -- Beyond what he
25  said, I can't -- I can't speculate.

Page 80

1      MS. WAGSTAFF: Okay.
2      Q. So what I'm -- what I'm asking you and --
3  and if -- if someone goes and they spray Roundup
4  every day -- this is a hypothetical; okay? Someone goes
5  and they spray Roundup every day, and they never feel it
6  on their face and they never spill it on their hands, is
7  it your opinion that they have no Roundup exposure?
8      A. Is it possible to have no Roundup exposure if
9  you are utilizing it in a -- in -- in a way which is --
10  with good equipment and understanding the -- the weather
11  and the wind patterns and all that? Yes. It is -- That
12  is possible. But I -- again, I base it on what he said,
13  and I -- and I increased it even from there.
14      Q. Right. So it's your opinion that unless
15  Mr. Hardeman felt the chemical in a drift or unless he
16  spilled the chemical on his hands, it's your opinion
17  that he had no exposure.
18      MR. DHINDSA: Objection.
19      THE WITNESS: Yeah. I'm basing it on what he said.
20  He said --
21      MS. WAGSTAFF:
22      Q. I understand that.
23      A. -- there was no exposure.
24      Q. So I'm saying that --
25      A. That's -- That's what it's based on, what he

Page 81

1  said. I -- And I don't have to --
2      Q. Well, actually --
3      A. -- go beyond that because --
4      Q. -- the questions were, "When did you feel the
5  inhalation" and "When did you spill it on your hands?"
6  No one ever asked him, "How many days were you exposed?"
7  Or did they?
8      A. You know, we would have to go back to the
9  deposition. I bel- -- I believe he specified a number
10  of days.
11      Q. Okay.
12      A. But I don't -- But un- -- But unless we look at
13  it, we'd have to -- that would be the basis.
14      Q. Okay. So I just want to be very clear. And --
15  And the scope of your opinion is, you are -- you're --
16  you're determining -- your entire exposure calculation
17  is based on his amount of exposure; correct?
18      MR. DHINDSA: Objection. Objection.
19      THE WITNESS: When you --
20      MS. WAGSTAFF:
21      Q. I mean, if that number is wrong --
22      A. When you use --
23      Q. -- the whole equation is wrong.
24      A. When you use words like "entire," it al- --
25  that's why I hesitate.

Michael Joseph Sullivan, Ph.D.

Page 82

1      My -- My exposure -- The dose I calculated from
2  Mr. Hardeman is based on many things:
3      It's based on his description of what he actually
4  did.
5      It's based on seeing the property.
6      It's based on the properties of glyphosate.
7      It's based on the toxicolog- -- toxicological
8  literature.
9      And then, all that wrapped together, I bumped those
10  exposures even higher to account for if there's
11  uncertainty in any of those values that I'm unaware of
12  at this point.  And so all that is part of my process of
13  calculating the dose.
14      I took Mr. Hardeman at what he said.  If he said he
15  wasn't exposed, I believed him that he wasn't exposed.
16  And when he said he was exposed, I believed him --
17      Q.  And --
18      A.  -- when he said --
19      Q.  And --
20      A.  -- he was exposed.
21      Q.  -- so it's your opinion that Mr. Hardeman knows
22  every single day that he was exposed.
23      MR. DHINDSA:  Objection.
24      THE WITNESS:  I have no reason to believe -- Since
25  he described what he did and he was very clear in his

Page 83

1  deposition about when he felt he was exposed, I have no
2  reason to believe that in the -- that in -- that --
3  that -- not to -- not to take him at -- at his word.
4      MS. WAGSTAFF:  Okay.
5      Q.  And again, just to drive this point home,
6  Mr. Hardeman was only exposed, in your mind, when he --
7  and I don't want an answer that that's what he testified
8  to.  What I'm saying:  In your mind, Mr. Hardeman, after
9  26 years of spraying, only had exposure when he felt it
10  on his skin or when he poured the chemical on his skin.
11      MR. DHINDSA:  Objection.
12      THE WITNESS:  I --
13      MS. WAGSTAFF:
14      Q.  You didn't calculate any other exposures into
15  your equation.
16      MR. DHINDSA:  Objection.
17      THE WITNESS:  Now we have multiple questions on the
18  table.  Could we break those up?
19      MS. WAGSTAFF:
20      Q.  Sure.
21      A.  Okay.  Can you ask me the first one again?
22      Q.  No.  I'll start all over.
23      A.  Okay.
24      Q.  The only exposure that is in your equation are
25  the times when Mr. Hardeman felt the drift or spilled

Page 84

1  chemicals on his hands.  Those are the only exposures
2  that are in your equation.
3      MR. DHINDSA:  Objection.
4      MS. WAGSTAFF:
5      Q.  That's a "yes" or "no."
6      A.  No.
7      Q.  Okay.  What other exposure is in your equation?
8      A.  I have increased the value in -- of his
9  reported exposures to account for that, any uncer- --
10  there may have -- if there's any uncertainty in his
11  own -- in his own -- in his own words describing when --
12  when he was exposed.  And he was pretty clear -- he was
13  very clear in his deposition about what he felt.  And so
14  I don't -- so it's not just what he said.  I've taken
15  what he said, and I've increased it.
16      In addition to increasing just the number of days,
17  if you go down the list of parameters there's a whole
18  lot of other parameters that are increased.  And so if
19  you make an argument that "Well, he was exposed not 10
20  days but 20 days," doesn't matter.  I've already
21  accounted for that.  "It wasn't 20 days; it was 40
22  days."  Doesn't matter.  These calculations are
23  sufficiently overestimates that if he were to change his
24  opinion about his own exposure that he described,
25  these -- these numbers are -- are overestimates across

Page 85

1  the board.  And so that's why I'm confident in using the
2  values that I have, based on his own description.
3      Q.  So when would it make a difference?  When --
4  When -- When would it make a difference and his exposure
5  was off?  You say it wouldn't matter if it's 20 days; it
6  wouldn't matter if it's 40 days.  When would it make a
7  difference?  100 days?
8      MR. DHINDSA:  Objection.
9      THE WITNESS:  I'd have to do the calculation.  I --
10  I couldn't tell you exactly which -- which -- which --
11  which parameter would have to be changed.  But I can say
12  that my numbers are at least a factor of 10 over and
13  probably more than that.  And so you could take a
14  parameter and -- at least one parameter and multiply it
15  by 10, and I still think my -- my -- my exposures would
16  be overestimates.  So there's --
17      MS. WAGSTAFF:
18      Q.  Well, let's --
19      A.  Tha- -- That -- That -- I've built in a -- a large
20  amount of conservatism overestimates into this process
21  on purpose to feel confident of hi- -- what his exposure
22  would -- the -- the maximum he could have been exposed.
23      Q.  Okay.  So the facts of the actual case don't
24  matter to your equation?
25      MR. DHINDSA:  Objection.

22 (Pages 82 to 85)

Michael Joseph Sullivan, Ph.D.

Page 86

1    THE WITNESS: That's -- Actually I've said exactly
2 the opposite. The facts of the case were the basis for
3 my equation.
4    I have looked at the -- what -- I have read
5 carefully what Mr. Hardeman said and how long he sprayed
6 and how he sprayed and how much he sprayed and where he
7 sprayed and did a site visit and walked that area to get
8 a sense of if what -- if how he described it matched the
9 loca- -- matched the -- the property. And all those
10 facts are built into here. It's not a -- It's not a
11 guesstimate. It's -- It's a -- It's a -- It's a
12 calculation based on not only my own experience of doing
13 this but -- but Mr. Hardeman's own words.
14    MS. WAGSTAFF:
15    Q. And you're an exposure expert; right?
16    A. I would consider myself an expert in the field
17 of exposure to -- yes.
18    Q. Yeah. I mean, you -- you know a lot about
19 exposure and exposure to pesticides; right?
20    A. I have studied lots of different chemicals
21 and -- in my career, and I consider myself an ex- --
22 exposure expert, yes.
23    Q. So you're an exposure expert for -- for
24 pesticides; right?
25    A. Pesticides are one of the chemicals that I

Page 87

1 would -- I feel comfortable putting together an exposure
2 estimate that reflects the exposure of an individual,
3 yes.
4    Q. Yeah. So you're an expert in that; right?
5    A. If you -- When you use the broad term
6 "pesticides," I -- I don't want -- I -- there -- could
7 there be a pesticide I haven't worked on? Of course.
8 But in this case, I am comfortable as an expert in the
9 field of exposure, studying the glyphosate literature,
10 putting together -- and ex- -- and Mr. Hardeman's own
11 information to put together an e- -- a defensible and --
12 but yet consi- -- overestimate of what he was exposed
13 to.
14    Q. So as an expert in pesticide exposure, it's
15 your opinion that people always know when they're
16 exposed to pesticides.
17    MR. DHINDSA: Objection.
18    THE WITNESS: That question is so vague it's
19 impossible to answer. For example, there -- what if
20 there's pesticides -- you know, there's -- what if
21 there's DDT, which is a pesticide, in fish that I eat
22 off the coast of California? I wouldn't know that. And
23 so, you -- you -- you're -- you know, it's such a broad
24 question it's unanswerable.
25    MS. WAGSTAFF: Okay.

Page 88

1    Q. So is it possible that Mr. Hardeman was exposed
2 to glyphosate that he doesn't know about?
3    A. It doesn't seem that way from his ex- -- from
4 his deposition. He clearly -- He's clear -- He's
5 clearly defines when he knows he was exposed. He talks
6 about mixing and spilling it on his hand, which I'm
7 assuming he would know. And he talks about spraying and
8 having -- and sometimes he had to spray into the wind,
9 and the spray would come back towards him. And so I
10 am --
11    Q. So --
12    A. -- assuming that he -- He describes that
13 ver- -- very clearly, and I'm taking him at --
14    Q. I understand --
15    A. -- face value.
16    Q. -- he describes it. That -- You've totally
17 missed the question. So please listen to what I'm
18 saying.
19    A. I'm sorry.
20    Q. Is it possible that Mr. Hardeman was exposed to
21 glyphosate and didn't know it?
22    A. I -- I don't know how to -- That's just too
23 vague of a question to understand.
24    Q. Why is it vague?
25    A. Because what other exposures could he have had?

Page 89

1    Q. So then say "no." If your answer is "no," he
2 would obviously -- I mean it's a "yes" or "no" question.
3    Is it possible that Mr. Hardeman was exposed to --
4 exposed to glyphosate and didn't know it?
5    A. For example, in his food, it's possible.
6    Q. Or when he was spraying, is it possible?
7    A. It doesn't seem that way based on his
8 description. And I'm going at -- I just -- All I can go
9 on is what he told me --
10    Q. Is it possible
11    A. -- in the dep --
12    Q. -- that the glyphosate went through his clothes
13 and he didn't feel it but he received exposure?
14    MR. DHINDSA: Objection.
15    THE WITNESS: Um...
16    MR. DHINDSA: Sorry.
17    THE WITNESS: It's -- That's highly unlikely
18 because he would have to have soaked his clothes in
19 order for there to be exposure. And that's very clear
20 in the -- in the literature about glyphosate applicators
21 and their -- and the -- and the clothes they wear.
22 So -- And he makes no -- He doesn't describe -- He only
23 describes light mist on his face a few times that it --
24 He never says, "I spilled a gallon on my clothes." He
25 never said, "I sprayed my arm and it soaked through."

23 (Pages 86 to 89)

Michael Joseph Sullivan, Ph.D.

Page 90

1  He ne- -- He doesn't describe any of that.  And so
2  it's -- that makes it unlikely.
3      MS. WAGSTAFF:  Okay.
4      Q.  And your chart that you made in -- which is
5  Exhibit 6, of "Timeline of Hardeman Herbicide Spray
6  Activities," you created this?
7      A.  I'm sorry.  What, uh -- What, um...
8      Q.  Exhibit 6.
9      A.  Exhibit 6.  I'm sorry.  I just want to make
10  sure I -- I don't want to get messed up.
11      Q.  Sure.  That's it (indicating), "Timeline."
12      A.  Yeah.  Thank you.
13      Q.  You created this?
14      A.  I created this table, yes.
15      Q.  So it's your opinion that Mr. Hardeman always
16  used a handheld pump sprayer?
17      A.  It's -- While he could have used other
18  sprayers, this is -- that is the exposure that I modeled
19  in this -- my calculations.  If he had -- And -- And --
20  So I don't say that's all he did.  But in his
21  description of what he did over the course of years,
22  it's -- it's the mo-- -- it's the consistent description
23  of -- of his spray activities.
24      Q.  Well, sir, you created this chart.  I mean, you
25  chose what to put in this chart; right?

Page 91

1      A.  I did.
2      Q.  Okay.  And you actually chose the type of spray
3  equipment to be one of the -- one, two, three -- one of
4  the six most important categories; right?
5      A.  This is a descriptive table to summarize what
6  Mr. Hardeman did, and you -- that's what the title says.
7      And he -- When you go to his deposition and read
8  what he says he did, he talks about using a pump
9  sprayer.
10      Could he have sprayed sometimes using something
11  else?  Potentially, but it's not -- but that is a
12  very -- if -- if it happened, it's a very minor
13  component because he doesn't describe it, doesn't spend
14  time talking about it.
15      What he talks about is a handheld -- I can't
16  remember if it's a one or two gallon without looking at
17  his deposition -- but a handheld sprayer that he would
18  then use at his property.  And so that's what -- What
19  I've summarized here is what -- is a summary of what he
20  said in his deposition.
21      Q.  Okay.  So this actually isn't reflective of --
22  of all of the facts and details; right?
23      A.  It was --
24      MR. DHINDSA:  Objection.
25      THE WITNESS:  -- not --

Page 92

1      I'm sorry.
2      MR. DHINDSA:  Go ahead.
3      THE WITNESS:  It was not intended to be a
4  comprehensive listing but a summary to show year by year
5  the timing and the activities that would have occurred
6  over the course of the -- of -- of the year.
7      MS. WAGSTAFF:  Okay.
8      Q.  So if Mr. Hardeman in fact had exposure to
9  glyphosate every day that he used the product -- so
10  let's assume that he had exposure to glyphosate every
11  day he used the product -- what would the impact be on
12  your estimate of Mr. Hardeman's average daily dose?
13      MR. DHINDSA:  Objection.
14      MS. WAGSTAFF:  What's the objection?
15      MR. DHINDSA:  It's a vague question.
16      MS. WAGSTAFF:  Okay.  You can do hypotheticals to
17  experts.  It's not vague at all.
18      MR. DHINDSA:  They need to be complete.
19      THE WITNESS:  So let me see if I understand.  Can
20  I, um...
21      MS. WAGSTAFF:
22      Q.  Do you -- Yeah.  Do you not understand my
23  question?
24      A.  No.  I -- I'm just want to make sure I have the
25  information in front of me.  Can I put the table away?

Page 93

1      Q.  Mm-hmm.
2      A.  Okay.  Thank you.
3      I want to look at -- pull out the calculation so I
4  have that in front of me.
5      As I've already stated, if you increase any of
6  these parameters, you would result in an increased
7  exposure.  That's mathematical fact.  It's a -- It's
8  an equation.  So you can change a parameter, and you can
9  increase it or decrease it, and it would have the s-- --
10  it would have an effect on the calculation.  But -- So
11  that -- that's my answer.  It would change the
12  calculation.
13      Q.  It would increase his average daily dose
14  proportional to the increase in exposure; right?
15      MR. DHINDSA:  Objection.
16      THE WITNESS:  If -- If you change any parameter
17  here mathematically, it changes the result.  But that
18  wouldn't be an accurate representation of Mr. Hardeman's
19  exposure.  It's a -- You're -- You're asking me, "If you
20  do math, if you change the number" -- "increase this
21  parameter, does it change the result?  Yeah.  That's
22  basic math.
23      MS. WAGSTAFF:
24      Q.  I was asking you a hypothetical question.
25      A.  And I -- And I'm -- And -- And so that's basic

Michael Joseph Sullivan, Ph.D.

Page 94

1   math. Hypothetically, if you change the number in an
2   equation, it changes the results. But I would never do
3   something like that because that would not reflect what
4   Mr. Hardeman actually --
5       Q. Right.
6       A. -- did.
7       Q. And then you would have to admit that your
8   exposure was wrong. And so I understand you're not
9   going to do that.
10      MR. DHINDSA: Objection.
11      MS. WAGSTAFF: That's why it was a hypothetical.
12      Q. So let's talk about your largest single-day
13  exposure. How did you get that information?
14      A. That is calculated by taking the day --
15  essentially by taking the days out of the equation. So
16  rather than dividing by averaging time, which in this
17  case is 9,673 days, and rather than coming up with a
18  total number of days that he might have sprayed, those
19  parameters are essentially removed from the calculation
20  and it just looks at a single day.
21      And so when I did that, I added -- I -- I took a
22  single-day exposure, which are reflected in the bottom
23  per exposure type, and then just added those parameters.
24  Actually only added the last two columns together.
25      Q. Okay. And the routes of exposure that's in

Page 95

1   this equation are dermal and inhalation; correct?
2       A. The routes of exposure that are presented
3   mathematically in this equation is dermal contact only.
4   But, as we've already talked about, I have considered
5   all the routes of exposure. In fact, I think I
6   mentioned the --
7       Q. I understand that.
8       A. -- the conceptual -- I know. I want to answer
9   your question.
10      Q. Well, I don't -- you can -- your --
11      MR. DHINDSA: You have to let him --
12      MS. WAGSTAFF:
13      Q. -- counsel can --
14      MR. DHINDSA: -- answer -- You have to let him
15  finish.
16      MS. WAGSTAFF: No.
17      Q. I asked you -- It's a -- It's a "yes" or "no"
18  question. And so you can either answer it or not. And
19  if he wants to follow up, he can.
20      You're -- You're mathematically --
21      A. I didn't even answer the question, but I'll --
22  that's fine.
23      Q. Okay.
24      A. I'm sorry.
25      Q. So -- That's okay.

Page 96

1       This -- Your exposure equation does not consider
2   expo- -- dermal exposure under clothing; correct?
3       A. If he -- If -- If he would have reported --
4   A- -- Any report of...
5       Q. Regardless of what he reported, I'm asking you:
6   There is no -- There is no mathematical representation
7   of any exposure -- a dermal exposure under clothing;
8   right?
9       A. This equation looks at all the area of his skin
10  that could have been exposed regardless how it happened.
11  If he had sprayed -- If he had sprayed his clothes until
12  they were soaked, I would have con- -- I would have
13  considered that quantitatively. But in this case, he
14  doesn't report that, and so I used the exposed area of
15  his skin to calculate the exposure.
16      Q. So when you were considering this exposure
17  equation and you considered dermal exposure under
18  clothing, the answer was "zero"; right?
19      A. No, because -- no- -- not -- I guess -- I'm
20  sorry -- I don't understand the question. I want to
21  make sure I understand --
22      Q. Okay.
23      A. -- the question.
24      Q. You considered -- As part of your equation, you
25  considered exposure that went through the clothes. You

Page 97

1   considered that; right?
2       A. I -- Yes, I did.
3       Q. Okay. And your -- the conclusion you came to
4   was that there was none.
5       A. Correct.
6       Q. Okay. And you considered dermal exposure to
7   residue on the plants that he may have brushed up
8   against; correct?
9       A. That would...
10      MR. DHINDSA: Objection.
11      MS. WAGSTAFF:
12      Q. Or did you not consider that?
13      MR. DHINDSA: Objection.
14      THE WITNESS: I would say I considered that.
15      MS. WAGSTAFF: Okay.
16      Q. And your conclusion was that he had none?
17      A. No, because I've already -- when he sprayed, he
18  already has liquid mist depositing on his skin. And so
19  if he's already exposed and he happens to walk up
20  agai- -- i- -- if -- and he doesn't report any of this.
21  In fact, since he's spraying poison oak, it's unlikely
22  that he is then walking through it because of the -- of
23  the dermal exposure to poi- -- the poison oak, which
24  would be obvious to him.
25      But since he already was spraying and his legs

25 (Pages 94 to 97)

Michael Joseph Sullivan, Ph.D.

Page 98

1  would already have been wet on the days that -- that I
2  assume he had short -- shorts on, it wouldn't matter if
3  he was then contacting other things because his legs are
4  already wetted.
5      Q.  Okay.  So did he wear gloves?
6      A.  I don't -- I'd have to go back and look at his
7  deposition.  I -- I don't recall if he sa- -- states he
8  wears -- wore gloves.  But I -- I have assumed he did
9  not for purposes of the calculation.  So it -- it would
10  not retard because we know -- It's clear that gloves
11  retard any type of exposure, and so I -- I assumed he
12  didn't wear any.
13      Q.  Okay.  So the 10 days of drift and spillage
14  that we talked about earlier, those are the exposure
15  days that you have reported on for Mr. Hardeman.
16      A.  That is correct.
17      Q.  Now I'm -- Now I'm considering the -- his
18  dermal exposure from residue on plants.
19      A.  Okay.
20      Q.  How much of that did you consider Mr. Hardeman
21  to have?
22      A.  On days that I exposed -- It -- It -- It
23  doesn't matter because on days he was spraying and was
24  exposed, his legs were already exposed.
25      Q.  Okay.  And he wore short sleeves?

Page 99

1      A.  Sometimes.
2      Q.  Okay.  You -- There's testimony that he
3  sometimes didn't wear short sleeves?
4      A.  Um, let me go back.  I think I summarized what
5  he said.  Where is that?
6      (Reviews document.)
7      I think I -- I'd have to go back to his deposition
8  to -- to get his exact language.  But he does describe
9  what he wore.  And what I have assumed in my
10  calculations is arms and face for exposure, which
11  suggest to me that his deposition probably says he wore
12  long pants.  But this -- I don't want to make it a
13  memory test.  If you want to know exactly what he said,
14  we should pull his deposition.
15      Q.  So going back to the -- to Mr. Hardeman's
16  exposure from residue on the plants, you've -- you've
17  given no additional exposure days based on that exposure
18  route.
19      MR. DHINDSA:  Objection.
20      THE WITNESS:  There is -- That is correct.
21      MS. WAGSTAFF:
22      Q.  And it's your opinion that long pants are --
23  are perfect barriers to pesticides?
24      A.  We -- Tha- -- That's such a vague question,
25  it's impossible to answer, the word "perfect" and

Page 100

1  "pesticides."  The data show that standard clothing worn
2  by pesticide applicators have a -- have a very high
3  level of protective effect to those applicators.  And
4  these are individuals that are spraying all day long
5  in -- in applicator scenarios.
6      What Mr. Hardeman has described with the short
7  period of time spraying, it's -- it's just not likely
8  that.  And what he wore is just -- is just not a -- it's
9  not a reasonable consideration that -- that his clothes
10  would be soaked with herbicide.
11      Q.  And -- So going back to your chart you have in
12  front of you, so AR in one of the parameters is the
13  "volume of glyphosate spray formulation on a set area of
14  the skin."  And you just testified that you used the
15  face and arms; right?
16      A.  Yeah.  You've asked two questions.
17      AR is the rate of liquid that deposits on the skin
18  during spraying.  And for Mr. Hardeman, based on his
19  description, I used his arms and his face since that's
20  what he described as areas he was exposed.
21      Q.  Okay.  So I just have just a housekeeping
22  question, just -- What's the -- You have two different
23  sort of values for that.  On 52 of your report, you have
24  a value that's different than on -- on page 11.  So I
25  just wanted to know which one was correct.

Page 101

1      So on page 11 of your report, at the very top I
2  think you're describing AR.  Am I right?
3      A.  I am describing AR on page 11 of 52.
4      Q.  Yeah.  And so you have "ml/cm2 per hour," and
5  then your AR over here (indicating) is different.
6      A.  You are correct.  In --
7      Q.  So which one's the right one?
8      A.  Yeah.  Thank you for pointing that out.
9      Q.  Yeah.
10      A.  On page 11 --
11      Q.  I didn't find it.
12      A.  So -- You know, it's -- That -- Actually I'm
13  off a decimal place.  It should be 10 to the minus 4,
14  which is correct in the -- in the -- The calculations
15  are correct.  I have a wrong number of zeros on page 11,
16  Roman numeral iii.  It should be 0.0001, which would be
17  10 to the minus 4.
18      Q.  Okay.  So you just have one extra zero?
19      A.  I have one extra zero on page 11.
20      Q.  Okay.  So on page 4 of your report -- let me --
21  actually, you cite that -- you talk about the Lavy
22  article on the bottom.
23      A.  Yes.  I see that.
24      Q.  You -- You state that -- that the scientist in
25  that report found that the applicators in forests

Michael Joseph Sullivan, Ph.D.

Page 102

1    received glyphosate exposures of .00005 mg/cm2 per hour.
2         I'd like to hand you what I think is the Lavy
3    report.  We'll will mark this as Exhibit...
4         THE REPORTER:  12.
5         MS. WAGSTAFF:  ...12.
6         (Exhibit 12 identified.)
7         MS. WAGSTAFF:
8         Q.  And I'd just like to know where you got --
9    where you got that from and if that's actually what you
10   meant to write.
11        A.  Certainly.
12        Now, the Lavy article presents -- is a passive
13   dosimetry-based calculation of exposure.  And what that
14   means is they put patches on individuals and then
15   measure those patches after they've been exposed.
16        Q.  Mm-hmm.
17        A.  And there are several different areas they look
18   at.  They look at the lower extremities, and they look
19   at the arms and the face and the head.  They look at
20   various locations.
21        And so what I need -- A-- -- And then they come up
22   with estimates of total exposure.
23        What I did is calculate what's an appropriate
24   exposure for Mr. Hardeman, since it was his upper body
25   that was exposed, arms and face, I had to look at this

Page 103

1    paper and -- and pull out information that would reflect
2    the appropriate rate of ex-- -- of -- of liquid coming --
3    going onto the skin for those body parts.  So on --
4    whether that -- that nu-- -- exact number may not be in
5    here, but -- because that's not the way they present it.
6    They presenting more of a total.  But I did utilize this
7    paper to calculate what it -- what would have appl-- --
8    what would have result in an -- a spraying activity
9    where the arms and the head are exposed.
10        Q.  So this paper reports deposition values in
11   units:  mg/kg per hour.  And then you are citing it as
12   something in mg/cm2 per hour.  So I'm just wondering
13   what you did to change the units and how you got that
14   number.
15        A.  The paper, in their methodology, describes the
16   size of the patches that were used.  I think it's on the
17   second page under "Passive Monitoring."  They say they
18   had 7.5 by 7.5 centimeter patches, which, if you
19   multiply, gives you an area -- and I don't know what
20   that would be -- about 50 square centimeters,
21   approximately.  And those patches were placed on various
22   parts of the body, and they -- they describe that.
23        And then those -- And then that's what's actually
24   measured.  And then they take those patches, and then
25   they make adjustments for the body surface area of these

Page 104

1    individuals.
2         And what I did is, I took the same data from those
3    patches and a- -- and applied it to what -- to
4    Mr. Hardeman's specific activities, which is ar-- -- arm
5    and -- and face exposure.  So that's how I got s- --
6    that's how I got area.  I based it on the patches that
7    they -- they use.  And they report that information per
8    patches.  But they were looking at it -- They had a
9    different end point in mind in their paper than -- and
10   they present the units slightly differently.
11        Q.  Okay.  Anything else in the -- to explain that,
12   or are you...
13        A.  That's --
14        Q.  Okay.
15        A.  That's --
16        Q.  So looking back at --
17        A.  Is it -- So are we going to mark this or...
18        Q.  Yeah.  We did.
19        Looking back at your chart, your exposure equation,
20   explain to me the "Mixing Activities" column.
21        A.  Okay.  Mixing occurs when concentrated
22   glyphosate is diluted to -- of an appropriate
23   concentration for spraying.  And so, for example, I have
24   assumed that Mr. Hardeman purchased a concentration
25   of -- concentrated glyphosate at -- I think that's

Page 105

1    18 percent.  I think that's correct.  And -- And I -- I
2    can go back and look, but I believe that's 18 percent.
3    And which would not be the way -- You wouldn't apply
4    18 percent.  It's not -- According to procedures, that's
5    not what's done.  And so you dilute it.
6         And the -- what's -- what's dil-- -- what happens is
7    you take some of the concentrate; you measure out a
8    certain amount.  That would then be put into your --
9    mixing into your spray unit.  And then you add water to
10   dilute it to the right concentration, which typically,
11   in this case, would -- I think would have been half a
12   percent, is what he has -- what he describes in his
13   deposition.  I -- I think that's correct.  And then
14   that -- that's what gets sprayed.
15        So what I did is:  In the mixing, I assumed that he
16   poured -- he got concentrated glyphosate liquid onto his
17   skin when he was filling up the measuring cup prior to
18   adding the -- prior to putting it in the sprayer and
19   adding water.
20        Q.  The variable area --
21        A.  I'm sorry.  Can I ask:  Is there another water
22   I can...
23        MS. WAGSTAFF:  You can have this one (indicating).
24        THE WITNESS:  Thank you.
25        MS. WAGSTAFF:

Michael Joseph Sullivan, Ph.D.

Page 106

1    Q. The variable area, which is the area of the
2  skin receiving glyphosate spray formulation, the 40 for
3  "Mixing Activities," does that represent both of his
4  hands, one of his hands?  What does that represent?
5    A. 40 square centimeters would be the area of one
6  hand holding a me- -- a measuring -- a small measuring
7  vessel into which Mr. Hardeman would have poured the
8  concentrate.  And the 40 square centimeters is what I
9  have used to -- as the surface area of the skin which
10  would have received liquid when -- when he did the --
11  when -- when he did that activity.
12    Q. Okay.  And you cite for that an experiment that
13  you conducted; correct?
14    A. That is what a -- That's a citation for that
15  information, yes.
16    Q. All right.  So let's talk about that.  It's
17  called -- You cite something called "Laboratory
18  experiment simulating liquid spillage onto the hand
19  during the mixing of concentrated herbicide solution";
20  right?
21    A. I -- I believe that's what I -- I called it,
22  yes.
23    Q. And you cite MJ Sullivan, 2018.
24  I assume MJ Sullivan is you?
25    A. Yes, ma'am.

Page 107

1    Q. And 2018 means you conducted this in 2018?
2    A. Yes, I did.
3    Q. And so you conducted this laboratory experiment
4  after Monsanto started paying you in this litigation;
5  right?
6    A. That is -- I -- I developed it as part of
7  this -- My devel- -- I -- I did that experiment as part
8  of this opinion, yes.
9    Q. Okay.  So is there any written material about
10  that opinion?
11    A. There is not, but I can explain -- if you want
12  to know more about it, I can -- I've explained it
13  slightly -- you know, a little bit in the -- my opinion,
14  and I can provide more details in you'd like.
15    Q. Yeah.  We'll get to that in just a minute.  I
16  just want to -- There's -- Is there a protocol for this
17  experiment?
18    A. There is a procedure that I follow that I
19  can -- that I can share with you, yes.
20    Q. Okay.  And there's nothing written --
21    A. I did not write anything down for this -- for
22  this -- for that part of this work.  But there's more to
23  it than just that -- that ex-- that -- the -- what's
24  described.  There's a whole process I went through that
25  includes other aspects in addition to pouring -- the

Page 108

1  pouring --
2    Q. Sure.  And we'll -- we'll get to the --
3    A. I know.
4    Q. -- experiment details in just a second.  I'm
5  just wondering:  There's no -- There was no procedure --
6  written procedure that you followed in conducting this
7  experiment.
8    A. I developed a procedure in my head, and I
9  followed that procedure, but I didn't write it out
10  anywhere, no.
11    Q. Okay.  So there's no way to -- to check sort of
12  your -- your methods on this procedure that it was
13  consistent with a protocol other than what was in your
14  head; correct?
15    MR. DHINDSA:  Objection.
16    THE WITNESS:  I -- It's actually very easy to
17  check.  You could -- I'll explain to you what was done,
18  and it's a very straightforward sort of evaluation.  And
19  my -- But more important is that my numbers don't just
20  solely rely upon that; they rely on oth-- -- other
21  measurements first.  And that was more a con-- -- a
22  confirmatory activity to help me understand the
23  estimates that I'd already come up with.  And so it
24  would be very easy for someone to do that.
25    MS. WAGSTAFF:  All right.

Page 109

1    Q. Let's hear about your experiment that you did
2  this year.
3    A. Okay.  So the procedure that I followed, which
4  is what I followed in other aspects of coming up with
5  surface area, would be to go to the literature first and
6  see what has been published regarding the surface area
7  of various body parts.  And so I looked up the hand.
8  And what's been published about the hand is essentially
9  the entire hand from the wrist out, which to me
10  represented one end of a spectrum of poten-- -- one end
11  that's most you could -- you could have.  If you dipped
12  a whole hand in a bottle of -- of liquid, you could
13  expose your whole hand.
14    The other end would be zero, which is actually
15  equally possible.
16    And -- And so then what I did is, I looked at --
17  I -- I had a measuring cup, which would -- I think it's
18  5 or 6 ounces, which is appropriate for what you would
19  use to measure certain -- a small number of ounces into
20  a gallon, which is what's recommended on the mixing on
21  the label.  And I held that cup in my hand.  And I
22  looked and said, "What areas of my s-" -- "of my hand
23  could get exposed through spillage?"  And so I cal- --
24  looked at measured areas of my fingers and came up with
25  a value of about 10 centimeters.

28 (Pages 106 to 109)

Michael Joseph Sullivan, Ph.D.

Page 110

1       So that was my initial estimate. And I felt that
2   that would be reasonable if every time I -- if every
3   time I -- somebody mixed, they spilled. And we know
4   that's not the case, but that's okay. I -- That would
5   be a reasonable value.
6       But there's no -- But I wanted to double-check
7   because I like to be sure. And so I decided to do some
8   pouring. So I had that cup in my hand, and I poured it.
9   And the first few times I poured, nothing got on my
10  fingers because I was careful. And I thought, "Well,
11  maybe a person is not careful." And so I started
12  pouring until it would go over. And then once it went
13  over, I looked at the parts of my hands that were wet.
14  And sometimes it was around 10, which is what I had
15  estimated. Sometimes it was lower.
16      And then when I got -- as I got more and more
17  aggressive pouring it, pouring over my fingers, pouring
18  so it spilled out over the edges of the -- of the
19  container, as I -- as I did -- I did about 20
20  different -- did it about 20 times. I purposely got
21  more and more sloppy in my -- my pouring -- I felt
22  that -- that 10 was still a good number, but I wanted to
23  increase it because maybe somebody was sloppier than --
24  than I was at the beginning. And so I increased it to
25  40. So I think that increases my dose by a factor of 4.

Page 111

1       I think 10 would be okay. And, in fact, someone
2   pouring reasonably carefully would probably have less
3   than 10. But I used 40 based on that con- --
4   confirmatory evaluation that was after I already had an
5   estimate that I used when I actually did the
6   measurement.
7       So that was the process I followed to confirm that
8   I -- that I -- what number I wanted to put in here,
9   again using a number that was much, much higher than I
10  actually thought would be initially.
11      Q. So who did you do this laboratory experiment
12  with?
13      A. Just myself.
14      Q. So you did an experiment by yourself following
15  procedures that you made up and kept in your head.
16      MR. DHINDSA: Objection.
17      THE WITNESS: Well, you're -- you're missing --
18  you're only -- you've missed a whole part of the
19  process -- you haven't described the whole part of the
20  process that I did.
21      MS. WAGSTAFF:
22      Q. No. Your process --
23      A. I measured --
24      Q. -- was how you came up with the --
25      A. Yeah.

Page 112

1       Q. -- procedures. But I'm saying: The procedures
2   that you came up with for this laboratory experiment you
3   kept in your head; right?
4       A. (No response.)
5       Q. You didn't put them on paper.
6       A. That's correct.
7       Q. And you did this experiment by yourself.
8       A. That's correct.
9       Q. So there's no way to know actually what
10  happened because nothing is written down and you were by
11  yourself.
12      MR. DHINDSA: Objection.
13      THE WITNESS: Well, it would be easy to have
14  someone take a cup and pour something in and see how
15  much hands -- how -- how much your fingers get wet.
16      But you have to remember that that was a
17  confirmation of something that I'd already cal- --
18  already calculated based on the area of my fingers that
19  were holding a -- a small measuring cup. So that would
20  have been -- that would have been the value I would have
21  used initially. But I wanted to see what sort of --
22  type of variability I might get on that number, and
23  could I get more than 10 square centimeters. And
24  through being very aggressive in that -- in that pouring
25  activity, it convinced me to increase that value.

Page 113

1       MS. WAGSTAFF: Okay.
2       Q. In page 6 of your report --
3       A. Sorry. I want to keep things in order here.
4   Page -- I'm sorry. You said page 6?
5       Q. 6, yeah.
6       A. Okay.
7       Q. You -- Let's go down to the paragraph that
8   starts, "The above discussion presents percent
9   absorption..." Do you see that?
10      A. I do, yes, ma'am.
11      Q. All right. So if you go down a few sentences,
12  it says, "What is actually measured in these studies is
13  flux: the mass of chemical (mg) moving through an area
14  of skin (cm2) over a period of time (hour)."
15      Do you see that?
16      A. I do.
17      Q. Okay. Can you explain how fu- -- flux is
18  measured in in-vitro studies of dermal absorption?
19      A. You said "in-vitro."
20      Q. Mm-hmm.
21      A. So what I would probably cite would be one of
22  the monkey studies where they -- I believe they looked
23  at concentrations in probably urine, but it -- I don't
24  know -- Actually, I probably should ask -- ask for that
25  paper because that way I can tell you exactly. But if

Michael Joseph Sullivan, Ph.D.

Page 114

1  you measure -- In general, if you measure uptake over
2  time, then you would be able to estimate a flux, which
3  is essentially a mass movement per time.  If you know
4  the area of exposure and you know the time and you have
5  some measurement over time, you can estimate flux.  And
6  I believe that's been done in at least one of the -- It
7  might have been done in one of the animal studies.  I'd
8  have to look and -- and -- and see.
9      Q.  So do you know how it's meas- -- flux is
10  actually measured in vitro?
11     A.  Like -- This -- That's a separate.  That's
12  in vitro.
13     Q.  Mm-hmm.
14     A.  In vitro --
15     Q.  That's what I said before.
16     A.  I thought you said "in vivo."
17     Q.  Hmm-mm.  "Vitro."
18     A.  Oh.  I'm sorry.  Then I misunderstood your --
19     Q.  Mm-hmm.
20     A.  -- question.
21     In vitro, which is in the laboratory, not in --
22     Q.  Mm-hmm.
23     A.  -- not in a -- a live animal, you would look at
24  the receptor fluid and try and calculate over time the
25  amount of glyphosate that gets in through the skin into

Page 115

1  the receptor fluid, and that would give you a -- that
2  would give you a -- you would then be able to estimate
3  the rate as you calc- -- as you come up with values over
4  time.
5      Q.  So you -- as you report in your report that
6  what's actually measured in these studies is flux, so
7  if -- if flux is actually what is measured in these
8  dermal update experiments, why did you use percent
9  uptake instead of flux in your exposure calculation?
10     A.  Well, these -- these papers also report
11  percentage, and I think that's an easier thing to
12  understand.  And since I know I have to explain this, it
13  made sense to me to use something that I think a -- a --
14  a person would understand.  2 percent is 2/100ths of the
15  amount that get applied.  That's an easy explanation.
16  But I just wanted to re- -- reference the fact that
17  indeed they measure flux, which is the more accurate
18  representation for the experiment.  But they present --
19  Often those papers are presenting it as a percentage as
20  well.  And for ease of explanation, I use percentage.
21     Q.  So can flux change over time during dermal
22  uptake?
23     A.  It's -- Looking at the data that I recall
24  sitting here -- and I might want to ask for a couple
25  papers -- but, for example, the uptake -- there's a lag

Page 116

1  time for glyphosate in studies looking at flux through
2  the skin, meaning that there's very little uptake in the
3  first few hours.  So in that first few hours, almost
4  nothing gets through.  And then you enter a more linear
5  phase of flux which suggests that after you've got
6  through those first few hours, then the flux is
7  relatively constant within the variation of the
8  experiment.
9      And so what my recollection of the data I've looked
10  at is:  Once you're out of that early phase, flux is
11  pretty constant.  But in the early parts of exposure in
12  the first couple of hours, it's much, much lower.  And I
13  don't account for that.  I assume the flux occurs
14  immediately upon exposure.  I don't do any discounting
15  for those first few hours, which the literature supports
16  is a -- would be a reasonable thing to do.  But that's
17  another, I --
18     Q.  So --
19     A.  -- think overestimate in my calculation.
20     Q.  Can you repeat my question?
21     Strike as nonresponsive.
22     A.  You asked if flux changes, and I just --
23  I tol- -- I explained it --
24     Q.  So is it --
25     A.  -- to you.

Page 117

1      Q.  -- "yes"?
2      A.  I explained it to you.  And the --
3      Q.  So is the answer "yes"?
4      A.  The answer is "yes" --
5      Q.  Okay.
6      A.  -- in the early --
7      Q.  That's all.
8      A.  -- in the early pha- -- for glyphosate in the
9  early --
10     Q.  Okay.
11     A.  -- phases of the ex- -- of the -- of dermal
12  uptake.
13     Q.  Can the skin be a reservoir for chemicals?
14     MR. DHINDSA:  Objection.
15     THE WITNESS:  That's a pretty broad question.
16  It's -- I don't believe it -- And so do you want -- do
17  you want to talk about glyphosate, or you want to talk
18  about general?
19     Q.  Glyphosate is fine.
20     A.  Okay.  What the data --
21     MR. DHINDSA:  Objection.
22     THE WITNESS:  I'm sorry?
23     MR. DHINDSA:  Go ahead.  I objected, but you can
24  answer.
25     THE WITNESS:  Okay.

Michael Joseph Sullivan, Ph.D.

Page 118

1      The data suggests that as gly- -- glyphosate gets
2   through the skin very, very slowly because of the lipid
3   layer.  And so I would not call the lipid layer a
4   reservoir for glyphosate, but it doesn't mean that there
5   aren't some there.
6      "Reservoir" has a very different meaning.  For
7   example, in the literature, if you look at organic
8   chemicals that are very lipophilic, the data suggests
9   that there is -- that the -- that you can have some
10  reservoir effects, depending on the chemical properties.
11  But that's not a -- not the case for glyphosate.
12     And that -- I think that's clear in that lag time.
13  It's that it's very difficult for glyphosate to get
14  through.  So I don't think -- I don't think I would use
15  the term "reservoir" to reflect glyphosate dermal
16  uptake.  That -- That has a different meaning that is
17  not applicable to glyphosate.
18     MS. WAGSTAFF:  Okay.
19     Q.  So let's talk about the ABS factor in your
20  chart.  You define --
21     A.  Can I ask a question before we do that?  I
22  don't know how long we've been going, but I could
23  probably use a restroom break.
24     MS. WAGSTAFF:  Sure.
25     THE WITNESS:  Is that okay?

Page 119

1      MS. WAGSTAFF:  Yeah.
2      THE WITNESS:  And that way, if you kind of --
3   you're going to change ideas; is that -- unless --
4      MS. WAGSTAFF:  Okay.
5      MR. DHINDSA:  -- you need a couple more --
6      MS. WAGSTAFF:  No.
7      MR. DHINDSA:  -- questions right now.
8      Okay.  Thank you very much.
9      THE VIDEOGRAPHER:  We are going off the record.
10  The time is 3:45 p.m.
11     (A recess is taken.)
12     THE VIDEOGRAPHER:  We are back on the record.  The
13  time is 3:53 p.m.
14     MS. WAGSTAFF:  All right.
15     Q.  Dr. Sullivan, if you could pull out your chart
16  that I think we've identified as Exhibit 7, your
17  exposure equation.  And I would like to talk about the
18  ABS factor.
19     Can you at the tell me what the ABS factor is and
20  why you included it?
21     A.  Yes.  We just talked a moment ago about flux
22  that -- that chemicals move in over time.  And at the
23  end of that time is when they -- is -- is the percentage
24  that these researchers often pre- -- pre- -- present.
25     For example, 2 percent dermal absorption rep- --

Page 120

1   represents the total absorption over the time of the
2   experiment.  And so -- And many of those are 24 to 4- --
3   48 hours long, which is much longer than Mr. Hardeman
4   would have had glyphosate on his skin, based on his own
5   description of his post-spray activities.  And so in
6   order to -- to reflect what is accurate for him, I
7   adjusted the uptake through the skin to account for the
8   duration of time after he was exposed.
9      Q.  Okay.  And why did you -- why did you use it
10  relative to 24 hours?
11     A.  Because that is typically what the -- I think
12  that's what the 2 percent is -- That's a common twe- --
13  That's a common duration of exposure in these studies.
14  And so that was a -- It could have been -- The 2 percent
15  could be longer than that or -- I don't recall without
16  looking at the paper.  But 24 hours is a common exposure
17  time period for these studies and -- and I think is
18  reflective of the 2 percent dermal absorption.  But I
19  have to -- If you want -- To be more accurate, I have to
20  go back to my paper and look --
21     Q.  Yeah.
22     A.  -- and see --
23     Q.  Go ahead.
24     A.  -- where that exactly comes from, if there's --
25  if I have the duration in there.

Page 121

1      (Reviews document.)
2      I don't -- I cite the -- I don't cite the number of
3   hours in the Wester study, and so I'd have to go back
4   and look and see how long that exposure was.  But I have
5   used 24 hours as a -- as -- as the -- the -- the
6   duration.  So I'd have to pull the Wester study to know
7   exactly.  But that's -- But 24 hours is a reasonable
8   period of time during which the- -- these experiments
9   were conducted.
10     Q.  All right.  And this is just for my own -- for
11  edification, but is the implication of the ABS factor
12  that the percent of the dose absorbed increases linearly
13  over time?  Is that the implication?
14     A.  Yeah.  And it ref- -- it refers back to the
15  flux we talked about previously.
16     Q.  Mm-hmm.
17     A.  With glyphosate, the first couple of hours
18  there's almost no uptake.  And then you get into a
19  relatively linear portion of uptake where the flux is
20  go- -- where it's going through the skin at a -- at a
21  relatively constant rate, again given variability in
22  these studies.
23     And -- And the -- And that -- And those fluxes is
24  what these -- as I mention in my paper, is what these
25  authors report.  But then they typically report the

Michael Joseph Sullivan, Ph.D.

Page 122

1    final number as what happened over the entire
2    experiment. So you need to account for time because
3    Mr. Hardeman didn't have glyphosate on his skin for 24
4    hours. So we need to account for what he actually did.
5        Q. So what do you cite in your report that
6    supports the theory that the percent of applied dermal
7    dose absorbed increases linearly over time?
8        A. I would have to --
9        Q. I couldn't find any.
10       A. You -- I'd have to go back to all the studies
11   I've looked at and -- and -- because they -- because
12   they are reporting a flux rate. And the -- And the
13   assumption in those papers when they provide a flux rate
14   is that that's the flux occurring over the -- the time
15   that they were doing the experiment. Other than the few
16   studies that look at some earlier times, that flux rate
17   is -- would be representative of what's happening over
18   the course of the experiment. So it would be a fairly
19   linear, um...
20       Q. So --
21       A. But -- But there is -- I think there are some
22   papers that plot it out over time. I just don't recall
23   which ones they are. But there are several papers
24   that -- that look at co- -- flux over time. And what
25   you have -- And all those papers are consistent.

Page 123

1    There's a lag phase or -- with very low absorption, and
2    then the absorption increases fairly linearly.
3        Q. So look at your report because, as you said,
4    that you -- you cite your -- some opinions, and then you
5    will cite references.
6        A. Right.
7        Q. And then you also have documents considered.
8    And I think what I hear you saying is that you -- you
9    don't know, out of the documents considered, which ones
10   support that proposition. But if you -- Is that opinion
11   in your report?
12       A. The...
13       Q. Is the opinion that the percent of applied
14   dermal dose absorbed increases linearly over time -- is
15   that opinion in your report?
16       A. Do I say those exact words? No.
17       Q. Where is it -- Just point --
18       A. But --
19       Q. -- me where it is in the report.
20       A. Those exact -- I don't believe those exact
21   words -- Well, let me see.
22       Q. Or the concept or whatever. Just show me where
23   it is in your report.
24       A. Certainly.
25       (Reviews document.)

Page 124

1        So in that -- in the paragraph on page 6, it would
2    be, if you count the little one at the top -- one, two,
3    three -- four paragraphs down. In that -- In that
4    discussion, I say -- and we -- we talked about this
5    before -- "What is actually measured in these studies is
6    flux: the mass of chemical moving through the skin over
7    a period of time. In over to" -- "In or-" -- "order to
8    calculate exposure and still use specific activity
9    information provided by Hardeman, a percent dermal
10   absorption is used with an adjustment factor to account
11   for exposures of less than 24 hours."
12       And so -- And then I even gave some examples
13   which -- So that would -- although I don't say -- I
14   don't say out -- I don't say specifically it's -- the
15   words "linearity" do not occur in my text, it's --
16   that's what I have used, and it's shown by the -- by the
17   factors that I have provided.
18       Q. And that's the only place in your report
19   where -- where that opinion would show up?
20       A. That is the only place where -- in this report
21   where I talk about that -- that percent absorption
22   factor adjustment that I did, yes. I believe that's --
23       Q. Okay.
24       A. -- true.
25       But if you -- But you have to look at all the

Page 125

1    studies because the various -- the various studies
2    also -- as I mention, so- -- a couple of them -- and I
3    wish I could remember which ones -- plot out uptake over
4    time and are indicative -- and -- and -- and show that
5    lag period versus a linear phase after the lag period.
6    I just would have to find which ones they are.
7        Q. Are you familiar with the Pesticide Handlers
8    Exposure Database?
9        A. No, I am not, no.
10       Q. Sometimes referred to as PHED?
11       A. I -- I don't think I cited it in any of my
12   references, so I'm not -- I don't think I've -- I've
13   looked at it. I'd have to look at --
14       Q. So you don't know what is? You've never heard
15   of it?
16       A. The way you've described it, the answer is
17   "no." Could I have seen it? I'd have to see a copy of
18   it to know for sure. I don't recall it based on what
19   your description is. But seeing it --
20       Q. My description is just the name of it.
21       A. I understand that. Sometimes you forget the
22   name of a paper but you've actually looked at it or --
23       Q. It's a database.
24       A. So -- or database. So it would -- you know,
25   it's something that I would want to see to be absolutely

Michael Joseph Sullivan, Ph.D.

Page 126

1  sure, but I don't believe so.
2      Q.  Okay.  Are you familiar with the predictive
3  operator exposure model also known as the P-O-E-M?
4      A.  Hmm.  I have heard of the POEM model, yes.
5      Q.  How did the POEM model fit into your opinion,
6  if at all?
7      A.  I do not use a model like the POEM model
8  because I believe in doing something that specific for
9  Mr. Hardeman which -- which I present in this opinion,
10  and models like the POEM model have -- I don't believe
11  are -- would be specific for Mr. Hardeman.
12      Q.  So you didn't utilize the POEM model, fair to
13  say?
14      A.  I did not.
15      Q.  Okay.  So if you turn to page 3, you state
16  that -- under 5 -- paragraph 5, "Summary of Glyphosate
17  Chemicals and Physical Properties" --
18      A.  Yes.  I am there.
19      Q.  -- you state that you reviewed the safety data
20  sheet for Ranger Pro?
21      A.  That is correct.
22      Q.  Why did you do that in this case?
23      A.  Because it -- I'm looking at the -- it was an
24  available SDS off the Internet, and the gl- -- the --
25  the properties of glyphosate are the same regardless of

Page 127

1  what mixture it's in.  And glyphosate has a molecular
2  weight and a vapor pressure and solubility which are
3  prop- -- intrinsic properties -- chemical properties
4  that are provided in that -- in that MSDS, so -- I'm
5  sorry -- that SDS.  So it -- that's why I -- I just
6  picked a source and then confirmed it with the PubChem.
7  But these are -- these are consistent chemical
8  properties that -- that wouldn't change.
9      Q.  So you know that Mr. Hardeman didn't use
10  Ranger Pro; right?
11      A.  Yeah.  He used a concentrate that I specify
12  earlier in my -- in my opi- -- later in my opinion that
13  contained glyphosate with the same chemical properties.
14      Q.  So it's your opinion that Ranger Pro has the
15  same chemical properties as the product Mr. Hardeman
16  used.
17      A.  No.  That -- That would -- You -- No.  That's
18  not what I said.  So I'll -- I'll try --
19      Q.  Okay.
20      A.  -- and say it clearer.
21  We're talking about the chemical glyphosate --
22      Q.  Mm-hmm.
23      A.  -- a specific unique chemical.  And that
24  chemical has a molecular weight, which doesn't change in
25  whatever formulation it's in.  It has a vapor pressure,

Page 128

1  which doesn't change, because that's an intrinsic
2  chemical property.  It has a solubility, which doesn't
3  change.  That's an intrinsic chemical property.
4      And so I used that SDS not to define Ranger Pro as
5  a formulation but to extract the glyphosate-specific
6  properties which would be the same regardless of what
7  formulation was being used.
8      Q.  Do you think that there is a difference --
9  Well, let me -- let me ask this.
10  We've been talking a lot about glyphosate; right?
11  Today?
12      A.  Yes, we have.
13      Q.  But you understand Mr. Hardeman wasn't exposed
14  to glyphosate alone; right?
15      A.  He -- I -- I would expect that he was exposed
16  to glyphosate in a -- through a -- through a -- through
17  spraying a diluted concentrate containing glyphosate,
18  herbi- -- an herbicide mixture, yes.
19      Q.  Yeah.  A -- A formulation; right?
20      A.  A formulation would be a better word.
21  Thank you.
22      Q.  Right?
23      A.  Yes.
24      Q.  So what he -- what Mr. Hardeman was exposed to
25  was glyphosate plus other chemicals; right?

Page 129

1      A.  I would expect that to be true, yes.
2      Q.  And so those other chemicals, do they affect
3  his exposure to glyphosate?
4      MR. DHINDSA:  Objection.
5      THE WITNESS:  I'm not -- "Affect" is kind of a
6  broad term.  But the good thing is that we have
7  glyphosate formulations that have been tested.  And so
8  if you're asking, for example, when I looked at the data
9  on -- in the study, does it -- is it only on glyphosate
10  without -- outside the formulation?  No.  There's
11  numerous studies in here, for example dermal uptake
12  studies that look at the formulation of glyphosate,
13  not -- and -- and glyphosate by itself.
14      And so while it's -- it's true that he would be
15  exposed to a diluted formulation, the -- the scientific
16  literature has kind of already accounted for that in --
17  in many of the papers that I've -- I've looked at.  So
18  it doesn't -- it wouldn't -- it doesn't materially
19  affect the -- the -- the calculations I put together.
20      MS. WAGSTAFF:
21      Q.  Do you know what other chemicals were in the
22  concentrate mixture that Mr. Hardeman used?
23      A.  I don't have a list of them, and so I note
24  there are things like surfactants and -- that are in
25  there that -- Obviously water is in it when -- when --

Michael Joseph Sullivan, Ph.D.

Page 130

1    as well.  There -- And there -- I've seen lists of other
2    chemicals, but I don't -- but I di-- but my -- since
3    my exposure is focused on glyphosate, my calculations
4    are focused on glyphosate uptake.  The other chemicals
5    don't -- don't -- I didn't -- don't have to have those
6    as part of that calculation.
7        Q.  Okay.  And you understand that this lawsuit is
8    about the formulated mixture; right?
9        MR. DHINDSA:  Objection.
10       THE WITNESS:  Actually, I don't really have much
11   detail on the lawsuit at all.  I'm just focused on
12   exposure.  I don't understand -- I'm not -- I don't
13   spend time on the legal issues.  I -- I try and read the
14   science.
15       MS. WAGSTAFF:  Okay.
16       Q.  And so you -- your opinion is limited to
17   exposure to glyphosate.
18       MR. DHINDSA:  Objection.
19       THE WITNESS:  The calculation is for glyphosate
20   uptake, which is the chemical of interest.  The data
21   that I've looked at include glyphosate exposures through
22   formula- -- through the use of formulated products.  And
23   so since Mr. Hardeman wasn't using pure glyphosate, as
24   you have already pointed out, it would be important
25   to -- to reflect the literature on the -- on the

Page 131

1    glyphosate formulations, which I have done.
2        So I believe that my calculations are appropriate
3    and reflect what Mr. Hardeman's exposure would be when
4    he sprayed a diluted formulation, got glyphosate,
5    probably surfactant on his skin, and then there was
6    uptake.
7        But we have -- The good thing is we have all these
8    studies that looked at that, and so I -- I can -- I can
9    utilize those studies to understand how he was exposed
10   to that mixture.
11       MS. WAGSTAFF:  Okay.
12       Q.  And so just to be clear, you -- as you sit here
13   today, you do not know what surfactants were in the
14   product Mr. Hardeman used?
15       A.  I don't know the exact name of the surfactants
16   in there.  I -- I've looked at those products, but I
17   don't remember, sitting here today, if we looked at
18   it -- if we had a label of this -- of the product he
19   used.  Even if he could remember -- and I don't even
20   think he was that specific -- I would be able to tell
21   you what they are, but --
22       Q.  Well, we all would if we could read --
23       A.  Yeah.
24       Q.  -- the label.
25       A.  But I -- I don't -- I don't have them

Page 132

1    memorized.
2        Q.  Okay.  Well, it's on your report; correct?
3        A.  It's -- It's -- The -- The exposure to the
4    study of and the exposure to glyphosate and formulation
5    is what my report's about.  And so the studies I've
6    looked at, the calculations I've done are appropriate
7    for exposure to glyphosate in formulation.
8        Q.  Okay.  And just to be clear, your report does
9    not even acknowledge that the product had surfactants.
10   The word "surfactants" is not in your report; is it?
11       MR. DHINDSA:  Objection.
12       THE WITNESS:  I -- I would -- I would quote what I
13   wrote on the first page.  "The calculation of Glyphosate
14   exposure and dose requires using information from the
15   scientific literature and information about activities
16   engaged by Mr. Hardeman," which we've discussed, "and
17   Glyphosate-containing herbicides."
18       And so I recognize right at the very beginning --
19       MS. WAGSTAFF:
20       Q.  Where are you reading from?
21       A.  I'm reading -- I'm sorry.  I should have told
22   you.
23       On page 1, Section -- Section 2, "Scope of the
24   Opinion."
25       Q.  Okay.

Page 133

1        A.  The middle sentence in this first paragraph.
2    And I -- I use the term "Glyphosate-containing
3    herbicides" because I recognize that that's what the
4    exposure was.  It was -- And -- And the chemicals in
5    those herbicide formulations are all part of it.  And
6    that's why, when I look at the -- use the -- utilize the
7    scientific literature, I'm u-- I'm looking at studies
8    that use the formulation.  So it's im-- it's implicit
9    in my work and stated on that first page that I'm
10   looking at the "Glyphosate-containing herbicides" that I
11   know that -- that this is a exposure to a mixture.  And
12   so it's -- why -- if I -- the fact that I may not have
13   used a particular word doesn't mean that I don't
14   understand that that's what we're -- that's what this is
15   about.
16       Q.  Okay.  And so you are -- just to be clear, you
17   are not giving any opinion or any calculation regarding
18   Mr. Hardeman's exposure to anything except for
19   glyphosate.
20       MR. DHINDSA:  Objection.
21       THE WITNESS:  My opinion -- Yes, that's correct.
22   My opinion is solely on glyphosate uptake.
23       MS. WAGSTAFF:
24       Q.  And, in fact, reading your report, I would not
25   know what other chemicals Mr. Hardeman was exposed to;

34 (Pages 130 to 133)

Michael Joseph Sullivan, Ph.D.

Page 134

1    correct?
2        MR. DHINDSA:  Objection.
3        THE WITNESS:  Other than the statement here where I
4    say that he used "Glyphosate-containing herbicides,"
5    which are a formulation, you would -- I -- I would
6    assume the person would understand that a formulation is
7    not just that chemical.
8        MS. WAGSTAFF:  Right.
9        Q.  But no -- nobody reading this report would
10   understand what other chemicals were in that
11   formulation; correct?
12       MR. DHINDSA:  Objection.
13       THE WITNESS:  Yeah.  I don't -- I can't speculate
14   what other people might know, but I'm -- but that
15   wording is -- is very particular.  And when someone says
16   "Glyphosate-containing herbicides," someone who knows
17   herbicides would know.
18       MS. WAGSTAFF:  Okay.
19       Q.  So let's have you, who's an expert in
20   chemicals -- if you read this report --
21       A.  Right.
22       Q.  -- can you tell what other chemicals were in
23   his formulation?
24       A.  I know -- I've already mentioned that, for
25   example, there are -- there are --

Page 135

1        Q.  Surfactants is a --
2        A.  There's surfactants.
3        Q.  -- is not a chemical.  That's a type.  I mean
4    that's -- there are specific surfactants in there.
5        So if you can tell me from reading your report what
6    surfactants are in there, I would love to know.
7        A.  Okay.
8        MR. DHINDSA:  Objection.
9        MS. WAGSTAFF:
10       Q.  So go ahead.  And you can read it.
11       A.  I -- I don't list the specific chemicals --
12       Q.  Okay.
13       A.  -- because it was not relevant to what I was
14   doing.
15       Q.  Okay.  Let's look at your CV, which has been
16   marked as Exhibit 4.
17       A.  Okay.  I am there.
18       Q.  Is this up to date as of November 27th, 2018?
19       A.  I would say "yes."
20       Q.  Everything is accurate?
21       A.  To the extent that I -- I reviewed it prior to
22   sending it in, yes, I would say it's accurate.
23       Q.  Okay.  And your invoices, which we've marked as
24   Exhibit 8, those, I believe, go through December 3rd; is
25   that right?

Page 136

1        A.  It looks like this -- Exhibit 8 begins with a
2    date of Dec- -- October 31st and ends -- oh, gosh.
3    Where is the last one? -- December 3rd of 2018, yes.
4        Q.  Okay.  And so today is December 19th.
5        A.  That's correct.
6        Q.  And I'm guessing you've spent a lot of time
7    preparing for these depositions.  How much time do you
8    think you've spent since your December 3rd invoice?
9        A.  I would probably guess three days.  That's --
10       Q.  Three --
11       A.  -- probably a reason- -- Three --
12       Q.  How many hours?
13       A.  Three eight-hour days, maybe 20 to 24 hours.
14       Q.  Okay.
15       A.  Something like that.
16       Q.  So did you meet with your lawyers this morning?
17       A.  We ha- -- We have met after my opinion and
18   prior to this deposition, yes.
19       Q.  Okay.  When did you meet prior to this
20   deposition?
21       A.  We -- I had one meeting in Los Angeles a -- I
22   want to say it was one or two weeks ago.  And then we
23   met yes- -- yesterday -- yesterday as well and -- and a
24   little bit on -- what's today?  Wednesday?  Little bit
25   on Monday as well.  So, you know, two-and-a-half, three

Page 137

1    days --
2        Q.  But who was --
3        A.  -- something like that.
4        Q.  -- at the first meeting?
5        A.  It would have been Ran and -- Sorry.  I don't
6    know his last name.  He goes by "John," and I don't
7    remember his last name.
8        Q.  Is John a lawyer?
9        A.  He's a lawyer.  He works for the same firm that
10   Ran works for.
11       Q.  The Hollingsworth firm?
12       A.  Yes.  Thank you.
13       Q.  Okay.
14       A.  I'm not very good at names.
15       Q.  And then you met Monday for a few hours with
16   Ran and John again?
17       A.  Yes.  That's correct.
18       Q.  And then you met yesterday?
19       A.  Correct.  And -- And yesterday Meghan was --
20   she was present this week as well.
21       Q.  Okay.
22       A.  And so that wa- -- she was additional on -- on
23   Monday afternoon and Tuesday, yes.
24       Q.  Okay.
25       So I think that I have no more questions.

35 (Pages 134 to 137)

Michael Joseph Sullivan, Ph.D.

Page 138

1    MR. DHINDSA:  Could we go off the record for a few?
2    MS. WAGSTAFF:  Mm-hmm.
3    THE VIDEOGRAPHER:  We are going off the record.
4    The time is 4:18 p.m.
5    (A recess is taken.)
6    THE VIDEOGRAPHER:  We are back on the record.  The
7    time is 4:44-p.m.
8
9    -EXAMINATION-
10
11    BY MR. DHINDSA:
12    Q.  Dr. Sullivan, if Mr. Hardeman had had any
13    exposure to glyphosate-based herbicides that he did not
14    perceive or recall, are those exposures accounted for in
15    your expert opinions?
16    A.  Yes.  I -- I have calculated a dose which is
17    much higher than I -- than I believe he was exposed to,
18    which could -- which would account therefore for any of
19    these other potentially very small exposures.
20    If he didn't perceive anything on his skin, then it
21    would be a very, very small exposure, much smaller than
22    the value that I -- I -- I have used in my calculations.
23    So yes, I think that my calculations are inclusive
24    of any of the exposures he could have had.
25    Q.  And when you inspected Mr. Hardeman's

Page 139

1    Forestville property, do you believe you covered the
2    areas he reported as having sprayed glyphosate-based
3    herbicide?
4    A.  Aft- -- I reviewed his deposition first.  And
5    when I went to the property, I walked those areas that
6    he described as having sprayed.  And it took us about an
7    hour.  Now, he -- he reports three to four hours of
8    spraying, but that's okay because I -- I -- I use the
9    values that he -- he provided.  And not only do I use
10    three to four hours, I actually upped it to five hours
11    to increase the amount of time he would have been
12    exposed.
13    So I -- I think we did walk the areas, and it
14    didn't take -- and it took us about an hour to walk
15    those areas that he -- that he cited in his deposition.
16    Q.  Do you hold all of the opinions you've stated
17    here today and in your expert report in the Hardeman
18    case to a reasonable degree of scientific certainty?
19    A.  Yes.
20    MR. DHINDSA:  No further questions.
21    MS. WAGSTAFF:  I have one.
22
23
24
25

Page 140

1    -EXAMINATION-
2
3    BY MS. WAGSTAFF:
4    Q.  Monsanto's lawyer just asked you if you -- your
5    opinions accounted for glyphosate exposure unknown to
6    Mr. Hardeman; right?
7    A.  I think the word was "unperceived."
8    Q.  "Unperceived"; right?  Is that correct?
9    A.  I think that's correct, yes.
10    Q.  And we discussed this at length this morning --
11    or this afternoon; correct?
12    A.  We -- We did discuss it, yes.
13    Q.  Are you changing any of your answers to me?
14    A.  No.  It was the exact same answer I gave
15    before, that my exposures are conservative and
16    overestimates and would account for the uncertainty in
17    those -- in the parameters that he provided.
18    Q.  So just to be clear, though, you testified that
19    you're not sure how much exposure would actually change
20    your opinion; correct?
21    MR. DHINDSA:  Objection.
22    THE WITNESS:  No.  You asked me to -- to give you a
23    certain number.
24    MS. WAGSTAFF:
25    Q.  Mm-hmm.

Page 141

1    A.  And I answered that.  It's -- It's a -- It's a
2    direct relationship.  You increase the number by two,
3    and it increases the result by two.  And so that's --
4    that's what I answered to that equation.
5    I am confident that the -- the -- the -- those
6    questions you asked me earlier about whether he could
7    have had something on his skin that he didn't feel.  And
8    the answer to that question is:  That exposure would be
9    so small because he wouldn't be able to feel it, because
10    we know -- because the other levels that I -- that I've
11    used in my equation are -- are levels that people sense
12    exposure, that those -- if -- if those things happen,
13    they -- they would already be -- they would contribute a
14    very small amount to his total expose.  And my exposure
15    is already high enough that I think it's -- it's
16    covered.  So I just want to be clear that -- that
17    there -- there would -- that I -- that there was
18    something that if -- in case you were wondering if
19    there's something I did not -- did not consider in my
20    evaluation.
21    Q.  So just so I understand your -- your opinion,
22    you believe that your estimates provided a buffer or a
23    padding or an overestimation, whatever word you want to
24    use, enough such that it would capture any and all
25    unperceived exposures?

Michael Joseph Sullivan, Ph.D.

Page 142

1          MR. DHINDSA:  Objection.
2          THE WITNESS:  I would not -- I've never said those
3    words.  What I did say is that Mr. Hardeman was very
4    specific in his -- in his description, in fact so
5    specific he used numbers.  And so he didn't just say
6    some- --
7          MS. WAGSTAFF:
8          Q.  I'm not asking you --
9          A.  I know.
10         Q.  -- about what he testified to.  I'm asking
11   you --
12         A.  But I'm asking -- I'm answering your question
13   about uncertainty.
14         So when I look at what he said, it leads me to
15   conclude that there's -- that that range of uncertainty
16   is not that big.
17         If someone has said "sometimes," that's different
18   from saying "six" or "seven times."  And so that level
19   of certainty gives me -- becau- -- bounds the amount of
20   uncertainty I feel I may have to address.  I feel --
21   I -- I feel that I've addressed the un- -- uncertainty
22   in his exposure based on his own des- -- descriptions.
23         Q.  Well, his descriptions were his -- what he
24   perceived; right?  It's --
25         A.  What he --

Page 143

1          Q.  Right.
2          A.  -- recalled --
3          Q.  Illogical --
4          A.  -- and what he perceived.
5          Q.  -- to think he would describe what he didn't
6    perceive; correct?
7          A.  Right.  And I'm assuming it's also logical that
8    he -- that he would not describe every exposure he had
9    because this is what this case is about.  So I'm taking
10   it at face value that he -- he thought about this, he
11   would have discussed it with others, and he -- when
12   asked those questions, he provided his best estimate.
13         Q.  Okay.  So your exposure days I think you said
14   was 19?
15         A.  19 mixing days and 19 spray day- -- mist --
16   mist-exposure days.
17         Q.  Okay.  So -- So that is -- 19 plus 19 is 38
18   days?
19         A.  That's correct.
20         Q.  So you -- your -- your opinion is that
21   Mr. Hardeman had 38 days -- independent days of
22   exposure?
23         MR. DHINDSA:  Objection.
24         THE WITNESS:  That's what I modeled for
25   Mr. Hardeman based on his own --

Page 144

1          MS. WAGSTAFF:  Yeah, yeah.
2          THE WITNESS:  -- recol- -- well, own recollection
3    of --
4          MS. WAGSTAFF:
5          Q.  You've --
6          A.  -- ten --
7          Q.  -- said a hundred --
8          A.  -- ten --
9          Q.  -- times that --
10         A.  -- ten days total.
11         Q.  Okay.
12         A.  I know.  But let's -- I want to put it in
13   context.
14         Q.  Uh-huh.
15         A.  Ten days total --
16         Q.  Mm-hmm.
17         A.  -- is what he said.  And he doesn't specify the
18   type of exposure.
19         Q.  Well --
20         A.  And so I gave him ten days of spray exposure --
21         Q.  I got it.
22         A.  -- and ten days of -- of spill exposure.  And
23   then I doubled it.  So I -- Does that -- Do I think that
24   accounts for what happened?
25         Q.  So --

Page 145

1          A.  Based on everything I've read, the answer is
2    "yes."
3          Q.  I -- I think there's a disagreement on what
4    Mr. Hardeman testified to, but I understand your basis
5    for your -- what your --
6          A.  Okay.
7          Q.  -- opinion is.  And you've said now many times
8    of what you believe Mr. Hardeman said.
9          So I'm asking you now:  You have 38 days of
10   exposure; right?
11         A.  That's correct.
12         Q.  And you're -- you're -- So anything over 38
13   days in 26 years, your -- your opinion is no longer
14   accurate?
15         MR. DHINDSA:  Objection.
16         THE WITNESS:  No, bec- -- and as I've explained
17   be- -- the -- and what you're asking is about the
18   question of uncertainty, and could it have been --
19   Let's -- Let's pick a number bigger than that.  Let's
20   say 40 days, which is more than 38.  And so if you look
21   at 40 days of exposure, yes, that would -- for that one
22   parameter, that would increase the -- the values.
23         However, you have to look at the entire set of
24   exposures, all the parameters together.  And so if
25   that -- if -- if -- to account for that potential

Golkow Litigation Services - 877.370.DEPS

Michael Joseph Sullivan, Ph.D.

Page 146

1    uncertainty.  I've increased parameter by parameter.  He
2    said he was at -- He said he sprayed three to four
3    hours.  I use five.  That puts an extra 20 to 25 percent
4    duration just for that one parameter of exposure.
5    That's dir- -- a direct increase in his -- in his total
6    exposure.
7        So as you go through --
8        MS. WAGSTAFF:
9        Q.  Well, if you --
10       A.  -- the parameters -- and -- and they are all
11   larger, so you -- if you argue, "Well, maybe it was 40
12   days," it's already accounted for if there's a few more
13   days than -- than he says --
14       Q.  Well, your model --
15       A.  -- because --
16       Q.  -- accounts for 38 days.
17       A.  Plus --
18       Q.  "Yes" or "no"?
19       A.  -- all the other -- If -- You ca- --
20       Q.  38 days --
21       A.  You can't --
22       Q.  -- "yes" or "no."
23       A.  You can't pick out a --
24       Q.  Okay.
25       A.  You can't --

Page 147

1        Q.  I'm just asking --
2        A.  -- pick out one parameter.
3        Q.  -- you a question:  Does your model account for
4    38 days?
5        MR. DHINDSA:  Objection.
6        THE WITNESS:  There are 38 days in the --
7        MS. WAGSTAFF:
8        Q.  Your model.
9        A.  -- in the -- in the model.
10       Q.  Okay.  That's my question; okay?  And then --
11       MR. DHINDSA:  I don't think he finished answering
12   it.
13       MS. WAGSTAFF:
14       Q.  My question is:  Does your model account for 38
15   days?  "Yes" or "no."
16       A.  It accounts for --
17       Q.  38 --
18       A.  -- a lot of things, including the number of
19   days --
20       Q.  Okay.
21       A.  -- of exposure.
22       Q.  Which is 38.
23       A.  You're cherry picking a single number.
24       Q.  I'm asking you a question.
25       A.  And I've answered it.

Page 148

1        Q.  You're -- You're like so afraid to answer
2    like --
3        A.  No.
4        Q.  -- the most basic questions.
5        A.  I'm not afraid to answer any of your questions.
6        Q.  It's really not a hard question.
7    38 days was accounted for in your model.
8        A.  38 days is -- is the parameter for dura- --
9    number of days of spraying.
10       Q.  Right.
11       A.  That's correct.
12       Q.  Okay.  So if he had more than 38 days, he would
13   presumably have more hours.
14       A.  If -- Every day has the same number of hours.
15       Q.  Yeah.  Right.
16       A.  That's correct.
17       Q.  Okay.
18   No further questions.
19       MR. DHINDSA:  Okay.  Nothing further.
20       THE VIDEOGRAPHER:  This marks the end of Media
21   Number 2 in the matter of Hardeman versus Monsanto
22   Company, et al.  This concludes today's video deposition
23   of Dr. Michael J. Sullivan.
24       We are going off the record.  The time reads
25   4:54 p.m.

Page 149

1        (The proceedings concluded at 4:54 p.m.)
2                    ***
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

38 (Pages 146 to 149)

Michael Joseph Sullivan, Ph.D.

Page 150

```
 1   STATE OF CALIFORNIA ) ss
 2
 3       I, Delia M. Satterlee, CSR 9114, do hereby declare:
 4
 5       That, prior to being examined, the witness named in
 6   the foregoing deposition was by me duly sworn pursuant
 7   to Section 2093(b) and 2094 of the Code of Civil
 8   Procedure;
 9
10       That said deposition was taken down by me in
11   shorthand at the time and place therein named and
12   thereafter reduced to text under my direction.
13
14       I further declare that I have no interest in the
15   event of the action.
16
17       I declare under penalty of perjury under the laws
18   of the State of California that the foregoing is true
19   and correct.
20
21       WITNESS my hand this _____ day of January,
22   2019.
23
24   _____
25   Delia M. Satterlee, CSR 9114
```

Page 152

```
 1            ACKNOWLEDGMENT OF DEPONENT
 2
 3       I,_____, do hereby
 4   certify that I have read the foregoing pages, and that
 5   the same is a correct transcription of the answers
 6   given by me to the questions therein propounded, except
 7   for the corrections or changes in form or substance, if
 8   any, noted in the attached Errata Sheet.
 9
10
11   _____
12   MICHAEL JOSEPH SULLIVAN, Ph.D.           DATE
13
14
15   Subscribed and sworn to
16   before me on this _____day
17   of_____,20___, by _____
18   _____,
19   proved to me on the basis of satisfactory
     evidence to be the person(s) who appeared before me.
20
21       Signature _____
22
23
24
25
```

Page 151

```
 1          ------
 2          E R R A T A
 3          ------
 4   PAGE  LINE   CHANGE
 5   ____  ____  _____
 6     REASON:  _____
 7   ____  ____  _____
 8     REASON:  _____
 9   ____  ____  _____
10     REASON:  _____
11   ____  ____  _____
12     REASON:  _____
13   ____  ____  _____
14     REASON:  _____
15   ____  ____  _____
16     REASON:  _____
17   ____  ____  _____
18     REASON:  _____
19   ____  ____  _____
20     REASON:  _____
21   ____  ____  _____
22     REASON:  _____
23   ____  ____  _____
24     REASON:  _____
25
```

Michael Joseph Sullivan, Ph.D.

**A**

a- 12:24 25:19
    32:23 44:1
    96:4 102:21
    104:3
ability 15:13
able 7:17 12:5
    17:18,19 28:6
    114:2 115:2
    131:20 141:9
ABS 63:5 64:9
    64:22 65:17
    118:19 119:18
    119:19 121:11
abs- 46:18
absolutely
    125:25
absor- 63:5
absorbed 42:10
    42:12 45:9,25
    46:1,6,13,19
    46:21,25 49:12
    121:12 122:7
    123:14
absorption 10:3
    32:23 39:8
    63:6 113:9,18
    119:25 120:1
    120:18 123:1,2
    124:10,21
ac- 9:2 46:17
acceptable
    47:10
accompany 19:7
account 82:10
    84:9 116:13
    120:7 122:2,4
    124:10 138:18
    140:16 145:25
    147:3,14
accounted 84:21
    129:16 138:14
    140:5 146:12
    148:7
accounts 144:24
    146:16 147:16

accurate 16:10
    75:6,7 93:18
    115:17 120:6
    120:19 135:20
    135:22 145:14
acknowledge
    132:9
ACKNOWLE...
    152:1
acreage 12:24
    13:10
acres 12:23 13:7
action 9:24
    150:15
activities 9:3,9
    11:16 18:22
    36:21 39:25
    43:15 74:5,10
    76:15 90:6,23
    92:5 104:4,20
    106:3 120:5
    132:15
activity 103:8
    106:11 108:22
    112:25 124:8
actu- 69:2
actual 36:21
    62:17,25 64:2
    64:7 65:13
    67:6 85:23
add 32:16 105:9
added 94:21,23
    94:24
adding 105:18
    105:19
addition 84:16
    107:25
additional 13:15
    32:18 99:17
    137:22
additionally
    32:21
address 142:20
addressed 41:13
    142:21
addresses 39:8
adjusted 76:3,4

120:7
adjustment
    124:10,22
adjustments
    103:25
ADME 10:3
    32:23 44:6
admit 94:7
affect 129:2,5,19
afraid 148:1,5
Aft- 139:4
afternoon 7:10
    7:11 137:23
    140:11
agai- 97:20
Agency 50:22
aggressive
    110:17 112:24
ago 8:1,4,7 73:1
    73:18,25
    119:21 136:22
agree 43:9
agreeing 58:13
agreement 7:16
    8:9
Agri- 33:18
Agricultural
    33:12,18 34:4
    34:15 35:19
    36:11,25 47:19
    48:1,6,22
Ah 26:8 52:12
ahead 92:2
    117:23 120:23
    135:10
AHS 35:12 36:3
    37:25 38:11,16
Aimee 2:5 6:14
aimee.wagstaf...
    2:9
al 5:8 6:8 148:22
al- 81:24
Alaska 2:6
allowed 12:12
    18:8
allows 11:21
    12:6,18 13:17

Altieri 3:6,10
    6:20,20
amount 75:21
    81:17 85:20
    105:8 114:25
    115:15 139:11
    141:14 142:19
amounts 60:10
    60:11
and- 2:10 3:13
Andrus 1:12 2:4
Angeles 1:13
    3:17 6:6
    136:21
animal 47:12
    114:7,23
answer 28:6
    40:23 41:8
    46:10 61:25
    62:6,8 67:12
    68:5,13,16
    69:16 70:21
    83:7 87:19
    89:1 93:11
    95:8,14,18,21
    96:18 99:25
    117:3,4,24
    125:16 140:14
    141:8 145:1
    148:1,5
answered 18:20
    59:5 68:17
    69:19 141:1,4
    147:25
answering
    142:12 147:11
answers 140:13
    152:5
anticipation
    57:15
anymore 72:23
    73:19
apart 28:15
appear 29:15
APPEARAN...
    2:1 3:1
appeared

152:19
appears 41:24
    42:10
appl- 103:7
applicable 57:11
    118:17
application
    70:12 71:18
applicator 49:13
    100:5
applicators 48:5
    48:13 89:20
    100:2,3 101:25
applied 9:8 51:1
    71:9 104:3
    115:15 122:6
    123:13
apply 56:19,24
    56:24 57:15
    67:18 74:15
    105:3
appropriate
    64:17 102:23
    103:2 104:22
    109:18 131:2
    132:6
approximately
    16:15 17:22
    76:12 103:21
AR 100:12,17
    101:2,3,5
ar- 104:4
area 13:19 14:23
    16:18 17:7,8
    17:15,16,20
    18:2 33:1
    60:23 86:7
    96:9,14 100:13
    103:19,25
    104:6 105:20
    106:1,1,5,9
    109:5,6 112:18
    113:13 114:4
areas 13:11,12
    13:14,16 14:18
    14:19 15:18
    16:23 17:9,11

19:14,14
100:20 102:17
109:22,24
139:2,5,13,15
**argue** 146:11
**argument** 84:19
**arm** 89:25 104:4
**arms** 99:10
100:15,19
102:19,25
103:9
**article** 28:4
101:22 102:12
**articles** 28:2,4
**ask-** 59:5
**asked** 8:12,14
8:24 9:10,13
9:17,23 28:3
31:7 34:1,17
51:25 55:19
65:7 69:19
81:6 95:17
100:16 116:22
140:4,22 141:6
143:12
**asking** 24:7
35:22 43:12
51:16 58:14,15
58:22 61:21
62:8 67:21,25
76:17,17 80:2
93:19,24 96:5
129:8 142:8,10
142:12 145:9
145:17 147:1
147:24
**aspects** 10:9
11:20 34:6,9
34:16,18 39:5
44:4 54:2 57:9
107:25 109:4
**assembled** 31:1
**assessment** 5:5,6
50:23,25 51:17
51:18,20 68:11
68:12 71:8
**assessments**

60:22
**assessor** 56:18
**assessors** 54:11
67:17
**assigned** 77:19
**assume** 36:1
79:10,13 92:10
98:2 106:24
116:13 134:6
**assumed** 98:8,11
99:9 104:24
105:15
**assuming** 17:2
57:24 58:6
60:1 88:7,12
143:7
**assumption**
122:13
**assumptions**
11:18 12:6
60:16
**at-risk** 67:17
**attached** 152:8
**Attachment**
4:13,17,20,23
**attempt** 11:15
**attorney** 71:25
**attributed** 76:14
**authorized** 27:7
**authors** 121:25
**authorship** 31:9
**available** 18:20
126:24
**average** 59:7,11
61:13,14,18
62:15 69:24
74:13,14 75:12
92:12 93:13
**averaging** 94:16
**awhile** 34:22

___

**B**

**b** 4:8 52:9,13
**back** 14:10
17:22 38:3
47:20 66:10
81:8 88:9 98:6

99:4,7,15
100:11 104:16
104:19 105:2
119:12 120:20
121:3,14
122:10 138:6
**barriers** 99:23
**base** 78:16 80:12
**based** 11:19
14:19 19:15
36:21 39:14
40:5 45:13
47:13 65:16
68:10,23 73:13
74:1,2 78:1
79:3,23 80:25
81:17 82:2,3,5
82:6,7 85:2
86:12 89:7
99:17 100:18
104:6 111:3
112:18 120:4
125:18 142:22
143:25 145:1
**basic** 67:18
93:22,25 148:4
**basing** 60:18
80:19
**basis** 81:13 86:2
145:4 152:19
**bathing** 72:22
**baths** 69:13
**be-** 27:24 145:17
**bearing** 29:4
**bec-** 145:16
**becau-** 142:19
**beginning** 49:11
67:1 110:24
132:18
**begins** 136:1
**behalf** 6:15,17
6:18,20,22
**bel-** 31:4 81:9
**believe** 8:14
12:20 16:24
17:3 21:19,23
21:25 31:4

32:7 34:21
50:1 51:25
61:15 75:7
78:11 81:9
82:24 83:2
105:2 106:21
113:22 114:6
117:16 123:20
124:22 126:1,8
126:10 131:2
135:24 138:17
139:1 141:22
145:8
**believed** 82:15
82:16
**bell** 31:23
**best** 15:12 22:1
41:9 50:13
143:12
**better** 128:20
**beyond** 79:24
81:3
**big** 142:16
**bigger** 145:19
**biggest** 75:8,11
**biomonitoring**
45:13
**bit** 27:2 47:20
50:8 107:13
136:24,24
**blow** 18:7
**bo-** 74:21
**board** 51:1 85:1
**body** 39:2 69:24
102:24 103:3
103:22,25
109:7
**bottle** 109:12
**bottom** 17:19
64:3 65:12
94:22 101:22
**Boulevard** 3:16
**boundary** 16:16
**bounds** 142:19
**break** 64:16
66:8 83:18
118:23

**bring** 58:7
**broad** 87:5,23
117:15 129:6
**broader** 44:3
55:18 56:5
**brushed** 97:7
**bu-** 79:4
**buffer** 141:22
**buildings** 16:4
17:12
**built** 85:19
86:10
**bullet** 23:16,17
**bumped** 77:23
79:18 82:9

___

**C**

**C** 4:17
**ca-** 146:19
**cal-** 51:6 54:2
109:23 112:17
**calc-** 115:3
**calculate** 32:9
46:13,21 59:14
62:2 79:5
83:14 96:15
102:23 103:7
114:24 124:8
**calculated** 41:15
43:14 46:20,25
49:12 75:18
82:1 94:14
112:18 138:16
**calculating**
82:13
**calculation**
42:15 44:7,24
49:23 50:9
65:2,13 74:19
75:1 76:13,16
81:16 85:9
86:12 93:3,10
93:12 94:19
98:9 102:13
115:9 116:19
130:6,19
132:13 133:17

calculations
4:23 23:6
41:22 43:18
61:22 65:5
69:1 78:1
79:18 84:22
90:19 99:10
101:14 129:19
130:3 131:2
132:6 138:22
138:23
calculator 47:23
CalEPA 51:6
California 1:3
1:14 3:17 6:6
6:10 51:5,16
54:2 87:22
150:1,18
call 14:21 39:5
59:16 60:2
69:22 118:3
called 14:22
28:14 32:23
47:10 106:17
106:17,21
cancer 10:12,15
10:25 61:19
62:3
capture 141:24
career 69:9 70:3
72:23 86:21
careful 110:10
110:11
carefully 86:5
111:2
case 1:5,8 6:8
8:13,16,25
24:25 25:2,12
26:11,13,14
27:23 28:1
31:1,5,5 33:7
42:25 53:11
55:11,17 56:19
57:1 59:14
60:3 65:23
70:2 71:10
85:23 86:2

87:8 94:17
96:13 105:11
110:4 118:11
126:22 139:18
141:18 143:9
categories 91:4
categorization
36:17
cau- 34:6
causation 10:18
10:19,19 11:2
61:22 62:9
caused 10:25
causes 10:12,15
centimeter
103:18
centimeters
103:20 106:5,8
109:25 112:23
central 44:24
45:3
certain 33:25
44:10 60:10,11
105:8 109:19
140:23
Certainly 51:12
55:10 102:11
123:24
certainty 139:18
142:19
certify 152:4
change 32:8,10
49:24 75:16,16
75:20,20,21
84:23 93:8,11
93:16,20,21
94:1 103:13
115:21 119:3
127:8,24 128:1
128:3 140:19
151:4
changed 85:11
changes 19:1,2
93:17 94:2
116:22 152:7
changing 140:13
chart 62:12,13

62:17 67:6
90:4,24,25
100:11 104:19
118:20 119:15
check 52:9
108:11,17
checked 75:3,6
chemical 79:20
80:15,16 83:10
113:13 118:10
124:6 127:3,7
127:13,15,21
127:23,24
128:2,3 130:20
134:7 135:3
chemicals 71:7
84:1 86:20,25
117:13 118:8
119:22 126:17
128:25 129:2
129:21 130:2,4
133:4,25
134:10,20,22
135:11
chemistry 24:7
cherry 147:23
chose 44:9 90:25
91:2
ci- 57:5
circle 16:21
17:10
circled 17:15
citation 29:19
106:14
cite 29:3 38:5
47:8 52:5
101:21 106:12
106:17,23
113:21 121:2,2
122:5 123:4,5
cited 4:18 22:25
28:16,19,25
29:10,13,14
34:24 35:25
36:4,5 37:24
38:4 51:11
57:3 77:25

125:11 139:15
cites 47:5 52:13
citing 103:11
Civil 150:7
clarify 29:11
clear 11:20
40:16 81:14
82:25 84:12,13
88:4 89:19
98:10 118:12
131:12 132:8
133:16 140:18
141:16
clearer 127:20
clearly 88:4,5,13
clears 61:16
Cleary 3:15 6:22
6:22
clothes 89:12,18
89:21,24 96:11
96:25 100:9
clothing 96:2,7
96:18 100:1
cm2 113:14
co- 38:23 77:2
122:24
coast 87:22
Code 150:7
cohort 48:12
cohorts 48:3
collected 34:19
collecting 35:4
37:1
Colorado 2:7
6:14
column 104:20
columns 74:4
94:24
com- 61:3
come 29:25
30:10,24 31:16
43:23 47:20
66:10 88:9
102:21 108:23
115:3
comes 44:15
60:20 120:24

comfortable
12:7 41:21
61:3,4 87:1,8
coming 44:4
94:17 103:2
109:4
comment 34:2,5
commenting
34:5 36:18
common 120:12
120:13,16
Company 1:7
3:3 6:8,19,21
6:23 18:13
148:22
compare 36:15
38:17 45:15
46:23,25 49:7
49:12 59:14
compared 36:22
43:1 45:9 46:5
47:6,12,24,25
48:3,11,23
49:22
comparing
36:20 38:24
comparison
36:15 48:24
49:3
comparisons
50:1,2,2
compiled 30:5
complete 60:7
60:13 92:18
complex 43:11
75:1
complicated
43:21
component
44:25 45:3
91:13
components
71:14
comprehensive
92:4
comprised
27:14

**con-** 12:13 96:12
  108:21 111:3
**concentrate**
  23:19 105:7
  106:8 127:11
  128:17 129:22
**concentrated**
  104:21,25
  105:16 106:19
**concentration**
  104:23,24
  105:10
**concentrations**
  113:23
**concept** 56:21
  56:22 123:22
**conceptual**
  55:23 56:3
  95:8
**conclude** 142:15
**concluded** 66:25
  149:1
**concludes**
  148:22
**conclusion**
  41:24 42:11
  44:2,15,17
  97:3,16
**conclusions**
  26:19 43:12
**conducted** 11:10
  106:13 107:1,3
  121:9
**conducting**
  108:6
**confidence**
  12:18
**confident** 41:15
  85:1,21 141:5
**confirm** 58:11
  111:7
**confirmation**
  112:17
**confirmatory**
  108:22 111:4
**confirmed** 127:6
**confused** 25:17

26:8
**confusion** 61:6
**Conifer** 5:8
**connection** 11:9
  20:3
**conservatism**
  12:13 85:20
**conservative**
  59:25 140:15
**consi-** 87:12
**consider** 32:18
  32:21 40:7
  54:3 86:16,21
  96:1 97:12
  98:20 141:19
**consideration**
  100:9
**considered** 4:14
  28:15 29:6,9
  29:13,23 30:14
  31:1,10 32:17
  39:19 40:13
  41:11,20 53:10
  95:4 96:13,17
  96:24,25 97:1
  97:6,14 123:7
  123:9
**considering**
  43:15 96:16
  98:17
**consistent** 17:18
  18:1 50:12,18
  51:9 52:6
  53:13 54:19
  60:20 90:22
  108:13 122:25
  127:7
**constant** 116:7
  116:11 121:21
**contact** 39:24,25
  56:14 95:3
**contacting** 98:3
**contacts** 56:16
**contained** 27:22
  29:9 127:13
**container**
  110:19

**containing**
  128:17
**contaminated**
  69:13 72:20
**contemplates**
  40:9 41:5
**context** 144:13
**Continued** 3:1
  5:1
**contribute**
  141:13
**convinced**
  112:25
**copied** 57:24
**copy** 7:16 52:22
  52:24 58:7,8
  58:13 125:17
**correct** 9:15,16
  10:20,21 11:1
  11:2 12:23
  13:2,5,6 14:3,5
  14:12 18:14
  19:10 20:19
  26:25 28:17
  29:24 32:7
  37:25 44:16
  46:7,9,17,21
  47:17 49:9
  50:5 56:25
  57:4,10 59:18
  62:13,23 63:8
  64:4,5,10,11
  64:12 65:25,25
  67:7 73:6,23
  74:7,10,11
  78:7 81:17
  95:1 96:2 97:5
  97:8 98:16
  99:20 100:25
  101:6,14,15
  105:1,13
  106:13 108:14
  112:6,8 126:21
  132:2 133:21
  134:1,11 136:5
  137:17,19
  140:8,9,11,20

143:6,19
  145:11 148:11
  148:16 150:19
  152:5
**corrections**
  152:7
**counsel** 2:1 6:12
  30:19 31:16
  95:13
**count** 37:16
  124:2
**couple** 8:15,22
  60:9 66:15
  115:24 116:12
  119:5 121:17
  125:2
**course** 87:7
  90:21 92:6
  122:18
**court** 1:2 6:9,25
**covered** 139:1
  141:16
**create** 9:6 68:20
  68:21
**created** 9:4 23:2
  47:23 62:13
  70:25 90:6,13
  90:14,24
**creating** 54:16
**criteria** 49:14
  50:3
**CSR** 1:15 150:3
  150:24
**cup** 105:17
  109:17,21
  110:8 112:14
  112:19
**current** 18:17
  18:19
**Curriculum**
  4:15
**CV** 22:23
  135:15

―――――――――
       **D**
―――――――――

**D** 4:1,20
**D-adj** 65:20,20

75:24
**D.C** 3:8
**da-da-da-da-da**
  77:11
**daily** 47:10 59:7
  59:11 61:13,14
  61:18 62:15
  74:13,14 75:13
  92:12 93:13
**data** 9:24 34:19
  35:4 37:2
  100:1 104:2
  115:23 116:9
  117:20 118:1,8
  126:19 129:8
  130:20
**database** 125:8
  125:23,24
**date** 6:3 7:14,17
  7:23 8:23
  31:20 135:18
  136:2 152:12
**dated** 7:25
**day** 27:9 59:17
  59:19 60:1
  80:4,5 82:22
  92:9,11 94:14
  94:20 100:4
  148:14 150:21
  152:16
**day-** 143:15
**days** 76:4,6,11
  76:12,20,24
  77:16,21,22,24
  77:25 81:6,10
  84:16,20,20,21
  84:22 85:5,6,7
  94:15,17,18
  98:1,13,15,22
  98:23 99:17
  136:9,13 137:1
  143:13,15,16
  143:18,21,21
  144:10,15,20
  144:22 145:9
  145:13,20,21
  146:12,13,16

Michael Joseph Sullivan, Ph.D.

146:20 147:4,6
147:15,19
148:7,8,9,12
**DDT** 87:21
**de-** 61:6
**Dec-** 136:2
**December** 1:14
6:4 135:24
136:3,4,8
**decide** 30:6
**decided** 59:6
110:7
**decimal** 101:13
**decision** 8:17
**declare** 150:3,14
150:17
**decrease** 93:9
**Defendant** 3:3
**defensible** 87:11
**define** 118:20
128:4
**defined** 62:10
**defines** 88:5
**degree** 139:18
**Delia** 1:15 6:25
150:3,24
**denominator**
74:24
**Denver** 6:14
**dep** 89:11
**dep-** 8:18
**depend** 73:9
**depending** 39:6
118:10
**depends** 73:7
**depo** 15:2
**deponent** 6:10
152:1
**deposed** 25:1,2
31:17,19
**deposi-** 31:14
**depositing** 97:18
**deposition** 1:11
4:10 6:5 8:18
8:19 11:19
12:1 13:12
14:2 19:15

21:5,16 22:14
22:16 23:18
24:19,21 25:4
25:5,12 31:15
32:3,11,19
39:23 40:3
61:6 77:14
78:2,3,15,19
81:9 83:1
84:13 88:4
91:7,17,20
98:7 99:7,11
99:14 103:10
105:13 136:18
136:20 139:4
139:15 148:22
150:6,10
**depositions**
24:24 136:7
**deposits** 100:17
**derm-** 39:24
**dermal** 39:24,25
40:9,16 41:5
41:13,19 51:4
51:7,20 53:24
54:2 55:9
56:12 57:1,8
67:16 68:25
69:8,10,10,23
71:6 95:1,3
96:2,7,17 97:6
97:23 98:18
113:18 115:8
115:21 117:11
118:15 119:25
120:18 122:6
123:14 124:9
129:11
**des-** 142:22
**describe** 12:2
13:16 14:23
51:7 63:5 77:5
89:22 90:1
91:13 99:8
103:22 143:5,8
**described** 12:4
13:11 28:4

40:12 43:8
82:25 84:24
86:8 100:6,20
107:24 111:19
125:16 139:6
**describes** 43:10
88:12,16 89:23
103:15 105:12
**describing**
84:11 101:2,3
**description** 4:9
5:2 12:1 40:6
76:9 79:17
82:3 85:2 89:8
90:21,22
100:19 120:5
125:19,20
142:4
**descriptions**
68:25 142:22
142:23
**descriptive**
64:13 65:9,10
91:5
**detail** 28:5 37:7
59:23 130:11
**details** 59:21
91:22 107:14
108:4
**deter-** 35:8
**determine** 59:6
**determined**
42:22
**determining**
81:16
**devel-** 107:7
**develop** 9:1
11:14
**developed** 11:18
12:10 68:23
107:6 108:8
**developing**
55:25 60:22
**development**
55:22
**Dhindsa** 3:5,9
4:5 6:18,18

14:13,17 15:6
21:20,24 22:4
32:12 33:13,15
33:23 35:13,20
35:22 36:12
37:3,14 38:2
38:12 39:3
40:11 41:7,10
43:3,6 44:20
45:11 49:25
52:22 53:20
60:17 61:20
62:4,7 64:16
64:20 65:4
66:2 67:24
69:19 70:19
71:3 72:2
75:14 79:22
80:18 81:18
82:23 83:11,16
84:3 85:8,25
87:17 89:14,16
91:24 92:2,13
92:15,18 93:15
94:10 95:11,14
97:10,13 99:19
108:15 111:16
112:12 117:14
117:21,23
119:5,7 129:4
130:9,18
132:11 133:20
134:2,12 135:8
138:1,11
139:20 140:21
142:1 143:23
145:15 147:5
147:11 148:19
**di-** 130:2
**difference** 39:14
39:15,17 85:3
85:4,7 128:8
**differences**
28:18
**different** 35:3,3
36:23,23 55:19
60:9 66:3

70:10 71:12,13
86:20 100:22
100:24 101:5
102:17 104:9
110:20 118:6
118:16 142:17
**differently**
65:19 66:1,4
104:10
**difficult** 118:13
**dil-** 105:6
**dilute** 23:20
105:5,10
**diluted** 104:22
128:17 129:15
131:4
**dipped** 109:11
**dir-** 146:5
**direct** 29:4
141:2 146:5
**direction** 150:12
**directly** 29:3
**dirt** 13:23
**disagreement**
145:3
**discounting**
116:14
**discuss** 14:7
51:2 140:12
**discussed** 13:19
47:20,24
132:16 140:10
143:11
**discusses** 39:5
39:23 40:2,17
**discussion** 44:6
49:20 113:8
124:4
**distill** 43:22
**distribution**
10:3 39:9
**District** 1:2,3
6:9,9
**divided** 65:14
**dividing** 94:16
**division** 74:22
**do-** 53:22

**doc-** 28:14
**docu-** 29:12
**document** 1:6
 4:11,13,17,19
 4:22 5:4,6 30:9
 30:22 36:5
 55:5,12 99:6
 121:1 123:25
**documents** 4:14
 5:5 28:15 29:9
 29:12,23 30:8
 30:10,16,17
 31:1 32:16,17
 50:22 51:11
 54:17 123:7,9
**doing** 9:4 10:17
 30:8 32:9
 43:25 73:10
 86:12 122:15
 126:8 135:14
**dose** 36:16,21
 40:5 41:15
 42:10,12,14
 43:14,17,24
 44:24 45:2,25
 47:10 48:3,7
 49:12,22 59:7
 59:11 60:2
 61:13,14,18
 62:15 68:25
 74:13,14 75:13
 75:18 76:1,4
 82:1,13 92:12
 93:13 110:25
 121:12 122:7
 123:14 132:14
 138:16
**doses** 38:24 43:1
 45:9,13,14
 46:1,6,13,21
 47:1,1,6,9,12
 47:15 48:20
 49:14
**dosimetry** 45:14
**dosimetry-bas...**
 102:13
**double** 75:17

**double-check**
 110:6
**doubled** 76:12
 77:25 79:4
 144:23
**doubling** 75:18
**download** 30:12
**Dr** 4:15,25 6:10
 7:10 22:18,23
 23:3 26:12,12
 26:21 67:4
 119:15 138:12
 148:23
**draft** 12:10
**draw** 15:12
**drew** 17:10
**drift** 59:20,22
 77:21 78:11,13
 79:14,19 80:15
 83:25 98:13
**drive** 2:6 49:21
 83:5
**driveway** 11:25
 12:3 13:18
 16:14 17:19
**duly** 150:6
**dura-** 148:8
**duration** 120:8
 120:13,25
 121:6 146:4

―――――――
E
―――――――

**E** 4:1,8,23 51:19
 151:2
**e-** 24:22,22 56:6
 71:4,21 87:11
**earlier** 7:13
 38:13 44:6
 51:4 72:22
 98:14 122:16
 127:12 141:6
**early** 116:10,11
 117:6,8,9
**ease** 115:20
**easier** 15:16
 34:23 115:11
**easy** 37:20

 108:16,24
 112:13 115:15
**eat** 87:21
**edges** 110:18
**edification**
 121:11
**Edwin** 2:3
**effect** 75:8,11,22
 93:10 100:3
**effects** 118:10
**eight-hour**
 136:13
**either** 28:7 34:1
 35:6 72:20
 95:18
**electronic** 27:5
**eliminate** 10:3
 40:14
**eliminating**
 44:23
**elimination** 10:4
 39:9
**Embedded**
 74:18
**encountered**
 76:7
**Endangerment**
 5:6 51:17 71:8
**ends** 136:2
**engaged** 132:16
**English** 45:18
**enter** 116:4
**entire** 43:10
 68:2 70:2,21
 81:16,24 109:9
 122:1 145:23
**entitled** 4:13,17
 4:19,22 5:8
**entry** 39:20
**Environmental**
 50:21
**ep-** 36:22
**EPA** 51:17 54:3
**epi** 36:17,22
 38:7,20 48:25
 49:2,5
**epidemiological**

 48:4
**epidemiology**
 9:11,14 33:24
 37:24 38:19,20
 48:12
**EPLay** 51:17
**equa-** 64:12
**equally** 109:15
**equation** 9:5,6,7
 11:15 32:10
 40:8 41:4,17
 41:18,19 42:20
 42:23 43:23
 44:9,19 46:5
 50:12,18 51:8
 51:8,16,22
 52:5 53:8,10
 53:12,15,22
 54:4,10,13,14
 54:16 55:25
 56:4,6,12,14
 56:19,24 57:5
 57:19,21 58:4
 58:19 59:2
 60:7,13,19,20
 61:1 62:18,19
 62:25 63:7,13
 63:25 64:2,3,7
 64:13 65:10
 67:5,6,8,9,16
 67:21 68:7,14
 68:20,22,23
 69:5,6,18 70:1
 70:10,12,15,24
 70:25 71:9,12
 71:21 73:2,11
 73:12,15 74:3
 74:16,18,19,25
 75:19 81:23
 83:15,24 84:2
 84:7 85:24
 86:3 93:8 94:2
 94:15 95:1,3
 96:1,9,17,24
 104:19 119:17
 141:4,11
**equations** 51:4,4

 51:5 53:1,18
 54:8,18 55:8
 55:21 56:15
 57:8 67:18
 69:8,15 71:22
 71:24 72:9,12
 72:17 73:16,21
 73:22
**equipment**
 80:10 91:3
**Errata** 152:8
**Eskovitz** 3:14
**Esquire** 2:5,12
 3:5,6,15
**essentially** 77:23
 78:1 94:15,19
 109:8 114:3
**estimate** 9:2
 12:16 13:10
 42:14 61:16
 87:2 92:12
 110:1 111:5
 114:2,5 115:2
 143:12
**estimated**
 110:15
**estimates** 34:3
 102:22 108:23
 141:22
**et** 5:8 6:8 148:22
**eval-** 57:16
**evaluated** 57:17
**evaluating** 57:1
**evaluation** 8:20
 12:14 108:18
 111:4 141:20
**event** 150:15
**evidence** 152:19
**ex-** 36:16 56:4
 65:10 67:4
 71:22 86:21
 87:10 88:3
 103:2 107:23
 117:11
**exact** 7:14,21,23
 8:23 12:24
 20:7 28:24

33:9 35:2,8,8
53:8 63:18
67:21 69:9,17
69:20 70:14
99:8 103:4
123:16,20,20
131:15 140:14
**exactly** 7:17
32:14 35:6
54:12 55:16
56:17,22 67:11
69:22 78:12
85:10 86:1
99:13 113:25
120:24 121:7
**EXAMINATI...**
4:3
**EXAMINATI...**
7:7 138:9
140:1
**examined** 150:5
**example** 11:24
16:5 29:14
34:3 38:21,22
44:5 48:5,10
48:22 55:22
56:1,21 61:2
87:19 89:5
104:23 115:25
118:7 119:25
129:8,11
134:25
**examples**
124:12
**Excel** 68:22
74:19
**Excellent** 14:25
**excuse** 40:6
61:16
**exhibit** 4:9,10
4:11,13,15,17
4:19,22,25 5:2
5:3,4,6,8 15:1
21:10,13,14
22:15,17,18,20
22:21,22,23,24
22:25 23:1,2,4

23:5,7,8,10,11
27:1 41:25
51:14 52:18,19
53:3 54:20
55:16 57:20,23
67:4 90:5,8,9
102:3,6 119:16
135:16,24
136:1
**exhibits** 5:1
22:14 27:14
57:23
**exist** 24:11
**expect** 128:15
129:1
**experience**
86:12
**experienced**
60:23
**experiment**
106:12,18
107:3,7,17
108:4,7 109:1
111:11,14
112:2,7 115:18
116:8 120:2
122:2,15,18
**experiments**
115:8 121:8
**expert** 25:9,14
26:3,6,9 29:21
33:17,21 36:1
38:19 57:18
86:15,16,22,23
87:4,8,14
134:19 138:15
139:17
**experts** 25:10,16
25:23 54:11
67:18 92:17
**explain** 77:2
78:20,22
104:11,20
107:11 108:17
113:17 115:12
**explained** 68:10
72:19 107:12

116:23 117:2
145:16
**explanation**
65:10 115:15
115:20
**expo-** 41:15
61:16 96:2
**expose** 109:13
141:14
**exposed** 56:20
76:10,22,24
77:17 78:13
79:24 81:6
82:15,15,16,20
82:22 83:1,6
84:12,19 85:22
87:12,16 88:1
88:5,20 89:3,4
96:10,14 97:19
98:22,24,24
100:20 102:15
102:25 103:9
109:23 120:8
128:13,15,24
129:15 131:9
133:25 138:17
139:12
**exposure** 4:11
4:13,17,19,22
4:23 5:4,9 9:1
9:5 10:5,12,15
10:25 11:15
12:15 23:5
27:25 30:12
32:9 33:25
34:2,7,12,16
34:18,19 36:16
37:1 38:15
39:14,16,18,19
39:21 40:1,8
40:10,13,17
41:4,5,12,12
41:13,14,16,19
41:22 42:20,23
43:15,23,24
44:4,9 46:5,6
47:23 50:9,12

50:18 51:8
53:24 54:2,11
55:9,20,24
56:4,12,14,15
57:1,9,10,12
57:14,19,21
58:4,17,25
59:9,11,13,17
59:19,19 60:22
61:5,10,11,12
61:17 62:2
67:5,16,18
68:11,25 69:8
69:10,11,12
71:6,11,21,22
72:12,17 73:2
73:16,21,21
74:3 76:4,5,8
76:14 77:22,24
77:25 78:4,10
79:1,9,21 80:7
80:8,17,23
81:16,17 82:1
83:9,24 84:7
84:24 85:4,21
86:15,17,19,19
86:22,23 87:1
87:2,9,14
89:13,19 90:18
92:8,10 93:7
93:14,19 94:8
94:13,22,23,25
95:2,5 96:1,2,7
96:7,15,16,17
96:25 97:6,23
98:11,14,18
99:10,16,17,17
102:13,22,24
104:5,19 114:4
115:9 116:11
116:14 119:17
120:13,16
121:4 124:8
125:8 126:3
129:3 130:3,12
130:17 131:3
132:3,4,7,14

133:4,11,18
138:13,21
140:5,19 141:8
141:12,14
142:22 143:8
143:13,22
144:18,20,22
145:10,21
146:4,6 147:21
**exposures** 12:17
38:17 59:12,15
60:1 77:17,18
79:5 82:10
83:14 84:1,9
85:15 88:25
102:1 124:11
130:21 138:14
138:19,24
140:15 141:25
145:24
**extent** 10:2
14:11 18:21
19:15 28:7
34:1 135:21
**extra** 101:18,19
146:3
**extract** 128:5
**extremities**
102:18

————————————
**F**
————————————
**F** 3:6
**face** 40:3 60:25
78:12 79:16
80:6 88:15
89:23 99:10
100:15,19
102:19,25
104:5 143:10
**fact** 11:19 31:15
38:21 70:25
92:8 93:7 95:5
97:21 111:1
115:16 133:12
133:24 142:4
**factor** 63:6
85:12 110:25

118:19 119:18
119:19 121:11
124:10,22
**factors** 44:9
124:17
**facts** 85:23 86:2
86:10 91:22
**fair** 9:5 42:11,19
47:14,22 49:1
126:12
**fairly** 122:18
123:2
**fall** 7:15 8:4
**familiar** 125:7
126:2
**far** 12:3 56:5
**fashion** 43:9
**federal** 50:20
51:2 75:5
**feel** 38:10 79:19
79:20 80:5
81:4 85:21
87:1 89:13
141:7,9 142:20
142:20,21
**feeling** 39:24
**feels** 44:22 77:16
79:13
**felt** 19:14 30:11
30:23 40:3
59:22 76:10
78:11 80:15
83:1,9,25
84:13 110:1,21
**fence** 11:25 12:3
16:14 17:8,21
18:24,25
**fences** 16:18
17:8
**field** 9:7 86:16
87:9
**Figueroa** 1:13
6:6
**figure** 47:8,13
**fill** 64:3
**filling** 105:17
**final** 122:1

**find** 31:6 53:5
67:9,16,21
101:11 122:9
125:6
**finding** 30:16
**fine** 58:21 65:5
95:22 117:19
**fingers** 109:24
110:10,17
112:15,18
**finish** 95:15
**finished** 147:11
**firm** 137:9,11
**first** 11:7 18:8
22:15 45:23
55:18 56:6
60:19 74:6
83:21 108:21
109:5 110:9
116:3,3,6,12
116:15 121:17
132:13 133:1,9
137:4 139:4
**fish** 87:21
**fit** 126:5
**fits** 49:20
**five** 139:10
146:3
**flip** 55:14
**Floor** 6:6
**fluid** 114:24
115:1
**flux** 113:13,17
114:2,5,9
115:6,7,9,17
115:21 116:1,5
116:6,10,13,22
119:21 121:15
121:19 122:12
122:13,14,16
122:24 124:6
**fluxes** 121:23
**focus** 62:24
**focused** 26:14
27:25 34:14
38:15 130:3,4
130:11

**focusing** 13:16
**follow** 11:14
95:19 107:18
**followed** 108:6,9
109:3,4 111:7
**following** 63:3,4
111:14
**follows** 7:5 36:9
41:3
**food** 89:5
**foot** 13:5
**foregoing** 150:6
150:18 152:4
**forests** 101:25
**Forestville**
11:12 16:12,13
74:10 139:1
**forget** 125:21
**form** 24:12
152:7
**formed** 12:8
**formula-** 130:22
**formulated**
130:8,22
**formulation**
100:13 106:2
127:25 128:5,7
128:19,20
129:10,12,15
131:4 132:4,7
133:8 134:5,6
134:11,23
**formulations**
129:7 131:1
133:5
**found** 42:21
101:25
**four** 52:14 124:3
139:7,10 146:2
**front** 27:20
35:23 37:7
40:14 58:12
92:25 93:4
100:12
**fu-** 113:17
**full** 53:8 72:24
**function** 62:17

**further** 52:15
139:20 148:18
148:19 150:14

———————
**G**
**gain** 13:17
**gallon** 89:24
91:16 109:20
**garage** 16:6
17:20
**garden** 16:17
**gate** 16:15
**general** 8:10
10:19 35:1
74:15 114:1
117:18
**generally** 27:24
31:4,9 39:19
51:1
**generic** 56:13,15
56:18 57:11,14
**getting** 30:7
78:9
**give** 9:10,13,17
9:23 33:11,17
33:21 35:1,8
36:2 71:24,25
115:1,2 140:22
**given** 24:19,24
57:23 99:17
121:21 152:6
**gives** 53:1 56:12
103:19 142:19
**giving** 9:14,20
10:24 32:19
58:6 133:17
**gl-** 126:24
**glean** 23:18
**gloves** 98:5,8,10
**gly-** 118:1
**glyphosate** 4:11
4:13,17,20,20
4:23 5:9 9:2,25
10:10,12 11:1
23:23 24:3,9
29:5 39:1,25
47:1,6,15

49:13 63:6
79:2 82:6 87:9
88:2,21 89:4
89:12,20 92:9
92:10 100:13
102:1 104:22
104:25 105:16
106:2 114:25
116:1 117:8,17
117:19 118:1,4
118:11,13,15
118:17 120:4
121:17 122:3
126:16,25
127:1,13,21
128:10,14,16
128:17,25
129:3,7,9,12
129:13 130:3,4
130:17,19,21
130:23 131:1,4
132:4,7,13
133:19,22
140:5
**glyphosate-ba...**
138:13 139:2
**Glyphosate-co...**
132:17 133:2
133:10 134:4
134:16
**glyphosate-sp...**
128:5
**go** 12:5 13:21
14:9,12 19:20
38:3 41:25
53:4,6 54:9
56:9 64:22
77:3 81:3,8
84:17 89:8
91:7 92:2 98:6
99:4,7 105:2
109:5 110:12
113:7,11
117:23 120:20
120:23 121:3
122:10 135:10
135:24 138:1

Michael Joseph Sullivan, Ph.D.

146:7
**go-** 121:20
**goes** 17:2 43:16
  80:3,4 137:6
**going** 13:14
  16:19 18:7
  21:8 27:2,15
  32:25 36:2
  51:14 54:22
  66:9,20,22
  74:12 77:8
  89:8 94:9
  99:15 100:11
  103:3 104:17
  118:22 119:3,9
  121:20 138:3
  148:24
**Golkow** 6:3
**good** 7:10,11
  25:3 45:6
  61:15 64:16
  66:12 80:10
  110:22 129:6
  131:7 137:14
**gosh** 136:2
**gotten** 41:17
**gravel** 11:25
  16:13,25 17:2
**greeted** 18:19
**Grossman** 2:11
  6:16
**Guala-** 74:6
**Gualala** 74:6,6
**guess** 13:8 35:1
  60:15,18 78:18
  96:19 136:9
**guessing** 8:8
  136:6
**guesstimate**
  86:11
**guidance** 5:4,6
  50:21 51:6,18
  51:18,20 53:12
  57:11 67:16
  68:24
**guide** 18:16 56:3
**guided** 19:16

**guidelines** 50:12
  50:17,25 51:2
  52:6,7 54:19
**guys** 15:13,25

---

**H**

**H** 2:5 4:8
**ha-** 71:14 136:17
**half** 105:11
**hand** 59:23
  79:11,20 88:6
  102:2 106:6,18
  109:7,8,9,12
  109:13,21,22
  110:8 150:21
**handful** 26:3,6
**handheld** 90:16
  91:15,17
**Handlers** 125:7
**hands** 78:4 80:6
  80:16 81:5
  84:1 106:4,4
  110:13 112:15
**Hang** 15:16
**happen** 59:12
  141:12
**happened** 59:19
  69:2 91:12
  96:10 112:10
  122:1 144:24
**happening** 60:4
  122:17
**happens** 97:19
  105:6
**hard** 148:6
**Hardeman** 1:7
  2:3 4:11,13,17
  4:20,23 6:7,15
  6:17 9:3,8
  11:16,24 13:11
  14:7 18:23
  19:4,8 21:3,25
  22:3,19 23:14
  23:19 26:11,13
  26:17,17,21
  31:15 39:22,23
  40:16 43:14

47:13 49:13
  50:9 56:17,20
  58:1 59:21
  60:10,24 69:3
  70:13 71:14
  74:7 76:7
  77:14 79:16
  80:15 82:2,14
  82:21 83:6,8
  83:25 86:5
  88:1,20 89:3
  90:5,15 91:6
  92:8 94:4
  98:15,20 100:6
  100:18 102:24
  104:24 106:7
  120:3 122:3
  124:9 126:9,11
  127:9,15
  128:13,24
  129:22 130:23
  131:14 132:16
  133:25 138:12
  139:17 140:6
  142:3 143:21
  143:25 145:4,8
  148:21
**Hardeman's**
  8:13,19 10:25
  11:11 14:2
  15:2 21:16
  25:12 41:14
  42:9,12,14
  45:25 46:25
  55:17 76:9
  86:13 87:10
  92:12 93:18
  99:15 104:4
  131:3 133:18
  138:25
**head** 102:19
  103:9 108:8,14
  111:15 112:3
**headed** 4:11 5:4
  5:6
**header** 49:15,23
**Health** 33:12,18

34:4,15 35:19
  36:11 37:1
  47:19 48:1,6
  48:23
**hear** 109:1
  123:8
**heard** 125:14
  126:4
**held** 6:5 109:21
**help** 56:3,3
  108:22
**herbi-** 128:18
**herbicide** 4:21
  29:5 48:4,12
  90:5 100:10
  106:19 128:18
  133:5 139:3
**herbicides**
  132:17 133:3
  133:10 134:4
  134:16,17
  138:13
**hesitate** 81:25
**hi-** 85:21
**high** 100:2
  141:15
**higher** 12:17
  82:10 111:9
  138:17
**highly** 89:17
**hike** 13:25 20:1
**hiking** 13:21,22
  14:7
**hill** 13:24
**Hmm** 19:21
  126:4
**Hmm-mm**
  114:17
**hold** 139:16
**holding** 106:6
  112:19
**Hollingsworth**
  3:4 137:11
**home** 11:10 12:9
  12:11 14:16,18
  49:22 83:5
**hour** 13:2,3

17:23 101:4
  102:1 103:11
  103:12 113:14
  139:7,14
**hours** 116:3,3,6
  116:12,15
  120:3,10,16
  121:3,5,7,17
  122:4 124:11
  136:12,13
  137:15 139:7
  139:10,10
  146:3 148:13
  148:14
**house** 14:21
  16:6,17 17:9
  17:20
**housekeeping**
  100:21
**huge** 67:13
**Human** 5:4
**hundred** 144:7
**hypothetical**
  80:4 93:24
  94:11
**Hypothetically**
  94:1
**hypotheticals**
  92:16

---

**I**

**i-** 62:16 97:20
**idea** 74:4,12
**ideas** 119:3
**identified** 20:24
  21:14 22:17,20
  22:22,24 23:1
  23:4,7,10
  52:19 53:3
  67:15 102:6
  119:16
**identify** 6:12
  17:11
**iii** 101:16
**Illogical** 143:3
**im-** 133:8
**immediately**

116:14
**impact** 92:11
**implication**
121:11,13
**implicit** 133:8
**important** 19:14
34:10,11 38:10
44:1,7 53:25
54:3,12,13,15
61:16 75:15
91:4 108:19
130:24
**impossible**
87:19 99:25
**imputation** 35:9
35:12,16
**in-** 41:20
**in-person** 35:5
**in-vitro** 113:18
113:19
**include** 41:20
47:9 53:18
57:8 130:21
**included** 53:15
53:23 119:20
**includes** 107:25
**including** 29:13
147:18
**inclusive** 41:16
138:23
**increase** 93:5,9
93:13,14,20
110:23 112:25
139:11 141:2
145:22 146:5
**increased** 80:13
84:8,15,18
93:6 110:24
146:1
**increases** 110:25
121:12 122:7
123:2,14 141:3
**increasing** 84:16
**independent**
143:21
**indicated** 38:13
63:7

**indicating** 15:6
17:4,7 21:10
54:23 90:11
101:5 105:23
**indicative** 125:4
**individual** 87:2
**individuals**
48:21 49:5
69:12 100:4
102:14 104:1
**infor-** 30:1
**information**
13:15 19:16
28:20,23 30:2
31:10 32:18
40:15 42:21,22
60:6,11,12,12
87:11 92:25
94:13 103:1
104:7 106:15
124:9 132:14
132:15
**ingestion** 51:5
**inhalation** 40:5
40:9 41:5,12
41:16,20 51:4
78:9 81:5 95:1
**initial** 110:1
**initially** 111:10
112:21
**input** 44:7 53:13
**inspected**
138:25
**intake** 47:10
**intend** 27:23
29:22 33:11,17
33:21
**intended** 92:3
**interest** 130:20
150:14
**interested** 34:15
**Internet** 126:24
**interviews** 35:5
**intrinsic** 127:3
128:1,3
**invoice** 136:8
**invoices** 4:25

23:8 135:23
**io-** 24:11
**ion** 24:12
**issue** 29:5
**issues** 27:25
130:13
**it'd** 34:23

—————————
**J**
—————————
**J** 6:10 148:23
**jaltieri@holli...**
3:12
**January** 150:21
**Jennifer** 2:12
6:16
**jmoore@gmi...**
2:16
**Joe** 6:20
**John** 137:6,8,16
**Johnson** 25:2
31:18,19 32:5
32:10 33:3,3,7
**Joseph** 1:11 3:6
4:2 7:3 11:7
152:12
**ju-** 15:16 36:19
36:19

—————————
**K**
—————————
**Kajim** 18:8
**keep** 63:23,23
70:24 72:25
74:1 113:3
**Kentucky** 2:14
**kept** 30:3 111:15
112:3
**kg-day** 43:14
46:3
**kind** 119:2
129:5,16
**know** 8:23 12:2
12:2,24 13:10
13:13 14:21
16:5 17:17
18:24,24,25
20:1 23:22
28:24 29:20

33:1,18 34:21
35:14,16,17,17
37:4,15 38:7
49:5 52:7
55:15 58:6,10
59:18 60:11
63:15 65:11
67:12,23 68:2
69:21,21 78:12
81:8 86:18
87:15,20,22,23
88:2,7,21,22
89:4 95:8
98:10 99:13
100:25 101:12
102:8 103:19
107:12,13
108:3 110:3
112:9 113:24
114:3,4,9
115:12 118:22
121:6 123:9
125:14,18,24
127:9 129:21
131:13,15
133:11,25
134:14,17,24
135:6 136:25
137:6 141:10
142:9 144:12
**known** 126:3
**knows** 79:8,10
79:13 82:21
88:5 134:16

—————————
**L**
—————————
**label** 109:21
131:18,24
**laboratory**
106:17 107:3
111:11 112:2
114:21
**lag** 115:25
118:12 123:1
125:5,5
**Lakewood** 2:7
**language** 38:22

45:18 99:8
**large** 12:25
13:13 85:19
**larger** 61:7
146:11
**largest** 59:17
60:2 61:9 62:1
77:19 94:12
**Lavy** 5:8 101:21
102:2,12
**laws** 150:17
**lawsuit** 130:7,11
**lawyer** 18:6
19:17 137:8,9
140:4
**lawyers** 31:2
136:16
**layer** 118:3,3
**leads** 13:24
142:14
**learn** 11:23
**leaving** 14:21
**legal** 10:22
130:13
**legs** 97:25 98:3
98:24
**length** 140:10
**let's** 50:7 54:20
57:19 62:24
64:1,6,8 75:24
77:20 85:18
92:10 94:12
106:16 109:1
113:7 118:19
134:19 135:15
144:12 145:19
145:19,19
**letter** 7:25 8:8
**level** 37:7 50:20
100:3 142:18
**levels** 141:10,11
**li-** 31:9
**LIABILITY** 1:5
**light** 89:23
**limit** 34:17,17
**limitation** 36:19
**limitations**

35:18 36:10,14
**limited** 130:16
**line** 11:25 15:21
  17:8,21 151:4
**linear** 116:4
  121:19 122:19
  125:5
**linearity** 124:15
**linearly** 121:12
  122:7 123:2,14
**lines** 66:4
**lipid** 118:2,3
**lipophilic** 118:8
**liquid** 56:20,23
  57:2 69:11
  72:18,20 73:6
  73:8,22 97:18
  100:17 103:2
  105:16 106:10
  106:18 109:12
**liquids** 73:23
**list** 4:14 28:14
  29:6,9,22,25
  30:2,5,10,14
  30:22 31:1
  32:5,16 36:5
  38:4 51:10
  52:10,15 84:17
  129:23 135:11
**listed** 29:6 31:8
  64:9
**listen** 88:17
**listing** 92:4
**lists** 47:11 130:1
**literature** 30:8,9
  32:23,24 39:10
  46:22 60:21
  67:10,12,22
  68:1,3,8,14
  70:15,17,21
  82:8 87:9
  89:20 109:5
  116:15 118:7
  129:16 130:25
  132:15 133:7
**litigation** 1:5 6:3
  8:9 26:1 69:5

69:17 71:1
  75:5 107:4
**little** 13:1 15:4,9
  27:2 32:25
  39:16 47:20
  50:8 107:13
  116:2 124:2
  136:24,24
**live** 114:23
**lived** 74:7
**living** 39:20
**LLP** 3:4
**loca-** 86:9
**location** 11:12
**locations** 102:20
**logical** 143:7
**long** 20:1 59:12
  60:22 64:18
  86:5 99:12,22
  100:4 118:22
  120:3 121:4
**longer** 72:24
  120:3,15
  145:13
**loo-** 58:8
**look** 14:10 15:5
  29:22 30:6,21
  34:14 35:7
  37:19 38:3,4
  43:16 49:11
  50:20 54:1
  56:13 58:2
  60:24 65:24
  70:21 75:24
  81:12 93:3
  98:6 102:17,18
  102:18,19,25
  105:2 114:8,23
  118:7 120:20
  121:4 122:16
  122:24 123:3
  124:25 125:13
  129:12 133:6
  135:15 142:14
  145:20,23
**looked** 29:2,7,8
  29:21 30:2,4

34:22 46:18
  52:15 68:7,13
  68:19 70:16
  86:4 109:7,16
  109:22,24
  110:13 113:22
  116:9 122:11
  125:13,22
  129:8,17
  130:21 131:8
  131:16,17
  132:6
**looking** 22:13
  26:19 52:9,12
  53:11,25 62:12
  67:4 71:11
  74:3 91:16
  104:8,16,19
  115:23 116:1
  120:16 126:23
  133:7,10
**looks** 37:21
  51:14 52:10
  57:25 58:5,9
  58:13 59:3
  62:15,18 65:23
  94:20 96:9
  136:1
**Los** 1:13 3:17
  6:6 136:21
**lot** 55:13,20
  84:18 86:18
  128:10 136:6
  147:18
**lots** 86:20
**Louisville** 2:14
**love** 135:6
**low** 123:1
**lower** 102:18
  110:15 116:12
**lowest** 46:1

_____

**M**

**M** 1:15 150:3,24
**ma'am** 9:19
  14:4 21:6
  28:12 33:20

37:23 63:4
  66:5 74:8
  106:25 113:10
**main** 2:13 25:8
  40:1 61:11,12
**Manual** 5:7
  51:18
**map** 5:3 15:3,11
  15:13 16:2,9
  21:8 23:11
**March** 31:17,21
  32:19
**mark** 15:18,20
  15:24 21:13
  52:17 53:2
  102:3 104:17
**marked** 15:1
  22:14 52:21
  54:22 135:16
  135:23
**marks** 16:2 67:1
  148:20
**mass** 113:13
  114:3 124:6
**matched** 86:8,9
**material** 107:9
**materially**
  129:18
**materials** 28:14
**math** 93:20,22
  94:1
**mathematical**
  75:19 93:7
  96:6
**mathematically**
  75:22 93:17
  95:3,20
**matter** 6:7 7:12
  22:19 25:10
  31:18,19 84:20
  84:22 85:5,6
  85:24 98:2,23
  148:21
**maximum** 85:22
**MCL** 22:21
**mcleary@wil...**
  3:19

**MDL** 1:5
**me-** 106:6
**mean** 13:22
  21:22 35:25
  36:2 46:13,14
  75:10 76:1,2,6
  76:21 78:17
  81:21 86:18
  89:2 90:24
  118:4 133:13
  135:3
**meaning** 116:2
  118:6,16
**means** 35:14,16
  35:17 76:16,18
  102:14 107:1
**meant** 67:17
  102:10
**meas-** 114:9
**measure** 102:15
  105:7 109:19
  114:1,1 115:17
**measured**
  103:24 109:24
  111:23 113:12
  113:18 114:10
  115:6,7 124:5
**measurement**
  111:6 114:5
**measurements**
  108:21
**measuring**
  105:17 106:6,6
  109:17 112:19
**meat** 37:13
**mechanism** 9:24
**Media** 66:25
  67:1 148:20
**meet** 136:16,19
**meeting** 19:8
  136:21 137:4
**Meghan** 3:15
  6:22 137:19
**memorized**
  132:1
**memory** 7:24
  99:13

Michael Joseph Sullivan, Ph.D.

mention 26:16
121:24 125:2
mentioned
13:17 14:8
17:1 39:8 95:6
134:24
mentions 26:13
messed 55:6
58:3 90:10
met 21:3 136:17
136:23 137:15
137:18
metabolism
10:4 39:9
method 37:1
methodologies
36:16 46:22
methodology
32:13 103:15
methods 32:9
108:12
metric 59:9,12
61:12
metrics 59:10
61:13
mg 113:13
mg/cm2 102:1
103:12
mg/kg 103:11
mi- 78:7
Michael 1:11
4:2 6:10 7:3
11:7 148:23
152:12
middle 11:7
133:1
milligram 43:13
milligrams 46:3
mind 83:6,8
104:9
minimal 40:9
41:5
minor 41:12
91:12
minus 101:13,17
minute 61:10
63:1 107:15

minutes 64:19
66:7,15
misguided 19:3
missed 88:17
111:18
missing 111:17
mist 40:3 89:23
97:18 143:15
Mist- 77:14
mist-exposure
143:16
misunderstood
114:18
mixed 110:3
mixing 59:19
77:21 78:5,7
88:6 104:20,21
105:9,15 106:3
106:19 109:20
143:15
mixture 127:1
128:18 129:22
130:8 131:10
133:11
MJ 106:23,24
ml/cm2 101:4
Mm-hmm 10:1
24:10 45:24
52:1 65:8
66:11,18 77:7
77:9,13 93:1
102:16 113:20
114:13,19,22
121:16 127:22
138:2 140:25
144:16
mo- 90:22
model 55:23
56:3 126:3,4,5
126:7,7,10,12
146:14 147:3,8
147:9,14 148:7
modeled 45:9
46:1 90:18
143:24
models 126:10
molecular 127:1

127:24
molecule 24:6
moment 119:21
Monday 136:25
137:15,23
monitor 67:2
Monitoring
103:17
monkey 113:22
Monsanto 1:7
3:3 6:7,19,20
6:23 18:13
26:3,10 30:18
30:18 31:3,8,9
75:4 107:4
148:21
Monsanto's
31:2 140:4
months 8:1,15
8:22
Moore 2:11,12
6:16,16
morning 136:16
140:10
move 58:23
119:22
moved 18:25
movement
114:3
moves 39:1
moving 44:8
113:13 124:6
MSDS 127:4
multiple 83:17
multiplication
74:20,22,23
75:2
multiply 74:12
85:14 103:19

N

N 4:1
name 6:2 11:4,7
11:7,7 18:7,8
18:11 125:20
125:22 131:15
137:6,7

named 150:5,11
names 137:14
narrow 52:4
56:9
ne- 90:1
near 16:16
necessarily
15:17
necessary 65:15
68:9
need 53:5 60:12
92:18 102:21
119:5 122:2,4
needed 60:6
never 21:3 70:20
80:5,6 89:24
89:25 94:2
125:14 142:2
new 70:11
no- 96:19
nonresponsive
67:20 116:21
Northern 1:3
6:9
note 129:23
noted 152:8
notes 20:14,15
20:18
notice 4:10
22:15
noticed 1:12
notified 8:15
November
26:24 135:18
nu- 66:3 103:4
num- 40:1
number 6:8 15:2
20:7 27:2
28:24 37:16
42:24,24 43:1
43:13 44:15,18
45:4,8,23 46:4
47:22 50:11
52:12 53:2,17
53:17 55:2
57:4 61:7 67:1
67:1 76:11,12

77:16,19 81:9
81:21 84:16
93:20 94:1,18
101:15 103:4
103:14 109:19
110:22 111:8,9
112:22 121:2
122:1 140:23
141:2 145:19
147:18,23
148:9,14,21
numbered 28:23
37:18
numbers 12:16
12:20 47:24
74:14,16 75:3
75:7 79:18
84:25 85:12
108:19 142:5
numeral 77:10
77:12 101:16
numerical 64:25
numerous 20:9
28:2 48:20
129:11
Nursery 5:8
NW 3:7

O

o- 30:21 38:7
oak 97:21,23
object 35:22
objected 117:23
objection 14:13
14:17 21:20,24
22:4 32:12
33:13,14,23
35:13,20 36:12
37:3,14 38:2
38:12 39:3
40:11 41:7,10
43:3,6 44:20
45:11 49:25
53:20 60:17
61:20 62:4,7
65:4 66:2
67:24 70:19

71:3 72:2
75:14 79:22
80:18 81:18,18
82:23 83:11,16
84:3 85:8,25
87:17 89:14
91:24 92:13,14
93:15 94:10
97:10,13 99:19
108:15 111:16
112:12 117:14
117:21 129:4
130:9,18
132:11 133:20
134:2,12 135:8
140:21 142:1
143:23 145:15
147:5
**observation**
20:16
**obvious** 97:24
**obviously** 13:13
18:22 27:7
31:14,16 33:7
42:15 75:4
89:2 129:25
**occur** 55:25 78:6
124:15
**occurred** 12:17
59:20 76:5
77:18 92:5
**occurring**
122:14
**occurs** 104:21
116:13
**October** 7:25
8:23 136:2
**offer** 28:10
**offering** 11:2
38:18
**oh** 8:2 19:18
24:22 25:15
29:16 42:12
49:17 114:18
136:2
**okay** 8:2,7,12,21
8:24,24 9:4,10

9:13,23 10:6
10:11,14,19
11:4,9,13,23
12:8,22 13:1,5
13:7 14:11,25
15:12 16:1,8
16:22 17:24
18:3,13 19:5,8
19:23 20:3,12
20:18 21:1,5,7
21:12 22:2,10
23:22 24:1,8
24:13,25 25:3
26:5,23 27:1,3
27:7,10,15
28:11 29:8,18
29:20 30:6
31:11,17,21,22
31:25 33:4
34:13,19 35:9
35:15,18,25
36:12,24 37:5
37:8,22 38:6,9
39:12,21 40:8
42:4,9,18
44:11,12 45:6
45:16 46:4,10
46:24 47:14,18
48:11,17 49:7
49:10,20 50:4
50:9,10,15
51:10,21,24
52:3,12,17
53:16 54:5,15
54:20,24 56:7
56:11 57:3,7
57:10,18,22
58:2,25 59:4,6
59:16 60:15
61:8,18,24
62:11,15,22,24
62:25 63:1,2
63:24 64:6,7,9
64:11,15 65:18
66:6,12,14,17
67:9,20 68:4
68:16,18,20

70:14,23 71:16
71:20 72:11
73:5,20 75:8
75:23,25 77:5
78:20,24 79:12
79:15,19 80:1
80:4 81:11,14
83:4,21,23
84:7 85:23
87:25 90:3
91:2,21 92:7
92:16 93:2
94:25 95:23,25
96:22 97:3,6
97:15 98:5,13
98:19,25 99:2
100:21 101:18
101:20 104:11
104:14,21
106:12 107:9
107:20 108:11
109:3 110:4
111:1 113:1,6
113:17 117:5
117:10,20,25
118:18,25
119:4,8 120:9
124:23 126:2
126:15 127:19
130:7,15
131:11 132:2,8
132:25 133:16
134:18 135:7
135:12,15,17
135:23 136:4
136:14,19
137:13,21,24
139:8 143:13
143:17 144:11
145:6 146:24
147:10,10,20
148:12,17,19
**old** 73:1
**once** 29:17,19
29:19 30:13
110:12 116:10
**one's** 101:7

**one-** 72:16
**ones** 30:11 52:2
122:23 123:9
125:3,6
**op-** 9:13
**operator** 126:3
**opi-** 127:12
**opine** 29:22
**opining** 38:19
**opinion** 4:11,13
4:17,19,22
8:13 9:11,14
9:17,20,23
10:11,14,17,24
11:10,18 12:8
12:10 22:7
23:16 25:5
27:18 28:1,5,8
28:21 29:4
32:8 33:1,3,11
33:17,21 38:14
38:16 39:1,13
40:12 42:5,19
44:2,2 48:3
57:25 62:10
71:20 77:6
78:19,25 79:21
80:7,14,16
81:15 82:21
84:24 87:15
90:15 99:22
107:8,10,13
123:10,13,15
124:19 126:5,9
127:12,14
130:16 132:24
133:17,21,22
136:17 140:20
141:21 143:20
145:7,13
**opinions** 11:3
22:6 27:12,23
36:3 39:11
123:4 138:15
139:16 140:5
**opposite** 86:2
**or-** 124:7

**order** 89:19
113:3 120:6
124:7
**organic** 118:7
**orient** 15:9
**oth-** 108:20
**ounces** 109:18
109:19
**outlined** 39:10
**outside** 10:13,16
61:23 62:9
129:10
**overall** 29:5
**overestimate**
12:14,21 41:14
43:17 61:5
87:12 116:19
**overestimated**
76:13
**overestimates**
84:23,25 85:16
85:20 140:16
**overestimation**
141:23
**owner** 18:17,19
19:13

_____
**P**
**P-O-E-M** 126:3
**p.m** 1:14 6:4
66:23 67:2
119:10,13
138:4 148:25
149:1
**pa-** 77:8
**pace** 17:18
**padding** 141:23
**page** 4:3,9 5:2
10:24 23:16,17
27:4 45:7 50:7
55:22 56:1,13
57:3 67:11
74:21 77:8,12
100:24 101:1,3
101:10,15,19
101:20 103:17
113:2,4,4

124:1 126:15
132:13,23
133:9 151:4
**pages** 4:11,14,15
4:18,21,23
27:21,22,24
37:13,16,21
55:13 56:14
152:4
**pants** 99:12,22
**paper** 10:5 28:5
34:23 35:7
43:2 45:10,13
45:15,20 46:6
46:9 47:9,11
47:16,25 48:20
49:4,8,23 50:3
53:22 103:1,7
103:10,15
104:9 112:5
113:25 120:16
120:20 121:24
125:22
**papers** 29:1
115:10,19,25
122:13,22,23
122:25 129:17
**paperwork** 7:14
**par-** 53:13,22
**paragraph**
41:24 42:1,2,3
42:6,6,24 45:4
45:23 47:7,18
49:11,16 52:5
52:13 113:7
124:1 126:16
133:1
**paragraphs**
124:3
**parameter** 75:8
75:17,21 85:11
85:14,14 93:8
93:16,21
145:22 146:1,1
146:4 147:2
148:8
**parameters**

12:19 53:9,14
53:23 54:9
56:16 62:21
63:1 64:23
69:14,22,23
74:22,23 84:17
84:18 93:6
94:19,23
100:12 140:17
145:24 146:10
**park** 17:20
**part** 41:18 51:19
51:19 55:16
64:3 82:12
96:24 107:6,7
107:22 111:18
111:19 130:6
133:5
**particles** 23:23
24:2,3,14
**particular** 42:16
133:13 134:15
**parts** 46:20
103:3,22 109:7
110:13 116:11
**passive** 45:14
102:12 103:17
**patches** 102:14
102:15 103:16
103:18,21,24
104:3,6,8
**path** 15:24
**patterns** 80:11
**Paul** 19:17
**paying** 107:4
**PC** 1:12 2:4
**PEA** 71:13
**peer-reviewed**
67:10,12,22
68:1,2,8,14
70:15,17,21
**pen** 15:8,24
**penalty** 150:17
**people** 87:15
134:14 141:11
**perceive** 138:14
138:20 143:6

**perceived**
142:24 143:4
**percent** 63:13
63:16,18 65:1
65:16,21,23
76:21,21,24,25
77:23 78:25
79:7,7 105:1,2
105:4,12 113:8
115:8,14
119:25 120:12
120:14,18
121:12 122:6
123:13 124:9
124:21 146:3
**percentage**
64:24 65:3
66:4 69:24
76:4,20 115:11
115:19,20
119:23
**perfect** 99:23,25
**performed**
50:24
**period** 33:9
59:12 100:7
113:14 120:17
121:8 124:7
125:5,5
**perjury** 150:17
**person** 48:24
57:15 71:10
110:11 115:14
134:6
**person(s)**
152:19
**personally** 49:2
**pesticide** 5:4
57:10 73:20
87:7,14,21
100:2 125:7
**pesticides** 73:3,5
73:17 86:19,24
86:25 87:6,16
87:20 99:23
100:1
**Ph.D** 1:11 4:2

7:3 152:12
**pha-** 117:8
**pharmacokin...**
39:6
**phase** 116:5,10
123:1 125:5
**phases** 117:11
**PHED** 125:10
**phone** 6:16
**photographs**
20:9
**photos** 20:4,12
20:15
**phrase** 36:13
**Physical** 126:17
**pick** 49:2 145:19
146:23 147:2
**picked** 127:6
**picking** 147:23
**pictures** 20:19
20:20,24
**pieces** 11:20
**place** 101:13
124:18,20
150:11
**placed** 103:21
**plaintiff** 2:3
4:20 6:15,17
26:6
**plaintiff's** 19:17
25:13
**plan** 16:10
**planning** 9:22
**plants** 97:7
98:18 99:16
**please** 6:12 11:5
45:20 51:13
88:17
**PLLC** 2:11
**plot** 5:3 16:10
23:11 122:22
125:3
**plus** 128:25
143:17 146:17
**POEM** 126:4,5
126:7,10,12
**poi-** 97:23

**point** 8:17 42:17
51:15 82:12
83:5 104:9
123:17
**pointed** 71:7
130:24
**pointing** 101:8
**poison** 97:21,23
**portal** 39:20
**portion** 32:25
121:19
**possible** 40:4
48:19 49:3
68:1 80:8,12
88:1,20 89:3,5
89:6,10 109:15
**post-spray**
120:5
**poten-** 109:10
**potential** 145:25
**potentially**
36:15 91:11
138:19
**pour** 112:14
**poured** 83:10
105:16 106:7
110:8,9
**pouring** 107:25
108:1 110:8,12
110:17,17,17
110:21 111:2
112:24
**powder** 73:9,13
**practice** 71:19
**practices** 50:13
68:12
**pre-** 119:24,24
**predictive** 126:2
**Preliminary** 5:6
51:17 71:8
**preparation** 5:4
32:2
**prepare** 25:4
**prepared** 38:11
**preparing** 136:7
**present** 2:12
3:21 61:14

103:5 104:10
115:18 119:24
126:9 137:20
**presentation**
42:13
**presented** 45:9
46:2,6,8 50:3
62:19,21 66:4
95:2
**presenting**
103:6 115:19
**presents** 45:15
46:9 102:12
113:8
**pressure** 127:2
127:25
**presumably**
148:13
**presume** 61:25
**pretty** 17:25
37:20 84:12
116:11 117:15
**previously**
121:15
**primarily** 39:24
**primary** 41:19
59:9 61:11,12
**prior** 12:11
22:14 33:6,7
69:4,16 105:17
105:18 135:21
136:18,19
150:5
**Pro** 126:20
127:10,14
128:4
**probably** 8:23
18:22 25:8
30:7 66:12
69:11 72:10,19
78:14 85:13
99:11 111:2
113:21,23,24
118:23 131:5
136:9,11
**procedure** 36:20
68:10 71:6

107:18 108:5,6
108:8,9,12
109:3 150:8
**procedures**
33:25 36:23
50:24 74:2
105:4 111:15
112:1,1
**proceedings**
149:1
**process** 11:14
28:22 43:8,10
43:21 55:24
70:13 82:12
85:20 107:24
111:7,19,20,22
**product** 22:3,7
23:14,23 92:9
92:11 127:15
131:14,18
132:9
**products** 1:5
130:22 131:16
**professor** 72:25
**proffer** 27:23
**project** 18:9
**prop-** 16:14
127:3
**proper** 28:21
**properties** 11:11
82:6 118:10
126:17,25
127:3,3,8,13
127:15 128:6
**property** 9:3
12:22 13:13,24
16:11,15,16,23
17:3 18:21
20:5 74:7,10
82:5 86:9
91:18 128:2,3
139:1,5
**proportion**
64:24
**proportional**
93:14
**proposition**

123:10
**propounded**
152:6
**Protection**
50:22
**protective** 100:3
**protocol** 107:16
108:13
**proved** 152:19
**provide** 8:12
13:15 60:10
107:14 122:13
**provided** 4:25
23:8 26:23
30:18 31:8
40:16 53:8
58:1 59:21,24
59:25 77:19
124:9,17 127:4
139:9 140:17
141:22 143:12
**providing** 10:17
58:12
**pu-** 43:18
**pub-** 30:10
**PubChem** 127:6
**publications**
25:7 50:20
**published** 30:9
47:1,4,5,15
49:13 51:6
109:6,8
**pull** 27:1 51:10
78:14 93:3
99:14 103:1
119:15 121:6
**pulling** 48:20
56:4
**pump** 90:16
91:8
**purchased**
23:19 104:24
**pure** 130:23
**purpo-** 44:24
**purpose** 42:19
43:23 85:21
**purposely**

110:20
**purposes** 23:20
44:12 98:9
**pursuant** 150:6
**put** 11:15 12:15
21:8 22:7
27:11 42:22
43:18 54:4
55:21 56:2
57:25 60:25
63:13 65:12,14
66:3 69:1
77:11 87:11
90:25 92:25
102:14 105:8
111:8 112:5
129:19 144:12
**puts** 146:3
**putting** 65:11
87:1,10 105:18

**Q**
**quantitative**
42:14
**quantitatively**
96:13
**que-** 28:3
**question** 23:12
23:24 24:7
25:18 28:3,6
33:15 36:7,8,9
36:10,13 40:23
41:2,3,4,9
44:13 46:10
52:4 55:18,19
56:5,6 60:8
62:1,9 64:1
70:22 87:18,24
88:17,23 89:2
92:15,23 93:24
95:9,18,21
96:20,23 99:24
100:22 114:20
116:20 117:15
118:21 141:8
142:12 145:18
147:3,10,14,24

148:6
**questionnaire**
35:5
**questions** 18:20
35:23 37:10
81:4 83:17
100:16 119:7
137:25 139:20
141:6 143:12
148:4,5,18
152:6
**quick** 57:20
**quite** 24:18
**quote** 132:12
**quoting** 22:6

**R**
**R** 151:2,2
**Ramirez** 3:21
6:2
**Ran** 18:6 137:5
137:10,16
**range** 47:11
49:4 142:15
**Ranger** 126:20
127:10,14
128:4
**Ranjit** 3:5 6:18
**rate** 100:17
103:2 115:3
121:21 122:12
122:13,16
**rdhindsa@hol...**
3:11
**re-** 12:20 14:20
26:13 29:13
38:13 40:2
68:25 115:16
**reached** 50:8
**read** 12:16 14:3
21:5,16 25:9
25:13 26:7,9
26:11,14 30:13
36:9 40:22
41:3 45:17,19
45:21 48:2
77:8 86:4 91:7

130:13 131:22
134:20 135:10
145:1 152:4
**reading** 78:2
132:20,21
133:24 134:9
135:5
**reads** 148:24
**real** 16:10 57:19
**really** 54:15
65:2 130:10
148:6
**realm** 61:22
**reas-** 43:8
**reason** 21:22
31:24 68:15,19
74:1 82:24
83:2 151:6,8
151:10,12,14
151:16,18,20
151:22,24
**reason-** 61:15
136:11
**reasonable**
100:9 110:2,5
116:16 121:7
139:18
**reasonably**
111:2
**recall** 7:14,19
14:9,23 18:11
19:22 26:11
33:5,9 35:6
69:23 73:24
98:7 115:23
120:15 122:22
125:18 138:14
**recalled** 143:2
**recalls** 78:13
**received** 78:4
89:13 102:1
106:10
**receiving** 106:2
**receptor** 114:24
115:1
**recess** 66:24
119:11 138:5

**recognize** 28:22
132:18 133:3
**recol-** 144:2
**recollection**
13:4 17:5
18:15 22:1
116:9 144:2
**recollections**
72:21
**recommended**
109:20
**reconstruction**
36:21
**record** 6:1,13
11:5 22:12,13
45:20 53:4
66:20,22 119:9
119:12 138:1,3
138:6 148:24
**reduced** 150:12
**ref-** 29:1 63:16
121:14
**refer** 52:2
**reference** 29:15
30:15,22 38:16
38:21 46:2
47:10 53:17
55:2 57:3
115:16
**references** 4:18
22:25 28:8,16
28:19,19,25
29:10,13 30:21
30:23 36:5
40:17 51:15
52:16 123:5
125:12
**referred** 125:10
**referring** 52:8
**refers** 121:14
**refine** 11:21
**reflect** 27:25
69:1 94:3
103:1 118:15
120:6 130:25
131:3
**reflected** 41:22

45:4 94:22
**reflective** 61:18
62:2 91:21
120:18
**reflects** 11:16
87:2
**refreshed** 25:6
**reg-** 68:24
**regar-** 57:12
**regarding** 10:17
22:7 25:6
109:6 133:17
**regardless** 75:20
96:5,10 126:25
128:6
**regula-** 60:20
**regulations**
51:11
**regulatory** 47:9
50:12,17 52:6
54:19 60:21
67:15 68:11,23
**relate** 10:2
54:12 72:18
73:22
**related** 9:24
25:11 26:12
28:7 50:23,25
**relates** 1:6 10:5
26:20
**relationship**
141:2
**relative** 120:10
**relatively** 17:18
116:7 121:19
121:21
**relevant** 29:4
30:11,23 40:7
42:22 44:5
49:14 55:11,16
55:20 135:13
**relied** 14:5 15:2
25:7 28:2,9
**rely** 108:20,20
**remember**
18:10 31:20
33:8 64:1

78:18 91:16
112:16 125:3
131:17,19
137:7
**remembers** 78:9
**removed** 94:19
**rep-** 64:25
119:25
**repeat** 36:8 41:2
116:20
**repeating** 40:21
**report** 5:8 20:4
20:18 22:18
26:12,12,14,16
26:22,23 27:13
27:13 28:11
34:24 36:1,4
37:12,13,22
39:4,10 40:22
41:25 50:7
53:8 57:18
58:7,8,24
78:18 96:4,14
97:20 100:23
101:1,20,25
102:3 104:7
113:2 115:5,5
115:10 121:25
121:25 122:5
123:3,11,15,19
123:23 124:18
124:20 132:2,8
132:10 133:24
134:9,20 135:5
139:17
**report's** 132:5
**reported** 84:9
96:3,5 98:15
139:2
**reporter** 6:25
36:9 41:3
54:23 102:4
**reporting**
122:12
**reports** 25:9,11
25:14,19 26:4
26:7,9,9 29:21

72:23 73:1,19
77:15 103:10
139:7
**represent** 70:16
77:1 106:3,4
**representation**
35:8 64:25
93:18 96:6
115:18
**representative**
122:17
**represented**
109:10
**represents** 67:8
74:8,17,25
120:1
**request** 72:5,7
**requires** 132:14
**reread** 25:5
**researchers**
119:24
**reservoir** 117:13
118:4,6,10,15
**residue** 97:7
98:18 99:16
**response** 24:5
24:20 63:9
67:23 76:23
112:4
**rest** 47:7
**restroom** 118:23
**result** 42:15
45:3 75:17,22
93:6,17,21
103:8 141:3
**results** 75:9 94:2
**retained** 7:12
69:4,17
**retard** 98:10,11
**retention** 7:25
8:8,9
**review** 12:6
30:12 32:2
38:11 39:10
**reviewed** 37:6
38:14 40:15
126:19 135:21

139:4
reviewing 32:22
Reviews 15:3
  55:12 99:6
  121:1 123:25
right 11:10 13:3
  18:18 19:9,19
  20:7 21:3 24:4
  26:24 27:8,17
  31:18 32:6
  37:13 40:10,24
  41:6,23,25
  43:24 44:14
  45:10 52:9
  53:18 57:21
  59:7 61:13
  62:24 64:2,9
  65:20,21 66:19
  72:14 74:5
  78:4,10 80:14
  86:15,19,24
  87:4 90:25
  91:4,22 93:14
  94:5 96:8,18
  97:1 100:15
  101:2,7 105:10
  106:16,20
  107:5 108:25
  112:3 113:11
  119:7,14
  121:10 123:6
  127:10 128:10
  128:14,19,22
  128:25 130:8
  132:18 134:8
  134:21 135:25
  140:6,8 142:24
  143:1,7 145:10
  148:10,15
ring 31:23
risk 50:23,25
  51:18,20 54:10
  56:18 61:19,22
  62:3 68:11
road 13:23,24
  14:21 16:12,13
  16:25 17:2

roll 15:14
Roman 77:10,11
  101:16
roughly 20:4
Roundup 1:5
  10:15,25 23:19
  24:25 69:4
  79:1 80:3,5,7,8
route 39:14,15
  39:18,19 40:1
  99:18
routes 39:21
  40:13 41:11
  43:15 51:3
  94:25 95:2,5

**S**

S 4:8
s- 93:9 104:5
  109:22
sa- 98:7
safety 126:19
salt 24:9
Samuel 3:21 6:2
satisfactory
  152:19
Satterlee 1:15
  6:25 150:3,24
saw 13:8 29:7
Sawyer's 26:12
  26:12,21
saying 43:22
  46:14 64:1
  68:21 70:24
  79:23 80:24
  83:8 88:18
  112:1 123:8
  142:18
says 43:5 60:24
  74:5 76:19
  77:15 78:6
  89:24 91:6,8
  99:11 113:12
  134:15 146:13
scenario 73:7,9
scenarios 73:11
  100:5

science 130:14
scientific 129:15
  132:15 133:7
  139:18
scientist 18:9
  20:11 101:24
scientists 36:25
scope 10:13 28:1
  28:9 34:12
  42:19 61:23
  62:9 81:15
  132:23
scribble 16:20
SDS 126:24
  127:5 128:4
search 30:24
searches 30:8
second 23:16
  42:6 45:21
  56:5 74:9
  103:17 108:4
section 39:4
  43:16 49:19
  52:13 77:10
  132:23,23
  150:7
see 12:5 22:5
  30:22 31:7
  38:4 42:2,12
  47:2,3 49:15
  50:13,16 52:10
  53:7 54:1
  55:14 65:24
  71:24 74:20
  92:19 101:23
  109:6 112:14
  112:21 113:9
  113:15 114:8
  120:22 121:4
  123:21 125:17
  125:25
Seedling 5:8
seeing 12:18
  82:5 125:19
seen 25:11
  125:17 130:1
selected 12:19

self-guided
  19:11
sending 135:22
sense 61:1 86:8
  115:13 141:11
sent 8:17
sentence 42:9
  43:5,22 45:19
  45:21 46:15,24
  133:1
sentences
  113:11
separate 28:15
  114:11
sequence 15:17
series 50:22
Services 6:3
set 100:13
  145:23
seven 142:18
share 107:19
sheet 11:19
  31:15 126:20
  152:8
short 98:2,25
  99:3 100:6
shorthand
  150:11
shorts 98:2
show 16:3 51:11
  52:25 55:8
  56:10 63:14
  65:15 92:4
  100:1 123:22
  124:19 125:4
showering 72:21
showers 69:13
showing 48:7
shown 16:18
  124:16
shows 15:11
side 26:2
signature 27:4,5
  152:21
signed 7:15
similarly 10:14
simple 74:20

75:2
simulating
  106:18
Singh 3:5 6:18
single 59:17
  82:22 94:20
  147:23
single-day 59:13
  59:15 61:9
  62:2 94:12,22
sir 90:24
sit 131:12
site 11:21 12:5
  12:18 16:4
  55:23 56:3,3
  86:7
sitting 49:5
  73:24 115:24
  131:17
situation 56:25
  57:16 67:19
six 91:4 142:18
size 23:22 24:2
  103:16
skin 56:22,23
  63:6 83:10,10
  96:9,15 97:18
  100:14,17
  103:3 105:17
  106:2,9 113:14
  114:25 116:2
  117:13 118:2
  120:4,7 121:20
  122:3 124:6
  131:5 138:20
  141:7
sleeves 98:25
  99:3
slightly 29:12
  104:10 107:13
sloppier 110:23
sloppy 110:21
slowly 118:2
small 40:4 41:16
  76:10 106:6
  109:19 112:19
  138:19,21

141:9,14
smaller 138:21
so- 125:2
soaked 89:18,25
96:12 100:10
soil 56:16 73:8
73:14
soil-based 73:14
sol- 24:9
solely 108:20
133:22
solid 56:20,21
73:14
Solomon 43:1
45:10,12,15,20
46:2,6,8 47:8
47:11,16,25
48:19,23 49:4
49:8,23 50:3
Solomon's 49:4
solubility 127:2
128:2
solution 24:11
106:19
some- 71:17
142:6
somebody 27:7
59:14 110:3,23
sorry 7:19 8:6
18:12 19:6
23:17,25 25:15
25:17 26:2
31:14 35:11
41:1 55:1
88:19 89:16
90:7,9 92:1
95:24 96:20
105:21 113:3,4
114:18 117:22
127:5 132:21
137:5
sort 19:11 49:21
60:15 100:23
108:11,18
112:21
source 28:22
127:6

sources 30:7
South 1:13 6:5
sp- 23:20
speak 10:10
19:13
speaks 11:24
specific 9:1
10:19,22 57:16
67:19 69:6,7
70:12 71:14
78:14 104:4
124:8 126:8,11
127:23 131:20
135:4,11 142:4
142:5
specifically 9:8
28:20 35:22
42:1 124:14
specifics 9:9
56:19 71:10
73:12
specified 79:5
81:9
specify 77:17
127:11 144:17
spectrum
109:10
speculate 34:21
79:25 134:13
spend 32:22
91:13 130:13
spent 17:16
32:25 33:2
136:6,8
spill 80:6 81:5
144:22
spillage 77:21
98:13 106:18
109:23
spilled 80:16
83:25 89:24
110:3,18
spilling 88:6
spills 79:10
spoke 44:5
spray 9:2 13:14
18:22 39:25

80:3,5 88:8,9
90:5,23 91:2
100:13 105:9
106:2 143:15
144:20
sprayed 11:17
11:17 13:12
14:20 17:9
19:4 76:7,11
79:1 86:5,6,6,7
89:25 91:10
94:18 96:11,11
97:17 105:14
131:4 139:2,6
146:2
sprayer 90:16
91:9,17 105:18
sprayers 90:18
spraying 11:24
12:4 13:20
23:21 40:7
74:5,9 76:10
76:24 77:22
83:9 88:7 89:6
97:21,25 98:23
100:4,7,18
103:8 104:23
128:17 139:8
148:9
spreadsheet
68:22 74:18
spring 17:1,4,22
square 103:20
106:5,8 112:23
ss 150:1
stand 66:13
standard 9:7
68:11,23 69:25
70:1,13,24
71:6,18 74:2
100:1
standpoint 34:7
start 55:23,25
65:7 83:22
started 33:5,10
50:24 64:1,23
107:4 110:11

starts 42:6 62:20
113:8
state 11:4 22:13
51:5 101:24
126:15,19
150:1,18
stated 93:5
133:9 139:16
statement 46:17
134:3
states 1:2 6:9
50:21 98:7
stay 64:6
step 48:15
straightforward
108:18
strategy 12:15
Street 1:13 2:13
3:7 6:6
stretch 66:13
Strike 32:17
67:20 116:21
structures 17:7
studied 48:4
86:20
studies 30:18
31:3,8 36:22
38:8,15,20
48:4,12,12,21
48:22 113:12
113:18,22
114:7 115:6
116:1 120:13
120:17 121:22
122:10,16
124:5 125:1,1
129:11,12
131:8,9 132:5
133:7
study 33:12,19
33:24 34:4,6,9
34:11,15,16,20
35:12,19,23
36:3,11,17
37:1,24,25
38:4,5,22
47:12,19 48:1

48:6,23,25
49:2 121:3,6
129:9 132:4
studying 87:9
submitted 20:4
submitting 75:4
Subscribed
152:15
substance 152:7
subtract 79:6
sufficiently
84:23
suggest 32:1
99:11
suggests 116:5
118:1,8
Suite 2:13 3:16
Sullivan 1:11
4:2,15,25 6:11
7:3,10 11:8
23:3 67:4
106:23,24
119:15 138:12
148:23 152:12
Sullivan's 22:18
22:23
summarize 91:5
summarized
23:17 91:19
99:4
summary 43:9
91:19 92:4
126:16
Superfund
50:25 51:19
support 44:18
123:10
supports 116:15
122:6
suppose 67:14
supposed 58:11
sure 10:23 11:6
12:7,16 13:9
13:22 15:6,15
15:19 17:13
18:1 19:1,12
20:8 22:6,9

Michael Joseph Sullivan, Ph.D.

26:18 40:14
41:21 46:11,16
48:18 49:6
52:11,23 53:12
54:18 55:4
60:8 62:16
64:20 72:13
75:10 76:13
83:20 90:10,11
92:24 96:21
108:2 110:7
118:24 125:18
126:1 140:19
surface 103:25
106:9 109:5,6
surfactant 131:5
surfactants
129:24 131:13
131:15 132:9
132:10 135:1,2
135:4,6
surprise 70:18
surv- 35:4
swear 7:1
swimming 69:13
72:21,21
swing 75:12
sworn 7:4 150:6
152:15
system 13:25
39:20

**T**

T 4:8 151:2
T.L 5:8
table 58:1 65:13
83:18 90:14
91:5 92:25
tailor 73:12
take 15:24 18:17
20:12,13,14
21:2 55:15
56:18 60:25
61:7 66:8 79:6
83:3 85:13
103:24 105:7
112:14 139:14

taken 1:13 20:9
20:11,24 24:21
66:24 79:16
84:14 119:11
138:5 150:10
talk 27:2 47:19
50:8 51:22
53:9 54:8,9,20
61:9 63:1 64:2
64:6,23 94:12
101:21 106:16
117:17,17
118:19 119:17
124:21
talk- 25:15
talked 51:3 67:5
95:4 98:14
119:21 121:15
124:4
talking 25:16,21
28:13 42:1
63:19 65:19,20
75:16 91:14
127:21 128:10
talks 53:1,5,23
54:13 55:8
59:22 88:5,7
91:8,15
tank 16:25 17:3
19:25
tanks 13:25
task 9:1
telephonically
2:12
tell 7:17 34:19
36:2 50:17
55:3 58:19
85:10 113:25
119:19 131:20
134:22 135:5
ten 66:7 144:6,8
144:10,15,20
144:22
tendered 26:3,6
26:10
tendering 75:5
term 10:23 87:5

118:15 129:6
133:2
terms 19:3 35:2
test 7:24 99:13
tested 129:7
testified 72:11
78:3,8 83:7
100:14 140:18
142:10 145:4
testifies 7:4
testimony 21:23
99:2
text 37:21
124:15 150:12
Tha- 85:19
99:24
Thank 6:24
23:15 26:8
66:19 90:12
93:2 101:8
105:24 119:8
128:21 137:12
the- 121:8
theory 122:6
thi- 53:10
thing 30:20 31:2
49:7,21,22
115:11 116:16
129:6 131:7
things 12:3 16:4
18:24 25:8
38:14 42:16
44:23 45:12
47:8 55:20
82:2 98:3
113:3 129:24
141:12 147:18
think 15:10
16:13,15 19:21
19:25 26:17,18
38:22 46:12,12
46:19,21 52:17
52:21 55:11,16
58:3 68:17
71:20 76:7
79:8 85:15
95:5 99:4,7

101:2 102:2
103:16 104:25
105:1,11,13
109:17 110:25
111:1 115:11
115:13 116:19
118:12,14,14
119:16 120:11
120:17 122:21
123:8 125:11
125:12 128:8
131:20 136:8
137:25 138:23
139:13 140:7,9
141:15 143:5
143:13 144:23
145:3 147:11
thinking 69:10
third 23:17
30:20
thought 25:15
25:21 110:10
111:10 114:16
143:10
thousands 69:8
72:12
three 18:14
30:25 51:22
52:14 74:4,4
91:3 124:3
136:9,10,11,13
136:25 139:7
139:10 146:2
throat 61:17
time 6:4 15:17
17:16 25:3
32:22,25 33:2
33:9,9 40:4
55:15 59:13
60:5,22 64:16
66:12,22 67:2
69:24,24 72:25
76:22 79:1,8
91:14 94:16
100:7 110:2,3
113:14 114:2,3
114:4,5,24

115:4,21 116:1
118:12 119:10
119:13,22,23
120:1,8,17
121:8,13 122:2
122:7,14,22,24
123:14 124:7
125:4 130:13
136:6,7 138:4
138:7 139:11
148:24 150:11
timeline 4:20
23:2 90:5,11
times 60:9 69:9
83:25 89:23
110:9,20
122:16 142:18
144:9 145:7
timing 92:5
title 49:19 91:6
today 6:10,25
9:21 32:3,11
32:19 33:8
38:11 49:5
73:24 128:11
131:13,17
136:4,24
139:17
today's 6:3
148:22
tol- 116:23
told 89:9 132:21
top 20:2 62:18
62:25 63:23
64:6,13 65:7
65:17,21 67:6
74:16,21,25
101:1 124:2
topography
12:2 13:18
total 41:22
94:18 102:22
103:6 120:1
141:14 144:10
144:15 146:5
totally 88:16
tour 18:18 19:11

Michael Joseph Sullivan, Ph.D.

toxicokinetics
39:6
toxicolog- 82:7
toxicological
32:24 49:14
82:7
toxicology 9:18
9:20 32:24
47:12
track 30:3
trail 14:22
trails 13:21,22
14:7
transcript 32:2
transcription
152:5
trial 32:6
triggered 8:18
8:19
true 124:24
129:1,14
150:18
try 16:1 55:14
60:24 114:24
127:18 130:13
try- 41:8
trying 41:8
46:16 63:15
Tuesday 137:23
turn 50:7 57:19
126:15
twe- 120:12
twice 29:15
two 25:8 40:5
46:20,22 51:9
51:9 59:10
61:12 66:4
74:4 91:3,16
94:24 100:16
100:22 124:2
136:22 141:2,3
two-and-a-half
136:25
type 69:14 73:14
75:1 77:24
91:2 94:23
98:11 112:22

135:3 144:18
typed 68:22
types 34:2 57:14
typical 59:11
74:5
typically 105:10
120:11 121:25
typing 74:18
typo 63:12

_____
U
u- 23:19 38:23
133:7
uh 90:7
Uh-huh 144:14
ultimate 42:10
44:17,22
um 38:1 89:15
90:7 92:20
99:4 122:19
un- 78:23 81:12
142:21
unanswerable
87:24
unaware 82:11
uncer- 84:9
uncertainty
82:11 84:10
140:16 142:13
142:15,20,21
145:18 146:1
understand
12:12,13,22,25
18:22 23:24
27:13,14,21
36:6 40:22
42:18 43:20,20
44:8 46:16
54:18 60:8
62:16 76:18
80:22 88:14,23
92:19,22 94:8
95:7 96:20,21
108:22 115:12
115:14 125:21
128:13 130:7
130:12 131:9

133:14 134:6
134:10 141:21
145:4
understanding
8:11 11:21
13:18 15:10
45:18 55:24
67:23 80:10
understood
18:21 78:23
unimproved
13:23
unique 70:8,11
127:23
unit 63:8 105:9
United 1:2 6:9
50:21
units 103:11,13
104:10
unknown 140:5
unperceived
140:7,8 141:25
update 115:8
upped 139:10
upper 102:24
uptake 69:23
114:1 115:9,22
115:25 116:2
117:12 118:16
120:7 121:18
121:19 125:3
129:11 130:4
130:20 131:6
133:22
urine 113:23
use 4:21 19:2
22:3 23:14
27:8 29:5
30:14 34:2
35:6,9,12
36:20,23 37:1
38:21,22 39:7
44:21 54:10
69:9,23 73:11
73:14 77:20
81:22,24 87:5
91:18 104:7

109:19 115:8
115:13,20
118:14,23
120:9 124:8
126:7 127:9
130:22 133:2,6
133:8 139:8,9
141:24 146:3
useful 42:7
46:25
USEPA 51:18
uses 33:25 36:13
utilize 14:6
68:10 103:6
126:12 131:9
133:6
utilized 28:20
38:23 50:11
69:5 71:6
79:17
utilizing 30:22
80:9

_____
V
v 1:7
vague 33:15
39:3,16 87:18
88:23,24 92:15
92:17 99:24
val- 65:12
valuation 53:24
value 59:25
60:25 65:16
79:16 84:8
88:15 100:24
109:25 110:5
112:20,25
138:22 143:10
values 61:4,5
65:6 82:11
85:2 100:23
103:10 115:3
139:9 145:22
vapor 127:2,25
variability
112:22 121:21
variable 105:20

106:1
variation 116:7
variety 17:6
45:12
various 51:3
53:9 54:19
74:22 102:20
103:21 109:7
125:1,1
ver- 88:13
version 27:5
versus 6:7 125:5
148:21
vessel 106:7
video 6:5 148:22
videographer
3:21 6:1,2,24
66:20,22,25
119:9,12 138:3
138:6 148:20
viii 77:12
visit 11:10,21
12:9,11,12
13:8 14:16,19
86:7
visited 15:18
vitae 4:15
vitro 14:10,12
114:14,17,21
vivo 114:16
voice 6:12
volume 51:19
100:13

_____
W
wa- 137:22
Wagstaff 1:12
2:4,5 4:4 6:14
6:14 7:9 14:15
14:25 15:7
21:15,21 22:2
22:8,18,21,23
22:25 23:2,5,8
23:11,13 32:15
33:14,16 34:8
35:15,25 36:8
36:24 37:5,8

Michael Joseph Sullivan, Ph.D.

| | | | | |
|---|---|---|---|---|
| 37:11,17 38:6 | **walking** 13:5 | 103:5 105:3 | **wish** 125:3 | 141:23 |
| 38:9,25 39:12 | 97:22 | 108:11 112:9 | **witness** 1:12 4:2 | **wording** 134:15 |
| 40:18,25 41:2 | **Walsh** 3:14 | 113:25 119:2 | 7:1,4 14:14,18 | **words** 44:21 |
| 41:23 43:4,19 | **want** 10:23 15:5 | 125:16 | 15:5 21:25 | 81:24 84:11 |
| 45:1,5,16 50:4 | 16:19 19:2 | **ways** 30:25 35:3 | 22:5 23:12 | 86:13 123:16 |
| 50:6 52:20,23 | 26:18 27:1 | **we'll** 21:13 | 32:5,13 33:24 | 123:21 124:15 |
| 53:4,16 54:5,7 | 29:20 39:7,7 | 52:17 53:2 | 35:14,21 36:13 | 142:3 |
| 54:24 61:8,24 | 43:9 46:11 | 61:9 62:25,25 | 37:4,6,9,15 | **wore** 98:8,25 |
| 62:5,11 64:19 | 48:18,24 50:8 | 102:3 107:15 | 38:3,7,13 39:4 | 99:9,11 100:8 |
| 64:21 65:8,18 | 52:4,10 54:1,1 | 108:2,2 | 40:12 41:1,8 | **work** 8:16 10:13 |
| 66:6,11,14,16 | 55:15 58:2,10 | **we're** 10:23 27:2 | 41:11 43:7 | 40:6 44:25 |
| 66:18,21 67:3 | 62:16 66:8 | 45:6 62:12 | 44:21 45:2,12 | 50:23 61:23 |
| 68:4,6 70:4,23 | 67:13 78:14 | 66:9 127:21 | 50:1,5 53:7,21 | 65:2,5 72:24 |
| 72:4 75:23 | 81:14 83:7 | 133:14 | 54:6 60:18 | 107:22 133:9 |
| 80:1,21 81:20 | 87:6 90:9,10 | **we've** 20:20 | 61:21 62:8 | **worked** 87:7 |
| 83:4,13,19 | 92:24 93:3 | 47:19 62:10,10 | 64:18 65:5,9 | **Worker** 5:8 |
| 84:4 85:17 | 95:8 96:20 | 67:5,15 95:4 | 66:3,9,12,15 | **working** 26:15 |
| 86:14 87:25 | 99:12,13 | 118:22 119:16 | 66:17,19 67:25 | **works** 137:9,10 |
| 90:3 92:7,14 | 107:11,16 | 128:10 132:16 | 68:5 69:20 | **worn** 100:1 |
| 92:16,21 93:23 | 113:3 115:24 | 135:23 | 70:20 71:4 | **worries** 69:20 |
| 94:11 95:12,16 | 117:16,17,17 | **wear** 89:21 98:5 | 72:3 75:15 | **worst** 60:3 |
| 97:11,15 99:21 | 120:19 125:25 | 98:12 99:3 | 79:23 80:19 | **wouldn't** 13:9 |
| 102:5,7 105:23 | 136:22 141:16 | **wears** 98:8 | 81:19 82:24 | 13:15 43:9 |
| 105:25 108:25 | 141:23 144:12 | **weather** 80:10 | 83:12,17 85:9 | 67:13 68:9 |
| 111:21 113:1 | **wanted** 31:6 | **Wednesday** | 86:1 87:18 | 70:18 72:23 |
| 118:18,24 | 32:22 46:19 | 1:14 6:3 | 89:15,17 91:25 | 85:5,6 87:22 |
| 119:1,4,6,14 | 52:7 59:14 | 136:24 | 92:3,19 93:16 | 93:18 98:2 |
| 129:20 130:15 | 65:15 100:25 | **weed** 18:9 20:11 | 97:14 99:20 | 105:3 127:8 |
| 131:11 132:19 | 110:6,22 111:8 | **week** 137:20 | 105:24 108:16 | 129:18 141:9 |
| 133:23 134:8 | 112:21 115:16 | **weeks** 136:22 | 111:17 112:13 | **wrapped** 82:9 |
| 134:18 135:9 | **wants** 95:19 | **weight** 69:24 | 117:15,22,25 | **wrinkly** 15:4 |
| 138:2 139:21 | **Washington** 3:8 | 127:2,24 | 118:25 119:2 | **wrist** 109:9 |
| 140:3,24 142:7 | **wasn't** 19:8 | **went** 11:11 | 129:5 130:10 | **writ-** 28:21 |
| 144:1,4 146:8 | 82:15,15 84:21 | 14:18,24 17:3 | 130:19 132:12 | **write** 28:11 |
| 147:7,13 | 128:13 130:23 | 17:5 19:13,14 | 133:21 134:3 | 102:10 107:21 |
| **Wait** 48:18 | **water** 13:25 | 71:5 89:12 | 134:13 140:22 | 108:9 |
| **walk** 17:19,21 | 69:13 72:20 | 96:25 107:24 | 142:2 143:24 | **written** 20:15 |
| 17:21 18:1 | 105:9,19,21 | 110:12 139:5 | 144:2 145:16 | 29:4 42:16 |
| 19:7,21 44:10 | 129:25 | **weren't** 19:1 | 147:6 150:5,21 | 67:9,11 107:9 |
| 97:19 139:13 | **way** 17:21 20:2 | **West** 2:6,13 | **wondering** | 107:20 108:6 |
| 139:14 | 20:16 28:21 | **Wester** 121:3,6 | 78:16 103:12 | 112:10 |
| **walked** 13:11 | 30:16 41:13 | **wet** 98:1 110:13 | 108:5 141:18 | **wrong** 81:21,23 |
| 15:13,25 16:6 | 43:17 44:10 | 112:15 | **word** 19:2 39:7 | 94:8 101:15 |
| 16:12,12,24 | 56:25 57:16 | **wetted** 98:4 | 46:17,18 69:20 | **wrote** 28:8 |
| 17:10,17,17 | 61:1 64:13 | **Wilkinson** 3:14 | 83:3 99:25 | 37:22 48:2 |
| 19:24,25 86:7 | 68:1 74:16 | **Wilshire** 3:16 | 128:20 132:10 | 132:13 |
| 139:5 | 80:9 88:3 89:7 | **wind** 80:11 88:8 | 133:13 140:7 | |

Michael Joseph Sullivan, Ph.D.

**X**

X 4:1,8 15:21

**Y**

yeah 7:20 8:4
  15:19 18:10
  20:21,23 24:23
  27:15 43:7
  44:21 45:1
  52:23 66:16,21
  77:4 78:17
  80:19 86:18
  87:4 90:12
  92:22 93:21
  100:16 101:4,8
  101:9 104:18
  107:15 111:25
  113:5 119:1
  120:21 121:14
  127:11 128:19
  131:23 134:13
  144:1,1 148:15
year 7:13 8:4,7
  92:4,4,6 109:2
years 73:1,18,25
  83:9 90:21
  145:13
yes- 136:23
yesterday
  136:23,23
  137:18,19

**Z**

zero 96:18
  101:18,19
  109:14
zeros 101:15

**0**

0.00000046
  45:25
0.0001 101:16
0.064 46:3
00- 43:13
00000046 42:25
  43:13 47:24
000001 46:2

00005 102:1
02 63:16,17
  64:24,25 65:13
  65:15

**1**

1 4:10,11 22:15
  22:17 28:23
  67:1 132:23
1:15 1:14 6:4
10 5:4 50:7,11
  52:5,13,18,19
  77:16,16,20,20
  77:20,21,25
  84:19 85:12,15
  98:13 101:13
  101:17 109:25
  110:14,22
  111:1,3 112:23
10.c 77:10
100 20:4 65:14
  79:6 85:7
102 5:8
11 5:6 53:2,3
  54:20 56:1
  77:8,12 100:24
  101:1,3,10,15
  101:19
11601 3:16
12 5:8 37:12,13
  41:24 42:1,2,3
  42:6,24 45:4
  45:23 49:11,18
  49:19 102:4,5
  102:6
13 37:21 43:16
1350 3:7
138 4:5
14 4:12 8:1
140 4:4
15 4:14
16-MD-02741...
  1:5
17 46:2
18 32:19 105:1,2
  105:4
1810 2:13

19 1:14 77:23,24
  143:14,15,15
  143:17,17
19th 6:4 136:4

**2**

2 4:11 15:2
  22:18,20 27:2
  27:14 41:25
  63:16 65:1,14
  65:16 67:1
  115:14 119:25
  120:12,14,18
  132:23 148:21
2/100ths 115:14
2:29 66:23
2:41 67:2
20 77:24 84:20
  84:21 85:5
  110:19,20
  136:13 146:3
  152:17
20005 3:8
2017 7:25
2018 1:15 6:4
  31:17,21
  106:23 107:1,1
  135:18 136:3
2019 150:22
202)898-5806
  3:9
202)898-5896
  3:10
2093(b) 150:7
2094 150:7
20th 7:25
21 5:3
22 4:10,11,13,15
23 4:14,17,19,22
  4:25
24 4:16 120:2,10
  120:16 121:5,7
  122:3 124:11
  136:13
25 146:3
26 83:9 145:13
2741 1:5

27th 26:24
  135:18

**3**

3 4:13 22:21,22
  47:8 126:15
3:16-cv-00525...
  1:8 6:8
3:45 119:10
3:53 119:13
303)376-6360
  2:8
31st 136:2
38 143:17,21
  145:9,12,20
  146:16,20
  147:4,6,14,17
  147:22 148:7,8
  148:12
3rd 135:24
  136:3,8

**4**

4 4:15 22:23,24
  43:12 101:13
  101:17,20
  110:25 135:16
4- 120:2
4:18 138:4
4:44~p.m 138:7
4:54 148:25
  149:1
40 84:21 85:6
  106:2,5,8
  110:25 111:3
  145:20,21
  146:11
401 2:13
40202 2:14
41 4:16
42 4:18
424)291-9669
  3:18
44th 6:6
46 4:18
47 4:21
48 52:10,12,14

52:21 53:17
  120:3

**5**

5 4:17 22:25
  23:1 51:14
  76:21,21,24,25
  77:23 79:7
  109:18 126:16
  126:16
5- 52:8
50 4:21 103:20
502)657-7120
  2:15
51 4:23
52 4:12,14,16,18
  4:21,23,24 5:4
  27:21,22,24
  100:23 101:3
53 5:6
56 12:23 13:7
  56:13,14 57:3
  57:5
56-acre 74:10
57 51:15,21 52:8
  53:2 55:2
  56:15 57:4,6
58 51:15,21 52:8
59 51:15,21 52:8
5th 31:21

**6**

6 4:19 23:2,4
  90:5,8,9
  109:18 113:2,4
  113:5 124:1
60 28:24
600 3:16

**7**

7 4:4,22 23:5,7
  27:14 57:20,23
  67:4 119:16
7.5 103:18,18
7171 2:6
777 1:13 6:5

Michael Joseph Sullivan, Ph.D.

| 8 | | | | |
|---|---|---|---|---|
| **8** 4:25 23:8,10 135:24 136:1 | | | | |
| **80226** 2:7 | | | | |

| 9 | | | | |
|---|---|---|---|---|
| **9** 5:3 21:13,14 23:11,16 55:22 | | | | |
| **9,673** 94:17 | | | | |
| **90017** 6:7 | | | | |
| **90025** 3:17 | | | | |
| **9114** 1:15 150:3 150:24 | | | | |
| **95** 78:25 79:7 | | | | |