# EXHIBIT 10

Case 3:16-md-02741-VC Document 2479-10 Filed 01/11/19 Page 2 of 32

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS ) MDL No. 2741
LIABILITY LITIGATION, )
) Case No.
_________________________ ) 16-md-02741-VC
)
This document relates )
to: )
)
Hardeman v. Monsanto )
(3:16-cv-00525-VC) )
_________________________ )

Video Deposition of DENNIS WEISENBURGER, M.D., held at 700 West Huntington Drive, Monrovia, California, commencing at 8:35 a.m., on Thursday, December 20, 2018, before Lisa Moskowitz, California CSR 10816, RPR, CRR, CLR, NCRA Realtime Systems Administrator.

\- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
Deps@golkow.com

APPEARANCES:

ANDRUS WAGSTAFF
BY: KATHRYN M. FORGIE
kathryn.forgie@andruswagstaff.com
1901 Harrison Street, Suite 1100
Oakland, California 94612
(310) 339-8214

Counsel for Plaintiff

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: JULIE DU PONT
julie.dupont@arnoldporter.com
250 West 55th Street
New York, New York 10019-9710
(212) 836-8572
Counsel for Defendant Monsanto

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: KATHRYN M. PODSIADLO
kathryn.podsiadlo@apks.com
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
(213) 243-4273

Counsel for Defendant Monsanto

VIDEOGRAPHER:

RYAN SCHAEFER,
GOLKOW LITIGATION SERVICES

– – –

I N D E X

| EXAMINATION OF | PAGE |
|---|---|
| DENNIS WEISENBURGER, M.D. | |
| By Ms. Du Pont | 6, 113 |
| By Ms. Forgie | 106 |

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Monsanto Company's Notice to Take Oral and Videotaped Deposition of Dr. Dennis Weisenburger | 7 |
| 2 | Dr. Weisenburger Materials List, November 13, 2018 | 8 |
| 3 | Curriculum Vitae | 8 |
| 4 | Handwritten Notes | 15 |
| 5 | Retention Agreement Expert Opinions and Testimony | 18 |
| 6 | Addendum to Dr. Weisenburger's Reference List | 19 |
| 7 | Expert Report of Dr. Dennis Weisenburger | 21 |
| 8 | IARC Monograph on Hepatitis C | 54 |
| 9 | Study by Dal Maso | 62 |
| 10 | Article by Mahale | 70 |

DEPOSITION EXHIBITS (Cont'd)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Castillo Article | 87 |
| 12 | Zuckerman Article | 100 |

MONROVIA, CALIFORNIA
THURSDAY, DECEMBER 20, 2018, 8:35 A.M.

THE VIDEOGRAPHER: We're now on record. My name is Ryan Schaefer. I'm a videographer for Golkow Litigation Services.

Today's date is December 20, 2018, and the time is 8:35 a.m. This video deposition is being held at 700 West Huntington Drive, Monrovia, California, in the matter of Hardeman versus Monsanto Company, case number 3:16-cv-00525-VC for the U.S. District Court, Northern District of California. The deponent is Dr. Dennis Weisenburger.

Counsel will be noted on the stenographic record and will counsel please identify themselves.

MS. FORGIE: Kathryn Forgie of Andrus Wagstaff for the plaintiff Mr. Hardeman.

MS. DU PONT: Julie du Pont of Arnold Porter on behalf of Monsanto.

MS. PODSIADLO: Kathryn

Podsiadlo on behalf of Monsanto.

THE VIDEOGRAPHER: The court reporter is Lisa Moskowitz and will now swear in the witness.

DENNIS WEISENBURGER, M.D. called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. DU PONT:

Q. Good morning, Dr. Weisenburger.

A. Good morning.

Q. It's nice to see you again. We met the other day. I'm Julie du Pont, and I represent Monsanto.

Do you understand that?

A. Yes.

Q. Can you go ahead, for the record, and just state your name and business address, please?

A. Dennis Weisenburger, 1500 East Duarte Road, Duarte, California. I work at City of Hope Center.

Q. Thank you. And you've previously given sworn testimony on behalf of plaintiffs in the Roundup litigation against Monsanto; correct?

A. Yes.

Q. And you stand by that prior testimony as truthful and accurate?

A. Yes.

Q. Nothing you want to correct today from that prior testimony?

A. No.

Q. Okay. So why don't we go ahead. I've marked as Exhibit 1 the notice of your deposition in the Hardeman case.

(Exhibit Number 1 was marked for identification.)

BY MS. DU PONT:

Q. Do you see that in front of you?

A. Yes.

Q. And this notice asked you to bring with you -- and your counsel has actually provided to us -- a number of materials to the deposition. I'm going to go ahead and mark those as well. They include your materials considered list, an updated

list -- sorry, a list dated November 13, 2015. 2013. Sorry. November 13, 2018.

A. Yes.

Q. And we've marked that as Exhibit 2.

(Exhibit Number 2 was marked for identification.)

BY MS. DU PONT:

Q. You can set that aside. You've also brought with you your current CV from August, 2018, that we have marked as Exhibit 3.

(Exhibit Number 3 was marked for identification.)

BY MS. DU PONT:

Q. Do you see that?

A. Yes.

Q. There's nothing on this CV that you need to update at this time; correct?

A. Correct.

Q. Okay. Why don't we just take a look, then, at your materials list dated November 13. This includes a number of medical references, but it also includes a number of case-specific materials on the last two pages; is that right?

A. Yes.

Q. And it looks like you've reviewed Mr. Hardeman's medical records; is that right?

A. Yes.

Q. And have you reviewed select records of Mr. Hardeman?

A. All available records.

Q. Right. And you've reviewed his fact sheet?

A. Yes.

Case 3:16-md-02741-VC Document 2479-10 Filed 01/11/19 Page 5 of 32

[redacted]?
[redacted]

[redacted]

[redacted]
Q. You also reviewed the testimony of several of Mr. Hardeman's doctors, Dr. [redacted], [redacted], and [redacted]; is that right?
A. Yes.
Q. You had the opportunity to review the depo transcript of Mr. Hardeman; right?
A. Yes.
Q. Did you review the deposition transcript of his wife's deposition?
A. Yes.
Q. That just wasn't listed here, but you did, in fact, review it?
A. Yes.
MS. FORGIE: We'd like to add it.

MS. DU PONT: Okay.
MS. FORGIE: I thought it was on there.
BY MS. DU PONT:
Q. Since you received -- since you wrote your report, you've also had the opportunity to review the reports of Dr. Arbor, Grossbard, Levine and Steidl; is that right?
A. Yes.
Q. Do you know Dr. Levine?
A. Yes.
Q. You worked together at the City of Hope; right?
A. She was my boss.
Q. She was your boss but now she isn't your boss?
A. Yes. She stepped down from her position.
Q. Did you respect her?
A. Yes.
Q. Did you consider her to be a highly qualified oncologist?
A. Yes.
Q. And you mentioned you also know

Page 14

Dr. Arbor and you respect him as well?
A. Yes.
Q. And, again, you believe him to be a highly qualified pathologist?
A. Yes.
Q. And how do you know Dr. Arbor?
A. Just we move in the same circles. He does the same thing I do. We always see each other at meetings. He also did his training at the City of Hope. We have kind of a common bond there.
Q. Okay. Do you know Dr. Michael Grossbard?
A. I don't.
Q. And do you know Dr. Steidl?
A. Yes.
Q. I may be pronouncing his name wrong.
A. Steidl.
Q. How do you know him?
A. Sort of the same way, through just we do -- we've done research together. You know, we see each other at meetings. He's visited City of Hope. So we know each other through our academic endeavors.

Page 15

Q. Okay. And do you respect him?
A. Yes.
Q. Do you consider him to be highly qualified in his field?
A. Yes.
Q. Okay. You can set that aside. We've marked as Exhibit 4 your invoice for your work in the Hardeman matter.
(Exhibit Number 4 was marked for identification.)
BY MS. DU PONT:
Q. Can you take a look at that?
A. Yes.
Q. It looks like between October 20, 2018, and November 20, 2018, you billed 32-and-a-half hours; is that right?
A. Yes.
Q. At $500 an hour?
A. Yes.
Q. And so as of November 20, 2018 you had made $16,250?
A. Yes.
Q. And have you worked on Mr. Hardeman's case since November 20, 2018?
A. Yes.

Page 16

Q. How many hours have you billed?
A. 32.5. 35.5.
Q. So you worked an additional three hours or you --
A. 35 hours. 35½ hours.
Q. In addition to the 32.5 you already billed. Okay.
MS. PODSIADLO: 17,750.
BY MS. DU PONT:
Q. You've earned an additional $17,750 on Mr. Hardeman's case since November 20?
A. If the math is correct, yes.
Q. So in total you've made $34,000 working on Mr. Hardeman's case to date?
A. Sounds right.
Q. Okay. And that additional 35½ hours, how did you spend that time?
A. Mostly reading additional materials on hepatitis C and hepatitis B and other topics.
Q. And why did you feel the need to read additional materials on hep C and hep B and other topics?
A. It's not an area I'm particularly an expert in; so I had to go back and learn

Page 17

a lot about hepatitis C and hepatitis B. When I read the Monsanto expert reports, there were some issues that I needed to research and understand.
So I pulled additional articles that were referenced in their reports.
Q. Did counsel for plaintiff provide you with any additional articles on hep B and hep C?
A. No.
Q. [redacted]
A. We looked at -- into autoimmune disease. I looked into eczema. I guess those were the main things.
Q. Okay. Now, you can set your invoice aside. We've marked as Exhibit 5 your retention agreement with Andrus Wagstaff.
Do you see that?
A. Yes.
Q. Do you understand this to be your retention agreement in the Roundup litigation as well as your W-9 which is on

the second page?
A. Yes.
(Exhibit Number 5 was marked for identification.)
BY MS. DU PONT:
Q. You can set that aside.
MS. FORGIE: I'd like to redact. I didn't realize his social security number was in there. I'd like to redact that from the deposition.
Can we do that on the exhibit?
MS. DU PONT: Sure.
MS. FORGIE: Can we do that now?
MS. DU PONT: Yeah. Do you want to take a brief break?
MS. FORGIE: Yeah, that's kind of a big deal.
THE VIDEOGRAPHER: The time is 8:49 a.m., and we are off the record.
(Recess taken from 8:50 a.m. to 8:50 a.m.)
THE VIDEOGRAPHER: The time is now 8:50 a.m., and we are back on the record.

MS. FORGIE: Just for the record, we -- by agreement of all counsel, we had the court reporter redact Dr. Weisenburger's social security number from Exhibit 5. Thank you.
MS. DU PONT: Okay.
BY MS. DU PONT:
Q. Moving on, marked as Exhibit 6 is your addendum to your reference list.
(Exhibit Number 6 was marked for identification.)
BY MS. DU PONT:
Q. When did you prepare this addendum?
A. It would have been last week.
Q. So it was prepared after you wrote your report and your report was served on Monsanto; correct?
A. Yes.
Q. Is it fair to say that the articles on this list you did not rely on in preparing your report?
MS. FORGIE: Objection.
THE WITNESS: Well, many of the articles on this are articles I pulled

to learn about hepatitis B and hepatitis C. I didn't include them all in my report, although I read them all. I guess I don't really need to rely on them for purposes of my testimony.
BY MS. DU PONT:
Q. So the main references that you are relying on for purposes of your testimony are those references that you included in the Hardeman specific report itself?
A. Yes.
Q. And you had reviewed some of the references on this addendum prior to serving your report, and you believe that you considered those materials but you are not necessarily relying on them for your opinions; is that accurate?
A. Yes.
Q. Okay. I think you can set that aside.
Now, did counsel for Mr. Hardeman provide you with any memo or memos regarding Mr. Hardeman's Roundup exposure?
A. No, just the fact sheet. The fact sheet.

Q. Okay. Let's take a look now at your report that you served in the Hardeman matter. We have marked Dr. Dennis Weisenburger's report under Hardeman versus Monsanto as Exhibit 7.
(Exhibit Number 7 was marked for identification.)
BY MS. DU PONT:
Q. And is this your report in the Hardeman matter, Dr. Weisenburger?
A. Yes.
Q. And this report discloses all the opinions that you intend to offer at trial in Mr. Hardeman's case?
A. Yes. There are a couple errors in the report. I don't know whether you want to talk about them now or later.
Q. You can go ahead and tell me what the errors are now.
A. So on the third written page at the end of the second paragraph, I see the latency is 29 years. It's actually 26 years. The first sentence of the paragraph says 26 years. The end paragraph says 29 years. It should be

26 years.
Q. You're saying his exposure to Roundup in this case should be 26 years and not 29 years?
A. Yes.
MS. FORGIE: It's a typo because the top says 26 years.
MS. DU PONT: Yes.
THE WITNESS: The other correction is the odds ratio for BMI. I put down the wrong odds ratio. I wrote down 1.14. It should be 1.27.
BY MS. DU PONT:
Q. And is the confidence interval, does that also need to be corrected?
A. Yes. The confidence interval is 1.09-1.47.
Q. And what I'll do later is we can take a look at the reference that you're relying on and understand where you're getting those numbers.
A. Okay.
Q. Do you have any other corrections that you want to make to your report at this time?

A. No.
Q. And your report along with your reliance list discloses all of the bases for the opinions you intend to offer in Mr. Hardeman's case?
MS. FORGIE: Objection.
THE WITNESS: Yes.
BY MS. DU PONT:
Q. Did you, in your preparation of this report, review any case-specific expert reports for Mr. Hardeman's other case-specific experts?
A. No.
Q. Did you review any of Mr. Hardeman's other case-specific expert reports after you prepared the report?
A. I did review the rough draft of the Nabhan deposition.
Q. Did you review the case-specific report in the Hardeman matter?
A. No.
Q. And anything you disagreed with that Dr. Nabhan said at his deposition?
A. Not that I remember.
Q. Had you actually, prior to writing

your Hardeman-specific report, reviewed Dr. Nabhan's generic testimony in the MDL?
A. You mean his general causation testimony?
Q. Yes.
A. I did review some of -- I don't remember exactly what I reviewed, but I did review some materials from him, yes. I don't know whether it was his report or a deposition. I don't remember.
MS. FORGIE: I'm going to object to this. It's going into general causation.
MS. DU PONT: I'm just inquiring whether he read other testimony from Dr. Nabhan who's a case-specific expert in his report.
BY MS. DU PONT:
Q. On Exhibit A, if you want to refer to Exhibit 2 which was your supplemental list, I'll just note that you did list under 76 on that supplemental list that you disclosed as part of the Hardeman record the deposition transcripts and exhibits of Dr. Nabhan taken on August 23, 2017.

A. Where is that? Oh, okay.
Q. Take a look at Reference Number 76. Just confirm for me that you did, in fact, review his August, 2017, testimony.
MS. FORGIE: Objection.
THE WITNESS: Yes, I did.
BY MS. DU PONT:
Q. Okay. Do you generally agree with the testimony that Dr. Nabhan gave in the Hardeman matter, the rough draft that you reviewed?
MS. FORGIE: Objection. Asked and answered.
THE WITNESS: Yes.
BY MS. DU PONT:
Q. You don't intend to offer at trial any opinions that are not disclosed in the expert report that we've marked as Exhibit 7; correct?
MS. FORGIE: Objection.
THE WITNESS: Correct.
BY MS. DU PONT:
Q. Let's talk about how you prepared your report in this case. Am I correct that you prepared the report yourself?

A. Yes.
Q. And how long did you spend drafting the report?
A. Hours. Many hours.
Q. Do you remember how many?
A. Well, most of my first --
Q. 32 hours were spent?
A. -- 32 hours were spent researching it and writing it and correcting it.
Q. Describe your process for drafting your report.
A. [redacted]
Q. Okay.
A. Considered the literature on

obesity and overweight.
Q. Okay. So let's talk a little bit about the telephone interview that you had with Mr. Hardeman. That took place on November 1, 2018; is that right?
A. Yes, yes.
Q. And do you understand that was prior to when Mr. Hardeman was deposed in this matter?
A. Yes.
Q. How long did the telephone call last that you had with Mr. Hardeman?
A. It was about an hour, more or less. I don't remember exactly.
Q. If you billed for an hour-and-a-half on November 1, would that hour-and-a-half have been for your phone call with Mr. Hardeman, or was it additional work as well?
A. It's probably additional work. Maybe preparation before the phone call. I didn't spend an hour-and-a-half on the phone with him. I believe it was 45 minutes to an hour.
Q. Was anyone else on the call besides

yourself and Mr. Hardeman?
A. No.
Q. And did you take notes of that phone call?
A. Yes.
Q. And did you rely on those notes in preparing your report in this case?
MS. FORGIE: Objection.
THE WITNESS: Yes.
BY MS. DU PONT:
Q. And did you review those notes prior to this deposition today?
A. Yes.
Q. And I would just request at this time that counsel for Mr. Hardeman produce the notes from Dr. Weisenburger's telephone interview with Mr. Hardeman?
MS. FORGIE: I'm inclined not to, but I'll talk to him at the break about it and make a final addition.
MS. DU PONT: Thank you.
MS. FORGIE: Pursuant to Pretrial Order Number 7 which states we don't have to produce drafts.
MS. DU PONT: I would just

maintain I'm not sure telephone interview notes are drafts, but would be more a reflection of the interview that took place and not a draft report.
MS. FORGIE: It includes notes as well.
BY MS. DU PONT:
Q. It looks like you spent about ten hours prior to your phone call with Mr. Hardeman working on his case based on the invoice you provided. If you want to take a look at it, feel free. It's Exhibit 4.
A. That's correct.
Q. And what did you do for those ten hours?
A. It was mainly reviewing the medical record and the fact sheet, which at that time, I think that's all I had.
Q. Okay. You mentioned already that your telephone conversation, one of the things you talked to him about was his exposures. What did you mean by that?
A. His use of Roundup, how did he use Roundup.

Q. On the call with Mr. Hardeman, did he have any trouble remembering the facts about his Roundup use?

A. No, I don't think so. He was pretty straightforward.

Q. Okay. And you said you asked him about -- when you said exposures, did you also consider other exposures to other chemicals or any viruses?

A. Yes, yes. I asked about other chemicals, solvents.

Q. What did he tell you about those other chemicals and solvents?

A. That pretty much he only used Roundup. There were a few instances where they had used something for ants, and there were a few instances where they had sprayed wasps or bees, I can't remember, but those were very infrequent.

Q.

MS. FORGIE: Objection.

MS. FORGIE: Objection. Asked and answered. You can answer it again.

Page 38

MS. FORGIE: Objection.

Page 39

MS. FORGIE: Objection.

say.

MS. FORGIE: Objection.

Page 40

Q. Would you agree with me that Mr. Hardeman -- let me start that again. I just lost my microphone.

MS. FORGIE: Objection.

Page 41

MS. DU PONT: I'd ask that you object to form. That's what the rules are.

MS. FORGIE: I'll make whatever objections I think are appropriate. I would ask that you stop asking the same question three or four times.

MS. DU PONT: I'm not asking it three or four times.

Case 3:16-md-02741-VC Document 2479-10 Filed 01/11/19 Page 13 of 32

MS. FORGIE: Yes, you are.
MS. DU PONT: Let's move to a different topic.
BY MS. DU PONT:
Q. Mr. Hardeman's Roundup use. You agree that he was using it as a home user; correct?
A. Yes.
Q. He was not a farmer spraying it on his crops; correct?
A. Correct.
Q. And in your report, you discuss for a couple pages what his Roundup use was and what his exposure was; correct?
A. Yes.
Q. And you mention that much of that discussion in your report came from the interview that you had with him in November of -- November 1, 2018; correct?
A. Yes.
Q. But you also read his deposition; right?
A. I did.
Q. And do you understand that there's some inconsistencies in what he said at his

deposition versus what he told you at that interview on November 1?
MS. FORGIE: Objection.
THE WITNESS: Yes.
BY MS. DU PONT:
Q. Do you remember any of those inconsistencies right now, sitting here today?
A. Yeah. So the main ones were that he told me he used the Roundup all year-round, pretty much every month. He used it intensively for about eight months and less intensively for the other four months.
At his deposition, he changed that and said he used it intensively for about six months out of the year and that he used it less intensively only two months out of the year.
So, yeah, there's some discrepancies that occurred. I can't explain those things. I didn't call him back and ask him what the truth was because by that time I had written my report.
So, you know, sometimes people have

difficulty remembering things. [redacted]
I don't know what happened. When I questioned him, I was very careful to be as precise as I could, and this is the history that he gave to me. So whether it was one or the other, he still had significant exposures to Roundup.
Q. So it's your understanding that when he gave his deposition under oath on November 8, 2018, that he testified that when he was spraying on the Forestville property, he was only spraying for about eight months per year; correct?
MS. FORGIE: Objection.
THE WITNESS: That's what he said.
BY MS. DU PONT:
Q. You did not note that discrepancy between his deposition transcript and your interview in your report; right?
A. No, because I read his transcript after I wrote my report. So my report was already written and submitted.

Q. Got it. So you reviewed his deposition transcript after the report was served on Monsanto?
A. Yes.
Q. Would you agree with me, though, that if we go by his testimony at his deposition, that in your report, you overestimated the amount of spraying that Mr. Hardeman was doing?
MS. FORGIE: Objection.
THE WITNESS: That's correct.
BY MS. DU PONT:
Q. [redacted]
MS. FORGIE: Objection.
THE WITNESS: No.
BY MS. DU PONT:
[redacted]

.

Q. Now, you wrote in your report that he would often get the spray on his hands, arms, face and sometimes mouth and sometimes he inhaled the mist while spraying.
Do you recall writing that in your report?
A. Yes.
Q. Did you actually ask Mr. Hardeman in the interview how many times he got the spray on his arms, face, and mouth?
A. It was frequent.
Q. But did you also review Mr. Hardeman's deposition to see how many times he had spilled on himself?
A. I can't remember the numbers, but it was less than what he told me.

Q. So if he testified at his deposition that he spilled on himself about ten times, does that sound right?
A. I don't remember what the deposition says. It was considerably less than what he told me.
Q. But, again, if we went by what he said in his deposition, that would have been less exposure to Roundup; correct?
MS. FORGIE: Objection.
THE WITNESS: Well, I think people get exposed to Roundup when they use mist, whether they know it or not. Okay? So the fact that he -- what he told me was that he frequently got it on his hands and his arms when he was spraying from the truck and over the fence. It was common. That's what he told me.
I don't understand him changing his story in the deposition. I wrote my report based on what he told me, and I believed it was true. If you deposed him today, he might tell you something totally different. I don't know.

BY MS. DU PONT:
Q. If we go by what he said in his deposition and what you've written in your report overestimates his exposure to Roundup; right?
MS. FORGIE: Objection.
THE WITNESS: Probably, although I think by him telling you that he only got it on his hands ten times, he's grossly underestimating his exposure.
BY MS. DU PONT:
Q. How do you know that?
A. Because of the story. When you spray Roundup in a mist, you're going to get it on your hands. You're going to get it on your arms. You're going to get it on your clothes, just by the nature of what you're doing.
Q. Have you sprayed Roundup before?
A. No. I prefer 2,4-D, thank you.
Q. What's your basis for saying that when you spray Roundup, you're going to get it on your hands?
A. Because it happens to me when I

spray 2,4-D.
Q. But you don't have any personal experience spraying Roundup; correct?
A. I don't.
Q. Now, you understand that at his deposition, he also testified that he only inhaled Roundup about two or three times; correct?
MS. FORGIE: Objection.
THE WITNESS: I believe that's what he said. What did I say? Sometimes.
BY MS. DU PONT:

A. Yes, I do.
Q. Mr. Hardeman also explained to you that he would wash his hands if he spilled on himself; correct?

A. So if he was mixing and he got it on his hands, he would wash it off with a hose. If he was out in the field spraying and he got it on his hands, he waited until he got back, which could have been one, two, three, four hours later.

Q. But he would take a shower after that happened, if he spilled it on himself; correct?

MS. FORGIE: Objection.

THE WITNESS: Yes, he usually took a shower after spraying.

BY MS. DU PONT:

Q. Does the fact that someone washes the Roundup off of them after they've gotten it on their skin, does that decrease their exposure in your mind?

A. Yes.

Q. You agree that hepatitis C is a risk factor for non-Hodgkin's lymphoma; correct?

A. Yes.

Q. And it's also a risk factor for diffuse large B-cell lymphoma; correct?

A. Yes.

Q. In fact, in your report you mention that there's a 2 to 2.6-fold increased risk of diffused large B-cell non-Hodgkin's lymphoma with the infection of hepatitis C; correct?

A. Yes.

Q. Do you know what the latency is between exposure to hepatitis C virus and development of diffuse large B-cell lymphoma?

A. There's one study that actually was able to look at that. It's probably somewhere between 6 and 8 years. These are in people with active hepatitis. So it's not very long, actually. Between 6 and 8 years.

Q. What study is that that you're referring to?

A. It's one of the ones that I reference. I can't remember which one.

Q. You can't remember, sitting here today, what reference it is that says the latency for hep C in development is 6 to 8 years?

A. I can't. It's one of the ones you

reference, but I can't remember which one it was.

Q. Is that the median?

A. Yes, that's the median.

Q. So if there's a bell curve, it can be much -- it could be shorter or it could be longer than 6 to 8 years; correct?

A. Yes.

Q. And do you recall what that reference says the bottom and the top of the bell curve are, sitting here right now?

A. I can't remember whether they give that information.

Q. Do you consider hepatitis C infection to be a causative risk factor for non-Hodgkin's lymphoma?

MS. FORGIE: Objection.

THE WITNESS: Yes, active hepatitis C infection. Chronic active hepatitis C infection.

BY MS. DU PONT:

Q. And do you consider chronic, active hepatitis C infection to be a causative risk factor for diffuse large B-cell lymphoma?

MS. FORGIE: Objection.

THE WITNESS: Yes.

BY MS. DU PONT:

Q. There are medical studies out there that actually discuss that infection with hepatitis C is not really a risk factor, but that it is a cause of diffuse large B-cell lymphoma; correct?

A. Yes.

Q. Are you familiar with the monograph from the International Agency for Research on Cancer regarding hep C?

A. Yes.

Q. But you did not cite that on any of your reference lists; correct?

A. I didn't think I needed to.

Q. And that's because it's redundant of your belief that hep C is a causative risk factor for non-Hodgkin's lymphoma?

MS. FORGIE: Objection.

THE WITNESS: It would be for the support. I've already accepted that as a fact in my report.

BY MS. DU PONT:

Q. Okay.

A. I could have referenced it, but I

didn't.
Q. I'm going to go ahead and mark as Exhibit 8 the IARC monograph on hepatitis C.
(Exhibit Number 8 was marked for identification.)
MS. FORGIE: Whenever you're ready for a break.
MS. DU PONT: We can finish this document, and we'll take a break.
MS. FORGIE: Thanks.
BY MS. DU PONT:
Q. If you turn to page 158 of the monograph under Section 5, "Evaluation," do you see that there is sufficient -- that IARC writes, "There is sufficient evidence in humans for the carcinogenicity of chronic infection with HCV"?
Did I read that correctly?
A. Yes.
Q. And they note, "Chronic infection with hepatitis C virus causes hepatocellular carcinoma and non-Hodgkin's lymphoma."
Do you see that?
A. Yes.
Q. And then they go on to say,

"Chronic infection with HCV is carcinogenic to humans Group 1."
Do you see that?
A. Yes.
Q. So IARC concluded that there was sufficient evidence that chronic infection with the hepatitis C virus causes non-Hodgkin's lymphoma; correct?
A. Yes.
Q. And that chronic infection with the HCV or the hepatitis C virus is carcinogenic to humans Group 1; correct?
A. Yes.
Q. And we know that Mr. Hardeman had anywhere between 25 and 40 years of chronic hepatitis C infection prior to his diagnosis of non-Hodgkin's lymphoma; correct?
MS. FORGIE: Objection.
THE WITNESS: Correct.
BY MS. DU PONT:
Q. And do you understand that when IARC concludes that there is sufficient evidence of carcinogenicity with respect to a virus or any substance, that that means that there's a positive relationship that

has been observed between the exposure and the cancer in studies in which chance, bias, and confounding could be ruled out with reasonable confidence?
Do you understand that that's their definition?
A. Yes.
Q. So with respect to hepatitis C, a positive relationship has been observed between exposure to chronic hepatitis C and cancer in studies in which chance, bias, and confounding could be ruled out with reasonable confidence; correct?
A. Yes.
Q. So is it fair to say that IARC's conclusion that chronic hepatitis C infection is a carcinogen is a stronger conclusion than IARC has put forth regarding glyphosate and carcinogenicity findings in humans?
MS. FORGIE: Objection.
THE WITNESS: Yes, they said HCV's a Group 1 and glyphosate is a Group 2A.
///

BY MS. DU PONT:
Q. And IARC has noted, with respect to glyphosate, that there is limited evidence of carcinogenicity in humans; correct?
A. Yes.
Q. And that's a lower standard than what they found here, which is sufficient evidence in humans with HCV infection and non-Hodgkin's lymphoma; correct?
A. Correct.
MS. DU PONT: We can take a break now.
MS. FORGIE: Thank you.
THE VIDEOGRAPHER: The time is 9:30 a.m., and we are off the record.
(Recess taken from 9:31 a.m. to 9:41 a.m.)
THE VIDEOGRAPHER: The time is now 9:41 a.m., and we are back on the record.
BY MS. DU PONT:

Page 58

Page 59

Page 60

Page 61

Page 62

BY MS. DU PONT:

Page 63

is

Page 64

Page 65

[REDACTED]

THE WITNESS: It's not really clear to me what they're trying to say. Are they trying to say that one is better than the other? It's clear that the viral RNA is a better test than the other, based on the other studies that I cite.

So it just depends on your methodology and what -- in some studies, how much money you have to do the testing.

So you have to make -- you have to make decisions based on a variety of parameters. They could have done a meta-analysis on the smaller group that just had the RNA. And they could have done that. They didn't do it.

BY MS. DU PONT:

Q. So the authors actually looked at whether or not just having the HCV RNA findings impacted the results.

I'll refer you to page 2083, the last paragraph on the right-hand column. The authors state, "Another possible

source" -- do you see where I'm reading from?

A. 2083 where?

Q. The last paragraph.

A. Yeah, okay.

Q. "Another possible source of heterogeneity between studies could be the definition of HCV infection that was not consistent across studies or different illicit generations used."

Then they note that some studies -- they basically say various studies are defining HCV positivity differently.

They note that when only studies using third-generation ELISA were included, the pooled relative risk was 2.5, suggesting that the HCV definition and ELISA generation neither explained the heterogeneity between studies nor adduced substantial bias; right?

A. I don't know. I'd have to reread this again.

Q. Basically when they tried to -- when they did further analysis and controlled for the different types of studies, they didn't see inconsistent

results when they were only looking at sub-groups within their meta-analysis; correct?

MS. FORGIE: Wait. Objection. Asked and answered. You just asked that question.

You can answer it again.

THE WITNESS: So I'd like to read the paragraph.

BY MS. DU PONT:

Q. Okay.

A. I have to read it to understand it.

MS. FORGIE: You can read as much as you need. You can read the whole study if you need to.

THE WITNESS: So what they're saying is that they had substantially the same finding, whether they looked at just the antibody or they looked at just the RNA.

BY MS. DU PONT:

Q. Right.

A. But they didn't do the critical thing and look at the risk for those that had the antibody but didn't have the RNA.

Okay?

So you would expect that both risk ratios would be increased because a subset of those with the antibody, maybe a substantial subset, have the RNA. Okay?

So this doesn't really address the question that's posed in some of the other studies. Okay?

Q. Okay.

A. It's saying you can measure both, and you'll pretty much find the same thing because everybody -- because many people who have the antibody also have the DNA -- or the RNA.

So it doesn't really -- it doesn't really -- they could have done this. They could have taken the cases that had just the antibody and didn't have the RNA and they probably would have found what the other papers I cite found, that the people with just the antibody do not have an elevated risk.

Q. Okay. You can put that aside.

Now, you also cite an article by Mahale entitled, "The Effect of Sustained



Virological Response on the Risk of Extrahepatic Manifestations of Hepatitis C Virus Infection."

A. In my report?

Q. In your supplemental list.

A. Okay.

MS. FORGIE: Is this 10?

MS. DU PONT: Yes, sorry. This is Exhibit 10.

(Exhibit Number 10 was marked for identification.)

BY MS. DU PONT:

Q. And this was included on your supplemental list. Now, do you know if you had reviewed this article prior to drafting your report or after you had drafted your report?

A. I don't know. I don't remember.

Q. Okay. And the results of this paper in the conclusions on the second page, they say, "Risks of several extrahepatic manifestations of HCV infection are reduced after antiviral therapy with sustained viral response" -- sorry, "sustained virological response. However, early initiation of

anti-viral therapy may be required to reduce the risk of glomerulonephritis, non-Hodgkin's lymphoma, and stroke."

Do you see that?

A. Yes.

Q. And if we take a look at Figure 2 on page 16, the authors are looking at several of what they call extrahepatic manifestations, one of which is not non-Hodgkin's lymphoma; right?

A. Right.

Q. What Figure 2D, which is referring to non-Hodgkin's lymphoma, is showing, is that over time, the longer you go without anti-viral treatment, there is no reduction in your risk of non-Hodgkin's lymphoma because of that treatment; correct?

MS. FORGIE: Objection.

THE WITNESS: Well, what they showed is that the most effective time to institute therapy is shortly after the diagnosis. Then you see actually a decrease in risk.

BY MS. DU PONT:

MS. FORGIE: Objection.

MS. FORGIE: Objection.



BY MS. DU PONT:

Q. And in your report, you note that the hepatitis B virus increases the risk of non-Hodgkin's lymphoma by approximately twofold; right?

A. Right.

Q. And you cite some articles to support that in your report?

A. Correct.

Q. And are you aware that the International Agency For Research on Cancer has looked at the hepatitis B virus and whether or not it is a human carcinogen for non-Hodgkin's lymphoma?

Are you aware of that?

A. I know they looked at it for a cellular carcinoma, but I don't believe they've looked at it for non-Hodgkin's lymphoma.

Q. Okay.

A. I think they actually do mention in their conclusions that there were some studies that showed increased risk for non-Hodgkin's lymphoma, but they didn't --

the firm conclusion was really about hepatocellular carcinoma.

Q. They also noted positive association between chronic infection with HPV and non-Hodgkin's lymphoma; fair?

A. Yes, they did.

Q. And they classify hepatitis B as a Class 1 human carcinogen; correct?

A. Yes.

MS. FORGIE: Objection.

Page 78

[redacted]

Page 79

[redacted]

Page 80

[redacted]

Page 81

[redacted]

Dennis Weisenburger, M.D.

Page 82

Page 84

Page 83

Page 85

BY MS. DU PONT:

Q. And you corrected your report earlier, and I think it's based on a Castillo study, but I need to take a break because I have no more exhibit stickers.

Golkow Litigation Services Page 22 (82 - 85)

So can we go off the record for a second?

(Discussion off the record.)

THE VIDEOGRAPHER: The time is now 10:15 a.m., and we are off the record.

(Recess taken from 10:15 a.m. to 10:29 a.m.)

THE VIDEOGRAPHER: The time is now 10:29 a.m., and we're back on the record.

BY MS. DU PONT:

Q. [redacted]

///

(Exhibit Number 11 was marked [redacted]

Q. And can you just refer me to the number that you are correct -- where in this article you've gotten the new number that you've corrected in your report?

A. Yeah, it's page 126, Table 3, which is the table on overweight. If you go down on the second column, about the middle, it says, "Male," and then you go across, it's 1.27. With odds ratio -- 1.27 with a 95 percent confidence interval load of 1.09 to 1.47.

That's what I was quoting.

Actually, the paper confuses the odds ratios. In some places, it reverses them. So it's hard to know what to rely on.

But I think this agreed with the text so that's, in the end, what I used.

The abstract, I think, is --

Q. It flips them in the abstract.

A. It flips them in the abstract; so that's an error. There's an error somewhere, and we don't really know for sure where the error is.

Q. So are these based on Table 3, the relative risk -- the unadjusted relative risk for males that are overweight with diffuse large B-cell lymphoma is 1.27 and the adjusted relative risk is actually 1.34; correct?

A. Yes.

Q. And explain to me why you are relying on the unadjusted number and not the adjusted number.

A. I could have relied on either one. It doesn't truly matter to me.

Q. Okay. And elsewhere, in this paper, it notes that the relative risks of diffuse large B-cell lymphoma in obese men and women was 1.4 and 1.34, respectively. That's in the abstract.

Do you see that?

A. It says, "The relative risk of

diffuse large B-cell lymphoma in overweight men and women was 1.22 and 1.27, respectively."

The number for men is wrong.

Q. Right.

A. So they just flipped those two, I think, is what they did.

Q. But I'm actually referring to later in the text where they're talking about obese men and women with diffuse large B-cell lymphoma, and they report relative risks of 1.4 and 1.34 in the abstract.

Do you see that?

A. Yes, yes. They didn't report the adjusted odds ratios either in the abstract.

Q. Right. So the -- and in Table 4, the relative risk for obese -- this is on page 127, "The relative risk for obesity and diffuse large B-cell lymphoma in males is 1.4"; correct?

A. Yes.

Q. Okay. You can set that aside.

We talked at your deposition the other day about how age is a risk factor for non-Hodgkin's lymphoma.



Do you remember that?
A. Yes.
Q. And you stand by the fact that age is a risk factor for non-Hodgkin's lymphoma?
A. Yes.
Q. And you -- let me withdraw that.
You agree that diffuse large B cells is most common in patients over 60?
A. Yes.
Q. And that cancer, in general, is a function of age; right?
A. Most cancers.
Q. But with respect to diffuse large B-cell lymphoma, that particular cancer is a function of age?
MS. FORGIE: Objection. Asked and answered.
THE WITNESS: Yes.

MS. FORGIE: Objection.

Q. And we know that males are more likely to develop non-Hodgkin's lymphoma than females; correct?

A. Yes.
Q. But, again, we don't really know why it is that men are more likely to develop non-Hodgkin's lymphoma than women; correct?
MS. FORGIE: Objection.
THE WITNESS: Correct.

MS. FORGIE: Objection.

BY MS. DU PONT:
Q. We can't control some causative risk factors either, can we?
MS. FORGIE: Objection.
THE WITNESS: We can control some.

Q.

Dennis Weisenburger, M.D.

Page 94

[text redacted]

16    MS. FORGIE:  Objection.  Even
17  though you phrased it as hard, it's a
18  general causation.
19    THE WITNESS:  It's a study
20  of -- I'm trying to remember, skin,
21  tumors in mice, where they initiated the
22  tumors with a chemical other than
23  glyphosate and then they introduced
24  glyphosate.  So there's one study that
25  suggests glyphosate is a promoter.

Page 95

1  BY MS. DU PONT:
2    Q.  Sitting here today, other than that
3  one study, you cannot reference for me an
4  additional study that suggests that
5  glyphosate is a promoter; correct?
6    MS. FORGIE:  Objection.
7  General causation.
8    THE WITNESS:  No, but there are
9  many studies that have now demonstrated
10  that glyphosate or Roundup are genotoxic
11  agents and so certainly has the
12  potential to be an initiator or a
13  promoter, or both.
14  BY MS. DU PONT:
15    Q.  But because something is genotoxic,
16  that suggests it is causing DNA damage;
17  correct?
18    MS. FORGIE:  Objection.
19  Causation.
20    THE WITNESS:  Right.
21  BY MS. DU PONT:
22    Q.  And that's different from
23  promotion; correct?
24    MS. FORGIE:  Objection.
25  General causation.

Page 96

1    THE WITNESS:  Well, promotion
2  is just what happens after initiation to
3  make the cell move to become a true
4  cancer cell, and that could be things
5  that initiate proliferation, genetic
6  events that prevent the cell from dying,
7  or additional genotoxic events that give
8  additional mutations that eventually
9  move the cell along to becoming a cancer
10  cell.
11  [text redacted]

16    MS. FORGIE:  Objection.  Asked
17  and answered.
18  [text redacted]

Page 97

1  [text redacted]

25  ///

Page 98

[redacted]

[redacted]

[redacted] .

[redacted]

Page 100

[redacted]

Page 101

[redacted]

Case 3:16-md-02741-VC Document 2479-10 Filed 01/11/19 Page 28 of 32

Page 102

[redacted]

Page 103

[redacted]

Page 104

[redacted]

Page 105

[redacted]

Case 3:16-md-02741-VC Document 2479-10 Filed 01/11/19 Page 29 of 32

Page 106

MS. DU PONT: Objection.

Page 107

MS. DU PONT: Objection. Form.

Page 108

Q. Do you consider yourself an expert in the causes of non-Hodgkin's lymphoma?

A. Yes.

Q. In fact, you've published over 50 papers in peer-reviewed journals about the causes of non-Hodgkin's lymphoma; correct?

A. Yes.

MS. DU PONT: Objection. Form.

Page 109

MS. DU PONT: Objection. Form.

.

MS. DU PONT: Object to form.

MS. FORGIE: That's all I have.

MS. DU PONT: Just give me one minute.

THE VIDEOGRAPHER: The time is now 10:55 a.m., and we are off the record.

(Recess taken from 10:55 a.m. to 10:57 a.m.)

THE VIDEOGRAPHER: The time is now 10:57 a.m., and we are back on the record.

FURTHER EXAMINATION



MS. DU PONT: Okay. I have no further questions.

MS. FORGIE: Nothing else.

THE VIDEOGRAPHER: The time is now 10:58 a.m., and we are off the record.

(Whereupon the deposition concluded at 10:58 a.m.)

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

I further declare that I have no interest in the outcome of the action.

In witness whereof, I have subscribed my name this 20th day of December, 2018.

LISA MOSKOWITZ
CSR 10816, RPR, CRR, CLR
NCRA Realtime Systems Administrator

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

ERRATA SHEET

------

PAGE LINE CHANGE

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

______ ______ ____________________

REASON: ____________________

ACKNOWLEDGMENT OF DEPONENT

I, DENNIS WEISENBURGER, M.D., do hereby certify that I have read the foregoing pages, 1-119, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

____________________ __________

DENNIS WEISENBURGER, M.D. DATE

LAWYER'S NOTES

PAGE LINE

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________

______ ______ ____________________