REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

# EXHIBIT 71

```
 1                  UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

 2                         - - -

 3   IN RE: ROUNDUP PRODUCTS      : MDL No. 2741

     LIABILITY LITIGATION         : Case No. 16-md-02741-VC

 4   ------------------------------

     STEVICK, ET AL. V.           : Case No. 16-cv-02341-VC

 5   MONSANTO COMPANY             :

     ------------------------------

 6   This document relates to:    :

                                  :

 7   ALL ACTIONS                  :

     ELAINE STEVICK               :

 8                         - - -

 9              Thursday, December 20, 2018

10                    CONFIDENTIAL

11                         - - -

12         Deposition of WILLIAM R. SAWYER, Ph.D., held

13   at Sundial Beach Resort, 1451 Middle Gulf Drive,

14   Sanibel, Florida, on the above date, beginning at 8:10

15   a.m., before Kimberly A. Overwise, a Certified Realtime

16   Reporter and Notary Public.

17                         - - -

18

19

20             GOLKOW LITIGATION SERVICES

            877.370.3377 ph | 917.591.5672 fax

21                   deps@golkow.com

22

23

24

25
```

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Confidential - William R. Sawyer, Ph.D.

Page 18

1 you intend to offer in the Stevick, Gebeyehou, and
2 Hardeman cases?
3     A   Yes.
4     Q   There's a tab on Exhibit 1 that contains your
5 CV.  This is from August of 2018.  It was attached to
6 your expert report.  Do you see that?
7     A   No.  I'm in the wrong report.  Okay.
8     Okay.
9     Q   This is the CV that was attached to your
10 expert report, Exhibit 1, when we received it in
11 November of 2018.  This CV is dated August of 2018.  Is
12 this your current curriculum vitae?
13    A   It has been updated with I believe one minor
14 change that I think was an e-mail, a second e-mail
15 address or -- or something of that sort, but, yeah,
16 essentially identical.
17    Q   Other than the addition of a second e-mail
18 address to your CV, is there anything else that needs to
19 be added to the CV that is part of Exhibit 1 so that it
20 is complete?
21    A   No.
22    Q   Okay.  I understand, Dr. Sawyer, that you're
23 offering a specific causation opinion about Elaine
24 Stevick; is that right?
25        MR. TRAVERS:  Objection to form.  It's not --

Page 19

1 specific causation is a legal term.  He's not a
2 lawyer.
3 BY MR. DERRINGER:
4     Q   You've been involved in a lot of litigation
5 where questions of causation are concerned; is that
6 right?
7     A   Yes.  Actually, I -- I can answer your
8 question, but I want to make sure I clearly understand.
9 I guess the best way I can answer this is that there are
10 elements in my report, the vast majority of my report,
11 that are directed to all three patients or to any -- any
12 human being, for example, dermal absorption, protective
13 gear, or the co-contaminants within the product, et
14 cetera.
15        And you ask for specific causation opinions,
16 and those elements that I'm referring to are not part of
17 general causation, which has already been hashed out in
18 this case is my understanding.  That's not what I'm here
19 for, to speak -- I'm not here to speak on general
20 causation at all, only specific causation among the
21 three plaintiffs.  But there are elements in my report
22 that are specific to Ms. Stevick and there -- the vast
23 majority of the report is specific to all three
24 plaintiffs.
25        So I know that sounds a little confusing, but

Page 20

1 that's the best I can do to answer your question.
2     Q   We'll try to parse that out.  You said you're
3 not here to speak on general causation at all, only
4 specific causation among the three plaintiffs.  So let's
5 start for a second with the specific causation among the
6 three plaintiffs.
7        MR. TRAVERS:  I'm just going to object to the
8 rehash of his testimony.
9        MR. DERRINGER:  I'm sorry?
10       MR. TRAVERS:  I'm just -- I'm objecting to
11 your summary -- summary of his testimony.  I don't
12 think it fairly characterizes it.
13       MR. DERRINGER:  Yeah, I'm reading from the
14 transcript.
15       MR. TRAVERS:  No.  You're summarizing it.
16       MR. DERRINGER:  No.  I'm reading from the
17 transcript.
18 BY MR. DERRINGER:
19    Q   Are you offering any specific causation about
20 Mr. Gebeyehou?
21    A   Yes.
22    Q   Can you show me in your report, Exhibit 1,
23 where your specific causation opinion about
24 Mr. Gebeyehou is disclosed?
25       MR. TRAVERS:  And I'm going to keep objecting

Page 21

1 to the use of "specific causation" and "general
2 causation."  They're legal terms.
3        MR. DERRINGER:  Right.  Dr. Sawyer used both
4 of those terms --
5        MR. TRAVERS:  Yeah.
6        MR. DERRINGER:  -- in his response.
7        MR. TRAVERS:  He's not a lawyer.
8        MR. DERRINGER:  He understands them.
9        MR. TRAVERS:  No.  He --
10 BY MR. DERRINGER:
11    Q   Go ahead.  Can you show me in the report where
12 your specific causation opinion about Mr. Gebeyehou is
13 disclosed?
14    A   Starting on page 39.
15    Q   Okay.
16    A   This section on the carcinogenic substances in
17 Roundup is identical for all three plaintiffs.  There's
18 no difference.
19    Q   Where on page 39 do you discuss
20 Mr. Gebeyehou's exposure to the allegedly carcinogenic
21 substances in Roundup that are described on page 39 of
22 your report?
23       MR. TRAVERS:  Objection; form.
24       THE WITNESS:  I don't recall stating that I
25 calculated a dose equation for that plaintiff.

Page 22

1    BY MR. DERRINGER:
2    Q   Right.  Am I correct that Mr. Gebeyehou's name
3  is not mentioned at all on page 39?
4    A   No, nor anywhere in the report.
5    Q   Where else in Exhibit 1 do you disclose a
6  specific causation opinion about Mr. Gebeyehou?
7    A   Page 40.
8    Q   Mr. Gebeyehou's name -- well, strike that.
9        Where else do you disclose a specific
10  causation opinion about Mr. Gebeyehou?
11    A   Page 41.
12    Q   Why don't you tell me the entirety of the page
13  ranges of your report where you contend that you've
14  disclosed specific causation opinions about
15  Mr. Gebeyehou?
16    A   I can do that, but perhaps I'm failing to
17  understand your question regarding specific causation.
18    Q   Specific causal -- well, let's take a look for
19  a second at page 121 of your report.  You see the last
20  paragraph right above your signature is titled "Summary
21  and Conclusions"?
22    A   Yes.

Page 23

21    Q   Go to your table of contents, please.  You
22  testified just a little bit earlier, I think you said
23  that the vast majority of what you have in your report,
24  Exhibit 1, addresses issues that apply across the board
25  to any person; is that right?  I want to make sure I

Page 24

1  have that right.
2    A   Yes.
3    Q   Okay.  And --
4    A   Approximately the first 38 pages are specific
5  to Mrs. Stevick.
6    Q   And those first 38 pages deal with
7  Mrs. Stevick's medical history and exposure review; is
8  that right?
9    A   That's correct; dose calculation.
10    Q   Right.  Including her Roundup application
11  notes or notes that you made about her Roundup
12  application; is that right?
13    A   Yes.
14    Q   And also includes -- including a dose
15  calculation and an exposure calculation that you made
16  regarding Mrs. Stevick; is that right?
17    A   Yes.
18    Q   Okay.  And then if you look at Part B of your
19  table of contents, that section is titled "Introduction
20  to Glyphosate and Mrs. Stevick's Exposures."  Do you see
21  that?
22    A   It is; up till about page 39.
23    Q   And then starting at page 39 is it your
24  testimony that -- that from pages 39 up through page
25  114, that that information is not specific to

Page 25

1  Mrs. Stevick?  Is that -- is that right?
2    A   Largely.  There may be a few points in there
3  where I may have actually specifically pointed out
4  something relative to her because of her low body weight
5  or -- or some other factor.  I don't recall.  So I can't
6  guarantee that there isn't any mention of her
7  specifically in that section.  There may not be any but
8  I'm not sure.
9    Q   That's fair.  I understand that.  I appreciate
10  that, Dr. Sawyer.  But Part B was -- starting at page 39
11  of your report, that was intended to address not
12  Mrs. Stevick in particular, but to address general
13  points that you're making regarding glyphosate, dermal
14  exposure, glyphosate exposure, things like that that
15  would apply to anybody; is that right?
16    A   Correct; the mechanisms of absorption, the
17  aspects of co-formulants and surfactants, et cetera.
18    Q   Okay.  Have you done anything to learn about
19  Mr. Gebeyehou?
20    A   I've reviewed his report and -- and the dose
21  calculation table prepared by Dr. Sullivan.
22    Q   I'm sorry.  You said you've reviewed his
23  report.  Whose report?
24    A   Dr. Sullivan.
25    Q   Okay.



Page 26

1    A    And his dose calculations as well.

Page 27

9         MR. TRAVERS:  Objection; form.  You're saying
10    "if we refer to it that way."  Again, he's not a
11    lawyer and you're trying to use a legal term.
12    BY MR. DERRINGER:
13    Q    I am not going to burden you, sir, with
14    adopting the word or the term "specific causation" in
15    its legal sense.  Like you said earlier when we
16    started -- actually, I think this was before we started,
17    we're trying to find ways to make today as efficient as
18    possible and so I want to just use the term and I will
19    use the term "specific causation opinion" to refer to
20    the opinion that you've put forward at page 121 under
21    Summary and Conclusions.  I'm not asking you to adopt
22    any legal significance to that.  I'm just going to tell
23    you that that's how I'll -- I'll refer to it in
24    shorthand today to help us along.  Is that okay?
25    A    I think so, yeah.

Page 28

1    Q    Okay.  So that specific causation opinion that
2    you've presented at page 121, am I right that the
3    significant considerations that you took into account --
4    and by that I'm referring to page 119, which is Part D
5    titled "Summary of Objective Mrs. Stevick's
6    Toxicological Factors," do you see under Evidential
7    Considerations you say that:  "The following represent
8    significant considerations in formulating an objective
9    toxicological assessment of Mrs. Stevick with respect to
10    her Roundup exposure..."?  Do you see that?
11    A    Yes.
12    Q    Okay.  So the significant considerations you
13    took into account in formulating your specific causation
14    opinion with respect to Mrs. Stevick, those are
15    presented in the bullet points at pages 119 through 121
16    of your report; is that right?
17    A    They are, but I -- I must caution you that the
18    second bullet on dermal absorption rates applies to not
19    only Ms. Stevick but any human being.
20    Q    Appreciate that.  And are there any other
21    bullets that you've described as your significant
22    considerations in formulating an objective toxicological
23    assessment of Mrs. Stevick that apply to any human
24    being, not only Mrs. Stevick?
25    A    Well, the mechanism of carcinogenicity as

Page 29

1    well.
2    Q    Okay.  So that would be the fourth bullet; is
3    that right?
4    A    Yes.
5    Q    Okay.  Any other bullet of these five bullets
6    you've listed that apply to any human being and not only
7    Mrs. Stevick?
8    A    No.

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Confidential - William R. Sawyer, Ph.D.

Page 42

1   BY MR. DERRINGER:
2      Q   Sure, sure.  Again, just going back to your
3   response a few minutes ago, I asked you about the
4   threshold, Dr. Sawyer, that you use to determine
5   initially whether there's a case, and you told me that
6   you initially compare it to human epidemiological study
7   with respect to a dose comparison based upon exposure
8   days to determine whether someone's within that range.
9   And you then, when I asked you -- or when I summarized
10  that, you -- you responded, yes, and defined by a
11  minimum of time per exposure day as per studies.  And
12  I'm -- I asked you, what is the minimum time per
13  exposure day that you believe the studies reflect?
14  So --
15     A   All right.  I can answer that.
16     Q   -- do you have the answer?  Do you have the
17  question clear in your head now?
18     A   Yes.
19     Q   Okay.  Great.  Go ahead.
20     A   Well, with the McDuffie study, at a minimum of
21  ten or greater than ten hours per year, and her exposure
22  was ten hours per year for 25.5 years.  And also on the
23  Eriksson study, the odds ratio was elevated at 1.69 for
24  ten days of exposure or less and 2.36 for greater than
25  ten days of exposure.  And in that case we know that she

Page 43

1   had 255 days of exposure at one hour.
2          And the methodology that is generally used in
3   most of the studies considers a six-hour application
4   day, and that is as per POEM methodology and actually in
5   some of the studies use six-hour equivalent.  So at one
6   hour a day she has 255 hours, which is considerably more
7   by a factor of four of -- that -- having to have ten
8   days at six hours per day, that would be 60 hours.  And
9   60 times four is 240, and she has over that number of
10  hours.  So, I mean, she's -- she's well above the
11  requirements for either of these studies.
12     Q   Is it your testimony that in the Eriksson
13  study when they refer to a day of exposure to determine
14  whether someone's been exposed for more than or less
15  than ten days, a day of exposure means six hours
16  application time?
17     A   That's what's generally in the literature.
18     Q   Okay.  And we'll take a look at Eriksson in a
19  bit, but you believe that's reflected and stated --
20  strike that.
21         Do you believe that the study itself, the
22  report of the study discloses that they're using a
23  six-hour day?
24     A   No.  In fact, it's more likely that they're
25  referring to any exposure on a given day actually.

Page 44

1      Q   When you say it's more likely that that's what
2   they're referring to in the Eriksson study, what are you
3   basing that conclusion on?
4      A   How other similar studies have been run
5   regarding herbicides.  But, see, the problem with
6   Eriksson, the study does not specifically put a number
7   on it, whether it be one hour or eight hour.  But what I
8   did state, which is generally accepted in the literature
9   and in the methodology, is that applicators generally
10  are assessed with a six-hour exposure day.
11     Q   In the absence of any other information from
12  the Eriksson study, either written or otherwise, your
13  operating assumption is that the exposure day referred
14  to in Eriksson refers to a six-hour day?
15     A   Yeah, you know, and that's a darn good
16  question because let's assume that Eriksson requires 24
17  hours of application per day, which is ridiculous but
18  let's assume that.  She still meets the requirement.
19     Q   Okay.  Have you ever spoken to any of the
20  study authors of the Eriksson study?
21     A   No.
22     Q   Have you ever communicated with them in any
23  way?  E-mail?  Letter?  Anything?
24     A   No.
25     Q   Okay.

Page 45

1      A   It wasn't necessary because even if it was 24
2   hours times ten days is 240 hours, and she's 255.  So, I
3   mean, any way you look at it she fits into the study.
4      Q   And just so you know how I tend to operate,
5   I'm not going to cut you off or tell you, you know -- or
6   interrupt you, sir.  I understand that, you know, you
7   wanted to start early today.  I was happy to do that
8   because it gets to be a long day by the 5 o'clock hour,
9   something like that.  And so to the degree that you can
10  just focus on my question and just answer that question,
11  that will be great.  Like I said, I'm not going to stop
12  you or interrupt you, but I know you've got some concern
13  about length of deposition and so the more you can focus
14  on my question, I think we'll -- we'll be better served.
15     A   I will do my best.  Thank you.
16         MR. TRAVERS:  Objection.  Just to note for the
17  record, Dr. Sawyer is being -- his answers are
18  being responsive to the questions.
19  BY MR. DERRINGER:
20     █████ ████████████████████████████
21     ██ ████ ██████
22     ██ █ ████████
23     ██ █ ████████████████████████
24     ██ ██████████████████████████
25     ██ █ ████

Confidential - William R. Sawyer, Ph.D.

Page 46

1  Q   Okay.  You did interview her I think you
2  mentioned.  You said you spoke to her via phone prior to
3  reviewing her medical records.  That was kind of an
4  initial conversation.  And then you recalled at least
5  one other phone call with her.  Do I have that right?
6      A   Yes.
7      Q   Okay.  If you look in your report, Exhibit 1,
8  at pages 9 to 10, you've included two pages here
9  describing your phone interview with Elaine Stevick
10  dated October 18, 2018.  Do you see that?
11      A   I do.
12      Q   Is what you've written here on pages 9 and 10,
13  does that reflect what you learned during your interview
14  with Mrs. Stevick?
15      A   Yes.
16      Q   Did you have any other notes that you didn't
17  include in here from your phone interview with Elaine
18  Stevick on October 18, 2018?
19      A   No.  Jen Clark from my office was on the call
20  and put everything in MS Word as we proceeded.
21      Q   Jen Clark is your assistant?
22      A   Yes.
23      Q   And she was listening in on the call?
24      A   Yes.
25      Q   And as you and Mrs. Stevick were conversing,

Page 47

1  she was -- she was typing down what each of you said?
2      A   Of significance; yes.
3      Q   Okay.  And who determined what was of
4  significance?  Did Ms. Clark or did you direct her about
5  what she should write down?
6      A   She wrote down things, but I -- I can't
7  guarantee she wrote down everything.  But I did speak up
8  and with certain items said, Jen, make sure you -- you
9  get that exact, and -- and really why that is is a
10  signal for me to put -- for her to put something in
11  quotations.
12      Q   And do pages 9 and 10 of your report, Exhibit
13  1, reflect everything that you consider relevant to your
14  opinion regarding Mrs. Stevick that you learned from
15  Mrs. Stevick during your phone interview on October 18,
16  2018?
17      A   No.  I also relied on her deposition.
18      Q   Oh, understood.  We'll -- we'll get to that.
19  Let me ask my question again.
20      A   And her medical records.
21      Q   Yeah.  So do pages 9 and 10 of your report,
22  Exhibit 1, reflect everything that you consider relevant
23  to your opinion regarding Mrs. Stevick that you learned
24  from Mrs. Stevick during your phone conversation on
25  October 18, 2018?

Page 48

1      A   Yes.
2      Q   Have you ever -- well, you mentioned you might
3  have talked to her one or two other times.  We know you
4  spoke to her at the outset of your work on her case.  Do
5  you have any notes from that conversation?
6      A   You mean the second phone call?
7      Q   No, no.  The first one before you reviewed
8  medical records.
9      A   I'm sorry.  I'm not sure I understand.
10      Q   Sure.  You testified that the first thing you
11  did to learn about Mrs. Stevick was you spoke to her on
12  the phone before you even reviewed her medical records.
13      A   Right.
14      Q   Okay.  Is that this October 18th conversation?
15      A   It is.
16      Q   Thank you.  And then you mentioned you had at
17  least one other phone call with her, maybe one or two
18  follow-ups, one with respect to her sprayer.  I didn't
19  see anything in your report reflecting notes from those
20  follow-up phone calls.  What did you learn, if you can
21  remember, during those follow-up phone calls with
22  Mrs. Stevick?  And -- and first, I guess, if you can
23  give me your best recollection of how many follow-up
24  phone calls you had.
25  ██ ████████████████████████████████

Page 49

1  ██████████████
2  ███████████████████
3  ████████████████████
4  ████████████████
5  ██████████████
6  █████████████████
7  ████████████████████
8  ███████████████
9  █████████
10  ████████████████
11  ██████████████████
12  ███████████
13  █████████████
14  ██████████
15  ██████
16  █████
17  ██
18  ███
19  █████████████████
20  ████████████████████
21  ███████████████████
22  ████████████████████
23  ███████████████████
24  ████████████████████
25  ████████████████

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED
Confidential - William R. Sawyer, Ph.D.



Page 50

Page 52

Page 51

Page 53

22    Q    Okay.
23    A    No, no.  That's the only deposition I've --
24    I've reviewed.
25    Q    You also mentioned you looked at her medical

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED
Confidential - William R. Sawyer, Ph.D.



Page 86

1  Q   What about lindane; known risk factor for
2  DLBCL?
3      A   Breast cancer; yes.  NHL I think so, but I --
4  I'd want to just verify that with the studies.  It's
5  been a while since I've actually researched the studies
6  on lindane.  That dates all the way back to Mission,
7  Texas, on a case I worked on.
8      Q   Okay.  What about 1,3-Butadiene?
9      A   1,3-Butadiene.
10     Q   -diene.  Thank you.
11         Is that a known risk factor for DLBCL?
12     A   You know, the studies on 1,3-Butadiene are, as
13  I recall, general for lymphatic and lymphohematic --
14  lymphopoiet -- lymphopoietic malignancies in general.  I
15  don't recall the studies specifically stating NHL, but
16  that would be included in the subgroup.  So the answer I
17  think is yes.  It's just I -- I can't guarantee that
18  you're going to find NHL segregated by itself.
19     Q   Is wood dust a known risk factor for DLBCL?
20     A   It is.
21     Q   Halocarbon impurities, such as dioxin, are
22  those known risk factors for DLBCL?
23     A   Dioxins, absolutely.
24     Q   What about hair dyes, are those a known risk
25  factor -- use of hair dyes; a known risk factor for

Page 87

1  DLBCL?
2      A   I'm trying to think what chemicals in hair
3  dyes would be present.  You know, hair dyes is too
4  general to actually offer a causation opinion.  In other
5  words, if -- if you approached me as a -- as an attorney
6  and said, look, my -- my client was overexposed to hair
7  dyes for 50 years, I'd say I need to know what chemicals
8  are in there to evaluate that in dose.  I -- it's just
9  too general of a question.
10     Q   Yeah.  Have you -- did you do anything to ask
11  Mrs. Stevick or to inquire or determine whether
12  Mrs. Stevick used hair dyes?
13     A   I did not.
14     Q   Okay.  All right.  I think you talked about
15  this before.  Mecoprop, that's been determined to be a
16  known risk factor for DLBCL; is that right?
17     A   Yes.
18     Q   And also 2,4-D also determined to be a known
19  risk factor for DLBCL?
20     A   Oh, yes.
21     Q   What about methylene chloride; has that been
22  determined to be a known risk factor for DLBCL?
23     A   Methylene chloride has never really made it to
24  the human carcinogen list.  You know, trichlorethylene
25  we know induces renal cancer and cancer at several

Page 88

1  sites, but methylene chloride is still considered a -- a
2  B2 animal carcinogen.  So we're really restricted on --
3  on animal evidence with respect to that chemical.
4      Q   And since you're restricted to animal
5  evidence --
6      A   What I mean is I'm not -- I'm not familiar
7  with human evidence that I can recall.  And it's
8  possible.  I just can't recall it.
9      Q   Why -- why is it important for you to know
10  whether there's human evidence of a causal association
11  between methylene chloride and DLBCL before you're able
12  to testify today as to whether methylene chloride is a
13  known risk factor for DLBCL?
14     A   Well, because, unless I'm incorrect on this, I
15  believe that methylene chloride is still considered to
16  be not carcinogenic to humans.
17     Q   Who -- who considers that?  Who -- whose
18  opinion is that?
19     A   US EPA, IARC primarily.
20     Q   Okay.  And you rely on their opinions about
21  that?
22     A   In part.

Page 89



REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Confidential - William R. Sawyer, Ph.D.

1    Q   Okay.  Well, if you don't recall the specific
2  picture, what makes you say that you probably saw it
3  before?
4    A   Because I looked at a lot of photos and if it
5  was in the set, I probably looked at it.
6    Q   Okay.
7    A   There's -- you know, these are chemicals I'm
8  familiar with.  I've testified on a WD-40 case.  I know
9  the ingredients in it.  I know the ingredients in GUNK.
10  I mean, these are --
11    Q   Benzene is an ingredient in GUNK; right?
12    A   No, it is not.
13    Q   Benzene is not in GUNK, the -- the --
14    A   It's less than .1 percent.
15    Q   Okay.  I'm just asking in Exhibit 7 in the
16  middle, you see the aerosol spray of the product GUNK;
17  right?
18    A   I do.
19    Q   Okay.  And is it your testimony that there's
20  no benzene in that bottle of GUNK?
21    A   I didn't say that.  I said look at the MSDS.
22  It's less than .1 percent.
23    Q   Okay.
24    A   There's no way with a product of less than
25  .1 percent in the liquid a person is going to reach part

1  per million levels in the air that's going to cause NHL.
2    Q   Did you ask Mrs. Stevick about whether she
3  ever used GUNK?
4    A   No.  It was not necessary because it's
5  irrelevant.
6    Q   What -- you mentioned that you have testified
7  in these kinds of cases, you know, about a lot of
8  products that are in the garages.  What -- what products
9  in Mrs. Stevick's garage did you identify that have
10  benzene in them, any level of benzene?  And I'm not just
11  talking about this picture, although you should
12  certainly use the picture for reference if you'd like.
13  I just mean generally based on your review of her --
14    A   None of these products contain benzene at a
15  level that is less than .1 percent.
16    Q   Okay.
17    A   In fact --
18    Q   Do any of them contain --
19    A   -- much of them are less than .01 percent.
20    Q   Do any of the products -- and I'm not just
21  talking about what's in this picture, Exhibit 7.  What
22  products did you identify, if any, in Mrs. Stevick's
23  garage that had any level of benzene in them?
24    A   Yeah, none -- nothing less than -- nothing
25  greater than .1 percent.

1    Q   What did you identify in Mrs. Stevick's
2  garage, what products, that had benzene at a level that
3  is more than zero but less than .1 percent?
4    A   Possibly WD-40; possibly GUNK; possibly the
5  CRC Lectra cleaner, although that's primarily a
6  fluorocarbon -- fluoro halocarbon gas.  The Armor All is
7  zero, the two Armor Alls in the back row.  And the
8  expansion foam is zero.  The Scotch Super Adhesive,
9  zero.  The cleaning duster is simply an inert gas.  And
10  that little can in the middle with a yellow label, I'm
11  not sure what that is.
12        But I identified nothing that contained any
13  significant concentration of benzene that could raise
14  the air level to even a measurable level and certainly
15  not into the PPM level.  And even if it were at the PPM
16  level, she would have to have years' worth of exposure
17  at that level and she wasn't in the garage years at a
18  time.  She was only occasionally in the garage.  It's
19  just ridiculous to insinuate that any of these chemicals
20  contained enough benzene to have any relevance.  And I
21  can -- I can demonstrate that mathematically.
22    Q   Did you take an inventory, Dr. Sawyer, of all
23  of the different products that are in the Sawyers'
24  garage?
25    A   I know what's in my garage.

1    Q   We'll talk about that in a different
2  deposition perhaps, but I'll ask a different question.
3  Thank you for clarifying that for me.
4        Did you take an inventory of all the products
5  that are in the Stevicks' garage?
6    A   I didn't take a written inventory.  I just
7  reviewed the photos looking for something that could
8  possibly contain a significant quantity of a carcinogen,
9  especially one that could induce NHL, and I found none.
10    Q   And do you believe that you've reviewed all of
11  the photos -- well, strike that.
12        Do you believe that the photos you've reviewed
13  identify all of the products that are contained in the
14  Stevicks' garage?  And I'm not talking about the two
15  photos that you have in front of you as Exhibits 6 and
16  7.  You mentioned that you reviewed photos of their
17  garage.
18    A   Yes.
19    Q   Do you believe that the photos that you
20  reviewed of the Stevicks' garage allowed you to identify
21  every product or every item that is contained in the
22  Stevicks' garage?
23    A   No.
24    Q   You never visited their garage; correct?
25    A   No.  It's -- again, it's possible I may do so,

Page 110

1  but I can't answer that because I don't know if it would
2  be appropriate in this case.
3      Q   Well, I -- I'm just talking about up until
4  today, you've never set foot in the Stevicks' garage;
5  correct?
6      A   No.
7      Q   I'm -- I'm correct about that?
8      A   No, no, you're correct.
9      Q   Okay.
10         (Sawyer Exhibit No. 8 was marked for
11     identification.)
12  BY MR. DERRINGER:
13     Q   Let me show you Exhibit 8.  This is another
14  photo depicting part of the Stevicks' garage.  Have you
15  seen this photo before?
16     A   Well, it's -- it's essentially the same as
17  Exhibit No. 7, just a different angle.
18     Q   Yeah.  Have you seen this photo before,
19  Exhibit 8?
20     A   I don't remember.
21     Q   Okay.  You mentioned when you were talking
22  about Exhibit 7 there's some bottle -- some product with
23  a yellow line on it.  Does Exhibit 8 allow you to
24  identify that product?
25     A   Oh, yeah.  That's Liquid Wrench, GUNK.

Page 111

1      Q   Yeah.  There's benzene in Liquid Wrench;
2  correct?
3      A   Less than .1 percent.
4      Q   You also see -- hold on a second.  If you look
5  at Exhibit 7 --
6      A   Okay.
7      Q   -- you see that red canister, CRC, it says
8  "Lectra"?
9      A   Yeah.  I -- I --
10     Q   Do you know what that is?
11     A   I already talked about that, yeah.  That's an
12  electrics -- an electric parts cleaner used on tuners
13  and that type of thing and -- that contains a propellant
14  and chlorofluorocarbons used to clean electronic parts.
15  And it doesn't leave any residue.  It's just immediately
16  dry.
17     Q   Does it contain tetrachlorethylene?
18     A   Yes.  And tetrachlorethylene is a suspected
19  animal carcinogen without sufficient human evidence and
20  is not a human carcinogen, according to NTP, US EPA, and
21  IARC.
22     Q   Do you know what percentage of Lectra-Motive
23  is tetrachloroethylene?
24     A   Pretty high percent because that -- it's
25  highly volatile and it dries flashes without a -- a

Page 112

1  residue.
2      Q   Greater than 95 percent?
3      A   It could be.  It's pretty high, I know that,
4  but it's not a -- not a chemical that's going to cause
5  NHL.
6      Q   Did you ever ask for anyone, Stevicks or
7  anyone else, to provide you with a full list of all of
8  the products that are contained in their garage?
9      A   No.
10     Q   Have you ever seen a full list of all of the
11  products contained in the Stevicks' garage?
12     A   No, I have not.
13     Q   Was Mrs. Stevick exposed in any way, to your
14  knowledge, to other things that you consider
15  carcinogenic with respect to developing lymphoma besides
16  the glyphosate that -- that you've discussed in your
17  report?
18     A   The only thing I can find is Roundup.

Page 113

Page 118

1  2,4-D.

2  Q   Okay.  Did she actually say she didn't use

3  2,4-D or is that your conclusion based on her telling

4  you that she used glyphosate?

5  A   No.  I asked her about 2,4-D.

6  Q   Do you know --

7  A   And I -- and I even asked her if she used it

8  prior to the 1970s.

9  Q   And when you say that you asked her if she

10  used 2,4-D, those were the words you used, you -- you

11  actually referenced that chemical?

12  A   I did say it.  I said -- I made a reference

13  that 2,4-D contained a certain contaminant prior to the

14  1970s that I want to know about.  Did you use 2,4-D?

15  And she said no.

16  Q   Okay.  What did you do to quantify

17  Mrs. Stevick's exposure to wood dust?

18  A   Asked her what her hobbies were and she had no

19  hobbies that involved wood dust.  The only wood dust was

20  during her phase of construction.

21  Q   What did you do to quantify her exposure to

22  wood dust during that phase of construction?  You're

23  talking about the rehab of her house; right?

24  A   Correct.

25  Q   Okay.  What did you do to quantify

Page 119

1  Mrs. Stevick's exposure to wood dust during the

2  rebuilt -- the rehab of her house?

3  A   Just noted that she did -- you know, was

4  involved in the remodeling of the home, and certainly

5  there was some wood dust exposure for a brief period of

6  time.

7  Q   Did you do anything else to quantify that

8  exposure?  Or strike that.

9      Did you do anything to quantify that exposure?

10  A   No, because I -- I know from my prior review

11  and knowledge of the generally accepted peer-reviewed

12  literature that, number one, there are certain types of

13  wood dust that are associated with human malignancy;

14  and, number two, it requires chronic either industrial

15  or hobby exposure, not just a -- a single episode

16  remodeling a house.

Page 120

16  Q   What --

17  A   -- before they build up enough millirem to

18  show any statistically increased risk of any type of

19  radiological malignancies.

20  Q   What studies are you referring to by name?

21  A   I -- I can't give the authors' names, but I'm

22  intimately familiar with them and I -- I could even

23  produce them.

24  Q   Are they on your reliance list?

25  A   No, because I -- I'm familiar with them from

Page 121

1  my professional work and training.  And primarily the --

2  the studies for adults I reference are the nurses

3  studies, the dental practitioner studies.  Probably I

4  would not use the children's studies because the

5  sensitivity differences would really disqualify the use

6  of those studies.

7  Q   Did Mrs. Stevick use any kind of head

8  protection when she was exposed at work to ionizing

9  radiation?

10  A   I believe she did have a leaded collar which

11  prevents those nodes from being exposed.

12  Q   What about the rest of her head; any

13  protection that you're aware of?

14  A   No, no.  I mean, no, there was no other upper

15  head, you know, protection.

16     (Sawyer Exhibit No. 9 was marked for

17     identification.)

18  BY MR. DERRINGER:

19  Q   Let me show you what I've marked as Exhibit 9.

20  This is taken from the website of the American Cancer

21  Society.  You see that this is a discussion of

22  non-Hodgkin lymphoma risk factors?

23  A   Yes.  Yeah, I -- I do.

24  Q   And do you agree with the American Cancer

25  Society that getting older -- this is under Age on the

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED
Confidential - William R. Sawyer, Ph.D.

Page 130

1  of 25 years.
2      Q    Right.  And you have no reason to doubt that;
3  correct?
4      A    That's what she stated.  I -- I -- you know,
5  I'm not a juror.  I'm a toxicologist.  And I know that
6  in my report I made it clear that she did not usually
7  mix it; her husband did.
8      Q    And she was clear that when she did do any
9  mixing, she was very careful; is that right?
10     A    That's what she states, she was very careful
11 and followed the directions on the label.
12     Q    And all of this information --
13     A    And she did occasionally spill some of the
14 Roundup one to two times on her hands, but only a small
15 amount.
16     Q    Yeah.  So when you say she occasionally
17 spilled some of the Roundup, just to be precise there,
18 she recalled spilling some of the Roundup, that is, a
19 small amount, on her hands a total of one to two times
20 over 25 years; is that right?
21     A    That's correct.
22     Q    Okay.  And, again, in fact, although I haven't
23 had a chance yet to review your revised pages 23 through
24 25, but am I right in your dose calculation you assumed
25 zero input from exposure during mixing and loading?  Is

Page 131

1  that right?
2      A    No.
3      Q    Okay.  Well, you give two different estimates
4  of her dose in your report.
5      A    Three actually.
6      Q    Well, actually I think six.  One at the
7  1 percent absorption level, one at the 3 percent
8  absorption level, one at the 10 percent absorption
9  level, and for each of those three absorption levels I
10 think ultimately you give in your report -- I'm at pages
11 20, 21 -- you give those figures both with mixing and
12 loading factored in --
13     A    Yes.
14     Q    -- and with mixing and loading not factored
15 in; is that right?
16     A    Yes.
17     Q    Okay.  And why did you present the figures in
18 your report for estimated milligrams per kilograms per
19 day dose removing the exposure that she would have
20 experienced from mixing and loading?
21     A    Because there were times where she did the
22 mixing and loading and the majority of the time she
23 didn't.  But on those days, to calculate what we call
24 the operator exposure dose in milligram per kilogram per
25 day on the days that she did it, I am providing that

Page 132

1  calculation.
2          And -- and the other important note is that
3  when one looks at the home and garden POEM results, the
4  mixing and loading only accounts for 11 percent of her
5  dose.  So if I were to assume that she never, ever
6  mixed -- mixed and loaded, I would simply decrease her
7  dose by 11 percent.  It's not that -- it's not that
8  important.
9  ████████████████████████████████
   ██████████████████████████████████████
   ██████████████████████████████████████████
   ██  █████████████████████████████
   ██████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████████
   ████████████████████████████████████████████
22     Q    Take a look -- I want to talk about her
23 periods of use of -- of glyphosate or Roundup.  One
24 thing is if you look at your report at page 9, here you
25 say that she used Roundup in a concentrated form from

Page 133

1  June of 1989 through approximately 2006.  And then
2  later, 2006 through 2014, you say she used the
3  ready-to-use version of the pesticide.  Do you see that
4  in the first paragraph on page 9?
5      A    I do.
6      Q    Okay.  And then if you go to page 13, Note 35,
7  and you can refer to the text that connects to Note 35,
8  you say that she used the concentrated Roundup for 11
9  years and the ready-to-use concentrate for about 14
10 years.  And I think that was based on the dividing point
11 being the year 2000 and not 2006.  Do you see that?
12     A    Yeah.
13     Q    Yeah.  Which one of those two that you
14 included in your report is correct?
15     A    Well, that's the information she gave me.  And
16 let's see if any of that is from her deposition.  So the
17 bottom of page -- I don't know.  I was not able to
18 quantify the ratio because of the discrepant testimony.
19 That's why I made the calculation such that I can say
20 when she did use the -- did do the mixing and loading --
21     Q    Right.  But she --
22     A    -- the value is such and such and when she did
23 not, it's roughly 11 percent less.
24     Q    Right.  But she used a different product at
25 some point; right?  There was some point where there was

Confidential - William R. Sawyer, Ph.D.

Page 150

1  did you do this inside or outside?
2     A   Outdoors.  Temperature was 67.
3     Q   How do you know?
4     A   Because I have a thermometer, outdoor
5  thermometer.
6     Q   An outdoor thermometer on your property?
7     A   I do.
8     Q   And you recorded in your own mind that it was
9  67 degrees Fahrenheit when you did this exercise?
10    A   Yes.
11    Q   Okay.
12    A   I also should add that I continually added
13  water to the top of the pump.  Where the handle enters
14  the stem, the stem enters the pump, there are some cut
15  notches, and I continually added water to that area
16  because it seemed to help increase the pressure.  I was
17  able to achieve a higher pressure by doing so.
18    Q   Is there anything else, sir, that you should
19  add to your description of your exercise that you
20  undertook yesterday so that you have fully disclosed
21  what you did?
22    A   I wore my forearm-length neoprene gloves.  I
23  would recommended that.  Even though I added water,
24  there is still probably residual glyphosate in the -- the
25  container.  The pump is in a bag which contains

Page 151

1  moisture, which contains glyphosate, so I would be very
2  cautious in terms of handling it.  And the bag is in a
3  dry cardboard box.
4     Q   Anything else to add so that you've completed
5  your description of your exercise that you undertook
6  yesterday?
7     A   Yes.  I measured the length of the wand, which
8  is only 14 inches, and I found that it was not possible
9  to spray it directly down on weeds without encountering
10  overspray on the ankle/lower leg area because the wand
11  is very short and holding it out sideways is not
12  effective in aiming it and directing it towards the
13  weed.  And when holding it downward, because the wand is
14  so short, there is some migration of droplets that would
15  contact the lower extremity, especially the ankle/foot
16  area.  So I would advise not wearing ankle socks or
17  breathable sneakers in using such a device.  Such a
18  device should be used with work boots.
19        THE VIDEOGRAPHER:  Mr. Derringer, we have five
20  minutes.
21        MR. DERRINGER:  Great.
22  BY MR. DERRINGER:
23    Q   How tall are you?
24    A   6 foot.
25    Q   Even?

Page 152

1     A   Yeah.  She's 5-foot-4, so it's a 6-inch
2  differential.
3     Q   You said --
4     A   Or 8-inch.
5        MR. KALAS:  6 inches.
6        MR. DERRINGER:  I'm getting tired.
7        MR. KALAS:  Poker face.
8        THE WITNESS:  Poker face.
9  BY MR. DERRINGER:
10    Q   You mentioned that there was residual
11  glyphosate in the -- in the container?
12    A   I -- I believe so, because the e-mail that I
13  received from Mr. Stevick, which I have with me and I --
14  I think you may already have it, did not indicate that
15  the material had been, you know, flushed and cleaned and
16  prepped.  He said he just removed the material into a
17  container and put water in it.  So there was probably
18  some residual there.
19    Q   You didn't measure that, did you?
20    A   You mean with a laboratory-certified test?
21    Q   Well, with a laboratory-certified test?
22    A   No.  Why would I --
23    Q   Okay.  Did you measure it in any way other?
24    A   Why would I do that?
25    Q   Did you measure it in any other way?

Page 153

1     A   No.  I had no interest in doing so.
2     Q   Okay.  And did you measure -- this 12.6
3  seconds, you said you --
4     A   No, no.  12.6 minutes.
5     Q   Thank you.  Thank you.
6     A   It's not a fire hose.
7     Q   6 inches, 8 inches, 12.6 seconds, minutes.
8     A   Maybe it's lunchtime.
9     Q   Just about.  Let's just finish one thing and
10  then we'll -- we'll take our lunch break.  At page 15 of
11  your report under Roundup Application Notes --
12    A   Page 14.  Okay.
13    Q   15.  15.
14    A   Oh, 15.
15    Q   Yep.  Roundup Application Notes, first
16  paragraph.  Do you see that?
17    A   Yes.
18    Q   You write in the second sentence that "She" --
19  meaning Mrs. Stevick -- "would typically spray 1-1/2
20  gallons each time."  Is that also a typo or a mistake?
21    A   It is a mistake in that it was not typical.
22  She typically sprayed 1 gallon or 1.1 gallon.  I don't
23  know where the half came from.  So yeah.
24    Q   You say it was -- it's a mistake in the sense
25  of using the word "typically."  You don't know any time

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Confidential - William R. Sawyer, Ph.D.

Page 158

1 And that's all I can recall.
2    Q    And the product you're referring to is Roundup
3 or a glyphosate concentrate?
4    A    Yes.
5    Q    Okay.  What you've just told me here at the
6 deposition is all that you know about Mrs. Stevick's
7 gardening; is that right?
8        MR. TRAVERS:  Objection; form.
9        THE WITNESS:  No.  I -- I know much more as
10 per my report.  You know, if you want me to look at
11 the report, I'll go through it and give you the
12 details.
13 BY MR. DERRINGER:
14    Q    Feel free to look at the report.  I'm
15 wondering if you know, for example, how many hours a
16 week she spent in her gardens.
17    A    No, I don't have an answer to that.
18    Q    Do you know how many days every week she did
19 gardening?
20    A    No.
21    Q    Now, when she used Roundup or glyphosate, she
22 always applied that product with a sprayer and wand
23 apparatus; is that your understanding?
24    A    In the earlier years, yes.  And then
25 eventually she switched to the prepackaged device, which

Page 159

1 has a very thin hose similar to an iPhone cord, charging
2 cord, a very thin hose with a kind of rectangular pump
3 nozzle with no wand.
4    Q    Okay.  How long was the hose that you
5 understand she used after -- would that be after she
6 went to the ready-to-use product?
7    A    Yes.
8    Q    Okay.  How long was that hose?
9    A    2 or 3 feet.
10    Q    Mrs. Stevick never used a backpack, did she,
11 when she was applying glyphosate?
12    A    No, she -- she did not.
13    Q    Okay.  And you say in your report at page 9
14 that the average temperature when she sprayed was a
15 range between 57 and 82 degrees Fahrenheit.  Go ahead
16 and look at that at page 9.  Tell me when you see it.
17    A    Yes.
18    Q    This would be in the third bullet.
19    A    Yes.
20    Q    How did you determine that?
21    A    Well, I asked her about her location in
22 Petaluma, California, and she states unlike southern
23 California that it is quite rainy and she explained the
24 fog, typical fog, layer around her home.  And I asked
25 her what the temperature range was when she used the

Page 160

1 product and she -- that's what she said, typically 57 to
2 82.
3    Q    Your testimony is that Mrs. Stevick told you
4 that the average temperature when she sprayed Roundup
5 ranged between 57 and 82 degrees Fahrenheit?
6    A    That's exactly what she said, yes.
7    Q    Okay.  What time of day are you assuming that
8 Mrs. Stevick applied glyphosate or Roundup?
9    A    Well, I don't know if I have that in my
10 report, but I -- I recall I think she said generally in
11 the morning or early afternoon.  I think that I do have
12 it here somewhere.
13    Q    She didn't apply Roundup or glyphosate to GMO
14 crops, did she?
15    A    No.
16    Q    On page 10 of your report -- actually, strike
17 that.
18        Let me ask this:  Did you ever see
19 Mrs. Stevick apply glyphosate or Roundup to her yard?
20    A    No.
21    Q    Did you ever ask Mrs. Stevick to show you how
22 she applied glyphosate or Roundup to her yard?
23    A    No, but we talked about it.  I -- I wasn't
24 there in person to see it.
25    Q    Now, you mentioned -- we looked at this a

Page 161

1 little bit before, the bottom of page 12 -- that
2 Mrs. Stevick was -- you say she was very careful and she
3 followed the directions on the label.  Do you see that,
4 bottom of page 12 --
5    A    Yes, I do.
6    Q    -- carried over to page 13?
7    A    Correct.
8    Q    Okay.  Do you assume, sir, that Mrs. Stevick
9 was careful not to get Roundup on herself?
10    A    Well, she tried, but she explained that it
11 would typically get on her hand from the spray trigger
12 apparatus.
13    Q    Do you assume, sir, in developing your
14 opinions about Mrs. Stevick that she did not apply
15 Roundup in a careless manner?
16        MR. TRAVERS:  Objection; form.
17        THE WITNESS:  Well, she tried her best not to,
18 but she -- she had leakage that wetted her hand.
19 That's a problem.  And it's also one of the reasons
20 why in my home and garden dose calculation I did
21 use hands because she constantly had exposure to
22 her hand from the leakage that was wetting her --
23 her fingers and hand.  You know, that's just --
24 it's not careless in the sense that she didn't
25 realize she was dealing with a carcinogen.

Confidential - William R. Sawyer, Ph.D.

Page 162

1   There -- there was simply no label on the container
2   to recommend the use of gloves and she didn't know
3   any better.  So I wouldn't consider that careless.
4   BY MR. DERRINGER:
5   Q   You -- you said that she constantly had
6   exposure to her hand from the leakage that was wetting
7   her fingers and hand?
8   A   Yes.
9   Q   What's the basis for your statement that any
10  leakage was constant, that is, that it resulted in
11  constantly having exposure to her hand?  What's your
12  basis for saying that?
13  A   That she did not stop and wash her hands
14  during the spraying.  She had -- during the one-hour
15  period, she had liquid on her hand.
16  Q   Is it your testimony, sir, that every time
17  Mrs. Stevick applied Roundup or glyphosate by spraying
18  it, that leakage occurred that resulted in Roundup or
19  glyphosate being spilled onto her hand?
20  A   It's my understanding that -- yeah, that the
21  speaker -- the -- the sprayer leaked at the handle
22  resulting in leaking on her hand, typically her right,
23  dominant hand.  And sometimes she would switch hands if
24  she was tired and hold the sprayer with her left hand,
25  causing that hand to get wet.  And my recall from

Page 163

1   interviewing her was that it -- it typically wetted her
2   hand.
3   Q   The word you used was "constant," and so I
4   want to know the basis for your statement that her
5   application of Roundup or glyphosate resulted in her
6   constantly having exposure to her hand during the time
7   she was applying the Roundup or the glyphosate.
8   A   That -- that's my understanding.
9   Q   What's the basis for that understanding?
10  A   Speaking with -- with the plaintiff.
11  Q   So your testimony is that Mrs. Stevick told
12  you that every time that she used Roundup or glyphosate,
13  there was leakage that resulted in Roundup or glyphosate
14  getting onto her hand?
15  A   Whether it was some type of mechanical failure
16  or bad seal or just what, I don't know, but she said
17  that her hand would get wet, not soaked, but her
18  finger -- two-finger area and part of her hand would get
19  wet, and that was typical.
20  Q   Did she tell you that that happened every time
21  she used Roundup or glyphosate?
22  A   It was implied.
23  Q   It's -- it's an implication you're drawing
24  from your conversation with Mrs. Stevick; is that right?
25  A   As per my recall, that's -- that's what she

Page 164

1   had meant to say, yeah.
2   Q   And when you say it was implied, you're
3   acknowledging that that's not something she actually
4   said; correct?
5   A   Well, I think she did but I just can't
6   remember exact words.  That's why I'm reading Bullet No.
7   4 -- no, not No. 4.  No. -- Bullet No. -- yeah, 4:  Her
8   sprayer leaked at the handle resulting in Roundup
9   leaking on her hand, typically right, dominant hand.
10  Sometimes she would switch hands if she was tired and
11  hold the sprayer in the left, causing the left hand to
12  get wet as well.
13      It's -- I just -- this conversation was in
14  October.  In fact, it was October 18th, which is two
15  months ago.  I just don't remember her exact language,
16  but I understood it to be that this was a typical slow
17  leak, not a blasting, spraying explosive leak, but a
18  drip, a drip slow leak that would wet her fingers and
19  hand.
20  Q   Well, is the implication that you drew from
21  your conversation with Mrs. Stevick that she felt
22  glyphosate on her hand every time that she used Roundup
23  or glyphosate?
24      MR. TRAVERS:  Objection; asked and answered.
25      THE WITNESS:  That's my understanding.

Page 165

1   BY MR. DERRINGER:
2   Q   Now, page 13 of your report, you see up at the
3   top the carryover paragraph you said that she testified,
4   that is Mrs. Stevick, that she would wash her hands
5   after spraying it.  Do you see that?
6   A   That's right.
7   Q   Do you know how long after she got Roundup on
8   her hands that she would wash her hands?
9      MR. TRAVERS:  Objection; form.
10     THE WITNESS:  She explained to me when she was
11  done spraying over that one hour, she would wash
12  her hands, but she wouldn't shower until usually --
13  she gave me a time -- it's in the report -- around
14  10 o'clock or late evening.  But she did wash her
15  hands after the work was done.
16  BY MR. DERRINGER:
17  Q   After the hour of work was done?
18  A   Well, yeah, after she put her equipment away
19  and -- and was completely done with it.  And then I
20  didn't ask her whether she did other kind of gardening
21  and -- and delayed for another hour washing.  I'm
22  just -- I'm assuming that once she put that equipment
23  away, she washed right away.  It could have been longer.
24  Q   You don't know?
25  A   I didn't ask.

Confidential - William R. Sawyer, Ph.D.

Page 190

1    MR. DERRINGER:  Well, the video will reflect
2  that he's been through his report.
3  BY MR. DERRINGER:
4    Q   Sir, any other article you're relying on for
5  the proposition that we've been discussing?
6    A   I think there's one more right here.
7    Q   Okay.  What is that?
8    A   Let me just double-check.  I know I have one
9  more with a graph in it.
10    Well, I'm not finding it and I don't want to
11  waste your time, but...

Page 191

16    Q   Well, do you plan to offer a differential --
17    A   Let me finish.
18    Q   I didn't ask the question.
19    A   You cut me off.
20    MR. TRAVERS:  Yeah, you've gotta let him
21  finish.  You asked the question.  He's --
22  BY MR. DERRINGER:
23    Q   Well, you've answered my question and we might
24  be able to avoid a lot of -- a lot of --
25    MR. TRAVERS:  No, no.  He was still in the

Page 192

1  middle of his answer.
2    Dr. Sawyer, go ahead.
3    THE WITNESS:  This is a very important answer.
4  I was given a copy of a judicial decision.  General
5  causation in this case has already been decided and
6  the attorneys asked me not to rehash general
7  causation as -- as I did in Hall.  Okay?  I'm --
8  I'm supposed to be looking at specific causation.
9  And I understand that's a judicial order, not --
10  not general causation.  So that -- that's the
11  answer.
12  BY MR. DERRINGER:

Page 193

Confidential - William R. Sawyer, Ph.D.



Page 194

Page 195

Page 196

Page 197

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED
Confidential - William R. Sawyer, Ph.D.



Page 198

1   A   Certainly.
2   Q   And your testimony is that you considered
3   idiopathic cause; right?
4   A   Yes.
5   Q   And the --
6   A   That -- that I know that the human
7   epidemiologic study evidence has already been generally
8   accepted as statistically significantly elevating the
9   risk level.
10   Q   And tell me the entire basis for your
11   conclusion that it's more likely than not that
12   Mrs. Stevick's cancer was not the result of an
13   idiopathic cause.
14   A   Yes.

Page 200

6   Q   Well, it's right in the middle bolded.  It
7   says "Comparison to Six Epidemiologic Studies."
8   A   Okay.  Well, I --
9   Q   Do you see that?
10   A   Yeah, I do now.

Page 199

Page 201

                        it looks like what you did here was
11   you compared her exposures with now again you say four
12   epidemiologic studies but a different mix:  Eriksson,
13   which if you look at the footnote, that's the 2008
14   Eriksson; right?
15   A   Right.
16   Q   And then McDuffie 2001; is that right?
17   A   Yeah.
18   Q   And then De Roos 2003 and Hardell 2002.  Do
19   you see that?
20   A   Yes.

Confidential - William R. Sawyer, Ph.D.

Page 222

1    A   No.  But that was eight years ago and we're
2   talking here over 25 years ago, close to 30 years ago
3   actually.
4    Q   All right.  So let's take a look at Exhibit 2.
5   I just have some --
6    A   And -- and fourth reason, Sullivan used 50 so
7   I thought it might be wise for the comparison of his
8   dose versus mine since 50 is a reasonable weight to use
9   50 and then I could make a better comparison with his
10  result.
11   Q   You're -- you're basing your estimation of
12  Mrs. Stevick's dose in order to come up with your
13  opinion about the amount of glyphosate to which she was
14  exposed, you're basing that on something that
15  Dr. Sullivan used as an input; is that what I'm hearing?
16       MR. TRAVERS:  Object to form.
17       THE WITNESS:  No.  I'm basing it on the fact
18  that she was using this material nearly 30 years
19  ago at -- at an age in -- in her -- in her 20s.
20  And certainly a girl in her 20s is going to weigh
21  less than a person, you know, who's in her late 50s
22  or even 62.  And I don't have medical records that
23  go back any further than eight years ago or nine
24  years ago.
25       And the fact that Sullivan used 50, since we

Page 223

1   don't know what her weight was exactly for that
2   period of about 20 years, I thought it would be a
3   reasonable weight to use.  And since Sullivan's
4   using it, I can compare apples to apples with his
5   work.
6   BY MR. DERRINGER:
7    Q   But you understand that your estimation of
8   dose here, the purpose isn't to compare apples to
9   apples, it's to render your own independent opinion
10  about Mrs. Stevick's exposure to glyphosate and any
11  relationship that has to her development of cancer?  You
12  understand that; right?
13   A   Yes.
14   Q   Okay.  Did you ever ask Mrs. Sullivan what her
15  weight was in her 20s?
16   A   Yes.
17   Q   What did she tell you?
18   A   What I said before, less, that she gained
19  weight around the time of her cancer and continued to
20  gain weight is what she told me.  She weighed less.
21   Q   You didn't put that in your report, did you?
22   A   No.  She didn't give me a number.
23   Q   And did you ever ask her what she gained --
24  what her weight was in her 30s or her 40s or her 50s?
25   A   Yeah.  I asked her what her weights were.  She

Page 224

1   said less.



20   Q   You see application technique home garden
21  sprayer?
22   A   Yeah.
23   Q   It says 5-liter tank?
24   A   Yeah, that's what she has.  She has a -- she
25  has a 5-liter cylinder.

Page 225

1    Q   How many gallons are in 5 -- 5 liters?
2    A   Oh, no.  Actually you're right.  I was
3   thinking 5-gallon.  She has a 5-gallon cylinder, yeah.
4    Q   Yeah.  How many gallons are in 5 liters?
5    A   I don't -- it doesn't matter because I didn't
6   use a value of 5.
7    Q   All right.  Can you --
8    A   I didn't use her spraying 5 gallons.
9    Q   Can you answer my question?
10   A   I have her spraying 3.78 liters.
11   Q   How many gallons are in 5 liters, do you know?
12   A   Yeah.  About 1.1 -- no, probably no.  More
13  than that actually.  Probably about -- about 4.5 gallon
14  roughly.
15   Q   And also under Dermal Exposure During Spray
16  Application, duration of exposure you used one hour; is
17  that right?
18   A   Yes, one hour, which does not mean trigger on
19  the finger continuously.
20   Q   Under the POEM model, do you know how long
21  that does mean, meaning trigger on the finger?
22   A   Yeah, that's -- that's --
23   Q   What's the trigger on the finger under POEM?
24   A   -- that's not how the POEM model was
25  developed.  It was six hours of application and the



**Page 238**

**Page 240**

22   I am not providing an
opinion as to the general causation of NHL supported by
23   the epidemiologic literature. That is being deferred.
24   Q  I understand that that is being deferred. You
25   mean you are deferring that to the epidemiologists?

**Page 239**

**Page 241**

1   A  Yes.

11   Q  Are you going to testify at all about any
12   information regarding those epidemiology studies?
13   A  None whatsoever, except that the way dose was
14   counted in three of the studies, which is on page 26,
15   27, and 29 of my report, are consistent with
16   Ms. Stevick's exposure. That's what I'm using the
17   epidemiologic studies for. I'm not the one who is
18   evaluating the strength of the associations, the -- the
19   statistical significance, and all of the potential
20   confounders and so on in those studies. That is
21   deferred. I'm not opining on the general causation of
22   those studies but, rather, that Ms. Stevick's exposure
23   dose is consistent with those studies.
24   Q  So am I right, sir, that you are going to
25   defer to others all opinions and all testimony regarding

REDACTED VERSION OF DOCUMENTS SOUGHT TO BE SEALED

Confidential - William R. Sawyer, Ph.D.

Page 246

1  epidemiologic studies in this case, but --
2  Q   I'm sorry to interrupt.  Let me just say we're
3  under -- I'm under a time constraint.  And if you're not
4  going to be testifying about the epidemiological
5  studies, which is what I think you just said --
6  A   Yeah, that's what I'm saying, yeah.
7  Q   I don't want to waste our time together on
8  something you are deferring to others on and not going
9  to testify about.
10  A   Yes.
11  Q   Okay.
12  A   Yes.
13  Q   And -- and whatever it was you were about to
14  tell me about the epidemiological studies is something
15  you're not going to testify about; right?
16  MR. TRAVERS:  Well, I just object because if
17  it's responsive to the question you're asking, then
18  I think he's got to be able to use his experience
19  to answer that.  But if you want to withdraw the
20  question, then --
21  THE WITNESS:  I can answer it in just a few
22  words --
23  BY MR. DERRINGER:
24  Q   Okay.
25  A   -- to clarify.  That if the control group in

Page 247

1  an epidemiologic study has groups of people in it who
2  are 62 years old and then the exposed group has
3  62-year-olds in it and there's a significant rate at
4  increase, that then is sufficient for causation.  But if
5  one were to say that NHL occurs in, you know, 2 percent
6  of the population and -- and in the epi study with
7  glyphosate it wasn't -- 2 percent of the population was
8  not achieved, see, that -- that would be another -- it
9  would be an improper comparison.  So one has to consider
10  are there -- does the control group versus the exposed
11  group, are they age-matched.  And if they are, well,
12  then background is overcome.
13  Q   And talking about control group versus the
14  exposed group, do you agree that in order to evaluate
15  whether an exposure to a chemical causes a particular
16  outcome, we want the control group or the unexposed
17  group to reflect the experience of the exposed group
18  with respect to everything except for their exposure to
19  the chemical of interest?
20  A   Correct, as best as possible.  No study's
21  perfect.
22  Q   And, likewise, a human epidemiological study
23  should control for risk factors other than the chemical
24  for which you are testing; is that right?
25  MR. TRAVERS:  Objection to form.  I thought

Page 248

1  you didn't want him testifying about epidemiology.
2  MR. DERRINGER:  Yeah, I --
3  THE WITNESS:  I'm humored by this because I'm
4  not testifying to it and you're asking me questions
5  that are needless.
6  BY MR. DERRINGER:
7  Q   Well, you've included quite a bit about it in
8  your report so it's -- it's my time so let me just ask
9  the question.  Do you agree that a human epidemiology
10  study should control for all known risk factors for a
11  disease other than the risk factor for which you are
12  testing?
13  A   As much as possible.  I mean, it -- and -- and
14  also the size of the study can defer some of that if the
15  study has a huge number of people in it.
16  Q   You didn't review the pathology of
17  Ms. Stevick's lymphoma, did you?
18  A   No, but I read it carefully.  It's -- I didn't
19  receive -- I didn't ask for the slides or sections, but
20  I reviewed the pathology.  And I have no adverse
21  opinions to it.

Page 249

21  Q   In your calculations under the POEM model,
22  both Exhibit -- in Exhibit 1, pages 23 to 25, and in
23  your replacement pages, which is Exhibit 2, you
24  generated three different calculations; is that right?
25  A   Yes.