# EXHIBIT 22

```
 1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   COUNTY OF SAN FRANCISCO

 3

 4  DEWAYNE JOHNSON,

 5               Plaintiff,

 6         vs.                    Case No. CGC-16-550128

 7  MONSANTO COMPANY, et al.,

 8               Defendants.
    _____/
 9

10

11

12      Proceedings held on Monday, July 9, 2018,

13      Volume 5, before the Honorable Suzanne R. Bolanos,

14      at 9:09 a.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2958698

24

25  Pages 1276 - 1533
```

1  to contradict in any way those visions that Robert

2  Shapiro set forth?

3      A.  Yeah, there are a couple experiences that I had

4  that really, kind of, changed my mind on these things for

14:35:16    5  safety.  One of which was -- well, the first one was

6  doing local market manager training in St. Louis,

7  Missouri.  And at some point during that time, we had a

8  meet-and-greet with the vice presidents of the company

9  and different managers and so forth.  And in sharing, you

14:35:37   10  know, some of this information with one of the vice

11  presidents, I remember, you know, talking about the

12  vision of Robert Shapiro.  Like, talking about reducing

13  of processed waste and the factories of the future not

14  being these pollution factories but, you know, being

14:35:51   15  these plants.  They're going to be green.  And we could,

16  you know, help save the world in this regard.  And

17  speaking of this vision, kind of quoting from the

18  prospectus, where Robert Shapiro is speaking on, you

19  know, the vice president pulled me aside and says, 'Hey,

14:36:06   20  we don't know what Robert Shapiro is really talking about

21  here.  He's just kind of this visionary guy.  And this

22  sort of thing isn't what we're really about.  We're about

23  making money.  So get it straight.'"

24          (End of video.)

14:36:21   25          MR. WISNER:  I asked a lot of questions about

1451

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  COUNTY OF SAN FRANCISCO

 3

 4   DEWAYNE JOHNSON,

 5              Plaintiff,

 6         vs.                  Case No. CGC-16-550128

 7   MONSANTO COMPANY, et al.,

 8              Defendants.
     _____/
 9

10

11

12       Proceedings held on Tuesday, July 10, 2018,

13       Volume 6, before the Honorable Suzanne R. Bolanos,

14       at 9:24 a.m.

15

16

17

18

19

20

21   REPORTED BY:

22   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23   Job No. 2958708

24

25   Pages 1534 - 1597
```

1  exhibit.  We have redactions on it.  It's just taking

2  them a little longer.

3         THE COURT:  That's fine.

4         And, Ladies and Gentlemen, we are resuming with

13:32:43   5  the video of Dr. Martens.

6         (Video played.)

7         MR. WISNER:  Your Honor, that concludes that

8  deposition.

9         THE COURT:  All right.  Very well.  Then are you

14:15:58  10  ready to play your next --

11        MR. WISNER:  Your Honor, before doing that, we'd

12  like to read an admission into the record that's been

13  agreed to by the parties.

14        THE COURT:  Very well.  Proceed.

14:16:11  15        MR. WISNER:  This is request for mission number

16  26.  "Request:  Admit that Monsanto never submitted the

17  reports written by Dr. James Parry in 1999 on behalf of

18  Monsanto regarding the genotoxicity of glyphosate and

19  glyphosate-containing products to the US EPA."

14:16:30  20        "Response:  To the extent that this request

21  references MONGLY01312093-104 and MONGLY01314233-83,

22  Monsanto admits that after reasonable inquiry into the

23  information that is known or generally obtainable, it has

24  not identified any documentary evidence that the

14:17:07  25  referenced reports were submitted to the US EPA.  To the

```
        1  extent that this request references other documents,

        2  Monsanto cannot respond."

        3          At this time, your Honor, we're going to play a

        4  second deposition video.  This is Dr. William Heydens, a

14:17:26  5  product safety specialist for Monsanto.

        6          THE COURT:  All right.  Very well.  You may

        7  proceed.

        8

        9          VIDEO-TAPED TESTIMONY OF MR. HEYDENS

14:18:45 10          (Video played.)

       11          MR. GRIFFIS:  Your Honor, one of the jurors is

       12  seeking your attention.

       13          THE COURT:  Yes.

       14          JUROR CLELAND:  Can we have a restroom stop?

14:53:21 15  I'm so sorry.

       16          THE COURT:  That's fine.  It's time for the

       17  afternoon recess.

       18          Ladies and Gentlemen, we'll take a 15-minute

       19  recess and resume again at 3:10 on the wall clock.  All

14:53:32 20  right.  Thank you.

       21          (Recess.)

       22          THE COURT:  Welcome back, Ladies and Gentlemen.

       23          All right.  Mr. Wisner, you may resume.

       24          MR. WISNER:  Thank you, your Honor.

15:14:43 25          (Video played.)
```

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5              Plaintiff,

6        vs.                    Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8              Defendants.
    _____/
9

10

11

12        Proceedings held on Thursday, July 12, 2018,

13        Volume 8, Afternoon Session, before the Honorable

14        Suzanne R. Bolanos, at 1:20 p.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2958711B

24

25  Pages 1776 - 1945

1  region of Canada found an increased risk of NHL

2  associated with glyphosate use that increased by the

3  number of days used per year."

4        That's what we were just talking about with the

15:58:18   5  McDuffie study; correct?

6        A.  That is correct.  Referenced the McDuffie study.

7        Q.  "These few subjective findings provide some

8  impetus for further investigation into the potential

9  health effects of glyphosate even though one review

15:58:35   10  concluded that the active ingredient is non-carcinogenic

11  and non-genotoxic."

12        Do you see that, Doctor?

13        A.  I see that's what it says, yes.

14        Q.  All right.  So in this point in the science, we

15:58:47   15  have a couple of positive and suggestive findings linking

16  NHL to glyphosate or Roundup exposure.

17        Is that fair?

18        A.  Yes, that's fair.

19        Q.  And Dr. De Roos is saying these provide further

15:58:59   20  impetus for investigation even though one review

21  concluded it was non-carcinogenic and non-genotoxic.

22        Do you see that?

23        A.  Correct, yes.

24        Q.  And that's -- what's the citation?  Is that

15:59:16   25  citation 50?

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                 COUNTY OF SAN FRANCISCO

 3

 4   DEWAYNE JOHNSON,

 5               Plaintiff,

 6        vs.                    Case No. CGC-16-550128

 7   MONSANTO COMPANY, et al.,

 8               Defendants.
     _____/
 9

10

11

12      Proceedings held on Friday, July 13, 2018,

13      Volume 9, Morning Session, before the Honorable

14      Suzanne R. Bolanos, at 9:30 a.m.

15

16

17

18

19

20

21   REPORTED BY:

22   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23   Job No. 2958714A

24

25   Pages 1946 - 2058
```

1  first author is William Heydens?

2       A.  Heydens, yes.

3       Q.  And then also you see Dr. Farmer as well as

4  Mark Martens as well as Larry Kier or Kier.  I'm not sure

10:32:37  5  how you say his name.

6       A.  Yes.

7       Q.  So having reviewed this paper and looked at

8  those action items or recommendations by Dr. Parry, are

9  the things that Dr. Parry recommended in his report, are

10:32:52  10  all those recommendations done in this paper?

11      A.  So there were recommendations that Dr. Parry had

12  that says do not do this.  So they didn't do those in

13  this paper.  So we put those aside.  I think there was

14  two of the recommendations.

10:33:10  15           Of the remaining recommendations, the only one I

16  can find in here is they looked at 8 deoxyguanosine,

17  which is a measure of oxidative stress, and I believe

18  that was one of his recommendations.

19      Q.  So of all of Dr. Parry's recommendations asking

10:33:27  20  for affirmative action, only one of them was done in this

21  study?

22      A.  Yes.

23      Q.  All right.  All right.  Let's talk about another

24  issue.  Let's talk about the EPA.

10:33:44  25      A.  Okay.

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5               Plaintiff,

6        vs.                    Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8               Defendants.
    _____/
9

10

11

12       Proceedings held on Thursday, July 26, 2018,

13       Volume 17, Morning Session, before the Honorable

14       Suzanne R. Bolanos, at 9:08 a.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2965331A

24

25  Pages 3553 - 3666

1  in toxicology.  I've been practicing nearly 30 years.

2      Q.  And you mentioned medical school.  Where did you

3  go to medical school?

4      A.  Indiana University School of Medicine with a

09:52:46  5  Ph.D. in toxicology.  And I trained under the late

6  Dr. Forney.

7      Q.  When did you graduate from medical school?

8      A.  I graduated from IU in 1988.

9      Q.  And prior to graduating medical school, you

09:53:01  10  actually obtained a Master's; is that correct?

11      A.  Yes.  I have a Master's degree in cellular and

12  molecular biology from State University of New York,

13  Geneseo.

14      Q.  And after graduating medical school, you said

09:53:16  15  you got a Ph.D. in toxicology; is that right?

16      A.  That's what I -- I went through a Ph.D. program

17  through the medical school in -- specifically in

18  toxicology, which included the first three years of

19  medical school course curriculum, along with specific

09:53:31  20  training in toxicology.  It was also training in the

21  State Department of Toxicology, as we handled all the

22  autopsies and deaths for the State of Indiana.

23      Q.  We've talked a lot about this case and heard

24  from witnesses who are toxicologists.  Can you explain to

09:53:47  25  us what is toxicology?

1    A.  It's a very specific field.  We are the ones who

2    determine causation, what chemicals, pharmaceuticals,

3    environmental substances can do to the body.  And

4    physiologically and mechanistically how they operate.

09:54:03    5    Q.  After graduating with your Ph.D. in toxicology,

6    what did you do next in your career?

7    A.  I worked for five years as a governmental

8    toxicologist in Syracuse, New York.  I was responsible

9    for assessing the environmental exposures, forensic

09:54:21    10   matters, in general Public Health.  Everything from lead

11   in water to hazardous chemicals from, I think, almost 18

12   different Superfund sites in the area.

13   Q.  You said that was through the Department of

14   Health?

09:54:39    15   A.  Yes.

16   Q.  After -- how long were you with the Department

17   of Health?

18   A.  Five years.  And during that time, I started

19   consulting and developed my own consulting business in, I

09:54:48    20   think, 1990, which I am still with today.

21   Q.  Okay.  And what's the name of that consulting

22   business?

23   A.  Toxicology Consultants and Assessment

24   Specialists, LLC.  And I do work throughout the US and

09:55:02    25   also internationally.

3587

1    Q.  And from 1990 to the present, you've had that

2 sole business as a toxicology or consulting toxicologist;

3 is that right?

4    A.  Correct.

09:55:12    5    Q.  And you said "consulting."  Who do you consult

6 with in that role for your actual business?

7    A.  Civil matters, which about -- 60 percent are

8 plaintiff, about 40 percent defendant.  Also a number of

9 governmental agencies, the United States Attorney's

09:55:29   10 Office, US Navy, various prosecutors, Attorney State

11 General of Montana, New York, New Jersey and other

12 states.

13    Q.  So you said both plaintiffs' and defendants'

14 side.  Have you ever served as an expert for a

09:55:44   15 manufacturer?

16    A.  Many times.  And currently.

17    Q.  So it's not just on the plaintiff's side of

18 claiming a chemical caused an injury.  You've also served

19 as an expert for the defendant saying it didn't?

09:55:58   20    A.  Oh, yes.  I have some very good defense experts

21 who have true, good defense cases.  I'm very selective in

22 what cases I take.

23    Q.  Now, there's a term "forensic toxicologist."

24 Are you a forensic toxicologist?

09:56:11   25    A.  Yes, I am.

1        Q.   Can you explain what a forensic toxicologist is?

2        A.   My training was in forensic toxicology.

3   Forensic toxicology is simply application of science to

4   the law.   The word "forensic," the Latin root stems from

09:56:25    5   debate, as we are debating today.   This is a forensic

6   matter.

7        Q.   And so, you know, based on that, you're involved

8   in a lot of cases, both civil and criminal; is that fair?

9        A.   That's correct.

09:56:37   10        Q.   And so you've probably done this a lot,

11   depositions and trial testimony.   Is that fair?

12        A.   Yes.   When I looked at my list of cases and

13   trials, I testify in court, in trials, about six times

14   per year on the average.

09:56:50   15        Q.   And, once again, that's both for plaintiff and

16   defense side?

17        A.   That's correct.

18        Q.   Other than your work for the Department of

19   Health that we talked about and your own company as a

09:57:00   20   forensic toxicologist, what else have you done in the

21   field of toxicology?

22        A.   I've served as a peer-reviewer for the Forensic

23   Examiner, which is a peer-reviewed journal.   In the past,

24   I've directed various laboratories as a licensed lab

09:57:20   25   director in multiple states, including clinical, forensic

3589

1    Q.  And who ultimately is responsible for the

2  warnings in the product labeling?

3    A.  Well, the manufacturer.

4    MR. DICKENS:  At this time, your Honor, we'll

10:03:05    5  tender Dr. Sawyer as an expert in toxicology, forensic

6  toxicology and exposure assessments.

7    THE COURT:  Any *voir dire*?

8    MR. LOMBARDI:  No objection, your Honor.

9    THE COURT:  All right.  Very well.  Then I will

10:03:16   10  accept Dr. Sawyer as an expert in toxicology and forensic

11  toxicology and related assessments.

12    You may proceed.

13    Q.  BY MR. DICKENS:  Okay.  Doctor, you're here

14  today in your role as an expert; is that right?

10:03:27   15    A.  Yes.

16    Q.  And you've reached some opinions in this case?

17    A.  Yes, I have.

18    Q.  And the opinions that you're going to be

19  expressing here today, do you hold those to a reasonable

10:03:39   20  degree of scientific certainty?

21    A.  Yes.

22    Q.  And did you review your role in this case from

23  the experience of a toxicologist?

24    A.  Yes.

10:03:49   25    Q.  And did you reach an opinion to a reasonable

3594

1  than glyphosate alone?

2      A.  Yes, I did.  Yes.

3      Q.  And what is that opinion?

4      A.  That glyphosate, based on animal test data, is

10:05:43  5  carcinogenic by itself.  However, there are additives to

6  the product which increase and enhance its

7  carcinogenicity by several mechanisms.

8      Q.  And one of those that we'll talk about is

9  surfactants; is that correct?

10:05:56  10      A.  That's correct.

11      Q.  Okay.  And those are your general opinions.  Did

12  you also look at Mr. Johnson's case specifically?

13      A.  Yes, I did.  In fact, I early on interviewed

14  Mr. Johnson by telephone.

10:06:08  15      Q.  And did you reach an opinion, after your review

16  of this case, as to whether or not Mr. Johnson's Roundup

17  and Ranger Pro exposures substantially contributed to his

18  diagnosis of non-Hodgkin's lymphoma?

19      A.  Yes.

10:06:22  20      Q.  And what is that opinion?

21      A.  That Mr. Johnson, and I'll explain in detail

22  when asked, was heavily exposed, far more than the

23  individuals in the Monsanto UK POEM studies, for example.

24  He was heavily exposed.  He had a wet face.  He had

10:06:48  25  exposures in which he was notably damp or wet with the

3596

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5               Plaintiff,

6          vs.                    Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8               Defendants.
    _____/

9

10

11

12       Proceedings held on Friday, July 27, 2018,

13       Volume 18, Morning Session, before the Honorable

14       Suzanne R. Bolanos, at 9:11 a.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2965334A

24

25  Pages 3812 - 3943

1          "Admission Number 12:  Request:  Admit that

2  Monsanto has never conducted an epidemiological study to

3  study the association between glyphosate-containing

4  formulations and non-Hodgkin's lymphoma.

09:57:27    5          "Response:  Denied.  Monsanto has conducted

6  epidemiological studies on glyphosate-containing

7  formulations, including the farm family exposure study.

8  Monsanto admits that that has not conducted a study

9  designed to examine specifically whether an association

09:57:46   10  exists between glyphosate-containing formulations and

11  non-Hodgkin's lymphoma.  However, multiple published

12  studies conducted by others show no association.

13          Finally, "Admission Number 4.  Request:  Admit

14  that after receipt of EPA's July 29, 1985, letter,

09:58:10   15  Monsanto stated that EPA's determination that glyphosate

16  was oncogenic," quote, "'would have serious negative

17  economic repercussions.'

18          "Response:  Monsanto denies this request as

19  written.  Monsanto admits that the cited document dated

09:58:30   20  March 13, 1985, states," quote, "'Monsanto is concerned

21  that even the initiation of formal regulatory action

22  would have serious negative economic repercussions, which

23  we believe are not justified by the scientific evidence.'

24          "Monsanto denies that this document was created

09:58:50   25  after Monsanto received EPA's July 29, 1985, letter,

3851

1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF SAN FRANCISCO

3

4    DEWAYNE JOHNSON,

5                  Plaintiff,

6          vs.                    Case No. CGC-16-550128

7    MONSANTO COMPANY, et al.,

8                  Defendants.
     _____/
9

10

11

12       Proceedings held on Friday, July 27, 2018,

13       Volume 18, Afternoon Session, before the Honorable

14       Suzanne R. Bolanos, at 1:26 p.m.

15

16

17

18

19

20

21   REPORTED BY:

22   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23   Job No. 2965334B

24

25   Pages 3944 - 4021

1          A.  Correct.

2          Q.  And that's the significance of rare tumors,

3   because if it's supposed to be, you know, 1 out of 300

4   and you're seeing 3 out of 50, that raises alarms.

14:31:15    5          A.  Particularly if the incidence of the tumor is in

6   a dose-related way.  The number goes up the bigger the

7   dose.  That's an important characteristic.

8          Q.  Now, if you look at the last page, the

9   classification of glyphosate.  Do you see Section E?

14:31:31   10          A.  Yes.  Got it.

11          Q.  And that reads:  "In accordance with

12   EPA-proposed guidelines, the panel has classified

13   glyphosate as a category C oncogen"; is that right?

14          A.  Correct.

14:31:46   15          Q.  And this is part of that kidney tumor we were

16   talking about earlier in your direct; is that right?

17          A.  Yes.  The renal tubular adenomas.

18          Q.  All right.  Great.  And in the other document,

19   537, that's before you, this is an April 3rd, 1985,

14:32:03   20   document.

21              Do you see that?

22          A.  Yes.

23          Q.  It's got a lot of writing on it.  But the

24   subject is "Glyphosate"; right?

14:32:08   25          A.  Correct.

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5                  Plaintiff,

6          vs.                    Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8                  Defendants.
    _____/
9

10

11

12      Proceedings held on Tuesday, July 31, 2018,

13      Volume 20, Afternoon Session, before the Honorable

14      Suzanne R. Bolanos, at 1:31 p.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2965340B

24

25  Pages 4311 - 4467

1  plausibility of glyphosate being a carcinogen; right?

2      A.  I reviewed it when I was reading the

3  epidemiologic studies, so I'm aware of the knowledge, but

4  I did not consider those in reviewing the epidemiology

13:33:48  5  studies.

6      Q.  So you reviewed it to the extent that it was in

7  the epidemiological literature that you looked at?

8      A.  Yes.

9      Q.  Now, you understand IARC has done an assessment

13:33:58  10  as well; right?

11      A.  Yes, I am.

12      Q.  You read it?

13      A.  Yes, I did.

14      Q.  And, of course, since you haven't looked at the

13:34:07  15  animal data or the mechanistic data, you don't have any

16  gripes with IARC for their assessments of that data;

17  right?

18      A.  No.  I'm only commenting on the epidemiology

19  studies.

13:34:18  20      Q.  Okay.  And from my understanding, IARC concluded

21  the epidemiological literature was limited; right?

22      A.  Yes, they did.

23      Q.  And that's your opinion as well?

24      A.  No.  That's not my opinion.

13:34:27  25      Q.  Well, I could have sworn you used the word

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5              Plaintiff,

6        vs.                   Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8              Defendants.
    _____/
9

10

11

12       Proceedings held on Thursday, August 2, 2018,

13       Volume 22, Afternoon Session, before the Honorable

14       Suzanne R. Bolanos, at 1:33 p.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2965341B

24

25  Pages 4569 - 4693

```
 1        A.  But it's also important we get it right.

 2        Q.  Sure.  I know.  But I think your answer was "we

 3   don't know"; right?

 4        A.  We don't know.

 5        Q.  Okay.  So then we go down here, and it's talking

 6   about the guidelines.  You understand the -- you've heard

 7   of guidelines.  They're talking about the EPA's

 8   guidelines; right?

 9        A.  Yes.

10        Q.  It says, "The guidelines also state that caution

11   should be exercised in simply looking at the ranges of

12   historical responses, because the range ignores

13   differences in survival of animals among studies and is

14   related to the number of studies in the database."

15        A.  Yes.

16        Q.  It goes on, "There is no evidence in the issue

17   paper that such a careful review was carried out in any

18   of the three studies that utilized historical control

19   information."

20            Do you see that, sir?

21        A.  Yes.

22        Q.  And then when we go down to the summary, it

23   says, "Summary of evaluation of agreement of EPA analysis

24   with EPA cancer guidelines.  Overall, based on the

25   previous discussion, many panelists concluded that the
```

14:11:44 (line 5)
14:11:54 (line 10)
14:12:09 (line 15)
14:12:19 (line 20)
14:12:39 (line 25)

4607

1  use of the historical control information in the issue

2  paper does not adhere to EPA cancer guidelines.  There is

3  no evidence that the issue paper authors performed a

4  careful review of any of the historical control data

14:12:55  5  employed as directed by the EPA guidelines, such as

6  discussing the likelihood of genetic drift, differences

7  among animals from different suppliers, differences in

8  laboratory techniques."  It goes on for a bunch.

9           "The timing of studies from which historical

14:13:12  10  control data come is not always clearly stated.

11  Although, it is clear that the 2- or 3-year limit

12  recommended by the EPA guidelines was not met in certain

13  circumstances."

14           In fact, we were doing that a second ago when we

14:13:25  15  were talking about the rates of lymphoma, weren't we?

16       A.  Yes.

17       Q.  We were talking about data that was almost ten

18  years old?

19       A.  Yes.  Now, let's remember, and I'm sorry that

14:13:35  20  you're on the clock, but these are guidelines.  They're

21  not tablets from the mount.  These are not the 10

22  commandments.  They're guidelines that we're asked to

23  follow.  And it's not unreasonable that we deviate from

24  guideline on occasion, as long as we justify why we've

14:13:55  25  done it.

4608

1  appeared to the panel that the recommendation that only

2  controls from studies completed within the two or

3  three years of the completion of Wood, et al, could not

4  have been met."

14:15:26    5          That's saying they don't think they did it

6  right; right?

7      A.  That's what it's saying, yes.

8      Q.  Okay.

9      A.  Now, of course, the SAP does not have all the

14:15:35   10  information to look at, so --

11      Q.  Okay.  All right.  There are some other issues

12  on here.  We've talked about -- we're going to get to the

13  concurrent controls in a second.

14          Well, actually, why don't we just start there.

14:15:53   15  Let's start with the statistical -- the use of

16  statistical significance; right?

17          And so when you say "concurrent controls," what

18  you're really saying is you have to make sure that what

19  you're seeing in the elevated dose groups is different;

14:16:04   20  right, than the concurrent control?

21      A.  You're trying to make sure that any change that

22  you're seeing in any of the dose groups is different than

23  your control.

24      Q.  Let's see what the SAP said about that.  It

14:16:25   25  goes, "In summary" -- this is page 52 -- "many panelists

1  concluded that the issue paper's protocol for assessing

2  the significance of laboratory animal carcinogenicity

3  studies does not appear to have followed agency

4  guidelines.  In addition to misinterpret the rule on

14:16:43   5  assessing significance from combined multiple comparison

6  tests in the Cochran Armitage trend test, the issue paper

7  incorporates in the protocol criteria, such as exclusion

8  of dose levels considered above the limit dose without

9  documenting findings that demonstrate that the limit dose

14:16:59  10  was actually exceeded.  Requiring a visual confirmation

11  of a monotonic trend and scatter plots of data" --

12         That means, you know, it goes up; right?

13      A.  Yes.

14      Q.  They said this is not required, but they did

14:17:13  15  require this for some reason.  And it goes, "Subjectively

16  incorporating information about historical control

17  levels."

18         We talked about that already.  So here, the SAP

19  is saying the EPA didn't even do what it's supposed to be

14:17:27  20  doing; isn't that true?

21      A.  The -- what I take it to say is that they

22  deviated from the guidelines.  They're not saying that

23  the conclusions reached were wrong.  They're saying that:

24  You have not documented why and how and what you did when

14:17:46  25  you deviated from the guideline.

1          And interestingly enough, this table that they

2    put in here, it's actually from Dr. Portier, isn't it?

3        A.  Yes.

4        Q.  All right.  It said, "Some panel members

14:19:26  5    suggested that while not discussed in the EPA's cancer

6    guideline as to how it considers the multiple studies for

7    each end point, the most appropriate way to address the

8    scientific question at hand:  Is there evidence of

9    carcinogenic in any end point in any species or gender,

14:19:43  10   is by conducting a pooled analysis for each species, end

11   point and gender combination."

12          And it talks about a meta-analysis that

13   Dr. Portier submitted to the EPA.

14          And it says -- this analysis suggests that EPA's

14:19:57  15   descriptor of, quote, "Suggestive evidence of

16   carcinogenic potential is the appropriate descriptor,

17   given that these pooled analyses show compelling

18   statistical evidence of at least one single positive

19   result in at least one species and gender."

14:20:14  20          MR. GRIFFIS:  May we approach, your Honor?

21          THE COURT:  Yes.

22          (Sidebar.)

23          MR. GRIFFIS:  This is Dr. Portier's table from

24   his expert report doing a pooled analysis.  The pooled

14:20:31  25   analysis was excluded.  And Counsel said that they

4613

1          Q.   Sorry.   I know it's a dumb question, but, you

2    know.

3               All right.   Carcinogenicity studies; right?   So

4    this is about carcinogenicity studies?

14:27:33    5     A.   Yes.

6          Q.   All right.   Please show the jury or tell me

7    where I'll find the 1,000 milligram dose limit.

8          A.   Well, since this is something that I haven't

9    looked at, it might take me a minute or two, if it's

14:27:48   10   here.

11         Q.   I can direct you, if you'd like, to where I

12   think it would be, but I don't want to speak for you,

13   sir.

14         A.   I would expect to find it under dose groups and

14:28:00   15   dosage, so from 21 on.

16              It doesn't appear to talk about the limit dose

17   in this one, which is -- as of June of 2018, they may

18   have dropped it.

19         Q.   I'll represent to you, sir, I went back and

14:28:49   20   looked since 1981.   I couldn't find it.

21              Now, if you look at paragraph 30, right, it

22   says, "For substances administered via the diet or

23   drinking water, it is important to ensure that the

24   quantities of the test chemical involved do not interfere

14:29:04   25   with normal nutrition or water balance"; right?

4620

1         THE COURT:  So it's on his disclosure list and

2  he reviewed it?

3         MR. WISNER:  He did.

4         THE COURT:  So then they're allowed to cross him

14:39:04   5  on it.

6         MR. WISNER:  Okay.  Your Honor.

7         (End sidebar.)

8         THE COURT:  You may continue, Mr. Wisner, and

9  just keep in mind we need to take an afternoon recess at

14:39:21  10  a convenient point.

11         MR. WISNER:  All right.  I'll keep that in mind,

12  your Honor.

13      Q.  We're on page 74; right?

14      A.  Yes.

14:39:26  15      Q.  And it said, "Many on the panel expressed

16  concern that not considering tumor responses at doses

17  exceeding 1,000 milligrams per kilograms per day is not

18  consistent with either EPA 2005 cancer guidelines or

19  standard ways in which bioassay results are typically

14:39:46  20  interpreted.  However, the panel also noted that tumors

21  induced at only very high doses are less of a safety

22  concern than those induced at doses within the range of

23  human exposure.  Though one panel member noted that it is

24  very likely that workers in manufacturing/formulation and

14:40:05  25  wholesale handling and also persons involved in accidents

4629

1          MR. GRIFFIS:  Counsel's testifying, your Honor.

2          THE COURT:  All right.  Do you have a question,

3    Mr. Wisner?

4          MR. WISNER:  Sure.

14:41:33    5     Q.  In trying to figure out who's right, one of the

6    ways of doing it is looking at the quality by which

7    people look at stuff; right?

8          A.  Correct.

9          Q.  And the EPA, they have guidelines that say how

14:41:44   10    they're supposed to do things; right?

11          A.  Correct.

12          Q.  And they didn't follow those guidelines, did

13    they?

14          A.  They followed the intent of the guidelines.

14:41:54   15    They provided their interpretation.  In some cases maybe

16    they could have done a better job of documenting why they

17    deviated from the guidelines, but even with this report,

18    my understanding is that they had still come back with

19    the conclusion that glyphosate is non-carcinogenic.  The

14:42:12   20    same conclusion that's been reached by ECHA, the same

21    conclusion that's been reached by EFSA, also independent

22    bodies or government regulatory bodies.

23          Q.  So the EPA panel was very critical in this part.

24    They said, "The EPA's 2016 practice of disregarding or

14:42:36   25    giving low weight to results at exposures greater then

4631

1    10,000 milligrams per kilograms per day seems to be at

2    odds with the EPA 2005 cancer guidelines, which suggest

3    that an exceedingly high does would be 5 percent of the

4    test substance in the feed for dietary studies."

14:42:56    5         Do you see that?

6         A.  Yes.

7         Q.  That's actually what we looked at a second ago

8    when we were looking at the OECD guidelines; right?

9         A.  Yes.

14:43:03   10         Q.  Then it says, "But 5 percent in feed is

11   considerably greater that 1,000 milligrams per kilograms

12   per day in both rats and mice, and none of the doses

13   utilized in the studies reviewed exceeded 5 percent in

14   feed.  Several panel members saw no overriding reason for

14:43:20   15   disregarding results from exposures greater than

16   1,000 milligrams per kilograms per day, so long as the

17   dose does not exceed the maximum tolerated dose"; right?

18         That's the proper scientific approach in a

19   carcinogenicity study; right?

14:43:36   20         A.  The proper approach is to give 1,000 mgs per

21   kilograms per day.  You can go higher, yes.

22         Q.  And if you do go higher, like the scientists who

23   did these studies, you'd better look at the results,

24   right?

14:43:51   25         A.  We did look at the results.