# EXHIBIT 31

Confidential - Subject to Protective Order

1         UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2

3   IN RE: ROUNDUP           )
    PRODUCTS LIABILITY       )   MDL No. 2741
4   LITIGATION               )
    _____  )   Case No.
5   THIS DOCUMENT RELATES    )   16-md-02741-VC
    TO ALL CASES             )
6

7         MONDAY, JANUARY 23, 2017
8   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
9                   - - -
10        Videotaped deposition of William F.
11  Heydens, Ph.D., held at the offices of HUSCH
12  BLACKWELL, L.L.C., 190 Carondelet Plaza,
13  Suite 600, St. Louis, Missouri, commencing at
14  9:03 a.m., on the above date, before Carrie
15  A. Campbell, Registered Diplomate Reporter,
16  Certified Realtime Reporter, Illinois,
17  California & Texas Certified Shorthand
18  Reporter, Missouri & Kansas Certified Court
19  Reporter.
20                  - - -
21
            GOLKOW TECHNOLOGIES, INC.
22       877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23

24

25

Confidential - Subject to Protective Order

```
 1         Q.    Yes, sir.
 2               That you wrote, right?
 3         A.    That's not correct.
 4         Q.    Here's what it says in
 5   January 2016.  You said then, sir, "I had
 6   already written a draft introductory chapter
 7   back in October/November."
 8               That's what happened, right,
 9   sir?
10         A.    Yeah, that's exactly what I was
11   just talking to in the previous -- in my
12   previous response.
13         Q.    Yet when we go to Exhibit 3:4
14   that you just pointed out, page 16, it says,
15   "Neither Monsanto" -- "neither any Monsanto
16   Company employees nor any attorneys reviewed
17   any of the expert panel manuscripts prior to
18   submission to the journal."
19               You didn't just review them;
20   you wrote them.
21               MR. JOHNSTON:  Objection.
22         Vague.
23   QUESTIONS BY MR. MILLER:
24         Q.    Wrote parts of the expert panel
25   report; you wrote them, right, sir?
```

1          MR. JOHNSTON:  Objection.
2     Vague.  Misstates the testimony and is
3     argumentative.
4          THE WITNESS:  I'll answer
5     again:  I wrote a draft introductory
6     chapter for possible use back at the
7     beginning, really, when the panel
8     concept was coming together.  That --
9     and that -- the information that was
10    in there, again, was historical.  It
11    had nothing to do with the panel
12    deliberations.  Didn't even deal with
13    the data at all because, again, it was
14    historical.
15         Subsequently it was -- like I
16    said in the previous -- my previous
17    response, you know, moving forward and
18    getting later in time, the journal
19    editor didn't think it was even
20    appropriate to have the chapter, so he
21    had Ashley extract what would be
22    relevant historical information to
23    include in that publication, and
24    that's what Ashley did.
25

 1        foundation.
 2   QUESTIONS BY MR. MILLER:
 3        Q.    Right, Doctor?
 4        A.    That's what's stated there.
 5        Q.    Okay.  Let's take a look at
 6   exactly --
 7        A.    And this is -- this is really
 8   what we've already covered, but go ahead.
 9        Q.    Thank you.
10              This is from William Heydens,
11   February, to Ashley Roberts:  "Ashley, I have
12   gone through the entire document and
13   indicated what I think should stay, what can
14   go, and in a couple spots did a little
15   editing."
16              So those are three of the
17   things you did to that Intertek epi report,
18   right?
19              MR. JOHNSTON:  Objection.
20         Vague and misstates the record.
21              THE WITNESS:  So this is --
22         I'll go back, and we'll talk about
23         this again.  This is what we had
24         talked about previously.
25              So this is very late stage in

Confidential - Subject to Protective Order

1          the process.  Recall that I had
2          mentioned that when we first -- when
3          this project started that there was
4          going to be four reports, and at that
5          point in time it was not envisioned
6          that there would be a summary document
7          and much less what the authorship
8          might be.
9                   So as the project progressed,
10         the concept for the summary article
11         progressed as well.  And what I mean
12         by that is it was decided that the
13         summary -- the overall summary article
14         would be authored by all -- was it
15         16? -- of them.
16                  And so what we're looking at
17         here, this is a point in the process.
18         So initially they were reviewing their
19         own sections, and so they very easily
20         could agree amongst themselves.  What
21         I mean by that is the epidemiologists
22         could agree amongst themselves what
23         they thought they should say about the
24         epidemiology, the gene tox folks, so
25         on and so forth.

Confidential - Subject to Protective Order

 1          So now we've gone through that
 2     whole process and they're at the point
 3     where, as I just described, they're
 4     all going to be authors on this paper.
 5     So then they start reviewing each
 6     others' -- another -- you can think of
 7     it as another level of peer review, if
 8     you will, where they were reviewing
 9     what the others had written.
10          So in these e-mail
11     communications, the epidemiologists
12     did a very hard look at the animal --
13     from the animal bioassay group, and
14     they're actually critiquing -- the
15     epidemiologists are actually
16     critiquing some of the things that
17     were said in the other; most notably,
18     one of them that I'm looking at right
19     here talking about Hill's criteria.
20          So the epidemiologists didn't
21     think that the toxicologists should be
22     talking about Hill's criteria when --
23     and they're just flat out wrong, quite
24     honestly, because if you go read, for
25     instance, EPA's cancer risk assessment

Confidential - Subject to Protective Order

1	guidelines, which they used on
2	glyphosate and use on other things as
3	well, they very clearly say that
4	there's a modified form of Hill's
5	criteria.  So anyway, there was
6	questions amongst -- around them about
7	that.
8	          Another thing that sticks out
9	in here, as I look at this, where
10	there was some disagreement -- and I
11	think we actually touched on this
12	earlier in the day, where the
13	different panels took somewhat
14	different approaches.  So I think I
15	mentioned how the epidemiologists,
16	when they did their review, they
17	didn't really want to do it from the
18	standpoint of here's what IARC got
19	wrong.  They did it just, what is all
20	the data, what does the data tell us,
21	here's our conclusions.
22	          The animal people -- when I say
23	"the animal," I mean the animal
24	bioassay group, because they worked in
25	their sections in isolation

Confidential - Subject to Protective Order

```
 1      previously.  They did do some
 2      criticisms, some direct criticisms,
 3      of founded -- well-founded criticisms
 4      of IARC, and some reference of that
 5      made it into their publication.  When
 6      the -- and some of that drained over
 7      into the overall review publication.
 8              So when the epidemiologists saw
 9      that, they didn't think that it was
10      appropriate.  So there was some dialog
11      back and forth about that.
12              So when you look at this
13      document here and you see some
14      editing, what was going on at that
15      point in time.  John, being the good
16      soul that he is, he stepped in and was
17      trying to make it easy for Ashley --
18      he was trying to be kind of a
19      go-between, I guess, if you will,
20      between the epidemiologists and Ashley
21      and the animal people to try and bring
22      this to some resolution.
23              And so John, as part of that,
24      he suggested a number of edits which
25      are reflected in this document.  You
```

Confidential - Subject to Protective Order

```
 1          can see some of them; you can't see
 2          others.  I don't know why that is.
 3          There appears to be some problem with
 4          picking up the editing function.
 5                  But anyway, that's what
 6          happened.  And then -- so Ashley --
 7          that's what Ashley sent to me and
 8          basically said, "Hey, look what John
 9          did."
10                  And I went through his
11          comments.  And that's what we talked
12          about earlier this morning where I
13          said I made some comments about John's
14          comments, sent them back to Ashley,
15          and then Ashley dealt with them as
16          he -- as he saw appropriate.
17                  MR. MILLER:  Objection.  Move
18          to strike as unresponsive.
19   QUESTIONS BY MR. MILLER:
20          Q.   Let's look at Exhibit 3-20.
21                  MR. JOHNSTON:  Objection.  You
22          asked the question, Counsel.  He
23          answered your question.
24   QUESTIONS BY MR. MILLER:
25          Q.   Let's look at Exhibit 3-20.
```

Confidential - Subject to Protective Order

```
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2

 3   IN RE: ROUNDUP            )
     PRODUCTS LIABILITY        )   MDL No. 2741
 4   LITIGATION                )
     _____ )   Case No.
 5   THIS DOCUMENT RELATES     )   16-md-02741-VC
     TO ALL CASES              )
 6

 7           TUESDAY, JANUARY 24, 2017
 8   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
 9                    - - -
10          Videotaped deposition of William
11   Heydens, Ph.D., Volume II, held at the
12   offices of HUSCH BLACKWELL, L.L.C., 190
13   Carondelet Plaza, Suite 600, St. Louis,
14   Missouri, commencing at 9:04 a.m., on the
15   above date, before Carrie A. Campbell,
16   Registered Diplomate Reporter, Certified
17   Realtime Reporter, Illinois, California &
18   Texas Certified Shorthand Reporter, Missouri
19   & Kansas Certified Court Reporter.
20                    - - -
21
             GOLKOW TECHNOLOGIES, INC.
22       877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23

24

25
```

Confidential - Subject to Protective Order

```
1           anyone on the phone call?
2                   MR. TRAVERS:  Jeff Travers from
3           The Miller Firm.
4                   MR. MILLER:  Good morning, Jeff
5           Travers from The Miller Firm.
6                   Who else?  Anyone?
7                   MR. JOHNSTON:  And the
8           plaintiffs' counsel attending in
9           person is the same as was present
10          yesterday.
11                    CROSS-EXAMINATION
12   QUESTIONS BY MR. JOHNSTON:
13         Q.    Good morning, Dr. Heydens.
14         A.    Good morning.
15         Q.    My name is Robert Johnston.  I
16   represent Monsanto in this case.  We've met
17   before, have we not?
18         A.    Yes, we have.
19         Q.    Can you tell the jury what your
20   profession is, Dr. Heydens?
21         A.    Yes.  I'm a toxicologist by
22   profession.
23         Q.    And what is your current title
24   at Monsanto?
25         A.    Currently I'm product safety
```

Confidential - Subject to Protective Order

1 assessment strategy lead.

2     Q.    And can you tell the jury what
3 you do in that role?

4     A.    In that role, my job is to work
5 with other scientists as we get new products
6 that come in that would need to be tested for
7 safety to work on, devise the overall testing
8 strategy and sets of studies that we would do
9 to support the safety of that product.

10     Q.    Are there standard studies or a
11 guide to what kind of studies need to be done
12 for a new product?

13     A.    There are for some -- for the
14 traditional pesticides, there are a set of
15 guideline studies.  A couple different sets
16 of guideline studies that we can use and we
17 can -- if necessary, we can adapt those for a
18 different product concept.

19     Q.    Are there any required studies
20 that would have to be done for a new
21 herbicide or pesticide?

22     A.    For new pesticides, for which
23 herbicide is one, yes, there's a whole set of
24 studies, a very comprehensive set of studies
25 that need to be done, all way from acutes,

Confidential - Subject to Protective Order

1        A.      Yes, there was.

2        Q.      Who was that?

3        A.      At the time that I took that
4   over, that would have been Donna Farmer.

5        Q.      How much work did you do with
6   glyphosate as the director of the toxicology
7   group?

8        A.      Very, very little for that
9   period of time.  Because the other thing that
10  was happening shortly after I became the
11  director of the toxicology group, I also
12  became the co-lead for what was -- what
13  Monsanto called the product safety center.
14  And the product safety center was responsible
15  for -- that was the group where the group of
16  scientists was housed who were responsible
17  for demonstrating the safety of Monsanto's
18  biotechnology portfolio.  And that's a
19  portfolio that in the early 2000s was growing
20  rather significantly, and so I found myself
21  spending more and more time working in those
22  areas and less on the traditional chemicals
23  like glyphosate.

24       Q.      What type of products were in
25  the biotechnology area?

Confidential - Subject to Protective Order

```
 1        A.     "It was concluded that, under
 2   present and expected conditions of use,
 3   Roundup herbicide does not pose a health risk
 4   to humans."
 5        Q.     Now, I want to look back at the
 6   acknowledgements for this paper on page 160
 7   of the journal.
 8               I want you to start with the
 9   authors in the acknowledgement, and can you
10   read that for the jury, please?
11        A.     "The authors were given
12   complete access to toxicological information
13   contained in the great number of laboratory
14   studies and archival material at Monsanto in
15   St. Louis, Missouri, and elsewhere.  Key
16   personnel at Monsanto who provided scientific
17   support were William F. Heydens, Donna R.
18   Farmer, Marian S. Bleeke, Steven J. Wratten,
19   and Catherine H. Carr."
20        Q.     Okay.  You can stop there.
21               Your name is in that list of
22   folks, correct?
23        A.     That is correct.
24        Q.     And so this paper disclosed in
25   the acknowledgements that you were involved
```