# EXHIBIT 71

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 2 of 79
Case 3:16-md-02741-VC  Document 2560-72  Filed 01/25/19  Page 2 of 79
Confidential - William R. Sawyer, Ph.D.

```
 1                UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

 2                         - - -

 3   IN RE: ROUNDUP PRODUCTS        : MDL No. 2741

     LIABILITY LITIGATION           : Case No. 16-md-02741-VC

 4   -----------------------------

     STEVICK, ET AL. V.             : Case No. 16-cv-02341-VC

 5   MONSANTO COMPANY               :

     -----------------------------

 6   This document relates to:      :

                                    :

 7   ALL ACTIONS                    :

     ELAINE STEVICK                 :

 8                         - - -

 9            Thursday, December 20, 2018

10                    CONFIDENTIAL

11                         - - -

12        Deposition of WILLIAM R. SAWYER, Ph.D., held

13   at Sundial Beach Resort, 1451 Middle Gulf Drive,

14   Sanibel, Florida, on the above date, beginning at 8:10

15   a.m., before Kimberly A. Overwise, a Certified Realtime

16   Reporter and Notary Public.

17                         - - -

18

19

20            GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

21               deps@golkow.com

22

23

24

25
```

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 3 of 79
Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 3 of 79
Confidential - William R. Sawyer, Ph.D.

APPEARANCES:

THE MILLER FIRM LLC
BY:  JEFFREY TRAVERS, ESQ.
The Sherman Building
108 Railroad Avenue
Orange, VA  22960
540-672-4224
jtravers@millerfirmllc.com
Counsel for Plaintiff

BARTLIT BECK LLP
BY:  STEVEN E. DERRINGER, ESQ.
BY:  WILL GOHL, ESQ.
Courthouse Place
54 West Hubbard Street
Chicago, IL  60654
312-494-4415
steven.derringer@bartlitbeck.com
will.gohl@bartlitbeck.com
Counsel for Defendant

HOLLINGSWORTH LLP
BY:  JOHN M. KALAS, ESQ.
1350 I Street, N.W.
Washington, DC  20005
202-898-5800
jkalas@hillingsworthllp.com
Counsel for Defendant

ALSO PRESENT:

LaJuana Pruitt, CLVS, videographer

APPEARANCES VIA TELEPHONE:

THE MILLER FIRM LLC
BY:  BRIAN KEITH BRAKE, ESQ.
108 Railroad Avenue
Orange, VA  22960
540-672-4224
bbrake@millerfirmllc.com
Counsel for Plaintiff

GROSSMAN & MOORE PLLC
BY:  JENNIFER A. MOORE, ESQ.
One Riverfront Plaza
401 W. Main Street, Suite 1810
Louisville, KY  40202
502-657-7100
jmoore@gminjurylaw.com
Counsel for Plaintiff Hardeman

ARNOLD & PORTER
BY:  CAITLIN M. W. ANNATOYN, ESQ.
70 W. Madison Street, Suite 4200
Chicago, IL  60602-4231
312-583-2300
caitlin.annatoyn@arnoldporter.com
Counsel for Defendant

WILKINSON WALSH + ESKOVITZ
BY:  KIRSTEN NELSON, ESQ.
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
202-847-4000
knelson@wilkinsonwalsh.com
Counsel for Defendant

I N D E X

WITNESS                              PAGE
WILLIAM R. SAWYER, Ph.D.
     By Mr. Derringer             8, 298
     By Mr. Travers             288, 301

Certificate of Oath                  306
Deposition Certificate               307
Errata Sheet                         308
Acknowledgment                       309

E X H I B I T S
(Exhibit 15 retained by Mr. Travers; others attached.)

| Number | Description | Identified |
|---|---|---|
| Sawyer 1 | Expert Report of Dr. William R. Sawyer, 11/20/2018 | 11 |
| Sawyer 2 | Expert report replacement pages, 23-25 | 14 |
| Sawyer 3 | Medical records, nonconsecutive Bates numbers beginning Confidential-Stevick-EStevick-KPNValley-MD-000010 | 14 |
| Sawyer 4 | Printout from lymphoma.org website titled "About Lymphoma" | 78 |
| Sawyer 5 | Printout from seer.cancer.gov website titled "Cancer Stat Facts: NHL - Diffuse Large B-Cell Lymphoma" | 80 |
| Sawyer 6 | Photograph | 101 |
| Sawyer 7 | Photograph | 105 |
| Sawyer 8 | Photograph | 110 |
| Sawyer 9 | Printout from American Cancer Society website entitled "Non-Hodgkin Lymphoma Risk Factors" | 121 |

| Sawyer 10 | Printout from Leukemia & Lymphoma Society website entitled "Central Nervous System (CNS) Lymphoma" | 122 |
| Sawyer 11 | Transcript of Deposition of Elaine Stevick | 127 |
| Sawyer 12 | Study entitled "MON 78294: An Applicator Exposure Study Conducted in Spain (Autumn 2005) Using Biomonitoring," by Bleeke, Bates number beginning MONGLY02908721 | 154 |
| Sawyer 13 | Document entitled "Herbicide Applicator Exposure to N-Nitroso-glyphosate During Application of Roundup Herbicide and Field Re-Entry," by Kramer, Bates number beginning MONGLY01621347 | 154 |
| Sawyer 14 | Article entitled "Predictive Exposure Modelling for Pesticide Registration Purposes," by Van Hemmen | 154 |
| Sawyer 15 | Sprayer | 238 |
| Sawyer 16 | Study entitled "Final Report Evaluation of the Percutaneous Absorption of Roundup Formulations in Man Using an In-Vitro Technique," by Franz | 256 |
| Sawyer 17 | Report of William R. Sawyer, Ph.D., re: Johnson, 12/21/2017 | 261 |
| Sawyer 18 | Dr. Sawyer Supplemental Reliance List, 12/18/2018 | 276 |
| Sawyer 19 | Chart entitled "Defendant Monsanto Company's November 9, 2018, Response to Plaintiffs' Request for Formulation Information for Group One Plaintiffs (Updated November 13, 2018)" | 278 |
| Sawyer 20 | Dr. Sawyer's list of trials and depositions | 278 |
| Sawyer 21 | Invoice, 12/14/2018 | 280 |

Page 6

1   Sawyer 22  Stevick-specific invoice, 12/14/2018  283
2   Sawyer 23  E-mail, 12/5/18, to              287
        toxdoc1@comcast net from Stevick
3
    Sawyer 24  Elaine Stevick deposition errata sheet 289
4
    Sawyer 25  Health Canada Science Policy Note   290
5       entitled "Dermal Absorption: Position
        Papers from the North American Free
6       Trade Agreement (NAFTA) Technical
        Working Group (TWG), 10/24/16, Bates
7       Nos. MONGLY07917118-28
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

## DEPOSITION SUPPORT INDEX

2            - - -

3

4   **Direction to Witness Not to Answer**
5   Page  Line
6   NONE
7
8   **Request for Production of Documents**
9   Page  Line
10  142   16
11
12  **Stipulation**
13  Page  Line
14  NONE
15
16  **Question Marked**
17  Page  Line
18  NONE
19
20
21
22
23
24
25

Page 8

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  We are now on the record.
3   My name is LaJuana Pruitt.  I'm your videographer
4   for Golkow Litigation Services.  The date today is
5   December 20th, the year 2018.  The time is
6   8:10 a.m.  This video deposition is being held in
7   Sanibel, Florida, taken in the matter of Stevick
8   versus Monsanto to be heard before the United
9   States District Court, Northern District of
10  California.  Our deponent is Dr. William R. Sawyer.
11       Counsel will be noted on the stenographic
12  record.
13       Our court reporter is Kim Overwise and will --
14  she will now swear our witness.
15            - - -
16       ...WILLIAM R. SAWYER, Ph.D., after having been
17  duly sworn, was examined and testified as follows:
18       THE WITNESS:  I do.
19            EXAMINATION
20  BY MR. DERRINGER:
21   Q   Good morning, Dr. Sawyer.
22   A   Good morning.
23   Q   My name is Steve Derringer.  We just met a few
24  minutes ago here in this room.  Could you state your
25  name, please?

Page 9

1   A   William Robert Sawyer.
2   Q   What's your current address?
3   A   6450 Pine Avenue, Sanibel, Florida 33957.
4   Q   You've given several days of deposition
5   testimony in the Roundup litigation in this past year;
6   is that right?
7   A   Yes.  In fact, my understanding is about 30
8   hours.
9   Q   I didn't count it up, but I do have the days
10  here.  You gave two days of deposition in the Johnson
11  case back in February of 2018; is that right?
12  A   Yes.
13  Q   And you gave two days of deposition just
14  recently in the Hall-Peterson case in August and October
15  of 2018; is that right?
16  A   Correct.
17  Q   And then you also testified on the 26th of
18  July of 2018 in the Johnson trial out in California;
19  correct?
20  A   Yes.
21  Q   You gave all that testimony under oath?
22  A   Yes.
23  Q   And you told the truth when you gave that
24  testimony?
25  A   I did.

Confidential - William R. Sawyer, Ph.D.

Page 10

1   Q   You testified as accurately as you could --

2   A   Yes.

3   Q   -- when you gave that testimony?

4   A   Yes, I did.

5   Q   And you stand by all the testimony that you

6  gave during those depositions and during the trial?

7   A   I do.

8   Q   Do you have any idea what number deposition

9  this is for you, not just in the Roundup litigation but

10  generally?

11   A   I would approximate perhaps 200.

12   Q   So one thing you are an expert at is having

13  your deposition taken by now; right?

14     MR. TRAVERS:  Objection; form.

15     THE WITNESS:  No, I'm not sure anyone ever

16  develops expertise in that fashion with top-notch

17  attorneys such as yourselves here today.

18  BY MR. DERRINGER:

19   Q   Do you know anyone who's had their deposition

20  taken more times than you?

21     MR. TRAVERS:  Objection; form.  It's a

22  ridiculous question.

23     THE WITNESS:  Well, yeah.  Probably my mentor,

24  Robert Forney, director of the state toxicology

25  unit in Indiana, a very famous toxicologist,

Page 11

1  internationally renowned.  I would believe he was

2  deposed many more times than I.  That's -- that's

3  what forensic toxicologists are trained to do is to

4  provide scientific information in litigation

5  matters.  The word "forensic" is basically a Latin

6  root word of to debate.  So, yes.

7     (Sawyer Exhibit No. 1 was marked for

8  identification.)

9  BY MR. DERRINGER:

10   Q   I'm going to show you what I've marked as

11  Sawyer Exhibit 1.  I'm handing a copy to your counsel,

12  Mr. Travers.  Can you identify Exhibit 1, please?

13   A   This is my November 20, 2018, report issued in

14  the current matter.

15     MR. TRAVERS:  And just before we go further, I

16  think Dr. Sawyer had a few replacement revised

17  pages he's got copies of.

18  BY MR. DERRINGER:

19   Q   Dr. Sawyer, do you have revised pages that you

20  brought with you to your deposition today with which

21  you'd like to replace anything in Exhibit 1, your report

22  dated November 20, 2018, in this MDL?

23   A   Yes.

24   Q   And what is -- what are those replacement

25  pages that you'd like to trade out or replace out of

Page 12

1  your expert report in this matter?

2   A   Pages 23 through 25.

3

4

5

6

7

8

9

10  BY MR. DERRINGER:

11   Q   I'm just reading from your report, sir, page

12  23.  It says at the top -- this is in your report -- the

13  UK predictive operator exposure model.

14   A   Yeah.  And that is for the home garden.  I

15  just abbreviated the -- actually, I didn't abbreviate

16  anything.  That is what the document actually reads, but

17  in smaller print you will see it's also stated in the

18  report it was for the home garden model.

19   Q   You're referring to the line underneath the

20  title of the graph or the screenshot you've put in your

21  report, that line underneath reading "Application

22  method"?

23   A   No.  Actually in the top box, which is in

24  yellow and green print, it states under "Container" --

25  well, actually I'm having trouble reading because the

Page 13

1  light is dim and I have contact bifocals and the print

2  is very small.  I think in the very first line it says

3  "Application method" --

4   Q   It does.

5   A   -- "home garden," blur, blur, blur.  Yeah.

6   Q   Yeah, this is the report as we received it

7  from your counsel.  It's in front of you at Exhibit 1.

8  I'll note we didn't receive a color copy of it.  Now,

9  what you want to do is replace pages 23, 24, and 25, the

10  three pages that you brought with you today to this

11  deposition?

12   A   That's correct.

13   Q   And why do you want to replace these pages?

14   A   Following exhaustive study of the methodology,

15  I've discovered several minor errors.

16   Q   Okay.

17     MR. DERRINGER:  Why don't we mark -- this is

18  the first time you've produced these to us; is that

19  right, counsel?

20     MR. TRAVERS:  Yes.

21     MR. DERRINGER:  Okay.  So, Dr. Sawyer, what

22  we'll do is we'll mark these as Exhibit 2.  And

23  you've just handed me a stapled collection that's

24  marked Stevick V. Monsanto Company replacement

25  page, page 23, 24, and 25.  Okay.

Page 14

```
1        (Sawyer Exhibit No. 2 was marked for
2   identification.)
3        THE WITNESS:  Before the next question,
4   without interfering and wasting time, if there is
5   an opportunity to request the facility to bring a
6   lamp, that would really help me because the light
7   is kind of dim in here and so I'm not seeing as
8   sharp as I would like to and that could interfere
9   with our -- our day.
10  BY MR. DERRINGER:
11       Q   You bet.  We'll -- we'll make that request of
12  the Sundial Resort where we're at.  I'll just note, sir,
13  that you were provided a list of, I think, four or five
14  acceptable locations from your counsel of where the
15  deposition can take place and this was one of them, and
16  that's why we are taking the deposition here.
17       A   Yeah, I -- I think what happened is they went
18  to LCD lighting or something.  It's usually much
19  brighter in here.
20       MR. TRAVERS:  I'll see if there's a dimmer
21  switch quickly.
22       THE WITNESS:  That could be, a dimmer problem,
23  too.
24       MR. TRAVERS:  Yeah.
25
```

Page 15

```
1   BY MR. DERRINGER:
2        Q   Okay.  I've handed you back what's been marked
3   as Exhibit 2 --
4        MR. TRAVERS:  Hang on one second.
5        MR. DERRINGER:  Let's go off the record.
6        THE VIDEOGRAPHER:  We're going off the record
7   at 10:18 (sic) a.m.
8        (Discussion off the record.)
9        (Short recess.)
10       THE VIDEOGRAPHER:  We're back on the record at
11  8:28.
12  BY MR. DERRINGER:
13       Q   Dr. Sawyer, our videographer has provided some
14  additional light in response to your request.  Does that
15  better enable you to see better what's in front of you?
16       A   Much better.
17       Q   Great.  So if we take Exhibit 1, which is your
18  expert report in this MDL litigation, and add to it
19  Exhibit 2, which are the replacement pages for pages 23
20  through 25, does this report now contain all the
21  opinions that you intend to offer in this litigation?
22       MR. TRAVERS:  Objection to form as far as
23  litigation as it's specific to the three cases.
24  BY MR. DERRINGER:
25       Q   Sure.  I understand this has been submitted in
```

Page 16

```
1   the Hardeman, Stevick, and Gebeyehou cases; is that
2   right, sir?
3        A   Yes.
4        Q   Okay.  Does this report, Exhibit 1, together
5   with Exhibit 2, your replacement pages, contain all of
6   the opinions you intend to offer in Hardeman, Stevick,
7   and Gebeyehou?
8        A   No.
9        Q   You do know that the purpose under the Federal
10  Rules of an expert report is to disclose all the
11  opinions that you intend to offer at trial?  You're
12  aware of that?
13       A   Understood.  But the --
14       Q   Okay.
15       A   -- report of Dr. Sullivan was not issued at
16  that time.
17       Q   I understand.  So you have some opinions about
18  Dr. Sullivan's report?
19       A   I do.
20       Q   Okay.  We'll get to those.
21       THE VIDEOGRAPHER:  Sir, can you put your mic
22  back on, please.
23       THE WITNESS:  I'm sorry.  Thank you.
24  BY MR. DERRINGER:
25       Q   Did you before today disclose -- well, you
```

Page 17

```
1   haven't today either, but have you disclosed those
2   opinions about Dr. Sullivan's report to anybody?
3        MR. TRAVERS:  Objection; form.  And
4        communications with counsel are confidential.  You
5        don't have to disclose communications with counsel.
6   BY MR. DERRINGER:
7        Q   I'm not asking for the substance of your
8   communication, sir.  I just want to know if you have, in
9   fact, discussed those opinions about Dr. Sullivan's
10  report that you have with anybody.
11       A   Via phone, yes.
12       Q   And who is that that you discussed them with?
13       A   A number of attorneys that represent
14  plaintiffs in this case.
15       Q   Okay.  And do you recall how long ago you
16  disclosed those opinions to them?
17       A   Yes.
18       Q   How long ago was that?
19       A   That would have been Tuesday.
20       Q   Tuesday of this past week, two days ago?
21       A   Yes.
22       Q   Okay.  Does Exhibit 1 together with Exhibit 2,
23  the replacement pages for pages 23 through 25, along
24  with your opinions about Dr. Sullivan's expert report in
25  this matter contain or constitute all of the opinions
```

Page 18

1 you intend to offer in the Stevick, Gebeyehou, and
2 Hardeman cases?
3    A   Yes.
4    Q   There's a tab on Exhibit 1 that contains your
5 CV.  This is from August of 2018.  It was attached to
6 your expert report.  Do you see that?
7    A   No.  I'm in the wrong report.  Okay.
8        Okay.
9    Q   This is the CV that was attached to your
10 expert report, Exhibit 1, when we received it in
11 November of 2018.  This CV is dated August of 2018.  Is
12 this your current curriculum vitae?
13    A   It has been updated with I believe one minor
14 change that I think was an e-mail, a second e-mail
15 address or -- or something of that sort, but, yeah,
16 essentially identical.
17    Q   Other than the addition of a second e-mail
18 address to your CV, is there anything else that needs to
19 be added to the CV that is part of Exhibit 1 so that it
20 is complete?
21    A   No.
22    Q   Okay.  I understand, Dr. Sawyer, that you're
23 offering a specific causation opinion about Elaine
24 Stevick; is that right?
25        MR. TRAVERS:  Objection to form.  It's not --

Page 19

1 specific causation is a legal term.  He's not a
2 lawyer.
3        BY MR. DERRINGER:
4    Q   You've been involved in a lot of litigation
5 where questions of causation are concerned; is that
6 right?
7    A   Yes.  Actually, I -- I can answer your
8 question, but I want to make sure I clearly understand.
9 I guess the best way I can answer this is that there are
10 elements in my report, the vast majority of my report,
11 that are directed to all three patients or to any -- any
12 human being, for example, dermal absorption, protective
13 gear, or the co-contaminants within the product, et
14 cetera.
15        And you ask for specific causation opinions,
16 and those elements that I'm referring to are not part of
17 general causation, which has already been hashed out in
18 this case is my understanding.  That's not what I'm here
19 for, to speak -- I'm not here to speak on general
20 causation at all, only specific causation among the
21 three plaintiffs.  But there are elements in my report
22 that are specific to Ms. Stevick and there -- the vast
23 majority of the report is specific to all three
24 plaintiffs.
25        So I know that sounds a little confusing, but

Page 20

1 that's the best I can do to answer your question.
2    Q   We'll try to parse that out.  You said you're
3 not here to speak on general causation at all, only
4 specific causation among the three plaintiffs.  So let's
5 start for a second with the specific causation among the
6 three plaintiffs.
7        MR. TRAVERS:  I'm just going to object to the
8 rehash of his testimony.
9        MR. DERRINGER:  I'm sorry?
10        MR. TRAVERS:  I'm just -- I'm objecting to
11 your summary -- summary of his testimony.  I don't
12 think it fairly characterizes it.
13        MR. DERRINGER:  Yeah, I'm reading from the
14 transcript.
15        MR. TRAVERS:  No.  You're summarizing it.
16        MR. DERRINGER:  No.  I'm reading from the
17 transcript.
18 BY MR. DERRINGER:
19    Q   Are you offering any specific causation about
20 Mr. Gebeyehou?
21    A   Yes.
22    Q   Can you show me in your report, Exhibit 1,
23 where your specific causation opinion about
24 Mr. Gebeyehou is disclosed?
25        MR. TRAVERS:  And I'm going to keep objecting

Page 21

1 to the use of "specific causation" and "general
2 causation."  They're legal terms.
3        MR. DERRINGER:  Right.  Dr. Sawyer used both
4 of those terms --
5        MR. TRAVERS:  Yeah.
6        MR. DERRINGER:  -- in his response.
7        MR. TRAVERS:  He's not a lawyer.
8        MR. DERRINGER:  He understands them.
9        MR. TRAVERS:  No.  He --
10 BY MR. DERRINGER:
11    Q   Go ahead.  Can you show me in the report where
12 your specific causation opinion about Mr. Gebeyehou is
13 disclosed?
14    A   Starting on page 39.
15    Q   Okay.
16    A   This section on the carcinogenic substances in
17 Roundup is identical for all three plaintiffs.  There's
18 no difference.
19    Q   Where on page 39 do you discuss
20 Mr. Gebeyehou's exposure to the allegedly carcinogenic
21 substances in Roundup that are described on page 39 of
22 your report?
23        MR. TRAVERS:  Objection; form.
24        THE WITNESS:  I don't recall stating that I
25 calculated a dose equation for that plaintiff.

Page 22

1   BY MR. DERRINGER:
2   Q   Right. Am I correct that Mr. Gebeyehou's name
3   is not mentioned at all on page 39?
4   A   No, nor anywhere in the report.
5   Q   Where else in Exhibit 1 do you disclose a
6   specific causation opinion about Mr. Gebeyehou?
7   A   Page 40.
8   Q   Mr. Gebeyehou's name -- well, strike that.
9       Where else do you disclose a specific
10  causation opinion about Mr. Gebeyehou?
11  A   Page 41.
12  Q   Why don't you tell me the entirety of the page
13  ranges of your report where you contend that you've
14  disclosed specific causation opinions about
15  Mr. Gebeyehou?
16  A   I can do that, but perhaps I'm failing to
17  understand your question regarding specific causation.
18  Q   Specific causal -- well, let's take a look for
19  a second at page 121 of your report. You see the last
20  paragraph right above your signature is titled "Summary
21  and Conclusions"?
22  A   Yes.

Page 23

21  Q   Go to your table of contents, please. You
22  testified just a little bit earlier, I think you said
23  that the vast majority of what you have in your report,
24  Exhibit 1, addresses issues that apply across the board
25  to any person; is that right? I want to make sure I

Page 24

1   have that right.
2   A   Yes.
3   Q   Okay. And --
4   A   Approximately the first 38 pages are specific
5   to Mrs. Stevick.
6   Q   And those first 38 pages deal with
7   Mrs. Stevick's medical history and exposure review; is
8   that right?
9   A   That's correct; dose calculation.
10  Q   Right. Including her Roundup application
11  notes or notes that you made about her Roundup
12  application; is that right?
13  A   Yes.
14  Q   And also includes -- including a dose
15  calculation and an exposure calculation that you made
16  regarding Mrs. Stevick; is that right?
17  A   Yes.
18  Q   Okay. And then if you look at Part B of your
19  table of contents, that section is titled "Introduction
20  to Glyphosate and Mrs. Stevick's Exposures." Do you see
21  that?
22  A   It is; up till about page 39.
23  Q   And then starting at page 39 is it your
24  testimony that -- that from pages 39 up through page
25  114, that that information is not specific to

Page 25

1   Mrs. Stevick? Is that -- is that right?
2   A   Largely. There may be a few points in there
3   where I may have actually specifically pointed out
4   something relative to her because of her low body weight
5   or -- some other factor. I don't recall. So I can't
6   guarantee that there isn't any mention of her
7   specifically in that section. There may not be any but
8   I'm not sure.
9   Q   That's fair. I understand that. I appreciate
10  that, Dr. Sawyer. But Part B was -- starting at page 39
11  of your report, that was intended to address not
12  Mrs. Stevick in particular, but to address general
13  points that you're making regarding glyphosate, dermal
14  exposure, glyphosate exposure, things like that that
15  would apply to anybody; is that right?
16  A   Correct; the mechanisms of absorption, the
17  aspects of co-formulants and surfactants, et cetera.
18  Q   Okay. Have you done anything to learn about
19  Mr. Gebeyehou?
20  A   I've reviewed his report and -- and the dose
21  calculation table prepared by Dr. Sullivan.
22  Q   I'm sorry. You said you've reviewed his
23  report. Whose report?
24  A   Dr. Sullivan.
25  Q   Okay.

Page 26

1    A    And his dose calculations as well.



Page 27

9         MR. TRAVERS:  Objection; form.  You're saying
10    "if we refer to it that way."  Again, he's not a
11    lawyer and you're trying to use a legal term.
12    BY MR. DERRINGER:
13    Q    I am not going to burden you, sir, with
14    adopting the word or the term "specific causation" in
15    its legal sense.  Like you said earlier when we
16    started -- actually, I think this was before we started,
17    we're trying to find ways to make today as efficient as
18    possible and so I want to just use the term and I will
19    use the term "specific causation opinion" to refer to
20    the opinion that you've put forward at page 121 under
21    Summary and Conclusions.  I'm not asking you to adopt
22    any legal significance to that.  I'm just going to tell
23    you that that's how I'll -- I'll refer to it in
24    shorthand today to help us along.  Is that okay?
25    A    I think so, yeah.

Page 28

1    Q    Okay.  So that specific causation opinion that
2    you've presented at page 121, am I right that the
3    significant considerations that you took into account --
4    and by that I'm referring to page 119, which is Part D
5    titled "Summary of Objective Mrs. Stevick's
6    Toxicological Factors," do you see under Evidential
7    Considerations you say that:  "The following represent
8    significant considerations in formulating an objective
9    toxicological assessment of Mrs. Stevick with respect to
10    her Roundup exposure..."?  Do you see that?
11    A    Yes.
12    Q    Okay.  So the significant considerations you
13    took into account in formulating your specific causation
14    opinion with respect to Mrs. Stevick, those are
15    presented in the bullet points at pages 119 through 121
16    of your report; is that right?
17    A    They are, but I -- I must caution you that the
18    second bullet on dermal absorption rates applies to not
19    only Ms. Stevick but any human being.
20    Q    Appreciate that.  And are there any other
21    bullets that you've described as your significant
22    considerations in formulating an objective toxicological
23    assessment of Mrs. Stevick that apply to any human
24    being, not only Mrs. Stevick?
25    A    Well, the mechanism of carcinogenicity as

Page 29

1    well.
2    Q    Okay.  So that would be the fourth bullet; is
3    that right?
4    A    Yes.
5    Q    Okay.  Any other bullet of these five bullets
6    you've listed that apply to any human being and not only
7    Mrs. Stevick?
8    A    No.

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 10 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 10 of 79
Confidential - William R. Sawyer, Ph.D.



Page 30

1  herbicides.

2      MR. TRAVERS:  And just for the record, the

3  reliance list is one of the tabs.

4      THE WITNESS:  Is it in here?  Okay.  Great.

5  Yeah.  There it is, I think.

6  BY MR. DERRINGER:

7  Q    You're looking at Exhibit 1?

8  A    Yes.

9  Q    Yeah.  And it's the tab --

10 A    Yeah.

11 Q    -- called "Dr. Sawyer Reliance List"?

12 A    Right.

13 Q    Great.

Page 32

20     BY MR. DERRINGER:

21 Q    Okay.  So what you just described for me with

22 respect to Mr. Gebeyehou, same answer with respect to

23 Mr. Hardeman?

24 A    Yes.

Page 31

Page 33



Page 34

11  Q    You didn't review their depositions; is that
12  correct?
13  A    That's right.
14  Q    You didn't review any other information that
15  would further give you knowledge about their alleged
16  exposures to glyphosate or glyphosate-based herbicides;
17  is that right?
18  A    That's correct.
19  Q    Okay.  But you did review Dr. Sullivan's
20  report?
21  A    Only with respect to methodology.
22  Q    What does that mean?
23  A    Whether or not his method of calculating the
24  exposure and dose and the dermal absorption was indeed
25  correct.

Page 35

1  Q    Okay.  Did you review his specific opinions
2  regarding Mr. Gebeyehou and Mr. Hardeman?
3  A    Did I review specific opinions?
4  Q    His specific opinions.
5  A    I did, yes.
6  Q    Okay.  And so that really is the genesis of my
7  question is everything that you know specific to
8  Mr. Gebeyehou and Mr. Hardeman, does everything you know
9  about them come from your review of Dr. Sullivan's
10  report and assessment with respect to those two
11  plaintiffs?
12  A    No.

Page 36

11  MR. TRAVERS:  I'm just going to stop.  You
12  can't reveal --
13  THE WITNESS:  Oh, okay.
14  MR. TRAVERS:  -- the substance of
15  conversations between --
16  THE WITNESS:  Oh, that's right.  It was -- it
17  was good stuff anyway.  They said -- they told me
18  the truth in terms of what I learned from her, it
19  matched up.  But the -- after speaking with her and
20  performing some basic calculations and comparisons
21  to some of the epidemiological studies that do
22  quantitate by exposure days, I determined that
23  there was merit to the case and I would be
24  interested in -- in further assessing it.
25

Page 37

1  BY MR. DERRINGER:
2  Q    And you didn't perform those basic
3  calculations and comparisons to some of the
4  epidemiological studies with respect to Mr. Hardeman or
5  Mr. Gebeyehou; is that right?
6  A    No.  I mean, I did speak to attorneys who are
7  representing those plaintiffs, but I did not -- no.  I
8  made it clear I could not carry out a specific causation
9  analysis as I did with Mrs. Stevick in the short amount
10  of time.
11  Q    Right.  You -- you said with Mrs. Stevick
12  you -- you did -- you performed some basic calculations
13  and -- and some comparisons to some of the
14  epidemiological studies to initially see if there was
15  even a case; is that right?
16  A    That's right.
17  Q    Right.  Did you do that with respect to
18  Mr. Hardeman or Mr. Gebeyehou?
19  A    No.
20  Q    And what's the -- what's the threshold,
21  Dr. Sawyer, that you use below which you determine that
22  there's not a case?
23  MR. TRAVERS:  Objection; vague.
24  THE WITNESS:  I compared -- and it's in my
25  report.  I could direct you to the page.  I

Page 38

1  initially compared to human epidemiological data
2  with respect to a dose comparison based upon
3  exposure days to determine whether she was in the
4  range and where in the range of those studies.
5    BY MR. DERRINGER:

[redacted]

21    MR. TRAVERS:  Objection; form, vague.
22    THE WITNESS:  -- as any toxicologist does, I
23  first ascertain what the disease outcome is and
24  whether that is generally accepted with human study
25  evidence to be causally connected.

Page 39

1    The next step -- and I could give you a good
2  example.  Just last week I received a call on an
3  alleged neurotoxic injury case from arsenic, a
4  woman who had been prescribed or given some type of
5  homeopathic Chinese herbal product.  The product
6  was tested and, in fact, it did contain arsenic.
7  The problem was when I made a rudimentary dose
8  calculation on the amount of capsules, it came
9  nowhere close to what was showing up in her urine.
10  And the urine had not been segregated as organic or
11  inorganic arsenic.
12    And I explained that even if we assumed it was
13  inorganic arsenic, the dose falls short by a factor
14  of about 40 and there's no case.  And I turned it
15  down because that threshold was that the dose was
16  way below what could possibly cause the injury and
17  the -- on top of that, the analytical evidence was
18  sketchy at best.
19    So I -- I always look for human data first to
20  be certain that the human epidemiologic data or
21  occupational, the case history data is sufficient
22  and then whether that person falls into the range
23  of the studies.  And -- and with cancer that's how
24  it works.  You can't really set a specific number
25  on that, but if a person is in -- within the range

Page 40

1  of that shown to significantly increase the rate of
2  cancer, well, then -- then there is potential
3  causation.
4    BY MR. DERRINGER:
5    Q    And with respect to glyphosate in particular
6  and human -- the human epidemiological data regarding
7  glyphosate and its, you know, alleged connection to
8  cancer, the comparison that you're doing at this
9  threshold stage has to do with number of days of
10  exposure; is that right?
11    A    Yes; and defined by a minimum of time per
12  exposure day as per studies.
13    Q    What's the minimum of time per exposure day
14  that you believe the studies reflect?
15    A    Well, the first thing I had to do is calculate
16  her application frequency.  On page 16 --
17    Q    Again, I -- I just want to make sure we're on
18  the same page about what I'm asking about.  I'm not
19  asking about her right now.  I'm again asking about what
20  you do methodologically when you're approached about a
21  glyphosate case and -- and you take a look as to whether
22  it meets that threshold when you compare it to the human
23  epidemiological data.  And you said that you look at
24  kind of -- you know, you're comparing to a number of
25  days of exposure and you said, yes, and defined by a

Page 41

1  minimum of time per exposure day as per the studies.
2    And I just -- not with respect to her right
3  now, but just for -- in terms of your methodology,
4  what's the minimum of time per exposure day that you
5  believe those human epidemiological studies reflect?
6    A    Well, yes.  On page 26 I referenced -- and I
7  did this early in the case, the very first thing I did
8  actually after ascertaining her exposure.  I compared
9  her exposure to the Eriksson 2008 study, the McDuffie
10  2001 study, and as well as the glyphosate applicators in
11  the Andreotti 2008 studies.  And it's clear that her
12  exposure days, including the cutoff of only one hour,
13  dose fit within these studies.
14    Q    Yeah.  And, again, I'm asking about what you
15  used as the minimum exposure time per day as per the
16  studies, the epi studies, that you've referred to.
17  Again, I'm just wondering what your threshold is.
18  What's the minimum time of exposure per day that needs
19  to be met to come within these studies in terms of your
20  analysis of these types of cases?
21    MR. TRAVERS:  Objection; asked and answered.
22    THE WITNESS:  I compare it to each study
23    for -- maybe you should repeat the question so I
24    don't waste time.
25

Page 42

1    BY MR. DERRINGER:
2        Q    Sure, sure.  Again, just going back to your
3    response a few minutes ago, I asked you about the
4    threshold, Dr. Sawyer, that you use to determine
5    initially whether there's a case, and you told me that
6    you initially compare it to human epidemiological study
7    with respect to a dose comparison based upon exposure
8    days to determine whether someone's within that range.
9    And you then, when I asked you -- or when I summarized
10   that, you -- you responded, yes, and defined by a
11   minimum of time per exposure day as per studies.  And
12   I'm -- I asked you, what is the minimum time per
13   exposure day that you believe the studies reflect?
14   So --
15       A    All right.  I can answer that.
16       Q    -- do you have the answer?  Do you have the
17   question clear in your head now?
18       A    Yes.
19       Q    Okay.  Great.  Go ahead.
20       A    Well, with the McDuffie study, at a minimum of
21   ten or greater than ten hours per year, and her exposure
22   was ten hours per year for 25.5 years.  And also on the
23   Eriksson study, the odds ratio was elevated at 1.69 for
24   ten days of exposure or less and 2.36 for greater than
25   ten days of exposure.  And in that case we know that she

Page 43

1    had 255 days of exposure at one hour.
2            And the methodology that is generally used in
3    most of the studies considers a six-hour application
4    day, and that is as per POEM methodology and actually in
5    some of the studies use six-hour equivalent.  So at one
6    hour a day she has 255 hours, which is considerably more
7    by a factor of four of -- that -- having to have ten
8    days at six hours per day, that would be 60 hours.  And
9    60 times four is 240, and she has over that number of
10   hours.  So, I mean, she's -- she's well above the
11   requirements for either of these studies.
12       Q    Is it your testimony that in the Eriksson
13   study when they refer to a day of exposure to determine
14   whether someone's been exposed for more than or less
15   than ten days, a day of exposure means six hours
16   application time?
17       A    That's what's generally in the literature.
18       Q    Okay.  And we'll take a look at Eriksson in a
19   bit, but you believe that's reflected and stated --
20   strike that.
21           Do you believe that the study itself, the
22   report of the study discloses that they're using a
23   six-hour day?
24       A    No.  In fact, it's more likely that they're
25   referring to any exposure on a given day actually.

Page 44

1        Q    When you say it's more likely that that's what
2    they're referring to in the Eriksson study, what are you
3    basing that conclusion on?
4        A    How other similar studies have been run
5    regarding herbicides.  But, see, the problem with
6    Eriksson, the study does not specifically put a number
7    on it, whether it be one hour or eight hour.  But what I
8    did state, which is generally accepted in the literature
9    and in the methodology, is that applicators generally
10   are assessed with a six-hour exposure day.
11       Q    In the absence of any other information from
12   the Eriksson study, either written or otherwise, your
13   operating assumption is that the exposure day referred
14   to in Eriksson refers to a six-hour day?
15       A    Yeah, you know, and that's a darn good
16   question because let's assume that Eriksson requires 24
17   hours of application per day, which is ridiculous but
18   let's assume that.  She still meets the requirement.
19       Q    Okay.  Have you ever spoken to any of the
20   study authors of the Eriksson study?
21       A    No.
22       Q    Have you ever communicated with them in any
23   way?  E-mail?  Letter?  Anything?
24       A    No.
25       Q    Okay.

Page 45

1        A    It wasn't necessary because even if it was 24
2    hours times ten days is 240 hours, and she's 255.  So, I
3    mean, any way you look at it she fits into the study.
4        Q    And just so you know how I tend to operate,
5    I'm not going to cut you off or tell you, you know -- or
6    interrupt you, sir.  I understand that, you know, you
7    wanted to start early today.  I was happy to do that
8    because it gets to be a long day by the 5 o'clock hour,
9    something like that.  And so to the degree that you can
10   just focus on my question and just answer that question,
11   that will be great.  Like I said, I'm not going to stop
12   you or interrupt you, but I know you've got some concern
13   about length of deposition and so the more you can focus
14   on my question, I think we'll -- we'll be better served.
15       A    I will do my best.  Thank you.
16           MR. TRAVERS:  Objection.  Just to note for the
17   record, Dr. Sawyer is being -- his answers are
18   being responsive to the questions.
19   BY MR. DERRINGER:
20   

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 14 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 14 of 79
Confidential - William R. Sawyer, Ph.D.

Page 46

1  Q  Okay. You did interview her I think you
2  mentioned. You said you spoke to her via phone prior to
3  reviewing her medical records. That was kind of an
4  initial conversation. And then you recalled at least
5  one other phone call with her. Do I have that right?
6  A  Yes.
7  Q  Okay. If you look in your report, Exhibit 1,
8  at pages 9 to 10, you've included two pages here
9  describing your phone interview with Elaine Stevick
10  dated October 18, 2018. Do you see that?
11  A  I do.
12  Q  Is what you've written here on pages 9 and 10,
13  does that reflect what you learned during your interview
14  with Mrs. Stevick?
15  A  Yes.
16  Q  Did you have any other notes that you didn't
17  include in here from your phone interview with Elaine
18  Stevick on October 18, 2018?
19  A  No. Jen Clark from my office was on the call
20  and put everything in MS Word as we proceeded.
21  Q  Jen Clark is your assistant?
22  A  Yes.
23  Q  And she was listening in on the call?
24  A  Yes.
25  Q  And as you and Mrs. Stevick were conversing,

Page 47

1  she was -- she was typing down what each of you said?
2  A  Of significance; yes.
3  Q  Okay. And who determined what was of
4  significance? Did Ms. Clark or did you direct her about
5  what she should write down?
6  A  She wrote down things, but I -- I can't
7  guarantee she wrote down everything. But I did speak up
8  and with certain items said, Jen, make sure you -- you
9  get that exact, and -- and really why that is is a
10  signal for me to put -- for her to put something in
11  quotations.
12  Q  And do pages 9 and 10 of your report, Exhibit
13  1, reflect everything that you consider relevant to your
14  opinion regarding Mrs. Stevick that you learned from
15  Mrs. Stevick during your phone interview on October 18,
16  2018?
17  A  No. I also relied on her deposition.
18  Q  Oh, understood. We'll -- we'll get to that.
19  Let me ask my question again.
20  A  And her medical records.
21  Q  Yeah. So do pages 9 and 10 of your report,
22  Exhibit 1, reflect everything that you consider relevant
23  to your opinion regarding Mrs. Stevick that you learned
24  from Mrs. Stevick during your phone conversation on
25  October 18, 2018?

Page 48

1  A  Yes.
2  Q  Have you ever -- well, you mentioned you might
3  have talked to her one or two other times. We know you
4  spoke to her at the outset of your work on her case. Do
5  you have any notes from that conversation?
6  A  You mean the second phone call?
7  Q  No, no. The first one before you reviewed
8  medical records.
9  A  I'm sorry. I'm not sure I understand.
10  Q  Sure. You testified that the first thing you
11  did to learn about Mrs. Stevick was you spoke to her on
12  the phone before you even reviewed her medical records.
13  A  Right.
14  Q  Okay. Is that this October 18th conversation?
15  A  It is.
16  Q  Thank you. And then you mentioned you had at
17  least one other phone call with her, maybe one or two
18  follow-ups, one with respect to her sprayer. I didn't
19  see anything in your report reflecting notes from those
20  follow-up phone calls. What did you learn, if you can
21  remember, during those follow-up phone calls with
22  Mrs. Stevick? And -- and first, I guess, if you can
23  give me your best recollection of how many follow-up
24  phone calls you had.
25  ██ ███████████████████████

Page 49

1  ██ ████████████████████████████████████
2  ██ ████████████████████████████████
3  ██ ██████████████████████████████████████
4  ██ ███████████████████████████████
5  ██ ████████████████████████████████
6  ██ ████████████████████████████████████████
7  ██ ██████████████████████████
8  ██ ████████████████████████████████████████
9  ██ ████████████████████████████
10 ██ █ ███████████████████████████████████
11 ██ ████████████████████████████████
12 ██ █ ████████████████████████████████████
13 ██ █████████████████████
14 ██ █ ██████████████
15 ██ █ █████████
16 ██ ████████████████████
17 ██ █ █████████
18 ██ █ ████████████████████████████
19 ██ ████████████████████████████
20 ██ █████████████████████████
21 ██ ███████████████████████████████████
22 ██ ████████████████████████████████████
23 ██ █████████████████████████████████████
24 ██ ██████████████████████████████████████
25 ██ ██████████████████████████████████





**Page 54**

1 records. Was that you who looked at her records or did
2 you have someone look at the records for you and
3 summarize them for you?
4 A I went through them and Jen Clark also went
5 through them and used -- included basic information plus
6 my markups and prepared the -- primarily prepared these
7 tab -- the table on page --
8 Q Page 4?
9 A Yeah.
10 Q Table 3?
11 A Yes.
12 Q Okay. You say Jen Clark prepared that table?
13 A Primarily.
14 Q What was your contribution to Table 3?
15 A I added and edited.
16 Q I'm sorry. Did you say you added --
17 A Yes.
18 Q -- and edited?
19 A Yeah, I added information and edited, yeah.
20 Q Looking at Table 3 today, can you identify
21 what information you added?
22 A No.
23 Q Okay. You mentioned you marked up her medical
24 records; is that right?
25 A Yes.

**Page 55**

1 Q Do you have those medical records that you
2 reviewed either here or at your office?
3 A As I recall, I believe this -- I used a PDF
4 highlighter directly --
5 Q And you saved it in a file?
6 A -- directly -- maybe.
7 Q Okay.
8 A Maybe. I usually keep the clean ones as my
9 final version because a lot of times the markups
10 interfere with the ability to read it.





Page 62

Page 64

5    Q    What did you do to -- to confirm that what she
6    was saying was true?
7         A    What I did on the home and garden application
8    was I went and made sure I had every detail from her
9    testimony or from my inspection of the instrument
10   calculated.  And if we look at page 23, for example,
11   that's the 1 percent dermal absorption --
12        Q    Are you now looking at Exhibit 2, which is
13   your replacement page?
14        A    Yeah, yeah.  The default values for -- and --
15   and I discovered this after the fact actually.  After I
16   was done with this I went back and compared it to all
17   the default values for home and garden use and she
18   matches them all very closely.  There -- there aren't
19   any red herrings there.  I mean, the default value for
20   application dose is 10 liters of product per hectare and
21   she's 11.22.  Of course, that's based upon the actual
22   number of hectares that she applied the quantity to.
23   You know, everything checks out very, very close to
24   default, so -- which is encouraging and it would suggest
25   that she's not stretching the truth with -- in any way.

Page 63

Page 65

1    Q    My -- well, so to make a credibility
2    determination about what Mrs. Stevick was saying, that
3    is, to test whether what she was saying was true, what
4    you did is you compared what she was saying about her
5    exposures to the POEM model and its assumptions?
6         A    Well, I used her testimony and her information
7    she provided and the actual spray rate of the instrument
8    used as input factors in a home and garden exposure
9    model, and the values throughout the model are very
10   consistent with the suggested default values.  There are
11   no significant deviations.
12        Q    Right.  I'm asking a slightly different
13   question.  The inputs that she gave you through her
14   discussions with you or through her testimony at
15   deposition, how did you determine whether what she was
16   saying was actually true?
17        MR. TRAVERS:  Objection; asked and answered.
18        THE WITNESS:  Well, I, for example, determined
19   the square footage or the actual hectares of her
20   property and looking at aerial photo and street
21   view realized that that's -- she obviously did not
22   treat that entire property, the number of hectare
23   property, but a subset of that, and obtained that
24   information and also used photos to obtain that
25   information.  And -- and even her duration of

Page 66

1  spraying at one hour is consistent with the amount
2  of product that she used and the sprayer device.
3  BY MR. DERRINGER:
4  Q   Let's take a look at page 10 of your report,
5  Exhibit 1. You see on -- well, go back to page 9 just
6  to orient you. You see how these bullet points at pages
7  9 and 10 are from your phone interview with Mrs. Stevick
8  on October 18th?
9  A   Yes.
10  Q   And do you see on page 10 the top bullet point
11  looks like she told you during that conversation that
12  her property's approximately 7,500 square feet? Do you
13  see that?
14  A   I do.
15  Q   Okay. And is that what she told you?
16  A   Is that what she told me?
17  A   Yeah.
18  A   Yeah. I think she was wrong.
19  Q   Okay. But that's what she told you. And then
20  you said at the last bolded sentence here in that bullet
21  point that at her deposition that her
22  property was actually only 5,300 square feet. Do you
23  see that?
24  A   I do.
25  Q   Okay. And I'm wondering what measures you

Page 67

1  took, if any, to determine whether anything else that
2  she told you during her interview with you was, similar
3  to this instance, not correct?
4  MR. TRAVERS: Objection; asked and answered.
5  THE WITNESS: Well, I -- I looked at Google
6  Earth to see if the values she gave me made sense
7  and were proportionally correct.
8  BY MR. DERRINGER:
9  Q   Right. Google Earth wouldn't tell you
10  anything about her frequency of spraying, would it?
11  A   No.
12  Q   And Google Earth wouldn't tell you anything
13  about what on her property she sprayed; correct?
14  A   No. And I had to rely on that as facts in the
15  case. There's -- there's just no way I could ascertain
16  any, you know, historical information to verify those
17  details.
18  Q   Okay. And I -- I know you've given lots of
19  depositions so I figured I didn't have to tell you this,
20  but I do want to remind you that any time you want a
21  break, just let me know. It's not an endurance contest.
22  Medical history, am I right that everything
23  that you considered relevant to your opinion about
24  Mrs. Stevick, that's contained at pages 1 through 8 of
25  your report with respect to her medical history?

Page 68

1  A   Yes.
2  Q   And I meant to ask this earlier, kind of a
3  more general question: Am I right, Dr. Sawyer, that
4  everything you know about Mrs. Stevick that's relevant
5  to your causation opinion regarding Mrs. Stevick is
6  contained in your report, Exhibit 1, and Exhibit 2, the
7  replacement pages?
8  MR. TRAVERS: Objection; vague.
9  THE WITNESS: I would add to that the sprayer,
10  Exhibit whatever.
11  BY MR. DERRINGER:
12  Q   We'll -- we'll mark it in a little bit when
13  you go out and get the sprayer from your car. But it's
14  a fair point so let me ask again then: Am I right that
15  everything you know about Mrs. Stevick that's relevant
16  to your causation opinion regarding Mrs. Stevick is
17  contained in your report, which is Exhibit 1; Exhibit 2,
18  which are the three replacement pages to your report;
19  and the sprayer that you've brought with you today,
20  Mrs. Stevick's sprayer?
21  MR. TRAVERS: Objection; vague, asked and
22  answered.
23  THE WITNESS: Did my answer also include
24  telephone conversations?
25

Page 69

1  BY MR. DERRINGER:
2  Q   Well, that's what I'm asking you. I'm
3  asking -- your -- your report includes a description of
4  a telephone conversation that you had with Mrs. Stevick
5  on October 18, 2018. Did you learn anything in any
6  other telephone conversation with her that you consider
7  relevant to your causation opinion regarding
8  Mrs. Stevick?
9  MR. TRAVERS: Objection; asked and answered.
10  THE WITNESS: Not that I recall that's not
11  already in the report.
12  BY MR. DERRINGER:
13  Q   Okay. So then, again, let me just ask the
14  question. Am I then right that everything you know
15  about Mrs. Stevick that's relevant to your causation
16  opinion regarding Mrs. Stevick is contained in your
17  report, Exhibit 1; Exhibit 2, the replacement pages 23
18  through 25 of your report; and the sprayer that you
19  brought with you today, Mrs. Stevick's sprayer?
20  MR. TRAVERS: Objection; asked and answered.
21  THE WITNESS: Yes.
22  BY MR. DERRINGER:
23  Q   Okay. Let's talk about her medical history
24  briefly. She didn't experience any skin irritations,
25  did she?



Page 70

1 A No, not -- not that she reported.

2 MR. TRAVERS: Before we go into medical

3 history, I actually need a break if that's okay.

4 THE VIDEOGRAPHER: Okay. We're going off the

5 record. The time is approximately 9:46 a.m.

6 (Short recess.)

7 THE VIDEOGRAPHER: We're back on the record.

8 The time is 10:02 a.m. This begins Media Unit

9 No. 2.

10 THE WITNESS: If it's okay, on your last

11 question I was thinking, I think I said video as

12 other evidence, but also there were photos and I

13 think I told you Google Earth. But there were

14 really three things: videos, photos, Google

15 Earth were the additional items.

16 BY MR. DERRINGER:

17 Q And this question you're -- you're referring

18 to now is -- was my question regarding whether Exhibit

19 1, Exhibit 2, and the sprayer constitute -- well, strike

20 that.

21 Okay. Then am I right that everything you

22 know about Mrs. Stevick that's relevant to your

23 causation opinion regarding Mrs. Stevick is contained in

24 your report, which is Exhibit 1; the replacement pages,

25 which is Exhibit 2; the sprayer that you brought with

Page 71

1 you today, Mrs. Stevick's sprayer; a video of Mrs. or

2 Mr. Stevick that you reviewed --

3 A Videos actually.

4 Q -- videos; photos that you reviewed; and your

5 view of Google Earth of her property? Is that right?

6 A Yes.

7 Q Okay. And what did the photos depict?

8 A As I recall, the driveway, the mulched zone

9 along the driveway with various vegetation, and just

10 other aspects of the yard.



Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 22 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/23/19 Page 22 of 79
Confidential - William R. Sawyer, Ph.D.

Page 78

1 what --
2    A    Generally an oncologist would be the
3 appropriate physician.  But the fact that it did make it
4 to the brain is, of course, a very serious metastatic
5 site that can result in death.
6        (Sawyer Exhibit No. 4 was marked for
7    identification.)
8 BY MR. DERRINGER:
9    Q    Let's take a look at what I've marked as
10 Sawyer Exhibit 4.  Exhibit 4 is actually a compilation
11 of two different web pages.  You can -- you can see that
12 this first one is from the lymphoma.org website titled
13 "About Lymphoma."  Do you see that?
14    A    Yes.
15    Q    And then if you go a few pages in, there's
16 another web page, it's from the same website also titled
17 "About Lymphoma."  Do you see that?
18    A    Yes.
19    Q    And the first one just discusses non-Hodgkin
20 lymphoma and the second one discusses diffuse large
21 B-cell lymphoma.  Do you see that?
22    A    That's right.
23    Q    Okay.  And on the first page of Exhibit 4, you
24 don't have any reason to disagree with what's written
25 here from the lymphoma.org organization kind of towards

Page 79

1 the bottom under Classifications of NHL where it says
2 that B-cell lymphomas develop from abnormal B-cells and
3 account for about 85 percent of all non-Hodgkin's
4 lymphomas?  You don't have any reason to dispute that,
5 do you?
6    A    No.
7    Q    And DLBCL is a subset of B-cell lymphoma?
8    A    Yes.
9    Q    Okay.  And if you go over to the
10 second-to-last-page of this exhibit, this is from the
11 website lymphoma.org, now we're discussing diffuse large
12 B-cell lymphoma.  Do you have any reason to dispute
13 what's written here, which is that diffuse large B-cell
14 lymphoma is the most common type of non-Hodgkin lymphoma
15 in the United States and worldwide?
16    A    Did you say primary DLBCL?
17    Q    No, no, no.  I'm just reading what's written
18 here.  I'm asking whether you have any --
19    A    I just didn't see that spot.  I'm sorry.
20    Q    Yeah.  No; that's okay.  Do you have any
21 reason to dispute that diffuse large B-cell lymphoma is
22 the most common type of non-Hodgkin lymphoma in the
23 United States and worldwide?
24        MR. TRAVERS:  I think you're on the wrong
25    page.

Page 80

1        MR. DERRINGER:  Oh.  Jeff, thank you.
2    Appreciate that.
3    BY MR. DERRINGER:
4    Q    It's -- it's the second-to-last page.  It's
5 titled -- oh, you know what, there's something written
6 on that very last page.
7    A    Oh, yeah.
8    Q    So that's why you were there.  My apologies,
9 Dr. Sawyer.  If you go to the third-to-last page, the
10 one that's titled "About Lymphoma" and then has a
11 subtitle of "Diffuse Large B-Cell Lymphoma."  Are you
12 there?
13    A    Yeah.
14    Q    Do you have any reason to dispute that diffuse
15 large B-cell lymphoma is the most common type of
16 non-Hodgkin lymphoma in the United States and worldwide?
17    A    No.  I'm just thinking of SEER registry
18 incidents which I -- I have reviewed in this case and I
19 believe that's true.
20    Q    Okay.
21    A    I don't have any reason to dispute it.
22    Q    Let's take a look at the SEER registry.
23        (Sawyer Exhibit No. 5 was marked for
24    identification.)
25

Page 81

1    BY MR. DERRINGER:
2    Q    I've put in front of you Exhibit 5.  Exhibit 5
3 is a web page.  You can see the address on the bottom
4 left.  It's from seer.cancer.gov/statfacts.  And this
5 one relates to diffuse large B-cell lymphoma.  Do you
6 see that?
7    A    Yes.
8    Q    Do you -- first of all, do you agree, sir,
9 that your risk for developing diffuse large B-cell
10 lymphoma increases with age?
11    A    Absolutely.
12    Q    And do you see here that the five-year
13 survival rate, according to the SEER data, for people
14 who were diagnosed with diffuse large B-cell lymphoma is
15 almost 63 percent?
16    A    No, I don't see that.
17    Q    Sure.  If you look at the bottom right --
18    A    Oh, there we go.  I was looking at the
19 graphic.  I'm sorry.
20    Q    No problem.  You can look at whatever you'd
21 like to in whatever exhibit I put in front of you.
22    A    Okay.
23    Q    But do you see here that the SEER data
24 reflects that the five-year survival rate for people
25 diagnosed with diffuse large B-cell lymphoma is nearly

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 23 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 23 of 79
Confidential - William R. Sawyer, Ph.D.



Page 82

1  63 percent?
2      A   Yes.
3      Q   Okay.  And you have no reason to disagree with
4  that, do you?
5      A   No, no.  This is SEER registry data.
6      Q   Yep.
7      A   It's fairly accurate.
8      Q   And Mrs. Stevick actually has -- has a type of
9  B-cell lymphoma referred to as primary CNS lymphoma?
10     A   Yes.
11     Q   Okay.  And is it your understanding that
12  primary CNS lymphoma is counted in the DLBCL data of the
13  SEER database?
14     A   It is.  But I caution you that what we
15  normally do is look at more specific SEER data for that
16  subtype to -- to weed it out because different sites can
17  vary quite a bit with respect to survival rates.
18     Q   Did you look for more specific SEER data for
19  primary CNS lymphoma in the SEER database?
20     A   I did with respect to new cases, but survival
21  rates is not part of my assessment.
22     Q   Okay.
23     A   I would defer that to other experts.
24     Q   And did you find more specific data in the
25  SEER database regarding primary CNS lymphoma?  I know

Page 83

1  you said you looked for it.  Did you find it?
2      A   I believe so, yeah.
3      Q   Okay.  When you reported at page -- I think
4  you said it was --
5      A   28, was it?
6      Q   Was it 28?  Let's take a look.
7          Yeah, you're correct.  When you reported your
8  SEER registry data at page 28 of your report, that's a
9  distribution of new cases by population and age of
10  B-cell lymphoma.  Do you see that?
11     A   Yes.
12     Q   Okay.  Why didn't you include whatever you
13  found from the SEER database, whatever that might have
14  been, I don't know what it was, but whatever you might
15  have found in the SEER database about primary CNS
16  lymphoma in your report?
17     A   I don't recall there being any graphic or
18  sufficient data to actually use.
19     Q   And -- and any sufficient data of any kind
20  regarding primary CNS lymphoma to use in your assessment
21  of Mrs. Stevick's DLBCL; is that what you mean?
22     A   Well, I know there wasn't any graphic that I
23  could use.

Page 84

24     Q   What are the known risk factors -- well, let
25  me -- let me ask it differently because I think you've

Page 85

1  given a number of depositions on this so I just want to
2  review.  Ionizing radiation is a known risk factor for
3  DLBCL; is that right?
4      A   That's correct.
5      Q   Okay.  And that would include UV radiation;
6  right?
7      A   Yes.
8      Q   Okay.  Suppression of the immune system,
9  that's a known risk factor for DLBCL; correct?
10     A   That's a biggie.
11     Q   Benzene is a known risk factor for DLBCL?
12     A   Legally, no.  But, yeah, it is.  The courts
13  only -- the courts only accept the ml so -- even though
14  there's a wealth of studies showing it.  So...
15     Q   Is it -- is it your opinion that benzene is a
16  known risk factor for DLBCL?
17     A   I'm sorry?  I didn't understand.
18     Q   Is it your opinion -- forget about what the
19  courts say.  I'm asking about your opinion.  Is it your
20  opinion that benzene is a known risk factor for DLBCL?
21     A   That has -- yes, it's been established in
22  human epidemiologic data, studies.
23     Q   What about chlorambucil; is that a known risk
24  factor for DLBCL?
25     A   Absolutely.

Page 86

1    Q   What about lindane; known risk factor for
2  DLBCL?
3    A   Breast cancer; yes.  NHL I think so, but I --
4  I'd want to just verify that with the studies.  It's
5  been a while since I've actually researched the studies
6  on lindane.  That dates all the way back to Mission,
7  Texas, on a case I worked on.
8    Q   Okay.  What about 1,3-Butadiene?
9    A   1,3-Butadiene.
10    Q   -diene.  Thank you.
11       Is that a known risk factor for DLBCL?
12    A   You know, the studies on 1,3-Butadiene are, as
13  I recall, general for lymphatic and lymphohematic --
14  lymphopoiet -- lymphopoietic malignancies in general.  I
15  don't recall the studies specifically stating NHL, but
16  that would be included in the subgroup.  So the answer I
17  think is yes.  It's just I -- I can't guarantee that
18  you're going to find NHL segregated by itself.
19    Q   Is wood dust a known risk factor for DLBCL?
20    A   It is.
21    Q   Halocarbon impurities, such as dioxin, are
22  those known risk factors for DLBCL?
23    A   Dioxins, absolutely.
24    Q   What about hair dyes, are those a known risk
25  factor -- use of hair dyes; a known risk factor for

Page 87

1  DLBCL?
2    A   I'm trying to think what chemicals in hair
3  dyes would be present.  You know, hair dyes is too
4  general to actually offer a causation opinion.  In other
5  words, if -- if you approached me as a -- as an attorney
6  and said, look, my -- my client was overexposed to hair
7  dyes for 50 years, I'd say I need to know what chemicals
8  are in there to evaluate that in dose.  I -- it's just
9  too general of a question.
10    Q   Yeah.  Have you -- did you do anything to ask
11  Mrs. Stevick or to inquire or determine whether
12  Mrs. Stevick used hair dyes?
13    A   I did not.
14    Q   Okay.  All right.  I think you talked about
15  this before.  Mecoprop, that's been determined to be a
16  known risk factor for DLBCL; is that right?
17    A   Yes.
18    Q   And also 2,4-D also determined to be a known
19  risk factor for DLBCL?
20    A   Oh, yes.
21    Q   What about methylene chloride; has that been
22  determined to be a known risk factor for DLBCL?
23    A   Methylene chloride has never really made it to
24  the human carcinogen list.  You know, trichlorethylene
25  we know induces renal cancer and cancer at several

Page 88

1  sites, but methylene chloride is still considered a -- a
2  B2 animal carcinogen.  So we're really restricted on --
3  on animal evidence with respect to that chemical.
4    Q   And since you're restricted to animal
5  evidence --
6    A   What I mean is I'm not -- I'm not familiar
7  with human evidence that I can recall.  And it's
8  possible.  I just can't recall it.
9    Q   Why -- why is it important for you to know
10  whether there's human evidence of a causal association
11  between methylene chloride and DLBCL before you're able
12  to testify today as to whether methylene chloride is a
13  known risk factor for DLBCL?
14    A   Well, because, unless I'm incorrect on this, I
15  believe that methylene chloride is still considered to
16  be not carcinogenic to humans.
17    Q   Who -- who considers that?  Who -- whose
18  opinion is that?
19    A   US EPA, IARC primarily.
20    Q   Okay.  And you rely on their opinions about
21  that?
22    A   In part.



Page 89





Page 94

Page 96

22    MR. TRAVERS:  Objection; form.

Page 95

1    BY MR. DERRINGER:
2    Q

Page 97

Page 98

1 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
2 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
3 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉
4    A    Yes.  On the phone I did ask her to go through
5 her occupational history, and it was completely negative
6 of using any chemicals.  She is -- it's not her line of
7 work.  She never worked in any industry with any type of
8 chemical exposures.
9    Q    Did -- did you -- when you asked her these
10 questions and you had this conversation with her, did
11 you actually call out particular product names to her,
12 not chemicals but product names, and ask her whether she
13 used it or whether Chris used it?
14    A    I think so, but I -- I don't want to answer
15 yes because I'm not a hundred percent sure.  I think I
16 asked her about benzene, trichlorethylene, and solvents,
17 but I -- I don't remember for sure.
18    Q    Yeah, my question was different.  I asked you
19 whether you asked her -- when you were discussing her
20 prior exposure with her, did you ask her about
21 particular product names, not chemicals, in those
22 products.
23    A    I did.  And I'm looking because she did point
24 out one -- one other chemical.
25    Q    What page in your report are you on?

Page 99

1    A    I'm on page 10.
2    Q    Okay.  What are you referring to?
3    A    There's another garden chemical she used that
4 she told me about.  And I know it's in my report, I'm
5 just trying to figure out where, because I asked her
6 what chemicals she has used in the past.  I think it
7 was, as I recall -- it is in my report, but I think it's
8 a -- it was a product using for -- in roses or some darn
9 thing.
10    Q    Take a look at page 15 of your report.  See
11 the second paragraph on the top of page 15?  Does that
12 refresh your recollection about another garden chemical
13 that she used?  Is this what you're referring to or is
14 this something else?
15    A    Yeah, yeah.
16    Q    What's the other garden chemical that she
17 used?
18    A    Weed and Feed.
19    Q    Okay.  And what's in Weed and Feed?
20    A    When Weed and Feed is used in the garden, her
21 husband applies it now.
22    Q    Well, it says her husband now applies it.  You
23 understand that there was a period of time before 2014
24 that Mrs. Stevick applied Weed and Feed; correct?
25    A    Yes.

Page 100

1    Q    Okay.  And what chemicals are in Weed and
2 Feed?
3    A    Well, it was the Weed and Feed for use in her
4 garden.  I need to look it up.
5    Q    Okay.  You didn't look it up before rendering
6 your opinion in Mrs. Stevick's case and turning in the
7 report on November 20 --
8        MR. TRAVERS:  Objection to form.
9 BY MR. DERRINGER:
10    Q    -- 2018; is that right?
11    A    I think I -- I think I did, but I don't
12 remember what it was.
13    Q    It's not reflected in your report whatever
14 chemicals are --
15    A    No.  I didn't -- I didn't find it significant.
16    Q    Okay.  You said you looked at some pictures.
17 Can you describe what's generally in the pictures that
18 you looked at?
19    A    Yeah, just the photos, for example, a box of
20 containers that she used with respect to applying her
21 Roundup.  There was the cylindrical pump sprayer and a
22 prepackaged Roundup jug with a thin hose and the pump
23 handle with no nozzle.  As I recall, there were some
24 measurement cups or something in a box, a picture of the
25 garage with various tools and junk, a picture of her

Page 101

1 driveway, picture of her row of plants with mulch around
2 them, a picture of, as I recall, a partial patio, and
3 just area -- just different aspects of her yard.
4    Q    Anything else you remember being depicted in
5 the pictures that you reviewed?
6    A    No.
7        (Sawyer Exhibit No. 6 was marked for
8 identification.)
9 BY MR. DERRINGER:
10    Q    I'm showing you what I've marked as Sawyer
11 Exhibit 6.
12        MR. DERRINGER:  There you go, Jeff.
13 BY MR. DERRINGER:
14    Q    This is one of the pictures from
15 Mrs. Stevick's garage.  Have you seen this before?
16    A    Yeah.  And I think that lower shelf is what I
17 described as junk.
18    Q    Okay.  What's on the upper shelf?
19    A    Primarily paints.
20    Q    And you understand that when they bought the
21 house, "they" being Mrs. Stevick and her husband, they
22 did a full house restoration, they like stripped it down
23 to its core and then rebuilt it?
24    A    Yes.
25    Q    Okay.  And that was back in 1989; right?  You

Page 102

1  can look at page 10 of your report if you want to refer
2  to what you wrote, but that's I think what you reflected
3  in your report.
4     A   Yes.  March, purchased in March.  Okay.
5     Q   Yeah.  And then it says -- you wrote:  The
6  house needed restoration.  It was built over a hundred
7  years ago; right?
8     A   Yeah; 1800s.
9     Q   Yeah.  And did you ever see any pictures from
10  Mrs. Stevick or her husband of the restoration in
11  process?
12     A   No.
13     Q   And it -- it took at least two months, right,
14  to do the restoration?
15     A   Well, that would be speculation.  I don't
16  know.
17     Q   I actually think you're right.  What you write
18  here is that "The house needed restoration and it was
19  over two months after the purchase of the property
20  before they could move into it."  You see that?
21     A   Yeah, yeah.  But I --
22     Q   So --
23     A   -- I don't know how long it took to finish.  I
24  mean, it could have been a year.  It could have -- I
25  don't know.

Page 103

1     Q   Right.  You don't know if it was done by the
2  time they moved in, do you?
3     A   No, no.
4     Q   And what -- actually, do -- do you know that
5  it wasn't done when they moved in?
6        MR. TRAVERS:  Objection; form.
7        THE WITNESS:  I don't know either way.
8     BY MR. DERRINGER:
9     Q   Okay.  You mentioned in here that her husband
10  did most of the work while she helped.  Then you write
11  in your report:  "This included demolishing lath..."
12  What is that?
13     A   Well, in the older 1800 houses, ceilings had
14  thin strips with a slight gap between them in which
15  plaster was then scraped into those grooves, which kept
16  it from falling back off the wood onto the ground.
17     Q   And scrapping paint, you see that, that
18  would -- that would require the use of paint strippers;
19  right?  Scrapping paint being something that they did
20  during the restoration process as reflected in your
21  report, that would require the use of paint thinners --
22  I'm sorry -- paint strippers; correct?
23     A   Probably not.  I mean, indoor restorations
24  involve scraping loose paint.  Because of the walls
25  being made of nonmetal, it's not possible to use paint

Page 104

1  stripper as it would destroy the underlying wall.  So
2  probably no stripped paints -- no significant use of
3  paint strippers.
4     Q   Did you -- did you ask Mr. or Mrs. Stevick
5  about that?
6     A   No, I did not.  But I --
7     Q   Okay.
8     A   -- do know that -- you know, I've restored
9  automobiles and antique cars as a hobby.  I mean, I --
10  I've worked with strippers.  They're not made to put on
11  a drywall or old lath ceilings made out of plaster.  I
12  mean, they're just -- it wouldn't work.
13     Q   Right.  Yeah.  I -- I read in another
14  deposition you gave some time ago about a project you
15  did I think with your son in the 1990s where you
16  restored a car --
17     A   Oh, yeah.
18     Q   -- is that right?
19     A   Yeah; a Buick Super.  Yeah.
20     Q   Yeah.
21     A   It was quite a car.
22     Q   And you stripped paint off the car there;
23  right?
24     A   Yeah.
25     Q   Yeah.  And you used a respirator there?

Page 105

1     A   Certainly did.
2     Q   Yeah.  When you write that -- that her husband
3  did most of the work while she helped, what you mean
4  there is she helped -- the things she helped with
5  included demolishing lath and plaster walls, scrapping
6  paint, and sanding floors; is that right?
7     A   Yes.
8     Q   Okay.  And if you look at Exhibit 6, the
9  picture --
10     A   Yes.
11     Q   -- do you know whether any of the products on
12  that top shelf were used during the house restoration
13  process?
14     A   No.
15     Q   Okay.  You didn't ask Mrs. Stevick about that?
16     A   No.
17     Q   Okay.
18        (Sawyer Exhibit No. 7 was marked for
19  identification.)
20     BY MR. DERRINGER:
21     Q   I'm handing you Exhibit 7.  This is also a
22  picture that depicts the Stevicks' garage.  Have you
23  seen this before?
24     A   Probably.  I -- I don't recall the specific
25  picture.

Page 106

1    Q.  Okay.  Well, if you don't recall the specific
2  picture, what makes you say that you probably saw it
3  before?
4    A.  Because I looked at a lot of photos and if it
5  was in the set, I probably looked at it.
6    Q.  Okay.
7    A.  There's -- you know, these are chemicals I'm
8  familiar with.  I've testified on a WD-40 case.  I know
9  the ingredients in it.  I know the ingredients in GUNK.
10  I mean, these are --
11    Q.  Benzene is an ingredient in GUNK; right?
12    A.  No, it is not.
13    Q.  Benzene is not in GUNK, the -- the --
14    A.  It's less than .1 percent.
15    Q.  Okay.  I'm just asking in Exhibit 7 in the
16  middle, you see the aerosol spray of the product GUNK;
17  right?
18    A.  I do.
19    Q.  Okay.  And is it your testimony that there's
20  no benzene in that bottle of GUNK?
21    A.  I didn't say that.  I said look at the MSDS.
22  It's less than .1 percent.
23    Q.  Okay.
24    A.  There's no way with a product of less than
25  .1 percent in the liquid a person is going to reach part

Page 107

1  per million levels in the air that's going to cause NHL.
2    Q.  Did you ask Mrs. Stevick about whether she
3  ever used GUNK?
4    A.  No.  It was not necessary because it's
5  irrelevant.
6    Q.  What -- you mentioned that you have testified
7  in these kinds of cases, you know, about a lot of
8  products that are in the garages.  What -- what products
9  in Mrs. Stevick's garage did you identify that have
10  benzene in them, any level of benzene?  And I'm not just
11  talking about this picture, although you should
12  certainly use the picture for reference if you'd like.
13  I just mean generally based on your review of her --
14    A.  None of these products contain benzene at a
15  level that is less than .1 percent.
16    Q.  Okay.
17    A.  In fact --
18    Q.  Do any of them contain --
19    A.  -- much of them are less than .01 percent.
20    Q.  Do any of the products -- and I'm not just
21  talking about what's in this picture, Exhibit 7.  What
22  products did you identify, if any, in Mrs. Stevick's
23  garage that had any level of benzene in them?
24    A.  Yeah, none -- nothing less than -- nothing
25  greater than .1 percent.

Page 108

1    Q.  What did you identify in Mrs. Stevick's
2  garage, what products, that had benzene at a level that
3  is more than zero but less than .1 percent?
4    A.  Possibly WD-40; possibly GUNK; possibly the
5  CRC Lectra cleaner, although that's primarily a
6  fluorocarbon -- fluoro halocarbon gas.  The Armor All is
7  zero, the two Armor Alls in the back row.  And the
8  expansion foam is zero.  The Scotch Super Adhesive,
9  zero.  The cleaning duster is simply an inert gas.  And
10  that little can in the middle with a yellow label, I'm
11  not sure what that is.
12    But I identified nothing that contained any
13  significant concentration of benzene that could raise
14  the air level to even a measurable level and certainly
15  not into the PPM level.  And even if it were at the PPM
16  level, she would have to have years' worth of exposure
17  at that level and she wasn't in the garage years at a
18  time.  She was only occasionally in the garage.  It's
19  just ridiculous to insinuate that any of these chemicals
20  contained enough benzene to have any relevance.  And I
21  can -- I can demonstrate that mathematically.
22    Q.  Did you take an inventory, Dr. Sawyer, of all
23  of the different products that are in the Sawyers'
24  garage?
25    A.  I know what's in my garage.

Page 109

1    Q.  We'll talk about that in a different
2  deposition perhaps, but I'll ask a different question.
3  Thank you for clarifying that for me.
4    Did you take an inventory of all the products
5  that are in the Stevicks' garage?
6    A.  I didn't take a written inventory.  I just
7  reviewed the photos looking for something that could
8  possibly contain a significant quantity of a carcinogen,
9  especially one that could induce NHL, and I found none.
10    Q.  And do you believe that you've reviewed all of
11  the photos -- well, strike that.
12    Do you believe that the photos you've reviewed
13  identify all of the products that are contained in the
14  Stevicks' garage?  And I'm not talking about the two
15  photos that you have in front of you as Exhibits 6 and
16  7.  You mentioned that you reviewed photos of their
17  garage.
18    A.  Yes.
19    Q.  Do you believe that the photos that you
20  reviewed of the Stevicks' garage allowed you to identify
21  every product or every item that is contained in the
22  Stevicks' garage?
23    A.  No.
24    Q.  You never visited their garage; correct?
25    A.  No.  It's -- again, it's possible I may do so,

Page 110

1 but I can't answer that because I don't know if it would
2 be appropriate in this case.
3    Q    Well, I -- I'm just talking about up until
4 today, you've never set foot in the Stevicks' garage;
5 correct?
6    A    No.
7    Q    I'm -- I'm correct about that?
8    A    No, no, you're correct.
9    Q    Okay.
10       (Sawyer Exhibit No. 8 was marked for
11    identification.)
12 BY MR. DERRINGER:
13    Q    Let me show you Exhibit 8.  This is another
14 photo depicting part of the Stevicks' garage.  Have you
15 seen this photo before?
16    A    Well, it's -- it's essentially the same as
17 Exhibit No. 7, just a different angle.
18    Q    Yeah.  Have you seen this photo before,
19 Exhibit 8?
20    A    I don't remember.
21    Q    Okay.  You mentioned when you were talking
22 about Exhibit 7 there's some bottle -- some product with
23 a yellow line on it.  Does Exhibit 8 allow you to
24 identify that product?
25    A    Oh, yeah.  That's Liquid Wrench, GUNK.

Page 111

1    Q    Yeah.  There's benzene in Liquid Wrench;
2 correct?
3    A    Less than .1 percent.
4    Q    You also see -- hold on a second.  If you look
5 at Exhibit 7 --
6    A    Okay.
7    Q    -- you see that red canister, CRC, it says
8 "Lectra"?
9    A    Yeah.  I -- I --
10    Q    Do you know what that is?
11    A    I already talked about that, yeah.  That's an
12 electrics -- an electric parts cleaner used on tuners
13 and that type of thing and -- that contains a propellant
14 and chlorofluorocarbons used to clean electronic parts.
15 And it doesn't leave any residue.  It's just immediately
16 dry.
17    Q    Does it contain tetrachlorethylene?
18    A    Yes.  And tetrachlorethylene is a suspected
19 animal carcinogen without sufficient human evidence and
20 is not a human carcinogen, according to NTP, US EPA, and
21 IARC.
22    Q    Do you know what percentage of Lectra-Motive
23 is tetrachloroethylene?
24    A    Pretty high percent because that -- it's
25 highly volatile and it dries flashes without a -- a

Page 112

1 residue.
2    Q    Greater than 95 percent?
3    A    It could be.  It's pretty high, I know that,
4 but it's not a -- not a chemical that's going to cause
5 NHL.
6    Q    Did you ever ask for anyone, Stevicks or
7 anyone else, to provide you with a full list of all of
8 the products that are contained in their garage?
9    A    No.
10    Q    Have you ever seen a full list of all of the
11 products contained in the Stevicks' garage?
12    A    No, I have not.
13    Q    Was Mrs. Stevick exposed in any way, to your
14 knowledge, to other things that you consider
15 carcinogenic with respect to developing lymphoma besides
16 the glyphosate that -- that you've discussed in your
17 report?
18    A    The only thing I can find is Roundup.



Page 113



Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 31 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 31 of 79
Confidential - William R. Sawyer, Ph.D.



Page 114

Page 116

1   A   I did.  And the only thing she --
2   Q   What product?
3   A   -- she told me was the Weed and Feed.
4   Q   Okay.  Did you ask her about any of the
5   products that we've seen in Exhibits 6, 7, and 8?
6       MR. TRAVERS:  Objection; asked and answered.
7       THE WITNESS:  Yes.
8   BY MR. DERRINGER:
9   Q   Which products did you ask Mrs. Stevick about
10  specifically?
11  A   I asked her if she used any solvents, and I
12  think I asked her specifically chemicals, solvents with
13  benzene in it or trichlorethylene, as I recall, but the
14  answer was negative.
15  Q   Did you make any attempt to quantify
16  Mrs. Stevick's exposure to 2,4-D?
17      MR. TRAVERS:  Objection; asked and answered.
18      THE WITNESS:  Yes.
19  BY MR. DERRINGER:
20  Q   Tell me about that attempt.
21  A   I asked her and she explained that when they
22  bought this house, it was heavily overgrown was her
23  words, that -- that there were weeds that were knee deep
24  or waist high, that it was -- had been let go.  And she
25  explained it was very overgrown and she used Roundup,

Page 115

Page 117

1   not 2,4-D, and -- and that she had to do for the first
2   several months more than one -- one treatment a month to
3   try to get it under control.
4   Q   Did you ever ask her -- well, let me strike
5   that.
6       I'm trying to find out if you ever quantified
7   her exposure to 2,4-D.
8   A   There was no significant exposure to 2,4-D
9   based on my questioning.
10  Q   Okay.
11  A   There was nothing to quantify.
12  Q   Did you ever quantify Mrs. Stevick's exposure
13  to mecoprop?
14  A   No.  There was no significant mecoprop
15  exposure.
16  Q   How do you know that?
17  A   Because all she used was Weed and Feed.
18  Q   Is that the basis, the entire basis, for your
19  opinion that there was no significant mecoprop exposure?
20  A   Based on my questioning, I was not informed by
21  her of any such exposure.
22  Q   Okay.  And, similarly, your opinion that she
23  was -- she did not have any significant exposure to
24  2,4-D is the -- well, what's the basis for that opinion?
25  A   That she explained she used glyphosate, not

20  Q   What did you ask her about that?
21  A   And she told me that her husband had, you
22  know, paints and things in the garage that he's used,
23  but she didn't use those -- those products.
24  Q   Did you ask her about any other product and
25  her use of that product outside of paints and things?

Page 118

1  2,4-D.

2    Q    Okay.  Did she actually say she didn't use

3  2,4-D or is that your conclusion based on her telling

4  you that she used glyphosate?

5    A    No.  I asked her about 2,4-D.

6    Q    Do you know --

7    A    And I -- and I even asked her if she used it

8  prior to the 1970s.

9    Q    And when you say that you asked her if she

10  used 2,4-D, those were the words you used, you -- you

11  actually referenced that chemical?

12    A    I did say it.  I said -- I made a reference

13  that 2,4-D contained a certain contaminant prior to the

14  1970s that I want to know about.  Did you use 2,4-D?

15  And she said no.

16    Q    Okay.  What did you do to quantify

17  Mrs. Stevick's exposure to wood dust?

18    A    Asked her what her hobbies were and she had no

19  hobbies that involved wood dust.  The only wood dust was

20  during her phase of construction.

21    Q    What did you do to quantify her exposure to

22  wood dust during that phase of construction?  You're

23  talking about the rehab of her house; right?

24    A    Correct.

25    Q    Okay.  What did you do to quantify

Page 119

1  Mrs. Stevick's exposure to wood dust during the

2  rebuild -- the rehab of her house?

3    A    Just noted that she did -- you know, was

4  involved in the remodeling of the home, and certainly

5  there was some wood dust exposure for a brief period of

6  time.

7    Q    Did you do anything else to quantify that

8  exposure?  Or strike that.

9        Did you do anything to quantify that exposure?

10    A    No, because I -- I know from my prior review

11  and knowledge of the generally accepted peer-reviewed

12  literature that, number one, there are certain types of

13  wood dust that are associated with human malignancy;

14  and, number two, it requires chronic either industrial

15  or hobby exposure, not just a -- a single episode

16  remodeling a house.

Page 120

16    Q    What --

17    A    -- before they build up enough millirem to

18  show any statistically increased risk of any type of

19  radiological malignancies.

20    Q    What studies are you referring to by name?

21    A    I -- I can't give the authors' names, but I'm

22  intimately familiar with them and I -- I could even

23  produce them.

24    Q    Are they on your reliance list?

25    A    No, because I -- I'm familiar with them from

Page 121

1  my professional work and training.  And primarily the --

2  the studies for adults I reference are the nurses

3  studies, the dental practitioner studies.  Probably I

4  would not use the children's studies because the

5  sensitivity differences would really disqualify the use

6  of those studies.

7    Q    Did Mrs. Stevick use any kind of head

8  protection when she was exposed at work to ionizing

9  radiation?

10    A    I believe she did have a leaded collar which

11  prevents those nodes from being exposed.

12    Q    What about the rest of her head; any

13  protection that you're aware of?

14    A    No, no.  I mean, no, there was no other upper

15  head, you know, protection.

16        (Sawyer Exhibit No. 9 was marked for

17  identification.)

18    BY MR. DERRINGER:

19    Q    Let me show you what I've marked as Exhibit 9.

20  This is taken from the website of the American Cancer

21  Society.  You see that this is a discussion of

22  non-Hodgkin lymphoma risk factors?

23    A    Yes.  Yeah, I -- I do.

24    Q    And do you agree with the American Cancer

25  Society that getting older -- this is under Age on the

| Page 122 | Page 124 |
|---|---|

**Page 122**

1  first page -- getting older is a strong risk factor for
2  lymphoma overall?
3     A   Well, yeah.  I already presented that at page
4  20 of my report.  I even included a graphic showing
5  that.  Of course.
6     Q   And do you see -- do you agree with the
7  American Cancer Society that most cases of lymphoma
8  occur in people in their 60s or older?
9     A   I think that's very general.  I would prefer
10  to use my SEER registry graphic that is more accurate on
11  page 28.  And it's not a matter of just being 60s.  It's
12  a matter of being 45 to 54 or even 35 to 44 or even 65
13  to 74.  It's an increasing risk with age.  It's not just
14  60-year-olds.
15     Q   So you disagree with the statement of the
16  American Cancer Society that most cases of non-Hodgkin
17  lymphoma occur in people in their 60s or older?
18        MR. TRAVERS:  Objection; form.
19        THE WITNESS:  No.  I agree with that.  I --
20  I'm just explaining that that is a very generalized
21  statement when, in fact, I have in black and white
22  or green and white in my report the actual
23  percentiles.
24        (Sawyer Exhibit No. 10 was marked for
25  identification.)

**Page 124**

22     Q   Now, Mrs. Stevick, she's not a farmer, is she?
23     A   No.
24     Q   She's never been a farmer; is that right?
25     A   No.  She's a home garden user.

**Page 123**

1     BY MR. DERRINGER:
2     Q   Let me show you Exhibit 10.  Exhibit 10 is
3  taken from the website of the Leukemia & Lymphoma
4  Society.  And under General Information -- well, first
5  you see that this page refers to CNS lymphoma?
6     A   I do.
7     Q   That's the type of lymphoma that Mrs. Stevick
8  was diagnosed with?
9     A   Yes.
10     Q   Okay.  And under General Information, the
11  third paragraph, the Leukemia & Lymphoma Society writes
12  that:  "Central nervous system lymphoma is more common
13  in men than women.  The median age of diagnosis is
14  55..."
15        Do you see that?
16     A   Yes.
17     Q   And you have no reason to disagree with that,
18  do you?
19     A   No.  That's correct.

**Page 125**

1     Q   Right.  She's never been a farmer?
2     A   No.
3     Q   And her use of Roundup, her use of glyphosate,
4  that's not part of her occupation, it's not what she did
5  for a living; right?
6     A   No.  She's a home garden user.
7     Q   Okay.  You agree that she did almost no mixing
8  or loading of glyphosate with water or with anything
9  else; is that right?
10        MR. TRAVERS:  Objection; form.
11        THE WITNESS:  I don't understand the
12  "anything" part.
13     BY MR. DERRINGER:
14     Q   Okay.  Do you agree that Mrs. Stevick did
15  almost no mixing and loading of glyphosate?
16        MR. TRAVERS:  Objection; form.
17        THE WITNESS:  No.  I -- I would rather
18  quantify that and say only about 10 percent.
19     BY MR. DERRINGER:
20     Q   Okay.  In your report at page 9, you write
21  that her husband carried out the majority of the mixing
22  of the Roundup with water per the directions on the
23  bottle.  Do you see that?
24     A   Yes.
25     Q   Okay.  And you stand by that today; right?

Page 126

1    A    Yes.
2    Q    Okay.  And you recall at her deposition she
3  testified that the mixing and the loading of the
4  glyphosate was her husband's job.  Do you remember that?
5        MR. TRAVERS:  Objection; form,
6  mischaracterizes her testimony.
7        THE WITNESS:  Again, I refer you to the
8        10 percent figure.
9  BY MR. DERRINGER:
10    Q    Okay.  But you would rely on whatever it was
11  Mrs. Stevick said in her deposition about whether the
12  mixing and the loading of glyphosate was her husband's
13  job; right?
14        MR. TRAVERS:  Objection; form,
15  mischaracterizes her testimony.
16        THE WITNESS:  No.  I -- I would say
17        10 percent.  That's the information I -- I derived
18        from the phone interview and is consistent actually
19        with her deposition.
20  BY MR. DERRINGER:
21    Q    Okay.  And so you would not rely on what
22  Mrs. Stevick said in her deposition about who did the
23  mixing and loading of the glyphosate and how often they
24  did it?
25        MR. TRAVERS:  Objection; form.

Page 127

1        THE WITNESS:  No, I didn't say that.  I said
2        that the 10 percent figure is consistent with the
3        deposition.
4  BY MR. DERRINGER:
5    Q    Okay.  At that deposition you recall that she
6  said she may have mixed it a few times, but she couldn't
7  really recall?
8        MR. TRAVERS:  Objection; form.  If we're
9        asking about specific questions from her
10        deposition, we need to put the transcript in front
11        of him.
12  BY MR. DERRINGER:
13    Q    I'm asking what you recall.  If you don't
14  recall that, you don't recall it.
15        MR. TRAVERS:  And PTO7 says if you're going to
16        ask questions from a document, you have to give it
17        to the witness.  And you're asking questions from
18        the transcript so you have to give it to the
19        witness if you're asking specific quotes.
20        MR. DERRINGER:  We can take the time to do
21        that, Jeff, if you'd like.
22        MR. TRAVERS:  I would like.
23        (Sawyer Exhibit No. 11 was marked for
24        identification.)
25

Page 128

1  BY MR. DERRINGER:
2    Q    Sir, I'm handing you what's been marked as
3  Exhibit 11.  This is a transcript of Elaine Stevick's
4  deposition given in this matter Friday, November 9,
5  2018.  You testified you reviewed the entirety of this
6  deposition transcript; is that right?
7    A    Yes.
8    Q    Okay.  So go to page 111.  Tell me when you're
9  there.
10    A    Okay.
11    Q    You see at the bottom of page 111, line 18,
12  she was asked whether she mixed the concentrate or her
13  husband, Chris, usually did that?
14    A    Yes.
15    Q    And she said she would say 90 percent of the
16  time Chris mixed it; is that right?
17    A    Yes.
18    Q    So is that where you get your 10 percent
19  figure?
20    A    Let me -- let me finish.
21    Q    Go ahead.
22    A    The record will reflect two or three times I
23  said 10 percent, and that is consistent with the
24  deposition.  Line 20 reads:  "I would say 90 percent of
25  the time Chris mixed it..."  100 minus 90 is 10 percent.

Page 129

1  What part of that do you not understand?
2    Q    Well, what's the rest of that line there, sir?
3  Doesn't she say also she barely remembers doing it?  By
4  "it" that means mixing and loading?  She says that;
5  right?
6    A    So as -- as a toxicologist I rely on the
7  entirety of what she said, not just the last four words.
8  I mean, that's just -- I don't understand why you're
9  even going there.
10    Q    Okay.  When you say you rely on the entirety
11  of what she said, that means you would rely on the
12  entirety of what she said about her recollection
13  regarding mixing and loading the glyphosate throughout
14  her deposition; right?
15    A    Yes.
16    Q    Okay.  You mentioned at page 12 of your
17  report, bottom of page 12 over to page 13, that she
18  estimated she performed the mixing of the concentrate
19  six to ten times over a period of 25 years; is that
20  right?  I'm looking at the very last line of page 12.
21    A    I am going to answer that by reading from my
22  report.  The sentence reads:  I would say 90 percent of
23  the time ████ mixed it.  I can barely remember it.
24        However, she estimated that she performed the
25  mixing of the concentrate six to ten times over a period

Page 130

1  of 25 years.
2      Q   Right.  And you have no reason to doubt that;
3  correct?
4      A   That's what she stated.  I -- I -- you know,
5  I'm not a juror.  I'm a toxicologist.  And I know that
6  in my report I made it clear that she did not usually
7  mix it; her husband did.
8      Q   And she was clear that when she did do any
9  mixing, she was very careful; is that right?
10     A   That's what she states, she was very careful
11  and followed the directions on the label.
12     Q   And all of this information --
13     A   And she did occasionally spill some of the
14  Roundup one to two times on her hands, but only a small
15  amount.
16     Q   Yeah.  So when you say she occasionally
17  spilled some of the Roundup, just to be precise there,
18  she recalled spilling some of the Roundup, that is, a
19  small amount, on her hands a total of one to two times
20  over 25 years; is that right?
21     A   That's correct.
22     Q   Okay.  And, again, in fact, although I haven't
23  had a chance yet to review your revised pages 23 through
24  25, but am I right in your dose calculation you assumed
25  zero input from exposure during mixing and loading?  Is

Page 131

1  that right?
2      A   No.
3      Q   Okay.  Well, you give two different estimates
4  of her dose in your report.
5      A   Three actually.
6      Q   Well, actually I think six.  One at the
7  1 percent absorption level, one at the 3 percent
8  absorption level, one at the 10 percent absorption
9  level, and for each of those three absorption levels I
10  think ultimately you give in your report -- I'm at pages
11  20, 21 -- you give those figures both with mixing and
12  loading factored in --
13     A   Yes.
14     Q   -- and with mixing and loading not factored
15  in; is that right?
16     A   Yes.
17     Q   Okay.  And why did you present the figures in
18  your report for estimated milligrams per kilograms per
19  day dose removing the exposure that she would have
20  experienced from mixing and loading?
21     A   Because there were times where she did the
22  mixing and loading and the majority of the time she
23  didn't.  But on those days, to calculate what we call
24  the operator exposure dose in milligram per kilogram per
25  day on the days that she did it, I am providing that

Page 132

1  calculation.
2          And -- and the other important note is that
3  when one looks at the home and garden POEM results, the
4  mixing and loading only accounts for 11 percent of her
5  dose.  So if I were to assume that she never, ever
6  mixed -- mixed and loaded, I would simply decrease her
7  dose by 11 percent.  It's not that -- it's not that
8  important.
9  [redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
[redacted]
22     Q   Take a look -- I want to talk about her
23  periods of use of -- of glyphosate or Roundup.  One
24  thing is if you look at your report at page 9, here you
25  say that she used Roundup in a concentrated form from

Page 133

1  June of 1989 through approximately 2006.  And then
2  later, 2006 through 2014, you say she used the
3  ready-to-use version of the pesticide.  Do you see that
4  in the first paragraph on page 9?
5      A   I do.
6      Q   Okay.  And then if you go to page 13, Note 35,
7  and you can refer to the text that connects to Note 35,
8  you say that she used the concentrated Roundup for 11
9  years and the ready-to-use concentrate for about 14
10  years.  And I think that was based on the dividing point
11  being the year 2000 and not 2006.  Do you see that?
12     A   Yeah.
13     Q   Yeah.  Which one of those two that you
14  included in your report is correct?
15     A   Well, that's the information she gave me.  And
16  let's see if any of that is from her deposition.  So the
17  bottom of page -- I don't know.  I was not able to
18  quantify the ratio because of the discrepant testimony.
19  That's why I made the calculation such that I can say
20  when she did use the -- did do the mixing and loading --
21     Q   Right.  But she --
22     A   -- the value is such and such and when she did
23  not, it's roughly 11 percent less.
24     Q   Right.  But she used a different product at
25  some point; right?  There was some point where there was

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 36 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 36 of 79
Confidential - William R. Sawyer, Ph.D.

Page 134

1 mixing and loading going on, and whether that was by her
2 or by her husband, there was a period of time when they
3 did mixing and loading and used glyphosate concentrate.
4 And then there was a different period of time when she
5 used a ready-to-use version; is that right?
6   A   Right, and that involved no mixing or loading.
7   Q   Right. And those two products have different
8 concentrations of glyphosate; right?
9   A   Slightly.
10   Q   Yeah. So can you tell me which of the two
11 periods that you've written about in your report is the
12 one that's correct; that is, was she using the
13 ready-to-use from 2016 -- 2006 through 2014 or from the
14 year -- from 2000 to 2014 or you just don't know?
15   A   Don't know for sure.
16   Q   Okay. Let's talk about her frequency of use.
17 If you look at page 9, first line, you write: "For
18 approximately 25 years, Mrs. Stevick used Roundup weekly
19 around her home."
20   A   That's an error.
21   Q   Okay.
22   A   That's a typo.
23   Q   Okay. So what should that be? How would you
24 correct that to make it right?
25   A   Monthly.

Page 135

1   Q   Monthly.
2   A   Yeah.
3   Q   Okay. So we should strike "weekly" and put
4 "monthly" in there?
5   A   Yeah.
6   Q   Okay. And, in fact, she didn't use it every
7 month for those 25 years, did she?
8   A   No. And I described that later.
9   Q   Okay.
10   A   Next -- the next line, June -- well, somewhere
11 I describe that there was three months a year that she
12 didn't use it.
13   Q   Yeah. If you look at page 12, see if I can
14 help you out here, first new paragraph: "After this
15 initial period" -- do you see that?
16   A   Yes.
17   Q   -- you write that "she used Roundup less,
18 spraying approximately one gallon of diluted concentrate
19 only once per month for ten months of the year"; right?
20   A   Yes.
21   Q   Okay. And so you -- you mentioned that this
22 was after the initial period. And those months were
23 March through December; is that right?
24   A   Right.
25   Q   Okay. The initial period was two or three

Page 136

1 months, right, when she moved in?
2   A   Yeah. And she used it more frequently during
3 those two or three months.
4   Q   Yeah. You -- you write here on page 11: I
5 probably -- it looks like you're quoting from her
6 deposition. "'I probably obviously sprayed more often
7 that time when I was killing a larger area of ground' -
8 probably two applications for that initial killing of
9 weeds in the yard over a period of two to three months."
10   Do you see that?
11   A   That's right.
12   Q   Okay. And so -- and then you say: "Thus" --
13 this is your conclusion about this period of time, this
14 two-to-three-month period of time: "Thus, one gallon of
15 diluted Roundup was sprayed by Mrs. Stevick one to two
16 times a month for one hour each time over a two to three
17 month period in 1989." Is that right?
18   A   That's right.
19   Q   Okay. And so it's once per month, other than
20 this initial period, and that initial period added at
21 most two to three times when she applied glyphosate in
22 her yard; is that right?
23   A   Yeah.
24   Q   And am I -- just so the record's clear, two to
25 three times doesn't mean multiplied. I mean, two to

Page 137

1 three additional instances when she applied Roundup?
2   A   Correct.
3   Q   Okay. And, in fact, when you say that she
4 applied it for one hour per month for ten months of the
5 year, it's actually a little bit -- well, it's actually
6 less than an hour that she applied it; correct?
7   A   No.
8   Q   Okay. Well, take a look at page 11. You have
9 in quotes that the actual spraying time was a little
10 less than an hour. You got that from her testimony,
11 Mrs. Stevick; is that right?
12   A   I'm looking. Which paragraph?
13   Q   Sure. Page 11.
14   A   Yeah.
15   Q   If you go to the last full paragraph on the
16 page and you look at the last sentence that you wrote:
17 "However, she" -- meaning Mrs. Stevick -- "does concede
18 that because she was walking around and doing other
19 things while she was spraying, actual spraying time was
20 'a little less' than an hour."
21   Do you see that?
22   A   Well, the actual trigger time, of course
23 that's less.
24   Q   Right.
25   A   You know, anyone, even in the -- in the patch

Page 138

1 studies that we used to develop POEM, the workers don't
2 hold the trigger around six hours nonstop. No one does.
3 That's not how it's used. The trigger's released and
4 there's movement to another weed and the trigger's fired
5 and during that time aerosol is still in the air.
6 Aerosol does not immediately disappear when you let go
7 of the trigger. So certainly the -- the actual spray
8 time, as I say in the report, was less than an hour.
9 Q Right. What you say in the report -- I
10 understand you're quoting her from her deposition -- is
11 that it was a little less than an hour. Actual spray
12 time was, in fact, a lot less than an hour, wasn't it?
13 A Yes.
14 Q Yeah. Do you -- did you estimate how much the
15 actual spray time was?
16 A Yes.
17 Q What was that? You go -- you're going to a
18 Redweld that you brought with you; is that right?
19 A Yes.
20 12.6 minutes.
21 Q Okay. Can you -- before you put that down,
22 just hold that up so we can see on the video what it is
23 that you're referring to.
24 A (Witness complies with request.)
25 MR. TRAVERS: And PTO7, notes aren't

Page 139

1 discoverable.
2 MR. DERRINGER: Well, he's relying on it in
3 his opinion.
4 MR. TRAVERS: And there's no exception for
5 that.
6 MR. DERRINGER: Oh, absolutely. If he -- if
7 an expert's relying on something for his opinion,
8 that's discoverable.
9 MR. TRAVERS: Let's read PTO7.
10 MR. DERRINGER: Let's go off the record.
11 THE VIDEOGRAPHER: Do you agree? Yes?
12 MR. TRAVERS: Yes.
13 THE VIDEOGRAPHER: Okay.
14 MR. TRAVERS: Actually, no. Let's keep it on
15 the record.
16 MR. DERRINGER: All right. Well, this is on
17 your time.
18 THE COURT REPORTER: Excuse me. I just have
19 to get the charger.
20 THE WITNESS: It's not on my time.
21 MR. TRAVERS: Okay. So PTO7, page 9, No. 1:
22 Production and discoverability of expert materials.
23 The limitation on -- limitations on expert
24 discovery set forth in Rule 26, including the
25 provisions regarding discovery with respect to

Page 140

1 draft reports and communications with experts,
2 shall apply to all cases.
3 Next sentence: No party will seek discovery
4 of any expert's notes, drafts of expert's reports,
5 or communications with counsel, provided, however,
6 that counsel may inquire at deposition about any
7 facts provided to the expert by counsel and upon
8 which such expert is relying in expressing the
9 expert's opinions.
10 MR. DERRINGER: Okay. And is that the entire
11 basis, Mr. Travers, of why you believe that
12 Monsanto is not entitled to disclosure of the
13 document that Dr. Sawyer just read from and just
14 relied upon --
15 MR. TRAVERS: Yes.
16 MR. DERRINGER: -- at his deposition?
17 MR. TRAVERS: Yes. That is the agreed
18 deposition protocol by the parties.
19 MR. DERRINGER: Okay. You're misreading the
20 protocol.
21 MR. TRAVERS: I don't -- I don't agree.
22 MR. DERRINGER: You're misunderstanding the
23 protocol.
24 BY MR. DERRINGER:
25 Q Dr. Sawyer, did you just in your deposition

Page 141

1 to -- well, strike that.
2 MR. DERRINGER: We're on the record; right?
3 THE COURT REPORTER: Yes.
4 MR. TRAVERS: This was the agreed protocol.
5 BY MR. DERRINGER:
6 Q Dr. Sawyer, you brought a number of materials
7 to your deposition; is that correct?
8 A I -- I brought materials with me, yes.
9 Q Okay. And some of those materials are laying
10 out in front of you right now at your deposition?
11 A Yes.
12 Q Okay. And one of the sets of materials you
13 brought is contained in a Redweld that's in front of
14 you; correct?
15 A Yes.
16 Q And to answer my last question, which was
17 whether you had calculated the amount of time that she
18 would have actually sprayed, which you said was far less
19 than an hour, you told me, yes, you had calculated that;
20 is that right?
21 A Yes.
22 Q Okay. And when you -- when I asked you what
23 that calculation was, you reached into the Redweld and
24 took out a piece of paper; is that right?
25 A That's right.

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 38 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 38 of 79
Confidential - William R. Sawyer, Ph.D.

Page 142

1    Q    And you read from that piece of paper?
2    A    Yes.
3    Q    And you held that piece of paper up so the
4    camera could record it?
5    A    Yes.
6    Q    Okay.
7        MR. TRAVERS:  And I objected to the production
8    of it when you asked him to do that.
9        MR. DERRINGER:  Okay.  We -- we're entitled
10   not only to that piece of paper, but to -- and
11   we're going to be requesting this, as we have at
12   every one of these depositions.  We're going --
13       MR. TRAVERS:  Yeah, but those other
14   depositions weren't in the MDL governed by this
15   agreed-to protocol.
16       MR. DERRINGER:  Okay.  I'm just making my
17   record here.  We are requesting that you produce
18   and make available to Monsanto all of -- number
19   one, everything you relied on to come to your
20   opinions in this case, which would specifically
21   include everything that you've -- well, strike
22   that.  We're asking for that.  We're also asking
23   for any material that you brought with you today to
24   your deposition.
25       So Mr. Travers, that's our request.  Are

Page 143

1    you --
2        MR. TRAVERS:  Yeah, I object pursuant to PTO7,
3    no party will seek discovery of any expert's notes.
4        MR. DERRINGER:  Okay.
5    BY MR. DERRINGER:
6    Q    Dr. Sawyer, because your lawyer will not allow
7    us to inspect what you've brought with you to the
8    deposition, can you -- just so we can establish a
9    foundation here, is everything that you brought with you
10   to the deposition things you consider your notes?
11   A    I don't understand the question.
12   Q    Yeah.  Well, is there anything that you've brought
13   with you to the deposition that is not your notes?
14   A    Everything I brought is not my notes except
15   for this one thing.
16   Q    Right.  The one thing that you relied on to
17   just now respond to my question at the deposition that
18   Mrs. Stevick sprayed at most, what was it, 12.7 minutes
19   on any one occasion?
20   A    Yes.  This -- this note of mine is known in my
21   office as, per Jen, quote, Bill's scribbles, unquote.
22   Q    Okay.  Do you intend -- if you're asked at
23   trial the amount of time during Mrs. Stevick's one hour
24   of applying glyphosate that she could have applied that
25   glyphosate in terms of actually spraying it, will you

Page 144

1    answer that question?
2    A    Of course.
3    Q    Okay.  And will your answer be 12.7 minutes?
4    A    Yes.  And I can tell you exactly how that was
5    derived.  You know, my notes simply just scribble
6    the mathematics, but I can tell you the mathematics.  I -- I
7    did --
8    Q    Great.  I'll -- ask you that in just a second.
9    I appreciate that.  But let me just finish this.  Is
10   there anything in the materials you brought with you
11   today that reflects conversations with your attorneys,
12   that is, plaintiffs' attorneys here?
13   A    Bill's scribble note has some information on
14   it that I discussed with the attorney, yes.
15   Q    And -- and Bill's scribble note that you're
16   talking about is the note, the one-pager, that you put
17   up in front of the camera that contains your calculation
18   that -- that results in 12.7 minutes; is that right?
19   A    Yes.
20   Q    Okay.  Any other document you brought with you
21   today that reflects conversations that you've had with
22   plaintiffs' attorneys?
23   A    No.
24   Q    Okay.  Any other document that you brought
25   with you today that contains your notes?

Page 145

1    A    Yes.
2    Q    What document is that?
3    A    The Johnson study, I know I have Bill's
4    scribbles all over it.
5    Q    Anything else?  Any other material you brought
6    with you today that contains your notes?
7    A    Yeah.  I mean, I have like a yellow sticky on
8    here that -- well, that's in the Johnson study actually.
9    But I may have some other -- well, no, I don't have any
10   notes on these stick-ons.  But, yeah, there -- there are
11   some other notes on some documents but not many.  I
12   mean, there's probably, you know, maybe a half dozen
13   studies where I -- I highlighted with a -- a comment or
14   something.
15   Q    Are you going to rely on anything that you
16   brought with you today outside of your report, Exhibit
17   1, outside of Exhibit 2, which is your replacement
18   pages, and outside of what we'll mark later,
19   Mrs. Stevick's sprayer, anything else that you brought
20   with you today are you going to rely on, anything from
21   that collection of materials, to present your opinions
22   in this matter?
23       MR. TRAVERS:  And objection.  Just for the
24   record, I told you earlier today we would give you
25   documents that might have notes in them that are

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 39 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 04/25/19 Page 39 of 79
Confidential - William R. Sawyer, Ph.D.

Page 146

1 not on his reliance list. Because they're not on
2 his reliance list, I think it's fair to give --
3 give those to you, but his note -- his notes are
4 not discoverable. It's the plain language of the
5 agreed deposition protocol.
6    MR. DERRINGER: Okay.
7    MR. TRAVERS: And -- and you said -- and,
8 yeah, I'm not refusing to let you inspect items.
9 The studies he brought are on his reliance list so
10 you have access to those studies.
11    MR. DERRINGER: Well --
12    MR. TRAVERS: And the ones that aren't on the
13 reliance list we will give to you.
14    MR. DERRINGER: Okay. I understand. Okay.
15 BY MR. DERRINGER:
16    Q   Tell me how you came up with a maximum time of
17 12.7 minutes on any one day that Mrs. Stevick applied
18 glyphosate or Roundup, that maximum time of 12.7 minutes
19 being the maximum time that she was actually spraying.
20    A   Well, for the --
21    Q   First, did I characterize that correctly?
22 That's what you calculated?
23    A   Yes.
24    Q   Okay.
25    A   First of all, I need to state that is only the

Page 147

1 time duration with respect to the hand pump sprayer. I
2 tested the hand pump sprayer by adding 1 gallon of water
3 to it and I pumped and pumped and pumped to the highest
4 pressure capacity I could achieve and measured the flow
5 rate into a graduated cylinder in milliliters and found
6 at 30 seconds the sprayer had discharged 150 milliliters
7 of liquid. Thus, 150 ml of liquid, if we convert ml to
8 ounces, that is multiplied -- or I divide 150 by
9 29.5735, we therefore come up with 5.072 ounces per 30
10 seconds. And if we then divide the 128 ounces in a
11 gallon, we end up with 12.6 minutes required to pump 1
12 gallon of water.
13    Now, I must say that is a maximal output. It
14 requires the highest pressure of the tank. And my
15 experience with that tank was it doesn't hold pressure
16 very long. You have to keep pumping to maintain that
17 high level of pressure. So 12.6, of course, is -- is
18 the least amount of time. If the pressure were lower,
19 that number would be longer. And really that's a simple
20 calculation.
21    Q   All those numbers you're -- you're reading off
22 of the notes that you made reflecting this -- this --
23    A   In part. Some is from memory.
24    Q   Okay. And I had said before you calculated
25 12.7 minutes, but -- but in looking at your notes, it's

Page 148

1 12.6 minutes; correct?
2    A   Yeah, yeah. I thought it was 12.7 but it's
3 12.6.
4    Q   Did you ever view the video of Mr. Stevick
5 performing kind of a similar exercise where he sprayed
6 with the pump that Mrs. Stevick used and calculated the
7 time it took to go through I think 8 ounces of liquid?
8    A   I did, but he did not use a calibrated
9 graduated cylindrical laboratory device and he did not
10 use a clock. Instead, he counted one thousand one, one
11 thousand two, and I didn't find it to be as reliable as
12 using a laboratory grade cylinder and a real timer.
13    Q   Is there anything else about the video you saw
14 where Mr. Stevick did the same exercise essentially that
15 you did trying to get liquid out of the spray pump that
16 Mrs. Stevick used and to measure how much it discharged
17 in a period of time? Do you have any other criticisms
18 or critiques of what he did? You -- you mentioned he
19 didn't use a calibrated graduated cylindrical lab device
20 and he didn't use a clock. Anything else that you found
21 deficient in the exercise that Mr. Stevick undertook
22 that's reflected on the video that you saw?
23    A   Yeah. He filled the cylindrical --
24 cylindrical container about three-quarters full, which
25 was never the case. She didn't have the strength to

Page 149

1 carry a three-quarter full. She carried only a gallon
2 or less. And due to that the headspace was far less and
3 I think he could have possibly achieved a higher
4 pressure than I could achieve. So I tested it under the
5 realistic condition of just 1 gallon.
6    Q   So in your -- in your exercise you put a
7 gallon of water in the spray --
8    A   Yes.
9    Q   -- in the -- in the pump?
10    A   I did.
11    Q   Okay. Did you videotape this exercise?
12    A   No.
13    Q   Did anyone watch you do it?
14    A   No.
15    Q   When did you do this?
16    A   This week.
17    Q   When?
18    A   Actually I think I did it yesterday morning.
19    Q   And other than your testimony about it,
20 describing it, is there any other record of this
21 exercise that you engaged in?
22    A   No. But I brought the -- the device with me
23 and, you know, I think your -- your experts will perhaps
24 want to repeat it.
25    Q   Do you know what the temperature was -- well,

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 40 of 79
Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 40 of 79
Confidential - William R. Sawyer, Ph.D.

1  did you do this inside or outside?

2      A    Outdoors.  Temperature was 67.

3      Q    How do you know?

4      A    Because I have a thermometer, outdoor

5  thermometer.

6      Q    An outdoor thermometer on your property?

7      A    I do.

8      Q    And you recorded in your own mind that it was

9  67 degrees Fahrenheit when you did this exercise?

10     A    Yes.

11     Q    Okay.

12     A    I also should add that I continually added

13  water to the top of the pump.  Where the handle enters

14  the stem, the stem enters the pump, there are some cut

15  notches, and I continually added water to that area

16  because it seemed to help increase the pressure.  I was

17  able to achieve a higher pressure by doing so.

18     Q    Is there anything else, sir, that you should

19  add to your description of your exercise that you

20  undertook yesterday so that you have fully disclosed

21  what you did?

22     A    I wore my forearm-length neoprene gloves.  I

23  would recommended that.  Even though I added water,

24  there is still probably residual glyphosate in the -- in

25  the container.  The pump is in a bag which contains

1  moisture, which contains glyphosate, so I would be very

2  cautious in terms of handling it.  And the bag is in a

3  dry cardboard box.

4      Q    Anything else to add so that you've completed

5  your description of your exercise that you undertook

6  yesterday?

7      A    Yes.  I measured the length of the wand, which

8  is only 14 inches, and I found that it was not possible

9  to spray it directly down on weeds without encountering

10  overspray on the ankle/lower leg area because the wand

11  is very short and holding it out sideways is not

12  effective in aiming it and directing it towards the

13  weed.  And when holding it downward, because the wand is

14  so short, there is some migration of droplets that would

15  contact the lower extremity, especially the ankle/foot

16  area.  So I would advise not wearing ankle socks or

17  breathable sneakers in using such a device.  Such a

18  device should be used with work boots.

19         THE VIDEOGRAPHER:  Mr. Derringer, we have five

20  minutes.

21         MR. DERRINGER:  Great.

22  BY MR. DERRINGER:

23     Q    How tall are you?

24     A    6 foot.

25     Q    Even?

1      A    Yeah.  She's 5-foot-4, so it's a 6-inch

2  differential.

3      Q    You said --

4      A    Or 8-inch.

5         MR. KALAS:  6 inches.

6         MR. DERRINGER:  I'm getting tired.

7         MR. KALAS:  Poker face.

8         THE WITNESS:  Poker face.

9  BY MR. DERRINGER:

10     Q    You mentioned that there was residual

11  glyphosate in the -- in the container?

12     A    I -- I believe so, because the e-mail that I

13  received from Mr. Stevick, which I have with me and I --

14  I think you may already have it, did not indicate that

15  the material had been, you know, flushed and cleaned and

16  prepped.  He said he just removed the material into a

17  container and put water in it.  So there was probably

18  some residual there.

19     Q    You didn't measure that, did you?

20     A    You mean with a laboratory-certified test?

21     Q    Well, with a laboratory-certified test?

22     A    No.  Why would I --

23     Q    Okay.  Did you measure it in any way other?

24     A    Why would I do that?

25     Q    Did you measure it in any other way?

1      A    No.  I had no interest in doing so.

2      Q    Okay.  And did you measure -- this 12.6

3  seconds, you said you --

4      A    No, no.  12.6 minutes.

5      Q    Thank you.  Thank you.

6      A    It's not a fire hose.

7      Q    6 inches, 8 inches, 12.6 seconds, minutes.

8      A    Maybe it's lunchtime.

9      Q    Just about.  Let's just finish one thing and

10  then we'll -- we'll take our lunch break.  At page 15 of

11  your report under Roundup Application Notes --

12     A    Page 14.  Okay.

13     Q    15.  15.

14     A    Oh, 15.

15     Q    Yep.  Roundup Application Notes, first

16  paragraph.  Do you see that?

17     A    Yes.

18     Q    You write in the second sentence that "She" --

19  meaning Mrs. Stevick -- "would typically spray 1-1/2

20  gallons each time."  Is that also a typo or a mistake?

21     A    It is a mistake in that it was not typical.

22  She typically sprayed 1 gallon or 1.1 gallon.  I don't

23  know where the half came from.  So yeah.

24     Q    You say it was -- it's a mistake in the sense

25  of using the word "typically."  You don't know any time

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 41 of 79
Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 41 of 79
Confidential - William R. Sawyer, Ph.D.

Page 154

1  when she sprayed 1-1/2 gallons of glyphosate or Roundup,
2  do you?
3     A   I don't think so, no.  And I didn't use 1-1/2
4  gallon in any calculation.  I always used 1 gallon.
5        MR. DERRINGER:  Okay.  Why don't we take our
6  lunch break.
7        THE WITNESS:  Okay.
8        THE VIDEOGRAPHER:  We're going off the record.
9  The time's approximately 12:02 p.m.
10       (Luncheon recess.)
11       THE VIDEOGRAPHER:  We're back on the record.
12  The time is 12:52 p.m.  This begins Media Unit
13  No. 3.
14       (Sawyer Exhibit Nos. 12 through 14 were marked
15  for identification.)
16  BY MR. DERRINGER:
17     Q   Good afternoon, Dr. Sawyer.  I'm putting in
18  front of you three exhibits -- Sawyer 12, Sawyer 13, and
19  Sawyer 14 -- that were given to me just now by
20  plaintiffs' attorney, Mr. Travers.  Let me put those in
21  front of you and just confirm -- I'd like you to
22  confirm, sir -- that these are the three items that you
23  brought with you today that do not appear on either your
24  reliance list attached to your report or the
25  supplemental reliance list that your attorney delivered

Page 155

1  to Monsanto earlier this week.
2     A   That's right.
3     Q   Okay.  We'll -- we'll take a look at those a
4  little bit later.  You can just put those to the side.
5     A   All right.
6     Q   Actually, I'll take them if you don't mind for
7  a minute.
8     A   And -- and one correction.
9     Q   Sure.
10    A   I went online on the iPhone and I checked on
11  the Weed and Feed and I was incorrect.  The -- well, I
12  was kind of correct.  The new formula does not include
13  2,4-D.  It includes dicamba and MCPA and mecoprop.  But
14  the older formula did have 2,4-D in it.  But it's
15  inconsequential anyway because pellets were used as per
16  page 127 of Ms. Stevick's -- or Stevick's deposition,
17  which indicates her husband used the application of the
18  pellets; therefore, she would have had no exposure.
19    Q   When did the Weed and Feed product stop using,
20  according to you, 2,4-D?
21    A   I can't say exactly, but the newest -- well,
22  the newest MSDS and, in fact, one of the Canadian
23  products I looked at has actually banned the -- the
24  2,4-D from the product.  And I think that might have
25  been 2010 but I really can't say for sure.

Page 156

1     Q   So you can't say for sure as you sit here
2  today whether the product that the Stevicks used on
3  their property, the Weed and Feed, did or didn't contain
4  2,4-D; is that right?
5     A   Well, no.  I -- I'm convinced that it did
6  prior to a certain year, which would have been in her
7  span of time.  But it was in pellet form and applicated
8  by her husband so her exposure would have been
9  negligible.
10    Q   And the basis for your conclusion that it was
11  in pellet form, is that her deposition?
12    A   Yeah, her testimony on page 127.
13    Q   And the basis for your statement that her
14  husband applied the Weed and Feed, is that also from her
15  deposition?
16    A   It is.
17    Q   Okay.
18    A   And -- and that's probably why she didn't
19  respond to my questions regarding 2,4-D, either she
20  didn't know what 2,4-D was or because her husband used
21  it.
22    Q   Yeah, but you're speculating about that;
23  right?
24    A   Yes.
25    Q   You don't know why she didn't --

Page 157

1     A   Yeah, so forget that.
2     Q   You said 2,4-D also includes dicambin?
3     A   Yeah, dicamba.
4     Q   Dicamba.  Thank you.
5        And is that -- does that increase the risk of
6  developing NHL?
7     A   Yes, it can.
8     Q   And M -- MCA you also said it contains?
9     A   Mecoprop.
10    Q   Mecoprop.  Okay.  That -- we've already I
11  think discussed that increases the risk of NHL; is that
12  right?
13    A   Yes, yes.  But her husband is not the one who
14  developed --
15    Q   Right.
16    A   -- NHL.
17    Q   What -- what did you discuss with Mrs. Stevick
18  about her gardening?
19    A   Well, what type of gardening.  I asked if she
20  grew vegetables and, if so, what kind, what type of
21  plants, and my understanding was ornamental and shrubs.
22    Q   What else did you discuss with her about her
23  gardening?
24    A   Just that she used the product to keep the
25  weeds out and -- and that she did mulch areas as well.

Page 158

1 And that's all I can recall.
2 Q And the product you're referring to is Roundup
3 or a glyphosate concentrate?
4 A Yes.
5 Q Okay. What you've just told me here at the
6 deposition is all that you know about Mrs. Stevick's
7 gardening; is that right?
8 MR. TRAVERS: Objection; form.
9 THE WITNESS: No. I -- I know much more as
10 per my report. You know, if you want me to look at
11 the report, I'll go through it and give you the
12 details.
13 BY MR. DERRINGER:
14 Q Feel free to look at the report. I'm
15 wondering if you know, for example, how many hours a
16 week she spent in her gardens.
17 A No, I don't have an answer to that.
18 Q Do you know how many days every week she did
19 gardening?
20 A No.
21 Q Now, when she used Roundup or glyphosate, she
22 always applied that product with a sprayer and wand
23 apparatus; is that your understanding?
24 A In the earlier years, yes. And then
25 eventually she switched to the prepackaged device, which

Page 159

1 has a very thin hose similar to an iPhone cord, charging
2 cord, a very thin hose with a kind of rectangular pump
3 nozzle with no wand.
4 Q Okay. How long was the hose that you
5 understand she used after -- would that be after she
6 went to the ready-to-use product?
7 A Yes.
8 Q Okay. How long was that hose?
9 A 2 or 3 feet.
10 Q Mrs. Stevick never used a backpack, did she,
11 when she was applying glyphosate?
12 A No, she -- she did not.
13 Q Okay. And you say in your report at page 9
14 that the average temperature when she sprayed was a
15 range between 57 and 82 degrees Fahrenheit. Go ahead
16 and look at that at page 9. Tell me when you see it.
17 A Yes.
18 Q This would be in the third bullet.
19 A Yes.
20 Q How did you determine that?
21 A Well, I asked her about her location in
22 Petaluma, California, and she states unlike southern
23 California that it is quite rainy and she explained the
24 fog, typical fog, layer around her home. And I asked
25 her what the temperature range was when she used the

Page 160

1 product and she -- that's what she said, typically 57 to
2 82.
3 Q Your testimony is that Mrs. Stevick told you
4 that the average temperature when she sprayed Roundup
5 ranged between 57 and 82 degrees Fahrenheit?
6 A That's exactly what she said, yes.
7 Q Okay. What time of day are you assuming that
8 Mrs. Stevick applied glyphosate or Roundup?
9 A Well, I don't know if I have that in my
10 report, but I -- I recall I think she said generally in
11 the morning or early afternoon. I think that I do have
12 it here somewhere.
13 Q She didn't apply Roundup or glyphosate to GMO
14 crops, did she?
15 A No.
16 Q On page 10 of your report -- actually, strike
17 that.
18 Let me ask this: Did you ever see
19 Mrs. Stevick apply glyphosate or Roundup to her yard?
20 A No.
21 Q Did you ever ask Mrs. Stevick to show you how
22 she applied glyphosate or Roundup to her yard?
23 A No, but we talked about it. I -- I wasn't
24 there in person to see it.
25 Q Now, you mentioned -- we looked at this a

Page 161

1 little bit before, the bottom of page 12 -- that
2 Mrs. Stevick was -- you say she was very careful and she
3 followed the directions on the label. Do you see that,
4 bottom of page 12 --
5 A Yes, I do.
6 Q -- carried over to page 13?
7 A Correct.
8 Q Okay. Do you assume, sir, that Mrs. Stevick
9 was careful not to get Roundup on herself?
10 A Well, she tried, but she explained that it
11 would typically get on her hand from the spray trigger
12 apparatus.
13 Q Do you assume, sir, in developing your
14 opinions about Mrs. Stevick that she did not apply
15 Roundup in a careless manner?
16 MR. TRAVERS: Objection; form.
17 THE WITNESS: Well, she tried her best not to,
18 but she -- she had leakage that wetted her hand.
19 That's a problem. And it's also one of the reasons
20 why in my home and garden dose calculation I did
21 use hands because she constantly had exposure to
22 her hand from the leakage that was wetting her --
23 her fingers and hand. You know, that's just --
24 it's not careless in the sense that she didn't
25 realize she was dealing with a carcinogen.

Page 162

1 There -- there was simply no label on the container
2 to recommend the use of gloves and she didn't know
3 any better. So I wouldn't consider that careless.
4    BY MR. DERRINGER:
5    Q    You -- you said that she constantly had
6 exposure to her hand from the leakage that was wetting
7 her fingers and hand?
8    A    Yes.
9    Q    What's the basis for your statement that any
10 leakage was constant, that is, that it resulted in
11 constantly having exposure to her hand? What's your
12 basis for saying that?
13    A    That she did not stop and wash her hands
14 during the spraying. She had -- during the one-hour
15 period, she had liquid on her hand.
16    Q    Is it your testimony, sir, that every time
17 Mrs. Stevick applied Roundup or glyphosate by spraying
18 it, that leakage occurred that resulted in Roundup or
19 glyphosate being spilled onto her hand?
20    A    It's my understanding that -- yeah, that the
21 speaker -- the -- the sprayer leaked at the handle
22 resulting in leaking on her hand, typically her right,
23 dominant hand. And sometimes she would switch hands if
24 she was tired and hold the sprayer with her left hand,
25 causing that hand to get wet. And my recall from

Page 163

1 interviewing her was that it -- it typically wetted her
2 hand.
3    Q    The word you used was "constant," and so I
4 want to know the basis for your statement that her
5 application of Roundup or glyphosate resulted in
6 constantly having exposure to her hand during the time
7 she was applying the Roundup or the glyphosate.
8    A    That -- that's my understanding.
9    Q    What's the basis for that understanding?
10    A    Speaking with -- with the plaintiff.
11    Q    So your testimony is that Mrs. Stevick told
12 you that every time that she used Roundup or glyphosate,
13 there was leakage that resulted in Roundup or glyphosate
14 getting onto her hand?
15    A    Whether it was some type of mechanical failure
16 or bad valve or just what, I don't know, she said
17 that her hand would get wet, not soaked, but her
18 finger -- two-finger area and part of her hand would get
19 wet, and that was typical.
20    Q    Did she tell you that that happened every time
21 she used Roundup or glyphosate?
22    A    It was implied.
23    Q    It's -- it's an implication you're drawing
24 from your conversation with Mrs. Stevick; is that right?
25    A    As per my recall, that's -- that's what she

Page 164

1 had meant to say, yeah.
2    Q    And when you say it was implied, you're
3 acknowledging that that's not something she actually
4 said; correct?
5    A    Well, I think she did but I just can't
6 remember exact words. That's why I'm reading Bullet No.
7 4 -- no, not No. 4. No. -- Bullet No. -- yeah, 4: Her
8 sprayer leaked at the handle resulting in Roundup
9 leaking on her hand, typically right, dominant hand.
10 Sometimes she would switch hands if she was tired and
11 hold the sprayer in the left, causing the left hand to
12 get wet as well.
13       It's -- I just -- this conversation was in
14 October. In fact, it was October 18th, which is two
15 months ago. I just don't remember her exact language,
16 but I understood it to be that this was a typical slow
17 leak, not a blasting, spraying explosive leak, but a
18 drip, a drip slow leak that would wet her fingers and
19 hand.
20    Q    Well, is the implication that you drew from
21 your conversation with Mrs. Stevick that she felt
22 glyphosate on her hand every time that she used Roundup
23 or glyphosate?
24       MR. TRAVERS: Objection; asked and answered.
25       THE WITNESS: That's my understanding.

Page 165

1    BY MR. DERRINGER:
2    Q    Now, page 13 of your report, you see up at the
3 top the carryover paragraph you said that she testified,
4 that is Mrs. Stevick, that she would wash her hands
5 after spraying it. Do you see that?
6    A    That's right.
7    Q    Do you know how long after she got Roundup on
8 her hands that she would wash her hands?
9       MR. TRAVERS: Objection; form.
10       THE WITNESS: She explained to me when she was
11 done spraying over that one hour, she would wash
12 her hands, but she wouldn't shower until usually --
13 she gave me a time -- it's in the report -- around
14 10 o'clock or late evening. But she did wash her
15 hands after the work was done.
16    BY MR. DERRINGER:
17    Q    After the hour of work was done?
18    A    Well, yeah, after she put her equipment away
19 and -- and was completely done with it. And then I
20 didn't ask her whether she did other kind of gardening
21 and -- and delayed for another hour washing. I'm
22 just -- I'm assuming that once she put that equipment
23 away, she washed right away. It could have been longer.
24    Q    You don't know?
25    A    I didn't ask.

Confidential - William R. Sawyer, Ph.D.

Page 166

1    Q   It could have been shorter than an hour, too;
2  right?
3    A   No, no.  She made it clear --
4    Q   Why is that?
5    A   She made it clear that she washed her hands
6  after she was done with the procedures.
7    Q   Right.  What I'm saying is -- well, is it your
8  testimony that every time she applied Roundup, it took
9  her a full hour before she was done?
10   A   Yeah.  She testified and she actually wrote in
11 her errata sheet at least one hour.  That's her words,
12 not mine.  So it's a fact in the case.  She said at
13 least one hour.
14   Q   So you would rely on what Mrs. Stevick said
15 under oath at her deposition; is that right?
16   A   Along with what she told me on my interview
17 and along with what she wrote on errata, yes.
18   Q   She didn't, that is, Mrs. Stevick didn't dip
19 her hands in a bucket full of Roundup ever; correct?
20   A   No.  However, that slow leakage on her hand is
21 no different.  It's -- it's liquid, direct liquid
22 exposure.
23   Q   Yeah, but she never dipped her hand in a
24 bucket of Roundup; correct?
25   A   I'm sorry.

Page 167

1    Q   Do you need to get that?
2    A   I need to shut this off.  I had it on to do
3  that research earlier.  Uh-oh.  A tornado watch has been
4  issued for Lee County till 4:00 p.m. so good thing I
5  didn't go out to the vehicle to get the sprayer.
6        Okay.  It's shut off.
7    Q   The research you just described, that was
8  looking something up on your iPhone?
9    A   Yes.
10   Q   Okay.  And what was it you looked up on your
11 iPhone?
12   A   The Weed and Feed ingredients, safety data
13 sheet.
14   Q   Right.  What website did you go to to look
15 that up?
16   A   I just Googled safety data sheet Weed and Feed
17 granular.
18   Q   You agree that Mrs. Stevick did not drink
19 Roundup or glyphosate; correct?
20   A   No; however, I should point out -- and I
21 learned this myself -- to adjust the tip on the item --
22 wearing my forearm-length neoprene chemical gloves, I
23 adjusted the tip, which got my hand with my fingers in
24 the glove very wet.  And she explains in my last bullet
25 on page 10 how she would use her bare hand to adjust

Page 168

1  that tip that would wet her fingers considerably.
2        And there is, of course, the -- as per EPA
3  human factors handbook, data in terms of how often
4  hand-mouth activity occurs in humans.  So, you know,
5  there is some possibility of hand-mouth contact.  But I
6  can't completely rule that out.  But I did not include
7  it in my assessment.  I assumed zero.
8    Q   She didn't drink Roundup or glyphosate;
9  correct?
10       MR. TRAVERS:  Objection; asked and answered.
11       THE WITNESS:  No.
12 BY MR. DERRINGER:
13   Q   And let me go back to something that you
14 didn't answer because of the cell phone.  She never
15 dipped her hand in a bucket of Roundup; correct?
16   A   No.
17   Q   Do you agree that when Mrs. Stevick applied
18 Roundup, she was applying it to things that were on the
19 ground?
20   A   Yes, that's true.
21   Q   And do you agree that when she applied
22 Roundup, she pointed the wand or the hose down to those
23 things that she was applying it to?
24   A   With the exception of her first two or three
25 months of residency she could not point down because the

Page 169

1  plants were so tall she had to shoot them horizontally.
2  She had weeds that were -- were no longer ground level.
3    Q   How tall were those weeds?
4    A   She described some of them as knee or hip --
5  you know, hip high.
6    Q   Where did she describe them in that manner?
7    A   Throughout her yard.
8    Q   No, no.
9    A   It was terribly overgrown.
10   Q   Where -- where did she describe them in that
11 manner?  Was this in a conversation with you or was this
12 in her deposition?
13   A   In my phone call with her.  Once she got it
14 under control, they were all ground level.
15   Q   Let's go to page 10 of your report.  I want to
16 ask you a few questions about the area where you say she
17 applied Roundup.  At first you noted that her property
18 was 7,500 square feet; is that right?
19   A   Yes.
20   Q   But that was wrong.  The actual square footage
21 of her entire property is 5,300 square feet, according
22 to you?
23   A   That's what I have in that bullet, yes.
24   Q   Okay.  And you -- well, do you know how large
25 her home is, the actual home?

1   A   No.
2   Q   Okay.  One thing I had a question about.  In
3  your report in the first bullet point, you talk about
4  two rose gardens.  Do you see that?
5   A   Yes.
6   Q   And then the -- the dimension you put down
7  there is 2 feet by 50 feet.  Is that then a total of a
8  hundred square feet or 200 square feet?  What I'm trying
9  to determine is was each of those two rose gardens in --
10  in your opinion 2 feet by 50 feet or was the total area
11  of both rose gardens together 2 feet by 50 feet?
12       I don't think you're going to find it in the
13  report.  That's why I asked the question, just because I
14  couldn't determine it from your report.  I just wanted
15  to know if you knew one way or the other.
16   A   Page 19.
17   Q   Uh-huh.
18   A   This is where I calculated, okay, sprayed --
19  sprayed the driveway 12 feet by 75 equals 900 square
20  feet.  The mulched area beyond the lawn, 20 feet by 30
21  feet, equals 600 square feet.  And two rose gardens
22  2 feet by 50 feet is 200 square feet.
23   Q   Right.
24   A   So -- so, yeah, that's where I measured and
25  converted that .01579 hectares, which is a critical

1  number for the dose assessment.
2   Q   Right.  The -- the hectares that you put in
3  here is critical to your dose assessment?
4   A   It is.
5   Q   And so if any of these measurements are
6  incorrect, that would result in some error in your dose
7  measurement?
8   A   Yeah.
9   Q   And -- and, again, here you say two rose
10  gardens 2 feet by 50 feet.  You don't say 2 feet by
11  50 feet each.  I just wonder if that 200 square feet is
12  an error of calculation, if that's supposed to be 100
13  square feet?
14   A   I -- I understood it to be two.
15   Q   Okay.  To be two, what, rose gardens?
16   A   Yeah.
17   Q   Each being 2 feet by 50 feet; is that your
18  understanding?
19   A   Yeah.
20   Q   Okay.  How did you come up with these
21  dimensions?
22   A   Follow-up call.
23   Q   Follow-up call with Mrs. Stevick?
24   A   Yeah.
25   Q   And what did you discuss with her that

1  informed you that these were the correct dimensions?
2   A   I think, if my memory serves me right, on this
3  particular call I asked Funmi or Jen to make the call
4  and ask.  So I don't think I made that call.
5   Q   Okay.  Who's Funmi?
6   A   Funmi, F-U-N-M-I.
7   Q   Who's Funmi?
8   A   My assistant toxicologist.  And Jen Clark is
9  my office manager.  And I'm not sure who made the call,
10  but I know I did ask one of them to call and provide me
11  with some more exact measurements.
12   Q   And these, that is, the measurements at page
13  19 of your report, Exhibit 1, are these the measurements
14  that Funmi or Jen Clark reported back to you?
15   A   Yes.
16   Q   And what do you know about how they determined
17  that these are the correct measurements, "they" being
18  Funmi and Jen Clark?
19   A   Simply asked for Mrs. Stevick.
20   Q   And what did Mrs. Stevick do to determine
21  whether these are the correct measurements?
22   A   She approximated the size.
23   Q   How do you know that?
24   A   Because I don't believe she went out there
25  with a tape and did it.  She did it over the phone and

1  she had inadequate time to run out and do it with a
2  tape.
3   Q   You weren't on that phone call, though, so you
4  don't know exactly what she did or didn't do to
5  approximate the size of these areas; is that right?
6   A   Correct.
7   Q   You've never measured those areas yourself,
8  have you?
9   A   No.  I haven't been there yet.
10   Q   And these are the -- the general areas that
11  contain the ground or weeds that Mrs. Stevick sprayed
12  with Roundup or glyphosate; is that right?
13   A   Yes.
14   Q   And you -- you agree that Mrs. Stevick never
15  sprayed these entire areas; correct?
16   A   You mean the -- the total lot size of 5,500?
17  No.
18   Q   No.  The total square footage that the area
19  that you say she sprayed within on page 19 of 1,700
20  square feet.  She never sprayed the full 1,700 square
21  feet with Roundup or glyphosate; correct?
22   A   She spot sprayed within that area.
23   Q   Right.  And what does spot spraying means?
24   A   It means it's continually trigger on/off, move
25  to another weed, trigger on/off, and so on.

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 46 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 46 of 79
Confidential - William R. Sawyer, Ph.D.

Page 174

1  Q  How many weeds did she spray?
2  A  I don't think she counted her weeds.
3  Q  So you don't know how many weeds she sprayed,
4 do you?
5  A  326.2. No, of course not.
6  Q  Okay. So 326.2, the record just won't
7 reflect, that was sarcasm; is that right?
8  A  That's sarcasm. There's no answer to that.
9 That's silly.
10  Q  Okay. But what we do agree on is that she
11 never sprayed the entire 1,700-square-foot area that
12 you've described on page 19 of your report; is that
13 right?
14  A  She treated the 0.1579 hectare area, and
15 that's what's important in the assessment. The
16 assessment model is not based upon continuous trigger on
17 for one hour covering every square inch of that area;
18 rather, it's treating an area of that size.
19  Q  In any one application, any one of these
20 monthly application sessions that Mrs. Stevick did with
21 Roundup or glyphosate, can you tell me how many square
22 feet she actually applied glyphosate or Roundup to?
23  A  No. And it doesn't matter because the formula
24 is based upon the quantity and milligrams of product
25 used over a given area, and that vary -- value can vary.

Page 175

1 The default value is generally about 10. And in her
2 case she used 11.22 liters of product per hectare. And
3 that varies. If the weeds are sparse, that's going to
4 be a lower number. If the weeds are heavy, it's going
5 to be a much higher number. If she -- if she had to
6 cover every square inch, it would be an enormously high
7 number. That -- that's why this model accounts for
8 that. It uses the hectare area and the amount of
9 chemical in the units of liters of product per hectare.
10 When I say "product," that's the concentrate.
11  Q  If you go to page 15 of your report, bottom
12 paragraph, does this constitute your notes on her
13 personal protective equipment or personal protection?
14 Bottom of page 15 carrying over to the three paragraphs
15 on page 16. Is this where you describe in your report
16 the personal protection that she used when she was
17 spraying?
18  A  It is.
19  Q  And so you note that she typically wore denim
20 jeans. Those jeans covered her legs; correct?
21  A  Yes. So she wore ankle socks and tennis
22 shoes, which offer very minimal protection.
23  Q  Those tennis shoes were always closed-toe
24 tennis shoes; is that right?
25  A  That's correct. But most tennis shoes are

Page 176

1 breathable. They're -- they're not sealed; they're
2 netted.
3  Q  You have no evidence that Mrs. Stevick took
4 off any of her clothing when she applied Roundup or
5 glyphosate, do you?
6  A  No.
7  Q  You have no evidence that her clothes were
8 soaked or drenched or otherwise unusually wet from
9 applying Roundup or glyphosate, do you?
10  A  Well, 10 to 20 percent of the time her
11 clothing was actually wet --
12  Q  Where are you looking?
13  A  -- exposed to the point of being wet.
14  Q  Where are you looking?
15  A  Somewhere in my report. She explained 10 to
16 20 percent of the time she was actually wetted to the
17 point of her clothes being wet.
18  Q  Right. In prior litigation involving Roundup,
19 you've referred or characterized some plaintiffs'
20 exposures as being that their clothes were soaked or
21 drenched with Roundup or with glyphosate. That wasn't
22 the case with Mrs. Stevick, was it?
23      MR. TRAVERS:  Objection; form.
24      THE WITNESS:  No, but wet.
25

Page 177

1 BY MR. DERRINGER:
2  Q  Okay.
3  A  Wet. When the wind was actually blowing back
4 on her -- and remember it's a 14-inch wand, it has to be
5 held very close to the body to be able to shoot
6 downward -- it blew back on her lower legs. And her
7 legs were wet 10 to 20 percent of the time. Rather than
8 just an undetectable aerosol, it actually wetted her
9 legs.
10  Q  Well, the -- the liquid that you say she told
11 you was on her -- when you say her legs, you mean her
12 jeans or her clothing; correct?
13  A  Yes, yes.
14  Q  Okay. The liquid that you say she told you
15 was on her, I think you said 10 to 20 percent of the
16 time, did you determine if that liquid was Roundup or
17 glyphosate?
18  A  That's what she told me, it was Roundup.
19  Q  She told you that?
20  A  Yes; from her wand.
21  Q  Okay. Did you ask her if on those occasions
22 she was applying during a rainy day?
23  A  She did not apply during a rainy day.
24  Q  How do you know?
25  A  Because we talked about that. She -- she

Page 178

1  didn't -- she didn't treat in the rain.  She explained
2  that she watered plants to make the process more
3  effective; in other words, not -- not at the time she's
4  spraying, but prior to the spraying she would water
5  products.  And she also, you know, simply didn't use the
6  product during -- during the rain.
7      Q    That's not in your report, that part of your
8  discussion, a specific discussion, with Mrs. Stevick, but
9  you have a specific recollection that she told you she
10  never applied glyphosate or Roundup when it was raining?
11      MR. TRAVERS:  Objection.
12      THE WITNESS:  That's right, she did not apply
13  during the rain.
14  BY MR. DERRINGER:
15      Q    Okay.
16      A    She knew that that was improper.  But she did
17  water the weeds, which seems kind of odd, but she did
18  water the weeds sometime prior to use, as she said that
19  makes the process more effective.
20      Q    The Roundup, the glyphosate that you say she
21  said got on her clothing, did you determine whether any
22  of that actually got through her clothing onto her skin?
23      A    No.  I -- I'm using the generally accepted
24  methodology of home and garden POEM, which gives a
25  percentage for her pants of 18 percent penetration.

Page 179

1      Q    But you didn't quantify that for Mrs. Stevick
2  with the particular clothing that she was wearing
3  specifically; right?
4      A    No.  That would be a novel untested procedure
5  with no known rate of error and be excluded, wouldn't
6  it?
7      Q    It would be excluded?
8      A    Yes; under Daubert.  That would be an
9  experiment.
10      Q    Okay.  Your lawyer earlier today mentioned
11  that you're not a lawyer, but you're testifying now
12  about legal standards?
13      A    I'm familiar with that as a scientist that you
14  must perform peer review, rate of error test,
15  reliability, general acceptance.  These are all things
16  that as a scientist I follow.
17      Q    You have no evidence that there was ever a
18  time when Mrs. Stevick used Roundup and did not wash her
19  hands after she used the Roundup; is that right?
20      A    I don't understand.
21      Q    Your understanding, sir, is that she washed
22  her hands every time after she used Roundup?
23      A    That's what she told me; yes.
24      Q    Okay.  And your understanding is that she
25  showered at the end of every evening on any day that she

Page 180

1  used Roundup?  That's your understanding?
2      A    I need to check my report on that.  She did --
3  I did ask her about that and I just don't remember so
4  I'll look.
5      Q    Take a look at page 12.
6      A    All right.  This is deposition testimony.
7      Q    First new paragraph, bottom of the paragraph.
8      A    Okay.  Well, this is consistent with what I
9  said earlier, that she would not immediately wash her
10  hands but would wait until she was done spraying, within
11  an hour.
12      Q    Right.
13      A    Although she washed -- within an hour of
14  spraying.  Although she washed her hands after spraying
15  Roundup, she did not shower until late in the day, until
16  approximately 10:00 p.m., until retiring for the night.
17      Q    Right.  My question was it's your
18  understanding that she showered around 10:00 p.m. in the
19  evening at the end of every day that she applied
20  Roundup?
21      A    Well, no, that's not what it -- that's not
22  what the testimony stated.
23      Q    Okay.  Then let me ask you this:  Are you
24  aware of any day when she applied Roundup or glyphosate
25  where at the end of that day she did not take a shower?

Page 181

1      A    No.
2      Q    And so am I right, Dr. Sawyer, that according
3  to your knowledge and understanding, Mrs. Stevick never
4  had more than 24 hours of exposure to glyphosate without
5  washing her hands and her body?
6      A    We don't know.
7      Q    Well --
8      A    We know that she -- what she stated in her
9  deposition about the approximately 10:00 p.m. time.
10  Beyond that is speculation.
11      Q    Right.  You're not aware of any time when she
12  was exposed to Roundup or glyphosate or a
13  glyphosate-based herbicide where she did not either
14  shower or wash her hands within 24 hours after that
15  exposure; is that right?
16      A    According to the testimony, it was within an
17  hour after spraying she washed her hands and showered at
18  approximately 10:00 p.m.  That's all we can objectively
19  say based on the evidence.
20      Q    Right.
21      A    Anything beyond that is speculation.
22      Q    And -- and what's your knowledge of the
23  earliest time in a day that she applied Roundup or
24  glyphosate?
25      A    In general, she just said morning hours so

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 48 of 79
Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 48 of 79
Confidential - William R. Sawyer, Ph.D.

Page 182

1  I -- I can't speculate on what time.

2      Q   But you're arriving at an opinion based on

3  your own set of reasonable inferences on things; right?

4      A   Yeah.  For example, morning means prior to

5  12:00 noon.

6      Q   Okay.  So --

7      A   12:00 noon to 10:00 is ten hours.

8      Q   That's right.  And that's why my question was

9  are you aware of any instance when Mrs. Stevick was

10  exposed to glyphosate or Roundup when she did not shower

11  within 15 hours of being exposed?

12     A   We don't know.  Testimony didn't state that

13  so --

14     Q   Right.  I know -- I know -- you say we don't

15  know.  That means you don't know that either?

16     A   No one knows.

17     Q   Right.  And so my question is -- well, are you

18  going to testify to there being any instance when

19  Mrs. Stevick was exposed to glyphosate for more than 15

20  hours before she showered, glyphosate or Roundup?

21     A   No, but I am going to testify somewhat

22  consistent with Dr. Sullivan that typically ten hours

23  passed in between exposure and showering and that --

24  this would be inconsistent with Sullivan -- that the

25  majority of dermal absorption occurs well before ten

Page 183

1  hours and very little of it can be removed from the skin

2  past the ten-hour standpoint.  And that's been well

3  shown in numerous dermal absorption studies of

4  glyphosate, that at the ten-hour mark you can wash that

5  skin all you want and it's already in the keratin and

6  epidermis and the surface material washout has very

7  little effect on further dermal absorption; in other

8  words, it's already on its way through the skin at ten

9  hours.  So --

10     Q   What study are you relying on?

11     A   A number of peer-reviewed studies and Monsanto

12  studies within my report --

13     Q   Can you name them?

14     A   -- which state exactly that.

15     Q   Can you name them?

16     A   Yeah.  We can go to them, sure.  In fact, I

17  have another one right here that I brought in this brown

18  pocket.

19     Q   Well, first you mention a number that in your

20  report you said.  I want to know the name of any one

21  you're relying on that's in your report.

22     A   All right.  The first study would be Maibach,

23  "Elimination of 14C-glyphosate in rhesus monkeys," et

24  cetera.

25     Q   That's Maibach 1983?

Page 184

1      A   Yes.

2      Q   Okay.  What's the next one, next study you're

3  relying on for the proposition that at the ten-hour mark

4  you can wash skin all you want and it's already in

5  keratin and the epidermis and the surface material

6  washout has very little effect on further dermal

7  absorption?

8      A   Yeah; that there's still -- some can be washed

9  off but it's not proportional.

10     Q   Right.  You named Maibach 1983.  Tell me

11  another study you're relying on for that proposition.

12     A   In the communications regarding the Maibach

13  study by Richard Dirks, Ph.D., senior product

14  toxicologist at Monsanto, that much of the test material

15  may in some way bind to --

16         THE COURT REPORTER:  I'm sorry, Doctor.  Could

17     you repeat that, much of the --

18         THE WITNESS:  -- that much of the test

19     material may in some way bind to or in the skin and

20     cannot be removed by washing.  This supported this.

21     It has been reported, Vickers 1963, that a chemical

22     reservoir is formed in the skin after drug

23     application, which is eventually shed without

24     penetration.  Thus, it is concluded that the bound

25     material is not apparently available for systemic

Page 185

1  absorption.

2         And there are time measurements on these

3  studies which -- on some of the studies I haven't

4  got to yet actually that show the amount that is

5  successfully washed off at one hour, two hour, six

6  hour, 12 hour, up to 24.  And by the time you get

7  to ten hour, very little can be washed off.

8  BY MR. DERRINGER:

9      Q   Yeah, I'm not asking right now about the

10  details of any studies.  I just want you to name the

11  studies you're referring to when you told me that dermal

12  absorption occurs well before ten hours and very little

13  of it can be removed from the skin past the ten-hour

14  standpoint.  And you say that's been well shown in

15  numerous dermal absorption studies of glyphosate that at

16  the ten-hour mark you can wash that skin all you want

17  and it's already in the keratin and epidermis and the

18  surface material washout has very little effect on

19  dermal absorption.  You've mentioned Maibach, 1983.  And

20  then the only thing you mentioned after that was a

21  communication from Richard Dirks.  And I think you

22  quoted from that communication a parenthetical that

23  refers to the Vickers 1963 study.

24         So you don't have to tell me what the studies

25  say right now.  I just want to know what studies you're

Page 186

1  relying on.
2      MR. TRAVERS:  Objection; form.
3      THE WITNESS:  The Monsanto in vitro absorption
4  study of glyphosate by DTL 2015 at the
5  72-gram-per-liter glyphosate gel formulation, MON
6  76829 study.
7  BY MR. DERRINGER:
8      Q   Okay.
9      A   The mean --
10     Q   What else?
11     A   The mean amount -- what I'm going to say is
12  that, quote, practically all of the applied glyphosate
13  acid was washed off the surface of the skin following
14  the six-hour exposure with a further .048 percent being
15  removed at the 24-hour wash.
16     Q   What other studies?
17     A   And -- and that study actually had tabular
18  data that shows that when the -- you know, after about
19  six hours you can't stop the train.  It -- it's
20  absorbing through the tissue.  And even if you wash it
21  off at 6 hours versus 12 hours, the differential is
22  pretty minor.
23     Q   Yeah, I'm just asking you to identify the
24  studies.
25     A   Yeah, yeah.  I mean, these are --

Page 187

1      Q   So go ahead.  Tell me what else.
2      A   Okay.  The same thing again, same statement
3  saying pretty similar numbers on the Monsanto in vitro
4  absorption study of glyphosate by DTL 2015,
5  7.2-gram-per-liter glyphosate gel formulation, MON
6  76258.
7      Q   Yeah.  You'll see in your report for all
8  those, I think it's seven of them that you described in
9  your report, the DTL studies, you say very similar
10  things about each of them.  So would you be -- would you
11  be including all of those DTL studies in response to my
12  question, you'd add them to Maibach, 1983 as studies
13  you're relying on for this notion that we've been
14  discussing?
15     A   Yes.
16     Q   So you've now been through your report.  And I
17  just want to make sure that I know that the studies that
18  you rely upon for the proposition that at the ten-hour
19  mark you can wash skin all you want and the glyphosate's
20  already in the keratin and epidermis and the surface
21  material washout has very little effect on further
22  dermal absorption, studies you rely on for that are
23  Maibach 1983 and the Monsanto DTL studies that you --
24  that you've described, the seven of them, in your
25  report.

Page 188

1      Any other studies for that proposition on
2  which you're relying?  I know you mentioned you brought
3  one with you today.  Are you relying on that study as
4  well?
5      A   Yeah; Wester 1991.
6      Q   You're relying on Wester 1991 --
7      A   Yes.
8      Q   -- for that proposition?
9      A   Yeah.
10     Q   Okay.  Now, that was discussed in your report.
11  Anything else other than Maibach, the Monsanto DTL
12  studies that are referred to and discussed in your
13  report, and Wester 1991?
14     A   Yeah, the study by Roberts, 2004, on factors
15  affecting the formation of a skin reservoir for
16  topically applied solutes does demonstrate the principle
17  of a tissue reservoir which cannot be removed by
18  washing.
19     Q   Okay.  Is that on your reliance list?
20     A   I'm sorry?
21     Q   Is that on your reliance list?
22     A   Yeah.
23     Q   Okay.  All right.  Have we now covered the
24  articles you're going to rely on for the proposition
25  we've been discussing?

Page 189

1      A   No.
2      Q   Okay.
3      MR. DERRINGER:  Why don't we go off the
4  record.
5      THE WITNESS:  I'm ready to go to the next one
6  if you're --
7  BY MR. DERRINGER:
8      Q   Well, I'm not asking you, sir, to go through
9  everything you have in front of you.  You've come to an
10  opinion and it's taken you now approximately 15 minutes
11  of our time to go through your report and to go through
12  different documents.  I want to know if besides reading
13  everything that's in front of you you're able to answer
14  my question.
15     A   Yeah, I have --
16     MR. TRAVERS:  Objection.  He is answering it.
17  You're asking a really open-ended question.
18  He's -- he's -- this is not a memory test.  If you
19  want to treat it as a memory test, you have to let
20  him go through his report and documents.
21     MR. DERRINGER:  Yeah, he did go through his
22  report throughout the --
23     MR. TRAVERS:  He's not finished.  He's not
24  finished, though.  You're not letting him finish.
25  You're stopping it.

Confidential - William R. Sawyer, Ph.D.

Page 190

1      MR. DERRINGER:  Well, the video will reflect
2   that he's been through his report.
3   BY MR. DERRINGER:
4      Q   Sir, any other article you're relying on for
5   the proposition that we've been discussing?
6      A   I think there's one more right here.
7      Q   Okay.  What is that?
8      A   Let me just double-check.  I know I have one
9   more with a graph in it.
10      Well, I'm not finding it and I don't want to
11   waste your time, but...

Page 192

1   middle of his answer.
2      Dr. Sawyer, go ahead.
3      THE WITNESS:  This is a very important answer.
4   I was given a copy of a judicial decision.  General
5   causation in this case has already been decided and
6   the attorneys asked me not to rehash general
7   causation as -- as I did in Hall.  Okay?  I'm --
8   I'm supposed to be looking at specific causation.
9   And I understand that's a judicial order, not --
10   not general causation.  So that -- that's the
11   answer.
12   BY MR. DERRINGER:

Page 191

16      Q   Well, do you plan to offer a differential --
17      A   Let me finish.
18      Q   I didn't ask the question.
19      A   You cut me off.
20      MR. TRAVERS:  Yeah, you've gotta let him
21   finish.  You asked the question.  He's --
22   BY MR. DERRINGER:
23      Q   Well, you've answered my question and we might
24   be able to avoid a lot of -- a lot of --
25      MR. TRAVERS:  No, no.  He was still in the

Page 193





Page 198

1    A    Certainly.
2    Q    And your testimony is that you considered
3    idiopathic cause; right?
4    A    Yes.
5    Q    And the --
6    A    That -- that I know that the human
7    epidemiologic study evidence has already been generally
8    accepted as statistically significantly elevating the
9    risk level.
10   Q    And tell me the entire basis for your
11   conclusion that it's more likely than not that
12   Mrs. Stevick's cancer was not the result of an
13   idiopathic cause.
14   A    Yes.

Page 200

6    Q    Well, it's right in the middle bolded.  It
7    says "Comparison to Six Epidemiologic Studies."
8    A    Okay.  Well, I --
9    Q    Do you see that?
10   A    Yeah, I do now.

Page 199

Page 201

it looks like what you did here was
11   you compared her exposures with now again you say four
12   epidemiologic studies but a different mix:  Eriksson,
13   which if you look at the footnote, that's the 2008
14   Eriksson; right?
15   A    Right.
16   Q    And then McDuffie 2001; is that right?
17   A    Yeah.
18   Q    And then De Roos 2003 and Hardell 2002.  Do
19   you see that?
20   A    Yes.

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 52 of 79
Case 3:16-md-02741-VC  Document 2250-1  Filed 04/23/19  Page 53 of 79
Confidential - William R. Sawyer, Ph.D.

Page 202

[REDACTED]

5    Q    Okay.  So including that then, is that now the
6  list of epidemiological study evidence that you're
7  relying on --
8    A    That makes six; yeah.
9    Q    Okay.  -- to conclude that it's not -- that
10  it's more likely than not that Mrs. Stevick's cancer was
11  not the result of an idiopathic cause?
12    A    Yes.  And back to the earlier question where I
13  only listed three studies -- McDuffie, Andreotti, and
14  Eriksson -- I didn't list the others in that section
15  because there was no quantifiable dose information that
16  I could extract.
17    Q    Okay.  So let's then talk about your dose
18  calculation.  Let's talk about your dose calculation.
19  That's described at pages 16 through 26 of your report;
20  is that right?
21    A    Yes.
22    Q    And here you on page 17 describe the active
23  ingredients of what you say were the products that she
24  used, either the glyphosate when it was mixed or the
25  ready-to-use glyphosate; is that right?

Page 203

1    A    Yes.
2    Q    Okay.  And the top one is the -- is the
3  glyphosate that got mixed and loaded; is that right?
4    A    Yeah.
5    Q    And the middle box on page 17, that's the --
6  what you believe are the active ingredients and other
7  ingredients for the ready-to-use product that you think
8  she used; is that right?
9    A    Yes.
10    Q    Okay.  How do you know that these are the
11  ingredients that were in the actual products that
12  Mrs. Stevick used from 1989 until 2014?
13    A    Well, she referred to it as concentrate, and
14  that's what the iso -- the glyphosate isopropylamine
15  salt mixture is formulated at.
16    Q    And for the ready-to-use product, how do you
17  know that that's the menu of ingredients that are in the
18  actual ready-to-use product or products that
19  Mrs. Stevick used?
20    A    Well, that's what Monsanto produced in their
21  concentrate product.
22    Q    Right.  But you've, in fact, listed in your
23  report, and I think it's in some other places, a variety
24  of different ready-to-use products that had different
25  mixtures of active and inactive ingredients; correct?

Page 204

1    A    Well, there -- there were various MON products
2  that were -- as I said, I understand that the
3  over-the-shelf home user product was what I have on page
4  17.



9    Q    Why is that important?
10    A    Well, it makes a difference on the ultimate
11  dose that she received.
12    Q    And then you used -- if you go to page 18,
13  you -- you used her weight of 56.7 kilograms; is that
14  right?  That -- that's the weight you plugged in to
15  whatever you used to determine her dose?
16    A    No.  I actually used 50 kilogram, 122 pounds.
17    Q    Well, that's something you changed in your
18  replacement page for the replacement of pages 23 through
19  25 that we've marked as Exhibit 2; is that right?
20    A    Yeah.
21    Q    Okay.  And we'll get to that in a minute, but
22  you used, it looks like, the UK Predictive Operator
23  Exposure Model to calculate Mrs. Stevick's dose; is that
24  right?
25    A    Yeah; for home garden outdoor use.

Page 205

1        MR. DERRINGER:  Okay.  All right.  Let's --
2  let's go off the record for a minute, take a break.
3        THE VIDEOGRAPHER:  Okay.  We're going off the
4  record at 2:14 p.m.
5        (Short recess.)
6        THE VIDEOGRAPHER:  We're back on the record at
7  2:28 p.m.  This is Media Unit No. 4.
8  BY MR. DERRINGER:
9    Q    Dr. Sawyer, when we took our break, we were
10  starting to discuss the UK Predictive Operator Exposure
11  Model, which I'll refer to as the POEM model.  Is that
12  okay?
13    A    Certainly.
14    Q    And you understand that the POEM is based on a
15  review of the data that was available on the exposure of
16  pesticide spray operators in the United Kingdom?
17    A    Yes.
18    Q    Okay.  And the POEM is a regulatory model; is
19  that right?
20    A    It's a model that -- it can be used as a
21  regulatory model, but the literature indicates that it
22  can be used in other fashions as well.
23    Q    One thing that regulators often build into
24  their models are protective factors; is that right?
25    A    Yes.

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 54 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/23/19 Page 54 of 79
Confidential - William R. Sawyer, Ph.D.

Page 206

1    Q    What does that mean, "protective factors"?
2    A    Well, in the case of POEM model, the 75th
3  percentile is used as opposed to the median or the mean
4  of 50 percent, so it's slightly higher degree of
5  protection than -- than the mean.
6    Q    And can you just translate that for the jury
7  because I don't know that -- well, how -- how does using
8  the 75th percentile translate into a protective factor?
9  What does that mean?
10   A    Well, let's say the leg exposure on patch
11 testing were -- gauze squares were taped on the body of
12 an applicator.
13   Q    That's passive dosimetry?
14   A    Passive dosimetry.
15   Q    Okay.
16   A    And let -- let's say that the average for the
17 legs is 4.5 milliliters of liquid spray on the lower
18 legs per hour.  Let's say -- let's just say that the --
19 that's the average of 4.5 and the 75th percentile would
20 be a higher number, might be 5.5.  The 25th percentile
21 instead of 4.5 might be 3.5.  So statistically it's
22 using -- instead of the very central value of the range,
23 it's using a slightly highly -- higher value to offer a
24 slight degree of protection; in other words, the error
25 is on the side to offer protection.

Page 207

1    Q    Okay.
2    A    It's not a gross overestimate, just slight
3  overestimate.
4    Q    Yeah.  And as a result of employing these
5  protective factors, sometimes these regulatory models
6  like POEM will overestimate things like dose?
7    A    Yeah.  As I said, the 75th percentile is used.
8    Q    Do you agree that when you plug or -- strike
9  that -- when you have a model like POEM where you're
10 plugging information in that generates some kind of
11 output, that the validity of your output depends on the
12 validity of your inputs?
13   A    Yes.  That's why I replaced pages 23 through
14 25.  Upon further study and scrutiny, I did find some
15 input errors.
16   Q    What were those errors that you found?
17   A    Well, I -- I misunderstood the software.  It
18 previously said T-shirt and shorts, and I found no way
19 of varying that and switching it to pants -- you know,
20 to -- yeah, to pants and shirt.  And I -- and then I
21 kept researching the model and the software and finally
22 understood how that is reverted back to full length
23 pants and shirt.  So that's -- that was one major
24 problem.
25   Q    So stop there for just a second.  And -- and I

Page 208

1  know you're looking at Exhibit 2.  If you could pull out
2  Exhibit 1 as well, I've got both of those in front of
3  me.  Exhibit 1 is your report with the pages 23 through
4  25, I'm calling the original pages in your report.  Can
5  you just tell me what that -- the correction of that
6  error, where is that reflected in a change between page
7  23 in your original report and page 23 in your
8  replacement page?
9    A    Yes.  Looking at the left-hand column, about
10 halfway down the page it says Clothing.
11   Q    I see it.
12   A    It previously said shirt and shorts.  It now
13 reads shirt and pants.  And below that the penetration
14 numbers are the same through the fabric, 20 and
15 18 percent.  But the important number, which is the
16 milliliters per hour, is now at 2.5 rather than 3.5 and
17 4.5 instead of 18.85.  And that's -- these numbers now
18 are reflective of the numbers from the POEM long pants
19 and long shirt values.
20   Q    I see.  So your original calculations at pages
21 23 through 25 of your report overestimated the amount of
22 Mrs. Stevick's dermal exposure in this regard and now
23 you believe you've corrected for that in your
24 replacement pages; is that right?
25   A    Yeah.  And I wrote in my report that she

Page 209

1  rarely used shorts.  I knew that.  I did not intend to
2  use the short number but I misused the software.
3    Q    Okay.  What -- go ahead.  What's the next
4  error that you corrected?
5    A    At the top, if you look at the application
6  dose, if we look on the left-hand column underneath
7  Exposure During Mixing, there's an application dose
8  value and --
9    Q    Yeah, you're in the white area, not up in the
10 yellow and green?
11   A    Right.
12   Q    Okay.
13   A    It previously said 10 liters of product per
14 hectare.  And that is a default value that is typically
15 used for home gardens, 10 liters of product per hectare.
16 But, in fact, in this case you'll see 3.78 liters.  And
17 then right below that you'll see .01579352 hectares per
18 day.  She actually -- her work rate was actually limited
19 to .01579 hectares.  And 3.78 liters to .01579 hectares
20 per day is equivalent to 11.2 liters per hectare.
21   Q    Okay.
22   A    So it's a simple mathematic relationship.
23 So --
24   Q    And the -- the .01579352 hectares, that comes
25 from your -- your description in your report of the

Page 210

1  spray area that would be kind of the driveway and the
2  rose beds and those areas?
3      A   Yeah, the area where you questioned me
4  regarding was there one rose bed or two --
5      Q   Right.
6      A   -- that particular paragraph.  That -- that's
7  where we find the hectares per day.
8      Q   Okay.  So that's the second error you've
9  corrected, you believe you've corrected.  What's the
10 next thing you changed that needed correction in your
11 opinion?
12     A   The application value and the dose.  Okay?  If
13 we look up in the top of the page on the left and we
14 read down, you'll -- you'll see dose and application
15 volume.
16     Q   I see it.
17     A   The dose was 11.22 liters per hectare, which
18 is a simple mathematical calculation used in the input.
19     Q   In fact, that's the calculation you just went
20 over; right?
21     A   Yeah.
22     Q   Okay.  And what about application volume?  I
23 see that's changed.
24     A   Yeah.  Application volume is the actual amount
25 of liquid used rather than the -- the absolute

Page 211

1  concentrate.  In other words, if we take 3.78 liters,
2  which is 1 gallon, and we divide that by the area
3  covered, that is .01579352, and set up a proportion and
4  then say, well, that X is equal to one hectare, it would
5  require 239.4 liters to do an entire hectare.
6          In other words, she did -- she used
7  3.78 liters to cover .01579 hectares, but to cover a
8  full hectare, it would require 3.78 times one divided by
9  .01579, which equals 239.4 liters per hectare.  And
10 that's what is -- the application volume is.  It's
11 actually 239.4 liters if she had treated a whole
12 hectare, where, in fact, she only treated .015 of a
13 hectare.  So, again, a simple mathematic relationship.
14     Q   Well, how did you come up with 400 -- the 4 --
15     A   400 was a default value.
16     Q   Okay.  And what's the next thing you changed?
17     A   If you look at page 24 -- now, wait a minute.
18 Maybe not.  Hang on.  No.  That's the same.  I think
19 that covers it.  I'm just checking.  Yeah.  Yeah.  No,
20 that's -- that includes the changes.  No, there is one
21 other change.
22     Q   What's that?
23     A   In the yellow box at the top on the right
24 side, you'll see what's called the work rate day per
25 day.

Page 212

1      Q   Yes.
2      A   Okay.  Her work rate was .01579352.  That's
3  what I entered in the yellow box up there.  And because
4  of the lack of space, Excel is -- is auto rounding to
5  .02, when in fact it's actually -- if you look at the
6  value in Excel, it's .01579352.  And if you look at what
7  I had before, I had in there the default value of 2,
8  which is incorrect.  She did not in one day cover 2
9  hectares.  She covered --
10     Q   Right.
11     A   -- .015.
12     Q   Is it your -- so if you -- if you look at page
13 23 and compare Exhibit 1 to Exhibit 2, you'll see that
14 the work rate per day in both is 0.02 hectares; right?
15     A   Oh, maybe -- maybe I had that -- yeah, I did
16 have that in originally.  Okay.  Okay.  Good.  But I
17 didn't have it under the work rate on the left-hand
18 column.  That's what it was.
19     Q   All right.
20     A   I had in there --
21     Q   So that wasn't a change that you made?
22     A   Okay.  No, you're right.  I did not make that
23 change.  That was already there.  Okay.  Good.
24     Q   Any other changes that you made to -- to
25 generate your replacement pages 23 through 25?

Page 213

1      A   No.  It's -- really the critical three things
2  then were that 11.22 and the 239.4 liter per hectare.
3      Q   All right.  I -- I did note, if you look up
4  the top under Product on the left-hand side --
5      A   On the -- in the report?
6      Q   Yeah.  Well, in both the report and the
7  replacement page.
8      A   Yeah.
9      Q   You see in the report the product that you
10 used was Glyphosate Super Concentrate?  You see that?
11     A   I do.
12     Q   And in the replacement page you replaced that
13 with MON 79376.
14     A   Yeah.
15     Q   Can you tell me why you did that?
16     A   I'm looking.  I think that's what she used in
17 my report, the page we had looked at previously on that.
18 I believe that's the -- the MON number I found for the
19 glyphosate that's in my report that we -- and I can't
20 figure out what page it is, the table.  Yeah, page 17.
21     Q   Page 17 you've got two different boxes.  Which
22 one of these do you believe is MON 79376, which is the
23 product you replaced on pages 23, 24, and 25 on your
24 replacement page?
25     A   I believe that the top box is what she used in

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 56 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/23/19 Page 56 of 79
Confidential - William R. Sawyer, Ph.D.

Page 214

1 her sprayer when she was diluting at 2-1/2 fluid ounces
2 per gallon of water. She also used, as per my report
3 and per her statement, a Roundup that required 6 ounces
4 to a gallon of water. And so I believe that I have the
5 correct MON number in there for the product used.
6   Q   Do you have a recollection, sir -- I think you
7 said you -- you generated these replacement pages
8 just -- when was it, yesterday? Two days ago?
9   A   These pages are new, yes.
10   Q   Yeah. But when did you -- when did you
11 generate them?
12   A   I've been working on these darn replacement
13 pages for about two days.
14   Q   Okay.
15   A   And just finished them up yesterday.
16   Q   Okay. And do you have a recollection of
17 changing the product entry, the input for the product?
18 Because that's not one of the things you mentioned
19 earlier when you described what changes you made.
20   A   Yeah, I thought I found that either in one of
21 my -- I -- I think I found it in one of my documents
22 that matched her formulation. I have to look.
23   Q   And am I right that the reason you replaced
24 that is because it's important in this model to put in
25 as the product something that is as close as possible in

Page 215

1 terms of its ingredients?
2   A   Yeah.
3   Q   As close as possible to the actual products
4 that Mrs. Stevick used; right?
5   A   Right. And it -- and it's tough to do because
6 she used this over a period of 25 years and there's just
7 no way to know what she used year to year. I'm just --
8 the only information I have is that when she said the
9 dilution rates were on the label, so I had to use that
10 to match the product.
11   Q   And tell me what you did to come up with MON
12 79376 as what you believe is the appropriate product
13 input in your POEM model.
14     MR. TRAVERS: Objection; asked and answered.
15     THE WITNESS: I don't remember where I found
16 it.
17 BY MR. DERRINGER:
18   Q   Okay. You also changed, it looks like,
19 something else. If you look at your replacement page
20 under Absorbed Dermal Dose, so it's in the right section
21 about two-thirds down. Tell me when you're there.
22   A   Yes.
23   Q   And then if you go over to the column under
24 which it -- or over which it reads Application -- do you
25 see that?

Page 216

1   A   Yes.
2   Q   -- and you look at I think it's concentration
3 of AS product or spray, that row, do you see that? So
4 it's the second column under Absorbed Dermal Dose under
5 Dermal exposure. Do you see it?
6   A   Oh, the concentration of the product or spray,
7 yeah --
8   Q   Right.
9   A   -- 431, which matches the top right corner
10 box.
11   Q   Yeah. Do you -- do you know what AS stands
12 for?
13   A   Yeah. That's as supplied.
14   Q   Okay. And if you look under Application in
15 that row, the figure you have there is
16 20.19974937 milligrams -- milligrams per milliliter;
17 right?
18   A   Yeah. That's a calculated number at the --
19   Q   Take a look at your original report, same
20 entry. What's there is just about half of what's in
21 your replacement page. There it gives a value of
22 10.78425 milligrams per milliliter. Do you see that?
23   A   Yes.
24   Q   Yeah. What was the reason for that change?
25   A   I believe that's reflecting the dermal

Page 217

1 exposure above for the legs with pants versus shorts.
2 You know, and I'm not -- I'm not exactly sure why it
3 converted to that number. I -- I didn't put that in.
4 That -- that is a calculated value.
5   Q   Okay. So you don't know as you sit here today
6 why your original calculation under POEM had for an
7 absorbed dermal dose a concentration of as-supplied
8 product or spray of 10.78 milligrams per milliliter and
9 your replacement page has a concentration of as-supplied
10 product or spray under absorbed dermal dose application
11 of 20.199 milligrams per milliliter? Just sitting here
12 today you don't know why that changed?
13   A   Oh, yeah, yeah. There was another error that
14 I fixed. I think this is what it was. And I just
15 spotted that now. If you go back to the top left column
16 and you look down under exposure during mixture, it says
17 number of operations two per day.
18   Q   Yeah.
19   A   She only mixed once a day or not at all. She
20 didn't mix twice a day. That was a default value, that
21 2 -- so you'll see now it reads number of operations
22 one. And then so that -- that has changed.
23   Q   Yeah, but that's during -- those are the
24 number of operations during mixing and loading; right?
25   A   Right.

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 57 of 79
Case 3:16-md-02741-VC  Document 2550-72  Filed 01/25/19  Page 57 of 79
Confidential - William R. Sawyer, Ph.D.

Page 218

1  Q   Yeah.
2  A   So she's only doing one mixing and loading.
3  Q   Yeah.  And so if you go to absorbed dermal
4  dose, that splits things up between the mixing and
5  loading in the application; right?
6  A   Right.  So the question you're asking me is
7  regarding application.
8  Q   Well, that's where the different value is, the
9  nearly doubling of the value that you've put in now is
10 under application, not under mixing and loading.  So do
11 you have any idea why that value concentration of
12 as-supplied product or spray doubled in your new
13 replacement page?
14 A   Yes, I do.
15 Q   Okay.  What's the reason?
16 A   If you take 431 milligram per ml and you take
17 6 ounces divided by 128 --
18 Q   Hold on. I'm sorry.  Where are you getting
19 6 ounces from?
20 A   Her testimony.  If you take 6 divided by 128,
21 that's the dilution factor, times 431 milligram per ml,
22 it comes out to 20.2.
23 Q   Okay.  You write in your report that she -- or
24 her husband or she mixed the glyphosate according to the
25 label instructions.  Is that your understanding?

Page 219

1  A   Yeah.
2  Q   Okay.  All right.
3  A   She also said 6 ounces specifically, either
4  2-1/2 or a 6.  And her 2-1/2 would be with the 500,000
5  product, the super concentrate.  And she said she used
6  concentrate.  And really based upon her testimony, I
7  think they used both because she said 2-1/2 or 6 ounces.
8  Q   When you say "both," concentrate and what?
9  A   Concentrate or super concentrate.
10 Q   Okay.
11 A   Based on her testimony of saying that they
12 either used 2-1/2 ounces per gallon or 6 ounces per
13 gallon.
14 Q   And your inputs in this -- this replacement
15 page, these replacement pages that are Exhibit 2, are
16 those based on 6 ounces or 2-1/2?
17 A   6 ounces using the 431 milligram per ml --
18 Q   Okay.
19 A   -- product, which is the concentrate as
20 opposed to the super concentrate.
21 Q   And, in fact, in your original, your original
22 POEM calculations, you used the super concentrate.
23 That's reflected under the product on pages 23 through
24 25 of your report; is that right?
25 A   Yes, but the AS concentration is wrong.  It's

Page 220

1  431 as opposed to a higher value like you see in
2  Sullivan's chart of 500.
3  Q   Dr. Sullivan you think is correct?
4  A   Well, I -- I don't think anyone's correct
5  here.  I think that this varied.  I mean, she used the
6  stuff for 25 years.  And to try to pin me down in saying
7  she used exactly this product for 25 years is not a
8  reasonable request.
9  Q   I'm not trying to pin you down.  I'm trying to
10 understand what made you decide to use the values, the
11 inputs that you decided to use in your POEM model,
12 according to which you have attempted to estimate her
13 dose.
14 A   Because her testimony, if you read it, and my
15 interview, she said either 2-1/2 or 6 ounce per the
16 label and then she used concentrate.  So, you know,
17 that's -- it's most consistent with the facts in the
18 case.
19 Q   Right.  And so just to close this out just so
20 I'm clear, what you used in your replacement page was
21 the 2-1/2 or the 6 ounce?
22 A   6 ounce.
23 Q   Okay.
24 A   And the 431 milligram per ml concentrate.
25 Q   Okay.  One other thing I noticed that's

Page 221

1  different in your replacement pages from your original
2  pages is her weight.  If you look at the bottom of your
3  model --
4  A   Yeah.
5  Q   -- originally you used 56.7 kilograms and
6  you've now changed that to 50 kilograms.  Did you intend
7  to do that?
8  A   Yeah.  There were several reasons.  One, she
9  testified that she gained weight after developing the
10 cancer and she gave -- gave some reasons why.  Also,
11 younger people in the earlier years weigh less than in
12 their older years.  People gain weight as they age.  And
13 Sullivan used 50.  And I think 50 for that period of 25
14 years is more realistic than the 55 kilogram which she
15 states she -- when she contracted cancer and she
16 believes that the pharmaceuticals caused her to gain
17 weight.
18 Q   The pharmaceuticals that she used after being
19 diagnosed with cancer?
20 A   Yes.
21 Q   Okay.  Have you seen any medical records, sir,
22 that indicates that her weight was ever 50 kilograms?
23 A   I don't have anything older than 2009.
24 Q   Have you seen anything in any medical record
25 that indicates that her weight was ever 50 kilograms?

Page 222

1    A    No.  But that was eight years ago and we're
2   talking here over 25 years ago, close to 30 years ago
3   actually.
4    Q    All right.  So let's take a look at Exhibit 2.
5   I just have some --
6    A    And -- and fourth reason, Sullivan used 50 so
7   I thought it might be wise for the comparison of his
8   dose versus mine since 50 is a reasonable weight to use
9   50 and then I could make a better comparison with his
10  result.
11   Q    You're -- you're basing your estimation of
12  Mrs. Stevick's dose in order to come up with your
13  opinion about the amount of glyphosate to which she was
14  exposed, you're basing that on something that
15  Dr. Sullivan used as an input; is that what I'm hearing?
16       MR. TRAVERS:  Object to form.
17       THE WITNESS:  No.  I'm basing it on the fact
18  that she was using this material nearly 30 years
19  ago at -- at an age in -- in her -- in her 20s.
20  And certainly a girl in her 20s is going to weigh
21  less than a person, you know, who's in her late 50s
22  or even 62.  And I don't have medical records that
23  go back any further than eight years ago or nine
24  years ago.
25       And the fact that Sullivan used 50, since we

Page 223

1   don't know what her weight was exactly for that
2   period of about 20 years, I thought it would be a
3   reasonable weight to use.  And since Sullivan's
4   using it, I can compare apples to apples with his
5   work.
6       BY MR. DERRINGER:
7    Q    But you understand that your estimation of
8   dose here, the purpose isn't to compare apples to
9   apples, it's to render your own independent opinion
10  about Mrs. Stevick's exposure to glyphosate and any
11  relationship that has to her development of cancer?  You
12  understand that; right?
13   A    Yes.
14   Q    Okay.  Did you ever ask Mrs. Sullivan what her
15  weight was in her 20s?
16   A    Yes.
17   Q    What did she tell you?
18   A    What I said before, less, that she gained
19  weight around the time of her cancer and continued to
20  gain weight is what she told me.  She weighed less.
21   Q    You didn't put that in your report, did you?
22   A    No.  She didn't give me a number.
23   Q    And did you ever ask her what she gained --
24  what her weight was in her 30s or her 40s or her 50s?
25   A    Yeah.  I asked her what her weights were.  She

Page 224

1   said less.



20   Q    You see application technique home garden
21  sprayer?
22   A    Yeah.
23   Q    It says 5-liter tank?
24   A    Yeah, that's what she has.  She has a -- she
25  has a 5-liter cylinder.

Page 225

1    Q    How many gallons are in 5 -- 5 liters?
2    A    Oh, no.  Actually you're right.  I was
3   thinking 5-gallon.  She has a 5-gallon cylinder, yeah.
4    Q    Yeah.  How many gallons are in 5 liters?
5    A    I don't -- it doesn't matter because I didn't
6   use a value of 5.
7    Q    All right.  Can you --
8    A    I didn't use her spraying 5 gallons.
9    Q    Can you answer my question?
10   A    I have her spraying 3.78 liters.
11   Q    How many gallons are in 5 liters, do you know?
12   A    Yeah.  About 1.1 -- no, probably no.  More
13  than that actually.  Probably about -- about 4.5 gallon
14  roughly.
15   Q    And also under Dermal Exposure During Spray
16  Application, duration of exposure you used one hour; is
17  that right?
18   A    Yes, one hour, which does not mean trigger on
19  the finger continuously.
20   Q    Under the POEM model, do you know how long
21  that does mean, meaning trigger on the finger?
22   A    Yeah, that's -- that's --
23   Q    What's the trigger on the finger under POEM?
24   A    -- that's not how the POEM model was
25  developed.  It was six hours of application and the

Confidential - William R. Sawyer, Ph.D.

Page 226

1 application is not a continuous spray. It's on and off,
2 on and off, on and off.
3    Q   Right. And just like you were able to give
4 some figure about how long it would take if your finger
5 were on the trigger the whole time to use up an entire
6 gallon of liquid in the sprayer that she used, I think
7 you said 12.6 minutes or so, I'm just wondering if you
8 know what this model incorporates as the actual
9 finger-on-the-trigger-time during the six-hour day that
10 it is based on.
11    A   I -- yeah, I've come across that in the UK
12 POEM model. I'm trying to remember the exact number.
13 The aerosol application, non-CDA application, does show
14 the average flow in liters per hour. And when you take
15 that number and apply it to six hours, it doesn't work.
16 It's not a continuous flow for six hours. It's
17 intermittent. And this model adjusts for it. This
18 model is using 3.78 gallons per .01579352 hectare, which
19 calculates to 239.4 liters per hectare. So we know how
20 much she was putting down per area. We know how much --
21 how many milligrams she used. And that's -- the
22 equation takes that into account. It's not based upon
23 one hour. It's based upon the milligrams of material
24 she put down over a given area during that interval of
25 one hour.

Page 227

1    Q   Let me get back to my question. The POEM
2 model, which is based you said before on a six-hour
3 application day, do you know what assumption is
4 incorporated into that model about how much
5 finger-on-the-trigger time is spent during those six
6 hours?
7    A   Yeah. It can be calculated from the table in
8 the UK POEM that shows the flow rate and the amount of
9 material used. And one can look at that and immediately
10 determine that it's not continuous spray for six hours.
11    Q   I'm not asking kind of when you plug things
12 into the model. The model is based on data; right?
13    A   No, I'm not even talking about plugging the
14 model in. I'm simply saying that the chart shows how
15 many liters per minute was coming out of the gun. And
16 if you multiply that by six hours, it does not equal the
17 result that would be there if you were spraying
18 continuously for six hours.
19    Q   Right. What does it equal? I mean, the
20 result that it equals, you can do the math, I assume,
21 and figure out how much time of those six hours the
22 model assumes is actual spray time. Have you done that?
23    A   No.
24    Q   And do --
25    A   But I believe that this equation calculates

Page 228

1 that because the equation knows what area you're doing,
2 how long you're doing it, and how much material you're
3 spraying.
4    Q   Do you know if the pressure that was used to
5 spray in the model was the same as the pressure that
6 Mrs. Stevick used when she was spraying?
7    A   That's irrelevant because what we're measuring
8 is how much material comes out of her aerosol gun in one
9 hour. And we know how many milligrams that was exactly
10 because we know how much she used. She used 3.78 liters
11 of a formulation at 431 milligram per ml. So
12 irregardless of the pressure, we know how much she put
13 down.
14    Q   Do you know if the pressure that was used to
15 spray in the model was the same as the pressure that
16 Mrs. Stevick used when she was spraying?
17    A   You're deviating from the model. The pressure
18 is not a factor in the model at all. Show me anywhere
19 in the UK model where pressure is mentioned. It doesn't
20 matter. It's the amount that comes out of the gun. So
21 you're asking questions that can't be answered.
22    Q   Do you agree, sir, that dermal exposure, the
23 amount of dermal exposure, is what drives the predicted
24 dose for Mrs. Stevick in your calculation?
25    A   Oh, by far, yeah. She only had one loading,

Page 229

1 if any. However, and this is where I'm going to
2 vehemently contend this, that she had hand contact
3 during her spray operations from leakage, which is
4 actually a worst-case situation. That's worse than just
5 handling a bottle that might have a few drops on it.
6 She's continuously getting a wet hand. So certainly
7 the -- the hand calculation is valid for her. I would
8 not agree to eliminating the hand to a zero. I think
9 that would be incorrect.
10    Q   What did you put in here for the hand?
11    A   Just one -- one -- one exposure. Under
12 Exposure During Mixing, if you look down about five
13 lines, it says number of operations 1, where the default
14 value is 2.
15    Q   Right. But where -- where are you reflecting
16 your hand application?
17    A   Well, the dermal exposure value under POEM is
18 .1 ml per day. That's under absorbed dermal dose. The
19 dermal exposure is .1 ml per day, as opposed to 17 ml
20 per day from the application of the trunk and legs.
21    Q   If it turns out that your understanding of how
22 much leakage got on Mrs. Stevick's hands, that would
23 result in your estimated dose being wrong; is that
24 right?
25    A   Yes. And I can explain how much. If you take

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 60 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/23/19 Page 60 of 79
Confidential - William R. Sawyer, Ph.D.

Page 230

1 the absorbed dose value of .431 milligram per day under
2 mix load and you divide that comparatively to the total
3 dose, which is 3.43 plus that amount times a hundred
4 percent, it's about 11 percent. So it's not a big
5 difference. It's -- I mean, because her -- her hand
6 exposure in this equation is only -- only about
7 11 percent of her total.
8     Q    And are you saying that under Application
9 the -- the dose that you've calculated under Absorbed
10 Dermal Dose under Application, 3.43, that does not
11 include any exposure or absorption on her hand; is
12 that --
13     A    Correct, correct. There's two different
14 numbers here that get added together.
15     Q    I understand. If you look up at number of
16 operations, you said you had put one in there. Do you
17 know what that number 11 refers to next to the 1?
18     A    Yeah. It -- it's actually not a number, as I
19 recall, but, rather, units. And for some reason in the
20 printout it was kind of jambled. I don't remember,
21 without actually turning on the Excel program, what the
22 units were, but that's not a -- it's not an entry
23 number.
24     Q    You see that that number is not in your
25 original report, the POEM model that you included?

Page 231

1     A    Yeah. It said per day, and now it doesn't say
2 that. It's -- and I'm not sure why. I'll have to open
3 up Excel and try to figure that out.
4     Q    Okay. Now, you also in your report talk about
5 her dose in terms of days of exposure; is that right?
6     A    Yes.
7     Q    And when Mr. Kalas deposed you just two months
8 ago on October 16 and you guys were discussing the POEM
9 model, kind of a similar discussion to what we were
10 having just now, you -- you pointed out or you testified
11 that, you know, any deficiencies in the POEM model were
12 somewhat irrelevant because your primary comparison is
13 hours and days worked compared to that of the hours
14 exposure and work days in the human epidemiological
15 data.
16     A    Yeah, that's absolutely true. That's the
17 important way, the most accurate way, to compare dose to
18 human study. Here this dose calculation, the only thing
19 it can be compared to is that of other applicators to
20 see is -- is this dose in range with applicators in the
21 studies.
22         And one can also consider, based on the AOEL,
23 was this dose, you know, four times -- four orders of
24 magnitude lower than the AOEL or was it approaching the
25 AOEL. It's kind of a gauge that tells us a little bit

Page 232

1 about the dose. We can't really compare it to the AOEL
2 for any causation purposes because that's a regulatory
3 value and it's also for noncancer effects. But I can
4 only use that AOEL as a gauge to say is she in range
5 with actual applicators on a given day of exposure.
6     Q    Yeah. And you testified two months ago that
7 you wouldn't be using the POEM model because with the
8 days of exposure, you said, quote, we're comparing
9 apples to apples. And if you take the dose calculation
10 you did using the inputs to the POEM model, you can't
11 compare that to the human epidemiological literature.
12         You still stand by that; correct?
13     A    Right. There's no -- no such dose
14 calculations performed in the human studies in a -- in a
15 milligram per kilogram body weight per day on -- on a
16 day of exposure.
17     Q    And that's, in fact, why you spend part of
18 your report talking about her days of exposure and
19 comparing that to the epidemiological studies?
20     A    Right, because that's what -- that's our --
21 our primary most accurate way of determining whether or
22 not she falls into the realms of the epidemiologic
23 studies.
24     Q    So -- so your specific causation opinion that
25 glyphosate or Roundup was a substantial factor in

Page 233

1 causing her cancer is primarily based on her days of
2 exposure and comparing that, like you just said, to the
3 human epidemiological evidence; is that right?
4     A    Yes.
5     Q    Okay. And you used 255 days of exposure as
6 her -- as her value?
7     A    Yes.
8     Q    You'll agree with me, sir, that at the very
9 most Mrs. Stevick's exposure was 255 hours over a period
10 of 25-1/2 years?
11         MR. TRAVERS: Objection to form.
12 BY MR. DERRINGER:
13     Q    Is that right?
14     A    Not exactly. She said -- her words were in
15 her errata page on her deposition were at least one
16 hour. So it could be -- it could be more.
17     Q    Right. But in your report I think you're --
18 you're relying on the fact that she sprayed for an hour
19 a day -- or, I'm sorry, that she --
20     A    I think I said approximately.
21     Q    Okay. All right. So, well, at the very least
22 can we agree that her exposure at most was approximately
23 255 hours over that period of 25-1/2 years? I think
24 that was the word you just used, "approximately"?
25     A    Yeah, I think that's -- that's reasonable.

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 61 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 61 of 79
Confidential - William R. Sawyer, Ph.D.

Page 234

1 Q Okay. So if we add up all those hours, then
2 the total amount of time that Mrs. Stevick used Roundup
3 adds up to a maximum total of roughly, approximately ten
4 days of exposure spread out over a 25-year period?
5 MR. TRAVERS: Objection to form.
6 BY MR. DERRINGER:
7 Q I'm just adding up hours and translating them
8 into days.
9 A No, no, because that's not how Eriksson or
10 McDuffie calculated exposure days in the human
11 epidemiologic studies.
12 Q You know, I'll -- we'll talk about Eriksson
13 and McDuffie. I'm just talking as a matter of fact
14 here. And you'll have your chance at trial, I'm sure,
15 to talk about Eriksson and McDuffie and what their
16 metrics were. But if -- if her exposure was
17 approximately 255 hours over a period of 25-1/2 years,
18 that 255 hours cumulatively adds up to roughly ten days;
19 right?
20 MR. TRAVERS: Objection; asked and answered.
21 THE WITNESS: That -- no. That's grossly
22 incorrect. When one is exposed to glyphosate and
23 doesn't wash it off the body for ten hours, over a
24 24-hour period a -- a certain level of absorption
25 occurs into the systemic bloodstream. Now, if you

Page 235

1 take the same amount of exposure and you throw it
2 all into 10 days or 25 days or whatever you're
3 talking about, it's going to result in a
4 significantly different dose.
5 She's -- what's important is that she's
6 exposed for one hour or even if she's exposed for
7 12 minutes, the fact is she has it on her skin, the
8 dermal absorption process is beginning and the
9 clock is ticking. And that happened 255 times.
10 BY MR. DERRINGER:
11 Q Over 25-1/2 years?
12 A The -- the -- I'm sorry. I'm getting tired.
13 Q You said it happened 255 times. Those 255
14 times occurred over a period of 25-1/2 years?
15 A Right. But -- but each time that happens for
16 only one hour, that dermal absorption continues and she
17 receives a certain dosage; whereas, if you change the
18 wording and say, well, what if we said it was an 8-hour
19 day and we take 255 divided by 8 and she was exposed for
20 only 31 days total, that's an entire -- from a
21 scientific and a toxicological standpoint, that results
22 in a very different scenario because of the lag in
23 absorption time.
24 You only have to be exposed for a little bit
25 dermally, but you continue to be exposed all day long.

Page 236

1 You're making an assumption that her damage that induces
2 the malignancy only occurs during that one-hour period,
3 and that's not true. The studies on dermal absorption
4 show how long it takes to absorb and excrete it.
5 Q Okay. Will you agree with me --
6 A We're not agreeing on much today, but I'll
7 try.
8 Q Will you agree -- will you agree with me that
9 any day of exposure, any day on which Mrs. Stevick used
10 glyphosate or Roundup occurred about one month after any
11 prior exposure that Mrs. Stevick had to glyphosate or
12 Roundup?
13 A I really want to say yes and agree with you,
14 but that first two or three months she was exposed more
15 than once a month so it kind of throws a wrench into me
16 saying yes.
17 Q Right. So more than once a month the maximum
18 she was exposed, according to her testimony, was twice a
19 month?
20 A Right.
21 Q For three months?
22 A Right.
23 Q Okay. So for three months you'll agree that
24 any day of exposure that Mrs. Stevick experienced in
25 terms of exposure to Roundup or glyphosate, for those

Page 237

1 first three months that occurred about two weeks after
2 any prior exposure that she had to Roundup or
3 glyphosate? You agree with that?
4 A I agree.
5 Q Okay. After those first two or three months
6 you'll agree that any time that Mrs. Stevick had any
7 exposure to glyphosate or Roundup, that exposure
8 occurred no less than one month after any prior exposure
9 that she had had to glyphosate or Roundup; correct?
10 MR. TRAVERS: Objection to form.
11 THE WITNESS: Maybe read it back. I'm just a
12 little tired.
13 BY MR. DERRINGER:



Page 238

Page 239

Page 240

I am not providing an
opinion as to the general causation of NHL supported by
the epidemiologic literature. That is being deferred.
Q   I understand that that is being deferred. You
mean you are deferring that to the epidemiologists?

Page 241

A   Yes.

Q   Are you going to testify at all about any
information regarding those epidemiology studies?
A   None whatsoever, except that the way dose was
counted in three of the studies, which is on page 26,
27, and 29 of my report, are consistent with
Ms. Stevick's exposure. That's what I'm using the
epidemiologic studies for. I'm not the one who is
evaluating the strength of the associations, the -- the
statistical significance, and all of the potential
confounders and so on in those studies. That is
deferred. I'm not opining on the general causation of
those studies but, rather, that Ms. Stevick's exposure
dose is consistent with those studies.
Q   So am I right, sir, that you are going to
defer to others all opinions and all testimony regarding

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 63 of 79
Case 3:16-md-02741-VC Document 2559-12 Filed 01/25/19 Page 63 of 79
Confidential - William R. Sawyer, Ph.D.

Page 242

1  the design of the human epidemiological studies?
2     A   Yes.
3     Q   You're going to defer all opinions and all
4  testimony to others regarding the validity of the human
5  epidemiological studies?
6     A   Yes.  Now, when I say "design," though, the --
7  the part that I am using it for is how many exposure
8  days were in those studies compared to Ms. Stevick.
9  That's the only element of design that I'm addressing.
10    Q   You are going to defer all opinions and
11 testimony regarding -- I'm sorry.  Strike that.
12        You are going to defer to others all opinions
13 and testimony regarding the statistical analysis of the
14 human epidemiological studies; is that right?
15    A   Yes.
16    Q   You are going to defer to others all opinions
17 and testimony about the results of the human
18 epidemiological studies; correct?
19    A   Yes.
20    Q   Have you had any new training in epidemiology
21 since you started working on the Roundup litigation --
22 well, strike that.
23        When did you start working on the Roundup
24 litigation?  Not just this case.  I know you gave a
25 deposition in the Johnson case back in February of 2018.

Page 243

1  With that as a reference point, can you give me an
2  estimate of when you started working on the Roundup
3  litigation?
4     A   I'm not sure I'm allowed to under the law.
5  I -- I was consulting.  I'm not sure I'm allowed to --
6  to say that --
7     Q   Okay.
8     A   -- because I was a consulting expert at one
9  point.
10    Q   Okay.
11        MR. TRAVERS:  Yeah, I think you can tell him
12 when -- when you started.
13        THE WITNESS:  I can tell him that.  All right.
14 I have permission.  All right.
15        MR. TRAVERS:  I think he'll find out anyway.
16        THE WITNESS:  I -- I began consulting on
17 this -- this was several months before the Daubert
18 hearings in -- in the federal cases.  When I say
19 "several months," it could have been March of '17.
20 I just can't remember the exact month, but in that
21 range.
22        Does that sound right?
23        MR. TRAVERS:  Yeah, could be something like
24 that.
25        THE WITNESS:  Roughly.

Page 244

1  BY MR. DERRINGER:
2     Q   Okay.  Since the time that you started working
3  on the Roundup litigation, have you had any new training
4  in the field of epidemiology?
5     A   No, but I have probably have reviewed since
6  that time about 500 studies.
7     Q   Five hundred human epidemiology studies?
8     A   Yeah; not -- not glyphosate but of any
9  chemical.
10    Q   Okay.  But you've taken no new classes during
11 that period of time, have you?
12    A   No, no.
13    Q   Okay.  And you're not holding yourself out as
14 an epidemiology expert, are you?
15    A   No.
16    Q   Do you agree, Dr. Sawyer, that an increased
17 risk must be higher than the background risk before you
18 can conclude that exposure to a chemical increases one's
19 risk of developing a disease?
20        MR. TRAVERS:  Objection to form.
21        THE WITNESS:  I do.  But I -- I'm not sure I
22 understand the context of the question because one
23 can have I'll just take liver cancer because I -- I
24 have the numbers off the top of my head.  The
25 incidence of liver cancer in -- in a young male is

Page 245

1  like 1 or 2 in a hundred thousand person-years, and
2  yet the incidence of liver cancer from arsenic
3  poisoning is greater than that, 1 in 100,000
4  person-years.  But if we take and define it as
5  cancer in general, well, 50 percent of the
6  population will ultimately develop some type of
7  cancer, even basal cell carcinoma.  So one has to
8  be very careful in understanding the contents of
9  that.
10

18 BY MR. DERRINGER:
19    Q   Would you agree that an increased risk must be
20 higher than the background risk before you can conclude
21 that exposure to a chemical increases one's risk of
22 developing DLBCL?
23    A   Yes.  I've thought about that, and in the
24 epidemiologic studies -- and I won't be specific because
25 I'm not testifying as to the design and merit of the

| Page 246 | Page 248 |
|---|---|

**Page 246**

1 epidemiologic studies in this case, but --

2 Q I'm sorry to interrupt. Let me just say we're

3 under -- I'm under a time constraint. And if you're not

4 going to be testifying about the epidemiological

5 studies, which is what I think you just said --

6 A Yeah, that's what I'm saying, yeah.

7 Q I don't want to waste our time together on

8 something you are deferring to others on and not going

9 to testify about.

10 A Yes.

11 Q Okay.

12 A Yes.

13 Q And -- and whatever it was you were about to

14 tell me about the epidemiological studies is something

15 you're not going to testify about; right?

16 MR. TRAVERS: Well, I just object because if

17 it's responsive to the question you're asking, then

18 I think he's got to be able to use his experience

19 to answer that. But if you want to withdraw the

20 question, then --

21 THE WITNESS: I can answer it in just a few

22 words --

23 BY MR. DERRINGER:

24 Q Okay.

25 A -- to clarify. That if the control group in

**Page 247**

1 an epidemiologic study has groups of people in it who

2 are 62 years old and then the exposed group has

3 62-year-olds in it and there's a significant rate at

4 increase, that then is sufficient for causation. But if

5 one were to say that NHL occurs in, you know, 2 percent

6 of the population and -- and in the epi study with

7 glyphosate it wasn't -- 2 percent of the population was

8 not achieved, see, that -- that would be another -- it

9 would be an improper comparison. So one has to consider

10 are there -- does the control group versus the exposed

11 group, are they age-matched. And if they are, well,

12 then background is overcome.

13 Q And talking about control group versus the

14 exposed group, do you agree that in order to evaluate

15 whether an exposure to a chemical causes a particular

16 outcome, we want the control group or the unexposed

17 group to reflect the experience of the exposed group

18 with respect to everything except for their exposure to

19 the chemical of interest?

20 A Correct, as best as possible. No study's

21 perfect.

22 Q And, likewise, a human epidemiological study

23 should control for risk factors other than the chemical

24 for which you are testing; is that right?

25 MR. TRAVERS: Objection to form. I thought

**Page 248**

1 you didn't want him testifying about epidemiology.

2 MR. DERRINGER: Yeah, I --

3 THE WITNESS: I'm humored by this because I'm

4 not testifying to it and you're asking me questions

5 that are needless.

6 BY MR. DERRINGER:

7 Q Well, you've included quite a bit about it in

8 your report so it's -- it's my time so let me just ask

9 the question. Do you agree that a human epidemiology

10 study should control for all known risk factors for a

11 disease other than the risk factor for which you are

12 testing?

13 A As much as possible. I mean, it -- it -- and -- and

14 also the size of the study can defer some of that if the

15 study has a huge number of people in it.

16 Q You didn't review the pathology of

17 Ms. Stevick's lymphoma, did you?

18 A No, but I read it carefully. It's -- I didn't

19 receive -- I didn't ask for the slides or sections, but

20 I reviewed the pathology. And I have no adverse

21 opinions to it.

**Page 249**

21 Q In my calculations under the POEM model,

22 both Exhibit -- in Exhibit 1, pages 23 to 25, and in

23 your replacement pages, which is Exhibit 2, you

24 generated three different calculations; is that right?

25 A Yes.

Page 250

1    Q   One was based on a 1 percent dermal
2 absorption, another was based on a 3 percent dermal
3 absorption, and a third was based on a 10 percent dermal
4 absorption; is that right?
5    A   Right.
6    Q   Okay.  On what -- well, let me strike that.
7        When you've been asked about that before, I
8 think you said that the 10 percent dermal absorption
9 figure that you used was based on the TNO study.  Is that
10 right?
11       MR. TRAVERS:  Objection to form.
12       THE WITNESS:  TNO 2002, yes.
13 BY MR. DERRINGER:
14    Q   Right.  Any other study that that 10 percent
15 figure is based on?
16    A   No, no.  And that's why I'm just providing a
17 range for the 1 to 10 percent.  And most likely the most
18 accurate dermal absorption is somewhere in between 1 and
19 10 percent.
20    Q   Okay.
21    A   And as you know from my report, there's a huge
22 range if you include the DTL studies.
23    Q   Yeah, that's reflected I think at Figure 9 of
24 your report; is that right?
25    A   Page 88.

Page 251

1    Q   88?
2    A   Yeah.
3    Q   Okay.  And Figure 9, let me ask you a few
4 questions about that.  Figure 9 is a graphic
5 presentation, I think, of what you've described in your
6 report from pages 59 up through 87; is that -- is that
7 right?  If you go to page 59, you'll see this is a
8 section that starts Dermal Absorption and
9 Pharmacokinetic Studies of Glyphosate.
10       Then as you progress through that section,
11 you'll see you discuss and describe certain studies, and
12 you have a Table 11 that I think is intended to capture
13 those studies.  And then you have Figure 9, which, like
14 I said, I think is intended to represent
15 graphically the studies that you discuss at pages 59
16 through 87; is that right?
17    A   Yes.
18    Q   And is this Figure 9 -- is this Figure
19 9 something you intend to show to the jury?
20    A   I think anything in my report is possible.
21    Q   Okay.  And you have three bars, it looks like,
22 for each study; is that right?
23    A   Yes.
24    Q   What do the three bars represent?
25    A   The receptor fluid and epidermis as per OECD

Page 252

1 regulations.  In other words, the regulation is what is
2 measured remaining in the epidermis and in the receptor
3 fluid should be added together as opposed to only the
4 receptor fluid.  So if you look at, for example, TNO
5 2002 in the yellow bar, if you have color --
6    Q   I don't.  We weren't provided with the color
7 copy.
8    A   Uh-huh.
9    Q   So the yellow bar is the middle one, the far
10 left one, or the far right one?
11    A   It's the far right one.
12    Q   Okay.  The lighter one.
13    A   Yeah.  The one to the far right, it's -- it
14 probably is lighter.
15    Q   Okay.
16    A   I just want to check to make sure I'm labeling
17 them right here.  Yeah, this one actually contained the
18 surfactant.  It was MON 35012 concentrate, has the
19 cocoamine.  But any rate, the receptor fluid and what
20 was left in the epidermis equals the tall bar.
21    Q   On -- on each of these studies?
22    A   Yeah.
23    Q   Okay.  And what about the middle bar; what
24 does that represent for each of the studies?
25    A   Receptor fluid.  That's -- that's what

Page 253

1 Monsanto would use.  Monsanto would use that number
2 only.
3    Q   And what about the far right bar under each
4 study; what does that represent?
5    A   All right.  Result measures some glyphosate in
6 epidermis...
7    Q   And I'm not asking you about what specifically
8 it represents for each study.  I just want to know if
9 each bar is intended to represent a different
10 measurement made in each of the studies.
11    A   It is, yeah, the different measurements.
12    Q   Okay.
13    A   That of receptor fluid and the -- and the --
14 what remains in the epidermis.
15    Q   Okay.  So take a look at Figure 9.  These are
16 not all human studies that you've listed here, is that
17 right, that is, studies in humans?
18    A   Well, none of them are in vivo.  They're
19 either in vitro human cadaver skin or primate.
20    Q   Which of these studies involved human skin?
21    A   In vitro human skin --
22    Q   Yeah.
23    A   -- not -- not living humans.
24    Q   Yep.
25    A   I probably should check for accuracy.  Franz

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 66 of 79
Case 3:16-md-02741-VC  Document 2559-72  Filed 01/23/19  Page 66 of 79
Confidential - William R. Sawyer, Ph.D.

Page 254

1 was human, unfrozen abdominal skin attained -- obtained
2 at autopsy, and it was maintained at 5 degrees
3 centigrade fresh.  It was not baked or frozen.
4     Q    I appreciate that.  I don't need the details.
5 I just want to know which of these involve human skin as
6 their test subject.  Isn't it true it's Franz 1983 and
7 the four DTL studies that you've listed?
8     A    Yeah.  I mean, Franz...
9     Q    And Maibach and Wester and TNO, none of them
10 involved human skin in vivo or in vitro; is that right?
11     A    No, but they were actually more appropriate
12 studies.  For example, Wester included primate, living
13 primate, as opposed to a deceased abdominal skin that
14 was installed into an in vitro cube.
15     Q    Primate, you mean monkeys?
16     A    Yeah.
17     Q    Yeah.  And Maibach involved rats?
18     A    Yeah.
19     Q    And TNO, what did that involve?  Also rats?
20     A    No, no.  See, Maibach was primate and Wester
21 used human or -- and/or primate in Wester.
22     Q    Yeah, the results you present here, these are
23 your primate results; is that right?
24     A    Primate is Maibach and primate is also in
25 Wester.

Page 255

1     Q    Okay.
2     A    Wester did both.
3     Q    Right.  But what you present here in Table 9
4 are his primate results --
5     A    Yeah.
6     Q    -- is that right?
7     A    Yeah.
8     Q    And TNO, what animal did that study involve?
9     A    TNO is a -- a rat, rat model.
10     Q    Okay.  So -- so Figure 9 here, what you're
11 presenting are studies, some of which studied humans and
12 some of which studied rats and some of which studied
13 monkeys; is that right?
14     A    Yes.
15     Q    And the studies that you present at Table 9,
16 some of them are 24-hour studies; is that right?
17     A    Yes.
18     Q    Some of them are 48-hour studies?
19     A    Yes.
20     Q    All right.  And if you look at your entry for
21 Franz, the first bar on the left -- well, if you look at
22 your description in the table, which is Figure 11 or
23 Table 11 --
24     A    Yes.
25     Q    -- and you go to Franz, are you there?

Page 256

1     A    Yeah.
2     Q    Okay.  What is the absorption that was
3 reported by the study authors that you reflect here in
4 the table under % Absorption?
5     A    .028 -- oh, in the table?
6     Q    In your table, Table 11.
7     A    Yeah, what I'm showing in Table 11 is the
8 spray mix, .152 versus 4.17, if you include what was
9 stuck in the epidermis.
10     Q    Right.  And let's -- let's take a look at the
11 Maibach study -- I'm sorry -- the Franz study that
12 you're referring to here.  I'm marking as Exhibit 16 the
13 Franz 1983 study, putting that in front of you, sir.
14         (Sawyer Exhibit No. 16 was marked for
15     identification.)
16 BY MR. DERRINGER:
17     Q    Have you seen that before?
18     A    Yeah.  I have it.
19     Q    Okay.  Go to Table 4, if you would.  This is
20 where the study authors reflect their results for
21 glyphosate absorption.  Do you see that?  It's on page
22 5.
23     A    Okay.
24     Q    And you'll see that they report total
25 absorption in terms of percentage of dose in micrograms

Page 257

1 per centimeter squared of the neat glyphosate, that's
2 the MON 0139, and Roundup and then the Roundup spray
3 mix.  Do you see that?
4     A    Yes.
5     Q    And the number you included in your table is
6 from the spray mix, .152 percent; is that right?
7     A    Yes.
8     Q    Okay.  Nowhere in the table that Franz
9 included in his study does it reflect an absorption
10 level of 4.17, does it?
11     A    No.  But under OECD you have to add in what is
12 remaining in the epidermis.
13     Q    Right.  And, in fact, the study authors at
14 page 11, if you go over to page 11, second conclusion,
15 they concluded that greater than 92 percent of the
16 unabsorbed glyphosate remains on the surface of the skin
17 and is readily removed by a water wash.  Do you see
18 that?
19     A    Yes.
20     Q    Okay.
21     A    But that doesn't specifically say for the
22 spray mix analysis.
23     Q    Right.  And -- and so Table 4 we've
24 acknowledged or -- well, let me ask you this:  Is there
25 anywhere in this report of the Franz study where the

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 67 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 67 of 79
Confidential - William R. Sawyer, Ph.D.

Page 258

1 authors of the study report an absorption level of
2 4.17 percent?
3    A    No.  They -- they failed to follow the OECD
4 guidelines.
5    Q    So that dark bar on Figure 9 that you've put
6 in -- go to Figure 9 in your report.
7    A    Yeah, I know what it is.  Yep.
8    Q    You don't have to have that in front of you,
9 you know it well enough?
10    A    I have it memorized.
11    Q    Okay.  There you -- that dark bar reflects 4.1
12 percent absorbed; is that right?
13    A    Yes.
14    Q    Okay.  That's your conclusion about the
15 percent that was absorbed in the Franz study, it is not
16 the conclusion of the Franz authors; correct?
17    A    No.  It's my conclusion if -- if one were to
18 follow the generally accepted methodology.
19    Q    Right.  This dark bar on your graph is not
20 what the authors reported but instead represents your
21 conclusion 35 years after the study; correct?
22    A    Correct; that the Monsanto Corporation failed
23 to follow the OECD rules.  And it's in my report.  It's
24 in black and white.  It wasn't followed.  It's an
25 objective finding.  Just because the author didn't

Page 259

1 conclude that doesn't mean the author is obeying the
2 rules.
3    Q    Speaking about those -- those OECD guidelines,
4 I know you've written before that you think that the
5 Wester authors also didn't follow those rules when they
6 were calculating absorbed dose; is that right?  I'm
7 talking about Wester 1991.
8    A    The human in vitro study are you referring to?
9    Q    Well, any part of the Wester 1991 study.  Do
10 you believe that they also failed to follow OECD
11 guidelines in calculating the absorbed dose?
12    A    I need to check the study to answer that.
13    Q    Okay.  I'll withdraw the question.
14        TNO, this is the fourth study with the largest
15 bar here.  Do you see that?
16    A    Yes.
17    Q    Okay.
18    A    10.3 percent.
19    Q    Right.  This is an in vitro dermal penetration
20 study?
21    A    Yes.  Right.
22    Q    And it was performed using rat skin membranes?
23    A    That's right.
24    Q    And this study involved formulation that
25 included the surfactant cocoamine?

Page 260

1    A    That's right.
2    Q    So that's a formulation of Roundup to which
3 Mrs. Stevick was never exposed; correct?
4    A    Not quite.
5    Q    Well --
6    A    She was exposed to other surfactants from the
7 same family.
8    Q    Right.  But this particular formulation that
9 was studied in the TNO 2002 study was a formulation of
10 Roundup to which Mrs. Stevick was never exposed;
11 correct?
12    A    Right.  And it's about the only study where
13 Monsanto actually included a surfactant in the test.
14    Q    The 10 percent figure here that you -- that
15 you reflect on your table with the largest bar, that
16 comes from a measurement taken after 48 hours of
17 exposure; is that right?
18    A    Yes.
19    Q    Now, the TNO study looked at a dilution of the
20 Roundup formulation; correct?
21    A    Yes.
22    Q    And it's that dilution of the formulation that
23 most closely approximates, in that study at least, what
24 Mrs. Stevick would have been exposed to; correct?
25    A    Yeah.  And that was 2.6 percent.

Page 261

1    Q    Right.  That's the middle bar, is that right,
2 on your chart?
3    A    Yes.
4    Q    And do you agree that Mrs. Stevick's skin is
5 thicker than a rat's skin?
6        MR. TRAVERS:  Objection; form.
7        THE WITNESS:  Yes.
8 BY MR. DERRINGER:
9    Q    Are you able to name a dermal absorption study
10 in human skin where the study authors themselves
11 reported a dermal absorption value higher than
12 2 percent?
13    A    No.  I think the highest, as I recall, is
14 Wester at 2.2 percent, I think.
15    Q    That -- that's his -- the human in vitro part
16 of his study?
17    A    I think so.
18    Q    Okay.
19        (Sawyer Exhibit No. 17 was marked for
20 identification.)
21 BY MR. DERRINGER:
22    Q    Let me show you what I've marked as Sawyer
23 Exhibit 17.  Sir, is this the report you submitted in
24 the Johnson case?
25    A    Yes.

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 68 of 79
Case 3:16-md-02741-VC  Document 2559-12  Filed 01/25/19  Page 68 of 79
Confidential - William R. Sawyer, Ph.D.

Page 262

1    Q   And, you know, I went through your Johnson
2 report and I went through your Stevick report and I
3 think, as you even noted, there are some similarities
4 and there are some differences; is that right?
5    A   Yes.
6    Q   And if you look at page 35 of your Johnson
7 report and you compare that to page 32 of the Stevick
8 report, they're basically the same; is that right?
9    A   Oh, yeah.  That -- that's very similar.
10   Q   Okay.  And if you look at pages 36 up through
11 52 of your Johnson report and you compare that to pages
12 40 to 57 of your Stevick report, those are also almost
13 identical except I think you added one image of the
14 dermis in your Stevick report; is that right?
15   A   Yeah.  Yeah, they're very close.  There's some
16 minor changes but not much.
17   Q   Right.  And, likewise, pages 54 to 55 of
18 Johnson are almost identical to pages 59 -- I'm sorry --
19 58 to 59 of Stevick; is that right?
20   A   Pages 54 in Johnson?
21   Q   54 to 55 in Johnson and comparing that to
22 pages 58 to 59 of Stevick.
23   A   I would have to look at that closely.  I think
24 I recall making some modifications to those two pages,
25 but I'm not sure.

Page 263

1    Q   Okay.  Well, you have the -- you have your
2 Stevick report out there, too, so feel free to go ahead
3 and make that comparison.
4        Aren't those basically the same?
5    A   Yeah, I see some word changes, like this
6 Monsanto-funded study versus the purpose of this.  Yeah,
7 I see some minor changes but pretty close, yeah.
8    Q   If you go to page 67 of your Johnson report.
9 And you can put that in front of you and take page 93 of
10 your Stevick report.  And you can flip through, but it
11 looks like pages 67 through 90 of Johnson, your Johnson
12 report, are almost identical to pages 93 to 114 of your
13 Stevick report.  Is that your impression as well?
14   A   No.  I have my pages --
15   Q   Sure.  I'll do it again.
16   A   67 of?
17   Q   67 through 90 of your Johnson report.
18   A   Oh, okay.
19   Q   The spiral-bound one there, yep.
20   A   Yeah, I got the wrong.  I had it reversed.
21 And -- and then?
22   Q   And then 93 of Stevick, your Stevick report,
23 93 to 114.  You're addressing, it looks like, the same
24 topic or topics and it looks to me like it was -- these
25 are essentially identical.  Is that your impression?

Page 264

1    A   Well, what I recall doing in this section was
2 eliminating any reading into these quotes.  It's not my
3 job to read into the quotes and try to guess what they
4 mean.  I'm just presenting the quotes and -- and using
5 the information as is.  So I think there's some
6 modifications throughout that section.
7    Q   Right.  I appreciate you bringing that to my
8 attention.  If you look at page 93 of your Stevick
9 report --
10   A   93 of Stevick.
11   Q   93 of Stevick.
12   A   Okay.
13   Q   In fact, you say right up there at the top
14 under Regulatory Guidance on Dermal Absorption and
15 Recovery --
16   A   Yeah.
17   Q   -- second sentence:  It's not the purpose of
18 this toxicological risk assessment to draw conclusions
19 about the intent you say of such misstatements.  Do you
20 see that?
21   A   Yeah.
22   Q   All right.  And you know you had that same
23 line in your Johnson report, too?
24   A   Probably, yeah.
25   Q   You agree that drawing conclusions about the

Page 265

1 intent of what people write in e-mails is not the job of
2 a toxicologist?
3    A   Yeah, absolutely.  It's in my report.
4    Q   And do you agree that when you draw
5 conclusions about the intent of what people write in
6 their e-mails, you're not applying any specialized
7 expertise in toxicology?
8    A   That -- I'm not sure I understand the
9 question.
10   Q   I'll say it again.  Do you agree that when
11 one -- if you were to draw conclusions about the intent
12 of what people write in their e-mails, you would not be
13 applying any specialized expertise in toxicology to do
14 so?
15   A   If -- your question read if I were to imply
16 intent?
17   Q   Well, if you were to draw conclusions about
18 the intent of what people write in their e-mails, do you
19 agree that in doing so you would not be applying any
20 specialized expertise in toxicology?
21   A   No, not -- not completely.  I agree that I
22 should not be implying intent, but it is possible I may
23 have to explain what the scientific toxicological terms
24 mean so a juror can then make up their mind what it
25 means because they may not understand what the

Case 3:16-md-02744-VC Document 2559-72 Filed 01/25/19 Page 69 of 79
Case 3:16-md-02744-VC Document 2553-72 Filed 04/07/19 Page 69 of 79
Confidential - William R. Sawyer, Ph.D.

Page 266

1 recovery -- the word "recovery value," what is recovery
2 value or what is an LOD or LOQ. A juror's not going to
3 understand that. A toxicologist has to explain that
4 high analytical LOD, limits of detection, means that you
5 just can't see things that can really be there. In
6 other words, I would be explaining simply the science
7 that's in such a document, not the intent.
8    Q   Or not the meaning of other words that don't
9 require specialized scientific or toxicological
10 background; right? That wouldn't be your job to
11 interpret those words --
12        MR. TRAVERS: Objection to form.
13    BY MR. DERRINGER:
14    Q   -- is that right?
15    A   That's right. But in any instance in my
16 report where I included these things, they are highly
17 specific to toxicological issues that would not be
18 understood without explanation.
19    Q   Okay. Take a look at your Johnson report at
20 page 70. And at the same time take a look at your
21 Stevick report at page 93. So Johnson at 70, which is
22 the spiral bound, and Stevick at 93. Are you there?
23    A   93, yeah. 70. Okay.
24    Q   Okay?
25    A   Yeah.

Page 267

1    Q   And if you go to the paragraph that starts
2 "The variability of the data" on page 70 of --
3    A   Yeah.
4    Q   -- what you have in front of you, do you see
5 you have a line at the end of that paragraph where you
6 write: "It is perhaps noteworthy that Jaime Costa
7 stated that it is 'critical' to have the product
8 accepted at the upcoming meeting," and then you have a
9 second sentence after that as well? Do you see that?
10    A   Yeah. I think I removed that from the new
11 report.
12    Q   Well, that's what I wanted to confirm with
13 you. If you go to page 93 --
14    A   I don't see it.
15    Q   Right. You did remove that; correct?
16    A   Yeah.
17    Q   Okay. And, in fact, I think you've
18 acknowledged and -- and I'll represent to you I was able
19 to find a number of instances where you removed things
20 like that. So if you go to page 72 of your Johnson
21 report and page 97 of your Stevick report, you see on
22 page 72 you have a whole paragraph there where you
23 discuss ethical quandaries?
24    A   Yeah. I removed that.
25    Q   Yeah. You go to page 97 of Stevick, you don't

Page 268

1 have that there anymore; right?
2    A   Right, right. So -- yeah.
3    Q   And tell us again why you decided to take
4 these -- why did you omit these things that you had put
5 in your Johnson report when you -- when you included
6 everything else from this section that you had in your
7 Johnson report?
8    A   Wait a minute. I'm -- I'm lost now. Which
9 report should I be looking at and what are you asking?
10    Q   Well, do you -- there's a number of things
11 that you've acknowledged, and we've looked at now two of
12 them, that you included in your Johnson report as part
13 of this section of the -- of your report but omitted,
14 took out, from your Stevick report; right?
15    A   Yes.
16    Q   Okay. And I want to know why it is that even
17 though you substantially copied the majority of this
18 section of your report from Johnson into Stevick, you
19 went back and selectively removed certain sentences or
20 paragraphs that were included in Johnson but were
21 omitted in the Stevick report. What was the reason for
22 doing that?
23    A   Well, I think --
24        MR. TRAVERS: Objection to form. I mean, it's
25     just vague. I -- you're asking about every --

Page 269

1 every change in the report --
2        THE WITNESS: Yeah, I think you need to --
3        MR. TRAVERS: -- and kind of have one
4     answer --
5        THE WITNESS: -- show me one at a time. I
6     could answer that.
7    BY MR. DERRINGER:
8    Q   Okay. Well, am I right, sir, that you went
9 back through your Johnson report and you made an effort
10 to amend it for purposes of the Stevick report so that
11 you implemented what you wrote in both reports, which is
12 it's not the purpose of this toxicological risk
13 assessment to draw conclusions about the intent of the
14 various statements that you discuss in both reports?
15    A   That's correct.
16    Q   Okay. And you acknowledged, I think before
17 you said there might be some that you missed?
18    A   It's possible.
19    Q   Okay. So let's look at your Stevick report at
20 page 110, for example. Tell me when you're there.
21    A   Okay.
22    Q   You see the paragraph right above the bolded
23 word "humectants"?
24    A   Yeah.
25    Q   You write: "Once again, the focus is strictly

Page 270

1  on the business aspects of introducing a commercial
2  product. This masterpiece of sophistry effectively
3  proclaims that Monsanto fully expected the results, and
4  this was all part of the plan. Unfortunately, the
5  potential human health issues raised by the product test
6  results were also, once again, ignored."
7      Can you tell me what expert methodology you
8  used to conclude or to come to the conclusion that you
9  wrote in the paragraph that I just read to you?
10      I'm sorry. What did you just do?
11  A  I crossed it out.
12  Q  Why did you cross it out?
13  A  It's not in my report anymore.
14  Q  Well, it is in your report, sir.
15  A  Well, no, I think it was a thing -- and I'm
16  not a lawyer or a legal expert, but I think I can -- I
17  can state on the record that it's not in my report and
18  I'm not going to testify to that statement. I -- I
19  failed to remove it. It's an error in my report.
20  Q  I understand. It was in your report in
21  Johnson. It was in the report we were served on
22  November 20th. And I want to know what expert
23  methodology you used to come to that conclusion that you
24  just crossed out.
25  A  It's an erroneous paragraph.

Page 271

1  Q  Okay. So you don't stand by it?
2  A  No.
3  Q  Okay. Go to page 94, please.
4  A  94?
5  Q  94. Top of the page, second sentence: "Faced
6  with the denial of Spanish product registration,
7  Monsanto employees attempted to redirect attention away
8  from deficiencies with respect to pharmacokinetics of
9  glyphosate."
10      Do you see that?
11  A  Yeah.
12  Q  Yeah. What expert methodology did you use to
13  come to that conclusion?
14  A  Well, the -- the subtitle "Error and Omissions
15  in Monsanto Communications" is correct. The information
16  in Section A covers that. However, this intent
17  statement, the first paragraph starting with "During," I
18  don't think that's appropriate for me to opine on and
19  I -- I'm canceling it.
20  Q  Striking it from your report?
21  A  I am, yeah.
22  Q  Go to page 99, please.
23  A  See, you should have helped proof my report.
24  Q  If you go to the middle paragraph, the one
25  that begins "It is always of great importance." Are you

Page 272

1  there?
2  A  I'm going to hire you as a consultant.
3  Q  Are you there?
4  A  Page 99.
5  Q  Correct. "It is always of great importance."
6  Do you see that paragraph?
7  A  Yeah.
8  Q  Do you see the second sentence reads:
9  "Inasmuch as the author of the Monsanto memo stated that
10  the potential finding of another mammalian metabolite
11  would be 'too risky,' one must presume a lack of
12  objectivity."
13      Do you see that?
14  A  Yeah.
15  Q  And, in fact, the second sentence as well
16  where you talk about failing to perform a study --
17  A  Yeah, I missed that. I'm canceling that
18  starting with the word "Inasmuch." That's the --
19  Q  Through the rest of the paragraph?
20  A  Yeah.
21  Q  And due to time, sir, I don't have the time to
22  go through all the other places in your report where I
23  identified areas where I think you may have missed
24  striking things from the report that would follow your
25  own directive of not commenting on or making assumptions

Page 273

1  about the intent, state of mind, motive, or thought
2  process that goes on in anyone's mind at Monsanto or
3  otherwise. Do you agree you may have missed some other
4  ones?
5  A  It's possible.
6  Q  Okay. And -- and if those are brought to your
7  attention now or at a subsequent deposition or a
8  subsequent hearing or at trial, would you do the same
9  thing you did here, which is strike those from your
10  report and agree not to testify about them?
11  A  Yes, I will.
12  Q  All right. The Stevick report, Exhibit 1, did
13  you write the entire thing yourself?
14  A  Funmi assisted me with some of it.
15  Q  Do you know what parts of this Funmi assisted
16  you with? Go to the table of contents if you'd like.
17      MR. TRAVERS: Can I get the time? I'm sorry.
18  What's the time?
19      THE VIDEOGRAPHER: 4:32. 4:32.
20      MR. TRAVERS: I'm sorry. How much time's
21  left?
22      THE VIDEOGRAPHER: Oh. About 28 minutes.
23      THE WITNESS: Funmi helped me with pages 23,
24  24, and 25.
25

Page 274

1  BY MR. DERRINGER:
2    Q    Anything else?
3    A    Throughout this report Funmi has assisted me
4  with researching, obtaining, and downloading studies, a
5  good number of them.  I would say probably 75 percent of
6  the studies I've referenced Funmi has obtained for me,
7  including especially the Dermal Absorption section.
8    Q    Did Funmi write those portions of the report,
9  like put pen to paper, or did you write them?
10   A    I -- I wrote all of the -- that section.
11   Q    Okay.  What -- you said Funmi was -- I'm
12 sorry.  What's his training?
13   A    Funmi has a master's in environmental
14 sciences, environmental toxicology.
15   Q    From where, do you know?
16   A    State University of New York at Syracuse.
17   Q    Does Funmi have any experience with the POEM
18 model, to your knowledge?
19   A    With the POEM model?
20   Q    Yeah.
21   A    He has researched and pulled some of the
22 studies I have with me today.  As far as actually using
23 the model, no.
24   Q    Take a look at page 120 of your report.  If
25 you look at the bullet about the comparison of the

Page 275

1  epidemiological studies --
2    A    Yes.



20   Q    -- what happened?
21   A    No, that's not it.  By the way, there are the
22 two footnotes that make six, but, no, this -- this was
23 at the very end of the 11th hour of the deadline to get
24 my report in after working about 18 hours with no rest
25 trying to make a stupid deadline.  And, yeah, I think I

Page 276

1  was kind of falling apart near the end.
2    Q    Take a look at your reliance list that you
3  attached to your report.  It should be on Exhibit 1.
4  And then let's go ahead and mark --
5        (Sawyer Exhibit No. 18 was marked for
6        identification.)
7  BY MR. DERRINGER:
8    Q    There's a tab on Exhibit 1.  And then I'm
9  going to attach -- well, I'm going to mark as Exhibit 18
10 a supplemental reliance list that we received from
11 plaintiffs' counsel.  I've put that in front of you,
12 sir.
13   A    This must be from yesterday, yeah.  Yesterday
14 or the day before.
15   Q    Yeah.  My question is:  The reliance list
16 attached to your report, Exhibit 1 --
17   A    Uh-huh.
18   Q    -- the supplemental reliance list, which is
19 Exhibit 18, and the three articles that you -- that your
20 attorney provided to us from you today that we've marked
21 as Exhibits 12, 13, and 14 in this deposition, does that
22 constitute a complete list of the materials that you
23 relied on to support your opinions in your report in
24 this MDL?
25   A    No.

Page 277

1    Q    All right.  What else that's not listed on
2  this reliance list exhibit -- in Exhibit 1 or the
3  supplemental reliance list, Exhibit 18, or the materials
4  that are marked as Exhibits 12, 13, and 14 did you rely
5  on to come to or to support your opinions in your expert
6  report, Exhibit 1?
7    A    These four documents that I'm holding, I don't
8  think these are on the list.
9        MR. TRAVERS:  Those are.
10       THE WITNESS:  Oh, these are on the list.
11 Okay.  Then what other documents?  I had reviewed
12 some additional -- I think like maybe three
13 documents that were -- I think at least one of
14 them, if not all of them, were referenced in
15 Dr. Sullivan's report.  But I didn't use those as
16 reliance studies in writing this report, if that
17 answers your question.
18 BY MR. DERRINGER:
19   Q    You didn't rely on those studies to arrive at
20 the opinions that are contained in your expert report in
21 this matter?
22   A    No.
23   Q    Okay.  I'm correct about that?
24   A    Yeah.  They're -- they're documents I found
25 later or were -- were referenced in Dr. Sullivan's

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 72 of 79
Case 3:16-md-02741-VC Document 2558-4 Filed 01/23/19 Page 72 of 79
Confidential - William R. Sawyer, Ph.D.

Page 278

1  report.
2      (Sawyer Exhibit No. 19 was marked for
3   identification.)
4   BY MR. DERRINGER:
5      Q   I've marked as Exhibit 19 another document we
6   received from plaintiffs' counsel yesterday or the day
7   before.  This is a chart titled "Defendant Monsanto
8   Company's November 9, 2018, Response to Plaintiffs'
9   Request for Formulation Information for Group One
10  Plaintiffs."
11     A   Yeah, this is basically in my report.
12     Q   Well, did you -- strike that.
13         Okay.
14     A   There's a table in my report that -- that
15  this -- I used this to devise -- to prepare.
16     Q   Okay.  So the table that's in your report, I
17  believe that's Table 8, but let's confirm this.  Go
18  ahead and review your report.  Just tell me what table
19  you were referring to.
20     A   Oh, Table 8.
21     Q   Yeah.  So did you use the information from
22  Exhibit 19 that we've just marked to generate Table 8?
23     A   I did, yes.
24         (Sawyer Exhibit No. 20 was marked for
25   identification.)

Page 279

1   BY MR. DERRINGER:
2      Q   Okay.  I'm showing you what we've marked as
3   Exhibit 20.  This was also provided to us by your
4   counsel or by plaintiffs' counsel.  This is trials and
5   depositions -- William R. Sawyer trials and
6   depositions past four years.  Is this an update of what was
7   contained as a tab in your November 20, 2018, report?
8      A   Yes.  It was updated two days ago.
9      Q   And it was updated with the Rene versus Salmon
10  & Sons deposition that you gave two days ago?
11     A   Yeah.  That was a continuation of Item No. 29.
12     Q   And this has 52 entries on it, "this" being
13  Exhibit 20.  The disclosure of your prior trials and
14  depositions in the past four years had 54 entries on it.
15  What came off of this list?
16     A   Well, whatever went outside of the four-year
17  window.  I would -- I would suggest probably the last
18  two on the old list.
19     Q   Okay.
20     A   Last two or three.
21     Q   And this list that's Exhibit 20, is this
22  accurate and complete?
23     A   Yeah.  Well, we have to add today's.
24     Q   Right.  But prior to today is this list,
25  Exhibit 20, accurate and complete?

Page 280

1      A   Yeah.  Jen -- Jen is very careful to keep this
2   updated.
3          (Sawyer Exhibit No. 21 was marked for
4    identification.)
5    BY MR. DERRINGER:
6      Q   I'm handing you what we've marked as Exhibit
7   21.  This was Exhibit A to the response to our Notice of
8   Deposition.  Plaintiff -- plaintiff's lawyer provided
9   this to us.  Do you recognize that, sir?
10     A   Yes.
11     Q   What is it?
12     A   It's my invoice dated December 14, 2018.
13     Q   And is this your invoice in the MDL?
14     A   Yes.
15     Q   As opposed to your Stevick-specific invoice;
16  is that right?
17     A   Yes.
18     Q   You know, before we -- before we get there,
19  take a look at your report, Exhibit 1, last tab.  It's
20  your fee schedule.
21     A   Okay.  Yep.
22     Q   This says your daily rate is $5,600 per day?
23     A   Yes.
24     Q   Okay.  When your deposition was taken in
25  February 2018, your daily rate for testimony was

Page 281

1   $4,600 per day; is that right?
2      A   Yes.
3      Q   When did you change your daily fee to $5,600 a
4   day?
5      A   I think in September of 2018.
6      Q   And what -- what changed, sir, that caused you
7   to increase your daily rate by nearly 22 percent?
8      A   A combination of things.
9      Q   Okay.  What are they?
10     A   Overworked, extreme stressful environments as
11  in depositions or trials, and -- yeah, I guess I would
12  just have to say those two things.
13     Q   No one forces you to do this work, do they?
14         MR. TRAVERS:  Objection; form.
15         THE WITNESS:  I don't understand the question.
16  BY MR. DERRINGER:
17     Q   You can stop doing this work if you wanted to;
18  right?
19     A   I don't know.  I never really thought about
20  it.
21     Q   I notice that you charge one fee for testimony
22  and another fee for when you're working but not
23  testifying?
24     A   Right.
25     Q   Okay.  And your fee for when you're working

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 73 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/23/19 Page 73 of 79
Confidential - William R. Sawyer, Ph.D.

Page 282

1  but not testifying is $650 per hour; is that right?
2      A   Yeah.
3      Q   I noticed under your fee for your day when
4  you're testifying, you also included a fee for a half
5  day; is that right?
6      A   Yeah.
7      Q   And the half day is four hours at most; right?
8      A   Right.
9      Q   So your full-day fee is for eight hours?
10     A   Yes.
11     Q   And so you charge more when you're testifying
12 under oath than when you're not testifying under oath;
13 correct?
14         MR. TRAVERS:  Objection; form.
15         THE WITNESS:  That may be true.  I've never
16     thought about that.  But the thing is I have to
17     schedule in advance a whole day and there's no
18     opportunity today for me to be returning calls
19     and -- and working on multiple items.  You know,
20     I'm here and dedicated for this.  Everything else
21     in the world stops.
22 BY MR. DERRINGER:
23     Q   Take a look at Exhibit 21.  This is the MDL
24 invoice.  Tell me when you're there.
25     A   MDL invoice, 21.  Okay.

Page 283

1      Q   There you go.  If you look at your entry for
2  November 19, tell me when you're there.
3      A   Okay.
4      Q   You have a reference here to rapid editing,
5  the very last line, archive and setup for rapid editing.
6      A   That's right.
7      Q   What does rapid editing refer to?
8      A   That means one very tired, overworked Jen
9  Clark, who is staying very late and working in my office
10 so she can edit and get through it as -- as needed.
11     Q   And you have an entry for November 20th.  Do
12 you see that?
13     A   Yes.
14     Q   And that's the day the report was submitted;
15 right?
16     A   Well, I think it was on the 11th hour,
17 whatever.
18     Q   Right.  Do you see on that entry you -- if you
19 turn to the next page, you researched and located data
20 for three additional studies.  You added them to the
21 study table, you reformatted, et cetera.  What were the
22 three additional studies that you researched and located
23 data for on November 20th?
24     A   I don't remember.  I have no idea.
25         (Sawyer Exhibit No. 22 was marked for

Page 284

1      identification.)
2  BY MR. DERRINGER:
3      Q   I'm marking as Exhibit 22 the invoice we were
4  sent by your -- by the plaintiff lawyers reflecting your
5  work in the Stevick case.  Does this invoice reflect
6  your work in the Stevick case?
7      A   It does.
8      Q   You see on the 17th of October you write that
9  you reviewed the summary received on Elaine Stevick?  Do
10 you see that?
11     A   Yes.
12     Q   What summary was that?
13     A   I think there was a -- just a brief e-mail
14 message to me that provided some facts for discussion
15 when I was first contacted with Ms. -- regarding
16 Mrs. Stevick.
17     Q   Who -- is that what this refers to?
18     A   Yes.
19     Q   Who sent you the e-mail?
20     A   I believe either Brian Brake or Jeff Travers.
21 Or, no, it could have been Jeff Seldomridge.  I'm not
22 sure.  One of the three.
23     Q   One of the plaintiffs' attorneys?
24     A   Yeah.
25     Q   Okay.  On 10/17 you also have down here that

Page 285

1  you prepared questions for the epidemiologist.  Do you
2  see that?
3      A   On 10 --
4      Q   17.
5      A   Okay.  Yes.
6      Q   Last entry on the 17th of October.  Do you see
7  that?
8      A   Yes.
9      Q   What were the questions you prepared for the
10 epidemiologist?
11     A   I -- I think I had some questions regarding
12 studies that included some measurement of exposure
13 and -- yeah, I think it was just exposure questions.
14     Q   Do you have those questions still?
15     A   No.  I didn't print them or anything like
16 that.
17     Q   Well, what did you do when you say you
18 prepared questions?  You just prepared them in your
19 mind?
20     A   No.  I sent I think to Jeff Travers a couple
21 of questions to pose to the epidemiologist.
22     Q   Who was the epidemiologist that you prepared
23 these questions for?
24     A   I don't even know.
25     Q   Did you ever get answers to these questions?

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 74 of 79
Case 3:16-md-02741-VC  Document 2559-72  Filed 01/23/19  Page 74 of 79
Confidential - William R. Sawyer, Ph.D.

Page 286

1    A    Verbally.

2    Q    From who?

3    A    Jeff.

4    Q    Jeff Travers?

5    A    Yeah.

6    Q    And he communicated to you what this

7  epidemiologist told him in response to your questions?

8        MR. TRAVERS:  Objection; form.  And you can't

9  talk about what we discussed.

10  BY MR. DERRINGER:

11    Q    Well, I'm not asking about the content of what

12  you said and what he told you.  I want to know whether

13  he communicated the answers to the questions that you

14  had prepared for the epidemiologist to you.

15    A    Yeah.  He just -- he gave me the information,

16  yeah.

17    Q    Okay.  Do you have any recollection of what

18  those questions were?

19    A    Yeah.  Again, it was -- had to do with what

20  studies had some metric for exposure.

21    Q    Did you rely on those answers in forming your

22  opinions in this case?

23    A    No.  I actually -- I think I was -- I recall I

24  simply went to the Eriksson study and whatever other

25  studies were -- were mentioned.

Page 287

1        (Sawyer Exhibit No. 23 was marked for

2    identification.)

3    BY MR. DERRINGER:

4    Q    I'm showing you Exhibit 23.

5    A    They were basically just sharing study

6  information.

7    Q    Exhibit 23 is Exhibit C to the response that

8  the plaintiffs served on Monsanto in response to our

9  Notice of Deposition.  Exhibit C appears to be an e-mail

10  from Chris and Elaine Stevick to ▓▓▓▓▓▓▓▓▓.

11  Is this an e-mail that the Stevicks sent to you on

12  December 5, 2018?

13    A    Yes.

14    Q    They refer to a video that her -- Elaine

15  Stevick's husband took.  Do you see that?

16    A    Yeah; the 727-milligram video.

17    Q    I think they mean megabyte.  And did you

18  receive this video?

19    A    I did.

20    Q    Did you view the video?

21    A    Yes.

22    Q    Okay.  Do you have that video with you?

23    A    I believe it was on the disclosure list.

24    Q    Okay.  And this was the video where

25  Mr. Stevick demonstrates his experience of filling an

Page 288

1  8-ounce cup with various spray settings from their

2  sprayer; is that right?

3    A    Yes.  It's the one thousand one, one thousand

4  two, et cetera, video.

5        MR. DERRINGER:  Okay.  Let's go off the

6    record.

7        THE VIDEOGRAPHER:  You've got four minutes

8    left.

9        MR. DERRINGER:  Give me one second, see if I

10  have anything else, and we may be done.  Okay?

11        THE WITNESS:  Very good.

12        THE VIDEOGRAPHER:  We're going off the record

13  at 4:52 p.m.

14        (Short recess.)

15        THE VIDEOGRAPHER:  We're back on the record at

16  5:01 p.m.

17        MR. DERRINGER:  Dr. Sawyer, those are the

18  questions I have for now.  I appreciate your time.

19  I pass the witness.

20        MR. TRAVERS:  Thank you.

21            EXAMINATION

22  BY MR. TRAVERS:

23    Q    Dr. Sawyer, I'll try to make this quick.

24  First of all, just something on the errata.  You had

25  mentioned earlier in the deposition that glyphosate was

Page 289

1  a Class A carcinogen.  Did you misspeak on that?

2    A    Well, it is an A.  It's a 2A, but yeah.

3    Q    Go to Exhibit 9.  And defense counsel showed

4  you this document; correct?

5    A    Yes.

6    Q    And it's from the American Cancer Society?

7    A    That's correct.

8    Q    If you go to page 2 under the heading

9  "Exposure to certain chemicals and drugs" -- do you see

10  that?

11    A    I do.

12    Q    -- and the American Cancer Society says that

13  certain herbicides may be linked to an increased risk of

14  NHL; is that correct?

15        MR. DERRINGER:  Object to form.

16        THE WITNESS:  That's what the document states,

17  yes.

18        (Sawyer Exhibit No. 24 was marked for

19    identification.)

20  BY MR. TRAVERS:

21    Q    I'm going to mark as Exhibit 24 -- you had

22  mentioned an errata sheet previously in the deposition.

23  Sorry.  I don't have staples.  I just want to mark that

24  as an exhibit.  And is this the errata sheet where

25  Mrs. Stevick clarifies that she did use Roundup over an

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 75 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/23/19 Page 75 of 79
Confidential - William R. Sawyer, Ph.D.

Page 290

1 hour per day?

2   A  Yes. I received this a few weeks ago and saw

3 that, yep.

4   Q  It's kind of hard to read -- read this, but

5 that's why I gave it to the -- it's on the -- if you

6 could go to the third page in this document, you can see

7 where it says page 102, line 20?

8   A  Yes.

9   Q  All right. Can you read what she write --

10 wrote into the record?

11   A  Again, did not take me, quote, less than one

12 hour, quote. It took at least a full hour.

13   Q  And she is referring to her spraying of

14 Roundup?

15   A  That's right.

16   Q  I'm done with that exhibit.

17      And -- and you -- and we went over this or

18 defense counsel went over this with you. You didn't

19 visit Mrs. Stevick's property; correct?

20   A  No.

21   Q  And was that necessary for your opinion in

22 this case to visit Mrs. Stevick's property?

23   A  No. I -- I have measurements and the data

24 needed for the assessment.

25      (Sawyer Exhibit No. 25 was marked for

Page 291

1 identification.)

2 BY MR. TRAVERS:

3   Q  And I'll mark as Exhibit 25 -- and I'm marking

4 as Exhibit 5 a document titled "Science Policy Note,

5 Dermal Absorption: Position Papers from the North

6 American Free Trade Agreement (NAFTA) Technical Working

7 Group." And have you seen this document before?

8   A  Yes.

9   Q  And -- and what's the date of this document?

10   A  October 24, 2016.

11      MR. DERRINGER: Jeff, just a quick question.

12 Is this on his reliance list?

13      MR. TRAVERS: Yeah.

14      MR. DERRINGER: It is?

15      MR. TRAVERS: Yeah.

16      MR. DERRINGER: Okay.

17 BY MR. TRAVERS:

18   Q  And if we go to -- I guess the pages are

19 numbered strangely, but it's the third page and the

20 title of page 1.

21   A  Uh-huh.

22   Q  And -- and can you read the first sentence

23 under Executive Summary?

24   A  This Science Policy Note (SPN) includes

25 information on two dermal absorption position papers

Page 292

1 that were developed by the North American Free Trade

2 Agreement's (NAFTA's) Dermal Absorption Group, which was

3 an expert working group formed under the NAFTA Technical

4 Working Group (TWG) on Pesticides. While these position

5 papers are discussed in the NAFTA TWG Accomplishments

6 Report (2008 through 2013) and Health Canada's Pest

7 Management Regulatory Agency (PMRA) has and continues to

8 share these papers with interested stakeholders, the

9 science policy now -- rather, the policy science note

10 now provides an opportunity for PMRA to publish these

11 positions for broader dissemination. In addition, the

12 other regulatory bodies involved with this initiative --

13 initiative will now also have to have a source to

14 provide to their stakeholders.

15   Q  And North America obviously includes the

16 Health Canada and the US EPA; correct?

17      MR. DERRINGER: Object to form.

18      THE WITNESS: Yes.

19 BY MR. TRAVERS:

20   Q  So this was a paper prepared for regulatory

21 bodies?

22   A  Right.

23      MR. DERRINGER: Object to form.

24 BY MR. TRAVERS:

25   Q  And I want to go to page 3, Section 1. I

Page 293

1 guess it's probably the fifth page. And -- and on the

2 first paragraph, the last sentence states: "Therefore,

3 use of in vitro data as the sole basis for derivation of

4 a Dermal Absorption Factor for human health risk

5 assessment is not recommended at this time."

6      Do you see that sentence?

7   A  Yes, I do.

8   Q  And did I read that correctly?

9   A  Yes.

10   Q  You cited a number of studies from DTL that

11 were sponsored by Monsanto in your expert report?

12   A  Yes.

13   Q  And those were all in vitro studies; correct?

14   A  They were.

15      MR. DERRINGER: Object to form.

16 BY MR. TRAVERS:

17   Q  So it would be -- at least based on this

18 paper, it would be inappropriate to derive a dermal

19 absorption factor from those studies; correct?

20      MR. DERRINGER: Object to form.

21      THE WITNESS: As a sole -- sole basis, yes.

22 BY MR. TRAVERS:

23   Q  And in the next paragraph they -- what they

24 recommend is that companies conduct a triple pack. Can

25 you explain what a triple pack is?

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 76 of 79
Case 3:16-md-02741-VC  Document 2559-72  Filed 01/23/19  Page 76 of 79
Confidential - William R. Sawyer, Ph.D.

Page 294

1    A   Yes.  I included a section in my report on the
2    triple pack of combined in vitro, human, and animal
3    studies and an in vivo, that's a living animal study,
4    such as the monkey, primate.
5    Q   Has Monsanto ever conducted a triple pack
6    study?
7        MR. DERRINGER:  Object to form.
8        THE WITNESS:  No.
9    BY MR. TRAVERS:
10   Q   I'm sorry.  I want to go to that first
11   paragraph again.  These scientists state that this
12   position or -- is based primarily on a lack of detailed
13   standardized methodology for in vitro dermal absorption
14   studies.  Do you see that?
15   A   Yes.
16   Q   And would that be one reason for not relying
17   on the DTL studies to make a conclusion about the dermal
18   absorption factor?
19       MR. DERRINGER:  Object to form.
20       THE WITNESS:  Yes.  DTL has strictly performed
21   in vitro human studies only and Monsanto has
22   disregarded the in vivo primate study in its
23   entirety.
24   BY MR. TRAVERS:
25   Q   I want to go to Point 6 -- paragraph 6 on Page

Page 295

1    4 titled "Regional variability in human skin."  Could
2    you -- actually, could you explain what that paragraph
3    is saying?
4        MR. DERRINGER:  Object to form.
5        THE WITNESS:  Well, it's pointing on what
6    areas of the body human skin should be derived from
7    for use in dermal absorption studies.
8    BY MR. TRAVERS:
9    Q   And are -- are some parts of -- is the skin
10   from some parts of the body more appropriate for use in
11   studying dermal absorption?
12   A   Yes.
13   Q   What parts of the body would be appropriate to
14   do an in vitro dermal absorption study?
15   A   Hand, neck, head, where less -- less desirable
16   skin would be from --
17   Q   And did the DTL --
18   A   -- the trunk, for example.
19   Q   I'm sorry.  And did the DTL studies use skin
20   from human hands?
21   A   No.  They used trunk, back and trunk.
22   Q   Now we go to page 7, paragraph 5, and there's
23   a paragraph titled "Skin-bound residues."  And this
24   recommendation published in 2016, does this support your
25   opinion that you should be -- does this support your

Page 296

1    opinion about what the absorption rate for glyphosate
2    is?
3    A   Yeah.  This, again, is being disregarded by
4    Monsanto.
5    Q   And -- and can you just summarize what
6    paragraph 5 says?
7        MR. DERRINGER:  Object to form.
8        THE WITNESS:  Simply that the residue that is
9    in the epidermis following the experimental reading
10   should be added to the result.
11   BY MR. TRAVERS:
12   Q   All right.  I've just got to make sure I have
13   everything.
14   A   Other -- other point is that the use of tape
15   stripping as done by DTL in place of washing or to rule
16   out skin-bound residues is not recommended due to
17   laboratory variability in kinds of tape and technique.
18   Q   So this -- this document does not recommend
19   the tape stripping methodology used by DTL?
20   A   That's --
21       MR. DERRINGER:  Object to form.
22       THE WITNESS:  That's correct.
23   BY MR. TRAVERS:
24   Q   I want to go to page 99 of your Stevick
25   report.

Page 297

1    A   All right.
2    Q   And just -- we went -- defense counsel went
3    through a lot of your report about corporate intent.  I
4    just want to look at one example sentence, and it's the
5    paragraph above Factors Intensifying Dermal Absorption
6    of Glyphosate.  And you wrote:  "Failing to perform a
7    needed study due to the risk of finding an adverse
8    result that could negatively impact marketing goals
9    represents an unacceptable practice in the field of
10   toxicology."
11       Do you see that?
12   A   Yes.
13   Q   And I understand you're not going to be
14   telling the jury that as part of your expert testimony,
15   but is that a -- is that a reasonable conclusion you
16   think the jury could come to after reviewing the e-mails
17   you cite and benefiting from your expertise on just some
18   of the technical terms of those e-mails?
19       MR. DERRINGER:  Object to form; foundation,
20   calls for speculation.
21       THE WITNESS:  Well, certainly if I explain the
22   content of the e-mail in terms of the science, the
23   jurors would understand and be able to figure out
24   for themselves whether there was any intent.
25       MR. TRAVERS:  I think that's about it.  Let me

Case 3:16-md-02741-VC  Document 2559-72  Filed 01/25/19  Page 77 of 79

Page 298

1    just double-check.
2        Yeah, that's it.
3            EXAMINATION
4    BY MR. DERRINGER:
5    Q    Sir, take a look at Exhibit 24, the errata
6    sheet.
7    A    Okay.
8    Q    You've given many depositions, you understand
9    what an errata sheet is; right?
10   A    Yes.
11   Q    An errata sheet is when you review the
12   transcript of the deposition to see if the court
13   reporter took anything down incorrectly when he or she
14   was transcribing your testimony; right?
15   A    That's part of it.
16   Q    Yeah.  And that's why on this errata sheet,
17   like most errata sheets, after the description of what
18   the change that the witness is making to the sworn
19   testimony, there's a reason that has to be put down;
20   correct?
21   A    Yes.
22   Q    Okay.  Because you can't just change your
23   sworn testimony for no reason at all; right?  You know
24   that from your experience in giving lots of
25   depositions --

Page 299

1        MR. TRAVERS:  Objection to form.
2    BY MR. DERRINGER:
3    Q    -- is that right?
4        MR. TRAVERS:  You're asking for legal
5    conclusions.
6        THE WITNESS:  I can only speak on my own
7    experience --
8    BY MR. DERRINGER:
9    Q    Yeah.
10   A    -- and not in the legalities, but there have
11   been rare times where I -- I used the -- mixed up and
12   said yes when it's not -- I get mixed up with yes or no.
13   So you agree with the blah, blah, blah, and I -- or you
14   disagree and I say yes, and I honestly made a mistake in
15   not understanding the question.  And -- and so that can
16   rarely happen, but --
17   Q    That's rare; right?
18   A    Yeah, yeah.
19   Q    And when comparing what the witness says under
20   oath in a deposition when being questioned by opposing
21   counsel to what the witness says on an errata sheet when
22   he or she is not being questioned by opposing counsel,
23   you take into account the reason for the change, don't
24   you, as a tox -- as a forensic toxicologist when you
25   determine which of the two accounts to believe; right?

Page 300

1    You want to look at the reason and understand the reason
2    for the change, the reason why the witness is making the
3    change; correct?
4    A    Yes.
5    Q    Okay.  And on Exhibit 24, that change that
6    Mrs. Stevick made at page 102, line 20, she doesn't list
7    any reason at all for that change, does she?
8    A    Doesn't appear to be a reason, no.
9    Q    And wouldn't you also agree, Dr. Sawyer, that
10   when you do make changes in an errata sheet, your
11   experience as a witness, an expert witness, giving
12   testimony under oath, if you make changes on the errata
13   sheet, that's something that should be sent to the
14   lawyers and the party that took your deposition so that
15   they can see and understand what changes you're making;
16   right?
17       MR. TRAVERS:  Objection; form.
18       THE WITNESS:  I don't know if that's the
19   procedure, but it makes sense.
20   BY MR. DERRINGER:
21   Q    Yeah, that would only be fair; right?
22   A    Yes.
23   Q    Okay.  Now, Exhibit 25 you talk about this
24   dermal absorption paper from the technical working
25   group.  Who's on the technical working group, do you

Page 301

1    know?
2    A    I believe it's produced out of Health Canada.
3    Q    Right.  But I mean individuals, do you know
4    who they are?
5    A    No.
6    Q    Okay.  But if you look back at the references
7    on Exhibit 25, whoever put this position paper together,
8    they referenced work and studies and material from
9    Maibach and from Wester; is that correct?
10   A    Yes.
11       MR. DERRINGER:  All right.  I have nothing
12   further.
13       MR. TRAVERS:  I have one more, just one more
14   brief one.
15            EXAMINATION
16   BY MR. TRAVERS:
17   Q    Is Mrs. Stevick's testimony or is
18   Mrs. Stevick's errata sheet with respect to the -- her
19   time spraying consistent with your discussions with her?
20   A    It is.
21       MR. TRAVERS:  That's it.
22       MR. DERRINGER:  Okay.  I think we're done.  I
23   just have some things to put on the record for
24   mainly -- well, for both of your purposes, I
25   suppose.

Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 78 of 79
Case 3:16-md-02741-VC Document 2559-72 Filed 01/25/19 Page 78 of 79
Confidential - William R. Sawyer, Ph.D.

Page 302

1    First, to the extent Dr. Sawyer reaches
2    additional, modified, or new opinions or
3    conclusions based on any site visit or anything
4    else following this deposition, we expect immediate
5    disclosure from the plaintiffs and we'll move for
6    appropriate relief, including potentially getting
7    more time at a deposition.
8    Pursuant to PTO8, we'll mark this deposition
9    as confidential.
10    Mr. Travers, you indicated today that you're
11    not producing anything of the materials that
12    Dr. Sawyer brought with him to defense counsel
13    other than the three exhibits that we marked as
14    Exhibits 12, 13, and 14. Let me just make sure
15    that you're still sticking to that position.
16    MR. TRAVERS: That's not accurate. Most of
17    the documents were on his reliance list.
18    MR. DERRINGER: I know. But I --
19    MR. TRAVERS: So I'm not producing the studies
20    that are on his reliance list. We're not --
21    MR. DERRINGER: You don't have to do that. I
22    understand --
23    MR. TRAVERS: We don't have to and I'm not
24    producing them pursuant to the agreed PTO7
25    deposition protocol.

Page 303

1    MR. DERRINGER: Okay. So, first of all, there
2    is a dispute between the parties regarding the
3    meaning of PTO7. And, second, we need to at least
4    have disclosure of what Dr. Sawyer brought today so
5    we can test your representation that everything
6    that's in there that you haven't provided to us is,
7    in fact, on his reliance list, including the
8    material we saw earlier on which he wrote some
9    notes. So I understand we're not going to resolve
10    that dispute today.
11    We do ask you to preserve all of the
12    documents, Dr. Sawyer, that you brought with you
13    today in their present condition so that when that
14    dispute is resolved, those documents are still
15    preserved. Do you agree to do that?
16    THE WITNESS: I will do that.
17    MR. DERRINGER: I appreciate that.
18    You mentioned at the beginning of your
19    deposition that you had some critiques of
20    Dr. Sullivan's report.
21    Counsel, I'll note that Dr. Sullivan's report
22    was produced to the plaintiffs on November 27th.
23    The PTO, I think it's PTO 53 but my colleagues will
24    correct me if I'm wrong, specifically provided a
25    day for a deadline for rebuttal reports. That was

Page 304

1    the 4th of December. Dr. Sawyer did not produce
2    any rebuttal report to Dr. Sullivan's opinions and,
3    therefore, we believe it's inappropriate and would
4    be a violation of the PTO for Dr. Sawyer to provide
5    any opinion regarding any critiques he has on
6    Dr. Sullivan's report. And we intend to seek
7    appropriate relief if he intends to testify with
8    respect to any critique he has of Dr. Sullivan's
9    report given that he did not submit the rebuttal
10    report on the 4th of December.
11    And then, finally, I'll note that this is the
12    first time I'm aware at least that defense counsel
13    has been provided with a copy of Mrs. Stevick's
14    errata sheet marked today as Exhibit 24 dated and
15    signed by Elaine Stevick on November 14, 2018.
16    MR. BRAKE: This is Brian Brake. When you're
17    finished, I'd like to comment on what you just
18    stated.
19    MR. DERRINGER: Sure. I'm done, Brian. Go
20    ahead.
21    MR. BRAKE: Yeah. Number one, we didn't --
22    the plaintiffs do not agree to keep this
23    confidential pursuant to Pretrial Order No. 8.
24    That deals with requesting a briefing regarding
25    developments of EPA and IARC. Maybe you misspoke.

Page 305

1    Number two, I personally sent the errata sheet
2    to the Arnold & Porter attorney or attorneys who
3    attended Ms. Stevick's deposition I believe the
4    same day I received it. If you did not receive it
5    from those attorneys, I don't know why.
6    Thus ends my statement.
7    MR. DERRINGER: Thanks, Brian. We don't
8    believe we need your agreement to mark the
9    deposition as confidential, and so we are marking
10    the deposition as confidential.
11    Oh, maybe I misspoke. We're designating it as
12    confidential under PTO 7.
13    And there end -- and there ends my response,
14    Brian. And that's all I've got for today.
15    MR. BRAKE: All right. Good night, everyone.
16    MR. TRAVERS: Good night.
17    MR. DERRINGER: Thank you.
18    THE VIDEOGRAPHER: This concludes the
19    deposition. The time is 5:26 p.m.
20    (Witness excused.)
21    (Whereupon the deposition concluded at 5:26
22    p.m. Reading and signing of the deposition was not
23    waived.)
24        - - -
25

Page 306

```
1              CERTIFICATE OF OATH
2    STATE OF FLORIDA    )
3    COUNTY OF LEE       )
4
5       I, the undersigned authority, certify that WILLIAM
6    R. SAWYER, Ph.D., personally appeared before me and was
7    duly sworn the 20th day of December, 2018.
8       Witness my hand and official seal this 2nd day of
9    January, 2019.
10
11              KIMBERLY A. OVERWISE, FPR, CRR
                Notary Public No. FF160203
12              State of Florida at Large
                My Commission Expires: 9/16/2022
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 307

```
1              DEPOSITION CERTIFICATE
2
3       I, KIMBERLY A. OVERWISE, a Florida Professional
4    Reporter and Certified Realtime Reporter, do hereby
5    certify that I was authorized to and did
6    stenographically report the foregoing deposition of
7    WILLIAM R. SAWYER, PH.D.; that a review of the
8    transcript was not waived; and that the transcript is a
9    true record of the testimony given by the witness.
10      I further certify that I am not a relative,
11   employee, attorney, or counsel connected with the action
12   and nor am I financially interested in the action.
13      Dated this 2nd day of January, 2019.
14
15
16          _____
              KIMBERLY A. OVERWISE, FPR, CRR
17
18
19
20
21
22
23
24
25
```

Page 308

```
1            - - - - - -
                E R R A T A
2            - - - - - -
3    Page  Line  Change
4    ____ ____ _____
5    REASON: _____
6    ____ ____ _____
7    REASON: _____
8    ____ ____ _____
9    REASON: _____
10   ____ ____ _____
11   REASON: _____
12   ____ ____ _____
13   REASON: _____
14   ____ ____ _____
15   REASON: _____
16   ____ ____ _____
17   REASON: _____
18   ____ ____ _____
19   REASON: _____
20   ____ ____ _____
21   REASON: _____
22   ____ ____ _____
23   REASON: _____
24   ____ ____ _____
25   REASON: _____
```

Page 309

```
1          ACKNOWLEDGMENT OF DEPONENT
2
3       I,_____, do
4    hereby certify that I have read the foregoing pages, and
     that the same is a correct transcription of the answers
5    given by me to the questions therein propounded, except
     for the corrections or changes in form or substance, if
6    any, noted in the attached Errata Sheet.
7
        _____     _____
8    WILLIAM R. SAWYER, Ph.D.            DATE
9
10
11
12
13   Subscribed and sworn
14   to before me this
15   _____ day of _____, 20____.
16   My commission expires:_____
17   _____
     Notary Public
18
19
20
21
22
23
24
25
```