# EXHIBIT 8

**Expert Report of Bradley D. Hanson, Ph.D**

I am a Cooperative Extension Specialist in the Department of Plant Sciences at the University of California, Davis. In this role, I have statewide responsibility for weed science research and extension in orchard and vineyard crops. My primary research interests include herbicide performance, herbicide-related crop injury, environmental fate of herbicides, weed biology and genetics, and system-level approaches to managing weeds in agricultural systems. In addition to my academic position, I currently serve as Vice-Chair for Outreach and Extension in the department, oversee the Davis California field research center for the USDA-Western Region IR-4 Program, and am the faculty chair for the department's 1000 acre field research facility.

My education includes a Bachelor of Science degree (1996) in Agricultural Studies (with a minor in Agronomy) from Iowa State University and a Masters of Science (1999) and PhD (2004) in Plant Sciences from the University of Idaho. Since 1991, most of my education and career steps have been related to weed and pest control in production agriculture. I have extensive experience in the use and application of weed control practices and techniques. I grew up on a corn, soybean, and livestock farm in Iowa where I spent several summers working as a pesticide applicator for a local farmer's cooperative. While in college at Iowa State University, I worked as a student lab assistant for a USDA weed biologist and also held two summer research internship positions with American Cyanamid Company supporting field research with new herbicides. While working on my masters degree, I spent two years conducting field and greenhouse research related to herbicide-related crop injury in the wheat-legume cropping systems of northern Idaho. After earning my masters degree, I worked as a staff researcher at Oregon State University conducting herbicide efficacy and crop safety experiments in wheat, grass seed, and oil crops of western and central Oregon. I later returned to the University of Idaho to conduct my PhD research which focused on gene flow from herbicide-resistant wheat to other wheat cultivars and jointed goatgrass, a weed species related to wheat. After completing the PhD program, I worked as a postdoctoral fellow at Colorado State University where I conducted research on a proposed natural-products herbicide and on the mechanisms of herbicide tolerance in imidazolinone-resistant wheat. In 2005, I was hired as a Research Agronomist with the USDA-ARS in California where I was the weed science expert (and later also supervised the nematology research) on a team conducting research on soil fumigants in high-value specialty crops. I joined the UC Davis Department of Plant Sciences in 2009 and now supervise a team of graduate students, postdoctoral researchers, and staff researchers who address weed management issues relevant to the fruit, nut, and vegetable production systems of the Central Valley.

As an academic researcher, I have authored or co-authored over 80 peer-reviewed scientific journal publications and book chapters. Since joining the faculty at UC Davis, I have been the lead or co-lead investigator on over $3 million in grant and gift-funded research related to herbicide performance, herbicide resistance, and soil fumigation. In the past 10 years, my team and I have delivered around 400 presentations on weed biology and genetics, weed management, and herbicides to growers and other agricultural stakeholders in California and the Western US.

A copy of my curriculum vitae is attached as **Attachment A**, which includes a list of my major scientific publications.

I am compensated in connection with this matter at my customary rate of $125 per hour for travel, $200 per hour for preparation, and $300 per hour for depositions, court testimony, and other proceedings.

In the last four years I have testified in: Peterson and Hall v. Monsanto Co., Case No. 1622-CC01071, Circuit Court of the City of St. Louis, MO (2018); Stanley v Tolle Flying Service, Inc, Case No. PO15-

*(www.thriftyfun.com). In each case, the herbicide is first diluted in water, and then pressurized and forced through an orifice to create droplets in a spray pattern.*

In a general sense, lower application volumes are used where the weight of water or number of refills is a limiting factor (e.g. aerial applications, broad acre crops) or when full coverage of a plant is less important (e.g. translocated herbicides). To ensure adequate coverage of the soil, preemergence herbicides often are applied at relatively high spray solution volumes.

*Carrier volume vs herbicide rate:* There is a key difference between carrier volume and herbicide rate. For example, if an herbicide is applied at a rate of 1 lb of active ingredient per acre, it is the same amount of pesticide whether it is applied in 10 gallons of water, 30 gallons of water, or 100 gallons of water per acre. The carrier volume in the latter two cases are 3 and 10-times greater than the first, but the amount of herbicide applied on a per area basis would be the same in all three cases (just more dilute).



*Figure 19. Example of spray droplet coverage comparison as influenced by carrier rate (4, 8, and 12 gallons per acre) and spray nozzle selection leading to different median droplet size. Image from http://sprayers101.com.*

*Minimizing off-target movement:* To maximize the efficiency of herbicide applications, reduce risk of damage to non-target plants, decrease risk of exposure to applicators and others, and minimize environmental risk, it is important to make sure that the equipment, operator, and environmental conditions maximize the amount of spray solution that lands and stays on the intended target (Grisso et al. 2013). Although there are several ways that herbicides can move off target, the most commonly encountered issues are related to "drift" or "leaching".

In a simple sense, leaching can be considered downward movement of herbicides through the soil profile. For herbicides that are taken up by the roots of seedling weeds, they can be considered "off site" if they move deeper than the weed's root zone. In some cases, herbicides that are quite water soluble and poorly bound to soil can leach deep enough to contaminate shallow groundwater resources. Because leaching is largely a function of chemical properties (solubility, binding affinity for soil, etc.) as well as soil physical

and chemical properties (texture, cation exchange capacity, organic matter and clay content), it is mostly not governed by the application equipment.



*Figure 20. Spray drift basics. Spray drift is typically defined as those droplets that never landed on their target and moved off site between exiting the nozzle and hitting a surface. Upper image from: http://integratedweedmanagement.org/wp-content/uploads/2017/02/Spray-drift.jpg. Data in the lower left image shows the effect of droplet size on potential off site drift, especially for droplets smaller than 150 micron in diameter (from http://www.topps-life.org/uploads/8/0/0/3/8003583/_1409408506.jpg). Lower right image shows winter wheat injury from glyphosate drift from an application made in the adjacent fallow field (photo Hanson).*

As compared to leaching, drift is usually described as those spray droplets that never reach their intended target and instead move off site before deposition. The risk of herbicide drift is largely managed by the setup and calibration of the application equipment and the operator's evaluation of the weather conditions (especially wind speed and direction, but also temperature and humidity which influence droplet evaporation rates). The risk of spray droplets moving off site is directly related to the size of the individual droplet; small droplets with less mass are more likely to stay aloft longer compared to large heavy droplets.

Many equipment factors affect the average size of spray droplets, the proportion of the smallest "driftable fines" (usually those smaller than 150 microns in diameter) and the life span of the droplet and are under the control of the applicator (Ozkan and Zhu 2016). Some of these include:
- Nozzle orifice size (which is often related to carrier volume) – lower GPA usually leads to more small droplets compared to high GPA applications.
- Operating pressure – generally systems run at higher pressure have greater shear force and, thus, more small droplets

- <u>Nozzle type</u> – a great deal of engineering has gone into developing nozzle technologies that result in more predictable and uniform spray droplet spectra.  Many older-type nozzles generate more small droplets (and often also more really large droplets).
- <u>Spray boom (or tip) height.</u>  All things being equal, applications made from a greater distance above the target will have more time to become smaller (through evaporation) between the time they exit the nozzle and before landing on a surface.
- <u>Spray additives.</u>  There are a number of "drift reduction" products that may be part of a formulation or added to spray tanks to influence how droplets are formed as they exit the spray nozzle to decrease the proportion of the small droplet size class.

**Understanding herbicide labels**

Herbicides and other pesticides each have a "label" that is an important source of information on how and when the product can be used.  Importantly, the label is also a legal document that outlines the responsibilities assumed by those who purchase and use the product (Siel et al. 2015).  To this point, labels typically specify "*Read the entire label before using this product.  Use only according to label instructions*".

Although there are some differences in format among manufacturers and between some consumer and commercial products, pesticide labels are required to provide certain information including:

- *Trade name or brand name.* This is the name of that the product is marketed under (e.g. Roundup PowerMax).
- *Ingredient statement.*  The product's active ingredients and the amount of non-pesticidal (inert) ingredients, usually listed as percentage by weight.  This section usually also indicates the net contents of the particular packaging (e.g. 32 fl oz, 1 gallon, 2.5 gallons).
- *Use Classification Statement.*  This indicates whether the product is "restricted use" or "general use" which has implications on who is allowed to purchase and use the product.
- *Manufacturer.*  Name and address of the manufacturer, formulator, or product registrant and emergency contact information.
- *Product registration number.*  Each formulated pesticide product registered in the US will have an individual EPA registration number (EPA Reg. No.) as proof that the product and label was approved by the US Environmental Protection Agency.
- *Precautionary statements.*  These may include:
    - Signal word.  Signal words on pesticide labels are used to indicate relative toxicity based on the results of six acute toxicity studies with formulated product.  In order of increasing toxicity, approved signal words include: Caution, Warning, Danger, and Danger/Poison (Fihsel 2018).  See figures 21 and 22 below for examples.
    - Applicator precautions to protect humans and animals.  All pesticides indicate "Keep out of the reach of children".
    - There may be specific instructions related to protecting the environments.
    - Some products have information about physical or chemical hazards (e.g. if flammable, explosive, or corrosive).
- *Personal Protective Equipment (PPE)* requirements.   This section, may be included in the precautionary statement section or a standalone section, outlines the equipment requirements that protect the applicator.
    - PPE requirements are specified on each herbicide label but, at a minimum, commercial products and concentrates usually require applicators to wear: long-sleeved shirt, long pants or coveralls, chemical-resistant gloves, eye protection, and shoes/socks.
    - Some labels have additional PPE requirements for "mixer-loaders" who work with more concentrated materials before they are diluted for application; these might include face shields, chemical-resistant aprons, and similar equipment.

Hanson, Pg. 23

- o For pesticides that are inhalation hazards, some labels will list requirements related to mechanical filter respirators (e.g. dust masks), chemical cartridge respirators, or even air-supplying respirators.
- *Directions for use.* The user is responsible for using the product as directed for approved uses; however it should be noted that the levels of detailed instructions vary among products. This is the section where the applicator typically finds information such as:
    - o Sites and crops on which the product is approved for use.
    - o Application rates and dilution instructions.
    - o Weeds that can be controlled and at what growth stage.
    - o Allowed, recommended, and prohibited application equipment.
- *Reentry and Preharvest information.* If there are restrictions as to when field workers or other users of a site can reenter a treated area, the "Restricted Entry Interval" (REI) will be specified in this section. Similarly, if a pesticide is used on a food crop, there may be a specified "PreHarvest Interval" (PHI) that provides instruction on the shortest time period between the last application of the pesticide and a harvest of the crop.
- *Storage and Disposal Statement.* Each pesticide label has general, and sometimes specific, information on how to safely store products and disposing of empty containers to minimize risks to users, bystanders and the environment.



Hanson, Pg. 24

*Figure 21. Example first page of an herbicide label that contains important use, safety, and legal information for applicators and users. (Monsanto 2010)*

*Figure 22: Examples of signal words and PPE requirement statements from pesticide labels (from Agrian.com Nov. 2018):*

> **Gramoxone SL (paraquat dichloride - Signal Word: Danger/Poison**
> *Applicators and other handlers (other than Mixers and Loaders) must wear:*
> *• Long-sleeve shirt and long pants*
> *• Shoes plus socks*
> *• Protective eyewear*
> *• Chemical Resistant Gloves - Category A (e.g. barrier laminate, butyl rubber, nitrile rubber, neoprene rubber, natural rubber, polyethylene, polyvinyl chloride (PVC) or Viton®)*
> *• A dust mist NIOSH-approved respirator with any N, R, P, or HE filter*
> **Mixers and Loaders must wear:**
> *• Long-sleeve shirt and long pants.  • Shoes plus socks*
> *• A dust mist NIOSH-approved respirator with any N, R, P, or HE filter*
> *• Chemical Resistant Gloves - Category A (e.g. barrier laminate, butyl rubber, nitrile rubber, neoprene rubber, natural rubber, polyethylene, polyvinyl chloride (PVC) or Viton)*
> *• Chemical resistant apron. • Face shield*
> *Discard clothing and other absorbent materials that have been drenched or heavily contaminated with this product's concentrate. Do not reuse them.*

> **Poast (sethoxydim) – Signal Word: Warning**
> *Applicators and other handlers must wear:*
> *• Coveralls over short-sleeved shirt and short pants*
> *• Chemical-resistant gloves, such as barrier laminate, nitrile rubber ≥ 14 mils, butyl rubber ≥ 14 mils, or viton ≥ 14 mils*
> *• Chemical-resistant footwear plus socks*
> *• Protective eyewear*
> *• Chemical-resistant headgear for overhead exposure*
> *• Chemical-resistant apron when cleaning equipment, mixing, and loading*
> *Discard clothing and other absorbent materials that have been drenched or heavily contaminated with this product's concentrate. DO NOT reuse them.*

> **Suppress (caprylic acid and capric acid) – (organic herbicide) – Signal word: Warning**
> *Applicators and other handlers must wear:*
> *• Protective eyewear*
> *• Coveralls worn over short-sleeved shirt and short pants. • Shoes plus socks*
> *• Chemical resistant gloves such as barrier laminate, butyl rubber, nitrile rubber, neoprene rubber, polyvinyl chloride or viton*

> ***Roundup Pro Concentrate (glyphosate isopropylamine) – Signal Word: Caution***
> ***Applicators and other handlers must wear:*** *long-sleeved shirt and long pants, shoes plus socks. Follow manufacturer's instructions for cleaning/maintaining Personal Protective Equipment (PPE). If there are no such instructions for washables, use detergent and hot water. Keep and wash PPE separately from other laundry. Discard clothing and other absorbent materials that have been drenched or heavily contaminated with this product's concentrate. Do not reuse them.*



*Figure 23. Pesticide labels specific the Personal Protective Equipment (PPE) requirements. PPE requirements may differ among products due to their relative toxicities or potential for exposure due to their use patterns. In some cases, there may be different PPE requirements for "mixers/loaders" who often handle large volumes of concentrated materials compared to applicators who only use more dilute materials. Above: mixer/loader image from www.pesticideresources.org, safe storage and handling for homeowner image from www.pesticidestewardship.org, residential applicator image from www.unce.unr.edu .*

It is important for each user to read and follow current label instructions for safe and effective use of the specific herbicide product they are applying for several reasons.   Products can change with regard to active ingredient concentration, formulation, and allowable uses which greatly impacts how and where it can legally be used.  Safety precautions and requirements also evolve over time, particularly for agricultural and professional pesticide applicators who typically have far greater chances for exposure due to the amount of area they treat and the duration of spray operations.  Commercial or professional applicators are also more likely than residential pesticide applicators to utilize larger containers and more concentrated products; thus, even within the same active ingredient, there may be slightly different label requirements for products intended for different uses and market segments.  Because of the way pesticides are used in different market segmentation, there are occasionally apparent contradictions in application instructions for products used in commercial or professional situations (large areas treated, long duration of use over extend time periods, etc.) compared to products used by non-professionals (less frequent use, smaller areas treated, less sophisticated application equipment).