**ANDRUS WAGSTAFF, PC**
Aimee H. Wagstaff (SBN 278480)
7171 W. Alaska Drive
Lakewood, CO 80226
Tel: (303) 376-6360
Fax: (303) 376-6361
Aimee.wagstaff@andruswagstaff.com

**WEITZ & LUXENBERG, P.C.**
Robin L. Greenwald
700 Broadway
New York, NY 10003
Tel: (212) 558-5802
Fax: (646) 293-4921
rgreenwald@weitzlux.com

**THE MILLER FIRM, LLC**
Michael J. Miller (*pro hac vice*)
108 Railroad Ave.
Orange, VA 22960
Tel: (540) 672-4224
Fax:(540) 672-3055
mmiller@millerfirmllc.com

*Co-Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 16-md-02741-VC |
| This document relates to:<br><br>*Hardeman v. Monsanto Co., et al.*, 3:16-cv-0525-VC;<br>*Stevick v. Monsanto Co., et al.*, 3:16-cv-02341-VC;<br>*Gebeyehou v. Monsanto Co., et al.*, 3:16-cv-5813-VC | **PLAINTIFFS' OPPOSITION TO MONSANTO'S MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE AND TESTIMONY REGARDING IARC'S CLASSIFICATION OF GLYPHOSATE** |

## INTRODUCTION

IARC is relevant to the first Phase of trial because the classification, by one of the most prestigious research organizations in the world, supports the opinions of Plaintiffs' experts. All of Plaintiffs' experts considered the data evaluated by IARC, and more, in concluding that exposure to GBFs is associated with a risk of NHL. IARC thus goes to the weight afforded by the jury to Plaintiffs' experts' opinions as one piece of reliable data considered by these experts. Monsanto's atomized qualms with the IARC classification—and the basis for Plaintiffs' experts' opinions to the extent that they rely upon IARC—are for cross-examination and irrelevant to the admissibility of such general causation evidence.

Moreover, as explained in greater depth below, introducing IARC during Phase 1 does not warrant admission of a slew of regulatory evaluations which are unaccompanied by the foundational testimony of a competent witness. In contrast to the evaluations of European regulators and the EPA, which have no sponsoring witness (not to mention the EPA's incomplete interim analyses), Plaintiffs are able to proffer witnesses who can testify competently, from first-hand knowledge, regarding IARC's methods and process which led up to the classification of glyphosate. To the extent that Monsanto is permitted to introduce regulatory evaluations to counter IARC, the volume and type of such evidence should be limited—as discussed below—and Plaintiffs should be able to challenge the credibility of regulatory evaluations by presenting evidence of Monsanto's conduct in affecting the outcome of such agencies' decisions.

Lastly, introducing IARC is important for disabusing the jury of the assumption that Roundup is unlikely to be a carcinogen merely because it has been marketed for over forty years, presumably with approval from regulators. Given that IARC was the institutional turning-point on glyphosate safety following decades of independent science indicating a risk, the jury should be informed of the classification both as a means of gauging the weight and credibility of Plaintiffs' experts' opinions, and to prevent unchallenged, extraneous assumptions from unduly influencing the determination of causation.

## ARGUMENT

As an initial matter, Monsanto does not contend that the IARC classification of glyphosate is irrelevant to the issues to be adjudicated in Phase 2. As such, Plaintiffs limit their response to explaining the import of the IARC classification to Phase 1 of trial.

In determining "what the science actually shows" relative to causation, the jury will hear testimony from Plaintiffs' experts in the fields of epidemiology, toxicology, mechanism, and exposure. As an internationally renowned research agency, which evaluated much of the same independent evidence considered by Plaintiffs' experts, IARC's classification thus goes to the weight of Plaintiffs' experts' testimony. *See, e.g.*, *Baxter Healthcare Corp. v. Denton* 120 Cal.App.4th 333, 349 (2004) (recognizing IARC as "as an authoritative body on the identification of chemicals causing cancer."); Ref. Manual at 564, n. 46 (same). The jury should be permitted to hear that Plaintiffs' experts' opinions are supported by the conclusions of a prestigious research organization when deciding how much weight to afford Plaintiffs' scientific evidence.

Moreover, Monsanto's contention, and this Court's holding during the general causation stage—that IARC does not consider exposure at real-world levels—is misplaced. While it is true that IARC *can* identify hazards which can cause cancer at levels not currently experienced by humans, it does not always do just that. Here, with glyphosate, IARC's classification did in fact conclude that "glyphosate causes NHL in doses within the realistic realm of actual human exposure…" *In re Roundup Prod. Liab. Litig*., No. 16-MD-02741-VC, 2018 WL 3368534, at *7 (N.D. Cal. July 10, 2018). As the IARC Director stated in January 2018, responding to this very criticism raised by Monsanto:

> A charge levelled at the Monographs is that evaluations are divorced from the 'real world' i.e. are made without taking account of realistic human exposures. However, epidemiological studies are a central part of Monograph evaluations and, by definition ***deal with people exposed in daily life, including at work***. The studies frequently consider the gradient of risk observed with different levels of exposure. One part of the Monograph evaluation is specifically ***dedicated to describing the circumstances under which human exposure occurs and at what levels***. In addition, when considering scientific evidence of carcinogenicity including biological mechanisms, the Working Groups place ***special emphasis on whether the observations are relevant to humans***. In light of occurring ("real world") human exposures, Working Groups synthesize evidence in humans, animals and other model systems in reaching overall conclusions.

Ex. 1, *Briefing Note for IARC Scientific and Governing Council Members Prepared by the IARC Director* (January 2018) ("IARC Briefing Note") (emphasis added).[1] Dr. Jameson's—who was a member of the IARC Working Group— and Dr. Portier's respective *Daubert* testimonies also confirmed that Working Group 112 accounted for real-world exposures to GBFs before concluding that GBFs are Class 2A carcinogens. *See* Ex. 2, Jameson Test. at 427:4-21; Ex. 3, Portier 04/6/18 Test. at 81:2-10. Put simply, the IARC Monograph, while not dispositive of the issue of general causation, is a reliable piece of evidence that Plaintiffs' experts considered in arriving at their opinions. And, the jury will be better placed to probe the bases for Plaintiffs' experts' opinion if presented with evidence and testimony regarding the IARC classification.

Furthermore, Monsanto concedes that its disputes with the IARC classification—such as the fact that Monograph 112 was published prior to Andreotti, *et al*. (2018)—is the stuff of cross-examination. Mtn. at 3. This issue is unlikely to create a "sideshow" given that Monsanto can simply point out to the jury that Andreotti, *et al*. (2018) was published after IARC finished reviewing the evidence, and argue to the jury why the findings of one study should be dispositive of causation. Monsanto cannot persuasively argue that the jury will be sidetracked by an inquiry of what IARC did or did not review without offering other data supposedly not considered by IARC. That is because IARC considered substantively the same literature reviewed by regulatory agencies such as the EPA, but placed more weight on independent, peer-reviewed studies rather than industry-sponsored data.[2] Again, such disputes go the weight of the expert opinions presented to the jury.

Evidence regarding IARC does not warrant opening the door to the conclusions of regulatory agencies. ***First***, Monsanto cannot present a single witness to testify competently about the procedures, practices, and methods employed by bodies such as ECHA, EFSA, Bfr, Health Canada, or indeed, the EPA in reaching their conclusions on glyphosate. No witness can walk the jury

[1] Admittedly, the IARC Briefing Note was not part of the MDL record at the commencement of the *Daubert* hearing on March 5, 2018 given that Plaintiffs' expert reports and briefs had been submitted by the time the Briefing Note was published. However, Plaintiffs introduced the Briefing Note during the hearing in response to Judge Chhabria's concerns regarding analysis of real-world exposures in IARC's analysis. *See* Ex. 2, Jameson Test. at 426:22-427:24.

[2] Although regulatory agencies are privy to the underlying animal bioassays provided by registrants, IARC had access to such data through the Greim, *et al*. (2015) publication. *See, e.g*., Ex. 4, IARC Monograph at 34-35. In any event, Plaintiffs' experts did evaluate some of the underlying bioassay data, and their opinions are supported by IARC's review of the summary Greim, *et al*. (2015) tables.

through how, and under what circumstances, these agencies reached their conclusions. The dangers of such evidence—presented in a vacuum—is demonstrated by the EFSA glyphosate conclusion, which evaluated the risk to human health posed by *food* contaminants. *See, e.g.*, Ex. 5, 11/09/18 Ritz. Dep at 271:22-272:2 (responding to Monsanto's questions regarding EFSA's evaluation). However, Drs. Jameson and Portier—as participants of Monograph 112—can both testify to the facts of the IARC glyphosate classification, thereby providing a reliable foundation for its admission.

***Second***, the 2015 EPA CARC Report and 2016 EPA Glyphosate Issue Paper, including its follow-up publications, are incomplete interim analyses, and thus do not bear the gravitas for causation afforded to them by Monsanto. *See, e.g.*, Ex. 6, 2016 Glyphosate Issue Paper at 13 ("The recent peer review performed by CARC served as an initial analysis…"). Such facts provide an independent reason for barring introduction of these reports, as discussed in Plaintiffs' *in limine* motion to exclude the recent EPA analyses.

***Third***, allowing Monsanto to bombard the jury with a smorgasbord of conclusions from every regulatory body Monsanto perceives to be favorable to its causation argument should, fairly, open the door to evidence of Monsanto misleading the same agencies regarding glyphosate safety. Monsanto should not be permitted to use bifurcation as both a shield and sword to enter facts in its favor while keeping out undesirable rebuttal evidence. If the Court does allow evidence of evaluations by regulatory agencies to accompany introduction of IARC's classification, there should be a limit to the volume and type of such regulatory actions heard by the jury, and Plaintiffs should be given the opportunity to challenge the credibility of regulatory evaluations during Phase 1 by pointing to Monsanto's attempt at influencing agency decisions. For example, Monsanto should be limited to presenting the EPA's 1993 glyphosate Registration Eligibility Decision ("RED"), and, to the extent the evaluations of European regulatory bodies such as Bfr and ECHA are raised through the cross-examination of Dr. Portier, Plaintiffs should be afforded the opportunity to introduce evidence which demonstrates that Monsanto failed to provide these agencies with Dr. Parry's evaluations, or the results of Monsanto's Roundup dermal absorption studies, and that Monsanto hired a scientist to find a "tumor" in the control group of the 1983 Knezevich & Hogan mouse study. It is only fair that the

jury be presented with the factual circumstances surrounding such regulatory decisions in order to properly gauge their scientific weight.

Plaintiffs will be materially prejudiced even if the Court is inclined to exclude all evidence of institutional evaluations of glyphosate, whether by IARC or regulatory agencies. Given that Roundup has been on the market since 1974 (presumably one of the first facts marshalled during Monsanto's opening statement), with ubiquitous promotion by Monsanto regarding its safety and benefits, the jury is bound to operate under the presumption that U.S. regulators have deemed the product safe for human use without being privy to evidence of another authoritative body reaching a contrary conclusion. IARC represents the institutional turning-point on glyphosate safety following decades of independent research evincing a carcinogenic risk with the product, notwithstanding the EPA's approval. If all evidence of IARC is excluded, a key piece of foundational scientific evidence for Plaintiffs' experts' opinions will be omitted while Monsanto reaps the benefits of the jury's extraneous assumptions.

In any event, IARC can be presented to the jury through the testimonies of Plaintiffs' fact and expert witnesses with an appropriate limiting instruction regarding the extent to which the jury may consider the classification. However, Plaintiffs' experts should not be limited in their discussion of IARC as a piece of evidence that they considered in forming their causation opinions, and Plaintiffs should be permitted to educate the jury on the factual circumstances of the IARC classification through the testimony of Dr. Jameson. Monsanto's proposal, while dressed as a limiting instruction, boils down to an attempt at improperly circumscribing Plaintiffs' experts' testimonies, contrary to the Court's *Daubert* ruling. Should the Court admit IARC during Phase 1, subject to the Court's ruling on the admissibility of regulatory evaluations, Plaintiffs are amenable to conferring with Monsanto to craft an appropriate limiting instruction.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Monsanto's motion *in limine* to exclude evidence and argument regarding IARC's classification of glyphosate during Phase 1.

Dated: 1/30/2019

Respectfully submitted,

/s/ Aimee Wagstaff
Aimee H. Wagstaff (SBN 278480)
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, P.C.
7171 W. Alaska Drive
Lakewood, CO 80226
Tel: (303) 376-6360

/s/ Robin Greenwald
Robin L. Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY 10003
Tel: (212) 558-5802

/s/ Michael J. Miller
Michael J. Miller (*pro hac vice*)
Brian K. Brake (*pro hac vice*)
mmiller@millerfirmllc.com
bbreake@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave.
Orange, VA 22960
Telephone: (540) 672-4224

*Plaintiffs' Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

I certify that on January 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ Aimee Wagstaff
Aimee H. Wagstaff (SBN 278480)
aimee.wagstaff@andruswagstaff.com