# EXHIBIT A

Pages 1 - 102

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  ROUNDUP PRODUCTS          )
LIABILITY LITIGATION,             )   NO. M. 16-02741 VC
_____ )

San Francisco, California
Thursday, August 24, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:

        The Miller Firm LLC
        108 Railroad Avenue
        Orange, VA  22960
        (540) 672-4224
        (540) 672-3055 (fax)
   BY:  **MICHAEL J. MILLER**
      **NANCY GUY MILLER**

For Plaintiffs:

        Andrus Wagstaff PC
        7171 West Alaska Drive
        Lakewood, CO  80226
        (720) 255-7623
   BY:  **AIMEE H. WAGSTAFF**

For Plaintiffs:

        Andrus Wagstaff PC
        6315 Ascot Drive
        Oakland, CA  94611
        (720) 255-7623
   BY:  **KATHRYN MILLER FORGIE**

For Plaintiffs:

        Weitz & Luxenberg PC
        700 Broadway
        New York, NY 10003
        (213) 558-5802
   BY:  **ROBIN L. GREENWALD**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

**APPEARANCES:**

For Plaintiffs:

                        Lockridge Grindal Nauen PLLP
                        100 Washington Avenue South
                        Suite 2200
                        Minneapolis, MN  55401-2179
                        (612) 339-6900
                   BY:  **YVONNE M. FLAHERTY**

For Plaintiffs:

                        Baum Hedlund Aristei and Goldman, P.C.
                        12100 Wilshire Boulevard, Suite 950
                        Los Angeles, CA  90024
                        (310) 207-3233
                   BY:  **MICHAEL L. BAUM**
                        **ROBERT BRENT WISNER**

For Plaintiffs:

                        Lundy Lundy Soileau & South LLP
                        501 Broad Street
                        P.O. Box 3010
                        Lake Charles, LA 70601
                        (337) 439-0707
                   BY:  **RUDIE RAY SOILEAU, JR.**

For Defendant Monsanto Corporation:

                        Hollingsworth LLP
                        1350 I Street, NW
                        Washington, DC  20005
                        (202) 898-5800
                   BY:  **JOE G. HOLLINGSWORTH**
                        **GARY IRA RUBIN**

For Baum Hedlund Aristei and Goldman, P.C.; and Robert Wisner:

                        Zitrin Law Office
                        535 Pacific Avenue, Suite 100
                        San Francisco, CA  94133
                        (415) 354-2701
                   BY:  **RICHARD ZITRIN**

Also Present:  Individuals appeared via speaker telephone in
listen-only mode, as reflected in the Court's minutes.

**Thursday - August 24, 2017**                          **10:00 a.m.**

                    **P R O C E E D I N G S**

                         ---o0o---

        **THE CLERK:**  Calling case number 16-MD-2741 In Re:

Roundup Products Liability Litigation.  Counsel, please step

forward and state your appearances for the record.

        **MS. WAGSTAFF:**  Good morning, Your Honor.  Aimee --

        **THE CLERK:**  To the podiums, please.

        **MS. WAGSTAFF:**  Oh.  Good morning, Your Honor.

Aimee Wagstaff, for the plaintiffs.

        **THE COURT:**  Good morning.

        **MR. MILLER:**  Good morning, Your Honor.

Michael Miller, for the plaintiffs.

        **THE COURT:**  Good morning.

        **MS. GREENWALD:**  Good morning.  Robin Greenwald, for

the plaintiffs.

        **MR. BAUM:**  Good morning, Your Honor.  Michael Baum,

for plaintiffs.

        **MR. WISNER:**  Brent Wisner, Your Honor.  And with me I

have Richard Zitrin.  He's an attorney that I've hired to

represent me for this proceeding.  He is a law professor, and

an expert in both legal ethics and protective orders.

        **THE COURT:**  All right.

        **MR. ZITRIN:**  Good morning, Your Honor.  I'm

Richard Zitrin.

```
 1              THE COURT:  Good morning.

 2              MR. HOLLINGSWORTH:  Good morning, Your Honor.  Joe

 3   Hollingsworth, for Monsanto.

 4              THE COURT:  Good morning.

 5              MR. RUBIN:  Good morning, Your Honor.  Gary Rubin,

 6   for Monsanto.

 7              THE COURT:  All right.  Okay.  So I guess obviously,

 8   I want to start with Mr. Wisner, or whoever is -- if you're

 9   representing Mr. Wisner.  I don't -- are you going to be

10   speaking on Mr. Wisner's behalf, or how is this going to go?  I

11   don't care, from my standpoint.

12              MR. ZITRIN:  May I come forward?

13              THE COURT:  Please do.

14              MR. ZITRIN:  Your Honor, to state my appearance

15   formally, I'm Richard Zitrin, on behalf of the firm of Baum

16   Hedlund, and in his position as member of that firm,

17   Mr. Wisner, as well.

18        Mr. Wisner is available to answer any questions that the

19   Court might want to put to him.  However, I do have a

20   presentation of several minutes if the Court would indulge me

21   in making that presentation.

22              THE COURT:  Divine "several minutes" with greater

23   specificity.

24              MR. ZITRIN:  Maybe ten.

25              THE COURT:  No.  I don't need to hear a ten-minute
```

1  presentation.  I want to have a discussion about this.

2          **MR. ZITRIN:**  Right.

3          **THE COURT:**  I've read all of the papers.

4          **MR. ZITRIN:**  All right.  You can ask me whatever

5  questions you want to ask me.

6          **THE COURT:**  So I want to start.  And again, I don't

7  particularly care who answers these questions; it's up to you

8  all.  But again, you know, I think to a large extent the brief

9  filed in response to the Order to Show Cause -- Mr. Wisner's

10  brief; Baum Hedlund's brief -- misses the point.

11      The point that I tried to articulate in an Order to Show

12  Cause is that, regardless of whether self-disclosure of these

13  documents under the circumstances in which they were disclosed

14  violated the Protective Order or Pretrial Order 15 or Pretrial

15  Order 20 -- that's not the issue.

16      The issue is that there was a live dispute about all of

17  that stuff.  And Mr. Wisner -- and apparently, with the

18  knowledge of at least some members of the plaintiffs'

19  leadership group -- decided to disregard the fact that there

20  was a live dispute, and go ahead and release the documents.

21  And that is the problem.

22      I will say that it seems obvious that these documents are,

23  in fact, relevant to the general causation phase of this

24  litigation.  And it seems clear that the position that Monsanto

25  was taking in the meet-and-confer was unreasonable.  And, you

1  know, to just state as a blanket matter that these documents

2  aren't cited in the plaintiffs' expert reports, and therefore

3  they are not relevant to the general causation phase of this

4  litigation -- I mean, it's almost laughable; but again, that's

5  not the point.

6      We had a live dispute about the relevance of the

7  documents.  And we had a live dispute about the process by

8  which the relevance of the documents would be adjudicated.  And

9  certainly, as a result of Pretrial Order 15 and

10  Pretrial Order 20, there was a degree of ambiguity about that.

11      By the way, that ambiguity -- that's my fault.  I mean, it

12  was my mistake to not simply amend the Protective Order at the

13  outset when I first became concerned about the plaintiffs'

14  lawyers focusing excessively on public relations, potentially

15  at the expense of actually getting the litigation job done in

16  this case.  I should have simply amended the Protective Order,

17  and so it was I who created the ambiguity that resulted in the

18  dispute between the parties about the appropriate process for

19  resolving the question whether these documents could be

20  released.

21      In the end, I mean, the great irony is that, had you teed

22  this up before me in a joint discovery letter or in a motion,

23  as you told the Monsanto lawyers that you would do, I would

24  have, no doubt, ruled in your favor.  And I probably would have

25  ordered Monsanto to pay the costs associated with adjudicating

1  the dispute about the relevance of these documents, because,

2  like I said, it seems quite clear that all of them -- or at a

3  minimum, the vast majority of them -- are relevant to the

4  general causation phase of the litigation, and potentially

5  quite significant.

6      But you know, this is about lawyers, you know, conducting

7  themselves, you know, in good faith.  And this is about my need

8  to manage this very complex litigation going forward

9  potentially for many years.

10      And I don't see how it would be acceptable to have

11  Mr. Wisner on the Executive Committee going forward, in light

12  of what has happened.  I will also say that -- and maybe his

13  firm, also.  And there could be a distinction between

14  Mr. Wisner not being permitted to be on the Executive

15  Committee, and the firm being not permitted to be on the

16  Executive Committee; I don't know.

17      I also will say that I think Monsanto's, you know, request

18  for discovery of communications amongst plaintiffs' counsel is

19  not unreasonable.  And, you know, the blame -- there's plenty

20  of blame to go around amongst plaintiffs' counsel for how this

21  went down.

22      So, you know, I'm willing to entertain the possibility of

23  granting Monsanto's other requests, but at a minimum, it seems

24  very difficult for me to -- it's difficult for me to understand

25  how I could be comfortable, given my role in managing this

 1  litigation -- how I could be comfortable retaining Mr. Wisner,

 2  and perhaps his firm, on the Executive Committee.

 3      So that's sort of my tentative thinking about all of this.

 4  And with that, I'm happy to hear from either of you, or both of

 5  you.

 6      **MR. ZITRIN:**  Well, I think you may want to hear from

 7  both of us, but let's start out with me, Your Honor, if you

 8  don't mind.

 9      Let me go to the last thing you said about the e-mails,

10  and the e-mails among counsel.  Mr. Miller makes reference to

11  those in his hybrid declaration in response.  Those e-mails are

12  privileged.  Mr. Wisner and Mr. Baum have come fully prepared

13  to share those e-mails with the Court *in camera*, but we want to

14  make sure that, since Monsanto is requesting them, that they

15  will stipulate that there is no waiver of privilege or

16  confidentiality beyond the parameters of the e-mails.

17      **THE COURT:**  I would assume that that would be the

18  case.

19      **MR. ZITRIN:**  Okay.  Well, that's -- and we're happy

20  to show them to you, with that caveat.

21      **THE COURT:**  Okay.

22      **MR. ZITRIN:**  With respect to the overriding issues of

23  the Order -- following the Order -- a live matter, and good

24  faith -- it's very difficult for me to come in in front of

25  United States District Court Judge for the very first time,

1  someone I have known by reputation, and disagree with him the

2  very first thing I say, but --

3        **THE COURT:**  Why?

4        **MR. ZITRIN:**  -- I'd like to take you through it,

5  because there was no violation of the Order, and there was no

6  violation of good faith.

7        **THE COURT:**  Okay.  As I tried to say at the outset,

8  I'm not talking about a violation of the Order here.

9        **MR. ZITRIN:**  Okay.

10        **THE COURT:**  And it seems again that the response to

11  the Order to Show Cause missed the point.  And I thought I had

12  made very clear in the Order to Show Cause that we could have a

13  long argument about whether it violates the Order -- it

14  violated the Order.  And I may very well come out on your side

15  on that question --

16        **MR. ZITRIN:**  Okay.

17        **THE COURT:**  -- but it misses the point.

18     The point is how counsel conducted themselves when we had

19  a live dispute about the meaning of the Order, and a live

20  dispute about how to resolve the dispute about the meaning of

21  the Order.

22        **MR. ZITRIN:**  Well, yeah.  Then I'm afraid I'm going

23  to disagree with the Court again.  Under the Protective Order

24  and under 16.2, it lays out a certain procedure that was

25  followed on June 30th, on July 14th, with respect to the

1  meet-and-confer, at least on the part of plaintiffs' lawyers.

2  Mr. Wisner's Declaration said that they did not comply with the

3  good-faith requirement of the meet-and-confer, but that's not

4  the issue here.

5        **THE COURT:**  Oh, I think you're probably right about

6  that.  I mean --

7        **MR. ZITRIN:**  Right, right, right.  And so, well, you

8  know, we --

9        **THE COURT:**  Oh, I may issue an Order to Show Cause

10 why Monsanto shouldn't be sanctioned for its role in this

11 affair.

12       **MR. ZITRIN:**  Right.  We wouldn't have any objection,

13 but let me go forward on Mr. Wisner.  On July 27th he writes an

14 e-mail, saying, *I'm not going to agree to anything*.  And in

15 that letter he doesn't say anything about, *You have a deadline*;

16 but you know, these guys are smart, and they can count to 30.

17 There's no ambiguity in the Order that in Section 16.3 --

18       **THE COURT:**  The ambiguity's in the conversation that

19 Mr. Wisner had with --

20       **MR. ZITRIN:**  Right, right.  I understand that.

21       **THE COURT:**  -- Monsanto.

22       **MR. ZITRIN:**  Then if you want to focus on the

23 conversation, let's focus on the conversation.  There are a lot

24 of -- there's a lot of *Sturm und Drang* in the three pleadings,

25 which I read again this morning, that Monsanto has filed.

1   There's accusatory statements.  There's -- an emergency stay

2   says --

3          THE COURT:  Just get to the point.

4          MR. ZITRIN:  All right.  They're accusing Mr. Wisner

5   of acting in bad faith, and yet the only thing that he says in

6   that hearing, assuming the best case for Monsanto, is the

7   following.

8          THE COURT:  In what hearing?  Says in what hearing?

9          MR. ZITRIN:  In the meet-and-confer conversation.

10         THE COURT:  Oh.

11         MR. ZITRIN:  -- is the following.  This is Rubin's

12  declaration.  Mr. Wisner stated at the meet-and-confer, quote,

13  *We could either anticipate a motion or a letter brief, or if*

14  *someone talks me into it, dropping it altogether.*

15     Ms. Wagstaff's declaration talks about how Mr. Wisner --

16  and now that I met her, I know this is true -- talks in a

17  jocular fashion.  He has 82 documents.

18         THE COURT:  I'll assume for the sake of argument that

19  he was talking in a jocular fashion --

20         MR. ZITRIN:  Right.  Okay.  I appreciate that.

21         THE COURT:  -- but nonetheless, none of what you've

22  said so far detracts from the point that I'm trying to convey

23  here --

24         MR. ZITRIN:  Then maybe you'll believe me.

25         THE COURT:  -- which is that there was a live dispute

1  about the relevance of the documents to the general causation

2  phase.  And there was a live dispute about the appropriate

3  procedure for resolving that dispute about the relevance, and

4  resolving the dispute about whether the documents could be

5  released.  And Mr. Wisner --

6         (Discussion off the record between counsel.)

7         **THE COURT:**  -- left the impression that they were

8  going to decide -- that the plaintiffs were going to decide

9  whether to file a letter, file a motion, or just drop the

10 matter.  And I'm sure he made reference to dropping the matter

11 in a jocular fashion, and it was never a particularly

12 reasonable alternative; but then he merely told Monsanto that

13 they were not filing a letter brief and they were not filing a

14 motion, and went ahead and released the documents.

15        **MR. ZITRIN:**  Giving -- giving Monsanto lawyers four

16 days to reply, as required under Section 16.3 of the

17 Protective Order.  Of course, they would have to file a motion.

18 Had they filed the declaration within the 30 days --

19        **THE COURT:**  Well, did he say, You have four days

20 under the Protective Order --

21        **MR. ZITRIN:**  That's not a requirement.

22        **THE COURT:**  -- to reply to my statement that we are

23 not going to file a letter brief and we're not going to file a

24 motion?

25        **MR. ZITRIN:**  In fact, Your Honor, I must say that is

 1  not his job.  It can be --

 2          THE COURT:  In light of the conversation that took

 3  place between the plaintiffs' lawyers and Monsanto, and in

 4  light of the fact that there was a live dispute about how to go

 5  about resolving this, it absolutely was his obligation to do

 6  that.

 7          MR. ZITRIN:  Well, Your Honor --

 8          THE COURT:  It was his obligation to get the dispute

 9  resolved before going ahead and releasing the documents; but

10  the problem is that he was not focused on being a lawyer.  He

11  was focused on being a PR man.  He was more interested in

12  getting these documents released, and getting them released

13  fast, than he was in being a lawyer, and making sure a live

14  dispute between two parties to the litigation got resolved

15  before he moved forward.

16      That's not how you lawyer.  That might be how you do

17  conduct PR --

18          MR. ZITRIN:  Well, Your Honor --

19          THE COURT:  -- but that's not how you lawyer.

20          MR. ZITRIN:  Well, Your Honor --

21          THE COURT:  Don't you agree?

22          MR. ZITRIN:  No, I don't.

23      I've been teaching legal ethics for 40 years.  I've taught

24  trial practice at USF for ten years.

25          THE COURT:  Neither of those two things is relevant

1   to this.

2            MR. ZITRIN:  If he --

3            THE COURT:  Hold on a second.

4        Neither of those two things is relevant to this

5   discussion.  Could you please just stick to the facts in this

6   case?

7            MR. ZITRIN:  If he had --

8        You asked me do I agree.

9        I said no.

10        And the reason I don't agree is that if Mr. Wisner had

11   said, *Look.  I said in the conversation on January 14th that I*

12   *was going to file a motion, but that motion is obviously*

13   *predicated* -- excuse me -- *on a declaration being done in*

14   *response*.  No declaration was done in response.  That ended the

15   matter.

16            THE COURT:  What declaration being done in response?

17   What are you talking about:  Declaration done in response?

18            MR. ZITRIN:  Here's what I'll say.  Let me read you

19   16.3.  This is your Order, Your Honor.  *Within 30 days of the*

20   *initial notice of challenge, or within 21 days of the parties*

21   *agreeing that the meet-and-confer process will not resolve*

22   *their dispute, whichever is earlier, that's the time in which*

23   *the designating party shall file and serve a motion to retain*

24   *confidentiality*.

25            THE COURT:  Okay, but what are you talking about:

1  Declaration?  They didn't file --

2           MR. ZITRIN:  Well, they didn't file a motion.  Right.

3           THE COURT:  The story now is that he was waiting for

4  them to file a declaration?

5           MR. WISNER:  Your Honor --

6           MR. ZITRIN:  No, the story is --

7           MR. WISNER:  Let -- let --

8           MR. ZITRIN:  Wait a minute, please.

9      The story is that they did not file a declaration.  They

10  did not file a motion.

11          THE COURT:  Okay.  You were reading to me from the

12  Order, and saying they were required to file a declaration?

13          MR. ZITRIN:  No.  The Order -- the Order --

14          MR. WISNER:  Could you read it?

15          MR. ZITRIN:  Brent, just --

16          MR. WISNER:  Sorry.

17          MR. ZITRIN:  The Order --

18      Each such motion must be accompanied by a competent

19  declaration affirming that the movant has complied with the --

20          THE COURT:  Motion.  Right.

21      But the dispute was about who was required to file what.

22          MR. WISNER:  That's not correct.

23          MR. ZITRIN:  No, no, no.  Let me -- Your Honor, if I

24  may continue, I know that the Court is impatient about

25  Mr. Wisner.  Please don't be too impatient with me.  Let me --

```
 1            THE COURT:  Just answer my questions, then.

 2            MR. ZITRIN:  Well, I am answering your questions, but

 3   I need to keep reading.  So you've got to file a declaration

 4   affirming that the movant has complied.  Failure by the --

 5        This is at the bottom of page 7.

 6            THE COURT:  But I don't understand.  You're saying --

 7            MR. ZITRIN:  Let me just read.

 8            THE COURT:  -- he was waiting.  And --

 9            MR. ZITRIN:  May I read the sentence?

10            THE COURT:  -- you're not going to file a motion,

11   because you didn't file a declaration?

12            MR. ZITRIN:  No, no.  It's them.

13            THE COURT:  What?

14            MR. ZITRIN:  They had to file the motion; the

15   designating party.

16            THE COURT:  Okay, but he said to Monsanto, *We're*

17   *either -- we're going to decide whether to file a joint letter,*

18   *or file a motion*.  That was in recognition that there was a

19   live dispute, and it needed to be resolved by the Court; a

20   dispute about relevance.  And there was also, apparently, a

21   dispute about how to get it resolved.  And it needed to go to

22   Court.

23            MR. WISNER:  Could I please explain?

24            MR. ZITRIN:  Well, Your Honor, I'm going to ask you

25   to let me explain Point A that leads to Point B that leads to
```

 1  Point C, if you could please be a little patient with me.

 2       I understand the Court's question.  You only have to file

 3  a motion --

 4           THE COURT:  It doesn't seem like it, because you're

 5  saying that he didn't file a motion, because he was waiting for

 6  them to file a declaration.

 7           MR. ZITRIN:  Because if you don't -- because you only

 8  have to file a motion --

 9           THE COURT:  And you also implied that he said to them

10  that he wasn't filing a motion because they hadn't filed a

11  declaration.  Where is that?  Where is that in the record?

12           MR. WISNER:  Your Honor, I think there's a confusion

13  on the facts, and I think I can help answer your question

14  very --

15           THE COURT:  You guys decide which one of you wants to

16  talk --

17           MR. ZITRIN:  Wait, wait, wait.

18           MR. WISNER:  I'd like to talk.

19           MR. ZITRIN:  There is --

20           THE COURT:  Hold on a second.

21           MR. ZITRIN:  There is a --

22           THE COURT:  Be quiet.  Be quiet.  Okay?

23       You decide amongst yourselves who wants to talk, and who

24  wants to sit down.

25           (Discussion off the record.)

1   MR. WISNER: I can answer his question. I can answer

2   his question.

3       THE COURT: Professor Zitrin, sit down. Sit down.

4       MR. ZITRIN: Your Honor --

5       THE COURT: Sit down.

6       MR. ZITRIN: A record needs to be made on this

7   matter.

8       THE COURT: I'm going to have security come to get

9   you removed from the court --

10      MR. ZITRIN: I don't want to be removed from the

11  court.

12      THE COURT: -- if you don't sit down.

13      MR. WISNER: Your Honor, I'll just answer a couple

14  quick questions, because I think the facts are getting lost

15  here.

16      The first question you asked, was there a -- the first

17  issue you said -- considering that you said there was a live

18  dispute, and I published them. Okay? If you read the first

19  header of my brief, I directly answer that. I state,

20  *Mr. Wisner and Baum Hedlund did not act in bad faith by making*

21  *the 86 documents public, because there was no longer a live*

22  *dispute as of August 1st, 2017.*

23      THE COURT: That's great that you say that in your

24  header, but it's just not true.

25      MR. WISNER: Well, Your Honor, by operation of this

1    Court's Order, it was.  Automatically, the confidentiality of

2    documents was waived.  There was no -- there was no ambiguity.

3            THE COURT:  Monsanto said to you that it was

4    disputing the idea that those documents were relevant.  And the

5    way you left it with them is that, to get the dispute resolved,

6    you would either file a letter brief, or file a joint discovery

7    letter, or file a motion.  You then told them you were going to

8    do neither of those things, and you left it at that.

9            MR. WISNER:  That's.

10           THE COURT:  There was still a live dispute.

11           MR. WISNER:  That's factually incorrect, Your Honor.

12       Here's the facts.  So during the call --

13           THE COURT:  So your co-counsel's declaration about

14   what happened -- you call it inaccurate?

15           MR. WISNER:  Read it closely, Your Honor.  That's not

16   what she said.

17           THE COURT:  I read it closely five minutes ago.

18           MR. WISNER:  She said I stated that plaintiffs'

19   options were -- I never once, for even a second, said, *You*

20   *don't have to do anything*.

21           THE COURT:  And -- but the options were file a joint

22   letter, or file a motion, or drop the issue.

23       You then -- after saying those things, you said to

24   Monsanto, *We are not going to file a joint letter, and we're*

25   *not going to file a motion*.

1        **MR. WISNER:**  Precisely, to put them on notice that

2   they had to take action, because the Protective Order's very

3   clear.  It's not ambiguous, Your Honor.

4        **THE COURT:**  Your position is that the Order was

5   clear.  Monsanto's position was different.  And there was --

6        **MR. WISNER:**  They did not state that.

7        **THE COURT:**  And there was a live dispute about it.

8        **MR. WISNER:**  That's not true.

9        **THE COURT:**  And --

10        **MR. WISNER:**  They didn't dispute that.  There was

11  never once a conversation about what they had to do or not do.

12  They disputed that the documents --

13        **THE COURT:**  There was.  There was a conversation in

14  which you said -- Monsanto made very clear that they wanted

15  this resolved by the Court, because they disagreed that these

16  documents --

17        **MR. WISNER:**  That's not what --

18        **THE COURT:**  -- should be released.

19        **MR. WISNER:**  That's not what they said.  That's all

20  not in the declarations, Your Honor.

21      What happened during the conversation was very simple.  I

22  tried going through to the documents.  They said, *Go away*.

23      I tried to address the relevancy of them.  They said, *We

24  don't have to.*

25        Putting that issue aside, then at the end of it I was

1   unbelievably blown away.  I've never been treated so

2   disrespectfully by anybody in any -- and I've done a lot of

3   these calendars before in many courts, Your Honor.  And I said

4   to them, *Well, it looks like you're saying I have three options*

5   *here.  I could either are file a joint letter, which I doubt*

6   *we're going to do.  We'll file a motion; or I guess if someone*

7   *talks me into it, we could withdraw.  I guess those are our*

8   *options.*

9       I never once said, *Oh, by the way, Monsanto, you don't*

10  *have to follow the Protective Order, because the thing says* --

11  and they admit this -- we reached an impasse.  And the Order

12  says once you reach an impasse, here is what the obligations

13  are.  This is what you're supposed to do.

14      And I looked at it.  I studied it closely.  I went back

15  and read every transcript; read every Order this Court said.

16  And never at one point did you shift that onus, not even for a

17  second.  It's not even ambiguous on that point.

18      And it occurred to me as it we got closer to the deadline

19  that they actually might not file something.  I couldn't

20  believe that they would just let it go, because they were so

21  obstinate on the call.

22      So to make sure that they weren't waiting for me to do

23  something, which -- I didn't want to run into a situation where

24  they said, *Oh, we are waiting for Mr. Wisner to file a motion.*

25  I made it clear to them I wasn't doing anything.

1          **THE COURT:**  If the Order was so clear, why did you

2     start preparing a motion to seek clarification of the

3     Protective Order?

4          **MR. WISNER:**  Because I thought what I had to do --

5     the hundreds of hours that I --

6          **THE COURT:**  The answer is:  Because you knew there

7     was a live dispute between you and Monsanto about how to

8     resolve this issue.

9          **MR. WISNER:**  That's not true, Your Honor.

10         **THE COURT:**  What possibly could be the other

11    explanation for preparing a motion to clarify the

12    Protective Order?

13         **MR. WISNER:**  Because I spent hundreds of hours

14    preparing a 30-page, single-spaced letter, going through each

15    document, explaining why it's relevant; doing everything this

16    Court told us to do.  And I spent countless amount of time.

17         And as I did the research preparing to oppose the motion

18    that I'd just made on the file, I did all of the research,

19    anticipating a motion of the opposition.  I looked into the

20    First Amendment.  I looked into the Ninth Circuit's ruling on

21    this stuff, and it became abundantly clear that this Court's

22    requirement that they be relevant was actually invalid under

23    the law; that you couldn't place a burden on plaintiffs.

24         And we can -- we can -- let's not have that fight now.

25    Right?  That's a different issue.

**PROCEEDINGS**

```
 1        But it became clear to me that we have a --

 2             THE COURT:  Well, I mean, it's relevant to how we're

 3   going to proceed going forward, but I did not see a single case

 4   that you cited that said that we could not have a kind of rule

 5   that I was contemplating, which is that documents that should

 6   never have been turned over to the plaintiffs in the first

 7   place that are not relevant may not be --

 8             MR. WISNER:  Sure.

 9             THE COURT:  -- disclosed.

10             MR. WISNER:  And I don't want to get into that fight.

11             THE COURT:  You're right that we -- particularly I

12   don't need to have that fight with you.

13             MR. WISNER:  Okay.  So putting that issue aside, I

14   did all of this research, and I had all of these really great

15   arguments I was getting ready to make.  And as the deadline

16   came, I actually realized that they weren't going to file

17   anything.  And that's when I decided, oh --

18             THE COURT:  Then why did you file the motion to

19   clarify?

20             MR. WISNER:  Because -- because moving forward, this

21   was an incredibly difficult --

22        That's why, if you look at the motion I filed, that's what

23   I say.  I say I filed this because moving forward --

24             THE COURT:  Right.  Release documents first.  Ask

25   questions later --
```

**PROCEEDINGS**

1              MR. WISNER:  No.

2              THE COURT:  -- because --

3              MR. WISNER:  No.

4              THE COURT:  -- you were too focused on being a PR

5    man, and not focused enough on being a lawyer.

6              MR. WISNER:  Your Honor, Your Honor --

7              THE COURT:  And what we need in this litigation is

8    lawyers.

9              MR. WISNER:  That is a preposterous.  That is

10   absolutely preposterous.  The idea that I'm trying to do PR is

11   absurd.  I tried to avoid the media this whole time, because I

12   don't want to become --

13      I do this because I care about public health.  I do this

14   because I live in California, and I grew up here; and my father

15   worked with Cesar Chavez, and helped protect farmworkers from

16   exposures to pesticides; because I actually care about people.

17      And there's really important decisions being made right

18   now in OEHHA, in the EPA -- they're doing an investigation to

19   potential collusion -- and in Europe.

20      And the first thing I did was not give them to reporters,

21   or any of that stuff.  The first thing I did was I sent them to

22   those people, because I wanted them to make informed decisions.

23      And those documents, Your Honor -- no matter how you look

24   at them, they tell a really just alarming story of corporate

25   malfeasance.

1        Now, you might not agree with that.  That's fine.

2            **THE COURT:**  No.  I actually tend to agree with you.

3   I mean, I think --

4            **MR. WISNER:**  And so that's why I did it.

5        PR?  That's not even close to what my firm does.  I barely

6   sleep, because I'm a brief writer.  I argue stuff.  I appeal

7   stuff.  I try cases.  The idea that I'm into PR is just

8   preposterous.  Ask the person who does the PR at my firm.  She

9   can barely get me on the phone.  I ignore her.  That's not just

10  not what this was about.

11       I actually was doing good lawyering.  I was following the

12  Protective Order to a T.

13       And they made a mistake.  They screwed up.  And their

14  screw-up --

15       I did what a good lawyer would do, is I put them in the

16  hands of decision makers to make the right decision.  That's

17  not bad faith.  Bad faith is deceptive intent; and there wasn't

18  even a drop of that in my blood.  All I was trying to do was

19  get this issue presented.

20       They stonewalled me, stonewalled me, stonewalled me.  And

21  in that hubris, they just decided they didn't have to do

22  anything, because the Protective Order's clear.  It says if

23  there's a dispute that requires Court intervention, if there is

24  a live dispute, the onus is on the party who's getting the

25  protection to do something; and if they don't, there is a

1    penalty.  There is an automatic resolution of that live dispute

2    as of August 1st, when -- actually, as of August 30th, quite

3    frankly, but I waited a few extra days, just to make sure that

4    there was no calendaring issues.  As of that day, there was no

5    live dispute.

6         And I honestly believe that the reason why they didn't

7    file anything was not because they forgot.  I realize that now,

8    because that's what they've basically conceded to; but what I

9    thought was they couldn't have brought a good-faith motion to

10   this Court, because there's -- none of these documents require

11   it.  And as part of that good-faith motion, they have to submit

12   a declaration saying, *We acted in good faith in the*

13   *meet-and-confer*, which they didn't, *and that these documents*

14   *actually weren't confidentiality* [sic], which they couldn't.

15        And this Court specifically threatened Monsanto with

16   sanctions in PTO 15 that if they proceed to file

17   unsubstantiated, nonsense-type declarations in the future, you

18   would sanction them.

19        So when I saw that, I went, *Oh, I guess they realized they*

20   *had no leg to stand on.  They finally came to their senses.*

21   *It's waived.  Now let me get these documents into the hands of*

22   *people that matter.*  There is no bad faith here, Your Honor.

23        And taking -- and regarding the sanctions issue, please

24   don't take my firm off.  I did this.  This was my -- this was

25   my crusade.  This was my attempt to do something.  And if you

1   want to sanction me, which -- I don't think it's warranted at

2   all, because I didn't act in bad faith -- I'd like to know what

3   you think I did that was deceptive, because in that call with

4   them I was anything but.  I wish we had a transcript of it.  If

5   you listened to that, if you saw the transcript, you would be

6   appalled by the kind of conversations we had.

7        And then when I sent that e-mail on the 27th, there wasn't

8   intent to deceive anybody.  That was specifically the opposite.

9        Now, I didn't say, *Hey, by the way, you have obligations*

10  *to file a motion within 30 days*; but that would be literally

11  violating my duty of loyalty and obedience to my clients,

12  because getting these documents into the public is in my

13  clients' best interests.  And if I were to violate that oath by

14  telling them how to practice law, that would be unethical.  I

15  actually spent some time thinking about that, and I even

16  researched the issue.

17       So I -- I -- I -- other than Monsanto raising their voice

18  and trying to blame me for their own mistake, I don't see how

19  sanctioning me is a good idea, or even sends the right message

20  in this litigation.  I mean, I literally did everything this

21  Court asked me to do.  I worked so many hours to do it.  And

22  you're going to sanction me because, at the end of the day,

23  they didn't do their job.  I don't think that's right,

24  Your Honor, and so I don't think you should sanction me.

25            THE COURT:  Okay.  Is there anything else you'd like

 1  Professor Zitrin to say on your behalf?

 2          **MR. ZITRIN:**  Yeah.  I should just --

 3          **THE COURT:**  So I'm asking Mr. Wisner, since you're

 4  representing him.  It's really his choice whether he'd like you

 5  to say anything further.

 6          **MR. WISNER:**  Yes, I'd like Mr. Zitrin --

 7          **THE COURT:**  Okay.

 8          **MR. WISNER:**  -- but -- yes.

 9          **MR. ZITRIN:**  Just a couple of points to wrap things

10  together, Your Honor.

11      16.3 of the Protective Order says that if the designating

12  party does not do so within 30 days of the initial notice of

13  challenge, which is the outside parameters, failure by the

14  designating party to make such a motion including the required

15  declaration within 30 days shall automatically waive the

16  confidentiality designation for each challenged designation.

17      There was no live matter under the Protective Order once

18  the 30 days had expired.  The *status quo ante* after the

19  meet-and-confer, which was not, as you know, very successful at

20  all, was on the designating party to move within 30 days.  They

21  did not.  It was on the designating party to declare under

22  penalty of perjury.  They did not.

23      And I'm sure that they read Your Honor's last sentence in

24  PTO 15, in which you admonished everybody not to come up with

25  declarations based on what we might call "alternative facts."

1   You made it very clear.  You cited to Rule 11(b).

2       So when Brent here says that it dawned on him that they're

3   probably not responding because they couldn't do a good-faith

4   declaration under PTO 15 and 11(b), they had to give up the

5   ghost.

6       You know, what happened in terms of the release of the

7   documents after the 30 days was over -- and this was actually

8   on the 33rd day -- was they were automatically designated

9   waived confidentially for each challenged designation.  All 82

10  documents were public.  He released them.

11      And I appreciate that the Court doesn't want Mr. Wisner

12  going out and calling the press and releasing them all over the

13  place.

14          **THE COURT:**  No, no.  You've got me -- you've got it

15  completely wrong.

16          **MR. ZITRIN:**  Okay.

17          **THE COURT:**  And I've said on a number of occasions

18  there is absolutely nothing wrong with calling the press and

19  communicating with the press about the case or issues related

20  to the case.

21          **MR. ZITRIN:**  Right.

22          **THE COURT:**  Nothing wrong with communicating with

23  government agencies about the issue.  A lawyer has expertise on

24  an issue like this.  And government agencies might be

25  interested in the information.  There's absolutely nothing

PROCEEDINGS

```
 1  wrong with communicating.

 2      And again, it just --

 3          MR. ZITRIN:  I appreciate that.

 4          THE COURT:  Your comments suggest that you're just

 5  again missing the point.

 6          MR. ZITRIN:  Well, no, Your Honor.

 7          THE COURT:  All you're doing is talking about what

 8  the Protective Order says.  And you've now made this comment

 9  about how you understand that I don't want them talking to the

10  press.  You're missing the point.

11          MR. ZITRIN:  I apologize.

12          THE COURT:  There's nothing wrong with talking to the

13  press.  There's nothing wrong with doing publicity.

14      What is wrong is moving forward unilaterally when there's

15  a live dispute about how to move forward.

16          MR. ZITRIN:  I appreciate that.

17          THE COURT:  And, you know, you don't seem to be in a

18  position to respond to that point.  And so maybe we'll hear

19  from Monsanto briefly.

20      Anything you want to say?

21          MR. ZITRIN:  May I add one brief thing, Your Honor?

22          THE COURT:  Sure.

23          MR. ZITRIN:  Two brief things, if I may.

24      First of all, Your Honor twice said that Mr. Wisner was

25  more interested in being a publicist than a lawyer.  You did
```

PROCEEDINGS

1  say that today.  I don't think that's true.  A lawyer

2  publicizes the information.

3      Second, with respect to the issue about him filing a

4  motion --

5           THE COURT:  And a lawyer does it once the dispute has

6  been resolved about whether the --

7           MR. ZITRIN:  Right.

8           THE COURT:  -- information can be published --

9           MR. ZITRIN:  Right.

10          THE COURT:  -- or not.  Beforehand.

11          MR. ZITRIN:  Right, but the second thing --

12          MR. WISNER:  But --

13          MR. ZITRIN:  -- is that although he told -- he may

14  have told counsel that he would file a motion, the need to file

15  the motion was obviated by the failure of Monsanto to respond.

16      And again -- and this may be the key issue here.

17  Plaintiffs' lawyers consider this not to have been an active

18  matter.  This was a done deal.  I don't see how it could be

19  anything other than a done deal, by reading the

20  Protective Order.  And I'll leave it at that.

21          MR. WISNER:  Would you like me to say up here,

22  Your Honor, or sit down?

23          THE COURT:  Your preference.

24          MR. WISNER:  Okay.  I'll stay up here.

25          MR. HOLLINGSWORTH:  Your Honor, the issues that the

 1  Court asked us to address were made clear by Your Honor

 2  beginning in last week's telephonic conference, and then

 3  reiterated by Your Honor in the Court's official Order to Show

 4  Cause.

 5       And the issues were, according to Your Honor, that there

 6  was a dispute between the parties; that Mr. Wisner was aware of

 7  the dispute; that Mr. Wisner knew Monsanto's position that the

 8  documents could not be released without involvement of the

 9  Court; and that -- two things -- notwithstanding his awareness

10  of Monsanto's position, and notwithstanding that he left the

11  impression that the documents weren't going to be released, he

12  put them out to the world.  And he did so in a PR kind of way.

13  You can read about them on the next day -- next day's version

14  of *The New York Times*, if Your Honor hasn't seen that.

15       And then Your Honor raised the issue, which Your Honor

16  said was clear to him, that there was a live dispute, and that

17  everybody knew that.  And the dispute was whether these

18  documents could be released without first submitting the issue

19  to the Court.  And because Mr. Wisner had submitted the

20  documents to various media outlets, and actually in advance of

21  August 1st -- I think there's evidence of that -- it seemed

22  clear to Your Honor that Mr. Wisner had acted in bad faith.

23       So that leaves two or three issues that I think are live

24  or remain issues for this hearing.  One is whether Baum Hedlund

25  and Mr. Wisner explicitly knew, and trumpeted to all kinds of

1  people in the world, that Monsanto wanted to maintain the

2  confidentiality of its documents; that it was not waiving or

3  giving up any rights to designation of confidentiality of the

4  documents; and it took a position opposite to the plaintiffs on

5  the de-designation issue.

6      That's not controverted.  That is not controverted.  That

7  is what should have been controverted, according to

8  Your Honor's Order, but it's not.

9          **THE COURT:**  I was having difficulty following what

10  you were saying.

11      Can you make that point again?  You're saying that --

12      I may have misheard you, but it seemed like you were

13  saying that the plaintiffs' lawyers trumpeted to people that

14  Monsanto did not want the documents released, and believed the

15  documents shouldn't be released?

16          **MR. HOLLINGSWORTH:**  Correct.  They said that.

17          **THE COURT:**  Could you explain that a little more?

18          **MR. HOLLINGSWORTH:**  Yes.  For example, Your Honor,

19  they said that specifically in their three letters to the

20  various agencies:  To the United States EPA, the Office of

21  Inspector General, to OEHHA, and also to the European Health

22  Safety Agency, or European Parliament.  And they said that

23  Monsanto had made clear that they did not agree to de-designate

24  the documents.  That's on -- that was in the first paragraph of

25  our earlier Reply Brief in connection with the main motion.

1  And that hasn't been controverted.

2      So Your Honor's statement that that was an issue that

3  Your Honor was interested in resolving, I think, is shown by

4  the papers, and by what's been said today, that there's no

5  controversy about.

6      The second thing was --

7          THE COURT:  But I want to go back and look at that,

8  to make sure I have a clearer understanding of what you're

9  saying.

10          MR. HOLLINGSWORTH:  Okay.

11          THE COURT:  This was in -- you're talking -- you said

12  you referenced this in your reply to -- on the motion -- on the

13  original motion for emergency relief that you filed?  Is that

14  what this is?

15          MR. HOLLINGSWORTH:  Yes, yes.

16          THE COURT:  And so point me to it.

17          MR. HOLLINGSWORTH:  Yes.  And that Reply Brief was

18  filed on August 7th.

19          THE COURT:  Okay. yeah.  I have it in front of me.

20          MR. HOLLINGSWORTH:  And on the front page of that

21  brief --

22          THE COURT:  Yeah.

23          MR. HOLLINGSWORTH:  -- we quote from these letters

24  that Mr. Wisner's office had prepared and sent to the three

25  agencies that I mentioned.  We quote the one that went to the

1  members of the European Parliament; the four members.

2       The letter -- the letter, which is also attached to -- as

3  an exhibit to that brief is before Your Honor; but my point is

4  that that letter makes a statement that Monsanto met with us,

5  and stated it would not retract claims of confidentiality over

6  documents we specifically challenged.  That's clear.

7            MR. WISNER:  Well --

8            MR. HOLLINGSWORTH:  It says that three times, and

9  three --

10           THE COURT:  Don't interrupt.  Don't interrupt.

11           MR. WISNER:  Actually I have the letter for you.

12           THE COURT:  Just don't interrupt opposing counsel.

13           MR. WISNER:  Sorry.  I was giving --

14           MR. HOLLINGSWORTH:  He says that three times in

15  separate letters.  That's clear from the -- I think that's

16  clear also from the various declarations, though.

17           THE COURT:  But my recollection is that he later said

18  that Monsanto then waived its confidentiality objection.  Isn't

19  that right?

20           MR. HOLLINGSWORTH:  He -- well, he took that -- he's

21  taken that position here in court.

22           MR. ZITRIN:  Yes.

23           THE COURT:  Again, I'm talking to opposing counsel

24  now, Professor Zitrin.

25           MR. ZITRIN:  I apologize.

1        THE COURT:  Usually the lawyers don't interject when

2  the Judge is talking to opposing counsel.

3        MR. HOLLINGSWORTH:  Yes.  He did go on and state that

4  Monsanto had made a mistake, and that its lawyers had erred,

5  and that, according to the Protective Order, Monsanto should

6  have done something; but Your Honor's question, pursuant to a

7  discussion last -- the telephonic hearing, which I think was

8  about a week ago, and then to Your Honor's Order to Show Cause

9  went to the issue of whether Monsanto had made clear that it

10  was not agreeing to the de-designate these documents, and that

11  there was a dispute about that.

12        The other thing that I think is not disputed now, clearly,

13  is that Baum Hedlund and the other members of this committee

14  knew that Monsanto had proposed a joint letter to the Court,

15  and that there was a live dispute.  And Your Honor's Order

16  mentions the live dispute.  And Your Honor's conversation at

17  the hearing mentions live dispute.  And that's known to all.

18  That was mentioned.  That's mentioned at page 9 of Mr. Wisner's

19  brief.  It's mentioned in all of the declarations.  There was a

20  live dispute.  That's not controverted.  So --

21        THE COURT:  I mean, it also seems like it's proved by

22  the fact that they filed this brief on August 1st, seeking

23  clarification of the Protective Order.  Right?

24        MR. HOLLINGSWORTH:  Well, I thought that was --

25        THE COURT:  Obviously, they were working on it before

1    August 1st.

2         **MR. HOLLINGSWORTH:**  Yes.  I think that's a very

3    powerful point that we've made in all of our briefs.  And, I

4    mean, that just -- that's just a thing that really confounds a

5    lot of what Mr. Wisner has said before the Court today, in my

6    opinion; but -- so the two basic -- the things that are at the

7    crux of the issue of whether or not there was bad faith

8    committed by this committee and by Mr. Wisner here are not in

9    controversy.  They haven't controverted those things.

10        And from that Your Honor, I think, was leading to the

11   conclusion that Baum Hedlund and Mr. Wisner and others had

12   actively misled Monsanto.  And they had left Monsanto with the

13   impression that the documents were not going to be released

14   until this dispute could be decided, which I think were Your

15   Honor's words mostly; not mine.  And I think that Your Honor is

16   heading to the right conclusion in that connection.  And I

17   don't think that the factual bases that Your Honor needs to get

18   there have been controverted.

19        **THE COURT:**  You know --

20        **MR. HOLLINGSWORTH:**  And that's our position.

21        **THE COURT:**  -- there's a lot of discussion of bad

22   faith.  And, you know, it does strike me that the Record, you

23   know, supports -- based on everything I've read and everything

24   I've heard today, it strikes me that the Record does support,

25   you know, a finding of bad faith.

1       I mean, I understand that a finding of bad faith is

2   necessary to support sanctions under Rule 11, or whatever, you

3   know; but the Court has a lot of discretion to manage its

4   cases.  And particularly in MDLs the Court has a lot of

5   discretion to manage these very complex, difficult-to-manage

6   cases.

7       And so I guess on the question of whether Mr. Wisner

8   and/or Baum Hedlund should be removed from the Executive

9   Committee, which is one of the things you've requested, does it

10  matter whether there was bad faith?

11      I mean, it seems to me that at an absolute minimum there

12  was misconduct.  Right?

13      And you could spin out a story, I suppose, that, you know,

14  a lawyer, in his zeal to, you know, get these documents

15  released --

16      And one can understand why a lawyer might be very anxious

17  to get these documents released.  And, as I've said a number of

18  times, there's absolutely nothing wrong with a lawyer wanting

19  these documents to be released, and communicating them to the

20  press, and, you know, communicating them to government

21  agencies.

22      -- but in his zeal to get the documents released, he sort

23  of decided to sort of shove aside the fact that there was a

24  live dispute between the parties about whether they could be

25  released, and about the process that needs to be undertaken to

 1  get them released.

 2      And at a minimum, that's misconduct, whether you describe

 3  it has bad faith or, you know, extreme overzealousness and

 4  disregard for, you know, someone's, you know -- neglect to

 5  properly consider someone's obligations to the Court and to

 6  opposing counsel.

 7      It seems like either one -- given the discretion I have to

 8  manage this litigation, either finding could just removal of

 9  Mr. Wisner and/or Baum Hedlund from the Executive Committee in

10  this case.

11          **MR. HOLLINGSWORTH:**  I agree with that, Your Honor.  I

12  think that the rule may be bad faith, or conduct tantamount to

13  bad faith.  It's something I've thought about, too.

14          **THE COURT:**  Well, you're talking about the rule for

15  sanctions, but the question that I'm asking is --

16      You know, there's an issue of sanctions hanging out here,

17  but there's also an issue of simply managing this case, you

18  know; managing this MDL; and, you know, concern that the kind

19  of lawyering that we saw -- the kind of conduct that we saw on

20  the part of Mr. Wisner and potentially on the part of other

21  members of the plaintiffs' leadership committee is not the kind

22  of conduct that we can have in a case like this, which is

23  already very complicated and very difficult to manage.

24      So, you know, does the bad-faith/tantamount-to-bad-faith

25  standard apply to whether I can remove somebody from the

1  Executive Committee for, you know, case-management purposes?

2  For MDL-management purposes?

3          **MR. HOLLINGSWORTH:**  I'm not sure what the answer to

4  that is, Your Honor.  I have looked -- I've also looked at

5  that.  I have seen MDL cases in which judges reported that the

6  ethical and -- ethical duties and the duty to conduct oneself

7  with good faith in connection with discussions with opposing

8  counsel is actually heightened in a case of an MDL.

9       So I think that -- I think that the actions of Mr. Wisner

10  meet the definition of bad faith that I've seen in the case

11  law, which is recklessness, and a clear improper motive.  And

12  it's either bad faith, or tantamount to bad faith.

13       Black's Law Dictionary says that bad faith is very

14  difficult to define precisely because it can arise in so many

15  different circumstances.

16       And I think I agree that Your Honor has tremendous

17  discretion in operating an MDL.  I've seen that in other MDLs.

18          **THE COURT:**  Okay.  Is there anything else you want to

19  add to respond to plaintiffs' presentation?

20          **MR. HOLLINGSWORTH:**  I agree with Your Honor that

21  discovery would be in order, especially in connection with the

22  other lawyers and the other law firms.  I think Ms. Wagstaff's

23  Declaration makes clear that she was complicit in this bad

24  faith or improper action.  I think other counsel are, too; but

25  I think that we should -- I think that we should see e-mails

1  and phone records for that -- for that discrete period of time

2  that we've asked for, in order to pursue this.  At least

3  those -- at least those two kinds of discovery are in order.

4          THE COURT:  Anything else?

5          MR. HOLLINGSWORTH:  No, sir.

6          THE COURT:  Okay.  How could you have taken the

7  position that these documents are not relevant to the general

8  causation phase?

9          MR. HOLLINGSWORTH:  Well, I don't see anything -- I

10  don't see anything in any one of those documents that has --

11  has any bearing on the issue of whether reliable science is

12  present to support the conclusion that glyphosate can cause

13  non-Hodgkin's lymphoma.

14          THE COURT:  But your --

15          MR. HOLLINGSWORTH:  Those documents are not --

16      Excuse me.

17          THE COURT:  I was just going to say, I mean, your

18  position is that the scientific consensus is that it doesn't

19  cause non-Hodgkin's lymphoma?

20          MR. HOLLINGSWORTH:  No.

21          THE COURT:  And -- I mean, you've said that in your

22  papers.

23          MR. HOLLINGSWORTH:  Well, yes, we've taken that

24  position; but that wasn't my position in response to

25  Your Honor's inquiry.

1          THE COURT:  You know, I'm just saying that that has

2    been your position --

3          MR. HOLLINGSWORTH:  Well, it has.

4          THE COURT:  -- in this litigation --

5          MR. HOLLINGSWORTH:  Sure, it has.

6          THE COURT:  -- with respect to the general causation.

7          MR. HOLLINGSWORTH:  I'm talking about *Daubert* now.

8          THE COURT:  Yeah.

9          MR. HOLLINGSWORTH:  I'm referring to the *Daubert* when

10   I made the comments that I made.

11         THE COURT:  Right.

12         MR. HOLLINGSWORTH:  *Daubert* is not going to regard

13   any of those documents that I saw.  And I went through most of

14   them, if not all of them.  I've seen some of them before,

15   because they actually released documents that had already been

16   excluded from release by one of Your Honor's prior Orders, by

17   the way.  Twenty-four documents they released were released in

18   violation of an earlier Order.

19      So I've seen those documents.  I'm up to speed on those

20   documents.  And I know what the case law says about documents

21   like those, and whether or not those kind of internal corporate

22   e-mails are -- are relevant to the -- to a *Daubert* issue, which

23   is whether or not reliable scientific data supports a general

24   causation opinion.  Those --

25         THE COURT:  Right, but --

1              **MR. HOLLINGSWORTH:**   -- internal e-mails are not --

2              **THE COURT:**  But --

3              **MR. HOLLINGSWORTH:**   -- reliable scientific data.

4              **THE COURT:**   But the internal e-mails reflect that

5    Monsanto has been ghostwriting reports.  And those reports have

6    been portrayed as independent.  And you -- I mean, your whole

7    presentation thus far has been about how all the independent

8    science supports a conclusion that glyphosate doesn't cause

9    non-Hodgkin's lymphoma.

10     So, you know, I don't understand how you could have taken

11   the position that the issue of Monsanto drafting reports for

12   allegedly independent experts on whether glyphosate causes

13   non-Hodgkin's lymphoma could be irrelevant to the question of

14   whether there's evidence that glyphosate causes non-Hodgkin's

15   lymphoma.  I just don't understand how you could take that

16   position.

17             **MR. HOLLINGSWORTH:**  It's because that -- the reports

18   that you're referring to, I think, are two reports in the

19   literature, Your Honor.  They're not -- they are not scientific

20   studies.  They're not reports on scientific studies.  They're

21   reports known as "surveys"; literature surveys.  That -- that's

22   the technical characterization of those reports.

23     Those aren't original science.  They aren't the original

24   reports of the 14 animal studies that are at issue here.  They

25   aren't the original reports by the epidemiologists who have

PROCEEDINGS

```
 1  done observational studies; both case-controlled and -- and

 2  prospective epidemiology.  They aren't the original reports of

 3  those authors.  And for that reason, they're not relevant under

 4  a Daubert -- in a Daubert context.  That's the basis for our

 5  statement.

 6         THE COURT:  So that sort of invokes another question

 7  for me, which is, you know, Phase One of this case is about

 8  whether there is enough to go to the jury on the question

 9  whether Roundup is capable of causing non-Hodgkin's lymphoma.

10  Right?  And we've --

11         MR. HOLLINGSWORTH:  Well, that's not exactly right,

12  Your Honor, with all due respect.

13         THE COURT:  Go ahead.

14         MR. HOLLINGSWORTH:  Phase One of this inquiry is

15  whether or not the expert-witness testimony that the plaintiffs

16  have that Monsanto -- that glyphosate can cause cancer is

17  reliable, and based on sound, reliable, scientific evidence

18  that's relevant.

19         THE COURT:  Right, but if there is enough reliable

20  evidence to go to the jury, then we get past Phase One.  Right?

21         MR. HOLLINGSWORTH:  Well, if there is enough reliable

22  evidence to support an expert witness' opinion --

23         THE COURT:  Mm-hm.

24         MR. HOLLINGSWORTH:  -- they would -- they may get by

25  the first phase, possibly.
```

1          THE COURT:  Okay.  And so --

2          MR. HOLLINGSWORTH:  I don't think that's going to

3  happen, but --

4          THE COURT:  Right, but --

5          MR. HOLLINGSWORTH:  So --

6          THE COURT:  And so we have to look at what everyone

7  is saying; what everyone in the scientific community is saying

8  about the question whether Roundup causes non-Hodgkin's

9  lymphoma.  Right?

10          MR. HOLLINGSWORTH:  I don't think that's the inquiry

11  specifically, Your Honor.  There --

12          THE COURT:  Well, I mean, if one of their plaintiffs'

13  experts came up and testified, and didn't mention some paper on

14  the ability of Roundup to cause non-Hodgkin's lymphoma that was

15  in your favor, no doubt you would cross-examine them on their

16  failure to consider that paper.  Yes?

17          MR. HOLLINGSWORTH:  We might if it's original

18  science.

19      If it's a review article, which is what I think you're

20  referring to from the -- from the information we've seen on

21  ghostwriting, which, by the way, I disagree with.  I don't

22  think it's correct.  I don't think it's a correct

23  characterization of what went on there.  It's become very

24  popular in the media, thanks to these guys, but --

25          THE COURT:  Well, Monsanto --

1          MR. HOLLINGSWORTH:   -- and I guess your Honor's been

2   influenced by it, but --

3          THE COURT:  Well, wait a minute.  It's Monsanto that

4   used the term "ghostwriting."

5          MR. HOLLINGSWORTH:  Well, yes.

6          THE COURT:  So you're saying that Monsanto

7   mischaracterized what it was doing --

8          MR. HOLLINGSWORTH:  Yes --

9          THE COURT:  -- when it was drafting these reports?

10          MR. HOLLINGSWORTH:  Yeah, I think that Monsanto

11  was --

12          THE COURT:  I haven't been tricked --

13          MR. HOLLINGSWORTH:  -- loosely using the word

14  "ghostwriting."

15          THE COURT:  I haven't been tricked by the plaintiffs.

16  I've apparently been tricked by Monsanto when Monsanto

17  internally referred to what it was doing as "ghostwriting."

18          MR. HOLLINGSWORTH:  Well, the ghostwriting memos,

19  Your Honor, don't refer to any original science.  Okay?

20     What they refer to is review articles done by groups of --

21  of -- of --

22          THE COURT:  Independent scientists?

23          MR. HOLLINGSWORTH:  -- professors, and independent

24  people, and oftentimes consultants.  That goes on.  I'll admit

25  that.  Okay?

PROCEEDINGS

1        But what it does not -- what none of those documents refer

2   to is any original science.   The original path. reports from

3   these 14 studies; the original scientific evidence that is

4   going to have to form the basis for an expert witness' opinion.

5        That's why all of the e-mails that Your Honor looked at in

6   these -- in this 30-page, carefully drawn exhibit that

7   Mr. Wisner says he spent hundreds of hours on are irrelevant to

8   the *Daubert* inquiry.   None of those things are going to go into

9   evidence; at least, they wouldn't go into evidence in the

10  Eighth Circuit or the Tenth Circuit or the Eleventh Circuit to

11  support --

12       They can go into evidence.   Anything can go into a *Daubert*

13  hearing.   That's what Rule 104 says.

14       But they won't be able to legitimately support an expert

15  witness' opinion.   I don't think that -- I don't think that any

16  solid expert is going to rely on review papers, or what

17  Monsanto's internal folks are saying in e-mails just to come up

18  with a reliable basis for his expert opinion.

19            **THE COURT:**   Monsanto has --

20            **MR. HOLLINGSWORTH:**   His or her expert-witness

21  opinion.

22            **THE COURT:**   Monsanto has made a number of filings in

23  this case since it began.   And in a number of filings it has

24  made statements to the effect of, you know, *There's no evidence*

25  *to support the conclusion that Roundup causes non-Hodgkin's*

PROCEEDINGS

1  *lymphoma.  The scientific consensus is that Roundup does not*

2  *cause non-Hodgkin's lymphoma.*

3     In any of those filings, did you rely on any of these

4  reports that we now know were ghostwritten by Monsanto?

5         **MR. HOLLINGSWORTH:**  No.  You're referring to --

6  you're referring to the 2000 article by Williams and others.

7  Williams is the only living author among three different

8  authors.  That's a review-based paper.

9     And you're referring to something called "the intertech

10  panel," which is a panel of seven or eight experts and

11  consultants that Monsanto put together after the IARC came out

12  with its conclusion.  It's a review article.  It's a review of

13  all of the literature.  Both of those papers are reviews of the

14  literature.  They're not the original opinions and findings and

15  reports of the people who conducted the original, basic

16  science.  And it's the original, basic science on which

17  Monsanto company has relied, in every statement that I'm aware

18  of, to say that there's no support for the notion that

19  glyphosate can cause cancer.

20     It's impossible for anybody to say that glyphosate doesn't

21  cause cancer, because you cannot prove a negative; all you can

22  say is that there's no reliable science to say that it does.

23  And that's what *Daubert* is to address to you.  That's what the

24  Supreme Court was talking about when it wrote the *Daubert*

25  Opinion.

1          **THE COURT:**  Okay.  Anybody on the plaintiffs' side

2   want to respond?

3          One question I do want answered by somebody is, you know,

4   if there is going to be a removal from the Steering Committee

5   [sic], is there -- I mean, the Executive Committee, should it

6   be Mr. Wisner, or should it be the firm of Baum Hedlund, or

7   should it be broader than just Mr. Wisner and Baum Hedlund?

8          **MR. WISNER:**  Can I just answer that question?

9          And I just want a couple just quick facts.

10         The short answer to the question you just asked is if

11  there should be any punishment, it should be at me.  I don't

12  agree that there should be; but if there should be, it should

13  be at me.

14         The leadership here appointed me to take on this task

15  because I asked them to let me do it; not because that -- there

16  was some selection.  I specifically petitioned the leadership

17  to be allowed to do this.  And they green-lighted me because of

18  my experience in this area, in challenging documents.

19         My partner, Mr. Baum, is on the -- is on the Executive

20  Committee; I am not, Your Honor.  I'm -- I'm --

21         **THE COURT:**  Well, I mean, the firm is on the

22  Executive Committee.

23         **MR. WISNER:**  That's correct.  I believe, yeah, the

24  firm or Michael Baum specifically from the firm is on the

25  Executive Committee.

1      Our firm has provided considerable resources to this

2  project, and we are heavily involved in all aspects of *Daubert*

3  right now.  I am one of the primary brief writers actually on

4  this issue.  And I believe that taking us off by not letting us

5  work on this, or somehow prohibiting our -- it would just

6  prejudice the case.

7      If any order to remove us was to be issued, it should at

8  the very least not take effect until after December, when we've

9  got these things briefed, because there's too much work right

10  now.  We're literally in the middle of the expert depositions.

11  We had one yesterday.  And I'm playing a very intensive role in

12  helping that effort, both from a science perspective, because I

13  actually do have a pretty, pretty, pretty robust

14  science/statistical background, as well as just the -- you

15  know, if we need someone to stay up all night working on a

16  brief, I'm usually that guy.  So I think it would be really

17  detrimental to these clients -- my clients, and everyone's

18  clients.

19      So I don't think that would be -- well, I don't think that

20  would effect the result of having more efficient litigation.

21      Prohibiting me from taking on further challenges or

22  negotiating these types of procedural things -- I don't think

23  you would even need to order that, because I'm pretty sure

24  they'll never let me do this again at this point; but I think

25  from purely practical perspective, I think that would be pretty

1  detrimental to the litigation.

2      At the very least, if you do remove Baum Hedlund, mixing

3  up the leadership right now at this point would literally be

4  like the day before trial, kicking the lawyers off of the --

5  you know, opening statements are ready, and kicking them off.

6  It would just be so detrimental.

7      And then generally, Your Honor, every year -- every year

8  or so, MDLs typically do a new application for leadership.  And

9  you could maybe mix it up at some later point, if you want to,

10 if you're concerned that we're not doing a good-enough job; but

11 right now it would be very dangerous and really bad.

12     At the very least, I think if there's going to be any ire

13 from this Court it should be at me.  I mean, I don't think I

14 acted in bad faith.  I don't think I acted with misconduct.  I

15 think I did what I was supposed to do ethically as an attorney.

16 And I believe in what I did.  And I apologize to the Court if

17 you believe I acted with misconduct.  That was never my intent.

18 I do respect this Court deeply.

19     Just a couple quick factual points, just to raise.

20 Mr. Hollingsworth referred to 24 documents that the Court

21 previously denied.

22         **THE COURT:**  Yeah.  I didn't follow that.

23         **MR. WISNER:**  What that's referring to is we did a

24 blanket challenge for 200 documents way back when.  And we

25 submitted a joint letter to the Court.

PROCEEDINGS

1    And the Court said, *Well, listen.  I'm not going to go*

2  *through these 200 documents.  This is PTO 15.*  You said, *Moving*

3  *forward, tell me why you need those documents and why they're*

4  *relevant.*   That's actually where that relevance issue comes in,

5  was in response to those 200 documents.

6    So of those 200, we actually -- I actually went through

7  them, and found the ones that were relevant.  And that was

8  those 22 documents that were part of this new challenge.

9    So the Court actually never --

10    **THE COURT:**  When you say "part of this new

11  challenge," you mean part of the detailed chart that you

12  presented to --

13    **MR. WISNER:**  That's correct.

14    **THE COURT:**  -- Monsanto.

15    **MR. WISNER:**  So I actually went through them, and did

16  exactly what the Court said, is find the ones that are relevant

17  to the phase of the litigation, because rest of them I didn't

18  think particularly were; I didn't think they had a really

19  strong argument.

20    So I found the ones that were really on point.

21    So the Court actually never ruled on the merits of them,

22  at all.  It was just sort of a blank -- so that's what I was

23  referring to.  And I think we ought to be really --

24    Sorry I'm speaking so quickly.  I am really sorry.  I do

25  that in depositions all of the time.

```
 1        And I think that that should be clear that's what happened

 2   there.  So there wasn't actually a ruling on the merits.

 3        And then the other factual issue is there was also another

 4   ghostwritten article that was --

 5        And when I say "ghostwriting," it's their own employees

 6   who said that it was ghostwritten; I'm not saying it.

 7        It was a Grimes article which was submitted, actually.

 8   It's been cited by Monsanto in past briefings; I don't know if

 9   it recently has been, but it has in the past.  And it was

10   submitted --

11            THE COURT:  I seem to recall in my mind's eye seeing

12   a citation to that --

13            MR. WISNER:  Yeah.

14            THE COURT:  -- a number of times in Monsanto's

15   filings.

16            MR. WISNER:  That's correct.  And it was submitted to

17   the EPA.  And it cited and relied on by the EPA in its CARC

18   report.  And it was even considered by IARC.  So --

19        And it's never been disclosed publicly really until

20   recently that that actually was, according to Monsanto's

21   employee -- and they're saying it's not the case, but -- that

22   it was ghostwritten by them, and it wasn't disclosed.

23        So, I mean, I don't want to get into the nitty-gritty of

24   how that affected anybody, but it is our position and will be

25   argued to the jury that this is conduct that manipulates
```

1 science.  And that's really a problem, particularly since our

2 regulatory agencies are actually relying on that science.

3     That's all I had to say, Mr. Zitrin.  I just wanted to

4 correct those factual points.

5     And again, Your Honor, my argument -- my legal argument is

6 I don't believe there was really a live dispute.

7     I think there's a really important distinction between

8 whether or not PTO 15 and 20's requirement for relevance was

9 appropriate, which we did dispute on the phone, and whether or

10 not these 86 documents were confidential; and as of August 1st,

11 the 86 documents were not, by operation of the Court Order.

12         **THE COURT:**  I understand that argument.

13         **MR. WISNER:**  This -- this legal issue was.  And

14 that's why I filed that thing.  And that's why I filed the

15 motion on August 1st, clarifying PTO 15 and 20 -- or August

16 2nd, clarifying 15 and 20:  Because that issue about the impact

17 of this moving forward was still ripe.

18     But it didn't affect those 86 documents, because we had

19 reached an impasse.  And the Order said if you don't file it

20 within 30 days, the impasse is resolved in the challenging

21 party's favor.  That's what it says.  And that's what happened.

22 So I believed I acted in good faith in taking that at its word.

23         **THE COURT:**  Okay.

24         **MR. ZITRIN:**  Your Honor, if I may, I have a very

25 brief response to what Mr. Hollingsworth said, and Mr. Wisner

 1   has just articulated most of it.

 2       I know that the Court has, in its PTO 28, not only this

 3   issue, but the issue of going forward.  And I think all of

 4   plaintiffs' counsel agree that the *status quo ante* needs some

 5   change, because it created this ambiguity.

 6       Two of the ideas floated were that all meet-and-confer

 7   conversations should be recorded, by agreement of all of the

 8   parties, which would certainly help.

 9       And the other one the Court suggested is maybe you need

10   motions made to the Court; but of course, the reason to do this

11   procedure was to avoid the Court having to be actively involved

12   each time around.  Maybe the recording of documents, which is

13   what I suggested to Mr. Wisner and Baum when they first

14   contacted me --

15           **THE COURT:**  Recording of documents?

16           **MR. ZITRIN:**  The recording of conversations, I

17   mean -- the meet-and-confer conversations -- would be a first

18   step.

19       The second thing I wanted to say is that there's a great

20   deal -- there was a greet deal of conversation, a great deal of

21   comments by Mr. Hollingsworth about what happened after the

22   fact.  And I agree with Mr. Wisner and with the Court that the

23   issue of whether this was a live matter or a done deal seems to

24   be central to the decision that the Court has to make.  I read

25   it, and it seemed like a done deal.  I think the Court feels

1   that it may not have been.  But everything that happened after

2   the fact, and what letters said going out to various agencies

3   are really not relevant to this issue.

4        They quoted a letter from Mr. Wisner, talking about how

5   Monsanto would not retract claims of confidentiality; and yet

6   there's another letter from Mr. Wisner or a -- further down on

7   that letter, where he says:  But 30 days went by, and they

8   hadn't objected.  He may not have specified 30 days, but he

9   said, *Since Monsanto did not file any motions seeking continued*

10  *protection of the documents, as required by 16.3, it waived*

11  *confidentiality of them.*

12       That was certainly my reading.  I guess perhaps it may not

13  entirely --

14           **THE COURT:**  Yeah, but the problem is that they filed

15  this brief on August 1st seeking clarification of the

16  Protective Order, explaining that Monsanto and the plaintiffs

17  had a live dispute about the issue of confidentiality.

18           **MR. ZITRIN:**  But the issue of -- but the live dispute

19  is not about the Protective Order's self-executing 30 days.

20       The live dispute set forth on page 4 -- set forth on page

21  2 of that motion --

22           **THE COURT:**  But in the motion to clarify the

23  Protective Order and to clarify Pretrial Orders 15 and 20, they

24  identified a live dispute about whether the Protective Order

25  was self-executing.  So how can you say that there was no live

PROCEEDINGS

1  dispute about whether the Protective Order was self-executing?

2       MR. ZITRIN:  Well, I don't think that's correct.

3    I think what they're talking about is a dispute over the

4  issue of whether they should be required to provide information

5  about --

6       THE COURT:  It's all about whether PTO 15 and 20

7  erected new barriers to the ability of the plaintiffs to

8  disclose documents.

9       MR. ZITRIN:  That's right, but those barriers don't

10 deal with the 30 days.  Those barriers deal with the

11 requirements that the plaintiffs demonstrate relevancy; that

12 plaintiffs demonstrate litigation need; and that there are

13 blanket restrictions about documents that can be opened for

14 public disclosure.

15   And that's what's stated on page little one of their

16 brief.  They very clearly set forth the three issues there.

17 Those disputes are live; but there's nothing in PTO 15 that

18 even arguably relates to the 30 days.

19   In PTO 13, Your Honor, at the end, is talking about the

20 fact that documents filed confidentially within the umbrella

21 are not necessarily confidential for purposes of being filed

22 under seal.  And Your Honor says that has no bearing on whether

23 the document, if it ends up being filed in court, should be

24 filed under seal.  And then the Court goes on to say whether

25 the documents -- we have to decide whether the documents

1   previously designated confidential truly need that designation.

2        When that's not practical -- when that's not practical --

3   the under-seal designation -- and when plaintiffs provisionally

4   file documents under seal, Monsanto must make a good-faith

5   review, and inform the Court.  For the remainder of the general

6   causation phase, Monsanto will have ten days to file responsive

7   declarations required by Civil Local Rule 79-5(e), but that

8   doesn't relate to the 30-day confidentiality in 16.3; the

9   30-day waiver.  That relates to the issue of whether

10  confidential documents can be filed under seal.

11       And then the Court continues, *If Monsanto continues to*

12  *file unreasonable or unsubstantiated declarations, it will be*

13  *sanctioned.  See Federal Rules of Civil Procedure 11(b).*

14       I think that they didn't file a response within 30 days,

15  because they didn't want to be sanctioned under what Your Honor

16  said in PTO 15; but the substance of PTO 15 has nothing to do

17  with 16.3 of the Protective Order.  It has to do with whether

18  documents that are confidential under the Protective Order may

19  also be filed under seal.  And that's why there's not, to me,

20  even an argument that that 30-day deadline in 16.3 was changed.

21  This is about something entirely different.

22       (Discussion off the record.)

23       **MR. ZITRIN:**  And our brief says that at page 7 and 8,

24  reaffirming the "automatically" language of Section 16.3.

25       **THE COURT:**  Well, that's the position that -- that's

1  certainly the position that the plaintiffs were taking.  And

2  this motion reflects the fact that Monsanto disagreed with

3  that.

4          **MR. ZITRIN:**  Right.

5          **THE COURT:**  And there was a disagreement.

6      That's the point.  And that's -- look.  That's why the

7  motion that's why the motion to clarify was filed.

8      Ms. Wagstaff, you seem like you want to say something.

9          **MS. WAGSTAFF:**  Yeah.  I just want to say a few

10 things.

11         **MR. HOLLINGSWORTH:**  May I respond?

12         **THE COURT:**  Sure, but why don't we give --

13         **MS. WAGSTAFF:**  Okay.

14         **THE COURT:**  -- Mr. Hollingsworth a chance to respond

15 to what was just said first?

16         **MR. HOLLINGSWORTH:**  I don't think anything the

17 professor said was responsive to Your Honor's Order.

18     I wanted to respond specifically to the matter that is

19 before Your Honor.  And it's in our briefs.  And Your Honor

20 perhaps didn't understand our point.  There was an Order, which

21 is PTO 20, that went to the issue of a motion to de-designate

22 and a motion to strike by Monsanto 200 documents.  And if

23 Your Honor looks at the second page of PTO 20, Your Honor will

24 see that Monsanto's motions to strike were granted in full.

25         **THE COURT:**  Right.

1      **MR. HOLLINGSWORTH:**  And that covered 24 of the 86

2   documents that he just sent off to the *New York Times*.  So I

3   think that he also has violated one of Your Honor's Orders.  So

4   there's not just good faith, or bad faith, or tantamount to bad

5   faith, or Your Honor's tremendous inherent discretion that

6   empowers Your Honor; but there's also the fact that that

7   Order's been violated.  And I wanted to correct the Record on

8   that so our position is clear.

9      **MS. WAGSTAFF:**  Good afternoon, Your Honor.

10      With respect to what Mr. Hollingsworth was just

11   immediately referencing, I have that in my Declaration at

12   paragraph 11(a) on page 4.  And I think that our position on

13   that was that Your Honor, with respect to those 24 documents in

14   PTO 20, did not actually look at the relevancy or look at the

15   confidentiality of those documents, but rather struck them, and

16   colorably added requirement that we must find that they were

17   relevant, which we believe we did in this most recent

18   challenge.  So we think that there is no violation of PTO 20,

19   and that Your Honor had not actually made an Order on the

20   confidentiality of those documents.

21      Moving sort of on to what I would like to say, seems that

22   I am a target in Monsanto's sanctions motions, myself.  So I

23   wanted to speak a little bit about that, and see if Your Honor

24   had any questions for me.

25      In this process I have, in my mind, put sort of the

1    conduct that I view into three buckets.

2        And I've seen the first bucket as sort of the actual

3    challenge process.  Was it proper to challenge?  Did we do the

4    challenge process correctly?

5        And then sort of the *mens rea* of us during the challenge

6    process.  Did we act in good faith?  Bad faith?  Was there

7    miscommunication in actually the production of the documents at

8    the end?

9        I don't think your Honor, from comments made at the

10   telephonic hearing last week and this morning, is much

11   concerned with the production of documents or the challenge

12   process, as long as our faith was good sort of during the

13   middle of it.  And so the way that I view that is there's

14   really two -- two sort of actions that I think that Your Honor

15   should be concerned with to determine our faith.  And one was

16   the meet-and-confer on July 13, which -- I was on that

17   telephone conference.  And then also the July 27th e-mail that

18   followed up.  You know.  And I was actually cc'd on that, and I

19   had internal correspondence prior to that.  So I'm actually

20   involved in all of the action that Your Honor should be

21   concerned with.

22       My co-leads, Ms. Greenwald and Mr. Miller, weren't on the

23   phone call, and they weren't involved.

24       Ms. Greenwald was cc'd on the July 27th e-mail, but

25   Mr. Miller was not.

```
 1        So I think that I can answer any questions you have with

 2   respect to that.

 3        I think in the -- Monsanto's response to show cause, they

 4   take my statement -- my Declaration, where Mr. Wisner said that

 5   there was two options, and they spin that in their favor.  And

 6   they forget to mention that my Declaration went on to state

 7   that on 5, paragraph 12, that it no --

 8             THE COURT:  Wait.  Hold on.  Give me one second --

 9             MS. WAGSTAFF:  Okay.

10             THE COURT:  -- to pull it up.

11             MS. WAGSTAFF:  Page 5, paragraph 12 --

12             THE COURT:  Okay.  I --

13             MS. WAGSTAFF:  -- the second little bullet point.

14   While I do state in there in the first bullet point that

15   Mr. Wisner told Monsanto he believed the plaintiffs had two

16   choices, the second bullet point goes on to say that at no

17   point --

18        And this is now on page 5.

19        -- that at no point did Mr. Wisner or anyone on the

20   meet-and-confer tell Monsanto's attorneys that Monsanto's

21   obligations under the Protective Order were dependent on

22   plaintiffs' decision.  And at no point during the

23   meet-and-confer did Monsanto's attorneys state to us that they

24   believed that their obligations were dependent on ours.

25        I mean, as a practical matter, we can only control what
```

 1   our options are, and we can only control what we do.  And the

 2   *mens rea* of how we were operating on there was pure, and it was

 3   not in bad faith.

 4        And I would suggest that if Your Honor -- I do not believe

 5   that the internal correspondence between counsel should be

 6   provided; but if Your Honor is inclined to do so, I would

 7   request that we also look at the internal correspondence

 8   between Monsanto and the Hollingsworth firm, to decide really

 9   what they were thinking, and if they really thought there was a

10   live dispute.

11        And I would like to also request -- Your Honor had

12   mentioned earlier that there might be an Order to Show Cause

13   why Monsanto should not be sanctioned for acting in bad faith

14   on the meet-and-confer on July 13th.  And I would request that

15   we entertain that a little bit further.

16        Mr. Rubin, who is here, was on that telephone call, as

17   well as Mr. James Sullivan.  I would request an Order to Show

18   Cause why they should not be sanctioned, as well as the

19   Hollingsworth firm in general, for failing to act in good faith

20   in there; and that we also get all of their internal

21   correspondence with how they explained the process to

22   Monsanto's attorneys, the in-house counsel; who made the

23   decision not to file the motion; why they thought a motion

24   shouldn't be filed.  And see if there is actually was a live

25   dispute on their end, before we just take that at face value.

1        Secondly, Mr. Hollingsworth stated earlier that the

2   Williams article was not relied on by Monsanto in this

3   litigation.  I believe you asked him.

4        In fact, it was the first sentence in the statement of

5   relevant facts in the Motion to Dismiss filed in the *Hardeman*

6   case, which was the lead case that I was counsel on with

7   Your Honor, before everyone joined us.  That was the first

8   statement in there; three of their expert reports.  And that

9   was filed on March 1st, 2016.  So they've been relying on that

10  article throughout the entirety of that litigation, contrary to

11  what Mr. Hollingsworth just said.

12       And July 31st, 2017 -- so only, like, three weeks ago --

13  their expert reports were served.  And three of their experts

14  cited that article in reliance of their position.  So what

15  Mr. Hollingsworth said, actually, was not completely true.

16       And so I can answer any other questions you may have for

17  me.  Otherwise, I stand on my Declaration.

18           **THE COURT:**  Okay.  I think what we'll do right now is

19  give the court reporter a little break, particularly given how

20  fast you all have been talking.  And maybe we'll return at

21  about 11:30 --

22           **MR. ZITRIN:**  Thank you.

23           **THE COURT:**  -- and look to wrap up.

24  (Recess taken from 11:29 a.m. until 11:50 a.m.)

25  (During recess a sidebar conference was held but not reported.)

1          **THE COURT:**  Okay.  So the two other things that I

2    want to talk about today are how we're going to handle the

3    documents that have been designated confidential going forward,

4    and kind of what the hearings are going to look like in

5    December.

6          But before that, does anybody else have anything else they

7    want to add on this Order to Show Cause?

8               **MS. GREENWALD:**  No, Your Honor.

9               **THE COURT:**  Anyone else?  We see.

10              **MR. WISNER:**  Nothing from me, Your Honor.

11              **THE COURT:**  Okay.  All right.  So I have a tentative

12   proposal for how to handle documents designated confidential

13   going forward.  It would be to amend the Protective Order.

14   And, like I said, you know, I should have done that a while

15   ago, to avoid any confusion; but you know, the burden would

16   remain on Monsanto to show why the documents should remain

17   designated confidential, but the procedure would be as follows.

18   And the procedure would be -- my idea is to adopt this

19   procedure out of concern regarding the overzealousness of

20   plaintiffs' counsel in wanting to release documents that are

21   not clearly allowed to be released.  And so the procedure would

22   be as follows.

23         First, the parties would be required to meet and confer

24   about confidentiality designations in the same way that the

25   Protective Order requires them to do now.

1        And I will say that, for all the complaints we might have

2   about Mr. Wisner's conduct, one thing that I thought he did

3   extremely well was put together this chart identifying each of

4   the documents, and describing why they have relevance.  And so

5   that part of the process, I think, is good.  And that remains.

6   This meet-and-confer process remains.

7        However, following the meet-and-confer process, if the

8   plaintiffs believe that a document designated confidential

9   should have that designation removed, they must make a filing

10  with the Court.  It's not putting the burden on the plaintiffs

11  to justify.  It's simply that the plaintiffs will be required

12  to file a notice with the Court; notice regarding -- I'm sort

13  of making this up as I speak, but notice regarding improperly

14  designated documents; something like that.  And then it would

15  say something very simple, such as, *Plaintiffs believe that the*

16  *documents with the following Bates numbers should be*

17  *de-designated*, and then just list the Bates numbers.  This will

18  be after the meet-and-confer process that's already called for

19  by the Protective Order.

20       And then Monsanto has 14 days to respond, to file a motion

21  or to file a response to the plaintiffs' notice, explaining why

22  the documents are or are not confidential; why the documents

23  should or should not be de-designated.  And then the documents

24  can be attached, if necessary.  They can be submitted with a

25  motion to seal, if necessary.

1        And then the plaintiffs will have 7 days from Monsanto's

2  filing to file a response.  And the burden, again, remains on

3  Monsanto to explain why the document should remain designated

4  confidential.

5        However, as I have said a number of times during this

6  litigation -- and I can't even really believe that I'm saying

7  it again -- the plaintiffs served exceedingly broad discovery

8  requests on Monsanto, requiring Monsanto to gather and deliver

9  an extraordinary number of documents in a very short period of

10  time.  I could have been much less generous with the

11  plaintiffs' discovery requests.  I could have denied or

12  narrowed a number of the discovery requests, but in the

13  interests of making sure that the plaintiffs were not denied

14  anything that they might be entitled to get, I gave the

15  plaintiffs the benefit of the doubt, and approved the bulk of

16  their very broad discovery requests.

17        The consequence of that was that Monsanto was required to

18  turn over a lot of irrelevant material that the plaintiffs

19  shouldn't have gotten their hands on in the first place if the

20  discovery requests had not been so broad, and if the time line

21  had not been so compressed.

22        And at least in Phase One of the litigation, it is not

23  appropriate for everybody to be wasting their time fighting

24  about de-designation of documents that are not relevant to

25  Phase One of the litigation.  So I will deny any --

1        Let me put it another way.

2        I will sustain any objection by Monsanto to the

3   de-designation of documents that are not relevant to Phase One

4   of the litigation.  Perhaps that can be revisited at a later

5   time, but this is a case-management issue.  This is an

6   MDL-management issue.  I do not want any of the lawyers or the

7   Court or Court staff spending any time pondering whether

8   documents not relevant to Phase One of the litigation should be

9   de-designated.  And so that is how I would propose that we

10  proceed going forward.

11        If anybody would like to argue against that, or ask any

12  clarification questions, feel free to do so.

13        **MS. WAGSTAFF:**  Your Honor, Aimee Wagstaff.

14        I will speak with my co-counsel on our side.  It seems

15  like something we might be able to agree to.  I will respond to

16  that.

17        I just wanted to bring something to your attention that

18  you probably aren't aware of that's happening in state courts

19  around the country.  I appreciate the time and resources that

20  it take your Court to have to do confidentiality challenges.

21  And I just wanted to let you know that Monsanto is requesting

22  in almost every state court as of late that state court

23  plaintiffs bring their challenges to the MDL.

24        And I don't know that if that's something that Your Honor

25  is even agreeable to.  I'm not even quite sure how it would

1  work, but one state court Judge has adopted something into a

2  Protective Order that, if the documents were produced in the

3  MDL, the state court plaintiff must bring the challenge to

4  Your Honor to adjudicate what is relevant to the litigation

5  need of that state court.  And I just wanted to know if that

6  was even something Your Honor was aware of.

7       We have objected to that in state courts, but they are

8  continuously trying to put that in state court protective

9  orders.  And the way that the document production has worked to

10 date -- and you may not know this, just because you're not

11 involved in the state court stuff -- is prior to the MDL being

12 formed, there was a state court case in Missouri that had

13 unphased discovery.

14          **THE COURT:**  Mm-hm.

15          **MS. WAGSTAFF:**  And a significant portion, if not the

16 majority -- I don't have the exact numbers, so I don't want to

17 speak out of turn, but at least close to 50 percent or maybe

18 over 50 percent of those documents were produced in that state

19 court litigation.

20      And when Your Honor formed the MDL, they just sort of were

21 put into this.  And it's the same document depository.  So we

22 just get access to the same -- you know, we have an ESI

23 depository, and everyone just gets access to that.  And

24 anything that gets produced around the country just gets put in

25 that.

1          So the majority of the documents so far to date were not

2   produced in here.  That's one thing -- in the MDL.  That's one

3   thing I wanted to let you know.  But we have access to them.

4          Does that make sense?  You look like I've confused you.

5          **THE COURT:**  I think so, but -- I think so.

6          What's the status of the Missouri case now?  Is discovery

7   still proceeding in an unbifurcated fashion?

8          **MS. WAGSTAFF:**  Yeah.  So there's one -- the one --

9   what was the name of that one?

10         **MR. WISNER:**  *Kennedy*.

11         **MS. WAGSTAFF:**  *Kennedy*.  So the *Kennedy* case is in --

12  is in St. Louis.  And it's sort of a solo case, all by itself.

13  And that was the one that most of the documents were produced

14  under.

15         In fact, our ESI kiosk which has all of our documents is

16  even called *Kennedy versus Monsanto*, because that's where all

17  of the documents first came from.

18         So, yes, we got some custodial files here, through

19  Your Honor and through this MDL; but the bulk of the documents

20  were produced pursuant to an unphased discovery order.

21         **THE COURT:**  Okay.

22         **MS. WAGSTAFF:**  Recently I think there's, like, 2- or

23  3,000 cases now filed in St. Louis.  And recently that Judge

24  has been sort of leading the way.  They're not sort of

25  consolidated like they are here; but that Judge has unphased

PROCEEDINGS

1  discovery.  So a lot of documents are being produced pursuant

2  to those.

3     But I know that in Delaware State Court, Monsanto

4  requested -- and the Judge allowed -- that if any document was

5  produced in the MDL --

6          **THE COURT:**  Mm-hm.

7          **MS. WAGSTAFF:**  -- that the plaintiffs' counsel and

8  the plaintiff, itself, has to come to you to challenge

9  documents, which seems -- I don't want to speak for the

10  Delaware Court, but it seems she --

11          **THE COURT:**  When you say come to me to challenge

12  documents, what does that mean?

13          **MS. WAGSTAFF:**  Uh-huh.

14          **THE COURT:**  To challenge the confidentiality

15  designation?

16          **MS. WAGSTAFF:**  Yes.  Yes.

17          **THE COURT:**  Well, in other words, it sounds like what

18  you're saying --

19     That's like a -- maybe a complicated way of saying that

20  what the Delaware Judge has done has said, *If the MDL Court has*

21  *concluded that these documents should be designated*

22  *confidential, then I'm going to defer to that conclusion, and*

23  *they will be confidential in the state court case.*

24          **MS. WAGSTAFF:**  No, that's not --

25     And Monsanto, I believe, attached the Delaware

1   Protective Order to one of its filings, but if not, I can

2   provide it to Your Honor.

3        But what they're saying is if the document was produced in

4   the MDL pursuant to the MDL Protective Order, which in and of

5   itself is sort of --

6        I mean, I guess every document would be, even though they

7   were produced in another case -- that the --

8        Let's say I have a client in Delaware.  And let's say that

9   I want to challenge a document in Delaware -- the

10  confidentiality -- because the litigation need of that Delaware

11  says that I get that document.  All right?

12       I am now ordered to come to Your Honor in San Francisco

13  Federal Court, which has no jurisdiction over that state court

14  case, and request that the document be de-designated.  It seems

15  very nonsensical.  I think that because the lawyers --

16            **THE COURT:**  I mean, if it is how you describe it --

17            **MS. WAGSTAFF:**  Uh-huh.

18            **THE COURT:**  -- then, you know -- and you came to me

19  and you filed a motion which says, *We need this document*

20  *de-designated.  We need this document no longer to be*

21  *designated confidential because of the needs in the Delaware*

22  *case*, I would deny it.  I would deny the order, because I will

23  only de-designate documents that meet the standard that I have

24  articulated here, which is, number one, *Are they relevant to*

25  *the first phase in this case*?, and, number two, *Is there some*

1  *privacy concern that would require maintaining the*

2  *confidentiality designation?*

3        **MS. WAGSTAFF:**  Right.  So I agree with you.

4        **THE COURT:**  So, I mean, other than what I've just

5  said, and other than denying any motion in which you ask me to

6  adjudicate the relevance of a document to some state court

7  case, what else can I do for you on that issue?

8        **MS. WAGSTAFF:**  Nothing.  I just wanted to let you

9  know that was going on, because that's over our objection.

10  Obviously, we didn't think it would be appropriate for a

11  federal Judge to be adjudicating a state court.  And it sounds

12  like you agree with that.  So I'll just -- those were the only

13  two.

14        **THE COURT:**  We have enough to handle, ourselves --

15        **MS. WAGSTAFF:**  Right.  Exactly.

16        **THE COURT:**  -- it seems like.

17        **MS. WAGSTAFF:**  All right.  Thank you.

18        **MR. WISNER:**  One thing, Your Honor.  And you said you

19  didn't want to change the meet-and-confer process.  And I think

20  that's fine, but what's happening is we create this chart.

21       And if we do this in the future -- we create a chart; we

22  go through it in detail -- I think it would be appropriate that

23  Monsanto, as part of the meet-and-confer process, is ordered to

24  actually respond to each document, or maybe it's the same

25  objection to each document, but maybe fill in a response on the

1  chart, because, you know, they wouldn't -- they wouldn't

2  engage.  And --

3           THE COURT:  I think that's an appropriate suggestion.

4           MR. WISNER:  That was all, Your Honor.  Thank you.

5           THE COURT:  And so what I would like -- I mean, if

6  anybody wants to argue against that approach, you are free to

7  do so; but if nobody's going to argue against that approach,

8  then what I'm going to do is I'm going to order the parties to

9  submit a revised Protective Order, consistent with what I've

10 stated here.  Okay?

11          MR. HOLLINGSWORTH:  That's fine with Monsanto,

12 Your Honor.

13          THE COURT:  Okay.  And so it sounds like that's fine

14 with the plaintiffs, as well?

15          MR. MILLER:  Yes, Your Honor.

16          MS. GREENWALD:  Yes, Your Honor.

17          THE COURT:  Okay.  So when do you want to submit a

18 revised Protective Order?

19      My sort of -- whatever you want to call it; TRO, or

20 whatever I issued in my -- you know, the temporary rule that I

21 adopted in --

22      Was it in the Order to Show Cause?

23          MR. HOLLINGSWORTH:  Yes.

24          THE COURT:  That remains in place until a revised

25 Protective Order is adopted.

1        **MS. WAGSTAFF:**  Your Honor, as long as the revisions

2  are limited to what Your Honor said, I think we could probably

3  have it submitted to you in a week, from plaintiffs' side.  It

4  wouldn't take long.

5        **THE COURT:**  Okay.  Why don't the parties meet and

6  confer, and submit it by Wednesday of next week?  Seems like a

7  good day.  So Wednesday will be a revised Protective Order that

8  the parties will have to jointly submit, consistent with what

9  I've proposed and what we've discussed here.

10        **THE CLERK:**  That's August 30th.

11        **THE COURT:**  August 30th.  Okay.  So that's that.

12      So, you know, this whole dispute, as annoying as it's

13  been, has sort of a side benefit, which is that it's sort of

14  forced me to start wondering a little bit earlier than I might

15  otherwise have done just what the proceedings are going to look

16  like in December, and who will we be hearing testimony from,

17  and, you know, what precisely the inquiry would be.  So I guess

18  I'm happy to hear, you know, any discussion about that; but my

19  initial question to you all is:  Were you assuming that we

20  would be limited to hearing testimony from both sides' expert

21  witnesses, or were you assuming that there would be some other

22  testimony or documentary evidence submitted?

23        **MR. HOLLINGSWORTH:**  Well, Monsanto -- for Monsanto's

24  part, if I may respond --

25        **THE COURT:**  Sure.

1          **MR. HOLLINGSWORTH:**   -- we're assuming that *Daubert*

2    puts the burden on the plaintiffs.  So we're assuming that the

3    plaintiffs' experts would appear first, and we'd have an

4    opportunity to cross-examine.

5          We also are assuming that we would present our own experts

6    in rebuttal -- or some of them.  I think we've submitted six or

7    seven expert reports.  We would want to introduce the live

8    testimony of some of those witnesses, if not all.

9          **THE COURT:**   Okay.

10         **MR. HOLLINGSWORTH:**   And there may be collateral

11   issues that we -- factual issues that I'm not contemplating

12   currently; but I do contemplate that we would submit possibly

13   factual evidence, given Your Honor's concern about the

14   ghostwriting issue, which I think is a false concern, with all

15   due respect, on the part of the Court.  So we may have to

16   introduce some sort of factual testimony on that, which would

17   be -- which would be very limited.

18         **THE COURT:**   Okay.  And I think that would be fine.

19   And I think that would be appropriate if you wanted to do that.

20         **MR. HOLLINGSWORTH:**   Thank you.

21         **MR. MILLER:**   Good morning, Your Honor.

22         We anticipate all six of our experts testifying live.

23         One procedural question we had was:  How long does the

24   Court contemplate?  Should we do one expert a day?  Two experts

25   a day?  What is the Court's wish in that regard?

1    **THE COURT:**  Well, I mean, I wonder if it's too

2  difficult for me to answer that question in a vacuum, you know,

3  without -- I haven't read any expert reports yet, or --

4       When are opening briefs due, by the way?

5    **MR. MILLER:**  I have that date -- or don't have that

6  date.

7    **MS. WAGSTAFF:**  December.

8    **MS. GREENWALD:**  It's the 11th.

9    **MS. WAGSTAFF:**  Was your question when are we going to

10  be here?

11    **THE COURT:**  No.  The briefs.

12    **MS. GREENWALD:**  October 3rd, I believe, is when

13  Monsanto has the opening *Daubert* briefs.

14    **THE COURT:**  Okay.

15    **MS. GREENWALD:**  I'll verify that, Your Honor.  I'm

16  pretty sure it's that day.

17    **THE COURT:**  So all of the experts reports will --

18    **MS. WAGSTAFF:**  It's October 6th.

19    **THE COURT:**  You're going to be moving to exclude all

20  of their experts, I assume?

21    **MR. HOLLINGSWORTH:**  Yes.

22    **THE COURT:**  And so there will be motions regarding

23  all six of the experts.

24    **MR. HOLLINGSWORTH:**  Yes.

25    **THE COURT:**  And do you think, by the way, that it

1  should come in one brief, or six separate briefs; or have you

2  thought about that?

3         MR. HOLLINGSWORTH:  I think it should come in six

4  separate briefs, but we can do it in one brief.

5         THE COURT:  I mean, I wonder if it makes --

6      I mean, I assume there will be a lot of overlap in what

7  you want to say about each.  And so I wonder if --

8         MR. HOLLINGSWORTH:  There is a lot of overlap in the

9  testimony of these experts.  They're all saying the same thing,

10  basically.  So could we think about that, and --

11        THE COURT:  Yeah.  I mean, it strikes me -- I mean,

12  I'm more interested in doing it -- I'm interested in doing it

13  as sort of efficiently as possible, from a written standpoint.

14        MR. HOLLINGSWORTH:  Yes.

15        THE COURT:  And I don't know -- you will be a better

16  judge of it than I will -- but it strikes me that having one

17  brief will avoid a lot of repetition, and will allow you to

18  organize it maybe a little bit more by subject matter than

19  by --

20        MR. HOLLINGSWORTH:  Okay.

21        THE COURT:  -- than by expert.

22        MR. HOLLINGSWORTH:  All right.

23        THE COURT:  I mean, I -- you know, again --

24        MR. HOLLINGSWORTH:  We'll seriously consider that.

25  So I take back my statement that we would want six different

1  briefs.  So we'll seriously consider that.

2          **THE COURT:**  Okay.  All right.  So -- but in any

3  event, by that time I will have --

4      By October 3rd?  Was that the date?

5          **MR. HOLLINGSWORTH:**  Yes.

6          **THE COURT:**  By October 3rd I will have opening briefs

7  from Monsanto --

8          **MR. HOLLINGSWORTH:**  Yes.

9          **THE COURT:**  -- or an opening or a brief from

10 Monsanto.  I'll have all of the experts reports, and whatever

11 other supporting material you're putting in.

12         **MR. HOLLINGSWORTH:**  The expert reports have already

13 been exchanged, Your Honor.  We're already in the process of

14 taking expert-witness depositions.

15         **THE COURT:**  Right.

16         **MR. HOLLINGSWORTH:**  We've taken two

17 plaintiff-expert-witness depositions already.

18         **THE COURT:**  Okay.  And actually that -- I'm sorry I'm

19 jumping around a little bit, but that actually makes me wonder.

20 You know, I think it's very common in litigation for parties to

21 submit deposition excerpts.  And often the Judge is wanting to

22 read more than the portions that the parties submitted.  And

23 then sometimes the other side submits other portions of the

24 deposition transcript.  And you're having to bounce back and

25 forth between two different documents, and sort of collate the

1   pages, or whatever.

2       I wonder if the best thing, given the importance and size

3   of these issues, would be to just require you to submit full,

4   full transcripts of every expert's deposition, so that I have

5   that at my disposal.

6           **MR. HOLLINGSWORTH:**  So far, we have designated the

7   depositions as confidential.  So if we did that for

8   Your Honor -- we'd be happy to do that, but we wouldn't want it

9   to be on a public docket.

10          **THE COURT:**  Well, it's not at all obvious to me why

11  the entire deposition transcript of these experts should be

12  designated confidential.  I understand why you'd want to

13  initially have the entire deposition transcript designated as

14  confidential, you know, in an abundance of caution; but these

15  proceedings that we are having in December are not going to be

16  confidential.

17          **MR. HOLLINGSWORTH:**  Correct.  And the portions of the

18  briefs that we rely on would not be confidential.  I mean,

19  depositions that we would rely on would not be confidential,

20  but the entire transcript we have thus far designated

21  confidential.  And I think the plaintiffs have agreed on that.

22  I'm not sure.

23          **THE COURT:**  I'm sure they --

24          **MS. WAGSTAFF:**  No, no, no.

25          **MS. GREENWALD:**  No.

```
 1            THE COURT:  Well, I mean, you know, it's often the

 2   case that when parties agree that stuff should be confidential,

 3   that it shouldn't be confidential; but I want the full

 4   transcripts of all of the depositions.  And so you can, you

 5   know, submit -- you can, you know, file a motion to seal

 6   portions of it that legitimately should be sealed; but I'm

 7   having a hard time imagining significant parts of these

 8   deposition transcripts being sealed, and having a hard time

 9   thinking of reasons why significant portions of these

10   deposition transcripts would be confidential.  But in any

11   event, I want the entirety of -- I want the entire deposition

12   transcript of every expert witness who's being relied on in

13   this case.

14            MR. MILLER:  Your Honor, perhaps the Court would want

15   a written copy of our expert reports now.  It's up to the

16   Court.  We offer that, if the Court wants it.

17            THE COURT:  I mean, that would be fine.  Yeah.  Why

18   not?  That would actually be good.  Yeah.

19            MR. MILLER:  We could just --

20            THE COURT:  That reminds me of another thing I want

21   to raise with you, but I'll hold off on for a second.  Yes, I

22   would like that.  That would be great if you all could.  I

23   mean, you can lodge them, so that -- because if you --

24         Are there aspects of the expert reports that are

25   confidential?
```

1          **MR. HOLLINGSWORTH:**  Well, I hadn't come here prepared

2   to address that, actually.

3          **THE COURT:**  Okay.

4          **MR. HOLLINGSWORTH:**  But if we could deliver them

5   though chambers, if that's --

6          **THE COURT:**  That's fine for now.  I mean, I'm

7   assuming all of these experts reports are, again, not going to

8   be confidential, and they're going to be part of the public

9   record; but if for now you just want to lodge the expert

10  reports in chambers, that's fine.  Why don't you do that by --

11         **MR. HOLLINGSWORTH:**  We can do that immediately.

12         **MR. MILLER:**  We can have that done in 48 hours.

13         **THE COURT:**  By Friday.  Close of business tomorrow,

14  or Monday, if that's best.  Maybe -- I don't wanting to go

15  through a fire drill, or whatever.

16         **MR. HOLLINGSWORTH:**  Okay.

17         **THE COURT:**  So by Monday, everybody -- both of you

18  lodge copies of the expert reports.

19         **MR. MILLER:**  Very well, Your Honor.

20         **MR. HOLLINGSWORTH:**  Yes, Your Honor.

21         **MR. MILLER:**  Substantively on *Daubert*, we had

22  contemplated that plaintiffs put their experts on, and then the

23  Court decide whether, under *Daubert's* standards, they meet the

24  threshold, and the case moves on to Phase Two.

25      I wasn't contemplating and requesting the Court to

1  consider that Monsanto's experts need not testify in that

2  regard.  Simply, is it plaintiffs' experts are the

3  scientifically reliable under the standards that are set in

4  *Daubert* and here in the Ninth Circuit.

5        **THE COURT:**  No, but their experts are going to

6  testify about the standard, and whether your experts satisfy

7  the standards.  I mean, we often rely on expert testimony to

8  help us determine whether expert testimony satisfies the

9  applicable standards.

10        **MR. MILLER:**  All right, Your Honor.  Thank you.

11        **THE COURT:**  And that brings me -- that's a good

12  lead-in to another issue that's been on my mind.  I've

13  continued to have -- I raised this issue in some form with you

14  all very early in the litigation.  And I don't remember the

15  details of our discussion about it, but as the hearings

16  approach, I find myself wondering again, or maybe wondering for

17  the first time -- I can't remember exactly if I should have --

18  I should hire a Court-appointed expert.  It would not be for

19  the purpose of preparing a report, and it would not be for the

20  purpose of opining; you know, providing an opinion on the

21  ultimate issue that we're deciding in Phase One.

22      It would be kind of, you know, like almost a glorified law

23  clerk with expertise in the field, kind of to help, you know,

24  sort of sift through the reports, and sift through the

25  testimony, and help me understand the concepts that are being

1  discussed; the scientific concepts that are being discussed by

2  the experts.

3      Thoughts?

4      **MR. HOLLINGSWORTH:**  We opposed that, Your Honor, the

5  first time you raised it.  I think the plaintiffs did, too.

6  It's probably the only thing we agreed on in the entire case so

7  far.

8      **THE COURT:**  Which makes me feel like I should

9  disagree with you.

10      (Laughter in the courtroom.)

11      **MR. HOLLINGSWORTH:**  Sounds like you're going to.

12      **THE COURT:**  Well, I'm sort of leaning -- I'm leaning

13  there, but can you remind me of the basis for your objections?

14      **MR. HOLLINGSWORTH:**  I -- I don't know any Courts that

15  have done this, save one, since 1993, that I'm familiar with --

16      **THE COURT:**  Mm-hm.

17      **MR. HOLLINGSWORTH:**  -- in one case.

18      And that -- you talk about an annoying, painful process --

19      **THE COURT:**  Uh-huh.

20      **MR. HOLLINGSWORTH:**  -- of helping the Court come to a

21  decision about which --

22      **THE COURT:**  Why was it annoying and painful?

23      **MR. HOLLINGSWORTH:**  Well, because the Court -- the

24  Court offered the parties the right to comment about potential

25  candidates.  We went down -- that was a long, drawn-out --

1          THE COURT:  Yeah, that sounds like a painful process.

2          MR. HOLLINGSWORTH:  That's painful.  Very painful.

3          THE COURT:  So we could just dispose of that.

4          MR. HOLLINGSWORTH:  Yeah, you could dispose of that.

5    I don't -- that would be a stretch of Your Honor's discretion

6    that I hadn't heard before; that Your Honor could go select his

7    own expert, without any input from the parties.

8          THE COURT:  Yeah.  I don't know.  I haven't looked

9    into it yet, so I don't know what the, you know, parameters of

10   my discretion are in that regard.

11         But substantively, like, what's the problem with having

12   somebody like that appointed, you know, as a Court-appointed

13   expert to help the Court, you know, sort of get a grip on the

14   scientific issues in the case?

15         MR. HOLLINGSWORTH:  Well, I think there's a reference

16   to that in the *Daubert* Opinion, itself, that's only a footnote.

17   I think I know which judge was responsible for it.  And it

18   hasn't been -- you know, it just has not been followed very

19   much, at all -- if at all, other than in one case that I'm

20   aware of.

21         And the reason is I think that the majority opinion --

22   seven-to-two opinion -- very much favored the notion that

23   federal judges should act as gate keepers.  The imprimatur of

24   an expert witness' opinion is so powerful with a jury, that if

25   it's misleading or it's not based on sound science, he should

1   figure out a way to gate-keep that out, in accordance with our

2   opinion; and that the notion that federal judges weren't

3   qualified to don the white coat of a scientist is something

4   that the Court did not accept.

5        I mean, Judge Rehnquist was strong on that issue in his

6   dissent, but by the time the second case came about, which is

7   *Joiner versus General Electric*, Rehnquist wrote the majority

8   opinion.  So the Court was pretty solid in its view that,

9   despite a lot of controversy about whether judges are competent

10  to understand science -- took the position that the judge has

11  to be a gatekeeper; the judge, in and of himself.

12          **THE COURT:**  But I --

13          **MR. HOLLINGSWORTH:**  And I don't know many judges --

14          **THE COURT:**  But I don't understand.  I mean, I guess

15  I'm a little confused about what you're saying.  And I should

16  go back and read the footnote that you're talking about; but I

17  mean, Courts hire/appoint experts all of the time to help them

18  understand technical matters.  Right?  I mean, it happens all

19  of the time in patent cases, for example.

20          **MR. HOLLINGSWORTH:**  I'm not familiar with patent

21  cases.

22          **THE COURT:**  So I guess I'm -- you seem to be said

23  that there's, like, some prohibition on doing that.

24          **MR. HOLLINGSWORTH:**  No, no.  I'm not saying that.  In

25  fact, I said that there is a reference within the *Daubert*

1  Opinion to the fact that this is a possibility under the

2  Federal Rules, because the Federal Rules provide --

3           THE COURT:  Oh, oh.  Oh, okay.

4           MR. HOLLINGSWORTH:  -- for this possibility, but

5  that's been honored in the breach -- almost totally in the

6  breach -- in the course of the last 25 years or 24 years.

7           THE COURT:  Really?  I thought it was sort of fairly

8  common in these MDLs for Court-appointed experts to be hired to

9  help Courts deal with --

10          MR. HOLLINGSWORTH:  Well, perhaps we should research

11 that.

12          THE COURT:  Mm-hm.

13          MR. HOLLINGSWORTH:  I'm not familiar with that

14 process --

15          THE COURT:  Okay.  Well, for now, it's --

16          MR. HOLLINGSWORTH:  -- other than as a rare

17 exception.

18          THE COURT:  Okay.  Any reaction?

19          MR. MILLER:  Let me agree with Mr. Hollingsworth.

20 I've been doing this for many, many years; many, many decades.

21 I've never seen one.  I've never seen a Court-appointed expert.

22 *Avandia*, *Actos*, *Fen-Phen*, *Zyprexa*, and on and on.  *Vioxx*.  I

23 just haven't seen a Court-appointed expert.

24      And I think the plaintiffs and defendants, I would

25 imagine, are going to do a pretty good job of turning science

1  into not only what the Court can understand, but for Phase Two,

2  science understood by a jury.  So I think we can get that done

3  without it, but -- and I think it's hard to find an expert.

4  They're -- I'd say the majority --

5          **THE COURT:**  Other than it's not done commonly, is

6  there any other reason not to do it?

7          **MR. MILLER:**  I think -- well, I do think, yeah,

8  because you could wind up inadvertently getting an expert

9  that's already weighed in on a scientific controversy.  There

10 is a controversy out there.  And we think the majority of

11 scientists are strong our way, but the scientists that -- there

12 are some that are their way, and I guess a few that haven't

13 heard about it yet; but the odds of getting one who hasn't

14 heard about it who's going to come in -- and then what's he

15 going to do?  Not usurp, hopefully, an Article III Judge's

16 responsibilities.  And he's going to just explain some things,

17 I guess, but that --

18    I think we -- the experts that are going to be coming in

19 can do that for both sides.  And then the advocacy skills and

20 intelligence and impartiality of the Court just gets it done.

21 That's sort of the way we've both seen it go, year after year,

22 case after case.

23         **THE COURT:**  Mm-hm.  Okay.  Well, it's something that

24 I'm going to think about a little bit more.

25         **MR. MILLER:**  I understand.

1       **THE COURT:**  Okay.  And then -- so I took us on a bit

2  of a detour, but we were talking about the process; these

3  hearings that will be taking place in December.

4       And you've got the experts.  And you may want to put on, I

5  guess, for lack of a better word, fact witnesses on this issue

6  of ghostwriting, or manipulating science, or whatever.  I know

7  you object to those terms, but on that issue you want --

8       **MR. HOLLINGSWORTH:**  We may bring into court one of

9  the authors of those papers that they say are ghostwritten.

10      **THE COURT:**  Okay.

11      **MR. HOLLINGSWORTH:**  So I think Your Honor would like

12 to talk to someone like that, based on Your Honor's statements

13 earlier that you thought that that was a disturbing thing from

14 the e-mails that you read.

15      **THE COURT:**  Uh-huh.

16      **MR. MILLER:**  If I could, Your Honor, if they're going

17 to bring in one of the authors, we'd like to bring in

18 Dr. William Heydens, who is at Monsanto, who we say did do the

19 ghostwriting.  So I think that would be a fair --

20      **THE COURT:**  Right.  So I mean -- so it seems like

21 maybe what needs to happen here is there needs to be an

22 exchange of Witness Lists and, you know, a process for

23 resolving any disputes about which witnesses will be allowed to

24 testify at this phase.  Does that sound right?

25      **MR. MILLER:**  That's sounds right, Your Honor.

1          **MR. HOLLINGSWORTH:**  With one caveat, Your Honor.

2    Dr. Heydens has already been deposed for seven and a half

3    hours.  His deposition is a matter of record.

4          **THE COURT:**  Well, he --

5          **MR. HOLLINGSWORTH:**  So that's a lot of testimony.

6          **THE COURT:**  Yeah, but I mean -- and it would be fine

7    to have, you know, the deposition testimony be put in, in lieu

8    of live testimony --

9          **MR. HOLLINGSWORTH:**  Sure.

10         **THE COURT:**  -- and particularly if it's not on a --

11      I mean, if it's on a central matter, I think it would be

12   preferable to have live testimony --

13         **MR. HOLLINGSWORTH:**  Yes.

14         **THE COURT:**  -- but it sounds like what needs to

15   happen is -- you know, we're having the experts.  And we're

16   going to have some degree of fact testimony, I guess, is the

17   best way to describe it.  I'm not sure, you know, if it is the

18   best way to describe it; but for lack of a better word, fact

19   testimony on these issues we've been discussing.  And that will

20   come from both -- of course, come from both sides; presumably

21   come from both sides.

22      And so should we set a deadline for the exchange of

23   Witness Lists and, you know, set, I mean, a further

24   case-management conference at some point in the next couple

25   months to discuss that issue, and any further issue --

1  case-management issues that need to be discussed?

2            **MR. MILLER:**  Yes, Your Honor.  I would suggest that

3  after the defendant's expert reports are in and they've

4  completed deposing our experts, at some point a case-management

5  conference, to see exactly the timing of things.  When should

6  we tell experts to be here?  And list.  And how is it going?

7  And, yes, a case-management conference.

8            **THE COURT:**  Yeah.  And, I mean, the upshot -- we've

9  blocked out that entire week.  Right, Kristen?

10           **THE CLERK:**  Yes.

11           **THE COURT:**  And so we -- and if it needs to be more

12 than that entire week, you know, we'll figure out a way to make

13 that happen, too.

14           **MR. MILLER:**  Very well.

15           **THE COURT:**  I mean, this -- you know, obviously, this

16 is --

17     Let me look at my calendar real quick.

18 (Pause in proceedings.)

19           **THE COURT:**  So -- but for me to say right now, *Okay.*

20 *I only want one expert testifying for X amount of time*, or --

21           **MR. MILLER:**  I understand.

22           **THE COURT:**  I mean, whatever.  I mean, I want us to

23 take whatever time is necessary to give me as good an

24 understanding as I'm capable of developing on these issues.

25           **MR. MILLER:**  I understand.  I understand.

1        **THE COURT:**  So I think, though -- so I think that

2  what you should do is you should put together a list of

3  witnesses, and you should kind of propose a schedule.  And I'm

4  not going to hold you to time limits, or anything like that;

5  but propose a schedule for how long you believe each witness

6  will testify for, and on which day, and all of that kind of

7  stuff.

8        **MR. MILLER:**  Very well.

9        **THE COURT:**  So when do you all want do that?

10       **MR. MILLER:**  We would need a couple of weeks to just

11  schedule, and see which experts are available on which date, so

12  we could --

13       **THE COURT:**  Yeah.  That's fine.  I mean, it's only

14  you know late August.  You know.  So --

15       **MR. MILLER:**  Yeah, we could --

16     (Discussion off the record.)

17       **THE COURT:**  And when are the --

18       **MS. WAGSTAFF:**  Briefing is due.

19     The depositions are done September 22nd.

20       **THE COURT:**  Okay.

21       **MS. WAGSTAFF:**  All of them by both sides.

22     The first briefing starts October 6th.

23     And we're going to spend October and November briefing.

24     The final reply, because we sort of have dual tracks, is

25  due right before Thanksgiving.

1          **MS. GREENWALD:**  It's November 10th.  I just looked.

2          **MS. WAGSTAFF:**  Yeah.  So I would propose that we come

3   back here in October at some point with, you know, either

4   exchanging Exhibit Lists before or after.  You know.  And I

5   don't know if we would need to depose someone who they have on

6   their list that we didn't know about, or whatever.  I don't

7   know until we see their list, but that's what I would propose:

8   As of October, coming back, with an exchange of the Witness

9   Lists maybe right before.

10          **THE COURT:**  Okay.  Does that sound good to you all?

11          **MR. HOLLINGSWORTH:**  Yes.

12          **MR. MILLER:**  Yes.

13          **THE COURT:**  Okay.  So we'll have you -- what we'll do

14   is we'll have you come back in October.  And we'll have you

15   file a case-management or status report or case-management

16   statement, you know, seven days before that.  And that would

17   require you to exchange Witness Lists, and whatnot prior to the

18   filing of that case-management statement.  So what date should

19   we set for you all to come back?

20          **MS. WAGSTAFF:**  Does Your Honor like Thursdays?  Is

21   that --

22          **THE COURT:**  I don't particularly care.  I mean, I'm

23   happy to specially set it for, like, a Wednesday.

24          **THE CLERK:**  (Shakes head from side to side.)

25          **THE COURT:**  Kristen is shaking her head.

1          **MR. MILLER:**  Whatever the Court has available.

2          **THE CLERK:**  If you want to special set it, we can do

3   Monday the 2nd.  We can do -- I'm looking at Thursday

4   afternoons.

5   (Discussion off the record.)

6          **THE CLERK:**  We could even do the 5th or the 12th in

7   the afternoon.

8          **MS. WAGSTAFF:**  Your Honor, there's a motion currently

9   on schedule for October 5th that would necessitate Mr. Miller,

10  Ms. Greenwald, and me to be here.  So we could kind of couple

11  that together, if that makes sense for you all.

12         **THE COURT:**  What's the motion scheduled for

13  October 5th?

14         **MR. MILLER:**  The Rowland deposition.  Motion for

15  fees.  There's a motion for sanctions for asking --

16         **MS. WAGSTAFF:**  Their attorney has filed a motion for

17  attorneys' fees.

18         **MR. MILLER:**  Attorneys' fees; not sanctions.

19         **THE COURT:**  Whose attorney has asked for attorneys'

20  fees?

21         **MR. MILLER:**  Mr. Rowland's attorney is asking for,

22  fees, for us asking for the motion to compel.

23         **THE COURT:**  I have a feeling you're not going to need

24  to be here on that.

25         **MR. MILLER:**  I was not planning on being here.  I was

1  planning on doing it by phone, obviously.

2          THE COURT:  We can certainly have a case-management

3  conference on that day.

4          MR. HOLLINGSWORTH:  October 5th?

5          THE COURT:  Yeah.  Does that work?

6          THE CLERK:  That's fine.  Do you want to specially

7  set it to allow more time?

8          THE COURT:  Yeah.  We should set it for the

9  afternoon.

10         THE CLERK:  Like, 2:00 o'clock?

11         THE COURT:  Yeah.

12         MR. MILLER:  Very well.

13         THE COURT:  Okay.  So we'll have a case-management

14  conference on October 5th at 2:00 o'clock.  We will move that

15  hearing -- that Rowland hearing -- to 2:00 o'clock.  I may end

16  up vacating that hearing, but deciding on the papers -- but so

17  that will be the 5th at 2:00 o'clock.

18     And then seven days prior to that, a joint case management

19  statement will be due.  Or did we set up some protocol for --

20  some different protocol for filing case management statements?

21  I can't remember.

22         MR. MILLER:  Me neither.  I don't remember.

23         MS. WAGSTAFF:  I remember talking about it.  I can

24  confer with -- I think at one point we can confer and look at

25  that, and file whatever we have decided; or we can file a joint

1    one.

2            **THE COURT:**  Okay.  Well, as of now, I'll require you

3    to file a joint case management statement seven days prior; but

4    you can go back and look.  If we have some other protocol,

5    you're free to submit a stipulation changing the schedule to

6    that other protocol.

7            But I want Witness Lists, and any discussion of

8    disagreement you have about the right of certain witnesses to

9    testify; the right of the parties to call certain witnesses.

10           I want to hear from you further on, you know, whether

11   there should be a Court-appointed expert; again, not to provide

12   a report or an opinion, but just to assist the Court in sort of

13   understanding the expert testimony.

14           What else should be in there?

15           Oh, and a proposed schedule for the week.  Who's going to

16   testify when; how long -- roughly how long -- an estimate of

17   how long it's going to take, and all of that.

18           **MS. WAGSTAFF:**  Your Honor, one of my colleagues just

19   pointed out to me that the *Daubert* motions that I had told you

20   the date of is October 6th.

21           **THE COURT:**  Mm-hm.

22           **MS. WAGSTAFF:**  And so in light of the fact that we

23   may not have to be here on October 5th, he suggested that we

24   push our next case management to the week of the 16th, so that

25   we can see their *Daubert* motions before we give our Witness

1    Lists, which sort of makes a little bit more sense

2    logistically.

3              **THE COURT:**  Uh-huh.

4              **MS. WAGSTAFF:**  And so if we could -- even though I

5    just requested --

6         What did you say?

7              **MS. GREENWALD:**  (Indicating).

8              **MS. WAGSTAFF:**  Early in the week of the 16th might --

9    October 16th might make more sense.  We could come a little bit

10   more educated and informed to you.

11             **THE COURT:**  That sounds fine.  I mean, we have a

12   trial that is almost certainly going to go that week, starting

13   on Monday.

14             **MR. MILLER:**  October 12?

15             **MS. GREENWALD:**  How about the week before?

16             **THE CLERK:**  That's better, I think.  Yeah.  I think

17   it's better.  Yeah.  October 12th is actually really light.

18             **THE COURT:**  I was sort of thinking I was wondering

19   about the 26th, because I don't know if that's getting too

20   close to the hearings, but --

21             **THE CLERK:**  You have a special-set criminal hearing

22   in the afternoon that's going to take a long time, I think.

23             **THE COURT:**  On the 26th?

24             **THE CLERK:**  Yeah.

25             **MS. WAGSTAFF:**  The week of October 23rd would work,

 1  as well.

 2          **THE COURT:**  Let me get back to you on this.

 3      Well, maybe -- let's try and plough through figuring it

 4  out.  So we have trial 16th, scheduled to go a couple weeks.

 5          **THE CLERK:**  Mm-hm.

 6          **THE COURT:**  Almost certainly a civil case, but almost

 7  certainly going to go.

 8          **THE CLERK:**  Mm-hm.

 9          **MS. WAGSTAFF:**  Your Honor, as mentioned on our call

10  last week, Ms. Greenwald's moving her daughter into college,

11  and she needs to go.

12          **MS. GREENWALD:**  I'm sorry, Your Honor.  I don't mean

13  to be rude.  I appreciate it.

14          **THE COURT:**  Go ahead.  Yeah.  It does make sense to

15  do it after the *Daubert* motions come in.

16      What about -- what if we scheduled it for October 27th, on

17  the theory that --

18          **THE CLERK:**  I won't be here.

19          **THE COURT:**  -- on the theory that that trial --

20  there's a fair chance that trial will be over.

21          **THE CLERK:**  Yeah.  That's fine.  I just won't be

22  here.

23          **THE COURT:**  Okay.  Congratulations.

24      Kristen says she won't be here on October 27th.  That's

25  why I said "Congratulations."

1    Yeah.  Let's do the 27th at, like -- just to be safe,

2  2:00 o'clock on the 27th.

3         **MS. WAGSTAFF:**  Your Honor, that day doesn't work for

4  me, but there's luckily three of us, so my co-leads will be

5  here.

6         **THE COURT:**  The benefits of a bloated leadership

7  structure.

8         **MS. WAGSTAFF:**  Oh, that word has --

9         **MR. MILLER:**  We'll be here, Your Honor.

10        **MR. HOLLINGSWORTH:**  Your Honor, is it possible to do

11  the 26th instead of the 27th?

12        **THE COURT:**  Apparently not, Kristen tells me.

13        **MS. WAGSTAFF:**  26th would work for me.

14        **THE COURT:**  What's specially set on the 27th?

15        **THE CLERK:**  The afternoon is all of the pretrial

16  motions in the *Morgovsky* matter.  And I just found out that

17  there's going to be at least four from one of the defendants.

18  And then there's a second defendant who's going to have more,

19  and I don't even know how many they have.

20        **THE COURT:**  Okay.

21        **THE CLERK:**  They had set this for 3:00.  You could

22  set this for 3:00.

23        **THE COURT:**  Set this for 3:00?

24        **THE CLERK:**  Yeah.

25        **THE COURT:**  When is the *Morgovsky* matter being heard?

1          THE CLERK:  2:00.

2          THE COURT:  I don't think that's going to work.  I

3   think there's a chance those will go away, but I think I'll

4   need to set it for Friday, the 27th.  Would it be helpful to do

5   it in the morning, rather than the afternoon?

6          MR. HOLLINGSWORTH:  Yes.

7          THE COURT:  Okay.  We'll do it at 10:00 o'clock on

8   Friday, the 27th.

9          MR. HOLLINGSWORTH:  Thank you.

10          THE COURT:  And so the case-management statement will

11   the joint case-management statement be due a week before then.

12   And the parties will be required to exchange their Exhibit

13   Lists, and proposed schedules.  And sorry.  Did I say Exhibit

14   Lists?

15          MR. MILLER:  I'm sorry.

16          MS. WAGSTAFF:  You said "Exhibit Lists."

17          THE COURT:  So the parties will be required to

18   exchange their Witness Lists and their proposed schedules seven

19   days before the case-management statement is due.

20      Should I also require you to exchange your Exhibit Lists

21   on that date, or is that too early?

22          MS. WAGSTAFF:  I think that's too early, Your Honor.

23          THE COURT:  Okay.  All right.  When would it be

24   reasonable to have you exchange Exhibit Lists?

25          MS. WAGSTAFF:  Your Honor, I think probably two weeks

1  before the hearing might be appropriate.  Two to three weeks

2  before the hearing.

3          **THE CLERK:**  Before the CMC?

4          **THE COURT:**  No, before the *Daubert* hearings.

5          **MS. WAGSTAFF:**  Yeah, which puts it around November.

6  If you look at a calendar, that puts it at around the 13th or

7  the 20th of November; somewhere around there.

8          **THE COURT:**  Okay.

9          **MR. HOLLINGSWORTH:**  We think the sooner the better on

10 that.

11         **THE COURT:**  Require an exchange of Exhibit Lists on

12 the 13th of November.

13         **THE CLERK:**  Witness Lists?

14         **THE COURT:**  No.  Exhibit Lists.

15    Yeah.  Witness Lists are being exchanged two weeks before

16 our October 27th CMC.

17         **THE CLERK:**  Okay.

18         **MS. WAGSTAFF:**  Your Honor, do you anticipate

19 objections being entertained to the Exhibit List?

20         **THE COURT:**  I mean, you know, this is not a jury

21 trial.  So the guidance I can give you is that unless there's

22 anything, like, very significant, you know, I can figure out

23 what's relevant and what's not relevant in the course of the

24 proceedings in December.

25         **MS. WAGSTAFF:**  Okay.

PROCEEDINGS                                      102

1          **THE COURT:**  So it has to be something that would be

2    really time wasting, or really problematic for some other

3    reason.

4          **MS. WAGSTAFF:**  Okay.  So I would take that to mean

5    that failure to file an objection when they serve their Exhibit

6    List doesn't waive an objection.  Is that --

7          **THE COURT:**  Yeah, because you can always argue --

8    yeah.  You can always, you know, argue or establish through

9    cross-examination that something that somebody's relying on is

10   not relevant.

11         **MS. WAGSTAFF:**  Okay.

12         **THE COURT:**  Yeah.  Okay.  Anything else?

13         **MR. MILLER:**  No, Your Honor.

14         **THE COURT:**  All right.  Thank you.

15         **MR. MILLER:**  Thank you.

16         **THE CLERK:**  Court is adjourned.

17      (At 12:40 p.m. the proceedings were adjourned.)

18   I certify that the foregoing is a correct transcript from the

19   record of proceedings in the above-entitled matter.

20

21   *Lydia Zinn*

22   _____   August 25, 2017
     Signature of Court Reporter/Transcriber   Date
23   Lydia Zinn

24

25