# EXHIBIT I

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5              Plaintiff,

6        vs.                  Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8              Defendants.
    _____/

9

10

11

12       Proceedings held on Thursday, July 12, 2018,

13       Volume 8, Afternoon Session, before the Honorable

14       Suzanne R. Bolanos, at 1:20 p.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2958711B

24

25  Pages 1776 - 1945

```
 1  APPEARANCES:

 2

 3  FOR THE PLAINTIFF:

 4       R. BRENT WISNER, ESQ.

 5       BAUM, HEDLUND, ARISTEI, GOLDMAN PC

 6       12100 Wilshire Boulevard, Suite 950

 7       Los Angeles, California 90025

 8       310-207-3233

 9

10       DAVID DICKENS, ESQ.

11       THE MILLER FIRM, LLC

12       108 Railroad Avenue

13       Orange, Virginia 22960

14       540-672-4224

15

16  FOR THE DEFENDANT:

17       SANDRA A. EDWARDS, ESQ.

18       FARELLA BRAUN + MARTEL LLP

19       235 Montgomery Street

20       San Francisco, California 94104

21       415-954-4400

22

23

24

25
```

```
 1  APPEARANCES (Continued):

 2

 3  FOR THE DEFENDANT:

 4       GEORGE C. LOMBARDI, ESQ.

 5       JAMES M. HILMERT, ESQ.

 6       WINSTON & STRAWN LLP

 7       35 West Wacker Drive

 8       Chicago, Illinois 60601

 9       312-558-5969

10

11       KIRBY T. GRIFFIS, ESQ.

12       HOLLINGSWORTH LLP

13       1350 I Street, N.W.

14       Washington, D.C. 20005

15       202-898-5800

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF PROCEEDINGS

2

3   WITNESS                 DIRECT   CROSS   REDIRECT   RECROSS

4   CHRISTOPHER JUDE
    PORTIER                  1793

5

6

7

8                    EXHIBITS ADMITTED

9   NUMBER                                          PAGE

10  Exhibit 640                                     1849

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              Thursday, July 12, 2018

 2                  1:20 p.m.

 3                  Volume 8

 4              Afternoon Session

 5            San Francisco, California

 6              Department 504

 7          Judge Suzanne Ramos Bolanos

 8

 9                PROCEEDINGS
```

























13:35:02

13:35:10

13:35:24     20          (Jury enters courtroom.)

             21          THE COURT:  Welcome back, Ladies and Gentlemen.

             22          Mr. Wisner, do you wish to recall Dr. Portier?

             23          MR. WISNER:  Yes, your Honor.  At this time, I

             24  recall Dr. Portier to the stand.

13:37:02     25          (Christopher Portier takes stand.)

1          THE COURT:  Good afternoon, Dr. Portier.  If

2  you'd please return to the witness stand.

3          And, Ladies and Gentlemen, Dr. Portier remains

4  under oath.

13:37:21     5          MR. WISNER:  Thank you, your Honor.

6          THE COURT:  All right.  Mr. Wisner, you may

7  proceed.

8

9          DIRECT EXAMINATION (Continued)

10  BY MR. WISNER:

11      Q.  Did you have a good lunch, Doctor?

12      A.  Sorry?

13      Q.  Did you have a good lunch?

14      A.  Yes.  Thank you.

13:37:32    15      Q.  All right.  Good.

16          All right.  Just before we ended off, we were

17  talking specifically about the reactions that you

18  experienced after the IARC Monograph was issued.

19          Do you recall that, Doctor?

13:37:48    20      A.  Yes.

21      Q.  And we discussed that there had been, sort of,

22  an outcry that emerged following the classifications?

23      A.  Yes.

24      Q.  And I think you testified you weren't sure where

13:37:58    25  that came from; right?

1793

1          A.  Correct.

2          Q.  Okay.  I'm going to show you a document that's

3     in evidence.  Exhibit 292.

4          A.  Okay.

13:38:08    5          Q.  This is a document that came in earlier in the

6     trial, Doctor.  And as you can see, the first page is

7     dated February 23rd, 2015, and it says, "Glyphosate and

8     IARC."

9               Do you see that?

13:38:20   10          A.  Yes.

11          Q.  All right.  Now, if we go down this document, I

12     just want to show you -- now, Attachment A to this

13     document says, "Preparedness and engagement plan for IRAC

14     carcinogen rating of glyphosate."

13:38:42   15               Do you see that?

16          A.  Yes.

17          Q.  And (inaudible) February 17th, 2015?

18          A.  February.

19          Q.  It's back far enough; right?  Right here

13:38:49   20     (indicating).

21          A.  Yeah, I see it.  It's one at the top, too,

22     February 23rd.

23          Q.  Yeah.  And this is before the IARC actual

24     classification; correct?

13:38:57   25          A.  Correct.

1      Q.  Okay.  And then down here it says, "Inform,

2 inoculate, engage in industry partners."

3          Do you see that?

4      A.  Yes.

13:39:04   5      Q.  All right.  This is the part that I wanted to

6 show you.  Sorry.  It's at the bottom of this page.

7 Post-IARC.

8          Do you see this section, Doctor?

9      A.  Yes.

13:39:14   10     Q.  And it states:  "Orchestrate outcry with IARC

11 decision, approximately March 10th of 2015."

12     A.  Uh-huh, yes.

13     Q.  As part of your work on the IARC panel, did you

14 keep in touch with some of the Working Group members

13:39:31   15 after the classification?

16     A.  Yes.

17     Q.  And do you understand whether or not they were

18 sent letters or intimidated in any way by Monsanto or

19 other organizations?

13:39:43   20         MR. GRIFFIS:  Calls for hearsay, your Honor.

21         THE COURT:  Sustained.

22     Q.  BY MR. WISNER:  As part of your work, have you

23 had to consult with anyone from the IARC program to

24 respond to subpoenas or requests for information?

13:40:12   25     A.  I have talked with IARC on those issues.

```
         1         Q.  You personally have?

         2         A.  Yes.

         3              MR. GRIFFIS:  I apologize.  This is the subject

         4    of a motion in limine.

13:40:25 5              THE COURT:  Mr. Wisner, do you wish to move on?

         6              MR. WISNER:  Was the motion granted?

         7              MR. GRIFFIS:  Yes.

         8              THE COURT:  Counsel, do you wish to approach?

         9              MR. WISNER:  Sure.

13:40:42 10             (Sidebar discussion.)

        11              THE COURT:  All right.  You may continue,

        12    Mr. Wisner.

        13         Q.  BY MR. WISNER:  Following this outcry, Doctor,

        14    do you know if the IARC director issued a letter

13:41:10 15   responding to these criticisms?

        16         A.  Yes, he did.

        17         Q.  And have you read that letter?

        18         A.  Yes, I have.

        19         Q.  And have you considered it?

13:41:16 20        A.  In what I've done here?

        21         Q.  Yeah.

        22         A.  Partially, but not totally.

        23         Q.  But there's portions of it you did read and

        24    consider?

13:41:25 25        A.  Yes.
```

1        Q.  I'd like you to turn to Exhibit 793.  It's in

2   your second binder, Volume 2.

3            Are you there, Doctor?

4        A.  Yes, I am.

13:41:57   5        Q.  Is this a fair and accurate copy of that letter?

6        A.  Yes.  This is the -- the letter the directors

7   sent to the governing council and made public.  Made

8   widely public.

9        Q.  And it was published online and available for

13:42:11   10  anyone to see?

11       A.  Correct.

12       Q.  And this is the one that you reviewed, sir?

13       A.  Yes.

14       Q.  And, obviously, minus these redactions at the

13:42:18   15  front, does this appear to be a fair an accurate copy of

16  that later letter?

17       A.  It appears to be, yes.

18       Q.  And to be clear, it was written by the director

19  of IARC.  Who is that?

13:42:28   20       A.  Chris -- Chris Wild.

21       Q.  And Chris Wild wrote this letter in his official

22  capacity as the IRAC director; is that correct?

23       A.  That's correct.

24       Q.  And this was made in the regular course of his

13:42:37   25  working at IARC; correct?

```
 1        A.  Correct.
 2            MR. WISNER:  Your Honor, at this time I move 793
 3   into evidence.
 4            THE COURT:  Any objection?
 5            MR. GRIFFIS:  Objection of hearsay, your Honor.
 6            THE COURT:  All right.  Then why don't we take
 7   this up at a later time.
 8            MR. WISNER:  So don't discuss the document, your
 9   Honor?  I want to make sure I understand what the ruling
10   is.
11            THE COURT:  Yes.  Not at this time.  It's not in
12   evidence.
13        Q.  BY MR. WISNER:  All right.  Let's get off of
14   IARC, Doctor.  Let's take about the science.  What --
15   what were you asked to do in this case?
16        A.  Originally I was asked to provide expert
17   scientific opinion to the law firm that I contracted with
18   about the science related to glyphosate.
19        Q.  And were you asked to determine whether or not
20   glyphosate or Roundup can cause non-Hodgkin's lymphoma?
21        A.  Not originally.
22        Q.  Okay.  But at some point were you asked to do
23   that?
24        A.  Yes, I was.
25        Q.  And did you go about trying to answer that
```

13:42:45

13:43:02

13:43:16

13:43:37

13:43:46

1  question?

2      A.  Yes, I did.

3      Q.  What did you do to examine or come to an opinion

4  about that question?

13:43:53   5      A.  Say that again.

6      Q.  What did you do to arrive at or come to a

7  conclusion -- an opinion about that question?

8      A.  I did a systematic review, study of the

9  literature.  I looked for all possible publications, both

13:44:07  10  in the peer-reviewed literature and anything else that

11  was available through regulatory sources, et cetera.

12          I read all of that material that I found

13  relevant and then used what's called the Bradford Hill

14  criteria to walk through all of that science and come to

13:44:24  15  a conclusion about the causality.

16      Q.  And when you looked at all this different

17  science and studies, did you look at things that IARC did

18  not look at?

19      A.  Yes.

13:44:35  20      Q.  What did -- what else did you look at that IARC

21  did not look at?

22      A.  Well, there were -- at the time of the IARC

23  Monograph meeting, there were studies that were

24  unavailable to them in enough detail for them to review

13:44:50  25  and act on it.

1      In my review, having combined information from

2  multiple sources, as well as those studies that IARC

3  decided not to do, and not being required to have it in

4  the public domain in my review, I reviewed those studies

13:45:09    5  as well.

6      These are cancer studies in animals that are

7  proprietary to the industry.  And genotoxicity studies,

8  again, proprietary to the industry.  And then any new

9  studies that came out since the IARC review.

13:45:24   10      Q.  So let's break that down just quickly.

11      So IARC, you said, only looks at stuff that's

12  publicly available; is that right?

13      A.  That is correct.

14      Q.  Why is that?

13:45:34   15      A.  Because they have a very strong belief in

16  transparency.  They are a public agency.  They feel that

17  their scientific reputation is -- it's important to their

18  scientific reputation to be transparent in everything

19  they do.

13:45:49   20      Q.  And you weren't bound by that requirement in

21  your assessment; is that right?

22      A.  That is correct.

23      Q.  And so you got the chance to look at, you said,

24  proprietary studies; correct?

13:45:59   25      A.  Correct.

1    Q.  To be clear, we're talking about studies that

2  were done by industry that just weren't publicly

3  available?

4    A.  Well, parts of them were publicly available but

13:46:09   5  not in a form with enough detail for IARC to feel like

6  they could review them.

7    Q.  And since you are obviously a part of

8  legislation here, you had a chance to, sort of, look at

9  stuff that IARC didn't have a chance to look at; is that

13:46:22  10  fair?

11    A.  Partially fair.  I mean, many of the

12  documents -- IARC does not generally reference articles

13  where someone else has reviewed the literature and come

14  to a conclusion.  The whole purpose of the IARC Working

13:46:39  15  Group is for them to come to a conclusion.

16    But some of those reviews contained appendices

17  that had raw data that, given time, the IARC Working

18  Group could have potentially used.  Again, doing

19  everything I did.  So it was there.  They looked at the

13:46:56  20  review articles but not at the appendices.

21    Q.  So to come to your opinion in this case, you

22  went and looked at studies that IARC did not look at; is

23  that fair?

24    A.  That is correct.

13:47:07  25    Q.  And what percentage?  What are we talking about

1  here in volume?

2     A.  In terms of the full -- full -- oh, 5 percent?

3     Q.  Five percent of --

4     A.  The whole set of science.

13:47:24  5     Q.  What did you look at?

6     A.  That IARC did not look at?

7     Q.  Oh, okay.

8     A.  No.  The part that I looked at that IARC didn't

9  look at was probably 5 percent of everything I looked at.

13:47:37  10     Q.  Okay.  So about 95 percent of the same, but you

11  looked at about an additional 5 percent; is that correct?

12     A.  Correct.

13     Q.  All right.  So I understand IARC has these

14  different categories of information.  You know, animal,

13:47:52  15  toxicology, epidemiology, mechanistic studies.  Did you

16  take a similar approach in your evaluation?

17     A.  Yes, I did.  All -- all reviewers generally take

18  that approach.

19     Q.  Okay.  And why is that, Doctor?

13:48:03  20     A.  Because they're separate science.  They -- they

21  really complement each other, but you have to have, sort

22  of, a different kind of scientific framework to look at

23  each of those three sections.

24     Q.  So let's talk about the three sections.  Start

13:48:20  25  off with toxicology.  Please explain to the jury what an

1 animal study is and how it's performed.

2     A.   So, generally, to assess the chronic effect of

3 chemicals in humans, we use what's called an animal

4 carcinogenicity study.   These studies are typically done

13:48:43  5 in rats and mice.   They're typically done for

6 approximately two years.   Some of the ones we're looking

7 at are 18 months.

8          The rats and mice will generally live about

9 30 months if they're left to go to the end of their life

13:49:00  10 span.

11          Let me take this out.   Sorry.   My -- I have a

12 bit of a cold.

13          Let see.   So length of time.   The animals are

14 from one colony.   So basically you have these companies

13:49:17  15 that grow these animals for this type of laboratory work.

16 And when the study gets ready to be started, they want to

17 choose animals that were all born at approximately the

18 same time, in the same facility, under the same

19 conditions, so that there's no problem with "I got

13:49:36  20 animals from here and here, and they gave me different

21 answers."

22          So basically everything is controlled.   The

23 animals go on study when they're about six weeks of age.

24 That's because that's when rats and mice reach puberty.

13:49:52  25 That's sort of the end of puberty time for them.   They're

1  beginning to become adults.  So it's intended to be like

2  the adult lifespan of the animal.

3        They start exposing them at that point.  In all

4  of the studies we have here, they mixed the chemical in

13:50:10    5  food, and the animals eat it every day for their entire

6  two years or 18 months.

7        Again, during that time, everything is

8  controlled in these laboratories.  The amount of time

9  they see light, the amount of time they see dark, the

13:50:27    10  water they drink.  Everything they can possibly control,

11  they control in these studies.

12        At the end of this time, they kill any animals

13  that remain alive.  Many animals die during the course of

14  the study just from natural problems in the animals.

13:50:43    15  Every animal that dies -- in most study, not all of the

16  studies we're looking at -- they go in and pathologists

17  review all the tissues in the animal and look for cancer.

18  Both for large tumors that they can see, as well as they

19  slice the tissues and look in the microscope to see if

13:51:06    20  they can see smaller tumors in these tissues.

21        That -- so the first phase takes about two

22  years.  That phase takes about half a year to a year,

23  depending on how big the study is.  It takes a lot of

24  time to read all these slides.

13:51:21    25        After that, it goes to the, sort of, statistical

1804

1 toxicological group who then analyze it, interpret it,

2 write the report.  Then that's the end of it.

3          That's a typical animal cancer study.

4      Q.  In that study, there's a control group; is that

13:51:35  5 right?

6      A.  Oh, right.  I'm sorry.  I didn't cover that.

7          A typical study -- in fact, virtually all the

8 studies we'll look at here -- had three groups of animals

9 that were exposed to glyphosate and one group of animals

13:51:47  10 that were not exposed to glyphosate.

11          These amounts lived under the same conditions.

12 They just didn't get the glyphosate.  Ate the same thing,

13 except no glyphosate in the food.  The doses given to the

14 other animals went from a low dose to a high does.  So

13:52:05  15 you could look at:  Does the risk of cancer increase as

16 you increase exposure?

17          And most of the studies have between 50 and 75

18 animals in each of these exposure groups.  Most studies

19 use males and females.  And if you're looking at

13:52:24  20 glyphosate as an agency or something like that, you

21 usually do rats and mice, males and females.

22      Q.  And, Doctor, earlier today you testified that

23 cancer's pretty rare.  How can you find out there's

24 cancer in mice but just looking at 50?  How does that

13:52:41  25 work?

1805

1      A.  So these studies are intended to -- for two

2 purposes.  One is:  Can it happen?  Can you see this in

3 these animal populations after they're exposed?

4           And the second purpose is to estimate risk in

13:52:58   5 human populations if there's no good epidemiology to do

6 that from.  So there are two purposes.

7           For the first purpose, if you believe that the

8 risk of cancer increases with the risk of exposure, then

9 to make the best possible study, you want the highest

13:53:14  10 exposure that the animal can take without it causing

11 other problems to the animal.

12           And so what you do, typically, is you do a

13 three-month study instead of a year study.  And you take

14 a bunch of doses and feed them to some animals for three

13:53:34  15 months.  And then you look to see how the animals handle

16 the food.  Did they lose weight?  Did they get sick?

17 Were there toxicological changes of concern?  And you

18 find an exposure where none of that happens.

19           And then you take that exposure as your maximum

13:53:50  20 exposure, and you run it for two years in the animals and

21 then lower doses.

22           The reason you do that is because -- what you're

23 interested in, of course, in human populations is much

24 lower exposures.  But you're also interested in human

13:54:06  25 risk in the range of 1 in a million to 1 in 100,000 to 1

1  in 10,000.  And we can't use that many animals to get at

2  that type of risk.

3          And so you don't do studies at human exposure

4  levels.  You extrapolate them.  You take what you see in

13:54:25   5  high doses, and you draw a line or some other technique

6  to get you into the low region.  That's how you estimate

7  human risk.

8      Q.  And that maximum dose that, I guess, the mouse

9  or rodent can take before, essentially, dying, what's

13:54:41   10  that called?

11      A.  It's called the maximum tolerated dose.  And

12  there are guidelines that all the agencies follow that

13  describe how to find that maximum tolerated dose and how

14  to evaluate it to make sure you didn't go too high in the

13:54:56   15  animals.

16      Q.  Doctor, if the study doesn't reach the maximum

17  tolerated dose, or the MTD, how can you learn anything

18  from that study?

19      A.  Well, it depends.  If the study actually shows a

13:55:09   20  cancer risk, then, of course, you're going to learn

21  something from that study, because it's positive.  Even

22  though it wasn't the highest dose the annual could

23  tolerate, you're seeing cancer at these lower doses.

24  That's good enough.

25          On the other hand, if you use too low of a dose

13:55:24

1807

1  and you see nothing, that could mean that you were in a

2  probability arrange that you just wouldn't see.  You'd be

3  unlikely to see an extra animal with a tumor.  Because

4  the risk to the animal -- let's not worry about humans

13:55:44   5  yet -- might be 1 in 1,000 or 1 in 100.  If it's that

6  small of a risk with only 50 animals, I won't see it.

7  It's unlikely I will see it.

8       Q.  So the rule, then, is:  Even if you haven't

9  reached the MTD, if you see a risk, that's a problem.  If

13:56:01   10  you don't see a risk, you're not safe yet.

11       A.  Correct.  Well, I wouldn't say not safe.

12       Q.  Fair enough.

13       A.  The purpose of these studies in a regulatory

14  context, like it is here with pesticides, is they --

13:56:13   15  they -- there's a debate.  The debate goes on in the

16  scientific literature.  And that's what set up these

17  guidelines.  And basically the guidelines are there to

18  say this is the minimum amount of information a

19  regulatory authority needs to make a determination of the

13:56:29   20  safety.  Now, if it's entirely negative, the agency will,

21  of course, determine it's safe and let it on the market.

22  But they come back and look at it again and again and

23  again.

24          But it's the minimum amount of evidence.  So

13:56:43   25  that's why these cancer studies.  They're part of that

1    minimum amount of evidence.

2        Q.  What is a historical control?

3        A.  Okay.  So when you -- when you do these animal

4    cancer studies, every once in a while you see a tumor

13:56:58    5    you've never seen before in your entire life in that

6    animal.

7            So, for example, NTP, where I worked, we saw

8    osteosarcomas in the leg of a -- in the muscle of a leg

9    of a mouse exposed to fluoride.

13:57:18    10           MR. GRIFFIS:  Doctor?

11           THE WITNESS:  Too much?

12           MR. GRIFFIS:  What is that?

13           THE WITNESS:  Fluoride?

14           MR. GRIFFIS:  No.

13:57:25    15           THE WITNESS:  Osteosarcoma.  So it's a bone

16    tumor.

17           MR. GRIFFIS:  Okay.

18           THE WITNESS:  But it appeared in the muscle

19    tissue, which made it extraordinarily unusual.  So we

13:57:32    20    went and said, okay, we've done a bunch of these studies

21    in this animal.  For the last five years, we might have

22    done 40 studies.  And each one of those studies has a

23    control group.  And each control group was treated

24    exactly the same as the one we're doing now.

13:57:47    25           So we go group them together and say, how rare

1809

1  is this tumor?  And in this case, having never seen it,

2  it's extremely rare.  So then the causation argument:

3  Did this chemical cause this tumor?  It's very high.

4  Because you've never seen it, it has to have been due to

13:58:06    5  the chemical.

6          So in most studies -- in most interpretations of

7  cancer studies, if you have a tumor that occurs less than

8  1 percent in the animals, it's considered a rare tumor.

9  And when you see those tumors, you go back to control

13:58:22   10  data sets that were treated the same way, over a period

11  of time not too far away from what you're looking at now,

12  and you look to see how often that tumor has occurred,

13  and then you compare that information to what you see in

14  your current study.

13:58:35   15      Q.  BY MR. WISNER:  But from looking at controlled,

16  what's better:  The concurrent control in the study or

17  the historical controls?

18      A.  In every guideline that's out there that I've

19  read, the concurrent control is always the best.  The

13:58:50   20  reason for that is because at this time, during this

21  period, they were exposed to exactly the same thing as

22  the treated animals.  So they're always the better

23  control.

24          But if you see these rare tumors, then you

13:59:03   25  really have to have something else to make a decision.

1 Because statistically, you'll never see them.

2       If I see 2 out of 50 versus 0 out of 50 in the

3 controls, that's not statistically significant.  It never

4 will be.  But it could be biologically significant if

13:59:21   5 it's never been seen before.

6       Q.  So, for example, in that case, you found two in

7 a high dose, zero in the concurrent control.  That,

8 itself, is not statistically significant?

9       A.  Not at all.

13:59:30   10      Q.  But if the historical control tells you that the

11 incidence of that tumor is 1 out of a million, right, the

12 fact that you saw 2 out of 50, what does that tell you?

13      A.  That the probability of seeing that is

14 virtually 0.

13:59:44   15      Q.  Okay.  All right.  So how many rodent studies

16 did you consider for this case?

17      A.  I think -- it's hard to say without looking at

18 my document.  I think it was 21 or 22 studies.

19      Q.  And, I'm sorry, when I say "rodent studies,"

14:00:05   20 that's probably too general.  I mean long, chronic

21 carcinogenicity studies in mice or rats.

22      A.  Correct.  And that's 21 or 22 of them.  I'd have

23 to look back.

24      Q.  But of those, how many were of sufficient

14:00:19   25 quality to actually be examined by yourself?

1    A.  So, yeah.  There were several studies that I

2  discarded as not being of sufficient quality.

3         I ended up with 13 studies that I felt were

4  sufficient quality:  Seven in rats, five in mice.  And

14:00:35    5  then one study that's known as an initiation promotion

6  study.  A different type of study.

7    Q.  Okay.  So let's start off with the mice.

8         I understand we prepared a demonstrative here to

9  help us get through this relatively complicated topic.

14:00:51   10         Please turn to exhibit --

11         MR. WISNER:  Well, your Honor, actually,

12  permission to set up the demonstrative?

13         THE COURT:  Any objection?

14         MR. GRIFFIS:  No, your Honor.

14:01:03   15         THE COURT:  All right.  Very well.  Is it marked

16  as an exhibit?

17         MR. WISNER:  Yes, it is.  I have to look at it.

18  It's Exhibit 1020.

19    Q.  All right, Doctor.  I'd like you to come off the

14:01:32   20  stand and use these markers to help us walk through this

21  chart.  Okay?

22    A.  I'll need my notes.

23    Q.  Sure.  You should probably use black, so you can

24  see much more --

14:01:52   25         All right, Doctor.  So what are we looking at

1812

1  here?  What is this a chart of?

2      A.  So these are the five different mouse studies

3  that I looked at.  Each one was done in a different

4  laboratory.  Each one was done in different years.  These

14:02:11  5  first four were done in exactly the same strain of mouse.

6  So mice --

7      Q.  Sorry, Doctor.  Stop.  I don't think some of the

8  jurors can see.  I'm going to bring this up much closer.

9          All right.  Continue.

14:02:31  10     A.  So mice are like cats.  You know, cats come in

11  different types of cats.  You have your tiger-looking

12  cat, your black cat.  There are different strains.  It's

13  the same with mice.

14          But in laboratory studies, they're very, very

14:02:47  15  carefully breeded and controlled as to which mice you

16  look at.  So that one laboratory using this mice, this

17  laboratory using it, they should get the same basic

18  results.  So you try to keep them clear.

19          These are all CD-1 mice.  But CD-1 mice also

14:03:06  20  have substrains.  So it's not just one type of CD-1 mice.

21  So these -- some of these have different substrains.  But

22  the idea is they're approximately the same animal.

23          This study went for two years, these two studies

24  (indicating).  These two studies went for 18 months

14:03:22  25  (indicating).  So we have to look at them differently,

1  because an 18-month old CD-1 mouse is more in the range

2  of a 50-year old, person.  Whereas a 24-month-old mouse

3  is more like a 60-year-old or a 65-year-old human.  So

4  we're going to consider them separately.

14:03:43    5        This is a different mouse.  This is a Swiss

6  Webster -- new mouse.  Well, Swiss Webster mouse.  And so

7  they did a different study.

8        Q.  All right.  So these different columns represent

9  different studies; is that right?

14:03:54   10        A.  Correct.

11        Q.  And they have dates underneath them.  The

12  earliest one on here is what date?  I can't see.

13        A.  1983.

14        Q.  Okay.  And then the last one is 2000 --

14:04:05   15        A.  2009.  They're not in chronological order.

16  They're in biological order.

17        Q.  Okay.  And which ones of these were actually

18  conducted by Monsanto?

19        A.  Sometimes I don't know these things.  I think

14:04:17   20  the Knezevich & Hogan.

21        Q.  Okay.  We'll deal with that later.  All right.

22  Fair enough.

23        So these different boxes underneath here reflect

24  what?

14:04:28   25        A.  So each box is a different tumor where some sort

1814

1 of statistically significant finding exists that says

2 there's an association between glyphosate and this tumor

3 and this study and these animals.

4          There are two ways in which we do that.  One is

14:04:49  5 trend test.  And what a trend test -- remember, I said

6 they do multiple doses, starting at the lowest dose going

7 to higher dose.

8          So what a trend test does, it says:  Okay, I've

9 got these data points.  Let's put a line through the data

14:05:08  10 points -- am I doing -- let's do it this way.  It's

11 easier.

12          You fit a line through a data point, and the

13 line has a slope.  You know, this has a slope of 0

14 (indicating).  It's flat.  And you can measure by drawing

14:05:18  15 that line the size of that slope.

16          And what the statistical test does is tells you

17 if that slope is bigger than 0.  It gives you a

18 probability that that is bigger than 0.  Roughly.

19          A dose test is where you take each dose group

14:05:35  20 and compare it to the control separately.  So you looked

21 to see if the lowest dose is -- response is bigger than

22 control, the next dose is bigger than control, et cetera.

23          And so you have, in this case, three tests for

24 dose and one test for trend in each sex species group for

14:05:55  25 each tumor.

1    Q.  Doctor, quick question:  What is the vehicle for

2  exposure for these animals?

3    A.  Food.

4    Q.  Okay.

14:06:08    5    A.  Meats in their food.

6    Q.  Okay.  And does that mean you're only looking at

7  it from a dietary perspective, or are there other types

8  of exposure as well?

9    A.  Well, when an animal eats, rats and mice, they

14:06:22   10  groom themselves as well.  So they don't just get

11  internal exposure in the stomach.  They will get exposure

12  on their skin.  Less, but, nonetheless, it's there.  And,

13  also, the feed itself, sometimes when they eat they

14  inhale the dry food.  So they might get some of it in

14:06:41   15  their lungs as well.

16    Q.  All right.  So let's go through some of these

17  studies.  Let's start with the first one in 1983,

18  Knezevich & Hogan.

19    A.  Okay.

20    Q.  This is one of the original registration studies

21  for glyphosate; is that correct?

22    A.  That is correct.

23    Q.  And, also, another important thing.  Do any of

24  these involve Roundup?

14:06:56   25    A.  No.  These are all pure glyphosate.

1    Q.  All right.  So what did we find in the Knezevich

2  & Hogan study?

3    A.  Well, the original evaluation of the data --

4  it's a complicated story, the Knezevich & Hogan.  The

14:07:13   5  original data came in.  See here, I have kidney

6  carcinomas and -- or adenomas.  A kidney adenoma is a

7  precursor to kidney carcinoma.  And so it's like you're

8  getting a lesser tumor, and then you get the really bad

9  tumor.  Okay?

14:07:32   10        And so when you look at the animals, you try to

11  decide whether this bump or tumor that I'm seeing is an

12  adenoma or a carcinoma, so you can look at the

13  progression.

14        So the original Knezevich & Hogan data was

14:07:45   15  adenomas found in the kidneys of the animals.  If I

16  remember correctly, there were 50 or 51 animals per

17  group.  It was males only they saw this in.  And what

18  they saw was none in control, none in the low dose, one

19  in the middle dose and three in the high dose.  All

14:08:04   20  kidney adenomas.

21    Q.  When that data first came in, what was the EPA's

22  assessment of it?

23    A.  The EPA's assessment of that data was that it

24  showed a positive association -- causal association

14:08:17   25  between glyphosate and kidney adenomas in this mouse.

1817

1    Q.  Are you familiar with the term "oncogenic"?

2    A.  Yes.

3    Q.  What does that mean?

4    A.  Causes cancer.

14:08:28    5    Q.  And what did the EPA conclude with regards to

6  this study as it relates to the kidney carcinomas or

7  adenomas?

8        A.  In terms of oncogenicity, a, sort of, general

9  cancer question.  Their original draft conclusion was

14:08:38   10  that this would fall into their Category C, which I

11  believe is possible carcinogen or something in that

12  category.

13        Q.  Okay.  Then what happened after that was the

14  initial assessment of those tumors?

14:08:51   15        A.  Well, through some discussion and debate that I

16  read in the documents here and documents that EPA has put

17  out, they allowed Monsanto to re-evaluate these kidneys.

18            Monsanto got a pathologist.  They went back, and

19  they -- usually when you do a kidney, you take three

14:09:15   20  slices through the kidney, and you look at the three

21  slices, and then microscope to see if you see tumors.

22  Kidneys are -- they're not big on a rat, but in me

23  they're pretty big.  But, you know, you take very thin

24  slices in three areas, and you look at them separately.

14:09:32   25            What they did here, and going back, is they took

1818

1  ten so that you get a much more detailed picture in each

2  of the animals.

3         And when they did that and re-evaluated, they

4  brought in some additional pathologists to look at the

14:09:45   5  data as well.  And then when they re-evaluated it, two of

6  the adenomas in the high exposure group became

7  carcinogens.  The one in the abnormality in the second

8  group stayed an adenoma.  But they found an extra adenoma

9  in the control group -- in one of the animals in the

14:10:03   10  control group.

11     Q.  And because of that addition of this adenoma

12  that no one had seen before in the control group, what

13  happened?

14     A.  There was a lot of scientific debate within the

14:10:17   15  EPA about that particular issue, because they couldn't

16  agree amongst themselves exactly.  There was a faction

17  that said, "Historical controls tell us this is a very

18  rare tumor.  We're seeing three.  That's enough.  It

19  should be statistically significant and biologically

14:10:34   20  significant."

21         There was another group that said, "No.

22  Statistical significance goes away.  We're not worried."

23         So it went to the EPA science advisory board,

24  science advisory panel.  And they reviewed it and gave a

14:10:46   25  recommendation.

1    Q.  What was the recommendation?

2    A.  They recommended that -- I believe they

3 recommended a new study with some modifications to how to

4 do it.  And they recommended that until then, EPA put it

14:11:02    5 in this inadequate category.  I think that's the category

6 they said.

7    Q.  The category just below C?

8    A.  A different category.

9    Q.  That category D, just below C?

14:11:13    10    A.  Category D.

11    Q.  Okay.  Now, this A, B, C categorization, it

12 doesn't exist anymore today; right?

13    A.  They have words that talk about it, but they

14 don't have A, B, C anymore, yes, correct.

14:11:24    15    Q.  I mean, I guess, did Monsanto ever do that

16 study?

17    A.  Not that I'm aware of.

18    Q.  Okay.  All right.  You've reviewed the data from

19 the study.  What did you conclude?

14:11:34    20    A.  So I concluded -- so I'm going to base my

21 claims -- as I think through this, I don't use these dose

22 tests at all in my thinking.  I'm strictly looking at

23 trends.  Because, to me, that's the more important test.

24 It's -- statistically, it's a better test.  It uses all

14:12:01    25 the data at once, rather than one dose at a group.  So

1    I'm going to use trend.

2         But here's what we saw when I looked at it.

3    There are no individual dose group effects that are

4    statistically significant.  The trend, when you look at

14:12:12    5    it, has a P value.

6         So do we need to talk about P values?

7    Q.  You probably do.  What's a P value?

8    A.  Okay.  This is where it gets really somewhat

9    complicated and backwards, if you're not a statistician.

14:12:27    10        Okay.  When you do these studies, you have a

11    hypothesis in mind.  And the hypothesis is -- you start

12    with the hypothesis:  Glyphosate does not cause cancer.

13    And you run the study.  And what you're trying to do is

14    decide if the results I got are so strange that I can no

14:12:49    15    longer stick with that hypothesis that it does not cause

16    cancer, and I have to go to the hypothesis that it does

17    cause cancer.

18        So that's the thinking as you look into this.

19    So what statisticians do is they build these tests where

14:13:04    20    you look at -- in the case of a trend test, you're

21    looking at how steep that trend is, and you're asking

22    yourself:  If truly there was no dose response here, what

23    is the probability I would see that trend that I'm

24    seeing?  Okay.

14:13:21    25        So if that probability is very small, then you

1  reject the hypothesis that it's flat, and you take the

2  hypothesis that it is increasing with dose.  That's how

3  you do it.

4          Now, typically in science, we look for

14:13:36  5  probabilities -- these are called P values -- that are

6  less than .05 or less than .01.  This is a tradition.

7  That's all it is.  One in 20 or 1 in 100.  It's -- or 1

8  in 10 -- .05 -- 1 in 10 -- 1 in 20, 1 in 100.  Because

9  that seems rare.  And that's what statisticians and

14:14:00  10  scientists usually use.

11          So that's what we look at here.  So when I talk

12  about the trend being statistically significant, I mean

13  the P value was less than .05.

14          If I talk about it being highly statistically

14:14:17  15  significant, then I'm going to mean the P value was less

16  than .01.

17          If I talk about it being marginally significant,

18  then I'm talking about a P value between .05 and .01.

19  It's bothersome, it's showing a direction, but it hasn't

14:14:35  20  reached that critical 05 value.  But I don't want to

21  forgot that when I look at all this data, that this one

22  sort of said something.  Because if I see it in another

23  study, I want to know it was kind of leading in that

24  direction with this study.  Okay?

14:14:47  25          So, here, what you saw were no pairwise

1 comparisons were significant.

2     Q.   Okay.   You can't say words like that and not

3 define them.   Pairwise comparison.

4     A.   The dose to control comparisons.   None of those

14:15:00   5 were significant.

6     Q.   Okay.

7     A.   So low dose was not significantly different.

8 Middle dose was not, high dose was not.   The trend test

9 was marginal.   Once you put that extra one animal in

14:15:12   10 there, I believe the trend was -- oh, I didn't write it

11 down.   I have to check my report.   But it was not .05.

12     Q.   But it was above -- between .05 and .1; is that

13 fair?

14     A.   I think so.   I have to check my notes to make

14:15:30   15 sure, because I didn't write it there.

16     Q.   Okay.   Why don't you put a star next to "trend."

17 We'll use the star as a marginal.

18     A.   Okay.   (Witness complies.)   But I also did the

19 trend test.   I did a calculation with where I looked at

14:15:48   20 historically what happened with this tumor, and I used

21 that historical rate in a calculation to get at the

22 probability that:   If that historical background rate is

23 the true rate, what is the probability I would have seen

24 this response?

14:16:08   25          And so I did that calculation as well for slope.

1 And that one is statistically significant.  I don't

2 remember where it was.  Just above .01.

3       Q.  Okay.  Great.  So let's circle that.

4           MR. GRIFFIS:  Your Honor, may I approach?

14:16:24    5           THE COURT:  Yes.

6           (Sidebar discussion.)

7           THE COURT:  All right.  You may continue.

8       Q.  BY MR. WISNER:  All right, Doctor.  Let's

9 continue.

14:21:16   10           Quickly -- let me ask more questions.

11       A.  Okay.

12       Q.  All right.  Let's go through this.  All right.

13 So you said there was a historical significantly --

14 result for the kidney carcinomas and adenomas; is that

14:21:32   15 right?

16       A.  Correct.

17       Q.  All right.  Why don't we circle the trend

18 indicating that.

19       A.  (Witness complies.)

14:21:36   20       Q.  And what species was that -- gender?

21       A.  Males.

22       Q.  Okay.  Great.

23           What else did you find in the study?

24       A.  Well, at a later point, a re-analysis of the

14:21:48   25 study of multiple tumor sites found what's called a

1  spleen composite lymphosarcoma.  And so a trend in that

2  tumor in these animals.

3      Q.  So why don't we circle "trend."  And why don't

4  you tell the jury what that tumor means, if you know?

14:22:08   5      A.  (Witness complies.)  The P value here was .015.

6  I wrote that down.  And this was in males.

7          Spleen composite lymphosarcoma, as I understand

8  it -- I am not a pathologist.  You should ask a

9  pathologist.  But as I understand it, back at the time

14:22:48   10  that Knezevich & Hogan were doing their studies, this is

11  a type of lymphoma.  It's a sub-classification of a

12  certain type of lymphoma that occurs in mice.  And here

13  it's only occurring in the spleen.

14          Now, from the data, it occurred in a lot of

14:22:52   15  different places.  And this was the only one that saw

16  significant trend that I saw.

17          But it -- nobody looked at all of them, which is

18  the typical way we do it now.

19      Q.  All right.  Let's move on to the next study, the

14:23:09   20  Atkinson study from 1993.  It says, "Limited."  Why is

21  that?

22      A.  Well, this is -- remember I said for animal

23  cancer studies they look at every tissue and every organ

24  microscopically and look for tumors.

14:23:23   25          In the Atkinson study, they did not do that.  In

1  the Atkinson study, there was a proposed new approach,

2  which was later dropped by everybody.  But at this time,

3  it was supposed to be a reasonable approach.

4          What you do is look at controls and the high

14:23:38  5  dose, and you look to see if you see any significant

6  changes.  And then you look at tumors in the animals

7  below, in the other dose groups.  It saves you time,

8  saves you money.

9          But here they did it slightly differently.  They

14:23:56  10  only looked at animals that died during the course of the

11  study and the pathology on those animals, looking at

12  slides.  And the ones that died in the end, they did not

13  do that on the middle groups.

14          So you didn't get to see what was in every

14:24:13  15  animal for every reported --

16      Q.  Notwithstanding those limitations, what did the

17  results show?

18      A.  For malignant lymphoma, they saw a marginal

19  trend.  There were no individual doses that were highly

14:24:26  20  significant.  And this was only in males.

21      Q.  All right.  So why don't we put a star, since

22  that's our current approach, and a circle at the end.

23      A.  (Witness complies.)

24      Q.  All right.  What else did they see?

14:24:41  25      A.  They saw an increase in hemangiosarcoma.  It's a

1  trend, that increase, and it's in males.  There were no

2  individual significant findings that I found.

3      Q.  Okay.  Great.  Let's circle it up.

4      A.  (Witness complies.)

14:25:05    5      Q.  Quick question, Doctor:  The CD-1 mice, are they

6  more prone to cancer than other strains of mice?

7      A.  No.  Not -- not -- strains of mice differ in

8  which tissues get cancers.  So you can either look at

9  overall -- but when I think about these things or when

14:25:26    10  most scientists and toxicologists look at these things,

11  you look at, for example, Sprague-Dawley rats have high

12  mammary tumor rates, but they have mediocre liver tumor

13  rates.  Fischer rats have high liver tumor rates, but

14  they almost never get mammary tumors spontaneously.  So

14:25:46    15  it's hard to say more or less.  Generally, it's a good

16  testing model.

17      Q.  And when these animals were given the food and

18  the glyphosate in it, how was it dissolved in it?  Do you

19  know?

14:25:58    20      A.  I'd have to go back.  Generally, there's

21  probably something that's dissolved, but I haven't

22  written it down or paid attention.

23      Q.  And is there any difference between the food

24  given to the control animals and the -- the dosing

14:26:11    25  amounts that's beyond the glyphosate?  Is there any other

1  difference?

2       A.  No, none at all.  But in this study

3  (indicating), the food given to the animals is different

4  than in this study (indicating).

5       Q.  Fair enough.

6       A.  Most of them use diets that are blended for

7  their laboratory.

8       Q.  But for an individual study, the food that's

9  given to the control animals is identical to the food

14:26:33  10  given to the dose animals, except that the food given to

11  the dose animals has glyphosate in it?

12       A.  That's correct.

13       Q.  Okay.  And, also, for all of the mice studies,

14  do you know if any of them actually reached the MTD?

14:26:50  15       A.  No.  None of these, in my opinion, exceeded the

16  maximum tolerated dose.  All of them, in my opinion, had

17  a high enough dose to be valid studies.

18       Q.  Okay.  All right.  And -- great.

19            So why don't we create a little key for this.

14:27:07  20  Why don't we put a star here that says, "Marginal."  You

21  can write bigger, too.  Circle, that means significant.

22  I think that's good for now.

23       A.  (Witness complies.)  I'd like to put at least

24  one more thing on it.

14:27:32  25       Q.  Sure.  Go for it.

1      A.  Because this significant one for here was

2 through historical controls.  So I want to put an "HC"

3 next to it, so we remember that.  This was the trend with

4 not the historical controls.  And that was the trend with

14:27:48   5 historical controls.

6      Q.  Perfect.  Put that in.

7      A.  I can't write on this very well.

8      Q.  Great.  Let's move through these studies.

9        We move on to the Sugimoto study from 1997.

14:28:08  10      A.  I'm just going to put one more thing on here.

11      Q.  All right.

12       MR. WISNER:  For the record, he wrote --

13       THE WITNESS:  We already said that.

14      Q.  BY MR. WISNER:  Yeah, I know.  I'm just going to

14:28:28  15 make the record.

16       MR. WISNER:  For the first two columns, he's

17 written, "24 weeks."

18       THE WITNESS:  Months.

19       MR. WISNER:  "Months."  Sorry.  And then for the

14:28:35  20 last three, he's written, "18 months."

21       THE WITNESS:  The last two.

22       MR. WISNER:  Last two.

23       THE WITNESS:  Because they're CD-1 mice.  The

24 last study is a different mouse, and I don't care.

14:28:44  25      Q.  BY MR. WISNER:  Okay.  All right.  Because you

1829

1 don't have more than one in that?

2     A.  Correct.

3     Q.  Great.  All right.  So let's move on to the

4 Sugimoto study.  We're still in the CD-1 mice.

14:28:53  5     A.  Correct.

6     Q.  And what -- what did you observe here?  It seems

7 like you saw quite a few tumors.

8     A.  Yeah.  There were five significant findings in

9 this particular study.  Kidney carcinomas or adenomas,

14:29:06  10 malignant lymphomas, hemangiosarcoma, hemangioma, which

11 is a completely different tumor, multiple malignant

12 tumors or neoplasms.  I'll explain that, if you'd like.

13 And harderian gland adenomas.

14     Q.  All right.  Why don't you just fill in the

14:29:23  15 information as you know it, and then we'll just summarize

16 it when you're done.

17     A.  Okay.  I doubt if you can see that that's a

18 star.

19     Q.  Okay.  Great.

14:30:25  20     So for kidney carcinomas, you have historically

21 significant, marginally and trend.  Also -- why don't you

22 just tell me what it is.

23     A.  Here, without looking at historical controls,

24 you saw a marginally significant finding --

25     Q.  Okay.

1          A.  -- with historical controls.  You see a

2  significant finding.  This is in males.

3          Q.  Great.

4              Malignant lymphoma?

14:30:48    5          A.  A significant trend in males.

6          Q.  Great.

7              Hemangiosarcoma?

8          A.  Marginal trend in males.

9          Q.  Great.

14:30:58    10          A.  Hemangioma.

11          Q.  I can't read it.  Hemangioma.

12          A.  Significant trend in females.  The high dose

13  group was significantly different from controls.  And

14  this is actually highly significant.

14:31:13    15          Q.  And that was in females?

16          A.  Females.

17          Q.  Okay.  And just to be clear, are any of these

18  rare tumors?

19          A.  The hemangiosarcomas in males are very rare

14:31:29    20  tumors.

21          Q.  And the kidney tumors as well?

22          A.  And the kidney tumors.

23          Q.  Okay.  And then you had multiple malignant

24  tumors and neoplasms?

14:31:37    25          A.  Yeah.  That's an incorrect title.  What this is

1  is looking at the animals, did an animal have at least

2  one malignant tumor, meaning a carcinoma, not an adenoma.

3  A malignant tumor.

4          So you look to see how many animals, as a

14:31:54  5  function of exposure, had malathion tumors.  Not any one

6  tumor, but just as a group.

7          So that's what this is looking at.  So I'm going

8  to call it malignant tumors or neoplasms.  And that had a

9  significant trend.  The -- I believe it's high dose.  The

14:32:11  10  high dose was significantly different than controls.  And

11  this is in males.

12       Q.  Okay.  And then the bottom one is -- I can't

13  read it, sir.

14       A.  Harderian gland adenoma.

15       Q.  Okay.

16       A.  Humans do not have harderian glands.  But these

17  mice do.

18          Here we saw significant trends in the mouse.

19  And it's in females.

14:32:34  20       Q.  Great.  Let's go on to the Wood study.  Why

21  don't you fill in the Wood study, and then tell us what

22  it says.

23          All right.  What does that show?

24       A.  The first tumor was malignant lymphomas.  There

14:33:01  25  was a high significant trend for malignant lymphomas.

1  The high dose group was significantly different than

2  controls.  And this was in males.

3       Q.  Great.  And for multiple malignant tumors, is

4  this a little different than the other one?

14:33:16  5       A.  Yes.  This one, they looked at something

6  different.  They looked at more than one malignant tumor

7  in each animal.  So you have to have two or more for it

8  to be counted here.  That's an unusual thing to do in a

9  study.  But that's what they did, so I'll report it.

14:33:34  10      There they saw a significant trend, and it was

11  in males.

12       Q.  And then the last one?

13       A.  Lung adenocarcinoma.  That's a lung tumor.  This

14  trend was significant.  And that was also in male mice.

14:33:48  15      Q.  Great.  Let's look at the last one.  Now, this

16  was not in CD-1 mice.  This was in the Swiss albino mice;

17  right?

18       A.  Yes.

19       Q.  And what -- what did that show?

14:33:57  20      A.  And I believe it was 18 months, but I'd have to

21  check.

22       Q.  Okay.

23       A.  But what this showed is the kidney carcinomas or

24  adenomas.  They saw a marginal trend, whatever.  And it

14:34:13  25  was in males.  And malignant lymphomas, a marginal trend,

1  and it's in males.

2       Q.  All right.  The last one was what?

3       A.  Hemangioma.  It had a highly significant trend,

4  and it's in females.

14:34:35    5       Q.  All right, Doctor.  So looking at all of these

6  different tumors and all of these different mice studies,

7  I see a couple of things.  I want to know what the

8  significance of that is.

9            In every tumor done after the Monsanto ones, all

14:34:48   10  the non-Monsanto studies, it appears that in every one of

11  those there is either a significant or marginally

12  significant observation of mall lymphoma; is that right?

13            MR. GRIFFIS:  Objection.  Leading, your Honor.

14            THE COURT:  Sustained.

14:35:05   15            Please rephrase.

16       Q.  BY MR. WISNER:  Is there malignant lymphoma in

17  every single study not conducted by Monsanto?

18       A.  If -- if you want to consider the spleen

19  composite lymphosarcoma as the same.  And I'm not

14:35:20   20  certain.  They're certainly a subset of each other in

21  some way, shape or form.  Yes, there's at least some

22  indication of malignant lymphoma in all of these studies.

23       Q.  And does that have any significance with the

24  fact that we're talking here today about non-Hodgkin's

14:35:37   25  lymphoma?

A.  Well, there are two important findings there. One is when you look at the animal studies, you look for consistency across the studies to see if they were all giving you the same result.  And if they are, then that

14:35:52

strengthens the findings that it causes that tumor in the mice.

And so we have fairly solid strength here that this malignant lymphoma is being caused in these mice by glyphosate.

14:36:05

The second thing is that it's a little different.  And it's, again, a little outside my area of expertise, but I've read and looked at it, and they're in my expert reports that have been available.  It seems that if you are developing a drug and you want a drug for

14:36:26

some type of lymphoma, B-cell, T-cell lymphomas, which NHLs are, then the best model for doing that is a mouse model.  So that says that this tumor in the mouse is closely related somewhat to humans' NHL.

Now, I want to make that this really clear.

14:36:49

Here we're using animals to see if we can cause the tumor.  In this case, we're using animals that actually have a fairly low chance of seeing malignant lymphomas.

If I want to do an evaluation of the safety of a drug -- or the efficacy, I want to see if I can stop the

14:37:09

living lymphomas, then I need a mouse strain that gets a

1835

1   lot of malignant lymphomas, so I can show it goes away.

2        This is not this strain.  So these are the

3   equivalent strains of mice.  I just got the observation

4   that the tumors appear to be somewhat similar.

14:37:25   5        Q.  And what is the significance, if any, the fact

6   that we see repeated tumors popping up in different

7   studies in different species?

8        MR. GRIFFIS:  Your Honor, I would need to

9   (inaudible) a sidebar, as to the courtroom rules.

14:37:41   10        THE COURT:  All right.  So just be mindful about

11   what we discussed, Mr. Wisner.

12        MR. WISNER:  One more question, and we're going

13   to another chart, so --

14        THE WITNESS:  I'm sorry, what was the question

14:37:50   15   again?

16        Q.  BY MR. WISNER:  Sure.  I'll just repeat it.

17   What, if any, significance is there to the fact that

18   there are multiple tumors that are appearing in multiple

19   different studies over the course of 20 years?  What does

14:38:01   20   that tell you?

21        A.  So when you -- the guidelines exist for

22   evaluating this type of evidence.  Give you some guidance

23   on what to think about these things.  Generally, in the

24   form of:  If you see this, your finding is strengthened.

14:38:19   25   Not -- it generally doesn't say:  If you don't see this,

1836

1   your finding is weakened.  It's generally if you see,

2   it's strengthened.

3        So the things that strengthen your finding is if

4   you have multiple tumors of the same type in multiple

14:38:36   5   studies of the same species -- so here we've got these

6   (indicating), et cetera, you can look at them in here.

7        The other thing that adds to the strength of

8   causality in the animals is if you see multiple findings

9   in the same study of cancer.  That means -- because when

14:38:54   10   you're looking to humans, you're not necessarily going to

11   get the same animal in the rodent that you're going to

12   get in the human.  But by seeing lots of different tumor

13   types hit in the animal, it's more important to the human

14   causal.  So you use that information as well.

14:39:12   15        Q.  Thank you, Doctor.  Let's talk about the rat

16   studies.  I understand we have a cart for that as well.

17            MR. WISNER:  Permission to publish, your Honor.

18            THE COURT:  Any objection?

19            MR. GRIFFIS:  No objection.

14:39:26   20            THE COURT:  And this has been marked as number?

21            MR. WISNER:  I'm just going to get the number.

22            It is Exhibit 1021.

23        Q.  BY MR. WISNER:  All right.  Doctor, what are we

24   looking at here?

14:39:51   25        A.  It's basically the same thing.  These are the

14:40:15

1  different studies in rats done over the years.  These are

2  the tumors that were found in those studies, and these

3  are Wistar rats.  And these are Sprague-Dawley rats.  So

4  they're different strains of rats.  And you can see the

5  difference here with the color at the top, the slight

6  brown -- gray in there versus this.

7      Q.  Now, the same question with the mice studies,

8  with these rat studies:  Are these types of rats any more

9  predisposed to cancers than other rats?

14:40:30

10      A.  No.  These are common species -- common strains

11  that are used for this type of testing exercise.

12      Q.  And, again, same question for the rat studies:

13  In any of these studies, did the maximum tolerated dose,

14  was it reached?

14:40:44

15      A.  No.  One of the studies showed a slight

16  indication that there might have been some problems with

17  the high dose, but it was so small that I wouldn't call

18  it exceeding the MTD.  This study did not reach the MTD.

19      Q.  Which one is the one that -- slight change?

14:41:05

20      A.  I'd have to look at my notes, I'm sorry.  I

21  can't recall.

22      Q.  It's okay.  All right.  Let's go through these

23  studies quickly.

24      A.  Okay.

14:41:12

25      Q.  Let's start off with the Lankas study from 1981.

1  This is a Monsanto study; is that correct?

2       A.  I think so.

3       Q.  Okay.

4       A.  Yes, I think it is.

14:41:24   5       Q.  It's fine.

6       A.  I really didn't pay attention to who did the

7  study.  I just looked at the science and the study.

8       Q.  Fair enough.

9            So what did you find for these tumors?

14:41:34   10      A.  So this was 26 months.

11      Q.  Okay.

12      A.  All the rest are 24.  So there's a slight

13  difference there.  The highest dose here is substantially

14  smaller than here.  That's important to note.

14:41:48   15           We found testicular interstitial cell tumors.

16  They have a highly significant trend.  There was a

17  significant effect at, I believe, the highest dose and in

18  males.

19           We found thyroid C-cell carcinomas or adenomas.

14:42:05   20  There was a significant trend.  I don't know what I wrote

21  there, but it was in females.

22           And then there was pancreatic islet cell tumors.

23  There was no significant trend in the data.  You saw at

24  the low dose a significant difference with -- from

14:42:26   25  controls.  And this was in males.

1    Q.  Great.

2        What do we have in the Stout & Ruecker study?

3    A.  This study we found, again, thyroid C-cell

4    adenomas and carcinomas.  It was a marginal trend.  There

14:42:49   5   were no individual dose effects.  And this was seen in

6    both males and females.

7    Q.  Okay.  Great.

8    A.  Pancreatic islet cell tumors.  That's the

9    pancreas is, sort of, an endochrome --

14:43:07   10   hormone-controlling organ.  There was no trend.  There

11   were -- two of the dose groups saw significant difference

12   from controls.  And this was seen in the males.

13   Q.  Why don't you put a "2" next to that, so it's

14   distinguishable.

14:43:24   15   A.  (Witness complies.)

16   Q.  Great.

17   A.  Hepatocellular carcinomas or adenomas.  That's

18   liver tumors.  They are -- there was a significant trend

19   in adenomas and a significant trend in adenomas and

14:43:36   20   carcinomas combined.  So there are two findings here.

21   And it's in both carcinomas with adenomas or adenomas

22   alone.  There were no individual dose effects.  And this

23   was in males.

24   Q.  Okay.

14:43:53   25   A.  Continue?

1      Q.  Yes.  Go.  Let's do them.

2      A.  Adrenal cortical carcinomas, there was a trend

3  that was significant seen in females.

4          And for skin keratoacanthoma, which is a skin

14:44:10   5  tumor, there was a marginal increase in the trend.  And

6  that was seen in males.  And those single doses were

7  significant.

8      Q.  Okay.  Great.  So between the Lankas study and

9  the Stout & Ruecker study, we see a repeat of two

14:44:25   10  different tumor sets; is that right?

11      A.  That's correct.  You see a trend in females in

12  thyroid C-cell carcinomas or adenomas in both studies.

13  And in the Stout & Ruecker, you also see that in males.

14  And you see pancreatic islet cell tumors, but these are

14:44:46   15  at individual exposure groups.

16      Q.  All right.  Now we're talking about the Atkinson

17  study.  It says, "Limited," here.  Is it limited for the

18  same reason the -- study was?

19      A.  Right.  It's the same laboratory that did both

14:45:00   20  studies, rats and mice.  And they used the same approach.

21  So that same issue of not looking at every tissue

22  microscopically is in this study.

23      Q.  What did you find in that study, notwithstanding

24  that limitation?

14:45:12   25      A.  A margin trend in thyroid follicular cell,

1841

1  carcinomas or adenomas.  So thyroids have follicles.

2  These are little -- little tubules in the thyroid that

3  release hormones, and they got cancer in those little

4  tubules.  And that occurred in the males.

14:45:36  5      Now, in this study, thyroid follicular cell

6  tumors, as I understand the pathology, but I'm not a

7  pathologist, are generally -- can generally be observed

8  grossly.  Meaning you can actually see it or feel it in

9  the tissue when they look at it.

14:45:56  10      So here, even though they didn't look at the

11  middle dose groups, I did an analysis that included the

12  middle dose groups with all the animals, treating those

13  that they hadn't looked at on the microscope as still

14  having -- not having the tumor.  Not at all having the

14:46:15  15  tumor.  And there, I did see a significant trend.  That

16  was just for my understanding of how strong this finding

17  was.

18      Then you see the skin keratoacanthoma again.

19  This was a significant trend, and it was seen in males.

14:46:32  20      Q.  Now, Doctor, you keep mentioning you're not a

21  pathologist.  You didn't actually look at the individual

22  slides for these; is that --

23      A.  No, of course not.

24      Q.  So you're relying on the pathology reports from

14:46:42  25  the studies themselves?

1842

1    A.  Part of a pathology report.  I don't actually

2  have the pathologists' written notes, which you typically

3  you would see.  All I have is their final tables.

4    Q.  Okay.  So someone else had determined these

14:46:57   5  tumors, but they're not -- not necessarily you?

6    A.  Yes, yes.  Definitely.  Correct.

7    Q.  Okay.  Great.  I just wanted to make sure that

8  was clear.

9         Let's talk about Enemoto.

14:47:06   10    A.  Back to kidney tumors again.  This showed a

11  significant trend.  But it was only in adenomas, not in

12  carcinomas.  And it was in males.  And this was a highly

13  significant trend.

14    Q.  Now, is there any significance to the fact that

14:47:25   15  we see kidney carcinomas or adenomas, which we discussed

16  were rare, in different species altogether, across rats

17  and mice?

18    A.  Well, to be clear, they're not rare here.  It's

19  only rare in the CD-1 mouse.  And the Sprague-Dawley

14:47:39   20  rats, they're not as rare.  So I wouldn't call this one a

21  rare tumor.

22    Q.  Okay.

23    A.  But, again, in looking at all of the evidence

24  and trying to reach a decision about casualty in the

14:47:51   25  rats -- in the rats and mice, one of the criteria that

1  helps you with that is if you see the tumor in multiple

2  species.

3       Q.  Okay.  All right.  Sorry.  I didn't mean to cut

4  you off.  What else did you see?

14:48:06

5       A.  Again, we saw skin keratoacanthomas.  But this

6  was a marginal effect.  There were no individual doses

7  that were significant, and it was males again.

8            And, finally, basal cell tumors, which I'm not

9  going to try to explain to you what basal cells are.

14:48:27

10  Here we saw a significant trend.  And this was also in

11  males.

12       Q.  Okay.  Great.

13            So now we get to the Suresh study.  And my

14  question to you is:  Was there something about the Suresh

14:48:40

15  study that's different than the other studies insofar as

16  how it was done?

17       A.  So Suresh also did that pathology where they

18  only did high and low, and then some of the middle dose

19  groups.  So that was a limitation.

14:48:58

20            As you can see, there were no significant

21  findings in the Suresh study at all.  This is a Wistar

22  rat.  And so I can go look at other historical Wistar

23  rats, the controls, and see what the rates look like.

24  And this study tends to have very unusual rate -- rate of

14:49:21

25  tumors in the control animals.

1    For example, they saw -- I think it's a

2  45 percent -- I'd have to look at it -- 45 percent liver

3  tumor control response.

4    These two other studies, which are also the same

14:49:42  5  rat, saw much smaller, 3 to 5 percent, control response.

6  So that gives you some indication that it's -- it's

7  somewhat different from these two.  But it's only an

8  indication.  It is still a Wistar rat.

9    Q.  What happens when you have so much cancer in the

14:49:59  10  control animal?  How does that affect the findings,

11  results?

12    A.  Well, for the liver cancers, it would make it

13  very difficult to see an effect.  Because, remember,

14  you're trying to see it climb above the controls.  And so

14:50:18  15  if the control's low, you've got between 0 and 1 for it

16  to climb, 100 percent response to 0 response.

17    But if you're already at 50 percent, you've got

18  a lot less room.  And so when you fit that slope, it's

19  harder to see that increase.

14:50:32  20    Q.  Okay.  All right.

21    And then we have the Brammer study from 2001.

22  It looks like there was only one tumor finding.

23    A.  That's correct.  They saw a statistically

24  significant increase in hepatocellular adenomas, not

14:50:49  25  carcinomas.  And that was in males.

1    Q.  And then, finally, the Woodward study.  Is that

2  also the same laboratory that did the Woodward study in

3  mice?

4    A.  Yes, it is.

14:51:04    5    Q.  Okay.  And what did that study show?

6    A.  Significant trend in skin keratoacanthomas.

7  Again, in male rats.  An increase in mammary gland

8  carcinomas or adenomas.  There was a significant trend in

9  the combined -- so I have to break these down for you.

14:51:25    10       There was a significant trend in carcinomas.

11  I'll circle that.  A marginal trend in adenomas.  I'll

12  put a little star near that.  And a significant trend in

13  both of them combined.  And I'll circle "trend" for that.

14  And that significant trend was highly statistically

14:51:48    15  significant.  And that was in females.

16       Finally, pituitary adenomas were significant in

17  both males and females.  And both trends were

18  statistically significant.

19       MR. WISNER:  Thank you, Doctor.  You can take a

14:52:06    20  seat.

21       THE WITNESS:  Thank you.

22    Q.  BY MR. WISNER:  Can you see the boards, Doctor?

23    A.  Yes.

24    Q.  Well, Doctor, taking a step back and looking at

14:52:39    25  all of these different mice and the rat studies, and

1  specifically, I'd like to note the volume of tumors in

2  all of the studies.  What, if any, relevance is there to

3  the fact that none of these reached the maximum tolerated

4  dose?

14:52:57   5          MR. GRIFFIS:  Objection to leading.

6          THE COURT:  Overruled.

7          You may answer this question.

8          THE WITNESS:  It means they're all balanced

9  studies.  That is why I've included them in my

14:53:07  10  evaluation.  There's a lot of things you'd look at to

11  determine if it's valid or not.  And reaching the MTD

12  is -- or exceeding the MTD is one thing that would make a

13  study probably pushed off to the side.  Or at least that

14  dose group pushed out of the evaluation.  None of these

14:53:25  15  have that problem.

16     Q.  BY MR. WISNER:  Is that one of the reasons why

17  we don't have every one of these studies that you looked

18  at up on the board?

19     A.  That's one of the reasons.  There were a couple

14:53:35  20  of studies with very low/high doses that saw nothing.

21  But that's expected.  There were other reasons.

22     Q.  And then the lack of MTD, that includes the

23  Suresh study; is that right?

24     A.  The Suresh study did fine in terms of maximum

14:53:51  25  tolerated dose.

1      Q.  It didn't reach it, though?

2      A.  It did reach it.

3      Q.  Oh, it did?  Okay.

4      A.  Oh, yes.

14:53:55      5      Q.  All right.  I want to talk briefly with these up

6  here, because I want to talk about the standard by which

7  you review this.

8          Let's take a look at -- in your binder, Doctor,

9  Exhibit 640.  It should be in the first binder.

14:54:29      10          Did you find it?

11      A.  Yes, I did.

12      Q.  Okay.  What is this document, sir?

13      A.  This is EPA's guidelines for carcinogenic risk

14  assessment.  This is what EPA uses as their guidance for

14:54:40      15  evaluating animal studies, human studies, mechanistic

16  studies.

17      Q.  Did you have a role in any way of helping to

18  create these guidelines?

19      A.  As I mentioned earlier, many of the scientist in

14:54:54      20  the federal government who do this type of work were

21  asked to provide comments early on in the process.

22      Q.  And did you provide comments on this, Doctor?

23      A.  Yes.

24      Q.  And, specifically, did you provide comments as

14:55:06      25  related to the assessment of carcinogenicity from

1  long-term animal studies?

2      A.  Yes.

3      Q.  Did you rely upon this at all in understanding

4  and informing your approach to looking at animal cancer

14:55:21  5  data?

6      A.  Yes.

7      Q.  And we're discussing some of the issues raised

8  in these guidelines to help you and help the jury

9  understand your testimony today?

14:55:30  10      A.  Yes.

11          MR. WISNER:  At this time, your Honor, I would

12  move Exhibit 640 into evidence.

13          MR. GRIFFIS:  No objection.

14          THE COURT:  All right.  640 may be admitted.

15          (Exhibit 640 admitted into evidence.)

16          THE COURT:  And, Mr. Wisner, I would like to

17  take the afternoon recess at 3:00.  So just keep that in

18  mind.

19          MR. WISNER:  Perfect.  We'll be done with

14:55:47  20  this -- just when we're done with this will be right

21  around 3:00, so --

22          THE COURT:  Okay.  Good.

23      Q.  BY MR. WISNER:  All right.  Doctor, let's take a

24  look at this.  This is a digital copy.

14:55:54  25          MR. WISNER:  I hope all of you can see it.

1849

1     Q.  We have the front page here.  It says,

2  "Guidelines For Carcinogen Risk Assessment."

3          Do you see it?

4     A.  Yes, I see it.

14:56:03   5     Q.  All right.  So let's turn to page 21 -- or 221.

6  221.

7          Are you there?

8          All right.  Do you see it on the screen?

9     A.  Yes.

14:56:24  10     Q.  All right.  So at the bottom here, we have

11  "Assessment of evidence of carcinogenicity from long-term

12  animal studies."

13          Do you see that?

14     A.  Yes, I do.

14:56:31  15     Q.  All right.  And it says, "In general,

16  observation of tumors under different circumstances lends

17  support to the significance of the findings for animal

18  carcinogenicity.  Significance is generally increased by

19  the observation of more of the factors listed below.  For

14:56:47  20  a factor such as malignancy, the severity of the observed

21  pathology can also affect the significance.  The

22  following observations adds significance to the tumor

23  findings."

24          And then I want to go to those factors.  And

14:57:00  25  that's listed right here.

1           Do you see that, Doctor?

2      A.  Yes, I do.

3      Q.  All right.  Great.

4           So we can just do a "yes" or "no" here, unless

14:57:08   5  you think it needs more explanation.

6           The first one, "Uncommon tumor types."  Do we

7  see that in the mice and rat studies?

8      A.  "We have two uncommon tumor types," yes.  Kidney

9  tumors in mice and hemangiosarcomas in mice at 18 months.

14:57:22  10      Q.  "Tumors at multiple sites."  Did you see that?

11      A.  Yes.

12      Q.  And that's demonstrated by all of these

13  different tumors we have on this board?

14      A.  Correct.

14:57:31  15      Q.  "Tumors by more than one route of

16  administration."  We'll put a flag on that and come to

17  that later.  Okay?

18      A.  We don't have it in this particular set.

19      Q.  Yeah.

14:57:41  20           "Tumors in multiple species, strains or both

21  sexes."

22           Do we have that here?

23      A.  Yes.

24      Q.  "Progression of legions from preneoplastic to

14:57:50  25  benign to malignant."

1          First of all, what does that mean, and do we

2  have it?

3      A.  So when tumors are formed in most tissues, they

4  start off as an irritation.  That's soon followed by a

14:58:04   5  little nodule that's considered benign and doesn't, sort

6  of, migrate around.  And after a while, that becomes a

7  carcinoma.  And a malignant tumor can then metastasize

8  and kill you.  Mostly that's the case.

9          So that progression, you can see that in the

14:58:20  10  pathology if you look carefully.  And, yes, we do have

11  that here.

12      Q.  Thank you.

13          "Reduced latency of neoplastic lesions."

14          Do we have that?

14:58:30  15      A.  Only if you consider looking at the 18-month

16  studies compared to the 24-month studies.  Then you can

17  see some things in the 18-month studies more clearly than

18  you see in the 24-month studies.  Because it came

19  earlier, and there's a lower control.

14:58:44  20      Q.  Okay.  "Metastasis"?

21      A.  That's not in these tables.  But, yes, there

22  were metastasis.  That's where the tumor migrates from

23  its primary site.  So you still have a tumor there, but

24  cells break off, they go elsewhere and cause a tumor to

14:59:01  25  occur somewhere else.  The pathologist can actually

```
 1  identify that.
 2       Q.  Okay.  And do we have an unusual magnitude of
 3  tumor response in these students?
 4       A.  No.  That, we do not.
 5       Q.  Okay.  The proportion of malignant tumors, is
 6  that here?
 7       A.  I haven't looked at it or thought about it, so I
 8  don't have an answer for it.
 9       Q.  Okay.  And do we have dose-related increases?
10       A.  Yes.  Absolutely.
11       Q.  And that's illustrated by all the circled
12  "trends" on the board?
13       A.  Correct.
14           MR. WISNER:  Okay.  Great.  That means it would
15  be a good time to take a break, your Honor.
16           THE COURT:  All right, Ladies and Gentlemen.
17  Then we'll take the afternoon recess right now.  We'll be
18  in recess for 15 minutes.  Please do not discuss the
19  case.  Thank you.
20           (Jury leaves courtroom.)
21  ███████████   ████████████   █████████████████████
22  ███████████████████   ████████████████████████
23  ██████
24      ███████████████   █████████████   ██████████████
25  ████████████████████   ███████████████████████████
```

14:59:10
14:59:21
14:59:32
15:01:12
15:01:20







15:03:55

15:04:10

16          THE COURT:  Welcome back, Ladies and Gentlemen.

17 Dr. Portier remains under oath, and Mr. Wisner, you may

18 continue.

19          MR. WISNER:  Thank you, your Honor.

15:17:42     20     Q.  Doctor, I just want to fill in, make sure we

21 complete this chart.  The Lankas study was 26 months; is

22 that right?

23     A.  Correct.

24     Q.  And the remaining studies were how long?

15:17:52     25     A.  24 months.

1      Q.  So that one was a little bit longer than the

2  other ones?

3      A.  Correct.

4      Q.  So I'm going to do 24 to reflect that.

5      A.  Okay.

6      Q.  I also noticed in the rat studies there is this

7  pink box that appears quite a few times.  It says skin

8  keratoacanthoma.  What is that?

9      A.  Skin keratoacanthoma.  Again, I'm not a

15:18:21  10  pathologist, but my understanding of the tumor is that

11  it's predominantly a benign skin tumor.  It can become

12  malignant and in some strains, it's more dangerous than

13  in others, but it's basically a skin tumor.

14      Q.  So it's a tumor in the skin?

15:18:40  15      A.  In the skin.

16      Q.  Okay, great.  Now I noticed we talked about five

17  mouse studies and seven rat studies, but you mentioned

18  that there was 13 studies that you thought were of

19  interest; is that right?

15:18:55  20      A.  That's correct.

21      Q.  What is the last study that we're missing?

22      A.  It's what's called an initiation promotion study

23  in Swiss albino mice.

24      Q.  And when was that -- what's that study called

15:19:07  25  and when it was conducted?

1      A.  It was conducted in -- well, it was published

2  this 2010.  The lead author was George.

3      Q.  All right.  I want to get into what a promotion

4  study is, but before I do that I think it would be

15:19:29    5  helpful to sort of talk about the mechanisms of cancer;

6  is that okay, Doctor?

7      A.  Certainly.

8      Q.  I understand you prepared a demonstrative to

9  help explain this phenomenon; is that right?

15:19:41   10      A.  That's correct.

11          MR. WISNER:  Permission to publish the

12  demonstrative, your Honor.

13          THE COURT:  What is the exhibit number?

14          MR. WISNER:  It is Exhibit 1024.

15:19:55   15          THE COURT:  Any objection?

16          MR. GRIFFIS:  No, your Honor.

17          THE COURT:  All right.  Very well.  You may

18  proceed, Mr. Wisner.

19          MR. WISNER:  All right.  We're going to do this

15:20:02   20  digitally.

21      Q.  What are we looking at here, Doctor?

22      A.  You're missing a line.  But what you're looking

23  at here is a theoretical picture of how skin -- how cells

24  go from being normal to being cancer cells.

15:20:22   25          And then you have some information -- oh, we

1 don't have other information.

2     Q.  It's on the next slide.  We'll get there in a

3 second.

4     A.  Okay, good.  Basically you start with normal

15:20:34  5 cells in the body, and in some way, shape or form the DNA

6 in the cell gets damaged.  So you end up with at least

7 one cell in that collection of cells that has genetic

8 damage on it.

9          Now, the cellular machinery can repair damage.

15:20:50 10 It has great capacity for protecting us from these types

11 of things.  And that can occur in one of two ways.

12 Sometimes the cell spontaneously repairs it when it

13 occurs, but most of the repair occurs when the cell

14 divides to make new cells and they break into two cells

15:21:10 15 from one cell.  During that process, there's quite a bit

16 of repair machinery that comes in.

17          So if that DNA damage is repaired, you end up

18 with normal cells again.  So that's what that bottom

19 arrow is for.  DNA repair takes you back.

15:21:26 20          If that damaged cell is not repaired and the

21 cell undergoes replication, then it duplicates DNA to

22 make the new cell, and when it does that, that damage is

23 fixed in the cell.  So from that point onward, it's no

24 longer repairable.  It's now called a mutation.

15:21:50 25          Now, there are lots of mutated cells in our

1  body, but certain specific mutated cells don't have

2  growth control.  They start losing the control of keeping

3  the tissue down in size and they replicate too often.

4        And as they replicate, you can get more

15:22:10  5  mutations and more mutations, and so you go from an early

6  group of cells that are mutated to a benign tumor to a

7  precursor tumor, benign tumor, and finally to a malignant

8  tumor, and that's additional stages in this process.  You

9  can get additional mutations that lead you on to cancer.

15:22:28  10       Q.  So if a chemical compound affects any one of

11  these boxes in these stages, can that help promote or

12  reduce cancer?

13       A.  Yes.

14       Q.  So let's look at the next chart, which is I

15:22:42  15  think what you're trying to show us.  Show us what this

16  demonstrative -- explain to us what this demonstrative

17  tells us.

18       A.  Well, this is the same picture, a progression,

19  but what I've now done is put some of the mechanisms of

15:22:54  20  course in the genesis, some of the ways in which

21  chemicals can alter this normal process that increases

22  the chance of getting cancers.

23       Q.  And what is the difference -- using this

24  diagram, what is the difference between an initiator and

15:23:10  25  a promoter of a cancer?

1    A.  So a chemical that goes in and directly damages

2    DNA, or even indirectly damages DNA, would be an

3    initiator.  It would be the thing that starts the process

4    from normal cells.  All the cells are normal, and it goes

15:23:30    5    and it causes that initial damage.

6    Q.  And then a promoter, what would that be?

7    A.  Pretty much everything else.  The tumor comes

8    in, the early progression of the tumor begins, and this

9    chemical comes in and says we're going to take these

15:23:48    10    cells and give them an advantage to grow and provide a

11    variety of different mechanisms.  And so you get the

12    tumor faster.  That is promotion.  It's promoting a

13    cancer that is already started on its way.

14    Q.  Now, Doctor, have you ever -- has there been

15:24:05    15    any -- a carcinogenicity study designed specifically to

16    look at whether or not glyphosate is an initiator or a

17    promoter?

18    A.  Yes, there's a classic protocol used for that.

19    Q.  And what does that protocol usually entail?

15:24:19    20    A.  I'll just talk about this one.  It's general

21    like any other.  You take instead of 50 animals per

22    group, you choose 20 animals per group.  And usually

23    these are hairless animals or you shave the hair off the

24    animal because you're going to paint the glyphosate on

15:24:39    25    the skin.  So it's a skin painting study.  You're trying

1861

1  to induce skin tumors in these animals.

2        An initiation promotion protocol, you take a

3  known chemical that's an initiator.  In this case,

4  they're using -- what is the initiator?  I think it's

15:24:57   5  DNBA.

6        Q.  Do you have the exhibit in front of you?

7        A.  Yes.  No, I have my notes.

8        Anyway, they take a chemical that's known to

9  attack that first said cell to cause that DNA damage, and

15:25:10   10  they put that on the skin of the animal in one shot

11  usually.  And then for the following weeks, they put

12  glyphosate on at a -- at a particular rate, and that

13  tells you if glyphosate is promoting the cancer effect.

14        Then what they do also in the same type of study

15:25:29   15  is they'll put glyphosate on first, and then they'll take

16  a chemical that's known to promote cancer from previous

17  studies, and they'll put that on top and see if you get

18  more cancers from that.  That test where the glyphosate

19  is an initiator.

15:25:45   20        And then you have appropriate controls which

21  have just DNBA or just TPA or et cetera.

22        Q.  And those different chemicals, those are

23  referring to things that are known promoters or known

24  initiators?

15:25:59   25        A.  Correct.  The classic design of this is with

1862

1  TPA, which is a chemical, and DNBA, which is another

2  chemical, and then the one you wish to study.

3       Q.  And the study that looked at this from

4  glyphosate, is that the George study from 2010?

15:26:11  5       A.  It is, yes.

6       Q.  And what did that study show?

7       A.  If you put glyphosate on first and follow by a

8  promoter, there's no change.  If you put glyphosate on by

9  itself, there's no change.  If you put the initiator down

15:26:24  10 and then follow up with glyphosate, there was a

11 significant increase in the number of skin papillomas on

12 these animals.  A skin papilloma is a benign tumor.

13      And there was an increase in the -- both the

14 number of animals -- number of tumors per animal and the

15:26:45  15 number of animals with papillomas.  So both of those were

16 increased.

17      Q.  What does that, the results of that study,

18 indicate to you?

19      A.  That -- that glyphosate has the potential to be

15:26:57  20 a promoter of carcinogenesis.

21      Q.  Now, Doctor, isn't it true that IARC in its

22 analysis didn't use that study to evaluate the

23 carcinogenicity of glyphosate?

24      A.  They -- they reviewed it.  I don't believe they

15:27:16  25 used it.

1    Q.  And why is that?

2    A.  One, they typically don't use initiation

3 promotion studies, especially if they have good two-year

4 cancer studies because a two-year cancer study is more

15:27:30    5 definitive.  You've -- you've not got anything else in

6 there, and sometimes initiation promotion studies don't

7 exactly tell you what will happen in chronic exposure to

8 just the chemical.

9         But also they had concerns with the study.

15:27:43   10    Q.  What were those concerns?

11    A.  First, they felt that they didn't use an

12 adequate untreated control.  I disagree with that.  I

13 think their controls were adequate in the study.

14         The other thing they argued was that the -- they

15:28:02   15 didn't do pathology on the papillomas that appeared on

16 the backs of the animals.  You could have either these

17 papillomas or it could be a carcinoma, which would be a

18 more important finding.

19         I disagree with them there.  The classic skin

15:28:19   20 painting studies, not all of them do pathology.  Because

21 if you see a bump, it had to have started as a papilloma,

22 not as a carcinoma.

23         So if they're interpreting the study as only

24 papillomas, then they're perfectly correct.  If they want

15:28:35   25 to interpret the study as papillomas and carcinomas, then

1864

1  they needed to do the histopathology to get a pathologist

2  involved.

3      Q.  Now, were there any papillomas in the control

4  group?

15:28:49  5      A.  None.  None at all.

6      Q.  How many of the animals in the glyphosate

7  exposed groups has papillomas?

8      A.  About 40 percent.  So with 20 animals, that

9  would -- and in the high dose group.  With 20 -- I think

15:28:57  10  that's the only dose group.  Let me be correct.  They

11  didn't do multiple dose groups.  They did one.  With 20

12  animals, that's, what, 8 of the 20.

13      Q.  And that -- although IARC didn't consider it as

14  part of its carcinogenicity weighting, did they conclude

15:29:19  15  that it was a study showing a promotional factor?

16      A.  Oh, yes, they did.

17      Q.  Why is it okay for you to consider it even

18  though IARC didn't?

19      A.  I'm interpreting it, I think appropriately.  I'm

15:29:35  20  not interpreting it as a carcinogenic finding; I'm

21  interpreting it as a papilloma finding, which is a benign

22  region, not really a carcinoma.  And all I'm using it for

23  is to give me an indication of some of the mechanistic

24  underpinnings of this particular chemical.

15:29:58  25      Q.  All right, Doctor.  I'd like to move off of --

1  we're going to come back to the mechanism issues in a

2  minute, but let's move on to the second sort of broad

3  area of science that's looked at by IARC and yourself.

4  Let's look at epidemiology, okay, Doctor?

15:30:14   5        A.  Okay.

6        Q.  All right.  I understand you have prepared a

7  plot summary of the epidemiological studies that form the

8  sort of core of your analysis; is that right?

9        A.  Correct.

15:30:25  10        MR. WISNER:  Permission to publish this, your

11  Honor.  It's a demonstrative.  It is 1022.

12        THE COURT:  Any objection?

13        MR. GRIFFIS:  No objection, your Honor.

14        THE COURT:  Very well.  You may proceed.

15:30:57  15        Q.  BY MR. WISNER:  All right, Doctor.  We're

16  looking here at Plaintiff's Exhibit 1022.  What is it?

17        A.  Okay.  This is -- this deals with the

18  epidemiology studies.  This is what's known as a forest

19  plot.  So in a forest plot you're plotting the findings

15:31:15  20  from the epidemiology studies on a common scale next to

21  each other so you can compare them.

22        Epidemiology studies, in their analysis, what

23  they look for is this thing called risk ratio.  There's

24  lots of different names for it, but the general concept

15:31:35  25  is you're looking at the ratio of the tumor appearing in

1  the exposed people over -- relative to the tumors

2  appearing in the unexposed people.

3          What does that mean?  That means if that ratio

4  is bigger than one, that means the exposed people had

15:31:56    5  more tumors or more exposure than the unexposed people or

6  the control population.  If it's below one, it means that

7  they actually had less.

8          So when you look at these pictures, they -- I

9  believe it's the green line where just above the "T" in

15:32:17   10  not provided.  Is that a green line?

11      Q.  Right here.  This is a blue line.

12      A.  Blue line.  That blue line is one.  So in the

13  forest plot, if that -- see, I guess I have to define

14  what the things are in the forest plot.

15:32:35   15      Q.  Let's take it one at a time.

16      A.  Okay.

17      Q.  So let's talk about the concept you just

18  expressed.  So let's say we have -- so in epidemiology,

19  we're comparing exposed people and potentially unexposed

15:32:45   20  people; is that correct?

21      A.  Well, it depends on the study.  Let's be clear.

22      Q.  Fair enough.  Let's make it simple.  For here

23  we're talking about never ever; right?

24      A.  Correct.

15:32:55   25      Q.  So this is referring to people who were exposed

1867

1    to Roundup and people who were not exposed to Roundup; is

2    that right?

3         A.  Correct.  Correct.

4         Q.  And here we're talking about the formulated

15:33:04    5    product.  We're not just talking about glyphosate; right?

6         A.  Correct.

7         Q.  Okay.  And so when we look at the number of

8    people in these two different groups, we count up how

9    many of them have non-Hodgkin's lymphoma; is that right?

15:33:15    10        A.  Not really.

11        Q.  Okay.

12        A.  Depends on the epidemiology study.

13        Q.  Fair enough.  But let's keep it at a high level

14   for now.  We can get specific with each study.  But

15:33:27    15   generally, you look at how many people got non-Hodgkin's

16   lymphoma in the exposed group and how many people got

17   non-Hodgkin's lymphoma in the unexposed group.

18        A.  No.

19        Q.  Okay.

15:33:40    20        A.  It's really -- it sounds technical, but it's

21   really not that.

22        Q.  What is it?

23        A.  Well, it depends on the study.

24        Q.  Okay.

15:33:46    25        A.  In a cohort study, what you've said is exactly

1 correct.  But in a case control study, you're looking to

2 see if the known cases have more exposure than the known

3 controls, the controls being those people who do not have

4 non-Hodgkin's lymphoma and the cases being those who do

15:34:03  5 have non-Hodgkin's lymphoma.

6        Q.  Okay.  Fair enough.

7             So even in the case control studies, right, we

8 pull up cases of exposed people, cases of unexposed

9 people, and then we still compare the number of the cases

15:34:16  10 in each group.

11            Is that fair?

12        A.  No, we're comparing the number of -- the exposed

13 versus unexposed cases to exposed versus unexposed

14 controls.

15:34:26  15        Q.  Okay, great.  I think that, yeah, I got it.  All

16 right.

17            In any event, if we do simple math, for example,

18 let's say we have two groups of a hundred.  This is very

19 simple because I want to make sure we understand this.

15:34:40  20 And there is five NHL in the unexposed group, and there's

21 five in the -- ten in the exposed group; right?  You'd

22 have twice as many NHL in the exposed than in the

23 unexposed; right?

24        A.  Correct.

15:34:57  25        Q.  And so that would lead to a risk ratio, is what

1  you were referring to, of 2.0?

2       A.  No.

3       Q.  Okay.  I'm trying to be a statistician.

4       A.  Because you're looking at two ratios when you

15:35:12  5  look at case control studies.

6       Q.  Sure.

7       A.  And in the cases you're looking at the ratios of

8  exposed to unexposed, and you're dividing that from the

9  controls, the ratio of exposed to unexposed effectively.

10      Q.  Okay.

11      A.  And so you have to bring the controls in there.

12      Q.  Okay.

13      A.  So it's a little more complicated.

14      Q.  Sure.  Fair enough.  And maybe that's an easier

15:35:34  15  way of saying it.  When you have a risk ratio of 2.0,

16  that means there's twice as much in the exposed?

17      A.  Correct.

18      Q.  Okay.  All right.  When we say the risk ratio is

19  2.0, that's the points that are on this chart; is that

15:35:47  20  right?

21      A.  The little black squares, yes.

22      Q.  Okay, great.  So, for example, for this one, we

23  have a point -- if you go down about three.

24          Do you see that?

15:35:56  25      A.  Yes.

1    Q.  And then over here, it's closer to the blue

2  line, it's like 1.3 or 1.2.  Actually, we know what it

3  is.  It's 1.2.

4    A.  It's written there on the chart, yes.

15:36:08    5    Q.  Okay, great.  Okay, good.  So now we know what

6  those points are.  Now let's talk about the bars that are

7  going through the points.  What is that?

8    A.  That is the 95 percent confidence interval

9  around that point.

15:36:21   10    Q.  Okay.  We have a demonstrative to talk about

11  confidence intervals.  So let's pull that up.

12    MR. WISNER:  Your Honor, permission to publish

13  Plaintiff's Exhibit 1023.

14    MR. GRIFFIS:  No objection.

15:36:47   15    THE COURT:  No objection?

16    MR. GRIFFIS:  No objection.

17    THE COURT:  All right.  1023.

18    You may proceed.

19    Q.  BY MR. WISNER:  All right.  So what we have here

15:36:53   20  on the screen is a fake confidence interval; is that

21  correct?

22    A.  Correct.

23    Q.  And we have a point, just like we do over there,

24  and that's right there; is that correct?

15:37:04   25    A.  That's correct.

1      Q.  And that's supposed to reflect 1.5?

2      A.  Correct.

3      Q.  All right.  And then we have a confidence bound

4 stretching between a little bit before one up until

15:37:13  5 another number, and we actually have the rate up here,

6 it's .9 through 5.

7           Do you see that?

8      A.  Correct.

9      Q.  All right.  So what does this tell us, in the

15:37:20  10 simplest terms as you possibly can explain.  And the next

11 slide shows the bell curve if you want to let me know

12 when you need it.

13      A.  Okay.  So remember when I was talking about in

14 the animal studies you had a null hypothesis or a

15:37:34  15 hypothesis you worked on that said there was no effect

16 and then you had to worry about the alternative.

17           So what you're doing here is you calculate this

18 risk ratio, this odds ratio, whatever.  They use

19 different names for different types of studies.  You

15:37:48  20 calculate that ratio, and then you say suppose truth was

21 there was no effect.  So you're back to that hypothesis

22 of nothing's there.

23           Then I want to know, given these data, what's

24 the 95 percent range.  So when I look at that, what's the

15:38:12  25 areas where two -- only two and a half percent chance

1872

1  that it's bigger than this number and there's only two

2  and a half chance that it's less than this number.

3        So you're looking at -- remember that 5-percent

4  rule we used in the animal studies?  You're doing the

15:38:30  5  same thing here, but it's on both ends.  Below one or

6  above one, you're looking at that 5 percent.

7        Q.  All right.  So let's look at the next part of

8  this diagram.  And can you explain to the jury how this

9  bell curve sort of fits into this confidence interval?

15:38:46  10       A.  Okay.  So the bell curve is what's called a

11  probability distribution.  You might think of it more

12  like a frequency thing.  So if -- if I roll a dice, it

13  can have values one to six, and I could roll it lots and

14  lots and lots of times.  And if it's a good dice, I roll

15:39:07  15  it a hundred times, I'm like -- well, let's make it 120.

16  It's easy.  I'm likely to see 21s, 22s, 23s, 24s, 25s,

17  26s.  And so that distribution looks like from one to six

18  flat across the top.

19        Here, because we're looking at something that

15:39:26  20  has a lot more values than one through six, then it's

21  more of a curve.  And so the middle of that curve, where

22  you see that big peak, that is where the highest chance

23  of getting the -- of the number that we think applies to

24  this data set.  And as you go along the edges, you have

15:39:47  25  less and less chance that that number applies.

1          So when you get down to the bottom of the

2   95th percentile, which is this .9 at the bottom half,

3   what it's saying is that if you add up all the

4   probability that's in this curve that is less than .9,

15:40:06   5   it's 2.5 percent.

6          So you only have a 2.5 percent chance that this

7   risk ratio is less than nine -- .9.

8      Q.  Doctor, let me stop you.  I think you might

9   actually have misspoke.

15:40:22   10     A.  Okay.

11     Q.  I'm using my statistics degree.  That

12   2.5 percent is the actual end of the confidence interval?

13     A.  Correct.

14     Q.  So what we're talking about below .9 is actually

15:40:32   15   not the red part, but the little part between the red and

16   the one?

17     A.  Say that again.

18     Q.  So when we talk about the confidence interval,

19   the 95-percent probability of the actual true risk is

15:40:46   20   somewhere under this curve; right?

21     A.  You're absolutely right.

22     Q.  So the probability within a 95-percent

23   confidence interval that it's below one here is actually

24   the red is already off.  So that's beyond 95 percent.

15:40:59   25   It's just this little area between the red and the one,

1874

1  the probability?

2      A.  No.  No.

3      Q.  Okay.

4      A.  Again, under the consumption that the true risk

15:41:11  5  ratio is one, what is the value that from this data set,

6  from this data set, what is the value that is smaller

7  than -- what data point has a probability of 2.5 percent

8  or less from this data of being that value.

9      Q.  Okay.  So when you have a confidence interval

15:41:42  10  like this and you have this distribution, and the vast

11  majority of the distribution is to the right of one, what

12  does that tell you as a statistician?

13      A.  Well, you could actually calculate it, but what

14  it tells me is that the area below one is probably three

15:41:58  15  and a half percent in this example, not two and a half

16  percent.  So that tells me I'm not really that far from

17  having that whole line above one.

18          If that -- if that bottom part of that line is

19  above one, in epidemiology that's usually what they call

15:42:18  20  statistically significant finding.  So that's what you

21  want to see here, but this tells me I'm almost there, but

22  I'm not quite.

23      Q.  Okay.  Is it also fair for me to say based on

24  this distribution that the likelihood that the actual

15:42:32  25  estimate is going to be above one is I guess over

1 95 percent?

2      A.  Yeah, it's over 95 percent in this case.  It's

3 probably 96 and a half, give or take.

4      Q.  Now that would change, obviously, if this

15:42:48      5 confidence interval would move closer to one.

6      A.  Correct.

7      Q.  And so more of this curve would then get -- be

8 passing the one line and be more and more probability

9 that it's below one or one?

15:42:58      10      A.  Correct.

11      Q.  Okay.  All right.  So turning to our plot

12 summary -- I'm just going to leave that up on the screen

13 now in case people need to think about it some more.

14 Turning to our plot summary now.  These lines are the

15:43:16      15 confidence intervals for these various point estimates;

16 is that right?

17      A.  Correct.

18      Q.  And the wider a confidence interval, that's a

19 reflection generally of the -- what does that reflect?

15:43:28      20      A.  In the case of the case control studies, that

21 reflects more than anything probably the number of

22 exposed cases to the number of exposed controls,

23 basically.

24          If it's a very few number of exposed people,

15:43:43      25 then you end up with these huge confidence bounds.  If

1  it's a lot of exposed people, you end up with a smaller

2  confidence bound.

3          In the case of a cohort study, it's a little

4  more complicated, but it's similar.

15:43:57  5      Q.  And would it be fair to say, then, that when you

6  have a larger number, it helps reduce the size of the

7  confidence interval?

8      A.  Correct.

9      Q.  Would it also be fair to say that -- okay,

15:44:10  10  great.  Let's kind of go through some of these studies

11  here that are on this chart.

12      A.  Okay.

13      Q.  So the first one we have here is McDuffie 2001.

14  Do you see that?

15:44:18  15      A.  Correct, yes.

16      Q.  And it says no pesticide adjustment.  Do you

17  happen to see that?

18      A.  Yes.

19      Q.  Now, again, this is a never-ever analysis; is

15:44:27  20  that right?

21      A.  That's correct.

22      Q.  What does that tell us?  Just reading the

23  McDuffie numbers, tell us how to read this chart.

24      A.  Remember we talked about confounders early and

15:44:38  25  what constituted a confounder.  Well, some pesticides

1  beyond glyphosate have been associated with NHL.  So that

2  makes those pesticides a potential confounder.

3        And so I looked at these studies and asked

4  myself which ones adjusted for pesticides, so took into

15:44:58  5  account the potential that there's these confounders, and

6  which ones did not.  So I put more weight on things that

7  did adjust for pesticides than those that didn't, but I

8  still used all the information.

9        In this case, looking at the little bar, what

15:45:14  10  you see is a slight increase above one with a confidence

11  bound that really has grabbed quite a bit of one.

12      Q.  So this is not a statistically significant

13  result?

14      A.  It's clearly not a statistically significant

15:45:29  15  result.

16      Q.  But you would say this is elevated but not

17  statistically significant; correct?

18      A.  That is correct.

19      Q.  And it's only slightly elevated because it's

15:45:38  20  only 1.2?

21      A.  And it has large confidence bounds relative to

22  1.2.

23      Q.  Okay, great.  Now in the McDuffie study, do you

24  recall what that study was about?

15:45:47  25      A.  A case control study in Canada looking at cases

1  versus controls, cases or people with NHL, controls of

2  people without NHL, and looking into their exposure.  I'd

3  have to go back and look and see more detail on this

4  study if you really want more detail.

15:46:07  5      Q.  That's good enough.  This is a case control

6  study.  Is it -- what kind of size of a population is it

7  pulling from?

8      A.  It depends on the study.  I mean, it depends on

9  where they work.  I didn't do the calculations except for

15:46:20  10  one of the studies, I did a calculation.  But you can

11  actually do that.

12      They define when they write the paper how they

13  got their cases and controls, and based on that

14  definition -- for example, if I say all of my cases are

15:46:38  15  men aged 18 to 55 in the state of North Carolina who have

16  NHL occurring between this year and that year.  Okay?  If

17  that's my definition, then I can go in North Carolina and

18  look and see how many men in that category existed

19  between those two years, and that's the size of the

15:46:59  20  population this study is drawing from.

21      But -- so that's where you've got your support.

22  But that doesn't enter into the evaluations.  That just

23  gives you some idea of the magnitude of the support.

24      Q.  Now when we talked about a never-ever analysis,

15:47:15  25  is there any particular problems that you can run into

1   with such an analysis?

2        A.  Oh, there are plenty.  First of all, if -- if --

3   exposure matters.  If the bigger exposure gives you

4   higher risk, then if you could break it down into those

15:47:32   5   different exposure groups, you might be able to see that.

6             So that's -- that's an advantage of the other

7   measures.  The disadvantage of the other measures, which

8   becomes an advantage of the ever-never, is people usually

9   get it ever never.  They -- people do remember whether

15:47:53   10  they were exposed to this or not exposed to this.  But

11  sometimes getting a quantitative measure for that is a

12  little more difficult, and that can be a problem in some

13  of the studies.

14            What else do you want to know about it?

15:48:06   15       Q.  No, that's exactly what I wanted to get at.

16            Now, did Dr. McDuffie in 2001 do a sort of an

17  intensity or duration analysis?

18       A.  I have to look at my notes for a second.  Yes,

19  he did.

15:48:20   20       Q.  Okay.  If you turn to Exhibit 818.  It's in the

21  second binder.  Is that a fair and accurate copy of the

22  study?

23       A.  Yeah, that is the McDuffie study.

24            MR. WISNER:  Permission to publish, your Honor.

15:48:47   25  I believe we've agreed we've published these literature

1  but not enter them into evidence.

2          THE COURT:  Any objection?

3          MR. GRIFFIS:  No, we haven't.

4          THE COURT:  All right.  So you may publish

15:48:59  5  Plaintiff's 818.

6      Q.  BY MR. WISNER:  All right.  So this is the

7  McDuffie paper, and we can see up here in the title

8  non-Hodgkin's lymphoma and specific pesticide exposure in

9  men across Canada, study of pesticides and health.

15:49:12  10         Do you see that?

11     A.  Yes.

12     Q.  And we have here it's done by Dr. Helen

13 McDuffie.  Do you see that?

14     A.  Correct.

15:49:19  15     Q.  Now, in the table, this is where you got -- oh,

16 sorry.

17         If we look at table 2, this is where you have

18 the 1.2 number; is that right?

19     A.  I'm looking for it.  Give me a minute.  Yes, I

15:49:42  20 see it.

21     Q.  Do you see Roundup, glyphosate, and then you

22 have this 1.26 and this 1.2.  Do you see that?

23     A.  Yes, I see it.

24     Q.  And you used the most adjusted one which got you

15:49:56  25 that number on the chart, which is 1.2; right?

1        A.   That is correct.

2        Q.   So if you also look at the next table, and this

3   is table 3, and it talks about -- oh, this is

4   insecticides.  Let's go to pesticides.

15:50:21    5        A.   Table 4.

6        Q.   Table 4.  Oh, thank you.  All right, table 4 is

7   fungicides, frequency of exposure to fungicides

8   classified in the major chemical classes as individual

9   compounds.

15:50:33   10             Oh, wait, Doctor, this is fungicides.

11        A.   Yeah, but they did a separate analysis with

12   glyphosate is a different table, I think.

13        Q.   Yeah, let's find the table.  Here we go.

14   Herbicides.  All right.  Table 8.

15:50:50   15             Frequency of exposure to selected herbicides.

16   Do you see that, Doctor?

17        A.   Yes.

18        Q.   Okay, great.  And if we look in here, do you see

19   this reference to glyphosate?

15:50:56   20        A.   Yes, I do.

21        Q.   Okay, great.  All right.  So walk us through

22   what these different numbers reflect.

23        A.   So the first is the group of unexposed people.

24   I can't see the top of the table.

25        Q.   Sorry.

1        A.   That's okay.   You can keep it there.   I'll go

2   look at...

3        Q.   You can see it now.

4        A.   The N is the number of cases that were

15:51:22    5   unexposed.   The second line, the next point is percentage

6   of -- total percentage of cases that were exposed --

7   unexposed.   Next line is the controls, the number of

8   exposed, the percentage.   And then the final line is the

9   ratio we were talking about.   Here it's one because it's

15:51:40   10   comparing itself to itself.   It's classically always

11   listed as one.

12        The next line is compared against that unexposed

13   line, and these are for people who typically use

14   glyphosate more than zero times a year but less than or

15:51:57   15   equal to two times per year.   So one or two times a year

16   they will use glyphosate.   That's the answer to the

17   survey question with those groups.

18        And you can see the numbers, 28, 5.4 percent,

19   97, 6.4 percent.   The ratio there is about one.   There's

15:52:12   20   just no change based upon that exposure pattern.

21        The next group is greater than twice per year,

22   and when that's compared to the unexposed, you get a

23   ratio of 2.12 with a confidence bound from 1.2 to 3.73.

24        Q.   So what we have here, then, is a more than

15:52:35   25   doubling of the risk for people who have been exposed for

1 more than two days a year, and that result is

2 statistically significant?

3     A.  Correct.

4     MR. GRIFFIS:  Objection.  Leading.

15:52:43   5     THE COURT:  Sustained.

6     MR. WISNER:  Your Honor, this is an expert.

7     THE COURT:  I sustained the objection.  You may

8 rephrase.

9     Q.  BY MR. WISNER:  Okay.  What do we see here,

10 Doctor?

11     A.  You see that after -- or people who have

12 non-Hodgkin's lymphoma and are exposed for more than two

13 days per year, they are two -- more than two times as

14 likely as the unexposed -- as the controls to be exposed

15:53:11   15 to glyphosate.

16     Q.  Now you've heard of something called a dose

17 response relationship.  Have you heard that before?

18     A.  Correct.

19     Q.  And in the epidemiological context, the fact

15:53:24   20 that the more that people are being dosed here to

21 glyphosate, is this similar to a sort of dose response?

22     A.  Yes.  In epidemiology, they call it exposure

23 response.

24     Q.  And although the never-ever results don't show a

15:53:39   25 statistically significant risk, the more than two days a

1  year does?

2      A.  Correct.

3      Q.  Okay.  Let's move on to the next study, the

4  Hardell study from 2002.  What do the results here show?

15:53:54    5      A.  I want to look at that.  I'm not sure if that

6  was the one that was NHL or a subset of NHL.  I don't

7  know if that's important to you, but I can look at it if

8  you'd like.  Or to combine.  That's Hardell and Eriksson?

9      Q.  This is Hardell 2002.  So this is not the

15:54:14   10  Hardell from 1999.

11      A.  Okay.  So this is Hardell and Eriksson.  This is

12  a combination of two studies.  It's what's called a

13  pooled experiment.  Hardell was in both of them so he had

14  access to data from both of them.  So he took them and

15:54:32   15  combined them and did an analysis with the combined data.

16  This is Sweden.  It's a study in Sweden.

17          The first line is with no pesticide adjustments.

18  You can see it's a significant increase in the risk.

19          The second is adjusted for pesticides, other

15:54:54   20  pesticide use.  I could be more specific if you want me

21  to look at that.  And there you see it's clearly not

22  statistically significant but elevated.

23      Q.  And when you look at these two confidence

24  intervals together, what, if anything, does that suggest

15:55:13   25  to you?

1885

1    A.  So my interpretation of these types of numbers

2 is that you're looking at the confounding for pesticides

3 to ask the question how much of the effect that I see,

4 without worrying about the other pesticides, remains

15:55:33    5 after I do the confounding.

6         And here what you see is that there's still a

7 fairly strong signal; it's just not statistically

8 significant.

9    Q.  Okay.  Let's move on to the next study.  De Roos

15:55:52   10 2003.  Tell the jury about that study to the best of your

11 memory.

12    A.  So this was a study that was done in the United

13 States.  It's again a pooled analysis from three separate

14 studies done in three different states in the United

15:56:03   15 States, or maybe even four.  I'd have to look.  Anyway,

16 it's a collection from different states.

17         When they did their analyses, they always

18 presented analyses with adjusting for pesticides.  They

19 never showed an analysis without an adjustment for

15:56:21   20 pesticides.  Whereas Hardell and others adjusted for only

21 a few pesticides, in this study I think they adjusted for

22 almost 60 other pesticides.  So it's a massive

23 adjustment.

24         And here you see that the first method of

15:56:38   25 analysis, which is called logistic regression, which is

1  what everybody else used effectively, is statistically

2  significant.  It's an elevated risk.

3       The second method of analysis of the same data

4  but a different method of analysis, using what's called

15:56:57  5  Bayesian statistics, shows a positive finding but not

6  statistically significant.

7       Q.  Doctor, please turn to Exhibit 710.  Is that a

8  copy of De Roos 2003 article?

9       A.  Yes, it is.

15:57:26  10      MR. WISNER:  Your Honor, permission to publish.

11      THE COURT:  Any objection?

12      MR. GRIFFIS:  No objection.

13      THE COURT:  710 may be published.

14      Q.  BY MR. WISNER:  All right.  Doctor, turning to

15:57:36  15  page 7 of 9, and this is the -- I'm pointing to the

16  paragraph here discussing glyphosate.

17      Do you see it's on the right column.  Do you see

18  that, Doctor?

19      A.  Yes.

15:57:47  20      Q.  It says:  "Glyphosate, commercially sold as

21  Roundup, is a commonly used herbicide in the United

22  States both on crops and on non-crop land areas.  An

23  association of glyphosate with NHL was observed in

24  another case control study, but the estimate was based on

15:58:04  25  only four exposed cases.  A recent study across a large

1   region of Canada found an increased risk of NHL

2   associated with glyphosate use that increased by the

3   number of days used per year."

4          That's what we were just talking about with the

15:58:18   5   McDuffie study; correct?

6          A.   That is correct.   Referenced the McDuffie study.

7          Q.   "These few subjective findings provide some

8   impetus for further investigation into the potential

9   health effects of glyphosate even though one review

15:58:35   10   concluded that the active ingredient is non-carcinogenic

11   and non-genotoxic."

12          Do you see that, Doctor?

13          A.   I see that's what it says, yes.

14          Q.   All right.   So in this point in the science, we

15:58:47   15   have a couple of positive and suggestive findings linking

16   NHL to glyphosate or Roundup exposure.

17          Is that fair?

18          A.   Yes, that's fair.

19          Q.   And Dr. De Roos is saying these provide further

15:58:59   20   impetus for investigation even though one review

21   concluded it was non-carcinogenic and non-genotoxic.

22          Do you see that?

23          A.   Correct, yes.

24          Q.   And that's -- what's the citation?   Is that

15:59:16   25   citation 50?

1        A.  Correct.

2        Q.  All right.  I'll pop it up on the screen.

3            If we look here, the citation for number 50 is a

4   study called Williams Kroes Munro.

15:59:28    5            Do you see that?

6        A.  Yes, I do.

7        Q.  Published 2000.  Is this a study that you

8   reviewed?

9        A.  I've read the study.  I've reviewed it, yes.

15:59:38   10        Q.  And would you recognize a copy of it if you saw

11  it today?

12        A.  Yes, I would.

13        Q.  Permission to publish -- please turn to

14  Exhibit 884 and let me know if that's a fair and accurate

15:59:51   15  copy of that exhibit of that study.

16        A.  Yes, it is.

17            MR. WISNER:  Okay.  Permission to publish, your

18  Honor.

19            THE COURT:  Any objection?

16:00:05   20            MR. GRIFFIS:  No objection to the Williams

21  review article.

22            THE COURT:  All right.  Very well.  You may

23  proceed.

24        Q.  BY MR. WISNER:  We're looking at the Williams

16:00:13   25  review article.  You see up here the title "Safety

1   Evaluation and Risk Assessment of the Herbicide Roundup

2   and Its Active Ingredient, Glyphosate, For Humans."

3          Do you see that, Doctor?

4      A.  Yes, I do.

16:00:23    5      Q.  And you see it has three authors:  Gary

6   Williams, Robert Kroes, and Ian Munro?

7      A.  Yes.

8      Q.  All right.  Now if we look at the end of this

9   document, there's actually an acknowledgement section.

16:00:37   10          Do you see it on the last page right here?

11      A.  Yes, I see it.

12      Q.  All right.  It says:  "The authors acknowledge

13   the assistance of individuals who participated in the

14   preparation of this document.  First, we are grateful to

16:00:47   15   those who gathered and made available the large amount of

16   information used to write the manuscript for this

17   document."

18          "Second, we thank toxicologists and other

19   scientists at Monsanto who made significant contributions

16:01:00   20   to the development of exposure assessments and through

21   many other discussions.  The authors were given complete

22   access to toxicological information contained in the

23   great number of laboratory studies and archival material

24   at Monsanto in St. Louis, Missouri, and elsewhere.  Key

16:01:17   25   personnel at Monsanto who performed scientific support

1  were William Heydens, Dr. Farmer, Marian Bleeke, Stephan

2  Bratton, and Katherine Carr.

3      Do you see that?

4      A.  Yes, I do.

16:01:33  5      Q.  Now, I assume you read this acknowledgement when

6  of course you reviewed this study.

7      Is that fair?

8      A.  I can't be certain.  I don't always read the

9  acknowledgement.

16:01:41  10      Q.  If -- does anywhere in this document it suggest

11  or indicate that a Monsanto employee actually wrote the

12  article?

13      A.  No.

14      Q.  Are you familiar with something called

16:01:57  15  ghostwriting?

16      A.  I've heard the term.

17      Q.  What is your understanding of it?

18      A.  Somebody writes the article and somebody else

19  puts their name on it.

16:02:05  20      Q.  If in fact this article had been ghostwritten,

21  does this acknowledgement tell you that?

22      A.  No.

23      Q.  All right.  Let's move on to the next study.

24      Well, I want to stop for a second.

16:02:17  25      You mentioned that De Roos adjusted for, what,

1  69 pesticides; is that right?

2       A.  Something in that range.

3       Q.  Is that a common thing to do in an

4  epidemiological analysis?

16:02:31   5       A.  That's a bit extreme.

6       Q.  And notwithstanding that fact, the results

7  showed the logistical regression -- a doubling of the

8  risk; is that right?

9       A.  That's correct.

16:02:41   10       Q.  And that risk, notwithstanding adjustment for 69

11  pesticides, was significantly significant; is that right?

12       A.  That's correct.

13       Q.  Does this study tell you anything about the risk

14  of confounding in these studies?

16:02:55   15       A.  It tells me a little bit.  Confounding from

16  pesticides, I assume, is what you're asking, because

17  there's other potential confounders they looked at in

18  here.

19            It would be better if I saw the unadjusted

16:03:08   20  analysis, because then I can make the comparison.  But

21  here, since they've adjusted by almost 70 pesticides, I'd

22  say that there's probably not a big effect of the

23  pesticides on confounding in this particular study, but

24  I've have to see an unadjusted evaluation first.

16:03:29   25       Q.  And, in fact, in the De Roos article, they did

1  not see any significant confounding by other pesticides,

2  did they?

3       A.  They didn't discuss it.

4       Q.  Okay.  It says here the Bayesian modeling.

16:03:41  5       Do you see that?

6       A.  Correct.

7       Q.  And Bayesian statistics, it's a type of

8  statistics that makes assumptions a priori before you

9  conduct the experiment; is that right?

16:03:53  10       A.  Correct.

11       Q.  And based on those assumptions, it influences

12  how you assess data that you see?

13       A.  To some degree, yes.

14       Q.  And in this study, they made an assumption about

16:04:05  15  the carcinogenic potential of glyphosate before

16  conducting this Bayesian model; is that right?

17       A.  That is correct.

18       Q.  And they made an assumption about the likelihood

19  of carcinogenicity based in part upon whether or not

16:04:16  20  there was an IARC finding; correct?

21       A.  That is correct.

22       Q.  And at this point in 2003, IARC had not, in

23  fact, made an assessment of glyphosate, had it?

24       A.  That is correct.

16:04:27  25       Q.  And because of that, it resulted in a Bayesian

1  assumption of, like, 30 percent probability of

2  carcinogenicity; is that right?

3      A.  They did that for all pesticides without an IARC

4  review unless they had other reasons to put it lower or

16:04:43    5  higher, but yes.

6      Q.  Okay.  So if we were to redo the Bayesian

7  approach today, that starting number would be

8  significantly higher than .3?

9      A.  It would be .6 by their rules.

16:04:54    10     Q.  And if you increase the starting assumption,

11  that would ultimately increase the ultimate risk?

12     A.  It's likely, but it's not guaranteed.

13     Q.  Okay.  Less turn to Eriksson study 2008.  Are

14  you familiar with this study, sir?

16:05:07    15     A.  Yes, I am.

16     Q.  All right.  And what is this study -- where was

17  this study conducted?

18     A.  I think it's in Scandinavia somewhere, but I

19  have to look.  I don't know which tab it is, but -- I

16:05:28    20  can't tell you without looking at the actual document.

21     Q.  Okay.  Would you like to look, sir?

22     A.  Yes, please.

23     Q.  All right.  It should be Exhibit 758.

24         Did I skip one?  I did.  Okay.  We'll come back

16:05:49    25  to that.

1       A.  Again, it's Sweden.  It's a case-controlled

2  study in Sweden of -- in this case, they're still looking

3  at "yes" or "no" exposure to glyphosate.

4       Q.  And when they looked at glyphosate and didn't do

16:06:02  5  any adjustments but just looked at the raw impact on the

6  data, what did it show?

7       A.  Significant increase in the relative risk ratio

8  of 2.02 with the confidence bound that did not include 1,

9  so it's significant.

16:06:18  10       Q.  And then they conducted something called a

11  multi-varied analysis; is that right?

12       A.  Correct.

13       Q.  And that took into account other pesticides?

14       A.  If I remember correctly, I think they did two

16:06:30  15  different types of analyses, but, yes, they adjusted for

16  other pesticides.

17       Q.  And what happens to the risk ratio when they did

18  that?

19       A.  It dropped.  It drops to 1.5, and it's no longer

16:06:43  20  statistically significant.  Although again, it still

21  shows an increase above 1.

22       Q.  I'm going to read a statement to you.  I want

23  you to tell me if this is true.  "And when Eriksson did

24  that adjustment, do you know what the result was?  No

16:06:57  25  effect.  No effect of glyphosate."  Is that a true

1 statement?

2      A.  No, of course not.  It's a nonstatistically

3 significant positive increase.

4      Q.  And when you read these two numbers together,

16:07:12    5 does it show you or indicate anything to you?

6      A.  It, again, indicates that other pesticides were

7 somehow confounded with the glyphosate result, and it

8 shows it -- they take away some of the significance of

9 that glyphosate finding.

16:07:32   10      Q.  And, Doctor, did Eriksson in this study try to

11 do something different than a never/ever analysis, try to

12 do a, sort of, exposure analysis?

13      A.  Again, I'm going to look at my notes here, but I

14 think yes.

16:07:50   15           Yes, he did.

16      Q.  And when they did a never, how did they break it

17 down?  I know that McDuffie was greater than two days a

18 year.  What did they do in Eriksson?

19      A.  They tried two different breakdowns.  One was

16:08:03   20 less than ten days' exposure, I believe, per year, and

21 the other one was greater than or equal to ten days of

22 exposure per year.

23      Q.  Great.  We'll talk about that one.  I don't

24 really care about the other one.

25      A.  Okay.

1    Q.  Let's talk about the greater than ten days of

2  exposure per year.  When they looked at people who had

3  more than ten days of exposure to Roundup per year, what

4  did the data show?

16:08:26    5    A.  It was a significant increase.  The -- the risk

6  ratio -- the relative number is 2.36, and it's

7  statistically significant in terms of having its

8  confidence bounds above 1.

9    Q.  And the lower one, the less than ten days a

16:08:44   10  year, what was the results for that?

11    A.  1.69 risk ratio, and it -- the confidence bound

12  did go below 1, but it is still increased, just

13  nonstatistically significant.

14    Q.  So when we, kind of, compile the two exposure

16:09:01   15  assessments, we have McDuffie, when they adjusted for

16  greater than two days per year, it's statistically

17  significant, doubling of the risk; is that right?

18    A.  Correct.

19    Q.  And for Eriksson, the other one that did

16:09:13   20  exposure analysis, greater than ten days per year, again

21  it's statistically significant?

22    A.  Correct.

23    Q.  Is that something you -- from a scientific

24  perspective, is that something you want to see in the

16:09:24   25  data to help you understand causality?

1    A.  Again, yes.  When you look at Bradford Hill,

2  which we'll do later, that's one of the criteria you want

3  to look for.

4    Q.  All right.  We skipped over one here, De Roos

16:09:42   5  2005.

6        Do you see that, sir?

7    A.  Yes, I do.

8    Q.  We also have Andreotti down here, 2018?

9    A.  Correct.  We have Orsi as well.

16:09:49   10    Q.  Sure.  Why don't we just talk about Orsi, and

11  then we can talk about those two, because those two are

12  related.

13        In Orsi, this one, of all of these, is

14  clearly 1.

16:09:57   15        Do you see that?

16    A.  Correct.

17    Q.  It's exactly -- exact ratio of 1; right?

18    A.  Correct.

19    Q.  And it has a ratio of .5 and 2.2, so it's not

16:10:09   20  statistically significant?

21    A.  Correct.

22    Q.  What about -- what is worthy or interesting

23  about this stuff?

24    A.  It's a case-controlled study.  It was done in

16:10:15   25  France.  It wasn't the smallest study.  They were

1  different than all the other studies, if I recall

2  correctly, because they used hospital-based controls

3  rather than population-based controls.  You can do it

4  both ways, although hospital-based controls can sometimes

16:10:37   5  give you problems.

6        What does that mean?  So for the other studies,

7  you found people with non-Hodgkin's lymphomas and then

8  you went to the general population and found people who,

9  sort of, looked like the ones you have that had the

16:10:51   10  non-Hodgkin's lymphoma.

11        When you use hospital-based controls, you go

12  find patients in the hospital, and in this case, patients

13  with no cancers, patients with no history of immune

14  disease, and I think there were some other criteria, but

16:11:05   15  then they choose those patients as their controls.  It

16  makes it easier, because you can go talk to the patient

17  right away, rather than trying to schedule something with

18  someone in the general population.

19        Q.  All right.  And this is a study that you

16:11:18   20  reviewed and considered as part of your analysis?

21        A.  Yes.

22        Q.  All right.  And then we have this De Roos 2005.

23        Do you see that, sir?

24        A.  Correct.

16:11:26   25        Q.  And then we have this Andreotti 2018?

1        A.   Correct.

2        Q.   Those are studies that occurred where, sir?

3        A.   Those are studies in the United States.  They're

4   based on people in North Carolina and Iowa.  They are

16:11:41   5   what are called -- it's the same study.  They're the same

6   study -- cohort study.  That cohort study is called the

7   Agricultural Health Study in the United States.  It was

8   started sometime earlier than that.  I don't remember the

9   exact year when they started the study.

16:12:00   10        But, basically, what they did was recruit

11   farmers and people who have to apply for licenses to

12   spray pesticides and asked them to join this cohort

13   study, and if they agreed, then what they would do would

14   be interview the people right at the beginning and find

16:12:20   15   out all kinds of things about them, and then ask them

16   about their exposure to 60, give or take, pesticides and

17   write that information down.  And then they'd wait five

18   years, some period of time.  They go back, and they

19   interview these people again, and at the same time or at

16:12:41   20   a different time, they looked to see if any of these

21   people have gotten a disease.

22        Here they're looking at more than non-Hodgkin's

23   lymphoma.  They're looking at any -- at a large variety

24   of diseases.  That's why it's the Agricultural Health

16:12:55   25   Study.  It's all kinds of things related to working in

16:13:17

16:13:30

16:13:38

16:14:00

16:14:10

1  agriculture and all kinds of diseases.  And then they

2  assess whether you've gotten the disease, and then they

3  do an analysis is -- the people who have never been

4  exposed to this, do they have higher risk of getting the

5  disease than -- or lower risk of getting the disease than

6  people who haven't been exposed to it.

7       Q.  And the Agricultural Health Study, when was it

8  started?

9       A.  I'd have to look.  I forgot.

10      Q.  Okay.  Do you want to look at the study, or what

11  would you like to look at?

12      A.  The study would be fine.

13      Q.  Okay.  Which one do you want, the Andreotti or

14  De Roos?

15      A.  De Roos is fine.  She does a better job of

16  describing it.

17      Q.  Okay.  Let's go to -- that would be Exhibit 709.

18      A.  Okay.

19      Q.  So when did this study start, based on your

20  understanding of this study?

21      A.  Between 1993 and 1997.

22      Q.  And to be clear, we're talking about people who

23  are professional and licensed pesticide applicators; is

24  that right?

25      A.  Yes.  There are slight differences between North

1  Carolina and Iowa as to how they did that, but that's a

2  good description.

3      Q.  And these individuals, they don't just spray

4  glyphosate?

16:14:25  5      A.  That's correct.

6      Q.  But many of them do; is that correct?

7      A.  Yeah, a large faction of them in 2005, when this

8  De Roos study was done, I think it was 76 percent, give

9  or take, spreading glyphosate.

16:14:40  10     Q.  So these people who are getting enrolled in this

11  study in 1993, they take this exam, and then they're

12  asked to fill out a questionnaire; is that right?

13     A.  That is correct.

14         MR. GRIFFIS:  Objection.  Leading.

16:14:51  15         THE COURT:  Sustained.

16     Q.  BY MR. WISNER:  What happens after they take the

17  examine?

18     A.  They identify people who say they'll do it.

19  They give them a questionnaire right then and there,

16:15:02  20  because they're -- the way they recruited people is they

21  stood around a state agency where you had to register,

22  and they'd grab you and say, "Do you have time to join

23  the cohort study," and, effectively, that's how they did

24  it.

16:15:15  25         And so they'd give them a questionnaire, and

1902

1 then they followed up with a much more detailed

2 questionnaire than they had to do in the paper, and you'd

3 get answers to these all sort of questions, including

4 exposures and things like that.

16:15:28  5      Q.  And the exposure questions, did they relate to

6 all the potential pesticides that they could be using?

7      A.  Yes and no.  There are all kinds of different

8 things about it that one has to look at.  "Yes" or "no"

9 for the pesticide, that pertained to whether they'd been

16:15:43 10 exposed to the pesticide or not.  They asked a question

11 about how often you're exposed to the pesticide and when

12 was the first time.  That's pesticide dependent, but then

13 they calculated these other intensity scores, and that's

14 not really pesticide -- that's not specific for a given

16:16:01 15 pesticide, because it uses some general rules as well.

16      Q.  Was there a question specifically about

17 protective gear?

18      A.  Yes, there was, but, again, it didn't pertain to

19 glyphosate alone.  It pertained to all the pesticides,

16:16:13 20 and, actually, at that time, they probably weren't --

21 well, that's speculation.  I'll avoid speculation.

22      Q.  Okay.  But it'd be fair to say, then, that if

23 somebody was spraying a very toxic pesticide and they

24 used protective gear for that, but they applied

16:16:31 25 glyphosate or Roundup differently, that couldn't be shown

1  in the questionnaire?

2      A.  That is correct.

3      Q.  And when they were asked to recall their use of

4  glyphosate -- or sorry -- Roundup in the past, how far

16:16:43   5  did they ask for to go back?

6      A.  In your entire history up to that point.

7      Q.  So right then after taking an exam, they have to

8  remember their amount of use for -- since, I guess, the

9  '70s when Roundup hit the market?

16:16:59   10      MR. GRIFFIS:  Objection.  Counsel's testifying,

11  leading.

12      THE COURT:  Please rephrase, Mr. Wisner.

13      Q.  BY MR. WISNER:  So right after the exam, they

14  have to remember their entire pesticide use for all the

16:17:16   15  pesticides being studied?

16      A.  Certain aspect of the pesticide use, when was

17  the first time they used it, how often do they use it, I

18  think it's on a yearly basis.  Those -- I think those are

19  the two questions.

16:17:30   20      Q.  And that memory of their previous pesticide use

21  and their answer about protective gear, was that used to

22  estimate their exposure moving forward?

23      A.  It was used to estimate certain aspects of their

24  exposure.  If they didn't use -- so when they looked at

16:17:49   25  all the chemicals, if they didn't use protective gear,

1  they got a higher factor in this calculation of intensity

2  than if they did use it, but again, it doesn't pertain to

3  the particular chemical, so it may or may not have made

4  sense for certain chemicals.

16:18:08    5      Q.  Would it be fair or accurate to say that the AHS

6  was a Roundup specific study?

7      A.  Not at all.

8      Q.  Would it be fair to say that the AHS was a

9  non-Hodgkin's lymphoma specific study?

16:18:20    10     A.  Not at all.

11     Q.  In fact, have there been more studies published

12  from the AHS beyond glyphosate?

13     A.  Oh, easily more than a hundred.

14     Q.  When they started the AHS, was there a

16:18:35    15  hypothesis generated to study glyphosate and NHL?

16     A.  No.  But they probably had it in -- well, no.

17  They probably didn't even have it in mind, because there

18  probably wasn't a lot of literature on that at that point

19  when they started the study, so they might have had an

16:18:56    20  inkling from one or two epi studies that were out there,

21  but in general, they brought NHL in because it was known

22  to be related to a number of pesticides at that point.

23     Q.  Now, Doctor, I understand De Roos published the

24  results as it related to glyphosate in 2005; is that

25  right?

1    A.  That is correct.

2    Q.  Okay.  What happened in 2018?

3    A.  It's a later time.  They've had another

4  interview or questionnaire sent to the people about their

16:19:25   5  exposure, and they've gone to death registries and cancer

6  registries to figure out who's still around and which

7  ones got cancer and which ones didn't.

8    Q.  And in 2018, did -- well, strike that.

9        I understand you said it started enrolling in

16:19:43   10  1993; is that right?

11    A.  Correct.

12    Q.  And then completed in 1997?

13    A.  That is correct.

14    Q.  Now, specifically with regards to Roundup, did

16:19:50   15  Roundup use change during that exact period of time?

16    A.  Yes.  Roundup usage has been increasing for the

17  last 10, 15 years.

18    Q.  Well, back in 1993, 1997, did it specifically

19  increase during that period?

16:20:07   20  A.  Yes, it did.

21    Q.  And when we talk about significantly, how much

22  are we talking about here?

23    A.  I don't remember looking at the 1993 to 1997,

24  but in the period of the Andreotti study, the later

16:20:21   25  period, 2000 to 2007, or something in that range, it more

1  than doubled.

2      Q.  And --

3      A.  Probably since '93 to 2007, it's probably

4  fourfold increase.

16:20:36    5      Q.  Now, previously you were talking about cohort

6  studies.  You said they followed them every year to see

7  what their exposure was.  Do you recall saying that?

8      A.  It's not every year, but fixed periods they

9  asked about the exposure.

16:20:46   10      Q.  How many times have they followed up in the AHS?

11      A.  They have the original questionnaire, they have

12  the questionnaire for the De Roos paper, and then they

13  have the questionnaire for the Andreotti paper, so they

14  followed up twice.

16:21:02   15      Q.  And that's spanning how long of a period of

16  time?

17      A.  Well, it depends on which study.  De Roos' study

18  they -- they stopped asking questions.  I'd have to look

19  it up again in terms of the materials and methods.

16:21:23   20  December 2001 is when they looked at incident cancers or

21  not, so that --

22      Q.  I'm sorry, Doctor.  I'm not being clear.  How

23  many times did they follow up about exposure?

24      A.  As far as I know, the only follow up on exposure

16:21:43   25  is Andreotti.

1    Q.  Okay.  So for De Roos, all the exposure being

2  used to estimate the exposed group is based upon their

3  answers from either -- between 1993 and 1997?

4    A.  That's my understanding, yes.

16:21:58    5    Q.  Now, you said in Andreotti there was a followup;

6  is that right?

7    A.  That's correct.

8    Q.  And so they called back all those people and

9  tried to get some more exposure information; correct?

16:22:08    10    A.  That's correct.

11    MR. GRIFFIS:  Objection.  Leading.

12    MR. WISNER:  I'm trying to get through this

13  before 4:30.  I apologize if I lead a little bit, your

14  Honor.  He is an expert.

16:22:17    15    THE COURT:  All right.  Well, just be careful

16  with the leading.

17    MR. WISNER:  Yes, your Honor.

18    Q.  So, Doctor, when they did the followup on

19  Andreotti, what percentage of people actually responded?

16:22:29    20    A.  Roughly 60 percent.

21    Q.  What effect, if any, does losing 40 percent of

22  your exposure analysis have on your study?

23    A.  Well, it's going to reduce the ability of your

24  study to identify a positive effect.  That's quite clear,

16:22:45    25  but it could also bias your study, and depending on how

1  you deal with the other 40 percent, it could have a major

2  impact on your findings.

3      Q.  Did Andreotti, did they try to -- how'd they try

4  to deal with that 40 percent?

16:23:02  5      A.  They did what's called an imputation.  They --

6  they took what they knew about people's first exposures

7  and their second exposures, they took some information

8  about their economics and race and, et cetera, and

9  exposure to other pesticides, and they calculated a

16:23:22  10  formula from that about what they knew and the people

11  they followed up, and then they used that to predict what

12  might have happened in the rest of the people.

13      Q.  And you're a biostatistician.  Have you actually

14  looked at how accurate that imputation process was?

16:23:42  15      A.  Yes, I have.

16      Q.  Best case scenario, how off is it?

17      A.  Best case scenario, my guess is that the -- for

18  the estimation of exposure in the 40 percent who didn't

19  respond, they probably put about 14 percent of those who

16:24:06  20  were really exposed into the control group.  At least

21  14 percent.

22      Q.  And to be clear, Doctor, when you take people

23  who --

24      A.  Or 7 percent.  Sorry.  7 percent.

16:24:19  25      Q.  Okay.  7 percent.  Okay.

1        When you take people who are actually exposed

2   and start treating them as though they're unexposed, what

3   happens to your study?

4        A.  Well, that's called exposure bias, and what you

16:24:31  5   probably will see if you do that is a reduction in the

6   risk ratio, because you've taken people who potentially

7   have the disease and are exposed and put them into a

8   group that has the disease but aren't exposed, and so

9   you've moved a group of people from an important category

16:24:51  10  into the unexposed category.  It's likely to reduce the

11  risk.

12       Q.  And when you do that, can that make a result --

13  what happens to a risk ratio?

14       A.  It certainly will likely be reduced.  It could

16:25:05  15  go below 1, even though in truth it might be above 1.  It

16  can have all kind of effects like that.

17       Q.  Now, that was the best case scenario.  What's

18  the worst case scenario of the imputation?

19       A.  Well, they didn't give me enough detail in the

16:25:23  20  paper for me to be exact as to what they did, so I looked

21  and did a best case/worst case scenario.  The worst case

22  scenario is, based on what they presented in the paper,

23  they got pretty much everything wrong.  Given the numbers

24  that they presented, they could have conceivably

16:25:41  25  missed -- put all the exposed in this predictive group

1 into unexposed and all the unexposed into the exposed.

2     Q.  Now, let's be fair.  Do you think it was the

3 best or the worst case scenario?

4     A.  I don't think it was either.  I think it's

16:25:55   5 somewhere in between.  It's probably from --

6 historically, what these types of imputation things do,

7 we're probably looking at 20-percent error, somewhere in

8 there.

9     Q.  Now, if the risk -- let's go back to De Roos

16:26:09  10 here.  You see De Roos back in 2005, this is without the

11 imputation problem, when there's no adjustment, you have

12 a risk ratio of 1.2.

13     Do you see that?

14     A.  Correct.

16:26:20  15     Q.  And then with adjustment, it's 1.1.

16     Do you see that?

17     A.  Correct.

18     Q.  And neither of these are statistically

19 significant?

16:26:26  20     A.  Correct.

21     Q.  When you -- if you have a modest or low effect

22 like this and you introduce 20-percent misclassification

23 of exposure, what happens to your -- your result?

24     A.  As a general rule, depending on how that

16:26:44  25 misclassification occurs, if it's biased

1 misclassification, like I just described, it's going to

2 definitely pull that risk ratio down closer to 1, even

3 below 1.

4      If it's random, so sometimes I make a mistake

16:27:00  5 and put it as a control, and sometimes I make a mistake

6 and put a control as an exposed, and it's really just a

7 flip of a coin, then that's undifferentiated,

8 nondifferential exposure misclassification, and that

9 tends to just bring you down to 1, but it's not likely to

16:27:19  10 bias you below 1 if truth is above 1.

11     Q.  And when you say it brings you closer to 1,

12 what's a -- sort of, a layman's way of describing that?

13     A.  It -- it hides the true effect, so if the true

14 effect would be 1.5 and you had a lot of -- well, there's

16:27:40  15 a paper on that, several papers.  In the Agriculture

16 Health Study, one of the papers showed that if the true

17 relative risk was roughly 1.5, then the degree of -- of

18 nondifferential exposure and misclassification can bring

19 that down to 1.01, 1.05, depending on some factors.

16:28:03  20     Q.  So with that kind of misclassification problem,

21 you could have a legitimate risk that just -- you can't

22 see in the data?

23     A.  That is correct.

24     Q.  Now, I understand -- stepping aside from

16:28:16  25 Andreotti for a minute, and we're going to have an

1  epidemiologist come and testify to talk much more about

2  epidemiology, so --

3       A.  Good.

4       Q.  -- but there was a metaanalysis done.

16:28:28     5       Do you see that?

6       A.  Yes.

7       Q.  What is a metaanalysis, very quickly?

8       A.  You take -- it's not a pooled analysis, because

9  you don't have access to all the data.  When you have all

16:28:37    10  the data, you pool it.  Here they have access to the

11  papers.  There's a statistical way where you can take the

12  information from all the papers, combine them and come up

13  with a weighted estimate of what the risks should look

14  like over all of these studies based upon the observed

16:28:53    15  statistics, observed data.

16       Q.  And are metaanalysis better that individual

17  studies?

18       A.  No, they're not.  But they -- they tell you

19  something the individual studies don't tell you.  They

16:29:05    20  tell you about the general trend across all of these

21  individual studies.

22       Q.  And this metaanalysis on your board here, who

23  paid for it?

24       A.  Well, it -- the one I've listed there as Model 1

16:29:18    25  was done by a group of scientists who, if I read the

1913

1  acknowledgements correctly, were paid by Monsanto or

2  some -- I think.

3       Q.  And that was in 2016.

4       A.  That is correct, after the IARC Monograph.

16:29:31  5       Q.  And what did that metaanalysis show?

6       A.  When it combined all of these studies for the

7  most adjusted finding, it -- it showed a risk ratio of

8  about 1.3 that was statistically significant.

9       Q.  Now, Doctor, taking a step back and looking at

16:29:51  10  all of this epidemiology, if, in fact, the risk was 1, so

11  there's no risk in the real world, what would you expect

12  to see by random chance or variation of these point

13  estimates?

14       A.  Well, when you put it that way, it's like

16:30:09  15  flipping a coin.  If above 1 is heads and below 1 is

16  tails, then because truth is 1, then sometimes you're

17  going to be above, and sometimes you're going to be

18  below, and it should be about 50/50.  So you'd see about

19  half of these with a risk ratio of below 1 and about half

16:30:27  20  with a risk ratio above 1.

21       Q.  Is that what we see here?

22       A.  No.  What we see here is of the six studies

23  before Andreotti, all of them are equal to 1 or

24  above 1.

16:30:37  25       Q.  And what does that tell you, both as a

1  statistician and someone who's looking at cancer risk in

2  humans?

3      A.  Well, an epidemiologist looking at this is going

4  to say, "Well, that's an interesting somewhat consistent

16:30:53  5  bit of information."  As a statistician, I would look at

6  this and apply what is probably the oldest statistical

7  test ever done.  It's called the sign test.  And here you

8  can actually calculate a probability of seeing all six

9  studies equal to or above 1, and that's one-half to the

16:31:12  10  sixth power and whatever that number is.  I think .03,

11  give or take.

12      If you want to do greater than 1, and so you

13  keep the RC study off to the side, it's still a fairly

14  small probability, so more complicated.

16:31:29  15      Q.  So would it be fair to say that based on this

16  data, if the true risk was just 1, the probability of

17  seeing so many results to the right of 1 is almost 0?

18      A.  No.  Not almost 0, but it's small.

19      Q.  Okay.  1 in 10,000?

16:31:44  20      A.  No, no.  It's less than -- it's bigger than

21  that.  It's one-half to the sixth power, which is 64 --

22  it's 1-64th, 1 out of 64.

23      MR. WISNER:  Okay.  Thank you.  I think this is

24  a good time to end for the day, your Honor.

16:32:00  25      THE COURT:  All right, Ladies and Gentlemen.  We

1915

1  are going to adjourn for today.  Please remember do not

2  do any research.  Please do not discuss this case with

3  anyone.

4          Also, we have been receiving a lot of questions.

16:32:13    5  Thank you for paying attention and submitting your

6  questions.  I just want to remind you the lawyers are not

7  permitted to answers the questions directly, because

8  anything the lawyers say is not evidence.  The questions,

9  if they're relevant and if they're permissible, will be

16:32:32   10  answered by the witnesses.

11          So at the conclusion of each witness' testimony,

12  I will give you an opportunity to submit questions that

13  you wish to ask the witness or that you wish to have

14  answered by the witness.  I'll discuss those questions

16:32:49   15  with the lawyer, and we'll see if they can be answered.

16          Okay.  Thank you very much, and we'll see you

17  tomorrow.

18          And, Counsel, can you please remain?

19          (Jury leaves courtroom.)

16:34:07   20

21

22

23

24

16:34:21   25

1916

























































17:11:49

17:12:02

(Time noted:   5:12 p.m.)

--oOo--

```
 1                REPORTER'S CERTIFICATE

 2

 3       I certify that the proceedings in the

 4  within-titled cause were taken at the time and place

 5  herein named; that the proceedings were reported by

 6  me, a duly Certified Shorthand Reporter of the State of

 7  California authorized to administer oaths and

 8  affirmations, and said proceedings were thereafter

 9  transcribed into typewriting.

10       I further certify that I am not of counsel or

11  Attorney for either or any of the parties to said

12  Proceedings, not in any way interested in the outcome of

13  the cause named in said proceedings.

14       IN WITNESS WHEREOF, I have hereunto set my hand:

15  July 12th, 2018.

16

17

18

19                        <%signature%>
                          Leslie Rockwood Rosas
20                        Certified Shorthand Reporter
                          State of California
21                        Certificate No. 3462

22

23

24

25
```