# EXHIBIT 3

WINTER.2008 AAJ-CLE 237

AAJCLE

Winter.2008 AAJ-CLE 237 (2008)
American Association for Justice

February 2008
AAJ Winter Convention Reference Materials
Advocacy Track

UNDERLYING PRINCIPLES THAT MOTIVATE JURORS TO GIVE

Table of Contents, List of Authors

Frank Costilla, Jr. [a]

I. Introduction

—

Juries can be motivated to return substantial verdicts. The application of fundamental principles can guide a jury in the direction of writing higher damages numbers in its verdict for the plaintiff. Opportunities to attain larger verdicts will likely escape the plaintiff's lawyer who fails to understand the value of applying these principles. They are important signposts in the evaluation, negotiation, discovery, and trial of any personal injury case.

II. Principle 1: The Mad Factor

—

*The Greater the Anger, the Higher the Verdict*

Human beings are moved to action by emotion. The social scientists tell us that among the basic human emotions, sympathy, fear and anger are the most common motivators to action. In the present climate, however, sympathy plays a much reduced role having been supplanted by an anti-plaintiff bias tending to denigrate personal injury plaintiffs as greedy or complaining.[1] Anger has emerged as a prime motivator in holding another responsible for blameworthy behavior.[2] Anger arises out of a threat to or violation of a social norm or expectation.[3] Arousing the anger component in an injury case can motivate jurors to write higher damages in their verdicts.

The obvious question becomes what arouses anger in a jury? In the year 2000, a Tort law professor, Neal Feigenson, wrote a book entitled *Legal Blame, How Jurors Think and Talk About Accidents*.[4] It is about how people decide who is responsible when a person is seriously injured or killed. Anger, professor Feigenson says, can be found on every list of basic emotions. According to Feigenson, to experience anger is to perceive "a demeaning offense against me and mine."[5] Anger, he explains, is aroused in a number of ways. Most often, anger is aroused by blameworthy conduct that is perceived to be intentional, but anger is also frequently reported as a response to accidents perceived to have been avoidable.[6] Feigenson points out that "anger motivates one who feels it to attack the source of the anger or, if that is not possible, to displace the attack on to another object. In the context of legal judgment, the tendency to attack may take the form of an urge to punish a criminal or civil defendant."[7] A more rudimentary approach can be applied in understanding human decision-making behavior by simply looking at the evolution and development of the human brain.

In his book, *The Culture Code,* Dr. Clotaire Rapaille discusses the reptilian brain, that part comprising the brain stem and cerebellum. The name reptilian comes from this area's similarity to the brains of reptiles, which are believed to be

relatively unchanged from the brains their predecessors had 200 million years ago. Our reptilian brains program us for two major things: survival and reproduction. These are our most fundamental instincts. Rapaille concludes that because survival is more fundamental to our existence than "feeling good" or "making sense," the reptilian brain always rules the day. In a battle between logic, emotion and instinct, he says, the reptilian brain always wins. [8] In addressing juries, it is therefore necessary to bypass the jurors' cortexes and reconnect to their reptilian brain. [9]

The reptilian brain is angered by conduct that threatens its basic self-interests. Perceiving a danger to its survival or the survival of its family or community, the angry reptile will attempt to eliminate or lessen the threat. In the legal blame context it uses its verdict to send a clear message to the defendant.

It is therefore important to identify the types of conduct that can anger the reptile mind.

1. Rule Breaking

Rules are ubiquitous in society and for the most part, they are based on sound rationales. Rules serve the purpose of individual and societal protection. Ignoring them jeopardizes us all. As children we are taught the importance of rules and the consequences of breaking them. There are rules for social interaction and comportment. We must abide by rules at our workplace. There are rules that must be followed in the courtroom. The judge has to follow rules. The court reporter and bailiff must follow rules. There are rules that the lawyers are obligated to follow. Finally, the jury takes an oath to follow the rules and instructions given by the court.

David Ball, the noted jury trial consultant and author of *David Ball on Damages, The Essential Update*, tells us that the reptile brain perceives the primary purpose of rules as protection from harm. [10] According to Ball, the reptilian brain, fearing that rule breaking by others will affect the reptile's own safety and security and endanger its offspring, is angered by the rule breaker and thus, becomes the enforcer of sound rules. [11]

If rule breaking produces anger in the reptilian mind, and if in the legal context anger can result in a higher damages verdict for the plaintiff, it is imperative to couch the defendant's liability in terms of rule breaking in any personal injury damages case.

Rules applicable to the conduct of the defendant exist within the ambit of the defendant's industry or profession and are not difficult to find. Rules or standards can be found in statutes, regulations, case law, court rulings, jury instructions, witness testimony, policies and procedures manuals, training manuals, operations manuals, textbooks, and professional literature. In their book, *Rules of the Road, A Plaintiff Lawyer's Guide to Proving Liability*, Rick Friedman and Patrick Malone tell us that the best way to identify a rule is by its attributes: It should be easy to understand, not easily disputed by the defense, violated by the defendant and important enough in the context of the case that proof of its violation will significantly increase the chance of a plaintiff's verdict. Every rule must be framed in terms that make common sense. [12]

According to David Ball, in the context of any adversary proceeding, a rule is not a rule until the other side agrees it's a rule. That is, the rule must be capable of universal application. It is therefore vital to explore the rationale for the rule, its importance in preventing harm and its value to society. The defendant must agree that every reasonable step must be taken to comply with the rule. The defendant's deviation from or violation of the rule engenders anger in the primal brain and prompts it to react in the only way legally permissible—a large damages verdict.

Here are examples of some useful general rules:

>"The greater the danger, the higher the level of care required."
>
>"Safety is the number one priority."

"Nothing is more important than safety."

"A doctor is never allowed to unnecessarily endanger a patient."

"When there are two ways of doing the same thing, a doctor is obligated to do it the safest way." [13]

2. Engaging in a Pattern or Practice of Harmful Conduct

Considering that the reptilian brain seeks security and self-preservation, a recurring pattern or practice causing repeated harm yet ignored by the defendant compounds the reptile's anger.

A systemic problem is infinitely more pernicious than a singular one. The reptilian brain will forgive the defendant for a single mistake, but if a known recurring or multiple problem was repeatedly ignored by the defendant, the defendant's conduct will likely be viewed as an intentional disregard for human safety. A showing of widespread, systemic or recurring harmful conduct gives rise to the type of anger in the reptilian mind which can translate into a substantial verdict.

3. Corporate Irresponsibility

The big and the powerful are expected to engage in reasonable and responsible conduct. Their superior knowledge, power, and resources put them in the best position to prevent, eliminate or warn of any untoward catastrophic event. Irresponsible conduct in light of this type of power will tend to anger the reptilian mind, particularly in situations where reasonable options or alternatives that could have eliminated or lessened the risk of harm, were available to the defendant, but consciously ignored. Where shown, corporate irresponsibility will not be tolerated by the reptilian brain.

As part of showing the irresponsibility of the corporate defendant, demonstrate that the catastrophic event was foreseeable. Identify and establish facts or reasonable inference forming a belief that the defendant could foresee or should have foreseen the consequences of his actions or inactions.

4. Defendant's Conduct Toward the Plaintiff

David Ball tells us that among other reasons that make jurors give large money damages are the following: defendant's lack of remorse, callousness, arrogance, or indifference. These can produce seeds of resentment against the defendant resulting in a high verdict for the plaintiff. In discovery it is worthwhile to ferret out the particular conduct of the defendant touching on these issues. The negative impact of this type of conduct by the defendant on the jury's verdict should not be underestimated. [14]

Also, defense lawyer conduct at trial can impact the verdict. Where a defense lawyer attacks your client undeservedly, the jury will oftentimes be resentful of the lawyer's conduct. The attack can come in the form of disrespect, disdain or even overzealous cross-examination. The old maxim that the jury identifies with the witness remains true, but the defense lawyer's attacks must be gratuitous and unprovoked.

5. Conscious Wrong Choices

If the defendant's conduct is framed as an act or acts of commission, not acts of omission, that is, what the defendant did, not what the defendant failed to do, it will demonstrate a consciousness on the part of the defendant to act in a harmful manner. Harmful action is stronger than harmful inaction. The framing of the defendant's conduct as the result of a "decision," "election," or "choice" makes the defendant's conduct active rather than passive.

Through use of the active voice, it can be effectively shown that the defendant(s) consciously *chose or elected* the course of conduct that set off a chain of events inexorably leading to the catastrophic event. On opening statement the plaintiff's story should start with a scenario when the defendant was presented with an opportunity to have eliminated or prevented the potentially harmful event, but for motives of profit, selfishness or other evil reasons, the defendant consciously chose to reject it.

6. Cheap and Easy Fix

The cheaper and easier the fix, the greater the anger aroused in the reptilian brain. Where the defendant consciously ignores a cheap and easy solution which would have prevented or eliminated the harmful event, the jury will be unsympathetic.

Every reasonable and feasible option or alternative available to the defendant to fix the potential problem should be explored in discovery. The more simple and cheaper the fix, the greater the juror anger generated. It is important to find out prior to trial what the fix would have entailed, how difficult the fix would have been, how much time and money the fix would have required, and most importantly, that nothing would have prevented the fix.

Once this information is discovered every effort must be made to quantify it for the jury at trial. Quantification will serve to illustrate to the jury that the cost of the fix or the effort involved in its doing was relatively insignificant in comparison to the harm caused to the plaintiff. Also, the greater the resources available to the defendant for the fix, the more culpable the defendant is perceived. These comparisons will inflame the reptilian mind even further and result in a substantial verdict.

7. No Justification for Defendant's Conduct

If reasonable and compelling justification or explanation is provided, the reptile's brain will forgive even the most consequential mistakes. To elicit the wrath of the jury, it must be made clear that there existed no reasonable justification for the defendant's conduct. For example, was the trucking company justified in putting the particular truck on the road without brakes? Was there any justification for not having used the correct electrical wire cable for the mobile home, or for not bringing in a qualified master electrician to do the electrical wiring in the house? The reptile brain must have justification for the defendant's bad conduct. Without an adequate explanation or justification, the reptile brain is unforgiving.

III. Principle Number 2: The Worthwhileness of the Money
–

*The Jury will Award Money to a Plaintiff Worthy of Compensation*

1. The Money Must Have a Purpose

The jury must feel that the money will do some good. It will not award money without a reason. The verdict must be tied to a tangible benefit. It must pay for something necessary to benefit the plaintiff. It must serve to encourage action or change. It must provide protection or help. Or, it must provide incentive for good. In sum, it is imperative that the jury know why it is awarding the money, to whom, and how it will help.

2. The Plaintiff Must be Worthy of Compensation

Plaintiff is "Exhibit A." A jury will not award money damages to an undeserving plaintiff. Today, plaintiffs and their lawyers come to court lacking in credibility. Based on polling studies, they are perceived by at least a third of the jury as seeking a fast buck, or trying to "hit" jackpot justice. In "tort reform" minded America it is not uncommon to find jurors who believe that plaintiffs and their lawyers are willing to misrepresent the truth for money. If jurors sense that the plaintiff is exaggerating, or otherwise being less than candid with them, they are unlikely to compensate the plaintiff for his or her losses.

In this writer's view, to be considered deserving a plaintiff must possess the conservative core values that George Lakoff describes in his book, *Moral Politics, How Liberals and Conservatives Think*. Lakoff discusses two views of the world based on two moral systems, the conservative (strict father) and liberal (nurturant parent) models. In protecting their moral order conservatives seek to uphold moral strength and authority and promote self-discipline, responsibility and self-reliance. The liberal morality, on the other hand, values empathetic behavior, helping those who cannot help themselves, protecting those in need, and promoting fulfillment in life. [15]

Juries in America today are comprised primarily of conservative moral system types who espouse the strict father model. This being the case, the plaintiff's lawyer trying a personal injury case must imbue the plaintiff with these conservative core values to increase the chances of prevailing in a jury trial. They include the following:

"Personally responsible in life"

"Self- reliant"

"Hard working"

"Independent"

"Fighter"

"Morally upstanding"

"Positive and hopeful not giving up and dejected"

"Good person, good father, good son, good sibling"

During the trial, the jury must be told and reminded of the plaintiff's conservative values at every opportunity. This allows the jury to "connect" with the injured plaintiff.

The plaintiff must not testify to these values himself or herself, lest it be taken as self-serving and even phoney. Stories or vignettes illustrative of the plaintiff's values are more powerful and persuasive if related by lay witnesses who have no monetary stake in the outcome of the case. The storyteller cannot be effectively cross-examined about his or her story. Stories that illustrate or give examples of the plaintiff's core values will almost certainly strike a responsive cord with the conservative jurors who will view the plaintiff as worthy of compensation.

3. The Jurors Must View the Injury Event from the Perspective of a Loss, Not a Gain

The reference point for damages must be the pre-injury healthy plaintiff, not the post-injury "damaged" plaintiff. If the event reference point is post-injury, any money requested by the plaintiff's lawyer will be viewed as a gain, a windfall, a giveaway or an enrichment of the plaintiff. On the other hand, if the event reference point is pre-injury, the plaintiff will be perceived as seeking compensation for a loss. The pre-injury plaintiff is viewed as he or she was on the eve of the injury event—healthy, happy, working, and looking forward to a bright future. The impact of the loss is perceived as greater from a pre-injury vantage point. The value of everything the plaintiff possessed or enjoyed on the eve of the injury event must be compared with what the plaintiff is left with today and the different future that the plaintiff now faces.

IV. Principle Number 3: The Likability of the Plaintiff
–

*The Jury Is Inclined to Help a Likable Plaintiff*

1. Plaintiff Acted Reasonably and Responsibly

It is essential that the jury be shown that the plaintiff was acting reasonably and responsibly at the time of the injury event. The jury should feel that the plaintiff was not doing anything they (jurors) themselves would not do or would not have done under the same circumstances. That is, the jury must know that the injured plaintiff did not voluntarily put himself or herself in potentially bad or harmful situation and is now complaining about the consequences. If the jury can put itself in the position of saying "I, unlike the plaintiff, would have avoided the predicament by doing X, Y or Z," then the juror will attribute the fault to the plaintiff, under the Defensive Attribution Theory. [16]

2. Plaintiff was Blind Sided

Establish that plaintiff was an innocent victim who was "blind sided" while acting reasonably and responsibly. Spotlight the defendant's conduct. There was nothing plaintiff could have done to prevent the harmful event from occurring. Plaintiff had no idea it was coming, was completely unaware, and therefore blameless.

3. Proportionality

The concept of proportionality compares the knowledge, control, and ability to prevent the occurrence of an untoward injury event between the defendant and the injured person. Facts demonstrating the defendant rather than the plaintiff had the opportunity, time, control, and superior knowledge to prevent the potential harm or protect the injured person from the harm but did not take advantage of its powerful position to do so will expose the defendant's irresponsibility and the injured's helplessness.

Comparing the defendant's knowledge and control over the instrumentality, condition or situation producing the injury with that of plaintiff's can reveal an overwhelming disparity. The greater the disparity, the greater the anger engendered in the reptile's brain and the higher the verdict.

4. Consistency, Consistency, Consistency

Consistency is imperative! Everything in the case must be consistent, the event with the injuries, the injuries with the damages, the plaintiff's post-event conduct with plaintiff's claims and allegations, the plaintiff's demeanor and complaints with the type of injury sustained, the losses with the money claimed, the testimony throughout, and the lawyer's presentation of the case. Every aspect of the case must be totally consistent. Nothing must remain outside the box of consistency. Inconsistency breeds distrust and destroys credibility. One inconsistent statement, inference or implication will destroy all the credibility built up to that point.

5. Juries Give Money to Stop Wrongdoing

David Ball teaches that juries will give large sums of money if they feel that the defendant must be stopped from engaging in conduct threatening to society as a whole. The purpose of punitive damages is to allow the jury to speak through their verdict to stop the defendant's egregious conduct. In the right case with the application of the principles discussed in this paper, juries will write in large punitive verdicts to stop the defendant's wrongdoing. [17]

V. Principle Number 4: The Universal Application of the Case

–

*A Jury with a Stake in the Verdict will Protect the Plaintiff*

1. What's at Stake?

The jury must have a stake in the verdict. The reptilian brain asks, "What's in it for me and mine?" It must be shown how a verdict for the plaintiff benefits them, their loved ones or their community. Show what the money is for and how it will benefit, not only the plaintiff, but those who might find themselves in the plaintiff's position in the future.

The verdict may even be perceived as benefitting the defendant who will be in a position to make necessary changes or corrections needed to become a good corporate citizen. Jurors want the verdict to have an impact on someone or something, for example, help the plaintiff, deter the defendant, or protect the community. In short, jurors want their verdict to make a difference!

The case should be pitched to the reptilian mind by addressing the reptiles' self-interest, namely, its own security and protection. This is done through the universalization of the case. Make the case bigger and more important than the facts of particular case itself. What is the universal importance of the case? How is each individual juror impacted? How will a fair and adequate verdict for the plaintiff protect us all? The reptile brain is more interested in the enforcement of a rule than the concept of justice, because a rule protects the individual and his or her children and justice does not, so it's imperative to make the defendant in the case a rule violator. [18]

2. Throw Down the Anchor

Anchoring is simply a referencing technique. It encompasses the anchoring of " points," "positions," "perspectives," and "money." Voice can anchor as can posture, place, and position. Repetition can anchor and numbers can anchor. Number anchors involve the suggestion of a number to the jury for its use as a reference point in deciding what number to use in assessing monetary value, cost, price, or "damages." The concept is based on the psychological principle that jurors deliberating on an issue involving numbers will shift to any salient reference point or "anchor" to start the decision-making process. Consequently, the first number suggested will subconsciously become the first number the jury will consider, and from which it will adjust downward. The higher the initial anchor suggested, the higher the ultimate number will be because the higher number serves to anchor the jurors' judgment. Should an anchor not be suggested to the jury, the jury will supply its own number when discussing monetary value, worth, or damages and adjust downward in its deliberations.

Number anchors can be set by discussing the values that Americans place on certain material items, games, consumer products, rare art. Anchors can also be set based on the value of a tangible or personal item possessed by the defendant or involved in the case, such as the price of a manufactured product, the value of a contract, salary, profit, percentage of sale, price of pieces of property or equipment. Number anchors can also be set on what an American human being would give, take, forgo, or trade for experiencing or not experiencing the horror, loss, pain, disability or impairment suffered by the plaintiff. The idea is to use analogies, comparisons, and contrasts to supply a logical reference point for the jury. If the anchor seems reasonable, the jury will consider it in coming to damages number.

VI. Principle Number 5: Motives of the Defendant
–

*A Defendant with Evil Motives Will Be Punished*

1. Search for the Evil Motive

Evil motivations tend to maximize verdicts. If a defendant deviates from a standard or practice of good care there is usually a reason. A secret and blameworthy state of mind may explain the deviation. Greed, dishonesty, hostility, corruption, callousness, selfishness, and self-interest are examples of evil motivators. Look long and hard for the evil motive. Where there is deviation from the norm, there is almost certainly a motive for the departure.

Establish that the defendant does not intend to change its conduct, policy or procedure regardless of what the jury does. Defendant would do the same thing all over again in just the same way regardless of what a jury thinks or how much money it writes into its verdict.

2. Polarize the Defendant's Values and His or Her Conduct to Reveal Evil Motives

Polarizing language (making bigger, expanding, growing, magnifying, intensifying) can be gathered in the deposition testimony of defendant's corporate officers, representatives, agents and employees. It is usually easily adduced from the defendant or its representatives in the form of self-serving assertions.

Allow the defendant to make a claim about his or her values and beliefs. Extol the virtues of the values the defendant embraces and stress the importance of conduct consistent with those values. Obtain an agreement that the defendant would take all reasonable and necessary steps to comport himself or herself in a manner consistent with these values, then expose the defendant's conduct inconsistent with the defendant's position and probe the reasons for the defendant's departure from these same values. The resulting polarization creates a wide gap between the defendant's stated values and beliefs and its departure from them in this instance. The wide gap serves to expose the real motives for the defendant's conduct.

3. Perch Defendant on a Pedestal

Defendants tend to climb on a pedestal without much prodding or assistance. Once aloof on the pedestal, the risk of disappointment is great.

Pedestal language can be easily found on Web sites, mission statements, preambles to company manuals, training manuals, policies and procedures and safety manuals and in other company literature. Some typical examples of pedestal language:

"Most powerful"

"Leader in the industry"

"Safest company in the world"

"Largest in the country/world"

"Greatest resources available"

"Greatest knowledge about. . ."

"Best position to research and develop. . ."

"Professes to be 100% safety conscious"

"Zero tolerance"

"Puts safety first"

"Unequaled expertise"

To increase the size of a verdict in a case, an effective technique is to incorporate "pedestal" language into your case at every opportunity. It can, for instance, be used on direct of a friendly expert witnesses (or other witnesses) to inflame the jury against the defendant. For example:

Mr. Plaintiff's Friendly Expert Design Engineer. . .

—Was Ford aware of the weakness in the A pillar. . .? How do you know?. . . Since when had Ford known?

—And what did Ford Motor Company, THE BIGGEST AUTOMOBILE MANUFACTURER IN THE WORLD do about it?

—*They did nothing!*

Or,

—Tell the jury what ABC company, A COMPANY WHICH PROFESSES TO PUT SAFETY OF THE PUBLIC FIRST, did when it found out that the machine was unsafe?

—*It hid it from the public!*

VII. Conclusion

_

This paper deals with the principles that induce juries to give money to the plaintiff. The mechanics of getting juries to award substantial damages are embedded in techniques for voir dire, opening statement, direct and cross-examination and closing which reach deep into the reptilian brain to develop righteous anger. When this anger is combined with the universalization of the case, the worthwhileness of the money and the likability of the plaintiff, with proper anchoring, it can produce substantial verdicts for deserving plaintiffs.

In the preparation and trial of personal injury cases, the principles discussed in this paper will prove to be powerful weapons in the battle to motivate jurors to give.

Endnotes

_

a. Law Office of Frank Costilla, L.P., 5 East Elizabeth St., Brownsville, TX 78520, (956) 541-4982, frank@costillalaw.com

1. NEAL FEIGENSON, LEGAL BLAME: HOW JURORS THINK AND TALK ABOUT ACCIDENTS 81-83 (Am. Psychological Ass'n 2000).

2. *Id.*

3. *Id.*

4. *Id.*

5. Neal Feigenson, *supra* note 1.

6. *Id.*

7. *Id.*

8. CLOTAIRE RAPAILLE, THE CULTURE CODE 76 (Broadway Books 2006).

9. The terms "reptile," "reptile brain," and "reptile mind," used variously in this paper are intended to be synonymous and refer to the human being on the jury reacting in a primal way to evidence threatening the fundamental reptilian instincts relating to survival and reproduction.

10. DAVID BALL, PH.D., DAMAGES, THE ESSENTIAL UPDATE (National Institute for Trial Advocacy 2005).

11. AAJ Education's Trial Advocacy College on Damages, Keystone, CO, October 2007.

12. RICK FRIEDMAN & PATRICK MALONE, RULES OF THE ROAD: A PLAINTIFF'S GUIDE TO PROVING LIABILITY 30 (Trial Guides LLC 2006).

13. AAJ Education's Trial Advocacy College on Damages, *supra* note 11.

14. *Id.*

15. GEORGE LAKOFF, MORAL POLITICS: HOW LIBERALS AND CONSERVATIVES THINK 65 (Univ. of Chicago Press 2002).

16. *See* Gregory S. Cusimano and David A. Wenner's Jury Bias Model?, which is the foundation for AAJ Education's seminars and colleges on Overcoming Juror Bias.

17. David Ball, *supra* note 10.

18. *Id.*

Copyright © 2008 American Association for Justice

WINTER.2008 AAJ-CLE 237

---

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.