# EXHIBIT 1

Pages 1 - 96

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

|  |  |  |
|---|---|---|
| IN RE ROUNDUP PRODUCTS | ) | |
| LIABILITY LITIGATION. | ) | |
| | ) | **NO. 16-md-02741 VC** |
| | ) | |
| _____ | ) | |
| EMANUEL RICHARD GIGLIO, | ) | |
| | ) | |
|        Plaintiff, | ) | |
| | ) | |
|   VS. | ) | **NO. C 16-05658 VC** |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
|        Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Wednesday, December 5, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        ANDRUS WAGSTAFF PC
        7171 W. Alaska Drive
        Lakewood, Colorado  80226
  BY: **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**
      **DAVID J. WOOL, ATTORNEY AT LAW**

        ANDRUS WAGSTAFF PC
        6315 Ascot Drive
        Oakland, California  94611
  BY: **KATHRYN M. FORGIE, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
        Official Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

        WEITZ & LUXENBERG PC
        700 Broadway
        New York, New York  10003
    BY:  **ROBIN L. GREENWALD, ATTORNEY AT LAW**

        THE MILLER FIRM LLC
        108 Railroad Avenue
        Orange, Virginia  22960
    BY:  **MICHAEL J. MILLER, ATTORNEY AT LAW**
        **BRIAN BRAKE, ATTORNEY AT LAW**
        **NANCY G. MILLER, ATTORNEY AT LAW**

        LAW OFFICES OF TESFAYE W. TSADIK
        The California Building
        1736 Franklin Street - 10th Floor
        Oakland, California  94612
    BY:  **TESFAYE W. TSADIK, ATTORNEY AT LAW**

        AUDET & PARTNERS LLP
        711 Van Ness Avenue - Suite 500
        San Francisco, California  94102
    BY:  **MARK E. BURTON, ATTORNEY AT LAW**

        LUNDY, LUNDY, SOILEAU & SOUTH LLP
        501 Broad Street
        Lake Charles, Louisiana  70601
    BY:  **RUDIE R. SOILEAU, JR., ATTORNEY AT LAW**

        BAUM HEDLUND ARISTEI GOLDMAN PC
        12100 Wilshire Blvd. - Suite 950
        Los Angeles, California  90025
    BY:  **ROBERT BRENT WISNER, ATTORNEY AT LAW**

For Plaintiff Emanuel Richard Giglio:
        GOMEZ TRIAL ATTORNEYS
        655 West Broadway - Suite 1700
        San Diego, California  92101
    BY:  **JOHN H. GOMEZ, ATTORNEY AT LAW**
        **KRISTEN K. BARTON, ATTORNEY AT LAW**

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant:
                         HOLLINGSWORTH LLP
 3                       1350 I Street NW
                         Washington, D.C.  20005
 4              BY:  KIRBY T. GRIFFIS, ATTORNEY AT LAW
                     ERIC G. LASKER, ATTORNEY AT LAW
 5
                         ARNOLD & PORTER KAYE SCHOLER LLP
 6                       777 S. Figueroa Street - 44th Floor
                         Los Angeles, California  90017
 7              BY:  PAMELA YATES, ATTORNEY AT LAW

 8                       ARNOLD & PORTER KAYE SCHOLER LLP
                         250 West 55th Street
 9                       New York, New York  10019
                BY:  ANDREW K. SOLOW, ATTORNEY AT LAW
10
                         WILKINSON  WALSH ESKOVITZ LLP
11                       2001 M Street, NW - 10th Floor
                         Washington, D.C.  20036
12              BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  figuring out who should be excused just on the paper and who

2  needs to come in, and we'll pick a jury, I'm confident, in less

3  than a day.

4          **MR. WISNER:**  Would the expectation be that we would

5  open that day?

6          **THE COURT:**  No.  Probably open the next morning.

7          **MR. WISNER:**  Okay.

8          **THE COURT:**  Just to preserve everybody's sanity.

9          **MR. WISNER:**  Two comments, Your Honor.  I'm waiting

10 because my colleague --

11         **MS. WAGSTAFF:**  Just on that, you currently under

12 PTO 53 have jury selection scheduled for the 20th of February

13 and then opening statements the 25th.  So should --

14         **THE COURT:**  It sounds like a good idea.

15         **MS. WAGSTAFF:**  So we're going to just keep that and

16 not do opening the next day?

17         **THE COURT:**  Yeah.

18         **MS. WAGSTAFF:**  Okay.

19         **THE COURT:**  That should -- yes.

20         **MR. WISNER:**  Good catch.

21     Your Honor, two comments.  One is actually sort of

22 amusing.  One of my clients was actually selected for this

23 survey, and she sent me a link to it and I actually considered

24 going into it and writing something really salacious so that I

25 can show the e-mail that I actually did it to invalidate the

```
 1  survey, but I decided not to and they didn't complete the
 2  survey either.
 3       The second issue, Your Honor, and this is something that
 4  we'll probably have to address closer to trial, is this idea
 5  that the Johnson verdict is wholesale inadmissible, and I think
 6  there's some truth to that except for one really important
 7  fact.  I'm not sure if the decision has been made to
 8  bifurcate --
 9            THE COURT:  The Neil Young and Daryl Hannah letter?
10            MR. WISNER:  No, Your Honor.  Those we're not going to
11  be seeking any admission of.
12       But immediately after the Johnson verdict, the CEO for
13  Bayer went and spoke, we have the recording of it, and said
14  that the $250 million in punitive damages changes nothing.  And
15  one of the primary purposes of punitive damages is actually to
16  deter future wrongful conduct, and so this is actually a
17  corporate admission that $250 million is insufficient to change
18  corporate conduct.
19            THE COURT:  Okay.  Well, we'll talk about that at the
20  motion in limine stage --
21            MR. WISNER:  Sure.
22            THE COURT:  -- but it does lead directly into the next
23  topic that I wanted to discuss, which is this is sort of an
24  introductory discussion to help us dive into the discovery
25  disputes, to the extent that any remain.  Hopefully you're
```

1    going to tell me at some point that no discovery disputes

2    remain.

3          But the general topic that I want to discuss that I think

4    will inform the discussion on a number of discovery disputes is

5    a topic that, you know, we've been discussing for many months,

6    which is the relevance and admissibility of exclusions by

7    agencies that Roundup is dangerous or is not dangerous or is

8    potentially dangerous or whatever.  Okay?

9          And I guess --

10                       (Counsel conferring.)

11          MR. WISNER:  Sorry, Your Honor.

12          THE COURT:  That's okay.

13          I guess I've developed a tentative view on this, not a

14   strong tentative view, a very tentative view.  I think my very

15   tentative view is that certainly there is at least a strong

16   argument that what the agencies have done, what the EPA has

17   done is relevant on the issue of punitive damages.

18          I mean, I would think that if I were Monsanto, on the

19   issue of punitive damages, I would want to parade in front of

20   the jury all of the agencies that have concluded -- have signed

21   off on use of glyphosate or have concluded that glyphosate is

22   safe, or whatever it is their conclusions were.

23          But on the issue of causation, I think that while you

24   can't say that the EPA's decision or the IARC's decision or the

25   European Union's decision is irrelevant, it's relevant, but I

1    the EPA documents and, in fact, that was the bulwark of their

2    testimony.  So it would be hard to see how it unbuckles.

3         The problem that I would see --

4         **THE COURT:**  Why?  I mean, when we did the general

5    causation phase, it seemed to me certainly it came up.  You

6    know, certainly it was part of everybody's testimony, but the

7    bulk of the testimony was about the studies themselves.  And,

8    you know, we didn't -- and I excluded expert testimony whose

9    methodology was "I adopt the analysis of the IARC"; right?  I'm

10   sure you disagree with that, but I excluded it.  It would,

11   therefore, be excluded -- such testimony would, therefore, not

12   be admissible at trial.

13        And so I guess I'm thinking back to the testimony that,

14   like, Dr. Ritz provided, Dr. Portier provided, Dr. Mucci

15   provided; and I'm thinking, well, if the EPA and the IARC were

16   off limits to them, they would have given substantially the

17   same testimony.

18        **MR. WISNER:**  Absolutely.

19        **THE COURT:**  Their testimony would not have been that

20   different, and so that makes me wonder why we should be getting

21   into it at all.

22        **MR. WISNER:**  Because the case is not just does this

23   cause cancer.  There's a lot more involved in the liability

24   context.  And let me give you some very specific examples;

25   right?

```
 1        Monsanto's conduct following the IARC monograph or even

 2    before it came out is very clear evidence of punitive intent.

 3    It shows a desire to manipulate scientists to orchestrate -- I

 4    mean, it's our position.  I'm sure they disagree.  I'm just

 5    giving our pitch.

 6        And it shows --

 7             THE COURT:  Hold on.  I think I understand all those

 8    arguments.

 9             MR. WISNER:  Okay.

10             THE COURT:  So you and I are pretty much on the same

11    page here, but then the question is:  Why not bifurcate the

12    trial?

13             MR. WISNER:  So --

14             THE COURT:  And why not do a punitive damages phase,

15    if necessary, after the jury conducts an inquiry into causation

16    that is not muddied up by all of this stuff that you are

17    talking about right now?

18             MR. WISNER:  So there's a couple of important parts of

19    this; right?  So, for example, the IARC participation,

20    Dr. Portier is an important part of the cross-examination.

21    They tried to impeach his credibility saying he went there to

22    influence IARC so he wanted to make money as a plaintiffs'

23    lawyer -- expert; right?  There's a whole bunch of sideshows

24    that are part of it; but I think the core issue, Your Honor, is

25    this statement.
```

1        **THE COURT:**  Let's assume for the sake of argument that

2   I said you can't cross-examine Dr. Portier about that.

3        **MR. WISNER:**  So this is a statement that's the

4   problem.  The first words that will come out in opening

5   statement -- and I know this because this is what happened in

6   the Johnson case -- "Roundup has been on the market for 40

7   years.  It has a demonstrated record of safety."  And there's

8   so much untruth about that that we have to unpack.  We will do

9   that with evidence, but a lot of it involves IARC because what

10  IARC did is it's the change in the narrative.

11       Because every single juror that I've interviewed, and

12  we've done a lot of jury science, they go, "Well, it's been on

13  the market for 40 years.  It must be safe."  They said the same

14  thing about tobacco.  They said the same thing about asbestos.

15       The simple fact is IARC was a game changer; right?  It was

16  the first time a group of independent scientists -- this is our

17  viewpoint; you don't have to agree -- looked at it with no dog

18  in the fight and made a decision, and that's why -- and the way

19  they responded to it and the way they generated junk science.

20  Science, by the way, that their experts rely upon; for example,

21  the Intertek manuscripts; for example, these are all sort of

22  integrated into the case.

23       And if we did this sort of hermetic look at just does it

24  generally cause cancer, I think that really creates a lot of

25  problems.  We'd have to bring back the experts afterwards.  For

1    letters.

2        I've had no oral communication with him about this.  He

3    sent me a written discovery letter and then filed that as

4    his -- he sent me a demand letter, to which I responded by

5    e-mail; and then he sent you that and attached my e-mail as the

6    discovery letter rather than incorporating my responses into a

7    filing to Your Honor.  I think it would go more smoothly and be

8    more intelligible to you, if not to all of us, if it was filed.

9        THE COURT:  Do you want me to deny it?  I'll deny it

10   on that basis and let you put together a discovery letter and

11   tee it up for me.  I think it's totally appropriate to simply

12   deny the motion to compel on that basis.

13       MR. GRIFFIS:  All right, Your Honor.

14       THE COURT:  Do you want me to do that?

15       MR. GRIFFIS:  Yes.

16       THE COURT:  All right.  When will be the deadline for

17   a discovery letter?

18       MR. GRIFFIS:  Since we have all the material for it,

19   we can get that on file this week easily.

20       THE COURT:  Okay.  Why don't you file the discovery

21   letter by Friday --

22       MR. GRIFFIS:  Okay.

23       THE COURT:  -- and I'll address it next week.

24       MR. GRIFFIS:  Thank you.

25       THE COURT:  Okay.  What next?

1          **MR. WISNER:**  Your Honor, late yesterday evening we

2    filed a discovery letter related to the Rule 30(b)(6)

3    deposition.  I don't know if you've had a chance to review it

4    yet.

5          **THE COURT:**  Let me pull it up.  I probably have not

6    reviewed it, but you never know.

7                        (Pause in proceedings.)

8          **THE COURT:**  Feel free if you-all want to have a little

9    chat.  Don't feel rushed.  My sense is that your chat with each

10   other is productive so go ahead.

11         **MR. WISNER:**  No, it was just do I have an extra copy,

12   Your Honor.  It wasn't -- we talked about it during the break,

13   and we could not reach agreement on the disputes on these five

14   topics.

15         **THE COURT:**  Okay.  No, I haven't really looked at

16   this.

17         **MR. WISNER:**  Okay.  Do you want to discuss it now or

18   would you like to not do that?

19         **THE COURT:**  Sure.

20         **MR. WISNER:**  So really there's five topics,

21   Your Honor.  The first two are very related and they relate

22   specifically to Monsanto's lobbying efforts after October of

23   2014, which is when we became -- we knew that IARC was going to

24   investigate glyphosate.  That's when everyone found out about

25   it.  At least that's when Monsanto found out about it I should

1  say.

2      They relate to GBFs or glyphosate-based formulations and

3  they relate to IARC specifically.  I can give you a lot of

4  background, but I'll just keep it very brief.  These are all

5  top -- this is -- we have a lot of documents by Monsanto to

6  FTI Consulting.  We actually describe some of those.

7          **THE COURT:**  What's FTI Consulting?

8          **MR. WISNER:**  It is the lobbying firm for Monsanto on

9  Congress.

10         **THE COURT:**  Okay.

11         **MR. WISNER:**  And we have a lot of documents showing

12  through them that Monsanto did certain things in light of IARC

13  that I think are relevant even to general causation.

14      Specifically they got a congressman to write a letter

15  threatening the NCI for not having published the HS data update

16  and why haven't they and demanding that they do so by

17  October 22nd.  On that date, NCI submitted it for publication.

18      And so we want to explore exactly what communications,

19  what conduct Monsanto's lobbyists did or did not do in sort of

20  creating that effect.  There was also a full congressional

21  hearing aimed to defund IARC based upon a Reuters article that

22  was -- actually we have the documents to support this -- that

23  was largely not written but put together in a PowerPoint for

24  Monsanto that was then published.  That same Reuters article

25  was the sole basis for the congressional hearings that accused

1    Dr. Blair of hiding data from its IARC panelists, and they

2    threatened to defund it.

3        It actually required IARC to come and testify before

4    Congress, and it was stuff that actually has formed the basis

5    of some of our general causation briefing, specifically a

6    letter by Director Wild of IARC talking about what they did and

7    did not do vis-a-vis exposure, for example.

8        The conduct that Monsanto engaged in in response to the

9    IARC monograph, both prior to its actual release and subsequent

10   to it, goes directly to punitive damages.  It goes to malicious

11   intent and that's why we want to discover it.

12       Now, obviously, what testimony we get will be subject to

13   admissibility decisions later; but for the purposes of

14   discovery, we think we should be allowed to inquire into that.

15       So those are the first two topics, Your Honor.  I'll just

16   take them up -- I think you should -- it would be probably

17   easier to respond topic by topic unless you want me to go

18   through all of them.

19           **THE COURT:**  Okay.  So this would be topics 11 and 12

20   that we're talking about?

21           **MR. WISNER:**  That's correct, Your Honor.

22           **THE COURT:**  Okay.  Go ahead.

23           **MR. STEKLOFF:**  Sure, Your Honor.

24       Just I want to give a little bit of background.  We're

25   talking about a notice that was issued of a 30(b)(6) witness.

1    There were 26 topics.  It's Exhibit A to that in that notice.

2    During the meet and confer, the plaintiffs withdrew I believe

3    five topics.  So there were 21 topics left.

4        We have agreed to produce a corporate representative under

5    Rule 30(b)(6) on 16 of those topics; and if you look at those

6    topics in Exhibit A on which there's no dispute, they are very

7    broad.  I mean, they talk about the company's overall position

8    on, you know, the science related to glyphosate and NHL.  They

9    talk about all of our regulatory interactions.  So I want to

10   give that context to try to show that this is a more narrow

11   dispute.

12       With respect to these issues on Congress, I actually think

13   that there's a lot of similarity.  I know we'll talk about

14   topics 19 and 26, but in some ways I think topics 11, 12, 19,

15   and 26 all have a lot of overlap.  They all involve plaintiffs'

16   efforts to seek discovery about Monsanto's interactions with

17   either government -- you know, Congress or other legislative

18   bodies or with the media.

19       A few other sort of background points for Your Honor.  I

20   mean, Mr. Wisner and his colleagues are going to depose some

21   fact witnesses before the Hardeman trial where we've agreed to

22   produce witnesses, and I think that some of those witnesses are

23   custodians on the documents that he's talking about.  So my

24   sense is that they will explore a lot of these topics through

25   fact witnesses.

1      With respect to FTI, the third party that he referenced,

2   he has served -- the plaintiffs have served a subpoena on FTI

3   both seeking documents and a corporate representative from FTI

4   to testify.

5      So there's a lot of other discovery going on on these

6   issues.  I mean, I think that -- you know, and so -- and absent

7   sort of privilege issues that might come up, there is nothing

8   precluding him from, for example, showing fact witnesses the

9   documents that he referenced that have been produced in the

10  litigation.

11     With respect to these topics, I think the danger of sort

12  of opening -- our fundamental position really on topics 11, 12,

13  19, and 26 is that there have been a lot of -- there have been

14  efforts -- and I'm not imputing anyone, but I am confident that

15  the plaintiffs' attorneys have also had interactions with

16  Congress, with governmental agencies, with European

17  governmental agencies, with media, that they have been doing

18  things.  There have been promotional efforts on the Internet.

19  If you look at topic 26, that they have been doing things in

20  the media both through advocacy groups, through celebrities,

21  through jurors in the Johnson case.

22     And I -- there's a goose/gander thing here, and I raised

23  it with the plaintiffs during the meet and confer, which is

24  there's no need to open up this can of worms because if they

25  are entitled, for example, to a company witness deposition

1   about these topics --

2       **THE COURT:**  I mean, I'll cut you off for a second to

3   just say that I do not think -- I mean, if we were just

4   having -- if this case was only about causation, I would

5   probably say "No further discovery on this stuff."

6       But when it comes to punitive damages, it's not a

7   goose/gander thing.  I mean, there is a responsibility that

8   Monsanto has to ensure that its product is safe and to the

9   extent there are serious concerns about the safety of its

10  product, Monsanto has a responsibility not to try to snuff out

11  those concerns but to investigate them.

12      And it seems to me that documents or information that -- I

13  know we're talking about a 30(b)(6) deposition -- documents or

14  information that speak to these topics, these four topics --

15  you keep bracketing 18 so I guess we'll talk about that

16  separately, but topic 11, 12, 19, and 26 -- it seems like those

17  are potentially relevant to, you know, the question whether

18  Monsanto should have been trying to snuff out concerns or, you

19  know, investigate concerns in a more objective fashion.

20      And in saying what I'm saying I'm not casting any -- I'm

21  not suggesting that I have an opinion either way about that,

22  but it's an inquiry that it seems to me is relevant to the

23  punitive damages part of the case.

24      So I'm going to allow topics 11, 12, 19, and 26.

25      What about topic 18?

1          **MR. STEKLOFF:**  Can I make one comment --

2          **THE COURT:**  Sure.

3          **MR. STEKLOFF:**  -- on 11, 12, 19 and 26, which is that

4    even punitive damages have to be relevant to the conduct

5    associated with the plaintiffs; and certainly with respect to

6    Mr. Hardeman but I think with respect to all three plaintiffs,

7    they were all diagnosed with their NHL prior to the events that

8    the plaintiffs are alleging took place.

9          **THE COURT:**  Okay.

10          **MR. STEKLOFF:**  And so I think that that is a second

11    problem, which is that, you know, for example, 26, things that

12    were happening in the last, I don't know, six months in the

13    San Francisco area have nothing to do even with punitive --

14    even -- have no bearing on punitives as it relates to these

15    three plaintiffs, and I think that that is true with respect

16    really actually to 11, 12, 19, and 26, because all of this

17    conduct so far -- alleged conduct so far postdates their injury

18    and the warnings that could have been given to them.

19          So I understand that if punitives are available, if it

20    goes to the jury, that may occur, but that should be based on

21    conduct tied to the allegations that relate to the plaintiffs'

22    claims, and the plaintiffs' claims all predate that.

23          **THE COURT:**  It strikes me that it's at least possible

24    that they would be allowed to make an argument, "Look, they're

25    still doing it.  Even now they're still doing it."  So I'm

1    allowing those four topics.

2         Obviously it's a separate issue whether anything

3    discovered through that is admissible at trial, but I'm

4    allowing those four topics.

5         Now, what about topic 18?

6         **MR. WISNER:**  Topic 18, Your Honor, is a little

7    different insofar as it involves something called "Let Nothing

8    Go."  It was a promotional scientific campaign, it's unclear

9    exactly what it is, that was managed and supervised by people

10   working out of St. Louis in Missouri for Monsanto; but it was,

11   according to defense counsel's representations to me, it was

12   limited to conduct in Europe.  So that's their big objection,

13   is that it relates to Europe and, therefore, is irrelevant to

14   our case.

15        And our position is, well, no, if they're attacking IARC

16   in Europe, that goes to the same exact issue as if it was done

17   attacking the IARC from the U.S.  And so while -- you know, I

18   don't know what we'll learn, but it's reasonably calculated to

19   lead to potentially admissible information.  So I think asking

20   questions about it, learning what the corporation has to say

21   about it will give us an insight into answering this question.

22        **THE COURT:**  Well, I mean, I don't know anything about

23   this "Let Nothing Go" campaign, but it seems to me that even

24   aside from IARC, to the extent that Monsanto wants to argue, as

25   I think it should have the right to do, "Look, how can you say

```
 1   that our conduct is malicious when not only in the

 2   United States have they approved it but in Europe, that place

 3   where they're really careful, you know, the regulators have

 4   allowed glyphosate on the market?"

 5       You know, that even putting aside IARC, to the extent

 6   there is, you know -- there were efforts by Monsanto to sort of

 7   obtain that result in the face of evidence, you know, that that

 8   result shouldn't have been obtained, it seems to me that you

 9   would have the right to explore that.

10       But go ahead.

11       MR. STEKLOFF:  I think this is more -- I think there

12   is a relevance aspect to this.  I also think there's just a

13   proportionality argument here under Rule 26 --

14       THE COURT:  Yeah.  Okay.

15       MR. STEKLOFF:  -- which is really -- again, my

16   understanding is that this "Let Nothing Go," they describe it

17   as a campaign, was taking place in Europe.  They have -- one of

18   their other topics --

19       THE COURT:  What is the -- can you give me kind of a

20   neutral description of what does "Let Nothing Go" mean?

21       MR. STEKLOFF:  If I could, I would.  I can give you a

22   description -- so the topic 17, I think, was something called

23   "Freedom to Operate," which is I think potentially -- I don't

24   want to bind myself to this, but they asked for a 30(b)(6)

25   representative about what they would describe as a "Freedom to
```

1   Operate" campaign.

2        **MR. WISNER:**  I believe Monsanto describes it as that.

3        **MR. STEKLOFF:**  Well, no, it's called "Freedom to

4   Operate" within Monsanto, I'm not denying that, and we are

5   producing a witness on that.  That was a U.S. endeavor, and so

6   I think it is -- I would describe it neutrally as an effort to

7   put accurate science -- make sure that accurate science is

8   being communicated about Monsanto's products.

9      Nothing precludes --

10       **THE COURT:**  But "Let Nothing Go" means -- does it mean

11  like respond to everything, don't let anything go unresponded

12  to?

13       **MR. STEKLOFF:**  I haven't talked to any company

14  witnesses --

15       **THE COURT:**  Okay.  All right.

16       **MR. STEKLOFF:**  -- about "Let Nothing Go" to be able to

17  tell you, Your Honor, so I don't want to try to be able to

18  characterize it.

19       **THE COURT:**  Okay.

20       **MR. STEKLOFF:**  What I would say here is, again I have

21  not looked at the documents myself but I've been told that

22  there are documents of U.S.-based employees in which "Let

23  Nothing Go" comes up.  Even assuming, which I think is

24  accurate, it is a European, to use their word, campaign,

25  nothing precludes them from asking fact witnesses about those

1    documents, but we would now need to go get someone from Europe

2    to come here potentially or have them go there.

3        We have a lot going on and so our position here was really

4    under Rule 26, given that it -- even if it -- I'm not sure it's

5    relevant to punitive damages here where they are asking lots of

6    witnesses about what they were doing with IARC in the

7    United States.  What was happening in Europe I'm not sure is a

8    central issue; but then when you throw in sort of I think the

9    burden and the concept of proportionality under the Federal

10   Rules, that was our position in asking them to consider

11   withdrawing this and why we are raising it in front of

12   Your Honor.

13           **THE COURT:**  Okay.

14           **MR. WISNER:**  Just for the record, I will be in France

15   for the Christmas holidays so if that makes anything easier on

16   your end.

17       No, joking aside, Your Honor, I think proportionality

18   argument sort of rings hollow when you actually listen to

19   opposing counsel's comment.  He doesn't even know what it is,

20   and that's literally our problem.  That's why we're conducting

21   discovery, to learn what it was, to learn how it was used.

22       And I can't imagine this testimony would be longer than

23   15, 20 minutes.  I have about 10, 15 documents at most that I

24   could even conceivably use for this, and I just need to know

25   what it is, and I need the testimony.

1          And it's an important distinction between a fact witness

2     and Monsanto -- right? -- because in the Johnson case their big

3     argument was Donna Farmer, Bill Heydens, all of the main

4     witnesses that we've taken, none of them are managing agents,

5     none of their conduct can be imputed to the corporation.

6          Okay.  So give me the corporation and I'm going to ask

7     about their conduct and let's see if you ratify it or not.  And

8     so in a "Let Nothing Go" context, I need the testimony from the

9     corporate representative so it's binding on the corporation for

10    trial.

11          **THE COURT:**  Okay.  I'll allow topic 18.

12          Anything else?

13          **MR. STEKLOFF:**  I don't think the defense has any other

14    agenda items, Your Honor.

15          **MS. WAGSTAFF:**  Your Honor, nothing else from the

16    plaintiffs.  We will continue to meet and confer on the

17    Hardeman discovery issues and submit a discovery letter by the

18    end of the week if we need to.

19          **THE COURT:**  Okay.  Sounds good.  So, good.  That was

20    fairly efficient.

21          You're going to get together, you're going to talk about

22    putting together a more detailed pretrial schedule with

23    deadlines, exchanges of this and that and the other thing.  Do

24    you want to come see us again in the month of December or would

25    you rather be doing trial preparation?

```
 1                    (Counsel conferring.)

 2          THE COURT:  Or early January.

 3          MS. WAGSTAFF:  All right.  I'm told by my colleague

 4  that we would like to put something on calendar and then cancel

 5  it if we need to.

 6          THE COURT:  Okay.  Do you want to come --

 7          MS. WAGSTAFF:  Because we only have 45 depos in the

 8  next two weeks.

 9          THE COURT:  Right.

10          MR. WISNER:  One other request, Your Honor.  We

11  actually would request oral argument on the reverse

12  bifurcation.

13          THE COURT:  I'll let you know if I need it.

14          MR. WISNER:  Okay.

15          MS. WAGSTAFF:  So I would propose either the week

16  between Christmas and New Year's or the first week of January.

17          THE COURT:  We can do the first week of January.  How

18  about --

19          MS. WAGSTAFF:  January 2nd?

20          THE COURT:  I was going to suggest the 4th.

21      Let me see, what's that?  Pretrial conference in what?

22      We could do the afternoon -- yeah, that's Morgovsky.

23  That's gone.  And then, let's see here, I think we could

24  probably do Thursday afternoon.  We could do Friday.

25          MS. WAGSTAFF:  The 3rd or 4th work for plaintiffs,
```

1

2

3                    **CERTIFICATE OF REPORTER**

4            I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Saturday, December 8, 2018

8

9

10

11    _____

12            Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25