**ANDRUS WAGSTAFF, PC**
Aimee H. Wagstaff (SBN 278480)
7171 W. Alaska Drive
Lakewood, CO  80226
Tel: (303) 376-6360
Fax: (303) 376-6361
Aimee.wagstaff@andruswagstaff.com

**WEITZ & LUXENBERG, P.C.**
Robin L. Greenwald
700 Broadway
New York, NY  10003
Tel: (212) 558-5802
Fax:  (646) 293-4921
rgreenwald@weitzlux.com

**THE MILLER FIRM, LLC**
Michael J. Miller (*pro hac vice*)
Brian K. Brake (*pro hac vice*)
108 Railroad Ave.
Orange, VA  22960
Telephone: (540) 672-4224
Facsimile: (540) 672-3055
mmiller@millerfirmllc.com
bbrake@millerfirmllc.com

*Co-Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-02741-VC<br><br>MDL No. 2741 |
| *Hardeman v. Monsanto Co., et al.*, 3:16-cv-0525-VC<br>*Stevick v. Monsanto Co., et al.*, 3:16-cv-2341-VC<br>*Gebeyehou v. Monsanto Co., et al.*, 3:16-cv-5813-VC | **PLAINTIFFS' RESPONSE IN OPPOSITION TO MONSANTO'S MOTION IN LIMINE NO. 7** |

I. **BACKGROUND AND SUMMARY OF ARGUMENT**

Plaintiffs, Edwin Hardeman, Elaine Stevick, and Sioum Gebeyehou (collectively, "Plaintiffs"), hereby oppose the entirety of Defendant Monsanto Company's (hereinafter, "Monsanto" or "Defendant") Motion *in Limine* No. 7 seeking to exclude evidence or argument regarding post-use corporate conduct ("MIL No. 7"). Most fundamentally, Monsanto's manipulation of studies regarding glyphosate—including ghostwriting articles and exerting improper pressure on scientists studying the same—have continued past Plaintiffs' last use of RoundUp, and thus Plaintiffs should be allowed to introduce evidence to impeach the credibility of Defendant's experts and display the true state of the science. *See* ECF Dkt. No. 2406 (PTO 61), at p. 2 ("if the plaintiffs have evidence that Monsanto manipulated the outcome of scientific studies … that evidence may well be admissible at the causation phase.").

On March 21, 2015, the International Agency for Research on Cancer ("IARC") classified the ingredient in Monsanto's Roundup, glyphosate, as "probably carcinogenic to humans." Plaintiffs anticipate that at trial their experts will opine, and Monsanto's documents and witnesses will show, that Monsanto predicted such a classification was on the horizon and, for ***decades***, engaged in extensive scientific fraud and manipulation of the scientific literature with respect to Roundup. Monsanto systematically ghostwrites articles relied upon by the EPA, IARC, and California's OEHHA, continuing through 2016 and beyond: it rewards its employees for ghostwriting articles, it ghostwrites published articles for the purpose of supporting its position in this litigation, misrepresents its role in journal published articles submitted to the EPA, and actively suppresses the publication of adverse articles. *See*, e.g., Wagstaff Declaration, Exhibit 1[1] (Benbrook Expert Report) at ¶¶ 10b, 94, 106, 499-500, 524-25, 547, 549, 553-54. Plaintiffs' complaints explicitly allege that Monsanto knowingly and intentionally engaged in a decades-long scheme to misrepresent, conceal, and downplay the risks of the side effects of glyphosate. *See, e.g.,* Exh. 2 (Hardeman First Amended Complaint), at ¶¶ 117, 119-120, 124p-q, 127h, 173. Plaintiffs should be permitted to prove these allegations by looking at the whole of Monsanto's conduct, up to any beyond the date of Plaintiffs' last use of RoundUp.

Monsanto bases its MIL No. 7 on Federal Rules of Evidence 401 and 403, arguing that

---

[1] All subsequent "Exhibit" or "Exh." citations refer to those attached to the Declaration of Aimee H. Wagstaff.

Monsanto's corporate conduct—which can be described as a continuous and concerted effort to spread misleading scientific propaganda to regulatory and scientific bodies for decades—is "irrelevant" to this litigation to the extent it continued to occur in 2012, 2014, or 2016 for Mr. Hardemann, Ms. Stevick, and Mr. Gebeyehou, respectively. *See* MIL No. 7, at pp. 1-2.  Not so. Monsanto's involvement in directing the relevant science, authoring the studies depicting that science, and suppressing studies contrary to its end goals is undoubtedly relevant to Monsanto's liability generally (*i.e.,* its knowledge or the "knowability" of glyphosate's carcinogenicity), causation (*i.e.*, had Monsanto not taken these steps it would have prevented or mitigated Plaintiffs' injuries), and punitive damages.  The jury should be permitted to learn the entirety of Monsanto's well-established pattern and practice of improperly influencing the science surrounding glyphosate, which continues today, and thus Monsanto's MIL No. 7 should be denied.

II. **ARGUMENT**

   A. **Monsanto's Corporate Conduct is Highly Relevant Because Monsanto's Own Causation Experts Rely on Articles *Ghostwritten* by Monsanto Well Into 2016.**

   Plaintiffs' expert, Dr. Benbrook, will opine and Monsanto's own documents and witnesses will show that Monsanto commissioned and ghost-wrote numerous reviews of genotoxicity studies and/or articles commissioned and ghost-written by Monsanto from at least 2000 through 2016 and attributed to Dr. Gary Williams and Dr. Solomon: *Williams, et al.* (2000); *Williams, et al.* (2012); *Williams, et al.*, (2016); *Solomon* (2016).  *See, e.g.,* Wagstaff Decl., Exh. 1, at ¶¶ 505-512, 538-545, 548-549, 588, 635-638, 643-644, 747.  In order to exercise influence over these articles, Monsanto hired consulting firms including Intertek Cantox / CanTox Intertek ("Intertek") and Exponent Inc. to manage and put together these articles from at least 2000 through 2016.  *See id*., at ¶¶ 507-511, 559-561, 670-699.

   Monsanto's ghostwriters and Intertek became extremely important tools Monsanto used to fraudulently downplay the risks of glyphosate. In 2016, Monsanto worked with Intertek to ghost-write numerous articles attributed to Dr. Williams and Dr. Solomon in a journal titled "*Critical Reviews in Toxicology*" (the "Intertek CRT Articles") to undermine IARC's classification of glyphosate as a probable human carcinogen and fraudulently concealed the true dangers of glyphosate.  *See id.* at ¶¶ 704-707, 760-777.  The Intertek CRT Articles (2016) include:

- Williams, *et al.* (2016) A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment, *Critical Reviews in Toxicology*, 46:sup1, 3-20;
- Williams, *et al.* (2016) Glyphosate rodent carcinogenicity bioassay expert panel review, *Critical Reviews in Toxicology*, 46:sup1, 44-55;
- Solomon, K.R. (2016) Glyphosate in the general population and in applicators: a critical review of studies on exposures, *Critical Reviews in Toxicology*, 46:sup1, 21-27.

Incredibly, Monsanto's own experts in this case, Drs. Goodman and Sullivan, rely on Monsanto's ghost-written Intertek CRT Article, *Solomon* (2016), for their opinion regarding Plaintiffs' dose/exposure range. *See* Exh. 3 (excerpt of Goodman Report), at pp. 29, 35, 43; Exh. 4 (excerpt of Sullivan Report re Hardeman), at pp. 4, 12; Exh. 5 (excerpt of Sullivan Report re Stevick), at pp. 4, 11; Exh. 6 (excerpt of Sullivan Report re Gebeyehou), at pp. 4, 12. And Monsanto's efforts to influence the science surrounding glyphosate go further: David Saltmiras, a Lead Science Fellow at Monsanto, asserts that he "[g]host authored/coauthored/ coordinated key and time critical glyphosate safety publications" in response to IARC's decision to evaluate Roundup®. Exh. 7; *see also* Exh. 8 (Saltmiras "ghost wrote cancer review paper Greim et al. (2015)"). Indeed, the EPA itself has relied on ghostwritten studies. *See* Exh. 9 (excerpt of EPA's OPP Revised Glyphosate Issue Paper), at pp. 22, 99 (relying on Kier and Kirkland (2013)). The Kier and Kirkland (2013) study, however—entitled "Review of genotoxicity studies of glyphosate and glyphosate-based formulations—was also originally written by Saltmiras, and there is even a draft which lists Saltmiras as an author. *See* Exh. 10.

Monsanto claims that its conduct after each Plaintiffs' last use of RoundUp is not relevant. *See* MIL No. 7, at pp. 2-3. The caselaw and jury instructions Defendant cites, however, require only that "knowledge or know*ability*" of a risk be demonstrated by the plaintiff. Monsanto's manipulation of the relevant science speaks directly to the "knowability" of glyphosate's risks. *See Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 999-1000 (1991), CACI Nos. 1203 & 1222.

Given the breadth and longevity of Monsanto's ghostwriting, and that **Monsanto's own experts have even rendered opinions relying on Monsanto's ghost-written CRT Articles from 2016,** Plaintiffs must be allowed to demonstrate the way in which such articles—and even the underlying science itself—have been manipulated through Defendant's corporate conduct. This includes being permitted to cross-examine Defendant's experts on the Intertek CRT Articles (2016) to show that they were ghost-written by Monsanto, and introducing post-use corporate conduct evidence which calls into

question the validity of this science. Not only are the articles relevant to the bias and credibility of Monsanto's witnesses, the jury's evaluation of these articles is critical to the weight the jury should give to the opinions of Monsanto's experts and to the weight of its scientific evidence generally.

**B. Monsanto's Corporate Conduct is Relevant to Its Course of Conduct, Pattern, and Practice of Fraudulently Concealing the Known Connection Between Roundup and NHL.**

Plaintiffs intend to show at trial that, for decades until present day, Monsanto has worked tirelessly to "Invalidate relevance of IARC," shield Monsanto from California's Proposition 65, fraudulently manipulate the scientific community, and take steps to prevent this type of litigation – namely, product liability lawsuits on behalf of victims diagnosed with non-Hodgkin's lymphoma after using Monsanto's glyphosate-containing products. *See* Exh. 1, at ¶ 665; Exh. 11 ("IARC FOLLOW UP") at p. 1. Indeed, Plaintiff anticipates that Dr. Benbook will opine that, in a document dated 2/15/15, Monsanto set forth a plan that would hopefully generate an "orchestrated outcry" after the March 2015 IARC working group meeting where IARC would eventually classify glyphosate as a probable human carcinogen. *See* Exh. 1, at ¶¶ 639-646. In other words, Monsanto's corporate pattern/practice—through present day—has been to 1) "invalidate" IARC, 2) undermine Proposition 65, 3) fraudulently manipulate the scientific community, and 4) prevent the exact type of products liability litigation *sub judice*. *Id.*, *see also id.*, at ¶ 667. Monsanto's corporate conduct from 2012 to present is simply a ***continuation*** of Monsanto's pattern/practice of scientific fraud established decades ago, accelerated in 2015, and continuing to present day.

The cases cited by Monsanto do not suggest otherwise. Apart from descending largely from foreign jurisdictions, they only address a defendant's conduct which is dissimilar from that being considered by the court. *See Diamond X Ranch LLC v. Atl. Richfield Co.*, Case No. 3:13-CV-00570-MMD-WGC, 2018 WL 2127734 (D. Nev. May 8, 2018) (discussing distant contaminated sites which unrelated to the pollution at issue in *Diamond X Ranch LLC*); *Miller v. Pfizer, Inc. (Roerig Div.)*, 196 F. Supp. 2d 1095, 1122 n. 92 (D. Kan. 2002) (considering admittance of advertising that prescribing doctor had not seen); *Holdgrafer v. Unocal Corp.*, 160 Cal. App. 4th 907, 928 (2008) (omitting only evidence of dissimilar events "radically different from the conduct at issue in this case.").[2] Thus where,

---

[2] Defendants' reference to *Georges v. Novartis Pharm. Corp.*, Case No. CV 06-05207 SJO VBKX, 2013 WL 5217198 (C.D. Cal. Apr. 4, 2013), can likewise be disregarded as the exclusion of label changes made after the plaintiff's last drug treatment was on the basis of the subsequent-remedial-efforts exclusion (FRE 407), not

as here, the evidence to be introduced is relevant to Defendant's ***ongoing*** behavior and conduct—behavior which continues to impact the science surrounding glyphosate—it should be allowed.

**C. Defendant's Corporate Conduct After January 2016 is Relevant to Punitive Damages.**

"The degree of reprehensibility of the defendant's conduct is the most important indicator of the reasonableness of a punitive damages award." *Bullock v. Philip Morris USA, Inc*., 198 Cal. App. 4th 543, 559 (2011) (*citing State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003); *accord BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). "Nothing the high court has said about due process review requires that California juries and courts ignore evidence of corporate policies and practices and evaluate the defendant's harm to the plaintiff in isolation." *Id.*, at 690-691 (quoting *Johnson v. Ford Motor Co.*, Cal.4th 1191, 1207 (2005)). Accordingly, evidence of Monsanto's intent, knowledge, and conduct—even if post-use—is highly relevant to the jury's consideration of punitive damages.

Notably, Defendant does not cite any case to support its claim that a plaintiff is limited to liability evidence when establishing punitive damages.[3] Indeed, Defendant's claim is untenable given that courts regularly prevent punitive damages evidence from being presented until liability has been established. *See*, e.g., California Civil Code § 3295 (preventing pretrial discovery of profits wrongfully gained or defendant's financial condition without explicit court approval). No court has imposed a time limitation on "the reprehensibility of the defendant's conduct," and thus to the extent a defendant was continuing to demonstrate a lack of concern for the public's health, after being explicitly on notice of the associated dangers of its product, such conduct is relevant to the "reprehensibility of [its] conduct."

Indeed, "[e]vidence of such conduct is admissible [] if the court 'ensure[s] the conduct in question replicates the prior transgressions'"; "other acts need not be identical to have relevance in the calculation of punitive damages." *Holdgrafer*, 160 Cal. App. 4th at 928 (quoting *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 422-24).

**D. Defendant's Corporate Conduct is Relevant to Causation.**

Had Monsanto not engaged in a decades-long campaign to fraudulently conceal the known risks

---

because of relevance or undue prejudice. Indeed, the *Georges* court denied the defendant's request to exclude evidence of its conduct and knowledge because "such evidence could be relevant to questions of causation." *Id.*, at *13-14, and n. 9 (collecting cases).

[3] Defendant's sole reference is to a case that noted no independent cause of action for punitive damages ***for a 42 U.S.C. § 1983 claim against a prison officer***. *See Cortez v. Skol*, 776 F.3d 1046, 1050, n. 2 (9th Cir. 2015).

of glyphosate, Plaintiffs would not have used the product. *See*, *e.g.*, Exh. 12 (Hardeman Deposition), at 295:19-298:21.

### III. CONCLUSION

For the foregoing reasons, Plaintiff requests that this Court **DENY** Defendants' MIL No. 7.

Dated:  January 30, 2019                                  Respectfully submitted,

/s/ Aimee Wagstaff
Aimee H. Wagstaff (SBN 278480)
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, P.C.
7171 W. Alaska Drive
Lakewood, CO  80226
Tel: (303) 376-6360

/s/ Robin Greenwald
Robin L. Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY  10003
Tel: (212) 558-5802

/s/ Michael J. Miller
Michael J. Miller (*pro hac vice*)
Brian K. Brake (*pro hac vice*)
mmiller@millerfirmllc.com
bbrake@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave.
Orange, VA  22960
Telephone: (540) 672-4224

*Co-Lead Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I certify that on January 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the CM/ECF participants registered to receive service in this MDL.

/s/ Aimee Wagstaff
Aimee H. Wagstaff (SBN 278480)
aimee.wagstaff@andruswagstaff.com