# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | Case No. 16-md-02741-VC<br>MDL No. 2741 |
| This document relates to:<br><br>ALL ACTIONS | |

# Glyphosate: Review and Interpretation of Key Aspects of the Scientific Literature Concerning Genotoxicity and Oxidative Stress Data

Jay I. Goodman

31 July 2017

## Background

I am a Professor in the Department of Pharmacology and Toxicology at Michigan State University. I hold a B.S. degree from Long Island University's College of Pharmacy in Brooklyn, New York. I obtained my Ph.D. in Pharmacology in 1969 from the University of Michigan, Ann Arbor, Michigan. I then completed a post-doctoral fellowship in 1971 at the University of Wisconsin's McArdle Laboratory for Cancer Research. I am board certified by the American Board of Toxicology and Academy of Toxicological Sciences.

After my fellowship, I joined the faculty of Michigan State University's Department of Pharmacology (renamed the Department of Pharmacology and Toxicology in 1978), where I have continued to teach and conduct research on toxicology, with a focus on the mechanisms involved in carcinogenesis, for over four decades. I teach mutagenesis, carcinogenesis, toxicology in drug development, and risk/safety

assessment of carcinogens to undergraduate, and, primarily, graduate students. Additionally, I have taught courses in antibiotics, antiviral drugs and cancer chemotherapy to medical students, and I coordinate a pharmacology course for veterinary students, where I teach the antibiotics section. From 1979-1997, I chaired MSU's Department of Pharmacology and Toxicology's Graduate Committee, playing a key role in recruiting, admission, course development/requirements, comprehensive examination and monitoring student progress.

I have served on a number of advisory committees and boards, including the Boards of Scientific Counselors of the National Toxicology Program and the National Institute of Health's National Institutes of Environmental Health Sciences, Chair of the Carcinogenesis Subcommittee, Committee for the Review of Functions and Purposes of the National Toxicology Program, Department of Health and Human Services, the Advisory Committee to the Director of the Centers for Disease Control and Prevention, the Pharmaceutical Sciences Advisory Committee to the U.S. Food and Drug Administration, the Board of Directors of the American Board of Toxicology, as well as a member of the Expert Review Group, U.S. Environmental Protection Agency Workshop on Cancer Risk Assessment Guideline Issues, Review of the draft revisions to the Guidelines for Carcinogen Risk Assessment. I am currently a member of the Committee on Inorganic Arsenic, National Academies of Science, National Research Council, and Board on Environmental Studies and Toxicology.

I have authored over 130 publications and currently serve as an Associate Editor for the journal *Regulatory Toxicology and Pharmacology* and I am a member of the Editorial Board for the journal *Toxicology*. I previously served as President of the Society of Toxicology (1999-2000) and was recently elected to membership on the Society's Nominating Committee (2017-2019), and I am currently the first American to serve as a member of the Education Subcommittee of the Federation of European Toxicologists & European Societies of Toxicology (EUROTOX). I am also a member of several professional societies, including the American Society for Pharmacology and Experimental Therapeutics, Society of Toxicology, American Association for the

Advancement of Science, American Chemical Society, International Society of Regulatory Pharmacology and Toxicology (I am currently a member of the Society's Council) and the Toxicology Forum (I am currently a member of the Forum's Board of Directors). I have received several awards for my work in Toxicology, including International Society of Regulatory Toxicology and Pharmacology's International Achievement Award (2014), Society of Toxicology's Merit Award (2014), the Toxicology Forum's George H. Scott Memorial Award (2007), John Barnes Prize Lecture, awarded by the British Toxicology Society (2005), among others.

My research interests involve a long-standing focus on discerning epigenetic mechanisms underlying carcinogenesis, with an emphasis on enhancing our understanding of mechanisms by which non-genotoxic compounds can cause cancer. My curriculum vitae, which more fully sets forth my qualifications, is attached as Attachment A.

My opinion is based on my review of the related scientific literature and my professional education, training, research, and experience. Unless otherwise stated, all of my opinions are offered to a reasonable degree of scientific certainty. I reserve the right to supplement or amend this report as new information comes to my attention or becomes available. A list of materials I have considered in forming my opinions is attached as Attachment B.

I am being compensated for my work in this matter at a rate of $450/hour. Over the past four years I have not provided any expert testimony.

## Conclusion

My review of the scientific literature dealing with the potential genotoxicity of glyphosate-based formulations (GBFs), glyphosate and aminomethylphosphonic acid (AMPA) leads me to conclude that these should be regarded as non-genotoxic materials. Furthermore, while GBFs and/or glyphosate might be capable of causing oxidative stress under certain experimental conditions, my review of the scientific

3

literature leads me to conclude that it is not appropriate to use this observation to support a contention that these materials are capable of causing cancer.

My disagreements with the conclusions drawn by Plaintiffs' experts (Drs. Jameson, Nabhan, Neugut, Portier, Ritz and Weisenburger) stem from a difference in perspective. Plaintiffs' experts tend to cite the scientific literature in a fashion that emphasizes the authors' bottom line conclusions without further analysis, while also ignoring large portions of the available science. My approach involves consideration of a larger number of scientific articles and is more focused on taking a constructive, scholarly, critical look at the underlying experimental design and methodology employed to produce the data in order to place the author's results and conclusions into proper perspective.

An example of how this difference in perspective between Plaintiffs' experts and myself leads to different conclusions can be seen in the section of this Report entitled "Genetic Effects (DNA damage or Chromosomal damage) of Glyphosate-Based Formulations (GBFs) in Allegedly Exposed Humans," which appears on p. 12-17. There I present a comparison of my evaluation of two key papers (Paz-y-Mino *et al.* 2007 and Bolognesi *et al.* 2009) which report that genotoxicity is caused in humans exposed to a glyphosate-based formulation (GBF) with views expressed by Plaintiffs' experts.

## A Basic Introduction to Toxicity Testing

In a fundamental sense, biology is very complex chemistry. When biological systems, e.g., whole animals, cells in culture, or subcellular organelles (e.g., mitochondria) are exposed to a chemical it is to be expected that effects might occur and not all of these are necessarily indicative of toxicity. Just what these effects are will be dependent on multiple factors, e.g., the particular chemical, test system (e.g., species), dose/concentration used, dosing frequency and route of administration. For example, dosing by the oral route does not necessarily yield the same result as dosing by intravenous administration. When evaluating data obtained from experiments aimed

F.  *In vivo* tests for micronuclei induction in mammals[11]

I have reviewed relevant study summaries or published articles for 19 *in vivo* tests for micronuclei induction in mammals. Three were positive (possibly suggestive of genotoxic potential) while 16 were negative (no evidence of genotoxic potential).

Positive responses were reported by Bolognesi *et al*. 1997 and Mañas *et al*. 2009 following administration of glyphosate to mice using doses of 300 mg/kg and 200 mg/kg, respectfully. Regarding Bolognesi *et al*. 1997, a highly non-physiological i.p. route of administration was used. As discussed above, the much higher rate of absorption following i.p. administration might result in toxicity that would not be observed following dosing under the more physiological routes of administration. Additionally, Bolognesi *et al*. 1997 did not include an evaluation of cytotoxicity in their study. This is a fundamental error. Without this the possibility that the finding reported might have been secondary to cytotoxicity cannot be ruled out. Therefore, in light of the use of the i.p. route of administration and lack of an evaluation of cytotoxicity, I conclude that it is not appropriate to use results reported by Bolognesi *et al*. 1997 in an overall evaluation of the potential of glyphosate to cause DNA damage.

There are 9 studies which employed doses of 300 mg/kg or higher (6 of these involved doses of 1,000 to 5,000 mg/kg) and reported that there was no induction of micronuclei. In one study, a significant increase was reported to occur in female mice following treatment with a dose of 5,000 mg/kg (Suresh 1993a). This is in contrast to two studies (Jensen 1991; Fox and Mackay 1996) which reported negative results when glyphosate doses of 5,000 mg/kg were used. ==To place this extremely high dose into perspective, it should be noted that the US EPA estimates that the exposure of the US population to glyphosate by food and water is 0.088 mg/kg/day (Solomon 2016)== and US EPA considers children 1-2 years old the most highly exposed subpopulation with an estimated combined exposure of 0.47 mg/kg/day (EPA 2016) making a 5,000 mg/kg

---

[11] Appendix 11: EPAs Table 5.6. *In vivo* tests for micronuclei induction in mammals: Glyphosate technical

by Zouaoui *et al.* 2013, discussed in the paragraph above, the 200 µg/ml concentration in the culture medium reported to give a positive result in the Chromosomal Aberration assay is 667 and 19 times higher than the blood levels in people who exhibited mild-moderate clinical signs of toxicity or died, respectively. Under these circumstances, it is not appropriate to conclude that data from Mañas *et al.* 2009 indicate that AMPA can AMPA can cause genotoxicity based on the Chromosomal assay.

Regarding the *in vivo* Bone Marrow Micronucleous test using Balb C mice, Mañas *et al.* 2009 report statistically significant increases in micronuclei following treatment with doses of 200 and 400 mg/kg using the intraperitoneal (i.p.) route of administration. These positive findings should be discounted because of a combination of the following: 1) there is no dose-response relationship; 2) the i.p. route of administration is very non-physiological; and 3) the doses used are extremely high. Since AMPA is a biodegradation product of glyphosate which is sometimes found in soil it is reasonable to assume that exposure to it is much less than exposure to glyphosate. The average human exposure to glyphosate from food and water is estimated to be 0.088 mg/kg/day (Solomon 2016). Thus, rodent doses of 200 and 400 mg/kg are 2,273 and 4,545 higher than the human dose. It is reasonable to say that the margins of exposure to AMPA are much higher.

The fourth study (Roustan *et al.* 2014) reported that AMPA caused chromosomal damage in an *in vitro* assay using Chinese Hamster cells. The validity of this study is, at best, dubious because the highest increase in damage was observed at an extremely low concentration (0.0005 µg/mL) in the presence of light irradiation which, by itself, can damage DNA.

In summary, I conclude that the results of the four mammalian-based AMPA genotoxicity assays, discussed above, are inadequate for use in making a decision regarding whether or not AMPA is a genotoxic compound.

In addition to the studies cited by IARC, I have reviewed underlying study reports for other studies on AMPA including:

Microbial Mutagenicity study (Shirasu 1980)

This study evaluated the ability of AMPA to cause mutations in two types of bacteria-based mutagenicity assays: 1) a recombination assay (rec-assay), which evaluates the ability of a compound to cause mutations in a strain of bacteria that lacks the ability to carry out a particular type of DNA repair as compared to a strain which has this capability. After addition of the chemical in question the impact (if any) is evaluated indirectly by assessing the extent of growth inhibition. If both strains grow equally well, that is taken as an indication the chemical in question is not mutagenic. If the strain lacking the ability to carry out DNA repair exhibits growth inhibition relative to the strain which has repair capability, this is taken as an indication the chemical in question is capable of causing mutations; and 2) the Ames test, as described above. The procedures followed are described thoroughly and positive controls were used to confirm that the systems were working. The results indicated that AMPA does not act as a mutagen.

Bone marrow micronucleus assay (Kier and Stegeman 1993)

This study evaluated the ability of AMPA to cause chromosomal damage in a bone marrow micronucleus assay, *in vivo*, in male and female mice. Three doses of AMPA were used (100, 500 and a very large high dose of 1,000 mg/kg), sampling was performed at three time points (24, 48 and 72 hours after dosing) and a positive control was used to confirm that the system was working. A statistically significant increase in micronuclei was observed only in the low does (100 mg/kg) female group at the 72 hour time point (in males all of the results were negative). However, this was still within the laboratory's range of historical controls. This coupled with the fact that no increases in micronuclei were observed in female mice at the two higher doses, at any time point, indicates that the effect seen at the low dose, 72 hour time point was not related to

Kwiatkowska *et al.* 2014 make their paper an inadequate study to use for an evaluation of the potential for glyphosate to cause oxidative stress in humans.

3. Bolognesi *et al.* 1997 (claimed to show oxidative stress *in vivo*, in mice): The mice were dosed with glyphosate (300 mg/kg) or Roundup (900 mg/kg, equivalent to 270 mg/kg of glyphosate) by i.p. injection. Dr. Portier's Expert Report states (bottom of p. 70 – top of p. 71) "Samples of liver and kidneys from these mice were evaluated for levels of 8-hydroxy-2'-deoxyguanosine (8-OHdG) which is a biomarker of oxidative stress. There was a significant increase in the liver of 8-OHdG at 24 hours following glyphosate exposure...At both eight hours and 24 hours, Roundup increased 8-OHdG in the kidneys...." However, he does not discuss the non-physiological aspect of i.p. administration nor does he indicate that the doses of glyphosate used are 638 and 574 times higher, respectively, than the 0.47 mg/kg daily dose of glyphosate that children are estimated to receive (EPA 2016), and 3,409 and 3,068 times higher, respectively, than the 0.088 mg/kg daily dose of glyphosate that the US population is estimated to receive (Solomon 2016). In my opinion the use of high doses in combination with the non-physiological route of administration make Bolognesi *et al.*1997 an inadequate study to use for an evaluation of the potential for glyphosate or Roundup to cause oxidative stress in humans.

As described above, the doses at issue in Bolognesi *et al.* 1997 are hundreds or thousands of times higher than the human daily dose reported by EPA for the US population or children, respectively. Further, the *in vitro* concentrations used in Mladinic *et al.* 2009 and Kwiatkowska *et al.* 2014 render these studies inadequate to use for an evaluation of the potential for glyphosate to cause oxidative stress in humans. Therefore, in my opinion, the results of such studies are inappropriate to use for human risk assessment, especially regarding both genotoxicity and oxidative stress. The concerns I have expressed are not discussed by Dr. Portier. Also, importantly, the

oxidative stress phenomenon in the list of studies presented in Dr. Portier's Expert Report (pp. 69-73) is not linked convincingly in a cause-effect relationship to an apical toxic endpoint (e.g., not linked convincingly to genotoxicity and not linked convincingly to induction of cancer).

**Conclusion Regarding the Possibility that Glyphosate or GBFs Can Cause ROS and Implications of this for Predicting that Glyphosate or GBFs Might Act as a Mutagen or Carcinogen**

In light of the discussion presented above, it is clear that detection of ROS in a test system following chemical-treatment is not a diagnostic criterion indicating that the chemical in question is capable of acting as a mutagen or a carcinogen. This conclusion is supported by the fact that both in the United States and in Europe, evaluation of the ability of a chemical to induce ROS is not on the list of tests for toxic potential that are required in order to place a chemical on the market as, for example, a medicine or crop protection chemical.

## Conclusion

Based upon my review of the scientific literature dealing with the potential genotoxicity of GBFs, glyphosate, and AMPA, I conclude that these should be regarded as non-genotoxic materials. Furthermore, while GBFs and/or glyphosate might be capable of causing oxidative stress under certain experimental conditions, my review of the scientific literature leads me to conclude that it is not appropriate to use this observation to support a contention that these materials are capable of causing cancer.

*[signature]*

Jay Goodman

44