# EXHIBIT 5

Opinion on Exposure of Stevick to Glyphosate

**OPINION**
**MICHAEL J. SULLIVAN, Ph.D., CIH, REHS**
**Stevick-Monsanto Glyphosate Exposure Case**
**Petaluma, California**

The following are the major points of my opinion in this case. Where appropriate, I have listed the supporting evidence, and additional support in a list of materials I have considered in forming my opinion is in ATTACHMENT A. Additional details are provided in Attachments. If new data become available I reserve the right to update this opinion.

1. Qualifications

My name is Michael J. Sullivan. I have a Bachelor of Science in Environmental Toxicology from the University of California at Davis and both a Master of Science and a Doctorate in Toxicology from The University of Michigan. I have worked as a toxicologist and human health risk assessor for over 30 years. I am also a Certified Industrial Hygienist and a Registered Environmental Health Specialist in California. I am a tenured Professor in the Department of Environmental and Occupational Health at California State University at Northridge in Northridge, California. I have published in the areas of exposure assessment and risk assessment. I am experienced in developing dose estimates for individuals exposed to chemicals through various occupational or community activities. I regularly work with both State of California and federal regulatory agencies in the development of exposure estimates. My resume is provided in ATTACHMENT B.

2. Scope of This Opinion

The scope of my opinion in this case focuses on the quantitative estimate of exposure of Simon Stevick (Stevick) to Glyphosate during spraying activities at her residence using Glyphosate-containing herbicides. The calculation of Glyphosate exposure and dose requires the use of information from the scientific literature and information about activities engaged in by Stevick using Glyphosate-containing herbicides. Both of these types of necessary information for exposure and dose calculation are presented in this opinion.

I am compensated in connection with this matter at my customary rate of $180 per hour for regular consulting work (e.g. reviewing documents, teleconferences, dose calculations), $180 per hour for preparation for deposition and court testimony, and $350 per hour for depositions, court testimony, and reviewing/editing transcripts.

In the last four years I have been deposed once as an expert in Johnson vs. Monsanto (Case No. CGC-16-550128, Superior Court of California, 2018). I have not testified in trial in any cases.

Opinion on Exposure of Stevick to Glyphosate

Unless otherwise stated, all of my opinions expressed in this report are to a reasonable degree of scientific certainty. I reserve the right to supplement or amend this report as additional information comes to my attention or becomes available.

The opinions I plan to offer in this matter will include opinions set forth in this report, opinions that may be elicited from me in discussing or elaborating on those areas and/or responding to the testimony of the plaintiffs' experts, and any opinions formed based upon further literature review.

My opinions are based on my review of the relevant scientific literature; materials specifically related to this case and related proceedings, including certain reports and supporting materials submitted by expert witnesses working on the plaintiffs' behalf, deposition testimony, my inspection of property, and my education, training, research and experience.

3. Summary of Opinion

My opinion, which I hold to a reasonable degree of scientific certainty, is summarized as follows:

> Stevick engaged in the mixing and spraying of Glyphosate-containing herbicide. I have calculated a total average daily dose of Glyphosate of $1.1 \times 10^{-6}$ mg/kg-day (or 0.0000011 mg/kg-day) from these activities. The highest single day dose is calculated to be $7.3 \times 10^{-4}$ mg/kg-day (0.00073 mg/kg-day). My calculated doses are based on an overestimated exposures. This dose estimate places Stevick in the lowest range of published applicator exposures. Any actual exposure of Stevick to Glyphosate is likely at least 10-fold lower than calculated in this opinion due to the use of parameters that overestimate exposure.

4. Scientific Process Followed in this Opinion

The steps followed in this evaluation are summarized here and discussed in subsequent sections of this opinion. The data evaluated include both Glyphosate and Glyphosate in herbicide formulations. For ease of presentation, this opinion refers just to Glyphosate to cover all data reviewed. The components of this opinion included:

    a. Summary of Glyphosate chemical and physical properties;

    b. Review of the scientific literature on herbicide applicator exposure to Glyphosate;

    c. Review of the scientific literature on the Absorption-Distribution-Metabolism-Elimination (ADME) of Glyphosate;

    d. Review of the protective effect of clothing/PPE on Glyphosate exposures during herbicide application;

Michael J. Sullivan, Ph.D., CIH, REHS                                                                           Page **2** of **54**
November 27, 2018

Opinion on Exposure of Stevick to Glyphosate

   e. Review of Stevick's reported Glyphosate herbicide use;

   f. Utilization of an exposure equation consistent with regulatory guidelines and best practices;

   g. Calculation of an absorbed dose of Glyphosate for Stevick;

   h. Comparison of the calculated absorbed dose of Glyphosate for Stevick to other published applicator doses and other relevant toxicological data;

   i. Evaluation of the calculated dose of Glyphosate for Stevick in terms of conservatism.

Additional details of these steps are provided below. A list of the documents cited in my opinion is provided in ATTACHMENT C.

5. Summary of Glyphosate Chemical and Physical Properties

A review of Glyphosate chemical and physical properties provides insight into the development of exposure estimates. Reported properties are from a Safety Data Sheet for RANGER PRO [1] or PubChem [2]. Glyphosate is a relatively small organic chemical with a molecular weight of 169 g/mole. Because it exists in the chemical form of a salt (i.e., a charged molecule) it has very high solubility in water (i.e., miscible). In contrast, Glyphosate is considered insoluble in non-polar or organic solvents. Glyphosate has a low vapor pressure, reported as $1.9 \times 10^{-7}$ mmHg or negligible. These properties provide insight into the expected routes of exposure and disposition of Glyphosate in humans.

6. Review of the Scientific Literature on Herbicide Applicator Exposure to Glyphosate

Numerous studies have quantified exposure to Glyphosate during herbicide application activities. These studies have examined a variety of application activities. The activities include boom sprayers [3, 4, 5, 6, 7], backpacks [4, 6, 8, 9, 10], pressurized lance [4, 11] hand-held sprayers [7, 11] or not stated [12]. Many of these studies utilize exposure biomonitoring through the measurement of Glyphosate in excreted urine [4, 5, 6, 8, 9, 12, 13]. Other studies use passive dosimetry using body patches. Some studies report the exposures in terms of exposure in mg Glyphosate/kg body weight [3, 5, 7, 10, 11]. Both applicators or applicators and their families may be included in these studies.

Some of these studies have included passive 'patch' sampling [5, 6, 14, 15]. These patches are placed on various parts of the subject's body, collected after Glyphosate herbicide use and analyzed for Glyphosate deposition. These studies estimate how much Glyphosate was deposited onto the skin surface of various body areas. The data from these studies generally show that Glyphosate herbicide exposure is application-specific. While the amount deposited may differ in these studies, these studies show a consistent location pattern of

Glyphosate deposition. For example, during application activities the lower extremities have the highest rate of deposition and those surfaces of the body facing away from spraying activities have lower deposition.

Two papers provide calculated doses from measured urine biomonitoring results in some of the above-mentioned studies. Neimann [16] provides exposure estimates from several studies reporting just urine Glyphosate levels and presents exposures for pesticide applicators ranging from non-detect up to 0.008 mg/kg. Solomon [17] provides a range of calculated exposures for applicators using both urine biomonitoring and passive dosimetry. Passive dosimetry-based doses are reported from 0.000001 to 0.064 mg/kg-day and biomonitoring-based doses from 0.000013 to 0.0046 mg/kg-day.

Some of these same researchers [5, 13] have compared calculated doses from biomonitoring (i.e., urine measurements) to modeled dose estimates derived from passive monitoring using patches. The authors conclude that accurate information related to retrospective Glyphosate use is necessary for accurate exposure estimates. Appropriately, modeled doses of Glyphosate were better estimates for biomonitoring-based Glyphosate dose estimates then modeled doses for other tested pesticides. However, Glyphosate modeled doses can overestimate exposure by 10-fold [5]. This is confirmed by the biomonitoring versus the dosimetry-based applicator dose estimates presented by Solomon [17]. Since exposure biomonitoring for Stevick is not available, this opinion presents a modeled exposure estimate. When individual exposure parameter values were selected as part of the modeling of exposure, a strategy of purposeful exposure overestimation was used by selecting parameter values that result in higher exposures. Adapting this strategy results in a higher degree of confidence (i.e., reasonable degree of scientific certainty) that the exposure estimates would not be higher than presented in this opinion and are very likely to be substantially lower.

Quantitative estimates of the amount of Glyphosate spray (i.e., mist) that contacts the skin of the lower extremities (i.e., the legs) during spraying activities have been published. Johnson [14] provides a measurement from spray activities that have been rounded up to 0.00007 ml Glyphosate herbicide solution/$cm^2$ of skin surface-hour of spray activity (mg/$cm^2$-hour) for ATV-riding applicators and 0.000005 ml/$cm^2$-hour for sprayers. Lavy et al. [15] provides measurements for herbicide applicators in forests of 0.00005 mg/$cm^2$-hour. The applicator activities described in these papers are more intensive than the residential application performed by Stevick. Therefore, since various application activities were included in these studies, skin contact rates should be selected that are representative of the activity done by

Stevick. These calculations utilize a value of 0.00001 ml/cm$^2$-hour which is a value twice that reported by Johnson [14] for sprayers.

7. Review of the scientific literature on the Absorption-Distribution-Metabolism-Elimination (ADME) of Glyphosate

The calculation of Glyphosate herbicide exposure requires an understanding of how the chemical and the subject interact. Specifically, after exposure occurs the chemical may be absorbed, distributed within the subject, metabolized and eliminated. These four toxicological processes, Absorption (A), Distribution (D), Metabolism (M) and Elimination (E), or ADME, are the focus of this review.

<u>Absorption</u>. Absorption is when a chemical crosses a biological membrane and enters the body's tissues or circulatory system (i.e., blood) of the subject. This can occur when a chemical enters the blood after crossing the skin epidermis (dermal), the gastro-intestinal track (ingestion), or the alveolar cells of the lung (inhalation). Exposures primarily associated with herbicide application would be dermal and inhalation. Any exposure by ingestion during herbicide spraying activities would be negligible and the exposure calculations presented in this opinion would be inclusive of any exposure by ingestion. Inhalation could occur during herbicide application, but several studies have shown that inhalation exposures are very low and insignificant when compared to dermal exposures [18, 19]. Dermal is the primary route of exposure associated with Glyphosate herbicide spray activities.

*Dermal Absorption*. Dermal absorption of Glyphosate has been studied in various experimental designs. The following are the paired characteristics evaluated in the numerous studies: concentrated vs. diluted Glyphosate herbicide solutions; Glyphosate vs. Glyphosate formulations; animal vs. human skin; *in vitro* vs. *in vivo*; liquid vs. Gel formulations; multiple exposure periods; and normal vs. abraded skin. In all of these studies the researchers typically measured both the percent (%) absorption as well as the percent (%) recovery as a measure of mass balance in the experiment. *In vitro* experiments, using human skin [19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33] report dermal absorption ranges from 0.011% to 2.2%. Human skin studied *in vitro* reported 0.5% and 2.6% absorption for normal and abraded skin, respectively [34]. *In vitro* studies using abraded rabbit skin reported a total dermal absorption of 2.4% [35]. *In vitro* studies using rat skin [36] reported a range of four measured absorption rates of 0.52 to 10.34%. The authors report that the higher two measured absorptions (2.6% and 10.34%) were associated with skin damaged during skin preparation, prior to adding Glyphosate to the experimental apparatus. The authors concluded that the absorption results due to damaged skin in this

study [36] were not valid. The other two reported absorption rates of 0.52% and 1.42% at 48 hours are consistent with the other reported *in vitro* study results.

The Wester [32] study is an *in vivo* Rhesus monkey experiment that reports a 0.8 to 2.2% dermal absorption. This Wester [32] study is often cited by others [38, 39, 40, 41, 42, 43, 44, 45] when referring to an estimated dermal absorption in humans. This study appropriately compares urine excretion after dermal exposure to I.V. dose. The percentage total recovery in one of the study groups in the Wester study has been raised as an issue. The study authors address this in their published paper and state that percent recovery in this dermal absorption study is consistent with historical laboratory experiments. In addition, the use of a comparison I.V. (intravenous) dose in this study is consistent with several regulatory guidelines [46, 47, 48] which suggests that with the I.V. dose comparison the percentage recovery is not an issue. The Maibach study of 1983 [37] is an *in vivo* study of dermal absorption in Rhesus monkeys. Dermal absorption rates on the abdominal skin were reported to be up to 1.8% at 24 hours of exposure. This value supports the results of the Wester [32] study.

Based on the above studies, a human, 24-hour dermal absorption rate of 2.0% is used in this exposure evaluation. This value is likely a 2-times overestimate as many of the studies support a lower (1%) dermal absorption through human skin.

The above discussion presents percent (%) absorption for each of the studies. Percent (%) absorption is a summary statistic which incorporates some of the other study characteristics listed: concentrated vs. diluted Glyphosate solutions; Glyphosate vs. Glyphosate formulations; animal vs. human skin; *in vitro* vs. *in vivo*; liquid vs. Gel formulations; 6-hour to 48-hour exposure periods. What is actually measured in these studies is flux: the mass of chemical (mg) moving through an area of skin ($cm^2$) over a period of time (hour). In order to calculate exposure and still utilize the specific activity information provided by Stevick, a percent (%) dermal absorption is used along with an adjustment factor of to account for exposure periods less than 24 hours. For example, adjustment factors for a 2-hour, 6-hour, 12-hour or 24-hour dermal exposure duration would be 0.083, 0.25, 0.5 or 1.0, respectively.

Distribution. *In vivo* studies of Glyphosate ADME provide insight into the distribution of Glyphosate in various test subjects. Studies have been done in Rhesus monkeys [32, 37] and rats [49, 50, 51]. These studies show a quick distribution into the blood (within the first hour) and then quick elimination phase through the kidneys into the urine (see Elimination, below). Evaluation of test animal tissues after necropsy showed no detectable residual glyphosate at 7 days [37] in monkeys and very low residual tissue concentrations in rats [49, 50, 51] 1 to 7 days after dosing, with measureable concentrations generally below 1% of the

total dose [50, 51, 52]. These studies suggest that any absorbed Glyphosate is quickly distributed in the blood of the test animals and does not accumulate in tissues (i.e., Glyphosate is essentially completely eliminated).

Metabolism. *In vivo* studies of Glyphosate ADME provide insight into the metabolism of Glyphosate in various test subjects. Studies have been done in rats [49, 50, 51] using I.V. and/or oral exposures. These studies show a quick distribution into the blood (within the first hour) and then quick elimination phase through the kidneys into the urine (see Elimination, below). Metabolism is limited and the major metabolite aminomethyl phosphonic acid (AMPA) has been measured at levels that are less than 7% of the total absorbed dose metabolized [44, 50, 51, 53] and the AMPA was found in the colon [50], i.e., fecal elimination of any metabolized Glyphosate.

Elimination. Both *in vivo* studies of Glyphosate ADME as well as *in vivo* dermal and oral absorption studies provide insight into the elimination of Glyphosate from various test subjects. Studies have been performed using monkeys [27, 38] and rats [51, 53]. Exposures via I.V., dermal and oral have been studied. In all studies the major pathway of elimination is the urine.

*Urinary Elimination.* I.V. administration in rats showed primarily (95%) urinary elimination [52]. Studies in monkeys showed primarily urinary elimination (>95%) [32] from IV administration and 89.9% from intramuscular (IM) administration [37]. Oral administration in rats showed lower urinary elimination (approximately 40%) than fecal [49].

*Fecal Elimination.* I.V. administration in rats showed low fecal elimination (approximately 5%) [51]. Fecal elimination was much lower in the high-dose group of dermally-exposed monkeys [32] but not in the low-dose. This finding may be due to the monkeys self-administering an oral dose and therefore fecal elimination is not reflective of a dermally-only-dosed animal. Oral administration in rats showed higher fecal elimination (approximately 50%) than urinary elimination [50].

Human exposure studies of Glyphosate herbicide applicators use urine Glyphosate levels as a biomonitoring measurement of total dose [4, 5, 6, 8, 9, 12, 13]. This is appropriate given that dermal is the primary exposure route and results in primarily urinary elimination. Fecal elimination as a major pathway is associated with oral exposures.

8. Review of the Effect of Clothing/PPE on Exposures during Herbicide Application

There can be up to three layers of protection from Glyphosate exposure during herbicide application activities. The skin provides a level of protection of 98% or greater (see dermal absorption discussion above). Typical clothes (see below)worn b y an herbicide applicator

provides protection by reducing dermal exposure. In addition, Personal Protective Equipment (PPE) worn by the applicator will also decrease exposure. Skin absorption is discussed above. Clothes and PPE are discussed below. Clothes and any PPE worn by Stevick would have reduced her exposure to Glyphosate during herbicide application.

<u>Clothing</u>. Two studies have evaluated the protection from dermal exposure of typical clothing that would be worn during Glyphosate herbicide spraying. The first study was performed during field herbicide application conditions [11]. Typical clothes, including long pants and long-sleeve shirts, provided greater than 90% reduction of Glyphosate exposure. An *in vitro* study of dermal absorption [33] showed that cotton reduced exposures approximately 50% when saturated with liquid and 90% when dry. Typical clothes provide an adequate protection from dermal exposure during the type of residential application that was performed by Stevick.

<u>PPE.</u> Boots, gloves, goggles and hats will all reduce dermal exposure during herbicide activities (i.e., mixing and application) [54]. PPE provides dermal exposure protection rates of approximately 90% or greater under the test conditions.

9. Review of Stevick's Reported Glyphosate Herbicide Use

A timeline that represents the Glyphosate herbicide use information provided by Stevick is presented in ATTACHMENT D. This timeline is derived from the Data Sheet [55] and deposition transcripts [56] provided by Stevick. From this timeline the number of days and the number of years that spraying was performed by Stevick was determined. In addition, the amount of time Stevick sprayed the herbicide and then may have had Glyphosate herbicide on her skin is estimated. The amount of exposed skin (i.e., the area of skin available for herbicide contact) is based on the clothing worn during spray activities. The types of clothing worn by Stevick is included in the timeline.

The following bullets cite information provided by Stevick about her herbicide use:

- Stevick began spraying in June, 1989 and relevant exposures ceased in February, 2013 when symptoms of the disease were reported. A total of 23.67 years. She continued spraying until 2014.
- Stevick generally sprayed once a month for 10 months per year except the first few months she sprayed herbicide twice a month for 3 months. The exact months when spraying occurred was not specified. A total of 241 spray days.
- Her husband generally mixed the concentrated herbicide to the diluted concentration for spraying.

Opinion on Exposure of Stevick to Glyphosate

- By the year 2000 Stevick switched from purchasing concentrate to ready-to-use which does not require mixing.
- Stevick reported that she performed the mixing only 6 to 10 times. Her husband did the mixing 90% of the time. There were approximately 120 spray days when mixing was done prior to 2000. It is assumed that Stevick mixed a total of 10 times.
- Stevick would wash her hands after spraying if she got herbicide liquid on it due to mixing.
- Spray activity was an hour.
- Based on the equipment used and a 'spray setting', up to 15 minutes of 'spray-release time' could have occurred during that hour. A 'stream setting' would have only provide about 10 minutes of 'spray-release time'.
- Initial spraying activites during the first few months were twice a month then once a month.
- Generally spot spraying was performed but sometimes the driveway, garden area and area behind the garage needed area-spraying.
- The volume she would spray would be about a gallon [which is 10 pounds] as larger volumes would be harder for her to carry.
- Spray with the wand pointing downwards.
- Drift would get on her hands 10% to 20% of the spray days.
- She would generally wear long pants/cotton jeans and rarely shorts. Stevick would generally wear a long sleeve shirt.
- She would wash her hands at the end of the 1-hour spraying and take a shower at 10pm in the evening. Spraying activities are assumed to occur between 10am and 2pm, which would result in an average of 10 hours until Stevick showered.

10. Utilize an exposure equation consistent with regulatory guidelines and best practices

A dermal exposure equation was used in this opinion to calculate the dose of Glyphosate received by Stevick. This equation is presented in ATTACHMENT E and described in the following text.

   a. Dermal contact is the major route of exposure to the herbicide during application activities [38]. However, inhalation is also a potential exposure route. Both my own calculations and published evaluations [18, 38, 40, 41] show that any inhalation exposure would be much lower than any dermal exposure. Therefore the total dose calculated in this opinion is considered inclusive of all Stevick's potential exposures: dermal, inhalation and inhalation. Ingestion of Glyphosate due to herbicide

Michael J. Sullivan, Ph.D., CIH, REHS   Page **9** of **54**
November 27, 2018

    application activities is negligible because Stevick does not describe any activities that would have led to ingestion exposure associated with her herbicide application.

b. The exposure calculations for dermal exposure to chemical agents represent standard risk assessment practice and are similar to published regulatory guidance [48, 57, 58, 59].

c. The calculations require the use of numerous quantitative parameter values. These values are summarized in the following text:

    i. The diluted Glyphosate solution for spraying is 1% concentration (*i.e.*, 10,000 mg/L). Prior to the year 2000 concentrated Glyphosate herbicide solution (assumed at 50% or 500,000 mg/L) was purchased and diluted. This is based both on the diluted Glyphosate herbicide product reportedly used by Stevick and the types of weeds sprayed.

    ii. Based on the type of equipment that Stevick used and the areas she reported to have sprayed, an estimate of 15 minutes of actual spray activity (i.e., spray-release time) on every spray day is used.

    iii. The volume of diluted herbicide spray liquid that deposits on the skin is 0.00001 ml/$cm^2$-hour skin for each spray activity based on contact with airborne liquid particulates (i.e., drift). This would only happen if Stevick sprayed into the wind. During mixing, Stevick could have spilled some of the liquid herbicide solution that then came into contact with her skin. Experiments simulating the amount of liquid on the skin (e.g., due to a pour-related spillage onto the hands) has resulted in an estimated 0.002 ml/$cm^2$ [60] contact rate.

    iv. The surface area of the lower legs is estimated as 1440 $cm^2$. This is based on the average surface area of an adult male as described by USEPA [61] and confirmed with measurements on an adult male. Since Stevick is a woman then her exposed area of the lower legs would be smaller. The median area of hand exposures to liquid herbicide solution during pouring/mixing is estimated to be 40 $cm^2$. This is based on laboratory experiments simulating pour-related spillage onto the hands [62]

    v. The dermal absorption of 2% is used for all the Glyphosate deposited on the skin during spraying and remaining in liquid solution on the skin for 24 hours.

    vi. A dermal uptake factor is used which assumes that glyphosate herbicide solution remains in liquid form on Stevick's skin for a given number of hours.

    vi. For lower leg exposure during herbicide spraying, a duration of 10 hours is used. For hand exposure during mixing, a duration of 1 hour is used.

    vii. Based on Stevick's reported activities, spraying was performed a total of 241 days over 23.67 years.

    viii. Stevick is estimated to weigh 110 lbs over the years she sprayed Glyphoste-containing herbicide. This is equivalent to 50 Kg. Medical records [63] indicate that her weight between 2009 and 2014 fluctuated between 116 lbs and 132 lbs.

    ix. The dose calculations include the duration of the total exposure. In this evaluation, the value of 8640 days is based on the total number of application years (23.67) multiplied by 365. The exposure duration ended at the time of the Stevick's reporting of symptoms.

11. Calculate an absorbed dose of Glyphosate for Stevick

The calculated average daily dose for the period of time that Stevick was spraying Glyphosate herbicide is $1.1 \times 10^{-6}$ mg/kg-day (or 0.0000011 mg/kg-day). This is the dose that can be compared to the published herbicide applicator doses. The dose on each of the 241 application days, which assumes both lower leg exposure and hand exposure during mixing, is also presented and that value is $7.3 \times 10^{-4}$ mg/kg-day (or 0.00073 mg/kg-day).

12. Compare the calculated absorbed dose of Glyphosate for Stevick to other published applicator doses and other relevant toxicological criteria

It is useful to compare Stevick's calculated absorbed dose to literature values of human exposures from herbicide spraying activities. Stevick's absorbed dose is 0.0000011 which is at the lowest end of the modeled absorbed doses presented in Solomon [17] of 0.000001 to 0.064 mg/kg-day.

It is also useful to compare Stevick's calculated absorbed dose to other published Glyphosate doses. Solomon presents in Figure 3 the various regulatory agency criteria of References Doses/Acceptable Daily Intake (RfD/ADI) ranging from 0.5 to 1.5 mg/kg-day, which are unadjusted for route-specific uptake. These unadjusted regulatory criteria provide appropriate order-of-magnitude comparisons. Stevick's calculated dose is 5 to 6 orders of magnitude lower than the published RfD/ADI. In addition the Solomon figure includes the range of unadjusted animal doses in toxicological studies which range from 50 to 5400 mg/kg-day. The calculated Stevick Glyphosate dose is at least 6 orders of magnitude (i.e., 1,000,000-times) lower than these animal doses.

Opinion on Exposure of Stevick to Glyphosate

The calculated dose in this opinion can also be compared to cohorts studied in epidemiology studies of herbicide applicators. An example would be Agricultural Health Study results reported by Andreotti [64].

The calculated dose of Glyphosate for Stevick is within the ranges of exposure discussed above. In addition, the Stevick calculated dose could be lower by a factor of 10-times due to the overestimates of several exposure parameters discussed above. (See next section)

13. Evaluate the calculated dose of Glyphosate for Stevick in terms of conservatism

The strategy used in the calculation of exposure to Glyphosate in Stevick's use of Glyphosate herbicides is that of overestimation. Many of the individual parameters used in the calculation have the effect of increasing the calculated exposure. The calculated doses are likely at least 10-times higher than the actual dose received by the Stevick. The key contributors to this overestimation include the use of patch-based estimates (10-times), the assumed contact rate of liquid on the skin (1.2-times), dermal absorption of 2% (2-times), the assumed hours of contact (1.5-times), the number of days of skin exposure (2-times) and the use of larger exposure areas (1.25-times).

14. Rebuttal To Report Provided by Sawyer.

The rebuttal to some of the major points related to Stevick's exposure to Glyphosate in the report provided by Sawyer is presented in ATTACHMENT F.

_____   November 27, 2018
Michael J. Sullivan, Ph.D., CIH, REHS