# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to:<br>*Hardeman v. Monsanto* (3:16-cv-525),<br>*Stevick v. Monsanto* (3:16-cv-2341), and<br>*Gebeyehou v. Monsanto* (3:16-cv-5813) | |

# EXPERT REPORT OF

# DR. CHARLES BENBROOK

# EXPERT REPORT OF CHARLES M. BENBROOK, PhD

## TABLE OF CONTENTS

I.   Summary of Opinions --------------------------------------------------------------------- 3

II.  Science Judgements Impacting the Use of Glyphosate --------------------------------- 14

III. Expert Background and Qualifications ----------------------------------------------- 31

IV.  The EPA Pesticide Regulatory Decision Process --------------------------------------- 40
   A. Three Major OPP/EPA Actions and Decisions ------------------------------------------ 40
   B. Applications to Register a New Pesticide ------------------------------------------- 42
   C. Actions Impacting the Future Use of an Already-Registered Pesticide -------------- 43
   D. Impacts of OPP Cancer Determinations on Tolerance Setting ------------------------- 44

V.   Early EPA Actions on Glyphosate Herbicide ------------------------------------------ 49
   A. Initial Uses and Tolerance Actions ------------------------------------------------- 49
   B. Studies on Glyphosate Conducted by Industrial BioTest ------------------------------ 52
   C. Contaminants, Adjuvants, and Surfactants ------------------------------------------- 54
   D. Sources of Pesticide Product Risk -------------------------------------------------- 56
      1. Impurities in Glyphosate Active Ingredient ---------------------------------------- 57
      2. Adjuvants and Surfactants in Roundup End Use Products ---------------------------- 57
      3. Heightened Toxicity Caused by the Surfactants in Formulated Roundup -------------- 57

VI.  Bio/dynamics Mouse Oncogenicity Study Triggers "Possible Oncogen" Classification 64
   A. Results of Bio/dynamics Mouse Oncogenicity Study ----------------------------------- 64
   B. Review of the Bio/dynamics Mouse Study --------------------------------------------- 65
   C. OPP Dismisses Monsanto's Historical Control Data Argument -------------------------- 71
   D. Monsanto Takes Its Case to the Director of the OPP Registration Division ---------- 72
   E. Monsanto Hires Another Pathologist to Re-read the Kidney Slides -------------------- 73
   F. Re-sectioning of the Bio/dynamic Mouse Kidney Slides ------------------------------- 74
   G. The 1986 SAP Review of the Mouse Oncogenicity Study -------------------------------- 78

VII. Monsanto Does Not Add New Worker Safety Language on Roundup Warning Labels -------------------------------------------------------------------------------- 87

VIII. Monsanto Terminates TNO Study, Which Showed Elevated Rates of Dermal Absorption -------------------------------------------------------------------------- 96

**IX. Monsanto's Relationships with "Friendly" Scientists and Officials in EPA** ------------ **100**
   A. *Jess Rowland* ------------------------------------------------------------------------------------ *100*
   B. *Jack Housenger* -------------------------------------------------------------------------------- *103*

**X. Monsanto Asks Dr. Parry to Assess Glyphosate Genotoxicity and Then Does Not Disclose His Findings to Regulators or Conduct the Studies He Recommends** ------------- **106**

**XI. Corporate Ghost-Authorship/Writing** -------------------------------------------------------- **111**
   A. *Gary Williams et al 2000 Paper* ---------------------------------------------------------- *112*
   B. *Williams et al 2012* ---------------------------------------------------------------------- *117*
   C. *Kier and Kirkland 2013 Paper* ------------------------------------------------------------ *119*
   D. *Critical Reviews of Toxicology Special Issue on Glyphosate Risks* ----------------------- *121*
   E. *Other Forms of Ghost-Writing* ------------------------------------------------------------ *125*

**XII. Responses to Scientists Raising Concerns over Glyphosate Safety** -------------------- **128**
   A. *IARC Working Group Members* ------------------------------------------------------------ *128*
   B. *Seralini Team* -------------------------------------------------------------------------- *128*
   C. *The IARC Classification* ---------------------------------------------------------------- *134*
   D. *Political and Other Activities Post-IARC* ------------------------------------------------ *151*
   E. *Blocking the ATSDR Review of Glyphosate* ----------------------------------------------- *153*

**XIII. Downplaying Glyphosate Risks** ------------------------------------------------------------- **155**
   A. *Freedom to Operate (FTO)* --------------------------------------------------------------- *156*
      1. Section 6(a)(2) of FIFRA ------------------------------------------------------------- 157
      2. Responding to FQPA Challenges -------------------------------------------------- 157
   B. *Understating Risks* ---------------------------------------------------------------------- *159*
      1. The IARC Review Process ----------------------------------------------------- 159
      2. Advertising ----------------------------------------------------------------- 165

32.     When such disagreements arise over the interpretation of a specific study, the routine response by OPP/EPA is to require the registrant to conduct a new, and hopefully more sensitive study. And so, OPP required Monsanto to conduct a new, much more powerful (statistically) mouse oncogenicity study.

33.     Monsanto responded to EPA's request by arguing no such study was needed. OPP/EPA responded by stating why it felt such a study was indeed essential.

34.     Eight years of Monsanto-EPA debate ensued over this 1983 mouse study. At multiple points, Monsanto found ways to raise new scientific issues in need of exploration with OPP scientists, prior to a final OPP decision on whether the 1983 Bio/dynamics study was positive or negative for cancer, and whether it needed to be repeated.

35.     Monsanto demonstrated both its ability and willingness to direct political pressure on the agency. The company's influence in Congress, and at senior levels in Executive Branch agencies, made it possible for Monsanto to incrementally raise the stakes facing the OPP, until OPP brought its evaluation of the Bio/dynamics study into alignment with Monsanto's.

36.     In 1991, EPA changed its interpretation of the 1983 Bio/dynamics mouse oncogenicity study, largely on account of one additional tumor in control-group mouse #1028. This tumor was found by a pathologist that Monsanto had hired to reread the study's kidney slides.

37.     All of the EPA pathologists that had reviewed the Bio/dynamics mouse kidney slides could not see, and did not agree that there was a renal tubular adenoma in the kidney of control mouse #1028.

of co-authors appears to accurately represent the contributions of different people to the paper. The Acquavella et al. paper also contains a different version of the statement regarding Monsanto's role in the review of the papers; the Acquavella et al. DOI states "The authors had sole responsibility for the content of the paper, and the interpretations and opinions expressed in the paper are those of the authors."

704.    On September 28, 2018, the Editor of *Critical Reviews in Toxicology* (*CRT*) and the publisher of the journal (Taylor and Francis) issued an "Expression of Concern" via its website that was also subsequently published in the journal (https://doi.org/10.1080/10408444.208.1522786).

705.    The "Expression of Concern" states in large part:

"We…have been informed of concerns over the completeness of acknowledged contributions [to the special glyphosate issue]…and in declarations of interest provided by the named contributors, for the following articles: [the five core papers in the issue are then listed]."

"We have requested corrigenda from the authors to provide additional disclosure as to the contributions to the articles. To date, we have only received corrigenda for three of the five articles that have been agreed to by all the authors. We have not received an received an adequate explanation as to why the necessary level of transparency was not met on first submission. We thank those who brought this to our attention."

706.    In my opinion, the Declaration of Interest statements accompanying the papers in the *CRT* special issue on glyphosate were not just incomplete, they were blatantly untruthful, as evident in the email traffic discussed above.

707.    It is also my opinion that if the Editor of *CRT* and Taylor and Francis ever come to understand the full degree to which Monsanto controlled the production of these five papers, as documented in this report, they will retract all the papers and issue an apology to its readers.

D.    **Political and Other Activities Post-IARC**

708.    In my opinion, the breadth of Monsanto's activities in response to the IARC

classification of glyphosate herbicide as a probable human carcinogen is striking. A June 5, 2015 update on "US Government Outreach – WHO IARC Classification on Glyphosate" outlines dozens of ongoing and proposed actions and goals. Under "**THE STRATEGY**", the document states:

> "One strategy for addressing widespread confusion in the wake of the IARC classification has been to seek clarification from the World Health Organization (WHO) which would provide the proper context of the classification for governments and regulators around the world to have greater confidence defending their science based regulatory decisions."

(MONGLY02953363).

709. The document reports on multiple briefings given to U.S. government agencies, including a Donna Farmer briefing of Dr. Mitchell Wolfe, the Deputy Assistant Secretary for Global Heath, in the of Department of Health and Human Services (HHS), to which "we came prepared with a robust set of technical materials for the Secretary's background…".

710. In the briefing for HHS Deputy Secretary Dr. Wolfe, he was told about ATSDR (Agency for Toxic Substances and Disease Registry), an agency under HHS of which he was reportedly unaware. Monsanto then told Wolfe about the ongoing ATSDR review of glyphosate, and made the case that such a review was unnecessary, and that the EPA bears the primary responsibility for "determination of pesticide safety."

711. Then Monsanto briefed Wolfe on "A common element between IARC and ATSDR…Christopher Portier Ph.D…[who] was Director of ATSDR and co-chair of the IARC Advisory Group."

712. Dr. Portier's views on glyphosate oncogenicity were discussed, as was the fact that Dr. Portier "was an invited specialist representing the Environmental Defense Fund."

713. According to Monsanto's recounting of the meeting "Dr. Wolfe said he would

follow up on what was going on with ATSDR and he was encouraged to have discussions with the EPA staff, as well."

714. Last, Monsanto asked for Wolfe's and HHS's "assistance in securing a WHO clarification. We emphasized that we were not seeking changes to IARC, the classification or the IARC process."

715. In fact, Monsanto had already initiated, and is still carrying out campaigns to punish IARC for its classification through, among other things (details below):

- Lobbying members of Congress to challenge U.S. government funding for IARC, via U.S. government support for the WHO;
- Calling for Congress to hold hearings;
- Mounting a campaign to force IARC to release drafts of its glyphosate review document and notes from Working Group deliberations;
- Working with a Washington Post reporter purportedly doing a hit piece; and
- Mounting multi-faceted outreach and third-party expert criticisms of the IARC process, the people who participated in it, the conclusion it reached, and its accountability.

716. Accordingly, in my opinion, the statement in Monsanto's account of the Wolfe-HHS briefing that "…we were not seeking changes to IARC, the classification or the IARC process" was not truthful.

E. **Blocking the ATSDR Review of Glyphosate**

717. Another important Monsanto action-item, post-IARC, was stopping an ongoing ATSRD review of glyphosate safety.

718. An ATSDR review that supported IARC's conclusions and classifications was to be avoided. (MONGLY03342947).

719. In response to the ATSDR review, Monsanto:

- Sought and carried out meetings, briefings, and webinars with ATSDR to communicate its assessment of the issues, explain why it felt the ATSDR review was unneeded, and the scientific flaws in the IARC review;

153

- Received significant help from two senior OPP/EPA officials – Jess Rowland and the OPP Director, Jack Housenger;
- Sought assistance and support from the Deputy Assistant Secretary for Global Health in HHS (the agency home of ATSDR);
- Asked Monsanto's home-state Senators to contact HHS and reinforce the urgency of quick HHS action to intercede with ATSDR, given information Monsanto had obtained suggesting the ATSDR report might be released in only a few weeks;
- Lobbied Congresswoman Lynn Jenkins to submit questions regarding the ATSDR glyphosate review to the Secretary of HHS at the conclusion of a hearing before the House Ways and Means Committee on health care reform (MONGLY03064699); and
- Recruited individuals to write letters to Congressmen complaining that the ATSDR review was duplicative and a waste of taxpayer money, so that the letter(s) could be used to trigger media coverage of the campaign to stop the ATSDR study. (MONGLY03342947)

720. In my opinion, a reasonable and prudent pesticide manufacturer would not attempt to prevent a regulatory agency from conducting a safety review, especially when there is concern that review may result in a safety finding.

multiple print adds appearing in publications distributed in the State. (MONGLY02510516-544)

783.    The Attorney General found that Monsanto advertising claims that Roundup herbicides:

- "…are safe and will not cause harmful effects to people…";
- Are safe "because they quickly break down into natural substances"; and
- Are "good for the environment".

784.    In addition, the AG states that Monsanto advertising asserts or implies that "The characteristics of Monsanto's glyphosate-containing pesticide products can be adequately described by the characteristics of glyphosate alone." (MONGLY 02510519).

785.    The AG found "that the representations set forth in paragraphs E and F above [encompassing the above quoted claims] constitute false and misleading advertising." After presenting why Monsanto's advertising claims were false and misleading, the AG reports agreement from Monsanto to cease and desist making all such claims in advertising associated with the marketing of Roundup in New York.

786.    In my opinion, the New York AG was correct to challenge the basis of multiple claims in Roundup advertising.

787.    In my opinion, Monsanto underperformed in its responsibility to dissuade false and dangerous assertions and statements regarding the risks associated with exposures to Roundup. One of the common, and most dangerous assertions often encountered is that "Roundup is safe enough to drink."  This is simply not true.

These are my opinions, and basis therein, to a reasonable degree of scientific certainty.

_Charles Benbrook_
Charles M. Benbrook, PhD.
Nov. 10, 2018