

**User Name:** TESFAYE TSADIK
**Date and Time:** Friday, February 8, 2019 12:10:00 PM EST
**Job Number:** 82489488

## Document (1)

1. *Duncan v. Spivak, 94 Cal. App. 4th 245*
   **Client/Matter:** -None-
   **Search Terms:** 94 Cal.App.4th 245
   **Search Type:** Natural Language
   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | Court: 9th Circuit,California |

🔴 Warning
As of: February 8, 2019 5:10 PM Z

# *Duncan v. Spivak*

Court of Appeal of California, Fifth Appellate District

December 6, 2001, Filed

F034907

**Reporter**

94 Cal. App. 4th 245 *; 114 Cal. Rptr. 2d 166 **; 2001 Cal. App. LEXIS 2903 ***; 2001 Cal. Daily Op. Service 10204; 2001 Daily Journal DAR 12719

RUSSELL DUNCAN et al., Plaintiffs and Appellants, v. YEMELYAN SPIVAK, Defendant and Respondent.

**Notice: [***1]** NOT CITABLE - ORDERED NOT PUBLISHED

**Subsequent History:** Review denied, Opinion withdrawn by order of court: *People v. Hightower, 2002 Cal. LEXIS 1610 (Cal. Feb. 27, 2002)*.

Review Denied March 20, 2002 and the Reporter of Decisions directed not to publish this opn. in the Official Reports (*Cal. Const., art. VI, § 14*; *rule 976, Cal. Rules of Ct.*), Reported at: *2002 Cal. LEXIS 1610*.

**Prior History:** APPEAL from a judgment of the Superior Court of Fresno County. Super. Ct. Nos. 620976-1 & 627936-8. Stephen J. Kane, Judge.

**Disposition:** The judgment is reversed. Costs are awarded to appellant.

## Core Terms

limitations period, one-year, suspicion, staple, surgery, foreign body, diligence, discover, cause of action, pain, notice, statute of limitations, discovery, commence, therapeutic purpose, negligence cause, three-year, suspects, cases, matter of law, malpractice, professional negligence, consulted, file suit, one year, patient, suspicion of wrongdoing, confirm, hernia, intent to sue

## Case Summary

### Procedural Posture

Medical malpractice plaintiffs appealed from the order of the Superior Court of Fresno County, California, granting summary judgment in favor of defendant doctor.

### Overview

A patient filed a medical malpractice claim after a staple was left in his body during his hernia surgery. Following dismissal of his claim, he contended the trial court erred in concluding the one-year limitations period set forth in *Cal. Civ. Proc. Code § 340.5* rendered his medical malpractice claim time-barred. *Section 340.5* set forth a three-year and a one-year limitations period. The trial court concluded the one-year limitations period set forth in *§ 340.5* rendered his medical malpractice claim time-barred. The appellate court disagreed. First, the appellate court determined the trial court erred in concluding that the statute of limitations period commenced when plaintiff consulted another physician about the negligent cause of his injury. Such facts merely raised a question of fact, regarding what constituted "discovery of the injury." Therefore, his claim could not be dismissed upon summary judgment.

### Outcome
The judgment was reversed.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General

94 Cal. App. 4th 245, *245; 114 Cal. Rptr. 2d 166, **166; 2001 Cal. App. LEXIS 2903, ***1

Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

**HN1[ ]** **Entitlement as Matter of Law, Appropriateness**

A motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Cal. Civ. Proc. Code § 437c (c)*. A court may grant summary judgment only when the evidence in support of the moving party establishes that there is no issue of fact to be tried.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

**HN2[ ]** **Standards of Review, De Novo Review**

An appellate court reviewing a trial court's granting of summary judgment will make a de novo determination of whether there is a triable issue of fact and whether the moving party is entitled to judgment as a matter of law. In conducting an independent review of the trial court's granting of a summary judgment motion, the appellate court applies the same three-step analysis required of the trial court. That analysis is as follows: First, the appellate court identifies the issues framed by

the pleadings since it is these allegations to which the motion must respond. Secondly, the appellate court determines whether the moving party's showing has established facts which justify a judgment in movant's favor. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

**HN3[ ]** **Summary Judgment, Entitlement as Matter of Law**

See *Cal. Civ. Proc. Code § 437c (o)*.

Governments > Legislation > Statute of Limitations > General Overview

Torts > Malpractice & Professional Liability > Professional Services

**HN4[ ]** **Legislation, Statute of Limitations**

See *Cal. Civ. Proc. Code § 340.5*.

Governments > Legislation > Statute of Limitations > Time Limitations

**HN5[ ]** **Statute of Limitations, Time Limitations**

*Cal. Civ. Proc. Code § 340.5* contains two periods of limitation: a three-year period and a one-year period, both of which must be met. The three-year period begins to run when the plaintiff discovers the harmful effect, i.e., the physical manifestation of the wrongful act. The negligent cause of that effect is not a concern for the three-year period.

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > ... > Statute of Limitations > Tolling > Discovery Rule

Governments > Legislation > Statute of Limitations > General Overview

Torts > Procedural Matters > Statute of Limitations > General Overview

**HN6**[↓] **Statute of Limitations, Time Limitations**

The one-year period for statute of limitations commences when the plaintiff is aware of both the physical manifestation of the injury and its negligent cause.

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Tolling

**HN7**[↓] **Statute of Limitations, Time Limitations**

The presence of a "foreign body" tolls the three-year limitations period, but that *Cal. Civ. Proc. Code § 340.5* makes clear that the one-year period is not similarly extended. Thus, regardless of extenuating circumstances, the patient must bring his suit within one year after he discovers, or should have discovered, his "injury."

Governments > Legislation > Statute of Limitations > Time Limitations

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > Doctors & Physicians

Torts > Malpractice & Professional Liability > Healthcare Providers

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > General Overview

Torts > ... > Statute of Limitations > Tolling > Discovery Rule

**HN8**[↓] **Statute of Limitations, Time Limitations**

In cases involving the "foreign body" exception, the one-year limitations period set forth in Cal. Civ. Proc. Code §

3405, does not commence until the patient discovers, or through reasonable diligence would have discovered, the existence of the "foreign body" and its negligent cause of his injury.

Civil Procedure > Discovery & Disclosure > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > Procedural Matters > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Torts > ... > Statute of Limitations > Tolling > Discovery Rule

**HN9**[↓] **Civil Procedure, Discovery & Disclosure**

The statutory "foreign body" exception only tolls the three-year outside limitations period and not the one-year "discovery" period. The "foreign body" exception in *Cal. Civ. Proc. Code § 340.5* lifts the three-year outside limit entirely if a nontherapeutic foreign body is left inside a patient. It gives that patient an unlimited time to discover or to use reasonable diligence to discover the presence of the foreign body. But once the patient discovers or through reasonable diligence would have discovered the foreign body and its role in her injury she only has one year to file her lawsuit against the practitioners responsible for leaving the foreign body inside her. That is, the patient is not free to completely ignore the statute of limitations just because she finds out her doctor left something inside her body which is causing her harm. She must still act within one year of her discovery the foreign body exists and is the negligent cause of her injury.

Governments > Legislation > Statute of Limitations > Time Limitations

**HN10**[↓] **Statute of Limitations, Time Limitations**

The "foreign body" exception applies where a foreign body is inadvertently left in the patient, such as a surgical sponge.

94 Cal. App. 4th 245, *245; 114 Cal. Rptr. 2d 166, **166; 2001 Cal. App. LEXIS 2903, ***1

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN11*[⬇] **Statute of Limitations, Time Limitations**

The "foreign body" doctrine was not intended to cover
situations where a substance is intentionally introduced
into a patient's body. To extend the foreign body
doctrine to a substance which is introduced intentionally
for a therapeutic purpose undermines the clear
legislative intent to restrict the foreign body exception to
situations where the foreign substance was
unintentionally left in a patient's body.

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN12*[⬇] **Statute of Limitations, Time Limitations**

*Cal. Civ. Proc. Code § 340.5* requires that the "foreign
body" exception have no therapeutic purpose or effect.
However, this requirement is satisfied even if the foreign
body had such a purpose or effect when originally
placed in the patient's body. It is enough the foreign
body was not removed after it had ceased having this
therapeutic purpose or effect.

Torts > Malpractice & Professional
Liability > General Overview

*HN13*[⬇] **Torts, Malpractice & Professional Liability**

Once an intentionally inserted object no longer serves a
therapeutic purpose, it becomes a foreign body with no
therapeutic purpose or effect.

Torts > Malpractice & Professional
Liability > Healthcare Providers

Torts > Malpractice & Professional
Liability > General Overview

*HN14*[⬇] **Malpractice & Professional Liability,
Healthcare Providers**

A claim based on a medical professional's deliberate
implantation of a "fixation device" in the wrong place
does not transform it into a foreign object. Such a claim
is more readily characterized as one predicated on

negligent medical treatment, which, like misdiagnosis, is
a category of malpractice not covered by the foreign
object rule.

Governments > Legislation > Statute of
Limitations > Time Limitations

*HN15*[⬇] **Statute of Limitations, Time Limitations**

The term "injury," as used in *Cal. Civ. Proc. Code §
340.5*, means both a person's physical condition and its
"negligent cause." Thus, once a patient knows, or by
reasonable diligence should have known, that he has
been harmed through professional negligence, he has
one year to bring his suit.

Governments > Legislation > Statute of
Limitations > Time Limitations

Torts > Malpractice & Professional
Liability > Professional Services

Governments > Legislation > Statute of
Limitations > General Overview

*HN16*[⬇] **Statute of Limitations, Time Limitations**

A plaintiff's claim is not necessarily time-barred under
the one-year period set forth in *Cal. Civ. Proc. Code §
340.5* immediately upon a suspicion of wrongdoing
where he subsequently receives objective medical
advice to allay those suspicions.

Family Law > Family Relationships &
Torts > Wrongful Death & Survival > General
Overview

Torts > ... > Statute of
Limitations > Tolling > Discovery Rule

Governments > Legislation > Statute of
Limitations > General Overview

Governments > Legislation > Statute of
Limitations > Time Limitations

Torts > Wrongful Death & Survival
Actions > General Overview

Torts > Wrongful Death & Survival Actions > Defenses > Statute of Limitations

*HN17*[ ] **Family Relationships & Torts, Wrongful Death & Survival**

A plaintiff need not be aware of the specific facts necessary to establish the claim; that is a process contemplated by pretrial discovery. A plaintiff discovers the cause of action when he at least suspects that someone has done something wrong to him, "wrong" being used, not in any technical sense, but rather in accordance with its lay understanding.

Governments > Legislation > Statute of Limitations > Time Limitations

Healthcare Law > Healthcare Litigation > Actions Against Healthcare Workers > General Overview

Torts > ... > Statute of Limitations > Tolling > Discovery Rule

*HN18*[ ] **Statute of Limitations, Time Limitations**

In circumstances where a person is aware something is physically wrong, but where the cause is not readily apparent to a lay person, that person must exercise reasonable diligence in order to avoid the consequences of *Cal. Civ. Proc. Code § 340.5*'s one-year limitations period. Thus, once someone suspects that their physical symptoms were caused by professional negligence they do have a responsibility to exercise reasonable diligence in discovering the cause of those symptoms. Whether a person has exercised "reasonable diligence" to discover the cause of their injury necessarily depends on the facts of the individual case.

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Tolling

*HN19*[ ] **Statute of Limitations, Time Limitations**

A plaintiffs diligence after he has become suspicious of wrongdoing is not relevant to the running of the statute of limitations. Once a plaintiff actually has the requisite suspicion, the statute of limitations commences to run. It is not tolled by efforts to learn more about the matter short of filing suit.

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > Malpractice & Professional Liability > Attorneys

Governments > Legislation > Statute of Limitations > General Overview

Torts > Procedural Matters > Statute of Limitations > General Overview

Torts > ... > Statute of Limitations > Tolling > Discovery Rule

*HN20*[ ] **Statute of Limitations, Time Limitations**

The appropriate standard under *Cal. Civ. Proc. Code § 340.5* is that a plaintiff's suspicion of wrongdoing only accrues the one-year period of limitations against him if he fails to be diligent in his attempts to confirm that suspicion or if his suspicions are confirmed or the cause of his injury obvious and he fails to file suit. This approach comports with the statute itself and presents no unjust result to the defendant, who is protected by the three-year limitations period in any event.

Family Law > Marital Duties & Rights > Causes of Action > Loss of Consortium

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > ... > Statute of Limitations > Tolling > Discovery Rule

Civil Procedure > ... > Statute of Limitations > Tolling of Statute of Limitations > Discovery Rule

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of

Limitations > Tolling

Torts > ... > Types of Losses > Loss of Consortium > General Overview

Torts > ... > Types of Losses > Loss of Consortium > Spouses

*HN21*[⬇] **Causes of Action, Loss of Consortium**

The statute of limitations for loss of consortium is one year from the date of the spouse's injury, and there is no tolling during the pendency of the spouse's personal injury action. The accrual of a cause of action for loss of consortium may be delayed pursuant to the discovery rule until the plaintiff is aware of the injury and its negligent cause.

**Counsel:** Jeffrey L. Wall; Wills & Benoit, Thomas W. Wills; Richter & Rouhani, Michael Richter; and Carl A. Mounteer for Plaintiffs and Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth, Mario L. Beltramo, Jr., and Patrick M. Martucci for Defendant and Respondent.

**Judges:** Ardaiz, P.J. I CONCUR: Levy, J. Wieland, J. *

**Opinion by:** Ardaiz.

# Opinion

## [*247] [**169]  INTRODUCTION

Plaintiffs and appellants Russell Duncan (Duncan) and Shari Duncan (Mrs. Duncan) (collectively the Duncans) appeal from the judgment entered after the trial court granted summary judgment in favor of defendant and respondent Yemelyan Spivak, M.D. (Spivak). Duncan contends the trial court erred in concluding the one-year limitations period set forth in **[***2]** *Code of [*248] Civil Procedure section 340.5* [1] rendered his medical malpractice claim time-barred. As more fully explained below, *section 340.5* sets forth a three-year and a one-year limitations period. The statute provides in pertinent

---

* Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Further statutory references are to the Code of Civil Procedure.

part that regardless of the three-year limitation period, "…the time for the commencement of action shall be…one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." *Section 340.5* goes on to exclude from its limitation periods any claim in which the plaintiff can show "the presence of a foreign body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

In the first part of this opinion we conclude that a staple used during Duncan's hernia surgery is not a "foreign body" and thus Duncan's claim is not tolled by the foreign body exception set forth above. **[***3]** However, we are also called on to decide whether Duncan's claim nevertheless escapes *section 340.5*'s one-year limitations period because, despite his diligent attempts to do so, he was unable to discover the negligent cause of his injury. For the reasons set forth herein, we conclude *section 340.5* does not necessarily bar a claim filed more than one year after a plaintiff "suspects" medical negligence and serves a notice of intent to sue when that plaintiff subsequently receives medical advice allaying those suspicions. In our view, such facts merely raise a question of fact, appropriately resolved by a jury, regarding what constitutes "discovery of the injury" and "reasonable diligence" that should result in discovery. The dissent concludes that the filing of a notice of intent to sue will in every case constitute "discovery" of an injury as a matter of law.

We set forth this summary of our holding at the outset in order to clearly convey the exact nature of what we decide here: whether, as a matter of law, a plaintiff "discovered or through the use of reasonable diligence should have discovered" the negligent cause of his injury when he experiences post-surgery pain, suspects **[***4]** professional negligence, consults an attorney who files a notice of intent to sue, but is subsequently unable to support his lay suspicion of negligence with medical fact despite numerous consultations with doctors and even an additional surgery. We conclude he does not "discover" his injury within the meaning of *section 340.5* under such circumstances. Thus, the facts alleged by Duncan do not, as a matter of law, require the legal conclusion that the one-year limitations period expired prior to initiation of the action.

We further conclude Duncan has alleged facts that would support a finding he was **[**170]** "diligent" within the meaning of the statute. For the reasons **[*249]** stated herein, we reject respondent's and the dissent's

94 Cal. App. 4th 245, *249; 114 Cal. Rptr. 2d 166, **170; 2001 Cal. App. LEXIS 2903, ***4

position that a mere suspicion of professional negligence triggers the one-year limitations period under section 340.5 *regardless of diligence*. We further reject respondent's and the dissent's position that the initiation of a notice of intent to sue under the specific alleged facts of this case triggers the one-year limitations period *as a matter of law*. As this matter is before us on summary judgment we, of course, do not decide whether the facts alleged actually [***5] constitute diligence such that the limitations period is tolled, but rather leave that factual conclusion to the trier of fact.

## FACTS AND PROCEDURAL HISTORY

### SUMMARY OF FACTS

While at work, Duncan experienced pain in the lower right groin, near the right scrotum, and was taken to an emergency room in Corcoran. There he was seen by both an emergency room physician and a surgeon, Dr. Schuster. Both doctors diagnosed Duncan's injury as a "groin pull." When Duncan continued to have severe burning pain, Duncan consulted with Dr. Sherwin, a family doctor, who diagnosed Duncan with a hernia and referred him to a surgeon, Dr. Spivak. Spivak also diagnosed Duncan with a hernia and recommended a laparoscopic hernia repair.

On October 16, 1996, Spivak performed a right, laparoscopic, inguinal hernia repair on Duncan at Central Valley General Hospital in Hanford. As part of the repair procedure, Spivak affixed surgical mesh to Duncan's abdominal wall using several surgical staples. Spivak stated in his supplemental declaration that the surgical staples were purposefully placed in Duncan's abdominal cavity with the intent they remain there permanently; he therefore concluded they [***6] served a therapeutic purpose as a fixation device.

Following the surgery, Duncan was taken to the surgical recovery room where, upon arousing from the anesthesia, he immediately experienced heightened pain in areas of his body that were previously asymptomatic, namely, his right hip, inner thigh and groin, and numbness in his upper right leg. These symptoms, which resembled an "electrical shock" coupled with numbness, were not present before the hernia repair surgery and, in fact, were far different from the complaints which prompted Duncan to seek medical treatment in the first place. Before the surgery, Duncan only felt pain in his right groin area, which would spread to the stomach area, causing an upset stomach. He would also experience discomfort when he had a bowel movement.

[*250] Duncan asked an attending nurse about these new symptoms and was told not to worry, because it was "part of the surgery." During a postoperative examination on October 23, 1996, Spivak affirmed what the nurse had said. Five days later, when Duncan saw Spivak for a follow-up examination, his pain had become worse -- he experienced numbing in the outer thigh and a "burning" sensation down the inner thigh. [***7] At that time, Spivak advised Duncan that the pain "would go away in time" and told him to go back to work. No follow-up appointment was scheduled.

In late October 1996, Duncan returned to his job as a construction worker. By this time, his pain was "a lot worse" than before the surgery, and he was ingesting large doses of pain relief medication just to get through the workday. Increasing pain caused Duncan to seek the advice of a neurologist, Dr. Richard Pantera, on December 3, 1996. Dr. Pantera was unsure what was causing Duncan's pain and said [**171] they may need to do exploratory surgery. Dr. Pantera told Duncan the pain might be related to the hernia repair surgery, "but he wasn't sure." As a preliminary measure, Dr. Pantera placed Duncan on additional medication to see if the pain would resolve.

On December 11, 1996, Duncan saw Spivak's partner, Dr. Schuster, about his continuing pain and was prescribed Ultram, a muscle-relaxant. Dr. Schuster purportedly advised Duncan that the symptoms he was experiencing were a nerve problem, which could be corrected by a course of injections to "kill the nerve." Dissatisfied with Dr. Schuster's answer and proposed course of treatment, Duncan decided [***8] to stop treating with Spivak's office. Duncan did not return to Spivak's office after December 11, 1996.

In February 1997, Duncan telephoned two different attorneys to inquire about his "status," to ask what he ought to do about his pain, and to determine what his rights were. One of these attorneys was David Drexler of Sherman Oaks, a plaintiff's medical malpractice attorney, whom Duncan authorized to obtain and review his medical records to "see what was wrong." [2] On February 18, 1997, Mr. Drexler sent Spivak a notice of intention to commence a legal action based on professional negligence on Duncan's behalf in

---

[2] Approximately at the same time as the contact with Mr. Drexler, Duncan consulted a San Diego attorney named Hill. Duncan admitted in his deposition that he consulted Attorney Hill by telephone, but there is no evidence that Mr. Hill did anything on Duncan's behalf regarding Duncan's complaints.

94 Cal. App. 4th 245, *250; 114 Cal. Rptr. 2d 166, **171; 2001 Cal. App. LEXIS 2903, ***8

accordance with *Code of Civil Proc. section 364*. [3]

[***9]  Meanwhile, on February 24, 1997, Duncan saw another physician, Dr. Gregory Rhodes, regarding his ongoing complaints. Dr. Rhodes advised [*251] Duncan that "something was wrong," and that he needed exploratory surgery. Dr. Rhodes therefore referred Duncan to Dr. Edward L. Felix, a specialist in laparoscopic surgery. Duncan initially testified in his deposition that at that time he was unaware that something was wrong, that he did not know that Spivak had done anything wrong, but he "just knew [he] was in a lot of pain." Duncan testified later in his deposition, however, that Drs. Pantera and Rhodes thought he needed exploratory surgery because "something was wrong."

On March 27, 1997, Dr. Felix performed exploratory laparoscopic surgery. Dr. Felix discovered that "a portion of [Duncan's] inferior lateral mesh rolled up, forming a firm hard ridge with scar tissue around that ridge which was entrapping the genital branch of the genital femoral nerve." Dr. Felix looked for a staple that might be irritating a nerve, but found none. Although Dr. Felix corrected the problem that he had discovered, Duncan's complaints persisted without any improvement whatsoever.

On April 3, 1997, Dr. Felix [***10] saw Duncan for a postoperative appointment. Duncan told Dr. Felix he still had a fair amount of pain but Dr. Felix told him that was not unusual. During a postoperative visit on May 12, 1997, Duncan was still complaining of pain in his testicles and hot flashes and pain in his scrotum, but Dr. Felix told him that the nerve sensitivity may markedly improve over time and may even return to normal.

In April 1997, Duncan received a letter from his attorney, Mr. Drexler, declining to represent him further. The letter advised [**172] Duncan that if he wished to pursue the matter he should "contact another attorney immediately," and warned him that failure to act could cause his action to be barred by the statute of limitations. Duncan admits receiving this letter in April 1997. [4]

[***11]  On June 20, 1997, Duncan consulted Dr. Espinas, a neurologist, but no diagnosis is found in the record. In February 1998, Duncan began treating with Dr. Kevin Hiler, who performed an open exploratory surgery in April 1998. Dr. Hiler discovered and removed "a corkscrew-shaped surgical staple directly through the lateral femoral cutaneous nerve." In Dr. Hiler's opinion, Dr. Felix did not detect the staple in the laparoscopic procedure he performed 13 months earlier because the staple had been obscured by its location. Dr. Hiler further opined that the staple he found was the cause of [*252] Duncan's ongoing complaints following the October 1996 operation, that it was placed in the nerve during that operation, and that under the applicable standard of care, Dr. Spivak should have promptly reoperated on Duncan to look for the source of his postoperative complaints. Duncan testified in his deposition that he "didn't know that Spivak had done anything wrong until [he] had surgery with Dr. Hiler."

Mrs. Duncan was aware of her husband's condition from the beginning, as he told her about the problems he was experiencing following the hernia repair operation. Duncan also told his wife about consulting [***12] with attorney David Drexler.

**THIS LAWSUIT**

On June 29, 1998, Duncan's attorneys served Spivak with a *Code of Civil Proc. section 364* notice on Duncan's behalf. On October 26, 1998, Duncan filed a complaint in Fresno County Superior Court alleging a single cause of action against Spivak for medical negligence. On March 11, 1999, Mrs. Duncan filed a separate complaint alleging loss of consortium damages against Spivak.

Spivak answered both complaints, contending that both actions were filed after expiration of the statute of limitations set forth in *section 340.5*. The actions were consolidated for all purposes.

On September 29, 1999, Spivak moved for summary judgment, alleging that both complaints were barred by the one-year limitations period set forth in *section 340.5*.

---

[3] *Code of Civil Proc. Section 364, subdivision (a)*, provides: "No action based upon the health care provider's professional negligence may be commenced unless the defendant has been given at least 90 days' prior notice of the intention to commence the action."

[4] In his declaration filed with Duncan's opposition, Mr. Drexler

explained that he decided not to represent Duncan because he concluded, based on Duncan's report to him that Dr. Felix found no apparent cause for Duncan's symptoms and did not find a staple entrapping the nerve, it would be impossible to establish any negligent cause of Duncan's pain. There is no evidence in the record that Mr. Drexler explained this to Duncan.

The Duncans filed opposing papers on November 8, 1999, and Spivak replied on November 16, 1999. On November 23, 1999, the trial court heard oral argument regarding the summary judgment motion, and took the motion under submission. On November 30, 1999, the trial court granted Spivak's motion as to both complaints. The trial court concluded that the statute of limitations commenced to run in February 1997, when Duncan consulted [***13] Mr. Drexler about pursuing a professional negligence action against Spivak, and when Mr. Drexler, as Duncan's agent, served Spivak with notice of intent to sue pursuant to *section 364*.[5]

[***14] [**173]  On December 16, 1999, judgment was entered in Spivak's favor and, on December 22, 1999, Spivak served notice of entry of judgment. On January [*253] 27, 2000, Duncan filed a timely notice of appeal. On February 17, 2000, Duncan filed an amended notice of appeal, which included Shari Duncan, who was not mentioned in the original notice of appeal, as an appellant.

DISCUSSION

Standard Of Review

HN1[ ] A motion for summary judgment "shall be granted if all the papers submitted show that there is no

_____

[5] On March 29, 2000, the Duncans filed a motion to take judicial notice of the trial court's tentative ruling issued prior to oral argument. By our April 18, 2000, order, we deferred ruling on this motion pending consideration of the appeal on the merits. Because our review of the trial court's decision to grant summary judgment is de novo, it is immaterial what course of reasoning led the trial court to grant the summary judgment motion. (See *Brantley v. Pisaro (1996) 42 Cal. App. 4th 1591, 1601*; *Diaz v. Shultz (1947) 81 Cal. App. 2d 328, 332, 183 P.2d 717* ["'Because … it is what the court did, and not what the judge of the court stated during the course of the trial, that determines the course of our inquiry upon this appeal, as there is a vital distinction between what the judge of a trial court may say and what the trial court actually does'"].) For this reason, we deny the Duncans' request. (See *People v. Rowland (1992) 4 Cal.4th 238, 268 fn. 6, 841 P.2d 897* ["Because … no evidence is admissible except relevant evidence it is reasonable to hold that judicial notice, which is a substitute for formal proof of a matter by evidence, cannot be taken of any matter that is irrelevant …'" (12 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Judicial Notice, § 47.1, p. 1749.)"].) Because we find the tentative ruling irrelevant, we do not address the issue raised by the parties, i.e., whether a tentative ruling is an "official act" under *Evidence Code section 452, subdivision (c)*.

triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Code of Civil Proc. § 437c, subd. (c)*; see also *Mann v. Cracchiolo (1985) 38 Cal.3d 18, 35, 210 Cal. Rptr. 762, 694 P.2d 1134*; *Lipson v. Superior Court (1982) 31 Cal.3d 362, 374, 182 Cal. Rptr. 629, 644 P.2d 822*; *Romano v. Rockwell Internat., Inc. (1996) 14 Cal.4th 479, 486-487, 926 P.2d 1114*.) "A court may grant summary judgment only when the evidence in support of the moving party establishes that there is no issue of fact to be tried." (*Neighbarger v. Irwin Industries, Inc. (1994) 8 Cal.4th 532, 547, 882 P.2d 347*.) [***15] HN2[ ]

An appellate court reviewing a trial court's granting of summary judgment will make a de novo determination of whether there is a triable issue of fact and whether the moving party is entitled to judgment as a matter of law. (*Brantley v. Pisaro, supra, 42 Cal. App. 4th at p. 1601*; *Saldana v. Globe-Weis Systems Co.(1991) 233 Cal. App. 3d 1505, 1511-1515, 285 Cal. Rptr. 385*.)In conducting our independent review of the trial court's granting of a summary judgment motion, we apply "the same three-step analysis required of the trial court." (, *AARTS Production Inc. v. Crocker National Bank (1986) 179 Cal. App. 3d 1061, 1064, 225 Cal. Rptr. 203*.) That analysis is as follows: "First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond . [P] Secondly, we determine whether the moving party's showing has established facts which justify a judgment in movant's favor. [P] When a summary [*254] judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." (*Id. at pp. 1064-1065*; [***16] in accord, see *Zuckerman v. Pacific Savings Bank (1986) 187 Cal. App. 3d 1394, 1400-1401, 232 Cal. Rptr. 458*, and this court's opinions in *Brantley v. Pisaro, supra, 42 Cal. App. 4th at p. 1602*, and *Saldana v. Globe-Weis Systems Co., supra, 233 Cal. App. 3d at p. 1513*.)

[**174] HN3[ ] *Subdivision (o) of section 437c Code of Civil Procedure* states in relevant part:

"(*o*) For purposes of motions for summary judgment and summary adjudication: [P] [P] (2) A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete

defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth **[***17]** the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

Spivak's motion for summary judgment attempted to show that "there is a complete defense to" the professional malpractice and loss of consortium claims in the Duncans' complaints. ( *Code of Civil Proc. § 437c, subd. (o)(2).*) That defense is the statute of limitations.

II

Statute of Limitations

A. Duncan's Professional Malpractice Claim

The parties do not dispute that the applicable limitations period for Duncan's professional malpractice claim is contained in *Code of Civil Proc. section 340.5.* **HN4[↑]** *Section 340.5* provides in pertinent part:

"In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first. In no event shall the time for commencement of legal action exceed three years unless tolled for any of the following: (1) upon proof of fraud, (2) intentional concealment, or (3) the presence **[***18]** of a foreign **[*255]** body, which has no therapeutic or diagnostic purpose or effect, in the person of the injured person."

**HN5[↑]** Thus, *section 340.5* contains two periods of limitation -- a three-year period and a one-year period, both of which must be met. ( *Rose v. Fife (1989) 207 Cal. App. 3d 760, 767-768, 255 Cal. Rptr. 440.*) "The three-year period begins to run when the plaintiff discovers the harmful effect, i.e., the physical manifestation of the wrongful act. The negligent cause of that effect is not a concern for the three-year period." ( *Id. at p. 768.*)

Here, Duncan experienced the effects of Spivak's alleged wrongful acts at the earliest in October 1996, when he felt pain immediately following the hernia repair surgery. His complaint was filed in October 1998. Therefore, Duncan met the three-year period of limitations, a fact that Spivak does not contest.

*1. The One-Year Limitations Period*

Because the three-year limitation period was satisfied, the issue here is whether the one-year limitation period was applicable and, therefore, bars the action. **HN6[↑]** "The one-year period commences when the plaintiff is aware of both the physical manifestation **[***19]** of the injury and *its negligent cause.*" ( *Rose v. Fife, supra, 207 Cal. App. 3d at p. 768*; accord, *Gutierrez v. Mofid (1985) 39 Cal.3d 892, 896, [**175]** 218 Cal. Rptr. 313, 705 P.2d 886* ( *Gutierrez*).)

*a. The "Foreign Body" Exception*

Duncan contends the one-year limitations period was tolled because the staple Dr. Hiler ultimately removed was a "foreign body, which has no therapeutic or diagnostic purpose or effect." ( *§ 340.5*; *Ashworth v. Memorial Hospital (1988) 206 Cal. App. 3d 1046, 254 Cal. Rptr. 104* (*Ashworth*).) Our Supreme Court has explained that **HN7[↑]** the presence of a "foreign body" tolls the three-year limitations period, but that "the statute makes clear … that the one-year period is not similarly extended. Thus, regardless of extenuating circumstances, the patient must bring his suit within one year after he discovers, or should have discovered, his 'injury.'" ( *Gutierrez, supra, 39 Cal.3d at p. 896*; accord, *Sanchez v. South Hoover Hospital (1976) 18 Cal.3d 93, 101, 132 Cal. Rptr. 657, 553 P.2d 1129.*)

In *Ashworth*, the Second District Court of Appeal held that **HN8[↑]** in cases involving **[***20]** the "foreign body" exception the one-year limitations period does not commence until the patient discovers, or through reasonable diligence would have discovered, the existence of the "foreign body" and its negligent **[*256]** cause of his injury. ( *Ashworth, supra, 206 Cal. App. 3d at p. 1058.*) The plaintiff in *Ashworth* brought a medical malpractice action after discovering her doctor had left "cotton pledgets" or "sponges" in her body during an operation to remove kidney stones. Noting the "unique characteristics" of this form of malpractice and the Legislature's special treatment of the "foreign body" exception, the court held the statute of limitations did not begin to run until the plaintiff was aware of the cotton

pledgets and the role they played in her ailments. (*Ashworth, at p. 1059.*) As the court explained in *Ashworth*:

*HN9*[↑] ] "It is said the statutory 'foreign body' exception only tolls the three-year outside limitations period and not the one-year 'discovery' period. (*Hills v. Aronshon* [(1984)] *152 Cal. App. 3d 753, 761*.) What this means, of course, is that the 'foreign body' exception in *section 340.5* lifts the three-year outside limit entirely if a [***21] nontherapeutic 'foreign body' has been left inside a patient. It gives that patient an unlimited time to discover or to use reasonable diligence to discover the presence of the 'foreign body.' But once the patient discovers or through reasonable diligence would have discovered the 'foreign body' and its role in her injury she only has one year to file her lawsuit against the practitioners responsible for leaving the 'foreign body' inside her. That is, the patient is not free to completely ignore the statute of limitations just because she finds out her doctor left something inside her body which is causing her harm. She must still act within one year of her discovery the 'foreign body' exists and is the negligent cause of her injury." (*Ashworth, supra, 206 Cal. App. 3d at p. 1058.*)

The issue the Duncans present is whether the staple was a "foreign body, with no therapeutic or diagnostic purpose or effect" that would in essence "toll" the one-year limitations period until Dr. Hiler discovered and removed the staple in April 1998. [6]

[***22] [**176] Generally, *HN10*[↑] the "foreign body" exception "applies where a foreign body is *inadvertently* left in the patient, such as a surgical sponge." (*Trantafello v. Medical Center of Tarzana (1986) 182 Cal. App. 3d 315, 319, 227 Cal. Rptr. 84*.) For example, in *Trantafello* the court found the foreign body exception inapplicable to acrylic that had been intentionally implanted in the plaintiff during disk surgery for the therapeutic purpose of maintaining a space between the vertebrae. The court concluded that while the acrylic may not have had a therapeutic *effect* (it allegedly was

_____

[6] In *Wallace v. Hibner (1985) 171 Cal. App. 3d 1042, 1047, 217 Cal. Rptr. 748*, we held that a needle fragment left in a patient's foot after an operation for its removal does not constitute a foreign body. We concluded that "the Legislature intended the 'foreign body' exception to apply only to medically inserted objects that have no therapeutic or diagnostic purpose which are left in the patient's body." (*Ibid.*, fn. omitted.) Although this case dealt with a foreign body, it does not resolve the issue in our case.

the cause of the plaintiff's injuries), the evidence established that it still had a therapeutic *purpose*, i.e., [*257] the doctor who implanted it intended that the acrylic maintain the space between the vertebrae. (*Ibid.*) Thus, the fact that the acrylic did not act as intended did not change the fact that the doctor who implanted it intended it to perform a therapeutic purpose.

Similarly, in *Hills v. Aronshon, supra, 152 Cal. App. 3d 753*, the court held that intrabreast silicone injections do not satisfy the "foreign body" exception. In so holding, the court explained: *HN11*[↑] [***23]

"We have found nothing to persuade us that the ['foreign body'] doctrine was intended to cover situations such as the case before us where a substance was intentionally introduced into a patient's body…. [P] … To extend the foreign body doctrine to a substance which was introduced intentionally for a therapeutic purpose would undermine the clear legislative intent to restrict the foreign body exception to situations where the foreign substance was *unintentionally* left in a patient's body." (*Hills v. Aronshon, supra, 152 Cal. App. 3d at p. 765*, fn. omitted.)

There is no issue of fact in this case regarding whether Spivak intentionally inserted the staple as part of the hernia repair procedure, or whether the staple served a therapeutic purpose. Spivak offered evidence that the surgical staple was intentionally implanted during the surgery for the therapeutic purpose of affixing the mesh to the abdominal wall, with the intent that it permanently remain there. The Duncans failed to offer any evidence to refute Spivak's statements. As Spivak points out, Dr. Hiler's declaration implies only that Spivak negligently placed the staple and thereafter negligently [***24] failed to remove it before it became embedded in scar tissue; Dr. Hiler's declaration says nothing about the staple's intended purpose. Dr. Hiler's declaration may raise an issue of fact regarding whether the staple had a therapeutic *effect*, since the staple apparently caused Duncan injury by being placed through a nerve; however, it does not raise an issue of fact regarding whether the staple's *purpose* was therapeutic, as the evidence establishes that Spivak intended the staple to hold the mesh in place. (See, e.g., *Trantafello v. Center of Tarzana, supra, 182 Cal. App. 3d at pp. 319-320*.)

Citing *Osborne v. County of Los Angeles (1979) 91 Cal. App. 3d 366, 370, 154 Cal. Rptr. 129* (*Osborne*), the Duncans contend that the staple may have originally served a therapeutic purpose, however, the fact that Dr. Hiler removed the staple means that the staple no

TESFAYE TSADIK

longer had a therapeutic purpose. As Spivak notes, *Osborne* is distinguishable from the present case. In *Osborne*, the surgery in question was for the express purpose of removing the pins and screws that were placed in the plaintiff **[\*\*177]** during an earlier surgery to repair the plaintiff's **[\*\*\*25]** leg and hip fractures. ( *Id. at pp. 368-369, 154 Cal. Rptr. 129*.) One screw, however, was overlooked during the later surgery. Though hospital records **[\*258]** showed that the hospital was aware the screw remained in the plaintiff's hip, the screw was not removed until eight and a half years later. ( *Id. at p. 369, 154 Cal. Rptr. 129*.) After its removal, the plaintiff applied for leave to present a late claim, which the county denied. (*Ibid.*)

The court, recognizing that the only reason for the second surgery was to remove the previously inserted pins and screws, noted that the "negligence consisted of failing to remove the screw while plaintiff was under defendant's care." ( *Osborne v. County of Los Angeles, supra, 91 Cal. App. 3d at p. 370, 154 Cal. Rptr. 129*.) The court found that while the screw was presumably a "therapeutic prosthetic device" when originally inserted and may have been left in the plaintiff intentionally for sound medical reasons, the record showed no awareness or reasonable suspicion by the plaintiff that the screw was improperly left in his hip. (*Ibid.*) The court therefore held that the county erroneously denied Osborne's application for leave to present a late claim.

 **[\*\*\*26]** Here, the surgery Spivak performed on Duncan was not for the specific purpose of removing a previously inserted object, but to repair a hernia. The hernia repair required the placement of mesh in Duncan, which was affixed to the tissue with surgical staples. Thus, the surgical staples were not "improperly" left in Duncan's body, but were intentionally placed there for a therapeutic purpose, i.e., as a permanent fixation device. That the staple may have been improperly placed, and therefore ultimately required removal, does not change the conclusion that the staple was intended to serve a therapeutic purpose. Although the staple may have pierced the nerve, there is no evidence that the staple's therapeutic purpose changed over time.

In *Ashworth*, the court explained how a foreign body that once served a therapeutic purpose can qualify for the "foreign body" exception:

*HN12*[⬆] "[*Section 340.5*] now requires that the 'foreign body' [exception] have no 'therapeutic purpose or effect.' However, this requirement can be satisfied even if the foreign body had such a purpose or effect when

originally placed in the patient's body. It is enough the foreign body was not removed after it had ceased **[\*\*\*27]** having this therapeutic purpose or effect. Otherwise the nine-inch drainage hose left in the patient in *Huysman v. Kirsch (1936) 6 Cal.2d 302, 57 P.2d 908* and all the other sponges, pins, needles, and similar objects left in patients in the paradigm 'foreign body' cases would not qualify for the 'foreign body' exception. For, in nearly all these cases, the tube or sponge or other object indeed had a 'therapeutic purpose or effect' at the time it was inserted into the patient's body -- to drain the wound or absorb blood or hold a bone in place. But the continued presence of these items for weeks, months or years after the wound was closed had no therapeutic value. At some point these articles only represented a threat of injury. Sensibly, **[\*259]** after enactment of *section 340.5* the 'foreign body' rule still applies to 'foreign bodies' even though they had a 'therapeutic purpose or effect' at the time they were placed in the patient so long as it can be shown they were allowed to remain there too long." ( *Ashworth, supra, 206 Cal. App. 3d at p. 1057*.)

 **[\*\*178]** Thus, *HN13*[⬆] once an intentionally inserted object no longer serves a therapeutic purpose, it becomes a "foreign body" **[\*\*\*28]** with "no therapeutic … purpose or effect." The screw in *Osborne* and the "cotton pledgets" or "sponges" in *Ashworth* clearly no longer served therapeutic purposes. In contrast, here Spivak's failure to remove the staple was negligent, if at all, not because the staple no longer served a therapeutic purpose, but because the staple was improperly placed, i.e., it pierced the nerve. This is exactly the opinion Dr. Hiler offered in his declaration opposing the motion -- that the staple was placed in the nerve during the hernia operation and that Spivak's failure to immediately perform exploratory surgery and remove the staple before it became embedded in scar tissue was below the standard of care. Dr. Hiler offered no opinion as to whether the staple continued to serve a therapeutic purpose. This simply is not a case where the doctor "left" a foreign object in the patient's body without any intended continuing treatment purpose, as in *Ashworth* and *Osborne*.

 *Rockefeller v. Moront (1993) 81 N.Y.2d 560 618 N.E.2d 119, 601 N.Y.S.2d 86* further supports this conclusion. In *Rockefeller*, the Court of Appeal held that a suture that was improperly affixed **[\*\*\*29]** to an organ during hernia repair surgery did not constitute a "foreign object" sufficient to delay accrual of New York's statute of limitations for medical malpractice. The court reached this conclusion because items such as sutures "are

deliberately introduced into the body and intended to perform the continuing function of securing the surgical closure." (*81 N.Y.2d at p. 566*.) [7] Noting that objects such as surgical clamps, scalpels and sponges serve a temporary medical function during the surgery and are normally intended to be removed after the surgery is complete, the court reasoned that "when such objects are left behind, no assessment of the medical professional's expert judgment or discretion in failing to remove them is necessary to establish negligence." (*Rockefeller v. Moront, supra, 81 N.Y.2d at p. 564*.)

[***30] In contrast, the court recognized that when a claim is based on the improper placement of "fixation devices" such as sutures, that claim: "is [*260] more accurately characterized as a challenge to [the] defendant [doctor's] medical judgment and treatment -- i.e., his placement of the suture -- and not as one predicated on defendant's failure to remove medical material that should have been extracted at the close of the operation…. if plaintiff were permitted to proceed with this action, defendants would be called upon to justify [the doctor's] professional judgment and the practices he employed in providing plaintiff with medical treatment -- a task which would be rendered extremely difficult due to the significant lapse in time and the attendant loss of evidence and witnesses likely to coincide with the delay." ( [***31] *Rockefeller v. Moront, supra, 81 N.Y.2d at p. 566*; see also *Shah v. Lehman (1997) 953 S.W.2d 955* [Missouri Court of Appeal held that cement restrictor intentionally placed into the plaintiff and intended to be left there as a medical [**179] implant during hip replacement surgery not a "foreign object," although it became imbedded in her thigh [***31] muscle; court applied rule stated in earlier Missouri case, *Hershley v. Brown (1983) 655 S.W.2d 671*, that "if the 'foreign object is intentionally introduced in the body and is intended to remain there,' even if the procedure is performed in a negligent manner, the negligence does not fall within the tolling provision"].) [8]

[***32] In the instant case, Duncan's claim is more accurately characterized as a challenge to Spivak's medical judgment and treatment than as a challenge based on Spivak's failure to remove medical material that should have been extracted at the close of the operation. If Duncan's case were permitted to proceed, Spivak would be required to justify his professional judgment and the practices he employed in providing Duncan with medical treatment. As the court reasoned in *Rockefeller*, HN14[↑] "a claim based on a medical professional's deliberate implantation of a 'fixation device' in the wrong place does not transform it into a foreign object. Such a claim is more readily characterized as one predicated on negligent medical treatment, which, like misdiagnosis, is a category of malpractice not covered by the 'foreign object' rule." (*Rockefeller v. Moront, supra, 81 N.Y.2d at p. 565*.)

Finally, the Duncans, relying on dicta in *Ashworth*, contend that the statute of limitations did not commence until Dr. Hiler's surgery in April 1998 [*261] because (1) the failure to remove the surgical staple constituted a "continuing tort" so that the right of action continued until the staple [***33] was removed, and (2) the operation was not complete until all appliances necessary to a successful operation had been removed from his body. (See *Ashworth, supra, 206 Cal. App. 3d at p. 1055*.)

The first contention fails because, as explained in *Osborne*, the tort continues only until the time that the plaintiff leaves the defendant's care, which in Duncan's case was December 1996. ( *Osborne v. County of Los Angeles, supra, 91 Cal. App. 3d at p. 370*; see also *Huysman v. Kirsch, supra, 6 Cal.2d at pp. 307, 312*; *Sanchez v. South Hoover Hospital, supra, 18 Cal.3d at p. 97*; *Trombley v. Kolts (1938) 29 Cal. App. 2d 699, 708, 85 P.2d 541* [holding medical malpractice claim extended during the entire period the defendant surgeon was in charge of the plaintiff's case, and her right of action became complete only when she terminated the physician/patient relationship and sought the aid of

---

[7] While the New York statute governing the applicable limitations period explicitly exempts "fixation devices" from the "foreign object" rule, the court did not rely upon this statutory exception in reaching its decision, but instead relied on New York's decisional law interpreting the foreign body rule, since the alleged act of malpractice occurred before the statutory "foreign object" rule was enacted. ( *Rockefeller v. Moront, supra, 81 N.Y.2d at p. 564, fn. 2*.)

[8] The Illinois Appellate Court case the Duncans rely on, *Mathis v. Hejna (1969) 109 Ill. App. 2d 356 248 N.E.2d 767*, is distinguishable. The court in *Mathis* held that Illinois's "foreign substance" tolling provision applied to a dye injected into the spinal canal during a diagnostic procedure, which the plaintiff claimed the defendants negligently permitted to remain in his body, thereby causing him to contract arachnoiditis. The court concluded since the Illinois "foreign substance" statute explicitly states that it applies to any "foreign substance other than flesh, blood or bone," and the dye is a substance other than flesh, blood or bone, the "foreign substance" tolling provision applied. ( *248 N.E.2d at p. 770*.) *Section 340.5*, however, is not as broad as the Illinois statute and we therefore do not find *Mathis* to be persuasive authority.

other surgeons].) [9] The second contention fails because **[**180]** the staple was not required to be removed to complete the operation; instead, it is undisputed that Spivak intended the staple to be inserted **[***34]** and to remain in Duncan's body as part of the operation. Therefore, the operation was complete not when the staple was removed, but when the hernia repair procedure concluded on October 16, 1996.

Thus, for the reasons set forth above, we conclude that the staple is not a "foreign body" **[***35]** subject to the tolling provision of *section 340.5*.

### When Did Duncan "Discover the Injury"?

Because we conclude the staple is not a "foreign body," the relevant inquiry regarding when the one-year limitations period commenced is when the plaintiff "discovered, or through the use of reasonable diligence should have discovered, [his] injury." ( *§ 340.5*.) Duncan claims there is a triable issue of fact regarding whether he "should have discovered his injury" through the use of reasonable diligence because he sought out an attorney and multiple medical opinions about his condition and its possible cause soon after his initial treatment by Spivak. Spivak argues that Duncan's suspicion of wrongdoing that prompted him to seek legal advice constituted **[*262]** "discovery" of his "injury." The dissent argues that the filing of the notice of intent to sue under *section 340.5* constitutes "discovery" of the "injury" as a matter of law.

As stated by the Supreme Court in *Gutierrez, supra, 39 Cal.3d at p. 896*, **HN15**[⬆] "the term 'injury,' as used in *section 340.5*, means both 'a person's physical condition *and* its "negligent cause.' [Citations.] Thus, once a patient knows, or **[***36]** by reasonable diligence should have known, that he has been harmed through professional negligence, he has one year to bring his

suit." (See also *Rose v. Fife, supra, 207 Cal. App. 3d at p. 768* ["The one-year period commences when the plaintiff is aware of both the physical manifestation of the injury and *its negligent cause*"].)

Duncan of course knew of his physical condition immediately upon waking from the original operation. It is reasonable to conclude he further at least *suspected* its negligent cause, at the latest, when he consulted an attorney in February of 1997. His suspicions were allayed, however, when subsequent physicians concluded his physical condition did not have a negligent cause. He did not discover the *facts* essential to his claim (i.e., that a staple from the original surgery was in fact the cause of his physical condition) until April 1998 when exploratory surgery by yet another doctor revealed the offending surgical staple. Thus, were we to hold, as a matter of law, that Duncan harbored the requisite subjective suspicion necessary to accrue the one-year period of limitations when he consulted with the attorney in 1997, we **[***37]** would be requiring him to sue during a time that there was absolutely no objective basis for believing any malpractice had occurred.

Spivak contends this is the proper result because prior case law indicates that a subjective belief of wrongdoing (i.e., a "suspicion") commences the running of the statute. Spivak relies on recent Supreme Court cases which effectively interpret the "discovery" of facts underlying a wrongful death or personal injury claim to include **[**181]** mere "suspicion" of facts underlying the claim. (See, e.g., *Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 981 P.2d 79* (*Norgart*); *Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1110-1111, 245 Cal. Rptr. 658, 751 P.2d 923*.) None of these cases, however, address the medical malpractice situation where a plaintiff's suspicions are allayed by subsequent objective medical opinions. Nor do these cases specifically address the delayed discovery rule as it is set forth in *section 340.5*. Accordingly, as set forth below, we conclude **HN16**[⬆] a plaintiff's claim is not necessarily time-barred under the one-year period set forth in *section 340.5* immediately upon a suspicion of wrongdoing where he subsequently **[***38]** receives objective medical advice to allay those suspicions.

### [*263]  i. Cases Involving the Limitations Period in *Section 340.5*

This conclusion is consistent with the Supreme Court's analysis in *Gutierrez, supra, 39 Cal.3d 892*, a case which did involve the limitations period in *section 340.5*

---

[9] Duncan contends that because the court in *Ashworth* stated that the "continuing tort" rationale is viable and applied to the plaintiff's case, and because the plaintiff in *Ashworth* terminated her relationships with the physicians who injured her, the tort continues despite termination of the doctor/patient relationship. While the court in *Ashworth* did state that the "continuing tort" rationale applied in the plaintiff's case, the court also stated that it "need not consider further the implications of the 'continuing tort' and 'incomplete operation' rationales for the [foreign body] rule." ( *Ashworth, supra, 206 Cal. App. 3d at p. 1057*.) Thus, the court's language in this respect is dicta.

and where the court reasonably concluded that the one-year limitations period commenced when a woman was immediately aware she had received a hysterectomy during a surgery she understood to be to remove a tumor from her appendix. ( *Gutierrez, supra, 39 Cal.3d at p. 896.*) Several doctors confirmed her suspicions of malpractice soon after the initial surgery. She contacted an attorney, however, who advised her that she did not have a viable claim. Plaintiff subsequently received different *legal* advice (i.e., that she did have a legal claim), and filed suit more than one year after the initial surgery. ( *Id. at p. 897.*) The Supreme Court rejected her contention that the statute of limitations should be tolled because of the legal advice she received, instead concluding "the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the **[***39]** *facts* essential to his claim." ( *Id. at p. 897.*) The facts essential to the claim being, in that case, that she had received a hysterectomy. Here, the fact essential to Duncan's claim is that a staple from the original surgery was misplaced, a fact he may have been suspicious of but that he had been told was an incorrect suspicion prior to April 1998. Thus, the basis for the accrual of the suit in *Gutierrez, supra, 39 Cal.3d 892*, was not an absence of knowledge of *fact*, but absence of knowledge of the *law*. [10]

**[***40]** Even more analogous to the facts before us is a case decided last year by the Fourth District, *Kitzig v. Nordquist (2000) 81 Cal. App. 4th 1384* (*Kitzig*). In *Kitzig* the plaintiff sued her dentist for malpractice based on his alleged negligence in providing dental implants over an almost four year period. **[**182]** ( *Id. at 1387-1389, 97 Cal. Rptr. 2d 762.*) During the third year of treatment, the plaintiff experienced "food escaping from her nose

---

[10] It was also on this basis that the court in *Gutierrez* disapproved of *Jones v. Queen of the Valley Hospital (1979) 90 Cal. App. 3d 700, 153 Cal. Rptr. 662*, a case relied on in *Enfield v. Hunt (1979) 91 Cal. App. 3d 417, 154 Cal. Rptr. 146*, cited later in this majority opinion. (See, *post*, section 1(b.)(v.).) The dissent characterizes our reliance on *Enfield v. Hunt* as "inappropriate," because the court in *Gutierrez* disapproved of cases holding that the one year statute tolls when a potential plaintiff "is told by an attorney that he has no legal remedy." ( *Gutierrez, supra, 39 Cal.3d at p. 902*, fn. omitted.) As explained above, our holding here is in no way contrary to *Gutierrez*. Rather, we logically distinguish between a plaintiff told by an *attorney* he has no *legal* claim, and a plaintiff told by *doctors* he has no *factual basis* to support his legal suspicion. *Gutierrez* in no way disapproves of such a conclusion, and the language disapproved of in *Gutierrez* merely refers to reliance on an attorney's legal advice.

when she ate" and "bubbles coming from her nose when she brushed her teeth." ( *Id. at 1388.*) She became "suspicious" the dentist may have done something wrong and sought a second opinion. ( *Id. at p. 1392, 97 Cal. Rptr. 2d 762.*) The second doctor told her everything looked "okay" and she returned to the defendant. On appeal, **[*264]** the defendant dentist contended that the one-year limitations period under *section 340.5* accrued when the plaintiff sought a second opinion because she subjectively suspected wrongdoing. The court rejected this argument despite the plaintiff's testimony that she was "suspicious" her doctor may have done something wrong in May 1994 (almost 2 years before filing suit). ( *Id. at p. 1392.*) The **[***41]** court concluded those suspicions did not, as a matter of law, accrue the statute of limitations. While the *Kitzig* court grounded much of its analysis on the fact that a second opinion should not trigger the accrual of the statute because it would hinder the on-going doctor/patient relationship, the court also recognized that the purpose of the one-year statute of limitations was to punish dilatory plaintiffs. ( *Id.* at p. 1396, 97 Cal. Rptr. 2d 762.) Recognizing this goal, the court refused to conclude that, as a matter of law, "a suspicion automatically triggers the limitations period." ( *Id. at p. 1395, 97 Cal. Rptr. 2d 762.*) Though here Duncan had discontinued treatment with the defendant physician, the analysis set forth in *Kitzig* nevertheless supports our conclusion that a jury could reasonably conclude that a subjective suspicion of malpractice may not be adequate to accrue the one-year period set forth in *section 340.5* where the evidence shows the plaintiff also had objective evidence to allay those suspicions upon his diligent attempts to confirm them.

**ii. Other Delayed Discovery Cases**

We do not ignore, of course, the seemingly contradictory language from our Supreme Court **[***42]** in *Jolly v. Eli Lilly, & Co., supra, 44 Cal.3d at page 1111*, wherein the Court, stated **HN17**[⬆] a plaintiff "need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery." (Compare, *Gutierrez, supra, 39 Cal.3d at p. 897* [the limitations period accrues "no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim"].) This language was reaffirmed and extended in *Norgart, supra, 21 Cal.4th 383*, where the court concluded a father's wrongful death suit was barred under *Code of Civil Proc. section 340, subdivision 3* (establishing a one-year statute of limitations in wrongful death cases) because he immediately suspected some wrongdoing after his

daughter's death. The court stated that a plaintiff discovers the cause of action "when, simply put, he at least 'suspects … that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]." ( *Norgart, supra, 21 Cal.4th at pp. 397-398*, fn. omitted.)

*Norgart,* on its face, appears to **[***43]** support the conclusion that Duncan's claim must be time-barred because the act of seeking legal advice and serving Spivak with a notice of intent to commence legal action indicates he **[*265]** suspected wrongdoing by Spivak. However, *Norgart* was a wrongful death action brought against a drug manufacturer wholly outside of the context of *section 340.5* and did not consider the issue **[**183]** presented here: whether suspicion triggers the commencement of the one-year limitations period where that suspicion is allayed by contradictory objective medical fact. There is nothing in *Norgart* that compels the conclusion that suspicion of wrongdoing as a matter of law triggers the commencement of the one-year limitations period under *section 340.5* where there is also evidence of diligence in attempting to acquire medical facts to support the suspicion. Rather, in *Rose v. Fife, supra*, a court of appeal case which examined the delayed discovery rule in the context of *section 340.5*, the court concluded the plaintiff's claim was barred by the one-year period because the evidence showed she had a suspicion of wrongdoing and yet *did not take any affirmative action to confirm her suspicions* **[***44]** . ( *Rose v. Fife, supra, 207 Cal. App. 3d at p. 770*.) The court did not conclude that the suspicion alone triggered the one-year period, rather it implied that the suspicion triggered a duty to pursue facts to support that suspicion. The court held "as a matter of law that a reasonable person would have suspected wrongdoing by Fife and would have inquired; she would have gone to find the facts rather than waiting until October 1985 for the facts to come to her. [Citation.]" (*Ibid.*) Thus, where the plaintiff does "go to find the facts" a question of fact exists as to whether that person was diligent. (*Ibid.* [acknowledging that "generally the reasonability of a plaintiff's 'belated discovery' is a question of fact"].)

This acknowledgment that a potential plaintiff's diligence is not (contrary to the dissent's conclusion) "irrelevant" even when that plaintiff may suspect professional negligence comports with common sense. People generally seek the advice of professionals *because* they do not have the education, information or experience to reach a reasonable conclusion without professional advice as to what is causing their pain. Some physical pains **[***45]** require medical expertise in order to determine their cause, some do not. A person who slips and falls and immediately has ankle pain knows what caused the ankle pain. If, on the other hand, that person has ankle surgery but still experiences significant residual pain, he may have no way of knowing without a medical opinion whether that is "as good as his ankle is going to get" or whether the surgeon performed the surgery in a negligent manner. *HN18* In circumstances where a person is aware something is physically wrong, but where the cause is not readily apparent to a lay person, we conclude that person must exercise reasonable diligence in order to avoid the consequences of *section 340.5*'s one-year limitations period. Thus, once someone suspects that their physical symptoms were caused by professional negligence they do have a responsibility to exercise reasonable diligence in discovering the cause of those symptoms. And whether a person has exercised "reasonable diligence" to **[*266]** discover the cause of their injury necessarily depends on the facts of the individual case.

Further strengthening this interpretation of *section 340.5* is the fact that in *Norgart* and *Jolly* the Court was **[***46]** applying the delayed discovery doctrine to *extend* an otherwise limited statute of limitations. (See *§ 340, subd. 3*; *Code of Civil Proc. § 338*.) In this case, however, as in *Kitzig,* the "delayed discovery doctrine" is written into a statute to *shorten* an otherwise conclusive three-year statute. ( *§ 340.5*.) Thus, to the extent the court in *Norgart* noted that the whole purpose of the application of any particular statute of limitations is to strike a balance between the public policies of "giving security and stability to human affairs" and, on the other hand, disposing of claims on the merits, the Legislature **[**184]** has chosen in *section 340.5* to strike that balance by refusing to extend claims beyond three years and further punishing dilatory plaintiffs by limiting their limitations period to one year. (See *Norgart, supra, 21 Cal.4th at p. 405, fn. 5*.) Thus, under *section 340.5* (unlike *§ 340, subd. 3*) there need be no concern that claims will be delayed indefinitely because defendants are protected by the three-year period of limitations nonetheless. Additionally, the express language of the delayed discovery rule as stated in *section 340.5* includes as a factor the plaintiff's **[***47]** diligence. Therefore, to the extent *Norgart, Jolly* and other cases discussing delayed discovery under other statutes imply that diligence or the reasonableness of a plaintiff's reliance on medical advice is irrelevant, they are distinguishable.

Finally, we note that our position also finds support in *Hills v. Aronsohn, supra, 152 Cal. App. 3d 753*, a case quoted at length in the dissent. *Hills* involved a woman's (Ms. Hills) malpractice claim for negligent injection of silicone in her breasts. The defendant doctor moved for summary judgment under both the one-year and three-year limitations periods of *section 340.5*. ( *Id. at p. 757*.) The court of appeal affirmed the trial court's grant of summary judgment, concluding that Ms. Hills's claim was barred by the three-year limitations period because she admitted she experienced pain in her breasts more than four years before ever filing suit. ( *Id. at p. 762*.) The court nevertheless analyzed the one-year limitations issue, concluding that her action may have been timely under the one year period had it not been barred under the three-year limitations period. The court stated **[***48]** that Ms. Hills had to be aware of the negligent cause of her harm in order to trigger the one-year limitations period, and that a question of fact existed as to whether she even could have discovered the negligent cause of her harm absent submitting to a "serious operation." The court did not address whether Ms. Hills suspected negligence, but appears to presume she did, refusing to bar Ms. Hills's claim based on the one-year limitations period merely because she did not submit to an operation to uncover the **[*267]** negligence sooner. ( *Id. at p. 760* ["We refuse to hold that submitting to such drastic surgery is the sole means by which a plaintiff may make the requisite showing of diligence"].) Here, Duncan did submit to surgery in an attempt to uncover the nature of his harm, and *still* could not ascertain the negligent cause of his injury. [11]

### [***49]  iii. *Kleefeld v. Superior Court*

Respondent further relies on *Kleefeld v. Superior Court (1994) 25 Cal. App. 4th 1680* (*Kleefeld*). In *Kleefeld* the plaintiff's wife died after treatment by a chiropractor and,

within five days of her death (in January 1991), plaintiff contacted the Board of Chiropractic Examiners to express his suspicion his wife received inappropriate treatment by defendant. **[**185]** ( *Kleefeld, supra, 25 Cal. App. 4th at p. 1683*.) Approximately seven months later (in August 1991) plaintiff was informed of the Board's decision to discipline the defendant, and plaintiff filed suit more than 14 months after that (in October 1992). ( *Id. at p. 1683*.) The court concluded plaintiff's suit was time-barred on the grounds that the plaintiff immediately suspected wrongdoing and failed to file suit within one year of that suspicion. The court concluded that the plaintiff's diligence was irrelevant to the running of the statute of limitations. ( *Id. at p. 1684* ["HN19 ↑] a plaintiffs diligence *after* he has become suspicious of wrongdoing is not relevant to the running of the statute of limitations …. Once a plaintiff **[***50]** actually has the requisite suspicion, the statute of limitations commences to run. It is not tolled by efforts to learn more about the matter short of filing suit"].)

To the extent the court in *Kleefeld* concluded that a plaintiff's diligence in discovering the facts that may substantiate his or her suspicions of wrongdoing is irrelevant under *section 340.5* we respectfully disagree. Rather, as stated by the Supreme Court in *Norgart, supra*, the purpose of any statute of limitations is "to protect defendants from the stale claims of dilatory plaintiffs. [Citations.] It has as a related purpose to stimulate plaintiffs to assert fresh claims against defendants in a diligent fashion." ( *Norgart, supra, 21 Cal.4th at p. 395*.) Thus, a plaintiff's suspicion of wrongdoing should only **[*268]** act to accrue the one-year limitations period where (as in *Rose v. Fife, supra, 207 Cal. App. 3d 760*, for example) a plaintiff suspects wrongdoing and yet fails to act on those suspicions. In any event, *Kleefeld* is distinguishable in that there the plaintiff waited more than one year to file suit *even after* he had factual confirmation of the negligent **[***51]** cause of the injury. ( *Kleefeld, supra, 25 Cal. App. 4th at p. 1683*.)

### iv. Effect of the Serving of the *Section 364* Notice

Additionally, as we previously pointed out, the express language of *section 340.5* includes as a factor the plaintiff's diligence and the one-year limitations period was clearly intended to punish dilatory plaintiffs. For these reasons, unlike our colleague in dissent, we do not consider the serving of the notice of intention to commence a legal action pursuant to *section 364* to be determinative of whether the one-year limitations period

---

[11] The portion of the *Hills* decision cited by the dissent that recognizes some malpractice claims may need to be filed before a plaintiff can discover the cause of his medical symptoms was pointing out the sometimes harsh effects of the *three-year limitations period*, a limitations period we do not question but that is not at issue in this case. As we previously pointed out, the existence of the three-year limitations period actually mitigates in favor of a less draconian interpretation of the one-year limitations period in that doctors are, with limited exceptions set forth in the statute, protected by the three-year limitations period in every case. Accordingly, the dissent's reliance on *Hills* for the proposition that the language of *section 340.5* justifies a harsh result in this case in the application of the one-year limitations period is misplaced.

has commenced. [12] **[***53]** An analysis that renders the filing of a *section 364* notice absolutely determinative of the statute of limitations issue would penalize diligent plaintiffs who have sought medical confirmation of their subjective suspicions of negligence but are dissuaded by contrary objective medical fact. Penalizing a *diligent* plaintiff, under a provision of a statute intended to penalize *dilatory* plaintiffs, is contrary to the statute and contrary to basic fairness. Moreover, there is nothing in *section 364* which compels such a conclusion. To the contrary, the purpose of *section 364* is to encourage **[***52]** the parties to settle their dispute prior to the filing of a lawsuit in **[**186]** order to decrease the number of litigated malpractice actions. (See *Woods v. Young (1991) 53 Cal.3d 315, 320, 279 Cal. Rptr. 613, 807 P.2d 455*.) This legislative goal surely is not furthered by holding that, *as a matter of law*, the filing of the notice under *section 364* starts the proverbial clock ticking on the one-year limitations period in *section 340.5*. Instead, such a holding would encourage plaintiffs to file suit even where they have no objective basis for believing their claim to be meritorious. [13] We do not dispute that the serving of a *section 364* notice may be a determinative factor in a case where, for **[*269]** example, there is evidence of suspicion but no attempts to confirm that suspicion. However, we cannot

agree that it is a determinative factor in every case as a matter of law. Instead, we conclude that the serving of a *section 364* notice is, in this case, merely a factor that the jury can consider when deciding whether a particular plaintiff was diligent.

**v. This Case**

If, under the facts of this case Duncan harbored suspicions and yet failed to seek any further medical advice for a year, we would rely **[***54]** on the statutory language to conclude that he, "through the use of reasonable diligence should have discovered," that a staple placed by Dr. Spivak was the cause of his pain. [14] Similarly, if Duncan waited more than one year after his April 1998 surgery to file suit we would not hesitate to apply the one-year limitations period against him. However, the evidence indicates that Duncan diligently tried to discover whether something Spivak did caused his pain. Under these facts, we cannot as a matter of law conclude he has either "discovered" his injury or "through the use of reasonable diligence should have discovered" his injury simply because he harbors some suspicion of wrongdoing. We believe such a situation is what the three-year limitations period was intended to protect against. (See *Rose v. Fife, supra, 207 Cal. App. 3d at pp. 767-768* ["The three-year period begins to run when the plaintiff discovers the harmful effect, i.e., the physical manifestation of the wrongful act. The negligent cause of that effect is not a concern for the three-year period"].) Thus, we conclude **HN20[↑]** the appropriate standard under *section 340.5* is that a plaintiff's suspicion **[***55]** of wrongdoing only accrues the one-year period of limitations against him if he fails to be diligent in his attempts to confirm that suspicion or if his suspicions are confirmed (or the cause of his injury obvious) and he fails to file suit. (See, also, *Enfield v. Hunt, supra, 91 Cal. App. 3d at p. 424* [determining **[**187]** a question of fact existed regarding a plaintiff's diligence where "evidence available to plaintiff and his attorney indicated plaintiff would have a weak or unmeritorious case. It would be contrary to public policy to reach a result in this case which would in effect require an attorney to file a malpractice action at a time when the **[*270]** evidence available to the attorney indicates the action has no merit"].) This approach comports with the statute itself and presents no unjust

---

[12] We also note that this conclusion does not, as the dissent argues, "effectively resurrect" former *section 411.30*. *Code of Civil Procedure Section 411.30* used to require plaintiffs to file a certificate of merit on or before the date of service of a claim for professional malpractice certifying that the filing attorney had consulted a medical expert and that the claim had merit. We certainly do not hold that a plaintiff *must* wait until they have objective medical evidence of malpractice before filing suit, we simply conclude that they should not be penalized under *section 340.5*'s one-year limitations period if they do.

[13] Nor do we believe that Duncan's consultation with an attorney is dispositive of the issue relevant to the accrual of the one-year statute where there is evidence of diligence in attempting to discover the underlying facts. As stated in *Gutierrez, supra, 39 Cal.3d at pages 903-904*, "the limitations period was not affected when counsel told [Ms. Gutierrez] there was 'no provable malpractice'" because she was *already aware of the facts* upon which the legal conclusion of malpractice would be based: that she had an unexpected hysterectomy. Here, Duncan did not have knowledge of the facts upon which a negligence claim could be based until his April 1998 surgery. Thus, Duncan's claim that the one-year period should not apply to him "is based on delayed discovery of the facts, not a delayed understanding of the law" and is "fully consistent with the *Gutierrez* decision." ( *Kitzig, supra, 81 Cal. App. 4th at p. 1394*.)

[14] Conceivably, a case could arise where a plaintiff fails to attempt to confirm his suspicions of wrongdoing yet presents medical evidence that, even if he had been diligent, he would have been unable to discover them for some medical reason. This is not such a case and we do not resolve that issue.

result to the defendant, who is protected by the three-year limitations period in any event.

**[***56]** There is some dispute in the record regarding when Duncan subjectively believed Spivak had done something wrong to him. Spivak urges that Duncan's consultation with a lawyer eliminates any possibility Duncan did not have a subjective belief Spivak had done something wrong. Duncan testified in his deposition that he knew something "was wrong" but he was not sure Spivak was the cause. As we explain, however, Duncan's subjective belief is not the only factor to consider when deciding the accrual of the one-year period where there is evidence of diligence in discovery of the facts. Thus, we reject Spivak's contention below and on appeal that evidence of diligence is irrelevant. Accordingly, there is a triable issue of fact regarding whether Duncan was diligent in discovering the facts which formed the elements of his claim. If the jury concludes he was not reasonably diligent in attempting to confirm those suspicions, then the one-year period accrued when the jury determines he suspected Spivak of wrongdoing.

**B. The Loss of Consortium Claim**

HN21[↑] "The statute of limitations for loss of consortium is one year from the date of the spouse's injury, and there is no tolling during the **[***57]** pendency of the spouse's personal injury action. ( *Priola v. Paulino (1977) 72 Cal. App. 3d 380, 383, 140 Cal. Rptr. 186*.)" ( *Meighan v. Shore (1995) 34 Cal. App. 4th 1025, 1034*.) The accrual of a cause of action for loss of consortium may be delayed pursuant to the discovery rule until the plaintiff is aware of the injury and its negligent cause. ( *Uram v. Abex Corp. (1990) 217 Cal. App. 3d 1425, 1438, 266 Cal. Rptr. 695*; *Jolly v. Eli Lilly & Co., supra, 44 Cal.3d at p. 1109*.) Accordingly, whether Mrs. Duncan's claim was timely filed will depend on when the jury concludes the one-year limitations period commenced against Duncan.

DISPOSITION

Ardaiz, P.J.

I CONCUR:

Levy, J.

Wieland, J.[*]

**Dissent by:** WIELAND

# Dissent

**[*271]** WIELAND, J. I dissent, respectfully. The trial court was correct. Russell Duncan's (Duncan) **[***58]** February 1997 service of a notice of intent to sue Yemelyan Spivak (Spivak) for injuries caused by Spivak's professional negligence started the running of the statute of limitations. Duncan's failure to file his lawsuit within that limitations period bars his claim.

The majority concludes that the service of the notice of intent to sue is but one of several relevant factors the trier of fact may consider in determining "whether Duncan was diligent in discovering the facts which formed the elements of his **[**188]** claim." (Maj. opn., *ante*, at p. 31.) That presents two concerns for me. First, to the extent the notice of intent to sue is one of several factors to consider, it is the trump card, and as such, it decides this case as a matter of law. Second, phrasing the issue as "whether Duncan was diligent in discovering the facts which formed the elements of his claim" presents a fundamental difference of opinion between us as to what *Code of Civil Procedure section 340.5* [15] is all about.

**[***59]** I believe the issue of diligence died with the service of the notice of intent to sue, that the notice of intent to sue constitutes Duncan's admission that he then believed Spivak's professional negligence caused him injury, and that the one-year limitations period started to run with that service.

I also believe that whether Duncan was diligent in discovering *the facts* to form *the elements of his claim* after February 1997 is irrelevant to a statute of limitations analysis in professional negligence cases. Facts are not necessary to start the running of the limitations period. A layperson's suspicions of harm caused by professional wrongdoing will suffice. Once the limitations period began to run, Duncan had only to

---

[*] Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution*.

[15] Further statutory references are to the Code of Civil Procedure unless indicated.

timely file his lawsuit to be compliant with *section 340.5*. His failure to discover facts tending to support his cause of action, with or without diligence, does not toll, suspend, or extend the limitations period. Nor does the early discovery of the supportive facts shorten the limitations period. Whether Duncan ever discovered the facts necessary to file his lawsuit is simply not part of this legal issue.

The interpretation and application of the discovery [***60] exception to the one-year statute of limitations of *section 340.5* begins with a fundamental understanding of statutes of limitations, accrual of causes of action, and the related discovery rule. Our Supreme Court's most recent discussion of these subjects is in *Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 981 P.2d 79*. In *Norgart*, the court explained the following about the **[*272]** statute of limitations: "'Statute of limitations' is the 'collective term … commonly applied to a great number of acts,' or parts of acts, that 'prescribe the periods beyond which' a plaintiff may not bring a cause of action. [Citations.] It has as a purpose to protect defendants from the stale claims of dilatory plaintiffs. [Citations.] It has as a related purpose to stimulate plaintiffs to assert fresh claims against defendants in a diligent fashion. [Citations.] Inasmuch as it 'necessarily fixes' a 'definite period[] of time' [citation], it operates conclusively across the board, and not flexibly on a case-by-case basis. [Citations.] That is to say, a cause of action brought by a plaintiff within the limitations period applicable thereto is not barred, even if, in fact, the **[***61]** former is stale and the latter dilatory; contrariwise, a cause of action brought by a plaintiff outside such period is barred, even if, in fact, the former is fresh and the latter diligent." ( *Norgart v. Upjohn Co., supra, 21 Cal.4th at p. 395*.)

The court in *Norgart* recognized that it is for the Legislature alone to establish any particular limitations period under any particular statute of limitations, subject only to constitutional restraints. ( *Norgart v. Upjohn Co., supra, 21 Cal.4th at pp. 396-397*.) A plaintiff, naturally, must file suit within the applicable limitations period after accrual of the cause of action. ( *Id. at p. 397, [**189] 87 Cal. Rptr. 2d 453, 981 P.2d 79*.) The court summarized the accrual rules as follows:

"The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' [Citation.] In other words, it sets the date as the time when the cause of action is complete with all of its

elements [citations]--the elements being generically referred to by sets of terms such as 'wrongdoing' or [***62] 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury' [citations]." ( *Norgart v. Upjohn Co., supra, 21 Cal.4th at p. 397*.)

The court further recognized the most important exception to the general rule defining the accrual of a cause of action is the discovery rule, which may be expressed by the Legislature or implied by the courts. ( *Norgart v. Upjohn Co., supra, 21 Cal.4th at p. 397*.) The discovery rule postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. (*Ibid.*) The court noted that as it explained in *Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 245 Cal. Rptr. 658, 751 P.2d 923*: "The plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof--when, simply put, he at least 'suspects … that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]. He has reason to discover the cause of action when he has reason **[*273]** at least **[***63]** to suspect a factual basis for its elements. [Citation.] He has reason to suspect when he has '""notice or information of circumstances to put a reasonable person *on inquiry*"'"[citation]; he need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place--he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does [citation]." ( *Norgart v. Upjohn Co., supra, 21 Cal.4th at pp. 397-398*, fns. omitted, quoting *Jolly v. Eli Lilly & Co., supra, 44 Cal.3d at pp. 1110-1111*.)

Thus, the determination of whether a plaintiff has discovered the cause of action is made from the layperson's point of view. Further, *Norgart* makes clear a plaintiff's mere *suspicion* of wrongdoing is enough to constitute "discovery"; the plaintiff need not have actual knowledge of the elements of his or her claim. Instead, the plaintiff [***64] has the applicable limitations period to learn the facts necessary to bring the cause of action. In case there was any doubt about this concept, the court clarified it by explaining:

"Not inconsistent with the proposition that the plaintiff

discovers the cause of action when he at least suspects a factual basis for its elements, even if he lacks knowledge thereof, is language like that which appears in *Jolly*, to the effect that a 'suspicion' of one or more of the elements of a cause of action, 'coupled with a knowledge' of the others, 'will commence the [applicable] limitations period.' [Citation.] Such words do not cast doubt on the sufficiency of suspicion of the elements of a cause of action *without* **[**190]** knowledge. To quote *Jolly* again: A plaintiff need not know the 'specific "facts" necessary to establish' the cause of action. [Citation.] Rather, such words merely make plain what is true a fortiori--the sufficiency of suspicion of one or more of the elements *with* knowledge of the others." ( *Norgart v. Upjohn Co., supra, 21 Cal.4th at p. 398, fn. 3*, italics in original, citing *Jolly v. Eli Lilly & Co., supra, 44 Cal.3d at pp. 1111-1112*.) **[***65]**

This rule is consistent with California Supreme Court cases applying the discovery rule to professional negligence actions under *section 340.5*, *Sanchez v. South Hoover Hospital (1976) 18 Cal.3d 93, 132 Cal. Rptr. 657, 553 P.2d 1129* and *Gutierrez v. Mofid (1985) 39 Cal.3d 892, 218 Cal. Rptr. 313, 705 P.2d 886*, both of which the court in *Norgart* noted the *Jolly* decision relied upon. ( *Norgart v. Upjohn Co., supra, 21 Cal.4th at p. 397*.) As the court explained in *Rose v. Fife (1989) 207 Cal. App. 3d 760, 768, 255 Cal. Rptr. 440*:

"Our Supreme Court has often discussed the one-year rule's requirement of discovery of the negligent cause of injury. When a plaintiff has information which would put a reasonable person on inquiry, when a **[*274]** plaintiff's 'reasonably founded suspicions [have been] aroused' and the plaintiff has 'become alerted to the necessity for investigation and pursuit of [his or] her remedies,' the one-year period commences. 'Possession of "presumptive" as well as "actual" knowledge will commence the running of the statute.' ( *Sanchez v. South Hoover Hospital, supra, 18 Cal.3d at pp. 101-102*; **[***66]** accord *Jolly v. Eli Lilly & Co., supra, 4[4] Cal.3d at pp. 1110-1111*; *Gutierrez v. Mofid, supra, 39 Cal.3d at pp. 896-897*.)"

Thus, in *Sanchez* the court held the statute of limitations began to run on a plaintiff's medical malpractice claim when the plaintiff, who had remained in the hospital eight days following the birth of her stillborn baby, with continuous drainage from a Caesarean incision she felt was not healing properly, had become alerted to the necessity for investigation. ( *Sanchez v. South Hoover Hospital, supra, 18 Cal.3d at pp. 95, 102*.) The court

stated the plaintiff's "reasonably founded suspicions were undeniably aroused" while she was in the hospital, both by the recognition of her own symptoms and by external corroboration in the form of a hospital employee's statement, upon observing her condition, that "They have done a mess with you." ( *Id. at pp. 96, 102*.) The court concluded the statute clearly began to run when the plaintiff was discharged from the hospital on March 30, 1972, since her deposition revealed she believed she had been a victim of malpractice. ( *Id. at p. 102*.) **[***67]** As the court explained: "Referring to her state of mind at the time of discharge she said 'Yes, I did think they had done something wrong because of all the time that I stayed there suffering.' It is fair to conclude that by March 30, 1972, plaintiff had become alerted to the necessity for investigation and pursuit of her remedies. The one-year statute of limitations commenced, and since more than one year elapsed before her complaint was filed the action was manifestly barred." ( *Ibid.*)

Our Supreme Court in *Gutierrez* cited the same rule from *Sanchez*: A plaintiff "is charged with 'presumptive' knowledge of his negligent injury, and the statute commences to run, once he has 'notice or information of circumstances to put a reasonable **[**191]** person *on inquiry*, or *has the* opportunity to obtain knowledge from sources open to his investigation ....'" ( *Gutierrez v. Mofid, supra, 39 Cal.3d at pp. 896-897*, italics in original, citing *Sanchez v. South Hoover Hospital, supra, 18 Cal.3d at p. 101*.) While, as the majority points out, the plaintiff in *Gutierrez* was clearly aware of the facts that formed the basis of her claim, i.e., the **[***68]** physician had performed a hysterectomy instead of an operation for appendicitis or to remove a tumor, the court did not limit the discovery rule in professional negligence cases to situations where the plaintiff knows the facts that form the basis of the claim. The court, instead, concluded that "if one has suffered appreciable harm and knows or *suspects* that professional blundering is its cause, the fact **[*275]** that an attorney has not yet advised him does not postpone commencement of the limitations period." ( *Gutierrez v. Mofid, supra, at p. 898*, italics added.)

In short, our Supreme Court has established a standard for the discovery rule that a plaintiff discovers his or her cause of action when he or she suspects a factual basis for its elements, i.e., when he or she has information which would prompt a reasonable person to make inquiry about the claim, not when the accuracy or validity of suspicions is confirmed or sufficient information to succeed on the claim is acquired.

The majority's opinion (*ante*, at pp. 20-21) states, in relevant part, as follows:

"Duncan of course knew of his physical condition immediately upon waking from the original operation. **[***69]** It is reasonable to conclude he further at least *suspected* its negligent cause, at the latest, when he consulted an attorney in February of 1997. His suspicions were allayed, however, when subsequent physicians concluded his physical condition did not have a negligent cause. He did not discover the *facts* essential to his claim (i.e., that a staple from the original surgery was in fact the cause of his physical condition) until April 1998 when exploratory surgery by yet another doctor revealed the offending surgical staple. Thus, were we to hold, as a matter of law, that Duncan harbored the requisite subjective suspicion necessary to accrue the one-year period of limitations when he consulted with the attorney in 1997, we would be requiring him to sue during a time that there was absolutely no objective basis for believing any malpractice had occurred."

I have four concerns with the above-quoted language. First, I do not understand the evidence to be that Duncan's physicians in 1997 concluded that his physical condition did not have a negligent cause. The evidence simply indicates they could not find the staple in March 1997, or any apparent cause of Duncan's symptoms; accordingly, **[***70]** Duncan's attorney concluded in April 1997 that it would be impossible to establish any negligent cause of Duncan's pain. Second, the law did not require Duncan to have an *objective* basis for the filing of litigation. Clearly, a subjective belief was sufficient. Third, Duncan's subjective opinion did not have to be based on all facts necessary to prove his case. Those facts were to be discovered during the remainder of the statute of limitations period or during pretrial discovery. Fourth, the quoted portion of the majority's analysis does not even mention the service of the notice of intent to sue required by *section 364* and served in February 1997.

*Section 364, subdivision (a)* provides that "no action based upon the health care provider's professional negligence may be **[**192]** **[*276]** commenced unless defendant has been given at least 90 days' prior notice of the intention to commence the action." While no particular form of notice is required, the notice must "notify the defendant of the legal basis of the claim and the type of loss sustained, including with specificity the nature of the injuries suffered." ( *Code of Civil Procedure § 364, subd. (b)*.) For purposes of *section*

*364*, "'Professional negligence' means **[***71]** negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." ( *Code of Civil Procedure § 364, subd. (f)(2)*.)

The purpose of the 90-day waiting period required by *section 364, subdivision (a)* before filing a medical malpractice action "is to decrease the number of medical malpractice actions filed by establishing a procedure that encourages the parties to negotiate 'outside the structure and atmosphere of the formal litigation process.' [Citations.]" ( *Woods v. Young (1991) 53 Cal.3d 315, 320, 279 Cal. Rptr. 613, 807 P.2d 455*.) The *section 364* notice, however, serves more than this purpose; it also evidences a plaintiff's intent to sue. (See, e.g., *Bennett v. Shahhal (1999) 75 Cal. App. 4th 384, 390, fn. 3* [plaintiff's *Code of Civil Procedure § 364* notice "clearly evidenced the specific intent to sue"].) The plaintiff decides when to give the statutory notice of intent to sue. ( *Woods v. Young, supra, at p. 327*.) **[***72]** Thus, the triggering event in all cases for accrual purposes is not necessarily service of the *section 364* notice of intent to sue; instead, it is awareness of the cause of action, which in this case is shown by Duncan's suspicion of wrongdoing as evidenced by the *section 364* notice of intent to sue. Naturally, a plaintiff may refrain from serving a *section 364* notice of intent to sue until during the last 90 days of the limitations period, thereby extending the one-year limitations period for one-year and 90 days from the date of accrual of the cause of action. ( *Woods v. Young, supra, at p. 325*.)

The above cited decisions of our Supreme Court merely require a layperson to "suspect a factual basis" in order to start the running of the statute of limitations. However, here, Duncan did more than "suspect a factual basis." Pursuant to *section 364, subdivision (b)*, he told Spivak the following:

"Please be advised, pursuant to *Code of Civil Procedure § 364*, that [Russell Duncan] intends on commencing a legal action against you for professional negligence. [P] It is claimant's contention that as a result of your professional negligence **[***73]** they [*sic*] suffered personal injuries and related damages including, but not limited to, medical, hospital and incidental expenses; physical and mental pain and suffering; and loss of

earnings."

The record of Duncan's suspicions of medical negligence in February 1997 could not be more clear. Thus, when Duncan served the *section 364* [*277] notice, Duncan had "discovered" his cause of action: he had knowledge of injury (the pain); suspicion of wrongdoing; and suspicion that the injury was caused by Spivak's improper care. The service of the notice conclusively established that the statutory period commenced in February 1997. Because the evidence demonstrates, as a matter of law, that the statutory period commenced over one year before Duncan filed his lawsuit, his negligence claim against Spivak is barred.

[**193] One has to wonder why Duncan's attorney served the notice of intent to sue in February 1997. It was served merely four months after the initial surgery or, more importantly, 11 months before the 15-month, one-year statute of limitations if one assumes that the notice of intent to sue can be served within 90 days of October 1997, the one-year anniversary of the initial surgery, thereby [***74] extending the limitations period. One assumes service was made in good faith and based on Duncan's subjective opinion. Based on the record, one also assumes it was served without a medical opinion to substantiate it. So, what was the hurry? The answer to that question has not been pointed to in the record. However, the practical effect of its service is that when Duncan filed his action in October 1999, he was saying that he was correct in his suspicions in February 1997 but he just did not know it as well as he did more than a year later. Unfortunately, in my view, his premature service of the *section 364* notice now bars his action.

The majority acknowledges that *Norgart* and *Jolly* state that a plaintiff discovers the cause of action when the plaintiff suspects someone has done something wrong to him or her, but contends that nothing in *Norgart* compels the conclusion that a suspicion of wrongdoing commences the limitations period under *section 340.5* where "there is also evidence of diligence in attempting to acquire medical facts to support the suspicion." (Maj. opn., *ante*, pp. 24.) This ignores, however, the critical fact that Duncan served the *section 364* notice. [***75] Once the notice was served, diligence was no longer an issue for limitations purposes, since Duncan had "discovered" his claim. Once the notice was served, suspicion, and the fact that the suspicion was allayed by inconclusive or contradictory objective medical fact, was no longer an issue for limitations purposes. Once the

notice was served, the limitations period commenced to run, and Duncan's obligation was to seek to learn the facts necessary to bring the cause of action within the following one-year period, and file suit if he did. (See, e.g., *Norgart v. Upjohn Co., supra, 21 Cal.4th at p. 398* ["*within the applicable limitations period*, (the plaintiff) must indeed seek to learn the facts necessary to bring the cause of action in the first place … he 'must go find' them himself if he can and 'file suit' if he does" (italics added)].)

The fact that Duncan later obtained another medical opinion that suggested Spivak did not render negligent treatment cannot thereafter have an [*278] effect on the running of the statute of limitations. To hold otherwise would be to establish a rule that the statute of limitations may be "suspended" or "tolled" if a plaintiff's [***76] belief that his or her health care provider was negligent changes. This is not what *section 340.5* states. (See *Kleefeld v. Superior Court (1994) 25 Cal. App. 4th 1680, 1685, 31 Cal. Rpt. 2d 12* [no tolling provision in the one-year limitation, not even for fraud or concealment, much less for the pursuit of evidence of negligence]; *Sanchez v. South Hoover Hospital, supra, 18 Cal.3d at p. 101, 132 Cal. Rptr. 657, 553 P.2d 1129*.)

I also find support for that conclusion in the analogous circumstances described by our Supreme Court in *Gutierrez v. Mofid, supra, 39 Cal.3d 892, 218 Cal. Rptr. 313, 705 P.2d 886*. The court held that "the one-year 'discovery' limitations period for medical malpractice ( *§ 340.5*) is not delayed, suspended, or tolled when a plaintiff with actual or constructive knowledge of the facts underlying his malpractice claim is told by an attorney that he has no legal remedy." ( *Id. at p. 902, 218 Cal. Rptr. 313, 705 P.2d 886*.) The court reasoned that [**194] since the plaintiff's presumptive knowledge of her claim caused her to seek legal advice, as well as start the running of the limitations period, the fact she received "discouraging legal advice" which led "to loss of a cause of action" was not a risk that should be borne [***77] by the defendant doctor. ( *Id. at p. 900, 218 Cal. Rptr. 313, 705 P.2d 886*.) Similarly, the fact that Duncan's attorney prematurely served notice of intent to sue and then abandoned him, and the fact that Duncan's first exploratory surgeon missed the offending staple, should not be risks borne by Spivak.

Moreover, to allow a plaintiff to wait to file suit until his or her suspicions of wrongdoing are confirmed by another health care provider runs contrary to *Norgart* and *Jolly*, which require only a layperson's suspicions regarding

94 Cal. App. 4th 245, *278; 114 Cal. Rptr. 2d 166, **194; 2001 Cal. App. LEXIS 2903, ***77

negligent injury to commence the limitations period. In addition, such a rule effectively resurrects former *section 411.30*, which was repealed by its terms effective January 1, 1989. Former *section 411.30* required the attorney for a plaintiff in an action for professional negligence to file a certificate of merit on or before the date of service of the complaint declaring that the attorney had consulted at least one licensed physician and surgeon, dentist, podiatrist or chiropractor knowledgeable in the relevant issues, and that the attorney concluded on the basis of such review and consultation that there is reasonable and meritorious cause for the filing of such **[***78]** action. (Stats. 1986, ch. 247, § 1, pp. 1207-1208.)

The majority attempts to distinguish the cases of *Norgart* and *Jolly* by claiming they do not specifically discuss the discovery rule as set forth in *section 340.5*. As discussed above, however, these cases were based on California Supreme Court cases involving *section 340.5*, which confirmed the "inquiry" rule as the standard in medical malpractice cases. (See *Sanchez v. South Hoover Hospital, supra, 18 Cal.3d at p. 101*.)

**[*279]** I disagree with the majority's analysis of *Rose v. Fife, supra, 207 Cal. App. 3d 760*. The majority states the court in *Rose* implies that suspicion alone does not trigger the one-year period. The court in *Rose* specifically stated that the same rules regarding discovery of one's cause of action, as stated in *Jolly v. Eli Lilly & Co., supra*, apply in professional negligence actions involving *section 340.5*, in part because *Jolly* based its holding on rules set out in *section 340.5* cases such as *Sanchez* and *Gutierrez*. ( *Rose v. Fife, supra, 207 Cal. App. 3d at p. 768, fn. 9*.)

Applying the rule from *Jolly* **[***79]** that "'Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; *she cannot wait for the facts to find her*,'" ( *Rose v. Fife, supra, 207 Cal. App. 3d at p. 769*), the court held a reasonable person would have suspected wrongdoing by her physician at the time the plaintiff had been hospitalized for a pelvic infection, when two doctors told her the infection was caused by the intrauterine device her doctor had inserted, and would have inquired, rather than waiting for the facts to come to her. ( *Id. at pp. 769-770*, citing *Jolly v. Eli Lilly & Co., supra, 44 Cal.3d at pp. 1110-1111*.) The court found there was only one conclusion that could be drawn from the evidence: "plaintiff's knowledge and suspicions at the time of her

hospitalization regarding the use of IUD's caused the one-year period of limitations to commence." ( *Rose v. Fife, supra, at p. 770, 255 Cal. Rptr. 440*.) Thus, **[**195]** consistent with *Jolly*, *Sanchez*, and *Gutierrez*, the court found the **[***80]** limitations period commenced when the plaintiff became alerted to the need for investigation, i.e., when she became, or a reasonable person would have become, suspicious.

Nor do I believe the majority's reliance on *Kitzig v. Nordquist (2000) 81 Cal. App. 4th 1384* is appropriate. That court declined to hold as a matter of law that "a suspicion automatically triggers the limitations period where (1) a briefly held concern is immediately abated after consulting with a respected medical doctor; (2) there is no discontinuation of the original doctor-patient relationship; and (3) there is no objective basis for the patient to have known or discovered the alleged malpractice." ( *Kitzig v. Nordquist, supra, at pp. 1395-1396*.) Duncan, in contrast, stopped treating with Spivak two months after the operation because he no longer trusted his advice. Two months later, he served Spivak with a notice of intent to sue Spivak for professional negligence. Contrary to the evidence in *Kitzig*, this was an unequivocal confirmation of Duncan's suspicion that Spivak had committed malpractice.

I disagree with the majority's view that my conclusions "would penalize diligent **[***81]** plaintiffs who have sought medical confirmation of their subjective **[*280]** suspicions of negligence but are dissuaded by contrary objective medical fact." (Maj. opn., *ante*, pp. 28-29.) First, there was no "contrary objective medical fact." At best, the March 1997 exploratory surgery did not support Duncan's clearly held and communicated suspicions of medical negligence. Second, the issue of Duncan's diligence expires when the one-year limitations period begins with the service of the notice of intent to sue. ( *Kleefeld v. Superior Court, supra, 25 Cal. App. 4th at p. 1684*.) Third, to the extent my conclusions tend to "penalize" Duncan, they penalize him for his premature service of the notice of intent to sue, an act wholly within his control. ( *Woods v. Young, supra, 53 Cal.3d 315*.) Fourth, since it was incumbent upon him to discover the facts that tended to support his suspicions, it was solely within his control as to which doctor to consult and when, relative to the second exploratory surgery. Why did he wait until April 1998? Nothing in the record suggests he could not have done so within the applicable statute of limitations. Furthermore, discovery **[***82]** of those facts was not necessary to start the running of the limitations period. Duncan did that without facts, as allowed by law.

94 Cal. App. 4th 245, *280; 114 Cal. Rptr. 2d 166, **195; 2001 Cal. App. LEXIS 2903, ***82

Whether he had facts to file his lawsuit in good faith is irrelevant to the accrual of his cause of action. Fifth, to the extent my conclusions can be interpreted to require the filing of a medical malpractice action at a time when Duncan--after the premature service of the *section 364* notice--discovered he had no medical support for his opinions, the answer is found in *Hills v. Aronsohn (1984) 152 Cal. App. 3d 753, 765-766, 199 Cal. Rptr. 816*:

"This result in turn may encourage premature filing of medical malpractice lawsuits, many of which will ultimately prove to be without merit. At this point, people experiencing physical discomfort or other symptoms which conceivably could be attributed to previous medical services have an incentive to file suit before ascertaining the true cause of those symptoms. Otherwise they run the risk any malpractice claim will expire while they seek to find out what is making them hurt. Predictably, many of these premature actions will be dismissed when the plaintiffs ultimately learn their symptoms did **[***83]** not result from negligent medical care, after all. Nonetheless even these suits will have imposed costs on courts and litigants **[**196]** during the time they proceeded through the process. [P] We are not altogether certain the Legislature intended to produce these consequences. But the language it enacted in … *section 340.5* does just that. This court, of course, has no choice but to apply that language and affirm the summary judgment granted below."

"These consequences" seem to assume that competent counsel would file lawsuits under these circumstances and incur unrecoverable costs and possible sanctions, which is a doubtful proposition. Furthermore, the speculative issue as presented by the facts of this case is not whether Duncan's lawyer should be required to file a factually unsupported lawsuit, but who should be **[*281]** responsible for the service of a factually unsupported notice of intent to sue: the lawyer, the plaintiff, or the doctor? Our high court clearly says it should not be the person who was not involved in making the decision to serve the notice, i.e., the doctor.

Lastly, the majority's reliance on quoted language from *Enfield v. Hunt (1979) 91 Cal. App. 3d 417, 424, 154 Cal. Rptr. 146* **[***84]** is inappropriate in that that language was derived from *Jones v. Queen of the Valley Hospital (1979) 90 Cal. App. 3d 700, 153 Cal. Rptr. 662*, which was disapproved in *Gutierrez v. Mofid, supra, 39 Cal.3d at page 902*. The *Gutierrez* court clearly stated that the discouraging opinions of third persons did not interrupt the running of the limitations

period. In that case, the discouraging views were from an attorney; here they are from an attorney and a doctor.

For these reasons, I would affirm the judgment. I concur with the remainder of the majority's opinion.

---

**End of Document**