**Volume 3**

**Pages 371 - 460**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | | |
|---|---|---|
| IN RE: ROUNDUP PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | |
| | ) | **NO. 16-md-02741 VC** |
| | ) | |
| _____ | ) | |

San Francisco, California
Monday, February 11, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        ANDRUS WAGSTAFF PC
        7171 W. Alaska Drive
        Lakewood, Colorado  80226
  BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**

        ANDRUS WAGSTAFF PC
        6315 Ascot Drive
        Oakland, California  94611
  BY:  **KATHRYN M. FORGIE, ATTORNEY AT LAW**

        THE MILLER FIRM LLC
        108 Railroad Avenue
        Orange, Virginia  22960
  BY:  **BRIAN BRAKE, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, RPR, CRR
           Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
           Official Reporters

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:

 3                        MOORE LAW GROUP
                          1473 South 4th Street
 4                        Louisville, Kentucky  40208
                     BY:  JENNIFER MOORE, ATTORNEY AT LAW
 5
                          LAW OFFICES OF TESFAYE W. TSADIK
 6                        The California Building
                          1736 Franklin Street - 10th Floor
 7                        Oakland, California  94612
                     BY:  TESFAYE W. TSADIK, ATTORNEY AT LAW
 8
                          LUNDY, LUNDY, SOILEAU & SOUTH LLP
 9                        501 Broad Street
                          Lake Charles, Louisiana  70601
10                   BY:  RUDIE R. SOILEAU, ATTORNEY AT LAW

11   For Defendant:

12                        WILKINSON  WALSH ESKOVITZ LLP
                          2001 M Street, NW - 10th Floor
13                        Washington, D.C.  20036
                     BY:  BRIAN L. STEKLOFF, ATTORNEY AT LAW
14                        RAKESH N. KILARU, ATTORNEY AT LAW
                          TAMARRA MATTHEWS JOHNSON, ATTORNEY AT LAW
15
                          COVINGTON & BURLING LLP
16                        One City Center
                          850 Tenth Street, NW
17                        Washington, D.C.  20001
                     BY:  MICHAEL X. IMBROSCIO, ATTORNEY AT LAW
18

19

20

21

22

23

24

25
```

**I N D E X**

Monday, February 11, 2019 - Volume 3

| PLAINTIFFS' WITNESSES | | PAGE | VOL. |
|---|---|---|---|
| **WEISENBURGER, DENNIS** | | | |
| (SWORN) | | 376 | 3 |
| Cross-Examination by Ms. Matthews Johnson | | 377 | 3 |
| Redirect Examination by Ms. Moore | | 422 | 3 |
| Recross-Examination by Ms. Matthews Johnson | | 433 | 3 |
| Further Redirect Examination by Ms. Moore | | 441 | 3 |
| Further Recross-Examination by Ms. Matthews Johnson | | 443 | 3 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 2052 | | 398 | 3 |
| 2101 | | 377 | 3 |
| 2108 | | 404 | 3 |

1    <u>**Monday - February 11, 2019**</u>                    <u>**8:53 a.m.**</u>

2                        P R O C E E D I N G S

3                        ---000---

4        **THE CLERK:**  Calling Case number 16-MD-2741, In Re:

5    Roundup Products Liability Litigation.

6        Counsel, please state your appearances for the record.

7        **MS. WAGSTAFF:**  Good morning, Your Honor, Aimee

8    Wagstaff for the Plaintiffs and with me is Jennifer Moore,

9    Kathryn Forgie, Brian Brake, Rudie Soileau and Tesfay Tsadik.

10        **MR. STEKLOFF:**  Good morning, Your Honor, Brian

11   Stekloff on behalf of Monsanto.  Along with me is Tammy

12   Matthews Johnson, Mr. Imbroscio and Mr. Kilaru.

13        **THE COURT:**  Good morning.  Before we get started, I

14   thought I might begin to provide you all with a little bit of

15   guidance for Wednesday because there are so many issues; and

16   there is so much for you to prepare for, I thought it would be

17   helpful to pare it down for you if I could.

18        First of all, before I forget, Dr. Arbor's expert report,

19   we think is not in the record.  If you all could just get us --

20   just file Dr. Arbor's expert report.

21        On -- so in terms of what we will and won't talk about on

22   Wednesday, on Monsanto's summary judgment motion relating to

23   issues other than the experts, the only issue I want to hear

24   argument about is -- is the statute of limitations issue for

25   Mr. Gebeyehou.  I won't -- I don't need to hear argument on any

**PROCEEDINGS**

1    of those other issues.  So to the extent you have already begun

2    preparing for that, I apologize.

3         With respect to the experts, I will want to hear argument

4    on the motion to exclude all or portions of Monsanto's specific

5    causation experts and I will give you -- I will probably put

6    out some guidance or a tentative ruling or something like that

7    before Wednesday on that issue.  I will also want to hear

8    argument on the motion to exclude Plaintiff's specific

9    causation experts.

10        And then I think that leaves -- so that leaves the motions

11   in limine, which I haven't begun going through yet.  So I'm not

12   sure -- I may put something out before Wednesday telling you

13   what I want to hear argument about and what I don't on the

14   motions in limine, and then that leaves -- I think the only

15   other issue we would potentially discuss on Wednesday is the

16   motion to exclude experts that are offering opinions on

17   something other than specific causation.  And on that, I'm not

18   sure -- I'm actually -- I'm not sure yet whether I -- I want to

19   hear argument on any of those.  I may and, again, I probably

20   will put something out on that to give you guidance before

21   Wednesday.  Is there anything I'm forgetting that we would

22   potentially be discussing on Wednesday?

23        MR. STEKLOFF:  I don't believe so in terms of pending

24   motions, Your Honor.

25        MS. MOORE:  Your Honor, I think the only other item on

**PROCEEDINGS**

1  the agenda would be jury instructions if we want to talk about

2  the jury instructions for Phase One.

3          **THE COURT:**  Yes, and at least we probably ought to

4  nail down the causation instructions or instruction at least

5  for Phase One.  I assume -- I assume for Phase One it will just

6  be the standard introductory instructions that I always give;

7  and causation is really all we need to nail down at the -- at

8  the front end for Phase One, right?

9          **MS. MOORE:**  I think causation will help us with the

10  verdict form too.

11          **THE COURT:**  And the verdict form, yeah.  Yes, we will

12  talk about that on Wednesday as well.

13          **MS. MOORE:**  Great.  Thank you, Your Honor.

14          **THE COURT:**  Sounds good.  With that, are we ready to

15  go with our final Daubert hearing?

16          **MS. MATTHEWS JOHNSON:**  Yes, Your Honor.

17          **THE COURT:**  All right.  Do we have Dr. Weisenburger

18  here?

19          **MS. MATTHEWS JOHNSON:**  We are going to begin with the

20  Cross-Examination based on Your Honor's prior instructions.

21          **THE COURT:**  Right.  Hello again.

22          **THE WITNESS:**  Good morning.

23                          **DENNIS WEISENBURGER**,

24  called as a witness for the Plaintiffs, having been duly sworn,

25  testified as follows:

1    THE CLERK:  For the record, please state your first

2  and last name and spell both of them.

3    THE WITNESS:  Dennis Weisenburger, D-E-N-N-I-S,

4  W-E-I-S-E-N-B-U-R-G-E-R.

5    THE CLERK:  Thank you.

6    MS. MATTHEWS JOHNSON:  May we proceed, Your Honor?

7    THE COURT:  Sure.

8                    <u>**CROSS-EXAMINATION**</u>

9  BY MS. MATTHEWS JOHNSON

10  **Q.**  Good morning, Dr. Weisenburger.

11  **A.**  Morning.

12  **Q.**  You are here this morning to offer opinions on specific

13  causation as it relates to three Plaintiffs.  Mr. Hardeman,

14  Mr. Gebeyehou and Ms. Stevick; is that correct?

15  **A.**  Yes.

16  **Q.**  And that's Stevick without an S, sorry.

17    MS. MATTHEWS JOHNSON:  I would like to move into the

18  record your expert reports on specific causation for each of

19  those.  Just for the record, for Hardeman it is Exhibit 2100;

20  for Mr. Gebeyehou, it is 2101 and for Ms. Stevick it is 2101.

21    THE COURT:  Any objection?

22    MS. WAGSTAFF:  No objection.

23    THE COURT:  Admitted.

24      (Trial Exhibit 2101 received in evidence)

25  \\\

1    BY MS. MATTHEWS JOHNSON

2    Q.    You have a couple of binders with materials.  Those expert

3    reports are in front of you, sir, correct?

4    A.    Thank you.

5    Q.    In the course of putting together these reports, you

6    reviewed medical records for each of the Plaintiffs; is that

7    correct?

8    A.    Yes, it is.

9    Q.    And you spoke with each of them by telephone approximately

10   45 minutes to an hour; is that right?

11   A.    Yes.

12   Q.    Okay.  And you did not conduct a physical examination of

13   any of the Plaintiffs?

14   A.    I did not.

15   Q.    In the course of speaking with them for that 45 minute to

16   an hour period, you were looking to determine the minimum

17   amount of Roundup exposure they had?

18   A.    I was looking to determine overall what kind of Roundup

19   exposure they had.  I was looking to clarify some points in the

20   medical record and to go through the differential diagnosis

21   of -- with regard to specific causation.

22   Q.    And with regard to exposure, you were using as a benchmark

23   particular epidemiology; and you were looking to see, fair to

24   say, that the minimum exposure would be at least two times per

25   year and at least a total of ten times so you would be able to

1    determine that the Plaintiffs' Roundup exposure was a

2    substantial contributing factor to his or her development of

3    NHL; is that right?

4    **A.**   Well, I used those sort of as a baseline or a guideline;

5    but I didn't use them as sort of an absolute floor number to

6    decide whether any of them had a high exposure or not.  So I

7    used them as a guideline.

8    **Q.**   Well, the guideline provided a threshold.  If it surpassed

9    that threshold, you determined that Roundup exposure was a

10   significant contributing factor; is that right?

11   **A.**   Not necessarily.  So, for example, let's take Mr. Hardeman

12   as a -- just as an example.  If he had only been exposed

13   greater than two days and two years, that would have been only

14   four exposures.  I wouldn't have considered that a high

15   exposure, okay.  So one has to look really at each of the cases

16   and determine on the basis of what they tell you what their

17   exposure really was; and the exposure for all three of these

18   cases was much, much higher than those floor limits, if you

19   will, from the epidemiology studies.

20   **Q.**   Right.

21   **A.**   So it wasn't an automatic decision.  It wasn't if it is

22   above this, they are in.  If it is not above this, they are

23   out.  So I looked at all the parameters related to exposure.

24   **Q.**   In your answer, sir, you just gave -- I don't like to do

25   math on the fly -- you did say two days per year for four years

1  for a total of eight days which would be below the *Eriksson*

2  2008 threshold of ten lifetime days, right?  That's what you

3  just said in your answer, eight lifetime days.

4  **A.**   I don't know what I said.  I meant to say two years -- two

5  days per for two years, so that is four days.

6  **Q.**   That's why I said I don't do math.  That is below the

7  *Eriksson* ten days lifetime exposure, correct?

8  **A.**   It is, yes.

9  **Q.**   So what I was asking about was a different bit of math,

10  which is two days per year for at least five years for a total

11  of ten lifetime days.  And my question was:  If a Plaintiff

12  exceeded that threshold, would you then determine that Roundup

13  exposure was a substantial contributing factor in his or her

14  development of NHL?

15  **A.**   I don't know.  I didn't have to make that decision.  I

16  would say probably not because that isn't very much exposure.

17  **Q.**   Well, in another deposition, sir, you gave relating to a

18  different Plaintiff -- a Ms. Adams -- you were asked about --

19  Adams is the lead Plaintiff, excuse me -- in this case you were

20  asked about Ms. Gordon.  That is a different case.  That was a

21  Plaintiff where you also offered an expert opinion, is that

22  correct, about specific causation?

23  **A.**   Yes.

24  **Q.**   Okay.  And in that instance you were asked:  If you took

25  Ms. Gordon's circumstances and said everything was the same

1   except that she testified and told you on the phone that she

2   had used glyphosate two times a year for five years, ten times

3   total, would any of your opinions be different?  Do you recall

4   that?  And your answer was no.

5           **MS. MOORE:**  Your Honor, can they refer to --

6           **THE WITNESS:**  The reason I said --

7           **MS. MATTHEWS JOHNSON:**  I'm happy to lay more

8   foundation.

9           **MS. MOORE:**  I was just going to say, if she is

10  referring to a specific page and line number in the deposition,

11  if she can refer that to the witness, please.

12          **THE COURT:**  Yes.

13          **MS. MATTHEWS JOHNSON:**  Absolutely.

14  **BY MS. MATTHEWS JOHNSON**

15  **Q.**   If we can go to Exhibit 2107 and if you would please go to

16  page 114, sir.

17  **A.**   Okay.  You are on what line?

18  **Q.**   Making sure I'm in the right place too.  Okay.  Line 5.

19  Can we bring it up?  So line 5, we are beginning at line 5,

20  page 114.  Okay.  I just want to take Ms. Gordon's

21  circumstances and say everything is the same except that she

22  testified and told you on the phone that she had used

23  glyphosate two times a year for five years, ten times total,

24  would any of your opinions be different?

25          No.  You would have the same -- I'm sorry -- you would

1    have the exact same opinions.

2         Answer, yes.

3         Do you recall that testimony, sir?

4    **A.**   I don't recall it, but I see it now, yes.

5    **Q.**   Okay.  And with respect to Plaintiff Hardeman, Plaintiff

6    Gebeyehou, Plaintiff Stevick, you were looking to see if they,

7    each of them, had two days per year, ten total lifetime days or

8    uses of Roundup; and based on that, sir, you ruled in Roundup

9    as a substantial contributing factor to each Plaintiffs'

10   development of NHL; is that correct?

11   **A.**   That was a long, complicated question.  Can you please

12   repeat it?

13   **Q.**   Sure.  I would be happy to.  When you looked at the

14   exposure for each of the Plaintiffs -- Gebeyehou, Hardeman, and

15   Stevick -- if you saw that they had been exposed to Roundup for

16   two days per year, and a total of ten lifetime days, you then,

17   based on that, ruled in Roundup as a substantial contributing

18   factor in each Plaintiffs' development of NHL; is that correct?

19   **A.**   I did, but it was based on much higher exposure than those

20   floor limits.

21   **Q.**   You are saying, in fact, you thought they had more

22   exposure.  I'm asking you about your methodology of ruling in

23   Roundup.

24   **A.**   So what are you asking me?

25   **Q.**   Based on the epidemiology were you were using two days per

1   year, ten lifetime days, as your basis for ruling in Roundup?

2   **A.**   I was using it as a guideline.  It wasn't a floored

3   number, a hard number.  I was using it as a guideline.

4   **Q.**   That was your guideline for determining sufficient

5   exposure, correct?

6   **A.**   Not necessarily.  Not necessarily.  As I told you, if

7   Mr. Hardeman only been exposed twice a year for two years -- he

8   only had four exposures -- he would have met the criteria for

9   one of those but not the other.  I wouldn't have ruled it in.

10  So these are --

11          **THE COURT:**  Dr. Weisenburger, if I could interrupt, it

12  does seem like you are not answering the question.  I think her

13  question is:  If Mr. Hardeman were exposed twice a year for

14  five years, would you rule -- would you rule it in?  That's the

15  question.  You keep going to twice a year for two years, and

16  you say, I wouldn't -- I would say that's not enough; but she

17  keeps asking you -- what she is trying to get at is -- it seems

18  like your methodology is that once somebody has been exposed

19  twice a year for at least five years, that that you would

20  conclude that NHL is a substantial -- excuse me -- that

21  glyphosate is a substantial contributing factor to their NHL.

22  That's really the question you should be answering now.  Yes or

23  no.

24          **THE WITNESS:**  It is a hypothetical.  I would say I

25  would probably change my testimony and say no because I would

1    have to look at all the rest of the exposure that goes on.  So,

2    you know, ten times over a lifetime is not very much exposure

3    and I would probably say no.  I would probably recommend to the

4    lawyers to settle on that case and not take it to trial because

5    I don't think it would be a very strong case.

6    **BY MS. MATTHEWS JOHNSON**

7    **Q.**  When you say ten days, two days per year, you would say

8    that that's not sufficient?  Is that -- you did mention

9    changing your testimony.  So just going back, if we could, just

10   call up the previous testimony, and then we are going to walk

11   through a little bit more testimony.  If we can go back to

12   where we were a moment ago, which was at Adams, page 114, are

13   you saying here that you are changing your testimony given

14   under oath in this case -- just for the record -- sorry, given

15   on November 26, 2018 in the case of *Adams V Monsanto Company*?

16   **A.**  Yeah, I'm changing my testimony.  You know, I was taken

17   through a whole litany of hypotheticals that were not really

18   very relevant to the case, and this is an example of that.

19   **Q.**  Okay.  Let's go back one page in the same sworn testimony

20   to see if there is any other testimony you would like to

21   change.  If we can go to page 113, line 6, please -- and we are

22   going to call it 6 through 21, sorry.  I should have -- Doctor,

23   are you with me now?  I'm on page 113, line 6 through 21.

24          **MS. MOORE:**  Counsel, his answer goes up to page 114.

25          **MS. MATTHEWS JOHNSON:**  I'm going to -- we will take it

1    one step at a time.

2    BY MS. MATTHEWS JOHNSON

3    Q.   The question is:  Okay.  So is it -- just to push a little

4    bit on that, is it fair to say that you would -- that your

5    minimum exposure would be at least two times per year and at

6    least a total of ten times for you to be able to determine that

7    the Plaintiff's Roundup exposure was a substantial contributing

8    factor to his or her development of NHL?

9        And we will do the whole answer.  Well, those are the only

10   things that I would know to really base my opinion on, so I

11   would say, yes, that would be at least the minimum exposure to

12   say she has a relative risk of greater than 2 for diffuse large

13   B-cell lymphoma -- if you go to the next -- but obviously her

14   exposure was much higher than that.

15        MS. MOORE:  It says greater.

16   BY MS. MATTHEWS JOHNSON

17   Q.   Excuse me.  Much greater than that, so her risk probably

18   was higher than that.  Okay.  If you believe that there is a

19   dose response, her risk probably would have been much higher;

20   but we don't have data on that.

21        And then we go onto the testimony that you gave in

22   response to the hypothetical.  And so are you here saying now

23   that your testimony on page 114 is the testimony that you would

24   now like to change?

25   A.   Yes.

WEISENBURGER - CROSS / MATTHEWS JOHNSON

1    Q.    Now, let's go to page 69 to see if you would -- if there

2    is any testimony that you would like to change there.  Same

3    deposition.  Okay.  We are looking at page 69, and we are going

4    to start at line 8.  If you can call out that whole area, yes.

5         Absent any causative risk factors other than glyphosate,

6    if a patient has -- I'm starting with glyphosate intentionally

7    --

8    A.    What line are you?

9    Q.    I apologize.  We are on page -- you can also look on your

10   screen.  I'm doing the same thing you are doing, crossing back

11   and forth.  If you go to page 69, and if you start -- it kind

12   of starts in the middle of that line, sir, if you look at line

13   8.  Absent any causatives risk factors other than glyphosate --

14   are you with me, sir?

15   A.    Yes.

16   Q.    Absent any causative risk factors other than glyphosate,

17   if a patient has -- I'm starting with glyphosate intentionally

18   -- as to any causative risk factors other than glyphosate, if a

19   patient has sufficient exposure to glyphosate, would you say

20   that the cause of his or her cancer in every instance is the

21   glyphosate?

22        And your answer is:  I would say it's more likely than not

23   glyphosate.

24        Question:  And if I asked you the same question about

25   Roundup, your answer would be the same?

1     And your answer is yes.

2   **A.**   I would stand by that.

3   **Q.**   And what you are saying now is that you are changing your

4   testimony as to what sufficient exposure to glyphosate is, sir?

5          **MS. MOORE:**   Objection.   Misstates his testimony.

6          **THE COURT:**   Overruled.   You can answer.

7          **THE WITNESS:**   So a sufficient exposure to glyphosate

8   is a subjective decision based on my expertise and the medical

9   record and what I'm told, okay; and there is no specific floor

10  for that.

11  **BY MS. MATTHEWS JOHNSON**

12  **Q.**   And that's a --

13  **A.**   So the epidemiology studies give you some parameters

14  which -- to guide you but, in fact, the parameters are very --

15  they are only a couple factors, greater than two days or

16  greater than ten days.   So you have to weigh all the evidence

17  in terms of exposure with -- in view of those.

18  **Q.**   But you have testified that there is no data on the

19  question of higher limits of exposure.   Was that your

20  testimony?

21  **A.**   This isn't any data.   That's right.   So that's all the

22  data you have.   That's all the data we have.

23  **Q.**   And --

24  **A.**   So -- but it doesn't mean that is the floor that one would

25  use to make a yes or no decision.

1    Q.    That's what -- you are changing your testimony on the

2    question of the hypothetical --

3    A.    Yes.

4    Q.    -- is that correct?

5    A.    Because all three of these people had markedly higher

6    exposures than these artificial floors created by the

7    epidemiology studies, okay.

8    Q.    When you say artificial floors, those are the floors you

9    relied upon?

10   A.    Yes, because this is the only data we have that we can

11   rely on.

12   Q.    If one hundred Plaintiffs are brought to you and they all

13   use Roundup for at least two times per year, for at least five

14   years, for a total of ten lifetime days and had no other

15   causative risk factors, would you say Roundup was a substantial

16   contributing factor in those cases?

17   A.    I most likely would say no.  It is most likely not

18   Roundup.

19   Q.    So under your methodology if there are no other causative

20   risk factors and there is glyphosate exposure in keeping with

21   the epidemiology you have cited, is glyphosate more likely than

22   not the cause, sir, yes or no?

23   A.    If it was only ten exposures over a lifetime, I would say

24   probably not.

25   Q.    What if it were two days per year, for five years for ten

1    lifetime days?

2    **A.**   I would say probably not.

3    **Q.**   With respect to each of these Plaintiffs, sir, have you

4    testified for Mr. Hardeman in each of these cases -- I just

5    want to establish this for the record -- Mr. Hardeman could he

6    have been diagnosed with the same exact diffuse large B-cell

7    lymphoma without exposure to Roundup?  Could he have been

8    diagnosed with the same cancer?

9    **A.**   He could have but it is unlikely.

10   **Q.**   If we can now go to Exhibit 2103, and that is your

11   testimony in the Hardeman deposition, if we can go to page 93

12   of that testimony.

13          **THE COURT:**  I'm sorry.  I missed the exhibit number.

14          **MS. MATTHEWS JOHNSON:**  Excuse me.  Sorry, your Honor,

15   it is Exhibit 2103.

16          **THE COURT:**  Thank you.

17          **THE WITNESS:**  What page?

18   **BY MS. MATTHEWS JOHNSON**

19   **Q.**   We are now looking at lines 1 through 5 on page 93, sir.

20   We will call out lines 1 through 5, please.

21       Question:  And you would agree that Mr. Hardeman could

22   have been diagnosed with the exact same diffuse large B-cell

23   lymphoma without exposure to Roundup, true?  And you said, It's

24   possible.

25   **A.**   He could have.  Could have been idiopathic.  It could have

1   been some other cause that we don't know.

2   **Q.**   Just a moment ago you said it was unlikely.  Now, are you

3   sticking by that testimony?

4   **A.**   Well, it is possible but unlikely.

5   **Q.**   With reference to --

6   **A.**   Anything is possible; right?

7   **Q.**   Well, I'm asking, sir, these are all in the context of you

8   appearing as an expert not -- you were here offering expert

9   testimony.  You are saying as an expert it is possible; is that

10  correct?

11  **A.**   It is possible but unlikely.

12  **Q.**   What about Mr. Gebeyehou?  Could Mr. Gebeyehou have been

13  diagnosed with the same cancer without exposure to Roundup?

14  **A.**   It is possible but unlikely.

15  **Q.**   Would you agree that Ms. Stevick could have developed the

16  exact same tumor without any exposure to Roundup?

17  **A.**   Yes, it is possible but very unlikely.

18  **Q.**   If we can go to Exhibit 2105, which is your testimony in

19  the Stevick case, if we can go to page 102, if we can look at

20  lines 15 through 18, please.

21      And the question asked there -- this is in the Stevick

22  deposition -- would you agree with me, though, that Ms. Stevick

23  could have developed the exact same tumor without any exposure

24  to Roundup?  And your answer there, sir, was yes.

25  **A.**   Yes, it is possible but unlikely.

WEISENBURGER - CROSS / MATTHEWS JOHNSON

1   Q.   In the record, sir, is your answer at line 18 yes, period?

2   A.   Yes, but I'm modifying it to say it is possible but

3   unlikely.

4   Q.   Now, let's talk about some other causative -- as you call

5   them -- causative risk factors because you do talk in your

6   testimony about the difference between associations and what

7   you consider to be causative risk factors; is that right?

8   A.   Yes.

9   Q.   So HIV -- we will start with HIV, it is a causative risk

10  factor, correct?

11  A.   Yes.

12  Q.   Okay.  And you have been asked this before.  If you have a

13  patient with active HIV; and their tumor doesn't have any

14  markers for that virus or infection, and that person also has

15  sufficient Roundup exposure, you would say in that situation

16  more likely than not that Roundup was a substantial

17  contributing factor; is that correct?

18  A.   Is this a hypothetical?  It is right.

19  Q.   It is.

20  A.   Yes.  So in that situation I would say the most

21  substantial contributing cause -- if those were the only ones

22  that are left -- was the HIV, but I couldn't rule out that

23  Roundup also contributed.  In other words, you can have more

24  than one contributing cause, okay.

25  Q.   And in that hypothetical that is your answer, you can have

1   more than one contributing --

2   **A.**   I would have to know how much exposure the person had to

3   Roundup.  Was it a substantial exposure like Mr. Hardeman had,

4   for example, or was it ten days in a lifetime?  I would have to

5   look carefully at the exposure, and I'd have to look carefully

6   at the degree of immunosuppression that he had with his HIV

7   infection to know what his risk of getting lymphoma was.  So it

8   is much more complicated than just a simple hypothetical.

9   **Q.**   What about a Plaintiff with active hepatitis C infection,

10  if you had someone who had an active hepatitis C infection and

11  sufficient exposure to Roundup, would you then still say that

12  Roundup was a substantial contributing factor that their NHL?

13  **A.**   It may well be a substantial contributing factor.  There

14  could be more than one substantial contributing factor in cases

15  where you have two substantial contributing factors.

16  **Q.**   So now, looking at hepatitis C, you agree, sir, that

17  hepatitis C is a causative risk factor for NHL, correct?

18  **A.**   Yes.

19  **Q.**   And IARC has also analyzed the hepatitis C infection and

20  classified it as a group 1 carcinogen; is that right?

21  **A.**   Yes.

22  **Q.**   And with respect to Mr. Hardeman, he was most likely

23  exposed and infected with HCV in the 1960s?

24  **A.**   Most likely, yes.

25  **Q.**   I think you yourself noted, sir, that in 1980 when

1    Mr. Hardeman applied for insurance with Kaiser, he had elevated

2    liver enzymes and was denied health insurance on that basis;

3    isn't that correct?

4    **A.**    Yes.

5    **Q.**    And based on that, I think you noted, sir, that we know in

6    1980 that he had active hepatitis, isn't that right?

7    **A.**    Most likely, yes.  Most likely he had active hepatitis.

8    **Q.**    Do you recall saying, quote, we know in 1980 that he had

9    active hepatitis?

10   **A.**    Well, most likely he did.  I mean, we don't know for sure

11   what was causing the elevated liver enzymes.  We don't know the

12   whole story.  Most likely that's what it was, yes.

13   **Q.**    Let's go to Exhibit 2103, which was your testimony in the

14   Hardeman case.  Go to page 1 -- I'm sorry, 35, excuse me.  If

15   we can just -- we are going to start at the bottom, line 20;

16   and then we will keep rolling to the next page.

17        If you start at line 20, sir:  We don't really know when

18   he contracted hepatitis C.  The most we know is that when he

19   applied for medical insurance at Kaiser in 1980, he had

20   elevated liver enzymes; and they wouldn't give him the

21   insurance.

22        Go to the next page.  And then we say -- looking at lines

23   1 through 6 -- at least we know in 1980 that he had active

24   hepatitis.  Before that we don't know.  So it is likely it was

25   in the '60s.  That's when his risky behavior occurred, but we

1  don't really know there.

2      So, sir, in that testimony you were clear that we know in

3  1980 he had active hepatitis that was most likely contracted in

4  the 1960s; is that right, sir?

5  **A.**   Well, I would modify that a little bit.  We know he had

6  elevated liver enzymes.  We don't know really know that he had

7  hepatitis.  He wasn't told he had hepatitis.  I'm making the

8  assumption that it was the hepatitis that caused the elevated

9  liver enzymes.  There are other things that can cause elevated

10  liver enzymes.  So it clearly is something else, but based on

11  the story, it was most likely hepatitis.

12  **Q.**   We know Mr. Hardeman had a chronic infection for hepatitis

13  C for 25 to 40 years; is that right, sir?

14  **A.**   That's what we are assuming.  That's an assumption.

15  **Q.**   We can go to page 71 of your Hardeman testimony, sir.

16  This is Exhibit 2103.  We are starting at the very bottom of

17  that, very last line, and then we are going to the next page.

18  So the bottom of 71 -- I will make sure you have time to get

19  there, sir.  Are you there with me?

20  **A.**   Yes.

21  **Q.**   We know Mr. Hardeman had a chronic infection for hepatitis

22  C for 25 to 40 years, right?  And your answer is right.

23  **A.**   Should have been most likely, okay, but it probably is

24  right.

25  **Q.**   And you agree --

WEISENBURGER - CROSS / MATTHEWS JOHNSON

1    **A.**    I mean, I don't try to hedge on every question that people

2    ask me thinking about what a lawyer will ask me in a month or

3    two.  I'm trying to give a straightforward answer.  I'm trying

4    to give the best answer I can; but, you know, I'm making some

5    assumptions here which I don't know are true.

6    **Q.**    You agree, sir, that the latency period for exposure to

7    HCV and the development of non-Hodgkin's lymphoma can range

8    anywhere from 5 to 35 years?  Do you agree with that, sir?

9    **A.**    Yes.

10   **Q.**    Decades?

11   **A.**    Yes.

12   **Q.**    And latency, sir, relates to the time it takes for cancer

13   to develop; but is it also not an issue of when an existing

14   cancer reaches a level at which it is detectable?

15   **A.**    Well, usually latency is from the time of first exposure

16   to when the diagnosis is made, okay.

17   **Q.**    And can cancer exist and not exist at a level where it can

18   be diagnosed so there is an issue of detectability where cancer

19   exists?

20   **A.**    Sure.  There is a period of time before the diagnosis when

21   the cancer exists when it is detectable, and then there is a

22   period of time before that where it probably is not detectable.

23   So there is a time before the diagnosis when it is not

24   detectable, sure.

25   **Q.**    And exists?

WEISENBURGER - CROSS / MATTHEWS JOHNSON

1    **A.**    And exists, yes.

2    **Q.**    You can't rule out the fact that chronic HCV infection for

3    25 to 40 years could cause mutations in Mr. Hardeman; is that

4    correct?

5    **A.**    It could cause mutations in Mr. Hardeman during that

6    period of time.

7    **Q.**    And, therefore, 25 to 40 years of chronic hepatitis C

8    infection could have played a role in Mr. Hardeman's NHL?

9    **A.**    It is possible but unlikely.

10   **Q.**    Is it possible that the hepatitis C could very well have

11   contributed -- could very well have contributed to

12   Mr. Hardeman's NHL?

13   **A.**    It is possible but it is very unlikely.

14   **Q.**    Can we go to your testimony Exhibit 2103 in the Hardeman

15   deposition and go to page 73.

16             **THE COURT:**  73?

17             **MS. MATTHEWS JOHNSON:**  Yes, sir.  Yes, Your Honor.

18   **BY MS. MATTHEWS JOHNSON**

19   **Q.**    We will start -- starting at line 11, Doctor, on page 73.

20   And you would agree that you cannot rule out the role that the

21   25 to 40 years of chronic hepatitis C infection played in his

22   diffuse large B-cell lymphoma?

23        Your answer, it could have played a role.  It could have

24   played a role.  You know, it is my position that the fact that

25   he was treated -- he was in a sustained virologic remission for

1  nine or ten years could have markedly decreased the risk; but I

2  can't be absolutely certain the hepatitis C didn't contribute

3  to his non-Hodgkin's lymphoma.  It very well could have.  Is

4  that your testimony, sir?

5  **A.**   Yes.

6  **Q.**   And so your testimony as of this day, that day and today,

7  is that it could have played a role; but yet in your report you

8  ruled out hepatitis C; is that right?

9  **A.**   I did rule it out because I don't think it would meet the

10  standard of substantial contributing cause, okay.  And I can

11  talk about why that is if you like; but I don't think it was a

12  substantial contributing cause, and it could have played a

13  role; but it is highly unlikely that it played a substantial

14  role.

15  **Q.**   When you were asked here under oath you cannot rule out

16  the role, you answered, It could have played a role.  Was that

17  your testimony, sir?

18  **A.**   Yes.

19  **Q.**   Now, you may be aware of this; but there was an article

20  that came up last week, sir, in testimony involving another

21  witness and that was Exhibit 2052, which is in your binder.

22          **THE COURT:**  Same binder?

23          **MS. MATTHEWS JOHNSON:**  I'm not totally sure if it is

24  in the same binder.  It is in a different binder.  It is

25  Exhibit 2052.

1    BY MS. MATTHEWS JOHNSON

2    Q.   The title of this article is "From Hepatitis C Virus

3    Infection to B-cell Lymphoma."  The lead author is Couronne.

4    A.   Okay.

5    Q.   Looking at the introduction, sir, it says persistent --

6         THE COURT:  Do you want this admitted?

7         MS. MATTHEWS JOHNSON:  I think Exhibit -- it's not?

8         THE CLERK:  It has not been.

9         MS. MATTHEWS JOHNSON:  We would like to admit that.

10   Thank you, Your Honor.

11        THE COURT:  Any objection?

12        MS. MOORE:  None, Your Honor.

13        THE COURT:  Admitted.

14        (Trial Exhibit 2052 received in evidence)

15   BY MS. MATTHEWS JOHNSON

16   Q.   If we can look at the introduction, Persistent hepatitis

17   C -- let me read the first sentence.  Persistent hepatitis C

18   virus infection is an etiological agent of chronic hepatitis

19   that may evolve toward cirrhosis and hepatic carcinoma.

20        Then skip that next sentence.  You say, This review aims

21   to summarize evidence from epidemiological and clinical studies

22   that have provided strong support for an etiological role of

23   HCV in NHL development and maintenance.

24        And if we go to page 95 of this article, there is a

25   section about DNA damages induction.  It is the second column

1    towards the bottom.  DNA damages induction.  By activating

2    error prone polymerases and aid, HCV is able to cause mutations

3    in immunoglobulin heavy chain, BCL6, TP53 and beta-catenin

4    genes of in vitro HCV infected B cell lines and HCV associated

5    peripheral blood mononuclear cells and lymphomas and

6    hepatocellular carcinomas.  Did I read that correctly?

7    A.   Yes.

8    Q.   And if we go to the figure at the top of this page --

9    there is a lot happening here -- figure 2, and the caption of

10   figure 2, it says:  Model of Direct HCV Related B-cell

11   Transformation Oncogenic Effects Mediated by Intracellular

12   Viral Proteins.  Did I read that correctly, sir?

13   A.   Yes.

14   Q.   At the top of this schematic they talk about gene

15   mutations, p53, BCL6, CTNNB1.  Do you see that, sir?

16   A.   Yes.

17   Q.   And they also talk about DNA repair alterations.  Now,

18   looking at the section and looking at this diagram, is this

19   talking about the ability of HCV to induce DNA damage and HCV's

20   action to reduce the ability of cells to repair DNA damage?

21   A.   Yes.  When the virus infects the cell, those are some of

22   the effects on the cell.

23   Q.   And if we go to page 96 -- and this is going to be

24   left-hand column, the second full paragraph starting with

25   overall -- a little higher.  There you go.  Perfect.

1   **A.**   Okay.

2   **Q.**   And it says, Overall, reduced ability of HCV infected

3   cells to efficiently repair DNA damage coupled with the ability

4   of HCV to induce DNA damages would introduce random

5   rearrangements into the genome leading to predisposition to

6   cancer.  Did I read that correctly, sir?

7   **A.**   Yes.

8   **Q.**   Have you examined Mr. Hardeman's records to see if there

9   was a BCL6 mutation?

10   **A.**   I have.  There was a BCL6 gene rearrangement.

11   **Q.**   So just one little quick aside while we are here, sir, you

12   never examined Mr. Hardeman's actual pathology slides, did you?

13   **A.**   I tried, but I couldn't get the slides.

14   **Q.**   So with respect to Mr. Gebeyehou and Ms. Stevick, you

15   looked at their medical records and the slides; is that

16   correct?

17   **A.**   Yes.

18   **Q.**   For Mr. Hardeman you looked at only the records and never

19   saw his pathology slides?

20   **A.**   That's correct.

21   **Q.**   If we can go to his medical records, Exhibit 2108.  Are

22   you there, sir?

23        **THE COURT:**  Which binder is that in?

24        **MS. MATTHEWS JOHNSON:**  I'm sorry, Your Honor.

25        **MS. MOORE:**  It is the same binder, Your Honor.

1            THE COURT:  The smaller binder?

2            THE CLERK:  Should this be published to the gallery?

3            MS. MATTHEWS JOHNSON:  I think what we can do -- I

4    think the call-outs we want to do are going to be okay but be

5    mindful -- not do it.

6            THE CLERK:  They are up right now.

7            MS. MATTHEWS JOHNSON:  He is taking them down.  Thank

8    you.  I'm not sure there is anything that is subject, but we

9    can walk through it without being displayed if everyone can

10   find where we are.

11   BY MS. MATTHEWS JOHNSON

12   Q.   Under immunohistochemistry -- if everyone is following

13   along because it's not on the screen for me -- it says,

14   Collected 2/6/2015, final pathological diagnosis, right neck

15   lymphoid, needle biopsy, morphologic and amino phenotypic

16   findings consistent with diffuse large B-cell lymphoma.  Do you

17   see that, Doctor?

18   A.   Yes.

19   Q.   If you go down to result, and there is an acronym there

20   that says FISH, F-I-S-H.  It says, Positive for BCL6

21   rearrangement in 29 percent, 29 out of 100 cells, and a

22   deletion of BCL2 in 32 percent of cells; is that right, sir?

23   A.   Where are you reading?

24   Q.   Do you see that, sir?

25   A.   I don't.

**WEISENBURGER - CROSS / MATTHEWS JOHNSON**

1   **Q.**   Okay.  Let me go through the --

2   **A.**   Could you show me on the screen?

3   **Q.**   We don't want to display that.  I'm going to orient you

4   without it being on the screen.

5           **THE CLERK:**  We can do it.

6           **THE COURT:**  The question is whether there is anything

7   on this page that is subject to sealing.

8           **MS. MATTHEWS JOHNSON:**  Exactly.  I don't think -- I

9   actually don't think so, but I'm so concerned about not looking

10  at every line --

11  BY MS. MATTHEWS JOHNSON

12  **Q.**   If you look almost two-thirds of the way down, there is

13  the word result.

14  **A.**   Yes, I see it.

15  **Q.**   And you see FISH.  Just for the record, we are Exhibit

16  2108, the first page, which has a little 691 in the corner; and

17  about two-thirds of the way down or halfway down, there is the

18  word result.  Under it, it says FISH.  And there it says,

19  Doctor, positive for BCL6 rearrangement in 29 -- 29 out of 100

20  cells; is that correct, sir?

21  **A.**   Yes.

22  **Q.**   Is that the same BCL6 that is referred to in the Couronne

23  article?

24  **A.**   Yes.

25  **Q.**   Now, you have been previously asked in your theories for

1   Roundup causation whether you know of any translocation,

2   mutation or deletion that Roundup causes?

3   **A.**   Yes.

4   **Q.**   Do you know that, sir?

5   **A.**   There is no characteristic, genetic abnormality that has

6   been attributed to Roundup.  BCL6 mutation or rearrangement is

7   a very common finding in diffuse B-cell lymphomas.

8   **Q.**   The BCL6 that's referred to in his records is the same

9   BCL6 that is referred to in the Couronne article; just the

10  same; is that right, Doctor?

11  **A.**   Yes.

12       **MS. MATTHEWS JOHNSON:**  May I have just one moment?

13  Your Honor, if we can have the Court's indulgence for just one

14  moment.

15       **THE COURT:**  Sure.

16       (Whereupon, a brief pause was had.)

17  **BY MS. MATTHEWS JOHNSON**

18  **Q.**   One last question, Doctor, as we sit here today, it is

19  true that you cannot cite to any peer-reviewed published

20  article saying that it's generally accepted that exposure to

21  formulated glyphosate causes DLBCL; is that right?

22  **A.**   I don't know the answer to that question because I haven't

23  reviewed everything that has ever been written, but it is my

24  opinion -- based on my review of all the literature that I

25  could find -- that glyphosate -- formulated glyphosate is a

 1  risk factor for non-Hodgkin's lymphoma including diffuse large

 2  B-cell lymphoma.

 3  **Q.**   So I will go back to my question:  Can you identify any

 4  peer-reviewed published article stating it is generally

 5  accepted that exposure to formulated glyphosate causes DLBCL?

 6  **A.**   No, but -- no, I can't; but people have not done careful

 7  reviews of this subject.

 8          **MS. MATTHEWS JOHNSON:**  Your Honor, I would -- just for

 9  the record, I would move to strike everything after no as

10  non-responsive.

11          **THE COURT:**  Denied.

12          **MS. MATTHEWS JOHNSON:**  We would like to move into

13  evidence Exhibit 2108.

14          **THE COURT:**  Any objection?

15          **MS. MOORE:**  Which one is that one?

16          **THE COURT:**  It is the medical records.

17          **MS. MOORE:**  That's fine, Your Honor.  No objection.

18          **THE COURT:**  Admitted.

19      (Trial Exhibit 2108 received in evidence)

20          **MS. MATTHEWS JOHNSON:**  We tender the witness,

21  Your Honor.

22          **THE COURT:**  Let me ask you a couple follow-up

23  questions, Dr. Weisenburger.

24          **THE WITNESS:**  Okay.

25          **THE COURT:**  First of all, just picking up pretty much

**WEISENBURGER - CROSS / MATTHEWS JOHNSON**

1    where you left off, you said -- at least I wrote this down.  I

2    think it is something along the lines of what you said -- BCL6

3    rearrangement is very common for NHL, and you didn't get any

4    follow-up questions about that.  I wanted to kind of get some

5    further explanation from you about that.

6          THE WITNESS:  Well, it's one of the most common gene

7    rearrangements that you see in diffuse large B-cell lymphoma.

8    Probably 30 or more percent of the cases have that specific

9    rearrangement, so it is a common rearrangement; but it is not

10   associated with any specific etiologic agent that we know of.

11         THE COURT:  So is there -- is there anything out there

12   that has looked at whether people who were infected with hep C

13   are more like to have had BCL6 rearrangement than -- people who

14   have NHL and were infected with hep C are more likely to have

15   BCL6 rearrangement than people who have NHL but were not

16   infected with hep C?

17         THE WITNESS:  I'm not aware of any information, no,

18   that would associate this rearrangement or mutation with hep C,

19   no.

20         THE COURT:  Okay.  You -- I think in one of your

21   depositions, you may have said that hep C has a roughly six to

22   eight year latency period.  Does that --

23         THE WITNESS:  Well, from -- one of the articles I read

24   found that, okay; but it was a limited number of cases.  So I

25   haven't found an article that gives a definitive latency period

1   for hepatitis C and non-Hodgkin's lymphoma; but it is probably

2   long.  I wouldn't argue with 5 to 35 years with a median of 15

3   years.  It is something like that, 15 to 20 years probably.

4          THE COURT:  Okay.  Can you just explain again -- now

5   that you are here on the stand -- the reasons for ruling out

6   hep C.

7          THE WITNESS:  Yes.  So in my report I reference a

8   number of articles that have looked at the occurrence of

9   non-Hodgkin's lymphoma in patients with hepatitis C based on

10  whether they were treated with antivirals and got a sustained

11  virologic response or not, okay.  And what those articles

12  demonstrate is that if you are treated, like Mr. Hardeman was,

13  with interferon, an antiviral therapy, and you get a sustained

14  virologic response, you are protected from secondary effects of

15  the virus because the virus disappears; and you no longer are

16  at significant risk for non-Hodgkin's lymphoma, okay.  So that

17  was the major reason that I did not consider hepatitis C a

18  major contributing -- a major contributing factor, okay.

19         THE COURT:  What are those articles that say that if

20  you -- if you get a sustained virological response, the risk

21  disappears?

22         THE WITNESS:  They are referenced in my report.

23         THE COURT:  Can we -- can you -- can we look at them

24  and --

25         THE WITNESS:  Sure.

1          **THE COURT:**  Can you give me a little more of a

2     description of what each of them says?  What exhibit is his

3     report again?

4          **MS. MATTHEWS JOHNSON:**  2100.

5          **THE COURT:**  I'm sorry, which one?

6          **MS. MATTHEWS JOHNSON:**  2100.

7          **THE WITNESS:**  In my report it would be references 8,

8     9, 10, 11 and 12.

9          **THE COURT:**  Hold on.  First, let's go to the paragraph

10    of your report where you talk about this.

11         **THE WITNESS:**  Bottom of the third page.

12         **THE COURT:**  Okay.

13         **THE WITNESS:**  So if we just read that last paragraph,

14    it makes the point.

15         **THE COURT:**  Okay.  Then I didn't see any articles

16    footnoted here.  So the references that support this point are

17    listed at the end of your report?

18         **THE WITNESS:**  No.  They are on the fourth line where

19    it says -- if you go to the end of the third line, it says

20    there is no significant increase in risk of NHL for those who

21    are cured with therapy and do not have circulating viral RNA,

22    and it gives references 8, 9, 10, 11 and 12.

23         **THE COURT:**  I see.

24         **THE WITNESS:**  There are a couple other references, 5

25    and 16 also speak to that point -- at least seven references

1    that make that point, okay.

2              THE COURT:  Okay.

3              THE WITNESS:  So you wonder why would that be?  I know

4    you have asked some of the other experts about how is hepatitis

5    C different than Roundup; right?

6              THE COURT:  Right.

7              THE WITNESS:  We are saying Roundup is genotoxic, and

8    it causes DNA damage; and we are saying that hepatitis C is

9    genotoxic and causes DNA damage; right?

10             THE COURT:  Right.

11             THE WITNESS:  So the difference is that when you treat

12   a patient with antiviral therapy, you get rid of the virus,

13   okay.  So you get rid of the virus, but also you get rid of all

14   the virally infected cells; and the virally infected cells are

15   the cells that have the DNA damage.  So those virally infected

16   cells are gone, and most or all of the cells with DNA damage

17   are gone; and that's why you get this marked benefit from the

18   antiviral therapy and why you get the decreased risk for

19   non-Hodgkin's lymphoma because you have not only gotten rid of

20   the virus, which is causing the problem; but you have got rid

21   of the cells that were infected by the virus, which would be

22   the precursor cells for the lymphoma.

23        So that's how viral infections are different from things

24   like Roundup because Roundup cells stick around.  At least

25   that's what we propose they do.  They stick around.  They get

1   additional hits, and then eventually they become lymphoma.

2   When you treat the patients with antiviral therapy, the cells

3   -- not only is the virus gone, but the cells are killed along

4   with the virus.

5        THE COURT:  And so what you are saying is it is not

6   possible that the cell damage caused by the virus could set off

7   a chain reaction that eventually gets you to cancer down the

8   road?

9        THE WITNESS:  Right, because once you treat with the

10  antiviral therapy, you get rid of the virus; and you get rid of

11  the damaged cells because the virus is infecting the cells.

12  When you get rid of the virus, the cells die as well.  It has

13  been shown in many studies when you treat people with antiviral

14  therapy, the clonal cells go away -- the cells with the genetic

15  abnormalities go away because you have killed -- not only have

16  you gotten rid of the virus, but you have killed the cells that

17  are infected by the virus.

18       THE COURT:  And with respect to Mr. Hardeman in

19  particular, how do we know that the virus went away?

20       THE WITNESS:  So the way we know the virus went away

21  is because before he was treated, he had a pretty large viral

22  load.  He had a lot of viral RNA in his blood, and he had

23  cirrhosis.  After they treated him, very quickly he got a rapid

24  response; and within 12 weeks the virus was completely gone

25  from his blood, okay.

 1              THE COURT:  Based on what kind of testing?

 2          THE WITNESS:  It was -- it is a very sensitive test

 3     for viral RNA in the blood.  It is a polymerase chain reaction

 4     test.  It can detect very low levels of RNA.

 5              THE COURT:  Is that what they refer to as the ELISA

 6     test?

 7          THE WITNESS:  No.  The ELISA test is for the

 8     antibodies to the virus.  That is a different test.  It tests

 9     whether you have antibodies to the virus.  The other test, the

10     test for viral RNA, actually tells you is there a viral RNA in

11     is that person's serum.  He had a very rapid response, and then

12     he was tested over the next five years; and he stayed totally

13     negative.  And then when he was tested again at the time he was

14     diagnosed with disease, he was still negative; and then they

15     treated him with combination chemotherapy, which was very

16     immunosuppressive, and they monitored him after his therapy;

17     and it never reactivated.

18          So he never reactivated the viral infection after 2005

19     when he was treated with the antivirals.  That's why I'm saying

20     his risk for non-Hodgkin's lymphoma would have been markedly

21     lower because he had this sustained viral response.  The

22     cells -- the damaged cells due to the virus were gone.

23              THE COURT:  And the way you are talking about it now

24     makes it sound like it is kind of a known, agreed-upon fact

25     that once you get the virus out of the system, the damaged

1  cells go away; and there is no longer -- the risk factor goes

2  away, essentially, right, a year after or two years after or

3  something like that; but essentially after a short period of

4  time, the risk factor goes away.  Is that -- is that sort of a

5  known fact that everybody agrees on or is there debate about

6  that in the literature?

7         THE WITNESS:  Well, that's what the papers that I

8  reference say; that once you treat the patient and they get a

9  sustained virologic response, it means they don't detect the

10  viral RNA anymore, the risk.  They no longer are at risk for

11  non-Hodgkin's lymphoma, okay.  That's what the papers I

12  referenced say.

13         THE COURT:  And that's the papers that you reference

14  say.  What I'm asking is:  Is there anything in the literature

15  that stands for the proposition that Hey, actually it may be

16  that the hep C infection damages the cells in such a way that

17  even after the infection is eradicated, the cell damage sets

18  off a chain reaction that can lead to NHL years down the road.

19         THE WITNESS:  I suppose theoretically that is possible

20  if some of those virus infected cells survive.  It is possible

21  that a very small number could survive, and the immune system

22  would hold those in check, okay.  But if you look at the

23  studies that I referenced, seven studies, none of them show

24  that there is a persistent increase in risk after treatment.

25  They all show that the risk goes away.

1    So what that tells you is that if you had a sustained

2  virologic response to hep C, your risk for non-Hodgkin's

3  lymphoma goes away.  Your liver disease stabilizes, and you

4  have effectively treated the hepatitis virus so it is not going

5  to cause complications in the future.

6    **THE COURT:**  Let me ask you a question that is not

7  about hep C.  I think you mentioned that obesity is a minor

8  risk factor, a very minor risk factor for NHL; is that right?

9    **THE WITNESS:**  Yes.

10    **THE COURT:**  And what -- I take that to mean -- and

11  correct me if I'm wrong -- but I take that to mean from a

12  methodological standpoint that when you are looking at

13  potential risk factors for NHL, you have to conduct an

14  assessment of how major or minor they are.  Is that -- do you

15  agree with that?

16    **THE WITNESS:**  Right.  So the first thing you do is you

17  make a list of all the possible known risk factors, and then

18  you go through the medical history.  You go through the medical

19  record.  You talk to the patients, and you try to see -- you

20  know, you try to cross off the things that are not in their

21  history; and then you are left with a few things.

22    So with Mr. Hardeman, we were left with Roundup with

23  vitamin -- with hepatitis C -- he should have taken vitamin

24  C -- with hepatitis C and hepatitis B; and he was overweight,

25  okay.  So what I did is:  I said, Well, I have these four left.

1   So how do I decide which is the substantial contributing factor

2   which is the most important risk factor?  And it was clear from

3   my review of the literature on hepatitis C that his risk would

4   have decreased dramatically after he had a sustained virologic

5   response to the antiviral therapy.  He was at risk when he had

6   the chronic active hepatitis although it is amazing he never

7   got it -- he never got the lymphoma over that 40 years; but

8   anyway, his risk decreased dramatically after he was treated.

9   So I said well, that probably isn't the cause because, you

10  know, he went for another ten years and never got lymphoma.

11      The same story for hepatitis B, okay.  He was immune the

12  whole time, so he wasn't at risk for any kind of hepatitis B

13  associated lymphoma.

14      So that left me with Roundup and with him being

15  overweight.  And he had a very extensive exposure to Roundup

16  over many years, okay.  He used lots of Roundup for many years.

17  So to me looking -- comparing that to his overweight, his odds

18  ratio for diffuse large B-cell lymphoma based on the NAPP study

19  would have been at least a two-and-a-half-fold increase.  It

20  was probably much higher because his exposure was much higher.

21      Whereas his risk for -- his risk from being overweight was

22  only about 30 percent.  It is a small risk.  You have something

23  that causes a big risk compared to something that causes a

24  small risk.  So I assume that the one that caused the big risk

25  would be the most substantial contributing factor.  Obesity

1   could have been a minor factor.  I'm not entirely ruling out

2   hepatitis C.  Yes, maybe there were some cells that survived

3   the treatment and contributed; but it wasn't the substantial

4   contributing cause in his case.

5           THE COURT:  And so when you are looking at Roundup

6   exposure, one of the things you are looking at -- it sounds

7   like, and placing great emphasis on -- is the amount of

8   exposure over time that the patient experienced, but what

9   about -- I mean, not all exposures are created equal, right?

10      And the comparison that I used in conversations with prior

11  experts is to smoking, right?  I mean, I assume that, you know,

12  even somebody who has your view of Roundup would say, Well,

13  sustained exposure to cigarette smoke is a lot more dangerous

14  than sustained exposure to Roundup, right, because the science

15  is so much stronger on the link between cigarette smoke and

16  cancer than the link between Roundup and cancer.  I mean, you

17  would agree with that, right?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.  So doesn't that need to be part of

20  the specific causation analysis as well?  In other words, part

21  of it when you are looking at Roundup is how much was he

22  exposed to it.  So part of it is, I would think, in the grand

23  scheme of things how -- you know, how -- how significant of a

24  risk factor is this particular agent?  You know, is it like,

25  Oh, my God, we know that there is this definitive and strong

1   link between cigarette smoke and cancer or is it one that is --

2   it a link that is less clear and less developed?  Even if you

3   do reach the conclusion -- even if you do believe there is an

4   association of -- a causal association between Roundup and NHL,

5   wouldn't you need from a methodological standpoint to take into

6   account the strength of that or lack of strength of that

7   association compared to other risk factors?  Does that question

8   make sense?

9          **THE WITNESS:**  Yes, it does.  So I agree with you that

10  smoking I think is a more well-defined and accepted cause of

11  cancer than Roundup exposure.  But I think there is a wealth of

12  information on the genotoxicity of glyphosate based herbicides,

13  the animal studies, studies in human who have had exposure and

14  they have seen genotoxicity in living humans and then the

15  epidemiology studies.  It goes back to general causation and

16  whether it all fits together, and it does.

17         Unfortunately, the epidemiology data does not give us the

18  kind of data that you see with smoking because there are only a

19  few studies; but what it does show is that there is a dose

20  response; and if you have more than two days per year exposure

21  or more than ten days total exposure, the odds ratio go up

22  above 2, and they are statistically significant.

23         So, you know, when you are doing the specific causation,

24  Roundup would be on your list, okay.  And if it is the only

25  thing on your list after you go through the process of

1  differential etiology and the -- and the case had extensive

2  exposure over 25, 26 years with lots of gallons and no

3  precautions, it is logical to come to the conclusion that more

4  likely than not that was the cause.  So that's the process I

5  went through.

6      THE COURT:  And that makes sense.  I would think,

7  though, that there would be some agents where you would say,

8  Well, that's the only risk factor we have been able to identify

9  is this -- this patient has been exposed to this particular

10  agent over time, but I'm still not going to conclude that this

11  particular agent caused this particular person's cancer because

12  the evidence of the link between this agent and cancer, while

13  there, is just too weak.  It is there.  There is an

14  association, but it is not strong enough for me to just

15  automatically conclude whenever somebody has been exposed to

16  that agent over a sustained period of time, that that must be

17  the cause of their cancer.  Would you agree that there are

18  scenarios like that?

19      THE WITNESS:  Yes, there are.  And so for each case,

20  you want -- one has to weigh that; but in the end, it is more

21  likely than not -- there being no other causes identified, it

22  is more likely than not that it is the Roundup.

23      THE COURT:  That it is the Roundup.  But I guess what

24  I'm trying to explore is how much of that opinion, that you

25  just expressed, is based on a conclusion that you reached at

1   the general causation phase that there is actually quite a

2   strong link between glyphosate and NHL?

3           THE WITNESS:   Well, of course, my --

4           THE COURT:   If I recall correctly -- and you can

5   correct me if I'm misremembering -- I think you concluded that

6   not only is there a link between glyphosate and NHL, but there

7   is a very strong link between glyphosate and NHL.  So I'm

8   trying to explore now at the specific causation phase how much

9   of your decision not to rule out Roundup or -- strike that --

10  how much of your decision to conclude that it is Roundup is

11  based on your opinion that it is quite a strong link -- that

12  there is quite a strong link between Roundup and NHL as opposed

13  to maybe a weaker link with some other agent?

14          THE WITNESS:   Well, I think when you do the

15  differential etiology, whether it is a strong link or a less

16  strong link or even a weak link, in the end when you go through

17  your list and it is the only link left, then, you know, the

18  conclusion is more likely than not that was the cause.  You

19  can't be a hundred percent sure; but, you know, in the end, I

20  think that is the way physicians think, okay.  I mean, you try

21  to come to a diagnosis that is the best diagnosis; and then you

22  say -- you know, and if you don't have a diagnosis, then you

23  say, Well, I don't know what caused it.

24          THE COURT:   I guess I'm having a little trouble

25  wrapping my mind around that one because I would think that if

1    you -- you know, if there are -- let's say we are aware of ten

2    things where there might be a link between, you know, exposure

3    to that thing and a particular cancer, and we examine someone's

4    history; and we conclude that they were only exposed to one of

5    the things, and the one thing that they were exposed to -- the

6    link between that thing and cancer is pretty weak.  It is

7    there.  There is some evidence in the literature to suggest

8    that there is a link, but the evidence is pretty weak.

9         On the other hand, we have a lot of people where we say,

10   We don't know how their cancer was caused.  I would think in a

11   hypothetical scenario like that, you might examine that person

12   and that person's history and say, Well, yeah, they were

13   exposed to this one thing; but it doesn't automatically mean

14   that we can conclude that that more likely than not caused

15   their cancer.  The only thing we can safely conclude is that we

16   don't know what caused their cancer.  We haven't identified

17   with, you know, any certainty what caused their cancer.

18             **THE WITNESS:**  Yes.

19         **THE COURT:**  Is that type of analysis possible

20   hypothetically?  I'm not talking about the Roundup context now.

21   I'm talking about hypothetically.  Is that type of analysis

22   possible in your field and within your methodology?

23             **THE WITNESS:**  Yes, it is.  And I think it goes back to

24   the -- to the initial interpretation of all the general

25   causation data; and if you believe that Roundup causes NHL --

1    can cause NHL, then -- and you believe that there is strong

2    evidence, which I think there is, then you would use that to --

3    in your interpretation of specific causation, sure.  If you

4    didn't think Roundup caused NHL -- you didn't believe the data

5    or you thought it was insufficient -- then you probably

6    wouldn't even put Roundup on your list or you might put it up

7    there but then --

8        THE COURT:  Right.  That's what I'm trying to get at.

9    Is there a scenario where, you know, there is enough in the

10   epidemiological and other scientific evidence to put it up

11   there; but if you engage in this process and you rule out

12   everything else, you would say, Yeah, you know, it is up there;

13   but the evidence isn't strong enough for me to conclude that

14   this person's cancer was caused by Roundup.  Rather, what I'm

15   left to conclude is that we don't know what caused this

16   person's cancer.

17       I'm asking -- I know that that's not your opinion with

18   respect to Roundup because you believe from a general causation

19   standpoint that the evidence is strong -- but I'm asking if

20   there is room for that in your methodology in general.

21       THE WITNESS:  Yes, I think there would be if my

22   opinion was that Roundup may not be a cause of non-Hodgkin's

23   lymphoma or may be a very weak risk factor for non-Hodgkin's

24   lymphoma.

25       THE COURT:  Like with obesity?

 1          THE WITNESS:  Yeah, exactly.

 2          THE COURT:  If all you had was that Mr. Hardeman was

 3   overweight, and you didn't have any -- and he had never been

 4   exposed to Roundup, what would your conclusion be about

 5   Mr. Hardeman?

 6          THE WITNESS:  Would be that his obesity probably

 7   contributed to his getting NHL.  I wouldn't be really sure

 8   whether it was the cause.  You know, it probably contributed;

 9   but it is a weak risk factor.

10          THE COURT:  So would you say that it is more likely

11   than not Mr. Hardeman's NHL -- excuse me -- more likely than

12   not Mr. Hardeman's obesity was a significant factor in causing

13   his NHL?

14          THE WITNESS:  Probably wouldn't because it is such a

15   weak risk factor.  Probably wouldn't.

16          THE COURT:  And so if we didn't -- take Mr. Hardeman's

17   case.  If we didn't have any exposure to Roundup, but we had

18   everything else with respect to Mr. Hardeman, what would your

19   conclusion be about him?

20          THE WITNESS:  Well, I think he would have been

21   unlikely to have gotten non-Hodgkin's lymphoma.

22          THE COURT:  Let's say he had.

23          THE WITNESS:  It wouldn't have been much different

24   than what the background --

25          THE COURT:  There are many people who are diagnosed

1  with non-Hodgkin's lymphoma, and the conclusion is we don't

2  know how they got it, right?

3        THE WITNESS:  Yes.

4        THE COURT:  Okay.  So -- so -- is it still your

5  testimony that somebody without the Roundup exposure could not

6  have gotten non-Hodgkin's lymphoma and had everything else that

7  Mr. Hardeman had?

8        THE WITNESS:  It is possible they could get it.  We

9  wouldn't know what caused it.

10        THE COURT:  Okay.  So what I'm asking you is:  Assume

11  Mr. Hardeman has non-Hodgkin's lymphoma and has all the other

12  factors in his medical history, except for the Roundup, what

13  would your opinion be of Mr. Hardeman's -- of the cause of

14  Mr. Hardeman's non-Hodgkin's lymphoma?

15        THE WITNESS:  I wouldn't really know.  You know, I

16  would say, Well, perhaps the hepatitis C contributed; but it is

17  unlikely that it played a substantial role.  I would say that

18  he was obese, so that could have contributed; but it probably

19  didn't play a substantial role.  So it would be a situation

20  where we have a couple risk factors that are not very

21  convincing, where the risk is not much increased.  So in the

22  end you would say, Well, we are not sure; just as you -- just

23  as you described in the other scenario.

24        THE COURT:  Okay.  Should we take a little bit of a

25  break maybe and then -- I'm happy to -- I guess you can begin

1   and then if you all have any cleanup that you want to do, you

2   can do that.  Why don't we take a 10-minute break.  We will

3   resume at 11:00 o'clock.

4            **THE CLERK:**  Court is in recess.

5                   (Recess taken at 10:53 a.m.)

6                 (Proceedings resumed at 11:06 a.m.)

7            **THE COURT:**  Okay.  You can proceed.

8        **MS. MOORE:**  Thank you, Your Honor.

9                   <u>**REDIRECT EXAMINATION**</u>

10  BY MS. MOORE:

11  **Q.**   Good morning, Dr. Weisenburger.

12  **A.**   Good morning.

13  **Q.**   The Court was asking you some questions about your

14  methodology, and I wanted to follow-up on a few things

15  regarding your methodology.

16       In general, did you apply the same methodology for all

17  three of the plaintiffs, Mr. Hardeman, Mr. Gebeyehou, and

18  Ms. Stevick?

19  **A.**   Yes, I did.

20  **Q.**   And can you just explain the process of the methodology

21  for all three of those plaintiffs without going into particular

22  details for each one of them?

23  **A.**   Right.  So the method is -- in medicine is called

24  differential diagnosis.  In legal situations it's called

25  differential etiology.  It's sort of the same method in which

1    you --

2              THE COURT:  Sorry to interrupt, but isn't it the

3    reverse?  That in medicine it's called differential etiology

4    and in the law it's called differential diagnosis?

5              THE WITNESS:  No.

6              THE COURT:  No?  Okay.  That was my impression from

7    the previous witness, from Dr. Nabhan.

8              THE WITNESS:  Okay.

9    BY MS. MOORE:

10   Q.   In your clinical practice, if you were going to try to

11   figure out the diagnosis for a patient, what do you call that

12   process?

13   A.   Differential diagnosis.

14   Q.   Okay.  And so in the legal context, when you're trying to

15   determine the cause of NHL for these three particular

16   plaintiffs, explain what the process is that you go through?

17   A.   Right.  So the patient has a specific disease and you're

18   trying to understand what caused the disease.

19             THE COURT:  I'm really sorry to interrupt, but I

20   just -- and this is a minor point, but I think it's important

21   for courts to describe these things correctly.

22        When you're trying to diagnose a particular patient, you

23   call it -- and you're conducting that analysis, you call it

24   differential diagnosis; but trying to diagnose a patient is

25   different from trying to figure out what caused the patient's

1    disease.  And so I'm asking what is the appropriate label you

2    attach to the exercise of trying to figure out what caused a

3    patient's disease where you already know what the disease is?

4            THE WITNESS:  So I think the terms are

5    interchangeable.  I mean, in medicine we say differential

6    diagnosis, but it really --

7            THE COURT:  For that?  For figuring out what caused

8    somebody's disease?

9            THE WITNESS:  Yeah.  Also for that, yes.

10           THE COURT:  Okay.

11           THE WITNESS:  But you could call it differential

12   etiology because that's actually what we're doing.  We're

13   trying to figure out, for example, what organism, what bacteria

14   cause a pneumonia.  So it's sort of differential etiology, but

15   in medicine we call it differential diagnosis.

16           THE COURT:  Okay.

17   BY MS. MOORE:

18   Q.   And so --

19           THE COURT:  Sorry.

20           MS. MOORE:  That's fine, Your Honor.

21   Q.   When determining what the cause of NHL is for these three

22   plaintiffs, just walk the Court through what the methodology is

23   that you used.

24   A.   Right.  So you begin with the disease.  So we'll say

25   non-Hodgkin's lymphoma.  And you, you know -- in a case like

1   this, you look through the medical records.  You read through

2   the medical records.  You read through -- if there are

3   depositions, you read through the depositions of the physicians

4   and other caretakers.  You talk to the patient and try to

5   elicit any additional information, and you have a list of known

6   accepted causes of non-Hodgkin lymphoma.

7        And so based on what you find out from the medical

8   records, from the physicians' records, from the depositions,

9   from talking to the patient, you can usually exclude most of

10  the diagnoses or etiologies on the list, and then you come down

11  to just a few.  And then you have to use your medical expertise

12  and your knowledge of the literature and some judgment to weigh

13  things in a way that you come up with the most likely etiology.

14  Q.   And is that, in fact, Dr. Weisenburger, what you did in

15  these three cases?

16  A.   Yes, it is.

17  Q.   Okay.  So when you come up with your list of known

18  accepted causes, is that what you've been referring to as the

19  risk factors for non-Hodgkin's lymphoma?

20  A.   Yes, causative risk factors.

21  Q.   Okay.  And simply because something is a risk factor, a

22  known risk factor, does that mean it's automatically going to

23  be the substantial factor in a particular case?

24  A.   No.

25  Q.   Okay.  What's your process for determining whether any of

1  the known risk factors that you've got up on your checklist

2  then becomes -- how do you determine what the substantial

3  factor is in a particular case?

4  **A.**   Well, that's also complex because some risk factors are

5  strong risk factors and some are weaker risk factors; and, of

6  course, you have to really determine whether the patient has

7  that risk factor and has had an extensive -- as an example, if

8  it's a chemical, have they had any extensive exposure to the

9  chemical over many years or was it just, you know, once or

10  twice in their lifetime.

11      And so you have to -- you have to decide whether the risk

12  factor stays up on the list or it doesn't based on what the

13  patient tells you what their exposures were.

14  **Q.**   And for these three plaintiffs, did you include Roundup --

15  did you rule in Roundup as one of those risk factors to

16  consider?

17  **A.**   Yes.

18  **Q.**   Okay.  And what did you rely upon in forming your opinion

19  that you should rule in Roundup as a risk factor for these

20  three plaintiffs?

21  **A.**   Well, it was based on my review of all the materials for

22  general causation.  I came to the conclusion that Roundup is a

23  significant risk factor for non-Hodgkin lymphoma; and then

24  looking at the exposure of each of the three individuals to see

25  did they have extensive exposure, a little bit of exposure,

1    almost no exposure.

2         And then, you know, based on that, determining whether

3    Roundup still is a substantial -- if they have a lot of

4    exposure and you accept it as a risk factor, then you have to

5    leave it up on the list.

6    Q.    And you were asked several questions by Monsanto's counsel

7    regarding the McDuffie and Eriksson studies when they talk

8    about 2 days per year or 10 lifetime days.  Do you recall those

9    questions?

10   A.    Yes.

11   Q.    And can you explain to the Court how you factored in the

12   McDuffie and Eriksson studies in forming your opinions in these

13   three cases?

14   A.    Well, I selected those two studies plus the NAPP study

15   because those were the three studies that showed a dose

16   response; in other words, that said people who have more

17   exposure have a higher risk of disease.

18        So I tried to determine whether each of these three

19   individuals would fall into the category of having a high

20   exposure which would put them at significant risk for this

21   disease, and they all three had exposures markedly above these

22   so-called thresholds that are set by these three epidemiology

23   studies.

24   Q.    And those thresholds, so that's the dose response?

25   A.    Yeah.  It's the odds ratio for the dose response.

1    Q.   And what does the odds ratio for the dose response in the

2    McDuffie and Eriksson studies tell you?

3    A.   Well, dose response is an important parameter that we

4    evaluate in epidemiology because if a chemical has a -- shows a

5    dose response, it's very likely an etiologic agent because

6    it's -- you know, it's unusual that a chemical would cause a

7    disease and not have a dose response.

8         So when you see a dose response, that gives you some

9    assurance that it really is causing the disease.

10   Q.   And what were the findings of the dose response from

11   McDuffie and Eriksson?

12   A.   So they were both positive.

13   Q.   And did you rely on that in forming your opinion to rule

14   in Roundup in these three cases?

15   A.   Yes.

16   Q.   Okay.

17        THE COURT:   Could I ask one follow-up question about

18   that?  I forgot to ask you earlier.

19        On the issue of dose response, you mentioned that

20   Mr. Hardeman's exposure was much greater than twice per year

21   for five years, which is sort of this baseline.  And I think

22   you said that, therefore, his risk is probably greater than

23   two.  Do I remember that correctly?

24        THE WITNESS:   Yes.

25        THE COURT:   But I assume, and it's been a long time

1    since I've looked at the Eriksson study and the McDuffie study,

2    but if I recall correctly, it was not the case that the people

3    being studied that resulted in a conclusion that there was an

4    odds ratio of 2.0, or whatever the number was, for people who

5    had had more than twice-a-year exposure or 10-lifetime-days

6    exposure merely had that kind of exposure.

7        In other words, I think that a lot of the people in the

8    pool of people studied that resulted in the 2.0 odds ratio had

9    the kind of exposure that Mr. Hardeman had or more.

10        So isn't it incorrect to say "I assume that Mr. Hardeman's

11   risk is greater than 2.0 because his exposure was so much more

12   than 10 lifetime days"?

13           THE WITNESS:  Well, I'm surmising.  I mean, I don't

14   really know.  Ideally you'd like to have --

15           THE COURT:  But isn't it incorrect to surmise that?

16   Because there are lots of people in the pool from McDuffie and

17   Eriksson and the NAPP study --

18           THE WITNESS:  That had high exposure, sure.

19           THE COURT:  -- whose exposure was much higher --

20           THE WITNESS:  Yeah.

21           THE COURT:  -- and presumably much higher than

22   Mr. Hardeman's as well; right?

23           THE WITNESS:  Yes.  So what you have is only two

24   groups.  You've got a group that's less than two days and

25   greater than equal to two days, and what you'd really like to

 1  have is four or five groups stratified to really see a dose

 2  response you, but we don't have that kind of data.

 3          **THE COURT:**  Other than the AHS.

 4          **THE WITNESS:**  Other than the AHS, yes.

 5          **THE COURT:**  So my question -- I want to get a -- ask

 6  you point blank.  Was that statement you made earlier today

 7  incorrect, that we should assume that Mr. Hardeman's risk

 8  factor is greater than 2 because his exposure was so much

 9  higher than 10 lifetime days?

10          **THE WITNESS:**  I don't know.  It was a hypothetical.

11  It was a hypothetical.  It may have -- it probably was correct,

12  but I can't prove it.

13          **THE COURT:**  Well, wouldn't you -- to be able to make a

14  statement like that, wouldn't you have to know the exposure

15  rates of the pool that was studied in McDuffie and Eriksson?

16          **THE WITNESS:**  Yes.  Yes, you would.  So, you know,

17  maybe I shouldn't have made that statement; but, you know, in

18  terms of the way chemicals -- carcinogenic chemicals work, the

19  more exposure you have, the higher your risk.

20      And they had only two categories so you've got sort of a

21  low risk and a high risk group, but you don't have a real high

22  risk group because the real high risk group is in your other

23  group.

24      So it would be nice to have more data to see that, but we

25  only have what we have.

1              **THE COURT:**  Okay.  Thank you.

2    **BY MS. MOORE:**

3    **Q.**   And, Dr. Weisenburger, is it a fair statement to say that

4    Mr. Hardeman's exposure exceeded the categories in both the

5    McDuffie and the Eriksson studies.

6    **A.**   Yes.

7    **Q.**   You testified earlier that you can -- you ruled out all

8    the known possible risk factors for NHL for Mr. Hardeman with

9    the exception of -- that left you with obesity, hepatitis B,

10   hepatitis C, and Roundup; is that correct?

11   **A.**   Yes.

12   **Q.**   Okay.  And did you do the same analysis for Mr. Gebeyehou?

13   **A.**   Yes.

14   **Q.**   And what were you left with when you went through -- based

15   on your medical review of the records, your interview with him,

16   and your review of the literature, what were you left with?

17   **A.**   I was left with Roundup and with hepatitis B.

18   **Q.**   And you testified earlier about how you eliminated

19   hepatitis B from the differential for Mr. Hardeman.  Is the

20   same true for Mr. Gebeyehou?

21   **A.**   Yes.

22   **Q.**   And why is that, Dr. Weisenburger?

23   **A.**   Well, again, because the literature on the subject shows

24   that if your immune -- if you have natural immunity to

25   hepatitis B or you're immunized against hepatitis B, you have

1  no increased risk for non-Hodgkin lymphoma.

2      So it's just like hepatitis C.  It's only those who have

3  chronic active infection that are at increased risk for

4  non-Hodgkin lymphoma.

5  **Q.**   And given that, were you able to form an opinion in

6  Mr. Gebeyehou's case as to whether -- as to what the cause of

7  his NHL was?

8  **A.**   Yes.  I thought it was more likely than not the Roundup.

9  **Q.**   And in Mr. Hardeman's case, based on your review and

10  determination that he was immune to hepatitis B at least since

11  2005, were you able to form an opinion as to ruling out

12  hepatitis B as a substantial factor?

13  **A.**   Yes.

14  **Q.**   And what was your opinion?

15  **A.**   Well, my opinion was that it wasn't a substantial

16  contributing factor, that it could have contributed but I

17  didn't think it was a substantial contribution.  It was more

18  like obesity or even less than obesity in terms of the way I

19  weighed it.

20  **Q.**   And so for Mr. Hardeman, after your review of his records,

21  your interview with him, your review of the literature, were

22  you able to form an opinion to a reasonable degree of medical

23  probability as to what the substantial factor in causing his

24  NHL is?

25      **THE COURT:**  You don't need to go through and repeat

1   everything he's already said in his report.

2         MS. MOORE:  I've got, like, two more questions,

3   Your Honor.  Thank you.

4         THE WITNESS:  Yes, I believe it was Roundup.

5   BY MS. MOORE:

6   Q.  Okay.  And for Ms. Stevick, were you able to form an

7   opinion within a reasonable degree of medical probability as to

8   what the substantial factor was in causing her NHL?

9   A.  Yes.  I also felt it was Roundup.  There weren't any other

10  etiologic factors that I could identify in her history.

11        MS. MOORE:  Thank you, Dr. Weisenburger.

12  Thank you, Your Honor.

13        THE COURT:  Anything further from the defendants?

14        MS. MATTHEWS JOHNSON:  Just very briefly, Your Honor.

15                    <u>RECROSS-EXAMINATION</u>

16  BY MS. MATTHEWS JOHNSON:

17  Q.  Hi, Dr. Weisenburger.

18  A.  Hi.

19  Q.  Can we go to Exhibit 2107, it's your Adams deposition, at

20  page 112?

21              (Pause in proceedings.)

22        MS. MATTHEWS JOHNSON:  All right.  We'll move on from

23  that.

24  Q.  I want to ask you a couple questions on the hepatitis C

25  subject first.

1  **A.**    Okay.

2  **Q.**    So when Mr. Hardeman was diagnosed in February of 2015 and

3  treatment was initiated, he was not just given chemotherapy,

4  was he?  He was also given medication to make sure that his

5  hepatitis C infection would not flare up; was he not?

6          **MS. MOORE:**  Objection.  I think you meant to say

7  "NHL."

8          **MS. MATTHEWS JOHNSON:**  Oh, I'm sorry.  I'm sorry.

9  Yes, his NHL diagnosis.

10 **Q.**    When he began treatment --

11         **THE COURT:**  Why don't you restate the question.

12         **MS. MATTHEWS JOHNSON:**  I will, Your Honor.

13         **MS. MOORE:**  I'm sorry, Your Honor.  I just --

14         **MS. MATTHEWS JOHNSON:**  No, no, no.  I think that's

15 good.  Thank you.

16 **Q.**    When Mr. Hardeman was diagnosed with NHL in February of

17 2015, they did not just initiate treatment for his

18 chemotherapy.  They also initiated a prophylactic treatment to

19 ensure that his hepatitis C infection would not flare up, did

20 they not?

21 **A.**    Well, that's not correct.  So at the time they diagnosed

22 him, they looked in his blood and they found that he didn't

23 have any evidence of hepatitis C infection and they found that

24 he didn't have any evidence of hepatitis B infection.  Okay?

25 So the prophylactic treatment was given for hepatitis B and not

1   for hepatitis C.  It may have helped with the hepatitis C, but

2   it was given mainly for hepatitis B.

3   **Q.**   Okay.  So when you say there's a prophylactic treatment,

4   you are talking about one or two viruses that you were saying

5   were eliminated but a prophylactic treatment was administered?

6   **A.**   It was administered empirically because we know that some

7   patients with hepatitis B and some patients with hepatitis C

8   have a latent infection; that is, you don't completely get rid

9   of the virus.  The virus lives in the body at a very low level

10  it's and is kept in check by the immune system.

11       And so whenever they give chemotherapy and patients have a

12  history of hepatitis B, they don't want that virus to flare up

13  when the immune system is knocked down so they give the -- they

14  give the antiviral therapy empirically just to prevent that

15  from happening in case it might.

16  **Q.**   So going back to our point about how cancer can exist

17  below a detectable level, there are viruses that can live in

18  the body below a detectable level.

19           **THE COURT:**  Was that a question?

20           **MS. MATTHEWS JOHNSON:**  Yes.

21  **Q.**   Is that correct?

22  **A.**   That is correct.

23  **Q.**   Now, there was some discussion about hepatitis C and the

24  efficacy of Interferon as it relates to regression; is that

25  right, sir?

1    You were testifying about how the treatment of hepatitis C

2  with Interferon is something that was seen to be effective in

3  the regression of low-grade lymphomas; is that right?

4  **A.**   Well, I didn't say that, but that's true.

5  **Q.**   Right.  They're low-grade lymphomas.

6  **A.**   Yes.

7  **Q.**   So if you have an intermediate or if you have a

8  high-level, Interferon is not going to do it?

9  **A.**   Usually people don't do it.  It does sometimes work, but

10  people don't usually do it, at least in our country.

11  **Q.**   Right.  The treatment modality is still chemotherapy?

12  **A.**   Yes.

13  **Q.**   And in looking at how HCV, the mechanisms by which it can

14  cause NHL, if we can go back to the Couronne article, which is

15  Exhibit 2052, in our earlier conversation we were talking about

16  Figure 2, which relates to the potential for the ability of HCV

17  to directly cause mutations and to prevent DNA repair; is that

18  right, Doctor?

19  **A.**   Yes.

20  **Q.**   But now I want to look at Figure 1.  So if we could have

21  *Daubert* Exhibit 2052, Figure 1.  If we can call out Figure 1.

22    And here we're talking about HCV-related B-cell

23  transformation through the continuous external stimulation of

24  lymphocytes receptors by viral antigens and cytokines; is that

25  correct, Doctor?

WEISENBURGER - RECROSS / MATTHEWS JOHNSON

1    A.    Yes.

2    Q.    So with reference to the efficacy of Interferon, are we

3    talking about here uncontrolled cell growth, which could lead

4    to spontaneous mutations for which Interferon has been deemed

5    to be effective?  Is this model of uncontrolled cell growth

6    triggered by HCV?

7    A.    So there are two models in this paper, two major models.

8    One is the one we talked about earlier where the virus actually

9    infects the cell, gets inside the cell and takes over the

10   workings of the cell.

11         And in the first one, the one you just pointed me to,

12   Figure 1, they think that the virus attaches to the cell but

13   doesn't actually infect the cell.  Okay?  So it attaches to the

14   cell by these external receptors, either the CD81 or the BCR

15   immunoglobulin intercepter, and stimulates the cell to

16   proliferate and, as a result of that, you can also have some

17   genetic abnormalities that occur.

18         This model that you're talking about in Figure 1, they

19   believe really applies to the low-grade B-cell lymphomas and

20   not diffuse large B-cell lymphoma.

21   Q.    This --

22   A.    The second model we discussed earlier is the model that

23   they really think is the model that is applicable to diffuse

24   large B-cell lymphoma.

25   Q.    Okay.  And when you talk about the low-grade lymphomas,

1    again we're going back to the low-grade lymphomas for which

2    Interferon treatment has been deemed to be effective; right,

3    Doctor?

4    **A.**    Yes.

5    **Q.**    Okay.  So treatment with Interferon to reduce the viral

6    load, decrease the amount of virus that can attach to these

7    cells and cause uncontrolled cell growth; is that right, sir?

8    **A.**    Right.

9    **Q.**    Okay.  Figure 2, if we can go to Figure 2 where we were

10   before, and we can call this out.

11        And, again, this is, just to be clear, model of direct

12   HCV-related B-cell transformation oncogenic effects mediated by

13   intracellular viral proteins; is that correct?

14   **A.**    Yes.

15   **Q.**    And when we talk about the gene mutations caused by HCV

16   and we're talking about the ability of the HCV to keep the

17   cells from repairing DNA damage, those are actual mutations;

18   correct?

19   **A.**    Mutations is one of the forms of genetic damage, yes.  So

20   there are breaks.  There are deletions.  There are

21   translocations.  There are all kinds of genetic abnormalities.

22   Mutations is one -- just one type.

23   **Q.**    And I think in your testimony in the Hardeman deposition

24   you said 25 to 40 years of chronic HCV infection could cause

25   mutations and those mutations would continue.

1    A.   Well, they could continue, exactly; but if you use this

2    model -- the model in Figure 2, as I explained earlier, if you

3    treat the viral infection, the virus goes away and the cells

4    that are infected with the virus die because they're infected

5    with the virus.  So when you get in there and kill the virus,

6    you kill the cell.

7         So those cells don't persist.  Okay?  Or if they do

8    persist, they're at very, very low levels as a form of latent

9    infection that is kept in check by the immune system.  Okay?

10   Q.   But latent infection --

11   A.   That's why I didn't entirely rule out hepatitis C because

12   you could have a latent infection and you could have some of

13   these virally infected cells still persisting, hiding, afraid

14   to come out because the immune system is waiting for them.

15   Q.   So we know a latent infection can maintain, we know

16   mutations can maintain that came from a chronic 25 --

17   multidecade period of HCV infection?

18   A.   It's possible at a very low level.  Okay?  At a very low

19   level.  We don't have any evidence of that in Mr. Hardeman

20   because he never had any evidence of infection after he was

21   treated.  But hypothetically, theoretically, yes, there could

22   have been some small few latent virally infected cells hiding

23   in his system.

24   Q.   Right.  And empirically as well, which is why doctors go

25   forward on the understanding that these things could still

WEISENBURGER - RECROSS / MATTHEWS JOHNSON

1  exist and adjust their treatment modalities accordingly?

2  A.   Yes.

3  Q.   Okay.  If we could go to Exhibit 2070, please, which is

4  the Mahale article.  This should already be in evidence.

5       And you were asked about this at your deposition, I think.

6  Do you recall, Doctor, the Mahale article?

7       And if we could go to page 7 of this article, and if we

8  could go down to the third full paragraph on that page, the

9  last sentence or maybe the last few sentences, "We observed"

10 after Footnote 25.  "We observed."

11      Okay.  Now, this is a 2018 article; is that correct?

12 A.   Yes.

13 Q.   And it says (reading):

14           "We observed that AVT with SVR led to a moderate

15      reduction in risk of B-cell NHLs when compared to

16      untreated patients."

17      And then they have a sentence about HIV, and then the last

18 sentence (reading):

19           "However, this risk reduction was not observed when

20      AVT was started two or more years after the HCV index

21      date."

22      Did I read that correctly?

23 A.   Yes.

24 Q.   And there's been a determination of -- wait.  Hold on.

25 Strike that.

1          MS. MATTHEWS JOHNSON:  May I have just one moment,

2     Your Honor?

3          THE COURT:  Sure.

4                    (Pause in proceedings.)

5     BY MS. MATTHEWS JOHNSON:

6     Q.   And, Doctor, you first considered Mahale, which is a 2018

7     article, at your deposition?  You had not included this in your

8     report; is that correct?

9     A.   That's correct.

10         MS. MATTHEWS JOHNSON:  We have no further questions,

11    Your Honor.

12         MS. MOORE:  Your Honor, just a couple follow-up

13    questions.

14         THE COURT:  Sure.

15         MS. MOORE:  Thank you, Your Honor.

16                  **FURTHER REDIRECT EXAMINATION**

17    BY MS. MOORE:

18    Q.   Dr. Weisenburger, just to follow on the line of

19    questioning about hepatitis C, do we know -- do you have an

20    opinion as to what percentage of people with active hepatitis C

21    infection actually develop non-Hodgkin's lymphoma?

22    A.   Yes.  It's a very low percentage.  It's about one tenth of

23    1 percent.  So it's not a very strong risk factor either.

24    Q.   And there were several questions about the cell mutations,

25    the damage to the cells caused by hepatitis C, and you were

1    asked some hypothetical questions and then questions about

2    Mr. Hardeman, and I just want to make sure we're clear.

3        With respect to Mr. Hardeman, what is your opinion as to

4    what happened following the hepatitis C treatment he received

5    in 2005 and 2006 to those cells, the damaged cells?

6    **A.**   Well, based on the references that I used in my report and

7    my knowledge of this disease and actually this nice paper that

8    we've been discussing, it was my opinion that when he was

9    treated, his risk for non-Hodgkin's lymphoma markedly

10   decreased -- okay? -- to the point where these studies that

11   were done couldn't detect an increased risk.  Okay?

12       So I didn't feel that hepatitis C really met the criteria

13   for a strong risk factor in Mr. Hardeman even though he had it

14   for a long time.  You know, he had it for many years.  He was

15   markedly responsive to treatment; and once you respond to

16   treatment, your risk for hepatitis C related sequelae go down

17   dramatically.

18   **Q.**   And how do we know if the treatment he received for

19   hepatitis C actually killed off the sells that may have been

20   damaged by the virus for Mr. Hardeman?

21   **A.**   Well, because the cells are infected.  So when you attack

22   the virus, you're attacking the cell that the virus is in and

23   it kills the cell; or in the first model that we talked about

24   in Figure 1, if you take away the stimulus to tell the cells to

25   proliferate, they stop proliferating and they die off.  Okay?

1   Q.   And after the treatment Mr. Hardeman received in 2005 and

2   2006 which would have killed off the damaged cells, has there

3   ever been any evidence since then that he had active

4   hepatitis C?

5   A.   No.

6   Q.   And did you factor that into your decision in determining

7   that hepatitis C was not a substantial factor in causing NHL

8   for Mr. Hardeman?

9   A.   Yes, I did.

10  Q.   And, Dr. Weisenburger, in forming your case-specific

11  opinions in these three cases, did you rely upon the

12  publications that you've either authored or co-authored

13  regarding NHL?

14  A.   One or two, but for the most part I was relying on

15  research done by others.

16  Q.   Approximately how many peer-reviewed publications have you

17  authored or co-authored about causes of NHL?

18  A.   About 50 or so.

19          MS. MOORE:   Thank you.

20      Nothing further, Your Honor.   Thank you.

21          MS. MATTHEWS JOHNSON:   Just one question.

22          THE COURT:   Sure.

23                  **FURTHER RECROSS-EXAMINATION**

24  BY MS. MATTHEWS JOHNSON:

25  Q.   Just to be clear, sir, Mr. Hardeman's NHL was a

**PROCEEDINGS**

 1   high-grade.  It was not a low-grade lymphoma; correct?

 2   **A.**   That's correct.

 3           **MS. MATTHEWS JOHNSON:**  Thank you.

 4           **THE COURT:**  Okay.  Congratulations.

 5           **THE WITNESS:**  Thank you.

 6           **THE COURT:**  You may step down.

 7                       (Witness excused.)

 8           **THE COURT:**  Okay.  Is there anything else that anybody

 9   needs to discuss today, or should we just plan on seeing each

10   other again on Wednesday morning?

11           **MS. MOORE:**  Your Honor, we don't have anything

12   further.  I think it can wait until the pretrial conference on

13   Wednesday.  I think Mr. Stekloff had a couple matters.

14           **THE COURT:**  Sure.

15           **MR. STEKLOFF:**  Yeah, just a couple questions for

16   guidance, Your Honor.  A couple questions in preparing for the

17   trial preservation deposition of Dr. Portier.

18        In trial do you allow recross of expert witnesses?

19           **THE COURT:**  I think that I always have.

20           **MR. STEKLOFF:**  Okay.

21           **THE COURT:**  And I think it would be appropriate in

22   this case.

23           **MR. STEKLOFF:**  Thank you.

24        Also, if we want to -- I mean, I understand there might be

25   debates later about whether something was proper impeachment,

PROCEEDINGS

1    but if we wanted to impeach an expert -- and this is true, I

2    guess, not only in Dr. Portier's testimony but at trial -- can

3    we use video on occasion, or are we stuck with the transcript?

4         **THE COURT:**  Certainly -- I mean, I'm thinking about,

5    you know, this came up in the last civil trial that I did, and

6    I believe that I ruled that video could not be used but it was

7    more based on, you know, the specifics of that case.

8         I have not developed a general rule about that one way or

9    the other.  I would think that there would need to be -- you

10   know, now that I think about it, I think I have on a number of

11   occasions allowed video to be used.

12        You're talking about for expert witnesses or witnesses in

13   general?

14        **MR. STEKLOFF:**  I think we're focused on expert

15   witnesses.  And to be clear, I don't think every time we

16   impeach a witness, we would use video; but there might be some

17   occasions where a witness in the video, either through his or

18   her facial reactions or pauses, the impeachment would come

19   across differently than it might if you just look at it on

20   paper.  And so I think we're just trying to test whether in

21   limited instances that we think might be appropriate we could

22   use video for impeachment.

23        **THE COURT:**  Yeah, I don't have a problem with that.

24        **MS. MOORE:**  Our only concern there, Your Honor, would

25   just be the time constraints that you've put on.  We just don't

1    want that to interfere.

2              **THE COURT:**  Yeah.  But, of course, if they are --

3              **MS. MOORE:**  That's them.

4              **THE COURT:**  It's their time.  It's their clock.

5              **MS. MOORE:**  Fair enough.

6              **MR. STEKLOFF:**  That actually -- so I only have two

7    more brief things, Your Honor.

8         I just wanted to flag for Your Honor, I don't know how to

9    deal with this -- I think you might hear more from them about

10   it on Wednesday -- they designated for Phase I 36 hours of

11   deposition testimony so we are now going through the process of

12   countering and objecting to that.  That seems like a poor use

13   of resources given that they are limited to 32 hours.

14        I guess maybe we're just flagging it for you, but I think

15   that we are concerned about the amount of resources we are

16   putting in to marking up transcripts of 36 hours of testimony

17   given I don't think that there will be 36 hours of deposition

18   designations.

19             **THE COURT:**  It's kind of the opposite of just dumping

20   a ton of documents on them and making them spend all their

21   resources sifting through the documents.  I'm sure that's never

22   happened in this case.

23             **MS. MOORE:**  We've never experienced that, Your Honor.

24        Your Honor, there's 67 witnesses disclosed or listed

25   between the two parties and so, you know, given the bifurcation

1  issue and the fact there's 67 witnesses, I think there's 34 or

2  so depositions, we did our best to narrow it down.  And I

3  appreciate them counting up the hours.  I hadn't done that yet,

4  but we'll get there.

5      I did -- since you mentioned the 32 hours last week, we

6  went back and in the *Johnson* case there were over 50 hours --

7  it might have been close to 55; I'm not exactly sure on that --

8  of trial time that was logged for that case.  The plaintiff in

9  that case did have more hours allocated because we have the

10  burden of proof.  So we wanted to bring that to Your Honor's

11  attention, and we can talk about it more on Wednesday.

12          **THE COURT:**  How many total hours of trial time?

13      **MS. MOORE:**  It was over 50.

14          **THE COURT:**  Over 50 total hours of trial time?

15      **MS. MOORE:**  No.  Over 50 for the plaintiff.  For the

16  plaintiff, Your Honor.  I apologize.  Over 50 for the

17  plaintiff.

18      Since that time, we've taken multiple depositions in the

19  litigation, four of which were just last month.  I think

20  there's eight or nine scheduled for this month before trial.

21  So some of those designations are part of that.  So there's

22  even more evidence --

23          **THE COURT:**  More to the fact that you took more

24  depositions doesn't mean you need more time.

25      **MS. MOORE:**  Well, that's a fair point, Your Honor.  I

**PROCEEDINGS**

1    mean, there's a witness they identified that for the first time

2    we just got the custodial file last week on their list.  We

3    don't know if they're going to call her or not.

4        So I'm just saying that right now with 32 hours, that is

5    basically hands -- you know, tying our hands behind our back,

6    and so we would ask the Court to reconsider that to give us

7    more time so we can present our evidence and make sure we meet

8    the burden of proof.

9        **THE COURT:**  Well, we can talk about that more at the

10   pretrial conference, but I will tell that you that so far I've

11   not seen anything to suggest that it should be expanded.

12       And, in fact, what I think you're going to find is that,

13   you know, there are a number of expert witnesses who are either

14   not going to testify at all per my rulings or their testimony

15   is going to be much shorter than what is contemplated by their

16   reports, and so that should provide some assistance to both

17   sides.

18       **MS. MOORE:**  I understand, Your Honor.  I just wanted

19   to put that on the record.  Thank you, Your Honor.

20       **THE COURT:**  And, as I said, as is always the case, if

21   I do conclude along the way that I've squeezed you

22   unnecessarily, we can do something about it and we don't have

23   to wait until the end of trial to do something about it either.

24   And part of it depends on, you know, whether people are using

25   their time efficiently.

**PROCEEDINGS**

1          **MS. MOORE:**  And I appreciate that, Your Honor, and we

2     have every intention of using our time efficiently.  I mean, we

3     want to make sure that we are mindful of the jury sitting here

4     for a long time too, but I just want the Court to be aware with

5     that number of witnesses and then what happened in the Johnson

6     case, we just wanted to bring that to your attention.

7     Especially when we talked about it last week, you know, 10 to

8     12 hours for Dr. Portier in Australia, I mean, that's a third

9     of the hours allocated to us.  So I just want to bring that to

10    your attention.  We can talk more about it on Wednesday.

11         **THE COURT:**  It sounds like you're going to need to

12    chop that testimony.

13         **MS. MOORE:**  And that includes the defense.  I

14    apologize, Your Honor.

15         **MR. STEKLOFF:**  And we're chopping our cross already.

16    We've mapped it out and are confident we can fit our case in

17    the 32 hours.

18         **THE COURT:**  And, you know, part of it here is that we

19    are -- there's an obligation on both sides to -- you know,

20    obviously you need to be able to put enough evidence in front

21    of the jury to allow the jury to make an informed decision, but

22    you also have an obligation to these members of the community

23    who are giving up a month and maybe more of their lives to

24    present the evidence efficiently.  And that, of course, is

25    always something we have to think about in these cases, both

**PROCEEDINGS**

 1   civil and criminal, in my opinion.

 2       So the other issue that I guess we may need to talk about

 3   with respect to time is are there going to be time limits for

 4   the different phases, or is that just going to be left up to

 5   each side?  And I don't know if you want to talk about that now

 6   or on Wednesday or neither.

 7       **MS. MOORE:**  If we could -- I'm sorry, Your Honor.

 8       If we could talk about it on Wednesday because that's part

 9   of -- you know, when we do the deposition designations, some

10   people are going to be played in both phases and so, you know,

11   we're trying to be as efficient as we can but we also have to

12   meet our burden.  And so if we could talk about that on

13   Wednesday just to give some more guidance, that would be great.

14       And then we can also meet and confer with the defense to

15   see if there's some witnesses they're not going to call.  That

16   might help us too and, likewise, we can do the same.

17       **THE COURT:**  Okay.  So what are the things we need to

18   talk about on Wednesday?  One is the nonexpert-related summary

19   judgment motion -- the summary judgment motion relating to the

20   statute of limitations.

21       **MS. MOORE:**  Yes.

22       **THE COURT:**  How do you pronounce the plaintiff's name?

23       **MR. TSADIK:**  Gebeyehou.

24       **THE COURT:**  Gebeyehou?

25       **MR. TSADIK:**  Yes.

1          **THE COURT:**  Okay.  That's what I thought.

2      Anyone is free to argue that issue, whether it's you-all

3  or -- is it Mr. Tsadik?

4          **MR. TSADIK:**  Yes.

5          **THE COURT:**  Whoever wants to argue that issue is free

6  to argue that issue, both of you.  So we have that issue.

7      We have the plaintiffs', in no particular order, the

8  plaintiffs' specific causation experts, Monsanto's specific

9  causation experts, the other experts, which again I may or may

10 not want argument on and I'll try to get some guidance out to

11 you in advance.

12         **MS. MOORE:**  That would be great.  Thank you,

13 Your Honor.

14         **THE COURT:**  The *motions in limine*.

15         **MS. MOORE:**  And, Your Honor, there are maybe two to

16 four that we've agreed to, might be three to four.  So we can

17 probably move through some of those.  The case-specific ones we

18 can move through pretty quickly I think.

19         **THE COURT:**  Sorry?  What?

20         **MS. MOORE:**  The case specific ones we can probably

21 move through pretty quickly on Wednesday because that's where

22 we have a couple stipulations.  Collateral source has been

23 stipulated to, and then smoking has been stipulated to to leave

24 out references to smoking history.

25         **THE COURT:**  Okay.  So can you do me a favor?  I

PROCEEDINGS

1   haven't read the *motions in limine* yet and that's next on my

2   list of things to do, but could you file a letter by the end of

3   the day updating us on whether you have any agreements that are

4   not reflected in the papers you've already filed?

5          **MR. STEKLOFF:**  I think that they're reflected already

6   in the papers.  I mean, I'm happy to file a letter, but nothing

7   has happened since the filings on the 31st.

8          **MS. MOORE:**  That's correct, Your Honor; but if you

9   want it in one place, that wouldn't take much time.

10         **THE COURT:**  That's fine then.

11         **MS. MOORE:**  Okay.

12         **THE COURT:**  That's fine.

13      So *motions in limine*, jury instructions, verdict form for

14   Phase I obviously.

15      Is there anything else we are going to need to be talking

16   about on Wednesday?

17         **MS. MOORE:**  We talked about perhaps going over some of

18   the exhibit objections and categories, and we did talk -- we

19   had a meet-and-confer about whether to come up with some

20   categories.  So we'll get that nailed down before Wednesday so

21   we can present Your Honor with some categories for discussion

22   on Wednesday.

23         **THE COURT:**  Okay.  And, you know, it might be helpful

24   if you could just -- without any argument or anything, if you

25   could just file a letter, you know, tomorrow or something,

1  maybe tomorrow by noon, saying, you know, here are the

2  categories of -- you know, here are the categories of exhibits

3  we'd like to discuss or, you know, the categories of issues

4  we'd like to discuss relating to the exhibits.

5       **MS. MOORE:**  Sure.  For example, one is peer-reviewed

6  literature.  I mean, there's some peer-reviewed literature on

7  the exhibit list so we just want to know -- we want guidance

8  from Your Honor as to that being an exhibit at trial.

9       **THE COURT:**  Okay.

10      **MS. MOORE:**  So can it just be as brief as that?

11      **THE COURT:**  Yes.

12      **MS. MOORE:**  Okay.

13      **THE COURT:**  Please, only -- absolutely as brief as

14  that --

15      **MS. MOORE:**  Wonderful.

16      **THE COURT:**  -- just to get me to start thinking about

17  it.

18      **MR. STEKLOFF:**  I suspect we may agree on that one.

19  For example, all these articles, they can be shown to the jury

20  but then they may not be sent back -- admitted for purposes of

21  being sent back to the jury during their deliberations because

22  that's my reading of the learned treatise rule.

23      **THE COURT:**  Why don't you file a joint letter on that

24  by noon tomorrow, again without any argument but just

25  identifying the issues that you -- that are presented by the

1    exhibits or --

2           **MS. MOORE:**  That's fine.

3           **THE COURT:**  -- groups of exhibits that you'd like

4    me -- you know, pick like your five most important, or

5    something along those lines.

6           **MS. MOORE:**  Okay.  Thank you, Your Honor.

7           **THE COURT:**  Okay.  Anything else?

8           **MR. STEKLOFF:**  Just briefly.  One question,

9    Your Honor.

10          Well, can we confirm what time we start on Wednesday?  Are

11   we doing all of this at 1:30?  I think there have been

12   differing -- or are we starting in the morning?  I'm just --

13          **THE COURT:**  Oh.  I thought we were planning on

14   starting in the morning, and then I was assuming we might need

15   to take a lunch break and then resume in the afternoon.  And I

16   don't -- you know, I don't know what we'll take up first.

17   Probably maybe we'll take up the statute of limitations first

18   and then do, you know, the -- maybe in roughly the order that I

19   just listed them, but I don't think it particularly matters.

20          **MR. STEKLOFF:**  And then just one last issue,

21   Your Honor.

22          As you know --

23          **THE COURT:**  So we'll start at -- shall we start at

24   9:30?  Is that what we have listed now?

25          **THE CLERK:**  We have argument starting at 9:30 and

PROCEEDINGS

1    pretrial and *motions in limine* at 1:30.

2          THE COURT:  Yeah.  So basically get here at 9:30 and

3    we'll figure it out from there how to proceed.

4          MS. MOORE:  Perfect.  Thank you.

5          MR. STEKLOFF:  And the last issue --

6          THE COURT:  Be ready to discuss everything in the

7    morning and if we can discuss everything in the morning,

8    wonderful.

9          MR. STEKLOFF:  We agree.

10      So, as you know, many of the documents have

11   confidential --

12         THE COURT:  Oh.  I apologize.  I just want to say this

13   while -- before I forget it.  Sorry to interrupt you.

14         MR. STEKLOFF:  Yeah.

15         THE COURT:  Remember that the jurors are coming on

16   Wednesday to fill out the questionnaires as well.  So

17   everybody -- you should avoid any discussion of the case in the

18   hallways or the elevator or -- I mean, I know you would anyway

19   but hallways, elevator, cafeteria.  Just everybody should avoid

20   discussing the case at all for fear of being overheard by a

21   prospective juror.

22         MS. MOORE:  Thank you.

23         THE COURT:  Go ahead.

24         MR. STEKLOFF:  Many of the documents have subject to

25   protective order confidentiality designations on them.  A lot

**PROCEEDINGS**

1   of them are the internal company documents that have been

2   produced.  We have asked the plaintiffs to remove those

3   markers, those stamps that say "Subject to Protective Order" or

4   "Confidential" for trial purposes, which is pretty easy to

5   redact.  They have stated that they will not do so.

6        My concern is that that is trying, whether explicitly or

7   not, to suggest to the jury --

8        **THE COURT:**  To suggest that Monsanto is trying to keep

9   it hidden or something?

10       **MR. STEKLOFF:**  Yes.  And so I think we're asking

11  Your Honor to order them to remove those designations for

12  trial.

13       **THE COURT:**  Yes.  I certainly think they should be

14  removed.

15       **MS. MOORE:**  Your Honor, that's how they produced the

16  documents to us so --

17       **THE COURT:**  Of course.

18       **MS. MOORE:**  I'm sorry?

19       **THE COURT:**  Of course that's how they produced to

20  documents to you.

21       **MS. MOORE:**  Going back to the documents, how many

22  documents were produced.

23       And those documents have been used in depositions with the

24  confidential stamp at the bottom.  So we've both designated

25  multiple depositions to play at trial and, of course, the

**PROCEEDINGS**

1    exhibits with those depositions we would move for entry into

2    evidence as an exhibit, and so they've already been used and

3    referenced in those depositions with that confidential stamp at

4    the bottom.  So that's why we object to that.

5          THE COURT:  So what?  So what?  What does that have to

6    do with what the jury needs to see or not see?

7          MS. MOORE:  Well, it was their choice, Your Honor, to

8    put the confidential designation on there.

9          THE COURT:  Okay.  Anything else?

10         MS. MOORE:  The only thing I would add, Your Honor, is

11   if your ruling is to remove the confidential designation, that

12   that burden be placed on Monsanto because they are the ones

13   that put it on there and we're talking, you know, many, many

14   documents.  And so if they want confidentiality removed --

15         THE COURT:  Well, but you're the one who needs to make

16   the decision about what exhibits you're going to use at trial;

17   right?  And I assume that's not narrowed down in a particularly

18   meaningful way by now but during the course of trial, it's

19   going to be narrowed down.

20         MS. MOORE:  Sure.

21         THE COURT:  And before you use a document, you need

22   to -- you know, whether it's the night before a witness comes

23   on or, you know, a couple days before a witness comes on,

24   you're going to narrow down the number of documents that you

25   might use with that witness; and when you do that, you can

**PROCEEDINGS**

1   remove --

2           **MS. MOORE:**  Okay.

3           **THE COURT:**  -- the designation of confidential.

4           **MR. TSADIK:**  Thank you, Your Honor.

5           **MR. STEKLOFF:**  Thank you, Your Honor.

6           **THE COURT:**  Thank you.

7           **THE CLERK:**  So --

8           **THE COURT:**  Oh, wait.  Hold on.

9           **THE CLERK:**  Hold on.

10       To be clear, they're supposed to be providing me an

11  original copy of all of the exhibits they're going to be using

12  ahead of time.  So does that mean that they're going to be

13  coming through and replacing everything the day before then?

14  I'm going to be getting new copies of things or should they be

15  doing this now?

16          **THE COURT:**  Well, the problem is that right now --

17  they're at a stage in their trial preparations right now where

18  they have a thousand possible documents that they're going to

19  use and they'll only end up using 50 of them.  I'm making up

20  the numbers.

21          **MS. MOORE:**  Right, but less.

22          **THE COURT:**  It's more like 20,000 and a hundred --

23  right? -- or 10,000 and 200.  So it doesn't make sense to make

24  them go through and remove the confidentiality designations now

25  unless that's easy -- unless that's somehow mechanically easy

1    to do, and I assume that it's not.

2          **MS. MOORE:**  I wouldn't say it would be, Your Honor.  I

3    think my staff would appreciate not having to do that at this

4    juncture.

5          I mean, we'll get Ms. Mellen copies of exhibits that are

6    redacted as soon as we can.  I think we've agreed to exchange

7    them 48 -- there's sufficient time between when the witness

8    will be on the stand and when those exhibits would be ready.

9          **THE COURT:**  And so -- but we'll figure this out

10   offline and we'll figure out a way mechanically to make it work

11   for the process of admitting the exhibits as well.

12         **MS. MOORE:**  Okay.  All right.  Thank you, Your Honor.

13         **THE COURT:**  Thanks.

14         **MR. STEKLOFF:**  I'll just say, Your Honor, that we have

15   already produced images of all of our exhibits and some of them

16   have the stamp and we -- on the exhibits that we've produced to

17   the plaintiffs so that they have notice of all of the exhibits.

18   We have removed the stamp on our end.  I wasn't involved in the

19   mechanics to tell you how complicated that was --

20         **THE COURT:**  Right.

21         **MR. STEKLOFF:**  -- but we have done that.

22         **THE COURT:**  But one question is since the documents

23   did come from Monsanto, I mean, maybe it would be easier

24   mechanically, from an IT standpoint, for Monsanto to remove the

25   stamps and resubmit them to the plaintiffs.  I don't know the

PROCEEDINGS

```
 1  answer to that and I don't want to spend any more time on it,
 2  but I will order you-all, both sides, to spend some time
 3  figuring out mechanically what's the easiest way to do that.
 4          MS. MOORE:  Okay.  Thank you, Your Honor.
 5          THE COURT:  Thank you.
 6          ALL:  Thank you, Your Honor.
 7              (Proceedings adjourned at 11:57 a.m.)
 8                      ---oOo---
 9
10              CERTIFICATE OF REPORTERS
11          I certify that the foregoing is a correct transcript
12  from the record of proceedings in the above-entitled matter.
13
14  DATE:   Monday, February 11, 2019
15
16
17
18  _____
19      Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
20              U.S. Court Reporter
21
22  _____
23          Marla F. Knox, RPR, CRR
24              U.S. Court Reporter
25
```